# EXHIBIT "2"
## (Page 1 - 30)

1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                  ORLANDO DIVISION

 3        Docket No.6:06-MD-1769-Orl-22DAB

 4   . . . . . . . . . . . ..
     IN RE:                       :
 5   SEROQUEL PRODUCTS LIABILITY  :
     LITIGATION                   :     Orlando, Florida
 6   MDL DOCKET No. 1769          :     April 12, 2006
                                  :     2:00 p.m.
 7   ALL CASES                    :
                                  :
 8   . . . . . . . . . . . . ..:

 9

              TRANSCRIPT OF PRETRIAL CONFERENCE
10       BEFORE THE HONORABLE DAVID A. BAKER
              UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:          Paul Pennock

14                                Larry M. Roth

15                                Fletch Trammell

16                                Michael E. Pederson

17                                Scott Allen

18                                E. Ashley Cranford

19                                Lezzlie Hornsby

20                                Jonathan Jaffe

21                                Scott Armstrong

22                                Dennis Canty

23                                Richard Freese

24

25   Court Reporter:      Sandra K. Tremel, RMR/CRR
```

```
 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:

 3                                Richard Laminack

 4                                Buffy Martines

 5                                Thomas Pirtle

 6                                Tim Goss

 7                                Larry Gornick

 8                                Lorie Siler

 9   For the Defendant

10   AstraZeneca:                 Fred Magaziner

11                                Stephen J. McConnell

12                                James Freebery

13                                Robert L. Ciotti

14                                Liz Balakhani

15   Proceedings recorded by mechanical stenography, transcript

16   produced by computer-aided transcription.

17

18

19

20

21

22

23

24

25
```

3

```
 1                    P R O C E E D I N G S

 2              THE DEPUTY CLERK:  Case number is

 3     6:06-MD-1769-ORL-22DAB.  In re: The Seroquel products

 4     liability litigation.

 5         Counsel in the courtroom, please state your

 6     appearances for the record.

 7              MR. ALLEN:  Scott Allen for the plaintiffs,

 8     Houston, Texas.

 9              MR. LAMINACK:  Richard Laminack, plaintiffs,

10     Houston, Texas.

11              MR. PENNOCK:  Paul Pennock for the plaintiff,

12     New York.

13              MR. ROTH:  Larry Roth for MDL plaintiffs.

14              MR. CAMP BAILEY:  Camp Bailey for the

15     plaintiffs.

16              MR. PEDERSON:  Michael Pederson for plaintiffs.

17              MS. MARTINES:  Leslie Martines, Houston, Texas

18     for the plaintiffs.

19              MR. F. KENNETH BAILEY, JR.:  Ken Bailey, Houston

20     Texas.

21              MR. PIRTLE:  Tom Pirtle for the plaintiffs.

22              MR. TRAMMELL:  Fletch Trammell, Houston, Texas.

23     Plaintiffs.

24              MR. FREESE:  Richard Freese, plaintiffs,

25     Birmingham, Alabama.
```

4

1        MR. GOSS:  Tim Goss, Dallas, Texas, plaintiffs.

2        MS. BANNO:  Tamara Banno, Dallas, Texas,

3   plaintiffs.

4        MR. MAGAZINER:  Fred Magaziner for AstraZeneca,

5   Your Honor.

6        MR. FINSON:  Lowell Finson.

7        MR. McCONNELL:  Stephen McConnell on behalf of

8   AstraZeneca, Your Honor.

9        MR. FREEBERY:  Jim Freebery on behalf of

10   AstraZeneca.

11        MR. CIOTTA:  Robert Ciotta for AstraZeneca.

12        MS. BALAKHANI:  Liz Balakhani for AstraZeneca.

13        THE COURT:  On the phone?

14        MR. FINSON:  This a Lowell Finson.

15        MR. JAFFE:  Jonathan Jaffe for the plaintiffs,

16   not counsel.

17        MR. GORNICK:  Larry Gornick and Dennis Canty for

18   plaintiffs.

19        MS. CRANFORD:  Ashley Cranford for plaintiffs.

20        MS. SILER:  Lori Siler for plaintiffs.

21        MS. HORNSBY:  Lezzlie Hornsby for plaintiffs,

22   Houston, Texas.

23        MR. ARMSTRONG:  Scott Armstrong for plaintiffs.

24        THE COURT:  There are a number of issues to

25   cover.  The matter that gives me the most urgent concern

1   is the plaintiff's position that the discovery received

2   from the defendants has been less than satisfactory.  Who

3   from the plaintiff wants to address the current status of

4   that?

5          MR. PENNOCK:  Paul Pennock for plaintiffs.  I

6   would be happy to go through the facts.  If you don't

7   mind, Judge, I do have a few slides on that very issue,

8   and if I could put those up if it's all right with the

9   Court.  I went through the slides before we started with

10  Mr. Magaziner.

11         MR. MAGAZINER:  Paul, excuse me.

12         MR. PENNOCK:  As the Court is aware, and we have

13  had this discussion or made these points several times.  I

14  mean there are a number of burdens that plaintiffs have in

15  this litigation, and in any case.  And in particular, in

16  this case, as has been outlined by the defendants in their

17  motion, we're going to be dealing with a number of summary

18  judgment motions.  We're going to be dealing with 12(b)(6)

19  motions on issues such as preemption.  We're going to be

20  dealing with motions for statute of limitations and other

21  motions that have been promised.  All of these burdens are

22  things that we're going to need a tremendous amount of

23  discovery in order to attempt to meet these burdens.

24  There's no doubt going to be Daubert challenges in this

25  case.  The defendants have already said that.  There are

6

1    no doubt going to be learned intermediary motions that the

2    physicians knew what AstraZeneca knew when they prescribed

3    the drug to our clients.   There will be, and central to

4    any prescription drug pharmaceutical case, absolutely core

5    to the case, is the deposition of the prescribing

6    physician or physicians in the case.   Without that

7    deposition it's very difficult for plaintiffs to meet any

8    of the burdens in proving the failure to warn case.   And

9    in this case, we will have no doubt many of the such

10   depositions at some point in time.   We will need to rebut

11   the cross-examination that occurs in those depositions and

12   at trial.   But in particular, depositions because in many

13   instances, if not most, these doctors do not come to

14   trial.   They testify by deposition.

15       The same is true of the causation, in causation

16   issues for the diabetes doctors.   There will be extensive

17   cross-examination at deposition of these doctors with

18   respect to causation issues involving this drug case

19   specifically and generally.

20       All of these things are burdens that we have to meet

21   and we have to have the discovery to do them, Your Honor.

22   And the problems that have been coming up I think are

23   crucial to all the issues that the Court will probably

24   have to address today.

25       And if you don't mind I'd like to go through what I

1   have -- what I see and we, the plaintiffs, see as a

2   derailing of discovery at this point.

3       As I said to Mr. Magaziner before the conference,

4   we're not at this juncture laying any blame for any ill

5   motive by the defendants in what has happened with respect

6   to discovery from the defendants.  But the bottom line is

7   that the discovery has been sporadic and the discovery has

8   been incomplete.  And any objective review of what's taken

9   place will indicate that.

10      The first thing that had to happen in this case, in

11  this litigation, was the disclosure of the IND and the

12  NDA.  And as Your Honor pointed out the very first

13  conference, this should be something that is not complex,

14  that is not problematic and that can be quickly and easily

15  done.  And the defendants themselves essentially agreed

16  through Mr. Davis, formerly counsel for AstraZeneca, that

17  it could be done.

18      The Court specifically, you know, made the point, and

19  I don't think it was really a metaphor, but the Court

20  said, I can go to Office Depot and get a scanner and

21  software and have it done tomorrow morning.  I don't care

22  how many thousands of pages it is.

23      Well, we're sitting here today some six or seven

24  months later and we don't have a complete IND.  We finally

25  got what was a nonsearchable format IND on November 10th,

1   over two months after the initial conference.  It took us

2   another month and a half working, trying to work with the

3   defendants to get something that was workable, something

4   that we could review, that we could get through in a

5   reasonable and efficient and effective manner.  Not

6   something that was an utter burden that no one could

7   effectively get through in a reasonable period of time.

8        We finally got that in late December.  And, yet, when

9   we go through the -- we have been through the IND and NDA

10  almost in its entirety, everything they have given us.

11  There is a wholesale lack of metadata with respect to this

12  IND and NDA.  The documents were not produced in

13  chronological order even though we would suggest and we

14  don't know yet because we haven't been allowed any

15  depositions, but we suggest that they're probably

16  maintained in some type of reasonable order by the

17  company.

18       There are a lack of serial numbers, there are

19  numerous documents in this disclosure missing any type of

20  identifying number even though that was the manner in

21  which they were produced.  There is no FDA logbook

22  whatsoever, something that's typically found and disclosed

23  in these NDA productions.

24       There is this CANDA safety database.  This was an

25  electronic format database that was, we believe, being

1  utilized at the time that this submission was made to the

2  FDA.  We have references as early as 1996 that the CANDA

3  database was being utilized.  It was the manner in which

4  the defendants would, we believe, produce the safety

5  evaluations and reports to the FDA in an electronic

6  format.  We have -- there is nothing in this NDA that we

7  could find that incorporates this CANDA database.

8  Obviously, a central and core aspect of NDA and our review

9  of it.

10      There are -- we know for a fact that internally from

11  the document review we have already done in the so-called

12  custodial files that have been produced that there were

13  reports of diabetes that the company knew about early on.

14  But in the NDA, we can't find those reports that were

15  being made to the FDA.  Now, of course, if they weren't

16  reported to the FDA, we will be happy to learn that fact.

17  But we are missing quite a number of reports.  And I'm not

18  going to read this into the record.  It's from the

19  document that's currently under the confidentiality

20  stipulation.  But the bottom line is we know that there

21  should be reports in this NDA that aren't there.  And the

22  question, of course, today is where are these reports.

23      Zero telephone contacts with the FDA.  We have no

24  internal documentation regarding the FDA-- regarding the

25  NDA and its submission.  In other words, memos to one

1    another saying this is what we're doing.  This is when

2    we're doing it.  This is why we're doing it and so forth.

3    There is no other documentation of contacts other than the

4    usual telephone contact log.  We don't have them.

5        There's -- in the periodic safety update reports,

6    PSUR, typically what we have seen is there will be a

7    discussion section, sort of an overview or a foreshadowing

8    by the company of what is in the PSUR.  We've found no

9    such sections in the PSURs that were given to us.

10        There's been no certification of completeness for

11   this production.  Again, it was produced in what we felt

12   to be an unusable format on November 10.  We're several

13   months out.  We have no certification of completeness and

14   I think having gone through it, we know why.  It is not

15   complete.

16        I have to say the same seems to be true for the

17   defendant document production that's occurred to date.

18        This is sort of an outline of the timeline we were to

19   be given custodial files.  In other words, witness files

20   for different company witnesses as of January 5th.  We

21   ultimately got something that we thought, after much

22   debate, would be usable on February 8.  We have got a part

23   of eight witnesses' files, a part of it.  And then there

24   was a supplementation of that on March 16 as indicated

25   there, and March 17.  Part productions.

11

        Now, I'd ask the Court to imagine getting huge
volumes of electronic documents, dedicating resources and
time to review them, and it's obvious that they're partial
productions.  But we don't even know what parts we have
been given and what parts we haven't.  In any event they
are certainly not complete and there's been no
certification of the completeness.  And as of two days ago
we're still getting partial on the very first eight
witnesses.  And again, we received no certification of
completeness because they obviously are not.

        This Court has ruled that things should be given at a
steady rate.  A lot of these issues have to some extent
been aired or at least mentioned that they were problems
earlier on in the year and the Court ruled that these
files should be given at a steady rate by June 30th.  We
seem to be having a problem with that as well.  I mean, as
I say here, I think it's anything but a steady rate.  On
April 3, three months after the initial incomplete
production of eight files, we got 20 more files which I
suspect are incomplete as well, although they were
produced only nine days ago and we're not obviously into
them very deeply yet.  But I suspect they're incomplete.
We certainly received no certification of completeness.
And in any event it's certainly not a steady rate.  I mean
it's something of, as I put it here, I really think it's

1   something of a document dump.  That's not helpful.  That's

2   not efficient.  And it does not allow us to effectively go

3   about meeting all the burdens that we need to meet in all

4   of the discovery that has to take place in this case, in

5   all of the motion practice that has to take place in this

6   case.

7        I'll skip through this, but essentially, Judge, I

8   just laid out here a definition of what's customarily

9   viewed as a custodial file in other litigations we have

10  been involved in, and it's a very broad production that

11  should be taking place, and we're simply not getting it.

12       Most -- not most importantly, but of extreme

13  importance is the lack of e-mails.  As the Court might

14  imagine, for 10 years now e-mail communication within any

15  entity is one of the primary means of communication and

16  also one of the most fertile areas of evidence.  For

17  everything we have to do that I outlined at the beginning,

18  Vikram Dev is one of the key witnesses in this case.  This

19  is one guy we know we will be deposing out of the 80 names

20  they have given us.  He's absolutely key.  He's one of the

21  chief guys with respect to this whole, all of these

22  issues.  No e-mails.  We believe he was there at least as

23  of 1998.  But we're still not even certain of that because

24  we haven't gotten discovery 30(b)(6)wise to determine

25  that.

13

1        And here are some other examples.  I'm going show the

2    Court each of the eight witnesses for whom there has been

3    some substantial production of documents.  Eighty-eight

4    e-mails for Mueller, 904 he mails for Boornazian in over

5    five years.  That's a rate of about one every two or three

6    days.  Again, if you look at Bush, Okay?  Bush had 275

7    e-mails.  We know that there were e-mails being used as

8    far back as 1977 because in Bush's case there were about

9    seven e-mails from 1997.  And yet we don't have any for

10   any of these other witnesses going back that far or even

11   close to it.  They all only go back to about 2002.  And

12   furthermore, with Bush there's three years in the middle

13   that we're missing -- there are no e-mails.  So we have a

14   few e-mails in '97, '98, '99, thereabouts, then we go

15   three years without any e-mail.  And, you know, the same

16   is very similar, I mean, even in a production such as

17   Boorstein with 1600 e-mails, that's only at the rate of

18   one per day, 1 e-mail per day over the years that we know

19   that witness was with AstraZeneca and he -- Boorstein may

20   have been with AstraZeneca before 2002.  We just don't

21   know yet.

22        The next issue with respect to the entire production

23   is we really have yet -- we cannot possibly understand yet

24   who these 80 people are and whether they are indeed the

25   key people.  And if AstraZeneca, the client, not the

14

1    lawyers, but if AstraZeneca the client tells us these are

2    the key people, well that's wonderful but we need to

3    analyze that.  We need to look at it and it's going to

4    take some time.  And I'll tell you that from our review,

5    and we had an extensive meeting in Houston a few weeks ago

6    with a few dozen lawyers, every one that's looking at it

7    and here are some of the highlights of things that we're

8    finding aren't there.  I mean, we don't see -- doesn't

9    appear there are any personnel that have been identified

10   from some of these key areas.

11        And, you know, now, maybe they didn't have these

12   departments or maybe they were named otherwise, but we

13   don't see anything that suggests that, we certainly know

14   we don't have anyone for Scientific Affairs until 2004.

15        Again, there are gaps in the departments, in the drug

16   regulatory affairs, drug development, financial support.

17   We don't see any witnesses on the list of 80 that are

18   purportedly the only people we will need to meet all the

19   burdens that I mentioned at the beginning.  We don't see

20   anybody in those.  Preclinical personnel, zero -- I'm

21   sorry -- four people pre1999.  That would be the personnel

22   that were involved in this, in the development of this

23   drug before they put it into clinical trials.

24        Part of the problem or perhaps the source of the

25   problem is that we haven't been given people, names of

15

1   people in positions before 1997 to any extent, although

2   we're certainly starting to see some names.

3        So the bottom line is we have a total lack of

4   documents from the preclinical years.  And we have already

5   identified potential additional witnesses that we would

6   want, but we're concerned about committing to these

7   witnesses because we haven't seen the entirety of what

8   they have yet.  We don't have anything near the big

9   picture yet, Judge.

10       You know, we're in the middle of this thousand piece

11  jigsaw puzzle and we have got some pieces we're putting

12  together, but we don't have it even close yet to say we

13  need this piece and that piece and that piece and that

14  piece.  We're working on it.  We have already identified

15  some but we can't commit, particularly if they're going to

16  be restrictions as the defendants have sought on how much

17  we can get and who we can get.

18       There some other issues I don't think I'll go into

19  that are a little more detailed on extracted text issues

20  and the page break issues but these are sort of issues

21  that are stumbling blocks in how the production is being

22  given to us.

23       The bottom line is that there's a tremendous amount

24  of discovery to be done, and that's not surprising to

25  anyone.  It's a pharmaceutical case and there are 10,000

1    possible claimants, and this drug started in development

2    in mid 1980.  There were no doubt, you know, 100 or more

3    people throughout those years.  Some of whom aren't with

4    AstraZeneca any more that worked on this drug and had

5    relevant information of this drug.  But what we need we

6    certainly don't have yet and we're not necessarily going

7    to have by June 30 even if they do everything that they're

8    supposed to do.

9        And there will need to be along the line here

10   tremendous input, I would suggest to the Court, by we, the

11   plaintiffs' lawyers, on what we think we have to have,

12   what we think we're missing, who the people are that we

13   have to have.  And all of that we think needs to be

14   substantially accomplished before we can get into areas

15   that is the next step up from this before we can get into

16   areas where this material is fundamental to the

17   prosecution of these cases.  In the depositions of the

18   treating and prescribing doctors before we can get there,

19   we need to know what our case looks like, what do we have

20   to defeat and rebut the summary judgment motion, the

21   learned intermediary defense and the other things that I

22   have outlined earlier.  What do we have?  We won't know

23   that until this process has been completed.  And right

24   now, we are -- we're quite stymied in the efforts that we

25   have been trying to make to put this case together.

17

1          MR. ALLEN:  Scott Allen from Houston.

2          One point I'm sure Mr. Pennock wanted to make was

3     that the 80 custodians -- and the Court expressed last

4     hearing the Court had never seen or heard of production

5     like this.  Well, the problem we're having on the 80

6     custodians that they chose, they made the selection, not

7     the plaintiffs on who would be produced, of the 80, we

8     have zero, none.  All that in nutshell means of the 80

9     people, we don't have one complete file yet, not one of

10    the people they chose.

11         And most importantly, Your Honor, if you take that

12    down to common sense, common sense, Karen Mueller was one

13    of the people on there.  She's a brand manager.  You saw

14    Mr. Pennock's chart, 200 e-mails?  Your Honor, I'm not

15    kidding, I get 200 e-mails in two days.  So if you use

16    common sense and their promises that we are going to get

17    the discovery we need, we don't have one complete file.

18    We don't have the e-mails.  They won't certify as

19    complete.  And they selected them.

20         And as Mr. Pennock said, and this is critically

21    important because a lot of it can get lost in there, this

22    product has been on the market since 1997, and when

23    Mr. Pennock talks about the preclinical years.  In a

24    nutshell it's the years where they're supposed to research

25    and develop this product.  Nothing.  Nothing.  So we don't

18

1   have the bare backbones of this case.

2        And we know there's other issues on the agenda and we

3   will be glad to talk to them.  But as we move forward in

4   this litigation, and all of us who've been involved in

5   MDLs.  Your Honor, I represented doctors for 15 years, the

6   doctors for 15 years at MDLs in drug company litigation.

7   Breast implants, Vioxx, currently.  I represent and I'm on

8   the MDL committee for doctors in hormone replacement

9   therapy.  I'm defending the doctors.  I defended them in

10  Phenfen, I defended them in Propulsid.  We have never not

11  been provided this information.

12       And so any other item that needs to be discussed

13  today has to be taken in context of just common sense.

14  And 200 e-mails from a brand manager and zero e-mails from

15  a critical witness goes beyond explanation.

16            THE COURT:  Have plaintiffs made any

17  30(b)(6)designations?

18            MR. ALLEN:  Have we made designations?  We have

19  been -- and I haven't been on the phone calls -- we're

20  prepared to go forward and take them now.  I know there

21  was a phone call.  Who was on it this week?

22            THE COURT:  Did you by March 31 send out your

23  designations of what your 30(b)(6) categories were?

24            MR. PENNOCK:  We did.  We indicated a number of

25  categories in which we would --

1          THE COURT:  Just yes or no.

2          MR. ALLEN:  Yes, we have and Mr. -- we

3    actually --

4          THE COURT:  Who have you got scheduled for

5    deposition next week?

6          MR. ALLEN:  No one.

7          MR. PENNOCK:  We noticed -- there was one notice

8    of a deposition of a 30(b)(6) witness.  We're prepared at

9    any time to move forward with appropriate 30(b)(6)

10   depositions in the categories that we have outlined.

11         MR. ALLEN:  Yes.  On that point we met last week

12   in Houston.  Our team.  We are ready to take depositions.

13   Even though the discovery has not been done, we're ready

14   to take 30(b)(6) depositions on corporate organizational

15   structure, internal structure of marketing, internal

16   structure of medical affairs.  We're prepared.  I will

17   take those depositions.  That's why I have been elected to

18   speak.  I'm going to be primarily responsible for the

19   depositions.  And we're ready to move forward.

20         MR. McCONNELL:  If I may just respond to that

21   briefly with respect to the 30(b)(6) issue.  It is the

22   case that on April 1 we received an e-mail from Mr.

23   Pennock that listed 10 witnesses and then listed a

24   description of possible 30(b)(6) categories.  We looked at

25   that, we thought some of those categories maybe made

20

1    sense, some didn't, some we just doesn't understand.  We

2    had a phone call earlier this week.  I was on it,

3    Mr. Pederson was on it, a number of people, maybe people

4    in this room were on the phone were on it.  And I wanted

5    to raise the issue about the categories whether they were

6    appropriate.  What I was told was that e-mail was just a

7    general description of possible areas of inquiry but there

8    hadn't been a decision about what the 30(b)(6) categories

9    were.  That's where we were at.

10             THE COURT:  Anyone want to respond to the

11   general issue of the status of discovery from the

12   defendant?

13             MR. MAGAZINER:  I'll begin the response, Your

14   Honor, then with your -- I'd like to turn it over to Jim

15   Freebery who has came on board a week or two before the

16   last hearing and has been doing nothing but managing the

17   document production since that time.

18        Many of the specifics that Mr. Pennock mentioned are

19   issues to which I cannot provide an answer today for the

20   simple reason they haven't been raised with us before.

21   Mr. Pennock didn't show the Court any letter he sent to us

22   raising these issues or e-mail or a motion to compel or

23   anything like that.  I first saw the list of issues when

24   Mr. Pennock previewed the slide show for me today at about

25   quarter of two.  So I don't have the answers to many of

1   these issues. And if Mr. Pennock would like to send us a

2   slide show, we will be able to put together a response and

3   respond on the merits to many of these detailed issues

4   he's raised, but I cannot do so today.

5        Mr. Freebery will be able to respond to some.

6             THE COURT:  We will take a recess so that you

7   can you have that discussion and then we will resume.

8             MR. MAGAZINER:  I won't be able to do it in a

9   recess, Your Honor.

10             THE COURT:  I'll bring you back here tomorrow

11   morning at 9:00.  I want these issues discussed before you

12   come to these conferences.  What don't you understand

13   about moving this case forward?

14             MR. MAGAZINER:  They weren't brought to me, Your

15   Honor, so I couldn't discuss them.

16             THE COURT:  Well, but you know you have an

17   obligation to see if there are any problems, is this

18   satisfactory.  Particularly, you haven't certified the

19   completeness of these.  How are you going to get these

20   files produced by the end of June?

21             MR. MAGAZINER:  Mr. Freebery will announce --

22   will describe to the Court where we are.  I am confident

23   that we will meet the Court's deadline.  We're going to

24   meet it without a problem.  It's -- it is a tremendous

25   effort we have undertaken.  It is going well now.  We have

22

1   put in place a huge complicated structure to make sure we

2   meet the Court's deadline.  Plaintiffs have a problem with

3   it, all they have to do is pick up the phone, send me a

4   letter, send me an e-mail and say, we didn't get any

5   e-mails from whatever, Karen Mueller.  Can you look into

6   that.  I would then ask Mr. Freebery and his team to look

7   into and we respond and tell them what the story is.

8   Maybe there are 800,000 pages of e-mails coming the next

9   day.  I don't know.  But they have to give me the issue,

10   express their concern in order for me to respond.  We will

11   then do our investigation and be able to respond.  But

12   Mr. Freebery can describe to you where we are in document

13   production, Your Honor.  I do know that we have produced

14   about two million pages already and we're on track to

15   produce 10 or 15 million more by June 30.

16        May Mr. Freebery address this, Your Honor?

17             THE COURT:  All right.

18             MR. PENNOCK:  If I may I just would like to

19   alert the Court that we did have a telephone conference

20   with Mr. Magaziner.  And the issues surrounding the

21   document production and whether or not we are going to

22   raise problems that we had with the document production

23   was specifically addressed.  And we -- I wouldn't raise

24   conversations I have, but he just said all you have to do

25   is pick up the telephone.  Mr. Bailey I believe was on

23

1    that call, Mr. Camp Bailey was on that call, and we said,

2    we said to Mr. Magaziner, we do have problems with the

3    document production.  They're extensive, and we intend to

4    address them with the Court under categories of this

5    agenda.

6            MR. ALLEN:  And, Your Honor, I think with all do

7    respect to my opposing counsel and my co-counsel, we're

8    now putting form above substance.  It is not our burden.

9    He says we need to call him.  We need to go through the

10   thousands of pages and we need to tell him the obvious

11   that Vicram Dev, and if I mispronounce it I apologize, had

12   zero e-mails and they're brand manager had 200?  It puts

13   the burden on us.  Their burden under the federal rules,

14   under any state I'm aware of and as their promises to us

15   is to give us a complete file.  And so, Your Honor,

16   they're on notice today and the rest of this litigation

17   they have to give us a complete file, not to come before

18   the Court and say, Your Honor, we didn't know.  They're

19   the ones that do know.  They produce the documents.  And

20   we shouldn't have to come and beg before this Court at

21   every hearing and identify more and more problems.  We

22   want the entire file of these witnesses.

23           MR. MAGAZINER:  We're producing the entire file

24   with the witnesses.  All I'm suggesting is if we -- the

25   plaintiffs in their review identify a particular problem

24

1   that we haven't identified, if they'll bring it to our

2   attention we will look into it and respond to them.   I

3   think that's a very ordinary, usual customary way that

4   things are done like this.   We produce two million pages.

5   They see a gap.   They see something we didn't see, bring

6   to it our attention.   I'm not suggesting that they

7   shouldn't.   I'm inviting them to bring these issues to our

8   attention so we can respond.

9       Mr. Freebery?

10       MR. F. KENNETH BAILEY, JR.:   Can I make a

11   statement, please, sir?   I would ask Mr. Magaziner to

12   recall a conversation I had with him on Thursday in which

13   I told him that we were disappointed in the completeness

14   and I also specifically mentioned e-mails to him.   So for

15   him to say that we have not approached these issues with

16   him is somewhat misrepresented to the Court.

17       THE COURT:   Let me hear from Mr. Freebery.

18       MR. FREEBERY:   Thank you, Your Honor. James

19   Freebery for AstraZeneca.

20       And I want to make sure it's clear from the outset, I

21   think Mr. Pennock allowed that there -- AstraZeneca is in

22   no way refusing to produce these documents or has any

23   intent to delay the production of documents.   In fact, we

24   are, as Mr. Magaziner mentioned, doing everything humanly

25   possible to efficiently and expeditiously get all the

1  documents for all of the 80 custodians out the door and in

2  the plaintiffs' hands.

3      Your Honor, at this time we're in full compliance

4  with the case management order.  We produced over one and

5  a half million documents in the month since we were before

6  Your Honor last.

7      It's over two million documents in total.  We

8  streamlined the collection and review process now.  So

9  things are going to start moving in a more quick manner

10  and it's going to get out in a plaintiff's hands in a

11  much -- in a much quicker time period.

12      We're on target, Your Honor, to meet the Court's

13  June 30, 2007 deadline for a completion of all the

14  documents for all of the 80 identified custodians.

15      And frankly, Your Honor, we're moving as fast as we

16  can.  At this time we have three separate attorney review

17  centers.  We have 225 contract lawyers reviewing these

18  documents from 7 in the morning to 7 in the evening.  We

19  have in the neighborhood of 45 to 50 associates dedicating

20  all their time looking at these documents, to getting them

21  through our process and getting them over to the

22  plaintiffs.

23      But now for the first time, again to echo what

24  Mr. Magaziner said, we're hearing about these specific

25  issues and we're fielding these specific problems the

1   plaintiffs have brought up concerning some of issues.  And

2   for the most part, I don't know that these need to be

3   addressed before Your Honor today, especially if they

4   could have been trouble shot before the hearing.

5        I mean, if and when they contact me or someone on the

6   discovery team, we try to do the best to accommodate any

7   issues they have.  For example, just in the last week they

8   have identified 10 of their first deponents.  We have

9   taken those 10 individuals.  We have moved their

10  production lines up to a priority level and we have them

11  in line to be the next document productions that are going

12  out the door.

13       To address some of their issues, as Mr. Pennock did,

14  though, first concerning the NDA and IND.  Your Honor, we

15  produced 480,000 pages which consists of our entire

16  file -- but for, our entire file for the NDA and IND.

17  That is a global regulatory database.  We gave them our

18  entire gel database and put it up on a system and gave

19  them access to it.  There was no systematic restrictions

20  of anything that came -- was in that database.  The only

21  thing that was redacted in any way was confidential

22  patient information and that was redacted out of it.

23       I understand that there is one database and I don't

24  know if it's one of the ones that plaintiffs talked about

25  because, again, we haven't had these conversations before

27

1    today, but it's item 12 where we could not read the file

2    and the vendor who actually stored this database on the --

3    that was part of NDA and IND, is no longer in existence.

4    So we're trying to find another vendor out there that can

5    read this file so we can get it up on the system and get

6    it again directly over to plaintiffs.

7         They brought up issues about the metadata and the

8    chronological order, the lack of serial numbers and some

9    Canadian database.  Your Honor, I'll be happy to look into

10   those issues.  Again, I'm hearing them for the first time

11   today.

12        They have brought up an issue about a certificate of

13   completeness.  I don't know that one was ever requested

14   for the NDA or the IND.  I know that we're in the process

15   of negotiating with plaintiffs a certificate of

16   completeness to cover the 80 custodians.  I don't think

17   that there's been a finalized form, and once there is, and

18   once we have complete productions for any of the

19   custodians we will be happy to sign off on them.

20             THE COURT:  Do you disagree with their

21   characterization they have gotten only eight and those you

22   can't make any representation as to the completeness?  Any

23   representation as to completeness, any representations?

24             MR. FREEBERY:  It's accurate, Your Honor, all

25   documents for the initial eight are not in their hands

28

1   yet.  What is in their hands for the first eight is

2   approximately 1.2 million pages.

3           THE COURT:  Don't tell me 1.2 million pages.

4   That doesn't mean anything.  It doesn't mean anything.

5           MR. FREEBERY:  What is left over is a small

6   fraction that had either technical issues or that there

7   was a privileged document that needed negotiation and

8   we're trying to get that out the door.  We suspect they'll

9   have complete productions within a week for all the first

10  eight.  Now --

11          THE COURT:  So in the seven or so months that

12  the case has been here you have done eight of these.

13  These are the ones you picked.  And out of the other 32

14  there's been no production whatsoever?

15          MR. FREEBERY:  That's not true.  There are

16  partial productions and that was one of the issues

17  Mr. Pennock brought up, that we have given part

18  production.  Because what we did, we didn't want to --

19          THE COURT:  I thought the whole point of this

20  custodial designation was that they be organized by the

21  witness.

22          MR. FREEBERY:  They will be organized by the

23  witness, Your Honor.  But what we didn't want to do is

24  wait till -- because we wouldn't have anything in their

25  hands now if we waited until we had the complete

29

1   production because of some of the issues dealing with the

2   vendors.  So I think they would be here complaining about

3   that if we didn't give them anything.  Instead, we have

4   given them a head start and given them $2 million (sic) to

5   get started at.  We produced at a steady rate what the

6   Court has ordered us to under the case management order.

7          THE COURT:  How is a steady rate if all the rest

8   of it is going to come out between now and the end of

9   June?

10         MR. FREEBERY:  Again, Your Honor, we have moved

11   these things -- it's almost like an assembly line where we

12   had to start and collect these things.

13         THE COURT:  You had no idea you might have to

14   produce documents when this case started.  You didn't --

15   that didn't come into your mind until March?

16         MR. FREEBERY:  No, and the client has been in

17   the process of identifying the custodians, has been

18   collecting the documents, and once they -- I can tell you

19   that all the documents are out from the client.

20   AstraZeneca now has all of the custodial productions are

21   in the hand of the vendors.  It's just moving it through

22   the system, getting them uploaded, getting out the

23   redacted information, voluntary reporter information, the

24   patient confidential information, and then getting it in a

25   form that that plaintiffs have negotiated and agreed to so

30

1   we can get up on their system so they can use it and have

2   it in a form where it's easily searchable for them, and

3   where, you know, it's usable for trial and all these

4   different jurisdictions.

5          Now, just to move forward.  What we expect to have

6   within the next week all -- the complete productions for

7   their first eight.  Because we have the system, we have

8   everything moved through the system to the final vendor.

9   We think that we're going to be able to follow-up in very

10  short order with complete productions for their next 10,

11  the ones they have identified as deponents.  We're hoping

12  within two weeks to have those in complete productions in

13  their hand.  So at that point they'll have 18 or -- excuse

14  me -- 17, because there's an overlap, 17 full productions

15  in their hand by that point.  And we're going to continue

16  on a rolling basis and we're on a timeline.  We have the

17  schedule in place to make the Court's imposed deadline of

18  June 30th.

19         Again, we haven't filled out a certificate of

20  completeness they complained of, because, number one, he's

21  correct that none of the productions are complete.  Within

22  a week or so hopefully that won't be an issue and they'll

23  have eight certificates of completion in their hand.

24         On the e-mail issue, Your Honor, there's absolutely

25  no systematic restrictions on e-mail.  There is no initial