# EXHIBIT "2"
## (Page 31 - 60)

31

1    date restriction on e-mail.  In fact, 80 percent of the

2    documents that we're producing, Your Honor, are electronic

3    documents.  Only 20 percent are actually in some type of

4    paper form.  But I think that's part of the reason.  I

5    think what they're going to find is when we do get the

6    complete productions run through and in their hands,

7    there's going to be a representative number of e-mails.

8        Again, to get them documents, to get them started to

9    produce on a steady rate, we gave them the easiest

10   documents that we could get out the door first which were

11   the paper documents normally not found in the e-mail form.

12       So I think once they have these productions in their

13   complete form, it's going to be a representative number.

14   If it's not, I mean, again, pick up the phone, call me, we

15   will find out if there's a reason, then we will get them

16   to them.

17       The identification of the 80 custodians was another

18   issue the plaintiffs brought up, and really we're hearing

19   the complaints of this for the first time in the papers

20   they filed this week.  And then here -- but they have

21   assurances, Your Honor, in the case management order that

22   if they want additional -- if they meet some of their

23   responsibilities and they want additional custodians, they

24   can come to us and talk to us and if Court says, yeah, go

25   get those people too, we will do that.  We will follow-up.

1   They have not.  So I don't understand why they're coming

2   here complaining that there is --

3           THE COURT:  I don't know who the 80 are and you

4   haven't given them any --

5           MR. ALLEN:  I can answer every one of the

6   questions including that one.

7           MR. MAGAZINER:  May I hand this up to the Court,

8   please?

9           THE COURT:  I'm listening to Mr. Freebery.  You

10  turned this over to him.

11          MR. FREEBERY:  And I'm going to finish up here,

12  Your Honor.

13      But Mr. Allen, again, mentioned the complete

14  productions that none of them are there in their hands.

15  Again, within a week we expect to have the eight there.

16  Within another two weeks of that we expect to have the

17  first 10 the deponents that they have identified.  We're

18  in compliance right now with the Court's case management

19  order.  We're on track to make the 6-30 deadline.

20      Again, in the last month, Your Honor, since I have

21  been on board we given the plaintiffs over one and a half

22  million documents, and it's coming out at a steady rate

23  and we're going to meet the deadlines.

24          MR. MAGAZINER:  May I just hand something to the

25  Court?

1            THE COURT:  Is that list of 80 names?

2            MR. MAGAZINER:  It's the information we provided

3    about who the 80 people are that we provided to the

4    plaintiff some time ago.  And they said they don't know

5    who they are and what their responsibilities were.  I just

6    would like to hand to the Court the lists we provided

7    them.

8            MR. ALLEN:  I have no objection to that.  He's

9    misunderstanding the argument.  There's 80 names on that

10   list.  We'll all agree to that.  I agree there's 80 names

11   on that list.

12           MR. MAGAZINER:  May I hand this to the Court?

13           MR. ALLEN:  I'm going to respond.

14           THE COURT:  I don't need it.

15           MR. MAGAZINER:  It shows the positions of each

16   of the 80 and the years they held these positions.

17           MR. ALLEN:  Can I respond?  Let me first respond

18   to Mr. Magaziner.

19       There is a list of 80 names.  I'll remind the Court

20   again it's 80 names they selected.  And I'll remind you of

21   what Mr. Pennock said.  They're not of the relevant years.

22   But we can argue over that another time.

23       The Court hit the nail right on the head when he

24   asked Mr. Freebery whether or not any custodial file has

25   been produced.  We heard a lot of language.  You know what

34

1    his answer was?  No, none have been produced.  None.

2         And this issue that we need to pick up the phone and

3    call them and tell them you haven't produced a complete

4    file -- Your Honor, they know it.  They just told you.

5    And the burden should not be upon the plaintiffs to pick

6    up the phone and call them when they have promised this

7    Court, they have promised us, and they are required by the

8    rules of procedure and evidence to produce complete files.

9    And for Mr. Freebery or anybody from the defense to say we

10   produced a million two documents, it's like saying we

11   almost have given you the car, but we left off the

12   steering wheel and four tires.  It is of no value.

13        We want the entire files.  The Court's been promised

14   the entire files.  They promised us the entire files.

15   They have started selecting them, as the Court hit the

16   nail on the head, years ago, October 2005.  And we're

17   standing here in April of 2007 and we have zero.  Zero

18   complete files.  And the next thing we're going to do is

19   ask for 58 doctors' depositions.  We want the files.

20        MR. PENNOCK:  Your Honor, one, if I may,

21   alternative is we do have, still have the opportunity at

22   this juncture in litigation to serve on the defendants

23   discovery demands that are focused on what we're looking

24   for and shift to a production that is -- that perhaps is a

25   little more focused or as to what we want and what we

35

1   think we need.  If they're so burdened by their own choice

2   of 80 custodial productions, maybe we need to switch to a

3   different system of getting these documents out.

4            MR. MAGAZINER:  Much of this I don't understand.

5   We're going to produce in accordance with the Court's

6   scheduling the complete custodial files with certification

7   for all 80.  Back in December 11, plaintiffs agreed that a

8   custodial production was appropriate.  We submitted it to

9   the Court on December 12, which the Court modified

10  slightly, but not in that regard, agreeing that the first

11  thing that would happen is there would be custodial

12  production.  Thereafter, as Mr. Pennock just said,

13  plaintiffs would have the right to seek additional

14  discovery if after they were reviewed the documents from

15  the custodial productions they felt that there was more

16  that they needed.  It didn't say otherwise.  That's in the

17  Court's order.

18       We are going to complete the production of the 80

19  custodial files by June 30.  We're not going to get them

20  all to them by June 29.  We're doing them in an

21  increasingly rapid pace.  As Mr. Freebery said, we will

22  get them all out in great numbers, as many as a million --

23  as Mr. Freebery said they got out a million and half out

24  in the last month since he first got involved.  We're

25  going to get more than that out each month from here on.

1   They're coming out in great volumes, and they will be

2   complete and they'll be certified by June 30.  That's our

3   promise to the Court.  That was our promise to the

4   plaintiffs.  If they have a particular --

5          THE COURT:  Well, when I set the June 30

6   deadline based on your representations as to how you chose

7   to produce these things, I thought having this conference

8   a third of way through from that time to the deadline that

9   we would have a third of them done by now.  We have got

10  none.

11         MR. MAGAZINER:  It's as Mr. Freebery said, it

12  took us --

13         THE COURT:  But that's the excuse I heard in

14  September.  It's the excuse I heard in November.  It's the

15  excuse I heard in December.  There's just no reason why

16  that should have happened.  There's no reason why the

17  plaintiffs should be subjected to -- I'm totally

18  underwhelmed by the production that's been provided by the

19  defendant to date.

20         MR. MAGAZINER:  I understand that, Your Honor.

21  And I assure you that we're concerned about Your Honor's

22  disappointment.  What I can tell Your Honor is we now have

23  in place with Mr. Freebery and his firm and all the

24  lawyers working with him a process to get all these

25  documents to the Court by June 30.  We put that whole

1    thing in place because we were mindful of how important it

2    was to the Court that we complete the production of our

3    documents on that schedule.  And we will do so.  And we

4    will do so -- we're not doing so as I said by producing

5    them all in the last two weeks of June.  They're going to

6    come out at a steady rate, in increasing numbers week

7    after week, as Mr. Freebery has described.

8         Your Honor will recall that we suggested a later

9    deadline because we were concerned about our ability to

10   meet it.  Your Honor said June 30.  We enhanced our staff

11   even more.  We added many more lawyers, more vendors, more

12   components to this assembly line, as Mr. Freebery said, to

13   make sure that we could do what Your Honor has ordered us

14   to do.  And we will do it.

15        Plaintiffs say that they don't think we will do it,

16   but I guess the proof will be in the pudding.  I'm telling

17   you that I'm confident that we will do it based on the

18   mammoth effort now under way and the processes that we

19   have developed to do it.

20        And to Mr. Allen's point, of course we will certify

21   each custodian to be complete when we have completed that

22   custodians's production.  As Mr. Freebery said, within a

23   week we ought to be able to certify the first eight;

24   within another week or two, the next ten and so forth and

25   so on.  We will complete this process by June 30 and

1   accordance with the Court's order.

2          MR. ALLEN:  Your Honor, I think at some point --

3   this may be the point -- we don't need to say anything

4   further.  The Court has hit the nail on the head and I

5   want to make sure that my opposing counsel understands

6   what we're saying.  We're saying that as the Court is

7   saying:  Nothing has been produced completely.  And so if

8   this -- they meet their deadline on June 30, I want the

9   Court to put itself in our position.  Then we have

10  supposedly 80 complete files and we don't get them

11  complete until the last of June.  And we have heard today

12  that they might have e-mails and will all be complete.  Do

13  you understand, Your Honor, under Mr. Magaziner's theory

14  of what production was, we don't even get a chance to

15  begin a complete review of the complete records of the

16  witnesses they chose until June 30th?

17      Our understanding was what the Court's  understanding

18  was.  This would be orderly.  We would get complete files.

19  They have haven't done it.  The answer to the Court's

20  question have complete files been produced remains.  The

21  answer is no.

22          MR. MAGAZINER:  I'm afraid that Mr. Allen

23  misunderstood what I said.  I did not say that we would

24  complete these productions on June 30.  I said we were

25  going to complete them on dates in the interim and we will

39

1  be providing certificates of completeness.

2        THE COURT:  You have communicated all of that to

3  the plaintiffs as to what your schedule is to get these

4  done?

5        MR. MAGAZINER:  Yes.  We have told them what our

6  schedule is, yes.

7        THE COURT:  You told them which of the 80 you

8  would have done by April 12, which by the 19, which by the

9  26?

10        MR. MAGAZINER:  We told them the priority in

11  which we're doing them.

12        THE COURT:  When they could expect to have the

13  first complete ones and when they could expect to have the

14  10th complete one, the 20th complete one?

15        MR. MAGAZINER:  I don't think we have provided

16  that to them.

17        MR. ALLEN:  They have not.

18        MR. MAGAZINER:  If you would like us to.

19        MR. FREEBERY:  We provided an e-mail to Mr.

20  Jaffe earlier this week.

21        THE COURT:  I want you and Mr. Freebery to sit

22  down this afternoon and figure that out based on what --

23  the representations you both made to me this afternoon

24  about all this work you have done to get this orderly and

25  ready and your factory up and going.  And then we're going

40

```
 1   to meet again tomorrow morning and you're going to report

 2   on that.  And we're going to have a definite schedule for

 3   a production of these things because it has not gone at

 4   the pace that I expected under my order.

 5        Now let's turn to the deposition protocol.  What

 6   depositions do you want to take starting next week?  I

 7   authorized the starting of depositions next week.  I

 8   assume from that that you would be scheduling some of

 9   these background 30(b)(6) so you would -- I didn't think I

10   was going to be hearing again, "We don't know who they

11   are.  We don't where they are.  We don't know who was

12   there when."

13             MR. PENNOCK:  Your Honor, may I address that

14   because I did -- defendants were right.  I sent -- I wrote

15   to them at 12:24 a.m. on April 1.  It was not March 31.

16   It was 24 minutes later.  And I remember why because my

17   baby woke up at 10 and I was helping take care of her and

18   got distracted, and that's the fact.  But in any event, at

19   24 minutes after midnight I gave them definitions of what

20   we wanted.  We wanted an MIS deposition, "A person with

21   knowledge of the archives system at the company and the

22   e-mail storage in back up."  We need to understand -- "We

23   need to understand why we have received so few e-mails or

24   e-mails deleted.  What can we expect in the future?"

25             "Number two, corporate organization.  Who were the
```

1    major players?  Who were the role players?  Who were the

2    defenders of the brand?"

3        "Number three, corporate structure, foreign

4    entities."

5        "Number four, databases, FDA databases, CANDA," which

6    I mentioned earlier.

7            MR. ALLEN:  Not Canada.

8            MR. PENNOCK:  C-A-N-D-A.  And clinical.

9        Next one was Pharmco vigilance.  And the list went on

10   with regulatory HCC representative, risk management.  Next

11   one was medical affairs, adverse events, scientific

12   liaison.  Next one was clinical trial design.  The next

13   area was business analytics IMS CRM.  The next one was

14   marketing, ad agency, cycle meetings, strategic plans.

15   And the last one we listed for MIS was investor relations.

16       I received no responses to whether they would produce

17   anyone in any of those categories on any days at all.  And

18   that was -- that was 12 days ago.

19       So Your Honor is right, we should be taking

20   depositions starting I think the order said April 16.  And

21   we would like to take depositions starting April 16.  And

22   we just need them to come forward with who it is, where it

23   is, and when it is.

24           MR. ALLEN:  Just so Your Honor knows, sometimes

25   a lot of this is overwhelming.  I don't know what -- these

42

1    phrases that we're using:  MIS and these words mean

2    something and they're terms of art.  That's their computer

3    people.  I think you used the term HCP.  That's healthcare

4    professionals.  These are categories that are common in

5    the drug business.  And I do want the Court to know that

6    at least the counsel we're here with on their behalf,

7    however anybody views this case, we have been doing this

8    work and I have been defending doctors for 15 years and

9    these people have been prosecuting them.  They know these

10   categories:  Medical affairs, regulatory affairs,

11   corporate structure, internal organization.  These are not

12   magic.  These are simple depositions.  And so the Court

13   again has hit the nail on head and it's right there and we

14   would like to proceed.

15          MR. McCONNELL:  Just to make sure we're not

16   engaged in revisionist history with respect to what Mr.

17   Pennock said -- by the way I wasn't complaining about the

18   fact the e-mail came at 12:34.  I fully commiserate.

19          My point was simply that what we received in an

20   e-mail was a general list of 30(b)(6) categories.  And I

21   did call and we did have a meet and confer to discuss

22   about getting these done.  And that's when I was told a

23   couple days ago -- Mr. Pederson's here -- he was on the

24   call.  I was told this was not in any way, shape or form a

25   30(b)(6) notice.  It was just a general discussion of

1   categories.  We see that.  I understand as we have been

2   sitting here today that our office was just served for the

3   30(b)(6) notice on corp org structure.  I assume that will

4   take place.  They give us a date of May 3rd.  Fine.  But I

5   had heard from plaintiff's attorneys themselves just a few

6   days ago that Mr. Pennock's e-mail with this list of

7   categories was not telling us that these are the 30 (b)(6)

8   depositions because we're prepared to have a discussion

9   about narrowing them or agreeing on them or doing

10  whatever.  But that didn't happen.

11          MR. PEDERSON:  Just to correct the record, I was

12  on that conversation.  The statement was that that was not

13  official notice.  These were categories we wanted to take

14  depositions on.  So that's not exactly correct.

15          MR. McCONNELL:  We were both on the call, but I

16  think Mr. Pederson will agree.  I said we have a problem

17  with some these categories.  We have to discuss them.  And

18  you told me these are not the categories.  They're

19  generally areas we're interested in, but we don't have

20  anything to fight about now.  That's either a true

21  statement or a false statement.

22          THE COURT:  You don't need to be fighting about

23  these.  There is nothing mysterious or surprising that

24  they're going to want to take these deposition.  This is

25  something that you knew about when the first lawsuit was

44

1  filed.

2      All right.  I'm going to come back to this.

3      With respect to the discovery from third parties, I

4  have directed the parties to provide a proposed schedule

5  for that.  The response indicates that you haven't done

6  that.  So I assume that you just wanted to waive any

7  third-party discovery, so I'll enter an order to that

8  effect.

9      MR. MAGAZINER:  We discussed that at a

10 conference call, Your Honor, and we decided that neither

11 party was far enough advanced in its understanding of the

12 case to be able to immediately discuss the schedule for

13 third-party depositions.  And we agreed to report that to

14 the Court.  I don't believe either plaintiffs or

15 defendants wishes to waive its right to third-party

16 discovery.

17     MR. ALLEN:  Right.  That is an agreement among

18 the parties.  And of course if the Court needs me to

19 elaborate because I need to say for the record the

20 plaintiffs are obviously not waiving those rights and

21 that's I'm sure the Court understands for the reasons that

22 the Court has expressed here today.  It would be as --

23     THE COURT:  You just told me you know all about

24 these cases.  You know what kind of witnesses you need.

25 You know how much you're going to need.  You know how to

45

1    schedule those things even if you haven't got the specific

2    names.

3              MR. ALLEN:   Third-party discovery would

4    necessitate by necessity their documents to determine

5    who -- what third-party vendors, advertisers, producers

6    they need.

7              THE COURT:   But I don't understand how you're

8    possibly going do get those scheduled if you haven't even

9    come to grips with it.

10             MR. ALLEN:   You and I totally agree on that.  I

11   totally agree with the Court.  But we're not waiving it.

12   If in fact we do not have the complete document production

13   it is almost asking me -- the term is putting the cart

14   before the horse.

15             THE COURT:   I'm not saying you should take the

16   discovery, but you should be able to get your arms around

17   the kind of people you need, how many there are, and

18   figure out which weeks in October you're going do these

19   kind of witnesses, which ones you will do in November.

20             MR. ALLEN:   I can tell the Court -- I can tell

21   the Court but he has a slide presentation.

22             THE COURT:   That's what my order anticipates.

23             MR. ALLEN:   Yes, sir.  As we said on the record

24   last hearing.  We need marketers, advertisers, clinical

25   trial researchers.  But we have to get the documents

1  before --

2          MR. PENNOCK:  Judge, as I wrote to the

3  defendants that night?  "Finally, there are numerous" --

4          THE COURT:  I've heard enough on that.

5          MR. PENNOCK:  I just wanted you to know.

6          THE COURT:  Hush.  Please do not interrupt me.

7          MR. PENNOCK:  I'm sorry, Your Honor.

8          THE COURT:  Now I'm going to direct that all of

9  you spend the rest of the afternoon after we recess.  This

10  will be one of the topics you discuss that I had ordered

11  you to discuss.

12          MR. PENNOCK:  We did.

13          THE COURT:  But you didn't provide me with

14  anything.  Nothing.  Just that you weren't going to

15  provide me with anything.  That's what you agreed on.  You

16  agreed not to provide the Court with what the Court

17  directed, not even an outline.  No suggestion that you

18  even come to grips with it.  You're going to do that.  And

19  we will meet again tomorrow morning to discuss that among

20  other things, so that perhaps by tomorrow morning you will

21  be prepared for the things that I wanted to talk about

22  this afternoon.

23          MR. PENNOCK:  Judge, may I ask a question?  If

24  we -- by providing a list of these third parties, will we

25  be locked in and limited to those because that was our

47

```
 1   concern.
 2          THE COURT:  I'm not talking about the specific
 3   people.  I'm talking about coming up --
 4          MR. PENNOCK:  Concept.
 5          THE COURT:  -- with an idea whether you're going
 6   to need six weeks with the FDA or six hours with the FDA,
 7   whether you will need to have --
 8          MR. ALLEN:  We owe the Court an apology.  We owe
 9   the Court an apology.  And I want to ask you -- we owe you
10   an apology for that.  We did not and I did not understand
11   that.  We thought specifics.  We felt at a disadvantage.
12   We owe you an apology.  We're going to do what you said.
13   We know the categories.
14          THE COURT:  You've got a limited amount of time
15   before this case is going to be over.
16          MR. ALLEN:  I apologize.
17          THE COURT:  And I want you to allocate that
18   time.  Get your arms around it.
19          MR. ALLEN:  Yes, sir.  And I have my arms around
20   it. I can get my arms around it.  I apologize.  We
21   misunderstood you.
22          THE COURT:  All right.
23      Let me take an individual matter.  In case 6 civil
24   1416 motion to withdraw, have you had any further
25   communication with the plaintiff in that case?
```

1           MR. CAMP BAILEY:  I think that's someone on the

2      phone's case.

3           THE COURT:  Mr. Roth, do you know?

4           MR. ROTH:  Is that Green?  Green case?

5           THE COURT:  Yes.

6           MR. ROTH:  No, Your Honor.  And the certified

7      mailing was returned.

8           THE COURT:  All right.  What I'm going to do is

9      deny the motion to withdraw, as I typically do in any case

10     where a party has declined to communicate with his or her

11     counsel but do an order to show cause because it's a

12     difficult position for plaintiff's counsel, but I don't

13     view it as a dilemma.  It's a problem of the party's own

14     creation and one which the Court will solve, if the

15     plaintiff continues to fail to respond then the case will

16     be dismissed and it's not through counsel's fault.  And I

17     think counsel is perfectly correct that they can't go

18     forward in the absence of communications.  But it's also

19     not proper to allow withdrawal.  So that case will be

20     taken care of in that fashion.

21          All right.  I read the defendant's submission

22     regarding dispositive motions.  Harken me back to days

23     when I studied set theory, draw circles that had overlaps,

24     other circles that had partial overlap, with another

25     circle and another circle and another circle.  Those were

1    called Venn diagrams.  I see the defendant's here is more

2    of a Zen diagram.

3         Can I get a two minute response from the plaintiffs

4    about that?

5              MR. ALLEN:  Yes, Your Honor.  Scott Allen.

6              THE COURT:  Not to exceed two minutes.

7              MR. ALLEN:  Yes, sir.  And if Mr. Laminack needs

8    to interject.

9         Our response on all that, Your Honor, is you

10   addressed this again properly at the last hearing, and I

11   have not read the transcript in detail.  But there are

12   general motions, general noncase specific motions which

13   can be addressed, we believe, properly by the MDL Court,

14   Judge Baker.  However, as -- and I think they're exact

15   words -- I can look at the exact language -- but it's the

16   case specific, as you said the Venn Diagram of the Venn

17   Diagram of the Venn diagram.  As I recall it begins on

18   page 10 of their memoranda on motions for summary judgment

19   and dispositive motions.  They indicated, and it's in a

20   footnote and a pleading that these case specific motions

21   are years away, years and years away.  And it is our

22   position that they're correct.  Those case specific

23   motions should be years away.  And those are not matters

24   that should be handled in the MDL.  That the purposes of

25   the MDL as set forth in the manual of complex litigation

1    is to avoid -- to prevent inconsistent pretrial rulings

2    and to conserve the resources of the parties, their

3    counsel, and the judiciary.  And then there's -- the

4    manual says case specific motions -- and I'm paraphrasing,

5    Your Honor -- can generally be handled by the transferring

6    court and not the MDL court.  Case specific motions.

7         So I guess our overall response, Your Honor, is those

8    first two sets, as you call it, the Venn Diagram, and I

9    can look at the motion, the general motions that they said

10   they could file this summer, and the second set after the

11   completion of the generic expert depositions.  Is the

12   Court following me?  Those two sets we think that their

13   proposals are reasonable.  We think the last proposal for

14   case specific motions, which they in their pleadings say

15   can be years away, we shouldn't sit here and wait on those

16   motions.  Those should be handled in another place and

17   another time.  And we need to be concentrating our efforts

18   on general issues of common discovery.  That is, their

19   documents and the expert witnesses.

20            THE COURT:  Mr. Magaziner, you're in the happy

21   position of having been declared two-thirds reasonable by

22   the plaintiffs.  Do you want to respond?

23            MR. MAGAZINER:  Yes, sir.  What we're trying to

24   do is respond to the Court's order that we identify

25   motions that we could file by July 31, identify other

51

1   motions that we could file by February 29.  You said that

2   those dates were subject to consideration after you heard

3   our arguments.  So we tried to lay out the various kinds

4   of motions we thought we could practically file by those

5   deadlines.  And of course Mr. Allen understands we can't

6   file a dispositive motion that depends on a doctor's

7   testimony on July 31 or indeed on February 29, if the

8   doctor's deposition hasn't yet been taken.  We did not --

9   we're not trying to suggest that dispositive motions would

10  be years and year and years away.  It would depend on how

11  much case specific --

12          THE COURT:  I didn't mean it that way.

13          MR. MAGAZINER:  -- it would depend on how much

14  case specific discovery is conducted over what timeframe

15  in the MDL and once that discovery has been conducted, we

16  would anticipate particularly on the learned intermediary

17  doctrine if we could file dispositive motions that would

18  be applicable to large groups of cases.  We would say in

19  all these cases the doctor has said the following.  There

20  would then be the deposition transcripts from the relevant

21  cases that say the law in the State of Missouri where all

22  these cases were brought is that if the doctor testifies

23  to this fashion, there is no basis for a claim against the

24  pharmaceutical manufacturer.  And we can do that at such

25  time as we have completed the discovery.  But not

1   necessarily years away.  It depends on the pace of

2   discovery on those issues in the MDL.

3           MR. ALLEN:  And, Your Honor, if you did not read

4   the motion the same way I did, I want to refer you to the

5   language that I'm talking about.  What I would say we

6   spent the majority of time preparing --

7           THE COURT:  No, I read it as identifying -- when

8   I talk about the Venn diagram, the problem is some of

9   issues -- I wasn't being critical with that -- just some

10  of them go back and forth depending on what needs to be

11  completed and it's difficult to unpack those to do what I

12  want to do which is to compel the parties to do it the

13  most efficient way.  It's not clear what's the most

14  efficient when you're talking about multiple motions that,

15  some of which are generic and the same plaintiff may have

16  issues that fall into the different categories.  And

17  defendant -- one way to be most efficient is file all your

18  motions with one plaintiff at one time.

19      Another way to do is if there's a controlling generic

20  issue, file that for everybody at the same time.  Or is

21  the proposal from the defendant or discussions from the

22  defendant recognizes, there's a fair number of issues that

23  will cover 13 percent of the plaintiffs or arguably covers

24  13 percent of them, others arguably covers 72 percent of

25  them.  And that -- I understand that creates problems.

53

1          MR. ALLEN:   I want to be clear because the Court

2     asked for a two minute response, but we spent a

3     substantial amount of our time in preparation for this

4     hearing in addressing this issue dealing with the case

5     specific dispositive motions because we feel there's an

6     underlying predicate there.   That is, they're trying to

7     contend.   If you take and break down what they have said

8     in their pleadings -- and I read all their pleadings --

9     they're contending that in the next 365 days, 54,000

10     depositions, 1800 expert reports, 3600 physician

11     depositions need to be taken, and then, and then they get

12     to choose on a case specific motion, a case specific

13     motion, what motion for summary judgment they need to

14     file.

15          I can tell the Court right now because we have --

16     it's our obligation to be -- to speak with candor.   Your

17     Honor, if they think that taking one plaintiff and two

18     treating doctors' depositions and they can file a case

19     specific motion, the first thing we're going to do, Your

20     Honor, the very first thing we're going to do is we --

21     we're going to ask for a continuance.   We're going to tell

22     the Court that you cannot hear a case specific motion for

23     summary judgment until we take all of the relevant

24     evidence in that case, until we take all the relevant

25     evidence.   And so we're suggesting that their proposal for

case specific motions for summary judgment, that is

dealing with one case as opposed to general issues of

general causation, dealing with general issues of statute

of limitations, general issues of statute of limitations

are fine.  But if we get into case specific motions, it is

our position that at this time such motions would be

premature, that the discovery that needs to be done cannot

be done to allow those motions to be heard.  And as their

pleading said, due process requires a meaningful response

at a meaningful time.  And we're not going to be in a

position to respond to case specific motions here in the

MDL at any time in the near future.

Mr. Laminack and I could address it at greater

length, but we don't -- you asked for a two minute

response and I exceeded that and I apologize.

MR. MAGAZINER:  Your Honor, it will not surprise

me if in response to any case specific motion we file the

plaintiffs say that they need more discovery.  That is a

time honored response by the party who's opposing any

motion for summary judgment.  Whether they will be

entitled to more discovery, whether Your Honor will agree

that more discovery must be had before you can decide the

motion, I suppose we will have to wait the event.

I think we will be able to bring case specific

motions that even though the plaintiffs respond by saying

1   they need more discovery, Your Honor will say, I don't

2   think you do need more discovery.  I think on this record

3   I can decide the motion.  But as I said, we will have to

4   see what the motion says, what their response is and Your

5   Honor will have to rule on that question.

6          MR. ALLEN:  Your Honor, Scott Allen again.  I

7   don't know if that is meant to be pejorative or to

8   teach -- to make plaintiffs' lawyers look bad in

9   responding to motions, but I think I'm not trying to do

10  anything but be fair with the Court.  And it's not because

11  I can tell the Court in advance when two doctors and one

12  plaintiff have been taken years before the case is set for

13  trial -- I represent real clients, real clients who have

14  been prescribed this medication.  If it was prescribed in

15  an on-label fashion.  My clients have schizophrenia and

16  bi-polar mania.  We have discovered in the documents in

17  the limited production that's taken place, Your Honor, the

18  limited production, 60 percent, Your Honor, 60 percent of

19  this company's drug was prescribed in an off-label fashion

20  and they marketed the drug in that way.

21         The United States Congress is concurrently conducting

22  hearings.  State attorney generals and the U.S. Justice

23  Department is looking into their marketing of this

24  product.  We have discovered that their clinical

25  researchers, Dr. Diamond and Dr. Boorstein are convicted,

56

1    convicted felons.  So when this -- when they suggest I'm

2    going to need additional discovery, Your Honor, I'm not

3    saying it is some matter of some plaintiff's lawyer

4    begging for time.  I'm asking for the right to complete

5    the general discovery of their clinical researcher who are

6    convicted felons.  I'm asking to get into their documents

7    of off-label promotion that the U.S. government and state

8    attorney generals are looking at.

9              THE COURT:  You will have all that before any of

10   this --

11             MR. ALLEN:  All right.  Well, that's what we

12   need in response to their summary judgment.

13             THE COURT:  Let me go back to what I thought I

14   was going to start with and I distracted myself, the

15   mechanics of opening the new files and getting the

16   complaints and the answers in in the severed cases and the

17   fees allocated and all that, filing fees.

18        Let me ask -- who wants to respond.

19             MR. MAGAZINER:  May I address that, Your Honor?

20   Because I think we have a proposal that is acceptable to

21   the plaintiffs.

22             THE COURT:  Well, first I want to get the status

23   from the plaintiffs.

24             MR. ALLEN:  I have no idea.

25             MR. CAMP BAILEY:  We have been -- we did get

1  word from Mollie in your alls' clerk office that we are, I

2  think, overloading the system, so we have been asked to

3  slow down on that regard.

4          THE COURT:  I'm not concerned about whether, you

5  know, we're a day or two behind on something.  I'm really

6  wondering whether in terms of in general on the -- that

7  you're comfortable where you are with your plaintiffs in

8  terms of their fact sheets.  And I know there's some

9  logistical problems.  I'll hear your proposal on something

10  we can do to make life easier for you, we will do that if

11  we can.  And I don't know how logistically you're doing in

12  terms of your staff or whether you're using a macro or

13  something to cause these to happen.  And I get them in

14  sort of a funny way each day and I scroll down through

15  them.  And I notice that at least the way they're entered

16  on our system they're -- sometimes you have lots of them

17  in row and then sometimes it looks like your skipping

18  numbers.  Is that because somebody else is doing those

19  numbers?  Or are there people that are dropping out?  I

20  really want to know are people dropping out?

21          MR. CAMP BAILEY:  People -- I think on the --

22  I'm speaking for the Bailey firm.  We have -- I'm

23  obligated under your all's order to do 1300 fact sheets a

24  month.  I think we met our burden on the first two months

25  of doing those 1300.  We have some plaintiffs that we have

58

1    identified from our limited further review, once we get

2    those completed fact sheets, that we are making a

3    recommendation to the plaintiffs that we would like to

4    dismiss the case.  We're trying to work out the mechanics

5    of that with the defendants.  But we have not seen a lot

6    of drop out.  The number I think is in maybe the 20 to 30

7    range out of the first 2600 we have done in a month.

8                THE COURT:  If I'm seeing those numbers not

9    having one is it just because somebody else is doing those

10   or --

11               MR. CAMP BAILEY:  That has to do with the

12   technical mechanics of getting them uploaded into the ECF

13   system.  We're actually having to get multiple people at

14   multiple computers, because it takes, I don't know what

15   the time is, maybe five to 10 minutes per individual

16   complaint to actually have it upload and to then verify it

17   has been uploaded.  So we have got -- they may be out of

18   order because we got one person sitting at one computer.

19               THE COURT:  That's actually what I thought was

20   happening.  I was trying to visualize.

21               MR. CAMP BAILEY:  There's an issue with the

22   payment of the fee.

23               THE COURT:  I understand that.  You have talked

24   to Mollie about that and again because they have -- the

25   clerk's office has to go through a process for accounting

1    purposes, audit purposes and make sure that it's correctly

2    allocated and accounted for.

3              MR. CAMP BAILEY:  Whatever the bandwidth is

4    technically and with your staff, I think we're keeping

5    that full.

6              THE COURT:  Well --

7              MR. CAMP BAILEY:  And we just want to make sure

8    we don't have a problem later.

9              THE COURT:  We have got a systems guy up in

10   Washington who's taking up some of that bandwidth too as

11   he runs a script that opens the new files.  I think we're

12   over 5,000.

13             MR. CAMP BAILEY:  Right.  And my inbox --

14             THE COURT:  We're getting there.

15             MR. CAMP BAILEY:  I have a separate inbox that

16   has 7,000 e-mails in it from the notices.

17             THE COURT:  All right.  Mr. Magaziner, is this

18   the combined answer and complaint?

19             MR. MAGAZINER:  Yes.  As I understand it, one of

20   the problems that we're creating for the clerk's office

21   the plaintiffs are filing a lengthy complaint in each of

22   separate case.  Once we're notified that's been done,

23   there's been some delay in the notice, we then have to

24   file our answer which is also quite lengthy.  But the

25   complaints are in every instance identical to the

1    consolidated complaint that was initially filed and our

2    answer is in every case identical to the consolidated

3    answer that was initially filed.

4        It occurred to, us and we discussed this some with

5    Mr. Bailey, that if we could -- if the Court could order

6    that we could provide to the clerk a piece of paper that

7    we filed that says, plaintiff is deemed to have filed for

8    plaintiff Sally Jones the same complaint as was originally

9    filed for her as part of the amended -- as the

10   consolidated complaint, the defendant has filed the answer

11   that was originally filed, we can just generate those.

12   The clerk needs a piece of paper to put in the file as I

13   understand it.

14           THE COURT:  Well, it won't be a piece of paper.

15   It will be a document.  It will be two docket entries.

16   One being the complaint.  One being the answer.  Even if

17   it's the same stipulation, if you will, it has to be

18   entered twice so the system then recognizes that there is

19   a complaint on file and there is an answer on file.  So

20   that when we generate a report, is there a -- is there a

21   complaint and no answer?  We get a complaint/no answer

22   report.  We don't want those.  We want -- that's why I

23   made the requirement.  I think we can do that.  Let's not

24   call it paper.  The same --

25           MR. MAGAZINER:  One of the problems is these