# EXHIBIT "D"

1

```
 1                  UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                       ORLANDO DIVISION

 3            Docket No.6:06-MD-1769-Orl-22DAB

 4   . . . . . . . . . . . . . ..
     IN RE:                          :
 5   SEROQUEL PRODUCTS LIABILITY     :
     LITIGATION                      :        Orlando, Florida
 6   MDL DOCKET No. 1769             :        April 12, 2006
                                     :        2:00 p.m.
 7   ALL CASES                       :
                                     :
 8   . . . . . . . . . . . . . .:

 9
                    TRANSCRIPT OF PRETRIAL CONFERENCE
10              BEFORE THE HONORABLE DAVID A. BAKER
                   UNITED STATES MAGISTRATE JUDGE
11

12   APPEARANCES:

13   For the Plaintiffs:         Paul Pennock

14                               Larry M. Roth

15                               Fletch Trammell

16                               Michael E. Pederson

17                               Scott Allen

18                               E. Ashley Cranford

19                               Lezzlie Hornsby

20                               Jonathan Jaffe

21                               Scott Armstrong

22                               Dennis Canty

23                               Richard Freese

24

25   Court Reporter:    Sandra K. Tremel, RMR/CRR
```

2

```
1   APPEARANCES CONTINUED:

2   For the Plaintiffs:

3                           Richard Laminack

4                           Buffy Martines

5                           Thomas Pirtle

6                           Tim Goss

7                           Larry Gornick

8                           Lorie Siler

9   For the Defendant

10  AstraZeneca:            Fred Magaziner

11                          Stephen J. McConnell

12                          James Freebery

13                          Robert L. Ciotti

14                          Liz Balakhani

15  Proceedings recorded by mechanical stenography, transcript

16  produced by computer-aided transcription.

17

18

19

20

21

22

23

24

25
```

3

```
 1              P R O C E E D I N G S
 2          THE DEPUTY CLERK:  Case number is
 3  6:06-MD-1769-ORL-22DAB.  In re: The Seroquel products
 4  liability litigation.
 5      Counsel in the courtroom, please state your
 6  appearances for the record.
 7          MR. ALLEN:  Scott Allen for the plaintiffs,
 8  Houston, Texas.
 9          MR. LAMINACK:  Richard Laminack, plaintiffs,
10  Houston, Texas.
11          MR. PENNOCK:  Paul Pennock for the plaintiff,
12  New York.
13          MR. ROTH:  Larry Roth for MDL plaintiffs.
14          MR. CAMP BAILEY:  Camp Bailey for the
15  plaintiffs.
16          MR. PEDERSON:  Michael Pederson for plaintiffs.
17          MS. MARTINES:  Leslie Martines, Houston, Texas
18  for the plaintiffs.
19          MR. F. KENNETH BAILEY, JR.:  Ken Bailey, Houston
20  Texas.
21          MR. PIRTLE:  Tom Pirtle for the plaintiffs.
22          MR. TRAMMELL:  Fletch Trammell, Houston, Texas.
23  Plaintiffs.
24          MR. FREESE:  Richard Freese, plaintiffs,
25  Birmingham, Alabama.
```

4

```
 1              MR. GOSS:  Tim Goss, Dallas, Texas, plaintiffs.

 2              MS. BANNO:  Tamara Banno, Dallas, Texas,

 3   plaintiffs.

 4              MR. MAGAZINER:  Fred Magaziner for AstraZeneca,

 5   Your Honor.

 6              MR. FINSON:  Lowell Finson.

 7              MR. McCONNELL:  Stephen McConnell on behalf of

 8   AstraZeneca, Your Honor.

 9              MR. FREEBERY:  Jim Freebery on behalf of

10   AstraZeneca.

11              MR. CIOTTA:  Robert Ciotta for AstraZeneca.

12              MS. BALAKHANI:  Liz Balakhani for AstraZeneca.

13              THE COURT:  On the phone?

14              MR. FINSON:  This a Lowell Finson.

15              MR. JAFFE:  Jonathan Jaffe for the plaintiffs,

16   not counsel.

17              MR. GORNICK:  Larry Gornick and Dennis Canty for

18   plaintiffs.

19              MS. CRANFORD:  Ashley Cranford for plaintiffs.

20              MS. SILER:  Lori Siler for plaintiffs.

21              MS. HORNSBY:  Lezzlie Hornsby for plaintiffs,

22   Houston, Texas.

23              MR. ARMSTRONG:  Scott Armstrong for plaintiffs.

24              THE COURT:  There are a number of issues to

25   cover.  The matter that gives me the most urgent concern
```

5

1    is the plaintiff's position that the discovery received

2    from the defendants has been less than satisfactory.  Who

3    from the plaintiff wants to address the current status of

4    that?

5             MR. PENNOCK:  Paul Pennock for plaintiffs.  I

6    would be happy to go through the facts.  If you don't

7    mind, Judge, I do have a few slides on that very issue,

8    and if I could put those up if it's all right with the

9    Court.  I went through the slides before we started with

10   Mr. Magaziner.

11            MR. MAGAZINER:  Paul, excuse me.

12            MR. PENNOCK:  As the Court is aware, and we have

13   had this discussion or made these points several times.  I

14   mean there are a number of burdens that plaintiffs have in

15   this litigation, and in any case.  And in particular, in

16   this case, as has been outlined by the defendants in their

17   motion, we're going to be dealing with a number of summary

18   judgment motions.  We're going to be dealing with 12(b)(6)

19   motions on issues such as preemption.  We're going to be

20   dealing with motions for statute of limitations and other

21   motions that have been promised.  All of these burdens are

22   things that we're going to need a tremendous amount of

23   discovery in order to attempt to meet these burdens.

24   There's no doubt going to be Daubert challenges in this

25   case.  The defendants have already said that.  There are

6

1    no doubt going to be learned intermediary motions that the

2    physicians knew what AstraZeneca knew when they prescribed

3    the drug to our clients.  There will be, and central to

4    any prescription drug pharmaceutical case, absolutely core

5    to the case, is the deposition of the prescribing

6    physician or physicians in the case.  Without that

7    deposition it's very difficult for plaintiffs to meet any

8    of the burdens in proving the failure to warn case.  And

9    in this case, we will have no doubt many of the such

10   depositions at some point in time.  We will need to rebut

11   the cross-examination that occurs in those depositions and

12   at trial.  But in particular, depositions because in many

13   instances, if not most, these doctors do not come to

14   trial.  They testify by deposition.

15        The same is true of the causation, in causation

16   issues for the diabetes doctors.  There will be extensive

17   cross-examination at deposition of these doctors with

18   respect to causation issues involving this drug case

19   specifically and generally.

20        All of these things are burdens that we have to meet

21   and we have to have the discovery to do them, Your Honor.

22   And the problems that have been coming up I think are

23   crucial to all the issues that the Court will probably

24   have to address today.

25        And if you don't mind I'd like to go through what I

7

1   have -- what I see and we, the plaintiffs, see as a

2   derailing of discovery at this point.

3       As I said to Mr. Magaziner before the conference,

4   we're not at this juncture laying any blame for any ill

5   motive by the defendants in what has happened with respect

6   to discovery from the defendants.  But the bottom line is

7   that the discovery has been sporadic and the discovery has

8   been incomplete.  And any objective review of what's taken

9   place will indicate that.

10      The first thing that had to happen in this case, in

11  this litigation, was the disclosure of the IND and the

12  NDA.  And as Your Honor pointed out the very first

13  conference, this should be something that is not complex,

14  that is not problematic and that can be quickly and easily

15  done.  And the defendants themselves essentially agreed

16  through Mr. Davis, formerly counsel for AstraZeneca, that

17  it could be done.

18      The Court specifically, you know, made the point, and

19  I don't think it was really a metaphor, but the Court

20  said, I can go to Office Depot and get a scanner and

21  software and have it done tomorrow morning.  I don't care

22  how many thousands of pages it is.

23      Well, we're sitting here today some six or seven

24  months later and we don't have a complete IND.  We finally

25  got what was a nonsearchable format IND on November 10th,

8

1    over two months after the initial conference.  It took us

2    another month and a half working, trying to work with the

3    defendants to get something that was workable, something

4    that we could review, that we could get through in a

5    reasonable and efficient and effective manner.  Not

6    something that was an utter burden that no one could

7    effectively get through in a reasonable period of time.

8        We finally got that in late December.  And, yet, when

9    we go through the -- we have been through the IND and NDA

10   almost in its entirety, everything they have given us.

11   There is a wholesale lack of metadata with respect to this

12   IND and NDA.  The documents were not produced in

13   chronological order even though we would suggest and we

14   don't know yet because we haven't been allowed any

15   depositions, but we suggest that they're probably

16   maintained in some type of reasonable order by the

17   company.

18       There are a lack of serial numbers, there are

19   numerous documents in this disclosure missing any type of

20   identifying number even though that was the manner in

21   which they were produced.  There is no FDA logbook

22   whatsoever, something that's typically found and disclosed

23   in these NDA productions.

24       There is this CANDA safety database.  This was an

25   electronic format database that was, we believe, being

9

1   utilized at the time that this submission was made to the

2   FDA.  We have references as early as 1996 that the CANDA

3   database was being utilized.  It was the manner in which

4   the defendants would, we believe, produce the safety

5   evaluations and reports to the FDA in an electronic

6   format.  We have -- there is nothing in this NDA that we

7   could find that incorporates this CANDA database.

8   Obviously, a central and core aspect of NDA and our review

9   of it.

10      There are -- we know for a fact that internally from

11  the document review we have already done in the so-called

12  custodial files that have been produced that there were

13  reports of diabetes that the company knew about early on.

14  But in the NDA, we can't find those reports that were

15  being made to the FDA.  Now, of course, if they weren't

16  reported to the FDA, we will be happy to learn that fact.

17  But we are missing quite a number of reports.  And I'm not

18  going to read this into the record.  It's from the

19  document that's currently under the confidentiality

20  stipulation.  But the bottom line is we know that there

21  should be reports in this NDA that aren't there.  And the

22  question, of course, today is where are these reports.

23      Zero telephone contacts with the FDA.  We have no

24  internal documentation regarding the FDA-- regarding the

25  NDA and its submission.  In other words, memos to one

1  another saying this is what we're doing.  This is when

2  we're doing it.  This is why we're doing it and so forth.

3  There is no other documentation of contacts other than the

4  usual telephone contact log.  We don't have them.

5      There's -- in the periodic safety update reports,

6  PSUR, typically what we have seen is there will be a

7  discussion section, sort of an overview or a foreshadowing

8  by the company of what is in the PSUR.  We've found no

9  such sections in the PSURs that were given to us.

10      There's been no certification of completeness for

11  this production.  Again, it was produced in what we felt

12  to be an unusable format on November 10.  We're several

13  months out.  We have no certification of completeness and

14  I think having gone through it, we know why.  It is not

15  complete.

16      I have to say the same seems to be true for the

17  defendant document production that's occurred to date.

18      This is sort of an outline of the timeline we were to

19  be given custodial files.  In other words, witness files

20  for different company witnesses as of January 5th.  We

21  ultimately got something that we thought, after much

22  debate, would be usable on February 8.  We have got a part

23  of eight witnesses' files, a part of it.  And then there

24  was a supplementation of that on March 16 as indicated

25  there, and March 17.  Part productions.

1        Now, I'd ask the Court to imagine getting huge

2    volumes of electronic documents, dedicating resources and

3    time to review them, and it's obvious that they're partial

4    productions.  But we don't even know what parts we have

5    been given and what parts we haven't.  In any event they

6    are certainly not complete and there's been no

7    certification of the completeness.  And as of two days ago

8    we're still getting partial on the very first eight

9    witnesses.  And again, we received no certification of

10   completeness because they obviously are not.

11       This Court has ruled that things should be given at a

12   steady rate.  A lot of these issues have to some extent

13   been aired or at least mentioned that they were problems

14   earlier on in the year and the Court ruled that these

15   files should be given at a steady rate by June 30th.  We

16   seem to be having a problem with that as well.  I mean, as

17   I say here, I think it's anything but a steady rate.  On

18   April 3, three months after the initial incomplete

19   production of eight files, we got 20 more files which I

20   suspect are incomplete as well, although they were

21   produced only nine days ago and we're not obviously into

22   them very deeply yet.  But I suspect they're incomplete.

23   We certainly received no certification of completeness.

24   And in any event it's certainly not a steady rate.  I mean

25   it's something of, as I put it here, I really think it's

1    something of a document dump.  That's not helpful.  That's

2    not efficient.  And it does not allow us to effectively go

3    about meeting all the burdens that we need to meet in all

4    of the discovery that has to take place in this case, in

5    all of the motion practice that has to take place in this

6    case.

7         I'll skip through this, but essentially, Judge, I

8    just laid out here a definition of what's customarily

9    viewed as a custodial file in other litigations we have

10   been involved in, and it's a very broad production that

11   should be taking place, and we're simply not getting it.

12        Most -- not most importantly, but of extreme

13   importance is the lack of e-mails.  As the Court might

14   imagine, for 10 years now e-mail communication within any

15   entity is one of the primary means of communication and

16   also one of the most fertile areas of evidence.  For

17   everything we have to do that I outlined at the beginning,

18   Vikram Dev is one of the key witnesses in this case.  This

19   is one guy we know we will be deposing out of the 80 names

20   they have given us.  He's absolutely key.  He's one of the

21   chief guys with respect to this whole, all of these

22   issues.  No e-mails.  We believe he was there at least as

23   of 1998.  But we're still not even certain of that because

24   we haven't gotten discovery 30(b)(6)wise to determine

25   that.

13

1    And here are some other examples.  I'm going show the

2    Court each of the eight witnesses for whom there has been

3    some substantial production of documents.  Eighty-eight

4    e-mails for Mueller, 904 he mails for Boornazian in over

5    five years.  That's a rate of about one every two or three

6    days.  Again, if you look at Bush, Okay?  Bush had 275

7    e-mails.  We know that there were e-mails being used as

8    far back as 1977 because in Bush's case there were about

9    seven e-mails from 1997.  And yet we don't have any for

10   any of these other witnesses going back that far or even

11   close to it.  They all only go back to about 2002.  And

12   furthermore, with Bush there's three years in the middle

13   that we're missing -- there are no e-mails.  So we have a

14   few e-mails in '97, '98, '99, thereabouts, then we go

15   three years without any e-mail.  And, you know, the same

16   is very similar, I mean, even in a production such as

17   Boorstein with 1600 e-mails, that's only at the rate of

18   one per day, 1 e-mail per day over the years that we know

19   that witness was with AstraZeneca and he -- Boorstein may

20   have been with AstraZeneca before 2002.  We just don't

21   know yet.

22       The next issue with respect to the entire production

23   is we really have yet -- we cannot possibly understand yet

24   who these 80 people are and whether they are indeed the

25   key people.  And if AstraZeneca, the client, not the

14

1   lawyers, but if AstraZeneca the client tells us these are

2   the key people, well that's wonderful but we need to

3   analyze that.  We need to look at it and it's going to

4   take some time.  And I'll tell you that from our review,

5   and we had an extensive meeting in Houston a few weeks ago

6   with a few dozen lawyers, every one that's looking at it

7   and here are some of the highlights of things that we're

8   finding aren't there.  I mean, we don't see -- doesn't

9   appear there are any personnel that have been identified

10  from some of these key areas.

11      And, you know, now, maybe they didn't have these

12  departments or maybe they were named otherwise, but we

13  don't see anything that suggests that, we certainly know

14  we don't have anyone for Scientific Affairs until 2004.

15      Again, there are gaps in the departments, in the drug

16  regulatory affairs, drug development, financial support.

17  We don't see any witnesses on the list of 80 that are

18  purportedly the only people we will need to meet all the

19  burdens that I mentioned at the beginning.  We don't see

20  anybody in those.  Preclinical personnel, zero -- I'm

21  sorry -- four people pre1999.  That would be the personnel

22  that were involved in this, in the development of this

23  drug before they put it into clinical trials.

24      Part of the problem or perhaps the source of the

25  problem is that we haven't been given people, names of

1   people in positions before 1997 to any extent, although

2   we're certainly starting to see some names.

3        So the bottom line is we have a total lack of

4   documents from the preclinical years.  And we have already

5   identified potential additional witnesses that we would

6   want, but we're concerned about committing to these

7   witnesses because we haven't seen the entirety of what

8   they have yet.  We don't have anything near the big

9   picture yet, Judge.

10       You know, we're in the middle of this thousand piece

11  jigsaw puzzle and we have got some pieces we're putting

12  together, but we don't have it even close yet to say we

13  need this piece and that piece and that piece and that

14  piece.  We're working on it.  We have already identified

15  some but we can't commit, particularly if they're going to

16  be restrictions as the defendants have sought on how much

17  we can get and who we can get.

18       There some other issues I don't think I'll go into

19  that are a little more detailed on extracted text issues

20  and the page break issues but these are sort of issues

21  that are stumbling blocks in how the production is being

22  given to us.

23       The bottom line is that there's a tremendous amount

24  of discovery to be done, and that's not surprising to

25  anyone.  It's a pharmaceutical case and there are 10,000

1  possible claimants, and this drug started in development

2  in mid 1980.  There were no doubt, you know, 100 or more

3  people throughout those years.  Some of whom aren't with

4  AstraZeneca any more that worked on this drug and had

5  relevant information of this drug.  But what we need we

6  certainly don't have yet and we're not necessarily going

7  to have by June 30 even if they do everything that they're

8  supposed to do.

9       And there will need to be along the line here

10 tremendous input, I would suggest to the Court, by we, the

11 plaintiffs' lawyers, on what we think we have to have,

12 what we think we're missing, who the people are that we

13 have to have.  And all of that we think needs to be

14 substantially accomplished before we can get into areas

15 that is the next step up from this before we can get into

16 areas where this material is fundamental to the

17 prosecution of these cases.  In the depositions of the

18 treating and prescribing doctors before we can get there,

19 we need to know what our case looks like, what do we have

20 to defeat and rebut the summary judgment motion, the

21 learned intermediary defense and the other things that I

22 have outlined earlier.  What do we have?  We won't know

23 that until this process has been completed.  And right

24 now, we are -- we're quite stymied in the efforts that we

25 have been trying to make to put this case together.