US District Court
Middle District of Florida

**PLAINTIFFS' EXHIBIT**

Exhibit Number: _____16_____

6:06-md-01769-ACC-DAB

**In Re:  Seroquel Products Liability
Litigation**

Date Identified:
_____

Date Admitted:
_____

# Exhibit 16

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In Re:  Seroquel Products Liability
        Litigation

Case No. 6:06-md-1769-ACC-DAB

MDL 1769

This Document Relates to All Cases

DECLARATION OF JONATHAN JAFFE
IN SUPPORT OF PLAINTIFFS'
MOTION FOR ORDER IMPOSING
DISCOVERY SANCTIONS

I, Jonathan Jaffe, declare as follows:

1.      I am Manager of Software Development with the law firm Weitz &
Luxenburg ("Weitz"), co-lead counsel for plaintiffs in the captioned matter.  I make this
Declaration in support of plaintiffs' Motion for Order Imposing Discovery Sanctions.  I
have personal knowledge of the facts set forth herein, and would testify competently to
the same if called upon to do so.

2.      I have been working in IT since 1995, developing and managing large
databases and systems. I have worked and consulted for companies such as AIG/AIU,
Sumitomo Mitsui, Garban Intercapital, Winstar, Valinor, The College Board, NMSS,
Merrill Lynch, and others. I headed teams that wrote applications handling financial
transactions of up to $6 billion per year, processing billions of pieces of data, and
carrying multimillion dollar budgets.  In 2002, I started at Weitz & Luxenberg PC.
Today, I am responsible for overseeing all software development at the firm, and our
systems and technologies have been widely adopted by others.  Our document
management system, DOXS, is used by dozens of law firms in litigation throughout the

country. Microsoft has used our work to highlight best practice use of their technologies in two case studies.

3.     In the captioned matter, I have been responsible for receipt and management of data produced to plaintiffs by AstraZeneca, and facilitation of review of that material by plaintiffs' counsel.

## IND/NDA

4.     On or about November 15, 2006, attorneys for AstraZeneca delivered to the Weitz offices six DVD's, containing electronic files related to AstraZeneca's IND/NDA for Seroquel. Examination of the DVD's revealed that the files:

> a. Contained only images of documents, and were not searchable;
>
> b. Were multi-page TIFFs, many of which were thousands of pages in length and hundreds of megabytes in size; as a result, some could not be opened, even on higher-end workstations;
>
> c. Contained images which were Bates numbered, though the file names, folders, and DVD labels failed to indicate corresponding Bates numbers or ranges;
>
> d. Were not accompanied by "load files" – separate files containing descriptive information, such as the Bates number and metadata, to facilitate search and review.

5.     By way of example, 8% of AstraZeneca's production was contained in one file, over 1 GB in size (determined to be over 20,000 pages in length,) and the path and filename of that document read as follows:

Disk2-NDA 20-639\Amendments & Supplements\2002\12 (December)\2002-12-30

(30Dec02) 1\Published Submission\N20639\clinstat\other\

19,25,33,35,36,44,45,49,64,132,259,271,273,347,369 - 670.TIF

6.     On November 17, 2006, I discussed with counsel for AstraZeneca the deficiencies set forth above. AstraZeneca's counsel indicated that, if plaintiffs wished to receive the data produced by AstraZeneca in an alternative format, plaintiffs would bear the cost of such formatting.

7.     That same day, I wrote to counsel for AstraZeneca, making note of the above deficiencies, asking what it would cost plaintiffs (in time and money) for AstraZeneca to make the changes, and requesting that we confer on formatting prior to any further production. A true and correct copy of my email appears at Exhibit 1.

8.     Thereafter, personnel employed by various plaintiffs' firms undertook to make the IND/NDA files suitable for substantive review. These personnel OCR'd the files, attempted to decipher defendants' inconsistent Bates number sequencing, and populated "metadata" fields with information derived from the names and characteristics of the files produced, and the images contained within them.   Review was further impeded because some files in AstraZeneca's production contained more than one document, and some documents were split across various files.

9.     The IND/NDA files initially produced by AstraZeneca did not include the records contained in AstraZeneca's CANDA database.

10.    On or about June 11, 2007, the Weitz offices received from counsel for AstraZeneca a hard drive containing TIFF files purportedly derived from AstraZeneca's CANDA database.

CUSTODIAL PRODUCTION

11.   On seventeen occasions between February 8 and July 6, 2007, Weitz
received from AstraZeneca's counsel various hard drives and compact discs containing
electronic files. These data (which include TIFF images and accompanying load files)
have been imported into Weitz' DOXS database for review and analysis. At my request,
my team ran a DOXS query against the data provided by AstraZeneca which summarizes,
for each of the seventeen "productions": the date of the production, the total number of
documents and pages produced, and the number of documents and pages designated as
part of the "First 8" custodial files produced by AstraZeneca. A true and correct copy of
the results of that query are attached as Exhibit 2.

12.   On January 1, 2007, four days before AstraZeneca was scheduled to begin
custodial production, AstraZeneca informed plaintiffs that a problem existed with the
format of production: "the OCR text files cannot be included as part of the load file and
cannot be split up into single pages." Telephone and email communications over the next
ten days culminated in AstraZeneca's agreement that custodial production of documents
originally in electronic form (as opposed to hard copy) would include load files with
extracted text containing page breaks. AstraZeneca agreed to provide two file samples of
its proposed production. Exhibit 3 is a true and correct copy of related email
correspondence.

13.   On January 11, AstraZeneca provided samples. The load files for the
samples provided contained errors, in that (*inter alia*):

   a) The metadata provided did not correspond to the fields set forth in CMO2;

b) The Bates numbering sequence did not follow the same conventions as
AstraZeneca's previous productions; and

c) The load files failed to adequately identify email attachments.

I discussed the foregoing with AstraZeneca's counsel, and we agreed upon a
method to remedy the foregoing problems. I then requested a larger sample of 100
documents, which AstraZeneca agreed to provide. Exhibit 4 is a true and correct copy of
related email correspondence.

14.     My review of the larger sample revealed that, while AstraZeneca's
production included a metadata field entitled "Source Location", that field contained no
data. According to AstraZeneca's counsel, though their vendor had earlier indicated that
the field would be available, the field had not been populated with data, and could not be
obtained without extraordinary effort. According to counsel, information pertaining to
the source of a document would be made available in the "File Location" and "Source
Name" metadata fields. Exhibit 5 is a true and correct copy of related email
correspondence.

15.     The sample files provided by AstraZeneca demonstrated resolution of the
formatting difficulties discussed above. Particularly, the load files appeared to contain
extracted text with page breaks. I then asked AstraZeneca to begin custodial production
in the sampled format.

16.     The Weitz firm received AstraZeneca's first custodial production on
February 8, 2007. A great majority of the electronic files produced by AstraZeneca on
that date were inconsistent with the sampled format, in that page breaks were not
provided.

17.     On February 13, 2007, I wrote to AstraZeneca's counsel regarding the lack of page breaks. Page breaks are essential to a meaningful review of multi-page documents because, without them, searches of the text will not direct the reviewer to the corresponding imaged page. On February 14, I provided AstraZeneca's counsel with a recommended "fix" of the problem, which counsel indicated he would pass on to the vendor. One month passed before AstraZeneca's counsel responded to my suggestion. On March 14, counsel indicated that AstraZeneca would "not agree to further modify the format of [its] production." Exhibit 6 is a true and correct copy of related email correspondence.

18.     Despite further requests from plaintiffs in April and May, (as more particularly set forth in correspondence attached to the concurrently filed Declaration of Michael Pederson), AstraZeneca continued in its refusal to provide page breaks in extracted text.

19.     In the parties' June 7, 2007 Joint Statement of Resolved Issues (Document 221), AstraZeneca agreed to provide page breaks in extracted text files for all non-redacted documents 10 or more pages in length. AstraZeneca agreed to provide corrected, extracted text files on a rolling basis, and estimated the process would be complete in six weeks. Plaintiffs received no "rolling" production. Plaintiffs received a hard drive purporting to contain all extracted text files after 6:00 p.m. on Friday, July 20, 2007. Plaintiffs have not yet had the opportunity to evaluate that production.

20.     As AstraZeneca's custodial productions progressed, and as plaintiffs' counsel had the opportunity to review those productions, problems with those productions became apparent and compounded.

21.     Another problem with AstraZeneca's custodial production is the lack of consistency in the metadata produced. Field headings, as well as field contents, such as Source names and Bates numbers, have been produced in inconsistent formats. Inconsistencies in field formats make it difficult and time consuming for plaintiffs to import the data produced. Inconsistencies in the imported data make it more difficult for plaintiffs to accurately search the documents, and to segregate and categorize them for review.

22.     In the parties' June 7, 2007 Joint Statement of Resolved Issues, AstraZeneca agreed to provide corrected load files for all custodial productions, resolving the metadata inconsistencies. AstraZeneca estimated that these corrected load files would take four weeks to produce. AstraZeneca did not produce corrected load files for more than six weeks. Plaintiffs received what purport to be corrected load files after 6:00 p.m. on July 20, 2007. Plaintiffs have not yet had the opportunity to evaluate that production.

23.     Another problem with AstraZeneca's custodial production is the presence of blank pages, with corresponding metadata indicating the pages should not be blank. For instance, blank pages appear amidst pages of emails, suggesting improper redaction.

24.     In the parties' Joint Statement of Resolved Issues, AstraZeneca agreed to investigate the blank page issues. Following that investigation, on July 18, 2007, AstraZeneca produced corrected images for five of the first eight custodians and, due to the large number of pages affected, provided replacement files for two of those custodians (Beamish and Busch) in their entirety. This will result in a complete re-review of the custodial files of Beamish and Busch.

25.     True and correct copies of correspondence by and between counsel regarding technical issues with AstraZeneca's custodial production are attached as Exhibits 7 through 15.

26.     Another problem with AstraZeneca's custodial production is its failure to accurately identify which documents make up which custodial files. While the metadata for each document contains a "Source" field, which should identify its particular custodian, as produced by AstraZeneca, this field instead contains multiple names (in varying formats across productions). Plaintiffs requested an explanation.

27.     In an April 30, 2007 letter, counsel for AstraZeneca informed plaintiffs that "there is nothing defense counsel or its vendor can do" about this problem, because "identical versions of electronic documents are de-duplicated on a family basis and the source name field is populated with the name of every custodian who has a copy of the de-duplicated document." As set forth below, this statement gives rise to grave concerns regarding the collection, search, de-duplication and production of documents by AstraZeneca in this litigation.

28.     Exhibit 16 is a true and correct copy of a document (AZSER 08028911) and its accompanying metadata, which were produced by AstraZeneca on June 25, 2007. The document is an email sent by "Murray, Michael F (Seroquel)". The accompanying "Source" metadata identifies two other persons as custodians, and one of them (Mueller) does not appear from the image file to be a recipient of the email. Further, the metadata fails to identify Mr. Murray himself as a custodian. (Michael Murray is one of the "first eight" selected by AstraZeneca for production.)

29.     The email contains an attachment, (AZ-SER-3153444) which was produced by AstraZeneca much earlier – on April 27, 2007. The metadata accompanying the attachment does identify Murray as "Source" or custodian of the attachment, identifying him as "Murray, Mike".

30.     Queries of the DOXS database reveal 1050 emails sent or received by "Murray, Michael F (Seroquel)" in which Murray is not identified as a custodian, as well as 707 instances in which "Murray, Michael F (Seroquel)" is identified as a custodian of a document. True and correct copies of excerpts of those queries and their results are attached as Exhibit 17.

31.     Thus, it appears that Mr. Murray may have multiple email aliases, identities or mailboxes. It also may be that documents collected for Mr. Murray's custodial file may have been gathered from different locations.

32.     Based upon the foregoing, any of the following may be true: (a) documents maintained by "Murray, Michael F (Seroquel)" were not subject to the collection and search process employed by AstraZeneca; (b) the de-duplication process employed by AstraZeneca removed documents or metadata identifying "Murray, Michael F (Seroquel)" as custodian; and/or (c) documents have been collected from "Murray, Michael F (Seroquel)" but have not yet been produced to plaintiffs.

## DATABASES

33.     On January 12, 2007, by email, AstraZeneca identified 15 databases related to the categories specified in CMO-2. On January 15, AstraZeneca identified another. On January 19, AstraZeneca identified five more, bringing the total identified to 21. Exhibit 18 is a true and correct copy of related email correspondence.

34.     On January 22, 2007, I attended informal interviews of AstraZeneca employees Daryl Draper and John Dowling in Wilmington, DE.  At those interviews, six more databases were identified.

35.     It is my understanding that additional databases were discovered in 30(b)(6) depositions during the month of May.

36.     In the parties' Joint Statement of Resolved Issues, filed June 7, 2007, AstraZeneca indicates that "the Parties will continue to meet and confer on database production so that a procedure can be worked out for their production."

37.     On June 11, 2007, AstraZeneca suggested the parties meet and confer regarding "database collection/production," and requested a "list of key databases and the types or fields of information… you would like to receive."  Exhibit 19 is a true and correct copy of related email correspondence.

38.     On June 12, AstraZeneca proposed to "work cooperatively with plaintiffs on the production of relevant databases."  Exhibit 20 is a true and correct copy of related email correspondence.

39.     On June 14, AstraZeneca offered to "begin collecting information from any 'hot' databases…"  Exhibit 21 is a true and correct copy of related email correspondence.

40.     On June 19, AstraZeneca's counsel stated: "My goal today is to collect sufficient information from Plaintiffs to begin the database production process."  Counsel then proposed an informal procedure for identification and sampling of databases. Exhibit 22 is a true and correct copy of related email correspondence.

41.     On June 20, plaintiffs sent to AstraZeneca a spreadsheet, containing a list of the 59 databases identified in interviews, 30(b)(6) depositions, and meet and confer sessions. Plaintiffs requested that AstraZeneca assist in prioritizing production by completing the spreadsheet, which called for information such as the time frame covered by each database, its size and availability, and whether systems diagrams or documentation were available. Exhibit 23 is a true and correct copy of related email correspondence.

42.     In a June 27, 2007 telephone conference, AstraZeneca refused to assist plaintiffs by providing the information listed on the spreadsheet. Plaintiffs then indicated they would seek the assistance of the court. Exhibit 24 is a true and correct copy of related email correspondence.

43.     On July 2, at 7:50 p.m., AstraZeneca returned a copy of the spreadsheet, partially completed. Exhibit 25 is a true and correct copy of related correspondence.

I declare under penalty of perjury according to the laws of the United States that the foregoing is true and correct.

Dated: July 23, 2007

By: _____
Jonathan Jaffe

# AZSER 08028911

# Designated Confidential

**Pursuant to stipulation, this document will be presented to the Court at the hearing.**