# EXHIBIT 44

```
                                                           Page 276
 1              IN THE SUPERIOR COURT
          OF THE STATE OF DELAWARE
 2        IN AND FOR NEW CASTLE COUNTY
                    - - -
 3    IN RE:
      SEROQUEL LITIGATION   : MDL NO. 1769
 4                          :
      THIS DOCUMENT RELATES:
 5    TO ALL ACTIONS        :
     ------------------------------------------
 6    IN RE:                : SUPERIOR COURT
      RISPERDAL/SEROQUEL/   : OF NEW JERSEY
 7    ZYPREXA LITIGATION    : LAW DIVISION
                            : MIDDLESEX COUNTY
 8                          : CASE NO. 274
     ------------------------------------------
 9    AIMEE DANIELS,        : IN THE CIRCUIT
                            : COURT OF THE
10         V.               : COUNTY OF ST. LOUIS
                            : STATE OF
11    ASTRAZENECA           : MISSOURI
      PHARMACEUTICALS, L.P.: 05CC-004759
12    ET AL.                : DIVISION 6
     ------------------------------------------
13    SANTOS MALDANADO,     : IN THE CIRCUIT
      minor, by and through: COURT OF THE
14    his natural mother    : COUNTY OF ST. LOUIS
      and next friend,      : STATE OF
15    LOUISE WILSON         : MISSOURI
           V.               : 06CC-003930
16    JANSSEN PHARMACEUTICA: DIVISION 6
      L.P., ET AL.          :
17                  - - -
                   May 10, 2007
18                  - - -
            C O N F I D E N T I A L
19                  - - -
        30(b)(6) deposition of ASTRAZENECA
20    PHARMACEUTICALS, L.P., by and through JON
      DOWLING.
21
                    - - -
22          Golkow Technologies, Inc.
                  Suite 760
23       1880 John F. Kennedy Boulevard
         Philadelphia, Pennsylvania  19103
24              877.370.3377
```

Page 277

```
 1  LENA BARNETT, minor,  : IN THE CIRCUIT
    by and through her    : COURT OF THE
 2  natural mother and    : COUNTY OF ST. LOUIS
    next friend,          : STATE OF
 3  MARY BARNETT          : MISSOURI
         V.               : 06CC-000333
 4  JANSSEN PHARMACEUTICA: DIVISION 6
    L.P, ET. AL.          :
 5  ---------------------------------------
    LOIS BAER, as         : IN THE CIRCUIT
 6  Representative of the: COURT OF THE
    Estate of MATTHEW     : COUNTY OF ST. LOUIS
 7  BAER, Deceased        : STATE OF
         V.               : MISSOURI
 8  JANSSEN PHARMACEUTICA: 06CC-002401
    L.P, ET. AL.          : DIVISION 6
 9  ---------------------------------------
    TERRY STRINGER        : IN THE CIRCUIT
10                        : COURT OF THE
         V.               : COUNTY OF ST. LOUIS
11                        : STATE OF
    JANSSEN PHARMACEUTICA: MISSOURI
12  L.P, ET. AL.          : 06CC-002173
                          : DIVISION 6
13  ---------------------------------------
    STEPHEN ROSAS         : IN THE CIRCUIT
14                        : COURT OF THE
         V.               : COUNTY OF ST. LOUIS
15                        : STATE OF
    ASTRAZENECA           : MISSOURI
16  PHARMACEUTICALS,      : 05CC-004755
    L.P., ET.AL.          : DIVISION 6
17  ---------------------------------------
    PAMELA MOORE,         : IN THE CIRCUIT
18                        : COURT OF THE
         V.               : COUNTY OF ST. LOUIS
19                        : STATE OF
    JANSSEN PHARMACEUTICA: MISSOURI
20  L.P, ET. AL.          : 05CC-006375
                          : DIVISION 6
21  ---------------------------------------
22
23
24
```

Page 278

```
 1  KATHRYN SCHULTZ,     : SUPERIOR COURT OF
    ET. AL.              : THE STATE OF
 2                       : CALIFORNIA IN AND
         V.              : FOR THE COUNTY OF
 3                       : SAN FRANCISCO
    ASTRAZENECA          : CGC-06-453676
 4  PHARMACEUTICALS,     :
    L.P., ET.AL.         :
 5  -----------------------------------------
 6
 7       30(b)(6) deposition of ASTRAZENECA
 8  PHARMACEUTICALS, L.P., by and through JON
 9  DOWLING, taken pursuant to notice, was
10  held at the Four Season Hotel,
11  Philadelphia, Pennsylvania, commencing at
12  9:00 a.m., on the above date, before
13  Linda Rossi Rios, RPR, CSR and Notary
14  Public.
15                   - - -
```

Page 279

```
 1  APPEARANCES:
 2
 3       AYLSTOCK, WITKIN & SASSER, PLC
         BY: KENNETH W. SMITH, ESQUIRE
 4       4400 Bayou Boulevard, Suite 58
         Pensacola, Florida 32503-2673
 5       850-916-7450
         ksmith@aws-law.com
 6       Representing Plaintiffs in New
         Jersey and Delaware
 7
 8       SHELLER LUDWIG & SHELLER, PC
         BY: THOMAS E. MELLON, III, ESQUIRE
 9       3rd Floor
         1528 Walnut Street
10       Philadelphia, Pennsylvania 19102
         215-790-7300
11       tmellon@sheller.com
         Representing Plaintiffs in New
12       Jersey
13
         DECHERT LLP
14       BY: BRENNAN J. TORREGROSSA, ESQUIRE
         and
15       BY: A. ELIZABETH BALAKHANI, ESQUIRE
         Cira Centre, 2929 Arch Street
16       Philadelphia, Pennsylvania 19104
         215-994-2358
17       215-994-2487
         brennan.torregrossa@dechert.com
18       elizabeth.balakhani@dechert.com
         Representing AstraZeneca
19
20
21
22
23
24
```

Page 280

```
 1  APPEARANCES:
 2
         PEPPER HAMILTON LLP
 3       BY: ALLYSON BACCINI, ESQUIRE
         3000 Two Logan Square
 4       18th and Arch Streets
         Philadelphia, Pennsylvania 19103
 5       215-981-4781
         baccinia@pepperlaw.com
 6       Representing Eli Lilly & Company
 7
 8  ALSO PRESENT:
         BAILEY PERRIN BAILEY
 9       RHONDA RADLIFF
         PROJECT MANAGEMENT
10
```

Page 281

```
           I N D E X

Testimony of: JON DOWLING

  By Mr. Smith              284


         E X H I B I T S

NO.      DESCRIPTION         PAGE

Dowling-3  Cross-Notices     409
```

Page 282

```
      DEPOSITION SUPPORT INDEX

Direction to Witness Not to Answer
Page Line   Page Line   Page Line
None


Request for Production of Documents
Page Line   Page Line   Page Line
None



Stipulations
Page Line   Page Line   Page Line
283   1



Question Marked
Page Line   Page Line   Page Line
None
```

Page 283

          (It is hereby stipulated and
     agreed by and between counsel that
     sealing, filing and certification
     are waived; and that all
     objections, except as to the form
     of questions, be reserved until
     the time of trial.)
                - - -
          JON DOWLING, after having
     been previously sworn, was
     examined and testified as follows:
                - - -
          MR. TORREGROSSA: I took a
     look at the protective
     stipulation, and I think it is
     within my right, and I've
     rethought my position here, to
     designate the entire transcript
     confidential.
          It also asks me to ask you,
     the court reporter, to please
     designate the legend as
     confidential on all copies of the
     original.

Page 284

          MR. SMITH: We object.
          MR. TORREGROSSA: I knew you
     would. That's something we'll
     have to sort out later.
                - - -
               EXAMINATION
                - - -
     BY MR. SMITH:
          Q.   Mr. Dowling, good morning.
          A.   Good morning.
          Q.   You are still under oath.
          A.   Yes, I am.
          Q.   Have you spoken with anybody
     since we last met concerning the subject
     matter of this deposition?
          MR. TORREGROSSA: That's a
     yes or no.
          THE WITNESS: No.
     BY MR. SMITH:
          Q.   Let's turn to ICON and talk
     about that to start off this morning.
     What is ICON?
          A.   ICON is the predecessor to
     the MACS system.

Page 285

1   Q.  Is that a system that you
2   managed?
3   A.  It is not a system that I
4   managed.
5   Q.  Is it a system that your
6   department managed?
7   A.  Yes, it is, in some way.
8   Q.  Your department provided
9   support to the users?
10  A.  Yes, the IS department did.
11  Q.  In some way, what do you
12  mean?
13  A.  I mean as my department is
14  organized today, no.  But a predecessor
15  organization did.
16  Q.  How was your department
17  organized in its previous life?
18  A.  Today we support all of
19  Commercial and previously there was
20  somewhat of a separation between the
21  sales or the marketing side application
22  center.
23  Q.  Separated from?
24  A.  Meaning the IS groups, we

Page 286

1   worked together, but we were still -- the
2   structure was different than it is today
3   in terms of who was responsible for the
4   applications.
5   Q.  Probably a better way to do
6   this might be to take a moment and make
7   sure we understand how your department is
8   organized today.  What applications and
9   databases is your department responsible
10  for today?
11  A.  The list that we talked
12  about yesterday.  My group is responsible
13  for Touchstone, Compass, NICE, MACS,
14  KNOWBOL.  ICON is on there, it's a
15  legacy, it would be our group's
16  responsibility for the information there
17  as the transition came to our group.
18  SnapPharma, ViewPoint, LectureBureau
19  Express, PREP and Northstar.
20      MR. TORREGROSSA:  For the
21      record, the list he's talking
22      about is the 30(b)(6) notice.
23  BY MR. SMITH:
24  Q.  Now, the other databases or

Page 287

1   systems that are listed in the notice are
2   not supported by your department at all?
3   A.  No, I did say NICE when I
4   said that list, correct?
5   Q.  If you didn't, we'll accept
6   it now.
7       MR. TORREGROSSA:  So
8       amended.
9       THE WITNESS:  Yes, those are
10      the ones supported by my
11      department.
12  BY MR. SMITH:
13  Q.  And Mr. Draper is not in
14  your department?
15  A.  No, he is not.
16  Q.  And his department is what?
17  A.  I believe his area is called
18  GDDIS.  I know you're going to ask.
19  Global Drug Development IS.
20  Q.  When was your department
21  reorganized to its current configuration?
22  A.  It was effective January 1,
23  2006.
24  Q.  And prior to January 1,

Page 288

1   2006, what department would have been
2   responsible for providing support for the
3   ICON system?
4   A.  BIS Marketing, Business
5   Information Services Marketing.
6   Q.  What other databases or
7   systems were included or supported by BIS
8   Marketing?
9   A.  The data warehouse.  The Web
10  sites.  KNOWBOL, MACS, ViewPoint.  Those
11  were the ones.
12  Q.  And what were the other --
13  prior to 2006, what were the other IS
14  departments?
15  A.  With us, we were called BIS
16  Sales.  That's where I was.
17  Q.  So there were just -- BIS
18  had two divisions, one was Marketing
19  Business Information and the other was
20  Sales?
21  A.  That's the ones that made up
22  what we are now called, CISS, Commercial
23  Information Services and Solutions.
24  Q.  So which databases or

Page 289

```
 1  systems were supported by your division,
 2  which was BIS Sales. Right?
 3      A.  BIS Sales would have been
 4  Compass, LB Express, PREP, Northstar.
 5  SnapPharma would have been housed in --
 6  the data we had would have been housed by
 7  BIS Sales.
 8      Q.  The data would have been
 9  housed by BIS Sales?
10      A.  Yes.
11      Q.  Is that different from
12  providing support for the system?
13      A.  Yes, it didn't exist.
14      Q.  Okay. Because it was a
15  legacy system?
16      A.  Like ICON, it's a legacy
17  system. It's my responsibility for the
18  legacy information now.
19      Q.  When you say "legacy
20  system," exactly what do you mean by
21  that?
22      A.  It means the system was
23  operated and no longer is in operation.
24      Q.  But you retained -- the
```

Page 290

```
 1  company's policy would be to retain the
 2  data that was in the system. Right?
 3          MR. TORREGROSSA:  Objection
 4      to form and scope. He's not here
 5      to talk about retaining the data
 6      from a litigation perspective. He
 7      can comment with respect to
 8      business purposes.
 9          MR. SMITH:  I didn't say
10      litigation. The notice says
11      retention.
12          MR. TORREGROSSA:  I
13      understand that.
14          MR. SMITH:  And that's what
15      I asked him about.
16          MR. TORREGROSSA:  And he can
17      answer on behalf of his group and
18      the business policies for
19      retention, but not litigation.
20          Do you understand the
21      instruction?
22          THE WITNESS:  Yes.
23          MR. TORREGROSSA:  Do you
24      want the question read back or do
```

Page 291

```
 1      you want to rephrase?
 2  BY MR. SMITH:
 3      Q.  I want to know what the
 4  retention policies of AstraZeneca were --
 5  what the retention policies of
 6  AstraZeneca are today with regard to
 7  these legacy systems?
 8          MR. TORREGROSSA:  And
 9      objection, scope, privilege, work
10      product. You can answer so long
11      as you answer with respect to the
12      retention policies of your group
13      and the company, not the
14      litigation perspective.
15          THE WITNESS:  The retention
16      policies for data, AstraZeneca, is
17      active life, useful life of the
18      information. If it's not active
19      life, it does not have to be
20      retained.
21  BY MR. SMITH:
22      Q.  How would you describe or
23  define "active life"?
24      A.  Based on the business' need
```

Page 292

```
 1  for that information.
 2      Q.  Who would make that
 3  determination as to whether it was needed
 4  for the business or not?
 5      A.  The business units that
 6  would own that system.
 7      Q.  Has any of the data from
 8  these systems that we mentioned this
 9  morning been lost or destroyed?
10          MR. TORREGROSSA:  Objection.
11      Compound.
12  BY MR. SMITH:
13      Q.  You can answer.
14      A.  We talked about SnapPharma
15  yesterday.
16      Q.  Some of the data in 1998?
17      A.  Yes.
18      Q.  I recall that. Other than
19  that?
20      A.  To my knowledge, I do not
21  believe any information would have been
22  lost and/or not available in archive.
23      Q.  So a slightly different
24  question. Does the data still exist
```

Page 293

1 today in some form?
2     MR. TORREGROSSA: Objection
3     to form.
4 BY MR. SMITH:
5     Q. In other words --
6     A. Yes.
7     Q. -- whether it's in its
8 original format or not, it still exists
9 today in some format. Right?
10     A. Yes.
11     Q. And that data is accessible?
12     MR. TORREGROSSA: Objection
13     to form.
14     THE WITNESS: Accessible,
15     yes. Complex to get to, yes.
16 BY MR. SMITH:
17     Q. But you can get to it.
18 Correct?
19     A. Right. There would be
20 challenges getting to some of the
21 information.
22     Q. Suppose AstraZeneca were --
23 let's say -- AstraZeneca has a breast
24 cancer product, doesn't it? Do you know?

Page 294

1 Let's say AstraZeneca has Crestor,
2 correct, as one of its products?
3     A. Yes.
4     Q. Do you do any work that
5 supports Crestor?
6     A. The systems support Crestor
7 in terms of the usage and the needs of
8 the business.
9     Q. If AstraZeneca decided to
10 sell Crestor to another drug company,
11 would they package up all of the
12 information, all of the data about
13 Crestor and give that to the purchaser of
14 the drug?
15     MR. TORREGROSSA: Objection
16     to form. We have real scope
17     problems here, but I'll allow him
18     to answer. It's hypothetical.
19     THE WITNESS: I could not
20     speak of what the business would
21     require on a termination if we did
22     something like you said there.
23 BY MR. SMITH:
24     Q. Have you ever been involved

Page 295

1 in the purchase or sale of a drug product
2 from the technical side?
3     MR. TORREGROSSA: Objection.
4     Compound.
5     THE WITNESS: I have not
6     been involved in the purchase or
7     sale -- explain the question, I'm
8     sorry.
9 BY MR. SMITH:
10     Q. If AstraZeneca either
11 purchased a line, a drug product, took
12 over the -- added it to their line and
13 they're going to start selling a new drug
14 product they bought from a drug company,
15 or if on the other hand AstraZeneca
16 decided to sell a product to another
17 company and they were going to take over
18 selling it.
19     A. I have not been involved in
20 the sale of a product nor the purchase or
21 any information it would require.
22     Q. If AstraZeneca decided to
23 sell Crestor, would you or some person or
24 people in the IS department be able to

Page 296

1 collect all of the data regarding that
2 product so that it could be given to the
3 purchaser?
4     A. If we were requested to
5 collect that kind of information, we
6 could be requested to do that, and it
7 would -- I'm sitting here thinking that
8 would be rather cumbersome in itself as
9 there's a lot of information and the
10 databases are very large in size. It
11 would be a goodly amount of effort to
12 pull that information out especially when
13 you talk about one product like Crestor.
14     Q. Or Seroquel, pick any
15 product.
16     MR. TORREGROSSA: Objection
17     to form.
18 BY MR. SMITH:
19     Q. Is there anything special
20 about Seroquel?
21     A. Well, the data is stored in
22 the databases. It's not necessarily
23 segmented by product in each table. It's
24 the information stored in it. So you

Confidential - Jon Dowling

Page 297

1  have a lot of complexities around making
2  sure you pull the right information.
3         Again, hypothetical example
4  of Crestor, if that were to be sold, we
5  would have to work diligently to ensure
6  that what we were providing was related
7  to Crestor, but also very much make sure
8  we weren't providing anything but
9  Crestor. Obviously we wouldn't want to
10 do that with the information.
11        Most of these systems are
12 very large and complex, so you would have
13 to have a definite -- a certain amount of
14 effort to go in there. I would say it
15 would be -- I would say several months
16 to -- longer than several months, to put
17 that kind of project together and pull
18 that information out of there, it would
19 be more closer to six. Just off the top
20 of my head.
21     Q.   So it's really a function of
22 time, then, to do something like that.
23 Right?
24        MR. TORREGROSSA: Objection

Page 298

1     to form. Mischaracterizes
2     testimony.
3        THE WITNESS: It's a
4     function of knowledge and time.
5     You would have to understand the
6     intricacies of all these
7     databases, and be able to study
8     and make sure that you understand
9     that. It would take time to
10    actually do the work which also
11    has to be fit in with the work you
12    are supposed to do to keep the
13    normal business running. And it
14    would be the time factor of -- it
15    would take resources to go and
16    actually make sure it's accurate.
17 BY MR. SMITH:
18    Q.   That three to six month time
19 effort, would that apply if we said
20 Seroquel instead of Crestor?
21        MR. TORREGROSSA: Objection
22    to form.
23        THE WITNESS: I would say
24    the same for any.

Page 299

1  BY MR. SMITH:
2     Q.   Back to the division of the
3  department prior to 2006, you were in
4  charge of the sales, BIS Sales, and who
5  was in charge of the other division, the
6  Marketing Business Information? Who
7  would have been in charge of that side of
8  BIS prior to 2006?
9     A.   The leader of that
10 organization would have been Matt Pammer.
11    Q.   What is his position today?
12    A.   He's the senior director of
13 Commercial Information Services and
14 Solutions, my group.
15    Q.   So he's one of your
16 supervisors?
17    A.   Yes. He would be -- it was
18 talked about yesterday. He is my
19 director's boss.
20    Q.   Back to ICON, would there be
21 a data map or an ERD for ICON?
22    A.   Yes.
23    Q.   How long -- if I asked you
24 to get that for me, how long would it

Page 300

1  take to get that for me?
2         MR. TORREGROSSA: Objection
3     to form.
4         THE WITNESS: For that piece
5     of information, it would have to
6     be -- when I say it's available,
7     you can generate it with tools.
8     It would have to be generated,
9     requested through this request
10    process. Prioritized for somebody
11    to do the work. Not having done
12    that, I would say in my current
13    environment, if I were to call
14    Jayne Tomforde, I would think she
15    would probably suggest two weeks.
16    That's just the mapping.
17 BY MR. SMITH:
18    Q.   The ERD, then, shows the
19 relationships between the tables.
20 Correct?
21    A.   Right. As you said, it's a
22 map.
23    Q.   It's a map of the fields and
24 the tables?

7 (Pages 297 to 300)

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 301

1   A.   Yes.
2   Q.   Digressing for a second to,
3  let's say, Touchstone, I believe you said
4  there were about 3,000 tables in
5  Touchstone, something like that. Is that
6  correct?
7   A.   Yes.
8   Q.   And Touchstone is used for
9  all of AstraZeneca's drug products, not
10 just Seroquel?
11  A.   Touchstone is used for the
12 products that are promoted by our sales
13 force, sold by our sales force.
14  Q.   And which products are
15 those?
16  A.   Let's see. Seroquel.
17 Crestor. Nexium. I may not get every
18 one.
19  Q.   It would be sufficient if
20 you say there are others.
21  A.   There are others. I'll
22 throw Arimidex out there.
23  Q.   So if you have 3,000 tables,
24 is it 3,000 tables for each drug product

Page 302

1  or is it only a portion of those tables
2  are for Crestor and a portion of those
3  tables are for Nexium and a portion of
4  those tables are for Seroquel?
5   A.   A portion is -- when you say
6  "portion," I'm cautious. There are
7  definitely tables that are used for
8  certain functionality that would hold
9  certain information.
10  Q.   So some tables would be used
11 for all the drug products you are
12 involved with?
13  A.   Correct.
14  Q.   And some tables would be
15 exclusive to a particular drug product?
16  A.   Actually I would say no.
17 This is a -- Touchstone is built on the
18 Siebel SFA. It is built to cover
19 multiple products within a configuration.
20 So there's not -- I would have to check
21 the data dictionary to verify. But I
22 would believe, without looking at that,
23 that there would not be a table dedicated
24 to a single product.

Page 303

1   Q.   When you say "data
2  dictionary," is that the same as the data
3  map or is that something different?
4   A.   The map is the picture. The
5  dictionary is the information about the
6  tables.
7   Q.   So for each system that you
8  have, you can provide me with a data map
9  and a data dictionary?
10      MR. TORREGROSSA: Objection
11  to form, to the extent you are
12  suggesting we will produce it to
13  you, but you can answer.
14      THE WITNESS: I'm looking.
15      MR. TORREGROSSA: While he
16  does that, can I have the question
17  back?
18           - - -
19      (The court reporter read the
20  pertinent part of the record.)
21           - - -
22      THE WITNESS: I believe for
23  most of the systems on here, we
24  could produce that information.

Page 304

1  BY MR. SMITH:
2   Q.   Would you also be able to
3  produce a diagram that showed information
4  flow to other systems, showed sources and
5  also information flow to other systems?
6       MR. TORREGROSSA: Objection
7  to form.
8       THE WITNESS: I don't know
9  if I could do that.
10 BY MR. SMITH:
11  Q.   Who is the database
12 administrator or who was the database
13 administrator for ICON?
14  A.   I believe it would have been
15 Tom McCarthy, who is the DBA for the MACS
16 system. However -- I believe that's it.
17 I'm not 100 percent sure.
18  Q.   Do you think he would be the
19 person with the most knowledge about ICON
20 today?
21  A.   If asked that question, yes.
22 He's one of our DBAs. There's a couple.
23  Q.   We talked about business
24 analyst yesterday within the IS division.

Confidential - Jon Dowling

Page 305

1  Did you have a different name or term for
2  that person, the person who heads
3  collection of system requirements from
4  the business owner?
5       A.  Yes.  I -- when you were
6  asking that question, I was translating
7  that -- business analyst to business
8  consultant.
9       Q.  Business consultant.  Okay.
10 I'll use your term then.  Who would have
11 been the business consultant for ICON?
12      A.  I'm trying -- it's a --
13 prior to our reorganization, the roles
14 were not as clear.  So that role may have
15 been fulfilled by Holly Branham.
16      Q.  And who would have been the
17 business owner of ICON?
18      A.  At that time, I could not
19 recall.  I know today -- the person we
20 spoke of yesterday was Grant Andes.  But
21 I don't know, I could not recall who the
22 owner would have been prior to Grant.
23      Q.  What would have been the
24 data sources for ICON?

Page 306

1       A.  Similar to MACS, it held the
2  same type of information.  It would have
3  had the entry by the call center and any
4  configuration to allow that entry.
5       Q.  Right.  Would there also
6  have been sources for knowledge that
7  would be accessible to the IC people?
8           MR. TORREGROSSA:  Objection
9       to form.
10          THE WITNESS:  Can you
11      explain that?
12 BY MR. SMITH:
13      Q.  Medical knowledge, let's
14 say, labeling, those sorts of things?
15          MR. TORREGROSSA:  Objection
16      to form.
17          THE WITNESS:  Are you saying
18      training documentation?
19 BY MR. SMITH:
20      Q.  That could be, too.  If it
21 somehow would show up in the ICON system,
22 do you know if there was any marketing
23 training information in the ICON system?
24      A.  From that perspective,

Page 307

1  within the system itself, my
2  understanding would be no.
3       Q.  Would there have been any
4  scripts in the ICON system?
5           MR. TORREGROSSA:  Objection
6       to form.
7           THE WITNESS:  Can you
8       describe "scripts," please?
9  BY MR. SMITH:
10      Q.  Something for the -- a
11 protocol or procedure for the call
12 operator to follow in handling the calls,
13 in speaking with people.
14      A.  What I understand about ICON
15 is it allows you to do the data entry
16 based on the call you receive.
17 Specifically if it was a script, I'm not
18 familiar with that, if it was within the
19 system itself or if it was a training
20 document.
21      Q.  Can you give me examples of
22 the types of fields that were contained
23 in the ICON system?
24      A.  Date.  Caller, if

Page 308

1  identified.  Notes about that interaction
2  with the customer.  And the product area
3  discussed.
4       Q.  Were the notes section, is
5  that a free form field?
6       A.  My understanding is yes.
7           MR. TORREGROSSA:  I'm sorry,
8       I didn't catch that.  Was that a
9       yes?
10          THE WITNESS:  Yes.
11 BY MR. SMITH:
12      Q.  Was there a maximum size for
13 the field?
14      A.  I would have to -- I would
15 not know that answer right off the top.
16 You would have to consult the data
17 dictionary.
18      Q.  In the MACS system, is there
19 a similar field for notes from the
20 caller?
21      A.  Yes, there is.
22      Q.  Is it also a free form
23 field?
24      A.  Yes, it is.

Page 309

1   Q.   Do you know the ICON system
2  had some provision for handling an
3  adverse event report?
4   A.   Similar to MACS, the adverse
5  event would have been taken by the call
6  center and provided to the drug safety
7  organization to manage.
8   Q.   Would that have been -- how
9  would that have been transmitted to drug
10 safety?
11  A.   When ICON was in operation,
12 they may have used a form, would be my
13 best understanding at this time.
14  Q.   They would send a piece of
15 paper over to drug safety?
16  A.   I believe there would have
17 been a form that may have been used with
18 Outlook. I'm not quite sure if they
19 would be able to send that through from
20 system to system.
21  Q.   Do you think they had the
22 capability of using e-mail to send that
23 communication to safety?
24  A.   I believe it would have been

Page 310

1  a form. They certainly could have sent
2  one to drug safety, but I believe the
3  policy would be to use the form.
4   Q.   Do you know if there was any
5  form of management within ICON to track
6  these adverse event reports?
7   A.   There may be. My
8  understanding is the AE system, the drug
9  safety is the system where that is all
10 tracked and followed through with.
11  Q.   Would people at safety have
12 the ability to access the ICON system
13 themselves?
14  A.   I do not believe the safety
15 organization accessed the ICON system.
16  Q.   When the adverse event
17 reports were filled out, were they filled
18 out within the ICON system so that there
19 was a record of it within the system?
20     MR. TORREGROSSA:  Objection.
21     Scope. And I think we're blurring
22     the lines of where Mr. Draper
23     comes in and where Mr. Dowling's
24     testimony stops, but you can

Page 311

1  answer if you have knowledge.
2     THE WITNESS:  As you asked
3  before, I believe they would
4  have -- it may have. I'm not
5  absolutely sure. I know it was
6  used to collect the information,
7  and we could pull that explicitly
8  in AE. Again, they had to provide
9  that to drug safety and that would
10 be the record of it.
11 BY MR. SMITH:
12  Q.   Do you recall whether there
13 was an online form that was filled in for
14 the adverse event?
15     MR. TORREGROSSA:  Same
16     objection.
17     THE WITNESS:  Within ICON, I
18  would suspect similar to how
19  salesmen have filled out a form
20  that would have been based on
21  Outlook.
22 BY MR. SMITH:
23  Q.   How would that work?
24     MR. TORREGROSSA:  Objection

Page 312

1  to form.
2     THE WITNESS:  They would
3  pull the form up, fill it out and
4  it would automatically be sent to
5  the drug safety organization.
6  BY MR. SMITH:
7   Q.   You think that -- that is
8  different from what I understood your
9  earlier testimony to be, so --
10  A.   I'm --
11     MR. TORREGROSSA:  Let him
12     ask the question first.
13 BY MR. SMITH:
14  Q.   Are you saying now that
15 within ICON there was a way to fill out a
16 form on line and use Outlook to send it
17 to safety, drug safety?
18     MR. TORREGROSSA:  Objection
19     to form.
20     THE WITNESS:  I'm sorry.
21  What I'm saying is if they used
22  the form, I believe it would have
23  been similar to how sales would
24  have done it, which they use a

Confidential - Jon Dowling

Page 313

```
 1    form in Outlook.
 2  BY MR. SMITH:
 3    Q.  Okay.  You're saying if they
 4  did it, it would have been like that?
 5    A.  Yes.
 6    Q.  But you're not sure whether
 7  they did it or not?
 8    A.  Right.
 9        MR. TORREGROSSA:  Some of
10    these answers, Mr. Smith, I think
11    we can provide you through the
12    deposition of Darryl Draper.
13  BY MR. SMITH:
14    Q.  Who is the vendor for ICON?
15    A.  I believe ICON was built
16  in-house.
17    Q.  Do you know if there was
18  documentation pertaining to ICON?
19        MR. TORREGROSSA:  Objection
20    to form.  Vague.  Go ahead.
21        THE WITNESS:  There is
22    documentation for ICON.
23  BY MR. SMITH:
24    Q.  Could you provide copies of
```

Page 314

```
 1  that documentation now?
 2        MR. TORREGROSSA:  Right now
 3    to you?
 4        MR. SMITH:  No.
 5  BY MR. SMITH:
 6    Q.  Now as in currently?
 7        MR. TORREGROSSA:  Objection.
 8  BY MR. SMITH:
 9    Q.  In 2007, let's put it that
10  way?
11        MR. TORREGROSSA:  Objection
12    to the extent you're suggesting we
13    will produce them.
14        MR. SMITH:  We wouldn't want
15    to suggest that you produce
16    anything.
17        THE WITNESS:  I believe the
18    documentation would exist and we
19    would be able to -- it would be
20    available.
21  BY MR. SMITH:
22    Q.  And what was the timespan
23  for ICON?
24    A.  I don't know the exact date
```

Page 315

```
 1  of inception, but it did exist prior to
 2  the merger.
 3    Q.  And it was changed over to
 4  MACS when?
 5    A.  It was changed over to MACS
 6  in April 2004.
 7    Q.  Was data in the ICON system
 8  migrated to MACS?
 9    A.  The call records were not.
10  The contact information was.
11    Q.  And what type of database
12  was ICON?
13    A.  Oracle.
14    Q.  And where was the server?
15    A.  It would have been
16  Southbury, Connecticut.  The AstraZeneca
17  data center.
18    Q.  Let's turn now to the
19  pricing database.  Is that a database
20  that IS provided support for?
21        MR. TORREGROSSA:  The
22    pricing database?
23  BY MR. SMITH:
24    Q.  Is there a pricing database?
```

Page 316

```
 1        MR. TORREGROSSA:  Objection
 2    to form.
 3        THE WITNESS:  There is a
 4    pricing tool.
 5  BY MR. SMITH:
 6    Q.  It's a tool.  Is there a
 7  collection of data associated with that
 8  tool?
 9        MR. TORREGROSSA:  Same
10    objection.
11        THE WITNESS:  Yes.  There
12    would be data, yes.
13  BY MR. SMITH:
14    Q.  Is there a name for this
15  tool?
16    A.  I believe the name would be
17  Pricing.
18    Q.  Does the name or term or
19  acronym AMOS, A-M-O-S, mean anything to
20  you?
21    A.  Yes, it's one of the
22  databases listed on the document here in
23  front of me.
24    Q.  Does it have anything to do
```

11 (Pages 313 to 316)