Confidential - Darryl Draper

Page 118

1  question about the business
2  process of communicating adverse
3  events to safety?
4  BY MR. SMITH:
5     Q.   It's about whether there's a
6  system in place to transmit information
7  concerning an adverse event from a CRF
8  form to somebody in safety?
9     A.   Yes.
10    Q.   Okay.  Can you describe how
11 that would be done?
12    A.   The system is COOL.
13    Q.   If the CRF form is put into
14 AMOS, if the information from the CRF
15 form is put into AMOS, I thought it was
16 not put into COOL; is that inaccurate?
17    I thought it was an
18 either/or situation?
19    A.   It is an either/or.
20    Q.   So safety's access to
21 adverse event information in the CRF
22 forms is only through COOL, or is it
23 through other systems such as AMOS or
24 CRF/DEN?

Page 119

1     MR. TORREGROSSA:  I object
2  on scope to the extent it calls
3  for business process, but he can
4  answer from a technological
5  standpoint.
6     THE WITNESS:  COOL -- that
7  was a very long question.
8     Can I ask the court reporter
9  to just read the question, please?
10    - - -
11    (The court reporter read the
12 pertinent part of the record.)
13    - - -
14    MR. TORREGROSSA:  And I
15 objected to the extent it calls
16 for business process, but you can
17 answer it on a technological
18 basis.
19    THE WITNESS:  Yeah.  Drug
20 safety don't seek -- they don't go
21 around and ask people to collect
22 information on adverse event
23 reports.  The company has a policy
24 whereby when it's a known

Page 120

1  adverse -- or a known event
2  occurs, that that be communicated
3  to drug safety.
4  BY MR. SMITH:
5     Q.   So is there a process by
6  which information regarding an adverse
7  event reported on a CRF form is
8  transferred to an adverse event report
9  form?
10    MR. TORREGROSSA:  Again, I
11 object to the extent it calls for
12 a business process, but you can
13 answer it on a technological
14 basis.
15    THE WITNESS:  COOL -- you're
16 referring to the paper case report
17 form; is that correct?
18 BY MR. SMITH:
19    Q.   I'm referring to the
20 information on the paper CRF or the
21 information gathered electronically
22 through COOL.  Either way it could come
23 into the system, as I understand it, two
24 ways, either by paper or electronically.

Page 121

1  So maybe we'd better break them up and
2  take them one at a time.  Let me do this.
3     Does drug safety have access
4  to the CRF/DEN system?  In other words,
5  are they authorized users of the CRF/DEN
6  system?
7     A.   They are -- generally
8  speaking, the users of CRF/DEN are not
9  folks in drug safety.  However, they may
10 inquire on the -- inquire or review an
11 image of a case report form, as that may
12 be the source for an adverse event.
13    Q.   Suppose somebody in drug
14 safety gets an adverse event report and
15 they want to look at the original data,
16 either on the image of the form or in
17 COOL.
18    Do they have access to those
19 systems to go and look at that online?
20    A.   Again, you're asking a
21 question more aligned with, you know,
22 business process.  And I --
23    MR. TORREGROSSA:  Objection,
24 scope.

31 (Pages 118 to 121)

Confidential - Darryl Draper

Page 122

1   THE WITNESS: Again, I'm
2   struggling to -- to really know
3   what the business process is. I
4   know about the architecture and
5   the technology for these
6   databases. And that's what I'm
7   most capable and skilled to talk
8   about.
9   BY MR. SMITH:
10   Q.   Isn't access to a system
11   part of the architecture and technology,
12   who has access to it, who can use it?
13   A.   No, not necessarily.
14   Q.   Wouldn't you know for most
15   of the systems that you are responsible
16   for who the authorized users are?
17   A.   Right, yes.
18   Q.   Would authorized users for
19   the CRF/DEN system include people in drug
20   safety?
21   A.   I don't believe so, no.
22   Q.   Would people in drug safety
23   be authorized users of the AMOS system?
24   A.   No.

Page 123

1   Q.   Would they be authorized
2   users of the COOL system?
3   A.   No.
4   Q.   Now, those we're kind of
5   talking about looking back from drug
6   safety to CRF. Okay?
7   Now let's talk in a -- take
8   a different aspect of that and talk about
9   whether there's something in the system
10   that you know about that allows the
11   information, from either a paper or an
12   electronically gathered clinical report
13   form, or CRF, to be transferred by
14   somebody in CRF -- and you can correct me
15   on the -- you can tell me what the name
16   of that team is, it's probably not CRF,
17   but, you know, the people who are
18   collecting that information, when they
19   see an adverse event, is there an
20   electronic method or system in which they
21   take that information and transfer it to
22   an adverse event report form?
23   And it's a horribly long
24   question, but let me explain it and then

Page 124

1   we'll break it up probably.
2   But let me ask another
3   question. Let's just stop here and ask
4   you another question.
5   Would it be possible
6   electronically to take the information
7   from the data or information from the CRF
8   form and transfer it to an adverse event
9   report form?
10   MR. TORREGROSSA: Let me
11   interpose a scope objection there.
12   I think we're really starting to
13   get into business process and drug
14   safety questions. But I will
15   allow him to answer to the extent
16   of his knowledge about the systems
17   and whether that's a possibility.
18   MR. SMITH: The pending
19   question is whether it's
20   technically possible,
21   technologically possible to take
22   the information from one form and
23   transfer it to the other form.
24   MR. TORREGROSSA: Same

Page 125

1   objection.
2   You can answer.
3   THE WITNESS: It's
4   technologically possible, yes.
5   BY MR. SMITH:
6   Q.   Do they do that?
7   MR. TORREGROSSA: Same
8   objection, same instruction.
9   BY MR. SMITH:
10   Q.   To your knowledge?
11   A.   They being?
12   Q.   The people who collect the
13   CRF forms, and transfer it to --
14   A.   I guess -- well, the people
15   don't do it. The systems would do -- is
16   the technology. And the technology --
17   but you keep going back to people.
18   Q.   Okay.
19   A.   So I'm struggling to answer
20   your question.
21   Q.   Let's put it in that
22   framework, because we're talking about
23   technology here.
24   Does the system take the

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Darryl Draper

Page 126

1　information gathered from the CRFs and
2　transfer it to an adverse report form?
3　　　A.　Which system?
4　　　Q.　Any system that you're
5　familiar with.
6　　　A.　Yes.
7　　　Q.　Which system?
8　　　A.　COOL.
9　　　Q.　And that information then is
10　transmitted to somebody in drug safety.
11　Right?
12　　　A.　It's not transmitted to
13　someone in drug safety, no.
14　　　Q.　Where does the
15　information on the -- where does the
16　adverse report form go?
17　　　　MR. TORREGROSSA:  Objection
18　　　to form.
19　　　　THE WITNESS:  It's sent to
20　　　the drug safety system.
21　BY MR. SMITH:
22　　　Q.　Okay.  People is the problem
23　we're running into here.  Right?  We want
24　to talk about systems, is that what

Page 127

1　you're saying?
2　　　A.　Yes.
3　　　Q.　So you don't know who's
4　using the system over there, but to your
5　knowledge, to the best of your knowledge,
6　the information from the CRF form gets
7　transferred through COOL to the drug
8　safety system; is that accurate?
9　　　A.　Certain studies can be
10　configured to transmit adverse event
11　information from an electronic case
12　report form into the safety system.
13　　　Q.　And the name of the safety
14　system?
15　　　A.　CLINTRACE.
16　　　Q.　CLINTRACE.
17　　　　Are you personally aware of
18　studies where that is done at AstraZeneca
19　for Seroquel?
20　　　　MR. TORREGROSSA:  Hold on.
21　　　Objection there.  Mr. Smith, I
22　　　think we're really getting into
23　　　business process here.  How the
24　　　study is developed and what are

Page 128

1　the processes around the transfer
2　of information from CRFs to drug
3　safety, and I mean, and how that's
4　developed, that's all protocol
5　that's developed by the study
6　teams, as well the people perhaps
7　in drug safety.  So I think you're
8　really crossing the line into
9　business process on drug safety.
10　　　　MR. SMITH:  Let's just
11　　　restrict the objections to
12　　　objection to form here.
13　　　　MR. TORREGROSSA:  No.
14　　　Because I'm allowed to, because I
15　　　can't allow my witness -- this is
16　　　not a drug safety deposition.
17　　　This is an IT deposition.  And
18　　　we're getting into drug safety way
19　　　more than we should be.
20　BY MR. SMITH:
21　　　Q.　Mr. Draper, you're here
22　today to talk about the IS systems as
23　they relate to drug safety.  Correct?
24　　　A.　Yes.

Page 129

1　　　Q.　All right.  And you said
2　it's possible, and that it happens with
3　some studies, that the data gets
4　transferred from the CRFs to the drug
5　safety system through COOL; is that
6　correct?
7　　　A.　Yes.
8　　　Q.　Okay.  And then my question
9　to follow up on that was, you know,
10　because your answer suggests that that's
11　not done all the time, I'm asking you,
12　are you aware of cases where that
13　actually is done?
14　　　　MR. TORREGROSSA:  I object
15　　　to what you suggested his answer
16　　　was, but go ahead.
17　　　　THE WITNESS:  I mean, I wish
18　　　I could answer that question, but
19　　　those are decisions that are made
20　　　by the business.  And what I'm
21　　　trying to explain to you is that
22　　　the technology allows the business
23　　　to make those decisions, and the
24　　　system perform those functions.

33 (Pages 126 to 129)

Confidential - Darryl Draper

Page 130

1    If they choose to do it
2    electronically, the system will do
3    it. If they don't, then the
4    system won't.
5  BY MR. SMITH:
6    Q.   I think I understand what
7  you're saying.
8         The technology exists. It's
9  in place. Whether they use it or not is
10 not your decision. Right?
11   A.   Correct.
12        MR. SMITH: Why don't we
13   take a break for lunch.
14        - - -
15        (A luncheon recess
16   occurred.)
17        - - -
18        MR. TORREGROSSA: If you
19   want to start there, we have some
20   names of people that we did not
21   have before, if you like.
22 BY MR. SMITH:
23   Q.   Mr. Draper, you had some
24 names of people that we didn't have

Page 131

1  before?
2    A.   Yes. You had questions with
3  regard to certain systems, the system
4  owners, business analysts.
5         I, actually, have written
6  down -- the system owner for AMOS is
7  Brian Bryzniski.
8    Q.   What's his position?
9    A.   He's a system owner.
10   Q.   I'm sorry, I can't hear you?
11   A.   System owner. You asked --
12 the question was a system owner.
13   Q.   Is that a business owner?
14   A.   Yes.
15   Q.   So he's on the business
16 side?
17   A.   Correct.
18   Q.   And that's for AMOS.
19        And did you spell his last
20 name?
21   A.   B-R-Y-Z-N-I-S-K-I.
22   Q.   And who's the business
23 analyst then for CRF/DEN?
24        MR. TORREGROSSA: We were

Page 132

1    on --
2         THE WITNESS: For CRF/DEN?
3         MR. TORREGROSSA: AMOS we
4    were on. I'm sorry, did you
5    intentionally go there or were you
6    meaning to follow down the line?
7    We gave AMOS --
8         MR. SMITH: We were actually
9    going through CRF/DEN. It's just
10   that it was related to AMOS and
11   COOL.
12        MR. TORREGROSSA: I
13   apologize, sir. Go ahead.
14        THE WITNESS: I answered the
15   question with regard to --
16 BY MR. SMITH:
17   Q.   With regard to AMOS.
18        Mr. --
19   A.   Brian Bryzniski.
20   Q.   -- Bryzniski is with regard
21 to AMOS. Right?
22   A.   Right.
23   Q.   And who would be the
24 business owner for CRF/DEN?

Page 133

1    A.   I gave that earlier.
2  That's --
3    Q.   Who would be, with regard to
4  AMOS, let's go back to AMOS then.
5         Who would be the business
6  analyst?
7    A.   Nate Blevins.
8    Q.   And the database manager for
9  AMOS?
10   A.   I gave that earlier.
11   Q.   So those were the only two
12 names that you had there?
13   A.   Yeah. The two names I was
14 unable to recall.
15   Q.   So there's still some names
16 that you can't recall?
17        MR. TORREGROSSA: We have
18   some more information.
19        THE WITNESS: I have other
20   names. The other, I believe you
21   had asked who the system owner was
22   for COOL.
23 BY MR. SMITH:
24   Q.   Okay.

34 (Pages 130 to 133)

Page 134

1      A.   That's Mohammad Kazemi.
2      Q.   Can you spell these names,
3  please, for the court reporter?
4      A.   M-O-H-A-M-M-A-D, last name
5  Kazemi, K-A-Z-E-M-I.
6      Q.   Who else did you have?
7      A.   The business analyst, Maria
8  Bjorkqvist.
9      Q.   For COOL.  Correct?
10     A.   COOL.
11     Q.   Can you spell her name,
12  please?
13     A.   Maria, M-A-R-I-A,
14  B-J-O-R-K-Q-V-I-S-T.
15          You also asked about SPOLA.
16  The system owner for SPOLA is Susan
17  Gutsmuth.  And do you want the spelling
18  of the full name or the last name?
19     Q.   We can spell Susan.
20     A.   G-U-T-S-M-U-T-H.
21     Q.   Who else?
22     A.   The business analyst is
23  Maria Bjorkqvist.
24     Q.   Who else?

Page 135

1      A.   And you had asked about
2  DIPLOMAT.  The system owner at the time
3  DIPLOMAT was in use was David Cartwright,
4  C-A-R-T-W-R-I-G-H-T.
5      Q.   And just go ahead and give
6  us all the people that you have on your
7  list, if you would.
8      A.   I'm sorry, you want me to go
9  through the list -- the names again?
10     Q.   Yes.  These are people whose
11  names you couldn't remember in response
12  to questions that were asked this
13  morning.  Right?
14          MR. TORREGROSSA:  Right.
15      And he wants to know, I think, if
16      there's any more.  That's all.
17          THE WITNESS:  There are no
18      more.
19  BY MR. SMITH:
20     Q.   Okay.
21     A.   I'm sorry.  The application
22  service manager, my peer who I would go
23  to to get answers for specific things
24  relating to COOL, would be Anna Sjoo.

Page 136

1  That's A-N-N-A S-J-O-O.
2      Q.   The identities of these
3  people for the COOL system, would those
4  be contained in a writing or some sort of
5  documentation for the system someplace?
6      A.   Yes.
7      Q.   And where would they be
8  located?
9      A.   It would be -- those names
10  would be located on materials such as
11  change requests.
12          So if we were to attempt
13  to -- if business asked to change the
14  system, those people in those roles would
15  sign off.  So they would be listed on
16  that document.
17     Q.   Is the only way you could
18  identify those people would be by going
19  through change requests?
20     A.   No.
21     Q.   Is there a list somewhere of
22  the people who hold these positions with
23  regard to the COOL database?
24     A.   Certain individuals would

Page 137

1  probably be listed in a service level
2  agreement.
3      Q.   Now, would that be true for
4  the other databases with regard to which
5  you're speaking today?
6          MR. TORREGROSSA:  Can we
7      have Exhibit 1, please, so he can
8      see the list of databases?  Thank
9      you.
10          THE WITNESS:  Yes, but there
11      are exceptions.  Just DIPLOMAT,
12      which I mentioned earlier.
13  BY MR. SMITH:
14     Q.   What is GERM?
15     A.   Can you spell it, please?
16     Q.   I'm giving it to you
17  phonetically.  It was one that your
18  counsel said that you would be speaking
19  on today.
20          MR. TORREGROSSA:  I'm sorry.
21      DIRM.
22      MR. SMITH:  DIRM?
23      MR. TORREGROSSA:  Yes.
24      MR. SMITH:  Oh, we

Confidential - Darryl Draper

Page 138

1  misunderstood.
2       MR. TORREGROSSA:  I
3  apologize.
4       MR. SMITH:  Thanks.
5  D-I-R-M.  Thank you.
6  BY MR. SMITH:
7       Q.   What is DIRM?
8       A.   What is DIRM?  DIRM is a
9  document imaging database.
10       Q.   Is D-I-R-M how you spell the
11  name of this database?
12       A.   Yes, D-I-R-M.
13       Q.   And what does that stand
14  for?
15       A.   Document imaging repository
16  management system.
17       Q.   Is there a system map for
18  DIRM?
19       A.   A system map with -- such as
20  I drew for AMOS?
21       Q.   Yes.
22       A.   I'm uncertain whether or not
23  there is a system map for DIRM.  I
24  would -- that would -- I would probably

Page 139

1  go to Rita White.  I'm sorry, not Rita,
2  but Paula George, and seek her assistance
3  in identifying whether or not there's a
4  system map.
5       Q.   Is there a data map for
6  DIRM?
7       A.   Yes.
8       Q.   Could you print that out?
9       A.   Yeah, I believe it could be
10  printed.  I'd have to -- again, it
11  probably would take some work to obtain
12  where that data map is and...
13       Q.   Who's the database manager?
14       A.   Sam Fitzpatrick.
15       Q.   The business analyst?
16       A.   Paula George.
17       Q.   The business owner?
18       A.   Susan Lamhorn.
19       Q.   Do you have -- excuse me.
20       Can you tell me what the
21  data sources are for DIRM?
22       A.   They're paper documents.
23       Q.   How do they get into DIRM?
24       A.   They would be scanned on a

Page 140

1  scanner.
2       Q.   What kind of documents?
3       A.   Contracts.  I believe study
4  master files, images of study master
5  files.
6       Q.   What kinds of contracts?
7       A.   Contracts with clinical
8  research organizations, contracts with
9  investigators.
10       Q.   Where are the study master
11  files maintained?
12       A.   I believe the study master
13  files are maintained in GEL.
14       Q.   Would study protocols be
15  maintained in DIRM?
16       A.   I'm sorry, could you --
17       Q.   Would study protocols be
18  maintained in DIRM?
19       A.   Study protocols maintained
20  in DIRM.
21       I don't think the study
22  protocols are maintained in DIRM.
23       Q.   Do you know where the study
24  protocols are maintained?

Page 141

1       MR. TORREGROSSA:  Objection,
2  scope.
3       You can answer if you have
4  any individual knowledge.
5       THE WITNESS:  I believe that
6  they are maintained in -- I'm not
7  certain.
8  BY MR. SMITH:
9       Q.   What systems interface with
10  DIRM?
11       A.   I don't believe DIRM has
12  system interfaces with other systems.
13       Q.   Are there any data feeds --
14  are there no data feeds into or out of
15  DIRM?
16       A.   Can you describe what you
17  mean by data feed?
18       Q.   Well, can you put data into
19  the system via a link with another
20  system?
21       A.   No.
22       Q.   Can you output data from
23  DIRM to any other system?
24       MR. TORREGROSSA:  Objection

36 (Pages 138 to 141)

Page 142

1    to form.
2         THE WITNESS:  I believe I
3    just answered that question.
4  BY MR. SMITH:
5         Q.   I think that was in relation
6  to an automatic feed.
7         A.   Can I ask how the second
8  question differs from the first?
9         Q.   Is there any way to send
10  data from DIRM to another system?
11        A.   Could you --
12             MR. TORREGROSSA:  Wait.  We
13  may have another question.
14             MR. SMITH:  No, I'd like to
15  him to answer this question.
16             MR. TORREGROSSA:  Go ahead.
17             THE WITNESS:  Can I answer
18  the question again, please?
19                 - - -
20             (The court reporter read the
21  pertinent part of the record.)
22                 - - -
23  BY MR. SMITH:
24        Q.   Actually, is there any way

Page 143

1  to send data from DIRM to another system?
2             MR. TORREGROSSA:  Objection,
3  form.
4             THE WITNESS:  I get the
5  sense of what you're asking me is
6  a business-related question.  I
7  mean, I thought I answered the
8  question earlier by simply stating
9  that there is no interface,
10  there's no -- again, I thought I
11  answered that question earlier.
12  I'm struggling to understand the
13  difference between the questions.
14  BY MR. SMITH:
15        Q.   Is it a standalone
16  repository?
17        A.   Yes.
18        Q.   There's no access or
19  connection with any other system?
20             MR. TORREGROSSA:  Objection
21  to the form, compound.
22             THE WITNESS:  No.
23  BY MR. SMITH:
24        Q.   Can you export data from

Page 144

1  DIRM?
2        A.   Yes.
3        Q.   How would you do that?
4        A.   You would identify the
5  object image that you desire to export,
6  and you would choose the export function.
7        Q.   Is the metadata stored in
8  relation to the .tifs in the system?
9        A.   Yes.
10        Q.   Is the metadata searchable?
11        A.   Yes.
12        Q.   Is that data used by anyone
13  in AstraZeneca outside of the DIRM
14  system?
15        A.   Could I hear the question
16  again, please?
17                 - - -
18             (The court reporter read the
19  pertinent part of the record.)
20                 - - -
21             THE WITNESS:  I think you're
22  asking me a question with regard
23  to business-related processes.
24             If I heard you correctly,

Page 145

1    you're asking me does the business
2    use metadata somewhere else.  I
3    can't answer that question.
4  BY MR. SMITH:
5        Q.   Can you print a list of the
6  users who have access to DIRM?
7        A.   Can I print a list of the
8  users?  We don't generally print lists of
9  users.
10        Q.   Can you do so?
11        A.   I suppose I could create a
12  list.
13        Q.   What are the document types
14  in DIRM?
15        A.   Contracts, I'm sorry,
16  what --
17        Q.   Okay.  You answered that one
18  earlier.
19             How would people be
20  permissioned to input data into the free
21  form text fields?
22        A.   I'm not certain there are
23  free form text fields to enter data into.
24        Q.   Can people make changes to

37 (Pages 142 to 145)

Confidential - Darryl Draper

Page 146

1  the data in any field in DIRM?
2      A.   Yes.
3      Q.   Which team or teams are able
4  to do that, have permission to do that?
5      A.   Fowkes in -- is what you're
6  asking me, who has access to the system?
7      Q.   Yes, another way of putting
8  it.
9      A.   The Fowkes that have access
10  are in the study delivery.
11      Q.   And those people who have
12  access, can they make changes to the
13  data?
14      A.   There are certain
15  individuals who can change the indexing
16  attributes for those images.
17      Q.   How are the images indexed?
18      A.   Author, title, investigator.
19      Q.   Who's the vendor for DIRM?
20      A.   AstraZeneca.
21      Q.   And when was it put into
22  use?
23      A.   In 1997.
24      Q.   Is it still in use?

Page 147

1      A.   Yes.
2      Q.   What system was used for
3  this purpose prior to 1997?
4      A.   I believe it was a system
5  called SAS.
6      Q.   One of the fields -- strike
7  that.
8          Is there a field in DIRM for
9  country?
10      A.   I don't believe there's a
11  field in there for country, no.
12      Q.   How about in CRF/DEN, is
13  there a field in CRF/DEN for country?
14          MR. CAMP BAILEY:  What was
15      that last question?
16              - - -
17          (The court reporter read the
18      pertinent part of the record.)
19              - - -
20          THE WITNESS:  I cannot
21      visualize a country field in
22      CRF/DEN.
23  BY MR. SMITH:
24      Q.   To be honest with you, when

Page 148

1  we met before back in January, I believe
2  you said that there was a field for
3  country in CRF/DEN.
4          Does that refresh your
5  recollection?
6          MR. TORREGROSSA:  Objection
7      to form.
8          THE WITNESS:  I don't recall
9      what I stated back in January.
10      I'm trying to explain to you what
11      I understand and recall about
12      CRF/DEN and DIRM.
13  BY MR. SMITH:
14      Q.   Can you print out a list of
15  the fields in CRF/DEN?
16      A.   Print out a list of fields
17  in CRF/DEN.
18          It's technically possible, I
19  believe, to possibly do a screen shot.
20          Would that --
21      Q.   Could you export the
22  metadata to an Excel spreadsheet?
23          MR. TORREGROSSA:  Do you
24      need the question again?

Page 149

1          THE WITNESS:  Yes.  Could I
2      have the question again, please?
3              - - -
4          (The court reporter read the
5      pertinent part of the record.)
6              - - -
7          THE WITNESS:  We currently
8      don't have a method for exporting
9      to Excel spreadsheets.
10  BY MR. SMITH:
11      Q.   Can you export the data in
12  any format?
13      A.   The metadata?
14      Q.   Yes.
15      A.   I believe it could be
16  exported into some form, although it -- I
17  cannot think -- well, the answer still
18  stands I guess yes, that it could be
19  exported in some form.
20          I'm not going to say that
21  all the metadata, but certain elements
22  that are relevant to that image as it
23  would relate to a -- going into a
24  submission.

38 (Pages 146 to 149)

Confidential - Darryl Draper

Page 150

1  Q.   Is DIRM built on Oracle?
2  A.   Yes.
3  Q.   Does it use FileNet?
4  A.   Yes.
5  Q.   Does it contain data from
6  any non-US sources?
7       MR. TORREGROSSA:  Can I get
8  that question again?
9       - - -
10      (The court reporter read the
11  pertinent part of the record.)
12      - - -
13      MR. TORREGROSSA:  You can
14  answer that limited question.
15      THE WITNESS:  I'm sorry?
16      MR. TORREGROSSA:  You can
17  answer that limited question.  You
18  can answer whether it has data
19  from non-US sources.
20      THE WITNESS:  No.
21  BY MR. SMITH:
22  Q.   Can you provide a list of
23  document types that are in DIRM?
24      MR. TORREGROSSA:  Objection,

Page 151

1  form.
2       You can answer.
3       THE WITNESS:  Yes.
4  BY MR. SMITH:
5  Q.   Was data prior to the
6  initiation of DIRM migrated into DIRM?
7  A.   Can I hear the question
8  again, please?
9       - - -
10      (The court reporter read the
11  pertinent part of the record.)
12      - - -
13      THE WITNESS:  No.
14  BY MR. SMITH:
15  Q.   Was data prior to DIRM
16  stored someplace?
17  A.   I'm sorry, can I -- I'm
18  struggling to understand -- I'm
19  struggling to understand whether or not
20  you're asking me technical questions or
21  business process questions.
22      Can I have the question
23  asked again?
24  Q.   Do you have a system for

Page 152

1  storing the type of images that are in
2  DIRM for those that were acquired prior
3  to the start of DIRM?
4  A.   If you're referring to the
5  paper, which was the form that they would
6  have been in, there is a storage facility
7  for paper documents.
8  Q.   Do you have an electronic
9  storage system?
10 A.   I'm not sure I understand
11  the question.
12 Q.   For the types of files that
13  are imaged in DIRM that were acquired
14  prior to DIRM, where and how are they
15  stored?
16 A.   There was no -- paper
17  documents were sent to archive.  And they
18  are indexed so that they can be retrieved
19  at a later time.
20 Q.   Okay.  So if I understand
21  you correctly, prior to DIRM, the
22  documents were in paper form only?
23 A.   Yes.
24 Q.   And they're archived in

Page 153

1  paper form, and no place are they
2  archived in electronic format?
3  A.   Can I just back up a little
4  bit?
5       What -- DIRM is an imaging
6  system.  There's always a paper document
7  for the image.  I'm not aware of any
8  electronic images being stored in DIRM.
9  Q.   DIRM contains electronic
10  images of documents.  Right?
11 A.   Yes.
12 Q.   And for documents prior to
13  DIRM, they weren't migrated into DIRM.
14  Right?
15 A.   I think I answered this
16  question before.  You asked if there was
17  a system.
18      Can I go back to the
19  question that was asked before about the
20  legacy system or prior system?
21 Q.   Let's do it this way.
22      DIRM was started in 1997.
23  Right?
24 A.   Correct.

39 (Pages 150 to 153)

Page 154

1    Q.   Prior to 1997, those
2  documents only existed in paper form, not
3  in electronic format.  Right?
4    A.   Yes.
5    Q.   And they are stored today
6  not in electronic format but as paper
7  documents only.  Correct?
8    A.   Yes.
9    Q.   But there is an electronic
10  system, an index, for those documents.
11  Correct?
12    A.   Yes.
13    Q.   Where is that electronic
14  index and in what form and who has it or
15  what system has it?
16       MR. TORREGROSSA:  Objection
17    to the four questions.
18       THE WITNESS:  That's four
19    questions.
20  BY MR. SMITH:
21    Q.   We'll do one at a time.
22    A.   Okay.
23    Q.   Where is the electronic form
24  of the index maintained?

Page 155

1    A.   It's in a system called
2  TRIM.
3    Q.   What is TRIM?  That has
4  never been identified before.  What is
5  TRIM?
6    A.   It's an index of paper
7  documents in an archive.
8    Q.   Who maintains that TRIM
9  system?
10    A.   I believe it's records
11  management.
12    Q.   Who's the business owner?
13       MR. TORREGROSSA:  Objection
14    to form.
15       THE WITNESS:  I don't know.
16  BY MR. SMITH:
17    Q.   Who's the --
18       MR. TORREGROSSA:  I'm sorry,
19    go ahead.
20  BY MR. SMITH:
21    Q.   Who is the database
22  administrator?
23       MR. TORREGROSSA:  Objection
24    to form.  It doesn't make sense.

Page 156

1       But go ahead.
2       THE WITNESS:  I don't know.
3  BY MR. SMITH:
4    Q.   Is TRIM a database?
5    A.   I'm sorry?
6    Q.   Let's break this down.
7       Is TRIM a database?  We'll
8  be here all day if it takes it.
9       Is TRIM a database?
10    A.   Yes.
11    Q.   All right.  There's some
12  sort of operating software that is used
13  to maintain this database?
14    A.   Yes.
15    Q.   What type of software is it?
16    A.   This system is beyond my
17  technical expertise.  I don't have all
18  the technical knowledge with regard to
19  TRIM.
20       MR. TORREGROSSA:  This is a
21    record management system.  It's
22    not particular to any one issue.
23    It's sort of outside the scope of
24    this deposition, because it's a

Page 157

1    record management issue.  I'm just
2    letting you know that, but go
3    ahead.
4  BY MR. SMITH:
5    Q.   Your job, one of your
6  functions is to manage records
7  electronically, is it not?
8    A.   No.
9    Q.   No, that's not your job at
10  all?
11    A.   No.
12    Q.   You don't do any document
13  management electronically?
14    A.   No.
15    Q.   You mean -- well, CRF/DEN,
16  isn't that an electronic document
17  management system?
18    A.   It's an imaging system.
19    Q.   Isn't it a management
20  system?
21    A.   It's -- they're images in
22  the system.
23    Q.   What is the purpose of a
24  document imaging system?

40 (Pages 154 to 157)

Confidential - Darryl Draper

Page 158

1      A.    To image physical documents.
2      Q.    Why would anybody want to
3  image physical documents?
4      A.    I think you're asking me a
5  question that is a -- related to a
6  business process.
7      Q.    Business owners come to your
8  department, and they work with you on
9  requirements for their business in the IS
10  realm.  Correct?
11     A.    That's correct.
12     Q.    Your job is to provide IS
13  support to the certain business
14  departments at AstraZeneca.  Correct?
15     A.    Yes.
16     Q.    Business departments
17  relating to drug safety.  Correct?
18     A.    Yes.
19     Q.    Business departments
20  relating to clinical studies.  Correct?
21     A.    Yes.
22     Q.    What other departments?  Any
23  other departments?
24     A.    The ones that I mentioned

Page 159

1  earlier.
2      Q.    If you have a document
3  imaging system, would you ever, as an IS
4  person, have a document imaging system
5  that didn't have some sort of index?
6      A.    No.
7      Q.    Have you ever heard of such
8  a system?
9      A.    No.
10     Q.    I think we're playing word
11  games here, to be honest with you.
12         MR. TORREGROSSA:  Mr. Smith,
13     that's just inappropriate.  All
14     I'm saying to you is you guys
15     issued a notice that was about
16     record management, okay, of
17     physical paper documents.  That's
18     not here what we're talking about
19     today.
20         So my only point to you is
21     that he's prepared to talk about
22     the databases that manage some of
23     these systems, and some of them,
24     you're correct, are document

Page 160

1  imaging systems.  TRIM is
2  completely different.  That's my
3  only point.
4         And it is outside the scope
5  of this.  If you want to issue a
6  record management 30(b)6 under our
7  agreement, you're welcome to do
8  that and we're welcome to object
9  to it.  My only point to you is,
10  sir, is you can ask this question
11  as much as you want about TRIM and
12  what he knows about it, but it's
13  not the purpose of this 30(b)6.
14  It's outside the scope.  That's
15  all I'm telling you.
16         I'm sorry, I apologize.  If
17  you would like to follow up on
18  TRIM, I will follow up for you and
19  we will consider your request.
20         That's my only point, Mr. Smith.
21  BY MR. SMITH:
22     Q.    If you have documents in
23  an -- if you have images of documents in
24  a system, you're going to have tools to

Page 161

1  manage those documents.  Correct?
2      A.    I'm not sure if you're
3  asking me from a technical perspective.
4      Q.    Sir, what does document
5  management mean to you as an IS person?
6      A.    Management of documents.
7      Q.    What do you mean,
8  management?
9      A.    That could mean --
10     Q.    Not could mean.  I'd like
11  you to tell me what it does mean to you.
12     A.    Managing documents to me
13  means the ability to author a document
14  and then manage it through its life
15  cycle, i.e., I create it, I send it out
16  for review, I approve it, I retire it.
17  That's what a document management system
18  is.
19     Q.    You don't think you were
20  managing documents that were created by
21  somebody else?
22         MR. TORREGROSSA:  Objection
23     to form.
24         THE WITNESS:  I don't

41 (Pages 158 to 161)

Page 162

1  understand the question.
2  BY MR. SMITH:
3      Q.   In your view, document
4  management means you're only dealing with
5  documents that are authored by the people
6  you're working for.  Correct?
7          MR. TORREGROSSA:  Objection
8      to form.
9          THE WITNESS:  Can I hear the
10     question again, please?
11              - - -
12         (The court reporter read the
13     pertinent part of the record.)
14              - - -
15         THE WITNESS:  Not
16     necessarily.  They could be
17     documents that are created by
18     someone else.
19  BY MR. SMITH:
20     Q.   Okay.  Well, I was confused
21  by your definition of document management
22  when you said that it only dealt with
23  documents that were authored by you and
24  tracked through their life cycle.

Page 163

1      A.   I thought you asked my
2  personal description.
3      Q.   Well, is your personal
4  description different from people in the
5  industry, the definition the people in
6  the IS industry would use for document
7  management?
8      A.   I don't know that answer.
9      Q.   Can we agree that
10 information management means storing a
11 document and having it organized in some
12 fashion so that it's accessible
13 electronically?
14     A.   Information management?
15     Q.   Yes.  Electronic information
16 management.
17     A.   No.
18     Q.   What is your definition of
19 electronic information management?
20     A.   It's the management of data,
21 electronic data.
22     Q.   Can data be an image?
23     A.   Data can be an image.
24     Q.   And when you manage it, you

Page 164

1  organize it in some fashion.  Correct?
2      A.   When you -- I'm sorry, the
3  question was, when you manage it --
4      Q.   When you manage data, you
5  organize it in some fashion.  Correct?
6      A.   You can organize it, yes.
7      Q.   If it's not organized, what
8  use is it to you?
9      A.   It becomes simply a
10 repository, an archive.
11     Q.   Is TRIM an archive?
12         MR. TORREGROSSA:  Again,
13     objection, scope.
14         You can answer on your
15     individual knowledge.
16         THE WITNESS:  It's a system
17     for managing physical paper
18     documents.
19  BY MR. SMITH:
20     Q.   Is it searchable?
21         MR. TORREGROSSA:  Same
22     objection.
23         THE WITNESS:  Yes.
24  BY MR. SMITH:

Page 165

1      Q.   Can you print out the data
2  in the system?
3          MR. TORREGROSSA:  Same
4      objection.
5          THE WITNESS:  I believe you
6      can.
7  BY MR. SMITH:
8      Q.   Can you provide a data map
9  or schema for the system?
10         MR. TORREGROSSA:  Same
11     objection, scope.  Same objection,
12     scope.
13         You can answer based on your
14     personal knowledge.
15         THE WITNESS:  I don't know.
16  BY MR. SMITH:
17     Q.   You don't know?
18     A.   I don't know.
19     Q.   Who would know?
20         MR. TORREGROSSA:  Same
21     objection.
22         You can answer.
23         THE WITNESS:  Someone in
24     records management.

42 (Pages 162 to 165)

Page 166

BY MR. SMITH:
1
2      Q.    Do you know who the users of
3  TRIM are?
4          MR. TORREGROSSA:  Same
5  objection.
6          You can answer.
7          THE WITNESS:  I don't know
8  all the users.
9  BY MR. SMITH:
10     Q.    Do you know any users?
11     A.    Yes.
12     Q.    Who?
13     A.    Study -- I'm sorry, clinical
14  data management.
15     Q.    Do you know how they access
16  it?
17         MR. TORREGROSSA:  Same
18  objection.
19         You can answer.
20         THE WITNESS:  They put a
21  request in for an account.
22  BY MR. SMITH:
23     Q.    Do you know what the fields
24  are in the indexing system?

Page 168

1  maintenance for the TRIM system?
2     A.    I don't know.
3     Q.    I may have asked you this
4  before, but is there a database manager
5  for TRIM?
6     A.    I don't know.
7     Q.    Do you know if there's a
8  business analyst for TRIM?
9     A.    No.
10     Q.    Do you know what other
11  systems TRIM interfaces with?
12     A.    No.
13     Q.    Do you know who the vendor
14  is for TRIM?
15     A.    AstraZeneca.
16     Q.    Do you know when the system
17  was implemented?
18     A.    No.
19     Q.    What type of system is it,
20  can you describe it for me?
21     A.    It's a client server system,
22  client server.
23     Q.    Is it Oracle based?
24     A.    I don't know.

Page 167

1          MR. TORREGROSSA:  Can I just
2  get a running objection here?
3          MR. SMITH:  To any question
4  about TRIM?
5          MR. TORREGROSSA:  Yes.
6          MR. SMITH:  Sure.
7          MR. TORREGROSSA:  Thank you,
8  sir.
9          THE WITNESS:  Can I just get
10  some clarity then?
11         MR. TORREGROSSA:  You can
12  answer the question based on your
13  personal knowledge.
14  BY MR. SMITH:
15     Q.    Is the TRIM system used by
16  the drug safety department or system in
17  some fashion?
18     A.    Could be.
19     Q.    Do you know whether it is or
20  is not?
21     A.    No.
22     Q.    Who would know?
23     A.    Somebody in drug safety.
24     Q.    Who in IS provides

Page 169

1     Q.    Could you print out a list
2  of the images in the TRIM system?
3          MR. TORREGROSSA:  Objection
4      to form, images.
5          THE WITNESS:  I'm sorry, the
6      question again?
7  BY MR. SMITH:
8     Q.    Could you print out an index
9  of the images in the TRIM system?
10     A.    No.
11     Q.    The index is a form of data,
12  isn't it?
13     A.    Yes.
14     Q.    And if there's data in a
15  system, you can get to it.  Right?
16         MR. TORREGROSSA:  Objection
17      to form.
18         THE WITNESS:  I think I
19      answered that question earlier.
20  BY MR. SMITH:
21     Q.    I don't recall the answer.
22     A.    You asked if it was
23  searchable.
24     Q.    So if it's searchable, can

43 (Pages 166 to 169)