# EXHIBIT
# 47

Confidential - Darryl Draper

Page 264

```
 1              IN THE SUPERIOR COURT
             OF THE STATE OF DELAWARE
 2          IN AND FOR NEW CASTLE COUNTY
                    -  -  -
 3   IN RE:
     SEROQUEL LITIGATION  : MDL NO. 1769
 4                        :
     THIS DOCUMENT RELATES :
 5   TO ALL ACTIONS       :
     ------------------------------------------
 6   IN RE:                : SUPERIOR COURT
 7   RISPERDAL/SEROQUEL/   : OF NEW JERSEY
     ZYPREXA LITIGATION    : LAW DIVISION
 8                         : MIDDLESEX COUNTY
                           : CASE NO. 274
 9   ------------------------------------------
     AIMEE DANIELS,        : IN THE CIRCUIT
10                         : COURT OF THE
             V.            : COUNTY OF ST. LOUIS
11                         : STATE OF
     ASTRAZENECA           : MISSOURI
12   PHARMACEUTICALS, L.P.: 05CC-004759
     ET AL.                : DIVISION 6
13   ------------------------------------------
     SANTOS MALDANADO,     : IN THE CIRCUIT
14   minor, by and through : COURT OF THE
     his natural mother    : COUNTY OF ST. LOUIS
15   and next friend,      : STATE OF
     LOUISE WILSON         : MISSOURI
16           V.            : 06CC-003930
     JANSSEN PHARMACEUTICA : DIVISION 6
17   L.P., ET AL.          :
                    -  -  -
18             May 18, 2007
                    -  -  -
19         C O N F I D E N T I A L
                    -  -  -
20        Continued 30(b)(6) deposition of
     ASTRAZENECA PHARMACEUTICALS, L.P., by and
21   through DARRYL DRAPER.
22                  -  -  -
           Golkow Technologies, Inc.
23               Suite 760
         1880 John F. Kennedy Boulevard
24       Philadelphia, Pennsylvania  19103
```

Confidential - Darryl Draper

Page 265

```
1
     LENA BARNETT, minor, : IN THE CIRCUIT
2    by and through her  : COURT OF THE
     natural mother and  : COUNTY OF ST. LOUIS
3    next friend,        : STATE OF
     MARY BARNETT        : MISSOURI
4        V.    : 06CC-000333
     JANSSEN PHARMACEUTICA: DIVISION 6
5    L.P., ET AL.        :
     ------------------------
6    LOIS BAER, as        : IN THE CIRCUIT
     Representative of the: COURT OF THE
7    Estate of MATTHEW    : COUNTY OF ST. LOUIS
     BAER, Deceased       : STATE OF
8        V.              : MISSOURI
     JANSSEN PHARMACEUTICA: 06CC-002401
9    L.P., ET AL.        : DIVISION 6
     ------------------------
10   TERRY STRINGER      : IN THE CIRCUIT
                         : COURT OF THE
11      V.    : COUNTY OF ST. LOUIS
                         : STATE OF
12   JANSSEN PHARMACEUTICA: MISSOURI
     L.P., ET AL.    : 06CC-002173
13                      : DIVISION 6
     ------------------------
14   STEPHEN ROSAS       : IN THE CIRCUIT
                         : COURT OF THE
15      V.    : COUNTY OF ST. LOUIS
                         : STATE OF
16   ASTRAZENECA          : MISSOURI
     PHARMACEUTICALS,     : 05CC-004755
17   L.P., ET AL.        : DIVISION 6
     ------------------------
18   PAMELA MOORE,        : IN THE CIRCUIT
                         : COURT OF THE
19      V.    : COUNTY OF ST. LOUIS
                         : STATE OF
20   JANSSEN PHARMACEUTICA: MISSOURI
     L.P., ET AL.    : 05CC-006375
21                      : DIVISION 6
     ------------------------
22
23
24
```

Page 266

```
1    KATHRYN SCHULTZ,    : SUPERIOR COURT OF
     ET AL.              : THE STATE OF
2                        : CALIFORNIA IN AND
        V.              : FOR THE COUNTY OF
3                        : SAN FRANCISCO
     ASTRAZENECA          : CGC-06-453676
4    PHARMACEUTICALS,     :
     L.P., ET AL.        :
5    ------------------------
6
7
8           Continued 30(b)(6)
9    deposition of ASTRAZENECA
10   PHARMACEUTICALS, L.P., by and through
11   DARRYL DRAPER, taken pursuant to notice,
12   was held at Four Seasons Hotel, One Logan
13   Square, Philadelphia, Pennsylvania,
14   commencing at 9:14 a.m., on the above
15   date, before Ann Marie Mitchell, a
16   Federally Approved RDR, CRR, CSR and
17   Notary Public.
18               - - -
19
20
21
22
23
24
```

Page 267

```
1    APPEARANCES:
2
3    AYLSTOCK, WITKIN & SASSER, PLC
     BY:  KENNETH W. SMITH, ESQUIRE
4    4400 Bayou Boulevard, Suite 58
     Pensacola, Florida  32503-2673
5    850-916-7450
     ksmith@aws-law.com
6    Representing Plaintiffs in New Jersey and
     Delaware
7
8
     PEPPER HAMILTON LLP
9    BY:  ANDREA E.K. THOMAS, ESQUIRE
     3000 Two Logan Square
10   Eighteenth and Arch Streets
     Philadelphia, Pennsylvania 19103
11   (215) 981-4000
     thomasa@pepperlaw.com
12   Representing Eli Lilly & Company
13
14   DECHERT LLP
     BY:  BRENNAN J. TORREGROSSA, ESQUIRE
15   Cira Centre, 2929 Arch Street
     Philadelphia, PA  19104
16   215-994-2358
     brennan.torregrossa@dechert.com
17   Representing AstraZeneca
18
19   DECHERT LLP
     BY:  A. ELIZABETH BALAKHANI, ESQUIRE
20   Cira Centre, 2929 Arch Street
     Philadelphia, PA  19104
21   215-994-2487
     elizabeth.balakhani@dechert.com
22   Representing AstraZeneca
23
24
```

Page 268

```
1
2    ALSO PRESENT:
        BAILEY PERRIN BAILEY
3       RHONDA RADLIFF
        PROJECT MANAGEMENT
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

2 (Pages 265 to 268)

Confidential - Darryl Draper

Page 269

```
1              - - -
2            I N D E X
3              - - -
4  Testimony of:  DARRYL DRAPER
     By Mr. Smith          272
5
6
7
8              - - -
9          E X H I B I T S
10             - - -
11
    NO.      DESCRIPTION        PAGE
12
13  Draper-4    Seroquel        360
                International
14              Approval Form,
                Bates stamped
15              AZ/SER 0834196
                through AZ/SER
16              0834198
17  Draper-5    Sources of      367
                Reporters, Bates
18              stamped AZ/SER
                2288019
19
    Draper-6    Welcome to      370
20              AstraZeneca SOP No.
                2 version 2 Drug
21              Safety Adverse
                Event Report
22              Training, Bates
                stamped AZ/SER
23              2288012 through
                AZ/SER 2288018
24
```

Page 270

```
1  Draper-7    IND Annual Report  379
                Call for
2               Information
                Contributors List
3               for Seroquel
                (quetiapine
4               fumarate) IND
                Number 32,132,
5               Bates stamped
                AZ/SER 0535899
6
    Draper-8    US Clinical       386
7               Information Science
                Organizational
8               Chart, Wilmington
                Clinical
9               Information Science
                Leadership Team
10
    Draper-9    Medical           390
11              Communications &
                Document Management
12
    Draper-10   Data Management   392
13              Technology
14  Draper-11   Information       393
                Strategy
15
    Draper-12   Packet of         426
16              Cross-Notices
17
18
19
20
21
22
23
24
```

Page 271

```
1              - - -
2      DEPOSITION SUPPORT INDEX
3              - - -
4
5  Direction to Witness Not to Answer
6  Page Line   Page Line   Page Line
     291  6
7    291  17
     373  2
8    421  22
     423  12
9
10
    Request for Production of Documents
11
    Page Line   Page Line   Page Line
12
13
14  Stipulations
15  Page Line   Page Line   Page Line
16
17
    Question Marked
18
    Page Line   Page Line   Page Line
19
20
21
22
23
24
```

Page 272

```
1              - - -
2          EXAMINATION
3              - - -
4  BY MR. SMITH:
5      Q.    Mr. Draper, I'd like to ask
6  you some questions about the CLINTRACE
7  system.
8          MR. TORREGROSSA:  Can I just
9  make one clarification on the
10 record?
11         MR. SMITH:  Okay.
12         MR. TORREGROSSA:  Yesterday
13 I neglected to tell you that you
14 can ask away about Webster and
15 eStar, technical questions to Mr.
16 Draper.  Webster I believe was one
17 you inquired into Mr. Dowling, and
18 he didn't have answers.  Mr.
19 Draper will have the technical
20 answers that you're looking for.
21         And then additionally, Mr.
22 Draper I believe would like to
23 make one clarification about his
24 testimony yesterday.
```

3 (Pages 269 to 272)

Confidential - Darryl Draper

Page 273

1    THE WITNESS:  There was some
2  questions with regard to AZ IMPACT
3  and previous systems, et cetera.
4    And I think I became a
5  little confused with some of the
6  acronyms that we -- that we
7  typically use in IS, in the IS
8  area, the information systems
9  area.
10    And thinking back through
11  things in my mind, there was a
12  system prior to AZ IMPACT.  And
13  that system was called CTM.  That
14  name is Clinical Trial Manager.
15  And that's the correction.  I
16  think I used some other letters.
17  And those were another predecessor
18  system, long before CTM.  So I
19  just wanted to clarify that.
20  BY MR. SMITH:
21    Q.   There was another
22  predecessor prior to CTM.
23    A.   Yes.
24    Q.   What was that?

Page 274

1    A.   The direct predecessor of
2  CTM was DIPLOMAT.  That was the system
3  that was used for clinical trial
4  management.
5    Q.   Let's talk about CTM for a
6  minute then.
7    A.   Okay.
8    Q.   What were the dates of its
9  use?
10    A.   1998 to 2000.
11    Q.   The predecessor was
12  DIPLOMAT?
13    A.   Correct.
14    Q.   And the successor was --
15  is --
16    A.   Successor to --
17    Q.   CTM?
18    A.   -- DIPLOMAT was CTM.  That's
19  correct.
20    Q.   The successor to CTM is
21  what?
22    A.   The successor CTM?
23    Q.   To CTM.
24    A.   AZ IMPACT.

Page 275

1    Q.   AZ IMPACT.
2    Is a data map available for
3  CTM?
4    A.   I don't believe a data map
5  is available, no.
6    Q.   Where could we get a
7  description of the fields and tables?
8    A.   That would be in some of the
9  system documentation.
10    Q.   Is that available?
11    A.   That information would have
12  been sent to paper archive.
13    Q.   So it is available?
14    A.   Yes, it's available.
15    Q.   And a system map or diagram,
16  is that available?
17    A.   Again, if one was produced,
18  that would be in the system
19  documentation.
20    Q.   Who was the application
21  service manager for CTM, please?
22    A.   I'm not sure that we used
23  the terminology "application service
24  manager," but the individual who I would

Page 276

1  have considered a peer for that system
2  would be Frank Savin.
3    Q.   Can you spell that last
4  name, please?
5    A.   S-A-V-I-N.
6    Q.   What would be the term that
7  was used at that time in place of
8  application service manager or something
9  analogous to that?
10    A.   Senior systems design
11  developer or systems design developer.
12    Q.   Would there have been
13  somebody called a database administrator?
14    A.   Yes.
15    Q.   And who would that have
16  been?
17    A.   That would have been a
18  AstraZeneca person.
19    Q.   Do you know which --
20    A.   I mean, you're talking 2000.
21  I mean, to the best of my recollection, a
22  gentleman by the name of Bob Hoskins.
23    Q.   Would there have been a
24  business partner for the CTM system?

4 (Pages 273 to 276)

Confidential - Darryl Draper

Page 277

1    A.   Yes.
2    Q.   Who was that?
3    A.   I believe that would have
4  also been Frank Savin.
5    Q.   Who was the business owner
6  for CTM?
7    A.   Dave Cartwright.
8    Q.   What types of information
9  were contained in CTM?
10   A.   Information used to manage
11  the trial.
12   Q.   What types of information?
13   A.   What types of information?
14  Number of visits, center, study,
15  investigator.
16   Q.   Those would be fields,
17  right, also?
18   A.   Yes.  Same information.
19  It's very similar information as you
20  would find, as I answered for AZ IMPACT.
21   Q.   What format or type of
22  information, in other words, data,
23  documents, collection of information?
24   A.   Data, yes.  Documents, I'm

Page 278

1  uncertain of.
2        And what was the last one?
3    Q.   Collections of information.
4    A.   Yes.
5    Q.   When you say that they are
6  collections of information, would that
7  be -- would that also be data or would it
8  be in some other form?
9    A.   I would expect it to be
10  purely in data.
11   Q.   Again, could fields and
12  tables for CTM be copied or printed at
13  that time?
14   A.   For that -- that data was
15  migrated to AZ IMPACT, so the information
16  would be in AZ IMPACT.
17   Q.   So that information is
18  available today then?
19   A.   Yes.
20   Q.   All of it?
21   A.   Yes.
22   Q.   Who is the vendor for CTM?
23   A.   To the best of my
24  recollection, I believe it was a company

Page 279

1  called -- I'm going purely on memory
2  here, my involvement, it was either
3  IMPACT or Phase Forward.
4    Q.   What was your involvement
5  with CTM?
6    A.   I didn't have a direct
7  involvement with CTM, but I worked
8  with -- a colleague, Frank Savin, and I
9  worked in the same group.  So I often
10  attended meetings with Frank.
11   Q.   Is that S-A-V, as in Victor,
12  or S-A-B, as in boy?
13   A.   V as in Victor.
14   Q.   You worked with Frank on
15  CTM?
16   A.   No.
17   Q.   You attended meetings with
18  Frank?
19   A.   Right.  Group department
20  meetings.
21   Q.   What was your involvement
22  with DIPLOMAT?
23   A.   I didn't have any direct
24  involvement with DIPLOMAT.

Page 280

1    Q.   Do you have any direct
2  involvement with AZ IMPACT?
3    A.   No.
4    Q.   Do you supervise personnel
5  who provide services to or did provide
6  services to each of these three systems?
7    A.   Each of the three systems
8  being?
9    Q.   I'll break it down.
10       Do you have any supervisory
11  responsibilities with regard to AZ
12  IMPACT?
13   A.   No.
14   Q.   Are the people who provide
15  IS services for AZ IMPACT peers as
16  opposed to being persons under you?
17   A.   Could I hear the question
18  again, please?
19   Q.   Are the persons who are
20  involved in AZ IMPACT peers as opposed
21  to -- providing services for AZ IMPACT
22  peers as opposed to persons under you?
23   A.   Peers.
24   Q.   What were the data sources

5 (Pages 277 to 280)

Confidential - Darryl Draper

Page 281

1  for CTM?
2      A.   Study team -- study team,
3  study center.
4      Q.   Is a study team a part of
5  AstraZeneca?  Are they employees of
6  AstraZeneca?
7      A.   Yes.
8      Q.   And the study center, would
9  that be outside research organizations?
10     A.   Yes.  The center, like a
11 medical institution or hospital or...
12     Q.   Right.  And how does
13 information from the study team get into
14 CTM?
15     A.   It's entered by somebody on
16 the study team.
17     Q.   And how is information
18 inputted to CTM from a study center?
19     A.   A study monitor would visit
20 the center and collect that information,
21 enter it into CTM.
22     Q.   A study monitor is a person
23 employed by AstraZeneca?
24     A.   Could be, yes.

Page 282

1      Q.   Who else could that person
2  be employed by?
3      A.   Again, you know, these are
4  nontechnical questions that are better
5  answered by someone from the business.  I
6  don't -- I don't know who the functional
7  areas employ to enter data.  I'm assuming
8  they're all AstraZeneca employees.
9          MR. TORREGROSSA:  Objection,
10     scope.
11 BY MR. SMITH:
12     Q.   Were there training
13 materials for CTM?
14     A.   Yes.
15     Q.   Are they available?
16     A.   I would expect that they are
17 available in the paper archives.
18     Q.   What type of database was
19 CTM?
20     A.   It's an Oracle database.
21     Q.   Where was the server
22 located?
23     A.   In Wilmington.
24     Q.   Was the server, the DIPLOMAT

Page 283

1  server, located in Wilmington also?
2      A.   Yes.
3      Q.   And the server for AZ
4  IMPACT, was that located in Wilmington
5  also or is that located in Wilmington?
6      A.   No.
7      Q.   Where is that located?
8      A.   I believe AZ IMPACT is
9  located in Lund, Sweden.
10     Q.   Was there a user list for
11 CTM?
12     A.   I would expect there would
13 be some information regarding users.
14 Whether or not there's any list, I can't
15 say whether or not there's a list such as
16 a piece of paper with all users listed.
17     Q.   Would you be able -- if the
18 system were running, would you be able to
19 look within the system and find out which
20 people have access to the system?
21     A.   I would expect that
22 information to be available if that -- if
23 the system were live.  It was
24 decommissioned, and the data was migrated

Page 284

1  to AZ IMPACT.
2      Q.   Could you run queries in
3  CTM?
4      A.   If what you mean by queries,
5  the business ability to search
6  information such as study, center, when
7  the last visit was, yes, very similar to
8  what you would perform, the types of
9  business functions that you would
10 perform.  Again, very similar to AZ
11 IMPACT.
12     Q.   Were you able to export data
13 from CTM to another system?
14     A.   The data was migrated to AZ
15 IMPACT.
16     Q.   Are you aware of any
17 corruption or loss of data from CTM?
18     A.   No.
19     Q.   What is eStar that your
20 counsel mentioned?
21     A.   EStar is a system used to
22 review promotional materials and/or --
23 sorry.  Yes, promotional materials.
24     Q.   Can you author promotional

Confidential - Darryl Draper

Page 285

1   materials within eStar?
2       A.   You can -- eStar stands for
3   submission -- I believe it's submission
4   tracking -- I believe it's submission
5   tracking of requests.
6       Q.   Not reporting?  You think
7   it's more likely requests?
8       A.   No, it would not be
9   reporting.
10      Q.   Does it allow users to
11  author promotional materials using the
12  eStar system?
13      A.   It allows individuals to
14  assemble information.  It tracks the
15  submission of that information and the
16  review of that information.
17      Q.   Does it track submission to
18  the FDA?
19      A.   No.
20      Q.   Submission to whom?
21      A.   Submission to the medical
22  affairs group.  So a request for -- we
23  need some medical information, sorry,
24  some promotional information for a

Page 286

1   therapy for a disease.
2       Q.   A request for medical
3   information would be what's known as a
4   PIR?
5       A.   No.
6       Q.   Would a PIR be one type of
7   request for medical information?
8       A.   A PIR is a form of request
9   for information.
10      Q.   PIR stands for professional
11  information request; is that correct?
12      A.   That's correct.
13      Q.   Is there a system that
14  manages PIRs?
15      A.   Yes.
16      Q.   What is the name of that
17  system?
18      A.   Webster.
19      Q.   What were the dates for use
20  of eStar?
21      A.   I'm sorry, I'm just -- I'm
22  trying to recall some information.
23           Could I hear the question
24  again, please?

Page 287

1       Q.   What were the dates for use
2   of eStar?
3       A.   2000.
4       Q.   To present?
5       A.   Yes.
6       Q.   Is a data map for eStar
7   available?
8       A.   No.
9       Q.   Is a system map available?
10      A.   No.
11      Q.   Is there a system map?  Does
12  one exist?
13      A.   Is that just your previous
14  question rephrased?  If it is, the answer
15  is still no.
16      Q.   There is no system map for
17  eStar.
18           Is that your answer?
19      A.   Yes.
20      Q.   And is there a data map for
21  eStar?  Does one exist?
22      A.   If what you're referring to
23  is an entity relationship diagram, I
24  believe that we have an entity

Page 288

1   relationship diagram for eStar.
2       Q.   And we talked about, when I
3   asked you about entity relationship
4   diagrams for other systems that we talked
5   about yesterday, you said you didn't use
6   that term.
7           Is eStar the only system
8   that you support that uses that term,
9   "ERD"?
10      A.   Again, I don't recall
11  everything that I said yesterday, but I
12  think I've answered the question with
13  regard to whether or not there's an
14  entity relationship diagram.  And that
15  answer is yes.
16      Q.   Do any of the other systems
17  you support have an ERD?
18      A.   Yes.
19      Q.   If there's an ERD, can it be
20  printed out?
21      A.   That's a difficult question
22  to answer.  And it's difficult in that
23  you're suggesting that an entity
24  relationship diagram is strictly some

7 (Pages 285 to 288)

Confidential - Darryl Draper

Page 289

1  electronic information that you could
2  otherwise print.  An entity relationship
3  diagram can be a physical piece of paper
4  with entity relationships on it.
5          So I can answer the question
6  yes and no.
7      Q.    Can you make a copy of an
8  ERD, if it exists, for any of the systems
9  you support?
10     A.    Yes.
11     Q.    All right.  For any of the
12 systems you support, are there any that
13 do not have an ERD?
14     A.    Can I just take a
15 five-minute break?
16         MR. SMITH:  Sure,
17     absolutely.  Any time.
18         - - -
19         (A recess occurred.)
20         - - -
21         MR. TORREGROSSA:  I want to
22     give you a little different name
23     for eStar.  I think we may have
24     confused you with our description

Page 290

1      of what eStar stands for, so we
2      want to try that again.
3          THE WITNESS:  Apologies.
4  BY MR. SMITH:
5      Q.    Mr. Draper, during the
6  break, did you have an opportunity to
7  confer with your counsel?
8          MR. TORREGROSSA:  That's a
9      yes or no.
10         THE WITNESS:  Yes.
11 BY MR. SMITH:
12     Q.    Did it involve a question of
13 privilege as to whether your answer to
14 any of my questions would involve
15 attorney-client privilege?
16         MR. TORREGROSSA:  That's an
17     extremely vague question.  I
18     object to the form.  And I also
19     think it's a legal determination.
20         You can answer the question.
21         MR. SMITH:  Let me rephrase
22     the question.
23 BY MR. SMITH:
24     Q.    Did you have to ask your

Page 291

1  lawyer whether something you wanted to
2  say would be privileged or not during the
3  break?
4      A.    No.
5      Q.    What did you talk about?
6          MR. TORREGROSSA:  No, don't
7      discuss that.  Instruct him not to
8      answer.
9  BY MR. SMITH:
10     Q.    Are you going to follow your
11 counsel's advice?
12     A.    Yes.
13     Q.    You weren't talking about
14 matters of privilege.  You were talking
15 about something that had to do with
16 today's deposition.  Right?
17         MR. TORREGROSSA:  Don't
18     discuss what we were talking
19     about.  Instruct him not to
20     answer.  This is lawyer 101.
21 BY MR. SMITH:
22     Q.    Are you going to follow your
23 counsel's advice?
24     A.    Yes.

Page 292

1      Q.    Well, now that you've had a
2  chance to confer with your counsel, what
3  would you like to change about your
4  testimony?
5      A.    I described eStar
6  incorrectly with regard to the R in eStar
7  being request.  It's actually review.
8      Q.    We were both wrong.
9      A.    We were both wrong.
10     Q.    Anything else about your
11 testimony so far that you'd like to
12 change or add to?
13     A.    No.
14     Q.    I asked you about a system
15 map for eStar.
16         Is there any sort of diagram
17 that would show the sources, the
18 interfacing of the eStar system with
19 other systems?
20     A.    Yes.
21     Q.    What would you call such a
22 diagram?
23     A.    I'm sorry, could I have the
24 question again?

8 (Pages 289 to 292)

Confidential - Darryl Draper

Page 293

```
 1              - - -
 2         (The court reporter read the
 3     pertinent part of the record.)
 4              - - -
 5         THE WITNESS:  System map.
 6  BY MR. SMITH:
 7     Q.    A system map, okay.
 8         So there is a system map for
 9  eStar then?
10     A.    The information that you
11  would use to accept --
12     Q.    Let me ask you to give me a
13  yes or no answer, and then you can
14  explain it, if you'd need to, but I'd
15  like a yes or no answer to my question.
16         Is there a system map for
17  eStar?  That's a yes or no question.
18         MR. TORREGROSSA:  No.  He's
19     allowed to explain his testimony.
20         MR. SMITH:  He doesn't have
21     to explain it.  You can answer
22     with just a yes or no.
23         MR. TORREGROSSA:  No.  You
24     can't force him to do that.
```

Page 294

```
 1         MR. SMITH:  I absolutely
 2     will require a yes or no answer to
 3     my question.  If he won't give it
 4     to me, we will take it up with the
 5     magistrate.
 6         MR. TORREGROSSA:  No.  He
 7     can give a yes or no, but if he
 8     can't, he's allowed to explain
 9     why.
10         Go ahead.
11  BY MR. SMITH:
12     Q.    Okay.  Can you answer that
13  question yes or no?
14     A.    No.
15     Q.    Why can't you answer that
16  question yes or no?
17     A.    Because there -- the
18  information is available for the system.
19  That's our documentation of the system.
20  And there may be information that you
21  could use to assemble a system map.  I've
22  not seen that system documentation.  I
23  can't say precisely whether or not it
24  contains a system map.
```

Page 295

```
 1     Q.    All right.  My question was,
 2  is there a system map, and your answer
 3  then is I don't know; is that correct?
 4         MR. TORREGROSSA:  Objection
 5     to form.
 6         THE WITNESS:  Yes.
 7  BY MR. SMITH:
 8     Q.    Who could you ask to find
 9  out whether a system map exists for
10  eStar?
11     A.    Steve Aaronson.
12     Q.    Is there a repository where
13  system maps are stored for multiple
14  systems that you support?
15     A.    Yes.
16     Q.    Where is that system?
17     A.    I'm sorry, could I -- I'm
18  not certain that I understood the
19  previous question.
20         You asked is there a system?
21  Or you asked was there a place where
22  they're stored?
23     Q.    Is there a repository?
24     A.    So your question, your last
```

Page 296

```
 1  question, could I have that --
 2     Q.    We established that there's
 3  a repository for system maps for multiple
 4  systems that you support.  Right?
 5     A.    The system maps are part of
 6  the system documentation.
 7     Q.    Is there a repository for
 8  system documentation?  That's a yes or no
 9  question.
10     A.    Yes.
11     Q.    Where is that repository
12  located?
13     A.    That repository could be in
14  paper archive.  It could also be on a
15  file system.  It could also be in a
16  document management system.
17     Q.    For currently-used systems
18  that you support, is there an electronic
19  repository that would contain system
20  maps?
21     A.    Yes.
22     Q.    And where is that electronic
23  repository?
24     A.    It could be on a file
```

9 (Pages 293 to 296)

Confidential - Darryl Draper

Page 297

1  system.
2      Q.   How would you access it if
3  you wanted to look for a system map?
4      A.   Well, I would talk to an
5  individual who has knowledge of where
6  that system map may be located, probably
7  would have to acquire access to that data
8  map, to that area, if it's a controlled
9  environment.  And --
10     Q.   Is there a shared -- I'm
11 sorry.  I didn't mean to interrupt you.
12 I thought you were finished.  Go ahead.
13     A.   And I would navigate through
14 the system documentation, identify the
15 data map or system map.
16     Q.   For eStar, who is the
17 application service manager?
18     A.   Steve Aaronson.
19     Q.   The business partner?
20     A.   Ed Wong.
21     Q.   Can you spell that, W-O-N-G?
22     A.   W-O-N-G.
23     Q.   The business owner?
24     A.   Dana O'Brien.  I'm sorry,

Page 298

1  Dina.  Dina O'Brien.
2      Q.   Type of information?
3          MR. TORREGROSSA:  I'm sorry?
4  BY MR. SMITH:
5      Q.   Type of information
6  contained in eStar?
7          MR. TORREGROSSA:  Yes, sir.
8          THE WITNESS:  That would be
9      promotional materials that need to
10     be tracked and reviewed.
11 BY MR. SMITH:
12     Q.   In what format are documents
13 in eStar?
14     A.   They're -- they can come in
15 as a native format, such as Word.  And
16 the official type is a .pdf.
17     Q.   Are documents also created
18 in eStar?
19     A.   No.  They're submitted into
20 eStar so that they can be reviewed and
21 approved.
22     Q.   What are the data sources
23 for eStar?
24     A.   If what you mean is, you

Page 299

1  know, how do these documents get in --
2  these so-called documents, that would be
3  the data, the promotional material, you
4  would also enter some indexing
5  information about those materials.
6      Q.   As to documents, where do
7  they come from?
8      A.   They would come from the
9  person who authors that promotional
10 material.
11     Q.   What group or team would
12 author those materials?
13         MR. TORREGROSSA:  Objection,
14     scope.
15         THE WITNESS:  I believe
16     that's medical affairs.
17 BY MR. SMITH:
18     Q.   What about the data, other
19 data that I believe you said is used for
20 indexing the documents; is that correct?
21     A.   I'm sorry, the question
22 again?
23     Q.   Is there data that is used
24 for indexing documents in eStar?

Page 300

1      A.   Yes.
2      Q.   Where does that data come
3  from?
4      A.   That data would be in
5  reference to the promotional materials,
6  such as therapeutic area, drug, disease.
7      Q.   What fields does eStar
8  contain?
9      A.   Drug and/or therapeutic
10 area, title, target audience, target
11 media.
12     Q.   Who's the vendor for eStar?
13     A.   AstraZeneca.
14     Q.   Strike that.
15         I assume there are other
16 fields that you can't remember off the
17 top of your head in eStar other than the
18 ones you mentioned?
19         MR. TORREGROSSA:  Objection.
20     I'm sorry, Counsel.  Objection to
21     form.
22 BY MR. SMITH:
23     Q.   Are there other fields than
24 the ones you mentioned in eStar?

10 (Pages 297 to 300)

Confidential - Darryl Draper

Page 301

1      A.   There may be others.  Those
2  are the ones I remember.
3      Q.   And the vendor is
4  AstraZeneca?
5      A.   Yes.
6      Q.   Do training materials exist
7  for eStar?
8      A.   There are training
9  materials.
10     Q.   Are there user training
11 materials?
12     A.   Yes.
13     Q.   Are there service training
14 materials?
15          MR. TORREGROSSA:  I'm sorry,
16     I didn't hear the last part.
17 BY MR. SMITH:
18     Q.   Are there service training
19 materials?
20          MR. TORREGROSSA:  Thank you.
21     THE WITNESS:  Yes.
22 BY MR. SMITH:
23     Q.   Could you produce copies of
24 those materials?

Page 302

1          MR. TORREGROSSA:  Objection
2     to form.
3          THE WITNESS:  Yes.
4  BY MR. SMITH:
5      Q.   Is there system
6  documentation for eStar?
7      A.   Yes.
8      Q.   Could you produce copies of
9  the system documentation?
10          MR. TORREGROSSA:  Objection
11     to form.
12          THE WITNESS:  Yes.
13 BY MR. SMITH:
14     Q.   Would the system
15 documentation for eStar, where would that
16 be maintained?
17     A.   On file share.
18     Q.   Whose file share?  What file
19 share?
20     A.   The IS function would own
21 that -- they don't own the server.  They
22 own or control access to that particular
23 area, so it's a controlled area of the
24 server.

Page 303

1      Q.   How would you describe that
2  file share area?  How would you identify
3  it or describe it?
4      A.   I would describe it very
5  similar to what you find on, say, your
6  laptop.  You create a folder.  And you
7  can grant certain permissions and
8  privileges on that folder.  And that
9  material would be stored beneath that
10 folder.
11     Q.   Is there a list of the
12 persons who have permissions and
13 privileges for eStar?
14     A.   For the training materials
15 and validation documentation, yes, there
16 would be a list of those individuals.
17     Q.   No.  People who would have
18 permissions to use the file share, have
19 access to the file share?
20     A.   Yes.
21     Q.   Would there be a list of
22 persons who have access to the eStar
23 system itself?
24     A.   Yes.

Page 304

1      Q.   Could you provide me with a
2  copy of those lists?
3          MR. TORREGROSSA:  Objection
4     to form.
5          THE WITNESS:  Yes.
6  BY MR. SMITH:
7      Q.   Can you access the file
8  share for eStar from your laptop if you
9  have an Internet connection?
10     A.   Yes.
11     Q.   Would you be able to click
12 on My Computer and find that file share?
13     A.   No, it's not -- I mean, I
14 don't map the eStar validation folder on
15 my computer.
16     Q.   How do you access the eStar
17 validation folder?
18     A.   I would enter the server
19 address and the location of that -- or
20 the folder name.
21     Q.   Is there a predecessor to
22 eStar?
23     A.   Yes.
24     Q.   What is the name of the

11 (Pages 301 to 304)

Confidential - Darryl Draper

Page 305

1  predecessor system?
2      A.   STEP 2000.
3      Q.   Was information from STEP
4  2000 migrated into eStar?
5      A.   Yes.
6      Q.   Was all of the data in STEP
7  2000 migrated into eStar?
8      A.   No.
9      Q.   What data was not migrated
10 into eStar?
11     A.   Anything that was no longer
12 active promotional material.
13     Q.   Is the material that is
14 promotional material that is no longer
15 active stored someplace else?
16     A.   It may be on a disk or a CD.
17     Q.   Who would be the custodian
18 of that?
19     A.   I would expect that to be
20 Dina O'Brien.
21     Q.   Could you make a copy of the
22 archived data?
23     A.   Yes.
24     Q.   In eStar, can you run

Page 306

1  queries?
2      A.   You can search those
3  promotional information by those fields
4  that I described earlier, yes.
5      Q.   Can you make reports of
6  those searches?
7      A.   No.
8      Q.   Are those queries or
9  searches saved somewhere?
10     A.   No.
11     Q.   Can you print out a report
12 from eStar?
13     A.   No.
14     Q.   Can you print out documents
15 from eStar?
16     A.   Yes.
17     Q.   Does eStar interface with
18 any electronic sources of information?
19     A.   Well, one interface is the
20 ability to import an electronic document.
21 So an interface would be, you know, a
22 document that sits on a C drive somebody
23 authors.
24     Q.   Does it interface with any

Page 307

1  other information management system?
2      A.   Yes.
3      Q.   Which ones?
4      A.   Market Pro.
5      Q.   Market Pro?
6      A.   Market Pro.
7      Q.   Do you provide support for
8  Market Pro?
9      A.   No.
10     Q.   Does your department provide
11 support for Market Pro?
12     A.   No.
13     Q.   Which IS department provides
14 support for Market Pro?
15     A.   I believe Mr. John Dowling
16 is the individual who has knowledge of
17 that system and the department provides
18 support.
19     Q.   Do you know what type of
20 information can be passed from Market Pro
21 to eStar?
22     A.   Yes.
23     Q.   What kind?
24     A.   .pdf of the promotional

Page 308

1  material.
2          Can I simply clarify that
3  earlier statement?
4          There is no push of
5  information from eStar to Market Pro.
6  It's not an automated interface whereby
7  data simply flows into Market Pro.
8      Q.   How about information from
9  Market Pro into eStar?
10     A.   No.
11     Q.   But you can access
12 information in Market Pro from eStar; is
13 that correct?
14         MR. TORREGROSSA:  Objection
15     to form.
16         THE WITNESS:  Can you --
17 BY MR. SMITH:
18     Q.   Can you import documents
19 from Market Pro into eStar?
20     A.   I'm sorry, can I have the
21 question again, please?
22     Q.   Yes.
23         Can you import documents
24 from Market Pro into eStar?

12 (Pages 305 to 308)