Page 393

1  A.   GDMRS is one of those
2  systems, seeing that they are -- this
3  organization chart represents some of the
4  drug development functions.  I would
5  assume a system also such as AZ IMPACT.
6      MR. SMITH:  Thank you.
7  Could you mark this for me,
8  please.
9          - - -
10     (Deposition Exhibit No.
11 Draper-11, Information Strategy,
12 was marked for identification.)
13         - - -
14     MR. TORREGROSSA:  Can we go
15 off the record while the witness
16 is looking at this.
17     MR. SMITH:  Yes.
18         - - -
19     (A discussion off the record
20 occurred.)
21         - - -
22 BY MR. SMITH:
23  Q.   Do you know who information
24 strategy is?

Page 394

1  A.   Can't say I recognize that
2  name, information strategy.
3  Q.   Or any of the people or
4  positions that are listed there in
5  Exhibit 11?
6  A.   I recognize two names.
7  Q.   Which ones?
8  A.   Dan Ringenbach and Nick
9  Ronca.
10 Q.   Do you know if GDDIS
11 provides any IS support to them?
12 A.   Just in general, I'd just
13 like to say that as I said earlier, the
14 owners of these systems decide who gets
15 access to what systems, not the IT
16 function.  Okay.
17     And as an IT organization,
18 we're not going to know all of the names
19 and all of the individuals that use these
20 systems or when they're granted access.
21 It's a business decision.  It's like I
22 said earlier about using the car.  It's
23 used for transportation, but people use
24 it for other things other than just

Page 395

1  transportation.  Manufacturer doesn't
2  necessarily understand or know that
3  somebody's going to use it outside of its
4  intended purpose.
5      So you're asking me
6  questions that, you know, individuals
7  having access and using these systems and
8  do we support them, it's very, very
9  difficult to give you answers to those
10 questions.
11 Q.   Can you give me an answer
12 for the two persons that you identified
13 in Exhibit 11?
14 A.   I recognize these
15 individuals as being IT -- former IT
16 people that were part of GDDIS who have
17 moved into the business.  And I believe
18 they're part of the organization not
19 called clinical information systems.  And
20 this appears to be information strategy,
21 seems to be just kind of a think tank
22 team, if you want to call it that.
23 Q.   Okay.
24 A.   For that group.

Page 396

1  Q.   Thank you.  Let me ask you
2  if you're familiar with a group called
3  clinical project coordination?
4  A.   Yes, I am.
5  Q.   Okay.  Do you know if GDDIS
6  provides support for them?
7  A.   Yes, we do.
8  Q.   What type of support?
9  A.   Planning and forecasting.
10 Q.   What system is used or
11 systems are used to do that?
12 A.   We use a resource planning
13 and forecasting system.  It's also used
14 for time sheet reporting for clinical
15 project teams.  And it's called Matrix.
16 Q.   And you support Matrix?
17 A.   I don't directly support
18 Matrix.
19 Q.   Somebody in GDDIS supports
20 Matrix?
21 A.   Yes.
22 Q.   Do you know who?
23 A.   Yes.
24 Q.   Who?

Page 397

1  A.  Susan Maw, M-A-W.
2  Q.  Matrix --
3  A.  Can I just simply also state
4  that clinical project coordination use
5  tools and technologies such as Microsoft
6  Project.
7  Q.  Are you familiar with a
8  group called clinical outsourcing that
9  may be part of or connected with clinical
10 project coordination?
11 A.  Yes.
12 Q.  Okay.  What does that group
13 do?
14     MR. TORREGROSSA:  Objection
15 to form and scope.
16 BY MR. SMITH:
17 Q.  Briefly.
18 A.  Again, their business
19 function and process, I'm not going to
20 know or understand from an IT person.
21 Q.  Do you know what IS services
22 your group provides to them?
23 A.  Matrix.
24 Q.  How about clinical agreement

Page 398

1  and grant management, are you familiar
2  with that group?
3  A.  What was the group name
4  again?
5  Q.  Clinical agreement and grant
6  management.
7  A.  I can't say that I'm
8  familiar with that function.
9  Q.  Next question.  Clinical
10 project management number 4, ISS
11 coordination?
12     MR. TORREGROSSA:  As opposed
13 to number 3.
14     THE WITNESS:  Information
15 overload.
16     I'm sorry, can you --
17 BY MR. SMITH:
18 Q.  Clinical project management
19 number 4, ISS coordination?
20 A.  I believe that is a function
21 or a component of clinical project
22 coordination.
23 Q.  Yes.  That also says that on
24 the paper that I have.

Page 399

1  And does GDDIS support them?
2  A.  Yes.
3  Q.  In what way?
4  A.  Again, the clinical project
5  planning and forecasting system, Matrix.
6  Q.  Who in ISS would be
7  responsible for -- would have those
8  responsibilities?
9     MR. TORREGROSSA:  Objection,
10 scope.
11     THE WITNESS:  I --
12 BY MR. SMITH:
13 Q.  Did I say ISS or GDDIS?
14     I meant to say GDDIS.
15 GDDIS.
16     MR. TORREGROSSA:  I withdraw
17 my objection.
18     THE WITNESS:  I don't know.
19 BY MR. SMITH:
20 Q.  Who would know?
21 A.  Can I have the earlier
22 question given back to me, please, by the
23 court reporter.
24 Q.  I'll just rephrase it.

Page 400

1     Responsibilities for the
2  Matrix, providing Matrix support to the
3  people in ISS coordination, who in GDDIS
4  would be the person responsible for that?
5  A.  Susan Maw.  I'm sorry.
6  Thank you.
7  Q.  GDDIS supports a group
8  having to do with study delivery; is that
9  correct?
10 A.  Yes.
11 Q.  And what is the name of that
12 group --
13 A.  Study delivery.
14 Q.  -- relating to study
15 delivery?
16 A.  Study -- I'm not sure I
17 understand the question.
18 Q.  Is there a group that
19 performs functions related to study
20 delivery?
21 A.  Yes.
22 Q.  And do you know the name of
23 that group?
24 A.  I believe it's called study

Confidential - Darryl Draper

Page 401

1  delivery enablement.
2      Q.   Study delivery enablement.
3  I believe you've used that term before.
4           And GDDIS provides support
5  for that?
6      A.   To study delivery
7  enablement, yes.
8      Q.   Yes. And what systems do
9  they use?
10          MR. TORREGROSSA: Objection
11  to the form. Go ahead. And
12  scope.
13          You can answer.
14          THE WITNESS: Investigator
15  safety letter process. It's
16  called SAMSON.
17 BY MR. SMITH:
18     Q.   Is there a system that would
19 manage preclinical studies such as animal
20 studies or laboratory studies?
21     A.   Yes, there are preclinical
22 applications.
23     Q.   What system would do that?
24     A.   Preclinical. LIMS.

Page 402

1      Q.   LIMS? Can you spell that,
2  please.
3      A.   L-I-M-S.
4      Q.   L-I-M-S. And what does that
5  stand for?
6      A.   Laboratory information
7  management system.
8      Q.   What is your degree of
9  involvement with LIMS?
10     A.   Zero.
11     Q.   Who's the application
12 manager?
13     A.   Suzanne Taylor.
14     Q.   Is there a predecessor
15 system to the LIMS system?
16     A.   No.
17          MR. SMITH: Counsel, could I
18 just send you a request for the
19 same types of information,
20 documentation I've requested on
21 all of these systems?
22          MR. TORREGROSSA: For LIMS?
23          MR. SMITH: For LIMS.
24          MR. TORREGROSSA: Yes, sir.

Page 403

1          MR. SMITH: We'll then skip
2  over that.
3          THE WITNESS: You don't have
4  any other questions for LIMS,
5  though? Yeah.
6  BY MR. SMITH:
7      Q.   Is there anything you'd like
8  to say about LIMS? Just kidding.
9          MR. TORREGROSSA: You're
10 talking about the similar requests
11 you've made in the past, the same
12 questions we've gone over.
13         MR. SMITH: Yes, sir.
14         MR. TORREGROSSA: Yes, sir.
15 We'll look into those.
16 BY MR. SMITH:
17     Q.   What kind of support does
18 GDDIS provide for SAP?
19         MR. TORREGROSSA: I'm sorry,
20 SAP?
21         MR. SMITH: Yes.
22         MR. TORREGROSSA: I have a
23 scope objection. It was covered
24 by Mr. Dowling.

Page 404

1          You can answer.
2          I'm sorry, you said what
3  support does GDDIS --
4          MR. SMITH: Yes.
5          MR. TORREGROSSA: I withdraw
6  my objection.
7          THE WITNESS: None.
8  BY MR. SMITH:
9      Q.   Do you know where within the
10 AstraZeneca system you would find
11 unpublished literature?
12         MR. TORREGROSSA: Objection
13 to form and scope.
14         THE WITNESS: If what you
15 mean by unpublished is not
16 appearing in a medical journal --
17 BY MR. SMITH:
18     Q.   Yes.
19     A.   Yes.
20     Q.   Where would that be?
21     A.   PLANET.
22     Q.   Where would you find the
23 patent application for Seroquel?
24         MR. TORREGROSSA: Objection

Page 405

1   to form and scope.
2       You can answer if you know.
3       THE WITNESS: There may be
4   patent information in GEL as it
5   relates to the submission.
6   BY MR. SMITH:
7       Q. Anyplace else that you can
8   think of?
9       MR. TORREGROSSA: Same
10  objections.
11      THE WITNESS: No.
12  BY MR. SMITH:
13      Q. Where would one find minutes
14  of meetings of the medical advisory panel
15  for Seroquel?
16      MR. TORREGROSSA: Objection
17  to the form and to the scope.
18      THE WITNESS: Can I have the
19  question again from the court
20  reporter.
21      - - -
22      (The court reporter read the
23  pertinent part of the record.)
24      - - -

Page 406

1       THE WITNESS: Assuming that
2   those materials would be
3   copyrighted by whatever --
4   whatever group or organization
5   that represents, they would I
6   assume have those materials.
7   BY MR. SMITH:
8       Q. Who would have those
9   materials?
10      MR. TORREGROSSA: Same
11  objections.
12      THE WITNESS: Could -- could
13  I just have the group or the name,
14  I guess the earlier question,
15  please.
16  BY MR. SMITH:
17      Q. I think I said medical
18  advisory panel.
19      A. Medical advisory panel.
20      Q. And it may be that it should
21  be medical advisory group.
22      A. It's my understanding
23  medical advisory panel is a regulators...
24      Q. An FDA thing?

Page 407

1       A. Right.
2       Q. How about physicians that
3   advise AstraZeneca on a drug such as
4   Seroquel?
5       MR. TORREGROSSA: Same
6   objections, form and scope.
7       THE WITNESS: I don't know.
8   BY MR. SMITH:
9       Q. Okay. Where would one find
10  minutes of a drug safety review
11  committee?
12      MR. TORREGROSSA: Same
13  objection, form and scope.
14      THE WITNESS: I don't know.
15  BY MR. SMITH:
16      Q. Do you understand what is
17  meant by a drug safety review committee?
18      A. I'm not sure I do.
19      Q. Is there a committee within
20  AstraZeneca that reviews adverse events
21  for a drug, for each drug?
22      MR. TORREGROSSA: Form and
23  scope.
24      THE WITNESS: Again, those

Page 408

1   are very business-oriented
2   questions, and I don't have
3   knowledge of that.
4   BY MR. SMITH:
5       Q. Getting down to the bottom
6   of the pile here.
7       Is there a list of the
8   people in teams that work in GDDIS?
9       A. I'm sorry, is there --
10      Q. A list of people in teams in
11  GDDIS?
12      A. Yes.
13      Q. Are there any other
14  systems -- well, strike that.
15      I was going to ask you
16  questions pertaining to GEL, but let me
17  just ask a couple and then I'll ask
18  counsel to provide the same information
19  for GEL that we've requested on the other
20  systems.
21      What is your involvement
22  with GEL?
23      A. I don't have any direct
24  involvement with GEL.

Page 409

1  Q. Did you at any time have any
2  direct involvement with GEL?
3  A. No.
4  Q. Who is the application
5  service manager for GEL?
6  A. Christine Gallia.
7  Q. And the predecessor for GEL,
8  if there was one?
9  A. I think prior to GEL, it was
10 primarily, if not all, paper -- I don't
11 believe that we had an electronic
12 library, per se, before GEL.
13  Q. Is there an electronic
14 collection of pre-GEL documents today?
15  A. Yes. They are in GEL. You
16 can scan documents into GEL, so if they
17 were paper, they...
18  Q. Are you aware of any data
19 corruption or loss for GEL?
20  A. No.
21  Q. Does GDDIS provide support
22 to medical affairs?
23  A. No.
24  Q. Who does provide IS support

Page 410

1  to them?
2  A. That would be BIS, business
3  IS.
4  Q. Who would be the person to
5  ask about BIS?
6  A. Could you be a bit more
7  specific?
8  Q. Do you know who the
9  application service manager would be for
10 BIS?
11  A. I guess what I'm trying to
12 say is I've answered questions with
13 regard to eStar.
14  Q. So eStar supports medical
15 affairs and GDDIS supports eStar.
16 Correct?
17      MR. TORREGROSSA: Objection
18  to form.
19      THE WITNESS: No.
20 BY MR. SMITH:
21  Q. Okay.
22      MR. TORREGROSSA: I think,
23  Mr. Smith --
24 BY MR. SMITH:

Page 411

1  Q. EStar is utilized by medical
2  affairs?
3      MR. TORREGROSSA: Form and
4  scope.
5      THE WITNESS: Yes.
6 BY MR. SMITH:
7  Q. And that's supported by
8  GDDIS then; is that correct?
9  A. No.
10  Q. Who supports eStar? BIS?
11  A. Correct. The application
12 service manager provides delivery and
13 support.
14  Q. Who's the head of BIS?
15      MR. TORREGROSSA: I will get
16  you the current head of BIS.
17 BY MR. SMITH:
18  Q. Now, with regard to
19 regulatory affairs, GEL supports
20 regulatory affairs. Right?
21  A. Yes.
22  Q. Do they use CLINTRACE?
23      MR. TORREGROSSA: Form,
24  scope.

Page 412

1      Go ahead.
2      THE WITNESS: No.
3 BY MR. SMITH:
4  Q. What systems do they use
5 besides GEL?
6      MR. TORREGROSSA: Same
7  objection.
8      You can answer.
9      THE WITNESS: I don't
10 believe they use any system. GEL
11 is the regulatory affairs system.
12 BY MR. SMITH:
13  Q. Are there any systems other
14 than the ones we have discussed for the
15 last two days for which GDDIS provides IS
16 support to the drug safety department?
17      MR. TORREGROSSA: Form.
18      THE WITNESS: Can I have --
19  I'm not sure I understood.
20 BY MR. SMITH:
21  Q. Any applications that we
22 have not discussed for which GDDIS
23 provides support to the drug safety
24 department?

Confidential - Darryl Draper

Page 413

1  MR. TORREGROSSA: Form.
2  THE WITNESS: Again, your
3  question was -- I mean, I'm
4  thinking of things like Office
5  Tools, e-room.
6  BY MR. SMITH:
7  Q. What's e-room?
8  A. It's like a file system.
9  Q. What type of system, what
10 sort of software does e-room use?
11 A. It's called e-room.
12 Q. Is that the name of an
13 application?
14 A. It's the name of -- it's
15 like Windows. It simply allows you to
16 visualize documents on a file share.
17 Q. And that's used by drug
18 safety?
19 MR. TORREGROSSA: Form and
20 scope.
21 THE WITNESS: I don't know.
22 BY MR. SMITH:
23 Q. Does GDDIS provide support
24 for e-room?

Page 414

1  A. We provide very limited
2  support. The primary support for that
3  technology comes from IT services.
4  Q. If I had questions about
5  backing up e-room or making copies of
6  data in e-room, I should direct those to
7  IT rather than to you?
8  A. You can ask me those
9  questions.
10 Q. Okay. Do you know whether
11 you can download documents from e-room?
12 MR. TORREGROSSA: I didn't
13 catch one part. Into or --
14 MR. SMITH: From.
15 MR. TORREGROSSA: From.
16 Sorry.
17 THE WITNESS: I can download
18 a document from a file share to my
19 C drive, yes.
20 BY MR. SMITH:
21 Q. I guess you can upload or
22 download documents in e-room. Right?
23 A. Yes. I would -- very
24 similar to your flash drive that you used

Page 415

1  earlier. It's a medium for storing
2  information and documents.
3  Q. Do you know when that came
4  into use?
5  A. 2002, possibly earlier, a
6  year or so, around the time of the
7  merger.
8  Q. Do you know if it is, for
9  lack of a better term, cleaned out
10 periodically?
11 MR. TORREGROSSA: Objection
12 to form.
13 THE WITNESS: I would tend
14 to believe that anything --
15 MR. TORREGROSSA: And scope,
16 go ahead.
17 THE WITNESS: -- that is
18 required to be retained by
19 AstraZeneca would be retained.
20 There's no automated cleaning
21 process whereby things would
22 expire and disappear or be
23 removed.
24 BY MR. SMITH:

Page 416

1  Q. And is there a backup for
2  e-room?
3  A. There is a backup of the
4  underlying hardware for e-room which
5  contains the data.
6  Q. Is there backup of the data
7  in e-room?
8  A. Yes.
9  Q. Is there a separate e-room
10 for clinical studies, the group clinical
11 studies?
12 A. Again, you're asking me a
13 question that's very similar to what I
14 tried to explain earlier, what is --
15 there's a service, and how and when it's
16 used is a business decision.
17 Q. Well, maybe you can answer
18 this question.
19 Is e-room an
20 AstraZeneca-wide thing that's used by
21 everybody, or do different department
22 have separate E. Rooms?
23 A. It's a technology used at
24 AstraZeneca very much like Windows.

39 (Pages 413 to 416)

Page 417

1  Q. Are there various servers,
2  are there separate independent servers
3  for different departments?
4  A. No.
5  Q. What can you tell me about
6  voice mail for drug safety? Do they use
7  voice mail?
8      MR. TORREGROSSA: Objection
9  to form.
10     THE WITNESS: Yes.
11 BY MR. SMITH:
12 Q. Is it archived?
13 A. Sorry?
14 Q. Is voice mail in drug safety
15 archived in some fashion?
16 A. No.
17 Q. Would GDDIS be responsible
18 for it if it were?
19     MR. TORREGROSSA: Objection
20 to form.
21 BY MR. SMITH:
22 Q. Strike the question.
23     What responsibilities does
24 GDDIS have for voice mail pertaining to

Page 418

1  drug safety?
2  A. None.
3  Q. Who handles the voice mail?
4  Who services it?
5  A. IBM.
6  Q. Do you know how long voice
7  mails in drug safety are ordinarily
8  retained?
9  A. Ordinarily they would be
10 retained, the system would retain them
11 for 10 days.
12 Q. After 10 days, would they be
13 archived?
14 A. No.
15 Q. Would they be erased?
16     MR. TORREGROSSA: Objection
17 to form.
18     THE WITNESS: They are no
19     longer retrievable by the owner of
20     the mailbox or the system
21     administrator.
22 BY MR. SMITH:
23 Q. Are they retrievable by
24 anybody? Do they exist? That's two

Page 419

1  separate questions.
2      Do they exist?
3      MR. TORREGROSSA: Objection
4  to form and also to the scope to
5  the extent it's calling for legal
6  retention testimony.
7      Go ahead.
8  BY MR. SMITH:
9  Q. I'm not asking you for
10 anything your lawyers told you. I just
11 want to know if the old voice mails,
12 after 10 days, if they exist?
13     MR. TORREGROSSA: Same
14     objections.
15     Go ahead.
16     THE WITNESS: No.
17 BY MR. SMITH:
18 Q. I just want to follow up on
19 a question I asked you yesterday.
20     My understanding is that you
21 don't have a job description, a
22 description of your objectives or a
23 performance review or any other document
24 that would list your job

Page 420

1  responsibilities; is that correct?
2      MR. TORREGROSSA: Form.
3  BY MR. SMITH:
4  Q. Do you want it read back?
5  A. Yes, please.
6      - - -
7      (The court reporter read the
8      pertinent part of the record.)
9      - - -
10     THE WITNESS: No.
11 BY MR. SMITH:
12 Q. It's not correct.
13     How is it incorrect?
14 A. I have performance reviews
15 that will have not direct -- not directly
16 listing every single application that I'm
17 responsible for, but in general, the role
18 requires certain activities and
19 responsibilities, behaviors, so on and so
20 forth, and those are listed. So I do
21 have performance review information.
22 Q. And that will list some
23 systems or applications that you're
24 responsible for?

Page 421

1  A. That will list activities
2  that I was involved in, maybe systems
3  listed in there during a particular
4  performance period.
5      I also want to say that
6  there are job descriptions for our
7  department that list roles and
8  responsibilities.
9  Q. Okay. And there would be in
10 your department a description of your job
11 roles and responsibilities, is that what
12 you're saying?
13 A. The information that you're
14 referring to is typically held and
15 maintained by human resources.
16 Q. But it exists?
17 A. Yes, yes.
18 Q. In your meeting request to
19 your colleagues, did you specifically ask
20 them not to send or bring you any
21 documents about their systems?
22     MR. TORREGROSSA: Don't
23 answer that. That request was
24 privileged or at the direction of

Page 422

1  counsel.
2  BY MR. SMITH:
3  Q. Are you refusing to answer
4  that question then?
5      MR. TORREGROSSA: You're
6  following my instructions.
7      THE WITNESS: I'm following
8  my lawyer's instructions not to
9  answer the question.
10 BY MR. SMITH:
11 Q. Did your lawyer tell you to
12 send such a communication to your
13 colleagues?
14     MR. TORREGROSSA: You can
15 answer that yes or no.
16     THE WITNESS: No.
17     MR. SMITH: And Counsel, if
18 you didn't tell him to do it, then
19 how is it privileged?
20     MR. TORREGROSSA: It's my
21 determination what's privileged.
22 I met with him. I told him what
23 to do. It's my determination. I
24 stand by my instruction.

Page 423

1      THE WITNESS: Did I
2  understand --
3  BY MR. SMITH:
4  Q. I hope so.
5  A. Did I understand the
6  question correctly?
7  Q. The question was, did your
8  lawyer tell you to send a letter to your
9  colleagues requesting a meeting but
10 asking them not to send you any or bring
11 you any documents about their systems?
12     MR. TORREGROSSA: Don't
13 answer that. That's privileged,
14 and that was not the question that
15 was asked.
16     MR. SMITH: Well, I think it
17 was, but we'll let the court
18 reporter be the arbiter and ask
19 her to read back the question.
20      - - -
21     (The court reporter read the
22 pertinent part of the record.)
23      - - -
24 BY MR. SMITH:

Page 424

1  Q. Do you still have the notes
2  that you made when you met with your
3  colleagues in preparation for this
4  deposition?
5      MR. TORREGROSSA: You can
6  answer that yes or no.
7      THE WITNESS: I'm sorry, the
8  question again, please.
9      MR. SMITH: Could you read
10 it back to him.
11      - - -
12     (The court reporter read the
13 pertinent part of the record.)
14      - - -
15     THE WITNESS: Yes.
16 BY MR. SMITH:
17 Q. Where are they located?
18 A. They're in my briefcase.
19 Q. Where is your briefcase?
20 A. I think I brought that to --
21 here to Philadelphia.
22 Q. Where in Philadelphia?
23 A. DoubleTree Hotel.
24     MR. SMITH: That's all the

Page 425

1  questions I have.
2      MR. TORREGROSSA: Counsel
3  for Lilly, any questions?
4      MS. THOMAS: No.
5      MR. TORREGROSSA: We will
6  read and sign. We would like to
7  mark the cross-notices of this
8  deposition as Draper-12 and ask
9  the court reporter to put the
10 state case cross-notices on the
11 caption.
12     COURT REPORTER: All of
13 them?
14     MR. TORREGROSSA: Please.
15 And we would note for the
16 record that at this time we would
17 allow other counsel to ask
18 questions, but Tom Mellon from the
19 Scheller firm is not here, nor are
20 any other counsel.
21     MR. SMITH: When I say
22 that's all the questions I have at
23 this time, I'm not concluding the
24 deposition, I'm suspending the

Page 426

1  deposition, because I think we're
2  going to have some matters to take
3  up with the magistrate.
4      MR. TORREGROSSA: And of
5  course our position is this
6  deposition is closed.
7           - - -
8      (Deposition Exhibit No.
9  Draper-12, Packet of
10 Cross-Notices, was marked for
11 identification.)
12          - - -
13     (Deposition adjourned at
14 approximately 1:42 p.m.)
15          - - -

Page 427

1  CERTIFICATE
2
3
4      I HEREBY CERTIFY that the
5  witness was duly sworn by me and that the
6  deposition is a true record of the
7  testimony given by the witness.
8
9
10 _____   _____
   ANN MARIE MITCHELL, a Federally Approved
11 Certified Realtime Reporter, Registered
   Diplomate Reporter and Notary Public
12 Dated: May 21, 2007
13
14
15     (The foregoing certification
   of this transcript does not apply to any
16 reproduction of the same by any means,
   unless under the direct control and/or
17 supervision of the certifying reporter.)

Page 428

1  INSTRUCTIONS TO WITNESS
2
3      Please read your deposition
4  over carefully and make any necessary
5  corrections. You should state the reason
6  in the appropriate space on the errata
7  sheet for any corrections that are made.
8      After doing so, please sign
9  the errata sheet and date it.
10     You are signing same subject
11 to the changes you have noted on the
12 errata sheet, which will be attached to
13 your deposition.
14     It is imperative that you
15 return the original errata sheet to the
16 deposing attorney within thirty (30) days
17 of receipt of the deposition transcript
18 by you. If you fail to do so, the
19 deposition transcript may be deemed to be
20 accurate and may be used in court.

Page 429

E R R A T A

PAGE  LINE  CHANGE

Page 430

1  ACKNOWLEDGMENT OF DEPONENT
2
       I,_____, do
3  hereby certify that I have read the
   foregoing pages, 261 - 428, and that the
4  same is a correct transcription of the
   answers given by me to the questions
5  therein propounded, except for the
   corrections or changes in form or
6  substance, if any, noted in the attached
   Errata Sheet.
7
8  _____
   DARRYL DRAPER          DATE
9
10
   Subscribed and sworn
11 to before me this
   _____ day of _____, 20_____.
12
   My commission expires:_____
13
14 _____
   Notary Public

Page 431

LAWYER'S NOTES
PAGE  LINE