21

1  them up if it helps you, that's fine.  I don't mind
2  bringing the equipment up.  On the other hand, Power Point
3  is what Power Point is.  You can decide whether they're
4  useful to you.  There are other ways to supply them to me.
5  You can submit them and I can put them up on my screen
6  here and then we don't need all the equipment, tell me
7  which slide you want to use.  I have got the software.
8  But anyway.
9           MR. MAGAZINER:  Thank you, Your Honor.
10          THE COURT:  I don't want to tell you how to
11  practice law.
12     Okay.  Let me hold off on the initial discovery
13  requests.  And the formatting issues that looks like it's
14  going to be something to talk about in greater depth.
15     The papers you submitted suggest the absence of a
16  meeting of minds on the issue of pilot or Bell Weather
17  cases.  Has there been any further discussion between
18  counsel on that?
19          MR. TRAMMELL:  Fletch Trammell for plaintiffs.
20     At the last status conference we proposed the idea of
21  selecting some Bell Weather plaintiffs to do -- to take up
22  the issue of aggregation in context of the individual
23  cases.  Court requested that the defendants come up with
24  counter proposal or our proposal, or at least answer our
25  proposal.  They filed what they proposed a pilot program

22

1  with several hundred cases.  I suppose the most practical
2  thing to do, and we haven't had a chance to talk about it,
3  I suppose the most practical thing to do is make agreement
4  on that so the Judge doesn't have to necessarily decide an

```
 5    adversarial position.  I think it's possible to find some
 6    common ground on that.  We would at least like the
 7    opportunity to do that and present our own competing
 8    program if that's not going to happen.
 9              THE COURT:  Mr. Magaziner, the proposal from the
10    defendant struck me as outlandish.  The notion of three
11    hundred pilot cases suggests to me a scattering of effort.
12    That does not serve the purposes of having a designation
13    of Bell Weather cases.  I don't see them as an opportunity
14    to do statistically significant sampling of things.  But
15    rather to the extent that you want issues to be presented
16    in the context of real live people, we can do a few of
17    them.  But I understand the notion of doing 300 of them
18    and the protocol by which you wanted to select them would
19    be better off asking the BCS voters to choose plaintiffs
20    for us, it seems to me.
21         It just struck me as unduly cumbersome.
22         And as you noted in your slide, we have three Florida
23    cases.  From a standpoint of judicial economy, even those,
24    using those as development cases would since they're going
25    to stay here presumably, if they go that far.
                                                              23
 1              MR. MAGAZINER:  May I address that?
 2              THE COURT:  Yes.
 3              MR. MAGAZINER:  Notion of Bell Weather trials or
 4    Bell Weather cases is one that has been much explored in
 5    MDLs for many years.  It gets complicated by the Lexicon
 6    Doctrine.  As you know in Lexicon, the United States
 7    Supreme Court ruled that Judge Conway does not have
 8    jurisdiction or authority to try any case if it's filed in
```

9   another district and transferred to this district.  So the
10  only cases she could try under Lexicon are the three cases
11  that are filed in Florida.  What plaintiffs typically do
12  in MDLs is, being aware of Lexicon, they select for filing
13  in the district where the MDL is eventually located, cases
14  that they think are particularly good for them, knowing
15  that the district court judge is going to able try cases
16  filed in that district.
17       That completely skews the purpose of a Bell Weather
18  trial.  Because instead of having cases that are
19  representative of the cases in the inventory of 7,000 now
20  pending before the Court, we get cases hand selected by
21  the plaintiffs filed in this district, with the hope that
22  the Court will then focus its attention on those three and
23  treat them as representative of the 7,000 cases or almost
24  7,000 filed elsewhere.
25       Because of that, as the judicial -- as the Manual of

                                                           24

1   Complex Litigation points out, courts that have tried to
2   establish any kind of process for testing and sampling and
3   learning something about the cases in front of them have
4   thought that a random selection of cases not controlled by
5   the plaintiffs, not selected by AstraZeneca, but randomly
6   selected serves a purpose much better of informing the
7   Court and the parties of the attributes of the cases in
8   the Court's inventory.
9        To focus on the three Florida cases would be a gross
10  distortion of that principal because they're cases
11  selected by plaintiffs rather than cases that represent
12  the inventory.
13       We're not proposing of course, that this Court would

```
14    try the 300 cases that we propose being the pilot program.
15    By definition, the Court could not try those cases unless
16    one of the randomly selected cases happens to be one from
17    Florida.  The odds against that are -- I'm not a
18    statistician -- the odds against that are pretty great.
19    If we selected 300 cases at random from 7,000, the odds
20    that it would be one of the three Florida cases is small.
21         But we're saying a random selection will actually
22    give Your Honor and Judge Conway a better opportunity to
23    appreciate the nature of these cases.  It may well be that
24    300 is a wrong number.  Maybe the number should be 250 or
25    200 or 150 because what we propose is to work up those
                                                          25
 1    cases, see what happens to them as the process unfolds,
 2    and learn from that how to establish procedures to deal
 3    with the remaining cases in the inventory.  We're not
 4    again talking about a trial.  We're talking about pretrial
 5    activities focused on those 300 or 200 cases.
 6         Bearing in mind what Your Honor said about Power
 7    Point, I'm not sure if I want to show you the other slides
 8    we prepared about Bell Weather.
 9              THE COURT:  I'm just saying even if you want to
10    use Power Point, there's easier ways than this.  You may
11    need to open your laptop.
12              MR. ROTH:  Isn't there a new Middle District
13    rule that we get sort of advance notice of some of this
14    before we come to the hearings if there's going to be a
15    Power Point presentation?
16              THE COURT:  Well, it's argument.  I mean this
17    isn't evidence.  Yeah, it would be nice if you would do
```

```
18   that.  A lot of things would be nice if you do it.
19             MR. MAGAZINER:  If we get our Bell Weather
20   program where the Court thinks that makes sense to have a
21   Bell Weather program, this is what experience shows is
22   likely going to happen.  And our view is as we go through
23   the -- I'm sorry -- our pilot program.  As we go through
24   the pilot program that we're proposing, something close to
25   it, this is what we think will happen if there were, for
```
                                                                26
```
 1   example, 300 cases chosen at random, 300 plaintiffs chosen
 2   at random.  We would expect that if those 300 plaintiffs
 3   are required to provide fact sheets sooner rather than
 4   later, some of them will fail to complete their fact
 5   sheets.  That always happens.  We would then come back to
 6   the Court and say those cases should be dismissed.  Some
 7   of them will fail to provide medical authorizations.  As
 8   always happened in every MDL we have been involved in, we
 9   come back and see a plaintiff is not willing to provide
10   medical authorizations to get the records.  Those cases
11   must be dismissed.
12        Failure to respond to other written discovery, for
13   example, we do not have it in the plaintiff fact sheet but
14   we think we would like to find out how many of these
15   plaintiffs actually have been adjudicated by some court
16   elsewhere to be incompetent to handle their own affairs
17   and have a guardian appointed for them.  Because if so,
18   this Court's going to have to do something about those
19   cases.  Substitute the guardian if the guardian is
20   interested in pursuing the case or dismiss it if the
21   guardian -- the person found by some other Court to be in
22   charge of the plaintiff's affairs, says it's not a case
```

```
23   that the guardian wants to pursue.  We would expect cases
24   to disappear at that point.
25        Failure to appear for deposition.  If we require
```
                                                                    27
```
 1   plaintiffs to show up for a deposition after we collect
 2   the medical records, experience teaches that some number
 3   of plaintiffs will fail to show up.  Despite counsel's
 4   efforts plaintiffs just are not interested enough in
 5   pursuing the case to show up.
 6        So we're going from 300 cases to -- 250 to 200, maybe
 7   100 left after we go through this process.  If Your Honor
 8   imposes a Lone Pine requirement, which is something we
 9   briefed or mentioned in our pilot program, that is a
10   requirement that the plaintiffs at some point down the
11   road submit an expert report on causation from a qualified
12   physician.  Experience teaches that many plaintiffs'
13   counsel as a focus on the case decides it's not worth
14   incurring the expense of obtaining an expert to prepare a
15   report because plaintiffs' counsel having focused on the
16   case realizes the case is not worth pursuing.
17        Beyond that, we would expect as we focus on these
18   cases with some of these other issues to develop.  And
19   these are all what we would call case specific issues.
20   I'll explain what I mean by that.  No Seroquel use of
21   course -- if a plaintiff says, "I took Seroquel, I got it
22   from the Rite-Aid Pharmacy."  When we subpoenaed the
23   Rite-Aid Pharmacy's records, there is no record of ever
24   filling a prescription for Seroquel.  We would expect the
25   plaintiffs' counsel would agree with us the case should be
```
                                                                    28
```
 1   dropped.
```

```
 2          No general causation.  By that we don't mean a
 3     generic question of whether Seroquel can cause diabetes,
 4     which I know is going to be a hotly contested issue in
 5     this case.  But some of the plaintiffs have alleged other
 6     medical conditions.  So if a plaintiff alleges, for
 7     example, a bladder problem caused by the use of Seroquel,
 8     we will come back to the Court, I predict, and say there
 9     is no scientific literature ever suggesting that the use
10     of Seroquel has been associated with, has been reported to
11     be associated with or can cause a bladder problem.  And
12     that would be a Daubert issue, perhaps, for the Court.
13     But you would say, you agreed with us, or Judge Conway if
14     she agreed with us, that's right, there is no basis in
15     which a plaintiff with a bladder problem could go forward
16     claiming Seroquel was causing a bladder problem.
17          No specific causation.  That would be a doctor
18     saying, for example, this plaintiff is claiming that her
19     diabetes was caused by the use of Seroquel.  Her diabetes
20     was diagnosed eight years, 15 years before she ever took
21     Seroquel.  And the plaintiff will find that no doctor is
22     willing to say Seroquel caused the diabetes in someone who
23     had previously been diagnosed with it.
24          Your Honor mentioned this next one:  Estoppel or
25     double recovery.  We may find not only that people took
                                                              29
 1     other atypical antipsychotics like Zyprexa and Risperdal,
 2     but they in fact have filed lawsuits against the
 3     manufacturers of those other antipsychotics claiming the
 4     exact same injuries, and perhaps have even participated in
 5     a settlement to be compensated for injuries which they're
```

```
 6    now claiming we'd cause.
 7           Continued use after filing suit.  We think that's
 8    going to be a threshold issue for many cases.  If a
 9    plaintiff having filed a lawsuit identifying all the side
10    effects that he alleges Seroquel caused continues to use
11    Seroquel, we would think as a matter of law there could be
12    no failure to warn claim left because once the doctor
13    knows everything about all the things plaintiff says can
14    happen, and the doctor says, please continue to use
15    Seroquel, that claim is gone we believe as a matter of
16    law.
17           Learned intermediatory.  Law in most states and as
18    Your Honor correctly observed, even though most of these
19    claims were filed in the District of Massachusetts, the
20    substantive law will be the law of about 46 other states
21    where these plaintiffs reside.  The law of most states,
22    not all, but most, says that if the doctor was given
23    adequate warnings of the side effects or if the doctor
24    understood the side effects without regard to anything the
25    pharmaceutical company told him or her, and the doctor in
                                                              30
 1    light of that understanding or those warnings opted to
 2    prescribe Seroquel, then that case has no merit, cannot
 3    proceed to trial.
 4           We would expect to be able to raise issues like that
 5    out of these 300 cases.
 6           Statute of limitations Your Honor understands.  And
 7    preemption.  If we have cases of people who first do
 8    Seroquel after the January 2004 label change, whose claim
 9    is that the label was inadequate to warn them of the risks
10    of Seroquel, we would belief that those cases are
```

11  preempted.  We don't know how many there are.
12      As you saw from one of my previous slides, our
13  testing of the eight first filed complaints revealed only
14  two people who alleged that they first used Seroquel after
15  the label change.  But there are 103 plaintiffs who told
16  us nothing.  It could be that all of them are post label
17  change plaintiffs.  We don't know.
18      Our experience.  Several of us were involved in some
19  other litigations where pilot programs of this nature were
20  adopted.  The one that comes to mind most readily is
21  Baycol.  The Sidley firm and we were involved in that
22  case.  In Baycol, Judge Davis created a 238 plaintiff
23  pilot program.  It was 200 cases transferred to his
24  courtroom by means of MDL transfer.  And the 38 cases
25  filed in the District of Minnesota which is where that MDL

                                                         31

1   is located.
2       So if we were to analogize here, that would be 200
3   cases filed elsewhere plus the three cases in Florida.  Of
4   those 238 cases, Your Honor, after they went through this
5   kind of pilot program, the number was reduced to not 100,
6   not 50, not 25, not 10, zero.  Zero cases went forward.
7   Zero.
8       That's what the history of these sorts of pilot
9   programs has proven to be.  That when there is some
10  testing, some focus, some analysis of these claims not
11  only by us, but by the plaintiffs' lawyers who quite
12  frankly have not had the ability, I'm sure, to really look
13  deeply into some of these claims, because the Bailey firm
14  I think has eight lawyers in it, according to its web site

```
15   and they have almost 6500 plaintiffs.  So I'm sure they're
16   doing their very best, but I'm sure that as we focus on
17   these claims, they will learn more about the claims than
18   what they now know.  Experience teaches that when that
19   focus is applied, a pilot program of 300 may be reduced to
20   100 or 50 or zero.  And we urge the Court to adopt that
21   kind of pilot program.
22              MR. TRAMMELL:  Brief response.
23        In listening to the explanation of the pilot program
24   some things were made clear.  I think that we're maybe not
25   as clear in reading about it which -- the purpose is to
```
                                                                      32
```
 1   identify cases that they think have a basis for being
 2   dismissed and try to dismiss those cases, which of course
 3   is not the reason that the Court might entertain a pilot
 4   program of any type.  The reason that the Court might do
 5   it is that it wants to identify whether there's general
 6   issues that affect a majority of cases and try to decide
 7   those issues that those rulings apply to the majority of
 8   the cases.
 9        I don't know whether there's a Seroquel bladder case.
10   I know that I don't have one.  But truth is that the
11   majority of these cases are people who are very ill with
12   diabetes or diabetes-related illnesses.  To the extent
13   that there is a pilot program, it needs to be identifying
14   people who the Court first of all can consider under
15   Lexicon.
16        Second, people who reflect the majority of the
17   plaintiffs in the MDL.  Otherwise, this Court will rule
18   for years on individual case-based motions to dismiss or
19   motions for summary judgment where multiple depositions
```

```
20   have to take place and where the Court gets bogged down
21   not deciding the things that affect the majority of
22   plaintiffs.  So if there's a pilot program we would
23   propose that it would be plaintiffs that satisfy the
24   requirements of Lexicon, the requirements of the mult-
25   district litigation scheme.  The plaintiffs reflect the
```

                                                                      33

```
 1   majority of the plaintiff populations, I think that's the
 2   only way that pilot program makes sense, helps the Court
 3   conduct an efficient MDL.
 4          With respect to the facts represented to the
 5   individual cases filed here in the Middle District, I
 6   think Mr. Roth has more information to the extent the
 7   Court is interested in that.
 8              MR. ROTH:  I was just going to say, maybe I
 9   misunderstood his argument from the first Power Point, but
10   the Florida cases were filed here in Florida because the
11   plaintiffs were Florida residents.  And I thought that was
12   part of the criticism of the initial presentation was
13   because all those folks in Massachusetts whoever they are
14   weren't Massachusetts residents.  Since my name went on --
15              THE COURT:  I didn't hear any criticisms.  He
16   was just recounting a fact.
17              MR. ROTH:  I just wanted --
18              THE COURT:  It may be implied, but I didn't hear
19   any.
20              MR. ROTH:  I just wanted to point out that since
21   my name went on those complaints, they were filed in
22   Florida because the plaintiffs resided in Florida.
23              MR. MAGAZINER:  I didn't intend any criticism,
```

```
24   Your Honor.  I would expect that plaintiffs' counsel would
25   file their cases in the venue where it's most advantageous
                                                              34
 1   to them.  They have a responsibility to do that on behalf
 2   of their clients.
 3        And what I was trying to point out to the Court,
 4   however, is that a pilot program that focuses only on
 5   those cases --
 6            THE COURT:  I understand.
 7            MR. MAGAZINER:  -- Your Honor can try under
 8   Lexicon as a three case program.
 9            THE COURT:  I understand.
10        I keep half waiting for Congress to repeal the
11   Lexicon or overrule it.  They haven't done it yet.  Maybe
12   they never will.  They talked about it some.
13            MR. MAGAZINER:  That might fall into be careful
14   what you ask for.
15            THE COURT:  I didn't say I wanted it.  I'm
16   anticipating it and I don't think Judge Conway -- It's an
17   abstract matter.
18        When Lexicon was decided there was, as you know, a
19   lot of discussions in judicial circles and academic
20   circles, I'm sure bar circles about it.  And there were a
21   lot of courts that thought it should have gone the other
22   way.  It's more efficient.  I haven't studied it in any
23   detail.  It seemed to me to be clearly correct on the
24   statute, and based on something that Congress can change.
25   But that's neither here nor there.
                                                              35
 1        I'll ponder what you said.  I have got to say, Mr.
 2   Magaziner, most of the issues that you put up there may be
```

```
 3   reasons why cases may not go to trial, but that doesn't
 4   strike me as for most of them why it's advantageous to
 5   have a pilot program.  There are a couple of them that may
 6   help.
 7           MR. MAGAZINER:  Mr. Trammell said that if
 8   there's going to be a pilot program it ought to be a
 9   representative sample, which, of course, we say is
10   correct.  That's why we say let's randomly select them.
11   It's not a representative sample if plaintiffs' counsel
12   selects the cases that are going to be in the sample.
13           THE COURT:  No.  I understand.
14           MR. MAGAZINER:  And what I was trying to say and
15   I think Mr. Trammell may have pointed out a failure of
16   communication on my part, we're not trying to use this
17   pilot program to get rid of cases.  We're trying to use a
18   pilot program to educate the parties and the Court on what
19   sorts of cases these are so the Court can say, you know,
20   if it turns out that 60 percent of these cases there is no
21   actual Seroquel use -- I'm making that figure up, of
22   course.  I wouldn't expect it to be that high -- that
23   would then inform the Court on entering some orders maybe
24   to quickly deal with the Seroquel use issue before
25   anything else is dealt with to determine whether this is a
```

                                                              36

```
 1   case that is actually going to be adjudicated.
 2           THE COURT:  By the same token, you're going to
 3   have these plaintiffs' fact sheet, PFSs, and I'm sure you
 4   will be doing your own analysis.  If you think whatever
 5   sample you draw, if there's an issue like that, I would
 6   expect you to raise those things.
 7           Anyway, I'll make a determination on that and make a
```

```
 8    recommendation to Judge Conway.
 9              MR. MAGAZINER:  May I address that last issue
10    you raised, if I haven't outstayed my welcome about --
11              THE COURT:  I want to move on.  I have got
12    criminal defendants coming in here.  Unless you want to
13    end up representing them or joining them, you got to move
14    forward.
15              MR. MAGAZINER:  I don't think a criminal
16    defendant would want to have me represent them.
17              THE COURT:  You would be surprised.
18              MR. TRAMMELL:  Your Honor, the plaintiffs would
19    like to have a competing program to present to the Court
20    if --
21              THE COURT:  You better move pretty quickly.
22        I tried to impress upon you the need to -- because I
23    have noticed now we have had several of these hearings,
24    and we talk about some things and we leave things for the
25    next agenda and sometimes -- I don't know how many hours
                                                              37
 1    you've spent talking to each other.  Some issues sound
 2    like you talk immediately and make a lot of progress and
 3    others doesn't seem like there's been much discussion
 4    until we get pretty close to the hearing date, and some
 5    you come to agreements on and some you don't get very far.
 6    So --
 7        All right.  I didn't see anything in anybody's
 8    papers, but I may have missed it, on thoughts about
 9    setting up an ADR program.  Any thoughts about having a
10    mediator appointed and having them on standby, whether
11    it's for pilot cases or Bell Weather cases or special
```

```
12   referrals or just to have somebody on board that you would
13   then refer to when you get to that point?
14            MR. CAMP BAILEY:  We talked informally after the
15   last hearing here in the jury room and welcomed anyone to
16   be involved with the ADR process.  I think Mr. Pennock had
17   someone in mind or we were happy with whoever the Court
18   would suggest down here in the Middle District.
19            THE COURT:  What occurs to me is we get a
20   mediator appointed for the case, it may be multiple
21   mediators, but go ahead and get them on board and require
22   that you meet with them to, for want of a better word,
23   educate that mediator a little bit and then decide whether
24   to make use of the mediator services as the case goes
25   forward.  Now, we talked about mediators.  We're
```
                                                           38
```
1    comfortable  with it here in Florida.  It's a concept
2    that's worked very well both in state court here and the
3    federal court.  But it's not the only way to do ADRs.  We
4    can do shadow juries.  We can do test trials.  We can do
5    any number of other things that we can do.  I'm open to
6    that.  My inclination is to -- we have got some really
7    excellent local mediators who have proven success in
8    various fields.  If you get one of them involved, even
9    invite the mediator to attend our next hearing or the
10   hearing after that, bounce some ideas off that mediator
11   about how best to structure it, it might do some good.  As
12   I say, Mr. Magaziner, that's one of the reasons to have a
13   more robust pilot program than some of your other reasons.
14            MR. MAGAZINER:  Well, to some extent I agree
15   with what Your Honor said.  I should preface my remarks by
16   making clear to the Court that at this moment in history,
```

```
17   we don't have any reason to think we're going to want to
18   settle any of these cases.
19            THE COURT:  I'm sure of that.
20            MR. MAGAZINER:  So --
21            THE COURT:  History has a way of teaching us
22   things.
23            MR. MAGAZINER:  To be sure.  But at the moment,
24   based on what we understand about what happened to the
25   company, we don't think there was any negligence on the
```
                                                                    39
```
 1   company's part.  So --
 2            THE COURT:  If we had a mediation today you
 3   would say your offer is zero and you would stick to it.
 4            MR. MAGAZINER:  So all I'm suggesting is if
 5   there ever comes a time when we are in a position to
 6   reconsider that because we think that would be the proper
 7   way to go, I'd think some sort of mediation might be
 8   something to be considered at that time.  I think at this
 9   point it would just be a waste of time because at this
10   point we will be saying we're not offering anything and to
11   have a bunch of mediations where our consistent offer is
12   zero is sort of a waste of time.
13            THE COURT:  Next issue I wanted to get settled
14   before it got lost, the frequency of future hearings in
15   front of me.  It's obviously expensive to bring all of you
16   down here.  And we had a lot to talk about.  We continue
17   to have a lot to talk about.  Do you have a sense, once
18   every three weeks or once a month, two weeks?
19            MR. MAGAZINER:  We proposed in the case
20   management order that we submitted --
```