```
21            THE COURT:  I saw that.
22            MR. MAGAZINER:  -- every other month.  We had a
23   discussion with plaintiffs' counsel before Court convened
24   this afternoon.  They thought that by that we were
25   proposing twice a month and I meant to propose every other
                                                              40
 1   month.
 2            THE COURT:  That's one of those words that --
 3            MR. MAGAZINER:  I learned my lesson.  I'm never
 4   going to use that word again.  But anyhow, as I understood
 5   Mr. Trammell said, he thought that every other month would
 6   be an appropriate timeframe unless there was some
 7   emergency or other urgency involved or the Court for some
 8   reason wanted to convene us more frequently than that.
 9            MR. TRAMMELL:  That's correct, Your Honor.
10            THE COURT:  Well, I'll tell you what we're going
11   to start out with, because until we get more of these
12   things firmly scheduled than we have now or likely to have
13   by the end of today's hearing, I think we may need to meet
14   more frequently than that.  I welcome you all to appear by
15   phone or if you want to sit in a video conference we can
16   do that, and I didn't hear back from my technical staff
17   about the streaming audio but I think he's about ready to
18   get that available to those who don't want to hook up on
19   the phone line.
20            MR. ROTH:  Can that done in the courtroom?  I
21   did recommend that to several of the outside counsel but I
22   wasn't sure if we do it in here.
23            THE COURT:  We have audio streaming now that's
24   internal to our network, and all I really need to do is
25   tell him -- he needs to make sure he's got a couple
```

41

1    glitches taken care of.  He's confident he can do it.  The
2    problem is getting it outside the court's firewall and to
3    have it on the Internet with a link that people using the
4    Internet can use, and also limiting the number of people
5    that can do that so the thing doesn't collapse.  And also
6    not violate Supreme Court dictates about broadcasting
7    federal proceedings.
8        So I think he can solve those problems, get it
9    through the firewall, and then we would have it.  But,
10   yes, it would be from the existing system we have.  It is
11   already doing that for all -- I know Judge Conway is
12   listening to us.  I don't know that, but she may be.  She
13   has the capability.
14       And we have -- actually, the other divisions of this
15   court have got -- as you may see, normally we don't use a
16   court reporter for most of our proceedings, just the ones
17   there's lots going on, and we're pretty confident there's
18   going to be a transcript, we ask for a court reporter to
19   come.  But most of the things are recorded on tape.  We're
20   going to switch that to digital recording as soon as we
21   move into the new courthouse.  So you can actually get the
22   digital file that way.  There's a fee for it, but
23   anyway --
24       Anyway.  I'd like to schedule another hearing for the
25   16th of January.

42

1             MR. MAGAZINER:  I'm very sorry.  I'm taking a
2    one week vacation in January that  happens to be that one
3    week.  Any time -- I'm actually leaving on the 12th and
4    then be gone the following week.  If Your Honor could

```
 5   possibly accommodate that schedule I would very much
 6   appreciate it.  It's a long scheduled vacation.  I hate to
 7   make such a request on the first appearance before Your
 8   Honor but I think if I didn't my wife would not be
 9   pleased.
10            MR. ROTH:  I took an informal poll of our side
11   and Thursdays generally worked pretty good.  Because
12   Fridays are bad travel days and Mondays are Mondays.  So
13   to the extent that works with the Court's calendar.
14            THE COURT:  All right.  Set it for the 25th at
15   2:00.
16            MR. MAGAZINER:  Very much appreciate that.
17   Thank you.
18            THE COURT:  It's my preference to avoid weeks
19   when I have criminal duty obligations as I do this week.
20   I have got some extra criminal duty this month because
21   Judge Glazebrook is unavailable.  I'm hoping January will
22   be a little bit better.
23      All right.  Where do we stand in terms of the -- let
24   me -- before I get to that.  The motion for creation of a
25   steering committee, defendant have any position on that?
```

43

```
 1            MR. MAGAZINER:  As to the steering committee, we
 2   don't much care one way or the other.  We certainly don't
 3   oppose it.  We're very much in favor of the appointment of
 4   lead counsel for the plaintiffs.
 5            THE COURT:  Again, it struck me that having any
 6   entity with the title "steering" as eleven hands on the
 7   tiller is a recipe for disaster.  I don't understand that
 8   concept.  I particularly don't understand why we have got
```

```
 9    multiple people from the same firm on a proposed steering
10    committee.  And I'm not entirely sure -- I understand the
11    difference between lead counsel and steering committee.
12    Maybe semantic problems on my part, but somebody want to
13    address that?
14              MR. ROTH:  I know on at least for several
15    members from the same firm at least the idea is, it was
16    presented to me, was just to make sure that -- as you can
17    see, it's imposed mostly of firms who have the majority of
18    the cases.  And having more than one person who's working
19    on the cases from that firm part of the steering committee
20    avoids the problem with, for example, Mr. Pennock can't be
21    available for something at least somebody else from the
22    firm is available to make decisions.  And that was the
23    rationale behind it.  I know it's not the traditional way
24    of doing it, but that was simply the rationale to gather
25    the firms that are going to be most involved in the cases
```
                                                                44
```
 1    because they have most of the cases, and then have one or
 2    more people from that firm inside all the discussions so
 3    that there is continuity there.  And we don't have a
 4    breakdown because somebody's in trial someplace else on
 5    some other case for four weeks from that firm.  And that's
 6    the sole reason, Judge, on that.  And again, it's mostly,
 7    I think there's maybe, what, five or six firms total out
 8    of the maybe 11 names or so that are on that list?
 9              THE COURT:  Well, what's the difference in
10    function between the steering committee and lead counsel?
11              MR. CAMP BAILEY:  I think lead counsel was
12    specifically so the defendants would have somebody to come
13    to on our side and know that when we represent something
```

```
14   or make an agreement with the other side we have the
15   authority to bind the group.  The committee was basically
16   our ability to go back to a representative sample of the
17   people who represent most of these cases to make sure we
18   had a consensus on behalf of whatever official group we
19   have on our side to get an agreement to then relay back to
20   the defendants.
21              THE COURT:  Would I be empowering that committee
22   with any authority by designating them as a steering
23   committee?
24              MR. CAMP BAILEY:  They would also have the
25   ability to take multiple other tasks like depositions.
                                                          45
 1              THE COURT:  You can do all that -- you're going
 2   to be doing that by yourself anyway.  I'm wondering if I'm
 3   giving them some authority that they exercise by majority
 4   vote or super majority vote or that binds other people who
 5   aren't on the committee.  I mean, is there some magic to
 6   this or is this really, just really blessing your internal
 7   convenience?
 8              MR. CAMP BAILEY:  I think just recognizing the
 9   people who have a significant stake in that they have a
10   significant number of cases in this case, in this MDL,
11   that they have sufficient seat at the table to not be
12   excluded from things, get to weigh in on their own
13   opinions, get to participate as they will.  But I don't
14   think there is anything magic that prevents them from
15   doing any more or less work than someone not on a
16   committee.
17              MR. ROTH:  I think that also the -- it was at
```

```
18        least intended, we tried to keep the -- you asked for the
19        specifics or the role or functions of the PSC or whatever
20        better name or acronym we come up for it, but like I know
21        over the weekend and last week there was discussions
22        about, you know, all sorts of issues and different members
23        of that group participate in the different issues, and so
24        that's how we thought that we would maintain both
25        flexibility of the continuity in terms of being able to
                                                                       46
 1        come to this -- you know, meet and confers because the
 2        lead counsel may not be present for meet and confers
 3        possibly and but somebody else from the committee would be
 4        and they could make those decisions.  So we tried to keep
 5        it as loose as possible and as general as possible in
 6        terms of what their functions would be.  But basically,
 7        it's help steer the ship as we go forward.  And if
 8        anybody -- no one has -- I canvassed every plaintiff's
 9        lawyer so far and no one has had objection to, you know,
10        that proposal in that format or however the Court may
11        tweak that format either as individuals or as to
12        functions.
13                THE COURT:  This is another one on which I'll
14        make the report and recommendation to Judge Conway, and if
15        you don't like what I have done, you can comment on it.
16                Let's move on to the -- one other little thing.  My
17        prior notice of hearing provided that if you wanted to
18        have an order for bringing in Blackberrys and the like
19        that you file a motion at least three days in advance.  I
20        point out to you that under Rule 6A, that means three
21        business days.  And it really is an imposition on the
22        Court if those things show up a day before a hearing or in
```

```
23        this case Friday before Monday hearing.  So I remind you
24        of that.
25             Let's get to the initial round of discovery problems
```
                                                                        47
```
 1        that you got.  I gather that discussions on that continued
 2        through the weekend.  Where do you stand in terms of
 3        plaintiff's understanding how defendants keep documents
 4        and what's going to be produced and what you need?  So the
 5        IT deposition.
 6             MR. JENSEN:  Keith Jensen for plaintiffs, Your
 7        Honor.
 8             In terms of where we stand right now is able to
 9        achieve a quorum, if you will, among the plaintiffs'
10        counsel in terms of the order we originally moved for on
11        December 5th and the second order we just filed yesterday,
12        Sunday the 10th.  And that quorum has reached the decision
13        to propose just yesterday's filed order, a much less
14        onerous one, one that was tailored off what we first got
15        Friday late afternoon from AstraZeneca counsel.  I might,
16        Your Honor, there's a number of issues that go into how
17        that final order that you might sign should be shaped.  I
18        choose to start with the, I believe, the more
19        straightforward issue before I get into the ones where
20        there's perhaps more disagreement.
21             First one is database discovery, Your Honor.  The
22        order now before the Court that the plaintiffs filed
23        yesterday, Sunday, the 10th, the order to the parties to
24        simply confer on database production and the format of how
25        the database will be produced.  And to facilitate those
```
                                                                        48
```
 1        discussions, requiring what AZ filed with the Court on
```

```
 2    Friday, which are the Delaware Federal Courts e-discovery
 3    default standards that they be used to require AstraZeneca
 4    for the first time to give us a list of who their
 5    e-custodians are, for example, and other basic disclosures
 6    required by the Delaware Federal Court.
 7         We submit that not ordering such discussions right
 8    now, Your Honor, allows AZ to hypothetically dictate the
 9    type, if any, timing of database discovery in which may
10    very well impede if not render impossible our ability to
11    comply with the Court's refreshingly aggressive deadlines
12    on preemption issue, discovery and briefing.
13         Second issue, search terms, Your Honor.  Again, right
14    back to the Delaware default standards, AZ brought to our
15    attention and the courts on Friday, they require the
16    parties meet and confer on search terms to be used to
17    search electronic databases.  All this order does is,
18    again, order the parties hypothetically to confer and
19    reach agreement on search terms, words and phrases.  It
20    also allows plaintiffs the ability to ask AZ and have them
21    run potential second searches because, of course, all
22    we're doing when we guess at search terms is exactly that.
23    Prior litigations would indicate that we would have no
24    idea what relevant terms might be because we don't know
25    the terminology like semi-monthly, that they might or
                                                              49
 1    bimonthly that opposing counsel, their entire corporation,
 2    might use to designate certain documents.
 3         Hence, we have asked for, very similar to a
 4    deposition transcript, Your Honor, that a concordance be
 5    produced.  Perhaps ironically a software program called
```

```
 6    Concordance which would allow the defendants in their
 7    electronic searches to produce -- pardon the repetition --
 8    a concordance of all the search terms, how often they
 9    appear, and how many different documents they appear in.
10    This would allow the plaintiffs' guesses to become
11    slightly more educated guesses as to those search terms.
12    It's all straightforward and reasonable.
13          It ordered also privileged logs and redaction logs,
14    Your Honor.  I think there's two easy issues under those.
15    The prior discussions between counsel, AZ had expressed a
16    justified concern that they didn't want either such log
17    creation or submission to slow down this Court's schedule
18    for preemption discovery and briefing.
19          Hence, the order before Your Honor contemplates that
20    AZ need not produce a privilege log until something is
21    done and provides them an "or."  Either that they produce
22    all discovery they assert is responsive to plaintiffs'
23    already filed and served first request for production or
24    issues they believe are relevant to preemption discovery.
25    Obviously -- there needs to come to that point, we submit,
                                                            50
 1    Your Honor, before we could have preemption service.
 2    Doing it otherwise would allow the potential production to
 3    be halfway through before we're required to review all the
 4    evidence, take our depos, and respond to their preemption
 5    brief.
 6          And secondly, in oral discourse as recently as
 7    yesterday, Your Honor, they objected to the type of
 8    information we're requiring or asking they be required to
 9    give in privilege redaction logs.  Those requirements in
10    the proposed order before Your Honor came virtually
```

11    verbatim out of Judge Fallon's MDL production preservation
12    protocol order entered in the Propulsil products liability
13    litigation as was our first order was based on.
14         Now, hard copies.  The parties have been unable to
15    reach an agreement on hard copies, documents produced by
16    AstraZeneca.  Your Honor, there is really two types of
17    hard copies.  There is ones already in existence in a
18    format ready to send to a document depository either
19    because copies have already been made or because AZ
20    chooses to put original documents in depository.  For
21    those documents this copying and scanning obligation
22    expense is plaintiffs'.  But there is also documents not
23    in a format ready to go to a document depository.  Such as
24    uncollected or unidentified custodian files.  As we sit
25    here today, we don't have any custodial file identities.

                                                    51
1     We don't have an organizational chart, despite the fact
2     they produced one a year ago in other litigation.  But
3     they stand on confidential and have chosen not to give it
4     to us yesterday.
5          For all these second type of documents, Your Honor,
6     the cost of scanning/OCRing and copying is substantially
7     the same.  For example, if the cost of scanning is 13
8     cents a copy and the cost of a copy is 12 cents a copy,
9     you need to, we submit, subtract the cost of maintaining,
10    manning and making a physical depository available.  Those
11    are the producer's costs, not the requester's cost.
12         Further, Judge, we believe to the extent that any
13    equity should play a role in your decision, here --
14    sitting here three months after organizational chart

```
15    discussion began, not even having one, not having any list
16    of electronic systems or databases, not one or any
17    information about what their document production or
18    retention standards or practices are, we believe the
19    plaintiff should not be further prejudiced with
20    AstraZeneca's choice to hypothetically produce what
21    amounts to a paper dump of documents and custodial files.
22    Because we want to adhere to and have the ability to
23    adhere to this Court's refreshingly aggressive schedule
24    for preemption briefings and discovery.
25              Hence, our order proposes this, Your Honor, as a
```
                                            52
```
 1    potential resolution to the matter.  If the difference
 2    between the scanning/OCRing of documents by AZ versus the
 3    copying of documents is greater than 15 percent, then that
 4    is the percent for which the parties should be ordered to
 5    agree.  And if they fail, come to Your Honor for a
 6    resolution of those additional costs.
 7              Another alternative, Your Honor, is for the type one
 8    set of documents that I defined, ones that are already in
 9    a format to be put in a document depository or originals,
10    that we copy and provide AZ our OCRs of them.  But for all
11    others, for yet to be identified custodians for other
12    documents they yet to create a potential paper dump for us
13    that AZ do the same.  And that they scan/OCR them and
14    provide us the OCRs.
15              Next is redactions.  How should it be handled.  There
16    are two issues.  There is a cost issue of redaction.
17    There is a content issue of redaction.  First, the cost of
18    a simultaneous OCR, we're talking about redacting a
19    document.  As we understand it, subject to correction, AZ
```

```
20    is going to produce all redacted documents in electronic
21    TIFF form and Bates stamp, Your Honor.  Because AZ is
22    scanning them, whether the purpose is to protect patient
23    confidentiality or to advance their assertion of a
24    privilege, AZ is degrading that original document, whether
25    it's hard copy or whether it's an electronic form.  There
```
                                                                53
```
 1    is virtually no additional cost to a simultaneous OCR of
 2    the document.  Therefore, we submit, that the plaintiff
 3    shouldn't incur the costship of AZ's choice to follow the
 4    law and/or advance their assertion of a privilege and have
 5    a degraded document that's less searchable that will pick
 6    up less characters through electronic searches.
 7         Next issue is how do you handle the redaction.  The
 8    content of nonredacted material and metadata, Your Honor,
 9    needs to be produced, we submit, in text searchable form.
10    We understand AZ's position -- they can correct me if I'm
11    wrong -- that they propose a TIFF/OCR of the unredacted
12    material, and the TIFF, not a text, if you will, dot txt
13    searchable file of the unredacted material.  If this is
14    the case, the plaintiffs lose the ability to the search
15    capability on the nonredacted content and metadata.
16         And I mean by metadata, two things.  One, the
17    objective list, that is sender, the recipient, the author,
18    the data of creation.  And two, the metadata based on some
19    definitions includes or excludes the actual content of the
20    document.  Okay?
21         AZ, as I understand it said, well, we can't do that.
22    We can't pull the content of the document out of the
23    original electronic image without messing up, without
```

```
24    altering the metadata.  No, we believe there is very
25    easily available, in fact free Microsoft available
                                                              54
 1    software, that allows them to pull the redacted content
 2    from the electronic image and therefore produce a fully
 3    .txt searchable electronic form.
 4          And, again, we don't believe we should be prejudiced
 5    by their advancement of the searchable privilege and
 6    therefore we should get a fully .txt searchable of the
 7    nonredacted content and of the metadata.
 8          Preservation order, Your Honor.  We believe there are
 9    a number of reasons why it's appropriate in this case.
10    First, despite numerous requests and opportunities
11    including Your Honor's directive on November 20th to have
12    a full discussion of nature of recordkeeping and record
13    retention policies, as I indicated, but to be clear, we
14    don't know of a single recordkeeping practice.  We don't
15    know of a single record retention policy despite at least
16    three scheduled multi-person teleconferences to adduce
17    such information on three of which we had our at least one
18    IT person present who was on the phone.  And on two of
19    which we had a second IT person with us who's presently on
20    the phone.  They've yet to bring an IT person to any of
21    these teleconferences.
22          They propounded -- excuse me -- submitted law for the
23    proposition that need a temporary injunction to enter a
24    preservation order.  Your Honor's I'm sure aware that the
25    Pueblo versus U.S. case, '04, the United Medical case is
                                                              55
 1    U.S. -- is just three months ago, September '06.  They
 2    said, no, we don't need to meet probably injury or
```