```
 1                   UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION

 3              Docket No.6:06-MD-1769-Orl-22DAB

 4    . . . . . . . . . . . . . . ..
      IN RE:                        :
 5    SEROQUEL PRODUCTS LIABILITY   :
      LITIGATION                    :        Orlando, Florida
 6    MDL DOCKET No. 1769           :        March 2, 2007
                                    :        10:00 a.m.
 7    ALL CASES                     :
                                    :
 8    . . . . . . . . . . . . . .:

 9

               TRANSCRIPT OF PRETRIAL CONFERENCE
10          BEFORE THE HONORABLE DAVID A. BAKER
                UNITED STATES MAGISTRATE JUDGE
11

12    APPEARANCES:

13    For the Plaintiffs:          Paul Pennock

14                                 Larry M. Roth

15                                 Fletch Trammell

16                                 Kenneth W. Smith

17                                 Lawrence J. Gornick

18                                 Michael E. Pederson

19                                 Scott Allen

20                                 Scott Burdine

21                                 E. Ashley Cranford

22                                 Dennis Canty

23                                 Lowell Finson

24

25    Court Reporter:      Sandra K. Tremel, RMR/CRR
```

```
 1   APPEARANCES CONTINUED:

 2   For the Plaintiffs:        Lezzlie Hornsby

 3                              David Matthews

 4                              Howard Nations

 5                              Robert Schwartz

 6                              Lorie Siler

 7   For the Defendant

 8   AstraZeneca:               Fred Magaziner

 9                              Stephen J. McConnell

10                              Shane Prince

11                              James Freebery

12                              Robert L. Ciotti

13

14   Proceedings recorded by mechanical stenography, transcript

15   produced by computer-aided transcription.

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S

2             THE DEPUTY CLERK:  The case number is

3    6:06-MD-1769-ORL-22DAB.  In re:  Seroquel products

4    liability litigation.

5         Counsel for the plaintiffs in the courtroom, please

6    state your appearances.

7             MR. ROTH:  For the record, Larry Roth on behalf

8    of the MDL plaintiffs.

9             MR. PENNOCK:  Paul Pennock on behalf of the

10   plaintiffs.

11            MR. ALLEN:  Scott Allen, Houston, Texas, on

12   behalf of the plaintiffs.

13            MR. TRAMMELL:  Fletch Trammell, Bailey Perrin

14   Bailey, for plaintiffs.

15            MR. BURDINE:  Scott Burdine, Hagans Burdine, for

16   the plaintiffs.

17            MR. NATIONS:  Howard Nations, Houston, Texas,

18   for the plaintiffs.

19            MS. SILER:  Lorie Siler, Nations Law Firm, for

20   the plaintiffs.

21            MR. MATTHEWS:  David Matthews, Houston, Texas,

22   for the plaintiffs.

23            THE DEPUTY CLERK:  Counsel for defendants in the

24   courtroom, please state your appearances.

25            MR. MAGAZINER:  Fred Magaziner for AstraZeneca.
```

4

```
1              MR. McCONNELL:  Stephen McConnell for
2   AstraZeneca.
3              MR. PRINCE:  Shane Prince for AstraZeneca.
4              MR. CIOTTI:  Robert Ciotti for AstraZeneca.
5              THE DEPUTY CLERK:  And now counsel on the phone,
6   please state your appearances for the record.
7              MR. SMITH:  Ken Smith for the plaintiffs.
8              MR. GORNICK:  Larry Gornick for the plaintiffs.
9              MS. CRANFORD:  Ashley Cranford for the
10  plaintiffs.
11             MR. CANTY:  Dennis Canty for plaintiffs.
12             MR. FINSON:  Lowell Finson for plaintiffs.
13             MR. PEDERSON:  Michael Pederson for plaintiffs.
14             MS. HORNSBY:  Lezzlie Hornsby for the
15  plaintiffs, Nations Law Firm, Houston, Texas.
16             MS. NIXON:  Angela Nixon, non-counsel filling in
17  for Robert Schwartz for plaintiff.
18             THE COURT:  Anybody else?
19        All right.  The clerk has asked me to notify
20  plaintiffs' counsel that we're going to make a change in
21  the MD docket.  There's going to be -- some of the entries
22  end up listing all 6,000 or 7,000 plaintiffs as having
23  filed something, which is tedious to print or display on
24  the screen and not useful.  We're going to create a new
25  party called "all plaintiffs."  And so that the effect
```

1    will be the same, but instead of listing all names, we

2    will list "all plaintiffs" as a designation.

3        So if you could, that should be a box that you should

4    be able to choose as who you're filing on behalf of, and

5    that will change the look and appearance.  Should be

6    easier for you and for us.

7        I have got to say that I'm perplexed by the approach

8    the parties are taking with respect to discovery.  Let me

9    ask, plaintiffs' counsel, as of today, what level of

10   documents have been made available to you and how much

11   have you actually reviewed?

12        MR. PENNOCK:  Paul Pennock for plaintiffs, Your

13   Honor.

14        As of today, we have been provided the NDA and the

15   IND, which we believe to be complete, although I don't

16   think it's been certified to be complete.  However, I

17   don't think there's a requirement it be certified.  I

18   just -- we believe that it is a complete document.

19        We have essentially completely reviewed the IND and

20   NDA.  And in fact, the folks that we had reviewing it,

21   we're holding a meeting with them in Houston at the end of

22   the month in order that everyone else can sort of be

23   educated on the findings and the outlines of everything

24   that's happened in terms of their review of the IND.

25        That was I think something on the order of 470,000

1   pages, which we finally, after working out the formatting

2   and so forth with the defendants, we received that in a

3   way that we could review it and in the format that we

4   wanted.  Again, I'm not faulting the defendants for the

5   formatting issues that we had to work out, but I think we

6   got that, I want to say six or eight weeks ago.  So I

7   think we have done a substantial amount of document review

8   for that.

9        In addition, about four or five weeks ago, or it may

10  have been a little longer than that, we got the eight

11  custodial files.  Those are not complete.  We have been

12  told that those are not complete.

13       And we have completed some portion of the review of

14  that, although our stated goal is that prior to our

15  meeting in Houston at the end of the month, we will have

16  completely reviewed all eight of those custodians and will

17  be prepared with respect to those eight custodians.  We

18  have started the review of that.  We have people,

19  including my office, looking at those files as we speak.

20       So if the Court has concerns that we're getting

21  things that we're not actually working on, I understand

22  those concerns, and I think they're fair and legitimate,

23  but the fact is that we are dedicating a tremendous amount

24  of time and resources to looking at those documents.

25            THE COURT:  Well, I mean, that's not my --

```
 1    that's part of my concern.  My concern is, I don't
 2    understand why we need 80 custodians.  To me, what you're
 3    entitled to from the defendants, it doesn't make any
 4    difference whether this is a single plaintiff case or a
 5    200,000 plaintiff case.  You're entitled to documentation,
 6    and I don't understand why this is complicated.  I don't
 7    know why we should have to wait months for you to get
 8    those things, and I don't know why you need 80 custodian
 9    depositions to talk about them.
10         MR. PENNOCK:  I don't know that we do, Judge.
11    You're right.
12         The first part of it is that we have not -- we
13    certainly don't have enough information now to say to the
14    defendants who are the custodians that we want.  I mean,
15    there are certain ones that we could identify clearly we
16    would want and we've -- you know, I think that would not
17    be in dispute.
18         But these 80 custodians were selected by the
19    defendants, and we just frankly, the vast majority of
20    them, we just don't know whether they actually are
21    custodians that we would want or that we would want to
22    look at.  In fact, we're sort of worried that we're going
23    to go through a lot of these custodial files and expend a
24    lot of effort only to find that it isn't anyone that we
25    could care less about, and yet, we really won't know until
```

1   we dig in and do that.

2       So those are the two problems.  We didn't pick them

3   and we just don't have the information yet.  We are going

4   to build information as we go along.  We're going to

5   ascend a learning curve, and we're already starting to

6   ascend it.

7       And that's why in the order that we propose, we want

8   to be able to notify them of what custodians we want and

9   then get those files per some reasonable schedule.  The

10  scheduling, when we were here the last time, the Court

11  said that it would like some deadlines, and we agree there

12  should be some fixed and certain deadlines.

13      It's often been said that attorneys are like --

14  litigators are like a gaseous substance, we will fill up

15  whatever space there is.  And so deadlines I think will be

16  helpful even though we will no doubt fill up those

17  deadlines.

18      So we are going to ascend a learning curve, and we

19  are going to hopefully, with the Court's permission, be

20  able to ask the defendants for custodians that we want.

21  I'm sure that some of these 80 are ones that we would

22  want, but not all of them.

23      But we've sort of -- without any other way of putting

24  it, I feel we've sort of been saddled with these 80.  So

25  if these are the 80 that they think are most important,

1    then we would like to get them as soon as possible so that

2    we can get through them as soon as possible and figure out

3    whether this is enough or whether it isn't.

4        The Court raised the issue of depositions and how

5    many depositions need to be done.  Typically in an MDL --

6    I certainly don't think there are going to be 120

7    depositions or anything close to that in this MDL of the

8    defendants.  Typically in an MDL, I think there are

9    somewhere -- I think the Baycol litigation, maybe there

10   were 70 or 80 depositions of corporate personnel.  I

11   really don't think we will have that many depositions

12   here.

13       And part of the proposal that we have is just leaving

14   some leeway to ensure that we're not truncating ourselves.

15   But, you know, at the end of the day, I mean, we feel that

16   it's likely that we will need somewhere in the range of 30

17   to 40 depositions.  Typically the majority of those are

18   depositions that flesh things out and sort of just give

19   you the picture so you can understand the most important

20   five or ten depositions.  But you still need to do those

21   extra ones to understand the important ones.

22       But I do understand anyone's reaction to how in the

23   world, why in the world would you need 120 depos.  I don't

24   think we do, and there was certainly a notion of let's not

25   truncate ourselves in that proposal.

1        But, you know, we are -- there is no doubt that in a

2    case like this, there is a tremendous amount of

3    information that we need to learn and understand.  In the

4    Vioxx trials, which I participated in, there are documents

5    and discovery things that come up that no one has ever

6    seen before.  In the middle of trial you will have an

7    hour-long side bar on some document that gets pulled out

8    by defendant from the discovery that has never even been

9    looked at.

10       So there's a lot of information that is relevant, and

11   although at the end in a trial you boil that down to a

12   fairly limited amount, in order to boil it down, you still

13   need to collect and review a great deal.  But believe me,

14   we want to collect and review as little as we have to, and

15   we're not looking to burden the defendant with document

16   production and depositions that don't need to happen.

17       We have too small of a plaintiffs group here to even

18   contemplate doing that.  So that is not our goal, and it's

19   certainly -- even if it were, it's not something we

20   could -- a goal that we could reach.

21       So I hope that in some way answers Your Honor's

22   concerns and questions.

23           THE COURT:  All right.  We're calling these

24   people custodians.  I take it from reading the context

25   that that's not really an accurate term.

1          MR. PENNOCK:  The term --

2          THE COURT:  They're not your witnesses, so...

3          MR. PENNOCK:  The term has been developed, and I

4    think the defendants often prefer to go about document

5    production this way, although I'll let Mr. Magaziner

6    comment on that, but the term has been developed that if

7    you have, you know, the director of -- let's take the

8    medical director of the company for drug development.

9    That person has within his or her possession, literally in

10   his or her office, on the laptop, on the Palm Pilot, on

11   their computer, and arguably even at their home, documents

12   which are relevant to the drug.

13        And so the way the production works is they, the

14   defendants will go to that person's office quite

15   literally, as I understand it, and collect everything and

16   print it and take the data off the computers and get it

17   all together for that one person.  So now we know that

18   everything that has been -- that the medical director has

19   maintained over the years that's relevant to the drug has

20   been collected.

21        And then we go to the next person who may have been

22   involved, let's say the national sales director for the

23   drug.  And we will collect everything from that person,

24   and now we know we have all that person's documents.

25        But that doesn't mean we now have all the medical

1    documents or all of the sales documents.  That just means

2    we have whatever those two people had.

3            THE COURT:  Well, that's what I'm saying.

4    You're entitled to the corporation's documents, wherever

5    they come from, and some 30(b)(6) depositions, to follow

6    up with the individuals that you think either you need

7    explanations from or that you think there's something that

8    isn't quite kosher, that you don't think the documents

9    reflect the true picture.

10       This seems like an awful cumbersome way to get you

11   the information you need.

12           MR. PENNOCK:  Well, I don't disagree it's

13   cumbersome, although I think in litigation by --

14           THE COURT:  Normally when we talk about a

15   custodian, it's a person who has charge of documents under

16   some set of responsibilities, and you take a deposition

17   for 45 minutes to establish a chain of custody or -- but

18   if these are substantive witnesses that you want to

19   depose -- I just don't understand why we need any

20   depositions to establish what documents you're getting.

21   It makes no sense to me.  And you do 15 a month and carry

22   this thing out for a year.  It makes no sense.

23       You're entitled to the documents sooner than that,

24   and then you're going to pick the witnesses that you

25   really need to take.  I don't know why it should take more

1    than six or seven months to get all -- everything you

2    need.

3            MR. PENNOCK:  Well, Judge, we have been here, as

4    the Court is well aware, for six months already.

5            THE COURT:  That's what troubles me.  You should

6    have had some -- a lot of this stuff way before now.  If

7    you haven't gotten it, that's a problem.

8            MR. PENNOCK:  We're equally troubled by that,

9    and the -- you know, by Judge Conway's order, we're

10   prevented from taking any depositions until the first 2500

11   fact sheets are served.  And those, we have about 1700

12   served, and by April 1st, which is the deadline, I think

13   we will have our 2500, and then we will be able to proceed

14   with depositions.

15       And I'm certainly in agreement with the Court that we

16   want to proceed with depositions and start discovery and

17   do it on -- based on the files that we have already

18   received and reviewed.  But I don't know that that -- that

19   we will be able to get all those depositions done in six

20   or seven months, although our schedule doesn't call for

21   much longer than that.

22           THE COURT:  Well, the schedules that both of you

23   proposed that you -- you've got some may be achievable and

24   might allow the possibility of the case getting ready.

25   That's not going to work.

 1          And let me hear from defendant on this subject.

 2          MR. McCONNELL:  Our Honor, the reason we have

 3  custodial production and the reason it was agreed to in

 4  this case, and the reason that's the way the documents are

 5  typically produced in these type of mass torts is, it's

 6  the only way that it reasonably works.

 7          When the case is filed, we know we're going to have

 8  to produce all the reasonably relevant documents relating

 9  to Seroquel and it's going to be millions and millions of

10  pages.  And we have an obligation to go out and identify

11  where those documents are and how we can collect them and

12  put them in a state where they could be produced to the

13  plaintiffs, and that's what we did.

14          And what we did was, looking throughout the company,

15  we identified everybody who we thought might have any

16  documents relating to Seroquel, and we identified 80

17  people.  So you're right, the word "custodian" here isn't

18  used in the sense that we typically use it when we talk

19  about a custodian of documents.

20          But we came up with the 80 people, and the reason you

21  have to do the collection and the production on a

22  custodial basis is, first of all, it's really the only way

23  you can do it.  If you think about how we get these

24  documents, we have to go -- and as Mr. Pennock said, if

25  you know there's somebody who has a position where they

1    may have something to do with Seroquel, we have to go in,

2    we have to interview that person and find every possible

3    place where they've had documents, hard documents, in

4    storage, out in the hallway, in any device they have.  At

5    home.  We have to find all those documents.  So that

6    collection is done on a custodial basis.

7         And we have collected those documents.  We have

8    already produced for the initial eight custodians

9    something like 220,000 pages of documents.  Another

10   600,000 are on the way.

11        Now, Mr. Pennock says that we may not need to depose

12   all 80 of those custodians, which is of course great news.

13   He also says, what if there are other people, what if we

14   find out that there are other custodians, other people who

15   had something to do with Seroquel who are not on the

16   initial 80 list.  Then we have to add those people.  We

17   have to get the documents from those people, and we have

18   to turn them over.

19        And if the plaintiffs want a different priority, if

20   they think that some of these 80 custodians are not people

21   they're really interested in, that's fine.  If there are

22   other people they are more interested in, that's fine.  We

23   will move those people up in priority.

24        But the point is, if you want us to get moving and

25   collect all the documents, we have got to get out there

1   and collect those documents from those 80 custodians, and

2   you produce them on a custodian basis because, first,

3   that's really the only doable way to do it, but second, if

4   you want to depose somebody, you want to depose somebody

5   when you know you have got all their documents.

6        If we were to sort of just go in there the way you do

7   on a typical smaller case and say, let's just try to

8   corral all the documents in the company relevant to this,

9   that's something that you can do in a smaller scale case.

10  You can't do that here.

11       We never have all the documents from particular

12  custodians.  They take depositions of witnesses.  It would

13  turn out there are still certain things that haven't been

14  collected or produced, and we have to go back and do depos

15  and do them again.

16       As the plaintiffs recognized in their paper, they

17  don't want to do that.  If they're going to take a

18  deposition of somebody, they want to take one deposition.

19  They want to know that they have everything from that

20  person.

21       So the custodial way is the way that was agreed to

22  earlier.  It's the way we have been working for months in

23  this case.  It's the way that we are working.

24       We have a schedule.  We can produce all the documents

25  no later than September.  That's not that far off.  And in

1    a case of this magnitude, that's with unprecedented

2    celerity.

3        And I think that the only disagreement that we had

4    coming in was sort of the pace of doing that.  Whether all

5    the documents would have to be produced in April, which is

6    absolutely undoable, or, in some of our negotiations,

7    whether we produce files from 15 a month as opposed to 20

8    a month.  That's doable.

9        That's a gap that can be bridged, and that's a gap

10   that can allow us, once we bridge it, to get this

11   production done, bring in all the documents that are

12   relevant, whether from these 80 custodians or anybody else

13   that any of us figure out, us or the plaintiffs, and get

14   this case in a position to have it ready within two years

15   as Your Honor ordered.

16            MR. PENNOCK:  Your Honor, may I respond?  First,

17   with respect to these 80 custodians which they have

18   selected, part of the initial problem we have and why

19   we're worried that there will be a lot more people who we

20   will actually want documents from, is that I think the

21   earliest time any of these people worked at the company,

22   at least by a -- per a chart that they gave us, was 1997.

23       Now, this drug -- development for this drug began in

24   the late '80s.  I think the IND was filed in like '88 or

25   '89.  And certainly there is an awful lot of information,

 1    and typically very critical information, that becomes

 2    available to the company during that development period,

 3    and during both the preclinical and clinical trial period,

 4    which all took place before 1997.

 5         So I don't think there is any doubt that there are

 6    going to be different folks whose information and files

 7    that we want.  But again, we didn't select these 80.

 8         As far as --

 9              THE COURT:  Have you talked to them about

10    30(b)(6) subject matters?

11              MR. PENNOCK:  We have discussed with them that

12    we would like a 30(b)(6) depo on the organization of the

13    company, both presently and going back basically 15 or 20

14    years.

15         We talked to them about a 30(b)(6) depo for MIS, so

16    that we can sort out databases.

17         But what Judge Conway -- right now we're operating

18    under an order that we are not allowed to get those

19    depositions, again, until the 2500 fact sheets are served,

20    which we'll have --

21              THE COURT:  You can't designate them and get

22    them set?

23              MR. PENNOCK:  The notices?

24              THE COURT:  Right.

25              MR. PENNOCK:  Actually, I'm not sure that we

1    would be entitled to serve that notice.  I think we're

2    stayed from --

3            THE COURT:  Well, you can negotiate and get it

4    ready.

5            MR. PENNOCK:  Well, we can --

6            THE COURT:  Or I'll modify the order.

7            MR. PENNOCK:  -- certainly try to do that, but

8    we're stayed from conducting those depositions or serving

9    notice of them until after the 2500 fact sheets are due.

10   But then we're allowed to move forward and notice whatever

11   depositions we want.

12       Can I just say one thing about the 80 custodians also

13   in terms of how quickly they should be delivered to us?

14   And I know that they're concerned about the April 7 date.

15   Perhaps that's a little abbreviated for the time period,

16   but I'm not sure how abbreviated.

17       Of those 80 custodians, I was looking at it last

18   night, 30 of them, according to a document that we got

19   from them that's in the papers, 30 of them were -- they

20   have a collection date of 2005.  So now they would have to

21   update the collection of those -- from those custodians up

22   through a later time period, because we want to see what

23   those custodians were saying and doing up through the

24   middle of 2006.

25       But a huge chunk obviously of those custodial files

1   was done, I guess, a year and a half ago.  I mean, we're

2   talking the earliest date was sometime in like October or

3   September of two thousand --

4           THE COURT:  If they were collected two years

5   ago, why didn't you have them six months ago?

6           MR. PENNOCK:  I don't know.  We just got this

7   last week.

8       And then that's 30 of them were in 2005.  The other

9   50 were all, according to this document, collected in

10  2006, and every one of those has a collection date of at

11  least July 6, 2006, which is two months before the initial

12  conference almost to the day that this Court held.

13      So I don't -- I understand that they need to go

14  through and update some of these -- some of this

15  collection, although July 6 is the cutoff that we have

16  agreed to.

17      So I'm not sure why we don't have them.  I'm not

18  saying that there is anything intentional at all.  I know

19  this is in all a very large and substantial project for

20  everyone concerned.  But my point is simply that getting

21  those documents sooner than September, much sooner than

22  September, is something that we think should happen, and

23  once we get them we'll commence reviewing them and we may

24  not -- in fact, I will say it's very unlikely we will

25  conduct even a quarter of those 80 custodial depositions.

```
 1              THE COURT:  Well, yeah.

 2              MR. PENNOCK:  But we're going to find new

 3   people, Judge.

 4              THE COURT:  You need certification as to who

 5   this person is, what they searched and, you know, you may

 6   look at most of those and say, yeah, that's exactly what

 7   we wanted.

 8              MR. PENNOCK:  We may.

 9              THE COURT:  And if you need to depose them to

10   clarify something, it would be very brief.  And then you

11   can focus on the merits.  I mean, you're talking about

12   corporate organization and MIS, but I mean, have you

13   talked to them substantively about who it is you need, the

14   medical director and any research scientist and that sort

15   of thing?

16              MR. PENNOCK:  Well, until we look at the

17   documents, we don't know.  I mean, you know, if -- you

18   know, I've personally been handed --

19              THE COURT:  Well, no, no.  I mean, you've got an

20   idea what the theory of your case is.  You know what --

21              MR. PENNOCK:  I do, but I don't know what that

22   person knew.  I mean, I have taken depositions of medical

23   directors who were post withdrawal from the market because

24   there was some thought that may -- and it turns out that

25   he knew virtually nothing that would be admissible at
```

1    trial because it all postdated the events in question.

2         So I mean, until we look at their documents and

3    figure out what the person knew and when did they know it,

4    so did they know anything, was what they knew relevant

5    and -- or might lead to some relevant evidence, and when

6    did all this transpire, until we've looked at all those

7    documents, we can't take the depo.

8         But we're willing to do that on a very quick

9    timetable, Judge, and we are doing it, and there are no

10   doubt depositions that we're going to take in these first

11   80, but those depositions will not be that brief.  I mean,

12   typically these depositions take -- I mean, we have a

13   two-day agreement between us that we would do the depo of

14   these people in two days.

15        But you're laying out the entire case in these

16   depositions.  Not only are you authenticating documents,

17   which often has to happen, and marginalia, writings in

18   these documents, but in addition, more importantly, you're

19   cross-examining the witness with their own words and their

20   own documents, and then those depositions are used by the

21   remand courts at the trials that may take place.

22        So that these witnesses are -- do not have to be

23   called into trial again and again and again at the remand

24   court.  Rather, the deposition, the videotape record is

25   used.

1            THE COURT:  How many -- do you have any estimate

2    as to how many people other than these custodians that

3    you're going to want from the defendant?  Substantive

4    people.

5            MR. PENNOCK:  Again, I apologize for being

6    redundant, Judge, but we didn't want these 80.

7            THE COURT:  I know that.

8            MR. PENNOCK:  Okay.  So I don't have an idea,

9    although I think it would be a very substantial number,

10   because these 80, not one of them, at least by the

11   information we have so far, not one of them had anything

12   to do with Seroquel before '97.

13           THE COURT:  In some cases 15 is a substantial

14   number.  Are you talking about 100 or are you talking

15   about 30?

16           MR. PENNOCK:  I don't think it would be more

17   than 30.

18           THE COURT:  How about third parties, the FDA and

19   other scientists?

20           MR. PENNOCK:  There certainly are some third

21   parties that we have already identified in the course of

22   our NDA review that we may want to depose.  It would be a

23   limited number.

24       As far as the FDA is concerned, if we're able -- I'm

25   not sure -- we haven't really reached that level --

1   whether there is anyone there that we would ask the Court

2   to permit us to depose.

3            THE COURT:  That's a -- you start out talking to

4   a brick wall when you're dealing with the FDA, and you're

5   going to need help from the Court in dealing with them,

6   it's a cumbersome process, as you know.

7            MR. PENNOCK:  That's right.  We haven't --

8            THE COURT:  It's not something to be put off to

9   the end.

10           MR. PENNOCK:  No, it wouldn't be, Judge.  It's

11  something that we may be able to decide in the next

12  several weeks, having completed the NDA production now,

13  review now.

14      And you're right, we will definitely need the Court's

15  assistance because they will -- generally at least will

16  not voluntarily appear for depositions.

17           THE COURT:  Well, or -- those are the ones where

18  I feel like I need a dental degree in oral surgery, to

19  extract anything out of government agencies.

20      Let me hear from the defendant.

21           MR. McCONNELL:  Your Honor, as to the question

22  about if these documents were collected a while ago, why

23  aren't they being produced yet, the first answer to that

24  is, that it wasn't until January that we reached an

25  agreement with the plaintiffs as to the format of the

1    production of the documents.

2         More and more of these documents over time involves

3    electronically stored information.  The plaintiffs want

4    certain sorts of metadata.  It took a long time to work

5    that out, and we worked it out in January, which mines you

6    collect the documents, but then documents have to be

7    processed to be put in the form that the plaintiffs want,

8    and that's one thing that's taking a lot of time.

9         But let me go back to this concept of custodian.  If

10   you take out the word "custodian" and put in the word

11   "witness," these 80 custodians are the people we've

12   identified as the people who are likely witnesses because

13   they did in fact work on Seroquel.  These are all the most

14   obvious suspects in terms of who worked with Seroquel.

15        If other people develop, they'll be added.  Fine.  If

16   the plaintiffs want to prioritize, they can do that.  In

17   fact, they already have.  They have already told us which

18   of the remaining 72, who are the ones they want us to do

19   first, and that's who we are doing first.

20        The 30(b)(6) point, Your Honor is right, that is

21   going to happen, and if, based on 30(b)(6), there are

22   other witnesses that the plaintiffs want to depose,

23   they're going to do that.

24        But the final point, Your Honor, is, in all of our

25   talks with the plaintiffs, what we have talked about is

1    doing these productions and doing these depos on a rolling

2    basis.  Doing, whatever it is, 15 or 20 per month.

3         That's the way that the plaintiffs want to do it.

4    It's the only logical way to do it, especially if you want

5    to dispose a witness when you have all their documents.

6    And that's a schedule that's manageable, and we're on

7    track to meet that schedule.

8         MR. PENNOCK:  Your Honor, may I just make one

9    final comment.  I mean, we have continued to propose that

10   this be done on a rolling basis, except for these first

11   80, which we feel that since it's been going on for so

12   long, that we need to get those files out as soon as

13   possible.

14        But as to the remaining work that we need to be done,

15   in terms of new custodians that we might identify, new

16   witnesses that we might identify, we have proposed that

17   that be done on a rolling basis.

18        And moreover, even as to these first 80 witnesses, to

19   the extent that we're going to depose them, we have

20   proposed that it be done on a rolling basis, between now

21   and next February 1st.

22        MR. MAGAZINER:  Your Honor, may I respond to

23   that briefly?

24        I'm somewhat mystified about what's going on here.

25   The discussions we had with the plaintiffs, and I can --

1   Mr. Pennock can confirm this, I think, or I can show you

2   an e-mail that will confirm it -- they said they're okay

3   with the custodial production.  That means, instead of

4   saying here are all the documents that deal with

5   advertising during 1999, give us documents by the person,

6   the witness in whose custody the documents are found.

7   They were all right with that.  It's incorporated in an

8   order, CMO2.

9        We then had a discussion about the timetable for

10  getting those documents to them.  What they proposed was

11  20 custodial files, that is files found in the possession

12  of a witness, 20 per month starting April 1st.

13       In our proposal, we said, we think that's ambitious.

14  Can we do 15 per month starting April 30th.  These are not

15  large differences.  20 per month starting April 1st, 15

16  per month starting April 30th.

17       In the papers plaintiffs filed, they said, instead of

18  20 per month starting April 1st, let complete the whole

19  thing, all 80, by April 7, which obviously is preposterous

20  and nothing to do with the position that we have been

21  talking about and try to negotiate for some time.

22       But the important point here is, what is reasonable

23  is some number of witnesses' files per month, starting

24  sometime in April.  They say 20 per month.  We said 15.

25  They say April 1st.  We said April 30.  That's where the

1  difference lies between what we think is feasible and what

2  they have, until the papers they filed on Monday, what the

3  plaintiffs have said they wanted from us.

4      So it's nice for them now to talk about April 7 for

5  completing it all, but that has nothing to do with the

6  reality of where we are, where we have been, what is

7  feasible and what is reasonable.

8      Also, I very much doubt that the plaintiffs can do

9  their job of reviewing the documents, analyzing them,

10  figuring out what additional information they may need

11  from us, at a faster pace than what we're proposing and

12  turning out documents.

13      We are proposing -- whether it's 15 a month or 20 a

14  month, it's going to be 10 million pages, maybe 15 million

15  pages.  Who knows?  In the Zyprexa litigation, which they

16  say is similar, it certainly involves another atypical

17  antipsychotic, as I understand, the number was between 16

18  and 20 million -- I don't have the precise number of pages

19  of documents -- which took two years to produce under

20  Judge Weinstein's supervision.

21      We're proposing to do an equally mammoth job in a

22  much, much shorter timeframe.  And I think the plaintiffs

23  understand that that's reasonable, that that is about what

24  one could expect the company to do, and that's what we're

25  proposing to do.

```
1          I think that the term "custodian," I think all the
2     lawyers on both sides of the aisle here have failed in our
3     job to communicate to the Court what we were talking
4     about.
5              THE COURT:  Well, no, I understood what you were
6     talking about.  I just think the term is not useful,
7     but -- it doesn't change the reality.
8              MR. MAGAZINER:  It's a term of art that the
9     lawyers use, and it's not something the Court -- we're
10    using it without informing the Court what it meant.
11             THE COURT:  Oh, no, I understood what you were
12    doing.  I just -- I think it's a poor term.
13             MR. MAGAZINER:  Well, we apologize.
14             THE COURT:  Given what that word normally means.
15    But I don't understand the approach either.  You just --
16    if you roll these out 15 a month starting the 1st of May,
17    you're not going to finish this year.
18         And then after all that is done, plaintiffs still
19    have lots of other people they're going to want to look
20    at, and this isn't going to get done in time.
21             MR. MAGAZINER:  Well, we think we can do all of
22    the 80 by -- including updating from the earlier
23    collection dates up through 2006, the middle of 2006, as
24    Mr. Pennock said -- by September 30.
25         We invite the Court to enter an order telling us we
```

1    need to complete it by September 30th.

2         If they, as they look at the documents, decide we

3    don't want witness Jones, we think he's not that

4    important, so stop collecting witness Jones files but give

5    us witness Smith's files instead, we'll do that.  We then

6    need to collect them from witness Smith.

7         We have a --

8              THE COURT:  I mean, I think what plaintiffs need

9    to do is get all the documents as quickly as you can

10   produce them, with certifications from each of these

11   witnesses as to the efforts they undertook to get things

12   from their files and the files for which they have access

13   and their predecessors', I assume we're getting, since

14   people leave the company or change duties, that through

15   this designation process you have identified everybody --

16   somebody -- there are probably some orphan documents out

17   there that no longer have a custodian because somebody's

18   changed titles or changed jobs or people have left, but

19   that all of the documents are produced.

20        And then plaintiffs figures out, out of those 80

21   people or anybody else whose name has popped up in any of

22   the documents, which ones they really want, which ones

23   they really need.  It won't be most of those 80, I

24   wouldn't think, and it would be a few other people.  So

25   that that gets done way sooner than you're talking about

1    here, so that they have got their best case to prove their

2    cause of action.

3              MR. MAGAZINER:  Your Honor --

4              THE COURT:  They have got to name experts based

5    on your documents.

6              MR. MAGAZINER:  Your Honor, I'd like to make two

7    points, if I may.

8         In my experience in other litigations of this sort,

9    what plaintiffs typically request is the documents be

10   produced on a custodial basis.

11             VOICE OVER PHONE:  Bailey & Galyen.  Our focus

12   is on solving your legal puzzle.

13             MR. PENNOCK:  I'm just glad it's not Weitz &

14   Luxenberg, Judge.

15             MR. MAGAZINER:  Maybe that term has something to

16   contribute here, but if I can continue.

17        In other litigations of this sort, what plaintiffs

18   are typically requested from the defendant, is that

19   documents be produced to them on a custodial basis.  As my

20   esteemed colleague has just explained to Your Honor, when

21   we go out to collect the documents, we have to go to

22   various people in whose custody we might find documents.

23   That's the only way to collect them.

24        And we collect them -- plaintiffs typically say, give

25   us those things on a custodial basis, rather than just

1  giving us documents as we collect them from various

2  people, here's some documents that came out of this file,

3  that file, the other file.

4      We're going through this process of using a custodial

5  approach because that is what in other litigation

6  plaintiffs typically request and what the plaintiffs in

7  this litigation agreed to.  No doubt because they also

8  find that is the most convenient way for them to receive

9  documents.

10      So it's not like we're inventing some sort of

11  complicated process that is unprecedented.  This is the

12  typical way documents are produced in this kind of

13  pharmaceutical mass tort litigation.

14      In terms of churning these things out as fast as they

15  can, Your Honor, I've prepared a little slide show.  A lot

16  of it has now sort of been covered, but if I can just --

17          MR. PENNOCK:  I'm sorry to interrupt

18  Mr. Magaziner, but I just -- there was something that was

19  said about five, ten minutes ago that I feel requires a

20  reply, and that was that we had, we the plaintiffs had

21  agreed to a rolling production of these 80 custodians and

22  then suddenly changed our mind and submitted a different

23  order.

24      But what -- the fact that I think needs to be again

25  enunciated is that after we had been discussing for some

1    weeks a rolling production, we received this proposal from

2    the defendants, which we objected to for a whole bunch of

3    reasons, that had this Exhibit A attached.  And for the

4    very first time we learned what I mentioned to the Court

5    earlier, that these files, commencement -- that collection

6    commenced on these files back in 2005.

7        So suddenly we were kind of -- first surprised we got

8    this Exhibit A from them, but secondly, we said to

9    ourselves, why are we agreeing, and why have we been

10   discussing this rolling basis production for months on end

11   or for weeks on end, when these files have already been

12   substantially collected, and as the Court pointed out, if

13   they've already been in the process of being collected for

14   two years, why don't we have them already?

15       And that was the reason that we had the change in

16   position that Mr. Magaziner referred to.

17           MR. MAGAZINER:  That's a little disingenuous, I

18   fear, Your Honor.

19       We gave them that list because we were -- let me try

20   to put this in context, if I may, Your Honor.

21       Seroquel is a drug that is still on the market.  Most

22   of the pharmaceutical mass tort litigations -- not all,

23   but most involve drugs that have been withdrawn from the

24   market.  But Seroquel is a drug that is still on the

25   market.  So as we are in court today, there are people at

1   AstraZeneca creating documents today relating to Seroquel.

2        We said to the plaintiffs, we need to establish some

3   sort of cutoff date for -- that we will collect documents

4   that were created up to a particular date in time, rather

5   than forever, because if you just say all Seroquel-related

6   documents, that means documents created on March 2nd,

7   2007, and it will mean documents created in August of

8   2007, and we will never come to an end.

9        They asked us what we had been doing in collecting

10  documents, and we said, we established different dates as

11  we went through and we can give you a list of the dates

12  that we've used as cutoff dates for the collections for

13  various of these witnesses or custodians, and we presented

14  that chart.

15       That doesn't mean the documents were ready to go in

16  2005.  It means we collected documents from a particular

17  witness through a particular date in 2005 or 2006, and

18  then we have been negotiating with the plaintiffs for a

19  month to several months about the format, as Mr. McConnell

20  mentioned to you, about the metadata they want us to

21  include in the documents, et cetera.

22       And as recently as February 20th -- here is

23  Mr. Pennock's e-mail to me as of February 20th.

24            THE COURT:  Mr. Magaziner, I've got to tell you,

25  the negotiations that you all had are not of great

1   interest to me, because as far as I was concerned, nothing

2   that the two of you were talking about is getting this

3   case ready fast enough.

4           MR. MAGAZINER:  I'm only responding to

5   Mr. Pennock's statement that they have not been proposing

6   a rolling basis for producing custodial files all along.

7   And they have been.

8       I agree with Your Honor -- I'll take this off the

9   screen.

10      I agree with Your Honor that the negotiations that we

11  have had should not be of interest to the Court.  They're

12  of interest to us because we're trying to reach some

13  resolution.  They shouldn't be of interest to the Court.

14      What should be of interest is what can feasibly be

15  done in a way that will allow us to get documents out in a

16  reasonable time and will allow them to review them and to

17  take the depositions of these 80 or however many of the 80

18  they want to depose on the substance of their documents,

19  and whatever other documents they want that are in the

20  custody of other witnesses within the company, and to take

21  the depositions of those people.

22      That's what we're trying to propose.  We believe that

23  we can get the documents that are already in the process,

24  all of them, to them on a 20 a month or 15 a month basis.

25  That will bring us to September 30, even updating the

 1   people whose documents we collected earlier.  If they have

 2   other people they want us to substitute, we're happy to do

 3   that.

 4       We have tremendous resources assigned to this, Your

 5   Honor.  I just -- if I may, here is what we're doing.

 6   Just so Your Honor has an idea, we have had for some time

 7   170 lawyers reviewing documents full-time.  We have 30

 8   additional lawyers conducting second-level document

 9   review.

10       We have recently retained another law firm, an

11   additional law firm, McCarter & English, to open another

12   facility in which there will be an additional 50 to 100

13   lawyers reviewing documents full-time in order to meet

14   this very ambitious but we believe feasible schedule.

15       And it's a schedule that the plaintiffs also believed

16   was reasonable until the papers they filed on Monday.  So

17   as I said, I'm a little mystified why it is that we're

18   having this discussion with the plaintiffs now when all

19   along they have thought this kind of schedule was

20   appropriate, reasonable, and the kind of thing that one

21   would expect a defendant dealing with what could be

22   ten million, 15 million pages of documents, the kind of

23   thing a defendant would have to do in order to deal with

24   that volume.

25       We're going to end -- we're going to have 220 or 300

1   or 270 lawyers, within a month we'll be up to that kind of

2   staffing, full-time document reviewers responding to the

3   plaintiffs' document requests here.  Full-time lawyers.

4        It's not like we are not investigating in this

5   process.  It's not like we're not pouring our resources

6   into it.  Just the contrary.

7        And we believe we can get these things out to them in

8   the format that they have requested on the schedule we're

9   proposing, which as I was saying is not very different

10  from the schedule that they themselves proposed until

11  their Monday filing.

12            THE COURT:  Mr. Pennock, how many expert

13  witnesses do you anticipate designating?

14            MR. PENNOCK:  I think that a trial of this

15  nature should -- general witnesses that may be subject to

16  a Daubert challenge will probably be two to three, I would

17  assume; that in addition -- meaning experts who will be

18  testifying regarding the foundations of general causation,

19  that Seroquel does indeed cause these injuries or can

20  indeed cause these injuries.  I think it will be two to

21  three of general causation.

22        I think additionally, whether they -- again, I don't

23  know that all of these we would end up deciding to use at

24  trial, but, you know, I imagine that we will have a

25  regulatory expert, somebody in that field.

1          As to the general causation, obviously -- maybe not

2    so obviously, but we would have an endocrinologist and we

3    would have probably an epidemiologist or a clinical

4    epidemiologist.

5          And in addition to those, the general causation and

6    the regulatory experts, I think there would be somebody

7    who typically -- this is again for trial -- who will take

8    the stand to discuss what was discovered in terms of what

9    the defendant knew and when did they know it.  We will

10   probably need a -- probably have a pharmacologist expert.

11         So when all is said and done, when our generic, as

12   some people call it, or I call it general expert

13   disclosures take place, I would imagine we will have six

14   or seven general experts.

15         There may be a marketing -- including a marketing

16   expert.  I don't know about a marketing expert, but

17   typically we have someone who will -- has reviewed

18   everything and sort of synthesizes everything for the

19   jury.

20         Obviously there's sometimes battles over what they

21   can say, is that within the realm of an expert opinion,

22   and so forth, but more often than not, we win out and

23   those experts are allowed to get on and you can put in

24   some documents through them and sort of paint the story.

25         So you will have those experts, and then I think six

1    or seven for the general, but I don't think any of that

2    could happen until discovery.

3              THE COURT:  Well, that's what I'm -- what do you

4    need to be able to designate these people?

5              MR. PENNOCK:  Well, we --

6              THE COURT:  Make them available?

7              MR. PENNOCK:  Before we would designate those

8    people, we would need to learn what our case is.  We would

9    need to have this evidence as to what the company knew and

10   when did they know it.

11         General causation is a perfect example.  It is, you

12   know, absolutely necessary that our general causation

13   experts have available to them not just what's in the

14   medical literature, but what the company had internally in

15   terms of studies that may not have been published,

16   information that has not yet and probably never will be

17   made available to the public.  And that information is

18   almost always the -- a bedrock for the general causation

19   opinion.

20         One of the reasons is, it's a little difficult to

21   cross-examine a general causation expert on their opinion

22   that the drug can cause these problems when their own

23   people inside, their own medical people inside were

24   drawing the same conclusions ten years ago.

25         So we will need to do the discovery against the

1    defendant and review these documents and do some number of

2    depositions, which I anticipate to be in the range, as I

3    said, between -- I think I said 30 to 40 depositions.  And

4    once all of that is done, and the entire record of this

5    case can be made available to our regulatory experts and

6    our medical experts and our clinical epidemiologist, then

7    we will be able to issue those expert reports, which I

8    suggested to be a year from yesterday.  That we would have

9    our generic general expert reports issued, and theirs

10   would be due a month from then, and we'd have two months

11   to get all the depositions done, with any general motions

12   being filed on July 1st of 2008.

13        And we will be essentially done with what really

14   needs to happen in this MDL -- there's no way these cases

15   can be remanded without all of that happening in this MDL,

16   and all of that would be done within two years from the

17   first conference.

18        And I think it's realistic.  I know that we're

19   committed to doing it, and that's the plan that I outlined

20   in my order that was attached to the papers filed by my

21   office.

22             THE COURT:  Mr. Magaziner, what areas and number

23   of expert witnesses do you anticipate from your side?

24             MR. MAGAZINER:  It's hard to say until we see

25   what their experts have opined.  Typically -- I'm

1    delighted to hear Mr. Pennock's prediction of how many

2    experts they'll have.  In other litigation like this,

3    typically the number that plaintiffs have is more like 20

4    or 30 of them rather than six or seven.

5        But I would think that if they have six or seven

6    experts, we probably would have an approximately equal

7    number.

8            THE COURT:  And in your mind, after you get

9    their disclosure of experts with reports -- I mean, I'm

10   confident you've already talked to some potential

11   witnesses, and of course you've got a lot of expertise in

12   house with the defendant, I mean they're by definition the

13   most knowledgeable and I assume have lots of good

14   credentials and expertise and experience, and so forth.

15       But how long will it take your people to be able to

16   do responsive reports, disclosures?  He's talked about 30

17   days, which is typical for a typical case.

18           MR. MAGAZINER:  Let me give you a two-part

19   answer.

20           THE COURT:  Because it does seem short to me,

21   given the complexity of some of the issues.  On the other

22   hand, you have been thinking about it for over two years

23   probably.

24           MR. MAGAZINER:  Sure, but --

25           THE COURT:  Nothing they say is going to be a

1    real surprise.  At least parts of it that will -- you

2    won't know exactly what they're going to say, but --

3              MR. MAGAZINER:  I don't know what their experts

4    are going to say.  I don't believe their experts are going

5    to agree with the view that those in the company have

6    about what the drug does and doesn't do and the effect it

7    has.

8         So their experts presumably are going to develop

9    theories that are going to be somewhat of a surprise to us

10   when we read the reports, because, as we know our own

11   documents and our own experience with the drug, we don't

12   think that it supports the claims they have made.  So we

13   will see.

14        But to answer Your Honor's question, 30 days is

15   shorter than is typically used in a litigation of this

16   sort.  Whether we can do it in 30 days depends in large

17   part on, I think, how many experts they have and how

18   complete their reports are, because we see different sorts

19   of reports from different sorts of plaintiffs' experts.

20   If it's a kind of bare-bones report --

21             THE COURT:  Some look like this (indicating).

22   Very helpful.

23             MR. MAGAZINER:  Right, exactly.

24        And we have proposed in the order that we put

25   together which the plaintiffs have rejected, we have

 1  proposed that we get their reports, we depose their

 2  experts, then we give them our reports and they depose our

 3  experts.

 4       They're very adamantly opposed to the idea that we

 5  would depose their expert before giving them our reports,

 6  which we think is a more sensible way to go, but if Your

 7  Honor wants reports, reports, depositions, depositions, we

 8  can work with that format as well.

 9       And 30 days I think is something we can probably do,

10  if we're talking about six or seven experts.  If we're

11  talking about more than that, we would need more time.

12       If there are reports included among the plaintiffs'

13  experts that are really quite different from anything we

14  anticipated, we may have to ask them for more time to

15  respond, because we --

16            THE COURT:  Or if the report is inadequate.

17            MR. MAGAZINER:  Or if the report is inadequate,

18  sure.  And we see --

19            THE COURT:  Well, I mean, my experience has been

20  that the reports can be inadequate because they look like

21  this, or because they look like this, and they really

22  ought to look like this (indicating).

23            MR. MAGAZINER:  Yeah.  I've seen both of those

24  things many times.  I'm sure Mr. Pennock has as well.  I'm

25  sure that he's had as many problems with reports that

1    defendants have submitted as we've had with reports that

2    plaintiffs have submitted.

3              THE COURT:  We have seen it from all sides.

4              MR. MAGAZINER:  I would think 30 days is quicker

5    than is normally done, but is feasible if we're talking

6    about the number of expert Mrs. Pennock has just

7    estimated.

8              MR. PENNOCK:  Your Honor, I was estimating the

9    number of specialities -- maybe I was unclear -- as

10   opposed to the number of experts.  I still don't think

11   it's going to be more than ten.

12       I mean, we are creating the general expert testimony

13   that presumably will be used in many trials when these

14   cases are remanded.  And presumably the expert testimony

15   will be on videotapes so that any lawyer around the

16   country can -- and that's typically what happens -- can

17   then use this general testimony at the trial.

18       So as a result of that, those six or seven

19   specialities that I mentioned, we may actually designate

20   more experts within that specialty just to have some

21   variation.  More than one expert within those specialties.

22       But for the purposes, I think, of general motions in

23   this court, we probably would be looking at six or seven

24   specialities.

25             MR. MAGAZINER:  If I may just make an

1    observation about an issue that the Court and the parties

2    will need to deal with at some point.

3         Typically the MDL Court in a situation like this will

4    enter an order at some point that says that all the

5    general experts whose testimony is ever going to be used

6    in court of any -- in trial of any case in the MDL after

7    remand, has to be disclosed in the MDL rather than after

8    remand.

9         Typically what happens -- Mr. Pennock is very

10   familiar with this procedure -- typically what happens is

11   the lead counsel or the steering committee say, here is

12   our roster of experts, and it's 10, 12, whatever

13   Mr. Pennock is now expecting.

14        There then needs to be some procedure for plaintiffs'

15   lawyers who are not working hand in hand with the steering

16   committee or with the lead plaintiffs' counsel to

17   designate additional generic experts that they may wish to

18   use.

19        So that if there are plaintiffs' lawyers who are not

20   part of the group that's controlling the MDL who have some

21   additional experts, they need the opportunity to designate

22   them, and then we have to respond if we think there is a

23   response needed.

24        So it's not always quite as neatly tied up in a

25   package as Mr. Pennock was describing.  He may have 10 or

1    12.  There may be another 10 or 12 that other plaintiffs'

2    lawyers around the country may wish to designate.

3         That doesn't necessarily mean we will need to have

4    exactly as many, because it could be that the other 10 or

5    12 designated by other plaintiffs' lawyers are completely

6    duplicative.

7         On the other hand, sometimes we have seen other

8    plaintiffs' lawyers not part of the steering committee or

9    not lead counsel who designate an expert whose opinion is

10   quite unexpected and unanticipated and not something we

11   were prepare to deal with, and we may need 45 or 60 days

12   to deal with that kind of thing.  It's hard to say.

13        MR. PENNOCK:  Your Honor, I doubt there will be

14   other lawyers from around the country who are not part of

15   this group that are litigating before Your Honor that will

16   be designating experts.  I suppose it's possible, but if

17   there are other plaintiff lawyers out there that are doing

18   that kind of level of work in this litigation, we

19   certainly would like to know about it.  We could use their

20   assistance.

21        In any event, I do think that once all the document

22   discovery is done and the defendant depositions are done,

23   we would be able to serve our reports and move quickly to

24   conclusion of what needs to be done here by September of

25   '08.

1          THE COURT:  Mr. Magaziner, what -- is there

2    anything in addition to the expert reports and depositions

3    that you need to be able to raise your Daubert issues?

4          MR. MAGAZINER:  Yes.  It depends what the

5    generic expert's report says.  Many of them -- in order to

6    raise a Daubert issue, we're going to have to -- we may

7    have to have discovery of plaintiffs whose situation is

8    encompassed within one of these generic expert reports.

9    Maybe not.  It really depends on what their generic

10   opinions are.

11        For example, if an expert says that this drug, that

12   the risks outweigh the benefits, which is something that

13   we often hear plaintiffs' experts say, the question is to

14   whom?  For whom?  This is a drug which is still, as I

15   said, on the market and widely prescribed.  It is being

16   prescribed day in and day out by physicians today who know

17   all of the risks that the plaintiffs say the physicians

18   needed to know when they prescribed Seroquel.

19        Even with all of that in the label today, a label

20   that says there are reports of diabetes in people using

21   Seroquel, the drug is being widely prescribed.  If they

22   have an expert who says, well, the risks of the drug

23   outweigh the benefits, then we will have to have some

24   examples of what kind of plaintiffs we're talking about

25   where you believe the risk outweighs the benefit, or want

 1   to develop some cases to test that proposition and see

 2   whether plaintiffs' expert really has in mind particular

 3   classes of plaintiffs or clients, particular plaintiffs,

 4   individuals for whom the risks outweigh the benefits.  I

 5   don't know what their experts are going to say.

 6       There are other experts, if the question is, for

 7   example, is Seroquel capable of causing diabetes, I would

 8   think that's -- if we have their expert reports, their

 9   expert depositions, we will then be in a position to

10   respond with expert reports of our own, and we won't need

11   more discovery.  It's a different kind of expert report.

12       If it's -- if there is an expert report about our

13   sales activities and promotional activities, it's hard to

14   know what we will need to challenge the factual

15   background.  For example, if the -- we have seen experts

16   in other litigations who opine on the kind of sales and

17   promotional activities the defendant company is engaged

18   in, and oftentimes depositions of the doctors shed great

19   light on whether what the experts' assumptions are --

20   whether the premise of the expert's report is true or

21   false.

22       So it's hard to say, but in general, there will be

23   reports from their experts that I think we will need

24   reports and depositions.  There will be others where we

25   may need some factual discovery in order to deal with the

1    opinions stated in those reports.

2        I apologize for that very long answer.

3        MR. PENNOCK:  Your Honor, I think -- I mean, I

4    would differ with Mr. Magaziner in that I don't think

5    there is any case-specific factual discovery needed for

6    these types of general Daubert challenges that may be

7    made.

8        He mentioned risk-benefit analysis.  I think that

9    that would be the most individual evaluation that could be

10   done in these cases.  I mean, that's really very, very,

11   very case specific.

12       Also, I'll add that in a pharmaceutical prescription

13   drug case, risk-benefit analysis technically doesn't even

14   really come into play because it's -- there is no design

15   defect claim that's really viable in these cases.  It's a

16   failure to warn claim that's the viable claim for the most

17   part.

18       There may be some jurisdictions that would have a

19   risk-benefit analysis involved with a drug case.  I can't

20   think of one off the top of my head.

21       But in any event, I do think that general experts can

22   be adduced and deposed, and we can make motions with

23   respect to them, without any detailed factual record from

24   any case-specific cases, and that -- I believe that's the

25   way it's always done.  In fact, there is often an effort

50

 1   by defendants to include the injection of any

 2   case-specific cases into that general process.

 3            MR. MAGAZINER:  Your Honor, I agree with

 4   something Mr. Pennock just said, which is I don't think

 5   that risk-benefit analysis as a general matter has any

 6   place in this litigation, nor even in an individual case.

 7        I'm only reporting to the Court that in other

 8   litigations there have been plaintiffs' experts who have

 9   opined that a particular drug had so many risks, that the

10   risks outweighed the benefit and it should not have been

11   marketed.  That's not an unusual expert report for the

12   plaintiffs to submit.

13        And if we have a report like that, we're going to

14   have to figure out what -- how to deal with that, and that

15   may require discovery of a kind that Mr. Pennock thinks

16   won't be required otherwise.

17        If they don't have an expert who's going to say such

18   a thing, then that is not a problem for us, of course.

19            THE COURT:  Mr. Magaziner, have you identified

20   the subject matters that you anticipate raising in general

21   dispositive motions?  Or partially dispositive motions?

22            MR. MAGAZINER:  Yes and no.  Let me elaborate on

23   that if I may.  And I think one of the slides we prepared

24   may be of some help.

25        Each of these issues could be the subject of a

51

1    dispositive motion.  Some of them are going to be of

2    general applicability to large groups of cases or maybe

3    all the cases.  Some of them will be more case specific.

4        We know a little bit more about some of these cases

5    based on the first 629 fact sheets that have come in and

6    thus can tell Your Honor a little about that and give Your

7    Honor an idea of where we might be headed.

8        We know that 25 percent of the plaintiffs, according

9    to the fact sheets, are still using Seroquel today.  After

10   we understand that a little more and understand how it is

11   that someone who is still using the drug today is suing us

12   on the theory that we should have warned about the risks

13   of the drug in a way that we didn't, but nonetheless they

14   still want to use it today, we may make a general motion

15   that challenges the validity of any claim by a plaintiff

16   who is still using the drug today.

17       We know that 18 percent of the plaintiffs -- and I'm

18   talking about the first 629 fact sheets.  18 percent of

19   them state in their fact sheet that they used the drug for

20   the first time after the label change in January of 2004.

21   After the FDA mandated a label change for all three drugs

22   in the class, saying that there were reports of diabetes

23   in people who use the drugs.  That could give rise to a

24   preemption motion, which says that if someone is claiming

25   diabetes as an injury, any claim that the label was

1  inadequate is preempted because of the preemptions

2  doctrine Your Honor is well familiar with, and the

3  plaintiff who says he first started using the drug after

4  the label warned of the risk, that plaintiff is out of

5  court under the doctrine of preemption.

6      We know that 39 percent of the plaintiffs, according

7  to these fact sheets, state that they also use Zyprexa.

8  Now, we have to get more deeply into those cases with some

9  discovery, but it may be that we will come to the Court

10  with some sort of motion that will apply very broadly to

11  large groups of cases that a plaintiff who has filed a

12  lawsuit alleging -- I'm sorry -- who's using Zyprexa and

13  Seroquel simultaneously may be in a different posture and

14  subject to some sort of dispositive motion than a

15  plaintiff who alleges only Seroquel use.

16      Incidentally, Your Honor, 50 of the plaintiffs in

17  this first 629 participated in the Zyprexa settlement.

18  They actually received money apparently on a claim that

19  Zyprexa caused them to develop diabetes, and now they're

20  suing AstraZeneca on a claim that Seroquel caused them to

21  develop diabetes.

22      That may be a motion that we will file and will apply

23  to hundreds of cases down the road.  Given the 7,000 or

24  8,000 cases in the MDL, it may be seven or eight hundred

25  cases based on what we have seen in the small sample so

1    far, where we will try to have those cases dismissed or

2    have a judgment entered in those cases based on the fact

3    that you can't have collected from Eli Lilly saying

4    Zyprexa caused my diabetes, and then turn around and say

5    Seroquel caused my diabetes.

6         There are 38 percent of them say they use Risperdal,

7    which is a Janssen product, another atypical

8    antipsychotic.

9         So there are a whole bunch of issues that are subject

10   to motions that will either be generic in the sense they

11   will apply to all the cases or will be case specific but

12   applicable to large numbers of cases.

13        No Seroquel use of course, that would be an

14   individual case.  If we go through the records and take

15   the discovery and determine that the plaintiff actually

16   never used Seroquel, of course we would expect to come to

17   the Court with a dispositive motion in that case and the

18   Court's opinion granting our motion might be such as other

19   plaintiffs who have similar evidence would decide they

20   don't wish to go forward with their cases.

21        The no general causation, we would think that

22   litigation being what it is, there may well be a Daubert

23   motion we would file with respect to their general

24   causation experts who say Seroquel causes diabetes.

25        That could be -- if Your Honor granted that notion or

1    Judge Conway did and knocked that expert out, that could

2    be the end of the entire litigation.  We'll have to see.

3         The no specific causation, of course that would be an

4    individualized matter, but again, it may extend and apply

5    to large numbers of cases.  Let me explain to Your Honor

6    how that might be.

7         We would anticipate many of these plaintiffs have

8    used Risperdal, Zyprexa, Seroquel, many other drugs.  Many

9    of them will have a family history of diabetes.  Many of

10   them will have risk factors for diabetes that are

11   unrelated to these drugs.  Diabetes is a very, very

12   prevalent condition in our society, as Your Honor knows.

13        Diabetes is particularly common without regard to any

14   drugs among people with schizophrenia, for example.  They

15   have a much higher incidence of diabetes than the general

16   population.

17        So we're anticipating many of these plaintiffs,

18   perhaps most of them, will have all sorts of other things

19   in their records which could account for their diabetes

20   besides their use of Seroquel, even assuming that there is

21   admissible expert testimony that Seroquel is capable of

22   causing diabetes.

23        We would anticipate that the plaintiffs' experts will

24   nonetheless opine that a particular plaintiff's diabetes

25   was caused by his use of Seroquel, not by his use of

1   Zyprexa, not by his use of Risperdal, not by the family

2   history, not by his preexisting risk factors, not by the

3   fact he's a schizophrenic, et cetera.

4        We may well bring to Your Honor a Daubert motion

5   attacking that particular expert's methodology for

6   determining that Seroquel was the cause of diabetes rather

7   than some of the other things.  If the Court in deciding

8   that motion says this kind of methodology is not Daubert

9   worthy, that could apply to hundreds or thousands of

10  cases.  So it would be an individual motion, but the

11  principles that the Court might use in deciding the motion

12  could be a very broad applicability.

13       Estoppel of double recovery, that has to do with

14  people who participated in another settlement.

15       The continued Seroquel use after filing suit, I have

16  already mentioned that.

17       Learned intermediary, that may be an individual

18  issue, but again, a very broad applicability.  As I said,

19  this drug is on the market and there are doctors

20  prescribing it today.  It is the -- as I believe, it is

21  the most widely prescribed antipsychotic today.  I may be

22  wrong, but that's my understanding.

23       So doctors are prescribing it today in Orlando as we

24  speak because they believe that even with the reports of

25  diabetes in Seroquel users, the risks are far outweighed

56

1   by the benefits to patients who need an antipsychotic.

2       Now, if doctors in individual cases when we take

3   their depositions say, "I would have prescribed Seroquel

4   to this patient even if I had known then what I know now,

5   and the proof that I would have done that is that I'm

6   continuing to prescribe Seroquel to great numbers of my

7   patients," we might then come back to the Court and say,

8   under the learned intermediary doctrine, all of these

9   cases where a doctor says, "I would have prescribed it

10  anyhow," all those cases are without merit, they cannot go

11  forward, they cannot be the basis for liability.

12      That again could be an individual motion that has

13  very broad application.

14      Statute of limitation is another sort of generic sort

15  of individual motion.  The reason I say that, there will

16  be some clear cases, as there would be in any

17  pharmaceutical litigation, where discovery shows that a

18  plaintiff knew about the alleged injury and the alleged

19  cause of it more than two years, or whatever it is,

20  depending on the state, before the suit was filed.

21      But we have a different issue which is going to be a

22  very interesting legal issue for the Court to determine

23  down the road, which is that many of the plaintiffs

24  apparently are in court on the theory that the statute of

25  limitations is tolled for people who are incompetent.  So

1    even if they otherwise would have had all the knowledge

2    they needed to file their lawsuit five years ago, and they

3    only filed it a year ago, they're saying the statute has

4    been tolled because of their incompetence.

5        Now, most of those people are in court on their own

6    name rather than through a guardian or a conservator or

7    someone who would have legal responsibility for someone

8    who's incompetent, so we're going to have a very

9    interesting issue.  Do they get to toll the statute of

10   limitations because of an alleged incompetence?  On the

11   other hand, they can be here in court without a

12   conservator or guardian.

13       And that issue when it's teed up to the Court may

14   have broad applicability to many, many hundreds or

15   thousands of cases, depending how many fall into that

16   category.

17       The forum non conveniens issue, I don't have a list

18   here, but again, that could be an issue which the Court

19   rules on in great numbers of cases at once.  The Court

20   could say under applicable law, plaintiffs who live in

21   Florida should not have filed suit in the district of

22   Massachusetts and those lawsuits should be dismissed under

23   forum non conveniens grounds, with the right to refile in

24   Florida, for example.

25           THE COURT:  I was going to raise that issue,

1    whether we need briefing on whether they could be

2    dismissed or remanded to someplace else other than where

3    they came from.

4              MR. PENNOCK:  I think the rule says that when an

5    FNC motion is made in federal court with a -- certainly

6    with a claim that's United States based, it shall be

7    transferred to the appropriate district.

8         So I don't think there could be a dismissal, as

9    Mr. Magaziner has suggested, for U.S. plaintiffs in a

10   United States federal district court.  I think if an FNC

11   motion is made, then it has to just -- and it's granted,

12   then it's not dismissed.  It's just transferred to

13   wherever it's supposed to be done.

14        So I don't think there's going to be a dismissal.

15             MR. MAGAZINER:  I don't know whether that's

16   right or wrong.  I thought Your Honor was asking a

17   different question, which is, is that something that the

18   MDL Court can deal with or is it something that --

19             THE COURT:  Well, I think this Court has to, for

20   the cases that get to that stage, decide where these cases

21   go back to.  I mean, presumptively they go back to the

22   transferor court, but we know that there were lots of

23   plaintiffs from all over the country combined in one

24   action or a few actions filed in the particular court that

25   those plaintiffs apparently have to relationship to.

1        I don't know if it goes back to -- if it goes to a

2   Court where they lived at some point in time or if it goes

3   someplace else.

4            MR. PENNOCK:  Judge, it typically has been done

5   one of two ways.  As Your Honor has suggested, the Court,

6   the MDL Court has remanded them to the district where the

7   MDL Courts think they should have been filed pursuant to

8   forum non conveniens principles, or the Court remands them

9   to the district where they were filed, the transferor

10  Court, and has some type of order saying within -- you

11  know, if the defendants want to challenge FNC, that motion

12  should be made within 90 days or whatever it is.  I've

13  seen it both ways.

14           THE COURT:  Well, that seems like something we

15  ought to take care of here.

16           MR. PENNOCK:  And very often it's stipulated to

17  by plaintiffs and defendants at the end where the cases

18  should go.

19       If I may, Your Honor, may I respond to some of the

20  things that --

21           THE COURT:  Well, I'm not quite done with him.

22       Mr. Magaziner, out of the issues that you have talked

23  about, it seems to me some of them require completion of

24  expert discovery, some of them are highly dependent on

25  state law, others it may be that the state law is so --

1   even though it provides rule of decision, is so uniform or

2   nearly so, that we don't need to worry about that too

3   much, and some of them frankly you need a little more than

4   you have now to raise them.

5        My concern is that if we push all these off to the

6   end, whatever the end is, that there will be too much for

7   you to raise and too much for the plaintiffs to respond to

8   and too much for Judge Conway to deal with at one time.

9   That it's going to delay things.  So that's my concern in

10  raising the issue.

11       And I can also tell you that as a matter of practice,

12  Judge Conway is not sympathetic to multiple motions for

13  summary judgment or partial summary judgment, and is

14  not -- is certainly not a fan of serial motions, so we

15  have got to overcome that in terms of setting the

16  schedule.

17            MR. MAGAZINER:  You mean in the same case.

18            THE COURT:  Yes.  I mean, we get one in almost

19  every case, but --

20            MR. MAGAZINER:  Well, this is not like a patent

21  case where there are typically 15 motions for partial

22  summary judgment.

23            THE COURT:  Patent cases, I've lamented with my

24  patent lawyer friends about their predilections and how

25  they want to space things out, they want what I call

1    illusory certainty on each point before they move to the

2    next.  And I say illusory because Federal Circuit reverses

3    us half the time anyway, on Markman issues and other

4    things as well.  So I don't know why the patent lawyers do

5    that.  Frankly, it mystifies me.

6           MR. MAGAZINER:  Your Honor, I was at a social

7    function where there were some district court judges and

8    several judges from the Federal Circuit Court of Appeals,

9    and one of the district judges said to the Federal Circuit

10   judge, why do you reverse us on more than half the Markman

11   decisions?  And the Federal Circuit judge said, because

12   more than half the time you have it wrong.

13          THE COURT:  Well, I invite those judges to read

14   their en banc multiple opinions, and I also invite them to

15   come down and sit for some patent pretrial proceedings.

16          MR. MAGAZINER:  To return to -- that's a little

17   off subject, but to return to this case, we don't

18   anticipate we would file more than one summary judgment

19   motion in any individual case.  There could be a summary

20   judgment that is overarching all the cases, and then after

21   this Court -- if the Court denies that, there may then be

22   a particularized motion.

23       But no, we would not think in the Sally Jones v.

24   AstraZeneca case we will file multiple summary judgments.

25          THE COURT:  But if you had a motion on each of

1    these, a separate one on each of these, that would be a

2    problem.

3              MR. MAGAZINER:  No, I don't think we would do

4    that.  I think --

5              THE COURT:  If you did all these in one motion

6    and argued each one in three pages, I think that's a

7    problem for you.

8              MR. MAGAZINER:  I think what we would look at

9    is, the Sally Jones case, if she didn't use Seroquel and

10   the -- and she also participated in the Zyprexa

11   settlement, and she also had a long family history of

12   heart disease, and her doctors also testified that he

13   would have prescribed Seroquel to her no matter what, we

14   would think that's a pretty good case for us to get

15   judgment, and we would put a motion together, we would

16   make three or four points and try to brief them and a

17   small number of pages and submit it.

18        But, no, we don't anticipate filing separate summary

19   judgments in the same case.

20             THE COURT:  Well, what about in the MDL case?

21   Which of these do you want to raise in the MDL docket as a

22   general matter, and when do you want to raise it, and how

23   much discovery do you need in advance to be able to do it?

24             MR. MAGAZINER:  We would like to be able to

25   raise all of these, because we think the Court's rulings

1   on these sorts of motions would provide significant

2   guidance to all the other plaintiffs for whom no motions

3   are yet filed.

4        So I know there's been some controversy and Your

5   Honor has expressed some views about whether there should

6   be discovery and how many cases and what that should

7   entail.  We have made a proposal as Your Honor has seen.

8            THE COURT:  I'm coming to that next.

9            MR. MAGAZINER:  Okay.  But we think what makes

10  sense is, we deal with -- we work up a number of cases

11  through the discovery process, through the depositions of

12  individuals, and then we would file whatever motions we

13  thought those cases gave rise to, and the Court would

14  decide those motions, and that would provide guidance to

15  both us and plaintiffs in all the other cases that are

16  similarly situated.

17       So that if, for example, we tee up a motion saying,

18  Sally Jones participated in the Zyprexa settlement, she

19  cannot be now in court claiming that Seroquel caused her

20  diabetes, having collected money from Lilly saying Zyprexa

21  caused her diabetes, if we tee that up in one case, after

22  discovery, if Judge Conway rules that we are correct and

23  that we are entitled to judgment, that would then be

24  applied, not automatically, but --

25           THE COURT:  I'm picturing you having a

64

1    spreadsheet with 8,000 names down this side, and all of

2    these categories across the top, and filling in

3    information in the boxes so that in your own mind you

4    decide Miss Jones has -- everybody has a general causation

5    issue, but she has a Zyprexa issue and a continued use

6    issue, and I assume that you're going to be having that

7    kind of a mental process.

8              MR. MAGAZINER:  Sure.

9              THE COURT:  In your back room.

10             MR. MAGAZINER:  Right.  We don't expect -- we're

11   not now asking the Court to allow full-blown discovery in

12   all of these 7,000 cases obviously.

13             THE COURT:  Well, but for a lot of those issues,

14   you don't need full-blown discovery.  You've got the fact

15   sheets and --

16             MR. MAGAZINER:  For some of them we think the

17   fact sheet will provide a basis.  For others, if someone

18   says in the fact sheet -- and remember, the fact sheets

19   come from the plaintiffs.

20             THE COURT:  Let me come back to that.  Because I

21   want to get plaintiffs' response on this subject matter

22   before I turn to individual plaintiff discovery.

23             MR. MAGAZINER:  Very well, Your Honor.

24             THE COURT:  But what I'm getting at is, I'm

25   concerned about pushing all of this off to the end of

1   discovery, because we're going to run out of time.

2          MR. MAGAZINER:  I know.  And let us come back to

3   the Court with a proposal.  I haven't thought about the

4   issue Your Honor has raised, and I'd like to come back

5   with a proposal on what sorts of motions we can file

6   earlier.

7          THE COURT:  We had this discussion actually

8   before you were in the case, and then, you know -- well, I

9   mean on the specific preemption issue, and we changed

10  gears on that, so that's -- we're not doing it that way.

11      That issue is -- not just that specific legal issue,

12  but the issue of how to get these things presented to

13  Judge Conway so she can deal with them in a way she's

14  comfortable with and that provides both sides with due

15  process.

16         MR. MAGAZINER:  I appreciate that, Your Honor.

17  In our proposed order, we didn't say -- we said there

18  should be a deadline for the filing of the dispositive

19  motion, but they can be filed at any time before that

20  deadline.

21         THE COURT:  But again, I'm concerned that

22  Judge Conway is not going to want to see six of them

23  covering different subject matters over the course of

24  eight months unless she specifically approved that because

25  she thinks it makes sense.

1      And the date that you have got in there, if we raise

2  all of these things at the end, isn't going to work.

3          MR. MAGAZINER:  The reason we didn't say no

4  dispositive motion shall be file before such and such a

5  date is because we think that we could start filing some

6  of them very early on, depending on the individual case

7  and what kinds of issues are raised.  Some of them will be

8  later, some of them will require a great deal of

9  discovery, some of them may require none.

10          THE COURT:  Okay.  Mr. Pennock, you want to

11  speak to this issue?

12          MR. PENNOCK:  Judge, first, I was hoping we

13  could stop putting down the Sally Jones case.  She happens

14  to be a very nice woman and has a very strong case.  She

15  no doubt exists in the context of 9,000 cases.

16          THE COURT:  That's what I was worried about.

17          MR. MAGAZINER:  I apologize to Miss Jones, Your

18  Honor.

19          THE COURT:  Let's use Sallie Mae and Freddie

20  Mac.  How about that?

21          MR. PENNOCK:  First, I think the Court is

22  asking, and I just want to make it clear for myself so I

23  can answer, how and when can general motions go forward,

24  and are they going to be in some staggered way, and how --

25  and I think the Court's made a point it can't be that

 1    staggered and so forth.  And those issues we've not

 2    discussed with Mr. Magaziner.  As he said, we can come

 3    forward with a proposal for these general motions.

 4        The only really -- the comments that I wanted to make

 5    is that, and I think it sort of dovetails into the next

 6    discussion, and that is that the fact sheet process was

 7    envisioned by the defendants in particular and asked for

 8    by the defendants in particular, as one that would develop

 9    a great deal of information on these individual

10    plaintiffs, and I'm happy to hear that it is doing so.

11    They're able to, just by having reviewed some 600-odd fact

12    sheets come up with all sorts of information that they

13    think they can already make motions on.

14        The defendants came to this Court and wanted a very,

15    very extensive and detailed fact sheet.  Something -- a

16    couple of hundred interrogatories really are within the

17    context of that fact sheet.  They wanted all these

18    authorizations, medical records, insurance records,

19    workers' comp records, disability records, employment

20    records.  They have gotten all of that.

21        They are now in the process of collecting and

22    evaluating that vast amount of information with respect to

23    all of these individual plaintiffs.  It's going to go

24    forward.

25        We're being very diligent in meeting the Court's

1   deadlines, and at some point over the next several months

2   they will have all of that information on all of those

3   plaintiffs, and many of these motions that they say are

4   general, at least to the extent that they may apply to a

5   large group of individuals, as Mr. Magaziner just pointed

6   out, can be made on the basis of the medical record

7   collection and the fact sheets that's happened, and I

8   think it's just a matter of determining how the Court

9   wants those general motions made and on what schedule.

10      But the general motions can be made on the basis of

11  the fact sheets for all of these things, or most of these

12  things.  In fact, the only thing that is probably of

13  concern, which would probably have to be a case-specific

14  motion, is going to have to wait full discovery in all of

15  the cases, is a case-specific learned intermediary motion,

16  but, you know, you're talking about, there will have to be

17  14 or 15 thousand depositions done before you can do a

18  learned intermediary motion in an individual case,

19  specific case.  Obviously there can be motions for summary

20  judgment generally on the adequacy of the warnings.

21      So -- but a lot of these other things, as

22  Mr. Magaziner has pointed out, they have gleaned a

23  tremendous amount of information from the fact sheets.  I

24  think that was the intention.

25      No Seroquel use.  Of course they're getting all the

1   pharmacy records and prescription records.  And let's

2   remember that the fact sheet is signed under the penalties

3   of perjury by the client.  That was something they

4   insisted on, and that's what allows them to get the sort

5   of information they need to make whatever general motions

6   they feel they have to make.  And again, by general I mean

7   that will affect some large portion of the cases.

8        We're happy to meet these motions whenever they make

9   them, as long as we have a reasonable amount of time to

10  respond.

11       For example, the fact that there are people that took

12  Zyprexa and may have gotten a Zyprexa settlement but are

13  alleging that Seroquel somehow was also a substantial

14  contributing factor in their illness, I think that that's

15  a motion that we would be happy to argue.

16       I know some of the money values that were obtained

17  from some clients in the Zyprexa settlement, and depending

18  on what was the perceived contribution of another drug,

19  they may have gotten much less money.

20       So there are a lot of issues that surround those

21  Zyprexa clients, and I don't want the Court to think that

22  we were filing cases with double -- seeking a double

23  recovery.  I think they are very legitimate claims of

24  people that Seroquel was a substantial contributing factor

25  to their illness, as was Zyprexa.

70

```
 1              THE COURT:  How much variation around the

 2   country is there on the substantial contributing factor,

 3   verbal formulation?  Multiple causes?

 4              MR. PENNOCK:  There is not tremendous variation.

 5   I mean the only one I can think -- Pennsylvania, for

 6   example, I think is somewhat different than some of the

 7   other states.  They don't use the word "contributing."

 8          So I think that they're, by and large, in terms of

 9   case -- in terms of causation, that substantial

10   contributing factor is the standard, but there is some

11   variation.  No question.  And as I mentioned, Pennsylvania

12   being one of them.

13          In any event, you know, we're producing this

14   information.  There's a vast amount of information that's

15   being produced with respect to each clients, and we're

16   happy to hereafter sit down with the defendants and work

17   out with them or try to work out with them a proposal for

18   how they might make these general motions which they have

19   just elucidated can probably be made based on the medical

20   records and all the other records of the fact sheets.

21          But, you know, other than that, we're just waiting to

22   hear what motions they want to make and we'll -- we will

23   meet.

24              THE COURT:  Well, let's put that on our agenda

25   for the next conference.
```

 1          One of my reasons for raising this with you

 2   particularly, Mr. Magaziner, is so you don't get surprised

 3   with Judge Conway, if you're anticipating this flow of

 4   events that just may be inconsistent with the way -- I

 5   have given you some idea of her general predilections, so

 6   that if we're going to do something that tends to cut into

 7   those predilections because you want to bring four motions

 8   at four different times, you need to have an explanation

 9   for it, and if you can convince me of it, I can recommend

10   it to her, you're better off, and if it's logical, that it

11   fits with the discovery schedule, and it lets her divide

12   up her work in a way that she would appreciate the benefit

13   of.

14          So let's work toward that goal.  And it's -- some of

15   it has to do with how much discovery you need.  Some of it

16   has to do with how universal the application is, which

17   you're not going to know for sure, and I understand that.

18          But, I mean, obviously a Daubert motion can't be

19   brought until after the experts are discovered.  But some

20   of these others don't need to wait for that.  We can group

21   them and show the logic of it.  I think we can get

22   Judge Conway to bless that in advance so that you don't

23   get motions stricken because they're repetitive.

24          Let me turn to the issue of plaintiff-specific

25   discovery.  You spent a lot of pages arguing that you

72

1    ought to go forward on that and before cases are remanded.

2        Let me ask you, each plaintiff is different, what --

3    given the detail and scope of the fact sheets, what scope

4    of plaintiff-specific discovery do you anticipate with

5    respect to each plaintiff?

6            MR. MAGAZINER:   I would be happy to address

7    that, Your Honor.

8        The fact sheets are, as Mr. Pennock said, like

9    interrogatory answers.   It is a commonplace preliminary

10   universal experience of litigants that interrogatory

11   answers are very helpful and they serve a purpose, but

12   much more is learned after interrogatory answers are in

13   place during depositions and further discovery.

14       For example, if the plaintiff -- I'll give Your Honor

15   the most common example.   Plaintiff says, "I have no

16   family history of diabetes."   We get the medical records.

17   We take a deposition of the doctor.   We take depositions

18   of someone else that the doctor gives us the name of.   And

19   we discover that sure enough, the mother and father of the

20   plaintiff both have a history of diabetes.

21       We don't know that from a fact sheet.   The fact sheet

22   just gives us the plaintiff's interrogatory answer, as it

23   were, but not necessarily the truth that may emerge

24   through the deposition process.

25       Plaintiff says, for example, that she received -- she

1    used Seroquel.

2          THE COURT:  But let me stop you right there.

3          MR. MAGAZINER:  Sure.

4          THE COURT:  With the plaintiff fact sheets and

5    records authorizations, you will have gotten the doctors'

6    records.  I guess -- I mean, I'm asking a simpler

7    question.  You're going into a longer explanation than I

8    wanted at this point.

9          MR. MAGAZINER:  I'm sorry.

10          THE COURT:  I mean, you can take the

11    individual's deposition, and you can take the doctors',

12    the main treating physicians' depositions, I suppose.  I'm

13    not sure you want all of them, but maybe you do.

14       What else?

15          MR. MAGAZINER:  Typically it would be the

16    plaintiff, the spouse or some other family member who

17    knows what's the plaintiff was doing with regard to

18    medication and diseases and whatnot.

19       A doctor or more typically several doctors.

20    Oftentimes there is a prescribing doctor who may not be

21    the same person as the doctor who treated the plaintiff

22    for the injury or may be one of several prescribing

23    doctors, so it's hard to say how many doctors.

24       In other comparable litigation, I would say the

25    number of depositions per case has ranged from as few as

74

 1    three to as many as 15, depending on the complexity of the

 2    plaintiff's situation.

 3         Sometimes there are -- there needs to be depositions

 4    of other family members besides the spouse.  Sometimes the

 5    coworker or employer, depending on what the allegations

 6    are and what the -- where the discovery leads.

 7         We would then in an individual case expect to have an

 8    expert report from the plaintiff, and we would want to

 9    depose a plaintiff's expert because we may or may not want

10    to have an expert report of our own.  The burden is on the

11    plaintiff.  We may or may not wish to have an expert

12    report after that.

13              THE COURT:  On medical issues?

14              MR. MAGAZINER:  On medical issues.  If the

15    plaintiffs typically are going to have an expert who will

16    say, Seroquel caused, or was a contributing cause or

17    something, my client's diabetes.

18         And we would -- that case-specific expert report, we

19    would want to take that expert's deposition so that we

20    would know whether we do or don't have a basis for filing

21    a Daubert motion with regard to that expert.

22         The important thing about the Daubert motion, as I

23    said, is it might, depending on the Court's ruling, have

24    very broad applicability.

25         By the way, I'd just point out one other issue that

 1   we are confronting.  The medical records collection

 2   process is not quite as simple as what Mr. Pennock said.

 3   Plaintiff says to his lawyer, "I treated with Dr. Zilch.

 4   That's the only -- he's the doctor who prescribed it and

 5   who treated me for the side effects of Seroquel."

 6        When we get the records, we see that Dr. Zilch has in

 7   his records references to 15 other doctors who apparently

 8   were dealing with issues of great interest to us, such as

 9   the endocrinologist who maybe was treating the plaintiff

10   for diabetes before the plaintiff ever took Seroquel.

11        So we then want to collect that doctor's records, and

12   that doctor's records may lead us to someone else's

13   records.

14        The fact sheets don't necessarily contain the names

15   of all the doctors, and almost every litigation I have

16   been involved in, what we say is that through

17   investigation and discovery, we learn the names of many

18   other people who have records.

19        And I'm not faulting Mr. Pennock for that.  I think

20   that Mr. Pennock has to rely on what his clients tell him,

21   and the other plaintiffs' counsel rely on what their

22   clients tell them, but it often turns out to be a much

23   more comprehensive investigation than just collecting the

24   records from the people identified on the fact sheet.

25             THE COURT:  Do you have a rough idea of what

1  percentage of Seroquel prescriptions are made by

2  psychiatrists and how many are made by GPs or internists

3  or --

4          MR. MAGAZINER:  I do not have any idea, Your

5  Honor.

6          THE COURT:  I mean, I know some antipsychotics

7  and other mental health drugs are routinely prescribed by

8  family doctors, others are not because they require more

9  specialization.  Not to say they're not done, but --

10          MR. MAGAZINER:  I just don't know the answer to

11  that, Your Honor.  I'm sorry.

12          THE COURT:  Mr. Pennock, do you want to speak to

13  individual plaintiff discovery?

14          MR. PENNOCK:  I think the first thing I would

15  say is, I'm not sure why we need such a devastating

16  extensive and complex program that's been proposed by the

17  defendants.  I felt that way before I walked in here this

18  morning, and having just heard that there are -- I just

19  added it up -- summary judgment motions that the

20  defendants could make right now, based on the fact sheet

21  discovery they have done -- as Mr. Magaziner said, the

22  record collection is a comprehensive investigation, and I

23  agree with that.  And I don't disagree that he discovers

24  new doctors, and we give them all those authorizations as

25  well.

1      So I just heard that we could -- there are 25 percent

2  of the clients are still using the drug today, based on

3  their own sworn statement in the fact sheet.  And that

4  they think a summary judgment motion could be made on

5  those.

6      18 percent used the drug for the first time after the

7  warning.  For the first time after the warning.  Based on

8  their own sworn statement and the support of the medical

9  records.  They could make a summary judgment motion on

10  those, they think.  I don't think they'll win them, but

11  they could make these general motions.

12      And then about 50 plaintiffs participated in the

13  Zyprexa settlement, and they think that may fall under a

14  double recovery estoppel motion.  I estimate that's about

15  7 percent of the 600 and some that they mentioned they

16  looked at.

17      That means that just on those three issues, they

18  could make, based on the investigation to date, summary

19  judgment motions in 50% of the cases in this MDL.

20  Generally speaking.

21      And if they could do that, and in addition, you know,

22  whatever else we -- that they propose and the Court agrees

23  with and we look at that are issues that are fleshed out

24  through this massive fact sheet and record disclosure, if

25  those types of motions in all these cases and issues can

 1    be dealt with -- by the way, along with all the general

 2    discovery that we're doing that we spoke about earlier,

 3    along with all the general expert work that we're doing,

 4    I'm not quite sure why we would need to come do something

 5    like 1500 depositions of plaintiffs, their family members,

 6    their spouses, their several doctors, their treating

 7    doctors, their main treaters.

 8         You know, Mr. Magaziner mentioned that there is

 9    anywhere between three and 15 depositions case

10    specifically in one of these types of cases.  I have never

11    seen one with three.  I agree with 15.  I have seen them

12    with 20.  I just completed a Vioxx case that had 21

13    case-specific depos.

14         Let's go with 10.  If we do 100 cases, that's 1,000

15    depositions.  And only in 100 cases.  And it just seems to

16    me that if we're talking about getting this case ready to

17    be remanded, as we should, and we know for a fact that a

18    huge volume of really case-specific issues just can't be

19    dealt with in this MDL and really need to be dealt with

20    individually, if we ever get to that point, and I do want

21    to talk about an ADR proposal that we've made in a moment,

22    but if we are only talking about dealing with 100 cases,

23    and yet if we spend our time and focus our energy on what

24    they asked for four months ago, massive comprehensive

25    investigation of -- based on records and sworn statements

 1   from these plaintiffs, if we focus on that, we have

 2   already seen this morning that they are going to be able

 3   to tee up, as they say, a very substantial number of

 4   general or nearly general issues that this Court can

 5   address, and perhaps they'll get what they want, which is

 6   reducing the number of cases.

 7        But this 100 cases with 1,000 depositions, it's only

 8   going to take us away from doing this, it's only going to

 9   take us away from doing the general discovery, the Daubert

10   issues, the general preemption and all that, and we don't

11   get anything from it, other than discovery in 1,000 cases.

12        THE COURT:  The discussion I have had with

13   Mr. Magaziner poses the risk of a double bind for him.

14   I'm telling him he's got to bring these motions one time,

15   and I agree that the fact sheets provide -- I don't know

16   what percentage -- a lot of the -- most of the information

17   they need, but they're certainly entitled to test the

18   reliability of it, and there certainly will be other

19   things they need to support these motions that he's

20   contemplating.  I mean, it stands to reason.

21        And if he's forced to file the motions before he's

22   got some of that discovery, well, like I say, that's a

23   double bind that I think he's entitled to avoid.

24        On the other hand, you know, there's not an infinite

25   set of resources to go forward here, but let me say my

1    inclination is to approve some number of individual

2    plaintiffs going forward, but what I haven't settled on

3    yet is whether the defendants should be able to pick them,

4    the Court should pick them, the plaintiffs should pick

5    them, whether we use a random number generator or some

6    other basis for picking them.

7              MR. PENNOCK:  May I comment on that, Your Honor?

8              THE COURT:  But I'm also not going to allow the

9    same range of discovery of any of those individual

10   plaintiffs that I would if there was just the one case

11   here, where you take your ten depositions or 15 and --

12   because I think, given the scope of the plaintiff fact

13   sheets, that we don't need that for most of them.  I

14   really don't.  If there's specific showing that things are

15   inaccurate or incomplete or misleading, yeah, but -- go

16   ahead.

17             MR. PENNOCK:  Your Honor, as to the -- if the

18   Court is inclined and does select the number, some number

19   of cases to go forward, and again, I'll come back to why I

20   don't think we need to do that in a moment, but as to the

21   selection process, we had an issue in the Vioxx litigation

22   before Judge Higbee, this exact issue, how do we pick the

23   cases that are going to go to trial.

24        And we briefed it and argued it, both sides, for

25   about two hours, and then the judge came out, and after

1   she said what she said, we all looked at each other and

2   said, why didn't we think of arguing that?

3       She came out and said, you know, I've thought about

4   it, and the defendants have said publicly, and she read

5   the press release, we're going to try every case.  So if

6   you're going to try every case, why should you have

7   anything to say about which cases get tried, because

8   you're going to try all of them.  So she allowed us to

9   select the cases for trial.

10      In this case I think two weeks ago I read in

11  Bloomberg or somewhere, one of the officers of AstraZeneca

12  came out and said, we're trying every case.  So I think

13  we're in the similar situation.  If they really are intent

14  on not discussing these cases, and they have told us they

15  won't do the ADR program we have, then I think it might --

16  I think logic is very compelling that the plaintiffs

17  should be able to select the cases that are going forward

18  with discovery, and sort of putting on -- purportedly

19  putting our best foot forward and living and dying by our

20  own decisions with respect to the cases that we wanted to

21  push forward.

22      Coming back to whether we should do this, there was a

23  great deal of discussion in defendant's papers regarding

24  what other MDLs have done.  And I would like to point

25  something out that I think is a great distinction between

 1     what happened in those MDLs as what has happened here.

 2          Let take Baycol, for example.  Both Mr. Magaziner and

 3     I were extensively involved in that.  And yes, there was

 4     an order with respect to case-specific discovery in a

 5     select group of cases.  But that order -- and that was

 6     being done specifically because it was a trial program.

 7     In other words, the cases were going -- some of them or

 8     one of them or five of them were going to ultimately be

 9     selected to go to trial before the MDL judge because the

10     parties had waived the lexicon issues and had agreed to

11     try it before the MDL judge, so that's why that

12     individualized discovery was going forward.  There was

13     going to be a trial.

14          The second point on Baycol.  The company had already

15     come out and settled a couple of thousand cases for over

16     $2 billion.  So they had -- and none of this trial program

17     or doing happened until after all of that had transpired.

18     There was general discovery.  There was a general -- there

19     were settlements of numerous cases, as I said, 1700 or

20     1900.  Then there was a trial program -- not trial in

21     terms of pilot, but a trial program in terms of cases

22     going to trial, and that's why they had a case-specific

23     discovery.  We don't have that here.

24          In Zyprexa, all of those cases settled without any

25     case-specific discovery being ordered.  It wasn't until

1  all of the massive cases settled and there were a few

2  hundred, I think six or seven hundred cases left out of, I

3  don't know, 17,000 that settled, that Judge Weinstein then

4  directed some case-specific discovery go forward.

5      In PPA, there was an order in here and a reference

6  that case-specific discovery took place in the MDL.  I

7  mean, my experience with that is that it didn't, that it

8  happened after remand.  In fact, I have the Gooding Zenaro

9  case in the -- that's in the Eastern District of New York

10  right now, where we're doing the case-specific discovery

11  following remand from Judge Rothstein to that court.

12      There was a mention of Fosamax litigation and

13  case-specific discovery going forward there.  There are

14  18 cases in the Southern District of New York in that MDL.

15      There was also a mention of the Fen-Phen litigation

16  and case-specific discovery going forward there.  That was

17  after not one but two settlements that took place.  And

18  then there were all these hangover cases that had not

19  resolved in the national class or outside the class or in

20  the second -- what they call Fen-Phen 2.

21      And consequently, case-specific discovery began in

22  Fen-Phen, and I should note that to date, ten years

23  approximately after that MDL was formed in the Eastern

24  District of Pennsylvania, there has not been a single

25  remand from that MDL.  The vast majority of cases have

1   settled, but those that are there have not been remanded

2   and that MDL is still going on ten years later with

3   case-specific discovery.

4       So, the main point is that we have not -- in terms of

5   this discussion of having case-specific discovery in

6   cases, if anything, it's not right.  But I think that in

7   the context of this MDL, it need not even be done at all

8   ultimately, but certainly at this juncture, with what we

9   just learned about the comprehensive information that the

10  defendants are getting, as expected and ordered by this --

11  by Your Honor and Judge Conway, from the fact sheets, at

12  this juncture this is really something that I think is

13  extremely premature.

14      What I don't think is premature is possibly setting

15  up some type of framework for an ADR, an alternative

16  dispute resolution, at this point.  I'm not saying one

17  that's -- where the defendants are forced to come meet

18  with us just to tell us they have a no-pay position.  But

19  as I suggested in the ADR order that I presented, with all

20  this information they have, and I think I allotted 90 days

21  after they get the fact sheets so they can get the records

22  and evaluate it, why is it that we can't sit down before

23  we start doing -- start moving ahead with lots of cases

24  for remain motions and so forth, why is it that we can't

25  sit down in this MDL and have them say, look, based on

1   these records, we think that this one case out of 500 or

2   this ten out of 500 or this 50 out of 500, we're willing

3   to talk to you about these cases.

4       I mean, you know, the Court asked about an ADR

5   program, and that's why I'm bringing it up.  And let's

6   face it, we're in the context nationally of an atypical

7   antipsychotic litigation, where one company, Eli Lilly,

8   with almost the identical situation, has settled those

9   cases, and these are publicly reported numbers, I'm not

10  disclosing anything, for about $1.2 billion and eradicated

11  a 17,000-case litigation.

12      So we know that at least one company has evaluated

13  and understands that there are some cases that although

14  they -- you know, I understand their settlement agreements

15  say we're not agreeing that there is any validity to these

16  cases or they have any merit, but we know that we have a

17  tremendous scientific basis that this drug can and does

18  cause these injuries in some people, and we know that

19  there will be some cases.

20      That the defendants themselves, looking at all of the

21  information, will say, you know what?  We can talk about

22  that case.

23      And so why not set up a framework, as I have

24  suggested to the Court, and when I say why not, I'm not

25  saying to the Court, I'm referring to the defendants,

1    because they have declined it, why not set up a framework

2    for allowing us to do that?  At least something is in

3    place so that if the defendants look at these fact sheets,

4    after 90 days or whatever time they want, they can come to

5    us and say no, we're not agreeing to mediate them, or yes,

6    we will agree to mediate these and get that process

7    potentially started.

8         But in sum, I do think that the case-specific

9    discovery is not something that we need.  I do think it's

10   devastatingly complex and we'll just complicate an already

11   difficult situation in terms of everything else we have to

12   do.

13        I think that the precedent for it is in situations

14   where there have been massive settlements already, and

15   where cases were being prepared for trial before the MDL

16   Court.

17        And lastly, if there is to be some small number of

18   cases, I would urge the Court to consider allowing

19   plaintiffs to select those cases, unless the defendants

20   are changing their position that there are some cases we

21   will talk about and there are some cases we won't.  In

22   that instance, the logic is a little more compelling for

23   the defendants to have some input on the selection

24   process.

25             MR. MAGAZINER:  May I respond, Your Honor?

1             THE COURT:  Yes, sir.

2             MR. MAGAZINER:  I need to respond to several

3     factual assertions that Mr. Pennock made, lest they go

4     unanswered.

5         First of all, the comparison to Zyprexa is of some

6     usefulness but not that much.  These two drugs are

7     different.  The science and medicine on whether Zyprexa

8     causes diabetes is not going to be the same as whether

9     Seroquel does.  These are two different drugs.  They're

10    used differently, that is some doctors prefer Zyprexa

11    because of its profile, some prefer Seroquel because of

12    its profile, the risks associated with each drug is going

13    to be different.

14        So I hope that this Court is not going to think this

15    is just going to be a copy of the Zyprexa litigation and

16    whatever happened in Zyprexa should happen here.  It's not

17    going to be the way this is.

18        We believe our drug is different.  We believe it is

19    better.  And we're not going to so quickly fall into

20    Mr. Pennock's hope that we will engage in some global

21    settlement just because Eli Lilly chose to do so in the

22    Zyprexa litigation.

23        With respect to the Bloomberg article, I guess

24    Mr. Pennock has read a different article than the one I

25    read.  I don't -- I did not see an article that said that

1   a company spokesman said we will try every case.

2       What I saw was an article that said that the company

3   had said it believes in Seroquel and it's a widely

4   prescribed drug, the drug of choice for many doctors, we

5   believe these cases are defensible and we intend to intend

6   them vigorously.

7       So I know Merck is taking the deposition in Vioxx

8   that it will try every case, but that is not what we have

9   said.  A small point, but I think it needed to be

10  clarified.

11      Mr. Pennock is just completely wrong about Baycol.

12  There was no waiver of lexicon in Baycol.  Didn't happen.

13  There were cases filed in the District of Minnesota.

14  Judge Davis said he wanted to try one of the cases.  It

15  was originally filed in his district, thereby avoiding a

16  lexicon problem.  There has been no such trial because as

17  he each of those cases approached trial, the plaintiffs

18  dismissed them.

19      The pilot program that we described in our papers in

20  Baycol was 200 cases filed in other districts, transferred

21  to the Baycol MDL, plus a number of cases filed in the

22  District of Minnesota, and Judge Davis ordered the program

23  of discovery on all 200, I think it was 38 cases, with the

24  understanding that the only ones eligible for trial would

25  be the -- those filed in the District of Minnesota.

1    Just to talk about Baycol for a moment, here's what

2    happened in Baycol.  Of the 34,000 plus plaintiffs in the

3    MDL, 941 cases settled.  There are still 1,116 pending,

4    and 34,194 were dismissed either voluntarily by the

5    plaintiffs or by the Court because of the plaintiff's

6    failure to meet minimal discovery obligations.  So it's

7    kind of different from what Mr. Pennock was telling you.

8    We don't have, by the way, the luxury that

9    Judge Davis had in Baycol of trying one of the many cases

10   filed in the District of Minnesota.  There are three cases

11   filed in this district.  One of them has been voluntarily

12   dismissed.  Plaintiff's counsel yesterday or the day

13   before filed a motion to withdraw from representing the

14   second of the three, so we are now down to one case in

15   this district.  A very different situation from Baycol,

16   where there were lots and lots of cases filed in the

17   District of Minnesota.

18   With respect to ADR, which is, I know, a very

19   important issue for Your Honor and for Judge Conway, we do

20   not object to there being an ADR program.  What we have

21   said to the plaintiffs is, we're not going to agree to

22   mediate cases when we have not had discovery.  I don't

23   know how much discovery we will need to mediate, but we're

24   going to need some discovery.  We're not going to do it on

25   the basis of a plaintiff's fact sheet and the

1   plaintiff's -- like an interrogatory.  This is what the

2   plaintiff has said, therefore, we're now willing to talk

3   with you about a settlement.  That we cannot do.

4       But after discovery has been had in some number of

5   cases, we can then say, if we think this is appropriate,

6   we will talk with you about the cases that have this

7   profile.  We will never talk with you about cases that

8   have that profile.

9       What we may say, we will talk with you about none of

10  them, or maybe we could say we'll talk with you about all

11  of them.  I don't know, but we can't make that assessment

12  based on the plaintiff's fact sheet, nor based on the

13  plaintiff's fact sheet and medical records alone.

14      But, you know, the idea of mediating a case without

15  there having been a deposition of a plaintiff I think is

16  anathema to me and to all the counsel and to our client.

17      But we are not opposed to an ADR program.  We think

18  it's premature to be talking about ADR until there has

19  been some discovery in a group of cases that will allow us

20  to see what sorts of cases we're dealing with here.

21          THE COURT:  All right.

22          MR. PENNOCK:  Judge, can I just -- I don't want

23  to -- I know there's a lot that goes on and we're all

24  working on a lot of litigations, but the order by

25  Judge Davis, and I was involved, I had 138, I think, of

1    those 200 cases, was very clear.  It says at the outset

2    that the parties were asked to meet and confer to agree to

3    a plan for the management of discovery, selection of cases

4    for trial and pretrial procedures.

5         It goes on in Paragraph 2 to say that, discuss the

6    program cases that PSC determines warrant discovery for

7    the purposes of trial, which were the eligible cases, and

8    it goes on to discuss what those are, and this

9    case-specific discovery that's going to happening, and

10   there is going to be a trial of -- we were arguing for

11   upwards of five cases consolidated together out of that

12   group, not just one.  It never reached that point because,

13   as Mr. Magaziner pointed out, as things proceeded the plan

14   sort of fell apart and went by the wayside.

15        But I stand by what I said, that those cases were

16   selected after 2,000 cases nationally were settled.  That

17   that's when that program was put into place, and that it

18   was put into place as a pretrial discovery program.

19             MR. MAGAZINER:  I was only correcting

20   Mr. Pennock when he said the company had agreed to waive

21   lexicon.

22             MR. PENNOCK:  I'm sorry.  I do recall that there

23   was at least in the hallway agreement with lots on both

24   sides that we were going to try cases before Judge Davis,

25   and that we weren't -- we were going to meet with Special

 1   Master Haydock and discuss that.

 2          MR. MAGAZINER:  Yes, that's true.  Because there

 3   were several hundred cases filed in the District of

 4   Minnesota.  It's a small point and not particularly

 5   pertinent to Your Honor --

 6          THE COURT:  Mr. Magaziner, if I were to give you

 7   the nod and say you could start taking certain kinds of

 8   individual plaintiff discovery starting April 1, how many

 9   would you want to do a month?

10          MR. MAGAZINER:  I would want to --

11          THE COURT:  Ten, 100, 1,000?

12          MR. MAGAZINER:  How many depositions per month?

13          THE COURT:  How many cases?  I'm contemplating

14   giving you a very circumscribed authorization with respect

15   to individual plaintiff discovery, a short period of time

16   for each case.  This would be the initial, and limit it in

17   duration and number of depositions and scope, and then you

18   could seek authorization for further discovery when some

19   circumstances point to it.

20          MR. MAGAZINER:  I would think we could take

21   discovery in 15 cases per month.  I think that would work

22   out well for us.

23          THE COURT:  Well, the trouble with that is

24   assuming cases don't get dismissed for other reasons, we

25   don't get 7,000 cases ready for remand that way.

1          MR. MAGAZINER:  Oh, I was -- I'm sorry.  Your

2     Honor asked a question.  I misunderstood it.

3          I was not contemplating discovery in all of the

4     cases.  If Your Honor wants us to talk about discovery in

5     all the cases, I would like to come back with the Court

6     very promptly next week with a schedule for doing that.

7          I was thinking if we were to have a program of 100

8     cases, for example.

9          THE COURT:  Well, I have heard what you said a

10    time or two ago and today, and I understand, like I say,

11    the spreadsheet that I have in my mind, but I'm not sure

12    how helpful sample cases are for that purpose, for -- and

13    I know in your papers you talk about illustrating things

14    and educating the Court and so on.

15         But if our goal is to get all of these cases, either

16    the Florida cases, get them tried for the cases that have

17    been sent here, get them dismissed or settled or ready for

18    trial, I mean, in an ideal world, when we remand these

19    back to the -- whatever court they should go to, you

20    should theoretically be ready for a final pretrial

21    conference and a trial date.

22         MR. MAGAZINER:  I agree with that, Your Honor.

23         THE COURT:  If we send 60 of them back to each

24    court around the country, they'll need to divide them up

25    among the district judges and if there's consents to the

1    magistrate judges, and go to town with them.  However they

2    do that.

3        There might need to be a little bit of follow-up on a

4    case or two, but -- and it may be that we decide that

5    that's just too ambitious and we won't get them all ready

6    to do that, but --

7            MR. MAGAZINER:  We will devote whatever

8    resources we need to -- on AstraZeneca's side -- to take

9    the discovery.  It would be ambitious, but we're willing

10   to devote those resources to take the discovery in all of

11   these cases on any schedule that the Court proposes.

12       If we were to try to do that in all 7,000 cases, and

13   let's say we have another 18 months, whatever 7,000

14   divided by 18 turns out to be, we would do that many per

15   month.

16       I think it won't turn out that way because I think

17   many, many of these cases will not go forward because

18   plaintiffs, for example, will choose not to proceed even

19   through their own depositions if they don't want to invest

20   that kind of time or money in it.

21           MR. PENNOCK:  That's called breaking the bank,

22   and that's why we may not want to.

23       It would be an unprecedented situation with the

24   defendants, what's being proposed.

25       I just would like to point out, even if they did a

1    plaintiff and a prescriber and a main treater, that's

2    21,000 depositions that would have to take place.  Which,

3    by the way, all that would be done knowing that there is

4    simply no possibility ever that 99.9 percent of those

5    cases would ever see a courtroom or even have a pretrial.

6         It would be a massive amount of transactional cost

7    for both sides, and the defendant more so than us

8    probably, that would just be spent on something that I

9    don't think would advance the ball or get these cases

10   ready for a trial that just would never ever happen.

11        As I see it, there are a couple of ways that these

12   mass tort situations resolve.  Settlement, or there's

13   dismissal of some large number of them and then settlement

14   of the rest, or there is an ADR process.

15        But to -- there's just typically no way these cases

16   are all going to trial, so why -- I'm just not sure why we

17   would want to proceed to do 21,000 depositions at a cost

18   of -- you know, my experience, we were able to get

19   defendants -- we got a -- we made a motion in the Vioxx

20   case to get defendant's billings for preparation of one

21   case up to trial with case-specific discovery, and there

22   was a lot of back and forth, but, you know, we have

23   learned over the years anyway that a single plaintiff

24   deposition is -- for the defendants is probably a total of

25   ten to twenty thousand dollars in prep work leading up to

1   that.  And you start adding treating doctors and so forth.

2       I mean, I'm sure that Mr. Magaziner would be thrilled

3   to have the company spend, you know, 100,000 or 200,000 a

4   case just to get three depositions for cases that are

5   never going to be tried.

6       But I think that that money could be far better spent

7   trying to get a more focused way of resolving these cases

8   one way or the other.  Either successfully for the

9   plaintiffs or the defendants, or partially from both

10  sides.

11          MR. MAGAZINER:  My response to that, Your Honor,

12  is this.  Obviously to take 21,000 depositions would be

13  unprecedented, but it won't happen.  What happens, what

14  history has shown in other MDLs is, when the courts say

15  the time has come to start case-specific discovery, cases

16  start dropping in large numbers because plaintiffs'

17  counsel for the first time have to confront the question

18  whether the particular case has enough merit to justify

19  the plaintiffs expending some resources on it.

20      And the Baycol example is a perfect example, I

21  believe, of what happens.  Many, many of these cases in

22  Baycol disappeared once Judge Davis said, let's start

23  case-specific discovery.  Plaintiffs' lawyers apparently

24  concluded that many of their cases were not cases that

25  they wished to pursue.

1      Mr. Pennock's firm itself, I believe, dismissed some

2  5,000 or so cases from Baycol rather than go through

3  discovery in them.  So this is what typically happens.

4      If we have to take 21,000 depositions, of course that

5  would be a mammoth undertaking.  I know that the company

6  would devote resources necessary to do that if it came to

7  be, but it's not going to happen that way.

8      What's going to happen is, many of these cases will

9  just disappear because the plaintiffs, when they really

10  evaluate their cases, will determine that many of them

11  have so little merit as to make it not worth pursuing the

12  case further.

13      MR. PENNOCK:  Judge, the Baycol situation that

14  keeps getting drummed up here again is an entirely

15  distinguishable.

16      In these cases we have people who allege type 2

17  diabetes or diabetes caused by this drug, a very severe

18  and very triable case in terms of ultimate damages

19  outcome.

20      In Baycol the cases that ultimately were in our

21  inventory were not the serious cases.  They were these

22  pain cases where the people had pain for a few, three,

23  four, five weeks.  So when that was determined, that these

24  people were not people with rhabdomyolysis, the severe

25  injury that was settled, he's right, we rejected those

1    cases.  But it wasn't because we had to go do depositions

2    in 100 cases.  We did depositions in that pilot program in

3    40 or 50 of the cases.

4        So it's really a complete mischaracterization of what

5    happened in Baycol.  In any event, it's not applicable in

6    this situation.  We have here thousands of cases of people

7    who either have or don't have the injuries that we've

8    claimed.  If they don't have them, that will be clear from

9    the interrogatory or certainly the medical records that

10   are being collected in vast numbers.

11       If they don't have the injuries that we the

12   plaintiffs have claimed and that we the plaintiffs'

13   lawyers are willing to represent, represent them for,

14   we're not going to go forward.  It's not going to have

15   anything to do with a deposition or not.  If the person

16   doesn't have diabetes, we're not going forward.

17       If they do, if they do have diabetes, and if that

18   injury was by all appearances -- if that injury was by all

19   appearances proximately caused by their use of Seroquel,

20   at least a substantial contributing factor, we're going

21   forward with this case.

22       So I mean, you know Mr. Magaziner and AstraZeneca

23   can -- you know, I'm warning them that this is not a

24   Baycol situation.  And be careful what you ask for,

25   because if you want 21,000 depositions, you're right, some

1    number of them may fall out from the fact sheet process,

2    that they don't meet our admissions criteria, but we're

3    not taking pill takers, as we call them.  We're not taking

4    anyone that just took the pill and then says, oh, I should

5    get some money, $100 or a thousand.  We're only taking

6    cases of people that we believe were injured by this drug,

7    that took this drug for some period of time that it might

8    in fact have caused them injury based on our expert

9    analysis generally of how it works, and then they filed a

10   lawsuit for those very serious injuries.

11          We're not going to have them -- we're going to have

12   to do the deposition.  You're not going to see the kind of

13   attrition that he's claiming.

14          You may see significant attrition from this fact

15   sheet process, and additionally, as I pointed out, there

16   can also be a massive dealing with issues that globally

17   affect these people from this fact sheet process.

18          But this is not Baycol, this is Seroquel.  The injury

19   is not, as the defendants called it, aches and pains for

20   four or five or six weeks, as we discovered.  This is a

21   very severe lifelong and debilitating injury in people

22   many of whom were already debilitated but many of whom,

23   perhaps as many as 30 to 40 percent, weren't even

24   prescribed this drug for the severe bipolar or other

25   indications.

1      So, I think this is a very dangerous concept that we

2  would be proposing for this MDL.  I think it would

3  essentially destroy any possibility of this MDL creating a

4  trial package and creating the discovery necessary so that

5  cases can -- so that this MDL can wrap up.

6      I don't see that -- we will be here for ten years.

7  There is no question.  But as I said, we won't achieve

8  anything.  These cases won't all individually be tried.

9      We need to move forward with the defendant discovery

10  and see where we stand, and if the discovery turns out the

11  way we're hoping, and if the documents are as damning and

12  as devastating as the Zyprexa documents, who knows, maybe

13  the company will have a change of heart on how they want

14  to deal with this litigation, without having to spend two

15  or three billion dollars doing a plaintiff's deposition

16  and a prescribing doctor's deposition in 7,000 cases.

17          MR. MAGAZINER:  Your Honor, it's not surprising

18  that plaintiffs would advocate that they can take all the

19  discovery they want.

20          THE COURT:  I understand.  And it's a two-way

21  street here, and you have got the fact statements coming

22  in, and that's where we started, was that was part of the

23  exchange of getting the IND and the NDA.

24      Again, I'm disappointed we didn't get all of that

25  done much sooner, but that's moving forward now, and the

```
 1    fact sheets are moving forward, and so these things are on

 2    track, but it's still a two-way street.

 3        Let me -- I have got a couple other subjects, and

 4    then I'm going to ask both sides to wrap up.

 5        I think one is what effect we do -- what effect there

 6    may be of what we do here on the schedule in the Delaware

 7    State litigation and what effect the Delaware State

 8    litigation should have on what we're doing here.  If we

 9    can address that.

10            MR. PENNOCK:  I think Mr. Gornick may still be

11    on the phone.

12            MR. GORNICK:  I'm here.

13            MR. PENNOCK:  And Judge, Mr. Gornick has been

14    sort of taking the point with Delaware, and if I could

15    defer to him on his thoughts on that.

16            MR. GORNICK:  Your Honor, if I may, we have a

17    very ambitious schedule in Delaware.  I don't have the

18    Delaware scheduling order in front of me, but the

19    defendants there, including AstraZeneca, have been ordered

20    to respond to my request for production of documents,

21    which in their own words requests everything related to

22    Seroquel.  They're ordered to produce those documents by

23    the end of May.

24        We do not have any documents yet other than those

25    that have been produced in the MDL.  We have -- we're in
```

1   the middle of exchanging meet and confer letters.  I hope

2   that I won't have to, but I believe I'll be filing a

3   motion to compel production of documents within the next

4   week or two.  So that's where we are on documents.

5         The current scheduling order is that AstraZeneca has

6   to produce everything to us by the end of May.  We're

7   allowed to start taking depositions of individually

8   identified witnesses I believe starting either June 1 or

9   July 1.  We're entitled to start taking 30(b)(6)

10  depositions on circumscribed subject matter starting now.

11  So that's the general discovery schedule.

12        As far as case-specific discovery goes, the plan is

13  that the parties will select ten cases which will be put

14  upon a trial track.  Those cases are to be selected by

15  March 15.  In those particular -- those ten cases, there

16  will be full discovery of the individual plaintiffs'

17  claims.  And there will be expert discovery -- the current

18  program is designed to have those ten cases completely

19  ready for trial by sometime in November of 2008.

20        In November of 2008, there will be a trial setting

21  conference, at which time the trial date will actually be

22  set, but the schedule contemplates them being fully and

23  completely prepared for trial by November of '08.  Those

24  ten cases.

25              MR. MAGAZINER:  May I respond, Your Honor?

```
 1              THE COURT:  All right.

 2              MR. MAGAZINER:  I don't believe that

 3    Mr. Gornick's description of Delaware is completely

 4    accurate, by any means.  I will be happy to submit to the

 5    Court the transcript of hearings, transcripts of hearings

 6    in front of the special master in Delaware.

 7         He could not have been more clear in saying to

 8    plaintiffs' counsel that if you want a May 31 production

 9    date, you are going to have to narrow your requests and

10    ask for far less from AstraZeneca than is happening in the

11    MDL, but why should it matter to you, plaintiffs, because

12    you will still have the benefit of all the additional

13    documents that are produced in the MDL later on.

14         So for Mr. Gornick to say AstraZeneca is required to

15    produce all of its documents on Seroquel by May 31 is just

16    not accurate.

17         The rest of what's going on in Delaware, as I

18    understand it, is in somewhat of a state of flux.  I

19    believe that at a hearing that I did not attend, so I

20    can't give you a firsthand report, I believe Judge Slights

21    indicated that he would be interested in seeing what sort

22    of discovery order comes out of the MDL and suggested that

23    he might then conform the Delaware schedule to the MDL

24    schedule, once the MDL Court has issued a scheduling

25    order.
```

1          THE COURT:  Well, let me state what ought to be

2    obvious, which is, I'm mindful of what's going on in

3    Delaware.  I think from the schedule, that regardless of

4    the precise terms, that the schedule entered so far in

5    Delaware is consistent with this Court's approach that

6    these cases be moved with expedition.

7          And it's my firm resolve that nothing we do here

8    would slow down those cases, and that nothing that the

9    Delaware Court does will slow down -- that nothing we do

10   here will slow done their cases, and nothing they do will

11   slow down these.

12         So keep that in mind, that you may get the benefit of

13   whatever is faster on either track.  That's what's going

14   to drive it.  Not whatever is slower.

15         And because I think the general approach is going to

16   be the same, that we expect you to move forward.

17         All right.  The other issue that I want to -- I

18   think -- I have got to check my notes here, but I think

19   the other issue that I still want to discuss with you is

20   the motion for reduced fees.

21         Let me ask how many of the -- using the imprecise

22   number 7,000, out of the 7,000 plaintiffs that are now

23   here, how many of those originated in cases that were

24   originally filed in a state court and then removed by the

25   defendant to federal court?

1           MR. PENNOCK:  I'll let Mr. Trammell from the

2   Bailey law firm respond to that, if that's all right.

3           MR. TRAMMELL:  About 21 petitions were filed --

4   Fletch Trammell for plaintiffs.

5       About 21 petition were filed in the United States

6   District Court for the District of Massachusetts

7   containing about 6500 plaintiffs.  And so a small minority

8   of the plaintiffs actually in the MDL were cases filed in

9   other federal courts or in state courts and then removed.

10          THE COURT:  Okay.

11          MR. TRAMMELL:  I would like to address the

12  merits of our motion, if Your Honor has any interest in

13  that.

14      We filed these cases in the District of Massachusetts

15  because we determined that an entity related to

16  AstraZeneca was headquartered there.  We thought that was

17  an appropriate place to lay venue, and we thought we had

18  enough similarity among these plaintiffs to join them for

19  purposes of Rule 20, and we did that in good faith.

20      However, we also knew that the MDL had been

21  established, that filing cases in the federal system would

22  make it easier to consolidate those cases here in this

23  course.

24      Had we filed those cases in defendant's headquarters,

25  headquarters state of Delaware, we would have paid about

 1    half the filing fee that we are scheduled to end up paying

 2    in this court.  On top of that, Your Honor, the defendants

 3    would have paid a removal fee.

 4         So really the point of our motion was, in light of

 5    the -- one of the primary purposes of an MDL was to reduce

 6    the costs and create efficiency for all the parties, that

 7    some reduction in the filing fees is appropriate.  Without

 8    a reduction in filing fees, obviously we would maybe look

 9    harder at filing in state court venues and pay a lower

10    filing fee when we have a large inventory of cases.  They

11    would then have to remove those cases.  They would pay a

12    removal fee.

13         And it really -- applying this type of filing fee

14    increases the cost to both parties as opposed to lowering

15    it, which we understand to be the purpose of coordinated

16    proceedings.

17              THE COURT:  What's the filing fee in state court

18    in Massachusetts?

19              MR. TRAMMELL:  I'm not certain of that, Your

20    Honor.  I can supply that to the Court.  It's $150 in

21    Texas, which I'm sure is not helpful.

22              THE COURT:  Well, I raise that.  You talked

23    about Delaware in your papers.  I think Massachusetts is

24    $250, depending on which court's jurisdiction you're

25    invoking.  And other states have other fees.

1          All right.  Well, I'll take that under advisement.

2          Let me ask the parties whether you want to make any

3    general statements to wrap up or whether you would like to

4    take a break for lunch and come back.

5          And I think I've covered the subjects I wanted to

6    cover, which would lead up to my entry of some orders

7    giving you direction for going forward, obviously subject

8    to -- I'm not entirely clear in my own mind how many --

9    which parts of which of this are going to be in an order

10   by me and how much will be in a report and recommendation

11   to Judge Conway.

12         I think of all the issues we have talked about today,

13   I have the authority to enter orders, obviously subject to

14   anybody seeking review from Judge Conway.  So in that

15   sense, it doesn't make any difference, it substantively

16   doesn't make any difference whether I do the order or the

17   R&R, but for a reason peculiar to myself I may split it

18   up.

19         So let me just ask, do you want break and then come

20   back and kind of having heard what I have said this

21   morning, and hearing your responses, whether you want to

22   do a summation or whether I've worn you out completely.

23              MR. PENNOCK:  No, Judge, you haven't warn us out

24   completely.  I don't know what the consensus is.

25         Larry, do you have anything?

```
 1              MR. ROTH:  Judge, I had just had a couple of
 2    comments to make as liaison counsel to some of the things
 3    that happened, and maybe it will take no more than just a
 4    couple, five minutes.
 5         In terms of --
 6              THE COURT:  I can -- we can keep going forward
 7    if it's only going to be five or ten minutes.  If you want
 8    a half-hour between two sides to talk a little bit, we can
 9    do that now, or we can take a five-minute recess for a
10    comfort break and then come back in five minutes and
11    finish up, or we can take a lunch break and come back.
12    I'm willing to do it however --
13              MR. MAGAZINER:  We have nothing more that we
14    wish to say, Your Honor.  Of course if the plaintiffs
15    saying something, then we may --
16              THE COURT:  You reserve the right to respond.
17              MR. MAGAZINER:  But at this point, no, we would
18    not wish to take a break and come back.  We're done.
19              MR. PENNOCK:  Judge, the only additional thing
20    that I have --
21              THE COURT:  And the reason I'm offering this is
22    because I have interrupted both sides quite a bit and I
23    have gotten you off track, and you may have things you
24    wanted to mention to me and didn't because I put you off
25    someplace else.
```

1              MR. PENNOCK:  No, I think actually these types

2    of back and forth discussions are the most useful with all

3    these issues, and I appreciate the Court's indulgence in

4    letting us go back and forth.

5         The only thing that I would want -- I think I'm

6    compelled to mention is that before we reached the

7    discussions with respect to how we would continue the

8    discovery against the defendants, in other words, before

9    those discussions were crystallized entirely, as proposed

10   in my order, and before we really kind of granted the

11   loggerheads on this pilot program idea of 100 cases or how

12   many cases, we had come to an agreement thinking that

13   everything was going to work out.

14        We had come to that joint deposition protocol

15   agreement, and I have to say that there are some things

16   we, the plaintiffs, agreed to in there that were extremely

17   important to the defense.  I mean that are the most

18   important things always to defendants.

19        Primarily that is, Paul, use these depositions in

20   every state court venue.  Agree to that.  Don't put us

21   under the pressure of having to do depositions again and

22   again and again in these other state court venues.  Do the

23   depositions once, get everybody on board, do the

24   depositions for two days, get it done, and then you can

25   just -- don't make us go through these hoops all over the

1    country.

2          And, you know, that was a major -- the most major

3    concession that we made to date in this litigation and

4    that any MDL or plaintiffs' lawyers would make, because

5    more typically there are these different litigations going

6    on with different potential for depositions against the

7    defendants.

8          We've taken that problem off the table for them.  I

9    don't know if that order has been entered yet, but I have

10   to say that based upon some things I have heard this

11   morning, such as an agreement by the defendants to go

12   forward with as many as 21,000 plaintiff depositions, I

13   mean, that really does kind of undermine the spirit of

14   going-forward cooperation that we had in mind when we made

15   the agreement on only doing their depositions here.

16         And I would -- I would ask, until I have had an

17   opportunity to let all of this sink in, to allow me to say

18   that I'm not so sure that joint proposal is -- I may be

19   estopped from saying this and I may be stuck with having

20   proposing it already, I understand that, but I would ask

21   that that order not be entered.

22              THE COURT:  Let me ask you a question about

23   that.  How many of those -- of these depositions do you

24   anticipate having to be done by subpoena?

25              MR. PENNOCK:  A very small number.  Almost none.

1    They're going to produce all the current and former

2    employees by consent, and they're going to try and do what

3    we agreed at their offices in Philadelphia.  And if

4    somebody didn't want to come to -- some former employee

5    didn't want to come to Philadelphia, they would try to

6    make that person agreeable to being made available without

7    subpoena in the district where they live, and we'd go take

8    that depo there.  These are the company witness depos.

9           MR. MAGAZINER:  Can I just clarify one thing.  A

10   very small point, but I hate to have things said and not

11   respond.

12       I don't think there will be very many that have to be

13   done by subpoena, but I don't think we ever represented

14   that we can necessarily produce every former employee.

15          MR. PENNOCK:  If you can.  If you can.  I was

16   just going to finish, there may be some we have to

17   subpoena.

18          THE COURT:  There are going to be some third

19   parties, too.

20          MR. PENNOCK:  There will be some third parties,

21   there will be probably some marketing firms, third

22   parties.  There will be some clinical investigators who

23   we've already identified, I think, that we're going to

24   want to take the depositions of.

25       But a limited number of third parties.  I mean, I

1    don't think -- I don't think we're talking 20 or 30 third

2    parties.  We're probably talking ten, five to ten.

3         MR. ALLEN:  I can take ten.  We have marketing

4    firms -- Your Honor, Scott Allen, Houston, Texas.

5         We have marketing firms, public relations firms.  We

6    have two clinical investigators who have been convicted of

7    crimes, that we want to take their depositions.  Probably

8    ten.

9         THE COURT:  Plus the FDA.

10        MR. ALLEN:  And the FDA.  Probably ten.  It

11   could be less, because a lot of times the defendants have

12   inroads with these people and can talk to their lawyers,

13   who sometimes they pay for their lawyers, and they can

14   arrange it.  But if they do not, ten.

15        THE COURT:  Mr. Roth?

16        MR. MAGAZINER:  Well, the broader issue about

17   the proposed CMO3, I am astounded that plaintiffs would

18   now seek to withdraw their agreement to an order that we

19   jointly proposed.

20        MR. PENNOCK:  I'm sorry.  I didn't say that,

21   Fred.  I just said I'd like an opportunity to let all this

22   sink in, because we've just been -- you've just come

23   forward with a position that has never been mentioned.

24        THE COURT:  Respond to the question I asked.

25        MR. PENNOCK:  That's all.

1          THE COURT:  Mr. Roth?

2          MR. ROTH:  Yes, Judge.  Two things.  One, I

3     don't know if you wanted to go ahead and set a date for

4     the next conference.

5          And the other thing is, as liaison counsel, what I

6     have been doing is reporting to the 70-odd attorneys that

7     I communicate with about what's going on in the case, and

8     in terms from my perspective, I have gotten a little

9     disconnect here this morning in terms of what two or three

10    status conferences ago was initially referred to, I think,

11    brought up by Your Honor as Bell Weather cases, has become

12    a pilot program that was recommended 100 -- I'm not

13    talking to the substance of any of this, just

14    clarification -- 100 cases, which the plaintiffs thought

15    was unpractical.

16         And then if I have understood things correctly, now

17    an idea that we're going to do discovery in 7,000, or

18    whatever the number is, individual cases, although

19    restricted discovery.  And that was a proposal that's

20    never been made.

21         And I'm trying to get some read on what to report,

22    you know, to those people who are not on the phone and not

23    here of, you know, what this issue is that you may

24    ultimately rule on in terms of case-specific discovery,

25    and the arguments for both ways have been made, but I'm

 1    not clear if from Your Honor's comments, whether you're

 2    talking about case-specific discovery, however limited or

 3    circumscribed, in all cases or in their proposed 100 pilot

 4    program or again the original concept of maybe 20 or 30

 5    cases.

 6        And then you also mentioned about the difficulty in

 7    how are we going to select those cases.

 8        So I just wanted to get some clarification from Your

 9    Honor, not a ruling obviously, but it seems to me that

10    you're talking about selection, you're talking about

11    circumscribed depositions, and we have all recognized how

12    extensive and valuable the plaintiffs' fact sheets have

13    been, and the follow-up with the medical records that

14    we're obviously, or at least to me you're not talking

15    about, or at least you're not telling us that you're

16    thinking about 7500 cases being individually litigated

17    within the context of what's going to be going on in the

18    general discovery and the general production and the

19    depositions of the defendants.

20        So I just -- if Your Honor could, without telling us

21    what your ruling is, I'm just trying to get some

22    clarification from my standpoint so I can tell everyone

23    what sort of options are being weighed and what to expect.

24            THE COURT:  Well, I raised the subject matter

25    because those were thoughts that went through my mind as I

1    was looking at the disagreements between the parties about

2    how to go forward, and I have not -- I listened as

3    carefully as I could to what everybody has said here, and

4    I have given you some idea, I think, of what I think is

5    important.  But and how I'm going to come out on that is

6    to be determined.

7         The -- but just to summarize, I mean, I think

8    everybody needs to recognize that discovery in these cases

9    is a two-way street.  You have got -- not to say it's like

10   a tennis match, but because the plaintiffs have different

11   needs than what the defendant has in terms of information.

12        And there's different ways to build momentum or keep

13   momentum going in these cases, whether it's towards

14   settlement or towards trial or towards dismissal.  And my

15   objective is to enter an order that frankly keeps pressure

16   on both sides to move forward, and recognizing the

17   practicalities of what has already been set in place and

18   what is absolutely necessary.

19        So you tell the other lawyers that a lot of things

20   are on the table and that there will be an order coming

21   out probably early next week that will give you more

22   specific guidance.

23             MR. TRAMMELL:  If I might, I hate to revisit

24   this, but on the issue of the filing of the new cases,

25   we've spoken with the clerk about having some sort of

116

```
 1    delay procedure for after a fact sheet is served, the

 2    obligation to then file a new petition.  We have also

 3    spoken about having to file a short one-page --

 4              THE COURT:  I don't have any problem with that.

 5              MR. TRAMMELL:  Okay.

 6              THE COURT:  And again, we talked about tying the

 7    fee requirement to the exchange or the supplying of the

 8    fact sheets, so if -- I don't know, have you identified

 9    plaintiffs that you just can't go forward with because

10    they're not going to have their fact sheets?

11              MR. TRAMMELL:  Your Honor, today we've produced

12    1700 fact sheets and we have been satisfied with the

13    merits of those cases.

14              THE COURT:  So none of them are getting or very

15    few are getting winnowed out that way?

16              MR. TRAMMELL:  Very few.  But I'll say this.

17    That what we envisioned was serving the fact sheet and

18    then having a certain amount of time to then file a short

19    amended petition with the individual plaintiff's name on

20    it.  And we put those positions in our papers before the

21    Court.

22              THE COURT:  Anything else from the plaintiffs?

23              MR. PENNOCK:  No, Your Honor.  Thank you for

24    your time.

25              THE COURT:  Mr. Magaziner?
```

```
 1              MR. MAGAZINER:  No, Your Honor.

 2              THE COURT:  Let's talk about dates.

 3         In terms of -- you may change your mind once you see

 4    my order or orders as to how soon you want to see me

 5    again, if at all.

 6         Mid April sound right?

 7              MR. MAGAZINER:  That will be fine, Your Honor.

 8              THE COURT:  Friday the 13th comes on a Friday in

 9    April.

10              MR. PENNOCK:  That's my lucky day, Judge, Friday

11    the 13th.

12              MR. MAGAZINER:  I think all counsel previously

13    told the Court that if it were convenient for the Court,

14    we would rather not have conferences on Fridays, but if

15    it's --

16              THE COURT:  I couldn't remember whether you

17    wanted them on Fridays or didn't want them on Friday.

18              MR. MAGAZINER:  No, I think we all said we would

19    rather not, and I think plaintiffs and we both suggested

20    Tuesdays, Wednesdays or Thursdays would be better, since

21    so many lawyers are traveling.

22              THE COURT:  We can do it Thursday the 12th.

23              MR. MAGAZINER:  That's fine with me.

24              MR. PENNOCK:  Judge, I don't think I would be

25    able to make a morning conference on Thursday the 12th.
```

1   My wife's birthday is the day before, and so I won't be

2   able to fly out that night if I want to have a home to

3   return to.

4          MR. MAGAZINER:  Then make it that afternoon,

5   Your Honor.  That would be fine with us.

6          THE COURT:  How about 2:00 on Thursday the 12th?

7          MR. PENNOCK:  That would be fine.

8          THE COURT:  All right.  We're in recess.

9              (Adjourned at 12:37 p.m.)

10                C E R T I F I C A T E

11          I certify that the foregoing is a correct

12   transcript from the record of proceedings in the

13   above-entitled matter.

14

15

16

17

18   _____              _____

19   Sandra K. Tremel

20

21

22

23

24

25