# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**IN RE: Seroquel Products Liability Litigation**

**MDL DOCKET NO. 1769**

_____

***This Document Relates to***:

> *Barnes v. AstraZeneca Pharms. LP*, 6:07-16752-ACC-DAB
> *Colman v. AstraZeneca Pharms. LP*, 6:07-cv-16751-ACC-DAB
> *Donaldson v. AstraZeneca Pharms. LP*, 6:07-cv-16742-ACC-DAB
> *Duncan v. AstraZeneca Pharms. LP*, 6:07-cv-16736-ACC-DAB
> *Gordon v. AstraZeneca Pharms. LP*, 6:07-cv-16738-ACC-DAB
> *Jackson v. AstraZeneca Pharms. LP*, 6:07-cv-00522-ACC-DAB
> *Jensen v. AstraZeneca Pharms. LP*, 6:07-cv-16743-ACC-DAB
> *Makinson v. AstraZeneca Pharms. LP*, 6:07-16757-ACC-DAB
> *Sauvageau v. AstraZeneca Pharms. LP*, 6:07-cv-16754-ACC-DAB
> *Thomas v. AstraZeneca Pharms. LP*, 6:07-cv-16748-ACC-DAB
> *Wilson v. AstraZeneca Pharms. LP*, 6:07-cv-16740-ACC-DAB

## ASTRAZENECA'S MOTION FOR PARTIAL JUDGMENT
## ON THE PLEADINGS ON THE BASIS OF FEDERAL PREEMPTION

Many plaintiffs in this MDL did not start taking Seroquel until after the medicine carried

a warning about diabetes-related risks.  The specific language of that warning was, as plaintiffs

acknowledge, *mandated* by the federal Food and Drug Administration ("FDA").  Nevertheless,

plaintiffs claim that AstraZeneca should be held liable for allegedly causing their diabetes

because the FDA-required diabetes warning purportedly is inadequate under state law.

These failure-to-warn claims are barred under the doctrine of implied conflict

preemption.  Indeed, they involve a direct assault on the FDA's authoritative federal

determinations concerning the appropriate diabetes-related warnings that must accompany

Seroquel.  By seeking to displace the FDA's congressionally mandated role in determining that

proper warning, and by urging warnings the FDA determined to be scientifically unsubstantiated,

plaintiffs' claims impermissibly "conflict" with, and would "stand as an obstacle" to, the FDA's authoritative federal determinations with respect to Seroquel.  *Geier v. American Honda Motor Co.*, 529 U.S. 861 (2000); *see also In re Bextra & Celebrex Mktg., Sales Pracs. & Prod. Liab. Litig.*, MDL-1699, 2006 WL 2374742 (N.D. Cal. Aug. 16, 2006) & 2006 WL 2472484 (N.D. Cal. Aug. 24, 2006); *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514 (E.D. Pa. 2006).

This targeted preemption motion focuses on eleven plaintiffs from the initial *Jackson v. AstraZeneca Pharms., LP* action who allege that they (a) were prescribed and took Seroquel only after warnings mandated by the FDA specifically addressed diabetes-related risks, and (b) allegedly developed diabetes as a result of taking Seroquel.[1]  As to these plaintiffs' failure-to-warn claims, AstraZeneca is entitled to judgment on the pleadings on preemption grounds.  A ruling that these plaintiffs' warnings claims are preempted is expected to support dismissal of other MDL cases in which either the complaint or discovery shows that plaintiffs complaining of diabetes took Seroquel for the first time *after* it carried the FDA-mandated diabetes warning.

Although several decisions in pharmaceutical cases have rejected certain preemption arguments (*see* Part II.B., *infra*), this motion implicates the quintessential case in which preemption necessarily applies:  where (i) *before* plaintiffs took the medicine, the FDA determined that the warning given was appropriate and the very warning demanded by plaintiffs under state law was scientifically unjustified; and (ii) *after* plaintiffs took the medicine, the FDA confirmed the continuing validity of that warning, and that the proposed stronger warning still is

---

[1] Those plaintiffs are Octavia Jackson, Darlene Duncan, Shelia Gordon, Jacqueline Darlene Wilson, Amber Donaldson, Shelly Jensen, Sandra Thomas, Tammy Colman, Terry Barnes, Leonard Savageu, and James Makinson.  As noted, plaintiffs initially were joined in a single action captioned *Jackson et al. v. AstraZeneca Pharmaceuticals LP et al.*  Pursuant to this Court's January 26, 2007 severance order, each plaintiff has been assigned an individual case number (noted in the caption above) and has adopted the allegations in the *Jackson* Amended Complaint.  For simplicity, we reference that complaint herein as "Compl."

not justified.  In short, these plaintiffs' theory—that AstraZeneca should be liable under state law for failing to provide the very stronger diabetes-related warning (*i.e.*, Seroquel "causes" diabetes) that the FDA considered but *rejected* in favor of its calibrated warning—fatally conflicts with federal law and the FDA's authoritative federal regulatory determinations.  Thus, plaintiffs' warning claims are preempted, and this motion for judgment on the pleadings should be granted.

## BACKGROUND

**A.    Plaintiffs' Inadequate Warning Claims Under State Law**

The prescription medication Seroquel (also called quetiapine fumarate) is an atypical antipsychotic approved by the FDA for treatment of mental health conditions, including schizophrenia and Bipolar I Disorder.  Compl. ¶ 50.  As the complaint alleges, in September 2003, the FDA "mandated" that AstraZeneca provide a warning concerning diabetes and diabetes-related conditions.  *Id*. ¶ 52.  That FDA-mandated warning indisputably provides in full:

> **WARNINGS**
> . . .
> **Hyperglycemia and Diabetes Mellitus**
> Hyperglycemia,[2] in some cases extreme and associated with ketoacidosis or hyperosmolar coma or death, has been reported in patients treated with atypical antipsychotics.  Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population.  Given these confounders, *the relationship between atypical anti-psychotic use and hyperglycemia-related adverse events is not completely understood.*  However, epidemiologic studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with the atypical anti-psychotics studied.  Precise risk estimates for hyperglycemia-related adverse events in patients treated with a typical anti-psychotics are not available. . . .
>
> Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control.  Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical anti-psychotics

---

[2] Hyperglycemia is "an abnormally high concentration of glucose in the blood."  *Stedman's Concise Medical Dictionary for the Health Professions* 468 (4th ed. 2001).

> should undergo fasting blood glucose testing at baseline and periodically during treatment.  Any patient treated with atypical anti-psychotics should be monitored for symptoms of hyperglycemia . . . .  Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing.

*See* Exh. 1 (full text of September 2003 FDA-mandated diabetes warning) (emphasis added).

Each plaintiff here was first prescribed Seroquel *after* this warning appeared in Seroquel's FDA-mandated labeling.[3]  Nevertheless, plaintiffs allege that AstraZeneca failed adequately to warn about diabetes and related conditions.  Invoking state law, plaintiffs fault AstraZeneca for not specifically warning that Seroquel "*causes* diabetes, hyperglycemia, glucose intolerance, ketoacidosis and/or pancreatitis and as such monitoring and/or testing to prevent against such injuries was required."  Compl. ¶¶ 152-54 (emphasis added); *see id.* ¶ 139 (alleging that the Seroquel labeling "*at al[l] times relevant to this action*, failed to warn that diabetes" is a risk associated with Seroquel use "and that physicians should perform testing and/or monitoring to prevent against such injuries.") (emphasis added).  Plaintiffs allege that, if their physicians were so warned, plaintiffs would not have taken Seroquel and thus would have avoided the "diabetes" they allegedly sustained as their claimed injury.  *See, e.g., id.* ¶¶ 60-65, 107-09, 124.

**B.    The FDA's Federal Regulatory Scheme Concerning Prescription Drug Warnings**

Under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), the "FDA is the expert Federal public health agency charged by Congress with ensuring that drugs are safe and effective, and that their labeling adequately informs users of the risks and benefits of the product and is truthful and not misleading."  Requirements on Content & Format of Labeling

---

[3] Ms. Jackson was prescribed and began using Seroquel in October 2005; Ms. Duncan in August 2004; Ms. Gordon in September 2004; Ms. Wilson in July 2005; Ms. Donaldson in August 2004; Ms. Jensen in 2004; Ms. Thomas in May 2004; Ms. Colman in November 2005; Mr. Barnes in January 2005; Mr. Sauvageau in May 2005; and Mr. Makinson in June 2005.  *See* Compl. ¶¶ 66, 74, 77, 79, 81-82, 87, 90-91, 93, 96.

4

for Human Prescription Drug & Biological Products, 71 Fed. Reg. 3922, 3934 (Jan. 24, 2006);

*see* 21 U.S.C. § 393(b); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)

(FDA's determination that a drug "is 'safe' and 'effective' for its intended use" is "one of the

[FDCA]'s core objectives").  For any prescription drug authorized for sale in the United States,

the FDA must approve all warnings contained in the package insert.  *See* 21 U.S.C.

§ 355(b)(1)(F).  The labeling includes information about risks and possible side effects and a

summary of certain data from the clinical studies underlying the new drug application ("NDA").

*See* 21 C.F.R. §§ 201.56, 201.57, 201.100.  The proposed labeling included in the NDA must be

supported by "annotations to the information in the summary and technical sections of the

[NDA] that support the inclusion of each statement in the labeling."  21 C.F.R. § 314.50(c)(2)(i).

In reviewing the labeling, FDA makes a "comprehensive scientific evaluation" considering

"complex clinical issues" from clinical trials and "important and practical public health issues

pertaining to the use of the product in day-to-day clinical practice."  71 Fed. Reg. at 3934.

The final approved labeling constitutes "[t]he centerpiece of risk management for

prescription drugs," and "reflects thorough FDA review of the pertinent scientific evidence and

communicates to health care practitioners the agency's formal, authoritative conclusions

regarding the conditions under which the product can be used safely and effectively."  *Id.*

("labeling is FDA's principal tool for educating health care professionals about the risks and

benefits of the approved product to help ensure safe and effective use").

A major limitation on what may be included in prescription drug warnings is the FDCA's

prohibition on "misbranding" drugs in interstate commerce.  21 U.S.C. §§ 331(a), (b), (k).  A

drug is misbranded when "its labeling is false or misleading in any particular."  21 U.S.C.

§ 352(a).  To comply with federal law, warnings in the package insert must not only *include*

those that FDA has found warranted, but also must *exclude* warnings that do not meet FDA's standards of scientific justification. *See* 21 U.S.C. §§ 352(a), (f). For this reason, the FDA itself has insisted that the FDCA "establish[es] both a 'floor' and a 'ceiling,' such that additional disclosures of risk information can expose a manufacturer to liability under the [FDCA] if the additional statement is unsubstantiated or otherwise false or misleading." 71 Fed. Reg. at 3935.

Following marketing under the initial approved labeling, the FDA "continuously works to evaluate the latest available scientific information to monitor the safety of products and to incorporate information into the product's labeling when appropriate." 71 Fed. Reg. at 3934. Under the "changes being effected" ("CBE") supplement regulations, a manufacturer may "add or strengthen" a warning where new scientific risk information comes to light that meets the agency's scientific standards. 21 C.F.R. § 314.70. The manufacturer must submit a CBE supplement to the FDA "fully explaining the basis for the change," and such a change "may be implemented before FDA approval, but after FDA notification," *only* if it meets the FDA's scientific standards. 71 Fed. Reg. at 3934; 21 C.F.R. § 314.70(c). Indeed, the FDA reviews the submission and "may later deny approval of the supplement" or take "enforcement action if the added information makes the labeling false and misleading" under 21 U.S.C. § 352. *See* 71 Fed. Reg. at 3934 (emphasizing that "the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's," and that "in practice, manufacturers typically consult with FDA prior to adding risk information to the labeling").

Strict adherence to these standards is critical to accomplishing the FDA's regulatory task of ensuring that labeling does not "overwarn" by including scientifically unjustified risks:

> Given the comprehensiveness of FDA regulation of drug safety, effectiveness, and labeling under the act, additional requirements for the disclosure of risk information are not necessarily more protective of patients. Instead, they can erode and disrupt the careful and truthful representation of benefits and risks that

6

prescribers need to make appropriate judgments about drug use.  Exaggeration of risk could discourage appropriate use of a beneficial drug.

. . .  [L]abeling that includes theoretical hazards not well-grounded in scientific evidence can cause meaningful risk information to "lose its significance." Overwarning, just like underwarning, can similarly have a negative effect on patient safety and public health.  Similarly, State-law attempts to impose additional warnings can lead to labeling that does not accurately portray a product's risks, thereby potentially discouraging safe and effective use of approved products or encouraging inappropriate use and undermining the objectives of the [FDCA].  [71 Fed. Reg. at 3935 (internal citations omitted).]

## C.   The FDA's Regulatory History Concerning Seroquel

The FDA first approved Seroquel for use in the United States in 1997, Compl. ¶ 50.  *See* FDA Approval Letter (Sept. 26, 1997) (Exh. 2).  In so doing, the FDA concluded that "adequate information has been presented to demonstrate that [Seroquel] is safe and effective for use as recommended in the enclosed marked-up draft labeling."  *Id*. at 1.  The FDA required that the final printed package insert accompanying Seroquel "must be identical" to the FDA-approved warning.  *Id.*  The initial package insert alerted doctors that "diabetes mellitus," "hyperglycemia," and "weight gain" had been observed in clinical trials.  *See* Nov. 1997 package insert at 3430-3431 (Exh. 3) (noting that diabetes and hyperglycemia were "infrequent" adverse events in short-term, placebo-controlled trials, and that those trials showed a "statistically significantly greater incidence of weight gain for SEROQUEL (23%) compared to placebo (6%)"); *id.* at 3431 (noting treatment-emergent adverse experience in 3- to 6-week placebo-controlled clinical trials for "weight gain" was 2% for Seroquel and 0% for placebo).

In the following years, the FDA extensively examined the scientific evidence of diabetes-related risks in all atypical antipsychotics, including Seroquel.[4]  Ultimately, in 2003, "[a]fter

---

[4] On May 1, 2000, the FDA sent a letter to AstraZeneca (then, Zeneca Pharmaceuticals) explaining that it was "fully evaluating the possibility that atypical antipsychotics may produce disturbances in glucose regulation" in response to "spontaneous reports of new onset diabetes mellitus" it had received with respect to various atypical antipsychotics.  May 1, 2000 FDA

reviewing the available data pertaining to the use of atypical antipsychotic medications and diabetes mellitus adverse events, [FDA] concluded that the product labeling for all atypical antipsychotics should be updated to include information about these events." Sept. 15, 2003 FDA Letter at 1 (Exh. 1).  Thus, the FDA revised the package insert for *all* atypical antipsychotics, including Seroquel, to reflect the specific diabetes-risk information that the agency determined to be scientifically supported within the meaning of its regulations.  *Id.*; *see also* Compl. ¶ 52.  That warning included the FDA's conclusion that "the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood."  Sept. 15, 2003 FDA Letter at 1.  The FDA also decided to advise prescribing physicians that epidemiological studies suggested an "increased risk of treatment-emergent hyperglycemia-related adverse events" and advised physicians to monitor patients for symptoms of hyperglycemia.  *Id.*

On January 12, 2004, the FDA approved AstraZeneca's revisions to Seroquel's package insert incorporating verbatim the FDA-"mandated" diabetes warning, and further required that the final package insert "be identical" to the approved labeling.  Compl. ¶ 52; Jan. 12, 2004 FDA Letter (listing new warning language) (*available at* www.fda.gov/cder/foi/appletter/2004/20639se1-017,016ltr.pdf) (Exh. 5).[5]  Thereafter, AstraZeneca sent a "Dear Doctor Letter" to prescribing physicians advising them of the new warnings.  Compl. ¶ 53; *see also* Exh. 6.[6]

---

Letter at 1 (Exh. 4).  "Although this examination revealed few of these adverse experiences in association with Seroquel treatment," the FDA wanted to study "the possibility that more cases associated with Seroquel will emerge as experience [with Seroquel] accumulates."  *Id.*

[5] The FDA ultimately decided to omit the following sentence from its September 2003 letter in the FDA-approved Seroquel warning:  "The available data are insufficient to provide reliable estimates of differences in hyperglycemia-related adverse event risk among the marketed atypical antipsychotics."

[6] On April 22, 2004, AstraZeneca issued an updated "Dear Doctor" letter to add four words— italicized in the following quote—that were not included in the quoted warning in its initial January 30, 2004 Dear Doctor letter:  "Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical anti-psychotics

Continuing its oversight of Seroquel, nearly three years later, on October 20, 2006, the FDA again endorsed its earlier warning in approving a supplemental NDA and again mandated that the labeling "must be identical" to the approved warning.  *See* Oct. 20, 2006 FDA Approval Letter at 1 (*available at* www.fda.gov/cder/foi/appletter/2006/020639s026ltr.pdf) (Exh. 7). Thereafter, on November 16, 2006, the FDA reiterated the continuing vitality of its federally mandated diabetes-related warning language, while also reconfirming the federal agency's view "that *it has not been established whether Seroquel causes diabetes*."  Nov. 16, 2006 FDA Letter at 3-4 (*available at* www.fda.gov/cder/warn/2006/Seroquel_letter.pdf) (Exh. 8).[7]  The FDA's federally mandated diabetes-related risk language remains in the FDA-approved Seroquel package insert to this day.  *See* Compl. ¶ 52 (referencing the Seroquel product warnings); 2006 package insert (*available at* www.fda.gov/cder/foi/label/2006/020639s026lbl. pdf) (Exh. 7).[8]

## ARGUMENT

Plaintiffs' claims are impliedly preempted by federal law because they are premised on the theory that state law may require a Seroquel diabetes warning that *irreconcilably conflicts* with the one mandated by the FDA, the expert federal agency charged by Congress with establishing the proper warning.  After studying the issue for years across all atypical antipsychotics, the FDA adopted a carefully calibrated warning with respect to diabetes-related

---

should undergo fasting blood glucose testing at the beginning of treatment *and periodically during treatment*."  April 22, 2004 Letter (*available at* www.fda.gov/medwatch/SAFETY/2004/ seroquel_deardoc_4-22-2004update.pdf) (emphasis added).

[7] FDA further advised that "it is infeasible to obtain an accurate percentage of all diabetes or diabetes-related adverse events associated with Seroquel based upon" post-marketing adverse event reporting by healthcare professionals and patients, and advised that such quantifications not be included in promotional materials.  Nov. 16, 2006 FDA Letter at 4-5.  This letter also addresses the manner in which risk information was displayed in certain promotional materials not at issue in this motion.

[8] AstraZeneca recently submitted a CBE supplement to the FDA reflecting new clinical study information.  *See* 2007 package insert (*available at* www.astrazeneca-us.com/pi/seroquel.pdf) (Exh. 9).

issues.  That warning specifically acknowledges the limited state of scientific evidence, given that "the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood."  Sept. 15, 2003 FDA Letter.  Thus, the FDA's chosen diabetes-related warning is calculated in this context to avoid the risks of overwarning based on unsubstantiated scientific information, which may wrongly deter use of important medications.

Moreover, in November 2006, the FDA confirmed the continuing vitality of its diabetes-related warning and reaffirmed that "the agency acknowledges that it has *not been established* whether Seroquel causes diabetes."  Nov. 16, 2006 FDA Letter at 3-4 (emphasis added) (Exh. 8).  Despite this indisputable FDA regulatory action, these 11 plaintiffs contend that AstraZeneca should be liable *under state law* for failing to provide precisely the warning FDA has considered but *rejected*, *i.e.*, that Seroquel "causes" diabetes.  As explained below, plaintiffs' inadequate warning claims inescapably conflict with federal law and the FDA's authoritative federal regulatory actions regarding Seroquel.  Consequently, they are preempted.

## I.    STANDARDS GOVERNING RULE 12(C) MOTIONS

"Judgment on the pleadings under Rule 12(c) is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts."  *Horsley v. Rivera*, 292 F.3d 695, 700 (11th Cir. 2002); *see* Fed. R. Civ. P. 12(c); *First Merch. Collection Corp. v. Rep. of Arg.*, 190 F. Supp. 2d 1336, 1338 n.3 (S.D. Fla. 2002) (motions under Rule 12(b)(6) and Rule 12(c) are treated "identically.").

Seroquel regulatory documents referenced in the complaint (*e.g.*, Compl. ¶¶ 50-53, 128, 138-39, 143, 152-53) are properly considered on this motion.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) (materials referenced in complaint and central to claim may be considered by court on dismissal motions; "defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for

summary judgment"); *see also Horslet v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) ("the Rule 12(b)(6) incorporation by reference doctrine should apply in Rule 12(c) cases").[9]

This Court also should take judicial notice of the labeling and FDA regulatory actions regarding Seroquel. *See* Fed. R. Evid. 201(b) & (d) (judicial notice mandatory if "requested by a party and [the court is] supplied with the necessary information"); *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 2006 WL 2374742, at *2 (taking judicial notice of FDA regulatory documents as well as "the actual content of documents referred to in the complaint"). Courts routinely take judicial notice of FDA regulatory documents, including labeling and approval letters. *See*, *e.g.*, *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (judicial notice of prescription drug warnings); *In re Amylin Pharms., Inc. Secs. Litig.*, 2002 WL 31520051, at *2 (S.D. Cal. Oct. 10, 2002) (judicial notice of FDA approvable letter). In fact, the Eleventh Circuit has upheld a district court's consideration of the warnings for a prescription drug even where (unlike here) it was *not* referenced in the complaint. *See Oxford Asset Mgmt.*, 297 F.3d at 1188 (while complaint did not reference drug's "package insert," "its contents could be judicially noticed" as "a matter of public record (part of the FDA public file)" and because it is included in every package and listed in Physician's Desk Reference).

## II.   PLAINTIFFS' INADEQUATE WARNINGS CLAIMS ARE PREEMPTED

This motion addresses a classic example of implied conflict preemption.  The FDA repeatedly mandated particular diabetes-related warning language that the agency had carefully

---

[9] *Accord Hodges v. Buzzeo*, 193 F. Supp. 2d 1279, 1281 (M.D. Fla. 2002) ("In determining whether to grant a Rule 12(b)(6) motion, the Court may also consider the allegations in the complaint, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint."); *Rhodes v. Omega Research, Inc.*, 38 F. Supp. 2d 1353, 1357-58 (S.D. Fla. 1999) ("On a motion to dismiss, the court may consider documents attached to the complaint or directly referred to in the complaint, and doing so will not convert the motion to one for summary judgment."); Wright & Miller, 5B FED. PRAC. & PROC. § 1357 (2006).

crafted to strike the appropriate public-health balance.  Plaintiffs' effort to urge that state law can require a heightened warning that Seroquel "causes" diabetes is irreconcilable with the federal agency's conclusion that "it has *not been established whether Seroquel causes diabetes*."  FDA's Nov. 16, 2006 letter at 3-4 (emphasis added).  Plaintiffs' claims therefore are preempted.

### A.  Plaintiffs' Claims Pose An Irreconcilable Conflict With Federal Law Under Well-Established Supreme Court Preemption Principles

Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, "state law is naturally preempted to the extent of any conflict with" federal law.  *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000).[10]  Conflict preemption applies "where it is impossible for a private party to comply with both state and federal law," *id*., or where state law poses "'repugnance; difference; irreconcilability; inconsistency; violation; curtailment; . . . interference', or the like" with federal law.  *Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000) (citation omitted).  Indeed, conflict preemption arises when a state law claim would "'stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" or a federal agency acting within the scope of its congressionally delegated authority.  *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698-99 (1984) (citation omitted); *see also Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).  Preemption applies even where a claim involves "a matter of special concern to the States."  *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982); *cf. United States v. Locke*, 529 U.S. 89, 108 (2000) (discussing federal supremacy when a "State regulates in an area where there has been a history of significant federal presence").

---

[10] Federal preemption may be "expressed or implied" in the pertinent federal regime.  *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).  There are "at least two types of implied preemption:  field pre-emption . . .  and conflict pre-emption." *Id.* (internal quotations omitted).  At issue here is conflict preemption.

The Supreme Court's *Geier* decision illustrates the application of these principles.  *Geier* involved whether a state-law action seeking compensation because a car was not equipped with airbags was preempted where the pertinent federal law "deliberately provided the manufacturer with a range of choices of different passive restraint devices" rather than mandating that all cars have one such restraint, *i.e.*, airbags.  529 U.S. at 875.  Although the plaintiff urged that this federal provision provided only a "minimum standard" and state law could endorse the view that "the more airbags, and the sooner, the better," this "was not the [federal agency's] view."  *Id.* The Supreme Court carefully assessed the federal agency's decision not to impose a "higher" safety standard by mandating airbags for all, and concluded that the agency made a reasoned policy determination about the appropriate safety calibration which sought to balance a number of competing objectives.  *Id.* at 875, 878-81.  If state law imposed an all-airbag rule, it would upset this federal balance.  Although the *Geier* Court acknowledged that a defendant theoretically could comply with both the federal standards and plaintiff's proposed state standard (because federal law permitted airbags as one of several options), the Court held that the state claims were preempted because they stood as "an obstacle to the accomplishment" of the federal agency's objective to have a range of options rather than to mandate airbags.  *Id.* at 886.

These principles apply even more forcefully here, where plaintiffs' state-law claims glaringly conflict with the FDA's specific and repeated determinations about the appropriate and scientifically supported diabetes-risk information to be included in Seroquel's labeling.  While in *Geier* it would have been possible for the company to comply with the letter of federal law and state law, it would be *impossible* for AstraZeneca to have warned that Seroquel "causes" diabetes when the agency specifically concluded that such a stark warning was *not* scientifically

13

supported under FDA standards.[11]  That is, the FDA never determined that the scientific

evidence supported the assertion that Seroquel *causes* diabetes or diabetes-related conditions.

On the contrary, the FDA found (and thus required AstraZeneca to warn) that (1) "the

relationship between atypical anti-psychotic use and hyperglycemia-related adverse events *is not*

*completely understood*"; and (2) that "[a]ssessment of the relationship between atypical anti-

psychotic use and glucose abnormalities is complicated by the possibility of an increased

background risk of diabetes mellitus in patients with schizophrenia."  Compl. ¶ 52; Exh. 1.  And

in November 2006, the FDA reaffirmed its own assessment that "it has *not been established*

*whether Seroquel causes diabetes*."  Nov. 16, 2006 FDA Letter at 3-4 (emphasis added); *accord*

Oct. 10, 2006 Approval Letter.  Thus, plaintiffs' state-law warnings claims inescapably conflict

with the FDA's authoritative federal regulatory determinations respecting Seroquel—even more

blatantly than the claims held to be preempted by the Supreme Court in *Geier*.

    **B.  Persuasive Opinions From Recent Pharmaceutical Cases Underscore That**
        **Preemption Is Warranted Here**

    A flurry of recent decisions from courts around the country have considered the

application of conflict preemption principles in a range of prescription drug warning contexts.

*See*, *e.g.*, *In re Bextra & Celebrex Mktg, Sales Pracs. & Prod. Liab. Litig.*, 2006 WL 2374742 &

2006 WL 2472484 (granting motions to dismiss failure-to-warn claims); *Colacicco v. Apotex,*

---

[11] Thus, paraphrasing *Geier*, plaintiffs here contend that the FDA-approved diabetes warning is a
"minimum standard" and state law can require "more [diabetes warnings], and the sooner, the
better."  529 U.S. at 875; *see* Compl. ¶ 142 (asserting that state law *required* warning that
Seroquel "could *cause* diabetes and/or other diabetes-related injuries") (emphasis added); *e.g.*,
Compl. ¶¶ 107, 124, 128, 135, 143, 151-54.  But here, as in *Geier*, this "was not the [federal
agency's] view."  529 U.S. at 875.  Rather, the FDA studied the diabetes issue and determined
that such a stark causation warning was not warranted.  As plaintiffs' allege, the FDA
"mandated" specific diabetes warning language, which contained significant caveats concerning
Seroquel's potential link to diabetes-related conditions.  *See generally* Compl. ¶¶ 52, 53.

*Inc.*, 432 F. Supp. 2d 514 (E.D. Pa. 2006) (same).[12]  Although some rejected preemption, those decisions either are distinguishable from the circumstances here or cannot be reconciled with the Supreme Court's conflict preemption analysis in *Geier*.  Moreover, most of the non-preemption decisions recognize that conflict preemption *would* apply where—as here—a state-law claim squarely challenges a specific FDA determination with respect to the strength of the appropriate warning language for a particular risk based on the agency's view of the underlying science.

Plaintiffs' claims are comparable to those held to be preempted by the MDL court in the Bextra and Celebrex litigation.  There, even though the labeling contained an FDA-approved warning about the risk of "aggravated hypertension," plaintiffs contended that the company inadequately warned about cardiovascular risks and "should have included an additional warning . . . not required by the FDA."  *In re Bextra & Celebrex*, 2006 WL 2374742, at *3-4 (C. Breyer, J.).  The MDL court rejected this argument because it conflicted with FDA's determination of the *appropriate strength* of such cardiovascular warnings:

> Plaintiffs' failure-to-warn claims therefore attempt to require [the company] to include . . . a warning which the FDA has considered and found to be scientifically unsubstantiated. . . .  FDA specifically considered whether Celebrex poses a greater risk of adverse cardiovascular events than other NSAIDs.  The

---

[12] *See also Price v. Cook,* No. 99-C-12-R, slip op. at 17-19 (Cir. Ct. W. Va. July 11, 2007) (state-law failure-to warn claims preempted) (Exh. 10); *Needleman v. Pfizer, Inc.*, 2004 WL 1773697 (N.D. Tex. Aug. 6, 2004) (same); *Dusek v. Pfizer Inc.*, 2004 WL 2191804 (S.D. Tex. Feb. 20, 2004) (same); *Ehlis v. Shire Richwood, Inc.*, 233 F. Supp. 2d 1189, 1198 (D.N.D. 2002) (negligent failure to warn claim preempted because finding of liability would require change of label, an area reserved for FDA), *aff'd on other grounds*, 367 F.3d 1013 (8th Cir. 2004); *Dowhal v. SmithKline Beecham Consumer Healthcare*, 88 P.3d 1, 11, 13 (Cal. 2004) (noting "a federal policy prohibiting defendants from giving consumers any warning other than the one approved by the FDA"; "a warning may involve balancing of competing interests"); *Kirilescu v. Am. Home Prods. Corp.*, 278 A.D.2d 457, 458 (N.Y. App. Div. 2000) (preemption applies where manufacturer "has complied with the Federal packaging and labeling requirements.").

Some have denied preemption motions.  *See, e.g.*, *In re Zyprexa Prods. Liab. Litig.*, 2007 WL 1678078 (E.D.N.Y. June 11, 2007); *Levine v. Wyeth*, 2006 WL 3041078 (Vt. Oct. 27, 2006) (same), *petition for certiorari filed in the United States Supreme Court* (No. 06-1249, Mar. 12, 2007), *order calling for the views of the Solicitor General of the United States* (May 21, 2007).

evidence also demonstrates that the *FDA determined that the scientific evidence does not establish that it does.*

*Id.* at *9-10 (emphasis added).  Thus, "Plaintiffs' state law failure-to-warn-claims conflict with the FDA's determination of the proper warning and pose an obstacle to the full accomplishment of the objectives of the FDCA" and were preempted.  *Id.* at *10.  Likewise here, plaintiffs' claims are preempted because they conflict with the FDA's determinations "that the scientific evidence does not establish" that a causation warning is justified, and would thus interfere with FDA's regulatory determinations and specific oversight of Seroquel.  *Id.*

Along similar lines, the district court in *Sykes v. Glaxo-SmithKline*, 2007 WL 957337 (E.D. Pa. Mar. 28, 2007), held state-law warnings claims to be preempted where the FDA had considered the alleged risks identified by the plaintiff but concluded there was not an adequate scientific connection between the FDA-regulated biological product and the alleged risk.  *Id.* at *17.  Thus, if the manufacturer sought to warn of the "danger" the plaintiffs urged "FDA would have rejected [the warning] as scientifically unsubstantiated and deemed it misbranded."  *Id.*

Likewise, *Colacicco v. Apotex, Inc.*, 432 F. Supp. 2d 514 (E.D. Pa. 2006), found preemption because FDA had "specifically and repeatedly *rejected* claims that adult use of SSRI's was associated with increased suicidality."  *Id.* at 527 (emphasis added).  As the court emphasized, warnings *must* be "scientifically substantiated" to appear on the FDA-approved labeling.  *Id.*  Accordingly, the "enhanced" warnings sought by the plaintiffs were in "actual[] conflict with the FDCA"—and thus were preempted—because they would have been "false or misleading" under the FDA's analysis.  *Id.* at 538; *see also id.* at 527-28 (endorsing FDA argument that warning which associated drug with a specific condition "would have constituted misbranding, because it was contrary to the scientific evidence, and thus 'false and misleading'"); *Needleman v. Pfizer Inc.*, 2004 WL 1773697, at *3-4 (N.D. Tex. Aug. 6, 2004)

16

(failure-to-warn claims preempted where "FDA determinations and clinical studies strongly suggest that any insert attributing such a causal relationship [between the product and the alleged risk] would be contrary to the scientific evidence, and deemed false by the FDA"); *Dusek v. Pfizer Inc.*, 2004 WL 2191804, at*4-10 (S.D. Tex. Feb. 20, 2004) (same).

Although plaintiffs in their opposition may try to rely on Judge Weinstein's recent denial of a broadly framed preemption motion in the *Zyprexa* litigation, any such reliance would be misplaced in the context of this narrower motion.  Indeed, the plaintiffs at issue in that motion began taking Zyprexa *before* the FDA-mandated diabetes warnings, *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 2007 WL 1678078, at *12 (E.D.N.Y. June 11, 2007), while here each plaintiff started taking Seroquel only *after* the FDA-mandated diabetes warning.  More fundamentally, particularly to the extent Judge Weinstein's opinion could be read to conclude that claims brought by plaintiffs *after* the FDA-mandated diabetes warning could survive preemption, *id.* at *14, that conclusion is flatly at odds with the Supreme Court's analysis in *Geier* (which is not even cited in the *Zyprexa* decision) where, as here, the FDA has repeatedly reaffirmed that there is no sufficient scientific basis to conclude that *Seroquel* "causes" diabetes. Indeed, Judge Weinstein acknowledged that preemption may indeed apply where the state-law theory at issue is premised on warning language that the FDA considered but "rejected" based on its assessment of the underlying science.  *Id.* at *39 (recognizing that a "direct conflict" would exist if state law "required a drug manufacturer to include a warning within the labeling for its product that the FDA had previously rejected as scientifically unsubstantiated," which "inclusion could expose the manufacturer to liability for misbranding, *see* 21 U.S.C. § 352").[13]

---

[13] Moreover, unlike in *Zyprexa*, the state-law claims of the plaintiffs here fault AstraZeneca for not specifically warning that Seroquel "causes" diabetes and related conditions—which is the very sort of warning found to be *unsubstantiated* by the FDA both before and after plaintiffs

Nor does the analysis of *Levine v. Wyeth*, 2006 WL 3041078 (Vt. Oct. 27, 2006), another case that is hard to reconcile with *Geier*, preclude preemption here.  In that case, the court focused on a "lack[] [of] any evidence that the FDA was concerned that a stronger warning was not supported by the facts, that such a stronger warning would distract doctors from other provisions in the drug's label, or that the warning might lead to less effective administration of the drug."  *Id.* at ¶ 21.  Here, the FDA made precisely these sorts of regulatory judgments.

Other cases finding no preemption are likewise distinguishable.  For example, *Perry v. Novartis Pharms. Corp.*, 456 F. Supp. 2d 678 (E.D. Pa. 2006), permitted "state law to require the addition of warnings so long as there has been no specific FDA determination as to the sufficiency of the scientific evidence to support a particular warning," *id.* at 685, and thus rejected preemption where it found that FDA had made "no finding regarding a link between the use of [product in question] and increased cancer risk."  *Id.* at 687.  But, as the *Perry* court recognized, "[t]here are, to be sure, situations in which preemption of state law claims is necessary to preserve the structure of the FDA regulatory scheme."  *Id.* at 684.  It recognized that preemption *would* apply where—as here—"the FDA has made a particular determination regarding a proposed warning."  *Id.* at 685; *id.* at 685-86 (if "FDA has made a conclusive determination, positive or negative, as to the existence of a link between the drug at issue and some adverse health consequence, state law cannot mandate that a manufacturer include additional warnings beyond those that the FDA has determined to be appropriate to the risk.").[14]

_____

were prescribed Seroquel.  *See* Sept. 15, 2003 FDA Letter ("the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood") (Exh. 1); Nov. 16, 2006 FDA Letter at 4 (FDA "acknowledges that it has *not* been established whether Seroquel causes diabetes") (emphasis added) (Exh. 8).

[14] Other cases finding no preemption in different circumstances similarly recognized that preemption would apply in cases such as this one.  *See, e.g., Barnhill v. Teva Pharms. USA*, No. 06-0282-CB-M, slip op. at 10 (S.D. Ala. Apr. 24, 2007) (recognizing that preemption would

In short, plaintiffs' claims in this case conflict with and therefore must yield to the FDA's findings about the sufficiency of the scientific evidence.

### C.   The FDA's Own Explanation Of The Application Of Preemption Principles Further Supports Preemption Of Plaintiffs' Claims

Consistent with the preemption principles addressed above, the FDA has explained that it "believes that State laws conflict with and stand as an obstacle to achievement of the full objectives and purposes of Federal law when they purport to compel a firm to include in labeling or advertising a statement that FDA has considered and found scientifically unsubstantiated"; inclusion of such a warning despite FDA's contrary findings renders the drug misbranded.  71 Fed. Reg. at 3935; *see id.* at 3936 ("claims that a sponsor breached an obligation to warn by failing to include contraindications or warnings that are not supported by evidence that meets the standards set forth in this rule" "would be preempted by [FDA's] regulation of prescription drug labeling").  Likewise, in recent *amicus* briefs, the United States (on behalf of the Department of Health and Human Services, FDA, and the Department of Justice) has reiterated this analysis, explaining that the use of a warning "not based on reliable scientific evidence [] would be 'false or misleading' and would constitute unlawful misbranding."[15]

Plaintiffs' state-law claims—which seek a causation warning that the FDA specifically rejected before and after plaintiffs allegedly were prescribed the drug—are preempted under the FDA's own conflict preemption analysis.  Indeed, according to the FDA, where drug labeling

---

apply where FDA requires a manufacturer to change its label); *Weiss v. Fujisawa Pharm. Co.*, 464 F. Supp. 2d 666, 676 (E.D. Ky. 2006) (acknowledging that failure to warn claims premised on adequacy of warnings and approved and reviewed by FDA are preempted).

[15]  Br. of the United States as *Amicus Curiae*, *Colacicco v. Apotex, Inc.*, No. 06-3107, at 16 (filed 3d Cir. Dec. 4, 2006) (citations omitted) ("*Colacicco* Br.") (Exh. 11); *accord* Br. of the United States as *Amicus Curiae*, *Perry v. Novartis Pharms.*, No. 05-5350, at 2 (filed E.D. Pa. Sept. 21, 2006) ("state tort law is preempted if it imposes liability for a company's failure to provide a warning that FDA . . . would reject [] as scientifically unsubstantiated") ("*Perry* Br.") (Exh. 12).

already recognizes the risk at issue, a plaintiff's contention under state law that the labeling "should have warned of an *increased* risk" is preempted if (as here) the "FDA concluded that the available scientific evidence" did not support the association. *Colacicco* Br. at 17 (emphasis in original). Further, the FDA maintains that where the "warning required by FDA specifically states" that no causal relationship between the drug and a specific risk had been established, then "*[n]ecessarily* . . . had defendants attempted to claim such a relationship in their labeling, the drug would have been deemed misbranded by FDA." *Perry* Br. at 12.

Preemption also applies here under the FDA's analysis because the type of enhanced warnings plaintiffs seek here—*i.e.*, warnings beyond those the FDA determined to be scientifically justified—would undermine the agency's federal mission. "Under-use of a drug based on dissemination of unsubstantiated warnings may deprive patients of efficacious and possibly lifesaving treatment. Further, allowing unsubstantiated warnings would likely reduce the impact of valid warnings by creating an unnecessary distraction and making even valid warnings less credible." *Colacicco* Br. at 16-17; *see* 71 Fed. Reg. at 3435 (detailing problems with such "defensive labeling"); *Perry* Br. at 3 n.2 (same). "Overwarning, just like underwarning, can similarly have a negative effect on patient safety and public health." 71 Fed. Reg. at 3435.[16] Thus, plaintiffs' claims are preempted because they seek to "second-guess" the FDA's authoritative federal determinations regarding what diabetes-related warning should and

---

[16] "Where FDA has exercised its authority to determine that a particular warning is not adequately supported by the evidence, it would *stymie the regulatory scheme* established by Congress to impose liability under state tort law for the failure to provide such a warning." *Perry* Br. at 10 (emphasis added); *accord Colacicco* Br. at 22 (explaining, as here, where "there was not adequate scientific evidence of an association between [the class of drugs and the alleged increased risk complained of by plaintiff to support an enhanced warning] . . . . [p]ermitting a judge or jury to second-guess this judgment would interfere with FDA's authority over drug labeling, and is barred by the Supremacy Clause") (citations omitted).

should not be provided for Seroquel, and ultimately "threaten FDA's statutorily prescribed role

as the expert Federal agency responsible for evaluating and regulating drugs." *Id.* at 3935.

Finally, we note that courts have divided on the degree of deference to afford the FDA's

preemption position as stated in the preamble to its final rule on labeling requirements and in

*amicus* briefs.[17]  Although the FDA's preemption analysis is instructive,[18] this motion should be

granted based on the application of the fundamental preemption principles discussed above and

is not dependant on the extent to which this Court "defers" to the FDA's preemption position.

**D.      Plaintiffs Cannot Escape Preemption By Invoking The FDA's Changes-Being
          Effected Provision**

In their effort to avoid preemption, plaintiffs may argue that their state-law warning

claims are supposedly *consistent* with federal law given the FDA's CBE provision.  But that

clearly would be wrong and, indeed, based on a fundamental misunderstanding of the federal

regulation on which the argument depends.  The CBE provision may permit a company "[t]o add

---

[17] *Compare*, *e.g.*, *Colacicco*, 432 F. Supp. 2d at 529 ("significant deference"), *In re Bextra & Celebrex*, 2006 WL 2374742, at *5-*9 (detailing why "FDA's interpretation of the preemptive effect of its regulations is entitled to deference"); *with*, *e.g.*, *In re Vioxx Prods. Liab. Litig.*, 2007 WL 1952964, at *9 (E.D. La. July 3, 2007) (invoking analysis of *Skidmore v. Swift & Co*., 323 U.S. 134, 140 (1944)); *Levine*, 2006 WL 3041078, ¶ 32 ("no deference").

[18] The Supreme Court has explained that the FDA "is uniquely qualified to determine whether a particular form of state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, and, therefore, whether it should be pre-empted." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 496 (1996) (internal quotation omitted); *see id.* at 506 (noting FDA's "special understanding of the likely impact of both state and federal requirements, as well as an understanding of whether (or the extent to which) state requirements may interfere with federal objectives") (Breyer, J., concurring).  Moreover, a federal agency's interpretation of its own regulations, and their preemptive effect, is entitled to considerable deference.  *See*, *e.g.*, *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation") (internal quotation omitted); *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 714 (1985) (FDA's understanding of the preemptive effect of its regulations is "dispositive"); *Novartis Pharm. Corp. v. Leavitt*, 435 F.3d 344, 349 (D.C. Cir. 2006) ("FDA interpretations of the FDCA receive deference, as do its interpretations of its own regulations unless plainly erroneous or inconsistent with the regulations"); *Berlex Labs., Inc. v. FDA*, 942 F. Supp. 19, 25 (D.D.C. 1996) (FDA's interpretations of its own regulations are entitled to *Chevron* deference).

or strengthen" a warning where new scientific risk information comes to light that meets FDA's scientific standards.  21 C.F.R. § 314.70.  For example, the CBE regulation may be implicated by sufficient "evidence of new side effects," *Perry*, 456 F. Supp. 2d at 682 (internal quotation omitted), or "new evidence of a particular risk," *Weiss*, 464 F. Supp. 2d at 675; *see also* New Drug & Antibiotic Regulations, 47 Fed. Reg. 46,622, 46,623 (Oct. 19, 1982) ("These supplements would describe changes placed into effect to correct concerns about *newly discovered* risks from the use of the drug.") (emphasis added); *id.* at 46,625.  Although a properly supported CBE supplement may be made without prior FDA approval, the FDA has explained that, because "the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's under the" FDCA, companies risk running afoul of FDA's standards and rendering the drug misbranded if the FDA finds the change inappropriate under its standards.  71 Fed. Reg. at 3934-35.

Thus, although the CBE provision might apply in a case where a new warning was warranted based on new scientific data, plaintiffs' state-law warnings theory is not premised on any such newly developed scientific data.  Indeed, plaintiffs identify no such new scientific data in their complaints.  Rather, their claims are premised on the conclusion that AstraZeneca should have been required to give a stronger warning (*i.e.*, that Seroquel "causes" diabetes) that the FDA rejected as lacking sufficient scientific substantiation.  *See*, *e.g.*, Nov. 16, 2006 FDA Letter at 3-4 (reaffirming the FDA's view that "it has *not* been established whether Seroquel causes diabetes") (emphasis added) (Exh. 8).  Thus, any CBE AstraZeneca might have proposed to the FDA around the time these plaintiffs began taking Seroquel that contained the sort of stark causation language on which plaintiffs' state-law claims depend would have been contrary to the

FDA's own clearly articulated position and, thus, would have been rejected in light of the agency's view of the underlying science.

Put simply, the CBE provision cannot be construed to require AstraZeneca to give additional and stronger warnings than those FDA agreed were supported by the available scientific data.  Moreover, if plaintiffs' overbroad interpretation of the CBE regulation were correct, then it would lead to the absurd result in which AstraZeneca would have had to submit a supplemental CBE warning *the very day the FDA's labeling change went into effect* based on plaintiffs' disagreement with FDA's conclusion that its narrower calibrated warning (as opposed to plaintiffs' desired stronger warning) was supported by the extant scientific data.  This futile theory could not survive *Geier* and the analysis above.[19]

## III.   PLAINTIFFS CANNOT AVOID PREEMPTION BY ARGUING THAT ASTRAZENECA DEFRAUDED THE FDA BY FAILING TO DISCLOSE RISK INFORMATION ABOUT SEROQUEL

Finally, plaintiffs may try to contend that the Court should refuse to find preemption on the theory that they allege AstraZeneca effectively defrauded the FDA by failing sufficiently to disclose risk related information to the agency.[20]  Any such efforts would fail as a matter of law.

---

[19] As noted, the "causation" warning plaintiffs seek has not been accepted by FDA to this day. But even if FDA were to require a causation warning at some future date based on new evidence, the preemption analysis would not change:  "If the agency had made a determination *at the relevant time* that a particular warning was unsubstantiated or would otherwise render a drug misbranded, then federal preemption bars liability for the failure to provide that warning." *Colacicco* Br. at 23 n.10 (emphasis added); *Perry* Br. at 11 ("Even if FDA ultimately determines that a specific warning should be added to a label, a state-law failure-to-warn claim would still be preempted if it sought to impose liability for failure to provide the same warning at an earlier time when existing scientific evidence would not have supported it.").

[20] *See* Compl. ¶¶ 51, 59 (alleging "wrongful suppression, active concealment and/or misrepresentation" of unspecified studies); *id.* ¶¶ 128, 131, 135; *see also id.* ¶¶ 107-09 (alleging that unspecified "various studies . . . demonstrated the risks of diabetes and diabetes-related injuries associated with Seroquel," but AstraZeneca did not disclose those studies to plaintiffs and the public).  *But see Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-66 (2007) (pleadings must be "more than labels and conclusions").

Indeed, the Supreme Court in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001), made clear that such fraud-on-the-FDA contentions are themselves barred under preemption principles.  Accordingly, any contention that AstraZeneca deviated from FDA standards for relaying information to that agency cannot save plaintiffs' warnings claims from being preempted.  The FDCA does not create a private cause of action for its violation; any such violation is determined and enforceable by FDA alone.  *See*, *e.g.*, 21 U.S.C. § 337(a); *Buckman*, 531 U.S. at 348-49.  In *Buckman*, the Supreme Court explained that only FDA is empowered to pursue noncompliance by a manufacturer with the agency's requirements:  "The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance."  531 U.S. at 349 n.4.  A different rule would risk the anomalous result that a company's compliance with FDA standards could be "deemed appropriate by the [FDA], [but] later be judged insufficient in state court."  *Id.* at 351.

Following *Buckman*, numerous courts have recognized that a plaintiff's state-law warning claims are not saved from preemption by assertions that defendants misled the FDA or failed to comply with federal regulatory requirements.  *See*, *e.g.*, *Garcia v. Wyeth-Ayerst Labs.*, 385 F.3d 961, 966 (6th Cir. 2004) (*Buckman* prohibits a plaintiff from pursuing claims where prevailing would require "state court findings of fraud on the FDA" absent "FDA itself determin[ing] that a fraud has been committed on the agency during the regulatory-approval process").[21]  For instance, the MDL court in the Bextra and Celebrex litigation held that, under

---

[21] *See also Kobar v. Novartis Corp.*, 378 F. Supp. 2d 1166, 1172-73 (D. Ariz. 2005) (finding state statute requiring plaintiff to prove fraud on the FDA to collect punitive damages was preempted by *Buckman*); *Webster v. Pacesetter, Inc.*, 259 F. Supp. 2d 27, 36-37, 39 (D.D.C. 2003) (dismissing negligence and fraud claims based on alleged failure to provide information to FDA); *but see Desiano v. Warner-Lambert & Co.*, 467 F. 3d 85, 95-96 (2d Cir. 2006) (*Buckman* did not preclude analysis of Michigan state-law defense implicating fraud on FDA), *petition for certiorari filed sub nom Warner-Lambert Co., LLC v. Kent* (U.S. No. 06-1498, May 10, 2007).

*Buckman*, "Plaintiffs' allegation that Pfizer withheld material cardiovascular risk data from the FDA does not change the preemption analysis":  "The law is well established that a claim premised on a drug manufacturer's failure to provide data to the FDA is preempted."  *In re Bextra & Celebrex*, 2006 WL 2374742, at *10.  Likewise, in the Vioxx litigation, a Texas state court emphasized that it is "FDA's exclusive responsibility to 'police fraud.'"  *Ledbetter v. Merck & Co.*, No. 2005-58543, slip op. at 6 (Tex. Dist. Ct. [Harris County] Apr. 20, 2007) (quoting *Buckman*) (Exh. 13).  Hence, allegations that a defendant withheld information from the FDA cannot save a plaintiff's warnings claims from preemption because "[t]he logic of *Buckman* was that the FDA promulgates detailed data submission requirements and is fully empowered to investigate wrongful withholding by manufacturers."  *Id.* at 8 (citing *Buckman*).  "Given the extent of federal regulation, and the extent to which the FDA is empowered to investigate and regulate drug manufacturers who fail to provide required information, permitting a [state] jury or judge to make the same inquiry would impinge on a uniquely federal issue."  *Id.* at 9.  Here as well, *Buckman* precludes any argument by plaintiffs that purported withholding of safety information from the FDA by AstraZeneca saves their warnings claims from preemption.[22]

## CONCLUSION

For these reasons, plaintiffs' claims are preempted and AstraZeneca is entitled to judgment as a matter of law.

DATED:  July 31, 2007                              Respectfully submitted,

---

[22] *Buckman* does not leave consumers without a remedy if they believe a company has, in fact, withheld important safety information from FDA.  To the contrary, *Buckman* recognized that the FDCA allows "citizens [to] report wrongdoing and petition the agency to take action."  531 U.S. at 349 (citing 21 C.F.R. § 10.30); *see also id.* at 354 (Stevens, J., concurring) ("If the *FDA* determines *both* that fraud has occurred and that such fraud requires the removal of a product from the market, state damages remedies would not encroach upon, but rather would supplement and facilitate, the federal enforcement scheme.") (emphasis added).  Here, the FDA *never* made any such determinations with respect to AstraZeneca or Seroquel.

/s/ Fred T. Magaziner
Fred T. Magaziner
DECHERT LLP
2929 Arch Street
Philadelphia, PA  19103
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
fred.magaziner@dechert.com

Steven B. Weisburd
DECHERT LLP
300 West 6th Street, Suite 1850
Austin, TX  78701
Telephone: (512) 394-3000
Facsimile: (512) 394-3001

Rebecca K. Wood
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC  20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711

*Counsel for AstraZeneca Pharmaceuticals LP
and AstraZeneca LP*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 31, 2007, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system through which all participating parties are deemed

served.

/s/ Lisa Modaff

## SERVICE LIST

**In Re: Seroquel Products Liability Litigation**
**MDL Docket No. 1769**

| | |
|---|---|
| Paul J. Pennock, Esq.<br>Michael E. Pederson, Esq.<br>Weitz & Luxenberg, P.C.<br>180 Maiden Lane - 17th Floor<br>New York, NY 10038<br>Telephone: (212) 558-5500<br>Ppennock@weitzlux.com<br>MPederson@weitzlux.com<br>***Plaintiffs' Lead Counsel*** | Camp Bailey, Esq.<br>Michael W. Perrin, Esq.<br>Fletcher Trammell, Esq.<br>Bailey Perrin Bailey LLP<br>The Lyric Centre<br>440 Louisiana, Suite 2100<br>Houston, TX 77002<br>Telephone: (713) 425-7240<br>cbailey@bpblaw.com<br>mperrin@bpblaw.com<br>***Plaintiffs' Lead Counsel*** |
| Larry Roth, Esq.<br>Law Offices of Larry M. Roth, P.A.<br>Post Office Box 547637<br>Orlando, FL  32854-7637<br>Telephone: (407) 872-2239<br>LROTH@roth-law.com<br>***Plaintiffs' Liaison Counsel*** | Tommy Fibich, Esq.<br>Fibich, Hampton & Leebron, L.L.P.<br>1401 McKinney, Suite 1800<br>Five Houston Center<br>Houston, TX 77010<br>Telephone: (713) 751-0025<br>tfibich@fhl-law.com |
| Matthew F. Pawa, Esq.<br>Law Offices of Matthew F. Pawa, P.C.<br>1280 Centre St., Suite 230<br>Newton Centre, MA 02459<br>Telephone: (617) 641-9550<br>Mp@pawalaw.com | Robert L. Salim, Esq.<br>Robert L. Salim Attorney at Law<br>P.O. Box 2069<br>Natchitoches, LA 71457-2069<br>Telephone: (318) 352-5999<br>robertsalim@cp-tel.net |
| Keith M. Jensen, Esq.<br>Jensen, Belew & Gonzalez, PLLC<br>1024 North Main<br>Fort Worth, TX 76106<br>Telephone: (817) 334-0762<br>kj@kjensenlaw.com | Scott Allen, Esq.<br>Cruse, Scott, Henderson & Allen, L.L.P.<br>2777 Allen Parkway, 7th Floor<br>Houston, Texas 77019<br>Telephone: (713) 650-6600<br>sallen@crusescott.com |
| Matthew E. Lundy, Esq.<br>Lundy & Davis, LLP<br>333 North Sam Houston Parkway East<br>Suite 375<br>Houston, TX 77060<br>Telephone: (281) 272-0797<br>mlundy@lundydavis.com | W. Todd Harvey, Esq.<br>E. Ashley Cranford, Esq.<br>Whatley Drake & Kallas, LLC<br>2323 2nd Avenue North<br>Birmingham, AL 35203<br>Telephone: (205) 328-9576<br>THARVEY@whatleydrake.com<br>ccf@whatleydrake.com |

| | |
|---|---|
| Robert L. Ciotti, Esq.<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard<br>Suite 1000<br>Tampa, FL 33607-5736<br>Telephone: (813) 223-7000<br>rciotti@carltonfields.com<br>***Attorney for Defendants AstraZeneca***<br>***Pharmaceuticals, LP, and AstraZeneca LP*** | Gregory P. Forney, Esq.<br>Shaffer Lombardo Shurin<br>911 Main Street, Suite 2000<br>Kansas City, MO 64105<br>Telephone: (816) 931-0500<br>gforney@sls-law.com<br>rbish@sls-law.com<br>***Attorney for Defendant,***<br>***Marguerite Devon French*** |
| Randy Niemeyer<br>22442 Pike 309<br>Bowling Green, MO 63334-5209<br>***Pro Se*** | Eric B. Milliken, Esq.<br>3 Sir Barton Ct.<br>Newark, DE 19702<br>***Pro Se*** |
| Catherine Solomon<br>3100 N.E. 83<br>Gladstone, MO 64119<br>***Pro Se*** | Louisiana Wholesale Drug Co. Inc.<br>C/O Gayle R. White<br>Registered Agent<br>Highway 167N<br>Sunset, LA 70584<br>***Pro Se*** |
| Aaron C. Johnson, Esq.<br>Summers & Johnson<br>717 Thomas<br>Weston, MO 64098<br>Telephone: (816) 640-9940<br>firm@summersandjohnson.com | Robert A. Schwartz, Esq.<br>Bailey & Galyen<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744<br>bschwartz@galyen.com |
| Todd S. Hageman, Esq.<br>Simon and Passanante, PC<br>701 Market St., Suite 1450<br>St. Louis, MO 63101<br>Telephone: (314) 241-2929<br>thageman@spstl-law.com | Mark P. Robinson, Jr., Esq.<br>Robinson, Calcagnie & Robinson<br>620 Newport Center Drive, 7th Floor<br>Newport Beach, CA 92660<br>Telephone: (949) 720-1288<br>mrobinson@robinson-pilaw.com |
| Thomas F. Campion, Esq.<br>Steven M. Selna, Esq.<br>Drinker Biddle & Reath, LLP<br>500 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>Telephone: (973) 360-1100<br>Thomas.Campion@dbr.com<br>steven.selna@dbr.com<br>***Attorneys for Defendants Janssen***<br>***Pharmaceutical Products and Johnson &***<br>***Johnson Co.*** | Michael Davis, Esq.<br>James Mizgala, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone:  (312) 853-7731<br>mdavis@sidley.com<br>jmizgala@sidley.com<br>***Attorneys for Defendants AstraZeneca LP***<br>***and AstraZeneca Pharmaceuticals, LP*** |

| | |
|---|---|
| Elizabeth Raines, Esq.<br>Baker, Sterchi, Cowden & Rice, LLC<br>2400 Pershing Road, Suite 500<br>Kansas City, MO 64108<br>Telephone: (816) 471-2121<br>raines@bscr-law.com<br>***Attorneys for Defendant AstraZeneca, PLC*** | Timothy Reese Balducci, Esq.<br>The Langston Law Firm, PA<br>P.O. Box 787<br>100 South Main Street<br>Booneville, MS 38829-0787<br>Telephone: (662) 728-3138<br>tbalducci@langstonlaw.com |
| Kenneth W. Bean, Esq.<br>Sandberg, Phoenix & von Gontard<br>One City Centre<br>15th Floor<br>St. Louis, MO 63101-1880<br>Telephone: (314) 231-3332<br>kbean@spvg.com<br>***Attorney for Defendant Dr. Asif Habib*** | John Driscoll, Esq.<br>Brown & Crouppen, PC<br>720 Olive St.<br>St. Louis, MO 63101<br>Telephone: (314) 421-0216<br>Jdriscoll@brownandcrouppen.com<br>asmith@brownandcrouppen.com<br>blape@brownandcrouppen.com |
| Aaron K. Dickey, Esq.<br>Goldenberg and Heller, PC<br>P.O. Box 959<br>2227 S. State Road 157<br>Edwardsville, IL 62025<br>Telephone: (618) 650-7107<br>aaron@ghalaw.com | Matthew J. Hamilton, Esq.<br>Pepper Hamilton<br>3000 Two Logan Square<br>18th & Arch Street<br>Philadelphia, PA 19103<br>Telephone: (215) 981-4000<br>hamiltonm@pepperlaw.com |
| Justin Witkin, Esq.<br>Ken Smith, Esq.<br>Aylstock, Witkin & Sasser, PLC<br>4400 Bayou Boulevard<br>Suite 58<br>Pensacola, FL 32503<br>Telephone: (850) 916-7450<br>Jwitkin@AWS-LAW.com<br>ablankenship@aws-law.com<br>ksmith@aws-law.com<br>noverholtz@aws-law.com | David P. Matthews, Esq.<br>Lizy Santiago, Esq.<br>Matthews & Associates<br>2905 Sackett Street<br>Houston, TX 77098<br>Telephone: (713) 222-8080<br>dmatthews@thematthewslawfirm.com<br>lsantiago@thematthewslawfirm.com<br>msalazar@thematthewslawfirm.com |
| Howard Nations<br>Lezzlie E. Hornsby<br>Lori A. Siler<br>The Law Offices of Howard L. Nations P.C.<br>4515 Yoakum Blvd.<br>Houston, TX 77006-5895<br>Telephone: (713) 807-8400<br>nations@howardnations.com | Mary B. Cotton<br>John D. Giddens, P.A.<br>226 North President Street<br>P.O. Box 22546<br>Jackson, MS 39225-2546<br>Telephone:  (601) 355-2022<br>betsy@law-inc.com |
| Salvatore M. Machi<br>Ted Machi & Associates PC<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744 | Jona R. Hefner, Esq.<br>3441 W. Memorial, Suite 4<br>Oklahoma City, OK 73134-7000<br>Telephone: (405) 286-3000<br>attorneyokc@hotmail.com |

| | |
|---|---|
| David Dickens<br>Miller & Associates<br>105 North Alfred Street<br>Alexandria, VA  22314-3010<br>(703) 519-8080<br>ddickens@doctoratlaw.com | Pete Schneider, Esq.<br>Grady, Schneider & Newman, L.L.P.<br>801 Congress, 4th Floor<br>Houston, TX  77002<br>(713) 228-2200<br>pschneider@gsnlaw.com |
| Fred T. Magaziner<br>Marjorie Shiekman<br>A. Elizabeth Balakhani<br>Shane T. Prince<br>Eben S. Flaster<br>DECHERT LLP<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA  19103<br>(215) 994-4000<br>fred.magaziner@dechert.com<br>shane.prince@dechert.com<br>marjorie.shiekman@dechert.com<br>eben.flaster@dechert.com<br>elizabeth.balakhani@dechert.com | Lawrence J. Gornick, Esq.<br>William A. Levin, Esq.<br>Dennis J. Canty, Esq.<br>Levin Simes Kaiser & Gornick LLP<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 646-7160<br>lgornick@lskg-law.com<br>dcanty@lskg-law.com<br>lsimes@levins-law.com<br>jkaiser@lskg-law.com<br>echarley@lskg-law.com<br>ddecarli@lskg-law.com<br>bsund@lskg-law.com<br>astavrakaras@lskg-law.com |
| Scott Burdine, Esq.<br>Hagans Burdine Montgomery<br>Rustay & Winchester, P.C.<br>3200 Travis, Fourth Floor<br>Houston, TX  77006<br>Telephone:  (713) 222-2700<br>sburdine@hagans-law.com | Lowell Finson<br>Phillips & Associates<br>3030 North 3rd Street<br>Suite 1100<br>Phoenix, AZ 85012<br>(602) 258-8900, ext. 295<br>lowellf@phillipslaw.ws |
| Gale D. Pearson<br>Stephen J. Randall<br>Pearson, Randall & Schumacher, P.A.<br>Fifth Street Towers, Suite 1025<br>100 South 5th Street<br>Minneapolis, MN 55402<br>(612) 767-7500<br>attorneys@outtech.com | Robert H. Shultz<br>Heyl, Royster<br>103 West Vandalia Street<br>P.O. Box 467<br>Edwardsville, IL 62025<br>(618) 656-4646<br>rshultz@hrva.com<br>bwallace@hrva.com |
| Ellen R. Serbin<br>Perona, Langer, Beck, Lalande & Serbin<br>300 San Antonio Drive<br>Long Beach, CA 90807-0948<br>(562) 426-6155<br>davidhwang@plblaw.com | Scott Armstrong<br>1719 West Main Street<br>Suite 201<br>Rapid City, SD 57702<br>(605) 399-3994<br>scottarmstrong1235@eathlink.net |

| Linda S. Svitak | James J. Freebery |
|---|---|
| Faegre & Benson, LLP | McCarter & English, LLP |
| 90 South 7th Street, Suite 2200 | 919 N. Market Street, 18th Floor |
| Minneapolis, MN 55402-3901 | Wilmington, DE 19801 |
| (612)766-7000 | (973) 622-4444 |
| lsvitak@faegre.com | jfreebery@mccarter.com |
| wjohnson@faegre.com | tpearson@mccarter.com |
| Richard D. Hailey | B. Andrew List |
| Ramey & Hailey | Clark, Perdue, Arnold & Scott |
| 3891 Eagle Creek Parkway | 471 East Broad Street, Suite 1400 |
| Suite C | Columbus, OH 43215 |
| Indianapolis, IN | (614) 469-1400 |
| (317) 299-0400 | alist@cpaslaw.com |
| rhailey@sprynet.com | lcollins@cpaslaw.com |