# Exhibit 10

## IN THE CIRCUIT COURT OF GREENBRIER COUNTY, WEST VIRGINIA

**CYNTHIA M. PRICE,**
**JESSICA STULL,** individually; and
**JESSICA STULL,** in her capacity as
natural mother and Guardian of Ethan Stull,
an infant under the age of 18,

        Plaintiffs,

v.

        Civil Action No. 99-C-12-R
        Judge Rowe

**PAUL D. COOK,** Administrator of
the Estate of Rosemary Cook, deceased;
**PFIZER, INC.,** a Delaware corporation; and
**DEBRA C SAMS, D.O.,**

        Defendants.

### ORDER GRANTING PARTIAL SUMMARY JUDGMENT

Pending before this Court is Defendant Pfizer Inc.'s Motion for Summary Judgment (Federal Preemption). Pfizer filed its Motion on November 8, 2005. Plaintiffs filed their response on December 22, 2005. Pfizer filed its Reply to Plaintiffs' Response on January 9, 2006, followed by a Supplemental Authority in Support of Preemption on November 6, 2006.

Plaintiffs' Second Amended Complaint claims that Pfizer knew or should have known the dangers of operating a motor vehicle while using its product, Zoloft, and that Pfizer failed to warn of those dangers. However, Plaintiffs' responses to Pfizer's interrogatories claim that Pfizer failed to warn that Zoloft may cause users to become suicidal. This Court will analyze them as two separate claims. Both parties acknowledge that Pfizer's Motion only seeks Summary Judgment on the claim that it failed to adequately warn of an increased risk of suicide among Zoloft users. Accordingly, this Order will only address the issue of whether Plaintiffs' claim that Pfizer should have included a warning on an increased risk of suicide is preempted.

### History

On June 15, 1998, Plaintiff Cynthia Price was driving her vehicle on Route 219 near Ronceverte, West Virginia, with Plaintiffs Jessica and Ethan Stull riding as passengers. Defendant Rosemary Cook's vehicle swerved into Plaintiffs' lane, colliding with the vehicle. Plaintiffs were injured and Defendant was killed. Ms. Cook was allegedly taking Zoloft at the time of the incident. Plaintiffs filed a complaint alleging, *inter alia*, that Pfizer failed to warn of the danger of operating a motor vehicle while on Zoloft. However, in their responses to Pfizer's interrogatories, Plaintiffs contended that Zoloft caused Ms. Cook to be suicidal and that she intentionally drove her vehicle into theirs to commit suicide. While admitting that they are not experts in such matters, Plaintiffs' Responses allege that Pfizer should have warned users of an increased risk of suicide but failed to do so. Specifically, Plaintiffs allege that Pfizer should have warned users that Zoloft "may … cause them to have suicidal thoughts and behavior and/or may cause the person to exhibit violent or aggressive behavior[.]"

Defendant argues that the Federal Food, Drug, and Cosmetic Act ("FDCA") and the implementing regulations and requirements of the Food and Drug Administration ("FDA") conflict with, and therefore preempt, Plaintiffs' state law tort claim that Pfizer failed to warn of an increased risk of suicide allegedly associated with using Zoloft. Pfizer argues that, at the time of approving Zoloft and at the time Defendant was prescribed Zoloft, the FDA had found no scientific evidence of a causal connection between using Zoloft and an increased risk of suicide. Pfizer argues that the FDA specifically told it how to phrase its warnings regarding suicide, and that the FDA's required warnings were mandatory, complete and verbatim. Furthermore, on multiple occasions the FDA considered whether to require a warning that medication such as Zoloft increases the risk of suicide but explicitly refused to do so. Thus, Pfizer argues it had no

2

duty to warn of an increased risk of suicide, that it was unequivocally forbidden by the FDA

from including such language, and that such a warning would have been false and misleading.

Plaintiffs argue that there is no conflict between their claims and Federal law. They

argue that the FDA's required warnings are only minimum standards, so Pfizer could and should

have included additional warnings regarding an increased risk of suicide while using Zoloft.

Plaintiffs also argue that summary judgment is improper because material facts are in dispute and

because discovery has been stalled due to a stay in bankruptcy court relating to one of the parties

in this matter.

A general summary of the FDA's drug approval process and of its review and approval of

Zoloft in particular are necessary.

**FDA's Prescription Drug Approval Process:**

The FDCA requires FDA approval of prescription medicines as "safe and effective"

before they may be sold in the United States. 21 U.S.C. §§ 393(b)(2)(B), 355(d). No

manufacturer can introduce a drug into interstate commerce until a new drug application

("NDA") has been submitted and approved by the FDA. *Id.* at § 355(a), (b), (d). Among other

things, an NDA must contain full reports of investigations, tests and studies to show whether the

drug is safe and effective, and specimens of proposed labeling for the drug. *Id.* at § 355 (b). The

FDA must refuse to approve the application if (paraphrasing): 1) it does not include adequate

tests to show that the drug is safe for use under the conditions of the proposed labeling, or 2) the

results of such tests show that the drug is unsafe, or … 4) based on the application or other

information there is insufficient information to determine whether the drug is safe for use under

the labeled conditions, or 5) there is a lack of substantial evidence that the drug will be effective

for the purposes it is represented to have under the conditions of the proposed labeling, … or 7)

3

based on a fair evaluation of all material facts, such labeling is false or misleading in any particular. *Id.* at § 355(d), 21 C.F.R 314.125. The FDA shall approve the application if clauses 1 through 6 do not apply. *Id.* Stated simply: "The FDA will approve an application after it determines that the drug meets the statutory standards for safety and effectiveness, manufacturing and controls, and labeling[.]" 21 C.F.R. 314.105(c).

The FDA regulations mandate the general format of all sections of labels for all prescription drugs and the specific content that must be included in each section. 21 C.F.R. §§ 201.56, 201.57. In selected circumstances, the FDA may inform the manufacturer by "approvable letter" that "the application ... substantially meets the requirements of this part and the agency believes that it can approve the application ... if specific additional information or material is submitted or specific conditions (*for example, certain changes in labeling*) are agreed to by the applicant." *Id.* at 314.110(a)(emphasis added). "The approvable letter will describe the information or material the FDA requires or the conditions the applicant is asked to meet." *Id.* Once these requirements and conditions are met, in addition to the initial requirements of the NDA, the FDA will issue an approval letter (as opposed to an approvable letter) to the manufacturer, which allows it to begin marketing the drug. *Id.* at 314.105.

Even after a medication gains approval, the FDA may withdraw its prior approval if further tests show the drug is unsafe or ineffective, or on the basis of new information, evaluated together with the evidence provided in the application, that the labeling of the drug is false or misleading in any particular and was not corrected within a reasonable time after receipt of written notice from the FDA specifying the matter complained of. 21 U.S.C. § 355(e).

Once an NDA has been approved, the FDA allows a manufacturer to make changes to the drug in accordance with the rules set forth for the following three categories: 1) major changes,

4

2) moderate changes, or 3) minor changes. 21 C.F.R. 314.70(a)-(d).  Major changes require a manufacturer to submit a supplement to the FDA explaining the proposed changes and the FDA to approve the changes before the drug may be sold in its altered form. *Id.* at 314.70(b). Moderate changes require a manufacturer to submit a supplement to the FDA explaining the changes, but the manufacturer may begin selling the drug in its altered form 30 days after the supplement is submitted even without gaining prior FDA approval. *Id.* at 314.70(c).  However, the FDA ultimately does have to approve the changes and may order the manufacturer to cease selling the drug in its altered form if the changes are disapproved. *Id.* at 314.70(c)(7).  Changes to labeling that would *add or strengthen* a contraindication, warning, precaution or adverse reaction fall under the "moderate changes" category, and can be made and the drug sold without gaining initial approval by the FDA. *Id.* at 314.70(c)(6)(iii)(A).  But, as stated, the changes ultimately would have to gain FDA approval and the FDA could order the manufacturer to cease selling the drug and eliminate the changes to the labeling. *Id.* at 314.70(c)(7).

**The FDA's Approval Process and Subsequent Action for Zoloft:**

Pfizer submitted its NDA for Zoloft to the FDA on April 13, 1988, seeking approval to market Zoloft to treat depression. Appendix to Pfizer's Motion, p. 49-52.  Subsequently, but prior to FDA approval, Pfizer submitted further studies focusing on suicide and suicide attempts among Zoloft users during testing. *Id.* at p. 52-135.  The FDA issued an "approvable letter" on September 30, 1991. *Id.* at p. 267-88.  As discussed above, an "approvable letter" indicates that the FDA believes it can approve the NDA if the manufacturer agrees to specific conditions, such as changes to labeling.  The approvable letter informed Pfizer that final approval of Zoloft would require attention to labeling (among other things) and included the FDA's required labeling,

5

informing Pfizer to "please use the following text verbatim." *Id.* at p. 267.  Under the

"Precautions" section of the labeling, the FDA required Pfizer to include the following warning:

> The possibility of suicide attempt is inherent in depression and may persist until
> significant remission occurs.  Close supervision of high-risk patients should accompany
> initial drug therapy.  Prescriptions for Zoloft (sertraline) should be written for the
> smallest quantity of capsules consistent with good patient management, in order to reduce
> the risk of overdose. *Id.* at p. 275-76.

Under the "Adverse Reactions" section of the labeling, the FDA required Pfizer to

include "Suicide Attempt" as an "Infrequent Occurrence" and to inform users "it is important to

emphasize that although the events reported occurred during treatment with Zoloft (sertraline),

they were not necessarily caused by it." *Id.* at p. 284-85.

By approval letter dated December 30, 1991,[1] the FDA approved Zoloft for treatment of

depression. *Id.* at 289-306.  The letter also included the final agreed labeling and stated that "the

application, with these labeling revisions, is approved," and "these revisions are terms of the

NDA approval," and "marketing the product before making the agreed upon revisions in the

product's labeling may render the product misbranded and an unapproved new drug." *Id.*  Pfizer

complied with the FDA's instructions and included the required instructions verbatim.

Subsequently, between 1996 and 2003, the FDA approved Zoloft as safe and effective as

labeled for the treatment of six different disorders. *Id.* at 800-987.  Additionally, the FDA

rejected three different petitions seeking a change in the labeling for Prozac, a drug in the same

class of drugs as Zoloft, to include a warning regarding an increased risk of suicide.  The FDA

has also written and submitted *amicus* briefs in multiple cases, stating its opinion that such

failure to warn claims are preempted.

---

[1] The letter is stamped as received by Pfizer on January 3, 1992. The date the letter was actually written by the FDA
is not legible on the copy provided in the appendix, but Pfizer avers in its Motion that it was December 30, 1991.

**Applicable Law**

Summary judgment shall be rendered if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. W.Va. R. Civ. P. 56(c). Summary judgment should not be granted if there is a genuine issue of material fact. Syl. pt. 4, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963). A party who moves for summary judgment has the burden of showing that there is no genuine issue of fact and any doubt must be resolved against the moving party. *Id.* at Syl. pt. 6. Upon motion for summary judgment, if judgment is not rendered upon the whole case, the court shall if practicable ascertain what material facts exist without substantial controversy and shall make an order specifying the facts that appear without substantial controversy and directing such further proceedings in the action as are just. W.Va. R. Civ. P. 56(d).

The authority of federal law to preempt state law is found in the United States Constitution in what is known as the Supremacy Clause, which provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. The West Virginia Supreme Court has held that "[t]he Supremacy Clause of the United States Constitution, Article VI, Clause 2, invalidates state laws that interfere with or are contrary to federal law." Syl. pt. 1, *Cutright v. Metropolitan Life Ins. Co.*, 201 W.Va. 50, 491 S.E.2d 308 (1997). However, "our law has a general bias against preemption." *Davis v. Eagle Coal and Dock Co.*, 220 W.Va. 18, 640 S.E.2d 81 (2006)(*quoting General Motors Corp. v. Smith*, 216 W.Va. 78, 83, 602 S.E.2d 521, 526 (2004)).

7

"Both [The West Virginia Supreme] Court and the U.S. Supreme Court have explained that federal preemption of state court authority is generally the exception, and not the rule." *In re: West Virginia Asbestos Litigation*, 215 W.Va. 39, 42, 592 S.E.2d 818, 821 (2003). "Given the importance of federalism in our constitutional structure ... we entertain a strong presumption that federal statutes do not preempt state laws; particularly those laws directed at subjects – like health and safety – 'traditionally governed' by the states." *Davis, supra* (*quoting Law v. General Motors Corp.*, 114 F.3d 908 (9th Cir.1997), *quoting CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993)). Thus, "pre-emption will not lie unless it is 'the clear and manifest purpose of Congress.'" *Id.* (*quoting Law*). In other words, "preemption is disfavored in the absence of convincing evidence warranting its application." *Hartley Marine Corp. v. Mierke*, 196 W.Va. 669, 474 S.E.2d 599 (1996). For these reasons, "consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *State ex rel. Orlofske v. City of Wheeling*, 212 W.Va. 538, 575 S.E.2d 148(2002)(*quoting Maryland v. Louisiana*, 451 U.S. 725 (1981)).

"In any preemption analysis, the focus of the inquiry is on congressional intent." *Hartley Marine Corp., supra.* "Preemption is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Id.* (*quoting Morales v. Trans World Airlines*, 504 U.S. 374 (1992). "Implied preemption may take two forms:

> In the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the states to supplement federal law, or where the state law at issue conflicts with federal law, either because it is impossible to comply with both or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives."

*Hartley Marine Corp., supra* (quoting *Northwest Cent. Pipeline Corp. v. Kansas Corp. Comm'n*, 489 U.S. 493 (1989)).  The *Hartley* Court quoted another United States Supreme Court case to differentiate between the two recognized types of implied preemption.  "Field pre-emption occurs where the scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Id.* (quoting *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992)).  "Conflict pre-emption occurs where 'compliance with both federal and state regulations is a physical impossibility,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Gade*).

There are no West Virginia cases regarding whether a plaintiff's state tort law failure to warn claim is preempted by the FDCA and its implementing regulations.[2]  Therefore, this Court looks to other courts' rulings for guidance and finds a split of authority.

In a suit involving the identical issue as the present case, the Federal District Court for the Southern District of Texas found plaintiff's claim that Pfizer should have warned of an increased risk of suicide among Zoloft users was preempted because such a warning conflicted with the FDA's conclusions and rulings regarding such a risk. *Dusek v. Pfizer, Inc.*, 2004 WL 2191804 (S.D Tex. 2004).  That court acknowledged that, pursuant to the FDCA, Pfizer had the authority to strengthen the warnings required by the FDA, but that any changes must eventually be approved by the FDA and must still comply with the federal law requirement that warnings not be false or misleading. *Id.*  The court analyzed several factors and found that plaintiff's

---

[2] In the very recent decision of *State ex rel. Johnson & Johnson Corp. v. Karl*, 2007 WL 1888777 (W.Va. June 27, 2007), the West Virginia Supreme Court refused to adopt the "Learned Intermediary Doctrine," which would have shielded a drug manufacturer from liability to a patient for a failure to warn claim.  The Court held that under West Virginia products liability law, manufacturers of prescription drugs are subject to the same duty to warn consumers about the risks of their products as other manufacturers.  That decision is not on-point.  It focuses on whom a drug manufacturer has a duty to warn, while the issue in the present case focuses on the content of the warnings.

proposed warning would have been false and misleading and, thus, was in direct conflict with the FDCA and the FDA's requirements. *Id.* The court stated that if it allowed the failure to warn claim to go forward, "Defendant will be liable for not including a warning that the FDA explicitly decided was not scientifically warranted." *Id.* at 8. The court also noted that the FDA's explicit rejection of the suicide warning came after "significant study," and Texas common law should not require more. *Id.* at 10.

Likewise, the Federal District Court for the Northern District of Texas found that plaintiff's proposed warning indicating a relationship between Zoloft and suicide would have been false and misleading and so the claim against Pfizer was preempted. *Needleman v. Pfizer, Inc.*, 2004 WL 1773697 (N.D. Tex. 2004). The court noted that allowing such a claim to go forward would "in effect, [allow] a state regulation to impose labeling requirements contrary to those required by federal law." *Id.* at page 2.

The Federal District Court for the Eastern District of Pennsylvania also found that the FDCA impliedly preempted state law failure to warn claims in a case involving Paxil, a drug in the same class of drugs as Zoloft known as Selective Serotonin Reuptake Inhibitors ("SSRIs"). *Colacicco v. Apotex, Inc.*, 432 F.Supp.2d 514 (E.D. Pa. 2006).

The Fifth Federal Circuit also found that the FDA's determination as to warnings for vaccines preempts state law, holding: "assuming that the FDA has processed all the relevant and available information in arriving at the prescribed warning, its decision as to the proper wording must preempt by implication that of a state." *Hurley v. Lederle Laboratories*, 863 F.2d 1173, 1179 (5th Cir.1988). However, that court denied summary judgment because it found a factual issue remained as to whether the manufacturer provided the FDA all the necessary information on which to base the warning. *Id.*

However, it appears the majority of courts that have addressed the issue have held that a state law failure to warn claim is not preempted by the FDCA because the Act merely sets a minimum standard for warnings, but allows drug manufacturers to strengthen those warnings without prior approval.

The Federal District Court for the District of New Jersey found "no conflict to exist as a result of Pfizer's alleged inability to comply with both state and federal requirements." *McNellis ex rel. DeAngelis v. Pfizer, Inc.*, 2005 WL 3752269 (D.N.J. 2005). It held "the FDCA and the FDA's regulations do not conflict with New Jersey's failure to warn law because those federal regulations merely set minimum standards with which manufacturers must comply." *Id.*

Similarly, the Federal District Court for the District of Minnesota found no conflict preemption in the plaintiff's failure to warn claim against Pfizer. *Witczak v. Pfizer, Inc.*, 377 F.Supp.2d 726 (D.Minn. 2005). Interestingly, that court found that Pfizer had no absolute duty to use the FDA-approved label "verbatim" even though the approvable letter and the approval letter both stated that final approval depended upon the inclusion of the required warnings. *Id.* at 729. Because Pfizer could have strengthened its label to warn of the alleged association between Zoloft and suicidality, the court found "it was not impossible for [Pfizer] to comply with both state and federal requirements." *Id.* The court also rejected Pfizer's reliance on the FDA's *amicus* brief as demonstrating that the FDA would have considered the unilateral change false and misleading. *Id.* at 730. The court acknowledged that the FDA's brief stated that it would have found such changes false and misleading, but declined to give the brief any weight or preemptive force. *Id.*

The Federal District Court for the Northern District of Illinois also held that the plaintiff's failure to warn claim against Pfizer was not preempted. *Zikis v. Pfizer, Inc.*, 2005 WL 1126909

(N.D.Ill. 2005). Noting that the FDCA allows a manufacturer to strengthen warnings, the court

stated, "nothing prevented Pfizer from seeking to amend the language in the labels to include the

known additional side effects."[3] *Id.* at 2.

Multiple other federal courts have held that federal law does not preempt a state law

failure to warn claim. *See Motus v. Pfizer, Inc.*, 127 F.Supp.2d 1085 (C.D.Cal. 2000), *Caraker v.*

*Sandoz Pharmaceuticals Corp.*, 172 F.Supp.2d 1018 (S.D.Ill. 2001), *Cartwright v. Pfizer, Inc.*,

369 F.Supp.2d 876 (E.D. Tex. 2005).[4]

### Facts Not in Substantial Controversy

The issue presented in the present Motion is primarily one of law. This Court has

reviewed the pleadings submitted by the parties thus far, including examination of the various

appendixes, and makes its ruling of law in this Order based on a finding that the following

material facts are not in substantial controversy:

1.  On June 15, 1998, Defendant Rosemary Cook's vehicle swerved into Plaintiffs' lane

    and collided with their vehicle on Route 219 near Ronceverte, West Virginia, injuring

    Plaintiffs and killing Ms. Cook.

2.  Ms. Cook was taking Zoloft at the time of the incident.

3.  Pfizer submitted its new drug application for Zoloft to the FDA on April 13, 1988.

4.  The FDA issued an Approvable Letter to Pfizer on September 30, 1991, stating that

    final approval of Zoloft would require attention to labeling, among other things.

5.  In regards to labeling, the FDA instructed Pfizer to "please use the following text

    verbatim."

---

[3] This Court points out that the plaintiff in *Zikis* made other claims in addition to failure to warn, and that the death
in *Zikis* occurred almost 7 years after the death in the present case. Thus it is unclear what the *Zikis* court found
were "additional known side effects," but they likely remained unknown at the time of the accident at issue here.
[4] This Court points out that it has cited and relied solely on cases concerning conflict preemption, which alleviates
Plaintiffs' argument regarding Pfizer's misapplication of cases concerning express preemption.

6. Under the "Precautions" section of the labeling, the FDA required Pfizer to include the following warning verbatim:

> The possibility of suicide attempt is inherent in depression and may persist until significant remission occurs. Close supervision of high-risk patients should accompany initial drug therapy. Prescriptions for Zoloft (sertraline) should be written for the smallest quantity of capsules consistent with good patient management, in order to reduce the risk of overdose.

7. Under the "Adverse Reactions" section of the labeling, the FDA required Pfizer to include "Suicide Attempt" as an "Infrequent Occurrence" and to inform users verbatim "it is important to emphasize that although the events reported occurred during treatment with Zoloft (sertraline), they were not necessarily caused by it."

8. The FDA approved Zoloft for treatment of depression by Approval Letter dated December 30, 1991, which informed Pfizer that any alterations to the FDA required labeling would render the product misbranded and an unapproved new drug.

9. Pfizer included the FDA's required labeling when it began marketing Zoloft and when Defendant Rosemary Cook was prescribed Zoloft in 1998.

10. In 1991, shortly before issuing its Approvable Letter to Pfizer, the FDA rejected a petition from the Citizen's Commission on Human Rights claiming that Prozac caused suicidal thoughts and asking the FDA to change the labeling or withdraw the approval of Prozac, which is also an SSRI like Zoloft. The FDA stated, "the data and information available at this time do not indicate that Prozac causes suicidality or violent behavior."

11. Also in 1991, the FDA convened its Psychopharmacologic Drugs Advisory Committee ("PDAC") to investigate suicidality in connection with pharmacological

treatment of depression, which unanimously found there was no credible evidence

that antidepressant drugs cause the emergence or intensification of suicidality.

12. In 1992, the FDA rejected a second petition claiming that the label for Prozac should

be changed to warn of suicidality related to its use.

13. In June of 1997, the FDA rejected a third petition to change the labeling on Prozac to

include a warning regarding suicidality, stating: "The [FDA] has continued to monitor

carefully reports of a possible connection between Prozac and increased suicidality.

However, no credible scientific evidence has caused the agency to depart from its

conclusion that the current Prozac labeling appropriately reflects the level of concern

about Prozac and suicidality."

14. In 2002, The United States filed an *amicus curiae* brief in the appeal of *Motus v.*

*Pfizer, Inc.*, 127 F.Supp2d 1085 (C.D. Cal. 2000), stating its position that "any

warning, no matter how worded, that could reasonably have been read as describing

or alluding to [a causal relation between Zoloft and suicide] would have been false

and misleading, and therefore in conflict with federal law because there was no (and

still is not) scientific support for such a warning."

**Analysis**

As required, this Court begins its analysis under the presumption that preemption does

not exist and will require "convincing evidence warranting its application." *See Hartley Marine*

*Corp. v. Mierke, supra.*

It is clear to this Court that Pfizer was required to use the language provided to it by the

FDA regarding suicidality when Zoloft was approved in late 1991. The FDA's Approval Letter

specifically informed Pfizer that "marketing the product before making the agreed upon revisions

in the product's labeling may render the product misbranded and an unapproved new drug."
Accordingly, Pfizer complied and began marketing the drug with the required labeling and
warnings. It is also clear to this Court that 21 C.F.R. 314.70(c) explicitly allows a drug
manufacturer to add or strengthen a drug's warnings without gaining prior FDA approval, but
any additions or strengthening of the labeling must still comply with the FDCA's requirement
that drug labeling not be false or misleading and the FDA must eventually approve such changes.

Thus, the issue before this Court is whether Pfizer could have added or strengthened the
required warnings at any point between Zoloft's approval in 1991 and the incident giving rise to
this case in June of 1998 while still complying with federal law. In other words, if this Court or
a jury would find that West Virginia tort law placed a duty upon Pfizer to add or strengthen the
suicidality warnings on Zoloft prior to 1998, 1) would Pfizer's compliance with federal law and
this State imposed duty be a physical impossibility, or 2) would this State imposed duty stand as
an obstacle to the accomplishment and execution of the full purposes and objectives of
Congress?

1) **Pfizer's compliance with a State imposed duty to warn and the FDCA and its implementing regulations would be a physical impossibility.**

The FDCA and its implementing regulations require a drug's labeling not be false or
misleading. Prior and subsequent to the incident in the present case, the FDA and its experts in
the PDAC gave substantial consideration to the exact issue presented in this case and repeatedly
found no scientific evidence of a causal connection between using Zoloft or other SSRIs and an
increased risk of suicide.

The FDA requested and considered studies concerning suicide and the use of Zoloft prior
to approving the drug with its required labeling in 1991. It concluded that there was no scientific

evidence of a causal connection.  It required labeling indicating that suicide is an inherent risk in

depression and that instances of suicide among Zoloft users "were not necessarily caused by it."

The FDA considered and rejected three separate petitions to require warnings of an

increased risk of suicide on the labeling of Prozak, an SSRI like Zoloft.  The FDA's most recent

rejection came in June of 1997, just one year prior to the incident in this case, when it stated it

had monitored carefully a possible connection between Prozac and increased suicidality, but had

found "no credible scientific evidence [to cause] the agency to depart from its conclusion that the

current Prozac labeling appropriately reflects the level of concern about Prozac and suicidality."

The United States filed an *amicus* brief on behalf of the FDA in 2002 in the case of

*Motus v. Pfizer, supra.*  That case involved the exact issue as this one and related specifically to

Zoloft rather than Prozac or some other drug.  In its brief, the FDA indicated that appropriate

warnings are drafted to express known scientific risks "while avoiding the statement of

unsubstantiated risks that may unnecessarily deter use of the drug."  It stated that in 1998, "any

warning, no matter how worded, that could reasonably have been read as describing or alluding

to [a causal] relation would have been false or misleading, and therefore conflict with federal law

because there was no (and still is not) scientific support for such a warning." (emphasis

supplied).  The FDA admitted that its regulations permit a drug manufacturer to add or

strengthen warnings without prior approval, but pointed out that "[u]ltimately … [the] FDA, not

each state court system applying its own standards, must approve the warning."  The FDA then

explicitly stated: "given the agency's repeated negative determinations on the subject, had Pfizer

given a warning as to a causal relation between Zoloft and suicide, [the] FDA would have

disapproved that warning."  In sum, in 2002, four years *after* the incident in the present case, the

FDA explicated in its *amicus* brief that it would have rejected as false and misleading any

warning alluding to a causal relation between using Zoloft and an increased risk of suicide.[5]  The
FDA reiterated its position in another *amicus* brief filed in the 2005 case of *Kallas v. Pfizer, Inc.*,
a case arising in the United States District Court for the District of Utah and alleging the same
failure to warn claim as the present case.[6]

In light of the FDA's initial approval of Zoloft with the required language in its labeling,
the FDA's repeated refusal to alter the labeling of other SSRI antidepressants as recently as one
year prior to the incident in the present case, and the FDA's explicit statement in its *amicus*
briefs four and seven years after the incident in the present case that *any* warning alluding to a
causal connection between using Zoloft and increased risk of suicidality would have been
rejected as false and misleading, this Court finds convincing evidence that it would have been
impossible for Pfizer to simultaneously comply with a State imposed duty to warn of an
increased risk of suicide and federal law that warnings not be false or misleading.  Therefore,
Plaintiffs' state law failure to warn claim conflicts with and is preempted by federal law.

## 2) Pfizer's compliance with a State imposed duty to warn would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress

Congress vested the FDA with the authority and duty to approve and monitor drugs
within the United States with the purpose of ensuring that all drugs introduced into commerce
are safe and effective and that labeling of drugs are not false or misleading.  The FDA followed
the requirements of the FDCA in its initial approval and continued monitoring of Zoloft.  Due to
various allegations through petitions and lawsuits of a causal connection between antidepressants
and an increased risk of suicide, the FDA has paid particularly close attention to the labeling of

---

[5] This Court in no way views the *amicus* brief as legal precedent, but simply as evidence that Plaintiffs' attempt to impose a common law duty upon Pfizer to include a warning on Zoloft alluding to a causal connection between its use and suicidality is preempted.
[6] The case eventually settled, so it remains unreported.

Zoloft and other such drugs regarding the warnings of such a risk.  The PDAC, comprised of various experts on psychopharmacologic drugs, analyzed multiple studies and found no scientific evidence of a causal connection between antidepressants and an increased risk of suicide prior to 1998.  The FDA repeatedly concluded that no causal connection could be shown and repeatedly refused to require a change to the labeling of antidepressants prior to 1998.

Plaintiffs now seek to impose a duty upon Pfizer to include within the State of West Virginia a warning on Zoloft that the FDA explicitly and repeatedly found was not warranted and would be false and misleading.  If this Court were to impose such a duty upon Pfizer, there is no question it would stand as an obstacle to the FDA's accomplishment and execution of the FDCA's purpose.  In essence, such a ruling would completely ignore and negate the significant study that the FDA conducted in reaching its conclusions regarding Zoloft's safety and the adequacy of the labeling.  Such a ruling would replace the FDA's determination, which was based on the study and recommendations of various experts in the field, with that of this Court or a jury of laypersons who presumably are far less qualified to make such a determination.

Imagine the ramifications of allowing each state's court system to determine appropriate labeling for Zoloft rather than leaving that determination with the FDA.  Instead of following and relying on the application and approval process set forth in the FDCA, and the FDA's repeated reiteration that a change to the warning on Zoloft or other SSRIs concerning suicide would be inappropriate, Pfizer would also have to determine the requirements of every state before marketing Zoloft there.  Presumably, in order to shield itself from the liability that Plaintiffs here seek to impose, Pfizer would have to submit their labeling and gain the approval of each state's courts before selling Zoloft in that state.  Pfizer could no longer rely on the approval of the FDA but would be forced to rely on the approval of the most stringent state's courts.

Accordingly, this Court finds that Plaintiffs' claim is preempted because imposing a duty to warn upon Pfizer in this case would greatly interfere with the FDCA and would serve as an obstacle to the accomplishment and execution of its purpose.

**Decision**

As discussed above, this Court **FINDS** no genuine issue of material fact regarding Plaintiffs' claim that Pfizer had a duty to warn about an increased risk of suicide among Zoloft users, and **FINDS** the presumption against preemption has been overcome by convincing evidence, and **FINDS** the claim preempted by federal law.

Accordingly, this Court **GRANTS** Pfizer's Motion for Summary Judgment as to Plaintiffs' claim that Pfizer failed to adequately warn that Zoloft may cause suicide.

Again, this Order is limited in scope and does not reach the viability of Plaintiffs' claim regarding Pfizer's duty to warn of the dangers of operating a motor vehicle while on Zoloft because that issue was not briefed or argued by the parties. This Court does not intend to imply that all failure to warn claims against a drug manufacturer are necessarily preempted. But, considering the specific and unique facts of this case and the FDA's significant prior involvement concerning the exact issue presented, this Court finds that preemption is proper regarding the limited issue of Plaintiffs' claim regarding Pfizer's duty to warn of an increased risk of suicide among users of Zoloft prior to 1998.

The Clerk of this Court is hereby **ORDERED** to forward a copy of this Order to the attorneys of record at their respective addresses of record.

Entered this _____ day of July, 2007

James K. Rowe, Judge
Eleventh Judicial Circuit

A True Copy:
ATTEST:

Clerk, Circuit Court
Greenbrier County, WV

By_____
Deputy

CIRCUIT COURT GREENBRIER CO., W.VA.

JUL 1 1 2007

LOUVONNE ARBUCKLE, CLERK

19