UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

| | |
|---|---|
| In Re:  Seroquel Products Liability Litigation<br>MDL Docket No.  1769<br><br>DOCUMENT RELATES TO ALL CASES | Case No. 6:06-md-01769-ACC-DAB<br><br>**PLAINTIFFS' MOTION<br>FOR ORDER APPOINTING<br>HITACHI CONSULTING AS<br>INFORMATION TECHNOLOGY ADVISOR** |

## I.      INTRODUCTION

By way of this motion, Plaintiffs present Hitachi Consulting to serve in the role of IT Advisor to the Court ("Advisor").  At the August 22 Status Conference, the parties and the Court discussed an Advisor who would conduct an independent audit of AstraZeneca's e-discovery processes (Transcript, 31:18-20), in order to get to the bottom of the technical issues presented by prior productions (33:24-25), to figure out what plaintiffs have not gotten, and why (46:12-14), and  to inform the court's decision regarding sanctions or remedies (34:9-13).  Going forward, the Advisor will figure out what problems still remain (29:2-3), ensure that AstraZeneca's processes will be completely transparent (27:2), and ensure that plaintiffs receive the information to which they are entitled in the proper form (27:4-6).  For the reasons set forth below, plaintiffs nominate Hitachi Consulting ("Hitachi") for the Advisor position.

## II. ISSUES TO BE ADDRESSED BY THE ADVISOR

### A. Investigation of Issues Related To Collection and Production

The following is a non-exhaustive list of the more significant issues which still persist, and which should be investigated by the Advisor.

1. Email

Significant issues remain with respect to AstraZeneca's production of email. These issues include the extent to which AstraZeneca has preserved, collected and produced email from all relevant email "mailboxes." At the July 26 hearing, this issue was illustrated through evidence presented by Jonathan Jaffe (Transcript July 26, p. 187-188) related to the "Seroquel" email address maintained by custodian Michael Murray. At the hearing, AstraZeneca indicated that it would investigate the issue (347:24-348:5). Following the hearing, AstraZeneca initially believed the problem was caused by a "quirk in the deduplication." (Canty Decl., Exh.1, p. 7). Then, on August 15, AstraZeneca indicated that some employees may have had "special email addresses" from which it failed to collect email (including mailboxes named "Seroquel"). (*Id.*, at 10.) Two days later, AstraZeneca alternatively theorized that custodians maintained only one email address, but that "display names" were changed over the years. AstraZeneca explained that, with respect to Mr. Murray, such a change became necessary when AstraZeneca hired another Michael Murray. (Canty Decl., Exh 2.)

For a number of reasons, AstraZeneca's "display name" theory does not withstand scrutiny. First, the theory does not pass AstraZeneca's own test. AstraZeneca explained how it would test its "display name" theory as follows:

2

> Our present investigation is to check whether Mike Murray changed to Mike Murray (Seroquel) at some period, or if rather the two names are interspersed. If the former, I think we are fine on collection. That would be good, as we reviewed everything collected hit by the key word search, and thus Plaintiffs would not be missing anything.

Andrew Dupre; Canty Decl., Exh. 2, p. 2.

As it turns out, the two Murray names are interspersed heavily, meaning that AstraZeneca's "display name" theory is wrong, and that we are not "fine" on collection. (Jaffe Decl., ¶4, Exh. 4.)

Second, AstraZeneca's documents show that at least some custodians have had multiple mailboxes across multiple email servers. Mr. Jaffe has found evidence that AstraZeneca's witnesses (including Michael Murray) appear to have sent email "on behalf of" themselves, suggesting that witnesses used one mailbox to send on behalf of another mailbox. (Jaffe Decl., ¶2, Exh. 1-3.) Mr. Jaffe has found evidence that these mailboxes were maintained across multiple servers. (Jaffe Decl., ¶3, Exh. 2 and 3.) This evidence indicates that alternate email mailboxes were in use by AstraZeneca's witnesses and may not have been preserved and collected by AstraZeneca for production. These are significant issues for investigation by the Advisor.

Additionally, AstraZeneca's investigation of the preservation, collection and production of email from proxies has not been concluded, (Canty Decl., Exh. 1, p. 1). Likewise, the paucity of emails from certain custodians from certain periods (e.g. Vikram Dev) has never been explained. These are significant issues for investigation by the Advisor.

### 2. Entire Categories of Missing Data

As demonstrated at the July 26 hearing, AstraZeneca's production to date is devoid of voicemail, fax attachments, video attachments, and electronic documents reflecting "Track

Changes" data. Though AstraZeneca promised to investigate (Transcript July 26; 266:2-18), and despite further inquiry (Canty Decl., Exh. 3), AstraZeneca has not responded with the results of its investigation into these issues.

AstraZeneca has never denied that it has failed to produce these categories of data. But, at the July 26 hearing, in its cross-examination of plaintiffs' witnesses, AstraZeneca introduced into evidence a document which appeared to include electronic "Track Changes" data. (Defendants' Exhibits 66, 67.) The clear reason for introduction of this evidence was to imply that electronic "Track Changes" data had, in fact, been produced to plaintiffs. (Transcript July 26; 111:25- 113:12; 240:6-241:4.) As explained by Mr. Jaffe, plaintiffs have discovered that this document was originally a hard-copy document which had been scanned for production. (Jaffe Decl., ¶5, Exh.5, 6.) In truth, this evidence supports the theory advanced by plaintiffs: that, while AstraZeneca's witnesses employed the "Track Changes" feature, ESI of this nature has been omitted from AstraZeneca's production. AstraZeneca has not responded to plaintiffs' inquiry about these facts. (Canty Decl., Exh. 3.) All categories of missing data are significant issues for investigation by the Advisor.

        3. <u>Search Terms</u>

Following the July 26 hearing, the parties met and conferred extensively regarding proposed additional search terms. In order to assist the parties in assessing the accuracy and scope of proposed search terms, it was agreed that AstraZeneca would apply the proposed terms to the data it had collected from its witnesses and provide a report detailing the volume of documents which might be found by each term. The report was to form the basis for further discussions regarding the proposed terms, and hopefully result in an agreed list.

On August 17, AstraZeneca initially represented that it would take a week to run the search terms through the data it had collected. (Canty Decl., Exh. 4.) This was due to the fact that AstraZeneca and its vendor did not index the files collected from AstraZeneca's witnesses. (Canty Decl., Exh. 5.) Though indexing files to be searched is a standard industry practice, and though Mr. Jaffe suggested to AstraZeneca's vendor a method by which it could be completed in approximately one day, and though (with the aid of indexing) searches would then take seconds rather than weeks, AstraZeneca insisted upon running the search through the document text strings. (Jaffe Decl., ¶¶6 - 8.) Today, plaintiffs received the report. (Jaffe Decl., ¶9, Exh. 15, 16.) The report is not in the agreed format, nor does it provide all of the agreed information. Additionally, it does not initially appear that AstraZeneca searched for all of the agreed terms. The report indicates that prior searches for "dm" – and, significantly, the original search for "Seroquel" – do not appear to have resulted in the capture and production of all discoverable information.  These terms continue to appear in what AstraZeneca has called the "discard pile." (Jaffe Decl., ¶9, Exh. 15, 16.)

The IT Advisor should investigate continuing failures in searching the data collected for the first 80 custodians, and assist AstraZeneca and its vendor in appropriately indexing and searching the files of the 25 custodians identified by plaintiffs.

    4.   <u>Correction of Previous Errors In Production</u>

On July 20, 2007, AstraZeneca provided to plaintiffs "corrected" load files associated with its production of the first 80 "custodial" files. Mr. Jaffe has identified for AstraZeneca issues which either were not addressed or were complicated by the "corrected" load files, including problems with the page breaks in extracted text files, native excel file issues, duplicate Bates numbers, blank pages , missing "source" data, and metadata fields which do not match

correctly. (Jaffe Decl., ¶10, Exh.7 - 12.) These issues have yet to be resolved, and require the assistance of the Advisor.

### B. Technical Solutions For Future Productions

Vast amounts of data remain to be produced by AstraZeneca, including the files of 25 "custodians" identified by plaintiffs, as well as the many databases maintained by AstraZeneca related to its investigation, development, marketing and sale of Seroquel. In fact, with respect to production of its promotional and regulatory affairs database (essential to identifying critical case-specific discovery materials) AstraZeneca is already deferring issues for consideration by the Advisor. (Canty Decl., Exh. 7.) The Advisor must be able to assist AstraZeneca in making its systems and processes "transparent," and must quickly be able to determine the most effective way to extract discoverable information from AstraZeneca's systems and deliver it to plaintiffs.

### III. HITACHI SHOULD BE APPOINTED AS ADVISOR[1]

At Mr. Jaffe's request, Hitachi has provided materials which detail the company's resources, as well as the experience and qualifications of certain of its proposed team leaders. Jaffe Decl., ¶11, Exh.13, 14.) Hitachi is positioned to meet the objectives of the Court and the parties as follows:

<u>The technical advisor must be able to assess AstraZeneca's preservation, collection and production processes to determine the source of and solutions to problems, particularly with email and the categories of missing data.</u> Hitachi is "Microsoft Information Worker Solutions, Messaging and Collaboration Partner of the Year, 2007." Hitachi has significant experience with integrating systems, so it is equipped to address any problems presented by AstraZeneca's various systems or by the integration of those systems during its recent merger.

---

[1] As the Court ordered on August 22, the parties exchanged their respective names of proposed advisors. As it turns out, the two advisors suggested by AstraZeneca (Jessen and Socha) have conflicts. Hitachi does not.

<u>The technical advisor must be able to determine the most effective way to extract discoverable information from AstraZeneca's systems and deliver it to plaintiffs.</u>  AstraZeneca maintains systems which are predominantly (if not entirely) based on Microsoft, Oracle and SAP platforms.  Hitachi has consulting alliances or partners with all three, and can make top-notch experts immediately available.

<u>The technical advisor must have sufficient resources.</u>  Discovery must keep moving forward if the parties are to have any chance of meeting deadlines set by the Court.  Hitachi is a leading national consulting firm with hundreds of highly experienced professionals.

<u>The parties must focus litigation efforts on the merits of the cases, and not allow "secondary" litigation over technical issues to develop.</u>   Hitachi offers the parties and the court real technical expertise, and real technical solutions: not mediation, special master services or another forum in which to litigate.  This Court is uniquely capable of "rolling up its sleeves" and getting to the "nitty-gritty" of the problems facing the parties, but it is critical that the Court maintain its judicial role.  This Court is well versed in e-discovery concepts, the new Federal Rules, and the latest edition of the Sedona Principles, and clearly needs no IT translator, no lecture from an e-discovery commentator, and no intermediate legal interpretations.  In Hitachi, the Court will have a true fact-finder, which will enable it to make the best decisions as quickly as possible and maintain direct control of this litigation.

**IV.  THE COURT'S DIRECTIVE TO HITACHI**

A. The firm of Hitachi Consulting is appointed to serve as an IT Advisor to the Court.  Hitachi shall:

(a) Conduct an independent audit of AZ's preservation, collection and production of ESI;

7

(b) Identify ESI which AZ has not yet produced to plaintiffs, and determine why AZ has not produced such ESI. Types of ESI which Hitachi should investigate include: voicemail, fax attachments, video attachments and "track changes" data;

(c) Investigate whether all relevant email for all custodians has been produced. Particular issues which should be addressed include:

   1. Whether custodians had multiple email addresses;

   2. Whether and when email was collected from all addresses and all servers;

   3. Whether custodians used proxies for sending or receiving email;

   4. Whether and when email was collected from all proxies;

   5. Whether metadata for all email was provided to plaintiffs;

(d) Investigate, analyze, report on, and suggest solutions to technical issues presented by AZ's prior productions;

(e) Identify remaining and future difficulties with the production of ESI to plaintiffs;

(f) Provide transparency to and implement appropriate quality control for AZ's preservation, collection and production processes;

(g) Ensure that, in the future, plaintiffs receive discoverable ESI in the proper form; and

(h) Provide such other information and technical assistance as the Court may request.

B. In furtherance of those duties, the Advisor shall:

       1.      Receive from Mr. Jaffe and Mr. Martin information identifying problems plaintiffs believe to exist in AZ's preservation, collection and production of ESI;

       2.      Have unfettered access to the following persons, outside the presence of AZ's counsel:

          a.     All relevant technical personnel employed by AZ and each of its vendors,

          b.     All personnel with knowledge of, and all information relating to, AZ's investigations of technical issues, and

       3.      Have unfettered access to all documentation (as set forth in Sedona Principles, Comment 6e) which describes what has been collected, the procedures employed in collection, and steps taken to ensure the integrity of the information collected.

    C.      Within 7 days, and with the input of the parties, Hitachi Consulting shall designate a specific individual to serve as IT Advisor.  The Advisor may make use of appropriate staff of Hitachi under his or her supervision to accomplish the purposes of this appointment. The Advisor may seek clarification or assistance from the Court in order to carry out the duties set forth herein.

    D.      The Advisor is directed to appear (by telephone) at the next status conference (currently scheduled for September 11, 2007 at 9:30 a.m).  At that time, issues relating to scope of duties, reporting, communications and other matters pertinent under this Order will be addressed.

E.  The Advisor shall provide the Court and parties with a schedule of rates and anticipated charges for the services contemplated. The Advisor shall submit a monthly bill to the Court, which will apportion costs between the parties.

## V.  3.01g CERTIFICATION

Counsel for plaintiffs have met and conferred extensively with AstraZeneca's counsel by telephone and by email regarding the issues which are the subject of this motion.

LEVIN SIMES KAISER & GORNICK LLP


_____/s/ Dennis J. Canty_____
Lawrence J. Gornick (CA State Bar No. 136290)
Dennis J. Canty (CA State Bar No. 207978)
44 Montgomery Street, 36th Floor
San Francisco, CA  94104
Telephone:  415-273-8138
Facsimile:  415-981-1270
E-mail:      lgornick@lskg-law.com
             dcanty@lskg-law.com