# EXHIBIT 11

---

**Page 1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

---oOo---

In Re: Seroquel Products
Liability Litigation
MDL Docket No. 1769

Case No. 6:06-md-01769-ACC-DAB

_____/

TELEPHONE CONFERENCE BEFORE SPECIAL MASTER BROWN

Taken before EARLY K. LANGLEY, RMR
CSR No. 3537
October 15, 2007

---

**Page 2**

TELEPHONE CONFERENCE BEFORE SPECIAL MASTER BROWN

BE IT REMEMBERED, that pursuant to Notice, and on the 15th day of October 2007, commencing at the hour of 10:06 a.m., in the offices of Aiken & Welch Court Reporters, One Kaiser Plaza, Oakland, California, before me, EARLY K. LANGLEY, a Certified Shorthand Reporter, the following proceedings were held telephonically in said cause.

---oOo---

ORRAN BROWN (by telephone), Brown Greer PLC, 115 S. 15th Street, Suite 400, Richmond, Virginia 23219-4209, appeared as Special Master.

DENNIS CANTY (by telephone), Levin Simes Kaiser & Gornick, LLP, 44 Montgomery, 36th Floor, San Francisco, CA 94104, appeared on behalf of the Plaintiffs.

BUFFY MARTINES (by telephone), Laminack, Pirtle & Martines, 440 Louisiana Suite 1250, Houston, Texas 77002, appeared on behalf of the Plaintiffs.

Aiken & Welch Court Reporters  Conference 10/15/07

---

**Page 3**

RUSSELL STEWART (by telephone), Faegre & Benson LLP, 3200 Wells Fargo Center, 1700 Lincoln Street, Denver, Colorado 80203-4532, appeared on behalf of the Defendants.

Aiken & Welch Court Reporters  Conference 10/15/07

---

**Page 4**

--oOo--

P R O C E E D I N G S,

--oOo--

MR. CANTY: This is Dennis Canty. And I guess we should go on record.

SPECIAL MASTER BROWN: Yes. Let's go ahead and go on the record and we'll take up this issue.

MR. CANTY: At this point I have made a submission that there have been, I guess, several items of correspondence that have been gone back and forth between myself and Mr. Stewart to which I imagine you're privy. And then on Thursday, when it was decided that we would be on this call and be on the agenda, I sent kind of a position statement. And, Special Master Brown, have you had an opportunity to look at that?

SPECIAL MASTER BROWN: Yes. And this is Orran Brown, and I do have a submission from Mr. Canty dated October 11 that I have reviewed, and this issue about the timeliness of some designations of sales representatives for depositions relative to when disclosures were made. We have discussed it at times with the parties, with Ms. Martines and Mr. Stewart, and I'm happy to take up this issue now, and see if we can get as far as we can with it to resolve it if we

Aiken & Welch Court Reporters  Conference 10/15/07

## 5

1  can.
2      I have your submission, Dennis, and have been
3  through it. I have other things from, papers from the
4  time this has come up before and why don't we do this.
5      I would like to have everybody say their peace
6  on this. It does not have to be in a very formal
7  manner and I have a few questions of my own and why
8  don't we just sort of have a discussion about it.
9      How many cases right now, and how many sales
10 representatives present this issue total?
11     MR. CANTY: From our perspective, at this
12 point, the reason this issue has come to light is
13 because of AstraZeneca's refusal to produce sales reps
14 in the Frederick, Glover, Coppola and Thomas cases,
15 four cases.
16     I don't know to what extent AstraZeneca's
17 disclosures have been deficient in cases that are under
18 Buffy's purview but those are the four clients at this
19 point where AstraZeneca is refusing to produce sales
20 reps.
21     SPECIAL MASTER BROWN: All right. So there are
22 four cases that you have, and then since we observe
23 very few formalities in these calls, we can still
24 continue to call each other by first names, even though
25 we have a court reporter, as far as I'm concerned.

## 6

1      But Russell, how many others other than those
2  four? I think at one time we had maybe a total of
3  seven cases that were at issue.
4      MR. STEWART: That's correct. This is Russell
5  Stewart. There are the Olive case, which is the
6  Mathews's firm, the Sonier case of which Ken Smith is
7  the plaintiff's attorney and then the Hodge case which
8  we have discussed previously on this call. Seven
9  total.
10     SPECIAL MASTER BROWN: Seven total. Four with
11 Dennis and then three others. And the Haas case we
12 discussed in our last call is actually Cranford's case.
13     MR. STEWART: Correct.
14     SPECIAL MASTER BROWN: And then when we talked
15 about the Haas case in that call without you present,
16 Dennis, we had been through the particular facts of
17 this one, and I had indicated that in that
18 circumstance, I felt that the entire series of things
19 could sort of be chalked up to sort of a transition
20 period from no PMO to a PMO and then working out how
21 the CMO 4 was going to work.
22     So on the one, we reached a -- I reached a
23 feeling that that one would be allowed. This
24 deposition would be taken. But then we tabled that
25 issue and I haven't issued any report and

## 7

1  recommendation on it to try to deal with all seven
2  cases at once.
3      And, and this brings us to today.
4      So that on the -- do you have anything, Dennis,
5  that you would wish to say or add to your written
6  submission dated the 11th of October?
7      MR. CANTY: Again, this was put, you know, put
8  together kind of quickly, obviously, you know. The
9  entire discovery, date-specific discovery has caused
10 everybody to be a little bit compressed.
11     I would say that probably the easiest way to
12 get to a determination on this issue is to ask
13 AstraZeneca point blank when, if at any time, it
14 produced all available documentation of contact with
15 the physician witness. That may include the -- the
16 sale -- the call notes. It may include the IMS data
17 which, to my knowledge, has never been produced in the
18 format ordered by the court, nor has it ever been
19 produced completely, and I guess finally perhaps ask
20 you that and whether they have ever produced any
21 accounts payable record in any of these cases.
22     And, when you -- when you reach the
23 determination that they have not done that, then by the
24 plain language of CMO 4, plaintiff's time to designate
25 a sales rep can begin to run. So maybe I think that

## 8

1  the best way to go about it is to ask AstraZeneca when
2  did you produce it.
3      SPECIAL MASTER BROWN: Okay. Thanks, Dennis.
4  Buffy, do you have anything to add to that, or is that
5  going to cover at least at this stage until Russell has
6  a chance to respond to everything you think that's an
7  issue?
8      MS. MARTINES: I'm sorry, Orran, are talking to
9  me?
10     SPECIAL MASTER BROWN: Yes.
11     MS. MARTINES: This is to the court reporter.
12 This is Buffy Martines as liaison counsel for the
13 plaintiffs.
14     With regard to all seven cases we've obviously
15 had -- had a preliminary ruling in the Cranford case,
16 we have the case from Ken Smith and Dave Mathews
17 outstanding and Dennis is on the line because of his
18 involvement with AZ from the start on this issue for
19 the Gornick firm. I'm going to let him take the lead
20 on these four and make his arguments, et cetera.
21     I don't have anything to add to that, but
22 obviously, I would withhold any arguments on the
23 Mathews and Smith cases until we get to those.
24     In other words, I think this discussion should
25 just be with regard to the four Gornick cases.

**Page 9**

SPECIAL MASTER BROWN: Okay. Thank you, and Russell, you've heard all of this, we've talked about it some before.

Do you have Dennis's October 11 package?

MR. STEWART: I do. And this is Russell Stewart.

Orran, do you have my October 10th letter which was attached to my agenda items?

SPECIAL MASTER BROWN: Yes. I had that and I have been through it and I'm going to pull it back out. Just give me a moment.

Yes, I have it in front of me now.

MR. STEWART: That states our position, but let me respond directly to Dennis's questions here.

The AP records have been produced, that is, the payable records, that's payables to physicians in all cases. And we have, in addition, supplemented those at times, as you know, as Buffy knows.

But right now, the Gornick's firm, I believe, has AP in all of their cases, and we are producing payment information for all the cases now in November.

And we have for all the cases in November and we are going forward.

IMS same thing. We produced IMS information back to March 1999 for all cases.

**Page 10**

Except there is a lacking here. You know, it's really, you know, Dennis should call me and talk about any problems on these issues but we haven't really discussed the problems he's mentioned here.

But I think the focus, or the important thing is the call notes, and Dennis asked me when we produced the call notes and in my letter we produced them on August 3rd, 2007.

And for each of the four cases that Dennis has those call notes contain the names of the sales representatives through detailed product to the prescribing physician that was identified in those cases.

And all of them contain notes from several years, and you can determine from those call notes at what time the PSSs were detailing the product and what time the plaintiff was being treated so that the plaintiffs can determine which sales reps were relevant to their case.

So that's the answer. It was done on August 3rd. And they had that information necessary, and it's our position that the information necessary to designate the sales representatives is the call notes with the names of the sales representatives included.

And these were all September. Plaintiff's, as

**Page 11**

I recall, they were chosen in the end of August by us, or the 1st of September by the court or the plaintiffs. So the designation of time for designating their sales representatives was -- they were due August 7, 2007.

And I did ask in my letter, you know, the question is, I take it the position of the plaintiff's is that the electronic format -- these weren't provided immediately in the electronic format. And as you can tell from our letter, that is precisely the same the changeover happened from paper to electronic and we subsequently did provide electronic.

But I think that's not the issue because the electronic form has the same information as the paper form about the sales reps, so the determination of which is the proper sales rep wouldn't have changed, it wouldn't have affected that. It's the same information that was in paper that later was provided in electronic form.

SPECIAL MASTER BROWN: And we -- this is Orran Brown again.

When you say in electronic format?

MR. STEWART: I mean a version of Excel as opposed to PDF. Actually all of our services are by e-mail, so as opposed to an e-mail containing a PDF, you know, I'm talking about in addition to that we also

**Page 12**

now provide Excel in a native format so that you can have the call notes on your computer and search through them and do searches and things.

SPECIAL MASTER BROWN: Okay.

MR. STEWART: That's what happened. The changeover was about that time.

SPECIAL MASTER BROWN: Before going back to Dennis Russell, do you have anything else to add at this juncture?

MR. CANTY: There are some other issues.

MR. STEWART: Just generally about some of these issues relating to the PSS designations, and we've discussed some of this with Ashley in the context of Ashley Cranford and the Haas deposition but, you know, I think the court entered this order in the MDL, and the case management orders are entered for the case-specific discovery for the purpose of making sure this can work, and it is a tight time frame.

And I think that the court adopted this two-day designation to get things moving and make sure that this happened and we could all complete things in a timely way, and our interest and our concern is that looking -- looking back on these cases two months from now, start reopening and designating additional people to depose. It's just not going to work with our

## Page 13

1  schedule.
2       We're having -- as you know, it's all we can do
3  now to do the 30 depositions a month, that we're doing
4  and it's taxing us all.
5       So that's our main concern is that we have a
6  byline so we know when this is done and we can look
7  back and say that there are no other PSSs that can be
8  pulled from earlier months.
9       SPECIAL MASTER BROWN: All right. This is
10 Orran Brown.
11      Russell, are the depositions, the other
12 depositions for these four cases that Dennis has, have
13 they all been completed except for the PSS for each
14 case?
15      MR. STEWART: I believe all the plaintiffs
16 have. All the plaintiffs' depositions. Now I'm not
17 sure -- and most of the physician depositions. But I
18 don't have that in front of me.
19      These are all September cases. So if they're
20 not completed they're certainly in the process of being
21 completed.
22      We would -- and another issue that's related to
23 this, too, is the timely -- the other plaintiffs in
24 these cases have been able to designate sales
25 representatives in a timely fashion, and there have

## Page 14

1  been a lot that have gone through, as you know. You
2  get those in -- you have seen those and those have
3  happened in August and September and throughout.
4       The other issue that this raises is the October
5  4th letter from Mr. Canty designating these, also
6  contained -- it also offered up the plaintiffs for
7  depositions.
8       But this was 40 days nearly after these
9  plaintiffs were selected for participation. And that
10 causes a problem, because, in our -- the fast pace that
11 we have to complete these depositions when it takes 40
12 days to designate these plaintiffs that puts us all
13 into a bind as far as scheduling coverage for those
14 issues.
15      So, that's an issue for us as well. And I also
16 take it that there's an issue -- and Mr. Canty can
17 address this -- of, I sense that Mr. Canty wants to
18 take all of these depositions at the same time to save
19 costs which is understandable.
20      But I think as we've concluded through this,
21 and our experience with this program so far is that we
22 can't have that luxury, that we have to take the
23 plaintiffs first and then we should take the sales
24 representatives and then we should, if we can, try to
25 schedule the physicians together. That's what makes

## Page 15

1  the most sense.
2       And the reason we take the plaintiffs first --
3  there are a lot of reasons. But particularly because
4  in this -- in this plaintiff population, there are a
5  lot that just don't up show up for their depositions.
6       So unless we can be sure that they're coming,
7  it causes a great deal of expense for us to take
8  depositions of physicians and sales representatives
9  where the plaintiffs in the case don't participate and
10 don't intend to proceed with their cases.
11      So those are generally our concerns about this,
12 Orran, and I think I've expressed our position before,
13 but it's stated in our October 10th letter.
14      SPECIAL MASTER BROWN: Appreciate it.
15      Dennis, let's go back to you for a moment. And
16 let me say this first. It is apparent that you had
17 some disclosures on August 3, for the four cases, and
18 that those disclosures did not contain everything at
19 that time that you eventually got or were supposed to
20 get, and they were not in a live Excel format which is
21 the way it's being done now. I understand why they
22 weren't.
23      But it is a given, I think, that the initial
24 disclosures that you got were not everything and they
25 were not in a live Excel format.

## Page 16

1       So, let's talk about your feelings about how
2  those two deficiencies, if you call them that, for lack
3  of a better word now, impaired your ability to select a
4  PSS for deposition, if they did, because I'm trying to
5  relate the nondisclosures to the ability to pick
6  someone.
7       So, talk to me about how things that you point
8  out quite well in your October 11 summary that were
9  missing or not done by the book at that stage, let's
10 say, how did that interfere with your picking the PSS
11 for each of the four cases?
12      MR. CANTY: Sure, Orran.
13      There's two real components to that. One is
14 it's not just the failure to disclose and not have the
15 material that I should have. But also let's consider
16 for a moment the fact that I communicated with Russell
17 on that, and Russell said, "Fine, we'll get you what
18 you need and we'll discuss it later."
19      But there's two components to that and we'll
20 take them one at a time.
21      Number one, the Excel sheets, the formatting
22 issue. With the data produced in native Excel format,
23 I can sort, I can search and I can filter the data so
24 that I can analyze, okay, well -- oh, and let's throw
25 in there the new columns that they added.

**17**

I can -- with the new data produced in the proper format, I can make a list as you will see in the exhibit that I attached Frederick, I believe it is. I can sort by the message. I can sort by the date. I can sort by the rep's sales name. I can do dates. I can say all right, I want to know all -- I'm going to look at the sales rep that called on the doctors between X date and Y date and deliver the doctor a minimum weight gain sales message.

I can do that with the Excel files. And by court order I have the right to do that before I take the sales rep's deposition.

What else do I have a right to do before I make a sales rep designation? I also have the right to IMS data in electronic format that tells me when, if at all, there was a spike in Seroquel prescription, or a falloff in Seroquel prescription.

What else do I have a right to? I have a right to accounts payable records that tell me, okay, was the doctor paid, was the doctor paid by AstraZeneca to speak, was the doctor paid by AstraZeneca to speak about Seroquel and deliver a minimal weight gain message, in what time frame, and, therefore, what sales rep was visiting the doctor at -- at that time. Was that arrangement made.

**18**

I get to pick a sales rep that talked to the doctor about weight gain, and assisted him, or had communications with him about messages he was delivering to other doctors.

All of that information came after August 3, 2007. And one thing that I will say is at this point, complete IMS data has not been produced and a complete accounts payable records, records, not interrogatory response, records, have not been produced in any of these cases.

So, at this point, you know, we asked, my initial question was let's ask AstraZeneca when this stuff was produced. We didn't get an answer to that. What we got was, okay, we produced the initial call notes on August 3, 2007, and then we got a statement about how plaintiffs had everything right now. It was a nice way to kind of jog a little bit off topic.

So, what we don't have is we don't have an answer to when these complete records were produced.

At this point, the assertion that, you know, producing the call notes is all the info, all the information that we need to choose sales reps, that position. It's not borne out in COM 4. COM 4 doesn't say that. COM 4 doesn't say produce call notes in unsearchable PDF format and from that plaintiffs will

**19**

choose a sales rep. That's not what a COM 4 says. COM 4 says produce all available documentation about contacts with the physician witness.

There's some comment about how, you know, other plaintiffs have been, you know, able to designate sales representatives. I guess just because they've been able to buffalo other people into -- into designating sales reps, they assume that, you know, they can do that in every case. And plaintiffs in this case, when it finally got down to it, in September, when they still didn't have any response to request for electronic format, made the designations anyway. That's what we did to move it along.

At this point, you can't forget the initial correspondence on the issue. The initial correspondence on the issue, wrote a letter three days after receiving the disclosures, wrote a letter to, I guess it was an e-mail to Mr. Stewart saying these disclosures are deficient, we can't choose a sales rep from them. We are entitled to more information. We won't choose a sales rep until you give it to us.

Mr. Russell -- Mr. Stewart wrote back, he said, okay, we'll give it do you and we'll discuss it later. Mr. Stewart didn't get back to me.

He led me to believe that he was going to give

**20**

me the information and then didn't produce it. And now, two months later, makes an argument that I have somehow waived the right to designate a sales representative.

Those are the facts.

SPECIAL MASTER BROWN: Okay. And this is Orran Brown again.

As we stand here today going forward in other cases, is AstraZeneca applying this type of information in Excel format, and is it complying, you think, in other cases, with the CMO 4 duty to provide all the information including the IMS information?

MR. CANTY: I'm aware of no case in which AstraZeneca has provided the information ordered by CMO 4.

IMS data is entirely incomplete. IMS data, it's clear from deposition testimony, and, I guess, the comment at the July 27 hearing, that available IMS data includes new prescriptions, total prescriptions for Seroquel and for its competitors.

At this point AstraZeneca has not provided that information in any case to my knowledge, nor has AstraZeneca in any case provided that information in electronic format as ordered on August 3.

I am aware of no case, mine or others, in which

Aiken & Welch Court Reporters  Conference  10/15/07

## Page 21

1  AstraZeneca has produced an accounts payable record.
2      SPECIAL MASTER BROWN: Okay. And I understand
3  that, Dennis. Again, this is Orran Brown.
4      Let me ask you, for the IMS data which deals
5  with prescribing behavior, right?
6      MR. CANTY: Correct.
7      SPECIAL MASTER BROWN: And the accounts payable
8  show payments by the company to physicians for speakers
9  bureau or engagements or other things, and I'm not
10 saying that it's not important, but, without giving
11 away any of your strategic secrets, how do you use the
12 IMS data or the accounts payable data, assuming you
13 have it, to help you select which sales representative
14 you think would be the one you need the most,
15 recognizing you can only do one and you need to pick
16 one.
17     MR. CANTY: Again, if IMS data indicates that
18 there was a spike in Seroquel prescriptions at a
19 particular time, obviously, I'm going to want to know
20 when that was and I'm going to want to know who was
21 seeing that doctor at the time that spike occurred.
22     If accounts payable data indicate that the
23 doctor began speaking about Seroquel, I would want to
24 know that. I would want to know who was seeing that
25 doctor during that time frame and what messages were

## Page 22

1  being delivered.
2      Now all of that would aid me in deciding who
3  was the best sales rep -- I only get one at this
4  point -- who the best sales rep is to take.
5      And whether or not that's going to help me
6  decide to pick a sales rep, that's getting far afield
7  at this point. CMO 4 ordered it. There's no question
8  as to whether that information helps me select a sales
9  rep; it's been ordered.
10     SPECIAL MASTER BROWN: I understand. All
11 right.
12     So, back to you, Russell, for maybe the last
13 comment before we move on.
14     MR. STEWART: We have provided AP information
15 for all of the physicians and we provided IMS data back
16 in March 1999 that we have, that AZ has in its
17 possession.
18     You know, Mr. Canty says that IMS is required
19 to be produced in Excel form. I am trying to find the
20 order here. I believe it just says that call notes
21 electronic form. We would be happy to provide --
22 actually my letter to him said the IMS information is
23 really only on two pages or so. It doesn't do you much
24 good to put it on Excel format or something like that.
25 But if you really want it that way, we'd do it for him,

## Page 23

1  and I frankly didn't hear back from him, so I don't
2  know that that's an issue.
3      We have provided all IMS information, all AP
4  information that is available to the company and we're
5  doing that now.
6      So I think that is the point.
7      My concern is that under Mr. Canty's view here,
8  is that these are never complete and there's never any
9  limit on when we can -- when sales reps can be
10 designated because under his view, none of the
11 disclosures are complete. They'll never be complete
12 and so he has no obligation to disclose them within the
13 two days.
14     That harkens back to one of my concerns and my
15 interests here is that we have a rule and we kind of
16 understand how this works so that we can complete what
17 the court has ordered us to do in cases of specific
18 discovery under the time lines and schedule the court
19 expects us to complete this.
20     MS. MARTINES: This is Buffy Martines.
21     May I say a couple of words on behalf all of
22 plaintiffs?
23     First of all, with regard to what the CMS says
24 regarding the production of electronic discovery, I
25 have it right here in front of me, and it states, and

## Page 24

1  I'm just going to read it, "As to case-specific
2  discovery from defendant set forth in CMO 4, defendant
3  shall provide the call notes for the prescribing
4  physicians associated with that plaintiff in readily
5  accessible electronic form. To the extent account
6  payable records, IMS, prescribing habits and the PIR
7  information for prescribing physician associated with
8  that plaintiff are available in electronic form,
9  defendant shall provide those in readily accessible
10 electronic form."
11     I just want to make a couple of comments on
12 behalf of all plaintiffs, because I'm a little
13 concerned about a few statements that have been made,
14 and I'm very concerned with the situation described in
15 Russell's letter last week.
16     We have, in fact, discovered that all accounts
17 payable information was not provided at first, that
18 there is a problem with the searches in the databases
19 and that's going to have to be taken up on a different
20 level.
21     But I believe Dennis is correct that the court
22 ordered this information and we've been through this
23 on -- in different issues, and the special master has
24 taken a look at this.
25     The court said this is the information that the

## 25

1  plaintiffs are entitled to in order to make this
2  selection and it specifically said that in a
3  transcript.
4      So I think that I understand AZ's position that
5  call notes really should be enough, but I don't think
6  AZ gets to make that decision.  I think the court made
7  the decision and, to be honest, it's a little like the
8  chicken guarding the henhouse when the wolf -- whatever
9  the heck that saying is -- when the person that's
10 required to produce the information gets to say what
11 information is enough for plaintiffs to make a
12 decision.
13     I think the order is clear, and on the whole we
14 have a lot of -- plaintiffs in general have a lot of
15 problems with this disclosure, not the least of which
16 we've discovered that the accounts payable information
17 that's produced is not correct, and at this point I
18 don't have any way of knowing other than Russell's good
19 word which I have no reason to disagree with that it's
20 corrected now.
21     So, I just wanted to make sure that that was
22 clear and that plaintiffs had not waived, because we do
23 have a lot of concerns with the disclosures that are
24 being made at this point and that's going to come up at
25 a later time.

## 26

1      But I wanted everyone to be clear on what this
2  order did say, and my thoughts on what the Court's
3  order means.
4      Thank you.
5      SPECIAL MASTER BROWN:  Thank you both.  You're
6  reading from a July 12, 2007 order?
7      MS. MARTINES:  That is correct -- no, no, I'm
8  sorry, Russell -- I'm sorry, Orran this is the August
9  3, 2007 order.
10     SPECIAL MASTER BROWN:  Yes, I have it.  It's
11 document 348.
12     MS. MARTINES: I was reading from Section 3 on
13 page 2.
14     SPECIAL MASTER BROWN:  I have it.
15     Let's do this.  Let me say this first, Russell,
16 and then I have one last question for you and then
17 we'll move on.
18     We obviously have today's problem which are
19 these four cases and there may be two others that we
20 haven't addressed that have this question of late or
21 potentially late PSS designations.
22     Then we have tomorrow's problem which is going
23 forward and making sure that we're all doing what we're
24 supposed to do to tender plaintiffs for depositions and
25 schedule them and these CMO 4 contact information

## 27

1  disclosures, that they're done in a way that everybody
2  agrees they're supposed to be done, and that they're
3  done timely and then we don't have continuing questions
4  about timeliness of PSS designations relative to when
5  there were supplemental disclosures.
6      So that's a large problem for today and going
7  forward for these four cases that Dennis has, and I
8  understand fully, Russell, your point about how we're
9  on a schedule, we're trying to meet the court's
10 schedule, a lot of people all around the table working
11 very hard to keep it on schedule and that anything that
12 goes off schedule is a disruption that has potential
13 ripple effects, and it causes hardship or
14 readjustments, and on and on for schedules of all the
15 lawyers and other depositions that are scheduled.
16     So, if we add four to the plate that we have to
17 deal with, that is always a problem.
18     But is there any particular prejudice to
19 AstraZeneca for having these four beyond this -- the
20 need obviously to do them and the rearranging and
21 having people cover them?
22     Is there anything unique about these four that
23 causes any particular heartburn?
24     MR. STEWART:  No.  These are not unique.
25 They're similar to all the rest.  Although I will say

## 28

1  given the timing on this, we would need some additional
2  time obviously to contact these and get them scheduled.
3      We would need some leeway in doing that, and I
4  think also we'd need some kind of resolution or leeway
5  on getting timely plaintiffs designation from the
6  plaintiffs.  That would help us as well so that we can
7  in the future move on with this and so we can have
8  discussion about having the plaintiffs taken before the
9  sales reps for the purposes we've discussed.
10     SPECIAL MASTER BROWN:  All right.  Because what
11 I would like to do is solve this problem once and for
12 all for all time to the best of our abilities and that
13 means that we have to deal with the four cases, or the
14 seven cases, and as I said, the last time, very
15 tentative at this stage myself, while we're
16 transitioning to the PMO, while we're all trying to
17 figure out what CMO 4 does and make sure it's complied
18 with and get our feet under us for making that work
19 like clockwork like it's supposed to, that prejudice to
20 the plaintiffs of not being able to depose a particular
21 PSS for a particular case probably outweighs the
22 prejudice to the system and to AstraZeneca from having
23 to go for these four depositions.
24     That's where I come out on the four or even the
25 seven.  Because there is plenty to debate about what

## Page 29

was going on and who was doing it and the timeliness of it and the format.

It got us to this point, and I'm tempted to say let's take care of what got us to this point by doing these and getting them out of the way on an orderly schedule rather than ruling at this stage that the timeliness was such that they cannot be deposed at all.

But that only solves part of the problem. We have to get to the point where we all know what's happening on these disclosures and when they're happening, and in what format they're supposed to happen, so that we remove any debate about when the PSS designations are due, and we have to make sure that the order of discovery that we are trying to follow, which does have the plaintiffs deposed in the earlier part of the month, and in general, in front of the physicians and sales representatives, that those plaintiff depositions are arranged from month to month so that they happen in that due order. Sometimes it's impossible for various reasons, but that ought to be the goal every month.

And so we do want to have going forward the commitment and understanding that the plaintiffs' depositions will be tendered up in the early parts of each month for that particular month, and that

## Page 30

everybody will work hard to get them scheduled. I'm not saying that anybody hasn't. I'm just saying that's the way it needs to be from here out to take care of that issue.

On the other issue about CMO 4 contact disclosures and whether they're complete and whether the two business days have started to run, we've got to do one of two things.

We've either got to make sure that we understand what is being disclosed all at one time and in a format that everybody finds acceptable and that Russell and his folks have done everything that they need to do to get that stuff out there in -- within the five business days, so that the two days are running, or we have to say that there's still some holes in that that we're trying to fix, and we cannot fix today, because the accounts payable information is still -- you're still trying to work through all that, Russell, or whatever.

And we have to say the plaintiffs have to designate their sales representative within two business days, even if they still feel like there's something missing, unless what's missing is really substantial and material to making that choice.

And I understand that's difficult, would be

## Page 31

difficult to apply.

So what we really need to do is get on the playing field where these disclosures are made, they're made once, unless something completely out of your control happens, and the two days is running and we can all tell when they start to run. Because if we don't solve that problem we're just going to have this over and over and over.

And, unless, Russell, you're in a position to discuss some agreements that these four will go forward or these seven will go forward and we'll get these under our belt and behind us, then that would be my ruling on it and another report and recommendation that these four that we're talking about today will be treated like the Haas case, that they will be considered to be in this transition period, and there are arguments on both sides of the table that are very legitimate about how things happen and when they happen, but that the prejudice of not doing them is going to outweigh the prejudice of doing them at this stage, provided we can fix the problem going forward.

And that's a problem that we can talk more about today. And I guess the issue then for you, Russell, is whether you're in a position to be able to say that the main three components of these disclosures

## Page 32

that you have to provide being the call notes, this prescribing behavior information, the IMS -- IMS data that people call it, and the accounts payable records, are you all -- you and all of us then in a position where you can get your hands on that information generally, in time to produce it within the five business days, all three of those pieces, and, once we get past that point, is it -- what form is it in? Is it in live Excel, and it does seem like the court wants the call notes to be in accessible electronic form, and the other information to be in electronic form to the extent it's already in electronic form is the way the order reads.

MR. STEWART: Would you like me to respond, Orran?

SPECIAL MASTER BROWN: Yes.

Can you tell me where you are on that and how comfortable you are with being be able to say we can get our hands on all of it and it's all going to be within the five business days?

MR. STEWART: This is Russell Stewart again. Right now our disclosures, the ones we just finished for November are complete. They have the complete accounts payable records information that we have, and for these doctors.

**Page 33**

It has the complete IMS and it has the complete PIRs which are the physician information requests to the extent we have them in the company. And the call notes are being produced in Excel form as we've talked and also in paper form.

Frankly, a little bit of this is surprising me because I haven't heard this, some of these issues that are talking about with the AP records and IMS.

If there are problems with that, I do want to know what those are so we can sit down and we can bring that up probably on another call to see exactly what it is the plaintiffs are unhappy with or want us to look at because I haven't heard that.

I haven't heard complaints from any of the plaintiffs about, recently, about the disclosures we're making.

MS. MARTINES: Well, now, Russell that's not true.

MR. STEWART: Once you brought to us an issue of this is a problem, we've tried our best to remedy it, you know, to get on it and fix it as fast as we can.

So, we, you know, in our view, we pride ourselves in being responsive to issues of plaintiffs.

There was another issue, for example, Orran, of

**Page 34**

some of the call notes not containing the entire verbiage, were being truncated. And as soon as we learned that, we fixed it and filed supplemental call notes.

Early on in this case, the call notes were produced in a way that was very difficult to read, and we corrected that. But it has to be a give and take between plaintiffs and defendants in talking about it and meeting and conferring about what it is that's going on.

But right now, in our view, the record disclosures we are doing are complete. So but if there's a view that's not true, I suppose it's something we should take up and plaintiffs should state their position and we should talk about it at the next call.

Is that -- is that responsive to your question, Orran?

SPECIAL MASTER BROWN: Yes, it is. And this is Orran Brown again.

This is what I would like to do, and unless, Russell, you can say we agree to take these four and be done with it, then I will issue a report and recommendation that says these four depositions of these PSSs will be scheduled and you said you needed

**Page 35**

time to find them and all that. We will -- certainly, obviously, you have to do that.

MR. STEWART: Actually, Orran, I may be able to relieve you of that obligation to do a report. I mean we can do it either way.

I think given your sense of how you like us to do this, as long as we can have some issue of timing with these plaintiffs and also some resolution of the, you know, the timing to do these PSSs and get them scheduled and also some discussion of what you mentioned, which is getting the plaintiffs first and getting the schedule so that the plaintiffs happen first and we know whether the plaintiffs are proceeding before the PSSs are deposed.

That would be, you know, very helpful. And, I'm not sure that you actually need a report and recommendation unless you want to because we're prepared to proceed on that.

SPECIAL MASTER BROWN: All right. Then how long do you think, Russell, to set up these four?

MR. STEWART: We haven't talked to them so we'd need --

MS. MARTINES: Can I ask a question.

Are we going to go ahead and include the -- (inaudible).

**Page 36**

Buffy Martines. My question to Orran and Russell is are we going to go ahead and include the Haas, H-a-a-s, case from Ashley Cranford's office with this four, or is the Special Master's office going to issue a report on that case?

SPECIAL MASTER BROWN: Russell, that's really up to you because now it comes down to whether you can agree that these five will be done and go ahead and schedule because if I do issue a report, which is fine if I do, then I would have the same -- it will have the same content that we're going to go ahead and do the deposition of the PSS and Ashley Cranford's case as well.

MS. MARTINES: I just wanted to make sure that one didn't get lost in the shuffle.

MR. STEWART: Would your report and recommendation also address the other issues, Orran, about the timing and deadlines?

SPECIAL MASTER BROWN: If need be.

But let me tell everybody what it would say, and that is, we are -- unless there's some extraordinary circumstances, we are following the order of discovery that has the plaintiffs in a given month that are designated for a month made available and tendered for deposition in the first half of the month,

**37**

and, as a general rule, before we schedule the PSS and physician depositions.

It's not 100 percent the rule because circumstances make one or the other impossible to schedule on that schedule. But that is the general rule and what everybody should be working towards on both sides of the table.

The second piece is is that going forward with AZ making disclosures under CMO 4, contact information, and making the call notes available in live Excel format, and making the other information available in electronic format if it exists that way, as the order requires, then the PSS designations are due within two business days of those disclosures, the initial disclosures, unless Dennis, you, or Buffy, or any of your colleagues, see a problem that you point out to Russell and to me within that two business days, that is somehow keeping you from making your designation, because going forward, they either have to be made within two business days, or you have to raise it as an issue that you feel that those particular disclosures are incomplete and we deal with it on the ground within that two-day period, assuming that -- I think in most instances we'll be able to do that so that we don't have it lingering or festering or growing as we get

**38**

further and further away from the time that the cases were supposed to be discovered.

So that's what -- if I issue anything on this issue, it's going to try to be global in the sense that we will take these five depositions, and we haven't addressed the specifics of the other two, but, unless there's something really different about them, that's where I come out on that, too, as transition issues, get them done, they should be done because the prejudice of not doing them to the plaintiffs outweighs the schedule and inconvenience and cost to the system and to the defendants from having to do them, but going forward it's not going to happen again, and we're going to deal with plaintiffs being scheduled first unless we all figure out that we can't, and PSS designations being made within two business days of whatever initial disclosures you get unless you -- whoever gets them feels that they're inadequate and then it raises a question within those two business days to the defendants, to Buffy and to me, that we take up contemporaneously so that we don't have this issue coming up every month.

MR. STEWART: This is Russell Stewart. I think you probably just made your -- all we need as the parties here. In addition to the proviso

**39**

that we will have some extra time, probably 60 days to schedule these particular four, or --

SPECIAL MASTER BROWN: Let's say the particular five.

MS. MARTINES: And if we're trying to settle all of this now, I will concede and Russell may note some facts on Olive and Sonier. I mean if we're going to try to clean all this up now, I mean I'm sure Russell is going to disagree with me but why don't we clean up these last two as well.

MR. STEWART: I'm tempted to, Buffy, but I haven't heard whether they really want to take them now. Literally I've heard nothing.

MS. MARTINES: Can we assume they do and if they don't, that's just two less to schedule.

I can confirm that they want to do them.

But can we have an agreement right now that if the plaintiffs want to move forward on those two it can be done?

MR. STEWART: I assume Orran has indicated his ruling would be the same on the others as well.

MS. MARTINES: Right. I just wanted to make sure. We're sure on 4 and 5. If we can finish this today and get to all seven and call it a day, that would be, I think that would get us down the road.

**40**

SPECIAL MASTER BROWN: That's what we should do.

Russell, are you okay with that?

MR. STEWART: Sure. As long as we get our extra time, one, as long as we talked about the issue you mentioned of the scheduling order, that's fine.

SPECIAL MASTER BROWN: All right. Now, 60 days to set these seven PSS depositions. Is that what you feel like you need?

MR. STEWART: I think given that they're on top of the rest of our depositions that would be helpful to us for our scheduling purposes.

SPECIAL MASTER BROWN: Does anybody object to that?

MS. MARTINES: I don't.

Dennis, are you okay with that?

MR. CANTY: At this point, it seems that AstraZeneca has not yet contacted the four sales representatives designated in September, and I don't think that at this point -- I think the sales representatives' depositions were late when they were noticed in October, but if we really are going to take another 60 days, there's nothing they can do about it.

SPECIAL MASTER BROWN: All right. Then let's do this.

41

1  Russell, I know you'll do this anyway. But
2  let's get them done. As soon as we can, if you can
3  contact them and try to arrange them and get them fit
4  in as soon as your best efforts will allow.
5  MR. STEWART: We will.
6  SPECIAL MASTER BROWN: But no later than 60
7  days from today. Okay? And try to beat that if you
8  can, but, no later than 60 days from today.
9  MR. STEWART: Okay.
10  SPECIAL MASTER BROWN: All right. On the
11  second two pieces of this puzzle, and that is,
12  plaintiffs being set first part of the month, the two
13  days for disclosures, unless somebody raises a flag and
14  says there's a problem that's keeping me from
15  designating the PSS, those two pieces of trying to
16  solve the problem going forward, does anyone have any
17  questions or comments about that?
18  MR. CANTY: This is Dennis Canty.
19  I'm not sure I quite understand the
20  plaintiffs-in-the-first-part-of-the-month theory.
21  Can someone just make sure they explain that to
22  me again so I can follow it?
23  SPECIAL MASTER BROWN: This is Orran Brown.
24  Let me, Dennis, tell you why that seems to be
25  appropriate to me.

Aiken & Welch Court Reporters  Conference  10/15/07

42

1  One is just from a logistical issue. We have
2  often found it very difficult to get the doctors in the
3  first part of the month by when we're calling them so
4  they kind of fall in later parts of the month anyway.
5  That should become less and less of an issue as
6  we move towards designating 60 days in advance and
7  we're talking to doctors sooner.
8  So there's one logistical issue that the PMO
9  has seen at least in when we set the physicians. And
10  the plaintiffs are people that you have control over
11  and you can generally make them or have them appear
12  whenever, the doctors are third parties and we can't do
13  anything about it, so we've been working deeper into
14  the month because it's further away.
15  Second issue is is that from a sort of process
16  standpoint, it to me generally is more efficient if the
17  plaintiffs are done in advance of the physicians,
18  because it seems that you often learn things at a
19  physician deposition that can -- that may make a
20  difference as to who the real treater is you want, or
21  who, sometimes the prescriber is who you want, and it
22  can alter the physician who's eventually deposed for
23  that case.
24  Plus there have been for lots of reasons, some
25  of them very good ones, instances where the plaintiffs

Aiken & Welch Court Reporters  Conference  10/15/07

43

1  fail to appear for their depositions. And in some
2  cases those cases go away, and that eliminates the need
3  to spend the time and money to depose any physicians or
4  PSS at all.
5  So, trying to meet the goal of having
6  plaintiffs first is really trying to serve those
7  procedural, sort of efficiency concerns.
8  MR. CANTY: Can I address that?
9  SPECIAL MASTER BROWN: Sure.
10  MR. CANTY: No. 1, no matter what anybody said
11  about plaintiffs not showing up for depositions, at
12  this -- no one has ever shown up for a plaintiff
13  deposition for this firm where that's happened. So
14  that's -- I don't know what's going on with anybody
15  else. If there's a scheduling problem we let you know
16  about it ahead of time.
17  With respect to plaintiffs being taken first.
18  At this point, and again, the procedure with my firm
19  may differ because I don't know what's going on if --
20  if the Bailey firm is producing their plaintiffs in
21  Texas, that's what's going on, but we don't do that.
22  We fly out.
23  So at this point, you know, from a -- from a
24  travel, attorney travel and attorney time perspective,
25  probably on both sides, it doesn't make any sense to

Aiken & Welch Court Reporters  Conference  10/15/07

44

1  have plaintiffs in the first half of the month and then
2  make another trip out for doctors in the second half.
3  From the process standpoint, taking the
4  plaintiffs in advance, whether -- no matter what you
5  learn at a plaintiff's deposition, it can't possibly
6  alter your choice for prescriber because he designated
7  a prescriber at the beginning five days from the
8  designation of the plaintiff when you produce the call
9  notes.
10  Now, with respect to the, whether it alters the
11  choice of treater, why should -- why shouldn't we be
12  designating treaters at the same time.
13  At this point, we have -- I guess AstraZeneca
14  gets it for 30 or 60 days depending on this new
15  schedule he develops, gets to review records of the
16  treater, prepare for the treater's deposition, and then
17  give us, what, ten, 15 days notice of a treater
18  deposition when they've had all this other time to
19  prepare?
20  Why are we not designating treaters at the same
21  time we're designating prescribers?
22  Why should a plaintiff's deposition going
23  forward and testimony learned at a plaintiff deposition
24  thereby affect AstraZeneca's choice of treater?
25  SPECIAL MASTER BROWN: Dennis, I understand all

Aiken & Welch Court Reporters  Conference  10/15/07

Page 45

those points. They're all very good questions and very good points, and if there are instances to achieve consolidation of travel, then, yes, the parties should be trying to do that, and, yes, we try to do that if plaintiff is going to be deposed and you're flying out to that particular location and the physician is there. We all should make an effort to try to coordinate those so that they're done together.

And I hope the parties are doing that. So far it's been difficult to make that happen because we've been operating on a compressed schedule and trying to get them done in a month regardless of whether we are achieving sort of travel efficiencies or not.

So far, the designation of treaters has lagged some behind prescribers because it requires the defendants to go through more documents to try to pick which one of the treaters is the best one to depose. And so far we're working within that. It does happen fairly quickly but it's not done the same time as a prescriber which is a more obvious choice.

But I understand all your points and what we can do is just try to monitor it as we go forward, try to hit this question about doing them in that sequence, because that's what I think is the most efficient way to do it so far.

Page 46

But do try to work together to set dates if you can so that if you're flying out, you can do it in one trip. That's always a good thing to do.

I don't think we have to make any more precise arguments or ruling on that beyond today except to say that for now, that is what we are trying to do, is do plaintiffs and then do physicians and sales reps. And for the most part, that seems to be working, and we're going to keep trying to do that unless circumstances that you see, or somebody sees, change or tell us from experience that that's not working and we need to alter it.

MS. MARTINES: Orran, this is Buffy Martines.

Orran, I think I was just glancing at the November plaintiffs to see if I'm right. The majority of the plaintiffs in the month of November is a good example. There are only two plaintiffs that don't belong to the Bailey firm for the month of November. I guess that's just our good fortune.

But Dennis is correct. We have chosen to do this method of bringing the plaintiffs to Houston because it is based on the volume that we do it, just works better for everyone.

And we have been consistently front-loading the plaintiffs at the beginning of the month, and I

Page 47

believe, and Russell and Dennis may correct me if I'm wrong, that they have been kind of going along on an ad hoc basis, and as these doctors get scheduled, trying to front-load the plaintiffs on the beginning of that trip.

For example, if you've got the doctor on a Thursday, even a Friday, then try to put the plaintiff on the Wednesday and achieve Russell's goal of putting the plaintiffs first and Dennis's goal of compressing down the travel to be more cost-effective.

And given the fact that Dennis's firm and some of these others who -- and I don't think that any of the other plaintiffs' firms have raised this issue, it's generally one or two plaintiffs a month at best, maybe we can just kind of continue on and say as a general rule, as you suggested, that we're going to front-load the plaintiffs at the beginning of the month, and then the folks that have one or two plaintiffs, such as the Gornick firm, can continue to work with Russell and see if they can't work out something that meets everyone's needs.

SPECIAL MASTER BROWN: All right. Thank you, Buffy.

That's what I would like to do, and Dennis, would like for you to try to make that happen, and if

Page 48

at any time you feel that there's a problem or you're not getting cooperation, or you'd like to combine people on the trip and you're not getting that done, and you want to raise it, then all you have to do is let me know and we'll get together again and we'll deal with it and I think resolve it. Just send me an e-mail or a letter or fax.

MR. CANTY: I certainly hope that won't be necessary.

So far, you know, we've been able to -- we've been able to coordinate trips where necessary, and be respectful of each other and each other's time so it's been good with respect to scheduling.

Do we have a dispute as to Naramore, Russell? Do we need to take this up next? This is probably a good segue way.

MR. STEWART: Yes. Naramore is the issue. This case is one that we have -- this is one on the list of Dennis's October 4th letter.

Allison Henderson is a PSS, and this came up because we offered a date for Allison Henderson and we had scheduled the plaintiff before that, but then Mr. Canty then changed his schedule for the plaintiffs until after the PSS deposition. So.

MR. CANTY: That's incorrect.

Aiken & Welch Court Reporters  Conference  10/15/07

## Page 49

1  MR. STEWART: No? Okay.
2  MR. CANTY: At this point, you chose a date for
3  the sales representative. Then you later fail to make
4  her available on that date and, as a result, the
5  deposition of the sales rep was moved to the week
6  following the Thanksgiving holiday.
7  As a result, the plaintiff's deposition for
8  convenience of the parties, also needed to be moved,
9  and I would recommend that since we have the time that
10  we try and move the physician as well.
11  That issue aside, at this point, you have the
12  sales rep schedule for mid-week. I have -- I'm able to
13  produce the plaintiff on the 30th, which is the Friday,
14  and for some reason, you need to make sure that the
15  plaintiff goes first.
16  And I would like you to explain to us why that
17  has to be, and why we can't just schedule the
18  depositions conveniently for all.
19  MR. STEWART: This is Russell Stewart again.
20  Let me address something that Mr. Canty said.
21  One example of a case in which, one of his cases that
22  is not going forward is the Tracy Flye case in Indiana.
23  And that was one where a PSS schedule but
24  luckily after the plaintiff and that case didn't go
25  forward. And when Tracy Flye was cancelled and that

## Page 50

1  case was not to proceed, then the PSS didn't proceed.
2  So that -- and it has happened in one of the Gornick
3  cases.
4  But that's our concern because it's not only
5  just the time of deposing this PSS, but also preparing
6  and meeting with this PSS and taking them out of their
7  work schedule in order to talk to them, and then also
8  the day of the deposition is time they're away from
9  their work and they have limited -- limiting schedules.
10  MR. CANTY: I'm sorry, Russell, before we go
11  any farther with that, I just would like to remind the
12  court that, you know, you should take a look at my
13  initial letter to Russell in August.
14  The disclosures for Tracy Flye did not even
15  identify a sales rep. It is impossible that a sales
16  rep was designated and set for deposition. Absolutely
17  impossible.
18  MR. STEWART: I would agree with you on that
19  one. But Tracy Flye is one of your cases that didn't
20  proceed, right?
21  MR. CANTY: And I informed you of that, so
22  there was absolutely -- before you provided them
23  adequate disclosure.
24  SPECIAL MASTER BROWN: Let's do this. Which
25  case is currently presenting the problem? You called

## Page 51

1  it Naramore?
2  MR. CANTY: Correct.
3  SPECIAL MASTER BROWN: Is that plaintiff's
4  schedule?
5  MR. CANTY: I can make the plaintiff available
6  on November 30. He can make the sales representative
7  available on Wednesday the 28th? Correct?
8  MR. STEWART: We've offered the 28th and
9  they've offered the plaintiff for two days after.
10  SPECIAL MASTER BROWN: And are the physicians
11  in that case scheduled, Russell?
12  MR. STEWART: No. I think it's one of the
13  cases they were, but I think we've agreed if we're
14  going to move these back, we didn't have some of the
15  records and so we also agreed to move both of these and
16  see if we couldn't schedule them together to make one
17  trip.
18  SPECIAL MASTER BROWN: All right. Is the PSS
19  and the plaintiff, are they located in the same city?
20  MR. CANTY: Correct. Same geographic area.
21  SPECIAL MASTER BROWN: And so, you're trying to
22  do them in one trip, and where is it?
23  MR. CANTY: Somewhere in the vicinity of
24  Atlanta.
25  SPECIAL MASTER BROWN: All right. And PSS on

## Page 52

1  the 28th, plaintiff on the 30th.
2  And Dennis, is there a way that the plaintiff
3  could be done before the 28th?
4  MR. CANTY: Before the 28th? It isn't
5  possible. With her travel schedule and ours it is not
6  possible.
7  Basically what -- we were pushing against the
8  holiday weekend, right there is the idea.
9  SPECIAL MASTER BROWN: If the plaintiff is not
10  done until the 30th, that's a Friday.
11  MR. STEWART: This is Russell Stewart again.
12  We're willing to take the plaintiff any time in
13  October. And that's certainly our preference and
14  consistent with what makes most logistic sense in these
15  cases.
16  SPECIAL MASTER BROWN: Dennis, are you sending
17  or are you coming from -- are you sending someone from
18  San Francisco to the Atlanta area for this deposition?
19  MR. CANTY: That is correct.
20  SPECIAL MASTER BROWN: And, are we, Dennis, are
21  you certain that this case is going forward, and the
22  plaintiff will appear and will be deposed on the 30th?
23  MR. CANTY: We wouldn't be here discussing it
24  if the plaintiff wasn't going to appear.
25  SPECIAL MASTER BROWN: All right. Then we are

Page 53

1    down to whether we have one trip or two. And generally
2    one trip is better than two. If this --
3         MR. CANTY: Mr. Brown, I'm sorry, at this
4    point, we don't have treater and prescriber scheduled,
5    I don't think, in that case. So, there are more trips
6    that are going to need to be made in that case.
7         MR. STEWART: I think the idea is that we're
8    trying -- the prescriber is Mathews, the treater is
9    Blomert?
10        MR. CANTY: I wouldn't know. You guys haven't
11   told me that you're taking the treater. For some
12   reason you're not obligated to do that.
13        MR. STEWART: This is Russell Stewart.
14        May I address that, too, because, in fact, we
15   are providing the names of treaters we're deposing to
16   the PMO, Mr. Canty, when we do that.
17        To the extent they're listed on the plaintiff's
18   facts statement we are providing treater information
19   and prescriber information.
20        And it's also true that it does -- our
21   experience has been that those names do change as we
22   learn more about the case, particularly deposing the
23   plaintiff, that we do change prescribers. And when we
24   do that, we also do change treaters. It just happens.
25   It's the nature of the process.

Aiken & Welch Court Reporters  Conference  10/15/07

Page 54

1         There are sometimes that the plaintiffs' facts
2    statements don't contain the names of treaters and then
3    we go to the plaintiffs to ask them to designate or to
4    help us with that and find one.
5         SPECIAL MASTER BROWN: And what's the
6    prescribers last name in that one?
7         MR. STEWART: I have it down as Matthews.
8         SPECIAL MASTER BROWN: And the treater is.
9         MR. STEWART: B-l-o-m-e-r-t.
10        SPECIAL MASTER BROWN: The most we can do on
11   this today is this. Let's say that the plaintiff is
12   tentatively scheduled for November 30 and the PSS is
13   tentatively scheduled for November 28, and we are going
14   to see if we can schedule the doctors for the same
15   week, to have all this done in one trip.
16        If the plaintiff does not appear at her
17   deposition on the 30th, I'm not saying she's not, if
18   she doesn't appear on the 30th, or if she, in that
19   testimony, reveals other physician names that would
20   have been better, deponents will take up at that time
21   whether there should be any remedy for that because
22   that's what we're concerned about.
23        I would like to do them all in one trip as I'm
24   sure you would. If that's possible, that's what we'll
25   do. But if it falls apart on the 30th because the

Aiken & Welch Court Reporters  Conference  10/15/07

Page 55

1    plaintiff doesn't show or identifies other physicians
2    that really need to be deposed, we'll take up then what
3    the consequences of that are.
4         We're going to try here to schedule Mathews and
5    Blomert for that week. I assume they're both in the
6    Atlanta area, too.
7         Okay?
8         MR. CANTY: Thank you very much, Mr. Brown.
9         SPECIAL MASTER BROWN: Thank you for your time
10   today, Dennis, and glad to have you and please join us
11   any time.
12        MR. STEWART: Before Dennis leaves, I do think,
13   I guess given the discussions here, I'm just -- as
14   we've been talking, I've been thinking about the pros
15   and cons about a report and recommendation.
16        Maybe it would be appropriate for you to issue
17   one, knowing that we are going to produce these, but
18   just to say what the ruling is and what the dispute is.
19        Would there be an objection to that?
20        MS. MARTINES: I don't have a problem with that.
21        MR. STEWART: I just think we've been talking
22   about a lot of issues. It would be nice to have them
23   in a written form.
24        SPECIAL MASTER BROWN: I would be happy to lay
25   that out and maybe it will be helpful to all of us

Aiken & Welch Court Reporters  Conference  10/15/07

Page 56

1    going forward.
2         MR. STEWART: I think so.
3         SPECIAL MASTER BROWN: So that takes care of, I
4    think, all of your issues today Dennis, you think?
5         MR. CANTY: Yeah. I think you guys can be rid
6    of me, what do you think, Buffy?
7         MS. MARTINES: That will be fine. Thank you
8    for helping out on your stuff. I appreciate it.
9         MR. CANTY: Thank you for putting me up with
10   me, Buffy.
11        So, Ms. Langley.
12        SPECIAL MASTER BROWN: Off the record.
13
14        (Whereupon, the proceedings
15        were concluded at 11:16 a.m.)

Aiken & Welch Court Reporters  Conference  10/15/07

```
                                                            57
 1   STATE OF CALIFORNIA    )
 2                          )
 3   COUNTY OF ALAMEDA      )
 4
 5        I, EARLY K. LANGLEY, do hereby certify:
 6        That foregoing proceedings were held in the
 7   above-entitled action at the time and place therein
 8   specified;
 9        That said proceedings were taken before me at said
10   time and place, and was taken down in shorthand by me,
11   a Certified Shorthand Reporter of the State of
12   California, and was thereafter transcribed into
13   typewriting, and that the foregoing transcript
14   constitutes a full, true and correct report of said
15   proceedings that took place;
16        IN WITNESS WHEREOF, I have hereunder subscribed my
17   hand this 15th day of October 2007.
18
19
20
21
22   _____
23   EARLY K. LANGLEY, CSR No. 3537
     State of California
24
25
```