# EXHIBIT G

1

1    07-E-93142

2
                    UNITED STATES DISTRICT COURT
3                    MIDDLE DISTRICT OF FLORIDA
                          ORLANDO DIVISION
4

5    IN RE:  Seroquel Products Liability Litigation

6    MDL DOCKET NO. 1769

7

8    This Document Relates to 6:07-cv-15736

9

10   **************************************************************

11                      ORAL DEPOSITION OF

12                   CHRISTINE M. HERNANDEZ

13                      August 15, 2007

14                         Volume 1

15   **************************************************************

16           ORAL DEPOSITION of CHRISTINE M. HERNANDEZ, produced

17   as a witness at the instance of the Defendants, AstraZeneca

18   Pharmaceutical LP and AstraZeneca LP, and duly sworn, was taken

19   in the above-styled and numbered cause on the 15th of August,

20   2007, from 10:01 a.m. to 5:05 p.m., before Shanon M. Hair, CSR

21   in and for the State of Texas, reported by machine shorthand,

22   at the law offices of Bailey Perrin Bailey LLP, 440 Louisiana

23   Street, Suite 2100, Houston, Texas  77002, pursuant to the

24   Federal Rules of Civil procedure and the provisions stated on

25   the record or attached hereto.

12

1  so my answer would be two different questions because I keep a

2  calendar and I keep a log of everything else.

3      Q.   Let me -- if you don't understand my question, ask me

4  to stop and I'll rephrase it.  I don't want you to be confused.

5      A.   Okay.

6      Q.   So, you keep a calendar that lists all of your

7  doctors appointments, correct?

8      A.   Yes.

9      Q.   And that covers the time period from 1989 to present?

10     A.   Yes.

11     Q.   And that would include doctors that you saw for any

12 of your psychiatric conditions?

13     A.   All.

14     Q.   All doctors?

15     A.   Yes.

16     Q.   Do you keep another calendar or document that lists

17 all the medications you've taken?

18     A.   Yes, I do, sir.

19     Q.   Is it in the same calendar or different calendar?

20     A.   It's a different calendar.  I wouldn't call it a

21 calendar.  That's why I'm saying -- I have logs.

22     Q.   Okay.  So, do you have a log of all the medication

23 you've taken?

24     A.   Yes, sir.

25     Q.   How far back does that logbook go?

13

1      A.   1989.

2      Q.   All right.  So, we have the calendar with the

3   doctors -- all the appointments from 1989 to present, correct?

4      A.   Uh-huh.

5      Q.   And we have the log from -- listing all the

6   medications you've taken from '89 to present, correct?

7      A.   Yes.

8      Q.   Are there any other logs or diaries you keep that

9   would track medications or doctor visits?

10     A.   I keep a separate log -- this is crazy.  I keep a

11  separate log of how I'm feeling.  It's a therapeutic thing.

12  That one doesn't go as further back as 1989.  But somewhere, I

13  would say, in '91, I started that one; moods, things that I do

14  during the days -- so, I do keep --

15     Q.   All right.  So, there's a third log that you keep,

16  correct?

17     A.   Yes.

18     Q.   And that's the --

19     A.   I have a fourth one, too.

20     Q.   We'll get to it.  And the purpose is just so we

21  understand what you have.

22     A.   Okay.

23     Q.   So, this is helpful.  So the third log, so I

24  understand it, you started to keep in roughly 1991, correct?

25     A.   Uh-huh.

1          Q.    And the third log, you would write down how you are

2     feeling?

3          A.    Uh-huh.

4          Q.    Correct?

5          A.    Yes, sir.

6          Q.    Would that include -- would the log -- the third log

7     include how you're feeling mentally and physically?

8          A.    Yes, sir.

9          Q.    Do you have a name for that log?

10         A.    No, not really.   I just know where to go and get it.

11         Q.    Okay.   So, the third log would include how you felt

12    mentally and physically from 1991 through the present; is that

13    right?

14         A.    Uh-huh.   Yes.

15         Q.    Okay.   Does that third log include anything else

16    other than your -- how you're feeling mentally and physically?

17         A.    Yeah, my daily things, important things I would do in

18    the day.   "I saw so-and-so.   I called so-and-so.   I met

19    so-and-so."   Yeah, work things.

20         Q.    Okay.   So, in addition to the mental and physical

21    feelings you were having, the third log would also include,

22    like, your daily activities; is that right?

23         A.    Oh, yes.

24         Q.    If you went to the store, would that be included in

25    the log?

15

1      A.   Yes.

2      Q.   And if you went -- if you went to the dry cleaner,

3  would that be included in the log?

4      A.   Sometimes, yes.

5      Q.   And so routine -- even routine daily activities would

6  be included in the third log?

7      A.   Yes.

8      Q.   Would there be anything else that would be in that

9  third log we're discussing right now that we haven't talked

10  about?

11      A.   I don't think you want to hear about that.

12      Q.   No.  No.  We -- we do want to hear about that, so --

13      A.   Okay.  If you -- if I had sex that day, I would write

14  it down because I would want to know if I got pregnant along

15  the way.  So, yes, it would be in my log.  We women do things

16  like that.

17      Q.   So, in addition to discussing the third log, your

18  sexual activity would also be included in there?

19      A.   Uh-huh.  Exactly.

20      Q.   How many volumes is this third log?

21      A.   I would say about a 9-gallon thing I have full with

22  notebooks and those other logs.

23           MR. BROWN:  Ms. Hernandez is indicating a box

24  maybe 2 or 3 feet long.

25      A.   It's bigger than that.  It's, like, a big thing.  I

1   have three of them and one is for medical, one is for my

2   calendars, like I said, and the other one keeps my logs.

3        Q.   So, the -- let me just take one little step back in

4   time.  So, the -- on the calendars for the doctors visits, is

5   that also a multi-volume set?

6        A.   Yes.

7        Q.   How many volumes would -- let me just finish.

8        A.   Okay.

9        Q.   How many volumes would the doctors calendar contain?

10       A.   One per year.

11       Q.   One per year?

12       A.   Yes, one calendar per year.

13       Q.   So, you have approximately, I guess, 18 calendars?

14       A.   He's -- yes, sir.

15       Q.   For the doctors visits?

16       A.   Yes.  That's what I'm saying.  I have three 9-gallon

17   big totes.

18            MR. BROWN:  Didn't bring those with you, did

19   you, Ryan?

20            MR. HICKS:  No, no, I did not.

21       A.   They're there.

22       Q.   (BY MR. BROWN)  And the -- and just to clarify, on

23   the -- on the second -- the second log we talked about that

24   contains your medications, correct --

25       A.   Uh-huh.

18

1    I would say a "no" to that.

2         Q.   The third log that contains your daily activities,

3    among other things, you have approximately 16 volumes of that,

4    from 1991 to the present; is that right?

5         A.   Uh-huh.   That's correct.

6         Q.   All right.   We've talked about three items here, the

7    calendar --

8         A.   Uh-huh.

9         Q.   -- correct?

10        A.   Yes.

11        Q.   The medication volumes, correct?

12        A.   Yes.

13        Q.   And the daily activity volumes which you've described

14   to us, correct?

15        A.   Yes.

16        Q.   Are there any other --

17        A.   Logs.

18        Q.   -- logs that you keep regarding anything?

19        A.   I have a menstrual period log.

20        Q.   Is that a separate log?

21        A.   Yes, sir.

22        Q.   Okay.   When did you start to keep the menstrual cycle

23   log?

24        A.   Five years ago.

25        Q.   So roughly 2002?

20

1      A.   Yes.

2      Q.   Does it feel good for you to keep track of your

3   medications?

4      A.   To keep track of my life, yeah.  So, it would include

5   medications, yes.

6      Q.   So, keeping these logs help you feel like you're

7   keeping control of your life; is that right?

8      A.   Yes.

9      Q.   And I'm going to ask you the same question about the

10  doctors visits log.  Does that -- why did you start keeping the

11  log for the doctors visits?

12     A.   That I can answer easily, because most the time when

13  you go to the doctor, they ask you what doctor you went before,

14  what did they tell you -- so, that's where they started coming

15  into play.  It was getting hard to answer when you had doctors

16  visits or who you went to, so I started keeping a log so that I

17  just carry that and just fill out the forms.

18     Q.   Did you tell your lawyers that you had the three

19  boxes --

20     A.   No, sir.

21     Q.   -- of documents?

22     A.   You're first hearing of this now.

23          Sorry, Ryan.

24          MR. HICKS:  That's okay.

25          MR. BROWN:  Ryan, I'm just going to put a

1    request on the record which I'll follow up in writing for

2    the -- the multi-volume set of the medical appointments, the

3    multi-volume log for the medications, and the multi-volume set

4    for the daily activities.

5         A.   Okay.

6              MR. BROWN:   As well as the multi-volume set for

7    the menstrual cycle.

8         Q.   (BY MR. BROWN)   Are there any -- we've talked about

9    four different collections of materials that you keep track of.

10   Are there any other logs, calendars, or charts that you keep

11   for any reason whatsoever?

12        A.   My personal?

13        Q.   Yes.

14        A.   No.

15        Q.   Do you have a computer at home?

16        A.   Yes, sir.

17        Q.   How long have you had the computer?

18        A.   This one or any computer?

19        Q.   This particular computer.

20        A.   2001.

21        Q.   Do you use your computer relatively regularly?

22        A.   Maybe every other day.

23        Q.   And we've talked about a number of different logs,

24   four different calendars or logs.  Is that information kept on

25   your computer?

1    deposition notice.  Do you see that?

2         A.    Uh-huh.

3         Q.    Can you just read through it for me?

4         A.    The -- the first page?

5         Q.    Read through the whole document for me.

6         A.    It's says "In regard" --

7         Q.    I'm sorry.  You don't need to read it aloud.  Just

8    read it to yourself.

9         A.    Oh, okay.

10        Q.    I'm going to ask you a couple questions about it.

11        A.    (Witness complies.)

12        Q.    Have you ever seen that document before, the

13   deposition notice?

14        A.    This one?

15        Q.    Yes.

16        A.    No, sir.

17        Q.    Did Mr. Hicks or any lawyer show that to you before

18   today?

19        A.    No, sir.

20        Q.    Can you take a look at Page 4 for me?

21        A.    Sure.

22        Q.    Have you had a chance to look at the 19 categories of

23   documents on Page 4?

24        A.    No.  I read the first page.  Reading too fast for me.

25        Q.    Just take a take a quick look.  I'm not going to ask

36

1    you specific questions about each of those categories, but

2    please just take a quick look through it.

3         A.   (Witness complies.)

4         Q.   Okay.  Before I ask you about that document, when you

5    did the research in the middle of 2002 on Seroquel, did you

6    print out what you found on the internet?

7         A.   No, sir.

8         Q.   Having looked at what we refer to as Schedule A here

9    on Pages 4 and 5 of Hernandez Exhibit 2, do you have any of

10   these documents in your possession at home?

11        A.   Yes.

12        Q.   Okay.  Let's just go through it.  And if you don't

13   mind, could you mark your copy with a check mark near the

14   categories of information that you have at home?

15        A.   Okay.

16        Q.   All right.  First, medical records from any

17   physician, hospital, or health care provider over the last ten

18   years prior to your first ingestion of Seroquel.

19        A.   Yes.

20        Q.   Do you have medical records at home?

21        A.   Yes, sir.

22        Q.   Approximately how many medical records do you have,

23   in volume?

24        A.   I have everything.

25        Q.   You have a copy of every medical record --

37

1     A.   Yes.

2     Q.   -- you have?

3     A.   Yes.

4     Q.   And I know we've been using estimates of boxes

5  earlier.

6     A.   You don't want to know.  My husband just doesn't know

7  what to do with my stuff anymore.

8     Q.   Can you give me a sense of the volume of medical

9  records you have from doctors, hospitals, and health care

10  providers?

11     A.   I have one 9-gallon -- you know, what are those,

12  totes that you use to store things?

13           MR. HICKS:  Uh-huh.

14     A.   One of those filled with medicals.

15     Q.   (BY MR. BROWN)  All right.  So we can check off

16  No. 1.

17     A.   Yes, sir.

18     Q.   Is -- how far back does that collection of medical

19  records go?

20     A.   Let's put it this way:  I have x-rays in there from

21  1987, '88.  It goes back.

22     Q.   To the -- so, you have medical records going back

23  from your doctors and hospital visits to roughly the 1980s?

24     A.   From today, uh-huh, to today.

25     Q.   To today?

38

1      A.   Yeah.

2      Q.   And --

3      A.   I'm sorry.  I don't have my last hospitalization.

4  That's the only thing I don't have.

5      Q.   Was your last hospitalization 2007?

6      A.   Six.

7      Q.   2006.  And what were you hospitalized for in 2006?

8      A.   Heart attack.

9      Q.   Okay.

10          THE WITNESS:  Can fairly say that, right?

11          MR. HICKS:  Yeah.  What -- what --

12     A.   Heart attack.

13     Q.   (BY MR. BROWN)  Okay.  And we'll come back and cover

14  the heart attack a little bit later today.  But the heart

15  attack in 2006, those records aren't yet in the collection,

16  correct?

17     A.   No.  It --

18     Q.   Are you in the process of collecting those records as

19  well?

20     A.   Soon as I have the means, I will get my medical

21  records, yes.  Costs a little bit.

22     Q.   Besides the heart attack in 2006, are there any other

23  medical records from the mid to late 1980s that you don't think

24  are in that collection of medical records?

25     A.   No, sir.  Everything's --

.

1              MR. HICKS:  Objection.  Speculation.

2    A.   Everything's there.  Trust me.  Everything's there.

3    Q.   (BY MR. BROWN)  And let's look at Item No. 2.

4    A.   Okay.

5    Q.   Do you have pharmacy records for the ten years prior

6    to your first ingestion of Seroquel to present?

7    A.   Yes, sir.

8              MR. HICKS:  Objection.  Speculation.  Vague.

9    A.   Okay.

10   Q.   (BY MR. BROWN)  You've read Item No. 2 in Exhibit --

11   Schedule A --

12   A.   Yes.

13   Q.   -- have you, Ms. Hernandez?

14   A.   Yes, sir.

15   Q.   Do you understand what that is -- that's asking for?

16   A.   Yes, sir.

17   Q.   I'm going to read it to you, "Pharmacy records for

18   ten years prior to your first ingestion of Seroquel to present,

19   including receipts" --

20   A.   Yes.

21   Q.   -- "prescriptions, or records of purchase."

22        Did I read that right?

23   A.   Yes, sir.  Yes, sir.  Every single one, yes.

24   Q.   Do you have that information at home?

25   A.   Yes, sir.

40

1     Q.   Where do you keep that information?

2     A.   In -- in those jugs.

3     Q.   Do you have a separate box or jug for the pharmacy

4  records?

5     A.   No.  They're in there with the medical records.

6     Q.   We can check that one off?

7     A.   I did, sir.

8     Q.   As you sit here today, can you think of any pharmacy

9  record, prescription record that would not be in that

10  collection?

11           MR. HICKS:  Objection.  Calls for speculation.

12     A.   No.

13     Q.   (BY MR. BROWN)  So, as far as you know as you sit

14  here today, the collection of pharmacy records that we

15  discussed in Item No. 2 is complete?

16     A.   Yes, sir.

17     Q.   Look at Item No. 3, "Advertisements for Seroquel or

18  articles discussing Seroquel which you reviewed before or

19  during a time you took Seroquel."

20           Did I read that correctly, Item No. 3?

21     A.   Yes, you read it correctly.  I don't have

22  advertisements, and I have an article because I still have

23  pills.  I saved the pills.

24     Q.   Okay.  Do you have the pills at home?

25     A.   Yes, sir.

43

```
1        Q.   So, let me see if I can help clear up some of this.
2   When we were discussing Item No. 3 on Schedule A, you indicated
3   that you have at home a sample of Seroquel, correct?
4        A.   Uh-huh.
5        Q.   And how many pills were in the sample of Seroquel
6   that you have at home?
7        A.   The -- the ones remaining is the question?  I would
8   say I have four pills.
9        Q.   And how many were in that particular sample that have
10  four pills remaining?
11            MR. HICKS:  I'm sorry.  Objection.  Vague.  It's
12  confusing.
13       Q.   (BY MR. BROWN)  Let me rephrase the question to clear
14  it up.  This sample package that you have at home, how many
15  total pills came in that package before you used any?
16       A.   It's still vague because -- because the question that
17  I wanted to answer you is how many the doctor gave me from --
18  from the beginning.  She gave me the two boxes, but she took
19  all the other ones from the other boxes and stuffed them in
20  those two boxes so I wouldn't carry everything.  So, every
21  blister pack might have had a dozen on them.
22       Q.   Okay.  Look at Item No. 4.
23       A.   Sure.  Oh, I'm --
24       Q.   Okay.  The packaging, including the box and label,
25  for Seroquel and any remaining indication.  That's what we're
```

44

1    talking about now, right?

2         A.    Remaining medication?

3         Q.    Yes.

4         A.    Yes, sir.

5         Q.    Let's check that -- can we check that one off?

6         A.    Sure.

7         Q.    And before we do -- we're going to come back and

8    discuss the samples in detail -- do you remember what the

9    sample packages looked like?

10        A.    I remember it having blue on it.  That's -- that's --

11   you mean the box?

12        Q.    Yes.

13        A.    The pills were sort of, like, pink salmon color, but

14   the packaging had some blue on it.  I remember that.  I didn't

15   keep the box.  I just kept the blister packs.

16        Q.    Okay.  After you used the Seroquel samples, did you

17   keep the empty blister packs?

18        A.    No, sir.  I kept the full blister packs.

19        Q.    Do your logs reveal how many Seroquel pills you took?

20        A.    In total?

21        Q.    Yes.

22        A.    If I were to -- to look through them, I would say so.

23        Q.    So, I could -- if you produce to your lawyers and

24   your lawyers gave to me the logs, I could add up every time you

25   took a Seroquel pill?

45

```
 1        A.   Yes.

 2             MR. BROWN:  And before we go through this

 3   exercise, I'm going to just put a statement on the record.

 4   We're going to request production of the box of medical records

 5   and pharmacy records that Ms. Hernandez spoke about, as well as

 6   the article she mentioned she kept, as well as the -- the

 7   packaging for the remaining samples, a color photograph of

 8   that.

 9             MR. HICKS:  Okay.

10             MR. BROWN:  Okay.  And we would like to inspect

11   the sample in -- at some point.

12             MR. HICKS:  Yeah, yeah, subject to objections

13   for scope or any of that, sure enough.

14        Q.   (BY MR. BROWN)  Look at Item No. 5.

15        A.   Okay.

16        Q.   "Product use instructions, product warnings, package

17   inserts, pharmacy handouts, or other materials distributed to

18   you or provided to you in connection with the use of Seroquel."

19             Did I read Item No. 5 correctly?

20        A.   Yes, you did, sir.

21        Q.   And do you have any information?

22        A.   No, sir.

23        Q.   Okay.  So that's going to be "no."  Why don't you

24   write "no" next to that.

25        A.   And how about No. 3?  It stays blank or just
```

1  "any of the defendants," in this case, AstraZeneca.

2          Do you have any documents that are AstraZeneca

3  documents?

4      A.   No, sir.

5      Q.   Did you ever -- did you ever write to or communicate

6  with AstraZeneca?

7      A.   No, sir.

8      Q.   Do you have any documents/communications at home?

9      A.   No, sir.

10     Q.   Okay.  If the answer to No. 9 is no, write "no."

11     A.   (Witness complies.)

12     Q.   Have you ever done any research on any other

13 antipsychotic medications?

14     A.   Yes, sir.

15     Q.   What other antipsychotic medications have you

16 researched or looked at?

17     A.   Tricyclics.  Those are the ones that work for me.

18     Q.   Do you have any particular names of tricyclics?

19     A.   I've checked on Paxil, I've checked on Effexor, I've

20 checked on amitriptyline, and the list goes on and on.

21     Q.   Do you have -- do you maintain records of the results

22 of your research?

23     A.   Yes, sir.

24     Q.   And do you have that at home?

25     A.   It could be -- that could be on my computer.

48

1      Q.   Okay.

2                MR. BROWN:  And we're going to make a request

3      for production of the material that she researched on

4      tricyclics.

5                MR. HICKS:  Okay.

6      Q.   (BY MR. BROWN)  Look at Item No. 11, "Photographs,

7      drawings" --

8      A.   Okay.  So, what am I doing --

9                MR. HICKS:  Just --

10     Q.   (BY MR. BROWN)  Oh, I'm sorry.  You have -- the

11     answer to that question is, yes, you have this material at

12     home?

13     A.   The answer was possibly on my computer at home.

14     Q.   Okay.  So, can we write down "possibly on computer"?

15     A.   Yes.

16     Q.   Would that be accurate?

17     A.   That would be accurate.

18     Q.   Okay.  All right.  Look at Item No. 11, "Photographs,

19     drawings, journals, slides, videos, DVDs, or any other media

20     training related to your alleged injury or life after the

21     incident."

22                Do you understand that question?

23     A.   Yes.  No.

24     Q.   It's "no"?  Okay.  You indicate that you haven't

25     worked since roughly 2001, correct?

50

```
 1                   (Discussion off the record at 10:55 a.m.)

 2        Q.   (BY MR. BROWN)  So, with respect to Item No. 12, your

 3   tax returns, do you have your tax returns for the last five

 4   years at home?

 5        A.   No, sir.  Four years.

 6        Q.   So, that's when you filed jointly with your husband;

 7   is that correct?

 8        A.   Yeah.  I didn't file before.

 9        Q.   And we're going to make a request for production of

10   the four years of tax returns that you have.

11        A.   Okay.

12        Q.   So, can you put down next to No. 12 "four years"?  Is

13   that right?

14        A.   Yes, sir.

15        Q.   And that's accurate, correct?

16        A.   Yes.

17             MR. HICKS:  And just note that there was not

18   affirmative response on what -- the claim regarding loss of

19   earnings or earnings capacity is, but she has noted the tax

20   returns are there, so -- just want to be clear.

21        A.   Yes.  It would be three years, right?  Because I've

22   been married four, so it would be three years of taxes.  And

23   this year running would be the fourth year, so -- right?

24        Q.   (BY MR. BROWN)  Okay.  Let me clarify this.

25        A.   Do I write "three" or "four"?
```

51

```
 1        Q.   So, with respect to No. 12, you don't have five years
 2   of tax returns, you have three years; is that correct?
 3        A.   Yes.
 4        Q.   Prior to when you filed jointly with your husband,
 5   did you file tax returns on your own?
 6        A.   Maybe twice before.
 7        Q.   When was the last time you filed a tax return on your
 8   own?
 9        A.   1994.
10        Q.   Okay.
11             (Sotto voce discussion.)
12        A.   I don't know.
13        Q.   (BY MR. BROWN)  I know you've told me -- strike that.
14             Look at Item No. 13, "If you claim to have
15   suffered a loss of earnings or earnings capacity, all
16   employment records in your possession, including employment
17   applications, performance evaluations, paychecks, and pay
18   stubs."
19             Do you have -- did I read that correctly?
20        A.   Yeah, you read it correctly.
21        Q.   Do you have --
22        A.   I don't understand it though.  "If you have" -- no.
23        Q.   Okay.
24        A.   No, I don't have that.
25        Q.   Okay.  If the answer's "no," let's put that next to
```

1      Q.    (BY MR. BROWN)  Let's go back to Item No. 13.  Did

2   you understand what you read in Item No. 13 of Hernandez

3   Exhibit No. 2?

4      A.    Yes.

5      Q.    And do you have any of that information described in

6   Item No. 13?

7      A.    I understand them, but I don't have them.

8      Q.    Okay.  If the answer's "no," why don't we write down

9   "no" next to No. 13.

10      A.    Okay.

11      Q.    And No. 14 refers to if you have a claim -- if you

12   claim any loss from medical expenses, we want copies of all

13   bills from any physician, hospital, pharmacy, or health care

14   provider.  Did I read that correctly?

15      A.    Yes, you did.

16      Q.    And, Ms. Hernandez, are you asserting a claim for out

17   of pocket medical expenses in this case?

18      A.    Yes, sir.

19      Q.    And do you know how much that is?

20      A.    No, sir.

21      Q.    Do you have the information referenced in Item No.

22   14, the bills?

23      A.    Yes, sir.

24      Q.    And can you put -- if the answer's a "yes," can you

25   write a "yes" next to 14?

54

```
 1        A.    (Witness complies.)

 2              MR. BROWN:  And we're going to make a request to

 3  counsel for all of the information identified in the -- in

 4  Ms. Hernandez' possession in Item No. 14.

 5              MR. HICKS:  Uh-huh.

 6        Q.    (BY MR. BROWN)  Ms. Hernandez, the bills from the

 7  hospitals, the pharmacy, and health care providers, is that in

 8  the same box as all the medical records and pharmacy records?

 9        A.    Yes.

10        Q.    Okay.  Item No. 15, if you have been the claimant or

11  subject of any Workers' Compensation, Social Security, or other

12  disability proceeding, all documents relating to such

13  proceeding.  Did I read that correctly?

14        A.    Yes, sir.

15        Q.    You have filed a Workers' Compensation claim, haven't

16  you?

17        A.    Yes, sir.

18        Q.    And have you also filed a claim with Social Security?

19        A.    Yes, sir.

20        Q.    Do you have records from those two cases?

21        A.    Yes, sir.

22        Q.    And where do you keep those records?

23        A.    Those are all the logs I've been keeping.

24        Q.    And do you have -- so, you have documents responsive

25  to Item 15?
```

1      A.   All of those, uh-huh.

2      Q.   Can you put a "yes" next to Item 15?

3      A.   Yes.

4           MR. BROWN:  And we're going to call for

5    production of all the documents that Ms. Hernandez just said

6    that she has at home.

7      Q.   (BY MR. BROWN)  Is that right?

8      A.   Yes, sir.

9           MR. HICKS:  I'm going to object that it assumes

10   facts not in evidence.  She's talking about journals, that she

11   kept some of these items in her journal.  So, I don't know if

12   that's a journal entry or these are separate documents.

13          MR. BROWN:  Yeah.  Let me clean that up.

14     Q.   (BY MR. BROWN)  In Item No. 15, we talked about all

15   the documents related to your Workers' Compensation and Social

16   Security actions?

17     A.   All of it has become -- as it will with you, all of

18   it has become part of the case.  All of my journals, any

19   intimate thing that I have written, have become part of this

20   Social Security, so --

21     Q.   So I'm clear, the items that you described in 15, the

22   Workers' Compensation and Social Security information, that

23   information is recorded in your journals, correct?

24     A.   Yes.  You're talking about journals now?  Because

25   we're talking about the big tote.  Or are we talking about

1      A.    I mean, if you give me everyday words for what's in

2   here, maybe I can answer.

3      Q.    Do you have -- in addition to your Workman's Comp

4   case --

5      A.    Uh-huh.

6      Q.    -- and your Social Security case -- and we'll talk a

7   little bit about that later on -- you were also involved in a

8   couple of civil lawsuits; is that correct?

9      A.    Those are all over a long time ago.

10     Q.    But you were involved in some civil litigation.

11     A.    Yes, sir.

12     Q.    And you filed lawsuits in those cases, correct?

13     A.    Yes, sir.

14     Q.    Do you keep all of --

15     A.    Yes, sir.

16     Q.    You have binders for each of those car accidents?

17     A.    Yes, everything.

18           MR. HICKS:  Just let him finish his question so

19   she can type.

20           THE WITNESS:  Oh.

21           MR. HICKS:  That's fine.

22     Q.    (BY MR. BROWN)  So, you have -- you have binders of

23   materials --

24     A.    Yes.

25     Q.    -- for --

61

1       A.   I have a 1990 folder for -- oh, I'm sorry.

2       Q.   Okay.  I want to -- the court reporter has a hard

3   time keeping track of both of us.  So, you have binders for

4   both of the lawsuits that stemmed from accidents; is that

5   correct?

6       A.   Yes.  Yeah.  I -- I keep everything.

7            MR. BROWN:  And we're going to call for

8   production of the binders for the accidents or any other civil

9   litigation.

10           MR. HICKS:  Uh-huh.

11      Q.   (BY MR. BROWN)  Seventeen, "Journals, diaries, notes,

12  letters" --

13      A.   What am I putting there?

14      Q.   Oh, for 16?  You -- do you understand what 16 means?

15      A.   No.

16      Q.   All right.  We've established you have a lot of

17  materials.

18      A.   I've asked you to clarify it.

19      Q.   But why don't you put a question mark next to that if

20  you don't understand the question, because that's probably

21  accurate.  Is that right?

22           MR. HICKS:  Or just -- if you don't know --

23      A.   You're asking me if I have stuff, but I don't know

24  what the stuff means.  Is that a fair question?

25           MR. HICKS:  I'm going to ask you not to mark 16