UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: SEROQUEL PRODUCTS
LIABILITY LITIGATION

MDL DOCKET  NO:
6:06-MDL-1769-ACC-DAB

This document relates to:        ALL CASES

**PLAINTIFFS' RESPONSE IN OPPOSITION TO ASTRAZENECA'S MOTION AND
COMBINED MEMORANDUM REGARDING
THE SCHEDULING AND SCOPE OF FUTURE DISCOVERY**

On October 23, 2007, AstraZeneca filed a "Motion and Combined Memorandum
Regarding the Scheduling and Scope of Future Discovery" (Doc. 602, hereinafter the
"Motion"), moving "the Court to enter an Order" regarding timing and breadth of future
discovery in this MDL.  Pursuant to Case Management Order 1 and Local Rule 3.01(b),
Plaintiffs in the above-referenced cases ("Plaintiffs") hereby file their Response in
Opposition to the Motion, and would respectfully show the Court as follows:

**I.
SUMMARY OF RESPONSE**

On its heals from a finding of sanctionable conduct relative to its general discovery
failures, and facing the possibility of additional sanctions resulting from further misconduct
in case-specific discovery, AstraZeneca lashes out in its Motion, apparently seeking to
prejudice all Plaintiffs' cases by disparaging a handful of Plaintiffs and distorting the case-
specific discovery record.  AstraZeneca's motive could not be more transparent, revealing
itself through hyperbole in the Motion: to convince the Court (falsely) that there are  only a
"few" cases worth trying, while throttling efforts to efficiently prepare the cases <u>as a whole</u>

1

for remand and trial.  (Mot. at 5 ("Testimony in cases subject to case-specific discovery has demonstrated *that most of the cases* lack even a colorable basis.") (emphasis added); Mot. at 6 ("plaintiffs . . . have engaged in volume filings of uninvestigated claims.").)

Despite AstraZeneca's caustic rhetoric and mischaracterizations, and in the spirit of furthering the parties' dialogue regarding issues raised in the Motion as well as this Court's Order (Doc. 551), Plaintiffs have carefully considered AstraZeneca's proposed methodology for trial-pool case selection and case management schedule.  As further described below, Plaintiffs have identified significant areas of agreement between the parties regarding such case selection methods and scheduling.

## II.
## SPECIFIC RESPONSES

### A. ASTRAZENECA'S UNSOLICITED CASE SYNOPSES ONLY DISTORT THE RECORD.

It is against Plaintiffs' better judgment to engage AstraZeneca in a debate regarding particular case-specific discovery findings for the precise reasons described above: AstraZeneca wants the focus shifted away from their *general discovery* failings and away from *common liability* issues in this litigation.  As Plaintiffs, and every court that has overseen consolidated litigation of this kind, have repeatedly recognized, parties' interpretations of de-contextualized facts, without the aid of complete general liability discovery and the resolution of general causation issues, are meaningless.  Further, subjective case-specific discovery findings—whether to the advantage or disadvantage of either party—have no residual value beyond the context of the *individual* cases themselves.

2

At this time, and for the foreseeable future, the Court can make no use of discovery generated by AstraZeneca's "case-specific discovery program" for two reasons.  First, the discovery resulting from the program provides an insufficient factual basis on which to dispose of any claim.  General liability discovery is required to put the facts related to an individual plaintiff's claim in context.

Second, neither the Court nor the parties is capable of any legitimate evaluation of Seroquel-related claims until the spectrum of general causation issues and other subjects of expert testimony are resolved.  Resolution of these issues too requires the completion of general liability discovery.

For these reasons, no MDL Court has adopted a proposal similar to Defendants' before the completion of general discovery and the resolution of scientific standards generally applicable to consolidated plaintiffs.  Such an ordering of proceedings is anathema to both the statutory purpose of consolidated litigation and basic practicality.

Nevertheless, in aid of its continuing efforts to prevent general liability discovery, AstraZeneca offers the Court its latest red herring: self-serving, abbreviated synopses of six Plaintiffs' cases identified in its Motion out of the over 45 Plaintiffs' depositions conducted. Of the six Plaintiffs identified by AstraZeneca in the Motion, half were selected by AstraZeneca for deposition, with only one being chosen for case-specific discovery by Plaintiffs.  While AstraZeneca's interpretations of the facts of these cases is of no value to the Court, the Plaintiffs at issue deserve to have the record clarified.  Therefore, Plaintiffs offer the Court the following:

- <u>Timothy Ell</u>: Mr. Ell suffers from a complexity of mental health issues including, but not limited to, paranoia, psychosis, depression, anxiety, and,

likely, schizophrenia.  (Tr. of Dep. of Dr. Michael Carroll, Mr. Ell's prescriber ("Carroll Dep.") at 15:13-17, 23-25.)   Resultantly, Mr. Ell has been hospitalized on numerous occasions and, more specifically, was treated as an in-patient at Dammasch, a state hospital, for six months.  (Carroll Dep. Tr. at 16:4-15.)  His mental illnesses are of the type that are "devastating" and life threatening.  (Carroll Dep. Tr. at 21:7-10.)  Despite AstraZeneca's assertions, Dr. Carroll did not strongly advise that Mr. Ell continue to take Seroquel, but, instead, contemplated switching his patient to another antipsychotic in light of his weight gain.  (Carroll Dep. Tr. at 159: 6-17.)  Because Dr. Carroll previously considered that the "benefit [of Seroquel] to specific patients could outweigh the potential risks," he initially prescribed the drug.  (Carroll Dep. Tr. at 165:1-6.)  Nonetheless, Dr. Carroll failed to address those risks with Mr. Ell despite the fact that he was aware that weight gain and diabetes were associated with the ingestion of Seroquel, among other atypical antipsychotics, and that he "usually" discussed that with those patients for which he was prescribing.  (Carroll Dep. Tr. at 30: 19-25; 31: 3-5, 18-25; 32: 1-24.)  Just as Dr. Carroll failed to alert Mr. Ell to such risks, AstraZeneca sales representatives failed to alert Dr. Carroll of the same, to the ultimate detriment of Mr. Ell and other similarly situated patients.  Notably, Dr. Carroll explained that he did not personally receive any information from sales representatives in that regard, but instead acknowledged the connection between the atypical antipsychotic and diabetes upon clinical experience "after [he] first saw that it happened."  (Carroll Dep. Tr. at 30:19-25; 150:2-4; 155:4-10.)

- <u>Deborah Elmore</u>:  Ms. Elmore suffers not only from bipolar and schizophrenic disorders and currently awaits a liver transplant to replace her cirrhosed liver, but is also plagued by diabetes mellitus and the debilitating complications arising therefrom as a result of her Seroquel use.  Aside from her considerable weight gain of 50 pounds, Ms. Elmore has also experienced periods of time where she "can't get up" "because she [can't put any weight down on [her] leg whatsoever [because] it hurts so bad" and has suffered "attacks" requiring hospitalization.   (Elmore Dep. Tr. at 25:22-25; 26:1-6; 106:13-21.)   Ms. Elmore's diabetes is such that she requires constant care, and although she is both a mother and a grandmother, she has recently moved in with her own mother in order to assure that she has assistance during these common attacks.  (Elmore Dep. Tr. at 25:3-8, 17-25; 26:1-2.)  Ms. Elmore was diagnosed with this most severe form of diabetes in April 2006, approximately four years after commencing treatment with Seroquel. (Elmore Dep. Tr. at 13:1-8.)  Ms. Elmore's heavy alcohol consumption continued through her first two years of Seroquel treatment, but she stopped drinking in 2005 soon after the time she began treatment for suicidal tendencies after having attempted suicide for the second time, contrary to AstraZeneca's averments that Seroquel contributed to Ms. Elmore's sobriety.  (Elmore Dep. Tr. at 82:24-25; 83:1-7.)  Likewise,

nothing in Ms. Elmore's medical history evidences the cessation of psychotic symptoms at any point in time, and particularly not during her Seroquel use, as AstraZeneca asserts.   Ms. Elmore testified that she discontinued her Seroquel regime because she "thought it had a relationship with diabetes." (Elmore Dep. Tr. at 45:18-22.)  Upon inquiry, Ms. Elmore was informed by her treating physician Dr. Marc McNaughton, "that [her diabetes] could have been caused by Seroquel," a sentiment echoed by her prescribing healthcare provider, Dr. Laura Dehelian, who emphasized "the potential that her diabetes was related to the use of [that] atypical."  (Elmore Dep. Tr. at 52:16-23; Dehelian Dep. Tr. at 82:17-21.)  Prior to her Seroquel use, Ms. Elmore was unaware of any possible side effects of the drug including, but not limited to, weight gain and diabetes.  During her Seroquel regime which lasted five years and consisted of the daily ingestion of 800 milligrams of the drug, Ms. Elmore was never once warned about causal relationship between the drug and diabetes. (Elmore Dep. Tr. at 90:6-8; 108:14-17, 25; 109:1-2.)   As Ms. Elmore's prescriber, Dr. Dehelian had also never been warned of the associated risks by any of the numerous sales representatives who frequented her office, and she testified that she remained "skeptical about drug company information," because "they are all interested in marketing their own product ... and the people who are the drug reps are not clinical people . . . so . . . their knowledge can be limited," and, in sum, unreliable.  (Dehelian Dep. Tr. at 109:25; 110:1-9, 18-25; 111:1-11; 117: 24-25; 118:1-10; 119:14-22.)

- Hope Lorditch:  Ms. Lorditch was diagnosed with diabetes in February 1999 and has since experienced hardening of the arteries of her brain as a result of her diabetic condition which has been exacerbated by her Seroquel use. (Lorditch Dep. Tr. at 18:24-25; 19:1-2, 25; 20:1-2.)  Notwithstanding her mental illnesses, Ms. Lorditch suffers from severe migraines, short term memory loss, and crippling leg pains attributable to diabetes.  (Lorditch Dep. Tr. at 18:24-25; 19:1-2; 20:20-23.)   Unable to walk for more than a short distance, she has been confined to a wheelchair for six years. (Lorditch Dep. Tr. at 32:17-19.)   On at least two separate occasions, Ms. Lorditch was prescribed Seroquel but was forced to stop taking Seroquel due to the weight gain she experienced with its use.  (Lorditch Dep. Tr. at 85:11-21; 130:3-16.)  Since her initial ingestion of Seroquel, Ms. Lorditch's diabetes has progressively worsened and has led to diabetic neuropathy for which she receives treatment, and which has caused her to suffer a "diabetic blackout" while driving.  (Lorditch Dep. Tr. at 53:1-9; 68:1-10.)

- Samuel Robinson:  Having battled schizophrenia and depression throughout his entire life, Plaintiff Samuel Robinson began taking Seroquel at the direction of his psychiatrist in July 2002 and continued to take the drug for several years thereafter.  (Robinson Dep. Tr. at 107:13-21; 109:21-25; 129:20-25; 130:1.)  He discontinued use in January 2007 because of the painful side

effects he experienced as a result of Seroquel therapy including, but not limited to, the development of diabetes in 2004.  (Robinson Dep. Tr. at 112:15-25; 116:13-15.)  Most noticeably, Mr. Robinson had maintained a healthy weight of approximately 160 pounds throughout the majority of his life; however, once exposed to Seroquel, he began gaining weight while taking the drug.  (Robinson Dep. Tr. at 143:2-20; 144:13-25; 145:9, 19-25.) He first noticed his weight gain "about three weeks or so" after commencing Seroquel therapy, and in the months and years to follow he noticed that Seroquel "started making [him] sick feeling."  (Robinson Dep. Tr. at 246:9-21; 250:1-5.)  Accordingly, Mr. Robinson testified that if he had known that Seroquel caused diabetes, he would not have taken it.  (Robinson Dep. Tr. at 248:14-19.)

- Vounzetta Edgeston:  Ms. Edgeston was never warned, by any source, of the potential side effects and risks posed by Seroquel.  (Edgeston Dep. Tr. at 136:14-21.)  Likewise, her prescriber, Dr. Shobha Gagrat, was never warned of the risks associated with Seroquel use or of the relationship between Seroquel and diabetes, *but was instead advised of procedures of higher dosing in her patients by AstraZeneca sales representatives and, similarly, assured of its safety and efficacy.*  (Gagrat Dep. Tr. at 88:1-3; 87:1-7; 90:20-24; 114:5-17.)  Nevertheless, Dr. Gagrat maintained a lower dosing regime in the majority of her patients in order to avoid those side effects she had witnessed in practice.  (Gagrat Dep. Tr. at 106:7-17.)  Following her hospitalization in 2002, Ms. Edgeston commenced intensive treatment for bipolar disorder, including Seroquel therapy in 2003.  Soon thereafter, Ms. Edgeston began treatment with Dr. Gagrat who first prescribed Seroquel to her in July 2004. (Edgeston Dep. Tr. at 44:13-20; 46:5-10; Gagrat Dep. Tr. at 60:15-24; 61:5-20.)  In 2005, months into her Seroquel regime, Ms. Edgeston presented with a pre-diabetic condition.  (Edgeston Dep. Tr. at 116:19-25; 117:1-8.)  Ms. Edgeston was then diagnosed with full-blown diabetes mellitus in 2006.  (Edgeston Dep. Tr. at 48:10-12.)

- Joanne Hinton:   Ms. Hinton was diagnosed with diabetes after having commenced Seroquel therapy at the direction of her physician, Dr. MacDonnell, who she liked and trusted.  (Hinton Dep. Tr. at 100:6-9, 15-17.) Accordingly, Ms. Hinton did not initially question Dr. MacDonnell regarding the risks of Seroquel, despite the doctor's failure to mention the risks associated with Seroquel use.  (Hinton Dep. Tr. at 100:10-14.)  Notably, Ms. Hinton testified that she "did not know . . . Seroquel was bad for [her]," nor did she know that "it was habit-forming."  (Hinton Dep. Tr. at 92:4-14.) Likewise, Dr. MacDonnell could not specifically recall any conversation with Ms. Hinton regarding the causal relationship between Seroquel use and diabetes.  (MacDonnell Dep. Tr. at 103:22-25; 104:1-5.)  Having experienced its risks first-hand, Ms. Hinton has since discontinued Seroquel use, because

"it made [her] a diabetic, and [she] gained weight," and, accordingly, "because [she] was scared it was going to kill [her]." (Hinton Dep. Tr. at 176:7-17.)[1]

Moreover, Plaintiffs have garnered other evidence favorable to their individual cases through case specific discovery:

- Dr. Thomas Wikstrom, testified that he prescribed Seroquel to Plaintiff Terry Stephens, who experienced severe weight gain and developed diabetes after using the drug for several months. (Wikstrom Dep. Tr. at 7:19-25; 8:9-17; 196:12-22.) Dr. Wikstrom testified as to an awareness of the cause and effect relationship between Seroquel and diabetes, but also testified as to the assurances he had received from Defendants' sales and other representatives as a "consistent message" concerning the *lack of causal connection* between diabetes, weight gain, and Seroquel. (Wikstrom Depo. Tr. at 156:1-13; 157:21-24; 158:1-7; 165:2-10, 19-22; 166:2-4.) More specifically, Dr. Wikstrom indicated that he often inquired of the sales representatives about weight gain and other potential side effects of Seroquel. (Wikstrom Dep. Tr. 147:11-18; 148:10-25.) In keeping with their talking points, the sales representatives not only assured Dr. Wikstrom that no such association existed, but also encouraged him to prescribe Seroquel to those very diabetic patients for whom he inquired. (Wikstrom Dep. Tr. 149:25; 150:1-18; 156:7-13.) Indeed, AstraZeneca sales representatives "pushed for adding Seroquel to Clozaril patients who have diabetes and weight gain." (Wikstrom Dep. Tr. 151:2-14.)

- Plaintiff Samantha Haas first was prescribed Seroquel in 2002 after being diagnosed with insomnia (an off-label use) when she was just fifteen years old (Seroquel is not approved for use in children). (Haas Dep. Tr. at 100:8-13; 101:16-24; 102:3-5; 20-22.) A healthy weight before ingesting the drug, Ms. Haas began to gain weight rapidly after taking Seroquel for several months. (Haas Dep. Tr. at 109:22-24.) In fact, Ms. Haas gained more than forty pounds from the time she was initially prescribed Seroquel until the time she discontinued use in mid-2003. (Haas Dep. Tr. at 109:25; 110:1-2; 114:18-19.) Although a portion of Ms. Haas' weight gain may have been attributable a

---

[1] Plaintiffs' deposition testimony often reveals harsh realities. Many Plaintiffs, particularly those chosen for case-specific discovery by AstraZeneca, suffer from chronic mental illnesses, and their diabetes has frequently worsened an already difficult existence. Although at least two thirds of Seroquel's billions in annual sales is off-label, the drug was designed for treatment of such individuals. Yet, the Company is apparently unhesitant to characterize these Seroquel patients—AstraZeneca's customers—as killers, drug addicts, and alcoholics. The obvious implication of Defendants' Motion is that injuries to this class of people, which result from otherwise actionable behavior, should not be compensable because, in Defendants' judgment, only bad lives were (further) ruined.

pregnancy, she ingested the drug during only one month of her three-month pregnancy, which ended in a miscarriage on June 25, 2003.  (Haas Dep. Tr. at 105:16-25.)  The majority of her weight gain thus coincides with her Seroquel ingestion, but not the three-month term of her pregnancy.  Likewise, when Ms. Haas presented as pregnant, she discontinued Seroquel therapy at the direction of her physician.  Two months after her miscarriage, Ms. Haas was diagnosed with diabetes, despite the fact that she had no family history of the disease and despite the fact that she was otherwise a physically healthy teen.  (Haas Dep. Tr. at 88:9-10, 6-19.)  Accordingly, Ms. Haas indicated that none of her physicians had discussed the association between Seroquel and diabetes.  (Haas Dep. Tr. at 106:13-22.)  Also, the package insert she received and read with each prescription failed to mention any causal relationship between the drug and the disease.  (Haas Dep. Tr. at 103:7-22.)  It was not until her pharmacist alerted Ms. Haas to the fact that her Seroquel ingestion could possibly have caused her diabetes that she inquired into this association.  She testified that after "[her pharmacist] printed some information up off the internet," she "immediately went back to Dr. Pappas and Cherie Booker," her treating and prescribing physicians, "because there's no family history of diabetes," and she "did not have gestational diabetes."  Upon evaluation, both physicians agreed that Seroquel was most likely the cause of Ms. Haas' diabetes.  (Haas Dep. Tr. at 121:12-25; 122:1-4, 16-17, 21-25; 123:1-2.)  Had Ms. Haas been aware of this association and the related side effects of Seroquel, she "definitely would not have taken it."  (Haas Dep. Tr. at 103:20-22.)

- Pulmonologist Dr. Alan Varraux treated Plaintiff Jesse Runner from approximately January 2002 until August 2005.  Jesse Runner developed diabetes only after he had maintained a Seroquel regime for several years.  Familiar with Seroquel and its potential side effects, Dr. Varraux claims he never prescribed the drug to Mr. Runner; however, he did, on occasion, renew Mr. Runner's prescription.  (Varraux Dep. Tr. at 36:15-18; 66:14-16.)  In fact, Dr. Varraux claimed it was his practice never to prescribe Seroquel in light of the literature he has read "linking second-generation antipsychotic drugs to weight gain," "hyperglycemia," "and also diabetes."  (Varraux Dep. Tr. at 32:16-25.)  Referencing Seroquel therapy, he further explained that he would not want to run the risk of diabetes in any of his patients; that he "wouldn't want to necessarily incur any increased illness to anybody"; and, that "normally [he] would not try to prescribe any medication if [he] knew it was going to definitely cause diabetes." (Varraux Dep. Tr. at 115: 21-25; 116:1-3, 10-12.)  Nevertheless, Dr. Varraux's nurse practitioner, Linda Schneider, prescribed Seroquel to Mr. Runner not only in the form of a renewal but also as a new prescription. (Varraux Dep. Tr. at 85: 3-21.)  Although permitting this practice, Dr. Varraux admittedly knew of the association and causal relationship between Seroquel use and diabetes. (Varraux Dep. Tr. at 125:3-

6.)   Accordingly, he would not "[rule] out that Seroquel could cause [Mr. Runner's] diabetes." (Varraux Dep. Tr. at 125:3-6.)   In relation to those prescriptions was AstraZeneca's presence in Dr. Varraux's practice.   Upon each of the 584 office visits made by AstraZeneca sales representatives, better access to Dr. Varraux's office was gained by way of food and beverages. (Varraux Dep. Tr. at 72:18-25; 73:1.)   More specifically, as call notes indicate, the number of "prescriptions of [AstraZeneca] products was directly proportional to the lunches they would bring" to the office and, particularly, the number of "new prescriptions." (Varraux Dep. Tr. at 77:4-10; 80:18-25; 81: 1-12.)

- Dr. O'Connell treated Larry Palen and diagnosed him with diabetes in May 2004.   (O'Connell Dep. Tr. at 96:21-25; 97:1-5.) Upon his diagnosis and the inquiry of Mr. Palen's wife, Dr. O'Connell agreed that his patient should switch to a drug other than Seroquel in light of his diabetic condition. (O'Connell Dep. Tr. at 99:1-9.)   In fact, Dr. O'Connell considered "that possibly the Seroquel [was] contributing to his high blood sugar levels." (O'Connell Dep. Tr. at 99:21-25.)   Further detailing the causal relationship between Mr. Palen's Seroquel use and his development of diabetes thereafter, Dr. O'Connell testified that "it sounds . . . like the patient was started on Seroquel in September of 2005" and "in October of 2005, his sugar level was very high . . . in the three hundreds"; however, "it's possible that the absence of Seroquel has contributed to improvement in his blood sugar control." (O'Connell Dep. Tr. at 100:13-16; 101:3-5.) Correspondingly, Dr. O'Connell admitted that Seroquel use could have been a contributing factor to Mr. Palen's extremely elevated glucose level.  (O'Connell Dep. Tr. at 108:16-22.)

- Testifying to the clinical effects of diabetes, Dr. Akingbade Akinyelu, Plaintiff Lisa Grant's physician, described diabetes as not only a bad disease, but "a horrible disease."  (Akinyelu Dep. Tr. at 97:19-21.)  Accordingly, Dr. Akinyelu testified that he first learned of the causal relationship between Seroquel and diabetes nearly four years ago at the end of his residency. (Akinyelu Dep. Tr. at 107:19-25; 108:1-11.)   Concerning other physicians' knowledge of the same, he explained that "you have an idea that, yeah, this is an agent . . . that may be associated possibly with hyperglycemia," and, likewise, as to the association between diabetes and Seroquel. (Akinyelu Dep. Tr. at 107:5-11.)  Dr. Akinyelu noted that he would prefer not to prescribe Seroquel to a patient, such as Lisa Grant, who possesses several of the most prominent risk factors for diabetes. (Akinyelu Dep. Tr. at 112:8-22.)  Such additional risk "[would] compound and worsen [a patient's] risk factors," he testified. (Akinyelu Dep. Tr. at 112:24-25.)  "[Seroquel therapy makes] . . . the management [of a patient's diabetes] probably even more difficult," Dr. Akinyelu emphasized. (Akinyelu Dep. Tr. at 113:1-6.)  Dr Akinyelu indicated to Ms. Grant that she should discontinue Seroquel use in light of the foregoing

> information.  (Akinyelu Dep. Tr. at 113:11-20.)  In doing so, he explained to Ms. Grant that "Seroquel may put [her] at further risk," and, thus, was probably not an effective or safe medication for her. (Akinyelu Dep. Tr. at 114:21-25; 127:23-25; 128:1-3.)

Where do these case observations get us?  The unfortunate answer is: not beyond the realization that, as in all cases, there is conflicting evidence—this despite AstraZeneca's inference that it alone has gleaned favorable evidence from case-specific discovery.  Ultimately, as repeatedly noted by Plaintiffs, all the case-specific discovery in the world accomplishes little towards completion of the discovery *common to all cases*, which constitutes the statutory basis for this MDL proceeding.

One other general point relative to AstraZeneca's case synopses should be made.  Plaintiffs do not concede—as AstraZeneca apparently believes—that a given Plaintiff's diagnosis with diabetes prior to taking Seroquel absolves AstraZeneca of liability for that Plaintiff's health problems.  Instead, as AstraZeneca well knows,

> Seroquel must not be administered to patients with diabetes or a history of diabetes.  In diabetic patients or patients having a history of diabetes, blood glucose levels may elevate, which may rapidly aggravate metabolic conditions. This drug must not be given to such patients.

AstraZeneca provided this precise warning to Japanese doctors in 2002, ***two years before*** it issued any warning regarding the increased risk of hyperglycemia and diabetes mellitus to doctors in the United States.  Correspondingly, American physicians now familiar with the association between diabetes and Seroquel caution against prescribing Seroquel to pre-diabetics or diabetics, "because it will compound and worsen . . . risk factors," and "it makes the management [of diabetes] probably even more difficult." (*See* Akinyelu Dep. Tr. at 113:1-6, 11-20; 114:10-12; 16-25.)

Most importantly, AstraZeneca's rantings do nothing to advance the ball. If AstraZeneca contends a case should be dismissed for want of merit, its attorneys well know the vehicles at their client's disposal under the federal rules and this Court's procedures to further that objective. AstraZeneca's foreshadowings of to-be-filed summary judgment motions, motions to compel, and others accomplish nothing. Indeed, motions of the kind referenced by AstraZeneca cannot be considered by the Court at this point. Motions for summary judgment based on lack of causation must await the Court's ruling under Rule 702, which must, in turn, await the substantial completion of general discovery. By the time general discovery is complete, and the Court resolves Rule 702 motions, the discovery taken by AstraZeneca over the past few months will be stale and provide an illegitimate basis for Rule 56 dismissal.

## B. ASTRAZENECA'S MOTION ELSEWHERE MISREPRESENTS THE RECORD.

AstraZeneca's Motion also misrepresents the status and record of these proceedings in at least two other important respects.

First, AstraZeneca claims that, of the Plaintiffs' depositions that AstraZeneca has noticed, "[a]bout twenty percent . . . have failed to appear." This is not correct. Of the Plaintiffs' depositions on which a notice was served by AstraZeneca, approximately <u>six percent</u> have failed to appear. All of the plaintiffs who have failed to appear for deposition were selected for case-specific discovery by AstraZeneca. Such Plaintiffs' nonappearances have many times resulted from difficulties attributable to their mental or physical illnesses. One such Plaintiff testified that he missed his original deposition date because his flight to the deposition was diverted midair due to the Plaintiff's health complications experienced in

flight.  Another Plaintiff's deposition had to be cancelled initially because the Plaintiff had only recently been released from the hospital and was still experiencing tremendous pain— the reason for her hospitalization.  Her deposition was later rescheduled and completed..  One Plaintiff who ultimately did attend her deposition had to be escorted by representatives of her attorneys' office from her hotel across the street from the deposition site because she was afraid to leave her hotel room.  Plainly, in light of the serious health conditions suffered by many of the Plaintiffs selected for case-specific discovery by AstraZeneca, which AstraZeneca itself acknowledges in its Motion at 3-4, some reasonable amount of rescheduling Plaintiffs' depositions is to be expected.

AstraZeneca's Motion implies that absenteeism at depositions shows that the underlying claims are illegitimate.  This is absurd.  A six percent rate of absenteeism would not be considered remarkable in any large population of prospective deponents and is particularly foreseeable given the pace of the "case-specific discovery program."

Second, in its "proposal" regarding Alternative Dispute Resolution, AstraZeneca calls out Plaintiffs' counsel for "openly stat[ing] at the last status conference . . . that the mere filing of lawsuits *en masse* should entitle plaintiffs to a settlement payoff."  (Mot. at 10 ("Plaintiffs and their lawyers should not be rewarded for filing claims without concern for their merit.").)  AstraZeneca's paraphrasing constitutes a gross distortion of Mr. Pennock's comments at the October 2, 2007 conference.  To set straight the record, Plaintiffs excerpt Mr. Pennock's actual statements below:

> In terms of ADR there are a few observations, if the Court doesn't mind, I'd like to make.  Number one, I believe I can go back to a transcript and find where Mr. Magaziner said that after we see 100 cases, we will be prepared to go to ADR.  I

12

think what I'm hearing, well, now, what I meant to say is after I see – and again, I'm not attempting to disparage Mr. Magaziner but it sounds as though his position has changed. And it's now, well, after I see 100 cases that I might want to settle maybe we will go to ADR.  You know, ADR or discussions regarding settlement I don't think ever should come from a posture of we're only going to settle the cases— we're only going to *discuss* cases that you can win.

In any mass tort there are cases that the plaintiffs will have great difficulty winning and [cases] that . . . defendants will have a great difficulty winning.  And what you typically do to get a resolution, *if that's the direction you intend to go as opposed to scorched earth and try every case*, is that all cases are discussed and there are, you know, for lack of a better term, but a term that is used frequently in this business, there is significant discounting that occurs depending upon the circumstances.

(Tr. of Oct. 2, 2007 Status Conference at 46:13-25; 47:1-11, emphasis added.)  Although Mr. Pennock's comments speak for themselves, Plaintiffs nevertheless seek to ensure that their ADR position is clear.

First, the Court has repeatedly requested the parties' position on ADR.  Second, *if the Court and parties are inclined to pursue ADR*, then a reality of mass tort settlement negotiations—of which seasoned defense counsel is well aware—is that it is common to *discuss* all cases in the settlement context, and to explore (or, as may be the case, rule out) the possibility of an early settlement before transaction costs of the litigation render settlement impossibly expensive.  *Accord* Manual for Complex Litigation (Fourth) § 13 (2004) ("The benefits of settlement are diminished . . . if it is postponed until discovery is completed. A better approach may be to target early discovery at information needed for settlement negotiations.").

In their "Memorandum Regarding Scheduling and Scope of Future Discovery, Venue Over 'Florida Plaintiffs'' Cases, and Alternative Dispute Resolution (Doc. 603, hereinafter, "Statement"), the Plaintiffs have re-urged the Court to utilize a Special Settlement Master to facilitate settlement negotiations, wherever the negotiations may lead.  However, *if the parties are disinclined to discuss settlement*, then the parties and Court should busy themselves with completion of general discovery and motion practice and preparation of the cases for remand and trial.

### C.   ASTRAZENECA'S PREVIEW OF ITS REQUEST FOR A *LONE PINE* ORDER IS MISGUIDED.

AstraZeneca asserts that it will shortly ask the Court for entry of a *Lone Pine* order, requiring <u>each</u> and <u>every</u> Plaintiff before the Court to produce at an early date a case-specific expert report supporting each Plaintiff's claim that Seroquel caused his/her injuries. Unilaterally requiring each and every Plaintiff to prematurely prove *prima facie* causation by the submission of an expensive and time-consuming expert witness report is not only unduly burdensome and contrary to the Federal Rules of Civil Procedure, but it will further delay this already behind-schedule litigation, and significantly postpone remand and trial of these cases.  Indeed, the so-called *Lone Pine* obligation only burdens Plaintiffs with unnecessary "make work," without any significant benefit to the Court, the parties, or the litigation as a whole.  *See* John T. Burnett, *Lone Pine Orders: A Wolf in Sheep's Clothing for Toxic Tort and Environmental Litigation*, 14 J. Land Use & Envtl. L. 53 (1998).

In light of the significant case-specific discovery already provided to AstraZeneca by each and every Plaintiff, coupled with the case-specific depositions—of which approximately 200 have been conducted during a period of approximately 75 days—requiring Plaintiffs to

provide *Lone Pine* reports is nothing more than a futile exercise.  Moreover, such an order further exacerbates the inequities in discovery thus far.  As Special Master Craig Ball recognized in his most recent report to the Court, Plaintiffs have been at the "short end of the discovery stick for so long."  (1st Status Report of Special Master Ball, October 26, 2007, at 2.)

As AstraZeneca well knows, if the Court were to adopt a *Lone Pine* order, Plaintiffs would be required to unnecessarily expend significant resources in order to comply with *Lone Pine* deadlines, further delaying these cases.  *See* Manual for Complex Litigation (Fourth) §10.1 ("Judges should tailor case management procedures to the needs of the particular litigation *and to the resources available from the parties* and the judicial system.") (emphasis added).  Indeed, as there are only a handful of firms representing thousands of pending cases, entry of anything remotely resembling a *Lone Pine* order would bring the litigation to a standstill.  In short, the Court must reject efforts by AstraZeneca to unduly burden Plaintiffs and their counsel with unnecessary "expert" reports.[2]

---

[2]     Although AstraZeneca cites a selection of distinguishable cases wherein district courts issued *Lone Pine* orders, the following is a sample of recent products liability MDL cases where a *Lone Pine* order, or its functional equivalent, has <u>not</u> issued: *In re St. Jude Med. Ctr., Inc. Silzone Heart Valves Prods. Liab. Litig.* (MDL-1396), *In re Serzone Prods. Liab. Litig.* (MDL-1477), *In re Prempro Prods. Liab. Litig.* (MDL-1507), *In re Paxil Prods. Liab. Litig.* (MDL 1574), *In re Ephedra Prods. Liab. Litig.* (MDL 1598), *In re Deep Vein Thrombosis Litig.* (MDL-1606), *In re Vioxx Mktg., Sales Practices and Prods. Liab. Litig.* (MDL 1657), *In re Bextra and Celebrex Mktg., Sales Practices and Prods. Liab. Litig.* (MDL-1699), *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.* (MDL-1708), *In re Medtronic, Inc. Implantable Defibrillators Prods. Liab. Litig.* (MDL-1726), *In re Celexa and Lexapro Prods. Liab. Litig.* (MDL-1736), *In re Human Tissue Prods. Liab. Litig.* (MDL-1763), *In re Zyprexa Prods. Liab. Litig.* (MDL-1596), *In re Bausch & Lomb Inc. Contact Lens Solution Prods. Liab. Litig.* (MDL-1785), and *In re Fosamax Prods. Liab. Litig.* (MDL-1789).

### D. **PLAINTIFFS ARE AMENABLE TO A FAIR SYSTEM OF CASE SELECTION FOR TRIAL PREPARATION.**

As provided in their Statement (Doc. 603), which is incorporated by reference herein for all purposes as if repeated in full, Plaintiffs do not oppose the Court's adoption of a fair and balanced system of case selection to establish a pool of cases on which to conduct trial preparative discovery. Plaintiffs agree in principle with AstraZeneca that a pool of 24 cases, eight each selected by the Plaintiffs, AstraZeneca, and the Court, constitutes a manageable number for which the parties may conduct future case-specific discovery and prepare for trial. Selection of such cases would be subject to such Plaintiffs' consent to venue in this Court. Also, as Plaintiffs explain in their Statement, such case-specific discovery on the trial-pool cases should only commence once the current case-specific discovery plan pursuant to Case Management Order 4 is terminated.

With the above-noted exceptions—in particular that venue over any such cases in this Court is subject to each individual Plaintiff's consent and that future case-specific discovery of trial-pool cases should be conducted only after the current case-specific discovery program is terminated—Plaintiffs otherwise do not oppose the schedule proposed by AstraZeneca at page 9 of its Motion.

### **CONCLUSION**

For the foregoing reasons, AstraZeneca's Motion Regarding the Scheduling and Scope of Future Discovery should be DENIED, except that, subject to the aforementioned exceptions and conditions set forth in Section "II-D" of this Response, (1) Plaintiffs agree to the number of cases (24) proposed by AstraZeneca to be included in the pool of cases to be

discovered and tried before this Court; and (2) Plaintiffs do not oppose the schedule proposed

by AstraZeneca at page 9 of its Motion.

Respectfully submitted

By: ___/s/ K. Camp Bailey_____
       F. Kenneth Bailey Jr.
       K. Camp Bailey
       Fletcher V. Trammell
       Robert W. Cowan
       **BAILEY PERRIN BAILEY LLP**
       440 Louisiana St., Suite 2100
       Houston, Texas 77002
       (713) 425-7100 Telephone
       (713) 425-7101 Facsimile
       kbailey@bpblaw.com
       cbailey@bpblaw.com
       ftrammell@bpblaw.com
       rcowan@bpblaw.com
       **Co-Lead Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of October, 2007, I electronically filed the foregoing PLAINTIFFS' RESPONSE IN OPPOSITION TO ASTRAZENECA'S MOTION AND COMBINED MEMORANDUM REGARDING THE SCHEDULING AND SCOPE OF FUTURE DISCOVERY with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to the counsel listed on the attached Service List.

/s/  Robert W. Cowan_____
Robert W. Cowan

**SERVICE LIST**
(As of September 5, 2007)

**In Re: Seroquel Products Liability Litigation**
**MDL Docket No.  1769 - Orl - 22DAB**

| | |
|---|---|
| Paul J. Pennock, Esq.<br>Michael E. Pederson, Esq.<br>Weitz & Luxenberg, P.C.<br>180 Maiden Lane - 17th Floor<br>New York, NY 10038<br>Telephone:  (212) 558-5500<br>Ppennock@weitzlux.com<br>Mpederson@weitzlux.com | Camp Bailey, Esq.<br>Fletcher Trammell, Esq.<br>Michael W. Perrin, Esq.<br>Bailey Perrin Bailey LLP<br>The Lyric Centre<br>440 Louisiana, Suite 2100<br>Houston, TX  77002<br>Telephone:  (713) 425-7240<br>cbailey@bpblaw.com<br>mperrin@bpblaw.com |
| Larry Roth, Esq.<br>Law Offices of Larry M. Roth, P.A.<br>Post Office Box 547637<br>Orlando, FL  32854-7637<br>Telephone:  (407) 872-2239<br>lroth@roth-law.com | Tommy Fibich, Esq.<br>Fibich, Hampton & Leebron, L.L.P.<br>1401 McKinney, Suite 1800<br>Five Houston Center<br>Houston, TX  77010<br>Telephone:  (713) 751-0025<br><br>tfibich@fhl-law.com |
| Matthew F. Pawa, Esq.<br>Law Offices of Matthew F.Pawa, P.C.<br>1280 Centre St., Suite 230<br>Newton Centre, MA 02459<br>Telephone:  (617) 641-9550<br>Mp@pawalaw.com | John Driscoll, Esq.<br>Brown & Crouppen, PC<br>720 Olive St.<br>St. Louis, MO  63101<br>Telephone:  (314) 421-0216<br>Jdriscoll@brownandcrouppen.com<br>asmith@brownandcrouppen.com<br>blape@brownandcrouppen.com |
| Keith M. Jensen, Esq.<br>Jensen, Belew & Gonzalez, PLLC<br>1024 North Main<br>Fort Worth, TX 76106<br>Telephone:  (817) 334-0762<br>kj@kjensenlaw.com | Scott Allen, Esq.<br>Cruse, Scott, Henderson & Allen, L.L.P.<br>2777 Allen Parkway, 7th Floor<br>Houston, Texas 77019<br>Telephone: (713) 650-6600<br>sallen@crusescott.com |

| | |
|---|---|
| Matthew E. Lundy, Esq.<br>Lundy & Davis, LLP<br>333 North Sam Houston Parkway East<br>Suite 375<br>Houston, TX  77060<br>Telephone:  (281) 272-0797      .<br>mlundy@lundydavis.com | W. Todd Harvey, Esq.<br><br>E. Ashley Cranford, Esq.<br>Whatley Drake & Kallas, LLC<br>2323 2nd Avenue North<br>Birmingham, AL  35203<br>Telephone:  (205) 328-9576<br>THARVEY@whatleydrake.com<br>ecf@whatleydrake.com |
| Lawrence J. Gornick, Esq.<br>William A. Levin, Esq.<br>Dennis J. Canty, Esq.<br>Levin Simes Kaiser & Gornick, LLP<br>44 Montgomery Street<br>36th Floor<br>San Francisco, CA  94104<br>Telephone:  (415) 646-7160<br>lgornick@lskg-law.com<br>dcanty@lskg-law.com<br>**llsimes@levins-law.com**<br>**jkaiser@lskg-law.com**<br>**echarley@lskg-law.com**<br>**ddecarli@lskg-law.com**<br>**bsund@lskg-law.com**<br>**astavrakaras@lskg-law.com** | Gregory P. Forney, Esq.<br>Shaffer Lombardo Shurin<br>911 Main Street, Suite 2000<br>Kansas City, MO 64105<br>Telephone:  (816) 931-0500<br>gforney@sls-law.com<br>rbish@sls-law.com<br>***Attorney for Defendant,***<br>***Marguerite Devon French*** |
| Robert L. Salim, Esq.<br>Robert L. Salim Attorney at Law<br>PO Box 2069<br>Natchitoches, LA 71457-2069<br>Telephone:  (318) 352-5999<br>robertsalim@cp-tel.net | Eric B. Milliken, Esq.<br>3 Sir Barton Ct.<br>Newark, DE 19702<br>***Pro Se*** |

| | |
|---|---|
| Justin Witkin, Esq.<br>Ken Smith, Esq.<br>Aylstock, Witkin & Sasser, PLC<br>4400 Bayou Boulevard, Suite 58<br>Pensacola, FL  32503<br>Telephone:  (850) 916-7450<br>Jwitkin@AWS-LAW.com<br>ablankenship@aws-law.com<br>aburrus@aws-law.com<br>asmith@aws-law.com<br>mailto:jsale@aws-law.comksmith@aws-law.com<br>noverholtz@aws-law.com<br>jsafe@aws-law.com | Louisiana Wholesale Drug Co. Inc.<br>C/O Gayle R. White<br>Registered Agent<br>Highway 167N<br>Sunset, LA 70584<br>*Pro Se* |
| Aaron C. Johnson, Esq.<br>Summers & Johnson<br>717 Thomas<br>Weston, MO 64098<br>Telephone:  (816) 640-9940<br>firm@summersandjohnson.com | Catherine Solomon<br>(current address unknown)<br>*Pro Se* |
| Todd S. Hageman, Esq.<br>Simon and Passanante, PC<br>701 Market St., Suite 1450<br>St. Louis, MO 63101<br>Telephone:  (314) 241-2929<br>thageman@spstl-law.com | Randy Niemeyer<br>22442 Pike 309<br>Bowling Green, MO 63334-5209<br>*Pro Se* |

| | |
|---|---|
| Thomas Campion, Esq.<br>Steven M. Selna<br>Heidi E. Hilgendorff, Esq.<br>Drinker Biddle & Reath, LLP<br>500 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>Telephone:  (973) 360-1100<br>tcampion@dbr.com<br>steven.selna@dbr.com<br>heidi.hilgendorff@dbr.com<br><br>***Attorneys for Defendants Janssen Pharmaceutical Products and Johnson & Johnson Co.*** | Mary B. Cotton<br>John D. Giddens, P.A.<br>226 North President Street<br>Post Office Box 22546<br>Jackson, MS 39225-2546<br>(601) 355-2022<br>betsy@law-inc.com |
| Michael Davis, Esq.<br>James Mizgala, Esq.<br>Sidley, Austin, LLP<br>Bank One Plaza<br>One South Dearborn Street<br>Chicago, IL 60603<br>Telephone:  (312) 853-7731<br>mdavis@sidley.com<br>jmizgala@sidley.com<br>***Attorneys for Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals, LP*** | Timothy Reese Balducci, Esq.<br>The Langston Law Firm, PA<br>P.O. Box 787<br>100 South Main Street<br>Booneville, MS 38829-0787<br>Telephone: (662) 728-3138<br>tbalducci@langstonlaw.com |
| Elizabeth Raines, Esq.<br>Baker, Sterchi, Cowden & Rice, LLC<br>2400 Pershing Road, Suite 500<br>Kansas City, MO 64108<br>Telephone:   (816) 471-2121<br>raines@bscr-law.com<br>***Attorney for Defendant AstraZenca, PLC*** | Kenneth W. Bean, Esq.<br>Sandberg, Phoenix & von Gontard<br>One City Centre<br>15th Floor<br>St. Louis, MO 63101-1880<br>Telephone: (314) 231-3332<br>kbean@spvg.com<br>***Attorney for Defendant Dr. Asif Habib*** |

| | |
|---|---|
| Robert L. Ciotti, Esq.<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard<br>Suite 1000<br>Tampa, FL 33607-5736<br>Telephone: (813) 223-7000<br>rciotti@carltonfields.com<br>***Attorney for Defendants, Astrazeneca***<br>***Pharmaceuticals, LP and Astrazeneca LP*** | Aaron K. Dickey, Esq.<br>Goldenberg and Heller, PC<br>P.O. Box 959<br>2227 S. State Road 157<br>Edwardsville, IL 62025<br>Telephone: (618) 650-7107<br>aaron@ghalaw.com |
| Jona R. Hefner, Esq.<br>3441 W. Memorial, Suite 4<br>Oklahoma City, OK 73134-7000<br>Telephone: (405) 286-3000<br>attorneyokc@hotmail.com | Mark P. Robinson, Jr., Esq.<br>Robinson, Calcagnie & Robinson<br>620 Newport Center Drive, 7th Floor<br>Newport Beach, CA 92660<br>Telephone: (949) 720-1288<br>mrobinson@robinson-pilaw.com |
| David P. Matthews, Esq.<br>Matthews & Associates<br>2905 Sackett<br>Houston, TX 77098<br>Telephone: (713) 222-8080<br>dmatthews@thematthewslawfirm.com<br>lsantiago@thematthewslawfirm.com | Robert A. Schwartz, Esq.<br>Bailey & Galyen<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744<br>bschwartz@galyen.com |
| David Dickens<br>Miller & Associates<br>105 North Alfred Street<br>Alexandria, Virginia 22314-3010<br>(703) 519-8080<br>ddickens@doctoratlaw.com | Howard Nations<br>Lori A. Siler<br>4515 Yoakum Boulevard<br>Houston, TX 77006-5895<br>Telephone: (713) 807-8400<br>nations@howardnations.com |

| | |
|---|---|
| Salvatore M. Machi<br>Ted Machi & Associates, PC<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058 | Scott Burdine, Esq.<br>Hagans Burdine Montgomery<br>Rustay & Winchester, P.C.<br>3200 Travis, Fourth Floor<br>Houston, TX 77006<br>Telephone: (713) 222-2700<br>sburdine@hagans-law.com |
| Pete Schneider, Esq.<br>Grady, Schneider & Newman, L.L.P.<br>801 Congress, 4th Floor<br>Houston, Texas 77002<br>(713) 228-2200<br>pschneider@gsnlaw.com | Lizy Santiago, Esq.<br>Abraham, Watkins, Nichols,<br>Sorrels, Matthews & Friend<br>800 Commerce Street<br>Houston, TX 77002-1776<br>(713) 222-7211<br>lsantiago@abrahamwatkins.com |
| Fred T. Magaziner<br>Marjorie Shiekman<br>A. Elizabeth Balakhani<br>Shane T. Prince<br>Eben S. Flaster<br>DECHERT LLP<br>2929 Arch Street<br>Philadelphia, PA 19103<br>(215) 994-4000<br>fred.magaziner@dechert.com<br>shane.prince@dechert.com<br>marjorie.shiekman@dechert.com<br>eben.flaster@dechert.com<br>elizabeth.balakhani@dechert.com | Lowell Finson<br>Phillips & Associates<br>3030 North 3rd Street<br>Suite 1100<br>Phoenix, AZ 85012<br>(602) 258-8900, ext. 295<br>lowellf@phillipslaw.ws |
| Scott Armstrong<br>1719 West Main Street<br>Suite 201<br>Rapid City, SD 57702<br>(605) 399-3994<br>scottarmstrong1235@eathlink.net | Linda S. Svitak<br>Faegre & Benson, LLP<br>90 South 7th Street, Suite 2200<br>Minneapolis, MN 55402-3901<br>(612)766-7000<br>lsvitak@faegre.com<br>wjohnson@faegre.com |

| | |
|---|---|
| James J. Freebery<br>McCarter & English, LLP<br>919 N. Market Street, 18th Floor<br>Wilmington, DE 19801<br>(973) 622-4444<br>jfreebery@mccarter.com<br>tpearson@mccarter.com | Richard D. Hailey<br>Ramey & Hailey<br>3891 Eagle Creek Parkway<br>Suite C<br>Indianapolis, IN<br>(317) 299-0400<br>rhailey@sprynet.com |
| Gale D. Pearson<br>Stephen J. Randall<br>Pearson, Randall & Schumacher, P.A.<br>Fifth Street Towers, Suite 1025<br>100 South 5th Street<br>Minneapolis, MN 55402<br>(612) 767-7500<br>attorneys@outtech.com | B. Andrew List<br>Clark, Perdue, Arnold & Scott<br>471 East Broad Street, Suite 1400<br>Columbus, OH 43215<br>(614) 469-1400<br>alist@cpaslaw.com<br>lcollins@cpaslaw.com |
| Ellen R. Serbin<br>Perona, Langer, Beck, Lalande & Serbin<br>300 San Antonio Drive<br>Long Beach, CA 90807-0948<br>(562) 426-6155<br>davidhwang@plblaw.com | Robert H. Shultz<br>Heyl, Royster<br>103 West Vandalia Street<br>P.O. Box 467<br>Edwardsville, IL 62025<br>(618) 656-4646<br>rshultz@hrva.com<br>bwallace@hrva.com |
| William N. Riley<br>Jamie R. Kendall<br>Price, Waterhouse & Riley, LLC<br>301 Massachusetts Avenue<br>Indianapolis, IN 46204<br>(317)633-8787<br>eamos@price-law.com | Earl Francis Carriveau<br>1012 6th Avenue<br>Lake Charles, LA 70601-4706 |

| | |
|---|---|
| Michael T. Gallagher<br>The Gallagher Law Firm<br>2905 Sackett Street<br>Houston, TX 77098<br>(713) 222-8080<br>shawnaf@gld-law.com | Stacy K. Hauer<br>Charles S. Zimmerman<br>651 Nicollet Mall, Suite 501<br>Minneapolis, MN 55402<br>(612) 341-0400<br>(800) 755-0098<br>csz@zimmreed.com |
| Buffy Martines<br>Laminack, Pirtle & Martines<br>440 Louisiana, Suite 1250<br>Houston, TX 77002<br>(713) 292-2750<br>buffm@lpm-triallaw.com | |