Brian S. Kaplan, Esq. (BK 4922)
KASOWITZ, BENSON, TORRES
  &amp; FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
*Attorneys for Non-party Daniel J. Edelman, Inc.*

DOC # 551

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| IN RE: SUBPOENAS SERVED ON HARRIS INTERACTIVE, INC., KLEMTNER ADVERTISING, INC., SAATCHI & SAATCHI HEALTHCARE, AND EDELMAN | Misc. Action No. M8-185 |
|---|---|

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION



-------------------------------------------------X
IN RE SEROQUEL PRODUCTS       :
LIABILITY LITIGATION           :
-------------------------------------------------X  MDL 1769
THIS RELATES TO                :
ALL CASES                      :
-------------------------------------------------X

### NOTICE OF MOTION TO QUASH THE SUBPOENA DUCES TECUM OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER

PLEASE TAKE NOTICE THAT, upon the accompanying Declaration of Brian S. Kaplan, dated October 5, 2007, and documents attached thereto, and the accompanying Memorandum Of Law In Opposition To Plaintiffs' Motion To Compel And In Support Of Defendant's Motion To Quash The Subpoena *Duces Tecum* Or, In The Alternative, For A Protective Order, dated October 5, 2007, Non-party Daniel J. Edelman, Inc. ("Edelman"), will move, before the Honorable Victor Marrero, United States District Court Judge, in Courtroom 20B, 500 Pearl Street, New York, New York on the 9th day of October 2007, at 11:00 a.m. or as

soon thereafter as counsel can be heard for an Order, pursuant to Rule 45(c)(3) of the Federal Rules of Civil Procedure, quashing the subpoena *duces tecum* issued by Plaintiffs' in the above captioned action, or, in the alternative, for a protective order.

PLEASE TAKE FURTHER NOTICE THAT, Plaintiffs' answering papers, if any, must be served upon the undersigned attorneys for Edelman on or before the return date.

Dated: New York, New York
October 5, 2007

By: _____
Brian S. Kaplan, Esq. (BK 4922)

KASOWITZ, BENSON, TORRES &
 FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

*Attorneys for Non-party
Daniel J. Edelman, Inc.*

To: Michael Pederson, Esq.
Paul Pennock, Esq.
Weitz & Luxenberg, P.C.
180 Maiden Lane - 17th Floor
New York, New York 10038
(212) 558-5504
*Co-Lead Counsel for Plaintiffs*

Camp Bailey, Esq.
BAILEY PERRIN BAILEY LLP
The Lyric Center
440 Louisiana, Suite 2100
Houston, Texas 77002
(713) 425-7232
*Co-Lead Counsel for Plaintiffs*

Holly Wheeler, Esq.
Blizzard, McCarthy & Nabers, L.L.P.
440 Louisiana, Suite 1710
Houston, Texas 77002
(713) 884-3750
*Counsel for Plaintiffs*

Fred Magaziner, Esq.
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2808
*Counsel for Defendants*

Brian S. Kaplan (BK 4922)
KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
(212) 506-1700
*Attorneys for Non-party Daniel J. Edelman, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| IN RE: SUBPOENAS SERVED ON HARRIS INTERACTIVE, INC., KLEMTNER ADVERTISING, INC., SAATCHI & SAATCHI HEALTHCARE, AND EDELMAN | Misc. Action No. M8-185 |
|---|---|

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

-----------------------------------------------X
IN RE SEROQUEL PRODUCTS             :
LIABILITY LITIGATION                :
-----------------------------------------------X   MDL 1769
THIS RELATES TO                     :
ALL CASES                           :
-----------------------------------------------X

**DECLARATION OF BRIAN S. KAPLAN IN OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL AND IN SUPPORT OF NON-PARTY
DANIEL J. EDELMAN, INC.'S MOTION TO QUASH THE SUBPOENA DUCES
TECUM OR, IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER**

BRIAN S. KAPLAN, ESQ. hereby declares as follows:

1. I am a member of the firm of Kasowitz, Benson, Torres & Friedman LLP, which serves as counsel for Non-party Daniel J. Edelman ("Edelman"). I am over the age of 21 and believe in the obligations of an oath. This Declaration is based on my personal knowledge and

communications with other employees and representatives of Edelman, except where otherwise indicated. I submit this declaration in opposition to Plaintiffs' motion to compel and in support of Edelman's motion to quash the subpoena *duces tecum* and deposition upon written questions, or in the alternative, for a protective order.

2. Edelman is not a party to the dispute between Plaintiffs and AstraZeneca and has no financial interest in its outcome. It is a public relations firm which, in early 2003, began performing public relations services for Seroquel, a drug produced by AstraZeneca, the defendant in the underlying products liability multi-district litigation (the "MDL Litigation"). Since 2003, Edelman has performed over 100 separate Seroquel-related projects involving more than 50 current and former employees located in various offices throughout the country. As described in more detail below, two such projects relate to the provision of expert consulting services in pending and/or anticipated Seroquel-related litigation by certain employees in Edelman's Litigation Communications group from 2006 through in or about April 2007, for which they were retained separately by the law firm of Sidley Austin LLP, outside counsel to AstraZeneca. Moreover, Edelman continues to perform work on Seroquel-related projects on an ongoing basis, meaning that potentially responsive documents and communications are continuously being created on a daily basis by dozens of Edelman employees working on multiple projects.

3. On or about July 2, 2007, Plaintiffs served a subpoena *duces tecum* and deposition upon written questions (the "Subpoena") upon Edelman seeking -- literally -- every document and communication ever created from 1986 through the present relating to Seroquel. A copy of the Subpoena is attached hereto as Exhibit A. On July 13, 2007, Plaintiffs agreed to extend for seven days, from July 16, 2007 to July 23, 2007, Edelman's time to serve written objections to the

Subpoena.

4.  Counsel for Edelman served written objections to the Subpoena on July 20, 2007 with a cover letter indicating Edelman's desire to discuss issues including clarification and narrowing of the excessively broad scope of the Subpoena. A copy of Edelman's objections, along with the accompanying cover letter dated July 20, 2007, is attached hereto as Exhibit B.

5.  Plaintiffs initially took the position that they were not able to compromise on the scope of the Subpoena at all, insisting that because they did not know what documents and communications Edelman possessed that would be relevant to the MDL Litigation, they needed everything. In other words, Plaintiffs essentially admitted that the Subpoena constituted a massive fishing expedition.

6.  On or about September 14, 2007, Plaintiffs requested a list of projects Edelman performed for Seroquel, which Edelman compiled and provided on September 19, 2007. That same day, however, Plaintiffs purported to serve a motion to compel production of documents to Edelman and other non-parties, resulting in the motion practice that Edelman had hoped to avoid or at least mitigate through good faith discussions with Plaintiffs' counsel. A copy of the letter from Plaintiffs' counsel dated September 14, 2007 setting forth their formal written request for a project list is attached hereto as Exhibit C.

7.  On September 17, 2007, I sent an email to Plaintiffs' counsel explaining that I was in receipt of their September 14th letter, but had not yet had a chance to read it as a result of religious holiday observance. A copy of my September 17, 2007 email correspondence to Plaintiffs' counsel is attached hereto as Exhibit D.

8.  The project list Edelman provided -- which, in Plaintiffs' memorandum of law in

support of their motion to compel they <u>incorrectly</u> represent to this Court they never received (Pl. Mem. at 19, ¶ 35) -- reflected approximately 100 different projects that Edelman worked on for Seroquel from 2003 to the present. A copy of the letter dated September 19, 2007 from Edelman's counsel to Plaintiff's counsel, along with the project list, is attached hereto as Exhibit E.

9. Unfortunately, Plaintiffs were willing to exclude only a relatively small number of projects from the list, while reserving the right to add such projects back to the list if deemed appropriate by Plaintiffs. Given the 70 projects remaining on the list, Plaintiffs' purported accommodation was nothing of the sort. Inasmuch as Plaintiffs continue to request <u>all</u> documents and communications relating to Seroquel, the Subpoena as modified remains tantamount to stating they continue to need virtually everything. A copy of a letter from Plaintiffs' counsel dated September 21, 2007 enclosing the revised project list is attached hereto as Exhibit F.

10. Suffice it to say, the burden associated with complying with the Subpoena is enormous, and, as detailed below, would entail lost revenue resulting from Edelman's loss of business, costs and attorneys' fees, estimated to be several hundreds of thousands of dollars, not to mention the tremendous inconvenience and harm to Edelman caused by diverting the time and energies of its public relations specialists to searching for documents that may very well have little to no relevance to the issues in dispute in the litigation, and which may have already been produced (or which could be produced) by AstraZeneca in the MDL Litigation.

11. In addition -- as a matter of paramount importance to Edelman and, upon information and belief, AstraZeneca -- a large quantity of documents and communications responsive to the Subpoena constitute work product of Edelman's Litigation Communications team, located in Washington D.C., performed for AstraZeneca and its lawyers in connection with the Seroquel

4

litigation. Many such documents and communications prepared and/or received by the Litigation Communications team are thus protected by privilege, including but not limited to the attorney-client privilege and the attorney work product doctrine.

12. Specifically, Sidley Austin LLP retained Edelman's Litigation Communications team, including but not limited to Charles Bakaly, on June 30, 2006 to provide expert consulting services to assist AstraZeneca and its counsel with AstraZeneca's defense of pending and anticipated Seroquel-related litigation.[1] Upon information and belief, Edelman's Litigation Communications team began work for AstraZeneca in the second quarter of 2006 in anticipation of a formal retention for the litigation communications engagement. Edelman documents or communications created by Edelman's Litigation Communications team to assist AstraZeneca in responding to Seroquel legal claims are clearly protected by the work product doctrine or the attorney-client privilege.

13. Based on conversations with Edelman employees, it is my understanding that the documents relating to the Seroquel litigation project can largely be isolated and should be excluded from any document production. It is estimated that there are approximately 11,500 emails of various lengths (approximately half with attachments), 990 electronic documents (other than emails) of various lengths, 2-4 file drawers and 5-10 binders filled with paper documents all associated with AstraZeneca's response to Seroquel-related litigation, and thus potentially responsive to the Subpoena as currently drafted. While some of these documents may not be privileged, Edelman is unaware of any circumstances that would justify the unreasonable burden that Plaintiffs seek to impose. Plaintiffs are able to obtain relevant, unprivileged documents reflecting Edelman communications from AstraZeneca – to whom (along with its counsel, Sidley Austin LLP) the right

---

[1] A description of Edelman's Litigation Communications team taken from Edelman's website

5

to assert privilege and work product belongs. Edelman is not a party to the litigation, and its internal communications, to the extent they do not constitute work product, are unlikely to bear on the merits of this products liability case.

14. The burden on Edelman, as a non-party, would be as significant as it is unjustified. Edelman estimates that it would take the three principal Litigation Communications employees who are actively employed by Edelman and who were significantly involved with this litigation-related project several days to gather these documents -- both paper and electronic, again, all of which will have to be scrutinized for privilege -- and coordinate with Edelman's Information Technology ("IT") Engineer to have the documents copied or scanned. The hourly rates for these three employees range from $160 to $465 per hour. Thus, the efforts required for merely gathering and copying the privileged documents would likely result in excess of $20,000 in lost earnings to Edelman, as these individuals are fully engaged and would need to take time away from other client-related projects. Moreover, the diversion of these employees' time and energy would prevent a hardship to Edelman and its clients they are presently servicing.

15. Once the voluminous number of privileged documents are copied or scanned (at further significant expense), it would be extraordinarily labor intensive and costly for Edelman to create a detailed privilege log of tens of thousands of documents. With Edelman's outside counsel who are involved in work relating to the Subpoena having hourly fees that range between $325 and $575 per hour, the cost of this exercise could easily exceed $75,000 in attorney's fees. Accordingly, all documents or communications pertaining to work performed by the Litigation Communications team should be excluded from the scope of the Subpoena and Edelman should be relieved of any

---

(www.Edelman.com) is attached hereto as Exhibit H.

obligation to create a detailed privilege log associated with any such documents.

16.     Separate and apart from the privilege issues identified above, the burden associated with identification, review, copying and production of documents and communications that are covered by the scope of the Subpoena as presently drafted, are staggeringly burdensome. I have been advised that the majority of the documents potentially responsive to the Subpoena are in electronic form, stored on the individual personal computer hard drives of approximately 50 different employees and, in certain instances, on the company's computer network.

17.     I am also advised that Edelman employees do not store and/or index emails in any single, uniform manner. For example, certain employees store emails by month or year, others by client (e.g., AstraZeneca), others by the specific product of a client (e.g., Seroquel), others by project or type of project (e.g., Media Monitoring or a specific industry conference), and still others by general subject matter or category (e.g., bipolar disorder). Thus, in many instances, Edelman would be unable to isolate Seroquel-specific data and would have to review *all* the contents of an employee's personal electronic files to locate responsive data. Moreover, given Plaintiffs' refusal to reasonably narrow the universe of data or people, or provide very specific search terms or targeted documents being sought to assist Edelman in reducing the scope of documents and communications at issue, the Subpoena essentially asks Edelman to shoulder the burden to identify, review and copy and produce (at least for its counsel's initial inspection for relevance, privilege, etc.) all work performed by employees who are reasonably likely to have performed work during the same period relating to Seroquel.

18.     Based on my communications with several Edelman employees and Edelman's recent examination of a sampling of electronic data, Edelman estimates that the average employee who

worked on Seroquel projects has between two and four gigabytes of electronic data (predominantly emails) stored in his/her personal electronic folders. Although it difficult to quantify the number of pages correlative with a single gigabyte of data without closely examining the contents of each employee's personal folders, upon information and belief a single gigabyte can be estimated to be roughly equivalent to 100,099 pages of emails (at an average of 1.5 pages per document), or 64,782 pages of Microsoft Word files (at an average of 9 pages per document). Thus, an average of three gigabytes of data per employee multiplied by approximately 50 employees who worked on Seroquel projects could be expected to yield roughly: (1) 150 gigabytes of data; (2) an enormous quantity of paper that could easily exceed 1,000,000 pages; and (3) exorbitant copying/printing and reviewing costs. A copy of a LexisNexis Discovery Services Fact Sheet listing the page approximations for a single gigabyte of data is attached hereto as Exhibit G.

19. Moreover, approximately ten additional gigabytes of additional Seroquel-related data exists on shared folders stored on Edelman's computer network, equivalent to several hundreds of thousands of pages of documents. We are advised that these shared folders predominantly encompass documents other than emails, such as Microsoft Word documents, Microsoft Excel spreadsheets and Microsoft PowerPoint presentations.

20. It is estimated that each employee would need to spend approximately two hours working with Edelman's IT Engineer to identify the data that needs to be copied. Employee hourly billing rates range between approximately $63 and $550 per hour. Employees would also have to spend additional time searching for responsive paper documents. Thus, it would be expected to cost Edelman over tens of thousands of dollars of lost billing for more than 50 employees to identify responsive data requiring copying.

8

21. Once the data is identified -- a process that alone would involve approximately dozens and possibly as much as 75 hours of an IT Engineer's time -- the IT Engineer (or his assistants, to the extent they are available) would be expected to spend up to three hours copying data for each employee, a total that could potentially reach 200 hours (not including time required for copying data residing on the shared network folders). The IT Engineer's hourly rate is $260. Accordingly, the IT Manager's time alone would cost Edelman approximately $60,000 in lost time and/or billing.

22. Finally, even though a majority of documents identified would not be expected to be privileged -- again, in contrast with the Litigation Communications team work product and communications discussed above -- once the electronic data is copied it will have to be closely reviewed by attorneys for any attorney-client privilege and work product privilege issues, as well as confidentiality and relevance. This is particularly so given that, reflected above, the data from certain employees' personal folders, including emails, relate to clients other than AstraZeneca and projects other than those related to Seroquel.

23. The cost of such review includes attorney time, as well as the expense of converting the data into a format that enables it to be uploaded onto a searchable electronic database designed for document review. Given the enormous quantity of data, Edelman estimates that the attorney's fees and costs associated with the document review alone -- exclusive of time spent responding to the Subpoena or preparing these motion papers, conferring with Plaintiff's counsel or coordinating with Edelman employees -- could easily exceed $100,000.

24. As the foregoing detail reflects, Plaintiffs have requested a gargantuan quantity of documents -- a virtually unquantifiable amount -- the production of which will cause Edelman and

9

its employees severe burden and will impose an enormous strain on its operations. It will also cost Edelman significant lost revenue resulting from its loss of business. Indeed, the time spent by Edelman's employees investigating the detail set forth herein and conferring with Edelman's attorneys in connection with the Subpoena and this motion has already cost Edelman thousands of dollars in lost revenue.

25. Accordingly, the Subpoena should be quashed in its entirety or, at minimum, quashed with respect to all documents or communications relating to work performed by Edelman's Litigation Communications team. In the alternative, a protective order should be entered to limit and reduce the scope of the Subpoena, as well as to exclude from the scope of the Subpoena all documents and communications relating to work performed by Edelman's Litigation Communications team or, at minimum, otherwise relieve Edelman of any obligation to create a detailed privilege log with respect to work performed by Edelman's Litigation Communications team.

26. A proposed Order quashing the subpoena is attached hereto as Exhibit I.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on October 5, 2007.

_____
BRIAN S. KAPLAN