UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re: Seroquel Products Liability Litigation

Case No. 6:06-md-1769

This Document Relates to ALL CASES

### DECLARATION OF A. RICHARD WINCHESTER

I, A. Richard Winchester, declare:

1. I am an attorney licensed to practice law in the state of Delaware, and a partner at the law firm of McCarter & English, LLP, counsel for defendants AstraZeneca Pharmaceuticals LP and AstraZeneca LP (collectively, "AstraZeneca"). This declaration is being submitted in support of AstraZeneca's Notice Regarding Substantial Completion of Document Production. The facts set forth in this Affidavit are based upon my personal knowledge or information, facts and data assembled by other McCarter & English attorneys working on this project. If called upon to do so, I could and would testify competently as to the facts set forth herein.

2. Since February 19, 2007 I have had primary responsibility for coordinating the document production from AstraZeneca in connection with the litigation pending nationwide relating to the use of Seroquel.

3. As of November 12, 2007, approximately 12 million pages of documents have been produced. The process by which those documents were collected, reviewed, processed and produced is described below.

4. The collection, processing, and coding of documents was a long and drawn out process that was comprised of many independent steps. Collection itself required numerous different steps. Processing, coding and production included even

ME1 6912938v.1

more steps. The collection steps are different for the type of documents involved, either hard-copy paper documents or electronic documents.

5. The process for paper collection was as follows. First, AstraZeneca interviewed the custodians solely to determine all the places that the custodians may have paper documents. These interviews were not substantive and were scheduled per the custodian's schedule. Second, AstraZeneca collected all the documents identified by the custodian, which frequently entailed retrieving multiple boxes of archived hard copy documents from AstraZeneca's outside storage facilities. To do this AstraZeneca ran various searches in its TRIM database to find the boxes of documents the custodian identified. The boxes contained numerous documents from many different sources and as such required AstraZeneca to comb through the boxes to find the custodian's documents. Paper documents were then sent to Digital Legal Services, LLC to be scanned. This was a time consuming process, which was exacerbated by the number of documents identified. The digital images of the hard copy documents were then burned onto a media and sent to Planet Data Solution's ("Planet Data") U.S. office outside New York City.

6. Collection of electronic documents from the custodian's hard drive was no less intensive. AstraZeneca first had to coordinate its IT resources with the custodian to collect the locally stored electronic documents. Thereafter, AstraZeneca predominantly used the collection tool EnCase to capture every last bit of data on the custodian's work computer. AstraZeneca then shipped the EnCase images directly to Planet Data's U.S. offices.

7. The collection of the custodian's "soft" electronic documents, i.e. those stored in network drives, was an equally taxing and time-consuming task. AstraZeneca first reached out to its collection vendor, IBM, to extract a custodian's emails from the Exchange Server into PSTs and O-drive on AstraZeneca's network. IBM then collected these documents and sent them to Planet Data.

2

8.   Thereafter, Planet Data began the second step of processing and coding the documents. After it confirmed receipt of the documents, Planet Data aggregated the data from the above three AstraZeneca sources to create a custodian data set. Planet Data then ran an automated relevance cull on the custodian data set, using the search terms provided by AstraZeneca. Documents that had none of the relevant search terms went no farther in this process and were stored electronically by Planet Data.

9.   Planet Data then converted every document that emerged from the relevance cull into the agreed format. This was a process where native documents were converted into single page tiff images. Planet Data then imposed the metadata required by CMO2 onto every document. This process was different for the different document types. For the electronic documents, these fields often were automatically collected from the metadata that was germane to every electronic document. Data that could not be automatically collected were entered by hand by Planet Data employees. For documents collected in paper form, Planet Data bibliographically coded the documents. This was a burdensome, time-consuming task, in which each document was read by a coder who then, from the face of the document, entered the information, by hand, corresponding to each metadata field required by CMO2. Once finished Planet Data transferred the tiffed and coded documents to Zantaz.

10.   After receipt from Planet Data, Zantaz loaded and prepared the documents so that review could commence. Zantaz first loaded the data into the production database Introspect. Thereafter Zantaz ran a global de-duplication process on the documents. This is a process that identified exact duplicates of documents and loaded the document so that the document would appear in the production only once. Thereafter, Zantaz ran an automated privilege filter on the documents. This is a keyword filter that highlights the documents for heightened attorney review, but does not remove the document. Both the de-duplication and privilege filters take an irreducible amount of time to process each document.

3

11.     Once the documents were loaded, de-duped and the privilege filter was run, attorney review commenced. A team of contract attorneys did an initial "first level" review. First level reviewers examined manually on a computer screen each document for several categories including relevance, trade secret information, other drug information, personal information about patients/voluntary reporters/study participants that must be redacted per federal law, and other information. Contract attorneys completed redactions by drawing a "black out" box over data on a tiff, a laborious and slow process. The tiffs then were rerun through an OCR process to include the black out marks in the produced documents.

12.     Second level review was triggered once a first level reviewer coded a document as "potentially privileged." If the second level reviewer classified the document "not privileged," it was put back into the production run. If the second level reviewer classified the document "privileged" it was removed from the production run and tagged for inclusion on a privilege log.

13.     Additionally, AstraZeneca conducted a foreign language review. A small amount of documents contain languages other than English. Such foreign language documents were reviewed in their native language with translators assisting the first level reviewers in making the normal first level review coding described above. This was a slow, expensive process whereby each document was reviewed by a translator/attorney team.

14.     Once AstraZeneca believed that all documents for a custodian had been coded, Zantaz ran a "preproduction process." This process was meant to identify documents that contained inconsistent coding that should be corrected. Inconsistently coded documents were placed in special work areas for the first level reviewers to correct.

15.     Thereafter Zantaz created a flat file of the proposed production. A "flat file" is a snapshot of the production at a moment in time, and is a quick way of

4

showing what a production will look like, that was used for quality assurance purposes. The production search criteria (substantially simplified) was "Coding complete = Yes. Relevant = Yes. Privilege = No." An AstraZeneca attorney ran a quality assurance on the flat file. This consisted of running various manual searches on the flat file to determine whether documents that should not have been included were, or vice versa.

16. After this quality assurance, Zantaz ran its production process. This process entailed stamping producible documents with a Bates number and saving them to the production media. This process was labor intensive for Zantaz and generally took one week for Zantaz to run a production of 1 million pages. Zantaz delivered the production media to an AstraZeneca attorney for quality assurance. The process again consisted of running various searches for improperly included documents. Once this quality assurance was completed, an AstraZeneca attorney QCed the entire production media. Only then could the production media be delivered to Plaintiffs.

17. The costs to AstraZeneca associated with the document collection and production process have been enormous, both in terms of money (including payments to outside counsel and to third-party vendors) and in the time spent by its employees.

18. After I assumed primary responsibility for coordinating the document production from AstraZeneca on February 19, 2007, and in order to meet the June 30, 2007 deadline for the first 80 custodial collections, as many as three document review sites were operated, two in Chicago and one in Philadelphia.

19. In the late spring, early summer AstraZeneca began speaking with FTI Consulting Inc. ("FTI") about the possibility of engaging them to supplement and eventually replace Planet Data and Zantaz. FTI signed its first agreement with AstraZeneca and began doing certain Seroquel related work on or about June 1, 2007. Prior to the sanctions hearing and Order, AstraZeneca formally retained FTI to take over

5

document production in the Seroquel products litigation, and has since migrated all of the data collected in the litigation to FTI.

20. Currently, AstraZeneca employs 169 contract attorneys for Seroquel document review, with an additional 128 contract attorneys scheduled to start on, or around, December 3, 2007 at review locations in Philadelphia and New York. Approximately 30-45 attorneys at various firms also review documents for relevance, privilege, and production.

I declare under penalty of perjury pursuant to the laws of the state of Florida that the foregoing is true and correct, to the best of my knowledge. Executed this 13th day of November, 2007, in Wilmington, Delaware.

By: _____
A. Richard Winchester

ME1 6912938v.1