## Dennis Canty

| | |
|---|---|
| **From:** | Dennis Canty |
| **Sent:** | Wednesday, October 10, 2007 3:10 PM |
| **To:** | 'Craig Ball' |
| **Cc:** | Larry J. Gornick; Jaffe, Jonathan; Pass, Robert W. |
| **Subject:** | RE: Seroquel MDL |
| **Attachments:** | custodian collection.pdf; oppos preservation order - excerpts.pdf; original search term list.pdf; dupre testimony.pdf; database priority.pdf; AZ Seroquel 7-2-07 Database Chart to Plaintiffs.XLS |

Mr. Ball:

Plaintiffs identify the following issues which carry over from our last call, and propose the following agenda:

Pace of production of "several hundred thousand documents" now in AZ's pipeline, and estimate for completion;

AZ's plan to keep production moving during vendor transition;

Status of the "catalog" of AZ's collection;

Report from Carmen Fields regarding review of QA and QC documents and procedures for preservation and collection;
        We attach documents which may assist in discussion: (1) chart detailing collection dates for particular custodians; (2) excerpts from AZ's opposition to plaintiffs' motion for a preservation order; (3) list of search terms originally applied by AZ; (4) Mr. Dupre's testimony July 26 regarding documentation of procedures.

Status of search term negotiations;

Progress of review and production of multimedia files identified and collected to date;

Report on the preservation and collection of Audix voicemail;

Report regarding the AZ's preservation and collection efforts with respect to Vikram Dev email;

AZ's plan for resolution of technical issues identified by plaintiffs;

List of track changes documents
        Plaintiffs propose production in TIFF format, accompanied by a load file containing ALL available metadata, with a reservation of the right to request native format if later justified.

Schedule for telephonic meet and confers with individuals most knowledgeable concerning databases.
        We attach documents which may assist in discussions: (1) plaintiffs' July email identifying the 17 priority databases; (2) an Excel sheet, partially completed by AZ in July, providing a limited description of databases.

**Dennis Canty**

| | |
|---|---|
| **From:** | Dennis Canty |
| **Sent:** | Wednesday, October 17, 2007 12:02 PM |
| **To:** | 'Craig Ball'; 'craigball@gmail.com' |
| **Cc:** | 'Pass, Robert W.'; 'Dupre, Andrew'; Larry J. Gornick; 'Jaffe, Jonathan' |
| **Subject:** | Agenda |

Mr. Ball –

Plaintiffs proposed agenda for today's call is as follows:

Databases
> Preservation
> Interview Process
>> Production of Documentation
>> Persons Most Knowledgeable
> Interview Schedule

Status of production of documents regarding scope of the original collection from sources and custodians
> Status of production of materials regarding initial interview of custodians

Status of privilege log production in Access format

Status of multimedia file delivery

Status of list of track changes documents

Status of Vikram Dev investigation

Status of investigation re Audix voicemail

Status of production of 750,000 previously "blank" pages

Update and schedule for transition to FTI
> Set dates
> Identify what is to be produced during transition
> Date for completion of custodial production

Status of report regarding what AstraZeneca has done to fix technical issues identified by plaintiffs

Status of parties' meeting regarding technical issues

Search terms

# Dennis Canty

| | |
|---|---|
| **From:** | Dennis Canty |
| **Sent:** | Thursday, October 18, 2007 3:38 PM |
| **To:** | 'Pass, Robert W.'; 'Adupre@mccarter.com'; 'Kerns, Kevin' |
| **Cc:** | 'Craig Ball'; Larry J. Gornick; 'Jaffe, Jonathan' |
| **Subject:** | Call with SP-ESI; October 17 |

The following will summarize yesterday's call.

Search terms

Prior to the call, Mr. Ball circulated his views with regard to the parties' remaining disputes. It was suggested that the terms SQL and SQ be run against the subject lines and message text of email -- standalone and case insensitive. AstraZeneca will provide its position on that by Thursday or Friday. AstraZeneca agreed to run the term "endocrine." Plaintiffs will provide AstraZeneca with a written proposal for refining certain terms taking into account Mr. Ball's views and Wednesday's discussions, with the hope of reaching agreement without Mr. Ball's involvement.

Databases

On Tuesday, plaintiffs conducted an interview concerning the GEL (Global Electronic Library) database, in which AstraZeneca maintains regulatory submissions, as well as drafts and annotations of those submissions. While it was at all times possible for the drafts and annotations to be saved, AstraZeneca has not implemented any measures to retain such drafts or revisions, and none have been preserved. AstraZeneca is to determine what efforts were made to preserve that data, as well as whether and where it may be recovered or found. AstraZeneca is to investigate its preservation protocols for all relevant databases, and identify any similar problems which may exist. AstraZeneca is to "act with alacrity" with respect to these items. Mr. Ball requested that this information be ready for the next call. Plaintiffs are to provide AstraZeneca with a sketch of any contemplated spoliation motion.

AstraZeneca will schedule telephone interviews and produce documentation sufficiently in advance. AstraZeneca will provide a schedule of next week's interviews ASAP. Prior to interviews, AstraZeneca will "do its homework," and provide persons knowledgeable about the subject databases.

Documentation of scope of AstraZeneca's collection of documents

AstraZeneca stated that AstraZeneca performed the "deskside" collection of documents. Though there is documentation of the collection efforts, it does not match with the files collected. There is no contemporaneous, comprehensive file listing of what was collected. Files are being sent to FTI for cataloging. There was a master protocol in place for collection. Mr. Ball asked for it, and related documents. Carmen Fields has this in her possession, and is attempting to resolve with AstraZeneca any issues of privilege which may exist. AstraZeneca will immediately provide to Mr. Ball contemporaneous (not reconstructed) documentation of the scope of collection.

Privilege logs

AstraZeneca will provide the Access file before close of business Friday.

Multimedia files

Drives were being burned on Wednesday. Plaintiffs are to send an email to Mr. Ball when they are received.

Track Changes

AstraZeneca has received and QC'd a list from Zantaz. It was provided to plaintiffs Wednesday evening.

Vikram Dev email

"Dead" hard drives are not tracked, they are destroyed. AstraZeneca will roughly identify the times of the alleged crashes, and determine whether backups exist. In a quick review of files produced, Carmen Fields has now discovered that AstraZeneca failed to process and produce one of Dev's .pst's. AstraZeneca is to describe how this happened, determine whether it happened with any of the other custodians, and describe how plaintiffs may be assured that it didn't. AstraZeneca will have this information, at least for Dev, before the next call.

Audix

This item was not addressed on Wednesday.  In the prior call with Mr. Ball, AstraZeneca confirmed that, as of October 12, it has made no effort to preserve or collect Audix voicemail, and no backup of that information exists.

750,000 previously "blank" pages

Zantaz is still numbering these documents for production.  Mr. Dupre guaranteed that the reproduction of these documents is cosmetic, and contains no information not previously produced to plaintiffs.  AstraZeneca will implement appropriate QC procedures prior to this production early next week.

Schedule for transition to FTI

Production of documents culled from the final 13 custodians using AstraZeneca's initial search terms will be complete by the end of October.  The "downtime" for custodial production is then estimated at one to two weeks.  Production of documents culled from custodians using agreed-upon search terms (now estimated by Mr. Dupre to number 800,000 to 1,000,000, before deduplication and privilege review) will begin on November 12.

Technical issues

The July 26 record demonstrates insufficient efforts on the part of AstraZeneca to correct load files.  On the next call, AstraZeneca is to report regarding efforts to correct and proposed solutions for the problems identified.

The next call is set for October 23 at 4:30 ET, 3:30 CT, 1:30 PT.

**Dennis Canty**

| | |
|---|---|
| **From:** | Dennis Canty |
| **Sent:** | Tuesday, October 23, 2007 9:31 AM |
| **To:** | 'Craig Ball' |
| **Cc:** | Pass, Robert W.; Larry J. Gornick; 'Jaffe, Jonathan'; Adupre@mccarter.com |
| **Subject:** | 10.23 Call with SP-ESI; Agenda |

The following is a proposed agenda for this afternoon's call.

Search terms

AstraZeneca's position re suggestion that the terms SQL and SQ be run against the subject lines and message text of email -- standalone and case insensitive.

Databases

Status of AstraZeneca's investigation re efforts to preserve GEL data, and whether and where it may be recovered or found.

Status of AstraZeneca' investigation re preservation protocols for all relevant databases, and whether any similar problems exist.

Interviews – discussions regarding mechanisms for delivery of data

Status of documentation of scope of AstraZeneca's collection of documents

Estimate for delivery of remaining multimedia files

Vikram Dev email

Report regarding the times of Dev's alleged crashes, and determination of whether backups exist.

Report regarding how Dev's pst was missed, and how plaintiffs may be assured that this didn't happen with other custodians.

Status of production of 750,000 previously "blank" pages

Report regarding AstraZeneca's efforts to correct technical issues with prior productions and proposed solutions for the problems identified.

## Dennis Canty

| | |
|---|---|
| **From:** | Dennis Canty |
| **Sent:** | Tuesday, October 23, 2007 1:40 PM |
| **To:** | 'Craig Ball' |
| **Cc:** | Pass, Robert W. |
| **Subject:** | FW: Today's call |

**From:** Dennis Canty
**Sent:** Thursday, September 27, 2007 8:01 AM
**To:** 'Pass, Robert W.'
**Cc:** 'Winchester, Tony'; 'Freebery, James J.'; 'stephen.mcconnell@dechert.com'; 'Jaffe, Jonathan'; Larry J. Gornick; 'Holly Wheeler'; 'Dupre, Andrew'
**Subject:** Today's call

Bob:

How does 4 ET look?

Items for the agenda:

1)   Search terms

2)   Databases

3)   Outstanding technical issues:

| Issue # | Description |
|---------|-------------|
| TI100 | Additional IND/NDA production? |
| TI101 | All load files misidentified custodians and continued misidentification in letters |
| TI102 | Blank page corrections - still outstanding |
| TI103 | Corrected load files bad format |
| TI104 | Corrected load files mismatched headers |
| TI105 | Corrected load files misidentified custodians |
| TI106 | Deduplication across custodians missing data |
| TI107 | Deduplication within a custodian missing data |
| TI108 | Detailed QC processes for three vendors |
| TI109 | Duplicate Bates numbers |
| TI110 | Email from proxies - missing |
| TI111 | eSTaR list of fields under confidentiality review |
| TI112 | eSTaR production of comments |
| TI113 | Excel native nonmatches |
| TI114 | Explanation of how prefix was left off of the Bates |
| TI115 | Faxes - missing |
| TI116 | Foreign language document production |
| TI117 | Inconsistent metadata - attachments with file create dates a year different from w |
| TI118 | Independent investigation into whitewashed pages |
| TI119 | Investigation into how seroquel, diabetes, and quetiapine documents were missed an repeated |

| | |
|---|---|
| TI120 | Low email count for some custodians such as Vikram Dev |
| TI121 | Marketpro production of data |
| TI122 | Media files - non collection based upon search and not custodial responsibility |
| TI123 | Media files - non production of what was collected |
| TI124 | Missing Bates numbers |
| TI125 | Missing tracked changes |
| TI126 | Multiple email addresses |
| TI127 | Multiple email servers |
| TI128 | New load file for AZSER 10765223-10765304 - 2007-09-05 - Seroquel USPT Materials.1 |
| TI129 | Nonproduction of other databases including documentation |
| TI130 | Overlapping Bates Numbers - Replacement Image AZSER03317929 contains 2 pages AZSER Related image AZSER03317930 also contains 2 pages first page starts with AZSER0331 the replacement image. |
| TI131 | Page breaks in extracted text missing break in first page |
| TI132 | Page breaks in extracted text unacceptable error rate |
| TI133 | Preservation of emails |
| TI134 | Search attachment question - did search capture email where attachments contained |
| TI135 | Search terms EU privacy |
| TI136 | Search terms results |
| TI137 | Third party discovery |
| TI138 | Voicemails |

Dear Mr. Ball:

This will serve as defendants' submission (a) summarizing the October 23, 2007 conference call among representatives of defendants, representatives of plaintiffs, and you; and
(b) in correction of Mr. Canty's October 18, 2007, email to you, me, and other participants in our October 17, 2007 call. This is a summary submission, and therefore not an attempt to restate or address every detail of our conference call of October 23.

Please note that, while organized in parts – Part I addresses the October 23 call and Part II addresses Mr. Canty's October 18, 2007, email (which related to the October 17 call), to the extent matters discussed in Part I below also reflect differences as to a topic addressed in Mr. Canty's email, the statement in Part I should be taken to constitute a disputation of that email, regardless of whether addressed specifically again in Part II.  In addition, Part I contains some discussion of the October 17 call for purposes of completeness.

Finally, Part III is a brief recapitulation of certain completed AstraZeneca ("AZ") deliverables identified in our conference calls. These do not, of course, constitute all the materials produced since July 2007 or even since your appointment.  They simply reflect materials delivered that were specifically the subject of discussions with you in our calls.

## I. CONFERENCE CALL OF OCTOBER 23, 2007.

## 1. Load File ("Technical") Issues.

Bill Adams reported on his investigation into "load file" issues.  Mr. Adams explained that his investigation took place within the week prior to the October 23, 2007 conference call.  Despite repeated inquiries, AstraZeneca could identify no investigation of these issues or efforts to address them that may have occurred between July 26 and last week.   The following is a summary of what Mr. Adams explained.

Up until early July, 2007 the delivery of image and objective coding load files (i.e. .lfp/.opt for images and .dat for objective coding) contained inconsistencies regarding prefixes, field order and field naming.  In response to complaints Zantaz developed a utility to handle the generation of the load files from the review database.  As a result, 86 pairs of load files were delivered to Plaintiffs.  Each pair included .lfp and .dat files. The filenames for these load files matched the produced custodians' names or the name of subject matter productions (e.g. Foreign Language).

To add perspective to the rest of the discussion, Mr. Adams discussed the current working of the global de-duplication scheme.  He described four scenarios, as summarized in the following chart:

| First in Database | Presented for Loading | Action |
|---|---|---|
| Stand Alone | Duplicate Stand Alone | Duplicate excluded and  source field updated with the source field value from the excluded duplicate |
| Email Family | Duplicate Email Family | Complete duplicate family excluded and source fields updated with the source |

| First in Database | Presented for Loading | Action |
|---|---|---|
| | | field values from the excluded duplicate document family |
| Stand Alone | Email Family in which one attachment is duplicative of the Stand Alone | Email family added and source field for the stand alone and duplicative email family attachment is updated |
| Email Family | Duplicate Stand Alone | Stand alone file excluded and source field for the duplicative email family attachment is updated with the source field value from the excluded stand alone duplicate |

He determined that the field naming and order in the corrected load files was consistent across all 86 pairs.  There were allocation errors where documents listed in a load file named for one custodian do not have the source name for that custodian coded to the document. This was caused by both the global de-duplication scheme as well as previous productions prior to July that were for multiple custodians. This misallocation of documents into the corrected load files is not an indication that the source name is incorrect but simply a problem of labeling.

This is an incorrect representation. The source name field contains the names of people who are not custodians. Logically, this would not happen if the above were true. Logically as well, unless there is a flaw in the de-duplication process, the source name field should never be missing the name of a custodian in whose possession a file was found. Logically, the only reason that a custodian's name would be missing from the source name field would be because the file was not in the custodian's possession.

Plaintiffs are still not satisfied as to why documents clearly belonging to a custodian, under a custodian's name in a load file, do not have the custodian's name in the source field.

On the phone, defendants indicated that there were certain situations where the deduplication process would result in a race condition. (It was determined on the telephone that BCC's would have been eliminated by the de-duplication process.)  Plaintiffs maintain that the metadata for the deduplicated documents should have been preserved. Outstanding questions remain. For example, if an independent file was encountered before the identical file as an attachment, would the relationship as an independent file or as an attachment be lost? would the file's date be the date of the attachment or the date of the file? On the October 17 call, Special Master Ball recommended dropping the de-duplication across custodians to preserve a custodian's complete file.

Defendants believe this constitutes a complete response to TI101 and TI105[1] as well as a partial response to Plaintiffs' Exhibit 11.[2]

Plaintiffs indicate in TI103 that the corrected load files have a formatting issue. Defendants

believe this is really a text encoding issue.  The corrective load files were text files, but were encoded as UTF-8.  The encoding on the text files can be changed by opening in Notepad and saving to ANSI encoding. This action would not threaten the integrity of the data. Mr. Jaffe expressed the desire that Defendants perform that operation and re-deliver the load files.  Defendants offered to redeliver load files with ANSI encoding.  Plaintiffs are not confident that this is the problem, but will wait for the redelivery.  These redelivered load files would not be organized by custodian but would be broken into smaller chunks.  While not discussed on the call, Defendants can work directly with Mr. Jaffe on the desired size (or maximum row count) of load file deliveries. Defendants believe this constitutes a complete response to TI103 as well as a partial response to exhibit 11 (which along with the response to TI101 and TI105 constitutes a complete response to exhibit 11).

Plaintiffs indicate in TI104 and in exhibit 12 that there is a mismatch between DAT file headers and columns.  At the time of the call, defendants were aware of 1 load file containing an extra empty column (which was also listed in a spreadsheet attached to the original email represented by exhibit 12) and were investigating the other load files.  Additional investigation showed issues with 3 other .dat files.  In any event, a re-delivery of the corrected load files with ANSI encoding makes TI104 a moot issue.

The 86 corrected load files had duplication for the Bates range AZSER7940097 to AZSER7977153.  This was caused by the allocation of the Foreign Language production across

[1] References to numbers preceded by "TI" herein refer to the numbering convention appearing under the heading "Outstanding technical issues" in Mr. Canty's September 27, 2007, email, that has been provided to Master Ball.  [2] Exhibit references are to exhibits in Plaintiffs' July 26 , 2007, hearing evidence.

the other load files.  The corrective action would be to simply ignore the foreign language load file, but the pending re-delivery makes this a moot issue.  Plaintiffs caution that any redelivery should undergo the same checks that were performed on these load files to ensure consistency in the data.

TI128 concerns the need for a corrected .lfp file to replace AZSER 10765223-10765304 2007-09-05 - Seroquel USPT Materials.lfp. The error related to a missing 0001 folder in the path.  Defendants have a corrected file, but Mr. Jaffe indicated that Plaintiffs had already self-corrected. Defendants believe that TI128 is now closed.

## 2. Search Terms.

The parties had previously agreed to 178 of Plaintiffs' proposed search terms. On the October 17 call, AZ further agreed to run the term "endocrine," and Plaintiffs agreed to drop the term "endocr*", bringing the total agreed search to 179 terms.  In that call AstraZeneca continued to object to generic and noisy terms that are not specific to Seroquel, such as "FDA". Master Ball suggested running the terms "SQ" and "SQL" over only email bodies and subject lines. AZ agreed to consider that proposal.  Master Ball stated that he was disinclined to allow the remaining generic or noisy terms.  Master Ball permitted Plaintiffs the opportunity to make a showing of why such terms are necessary.

The parties agreed in the October 23 call to run the terms "SQL" and "SQ" over all documents, but attached to certain limiting terms with a "but not" Boolean connector.  This was a variant of Mr. Jaffe's October 5 suggestion.

The current number of agreed terms is therefore 181.

AstraZeneca not yet responded to plaintiffs' October 23 proposal with regard to certain remaining terms.

### 3. Documentation Of Scope Of AstraZeneca's Collection Of Documents.

After multiple requests by Mr. Ball spanning two weeks, ~~We~~AstraZeneca reported on the three categories of information supplied to Master Ball on the AZ collection efforts and reported on the status of a fourth category. Prior to the call we sent documents to Mr. Ball in camera to provide detail about the technical collection efforts executed by AZ. The first category of documents sent to Master Ball included the technical collection documents as drafted by AZ. We confirmed that these documents were created by AZ to direct the collection efforts and they were not created by AZ specifically for Master Ball's request. We reported that one document was created by the resource that was responsible for PST file creation to memorialize the process he had used for PST collection. However, it was completed prior to Master Ball's request. The second category of data sent was created and maintained by AZ to memorialize the running status of the collection effort throughout the collection process. The final category of information sent was created by FTI after they received a copy of the collected data as a part of their normal intake process. The FTI consultants documented in detail what they received and cross referenced that information with the data supplied in category two. For the fourth category we reported on the status of the file-listing request, which is currently under way. We also confirmed the deliverable with Master Ball to ensure that he received the file listing data in a manner that was convenient for him. He responded that he would be comfortable receiving the file listings either per custodian or in one complete delivery in either Microsoft Excel or Microsoft Access.

### 4. Vikram Dev Emails.

AZ reported the three dates of the computer complications encountered by Mr. Dev between 2003 and 2005. The specific dates of the computer issues were 03/03/03, 12/09/04 and 12/14/05. We then confirmed that the monthly backup tapes during those time periods had been preserved (without agreeing that the data on them must be restored and searched). Lastly, we discussed the human error that resulted in Planet Data not processing Mr. Dev's largest mail file after they received it from AZ. AstraZeneca explained that its vendor had intended to temporarily remove the file from the production process because it was so large, but had failed to later address it. The vendor has commissioned an internal review to ensure that further data had not been missed and will alert us promptly if they encounter any other data that was not processed. We in turn agreed to alert Master Ball and Plaintiffs if such an event occurred. We also alerted Master Ball that we will be following Planet Data's reconciliation process with our own to ensure that nothing further was missed. Master Ball then requested that AZ look at the original mail file to determine if any gaps existed and to ask Mr. Dev directly if he had been aware of any email losses as a result of his computer problems.

### 5. Correction Of "Blank" Pages.

On October 17, AstraZeneca indicated it would deliver of a reproduction of these documents (which Mr. Dupre "guaranteed" was "cosmetic" only) early the following week. Mr. Ball emphasized the need for adequate quality control procedures, and Mr. Dupre related that the same were in place. On October 23, the production had not yet been delivered, and AstraZeneca informed Plaintiffs that the

agreed delivery of blank pages would occur on Wednesday, October 24, 2007. The delivery occurred. ~~Yesterday afternoon Plaintiffs raised~~ Within hours of receipt, plaintiffs identified certain issues concerning that production.  For instance, at least 10% of the documents were reproduced with more pages than as originally produced. Pages which were originally blank now contained text.  Some replacement documents appeared entirely different and unrelated to their corresponding originals. AstraZeneca is investigating those issues with their vendors on a priority basis, and will correct any legitimate problems that may be identified.

**6. Retention Of Database Materials.**

**A. GEL Database**. We reported that our current information, gathered since the October 17 call, which information we continue to gather and refine, is that drafts and revisions to materials on the GEL database (a Documentum database) were retained by Kathy Bradley, one of the original AZ Custodians, as well as other produced Custodians for document production. AZ is to obtain a detailed declaration from Ms. Bradley setting out how she retained such materials, describing the measures she employed to make sure that all such materials were saved, and listing the Seroquel related materials retained, providing Bates numbers for documents produced.  .—

**B. Other Documentum Databases**. We reported that our current information, which we continue to gather and refine, is that drafts and revisions of materials relating to Seroquel on other AZ Documentum databases were generally retained either on the database or in other locations, such as employee laptops.  By October 30, 2007, AZ will submit a time frame for completing its factual investigation and reporting on these matters.

**C. Other Databases**. We reported that as to other databases relevant to Seroquel, our current indications are that no such draft issues should exist. By October 30, 2007, AZ will submit a time frame for completing its factual investigation and reporting on these matters.

**D. Going Forward**. AZ reported that it is implementing appropriate steps to retain Seroquel materials in Seroquel relevant databases going forward, to the extent, *if any*, that such materials would otherwise not be retained.  AZ is not required to alter the way in which the databases function in order to do so, and may retain such materials on accessible media outside the databases.

The above discussion assumed *arguendo*, without AZ agreeing, that there was a substantive law obligation to take steps to retain such database materials (e.g., drafts), even though AstraZeneca continues to believe that no such legal duty exists.

**7.    Database Meet And Confers.**

From October 16-26th, we will have conducted database meet and confers for sixteen databases. We have accomplished the following:

We will have conducted meet and confers for GEL, SnapPharma, Clintrace, LBX, CRF/DEN, AZER, Planet, Viewpoint, Compass, Northstar, CTM/Impact, Data Warehouse, Webstir, Touchstone Interactive, Touchstone SFA, and Radar.

We will have put up, conservatively, in excess of 30 individuals to speak on behalf of AstraZeneca with respect to these databases.

To facilitate productive discussions, we have provided Plaintiffs, where available, with technical

documentation regarding the database, such as technical specifications and data maps.

——In addition, we have agreed on each conference thus far, and anticipate that we will continue to agree, to provide additional documentation and sample reports at Plaintiffs' requests so that they will be able articulate their requests with respect to each database.

The remaining database has been identified as "Seroquel Lifecycle Scientific Database." We asked Plaintiffs on Friday October 19th to clarify this request, as our IT people were unfamiliar with this database.  Plaintiffs' provided a document referencing "Seroquel Lifecycle Scientific Database" on the evening of October 23rd.  AstraZeneca is investigating this database and will get back to Plaintiffs as soon as possible.

**8.     ~~Additional~~ Information To Be Provided Regarding Multimedia Files Already Produced.**

On October 18 and 22, 2007, AstraZeneca delivered to Plaintiffs approximately 3,000 multimedia files that had been stored on the hard drives of the first 80 custodians.  This delivery was made in native format and included the metadata naturally embedded in these files.  On the call, AstraZeneca explained that these files were not housed in its vendor database because those databases do not have the capability to structure non-text files.

Master Ball directed AstraZeneca to retrieve certain metadata germane to the location of the multimedia files on the custodians' hard drives, such as folder and file name.  This information should have been provided to plaintiffs when the files were produced, but AstraZeneca had "dissociated" this metadata from the files.  AstraZeneca and Master Ball agreed that this metadata is not embedded in the multimedia files, but rather is overlayed based on storage location.  Immediately after the call, AstraZeneca instructed its EDD vendor to reconstruct file names and modified, accessed and created dates from the client deliveries as requested by Master Ball to provide to Plaintiffs.

**9.     FTI Conversion Scheduling**.

AZ explained in the October 17 call that it cannot begin the conversion from Zantaz/Introspect to FTI/Ringtail until delivery of documents for the outstanding 13 custodians. AZ estimated that delivery will occur on October 31, 2007. AZ indicated that there will be a data delivery and conversion period of 1-2 weeks, during which time AZ will be unable to work on documents that require global deduplication, i.e. the custodial documents. Instead, AZ will work on responses to outstanding requests for production during that period. There is substantial work to be done on responses to requests for production, which AZ is currently producing on a rolling basis, such that there will be no downtime for the reviewers or gaps in the production of documents to Plaintiffs.  If this plan works as expected, AZ estimates that it will be able to resume the custodial production, which then will consist solely of new search term documents, (according to Mr. Dupre, numbering some 800,000 to 1,000,000 documents, before deduplication) sometime during the week of November 12, 2007.

**II. <u>RESPONSE TO MR. CANTY'S EMAIL</u>.**

Defendants dispute or correct Mr. Canty's email as to the points set out below.

## 1. GEL Database.

On the October 17 call, Kevin Kerns confirmed that the GEL database was capable of saving the materials, and, as reflected in GEL documentation, that GEL software settings could easily have done so, and that the software had not been set to do so. As also discussed in our October 23 conference call, AstraZeneca now contends that it was incorrect to state, as Mr. Canty's October 18, 2007, email did, that no drafts or revisions of materials on the GEL database had been "preserved" or that no measures were employed that did so. Rather, because Plaintiffs raised an issue concerning this at the Eleventh Hour on the October 17 call, (AstraZeneca having disclosed that information only the previous day in a database interview), we indicated in that call that we would need to look into the assertions made by plaintiffs and would report back, which the Special Master permitted. We did so, as indicated in Part I above.

## 2. AUDIX.

Plaintiffs' statement of the AUDIX voicemail system is incorrect. At all relevant times, the custodians had available to them a program called Message Manager. (This implies that each of the 80 custodians identified by AstraZeneca had Message Manager. AstraZeneca's previous representation was that only 30 did.) A custodian can use the Message Manager program to save voicemails from the AUDIX phone system to the custodian's computer hard drive. The custodian's hard drives, including any voicemails they may have saved, were collected and preserved. (This implies that every custodian was instructed to save every voicemail during relevant period. Is this accurate?)- Those voicemails were produced along with other multimedia files on October 22, 2007. Plaintiffs appear to believe that AstraZeneca was required to save all voicemails in the entire company on the AUDIX system, rather than on hard drives through Message Manager. (At the very least, AstraZeneca was obligated to preserve relevant voicemail for the 80 most significant witnesses.) This demonstrates a misperception of how AUDIX systems work. Such misperception could be cleared through a meet/confer in the same format as those presently being undertaken for certain databases. In addition, scripts of voicemails left for AZ's sales representatives relating to Seroquel are being produced in response to Plaintiffs' requests for production of documents. At a minimum, AstraZeneca was obligated either to preserve relevant voicemail via Message Manager, or to preserve the information in the Audix system. It appears that AstraZeneca has done neither.

## 3. Documentation of Collection.

Mr. Canty's email incorrectly states that the documentation of the collection efforts does not match the files collected. This was precisely what Carmen Fields related on the October 17 call. AstraZeneca now appears to be changing its position. The processes created and memorialized by AZ do in fact match with the data that was collected. While AZ had not created full file listings of the data collected, AZ does have the full data set preserved. A full copy of the data was sent to FTI so their consultants could provide the full file listings to Master Ball.

## 4. Load File ("Technical") Issues.

Mr. Canty's email argumentatively asserts that AZ has made "insufficient efforts" to "correct load files." AZ has repeatedly offered to have a substantial meet/confer session with Plaintiffs to resolve all backward-looking technical issues. AZ has offered to include the project manager of Zantaz (Jarod Kidd), the project manager of FTI (Bill Adams), AZ's litigation technical committee representative

(Carmen Field), and AZ's technical lawyers (Bob Pass, Andrew Dupre) in this meet/confer. Plaintiffs have repeatedly refused this offer.have agreed to meet with AstraZeneca following AstraZeneca's report on what it has done to investigate the various issues identified in June and July, most notably in connection with the sanctions hearing.  —Instead, Plaintiffs demand that AZ catalogue all errors (while refusing to share what errors they currently believe exist) and attempted fixes that have occurred to date. Plaintiffs indicate that they believe such a catalogue is important to their sanctions motion. Plaintiffs would like to have the benefit of AstraZeneca's investigation before turning additional efforts to resolving problems repeatedly identified in detail.  Mr. Gornick suggested that we start at "Square 15" rather than "Square 1" assuming AstraZeneca had done some work since July 26.  Until Mr. Adams' report, discussed above, AstraZeneca had provided no indication that any work had been done.  AZ suggested prioritizing going-forward fixes over backwards-looking sanctions analysis, the latter of which seems counterproductive to the goal of completing discovery in a timely and orderly manner. Plaintiffs refused, demanding that their proposed cataloguing occur first.  AZ explained that fixes for many of the outstanding technical issues require Plaintiffs' involvement and cannot occur so long as Plaintiffs refuse to meet and confer.  This issue remains unresolved and a large number of possible technical fixes therefore remain in limbo.

Mr. Ball indicated that plaintiffs are entitled to a report detailing AstraZeneca's investigation and efforts from July 26 to today, identifying the roots of problems and proposed solutions.  Mr. Ball suggested that AstraZeneca employ a person or persons with that sole focus.  AstraZeneca agreed to consider this, and reply.—

## III. NOTE REGARDING COMPLIANCE WITH CERTAIN DELIVERY DATES

AZ would further note that it timely complied with deadlines agreed to or established during the October 17, 2007, conference call as follows:

**Privilege Log Delivery**. Privilege Logs: AZ agreed to deliver the privilege logs in MS Access format in addition to the usual searchable .pdf format. AZ did so on October 18, 2007. The privilege logs had been timely delivered previously.  This was a delivery responsive to Plaintiffs' request that they be provided in a form that would allow plaintiffs to sort them by custodian and witness. Mr. Ball requested that AstraZeneca provide this information on the very first conference call in September, but AstraZeneca finally produced it only when a firm deadline was given.

**Tracked Changes Documents Listing**. Track Changes:  AstraZeneca first delivered a spreadsheet of 20,000 control numbers which did not match with the documents it had produced in the litigation.  After this was brought to AstraZeneca's attention, AZ delivered a spreadsheet of 16,000 Bates numbers showing documents with metadata indicating the presence of "track changes" on October 17, 2007, as directed by Master Ball.

**Multimedia Files**. Multimedia files:  AstraZeneca first agreed to produce the multimedia files on October 18, but only delivered a portion.  AZ  subsequently agreed to produce all relevant, non-privileged multimedia files before the October 23, 2007 call with Master Ball. AZ delivered the files at 3:00 p.m. EDT on October 22, 2007. The files delivered had been renamed and "dissociated" from their basic metadata.  AstraZeneca was ordered to correct this on October 23.  ————.

-Thank you.

Robert Pass

cc: Larry Gornick, Dennis Canty, Jonathan Jaffe

## Dennis Canty

| | |
|---|---|
| **From:** | Larry J. Gornick |
| **Sent:** | Friday, November 02, 2007 6:46 AM |
| **To:** | 'Craig Ball'; RPass@carltonfields.com |
| **Cc:** | Dennis Canty; Jaffe, Jonathan; Field, Carmen Oveissi; McConnell, Stephen; Jim Freebery; Adupre@mccarter.com; Bill.Adams@fticonsulting.com; Kerns, Kevin |
| **Subject:** | Agenda for 11/2 Conference Call with Master Ball |

Mr. Ball's findings regarding AstraZeneca's collection of documents

Vikram Dev
>    Results of AstraZeneca's review of the original mail file to determine if any gaps existed
>    Results of inquiry to Mr. Dev re his awareness of any email losses as a result of computer problems.

GEL database
>    Shortcomings of Bradley declaration
>    Listing of the Seroquel related materials retained, providing Bates numbers for documents produced
>    Status of preservation of non-US materials
>    Production issues

Past preservation of other databases
>    Time frame for AstraZeneca's completion of its factual investigation and reporting on these matters (due 10/30).

Database preservation going forward
>    Assurance that materials retained in "accessible media outside the databases" do not lose their association with materials remaining in the databases.

Status of database interviews

Audix
>    Schedule meet and confer in the same format as those presently being undertaken for certain databases.

Multimedia file delivery
>    Status of production of metadata

Privilege Log
>    Re-production of data in Access format, indentifying documents for which privilege designation has been recently removed

Track Changes

Status of search term negotiations
>    AstraZeneca's response to plaintiffs' proposal

Custodial Affidavit
>    AstraZeneca's response to plaintiffs' revisions

"Blank page" and related production issues
>    Status of investigation

Load file and de-duplication issues
>    Status of investigation
>    Status of redelivery of load files with ANSI encoding
>    Report detailing AstraZeneca's investigation from July 26 to October 8

AstraZeneca's response re employment of a person or persons with that sole focus.

Schedule to complete ESI production

Lawrence J. Gornick
Levin Simes Kaiser & Gornick LLP
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
(415) 646-7179

Dear Special Master Ball:

Please accept this submission as AstraZeneca's summary of our November 2, 2007 meet and confer call. This summary, meant to be a factual report rather than an adversarial pleading, is organized according to the agenda submitted by Plaintiffs.

At the beginning of the call, Special Master Ball gave Mr. Pass an opportunity to offer agenda items for discussion.  Mr. Pass indicated that the defendants would defer to Plaintiffs' agenda.

## 1. Vikram Dev Emails

AstraZeneca reported that it had completed review of Vikram Dev emails recently discovered from an unprocessed .pst file.  AstraZeneca agreed to produce those emails on Wednesday, November 7, 2007. Ms. Field also reported that AstraZeneca's investigation of this topic revealed that Mr. Dev's email files appear sparse (though not void) for certain periods, possibly relating to Mr. Dev's already-known computer issues.  AstraZeneca reported that they discovered emails from 2000-2002, that there were gaps in the emails from September 2002-September 2004, and that there was full data loss from laptop incidences.

Plaintiffs stated their belief that reminded the group that AstraZeneca had identified Mr. Dev is a critical as one of the eight most important custodians, and that the period from September 2002 to September 2004 may be is an important time for emails due to changes in the Japanese and U.S. labels for Seroquel and related communications between AstraZeneca and U.S. and Japanese regulatory agencies.  Plaintiffs stated that Mr. Dev is the Vice President of Drug Safety, and likely to have sent emails to high level managers who are not designated custodians. Plaintiffs also stated that they believed Mr. Dev's conceded three successive computer problems, each of which resulted in total data loss, appeared to could be amount to spoliation.

Special Master Ball stated that he did not believe that any accidental data loss occasioned by crashes or viruses on Mr. Dev's computer hard drive constitutes spoliation.  [Plaintiffs do not recall Special Master Ball stating this.]  Mr. Ball directed AstraZeneca to produce relevant, non-privileged emails from Mr. Dev's recently discovered .pst file by Wednesday, November 7, 2007 (AstraZeneca agreed) and requested that AstraZeneca confirm the production date by close of business the day of the call.  Mr. Ball also directed Plaintiffs directed AstraZeneca to propose a sampling methodology to determine the likelihood that the production is missing any important Vikram Dev emails, perhaps by proposing certain restoration dates from back up tapes close to the known dates of Mr. Dev's computer crashes.  Special Master Ball requested that AstraZeneca provide an analysis of the costs associated with restoring backup tapes for Mr. Dev. Special Master Ball also requested AstraZeneca to talk with Dr. Dev about steps taken by him after the crashes to recover data.  AstraZeneca stated they would provide Special Master Ball a list of Mr. Dev's documents marked confidential.  AstraZeneca represented they would begin analysis of what Mr. Dev may have in other mailboxes.

## 2. GEL Database

The parties discussed the limitations of a declaration submitted by custodian Kathryn Bradley regarding the input of drafts into the GEL database.  Specifically, Mrs. Bradley cannot address non-US use of GEL, and also was not in charge of entering drafts into GEL during a four month period while she was on maternity leave.  Further, Mrs. Bradley did not save anything related to non-U.S. labeling, correspondence between AstraZeneca and various regulatory authorities, Safety Evaluation and Review meeting materials and Periodic Safety Update Reports for Seroquel, and would not have saved anything prior to 2002.  In addition, Plaintiffs requested that Mrs. Bradley's declaration be amended to reflect that the steps taken by her were part of her normal custom and practice, and that she does not recall any instance where she did not take the preservation steps described.

The parties disagreed regarding the start date of AstraZeneca's duty to preserve any documents related to Seroquel. AstraZeneca stated (without conceding) that the earliest possible date preservation duty could have arisen was the first Seroquel suit filed approximately September 2003.  AstraZeneca therefore argued that Mrs. Bradley was in charge of entering drafts during the entire period of AstraZeneca's preservation duty in this case, except for the four months that she was on maternity leave.  AstraZeneca offered to procure a similar declaration from the employee that filled in for Mrs. Bradley during the maternity leave period. AstraZeneca expressed the view that those two declarations therefore entirely covered the issue of GEL drafts regarding labelling, except for foreign materials discussed more fully below.

Plaintiffs argued that AstraZeneca may have had an earlier duty based upon a circa 2000 ~~Justice Department~~ government investigation related to off-label marketing, which resulted in a June 2003 corporate integrity agreement, but not to Seroquel specifically. Plaintiffs also stated that, even if no preservation duty existed, AstraZeneca must produce earlier created drafts that it might still possess.

Regarding possible drafts entered by foreign business units, AstraZeneca stated that there was already an agreement in place to produce regulatory materials from several countries, but not all 50+ countries which use GEL.  AstraZeneca acknowledged that Plaintiffs have reserved the right to ask for additional countries at a later date.  Plaintiffs agreed that AstraZeneca should focus its investigation on the previously agreed countries.  Plaintiffs clarified that the country limitation related to a motion to compel in the MDL.  AstraZeneca agreed that Plaintiffs did ask for all drafts, and that the country limit was set during the meet and confer process.

Special Master Ball directed AstraZeneca to address what information is absent from the GEL database concerning Seroquel and to determine whether or not GEL contains a log of documents that are deleted as that database is used in the ordinary course of business. (AstraZeneca has since reported that GEL does not contain such a log.)

## 3. Status of Production Issues

AstraZeneca restated its previous objections that Plaintiffs appear to be unprepared for the database "meet and confer" calls, that the bulk of their questions are directed to spoliation investigation (i.e. looking back) and not to what is in the databases or how it could be produced (looking forward), and that Plaintiffs are unnecessarily grilling non-legal, technical employees about issues outside of their expertise.

Plaintiffs ~~stated an objection that any lack of preparation is due to the fact that they are receiving large volumes of data related to the databases at a very rapid pace~~ explained that they are focusing almost all of their time on learning about what data the databases contain, how the data is stored and how it is queried so that they can extract the data in a manner not overly burdensome to AstraZeneca, but usable for Plaintiffs.  Plaintiffs are~~, but are still attempting to~~ meeting the aggressive meet and confer schedule.  Plaintiffs stated that their spoliation questions are legitimate because ~~it~~ AstraZeneca has ~~been conceded~~ admitted that the GEL database ~~does not preserve drafts~~ has been set to delete drafts and revisions even thought it can easily be set to save them.  Plaintiffs agreed to provide five formal requests per day beginning Monday and continuing through Thursday for the first 18 database interviews.  (Plaintiffs have been doing so).  Moreover, Defendants' delays in providing the relevant documents prior to doing the interviews has forced Plaintiffs to prolong the interview process.

Special Master Ball directed the parties to substantially accelerate their meet and confer efforts to cover 20 databases a week.  Special Master Ball directed Plaintiffs to name their next 20 priority databases to facilitate that process.  AstraZeneca is to object promptly if it believes that any of those 20 are irrelevant or duplicative.

**4. Database Preservation Going Forward**

Plaintiffs stated an expectation that AstraZeneca would ~~alter~~ set its GEL database to preserve drafts and revisions ~~inside GEL~~. Plaintiffs stated that ~~intradatabase~~ such preservation is necessary to maintain certain relational information that will assist Plaintiffs in gauging the relevance and relationships of preserved drafts and revisions.

AstraZeneca objected that it would be unduly expensive and burdensome to alter  the functioning of GEL, especially because it is currently used by many employees in an environment heavily regulated by the U.S. federal government and other foreign governments. AstraZeneca expressed a belief that it is not obligated to undergo that burden, so long as it meets any preservation obligation in some fashion.  AstraZeneca further stated that it is problematic to maintain drafts on a database from which it makes regulatory submissions, because the risk of mistakenly submitting a draft instead of a final version to the FDA, for example, could have grave public health consequences.

Special Master Ball directed AstraZeneca to propose a plan by the next meet/confer call of how it will preserve GEL drafts without altering the functioning of GEL, and what steps are being taken.

**5. Status of Database Interviews**

Covered in #3 above.  Special Master Ball stated that AstraZeneca has had Plaintiffs' list of databases, and that if AstraZeneca knows of any database they will not object to, they should tell Plaintiffs so those databases can be scheduled.  Plaintiffs agreed to provide a list of the next 20 databases (Plaintiffs did so on 11/2/07).

**6. Audix**

Plaintiffs stated their desire to conduct a meet/confer regarding the AUDIX voicemail system.  AstraZeneca agreed that such a meeting could be scheduled along with the other database meet/confers.  The parties agreed that because AstraZeneca had already confirmed that no Audix data had been preserved, this was a lower priority than the other database meet/confers.

## 7. Status of Production of Metadata

Plaintiffs reiterated their demand that AstraZeneca provide certain ~~overlayed~~ metadata related to the previously produced multimedia files such as control names and file names.

Special Master Ball ordered AstraZeneca ~~indicated that it would~~ to produce that metadata this week.  AstraZeneca agreed and stated, ~~and~~ that it was presently conducting quality assurance on the submission of its vendor.

Special Master Ball inquired whether Plaintiffs had begun to review any of the multimedia files previously delivered.  Plaintiffs stated that they had not.  Special Master Ball directed Plaintiffs to review those files quickly to determine whether or not further investigation on this topic is worth pursuing once the metadata is received.  Special Master Ball directed AstraZeneca to produce the metadata by Monday, November 5, 2007. AstraZeneca agreed.  (Plaintiffs received an attachment on November 6, 2007.)

## 8. Privilege Log

Plaintiffs ~~stated a demand~~ requested that AstraZeneca provide updates to each of its privilege logs to indicate what had lately fallen off the log.

Special Master Ball stated that he had already ordered AstraZeneca to provide the privilege log in MS ACCESS format, and that as AstraZeneca produces updated logs, Defendants advised Plaintiffs ~~could~~ that they could ~~easily~~ see how the log changed over time by using the "compare" function.  Special Master Ball therefore rejected Plaintiffs' demand.

## 9. Search Term Negotiations

AstraZeneca proposed a query to limit Plaintiffs' proposed term "SQ" and agreed to deliver the query by Friday (AstraZeneca has done so).  Plaintiffs agreed to examine that proposal.  AstraZeneca stated that it chose to stand on its objection that all remaining search terms proposed by Plaintiffs were overbroad, needlessly duplicative, and not calculated to lead to the discovery of admissible evidence.  Plaintiffs disagreed.  AstraZeneca expressed its opinion that the search terms were already overbroad and yielding plethoric irrelevant documents that AstraZeneca must review at great expense.

Plaintiffs restated their proposal that AstraZeneca run an additional 8 search terms over a subset of custodians that worked for more than 75% of their time on Seroquel.

Special Master Ball stated that he now believed that the search terms were sufficiently

broad. Special Master Ball therefore rejected Plaintiffs' proposal regarding the remaining terms. Special Master Ball stated that Plaintiffs were free to attempt to take that issue to the judge if they disagreed with his decision. Special Master Ball also reminded AstraZeneca of its duty to produce documents broader than those revealed by the search terms in certain contexts, and that AstraZeneca may want to have discussions with custodians to ensure that all relevant data had been produced. AstraZeneca indicated that it believed it is meeting that duty in its responses to RFPs.

**10. Custodial Affidavit**

AstraZeneca objected to Plaintiffs' proposed changes to the draft affidavit as moving beyond the scope of what was discussed on previous calls and what this exercise is supposed to accomplish. Plaintiffs disagreed with that characterization. Special Master Ball agreed to review the dueling drafts to forge a compromise.

AstraZeneca updated Plaintiffs and Special Master Ball regarding the so-called "alternate email" investigation. AstraZeneca indicated that it had discovered the temporary co-existence of two separate mailboxes for the same person to support the conversion of AstraZeneca's email program from Exchange 5.5 to 2003 and that some of those addresses may not have been collected. Plaintiffs also indicated that they believed there may be a similar issue related to the use of two email systems during the period of merger between Astra and Zeneca. Ms. Field's investigation into that issue is not complete, but she agreed to look into the issue in greater depth. AstraZeneca indicated that despite these issues, every AstraZeneca employee had only one network identifier called a PRID, and that the collection was based on that identifier and therefore comprehensive. AstraZeneca agreed that this explanation does not address the problem where more than two mailboxes exist. Mr. Jaffe also offered to send Ms. Field an explanation of what led him to be concerned about the email mailbox issues.

Special Master Ball stated that the draft affidavit should directly ask the custodians about their PRID. Special Master Ball also indicated his belief that the affidavits should not have to be notarized and that AstraZeneca would provide the updated information to the affidavit as discussed on the call. The parties agreed they will be signed under penalty of perjury.

Plaintiffs inquired whether AstraZeneca specifically was aware whether there were shared mailboxes used by custodians. In response, Ms. Fields admitted that her investigation AstraZeneca also informed Plaintiffs and Master Ball that it had recently discovered a common mailbox related to Seroquel created for Seroquel litigation that was not previously collected. The mailbox was created as a place for AstraZeneca custodians to send relevant documents. AstraZeneca indicated that the data size was approximately 2.8G and was being processed on an expedited basis. AstraZeneca agreed to report on a doc count per custodian as soon as one was available. AstraZeneca also reported that this mailbox is still active. Ms. Fields agreed to report on whether there were similarly shared mailboxes where custodial emails might have been stored that have not been produced to date.

**11. Blank Page and Related Production Issues**

The parties discussed the issues known to have affected this production, as stated in numerous prior emails. Plaintiffs were concerned that the data received appeared to contain

more than a blank page fix, and that many documents had been substantially altered in a substantive way.  Plaintiffs also expressed concern that the problems illustrated by this production may apply to the entire production.

AstraZeneca acknowledged that this production, contrary to expectation, actually did contain more than a fix of cosmetic blanks.  AstraZeneca explained that early in 2007 its vendor had decided to repair numerous bad TIFFs created by a subvendor, and thatPlanet Data had "pre-TIFFed" everything.  It used a third party subvendor to assist.  TIFFs created by Planet Data and the subvendor were deficient.  Tthose fixes had becomewere mixed into this production.  AstraZeneca further indicated that the vendor fixed a smaller number of its own bad TIFFs, and also included those in the production.  AstraZeneca stated it is possible that these problems could affect the entire production.  AstraZeneca cannot say that the remainder of its production is reliable.

AstraZeneca suggested that the most efficient way to deal with real and perceived problems with the TIFFs is to provide Plaintiffs with matching native files for non-redacted, electronic documents. AstraZeneca stated that it would take more time to fix the TIFFs then to produce the native files, which Plaintiffs had previously stated a year earlier that they wanted anyway.  In November of 2006 AstraZeneca had rejected Plaintiffs' request for native files.

Plaintiffs expressed openness to a native file production fix in theory, but were concerned with the details of such a production.

Special Master Ball directed AstraZeneca to make a brief written proposal to provide a high-level view of what AstraZeneca expects to accomplish with a native file production and how they would accomplish it. The parties and Special Master Ball would then discuss whether that proposal can adequately address the outstanding issues. AstraZeneca agreed to do so on an expedited basis.  In response to Special Master Ball's question as to why AstraZeneca did not identify the problems earlier themselves (Plaintiffs had to repeatedly bring this problem to AstraZeneca's attention on its own), AstraZeneca stated they thought the fixes were limited to the blank page issue only, and indicated that their vendor had not been candid with them.

Special Master Ball advised Defendants that they should advise Plaintiffs of problems that they discovery prior to Plaintiffs having to advise them of the same problem.

AstraZeneca also indicated its intent to commence migration from Planet Data and Zantaz, to its new vendor FTI, at close of business on Friday, November 2, 2007. Plaintiffs expressed concern that the migration would delay productions.  AstraZeneca indicated that it had numerous productions related to responses to RFPs already in the FTI production pipeline. AstraZeneca also indicated that it had reserved several productions to come from Zantaz directly after the migration.  AstraZeneca therefore indicated that it believes the production will not be delayed.

Special Master Ball indicated that it is up to AstraZeneca whether or not to commence the migration, and that he would not intervene in this issue.

## 12. De-Duplication Issues

Plaintiffs restated that they believed certain file path information was lost during global

deduplication.  Plaintiffs also restated that previous calls had indicated that certain information related to BCCs was also affected by global deduplication.  Defendants admitted that Plaintiffs were correct, but stated that they needed direction from Mr. Ball whether to produce this metadata.

AstraZeneca indicated that it was already implementing a fix to the previously identified BCC issue.  AstraZeneca indicated that it could implement a fix to the file path issue by creating a new load file, but needed to meet and confer with Plaintiffs' technical team in order to eliminate old issues regarding load files at the same time.  Defendants also indicated that Plaintiffs should have been receiving regular updates to the existing load files when new custodians were added as a consequence of the global de-duplication.  Plaintiffs had never received such updates.

Plaintiffs restated their belief that they should not be required to meet and confer regarding load file fixes until AstraZeneca ~~created a document indicating all~~reported on the actions it took from late July until early October to remedy ~~technical fixes~~load files and other technical issues so that the parties would not have to start at square one, but rather could build on any work that AstraZeneca had done, assuming it had done something during that time.

Special Master Ball stated it appeared that the parties seemed to be making progress during the call, and suggested the dialogue continue off-line.  Plaintiffs agreed. Special Master Ball also stated he wanted Mr. Adams to have a face-to-face meeting with Mr. Jaffe.  (Plaintiffs have scheduled this meeting with Mr. Adams for Thursday.) ~~directed Plaintiffs to meet and confer on load files and other outstanding technical issues~~.

**13. <u>Schedule</u>**

Special Master Ball scheduled another conference call for November 9, 2007 at 1 PM Eastern.

14.    **Past Preservation of Other Databases**
             AstraZeneca reported that they will report to Plaintiffs by 11/9/07.

15.    **Track Changes**
             AstraZeneca stated they were currently burning 87 of the 100 documents, and that they are willing to discuss the remaining 13.  Plaintiffs agreed to provide 15 more documents that are not redacted for track changes.