## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**IN RE: Seroquel Products Liability Litigation.**

**Case No. 6:06-md-1769-Orl-22DAB**

_____/

### ORDER

This cause came on for consideration with oral argument on the following motions filed herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF NON-PARTY DOCUMENTS [AS TO HARRIS INTERACTIVE, INC.] (Doc. No. 666)** |
| **FILED:** | **November 9, 2007** (originally filed September 28, 2007 in Southern District of New York) |

**THEREON** it is **ORDERED** that the Motion as to Harris Interactive, Inc. is **GRANTED** in part and **DENIED** in part as set forth below. The ruling as to the other non-parties is **DEFERRED** pending further consideration at the December 18, 2007 status conference.

| | |
|---|---|
| **MOTION:** | **NON-PARTY HARRIS INTERACTIVE, INC.'S MOTION FOR PROTECTIVE ORDER (Doc. No. 674)** |
| **FILED:** | **November 9, 2007** (originally filed October 9, 2007 in Southern District of New York) |

**THEREON** it is **ORDERED** that the motion is **GRANTED** in part and **DENIED** in part.

Plaintiffs issued a subpoena and deposition on written questions to Harris Interactive, Inc. in connection with the *In re Seroquel* MDL, involving the anti-psychotic prescription drug manufactured by AstraZeneca. Plaintiffs allege they took Seroquel for a variety of mental disorders and allegedly suffered serious side effects including weight gain, hyperglycemia, and diabetes mellitus. Harris Interactive is a third-party vendor hired by AstraZeneca to provide marketing

research related to Seroquel. Central to Plaintiffs' case is their theory that AstraZeneca, through its promotion of Seroquel, exaggerated the efficacy of Seroquel while downplaying the side effects and failed to provide physicians with critical safety information. Plaintiffs further allege that, through marketing campaigns, AstraZeneca promoted Seroquel for a number of "off-label" uses, and AstraZeneca has allegedly been reprimanded by the FDA for its false and misleading promotional activities.

Plaintiffs represent in their Motion to Compel (and supporting affidavit) that Harris Interactive conducted tracking studies and message recall for Seroquel marketing campaigns and provided quarterly attitudinal research understanding (ATU) reports, which analyzed physicians' therapy choices. Doc. No. 668. Plaintiffs also point to Harris Interactive's involvement in other Seroquel projects including, research of AstraZeneca's direct to consumer marketing campaigns, ways to position Seroquel for treatment of anxiety disorders, research on negative ad campaigns related to the diabetes/hyperglycemia warning on physician prescribing behavior and research on the Seroquel marketing campaigns' risk, awareness among physicians, and impact on physician prescribing habits. Doc. No. 668 at 5.

Plaintiffs served Harris Interactive at its office in New York on July 2, 2007. The subpoena required the documents be produced on July 30, 2007. The subpoena to Harris Interactive sought six categories of documents, including: contracts, communications, marketing materials, documents between Harris and AstraZeneca, or others relating to Seroquel; and documents reflecting the amount of money paid to Harris by AstraZeneca relating to professional services relating to Seroquel. Doc. No. 668. On July 20, 2007, Harris served written objections to the subpoena asserting the requested categories were vague, overbroad and unduly burdensome, and

sought material that were confidential, proprietary, work product, attorney/client privilege, and is not reasonably related to the claims in the underlying matter. In its Response to the Motion to Compel (Doc. No. 676), Harris contends the requests are over-reaching and seek documents since 1986 to present (when the actual period may be 2000 to present). Doc. No. 676.

At the hearing on the matter held on November 21, 2007, counsel for Harris Interactive represented to the Court that Harris had narrowed the list to 25 electronically-maintained project list files that may contain information relevant to Plaintiffs' requests. Counsel projected that the cost for the files to locate, review and make production is $25,000. Harris maintained that it is not required to bear the entire costs of the production because it is a non-party; consequently, it requests that the Court require Plaintiffs to reimburse Harris for half of its expenses, which include attorneys' fees and internal costs for locating and preserving the files. The Court directed Harris to provide supplemental briefing on the issue of fees to be incurred and its entitlement to reimbursement.

On November 27, 2007, Harris filed a Supplemental Memorandum (Doc. No. 718) in which it contends it is entitled to recover the full amount of its fees expended to retrieve, identify and review the documents sought Plaintiffs, which it estimates to be $28,950 ($18,750 in attorneys fees for 50 hours of review) for the 25 project files identified. The 25 files relate to market research that Harris performed on behalf of AstraZeneca with respect to Seroquel, for which Harris generated approximately $3.7 million in fees. Doc. No. 718. Counsel, Philip Spellane, opines that all 25 electronic files contain detailed information that should be reviewed prior to production "in fairness to all involved in this litigation" and "given the nature of Plaintiffs' allegations in this action and the alleged involvement of Harris." Doc. No. 718.

**Standard of Review**

Rule 45 of the Federal Rules of Civil Procedure requires the Court to protect non-parties from "significant expense resulting from the inspection and copying commanded." FED.R.CIV.P. 45(c)(2)(B). "However, the required '[p]rotection from significant expense does not mean that the requesting party necessarily must bear the entire cost of compliance. . . . [A] non-party can be required to bear some or all of its expense where the equities of a particular case demand it.'" *In re Law Firms of McCourts*, No. M19-96 (JSM), 2001 WL 345233, at *1 (S.D. N.Y. Apr. 9, 2001) (quoting *In re Exxon Valdez*, 142 F.R.D. 380, 383 (D.D.C.1992)). In multi-district litigation, the court in charge of the consolidated proceedings has the power to rule on a motion to quash subpoenas. 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 2459 (1991 & Supp. 2007) (citing *Wilmer, Cutler & Pickering & Goodwin Proctor LLP*, 255 F. Supp. 2d 1 (D. D.C. 2003); *In re Subpoena Issued to Boies, Schiller & Flexner LLP*, 2003 WL 1831426, *1 (S.D. N.Y. 2003)); *see also Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F.Supp.2d 270, 275-76 (D. D.C. 2002) (holding that § 1407 gave MDL judge in the District of Columbia the power to enforce subpoena duces tecum issued by the Middle District of Tennessee to non-party in that district) (collecting cases)).

For courts considering whether to order the reimbursement of costs related to non-party production, courts consider how expensive and time-consuming the compliance will be; the size and ability of the subpoenaed person to bear the costs itself; whether the expenses of compliance are part of the subpoenaed person's or firm's normal cost of doing business; whether and to what extent the serving party has made efforts to minimize the burden of compliance; and whether the court has denied similar motions for advancement of costs by other witnesses in the case. FEDERAL

PROCEDURE, LAWYERS EDITION § 65:260 (citing *Raio v. American Airlines, Inc.*, 102 F.R.D. 608, 39 Fed. R. Serv. 2d 1331 (E.D. Pa. 1984); *Ghandi v. Police Dept. of City of Detroit*, 74 F.R.D. 115 (E.D. Mich. 1977); *United States v. International Business Machines Corp.*, 62 F.R.D. 526 (S.D. N.Y. 1974); *Celanese Corp. v. E. I. duPont de Nemours & Co.*, 58 F.R.D. 606 (D. Del. 1973)). In order to determine whether a nonparty to the suit should bear the costs of gathering and copying documents, courts should consider whether the nonparty actually has an interest in the outcome of the case, whether the nonparty can more readily bear the costs than the requesting party and whether the litigation is of public importance. *See, e.g., In re Honeywell International, Inc. Securities Litigation*, 230 F.R.D. 293 (S.D. N.Y. 2003).

When a party from whom documents are sought is not a "classic disinterested non-party," as in *In re First American Corporation*, where the non-party was the auditor of the defendant corporation accused of bank fraud, the court can order that the non-party produce the documents at its own expense. *In re First Am. Corp.*, 184 F.R.D. 234, 241-42 (S.D. N.Y. 1998). Although the accounting firm was not a party to the suit, it was deemed interested for the purposes of absorbing costs of compliance with the applicant's subpoena for documents. Finding the bank was not the "quintessential innocent, disinterested bystander," the court treated the auditor as interested, because it was substantially involved in the underlying transaction, and should have reasonably anticipated being drawn into subsequent litigation; as the auditor for a bank that had committed the "largest bank fraud in world history," the auditor's "involvement in subsequent litigation was virtually assured." *Id.* at 235. As a result, the auditor was reimbursed only $75,000 of its requested $210,990 of costs incurred in complying with the subpoena.

In another case involving reimbursement of costs from a non-party involved with the claims at issue, *In re Exxon Valdez*, the court analyzed the non-party American Petroleum Institute's ("API's") revenue from the Defendants and its overall revenue and ability to bear the production costs as "overhead," before ordering API to bear 29 percent of the total cost; this percentage was the same percentage as the proportion of its income attributable to the defendants and their principals. The court opined:

> Here, despite API's repeated attempts to distance itself from the *Valdez* litigation, it is clear that API and its members do have an actual interest in the outcome of that litigation. API's own documents reveal that it "represents over 250 companies involved in all aspects of the oil and gas industry." Respondents Exh. 5. At the hearing, API's counsel argued, somewhat disingenuously, that since the *Valdez* litigation affects only a small number of those 250 members, it is of little interest to API's other members or to the organization as a whole. Tr. 29-32. However, API's admission that 29 percent of its income comes from the *Valdez* defendants and their corporate principals weakens API's claim that it acted solely as a neutral third party during the negotiations, sheds some light on its immediate decision to cancel the production once the *Valdez* defendants openly objected, and materially distinguishes API from the pure non-party witness identified in Rule 45. Moreover, even if the relationship between API and the *Valdez* defendants were less substantial, it seems certain that the precedential value of the *Valdez* case is a matter of real concern to a large portion of the petroleum industry. Nor has API denied that this suit is of great public importance generally. Further, there can be little doubt that API, which in 1989 had gross receipts of $58 million and a net worth of $17 million, *see* Petitioners' Exh. B, would be able to absorb at least some of the costs of production and copying. *Wilk v. American Medical Ass'n,* 28 Fed.R.Serv.2d 580 (D.D.C.1979) (given non-party professional association's "obvious and understandable substantial interest in the outcome," costs of compliance held to be "business overhead"). This is especially true in comparison with the financial situation of petitioners, who are five disparate classes of Native Alaskans, fishermen, business persons, property owners, and cannery workers affected by the spill. Thus, although new Rule 45(c) does require petitioners to bear the major portion of the costs of producing and copying the documents, API equitably should bear 29 percent of the total cost, the same percentage as the proportion of API's income attributable to dues paid by the defendants and their principals. This figure takes into account the special circumstances recited above, while still ensuring that API could easily and sufficiently protect itself from significant expense within the meaning of the Rule, by simply assessing this special expense to the defendants, who are its members and a principal source of its revenue.

142 F.R.D. 380, 383-84 (D. D.C. 1992).

In this case, Harris has performed work for Seroquel marketing campaigns; analyzed physicians' therapy choices; and researched direct to consumer marketing campaigns and negative ad campaigns related to the diabetes/hyperglycemia warning on physician prescribing behavior. *See* Doc. No. 668. Plaintiffs' claims directly involve physicians' prescribing behavior and therapy choices, with consumer choices and negative ad campaigns having an impact. It should come as no surprise to Harris that market research work it did for Seroquel would be relevant to Plaintiffs' claims and Harris should have reasonably anticipated being involved in the discovery process of subsequent litigation concerning the marketing/prescribing behavior it studied for Seroquel.

Moreover, the cost can certainly be borne by Harris as overhead. According to (uncontroverted) publicly-available information Plaintiffs cite in their Motion, Harris is the twelfth largest market research firm in the United States and the thirteenth largest market research firm in the world, with 1,300 full-time employees and annual revenue of $211.8 million (as of October 2007). According to counsel for Harris, Harris generated revenue of $3.7 million from AstraZeneca on Seroquel related-work. Doc. No. 718. The projected expense of Harris's compliance is $28,950, of which $18,750 is for attorney's fees and $10,200 for internal costs. The entire expense of $28,950 is less than four fifths (4/5) of one percent of the revenue Harris generated from work on Seroquel products.

With respect to retrieval and review expenses (including attorneys' fees), Harris will bear those expenses itself (subject to any agreement it may have with its customer). Actual costs of duplication (electronic or otherwise) may be passed through to the parties (to be divided as they have agreed). All involved are directed to continue to cooperate to minimize the costs of retrieval

and duplication, while providing documents with reasonable dispatch and in a reasonably convenient format.

**DONE** and **ORDERED** in Orlando, Florida on December 6, 2007.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record