1

```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                    ORLANDO DIVISION

 3              Docket No.6:06-MD-1769-Orl-22DAB
     . . . . . . . . . . . . . . . .:
 4   IN RE:                          :
     SEROQUEL PRODUCTS LIABILITY     :
 5   LITIGATION                      :
     MDL DOCKET No. 1769             :       Orlando, Florida
 6                                   :       October 2, 2007
     ALL CASES                       :       10:00 a.m.
 7                                   :
     . . . . . . . . . . . . . . . .:
 8
 9           TRANSCRIPT OF PRETRIAL CONFERENCE
           BEFORE THE HONORABLE DAVID A. BAKER
10            UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Plaintiffs:      Paul Pennock

13                            Richard Laminack

14                            F. Kenneth Bailey

15                            K. Camp Bailey

16                            D. Renee Baggett

17                            Craig Ball

18                            Buffy Martines

19                            Holly Wheeler

20                            Angela Nixon

21   Court Reporter:  Sandra K. Tremel

22

23

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription.
```

2

```
 1   For the Defendant

 2   AstraZeneca:                   Fred Magaziner

 3                                  Stephen J. McConnell

 4                                  James Freebery

 5                                  Robert Pass

 6                                  Robert Ciotti

 7                                  Liz Balakhani

 8

 9   Special Master:  Orran Brown

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                P R O C E E D I N G S
 2           THE DEPUTY CLERK:  The case number is
 3   6:06-md-1769-Orl-22DAB, In Re: Seroquel Products Liability
 4   Litigation.
 5           Counsel in the courtroom, please state your
 6   appearances for the record.
 7           MR. PENNOCK:  Paul Pennock for plaintiffs.
 8           MR. CAMP BAILEY:  Camp Bailey for plaintiffs.
 9           MR. LAMINACK:  Rick Laminack for plaintiffs.
10           MS. WHEELER:  Holly Wheeler for plaintiffs.
11           MR. KEN BAILEY:  Ken Bailey for plaintiffs.
12           MS. MARTINES:  Buffy Martines for plaintiffs.
13           MS. BAGGETT:  Renee Baggett for plaintiffs.
14           MR. MAGAZINER:  Fred Magaziner for AstraZeneca.
15           MR. MCCONNELL:  Steve McConnell for
16   AstraZeneca.
17           MR. PASS:  Robert Pass for AstraZeneca.
18           MR. FREEBERY:  Jim Freebery for AstraZeneca.
19           MR. CIOTTI:  Robert Ciotti for AstraZeneca.
20           MS. BALAKHANI:  Liz Balakhani for AstraZeneca.
21           THE DEPUTY CLERK:  Counsel on the phone, please
22   state your appearances.
23           MR. BROWN:  This is Orran Brown the special
24   master and PMO.
25           MR. BALL:  This is Craig Ball.  I believe I have
```

4

```
 1   been appointed special master for IT matters.
 2           MS. CRANFORD:  Ashley Cranford for the
 3   plaintiffs.
 4           MS. NIXON:  Angela Nixon, noncounsel for
 5   plaintiffs.
 6           THE COURT:  Anybody else on the phone?
 7           All right.  Let me start first, see if Mr. Brown, PMO
 8   has any comments.  I know your formal report is not due
 9   for a couple weeks.  So any quick thoughts?
10           MR. BROWN:  Yes, Your Honor.
11           If I heard you correctly, quick thoughts on where we
12   stand and we did want to discuss with the Court a plan we
13   have been working for transitioning to designation of
14   cases for case-specific discovery 60 days in advance
15   rather than the 30 days in advance that CMO4 has
16   implemented thus far.  It's an issue that came up in our
17   last status conference, and I have been working with the
18   parties' representatives since then to come up with a
19   program that we wanted to review with you.
20           As a highlight of a report on how it's going, we have
21   been working with the representatives of the plaintiffs
22   and defendant to schedule physicians depositions, and
23   parties are still scheduling the plaintiff and the sales
24   representatives' deposition witnesses for depositions each
25   month with 30 cases a month.  And as I reported last time,
```

5

1  ard as reported in our first written report, we are making
2  a lot of headway in getting these schedules and trying to
3  reach solutions to any of the logistical impediments that
4  we're having primarily with the physicians about their --
5  some of -- they range, as you can imagine, from witnesses
6  who are fully cooperative in providing the records to
7  witnesses who do not do depositions if they can avoid it.
8  And we're generally able to work through those problems.
9       And as I reported last time, continue to encounter
10 outdated contact information from physicians that we have
11 to update with the parties' assistance.  We have some
12 physicians who are deceased and we have to usually find
13 replacement physician to serve as a witness.  We have some
14 physicians that we are really unable to locate, and
15 generally that means that the parties need to select
16 another potential physician from the fact sheets to
17 designate as a witness.  And we have the processes in
18 place working with the parties to make that happen as
19 fluidly as possible.
20      We have not yet been successful in scheduling every
21 physician deposition for the month in which the case has
22 been designated partly because for the September cases, we
23 came onboard right as that was on the cusp of being
24 scheduled.  So we were calling people in September for
25 September depositions which made that a little difficult,

6

1  but we were successful in scheduling a lot of them in
2  September and ultimately most of the rest of them in
3  October or thereabouts.  We still have some cases from
4  September that we're trying to schedule.  For example,
5  about eight of them where we're unable to locate the
6  doctor or there's some issue that, logistical issue that
7  is holding us up.  But we have a full court press on with
8  the parties, and the parties do -- to make those
9  scheduling -- solve those scheduling problems and to work
10 through them.
11      For October we have gotten designations for a total
12 of 48 physician witnesses.  We have successfully scheduled
13 17 of them thus far.  We have 10 of them that have
14 problems with a deceased physician or contact information
15 bad that we're working through.  We have the other 21
16 we're in the processes of talking to the doctors, getting
17 a date, waiting for return calls.
18      And we have developed internally here with the
19 parties' approval steps to keep the pressure on in a
20 relentless way to make that scheduling happen.  And what
21 we're seeing many times is that the physicians do not
22 respond to phone calls, do not return them.  And so if
23 we -- we have a schedule where we call them.  If we don't
24 hear back in 24 hours, we call them again.  If we don't
25 hear back in 48 hours from them, we send them, because we

7

1  usually have fax numbers, we send them the Court's order
2  that the Court recently entered at our request which
3  impresses upon them the importance of returning a call and
4  their duty to cooperate with us.  And that is more than
5  half of the time finally getting a reaction from the
6  physicians, and we're getting calls back.  There are still
7  some witnesses even after that that we do not hear back
8  from.  And we have a rule thus far that if we have not
9  gotten a call back from a physician's office within 10
10 days of the first calls, 24 hours, 48 hours send a
11 package, we go out to 10 days.  We send them a deposition
12 notice and a subpoena that we have completed and we pick a
13 date.  And thus far that is generally getting a call back
14 finally from a physician or a physician's lawyer.
15      As we work through the initial set of cases for
16 September and in October, we think we will hit the point
17 where we are successfully scheduling cases in the month in
18 which they are intended to be scheduled.  That is
19 definitely the goal.  And we think that one of the things
20 we're going to discuss about today in terms of designating
21 cases 60 days in advance will help us achieve that goal.
22      We have done -- we have modified some of our
23 processes and talking about further modifications about
24 obtaining medical records, because in each instance, thus
25 far, we are asking the plaintiffs -- the physician's

8

1  office to provide us medical records for either the
2  prescribing physician during the time that the product was
3  prescribed or a treating physician who's currently
4  treating the patient, the plaintiff, to provide those
5  medical records.  That process is working fairly well,
6  although we're discussing with the parties whether in some
7  instances it is somewhat redundant because the parties
8  collectively using a national collection service record
9  track have already canvassed most of these physicians and
10 have gotten medical records at some point before now.
11      And so we're studying the issue about whether we can
12 identify the instances where it may be redundant where we
13 cannot go through the step of asking for the records
14 again.  Maybe in some instances asking only for an update
15 or maybe not asking for them at all if parties recently
16 have obtained them through their other collection service.
17 We're trying to avoid duplication of any redundant effort
18 or any unnecessary costs.
19      The other issue that we wanted to make sure we
20 previewed with the Court today was the transition from
21 designating cases 30 days in advance, as CMO6 requires, to
22 designating cases 60 days in advance.  The 60 days in
23 advance we think will help us a lot getting the doctor's
24 attention first of all and then getting all their
25 calendars in the month in which they're supposed to be

9

1  deposed.  That requires a transition period moving from 30
2  days out to the 60 days out because we have phase-in
3  double tracking designations to get us to the point where
4  we can designate 60 days -- the parties and the Court can
5  designate cases 60 days out.
6       The parties and the Court are right now making their
7  designations on September and the early part of October
8  for the November cases which is the 30-day-out model.
9  We're working on making additional designations in October
10  for December cases and then shortly thereafter making
11  designations for the January cases which will then get us
12  60 days out.  And then starting the designations that are
13  being made in late November, they will be making
14  designations for February which will then put us on
15  60-day-out schedule.
16       That requires working with the parties to make sure
17  that we phase in the designations in a manner that they
18  can handle because parties have to designate their 10
19  cases and then their -- the other 10 cases from the
20  plaintiffs, and then the Court designates 10, and then
21  those designations trigger dates for defendants to
22  disclose documents relating to contact by the prescriber
23  with a sales representative which requires that the
24  defendants to dig through records and identify and round
25  those up and disclose those documents.  Case Management

10

1  Order 4 requires those disclosures within five business
2  days after the cases are designated.
3       And then the plaintiffs have to designate a sales
4  representative as a deponent they went to depose based
5  upon those document disclosures.  And Case Management
6  Order 4 says that occurs within two business days after
7  disclosure of the records.
8       So those dates have to be phased in along with the
9  designations to get us to the point of doing a 60 days
10  out.  And if we're double tracking designations starting
11  in October to catch, to phase in the cases for December
12  and January, those dates are also going to be doubled up.
13  So there's a lot of work the parties have to do to make
14  this happen, to phase it in the 60 days out.
15       We have been working with the plaintiffs' designated
16  representatives and defendant's counsel to make that
17  happen.  And we think that during the transition phase
18  while they're double tracking this, the five business days
19  for the defendants to disclose the sales representative
20  contact records should be extended to seven, and that the
21  plaintiffs should have four business days rather than two
22  to pick a deponent witness because they're going to be
23  doing so much of this at the same time.
24       We have been considering a transition phase that will
25  allow that to happen, changing the five to seven and two

11

1  it four.
2       We wanted to preview that with the Court and get the
3  Court's reaction to it.  And then we also have been
4  considering when to kick this off because we have been
5  working on a couple of models that would require, one of
6  which would require designations and the end of October is
7  normal for the December cases, and then about a week later
8  in November, early November, designating for the January
9  cases.  And we had talked about starting that with the
10  normal designations on the 26th of October.  We have also
11  talked about trying to accelerate that and do it a little
12  earlier if the parties can and if the Court has the
13  opportunity to consider this between now and then, to
14  start doing it in the middle of the month, on the 15th of
15  October, which would start getting us designations a
16  couple weeks sooner for the November -- the December and
17  January cases.
18       We have -- we will come up with a proposed order that
19  we can send the Court by the end of this week that would
20  express within that order the modifications that would be
21  required to Case Management Order 4 to make this happen
22  for the double tracking designations to get us to the
23  point of 60 days out, so that by the designations in late
24  November, it will be occurring for February cases.  That
25  will give us the cases sooner.  We will start on the

12

1  physicians sooner.  We think that will help.  And the
2  order that the Court will see this week, and we'll
3  contemplate phasing in the double designations in a
4  somewhat staggered manner so that it can be achieved.  And
5  then for the transition period, allowing the defendant's
6  disclosure of sales rep documents, seven business days
7  instead of five, plaintiff designating the sales rep
8  witnesses four business days after that instead of two
9  during the transition period.
10       We are also constantly working with parties to come
11  up with any other steps that we can to enhance the
12  efficiency of this process to make it work smoothly and
13  cleaner or faster, more with less cost.  And we don't yet
14  have a whole lot of experience to be able to identify any
15  other areas that we would change.  We think that right now
16  we should accomplish this transition 60 days out, and then
17  continually evaluate what else we can do, like the change,
18  perhaps, in the document collection that we're studying.
19  The parties now see if the documents that we're receiving
20  are redundant or they're helpful.  But it's a constant
21  process of reevaluating to see if there is a better way to
22  do this.  And if we come up with things, then we will
23  present those ideas to the Court as well.
24       The last thing worth mentioning, I think, Your Honor,
25  is that we do have a master calendar up in place.  We set

13

```
 1   that up two week ago.  We forereed to the Court a manual
 2   to explain how to use it and assigned you a user name and
 3   password should you choose to view it.  That is up and
 4   running.  We're listing all the depositions and keeping
 5   the master calendar.  We're also refining and improving
 6   that as we go along.  Now working on the option to make it
 7   searchable by case name, plaintiff name, and doctor names
 8   so that if you're looking for a particular case in all the
 9   depositions that have ever been done or assigned to in the
10   future, you can research it and it will show you each one.
11   And also if you're looking for a particular doctor's name
12   or witness's name you can search it and it will take you
13   to each one.  That's a feature that we're adding this
14   week.
15        So that's a quick report, Your Honor.  Maybe not as
16   quick as Court intended.  But we are going to present to
17   the Court an order to effect this transition to the
18   60-day-out change.  If that meets with the Court
19   expectations, we can present that this week.
20        THE COURT:  Do you anticipate that that order
21   will be agreed in all respects?
22        MR. BROWN:  Yes, Your Honor, I do.
23        THE COURT:  All right.  Then I don't have a
24   problem.
25        MR. BROWN:  Like we did before, it will be a
```

14

```
 1   joint unopposed motion for an order to change that
 2   schedule to make that happen.
 3        THE COURT:  All right.  I'll look forward to
 4   seeing that when it arrives.
 5        I'd like you to stay on the phone.  I'm going back to
 6   an issue that may affect your role here later on --
 7        MR. BROWN:  Yes, Your Honor.
 8        THE COURT:  -- on the agenda.
 9        Mr. Ball, let me welcome you to the courtroom here,
10   and ask whether since I talked to you last week, have you
11   had any further contact with the parties or were you just
12   waiting for today's hearing?
13        MR. BALL:  Waiting for today's hearing, Your
14   Honor.
15        THE COURT:  All right.  Parties have each
16   submitted at the Court's direction proposals with respect
17   to the scope of your duties.  I'm going to sift through
18   those disparate proposals and come up with an order and
19   turn the nuts and bolts of the ESI over to you, and,
20   hopefully, you will be able to solve some problems the
21   parties have been unable to solve.  And I'll -- we will
22   have you participate again in the next status conference.
23        I may require that you submit some sort of a report
24   as to the status of things.  And then I expect I'll be
25   hearing from either or both sides about -- as we move
```

15

```
 1   through that, whether issues about your role ought to
 2   change.
 3        I'm going to ask parties very briefly to comment on
 4   anything beyond what's in your written submissions that I
 5   really don't want to argue at this point, but just
 6   anything else that you want to comment on.  I'll get that
 7   order out in the next day or two.
 8        MR. PENNOCK:  Paul Pennock for the plaintiffs.
 9   The only comment is timing.  In the next -- by
10   December 31, three months, we have third party discovery,
11   disparate witness discovery, database discovery.  We, of
12   course, have to review all those documents and get our
13   initial round of expert reports in.  And at this juncture,
14   we feel that we still, as the Court knows, don't really
15   have much to begin with.  And we're -- we feel very
16   handcuffed.  We feel that we have been prejudiced.  We're
17   continuing to be prejudiced.  And the only thing that
18   really disturbs me about the defendant's proposal, and I
19   agree with you, they're very disparate, and you can
20   probably combine the two and come up with what would be
21   the appropriate order.  But the thing that bothered me the
22   most, Judge, was the statement regarding monthly reports.
23   I kind of wanted to ask what planet have they been living
24   on for the last few months.  This is a monthly report.  We
25   have to have this stuff done this month and certainly by
```

16

```
 1   next month.  And even next month is too far out.  And that
 2   is the thing that concerned us the most is their kind of
 3   just failure to recognize the very difficult timing
 4   situation we're in.  But other than that, I think -- our
 5   proposals, we discussed them at length and the problems,
 6   and the proposals are before the Court.
 7        THE COURT:  Anything from the defendants?
 8        MR. PASS:  Your Honor, Robert Pass.  It's only
 9   my second time here, I don't know if you remember who I
10   was.
11        Let me just address very quickly Mr. Pennock's
12   observations.  The inclusion of a reference to monthly
13   reports in our proposed job description is not intended in
14   the least to suggest or betray any desire to drag this out
15   at all.  We're ready to start meeting with Mr. Ball as
16   promptly as possible.  We want to move this forward.  This
17   was our idea in the first place to try to get things fully
18   on track and resolved.  So there simply needed to be some
19   sort of procedure by which there will be periodic reports
20   and we simply chose monthly.
21        Mr. Ball can report as frequently as the
22   circumstances allow.  So there's nothing suggested by that
23   in terms of delay.
24        The only other thing I would remark about is I'd like
25   to comply with the Court's order which directed that we
```

17

1  identify a lead attorney contact and a lead technical
2  representative. I'll be the lead attorney contact, and
3  here in the courtroom today is the lead technical contact
4  which will be Carmen Field. And I'd ask her just -- so
5  you know who she is. Ms. Field is the person I referred
6  to when we were here last who is part of AstraZeneca's
7  response to the Court's order which included the formation
8  of special technical committee that I chair, the bringing
9  onboard of the new electronic discovery, additional new
10 electronic discovery vendor FTI Consultants and Ms. Field
11 who is with Daylock (phonetic) Forensic and Advisory in
12 New York City, is the information technology expert
13 adviser to AstraZeneca in connection with this case and
14 will work also with Mr. Ball.
15      THE COURT: Okay. Let me turn to the pending
16 motions that are in my bailiwick. Number 492 is
17 AstraZeneca's motion regarding documents to be obtained
18 from Eli Lilly. What's the plaintiffs' problem with the
19 proposed order with that?
20      MR. CAMP BAILEY: On the motion they filed, we
21 have a disagreement as to the appearance that the only
22 issue being disputed is just the language of the order.
23 We said on the record last time we were down here that we
24 did not have a problem in assisting them in getting
25 plaintiff's medical records and other things that the

18

1  HIPAA authorization would allow them to otherwise get.
2      I think Buffy and the special master -- actually,
3  Orran Brown has been dealing with that and I know that
4  they have been in contact with Pepper Hamilton, the
5  lawyers for Eli Lilly, and they have some very strong
6  thoughts on disclosing any of information related to the
7  settlement amounts and the settlement documents and
8  submissions related to the settlements. And Buffy may
9  want to add something as far as her conversations with the
10 PMO.
11      MS. MARTINES: Good morning, Your Honor. Buffy
12 Martines on behalf of plaintiffs.
13      The concern I have with the motion is that there may
14 be some overlap in what we're trying to do with Special
15 Master Brown and this particular motion. The motion that
16 I reviewed calls for three things to be produced from
17 Lilly: Medical records, litigation documents such as fact
18 sheets, pleadings, et cetera, and Section C which seems to
19 imply documents underlying settlements. And Section C is
20 the concern.
21      What we have been trying to do with Special Master
22 Brown, and he can jump in any time he'd like, is that
23 Lilly does have very strong feelings about the
24 confidentiality of Zyprexa settlements and the documents
25 underlying them. The Special Master has already

19

1  undertaken in camera review of the confidentiality
2  language of those settlements. And I believe, and I'll
3  allow him to jump in, I believe he agrees that the
4  confidentiality provisions are very strong. So I don't
5  believe the parties are very far apart on the production
6  of the medical records and perhaps the litigation
7  documents.
8      But Section C which discusses the underlying
9  documents related to settlements can be a sticking point.
10 I have also provided to the Special Master's office a
11 contact person from Lilly, and they would like to speak
12 with him on this matter.
13      So I think the biggest problem is there may be some
14 overlap between what we're trying to do with the Special
15 Master's office and this motion. And I don't know if
16 Special Master Brown has a comment on that. But I believe
17 within the next week he will be able to talk to the folks
18 at Lilly and hopefully try to figure this thing out.
19      MR. BROWN: This is Orran Brown. Would it be
20 helpful if I added to that?
21      THE COURT: Well, let me ask defendants first.
22 I thought you had an agreement with Lilly they didn't
23 object to this?
24      MR. MAGAZINER: This form of order has been
25 submitted to counsel for Lilly at Pepper Hamilton. And as

20

1  recently as yesterday afternoon, counsel for Lilly
2  confirmed to me that they have no problem with the order
3  that we have submitted to the Court.
4      Now, the order does not contemplate, as Your Honor
5  will see, that Lilly will tell us the amount of a
6  settlement that has been made with the plaintiff. What
7  the order contemplates is Lilly will give us any
8  submissions made by individuals who are plaintiffs in this
9  litigation in support of their efforts to settle their
10 claim against Lilly.
11      That's right on the face of order. Lilly does have
12 an issue with our obtaining from plaintiffs, not from
13 Lilly, from plaintiffs, information about the amount that
14 was paid to a plaintiff or has been agreed to be paid to a
15 plaintiff to settle the claim against Lilly. But that's
16 not covered by this order.
17      As to that latter subject, we intend to ask
18 plaintiffs, as we have already done in depositions taken
19 to date, how much they have been paid by Lilly or how much
20 Lilly has agreed to pay them. If Lilly has a problem with
21 that, and I understand that they do have a problem with
22 that, then Lilly is going to have to raise that problem in
23 some appropriate forum which I take it might be in this
24 Court, could be in Judge Weinstein's court, could be in
25 front of the special master, we will have to see how that

21

```
 1   resolves.  Special master, meaning the PMO, Mr. Brown.
 2   But that's not covered by this order.
 3        So as to this order that we have submitted, Lilly's
 4   counsel has --
 5        THE COURT:  I want this resolved, and I'm going
 6   to renotice this motion with Lilly being served and get
 7   their response on the record.  I don't understand.  I
 8   mean, I don't want to prejudge anything, but just because
 9   they want to keep it secret -- it has an affect on this
10   litigation.  We have got to find out what's going on.
11        MR. MAGAZINER:  I certainly agree with that,
12   Your Honor.  It seems to me it's fundamental that we're
13   entitled to find out how much someone has been compensated
14   for an injury that --
15        THE COURT:  That's at least arguably related to
16   the injury -- the claim here.
17        MR. MAGAZINER:  Absolutely.  And I understand
18   Lilly has secured from each of the plaintiffs a promise
19   that the settlement amount would be kept confidential.
20   And that creates an issue to me.
21        THE COURT:  It's a dilemma for the plaintiffs
22   which -- well, I mean you know my general attitude about
23   confidentiality on this thing.  I mean, I'm just --
24        MR. MAGAZINER:  As Your Honor said, it creates a
25   dilemma for the plaintiffs.  But I do ask if the Court
```

22

```
 1   would approve the order that we have submitted, it would
 2   at least get us started.  And I don't understand even from
 3   what Ms. Martinez said there is any issue with this order.
 4   This order does not require that plaintiffs divulge or
 5   Lilly divulge the amount of any settlement between the
 6   plaintiff and Lilly.
 7        THE COURT:  All right.  Next is defendant's
 8   motion for extension of time to complete some more of the
 9   custodial production.  What's plaintiffs' position?
10        MR. LAMINACK:  Rick Laminack for plaintiffs,
11   Your Honor.
12        It's our position -- I guess if they need to file a
13   motion on everything they produce because it's our
14   position that we've never been given from day one adequate
15   documentation.
16        Here's the situation we're in so the Court knows.  We
17   start general liability depositions next week.  First up
18   is the person in charge of direct to consumer marketing.
19   As one might suspect, their promotional materials would be
20   relevant to that deposition.  Unfortunately, we don't have
21   those.  Or more accurately, we don't have them in a format
22   that we can access the information.
23        So in a week we're supposed to depose the person with
24   most knowledge of the documents involving Lilly --
25   AstraZeneca's promotional materials and we don't have
```

23

```
 1   them.  And we can sit here all day and cite examples of
 2   this.  As we depose doctors -- you heard Mr. Brown talking
 3   about how difficult it is to schedule doctors.  One of the
 4   key things we asked for in doctor's depositions prior to
 5   the deposition is how much money has AstraZeneca paid you.
 6   And time after time we get sworn affidavits from
 7   AstraZeneca lawyers saying nothing only to find out that
 8   that's not true.
 9        So we are taking depositions without correct
10   information.  We are about to begin taking depositions
11   without the necessary information.  And obviously what
12   we're going to need -- and I want to make it real clear to
13   the Court, we do not want to postpone these depositions.
14   That would be rewarding their bad behavior.  We are going
15   to need time, additional time to file reports because we
16   don't even have the documents necessary to show our
17   experts.  We're probably going to take more than the 25
18   general liability experts because what we know now is we
19   have had to pick the 25 in the dark without the benefit of
20   the documents.  So I have no doubt that they need more
21   time.  But you see the problem that creates for us.  And
22   want to emphasize we don't want them to benefit by
23   problems of their own making my postponing these
24   depositions.
25        Thank you, Your Honor.
```

24

```
 1        MR. MCCONNELL:  Your Honor, I'll be very brief,
 2   Your Honor, because I actually didn't hear much discussion
 3   of the motion.  And I get the strong sense that Your Honor
 4   reads these motions pretty careful and I'm not going to
 5   repeat what we said.
 6        We just -- because of the issues with European
 7   privacy laws, and we had problems being able to process
 8   the documents for the Canada custodians.  Three domestic
 9   custodians is just sort of a puzzle why we can't find the
10   stuff.  We're trying to find it.  That's why asked for the
11   extension because we just were unable to produce the
12   documents by the October 1 date, and that remains the
13   case.
14        I don't even know where to begin to address
15   Mr. Laminack's points which are things that we have heard
16   before.  I will say that he made a reference to sworn
17   affidavits from AstraZeneca lawyers about nonpayment to
18   doctors.  I don't know what he's talking about.  It's
19   absolutely not true.  And I will say this, I can only talk
20   about what I know from personal experience.  I was at a
21   deposition last week of two doctors in one of these cases.
22   The PMO did a great job getting them scheduled.  We showed
23   up.  The inquiry by the plaintiffs' attorney was
24   searching, comprehensive, effective, made use of the --
25   all the call notes and those materials.  I did not observe
```

25

```
1   any disability.  Granted that's only one deposition.  And
2   that's really all I have to say about those other points
3   raised by Mr. Laminack.
4        THE COURT:  Well, at some point we're going to
5   have to come to grips with the effects of the issues that
6   we have had to date complating the opening rounds of
7   discovery and how that affects parties' ability to prepare
8   the rest of the case.  I'll simply make the observation
9   that most of the issues that are raised in the motion is
10  justification for not being able to meet the deadline.  It
11  really seems to me to be things that from a year ago,
12  really now over a year ago, could have and should have
13  been anticipated so that they weren't coming up as an
14  impediment now.
15       I'll make a ruling on that motion.
16       All right.  Let me -- next item on my agenda is the
17  issue of what I'll call Florida-related cases.  Plaintiffs
18  filed a list of cases that they have indicated plaintiffs
19  agreed to have transferred here.  I suspect the defendant
20  has other cases that they think are Florida related that
21  ought by the same consideration be transferred here.  I'm
22  back to the issue I raised a couple months ago is how we
23  accomplish the actual transfer of the ones plaintiffs have
24  agreed and for the ones that AstraZeneca wants to add to
25  that list, how we tee that up for either this Court's
```

26

```
1   consideration of the panel or the transferor court.
2        Let me ask plaintiffs, with respect to the ones that
3   you listed, who do you think is required jurisdictionally
4   to accomplish the transfer?
5        MR. CAMP BAILEY:  Under my understanding if the
6   parties agree and the plaintiffs agree to lay venue here
7   directly in the Middle District of Florida, we can either
8   file an amended complaint or we can have an order allowing
9   us to file, in essence, a new original complaint which
10  relates back to the original complaint laying venue in
11  this Court and proceed forward as it were an original
12  filed case in this jurisdiction and go forward as if it
13  was a --
14       THE COURT:  Without any order from the
15  transferor courts or from the multidistrict panel?
16       MR. CAMP BAILEY:  That's my understanding is if
17  we agree as parties to the litigation to lay venue here as
18  an original matter, it's treated as an original matter as
19  opposed to a 1407 transfer.
20       THE COURT:  Mr. Magaziner, do you want to
21  address what I anticipate to be your position based on
22  what we discussed earlier?
23       MR. MAGAZINER:  Yes, sir.
24       Just to dispel any confusion here maybe, we're not
25  going to agree or consent to the filing of amended
```

27

```
1   complaints in a handpicked group of cases.
2        THE COURT:  I assume that.
3        MR. MAGAZINER:  So Mr. Bailey's suggestion is
4   correct, that if we were willing to agree by agreement, we
5   could no doubt effect a transfer or create new cases here
6   and dismiss cases that have been filed elsewhere with some
7   such procedure, if we agree.  But we're not going to agree
8   to a selective transfer.
9        So Mr. Bailey might address the question of what --
10  how cases would be transferred in the absence of our
11  agreement since that is in fact the state.  Now what we --
12       THE COURT:  What I'm interested in is, quite
13  frankly, getting the Florida cases here and not just hand
14  selected ones.  I really want any that -- and there may be
15  some on the margin where there's a debate about whether
16  they're really Florida cases or has moved, but for the
17  ones that somebody decides have a Florida connection, I
18  think they ought to be here.  How many do you think are in
19  that universe?
20       MR. MAGAZINER:  My recollection is that there
21  are something like 200, in the neighborhood of 200, Your
22  Honor.
23       THE COURT:  And plaintiffs have listed 100
24  something or --
25       MR. MAGAZINER:  No.  They have listed 36.
```

28

```
1        MR. CAMP BAILEY:  I think there's 160 some odd
2   that are not subject to a motion for dismissal that are
3   actually still live cases in the MDL.  And I think 38 or
4   so were on the list.
5        MR. MAGAZINER:  I don't --
6        MR. CAMP BAILEY:  They consented now to an
7   immediate transfer or to voluntarily lay jurisdiction
8   directly here in this Court.
9        MR. MAGAZINER:  I don't want to either agree or
10  disagree with Mr. Bailey's numbers because I'm not exactly
11  sure.
12       THE COURT:  Ballpark here.
13       MR. MAGAZINER:  But it is a ballpark of, let's
14  say, between 160 and 200 Florida resident cases.  There
15  may be some that's in which the Florida resident recently
16  moved here and all the pertinent events occurred somewhere
17  else.
18       THE COURT:  That's what I'm saying.  Those are
19  ones that maybe shouldn't be transferred.
20       MR. MAGAZINER:  Right.  But as to the rest, we
21  would think that they should all be transferred here and
22  we think we can do that by filing a forum non conveniens
23  motion asking the Court to transfer those cases.  The
24  Court has jurisdiction over those cases now because
25  they're part of MDL and they could be transferred to this
```

29

```
1    Court forum non conveniens basis.
2           THE COURT:  But who has to that under lexicon?
3    The transferee court?  The panel?  Or can this Court?
4           MR. MAGAZINER:  I -- we briefed that issue
5    before.  I'll be happy to brief it again -- or actually,
6    review the briefs we filed before and reeducate myself.
7    But I think that what lexicon clearly prohibits is a
8    transfer to this Court of a case that has nothing to do
9    with Florida other than for the purpose of trying it here.
10   I don't know that lexicon --
11          THE COURT:  I'm not sure it speaks to it either.
12   That's why I'm a little bit at sea myself.
13          MR. MAGAZINER:  Lexicon prohibits this Court
14   from transferring a case on a forum non conveniens basis
15   that it would be consistent with transfers that courts
16   usually make where the -- all the events at issue occurred
17   in the forum different from the forum where the case was
18   filed, which would be the case here because all of these
19   cases that we're talking about are -- almost all been
20   filed in Massachusetts which has nothing to do with any of
21   the events at issue.  So we would contemplate filing an
22   appropriate motion to transfer all of the Florida cases
23   from the district in Massachusetts to the Middle District
24   of Florida.
25          THE COURT:  Well, here's what I would look to to
```

30

```
1    tee this up.  And there's a reason I'm doing all of this.
2    I'll explain in just a moment.
3           I want you to go ahead and file that motion to -- and
4    since, as you just discussed Mr. Bailey's proposal
5    doesn't work unless you agree and you're not going to
6    agree to their selection of the ones.  And whether that's
7    lawyers or plaintiffs, I don't really care.  I certainly
8    understand your point on that.  So you would be moving to
9    transfer the 160 or the 200 or however many it is based on
10   your reading of lexicon.  And then plaintiffs could
11   respond and say, "We think lexicon prohibits that.  We
12   think if you're going do it, you have to do it this way or
13   you can't do it, or we can't do it until everything is
14   over," whatever your position is.  I'm not telling you
15   what your position is, but I'll -- and then if there's
16   also some of them on the 160 to 200 that you just don't
17   think fit even under their theory of forum non conveniens,
18   if they're not really Florida cases, you can raise that as
19   to the specific ones.  And I'll review -- I don't know
20   whether I'm going to do that or Judge Conway, but one of
21   us will look at the -- ultimately I think if I have do it,
22   it would be on a report and recommendation.  If Judge
23   Conway does it, obviously an order.  But we will look at
24   those issues and then make a determination whether we can
25   do it in our view of the law and the facts of what I'll
```

31

```
1    call the marginal cases.
2           MR. CAMP BAILEY:  And I'm not an expert on
3    lexicon, but I do think we would -- we think that the
4    lexicon decision would prohibit a voluntary transfer by
5    this Court to itself under the Lexicon decision.
6           THE COURT:  Well, that's certainly one reading
7    of the tenor of lexicon.  But this set of facts is not
8    what was before the Court in lexicon.  So I think that's
9    an open issue.  What I'm leaning towards, and I'll be
10   frank about it, again without prejudging anything or at
11   least I'm not prejudging it, it's my goal to get, if we
12   can, consistent with the law, the truly Florida related
13   cases here as Middle District of Florida cases.
14          And I'm fudging a little about the fact that Florida
15   has three judicial districts.  But leaving that aside for
16   the moment, that that gives us a separate set of cases and
17   not the two or three we had originally, but a real number
18   of cases that we could at least consider pulling out for
19   trial here.  And Judge Conway's prepared, if necessary, to
20   tap some of her colleagues and do a bunch of these trials.
21   So that's where we're going.
22          How long do you need to file your motion to
23   accomplish your purpose?
24          MR. MAGAZINER:  Ten days, Your Honor.
25          THE COURT:  All right.  Then the response.
```

32

```
1           MR. MAGAZINER:  With the Court's permission,
2    Your Honor asked us to file the Lexicon motion but what
3    I'd like to do is file a motion based on Lexicon or
4    whatever other authority we think would be appropriate.
5           THE COURT:  I'm referring to Lexicon as
6    shorthand.
7           MR. MAGAZINER:  Thank you, Your Honor.
8           THE COURT:  Whatever method is sustainable.
9           MR. CAMP BAILEY:  And I would just say as an
10   aside, in the Zyprexa litigation the way it was
11   accomplished there is that plaintiffs filed 27 cases
12   originally in Judge Weinstein's court.  He took those up
13   as a big enough subset to do case-specific discovery and
14   those ultimately we're going to be the trial pool to go
15   forward on and the trial took, I think, a year and a half to
16   get through those 27 cases before that even got to trial
17   is when the whole settlement occurred and the whole --
18          THE COURT:  I understand then.
19          MR. CAMP BAILEY:  -- thing went away.
20          THE COURT:  We don't have that pool right now,
21   and I just don't choose to proceed that way.
22          All right.  To your agenda, counsel has already
23   touched on this a little bit, but plaintiff indicates some
24   issue about corporate witnesses.
25          MS. WHEELER:  Yes.  Good morning.  Holly
```

33

```
1    Wheeler.
2          To give you an update where we are on that ties in
3    with what Mr. Laminack has already said.  We have
4    requested 25 corporate witness depositions this time.  We
5    have received dates for 17 of those depositions, and those
6    have been noticed for October and November and December.
7    So we're still waiting upon a few.  We just wanted to make
8    the Court aware of where we are on that, and also just
9    impress upon the Court, again, the need for the materials
10   that have been the subject of so much debate of late.  So
11   that's pretty much all we needed to say on that.
12         THE COURT:  Okay.  Third party discovery.
13         MS. WHEELER:  Since we were here last we
14   actually made quite a bit of progress on this.  We have
15   received documents from three of the third parties.  Five
16   of the third parties have told us that they are ready to
17   go.  We just have very minor issues with respect to the
18   protective order that was entered on September 19.  They
19   need clarification on one of the sentences in that order.
20         Some of them have very, very minor cost issues.  We
21   have asked AstraZeneca to share not only the copying costs
22   incurred by those third parties but also any location cost
23   and possibly attorney's fees associated with those
24   subpoenas.  Some of the parties -- most of the parties
25   have in fact provided pretty detailed estimates to us
```

34

```
1    regarding those costs.  We are still waiting on those
2    estimates.  But five are just about ready to go.
3          We have filed motions to compel against six of the
4    third parties.  Four were combined into one motion that is
5    now pending in the Southern District of New York.  Two
6    were combined in one motion that is now pending in Eastern
7    District of Pennsylvania.  I know where the New York
8    motion has been assigned.  I don't know yet about
9    Pennsylvania.
10         THE COURT:  Just for your information, I did as
11   I indicated I might, send out an e-mail to all magistrate
12   judges in the country alerting them that such motions
13   might be coming and inviting them to refer the motions
14   back here.  There's -- in response to that, I got a copy
15   of an order that was entered up in Boston by one of my
16   colleagues accomplishing the same purpose in a different
17   case by taking a different tack.  It was during the MDL
18   authorization to -- which we have talked about which I
19   agree with.  But just an issue I didn't particularly want
20   to bite off.  But assuming in the transferee court the
21   authority to make rulings in other -- in effect in other
22   districts, some of you may be aware of that order.
23         So I'll see if the judge in New York or Pennsylvania
24   will refer those back to me, and, if so, I'll pick them
25   up.
```

35

```
1          MS. WHEELER:  Just to let you know, we did
2    provide quite a thorough analysis of the case law
3    permitting transfer of those matters to the MDL.  I don't
4    know if the Court has had an opportunity to review the
5    motions we have filed.  We did --
6          THE COURT:  I didn't look at the substance of
7    them.
8          MS. WHEELER:  We did e-mail to your chambers.
9          THE COURT:  I saw it was there and didn't really
10   look at it.  Who was the judge in New York?
11         MS. WHEELER:  Judge Victor Marrero.
12         Now Par Excel (phonetic), one of the other third
13   parties, has filed a motion to quash in the District Court
14   of Connecticut.  That has been assigned to Judge Hall.
15   Docket number 3:07MC264.  And we have a response prepared
16   to file in that.  We have had some issues locating
17   Connecticut counsel.  The court's there require that we do
18   have local counsel.  We have been unable to locate one of
19   at this point.  So our intention is to file a motion for
20   pro hac vice which time we will then be able to file the
21   response.  But we intend to address that this week.
22         THE COURT:  All right.
23         MS. WHEELER:  That's the problem.  We're trying
24   to locate attorneys.  We have got a couple leads.  So
25   we're working on that.
```

36

```
1          Let's see, Your Honor.  The issue with the protective
2    order, paragraph 8, indicates that the nonparties may
3    designate discovery materials as confidential so long as
4    the nonparty have a written agreement to be subject to and
5    governed by the requirements of this order.  Many of the
6    third parties have asked me what does that mean.  I know
7    that the Court provided an endorsement with the protective
8    order, but the way that it's worded doesn't necessarily --
9    doesn't really mesh with the third parties.  Do we need
10   some direction about what needs to be done there.  Do we
11   need to draft an order that's similar to the endorsement
12   that those third parties can sign when they turn over the
13   documents or does the Court envision something else?
14         THE COURT:  Well, the endorsement was a form
15   submitted by AstraZeneca, I guess.  If it's creating a
16   problem, we can create a second form of endorsement.
17         MS. WHEELER:  It's not necessarily a problem.
18   It's just the way that I read the endorsement is it's
19   parties who receive or who view the documents that have
20   been designated as confidential or bound by the order.  In
21   this case we obviously got third parties who are producing
22   and designating materials as confidential and they need
23   some language that would require them to be bound by the
24   order.  I don't think it would be a difficult thing.  But
25   I'll be happy to draft it.  It would probably be very
```

37

1 similar to the endorsement that's already with the
2 protective order.
3 THE COURT: Why don't you see if you could get
4 it in the next day or so.
5 MS. WHEELER: I'm sorry?
6 THE COURT: See if you can get that in the next
7 day or so.
8 MS. WHEELER: That would be easy. They just
9 need clarification on that.
10 And the last issue I want to address very quickly is
11 the cost. That's, I think, going to end up being the
12 primary issue. Most of the parties and the plaintiffs
13 have been able to narrow the scope of the subpoena. It's
14 really the costs that seem to be the problem. Some of the
15 third party costs could be very reasonable. Others have
16 estimated costs in excess of 100,000 or $200,000. That's
17 where we're really running into some problems. And so I
18 anticipate that will be the primary issue that the Court
19 will need to address when those motions are transferred to
20 this Court.
21 THE COURT: Talking about a photocopy cost or
22 search cost?
23 MS. WHEELER: No. Search costs and attorney's
24 fees. The photocopying costs are not the problem.
25 THE COURT: All right. I'll address those then.

38

1 Some of those things bears cost of doing business in the
2 big world.
3 So sales force and marketing databases.
4 MR. PENNOCK: Your Honor, in further considering
5 this issue that's on the agenda, we think it's probably
6 going to fall under the purview of what Mr. Ball will be
7 looking at.
8 THE COURT: That's what I thought. If we get in
9 some substantive legal issues about the scope, it will
10 come back to me. If it's just a matter of mechanics and
11 logistics, he will be able to bring to bear his expertise
12 along with the designees of parties to solve that.
13 MR. PENNOCK: Very good. Thank you, Judge.
14 THE COURT: There was a rather vague designation
15 by AstraZeneca about issues on a specific discovery. I
16 don't mean that pejoratively. I just don't know what
17 you're talking about.
18 MR. PENNOCK: Neither do we, Judge.
19 MR. MAGAZINER: And in light of the conversation
20 the Court has had with Mr. Brown and his report, we don't
21 have any issues. We thought the 60-day transition might
22 be something to be discussed.
23 With Your Honor's permission go back to the question
24 of Florida transfer. Your Honor entered an order, which
25 unfortunately I can't seem to find in my notebook, that

39

1 require plaintiffs to list the cases that they wanted to
2 have transferred and then for us to respond by October 5th
3 to their designation.
4 With Your Honor's permission what I would suggest is
5 that we file a motion 10 days from now.
6 THE COURT: All that's folded in what we're just
7 talking about.
8 MR. MAGAZINER: Okay. Thank you.
9 THE COURT: All right. Next issue I wanted to
10 broach with you, and I don't know if you're going to want
11 to give me anything firm here today, but maybe able to
12 give me some initial responses and then you can try to
13 bring this back down to earth in the future, plaintiffs
14 have expressed, and it's obvious from the nature of things
15 that there may be some issues about meeting -- the
16 parties, both sides, their ability to meet the previous
17 set deadlines. I'd like to you give me some global thought
18 as to the overall goals for this MDL as to, for example,
19 how far should each case be -- we talked about this a
20 little bit. We alluded to it, for the cases to be
21 prepared prior to remand. There are a lot of choices. We
22 can ramp up the case-specific discovery on a limited basis
23 to starting in January to 100 or a 1,000 cases a month to
24 get all of those done within some timeframe.
25 We could pick some cases for full discovery, whether

40

1 those are the selection from the Florida cases leading to
2 a trial schedule, which has a certain appeal to me, and
3 how many of those we do and how we select them are obvious
4 issues. And I don't know what Judge Conway's views are,
5 frankly, as to how far she wants to take all these cases.
6 So whether she wants them, as we have discussed, is
7 one possibility to do it all, however many cases survive
8 various motions, when we're done with it it should be
9 ready for final pretrial conference and a trial in the
10 transferor districts or whatever district transferor court
11 may ultimately send them to. Do we -- is it our goal
12 simply to resolve global issues that we have scheduled
13 that you had arguments on for some of the issues and other
14 deadlines coming up next year, to get those resolved and
15 then send the cases back for routine final discovery at
16 trial.
17 Those are all possibilities.
18 Some of this will relate back to something we talked
19 about last time which in anticipation from the defendants
20 of some motions to dismiss based on the case specific
21 discovery. You -- Mr. Magaziner, do you have just a
22 ballpark figure as to how many -- based on what you have
23 done so far, how many of those you would have ready to go
24 in the next month or if you chose to do them now? I'm
25 just trying to -- talking about a tenth of them, a third

41

```
 1   of them?
 2        MR. MAGAZINER:  They fall into various
 3   categories.  We're studying very closely to figure out
 4   what would make sense.  There are some, and it's a very
 5   small number of cases, where the discovery suggests that
 6   there is a very clean statute of limitations motion, for
 7   example, or a very clean motion based on nonusage, for
 8   example, which we're hoping maybe when we bring these to
 9   the attention of plaintiffs' counsel who are involved in
10   those particular cases, they will decide this is not a
11   case they wish to pursue.  But there are a very small
12   number of them.  There are a larger group of cases which
13   we're studying much more carefully in trying to decide can
14   these be teed up now?  Do we need to take some further
15   discovery?  Do we need to see what the plaintiffs' experts
16   have to say.  We will report back to the Court.
17        THE COURT:  You have got a strategic decision
18   whether it's -- they're really appropriate to take that
19   shot at them now or you want to wait and get all your
20   arrows together on them.
21        MR. MAGAZINER:  I would like the opportunity,
22   perhaps a month from now when we see Your Honor, to report
23   to the Court on where we are and perhaps we will have
24   filed some motions by then.
25        But unfortunately --
```

42

```
 1        THE COURT:  You asked last time for some
 2   guidance on how to do that, and I did talk to Judge Conway
 3   about that, and the best we can do is similar to the
 4   thought process you're going through which is just do any
 5   kind of logical way.  We would prefer if you can group
 6   them in some logical way.  I'm not going to tell you which
 7   logic because it's going to depend on your strategy which
 8   you're entitled to do.  But for the -- for your
 9   convenience, for the plaintiffs' convenience and the
10   Court's convenience, if -- however you can group them
11   either in time or subject matter or otherwise, and I know
12   some of them overlap, so it won't be an easy decision for
13   you but I'll just ask that you -- to the extent you can
14   group them in a logical fashion --
15        MR. MAGAZINER:  We're going to try to do that.
16        Just so Your Honor understands why I can't say more
17   now than I have said, the number of cases, despite the
18   heroic efforts of parties and -- both parties and the PMO,
19   the number cases that have been fully discovered, that is
20   where all four of the depositions have --
21        THE COURT:  Fully limited discovery.
22        MR. MAGAZINER:  Yeah.  The limited discovery has
23   been completed is a relatively small number.  So trying to
24   extrapolate in those relatively small numbers say, okay,
25   how are we going to proceed with the motion practice, what
```

43

```
 1   we anticipate to be a large number of cases, is very
 2   difficult.  But next month I think we will have
 3   sufficiently large number of cases that have been -- in
 4   which the limited discovery has been completed that I can
 5   say something more useful than I'm able to say today.
 6        THE COURT:  While I got you on that particular
 7   spot, let me ask you, because one of the purposes of this
 8   was to do exactly what you're talking about but also to
 9   feed into the consideration of ADR or settlement
10   discussions.  In terms of data gathering that was part of
11   your client's processing of that, where do you stand?
12        MR. MAGAZINER:  To speak very frankly --
13   Mr. Pennock or Mr. Bailey may disagree -- the cases we
14   have seen to date do not seem to us to be cases that we
15   would ever consider settling.  That isn't to say there may
16   not be some such cases.  As a matter of fact, we have
17   counseled among ourselves with the client what sort of
18   fact person would we want to see which would perhaps
19   suggest that something should be considered for
20   settlement.  But what we have seen to date, and it may
21   just be because the numbers are so small that they're not
22   representative, maybe that they're all like this, we don't
23   know, but what we've seen to date are cases in which if I
24   were to provide the Court the details of the testimony of
25   the plaintiffs and the doctors I think the Court would
```

44

```
 1   understand these are not cases that have frankly any
 2   value.
 3        And, again, I'm not saying that that's true of all
 4   plaintiffs' cases.  I'm saying the cases that have been
 5   fully discovered when we take into account the plaintiff's
 6   testimony and doctor's testimony, and the sales rep's
 7   testimony, they don't seem to us to be going anywhere.
 8        We have cases where the plaintiff, for example, was
 9   diagnosed with diabetes long before the first Seroquel.
10   Not likely a kind of case we would consider settling.  We
11   have cases where the plaintiff was on Risperdal and
12   Zyprexa and Seroquel and other antipsychotics during the
13   entire period where the plaintiff doctor has testified
14   that the plaintiff had numerous risk factors for diabetes
15   before ever taking any antipsychotics, where the plaintiff
16   has a long and troubled tragic history of medical problems
17   which in and of themselves create more risk factors for
18   diabetes.  Those are -- that is not a case where -- which
19   at present juncture we would think we ought to consider
20   settlement.
21        So again, I'd like to be able to say something more
22   to the Court on that score next month.  I know the Court's
23   interest in that subject, and as we said we have not -- we
24   are not ruling out the possibility of ADR and appropriate
25   cases.  But we have not seen cases to date from this very
```

45

```
1   limited number that have been subject to limited discovery
2   and completely discovered in a limited way.  We haven't
3   seen cases that seem to us worthy of consideration.  But
4   next month, if I may, I would like to report further to
5   the Court on that subject.
6       I'll step down unless Your Honor has further
7   questions.
8       THE COURT:  No.  That's --
9       MR. PENNOCK:  Your Honor, to address the Court's
10  initial sort of question regarding globally where do we go
11  or do we change anything.  There's one thing that I think
12  is for sure, and that is that nothing can be remanded
13  until the general discovery and any general matters are
14  dealt with.  And, you know, it's no secret that our
15  position all along that should be the primary focus of
16  what we're all doing and we --
17      THE COURT:  Yeah, that clearly is the big --
18  that's the easy obvious goal to me that.  An MDL does
19  nothing else it has to do that.
20      MR. PENNOCK:  And the Court's making strides for
21  getting that done with everything the Court's been doing.
22      As far as ratcheting up case-specific cases, I mean,
23  this is just off the cuff, I would suggest that the
24  relatively small morass in which we have found ourselves
25  despite the defendant's commitments and promises, even
```

46

```
1   despite this Court putting together PMO, is just a small
2   morass to where we would be if we start ratcheting up
3   case-specific discovery at any time, let alone starting
4   again.  So we would be strongly opposed to that.  I think
5   we have very strong factual basis now that we have seen
6   what's transpired.  As opposed to our prediction of a
7   morass, and our prediction that the defendants might not
8   be able to fulfill getting these things done despite their
9   hundreds of lawyers, we actually have a factual record for
10  that, and we would like to discuss that further if the
11  Court wants to explore it further and perhaps brief it and
12  lay that out.
13      In terms of ADR there are a few observations, if the
14  Court doesn't mind, I'd like to make.  Number one, I
15  believe I can go back to a transcript and find where
16  Mr. Magaziner said that after we see 100 cases, we will be
17  prepared to go to ADR.  I think what I'm now hearing is
18  well, now, what I meant to say is after I see -- and
19  again, I'm not attempting to disparage Mr. Magaziner but
20  it sounds as though the position has changed.  And it's
21  now, well, after I see 100 cases that I might want to
22  settle maybe we will go to ADR.  You know, ADR or
23  discussions regarding settlement I don't think ever should
24  come from a posture of we're only going to settle the
25  cases -- we're only going to discuss cases that you can
```

47

```
1   win.
2       In any mass tort there are cases that the plaintiffs
3   will have great difficulty winning and plaintiffs that
4   will -- defendants will have a great difficulty winning.
5   And what you typically do to get to a resolution, if
6   that's the direction you intend to go as opposed to
7   scorched earth and try every case, is that all cases are
8   discussed and there are, you know, for lack of a better
9   term, but a term that is used frequently in this business,
10  there is significant discounting that occurs depending
11  upon the circumstances.
12      Mr. Magaziner mentioned three categories of cases.  I
13  would like the opportunity between now and the next
14  hearing to perhaps show the Court that I don't think those
15  are categories that they have been seeing, but individual
16  cases.  In other words, he's mentioned three examples.  I
17  think there are only three examples or close to three
18  examples for what has been mentioned as the type of cases
19  they're seeing.  I think that we on our side between now
20  and the end of the month could give the Court sort of a
21  report on, well, here are the rest of the cases or here
22  are 25 cases or 30 or 40 that they have taken discovery in
23  where there aren't these blatant and obviously very
24  significant impediments to discussions.  So I'd say the
25  Court's permission to submit that by the next hearing.
```

48

```
1       Even in terms of the cases that he mentioned, they
2   are all imminently triable and the reason is as with any
3   type of toxic exposure and drug exposure, there is the
4   gasoline on the fire theory.  And the very person that you
5   don't give a drug to that you know or should know could
6   cause a problem, is a person that's already seriously
7   predisposed to that.
8       So notwithstanding any predisposition in a plaintiff
9   to having a particular disease or ailment, I think that
10  those cases can be tried and should be discussed if we are
11  able to get to discussing these cases.
12      I also would like to mention to the Court that in New
13  Jersey where I'm one of the leading players for the
14  plaintiffs in the state court litigation, with Judge
15  Happas, she's the new coordination judge there, formerly
16  Judge Garruto until last month, I have served on the
17  defendants formal demands or offers of judgment for dozens
18  of cases, and I have asked them to respond to that
19  command.  I think these commands are imminently reasonable
20  in terms of the dollar value.  And I just wanted to
21  mention that to the Court.
22      We have our first conference with Judge Happas is on
23  October 10th, and we will see that perhaps we may end up
24  with a mediation program in New Jersey based on those
25  offers of judgment that we make here.
```

49

```
 1    And that kind of ties me back into the request for
 2  the Lilly settlement money.  You know, unless and until
 3  the defendants say, yes, we're ready to move forward to
 4  mediate cases, I don't understand why they need to know
 5  those dollars aside from the confidentiality issues.  What
 6  possible benefit did they obtain at this juncture from
 7  knowing how much our client settled for.  Now, if we were
 8  going to trial or verdict, of course it would be a
 9  different issue in terms of offset.  But right now it
10  seems to me that this is just a grab at information to
11  help them strategize with respect to the mediation.  But
12  if they're telling us that they're going to mediation and
13  they're willing to mediate every case, then I would agree
14  that maybe this is something that we would want Lilly to
15  come in here and explain.  But short of that, I don't
16  think they should be getting it.
17    In any event, Your Honor, we would like that
18  opportunity to explain to the Court why ratcheting up the
19  case-specific discovery is not a good idea.  We're willing
20  to do that by the next hearing.  And if I may suggest,
21  Your Honor, I would ask that the next hearing be before
22  the end of this month.
23    There are two motions that I met and conferred with
24  the defendants that I know I have to make because they
25  won't agree.  I'm planning on making those motions this
```

50

```
 1  week.  And there is an additional motion that I need to
 2  speak to them about.  I don't know what their position is,
 3  but I'd like to get that teed up if they don't agree to
 4  that.
 5    We have the Florida issue and if we can't resolve
 6  that, which I think there is still a possibility for that,
 7  we need to get that taken care of.
 8    And so as this Court has been typically doing, I'd
 9  ask for a short date for the next hearing so that those
10  motions that we're going to file this week could be heard.
11    Thank you, Judge.
12    THE COURT:  All right.  I'll note also there's a
13  motion pending to file a reply on some of the motions that
14  were argued last week.  I'm going to leave that for Judge
15  Conway to look at.  It was just filed yesterday.
16    In terms of next status conference, I was looking at
17  30th of October which is a Tuesday and also it's -- also
18  it's a week that I have criminal duty assignments, so
19  again might not be able to go as long as we have in some
20  prior hearings, but we can do it in an hour and a half.
21  30th sound all right?
22    MR. PENNOCK:  That's perfect, Judge.
23    THE COURT:  Start that at 10:30 on 10/30 is
24  that -- because I have got a 10:00.  10:30 on 10/30.
25    Let me review where we are.  Special Master Brown is
```

51

```
 1  going to submit a proposed order by the end of the week
 2  regarding the transition to earlier designation and timing
 3  changes on matters within his consideration.  Special
 4  Master Bell is going to be meeting with the designated
 5  representatives of parties immediately and I'll get him a
 6  more specific order about the scope of his duties but he
 7  can go ahead and start meeting and talking before then.
 8    I will issue an order directed to Eli Lilly to
 9  provide me with any thoughts they have got about the scope
10  of issues they may claim confidentiality on.
11    Let me ask Mr. Magaziner that after the hearing you
12  provide the clerk or my law clerk with a -- whoever their
13  designated person is from Reed Smith, whoever their
14  counsel.
15    MR. CAMP BAILEY:  Pepper Hamilton.
16    MR. MAGAZINER:  I've communicated to them.  I
17  have been speaking to Andrew Rogoff.
18    THE COURT:  You can do that later.
19    MR. KEN BAILEY:  Your Honor, that's a different
20  person than's at Pepper Hamilton that has been designated.
21    THE COURT:  Well, talk amongst yourselves,
22  figure out who it is.  Otherwise, we will just serve on
23  him.
24    MR. MAGAZINER:  Actually, I don't care which
25  Pepper Hamilton lawyer we talk to.  I assume they're
```

52

```
 1  working together.
 2    THE COURT:  Within 10 days AstraZeneca will file
 3  its motion and response regarding all Florida-related
 4  cases, and plaintiffs can respond to that.
 5    I'll take a look at these motions that have been
 6  filed in the districts and see what's going on with those.
 7  Next, by the end of the week plaintiff will submit,
 8  hopefully, agreed language to be provided with third
 9  parties for their endorsement of the confidentiality
10  order.  And I'm going to enter an order directing the
11  parties to submit their positions with respect to these
12  scheduling and ADR type issues.  I'll flesh that out a
13  little bit.  But it will be -- it will track what we have
14  just been talking about as to your views on what the goals
15  for the MDL should be in light of how things have
16  developed.  And assuming we do identify some cases for
17  trial this court can try, what we're going to go with
18  that, how far we should go with limited case discovery,
19  and how that dovetails in with the settlement
20  considerations.  I think that's where we are.  But let me
21  ask each side in turn to anything else.
22    MR. WHEELER:  I just learned that the
23  Pennsylvania motion to compel has been assigned to Judge
24  Thomas O'Neill.  So I just wanted to let you know this --
25    THE COURT:  Anything else from plaintiffs?
```

53

1       MR. FENWICK:  No, Your Honor.  Thank you.

2       THE COURT:  Defendant?

3       MR. MAGAZINER:  No, Your Honor.

4       THE COURT:  All right.  We're in recess.

5           (End at 11:15 A.m.)

6               C E R T I F I C A T E

7       I certify that the foregoing is a correct

8   transcript from the record of proceedings in the

9   above-entitled matter.

10

11

12

13

14  _____              _____

15  Sandra K. Tremel

16

17

18

19

20

21

22

23

24

25