```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                         ORLANDO DIVISION

                   Docket No.6:06-MD-1769-Orl-22DAB
    . . . . . . . . . . . . . .
    IN RE:                       :
    SEROQUEL PRODUCTS LIABILITY  :
    LITIGATION                   :       Orlando, Florida
    MDL DOCKET No. 1769          :       October 2, 2007
                                 :       10:00 a.m.
    ALL CASES                    :
                                 :
    . . . . . . . . . . . . . .  :

              TRANSCRIPT OF PRETRIAL CONFERENCE
              BEFORE THE HONORABLE DAVID A. BAKER
                  UNITED STATES MAGISTRATE JUDGE

    APPEARANCES:

    For the Plaintiffs:       Paul Pennock

                              Richard Laminack

                              F. Kenneth Bailey

                              K. Camp Bailey

                              D. Renee Baggett

                              Craig Ball

                              Buffy Martines

                              Holly Wheeler

                              Angela Nixon

    Court Reporter:  Sandra K. Tremel



    Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
```

```
    For the Defendant
    AstraZeneca:              Fred Magaziner

                              Stephen J. McConnell

                              James Freebery

                              Robert Pass

                              Robert Ciotti

                              Liz Balakhani


    Special Master:  Orran Brown
```

```
                         P R O C E E D I N G S
         THE DEPUTY CLERK:  The case number is
    6:06-md-1769-Orl-22DAB, In Re: Seroquel Products Liability
    Litigation.
         Counsel in the courtroom, please state your
    appearances for the record.
         MR. PENNOCK:  Paul Pennock for plaintiffs.
         MR. CAMP BAILEY:  Camp Bailey for plaintiffs.
         MR. LAMINACK:  Rick Laminack for plaintiffs.
         MS. WHEELER:  Holly Wheeler for plaintiffs.
         MR. KEN BAILEY:  Ken Bailey for plaintiffs.
         MS. MARTINES:  Buffy Martines for plaintiffs.
         MS. BAGGETT:  Reneé Baggett for plaintiffs.
         MR. MAGAZINER:  Fred Magaziner for AstraZeneca.
         MR. MCCONNELL:  Steve McConnell for
    AstraZeneca.
         MR. PASS:  Robert Pass for AstraZeneca.
         MR. FREEBERY:  Jim Freebery for AstraZeneca.
         MR. CIOTTI:  Robert Ciotti for AstraZeneca.
         MS. BALAKHANI:  Liz Balakhani for AstraZeneca.
         THE DEPUTY CLERK:  Counsel on the phone, please
    state your appearances.
         MR. BROWN:  This is Orran Brown the special
    master and PMO.
         MR. BALL:  This is Craig Ball.  I believe I have
```

```
    been appointed special master for IT matters.
         MS. CRANFORD:  Ashley Cranford for the
    plaintiffs.
         MS. NIXON:  Angela Nixon, noncounsel for
    plaintiffs.
         THE COURT:  Anybody else on the phone?
         All right.  Let me start first, see if Mr. Brown, PMO
    has any comments.  I know your formal report is not due
    for a couple weeks.  So any quick thoughts?
         MR. BROWN:  Yes, Your Honor.
         If I heard you correctly, quick thoughts on where we
    stand and we did want to discuss with the Court a plan we
    have been working for transitioning to designation of
    cases for case-specific discovery 60 days in advance
    rather than the 30 days in advance that CMO4 has
    implemented thus far.  It's an issue that came up in our
    last status conference, and I have been working with the
    parties' representatives since then to come up with a
    program that we wanted to review with you.
         As a highlight of a report on how it's going, we have
    been working with the representatives of the plaintiffs
    and defendant to schedule physicians depositions, and
    parties are still scheduling the plaintiff and the sales
    representatives' deposition witnesses for depositions each
    month with 30 cases a month.  And as I reported last time,
```

5

1  and as reported in our first written report, we are making
2  a lot of headway in getting these schedules and trying to
3  reach solutions to any of the logistical impediments that
4  we're having primarily with the physicians about their --
5  some of -- they range, as you can imagine, from witnesses
6  who are fully cooperative in providing the records to
7  witnesses who do not do depositions if they can avoid it.
8  And we're generally able to work through those problems.
9      And as I reported last time, continue to encounter
10 outdated contact information from physicians that we have
11 to update with the parties' assistance.  We have some
12 physicians who are deceased and we have to usually find
13 replacement physician to serve as a witness.  We have some
14 physicians that we are really unable to locate, and
15 generally that means that the parties need to select
16 another potential physician from the fact sheets to
17 designate as a witness.  And we have the processes in
18 place working with the parties to make that happen as
19 fluidly as possible.
20     We have not yet been successful in scheduling every
21 physician deposition for the month in which the case has
22 been designated partly because for the September cases, we
23 came onboard right as that was on the cusp of being
24 scheduled.  So we were calling people in September for
25 September depositions which made that a little difficult,

6

1  but we were successful in scheduling a lot of them in
2  September and ultimately most of the rest of them in
3  October or thereabouts.  We still have some cases from
4  September that we're trying to schedule.  For example,
5  about eight of them where we're unable to locate the
6  doctor or there's some issue that, logistical issue that
7  is holding us up.  But we have a full court press on with
8  the parties, and the parties do -- to make those
9  scheduling -- solve those scheduling problems and to work
10 through them.
11     For October we have gotten designations for a total
12 of 48 physician witnesses.  We have successfully scheduled
13 17 of them thus far.  We have 10 of them that have
14 problems with a deceased physician or contact information
15 bad that we're working through.  We have the other 21
16 we're in the processes of talking to the doctors, getting
17 a date, waiting for return calls.
18     And we have developed internally here with the
19 parties' approval steps to keep the pressure on in a
20 relentless way to make that scheduling happen.  And what
21 we're seeing many times is that the physicians do not
22 respond to phone calls, do not return them.  And so if
23 we -- we have a schedule where we call them.  If we don't
24 hear back in 24 hours, we call them again.  If we don't
25 hear back in 48 hours from them, we send them, because we

7

1  usually have fax numbers, we send them the Court's order
2  that the Court recently entered at our request which
3  impresses upon them the importance of returning a call and
4  their duty to cooperate with us.  And that is more than
5  half of the time finally getting a reaction from the
6  physicians, and we're getting calls back.  There are still
7  some witnesses even after that that we do not hear back
8  from.  And we have a rule thus far that if we have not
9  gotten a call back from a physician's office within 10
10 days of the first calls, 24 hours, 48 hours send a
11 package, we go out to 10 days.  We send them a deposition
12 notice and a subpoena that we have completed and we pick a
13 date.  And thus far that is generally getting a call back
14 finally from a physician or a physician's lawyer.
15     As we work through the initial set of cases for
16 September and in October, we think we will hit the point
17 where we are successfully scheduling cases in the month in
18 which they are intended to be scheduled.  That is
19 definitely the goal.  And we think that one of the things
20 we're going to discuss about today in terms of designating
21 cases 60 days in advance will help us achieve that goal.
22     We have done -- we have modified some of our
23 processes and talking about further modifications about
24 obtaining medical records, because in each instance, thus
25 far, we are asking the plaintiffs -- the physician's

8

1  office to provide us medical records for either the
2  prescribing physician during the time that the product was
3  prescribed or a treating physician who's currently
4  treating the patient, the plaintiff, to provide those
5  medical records.  That process is working fairly well,
6  although we're discussing with the parties whether in some
7  instances it is somewhat redundant because the parties
8  collectively using a national collection service record
9  track have already canvassed most of these physicians and
10 have gotten medical records at some point before now.
11     And so we're studying the issue about whether we can
12 identify the instances where it may be redundant where we
13 cannot go through the step of asking for the records
14 again.  Maybe in some instances asking only for an update
15 or maybe not asking for them at all if parties recently
16 have obtained them through their other collection service.
17 We're trying to avoid duplication of any redundant effort
18 or any unnecessary costs.
19     The other issue that we wanted to make sure we
20 previewed with the Court today was the transition from
21 designating cases 30 days in advance, as CMO4 requires, to
22 designating cases 60 days in advance.  The 60 days in
23 advance we think will help us a lot getting the doctor's
24 attention first of all and then getting all their
25 calendars in the month in which they're supposed to be

9

1  deposed. That requires a transition period moving from 30
2  days out to the 60 days out because we have phase-in
3  double tracking designations to get us to the point where
4  we can designate 60 days -- the parties and the Court can
5  designate cases 60 days out.
6       The parties and the Court are right now making their
7  designations on September and the early part of October
8  for the November cases which is the 30-day-out model.
9  We're working on making additional designations in October
10 for December cases and then shortly thereafter making
11 designations for the January cases which will then get us
12 60 days out. And then starting the designations that are
13 being made in late November, they will be making
14 designations for February which will then put us on
15 60-day-out schedule.
16      That requires working with the parties to make sure
17 that we phase in the designations in a manner that they
18 can handle because parties have to designate their 10
19 cases and then their -- the other 10 cases from the
20 plaintiffs, and then the Court designates 10, and then
21 those designations trigger dates for defendants to
22 disclose documents relating to contact by the prescriber
23 with a sales representative which requires that the
24 defendants to dig through records and identify and round
25 those up and disclose those documents. Case Management

10

1  Order 4 requires those disclosures within five business
2  days after the cases are designated.
3       And then the plaintiffs have to designate a sales
4  representative as a deponent they want to depose based
5  upon those document disclosures. And Case Management
6  Order 4 says that occurs within two business days after
7  disclosure of the records.
8       So those dates have to be phased in along with the
9  designations to get us to the point of doing a 60 days
10 out. And if we're double tracking designations starting
11 in October to catch, to phase in the cases for December
12 and January, those dates are also going to be doubled up.
13 So there's a lot of work the parties have to do to make
14 this happen, to phase it in the 60 days out.
15      We have been working with the plaintiffs' designated
16 representatives and defendant's counsel to make that
17 happen. And we think that during the transition phase
18 while they're double tracking this, the five business days
19 for the defendants to disclose the sales representative
20 contact records should be extended to seven, and that the
21 plaintiffs should have four business days rather than two
22 to pick a deponent witness because they're going to be
23 doing so much of this at the same time.
24      We have been considering a transition phase that will
25 allow that to happen, changing the five to seven and two

11

1  to four.
2       We wanted to preview that with the Court and get the
3  Court's reaction to it. And then we also have been
4  considering when to kick this off because we have been
5  working on a couple of models that would require, one of
6  which would require designations at the end of October as
7  normal for the December cases, and then about a week later
8  in November, early November, designating for the January
9  cases. And we had talked about starting that with the
10 normal designations on the 26th of October. We have also
11 talked about trying to accelerate that and do it a little
12 earlier if the parties can and if the Court has the
13 opportunity to consider this between now and then, to
14 start doing it in the middle of the month, on the 15th of
15 October, which would start getting us designations a
16 couple weeks sooner for the November -- the December and
17 January cases.
18      We have -- we will come up with a proposed order that
19 we can send the Court by the end of this week that would
20 express within that order the modifications that would be
21 required to Case Management Order 4 to make this happen
22 for the double tracking designations to get us to the
23 point of 60 days out, so that by the designations in late
24 November, it will be occurring for February cases. That
25 will give us the cases sooner. We will start on the

12

1  physicians sooner. We think that will help. And the
2  order that the Court will see this week, and we'll
3  contemplate phasing in the double designations in a
4  somewhat staggered manner so that it can be achieved. And
5  then for the transition period, allowing the defendant's
6  disclosure of sales rep documents, seven business days
7  instead of five, plaintiff designating the sales rep
8  witnesses four business days after that instead of two
9  during the transition period.
10      We are also constantly working with parties to come
11 up with any other steps that we can to enhance the
12 efficiency of this process to make it work smoothly and
13 cleaner or faster, more with less cost. And we don't yet
14 have a whole lot of experience to be able to identify any
15 other areas that we would change. We think that right now
16 we should accomplish this transition 60 days out, and then
17 continually evaluate what else we can do, like the change,
18 perhaps, in the document collection that we're studying.
19 The parties now see if the documents that we're receiving
20 are redundant or they're helpful. But it's a constant
21 process of reevaluating to see if there is a better way to
22 do this. And if we come up with things, then we will
23 present those ideas to the Court as well.
24      The last thing worth mentioning, I think, Your Honor,
25 is that we do have a master calendar up in place. We set

13

1  that up two week ago. We forwarded to the Court a manual
2  to explain how to use it and assigned you a user name and
3  password should you choose to view it. That is up and
4  running. We're listing all the depositions and keeping
5  the master calendar. We're also refining and improving
6  that as we go along. Now working on the option to make it
7  searchable by case name, plaintiff name, and doctor names
8  so that if you're looking for a particular case in all the
9  depositions that have ever been done or assigned to in the
10 future, you can research it and it will show you each one.
11 And also if you're looking for a particular doctor's name
12 or witness's name you can search it and it will take you
13 to each one. That's a feature that we're adding this
14 week.
15     So that's a quick report, Your Honor. Maybe not as
16 quick as Court intended. But we are going to present to
17 the Court an order to effect this transition to the
18 60-day-out change. If that meets with the Court
19 expectations, we can present that this week.
20         THE COURT: Do you anticipate that that order
21 will be agreed in all respects?
22         MR. BROWN: Yes, Your Honor, I do.
23         THE COURT: All right. Then I don't have a
24 problem.
25         MR. BROWN: Like we did before, it will be a

14

1  joint unopposed motion for an order to change that
2  schedule to make that happen.
3         THE COURT: All right. I'll look forward to
4  seeing that when it arrives.
5     I'd like you to stay on the phone. I'm going back to
6  an issue that may affect your role here later on --
7         MR. BROWN: Yes, Your Honor.
8         THE COURT: -- on the agenda.
9     Mr. Ball, let me welcome you to the courtroom here,
10 and ask whether since I talked to you last week, have you
11 had any further contact with the parties or were you just
12 waiting for today's hearing?
13         MR. BALL: Waiting for today's hearing, Your
14 Honor.
15         THE COURT: All right. Parties have each
16 submitted at the Court's direction proposals with respect
17 to the scope of your duties. I'm going to sift through
18 those disparate proposals and come up with an order and
19 turn the nuts and bolts of the ESI over to you, and,
20 hopefully, you will be able to solve some problems the
21 parties have been unable to solve. And I'll -- we will
22 have you participate again in the next status conference.
23     I may require that you submit some sort of a report
24 as to the status of things. And then I expect I'll be
25 hearing from either or both sides about -- as we move

15

1  through that, whether issues about your role ought to
2  change.
3      I'm going to ask parties very briefly to comment on
4  anything beyond what's in your written submissions that I
5  really don't want to argue at this point, but just
6  anything else that you want to comment on. I'll get that
7  order out in the next day or two.
8          MR. PENNOCK: Paul Pennock for the plaintiffs.
9  The only comment is timing. In the next -- by
10 December 31, three months, we have third party discovery,
11 corporate witness discovery, database discovery. We, of
12 course, have to review all those documents and get our
13 initial round of expert reports in. And at this juncture,
14 we feel that we still, as the Court knows, don't really
15 have much to begin with. And we're -- we feel very
16 handcuffed. We feel that we have been prejudiced. We're
17 continuing to be prejudiced. And the only thing that
18 really disturbs me about the defendant's proposal, and I
19 agree with you, they're very disparate, and you can
20 probably combine the two and come up with what would be
21 the appropriate order. But the thing that bothered me the
22 most, Judge, was the statement regarding monthly reports.
23 I kind of wanted to ask what planet have they been living
24 on for the last few months. This is a monthly report. We
25 have to have this stuff done this month and certainly by

16

1  next month. And even next month is too far out. And that
2  is the thing that concerned us the most is their kind of
3  just failure to recognize the very difficult timing
4  situation we're in. But other than that, I think -- our
5  proposals, we discussed them at length and the problems,
6  and the proposals are before the Court.
7          THE COURT: Anything from the defendants?
8          MR. PASS: Your Honor, Robert Pass. It's only
9  my second time here, I don't know if you remember who I
10 was.
11     Let me just address very quickly Mr. Pennock's
12 observations. The inclusion of a reference to monthly
13 reports in our proposed job description is not intended in
14 the least to suggest or betray any desire to drag this out
15 at all. We're ready to start meeting with Mr. Ball as
16 promptly as possible. We want to move this forward. This
17 was our idea in the first place to try to get things fully
18 on track and resolved. So there simply needed to be some
19 sort of procedure by which there will be periodic reports
20 and we simply chose monthly.
21     Mr. Ball can report as frequently as the
22 circumstances allow. So there's nothing suggested by that
23 in terms of delay.
24     The only other thing I would remark about is I'd like
25 to comply with the Court's order which directed that we

16

HIPAA authorization would allow them to otherwise get.

I think Buffy and the special master -- actually, Orran Brown has been dealing with that and I know that they have been in contact with Pepper Hamilton, the lawyers for Eli Lilly, and they have some very strong thoughts on disclosing any of information related to the settlement amounts and the settlement documents and submissions related to the settlements. And Buffy may want to add something as far as her conversations with the PMO.

MS. MARTINES: Good morning, Your Honor. Buffy Martines on behalf of plaintiffs.

The concern I have with the motion is that there may be some overlap in what we're trying to do with Special Master Brown and this particular motion. The motion that I reviewed calls for three things to be produced from Lilly: Medical records, litigation documents such as fact sheets, pleadings, et cetera, and Section C which seems to imply documents underlying settlements. And Section C is the concern.

What we have been trying to do with Special Master Brown, and he can jump in any time he'd like, is that Lilly does have very strong feelings about the confidentiality of Zyprexa settlements and the documents underlying them. The Special Master has already

17

identify a lead attorney contact and a lead technical representative. I'll be the lead attorney contact, and here in the courtroom today is the lead technical contact which will be Carmen Field. And I'd ask her just -- so you know who she is. Ms. Field is the person I referred to when we were here last who is part of AstraZeneca's response to the Court's order which included the formation of special technical committee that I chair, the bringing onboard of the new electronic discovery, additional new electronic discovery vendor FTI Consultants and Ms. Field who is with Daylock (phonetic) Forensic and Advisory in New York City, is the information technology expert adviser to AstraZeneca in connection with this case and will work also with Mr. Ball.

THE COURT: Okay. Let me turn to the pending motions that are in my bailiwick. Number 492 is AstraZeneca's motion regarding documents to be obtained from Eli Lilly. What's the plaintiffs' problem with the proposed order with that?

MR. CAMP BAILEY: On the motion they filed, we have a disagreement as to the appearance that the only issue being disputed is just the language of the order. We said on the record last time we were down here that we did not have a problem in assisting them in getting plaintiff's medical records and other things that the

19

undertaken in camera review of the confidentiality language of those settlements. And I believe, and I'll allow him to jump in, I believe he agrees that the confidentiality provisions are very strong. So I don't believe the parties are very far apart on the production of the medical records and perhaps the litigation documents.

But Section C which discusses the underlying documents related to settlements can be a sticking point. I have also provided to the Special Master's office a contact person from Lilly, and they would like to speak with him on this matter.

So I think the biggest problem is there may be some overlap between what we're trying to do with the Special Master's office and this motion. And I don't know if Special Master Brown has a comment on that. But I believe within the next week he will be able to talk to the folks at Lilly and hopefully try to figure this thing out.

MR. BROWN: This is Orran Brown. Would it be helpful if I added to that?

THE COURT: Well, let me ask defendants first. I thought you had an agreement with Lilly they didn't object to this?

MR. MAGAZINER: This form of order has been submitted to counsel for Lilly at Pepper Hamilton. And as

20

recently as yesterday afternoon, counsel for Lilly confirmed to me that they have no problem with the order that we have submitted to the Court.

Now, the order does not contemplate, as Your Honor will see, that Lilly will tell us the amount of a settlement that has been made with the plaintiff. What the order contemplates is Lilly will give us any submissions made by individuals who are plaintiffs in this litigation in support of their efforts to settle their claim against Lilly.

That's right on the face of order. Lilly does have an issue with our obtaining from plaintiffs, not from Lilly, from plaintiffs, information about the amount that was paid to a plaintiff or has been agreed to be paid to a plaintiff to settle the claim against Lilly. But that's not covered by this order.

As to that latter subject, we intend to ask plaintiffs, as we have already done in depositions taken to date, how much they have been paid by Lilly or how much Lilly has agreed to pay them. If Lilly has a problem with that, and I understand that they do have a problem with that, then Lilly is going to have to raise that problem in some appropriate forum which I take it might be in this Court, could be in Judge Weinstein's court, could be in in front of the special master, we will have to see how that

21

resolves. Special master, meaning the PMO, Mr. Brown. But that's not covered by this order.

So as to this order that we have submitted, Lilly's counsel has --

THE COURT: I want this resolved, and I'm going to renotice this motion with Lilly being served and get their response on the record. I don't understand. I mean, I don't want to prejudge anything, but just because they want to keep it secret -- it has an affect on this litigation. We have got to find out what's going on.

MR. MAGAZINER: I certainly agree with that, Your Honor. It seems to me it's fundamental that we're entitled to find out how much someone has been compensated for an injury that --

THE COURT: That's at least arguably related to the injury -- the claim here.

MR. MAGAZINER: Absolutely. And I understand Lilly has secured from each of the plaintiffs a promise that the settlement amount would be kept confidential. And that creates an issue to me.

THE COURT: It's a dilemma for the plaintiffs which -- well, I mean you know my general attitude about confidentiality on this thing. I mean, I'm just --

MR. MAGAZINER: As Your Honor said, it creates a dilemma for the plaintiffs. But I do ask if the Court

22

would approve the order that we have submitted, it would at least get us started. And I don't understand even from what Ms. Martines said there is any issue with this order. This order does not require that plaintiffs divulge or Lilly divulge the amount of any settlement between the plaintiff and Lilly.

THE COURT: All right. Next is defendant's motion for extension of time to complete some more of the custodial production. What's plaintiffs' position?

MR. LAMINACK: Rick Laminack for plaintiffs, Your Honor.

It's our position -- I guess if they need to file a motion on everything they produce because it's our position that we've never been given from day one adequate documentation.

Here's the situation we're in so the Court knows. We start general liability depositions next week. First up is the person in charge of direct to consumer marketing. As one might suspect, their promotional materials would be relevant to that deposition. Unfortunately, we don't have those. Or more accurately, we don't have them in a format that we can access the information.

So in a week we're supposed to depose the person with most knowledge of the documents involving Lilly -- AstraZeneca's promotional materials and we don't have

23

them. And we can sit here all day and cite examples of this. As we depose doctors -- you heard Mr. Brown talking about how difficult it is to schedule doctors. One of the key things we asked for in doctor's depositions prior to the deposition is how much money has AstraZeneca paid you. And time after time we get sworn affidavits from AstraZeneca lawyers saying nothing only to find out that that's not true.

So we are taking depositions without correct information. We are about to begin taking depositions without the necessary information. And obviously what we're going to need -- and I want to make it real clear to the Court, we do not want to postpone these depositions. That would be rewarding their bad behavior. We are going to need time, additional time to file reports because we don't even have the documents necessary to show our experts. We're probably going to take more than the 25 general liability experts because what we know now is we have had to pick the 25 in the dark without the benefit of the documents. So I have no doubt that they need more time. But you see the problem that creates for us. And I want to emphasize we don't want them to benefit by problems of their own making by postponing these depositions.

Thank you, Your Honor.

24

MR. MCCONNELL: Your Honor, I'll be very brief, Your Honor, because I actually didn't hear much discussion of the motion. And I get the strong sense that Your Honor reads these motions pretty careful and I'm not going to repeat what we said.

We just -- because of the issues with European privacy laws, and we had problems being able to process the documents for the Canada custodians. Three domestic custodians is just sort of a puzzle why we can't find the stuff. We're trying to find it. That's why asked for the extension because we just were unable to produce the documents by the October 1 date, and that remains the case.

I don't even know where to begin to address Mr. Laminack's points which are things that we have heard before. I will say that he made a reference to sworn affidavits from AstraZeneca lawyers about nonpayment to doctors. I don't know what he's talking about. It's absolutely not true. And I will say this, I can only talk about what I know from personal experience. I was at a deposition last week of two doctors in one of these cases. The PMO did a great job getting them scheduled. We showed up. The inquiry by the plaintiffs' attorney was searching, comprehensive, effective, made use of the -- all the call notes and those materials. I did not observe

25

1  any disability. Granted that's only one deposition. And
2  that's really all I have to say about those other points
3  raised by Mr. Laminack.
4       THE COURT: Well, at some point we're going to
5  have to come to grips with the effects of the issues that
6  we have had to date completing the opening rounds of
7  discovery and how that affects parties' ability to prepare
8  the rest of the case. I'll simply make the observation
9  that most of the issues that are raised in the motion is
10 justification for not being able to meet the deadline. It
11 really seems to me to be things that from a year ago,
12 really now over a year ago, could have and should have
13 been anticipated so that they weren't coming up as an
14 impediment now.
15      I'll make a ruling on that motion.
16      All right. Let me -- next item on my agenda is the
17 issue of what I'll call Florida-related cases. Plaintiffs
18 filed a list of cases that they have indicated plaintiffs
19 agreed to have transferred here. I suspect the defendant
20 has other cases that they think are Florida related that
21 ought by the same consideration be transferred here. I'm
22 back to the issue I raised a couple months ago is how we
23 accomplish the actual transfer of the ones plaintiffs have
24 agreed and for the ones that AstraZeneca wants to add to
25 that list, how we tee that up for either this Court's

26

1  consideration or the panel or the transferor court.
2       Let me ask plaintiffs, with respect to the ones that
3  you listed, who do you think is required jurisdictionally
4  to accomplish the transfer?
5       MR. CAMP BAILEY: Under my understanding if the
6  parties agree and the plaintiffs agree to lay venue here
7  directly in the Middle District of Florida, we can either
8  file an amended complaint or we can have an order allowing
9  us to file, in essence, a new original complaint which
10 relates back to the original complaint laying venue in
11 this Court and proceed forward as it were an original
12 filed case in this jurisdiction and go forward as if it
13 was a --
14      THE COURT: Without any order from the
15 transferor courts or from the multidistrict panel?
16      MR. CAMP BAILEY: That's my understanding is if
17 we agree as parties to the litigation to lay venue here as
18 an original matter, it's treated as an original matter as
19 opposed to a 1407 transfer.
20      THE COURT: Mr. Magaziner, do you want to
21 address what I anticipate to be your position based on
22 what we discussed earlier?
23      MR. MAGAZINER: Yes, sir.
24      Just to dispel any confusion here maybe, we're not
25 going to agree or consent to the filing of amended

27

1  complaints in a handpicked group of cases.
2       THE COURT: I assumed that.
3       MR. MAGAZINER: So Mr. Bailey's suggestion is
4  correct, that if we were willing to agree by agreement, we
5  could no doubt effect a transfer or create new cases here
6  and dismiss cases that have been filed elsewhere with some
7  such procedure, if we agree. But we're not going to agree
8  to a selective transfer.
9       So Mr. Bailey might address the question of what --
10 how cases would be transferred in the absence of our
11 agreement since that is in fact the state. Now what we --
12      THE COURT: What I'm interested in is, quite
13 frankly, getting the Florida cases here and not just hand
14 selected ones. I really want any that -- and there may be
15 some on the margin where there's a debate about whether
16 they're really Florida cases or has moved, but for the
17 ones that somebody decides have a Florida connection, I
18 think they ought to be here. How many do you think are in
19 that universe?
20      MR. MAGAZINER: My recollection is that there
21 are something like 200, in the neighborhood of 200, Your
22 Honor.
23      THE COURT: And plaintiffs have listed 100
24 something or --
25      MR. MAGAZINER: No. They have listed 34.

28

1       MR. CAMP BAILEY: I think there's 160 some odd
2  that are not subject to a motion for dismissal that are
3  actually still live cases in the MDL. And I think 38 or
4  so were on the list.
5       MR. MAGAZINER: I don't --
6       MR. CAMP BAILEY: They consented now to an
7  immediate transfer or to voluntarily lay jurisdiction
8  directly here in this Court.
9       MR. MAGAZINER: I don't want to either agree or
10 disagree with Mr. Bailey's numbers because I'm not exactly
11 sure.
12      THE COURT: Ballpark here.
13      MR. MAGAZINER: But it is a ballpark of, let's
14 say, between 160 and 200 Florida resident cases. There
15 may be some of them in which the Florida resident recently
16 moved here and all the pertinent events occurred somewhere
17 else.
18      THE COURT: That's what I'm saying. Those are
19 ones that maybe shouldn't be transferred.
20      MR. MAGAZINER: Right. But as to the rest, we
21 would think that they should all be transferred here and
22 we think we can do that by filing a forum non conveniens
23 motion asking the Court to transfer those cases. The
24 Court has jurisdiction over those cases now because
25 they're part of MDL and they could be transferred to this

29

1  Court forum non conveniens basis.
2          THE COURT: But who has to that under lexicon?
3  The transferor court? The panel? Or can this Court?
4          MR. MAGAZINER: I -- we briefed that issue
5  before. I'll be happy to brief it again -- or actually,
6  review the briefs we filed before and reeducate myself.
7  But I think that what lexicon clearly prohibits is a
8  transfer to this Court of a case that has nothing to do
9  with Florida other than for the purpose of trying it here.
10 I don't know that lexicon --
11         THE COURT: I'm not sure it speaks to it either.
12 That's why I'm a little bit at sea myself.
13         MR. MAGAZINER: Lexicon prohibits this Court
14 from transferring a case on a forum non conveniens basis
15 that it would be consistent with transfers that courts
16 usually make where the -- all the events at issue occurred
17 in the forum different from the forum where the case was
18 filed, which would be the case here because all of these
19 cases that we're talking about are -- almost all been
20 filed in Massachusetts which has nothing to do with any of
21 the events at issue. So we would contemplate filing an
22 appropriate motion to transfer all of the Florida cases
23 from the district in Massachusetts to the Middle District
24 of Florida.
25         THE COURT: Well, here's what I would look do to

30

1  tee this up. And there's a reason I'm doing all of this.
2  I'll explain in just a moment.
3          I want you to go ahead and file that motion to -- and
4  since, as you just discussed Mr. Bailey's proposal
5  doesn't work unless you agree and you're not going to
6  agree to their selection of the ones. And whether that's
7  lawyers or plaintiffs, I don't really care. I certainly
8  understand your point on that. So you would be moving to
9  transfer the 160 or the 200 or however many it is based on
10 your reading of Lexicon. And then plaintiffs could
11 respond and say, "We think lexicon prohibits that. We
12 think if you're going do it, you have to do it this way or
13 you can't do it, or we can't do it until everything is
14 over," whatever your position is. I'm not telling you
15 what your position is, but I'll -- and then if there's
16 also some of them on the 160 to 200 that you just don't
17 think fit even under their theory of forum non conveniens,
18 if they're not really Florida cases, you can raise that as
19 to the specific ones. And I'll review -- I don't know
20 whether I'm going to do that or Judge Conway, but one of
21 us will look at the -- ultimately I think if I have do it,
22 it would be on a report and recommendation. If Judge
23 Conway does it, obviously an order. But we will look at
24 those issues and then make a determination whether we can
25 do it in our view of the law and the facts of what I'll

31

1  call the marginal cases.
2          MR. CAMP BAILEY: And I'm not an expert on
3  lexicon, but I do think we would -- we think that the
4  lexicon decision would prohibit a voluntary transfer by
5  this Court to itself under the Lexicon decision.
6          THE COURT: Well, that's certainly one reading
7  of the tenor of lexicon. But this set of facts is not
8  what was before the Court in Lexicon. So I think that's
9  an open issue. What I'm leaning towards, and I'll be
10 frank about it, again without prejudging anything or at
11 least I'm not prejudging it, it's my goal to get, if we
12 can, consistent with the law, the truly Florida related
13 cases here as Middle District of Florida cases.
14         And I'm fudging a little about the fact that Florida
15 has three judicial districts. But leaving that aside for
16 the moment, that that gives us a separate set of cases and
17 not the two or three we had originally, but a real number
18 of cases that we could at least consider pulling out for
19 trial here. And Judge Conway's prepared, if necessary, to
20 tap some of her colleagues and do a bunch of these trials.
21 So that's where we're going.
22         How long do you need to file your motion to
23 accomplish your purpose?
24         MR. MAGAZINER: Ten days, Your Honor.
25         THE COURT: All right. Then the response.

32

1          MR. MAGAZINER: With the Court's permission,
2  Your Honor asked us to file the Lexicon motion but what
3  I'd like to do is file a motion based on Lexicon or
4  whatever other authority we think would be appropriate.
5          THE COURT: I'm referring to Lexicon as
6  shorthand.
7          MR. MAGAZINER: Thank you, Your Honor.
8          THE COURT: Whatever method is sustainable.
9          MR. CAMP BAILEY: And I would just say as an
10 aside, in the Zyprexa litigation the way it was
11 accomplished there is that plaintiffs filed 27 cases
12 originally in Judge Weinstein's court. He took those up
13 as a big enough subset to do case-specific discovery and
14 those ultimately we're going to be the trial pool to go
15 forward on and that took, I think, a year and a half to
16 get through those 27 cases before that even got to trial
17 is when the whole settlement occurred and the whole --
18         THE COURT: I understand that.
19         MR. CAMP BAILEY: -- thing went away.
20         THE COURT: We don't have that pool right now,
21 and I just don't choose to proceed that way.
22         All right. To your agenda, counsel has already
23 touched on this a little bit, but plaintiff indicates some
24 issue about corporate witnesses.
25         MS. WHEELER: Yes. Good morning. Holly

33

Wheeler.

To give you an update where we are on that ties in with what Mr. Laminack has already said. We have requested 25 corporate witness depositions this time. We have received dates for 17 of those depositions, and those have been noticed for October and November and December. So we're still waiting upon a few. We just wanted to make the Court aware of where we are on that, and also just impress upon the Court, again, the need for the materials that have been the subject of so much debate of late. So that's pretty much all we needed to say on that.

THE COURT: Okay. Third party discovery.

MS. WHEELER: Since we were here last we actually made quite a bit of progress on this. We have received documents from three of the third parties. Five of the third parties have told us that they are ready to go. We just have very minor issues with respect to the protective order that was entered on September 19. They need clarification on one of the sentences in that order.

Some of them have very, very minor cost issues. We have asked AstraZeneca to share not only the copying costs incurred by those third parties but also any location cost and possibly attorney's fees associated with those subpoenas. Some of the parties -- most of the parties have in fact provided pretty detailed estimates to us

34

regarding those costs. We are still waiting on those estimates. But five are just about ready to go.

We have filed motions to compel against six of the third parties. Four were combined into one motion that is now pending in the Southern District of New York. Two were combined in one motion that is now pending in Eastern District of Pennsylvania. I know where the New York motion has been assigned. I don't know yet about Pennsylvania.

THE COURT: Just for your information, I did as I indicated I might, send out an e-mail to all magistrate judges in the country alerting them that such motions might be coming and inviting them to defer the motions back here. There's -- in response to that, I got a copy of an order that was entered up in Boston by one of my colleagues accomplishing the same purpose in a different case by taking a different tack. It was during the MDL authorization to -- which we have talked about which I agree with. But just an issue I didn't particularly want to bite off. But assuming in the transferee court the authority to make rulings in other -- in effect in other districts, some of you may be aware of that order.

So I'll see if the judge in New York or Pennsylvania will refer those back to me, and, if so, I'll pick them up.

35

MS. WHEELER: Just to let you know, we did provide quite a thorough analysis of the case law permitting transfer of those matters to the MDL. I don't know if the Court has had an opportunity to review the motions we have filed. We did --

THE COURT: I didn't look at the substance of them.

MS. WHEELER: We did e-mail to your chambers.

THE COURT: I saw it was there and didn't really look at it. Who was the judge in New York?

MS. WHEELER: Judge Victor Marrero.

Now Par Excel (phonetic), one of the other third parties, has filed a motion to quash in the District Court of Connecticut. That has been assigned to Judge Hall. Docket number 3:07MC264. And we have a response prepared to file in that. We have had some issues locating Connecticut counsel. The court's there require that we do have local counsel. We have been unable to locate one of at this point. So our intention is to file a motion for pro hac vice which time we will then be able to file the response. But we intend to address that this week.

THE COURT: All right.

MS. WHEELER: That's the problem. We're trying to locate attorneys. We have got a couple leads. So we're working on that.

36

Let's see, Your Honor. The issue with the protective order, paragraph 8, indicates that the nonparties may designate discovery materials as confidential so long as the nonparty has a written agreement to be subject to and governed by the requirements of this order. Many of the third parties have asked me what does that mean. I know that the Court provided an endorsement with the protective order, but the way that it's worded doesn't necessarily -- doesn't really mesh with the third parties. So we need some direction about what needs to be done there. Do we need to draft an order that's similar to the endorsement that those third parties can sign when they turn over the documents or does the Court envision something else?

THE COURT: Well, the endorsement was a form submitted by AstraZeneca, I guess. If it's creating a problem, we can create a second form of endorsement.

MS. WHEELER: It's not necessarily a problem. It's just the way that I read the endorsement is it's parties who receive or who view the documents that have been designated as confidential or bound by the order. In this case we obviously got third parties who are producing and designating materials as confidential and they need some language that would require them to be bound by the order. I don't think it would be a difficult thing. But I'll be happy to draft it. It would probably be very

*Page 37*

similar to the endorsement that's already with the protective order.

THE COURT: Why don't you see if you could get it in the next day or so.

MS. WHEELER: I'm sorry?

THE COURT: See if you can get that in the next day or so.

MS. WHEELER: That would be easy. They just need clarification on that.

And the last issue I want to address very quickly is the cost. That's, I think, going to end up being the primary issue. Most of the parties and the plaintiffs have been able to narrow the scope of the subpoena. It's really the costs that seem to be the problem. Some of the third party costs could be very reasonable. Others have estimated costs in excess of 100,000 or $200,000. That's where we're really running into some problems. And so I anticipate that will be the primary issue that the Court will need to address when those motions are transferred to this Court.

THE COURT: Talking about a photocopy cost or search cost?

MS. WHEELER: No. Search costs and attorney's fees. The photocopying costs are not the problem.

THE COURT: All right. I'll address those then.

*Page 38*

Some of those things bears cost of doing business in the big world.

So sales force and marketing databases.

MR. PENNOCK: Your Honor, in further considering this issue that's on the agenda, we think it's probably going to fall under the purview of what Mr. Ball will be looking at.

THE COURT: That's what I thought. If we get in some substantive legal issues about the scope, it will come back to me. If it's just a matter of mechanics and logistics, he will be able to bring to bear his expertise along with the designees of parties to solve that.

MR. PENNOCK: Very good. Thank you, Judge.

THE COURT: There was a rather vague designation by AstraZeneca about issues on a specific discovery. I don't mean that pejoratively. I just don't know what you're talking about.

MR. PENNOCK: Neither do we, Judge.

MR. MAGAZINER: And in light of the conversation the Court has had with Mr. Brown and his report, we don't have any issues. We thought the 60-day transition might be something to be discussed.

With Your Honor's permission go back to the question of Florida transfer. Your Honor entered an order, which unfortunately I can't seem to find in my notebook, that

*Page 39*

require plaintiffs to list the cases that they wanted to have transferred and then for us to respond by October 5th to their designation.

With Your Honor's permission what I would suggest is that we file a motion 10 days from now.

THE COURT: All that's folded in what we're just talking about.

MR. MAGAZINER: Okay. Thank you.

THE COURT: All right. Next issue I wanted to broach with you, and I don't know if you're going to want to give me anything firm here today, but maybe able to give me some initial responses and then you can try to bring this back down to earth in the future, plaintiffs have expressed, and it's obvious from the nature of things that there may be some issues about meeting -- the parties, both sides, their ability to meet the previous set deadlines. I'd like to you give some global thought as to the overall goals for this MDL as to, for example, how far should each case be -- we talked about this a little bit. We alluded to it, for the cases to be prepared prior to remand. There are a lot of choices. We can ramp up the case-specific discovery on a limited basis to starting in January to 100 or a 1,000 cases a month to get all of those done within some timeframe.

We could pick some cases for full discovery, whether

*Page 40*

those are the selection from the Florida cases leading to a trial schedule, which has a certain appeal to me, and how many of those we do and how we select them are obvious issues. And I don't know what Judge Conway's views are, frankly, as to how far she wants to take all these cases.

So whether she wants them, as we have discussed, is one possibility to do it all, however many cases survive various motions, when we're done with it it should be ready for final pretrial conference and a trial in the transferor districts or whatever district transferor court may ultimately send them to. Do we -- is it our goal simply to resolve global issues that we have scheduled that you had arguments on for some of the issues and other deadlines coming up next year, to get those resolved and then send the cases back for routine final discovery at trial.

Those are all possibilities.

Some of this will relate back to something we talked about last time which is anticipation from the defendants of some motions to dismiss based on the case specific discovery. You -- Mr. Magaziner, do you have just a ballpark figure as to how many -- based on what you have done so far, how many of those you would have ready to do in the next month or if you chose to do them now? I'm just trying to -- talking about a tenth of them, a third

41

1  of them?
2       MR. MAGAZINER: They fall into various
3  categories. We're studying very closely to figure out
4  what would make sense. There are some, and it's a very
5  small number of cases, where the discovery suggests that
6  there is a very clean statute of limitations motion, for
7  example, or a very clean motion based on non-usage, for
8  example, which we're hoping maybe when we bring these to
9  the attention of plaintiffs' counsel who are involved in
10 those particular cases, they will decide this is not a
11 case they wish to pursue. But there are a very small
12 number of them. There are a larger group of cases which
13 we're studying much more carefully in trying to decide can
14 these be teed up now? Do we need to take some further
15 discovery? Do we need to see what the plaintiffs' experts
16 have to say. We will report back to the Court.
17      THE COURT: You have got a strategic decision
18 whether it's -- they're really appropriate to take that
19 shot at them now or you want to wait and get all your
20 arrows together on them.
21      MR. MAGAZINER: I would like the opportunity,
22 perhaps a month from now when we see Your Honor, to report
23 to the Court on where we are and perhaps we will have
24 filed some motions by then.
25      But unfortunately --

42

1       THE COURT: You asked last time for some
2  guidance on how to do that, and I did talk to Judge Conway
3  about that, and the best we can do is similar to the
4  thought process you're going through which is just do any
5  kind of logical way. We would prefer if you can group
6  them in some logical way. I'm not going to tell you which
7  logic because it's going to depend on your strategy which
8  you're entitled to do. But for the -- for your
9  convenience, for the plaintiffs' convenience and the
10 Court's convenience, if -- however you can group them
11 either in time or subject matter or otherwise, and I know
12 some of them overlap, so it won't be an easy decision for
13 you but I'll just ask that you -- to the extent you can
14 group them in a logical fashion --
15      MR. MAGAZINER: We're going to try to do that.
16 Just so Your Honor understands why I can't say more
17 now than I have said, the number of cases, despite the
18 heroic efforts of parties and -- both parties and the PMO,
19 the number cases that have been fully discovered, that is
20 where all four of the depositions have --
21      THE COURT: Fully limited discovery.
22      MR. MAGAZINER: Yeah. The limited discovery has
23 been completed is a relatively small number. So trying to
24 extrapolate in those relatively small numbers say, okay,
25 how are we going to proceed with the motion practice, what

43

1  we anticipate to be a large number of cases, is very
2  difficult. But next month I think we will have
3  sufficiently large number of cases that have been -- in
4  which the limited discovery has been completed that I can
5  say something more useful than I'm able to say today.
6       THE COURT: While I got you on that particular
7  spot, let me ask you, because one of the purposes of this
8  was to do exactly what you're talking about but also to
9  feed into the consideration of ADR or settlement
10 discussions. In terms of data gathering that was part of
11 your client's processing of that, where do you stand?
12      MR. MAGAZINER: To speak very frankly --
13 Mr. Pennock or Mr. Bailey may disagree -- the cases we
14 have seen to date do not seem to us to be cases that we
15 would ever consider settling. That isn't to say there may
16 not be some such cases. As a matter of fact, we have
17 counseled among ourselves with the client what sort of
18 fact person would we want to see which would perhaps
19 suggest that something should be considered for
20 settlement. But what we have seen to date, and it may
21 just be because the numbers are so small that they're not
22 representative, maybe that they're all like this, we don't
23 know, but what we've seen to date are cases in which if I
24 were to provide the Court the details of the testimony of
25 the plaintiffs and the doctors I think the Court would

44

1  understand these are not cases that have frankly any
2  value.
3       And, again, I'm not saying that that's true of all
4  plaintiffs' cases. I'm saying the cases that have been
5  fully discovered when we take into account the plaintiff's
6  testimony and doctor's testimony, and the sales rep's
7  testimony, they don't seem to us to be going anywhere.
8       We have cases where the plaintiff, for example, was
9  diagnosed with diabetes long before the first Seroquel.
10 Not likely a kind of case we would consider settling. We
11 have cases where the plaintiff was on Risperdal and
12 Zyprexa and Seroquel and other antipsychotics during the
13 entire period where the plaintiff doctor has testified
14 that the plaintiff had numerous risk factors for diabetes
15 before ever taking any antipsychotics, where the plaintiff
16 has a long and troubled tragic history of medical problems
17 which in and of themselves create more risk factors for
18 diabetes. Those are -- that is not a case where -- which
19 at present juncture we would think we ought to consider
20 settlement.
21      So again, I'd like to be able to say something more
22 to the Court on that score next month. I know the Court's
23 interest in that subject, and as we said we have not -- we
24 are not ruling out the possibility of ADR and appropriate
25 cases. But we have not seen cases to date from this very

45

limited number that have been subject to limited discovery and completely discovered in a limited way. We haven't seen cases that seem to us worthy of consideration. But next month, if I may, I would like to report further to the Court on that subject.

I'll step down unless Your Honor has further questions.

THE COURT: No. That's --

MR. PENNOCK: Your Honor, to address the Court's initial sort of question regarding globally where do we go or do we change anything. There's one thing that I think is for sure, and that is that nothing can be remanded until the general discovery and any general matters are dealt with. And, you know, it's no secret that our position all along that should be the primary focus of what we're all doing and we --

THE COURT: Yeah, that clearly is the big -- that's the easy obvious goal to do that. An MDL does nothing else it has to do that.

MR. PENNOCK: And the Court's making strides for getting that done with everything the Court's been doing.

As far as ratcheting up case-specific cases, I mean, this is just off the cuff, I would suggest that the relatively small morass in which we have found ourselves despite the defendant's commitments and promises, even

46

despite this Court putting together PMO, is just a small morass to where we would be if we start ratcheting up case-specific discovery at any time, let alone starting again. So we would be strongly opposed to that. I think we have very strong factual basis now that we have seen what's transpired. As opposed to our prediction of a morass, and our prediction that the defendants might not be able to fulfill getting these things done despite their hundreds of lawyers, we actually have a factual record for that, and we would like to discuss that further if the Court wants to explore it further and perhaps brief it and lay that out.

In terms of ADR there are a few observations, if the Court doesn't mind, I'd like to make. Number one, I believe I can go back to a transcript and find where Mr. Magaziner said that after we see 100 cases, we will be prepared to go to ADR. I think what I'm now hearing is well, now, what I meant to say is after I see -- and again, I'm not attempting to disparage Mr. Magaziner but it sounds as though the position has changed. And it's now, well, after I see 100 cases that I might want to settle maybe we will go to ADR. You know, ADR or discussions regarding settlement I don't think ever should come from a posture of we're only going to settle the cases -- we're only going to discuss cases that you can

47

win.

In any mass tort there are cases that the plaintiffs will have great difficulty winning and plaintiffs that will -- defendants will have a great difficulty winning. And what you typically do to get to a resolution, if that's the direction you intend to go as opposed to scorched earth and try every case, is that all cases are discussed and there are, you know, for lack of a better term, but a term that is used frequently in this business, there is significant discounting that occurs depending upon the circumstances.

Mr. Magaziner mentioned three categories of cases. I would like the opportunity between now and the next hearing to perhaps show the Court that I don't think those are categories that they have been seeing, but individual cases. In other words, he's mentioned three examples. I think there are only three examples or close to three examples for what has been mentioned as the type of cases they're seeing. I think that we on our side between now and the end of the month could give the Court sort of a report on, well, here are the rest of the cases or here are 25 cases or 30 or 40 that they have taken discovery in where there aren't these blatant and obviously very significant impediments to discussions. So I'd ask the Court's permission to submit that by the next hearing.

48

Even in terms of the cases that he mentioned, they are all imminently triable and the reason is as with any type of toxic exposure and drug exposure, there is the gasoline on the fire theory. And the very person that you don't give a drug to that you know or should know could cause a problem, is a person that's already seriously predisposed to that.

So notwithstanding any predisposition in a plaintiff to having a particular disease or ailment, I think that those cases can be tried and should be discussed if we are able to get to discussing these cases.

I also would like to mention to the Court that in New Jersey where I'm one of the leading players for the plaintiffs in the state court litigation, with Judge Happas, she's the new coordination judge there, formerly Judge Garruto until last month, I have served on the defendants formal demands or offers of judgment for dozens of cases, and I have asked them to respond to that command. I think these commands are imminently reasonable in terms of the dollar value. And I just wanted to mention that to the Court.

We have our first conference with Judge Happas is on October 10th, and we will see that perhaps we may end up with a mediation program in New Jersey based on those offers of judgment that we make here.

49

And that kind of ties me back into the request for the Lilly settlement money. You know, unless and until the defendants say, yes, we're ready to move forward to mediate cases, I don't understand why they need to know those dollars aside from the confidentiality issues. What possible benefit did they obtain at this juncture from knowing how much our client settled for. Now, if we were going to trial or verdict, of course it would be a different issue in terms of offset. But right now it seems to me that this is just a grab at information to help them strategize with respect to the mediation. But if they're telling us that they're going to mediation and they're willing to mediate every case, then I would agree that maybe this is something that we would want Lilly to come in here and explain. But short of that, I don't think they should be getting it.

In any event, Your Honor, we would like that opportunity to explain to the Court why ratcheting up the case-specific discovery is not a good idea. We're willing to do that by the next hearing. And if I may suggest, Your Honor, I would ask that the next hearing be before the end of this month.

There are two motions that I met and conferred with the defendants that I know I have to make because they won't agree. I'm planning on making those motions this

50

week. And there is an additional motion that I need to speak to them about. I don't know what their position is, but I'd like to get that teed up if they don't agree to that.

We have the Florida issue and if we can't resolve that, which I think there is still a possibility for that, we need to get that taken care of.

And so as this Court has been typically doing, I'd ask for a short date for the next hearing so that those motions that we're going to file this week could be heard. Thank you, Judge.

THE COURT: All right. I'll note also there's a motion pending to file a reply on some of the motions that were argued last week. I'm going to leave that for Judge Conway to look at. It was just filed yesterday.

In terms of next status conference, I was looking at 30th of October which is a Tuesday and also it's -- also it's a week that I have criminal duty assignments, so again might not be able to go as long as we have in some prior hearings, but we can do it in an hour and a half. 30th sound all right?

MR. PENNOCK: That's perfect, Judge.

THE COURT: Start that at 10:30 on 10/30 is that -- because I have got a 10:00. 10:30 on 10/30.

Let me review where we are. Special Master Brown is

51

going to submit a proposed order by the end of the week regarding the transition to earlier designation and timing changes on matters within his consideration. Special Master Ball is going to be meeting with the designated representatives of parties immediately and I'll get him a more specific order about the scope of his duties but he can go ahead and start meeting and talking before then.

I will issue an order directed to Eli Lilly to provide me with any thoughts they have got about the scope of issues they may claim confidentiality on.

Let me ask Mr. Magaziner that after the hearing you provide the clerk or my law clerk with a -- whoever their designated person is from Reed Smith, whoever their counsel.

MR. CAMP BAILEY: Pepper Hamilton.

MR. MAGAZINER: I've communicated to them. I have been speaking to Andrew Rogoff.

THE COURT: You can do that later.

MR. KEN BAILEY: Your Honor, that's a different person that's at Pepper Hamilton that has been designated.

THE COURT: Well, talk amongst yourselves, figure out who it is. Otherwise, we will just serve on him.

MR. MAGAZINER: Actually, I don't care which Pepper Hamilton lawyer we talk to. I assume they're

52

working together.

THE COURT: Within 10 days AstraZeneca will file its motion and response regarding all Florida-related cases, and plaintiffs can respond to that.

I'll take a look at these motions that have been filed in the districts and see what's going on with those. Next, by the end of the week plaintiff will submit, hopefully, agreed language to be provided with third parties for their endorsement of the confidentiality order. And I'm going to enter an order directing the parties to submit their positions with respect to these scheduling and ADR type issues. I'll flesh that out a little bit. But it will be -- it will track what we have just been talking about as to your views on what the goals for the MDL should be in light of how things have developed. And assuming we do identify some cases for trial this court can try, what we're going to do with that, how far we should go with limited case discovery, and how that dovetails in with the settlement considerations. I think that's where we are. But let me ask each side in turn to anything else?

MS. WHEELER: I just learned that the Pennsylvania motion to compel has been assigned to Judge Thomas O'Neill. So I just wanted to let you know that.

THE COURT: Anything else from plaintiffs?

53

1    MR. PENNOCK: No, Your Honor. Thank you.
2    THE COURT: Defendant?
3    MR. MAGAZINER: No, Your Honor.
4    THE COURT: All right. We're in recess.
5         (End at 11:15 a.m.)
6         C E R T I F I C A T E
7    I certify that the foregoing is a correct
8    transcript from the record of proceedings in the
9    above-entitled matter.
10
11
12
13
14   _____        _____
15   Sandra K. Tremel