UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Docket No.6:06-MD-1769-Orl-22DAB

. . . . . . . . . . . . . ..
IN RE:                              :
SEROQUEL PRODUCTS LIABILITY  :
LITIGATION                         :          Orlando, Florida
MDL DOCKET No. 1769           :          January 4, 2008
                                       :          2:00 p.m.
ALL CASES                        :
                                       :
. . . . . . . . . . . . . .:


TRANSCRIPT OF PRETRIAL CONFERENCE
BEFORE THE HONORABLE DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiffs:

                        Larry M. Roth

                        Lawrence J. Gornick

                        Dennis Canty

                        Gale Pearson

                        Angela Nixon

                        David Dickens

For the Defendant

AstraZeneca:

                        Stephen J. McConnell

                        Robert Pass

Proceedings recorded by mechanical stenography, transcript

produced by computer-aided transcription.

Page 2

```
 1
 2    APPEARANCES CONTINUED:
 3              Chris Coutroulis
 4              Ben Barnett
 5              Kevin Kerns
 6              Shane Prince
 7              Russell Stewart
 8              Colleen Casey Voshell
 9              Colin West
10              Robert Ciotti
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              PROCEEDINGS
 2         THE DEPUTY CLERK:  The case number is
 3    6:06-MD-1769-Orl-22-DAB.  In Re: The Seroquel Products
 4    Liability Litigation.
 5         Counsel for plaintiff in the courtroom, please state
 6    your appearances for the record.
 7         MR. GORNICK:  Larry Gornick for the plaintiffs.
 8         MR. CANTY:  Dennis Canty for the plaintiffs.
 9         MR. ROTH:  Larry Roth from Orlando for the
10    plaintiffs.
11         THE DEPUTY CLERK:  Counsel for defense in the
12    courtroom, please state your appearances.
13         MR. MCCONNELL:  Good afternoon, Your Honor.
14    Stephen McConnell from Philadelphia for the defendants.
15         MR. PASS:  Robert Pass, P-A-S-S, also for
16    defendants.
17         MR. BARNETT:  Good afternoon, Your Honor.  Ben
18    Barnett on behalf of the defendants.
19         MR. COUTROULIS:  Chris Coutroulis on behalf of
20    defendants.
21         MR. KERNS:  Kevin Kerns for defendants.
22         MR. CIOTTI:  Robert Ciotti for defendants.
23         MR. PRINCE:  Shane Prince for the defendants.
24         MS. VOSHELL:  Colleen Casey Voshell for the
25    defendants.
```

Page 4

```
 1         THE DEPUTY CLERK:  Counsel on the phone, please
 2    state your appearances for the record.
 3         MS. PEARSON:  This is Gail Pearson for the
 4    plaintiffs.
 5         MR. DICKENS:  David Dickens for the plaintiffs.
 6         MS. NIXON:  Angela Nixon for the plaintiffs,
 7    non-counsel.
 8         MR. STEWART:  Russell Stewart for the
 9    AstraZeneca defendants.
10         MR. WEST:  This is Colin West representing the
11    third party Zantaz Incorporated.
12         THE COURT:  Mr. Ball.
13         MR. BALL:  Your Honor, I'm Craig Ball.  I'm here
14    as special master concerning matters of electronically
15    stored information.
16         THE COURT:  Okay.  Before we get into the nuts
17    and bolts of what we noticed the hearing for, why don't I
18    get a brief status report on the development since the
19    last time we talked in terms of actually getting things
20    produced.
21         Mr. Gornick, you want to talk about that.
22         MR. GORNICK:  Thank you, Your Honor.  I can
23    report that we received four discrete production items on
24    December 31st, totaling approximately 60,000 pages.
25         Our meet and confers on the data bases are
```

Page 5

```
 1    proceeding, I guess the best way to say it is with great
 2    detail, but not much alacrity.  We have, I believe, agreed
 3    to the format for production of less than ten data bases.
 4    We met for the last day and a half on that.  We covered
 5    less than one, although we did make some progress on one
 6    issue that should span many others.  That's the redaction
 7    of Excel spreadsheets in native.  We have the outline for
 8    an agreement on that, which both sides I believe are
 9    hopeful we will consummate next week.
10         If that happens, I think we ought to be able to wrap
11    up a number of data bases very quickly, because that was
12    probably the only major hangup for some, but the progress
13    on the data bases has been slow.
14         Production of documents that had been discovered that
15    should have been produced in the past has started to flow
16    in native.  The first big traunch of that was December 31.
17         We still don't have a firm timetable for the
18    defendants' reproduction of everything they had produced
19    earlier in the TIFF and load file form.  I would like to
20    hear when that's going to begin, the reproduction.  This
21    is a recap.  They are starting over on that.  And I'm not
22    sure when the reproduction is going to begin.
23         THE COURT:  Very quickly, Mr. McConnell,
24    Mr. Pass, how are you feeling in terms of the March
25    deadline?  I don't need you to get terribly specific, but
```

Page 6

1  just in general, do you feel like you're making the
2  progress you hoped and that sort of thing?
3        MR. PASS:  Judge, we feel confident about the
4  March deadline at this point.  I expect to remain so as
5  long as certain issues do not derail it that have in part
6  to do with the issues we have with the third report of the
7  special master, but let me just give you a quick rundown.
8        We have completed the 35 productions since August of
9  '07. since the sanctions order, consisting of about
10  232,000 documents and about a million six pages.
11       Since the substantial completion plan was placed
12  before Your Honor on November 13, we have produced 161,000
13  documents.  We have made six productions in December.  We
14  have already made one in the year 2008.  We expect to make
15  another one on January 7.
16       We have the outstanding request for productions less
17  than a -- about 100,000 documents to get reviewed and
18  produced.  In terms of the rolling productions, there's a
19  lot to be collected and reprocessed.  We expect to begin
20  those soon.  I'm not going to give specific dates at this
21  point, because we want to make sure when we give you dates
22  that we will be making, as I think we already are,
23  substantial rolling productions, and we expect to meet the
24  March date.
25       So we have -- I would also just point out, so you

Page 7

1  know, we now have 172 contract lawyers working in two
2  cities doing the review process, which is of course sort
3  of the biggest time issue in these things.  We just added
4  today 45 more lawyers in the New Jersey site, and we're
5  continuing to assess through a number of project
6  management tools, both hands-on human and software based,
7  our needs on an absolutely weekly basis, every Friday.  So
8  we feel good about the substantial completion dates.
9        The issues, which we can talk about later if you
10  wish, that were of concern to us had to do with what we
11  regard as potentially changing -- changing the rules of
12  the game in terms of Excel spreadsheet and native
13  production of redacted matters.
14       And Mr. Gornick indicated we have reached agreement
15  today, we won't go into the details of it here, in the
16  mediation process with the plaintiffs and Special Master
17  Ball that would appear to resolve the issue of the
18  redaction of Excel spreadsheets, in TIFF or native, and
19  the agreement that we have reached is in essence one that
20  would result in the production of a limited number of
21  Excels in native format and therefore, should not
22  jeopardize our substantial completion date.
23       On the data bases, we are on track to capture by
24  January 20 all of the remaining data bases subject to AZ
25  objections concerning the scope of the plaintiffs'

Page 8

1  requests for production, which have not been brought on
2  for hearing, but under our plan, which we advised you
3  about when we did the notice of intent for substantial
4  completion, we're moving ahead with that plan for
5  production to pull all the Seroquel-related material out
6  of each of those data bases in the Seroquel relevant
7  cabinets.
8        We should be getting those to review teams shortly
9  after January 20, and we are on track for substantial
10  completion for the 23 data bases that had been the subject
11  of requests for production as of the date that the
12  substantial completion plan was filed, which was the
13  cutoff date.
14       As we said to the Court at the time we presented that
15  on November 15, we're also making every effort, although
16  it's not part of the substantial completion plan, to
17  produce the material from all of the data base extracts by
18  March 14 as well.
19       So that's basically where I think things stand.  I
20  think they're moving along well.  A great amount of
21  resources are being devoted to the process, and we have no
22  reason at this point to think we would not complete it as
23  planned.
24       MR. GORNICK:  Your Honor, if I may, just because
25  I am concerned about the concept of a fair rollout of the

Page 9

1  data, and what we didn't hear was any explanation as to
2  when the reproduction of what had previously been produced
3  in TIFF and load would come to us.
4        We did hear that we're not going to start getting, it
5  sounds like we're not going to start getting 20 of the
6  data -- 20 of 23 data bases until sometime after
7  January 20.  That makes me very concerned that we're going
8  to have a big dump at the end of the period, as opposed to
9  a steady rolling production, which is what I understood we
10  were getting.  I believe the court order actually says it.
11  So that's a concern of mine.
12       And another concern is that -- well, we don't agree
13  that the March 14 deadline only covers 23 data bases.  I
14  don't believe it says it.  We never agreed to it.  Just so
15  the record is clear, that's the defendant's position, that
16  they only have to produce 23 data bases by March 14.  We
17  think they have to produce all of the relevant data from
18  the relevant data bases that we have asked for by
19  March 14.
20       THE COURT:  Well, it's not my intention today to
21  get into, as we have on occasion in the past and as have
22  the parties themselves and with the special master, get
23  into formats and dates and schedules.
24       I asked, and both sides appropriately responded
25  mostly, the current status just to see if any big issues

Page 10

1 or more stumbling blocks have arisen, as it may pertain on
2 the issue as to whether and how we go forward with the --
3 and when -- what we now have scheduled for the 28th.
4     As I understand it, at least at one level, the
5 defendant is asking that that hearing be delayed until the
6 substantial completion of fact discovery.  Is that still
7 the defendant's position?
8     MR. MCCONNELL:  It is, Your Honor.  I can
9 explain if you want.
10    THE COURT:  No.  I just -- I just -- in
11 considering that, it -- it strikes me a couple of
12 different ways.  There's a certain logic to it in the
13 sense that it relates to what our ultimate goal is here in
14 discovery, which is not to see how many documents can be
15 produced and how many lawyer hours can be spent by both
16 sides in doing it, it's to get produced the evidence
17 that's appropriate to the case to allow both sides to
18 marshal their evidence and prepare their cases.
19    And to the extent there's a failing in that regard,
20 either inadvertent or purposeful or negligent or whatever,
21 to provide a remedy for that.  And if there's any
22 allegation of spoliation at the end of the day, that there
23 be a remedy for that as well.  All of it tied to the
24 issues in the case and the circumstances.
25    And at one level it's tempting to want to look at

Page 11

1 that when things are done, but that raises the stakes
2 quite a bit.  If failings are found and they're
3 prejudicial and beyond the time for remedy, going forward,
4 it's -- the other sanctions that would occur can be
5 draconian.
6     Other remedies which are sanctions which are remedial
7 can take a lot of forms, some of which in lots of cases
8 simply involve compensation for extra expenses and wasted
9 time and that sort of thing when appropriate.
10    So it seems to me that delaying at all, like I said,
11 while it has some logical appeal, it does raise the
12 stakes, but it does have the advantage of crystalizing the
13 issues to a greater degree than if we proceeded in this
14 month, because we don't know or won't know at the end of
15 January what else is -- ultimately how prejudicial things
16 may be or so forth.
17    So I have got that rattling around in my head here.
18 That's one issue.
19    The other issue, which the parties don't seem to have
20 come to much agreement on, is regardless of when we
21 proceed, whether it's this month or in March, how we get
22 there.  The -- I haven't seen anything specific from the
23 plaintiffs, and I think that is crucial.
24    I'm not quite sure the defendant's approach is
25 workable, but well in advance of the hearing we need a

Page 12

1 specification of the plaintiffs' contentions, and whether
2 it's -- whether we break out the subject matter of my
3 prior order or take things as we find them now or take
4 things as we find them in March, and each of those
5 presents its own sets of difficulties.
6     You know, I need plaintiffs to specify what
7 violations you're saying I've either found or you think
8 are in addition to what I've found.  What level of
9 culpability you think you can establish with respect to
10 those, what evidence, additional evidence not relating to
11 things we've already done, is pertinent to those things
12 and how you're going do it, whether it's by documents or
13 affidavits or reports or testimony.
14    Any additional discovery on discovery, which I'm
15 pretty loath to get into, that plaintiffs need, and then
16 really what I left open in my order, what specific effects
17 does that have on the plaintiffs measured against the
18 issues in the case and the -- what has been accomplished
19 in terms of the obvious items of cost and delay and
20 inability to prove the case and ultimately what sanctions
21 are sought and how do those tie into all the above.
22    And then defendant obviously needs the opportunity to
23 respond to all that with what I assume to be pretty
24 substantial disagreements, and an opportunity to present
25 evidence in various forms.

Page 13

1     So, and then how long is all this going to be take to
2 be heard.  It seems to me that a day probably is not
3 enough, depending on how you people want to proceed.
4     So with that as sort of preparatory remarks,
5 Mr. Gornick, what are plaintiffs' thoughts?
6     MR. GORNICK:  Your Honor, we have been thinking
7 a lot about this.  We have reviewed the submissions by the
8 defendants.  We actually had made a proposal to the
9 defendants on December 17, I believe.  We never heard back
10 from them until they filed their objection to it yesterday
11 and attached it as an exhibit.
12    But be that as it may, we agree with the defendants
13 to this to this much.  All of the issues will not be ripe
14 on January 28th.  There's no doubt about that because
15 we're just now starting to get a lot of documents that
16 should have been produced a long time ago.
17    For example, on the 31st we received that special
18 Seroquel litigation e-mail box.  We haven't had a chance
19 to crunch through all that yet.  There are a lot of
20 examples like that.
21    So we're not going to be in a position on January 28
22 to finally establish the breadth of the problems and the
23 breadth of the prejudice from all of the conduct put
24 together.
25    There is a very discrete issue, though, and an

## Page 14

1  important issue but fairly narrow issue, that will be ripe
2  for January 28. It's ripe right now. And that is the
3  amount of sanctions for AstraZeneca's failure to produce
4  usable or reasonably accessible data. That is an item
5  that you targeted in Your Honor's August 21 order as
6  something to be determined at a later date. It's a
7  discrete item.
8      Much of the conduct leading up to the conclusions of
9  Your Honor's sanction order, it's already in the record.
10  We would produce evidence of conduct related to that issue
11  that occurred after the sanctions hearing, and we would
12  ask you to award a monetary figure as a sanction.
13      And the reason why it's important is because of the
14  magnitude of the expense we have been forced to incur.
15  The short story is, the defendants were ordered in Case
16  Management Order 2 to produce custodial files in a TIFF
17  and load file format. It was specified. It's established
18  that they failed to do it in a reasonable way.
19      Since the sanctions hearing, the depth and breadth of
20  the problems with how they produced the data have ripened.
21  We know it's even worse than as it was presented at the
22  sanctions hearing, to the point where they have to start
23  over. That fact, the fact that they have to start over,
24  the fact they're insisting on producing the data to us in
25  a way that violates Case Management Order 2, that is a

## Page 15

1  native production, has required us to go out and hire a
2  vendor to the tune of $3.3 million. That will be the
3  evidence, that it's going to cost us $3.3 million to
4  process the native production. And that is squarely
5  because they failed to do what CMO-2 required them to do.
6      There's a lot of conduct that we find to be -- we
7  believe to be sanctionable conduct in addition to what
8  Your Honor found in July or in August following the July
9  hearing. So what we would like to do on the 28th is put
10  on evidence that supplements the findings this Court made
11  following the sanctions hearing, and then we would like to
12  put on evidence of essentially our damages caused by
13  AstraZeneca's failure to produce usable or reasonably
14  accessible data. And that's a quote from Your Honor's
15  opinion from August.
16      And the evidence as to our damages, which would total
17  the sanction asked for, is our vendor's cost of
18  $3.3 million, all the time expended by the lawyers and IT
19  personnel on the plaintiff side in investigating the
20  technical problems, arguing with the defendants about
21  their significance, trying to work through them,
22  litigating them, and then the costs associated with those
23  efforts as well.
24      I may be leaving out some discrete things, but those
25  three buckets are going to be the primary areas of

## Page 16

1  damages. Time, cost, vendor for processing the redone
2  native production.
3      We think that can be done discretely on January 28th.
4  Clearly the defendants have had full notice, because this
5  has been an issue since April, discussed at length in
6  July, the subject of an order in August, and on
7  November 16, when you set this -- set the January 28th
8  hearing, you expressly explained that our assertion that
9  receipt of the redone production in native would cost us a
10  great deal of money and that the matter of such cost could
11  be considered in connection with the outstanding sanctions
12  issues.
13      So it's a ripe issue. There's been full notice. I
14  don't think there are any due process concerns. But it's
15  a very important issue, given the size of the outlay, and
16  we would like to proceed with that on January 28, and we
17  could defer the other issues until sometime after
18  March 14.
19      THE COURT: Is there anything else that you need
20  if we figure out a way to carve out that issue, to get
21  ready for that hearing?
22      MR. GORNICK: Your Honor, we do need two things.
23  I think two things would suffice. We have issued
24  subpoenas to Planet Data and Zantaz. Those are two of the
25  vendors that AstraZeneca has faulted.

## Page 17

1      THE COURT: Why is that pertinent, given what it
2  is that you have described as the issue?
3      MR. GORNICK: Well, Your Honor, AstraZeneca in
4  their filing from yesterday makes the case as to why those
5  are relevant. They claim that any sanction, particularly
6  a sanction that's significant, and we're going to be
7  asking for millions of dollars, has to be related to
8  conduct, closely related to conduct. So we intend to
9  produce -- to prove conduct that warrants a seven-figure
10  sanction.
11      AstraZeneca has stated that their vendors are at
12  fault. On one hand they say, we stand behind them, we
13  agree under the Sedona principles we're responsible for
14  what they do, but on the other, they stand up and say,
15  there's no bad faith, we were essentially innocent, we did
16  our best, we hired the world's best vendors and they let
17  us down, which was a surprise.
18      THE COURT: But my point is, if as I understood
19  what it is that you want to restrict the hearing to for
20  present purposes, that you're at this point seeking only a
21  remedial sanction, costs and such things, broadly defined,
22  so that how it came about and what the interaction was
23  between the vendors and AstraZeneca and AstraZeneca's
24  outside counsel, you know -- I mean, I was surprised back
25  last summer that AstraZeneca put a cloak over that.

Page 18

1    That's not what I expected from them. I expected to hear
2    a little bit more about what their process was and why it
3    was reasonable and all of those things.
4        I never heard any of that. And that's what they
5    chose to present. And they stand or fall on the results
6    of what they produced. And it's -- that's what led to
7    your argument that the production itself was in
8    contravention of the requirements.
9        So how it came to be that way, for purposes of that
10   kind of a sanction, I'm not sure helps us any.
11       MR. GORNICK: Well, if that's clear, that
12   AstraZeneca can in no way avoid blame, avoid a large
13   monetary sanction, seven-figure sanction, by shifting
14   blame to the vendor, because what I anticipate is
15   AstraZeneca is going to stand up and say, there's no
16   showing of bad faith. There's no showing of willfulness.
17   There's no showing of recklessness. There's not even a
18   showing of negligence because we went out and we hired the
19   best vendor we could find. We did our due diligence and
20   hired the best vendor. And we did everything we thought
21   we should be doing, but the vendor was doing things that
22   we had no idea they were doing.
23       And there is some sense to that. With respect to the
24   blank page production, they basically claim they were
25   deceived by their vendor. And so if they're going to --

Page 19

1        THE COURT: Well, I mean, it's been made clear
2    several times that -- in different ways, at different
3    times, that AstraZeneca was -- came to the conclusion that
4    it was being ill served by the vendors in various
5    respects.
6        But -- and I agree with you, they've waffled a little
7    bit, I guess, but basically they said, we live with the
8    mistakes they make, and I haven't heard a big deviation
9    from that. Occasionally they've wanted to say it's not us
10   personally, it's us vicariously and it's our fault. I
11   mean, that's how I'm reading them.
12       MR. GORNICK: So this is --
13       THE COURT: I think the record supports that.
14       MR. GORNICK: This is what I would say. If
15   AstraZeneca directed their vendors to proceed in the way
16   they proceeded, that goes to their conduct. If they
17   hamstrung their vendors by putting them on an unreasonable
18   budget and that resulted in the deficient production, that
19   goes to conduct.
20       THE COURT: Again, for purposes of the issues
21   you outlined, I'm just looking at the results.
22       MR. GORNICK: If -- I could live with that then.
23   I mean, if all I have to do is show I didn't get what I
24   was supposed to get --
25       THE COURT: Mr. McConnell, have I misstated any

Page 20

1    position that you're taking here?
2        MR. MCCONNELL: Thus far everything you've said
3    has been fair and accurate, which allows me to be
4    blissfully brief when I get my chance to speak.
5        THE COURT: All right. I don't want to misstate
6    your position, but I believe I understood it.
7        We covered these issues a couple of times before, and
8    I know you have taken the position that you have turned
9    the page a couple of times. A couple of times you turned
10   it you weren't happy with what you saw and you turned it
11   again.
12       And, you know, it's the world we live in. It's not
13   that often everything is perfect the first time out. And
14   so we -- you know, there's got to be some play for that.
15   Not to say -- I was surprised you didn't -- back when we
16   were first looking at this, to -- to explain some more of
17   that, but I accept your choice in doing so.
18       Now, Mr. Gornick, the other thing I'm concerned about
19   under your proposal is -- well, a couple of things. One
20   is, I'm confident that Mr. McConnell is going to want to
21   have some limited discovery of what it is you're trying to
22   prove, and he will be entitled to do that.
23       The other issue, and this is why I kind of hesitated
24   when we met back in December and set this hearing today,
25   was to try to get my arms around this. Is it realistic to

Page 21

1    keep it as discrete as you've described? And because
2    AstraZeneca already thinks this is your second bite at the
3    apple, and I don't want to give you -- if this is the
4    second, I don't want to give you a third on this issue.
5        I think based on what we have seen, there will be
6    some further proceedings where you're going to be seeking
7    additional sanctions and based on where we are at the end
8    of things. I could be wrong about that, but I anticipate
9    it based on the other problems that we have talked about.
10       And like I say, I don't want any double dipping, I
11   don't want any rehashing, relitigating or disputes about
12   that. How are we going to keep that from happening?
13       MR. GORNICK: Well, I think there's two issues.
14   One is the conduct, AstraZeneca's conduct that warrants
15   imposition of sanctions to compensate the plaintiffs for
16   all the expenses that we will have to have incurred, both
17   time, cost, and vendor cost occasioned by the technical
18   failings.
19       Some of that conduct is already in the record. It
20   doesn't have to be rehashed. Our plan would be to bring
21   it current.
22       Now, there's a possibility that some of that conduct,
23   for example, continued sluggishness, continued refusal to
24   talk to us about issues, it goes to the discrete item
25   we're talking about now, but also may inform the Court,

Page 22

```
 1   when it's trying to determine whether we proved bad faith
 2   for the sanctions we'll be seeking later for all the other
 3   issues that have arisen since the sanction hearing. And
 4   there are a lot of them, including spoliation.
 5         So it's possible there would be some minor overlap of
 6   evidence.
 7         THE COURT: I mean spoliation is a whole
 8   different ball game, as you're aware.
 9         MR. GORNICK: Yes, Your Honor. And when we
10   could talk about that, we're concerned about it. Greatly
11   concerned about it. And that's one of the reasons why I'm
12   here to agree today that as of January 28th, we won't be
13   ready to wrap up all discovery sanction issues and all
14   prejudice for all time in this case, because there are
15   some major issues outstanding.
16         That's why we looked at it and thought, okay, what
17   discrete is done? And the discrete item that is done is
18   the damages from the technical failure that was
19   established in July and which has actually mushroomed and
20   developed into a much bigger problem.
21         And the lion's share of the damage was only
22   discovered the last couple of months. So there's no
23   double dipping at all. I mean, if the Court had awarded
24   us sanctions in August for the technical problems, I would
25   hazard to bet they wouldn't have come close to what we're
```

Page 23

```
 1   going to be asking for in January because of what we have
 2   been forced to incur.
 3         THE COURT: Mr. McConnell?
 4         MR. MCCONNELL: First of all, thank you very
 5   much for having this hearing. I think it's already begun
 6   on a very thoughtful note. You have already covered a lot
 7   of points that I was going to make, in fact.
 8         I'm going to make just some of the points, and then
 9   with Your Honor's permission, I was going to turn over the
10   second half of what we're going to say, and it's not going
11   to be as long as that sounds when you talk about a second
12   half, but I was going to turn the second half over to
13   Mr. Barnett.
14         Let me explain why. We had divvied up the issues as
15   follows. I would be here to talk about the timing of the
16   hearing, why it shouldn't take place as early as
17   January 28th, and then Mr. Barnett was going to talk about
18   what should be in the hearing and what shouldn't be in the
19   hearing. It seemed like you have really hit on both
20   issues.
21         The reason I'm talking about the timing, of course,
22   is, as Your Honor knows, I have been standing before you
23   for many months now talking about the document issues, as
24   you know. As frustrating as it's been for you, it's been
25   frustrating for me, too, and I have learned that these
```

Page 24

```
 1   document issues and ESI and all that is extremely complex,
 2   and it's been a painful learning process and we're still
 3   learning.
 4         One thing that we have been doing from the start,
 5   when we would show up at these hearings and Mr. Pennock,
 6   for example, would stand up and say, "I have got these
 7   blanks pages," I have to tell you, Your Honor, that my
 8   reaction as a lawyer representing the client when I would
 9   hear something like that would be to go back and say,
10   what's going on here, let's fix it. And that was always
11   the kind of mode that we were in, which is let's fix it.
12         And so when it came to the sanctions hearing, and
13   Your Honor may recall I'm the guy for the defense who put
14   on all the stuff, I was in the mode of trying to
15   demonstrate what we were doing to try to fix it, to fix
16   the custodial production, and why we were dealing with the
17   data bases issue the way we were. So it was kind of a
18   present mode of what are we doing to try to make this
19   right as opposed to engaging in sort of an archeological
20   dig.
21         Maybe that was a mistake, but that's always the
22   footing that I have been on, which is to try to decide how
23   we're going to fix it.
24         Well, Your Honor came out with your order and you
25   decided that it hadn't been fixed enough obviously and
```

Page 25

```
 1   what the plaintiffs got wasn't everything that they were
 2   entitled to. And that specifically the custodial
 3   production was deficient, and that we hadn't made
 4   sufficient progress towards resolving the data bases. As
 5   I read your order, you said those were the two areas where
 6   we needed to be sanctioned because of purposeful
 7   sluggishness.
 8         And the issue that remained was the issue of specific
 9   prejudice and added costs, and that was my understanding
10   as to what the plaintiffs were entitled to prove up and
11   that we would be talking about in January.
12         And what I just heard from Mr. Gornick is, he's not
13   going be in a position to prove all those examples of
14   specific prejudice, and he's right, I agree with him on
15   that, and he's not going to be able to prove what his
16   damages are by January 28th.
17         And I have to tell you, I'm very concerned about --
18   Your Honor alluded to this -- making this a second bite,
19   third bite, by having this become, even more than it
20   already has been, a case about sanctions, as opposed to a
21   case about what the claims are, what the facts are and
22   who's entitled to what and all the evidentiary issues that
23   we're supposed to get into as opposed to these, these
24   issues of discovery about discovery.
25         And to me, it should be fairly concrete. And it's --
```

Page 26

1  but it's been difficult to even talk about this because
2  everything that we've heard from the plaintiffs from the
3  beginning, and I don't completely blame them for this, but
4  the fact is that their claims of what was the damage has
5  been, what the prejudice has been, and what the relief for
6  that should be, has changed on a constant basis.
7      Your Honor will recall in the first motion there was
8  a request to shut down the case-specific discovery
9  program.  That was -- they said they were prejudiced in
10  going forward with that.  Let's stop that.  Obviously that
11  has been stopped, although it went on for a number of
12  months.
13      Then we heard about striking the learned intermediary
14  motion.  Your Honor was the first person who talked about
15  monetary damages.  You said that's what we ought to be
16  talking about.  And now today for the first time we're
17  hearing what shape those monetary damages might assume.
18      We need notice on that.  We need to know what's the
19  actual specific prejudice, what are the damages.  Let's do
20  what we can to test it on some reasonable basis and we'll
21  have a hearing about that, and Mr. Barnett is going to
22  talk about that.
23      But in terms of the timing, let me be concrete about
24  this.  What really would need to be done to address the
25  kinds of prejudice that the plaintiffs claim from the

Page 27

1  defective custodial production and from failure to get
2  whatever they think they were supposed to get in data
3  bases, and the most concrete thing I can think of is what
4  the plaintiffs themselves said every time they had an
5  opportunity to talk about what the prejudice was.
6      Your Honor will remember Mr. Allen in particular
7  standing up and saying, I have got to do depositions, and
8  how am I going to do depositions effectively if I don't
9  have all the documents?  That's a fair point.
10      And depositions have been taken of company witnesses.
11  Now, initially when Mr. Allen and others from the
12  plaintiffs' side would make these arguments, they would
13  say, we're looking at what is functionally a deadline of
14  the end of 2007.  We have got to do those company
15  depositions then, and how can we do that when we don't
16  have the documents?  Again, that's a logical point.
17      But the schedules changed, and there were some
18  company depositions that were done up through this point.
19  Most have not.  Most are going to take place much later.
20      But it seems to me if you really want to get at what
21  the specific prejudice is and what the costs are, what you
22  do is something like this.  We're going to be producing
23  more documents.  We already have.  We're going to be
24  producing even more documents, and producing documents in
25  a different form than native form as well.  And the

Page 28

1  plaintiffs are going to get these things.
2      And then there's an issue, and there's going to be an
3  answer to this yes or no, which is, did it turn out that
4  there were some documents that they should have had to
5  depose a witness, say, Jamie Mullin, who is one of the
6  people that they deposed.  Are their documents that we
7  should have had earlier, we should have had them available
8  to take that deposition and we didn't have them?  Okay?
9  And that's a damage.  And what's the remedy for that, I
10  don't know.  I assume Your Honor would say they get a
11  chance to depose them again, and whatever the costs are
12  associated with that -- I mean Your Honor would come up
13  with whatever you think is the appropriate sanction.
14      But you need facts.  You need information.  And
15  that's -- none of that information is going to be
16  available on January 28.  And we do not want this
17  proceeding of let's do a little bite of it on the 28th and
18  heaven knows what after that.
19      And I think there's going to be a logical point in
20  time where we can gather the facts.  We suggest that it's
21  the end of fact discovery, certainly after substantial
22  completion.  It's got to be sometime after that so
23  plaintiffs can look at what they've got and do a
24  comparison.
25      But to my eyes it doesn't make any sense to go

Page 29

1  forward on January 28th, and all that does is, it just
2  keeps turning this into a case about sanctions, and what I
3  actually heard Mr. Gornick say is, it sounds like he wants
4  to go back and revisit what Your Honor found, even about
5  those issues of custodial production and data bases.  He
6  wants to say, whatever you thought, it's even worse.  He
7  wants to change the level of culpability.  I suggest he
8  can't do any of that.  And he wants to come up with more
9  sanctions.
10      If he does have other new independent basis for a
11  sanctions motion, I guess he's going to file it and you're
12  going to do it.  But what this issue is about is, Your
13  Honor issued an order in August and Your Honor said
14  there's got to be a hearing that actually gets at the
15  issues of specific prejudice and damages, and you're right
16  about that, and we just can't do it on January 28th in any
17  sort of form that makes sense.
18      And what I'd like to do now is let Mr. Barnett speak
19  a little bit about what the contours of that hearing
20  should be.
21      MR. GORNICK:  May I first respond to some of
22  that?
23      THE COURT:  Let's hear from Mr. Barnett first.
24      MR. BARNETT:  Good afternoon, Your Honor.
25  As is typical, my partner has covered a lot of

Page 30

1   ground, and so you will just be hearing from me briefly.
2       Obviously the plaintiffs did send us a proposal for
3   the scope of the hearing as they saw it on December 16th
4   or 17th. We filed our objections, I believe, to their
5   plan yesterday and submitted our own plan. And I did so
6   with the help of Mr. Coutroulis and Mr. Pass, and even
7   under our -- our view is obviously, the sole issue is
8   proof of the actual prejudice flowing from the two
9   instances of sanctionable conduct that the Court found in
10  July of last year. And that is consistent with due
11  process, consistent with the rules of procedure,
12  consistent with the evidentiary rules. That's the only
13  issue that should properly be heard, if heard at all, on
14  the 28th.
15      We now have Mr. Gornick's new proposal. I don't
16  fault him for that at all. He's been very busy with a
17  number of discovery issues. But it does seem as though in
18  some respects, what they're proposing now tracks what they
19  proposed back in December, and there's some effort to look
20  at the pre-hearing conduct on the part of AstraZeneca, and
21  that clearly is an effort to rehash or relitigate issues
22  that the Court has already decided.
23      In terms of looking at post-hearing conduct, there is
24  very deep concern that this is not only just an ongoing
25  effort to look for any sort of conduct that might give

Page 31

1   rise to sanctions, but would actually interfere with our
2   ability to hit the substantial completion deadline of
3   March 14.
4       Just taking a step back, there ought to be -- there
5   ought to be the ability of the parties to disagree about
6   certain issues, to seek assistance from Special Master
7   Ball to resolve those issues, and hopefully reach a
8   resolution without a sort of damage hanging over our heads
9   that would be used as evidence or further evidence of
10  sanctions against AstraZeneca.
11      If the idea is to limit it to the actual -- evidence
12  of actual prejudice, and the new claim is the fact that
13  now the plaintiffs have to employ a new vendor to look at
14  the native productions, that would at least seem to be the
15  ballpark of the Court's August order, but there is
16  necessarily going to need to be discovery about that.
17      Specifically, and I wasn't present for the hearing
18  but I read the transcript, there was a lot of talk at the
19  hearing about how the plaintiffs originally wanted the
20  productions in native, and then negotiations over the case
21  management order were an effort to get to near native
22  production.
23      And so I think a legitimate question, and maybe one
24  for discovery, and it may pan out, it may not, is if in
25  fact their original desire was to get documents in native

Page 32

1   form, and now we have agreed to produce them in native to
2   clean up the issues that did exist, and to get these
3   things produced by March 14, how is it that they are
4   prejudiced by using a system that they themselves wanted
5   initially?
6       And I'm not trying to argue the issue. I'm just
7   trying to offer that as an illustration for the kind of
8   discovery that might in fact be necessary to get into even
9   a limited scope hearing.
10      The other issue, just to flag quickly for the Court,
11  is depositions. Under the plaintiffs' plan, they said
12  that they might want to depose Andrew Dupre, who is an
13  attorney at McCarter English. I believe he testified at
14  the sanctions hearing. Again, I'm not sure what relevant
15  evidence --
16      THE COURT: I asked Mr. Gornick if he needed --
17  under his proposal for the hearing, whether he needed
18  anything else to get ready. He said no.
19      MR. BARNETT: Right.
20      THE COURT: I understand that you would.
21      MR. BARNETT: We would, and one of the thorny
22  issues that we would have to overcome is the fact that
23  we're not seeking to pierce the privilege on the
24  plaintiffs' side or get into work product, but we would
25  need some -- a notice of exactly what they're talking

Page 33

1   about and some ability to test those claims, either in a
2   document form or potentially depositions.
3       I raise it only because again, the time period we're
4   talking about here is very compressed. There is no -- if
5   I were in the plaintiffs' shoes and I said I want to
6   depose Mr. Jaffe or some of the other attorneys that were
7   involved in preparing for depositions, I would have real
8   concerns about that.
9       So I think that it's perhaps a long way of saying the
10  deadlines that even we propose in our plan are aggressive,
11  and they're aggressive to deal with the one specific issue
12  that we think is properly subject to hearing, which is
13  limited to the sanctionable -- prejudice borne from the
14  sanctionable conduct that the Court found previously.
15      THE COURT: Response, Mr. Gornick?
16      MR. GORNICK: Yes, Your Honor. It's as if this
17  is a new issue. On November 16, last November, it might
18  have been November 15, I explained to the Court that we
19  objected to the redo of all the discovery in native form
20  because it would cost us a lot of money, and I gave an
21  estimate as to the bids and they were in the millions of
22  dollars. And this Court put in its November 16th order
23  that we could address those costs at the sanctions hearing
24  in January.
25      It's not a new issue. This issue flows directly out

Page 34

1    of the conduct this Court found sanctionable, and you may
2    recall that at the sanctions hearing, when we explained
3    through Mr. Jaffe and our expert that it would be cheaper
4    and more cost effective to start over, they said they had
5    fixed all the problems on July 20th.
6         Well, they hadn't.  We tried to work with them
7    throughout August.  They ignored us.  And I'll put
8    evidence of that on.
9         Only after you sanctioned them did they wake up.  But
10   even after you sanctioned them, it was our forensic work,
11   our constant review of what they were giving us, our
12   questions, that led them finally to concede they couldn't
13   fix what they had done.
14        This flows directly out of the issues we raised.  The
15   reason why it's sanctionable is not only because of our
16   damages but their conduct.  And I mean, to stand here and
17   listen to this as if they were doing us a favor or if
18   they're totally innocent, I mean it's rather upsetting.
19        But getting back to January 28th, it's a discrete
20   issue.  If the plaintiffs will not have the burden of
21   proving bad conduct by the defendants in order to obtain
22   monetary sanction only, then I don't think there will be
23   even any overlap of evidence between what will happen in
24   January and what's going to happen in March or April.  It
25   will be discrete.

Page 35

1         It will be the amount of money.  It will explain why
2    the amount we're seeking is related to the conduct Your
3    Honor found in July, and the related actions between July
4    and now.  It will be very discrete, very easy.  There's no
5    reason why we shouldn't do it.
6         As far as the discovery that the defendants claim
7    that they need, they were on notice at least by
8    November 16, when Your Honor put out your order saying
9    that we could address that large cost item in the
10   sanctions hearing, that we would be addressing that large
11   cost item in the sanctions hearing.  They simply didn't do
12   anything.
13        And so it seems a bit disingenuous to be arguing now
14   that they're behind the eight ball, since they could have
15   got on it by November 17th.
16        THE COURT:  Okay.  At the risk of appearing
17   facetious, I have got to say the discussion we have had
18   here has been remarkably productive in terms of my
19   understanding where we are.
20        Here's what I want to do.  I'm now persuaded based on
21   what both sides have said that there's at least the
22   probability that we could go forward with something on the
23   28th that will be appropriate and useful.  Oftentimes in a
24   typical civil case, when I enter a discovery order, I'll
25   often indicate that the request for sanctions can be

Page 36

1    renewed at the close of discovery, and oftentimes it never
2    reappears.  But that's when we're talking about a
3    deposition or two or an extra document production, and the
4    difficulties are much smaller than the problems that we've
5    had here.
6         So the reason I think we can go forward with
7    something on the 28th is the indication from the
8    plaintiffs that really have been quite extraordinary, and
9    that's based on the findings I made in my August order.
10        That said, I still have the concerns that I had when
11   I quizzed Mr. Gornick and the issue is not free from
12   doubt.  So I'm going to require plaintiff to file by next
13   Tuesday, the 8th, a statement.  And I'll repeat what I
14   want in there, but it's the sort of things I was talking
15   about at the start of the hearing.  And then require the
16   defendants to respond to that by Friday, the 11th, and the
17   response from the defendants should include -- and --
18   well, and very specifically, plaintiffs must explicitly
19   define what they're seeking and what the scope is, so that
20   we don't come back to those same issues.
21        And what I'm thinking about is that it's limited to
22   the plaintiffs' contentions that they have had increased
23   in effect technical costs, that the vendor and other
24   things they may claim.  It won't be the kind of things
25   that Mr. McConnell described as other possibilities, such

Page 37

1    as redoing depositions and those sorts of prejudice.
2    We're going to leave all those aside, and those will be
3    taken up, if at all, at a later date in a different
4    context.
5         Now, if the definition that you put in that document
6    on the 8th is too broad and defendants object to it, I may
7    say, all right, we're just not going to do anything on the
8    28th.  So define yourself carefully.
9         So your response can include an indication that you
10   just think that this is a triple dip or it will be too
11   confusing or is otherwise unfair, and I'll consider all
12   that, but your response should also include then
13   specifically what kind of discovery you want before the
14   28th and how you're going to do it, and then responding to
15   the other matters.
16        And so the plaintiffs' statements should include its
17   contentions as to the technical -- increased technical
18   costs that it's contending should be the subject of
19   sanctions or compensatory sanctions arising from the
20   technical problems, and then defining what evidence you're
21   planning to submit to support that.
22        And then defendants, as I say, can object to the
23   scope and say, look, this is just a mishmash and we're
24   objecting to it.
25        And I say, that's not a settled issue.  This is how

Page 38

1    I'm leaning, and if the plaintiffs define it tightly
2    enough, and I think you've got enough time to prepare and
3    respond, we will go forward.  But if not, it will get
4    carried.
5        MR. GORNICK:  Your Honor, may I just -- this is
6    troubling me.  Your indulgence, please.  Given the Court's
7    statements and the statements from the defense side, my
8    understanding is I don't have to prove bad faith.  I don't
9    have to put on evidence of conduct.
10       THE COURT:  No.
11       MR. GORNICK:  So I will not list conduct-related
12   evidence.
13       THE COURT:  No.  Because if I thought we were
14   doing that, then I'm back in that quandary I started with.
15   That's why I say this was a very useful discussion.
16       And because we're not getting -- those things won't
17   matter in terms of the compensatory remedy.  And there's
18   still some cause and effect issues and things like that
19   and, you know, where we are.  But we're taking my previous
20   findings and then some of the things that have happened
21   since then that have had an impact on that in terms of how
22   the defendants, as I say, have turned a couple more pages
23   and a couple false starts and a couple of true starts.
24       So, then I'm thinking we'll have a telephone hearing
25   on the 15th where I'll consider both of those and let you

Page 39

1    know what we're doing.  And that will define what you --
2    assuming we're going forward, what discovery you need.
3    Obviously you will have to get that done between the 15th
4    and the 25th.  So don't plan too much.
5        MR. ROTH:  Your Honor, just a quick query.
6    Assuming a hearing goes forward on the 28th, do we have
7    all day for that?
8        THE COURT:  Well, I have got the day blocked
9    out, and of course I plan to see you all again on the
10   29th.  I have got that day clear, too, so if we spill
11   over, but -- and your statement should include how long
12   you think your presentation will take by way of evidence
13   and argument.
14       So I think that will let us join issue on this, and
15   then that will reserve any number of other things for a
16   later date.  But I caution you that assuming that later
17   date comes, that there is another motion which I would be
18   surprised not to see, I'm going to be -- if you try to
19   revisit it ever, there's going to be a problem.  I'll cut
20   you off on that.
21       MR. GORNICK:  Understood.
22       THE COURT:  Okay.  Let me take up a couple other
23   things while we've got you here.  And I don't want to do
24   this in any way that's unfair, since we really had kind of
25   limited notice for this hearing, but we do have a special

Page 40

1    master here.  Good to see him.  He's here in person.
2        And there were some -- defendants filed a pretty
3    lengthy objection to your latest report.  I'm not quite
4    sure what to do with that, except try to keep everything
5    in context.
6        Anything you want to report on at this stage or --
7        MR. BALL:  Yes, Your Honor.  I saw that for the
8    first time yesterday morning, and I believe it's a 36-page
9    expansion, which boils down to essentially that they don't
10   feel that I am being fair or accurate.
11       When I received the notice of the intent to object, I
12   responded that I've never seen a notice of intent to
13   object, it's very provocative, and that I looked forward
14   to reading how I had erred so much.  And I -- although it
15   was not shared with you by the defendants when they quoted
16   from that, I followed up in that same missive by saying
17   that I wanted to read it because if I had in fact
18   misbehaved in some way, I wanted the opportunity to
19   rectify it as quickly as possible.
20       As I say, they didn't share that part of it with you.
21   Presumably it didn't support their position.
22       I now have had the chance to look at the 36 pages of
23   description, description of their position with respect to
24   their ability to use certain methodologies that I advised
25   them would be corruptive of the evidence, of the lack of

Page 41

1    cooperation with respect to what they call non-retention
2    of certain information during the period of an obligation
3    to preserve electronically stored information.
4        I have laid those out in my most recent report.  I
5    have looked again at my most recent report with the idea
6    of was there something that I needed to correct beyond
7    grammatical errors and spelling errors that I had
8    previously corrected, did I owe, in fact, AstraZeneca
9    something in the nature of an apology, because I would be
10   not -- in no way hesitant to indicate I'd erred.
11       I have the benefit of having spent once again the
12   last day and a half with AstraZeneca representatives, and
13   I am confident in saying that I stand by my report in
14   every respect.  If the Court directs me to file an
15   extensive detailed explication of why it is everything I
16   said in that report is amply supported by behavior and
17   evidence, I will do so.  However, I think that would only
18   be further corrosive of the ongoing process.
19       I'm willing to do it.  I'm willing to stand behind
20   anything I said.  But as I bring to the Court's attention
21   other matters that don't necessarily go to the ultimate
22   outcome of the electronic discovery but more the process
23   by which we're going to arrive at that outcome, I think it
24   makes it further difficult for me to work with the
25   parties.

Page 42

1    So while I'm willing do it, I hope that it won't be
2  necessary for me to do it.
3         THE COURT:  Well, I read through their
4  objections pretty quickly, and didn't go back and match it
5  up with your report or anything else, and I'm really loath
6  to get you in a position of having to be a witness to
7  something or providing expert testimony.  That's not what
8  you hold yourself out as.  I'm sure you could do it in
9  some circumstances, but it's not your intended role here.
10   And AstraZeneca didn't seek any particular relief
11  from the Court in that objection.  I took it for present
12  purposes as their statement that they don't agree with
13  everything you said in the last report, which I was pretty
14  confident when I read your report they wouldn't agree with
15  everything that was in there.
16   A lot of those things I suspect will never have to be
17  adjudicated by the Court.  And so I would at least for
18  present purposes like to leave it as you suggest, that you
19  have read what they said and you thought about it, and you
20  stand by your report, and you're still working with them
21  even today, which is all to the good.
22   And I agree with you, that if we end up getting into
23  in effect a litigation over your technical
24  characterizations and recommendations and directions, then
25  it may well destroy your ability to get us through to the

Page 43

1  end of March.  So if we can avoid that, I'd like to.
2    But since you were here and I knew you were working
3  with the parties this week, and we did get that long
4  document, I thought I'd let you talk about that.
5         MR. BALL:  If I may also add, Your Honor.  There
6  was some progress made this last day and a half.  I share
7  the plaintiffs' frustration, I'm sure the defendants share
8  a measure of the same frustration, that the process of
9  getting through the highly technical aspects of how to
10  produce these data bases has consumed so much time.
11   I invite either party to talk with me collectively or
12  on an ex parte basis or otherwise if they see a way to
13  improve the speed by which we can address these things.
14  I'm happy to do that.
15   I know the plaintiffs probably feel that I am
16  affording too much leeway for the sharing of information
17  and deliberation on the part of their opponents.  I'm sure
18  the defendants have other concerns about how I'm
19  proceeding.  I'm happy to air those.
20   I do believe, however, that today we were able to
21  culminate -- it almost fell apart at the last minute but
22  was salvaged, and we were able to culminate a detailed and
23  I think a workable series of compromises and technically
24  explicit and I think technically excellent results with
25  respect to producing the GEL data base that is the subject

Page 44

1  of the 36-page -- here again, the word that comes to mind
2  is diatribe, but AstraZeneca doesn't like it when I use
3  those terms, so I'll say --
4         THE COURT:  I've used that word, I think, at
5  least in my head, for some things, but I wouldn't use it
6  for that one.  Let me say that.
7         MR. BALL:  All right.  Let me just say the
8  36-page objection.
9         THE COURT:  Yes.  It's got some strong words in
10  it, but I wouldn't take it into the diatribe category.
11        MR. BALL:  Fair enough.  I think that we have
12  resolved -- perhaps I'm overstating it, and I again invite
13  the parties to weigh in.  I think we have resolved all, if
14  not virtually all of the issues raised with respect to the
15  redaction of native electronic spreadsheets.  That was the
16  subject, that there is a mechanism proposed to achieve
17  that.  There will be negotiations ongoing in terms of
18  exactly how it will proceed, but both parties have
19  committed in principle to resolving that in a matter that
20  will afford the plaintiffs, I believe, the level of
21  functionality at a native spreadsheet way which would cure
22  the concerns that I have raised with the Court in my
23  opinion.
24   With regard to the non-retention in GEL, that remains
25  an issue which is being investigated, and I continue to

Page 45

1  call on both sides to share with me the information I'm
2  requesting in order to be able to apprise the Court of
3  what I feel is necessary, if anything, to recreate
4  information that may not have been retained during a
5  period of preservation and that would be relevant to
6  Seroquel-related issues.
7    So some progress was made in the last day and a half,
8  less than I think any of us hoped, but I think it was time
9  well spent, and I will commit to the Court, with the
10  parties' cooperation, I will literally double the amount
11  of time and effort that is going into resolving these data
12  base issues so that we have much greater focus on them in
13  a shorter period of time.
14        THE COURT:  Okay.  This is not just an
15  electronic discovery issue, but as lawyers involved in a
16  litigation process, in our selfish way, we all agree that
17  if business people would just organize their businesses to
18  be litigation ready, then we wouldn't have so many
19  problems.  But we wouldn't want them to run their
20  businesses that way, so we have to take them as we find
21  them.  That's a fact of life.
22   All right.  Let me ask those present, and I do this
23  with a little bit of trepidation because there are people
24  not here, we got notice from the MDL panel about these
25  tag-along cases involving marketing issues.  Are there any

Page 46

1    of the lawyers here who are involved with that?  Does
2    anybody know what I'm talking about?
3        Mr. Roth, your name was on some of that.  I don't
4    know how it got to be there, but what I'm talking about,
5    there's some litigation related enough that the MDL is
6    sending them here, and it's from the union benefit funds.
7        MR. GORNICK:  Is it a third-party payer class
8    action?
9        THE COURT:  Right.  Well, I don't know if -- I
10   haven't seen anything except the MDL panel's order that's
11   sending these cases to Judge Conway and me.
12       MR. GORNICK:  This is the first --
13       THE COURT:  Without asking us, I might add,
14   which is their prerogative, I guess.
15       Well, let me just tell you, for your benefit, I'm not
16   going to obviously do that.  I'm just going to tell you
17   that we will have at some point a joint status conference
18   with the people in this case, these cases, and the people
19   in that case, to find out how much overlap and stuff there
20   would be and what that's going to do to -- how we're going
21   to schedule that.  And undoubtedly a lot of the
22   information that these plaintiffs have gotten, those
23   plaintiffs are going to want.  And we will have to see how
24   we can facilitate that.
25       So I saw a lot of quizzical faces here, so I take it,

Page 47

1    Mr. McConnell, that the folks here are not privy to that
2    process.
3        MR. MCCONNELL:  We saw the order, and just like
4    you, we kind of wondered about whether it was appropriate
5    or not.  We're still looking into it.
6        THE COURT:  Well, and I don't know whether your
7    firm is going to be involved with any of that or how
8    that's going to be staffed or anything else, but we'll --
9    there will be an opportunity for people with this
10   perspective to comment on what's going on there and vice
11   versa.  And we're going to have to work out some issues
12   about docketing to keep things separate, because I don't
13   need their filings to make it more difficult to follow the
14   docket here, and again, vice versa, they don't.
15       But like I said, there's going to be some discovery
16   and evidentiary issues in common.
17       Okay.  Anything else for the order at this point?
18   From the plaintiffs?
19       MR. GORNICK:  Your Honor, there is a long-term
20   housekeeping matter, I suppose, and it's related to
21   Special Master Ball, and you had raised it in your order
22   governing today, and it was how -- how information from
23   Special Master Ball may impact on the sanction issues to
24   be presented to the Court.
25       And it strikes me that we should probably start

Page 48

1    thinking about that earlier rather than later.  And my
2    suggestion would be, and I hope I don't incur
3    Master Ball's wrath, is that at some point before the
4    final sanctions hearing, he prepare a final report
5    supported in whatever way he wants to support his
6    findings, and it could cover four different types of
7    things.  Anything the Court would ask him to cover,
8    anything that he thought he should cover in addition,
9    anything the plaintiffs wanted him to cover, anything that
10   the defendants wanted him to cover.  So everybody with a
11   dog in the fight would have an opportunity to say, please
12   cover these issues.
13       He would -- it would be a final document.  Any party
14   would have the opportunity to contest any of the findings
15   in it, but at least we would have that document, and I
16   think it would be important to have his perspective, given
17   everything that has occurred since he was appointed.
18       THE COURT:  Well, let me say this:  I certainly
19   had the hope when I appointed him that he would be able to
20   wave some magic wands and get some reports from him and
21   everything would be done, and we'd thank him and let him
22   add that to his resume.  Good chance that's not going to
23   be that simple.  It has not been that simple.
24       Assuming that you do file that motion, as I said I
25   expect you will be, I think your motion will need to

Page 49

1    include a request along the lines you just made, that you
2    think it's appropriate that he provide a report with this
3    information in it.
4        And defendants, I think, will have a different view
5    as to whether he can make findings or report findings or
6    how his report should be characterized, and I'll hear
7    that, because frankly I don't have any experience in
8    getting that kind of a report from a special master.
9        And there is, I think, a little bit of law on that,
10   but not an unlawful lot.  So we will have to craft that.
11   And I'm not going to prejudge what that should be.
12       So just I agree with you, we should start thinking
13   about it, because it looks like on the odds we're going to
14   be getting that motion and a lot of the things that he's
15   had to deal with are going to be part of the subject
16   matter of that.
17       Depending on what you think you want from him and
18   what the defendants want from him or don't want from him,
19   we will adjudicate that.  I have already expressed my
20   preference, which is that he not be put in a position of
21   having to be a witness, neutral, adversarial or otherwise,
22   and he'll have things to report.  The closer we can keep
23   it to a report format, subject to due process rights for
24   both sides, the better.
25       So that's an issue we will have to resolve.  I think

Page 50

1 the way to resolve it is for you to -- assuming you file
2 that motion, you're going to be proposing a lot of other
3 things about which you want to present. There will be an
4 opportunity for the defendants to respond to that and come
5 up with their own counter-proposal. I literally have no
6 predetermination as to what that should be like.
7     Let me add one other thing, that as you prepare your
8 response next week in terms of the needed discovery, do a
9 little meet and confer on that to see if you can't narrow
10 any -- in other words, how many witnesses you want and how
11 you're going to take them and that sort of thing. It
12 doesn't -- just to try to narrow that, any issue, any
13 misunderstandings and disputes. I mean ask for what you
14 want, but have that discussion so it doesn't just fly up
15 Friday afternoon.
16     MR. PASS: Could we be heard briefly on the
17 issue that Mr. Gornick raised?
18     THE COURT: Sure. Anything else you want to --
19 kind of closing for them and AstraZeneca, I presume.
20     MR. PASS: First, I'm assuming that given what
21 else has been discussed and what Your Honor has said
22 today, Mr. Gornick's remarks about further reports from
23 Special Master Ball that might in Mr. Gornick's view form
24 the basis for some sort of additional sanctions motion, is
25 not something we're talking about hearing on the 28th. I

Page 51

1 think that's clear.
2     Secondly, we do have a concern about this process and
3 the record for it and whether we're going off the rails
4 that are appropriate and what the Court intended in the
5 first place in setting up the special master process.
6     I thought the basic idea of the special master
7 process was to -- which was after all, AstraZeneca's
8 original idea was to try to resolve problems of a
9 technical nature, try to get where there were problems of
10 how to do something in electronic discovery that the
11 parties weren't adequately resolving or one party was not
12 able to figure out how to do, to get his expertise and
13 assistance in that.
14     It sounds as if the plaintiffs now are sort of
15 envisioning Special Master Ball as becoming some sort
16 of -- I'm not sure what the right term is. I don't want
17 to use an inappropriate one, but some sort of special
18 prosecutor for them. I'm not sure Mr. Ball regards
19 himself that way. I certainly don't regard him that way.
20     But I would say this: The process that has been used
21 in working with the special master has been to date a
22 relatively informal one. It has certainly not been
23 accompanied by any of the normal formalities of record
24 making, the taking of evidence, or any of those sort of
25 basic due process matters that one would expect if one

Page 52

1 were going to be formulating something that would
2 ultimately be used and relied upon to seek serious
3 sanctions against a party.
4     I believe Special Master Ball himself has more than
5 once advised the parties that in his view, he is not
6 making a record for formal purposes and that he regards
7 himself and whatever reports he makes as subject to full
8 de novo review before the Court, as I think Rule 53 makes
9 clear, with the notion, at least as I read it, therefore,
10 that anything he might say to the Court in a report would
11 in effect be subject to full judicial determination upon a
12 judicially created record.
13     If we are going to be moving forward at this point
14 with this notion that Mr. Ball will take on or exercise
15 powers with which he would begin to make reports that the
16 plaintiffs would seek to offer in some fashion to be a
17 basis for sanctions, then I think, A, we're going off the
18 track of what we were supposed to be doing with Special
19 Master Ball, but, B, I think one of two things would have
20 to happen. Either we would have to dramatically change
21 the formalities with which we're dealing with him, which
22 I'm not particularly in favor of. I don't think that
23 process works very well, if one starts taking depositions
24 or evidence in the formal way. Or B, that just should not
25 be a part of the special master process. Whatever

Page 53

1 sanctions arguments are going to be made based upon any
2 purported additional transgressions by AstraZeneca, need
3 to be judicially developed in a judicial record.
4     So we have a concern about that whole approach. We
5 think Special Master Ball should continue to function in
6 the notion or in the vein of a technical adviser, mediator
7 and assister to the parties, and apprise the Court on a
8 non-binding basis what thoughts he has on those topics.
9     But if we're going to be talking about the threat of
10 sanctions, in whatever form they may be, then either that
11 has to be something that the Court alone deals with or we
12 would have to dramatically change the record-making
13 process before Special Master Ball. We would prefer the
14 former.
15     THE COURT: Well, I have said what I said, and
16 the -- I don't -- I don't want the process to get more
17 formalized than it is. I think that would be
18 counterproductive.
19     I expect at the end of the day, end of March,
20 sometime, whenever plaintiffs file that motion we have
21 been talking about, if they do, and they have a proposal
22 as to Mr. Ball's role in that -- I mean, we will continue
23 to get monthly reports from him, but when we're done with
24 the discovery, I expect there will be a report from him
25 that -- as to what the status of things are in terms of

Page 54

1   what got done, what didn't get done, much of which will be
2   essentially undisputed.
3       There may be characterizations, there may be process
4   issues and things, and -- but I think you're right, to the
5   extent that -- just like with the issues we're talking
6   about for the 28th, I'm looking at the results much more
7   than the process, and I think as to the results, there may
8   not be that much dispute, and that's where Mr. Ball would
9   continue to be useful.
10      But you will have the opportunity to both object to
11  whatever the plaintiffs propose he be used for and to make
12  your own proposal and to include in that exactly what you
13  have said, that -- which I think is essentially correct,
14  that any issues that he's going to offer information about
15  are going to be for the Court to decide.
16      And it really is my preference that to the extent
17  there's disputed matters, that he not be the witness.  And
18  certainly he's -- I have not asked him to make findings
19  that are going to be binding on anybody, but for me to
20  review, but I think he will -- as his reports to date have
21  done, subject to your objection, disagreement with part of
22  the most recent one, it lays out where we are.
23      So I think you're -- you should continue as you have,
24  and to the extent that you or the plaintiffs have
25  disagreements with him or his characterization of things,

Page 55

1   you will have plenty of opportunity to develop that and
2   not be blindsided by anything he says.
3       MR. PASS:  Thank you.
4       THE COURT:  Anything else, Mr. McConnell, from
5   your side?
6       MR. MCCONNELL:  Your Honor, just that you
7   alluded to there being a telephonic conference call with
8   Your Honor on the 15th, and I just want to know what time.
9       THE COURT:  1:00.
10      MR. MCCONNELL:  1:00 p.m. Eastern time?
11      THE COURT:  Yes.  Does that work?  I have
12  criminal duty that day, so, I don't know normally have
13  hearings at 1:00, but criminal matters.
14      MR. GORNICK:  That works.
15      THE COURT:  Hearing the click of Blackberry
16  wheels and no objections, we will set it for then.
17      MR. MCCONNELL:  Thank you, Your Honor.
18      THE COURT:  We're in recess.
19          (End at 3:30 p.m.)
20          C E R T I F I C A T E
21      I certify that the foregoing is a correct
22  transcript from the record of proceedings in the
23  above-entitled matter.
24  _____    _____
25  Sandra K. Tremel