Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Docket No.6:06-MD-1769-Orl-22DAB

. . . . . . . . . . . . . ..
IN RE:                             :
SEROQUEL PRODUCTS LIABILITY  :
LITIGATION                         :          Orlando, Florida
MDL DOCKET No. 1769           :          August 22, 2007
                                         :          1:30 p.m.
ALL CASES                          :
                                         :
. . . . . . . . . . . . . .:


TRANSCRIPT OF PRETRIAL CONFERENCE
BEFORE THE HONORABLE DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For The Plaintiffs:              Larry M. Roth

                                         Scott Allen

                                         F. Kenneth Bailey

                                         Camp Bailey

                                         E. Ashley Cranford

                                         Dennis Canty

                                         Lawrence Gornick

                                         Glenn Kramer

                                         Fletch Trammell

                                         Holly Wheeler

                                         Angela Nixon

                                         Robert Cowen

                                         Gail Pearson

Page 2

1  For the Defendant
2  AstraZeneca:          Fred Magaziner
3                        Stephen J. McConnell
4                        James Freebery
5                        Robert Ciotti
6                        Liz Balakhani
7
8  ALSO PRESENT:  Orran Brown, Special Master
9
10 Court Reporter: Sandra K. Tremel
11
12 Proceedings recorded by mechanical stenography, transcript
13 produced by computer-aided transcription.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              P R O C E E D I N G S
2          THE DEPUTY CLERK:  Case number
3  6:06-MD-1769-ORL-22DAB.  In Re: The Seroquel Products
4  Liability Litigation.
5          Counsel in the courtroom, please state your
6  appearances for the record.
7          MR. GORNICK:  Larry Gornick for the plaintiffs.
8          MR. CANTY:  Dennis Canty for the plaintiffs.
9          MR. ALLEN:  Scott Allen for the plaintiffs.
10         MR. CAMP BAILEY:  Camp Bailey for the
11 plaintiffs.
12         MR. ROTH:  Larry Roth for the plaintiffs.
13         MR. TRAMMELL:  Fletch Trammell, plaintiffs.
14         MR. KEN BAILEY:  Ken Bailey, plaintiffs.
15         MS. WHEELER:  Holly Wheeler, plaintiffs.
16         MR. KRAMER:  Glenn Kramer, plaintiffs.
17         MR. COWEN:  Robert Cowen, plaintiff.
18         MR. MAGAZINER:  Fred Magaziner for defendant
19 AstraZeneca, Your Honor.
20         MR. MCCONNELL:  Good afternoon, Your Honor,
21 Steven McConnell on behalf of the defendant AstraZeneca.
22         MR. FREEBERRY:  James Freebery on behalf of
23 AstraZeneca.
24         MR. CIOTTI:  Robert Ciotti for AstraZeneca.
25         MS. BALAKHANI:  Liz Balakhani for AstraZeneca.

Page 4

1          THE DEPUTY CLERK:  Counsel on the phone, please
2  state your appearances for the record.
3          MS. CRANFORD:  Ashley Cranford for the
4  plaintiff.
5          MR. BROWN:  This is Orran Brown from the Project
6  Management Office and special master.
7          MS. NIXON:  Angela Nixon, non-counsel for
8  plaintiff.
9          THE COURT:  All right.  Mr. Brown, welcome.
10         MR. BROWN:  Thank you.  Delighted to be here.
11         THE COURT:  We're going to take you up first.
12         Before I get to that, though, I want to remind
13 counsel, particularly those who are not resident in this
14 division, issues of courtesy here in this courthouse.
15         We are in the process of moving.  There are a lot of
16 people coming in and out of the courthouse and we've only
17 got two elevators working, it's crowded, people move
18 things.
19         Regardless of all that, I just want to remind you
20 that as users of the courthouse and members of the Bar,
21 whether it's pro hoc or otherwise, that we expect you to
22 comport yourselves with courtesy and dignity toward
23 everyone that you encounter in the courthouse.
24         It's come to my attention that there were some
25 issues, I believe, this morning or early this afternoon.

Page 5

1  So I hope that's a sufficient message to those of you who
2  were involved, that we do expect better behavior.
3          Let me turn to the first issue, the issue of the
4  Project Management Office special master.
5          Mr. Brown, what can you tell me so far?
6          MR. BROWN:  Your Honor, good afternoon,
7  everyone.  So far, we received the order.  We have been
8  gathering information on our own to obtain all of your
9  case management orders and the existing scheduling orders
10 to try to get up to speed.  And we -- I have been through
11 the existing scheduling orders and CMOs that you have to
12 just see where we are at the stage that we stepped into
13 this.
14         We're ready to start assisting the Court and the
15 parties in any way the parties and the Court would like on
16 scheduling the depositions and the case specific
17 discovery.
18         We have not actually had any contact -- or I haven't
19 had any contact with the parties to date to implement that
20 or get it going.  I sort of got the impression that we
21 were going to kick start that after today's status
22 conference, after we had a chance to talk a little bit
23 more about the scope of the duties that we can provide and
24 the services we can provide to help the Court and the
25 parties move forward on the case specific discovery.

Page 6

1    I do know that there have been some designations made
2   already in case specific discovery underway during the
3   month of August.  We have not been involved in that yet
4   but stand ready to start getting involved as the parties
5   and the Court would like.
6    I want to say generally that we're delighted to be
7   able to help on this.  And as we talk today or move
8   forward, wanted the Court and the parties to know that
9   there's not a single task that we will shy away from.
10    On the other hand, if there -- we don't want to give
11   any impression that we're trying to usurp or take over
12   tasks that are already well covered or the Court and the
13   parties do not need.
14    What we want to do is help to meet the Court's
15   expectations and the parties' expectations and provide as
16   much service as we can to facilitate the progress of this
17   discovery, and welcome the chance to define what it is
18   that we can do and talk some about our role and are ready
19   to get started as soon as we get that in place.
20    THE COURT:  Well, let me tell you what my
21   expectation is, which is that -- it would have been my
22   expectation that you were unnecessary, but that
23   expectation was not fulfilled, and in the course of
24   things, maybe it was unrealistic.
25    You know, in one sense you're a traffic cop and a

Page 7

1   travel agent and in another sense, you've got the
2   authority to direct people to be where they need to be at
3   various times so that this thing can go forward.
4    I will be happy to clarify your authority and to
5   reinforce it in any way that you need it to be done.  It
6   would be my hope that as you get appropriate liaisons from
7   each side, that we'll get into a rhythm and you'll just be
8   there to solve problems as they arise and your role will
9   diminish, but it may take a while to get into that rhythm.
10   Some of that will relate to issues of cost as well.
11    I was sort of hoping the parties would decide that
12   it's easier to do this on their own primarily and just use
13   you when there are things that they can't resolve that you
14   can resolve.
15    Have you filed any kind of a notice of appearance in
16   the case?  I know you've filed a response to my order
17   directing that we get an individual's name.  But you're
18   not on the court's service list, are you?
19    MR. BROWN:  Yes, Your Honor, we are -- I am.
20    THE COURT:  Okay.
21    MR. BROWN:  We joined the electronic service
22   list and we filed our designation of special master and my
23   declaration of disclosure of no conflict.  We -- I am now
24   getting electronically service of each item that's filed
25   in the electronic filing system.

Page 8

1    THE COURT:  All right.  Well, then I'm sure you
2   can figure out which ones of those you can safely
3   ignore --
4    MR. BROWN:  Yes, sir.
5    THE COURT:  -- and which ones you need to deal
6   with.
7    All right.  Let me hear from the parties, then.
8    What are you doing with the August discovery and how
9   do you plan to interact with Mr. Brown to get September
10   and October rolling?
11    MR. ALLEN:  Your Honor, Scott Allen.  Buffy
12   Martinez of the law firm of Laminack, Pirtle and Martinez,
13   who I think has been in this court before, maybe last
14   hearing, is our primary, as you say, traffic cop to
15   contact.  Her telephone number -- I think -- she may have
16   been in contact with the master.  She's with the law firm
17   of Laminack, Pirtle and Martinez in Houston, Texas.  And
18   we'll get the number if the master needs it.
19    She's primarily -- like, I'm leaving today to go to
20   Ohio to take a deposition.  She's telling us where to go.
21   And so she has the best information.  We're already taking
22   depositions.
23    Last week -- someone can correct me if I'm wrong --
24   but we presented, how many plaintiffs?  We presented
25   plaintiffs last week.  We're presenting plaintiffs this

Page 9

1   week, currently right now, I think.  And depositions are
2   taking place in North Carolina, Houston, Ohio and
3   California this week on our behalf.  So we're hard at
4   work, I guess.
5    THE COURT:  Mr. Magaziner?
6    MR. MAGAZINER:  Yes, Your Honor.
7    I'd like to report that depositions of the plaintiffs
8   have gone forward except for two, one of whom I think was
9   in the hospital and another one of whom had a medical
10   emergency while traveling on an airplane, as I recall.
11    Other depositions -- so I think 10 have been taken.
12   There were 15 total.  Two have not yet been taken because
13   of the circumstances I just described and I think there
14   are three others that are scheduled or either taking place
15   now or in the next very short period of time.
16    Our point person is Russell Stewart of the firm
17   Fabian Benson.  We've given his name to plaintiffs'
18   counsel, of course.  I believe that the special master has
19   his contact information, but if not, we can certainly
20   provide it.
21    It had been our hopes that the special master would,
22   after today's hearing, be in contact regularly with Buffy
23   Martinez and with Russell Stewart to make this process
24   flow as smoothly as possible.
25    Our hope -- and I don't know whether the plaintiffs

Page 10

1  joined in this or not -- but our hope was that the PMO
2  would actually schedule the depositions of the doctors and
3  just tell the parties: I've arranged for Dr. Smith to be
4  deposed in Tulsa, Oklahoma on next Monday at 3:00 p.m.
5          THE COURT: Who are you going to have there?
6          MR. MAGAZINER: Yeah. Well -- or we wouldn't
7  even have to know who we have. Just tell us we need to
8  have a lawyer there to take the deposition.
9          THE COURT: Well, yeah. I mean, the special
10  master says you need to have a lawyer. Who is it? I
11  mean, I think the special master needs to have that.
12         MR. MAGAZINER: That's right. So we were hoping
13  that the special master could deal with whatever problems
14  there are with doctors.
15         I know one problem we've encountered so far -- the
16  plaintiffs may have other anecdotes to share -- I know one
17  of the doctors we learned is in India and not coming back
18  for several months.
19         Now, we worked that out with plaintiffs' counsel. We
20  agreed that it made sense under those circumstances to
21  defer that deposition until the doctor returned from
22  India.
23         And there will be other situations like that and we
24  were hoping the PMO would be able to work those situations
25  through.

Page 11

1          We also were hoping that if a doctor refuses to
2  comply with the subpoena, that the PMO would be the one
3  that would go into whatever the appropriate court might be
4  with Your Honor's authority to enforce a subpoena rather
5  than having the parties do it. But that's something that
6  Your Honor may wish to consider.
7          If there needs to be rescheduling, we would think
8  that the PMO would contact the parties and say: Although,
9  we had scheduled Dr. Smith for such and such a date, it
10  now turns out that the doctor has a problem, we'll have to
11  move it by two days. But that would all be done by
12  Mr. Brown.
13         The payment of physician witnesses, we have a
14  proposal which we think makes sense. Many of these
15  physicians are asking to be compensated for their time.
16  Of course, that's a standard request in any situation like
17  this.
18         We thought we should create an escrow account. And
19  given Your Honor's allocation of time at the depositions,
20  that we ought to pay three-fifths of the cost and the
21  plaintiffs ought to pay two-fifths. In other words, each
22  side would fund the escrow account. And if the doctor
23  wants $100, we would pay 60 -- the special master or the
24  PMO would pay out 60 -- would pay out the 100 and would
25  debit the defendant's account by 60 and the plaintiffs'

Page 12

1  account by 40. And that would not have to go through us.
2  It would go through the special master.
3          And as I said, that allocation, 60/40, is based on
4  Your Honor's allocation at the time of deposition in PMO4.
5          And we were hoping the special master would be able
6  to create the master deposition calendar and circulate it
7  to the parties so we all were operating from the same
8  page.
9          As we get into the program, we have designated, as
10  Your Honor knows, cases for September, and we will surely
11  be designating cases for October. We have had a number of
12  problems. We have tried to work through them.
13         We think it would actually be more efficient if the
14  special master had a larger role rather than a smaller.
15  And I think it'll be cheaper for the parties, because
16  otherwise, we're going to be duplicating the special
17  master's efforts, I'm afraid.
18         We think most of these -- if someone with the Court's
19  authority, speaking on behalf of the Court deals with
20  these problems, they'll probably get resolved more easily
21  and quickly than if one of the parties is trying to
22  resolve it.
23         MR. ALLEN: Your Honor, Scott Allen for the
24  plaintiffs.
25         I think I need to respond to some of that. Let me go

Page 13

1  to the first issue on the PMO's authority in whatever
2  court in case motions to quash are filed.
3          I totally agree with -- I totally agree with
4  Mr. Magaziner that if a party files a motion to quash in
5  another district court, that the MDL should have the
6  authority to rule on that, be it through Your Honor, Judge
7  Baker, Judge Conway or the special master. Third parties'
8  motions to quash, as Mr. Magaziner said, should be dealt
9  with by this court. We agree with that.
10         MR. MAGAZINER: Excuse me. That's not what I
11  said, Your Honor. And I don't believe that the law
12  supports that.
13         I said, I think it should be the PMO who would go to
14  the appropriate court in the jurisdiction over the third
15  party.
16         As Your Honor has said many times from the bench, you
17  have lots of friends around the country, other magistrate
18  judges, to whom you might send out word about your desire
19  of how this program proceeds.
20         So I think Your Honor has acknowledged that it is the
21  magistrate judge in the district where the plaintiffs --
22  where the witness resides who has jurisdiction to enforce
23  the subpoena issued out of that district, which is where
24  these subpoenas will be issued. They're not issued from
25  the MDL. They're issued from the district where the third

## Page 14

1  party doctor or otherwise resides.
2      So I think Mr. Allen may have misunderstood what I
3  was saying. I wasn't talking about the MDL court's
4  jurisdiction. I was talking about the PMO being the
5  appropriate person to go to the court to enforce a
6  subpoena that the PMO has issued for a doctor to show up
7  on a particular date.
8      MR. ALLEN: Your Honor, can I finish?
9      It's my understanding, of course, that the PMO acts
10 under the authority of the magistrate. So I disagree that
11 this court should rule on motions to quash of third
12 parties, such as doctors in other jurisdictions.
13     And, in fact, the manual on multi-district
14 litigation -- I know the Court's familiar with that
15 section, 11.424 -- specifically provides that you, as the
16 MDL judge, have the authority to act as a ruling judge on
17 deposition questions in other jurisdictions and you can
18 use your authority to do so.
19     So I agree with Mr. Magaziner: If a third-party
20 doctor files a motion to quash, either the PMO, acting
21 under your authority, or this Court, exercising its
22 inherent authority, should be the authority to handle
23 issues dealing with third party motions to quash and
24 subpoenas or notices. I agree with that.
25     Now, on the issue of fees for the deposition of the

## Page 15

1  doctors, the depositions of the doctors are taken at the
2  request of the defendants. The Court is aware we opposed
3  it. The Court ordered it. We're attending the
4  depositions they notice.
5      I have never known that -- and we will be conducting
6  a cross-examination as directed by the Court. I think you
7  gave us an hour and a half. Once a party proffers a
8  witness, we're entitled to cross-examine. And I do not
9  feel we owe any fees.
10     This issue has not been raised with me, and to my
11 knowledge, with anybody in this courtroom before this
12 hearing, so I'm caught off guard. If you want to direct
13 us to meet and confer on that, I will be glad to do so.
14     But I will tell you it will be our position that
15 we're happy not to do these doctors' depositions. They're
16 the one that want them. They go first on direct, is what
17 they've asked for. They're their witnesses and they
18 should pay them. We oppose it. We never had any notice
19 of that. I'll be glad to meet and confer, however, if the
20 Court wants to.
21     On the issue of the PMO's role, we -- I think I
22 generally agree with what Mr. Magaziner said, although I
23 want the Court to know that Ms. Martinez, who is working
24 for us at the law firm I designated, has extensive
25 experience in handling the scheduling. And I would hope

## Page 16

1  that with the efforts of Ms. Martinez -- and I'm sorry, I
2  forgot the name --
3      MR. MAGAZINER: Mr. Stewart.
4      MR. ALLEN: Mr. Stewart. I hope that we can
5  cooperate without too much intervention of the special
6  master, although we welcome his assistance.
7      The one thing that we want to have clear if there's a
8  doctor, as he said, that's out of the country, obviously
9  if he's out of the country, we're not going to say we have
10 to get that deposition done and you've waived it. We want
11 to be reasonable.
12     We had a client that went to the hospital, couldn't
13 be there for the deposition. We understand that that
14 witness, as soon as he's out of the hospital, when
15 convenient should be done.
16     But we don't want to get into a process, and we want
17 the special master and the Court to know, where we begin
18 rolling out of the designated time periods. This Court at
19 the time Judge Conway and Your Honor entered the orders on
20 case specific discovery, designated three depositions per
21 case per month. If -- generally, that would be 90
22 depositions per month. The Court generally said, we try
23 to avoid Saturdays and Sundays. So I take those out.
24 That's about 22 days a month to perform 90 depositions.
25 The Court can do the math. That's over three depositions

## Page 17

1  a day on average.
2      If we begin rolling over as a matter of custom and
3  habit, we feel that the system will fail. We could easily
4  have over 100 depositions, 200 depositions a month. So we
5  think absent exigent circumstances or special
6  circumstances, the depositions need to be taken in the
7  month designated. Those need to be accomplished. The
8  special master can tell us when to be there. We'll be
9  there.
10     We have hired and we have trained in the last two
11 weeks 30 -- was it 30 -- 30 other lawyers to help us take
12 these depositions. We have prepared for this. We cannot
13 be expected, though, to go beyond the parameters of the
14 Court's order and begin to get down the road taking more
15 than 90 depositions a month.
16     So we'd like the special master and the Court to keep
17 us on schedule, and absent exigent circumstances, a doctor
18 being in India, we need to stay within the parameters of
19 the order.
20     So we agree that the Court has the authority to rule
21 on motions to quash. We ask for the 30 days to be kept,
22 and we oppose the fees, Your Honor. Thank you.
23     MR. GORNICK: May I add just one thing just so
24 it's --
25     THE COURT: No.

Page 18

1    Mr. Brown, you have heard, I hope, what the parties
2  were just saying.  You've got liaisons with both of them.
3  The goal, it sounds like you understand it very well and
4  it's actually consistent with what Mr. Allen just said,
5  which is to keep these depositions rolling and on track
6  subject to exigent circumstances.
7    You've got the authority to keep pushing them so that
8  reasonable decisions are made as to what is exigent, and
9  if a few need to roll out beyond for one reason or
10 another, keeping everything else on track.
11   I will make an order with respect to who's going to
12 have the authority to rule on Rule 45 issues if they
13 arise.  And I'm either going to decide that I do have that
14 authority and direct that it come to me probably after the
15 special master has wielded a large stick, but if you need
16 a court order, I will do that, or in the alternative, I
17 will send out an all points bulletin to my colleagues
18 around the country and let them know that unless they just
19 are dying to get into this, they should send them back to
20 me.  So I think that's where that's going.
21   With respect to the doctors' fees, I am going to
22 direct that the parties meet and confer about that and
23 talk to Mr. Brown.  There are a lot of different ways to
24 look at that particular issue, and it may be subject to
25 change if it turns out that the plaintiffs forego

Page 19

1  cross-examination or it's nominal, that's one thing.  But
2  if they're actually using a lot of time and using those
3  cross-examinations, as I suspect they will with some of
4  the doctors to help develop their case, that's something
5  else.  But I suspect you can talk that through with the
6  help of Mr. Brown.
7    Mr. Brown, I think I would like to direct you to
8  start as you're now ready to do and then make a report at
9  least once a month that you file indicating the status of
10 things and any -- and if there's a problem that needs a
11 ruling in the meantime, you could call that to the Court's
12 attention, but a regular monthly report -- I'm thinking
13 out loud here -- the 15th of the month might be an
14 appropriate time for that, as you look back to what's
15 happened the month before in terms of scheduling for the
16 current month and what's going on for the months ahead.
17 But if the 15th is the wrong date on a monthly basis, we
18 could use a different date.
19   I'm just -- and I think you've already gleaned that
20 my plan is to continue to have status conferences with
21 counsel on all issues and we would be taking up any
22 specific issues that you've raised.
23   How's the 15th sound for you, starting the 15th of
24 September?
25   MR. BROWN:  Your Honor, the 15th is fine and

Page 20

1  that makes a lot of sense, I think, in terms of capturing
2  the previous month by the 15th of the following month is a
3  good schedule.
4    THE COURT:  All right.  If the 15th is on a
5  weekend, make it the following Monday --
6    MR. BROWN:  Yes, sir.
7    THE COURT:  -- as it is in September.
8    All right.  Any other issues with respect to the PMO
9  for now?
10   MR. BROWN:  Your Honor, if I could just ask a
11 question.  I have some detailed questions about the
12 specific tasks that we will be doing and the parties --
13 the types of witnesses that we'll be helping with and will
14 be happy to walk through some of them at this time or if
15 the Court would prefer not taking up the time now, would
16 be happy to deal with Ms. Martinez and Mr. Stewart about
17 them and then come back to the Court only if there is some
18 issue that we cannot flesh out about the scope.
19   THE COURT:  Why don't you go with them first and
20 then let me know what the problems are.  You've got
21 authority to exercise good judgment to cut through
22 unreasonable disagreements.  If you think you need the
23 Court's authority to enforce any of that, then bring it on
24 back to me.
25   Again, it's my hope that -- I think you will be

Page 21

1  having to maintain a master calendar in directing when
2  these things are going to go forward, but as much of the
3  work that you don't have to do because the parties -- this
4  is something that they should be doing on their own, but
5  you'll be the master coordinator with some enforcement
6  powers.
7    MR. BROWN:  Yes, Your Honor.  We can do as much
8  or as little as the parties and the Court would like.
9    And we handle escrow accounts all the time, and would
10 be very adept at handling the fee payment for the
11 witnesses.  One of the questions that I had is to how that
12 would be handled.
13   The Rule 45 issues, obviously very familiar with
14 because I've taken lots of depositions myself and could
15 assist on that as the Court would direct.
16   I can speak with the parties' representatives and
17 walk through my questions about scope of the role, and
18 then get up and running and just get the parties to get us
19 up to speed on the deposition schedule that's already
20 occurred for August and the designations for September,
21 which we have not seen, but we can get up to speed on that
22 very quickly, I think.
23   THE COURT:  All right.
24   MR. MAGAZINER:  Can I ask Mr. Brown whether he
25 needs contact information for Mr. Stewart or does he

Page 22

1 already have it?
2 THE COURT: Have you got Mr. Stewart's
3 information?
4 MR. BROWN: We -- I don't think I have it. We
5 could certainly find it on our own. Though, if
6 Mr. Magaziner has it, I would be delighted to have it.
7 THE COURT: He'll call you right after this
8 hearing is over.
9 MR. BROWN: Okay. That sounds fine.
10 MR. MAGAZINER: Yes, we'll do that.
11 THE COURT: All right. Second item on my agenda
12 is -- I don't know -- I entered an order last night that
13 you may or may not have had a chance to fully peruse that
14 calls for some followup. I suspect the defendant's not
15 happy with some of my rulings and observations.
16 Let me ask plaintiffs' counsel first: Have you had a
17 chance to read that?
18 MR. GORNICK: Your Honor, I have, many of us
19 have, if not all of us. We have actually had an
20 opportunity this morning to discuss it and to come up with
21 some preliminary thoughts, both on the discovery we need
22 to determine the scope and impact of the conduct at issue
23 and the types of sanctions that we think should be on the
24 table. I could walk through those things for you if you'd
25 like.

Page 23

1 THE COURT: Well, things I wanted to address is
2 what prejudice you think there has been that you can
3 demonstrate and the -- frankly, the sanctions that were
4 sought in the various motions I just didn't think were
5 very appropriate to what we're trying to deal with here.
6 They're just separate issues.
7 On the other hand, I think there has been some
8 serious problems that I'd like to find out how that's
9 impacted the defendants and whether we need a further
10 hearing on that or whether you simply want to submit
11 documents.
12 Then we -- at the hearing, we had discussions about
13 things that have been submitted -- discovery that had been
14 provided just prior to the hearing, the sanctions that we
15 really couldn't tell how compliant they were, I'd like to
16 find out the status of that, what communications you've
17 had between the parties about solving those problems and
18 whether we need to convene a technical summit where we get
19 some real technical people in here and I'll sit in there
20 with you if you need to, to make sure that the problems
21 really are solved.
22 MR. MAGAZINER: May I address that, Your Honor,
23 because I have a proposal which I think we will find --
24 the Court will find very constructive, and I hope the
25 plaintiffs will as well.

Page 24

1 We did get the order late last night. We have read
2 it with some care, of course, taking it very seriously. I
3 know that the company has already today launched a from
4 the bottom to the top review of every resource that we're
5 using, whether the resources are insufficient, whether
6 they're the right resources, who is at fault, if you will,
7 for problems that have occurred, looking both at the
8 external lawyers, the in-house people and the vendors.
9 We are, of course, very distressed that Your Honor
10 has found that there has been purposeful sluggishness on
11 our part. From our point of view -- and I know our point
12 of view is not particularly important to the Court -- but
13 from our point of view, our team has worked extremely hard
14 to solve all these problems as quickly as we can and to do
15 things in the future that will avoid more of these
16 technical problems.
17 We are, if you will, trying to make repairs to a car
18 that's going 90 miles an hour. And it's been difficult,
19 but we have been trying our best.
20 As I said, however, it's Your Honor's perception that
21 matters, not our perception of what we have been doing
22 ourselves. And we're very distressed by Your Honor's --
23 that Your Honor believes we have been purposefully
24 sluggish, but we don't want that to continue.
25 We are determined that Your Honor's perception of

Page 25

1 what we are doing will change. And to that end, we would
2 make the following proposal: We would ask that the Court
3 appoint a neutral, independent technical consultant expert
4 who will work day in and day out with us, with our team,
5 with plaintiffs' team, presumably chiefly Mr. Jaffe, who
6 is here in the courtroom again today, day in and day out
7 to make sure whatever problems still remain from the
8 production that we've already made that those problems are
9 resolved satisfactorily so there will be no further issues
10 for the Court.
11 If the technical person we're envisioning says, here
12 is the fix that needs to be done to resolve this problem
13 that still remains from the past production, we intend to
14 implement that fix so there's nothing further to be
15 discussed about have we or have we not done the right
16 thing with the past productions to correct the problems
17 that crept into them over the course of the last many
18 months.
19 And then going forward, we would like that technical
20 person to work with our team and with plaintiffs' team to
21 make sure we are doing the things that the plaintiffs and
22 special master and we think are best. And if the -- I
23 call him the special master, if the technical -- neutral,
24 independent technical expert says, what you're doing now
25 isn't right, I'd like you to do it a different way, we

Page 26

1    will do it a different way that the technical expert tells
2    us to do it.
3        We do not want to be in this Court again where the
4    issue is did we create some technical problem, did we fail
5    in some technical obligation, have we screwed up somehow
6    with regard to this E-discovery, either in the past or in
7    the future. We want it all to be transparent. We want to
8    work closely with a neutral independent expert that Your
9    Honor would appoint and who would be responsible for
10   reporting to you.
11       We would say to the Court that we would allow Your
12   Honor -- we would suggest that Your Honor allocate the
13   fees of that person as Your Honor deems fit, given all the
14   circumstances. But we would like to have that person on
15   board as soon as possible.
16       We haven't gotten to the details in our own minds
17   about how that person would be selected, whether Your
18   Honor would get input from us and input from them,
19   whatever, those are technical details. But we would like
20   to have a neutral independent person onboard to make sure
21   we do all the right fixes for all the -- whatever problems
22   remain from the past and do everything right going
23   forward.
24       And we think if we can do that, these issues could be
25   taken off the table and Your Honor's perception of our

Page 27

1    compliance, we hope, will change and you will understand
2    because the process will be completely transparent, you
3    will understand that we are doing everything humanly
4    possible to comply with the Court's orders and to give to
5    the plaintiffs in the form that they are entitled to get
6    it, the documents that they're entitled to get.
7        MR. GORNICK: Your Honor, this is the first
8    we've heard of this idea about the independent neutral
9    expert. Frankly, it strikes me that it might be helpful.
10   But I think before we had the neutral expert start its
11   work, we need to get to the bottom of some very
12   fundamental issues, because we're still having a lot of
13   problems since the sanction hearing.
14       So we do like the Court's idea of having a tech
15   summit with yourself presiding where AstraZeneca's --
16   persons most knowledgeable from AstraZeneca's vendor and
17   inside the company who know about how the e-mail
18   architecture works, who know about the different servers
19   that the e-mails are on which we could demonstrate, the
20   people who know about really how the databases are
21   structured and how hard it truly is to extract the data,
22   have some kind of a proceeding, whether it's a deposition
23   that you preside over and participate in of the individual
24   witnesses or something else. But we got to get to the
25   bottom of what has happened, the quality control problems,

Page 28

1    what the original collection and preservation protocols
2    were.
3        And once there's transparency on that, so we can
4    really figure out what the issues are, the neutral -- this
5    neutral independent expert, tech expert can be part of
6    that and then we can figure out how to go forward.
7        And if that independent expert was truly independent
8    and paid through the Court and only met with the parties
9    together or with truly technical people, not the lawyers,
10   I think there's something to that. And we need to think
11   about it.
12       And I'm speaking totally for myself, because we've
13   never -- we haven't had a chance to think about this or
14   discuss it. But I think there's something to it that we
15   can work with.
16       One more thing I would add is we got to go fast. We
17   have to go fast. We have deadlines. We have some
18   thoughts on how the conduct that's lead us to this point
19   impacts us and what we should do with respect to certain
20   deadlines. But we will need to move fast.
21       And I'd be happy to go into at this point, Your
22   Honor, the group's thoughts on both the discovery we think
23   we need to assess the total scope of the conduct and how
24   it's impacted us and then the appropriate sanctions.
25       MR. MAGAZINER: Your Honor, we -- First of all,

Page 29

1    we agree that we ought to move very fast. The kind of
2    session that Mr. Gornick was describing in which we try to
3    figure out what problems still remain is exactly the kind
4    of session in which we were hoping an independent neutral
5    would participate or would preside and would report to the
6    Court, if that's appropriate, and would recommend or
7    determine the appropriate fixes for those problems.
8        So rather than saying we ought to have the
9    independent neutral come onboard after we have the
10   session, we say, let's get the independent neutral onboard
11   as promptly as we possibly can. And then maybe the first
12   thing would be a session of the kind that Mr. Gornick
13   described where the independent neutral together with the
14   technical people from both sides would get together and
15   see if we can identify the problems that need to be fixed
16   and then how to fix them. That's exactly what we think
17   should happen.
18       With regard to Your Honor's question about what
19   procedures should there be for the plaintiffs to
20   demonstrate how they've been harmed by the conduct that
21   Your Honor found to be purposefully sluggish or the other
22   conduct that Your Honor dealt with in Your Honor's opinion
23   of last night, we have thought that the hearing on
24   plaintiffs' motion was their opportunity to make their
25   case and if there's been prejudice to them, since they

## Page 30

1  pled in their motion that there was prejudice and claimed
2  there was prejudice, we thought that was their opportunity
3  to prove to the Court whatever prejudice they have
4  suffered.
5      What Your Honor -- as I understand Your Honor's
6  order, you're now saying plaintiffs didn't prove any
7  prejudice when they were given the opportunity to do it,
8  so they're now going to have a second opportunity to prove
9  prejudice. We don't think that's fair.
10     We don't quite understand why they should have a
11 hearing at their request to prove the elements of their
12 claim for sanctions and then having failed to prove it,
13 should be given a second chance yet again to prove it.
14     But whatever Your Honor will rule on that, we just
15 don't see why that --
16     THE COURT: To tell you quite frankly, I think
17 it's in your interest that we do it that way than that I
18 pick a sanction out of the air.
19     MR. MAGAZINER: Well, if Your Honor thinks it's
20 in our interest, we'll probably be very persuaded by Your
21 Honor's view on that.
22     THE COURT: Take me on trust on that one.
23     You know, I -- as I think most of you know, I am not
24 shy about technical issues. I have been involved with
25 court technology since before I was on the bench, but I'm

## Page 31

1  no technical expert. I'm conversant with a lot of the
2  terminology and some of the concepts and a few nuts and
3  bolts. And I'm certainly not afraid about rolling up my
4  sleeves and getting down and dirty on such issues. I have
5  some hesitation in doing so, because it's really easy to
6  step out of the judicial role in doing that.
7      So having appointed a project management office for
8  your calendaring and scheduling, we have now crossed that
9  river in terms of getting some outside help to assist the
10 parties and the Court in moving the case forward. So I'm
11 not necessarily opposed to getting somebody with
12 appropriate expertise. But -- and both of you have
13 acknowledged that if we do that, we need to do it with
14 great dispatch.
15     The -- and I think this was mentioned in somebody's
16 paper in the status report that the concept was mentioned,
17 it may have been the plaintiffs that raised the idea.
18     MR. GORNICK: We had suggested the concept of an
19 independent audit to get to the bottom.
20     THE COURT: Yeah. Well, that would be included.
21 But obviously, the two of you have not talked -- the
22 two sides have not talked about trying to find such a
23 person.
24     And I don't have a closet of technical advisers that
25 I can open and pull one off the shelf. Although, I do

## Page 32

1  know some people who are involved with the Sedona project
2  who may be able to make some suggestions to me.
3      I don't know that they would have somebody on tap
4  either, but they probably could direct us there. Or we
5  can do, as we did with the project management office, and
6  I'll give you a couple of days to confer and see if you
7  can nominate somebody who's acceptable to both of you.
8  And even while you're doing that, I can make my phone
9  calls out to Arizona.
10     MR. MAGAZINER: I think if we had until Tuesday,
11 that would work. The only reason I say until Tuesday
12 instead of a couple of days is because I know for other
13 unrelated things, it's very hard -- and it's August. A
14 lot of people are unreachable right now.
15     MR. ALLEN: Again, Your Honor, on that point, we
16 didn't hear that before today and we'll be glad to talk to
17 them. I think it's implicit in the discussion, though,
18 the plaintiffs should not incur any cost or expense
19 related to this independent expert to get to the bottom of
20 the discovery problems they had. I think part of the --
21     THE COURT: Well, I think that aspect, but the
22 other aspects, parts of it are a two-way street. So --
23     MR. ALLEN: All right. Your Honor, just so that
24 the Court is clear, on the issue of prejudice, I know
25 you're going to consider it, but as the Court said in its

## Page 33

1  opinion, there are 10 million pages of documents that are
2  unaccessible, unsearchable and unusable as contemplated by
3  the rules.
4      And so as we sit here today, and as I know I've
5  stressed at every hearing, we have unaccessible,
6  unsearchable and unusable documents.
7      And so there's no doubt we are prejudiced. And we do
8  have some suggestions, because we have depositions of
9  their corporate witnesses starting in approximately six
10 weeks and I have unusable, unsearchable and unaccessible
11 documents.
12     So I would appreciate, and I know Mr. Gornick is
13 prepared and we met this morning and last night to discuss
14 these issues, if the Court would entertain some of the
15 suggestions today because it impacts upon what we're able
16 to do or not do.
17     THE COURT: Well --
18     MR. MAGAZINER: Your Honor, may I get some
19 water?
20     THE COURT: Sure.
21     If you want to rattle off your list, but here's where
22 I'm contemplating. Namely that if we go forward with this
23 neutral technical adviser, that that person's getting
24 to -- as we've said, get to the bottom of some of these
25 issues, flesh them out and then get you pointed on the

Page 34

1  right track, and then how well that gets implemented.
2  I mean, I heard some very good things from
3  Mr. Magaziner as he politely disagreed with my opinion,
4  but took it to heart, at least it certainly sounded like
5  he was, without necessarily believing all of it,
6  everything I said was true, but he's entitled to that, I
7  mean, that's his role. I don't have any problem with
8  that.
9      The -- my point is that what I ultimately order in
10  terms of either sanctions or remedy or just provisions
11  going forward, will be informed by that. If there's
12  things we need to do more quickly, then we'll do it more
13  quickly.
14      And so I think -- I'll hear what you've got to say,
15  but then we're going to need to have another hearing or
16  submit further briefs or affidavits or just get a report
17  from this neutral adviser. We'll see.
18      MR. ALLEN: Let me say this, Your Honor, it's
19  what I said at the last time: We want the Court involved.
20  What I'm concerned about here with, as Mr. Magaziner
21  proposed last time a special master, I objected to what
22  the Court involved. The Court had not ruled and had
23  written -- issued the order. Everything Mr. Magaziner
24  said about this independent person, we had never heard of.
25  We think it's probably related to the Court's opinion,

Page 35

1  that's when he's taking it to heart.
2      We want the Court involved, Your Honor. We want it.
3  And we don't want this being passed on to somebody else.
4  We want the Court involved.
5      And we really believe that if the special master --
6  you are knowledgeable in these issues of technology, and
7  maybe the special master that they want appointed can be
8  present with you, but we want the Court involved. That's
9  number one.
10      THE COURT: Well, I'm going to -- I'm not giving
11  up any of my authority here.
12      MR. ALLEN: Right.
13      THE COURT: For example, the issue of the
14  searchability of these large databases and extracting the
15  Seroquel data, we had some affidavit or indication or
16  deposition that it would take six months to extract it. I
17  don't believe that, but I don't know that that's not true.
18  It doesn't sound right to me. But that if you -- but, you
19  know, if it's on some ancient software and it requires
20  digging up a machine that's sitting in the back of
21  somebody's shop and, you know, it only runs 12 hours a day
22  because it overheats, you know, or that it's just bad
23  database technology, I can't judge that.
24      MR. ALLEN: Yes, sir. I understand.
25      THE COURT: I can hear experts talk about it and

Page 36

1  decide it. But a technical adviser could if we get the
2  right person.
3      MR. ALLEN: Yes.
4      THE COURT: So issues like that, so that you can
5  get to the bottom of what can be searched and how hard it
6  is and who the burden is on, then I'll enforce it.
7      MR. ALLEN: Yes, sir.
8      THE COURT: So that's what I'm thinking about
9  and I think that's consistent with what Mr. Magaziner
10  said.
11      MR. ALLEN: And we do have since we have -- we
12  have taken the time. I thought I heard the Court say
13  you'd like to listen to what we have.
14      And then I will remind the Court just simply on the
15  issue of prejudice, since nothing will be solved today. I
16  think Mr. Magaziner is saying they're going to get a
17  technical guy, we're going to get to work. But since --
18  when we leave this courtroom today, I'm heading to
19  Cleveland. And I have received from the defendants
20  Friday, five days ago, this index of third party -- of
21  promotional material. This is just the index. And I
22  promise you and I'm prepared to argue, it doesn't comply
23  with the Court's order. There's not a document one.
24      I'm just going to be honest with the Court, I can't
25  even read the index between now and next week much less

Page 37

1  the documents. We have unaccessible, unusable databases
2  and I'm out there taking depositions for databases I can't
3  use.
4      So I think the prejudice is just obvious and I would
5  like Mr. Gornick to go ahead and give us his suggestions
6  on the remedies.
7      MR. GORNICK: Your Honor, in addition to having
8  a problem with those 10 million documents that are
9  produced -- that have been produced, I can report that the
10  fix was delivered on July 20. We have issues with those.
11  They're not working properly. And in large respects --
12  Mr. Jaffe is here. He can explain any details about that
13  if the Court would like.
14      For those 80 custodians, we know we don't have all
15  their documents because the new keyword search hasn't been
16  run yet. We know that AstraZeneca ran a new keyword
17  search for just two of the words, DM and Quetiapine. And
18  we've been told that we have the first traunch of
19  documents they're going to deliver, I think today, is 6400
20  documents.
21      We have a key -- new keyword search, new terms that's
22  dozens of terms long. So we don't know what we don't have
23  yet. Because of the problems we had with the custodial
24  production, we did have to propound extensive requests for
25  production of those documents, we're negotiating

Page 38

1   objections, there's been some production. And there's the
2   database issue. So we don't know what we don't have.
3   We're up against deadlines.
4       So we would ask for a 60-day continuance of the
5   deadlines related to general discovery, not case specific
6   but general. That is, deadlines for us taking the
7   depositions, deadlines for us opposing dispositive
8   motions, deadlines for expert reports, so we can get to
9   the bottom of what's out there, what's coming, and
10  hopefully we can get it all done in 60 days.
11      And really it's a due process issue that we have --
12  what we're entitled to have before we embark on things
13  that are going to impact the litigation in very profound
14  ways, such as the depositions of the corporate people,
15  expert reports and opposing dispositive motions.
16      We were going to suggest today that we have PMK
17  depositions on outstanding technical issues, such as the
18  missing e-mails -- PM, person most -- real person most
19  knowledgeable depositions of people so we could figure out
20  why we don't have the e-mails, why we didn't get e-mails
21  from -- addresses where people clearly had more than one
22  address and we can prove, and I'm ready to prove it today,
23  that people had -- the custodians -- some of the
24  custodians had more than one address, some of them had
25  more than one address on multiple servers. We can't

Page 39

1   figure out why we don't have those things. And as of
2   yesterday, AstraZeneca told us, no, one address per
3   person, we searched it if it existed.
4       We were going to suggest we have PMK depositions,
5   person most knowledgeable depositions on the databases,
6   maybe the combination of the technical expert, special
7   master, combined with the Court's tech summit idea would
8   do away with that necessity. But we need that step to
9   figure out the extent of how we've been put behind the
10  eight-ball, in other words, the extent of our prejudice.
11      We also need to get -- and maybe part of -- maybe
12  just a corollary to the issue I've just suggested, we need
13  the documents that show the protocols for the collection,
14  preservation and production of the data and the related
15  quality control protocols, because that could help us
16  figure out where the collection, preservation and
17  production program went off the ramps.
18      So those are the discovery items we would ask for
19  that go to the order you issued last night. And then we
20  have some suggestions about the types of sanctions that
21  should be on the table.
22      The most obvious type of sanction is monetary
23  sanctions. Frankly, we've never -- we've never had that
24  as a primary goal. I think our track record on this,
25  pulling back motions when we thought we had gotten over

Page 40

1   things, reflects that.
2       But at this point, look at how far behind we are, the
3   fact that we've had to spend huge resources that we
4   shouldn't have had to have spent to manipulate their data,
5   to get their data, to bring these motions. We have
6   expended between the firms a huge amount of time and
7   money.
8       And if we do decide that we want to pursue a monetary
9   sanction, we think it could be a seven-figure number. And
10  I just wanted to lay that out there because it's very
11  significant, the extra unnecessary effort we've had to
12  expend.
13      We think there should be issues sanctions. We, right
14  now, are taking depositions of doctors that the defendants
15  requested. The reason the defendants want those are for
16  learned intermediary.
17      We think that for each case where a doctor deposition
18  proceeds before AstraZeneca has finished producing
19  documents to us, the learned intermediary affirmative
20  defense should be struck, because we are not in a fair
21  position to take those depositions, because we don't have
22  a vast amount of information that could be and probably is
23  relevant to disproving or undermining the learned
24  intermediary defense in those individual cases.
25      We think that the preemption affirmative defense

Page 41

1   should be stricken, because we're in a position we should
2   not be in. If we have to oppose learned intermediaries,
3   summary judgment motions, and we are in a position of
4   opposing a preemption summary judgment motion right now,
5   it might be a 12B6 motion, before we've had the
6   opportunity to take the relevant discovery on those
7   issues, our due process rights have been violated.
8       So we don't want to ask for the case specific
9   discovery program to be derailed. Our group is geared up.
10  We're ready to go. But at the same time, we can't stand
11  by and without doing anything allow our clients' due
12  process rights to be violated. So we would ask for
13  that -- those issue sanctions to be imposed.
14      Because of the way the custodial production was
15  characterized at the outset, we thought we were going to
16  get pretty much everything with only the necessity of some
17  rifle shot requests for production to fill in the gaps,
18  and because we thought we were going to get stuff rolled
19  out on a somewhat continuous basis as opposed to
20  back-loaded. Both of those things turned out not to be
21  true. And so we've had to do extensive requests for
22  production.
23      We don't have responses -- actually -- well,
24  documents produced in response to a lot of those. We
25  think an appropriate sanction, because it's related, is

Page 42

1  that the defendant's objections to those requests for
2  production should be stricken and they should be ordered
3  to produce the documents within 30 days.
4      Same thing with the databases. We're so far behind
5  right now. We think the Court -- and I take your comments
6  about wanting to hear at least about the technical
7  limitations, we think Court should order production of
8  those databases. Strike any objection --
9      THE COURT: I'm not sure you want them, at least
10 not all of them.
11     MR. GORNICK: You know, actually, we talked
12 about that. I understand what you're saying. And I
13 understand beware of what you ask for, you might get it.
14 But we would expect if they were to produce them, they
15 would produce them in a usable format and we would have
16 access to technical people that can answer our questions.
17 And we actually -- we do think we would like that. And I
18 understand --
19     THE COURT: Maybe for some of it but not some of
20 the others.
21     MR. GORNICK: So those are -- those are the
22 proposed sanctions that we have that we think should be on
23 the table: The monetary, the issue sanctions, the strike
24 all objections to the outstanding requests for production
25 and to strike the objections to production of the

Page 43

1  databases.
2      We do think we need to do some discovery to get to
3  the bottom of the scope of the hole we've been put in.
4  Because we're in this hole, would like a continuance of
5  deadlines that we're pushing up against. Otherwise,
6  AstraZeneca is rewarded for delaying. And if we have to
7  live with the current deadlines starting depositions in
8  six weeks of critical corporate people, we will be --
9      THE COURT: I'm going to hear everything that
10 you request and defendant will have a chance to respond to
11 all that. I'm not going to rule on any of those today. I
12 will take up with Judge Conway issues about scheduling. I
13 might add that she's senior request for oral argument on
14 the substantive motions and she'll decide those on a
15 motion-by-motion basis, depending on her view as to
16 whether it would be useful. So you'll hear from her on
17 that.
18     All of the other issues, I think to a greater or
19 lesser degree, will be informed by the analysis from this
20 neutral technical adviser.
21     I don't want this issue of sanctions and discovery
22 responses to become any more of a mini litigation than it
23 already has. It's unfortunate. It shouldn't have
24 occurred. We shouldn't have had these problems. We've
25 had them. We're going to deal with them. But I want to

Page 44

1  try to keep it within bounds and not let that become the
2  focus of this case rather than the legal/medical issues.
3  And that's a point I maybe buried in my opinion.
4      But I really want to emphasize to both sides -- and I
5  thought I did this last September and in November and in
6  December -- this case is hard enough. It's important
7  enough to both sides. There are, what I see, as issues at
8  the cutting edge of medical science in terms of the
9  research and development that was done by the defendant in
10 the creation of this drug and its marketing and the
11 doctors that have prescribed it and the plaintiffs that
12 have used it and what effects they've had. Figuring that
13 out is hard. That's hard work. That's hard medical work,
14 hard legal work. Figuring out how this fits into our
15 legal framework of torts is hard.
16     The fact that we're dealing with 6500 plaintiffs here
17 and some thousands more in the state courts, trying to
18 coordinate all that, that's hard work. That's hard legal
19 work, it's hard logistical work. Some of those require
20 the very finest application of legal expertise and medical
21 expertise in the context of our adversarial system.
22     But the issues that we've been dealing with on this
23 discovery shouldn't have been a part of that. That should
24 have a cooperative transparent part of this from the very
25 beginning to -- not to give up on what's relevant or not

Page 45

1  relevant and what's privileged and not privileged, but to
2  figure out what there is and how to get at it. It should
3  not have been this hard. So we're going to solve all
4  those problems and keep the case moving.
5      But if you really could make the effort to figure out
6  which things you need to be adversarial about and which
7  things you need to be cooperative about, that's what I'm
8  driving at here.
9      All right. I will direct that the parties talk and
10 see if you can nominate somebody by Tuesday. In the
11 meantime, I will make a call out to my contact in Arizona
12 to see if he has any suggestions about somebody. It may
13 well be that this person -- doesn't have to be a lawyer
14 but it may well be a lawyer technician.
15     I certainly know of some that I've heard give talks
16 at various Bar things and technical seminars who talk a
17 good game. Whether, you know, I've looked at all their
18 credentials and things, but I certainly have heard some
19 over the years who seem like they know what they're doing
20 and could help here.
21     That person will get to the bottom of this, I hope,
22 without having to do a formal round of discovery about
23 discovery. We'll get that presentation. I will -- we'll
24 have another conference, probably with the technical
25 adviser here and technical representatives that -- it

Page 46

1  won't be the summit that I was talking about, but it will
2  be an opportunity to get to the bottom of that. And then,
3  I think we'll have focused -- you'll have a better idea of
4  more precisely describing what you think has happened to
5  you. And AstraZeneca will certainly have a chance to
6  respond to that and contest it and I'll make a decision.
7      MR. GORNICK: Your Honor, may I point out, there
8  are a number of issues that aren't really for technical
9  adviser. There are just broad swaths of data we just
10  still don't have. And it's not a -- and, I mean, we
11  still --
12      THE COURT: Well, the technical person can help
13  you figure out why you haven't gotten them and how hard it
14  is to get them. And then I'll make orders as we need to
15  on a motion to compel or otherwise.
16      So I think that will get swept into that, at least we
17  will be better informed.
18      All right. Move on then to my third issue from your
19  submissions, this motion to file under seal.
20      Who was it that wants to file that material and why?
21      MR. MAGAZINER: We have already provided in
22  camera to Your Honor for in camera review the documents in
23  question.
24      THE COURT: Yeah, I've looked at it.
25      MR. MAGAZINER: The plaintiffs have said at a

Page 47

1  previous conference that they intend to file a motion to
2  compel us to produce to them in unredacted form the
3  documents that we produced to them in redacted form.
4      We said, if you want to file the motion, file the
5  motion. But we would like the motion at our opposition to
6  be filed under seal, so Your Honor could then take the
7  motion to compel and rule on it, but the motion will be
8  filed under seal.
9      If Your Honor rules on the merits of the motion that
10  we need to produce the documents to plaintiffs in
11  unredacted form, that will Your Honor's ruling.
12      THE COURT: Take me back a second.
13      MR. MAGAZINER: Okay. Let me start again.
14      THE COURT: You submitted to me a pack of
15  material about this thick.
16      MR. MAGAZINER: Let me -- yeah.
17      THE COURT: Now, has that material been provided
18  to the plaintiffs in redacted form or have they seen
19  everything?
20      MR. MAGAZINER: May I start again.
21      As we went through our collection process, we came
22  across these documents. We redacted the salacious
23  material from the documents and produced it to
24  plaintiffs in redacted form. And then we said to
25  plaintiffs, the reason for these redactions is not

Page 48

1  attorney/client privilege or trade secret or proprietary
2  confidential business information. This material we
3  believe is salacious and really has no part -- or no
4  proper role in this litigation.
5      But plaintiffs, we said, come into our office, we
6  will give you the documents in unredacted form so you can
7  go through the unredacted documents and can confirm our
8  characterization of the material that we've redacted.
9      But we said, we're not going to allow you to copy it,
10  but you can review it all to confirm the nature of the
11  material we've redacted. We're happy for you to see it
12  for that purpose.
13      They came to the office, they saw it. They said to
14  us, we think you need to provide this to us in unredacted
15  form and we're going to file a motion seeking the court
16  order that we get the documents from you in unredacted
17  form with all the salacious material in it rather than in
18  the redacted form.
19      We then filed a motion saying we would like to
20  file -- them to file their motion to compel under seal and
21  we will file our opposition under seal, then Your Honor
22  will rule.
23      And if Your Honor rules that we have to give them the
24  material in unredacted form, we would do so. If Your
25  Honor rules we don't, then we won't. We hope that on the

Page 49

1  merits of the motion, you will rule in our favor, but the
2  motion to seal, I believe, is unopposed. The plaintiffs
3  have not opposed the idea that their motion to compel will
4  be filed under seal and our opposition would be filed
5  under seal. What we provided to the Court --
6      THE COURT: I don't understand why the motion to
7  compel and the response need to contain any of this
8  material in anything more than a reference to the fact
9  that it's salacious.
10      MR. MAGAZINER: Well, that's fine as long as --
11      THE COURT: There's an old case that --
12      MR. MAGAZINER: The lawyer versus --
13      THE COURT: -- refers to something that says,
14  further description of which need not sully the pages of
15  the Southern Report.
16      MR. MAGAZINER: Well, if we could do it that
17  way --
18      THE COURT: That material is in that category.
19      MR. MAGAZINER: If we can do it, that's fine.
20  As a matter of fact, since Your Honor now has the
21  materials in your chambers, you will know very well what
22  it is we're referring to. The plaintiffs can tell why
23  they think we should be required to give them these
24  materials in unredacted form. They've seen them, they
25  know what they say, we can respond --

Page 50

1    THE COURT: It's presumptively discoverable.
2    Whether it's relevant to anything or not, I have some
3    doubts about, but I haven't heard the plaintiffs'
4    arguments on that.
5         MR. MAGAZINER: But to be clear on our point and
6    on our position, we're not trying to prevent the
7    plaintiffs from learning. In fact they already have
8    learned that the individual in question -- the custodian,
9    if you will, in question was involved in inappropriate
10   relationships with some other people. There's no question
11   about that and that's clear from the redacted version that
12   we've given the plaintiffs.
13        So what may be relevant, we can argue about whether
14   it is or isn't, but at least there's an argument that it
15   could be relevant, is to say that this particular
16   individual from the company, who's since been fired
17   because of this, you know, that this particular
18   individual -- I misspoke. He was allowed to resign. But
19   this particular individual -- it may be relevant that this
20   particular individual was involved in a very personal
21   relationship with someone else. The exact details of that
22   relationship is a highly salacious material of which we
23   think we should not provide to them and that there's no
24   proper purpose that they can make of those materials.
25   They can depose the individual from the company who used

Page 51

1    to be with AstraZeneca and can ask him about these
2    relationships. They can, if they wish to do this, they
3    have the names of the other people, they could do
4    something, like, subpoena those other people. I don't
5    know why they'd want to but they could. So they know
6    the -- about the relationships and they know the nature of
7    the relationships. All we're trying to prevent is giving
8    them the highly salacious material. If you've reviewed
9    it, you know what I'm talking about. It's highly
10   salacious.
11        And the exact details of how this relationship was --
12   or the attributes of the relationship were not really, is
13   our view, relevant to anything. The fact of the
14   relationship might be, the mechanics may not.
15        MR. ALLEN: I don't know where to begin on the
16   response, but let me say these things briefly, Your Honor.
17   You're right. It's presumptively discoverable. And
18   I didn't know we were going to get this detailed. And I
19   want to be clear, this was Wayne McFadden. If I misspeak,
20   feel free to correct me. It's Wayne McFadden. The United
21   States medical --
22        THE COURT: Medical director, I understand his
23   role.
24        MR. ALLEN: Okay. But I want to make sure this
25   wasn't some person and he was having --

Page 52

1    THE COURT: I understand.
2    MR. ALLEN: -- with an outside third-party
3    vendor during clinical studies.
4    THE COURT: I understand. I understand the
5    potential relevance that you're --
6    MR. ALLEN: Right. Right. Exactly.
7    THE COURT: -- you're going to argue that it
8    calls into question the whole --
9    MR. ALLEN: Right.
10   THE COURT: -- series of tests and protocol and
11   everything --
12   MR. ALLEN: Exactly. And I'll make that
13   argument. But it's not my fault the relationship was bad.
14   And there's is no --
15   THE COURT: I understand.
16   MR. ALLEN: So --
17   THE COURT: The other thing, it's not just that
18   it was bad, it's that he detailed it in e-mails on company
19   server.
20   MR. ALLEN: Exactly. It's attention to detail
21   at the very least. But we should not be required under
22   the local rules, at least as I understand the local
23   rules -- we looked them up to file these under seal.
24   Now, that being said, you know --
25   THE COURT: Well, you don't have the unredacted

Page 53

1    material --
2    MR. ALLEN: Right. Here's --
3    THE COURT: -- so you've got nothing to file.
4    It seems to me if you've got a motion to compel, you can
5    file that without -- in fact, you would have to file it
6    without the unredacted material.
7    MR. ALLEN: You've hit the nail on the head one
8    more time, Your Honor. The only thing I would say about
9    that, it is difficult -- well not impossible -- Mr. Tom
10   Pirtle, who's in depositions right now, is the one who
11   looked at that along with his paralegal.
12        But it is difficult for me to file a motion on those
13   documents without having them in my possession.
14   THE COURT: Oh, no. No. No.
15   MR. ALLEN: Okay. So you don't think --
16   THE COURT: That's not a problem at all.
17   MR. ALLEN: Okay. Well, then, if you're
18   comfortable, then we'll file the motion. We just think
19   the local rules don't require sealing.
20   THE COURT: You know, this is a four-page motion
21   that --
22   MR. ALLEN: Okay.
23   THE COURT: -- you don't need to do anything
24   more than describe that the material that you've seen and
25   haven't produced officially --

Page 54

1   MR. ALLEN: Right.
2   THE COURT: -- contained salacious material with
3   details about the relationship. That's all you need to
4   say.
5   MR. ALLEN: Okay.
6   THE COURT: You can respond to that without
7   getting into any more detail than that.
8   MR. MAGAZINER: That's fine, Your Honor.
9   MR. ALLEN: That's fine with us. And we do --
10  THE COURT: It's a little bit euphemistic, but
11  we know what we're talking about.
12  MR. ALLEN: Right.
13  MR. MAGAZINER: Well, Your Honor, the important
14  thing is --
15  THE COURT: I would have known that without
16  seeing this material, which frankly I'd have preferred not
17  to see it.
18  MR. MAGAZINER: Well, the important thing is
19  Your Honor knows exactly what we're talking about. So --
20  THE COURT: And I've not seen it.
21  MR. MAGAZINER: -- neither party needs to
22  describe it in a motion or opposition.
23  MR. ALLEN: Well, I won't describe it except to
24  say that I have to file a motion and I can't be -- he's
25  trying to tell me what I can say in a motion. I mean, if

Page 55

1   you think I said something wrong in a motion, I'm sure
2   you'll let me know.
3   THE COURT: Well, I'm just saying you don't need
4   to provide any of the details.
5   MR. ALLEN: I won't, Your Honor. I will in
6   questioning of the witness.
7   THE COURT: I can rule on the issue of
8   discoverability without that.
9   MR. ALLEN: Yes, sir. All right.
10  THE COURT: All right. Motion for protective
11  order on foreign discovery.
12  First issue is Attorney Pearson. What's going on
13  with Attorney Pearson?
14  MR. ALLEN: I don't know. She's a lawyer in
15  Houston that was supposed to be on the phone that's not on
16  the phone.
17  MR. MAGAZINER: In Minneapolis, Minnesota.
18  THE COURT: She may be dodging the flood waters,
19  you know.
20  MR. MAGAZINER: She's the one that we described
21  in the motion.
22  MS. PEARSON: Excuse me. Can you folks hear me?
23  This is Gail Pearson from Minneapolis, Minnesota.
24  THE COURT: All right. Ms. Pearson, are you
25  part of this case?

Page 56

1   MS. PEARSON: Well, actually, this is the first
2   I heard that my name would even come up in this court.
3   I have a case in Minnesota that involves a clinical
4   trial that my client died during and we have sued out that
5   case against an IRB, the University of Minnesota and the
6   physicians that were the principal investigator and
7   treating physicians for this individual and AstraZeneca.
8   So this is a state court case. And quite frankly,
9   I'm, you know, completely cut aback. I didn't realize my
10  name would even come up here or if there was -- I didn't
11  realize there was any issues regarding myself and
12  Seroquel.
13  We also separately are serving as local counsel for
14  cases in the MDL -- in the Seroquel MDL. So I don't know,
15  you know, in a tangential issue we're certainly
16  involved in the Seroquel MDL, but we also have a state
17  court case going in Minnesota. So I don't know what the
18  issue regarding Attorney Pearson would be. This a first
19  I've heard of it.
20  THE COURT: It's been represented to the Court
21  that you have asserted that you're not bound by the
22  confidentiality agreement that was negotiated by the
23  parties in this case with respect to any discovery
24  provided in this case.
25  MS. PEARSON: I represented to which court?

Page 57

1   THE COURT: No, not that you represented --
2   well, that you asserted to -- I don't know who, I suppose
3   defense counsel, that you're not bound by the
4   confidentiality agreement that's been governing this case,
5   the MDL case.
6   MS. PEARSON: I have never signed a
7   confidentiality in the MDL case. I have, however, signed
8   a confidentiality agreement with regard to documents that
9   are being produced to me from AstraZeneca which would
10  cover documents that, for instance, would cover the
11  30(b)(6) depositions. And so I have entered into a
12  confidentiality agreement with the defendants regarding
13  that case.
14  Early on, the defendants presented to me what I
15  understood was a confidentiality agreement that was
16  produced in the MDL with regard to the case that I'm
17  working on in Minnesota. That confidentiality agreement
18  required that any documents produced by any parties in the
19  case be treated as confidential.
20  And in our case we're dealing with documents produced
21  by the University of Minnesota, the University of
22  Minnesota IRB, they produced documents to me. And I've
23  told our local counsel and AstraZeneca's counsel that in
24  our Minnesota case, I don't think it's appropriate that
25  there are restrictions on documents that are placed by

Page 58

1   AstraZeneca on any documents that are produced in this
2   case.  So that was a bone of contention in our Minnesota
3   case.
4       I have also told them I've never signed a
5   confidentiality agreement in the MDL, which I have not.
6   So -- but with regard to the confidentiality agreement
7   that I have entered into and documents I've received, some
8   of those have been produced in the MDL.
9       I have agreed to sign a confidentiality agreement,
10  but does not -- I do not agree to have AstraZeneca
11  restrict my ability to have documents publicly available
12  that I get, for instance, from the University of
13  Minnesota.
14      And so those have been our issues of disagreement
15  between, you know, us up here in Minnesota.  And quite
16  frankly, this is the first I've ever heard of this being
17  brought to this Court's attention.
18      THE COURT:  Well, there may be some
19  misunderstanding and failures to communicate on this
20  subject as well.
21      MS. PEARSON:  It sounds like it.
22      THE COURT:  My position is that all of the
23  plaintiffs who are subject to the MDL are -- with respect
24  to documents produced in MDL, this has nothing to do with
25  your Minnesota litigation as far as I'm concerned --

Page 59

1       MS. PEARSON:  Correct.
2       THE COURT:  -- even though, obviously, some of
3   the documents will be the same, but they're coming under
4   different auspices.  With respect to anything that's
5   discovery from the MDL, all of the plaintiffs are subject
6   to the agreement they made with AstraZeneca, whether
7   they're lead counsel or liaison counsel or just sitting
8   back and waiting for things to develop.
9       So, with respect to any discovery that's through the
10  auspices of the MDL, you're covered whether you signed
11  anything or not.
12      With respect to your Minnesota issues, I don't have
13  any authority over anything you get out of the University
14  of Minnesota or don't know what your issues are with them
15  or if you get issues under multiple auspices, then, you
16  can use them for one purpose in one case and for another
17  purpose in another case, I suppose.  And, of course,
18  there's --
19      MS. PEARSON:  Right.  And my issues with the
20  AstraZeneca national counsel was the restriction on the
21  MDL confidentiality order that says we -- you know, any
22  document produced by any party in this case, and they
23  would be specifically referring to my Minnesota State case
24  then, would be treated as confidential.  And I said, no, I
25  don't believe that my involvement in this Minnesota case

Page 60

1   is governed by an MDL confidentiality agreement.
2       That does not mean that I don't respect
3   confidentiality agreements or court orders but this --
4   this case I treat separately as from the MDL case.  So I
5   felt it was appropriate that we had different
6   confidentiality orders.
7       If I'm bound by a confidentiality agreement in the
8   MDL Seroquel litigation, this, quite frankly, would be the
9   first I understood it to be so.  But it would still be my
10  position that that agreement does not govern our state
11  court case.
12      And that was very much my strong position with regard
13  to my representations to AstraZeneca's national counsel.
14      THE COURT:  Well, I'm not sure there's any
15  disagreement.  I mean, I think you are governed by it but
16  only with respect to the materials that you get through
17  the auspices of the MDL.
18      MS. PEARSON:  And I have not received any
19  documents from the MDL up to this point.  I have received
20  documents from AstraZeneca's national counsel that have
21  been produced in the MDL and those -- with respect to
22  those documents, there is a confidentiality agreement that
23  both parties have entered into.
24      We have yet to come to an agreement on a broad -- a
25  blanket confidentiality agreement in our Minnesota State

Page 61

1   case.  And that issue is still being discussed.  But it
2   was my position that anything that was going on in the MDL
3   is not relevant to my Minnesota case with regard to a
4   confidentiality agreement.
5       I'm certainly willing to be told otherwise by this
6   Court.  I don't mean to disrespect this Court at all, but
7   this was -- what initially I was told about the
8   confidentiality agreement in the MDL, that was the first
9   I'd heard of it from AstraZeneca.  And when they gave me a
10  copy of what was agreed to in the MDL, I immediately
11  focused on the restriction of any documents produced by
12  any parties are to be treated as confidential.  And I
13  objected to that portion of the agreement completely with
14  national counsel.
15      MR. MAGAZINER:  Your Honor, I'm at a remarkable
16  disadvantage here because I don't know all the going back
17  and forth between Ms. Pearson and counsel from AstraZeneca
18  who's been dealing with her.
19      MS. PEARSON:  And I can't hear what the
20  gentleman said.  And, quite frankly, this is -- you know,
21  the fact that my name was even brought up is completely
22  news to me.  I was not aware this was going to be brought
23  up at this hearing.
24      MR. MAGAZINER:  I'll repeat it so Ms. Pearson
25  can hear it.  I was saying --

Page 62

1    MS. PEARSON: Thank you.
2    MR. MAGAZINER: -- that I'm at a disadvantage
3  because I was not involved in any of the colloquy between
4  Ms. Pearson and counsel for AstraZeneca. So I can't
5  really speak to what was said.
6    But what Ms. Pearson just said a moment ago I think
7  is a most significant part, Your Honor. She is taking the
8  position, as I understand it, and I say is taking it, I
9  mean in this court, that she doesn't agree with some of
10  the provisions of the confidentiality agreement that
11  governs counsel who represent plaintiffs in the MDL.
12    Your Honor has made it clear, I think, that you
13  regard her and all other plaintiffs' counsel representing
14  plaintiffs in the MDL to be bound for purposes of their
15  MDL litigation by that agreement. And, of course, that
16  would be our understanding as well. We cited
17  Ms. Pearson's position in our papers as one example of --
18    THE COURT: All right. Ms. Pearson, just so you
19  understand, this is a little bit of a side issue having to
20  deal with trying to get documents out of the European
21  Union --
22    MS. PEARSON: Okay.
23    THE COURT: -- AstraZeneca. So that's why your
24  name came up. And they raised your position -- and,
25  again, there may have been a little bit of a

Page 63

1  misunderstanding, is one of the reasons why they needed
2  further order from this court.
3    And it sounds to me like we've, in a sense, mooted
4  that issue, but we still have -- I still have to deal with
5  counsel here about the European Union issues.
6    MS. PEARSON: And I don't -- if my name appeared
7  in papers by AstraZeneca, I would have asked that I would
8  have been served those papers, because this is really the
9  first I've even heard of my -- you know, I'm kind of
10  surprised it was even brought up.
11    So if my name appeared in papers, I was never served
12  a copy of those papers so that I could respond.
13    MR. MAGAZINER: As Your Honor knows, we were not
14  asking for any relief against Ms. Pearson or any order.
15    THE COURT: That's right.
16    MR. MAGAZINER: So -- but in any event, if I may
17  move on to the more general subject, Your Honor. I think
18  there are -- Ms. Pearson in an example of one of our
19  issues and the other is a foreign document issue. And
20  I'll address them separately, if I may.
21    We -- I believe that the plaintiffs may misunderstand
22  our position with regard to the foreign documents. Some
23  of the case that they cite deal with issues that are quite
24  different from the issues we've raised with regard to the
25  foreign documents.

Page 64

1    We are not trying to withhold documents from
2  plaintiffs. We are saying in order that we not violate
3  the law in Sweden and the law in the United Kingdom, we
4  need to have the Court, if it is inclined, to enter an
5  order that will then protect the company and that can be
6  shown to regulators or judicial officials in those
7  countries. If the question comes up whether we had the
8  right to go into an individual's computer and extract what
9  in the EU is called personal data, which is a very broad
10  category in the EU, and in Sweden and in the U.K. in
11  particular, to extract that data and provide it to
12  plaintiffs.
13    If Your Honor grants our motion and enters the order,
14  we will then extract that data, collect it, process it and
15  give it to plaintiffs just as if it were data from
16  AstraZeneca in the United States. We're not trying to
17  withhold it. We're just saying, if we can have a
18  protective order --
19    THE COURT: That's what I understood your
20  submission to be.
21    MR. MAGAZINER: Yes, sir.
22    THE COURT: It just -- I haven't -- I haven't
23  had any international discovery problems recently. And
24  I'm slightly dumb-founded, if I'm reading the affidavit
25  from your Swedish expert correctly, I don't know how they

Page 65

1  conduct any litigation at all. I know they've got a
2  different method, different systems, but if his worries
3  about how broadly things are construed is accurate, it
4  seems to me everything grinds to a stand-still.
5    MR. MAGAZINER: Well, Your Honor, actually, I
6  have been involved in this before, and --
7    MR. ALLEN: I have, too.
8    MR. MAGAZINER: I know -- Mr. Pennock is not
9  here. Mr. Allen was involved in Baycol where there was a
10  similar situation, Bayer AG was a German company and we
11  had to go through the whole same situation. And the Court
12  entered an order that allowed Bayer AG then to collect
13  e-mails from the computers of the Bayer AG personnel. The
14  law in Germany was just the same as in Sweden -- well, to
15  my unsophisticated ears, it sounded like it was just the
16  same as in Sweden.
17    Once Judge Davis in the Baycol MDL entered the order,
18  then Bayer was able to turn over all those documents to
19  plaintiffs. But without the order, they would not have
20  been allowed to because it would have been a violation of
21  German criminal law.
22    And Your Honor says, what happens to litigation in
23  those countries? As I understand it, discovery of the
24  type that we engage in routinely in the United States is
25  almost unheard of in those countries. For example --

Page 66

1    THE COURT: I do understand that. That's been
2  true for a long time.
3    MR. MAGAZINER: So litigation doesn't grind to a
4  halt. It's just a completely different system that
5  doesn't require in litigation in Sweden that e-mails be
6  turned over, that personal --
7    THE COURT: But at some point you come -- you've
8  got to prove your case.
9    MR. ALLEN: It's kind of like what's been going
10  on here for six months.
11    THE COURT: Let's not rehash that ground. We've
12  moved on to different field.
13    MR. ALLEN: All right.
14    MR. MAGAZINER: So that's the new issue. Now,
15  the only -- the plaintiffs say that we want to redact
16  large portions of the documents and they think that we
17  said we want --
18    THE COURT: No. No. I think you wanted to get
19  something more than a fig leaf to be able to -- I don't
20  know how realistic the prospect is, but in case somebody
21  really comes after you. I mean, I have heard of such
22  situations. And -- but the trouble is -- I've heard of
23  situations where it causes things to bog down for years
24  trying to do that. Now, that's where somebody's trying to
25  get it from a third party. These are your own records.

Page 67

1    MR. MAGAZINER: Well, Your Honor, the --
2    THE COURT: Why isn't it sufficient just to say
3  that the records will be used only for this litigation and
4  they're necessary -- reasonably necessary for the
5  prosecution of these cases?
6    MR. MAGAZINER: Well, that's in effect what the
7  order says.
8    THE COURT: But it takes 20 pages to do.
9    MR. MAGAZINER: Well, the order is -- it has
10  procedures and processes and it is identical -- virtually
11  identical to the Zyprexa order and very similar to many
12  other orders in mass torts. And we cited a lot of law and
13  how courts, including this circuit, have commended
14  district courts for entering such orders and saying, these
15  things are appropriate in order to allow litigation to go
16  forward.
17    Now, Your Honor, the problem we have with Ms. Pearson
18  is just maybe not the right example, is because we have --
19  do not have an order that we can show to lawyers and
20  lawyers who -- if someone files a Seroquel case tomorrow,
21  plaintiff, that lawyer will not know automatically that he
22  or she is bound by any confidentiality agreement because
23  if one searches the Seroquel docket, there is no order
24  there, the way there is in most MDLs of this nature which
25  provide for confidentiality and for the procedures to

Page 68

1  challenge confidentiality, et cetera.
2    The substance of what we are asking the Court to
3  enter by way of order is no different than what we were --
4  agreed to way back in September before I was involved but,
5  Your Honor, of course, will remember.
6    What we're now forced to do, for example, with
7  someone like Ms. Pearson, a lawyer who was not present at
8  the time and say, well, if you read what we submitted and
9  you read Judge Baker's colloquy from the bench with
10  counsel for the parties, you will see that Judge Baker
11  believes that what we submitted constitutes an agreement
12  which binds absent plaintiffs' counsel to the same
13  confidentiality restrictions and -- as those who signed
14  the joint submission that was given to you back in
15  September.
16    But it's far clearer and easier for there to be an
17  order on the docket that someone can look at and learn
18  what their obligations are.
19    MR. ALLEN: Can I -- I'm a little lost, to be
20  honest. It seems like there's two separate issues and
21  we're putting them into one, unless I'm confused.
22    But it looks like there's a, for lack of a better
23  word -- sorry, Ms. Pearson -- the Gail Pearson issue and
24  then there's the European issue or am I wrong, Your Honor?
25    THE COURT: No. No. They're separate, but

Page 69

1  they're related.
2    MR. ALLEN: Okay.
3    THE COURT: And here's what I'm planning to
4  do --
5    MR. ALLEN: Okay.
6    THE COURT: -- but I'll let you respond before
7  I --
8    MR. ALLEN: You can tell me and maybe I'll agree
9  with you and then I won't need to respond.
10    THE COURT: I will enter an order that will
11  clarify, as Mr. Magaziner suggests, on the docket that --
12  what I just said to Ms. Pearson, mainly that all the
13  plaintiffs, all the lawyer -- everybody is subject to that
14  confidentiality agreement with respect to anything that is
15  produced under the auspices of this MDL.
16    I will enter some sort of -- some form of order with
17  respect to provide comfort -- aid and comfort to
18  AstraZeneca so they can produce this foreign discovery. I
19  may end up entering the one they've got or some form of
20  it, but I'm going to see if I can't butcher it first.
21    MR. ALLEN: Can I now respond?
22    THE COURT: Yes.
23    MS. PEARSON: And, Your Honor, this Gail
24  Pearson, I just -- again, I'm trying to kind of put
25  together where my role is here. I just want to clarify.

Page 70

1      If, for instance, I was doing discovery and being
2   involved with the discovery in the MDL -- the Seroquel
3   MDL, I -- you know, I would be bound by the
4   confidentiality order that Your Honor has entered. But
5   with regard to my case in Minnesota, I have the right, I
6   understand it, under Minnesota law to negotiate a
7   confidentiality order with regard to the documents that
8   AstraZeneca produces to me in this case.
9      And as I said, I've already agreed to the
10   confidentiality order regarding -- with regard to the
11   30(b)(6) depositions.
12      But I understand Your Honor is saying that with
13   regard to my case up here, the issues are different, by
14   the way, than -- not entirely but somewhat different, with
15   regard to my case up here, I have a right under Minnesota
16   law to negotiate what is appropriate under Minnesota law a
17   confidentiality order in this case.
18      THE COURT:  I'm not going to tell you what
19   Minnesota law is because I don't know it and I'm not going
20   to limit you in your Minnesota case and material that you
21   get under the auspices of the courts in Minnesota.  It's
22   between you and the other parties in that case.
23      MS. PEARSON:  And I think that's where the
24   misunderstanding came up about that I think AstraZeneca
25   was misrepresenting that even in my Minnesota case, I was

Page 71

1   bound by the MDL confidentiality order because I do have
2   some cases in the MDL.
3      THE COURT:  You can wear two hats.
4      MS. PEARSON:  Thank you.
5      THE COURT:  Mr. Allen --
6      MR. ALLEN:  Yes, sir.
7      THE COURT:  -- please finish.
8      MR. ALLEN:  I think what the Court said, I
9   understood, I read that affidavit of that lawyer from
10   Sweden, I think much like you did.  It seemed to me to be
11   a process that they were trying to institute, with all due
12   respect, that would further bring this matter to a
13   stand-still.
14      Mr. Bob Cowen is with me.  I know the Court doesn't
15   need to hear from him now, but we filed a brief response
16   last night.  We believe the U.S. Supreme Court has an
17   opinion on this matter.
18      THE COURT:  I've got authority --
19      MR. ALLEN:  Right.  Right.
20      THE COURT:  -- to do things, but I don't want to
21   do that if I don't have to.
22      MR. ALLEN:  I understand, Your Honor.  But
23   here's, I guess, my point.  I think, and Camp is prepared
24   to address this, we may not be saying anything different
25   than you are, except I can't tell until I see this order.

Page 72

1   Why not -- why not Mr. Magaziner, in the spirit of meeting
2   and conferring, try to get an order that we can both agree
3   to and submit to the Court as opposed to the order that's
4   been submitted.  Because I oppose that order.
5      MR. MAGAZINER:  We had extensive --
6      THE COURT:  I want to move on.
7      MR. MAGAZINER:  Just to clarify something
8   Ms. Pearson said, so it's absolutely clear on the record.
9      If Ms. Pearson wishes to use in her Minnesota State
10   Court case documents that she has obtained from the MDL
11   production by virtue of her being an MDL lawyer, then, of
12   course, those -- she is subject to using those documents
13   in a way that is consistent with the Court's orders.  If
14   she obtains --
15      THE COURT:  That's correct.  But if she gets
16   some -- the same documents under her Minnesota discovery
17   requests and Minnesota rules, then she can --
18      MR. MAGAZINER:  You and I are saying the same
19   thing.
20      MR. ALLEN:  Your Honor --
21      MS. PEARSON:  And I understand that as well.
22      THE COURT:  Okay.
23      MR. ALLEN:  We oppose the order they have
24   submitted to this Court and we filed a response last
25   night.  We believe there's authority.  AstraZeneca has

Page 73

1   submitted --
2      THE COURT:  I got it all.
3      MR. ALLEN:  All right.
4      THE COURT:  Next thing I want to take up was the
5   motion for pro hoc admission of everybody who appears at a
6   deposition.
7      Why do we need that?  I'm happy to have pro hoc for
8   anybody that needs to come in here and argue or file
9   something here.  But if you've got 600 lawyers taking
10   depositions, I don't know if they need to be pro hoc.
11      If they're going to be taking them in Indiana, they
12   don't need to be pro hoc.
13      MR. MAGAZINER:  The lawyer -- as I understand
14   it, if a lawyer in Indiana wishes to take a deposition in
15   Indiana, he has to be representing someone, the plaintiff
16   or the defendant in that case.  There is no separate --
17   the lawyer doesn't have the right to just go in and start
18   questioning a witness without representing a party.  So --
19      THE COURT:  He can represent a party at a
20   deposition without being a member of the bar of this
21   court.  It happens all the time.
22      MR. MAGAZINER:  All we need is an order that
23   says -- and we discussed this last time.  I don't know if
24   the plaintiffs disagree because they also are using a very
25   large number of lawyers who are not -- who have not

Page 74

1    entered an appearance.
2        We need a clear order that gives any lawyer who's a
3    member of the bar in any district court in the country has
4    a right to go and take a deposition or defend a deposition
5    in this MDL whether or not the lawyer has entered an
6    appearance in this --
7        THE COURT:  That's fine.  I don't have any
8    problem with that.
9        MR. MAGAZINER:  And --
10       MR. CAMP BAILEY:  I agree.  I think that was the
11   whole point was that this was a procedure to avoid the
12   need for everyone to come in and think they have to file a
13   pro hoc every time just to --
14       THE COURT:  We don't need to do that.  I don't
15   want them to do that.  All right.
16       MR. ALLEN:  Your Honor, is it possible -- I have
17   a plane and I have to leave earlier before the hearing,
18   there's one thing that was assigned to me and I -- in 15
19   minutes --
20       THE COURT:  Which topic?
21       MR. ALLEN:  It's the topic of third party
22   document production.
23       THE COURT:  All right.  That's -- that was going
24   to be number 7.  I'll move it up to number 6.  Go ahead.
25       MR. ALLEN:  Is it number 6 now?

Page 75

1        THE COURT:  Yes.
2        MR. ALLEN:  Okay, Your Honor.  Quite simply, and
3    if I need to -- does the Court have a copy of our motion
4    that we filed?
5        THE COURT:  Yes.
6        MR. ALLEN:  Okay.  And, Mr. Magaziner, I think
7    you have a copy, don't you?
8        MR. MAGAZINER:  Uh-huh.
9        MR. ALLEN:  Okay.  I just -- Your Honor, and
10   this topic is also related to the issue of the production
11   of PRAs.  What's PRA stand for?  Promotional regulatory
12   affairs materials.
13       When we have looked at the documents that we looked
14   at, Your Honor, the plaintiffs identified -- and if I miss
15   a number by a number, I apologize.  We identified 22
16   separate third party vendors who work for AstraZeneca on
17   issues involving marketing research, product forecasting,
18   prescribing behavior by physicians, media planning and
19   medical publication.  And we identified 22 companies.
20       We then issued third party subpoenas, Your Honor,
21   which are attached to the motion as exhibit B as an
22   example.  In the third party subpoenas, we asked for six,
23   a limited number, six categories of documents as the third
24   party who worked for AstraZeneca were paid a fee by
25   AstraZeneca and were performing the work that AstraZeneca

Page 76

1    wanted them to perform, to produce all contracts relating
2    to Seroquel.
3        And I'm quoting directly:  Any and all communications
4    between AstraZeneca and the third party relating to
5    Seroquel, any and all communications between the third
6    party and other persons related to Seroquel, all documents
7    prepared by or for the third party related to Seroquel,
8    all marketing materials relating to Seroquel, and all
9    documents of the amount of money that they have been paid
10   by AstraZeneca relating to Seroquel.
11       Every one of our requests, six targeted requests, all
12   relating to Seroquel and what they did with AstraZeneca.
13       The long and the short of it is we believe and the
14   Court has told us -- this was many months ago, I was
15   here -- that we should institute a third-party discovery
16   plan.
17       Since the time we've issued those subpoenas, we have
18   at this juncture, again, six weeks before I was supposed
19   to take a corporate witness deposition, zero documents.
20       Now, we have been told and we have attached as
21   examples to our motion various letters concerning issues
22   of cooperation, but most generally I would describe the
23   responses as this:  It's none of your business, you're not
24   going to get the documents, your request is overly broad
25   and it's going to be too expensive.  That's what it boils

Page 77

1    down to, overly broad and too expensive and none of your
2    business.  And we related all of this to Seroquel.
3        Now, it's my position, as Mr. Magaziner talked about
4    earlier, that this Court in dealing with third parties has
5    inherent authority to deal with this matter.  I'm sure the
6    Court as a multidistrict litigation court is familiar with
7    its authority.  The whole purpose -- the entire purpose of
8    multidistrict litigation is to bring under one umbrella
9    discovery disputes, no matter where they come from, so we
10   do not have different and inconsistent rulings.
11       So if these third party defendants are going to be -- third party
12   non-defendants are going to be filing motions to quash,
13   and AstraZeneca, by the way, submitted a letter to the
14   third parties, it may be described by some as a letter
15   instructing the third parties to cooperate, but if you
16   read it closely it is not.  It tells the third party, we
17   asked you to cooperate -- and I'm paraphrasing -- without
18   waiving any objections or rights, don't destroy the
19   documents but make -- gather the documents quickly so that
20   AstraZeneca has sufficient time to conduct any necessary
21   review.
22       The reason AstraZeneca says that, Your Honor, if I
23   was a third party -- if I was a party to litigation, like
24   AstraZeneca, and you asked for my tax documents and
25   they're in the possession of the tax accountant that I

Page 78

1   hire and you said, Mr. Allen, bring your tax documents and
2   I told Your Honor, I don't have to give you those, I don't
3   have them, my accountant has them, you would be fully
4   within your authority, say, Mr. Allen, you have the
5   authority to get those from your tax accountant. The fact
6   you are not in personal possession of those documents, you
7   have the authority to reach out, gather those documents
8   from your accountant and bring them to court.
9        Every one of the third parties that we have asked for
10  the documents from appeared and were hired and were paid
11  by AstraZeneca.
12       So the documents that are in possession of these
13  third parties are not, for example, Edleman's documents or
14  not, for example, Perry Communications documents. They're
15  their documents.
16       THE COURT: Well, that's not necessarily true.
17       MR. ALLEN: Well, okay, to the extent --
18       THE COURT: That depends on their contract --
19       MR. ALLEN: All right.
20       THE COURT: -- depends on who owns the work
21  order.
22       MR. ALLEN: Of course. And, Your Honor, we have
23  a contract relationship --
24       THE COURT: The relationship between a
25  corporation and a contract is not the same as between you

Page 79

1   and your tax accountant --
2        MR. ALLEN: All right. All right.
3        THE COURT: -- it's just not the same.
4        MR. ALLEN: Yes, Your Honor. Hear me out,
5   though.
6        If we asked for the contract, if that's not the case,
7   if they intend to file a motion to quash, then we believe
8   this Court has the authority to reach out -- as you said,
9   you know magistrates and judges across the country. And I
10  will read directly from the -- from the manual of complex
11  litigation, it says: When a dispute is presented to a
12  deposition district court -- that's another court --
13  however, the assigned judge -- that would be Conway and
14  Baker -- may have or be able to obtain authority to act as
15  deposition judge in that district and may be able to
16  exercise those powers by telephone. In multidistrict
17  litigation, under 28 USC 1407B, the -- quote, the judge or
18  judges to whom such actions are assigned, Conway and
19  Baker, the members of the judicial panel or multidistrict
20  litigation and other circuit and district judges
21  designated when needed by the panel may exercise the
22  powers of a district judge in any district for the purpose
23  of conducting pretrial depositions.
24       So, Your Honor, we have submitted subpoenas, we have
25  depositions or written questions, we have six categories

Page 80

1   of documents all relating to Seroquel. And we suggest
2   that if the third parties file motions or -- to quash in
3   various regions, we ask the Court to contact, pursuant to
4   its inherent authority, either the MDL panel or the other
5   judges directly and have the matter referred to you.
6        If we do not do so, Your Honor, we're sitting here
7   six weeks away -- and I'm going to repeat it again --
8   unaccessible, unobtainable, unreadable documents. And
9   then we have documents for third parties dealing with
10  marketing sales and promotion, and we don't have them.
11  And I begin depositions in --
12       THE COURT: Is this the end of the third party
13  vendors?
14       MR. ALLEN: Is this the end?
15       THE COURT: Yes.
16       MR. ALLEN: Your Honor, the answer to that is we
17  believe yes. But, of course, if we find out otherwise --
18       THE COURT: You've all been served?
19       MR. ALLEN: We've all been served.
20       MS. WHEELER: Yes. Your Honor, Holly Wheeler.
21  There is a possibility that there could be -- that other
22  third party vendors could be identified in the future when
23  we get more documents and we take more depositions. But
24  at this time, this is our comprehensive list.
25       MR. ALLEN: Yeah. We worked on that.

Page 81

1        MS. WHEELER: We've all been served.
2        MR. ALLEN: We worked on it. We tried to narrow
3   it down and they've all been served.
4        THE COURT: And nobody has filed a motion to
5   quash yet?
6        MS. WHEELER: No, Your Honor. Certain motions
7   to quash and objections have been filed in other district
8   courts.
9        THE COURT: Oh, there have been motions to quash
10  filed?
11       MS. WHEELER: Yes. One or two -- Out of the 22
12  parties, one or two have filed motions to quash.
13       MR. ALLEN: And we ask in our motion, Your
14  Honor, that all these be heard by September 7th by this
15  Court, that all the documents be produced by
16  September 17th.
17       We're glad to share the copying cost with
18  AstraZeneca. We don't think we have to pay the cost of
19  the third parties' personnel, that's unfair, but we need a
20  process put in place so we get them before I go off to
21  take depositions.
22       MR. MCCONNELL: Your Honor, we have met and
23  conferred with Mr. Blizzard on this. And for the most
24  part, we actually didn't have any disagreement with him.
25  In fact, they asked us to write the letter encouraging

Page 82

1  cooperation from the third parties. And we did write the
2  letter. It's attached as exhibit P to this filing. I
3  think it's a perfectly appropriate letter. There's no
4  wink and a nod. I think what we said is exactly
5  appropriate.
6      The reason we didn't agree with this order was for a
7  couple of reasons. One, I think until the multidistrict
8  panel assigns you to take charge of these depositions,
9  then I don't think you have jurisdiction.
10     Yeah, there's a process whereby it can happen and
11 that's fine, but until it happens, I don't think we can
12 agree that you can enter orders compelling anything.
13     And the other issue that we had was with the nature
14 of the confidentiality order that's attached. We think
15 that the confidentiality order, the third parties ought to
16 be parallel to the one that's in place in this case in
17 terms of the stipulation.
18     The confidentiality order that the plaintiffs drafted
19 is different in a number of respects. It's kind of
20 onerous on the third parties that limits the categories of
21 confidentiality. The burden is on the third party to come
22 in and make a showing to the Court.
23     The plaintiff counsel under this order can show
24 confidential documents to anyone so long as the plaintiff
25 attorney, quote, deems it necessary, and their attorney

Page 83

1  fees for the winner in any dispute over confidentiality I
2  think those provisions are necessary. I don't see why it
3  isn't just exactly the same as it is for everything else
4  in this case.
5      MR. ALLEN: We took the confidentiality order
6  from the manual in multidistrict complex litigation. We
7  think that should apply. They are not parties. We took
8  it directly from that manual. Ms. Wheeler drafted that
9  order. We think it's fair. We followed the manual.
10     We need the documents and we need them now and we
11 would like the Court to act.
12     THE COURT: All right. I'm going to -- I hate
13 to disturb the MDL panel. They have other things to deal
14 with. I think it's an open question as to whether without
15 the MDL panel's specific blessing whether I can reach out
16 and take them by force of my own personality.
17     On the other hand, there's plenty of case law under
18 Rule 45 that allows the judges presiding in a deposition
19 district to refer cases -- refer issues back to the
20 district where the case is pending. I've done it many
21 times and I've had it done back to me many times. This is
22 the kind of case where you do it, for most issues anyway,
23 and certainly the kind of issues that are being raised
24 here.
25     So I think I will go ahead and do what I've said I

Page 84

1  might do, which is to -- because I don't know who's going
2  to be assigned to the motions to quash and some places may
3  not have magistrate judges do it, they may have district
4  judges do it.
5      But in any event, in respect of their authority as
6  judicial officers, I will simply send it to magistrate
7  judges, ask them to be on the look out for such motions.
8  And if they have them, suggest to them that I'd be happy
9  to take it back off their docket and if they would notify
10 me of them and if you'll notify me of them, I'll -- I
11 think I'll be resolving it.
12     I think I can, in the context of that, enter a
13 confidentiality agreement and deal with any issues of
14 costs that may arise that you are not able to resolve in
15 specific cases. So I'll go ahead and do that.
16     MR. ALLEN: Ms. Wheeler has informed me, Your
17 Honor, that some of the people have just -- have just sent
18 objections to us and not filed them.
19     THE COURT: Well, you may need to file a motion
20 to compel. That's the flip side of it.
21     MR. ALLEN: Okay. Anything else?
22     Your Honor, there's nothing else except we surely
23 need your help. And I guess -- I think the Court in its
24 statements is operating under the assumption that there
25 has been no wink and a nod between AstraZeneca and these

Page 85

1  third parties.
2      If that's the assumption the Court's operating under,
3  I can't argue with it. But if, in fact, AstraZeneca's
4  lawyers are in contact with the third parties who they've
5  been paying and have told their lawyers do everything you
6  can not to prevent these documents from being -- I think
7  the Court has inherent authority over AstraZeneca to
8  discover whether or not there is a wink and a nod and to
9  discover whether or not they were -- instructed them to
10 withhold these documents. I think the Court has that
11 authority.
12     THE COURT: I'm not going to presume any such
13 thing.
14     MR. ALLEN: We'll file a motion.
15     THE COURT: I mean, these really should be
16 fairly routine document production subpoenas.
17     MR. ALLEN: We don't have one response yet.
18     THE COURT: I understand that.
19     All right. I want to go back to my number 6,
20 which -- what I call future discovery additional
21 document -- and some of this dovetails back to our earlier
22 discussion about the technical issues, but this is more
23 substantive with respect to getting the marketing
24 material, issues about former sales reps, potential
25 additional custodians, additional 30(b)(6) and additional

Page 86

1 document requests. This is something I think plaintiffs
2 had listed under their objection.
3     What's going on with that? What do we need to deal
4 with?
5     MR. GORNICK: Well, we can take these one by
6 one. One of the issues I think we ought to be able to
7 address very easily is the former sales rep issue. And I
8 could give you an illustration.
9     Right now, in one of the cases that we have
10 designated for case specific discovery this month, we
11 designated a sales rep on, I believe, July 27, and we
12 don't have a date for that sales rep. All we knew is it's
13 a former rep. We have asked AstraZeneca to give us the
14 contact information so we can arrange the deposition.
15 They haven't done it. They told us that in the event this
16 former sales rep doesn't want them to represent her,
17 they'll give us the contact information.
18     But they won't tell us if they've been retained, they
19 won't give us the contact information, they won't give us
20 the date for the deposition. And now, we're scheduled to
21 go take the depositions of the plaintiffs and the doctors
22 next month and -- next week in Ohio. And because of this,
23 we're either going to have to put that trip over or we're
24 going to have two trips.
25     And so I think in this particular type of situation,

Page 87

1 it's only appropriate, given the example that we're
2 dealing with here, is that when we designate -- our side
3 designates a sales rep that we want to have in the case
4 specific plan --
5     THE COURT: This is the precise kind of issue
6 that the PMO is going to solve for you.
7     MR. GORNICK: Well, I didn't know that. I
8 didn't know that, but I guess -- I guess that makes sense.
9 For former sales reps, AstraZeneca should immediately give
10 the PMO contact information so the PMO can --
11     THE COURT: Well, if AstraZeneca can't do it,
12 then the PMO will do it and direct AstraZeneca to provide
13 whatever information is needed.
14     MR. GORNICK: Your Honor, the problem is just
15 that we get into delay and we get in a rollover. And then
16 there's a related issue that we're entitled to the contact
17 information. We ought to be able to call that person and
18 interview them.
19     So there's no legitimate legal reason for the
20 defendants to withhold that information unless they truly
21 do represent that former sales representative.
22     So we would ask that they have to make that
23 determination immediately and give the contact information
24 to us and give it to the PMO so we can get those
25 depositions scheduled and we have the opportunity to

Page 88

1 conduct an interview and perhaps we won't even take the
2 deposition.
3     MR. MCCONNELL: Your Honor, there was a meet and
4 confer held on this between me and Mr. Blizzard and
5 Ms. Wheeler may have been involved in that.
6     What happened was Mr. Blizzard made the request for
7 the contact information for former sales reps. And we
8 said, well, those former sales reps we'd like to contact
9 them because we very well may represent them, as Your
10 Honor would understand, that's actually typical in these
11 cases. And Mr. Blizzard's response was, okay, that makes
12 sense.
13     But you've got to -- there's got to be a point in
14 time when you tell us whether or not you're representing
15 them. He's right about that, and he said, five days. So
16 five days after the sales rep, AstraZeneca should then
17 fish or cut bait and tell us.
18     And what we said was, after going back and talking
19 with our folks, based on our experience, because a lot of
20 these sales reps aren't that easy to contact, we said, we
21 would like 10 days to decide -- to try to contact them.
22 Obviously, if we can get them sooner, great. So we
23 thought 10 days, Mr. Blizzard said five days. And that's
24 kind of where we were stuck.
25     THE COURT: As an ongoing matter, this is

Page 89

1 something I expect the PMO to deal with and solve for you
2 either by persuasion or direction.
3     And, you know, if plaintiffs want to make a general
4 document request or interrogatory for the contact
5 information for all of AstraZeneca's Seroquel sales
6 reps -- former sales reps, they can do that and you can
7 object and I'll rule on it.
8     It's probably discoverable but it doesn't sound
9 terribly pertinent except when you need to take them and
10 that's what the PMO is going to solve for you.
11     What about the marketing material?
12     MR. GORNICK: Your Honor, we -- Mr. Allen
13 addressed that briefly earlier. We have -- on Friday we
14 received marketing material. On Friday, we received that
15 massive index for the written materials and we received a
16 thinner index for the videos.
17     As you can tell just by the size of the index, it was
18 a lot of material that was laid on us on Friday. The
19 index to us is not helpful. It doesn't have dates.
20     A good example of why it's not helpful is the video
21 that Mr. Allen so colorfully described the last time we
22 were here, the Kek (phonetic)and Nas (phonetic) video that
23 was shown to one of his treaters, we can't find that on
24 the index.
25     We have another meet and confer scheduled with

Page 90

1   AstraZeneca for Friday.  We believe that we'll have
2   technical -- sophisticated technical reps at that
3   interview and hopefully we'll be able to figure out how to
4   get a usable index.
5       But at this time, we have documents and we need to
6   figure out a reasonable way to wade through them quickly
7   to identify what might be relevant to specific physicians.
8       MS. WHEELER:  I might just add, Your Honor, that
9   in a meet and confer with AstraZeneca, they did indicate
10  that next week they will be providing another index with
11  information extracted from the E Star database, which is
12  the database that they use to document what promotional
13  materials were approved.  And apparently, that material
14  will provide some dates.  But, again, we haven't seen that
15  yet.  So actually, that'll be something that will be
16  addressed at the meet and confer.
17      THE COURT:  Have you started providing the
18  actual materials?  I mean, are they someplace where
19  somebody can go look at them?
20      MR. MCCONNELL:  We did produce the materials.
21  We produced on Friday, just looking at the notes here,
22  8,789 documents, about 62,000 pages, we provided them on
23  Friday.  And Your Honor had also ordered that we had to
24  provide an index that would help do the matching.
25      THE COURT:  Right.

Page 91

1       MR. MCCONNELL:  And we did provide an index and
2   I'm now hearing that it's not usable.
3       Before we sent that index out, we actually sought a
4   meet and confer with the plaintiffs because we thought
5   this might be an issue.  We said, do you want to talk
6   beforehand so we make sure that the index that we send you
7   is in a form that you'll find usable.  They didn't get
8   back to us, but we're certainly happy to do that.  I think
9   that's what we're going to be doing on Friday.
10      THE COURT:  You really -- and I know there's
11  lots of things going on and there's lots of issues, but --
12  and I alluded to this in my order yesterday, that the
13  plaintiffs aren't free of responsibility here.  Something
14  like this, that's where it's supposed to be a cooperative
15  process.
16      This index -- you know, we use the word, "index", or
17  chart or table.  That can mean a lot of different things
18  to a lot of different people.  And it may well be that the
19  defendants in, you know, exercise of reasonable judgment
20  came up with something that's not very useful to you.  But
21  if you'd sit down with them as they're figuring out what
22  the data fields are and what they have, again, this is --
23  you know, the existence of these documents and making them
24  available is not adversarial.  Everybody knows what
25  there is and it's just a question of making it convenient

Page 92

1   for each other.  And it should not be part of your
2   litigation here and make it harder for each other.
3       So at that point when they say, look, we're
4   developing an index, would you like to come over and work
5   with us to work out the data field and to match it up, if
6   there's something else that we can do that makes it more
7   useful, tell us.
8       So that's what you need to -- and you can do it
9   beforehand or after, but it's going to be a lot faster if
10  you do it beforehand.
11      MR. GORNICK:  Your Honor, we do have that meet
12  and confer scheduled for Friday, two days from now and
13  hopefully this won't be an issue.
14      I was meaning to give you a status report on that.  I
15  didn't raise it as a complaint.  We do have the meet and
16  confer on Friday.
17      MR. MCCONNELL:  I also have an understanding
18  we'll just refer to the fact that we said we're going to
19  produce extra material.  I actually thought it was this
20  week.
21      MS. WHEELER:  You're right.  I was thinking from
22  the meet and confer next week.  Actually, that would be
23  this week.  I apologize.
24      MR. MCCONNELL:  No reason to apologize.  But
25  there will be more information, I think, going out today

Page 93

1   that furnishes dates.
2       But, Your Honor, frankly, I don't think it's possible
3   to create an index with 8,798 entries that isn't going to
4   be a little challenging, but we'll try to make it as user
5   friendly as possible.
6       THE COURT:  Like I say, that's not easy, but
7   it's not adversarial.  And so that's one where really as
8   professional you should be able to cooperate and make it
9   the best you can without -- it reduces the burden on both
10  sides.
11      What about -- have you got issues you've already
12  identified with respect to additional 30(b)(6) or
13  custodial witnesses?
14      MR. GORNICK:  I don't believe we -- maybe we do.
15      THE COURT:  Nothing to speak of?
16      MR. CANTY:  At this point, Your Honor -- Dennis
17  Canty, Your Honor.
18      At this point, we don't have any anticipated problems
19  with the future custodians except for the fact that we're
20  not -- we haven't quite reached the end of the meet and
21  confer on the search terms yet.
22      THE COURT:  I understand.  All right.  Let's
23  move on then to transfer of what I'll call Florida cases
24  that aren't Florida cases yet.
25      I was -- I saw plaintiffs' position and didn't feel

Page 94

1   like I knew a lot more after that than before I saw it.
2       How many are you talking about?  When are you going
3   to do this?  And are there others that the defendant
4   thinks are Florida cases that aren't covered by this?
5       MR. TRAMMELL:  We haven't -- Your Honor directed
6   that all Florida cases be considered eligible for trial
7   here.  We reached out to those plaintiffs to begin the
8   process of conferring with them about whether they'd like
9   to have their case tried here.  It's going to be their
10  choice.  But we've started that process.  We expect to
11  have it done and have the entire group of trial plaintiffs
12  have the petitions or have moved for leave to amend their
13  positions to establish venue here within 30 days.
14      THE COURT:  All right.  We'll do that.  And then
15  I'm going to give the defendants the opportunity for -- to
16  raise any legal theory they want to have the Court
17  exercise jurisdiction over the ones they think belong
18  here.
19      MR. MAGAZINER:  Our position is that all the
20  cases that have been filed by Florida residents should be
21  transferred or --
22      THE COURT:  No, I understand.  And I'm going to
23  give you the chance to do that and let you argue whatever
24  you think the most substantial basis for doing that is.
25  And then there may be a plaintiff or two that the

Page 95

1   residence is in question.  I understand that.  But you'll
2   have a chance to do that and they'll be able to oppose it
3   if they want to oppose it and Judge Conway or I will rule
4   on that.  And then whether it's -- well, we'll rule on it.
5   There's different ways to accomplish that potentially and
6   you can argue whatever you think is best, and the Court
7   will rule on whatever we think is right.
8       MR. MAGAZINER:  Lest my position be unclear on
9   this record, we will oppose the idea of the plaintiffs
10  should pick and choose which of their cases --
11      THE COURT:  You're real clear on that and I
12  understand that position.
13      All right.  Defendants raised an issue about -- that
14  I didn't -- just raised the subject, getting Zyprexa
15  related documents.  What's going on with that?
16      MR. MAGAZINER:  We have a meet and confer on
17  this.  Mr. Camp Bailey and I and Ms. Balakhani talked on
18  the telephone and then we had another communication from
19  Mr. Bailey this morning, I guess -- last night.
20      I believe this is the situation:  Plaintiffs agree
21  that we are entitled to get any medical records or other
22  documentation that Eli Lilly collected with regard to
23  plaintiffs in this litigation who also were suing Eli
24  Lilly for Zyprexa related injuries.
25      Plaintiffs disagree, and we have not been able to

Page 96

1   resolve this with the meet and confer, or the question
2   whether we ought to be able to get from Eli Lilly any
3   submissions that plaintiffs made to Eli Lilly to support
4   their Zyprexa claims.
5       In other words, if plaintiff in the Zyprexa
6   litigation filled out a fact sheet, submitted it to Eli
7   Lilly, we believe we are entitled to get that.  It's
8   clearly discoverable.  It's going to be admissible at
9   trial and we're entitled to get it from Lilly.
10      Plaintiff will say we're not -- plaintiff have said
11  we're not entitled to get those sorts of submissions.
12  We're entitled to get records that Lilly collected about
13  plaintiffs, but we're not entitled to get whatever the
14  plaintiffs in this litigation submitted to Lilly to
15  support their claims in the Zyprexa litigation.
16      That is a complete, I think, scope of our
17  disagreement; is that correct, Mr. Bailey?
18      MR. CAMP BAILEY:  What we've agreed to do is
19  we've agreed to facilitate expediting AstraZeneca's
20  collection of documents that Eli Lilly may have collected
21  in the Zyprexa case.  Those include medical records,
22  pharmacy records, basically anything they got, either
23  through a HIPPA authorization signed by a client who was
24  common to that case and this case or that Eli Lilly -- or
25  that the plaintiffs, I guess, themselves provided to Eli

Page 97

1   Lilly.
2       The proposed order they have given us and the
3   language, I guess, that caused the problems for us is that
4   it says, any submissions.  And the true background of the
5   Zyprexa case for most of these clients is that settlement
6   discussions began almost as soon as the cases began.  In
7   fact, many cases didn't even file cases.  And many -- most
8   of those submissions were all done under an ongoing
9   settlement process that is still ongoing this day.  Most
10  of these claims are still undergoing a settlement process.
11  And we didn't want the overbroad language used in the
12  proposed order to somehow compel us to turn over a bunch
13  of documents that are used being -- being support our
14  settlement discussions which are still ongoing with these
15  cases.
16      Once the cases are settled, at that time maybe we can
17  turn over things such as fact sheets.  But settlement
18  releases, other submissions that we -- and communications
19  between us and Pepper Hamilton, the law firm representing
20  Lilly, we think are protected and subject to a
21  confidentiality order in the Zyprexa case as well as
22  confidentiality agreements in the documents themselves.
23      MR. MAGAZINER:  Your Honor --
24      MR. CAMP BAILEY:  I'm trying to help, it's just
25  that there are certain documents we feel are beyond --

25  (Pages 94 to 97)

Page 98

```
 1        THE COURT:  Some of these sound like pretty
 2   fundamental documents that defendants are going to be
 3   entitled to get.  I mean, they're not -- you know, if
 4   there's inconsistent positions being taken by the
 5   plaintiffs or different recitation of their symptoms or
 6   when they started and what caused them and what they were
 7   taking, and if that's what you're talking about -- it's
 8   one thing talking about settlement postures, but these
 9   basic facts that are admissions -- I'll call them
10   admissions, but statements by the -- by a party that
11   relate to the subject matter, they're going to -- we're
12   going to get to those so that AstraZeneca can deal with
13   them on a timely basis.
14        MR. CAMP BAILEY:  Your Honor, it may be an issue
15   of just more narrowly tailoring what we will agree to.
16        THE COURT:  Well, I mean, I don't know what
17   we're talking about, but it -- I mean, I don't think the
18   settlement privilege is going to -- or settlement
19   discussion privilege is going to exempt out whatever
20   their -- the equivalent in the Zyprexa case was the
21   plaintiff fact sheets and there's probably some other
22   things too, now -- and the final settlement.  I mean,
23   whatever they pay, they're just -- you know, to the extent
24   that there's been a financial recovery and there's
25   potential for whatever state law, joint and several
```

Page 99

```
 1   liability issues or joint tort feasor or however the
 2   correct terminology is, to avoid a double recovery, the
 3   defendants are entitled to that, too.
 4        MR. MAGAZINER:  This will come up later on
 5   another item of the agenda.  But we've already had
 6   instructions in the depositions we've taken of the
 7   plaintiffs.  We've had instruction by plaintiffs' counsel
 8   to plaintiffs that they are not to answer our question
 9   about how much money they have received from Eli Lilly in
10   settlement of their claim against Lilly for diabetes
11   allegedly caused by the use of Zyprexa.
12        MR. KEN BAILEY:  And there's a reason for that,
13   Your Honor.  There's a reason for that theory, I think.
14        First of all, let me say this:  We're not saying
15   we're not going to give it to them.  We're just saying
16   that at the present time, it's a very short window of time
17   until this settlement is concluded.
18        THE COURT:  How short?
19        MR. KEN BAILEY:  Like, 60-90 days, as early as
20   that.
21        THE COURT:  Well --
22        MR. KEN BAILEY:  And so I'm not saying they
23   don't --
24        THE COURT:  Mr. Magaziner has been saying 60-90
25   days about things and we've had a problem with that.
```

Page 100

```
 1        MR. KEN BAILEY:  It's in the agreement, Your
 2   Honor.  The date specific is that it's when we're supposed
 3   to be able to get our releases and everything in.  And
 4   there is still an ongoing evaluation of what the amount of
 5   money is that these people are going to be getting.  It's
 6   a moving target.
 7        THE COURT:  If it's not resolved, it's not
 8   resolved.  But if it is resolved, then --
 9        MR. KEN BAILEY:  It's not resolved yet.
10        THE COURT:  Well, it is for some of them, I take
11   it.
12        MR. KEN BAILEY:  No, sir.
13        MR. CAMP BAILEY:  It is.  Well, some clients --
14        THE COURT:  All right.  I've made my views
15   clear.  Go ahead and confer some more, see if you can
16   narrow this or make it more precise.
17        And, Mr. Magaziner, if you need to put it in the form
18   of a motion to compel, we'll deal with it that way.
19        MR. MAGAZINER:  Thank you, Your Honor.
20        MR. GORNICK:  May I ask that Mr. Magaziner serve
21   Eli Lilly?
22        They have a dog in this fight and they will come in
23   here, my prediction is, and object to --
24        THE COURT:  Well, if there's a colorable
25   argument that this is covered by another judge's
```

Page 101

```
 1   confidentiality order or --
 2        MR. MAGAZINER:  As I've informed Mr. Bailey,
 3   Your Honor, we consulted for months with Eli Lilly's
 4   counsel to make sure that the former order we were
 5   presenting to Your Honor would be acceptable to them and
 6   that they would respect it.
 7        THE COURT:  You can make that representation in
 8   the motion.
 9        MR. MAGAZINER:  Yes.
10        THE COURT:  All right.  We've had this come up
11   several times, but I list it as another item.  Issues that
12   have -- that are arising with respect to case specific
13   deposition other than the -- what I call the PMO issues
14   and I just heard a couple more.  Anything else that --
15        MR. MAGAZINER:  Yes, Your Honor.  There are -- I
16   think it would be helpful to have some guidance from the
17   Court on how we ought to proceed.
18        Let me begin by saying that the program has been
19   extremely useful to date, I hope -- certainly for us, I
20   hope for plaintiffs' counsel, as I understand more about
21   the nature of the cases that we're dealing with in this
22   litigation.
23        But I think there are two areas in which we would
24   seek the Court's guidance.  One is:  Problems that we are
25   encountering in depositions and how we are to deal with
```

Page 102

1  them. And another is: What sort of motions are likely to
2  flow from these depositions and how the Court would like
3  us to deal with those motions.
4      As to the problems in the depositions: We have taken
5  10 depositions to date, as I reported earlier. We have
6  reviewed the transcripts of those 10 depositions. Six of
7  the 10 plaintiffs have testified under oath that they have
8  numerous, sometimes large droves of documents which have
9  never been turned over to us. They were turned over in --
10  when the fact sheets were submitted, which is when they
11  were supposed to be turned over.
12      We appended the same exact list of documents to the
13  notices of depositions as a reminder that they should be
14  brought to the deposition if they had not previously been
15  turned over. They weren't turned over in response to the
16  notice of deposition.
17      Five of the six people testified under oath that
18  their lawyers had never told them that they had any
19  obligation to collect the documents that were supposed to
20  be collected under the fact sheet procedure. They had
21  never been told by their lawyers.
22      These plaintiffs testified that they'd never spoken
23  to a lawyer until, in some cases, the day of deposition or
24  in some other cases the day before, but not when they
25  filed their cases. And they had no idea that there was

Page 103

1  any legal obligation on them to collect these documents.
2      Now, this is creating a problem for us. There's a
3  woman who testified that she had collected -- she has an
4  OCD issue, apparently. I'm not going to use names, Your
5  Honor, because of the confidentiality issues, but we can
6  submit all of this to Your Honor in camera or to
7  plaintiffs, actually, so they can see it.
8      There's a woman who testified that she has retained
9  all of her medical records since the mid 1980s and she has
10  them all at home, including all the records relating to
11  the injuries she's claiming from her use of Seroquel.
12      When we said to her lawyer representing her, will you
13  turn them over, he said, no. You're going to have to file
14  a formal document request. But these are exactly the same
15  documents we've been asking for since November when the
16  fact sheet procedure was approved.
17      I think it would be helpful if the Court would state
18  on the record, so plaintiffs' counsel will understand,
19  that if their clients have documents that are responsive
20  to the list of documents that were supposed to be
21  submitted on the fact sheet, that they are to turn them
22  over to us. We are entitled to them. We should have
23  gotten them when the fact sheets were submitted many, many
24  months ago, but we certainly should get them before we go
25  into these depositions and not have lawyers for plaintiffs

Page 104

1  saying we have to file new document requests for the self
2  same documents that we have been entitled to for months.
3  That's one problem.
4      I mentioned that we have lawyers instructing
5  clients -- plaintiffs not to tell us how much money they
6  received from Eli Lilly, an instruction not to answer
7  which is totally without any basis as far as I can figure
8  out.
9      We have six -- most of the plaintiffs who have been
10  deposed have given us the names of numerous additional
11  doctors -- looking for a paper which I can't find -- whose
12  names were never disclosed on the fact sheet.
13      One plaintiff identified 12 additional providers,
14  another plaintiff gave us two additional prescribers.
15  Almost all of them have named at least four additional
16  doctors.
17      This is a problem that I think the plaintiffs'
18  lawyers should have to help us solve. They ought to be
19  saying to their clients, if they didn't say it before when
20  the case was filed and if they didn't say it when they
21  submitted the fact sheet, at least when the case is
22  designated for case specific discovery, plaintiffs'
23  counsel ought to be saying, are there other doctors, tell
24  me about them now, rather than finding out when we ask
25  these people at their depositions and they say, oh, yes,

Page 105

1  sure, I have -- these other two doctors prescribed
2  Seroquel or my diabetes have been treated by these other
3  six doctors that we never heard of.
4      So we're at a real disadvantage when we go into
5  depositions without this information.
6      I can file motions. I don't want to have to file
7  motions on each of these cases. I don't want to go back
8  and file a motion on each of these 10 seeking leave to
9  take a second deposition after the plaintiffs provide the
10  information they were supposed to provide.
11      I think if the Court would say something on the
12  record, I think that would be -- probably suffice to make
13  sure that we get the kind of cooperation from plaintiffs'
14  counsel that we ought to be getting on these issues.
15      The other major issue that I wanted to raise with the
16  Court under which I would appreciate the Court's guidance
17  is what sort of motion practice you would like us to
18  engage in.
19      We have found from these depositions that many of
20  these cases in our view are so extremely lacking in merit
21  that we will no doubt want to move to dismiss them.
22  Probably we will wait until the doctors are deposed, but
23  we will then move to dismiss.
24      We are beginning our work on that now. And I don't
25  know whether the Court would prefer that we file them case

Page 106

1  by case by case or whether we group them once a month, we
2  say. here are all the motions to dismiss for the
3  plaintiffs who have been -- whose cases were discovered in
4  the previous month or whether we wait until the end of the
5  process, but if -- any guidance the Court could offer us
6  on that would be most appreciated.
7       If we're left to our own devices --
8       THE COURT: Are you talking about factual holes
9  or --
10      MR. MAGAZINER: Yeah, the -- we have -- we
11  have -- yes, factual holes, plaintiffs who testify under
12  oath and the medical records confirm that -- the records
13  we've collected that they were diagnosed with diabetes
14  years before they ever took Seroquel. We've had several
15  of those. Plaintiffs whose use of a drug before they were
16  diagnosed with diabetes was entirely Zyprexa, not
17  Seroquel. Plaintiffs who were first diagnosed with
18  diabetes five or six years after they took Seroquel.
19      And I don't think plaintiffs have a medical expert
20  who's going to say someone who stopped Seroquel in 2000
21  and then was diagnosed with diabetes in 2006 that that can
22  be causally linked to the use of Seroquel, even plaintiffs
23  I don't think will have that expert. So these are going
24  to be a series of factual motions.
25      Now, this, of course, is exactly one of the purposes

Page 107

1  of this program, as we saw it, and we told the Court many
2  months ago, we would like to be able to understand these
3  cases so we can bring representative motions to the Court
4  and the Court could rule on the motions.
5       And if the Court agrees with our position that these
6  cases have no merit and should be thrown out of court,
7  then other plaintiffs' counsel, presumably, will be guided
8  accordingly and we will not keep taking depositions --
9  four depositions per case, plaintiff, two doctors and a
10  sales rep, in cases which really should not be taking our
11  time or the Court's time.
12      But we don't know in what fashion the Court wishes us
13  to file those motions and we would like the Court's
14  guidance on all those issues.
15      As to the things in the depositions, that instruction
16  not to answer, we don't know that the Court wants us to --
17  does Your Honor want our lawyers to call you, do you want
18  us to file motions, we'll do whatever thing makes the most
19  sense and would be most convenient for the Court. But we
20  would like to press -- we would like to assert our right
21  to the discovery that the Court has ruled that we're
22  entitled to have in this program.
23      MR. KEN BAILEY: Your Honor, I accept the blame
24  for this. If it did happen, I was not aware of it. I
25  will address it and I will take care of the problem that

Page 108

1  Mr. Magaziner raised here today. I was not aware of it.
2       We did ask people for doctors. We did ask them about
3  medical treatment. If people didn't give it to us, we
4  didn't put it down. So I will take care of it as far as
5  my law firm is concerned.
6       And I will also use at this time what Mr. Magaziner
7  has used throughout this entire litigation, this is the
8  first time I heard about this, I would have appreciated a
9  phone call.
10      THE COURT: Well, that's true enough, but these
11  are basic things. I mean, and if -- this is the other
12  side of the street that was discussed in my order
13  yesterday. And it's -- this is, you know, one of the
14  characteristics of having this many claimants, that
15  there's a danger in that they won't understand their -- as
16  parties, they don't understand their individual
17  responsibilities.
18      And, Mr. Bailey, you've indicated that you understand
19  that.
20      MR. KEN BAILEY: Yes, sir.
21      THE COURT: They need -- and this is true for
22  all of them, but now we're getting down to particular
23  cases, and which just like that news, it focuses the mind
24  wonderfully. You need to make sure that whoever is
25  prepping them for their depositions that there's -- they

Page 109

1  made doubly sure or triply sure that all the doctors have
2  been disclosed, all the documents that they've got have
3  been produced.
4       And, again, this is the cooperative part. This is
5  not the adversarial part. The -- those need to be
6  provided. And if it becomes a recurrent problem or
7  remains a recurrent problem, then I will make provision
8  for defendants to be able to file motions for sanctions.
9       MR. KEN BAILEY: I accept the responsibility,
10  Your Honor.
11      THE COURT: With respect to the prospective
12  motions to dismiss for what I'll call fact based,
13  defendants' assertion the claims are simply untenable as a
14  matter of fact and that can arise in the ways you've
15  discussed as well as others, I suppose.
16      Let me confer with Judge Conway about that. My
17  thought just sitting here would be to kind of direct you
18  to put them in some sacks and we will take them, you know,
19  couple, three months at a time.
20      MR. MAGAZINER: If you tell us sacks, we will
21  do.
22      THE COURT: I'm going to suggest that to her.
23  These motions would obviously go to her, they're
24  dispositive motions and unless she asks me to do a report
25  and recommendation on them, but -- or if the parties

Page 110

1    consent for me to hear them.
2        Interesting issue as to what the parties can consent
3    to in an MDL in terms of magistrate judges' authority. We
4    will cross that bridge and see if that ever comes up,
5    but --
6            MR. MAGAZINER: Is that a different issue in an
7    MDL than in a --
8            THE COURT: I don't know. I don't know why it
9    would be, but --
10           MR. MAGAZINER: I didn't even think there was a
11   possibility that we couldn't consent --
12           THE COURT: You know this perhaps better than IA
13   lot of MDLs and magistrate judges are not very involved in
14   a lot of districts. Judge Conway did ask me to be
15   involved in obviously a serious way here. So that's not
16   how all district judges approach MDLs. And that's how
17   magistrate judges are used in this district, routinely.
18   So it's consistent with our practice, one that we think
19   has worked very well.
20           Anyway, I will suggest to her something like that.
21   That will depend at least a little bit in how she intends
22   to deal with those and what her own calendar is.
23           So I will endeavor to get you some guidance on that,
24   because I think what I prefer not seeing is six or seven
25   of them coming in, you know, two a week, and it just

Page 111

1    doesn't -- it's not good for you and it's not going to be
2    good for the Court.
3        So just as I did with that order that you batched,
4    the ones that are -- where there's more than four of the
5    same issue, I'll suggest that we batch these by time.
6        All right. That's the end of my list. But I'll be
7    happy to hear from the parties. I've been -- most of the
8    issues I've dealt with have -- were others suggested by
9    the plaintiff or dealt with things plaintiffs want.
10       So I'm going to let Mr. Magaziner start first if he's
11   got anything else.
12           MR. MAGAZINER: I think we've covered all the
13   issues we wish to raise, Your Honor.
14           THE COURT: Okay. How about plaintiffs?
15           MR. GORNICK: Your Honor, a couple things, just
16   to respond to the last subject matter.
17       On the settlement issue, some of these clients that
18   have Zyprexa settlements will have entered into agreements
19   with Eli Lilly where they've agreed not disclose the
20   amount. And if they're compelled to do so, they have to
21   give Eli Lilly notice, so Eli Lilly has the opportunity to
22   weigh in and object and do whatever they want in the event
23   Eli Lilly wants to do it. Eli Lilly --
24           THE COURT: Mr. Magaziner said he's already
25   talked to Lilly and --

Page 112

1            MR. MAGAZINER: It was about submissions and
2    records I collected. I did not ask Lilly for -- I will go
3    to Lilly's counsel and ask that.
4            THE COURT: I think --
5            MR. MAGAZINER: I do not recognize -- to be
6    clear on our position, I do not recognize that plaintiff
7    can withhold from us a discoverable document because it
8    made -- plaintiff made some agreement with Eli Lilly that
9    it wouldn't -- that he wouldn't tell us how much Lilly has
10   paid him to settle his --
11           THE COURT: I can override an agreement. If
12   they've got a court order not to disclose it, then we may
13   get into a fight with --
14           MR. MAGAZINER: I don't think there are any
15   court orders.
16           THE COURT: -- with that court.
17       But in any event, I think the parties can work this
18   out.
19           MR. GORNICK: My point is they haven't asked
20   discovery requests, apparently they were doing it in the
21   deposition. It's difficult because in the deposition, the
22   client is faced with do I violate my agreement with Lilly.
23       Now, if they really wanted to do this, they would
24   send out an interrogatory saying, how much did you get
25   from Lilly.

Page 113

1            THE COURT: Well, they shouldn't have to do
2    that. I mean, they can do that, but they shouldn't
3    have --
4            MR. GORNICK: We're under obligations to give
5    Lilly notice so Lilly can come in. Lilly doesn't want the
6    amounts known. We don't care about the amounts getting
7    out.
8            THE COURT: Both of you talk to Lilly and see if
9    there's an objection. If there is, I'll hold a hearing on
10   it.
11           MR. GORNICK: Thank you, Your Honor. That's my
12   only point is we need to make sure Lilly is involved --
13           THE COURT: And I don't think it's privileged.
14   It may be subject to an agreement, but I don't think it's
15   privileged.
16           MR. GORNICK: Understood, Your Honor.
17           THE COURT: I mean, if they're not done yet,
18   they're not done.
19           MR. KEN BAILEY: And I talked to Lilly
20   yesterday, George Langner, who's one of the attorneys, and
21   I brought up the idea of this, trying to see what their
22   impression was going to be and he said he would have to
23   get back with me. So --
24           MR. MAGAZINER: We will have a three-way
25   conversation.

Page 114

1    THE COURT: All right.
2    MR. GORNICK: Your Honor, then another issue was
3 the fact that some of these witnesses in depositions may
4 remember doctors that they didn't put in the fact sheet.
5 I'd just like to say --
6    THE COURT: That's going to happen. We know
7 that's going to happen. But if, you know, it turns out
8 that there was a primary treater for six years and they
9 disclosed somebody that they saw twice over a, you know --
10    MR. GORNICK: Okay. Understand. I was going to
11 remind the Court that some of these people have difficult
12 circumstances.
13    Now, we do -- we do have some other issues. We have
14 some issues related to the case specific discovery, and
15 tell me if we've addressed it and I'll sit right down, but
16 there are just categories of things, essentially
17 everything raised at the sanctions hearing, nothing has
18 got better yet.
19    So we're a month further behind than we were then.
20 And I can go through each of them and I'm just concerned
21 that we're now hunting them all over to a yet to be
22 identified special master, we then have more delay on top
23 of the delay we already had going into July 26th and the
24 delay we've had until today. And it's making me very
25 nervous that we're going to have the discovery we need to

Page 115

1 do all the things that are going to happen between now and
2 the end of the year.
3    So I could tick through all the things we don't have.
4 I'm happy to do it. And I'm ready to go.
5    THE COURT: All right.
6    MR. GORNICK: We still have the missing
7 e-mails. And this is -- this is important, Your Honor.
8 We demonstrated that custodians had multiple e-mail boxes,
9 they only searched apparently one.
10    THE COURT: How does that relate to the case
11 specific discovery?
12    MR. GORNICK: It doesn't. It's the general
13 things that we don't have that were raised at the
14 sanctions hearing that we still don't have.
15    THE COURT: No, I understand that. I'm talking
16 about -- but I thought you were talking about things that
17 were interfering with your ability to conduct the case
18 specific discovery.
19    MR. GORNICK: Okay. Well, the case specific
20 discovery, the depositions of the doctors and the sales
21 reps, we don't have all the materials. It impacts our
22 ability to take meaningful, complete depositions of those
23 people. I mean, it goes to our fundamental due process
24 rights.
25    We are taking depositions of doctors and sales reps

Page 116

1 right now, today, and this week without all the documents
2 we need. And now we're going to build in --
3    THE COURT: You're talking about the marketing
4 materials and the --
5    MR. GORNICK: And the training materials --
6    THE COURT: Yes.
7    MR. GORNICK: -- and all that stuff.
8    THE COURT: But you've gotten some of that. You
9 had access to --
10    MR. GORNICK: We have some. We definitely have
11 some. And I'm worried that not having that stuff -- and
12 some of this doesn't have to do with technical reps. Some
13 of it we just don't have categories. We still don't have
14 voice mails. We still don't have that fax attachments.
15 We still don't have track change documents. The document
16 they put into evidence the last time --
17    THE COURT: Well, I'm going to deal with all
18 that in September.
19    MR. GORNICK: Okay. I understand. And we'll
20 move to case specific discovery. Mr. Canty has a
21 situation that hasn't arisen yet and he's prepared to
22 explain that.
23    MR. CANTY: Thank you, Your Honor.
24    I guess point by point, first, with respect to case
25 specific disclosures that are ongoing and ongoing

Page 117

1 deficiencies in those disclosures, on July 27th you
2 ordered and defendants agreed that there would be a
3 production of the disclosure materials in the electronic
4 format in which they were maintained by the defendants,
5 manipulable, searchable and it's not happening.
6    On August 6, they made the September disclosures in
7 the same format that they made them before. And despite
8 meet and confer efforts following that, they remain -- the
9 September disclosures are without the electronic Excel
10 files that the defendants are maintaining.
11    Further, the -- and this is the kind of thing that
12 we're getting as far as the IMS data and this is, you
13 know, virtually illegible for someone particularly like
14 somebody I'm trying to take a deposition but also
15 incomplete. There are various forms -- various kinds of
16 data that are available to this sales representative
17 detailing the positions among them, not just Seroquel
18 prescription, total Seroquel prescriptions, new Seroquel
19 prescriptions and the same prescriptions for the other
20 atypical anti-psychotics on the market and those materials
21 just aren't being provided.
22    And that's one point I think it probably should be a
23 response and then I'll continue.
24    MR. MAGAZINER: With regard to electronic, as I
25 understand it, and this is being handled by Fabian,

Page 118

1  Benson -- maybe Mr. Freebery knows something about this.
2  No?  It's handled by Fabian, Benson.  This is the first
3  I've heard that there was a problem.
4      As far as I know, we are giving them in electronic
5  for the call notes.  Mr. Canty says they're not --
6  Mr. Canty says he's only receiving hard copies.  That's
7  news to me.
8      May I address Mr. Canty directly, Your Honor, try to
9  figure out what the problem is?
10     THE COURT:  No.  I'll tell you how we're going
11 to deal with this issue.  Let's wait until you finish the
12 August depositions and you can have a -- if there's -- you
13 can flesh this out in your meet and confer.  And then if
14 plaintiffs need to file a motion to compel after that,
15 I'll hear it in our September conference.
16     MR. CANTY:  If I may, Your Honor, there are a
17 number of things that are supposed to be -- that are going
18 to be triggered from the production of those disclosures.
19 It's going to be -- we're going to have to designate a
20 sales representative.
21     Now, we can't -- if we have the proper electronic
22 form, we can search the data, we can sort it, we can sort
23 it by, for example, sales representative by date and make
24 an assessment as to which sales rep it is that we want,
25 then we disclose a sales rep for them to find.  And if

Page 119

1  that sales rep is a former employee, they have to go
2  subpoena that person, possibly, if they don't make an
3  offer of representation.
4      THE COURT:  Let me back off what I just said.
5  I'll say this, that this is -- I didn't think this would
6  be an issue, but I anticipated it might be.
7      It's a -- this is a -- the whole case specific
8  scheduling for each month is a difficult and delicate
9  dance for each side to pick your plaintiffs, pick your
10 doctor, pick your sales rep and make sure you got the
11 relevant documents and has to happen very fast in
12 sequence.  And you need to have the information -- enough
13 information to pick the sales rep you think you want, just
14 as defendants need to figure out which doctor they want so
15 that you can get these people onto a calendar.
16     So I'm going to dump this on to Mr. Brown as to
17 whether if you think you're not getting the documentation
18 you need to make your designation timely, you take it up
19 with the PMO in a specific case and he will bash heads and
20 resolve it.  And if he needs to get an order, he can get
21 an order.
22     And if he thinks you've got enough information for
23 you to proceed, you proceed.  And the whole point of
24 having the PMO is that you can do this fast enough so that
25 we don't end up running these things out beyond the end of

Page 120

1  the month.
2      And, like I say, I recognize it's just a whole lot of
3  things that have to happen one right after the other.  So
4  everybody has to be proceeding on that basis and that's
5  why we'll have -- that'll be a more substantive portion of
6  the PMO's undertaking and simply scheduling and telling
7  doctors to do what doctors don't like to do, just listen
8  to lawyers.
9      And if that's not working, I'll find out about it
10 from Mr. Brown in his next report.
11     What else have you got?
12     MR. CANTY:  One other issue, Your Honor, is --
13 and I'll try and fuss with my electronics here a little
14 bit at the same time, too -- but it's an issue that isn't
15 contemplated by CMO4 and it isn't something that's been
16 before the Court yet but it's something that we're
17 probably going to see a lot of and that is, CMO4
18 contemplates a situation where plaintiff has gone to one
19 physician, perhaps a psychiatrist, got a prescription for
20 Seroquel and then perhaps received treatment for the
21 resulting injuries from a different physician, more
22 typically a general practitioner or a PCP, a primary care
23 physician.
24     CMO4 has ordered disclosures of -- related to those
25 prescribing physicians, and particularly the prescribing

Page 121

1  physician and only the prescribing physician designated by
2  the defendants for deposition.
3      But the problem is in the situation that we're
4  dealing with now with this one particular case that was
5  designated in August, and will continue to come up, is
6  when a treating physician is also a prescribing physician.
7  And a treating physician designated for deposition by
8  AstraZeneca is somebody who has prescribed Seroquel and
9  played a role in the plaintiffs' ingestion of Seroquel or
10 instructed that the plaintiff discontinue Seroquel.
11     And I would like to at this point give the Court an
12 example of what I'm talking about.  This is the -- this is
13 a situation in which the treating physician, not the
14 prescribing physician, but the treating physician has
15 recognized that -- made an association between Seroquel
16 and the adverse event and recommended that plaintiff
17 discontinue Seroquel.
18     And it is -- not to beat a dead horse, but, again,
19 we're back on the due process rights of plaintiffs, if the
20 defendants have been in contact with a PCP, a primary care
21 physician, and influenced their prescribing habits,
22 plaintiffs are entitled to that information.
23     And if you think about the burden on the defendants,
24 they've already written the query, search their databases
25 for it, they're adding another name, it's not a

31 (Pages 118 to 121)

Page 122

1  significant burden to ask them to give us the data for
2  the -- even in situations like this where a treating
3  physician has obviously played a role in the plaintiff's
4  ingestion of the drug.
5     And there's one more thing that I would like the
6  Court --
7     THE COURT: I'm not sure what you're asking for
8  that you're not getting.
9     MR. CANTY: At this point, CMO4 does not provide
10 for disclosures as of the type that -- that are required
11 for prescribing physicians for those treaters. We're not
12 getting that information. At this point, AstraZeneca is
13 providing disclosures for the prescribing --
14    THE COURT: Sales and training information
15 provided to treating physicians?
16    MR. CANTY: Not just the sales and training but
17 call notes --
18    THE COURT: Call notes.
19    MR. CANTY: -- IMS data, all that material at
20 this time. And in the meet and confers --
21    THE COURT: For this case, is there somebody
22 else who was the -- designated as the prescriber?
23    MR. CANTY: That's correct.
24    THE COURT: But this doctor is the treater?
25    MR. CANTY: In this case, this plaintiff went to

Page 123

1  a psychiatrist, was originally prescribed Seroquel,
2  stopped seeing that psychiatrist, the prescription was
3  continued by her PCP. The prescription was continued, she
4  contracted diabetes, she got pancreatitis, the primary
5  care physician noted elevated triglycerides and indicated
6  that she had some indication that that was the result of
7  her ingestion of Seroquel.
8     THE COURT: Well, is there any problem providing
9  the call notes and related materials for all the doctors?
10    MR. MCCONNELL: Well, there is. I mean, the
11 burden is enormous. And this -- the phrase was just
12 beating a dead horse, this really is beating a dead horse
13 because the plaintiffs made exactly this request earlier
14 when they were filing for the defendant fact sheet. It's
15 docket number 236.
16    And they talk about what kinds of discovery they want
17 in the course of this case specific program. They wanted
18 info for prescribers as well as treaters. We argued
19 against that. And Your Honor struck a balance and the
20 information regarding sales calls as provided to the
21 prescribers, but not treaters, thank goodness, because I
22 think everybody is really at the breaking point in terms
23 of this case specific program. You've kind of stuffed as
24 much into it as you possibly can.
25    If now we're on the hook for having to provide

Page 124

1  information relating to treaters, that's an incredible
2  burden. And there are already plaintiffs who have
3  multiple prescribers. The way it works is we pick one and
4  that's the one prescriber where we have to provide the
5  information. We don't have to provide the information
6  relating to all the prescribers, that would be incredibly
7  burdensome.
8     But it does appear in this case -- I can't even tell
9  if the treater is a prescriber or a describer because
10 all -- this is a treating physician saying, stop taking
11 this. So I don't know. But even if he is -- and there
12 already was a prescriber who was the primary prescriber.
13 We run into this case all the time.
14    If we're going to have to start providing this same
15 information, which is incredibly difficult on this
16 truncated basis in this very short period of time, come up
17 with all this info for the sales calls relating to
18 treaters as well as prescribers, it's absolutely
19 unnatural.
20    THE COURT: Well, as a general rule, is it
21 correct that what we've been calling the treater is an
22 internist or somebody else that was treating the diabetes
23 and other medical problems, non-mental health problem,
24 that's who we're calling the treater as a general rule?
25    MR. MCCONNELL: Yes.

Page 125

1     THE COURT: Doctors, like lawyers, have
2  different kinds of practices and some non-psychiatrists
3  feel more free to prescribe all sorts of things. And I'm
4  not criticizing them. You know, if they're comfortable
5  with their expertise, they should be doing that. But it
6  depends on what the drug is, too.
7     MR. CANTY: It's more than that, Your Honor. If
8  I could for just a moment, I'd like to provide the Court
9  something to consider with this.
10    Is that all right, Your Honor?
11    THE COURT: All right.
12    MR. CANTY: Thank you. This is -- these have
13 been previously provided to the defendants days in advance
14 of the hearing. And I know that this is something that we
15 want to get through rather quickly, but there's one thing
16 that I really want the Court -- one excerpt from these
17 documents that I'd really like the Court to take a look
18 at.
19    MR. MAGAZINER: Excuse me, Your Honor. You said
20 you provided this? We didn't get this.
21    MR. CANTY: You responded to the e-mail.
22 Those are the --
23    MR. MAGAZINER: Which e-mail was it?
24    THE COURT: This is the marketing program that
25 AstraZeneca had for non-psychiatrist --

Page 126

1    MR. CANTY: For primary care physicians.
2  Because the difference between the primary care physicians
3  and the psychiatrists are the psychiatrists recognize the
4  potential for a weight gain and the PCPs don't. This is
5  why we're going to target these people.
6    MR. MCCONNELL: Couple things, one, I mean, it
7  seems to show actually the plaintiffs can search documents
8  pretty well. But two, it's just -- this is an argument
9  that was already made in docket 236 and already rejected,
10 because Your Honor struck a balance. And this is, you
11 know, post hoc dramatically increasing the burden.
12    I mean, they can ask these questions of the treater,
13 you know, what were you shown, what were you told. But to
14 make us on very short notice have to come across with this
15 massive amount of material, it's not so easily for us to
16 find and gather and produce is really adding to the
17 burden.
18    MR. MAGAZINER: Another point, if I may, Your
19 Honor, since they double-teamed, can we double-team?
20    THE COURT: One time.
21    MR. MAGAZINER: Thank you.
22    Most of the treaters are not people who had anything
23 to do with Seroquel. Mr. Canty --
24    THE COURT: Well, that's why I was asking the
25 question. I'm going to do this. The -- in terms of the

Page 127

1  Court having struck a balance, I rejected the defendant
2  fact sheet, but I wasn't balancing this particular item.
3  I can tell you that. And even when a balance is struck,
4  it can be reweighed on the face of circumstances.
5    But I'm going to leave it as it is for now. But the
6  plaintiffs will, over the course of the next few weeks if
7  it's a frequent and serious issue, if they feel like they
8  need to take an additional sales rep related to a treater
9  and really looks like in particular cases it's pertinent,
10 they can gather those up in a different sack and we'll
11 consider them.
12    MR. CANTY: But, again, Your Honor, at this
13 point --
14    THE COURT: This is -- you know, these
15 depositions that -- and this is where defense counsel's
16 correct. You know, this program over the next few months
17 to get a first quick brush at a certain number of
18 plaintiffs was not designed to exhaust the discovery
19 that's relevant to those plaintiffs.
20    And I realize that, you know, when you're taking the
21 primary care physician's deposition that there may be some
22 things that you wish you knew beforehand that you won't
23 know. But I'm going to -- let's get some experience under
24 our belts and if it turns out that that's really a serious
25 problem, we can deal with it. But I think for now, we've

Page 128

1  got enough to do and you've got enough to be prepared to
2  take at least a first run at it.
3    MR. GORNICK: Your Honor, this is a huge point
4  to Ms. Gatchel's case, because they're taking these
5  depositions to tee-up in an intermediary motion for
6  summary judgment.
7    This treating physician was the last prescriber.
8  They're going to ask her questions, given everything you
9  knew, would you have prescribed it anyway, did you know
10 this.
11    They're going to use this to establish an affirmative
12 defense, they're going to move for summary judgment on.
13 And if we don't have the information, they were providing
14 this primary care physician under a program targeting
15 prime care physicians, it won't be fair. We won't be able
16 to --
17    THE COURT: You'll have a chance to respond.
18    MR. GORNICK: Thank you, Your Honor.
19    THE COURT: Due process will be satisfied.
20 Anything else from the plaintiffs?
21    MR. CAMP BAILEY: I wanted to address an issue
22 just on the outstanding motions to dismiss on fact sheet
23 issues.
24    THE COURT: I'm not going to deal with this.
25 Judge Conway has got those under her view, unless there's

Page 129

1  something you want me to call to her attention.
2    MR. CAMP BAILEY: Well, the first traunch
3  against those cases that are coming due to have their
4  cases converted from dismissals without prejudice to
5  dismissals with prejudice were filed this week. And we
6  just wanted to seek some guidance from you or from Judge
7  Conway on how the best way to respond to those are, in
8  that there are many plaintiffs out there that we have sent
9  letters, that we have put calls into, that we have hired
10 investigators, we have talked to neighbors, that we're not
11 getting a response from.
12    And our fear is that there are people out there that
13 have no knowledge that their cases are about to be
14 converted from a dismissal without prejudice to a
15 dismissal on the merits and --
16    THE COURT: Well, if you think there's some
17 legal excuse that you can make as to individual
18 plaintiffs, make your case.
19    MR. CAMP BAILEY: I know one thing you've
20 considered in the past is a motion to withdraw from the
21 case. And in that circumstance, you said what you would
22 do is deny it and then --
23    THE COURT: But I don't want to allow motions to
24 withdraw -- I mean, I'm not going to allow that if the
25 plaintiff doesn't know you're not trying to withdraw.

Page 130

1    I mean, if you can't get them noticed, they're going
2  to lose their case one way or the other. It won't be your
3  fault if they don't -- I mean, I have this issue come up
4  about every week when I get attorneys who want to withdraw
5  from cases because their clients are being irresponsible.
6  And I'm not saying these clients are; I'm just saying it
7  happens. It can be corporations, it can be individuals,
8  it can be plaintiffs, it can be defendants. It's not the
9  lawyer's fault.
10    And if you've done everything you reasonably can to
11  communicate with them and they don't communicate, they
12  don't deserve to be in court at that point. That's not your fault.
13  They'll lose their case, but it's not your fault.
14    MR. CAMP BAILEY: And I guess what we may bring
15  and I guess we will respond to the motions that have been
16  filed this week on the first 11 and subsequent cases is
17  that I understand Court's order as in regards to people
18  who do not comply with the order to sign the verification
19  with the fact sheet they provided. But it may be another
20  issue to punish them and to convert that to a with
21  prejudice motion as opposed to a without prejudice, where
22  they're off the docket, where they're gone. But if they
23  happen to show up two months from now and say, hey, I've
24  been in the hospital the last three months, what's going
25  on with my case, you know, their case can never be

Page 131

1  rectified at that point.
2    THE COURT: Well, there's Rule 60 out there, if
3  you've got appropriate grounds. I mean, you know, the
4  litigation moves on. If they've got a good excuse, they
5  can make the excuse. If it's not a good excuse, then they
6  don't -- there are going to be some cases that get
7  dismissed.
8    I mean, you can't just throw it into court and then
9  walk away and expect to have it just linger out there.
10  It's not fair to defense, it's not fair to the Court, it's
11  not fair to you.
12    MR. CAMP BAILEY: I agree. The whole -- I mean,
13  these are mainly clients that did answer a fact sheet and
14  then didn't file whatever for whatever reason, they can't
15  get them. I'm just trying to cleanse my hands of the
16  situation.
17    THE COURT: Well, you try to represent your
18  clients and perform your professional responsibility. And
19  like I say, it's a routine thing that I tell lawyers if
20  you're happy you've done the best you can, then you can
21  sleep at night. And you feel sorry that the -- even if --
22  there may have been a good claim there, but plaintiff has
23  certain obligations.
24    And if they need to have a guardian appointed, then
25  you need to get a guardian appointed. If it's just that

Page 132

1  they're not communicating with you, they don't care enough
2  about the case, then I don't have a lot of sympathy for
3  them.
4    MR. CAMP BAILEY: Well, I'm sure there are
5  people that fall into that category. I'm more worried
6  about the people who it's not because they've made a
7  conscious decision to not participate, it's just that we
8  find out later they were in the hospital or out of town or
9  they just never got our mail or the neighbor was stealing
10  the mail or for whatever reason, they were not given
11  adequate notice and did not make a conscious decision to
12  dismiss the case.
13    I guess we will file a response on whatever legal
14  basis we can come up with.
15    THE COURT: All right.
16    MR. GORNICK: Your Honor, I do have one last
17  thing and it's quick and I just feel compelled the need to
18  say something -- oh, I'm sorry.
19    MR. ROTH: Judge, if I could just -- kind of a
20  procedural thing on this, Your Honor, and this has come
21  up, several attorneys have asked me this.
22    On these motions to dismiss, Mr. Bailey was just
23  talking about, you know, I think it's CMO2, there's some
24  timeframes, like, 60 days and that's why the defendants
25  filed the motions.

Page 133

1    My concern is that Judge Conway or at least alerting
2  her to the fact that there may be extenuating
3  circumstances or responses that need to be filed and she
4  may be entering orders before the 11 days for a technical
5  response from the plaintiffs on these motions to dismiss.
6    We've seen it happen on the case selection, for
7  example, when the plaintiff -- when the defense wanted to
8  object to one of the -- one of the cases. And so they
9  filed a motion and the District Court judge, Judge Conway,
10  went ahead and entered an order before we had a chance to
11  respond.
12    So the concern is just procedurally, do these motions
13  to dismiss fall under the regular 11 day response time or
14  at least 30 days --
15    THE COURT: Well, that's my understanding. I'll
16  make sure Judge Conway is aware of your concern.
17    MR. GORNICK: Your Honor, the issue I want to
18  raise and I feel I need to bring this to the Court's
19  attention because of the Court's intention to issue an
20  order that will notify litigants that there is this
21  confidentiality agreement.
22    We have some serious issues with that agreement which
23  was negotiated before a single document was produced. And
24  it goes to how we're going to file documents that they
25  have designated as confidential.

Page 134

1    What the agreement now says is:  Any document that's
2   been stamped confidential, if we want to file it, we have
3   to file it under seal.  Okay?
4    The only way that we can challenge is to either
5   notify AstraZeneca that we don't think a document was
6   properly designated and they essentially have 30 days to
7   then bring a motion to this Court.
8    THE COURT:  That's why I don't like those
9   orders.
10    MR. GORNICK:  And then the other thing is we
11   could actually bring it to the Court's attention, that's
12   paragraph 4A, and seek a designation ourselves.  The
13   problem is, is that in our view, there's been a vast
14   overdesignation of confidentiality.
15    THE COURT:  I have no doubt of that.
16    MR. GORNICK:  And then we've received so many
17   documents late in the day, the concept that we would go
18   through them and the challenging confidentiality in some
19   small subset of the documents and that's just not true.
20    We have millions of confidential documents.  And when
21   they start filing their motions, we need to file
22   oppositions, we need to attach documents they say
23   confidential on them and we're stuck.  And we're stuck
24   because we haven't had the ability to give them -- figure
25   out what documents we're going to need far enough ahead of

Page 135

1   time and impose a motion to give them 30 days notice.
2    MR. MAGAZINER:  So Mr. Gornick's remedy is to
3   file it under seal.  And if he wants to --
4    THE COURT:  Well, no, he's got to seek leave to
5   file it under seal which --
6    MR. GORNICK:  Local rules don't allow it.
7    THE COURT:  -- as you have learned I'm not too
8   inclined to grant.  So --
9    MR. MAGAZINER:  Well, but he doesn't have to
10   seek leave to file it, as I understand.  He doesn't have
11   to seek leave to file under seal something that has been
12   designated as confidential.
13    THE COURT:  Oh, yes, he does.
14    MR. MAGAZINER:  Okay.  Well --
15    THE COURT:  And that's why I wouldn't enter the
16   order.  That's exactly -- that's the primary reason I
17   don't enter these orders because I don't like that in this
18   whole process because it's -- what's happened here is what
19   happens in most of these cases, and oftentimes there's
20   corporations on both sides, is everybody wants to
21   designate almost everything as confidential and almost
22   none of it really is.
23    Now, I'm not prejudging anything here, but for
24   walking around purposes, companies don't want people
25   talking about stuff.  But when it's in litigation, there's

Page 136

1   really not very much that's protected from public
2   disclosure because it's in open court.  This is taxpayer
3   funded.  Here we are.
4    I'll say this:  You reached an agreement, which I
5   told you I wasn't going to bless as an order back a year
6   ago.  If you want -- and it's -- this cumbersome notion of
7   confidentiality versus filing versus seal is one of the
8   reasons.
9    If you want to try to -- it is way too cumbersome and
10   it -- I can't anticipate what motions you decide he's
11   going to file or what responses the other side is going to
12   feel like they have to file and what they need to -- just
13   like this issue we had with the salacious stuff.  But
14   you -- we are now getting into where the cooperative and
15   the adversarial hit heads as you -- you can either try to
16   renegotiate that agreement and present it to me in a way
17   that's less cumbersome, or as you encounter motions that
18   you need to file or motions you need to respond to, that's
19   an awful lot of conferring between counsel, but you'll
20   have to confer, here's what we're planning to attach,
21   you've labeled them confidential, are they really.
22    I know it says you've got 30 days, but, you know, we
23   need to get this filed, can you tell me in three days
24   whether you really think it's confidential and why.  And
25   if so, do you want to file the motion to file under seal

Page 137

1   or do you want me to.
2    But just so you're clear about what my attitude is,
3   most of this -- just company stuff is not going to be
4   worthy of filing under seal.  And let me explain to you
5   why.
6    There's a public policy purpose that this is an open
7   public forum.  It's also just physically cumbersome to --
8   for the clerk's office and for chambers to deal with it
9   when it's under seal.  It just -- it doesn't work very
10   well.  And that was even before we went to electronic
11   filing and it'd be even more true now.
12    MR. GORNICK:  In all due fairness, we haven't --
13   I don't believe our side has actually started the meet and
14   confer process with Mr. Magaziner.  We were discussing
15   this, I think, late last week or Monday.  And I just --
16   your comment just led me -- I just had to tell you --
17    THE COURT:  I understand.
18    MR. GORNICK:  -- about where we were.  And so we
19   will engage on that.  But it's an issue.
20    MR. MAGAZINER:  Very well.
21    THE COURT:  All right.  When shall we meet
22   again?
23    MR. GORNICK:  Your Honor, we can't meet again
24   too soon.  I mean, we have so much --
25    THE COURT:  I'll be here tomorrow morning.

Page 138

1    MR. GORNICK: So am I, actually. People here
2  might kill me.
3    THE COURT: I was planning to pack, but --
4    MR. GORNICK: I'm not kidding. I mean, two,
5  three weeks that couldn't be too long, the sooner the
6  better. We have a lot to do and we just get further and
7  further behind the eight-ball every day that goes by that
8  we don't get what we need.
9    THE COURT: Well, we won't meet next week.
10  September 4th I have got a two-day trial, September 6th is
11  pretty busy. I could meet the 7th.
12    MR. KEN BAILEY: Did you indicate when we were
13  going to get back with you on the supervisor, the IT guy,
14  what --
15    THE COURT: Tuesday sounded reasonable. See if
16  you can't come up with a joint recommendation.
17    MR. MAGAZINER: September 7th, Your Honor, I
18  have an argument in the Court of Appeals in the District
19  of Columbia Circuit.
20    THE COURT: You're not one of those lawyers that
21  can be in two places at once?
22    MR. MAGAZINER: No.
23    THE COURT: I haven't met that lawyer yet. I
24  often say unkind things about circuit judges, but I won't
25  presume to interfere with their docket. Standard trial

Page 139

1  judge humor about -- appellate judges, don't understand.
2  They say the same things about us.
3    MR. MAGAZINER: September 11th work for you,
4  Your Honor?
5    THE COURT: Well, it'll have to be shorter than
6  this one if we do that. We've got a holiday later in that
7  week we would like to respect.
8    Let's do it the 11th. But it'll have to be a shorter
9  agenda.
10    MR. MAGAZINER: That'll be -- it's a Tuesday.
11    MR. MCCONNELL: What time of day, Your Honor?
12    THE COURT: Well, let me confer. I've got
13  criminal duty that day. So let me confer with my boss
14  here.
15    All right. We'll do it in the morning. Let's make
16  it 9:30.
17    MR. MAGAZINER: May I confer with my clients for
18  one moment, Your Honor?
19    THE COURT: All right.
20    MR. MAGAZINER: That's fine, Your Honor. Thank
21  you.
22    THE COURT: All right.
23    MR. GORNICK: Your Honor, my understanding is
24  you don't expect anything from the plaintiffs between now
25  and then on the sanctions issue or the discovery related

Page 140

1  to that and we're going to ferret out those issues with
2  the new technical --
3    THE COURT: I think that'll be one of the major
4  subject matters, but it won't be as an extended discussion
5  as we might otherwise have or might have later in
6  September.
7    MR. GORNICK: Do I also understand this
8  correctly that we should so that everything we can to agree on
9  somebody by Tuesday and in the event we can, we should
10  have that person engaged and start?
11    THE COURT: Well, I need to give them authority.
12    MR. GORNICK: Okay.
13    THE COURT: But if you submit the -- if you have
14  a joint recommendation and I approve it, then I'll appoint
15  him next week. If not, if you have -- if you each submit
16  separate ones or I get suggestion from my friends out in
17  Sedona, I might have a telephone conference with you,
18  we'll hash that out.
19    MR. GORNICK: Okay. Because my concern is that
20  timing is that this person will have to do a lot of work
21  to figure out what happened in the past before we can
22  figure out going forward.
23    THE COURT: A little bit of that.
24    MR. GORNICK: How do we find the holes? And the
25  example is --

Page 141

1    THE COURT: I understand. I mean, he's going to
2  have to do -- or she's going to have to do top to bottom,
3  but, you know, there's --
4    MR. GORNICK: To highlight this --
5    THE COURT: I don't want to get bogged down in
6  the weeds.
7    MR. GORNICK: And I don't mean this to be
8  adversarial, but to highlight it, they say they have
9  investigated this alternate e-mail box issue, they say
10  it's not an issue, no one has an alternate e-mail box. I
11  have evidence right here today that they do.
12    THE COURT: I understand. There'll be discreet
13  issue, but --
14    MR. GORNICK: Yeah. Okay.
15    MR. MCCONNELL: Can I just address that very
16  quickly because it's come up.
17    There are not other e-mail addresses. There's
18  another issue, we'll talk about it with Mr. Jaffe, whether
19  it's the -- as you characterized it, mysterious de-duping
20  process, I don't know. It's something wrong, but it's not
21  another mailbox. That's it.
22    And, Your Honor, one last thought, if we can make
23  this innovative, independent IT expert process work,
24  really help this case, really break new ground and trust
25  that Your Honor will use good auspices to make sure that

Page 142

1   we can all be on the panel at Sedona in the next year.
2       THE COURT:  Sedona is a lovely city.  Good
3   hiking to be done out there, if you can stand the heat, at
4   least in the summertime.
5       All right.  We're in recess.
6           (end at 4:22)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 143

1           C E R T I F I C A T E
2
3       I certify that the foregoing is a correct
4   transcript from the record of proceedings in the
5   above-entitled matter.
6
7
8
9
10  _____        _____
11  Sandra K. Tremel
12
13
14
15
16
17
18
19
20
21
22
23
24
25