112006mdl.txt

1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                  ORLANDO DIVISION

 3          Docket No.6:06-MD-1769-Orl-22DAB

 4    . . . . . . . . . . . . . . . . . .
      IN RE:                          :
 5    SEROQUEL PRODUCTS LIABILITY      :
      LITIGATION                       :       Orlando, Florida
 6    MDL DOCKET No. 1769              :       November 20, 2006
                                       :       10:00 a.m.
 7    ALL CASES                        :
                                       :
 8    . . . . . . . . . . . . . . . . .:

 9
                TRANSCRIPT OF PRETRIAL CONFERENCE
10           BEFORE THE HONORABLE DAVID A. BAKER
                UNITED STATES MAGISTRATE JUDGE
11

12    APPEARANCES:

13    For the Plaintiffs:          Paul Pennock

14                                 Larry M. Roth

15                                 K. Camp Bailey

16                                 Fletch Trammell

17                                 Matthew E. Lundy

18                                 Keith M. Jensen

19                                 John J. Driscoll

20                                 Lawrence J. Gornick

21                                 Michael E. Pederson

22

23

24    Court Reporter:  Sandra K. Tremel, RMR/CRR

25
```

2

```
 1          APPEARANCES CONTINUED:

 2    For the Plaintiffs:          F. Kenneth Bailey, Jr.

 3                                 W. Todd Harvey

 4                                 Ken Smith

 5                                 Karen Schaeffer
```

Page 1

112006mdl.txt
```
 6                              Lizy Santiago

 7   For the Defendant

 8   AstraZeneca:              Michael W. Davis

 9                             James W. Mizgala

10                             Tamar B. Kelber

11                             Robert L. Ciotti

12

13   Proceedings recorded by mechanical stenography, transcript

14   produced by computer-aided transcription.

15

16

17

18

19

20

21

22

23

24

25
```
                                                        3
```
 1                    P R O C E E D I N G S

 2           THE DEPUTY CLERK:  The case number is

 3   6:06-MD-1769-ORL-22DAB.  In re: Seroquel Products

 4   Liability Litigation.

 5       Counsel, in the courtroom, please state your

 6   appearances for the record.

 7           MR. PENNOCK:  Paul Pennock, Weitz & Luxenberg

 8   for plaintiffs.

 9           MR. DAVIS:  Larry Roth for the plaintiffs.

10           MR. CAMP BAILEY:  Camp Bailey for the

11   plaintiffs.
```
                        Page 2

112006mdl.txt

12          MR. TRAMMELL:  Fletch Trammell, Bailey Perrin

13   Bailey for the plaintiffs.

14          MR. KEN BAILEY:  Ken Bailey, Bailey Perrin

15   Bailey for the plaintiffs.

16          MR. PEDERSON:  Michael Pederson Weitz &

17   Luxenberg for the plaintiffs.

18          MR. JENSEN:  Keith Jensen for the plaintiffs.

19          MS. SANTIAGO:  Lizy Santiago for the plaintiffs.

20          MR. DRISCOLL:  John Driscoll for the plaintiffs,

21   Your Honor.

22          MR. DAVIS:  Michael Davis, Sidley Austin on

23   behalf AstraZeneca.

24          MS. KELBER:  Tamar Kelber, Sidley Austin

25   AstraZeneca.

                                                        4

1          MR. MIZGALA:  James Mizgala on behalf of

2   AstraZeneca.

3          MR. CIOTTA:  Robert Ciotta, Carlton Fields on

4   behalf of AstraZeneca.

5          THE DEPUTY CLERK:  Counsel on the telephone,

6   please state your appearances for the record.

7          MR. LUNDY:  Matt Lundy for the plaintiffs.

8          MR. HARVEY:  Todd Harvey for plaintiffs.

9          MR. GORNICK:  Larry Gornick for the plaintiffs.

10          MR. SMITH:  Ken Smith for plaintiffs.

11          MR. BURDINE:  Scott Burdine for plaintiffs.

12          MR. SCHNEIDER:  Pete Schneider for plaintiffs.

13          MS. SCHAEFFER:  Karren Schaeffer for plaintiffs.

14          THE COURT:  Anybody else on the phone?

15          MR. JAFFEE:  Jonathan Jaffe for the plaintiffs,

16   but not counsel.

17          MS. NIXON:  Angela Nixon for plaintiffs, but not

112006mdl.txt

18    counsel.

19              THE COURT:  Is that it.  Anybody else?

20              MR. PENNOCK:  I think that's it, Your Honor.

21              THE COURT:  All right.

22         I'm going to start setting some deadlines so the case

23    will continue to move forward.

24         The proposal for a plaintiff's steering committee

25    was -- some names were in the file and it was made Friday.

                                                              5

1     I'm going to leave that for Judge Conway to deal with.

2     But let me ask Mr. Pennock, what scope of authority you

3     contemplated the committee having and whether Mr. Roth

4     should be part of the committee or liaison to the

5     committee and the other plaintiffs.

6              MR. PENNOCK:  Thank you, Your Honor.

7         At present what we're trying to do is put together a

8     committee that has firms which essentially represent all

9     of the plaintiffs that will be here in the MDL.  But

10    despite our efforts, there will no doubt be other firms

11    who are not part of the committee and don't want to be

12    part of the committee that will have cases perhaps.  They

13    may come forward.  They may already be present, were not

14    aware of that, or they may come forward in the future.

15    But in order for, we think for the Court to make orders

16    requiring us to do things and brief things and argue

17    things and so on and so forth, we think we need to have

18    the committee that has authority to speak for those who

19    are not on the committee as well as those on the

20    committee.  If I have -- if I'm here and the other members

21    of the PSC aren't, I think the Court needs to know that

22    I'm able to speak with authority for the rest of the PSC.

23    And the same would go for Mr. Roth who, yes, I think he

                          Page 4

112006mdl.txt

24    should be on the PSC in the role as liaison counsel for

25    the Court.

6

1        This proposal that we're contemplating, we're not --

2    we are specifically not contemplating any type of

3    assessments that some times occur in these MDLs.  For

4    example, if we are ever able to achieve success for our

5    clients here and there is some type of settlement, in many

6    MDLs there's an assesment, and then the PSC members are

7    paid money for the work that they've done from that

8    assessment.  And that assessment comes from every

9    settlement that takes place.  We're only contemplating

10    assessment that will compensate liaison counsel.  We're

11    not looking for an assessment for common benefit for all

12    the work that we may have to do on behalf of our clients

13    over the next couple of years.

14        But in any event, we do have a number of firms that

15    are interested in being on this PSC because they have a

16    lot of cases.  They have a lot of clients that will be

17    here, and they are willing and able to do the work that

18    will be necessary to move this MDL to a conclusion and in

19    particular to move it to a conclusion at a speed that is

20    as rapid as possible.

21        And for all of those reasons, we think that we need a

22    court ordered PSC to represent the plaintiffs' interests.

23        MR. ROTH:  If I might, Your Honor, too, part of

24    the reasons I understand it is to make sure that there are

25    enough firms with attorneys so that things can get covered

7

1    and that we have, if you will, the horsepower to meet the

2    schedules that are already agreed upon or ordered by the

3    Court in terms of depositions or document reviews,

4    whatever it may be.  And that was my understanding and my

Page 5

112006mdl.txt

5    discussions with the other attorneys.  There is sort of a

6    concept of the PSC which is a little bit different than

7    the traditional regular MDL type concept.

8        And the other question I actually I had for the Court

9    is whether you want me -- want a formal motion for Judge

10   Conway on that or she can just take it off the transcript?

11        THE COURT:  Well, is there agreement among all

12   of the plaintiffs' attorneys who have appeared that we

13   should have a committee and it should consist of

14   Mr. Pennock, Mr. Bailey and Mr. Roth?

15        MR. PENNOCK:  Your Honor, actually, in

16   discussions since last conference, we -- looking at what

17   we think we need to move this MDL and particularly in

18   distinct light of Your Honor's comments on what you would

19   like to see happen and when, we actually would like a much

20   broader committee that all of the folks who have a lot of

21   cases here will have a lot of cases here, are integrally

22   involved in the process and in the decision making process

23   by the plaintiffs.  So that, you know, there are a lot of

24   people that, let's say there's a firm that has 1,000

25   cases.  They want to know that they are being included in

                                                              8

1    whatever decision making process we have and that they

2    have a right to be included in that process and a right to

3    deal with all issues that we're going to have to deal

4    with.  So the committee that we contemplated is actually

5    broader in light of the last conference than we had

6    originally suggested and it involves a number of firms,

7    probably upwards of seven or eight firms.  All of them

8    have been -- have appeared here before Your Honor or on

9    the phone.  All of them have been involved with us.  All

10   of them have a substantial number of cases.

                          Page 6

112006mdl.txt

11          There is no firm that we're proposing for this PSC

12      that does not have a substantial number of cases.   And

13      that's very different than many MDLs where sometimes you

14      will see firms coming in without cases that are going to

15      lend their assistance to the MDL and just bill up hours.

16      We're not proposing anything of the kind here.   But there

17      will be more firms than Mr. Bailey's firm, my firm and

18      Mr. Roth's firm that we're asking be allowed to sit as a

19      PSC in front of this Court.

20          THE COURT:   Well, in response to Mr. Roth's

21      inquiry then, I think you need to fix this as a motion

22      with a specific proposal as to who and why they're on

23      there and what the role and authority of that committee is

24      going to be and what its structure is going to be and why

25      that's going to be beneficial.   And you need to get that

9

1       in right away.

2           Throwing a lot of dates out here, so before I fix the

3       date on that, I'll talk about some other issues.

4           I noted in the notice of this hearing that I was not

5       enamored of the proposed order on the production of the

6       plaintiff's facts sheets.   I understand all the arguments

7       about the number of cases and the difficulty that

8       certainly many of the individual plaintiffs have in being

9       organized and supplying information because of the nature

10      of their medical conditions.   But I'm really determined to

11      hold both sides to a faster schedule than you have

12      contemplated there in terms of moving things forward.

13          So it's my thought that on the plaintiff's fact

14      sheets for any of the existing cases that those fact

15      sheets and supporting materials should be produced by

16      December 4.

112006mdl.txt

17              MR. PENNOCK:  Which year, Your Honor?  Of this
18 year?

19              THE COURT:  Yes, sir.

20              MR. PENNOCK:  We had looked at a date that went
21 out into 2008 in terms of the rolling production.

22              THE COURT:  Well, I don't understand that.  I
23 mean, cases are filed.  They should be ready to go.

24              MR. PENNOCK:  Judge, in terms of the -- well, a
25 couple things.  May I address your Court, Your Honor's
                                                              10

1 thoughts on the date?  May I make some suggestions or make
2 some comments on --

3              THE COURT:  I'll hear you.

4              MR. PENNOCK:  We had -- as the Court knows we
5 did sit down with the defendants and worked out a number
6 of things with respect to moving the case forward.  A
7 major component of everything from, that we discussed and
8 agreed to was that we had agreement from the defendants
9 that they did not need to receive all of the fact sheets
10 over the course of even the next four months, let alone
11 the next few weeks.

12      In essence, even if somehow thousands of fact sheets
13 with authorizations were able to be served by December 4
14 of this year, I think the defendants would agree that for
15 the most part a lot of that information would just pile up
16 in their office and would not be addressed and in many,
17 many cases, the authorizations themselves would become
18 stale, in fact.

19      But beyond the practical aspect of can the defendants
20 or are the defendants and do the defendants want to do
21 anything with that mountain of information at this point,
22 I just -- I hope the Court appreciates that that fact
                        Page 8

112006mdl.txt

23  sheet production that we contemplated does not any way

24  slow down the rest of the discovery that has to happen.

25  In other words, we're not suggesting in any way that all

                                                                    11

1  the other things that need to happen in this MDL should

2  await completion of the fact sheet production.   On the

3  contrary.   We're suggesting, and Mr. Roth has a schedule

4  that we developed and have wanted to discuss with the

5  Court, if the Court's interested, a schedule whereby all

6  of the discovery that needs to happen will be happening

7  concurrently with all the fact sheet production that

8  happens.   And in the schedule that we would like to have

9  Your Honor's thoughts on, all of the discovery in this

10  litigation would essentially be complete by, I think it's

11  November of 2008.   So within two years approximately of

12  today.

13       And during the time that we would be doing, we would

14  be collecting probably somewhere on the order of 20

15  million pages of documents from the defendants and

16  reviewing all that, and doing probably several dozen

17  depositions of the defendant, and getting together

18  cases -- sorry -- general expert reports, and doing

19  general expert discovery and general expert depositions.

20  While all of that is going on, we will also be serving

21  thousands of these fact sheets.   And by April 1, I think

22  our proposal contemplated that upwards of probably 2,000

23  cases will have fact sheets and authorizations fully

24  served within a few months from now.

25       And then, you know, there will be this rolling basis

                                                                    12

1  of 500 a month, which I think we have in our proposal

2  would be, nevertheless, completed by March 1 of 2008.   So

112006mdl.txt

3   all fact sheets would be in by that date, March 1 of 2008.

4        But thousands of them will be served within the next

5   four to six months, and thousands more within the six

6   months after that.  So I understand the Court's point

7   that, look, these cases have been filed.  They should be

8   ready to go.  I think that we are ready to go.  We're

9   ready to start litigating these cases.  But what hasn't --

10  we haven't litigated them yet.  And we're ready to move

11  forward with all deliberate speed.  We're ready to start

12  producing anything and everything that we have to produce.

13  And we do not in any way intend to delay or slow down this

14  MDL because of fact sheets.

15       And I think if the Court has an opportunity to look

16  at the schedule that we've contemplated for all the

17  discovery because I think the Court had suggested that you

18  wanted to talk about specific dates today, so we came

19  prepared with a proposal.  Perhaps we jumped the gun on

20  that, but we -- I think you will see, Your Honor, that

21  this fact sheet issue is really something of a red herring

22  in terms of moving the MDL forward.  And in any event, in

23  thousands of cases, we'll have this information very soon.

24            MR. ROTH:  May I present this to the clerk?

25            THE COURT:  All right.

                                                            13

1            MR. ROTH:  Actually, three copies of the same

2   thing.

3            MR. PENNOCK:  If I may also add, Your Honor,

4   this production of fact sheets we do not see in any way as

5   slowing down any dispositive motions of general

6   applicability or, indeed, case specific motions that

7   defendants may want to make as they begin to accumulate

8   information on individual cases.

                        Page 10

112006mdl.txt

9          THE COURT:   Mr. Davis, do you want to comment?

10          MR. KEN BAILEY:   May I make a comment first,

11   Your Honor.   My name is Ken Bailey.

12          Your Honor, I have been involved in the antipsychotic

13   litigation for two and a half years now representing

14   clients in the Zyrexa litigation.   I represented over

15   3,000 of these people.   I have some experience in knowing

16   what it -- the undertaking that it takes to get these

17   people to respond, to get them to focus, to get them to

18   give complete work sheets, fact sheets I mean.   And it is

19   a monumental task.   And I would respectfully ask the Court

20   to take that into consideration.

21          Secondly, I would say to you that what we have done

22   in the Zyprexa litigation was because of this problem in

23   and in order to expedite it so the defendants can get the

24   information they needed, we supplied them with the HIPPA

25   authorization so they could go out and get the medical and

                                                              14

1   so that that didn't delay their ability to be able to

2   interpret whether or not these people might have a medical

3   claim or not.

4          But with all due respect, Your Honor, this would put

5   such a burden on these people that -- I want to give them

6   the best chance to answer them.   I want them to be

7   complete and I really do not think that it impedes the

8   going forward on this particular litigation.

9          MR. ROTH:   If I might, with the Court's

10   indulgence just for a second.   As liaison counsel, I have

11   to tell the Court that -- and I have talked to each of

12   these attorneys on the plaintiff's side, this is the first

13   time I have been involved in this type of litigation, and

14   they will not be able to make the December 4th deadline.

                          Page 11

112006mdl.txt

15   Part of it is because the final version of the fact sheet
16   was only sort of agreed to within the last couple of
17   weeks.  As the Court knows, it's fairly extensive.  I know
18   Mr. Bailey, for example, has some 6,000 cases that he has
19   at some point are going to end up here in Orlando.  And in
20   terms of my role of trying to be at least on some things
21   objective, I've got to advise the Court that that deadline
22   won't, despite ever one's best efforts, won't be able to
23   be met.
24        THE COURT:  Well, I was only talking about the
25   ones that were already here for December 4.  I was going
                                                              15

1    to set another deadline for the other cases as they
2    arrive.
3         MR. ROTH:  The ones that are already here, that
4    fact sheet, that 10 page fact sheet or whatever it is that
5    goes back with information 10 years with a fairly
6    extensive, and I understand it's what's less than what's
7    been used in other cases, you know, even that has just
8    been able to be sent out to the cases that are now pending
9    in terms of getting the information back on those.  So at
10   least as to the pending cases, even some leniency towards
11   moving that deadline back a little bit would be helpful
12   because, again, we had the one page fact sheet that
13   because we did not have the initial agreement that we
14   thought would give them the information they needed for
15   purposes of statute of limitations, did they even take the
16   drug, that sort of thing.
17        And then, finally, we did not end up with the final
18   fact sheet until the last two weeks.  And it's just
19   impossible to, even with the pending cases to get all that
20   filled out, all the authorizations signed, you know, by

Page 12

112006mdl.txt

21  December 4, Your Honor.

22      It's just -- I mean, I don't know how to be more

23  candid or frank than that.  Not that it doesn't want to be

24  done, but they would need some additional time on that for

25  the pending cases.

                                                            16

1       MR. BAILEY:  We spent time on these cases before

2   they were ever filed trying to thin them out best we

3   could, but some of the information you get back from these

4   clients are not the most accurate that you can possibly

5   rely upon.  But we also had to go down and file these

6   cases because of the statute of limitations in order to

7   protect their rights.  So to say that because we filed the

8   lawsuit, we're ready to go, is really not factual in

9   reality, unfortunately.

10      The last thing I would say to the Court is that we

11  approached the defendants who I would like to advise the

12  Court that we have been working as closely as we can with

13  them on their concerns, and they have been trying to deal

14  with us on our concerns.  And they -- and I'll let

15  Mr. Davis respond to this -- but they even agree that

16  would be all right for them to receive these fact sheets

17  on a rolling basis.  I would ask your consideration of

18  that, please, sir.

19          THE COURT:  Mr. Davis?

20          MR. DAVIS:  Yes, Your Honor.  Good morning.

21      We have, as the Court knows, emphasized the

22  importance of completion of the plaintiff's facts sheet.

23  What Mr. Bailey has said is right.  We had worked out an

24  arrangement in terms of a roll out basis in connection

25  with the completion of the plaintiff's fact sheets.  It

                                                            17

1   was critical that we get the plaintiff's fact sheet which

                    Page 13

112006mdl.txt

2   provided us with the information that we needed.   And it

3   was critical that we get it in a timely fashion.   But we

4   had worked out what we thought was an appropriate and

5   acceptable timeframe.

6           THE COURT:   Mr. Roth, do you know how many cases

7   are here now?

8           MR. ROTH:   Last count I think on Friday there

9   was like 200 cases and about 850 different plaintiffs.   I

10  may be off 30 or so plaintiffs, but that's -- when we

11  checked on Friday that's what Mollie indicated that had

12  been transferred here.

13          THE COURT:   When do you think these thousands

14  are going to roll in?

15          MR. BAILEY:   Your Honor, we filed the lawsuits

16  and it's just a matter of the Court -- there transferring

17  them down.

18        And my son has, Camp, has been in contact with your

19  office, your clerk here.

20          MR. CAMP BAILEY:   She called me a couple weeks

21  ago on a fact finding mission.   The first wave of our

22  cases have been on file for over six months now, I think.

23  And the defendants have answered -- they're somewhere in

24  the process -- they have been notified to the Court up in

25  Massachusetts where our cases are that they are tag along

18

1   actions subject to being transferred to this MDL.   It's

2   just somewhere -- the JPML, wherever gets in that system.

3           THE COURT:   I have never quite figured out how

4   that works.

5           MR. CAMP BAILEY:   However it gets back to here,

6   until it gets docketed down here, we have no control over

7   pushing them through any further.

Page 14

112006mdl.txt

```
 8              MR. ROTH:  They're trickling in, as you can see.
 9    The conditional transfer orders are -- I mean, I think
10    there's only been three.
11              THE COURT:  That's what surprises me.  And
12    having been transferor court for a number of cases over
13    the years too, it's -- the way they communicate with the
14    local courts is less than satisfactory.  I'm sure it's
15    frustrating to counsel as well.
16              MR. BAILEY:  Your Honor, I know we have close to
17    6,000 cases that are going to be coming here for this MDL.
18    So I don't know about the other people, but I know that
19    that amount is coming.
20              MR. PENNOCK:  If I may just make one other
21    comment.  I'm sure the Court observed this.  But if a firm
22    has less cases -- I think our number is 500.  There's a
23    much more rapid requirement for disclosure of the fact
24    sheet.  I think it was 45 days if they're already here,
25    and 90 days after they get here if they're not here.  So
```
                                                                    19
```
 1    in terms of any volume of cases that as you point out
 2    should and could be more quickly prepared, we tried to
 3    account for that in saying that, yes, these cases if you
 4    don't have 6,000 cases, you have got to get your fact
 5    sheets done much more quickly.
 6         My firm, for example, although our proposal was a
 7    rolling production, all of my fact sheets will be served
 8    and filed, I think I estimate about June or July, assuming
 9    I have 2,000 cases in the end.
10         So you know, although it's not started, the actual
11    process, it doesn't start until 120 days from entry of the
12    order.  You know, within a couple months after that, I'll
13    have 1500 sheets that have been served and filed.  And
```
                              Page 15

112006mdl.txt

14    again --

15          THE COURT:  But my problem with this is this all

16    should have been done months ago and we're starting -- you

17    want to start it months from now.

18          MR. PENNOCK:  We have served --

19          THE COURT:  This is information that most of

20    which I assume now, I understand Mr. Bailey's point, but

21    you know, before you took these clients on, you studied

22    them to some degree to make sure they have claims that

23    they fit within the profile, and, you know, took you

24    months to come up with the agreement.  I don't consider

25    that an excuse for not having things ready.  The fact that

                                                              20

1     you and the defendant couldn't agree on the form for

2     the -- you should have been getting things ready.

3     Whatever was going to be, you knew what you needed.

4           MR. PENNOCK:  We did, Judge.  We did send it out

5     in anticipation of that as soon as we realized where

6     things, the direction things were going.  We originally

7     contemplated this one page fact sheet that clearly would

8     encompass all of the information that we would have

9     already had.  But there is a lot of information -- this

10    may only be nine or 10 pages, this fact sheet, but, you

11    know, if you look at it in terms of each -- if you start

12    counting the questions, there are literally hundreds of

13    questions in this nine or 10 pages.

14          THE COURT:  I understand.

15          MR. PENNOCK:  So for example, you know, if you

16    look at this table, you know, with the clients, on page 7

17    of the fact sheet there's a table saying have you ever

18    been diagnosed with any of the following.  And a lot of

19    these things are just things that we may not have asked
                          Page 16

112006mdl.txt

20  about during our initial discussions.  Even more to the

21  point is family medical history.  To the best of your

22  knowledge -- this is on page 8 of the proposed fact

23  sheet -- obesity, has anyone in your family, parents

24  sibling, children or grandparents ever suffered any of the

25  following:  Obesity, hypertension or high blood pressure,

                                                              21

1  vascular problems, poor circulation, high cholesterol,

2  alcoholism, and so forth.  And there are a lot of

3  questions in this fact sheet directed at that that really

4  is information that even under the best of scenarios that

5  you need to evaluate whether somebody's case might have

6  merit.

7        And as Mr. Bailey pointed out, there was some

8  concern.  There is always some concern that your time is

9  ticking and you need to file cases.  Realizing that you

10  are going to have as quickly as possible investigate them

11  and move them out if they're not a case.

12       But we did put this -- did take us several weeks to

13  put this fact sheet together, you're right, Your Honor.

14  But we have sent it out to our clients, and we are getting

15  them back and we're starting to try and process them to

16  get ready for the initial disclosure.

17            MR. CAMP BAILEY:  Judge, Your Honor, may I add?

18  You know, as a practical matter, when we take these

19  clients in, we have them fill out an extensive --

20  extensive questionnaire with us.  We interview them.  We

21  make sure they have a prima facie case.  When we got down

22  here we recognized the defendant's need -- if they're

23  going to need a fact sheet.  We tried to come up with that

24  with our one page fact sheet.  We had some basic

25  information.  The defendants always had a different view

                          Page 17

112006mdl.txt

22

1  of needing additional information, but until we were able
2  to get together and agree to the scope and form of the
3  fact sheet, we're kind of in a holding pattern in being
4  able to send that out to our own clients.
5      As a practical matter, until we finally agreed and
6  hear that the Court is good with that form of the fact
7  sheet, the practical matter is we send that out to our
8  clients.  The clients are required in there to sign an
9  acknowledgement or verification.  They have got to go
10  through and answer questions that we never even
11  contemplated when we first signed up the case.  Certainly
12  goes beyond the basic information that we think merits the
13  prima facie case.
14      So when we thought about that, and I mean that
15  involves mailing it out to the clients, letting them send
16  it back to us, having us review it and see if there's
17  anything there that's, you know, maybe not subject to
18  discovery or whatever, subject to privilege or stuff like
19  that.  And it normally involves sending it back to them
20  and having them sign it again.
21      So even on a normal plaintiff -- I mean with all of
22  his capabilities and everything, it's a massive
23  undertaking.  With these plaintiffs it's even more so.
24  And all that was taken into account.
25      To show how serious we view this issue we have hired

23

1  20 something people, have them on stand by ready to go on
2  this massive undertaking.  We have agreed with the
3  defendants to a dismissal procedure for all this stuff on
4  being able to get these into them in a timely manner and
5  if they don't get in then we have agreed those cases need

Page 18

112006mdl.txt
6    to go away.  But we all put a lot of thought and

7    compromise into coming up with a comprehensive plan to

8    make sure all this could be taking forth, which I don't

9    think in any way would impede any of the other issues

10   before the Court.

11           MR. KEN BAILEY:  Your Honor, one last comment.

12   We have done this, like I said, with these people.  And

13   when you even get them on the telephone for an hour or two

14   you still do not get everything completed because halfway

15   through the deal they might go off into wherever they go,

16   you know.  I just -- you said this at the original hearing

17   we had that you recognized the difference of these

18   clients.  And I would really, really like to ask your

19   consideration of the plight that these people have.

20           THE COURT:  All right.  Let's move on.  I'll

21   enter an order with a schedule for you.

22       This proposed confidentiality order, I got to tell

23   you that I couldn't read that without going cross eyed.

24   It's most convoluted -- well, not the most convoluted

25   thing I have ever seen, but it's convoluted and it seems

                                                           24

1    to me unworkable.  And I just don't understand it's

2    necessity.  And the potential impact on third party

3    witnesses, if there are any, I just don't know how anybody

4    would know what they're doing under this proposed order.

5           MR. DAVIS:  Well, Your Honor, the order was

6    worked out between us and the plaintiffs.  And it was an

7    arduous process in terms of coming up with what both

8    parties agreed to.  Parties submitted it.  There was in

9    effect an agreement regarding it.  We have pursuant to the

10   Court's order of September 21, produced our IND and the

11   NDA pursuant to the protective order.

                        Page 19

112006mdl.txt

12          If there are awkward provisions in there, it's
13   probably a result of some draftsmanship.  I think the
14   plaintiffs had found it comfortable to live with.  We have
15   found it comfortable to live with.  The Court has
16   identified one particular provision that needed to be
17   worked out and changes have been made with respect to that
18   one particular provision.
19          MR. PENNOCK:  Your Honor, these confidentiality
20   orders, you're right, are extremely difficult to wade
21   through.  And they do take hours to even figure out, okay,
22   what is the defendant, why does the defendant have three
23   paragraphs on this and how does this affect us.  But
24   really what it comes down to, why these orders are
25   negotiated or why we even agree to them is speed of the

                                                              25

1   MDL.  We want the documents and the only way we can get
2   the documents to start looking at them is to have an order
3   like that, because otherwise, they very legitimately say,
4   well, we can't give it all to you until we all go through
5   it, because we need to go through it and find out, does
6   this -- is this really protected?  Is there some type of
7   privilege that we honestly and truly have on this
8   document?  Or is there some type of trade secret that's
9   somehow contained in there?
10          Now, I think as the Court no doubt realizes and I
11   certainly do, 99 percent of those documents will not
12   ultimately have a real privilege or confidential claim to
13   them or trade secret claim, but it's the one percent or
14   less that may be mixed in that they need to -- that they
15   need to go through it on, go through the entire disclosure
16   on before they give it to us.
17          So that's why we agreed to these convoluted orders,
                          Page 20

112006mdl.txt

18   because we want to get the stuff and start looking at it
19   ourselves.   And if we signed off and protected them, then
20   we can get it and we can get the document review going and
21   then we can get the depositions going and we can get to
22   the end of the tunnel in terms of all the discovery that
23   needs to happen.
24        Now along the way, I would -- I would imagine will be
25   coming to Your Honor and to say, Your Honor, these
                                                           26
 1   documents clearly are not confidential.   I mean they're
 2   protected right now because they gave them to us, but we'd
 3   like to take them off the list and so forth.   These
 4   documents are not trade secrets.   We want to take them off
 5   the list.   Thus making things a lot easier in terms of as
 6   you say third party depositions and so forth.
 7        But to get the ball rolling, I must admit that we
 8   probably do need an order of this nature.
 9           MR. DAVIS:   Your Honor, and I think I said at
10   the outset when we were first before the Court and Judge
11   Conway that a protective order was a sine quanon in
12   connection with the documents.   We can't emphasize how
13   important it was.   The parties have worked on this.   This
14   is not a protective order that differs in any material
15   respect from the protective orders that have been entered
16   in dozens of MDLs.   I mean, the model for the protective
17   order was protective orders that Mr. Pennock is very
18   familiar with.   It reflects and resembles exactly what has
19   been done in any number of other situations.
20        And again, Your Honor, pursuant to the Court's order
21   of September 21, consistent with the Court's most recent
22   order, we produced the IND and NDA pursuant to the
23   protective order that the parties worked out that we

112006mdl.txt

24  submitted.  And in connection with the Court's order,
25  there was one provision as we read the order that raised a
                                                           27
1   difficulty.  We have had discussions with plaintiffs'
2   Counsel about that one provision, and that's what's --
3   that's the issue that we're discussing and the issue that
4   separates us in terms of what I understood to be the
5   Court's acceptance of the protective order pursuant to,
6   which again, we have produced the IND and the NDA which as
7   the Court knows contains a wealth of critically important
8   information to the plaintiffs.  That's been done.  We met
9   that deadline, that obligation that the Court imposed.
10  And it was pursuant to that protective order as the Court
11  treated it as a stipulation that we produced the IND and
12  the NDA.
13          THE COURT:  Why is it not sufficient for this to
14  continue a stipulation without a court order?
15          MR. DAVIS:  Well, I think, Your Honor, the
16  parties contemplated that it would be a court order, and
17  you know, I think the Court -- the Court's imprimatur on
18  the protective order, one, is critical to our going
19  forward and essential to our going forward.  So that we
20  can come to the Court if they have a disagreement with
21  respect to the order and say there's some provision in
22  there that is not being lived up to.  And similarly to us,
23  if there's something taking place where there's a dispute.
24  We can come to the Court pursuant to the protective order
25  that the parties have agreed to that they worked out over
                                                           28
1   a long period of time.  There is this one narrow --
2           THE COURT:  Precisely why is it better to have
3   that in the form of an order rather than trying to do
4   enforce a stipulation?
                        Page 22

112006mdl.txt

5           MR. DAVIS:  Your Honor, I have -- I agree that a

6    stipulation is fine, and we can move to have it pursuant

7    to the stipulation.  But I think it's contemplated by the

8    parties that it would be a protective order entered by the

9    Court, and we have submitted it to the Court.

10          THE COURT:  I tell you why I don't like doing

11   those and routinely I do not.  This is your language.  I

12   don't like your language.  And like I say, it's -- to me

13   it is what it is, but to me it's -- but it's your language

14   and you agree to whatever you want to agree to as between

15   yourselves if you think you know what it means.  And it

16   may be that at some point I'll be called on to interpret

17   or Judge Conway will be called to interpret it to enforce

18   it.  We're used to doing that.  We can handle that even if

19   we don't like the language.  But if I sign it as my order

20   using your language, then I'm interpreting now what is my

21   order.  I'm not comfortable doing that when you're the

22   ones that's drafted it and done it in a way I find

23   confusing.  And to the extent it affects third parties,

24   for me to enter an order without having heard them or for

25   them to have an opportunity to have some input on this,
                                                          29

1    I'm not comfortable with that either.

2           MR. DAVIS:  Well, again, Your Honor, I think in

3    good faith consistent with the Court's order, we produced

4    the NDA and the IND and Court has entered an order saying

5    that this is a stipulation and that the parties, the

6    plaintiffs and the defendants are bound to the language

7    that's contained in the protective order with the

8    exception of this one provision that's being worked out.

9    We would ask the Court to enter it.

10          I recognize that there may be parts of it that the
                            Page 23

112006mdl.txt

11   Court has not previously seen.  But I can tell the Court
12   that given the number of plaintiffs' lawyers with whom we
13   have dealt and the amount of effort that we have put into
14   it, it took a long time and it was a long road to travel
15   to get to this language.  And each one of these sentences
16   was looked at exceptionally carefully and parsed by us and
17   by plaintiffs' counsel.  And with all due respect, Your
18   Honor, the plaintiffs' group is quite experienced in MDL
19   and we have substantial experience ourselves.
20       This sort of order that we have tendered to the
21   Court, which I recognize the Court acknowledges, is a
22   stipulation between us and plaintiffs, has been routinely
23   regularly entered in MDLs that we appear in and that
24   plaintiffs' counsel appear in all of the time.
25       So with all due respect -- if there is a time when

                                                              30

1    there is an issue that arises with respect to the
2    protective order, we can explain each and every one of
3    those provisions and explain how it is that it should
4    impact that particular situation.
5        I myself, Your Honor, don't foresee any difficulties
6    arising with respect to the stipulation and the scope and
7    nature of this protective order.
8        The only issue that could be -- that might arise are
9    some issues with respect to what documents have been
10   designated as confidential and whether they should be
11   confidential.  But that is not -- that is not uncommon in
12   these sorts of situations, and the Court deals with it on
13   a rather routine regular basis.  We're not going to be
14   designating what we believe is an overly broad number of
15   documents confidential, and most of the time that gets
16   worked out between us and plaintiffs' counsel regarding

112006mdl.txt

17    the proper designation.  If they pick up the phone with

18    respect to a document that's been designated as

19    confidential and they say, we don't believe it is.  We're

20    not going to spend the Court's time trying to file a

21    motion to secure its protection if indeed it is not.

22         So to the extent that that's a concern, it should not

23    be.  I do not believe we're going to be before the Court

24    very often with respect to the scope and meaning of this

25    protective order given, again, that the parties have

                                                                31

1     worked on it and it is, as the Court says, a stipulation

2     between the parties.

3              MR. PENNOCK:  Your Honor, I have to say, it is

4     honestly and sincerely very refreshing that we're before a

5     Court that recognizes that a lot of this stuff should not

6     be confidential and that the Court does not want, as the

7     Court said at the first hearing, I think you made a

8     comment, I'm sure you don't want a lot of those documents

9     seeing the light of day.  But to make this work, and to do

10    all the things we need to do, I must admit that we do

11    need -- they do need some kind of protection going forward

12    so we can start the ball rolling.

13             THE COURT:  All right.

14        I understand there's some issue about the format of

15    the documents produced by the defendant with respect to

16    the IND and the NDA.

17             MR. PENNOCK:  That's correct.  And Camp is going

18    to address that, if you don't mind.

19             MR. CAMP BAILEY:  I know we have had

20    conversations and Jonathan Jaffe who is on the phone from

21    Weitz & Luxenberg in New York who I think has had a

22    conversation with the defendants' computer people.  When

112006mdl.txt

23    we first came here on September 7, we talked about the
24    obvious necessity for the IND and the NDA and Seroquel.
25    We never discussed the particular format in which it would
                                                                    32
1     be produced.  There was a discussion about CDs versus hard
2     drives and all that stuff.  But Mr. Pennock said he's not
3     a computer expert, doesn't care how it's produced as long
4     as it's searchable and readable.  I think under the new
5     federal rules that go into effect here in 10 days, there's
6     a whole bunch of provisions in Rule 34 that talks
7     specifically about the formatting of electronic documents.
8         To make a long story short, when we got the NDA and
9     IND the other day, they were on DVDs that we immediately
10    had Jonathan and his computer people review them.   And
11    what they were, they were in multi-page TIFs with no Bates
12    range on them, no way to identify them from the documents.
13    So basically they were unusable, unreadable.   And there
14    are certain documents that are over a gig in size that
15    even the most sophisticated computer can't even open.   And
16    so we would just like an opportunity to specify the manner
17    in which they produce documents to us to where they're
18    reasonably usable which I think will greatly enable us to
19    try to meet the goals of moving this thing along in a
20    timely fashion.
21        MR. PENNOCK:   Your Honor, if I may, Mr. Jaffe is
22    in charge of the IT department of Weitz & Luxenberg, has
23    been for several years.   He's been involved in numerous
24    document disclosures in different litigations.   And in
25    fact, has helped craft a proprietary document data server
                                                                    33
1     or document server that we have used in litigation.   So
2     he's very familiar with all these issues if the Court has
                              Page 26

112006mdl.txt

3    any questions for him because, unlike Your Honor, I would
4    not be -- I'm not versed in this information.
5        But he runs a very large IT department at our firm
6    servicing 60 lawyers and 350 support staff and he's very
7    familiar with these issues.
8        MR. DAVIS:  If I may, Your Honor, I don't have
9    the head of our IT department with me, but I do have with
10    me the head of our IT team in terms of the work that's
11    been done in connection with the production of documents
12    and the person who is familiar to plaintiffs' counsel, my
13    partner, Tamar Kelber, who has addressed all of these
14    issues with plaintiffs' counsel.  And with that, Your
15    Honor, I'll ask that Ms. Kelber be permitted to address
16    the Court.
17        MS. KELBER:  We, before producing the IND and
18    the NDA, asked plaintiffs for feedback on the format of
19    the production.  I think we have different recollections
20    of what our discussions were.  But it is true that there
21    was no information provided from the plaintiffs before our
22    production regarding the format that they were interested
23    in.  In the absence of direction and with the deadline
24    looming, we reproduced the IND and the NDA in the same
25    format as it's maintained at AstraZeneca.
                                                              34

1        The reference that Mr. Bailey made with regard to
2    file size follows from the fact there are a lot of files
3    in AstraZeneca's system that are large.  So we took the
4    file as it was and reproduced it on a disk.
5        Since receiving the IND and NDA disks, the plaintiffs
6    have raised a number of issues.  We, last Friday, had a
7    call with their IT person and some people with more
8    specific IT knowledge from our firm.  They gave us a list

112006mdl.txt

9    of questions and we are following up on them.

10        At this time I think we seem to be working the issues

11   out amongst ourselves, and I expect and hope that we will

12   resolve all the issues regarding the specific format of

13   further productions and regarding any supplementation that

14   we need to be done with regard to this production amongst

15   ourselves.

16        MR. JENSEN:   Keith Jensen for plaintiffs.   I'm

17   speaking today -- I don't think it jumps ahead.   There's a

18   lot of overlap of issues, I submit, between the

19   preservation order that we proposed to the defendants.

20   There's also not only a classic preservation order but a

21   production protocol order.   And I would be happy to sit

22   down and present that as Your Honor deems fit later.   But

23   there is a great deal of overlap of the issues addressed

24   in the Manual for Complex Litigation that we're proposing

25   in our preservation and production of protocol order deal

                                                            35

1    with of course the manner in which things will be

2    electronically produced, the manner in which they'll be

3    stored, and the manner in which the parties will be able

4    to communicate with basically native format, as it's

5    called, data from the defendants.

6         If you would like to hear from me now, I would be

7    happy to go through what we're requesting today in that

8    regard and I think you will see that the harmony of the

9    meeting of the issues, if you will, Your Honor.

10        THE COURT:   Well --

11        MR. CAMP BAILEY:   Let's try to resolve the

12   formatting deal first, though.

13        THE COURT:   Are these files actually kept by

14   AstraZeneca in TIF format?

                            Page 28

112006mdl.txt
15          MS. KELBER:  They're kept PDF and scanned PDF
16   format.  They have been converted to TIF to be Bates
17   numbered.  So it's a TIF --
18          THE COURT:  I don't think that's true.
19          MS. KELBER:  Well, that's -- that's what -- when
20   we try to Bates number, then that's what we have been told
21   by the IT people.
22          THE COURT:  I think Adobe's got tools that will
23   let you do that without converting to a TIF.
24          MS. KELBER:  I'm happy to look into whether or
25   not if it will be possible to do the Bates numbering in
                                                                  36
1    PDF, but that issue would not resolve the issue of whether
2    they would like the pages to be broken down as single
3    pages or as multiple pages.
4         The issue with regard to the file format is it has
5    been presented to us is that they would like each document
6    separated out into individual files for each document.
7    And that may well be -- individual files for each page of
8    the documents.  So if you had a 50 page document, it was
9    produced as a 50 page file.  What they would like is 50
10   separate files and we're looking into whether we can do
11   that and how we can get that done.  And I would expect
12   that we will be able to do that.  It's just that we
13   weren't asked to do that before we had to produce our
14   documents.
15          THE COURT:  Well, I'm assuming that there is a
16   host of different kinds of documents.  Some are probably
17   things that were originally written in Word and then other
18   things that were lab reports and other things that were
19   protocols and other things that were things that were
20   submitted to the FDA and attachments, a lot of duplicates
                         Page 29

112006mdl.txt

21   and things started one way and then I suspect you stored

22   them in many different ways on various serves, whatever it

23   is AstraZeneca calls it's NDA or the IND, is that -- do

24   they take all those things and then put them into a single

25   place on the computer and everything that was something

37

1   else is transformed into a PDF?

2           MS. KELBER:   Exactly.   It's maintained by

3   AstraZeneca in one space as PDFs and that's what we

4   replicated for our production.

5           THE COURT:   And is that created by scanning or

6   by an electronic conversion?

7           MS. KELBER:   Scanning.

8           MR. CAMP BAILEY:   After the first hearing we had

9   on September 7, we got together and kind of had multiple

10  tracks going here.   We have the MDL here.   We also have

11  some state court litigation going up in Delaware and the

12  Delaware CMO that was proposed on, I think, November --

13  September 20th, we specified kind of a specific format

14  that we'd like them in which is kind of the standard in

15  the industry.   And what it is is TIF, single page TIF

16  which has an OCR page that goes with it.   It has a load

17  file that tells everything, kind of where it's going.   I'm

18  botching this all up because I'm not a computer expert.   I

19  think that's how most databases today are run.

20          And what I think the Court's talking about

21  specifically is we had a provision that says after initial

22  production and image file format is complete, a party may,

23  if we have an issue with the particular file or something,

24  upon specific request, seek production of electronic

25  documents in their native format, which means we can ask

38

1   for the Excel spread sheet with all the attached metadata

Page 30

112006mdl.txt

2    and revision history and all the other stuff like that.
3    But I think in the Zyprexa litigation, in the Resterol
4    litigation, in all these litigations, I think you will
5    find that for a company to even be able to use their own
6    data, it has to be some way searchable.  If the FDA asks
7    AstraZeneca, hey, what did you all send us two years ago?
8    I don't find it believable that there's no searching
9    capabilities in there.  And that's all we're asking is
10   that when they produce it to us, we have to be able to
11   look through it in a reasonable manner as contemplated by
12   the new federal rules and old federal rules.
13           THE COURT:  In terms of the documents already
14   produced and the need for a preservation and protocol
15   directive for the -- going forward for other things that
16   are produced, I want a specific proposal either agreed to
17   or with the disagreements highlighted.  We'll take that up
18   at the next conference which will be in a couple weeks.
19   So we'll get all that resolved shortly.  But we need to
20   formalize it.
21       And let me just tell you what my predilections are,
22   which I think are consistent with the new rules.  And that
23   is that if we're talking about existing files, and I see
24   this phrase "native formatting" and smile a little bit
25   because there's, in some sense there is no such thing
                                                        39
1    because as soon as you look at it you have changed the
2    document electronically, more than just leaving
3    fingerprints on it.
4       And as I say, I'm sure these documents, these items,
5    whatever they are, are different kinds that were created
6    one way and they have been stored and submitted several
7    other ways and then compiled in yet another way and then
                        Page 31

112006mdl.txt

8   recompiled in yet another way.  All of those things have

9   potential interest.

10        But in any event, what needs to be produced is the

11  most useful version with other versions available, and

12  there shouldn't be any -- I'm not suggesting there has

13  been, but there should not be any attempt to make it

14  difficult or hide the ball or if defendant actually has

15  already an index, electronic index of the files, that

16  ought to be produced along with the documents.

17        And if there's some -- if there's particularly

18  crucial documents that are already word searchable, they

19  ought to be produced.  I don't know how well the scanning

20  ones that were scanned and created in PDFs, how well the

21  OCR works on that or how accurate that is making them

22  searchable.  But that's an issue that works fairly well.

23  It solves some of your problems, although it's hard to do

24  that on a large volume.

25        But in any event, I want you to continue discussing

                                                          40

1   among yourselves how you're going to solve those problems

2   and, again, if you can't solve them, we'll get them all

3   solved at the next hearing.

4         MR. JENSEN:  May I ask a question, Your Honor?

5   Keith Jensen.

6         I have been a designee on this issue and I have been

7   waiting to ask for this since, actually since September 7,

8   but haven't been able to achieve an agreement on

9   maintaining the status quo so Your Honor has the complete

10  ability to make any orders you deem appropriate or not

11  regarding preservation and protocol, and that is, of

12  course, that any -- as you well know, the Manual for

13  Complex Litigation contemplates as well the new one -- the

112006mdl.txt

14    federal -- new and old federal rules and their comments
15    that once you start litigation that you -- and I have
16    asked for this specific agreement and representation from
17    the defendants.  I've not been able to get this agreement
18    to date, Your Honor.  I have asked them to agree on the
19    record that AZ has suspended the ordinary routine or
20    automatic deletion or overwriting of discoverable
21    electronic information including e-mails.
22         And I could read you what I most recently got from
23    them, but it does not do that.  It in fact only agrees
24    that if you enter an order in the future they might
25    start -- they might start no longer overwriting in the
                                                              41

1     routine or ordinary course of business backup tapes,
2     including e-mails.
3          So I request, if Your Honor deems it appropriate, of
4     course, that even as of today, that defendants agree to
5     that so we have the complete ability to negotiate.
6          The second thing I'd like to rise with Your Honor is,
7     is I have been trying to get this for a while, that you
8     order us to negotiate exactly as the Manual for Complex
9     Litigation -- it's 40.25 as we put in our agenda --
10    contemplates, which is that we have a conference.  And I'd
11    like to have you order the IT people be present.  I think
12    there's no problem with that from either side.  And if
13    we're unable to reach agreement as of that conference date
14    that both parties outline why they want their particular
15    preservation provisions and/or production protocols
16    hypothetically ordered by Your Honor and advocate why
17    within three days of that so Your Honor before we arrive
18    next time has an order and a competing order and briefs to
19    the extent they're necessary on why the parties support or

112006mdl.txt

20    oppose their various provisions.

21         MS. KELBER:  As for the specifics of the

22    discussions amongst the parties, as with the other issues,

23    we have disagreements as to the extent and timing of those

24    discussions.

25         With regard to a specific preservation order, there

                                                              42

 1    needs to be a specific showing of the need for a

 2    preservation order.  There has been no such showing here.

 3    There are all sorts of computer issues with regard to

 4    processing of information.  So at this moment, it would

 5    not be appropriate for us to entertain any stipulations.

 6    But we're, of course, willing to confer with the

 7    plaintiffs.  And I understood from your last comment that

 8    we would be doing that as part of our discussions on the

 9    document production issue. Then we will be prepared to

10    submit something jointly at the next hearing.  I don't

11    think there is a need for anything more specific than

12    that.

13         MR. JENSEN:  Briefly respond, Your Honor.

14         All they told me they are willing to agree to in

15    writing is the following.  The pertinent part is three

16    sentences, but this last sentence says it all.  They're

17    willing to agree "subject to further order of the Court

18    the party may continue routine erasures of computerized

19    data pursuant to the existing programs but shall preserve

20    any printouts of any such data related to Seroquel."

21         What that clearly says is AstraZeneca wants to

22    continue doing precisely what might inadvertently or

23    advertently destroy existing discoverable electronic

24    information.  I think it's appropriate that they be asked

25    to stop that.

                         Page 34

112006mdl.txt

43

         1          THE COURT:  Well, they're under existing
         2     principles that govern spoliation, and for present
         3     purposes I'm going to leave it at that.  If it turns out
         4     something has been erased, is unrecoverable or is -- over
         5     the next couple of weeks, we'll deal with that issue.  But
         6     I do want you to submit either agreed proposals or
         7     competing proposals to cover document preservation,
         8     production protocol and resolution of this issue about the
         9     formatting of things already produced by December 5th.
        10     And if you need to cite authority, you can do that too, if
        11     there's disagreement on an issue that has some legal
        12     precedent.
        13          MR. JENSEN:  One more thing.  Here's the issue.
        14     Having read the cases and understanding their position
        15     that they take the position there is no need for any
        16     preservation order, I need to therefore establish that
        17     there is a need, therefore, before December 5, I request
        18     one 30(b)(6) deposition of a knowledgeable IT person so I
        19     can under some of the case law establish the need for a
        20     preservation order.  Obviously common first deposition in
        21     this case isn't an IT person.  I'd request that I have it
        22     before I'm required to submit it to Your Honor on
        23     December 5th.
        24          MS. KELBER:  I'd like to note we're under
        25     obligation under the Federal Rules to preserve documents.

44

         1     We're taking those obligations seriously and we're
         2     following the rules.
         3          I think the suggestion that there needs to be a
         4     30(b)(6) deposition at this point puts the cart before the
         5     horse.  I would like to be able to have the opportunity to

                              Page 35

112006mdl.txt

6    work out a mutually acceptable order and submit it to the

7    Court at the next hearing.

8          THE COURT:   I don't think you need a 30(b)(6) to

9    make your arguments here.   If you have a full discussion

10   as to the nature of the recordkeeping and record retention

11   policy, seems to me you will have sufficient basis to make

12   your arguments.

13        All right.   I set the next hearing for December 8,

14   10:00.

15        Let's talk about the preemption issues.   Judge Conway

16   has indicated to me that she wants to have oral argument

17   on that issue in May of next year.   So my thought would be

18   to have defendant's motion due April 2 with response due

19   April 30.   I know parties have varying views about the

20   impossibility of meeting those dates.   So I'll hear you on

21   that.

22          MR. DAVIS:   Well, Your Honor, the Court will be

23   pleased to know that we're prepared on January 15 to file

24   a motion based on preemption.   So this is one of those

25   occasions where I think we can expedite matters.

                                                            45

1          The motion we would file is a 12(b)(6) motion, and it

2    would be based on -- it's an exemplar motion that would be

3    based on the complaints that are before the Court.   And we

4    would be in a position, we think, to suggest that we file

5    our motion in brief on January 15; that plaintiffs be

6    given 30 days to respond.   And that if the Court would

7    agree, we would have a reply within 15 days.

8          We have every reason to believe that the 12(b)(6)

9    vehicle which we're suggesting is appropriate.   It's been

10   sanctioned by the Supreme Court.   And the rulings that the

11   courts have been entering with respect to preemption would

                            Page 36

112006mdl.txt

12    allow us to give to the Court the arguments we make with
13    respect to the preemptive effect of the labeling in place
14    in some of these exemplar cases.
15              MR. TRAMMELL:  Flech Trammell for the
16    plaintiffs.
17          As a practical matter, we agree with the Court,
18    January briefing schedules are impractical given the
19    factual nature of the preemption inquiry.  If the Court
20    knows whatever type of motion they file, they won't
21    necessarily be factual discovery by the Court or what the
22    regulatory history was dealing with this product.  They
23    will make certain assertions about things they represented
24    to the FDA, things the FDA may have told them, things the
25    FDA may have considered.  The FDA will probably also weigh
                                                              46
1     in as they have on these other issues like this around the
2     country.
3           Therefore, we're going to be required to do discovery
4     on what they may have known but didn't tell the FDA, what
5     they knew at certain periods of time before the warning's
6     actually mandated by the FDA.
7           We'll have to do a series of 30(b)(6) depositions.
8     Before we can do those, we'll have to have documents from
9     the defendants.  We're prepared to issue documents,
10    discovery requests almost immediately.  We're prepared to
11    issue those document requests almost immediately as soon
12    as we get those documents.  And I think it would be
13    appropriate for the Court to require those documents to be
14    produced in an expedited way.  As soon as we get those
15    documents and have had a chance to review them, we can do
16    meaningful depositions of their regulatory people and
17    present this Court with a detailed factual record that
                        Page 37

112006mdl.txt
18  will allow it to render an appropriate ruling on
19  preemption.
20      As Your Honor knows, there have been two types of
21  rulings basically.  Legal rulings, but also rulings that
22  take into account what was presented to the FDA.  We think
23  for the Court to be able to distinguish those cases,
24  they're going to need to know what the regulatory history
25  of this product was.  And we can't be put in a position of
                                                            47
1   having to take their word for it.  We need to be able to
2   get out and do discovery.  We'll have to issue a Freedom
3   of Information Act request to the FDA.
4       There is an extensive factual record that has to be
5   developed for us to appropriately respond to even a
6   12(b)(6) motion.  And Your Honor, also in this issue my
7   co-counsel, Mr. Pennock, has some points he would like to
8   make.
9           MR. PENNOCK:  Your Honor, it's fine to say
10  they're going to make a 12(b)(6) motion as they have said
11  in January and we don't need any discovery.  I think when
12  that time comes, if they do make it in January, we'll all
13  see that we did need a lot of discovery.  And we would
14  like to start it sooner rather than later.
15      I don't think there's much doubt that you need a lot
16  of discovery.  You know, the FDA itself has said that
17  state laws conflict only when they purport to compel a
18  firm to include in labeling or advertising, a statement
19  that the FDA has considered, considered and found
20  scientifically unsubstantiated.  It has considered and
21  found.  Those are clearly factual inquiries that must be
22  explored by both parties, and certainly by the Court.
23      And although the FDA may weigh in on it as they
                        Page 38

112006mdl.txt

24    have -- they seem to have taken that sort of course over

25    the last six months that they're going to start filing
                                                              48

 1    Amicus saying this is what we considered.  This is what we

 2    thought.  We can't really rely on that either for a lot of

 3    different reasons, not the least of which is that they're

 4    not submitting affidavits, for example, or allowing

 5    depositions of the actual scientists who did the reviews.

 6    It's more of the higher level political appointees that

 7    are weighing in on what they did consider and what they

 8    didn't consider.

 9         In any event, the FDA filed an Amicus brief and the

10    Court may have -- I'm sure has looked at the Perry case.

11    It's an Eastern District of Pennsylvania case.  And the

12    Amicus in that case, if the Court hasn't had an

13    opportunity to see it, I do have -- whether you have or

14    haven't, I have a copy of it and may I hand it?

15              THE COURT:  All right.

16              MR. PENNOCK:  This case, you will see a received

17    stamp by the law offices of Larry Roth because it's

18    actually Mr. Roth's case that has now become one of the

19    centers of this debate.  But the Amicus lays out from the

20    FDA what I think and I suggest to the Court is very

21    clearly a factual -- a description of factual inquiries

22    that must be conducted.  As it says here, I'll just skip

23    here, the Court must ask whether the warnings sought by

24    the plaintiff would have rendered the drug misbranded in

25    the agency's judgment at the relevant time, or if any new
                                                              49

 1    warnings proposed to be added to the warning label would

 2    have been rejected -- would have been rejected by the

 3    agency.

 4         I think those are clearly factual questions that are
                              Page 39

112006mdl.txt

5    raised.   And in fact, I would even suggest to the Court
6    that based on what the FDA has said in this brief, there
7    may be jury questions.   Because a lot of -- what they're
8    saying there is that factual issues need to be determined
9    by somebody, and unless the record is that clear and that
10   uncontested, the Court itself may not even be able to make
11   those determinations.   And that's what the FDA has said.
12   Now that they've jumped into the litigation fray with this
13   Amicus.   And their preamble in the Amicus, they jumped
14   into the fray and they said these are factual issues.   And
15   they have said it wittingly or not I think that there are
16   actually jury questions that may be determined.
17         But in any event, the Perry Court, Eastern District
18   of Pennsylvania, they said that this statement overstates
19   the scope of preemption.   Nevertheless, the Perry Court
20   went on to say that it should be obvious that this can
21   only be true, meaning this preemption position if the FDA
22   scientists who made this specific determination had
23   available to them all the relevant data.
24         And so there again, there is a great deal of factual
25   underpinning for this entire situation or proposal that we
                                                          50
1    think needs to be done and I think that the Perry Court
2    acknowledged that.
3         We have, as Mr. Trammell noted, we have some ideas,
4    and having done this before, the discovery that needs to
5    be conducted.   We have document demands that we're ready
6    and willing to serve, if the Court so indicates.
7    Obviously we will need communications with the FDA
8    regarding the risks of Seroquel.   We're going to have to
9    explore a large body of documents to determine what they
10   didn't give the FDA.   And therein lies the rub in terms of
                          Page 40

112006mdl.txt

11    timing, Your Honor.

12        And the April date I think is certainly a generous

13    one considering where the Court was at a couple weeks ago,

14    but it's the information that they didn't give the FDA.

15    That's not going to be in the IND or the NDA or anything

16    else.   It's going to be in other places.   And they're not

17    going to point it out to us.   And it may not be a needle

18    in a haystack.   It's several needles in a haystack and we

19    have got to go find them.   And that's why it will take, we

20    think, a little bit longer than the Court is

21    contemplating, but not much longer, to get to the end of

22    the road on the preemption discovery.

23        Internal communications and analysis regarding risks,

24    again, these are not things that we could find in what was

25    actually submitted to the FDA, but what they were saying

                                                              51

1    about the information that they didn't go tell the FDA.

2        Communications with foreign regulatory agencies.   As

3    the Court may be aware, in this instance there was a very

4    significant labeling change in foreign countries much

5    earlier than what took place here in the United States,

6    and we'd like to know what happened with that and why that

7    type of information was -- why the FDA was either not

8    looking at that or whether the FDA had opportunity to look

9    at what the foreign regulatory agencies were looking at.

10        Communications with third parties, that's something

11    that often shows up.

12        So as the Court can see, these -- this discovery that

13    we need goes substantially beyond just the regulatory

14    affairs people.   And that's why it's a huge component of

15    all the discovery that we have to do anyway.

16        So in our schedule, we contemplate all of this being

                                Page 41

112006mdl.txt

17    done by the end of August -- sorry -- by the end of July,
18    by the end of July with our brief due the end of August.
19    What that will mean, as the Court can see from the slides
20    I put up, is that a large portion of the discovery
21    generally that will have to be done, we will have already
22    completed by the end of July.  And thereby having it --
23    we'll have advanced this MDL offensive discovery wise very
24    quickly in the first seven months of 2007.  And at the
25    same time, laying bare to the Court what we think is an

                                                              52

 1    extensive factual record that it will need to examine in
 2    evaluating the preemption issue.
 3         So here's the overview that we have suggested.  We
 4    would like just some initial disclosure regarding
 5    corporate organizational structure.  This is not anything
 6    too complicated.  We don't want to put too much of a
 7    burden on the defendants, particularly here over the
 8    holidays over the next week.  But we'd like to get some
 9    information.  You must have some organizational charts
10    going back several years.  Who's who, kind of a cast of
11    characters so we can start looking at that and figuring
12    out who we want to depose.
13         We would like to take some depositions between -- in
14    the next 30 days, a couple of depositions.  Again, now
15    having looked at a list of who's who, let us talk to a
16    couple people and find out who is doing what, when and
17    where so we know who we want to depose substantively and
18    we would like to do that in the next 30 days if possible.
19         During this timeframe, as Mr. Trammell noted, it may
20    be more of a request to produce that we would like to
21    serve generally for documents.  But having taken these
22    30(b)(6) depos, we would then say to the defendants, all

112006mdl.txt

23  right, these 10 people, 12 people, however many it is, 15
24  people, we definitely know we need these people for the
25  preemption defense.   Please give us their custodial files.
                                                              53
1   And the defendants have already indicated that a custodial
2   production is the manner in which they would like to
3   proceed with discovery, and we're okay with that generally
4   speaking.   Although, as I said, there may be some
5   overriding or initial request to produce that would be
6   appropriate here.
7        Then we would proceed during the next several months
8   to take depositions, determine other folks that we might
9   want to depose.   Again, all will be deposing these people
10  in total.   And have everything done by the end of July,
11  serving our opposition brief at the end of August, and of
12  course be ready to go to the hearing set by the Court.
13       I realize it's, you know, a schedule that's probably
14  twice as long or nearly -- not quite twice as long as the
15  Court was contemplating, but I do think that it is one
16  that can realistically be complied with, although it's
17  going to take a tremendous amount of work.   If we do 20
18  depositions, let's assume 200,000 pages of documents for
19  each depo, somebody else will have to do the arithmetic,
20  that's why I went to law school, but I know that's a lot
21  of pages that we'll have to look at.
22       So that's in essence what we were thinking about and
23  wanted to propose to the Court with respect to preemption
24  issues.
25       Thank you, Your Honor.
                                                              54
1        MR. DAVIS:   Yes.   Thank you, Your Honor.
2        Your Honor, we're proposing a 12(b)(6) motion.
                        Page 43

112006mdl.txt

3   That's the vehicle to present to the Court.   As I
4   understand what Mr. Pennock and what Mr. Trammell have
5   said, there have been a series of misstatements or
6   misinformation provided to the FDA or information that was
7   concealed or hidden.  That's how I understand what you
8   have been saying.  And Your Honor, that sort of
9   information, one, we believe doesn't exist, but if it
10  does, it's barred in terms of preemption by the Buckman
11  ruling, the United States Supreme Court, which sanctioned
12  the presentation of a preemption motion early on as a
13  threshold matter on using a 12(b)(6).
14       So what they've been saying with respect to the
15  nature of the discovery that they need relates to
16  information that we misrepresented to the FDA or failed to
17  provide to the FDA or concealed to the FDA, and that
18  information is not information that is germane to the
19  12(b)(6) motion under the Supreme Court's decision in
20  Buckman which sanctioned the use of the 12(b)(6) vehicle.
21       The second point I would like to make to the Court,
22  as I sit here and listen to this timeframe and all of the
23  discovery when we're prepared to file a preemption motion
24  on January 15, is that it's a 12(b)(6) motion that we
25  intend.  They can make all these arguments with respect to
                                                        55
1   this discovery that they need regarding a 12(b)(6) motion.
2   If we're wrong and they need all of this discovery in
3   order to avoid the preemptive effect of the labeling, then
4   we lose our motion.  We lose our motion.  They can make
5   these arguments with respect to this discovery without our
6   having to pursue all of this discovery which is based on,
7   as I hear and I read their papers, misinformation that's
8   provided to the Court.

Page 44

112006mdl.txt
9          We believe we can give the Court a compelling strong
10    motion on 12(b)(6) using the exemplar complaints that are
11    before this Court that do contain dates with respect to
12    use and do contain the injuries that were allegedly
13    suffered.
14          So for those two reasons, this notion that this
15    discovery is necessary and that it would slow up the
16    presentation of the preemption motion to the Court on a
17    12(b)(6) motion, which again has been sanctioned twice by
18    the United States Supreme Court, one in the Buckman case
19    the other was not a pharmaceutical case, the Guyer
20    (phonetic) case and has been in each of the decisions in
21    pharmaceutical cases the vehicle that has been used to get
22    the preemption matter before the Court in a preliminary
23    early fashion so that we have a sense of what the
24    population is like in the MDL.  We can submit that motion
25    on January 15.
                                                          56
1          I would propose giving the plaintiffs 30 days in
2     which to respond.  And if we could, we'd like to get a
3     reply.
4          But for those two reasons in connection with this
5     discovery, they can make all of these arguments in their
6     papers.  If they're right with respect to discovery, we
7     lose our motion.  We lose our motion.
8          In addition, with respect to the arguments they're
9     making regarding misrepresentation, again I say that under
10    the Buckman ruling, that those -- that that claim is
11    barred.
12          MR. PENNOCK:  Your Honor, may I respond briefly?
13          First, I don't think -- I don't have the Buckman case
14    in front of me.  I haven't read it in awhile, but I do
                          Page 45

112006mdl.txt

15    know it's not a pharmaceutical case.  It was -- I believe

16    it was a pedicle screw case.  It involved a medical device

17    under the medical amendments, the medical device

18    amendments of 1976 and there may -- I don't recall whether

19    it was a 510K devise, meaning one that was grandfathered

20    in or a premarket approval device, either way the

21    preemption issues there were very dissimilar from the

22    issues that are presented here.

23        Furthermore, there was, again as I recall, in the

24    Buckman case the plaintiffs actually were alleging a cause

25    of action that they could recover as a third party for the

                                                        57

1    fraud by the company on the FDA.  So that -- and I believe

2    that was fairly central to that case.  And therefore,

3    again, I don't have it in front of me, but I don't think

4    it speaks to the issues that we're dealing with here on

5    pharmaceutical cases.

6        And the Guyer case, again, clearly, I don't think is

7    applicable.

8        In any event, Your Honor, I do think a review of this

9    entire situation will reveal that there is ample discovery

10    that needs to be done to flesh these issues out before the

11    motion can be heard.

12        MR. TRAMMELL:  I'd like to briefly follow-up on

13    that, and we certainly welcome defense counsel's

14    endorsement of Guyer.  As the Court knows, Buckman was a

15    fraud on the FDA case.  It was a prima facie case based on

16    defendant's somehow defrauded the FDA and that therefore

17    defendants -- or the plaintiffs were entitled to damages.

18        What the Court in Buckman said was that it explicitly

19    carved out common law state tort.  Those weren't preempted

20    into that type of ruling.  It also said, and most courts

                        Page 46

112006mdl.txt
21    that have addressed this issue have said, that it's not --
22    the preemption claim is not they have defrauded the FDA.
23    It's that they had information that they didn't give to
24    either the FDA or to plaintiffs.  And the fact they didn't
25    give it to the plaintiffs that makes it an inadequate
                                                              58
1     warning.  And that's what we have got to flesh out in
2     discovery, is what information they had, whether or not
3     they gave to it FDA, what information they had that they
4     didn't pass along to our clients.  That's the basis of our
5     need for discovery.  And that's going to be before the
6     Court whether it's in their detailed description of their
7     regulatory history or what they told the FDA or it's
8     whether the FDA coming in with an Amicus brief saying this
9     is what happened in the regulatory history of this drug.
10    And we have got to have the right to rebut those kinds of
11    factual assertions in our briefing.
12            THE COURT:  Have you talked to the FDA about how
13    far it's going to be to extract their regulatory file?
14            MR. TRAMMELL:  We haven't.  Based on prior
15    experience, it's not easy.
16            THE COURT:  All right.
17        Well, as you might imagine, my view of the issue is
18    that it is probably neither as simple as Mr. Davis
19    contends or as complex as plaintiffs' counsel are
20    contemplating.
21        And Buckman says a lot of things.  I'm not sure it's
22    controlling here or the language that's in there that's
23    important.
24        I'm going to set a schedule for the briefing.
25    Defendant can file a motion if they want to do a 12(b)(6),
                                                              59
1     that would be their shot at this.  The 15th of January is
                        Page 47

112006mdl.txt

2    a federal holiday.  So I'm going to set their deadline for

3    filing the motion for January 16 with plaintiffs' response

4    due April 20th.  And I'll give defendants a chance to file

5    a reply due April 30.  And then Judge Conway will by

6    separate notice schedule an oral argument on the issue.

7         Plaintiffs, go ahead and pursue your discovery.  I

8    would suggest to you that to the extent what you presented

9    here is what you think you need, you go for the good stuff

10   and leave out the chaff.  And whether it's pertinent to

11   the motion, contrary to defense counsel's position or not,

12   we'll let you pursue it.  If it's not pertinent, then it

13   won't matter.  We'll just hear it.

14        MR. DAVIS:  My only additional point is that any

15   discovery that I have heard directed towards the

16   misrepresentations is going to detract from the ongoing

17   discovery with respect to the case in general with respect

18   to the --

19        THE COURT:  I don't think it's going to detract

20   from anything.  Synergize.  I mean, it's just discovery.

21        MR. DAVIS:  We think it's going to take a great

22   deal of time.  And again, for reasons I have given to the

23   Court, we think given the basis of the motion it is not

24   going to be necessary for the Court's decision with

25   respect to the --

                                                        60

1         THE COURT:  Like I say, you may be right on that

2    which case it will drop out.  But you're going to get it

3    anyway.

4         MR. ROTH:  May we ask that -- there is a stay

5    that was entered in Judge Conway's original August order

6    on all discovery.  So I assume that that stay has been

7    lifted so if we want to file a motion -- a request for

                        Page 48

112006mdl.txt

8    production, we can go ahead and do that?

9              THE COURT:   Certainly.

10             MR. ROTH:   All right.

11             THE COURT:   All right.

12        I meant to but did not go back, have answers been

13   filed for all the cases that are docketed in this court?

14   They come in different conditions, and --

15             MR. DAVIS:   I cannot answer that question with

16   certainty.   I think the majority of cases have been

17   answered, but I do not believe all of them have been, Your

18   Honor.

19             THE COURT:   Well, I want go back and look and

20   get an answer in every case that's docketed here.   Some of

21   them are answered before they get transferred.   Some you

22   move to not have to file an answer, and get that done by

23   December 4.

24        All right.

25             MR. DAVIS:   Your Honor, if I may in that regard,
                                                                61

1    there's a stay with respect to responsive pleadings and

2    I'm assuming what the Court is saying, that the stay with

3    respect to responsive pleadings is lifted.   And so --

4              THE COURT:   Right.   Right.

5        Okay.   I have two other issues on my list.   One is

6    just something to think about.   We can talk about it at a

7    later hearing.   I think we mentioned this back in

8    September.   I just threw it out there and you all

9    obviously had given some thought in the back of your heads

10   about it, but I want to raise it again and try to start

11   moving it toward the front, which is what kind of ADR

12   format we want to use at some point in the case and when.

13   We haven't addressed that substantively and it may tie in

                          Page 49

112006mdl.txt

14   with the last issue on my list which I know is an issue

15   that plaintiffs want to take up which is test cases or

16   Bell Weather cases, whether that's a format for that.

17          So I'll hear anything you want to say about ADR now.

18   Otherwise, I raise it again as something that we should

19   take up either at the next hearing or the one after that.

20   Start thinking about when we want to do it and how.   And

21   so I throw that out there.

22          And then, the last thing I have is talking about --

23   I'd like to hear what the plaintiffs' ideas are about the

24   Bell Weather cases.

25          MR. PENNOCK:   Thank you, Your Honor.

                                                              62

1           Judge, I think very often it's helpful for the

2    context of everything that has to happen in a litigation

3    of this massive scale that individual cases be proceeding

4    a pace -- individual cases that can receive actual

5    concentrated attention focus like all the normal cases, if

6    you will, that Your Honor has before him.   And it gives us

7    context for things that we know will happen.

8    Additionally, it will also kind of ferret out things that

9    happen that we -- in terms of motion practice and so forth

10   that we haven't thought of yet.

11          And by doing that over the next year and a half, or

12   two years, I think we will be able to develop a set of

13   custom and practices, if you will, for how these cases

14   proceed and work, how the plaintiffs and the defendants

15   work up one of these cases so that the remanding court

16   will have the benefit of that.   I think there will no

17   doubt be rulings case specifically on these, on a Bell

18   Weather group that will undoubtedly be of some guidance,

19   if not a great deal of guidance to any remand court.

112006mdl.txt

20          An example, if I could throw one out, is length of

21      depositions.  Perhaps for some reasons the local rule

22      needs to be, you know, changed or modified or if certain

23      depositions are going too long, treating doctors, for

24      example, maybe we're finding that treating doctor

25      depositions are going seven hours, when in fact, really,

                                                              63

1       they should happen in three hours.  These kinds of things.

2           I believe that there's probably a list of things that

3       we could kind of ferret out over the course of working on

4       Bell Weather Court that Your Honor would have an

5       opportunity to give guidance to that.

6           So for these reasons, I think that moving ahead with

7       a case specific group will be helpful.  It will really

8       allow us and allow the Court and all of us to zero in on

9       what are these cases really all about when you get down to

10      litigating them, not just merely looking at, you know,

11      what we, the plaintiffs, think they're about, what we're

12      alleging they're about, or what the defendants are

13      alleging they're not about, but litigating a discrete

14      group of cases where more than just some cursory view of

15      the case can be had, but actually we get into it and we do

16      the depositions and so forth in the case.

17          I'm going to skip past the general discovery notes

18      that I have in these slides because it's kind of not

19      applicable to the BWG group, although I would say that it

20      will -- they need to track each other because the general

21      things need to happen while we're doing the case specific

22      things so that at the end of the day, the end of two

23      years, we have all of the discovery that we need against

24      the defendant to try the case, meaning the cases that may

25      go back on remand.

                            Page 51

112006mdl.txt

64

1      So for the general discovery we were suggesting that
2   in addition to the work that we're doing on preemption
3   we'll start doing some who's who depositions, generally.
4      But as Your Honor noted, there's tremendous synergy
5   here, so a lot of that will be part and parcel of what
6   happens with respect to the preemption motion.  And we'd
7   like to try get those done by the end of January.
8      We want to with the BWG issue, we want to serve all
9   fact sheets on the cases that may be selected.  We're
10  suggesting a group of 20 cases.  We're suggesting that the
11  plaintiffs select those cases, primarily based on the
12  point that the defendants have not stated they're settling
13  or resolving any cases.  So I guess to them it doesn't
14  matter what cases go forward first because they think
15  they're all essentially the same.  Much like in the Vioxx
16  coordination before Judge Higbee where Merck has taken the
17  position, we're trying every case.  We're not settling
18  anything.  So the Court said --
19      THE COURT:  Well, just because they want to try
20  every case doesn't mean -- or they don't want to settle
21  any case doesn't mean they want to try any case.  I mean,
22  the -- some -- we talked about this last time, there's
23  some cases that you had to bring them but chances are
24  you're not going to want to pursue them when push comes to
25  shove.

65

1      MR. PENNOCK:  Right, falls by the wayside.
2      THE COURT:  May be some that have specific
3   issues that the defendant wants to highlight and get legal
4   rulings based on whatever the fact pattern is.
5      MR. PENNOCK:  That's true, Judge.

Page 52

112006mdl.txt

6       But in any event, we were proposing that we'd select
7   them and we're certainly willing to listen and obviously
8   follow whatever the Court wants in this regard.
9       But we suggest that we work those cases up to the
10  point of getting all the medical records and so forth by
11  June.   Then going back to general discovery by the end of
12  or by early November of 2007.   We expect to have
13  identified and demanded all of the custodial files that
14  we'll want from the defendant on all of the general
15  discovery.
16      Remember, we're doing that with respect to what we
17  think is, as you say, in a focused manner, a wheat from
18  the chaff on a preemption discovery.   And then by early
19  November we were proposing we will have demanded what we
20  want custodian wise for everything else.
21      Also in November by that date we're suggesting that
22  all plaintiff depositions in the BWG group be completed.
23      By April 1 of 2008 -- so assuming we demand all of
24  those documents that we want by November 1 of 2007, then
25  there's some time for us to get them, let's say a couple
                                                              66

1   of months, and then we need time to review them, but
2   during that time period we still would be doing
3   depositions and we would have all depositions of the
4   defendants done by April 1 of 2008.   That's our goal.
5       By August 1 of 2008, depositions of all experts of
6   general applicability would be completed.   By September 1
7   all case specific depositions in the Bell Weather group
8   would be completed.   And then by October we can start
9   filing motions, October of '08.
10      But in essence what we would be proceeding along as
11  follows, Your Honor.   We would select this Bell Weather

Page 53

112006mdl.txt
12    group.   We would do the plaintiff's depos by November of
13    '07.   Then we start doing all the treating doctor
14    depositions which have to happen because you can't have an
15    expert offer opinions or draw any conclusions regarding
16    case specific causation until he or she has heard what the
17    treating doctors have to say about that person in that
18    case.   I mean, sometimes it's just as simple as not being
19    able to read the medical records because you can't read
20    the handwriting or don't understand what that note is.
21    Many times, though, and more often, there is a lot that a
22    treating doctor adds to the factual scenario of the
23    treatment that occurred that our experts need to look at
24    and consider before they give a case specific expert
25    report.   And so we'll have to do the treating expert
                                                              67
1    depos, treating doctor depos in this Bell Weather group.
2    After that we'll be able to serve -- there are also fact
3    depos.   They always ask for some family members or
4    friends, and our experts consider that as well.
5        We'll do all that.   Then we'll have our case specific
6    expert reports in the Bell Weather group.   And then the --
7    it's all on this hand up that Mr. Roth gave the Court.
8    Then the defendants would give their case specific expert
9    reports.   This kind of tracks the general discovery that
10    would happen.   And then we would do the case specific
11    expert and general expert depositions.
12        But the idea here is that by the time any motions of
13    general applicability need to be made other than the ones
14    that they're contemplating now, the preemption motion, for
15    example, Daubert.   We will have a group of cases that we
16    have worked up through full discovery which I think is
17    appropriate and necessary and on which we can analyze the
                         Page 54

112006mdl.txt

18   issues that they're raising.

19         MR. DAVIS:   Your Honor, we're not by any stretch

20   rejecting this notion out of hand.   The Court has asked

21   the plaintiff to present on it and for us to entertain it,

22   and we will do so.

23         But the Court must keep in mind, if we don't have a

24   completed fact sheet, we don't have a single completed

25   fact sheet and we're talking about a timeframe for Bell

                                                            68

1   Weather cases.   Again, we're not rejecting it out of hand.

2   We want to give it consideration and perhaps Court should

3   put it on agenda for next week.   We do, as the Court

4   indicated, would like to have a role with respect to the

5   selection of these cases if in fact we go down this

6   process.

7         But the other concern I have is that by focusing on

8   whatever number of cases we focus on, I don't want us to

9   get distracted from the work up of all of the other cases

10   because I believe with the plaintiff's fact sheet will be

11   able to cull and we will be able to winnow and we will be

12   able to narrow this dramatically based on experience.   And

13   we will have PFS based motions to present.

14         So again, I'm not rejecting this motion out of hand.

15   I would like for the opportunity to consider it, but I

16   don't want us focusing on whatever cases that plaintiffs

17   would like to pick.   And I think the Court rightly pointed

18   out that maybe the Court and maybe defendants would like

19   to have some say in the plaintiffs that are chosen if we

20   go down this road.   But I want to get some plaintiffs'

21   fact sheets that are completed.

22         THE COURT:   Almost like exercising peremptory

23   strikes.   Picking a jury.

                          Page 55

112006mdl.txt

24          MR. DAVIS:   No.   I think that's right.   We

25  should have some say.   We have some cause here to have an

                                                          69

1  interest in it, Your Honor.

2          But, you know, in this regard, let us get the

3  plaintiff's fact sheets completed.   And then we will take

4  up with the Court, if the Court would, consideration of

5  this option.

6          But, again, my concern is that if we focus too much

7  on this and we will get the Court some additional

8  thoughts, we lose track of the progress of the, all of the

9  cases.   Twenty-four cases are different than the 6,000

10  cases.   We've got to focus on those as well in connection

11  with what we do with those and winnow those down and cull

12  those out with respect to plaintiff's fact sheets and then

13  motions that are based on the completed plaintiff's fact

14  sheets.

15          MR. PENNOCK:   I didn't mean -- of course, we

16  will be proceeding with all the other fact sheets,

17  discovery and any motions they think they need to make on

18  those cases.   We would not say that they should be held up

19  based on a Bell Weather group, but I do think this group

20  would be helpful in sorting out a lot of things.

21          THE COURT:   My assumption is that as the

22  plaintiffs' counsel works up the fact sheets with their

23  clients, some of them, some of the cases will disappear.

24  You will decide, you know, even if it is arguably

25  meritorious it's not provable or too hard to prove or the

                                                          70

1  case's too weak or something.   My contemplation is that as

2  the defendants peruse those fact sheets they'll identify

3  some patterns that they think support either the statute

4  of limitations issue as to a group or a course of

Page 56

112006mdl.txt

5   treatment that doesn't fit the potential for liability and
6   they'll argue with you about those and you may agree with
7   them on some, and you will drop some out.
8        And then there will be others where they want to file
9   some motions but you don't agree with them.  We will take
10  those up as they come.  There will be others.  We will
11  have Daubert motions and other things.
12       Let's leave it for today that you talk some more
13  about how you view the Bell Weather issues and schedule
14  and we will take it up again at our next conference on the
15  8th.
16       And, Mr. Davis, if you would flesh out your response
17  in terms of timing and how you would go about picking some
18  of the cases and how many you want.  Again, I know you're
19  shadow boxing a little bit, but you do have an idea what
20  this universe of plaintiff looks like.
21            MR. DAVIS:  Well, indeed.  If I may, Your Honor.
22  I'm glad to do what the Court is suggesting.  We don't
23  have --
24            THE COURT:  I know you don't have any specifics.
25  You couldn't pick one today, but you have an idea what the
                                                              71
1   claims are based on and what kind of a plaintiff you need
2   to set up the issues you want to raise.  Plaintiffs I'm
3   sure will be picking a set of issues that they want to
4   meet you on, so -- we understand that.
5        Let me raise a couple of other issues then.  Then see
6   what else you all want to do.
7        Let me ask you to think about whether you would have
8   any interest in having these hearings available to you for
9   those of you who are not in attendance by streaming audio.
10  We can technically set it up so that you can listen to
                          Page 57

112006mdl.txt

11    this off the Internet.  And what I would contemplate is
12    not to make it publicly available, but to probably have
13    some sort of a PIN where we have a place to click on our
14    website where with a PIN you can get in and listen to it.
15    That way you wouldn't need to use the conference call.  If
16    you're not planning to speak, you just wanted to listen to
17    it live, you could have a chance to do that if that's
18    something you're interested in.  I could get my technical
19    people working on that.
20        And reason I -- the Florida Supreme Court makes the
21    oral arguments available on streaming video to the public.
22    Federal courts are under -- we're not allowed to have
23    cameras and recording devices that go out to the public,
24    but we can do it on a closed basis.  So it's technically
25    feasible if you think people would want to do it.
                                                              72

1        Second thing, listening to some of the issues here,
2    give some thought as to whether, and this is really more
3    between me and Judge Conway, but how often do we need to
4    have these hearings and particularly if we're going to get
5    into Bell Weather cases, do we need another magistrate
6    judge in addition to me?  We have two others here in the
7    courthouse and others in the district that we can call on.
8    Obviously, we will have to coordinate, but I'm just
9    thinking you might want to do that if things get busier.
10        All right.  Anything else from the plaintiffs?
11            MR. TRAMMELL:  One more thing.  I'd like to --
12    we're going to issue preemption targeted request for
13    production hopefully before the holiday as well as
14    30(b)(6) requests.  Even doing that, we're going to be in
15    a dead sprint to do all this discovery by time our
16    response is done.  It would be very helpful for us if they
                            Page 58

112006mdl.txt

17   would give us their written responses to our discovery
18   requests before the next status conference.  We can
19   address those then.  We're not saying they have to
20   respond, they have to give us their documents.  But it
21   would be helpful for us to frame those issues earlier
22   rather than later so that they have a clear idea what they
23   have to produce and when so that we can begin depositions
24   in a meaningful way.  Hopefully, before the end of the
25   year but certainly right after that.

                                                          73

1         THE COURT:  Well, let me say this.  If you get
2    your requests out by Wednesday, I would expect Mr. Davis
3    to be able to identify for me on the 8th any issues he
4    contemplates in terms of objections or difficulty in
5    production.  If not chapter and verse, at least topically
6    so that we can determine whether -- and again, as we
7    discussed back in September, and as I mentioned it at the
8    outset today, the rules provide 30 days for this and two
9    weeks for that and but not everything needs the 30 days.
10   I really -- I know you have done this, but I want you to
11   continue and really take it to heart.  If there's
12   important things like an organization chart or issues like
13   that, I'm just not going to have any patience, either
14   side, making it hard for the other side.  Do the easy
15   stuff easily.  Because it's going to -- it will be to
16   everybody's benefit both in the short-term and the long
17   term.  So I'm not going to require that they file a formal
18   response, but Mr. Davis, be ready to talk about any
19   problems with that on the 8th.
20         MR. DAVIS:  As the Court knows, we will do the
21   very best we can.  We're talking about addressing issues
22   that are figments right now.  I don't have the requests so
                              Page 59

112006mdl.txt

23    I'm -- I can't respond other than to say, again, that we

24    don't have a completed plaintiffs' fact sheet and here we

25    are responding to some discovery that hasn't even been or

                                                                74

1     served yet.

2              THE COURT:  I understand.

3              MR. DAVIS:  So I'm not quite sure in terms of

4     the process that we'll be in a position where we can

5     respond with great thought and insight with respect to

6     those requests.  Again, we haven't seen them and we don't

7     have a plaintiffs' fact sheet even from one of the

8     plaintiffs yet.

9              MR. TRAMMELL:  I think the Court's instruction

10    are perfectly clear.

11             THE COURT:  Anything from the plaintiffs?

12             MR. PENNOCK:  Just to comment in terms of

13    magistrates.  I mean, I think our preference would be if

14    it's possible and recognizing this is enormous work for

15    Your Honor to handle essentially everything with respect

16    to this litigation.  I don't know if that's possible.  But

17    that would be our preference.  And I guess we will have to

18    see how that shakes out.  But that's our preference.

19         As far as how often these hearings are, I think that

20    the speed with which the Court's moving the cases, again

21    very refreshing.  We're very happy with it.

22         I don't know if Your Honor ever wants to hear whether

23    or not there is a conflict.  On December 8 I can't be

24    here.  That doesn't matter.  There's more than enough

25    capable people to handle it.  I don't know if the Court

                                                                75

1     works in terms of giving a darn whether or not it works

2     with the schedule or sometimes you just can't.

                        Page 60

112006mdl.txt

3          THE COURT:  Well, I care, but sometimes it

4    doesn't matter if I care or not.  I mean I picked the 8th

5    just because it looked like a good date in the sense of

6    how long it's from now and in between the holidays.

7          MR. PENNOCK:  Would the 15th work?

8          MR. BAILEY:  First of next week be available to

9    Your Honor?  The following week by any chance?

10          THE COURT:  I thought about that, the 11th?

11          MR. BAILEY:  Yes, sir.

12          THE COURT:  I was debating that this morning

13    when I was looking -- if that's better for people, I'll

14    make it the 11th.

15          MR. CAMP BAILEY:  I hate to bring it up, but

16    10:00 Eastern time tends to be a problem on air fare and

17    the people on the West Coast, I don't know if we can talk

18    about --

19          THE COURT:  You want to have 2?

20          MR. CAMP BAILEY:  It's easier for people to get

21    in town for the people on the West Coast who are either

22    teleconferencing in or streaming in, they don't

23    necessarily have to get to their office any earlier

24    than --

25          THE COURT:  Mr. Davis, any issues for you, one
                                                              76
1    way or the other?

2          MR. DAVIS:  Well, with respect to timing, I

3    don't disagree with what Mr. Bailey has just said.  I'm

4    trying to check my calendar in terms of -- what are the

5    dates Court is considering?

6          THE COURT:  December 11th?

7          MR. DAVIS:  That would be just fine.

8          THE COURT:  Well, set it for December 11 at

                        Page 61

112006mdl.txt

```
 9   2:00.
10        Anything else from the defendant -- plaintiffs?
11             MR. JENSEN:  We keep the 12-5 deadline you gave
12   us on the preservation/protocol order, if that's
13   acceptable.  So we have more time to get it here.  Still
14   get it to you on December 5th.
15             THE COURT:  Right.
16             MR. ROTH:  Judge, you asked me about the number
17   of cases and I actually made a note on it but and I was a
18   little bit incorrect on, as of November 15, there were 213
19   total cases, 898 plaintiffs that are here in the Middle
20   District as of November 15.
21             THE COURT:  Mr. Davis, anything else for you?
22             MR. DAVIS:  I think we're done, Your Honor.
23             THE COURT:  All right.  See you in a couple
24   weeks.
25                  (End at 11:51 a.m.)
```
                                                          77
```
 1             C E R T I F I C A T E
 2        I certify that the foregoing is a correct
 3   transcript from the record of proceedings in the
 4   above-entitled matter.
 5
 6
 7
 8
 9   _____                    _____
10   Sandra K. Tremel
11
12
13
14
```

112006mdl.txt

15
16
17
18
19
20
21
22
23
24
25