```
                  UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
                       ORLANDO DIVISION

             Docket No.6:06-MD-1769-Orl-22DAB


    .  .  .  .  .  .  .  .  .  .  .  .  .  ..
    IN RE:                              :
    SEROQUEL PRODUCTS LIABILITY  :
    LITIGATION                   :              Orlando, Florida
    MDL DOCKET No. 1769          :              July 26, 2007
                                 :              9:30 a.m.
    ALL CASES                    :
                                 :
    .  .  .  .  .  .  .  .  .  .  .  .  .  .:


                          VOLUME 1
               TRANSCRIPT OF PRETRIAL CONFERENCE
             BEFORE THE HONORABLE DAVID A. BAKER
                UNITED STATES MAGISTRATE JUDGE



    APPEARANCES:

    For the Plaintiffs:          Paul Pennock

                                 Larry M. Roth

                                 Scott Allen

                                 F. Kenneth Bailey

                                 Camp Bailey

                                 E. Ashley Cranford

                                 Dennis Canty

                                 Lawrence Gornick

                                 Lezzlie Hornsby

                                 Glenn Kramer

                                 Richard Laminack

                                 Fletcher Trammell
```

Page 2

1        Holly Wheeler
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1   For the Plaintiffs:        Buffy Martines
2
3   For the Defendant
4   AstraZeneca:              Fred Magaziner
5                             Stephen J. McConnell
6                             James Freebery
7                             Robert Ciottai
8                             Shane Prince
9                             Eben Flaster
10                            Andrew Dupre
11                            Liz Balakhani
12                            Meghen Rohling
13
14  Court Reporter: Sandra K. Tremel
15
16  Proceedings recorded by mechanical stenography, transcript
17  produced by computer-aided transcription.
18
19
20
21
22
23
24
25

Page 4

1              P R O C E E D I N G S
2        THE DEPUTY CLERK:  The case is number
3   6:06-MD-1769-Orl-22DAB, in re: Seroquel products liability
4   litigation.
5      Counsel, please state your appearances for the
6   record, and let's start with the plaintiffs.
7        MR. GORNICK:  Good morning, Your Honor.  Larry
8   Gornick for the plaintiffs.
9        MR. CANTY:  Dennis Canty for the plaintiff.
10       MR. ROTH:  Larry Roth for the plaintiffs.
11       MR. TRAMMELL:  Fletch Trammell for the
12  plaintiffs.
13       MR. LAMINACK:  Rick Laminack for plaintiffs.
14       MR. ALLEN:  Scott Allen for plaintiffs.
15       MS. MARTINES:  Buffy Martines for plaintiffs.
16       MR. KEN BAILEY:  Ken Bailey, plaintiff.
17       MR. PENNOCK:  Paul Pennock for plaintiffs.
18       MS. CRANFORD:  Ashley Cranford for the
19  plaintiffs.
20       MR. CAMP BAILEY:  Camp Bailey for the
21  plaintiffs.
22       MR. KRAMER:  Glenn Kramer for the plaintiffs.
23       MR. MCCONNELL:  For the defense, good morning,
24  Your Honor.  Steven McConnell on behalf of defendant
25  AstraZeneca.

Page 5

1        MR. FREEBERY:  Jim Freebery, Your Honor, on
2   behalf of AstraZeneca.
3        MR. PRINCE:  Shane Prince for AstraZeneca.
4        MS. BALAKHANI:  Liz Balakhani for AstraZeneca.
5        MS. ROHLING:  Meghen Rohling for AstraZeneca.
6        MR. CIOTTI:  Robert Ciotti for AstraZeneca.
7        THE COURT:  All right.  Counsel, we're here for
8   proceedings on the plaintiff's motion for discovery
9   sanctions.  I directed that this would be the opportunity
10  to clear the decks on anything that's occurred prior to
11  now with respect to discovery and give the parties an
12  opportunity to create whatever record they want and make
13  arguments and dispose of these things so the case can move
14  forward without having to go back and rehash these things
15  again and again.
16     Let me direct that with respect to any witness who's
17  called, that there's only going to be one attorney for
18  each side examining the witness, and with respect to any
19  issue that is being argued, I only want to hear from one
20  attorney for each side.
21     And contrary to problems that we had at the last
22  status conference, I don't want counsel interrupting each
23  other or speaking over me, and I will impose sanctions if
24  there's any violation of that directive, to maintain
25  appropriate decorum here.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 6

1    Who's going to proceed for plaintiffs?
2        MR. GORNICK:  Your Honor, Larry Gornick.  If it
3    may please the Court, I will.
4        MR. MCCONNELL:  Your Honor, not to object -- not
5    to interrupt, but we filed objections to the plaintiff's
6    list that was filed.  I don't know whether Your Honor is
7    taking that up now or later, but I did want to make that
8    point that we did file objections to the list that was
9    filed on Friday and the designation of the expert.
10        THE COURT:  Well, I'll take it up as the matters
11    are presented.
12        Go ahead, Mr. Gornick.
13        MR. GORNICK:  Thank you, Your Honor.  If I may,
14    I have an opening statement to give you a road map through
15    the evidence.
16        THE COURT:  Go ahead.
17        MR. GORNICK:  Your Honor, the discovery problems
18    that the plaintiffs have had in this case break down into
19    four different categories.  I have also handed up a hard
20    copy of the PowerPoint and I hope that's on your -- on the
21    bench.
22        The problems we have had, and these are major
23    problems in four areas: custodial production, databases,
24    organizational charts, and production of the IND and the
25    NDA.

Page 7

1        The custodial production problems break down into
2    five areas.  We have missing data, just stuff we didn't
3    get.  There was an unreasonable keyword search employed
4    which resulted in us certainly not getting documents we
5    should have gotten.  There was an unreasonable
6    de-duplication method used, which in all probability
7    eliminated non-duplicative relevant documents.  Missed
8    deadlines and late productions by AstraZeneca has put us
9    months behind.  And there are technical flaws to this day
10    that have resulted in us not getting reasonably
11    searchable, reasonably usable data.
12        The missing data.  A big one, is voice mail.  Your
13    Honor, we simply didn't get any voice mail.  We have
14    discovered through Google searching and others that
15    AstraZeneca is quite proud of their technology which
16    delivers voice mail right into their employees' Outlook
17    in-boxes.
18        Their voice mail should be in their in-boxes.  We
19    didn't get any, and we have the evidence from the e-mails
20    that the custodians did get relevant voice mails.  We
21    didn't get them.
22        We have no fax attachments.  The same technology that
23    AstraZeneca has to deliver voice mail in the in-boxes
24    delivers faxes into their in-boxes.  We got no fax
25    attachments.

Page 8

1        Word documents with track changes.  We have no Word
2    documents showing track changes, for 80 custodians in this
3    litigation where they were searching going back years,
4    it's inconceivable we would have none.
5        We have no video attachments, and we have evidence
6    from looking through the files they did produce that we
7    didn't get video attachments to e-mails.
8        E-mail.  We have known for a long time that we're not
9    getting the proper amount of e-mails.  There should be a
10    lot of e-mails.  We have been complaining about it.  One
11    possibility, and we can't tell for sure because we can't
12    see inside AstraZeneca's house, are proxies.  Big
13    companies, executives often have proxies, administrative
14    assistants or secretaries, that send or receive on their
15    behalf.  We can find no evidence that AstraZeneca searched
16    custodians' proxies for e-mails.
17        An example where we don't have e-mails is Vikram Dev,
18    vice president of safety, responsible for Seroquel, 47
19    e-mails authored by Vikram Dev were produced, since 2004.
20    That's 30 months.  We're supposed to believe that the vice
21    president of safety authored one and a half e-mails a
22    month.
23        As Mr. Martin, our expert will testify, that kind of
24    volume is a huge red flag and needs explaining.  That kind
25    of volume would cause any electronic vendor to go back and

Page 9

1    figure out why there weren't more.
2        Another possible source, Your Honor, of missing
3    e-mails is alternate e-mail boxes.  One of the custodians
4    in the first eight, one of the most important custodians,
5    Michael Murray, we received an e-mail for him in the
6    June 25th production that he authored.  He was not
7    custodian of that e-mail.  So we looked at that e-mail and
8    it appears that he has at least two different e-mail
9    boxes.
10        And Mr. Jaffe's team from Weitz & Luxenberg ran that
11    second e-mail box through the system.  We came up with
12    1,050 e-mails authored or received by that alias e-mail
13    box that weren't in Mr. Murray's custodial file.
14        And if at any time you want to see exhibits, I have
15    links to them and I can pop them up on the screen for you.
16        But there's 1,050 e-mails that Murray authored or
17    received not in his custodial file.  And the name of that
18    e-mail box that he has is Murray Michael F., paren,
19    Seroquel.
20        Those are the e-mails we didn't get.  Seroquel
21    e-mails.  Well, we didn't get them in his custodial file.
22    We got them because they went to other custodians.  So we
23    can only imagine where the e-mails from the Seroquel box
24    are that went to non-custodians.
25        That brings me to the unreasonable keyword search

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

1   that was employed, Your Honor.  In this case we always
2   believed until May that AstraZeneca was searching all
3   relevant files for the 80 custodians they identified as
4   being Seroquel people.  We didn't learn the truth until
5   May, when they filed their keyword search with the Court.
6   It was dated April 30th.  We didn't learn it until
7   probably May 1st or 2nd.  I couldn't pinpoint it better
8   than that.
9       It's inadequate for a lot of reasons, but here's some
10  obvious ones.  It did not contain dozens of terms that
11  should have been on there, such as quetiapine, the generic
12  name for Seroquel.  They put in quetiapine fumarate, the
13  long version, not short version.
14      They didn't search for diabetic.  Our clients are
15  diabetic.  They didn't search for DM, the universal
16  acronym for diabetes.  Endocrine.  Metabolic.  Atypical.
17      Second generation.  That's what Seroquel is, a second
18  generation antipsychotic.  They didn't search for that.
19  They didn't for its acronym, SGA.
20      Off label.  A big part of our case is off-label
21  marketing, illegal off-label marketing.  They didn't
22  search for that.
23      Acronyms they didn't search for, such as Seroquel
24  leadership team, Seroquel brand team, Seroquel takes
25  olanzapine/Risperdal market share.  They didn't search for

1   those acronyms.
2       AstraZeneca is an English company.  They didn't
3   search for hyperglycaemia, spelled the English way.  I
4   have examples of documents that have hyperglycaemia the
5   English way in them, including a long list of keywords
6   that we found last night with synonyms for diabetes that
7   include hyperglycaemia, English spelling.
8       And endocrine, Your Honor.  And on this one, I'd like
9   to turn your attention to Exhibit 1.07.  In the
10  AstraZeneca world, endocrine is a synonym for diabetes.
11  Exhibit 1.07 is an e-mail, an internal e-mail where the
12  AstraZeneca people are worrying about the fact that in
13  their clinical trials they undercounted diabetes cases
14  because they didn't search the term endocrine.  I would
15  think they wouldn't have made that mistake here and left
16  endocrine off their keyword search.
17      They didn't look for misspellings.
18      Then when it came -- then they technical issues, that
19  any e-discovery person could have told them about.  They
20  put in plurals.  Plurals don't pick up singular.  It's
21  basic.  You put in singular, and that gets to plurals.
22      They didn't account for spaces and dashes, and they
23  used like exclamation points.  I'm told that's called a
24  bang, and that will limit what comes before it.
25  Mr. Martin can explain that.

1       Mr. Martin looked at this for us.  His conclusion is
2   that it's one of the most deficient keyword lists he's
3   seen in the last decade.  It has inaccuracies, holes.  In
4   all probability it missed relevant documents.
5       Mr. Martin will tell you what AstraZeneca should have
6   done.  They should have gone and interviewed the right
7   people, the custodians.  If they interviewed the
8   custodians, they would have gotten the alternative words.
9   They would have gotten those internal acronyms.  They
10  should have sought input from us.  They didn't.
11      They should have tested and fine-tuned the list.
12  They didn't.  The result is they ran an inadequate list
13  and we likely didn't get relevant documents.
14      And if you think about some of the terms that aren't
15  on there, DM, quetiapine, SBT, Seroquel brand team.  What
16  if there's e-mail, Seroquel brand team has determined that
17  quetiapine causes DM.  We wouldn't have that e-mail.  And
18  you could spin out dozens of examples like that.
19      AstraZeneca in their papers claims, and I believe
20  somewhere they're going to claim, we should have given
21  keywords earlier.  But remember, we didn't know they were
22  doing this until May.  And if they make that claim, it's a
23  red herring.
24      In this Court, on April 12th, Mr. Freebery reported
25  that all the documents were out from AstraZeneca to the

1   vendor.  And we know from their filings, and we submitted
2   it to the Court, they -- an appendix to a CMO4 they
3   proposed to us, listed all the custodians and when they
4   collected the documents.  They were all collected in 2005
5   and 2006.  All the documents were out to the vendor by
6   April 12th.  We didn't learn about the key search list
7   until May.  That same month we raised the issue.
8       Example 17.12.  A letter to Mr. Freebery where we
9   objected to the key term list and pointed out it would not
10  have picked up relevant documents.
11      We have been objecting to the keyword list ever
12  since.
13      On July 18, I believe it was, we sent a proposed
14  keyword list that Mr. Martin helped us put together to
15  AstraZeneca and said, this is a partial list.  Of course
16  we can't figure it out perfectly because we don't have
17  access to your people, but at a minimum it should have had
18  all these things.  We have that list as an exhibit to the
19  Martin report and he can explain it.  We haven't heard
20  back from them.
21      Our next problem is the de-duplication methodology.
22  Mr. Martin is here to explain that when you're going to
23  de-duplicate, you need to be careful, and the standard is
24  a hash method.  He can tell you what that is.  I can't.
25      What I can tell you is that AstraZeneca did not use a

Page 14

1   hash method.  They used a less sensitive method.  We
2   believe it's a fielded de-duplication method where the
3   metadata in a certain designated field is compared.  If
4   it's the same, the document's eliminated.
5       The problem is, our testing has revealed that the
6   fields they used have resulted in us losing documents.
7   The best example I could give you is if there is an e-mail
8   from custodian A to B and C, and the same thing is BCC'd
9   to D, the way they did it, if the first time they saw that
10  e-mail was a recipient, all the other e-mails would be
11  de-duped.  But that recipient's metadata would not show
12  the BCC.  We would never know that e-mail went to the BCC.
13      There are other examples that Mr. Martin can explain.
14  But the custodial -- the de-duplication method they used
15  has resulted in us not getting relevant non-duplicate
16  documents.
17      Mr. Martin, frankly, he was appalled when he saw
18  this.  He said it's the worse de-duplication he's ever
19  seen.  And he believes we missed relevant documents.
20      So that's the end of missing data.  All the
21  categories of data, the keyword searching and
22  de-duplication that has caused us to miss documents.
23      But we have also been prejudiced because of
24  consistently late productions and missed deadlines.
25  Exhibit 17.02, Your Honor, in the back.  It's the

Page 15

1   appendix.  AZ began collecting documents.  They collected
2   documents in '05 and '06.  Six of the first eight
3   custodians' documents were collected, according to their
4   document, in September and May of 2005 -- September and
5   October of 2005, Your Honor.
6       AstraZeneca claimed in this court a custodial
7   production would be the quickest.  It makes sense, since
8   they had finished collecting the documents a year before.
9   As of December 12th, AZ had reported to the Court that it
10  substantially collected documents for the first eight
11  custodians.  So the Court ordered -- it was actually a
12  stipulated order.  We all agreed to it and the Court
13  ordered it.  The first eight custodians, produce them,
14  starting on January 5.
15      They started on February 6.  And what we got on
16  February 6 was 14 percent.  We got 14 percent of the
17  documents associated with the eight custodians.
18      On April 12, AstraZeneca told the Court that only a
19  small fraction of documents for the first eight custodians
20  had not been produced.  That's Exhibit 8.  In truth, a
21  million more pages had yet to be produced, more than half.
22  Not a small fraction.
23      On April 12 AstraZeneca promised the Court it would
24  complete production for the first eight custodians in a
25  week with a certificate of completion.  We didn't get the

Page 16

1   certificate until April 30.  They completed production on
2   June 25, according to them.
3       And that doesn't include two entire files, Bemish and
4   Bush, that were reproduced completely on July 18 because
5   there were so many blank pages in the earlier production.
6       May 2nd, AstraZeneca told the Court it had produced
7   all documents for the first eight custodians, and they did
8   that because on April 26, Mr. Pennock filed a motion to
9   compel to get those first eight finished and certified.
10  And so in response to that, AstraZeneca filed with the
11  Court an opposition and they chastised us and they said
12  plaintiffs' motion is moot as to the first eight, because
13  AstraZeneca has completed.
14      But they hadn't completed.  They had 25,000 pages to
15  go.  I think that's ten boxes.  I can never remember if
16  it's 2500 or 5,000 in a box, but it's a lot of pages that
17  they hadn't finished.
18      After May 2nd -- Your Honor, and those documents they
19  produced after May 2, that's only the documents that they
20  put in the custodial files.  But that Murray example I
21  described earlier, those thousands e-mails from and to him
22  that weren't in his custodial file, those -- that isn't
23  even included in the 25,000 pages.  And I'm not sure which
24  of those thousand e-mails were produced before and after
25  May 2.  But we know some were.

Page 17

1       As I said a moment ago, on July 18, AstraZeneca
2   completely reproduced two entire files for those first
3   eight because of blank pages.  That leads us to the
4   rollout steady rate facade.  We were led to believe that
5   the custodial production would roll out at a steady rate
6   over time.  The spirit of CMO2 required it.  From reading
7   the transcripts, I believe the Court thought that is what
8   would happen.
9       AstraZeneca produced 41 percent of its production in
10  the last three weeks of June.  3.75 million pages in the
11  last three weeks of June.  On June 6, after a fairly
12  contentious hearing on May 22, June -- on June 6,
13  AstraZeneca promised to deliver to us new load files that
14  would fix all sorts of problems we were having in trying
15  to get reasonably searchable data which we didn't have.
16  AstraZeneca promised to give us new load files to
17  predict -- to fix those things, in about four weeks.
18      We wouldn't be here if they were a day late or two
19  days or even five days late.  We got those new load files
20  at 6:13 p.m. on Friday, July 20th, and we can't make them
21  work, because there are technical problems with them.
22      On June 6 AstraZeneca promised us, and this is in the
23  joint statement that we filed when we said we didn't need
24  that technical hearing, on June 6 AstraZeneca promised to
25  give us page breaks in all productions after that day.  We

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

1   received 3.75 million pages after that day with no page
2   breaks.
3       The files we received from AstraZeneca have never
4   been reasonably searchable, Your Honor.  What they
5   delivered to us last Friday might fix some of the
6   problems, rather technical -- the things won't load, so
7   clearly there was no quality control on their side.  They
8   didn't test them before they sent us those load files.
9   They won't load without us having to remove
10  characteristics and do things that change the data.
11      Your Honor, even if those fixes that they're supposed
12  to be delivering take, it's not going to fix the fact that
13  we just don't have documents in custodial files that
14  should be in custodial files.  We don't have reasonably
15  searchable data.  Setting aside everything we don't have,
16  what we did have, what we do have is not reasonably
17  searchable.
18      And that brings us to the technical flaws, do that to
19  us.  Date format changes in metadata across the
20  productions, meaning we can't search reliably by date, one
21  of the most basic types of searches you need to do when
22  you have a huge body of documents.
23      E-mail attachments are not consistently associated
24  with the attachment.  We have an example of that in
25  Exhibit 16.16, the Murray e-mail.  We received the

1   attachment in production 8, I believe in May.  We received
2   the e-mail it went with on June 25th.
3       The attachment didn't tell us it was an associated
4   with anything.  We had to wait until June 25th to know
5   they went together.  And that's the e-mail where Murray
6   was the author but he's not a custodian.  So we have these
7   attachment issues which makes searching unreliable.
8       Authors not identified as custodians.  That's the
9   example I just gave you.  All those Murray e-mails where
10  he's not a custodian, which means I can't say, Mr.Jaffe,
11  send me Murray's custodial file, I want to take his
12  deposition.  That won't do it because I would miss all
13  those e-mails.
14      The only way we would be able to get all of Murray's
15  custodial file is, I'd have to say, Mr. Jaffe, give me his
16  custodial file and search the entire rest of the database
17  for his name, and send me all that.  Which means the
18  searches we did before June 25th have to be redone.
19      Once we could get those load files to work that we
20  got last week.  Transposed metadata.  We had authors and
21  recipients transposed.  There again, can't do basic
22  searches by author.  Can't do a search by author or date.
23  Can't combine those things.  Those are basic.
24      Page breaks.  We've been asking for page breaks, I
25  believe, since December.  Maybe even November.  We were

1   led to believe we would get page breaks in January and
2   February.  We didn't get page breaks.  I believe we were
3   delivered some page breaks solutions on July 20th, but we
4   didn't get the page breaks, which makes searching slow.
5       Inconsistent metadata fields.  Mr. Martin has looked
6   at this, and he just can't believe what we have.  He said
7   you put it all together, the keyword search list that's
8   deficient, the de-duplication method, the technical
9   errors, has resulted in large amounts of missing relevant
10  data, and has resulted in a production that's not
11  searchable nor reliable.
12      He thinks we should just start over.
13      Databases.  Your Honor, AstraZeneca was ordered to
14  identify databases by January 5, relevant databases.  They
15  identified some by January 12th.  And through the 19th, we
16  got 21 -- 21 databases identified.  Interviews in late
17  January identified six more, so we were up to 27.  We had
18  to take 30(b)(6) depositions in May to discover there were
19  59 relevant databases.
20      We then started to meet and confer with the other
21  side, and this is the mother of all sandbags right here,
22  we started meeting and conferring with the other side
23  about production of databases.  CMO2 actually contemplates
24  production of databases without requests for production of
25  documents.

1       In June we had meet and confers with AstraZeneca
2   where the whole tenor of it was producing the databases
3   without meet and -- without requests for production of
4   documents.
5       In late June AstraZeneca asked us to prioritize.
6   Maybe in early June.  So we sent them a chart and said
7   please fill this out with some data so we could try to
8   work with you on prioritizing.  We sent it on June 20.  On
9   June 27 they said, no, we're not giving you the
10  information for you to prioritize.
11      So on June 29 -- no.  And so Mr. Pennock told the
12  other side, we will talk to the Court about that.  All --
13  on July 2 we got the chart, before the July 5th hearing.
14  But it wasn't filled out very well.
15      And now we hear from the other side we're being
16  criticized about the database issue.  There was an e-mail
17  on June 29 that said, you haven't even propounded requests
18  for production.  We were led to believe we didn't have to.
19  Yes, shame on us for believing that.
20      So we're months lost on databases.
21      Organizational charts.  This isn't as big of a deal.
22  I'll do it quickly.  But we've lost time.  AstraZeneca was
23  ordered to produce them in December and January.  They
24  produced some.  We got most of them at 30(b)(6)
25  depositions in May.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

1     At the beginning of the Barberian (phonetic)
2  deposition that Mr. Pennock took, the AstraZeneca lawyer
3  walked in with a bunch of org charts to give.  And if you
4  look at the transcript excerpts we submitted, I believe
5  it's Exhibit 18, you'll see that it wasn't even all the
6  org charts that were in the files.  They picked some of
7  them and left some home.
8     The bottom line of that is, again, we just lost
9  months in identifying relevant custodians and witnesses.
10    The IND and the NDA, this should be ancient history
11 since the Court ordered its production in November.  We
12 got it in November.  But there was no OCR, there were no
13 load files.  There were documents in there, 20,000 or more
14 pages, we couldn't even load them on a PC or laptop.
15    We asked for help from the other side.  It was the
16 beginning.  They told us it would cost us tens of
17 thousands of dollars and months of time to fix.  We did it
18 ourselves.  It took weeks.  It put us behind again.  It's
19 just an example of the discovery abuses that put us months
20 behind.
21    And then by the way, we didn't finish getting the IND
22 and NDA until June, when we got the CANDA part that had
23 not been produced.  So we lost months of time.
24    Your Honor, those are the four big areas.  We're
25 missing data.  Custodial production with the missing data.

1  The keyword search that was deficient.  The de-duplication
2  that was deficient.  The technical errors.  The databases
3  we still don't have.  The IND and NDA put us behind.  The
4  org chart issues put us behind.
5     The result is, we're many months behind where we
6  should be in the data that we do have.  The data that we
7  do have is not reasonably searchable.
8     I'll tell you this:  The defendants in their
9  PowerPoint, they have the Sedona Principles.  I guess they
10 like the Sedona Principles.  I think they're good
11 principles.  One of the principles --
12       THE COURT:  Are you referring to the new ones or
13 the old ones?
14       MR. GORNICK:  I believe they're the new ones,
15 Your Honor.
16    Sedona Principle Number 12.  I think this goes to the
17 heart of the matter.  We're entitled to, I believe what
18 this says, data in reasonably usable form, which we don't
19 have, taking into account the need to produce reasonably
20 accessible metadata that will enable the receiving party
21 to have the -- this is the key -- the same ability to
22 access, search and display the information as the
23 producing party.
24    We did not get native files.  We negotiated for near
25 native.  Mr. Jaffe could explain that.  We thought what

1  CMO2 was giving us was near native.  Without the page
2  breaks, without consistent metadata, without consistent
3  dating and Batesing conventions, we don't have the ability
4  to what they can to the data.
5     So with the data we do have, we don't have what the
6  Sedona Principles say we should have.
7     And because of all of this, Your Honor, and I don't
8  know if this is the time you want to hear about what we
9  think we need, but we think we need some orders that
10 require immediate production of documents, immediate
11 production of data, and then we need sanctions to protect
12 us from what's coming up.
13    We don't have the ability, Your Honor, at this time
14 to adequately prepare for the doctor depositions next
15 month and in September which are going to tee up the
16 affirmative defense of learned intermediary, so we think
17 the only fair solution is to strike that defense for all
18 those cases on the August and September discovery
19 timeline.
20    We think a related -- a sanction that might get them
21 moving is that if that -- if you will order them to produce
22 what we need to produce, and I have the list, and I think
23 we put it in our last submission.  If they don't do those
24 things within 30 days, learned intermediary goes away for
25 all the October cases, et cetera, et cetera.  We will go

1  month by month.
2     Your Honor, we are not in a position to oppose the
3  motions that AstraZeneca has been ordered to file next
4  week on thing likes preemption.  We think that the motions
5  they're going to file, the affirmative defenses that
6  they're going to pursue in their motions next week should
7  be stricken, because we're not in a position to oppose
8  them with all of the data that we're entitled to have and
9  should have by now.
10    Your Honor, another thing that's smaller that we
11 would like is, we would like to move our expert disclosure
12 back by I think a month so they coincide with the
13 defendant's.  Why that's related to this is it gives us a
14 little extra time to get ready, and it's a small sanction
15 on the defendants because it will require simultaneous
16 disclosure of expert issues.
17    And finally, Your Honor, and this may sound a little
18 bit different than things you might have heard before,
19 given the magnitude of the problems we have had and just
20 really the remarkable inability for AstraZeneca to produce
21 data to us in a way that is usable and searchable, the
22 fact that we just don't have stuff, and it's clear that
23 their vendor, someone on that side is just incompetent, we
24 think we should have an audit by a competent e-discovery
25 forensic person who could go in and look at the native

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 26

1  files and look at what they have extracted from their
2  custodians, figure out how they did the extraction. Was
3  it self-harvesting by the custodians, which has all sorts
4  of potential perils? Was it something else? What was
5  that de-duplication method? How could we fix it?
6  Because, you know, we don't know what we don't have. We
7  don't know what we don't know.
8      And it seems like every step of the way, there is a
9  new problem. Mr. Jaffe will tell you that the technical
10  problems got worse after the first production. It's not
11  like they got better. They got worse. We found new
12  technical problems in the last two productions. At least
13  that's when we were able to discover them.
14     So we think we should have an audit. A third-party
15  forensic e-discovery person paid for by AstraZeneca but
16  independent of AstraZeneca gets to go in and audit and
17  look and report back on what's missing and where the
18  problems are.
19     Thank you, Your Honor.
20         THE COURT: Call your first witness.
21         MR. GORNICK: Plaintiffs will call Mr. John
22  Martin.
23             (Witness sworn.)
24         MR. GORNICK: May I put an exhibit binder at the
25  witness table, Your Honor?

Page 27

1          THE COURT: All right.
2          MR. GORNICK: And, Your Honor, if I may, a
3  little housekeeping. The defendants and the plaintiffs
4  reached a stipulation last night that all of the exhibits
5  that had been submitted to the Court other than Exhibit 1
6  and 1.01 may be admitted into evidence.
7      And with that stipulation, if it would please the
8  Court, I would offer into evidence every exhibit on the
9  plaintiffs' exhibit list other than Exhibit 1 and 1.01.
10         MR. MCCONNELL: That is a stipulation and that
11  is accurately stated, and it applies to both side, to our
12  exhibits as well.
13         THE COURT: All the exhibits except
14  Plaintiff's 1 and 1.01 for both sides are received.
15         MR. GORNICK: Thank you, Your Honor. For the
16  record, Exhibit 1 is Mr. Martin's report, and 1.01 --
17         THE COURT: Let me ask counsel to -- you went to
18  some effort to electronically file the exhibit list and
19  the exhibits. Are you comfortable with the matters that
20  you filed electronically being -- accurately being the
21  ones that we're talking about here so that I can treat
22  those as the record, so we don't need to track the paper
23  exhibits other than for convenience here?
24         MR. GORNICK: Yes, Your Honor. I do believe --
25  yes.

Page 28

1          THE COURT: All right. If at any time during
2  the hearing or shortly thereafter you discover something
3  that's wrong in one of the electronic exhibits, there be
4  will an opportunity to correct that. But let's proceed on
5  the basis that the electronically filed exhibits are the
6  exhibits for this hearing subject to the need to correct
7  something if -- I mean mistakes happen when you're filing
8  things. So we can deal with that, too.
9          MR. GORNICK: Thank you, Your Honor.
10              DIRECT EXAMINATION
11  BY MR. GORNICK:
12  Q   Good afternoon, Mr. Martin.
13  A   Good afternoon.
14  Q   Mr. Martin, can you briefly tell us who you are and a
15  very short synopsis of your experience in the area of
16  electronic discovery?
17  A   Yes, sir. My name is John Martin. I'm the president
18  of EDD Labs. EDD Labs is a vendors' vendor, in that I
19  mean a lot of electronic discovery companies use us for
20  either capability or capacity limitations that they have.
21      I've done electronic discovery work for the better
22  part of 15 years, primarily defense side, and I have
23  worked on some of the largest cases that have so far come
24  about.
25  Q   In this particular case, the issues we're faced with

Page 29

1  involve methods for collecting data, processing data, and
2  producing data to an opponent in litigation. Have you
3  been involved with all those things for 15 years or more?
4  A   Yes.
5  Q   Can you give us a very brief description of some of
6  the more recent litigations you have been involved with
7  and tell us who the party was that you were working for
8  and who the law firms were. Quickly, highlights.
9  A   Most recently, in the pharmaceutical area, with Barr
10  Laboratories, with three different litigations, all
11  drawing from the same custodial production source of about
12  900, a little over 900 custodians.
13     Two of those cases were managed by Williams &
14  Connolly out of D.C. The third is managed by Winston &
15  Strawn out of Chicago.
16  Q   Have you ever done work for GlaxoSmithKline?
17  A   Yes. Through IKON, who is one of our vendors about
18  two, two and a half years ago, conversion of electronic
19  documents for review and production.
20  Q   How about Purdue Pharma?
21  A   We worked with -- within the last, I would say within
22  the last three years, with a firm called Megler out of
23  Chicago where we were provided data related to the
24  OxyContin litigation, where the local vendor had failed to
25  meet a court-ordered production method.

Page 30

1    We were brought in and ran that production method,
2  accounting for about 1.1, 1.2 millions pages within a
3  week.
4  Q   How about Metronic?
5  A   Metronics I've worked with over the years, probably
6  the last six years in different cases.  Most recently with
7  Hogan & Hartson out of D.C.
8  Q   By the way --
9  A   Again, through IKON.
10  Q   There's a firm called Sidley Austin that represents
11  AstraZeneca in this litigation, along with other firms.
12  Have you -- has Sidley Austin ever retained you?
13  A   Yes.  We worked with Sidley Austin within the last
14  five years out of their D.C. office.
15  Q   But not for AstraZeneca?
16  A   No.
17  Q   Okay.  Now, you told us -- the last thing on this
18  issue, on this subject.  You told us you have worked on
19  some of the largest e-discovery productions in history.
20  What did you mean by that?
21  A   My team handled the WorldCom litigation.  I had both
22  WorldCom and MCI as a client, and Piper Rudnick, which is
23  now Piper, or DLA Piper.  Prior to the bankruptcy, we were
24  one of two vendors that initially started handling all the
25  electronic discovery when everything hit the fan with the

Page 31

1  SEC investigation.
2    And about two or three months into that process,
3  there was -- there was my team and Onsite, and eventually
4  the outside counsel made us the sole vendor.  We were
5  approved as a critical vendor by the bankruptcy court
6  itself, and we serviced everything.  We serviced the
7  bankruptcy, we serviced the SEC investigations, we
8  serviced various Congressional inquiries, plaintiffs'
9  litigations, everything.
10  Q   In the WorldCom, how many e-mails did you guys
11  process?
12  A   The number, the total volume we started with was
13  142 billion would be e-mails and 52 billion attachments.
14  Q   Okay.  Is it fair to say that the majority of your
15  work over the last 15 years has been with companies and
16  major American corporate law firms?
17  A   Yes, sir.
18  Q   When did we retain you?
19  A   Friday the 13th.
20  Q   I hope that doesn't bode ill for us.  That was just a
21  little less than two weeks ago?
22  A   Yes, sir.
23  Q   Any prior relationship with me or my firm?
24  A   No, sir.
25  Q   Any prior relationship with any of the plaintiffs'

Page 32

1  firms?
2  A   Of the two I'm aware of, no, sir.
3  Q   Can you briefly describe for us the work you have
4  done since Friday the 13th.
5  A   Well, initially I got to talk to Jonathan Jaffe, who
6  works for Weitz & Luxenberg.  He described to me various
7  issues he has had over several months with different data
8  that were delivered from AstraZeneca, problems related to
9  inconsistent load file formats, problems related to page
10  breaks within text files and various other things.
11    We then took the original load files as delivered,
12  the image sets as delivered, and the text sets as
13  delivered in the electronic custodial productions, and
14  loaded, analyzed and ran testing against those to
15  determine problems.
16  Q   I take it you found some problems?
17  A   We found an abundance of problems.
18  Q   I want to go through these in somewhat of a logical
19  sequence.
20    Missing data.  Did you find some things where there
21  just weren't entire types of data?
22  A   Yes, sir.
23  Q   Okay.  Can you describe those types of data that
24  appears simply were not produced based on your analysis of
25  the data set?

Page 33

1  A   Yes, sir.  During our initial conversation, Jonathan
2  Jaffe mentioned that he had found a press release from a
3  company called Swisscom that indicated that AstraZeneca
4  had a unified messaging system.  We subsequently then
5  began looking for things we would normally expect to find
6  in a custodial production from a company that had a
7  unified messaging system.
8    During the course of looking through the produced
9  documents, we also found e-mails where custodians were
10  referencing voice mails they were forwarding to each other
11  through AstraZeneca's e-mail system from the AUDIX system,
12  which was apparently a predecessor to the Swisscom system.
13  Q   Mr. Martin, would you turn your attention there to
14  Exhibit 1.03.
15  A   Okay.
16  Q   Can you tell us what that is, please?
17  A   This is an e-mail chain from Rosemary Kennedy on
18  September 4th, 2003.
19  Q   And did you use this to illustrate a point?
20  A   Yes, sir.  If you will go down to the fourth e-mail
21  in the chain, bottom third of the first page, the first
22  paragraph.  "Thanks for progressing this FDA request.  I
23  was copied on the voice mail message from Pratt to Tony
24  Rogers as well."
25  Q   Who sent that?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

1  A   Gerald Limp.
2      MR. GORNICK:  I would just note for the record
3  that Mr. Limp is one of the 80 custodians.
4  BY MR. GORNICK:
5  Q   What have you done, Mr. Martin, to determine that we
6  in fact don't have voice mail files?  How can we be
7  certain?
8  A   Well, voice mail files are delivered in a custodian's
9  in-box in the form of a sound attachment to an e-mail.
10  Normally any sound attachment occurring would have a
11  parent e-mail from which the from or the sender would be a
12  phone number, since it comes in through the phone system
13  to begin with.
14      We don't find any of those, and we also -- in the
15  entire production, there are no wav files or no MP3 files
16  that would indicate voice mail.
17  Q   The only way we would have voice mail would be if it
18  was a wav file or MP3 file?
19  A   Yes, sir.  You can't print them.
20  Q   What's the next category of data that we simply do
21  not have?
22      THE COURT:  Are there any other file formats of
23  sound files that are typically used for voice mail storage
24  and transmission?
25      THE WITNESS:  Your Honor, in my experience it's

1  normally either a -- I have seen wav files.  I have seen
2  MP3 files.  I have seen, I believe AIFF, but not very many
3  of them.
4      THE COURT:  What about when they're archived?
5      THE WITNESS:  When they're archived, they're
6  generally archived within the confines of a PST or an
7  Exchange EDB.
8      THE COURT:  Are they converted when they're put
9  into the PST?
10      THE WITNESS:  No, I don't believe so.
11      THE COURT:  There's no compression or --
12      THE WITNESS:  The compression would happen by
13  the audio codec at the server, at the voice mail system.
14  So they're already delivered compressed into the
15  custodian's in-box.
16      Now, the archive itself might be compressed, but
17  that's not specific to the audio file.
18      THE COURT:  Go ahead.
19  BY MR. GORNICK:
20  Q   Mr. Martin, what's the next broad category of things,
21  data that you don't have?
22  A   Additionally, in the unified messaging system, you
23  would expect to see faxes delivered as either TIFFs or
24  image only PDFs.  Some of the older fax systems would also
25  deliver in DCX format.  All of which are simply images.

1  They're simply photographs of what the fax looks like, so
2  therefore, they don't have any text component to search
3  by.
4  Q   How do we know we don't have faxes that were
5  delivered into custodians' in-boxes?
6  A   Because again, in a unified message system, when you
7  see a file that's a fax being delivered, it's from a phone
8  number.  It's from whatever fax number it came from.  And
9  we don't find any of those.
10      THE COURT:  What if it's being sent by a fax
11  server that's part of an IP system?
12      THE WITNESS:  It's still normally from a fax
13  number.  It may be either prefixed or suffixed with the
14  sender tag, which would be the company in most cases.
15  BY MR. GORNICK:
16  Q   Mr. Martin, there are some faxes in the production
17  set, right?
18  A   Yes.
19  Q   We have evidence of faxes?
20  A   Yes.  We found one e-mail that contains two
21  attachments.  The two attachments are both called fax.tif.
22  That indicates that -- I've seen that format before in fax
23  servers delivered from unified messaging systems.
24      In this case, though, the two attachments were
25  attached to an e-mail where a person was saying, I have

1  seen -- I received these.  Please look at them, and we
2  have got some more work to do, or something to that
3  effect.
4      So my opinion would be that somebody detached a fax
5  from the unified message system from its original parent
6  message and then saved it and then reattached it to the
7  message we located it in.
8  Q   So the only reason why we got those was because
9  somebody manually attached them to an e-mail and sent them
10  to someone else?
11  A   Yes.
12  Q   As -- okay.
13      What's the next category of data that we don't have?
14  A   In missing data past the electronic or the unified
15  messaging system, there's missing multimedia files such as
16  video.
17  Q   How do we know we don't have video files?
18  A   Well, in going through AstraZeneca's production data,
19  we found people referring to and documents referring to
20  video files which seem to be related to Seroquel and
21  marketing-type operations.
22  Q   Is there any other way we know that there are video
23  files and we just don't have them?
24  A   Yeah.  Actually we ran across, and this was a needle
25  in a haystack thing, we were searching for something else,

Page 38

1  but we ran across a placeholder that had been inserted by
2  some electronic discovery system that actually said file
3  removed because it was non-printable, and then the name of
4  the file, which was an MPEG video.
5  Q    Would you have -- in analyzing the data, was there
6  any way for you to know that we -- that these placeholders
7  might exist other than just stumbling across them?
8  A    No.  They don't have metadata in their images, so
9  they're not searchable.
10 Q    What other types of data are we just missing,
11 categorically?
12 A    We were unable to find any track changes views of
13 Word or Excel within the AstraZeneca production.  We did
14 see some e-mail chains where people were passing Word
15 documents around for edits, but none of the resulting
16 TIFFs show -- that we've look at -- show track changes.
17 Q    What would explain just not getting track changes?
18 A    Not getting track changes generally would mean that
19 whoever had processed the files had processed them in a
20 final print view rather than a track changes view.
21 Q    What would explain us not getting the fax attachments
22 and the voice mails?
23 A    The fact that faxes in and of themselves in a unified
24 message system aren't searchable.  The parent message
25 would be a phone number and who it was to or from.  The

Page 39

1  attachment would have no text component to it.  So there's
2  no way to search it.
3  Q    Same thing for voice mails?
4  A    Yes, sir.  There is technology that can search voice
5  mails, but not that exists within a unified messaging
6  system.
7  Q    What type of issues did you spot with respect to
8  e-mails?
9  A    Well, with e-mails, as we went through, we noticed
10 really several, but in the missing data section we noticed
11 an abnormally low volume of e-mail for certain custodians.
12      Vikram Dev was the example that we ran.  Over the
13 course of a ten-year period, according to AstraZeneca's
14 produced metadata, he authored a total of 125 e-mails,
15 which would average roughly one a month for ten years, 47
16 of which had been written since January 1 of 2004 until
17 the present.
18 Q    Now, when you're doing a data production for a
19 company in litigation, and you see a custodian who is
20 supposed to be important, and Vikram Dev is a vice
21 president of safety, identified as important by
22 AstraZeneca, in that kind of situation, when you see a low
23 volume of e-mails, does a red flag go up?  Do you do
24 something?  What kind of -- what does that tell you?
25 A    Yes, sir.  A big red flag goes up.  Were we producing

Page 40

1  data for key custodians and we noticed something like
2  this, because my team over the last, I guess six or seven
3  years, has handled over 100 terabytes of data in their
4  projects, and we have kind of some guidelines that we have
5  seen as to, you know, if somebody sends more e-mail than
6  they receive, that's a red flag.
7       In this case, we would bring this to our client's
8  attention, which would be the outside counsel, and they
9  would, you know, go say, hey, where is the rest of this
10 guy's data normally.
11 Q    So that's -- the Vikram Dev example is a situation
12 which needs explaining before you go ahead and produce and
13 say that's all there is, in your experience?
14 A    Yes, sir.
15 Q    Okay.  What other e-mail issues did you identify?
16 A    We also identified that there was a lack of proxies.
17 One thing that we have learned over the years is in large
18 corporations, it's not necessarily as important what --
19 who the person is as what they are.  If a person is a
20 higher-level executive in a company, that position over a
21 timeframe that the case may require may change.  It may be
22 more than one person who was the vice president of
23 development.
24      You may also -- for example, you may also have that
25 person with proxies, an administrative assistant,

Page 41

1  secretaries, who can send and receive e-mails on behalf of
2  that person.
3  Q    Typically in your experience over the last 15 years
4  when you are doing a custodial production, is it common
5  practice to figure out and verify if a custodian has a
6  proxy who sends and receives e-mail for them?
7  A    Absolutely.
8  Q    Did you test the best you could to see if we had
9  custodian proxies?
10 A    Yes, sir.
11 Q    And what did you discover?
12 A    We found examples of people proxying e-mails back and
13 forth, documents back and forth, meeting appointments back
14 and forth.  So we do know that they used proxies and they
15 have proxies within the company.
16 Q    Did you find any evidence that AstraZeneca produced
17 e-mails that any of the custodians' proxies sent or
18 received for the custodian?
19 A    Yes, sir.  That's -- I believe that's my exhibit
20 attached to the report.
21 Q    And my question is a little different.  Did you find
22 any evidence that AstraZeneca produced e-mails that a
23 custodian's proxy sent or received for the custodian?
24 A    No, they did not produce any what we would call
25 proxy-sourced e-mails.  In other words, they collected

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 42

1  this person who is a proxy. We didn't find any of those.
2  Q   So the exhibit you referred to, Exhibit 5, that's an
3  example of simply the fact that within AstraZeneca there
4  are proxies. You're not saying that that was a
5  custodian's proxy.
6  A   Correct.
7  Q   Okay. Now, in your experience, when there's a proxy,
8  a custodian's proxy, you need to go and suck up all the
9  e-mail out of the proxy's e-mail box?
10 A   Yes, sir. In my experience with WorldCom, for
11 instance, Bernie Ebbers had very, very few e-mails. He
12 had an administrative assistant who had, you know,
13 hundreds of thousands of pages of e-mails on his behalf.
14     But my understanding from interacting with the
15 attorneys on that case was, his preferred method was to
16 have a proxy receive a document, do a human filter,
17 deciding what he wanted to see or didn't want to see, and
18 then they'd print it out and put it on his desk.
19 Q   So in the WorldCom example, if WorldCom produced only
20 Bernie Ebbers' custodial file and never searched his
21 proxy's files, his file would have just a few e-mails in
22 it?
23 A   Yes, sir.
24 Q   And that would be misleading, wouldn't it?
25     MR. McCONNELL: Objection. Leading.

Page 43

1  Argumentative.
2      THE COURT: It's leading. Sustained.
3  BY MR. GORNICK:
4  Q   Mr. Martin, did you find any evidence of eRoom data?
5  A   Yes, sir. Actually, we ran across that yesterday.
6  Q   What did you run across yesterday?
7  A   In --
8      MR. McCONNELL: Objection. This isn't disclosed
9  in the report that was submitted by the plaintiffs, Your
10 Honor.
11     THE COURT: I thought you were objecting to the
12 report anyway.
13     MR. McCONNELL: Well, that's true, and Your
14 Honor tabled that matter. That's still a live issue as
15 far as we're concerned.
16     THE COURT: Overruled. Go ahead.
17     THE WITNESS: We were reviewing -- I believe
18 there are technical depositions from a person named
19 Darryl, last name starts with a D.
20 BY MR. GORNICK:
21 Q   Was it Draper?
22 A   Draper. Yes, sir. In this deposition he describes
23 the use of eRooms. ERoom is a software that allows people
24 to collaborate together online, do online markup of
25 documents through Adobe Acrobat, share documents, share

Page 44

1  calendar items. The company was, I think, purchased by
2  EMC, is who now owns it.
3  Q   Did you see any evidence of eRoom data in the data
4  set we received from AstraZeneca?
5  A   No.
6  Q   I'd like to turn your attention now, Mr. Martin, to
7  the subject of keyword searching. Did you review the
8  keyword search list that AstraZeneca claimed to use in
9  this particular case?
10 A   Yes, sir.
11 Q   And can you tell us what your conclusion is regarding
12 that list?
13 A   I believe the list was very, very limited in scope,
14 and I would characterize it as having been put together
15 haphazardly or by people who don't have a lot of
16 day-to-day working knowledge of the subject matter.
17 Q   Can you take us through the ways the list was
18 inadequate?
19 A   Yes, sir. Initially it's just inadequate scope, for
20 there's inadequate scope in the list simply because it's a
21 very limited search term list. There are a lot of words
22 that we found in AstraZeneca's production documents where
23 AstraZeneca personnel are referring to other words that
24 obviously relate to the limited search term list that they
25 provided.

Page 45

1  Q   May I just excuse you for one second, Mr. Martin.
2      MR. GORNICK: Your Honor, the search word list
3  that AstraZeneca submitted is attached -- it's the last
4  two pages of Exhibit 1.06.
5  BY MR. GORNICK:
6  Q   I'm sorry, Mr. Martin.
7  A   That's fine.
8      Going through the search term list, it starts with
9  Seroquel and doesn't, you know, doesn't search for the
10 generic term of that in the short form, which is -- sorry,
11 I'm not a doctor -- quetiapine, I guess.
12 Q   Quetiapine.
13 A   Quetiapine. Also, the middle section here are
14 obviously drug names, but then you get into issues with,
15 you know, do those drugs have generics. Now, I don't know
16 if they do or not.
17 Q   Okay. So just so we could go through this in a
18 methodical way, how was the scope of the keyword search
19 list?
20 A   The scope is limited because they're missing obvious
21 words like quetiapine, now that I know how to pronounce
22 it, endocrine, diabetic, metabolic, atypical, second
23 generation, and several other examples.
24 Q   And did you propose a search term list?
25 A   Yes, I did.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 46

1  Q   Is that Exhibit 1.08?
2  A   Yes.
3  Q   Now, turning back to your report, you mentioned that
4  the search term list lacked synonyms.  What do you mean by
5  that?
6  A   Well, it's very common, especially in technical
7  organizations, be it high-tech companies or pharmaceutical
8  companies, to have different meanings and different terms
9  for the same thing.  An example would be, I think
10  everybody in the room would know what the little blue pill
11  is, but that's not the name it's sold under, which would
12  be Viagra.  That's kind of a marketing term for it.
13  Q   In your report do you cite an example?  I refer you
14  to Exhibit 1.07.
15  A   Yes.  In this exhibit we found this document and in
16  it, it says in the second -- I'm sorry, third paragraph
17  down, and this is an example, in this trial 56, there are
18  originally 25 cases of diabetes that might have been
19  missed in our search for the text, quote, diabetes.  High
20  term -- I'm sorry.  High-level term for diabetes cases
21  seems to be endocrine, in paren, which we did not include
22  in our initial search.  However, these patients might have
23  been categorized due to some other criteria.
24     So what they're saying in effect is that endocrine is
25  a synonym for diabetes in their world.

Page 47

1  Q   And endocrine wasn't on their list?
2  A   Yes, sir.
3  Q   Okay.  Acronyms.
4  A   Acronyms, we noticed in their search term list they
5  had acronyms for certain terms and then they didn't have
6  acronyms for other terms.  For instance, DM is the acronym
7  for diabetes.  They did search for diabetes, they didn't
8  search for DM.  So anywhere it would have been
9  abbreviated, that would have been missed.
10     Also, other examples were Seroquel leadership team
11  versus searching for SLT.  Seroquel brand team, or SBT.
12  They did use, for example, NIDDM, but didn't spell out the
13  term that it actually represents, which is
14  non-insulin-dependent diabetes mellitus.
15  Q   So they not only missed acronyms, but sometimes they
16  used acronyms but then didn't search the actual words that
17  the acronym represents?
18     MR. MCCONNELL:  Objection.  Leading, Your Honor.
19     THE COURT:  Sustained.
20  BY MR. GORNICK:
21  Q   Okay.  Is it true that at times the AstraZeneca
22  keyword list did not include words that an acronym
23  represented?
24     MR. MCCONNELL:  Objection.  That's still
25  leading.

Page 48

1     THE COURT:  Sustained.
2  BY MR. GORNICK:
3  Q   What was the problem with AstraZeneca using only
4  NIDDM in their keyword list?
5  A   It limits, it limits the scope of the list and would
6  potentially miss documents where the NIDDM term is spelled
7  out.  They actually went both ways.  In some cases they
8  used the full term and some cases they used the acronym
9  but not both.
10  Q   In your experience in doing a keyword list, what's
11  the proper way to do it?
12  A   To do both.
13  Q   There's another section in your report called
14  "English versus American" --
15     THE COURT:  Stop.
16     Mr. Martin, the contemporary versions of keyword
17  software, is it -- have they got features beyond just
18  composing a list?  Does it have any artificial
19  intelligence that will prompt you to add alternatives, or
20  are there --
21     THE WITNESS:  Yes, Your Honor.  Some do.  Neural
22  net software, such as Attenex, has that ability.  Most of
23  what I would characterize as the biggest genre of search
24  software that is used in litigation systems, like
25  dtSearch, ISIS, engines like that rely on synonym lists

Page 49

1  for that application, simply because the acronyms and
2  synonyms really vary by industry.
3     THE COURT:  But will the software generate the
4  synonyms based on starting to look at some of the
5  documents?
6     THE WITNESS:  No, sir.
7     THE COURT:  Doing a concordance where they'll
8  find words that are showing up a lot, therefore --
9     THE WITNESS:  I have seen that happen in
10  situations where the acronym and the spelled-out word are
11  together and one or the other is in paren.  Some of the
12  neural net engines are good enough to realize that that's
13  a relationship.
14     But if they're separated in a document, no.
15     THE COURT:  How much fuzzy logic do some of
16  these have in terms of picking up misspellings or
17  alternative spellings or typos?
18     THE WITNESS:  It really depends on the product
19  that you use.  They -- different search engines have
20  different abilities.
21     DtSearch, for instance, has a fuzzy logic based on
22  missing characters, so you can actually say I'm going to
23  search for this word but I'm willing for one character to
24  be wrong or I'm willing for two characters to be wrong or
25  anything up to ten.

13  (Pages 46 to 49)

Page 50

1    Other engines like ISIS actually use a neural net
2  technology to substitute for common errors in OCR. For
3  instance, the word burn, B-U-R-N, a common OCR error would
4  be the R and the N look like an M, so you would wind up
5  with "bum" or you would wind up with -- the U might look
6  like an O so you might wind up with "born."  That's the
7  technology that ISIS uses.
8       THE COURT:  Do any of these produce a
9  concordance that could lead you to add terms?
10      THE WITNESS:  They actually -- ISIS and dtSearch
11 both do it in the form of an external word list that gets
12 generated when the index is built, but to associate them,
13 you actually have to write an external synonym list saying
14 that, you know, for instance, saying that NIDDM --
15 basically you say the term you want to search for, so you
16 pick the base word.
17    So let's say the base word in this case is NIDDM.
18 The synonyms and the acronyms would be NIDDM,
19 non-insulin-dependent diabetes mellitus, insulin-dependent
20 diabetes mellitus and IDM.  Because you would do both the
21 positive and the negative of the term.
22      THE COURT:  But a human being could look at the
23 list, the index, the concordance, and say, gosh, we should
24 have used this term --
25      THE WITNESS:  Yes, sir.

Page 51

1       THE COURT:  -- to see if there is anything else
2  that could pass this --
3       THE WITNESS:  Absolutely.
4       THE COURT:  Go ahead.
5       MR. GORNICK:  Thank you, Your Honor.
6  BY MR. GORNICK:
7  Q   And the most sophisticated software that does these
8  search terms lists and stuff like that, can they
9  independently, without prompting, determine internal
10 corporate synonyms?
11 A   No.
12 Q   Could they determine internal corporate acronyms?
13 A   No.
14 Q   English versus American spellings.  In this
15 particular case, is that an issue?
16 A   Yes.  This is an issue simply because you're dealing
17 with an international company who have offices and
18 employees in Europe.  The problem you get into is when
19 you're doing text searching for relevance, you now have
20 the -- I'll call it the Americans spelling and the English
21 spelling.
22    The American spelling in their list, they use
23 hyperglycemia, but they did not use hyperglycaemia in the
24 English spelling with the extra C-A there in the middle.
25      MR. GORNICK:  Your Honor, may I introduce an

Page 52

1  exhibit on this issue?  It hasn't been introduced before
2  we got it last night.  And it illustrates the English
3  spelling of hyperglycaemia being important.
4       THE COURT:  Have you shown it to counsel?
5    I was almost prepared to take judicial notice that we
6  and the British are common people or a people divided by a
7  common language.
8       MR. MCCONNELL:  No objection, Your Honor.
9       THE COURT:  It's received.
10      MR. GORNICK:  Thank you.  May I approach the
11 witness, Your Honor?
12      THE COURT:  Go ahead.  Has this got a tag?
13      MR. GORNICK:  It does not, Your Honor.
14      THE COURT:  Meta or otherwise?
15      MR. GORNICK:  It does not.  I apologize.  Safely
16 we can make it 100.
17 BY MR. GORNICK:
18 Q   Mr. Martin, I placed before you what I believe has
19 been marked as Exhibit 100.  Do you have that?
20 A   Yes.
21 Q   Is this an example of an internal document from
22 AstraZeneca, the keywords in it?
23 A   Yes.  This appears to be AstraZeneca employees
24 formulating or improving upon a keyword list.
25 Q   And does the term hyperglycaemia spelled A-E-M-I-A

Page 53

1  appear in the document?
2  A   Yes, it does.  In the third paragraph, twice with the
3  C-A-E.
4       MR. GORNICK:  Your Honor, I'll offer
5  Exhibit 100.
6       THE COURT:  Received.
7  BY MR. GORNICK:
8  Q   Mr. Martin, is there a problem with AstraZeneca's
9  keyword search not containing common misspellings and
10 abbreviations?
11 A   Yes.  The issue with misspellings and abbreviations
12 are simply in e-mail, people that are mobile workers with
13 BlackBerrys and Treos and things tend to abbreviate in
14 their e-mail.  One abbreviation we have seen for Seroquel
15 is Serq, which has been used.
16    Also, Seroquel itself, according to searching for
17 different documents just through Google, through publicly
18 available sources, has many, many, many different
19 misspellings, and we've even seen one example within, and
20 I guess now two examples within AstraZeneca's own
21 production where someone had spelled Seroquel with a lower
22 case G replacing the Q.
23 Q   Stemming.  Did AstraZeneca's keyword search have
24 problems with improper stemming?
25 A   Yes.  They -- within their list they searched for

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 54

1   plurals of certain words without searching for the
2   singular.
3   Q   Why is that bad?
4   A   Because you're going to miss the singular.  For
5   instance, they searched for antipsychotics but did not
6   search for antipsychotic.  They searched for tremors but
7   not tremor.
8   Q   How basic of a rule is it that in electronic
9   searching, you search for the singular not the plural?
10  A   In my business, the cardinal rule is you always start
11  with the singular and you stem from there.  Fuzzy logic in
12  some engines will make up for the S if you search for the
13  singular.
14      Stemming will add from the base word things like
15  burn, burned, burning.  In this case, if you had searched
16  for or if AstraZeneca searched for antipsychotic with
17  stemming, they would have gotten antipsychotic and
18  antipsychotics.
19  Q   Typically do the search engines not work backwards?
20  A   Typically they start from the base word.  So, yes,
21  they -- yes, they don't work backwards.
22  Q   What about format variations?  Did the AstraZeneca
23  keyword search list suffer problems because of format
24  variations?
25  A   Yes.  When they searched for antipsychotics, they

Page 55

1   searched for it with no space, and no break within the
2   word.  This is one example.  They did not --
3   Q   But they spelled antipsychotics properly, I believe.
4   A   Yes, they did.
5   Q   So what is the -- what is the deal with this format
6   variation?
7   A   Well, the problem is, search engines aren't quite as
8   smart as we are.  So when you have terms that people will
9   hyphenate or people will break a single long word into two
10  words, it's very common to find antipsychotic spelled anti
11  hyphen psychotic or anti space psychotics.
12      The problem there is that most search engines will
13  pick up that space and consider antipsychotics two words
14  instead of one word.  So you would miss that.
15      Also, in the case of a hyphen, most search engines
16  would treat the hyphen as a space, so you would
17  potentially miss that.
18  Q   Non-searchable characters.  In the report you mention
19  that AstraZeneca used things called bangs, non-searchable
20  characters.  What did you mean by that?
21  A   Well, non-searchable characters in AstraZeneca's
22  list, we noticed in, I believe, two incidences where they
23  used an AD exclamation point or as we call it a bang
24  character.  It was unusual because nowhere else in the
25  list does it show any kind of -- any kind of operator, any

Page 56

1   kind of and, or, not, anything else a search engine would
2   interpret as a reserved character.
3       The bang normally in sequel searching indicates "not"
4   to a search engine, so the searching for DTC AD bang would
5   be DTC not AD, is the way it would be interpreted.
6   Q   Now, you put all these problems with AstraZeneca's
7   search term list together.  Do you believe their search
8   term list identified all relevant documents?
9   A   No.
10  Q   Given their search term list that they said they
11  used, what can you conclude about the process AstraZeneca
12  went through to develop the list as opposed to what's
13  typically done in your experience?
14      MR. MCCONNELL:  Objection.  Lack of foundation
15  on this one, Your Honor.
16      THE COURT:  You will have to ask a couple
17  foundational questions.
18  BY MR. GORNICK:
19  Q   Mr. Martin, can you tell us, in your experience, how
20  a reasonably created search term list is put together?
21  A   Yes.  The process is normally, in my experience, and
22  this is not necessarily specific to any type of case, this
23  is just kind of generally the way I've seen it done for
24  the past, you know, 12 or 15 years, what happens is
25  initially the company or the lawyers receive the complaint

Page 57

1   or a discovery command that states what the opposing side
2   is wanting to discover.
3       There's a meeting that occurs which generally would
4   include outside counsel, depending on how big the case is,
5   either general counsel or assistant general counsel, the
6   e-discovery team, if there is one, and also vendors.  They
7   would sit down and come up with an initial list of what
8   are the terms that we're going to have to search our
9   systems for to find these documents that this party is
10  requesting.
11      Once that initial list is put together, then
12  custodians are determined internally, you know, who
13  worked -- who worked with this product, who sold this
14  product, who bought the materials for this product.
15  Whatever it is.
16      They would then go to some, depending on how many
17  there are, some or all of those custodians who are the
18  knowledge workers of the company, and they would say,
19  okay, here's our list of terms that we want to search for.
20  What other terms can you add to this based on your job, or
21  based on your knowledge.  And then through that process,
22  be it, you know, ten people or 20 people or however many
23  people, they then bring all of those lists back together
24  and compile them into what becomes the search term list.
25      That search term list, once it's compiled, would then

15  (Pages 54 to 57)

Page 58

1  be submitted to -- through counsel normally to the
2  opposing side to get them to agree to the search term
3  list.  Then generally there is some back and forth about,
4  you know, date ranges which you're going to apply the
5  search term list to, things like that.
6      Once both sides have agreed that this is the list and
7  this is how we're going to search for it and everybody's
8  happy, then we're given the go ahead to go ahead and
9  search using that criteria.
10 Q   And then once that list is finalized, so to speak, is
11 it truly final or is it something that changes over time?
12 Is there any kind of testing?
13 A   They -- depending on the case, they do evolve over
14 time.  As discovery goes on, people who were initially not
15 thought to be important may be important.
16    I have had situations where, you know, where -- I
17 have actually got an active one right now where we're two
18 years into a trial and all of a sudden some custodian that
19 was, you know, never originally captured suddenly has
20 become important, and, you know, Monday of this week, you
21 know, we go back out to get that custodian and put him
22 back in the process and search him the same way we
23 searched everybody else.
24 Q   Setting aside the custodians, what's the plan -- once
25 the lawyers on both sides have signed off on what they

Page 59

1  think is the list, typically is some kind of a test run to
2  see how that list works?
3  A   Yes.
4  Q   At the beginning of the process?
5  A   Yes.  During -- there's actually several different
6  tests run.  The initial test is once the interview process
7  with custodians is complete, and the final -- well, I'll
8  call it final, the internal list is built, that list is
9  searched against one or two or three or, you know, however
10 many important custodians, you know, we think will
11 generate a good sample.
12    And then that result will be pulled back and given to
13 outside counsel, possibly inside counsel.  They will then
14 look at both the hits and the non-hits.  We deliver both.
15 We say, here's everything that hit the search term list,
16 here's everything that didn't hit the search term list.
17    The reason in my experience clients like to do that
18 is because in discovery they would prefer to be a little
19 overinclusive rather than underinclusive.  So they check
20 the non-hits just to make sure that the filter's not
21 leaving something behind that somebody didn't think of.
22 Q   In this particular case, given all the problems we
23 went through with the creation or what the AstraZeneca
24 search term list looks like, in your opinion, was it built
25 in a reasonably diligent way?

Page 60

1  A   No.
2  Q   I would like to turn your attention to
3  de-duplication.  Do you in your efforts try to determine
4  what type of method AstraZeneca used to de-duplicate
5  documents in this case?
6  A   Yes.
7  Q   What did you discover?
8  A   By looking at the metadata and resulting TIFFs, and I
9  want to qualify this by saying the metadata we're looking
10 at we know is flawed to begin with, so we're kind of
11 limited as to what we can actually, you know, go into.
12    But by looking at this metadata as it was delivered
13 and looking at the resulting sets and comparing things
14 like who's the custodian of this file versus who's listed
15 on this file, in the form of an e-mail, we determined that
16 they were most likely using a fielded de-duplication
17 method rather than the industry standard hashing method.
18 Q   What is the problem of using a fielded method as
19 opposed to the industry standard hash method?
20 A   Well, a hash method is a statistically reliable
21 accurate way to de-duplicate and determine that two files
22 are in fact identical.  A fielded method relies on
23 metadata or fields of data about an e-mail, say, or a
24 document.
25    The problem is that a document object or an e-mail

Page 61

1  may have 20 metadata fields.  But in a fielded method,
2  whoever is running the method determines which fields
3  they're going to look at.  They may not use all 20.  They
4  may use six, they may use five.
5     Depending on the fields that they choose, it's
6  possible, since it is much less accurate than -- I would
7  characterize it as an order of magnitude less accurate
8  than a hash method, documents that would be similar, you
9  know, but aren't duplicates can get missed.
10 Q   In this particular case, were you able to determine
11 if de-duplication in this case by AstraZeneca was done
12 within custodians and across custodians?
13 A   Yes.  I believe it was done both what we call
14 vertically within a custodian and horizontally across
15 multiple custodians, however, the results applied
16 incorrectly.
17 Q   When you have a fielded de-duplication method
18 applied, with a vertical and horizontal duplication
19 process, are the problems multiplied?
20 A   They're magnified significantly.
21 Q   What kind of documents would you expect we have not
22 received, non-duplicate relevant documents that we have
23 not received, given a fielded de-duplication method,
24 vertical and horizontal?
25     MR. MCCONNELL:  Objection.  Calls for

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 62

1  speculation.
2       THE COURT:  Overruled.
3       THE WITNESS:  In the method or -- we're working
4  from a slight disadvantage in that, one, we have never
5  seen the native data.  We have seen flawed metadata.  We
6  have seen the documents and the results.  We can tell that
7  the result is just horrific.
8       The things that you would be missing would be
9  messages and their attachments that are -- that were
10  incorrectly identified as duplicative.  In my opinion,
11  this method has totally obviated the entire concept of a
12  custodian production, simply because this de-duplication
13  method that was used has actually broken parent-child
14  relationships between e-mails.  So you may find an
15  e-mail -- I'm sorry.  You may find an attachment or an
16  e-mail, and you may find the related parent e-mail or the
17  related attachment anywhere in the collection.  It's just
18  scattered to the wind the way it outputted.
19  BY MR. GORNICK:
20  Q   What types of documents would we, in your opinion,
21  based on all of your experience and your analysis of the
22  data, would you expect that were eliminated from the data
23  set before being produced?
24  A   Well, because of the compounding effect of the flawed
25  search and then this de-duplication method on top, you're

Page 63

1  going to be missing relevant documents that were -- even
2  the ones that were located by the limited search would
3  then potentially fall victim to the flawed de-duplication
4  method and you would be missing relevant documents that
5  were different.
6  Q   And specifically, you may have heard me try to
7  explain this to the Court earlier, something about BCC's.
8  A   Uh-huh.
9  Q   Was I right about that?
10  A   Yes.  That's one of the best examples.  The problem
11  with using this method is that it totally -- which version
12  gets kept totally depends on which custodian you run
13  first.  If a person sends -- let's say a custodian sends
14  an e-mail to another custodian, and then sends another
15  e-mail to a person who isn't a custodian in the form of a
16  blind carbon, BCC, and the first one they encounter is not
17  the author in an Exchange, in an Outlook environment,
18  which is what AstraZeneca has, the author is the only
19  person who can see the BCC metadata.  So unless you
20  process all of the author data first for every single
21  custodian, you're going to miss BCC metadata and you will
22  never see that part of an e-mail chain.  You will never
23  know if that recipient forwarded it or, you know,
24  anything.
25       THE COURT:  Does the de-duplication software

Page 64

1  provide a list of what's been deleted?
2       THE WITNESS:  It should, Your Honor.
3       THE COURT:  Was that provided here?
4       THE WITNESS:  No.  No, sir.
5  BY MR. GORNICK:
6  Q   Can you turn your attention, please, Mr. Martin, to
7  Exhibit Number 12.  1.12 I would say.  I'm sorry.  1.12.
8  A   1.12.  Yes.
9  Q   Can you tell us what that is, please?
10  A   Yes.  This is an example of the output from this
11  severely flawed de-duplication method.  What you see is,
12  in the top AstraZeneca metadata, you see a document that
13  was produced as Bates Number 8,028,911 which came in in
14  Production Number 16.  This is an e-mail.  The one below
15  it is a Word document that was produced as 3,153,444, is
16  the Bates number on that one.  So they're a half --
17  they're literally a half a million Bates numbers apart.
18       This one was produced in Production Number 8, which I
19  believe was several weeks before Production Number 16.
20  The problem you have here is, since this attachment was
21  delivered but not designated as an attachment, a reviewing
22  attorney would not know that this Word document had a
23  parent or came from an e-mail until you get Production
24  Number 16.
25       The other interesting thing about it is that if you

Page 65

1  notice in the field that AstraZeneca provided for source,
2  in the second one the source indicates three people.  It
3  indicates -- I believe this is Javassi, Mueller and
4  Murray.  If you look at the parent e-mail and you look at
5  the source, it indicates Javassi and Mueller but not
6  Murray.  Even though -- even though these have been
7  delivered as a parent attachment and a child e-mail.
8  Q   Is Murray actually listed as the author of the
9  e-mail?
10  A   Yes.
11  Q   But not a source?
12  A   Right.  Which means that Murray's copy of this e-mail
13  was not -- was not pulled or accurately represented
14  throughout the process.  This is a symptom of the flawed
15  process.
16  Q   The flawed de-duplication process?
17  A   Yes, sir.
18  Q   Other than missing or other than eliminating from
19  production non-duplicative relevant documents, would the
20  flawed de-duplication process AstraZeneca employed have
21  any kind of negative impact on chain of custody issues?
22  A   Absolutely.  There's no way from the delivered data
23  set that AstraZeneca provided, both in the delivery method
24  and the fact that they have effectively removed
25  parent-child relationships, the fact that there are -- you

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 66

1  know, there are e-mails that show attachments with no
2  attachments.  Because of this method there's no way for
3  anybody to know whether everything has been delivered for
4  a custodian, whether it hasn't, whether it's going to come
5  five deliveries down the road, whether all the e-mails
6  have been delivered, whether all the attachments have been
7  delivered.
8      Right now today, we don't know that this example
9  doesn't have another attachment somewhere.  There's no way
10 to tell.  So it's -- I mean, it's -- there's no chain of
11 anything in this.
12 Q   In your experience in e-discovery, have you ever seen
13 another example of a de-duplication process this flawed?
14 A   No.  This is -- this is definitely the granddaddy of
15 flawed de-duplication that I have seen in my experience.
16 Q   I'd like to turn your attention to technical errors
17 in AstraZeneca's production.
18 A   Okay.
19 Q   This has been going a lot longer than I thought it
20 would, and what we have here is, we have a long list of
21 technical errors.  It's a two-page list.  I don't know if
22 the Court wants me to take these slowly.
23     Why don't you -- Mr. Martin, why don't you tick off
24 for us the more significant technical errors that you have
25 been able to identify that would in real-world terms

Page 67

1  prevent us, the plaintiffs' lawyers in this case, from
2  having a reasonably searchable database.
3  A   I guess I'll start with the basics.  In my
4  experience, lawyers, when they're doing preparation for
5  depositions, rely on dates, and dates within custodians.
6  We found examples within the load files where date formats
7  have been delivered inconsistently in three or four
8  different formats.  In some cases, it's a four-digit year
9  with a two-digit month with a two-digit day, and some
10 cases, it's, you know, letter, you know, January
11 something, whatever, and other variations on that theme.
12 Q   So what's the bottom line on these date
13 inconsistencies?
14 A   This is -- this is basic Romper Room delivery.  Okay?
15 Date formats are the same all the time.
16 Q   You mean they should be?
17 A   They should be.  The problem this raises is that you
18 can't reliably do date range searching if the date format
19 is constantly changing load file to load file.
20 Q   Okay.  What's the next big technical error,
21 significant technical error that has real-world
22 consequences for lawyers who need usable data?
23 A   Custodian fields.  Custodian fields weren't provided.
24 They're not -- they're unpopulated where some of this
25 stuff came from.

Page 68

1      Sources that are custodians people were, but where
2  this person is, came from, you don't know if the person is
3  in the U.S. or the U.K. or wherever.  You don't know what
4  department they're assigned to necessarily.
5      It just takes more and more and more research time to
6  find out all this stuff that should be obvious from the
7  delivery.
8  Q   What's the next big technical issue that impacts the
9  lawyers' real-world terms who need usable data?
10 A   Next beyond that, I would say page breaks in text
11 files to me is a biggy.  I personally made this mistake in
12 about 1992.  Okay?  We had pulled data from a spreadsheet
13 and the spreadsheet, it was a workbook.  The workbook had
14 two worksheets in it that were populated.
15     We converted the two worksheets to TIFF and we pulled
16 the native text.  Well, when you do that, you get one page
17 break between the first sheet and the second sheet, if you
18 don't go through the TIFF and text process correctly.  And
19 the result of that was I had a 15-page document with one
20 page break in the middle.  And I got called on it.  And I
21 fixed it.
22 Q   That was in 1992?
23 A   About '92, '93 time frame.
24 Q   Real-world terms, what is the -- what's the result in
25 a case like this with over nine million pages of documents

Page 69

1  if you don't have page breaks?
2  A   The problem is that without page breaks there is not
3  a correspondence, one-to-one correspondence between the
4  page that the search hit occurred on and the TIFF page
5  that the attorney is going to review.  So if you have a
6  document that is 200 pages long and the page breaks don't
7  match, the attorney literally has to scan up and down and
8  try to read through 200 pages when he should be dropped
9  directly onto the page that contains the hit.
10 Q   I'd like to turn your attention, if you would,
11 Mr. Martin, to Exhibit 16.06.  Specifically if you would
12 turn to the third page of that exhibit.
13 A   Okay.
14 Q   Excuse me.  The second page of the exhibit.
15 A   Okay.
16 Q   Do you see the e-mail from Jonathan Jaffe to Rodney
17 Miller dated February 14?
18 A   Yes.
19 Q   I take it, and this in evidence, I take it that
20 e-mail is Mr. Jaffe's proposal to Rodney Miller, who
21 represented AstraZeneca, on how to add page breaks even
22 though the documents had already been TIFFed and
23 generated?
24     MR. MCCONNELL:  Objection.  The document speaks
25 for itself, and this witness lacks any foundation to talk

Page 70

1  about these documents.
2      THE COURT:  I'll allow it just as foundation.
3  Go ahead.
4      THE WITNESS:  The document here says Jonathan is
5  writing to Rodney, and he says, "Windows has a generic
6  text print driver.  This morning testing and confirming.
7  Not only does it designate page breaks, it will do so
8  consistently as to how the document is printed."
9      So Jonathan Jaffe is suggesting a workaround to
10  Rodney, I guess Mr. Miller, because since the TIFFs
11  already exist, he's offering a solution.
12  BY MR. GORNICK:
13  Q   For page breaks?
14  A   Yes, sir.
15  Q   Okay.  Now, you've looked at the data we're talking
16  about, right?
17  A   Yes, sir.
18  Q   Okay.  And from looking at that data, were you able
19  to determine whether or not there were page breaks?
20  A   There weren't.
21  Q   Okay.
22  A   Or they were so random they were irrelevant.
23  Q   Turn your attention, please, to the first page of
24  Exhibit 16.06.
25  A   Okay.

Page 71

1  Q   This is in evidence.
2      Mr. Miller said to Jonathan Jaffe on March 14, "We
3  have consulted with our vendor regarding your request for
4  page breaks.  As it stands, it's not feasible within the
5  time parameter established by the Court's order to comply
6  with your request."
7      First question:  Would Mr. Jaffe's proposed solution
8  for page breaks have worked?
9  A   Absolutely.
10  Q   How long would that have taken in your shop?
11  A   Depending on the volume of pages, anything -- a
12  million, a half million, maybe a week or two at the most.
13  Q   Turning back to your report.
14  A   Okay.
15  Q   What was the next major technical error that you
16  discovered you were able to identify that would have a
17  real-world impact on lawyers who need usable data?
18  A   I'll say the field order variations in the load
19  files themselves.  What we discovered was that in
20  different load files, the fields would swap unexpectedly.
21      For instance, as the first load file was originally
22  delivered, create date was originally the fourth field.
23  It was in the fourth position within the metadata.  In the
24  production April 9 for Boornazian, author became the
25  fourth field.

Page 72

1      In the April 9 production for Boorstein, so these two
2  were produced at the same time, BCC became the fourth
3  field.
4      The problem that that results in is that if you are
5  loading -- if you set up your database template and you
6  have mapped in the field positions, which is what
7  everybody does, and you just continue loading load files,
8  all of a sudden you're going to begin mixing different
9  data in different field positions because the positions
10  change.
11  Q   In your experience, how common is it to have field
12  order variations in load files across productions?
13  A   It's not common after the first two or three.
14  Generally what happens is you deliver the load file.  The
15  other side wants to swap this position for this position
16  for whatever reason.  You make that change.  You redeliver
17  the file.  They sign off on it.  From there on, it's
18  smooth sailing.
19  Q   And does that kind of thing take time?
20  A   It does take time, but it would be maybe a day or
21  two.  Nothing significant.
22  Q   What's the next big technical error in the data that
23  results in the data not being reasonably usable for
24  lawyers?
25  A   Well, fragmented custodian data is significant in

Page 73

1  that you literally can't tell when a custodian is
2  complete.  You can't tell what the relationships are
3  between the custodians' metadata or the custodians'
4  documents and other custodian documents.  You can't even
5  tell what the relationship is within single custodian's
6  documents.
7  Q   Mr. Martin, setting aside the option of starting over
8  from scratch, is there a way to fix the problems that you
9  have identified, all the technical problems, the
10  de-duplication problems, the keyword, the deficient
11  keyword search list, and the missing data we just don't
12  have?  What's a solution, short of starting over?
13  A   I honestly cannot think of one.  The problems are so
14  compounded.  The oldest rule in computers is called GIGO.
15  Garbage in, garbage out.
16      There's no way that I can think of with this
17  magnitude of errors compounding and compounding and the
18  fact that you can't successfully backtrack through digital
19  chain of custody reliably, that you would ever know.
20  Q   Is it possible you would be able to come up with a
21  solution if you or someone like you in your business was
22  actually able to go inside and see what AstraZeneca's
23  done, see the native files, see the database where they
24  collected everything?  Would that be the kind of thing
25  where you could start?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 74

1  A   Yes, sir.  From that standpoint, looking at the
2  native files, interviewing people who had participated in
3  the production process of, you know, how the
4  de-duplication logic was set up, you would, you would be
5  able to come up with a method that would reliably show you
6  what was or wasn't missing, and then you would have to
7  kind of fill in the blanks with subsequent rolling
8  productions of wherever the gaps were.
9  Q   Thank you, Mr. Martin.
10       MR. GORNICK:  That's all I have for Mr. Martin,
11  Your Honor.
12       THE COURT:  Let's take a five-minute recess.
13       (Recess taken.)
14           CROSS-EXAMINATION
15  BY MR. MCCONNELL:
16  Q   Good morning, Mr. Martin.
17  A   Good morning.
18  Q   How are you?
19  A   I'm in Florida so I'm pretty good.
20  Q   My name is Steven McConnell.  I'm a lawyer
21  representing AstraZeneca.
22       You and I haven't met before, have we?
23  A   No, sir.
24  Q   I want to ask you a few questions about your CV, and
25  that was provided to the Court as Plaintiff's Exhibit

Page 75

1  1.01.  I think you have that in front of you.  I think the
2  Court has a copy of 1.01 also.
3       Can you turn to that, please.
4  A   Yes, sir.
5  Q   We also have it up on the board.
6  A   I can't really see it.
7  Q   Well, as long as you can look at the copy in front of
8  you, sir.
9  A   Okay.
10  Q   Do you have that?
11  A   Yes, sir.
12  Q   And I see your name John Martin.  Do you have a
13  middle initial?
14  A   M.
15  Q   M.  Okay.
16       And what is your date of birth, please?
17  A   January 27, 1965.
18  Q   What is your place of birth?
19  A   Laurel, Mississippi.
20  Q   Thank you.
21       Now, the entry that you have on your CV under
22  education.
23  A   Uh-huh.
24  Q   The first one lists that you acquired a B.S. in
25  engineering from Buxton University.  Is that so?

Page 76

1  A   Yes.
2  Q   Where is Buxton University located?
3  A   It's located in England.  It's an online college.
4  Q   I'm sorry?
5  A   It's located in England.
6  Q   In England?
7  A   Yes.
8  Q   It's an online school, true?
9  A   Yes.
10  Q   And how long did you attend Buxton University?
11  A   For, I would say -- well, kind of an on and off
12  thing.  You work as you go, but I would say about two
13  years.
14       MR. MCCONNELL:  With the Court's permission, I
15  would like to provide to the witness what's been premarked
16  as Defendant's Exhibit 57.  I have a copy for plaintiffs'
17  counsel and a copy for the Court as well.  It's from the
18  Buxton University website.
19       THE COURT:  I have got the exhibits here.
20       MR. MCCONNELL:  This is not a premarked exhibit.
21  It's a cross-examination exhibit, Your Honor.  So this has
22  not been provided to the Court prior to the testimony of
23  the witness.
24       THE COURT:  Have you shown it to counsel?
25       MR. MCCONNELL:  I'm giving it to him right now.

Page 77

1  I'm not moving it into evidence at this time, Your Honor.
2  I just want to use it for the witness.
3       THE COURT:  Well, you can't use it unless you're
4  going to offer it.  It's got to be part of the record if
5  you use it.
6       MR. MCCONNELL:  But I'm not asking for it to be
7  admitted into evidence.
8       THE COURT:  What are we doing with it?
9       MR. MCCONNELL:  I'm cross-examining the witness
10  with it.
11       THE COURT:  Then it's going to be part of the
12  record.
13       MR. MCCONNELL:  All right.
14       THE COURT:  Any objection?
15       MR. GORNICK:  Objection, Your Honor.  I don't
16  know what this is, where it's from, if it's authentic.  I
17  just -- I can't -- I don't know what it is.
18       MR. MCCONNELL:  May I hand it to the Court?
19       THE COURT:  You can give it to the witness and
20  ask him to see if he can...
21       MR. MCCONNELL:  May I approach?
22       THE COURT:  All right.
23  BY MR. MCCONNELL:
24  Q   Mr. Martin, do you have Exhibit 57 in front of you?
25  Well, do you have a document in front of you that says

Page 78

1  "Buxton University" at the top?
2  A  Yes.
3  Q  You see there's a mascot there of a unicorn?
4  A  Yes.
5  Q  Is this the same Buxton University that you attended?
6  A  I believe so.
7  Q  All right.  And it says, "Earn a degree in your free
8  time, convenient, flexible, online."  Is that right?
9  A  Right.
10  Q  And before you applied to Buxton University, did you
11  do any investigation to find out what sort of school it
12  was?
13  A  No.  I was working a lot and basically was looking
14  for some kind of an online program that I could do in my
15  spare time.
16  Q  Did you do any investigation to determine whether or
17  not Buxton University was accredited or unaccredited?
18  A  No.
19  Q  Do you know in fact that it is absolutely
20  unaccredited?
21  A  No.
22      MR. GORNICK:  Objection.  Vague.
23  BY MR. MCCONNELL:
24  Q  When you applied to --
25      THE COURT:  Overruled.

Page 79

1  BY MR. MCCONNELL:
2  Q  -- Buxton University, did you apply online?
3  A  Yes.
4  Q  And didn't you in fact apply through a website called
5  InstantDegrees.com?
6  A  I don't believe so.  No.
7  Q  What website did you use to apply to Buxton
8  University?
9  A  It was -- they have an online system or at least they
10  did.
11  Q  Well, let me ask you --
12      MR. MCCONNELL:  Your Honor, I have another
13  document I'd like to show to the witness.  It goes to his
14  investigation about the school.  Provided a copy.
15      THE COURT:  Where are we going with all this?
16      MR. MCCONNELL:  To show -- I want to challenge
17  the qualifications of this witness, Your Honor.  My point
18  is that this is an unaccredited diploma mill school.  No
19  work at all.
20      THE COURT:  How does that relate to his
21  qualifications to provide the testimony that you heard on
22  direct?
23      MR. MCCONNELL:  Well, Your Honor, if -- well,
24  two things.  One, if you in fact don't have a degree in
25  engineering and you claim you do, that's one point.

Page 80

1      Two, it goes to the credibility of the witness, and
2  Your Honor has to make the credibility assessment of this
3  witness.
4      If this witness is providing a CV to the Court and
5  the CV purports to show a B.S. in engineering from a
6  school that in fact isn't a real school, involving no real
7  work, and is a diploma mill, I think that's something that
8  Your Honor would take into account in assessing the weight
9  to be given to this witness' testimony.
10      THE COURT:  Well, you can show him your proposed
11  exhibit.
12  BY MR. MCCONNELL:
13  Q  Mr. Martin, do you recognize this to be a Wikipedia
14  entry?
15  A  Yes, it appears to be.
16  Q  Have you ever seen this before?
17  A  No.
18  Q  Is it not the case that if you type in Buxton
19  University online, the first entry that comes up is the
20  Wikipedia entry on Buxton University?
21      MR. GORNICK:  Objection.  Calls for speculation.
22  No foundation.
23      THE COURT:  If he knows.
24      THE WITNESS:  I have never searched for it
25  through Google, so I don't know whether it's the first

Page 81

1  search.  I mean it's titled Buxton, so it should come up.
2  BY MR. MCCONNELL:
3  Q  Right.  And have you ever learned that Buxton
4  University is a university typically where people apply
5  online and get degrees in minutes with absolutely no
6  coursework?
7  A  No.
8  Q  Isn't that how you got your degree from Buxton
9  University?
10  A  No.  I mean it's an online school.
11  Q  What coursework did you do, sir?
12  A  Basically things related to engineering, engineering
13  studies.
14  Q  Tell me exactly how long the interval of time was
15  between when you initially applied to Buxton University
16  and when you earned your B.S. in engineering.
17  A  Probably less than two years.
18  Q  Less than maybe two weeks?
19  A  I don't believe so.  No.
20  Q  Do you have any coursework still in existence showing
21  that you actually did coursework for Buxton University?
22  A  No.
23  Q  When you got your degree, did you avail your of their
24  service where they will give you a degree and backdate it?
25  A  No.

Page 82

1   Q   When did you apply for your application to Buxton
2   University?  What year was it?
3   A   It would have been around 2002 or so.
4   Q   You stated that Buxton University is in the United
5   Kingdom.  Is that true?
6   A   That's my understanding, yes.
7   Q   Are you aware whether it has any physical facility in
8   the United Kingdom at all?
9   A   I don't know.
10  Q   Do you know that in fact it has a mail drop in
11  Portugal?
12  A   No.
13  Q   By the way, this CV that we have in front of us as --
14  that you looked at, as 1.01, how long has that CV been in
15  existence?
16  A   We put this together in -- I think probably three,
17  four weeks ago.  Two, three weeks ago.
18  Q   Two, three week ago.  So --
19  A   It was updated at that point.
20  Q   Sorry?
21  A   It was updated at that point.
22  Q   All right.  Did this CV exist last Friday?
23  A   Yes.
24  Q   Had you provided it to plaintiffs' counsel prior to
25  last Friday?

Page 83

1   A   Yes.
2   Q   Now, I believe you said that you applied for your
3   membership at Buxton University in 2002; is that right?
4   A   No.
5   Q   Okay.  What year did you say?
6   A   It would have been '92 roughly.
7   Q   Okay.  You also list in your CV that you attended a
8   school called William Carey College.  Is that so?
9   A   Yes.
10  Q   Where is that please?
11  A   Hattiesburg, Mississippi.
12  Q   And you didn't get a degree there, did you?
13  A   No.
14  Q   Have you ever gotten any sort of degree in computer
15  science?
16  A   No.
17  Q   You list in your CV -- can we go back to the CV --
18  awards.  Do you see that?  That's 1.01.
19  A   Yes.
20  Q   And the first award that you list is Delaware
21  Paralegal Association, lecturer recognition.  Do you see
22  that?
23  A   Yes.
24  Q   Who at Delaware Paralegal Association can I contact
25  to see what you actually did, since I tried and they never

Page 84

1   heard of you?
2   A   This was done through IKON, so there were
3   basically -- there was a panel of speakers and we were all
4   given a little thing saying award of appreciation at the
5   end of the presentation.
6   Q   Were you in fact a lecturer before the Delaware
7   Paralegal Association?
8   A   Yes.
9   Q   Where and when, please?
10  A   That was in 2006 at their annual -- their annual
11  convention in Wilmington.
12  Q   You received a piece of paper that said lecture
13  recognition?
14  A   No.  It's like a little clock or something.
15  Q   So you have a clock?
16  A   Yes.
17  Q   You also list same award, lecturer recognition from
18  DELVACCA; is that right?
19  A   Yes.  That was actually -- that actually occurred in
20  Philadelphia, the day prior to the Delaware Paralegal
21  Association.
22  Q   And what award did you receive from DELVACCA?
23  A   It's again a lecturer recognition.  They just give
24  you a -- you know, a little whatever, cup or whatever.
25  Q   Did they give you a clock or something different?

Page 85

1   A   I don't recall right off the top of my head.
2   Q   Where in Philadelphia was this lecture?
3   A   At, I believe it's called Union Hall.
4   Q   Do you mean the Union League Club?
5   A   Union League Club, yes, sir.
6   Q   Who at DELVACCA can I call to verify what it is you
7   did for DELVACCA?
8   A   Again, that was done through IKON.
9   Q   Right.  But my question is, do you know of any person
10  at DELVACCA I can call?
11  A   No.
12  Q   And you also say that you got lecturer recognition at
13  the Alabama Paralegal Association; is that right?
14  A   Yes.
15  Q   Are you sure about the name, because there is no
16  entity called the Alabama Paralegal Association.  True?
17  A   I may be wrong about the name, but it is their --
18  whatever the paralegal/legal assistant association in
19  Alabama.
20  Q   And what's the lecturer recognition award you
21  received from them?
22  A   I believe they gave me -- I think that was a cup that
23  says in appreciation.
24  Q   Still have that cup?
25  A   I don't know.

Page 86

1   Q   All right.  And who's the person at the Alabama
2   Paralegal Association that I can call to verify that you
3   actually supplied this lecturing service?
4   A   That was again through IKON.  I can give you IKON
5   people you can contact, if you would like.
6   Q   Sure.  Give me the name of someone at IKON.
7   A   Tom Towey.
8   Q   Tom?
9   A   Towey.  T-O-W-E-Y.
10  Q   Where is he located?
11  A   He's in Atlanta.
12      MR. GORNICK:  I'm going to object to this line
13  of questioning on the grounds of relevance.  This sounds
14  like a deposition.
15      MR. MCCONNELL:  It sound like a credibility
16  issue, Your Honor.
17      THE COURT:  Well, I'll let you make your record.
18  BY MR. MCCONNELL:
19  Q   You also state that you have engaged in teaching
20  experience and you list some CLE lectures; is that right?
21  A   Yes.
22  Q   So, for example, you state that you were a CLE
23  lecturer in Birmingham, Alabama in 2007.  Is that true?
24  A   Yes.
25  Q   You actually gave a lecture?

Page 87

1   A   Yes.
2   Q   Who's the person at -- well, first of all, tell me
3   what CLE entity you worked with to provide that lecture.
4   A   That was arranged through Bradley Arant, a law firm.
5   They got the accreditation.  I was the speaker.
6   Q   Who was the lawyer at Bradley that can confirm that
7   you did this?
8   A   Paul Sykes.
9   Q   Is he in Birmingham?
10  A   Yes.
11  Q   What was the entity that you provided the CLE lecture
12  for in Philadelphia in 2006?
13  A   That was for -- that was through IKON and the person,
14  I can't think of who was -- John Atkinson.
15  Q   A-T-K-I-N-S?
16  A   S-O-N.
17  Q   S-O-N.
18      And again, that's somebody at IKON?
19  A   Yes.
20  Q   Also in Atlanta?
21  A   They're out of D.C.  John is out of D.C.
22  Q   Now --
23  A   And you can also contact him for Delaware.
24  Q   Your current employer's EDD Labs; is that right?
25  A   Correct.

Page 88

1   Q   And you list yourself as the president; is that true?
2   A   Yes.
3       MR. MCCONNELL:  Your Honor, with permission, I
4   would like to approach the witness and hand him a copy of
5   the pages from the website for his company.
6       THE COURT:  All right.  Put a tag on it.
7       MR. MCCONNELL:  If I can give a copy to the
8   Court.
9       THE COURT:  Give it to the clerk.
10  BY MR. MCCONNELL:
11  Q   Sir, this document has been premarked by the defense
12  as Exhibit 60.  Is it something that you have seen before?
13  A   Yes.
14  Q   Could you tell the Court what it is?
15  A   It's our website.
16  Q   Is this a website that you helped design?
17  A   Yes.
18  Q   How long have you been at EDD Labs, Inc.?
19  A   Since 2004.
20  Q   And are you the founder of EDD Labs?
21  A   Well, I bought 90 percent control of an existing
22  company that was called Signals, Incorporated, and changed
23  the name to EDD Labs.
24  Q   How many employees does EDD Labs have?
25  A   Currently we have seven.

Page 89

1   Q   And in this website you have a section under recent
2   projects.  You see that?
3   A   Uh-huh.
4   Q   And it says "coming soon."
5   A   Yes.
6   Q   How long has that been blank and said just "coming
7   soon," as opposed to listing actual projects?
8   A   Let's see.  Which page is that?
9   Q   They're not numbered.
10      THE COURT:  No page breaks?
11      THE WITNESS:  We haven't posted recently
12  projects on there since inception.  That's just basically
13  a placeholder.
14  BY MR. MCCONNELL:
15  Q   All right.  But there's nothing in there now; is that
16  right?
17  A   Right.
18  Q   And in your library section on the next page, that's
19  currently under construction.  True?
20  A   Right.
21  Q   Now, before you worked at EDD Labs, did you work at
22  an entity called Cricket Technologies?
23  A   Yes.
24  Q   And that's listed in your CV, true?
25  A   Yes.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 90

1   Q   And you do you list yourself as founder of Cricket
2   Technologies?
3   A   Yes.
4        MR. MCCONNELL:  Your Honor, I have a document,
5   it's the website for Cricket Technologies, that I'd like
6   to show to this witness.
7        THE COURT:  All right.
8   BY MR. MCCONNELL:
9   Q   Mr. Martin, is this the website for Cricket
10  Technologies?
11  A   Yes.
12  Q   And were you in fact working at Cricket Technologies
13  when you applied to Buxton?
14  A   No.
15  Q   Who is General Arthur C. Blades, U.S. Marine Corps
16  retired?
17  A   He is the president of Cricket Technologies.
18  Q   Does he not list himself in this website as the
19  cofounder of Cricket Technologies?
20  A   Yes.
21  Q   And isn't Whitney Adams also the cofounder of Cricket
22  Technologies?
23  A   No.
24  Q   Do you want to look at this website and verify
25  whether or not she's at least listed as the cofounder of

Page 91

1   Cricket --
2   A   She is listed as it, but she's not.
3   Q   You're saying that's false?
4   A   Yes.
5   Q   Were you fired by Cricket Technologies?
6   A   I was wrongfully terminated by Cricket Technologies.
7   Q   While you were at Cricket Technologies, one of the
8   things that Cricket Technologies did was ask you to
9   register the Cricket Technologies domain name on behalf of
10  the company, true?
11  A   I registered the Cricket Technologies domain name
12  prior to the company being formed, yes.
13  Q   You actually registered the Cricket Technologies
14  domain name in your own name, didn't you?
15  A   Yes.
16  Q   And after --
17  A   That was because at the time the company didn't
18  actually exist.
19  Q   And after you were fired by Cricket Technologies,
20  they sued you for wrongful use of their domain name, true?
21  A   We had an unfriendly separation and there were a lot
22  of things going back and forth.  I'm sure that may be one
23  of them.
24  Q   And weren't you found by the arbitration panel to
25  have wrongfully taken the domain name and to have acted in

Page 92

1   bad faith?
2   A   I don't believe so.  I mean the domain name returned
3   to the company.  During the course of the litigation, our
4   position was, due to my employment contract, they could
5   not remove me, and therefore I was still a member and
6   manager of the company.
7   Q   Were you not party to a dispute that went to an
8   arbitration panel that resulted in a judgment against you?
9   A   They did remove or changed the domain heading to the
10  company.  Yes.
11  Q   And the panel found you to have acted in bad faith?
12  A   I have never seen a document that said that, but --
13       MR. MCCONNELL:  Your Honor, may I show the
14  decision to the witness?
15       THE COURT:  You're getting pretty far afield
16  here, Mr. McConnell.  You can offer it to him.
17       MR. MCCONNELL:  Exhibit 62.
18       MR. GORNICK:  I object again to all of this on
19  the grounds of relevance, Your Honor.  I'm not sure what
20  it has to do with the issues we're here for today.
21       MR. MCCONNELL:  Credibility, Your Honor.
22       THE COURT:  Well, I don't see how this has much
23  bearing on his credibility as to the issues he's talking
24  about here.
25       MR. MCCONNELL:  Well, Your Honor, if somebody

Page 93

1   does --
2        THE COURT:  I'm not going to have a mini trial
3   about his relationship with every place he's ever worked
4   or gone to school or --
5        MR. MCCONNELL:  The first issue is whether the
6   relationship actually existed.  That is relevant.
7        THE COURT:  Not particularly.
8        MR. MCCONNELL:  I won't dwell on this.
9   BY MR. MCCONNELL:
10  Q   Is this the first time that you've seen this
11  decision, sir?
12  A   I believe so.
13  Q   Does it not say at the end you used the domain name
14  in bad faith?
15       MR. GORNICK:  Objection.
16       THE COURT:  Are you relying on the part you've
17  got up on the screen where they say it's evidence that he
18  used it?  That's not a finding.
19       MR. MCCONNELL:  Well, I think you have the whole
20  document in front of you.  It was a finding that he acted
21  in bad faith.
22       MR. GORNICK:  Object on the grounds of hearsay,
23  Your Honor.
24       MR. MCCONNELL:  I'll move on.
25       THE COURT:  All right.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 94

1  BY MR. MCCONNELL:
2  Q   Next topic.  You state that you wrote a paper called
3  The Minefield of Electronic Discovery; is that right?
4  A   No, I did not state that I wrote a paper.  I state
5  that I lectured on the paper.
6  Q   Let's look at page 2 of your CV under "Publications
7  and Papers."
8  A   Right.
9  Q   Do you see where it says "The Minefield of Electronic
10  Discovery"?
11  A   Right.
12  Q   White paper presented at the South Carolina Bar
13  Annual Conference, right?
14  A   Right.  I co-wrote that.
15  Q   You co-wrote it?
16  A   Yes.
17  Q   Wasn't it in fact written by people at Cricket
18  Technologies and you're not listed as an author at all?
19  A   Actually, if I remember correctly, the footer at the
20  bottom of the document says, "For further information
21  contact John Martin."
22  Q   Right.
23  A   I was the -- I was the technical source in writing
24  that paper.
25  Q   But they're actually authors -- the author listed for

Page 95

1  the paper is Whitney Adams, true?
2  A   She takes a lot of credit for other people's work.
3  Q   You're not listed as an author of that, are you?
4  A   I'm not listed as an author on the document.
5  However, she put me in the footnote on every single page,
6  if I remember correctly, as, "For further information,
7  please contact John Martin," as she herself would not be
8  able to answer any further questions related to the
9  document.
10  Q   Well, when it says in your CV "white paper presented
11  at the South Carolina Bar annual conference," did you
12  present the paper?
13  A   The paper was handed out.  I spoke on basically the
14  electronic discovery topic.
15  Q   Who's the person at the South Carolina Bar
16  Association I can contact to verify that?
17  A   That was through Document Management Systems of South
18  Carolina in Columbia.
19  Q   Who's the person I can call there?
20  A   That company is no longer in existence.
21  Q   Let me ask about your work that you referred to in
22  your report, the report being Exhibit 1, which you should
23  have in front of you, which I believe the Court has.
24  Exhibit 1, and it's page 5 of 14, representative clients'
25  projects.  Do you see that?

Page 96

1  A   Yes.
2  Q   And it says that you worked with Williams & Connolly.
3  Is that so?
4  A   Yes.
5  Q   I have called Williams & Connolly.  You tell me who
6  to call who actually would know you.
7  A   Jessamyn -- I don't remember her last name.  Can I
8  look at my BlackBerry?
9       THE COURT:  All right.
10       THE WITNESS:  This can take a minute.  I have
11  got a lot of e-mail.  I'm picking up a lot of Womble
12  Carlyle, so...
13       I don't have it in my BlackBerry.
14  Jessamyn --
15       THE COURT:  Is it Berniker?
16       THE WITNESS:  I believe so.
17  BY MR. MCCONNELL:
18  Q   D.C. office?
19  A   Yes.  D.C. office.
20  Q   Who's the person at Winston & Strawn I can call,
21  since I have also tried calling them?
22  A   (No response.)
23       THE COURT:  The witness doesn't know.  Move on.
24  BY MR. MCCONNELL:
25  Q   You mentioned the Metronic matter, and the law firm

Page 97

1  that worked on Metronic was Hogan & Hartson, true?
2  A   Correct.
3  Q   They have seven lawyers who work on the Metronic
4  matter, right?
5  A   I don't know how many lawyers they have.
6  Q   I've talked to them.  You tell me who I call at Hogan
7  & Hartson to confirm you worked with them.
8  A   That would be through IKON, so it would be Chris
9  Anderson at IKON, and I believe Keeser Khan.
10  Q   At Hogan & Hartson?
11  A   At Hogan.
12  Q   Who is that?  Keeser?
13  A   Keeser Khan.
14  Q   These -- yeah go ahead.
15  A   Or it would either have been Keeser or one of his
16  other people.  He's head of litigation support.
17  Q   For these projects, were you acting as a
18  subcontractor under IKON?
19  A   Most of the time, yes.
20  Q   What was ICON's task in these projects?
21  A   IKON generally handled the paper side of the project.
22  Q   Back to your CV.  You also list on page 2 that you
23  have a number of patents; is that right?
24  A   These are actually -- let me find it -- U.S. PA
25  indicates patent application number.

Page 98

1  Q   None of those patents have been granted, true?
2  A   Correct.
3  Q   And in fact, the second patent, 20050066190, that's
4  been rejected, hasn't it?
5  A   Not that I'm aware of.
6  Q   You didn't receive a rejection from the Patent
7  Office?
8  A   No.
9  Q   Let me talk a little bit about some of your
10 qualifications.  Just to be clear, you're not a lawyer,
11 are you?
12 A   No.
13 Q   And you're not a doctor?
14 A   No.
15 Q   You're not a paralegal?
16 A   No.
17 Q   You're not a chemist?
18 A   No.
19 Q   You're not an endocrinologist, true?
20 A   No.
21 Q   And nor are you a psychiatrist or a psychologist; am
22 I right?
23 A   Correct.
24 Q   And I want to ask you some specific questions about
25 AstraZeneca.

Page 99

1     Do you know how many employees AstraZeneca has?
2  A   No.
3  Q   Do you know whether or not AstraZeneca is regulated
4  by the FDA?
5  A   I believe they would have to be.
6  Q   Right.  Do you know how many pharmaceutical drugs
7  AstraZeneca manufactures and sells?
8  A   No.
9  Q   Do you know if they make Arimidex?
10 A   No.
11 Q   Atacand?
12 A   No.
13 Q   You know they make Crestor, I hope.
14 A   No.
15 Q   You don't know.  Okay.
16    Do you know whether they make Diprivan?
17 A   No.
18 Q   Faslodex?
19 A   No.
20 Q   Inderal?
21 A   No.
22 Q   By the way, for those drugs I have named so far, you
23 don't know what those drugs do, do you?
24 A   I'm not a doctor.
25 Q   Okay.  Fair.

Page 100

1     Do you know whether or not AstraZeneca makes Nexium?
2  A   No.
3  Q   Symbicort?
4  A   No.
5  Q   Xylocaine?
6  A   No.
7  Q   Do you know how many CNS drugs AstraZeneca makes?
8  A   No.
9  Q   Do you know what I mean by CNS drugs?
10 A   No.
11 Q   What did you do to become familiar with the way in
12 which AstraZeneca treats its documents?
13 A   I don't know how AstraZeneca treats its documents.  I
14 simply know, given the AstraZeneca production documents,
15 what I can see as a result of the discovery process.
16 Q   Do you know what kind of e-mail system they use?
17 A   Yes.
18 Q   What kind is that?
19 A   Outlook and Exchange, according to the documents that
20 I have reviewed.
21 Q   Did you read any of the depositions of any of the
22 AstraZeneca witnesses who have been deposed in this case?
23 A   One.
24 Q   Which one?
25 A   Mr. Draper, I believe.

Page 101

1  Q   Did you read the whole deposition?
2  A   Read through it.  I wouldn't say I read it cover to
3  cover, but yes.
4  Q   How many volumes was it?
5  A   It was about as thick as this (indicating).
6  Q   Really.  As thick as that whole binder?
7  A   Well, part of it was -- part of it was single-spaced
8  or double-spaced and 25 per line, and then part of it was,
9  I believe, mini scripted.
10 Q   Now, you were hired by the plaintiff attorneys on
11 July 13; is that right?
12 A   Yes.
13 Q   And you're not doing this for free, are you?
14 A   No.
15 Q   You're charging with an hourly rate?
16 A   Yes.
17 Q   What hourly rate are you charging?
18 A   $200 an hour.
19 Q   And how many hours have you worked thus far?
20 A   Myself, probably in the neighborhood of 50 or 60.
21 Q   So you have charged between ten and twelve thousand
22 dollars to the plaintiffs' lawyers so far?
23 A   Well, I haven't build them, but yes, I will.
24 Q   You intend to.
25 A   Uh-huh.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 102

1  Q    You don't have any contingency fee interest in this
2  case, do you?
3  A    No.
4  Q    And you said yourself.  Are there other people
5  working on your behalf for your work in this case?
6  A    Yes.
7  Q    Who is that?
8  A    Mike Burnett.
9  Q    Who else?
10 A    Sinaya Burro (phonetic).
11 Q    Are these people at EDD?
12 A    Yes.
13 Q    What have they been doing in this case?
14 A    The have been testing load files, searching, managing
15 the data and assisting me with looking through it all.
16 Q    You have been talking a lot about the AstraZeneca
17 documents.  Have you yourself reviewed AstraZeneca
18 documents?
19 A    Yes.
20 Q    How many would you say you have reviewed?
21 A    Generally we have run so many different searches and
22 tests against it, it's generally a sampling of pretty much
23 everything a search result would pull back.  So I would
24 say -- I'll say I have seen hundreds easily.
25 Q    And when you say seen, you have actually read

Page 103

1  documents, true?
2  A    I have looked at the documents for errors and
3  problems as they would relate to what our task was.
4  Q    Of your 50 or 60 hours that you have spent, about how
5  many hours were spent actually looking at AstraZeneca
6  documents?
7  A    Probably 30 or 35.
8  Q    Have you been, since you were retained on the 13th,
9  been involved in any of the negotiations between the
10 plaintiffs' lawyers and the defense lawyers about how to
11 deal with the document discovery?
12 A    No.
13 Q    Have you read any of the court orders in this case?
14 A    CMO2.
15 Q    And you have read all of CMO2?
16 A    Yes.
17 Q    I want to go back to your expert report, which is
18 Exhibit 1.  Is this a report that you yourself wrote?
19 A    Yes.
20 Q    And when you wrote it, did you try to be accurate and
21 fair and careful?
22 A    Yes.
23 Q    And you knew that this was a report that was going to
24 be submitted to the Court, right?
25 A    Yes.

Page 104

1  Q    When was it that you arrived at the opinions that are
2  included in Exhibit 1?
3  A    Over the course of the two weeks.  The final report
4  was finished, I believe, Monday morning of this week.
5  Q    And before you finalized it, did you take another
6  look at the report, proofread it, make sure it's accurate?
7  A    Yes.  And I also had Mike Burnett go through it and
8  see if he could see any inaccuracies in it.
9  Q    Now, in this report I want to go back to the page
10 that we were looking at where you talk about your prior
11 experience.  This is on page 5 of 14.  This is in evidence
12 so we can put it up on the screen.
13 Q    Which one?
14 Q    Page 5 of 14 in your report.
15 A    Oh, in my report.
16     MR. GORNICK:  I'll object.  It's provisional.
17 AstraZeneca's counsel objected to this going into
18 evidence, but we would stipulate it going into evidence.
19     MR. MCCONNELL:  I'm using it.  I'm not putting
20 it in evidence.
21     MR. GORNICK:  I would offer it then --
22     MR. MCCONNELL:  He already talked about it.
23     THE COURT:  I haven't had it offered yet, but --
24     MR. MCCONNELL:  I'm not offering it.
25     THE COURT:  Well, you may have misunderstood me.

Page 105

1  I told you I didn't want to hear your objection before the
2  opening statement.  When I said we will take it as it
3  comes up, I was expecting you to object and voir dire the
4  witness as soon as he appeared.  I didn't know who was
5  coming first.
6      So to me in that sense, we're sort of out of order
7  here.  This is something you should have raised -- like I
8  say, I think you misunderstood me.  I mean, to me, you're
9  trying to impeach the witness with his CV and with his
10 report, which is fine.
11     I'm going to admit them as part of the record subject
12 to your impeachment.
13     MR. MCCONNELL:  It's just like with a police
14 report, Your Honor, where you use it to impeach but it
15 doesn't come into evidence.
16     THE COURT:  Well, I think they're both part of
17 the record.
18     MR. MCCONNELL:  All right.  By the way, Your
19 Honor, I was planning on doing the voir dire at the point
20 when the plaintiff's lawyer tendered the witness as an
21 expert, which never happened, so --
22     THE COURT:  Well, he was offering expert
23 opinions without objection.
24 BY MR. MCCONNELL:
25 Q    In your expert report on page 5 of 14, when you talk

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 106

1  about representative pharmaceutical companies with whom
2  you work, you list GlaxoSmithKline, true?
3  A    You mean page 3?
4  Q    Well, I have it 5 of 14 on the version that I have,
5  but it's the section that starts "Representative Clients
6  and Projects."  Do you see that?
7  A    Yes.
8  Q    Okay.  Is that page 3 of your version?
9  A    Yeah.  That's page 3 in my report.
10  Q    And you list GlaxoSmithKline, which was obviously an
11  important and large project that you worked on.  Correct?
12  A    That project was again through IKON, as I state in
13  here, and was -- I mean, I don't have any idea how big the
14  project itself was.
15  Q    Did you look at a lot of GlaxoSmithKline documents?
16  A    Yes.
17  Q    And you see that you spelled GlaxoSmithKline wrong,
18  right?  Do you understand that?
19  A    I may have.
20  Q    Well, can we put up the --
21       MR. MCCONNELL:  May I approach, Your Honor, with
22  the GlaxoSmithKline website?
23       THE COURT:  Are we going to go through every
24  typo in his report?
25       MR. MCCONNELL:  No.  Just the big ones.

Page 107

1       THE COURT:  I know how to spell GlaxoSmithKline.
2       MR. MCCONNELL:  So you don't --
3       THE COURT:  I do.
4       MR. MCCONNELL:  Okay.  Then the point's made.
5  BY MR. MCCONNELL:
6  Q    Same thing with Purdue Pharmaceuticals.  You spelled
7  that P-E-R-D-U-E, right?
8  A    It should be P-U-R.
9  Q    Right.  Perdue P-E-R is the chicken company, right?
10  A    Right.
11  Q    I'm going to ask your about the voice mail issue.
12  You attached to your expert report Exhibit 1.02.  I'm
13  sorry.  1.0 -- it is 2.  Do you see that?
14  A    Yes.
15  Q    That's a document that Mr. Jaffe who works for the
16  plaintiff lawyers found; is that right?
17  A    Yes.
18  Q    And it talks about a voice mail system that was
19  installed at a company called AZAG, correct?
20  A    Yes.
21  Q    What is AZAG?
22  A    Actually it's called AstraZeneca AG.
23  Q    Right.  Do you know what AG stands for?
24  A    I believe that's the European division.
25  Q    You actually read this article, didn't you?

Page 108

1  A    Yes.
2  Q    It's about a Swiss company providing a voice mail
3  system to a Swiss AstraZeneca entity, correct?
4  A    Yes.
5  Q    And you know that that same voice mail system was not
6  installed in Wilmington, Delaware, don't you?
7  A    I don't know that it was or wasn't.
8  Q    Do you know what system was used at AstraZeneca in
9  Wilmington, Delaware?
10  A    I would assume either AUDIX or this system.
11  Q    Now, and AUDIX, this is a successor to AUDIX; is that
12  right?
13  A    I would -- I believe, according to the documents that
14  we looked through, there was reference to AUDIX in an
15  e-mail that was either the same time or slightly previous
16  to the date of the press release.
17  Q    And you're aware that there are some voice mail
18  systems where when one gets a voice mail, it actually goes
19  into the computer; is that right?
20  A    Yes.
21  Q    And becomes actually an e-mail that shows up in
22  your -- as you said before, the Outlook in-box, true?
23  A    Correct.
24  Q    Not true with AUDIX, right?
25  A    I believe AUDIX can do it either way.  It can either

Page 109

1  be a referential link back to the AUDIX system or it can
2  be delivered into the system.
3  Q    Do you know which system AstraZeneca in Delaware
4  used?
5  A    No.
6  Q    In the exhibit you attached to your expert report
7  1.03, which references a voice mail, somebody said they
8  were copied on a voice mail.  There is no voice mail
9  attached to that e-mail, is there?
10  A    No.
11  Q    Take a look at Exhibit 1.04, which again is attached
12  to your expert report.  This is where you talk about video
13  files, right?
14  A    Yes.
15  Q    And you say in your report that this document shows
16  that there are video files related to Seroquel that were
17  not produced; is that right?
18  A    Yes.
19  Q    And looking at the Exhibit 1.04, there's no link to
20  any video in 1.04, right?
21  A    No.
22  Q    And what's the date of this document?
23  A    The date of the document, I would have to go back
24  into the metadata.  I believe it just says Seroquel
25  internal PR milestones from 2003 to 2004.  It has several

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 110

1  dates within it indicating anticipated dates of delivery
2  and dates of delivery.
3  Q   For videos that don't exist yet, right?
4  A   I don't know if they existed or didn't exist or were
5  in process or whatever.
6  Q   Where the videos are listed, it's under a column
7  called "Proposed PR"; is that right?
8  A   Yes.
9  Q   Do you know what "Proposed PR" stands for?
10  A   Proposed public relations.
11  Q   Right. So doesn't that suggest to you that these are
12  items that do not exist yet?
13  A   Yes. That would indicate that.
14  Q   Do you know from whose custodial file this document
15  was produced?
16  A   I would have go back and look at the metadata.
17  Q   Do you know who Jim Minnick is?
18  A   He's one of the -- I believe he's one of the original
19  eight custodians.
20  Q   Is that right?
21  A   I believe so.
22  Q   All right. Do you know what Jim Minnick does at
23  AstraZeneca?
24  A   No.
25  Q   Who found this document, you or the plaintiff

Page 111

1  lawyers?
2  A   I did.
3  Q   How did you find this document?
4  A   I found this by doing full text searching in Weitz &
5  Luxenberg's doc system.
6  Q   Now, looking at this document, keeping in mind where
7  the videos are listed under "Proposed PR," if we assume
8  that the videos -- even if they did exist at the time this
9  document was drafted, does this document or doesn't this
10  document indicate that Jim Minnick actually possessed the
11  videos in his custodial file?
12  A   No. This means that he possessed the document
13  referring to video.
14  Q   Right. So you have no basis to say that Jim Minnick
15  was in possession of relevant video files that AstraZeneca
16  did not produce in this litigation, do you?
17  A   I actually -- after using this document as an
18  exhibit, we located other documents within the set, one of
19  which includes a link to a video called Dog's Eye View
20  related to marketing.
21  Q   When did you find that?
22  A   Within -- probably Monday afternoon or Tuesday.
23  Q   It's not in your expert report, is it?
24  A   No.
25  Q   You talk about track changes. Did you personally

Page 112

1  search for track changes?
2  A   Yes.
3  Q   And you searched through the documents and your
4  company searched, and you say there are no track changes
5  in the production; is that right?
6  A   We can't find a -- your normal view of track changes
7  as they would be rendered.
8  Q   And did you and your company look very hard to try to
9  find them?
10  A   We formulated queries and ran the queries against the
11  database as we were trying to locate them.
12  Q   You said you read CMO2. Do you recall whether or not
13  CMO2 requires as part of the metadata in this case that
14  track changes be provided?
15  A   I don't recall.
16       MR. MCCONNELL:  Can we have Exhibit 66.
17  May I approach with an AstraZeneca document, Your
18  Honor?
19       THE COURT:  All right.
20  BY MR. MCCONNELL:
21  Q   It's been premarked as 66. Let me know, sir, when
22  you've had an opportunity to look at this document.
23  A   Okay. Okay.
24  Q   Do you recognize this document?
25  A   No.

Page 113

1  Q   Have you ever seen it before?
2  A   No.
3  Q   Can you tell it's an AstraZeneca document?
4  A   Yes.
5  Q   How can you tell that?
6  A   I'm assuming from the contact information with the
7  James Minnick and Steve Lambert, AstraZeneca, at the top.
8  Q   And can you tell that this is a document that was
9  actually produced in this litigation?
10  A   No.
11  Q   Does this document or does it not show track changes?
12  A   It does show track changes.
13  Q   I'm going to ask you about e-mails. You mentioned
14  the instance of Vikram Dev; is that right?
15  A   Yes.
16  Q   And did you yourself review Vikram Dev documents in
17  this case?
18  A   Yes.
19  Q   You say that he authored 125 e-mails over a ten-year
20  period; is that right?
21  A   Based on our metadata search that AstraZeneca
22  provided, he came back as the author of 125 e-mails in a
23  ten-year period.
24  Q   Now, you were here and you heard Mr. Gornick in his
25  opening statement say that Vikram Dev authored 47 e-mails,

Page 114

1  correct?
2  A   47 of the 125 between January the 1st of 2004 and the
3  present.
4  Q   So 47 certainly isn't the total, right?
5  A   47 is the total for that time period per the metadata
6  provided by AstraZeneca.
7  Q   How many e-mails did Vikram Dev receive during the
8  time period covered?
9  A   I don't know.
10 Q   Did you try to count that?
11 A   No.  We were looking, given the timeframe and the
12 volume of data we were looking for, we were looking for
13 simple indicators and those are the ones we went with
14 first.
15    And we're daily to this day discovering additional
16 issues with it, as we get deeper and deeper into it.
17 Q   By the way, in your report, I'm not going to linger
18 on typos, but you misspelled Vikram Dev's name, true?
19 A   I may have.
20 Q   What was Vikram Dev's position at AstraZeneca?
21 A   I believe he was a manager or vice president of
22 product safety.
23 Q   What period of time was that his position?
24 A   I don't know.
25 Q   What were his responsibilities regarding Seroquel?

Page 115

1  A   Don't know.
2  Q   Where did he sit physically in the building with
3  relation to other people with whom he worked to the extent
4  he did work on Seroquel matters?
5  A   I don't know.  With the AstraZeneca-provided data, I
6  can't even tell you which building or what city.
7  Q   Do you know to what extent when Vikram Dev
8  communicated with his colleagues regarding Seroquel, he
9  did so personally as opposed to use of e-mail?
10 A   No.
11 Q   Do you know how old Vikram Dev is?
12 A   No.
13 Q   Do you know whether he was a heavy or light e-mail
14 user?
15 A   No.
16 Q   If he didn't retain e-mails that he sent but he sent
17 them to other custodians, would you or would you not
18 expect them to show up in AstraZeneca's production in this
19 case?
20 A   Could you restate that.
21 Q   Sure.  If he sent an e-mail to somebody else who was
22 a custodian in this case, and even if Vikram Dev for
23 whatever reason didn't retain e-mails or something was
24 wrong with his system, would you expect that the e-mail
25 sent by Vikram Dev but arriving in somebody else's file,

Page 116

1  would be produced in this case?
2  A   I don't really -- I don't understand.  Are you saying
3  assuming the search term hit and assuming the entire
4  process went through --
5  Q   Right.
6  A   -- correctly?
7  Q   Right.
8  A   Would it have or would it have resulted?
9  Q   No.  Let me try to make it clear.
10    If I send an e-mail to you --
11 A   Yes.
12 Q   -- but after I send it, either I don't retain it or
13 something went wrong with my system.
14 A   Right.
15 Q   But it would still show up, the document would still
16 show up if you're a custodian, right?  Because you
17 received it.
18 A   The received version would show up.  The authored
19 version showing potentially a BCC would not.
20 Q   Okay.  I want to ask you about proxies.  And you made
21 the point that there should be a search of files of people
22 who may have acted as proxies on behalf of principals; is
23 that right?
24 A   Yes.
25 Q   When say proxies, would that more often than not

Page 117

1  be secretaries or administrative assistants?
2  A   Yes.
3  Q   And you say you've worked on a lot of other projects
4  for large companies like GlaxoSmithKline and Purdue,
5  right?
6  A   Yes, that's correct.
7  Q   So you know, don't you, that typically when a proxy
8  sends something out on behalf of a principal, it's
9  typically a ministerial matter, fair?
10 A   It's -- it's all sort of things.
11 Q   But it's fair to say it's typically something like
12 setting up a meeting or please find this enclosed, as
13 opposed to actually substantive discussion.  Is that your
14 experience?
15 A   No.
16 Q   Okay.
17 A   I would disagree with that.
18 Q   Well, let me ask you this.  If the proxy sent
19 something out on behalf of the principal, doesn't the
20 proxy typically CC the principal on the document?
21 A   Usually.
22 Q   And in this case, if a proxy sends something out on
23 behalf of a principal relating to Seroquel, would you or
24 would you not expect that at least one of the recipients
25 would be another custodian in the case?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 118

1  A   I don't have any basis to know how the custodians
2  were selected, so I can't make that assumption.
3  Q   Well, let's look at Exhibit 1.05, which is attached
4  to your report.  Can you find that, please?
5  A   Uh-huh.  Okay.
6  Q   And is this a document that you found or that the
7  plaintiff lawyers found?
8  A   This is one that I found.
9  Q   And this is an example of a document that was sent
10 out by a proxy; is that true?
11 A   Yes.
12 Q   A proxy on behalf of whom?
13 A   According to the e-mail, on behalf of Kathy Bradley.
14 Q   Who's the proxy in this document?
15 A   The proxy in this document would be Pat Webb.
16 Q   And what is it that this document does?  What's the
17 person, the proxy doing with this document?
18 A   They're setting up a meeting for several other
19 people.
20 Q   And among the required attendees -- by the way, all
21 the required attendees would be copied on this document,
22 true?
23 A   Yes.
24 Q   And if this proxy is acting, as it says here, on
25 behalf of Kathy Bradley, is Kathy Bradley one of the

Page 119

1  people CC'd?
2  A   Kathy Bradley.  Yes.
3  Q   Right.  And are there not other people listed among
4  the required attendees who are in fact custodians in this
5  case?
6  A   Yes.
7  Q   For example, who?
8  A   Gerald Limp.
9  Q   Yes.  Anybody else?
10 A   Jimmy Mullen.
11 Q   Yes.  Anybody else?
12 A   And I believe Linda Warner.
13 Q   How about Ron Leonne?
14 A   I believe so.
15 Q   Have you suggested to the plaintiff lawyers that if
16 they want to get the documents from proxies on behalf of
17 some of the custodians, that they ask to designate the
18 proxy as custodians and add them to the custodian list?
19 Is that a suggestion that occurred to you?
20 A   Yes.
21 Q   Do you think it's a good suggestion?
22 A   Yes.
23 Q   Do you know any reason why it hasn't been done
24 already?
25 A   No.

Page 120

1  Q   I'm going to ask you about your key search issue.
2  Now, you're experienced in the production of electronic
3  documents, right?
4  A   Uh-huh.
5  Q   And you've worked --
6  A   Yes.
7  Q   I'm sorry.  I should have let you say that orally.
8  A   Yes.
9  Q   You've worked on other productions of ESI,
10 electronically stored information, true?
11 A   Yes.
12 Q   And it's true, isn't it, that use of search terms is
13 quite typical when you're talking about a large-scale
14 production?
15 A   Yes.
16 Q   And also, I believe you said this in your direct
17 exam, that in your experience, when search terms are used,
18 that sometimes over time the search terms can evolve; is
19 that right?
20 A   Yes.
21 Q   People start figuring stuff out and they start adding
22 search terms to the list; is that right?
23 A   Yes.
24 Q   That's what happens more often than not, right?
25 A   I'd say it's probably 50 percent of the time.

Page 121

1  Q   In the projects that you described involving IKON and
2  Williams & Connolly, and Winston & Strawn and Hogan &
3  Hartson, search terms were used in all those projects,
4  weren't they?
5  A   Search terms -- in the projects where I was involved
6  in that phase, I know they were.  In the search -- in
7  projects where I was simply handed data after the fact,
8  they may or may not have been.
9  Q   And in this case, so far, you have been working with
10 the plaintiff lawyers, right?
11 A   Yes.
12 Q   And have you worked with Mr. Jaffe?
13 A   Yes.
14 Q   And Mr. Jaffe seems to know his way around computer
15 issues and software, doesn't he?
16 A   Yes.
17 Q   And does it strike you that the law firm with whom he
18 works, Weitz & Luxenberg, is pretty sophisticated in terms
19 of electronic discovery and software, right?
20 A   Their -- I don't have any knowledge of their
21 electronic discovery capabilities.  I know the doc system
22 that I was given access to.
23 Q   And you know the people there that you've worked
24 with, true?
25 A   Yes.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 122

1   Q   And you would expect them to be sophisticated in
2   terms of the use of search terms, right?
3   A   Yes.
4   Q   The Sedona Principles were mentioned, I think
5   actually first by the plaintiffs' lawyer.  You're familiar
6   with the Sedona Principles, aren't you?
7   A   Yes.
8   Q   And can you just briefly describe what they are?
9   A   Basically they're a cumulative set of guidelines that
10  describes the best practices for the acquisition,
11  identification, review and production of electronic data.
12  Q   Are you familiar that Principle 6 is, "Responding
13  parties are best situated to evaluate the procedures,
14  methodologies and technologies appropriate for preserving
15  and producing their own electronically stored
16  information"?  Right?
17  A   Yes.
18       MR. MCCONNELL:  And can you get 11.
19  BY MR. MCCONNELL:
20  Q   Principle 11 says that "A responding party may
21  satisfy its good faith obligation to preserve and produce
22  relevant electronically stored information by using
23  electronic tools and processes, such as data sampling,
24  searching, or the use of selection criteria to identify
25  data reasonably likely to contain relevant information."

Page 123

1   Right?
2   A   Yes.
3   Q   You agree with that, don't you?
4   A   Yes.  If it's applied properly, I do.
5   Q   Okay.  You say you have been working with the
6   plaintiffs' lawyers since July 13, and do you know why
7   they haven't proposed additional search terms to the
8   defendants prior to their sanctions motion?
9   A   No.
10  Q   There is a document that you attached to your report,
11  it's 1.07.  And you use it as an exemplar for how other
12  terms should be used to try to get at the issue of
13  diabetes.  Is that right?
14  A   Yes.
15  Q   Is that a document that you found or the plaintiffs'
16  lawyers found?
17  A   This is a document that I found.
18  Q   And that's a document where within AstraZeneca
19  somebody said that maybe the word endocrine would have
20  captured other cases of diabetes, true?
21  A   True.
22  Q   Now, you as part of your report, you submit your list
23  of proposed search terms, don't you?
24  A   Yes.
25  Q   Is that a list that you came up with or the

Page 124

1   plaintiffs' lawyers came up with?
2   A   That's a list that I came up with.
3   Q   Okay.  How in the world did you come up with that
4   list when it involves all these medical terms that you
5   don't even know what they mean?
6   A   I relied on a medical resource.
7   Q   Okay.  Do you recall that I used the phrase CNS
8   before?
9   A   Yes.
10  Q   And you didn't know what it meant, right?
11  A   Right.
12  Q   That's on your list, though, isn't it?
13  A   Yes.
14  Q   Okay.  The word endocrine, however, which is the one
15  that shows up in 1.07, does not show up in your 1.08 list
16  of search terms at all, does it?
17  A   I don't know if it does or doesn't.  Which exhibit is
18  the search term list?
19  Q   1.08, sir.
20  A   1.08.  I think this is a versioning issue.
21  Q   What does that mean?
22  A   Well, when I located this example, I stuck endocrine
23  in this, the line that reads diabetes or diabetic, and
24  then I edited, or endocrine or endocrinologist or
25  endocrinology, but I believe this is an earlier version of

Page 125

1   that document.
2   Q   But in the version that you have here, where it says
3   diabetes or diabetic or endocrinologist or endocrinology,
4   you left out the word endocrine, right?
5   A   In this version, yes.
6   Q   Which is the version you produced to the Court,
7   right?
8   A   Yes.
9   Q   You didn't do that on purpose, did you?
10  A   No.
11  Q   It was a mistake?
12  A   Yes.
13  Q   That's all it was, was a mistake on your part.
14  A   Uh-huh.
15  Q   You list criteria that you think should be used in
16  putting together a search terms list, and I want to ask
17  you about a couple.
18       You think that the search should be case insensitive,
19  right?
20  A   Yes.
21  Q   Why is that?
22  A   Because case sensitive searching will -- in my
23  experience, it kind of muddies the water.  When you have
24  people with mobile devices, a lot of times they'll not
25  capitalize things in e-mail that are abbreviations.

Page 126

1  Q   And do you know whether or not when AstraZeneca ran
2  the search, they applied it in a case insensitive way?
3  A   No.
4  Q   Another one of your criteria is that fuzzy logic
5  should be turned off.  The Judge asked you about fuzzy
6  logic.  You think it should be turned off for the search,
7  right?
8  A   Yes.
9  Q   Why?
10  A   Because we're including misspellings of the word.  So
11  we have covered the eventuality that way rather than
12  relying on fuzzy logic.
13  Q   Do you know whether or not when AstraZeneca conducted
14  the search, they did so with fuzzy logic on or off?
15  A   I don't know.
16  Q   What's the phrase "QT prolongation" mean?
17  A   If I remember correctly, QT prolongation is the
18  interval between peaks in an electrocardiogram.
19  Q   And what's that have to do with Seroquel?
20  A   Don't know.
21  Q   What's dystonia?
22  A   Dystonia is, I believe, a muscle ailment.
23  Q   What's that got to do with Seroquel?
24  A   I don't know.
25  Q   What's CATIE mean, C-A-T-I-E?

Page 127

1  A   I don't know.
2  Q   So that means you don't know what it has to do with
3  Seroquel, right?
4  A   Right.
5  Q   Is it your opinion that if you used all of these
6  search terms that you suggest, that would be a good
7  search, you would be happy with the results of that
8  search?
9  A   No.  What I'm suggesting is this would be a better
10  methodology to use with examples.
11  Q   You haven't put together a list that you'd say this
12  is a list that I would be satisfied with?
13  A   I'm not in the position of being satisfied.  I'm not
14  the plaintiff attorney.
15  Q   Did the plaintiff attorney suggest any of these
16  search terms to you?
17  A   We worked through some of the documents that they
18  indicated.  We talked back and forth on some of them.
19  Like we found e-mails related or where people were
20  mentioned in Clintrace reports, where we would go and say
21  they're talking about something related to a Clintrace
22  report, does that make sense?  Should that be in the list?
23  Q   I want to ask you about some of your search terms.
24  At the bottom of -- I have it as page 4 of 7, it's the
25  word best.  Do you see that as one of your proposed search

Page 128

1  terms?  BEST, B-E-S-T?
2  A   At the bottom of the page?  Yes.  BEST.
3  Q   And it's all in capitals, right?
4  A   Yes.
5  Q   But if you ran the search for BEST in a case
6  insensitive way, you would come up with the word best,
7  wouldn't you?
8  A   Best is normally -- I believe that's normally in a
9  stop word list.
10  Q   I'm sorry.  It's a what?
11  A   A stop words list.
12  Q   Okay.
13  A   There are approximately 429 words in the English
14  language that most search engines consider to be
15  irrelevant, but you can't write sentences without them.
16  Like the, this, that, we, they.  Those kind of words.
17  Q   So if you ran a search and one of your search terms
18  was BEST, would you or would you not pick up every e-mail
19  in the company where somebody said best wishes or best
20  regards?
21  A   It depends on whether the search engine in use has
22  best in its stop words list.  You may or you may not.
23  Q   Similarly on page 5, the next page, you want to do a
24  search for Department of Corrections or DOC all in caps,
25  right?

Page 129

1  A   Yes.
2  Q   And one of the things that you talk about in terms of
3  running an appropriate search, there should be stemming;
4  is that right?
5  A   Yes.
6  Q   If you ran a search and you put in DOC all in
7  capitals, would you not retrieve every document in the
8  company that has the word document in it?
9  A   No.
10  Q   Why not?
11  A   Because you're confusing stemming and conflation.
12  Stemming --
13  Q   I very well might be.
14  A   Stemming is -- stemming is based on the initial word.
15  The initial word is DOC, so you might get docs.
16      Conflation is an extension of the root word, so you
17  could get -- to give an example, if you search for problem
18  with stemming, you would get problems, problem and
19  problems.  If you searched problem with conflation, you
20  would get problem and problematic, as an example.
21  Q   How would you run a search for DOC and not pick up
22  the word document?
23  A   You would just run DOC.
24  Q   What about FDA?  You said before that you assumed
25  that AstraZeneca was regulated by the FDA, correct?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 130

1   A   Yes.
2   Q   And you know they have -- you don't know the specific
3   drugs, but you know they have lots of drugs that are
4   subject to FDA regulations, correct?
5   A   Yes.
6   Q   One of your search terms is FDA, right?
7   A   Yes. I believe so.
8   Q   Wouldn't that pick up an incredible amount of
9   documents at the company having nothing to do with
10  Seroquel?
11  A   It may.
12  Q   Wouldn't it pick up -- if AstraZeneca sells 50
13  different drugs, you would be getting regulatory documents
14  relating to 50 different drugs.
15  A   Well, I'm going to have to disagree with the basis of
16  your question.
17  Q   Okay.
18  A   What you seem to be implying is that I would run
19  these searches across AstraZeneca as a whole. That's not
20  the process I described. The process I described was, you
21  pick one or two or three sample custodians and you run the
22  search across them and you check both the hits and the
23  non-hits.
24  Q   But you know that some of the custodians, all that
25  they do is do regulatory matters, true?

Page 131

1   A   I don't know what their jobs are specifically.
2   Q   But if there were -- I know you don't know specific
3   custodians, but if there were custodians who were in, say,
4   the regulatory department and you ran an FDA search, you
5   would come up with all their stuff, not their Seroquel
6   stuff specifically, true?
7   A   True. If it hit everywhere.
8   Q   You also suggest a search for 25 milligrams; is that
9   right?
10  A   Yes.
11  Q   What makes you think that search would retrieve items
12  specific to Seroquel?
13  A   These are terms added -- these are, my understanding,
14  from the plaintiffs' lawyers dosage measurements from
15  different drugs. These should be used in combination with
16  other words to result in relevant hits.
17  Q   What other words? When you say new added terms, is
18  that what you mean, that all these new added terms should
19  be used in combination with something else?
20  A   Yes. Yes.
21  Q   So what would be -- what would the 25 milligrams be
22  added to, to restrict the search?
23  A   I would assume a drug.
24  Q   So you would actually run a search for, for example,
25  Seroquel and 25 milligrams; is that right?

Page 132

1   A   Or Seroquel followed, you know, within two words by,
2   something like that.
3   Q   But if the search already was for Seroquel, it would
4   pick up those documents, wouldn't it?
5   A   It would pick up the documents, yes.
6   Q   What do you get from this search that you didn't
7   already get from the way the search in fact was conducted?
8   A   Well, these would be more specific terms related to
9   drug dosages. So from a search standpoint, what I'm used
10  to seeing is, when somebody runs a search, there is a
11  field that says which term to search this document hit on.
12  So sometimes you have overlapping search terms for that
13  specific reason.
14  Q   But for all these new added terms, these are ways of
15  actually narrowing the search or making it more precise;
16  is that true?
17  A   Yes.
18  Q   One of your terms there is case study, under new
19  added terms. Why do you want to search for case study?
20  A   They referred to case studies and they referred to
21  case studies in conjunction with things like Clintrace
22  reports.
23  Q   When you say they refer --
24  A   The AstraZeneca custodians in their e-mail.
25  Q   Okay. And again, you would be using case study in

Page 133

1   conjunction with something else to narrow the search?
2   A   Yes.
3   Q   And you say that you want to search for key opinion
4   leader. Is that right? Or KOL. That's one of the
5   searches that you have listed here.
6   A   Which page is that on?
7   Q   I have got it on page 5. This is not an added term.
8   This is under new abbreviated terms. You said that want
9   to search for KOL or key opinion leader. True?
10  A   Yes.
11  Q   Why do you want to search for that?
12  A   That was a term that was indicated to be important.
13  Q   Indicated by whom?
14  A   By plaintiffs' counsel.
15  Q   All right. Do you know or do you not know whether
16  key opinion leader is specific to Seroquel?
17  A   I don't.
18  Q   If it's the case -- you're an expert so I can ask you
19  a hypothetical. If key opinion leaders exist for almost
20  all the drugs at AstraZeneca, wouldn't that search -- and
21  this is not the new added term section, this is a separate
22  section -- wouldn't this pick up documents from all over
23  the company having nothing to do with Seroquel?
24  A   If that condition were true, yes, but again, I
25  disagree with the basis. You would start with your

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 134

1   Seroquel custodians that you have designated and you would
2   run it within them. I'm assuming their -- I would be
3   assuming that they don't work on all of the drugs at
4   AstraZeneca, so...
5   Q   But if you're wrong or if they work on lots of drugs,
6   this search would pick up lots of documents having nothing
7   to do with Seroquel, true?
8   A   If the custodians you selected worked on multiple
9   drugs, yes. But that's why we run the test and run the
10  review.
11  Q   And why did you want to run a search for SERM,
12  S-E-R-M, safety evaluation review meeting?
13  A   That was indicated in e-mail.
14  Q   What e-mail?
15  A   AstraZeneca e-mail.
16  Q   Do you know whether SERM is specific to Seroquel?
17  A   No.
18  Q   You say you want to run a search for SWOT. Why?
19  A   SWOT? Was that one -- let's see. SWOT, strength
20  weakness opportunity threat. I believe that was in
21  marketing-related documents in AstraZeneca.
22  Q   Do you know if it's specific to Seroquel?
23  A   No.
24  Q   Do you know whether or not the marketing department
25  conducts a SWOT analysis for every drug that it markets?

Page 135

1   A   I don't know.
2   Q   And now I asked you earlier about CNS, which is at
3   the top of page 5 of 7. You see there that CNS stands for
4   central nervous system, right?
5   A   Yes.
6   Q   And I asked you before if you knew how many
7   AstraZeneca drugs were CNS drugs. You don't know, right?
8   A   Right.
9   Q   So you have no idea whether a search for CNS would
10  pick up Seroquel documents or documents for lots of other
11  drugs, too, right?
12  A   No. I think I could blanketly say that my job is to
13  give examples of searching and proper search methodology
14  as I have described. I am not purporting to be a drug
15  expert or a medical expert.
16  Q   Fair.
17      Let me ask you this. When you design a good search,
18  you do want a search that captures a lot of the relevant
19  materials, right?
20  A   Ideally you want one that overcaptures relevant
21  material.
22  Q   But how far over do you want your search to be if
23  it's to be well designed? It's not much of a search if it
24  captures every document in the company. Do you agree with
25  me on that?

Page 136

1   A   Yes. And in the methodology I have described, it
2   wouldn't, because you would be starting within your
3   custodians.
4   Q   Your effort would be, with whatever resources you
5   have, to come up with a list of search terms that captures
6   the relevant materials, but is useful as a search because
7   it filters out a lot of things that aren't relevant, true?
8   A   True.
9   Q   And is that something that you think reasonable minds
10  can sit down and talk out and come up with a good list of
11  search terms?
12  A   Yes. I believe that's the process.
13  Q   You would encourage that, wouldn't you?
14  A   Yes.
15  Q   Why do you want to search for CVA? Do you know what
16  CVA is?
17  A   Yeah. Core visual aid.
18  Q   Right. Doesn't that apply to every drug that's
19  marketed in the company?
20  A   I don't know.
21  Q   What's akathisia?
22  A   I don't know.
23  Q   Why do you want to search for it?
24  A   I believe that was -- I believe that was a term that
25  was indicated to indicate something about Seroquel by

Page 137

1   plaintiffs' counsel.
2   Q   By plaintiff's counsel.
3       Glucose, you say you want to search for glucose,
4   right?
5   A   Uh-huh.
6   Q   Isn't it the case, since you worked on other
7   pharmaceutical matters, glucose levels are measured in
8   most clinical trials for all drugs?
9   A   I don't know that.
10  Q   If that's the case.
11  A   If that's the case.
12  Q   Then a search for glucose is going to come up with
13  lots of stuff that has nothing to do with Seroquel, true?
14  A   I believe the search for glucose would be more
15  closely related to the diabetic or diabetes aspect.
16  Q   And not other drugs besides Seroquel?
17  A   I don't know that it does or doesn't. I'm saying in
18  this case.
19  Q   You also want to search for hypercholesterol and
20  cholesterol levels. Why?
21  A   Because those relate to diabetes and --
22  Q   Cholesterol does?
23  A   That's my understanding.
24  Q   Okay. Now --
25      THE COURT: Mr. McConnell, how much longer do

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 138

1    you anticipate being with this witness?
2         MR. MCCONNELL: 15 minutes.
3         THE COURT:  All right.
4    BY MR. MCCONNELL:
5    Q    You understand, you've heard of Crestor, right?
6    A    Yes.
7    Q    That's a cholesterol drug, isn't it?
8    A    If I remember the commercial correctly, yes.
9    Q    So if you search for cholesterol, you're going to
10   come up with all this Crestor stuff that has nothing to do
11   with Seroquel, true?
12   A    Assuming those custodians have something to do with
13   Crestor.
14   Q    You'd want to find that out?
15   A    Yes.
16   Q    Okay.  You want to do a search for weight gain and
17   weight loss.  Don't you understand that weight gain and
18   wait loss again is measured in almost all clinical trials
19   for all sort of drugs?
20   A    I didn't know it was or wasn't.
21   Q    Okay.  Why do you want to search for quantitative
22   decision science?
23   A    Because I believe that is a term -- that is a term
24   that was indicated to be relevant by plaintiffs'
25   attorneys.

Page 139

1    Q    Specific to Seroquel?
2    A    That's my understanding.
3    Q    Okay.  Black box, that can apply to lots of drugs at
4    the company; isn't that true?
5    A    I don't know.
6    Q    That's another search term.  You don't know.
7         Off labeling, that could apply to all sorts of drugs
8    besides Seroquel, true?
9    A    I believe in this case off labeling, selling drugs
10   off label is one of the topics.
11   Q    Sure.  But my question to you is, it's not in any way
12   specific to Seroquel, is it?
13   A    I don't know if AstraZeneca -- I have no way of
14   knowing if they sell lots of drugs off label.  I don't
15   know.
16   Q    Would the issue of off label or preventing off-label
17   sales be discussed in the context of drugs other than
18   Seroquel?  Do you know?
19   A    I don't know.
20   Q    Anxiety, depression, insomnia, those are other terms.
21   They can all apply to drugs other than Seroquel, right?
22   A    I would imagine so.
23   Q    In fact, can you even say sitting here whether most
24   documents referring to insomnia would refer to Seroquel or
25   non-Seroquel drugs at AstraZeneca?

Page 140

1    A    Couldn't say.
2    Q    All right.  You think on the issue of de-duplication
3    that the hash method is superior; is that right?
4    A    Myself and a lot of other people in the industry,
5    yes.
6    Q    Why is hash better?
7    A    Because it's an exact match.
8    Q    Do you know whether or not AstraZeneca actually
9    employed that method?
10   A    No.
11   Q    You talk about technical errors in your report.  Do
12   you know how many of those technical errors still exist as
13   we sit here today?
14   A    I'll say the vast majority of them do.
15   Q    Do you know that, to a degree of certainty as you sit
16   here today, that that's the case?
17   A    I know -- I know that it is the case, and if what you
18   are implying are the most recent deliveries, the most
19   recent deliveries have issues that would prevent them from
20   being loaded.  So, yes, I am sure that the problems still
21   exist, because there's been no way to correct it.
22   Q    Did they improve the situation at all, as far as you
23   could tell?
24   A    The new load files?
25   Q    Yes.

Page 141

1    A    They can't be loaded without altering the data.
2    Q    Has anybody contacted the defense lawyers to see
3    about fixing that problem, as far as you know?
4    A    I don't know.
5    Q    Are you familiar with a company called Zantaz?
6    A    Yes.
7    Q    What do they do?
8    A    They started in electronic -- I'm sorry -- e-mail and
9    data archiving, and in recent years they kind of migrated
10   over into the electronic discovery.
11   Q    Now, isn't it the case that for 2007, they were named
12   a top five electronic discovery provider?
13   A    By whom?
14   Q    Are you familiar with the -- I may mispronounce
15   this -- Socha --
16   A    Socha-Gelbmann?
17   Q    Yes.
18   A    Yes.
19        MR. MCCONNELL:  No further questions, Your
20   Honor.
21        THE COURT:  Redirect.
22        MR. GORNICK:  Thank you, Your Honor.
23        At the outset, Your Honor, we would offer
24   Mr. Martin's CV and his report into evidence, since we
25   spent a lot of time on it.

Page 142

1    THE COURT: Received subject to the -- I'll call
2  it the inherent objections from the defense.
3        MR. GORNICK: Thank you, Your Honor.
4        REDIRECT EXAMINATION
5  BY MR. GORNICK:
6  Q   Mr. Martin, you spent a lot of time on your
7  qualifications. I'm sure you remember that.
8  A   Yes.
9  Q   Did you go to college?
10  A   Yes.
11  Q   Among the places you went to college was University
12  of Mississippi or Southern Mississippi?
13  A   William Carey College, Southern Mississippi. Yes.
14  And University of Southern Mississippi.
15  Q   And at the risk of rehashing things that seemed to be
16  irrelevant, did you take courses through Buxton?
17  A   Yes.
18  Q   Did you actually engage in that process online in
19  good faith?
20  A   Yes.
21  Q   You were asked a lot of questions about engagements
22  you had.
23  A   Yes.
24  Q   Whether or not you could provide names of lawyers
25  that you communicated with at law firms.

Page 143

1  A   Yes.
2  Q   And you had to look at your BlackBerry to get those?
3  A   Yes. Some of them I have and some of them I would
4  have on my notebook.
5  Q   When you're on these projects, is your day-to-day
6  communication on these projects with the people at IKON
7  and the people inside the companies that you're actually
8  dealing with?
9  A   It depends on the engagement. For instance, on the
10  Williams & Connolly and the Winston & Strawn example with
11  Barr Pharmaceuticals, who I was meeting with and e-mailing
12  most of the time was Shannon Kilger, who is the assistant
13  general counsel of Barr.
14     The people we work with at Williams & Connolly and
15  Winston & Strawn are normally litigation support people,
16  paralegals, and associate attorneys. Occasionally if
17  something comes up, partner-level attorneys would be
18  brought in.
19  Q   Who is that assistant general counsel at Barr that
20  you would have your communications with?
21  A   Shannon Kilger. She's former -- she actually
22  represented Barr when she was at Alston & Bird before
23  taking that position.
24  Q   You said that a lot of your work -- actually let me
25  back up.

Page 144

1     At the very beginning you were giving us your
2  background. You said you were a vendors' vendor. What
3  did you mean by that?
4  A   We normally get called in to -- about 50% of the
5  projects that we do involve errors that have occurred with
6  other vendors in projects that need to be addressed
7  rapidly and done to the satisfaction of both our client
8  and the opposing side.
9  Q   Have you been approved by the Court, by courts in
10  this country, to do any discovery?
11  A   The U.S. Bankruptcy Court in the WorldCom matter. A
12  couple of -- I would have to go back and get the
13  specifics, but in one case where both parties had agreed
14  to use the same vendor just to cut down on confusion in
15  the case several years ago.
16     We have got a current forensic project in North
17  Carolina where we were waiting on the judge's decision for
18  us to come back. So I have submitted an affidavit there.
19     And normally getting to this point and me being here,
20  you know, normally means something's gone wrong.
21     Initially I believe Weitz & Luxenberg went to IKON,
22  who is a vendor who is the largest litigation support
23  vendor in the country, and the largest litigation support
24  vendor in the country relies on me and my team when they
25  can't get something done either from a capacity standpoint

Page 145

1  or capability standpoint.
2  Q   Since you finished your education in the early '90s,
3  have you developed some or most of the knowledge that
4  you've brought to bear on this project that you're here
5  about today?
6  A   The vast majority. Very little of anything I ever
7  learned in school I use in my job. They just don't train
8  people for this.
9  Q   And when you were describing your background, you
10  weren't bragging about what you did at school. You were
11  telling us about your real-world experience, weren't you?
12     MR. MCCONNELL: Objection. Leading, Your Honor.
13     THE COURT: Sustained.
14  BY MR. GORNICK:
15  Q   We had some questions about voice mail. I'm not sure
16  what the implication was supposed to be.
17     MR. MCCONNELL: Objection, Your Honor. Move to
18  strike.
19     THE COURT: Overruled.
20     MR. GORNICK: Your Honor, may I approach the
21  witness, and offer an exhibit?
22     THE COURT: All right.
23     MR. GORNICK: This should probably be Exhibit
24  101.
25  BY MR. GORNICK:

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 146

1  Q   Mr. Martin, do you have Exhibit 101 in front of you?
2  A   Yes, I do.
3  Q   Can you tell us what that is, please?
4  A   This is an AstraZeneca e-mail, custodian e-mail. It
5  actually includes more than one custodian. Actually the
6  e-mail chain. And in this e-mail, which we actually
7  located through our ongoing review --
8  Q   When did you locate it?
9  A   I believe this one came up yesterday.
10 Q   What does this e-mail tell us about AstraZeneca's
11 voice mail and the way it goes into in-boxes and the use
12 of AUDIX and things like that?
13 A   Well, if you flip to the second page, the bottom
14 third of the page, there is a message from Frederick
15 Koeller to Ronald, I guess Leonne. Is that correct? Or
16 Leonne.
17      And it says, "Hi, Ron. Does a pregnancy registry
18 exist for Seroquel? Please refer to CNS MIS Mike Barber's
19 AUDIX message attached to this e-mail and kindly copy him
20 with your response."
21      Then directly below that is a file attachment
22 indicator with a file named SeroquelPregnancyRegistry.wav,
23 indicating an audio file.
24 Q   Does this indicate to you that AstraZeneca employees
25 are passing around voice mails from their in-boxes?

Page 147

1  A   Yes.
2  Q   Back to what the important issue is. Did you see --
3      MR. MCCONNELL: Objection. Move to strike.
4      THE COURT: Overrule.
5      MR. GORNICK: Thank you.
6  BY MR. GORNICK:
7  Q   Did you see any evidence in the production by
8  AstraZeneca that any voice mails or any wav files were
9  produced?
10 A   No. They would have had to have been produced in a
11 native file, since wav files don't TIFF. You can't TIFF
12 them.
13 Q   We talked about videos on cross-examination.
14 A   Yes.
15 Q   Counsel asked you to look at the Exhibit 1.04. Do
16 you remember that?
17 A   Yes.
18 Q   On the second page he drew your attention, I believe
19 it was the second page, to references to videos that were
20 going to be linked on the website plus e-mail messages and
21 things like that. Do you see that?
22 A   Yes.
23 Q   And the point was made that these were proposed
24 videos, so it's possible they weren't created yet at the
25 time this document seems to have been created in '03 and

Page 148

1  '04. Do you remember those questions?
2  A   Yes.
3  Q   Okay. Did you use this document as an example to
4  show that there would be videos in use inside AstraZeneca
5  on Seroquel issues?
6  A   Yes.
7  Q   And the fact of the matter is, did you see any
8  evidence that we received any videos in the AstraZeneca
9  production?
10 A   We didn't receive any.
11 Q   The search term list you put together. Did you do
12 that with aid from my office?
13 A   For parts of it, yes.
14 Q   Of course. And typically in your experience, when
15 you're putting together a search term list, you ask the
16 lawyers for their input, right?
17 A   Yes. That's always the case, as they have better
18 core knowledge of what they're after than I do.
19 Q   Is it unusual when you're putting together a term
20 list that you ask the lawyers for their input?
21 A   No.
22 Q   It's not unusual?
23 A   No, it's not unusual.
24 Q   And in your experience, the best way to do it is not
25 only ask the lawyers you're working for, but you get the

Page 149

1  input from the lawyers on the other side, too; is that
2  correct?
3      MR. MCCONNELL: Objection. Leading.
4      THE COURT: Sustained.
5  BY MR. GORNICK:
6  Q   In your past practice, what's more typical? Do you
7  just try to get input from one side or do you try to get
8  it from both?
9  A   Normally when you have a complex search term that's
10 going to be applied in a large litigation, both parties
11 negotiate what that is. I'm normally not privy to the
12 negotiation that goes on. I generally see it from one
13 side or the other, but I do know that the process goes on,
14 and I do know that there is a result, and at that point
15 I'm told to move forward.
16 Q   A lot of questions about individual keywords. Did
17 Mr. McConnell ask you about every keyword you proposed
18 should be added?
19 A   No.
20 Q   The process that you engaged in with Mr. McConnell,
21 the give and take, the questions about should we really
22 use this keyword or will it be too broad, is that the kind
23 of give and take you would expect in a legitimate keyword
24 search development?
25 A   To a degree. Generally, an attorney would ask me a

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 150

1  question very much like what Mr. McConnell did, and say,
2  well, if we search for this, are we going to get the sun,
3  the moon and the stars, and then I would ask a qualifying
4  question about how do we focus it, because what I'm trying
5  to get to in my job is what they need to get there.  The
6  attorneys are explaining to me what they want, and I have
7  to technically make that connection.
8  Q   De-duplication process.  I'm not sure if I heard this
9  right, but how certain are you that AstraZeneca failed to
10  use a hash method de-duplication?
11  A   I would say I'm 95 percent certain that they did not
12  use a hash de-duplication, specifically on the e-mails.
13  It is possible that they used a hash de-duplication on
14  attachments for the e-mails, but again, I'm not certain
15  that they did.
16  Q   You're familiar with the Sedona Principles?
17  A   Yes.
18  Q   I imagine Mr. McConnell's questions to you have
19  caused you to think a little bit more about all of the
20  problems that you described for us here this morning and
21  this afternoon about AstraZeneca's production.
22       MR. MCCONNELL:  Objection to form.
23       THE COURT:  Overruled.
24       THE WITNESS:  Yes, I have thought about it some
25  more since he brought them up.

Page 151

1  BY MR. GORNICK:
2  Q   I'm referring now to Sedona Principle Number 12.  I'm
3  going to ask you some questions.
4       Do you believe that AstraZeneca has produced to
5  plaintiffs data in a reasonably usable form?
6  A   No.
7  Q   Do you believe that AstraZeneca has produced to
8  plaintiffs' counsel in this case data that will enable the
9  receiving party -- that's the plaintiffs -- to have the
10  same ability to search, access, search and display
11  information as the producing party, meaning AstraZeneca?
12  A   Absolutely not.
13       MR. GORNICK:  That's all I have, Your Honor.
14       THE COURT:  All right.  Let's take -- you're
15  excused.
16       How many more witnesses for plaintiffs?
17       MR. GORNICK:  Your Honor, we have one more
18  witness, Mr. Jonathan Jaffe.
19       THE COURT:  All right.  And Mr. McConnell, what
20  do you expect for the defendants?
21       MR. MCCONNELL:  Sort of depends on what we hear.
22  We know we're going to have at least one witness.
23  Probably one witness.
24       THE COURT:  All right.  Let's take a lunch break
25  for 40 minutes.  We will reconvene at 2:00.

Page 152

1            (Lunch recess at 1:20 P.M.)
2       MR. GORNICK:  The plaintiff will call Jonathan
3  Jaffe.
4            (Witness sworn.)
5  BY MR. GORNICK:
6  Q   Mr. Jaffe, would you please state your name for the
7  record?
8  A   Sure.  My name is Jonathan Jaffe.
9  Q   Can you briefly tell us your background and as it
10  relates to the current situation.
11  A   Since 2002 I have worked for Weitz & Luxenberg.  I'm
12  presently the manager of software development.  I oversee
13  all aspects of software development, our Internet site,
14  teams of individuals' responsibilities, including
15  e-loading and production -- the loading and processing of
16  all of the document productions in our various different
17  litigations.
18       Since 1995 I have been -- even before that, but I've
19  been working full-time since 1995 in information
20  technologies, working with very large databases and data
21  management systems, applications that I helped develop or
22  author, multi- -- some multibillion dollar transactional
23  applications.
24       MR. GORNICK:  And Your Honor, just for
25  convenience sake, I would note for the record that we have

Page 153

1  offered into evidence Mr. Jaffe's declaration.  It's
2  Exhibit 16 and it is in evidence, and in that declaration
3  Mr. Jaffe more fully describes his background.
4  BY MR. GORNICK:
5  Q   Mr. Jaffe, could you please tell us what your job is
6  with respect to the Seroquel litigation?
7  A   I received the document productions.  I have been
8  involved in the negotiations about going forth from the
9  IND/NDA with respect to the format of those productions
10  that we received.  Involved in the drafting, but even
11  before drafting of CMO2, and involved in the day-to-day
12  helping out and litigation support for producing those
13  documents to plaintiffs' counsel.
14  Q   Have you had involvement with attempts to take the
15  data AstraZeneca has produced and turn it into a usable
16  form for the plaintiffs' lawyers in this litigation?
17  A   Directly, and also as overseeing the team of
18  individuals that does this.
19  Q   When was the first production of documents in this
20  litigation by AstraZeneca?
21  A   The first production of documents, to my knowledge,
22  was on or about November 15 with the IND/NDA.
23  Q   Was that production as received from AstraZeneca
24  searchable?
25  A   No, it was not.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 154

1  Q   Was it reasonably usable in any way as received from
2  AstraZeneca?
3  A   It was not.
4  Q   What was wrong with it?  Why wasn't it searchable or
5  usable?
6  A   There were a good number of problems.  Just to name
7  the highlights, first of all, there was no metadata.
8  There was nothing that plaintiffs' counsel could
9  reasonably search to retrieve a given document.  The
10 documents were provided as multi-TIFF images.  Some of
11 those images were over 20,000 pages, including one -- in
12 fact, the entire production, 8 percent of the entire
13 production was contained within one document.
14      The documents did not have any metadata showing Bates
15 numbering, and the Bates numbering was inconsistently
16 done.
17 Q   That one big document that was 8 percent of the
18 production, was that -- could you even open that on a
19 laptop or a run-of-the-mill PC on a lawyer's desk?
20 A   I don't believe that most lawyers in this litigation
21 would have been able to open it, without some sort of
22 very -- not a laptop, maybe a very powerful work station
23 that would have been able to open it properly.
24      Even if they were able to open it, they wouldn't have
25 been able to work within it.

Page 155

1  Q   Did we get load files -- did you get load files from
2  AstraZeneca in that first production?
3  A   We did not.
4  Q   Can you turn to -- to Exhibit 16.01, please.
5  A   Yes.
6  Q   Can you tell us what that is?
7  A   This is an e-mail that I sent to defense counsel on
8  November 17, 2006, giving the production requirements to
9  fix the IND/NDA.
10 Q   Okay.  And this is a document that is in evidence.
11 Can you just tick through the problems with the IND/NDA
12 production that you informed AstraZeneca about on
13 November 17, 2006?
14 A   Again, as much as I just told you, there was no OCR.
15 The files were not in searchable forms.  They were
16 provided as pure images.  They were multi-page TIFFs that
17 we needed single page.
18      I made aware of precisely the documents that
19 were tremendous, totaling 8 percent of the data size of
20 the entire production.  But that was just an example.
21 There were other documents that were nearly as large.
22      I talked about the Bates numbers stamped on the
23 documents, saying that by the name of the files, the
24 labels on the disk or the folders, nothing indicated the
25 Bates ranges.

Page 156

1      And I specified there was no load files telling us
2  any information about these documents.
3      And I gave them some suggestions as well in the
4  e-mail about concerns I had with the productions in
5  general and things that we needed to do to go forward,
6  saying we need to ensure the production will be in a
7  useful searchable format.
8  Q   Did you give AstraZeneca examples of the kind of
9  metadata we expected?
10 A   Yes.  I believe I gave them eight or nine different
11 examples of different types of metadata.  This was by no
12 means a comprehensive list.  This was a list specifically
13 for IND/NDA.
14 Q   Did you tell AstraZeneca that these were issues we
15 were going to have to resolve before there were more
16 productions?
17 A   Yes, I did.  I said, clearly we will need to sit down
18 and discuss each future production before any documents
19 are produced, and I gave them a list of subjects that
20 would be addressed in the future discussions.
21 Q   And the point was to get to a point where the
22 plaintiffs would receive reasonably usable documents?
23 A   Yes.
24 Q   Did you ask -- did AstraZeneca fix the problems you
25 identified on November 17, last year?

Page 157

1  A   To date, AstraZeneca has never addressed the problems
2  of IND/NDA.  My team attempted to resolve the majority of
3  these issues themselves.  We OCR'd the documents.  We
4  split apart the multipage TIFFs.  It took a hit on their
5  systems to do that, affected some internal processes
6  running.
7      We attempted to try and get Bates numbers out of the
8  documents, but there were a lot of inconsistencies.  For
9  example, you would have two documents in one directory
10 with the same name except the last one had the character A
11 after it, and sometimes the Bates number of the document
12 with the character A after it would be the earlier Bates
13 number, sometimes it would be the later Bates number.
14      So we couldn't find a consistent way of discovering
15 the Bates numbers.  Eventually we did the best job that we
16 could, even trying to extract some data from the file
17 paths as we could.
18      And we presented it to plaintiffs' counsel for
19 paralegal review, instructing paralegals that Bates
20 numbers cannot be relied upon, and in fact initiating a
21 couple projects to go through and re-Bate or try to
22 correct these Bates numbers.
23 Q   Now, these problems you identified in November of
24 2006 and told AstraZeneca about, did you ask them if they
25 would fix them?

Page 158

1   A   We did.
2   Q   What did they say?
3   A   They gave us a quote for, I believe it was close to
4   $26,000, that included three different components of how
5   to get the metadata out, how to OCR it, how to split it
6   apart into single-page TIFFs.
7   Q   And how long did they say it would take?
8   A   I don't remember the precise time, but it was
9   certainly -- I can't remember for sure, but I think it was
10  no fewer than six weeks.
11  Q   So your team did the best it could?
12  A   We did, because we were under tremendous pressure to
13  get these documents.
14  Q   How long did it take your team to turn the IND/NDA
15  into something that was remotely usable?
16  A   We did it on a semi-rolling basis, but it retook us
17  over the course of a month, and it took a few people
18  dedicated to the task.
19  Q   Did you talk to AstraZeneca during November and
20  December of 2006 about how we needed to get the documents
21  so that they would be reasonably searchable?
22  A   We didn't want to repeat the same problems with the
23  IND/NDA, so it was first and foremost in my mind to talk
24  about how we would receive any future productions such as
25  custodial productions.

Page 159

1   Q   And did you ask for documents to be produced in a
2   particular format?
3   A   The original discussions that we had was at the
4   original drafting, this is early versions of CMO2, as for
5   documents in native electronic format.  Rule 34 had just
6   been on the cusp, just brought about, and we really did
7   want to get all of the documents in native format.
8   Q   And eventually what did the plaintiffs compromise on?
9   A   There were strenuous objections from the defense
10  counsel about receiving a native format.  So we
11  compromised on something that we call near native.  We
12  wanted the documents in as close to native as possible.
13      So if we -- we were going to do a three-part
14  delivery.  We were going to receive printouts of the
15  documents, and TIFF images.  We would receive a load file
16  that would enable us to see where all the documents
17  belonged, including the metadata to the file.  And we gave
18  a very extensive list of metadata that was whittled down
19  in our negotiations.  And finally we asked for the
20  extracted text with -- originally it was going to be a
21  one-to-one correspondence.  Single page -- we said we
22  want -- for every page, we want image and we want a
23  corresponding text file.
24  Q   After CMO2 was negotiated -- let me back up a little
25  bit.

Page 160

1       During those negotiations, was it contemplated that
2   the plaintiffs would receive documents with page breaks so
3   the plaintiffs could actually search them?
4   A   Well, by implication, because I was insisting upon
5   getting a single -- for every single page, you would get
6   an image file and you would get a text file.  There was --
7   by that very definition, it has page breaks in it because
8   you would get a page of text for every page of image.
9   Q   Once CMO2 was negotiated and agreed on in December of
10  2006, did things go smoothly?
11  A   No.
12  Q   Turn your attention, if you would, to Exhibit 16.03,
13  which is in evidence.  Can you tell us what Exhibit 16.03
14  is, please?
15  A   Sure.  This is a string of e-mails.  I was a party to
16  most of these e-mails, not all of them.  The original
17  string started between Miss Kelber for the defense to Camp
18  Bailey for the plaintiffs, talking about the first set of
19  custodial documents for production and a sampling of it.
20  It was back on January 1, culminating with an e-mail from
21  Miss Kelber to myself and Camp Bailey on Thursday,
22  January 11.
23  Q   And in this e-mail string, did you make it clear to
24  AstraZeneca that we expected documents to be produced with
25  page breaks?

Page 161

1   A   We did once the e-mails that Tamar Kelber sent on
2   January 11th -- actually, this is -- that's my e-mail.
3   I'm sorry.  What my e-mail that I sent -- it was my e-mail
4   to her on January 11th -- was, "Hi, Tamar.  I just want
5   to know when we can expect the sample load file, extracted
6   text."  In parentheses I put, "with page breaks indicated,
7   and TIFFs, as we discussed in our last conversation."
8   Q   And did Mr. Camp Bailey also chime in and say,
9   "Please make sure that both samples are multipage
10  documents so we can also make sure the page break tags on
11  the load files will work"?
12  A   He did.
13  Q   What did Miss Kelber say to our side?
14  A   Her last e-mail, January 11th, in this string is,
15  "They are."
16  Q   Based on that e-mail string, did you assume and rely
17  on the fact that we were going to get page breaks in our
18  documents?
19  A   Yes.
20  Q   What happened after?
21  A   Well, it was a big time gap in that we got -- until
22  we got a grand sample of two documents.  I mean we're
23  talking millions of pages expecting from production.  We
24  got a sampling of two documents with a few pages.
25      I was able to analyze that sample.  There were a

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 162

1  number of problems with that sample, starting with there
2  was only two documents.  But it didn't conform to CMO2, in
3  what we had laid out as required fields.
4      I at that point also requested a much larger sample
5  of 100 document, because I said, again, in my mind, we did
6  not want any of the same problems from the IND/NDA.
7  That's why we so hardly fought for CMO2, the negotiation
8  there.
9  Q   Will you turn to Exhibit 16.04, please.
10 A   Yes.
11 Q   Can you tell us what that is?
12 A   This is a series of e-mails between me and mostly
13 Rodney Miller for the defendants, talking about issues in
14 the sample productions, going from Thursday, January 18th,
15 through Monday, January 29th.
16 Q   In that e-mail string, that e-mail exchange between
17 you and Mr. Miller, numerous others on both sides, did the
18 issue of page breaks come up?
19     I'll refer you, just for speed, ease of reference and
20 for speed, I think it comes up on the bottom of the second
21 page of the exhibit.
22 A   Yes.  On January 22, I believe.  From -- an e-mail
23 from Rodney Miller to myself.  He's copying a number of
24 people on the plaintiffs' and defense side.  Says in the
25 last sentence of the first paragraph, "Page breaks are

Page 163

1  delineated by a page break character."
2  Q   Based on that e-mail, did you assume we were going to
3  get documents with page breaks?
4  A   It really wasn't an assumption.  It was an
5  expectation at that point.  It was very clear.  The only
6  question was what that page break character was going to
7  be.
8  Q   During this exchange or review of the two samples,
9  did you identify a problem with the attachments?
10 A   Absolutely.  CMO2 had said that we needed attachment
11 information, and the load file.  Now, we left this not
12 explicit, figuring the technical details would be worked
13 out later, but in the sample set, their idea of attachment
14 information was number of attachments, which gave no
15 relationship between an e-mail and its attachment and no
16 association whatsoever.
17     When they seemed confused by this, I said that we
18 wanted to get started, and in my e-mail Friday,
19 January 26, I gave them again, and this is again for --
20 because I had called -- in addition to these e-mails,
21 there's a whole string of phone conversations with
22 Mr. Miller.
23     I gave them three separate different ways of
24 providing us attachment information that would satisfy us.
25 Q   So you weren't just firing out lists of problems, you

Page 164

1  were working to come up with solutions as well?
2  A   That's part of -- my position at the firm is not to
3  stand in obstruction of litigation.  My position is to
4  facilitate it.  The documents not coming in at that point
5  was a failure on my part, because I had to see if I could
6  find ways to help the defendant's counsel get documents
7  moving.
8      I didn't have any access at that point to any IT
9  personnel at the defendant's side or their vendor or
10 talking to anybody else.  I had to try and convey
11 information in a way that would be understandable by
12 defendant's counsel and understandable ultimately that
13 could be turned over to their vendor.
14 Q   Did you ask -- did you ever make a request to speak
15 directly to the vendor or the IT people?
16 A   Yes, I did.  I received an e-mail back -- in fact, I
17 made multiple, multiple requests, because a lot of these
18 issues were not necessarily issues that were difficult to
19 solve on the defendant's side.  What -- you know, for
20 example, the number of attachments, it's clear what we
21 needed.  There was just a disconnect.
22     When I continued addressing this with Miss Kelber,
23 she sent me an e-mail saying, there is no IT person who's
24 a counterpart on our side who can speak to you.  We can't
25 provide you with our vendor.

Page 165

1      And they provided an attorney, I believe Colleen
2  Kennedy, who had two conversations with us and was
3  supposed to start addressing these issues.
4  Q   After the two samples that you got and this e-mail
5  exchange about the problems with them, what happened after
6  that?
7  A   They sent a larger sample size of 100 documents.
8  They agreed in those samples, they talked about
9  attachments solution, talking about how they would
10 identify the attachments.
11     The solution sounded fine, but it was our expectation
12 at the time that the attachments would be hand in hand
13 with the same productions with the e-mail.  They would
14 just be maybe separated by a few records here or there.
15 Unless they were pulled for a redaction reason, and then
16 we would know that afterwards.
17 Q   When was the first custodial production?
18 A   To my recollection, we received the documents on
19 February 8th.
20 Q   Can you turn to Exhibit 16.02, please, Mr. Jaffe.
21 A   Yes.
22 Q   Can you tell us what that is, please?
23 A   This is a report I asked my team to draw up at the
24 request of plaintiffs' counsel, detailing the productions,
25 the dates of letters provided to us by defendants for each

Page 166

1  production.  Keep in mind we might have actually received
2  the production a day or two later.
3      The total document count for each production, the
4  total number of pages for a production, the document count
5  against the first eight custodians, so the total number of
6  documents in the production relating to those first eight
7  custodians, and the total number of pages relating to
8  those first eight custodians.
9  Q   The first entry on the chart shows a date of
10 February 6.  I think you said the first production was
11 February 8.  Could you explain that?
12 A   Yes.  The way that -- for convenience sake, we didn't
13 want to tell -- we needed some agreement to talk to the
14 defendants about productions and the dates, and it was
15 agreed upon that we would use the dates on a letter that
16 they provided to us.
17     Typically we received the production in my hands, it
18 would come in a day or two later.  Usually they would date
19 the letter and then send it by FedEx that night and we
20 would receive that production in the morning.
21 Q   So the date you used for Exhibit 16.02 is the date on
22 the letter transmitting the productions to you?
23 A   That's correct.
24 Q   Okay.  How many documents -- well, let me ask you
25 this first.  As of February 6th, before receiving the

Page 167

1  first production, did you believe you would receive
2  reasonably searchable documents from AstraZeneca?
3  A   CMO2 was hard for -- hard negotiated.  The purpose of
4  CMO2 was to receive reasonably usable documents.
5  Q   Did you believe you would receive the metadata
6  required by CMO2?
7  A   At that point I already knew I would not.  Mr. Miller
8  had already sent correspondence to the effect that we
9  would not receive the source location field.  There were a
10 couple of other fields that they had sort of changed
11 slightly through definition, but -- so it was not my
12 expectation to receive identically what we had requested
13 in CMO2.
14 Q   Was it your expectation that you would receive
15 sufficient metadata so that documents would be reasonably
16 and reliably searchable?
17 A   Yes.
18 Q   Was it your expectation we would receive documents
19 with page breaks?
20 A   Yes.  The expectation is we would get documents where
21 we could see this page break character that Rodney Miller
22 had talked -- spoke in e-mails about.
23 Q   That first production that came in shortly after
24 February 6th, did we get page breaks?
25 A   No.

Page 168

1  Q   Were there problems with the load files?
2  A   Well, in retrospect, the production with -- the first
3  production was actually fairly clean.  Problems with the
4  load files redeveloped later.  There were minor things,
5  but again, we're used to working around some minor
6  inconveniences and trying to facilitate getting them in.
7  Q   I'll turn your attention to Exhibit 16.04 -- 16.06,
8  excuse me.  Can you tell us what that is, please,
9  Mr. Jaffe?
10 A   This is a string of e-mails started on Tuesday,
11 February 13, ending on Wednesday, March 14, a month later,
12 between basically myself and Mr. Miller on the defendant's
13 side.  Defendant's counsel.
14 Q   Mr. Miller, he was from Sidley, as far as you know?
15 A   Yes, as far as I know.
16 Q   Okay.  And in this e-mail string, did you explain to
17 Mr. Miller what the problems were with that first
18 production?
19 A   Yes.  We received it on February 8th.  We started
20 loading it in.  By February 13 we were kind of befuddled, and
21 in fact I think it was probably a day or two earlier that
22 we noticed this.  We couldn't see any page breaks, and he
23 had said there would be a page break character, so I had
24 thought in reviewing the sample documents it appeared as
25 if there was a page break character they were using, was

Page 169

1  less than, less than.  I didn't know why they would choose
2  this character.  I didn't know how it would come about,
3  but it appeared that's what they were attempting to use.
4      Upon getting the actual custodial production, didn't
5  see this, and started looking through all these documents,
6  and we couldn't find page break characters.
7      I raised this to Rodney Miller's attention and he
8  says, in the e-mail again back on the same day, end of the
9  day, "After speaking with our vendor, page breaks are
10 provided only for those documents for which page breaks
11 were affirmatively inserted into the document by its
12 author."  He calls them explicit page breaks.
13     So what he says further down, their extracted files
14 do not contain these implicit page breaks or breaks
15 determined by printer page format.  So he was not
16 providing that.
17 Q   So that first production as a stand-alone production,
18 given what we could tell about the production in early
19 February, is it fair to say that other than the page break
20 issue, it wasn't too bad?
21 A   It wasn't terrible, other than the page break issue.
22 In fact, the problems that we had later with Bates numbers
23 and, you know, different delineators within fields like
24 custodian, they weren't present in that first production.
25 Q   And we were dealing with a small set of documents at

Page 170

1  this point?
2  A   Yes.
3  Q   Okay.  Your e-mail to Rodney Miller on February 13,
4  did you raise some other issues with him in addition to
5  the problem with the -- actually the missing page breaks?
6  Were there other problems?
7  A   I mentioned that there were minor inconveniences
8  remedied, I said easily remedied, because that's what my
9  team does.
10     I talked about that all the images and text files
11  were in a single folder, and there were a quarter million
12  plus images and tens of thousands of text files.  That was
13  a problem.
14     I said that the load files, and I was talking about
15  the LFP file specifically that helps you determine -- it
16  links the image to the text to the metadata.  That file
17  didn't contain a relative location or path to the major
18  text files.  So even though visually inspecting it you
19  would know where they were, I anticipated this would be a
20  bigger problem.
21     And I told him about that the image file ending Bates
22  in the load files, LFP files, were missing the leading
23  zero and they didn't match the text file names.
24     So again, these were all issues that we had to
25  rectify, and I didn't want to have them continually going

Page 171

1  forward.
2  Q   And so my take is, within the confines of this one
3  small limited production, those were issues, but you were
4  able to craft a workaround?
5  A   Yes, we were.
6  Q   And that you told the other side about these issues
7  so they could fix them going forward so they wouldn't
8  multiply?
9  A   Yes.  To say that we're crafting a workaround means
10  that we can't use our default ways of loading things in.
11  We have to write special programs.  And again, as my
12  position, I have the fortunate advantage of having a team
13  of developers who can write specialized software if
14  necessary.
15  Q   Is that what we had to do with load file -- with the
16  first production?
17  A   Yes.
18  Q   So I take it that first production is a good example
19  of you working to create solutions.  You're not just
20  throwing out lists of problems.
21  A   No.  We always suggest solutions because, again, we
22  want to get the productions up and into our system.  When
23  the attorneys come and say, why aren't these things in our
24  system, they're looking at me, they're not looking at the
25  defense counsel.  They're looking, we got something in,

Page 172

1  it's my job to make sure we get it in, and when we get the
2  next production, it's not a good excuse if you're
3  preparing for a deposition for me to say, well, I have to
4  massage the file a little bit to get it into our system.
5  Q   So you weren't just telling AstraZeneca what the
6  problems were and throwing it back in their face, you were
7  doing everything you could to make the system work?
8  A   I continued doing that.  I continued to give the
9  additional solutions even before they said their vendor
10  couldn't find other solutions.  With the text break issue,
11  the page break issue and extracted text files, I proposed
12  solutions to them.
13  Q   On what day did you first tell AstraZeneca there was
14  a solution for the page break problem?
15  A   Well, I notified them on February 13 about the
16  problem, received Rodney Miller's response after close of
17  business at 5:26 p.m. on February 13, and then the next
18  morning by 9:44 a.m., I had responded, this is Wednesday,
19  February 14th:  "Rodney, I do not know your current
20  process to generate the text files, but here's a
21  recommendation that would make putting in the text page
22  break trivial for all document types."
23     And then I gave him the solution, and I also told
24  him, "I spent this morning testing and confirming.  I did
25  that personally because I wanted to make sure it was

Page 173

1  correct," and saying, "But not only does it designate page
2  breaks, it will do so consistent with how the document is
3  printed, imaged to TIFF."
4     I even told him exactly how to do it, saying, "From
5  control panel add a printer, select the local non-plug and
6  play, select file port from the list of drivers, then
7  select the generic text drive for the first option on the
8  right.  Follow the wizard to its conclusion."
9  Q   What was the response from AstraZeneca?
10  A   The response came later that day about an hour later
11  that said, received both my e-mails.  "Appreciate your
12  recent efforts to come up with a solution.  We will
13  communicate your suggestion to our vendor and let you know
14  whether this fix will work, or if not, what we can do to
15  remedy this issue."
16  Q   Finally, did they let you know if they would do it?
17  A   A month later, March 14, they said -- this is from
18  Rodney Miller specifically.  Mr. Miller said, "We have
19  consulted with our vendor regarding your request for page
20  breaks.  As it stands, it's not feasible within the time
21  parameter established by the Court's order to comply with
22  your request."
23     And in between there were several communications back
24  and forth saying any update, any update, is there
25  something that we can do to help.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 174

1  Q   When was AstraZeneca's second document production?
2  A   I'll have to refer back to the exhibit.  The date of
3  the letter was March 15.  I believe the production
4  probably came in March 16.
5  Q   What was the size?
6  A   The size of that production was another 30,000
7  documents, 30,575.  It was larger than the first.  It was
8  325,000 pages.
9  Q   Did that production have the same problems as the
10 first production?
11 A   That production had the same problems as the first
12 production.
13 Q   So no page breaks, and then those two lesser issues
14 that you had asked AstraZeneca to fix?
15 A   Yes.
16 Q   Okay.  Were there any new problems?
17 A   It's difficult because there are so many productions
18 and they're all running together.  I don't remember the
19 exact production where more problems started developing,
20 partially because these problems sort of progressively got
21 worse over time.
22    I would say that the productions in March, we started
23 noticing potential problems once we started getting to
24 review them with potentially swapped fields.  I don't know
25 if that occurred in the production in March per se or the

Page 175

1  production in April, the first production.
2  Q   Okay.  Whether it was that production in March or the
3  first production in April, what were those new problems
4  that you detected following Production Number 1?
5  A   There were a number of new problems.  Inconsistency
6  in the Bates numbering field, inconsistency in the
7  delineation of multiples in a single field.  When you
8  specify multiple authors for an e-mail -- sorry, multiple,
9  let's say recipients for an e-mail or multiple CCs, it's
10 customary to do last name, comma, first name, semicolon,
11 last name, comma, first name and -- or they had chosen, I
12 think in the first production, to use what's known as a
13 pipe symbol or a vertical line, and then that started
14 alternating.  Sometimes it would be a pipe, sometimes it
15 would be a semicolon.  In certain other columns, it would
16 be commas.  It started becoming more difficult.  I think
17 we had slashes.
18    The ending Bates number, all of the sudden in one of
19 the productions, became AZSER space G and the number.
20    The load files continued not to match the location of
21 the text files or the images with the ending Bates being
22 incorrect in format.
23    Plus just a whole host of the other minor -- I call
24 them minor, but they all add up to a tremendous number of
25 different problems, like swapped fields.  It's a minor

Page 176

1  correction, but if the fields start changing places on us
2  and the headings start changing places, then we actually
3  loaded up the wrong data in the wrong field, and we didn't
4  know that.  We didn't see it.  We have a lot of
5  different -- a lot of different load files that we're
6  trying to process with these productions.  We assume -- we
7  checked one or two, and they would vary in the exact same
8  production.
9     We also had issues -- so that was actually a major
10 issue, because it represented that you couldn't search
11 through the documents effectively.
12    We also had a number of other issues -- I'm just
13 trying to recollect all of them -- that were more
14 significant.
15 Q   So I take it, it was somewhere late March, early
16 April where you were starting to see these issues that are
17 new and bigger and more comprehensive than just the page
18 breaks and the more minor issues from the first production
19 in February?
20 A   Oh, yes.  There was a -- a big issue, actually, was
21 after I had said, well, don't just dump them all in one
22 folder and, you know, 250,000 images in one folder is just
23 not very manageable.  When you try to load the data, it
24 takes a much longer time to do it.  It takes much longer
25 to copy.  There are multiple technical reasons why.

Page 177

1  They started putting them in folders by custodian, so
2  they would have a folder for Lisa Boornazian, and they'd
3  have a folder for a Don Bemish, and they'd have a folder
4  for Kim Bush.
5     And it started getting very confusing to us because
6  we would see documents in Lisa Boornazian's folder -- I
7  remember people on my team coming up to me saying, "Well,
8  Lisa Boornazian doesn't seem to be in the source field.
9  What do we do with this?  Is she the custodian?  Is she
10 not the custodian?"
11    And we said, well, it look likes defendants are
12 saying that she must be a custodian because it's in this
13 folder that we're receiving.
14    And we also got something that was strange to us
15 because we expected these productions would be complete
16 for the first eight custodians on production 1.  That was
17 my understanding.  By production 2, I don't remember if it
18 contained explicitly folders for those eight custodians,
19 but then we started getting more productions for those
20 first eight, and that threw us tremendously off because we
21 didn't expect it.  The idea was, there was only a few more
22 documents for those first eight.  And that just threw our
23 systems off because we had set them up to be complete.
24 Q   By the way, have you ever received in all the
25 litigations you have been involved with TIFF files and

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 178

1  TIFF production without page breaks?
2  A   Without -- we have always received TIFF images with
3  text that you could search and you can match back to a
4  specific TIFF image.
5  Q   Now, so we're in early April, we have some more
6  productions.  You have identified new and additional and
7  more serious problems than in production number 1.
8  Continuing to get no page breaks.  What did you do?
9      And excuse me.  You have AstraZeneca saying, no,
10 we're not going to give you page breaks, we're not going
11 to try your solution.  What did you do?
12 A   Well, at that point I couldn't go back to defendant's
13 counsel.  I went to plaintiffs' counsel.  I sat in
14 meetings with Mike Pederson from my firm.  We went and
15 discussed things with Paul Pennock and other plaintiff
16 attorneys on the phone.
17     It was decided that a lot of these issues would start
18 being brought up at the hearings, which I listened into,
19 and was ready -- told I might have to actually testify
20 about those hearings.
21 Q   Can you turn to Exhibit 17.04, please.
22     Can you tell us what it is?
23 A   This is 16.17?
24 Q   17.04.
25 A   Oh, I'm sorry.  This is a letter to Mr. Freebery from

Page 179

1  plaintiffs' counsel documenting different problems that we
2  have with custodial production.
3  Q   Who sent this letter?
4  A   This letter was sent by Michael Pederson, but I
5  actually helped draft it, helped edit it, and with him --
6  obviously he needed my help on the technical issues.
7  Q   And in that letter, did you tell AstraZeneca's
8  lawyers about the problems you were identifying in the
9  custodial productions?
10 A   Oh, yes.  We have a number of different issues
11 addressed by the letter.  We talked about the lack of page
12 breaks in documents.  We reiterated the possible solution
13 for those page breaks.  We told why this was a serious
14 issue.
15     We talked about that -- actually this was something
16 that we brought up and then Mr. Miller confirmed, that in
17 trying to convert Excel spreadsheets to TIFF, there was an
18 issue with -- for custodial production, I believe it's 1,
19 the copies will have that, for a Kevin Hammel, that
20 Mr. Miller had said, in converting these Excel
21 spreadsheets to TIFF, the resulting images do not fully
22 recreate the native formatting for these documents.  That
23 was a problem.
24     Then we were talking about -- what we were trying to
25 get out with this lump sum is the problem that we couldn't

Page 180

1  identify the custodian of the document.  In AstraZeneca's
2  letters they always said, these are the documents for this
3  custodian.  Here's the start Bates range, here's the
4  ending Bates range.  Then they put those documents in a
5  folder on a disk that was presented to us, produced as
6  part of production, so it could be, here's Lisa
7  Boornazian's folder, here's Lisa Boornazian's beginning
8  Bates and ending Bates, and it was becoming very confusing
9  to us because we said, but what's this source field doing
10 here?  We thought maybe that is the custodian, but now
11 you're telling us it's not, in your letters.  So we didn't
12 know who the custodian was.
13     We were slowly starting to realize that at that point,
14 wait a second, maybe this actually belongs to two people.
15 We didn't know if we got any duplicates or we weren't
16 getting duplicates or how they were dealing with the
17 de-duplication issue.
18 Q   Did they eventually confirm that source field was
19 what we should rely on as who the custodians are for the
20 documents?
21 A   In the May 30th meet and confer, it was again raised
22 as an issue.  It had been raised.  And they said ignore
23 any folders.  The source field, it would be -- that is the
24 custodian field.
25     They also told us that due to some issues at the

Page 181

1  vendor, the source field may -- because I pointed out a
2  number of individuals who weren't custodians who were in
3  the source field.  That was confusing us, because we said
4  how are these people present in this source field?
5      They said, well, there may be people in the source
6  field who are not custodians, but all the custodians
7  should be in the source field.
8  Q   Now, back to Exhibit 17.04.  You were explaining the
9  problems to AstraZeneca.  Did they agree to fix the
10 problems?
11 A   Eventually they agreed to address these issues.
12 Q   Well, let me turn your attention to Exhibit 17.07.
13 A   Yes.  This is --
14 Q   Just what is Exhibit 17.07?
15 A   This is an e-mail dated April 30 from Jim Freebery to
16 Mr. Pederson.
17 Q   Did Mr. Pederson share this letter with you around
18 April 30?
19 A   I received a copy as soon as he received it.  I may
20 have even received it earlier than he received it.
21 Q   And in this letter, did AstraZeneca agree to provide
22 the plaintiffs with page breaks?
23 A   No.  They said --
24 Q   Eventually, eventually did AstraZeneca agree to
25 provide the plaintiffs with page breaks?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 182

1  A   Yes.  At May 30th.
2  Q   When was that?
3  A   May 30th.
4  Q   And that was after the May 22nd hearing?
5  A   May 30th.
6  Q   Okay.  And what method did AstraZeneca employ to
7  give -- what method did they agree to employ to provide
8  the plaintiffs with page breaks?
9  A   They actually employed the method that I had
10  recommended on February -- was it 13 or 14, I believe.
11  Q   Mid February?
12  A   Mid February.
13  Q   On April 30, did AstraZeneca agree to provide
14  corrected load files?
15  A   No.
16  Q   Did they agree to provide corrected metadata?
17  A   No.
18  Q   Now, these flaws in AstraZeneca's production that had
19  come through as of April 30, the lack of page breaks,
20  these field issues you just described for us, the metadata
21  problems, in real-world terms, what did those problems add
22  up to in terms of the plaintiffs' lawyers having a
23  reasonably searchable set of data?
24  A   Well, they made the documents as provided
25  unsearchable in part because there was no identification

Page 183

1  of the problems.  We would raise a problem as we came
2  across it, but honestly, my team's function is to get the
3  data into the litigation support software, in this case
4  our proprietary system, but for others it would be
5  Concordance or Summation, and make sure that it's all
6  loaded in, it's all prepared and somebody can -- the
7  fields are all there.
8       Certain of these problems didn't -- some of them
9  affected the loading, some them didn't.  All of them
10  affected the searchability and made it impossible to get a
11  particular custodian's file with any reliability.
12  Q   And the searches that would have been conducted back
13  in the April-May timeframe, would they have been reliable?
14  A   No.  We knew -- we tried to advise people -- there
15  was a lot of workarounds with the searches going on.  It
16  was a heavy burden on my staff, because they had to try
17  and find ways of, very creative ways to try and determine,
18  well, are we missing something in here or there.
19  Q   After -- with the productions that AstraZeneca made
20  on May 1 through June 25, did the problems that you had
21  been squawking about, did they get better, or did they get
22  worse, or did they stay about the same?
23  A   There was a progression of problems.  Every single
24  day we'd find something new.  Just on Monday coming down
25  here, the thing I found, which was unbelievable, was we

Page 184

1  had a page that was -- I was shown two documents, two
2  separate documents by a member of my team who showed it to
3  men, and they had the same Bates number.  How did that
4  happen?
5       And the problem was, the problems not only get worse
6  but they got -- even the inconsistencies were
7  inconsistent.  If, you know, in production 3 they start
8  putting hyphens in Bates numbers, well, in production 4
9  they took out one and put a space instead.  So there was
10  no way to keep up.
11       And even internally in a given production, different
12  custodians' load files would vary.
13  Q   Were you involved in negotiations with AstraZeneca
14  after the May 22nd hearing and before the joint statement
15  that was filed with the Court on June 7?
16  A   Yes, I was involved.  I was participating in the meet
17  and confer on May 30th.
18  Q   Is it fair to say that during that period you and the
19  plaintiffs' team made known to the defendants all the
20  problems we were having with their production?  That we
21  knew about as of that time?
22  A   We made them aware of the problems that we knew
23  about.  As I said, the problems are continuing to crop up
24  that obviously we did not know about.  As we take much
25  closer looks at the data, we start -- you know, instead of

Page 185

1  trying to get the data into the litigation support system,
2  we transfer it into sort of a forensics team to try and
3  determine problems with the data.  We're discovering more.
4  Q   After May 30, how many documents did the -- how many
5  pages of documents did AstraZeneca produce?
6  A   I'd have to reference an exhibit.
7  Q   Go ahead.  16.02.
8  A   Very roughly, 3.7, 3.8 million pages.
9  Q   Did those productions after May 30, after months of
10  telling AstraZeneca what was wrong with their productions,
11  did those productions start to improve?
12  A   There were some improvements in those productions.
13  But we still didn't have page breaks in the extracted text
14  files.  We still didn't have a clear mapping to the
15  extracted text.
16       Let me correct one thing.  There was a very small
17  subset of those documents that were foreign language
18  documents that I believe -- I didn't check all of them,
19  they're foreign language, a little bit tougher to check --
20  I believe they were maintained by defense counsel that
21  they include page breaks.  Those weren't the documents we
22  were reviewing at the time, and very small of this
23  3.7 million.
24  Q   In those June productions, 3.75 million pages, were
25  there new problems?

Page 186

1   A   Yes.
2   Q   What were the new problems?
3   A   Some of the new problems we discovered was that the
4   source field, which we had been told was the sole way or
5   the authority on the custodian no longer appeared to be
6   the authority on the custodian. Not only did it contain
7   additional people who are not custodians or not part of
8   the list of 80 custodians, now the source field appeared
9   to be missing custodians.
10      We came upon a lot of these documents just by chance,
11  and some of them came up as late as IP-16.
12  Q   Did you run a test to kind of see if a certain
13  custodian was simply missing documents?
14  A   I did a very, very partial test on one particular
15  scenario with Michael Murray.
16  Q   I'll refer you to Exhibit 16.17. Can you tell us
17  what that is?
18  A   Sure. This is a list of documents, they're probably
19  e-mails, and I assume they're e-mails because of the "to"
20  and "from," where Michael Murray was the author but not
21  designated a custodian.
22      There are over 1,000 documents where Mike Murray was
23  the author or one of the CCs or one of the recipients, and
24  actually, to be very exact with this, this is not a
25  complete list. This is a partial list, because I only

Page 187

1   searched for if he was the sole recipient, if he was the
2   sole person copied. I would assume this is a much, much
3   larger list. Just that I didn't want to bring the whole
4   server down going to searches.
5       It's a fairly involved query, as you can see. I have
6   the query right here. I wrote that query.
7   Q   So Exhibit 16.17 tells us that more than 1,000
8   Michael Murray e-mails are not in Michael Murray's
9   custodial file as that term is defined by AstraZeneca?
10  A   I would not be shocked if it were many multiples of
11  that amount. Again, I just read -- this is a pretty basic
12  search, just to illustrate this point.
13  Q   So does that mean if I asked you or if Mr. Pennock or
14  if Mr. Allen asked you, Mr. Jaffe, give me the Murray
15  custodial file, those thousand or more e-mails would not
16  be in it?
17  A   They definitely would not be in it.
18  Q   Based on all your work with this file, how could it
19  be that those e-mails aren't in the Murray custodian file?
20  A   Well, it's a bit of speculation, but it's -- if you
21  notice, it's Michael Murray, or it's Michael, comma,
22  Murray F., open paren, Seroquel, closed paren.
23      Based upon some research that I did, it turns out
24  that in AstraZeneca, people have multiple mailboxes.
25  That's typical. I have multiple mailboxes. I probably

Page 188

1   have 13 mailboxes. Some of them -- for example, my
2   BlackBerry has an e-mail address. I don't really want to
3   give it out here because people will e-mail me, but it
4   starts with BB. You know, you wouldn't know it was me
5   unless you interview me and I say, yeah, that's part of my
6   e-mail. And I have many of them. I segregate e-mail out.
7       This is a special e-mail box that he set up for his
8   Seroquel e-mail or some administrator set up for his
9   Seroquel e-mail. It's not the only instance that we
10  found. So there's Susan Force, she's a custodian. Mark
11  Jones.
12  Q   But it's the Murray Seroquel e-mails that aren't in
13  the Murray custodial file?
14  A   I don't know if he was talking about walking his dog
15  in the Seroquel box, but these are -- ostensibly why would
16  you put e-mails in a separate in-box entitled Seroquel?
17      And, you know, for example, other custodians had
18  upwards of nine different types of e-mail boxes. There is
19  no reason to believe he doesn't have more e-mail boxes
20  here.
21  Q   And this was one test you ran. These results could
22  be magnified across all or most of the custodians?
23  A   Well, it's --
24  Q   We just don't know?
25  A   It's almost a given that they are, because usually

Page 189

1   when you find one problem, it's indicative. I mean, these
2   are computers. They do the same things over and over
3   again. So if it was excluded in some way, it was excluded
4   in other ways or in other custodians. I would just feel
5   that's naturally an extension.
6   Q   Can you turn to Exhibit 16.16, please.
7   A   Yes.
8   Q   What is it?
9   A   This is a series of e-mails between Mr. Yaeger for
10  the defense, and myself, starting with July 19, 2007,
11  going through Friday morning, July 20.
12  Q   I'm sorry. I think I misspoke. 16.16.
13  A   I'm sorry. This is the metadata from the e-mail
14  that's an e-mail from Michael Murray and the associated
15  attachment.
16  Q   What does this show us concerning problems with
17  AstraZeneca's production, particularly the late
18  production, the June production?
19  A   Well, clearly this e-mail, which is the first set of
20  metadata AstraZeneca has designated that the -- at the
21  meet and confer May 30th, they said rely upon the source
22  field.
23      If you look at the source field, you don't see
24  Michael Murray. You do see him under author. Note that
25  as was previously mentioned, source location is always

Page 190

1  blank here.
2      If you look at that attachment, Mike Murray is part
3  of the attachment, so -- sources.  He would appear -- if I
4  gave you his custodial file, you would get his document
5  from production number 8 and not his e-mail from
6  production number 16, if I believe they are -- you know,
7  also the issue is they're not right next to another or
8  even close.  They're five million Bates numbers apart.
9  Q   According to the chart, production 8 came in on
10  April 27, and production 16 came in on June 25.  Is that
11  right?
12  A   Production 8, looking back at Exhibit -- production 8
13  came in around April 27, if I'm reading this properly.
14  Probably a day or two afterwards.  And production 16 on or
15  about June 25.
16  Q   Now, when you were negotiating CMO2 and involved with
17  discussions about production, did it ever dawn on you that
18  we would be getting e-mails and the attachment to the
19  e-mail two months apart and 500,000 or five million pages
20  apart?
21  A   I believe it's five million.
22     No, it did not.  In fact, when I talked about the
23  attachment solutions with Mr. Miller, I mentioned that the
24  attachment should follow.  It was fine if he provided the
25  e-mail and then the attachments right after the e-mail.

Page 191

1      But certainly this custodian's production was
2  certified complete, to my understanding.  I certainly
3  didn't expect to get more e-mails from him.
4  Q   Now, take a look at the control numbers for the two
5  documents.  Are those consecutive?
6  A   Yes, they are.
7  Q   Does that mean they actually were together at one
8  time and when we got them they were five million apart?
9  A   It's my understanding in the defendant's system, if
10  they looked at these two, they would be consecutive
11  numbers, since they would go by their control number.
12      MR. GORNICK:  May I approach the witness, Your
13  Honor?
14      THE COURT:  What have you got?
15      MR. GORNICK:  I have an exhibit which the
16  defense counsel has stipulated to the admission of.
17      THE COURT:  All right.
18      MR. GORNICK:  Exhibit 102.
19      MR. MCCONNELL:  Just for clarification, for the
20  record, it was a document that had previously been
21  slip-sheeted with a confidential designation, and for the
22  purpose of this hearing we have no objection to its
23  admissibility.
24      THE COURT:  All right.
25  BY MR. GORNICK:

Page 192

1  Q   Mr. Jaffe, I've handed you Exhibit No. 102.  Is this
2  the actual e-mail that corresponds with the metadata shown
3  on Exhibit 16.16?
4  A   I believe it is.  It's a little tough to read the
5  Bates number at the bottom, but it seems to correspond.
6  Q   Okay.  And it's from Murray, comma, Michael F.
7  Seroquel?
8  A   That's correct.
9  Q   And that's the e-mail that he's not a custodian of?
10  A   That is the e-mail he is not a custodian of.
11  Q   And it's an example of the more than 1,000 e-mails to
12  or from that mailbox that didn't make it into Mr. Murray's
13  custodial file?
14  A   That's correct.
15  Q   Now, all these problems with missing page breaks and
16  metadata and swapped fields and date inconsistencies and
17  prevent us from doing reasonable searches of any kind,
18  have they been fixed?
19  A   Not currently.
20  Q   Did AstraZeneca deliver what purports to be a fix to
21  you recently?
22  A   After close of business, after 6:00 p.m. on Friday,
23  last Friday, by courier, we received four hard drives with
24  purported fixes to a series of issues.
25  Q   Now, before we get into that issue, as of July 20,

Page 193

1  the close of business, 5:00 p.m., any of the searches
2  that's we have run on the AstraZeneca data, are those
3  reliable searchings?
4  A   Not only are the searches not reliable, but your
5  review of the documents themselves are not necessarily
6  reliable.
7  Q   And even if I, for example, was to take the entire
8  custodial file and just do it the old-fashioned way, I
9  wouldn't even know if I had the whole file?
10  A   That's correct.
11  Q   Now, what is it about the solution that was delivered
12  on Friday night, why don't we know if it works?
13  A   We're unable to load the solution in without altering
14  it and removing and changing characters during these load
15  files.
16  Q   I'd like to change topics to missing data.  I'll just
17  do this quickly.
18      Do you have any evidence -- do you think we have
19  received any voice mail files?
20  A   I have no evidence of receiving any voice mail files.
21  Q   How about fax attachments?
22  A   There are two pages that I know of that are fax
23  attachments in the entirety of the production.  No
24  evidence of any other fax attachments.  In fact, I did a
25  search to look at types of documents by category, pages

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 194

1  that we had that were TIFF, categorized as TIFF pages that
2  would associate with a fax attachment or other image
3  files.  Those counts were pretty low.  Didn't see that
4  that would be substantial, even if there were a few here
5  or there.
6  Q   How about video files?  Did we get any of those?
7  A   We did not get any video files.
8  Q   Were you in the courtroom earlier today when the
9  defendants purported to show or showed an exhibit that
10 purported to mean that we had received word track change
11 documents?
12 A   Yes, I was.
13     MR. GORNICK:  Your Honor, may I approach the
14 witness to hand him Exhibit 66?
15     THE COURT:  Yes.
16 BY MR. GORNICK:
17 Q   Mr. Jaffe, I understand you have a copy of
18 Exhibit 66.  Will you pull that out and take a look at it?
19 A   Yes.
20 Q   Is there a Bates number on that document?
21 A   There is no Bates number on this document.
22 Q   What's on that document?
23 A   It says, document space ID 2416160.
24 Q   Did AstraZeneca produce documents to us identified
25 like that?

Page 195

1  A   No.  Every document that I have seen from AstraZeneca
2  is similar to the exhibit you just handed to me with the
3  Bates number at the bottom.
4  Q   As we sit here today, do we even know if we ever got
5  that document?
6  A   As far as I know, I do not know whether we got this
7  document.  I instructed a couple of people at my office to
8  see if they could find the document.  They were not able
9  to pull it up readily available, because they don't know
10 how to find this particular document.
11 Q   And as we sit here today, we don't know if that's a
12 copy, hard-copy document?
13 A   No.  I don't know that that's not a hard-copy
14 document.
15 Q   I'd like to turn you now to a new subject, the
16 keyword search subject.  Do you have that in mind?
17 A   Yes.
18 Q   Have you been involved in scores, maybe hundreds of
19 conferences, phone calls and e-mail and letter
20 correspondences with AstraZeneca related to electronic
21 discovery in this case?
22 A   Since November 15, there have probably -- I could
23 count on one hand the ones that I haven't been involved
24 in.
25 Q   Is it scores?  I mean how many?  Just some rough

Page 196

1  estimate of how many communications, whether on the phone,
2  in person, by e-mail or letter.
3  A   Oh, it's a lot of different communications.  I know
4  I -- it was probably, you know, upwards of hundreds,
5  maybe.
6  Q   In all those conferences between mid November and
7  May 1, did anyone from AstraZeneca ever mention in any
8  way, orally or in writing, in your presence, have you
9  heard about anything that they were using a keyword search
10 to sift the documents?
11 A   No.  They did the opposite.
12 Q   Hold on.  What do you mean they did the opposite?
13 A   Well, I was a participant in many of the earlier
14 conferences.  They dealt with custodial productions
15 before custodial productions.  I wasn't involved in this,
16 but it was my understanding that plaintiffs' counsel had
17 submitted a list of discovery searches that they wanted
18 defendants to do on certain words, and it wasn't going to
19 be custodial -- there was a big question as to whether we
20 do a custodial production or we do a search production.
21     And on several calls that I remember, pretty clearly,
22 Miss Kelber from Sidley Austin was adamant about how the
23 defendants would not consent to keyword productions as
24 being rigorous, very difficult, and I can't quote exactly,
25 but something to the effect of, well, we have all the

Page 197

1  custodial documents.  We've been collecting the documents
2  for these custodians.  We have been collecting them for,
3  you know, a very long time, over a year, and we will just
4  give them to you, and we will give you all of the
5  documents for that custodian, and that's my understanding
6  of the production.
7  Q   They led us to believe we would get all documents
8  without a keyword sift?
9      MR. MCCONNELL:  Objection.  Leading.
10 BY MR. GORNICK:
11 Q   Or sort.  Is that right?
12     THE COURT:  Overruled.
13     THE WITNESS:  Yeah.  When I heard of the keyword
14 list, and I believe it was May, I was a bit shocked.  I
15 said how did they do a keyword search?  We were just going
16 to get everything.
17     So, you know, I imagined they would go through the
18 documents and look for relevant stuff and just give it to
19 us.
20 BY MR. GORNICK:
21 Q   Last subject.  Databases.  Were you involved in
22 discussions with the defendants about database production
23 in late May and early June?
24 A   Yes.  Even beforehand, going back to CMO2, I was
25 involved in discussions about databases and their

Page 198

1    production. The drafting of CMO2, we clearly anticipated
2    databases in their production, and, you know, for me as an
3    IT professional, the databases are a little bit more
4    interesting than the document production, which normally
5    is very dry. The databases are a little bit more
6    exciting, as to how we get the data out, what are we
7    looking for, how do we get it into our system. The scope
8    is a little bit larger. That's what I specialize in,
9    databases.
10   Q    And in negotiating CMO2, was the idea we would at
11   some point, after a certain number of fact sheets were
12   out, we would negotiate with AstraZeneca on production of
13   the databases without going through the formal request for
14   production exercise?
15   A    No. It was not contemplated in my mind at that
16   point. The database discussion was pretty much perceived
17   at that point going forward. So we were going to, you
18   know, start to receive custodial productions, but at the
19   same time start talking about databases.
20   Q    I think I misspoke. My question was, was it
21   contemplated that AstraZeneca would produce databases to
22   us without us having to go through the requests for
23   production exercise?
24   A    It was spoken about, and the idea was to keep it
25   generally an informal process.

Page 199

1    Q    And then in May -- late May, early June, were you in
2    discussions with AstraZeneca about production of
3    databases?
4    A    Yes, I was.
5    Q    What was the tenor of those? Had it changed, that we
6    were going to have to propound discovery, or in May, early
7    June, was AstraZeneca still talking about working
8    informally to propound databases?
9    A    Well, I can't speak about the legal things that may
10   have been going on that I wasn't aware of, but I was
11   engaged in informal discussions about trying to get the
12   databases, trying to decide how to provide these
13   databases.
14   Q    Would you turn to Exhibit 16.19, please.
15   A    Yes.
16   Q    Can you tell us what that is, please?
17   A    This is a couple of e-mails between myself,
18   Mr. Freebery, and Mr. Pederson, talking about meet and
19   confers with database collection and production and, you
20   know, did -- Mr. Freebery asking for a list of key
21   databases and the types or fields of information within
22   each database we would like to receive.
23   Q    Okay. Can you turn to Exhibit 16.20, please?
24   A    Yes.
25   Q    The first e-mail in the string at the bottom of the

Page 200

1    page, what is that?
2    A    This is an e-mail from Mr. Dupre to myself, to
3    Mr. Pederson. It's dated Tuesday, June 12. It says,
4    "Mike and Jonathan, we would like to work cooperatively
5    with plaintiffs on the production of relevant databases."
6    Q    We would like to work cooperatively?
7    A    Yes.
8    Q    With plaintiffs.
9         16.22, please.
10   A    Yes.
11   Q    Can you tell us what that is?
12   A    This is an e-mail from Mr. Dupre -- actually, it
13   looks like a series of e-mails, two e-mails, between
14   Mr. Dupre, Mr. Pederson. I'm copied on all of this. And
15   the e-mails --
16   Q    Would you read the very first two sentences of the
17   document at the top of the first page of the exhibit,
18   please?
19   A    "Good morning, Michael. Thank you for providing this
20   list. My goal today is to collect sufficient information
21   from plaintiffs to begin the database production process.
22   I see the process occurring similar to other large former
23   litigation along the following lines."
24   Q    Okay. And as part of this meet and confer between
25   the parties in June, did AstraZeneca ask the plaintiffs to

Page 201

1    prioritize the databases?
2    A    Yes, but they were pressuring us for a very, very
3    small list of databases, which I had conducted IT
4    interviews with AstraZeneca back in, I believe it was
5    January, and it was clear that AstraZeneca as a large
6    organization had many different departments, many
7    different IT organizations, many different consulting
8    groups, all of which are in charge of a given database.
9         So in my mind, my philosophy, well, each of those
10   groups are running as independents, they can independently
11   look at databases, and there's no reason to say, well,
12   only one group can work at a time, or how to prioritize
13   it. It could be done as a simultaneous endeavor.
14   Q    Nevertheless, AstraZeneca did ask the plaintiffs to
15   prioritize?
16   A    They did.
17   Q    And on June 20th, did the plaintiff send AstraZeneca
18   a chart and said, fill out this chart with information so
19   we can prioritize?
20   A    Yes. Because we had no information about these
21   databases that was significant. We didn't know their
22   relative sizes. So we didn't know what we could get. We
23   didn't know how much Seroquel information was in them.
24        We had information from depositions, but the
25   depositions, and the IT interviews, I interviewed

Page 202

1  personally the two people who were deposed by Mr. Smith,
2  John Dowling and John Draper.  They were very fuzzy about
3  dates on things.  They weren't clear.  They weren't
4  responsible for these databases.  They didn't -- they
5  thought, well, maybe it's this person responsible for it
6  or that person, or maybe this unit uses it or that unit.
7  We asked them for specifics.
8  Q   That's why we asked them for specifics on June 20th?
9  A   Absolutely.  Because without the specifics, how could
10  we prioritize?
11  Q   Were you personally on a phone call with AstraZeneca
12  on June 27 concerning this issue?
13  A   Yes, I was.
14  Q   And did they refuse to provide the information?
15  A   I was extremely disappointed.  There was a lot of
16  pressure to get this out and done.  Certainly we didn't
17  want to have to get the Court's involvement in any of
18  this.
19       And they -- we had provided them, I think it was
20  59 different databases that they were to get very basic
21  information and fill out -- we said, fill out what you
22  have.  Just give us -- fill out part of this.  We'll get
23  it started.  We'll get the ball rolling.  We'll look at
24  what you have on hand, what you could fill out today.
25  They gave us nothing back, and --

Page 203

1  Q   They refused to do it on June 27; is that right?
2  A   That's correct.  They gave us a spreadsheet that was
3  blank and they said, well, this is it.  This is what we
4  can do.
5  Q   And on that phone call, what did Mr. Pennock say to
6  them?
7  A   I can't quote it as well as he would do it, but
8  something like, we have discussed this a long time.  We
9  have been patient.  We have met and conferred.  You know,
10  we're not moving forward on this.  That's what courts are
11  for, and courthouses are for.
12  Q   What happened late in the day on July 2nd?
13  A   I believe we got a partially filled out list of
14  databases.
15  Q   And since that time, any database production from
16  AstraZeneca?
17  A   No.  And that list was -- even the parts that were
18  filled out, in my mind, were not filled out well.  They
19  were not clear answers on that.
20  Q   Thank you, Mr. Jaffe.
21       MR. GORNICK:  That's all I have.
22       THE COURT:  Cross-examination.
23            CROSS-EXAMINATION
24  BY MR. FREEBERY:
25  Q   Good afternoon, Jonathan.

Page 204

1  A   Good afternoon.
2  Q   How's the baby?
3  A   Doing well.
4  Q   What school did you attend?
5  A   Columbia University.
6  Q   And what year did you graduate?
7  A   1999.
8  Q   What was your degree?
9  A   It was in economics and mathematics.
10  Q   Any postgraduate work?
11  A   I didn't do any postgraduate work.
12  Q   I'm sorry?
13  A   I did not do any postgraduate work.
14  Q   You are not a lawyer, correct?
15  A   I do not have a JD.
16  Q   You do or you don't?
17  A   I do not.
18  Q   You stated on direct and in your declaration that you
19  began IT work in 1995.  Correct?
20  A   That's correct.  I was working -- what I did was, you
21  know, I started the last year of high school at what -- it
22  was actually a good deal for me.  I actually, I worked
23  three days.  I worked -- technically it was full-time
24  because it was over 20 hours per week, which is the
25  definition of full-time.

Page 205

1       I worked at Ballenor, Incorporated.  It's a Microsoft
2  Solution Partner provider.  I was a -- first a developer,
3  and then I helped lead teams of developers there.  It was
4  a consultant.  It was one of the only Microsoft consultant
5  shops in the city, in New York City.
6       And it afforded me the opportunity -- Columbia was
7  nice.  I got my classes squeezed into two days.  I still
8  did well.  I still, you know, graduated magna cum laude.
9       And I was being billed out.  I would work late, you
10  know, so I would make up hours that way.  And I would work
11  on projects for, you know, really big corporations, such
12  as AIGAIU, a Fortune 20 company.  And I was being billed
13  at rates between $165 an hour and anywhere up to $300 an
14  hour.
15  Q   Did you work anywhere else other than Ballenor
16  Company between '95 and '02, when you started at Weitz &
17  Luxenberg?
18  A   Yes.  I worked for Winstar.  Winstar was a telephone
19  company.  I worked for them for a year, and then they went
20  bust, unfortunately, like -- they were a dot-com telco, so
21  you could see how that ended up.
22  Q   Did you work -- do any work for any pharmaceutical
23  companies?
24  A   You know, I worked for a lot of different
25  consultants, but I did not do any work -- a lot of

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 206

1  different firms, but I did not do work for pharmaceutical
2  companies.
3      I did work for -- not directly at least. Some of
4  these companies were huge conglomerates and I don't know,
5  they may have owned a pharmaceutical company that I'm not
6  aware of.
7  Q   Now, you began working at Weitz & Luxenberg in 2002,
8  correct?
9  A   That's correct.
10  Q   And you've been there five years now?
11  A   I have been there five years.
12  Q   You work with Paul Pennock and Mike Pederson?
13  A   Well, just on this particular project. You know, the
14  number of litigations at Weitz & Luxenberg is
15  considerable. So this is just one of the many.
16  Q   But both Mr. Pennock and Mr. Pederson are partners at
17  Weitz & Luxenberg?
18  A   No. Only Mr. Weitz and Mr. Luxenberg, and they're
19  called founding members if you look at the website.
20  Technically it's a personal corporation, so I guess they
21  would be called shareholders, in a sense.
22      They're -- Rob Gordon, he's also a shareholder.
23  Q   I appreciate all this information, but all I was
24  asking is whether or not they were partners.
25  A   They are not partners.

Page 207

1      THE COURT: It's a misleading question if it's
2  not a partnership. Come on, let's move on. Let's get to
3  something relevant here.
4  BY MR. FREEBERY:
5  Q   Have you ever testified as an expert on IT issues in
6  the past?
7  A   I have never testified as an IT expert. I have never
8  testified on any issue.
9  Q   And you're not testifying as an expert today. It's
10  simply as a lay witness, correct?
11  A   Well, it depends on how you're using that term. I
12  mean, I would say that I have been involved in this. I
13  have knowledge of all these different issues.
14  Q   And you're testifying as to your personal knowledge
15  on these issue, correct?
16  A   Yeah.
17  Q   Okay.
18  A   In my capacity as, you know, what I do at Weitz &
19  Luxenberg.
20  Q   Have you ever worked with plaintiffs' expert John
21  Martin before?
22  A   I have never worked with John. I did not know John
23  directly or indirectly. When we preparing for this
24  hearing, I did, you know, talk to people at IKON, and they
25  gave me the name John Martin, and I was his first contact.

Page 208

1  He spoke to me first.
2  Q   Did you ever interview any other people to be an
3  expert for this hearing?
4  A   There were other individuals that I considered. In
5  fact, I had many different contacts. All the other
6  individuals I knew personally, though. Some of them may
7  have had appearances of conflicts, so, you know, John was
8  someone I did not know and came through IKON.
9  Q   So you recommended him for the hearing?
10  A   Yes. I recommended IKON really, and I said, IKON can
11  provide us some -- IKON is a huge leader in this field,
12  so...
13  Q   Understood. But you recommended John Martin to
14  testify; is that accurate?
15  A   Yeah.
16  Q   And you provided him with the documents sampling to
17  review, to prepare his testimony?
18  A   I provided him the copy of the documents, the load
19  files. Everything that we had received, I gave him. I
20  didn't export anything. I gave him exact copies of what
21  we had received.
22  Q   You heard him state during his testimony today that
23  you helped identify some of the technical issues that you
24  were experiencing with the production, correct?
25  A   Well, absolutely.

Page 209

1  Q   You also provided Mr. Martin with some examples of
2  some perceived problems; is that accurate?
3  A   Well, as he would discover a problem, bring to our
4  attention things that we didn't notice, we would go back
5  and check it out and say, oh, wait a second, this is a
6  problem.
7  Q   Did you -- excuse me. I'm sorry to interrupt.
8      But did you actually provide him with examples?
9  A   There were -- I provided him with a baseline to start
10  with, and I provided him with additional things that were
11  coming up as we started looking closer at the data. For
12  example, the Mike Murray stuff.
13  Q   And to your knowledge, Jonathan, Mr. Martin was
14  retained on July 13, correct?
15  A   I can't confirm the date. It was thereabouts.
16  Q   What date did you provide him with access to the
17  document production?
18  A   After he was retained. Maybe before. I don't
19  remember because, you know, there's retainment, and there
20  was also -- I can't recall the dates that we spoke to him.
21  I can't recall -- he signed the orders -- you know, we
22  went through the proper channels. Once he signed off the
23  orders that would be necessary, I don't know if he was
24  retained at that point or not, but he was receiving what
25  we had.

Page 210

1  Q   Okay.  Now, you did not provide him with any of the
2  technical fix data that you stated came on July 20, to
3  review?
4  A   I provided him with everything.  In fact, he was
5  unable to load any of that technical fix data.  He tried
6  to load it into Concordance.  He came up with, you know,
7  the beginning A at the beginning of every field and a
8  letter A ending at every field.
9  Q   And he filed his report on July 22; is that accurate?
10  A   I believe so.
11  Q   Now, what I'd like to do, Jonathan, is --
12        THE COURT:  Counselor, local rules require that
13  you refer to witnesses by their last name.
14        MR. FREEBERY:  Understood.
15  BY MR. FREEBERY:
16  Q   Mr. Jaffe, I'd like to now ask a series of questions
17  which really kind of follows along with your declaration
18  to get some clarification on some of the things you stated
19  in there.
20  A   Of course.
21  Q   And to try to clarify some of your testimony, if
22  that's all right with you.
23  A   That's fine.
24  Q   Okay.  I'd like to begin with paragraph 4 of your
25  declaration, where you discuss the IND/NDA.

Page 211

1  A   Okay.  I do not have my declaration in front of me.
2  Is there a particular exhibit that I can refer to?
3  Q   I have a copy here.
4        MR. FREEBERY:  Your Honor, may I approach?
5        MR. GORNICK:  It's Exhibit 16.
6  BY MR. FREEBERY:
7  Q   If it's easier to do it that way.
8        16.0.  Let me ask you to take a look at that, and you
9  recognize that document as your declaration that you filed
10  in this case?
11  A   Absolutely.
12  Q   And in paragraph 4 of your declaration, you state
13  that on or about November 15, 2006, attorneys for
14  AstraZeneca delivered to the Weitz offices six DVDs
15  containing electronic files related to AstraZeneca's
16  IND/NDA for Seroquel.  Correct?
17  A   That's correct.
18  Q   And then you state in the subsequent subparagraphs
19  your complaints about what was contained in that IND/NDA;
20  is that correct?
21  A   These are not complaints.  These are problems that
22  prevented the plaintiffs' counsel from reasonably
23  searching and using the IND/NDA.  It's not my personal
24  complaints.  I don't have to do the searches, they do.
25  Q   Okay.  Understood.

Page 212

1        And in paragraph 6 and 7 of your declaration, if I
2  can just draw your attention there, you note that after
3  production of these documents, that you addressed these
4  issues with AstraZeneca on or about November 17; is that
5  accurate?
6  A   Yes.  I believe in my testimony, I -- there was an
7  e-mail presented as an exhibit that had that exact date
8  going from me to Miss Kelber stating everything that was
9  in number 40.
10  Q   And this was the first production of documents in
11  this litigation, correct?
12  A   This was the first production, to my knowledge, my
13  understanding, that was ever produced in this litigation.
14  Q   Okay.  This was the first production of documents in
15  a production that now is in the neighborhood of 10 million
16  pages, correct?
17  A   That's correct.
18  Q   And this first production occurred prior to the
19  implementation of CMO2, correct?
20  A   That's correct.
21  Q   And you were involved in negotiations concerning the
22  format of production of the custodial files that was
23  contained in CMO2, correct?
24  A   Yes.  To correct the deficiencies that occurred in
25  the IND/NDA.

Page 213

1  Q   Exactly.  And those negotiations resulted in
2  Section 3 of CMO2, which dealt with the format of
3  production of custodial files, correct?
4  A   If you could direct me to the CM0.
5  Q   Sure.
6  A   I give you that it's the correct section, but they
7  didn't include such a format.
8  Q   If you look at Plaintiff's Exhibit 11, Mr. Jaffe.
9  A   Give me a page number.
10  Q   Do you have that document first?
11  A   Yes.
12  Q   And do you recognize that document as CMO2?
13  A   Yes.
14  Q   And could you turn, please, to page 7 of CMO2.
15  A   Yes.
16  Q   And that is Section 3.  Would you agree with me, it
17  says the format of production of custodial files?
18  A   That's correct.
19  Q   And is it your understanding that came about as a
20  result of your negotiations with AstraZeneca concerning
21  the format going forward?
22  A   Yes.  It was not just my negotiation, but it was
23  negotiations between plaintiffs' and defendant's counsel,
24  several compromises made in the negotiations.
25  Q   Okay.  You agree with me, if you turn to page 9 of

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 214

1  this document, sir, that CMO2 also provided a listing of
2  the metadata fields that were to be produced?
3  A   Yes. It's CMO2 did provide a listing of metadata
4  fields that would be produced.
5  Q   Now, since your mid November discussions concerning
6  the format of the initial production of the IND and NDA,
7  and since the entry of CMO2, you're not aware of any other
8  instances when you raised the problems, initial problems
9  you had with the IND/NDA with plaintiffs, or excuse me,
10  with AstraZeneca, are you?
11  A   There were multiple times that I raised the issues of
12  the IND/NDA with defendants. Can you repeat it?
13  Q   Sure. After implementation of CMO2 -- first of all,
14  are you aware that that was implemented and signed as an
15  order in January of 2007?
16  A   Yes.
17  Q   Since January 2007, this became an order? You
18  haven't come to AstraZeneca since then to discuss problems
19  with the formatting of the IND/NDA, correct?
20  A   I referred to it multiple times. There was an
21  agreement between plaintiffs and defendants stating that
22  we would attempt to work through these problems. I
23  referred to it personally in my e-mail correspondence with
24  Rodney Miller, referencing problems and saying we don't
25  want repeats of these problems.

Page 215

1     It was referred to in letters that I helped draft to
2  you. Those letters from April 17th specifically mention
3  some of the issues from IND and NDA. In fact, I think, I
4  just looked at them a moment ago, it mentioned 22,000 page
5  documents and that's why we needed page breaks.
6  Q   But that didn't have anything to do with the initial
7  production, because you stated on direct you guys went out
8  and fixed that. Is that accurate?
9  A   We did the best -- well, fix, we did the best job
10  that we could to give them what we had.
11  Q   And you agree with me that this problem, these
12  problems with the initial production of the IND/NDA did
13  not come up during our May and June discussions on the
14  technical issues? Correct?
15  A   Well, at that point we had, you know -- well, that's
16  not quite true. Because the candid documents, which are
17  part of the IND/NDA --
18  Q   I'm going to get to that in a minute. I just mean
19  this initial production and the formatting issues, sir.
20  A   Well, it was referenced, again, it was referenced
21  this is why we need page breaks. In fact, I believe at
22  the May 30 conference, I in fact went back to the IND/NDA,
23  saying this is why we did all this stuff, and this is why
24  we did CMO2, and this is why we -- we were trying to
25  eliminate all these problems ahead of time, before your

Page 216

1  involvement, as to my knowledge.
2  Q   Sure. And you're aware that at the conclusion of our
3  discussions in May and June, on all these technical
4  issues, we filed an order or a joint statement of resolved
5  issues with the Court, correct?
6  A   I am aware of that statement.
7  Q   And you're familiar -- can you actually turn to -- do
8  you have the AstraZeneca exhibits in front of you, sir?
9  A   I don't know. I think I don't.
10  Q   It's Exhibit 12, I'm told, to --
11  A   Okay.
12  Q   Plaintiff's exhibits. If you take a look at that.
13     You said you're familiar with this document, sir?
14  A   Yes, sir.
15  Q   Now, there's nowhere in here specifically that talks
16  about the initial formatting issues with respect to the
17  IND/NDA; is that accurate?
18  A   There is nothing in here that talks about the initial
19  formatting. Hold on. I have to read through this again.
20  I mean the initial ones, no. It talks about CANDA, of
21  course, in it.
22  Q   Sure. And again, I'm going to get to the CANDA issue
23  in a second. But I was present at those meetings, and I
24  sure don't remember those issues coming up about the
25  initial production.

Page 217

1  A   Well --
2  Q   You don't have a different recollection, do you?
3     MR. GORNICK: I'll object to counsel testifying.
4     THE COURT: Sustained.
5  BY MR. FREEBERY:
6  Q   Do you have any different recollection?
7  A   In terms of what?
8  Q   Whether the IND/NDA initial production was brought up
9  during our meet and confers --
10  A   It was brought up as an example of why we were there.
11  I do not if you were presently in the room at that point,
12  if you stepped out, if you were there or not, but I do
13  know it was brought up.
14     I mean, this is the whole reason for page breaks, is
15  because of that --
16  Q   Well, page breaks is a different issue, correct?
17  A   Page breaks was brought up at that meeting. You
18  asked if at that meeting I brought up the IND/NDA. I did
19  bring up the IND and the NDA at that meeting in the
20  context of page breaks to say this is the reason why we
21  have been talking about this for a long time.
22     And specifically, I brought some of those things up
23  because you weren't a party at that point to the
24  discussions. It was Miss Kelber from Sidley Austin. This
25  is going back much further than your involvement. And I

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 218

1  remember trying to provide some context of the discussion
2  so that it was clear where we had been, and where we
3  wanted to be, and why we weren't there by -- I was
4  personally very frustrated, if you recall, at the meeting.
5  Q   And you stated, you talked along these lines on your
6  direct examination.  You stated that it was your job to
7  really work with defendants to help work out any issues
8  you had with the production, correct?
9  A   Oh, absolutely.
10  Q   And you stated also that you had some problems
11  initially because there was no one on AstraZeneca's side
12  with the IT experience to talk with you on some of these
13  issues, correct?
14  A   There is still no one on AstraZeneca's side for me to
15  talk to with IT solutions.  There is no vendor who I'm
16  talking to on a daily basis.  I talk to counsel, which to
17  me is inefficient.
18  Q   Okay.  Well, let's talk about that.  You have been
19  speaking pretty much on a daily basis or at least a weekly
20  basis with counsel to resolve perceived issues and issues
21  in this case, correct?
22  A   That's correct.
23  Q   And this kind of began in April when Mr. Dupre and
24  some of our team got involved.  Would you agree with me on
25  that?

Page 219

1  A   No.  I have been talking continuously from before we
2  received productions, from November 15, the day that I got
3  involved, Mr. Pennock called me in and said, here's six
4  DVDs, what are on these, what did we get, what's going on
5  here.
6      And I started analyzing it, and that day met with
7  defendant's counsel, and every -- practically every day
8  thereafter, talking about different issues that worked out
9  with the production.
10      They may have preceded your involvement in the case
11  and Mr. Dupre's, but every day, whether it's directly from
12  me or indirectly through Michael Pederson or through Paul
13  Pennock, or through any of the other attorneys, such as
14  Keith Jensen, or Ken Smith, I have been talking to you --
15  Q   And you would agree with me that since we have been
16  involved in April, we have been talking back and working
17  with you to try to resolve some of these issues, correct?
18  A   To try and resolve the issues, I would say that
19  there's been, you know, certainly communication back,
20  except that, you know, when it comes to issues like
21  databases, where we were just flatly told no.
22  Q   Mr. Gornick referred you to a couple back and forths
23  in April between Mr. Pederson and myself during direct
24  examination.  Do you recall that?
25  A   That's correct.

Page 220

1  Q   And do you recall me -- and do you recall
2  Mr. Pederson replying to one of my back and forths on the
3  technical issues on May 21 of 2007?
4  A   Is there an exhibit that I can look at?
5  Q   Sure.  Could you please turn your attention to
6  Exhibit 17.08 -- .08.  You see that document, Mr. Jaffe?
7  A   Yes.
8  Q   And it's a May 21 letter from Mr. Pederson to me,
9  Mr. Freebery, correct?
10  A   Correct.
11  Q   Could you read the first sentence there for me,
12  please?
13  A   "In response to your April 30, 2000 letter and
14  pursuant to our discussions of last week, I would like to
15  thank you for offering solutions to some of the problems
16  plaintiffs have addressed."
17  Q   Okay.  And going forward from that date, you agree
18  with me that we met extensively in May and June to discuss
19  the technical issues that were brought up after the
20  May 22nd hearing, correct?
21  A   No.  We met sporadically.  We met not on timelines
22  that -- let's put it this way:  If someone -- if I mess
23  up, if my team messes up, by the next day we have fixes
24  out there.  We're meeting with people, we're doing it
25  right away.

Page 221

1      I mean, this has all been dragged over weeks or
2  months.  That's -- to me, it's not -- it's sporadic, it's
3  not extensive.
4  Q   Do you recall us coming to your offices in New York
5  City and meeting with you so you could explain the
6  technical issues?
7  A   This is May 30?
8  Q   Yes, sir.
9  A   Yes.
10  Q   Do you also recall meeting in Philadelphia to discuss
11  technical issues, and fixes, too?
12  A   No.  I wasn't present at that particular meeting.
13  Q   But you're aware of that meeting where Mr. Pederson
14  attended?
15  A   I'm aware there were meetings.  I do not know what
16  was said at the meeting.  I wasn't at that meeting and I
17  didn't listen into that meeting.
18  Q   Now, Jonathan, in your declaration --
19      THE COURT:  Counsel.
20      MR. FREEBERY:  Excuse me.
21  BY MR. FREEBERY:
22  Q   Mr. Jaffe, you talk about in paragraph 9 of your
23  declaration, the second issue with respect to the IND/NDA,
24  and that deals with CANDA, correct?
25  A   May I turn back to that declaration?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 222

1  Q   It was Exhibit 16, sir.
2  A   Exhibit 16.  Which page was this?
3  Q   Paragraph 9, sir.  It is -- I think it's page 4 of
4  13.
5  A   Yes.
6  Q   And what you're stating here is the fact that in the
7  initial production of the IND/NDA, this CANDA database,
8  what's been called a CANDA database, was omitted, correct?
9  A   That's correct.
10  Q   Let me ask you this.  When did you actually complete
11  your review of the initial IND/NDA production?
12  A   I think it mischaracterizes for me to say I reviewed
13  the production.  I reviewed for formatting issues, for
14  usability, for searchability.  I'm not counsel.  I cannot
15  look and say, what's in there or what's missing.  I'm not
16  an FDA expert.  I'm not a medical expert.  I don't know
17  what should have been there.  I just looked at technical
18  issues that were there.
19  Q   Understood.
20    So you were never the person who determined, hey,
21  there's this CANDA database that's missing?
22  A   To my understanding, it's just my understanding,
23  there was no disclosure that the CANDA database existed.
24  So at that point I don't know who would have known that it
25  was missing.  How do we know that there's not one called

Page 223

1  PANDA out there?
2  Q   I appreciate that information.  But what I'm trying
3  to determine is, are you the one who actually discovered
4  that it was missing?
5  A   No, I was not the one to discover it.
6  Q   Okay.  Now, it's your understanding that this issue
7  was brought to defendant's attention at the April 12, 2007
8  MDL hearing?
9  A   That's my understanding.
10  Q   And you acknowledge that we wrapped the CANDA
11  database discussion the tech issues that we were
12  discussing in late May and early June, correct?
13  A   Well, it was part of the May 30th discussion.  And
14  that's my understanding.  Well, that's where I heard, that
15  it was brought up, it was a big issue at that discussion.
16  Q   And in fact, it was included, we included CANDA in
17  the joint statement of resolved issues that was filed on
18  June 7, correct?
19  A   Yes.
20  Q   And what we agreed to at that point is that we would
21  produce the CANDA database on June 11, correct?
22  A   I would have to reference it for the date.
23  Q   Okay.  It was Exhibit 18, if you would like to.
24  A   Exhibit 18?
25  Q   Exhibit 12.  I'm sorry, Mr. Jaffe.

Page 224

1  A   What date did you say?
2  Q   I said June 11, sir.
3  A   Yes.
4  Q   And you state in your declaration at paragraph 10
5  that on or about June 11, that AstraZeneca -- that you
6  received a hard drive containing TIFF files purportedly
7  derived from the CANDA database, correct?
8  A   That's correct.
9  Q   Now, as you sit here, are you aware of anything else
10  missing from the IND/NDA?
11  A   I can't be aware of things that are missing from the
12  IND/NDA.  How would I know if that's missing?
13    CANDA, I believe, came up during a deposition.
14  Somebody discovered it.  So I assume, there is one missing
15  piece, I assume there are other missing pieces.
16  Q   Let me ask it this way:  You're not aware of anything
17  from the IND/NDA that exists that we haven't provided to
18  you?
19  A   Again, it's not my responsibility to review and --
20  you know, I can never testify -- even if I were, all I
21  could say is, as a technical professional, I can say that
22  technically if you don't provide the whole thing and
23  something's missing, you give us parts and pieces, there's
24  probably another piece out there.  I assume that there may
25  be.

Page 225

1  Q   Skipping from the CANDA database, one of the first
2  issues you discussed under the custodial production
3  heading of your declaration, sir -- I guess you can --
4  that begins on page 5 of 13, but you explained on direct
5  to me and the Court what you perceived to be the issues
6  with respect to page breaks, and it's one of the first
7  technical issues you mentioned, correct?
8  A   Yes.
9  Q   And what you said on direct is that you thought by
10  implication you were going to get page breaks in the
11  production in extracted text, correct?
12  A   It was told to me, it was told to me by Mr. Miller
13  that there were page breaks characters.  It was only told
14  because there was an e-mail from Tamar Kelber that said
15  that we weren't going to be getting this separate text and
16  a text file for every page, which was unusual.
17    So I went through the extra step at that point
18  saying, we need page breaks, and then Rodney Miller
19  saying, well, you're going to have them, there's a page
20  break character in there.
21    We never located that page break character.
22  Q   Well, Mr. Jaffe, you said you were involved in
23  negotiating the formatting of the production of custodial
24  files that was put in CM20, correct?
25  A   That's correct.

Page 226

1   Q   And you can agree with me that there is nothing in
2   CMO2 that states that we're required to put page breaks
3   into extracted text, correct?
4   A   I'm not so sure about that.  I have to look back very
5   carefully.  Because my recollection is said we said
6   single -- do you have CMO2?
7   Q   It's Plaintiff's Exhibit 11, sir.  And again, the
8   formatting section.
9   A   But I need to look at the way it said.  I mean, it's
10  implied pretty clearly under format reduction, page 7.
11  Format production, 3A1, you're getting a single page
12  tagged image file format, TIFF, with an accompanying globe
13  file, an extracted text file of documents which are
14  unredacted, and OCR text files that are redacted.
15      You put page breaks in the OCR ones, why would you
16  not put it in the other extracted ones?
17  Q   I appreciate that.
18  A   Single page.  So, single page of text, single --
19  single image, single file of text.  Miss Kelber understood
20  that.  She said that we couldn't do separate text files
21  for each page.  We would have to lump them all together.
22      Mr. Miller understood it because he said there were
23  page breaks in there.  So it was -- you know, and they
24  were all involved in negotiating this.  So it was very
25  clear in all of our minds at that point.

Page 227

1   Q   But it's not clear in here.  You agree with me?
2   A   I don't agree on that.  I think it's -- if I were
3   reading this, and --
4   Q   Show me where it says that we have to put page breaks
5   in extracted text.
6   A   It says it right here.  Single page text image file
7   format with accompanying load extracted text file.  Single
8   page with an extracted text file.  Single page extracted
9   text file.
10  Q   But the single page refers to the TIFF, correct?
11  A   Single page extracted text file.  It says it.  I mean
12  that's my clear reading of it.  It says it very clearly in
13  here.
14      That was Miss Kelber's reading of the same document.
15  There was obviously later on a problem and it was never
16  provided to us.
17  Q   Well, that's not entirely true.  It was eventually
18  provided to you, correct?
19  A   Last Friday, 6:13 p.m., I know it well because I had
20  people staying in the office late to try and receive it,
21  as the car was coming from Boston at 2:00 p.m. to our
22  office.  Yes, it was provided to us.
23      I haven't gotten a chance to look at it, given the
24  time, and I had to be here, so --
25  Q   Understood.

Page 228

1   A   -- I can't validate as to how good it is.
2   Q   Just to walk through the timeline, you know, you're
3   the one who offered a solution in February to AstraZeneca.
4   A   That's correct.
5   Q   Correct?
6   A   Yes.
7   Q   And at that point, Mr. Jaffe, they said that, you
8   know, we can't do it, you know, if we have any hope of
9   making the Court-imposed deadlines.  Is that your
10  understanding of what they said?
11  A   Well, they said that in March.  I actually was pretty
12  frustrated when I got that because a month later I get an
13  e-mail, well, we have no more time left.  And I'm saying,
14  well, what happened to this last month, because you
15  probably could have done it within a month.
16  Q   At that point in February, though, you're aware that
17  the custodial production was underway, correct?
18  A   It's my understanding the custodian production was
19  underway before we ever decided to or agreed to any
20  custodial production.  My understanding, it was underway
21  in 2005, and way before I ever got involved in anything.
22  Q   You're also under the understanding that there was a
23  June 30th deadline for production of the 80 custodians at
24  that time?
25  A   That's correct.

Page 229

1   Q   Now, we spoke about this a second ago, but eventually
2   we did go back and pursuant to agreements made in the meet
3   and confer and agreements put in the joint resolution --
4   joint statement of resolved issues, we agreed to provide
5   you with page breaks, correct?
6   A   You did agree.
7   Q   And at this point, because you didn't have a chance
8   to review it, you just don't know if there's any issues
9   with respect to the page breaks?
10  A   I do not know.
11  Q   And as always, we've never shut off discussions and
12  said that's it.  You understand that if you have issues,
13  you would feel welcome to come to us and talk to us about
14  that, correct?
15  A   I know in certain areas, there have been shutoffs in
16  discussion.
17  Q   Would this be one?
18  A   This particular issue, there were multiple shutoffs.
19  It's only of late, you know, after, you know, basically --
20  I was listening to the hearing beforehand where it was
21  clear that in a sense it was under duress of coming to us
22  and saying, okay, well, we will deliver page breaks to
23  you.  So, given that, yes.
24  Q   Now, the reason we only did page breaks for the
25  non- -- and the agreement was, correct me if I'm wrong, to

Page 230

1   do it for non-redacted pages.  Non-redacted documents,
2   correct?
3   A   Well, because the redacted ones are ORC.
4   Q   And the OCRs contain page breaks already, correct?
5   A   They contain page breaks.  They should contain page
6   breaks.
7   Q   Now, I wanted to turn your attention to something you
8   said regarding the page break issue in your declaration at
9   paragraph 19.
10  A   Yes.
11  Q   Do you see that, sir?
12  A   Uh-huh.
13  Q   In the second paragraph of your declaration, it
14  states that "AstraZeneca agreed to provide the corrected,
15  extracted text files on a rolling basis and estimated the
16  process would be complete in six weeks."  Do you see that
17  statement?
18  A   I do.
19  Q   Is that your understanding?
20  A   Yes.
21  Q   Okay.  As you sit here today, are you stating that
22  providing these on -- at a one-time shot instead of on a
23  rolling basis was against our agreement?
24  A   Well, I know the agreement stated specifically IP-15,
25  production 15, every production after 14 should have had

Page 231

1   text breaks in it.  Production 15 didn't.  Production 16,
2   with the exception of the foreign language documents,
3   didn't.  So it was not certainly on a rolling basis.
4        My job is to give them, to give plaintiffs' counsel
5   deliverables today as soon as I have them.  So if I can
6   make their -- they have to do work.  They have to do
7   preparation for motions and depositions.  I need to give
8   it to them sooner than later.
9        Partial solutions, sir, are partially better than
10  complete solutions -- than no solution, but it's partially
11  better.  So I try and give them stuff faster and sooner.
12  Q   Mr. Jaffe, I just want to clarify this issue.  If you
13  could turn to Plaintiff's Exhibit 16.08, please.
14  A   Yes.
15  Q   Do you recognize this document?
16  A   I do.
17  Q   And how do you recognize it?
18  A   This is an e-mail I was CC'd on from Mr. Pederson to
19  you and Mr. Dupre from Tuesday, June 5.
20  Q   Could you turn to the section, please, on page
21  breaks, which I believe is the second page of the actual
22  e-mail.
23  A   Yes.
24  Q   And if you could read for me the statements at
25  numbers 3, 4 and 5 under page breaks.

Page 232

1   A   "Plaintiffs have agreed to accept that kind of error
2   rate for this process.  Defendants do not guarantee this
3   proposal's success.  Plaintiffs have agreed to accept one
4   production with the corrected extracted text files
5   containing page breaks."
6   Q   Okay.  Is that consistent with your understanding as
7   we sit here today?
8   A   Well, take a look at number 1.
9   Q   Okay.
10  A   If you take a look at, well, number 1 and number 2,
11  number 2 says specifically, "Defendants agree to put in
12  page breaks in all future productions for documents that
13  are ten or more pages in length, i.e., all productions
14  after IP-15."
15       That to me reads IP-14, IP-15 and IP-16 should have
16  come in with page breaks.  Those two productions were
17  3.7 million pages, so now we've got 3.7 million additional
18  pages missing millions of page breaks at the least that we
19  didn't get.
20       Now, we might say rolling or say that we were
21  supposed to get this.  You know, one production, we were
22  talking about corrections to, you know, 1 through 14,
23  and --
24  Q   You agree with me what it says in Section 5 there is
25  that plaintiffs agree to accept one production with the

Page 233

1   corrected extracted text files containing page breaks,
2   correct?
3   A   Are you ignoring the number 2 right above it?
4   Q   I'm just asking you if that's what number 5 reads.
5   A   That's what it reads.
6   Q   You also stated in that sentence, you use the word
7   "estimated," that the process would be complete in six
8   weeks, correct?
9   A   Which sentence are you referring to?
10  Q   Back on -- I'm sorry.  Back, Mr. Jaffe, at
11  paragraph 19 of your declaration.
12  A   That is correct.
13  Q   And that's your word, correct?  Estimated?
14  A   Yeah.
15  Q   Was that your understanding as to what these timeline
16  were that we put in the joint statement of resolved
17  issues?
18  A   Well, my understanding was that the timeline is a
19  little bit up in the air, that you were trying to work as
20  quickly as you could get it done.  You know, given what we
21  were doing, the testing, setting it up, but it was
22  supposed to be done as quickly as possible.
23  Q   And so notwithstanding all this, we did in fact
24  provide you with page breaks, albeit it was six weeks down
25  the road, correct?

Page 234

1   A   Yes.  But every week does count in this litigation.
2   Q   Now, the page break issue was not the only technical
3   issue brought up to the defendants in May and June which
4   we agreed to resolve, correct?
5   A   That's correct.  There were a number of other issues.
6   Q   Another example appears at paragraph 21, Mr. Jaffe,
7   of your declaration, which deals with the consistency of
8   metadata.
9   A   Yes.  But at the time we didn't even know how
10  inconsistent some of this was.  For example, personally I
11  thought all the date fields were okay.  I later learned
12  from the work that John Martin did on this behalf, of
13  analyzing these, that there are actually additional
14  inconsistencies and problems.
15      You know, at the time, and even at the time of
16  writing this declaration, my understanding was, a lot of
17  these inconsistencies may have been addressed by the
18  corrections, but at this point I realized -- we're
19  discovering them.
20      I told you about the one I discovered, my staff
21  discovered on Monday with the Bates number on -- the same
22  Bates number on two separate documents.
23  Q   And I'm sure that you will bring this issue to our
24  attention once you have appropriately identified it.
25  A   As we try to do with all issues, we will try and

Page 235

1   find -- we will try and figure out why it occurred, and
2   some way, as best as we can, try and propose a solution,
3   as we have been doing consistently.
4   Q   The third issue, technical issue you raise in your
5   declaration, you testified a little bit, was about blank
6   pages.
7   A   Uh-huh.
8   Q   Is that accurate?
9   A   That's correct.
10  Q   And you note, Mr. Jaffe, in paragraph 20 of your
11  declaration that we agreed to investigate this issue; is
12  that accurate?
13  A   That's correct.  But I would not characterize it as
14  one issue.  There are four categories of this issue.
15  Q   Understood.
16      That's something that we went back with our vendor
17  and obtained an explanation for that and came back to you
18  with what your investigation revealed, correct?
19  A   You did an investigation on two of those issues but
20  not the other two issues.
21  Q   And this is something that we have been in the
22  process of providing you fixes to resolve, correct?
23  A   The fixes were to the issues that were not
24  significant, in my way of thinking.  The fixes were to the
25  issues where you have inserted in page breaks -- I'm

Page 236

1   sorry, blank pages that didn't exist before, but we also
2   have the more -- much, much more serious issue of where we
3   see just missing data, and replaced by a blank page, and
4   that according to your e-mail still under investigation.
5   You're still looking into those issues.
6       And I give you a substantial list of examples of
7   those issues where, you know, we're not talking about the
8   Excel problem, because we're talking about e-mails, where
9   in the middle of an e-mail there's a blank page and
10  there's missing data, and we think there's improper
11  redaction, because there no reason for redaction.  But we
12  can't know.  We're giving you some ideas of about maybe
13  what might be going on.
14  Q   We have been working with you to try to resolve those
15  issues, correct?
16  A   This issue was raised quite a while ago, and one of
17  the things that we need to do is not conflate or combine
18  these different issues.  We have to separate them out,
19  segregate them, deal very clearly with them, because blank
20  documents, as I said, has four different categories of
21  problems.
22      Two of the categories, this and the Seroquel flash
23  report, documents that appear just with Seroquel flash
24  report and blank, those two issues haven't been resolved
25  yet.  And it wasn't clear in your e-mails to me that the

Page 237

1   blank pages issue wasn't completely resolved until I
2   countered with e-mails asking.  This was all this e-mail
3   chain, I guess last Friday.
4   Q   Last week?
5   A   Last week, saying, you know, what's going on with
6   these other two categories of blank pages, and you said,
7   oh, we're still working on it.
8   Q   So you agree with me that back and forth is still
9   going on between us?
10  A   Yes, but you have to let me know that there are
11  issues that are still open.  The issue here is that we
12  don't know about issues that are still open.  We don't
13  have the list.
14      With every other vendor that I work with, and I know
15  you're not a vendor and that's the problem, but every
16  vendor I work with, be it for ordering medical records or
17  anything else, we have a list of open issues.  We assign
18  each issue an ID number and we check off these lists of
19  open issues to work through them, to do that.
20      We have no such formalized list, partially because
21  I'm not looking at a vendor here, I'm trying to deal
22  through counsel, and sometimes through counsel through
23  counsel to a vendor.
24  Q   Sure.
25  A   It makes it very -- a very frustrating process, if

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

1  you can get what's going on.
2  Q   For both sides.
3      With respect to the technical fixes that have been
4  going on since these May and June meet and confers, it's
5  your understanding that AstraZeneca has borne the cost and
6  expenses of implementing these, correct?
7  A   Yes.  But these are serious issues and deficiencies
8  in the production, and who would have borne the cost?
9  Q   Let me jump off the tech issues for a second and into
10 the databases.  Because you addressed the timeline a
11 little bit in your declaration.
12     And kind of let me draw your attention, Mr. Jaffe, to
13 paragraph 33 of the declaration.  I'm sorry, are you at
14 the --
15 A   Yes.
16 Q   Thank you.
17     And in paragraph 33, it kind of start your timeline,
18 if you agree with me, on the database discussions; is that
19 accurate?
20 A   No.  Our timeline on database discussions started
21 with drafting CMO2.  We went back and forth.  I know it
22 was before your involvement, but we did go back and forth
23 quite a while talking about databases, making sure we had
24 specific language in there, and I think we have something
25 to the effect of databases are delivered as databases,

1  they're not going to be delivered as, you know, some --
2  Q   I'm sorry, what was that?
3  A   I think we have something to the effect of that, you
4  know, databases are delivered as databases.  We were
5  talking about even contemplating that we wanted a
6  searchable format when we were getting databases, in CMO2.
7  Q   Can you turn your attention to CMO2, sir?
8  A   Absolutely.  This is Exhibit?
9  Q   I believe it's Plaintiff's 11.  Let me double-check
10 that.  It is.
11     Can you show me, sir, the section that deals with the
12 databases and corresponds with your understanding, as you
13 just said?
14 A   Okay.  Well, there are a couple of different
15 sections.  Just bear with me for a second.
16     I believe there's two things.  There's 2F.  There's
17 also 3C1, I believe.
18 Q   Okay.  Let's start with 2F, sir.
19 A   Uh-huh.
20 Q   Okay.  You were involved in this negotiation?
21 A   Yes.  There was drafting -- there are a lot of
22 drafts, keep in mind, that went back and forth between
23 plaintiffs and defendants on this.
24     MR. FREEBERY:  Your Honor, may I have one
25 second.

1      THE COURT:  What's the problem?
2      MR. FREEBERY:  Just trying to finish up here and
3  see if I can get rid of some of the line of questions.
4  BY MR. FREEBERY:
5  Q   One last line of questioning, Mr. Jaffe.
6      MR. FREEBERY:  And handing the clerk and
7  plaintiffs' counsel what has been marked as Defendant's
8  Exhibit -- it's a new exhibit.  Whatever the next one on
9  the list is.  It's Defendant's Exhibit 67.
10     May I approach the witness, Your Honor?
11     THE COURT:  All right.
12 BY MR. FREEBERY:
13 Q   Mr. Jaffe, I'll just ask you to take a look at this
14 and see if that -- if you recognize that document.
15 A   Yes, I do.
16 Q   Okay.  Is that the document that Mr. Gornick showed
17 you that contained the track changes that were shown to
18 plaintiffs' expert earlier today?
19 A   I do not know.
20 Q   Okay.  You had the original?  The previously
21 provided?
22 A   But it doesn't have the Bates stamp on it, and this
23 one doesn't have the document ID, so I can't say that
24 they're the same document.  They appear to be the same.
25 Q   And the second document contains the Bates number; is

1  that correct?
2  A   Yes, it does.
3  Q   Could you read the Bates number just for the record?
4  A   AZSER4865045.
5      MR. FREEBERY:  Nothing further at this time.
6      THE COURT:  Mr. Jaffe, in what sense are you
7  using the term database?
8      THE WITNESS:  The databases at AstraZeneca that
9  I talk about, we're trying to use an expansive sense of
10 the term database because --
11     THE COURT:  To me an e-mail file is a database.
12 I mean a database is anything that has data in it.
13     THE WITNESS:  What we have done --
14     THE COURT:  But there's also a technical
15 meaning, that it's an organized set of something.
16     THE WITNESS:  Well, we said whatever doesn't
17 fall under a custodial production, and in terms of the
18 documents that they have provided to us that were in
19 Excel, anything else, the e-mails, the PowerPoints,
20 everything else would be considered a database, so there's
21 certain aspects of Exchange I think of as a database.
22     If someone contained -- like the PIR requests.  I
23 believe we were calling it a medical affairs database,
24 because the product information requests that were sent
25 up, I believe they get stored in some sort of Exchange

1  folder that was a public folder or a special mailbox that
2  even though it would be potentially custodial, might not
3  fall under the custodial production.
4      THE COURT:  My problem in listening to you and
5  the lawyers is the word custodial is not being used in any
6  sense that I recognize, and the word database is not being
7  used in a sense that I recognize.
8      THE WITNESS:  We have tried to say that
9  custodial -- custodial documents are documents in
10 somebody's possession that could be attributed to a single
11 individual, or it could be attributed to the custodian.
12  But anything that doesn't fall under that definition,
13 we didn't want to make it not discoverable, so that's
14 talked about under -- or not producible or not falling
15 within CMO2.
16  So the database became a little bit more of an
17 expansive word.  But there are a lot of databases that we
18 spoke about at the IT --
19      THE COURT:  Sorry to interrupt you, but does
20 that mean that you're using the term database to mean any
21 document broadly defined that's not been put into a
22 custodial production?
23      THE WITNESS:  To a degree.  The majority of
24 databases we're talking about are Oracle databases or --
25 everything that we've sort of brought up.  For example, an

1  Internet site, how do we qualify that as custodial?  It's
2  not custodial.
3      THE COURT:  Well, I have got a problem with in
4  general trying to say what an Internet site is and what it
5  means to produce it.  We have paper copies of some screen
6  images coming in this morning.  That's not a website.
7      THE WITNESS:  I consider that a database.
8      THE COURT:  You learned that they had used
9  keywords to search some set of electronic storage in order
10 to create the custodial files.  You learned that in early
11 May?
12      THE WITNESS:  That's correct.
13      THE COURT:  That's the first you had known that
14 they had done that?
15      THE WITNESS:  I hadn't anticipated that they
16 would do that.
17      THE COURT:  And as soon as you learned that, did
18 you raise an alarm with your people or with the
19 defendants?
20      THE WITNESS:  I raised it internally with
21 plaintiffs' counsel.  I went to Mike Pederson.  I said,
22 "What's going on?  Why do we have a search terms list?"
23  I thought it was a mistake, and it just ran very
24 contrary to what my understanding was from all the earlier
25 discussions.

1      THE COURT:  Have you ever had any discussions
2  with any of the people from the defendant's vendor?
3      THE WITNESS:  To my knowledge, no.  I don't know
4  if one of them happened to be on the phone at one point,
5  but no one was ever identified as a vendor.  And Miss
6  Kelber's e-mail from early January said there's no IT
7  counterpart for you to talk to.
8      THE COURT:  Did that make it more difficult for
9  you to try to resolve some of these issues?
10      THE WITNESS:  Absolutely.  I think most of these
11 issues, it's kind of -- you have 10.5 million documents,
12 you remove two.  Well, they know which ones they removed.
13 They have the native electronic files.
14  But if I talk to a vendor, I could probably have
15 straightened a lot of these issues out immediately.  I
16 would have just said, why aren't you using the same
17 template each time you're producing it or -- you know, I
18 don't know if they have one vendor or if they have 100
19 vendors doing this.
20      THE COURT:  Were you ever given any reason why
21 you weren't being put in touch with any of their vendors?
22      THE WITNESS:  Just more of that there was no
23 equivalent counterpart or there's -- I guess they were
24 trying to look for somebody in the defendant's law firm
25 who was equivalent to me or my role, and there really

1  isn't.  It should be the vendor.
2      THE COURT:  Do you have an understanding as to
3  the methods and hardware by which AstraZeneca stores all
4  of this ESI?
5      THE WITNESS:  I have a limited understanding.  I
6  see it secondhand.  I went through it in the IT interviews
7  that I spoke about.  I understand some of their technology
8  of what they have.
9  I would probably understand their technology if I saw
10 it firsthand.  I know some of the systems are standard and
11 some of the systems are proprietary.
12      THE COURT:  Do you have any notion as to how
13 large, in storage terms, the -- were searched in order to
14 produce the custodial files or need to be searched to
15 produce all these databases?
16      THE WITNESS:  Only that I do not believe -- this
17 is what I can concede, that probably not everything was
18 searched.  That's something I have been sort of looking at
19 more recently and seeing just hints or glimpses of signs
20 that there's something missing.
21  Just even in terms of the manner in which it was
22 produced.  It was produced so -- it was taken away from
23 the site so long ago.  I just don't see -- I don't know if
24 backups were searched.  I don't know what was restored.
25  I know about some of their retention policies.  I

Page 246

1  know that if they had told certain things at certain
2  times, it would have fell outside of a retention policy or
3  in a cycle of backups that were being overwritten and
4  potentially missed something.
5      But since I don't know everything exactly, nor am I
6  qualified without looking at them to do more than just say
7  I just have this sense that it's considerable what was
8  possibly not included.
9      THE COURT:  Well, I'm trying to figure out what
10  was searched in order to come up with the things that you
11  were provided with.  They sent you hard drives or disks or
12  some combination of those things that were taken from
13  various servers and storage devices, I assume.
14      THE WITNESS:  Yes.  That I have an idea about.
15  It was a little bit broad.  I know their information store
16  and their e-mail was searched.  To what degree, I don't
17  know.
18      THE COURT:  Are we talking about terabytes of
19  data or --
20      THE WITNESS:  Well, even if they searched
21  terabytes of data, it doesn't mean that there weren't
22  petabytes of data to be searched.  Just because a search
23  is large -- this is a very, very large organization.
24      I have a feeling it was very tightly confined.  It
25  was a search against a custodian or a grouping of

Page 247

1  custodians afterwards.
2      THE COURT:  Were you ever provided with or do
3  you know if anybody for the plaintiffs were provided with
4  any documentation as to how they organized their ESI
5  production and how they validated the methodology for
6  completeness?
7      THE WITNESS:  To my knowledge, no.
8      THE COURT:  Do you know whether there has been
9  any production of anything in discovery outside of ESI?
10      THE WITNESS:  No.  I don't believe so.
11      THE COURT:  Any redirect?
12      MR. GORNICK:  No, Your Honor.  Thank you.
13      THE COURT:  All right.  Let's take a five-minute
14  recess.
15          (Recess taken.)
16      THE COURT:  Any more witnesses for the
17  plaintiff?
18      MR. GORNICK:  Your Honor, plaintiff rests.
19      THE COURT:  Any witnesses for the defendant?
20      MR. MCCONNELL:  As did the plaintiffs, we would
21  like to start with an opening statement, Your Honor.
22      THE COURT:  All right.
23      MR. MCCONNELL:  Thank you.  Thank you, Your
24  Honor.
25      There are a couple of key thematic points I'd like to

Page 248

1  start off with before we go through the evidence, and also
2  offer the explanations, if you have any questions, for
3  example, on the database issue, I'd like to say whatever I
4  can to clarify it, and also we will have a witness who I
5  hope is going to take you through the process, but also
6  supply whatever definitions that are needed to help you
7  make your decision.
8      But the key points that I think we need to keep as
9  overarching points for this hearing is that first of all,
10  this is a sanctions hearing.  It is not a hearing about a
11  motion to compel.  This is the first hearing in this case,
12  I believe, involving sanctions, and I hope for either side
13  the last.
14      But because it's a sanctions hearing, that transforms
15  the nature of what's going on here and what standards
16  apply.  In part, that's because it's not just a sanctions
17  hearing, but the sanctions that the plaintiffs are asking
18  for are severe sanctions, and the case law that was cited
19  actually by both sides, the cases have all uniformly said
20  that when you're seeking severe sanctions, like
21  dismissal -- in most of those case it looked like it was
22  dismissal of claims by plaintiffs.  Here the sanction that
23  the plaintiffs are seeking is basically dismissal of our
24  defenses, our learned intermediary defenses in the next
25  few months of cases, but basically the equivalent.

Page 249

1      And what the case law has said is that when you are
2  seeking a severe sanction, unlike perhaps with some other
3  sanctions that are sought, you actually do need a
4  violation of a court order, and you do need some sort of
5  willfulness or bad faith, and I'll put up some of the
6  cases later, although I'm sure Your Honor is familiar with
7  them.
8      The other point that I think is important is that
9  some of the issues that we have heard here today are
10  issues that exist nowhere in the plaintiffs' sanction
11  motion that was filed on July 3rd.  You can look at that
12  motion, it's very short, and it lays out points which we
13  then wanted to address, and we've heard points here today
14  that aren't in that sanctions motion anywhere, which is
15  sort of emblematic of the process that we've encountered
16  over the last few months of kind of this vast game of
17  Whac-a-Mole where the plaintiffs raise an issue and we try
18  to address it, and then another one comes up and another
19  one comes up, as if there is more of a determination to
20  keep issues existing rather than resolving legitimate
21  problems that exist.
22      The next point is, because the plaintiffs are seeking
23  severe sanctions, there has to be a showing of bad faith
24  or willfulness.  Problems in the production exist and have
25  existed.

Page 250

1    There is no showing of bad faith in this case.  You
2  may think that there's incompetence.  You may think that
3  there are things that should have been, could have been
4  done differently.  That's a far cry from bad faith, I
5  suggest.
6    Another point is that a lot of issues that have been
7  raised by the plaintiffs, both today and over the last
8  seven or eight months, are issues where things have been
9  resolved, or are very close to being resolved.  That's
10  important.
11    And the last point is that AstraZeneca has been, and
12  we're going to show you through our witness, is working
13  diligently to produce massive amounts of discovery.  This
14  Court issued an order on June 8, and you talked about the
15  technical issues, which this Court had been addressing for
16  months and months and months, and the parties have been
17  working on these issue, and this Court issued an order
18  deeming all issues regarding technical aspects of
19  defendant's initial production of documents and the pace
20  of that production to be moot.  "The Court will not hear
21  any further motions addressed to those issues."
22    We've still been working, we're still trying to
23  cooperate with the plaintiffs to address their concerns.
24  Sometimes there have been hiccups in the process.  Mostly
25  I think we've tried to be very, very civil, and you will

Page 251

1  see some of the e-mail exchanges that I think will show
2  kind of an asymmetry in that regard, where we've tried
3  very, very hard, and at times, and I think Mr. Jaffe's
4  testimony alluded to this, there came a point in time in
5  this case when, not Mr. Jaffe, but the plaintiffs' lawyers
6  said, you know what?  We're going to start just taking
7  these things to court.  And you see a real change in the
8  tenor.
9    And I know that no judge likes reading the back and
10  forth, the e-mails, the skirmishing between the parties.
11  Both sides have filed a lot of exhibits relating to this
12  hearing, and a lot of those exhibits are e-mails and are
13  the dialogue between parties.  And as painful as it might
14  be, I urge this Court to actually read as many of those as
15  you can, because I think it will give you a flavor for
16  what the parties have really been doing and who's really
17  been trying to work these issues out and who's actually
18  been trying to create issues.
19    But the fact is, we have been trying, and I think the
20  evidence will show this, we have been trying very hard to
21  resolve the issues, and we have tried very hard to produce
22  a massive amount of documents in an unprecedentedly short
23  period of time, Your Honor.
24    This chart shows we're almost at 10.5 million pages.
25  I don't think anybody has produced that many pages in so

Page 252

1  short a time.  Now, if somebody had a 0.1 percent error
2  rate, which is a pretty low error rate, if you had a
3  0.1 percent error rate, we would be talking about
4  something like 10,000 pages with problems.
5    One thing that we haven't seen anywhere in this
6  hearing or anywhere period, is any sense of the scope of
7  the problem with respect to the overall issue.  In other
8  words, we know what the denominator is, and we don't know
9  what the numerator is.
10    I dare say, Your Honor, if anybody, Mr. Martin or
11  anybody, anybody who you think is the greatest expert in
12  the world was put in charge of producing 10.5 million
13  pages in a matter of months, there would be problems.  I
14  think perfection is absolutely elusive here.  And I'm not
15  claiming that we're anywhere near perfect.  There were
16  problems.  But I'm saying those are problems that arise
17  from the nature of the task and are unavoidable.
18    In looking at the entire context, we haven't just
19  produced 10.5 million pages, but we have also -- can I see
20  the next chart, please -- we have also been putting
21  witnesses up for depositions.
22    You can see these are our witnesses who have been
23  deposed thus for.  In fact, one was deposed just
24  yesterday.  Now, that's relevant in a couple of respects.
25  It shows that the discovery in this case has been utterly

Page 253

1  one-sided.  We provided a lot of information, but you
2  remember that one of the issues --
3    THE COURT:  Don't, don't even say that.
4    MR. MCCONNELL:  Let me explain why this is
5  absolutely pertinent to what was said today.  And that is
6  that Mr. Gornick, I believe, said it wasn't possible for
7  the plaintiffs to come up with alternative search terms
8  because, and the exact quote was, "We didn't have access
9  to your people."
10    And that's not entirely true.  They've had access to
11  our people since early May.  If the plaintiffs wanted to
12  propose new, better, different search terms, they could
13  have done that as early as early May, and we would have
14  listened, and we're still ready to listen.
15    The issue with the search terms isn't that we're
16  saying we don't want to add search terms or we don't want
17  to do it differently.  Every time we have had a dialogue
18  about search terms, and it's only been recently because
19  they only raised it recently, we said, tell us what search
20  terms you want, we'll do it.  We'll run them.  Provided
21  they're reasonable.
22    And what the plaintiffs said to us in the most recent
23  meet and confer is, your search terms are terrible and you
24  omitted this, and you omitted this, and you omitted this,
25  and we said fine, what if we run those.  And they said

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 254

1  it's still not going to do it, and they basically said
2  search terms aren't going to work, period. And I think
3  that the e-mail traffic shows that, and we will direct you
4  to that.
5      In addition, I don't want the Court to be under the
6  impression that when we talk about the documents being
7  produced, that it's been wholly custodial. In addition to
8  the 80 custodians, and in fact the plaintiffs have asked
9  for other custodians and we're in the process of gathering
10  those documents, the plaintiffs have submitted a number of
11  other document requests, and this is relevant because to
12  the extent these document requests call for information
13  that exist in databases, we are seeking them and we are
14  producing them. So it's simply not correct to say
15  material hasn't been produced from databases.
16      In fact, Your Honor the NDA exists in a database
17  called GEL. That came out of a database. It's not that
18  we've said we're not producing things from databases. The
19  issue is what do we produce from databases, how much, and
20  how do we produce this.
21      The issue is, do we produce things from databases or
22  do we turn over an entire database? That's really the
23  debate here.
24      But if you look, what the plaintiffs did was in May,
25  they provided us with a set of 149 document requests,

Page 255

1  which even they said there are a lot of document requests
2  there that don't make sense, cut down to 76.
3      Then there was a second set with 62 requests, 100
4  subparts. Then there were third-party discovery
5  subpoenas, a set of 33 document requests. That's
6  important because one of those document requests is a
7  request for a database. And I'll show Your Honor that.
8  You will see that through the testimony.
9      So the plaintiffs know how to ask for a database
10  following the Rules of Civil Procedure when they need to.
11  They have done it one time.
12      There's a fourth set of 14 document requests that was
13  just filed on us. Our response is due August 23rd, and
14  the plaintiffs are saying we want your response sooner.
15  But the point is, a lot of documents have been collected,
16  are in the process of being collected, and will be
17  produced.
18      If I could turn to the next slide.
19      In addition, the plaintiffs want to depose not only
20  the 30(b)(6) witnesses, but they recently told us they
21  want to depose other witnesses, and they've listed 46,
22  although Your Honor has said they get 25. So that may be
23  an issue that we have to discuss.
24      Next chart, please.
25      If this is a sanctions hearing and the issue is good

Page 256

1  faith, I submit to Your Honor that there isn't evidence
2  that the defendants have lacked good faith. If anything,
3  there's evidence that the plaintiffs have lacked good
4  faith. And that if you look at the e-mails, and we'll go
5  through some of the specifics, they've gotten to a point
6  somewhere along this process where they are not interested
7  in resolving issues, but rather in creating them.
8      And by the way, when I say that, I don't address that
9  to Mr. Jaffe. Mr. Jaffe, the IT person that you just saw,
10  is somebody that we've been working with productively, but
11  as he said, there came a point where the lawyers took over
12  and said, we'd rather just take these issues to court.
13      What has happened is that there's a pattern where the
14  plaintiffs have basically attempted to create an issue
15  just prior to every hearing, because as long as these
16  hearings were about what we're not producing, they haven't
17  been about anything else. Your Honor obviously knows
18  what's been going on at these hearings.
19      And the plaintiffs provided absolutely no notice
20  before filing the motion that's the subject of this
21  hearing. That sanctions motion was filed July 3rd at
22  8:47 p.m., just before the July 5th hearing.
23      And since filing that motion, and again the e-mail
24  traffic that we have saddled you with shows this, there
25  hasn't been meet and confer. The local rules and the case

Page 257

1  law are clear that meet and confer means parties really
2  have to talk and really have to try to resolve issues.
3      A meet and confer isn't the same thing as a meet and
4  demand, and that's all that's happened. Even since before
5  the sanction motion, and since every time we've talked, if
6  we say, what do you want, what can we do, and they just
7  say, here's what we want. And basically it's the relief
8  that they're seeking in the sanctions motion. There's no
9  effort to try to say what search terms really will work,
10  what search terms really will get what's relevant but not
11  get all documents in the company.
12      That's the process that we need to engage in, some
13  sort of reasonable process to resolve issues instead of
14  just setting up motions.
15      The next chart, please.
16      THE COURT: When did you request them to supply
17  search terms or review your proposed search terms before
18  you set the computers loose?
19      MR. MCCONNELL: We didn't. When we did the
20  initial search, we had our set of search terms, and what
21  happened was --
22      THE COURT: Is that your custom, counselor?
23      MR. MCCONNELL: I don't have a custom on that
24  one way or the other.
25      THE COURT: Is that what Rule 26(f)

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 258

1  contemplates?
2      MR. MCCONNELL: I don't think Rule 26(f) applies
3  to how you decide on search terms.  Rule 26(f) is
4  producing documents.  And if you look at our list of the
5  search terms that we used --
6      THE COURT: You don't think there's any
7  obligation under Rule 26(f) to engage in a dialogue so
8  that documents that are produced can be relied on?
9      MR. MCCONNELL: On search terms?  No, I don't
10  think so.  I think our obligation is that we're supposed
11  to pick reasonable search terms that will provide the
12  documents that are reasonably called for and that are
13  relevant.
14      You have got our list of search terms.  Seroquel,
15  diabetes, all these terms.  At the time we thought that
16  was perfectly reasonable.  It did produce over
17  10.3 million documents.
18      You can say there are other terms that should have
19  been added.  Mr. Martin said it is typically an evolving
20  process.  You have a set of search terms.  As things go
21  on, you decide to start adding them.  We have asked
22  plaintiffs, what do you want to add, and that's the
23  process that's broken down.
24      But one thing that I want to be clear, the plaintiffs
25  have suggested that this is some vast surprise to them,

Page 259

1  that search terms were used.  And Your Honor is going to
2  see that in fact in November, one of the plaintiffs'
3  lawyers, Keith Jensen, knew that search terms were being
4  used.  So that's not a surprise.
5      The plaintiffs never asked us what search terms are
6  you using.  When we disclosed the search terms at the end
7  of April, they didn't provide any reaction whatsoever.  We
8  didn't hear anything about what other search terms should
9  be used until July.
10      And then when we said, okay, fine, we will run them,
11  they said it doesn't matter, because search terms
12  themselves are illegitimate.
13      The next slide.
14      I think that the record -- I'm sorry, the slide
15  before this.
16      The issue is the record before Your Honor and whether
17  that record supports any sort of sanctions.  And I would
18  submit to you that it doesn't under the appropriate case
19  law and under the facts.
20      First of all, not only does the law suggest when
21  you're talking about the kind of sanctions at issue here
22  that there has to be a violation of a court order and
23  there has to be something willful, we have got a situation
24  here, Your Honor, where the plaintiffs are asking for
25  sanctions because we have not produced things to them that

Page 260

1  they have not asked for.  And the specific databases are
2  paramount here.
3      The plaintiffs have asked for one database, and we
4  are actually responding to that.  The plaintiffs have not
5  ever submitted a request for the 59 databases, and there's
6  a good reason for that, because that's an absurd request.
7  If they actually teed that issue up the way you're
8  supposed to under the Federal Rules of Civil Procedure,
9  made a document request, for example, saying give us all
10  59 databases, and we provided objections, and then we had
11  a meet and confer process, and then it results in a motion
12  to compel and that issue arrived in front of Your Honor,
13  there would be a record worked out for you to make a
14  decision as to what should be produced and how it should
15  be produced and when it should be produced, and we didn't
16  have any of those things.
17      So to my mind, it's sort of strange to be sanctioned
18  not only when there hasn't been a court order or a motion
19  to compel, there hasn't even been a request.  In this
20  case, for a number of the items, there hasn't been a
21  proper request.  There hasn't been a motion to compel.
22  There really hasn't been any real meet and confer.  And in
23  the case of the sanctions motion, the only meet and confer
24  took place after the motion was filed.  And there hasn't
25  been any showing of actual prejudice.

Page 261

1      Your Honor, on the no proper request point, this is
2  reminiscent of an earlier hearing that took place before
3  Your Honor as well as Judge Conway.  You will remember
4  that the plaintiff said we want this, and we want that.
5  And the answer from both you and Judge Conway was, then
6  ask for it.  And that's what they did.  They submitted a
7  proper request, and we're off to the races and we've been
8  working on it.
9      If we can just take a look at CMO2, Your Honor, which
10  has been discussed a number of times already, especially
11  in the examination of Mr. Jaffe.  What Mr. Jaffe said is
12  that under CMO2, and this is what Mr. Gornick said, too,
13  it is contemplated that there doesn't have to be a request
14  for databases.
15      That is utterly not true.  And since you were a
16  draftsman of CMO2, you're in a better position to assess
17  that than anybody.
18      But on page 6 of CM02, it talks about databases and
19  the whole process and the way it was supposed to work, and
20  the way it was supposed to work is what the defendants
21  have done.  And that is, the plaintiffs named 14
22  categories they were interested in.  It's not as
23  Mr. Gornick said, we were supposed to produce all relevant
24  databases at a certain point in time.  They named specific
25  categories.  We were supposed to name databases that

66  (Pages 258 to 261)

Page 262

1  corresponded to those categories and we did.
2     We were supposed to make witnesses available for
3  interviews and we did.
4     And the order then says if the -- if after the
5  interview, plaintiffs determine that the individual cannot
6  adequately answer their questions or does not have the
7  requisite knowledge about the databases in question,
8  plaintiff shall identify the issues for which they seek
9  additional information.  They did not do that.
10    Later on, we submitted witnesses for depositions for
11 full days on the databases.  Every bit of information
12 regarding the databases that the plaintiffs have asked for
13 we have supplied.
14    There was one instance when they asked for to us fill
15 out the chart, and we had frankly had enough of them
16 nickel and diming us and asking for information on this
17 and this and this, and we shut it down for a couple of
18 days.  In the end, we filled out that chart.  We provided
19 that information.
20    But the point is, nowhere in CMO2 does it say that
21 there's no need to request information from databases.
22 And in fact, on page 10 of CMO2, there's a Section C
23 entitled "Databases."  And what it talks about is the
24 parties conferring regarding the discoverability -- I'm
25 reading from the order -- and feasibility of any request

Page 263

1  for production of the database, including the form and
2  scope of any such production.
3     And here's why that's important.  And here's what the
4  distinction is between the custodial production, that is
5  the documents that are sort of owned by individuals of the
6  company, and databases.  When we collected documents for a
7  custodian, which is just an employee in this case who had
8  something to do with Seroquel, we got all of the
9  information from their applications, that is their hard
10 drive, their Word files, their e-mails.  All that sort of
11 stuff.  That's stuff that is their documents.
12    Those aren't actually considered databases.  E-mail's
13 not a database, for example.  That's a question Your Honor
14 asked.
15    The difference would be, for example, you, Your
16 Honor, have your set of files.  I'm sure the courthouse
17 has databases regarding all sorts of things, intake and
18 outtake, payroll.  You would be shocked at how almost
19 every entity, every business has a number of databases.
20 Any company has lots and lots of databases with things
21 like payroll.
22    And in the case of AstraZeneca, there are databases
23 for all sorts of things.  Marketing alone has a number of
24 databases for the things that the sales reps use.  There
25 are databases for clinical trials.  There are databases

Page 264

1  for adverse events.
2     Those databases don't belong to anybody.  They don't
3  belong to me, they don't belong to you.  They exist, and
4  there is a lot of information, and some of that
5  information is going to be relevant to this case.
6     And what the plaintiffs are supposed to do is
7  propound document requests for stuff that is relevant from
8  those databases, and then we discuss the databases, how do
9  you get it.  Because you used the phrase terabytes, of
10 some these databases are multi-terabytes, they're huge.
11 Getting the stuff, extracting the data and extracting it
12 in a way that's reliable is really hard.  And they have to
13 ask for that information.  We have got to figure it out
14 and let's get it for them.
15    But what they're saying now is, you know, this
16 process of figuring out what's in these databases and how
17 hard it is to get stuff, no more.  We don't want it.  Just
18 give us the entire database.
19    And you're talking about a database, for example, an
20 adverse event report database, that is not Seroquel
21 specific.  None of these databases are Seroquel specific.
22 For them to say give us all 59 databases is an act of
23 insanity and has not been done anywhere.
24    And I'm going to show Your Honor a case later on from
25 the 11th Circuit saying plaintiffs can't just say we want

Page 265

1  access to all your databases.  It's crazy.  Because it's
2  huge, it's undoable, but also, the plaintiff would get
3  access to all sorts of material that is utterly
4  undiscoverable, that has nothing to do with the lawsuit.
5     So for the plaintiffs to say turn over all 59
6  databases in 30 days, is not an appropriate sanction no
7  matter what the conduct, even if you think there's bad
8  faith.
9     Your Honor, much has already been produced, and I'm
10 sure, Your Honor, that much will be produced in this case.
11 And we're not trying to get in the way of that.  This is
12 not helping us when we have hearings like this.  I mean,
13 we want to actually get to what this case is supposed to
14 be about, and it's not sort of this meta issue of what
15 we're producing and how we're producing it.
16    In addition, Your Honor, as I mentioned before, there
17 are a lot of new issues that have been raised in this
18 case, and I want to talk very briefly about them.
19    Voice mails.  If you look at the sanctions motion
20 that was filed by the plaintiffs, there's not a word in
21 there about voice mails, and yet we heard a lot about that
22 here today.
23    It's not an issue that nobody's thought of before.
24 This Court issued an order, CMO2, that talked about voice
25 mails.  What the Court said is, voice mail for

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 266

1   AstraZeneca, only to the extent practicable and to the
2   extent a custodian utilized a program that allowed
3   maintenance of such voice mail, that's what has to be
4   preserved.
5       So the issue isn't whether some AstraZeneca entity in
6   Switzerland had a program. The issue is in Wilmington,
7   who had what program that allowed them to save voice mail?
8   And there's a program called Message Manager, and the fact
9   is most of those custodians did not -- I don't know if any
10  of them had Message Manager at the time when the documents
11  were collected, but I'm going to find out.
12      And if there are voice mails that should have been
13  produced, we're going to get them. But that's what
14  actually applies here. I mean, it's not just sort of this
15  theoretical thing about what we want or what Martin thinks
16  is a good idea. What did this Court order and what do we
17  have to do? And we have to do that. And if we didn't do
18  that, then we better do it, and we understand that. But
19  voice mails is an entirely new issue.
20      Also, proxy searches. Mr. Martin came in here and
21  said that the search is no good, even though you've got
22  10.4 million documents, there should be more, because
23  though you searched for the custodians, you didn't search
24  for the proxies, and I guess that mostly means the
25  secretaries.

Page 267

1       And, you know, we didn't. Absolutely true. We
2   didn't. Didn't seem like a good idea, frankly. If Your
3   Honor thinks it is, fine, but it doesn't make sense. The
4   very example that Mr. Martin supplied shows why that is
5   frankly a little silly, because when a proxy sends
6   something out for a principal, typically it's a
7   ministerial thing, and typically the custodian is copied
8   on it, and if you're talking about Seroquel --
9       THE COURT: I don't know whether that's true.
10  People that don't like to use e-mail because they think
11  they're too busy don't want to get copies of those things
12  either. They want to be told in the morning here's your
13  agenda. They don't want to see any of that back and forth
14  or know that it's been done.
15      MR. MCCONNELL: And maybe it varies from
16  custodian to custodian.
17      THE COURT: Secretary of Homeland Security says
18  he doesn't do e-mail. I suspect he doesn't get copied on
19  what his assistant sends out.
20      MR. MCCONNELL: Well, now we're starting to
21  wonder if Vikram Dev does e-mails. But you're right.
22      THE COURT: I don't know. My point is, there
23  are people that manage, you know, that think they're too
24  busy to use e-mail. They've got other people doing it for
25  them. They're not going to be the same ones getting

Page 268

1   copies of it.
2       It seems pretty calculated not to provide stuff if
3   they're serious users of proxies.
4       MR. MCCONNELL: But we don't know if they're
5   serious users of proxies.
6       THE COURT: Why don't you know at this stage of
7   life? You're the one that chose the custodians and
8   interviewed them and decided how you do your work and made
9   the representation this is going to be an adequate
10  production of what AstraZeneca has.
11      MR. MCCONNELL: Because when you look at the
12  actual numbers of the documents, including the e-mails,
13  that people sent out, there is no paucity of e-mails,
14  except perhaps for Vikram Dev. I mean we'll talk about
15  the specifics and we will talk about some of the other
16  people they mentioned.
17      And here's my solution. My solution is, if -- they
18  get to name extra custodians. If they say, add to your
19  list the custodian who is the proxy for Vikram Dev, then
20  we do it, and that's what we have to do.
21      But to say do it en masse all the proxies -- you made
22  the point, there are some people who maybe are light
23  users, but then there are other people who aren't, so
24  collecting -- I mean you'd double the amount of the
25  documents you're looking at, if all the sudden you've got

Page 269

1   to look -- talk about terabytes. I've got to look for all
2   the secretaries for all the 80 custodians.
3       I mean maybe as you say there's some -- and maybe we
4   now have a factual record that says, all right, it makes
5   sense to get this proxy and that proxy, but to say that
6   there was bad faith because we didn't do that at the
7   outset, I don't think that holds water. And again, the
8   one example that their expert gave, if anything, seems to
9   validate our position.
10      But if we need to go and get more documents, we will
11  go and get them. I think we're at the point of
12  diminishing returns. If that's what we ought to do,
13  though, if that's what you think, then we will just do it.
14  And that's a constructive response than do this. We'll do
15  it. But just to say, you're bad guys and do the whole
16  thing over again, doesn't seem very constructive and
17  doesn't seem an appropriate sanction in any event.
18      I want to talk a little bit about the IND/NDA, and
19  most of this involves facts that aren't disputed. In
20  November of 2006, we produced 450,000 pages. There
21  were -- Your Honor probably recalls, there were formatting
22  issues.
23      In April the plaintiffs raised CANDA for the first
24  time, and it turns out we didn't include it. We should
25  have. And as soon as they told us for the first time --

68  (Pages 266 to 269)

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 270

1  and remember, they had the NDA between November and April,
2  and in fact, I think I'll be able to show you -- I don't
3  know if it's the next slide.  Yeah.
4      Here's Mr. Pennock in March of '07, and he says,
5  we've been provided the NDA, which we believe to be
6  complete.  And you know, I absolutely believe him, and --
7  because he was wrong, but it makes sense.  When you have
8  something this big and this complicated, you may think
9  it's all there and it's not.  It's not deception, it's not
10  hiding the ball.  What's the point of that?  It's hard
11  when you have this much complicated stuff to get it right.
12      We didn't get this right.  And when a month later he
13  figured out that we were missing CANDA and came into this
14  court and raised it, and it was raised for the first time
15  in here, as opposed to, you know, picking up the phone and
16  saying, where's CANDA, we went back and we investigated
17  and we got it.  And that is something that is solved.
18  Mr. Pennock here in an e-mail says, CANDA we agree was
19  produced.  We produced it.  We produced it late, and we
20  shouldn't have, but we produced it, and we did the best we
21  could.
22      Can I see the next slide, please.
23      Organization charts is another issue where it just
24  doesn't seem fair that here we are at a sanctions hearing
25  talking about something where actually we played by all

Page 271

1  the rules and there is no existing problem, Your Honor.
2      I mean what happened is -- here's the court order.
3  And it's not a court order, as suggested in the papers by
4  the plaintiffs -- this is something that was in the
5  sanctions motion -- where the order was we're supposed to
6  provide all organization charts back in January.  Not
7  true.
8      Look what CMO2 says.  "AstraZeneca shall produce to
9  lead counsel for plaintiffs available organizational
10  charts reflecting its general corporate structure, the
11  structure of the Seroquel team, and the structure of the
12  drug safety team for the past ten years."
13      Did we do that?  Your Honor, you have Exhibit 8 and 9
14  in front of you, defense exhibits.  That's what we
15  produced.  Take a look at them.  There's several
16  organization charts, including on drug safety.
17      I suggest that what we produced in January was
18  exactly what we were supposed to, and it is clear that the
19  Court did not contemplate in January we were supposed to
20  produce all of our charts.  How do I know that?  Because
21  the next line in the order says, "Plaintiffs may at any
22  time serve a written request for additional organizational
23  charts, and AstraZeneca reserves the right to object to
24  such requests."  So they can ask for more.
25      Now, what actually happened in this case?  And it is

Page 272

1  bizarre that we are being blamed, because what happened
2  next is, we on our own produced organization charts,
3  without them asking for it.  What happened was, they asked
4  for 30(b)(6) depositions, and I showed you the list of all
5  those people who were deposed, people from different
6  departments, and they asked for these people to show up
7  and to talk about the department and talk about the
8  organization of the department.
9      And what we did was we had those 30(b)(6) witnesses
10  go and collect organization charts for their organization
11  to help them testify.  So we showed up, and you can read
12  the excerpts provided by the plaintiffs, the Ann Barberian
13  deposition.  We showed up at the beginning and we said
14  guess what?  She's not just here, she's brought these
15  charts.
16      And what the plaintiffs say is, why didn't you give
17  them to us sooner?  You didn't ask for them.  We gave you
18  what we were supposed to give you under CMO2, and then we
19  on our own give you the organization charts to help the
20  witness testify, and now we're being criticized because we
21  didn't produce things in January that we were not required
22  to produce.
23      And moreover -- well, I want to turn to the issue of
24  search terms very quickly, and Mr. Martin, plaintiffs'
25  expert, even allowed -- I think everybody -- I think

Page 273

1  Mr. Jaffe has allowed that search terms are typically
2  used.
3      Why do I even have to say that?  That should be very
4  obvious.  In fact, it seems like the Court's interest is
5  in the right search terms, which is the proper inquiry.
6      But the problem is, in our effort to meet and confer
7  over search terms, what we're hearing from the plaintiffs
8  is forget about search terms.  And that's not right.  You
9  can't do this without search terms, when you're talking
10  about this much material, without even getting into the
11  databases.  You have to use search terms to keep this
12  thing under control.
13      The question is just using the right ones.  And if we
14  should use better ones, fine, but the fact is -- can
15  I see the next exhibit -- we don't have the Keith Jensen
16  talking about search terms?  Okay.
17      Oh, actually, Your Honor, it's not a slide.  It's
18  Exhibit 29.  Exhibit 29 in the defense exhibits, all of
19  which are now in evidence, Exhibit 29 shows plaintiffs'
20  counsel Keith Jensen discussing search terms in November.
21  Again, we all sort of understood that we were going to be
22  using search terms, and the plaintiffs have been aware of
23  the search terms since at least April.
24      And Exhibit 51 -- again, this is sort of the back and
25  forth thing that I know you don't ordinarily want to get

Page 274

1  into, but Exhibit 51 is an e-mail back and forth involving
2  a meet and confer that took place after they filed the
3  sanctions motion.  Plaintiffs filed the sanction motion on
4  July 3rd.
5       And then we had the hearing on July 5th, and Your
6  Honor set this hearing.  And then the next week we had a
7  meet and confer and we said, okay, let's talk about your
8  sanctions motion.  Let's talk about what your problems
9  are.
10      And they said your search terms are terrible.  And
11 you can read the e-mail traffic, because I said in a
12 confirming letter to Mr. Pennock, I said, you know, I'm
13 getting the sense that if I run search terms, you're
14 saying it's not enough, we've got to read all the document
15 in the company.
16      And he said, no, you just have to read all the
17 documents of the custodian.  So he's saying the way it's
18 supposed to work, according to Mr. Pennock, and this is
19 not in CMO2, it's not anywhere, it's not in the Sedona
20 Principles, he's saying, once you pick who the custodians
21 are, you just read all their documents, you don't get to
22 use search terms, which I mean, if you think there's been
23 a delay in the way things have been run, that would be
24 intractable.  And I hope Your Honor would never order such
25 a thing.  That makes no sense at all.  But that's

Page 275

1  basically where we are.
2       And I hope if Your Honor is going to do something
3  about search terms coming out of this hearing, that what
4  Your Honor will say is, the parties get together and come
5  up with a list of search terms that make sense.  And then
6  if we agree, great.  If we don't, you decide.
7       But I sure as heck hope you don't decide on search
8  terms where we're looking up words like best or FDA, which
9  is some of the things that the plaintiffs' expert
10 suggested.  That list of search terms was crazy.  We're
11 hearing a lot of criticism about our list of search terms,
12 which I hope Your Honor will look at.  Maybe you could add
13 a thing here or there.  But if this were a baseball
14 arbitration, Your Honor, where you're choosing just
15 between our proposal and theirs, our search terms make a
16 heck of a lot more sense than theirs.  You may say ours is
17 a little underinclusive.  There's is massively
18 overinclusive.
19      But if the right rule is that we come up with a
20 better set of search terms, then let's do it, but we both
21 have got to play by the same rules and agree that's going
22 do it.  I don't want to -- every time you run one of these
23 searches, it is extremely difficult to sort of do a search
24 and crawl through all these documents.  And we want to --
25 we can come up with a search with all the search terms we

Page 276

1  want and let's do it, and see how that works.  See if it
2  makes any difference.  I mean my suspicious is, it's very
3  marginal, but if that's what we need to do, let's do it,
4  but let's arrive at a result that makes sense.
5       The e-mails.  We heard about e-mails, this in April.
6  It was a hearing before Your Honor in April where the
7  plaintiffs raised the issue of e-mails, and here's what
8  they said.  Vikram Dev, no e-mails.  Then what else did
9  they say?  They said only 88 e-mails from Mueller, and
10 they said Bush had 275 e-mails.  And they said those are
11 really low numbers.  We said we're not done.
12      So what happened next?  As the production went on and
13 as we produced the documents going into June, we were not
14 hiding e-mails, we were not trying not to collect e-mails.
15 Almost half the documents that we produced are e-mails.
16      And the next, please.
17      And then let's talk about those three people about
18 whom the plaintiffs complain.  Remember Karen Mueller only
19 had a couple hundred e-mails.  Now we're not hearing her
20 name because it turned out there were 11,000 e-mails.  And
21 Vikram Dev 1,647 e-mails.  That's all e-mails, not just
22 authored.  Apparently plaintiffs were at one point
23 complaining about numbers of e-mails and now we're hearing
24 about authored e-mails, so it's a different issue which
25 deserves inquiry, which we're going to do and we are

Page 277

1  doing.
2       But Kimberly Bush, 5,211 e-mails, when we did a meet
3  and confer with the plaintiffs after the sanctions motion
4  was filed, they said, you know what?  Even though there
5  were a lot of e-mails by Kimberly Bush, she didn't have
6  very many in 2000, 2001, 2002, 2003, or some three-year
7  period.  And they said, so there's something fishy there.
8       There's nothing fishy there.  When we provided the
9  list of the 80 custodians, we also provided the list of
10 their positions.  Kimberly Bush for the years in question
11 had nothing to do with Seroquel.  So the fact that she
12 didn't have Seroquel e-mails during that period of time
13 proves nothing, except she was doing the job she was doing
14 and she wasn't doing the job she wasn't doing.
15      On databases.  Here's what happened.  14 categories
16 identified by plaintiffs.  We identified the databases
17 that corresponded and then we added.  I mean life goes on,
18 you find out more stuff and you add stuff, and we ended up
19 with more than 14, 21.
20      IT witness interviews.  Plaintiffs don't follow up.
21 Four days of IT witness testimony.
22      And then we hear about this chart.  Here's what
23 happened, Your Honor.  After the depositions, plaintiff
24 had come back to us and asked us a few more questions
25 about the database, and then more, and then more.  And it

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 278

1   was pretty clear -- I mean, after a while you wonder what
2   were the depositions for?  And they come back, and more
3   and more.
4       And frankly, it's exasperating.  And maybe this isn't
5   the best thing to do, but at a certain point when they
6   asked us for this chart we're like, when is this going to
7   stop, and so time out.  We called a timeout.  Said no,
8   we're not doing it.  Which wasn't the right idea.  And a
9   couple days later, four or five days later, we gave them
10  the chart.
11      Here's the chart, which is Exhibit 50, so Your Honor
12  has this.  This is the chart.  The plaintiffs said fill
13  this chart out, and we filled it out.  It's not complete
14  because it takes a lot of time to investigate these
15  databases, but what these -- what this chart shows you is,
16  for these databases -- by the way, they're not all
17  databases, as it turns out.  Some of these databases are
18  closed.  They're not active anymore.  That's a problem,
19  you know, accessing them.
20      Some of them are active.  That's a problem because
21  accessing them can make you have to shut down your
22  business.
23      Some of them are huge.  Compass, which is one of the
24  ones I know that the plaintiffs are interested in,
25  1.89 terabytes.  Though, again, these are databases.

Page 279

1   They're not custodial files.  They're huge.  They're
2   difficult.
3       We heard the phrase from Mr. Jaffe some of them are
4   customized or proprietary, so you don't necessarily want
5   somebody rooting around in them.  But the fact is, the
6   plaintiffs asked for the information about the databases,
7   ultimately we gave it to them.  A four-day delay on this
8   one.  I'm sorry.  But we did it.
9       And the way it's supposed to work, through Mr. Jaffe,
10  and if you think -- you know, through us, whatever IT
11  people we have, we need to carry on a dialogue, and let's
12  figure this out.  Figure out these databases.  What's in
13  there relating to Seroquel?  What's doable?  And then do
14  what the plaintiffs obviously know how to do, which is to
15  file a document request, since we already have four sets,
16  and say we want these documents, and if they're in the
17  database, we will produce them.
18      In fact, they know how do it.  The plaintiffs here
19  filed requests for production of documents.  This is June.
20  And there it is number 50, the e-Star database.  That is
21  the only time that the plaintiffs have properly asked for
22  a database, and we're working on it.
23      And the next slide.
24      And we have in fact produced documents from
25  databases.  Many of the requests that the plaintiffs have

Page 280

1   submitted, even though they don't say database, they ask
2   for certain sorts of documents and the only place you get
3   them is in a database.  So that's happened.  I mentioned
4   the GEL database for the IND.  Adverse events.  There's a
5   database called Clintrace.  We've produced material from
6   there.
7       Sales rep documents.  Your Honor has entered this
8   order with the plaintiff specific discovery and we've got
9   to provide information about sales reps.  We have to go to
10  databases to get that material, and we're doing it.
11      Compass, Touchstone, SnapPharma, PRA, eStar database,
12  ISS database, Webstir database.  Account payable they have
13  asked for.  MySAP and predecessor databases.  And IMS
14  data.
15      We have been going through these databases and we're
16  giving them materials from the databases.  I submit to you
17  that the databases is a non-issue, but if they want to ask
18  for more databases or information from databases, because
19  that's what we're talking about, then do it.
20      Think of databases as like file cabinets that hold
21  stuff and -- or pieces of paper where information exists.
22  If somebody in any litigation said, here's my request.  I
23  want everything relating to this issue in a file drawer or
24  everything relating to this issue on a piece of paper,
25  that is not a request that would withstand the objection,

Page 281

1   motion to compel process.  You have to make a request
2   that's intelligible, that we can discuss, and that Your
3   Honor can ultimately decide upon.
4       Your Honor, that's it for my opening statement.  I'm
5   sorry I went as long as I did, but I think when you hear
6   the testimony of our witness and you hear the process,
7   which has been a long drawn-out difficult process, I hope
8   not much more long and drawn out, hope not much more
9   difficult, we are trying to do the best we can.
10      And it could be better, and maybe it will be better,
11  and maybe Your Honor has ideas, but there's no effort to
12  hide the ball.  There's no effort to keep the plaintiffs
13  from getting what they are actually entitled to, and
14  there's no effort to show up for sanctions hearing,
15  because I don't think anybody wants that.
16      Thank you, Your Honor.
17      MR. FREEBERY:  The defense calls Andrew Dupre to
18  the stand.
19      (Witness sworn.)
20      DIRECT EXAMINATION
21  BY MR. FREEBERY:
22  Q   Good afternoon, Mr. Dupre.  By whom are you employed,
23  sir?
24  A   McCarter & English, LLP.
25  Q   And in what capacity are you employed by McCarter &

Page 282

1  English?
2  A   My title is associate attorney.
3  Q   How long have you been with McCarter & English?
4  A   Two years.
5  Q   And prior to joining the firm, where did you work?
6  A   I worked for the State of Delaware, State of Delaware
7  Superior Court.  It was the Trial Court of General
8  Jurisdiction in Delaware.
9  Q   And you were a law clerk?
10  A   Yes.
11  Q   Did you -- what was the position you held prior to
12  that?
13  A   I worked for the Delaware Court of Chancery, same
14  position.
15  Q   A law clerk?
16  A   Yes.
17  Q   Prior to your law clerk position, where did you work?
18  A   I worked for a subsidiary of Kellogg, Brown & Root on
19  a contract to the Dupont Company.
20  Q   And in what capacity?
21  A   My title was database analysis.
22  Q   How long did you work as a database analyst at that
23  time?
24  A   About two years.
25  Q   And what type of work did you do?

Page 283

1  A   I supported a business group, a specialty chemicals
2  business group in the Dupont Company.  Basically managing
3  information, from retrieving accounting data, legal
4  environmental support, best practices data, that kind of
5  thing.
6  Q   Now, in connection with your current job, did you
7  have occasion to become involved in the Seroquel product
8  liability litigation?
9  A   Yes, I did.
10  Q   And who do you represent in that litigation?
11  A   AstraZeneca.
12  Q   And in what capacity do you represent AstraZeneca?
13  What is your role in the litigation?
14  A   Well, I really have kind of three roles, I guess.
15  I'm a mid-level project manager reporting to the
16  partner-level attorneys that manage the document
17  production.
18  I have liaise role with the vendors, sometimes with
19  the plaintiffs, and you heard from Mr. Jaffe, I talk to
20  him a lot.  And I also have a litigation support role of
21  getting documents to the lawyers who are doing the cases.
22  Q   Let me first talk about your involvement in the
23  project management aspect of the litigation, in connection
24  with the production of documents.  Okay?
25  A   Sure.

Page 284

1  Q   When you first became -- well, when did you first
2  become involved in this litigation?
3  A   We were hired for this late February, maybe very
4  beginning of March.
5  Q   And at that time, do you have any idea how many pages
6  had been produced to plaintiffs?
7  A   About a quarter of a million, or three-quarters of a
8  million.  I'm sorry.
9  Q   Three-quarters of a million?
10  A   Yes.
11  Q   And at that time, were you aware of whether there was
12  any deadline for completion of the production of the
13  80 custodial files?
14  A   I think when I first became involved there was a
15  putative deadline of September 30th.  That subsequently
16  became June 30th.
17  Q   And let's talk about the status of production now,
18  that we're past June 30.  Were you able to meet the
19  deadlines that were set out by the Court, of the June 30
20  deadline?
21  A   To complete -- the deadline of June 30 was to
22  complete the custodial production for the first 80
23  custodians.  That production was completed on June 25.
24  Q   Okay.  And do you know how many documents were
25  actually produced?

Page 285

1  A   It was in the range of 840,000 unique documents.
2  Q   What do you mean by unique documents?
3  A   They were de-duped, so there's no copies of documents
4  or anything like that.  All 840,000 documents are de-duped
5  documents.
6  Q   How many pages does that translate to?
7  A   About 10.35 million.
8  Q   In addition to producing documents for the
9  custodians, has AstraZeneca also produced documents from
10  other sources?
11  A   Yes.  There's been many other sources.  We produced
12  the IND/NDA that we heard about.  We produced CANDA.  We
13  produced the org charts.  We produced documents that were
14  used as exhibits for 30(b)(6) depositions.  We produced
15  documents in response to requests for production.
16  So it was more than just custodians.
17  Q   Are you aware whether AstraZeneca is currently in the
18  process of running, processing additional custodial files?
19  A   Yes.  Plaintiffs have asked for 25 new custodians, I
20  believe, and we're running them up.
21  Q   And it's going through the collection process first.
22  Is that your understanding?
23  A   Well, that's right.  This is the first time they have
24  been named.
25  Q   There's been some issue on whether any documents from

Page 286

1  databases have been produced. Are you aware of any
2  documents from databases that have been processed and
3  produced to plaintiffs?
4  A   Yes. The IND/NDA was in a database. It was in a
5  database called GEL.
6      Documents from a database called Clintrace have been
7  produced. Documents from a database called E-Star either
8  have been or are just about to be produced. There was a
9  request for production.
10 Q   Switching gears a little bit, in addition to your
11 involvement in the -- with project management, production
12 of documents, you stated you were involved in dealing with
13 the vendors and in some cases the plaintiffs, correct?
14 A   That's right.
15 Q   And I'd like to talk about that now. Did you
16 initially become involved in speaking and liaising with
17 the plaintiffs in connection with any concerns they had
18 regarding the production?
19 A   Well, my initial work, say circa March and early
20 April, was behind the scenes. It was really to whip the
21 vendor to meet those production deadlines. There was a
22 series of meet and confers and hearings in April in which
23 the parties have reached out to each other, I guess to
24 discuss issues like CANDA.
25     And as time went on, issues such as CANDA developed

Page 287

1  into the technical issues that other people have discussed
2  up here today. It was decided, you know, in mid May or
3  so, that it should be me that should reach out to the
4  plaintiffs and talk about resolutions for these technical
5  issues.
6  Q   What was the reason for that?
7  A   Level of technical expertise, and we had asked for
8  several meets and confers. I believe we were ordered to
9  meet and confer maybe in the May 22nd hearing. So it was
10 in response to that.
11 Q   You mentioned first that there was a meet and confer
12 on May 15. Is that your recollection?
13 A   Yes, there was. Although I did not attend that
14 session.
15 Q   And CANDA, to your understanding, was one of the
16 issues raised?
17 A   There was e-mail traffic immediately after that said,
18 hey, let's talk about this CANDA. What is it? So, yes.
19 Q   Are you aware of another meet and confer that took
20 place in May?
21 A   There was another one on May 30th that I did attend.
22 It was in the New York City offices of Weitz & Luxenberg.
23 Q   Who attended that meeting in New York City with the
24 members of Weitz & Luxenberg?
25 A   Me, you, members of the Dechert law firm, who are

Page 288

1  lead counsel, and some technical people that work for
2  McCarter & English. IT professionals.
3  Q   And they were present at that meet and confer?
4  A   Oh, yes, they were there.
5  Q   What occurred at that meet and confer?
6  A   It was a pretty lengthy meet and confer, maybe five
7  hours or so. Jonathan Jaffe gave a presentation about all
8  the issues that he wanted to discuss. He had exemplars.
9  It was a PowerPoint presentation where he went through
10 various things. All the issues that ended up in the joint
11 statement of resolved issues, those are what we talked
12 about.
13     We went back and forth on a variety of that stuff.
14 We agreed to certain solutions right there, and we took
15 away several action items that needed further
16 investigation.
17 Q   Was that the first time you had heard of some of
18 these technical issues?
19 A   Yes.
20 Q   Was there -- what happened subsequent to the May 30
21 meet and confer?
22 A   There was an exchange of correspondence between me,
23 you, Mr. Freebery, Michael Pederson at Weitz & Luxenberg
24 and Jonathan Jaffe, also at Weitz & Luxenberg,
25 memorializing our understanding of what the issues were,

Page 289

1  what the action items were, what the agreed resolutions
2  were.
3  Q   And was there a second meet and confer in person?
4  A   Yes. We met again in Philadelphia on June 6.
5  Q   And what happened at the conclusion of that meeting?
6  A   By the time we reached June 6th, through the
7  correspondence between basically me and Jonathan Jaffe, we
8  had resolved every issue except production of native Excel
9  files. That issue was subsequently resolved at the June 6
10 meet and confer.
11     And we agreed to file the joint statement of resolved
12 issues.
13 Q   Did you participate, were you involved in the
14 drafting or at least the negotiation of that joint
15 statement?
16 A   Yes. We negotiated it. The plaintiffs drafted it.
17     MR. FREEBERY: Your Honor, may I approach the
18 witness with an exhibit?
19     THE COURT: Have you given it to counsel?
20     MR. FREEBERY: Yes, Your Honor. These are
21 exhibits that are in evidence already.
22     MR. GORNICK: Which exhibit?
23     MR. FREEBERY: This is Defendant's Exhibit 18.
24 BY MR. FREEBERY:
25 Q   Mr. Dupre, I'm handing you what's been premarked and

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 290

1    admitted into evidence as Defendant's Exhibit 18.  I'll
2    ask you to take a look at that document and tell me if you
3    recognize it.
4    A    Yes.  I have seen this document many times.  It's the
5    plaintiffs' joint statement of resolved issues and notice
6    that a hearing is not required.
7    Q    And in looking at this document, you notice that
8    there are some estimates provided within the paragraphs
9    explaining the resolution of the issues?
10   A    Yes.  I gave those estimates.
11   Q    Can you me what your understanding of those estimates
12   was?
13   A    Although there was some dispute about this later in
14   e-mail exchange between myself and Mr. Pennock, the
15   estimates were exactly what they say they are in this
16   file.  They're just estimates.  They weren't deadlines,
17   nor were they understood by any party who was at that meet
18   and confer session to be deadlines.
19   Q    And in fact, wasn't that confirmed by Mr. Pederson
20   subsequent to the filing of the joint statement?
21   A    Yes.  We met on June 6th at the meet and confer.  We
22   sort of had to rush this.  Plaintiffs had some delays
23   drafting it.  So we wanted to make very certain that even
24   though language wasn't in this, that the plaintiffs
25   memorialized their understanding that the times given in

Page 291

1    here were estimates.
2         So we asked Mike Pederson for an e-mail to that
3    effect and he obliged.
4    Q    I'm handing you what's been marked as Defendant's
5    Exhibit 22 and ask you to take a look at that and tell me
6    if you recognize it.
7    A    Yes.  That's the e-mail I just mentioned.  It's
8    addressed to me.
9    Q    What occurred then subsequent to the filing of the
10   joint statement?
11   A    Well, Your Honor entered it as an order a couple days
12   later.  Subsequently there were several easy technical
13   issues that we had to address.  I addressed those pretty
14   much immediately.  There were several, maybe four or five
15   that were much more difficult and required a scope of
16   work.
17        So I immediately went to the vendor.  I believe I may
18   have went to Boston to do that, to scope out this work in
19   several separate projects so they could proceed on
20   parallel tracks and get it done as fast as possible.
21   Q    And during this time, were you keeping plaintiffs
22   apprised of what was going on with implementation of the
23   agreed-upon resolutions?
24   A    Yeah.  At this time we had a pretty positive dialogue
25   with Mr. Jaffe and Mr. Pederson, so the lines of

Page 292

1    communication were open.  I think there was a -- there
2    were several e-mail exchanges shortly thereafter
3    culminating in my e-mail of June 14th to Jonathan Jaffe
4    explaining resolution of certain issues.
5    Q    Did you also provide plaintiffs with a status report
6    on the implementation of issues on June 25th?
7    A    Yes, I did.  This -- I should go back.  Defendant's
8    Exhibit 22, which is the e-mail, I promised Mike Pederson
9    that if the estimates would slip for any reason, that I
10   would promptly notify plaintiffs.  So after I went and
11   scoped the work with the vendor, created all the processes
12   that were necessary to implement the agreed technical
13   solution, I wrote a detailed e-mail to Michael Pederson
14   and Jonathan Jaffe on June 25, and that e-mail was a
15   status report on all the agreed technical resolutions.
16   Q    Mr. Dupre, I'm handing you what's been premarked and
17   admitted into evidence as Exhibit 16.01.  It's a
18   plaintiff's exhibit.  And ask you to take a look at that
19   and tell me if you recognize it.
20   A    Yes.  This is the e-mail I just mentioned.  It's
21   addressed to Michael Pederson and Jonathan Jaffe and some
22   other technical people that work for the plaintiffs.
23   Q    Now, take me back to where you are and where the
24   defendants feel like they are at around June 25, 2007.
25   A    We were pretty good on June 25th.  We finished the

Page 293

1    custodial protection that day and we delivered it to
2    plaintiffs, so we had made the June 30th deadline, which
3    was difficult for both lawyers and technical people.
4         And then subsequently we had scoped all the work to
5    resolve all the technical issues that were outstanding
6    with the custodial production.  So as far as we knew, you
7    know, the end was in sight regarding both the technical
8    issues and the custodial production.
9         Vis-a-vis the plaintiffs, the lines of communication
10   were open.  We had a good dialogue.  That's why I sent
11   this e-mail.
12   Q    And what happened, or let's say how long did this
13   period of thinking we're out of the woods last?
14   A    Until June 27th.
15   Q    And what happened on June 27th?
16   A    On June 27th, Paul Pennock wrote an e-mail to Fred
17   Magaziner, who is counsel for AstraZeneca, rejecting the
18   solution and status update that I gave in this June 25th
19   e-mail.
20   Q    Mr. Dupre, I'm handing you what has been premarked as
21   Defendant's Exhibit No. 25.  I'd ask you to take a look at
22   that and tell me if you recognize it.
23   A    This is the end of the e-mail string that started
24   with that June 27th e-mail from Paul Pennock that I just
25   mentioned.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 294

1  Q   In your initial reading of Mr. Pennock's e-mail, what
2  language stood out to you?
3  A   Well, in a personal context there is a line in here
4  where Mr. Pennock says, "You better have somebody down in
5  Orlando next week," which obviously meant me, "to answer
6  for breaches in our agreements and their general failure
7  to abide by CMO."
8      That stood out to me because I had to cancel a
9  personal vacation. So that was the first thing I saw.
10 Q   Now, did you have any understanding at that time
11 where Mr. Pennock was coming from?
12 A   Well, when I read through the e-mail a couple times,
13 at first I thought he was misinformed, frankly. He hadn't
14 been part of any of the meet and confer sessions. Mike
15 Pederson was the attorney and Jonathan Jaffe was the
16 technical expert, so he wasn't in the room. And I thought
17 maybe he was transferring disputes about other things onto
18 this stuff where there were no remaining disputes.
19     So I responded to him and offered him a more detailed
20 response of where we were on every issue.
21 Q   Let me ask you this: After filing the joint
22 resolution with the Court and receiving the Court's order,
23 and prior to this June 27 e-mail from Mr. Pennock, had you
24 heard any complaints or did Mr. Jaffe or Mr. Pederson
25 raise any issues with respect to the technical fixes we

Page 295

1  were in the process of implementing?
2  A   No. There were no complaints with the technical
3  issues between when we made the joint filing, and
4  Mr. Pennock's complaint I believe was the first.
5  Q   Now, what did you do in response to this letter?
6  A   Well, like I said, I responded. I gave a detailed
7  point-by-point response of where Mr. Pennock was
8  inaccurate or where he had misunderstood the agreement.
9      And he responded to me that we will talk about it in
10 Orlando.
11 Q   And in fact, if I could draw your attention to the
12 first page of that e-mail string, and could you read to me
13 the section you're referring to?
14 A   This is a response from Mr. Pennock to my detailed
15 status report. It says, "You're in breach or you've
16 dragged on far too long. We've been more than patient.
17 We will deal with it next week," which was a reference to
18 the July 5th status conference.
19 Q   It seems like an actual time to actually kind of dive
20 into the technical issues. And maybe a logical way to do
21 it is to go through this e-mail.
22     The first issue that is addressed is load files. Do
23 you see that?
24 A   Yes.
25 Q   Can you tell me what the issue with respect to load

Page 296

1  files is or was?
2  A   Yes. We had many parallel productions going on at
3  once to try to meet the June 30 deadline, so it wasn't
4  just one massive pile of documents slowly inching its way
5  through by itself. It was running on many, many parallel
6  tracks, many smaller projects.
7      Now, it turned out due to vendor error, the
8  nomenclature that was in the load files which tells the
9  plaintiffs how to load documents was inconsistent between
10 these many projects. So, for example, some project
11 manager would put 7-7-06 for a date and another one would
12 put 7/7/06 for a date. Mr. Jaffe said this was causing
13 plaintiffs problems, but for the most part they were able
14 to -- they ran a normalization problem that allowed them
15 to search the data.
16     So they asked us to give them corrected load files
17 with consistent nomenclature, which we agreed at the
18 May 30th hearing, and we agreed to do that.
19     I should address a point on this. Mr. Martin earlier
20 today, I heard him say that the plaintiffs were unable to
21 use these load files to load documents. They're not meant
22 to load document. There is no way that you could possibly
23 do that. And the reason is, we provided them just as a
24 cross-reference.
25     To make them load documents, you would have to go

Page 297

1  into the underlying metadata of the documents that the
2  plaintiffs already possess and make them match. The point
3  of this was to give consistent nomenclature. It was never
4  intended to work the way that Mr. Martin said.
5  Q   The plaintiffs understood that?
6  A   Oh, yeah. That was the whole point. If we had to
7  redeliver all the documents all over again, there is no
8  possible way we could have done that and still made the
9  June 30th production deadline.
10     So Mr. Jaffe wanted this as a cross-reference table.
11 It wasn't meant to be what was described earlier today.
12 Q   What was Mr. Pennock's response in here on -- or what
13 was his issue with respect to load files?
14 A   Mr. Pennock says, "Corrected load files are to be
15 done July 7th per our agreement. Your people now tell
16 us" -- "your people" meaning me -- "that it will perhaps
17 happen by July 15th. That's not acceptable. We had an
18 agreement about which we informed the Court, and this must
19 be done by July 7th."
20     So he's complaining that I told him that the estimate
21 that I had given him would have to be pushed out a week.
22 Q   Was that an accurate statement by Mr. Pennock?
23 A   That's not correct. The simple fact of the matter
24 is, we gave an estimate for all of this work. We
25 delineated it through the -- through what was filed on

Page 298

1  June 7th, the joint statement to resolve technical issues,
2  and everybody understood these to be estimates. In fact,
3  I had to specifically agree with Mike Pederson that if the
4  estimates moved, I would promptly tell the plaintiffs.
5      So his assertion that it was a deadline or that we
6  had some agreement to get it done July 7th was simply
7  incorrect.
8  Q   And did you inform Mr. Pennock in this e-mail of
9  that?
10  A   Yes.
11  Q   Have the load files been produced to plaintiffs?
12  A   Yes. They were delivered last week.
13  Q   Let's talk about the next issue here, which is
14  metadata consistency. Can you explain to me what that
15  issue is?
16  A   It's really part and parcel of the same issue.
17  Metadata consistency is just, as I said with the dates, if
18  it's 7-06-07 instead of 7/06 -- it's just a nomenclature
19  issue. We agreed to certain nomenclature, like once and
20  for all separate the custodian first and last names by a
21  comma instead of a pipe symbol or a hash mark. And we
22  agreed to that on May 30th, so, obviously what
23  Mr. Pederson is saying here is that we can't verify that
24  you gave us consistent metadata per what you agreed until
25  we get the new load files, and I responded, well, of

Page 299

1  course. It obviously would be impossible.
2  Q   And has that since been rectified?
3  A   Sure. It's part and parcel of the first issue.
4  Q   So with the delivery of load files, the issue is
5  resolved?
6  A   That's right. It's resolved.
7  Q   The third issue on this list is swapped metadata
8  field. Can you explain that for the Court, what that
9  issue was.
10  A   This is a slight variation of the first two issues.
11  Like I said, there were numerous production teams running
12  at the same time, and sometimes a production team would,
13  say, put source name as the first field or creation date
14  as the first field of the document. And a different
15  production team would invert that. They would put
16  creation date instead of source date.
17      So what we had to do was agree with Mr. Jaffe that we
18  would give a consistent order, which was set out at that
19  May 30th meet and confer, and then do it in the load
20  files.
21      There was an additional concern by plaintiffs that
22  the swapped metadata fields were actually in the
23  underlying documents, that they were miscoded in the
24  underlying documents. Mr. Jaffe asked me to conduct an
25  investigation to see if that was true. And I agreed, of

Page 300

1  course. And it turned out not to be true. It was the
2  load files that were the problem.
3  Q   So that issue is resolved?
4  A   Yes. It was resolved on June 14th.
5  Q   A big issue that appears next is the page break
6  issue, and we've heard a lot about that today. Can you
7  explain what that issue is?
8  A   Well, every document that we give to the plaintiffs
9  is a tagged image file format or TIFF file, which is
10  similar to the more commonly used PDF file, and that is
11  accompanied by an extracted text file that has all the
12  text that's in that document so the plaintiffs can read
13  and review it.
14      The issue here was that that extracted text file, as
15  we have heard from everybody else who's been up here
16  today, didn't have page breaks in it. Jonathan Jaffe came
17  up with a solution, rather ingenuously, I must say, to put
18  page breaks on there as if we were printing the documents,
19  even though they were never going to be printed. He was
20  basically cannibalizing a print driver and overlaying it
21  onto these extracted text files in order to hard insert
22  page breaks on them.
23  Q   And did we implement Mr. Jaffe's solution?
24  A   Yeah. It actually took a little bit more doing than
25  I think he expected. When we had spoke on May 30 with

Page 301

1  Jonathan, he had tested this solution for about 1,000 -- a
2  production of 1,000 documents. Well, that was all well
3  and good except that we had to do it for 10.3 million
4  documents.
5      So when we scaled this solution up into the millions,
6  it turned out errors that were small in a 1,000-page
7  production would be very large, like the solution would
8  start to lose and the page breaks would be farther and
9  farther and farther away from the matching TIFF. So we
10  had a lot of problems scaling this.
11      We eventually overcame them, and then we had to
12  automate it to run on the template from the pages.
13  Q   And when were we able to finally resolve this issue
14  and implement the page breaks?
15  A   Once we had the solution and the automated script, I
16  mean it took about two weeks, and I think we delivered the
17  page breaks last week as well, for all the documents that
18  were over ten pages.
19  Q   Are you familiar with CMO2?
20  A   Yes.
21  Q   And to your knowledge, are page breaks on extracted
22  text required anywhere in Case Management Order 2?
23  A   No. They're not.
24  Q   And why in this case then did we provide them to the
25  plaintiffs?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 302

1  A   That's an accommodation.  This was really important
2  to Mr. Jaffe.
3  Q   Now, you heard Mr. Jaffe say that even after we
4  agreed to this solution, that productions were still
5  coming in and had some problems.  Do you recall him saying
6  that today?
7  A   Yes.
8  Q   Can you explain that?
9  A   That was the only thing -- well, it was the only
10 thing I thought there was a bit of disingenuity.  We
11 discussed this very thoroughly at the May 30th meeting,
12 and to be very frank, we were very, very clear that the
13 80 custodians were already burning their way through the
14 pipeline and they had to be put out at top speed in order
15 to be produced on June 30th.  It was all cylinders firing
16 to be able to do that at all.
17     There was no way that we could possibly have
18 interrupted those productions to do all these tech fixes,
19 many of which were cosmetic.  We had to do them after we
20 completed the 80 custodians.  Which is what we did.
21 Q   And all these tech fixes that we're talking about,
22 were you implementing these solutions and utilizing vendor
23 resources in the midst of our production?
24 A   Yeah.  We had to pull off some very substantial
25 high-level vendor resources because it wasn't just a drone

Page 303

1  who was sitting there, you know, pushing a production
2  button.  These were guys that had to write scripting and
3  solve the scalability problems, figure out how to
4  normalize the data.  We had to utilize some of our highest
5  level resources.
6  Q   And Zantaz is the vendor you're utilizing?
7  A   That's right.
8  Q   Can you give me just a brief description of Zantaz's
9  credentials, if you're aware?
10 A   They're a top five production vendor.  At least
11 everyone tells me.  And AstraZeneca has used them on other
12 projects.
13 Q   Can you tell me what your day-to-day involvement with
14 Zantaz is?
15 A   It's extensive, to say the least.  There is a daily
16 status call with Zantaz 10:30 every working day that
17 usually lasts an hour and a half or so.
18     In addition to that, I'm probably on the phone with
19 them between 10 to 20 times a day, managing various
20 production issues.
21     They're running seven days a week.  So am I.  Their
22 production effort runs 24/7.
23 Q   Do weekends mean anything in this production?
24 A   No.  Nor holidays.
25 Q   One of the other tech issues that was addressed in

Page 304

1  this e-mail is the Excel sheets, and I think that appears
2  at number 5, Mr. Dupre.  Do you see that?
3  A   Yes.
4  Q   Can you tell me what the issue is with respect to
5  Excel sheets or what it was?
6  A   Sure.  This goes to the very heart of producing
7  documents in a tagged image file format.  When you use a
8  TIFF, when you TIFF a document, it's sort of like running
9  it through a scanner.  It takes a bite of the document to
10 display, and obviously it takes an eight-and-a-half-by-11
11 bite because that's what everything usually displays at, a
12 PDF or a Word document would display at.
13     Now, often Excels are not used that way.  Excels
14 could be, you know, if you wanted to print them 20 feet
15 long, because they have 2,000 columns.  They're used like
16 databases.  So when you TIFF an Excel sheet that's meant
17 to be used as a database and not really meant to be used
18 as a print module, so it's used to run reports but not to
19 use as a print module, a TIFFing engine is not going to
20 make that look like the Excel sheet that you would see on
21 the screen.  It would come out in eight-and-a-half-by-11
22 bites that don't necessarily correspond to anything that
23 you will see on the screen.
24 Q   And who came up with the solution to fix this issue?
25 A   I did.

Page 305

1  Q   And what was the solution?
2  A   The solution was to deliver to plaintiffs native
3  Excel files with scrubbed metadata, because plaintiffs had
4  already had all the metadata they're entitled to under
5  CMO2 in the TIFFs that we had previously delivered, in
6  read-only format, locked down so there wouldn't be any
7  arguments about authenticating them later.
8  Q   And were the Excel sheets eventually produced to
9  plaintiffs?
10 A   Yes.  All the Excel sheets for all the custodians in
11 the format I just described were produced last week.
12 Q   Let me draw your attention to the dialogue between
13 you and Mr. Pennock in this e-mail.  What was his
14 complaint pursuant to or pertaining to the Excel sheets?
15 A   Perhaps I should just read it.  It says, "Your people
16 have only now" -- "your people" meaning me -- "have only
17 given us a timetable with respect to the Excel sheets.
18 You've now told us that it won't be done by July 31st,
19 instead of the generally understood on or about July 7th.
20 This is another breach."
21 Q   What was your response?
22 A   I told Mr. Pennock that we'd never given any date at
23 all for the Excel sheets for the simple reason that we had
24 invented this process.  We obviously couldn't scope or
25 timetable a process that hadn't even been invented yet.

Page 306

1  He was simply wrong about the deadline.
2  Q   Now, this off-the-shelf normalization protocol, who
3  actually bore the expense of all this?
4  A   AstraZeneca. We tried -- actually, I should explain
5  that we tried an off-the-shelf piece of software to
6  normalize the data. By normalize, I mean unhide rows,
7  show columns, show the number that belongs in a cell
8  instead of a formula.
9     That didn't work for this project. We had to invent
10 a script in order to be able to do it. So we bore both
11 the cost of the software that we bought that didn't work
12 and then subsequently the cost of paying the vendor to
13 write the script that did work.
14 Q   Skipping down to the blank documents issue,
15 Mr. Dupre. Tell me what that is. We heard something
16 about it earlier today.
17 A   There were several issues that related to blank
18 documents. It's really kind of a misnomer to call them
19 blank. The key one, I guess, was a document that was
20 shown to me by Scott Allen in the June 6 meet and confer
21 in which the pages were mismatched. The order didn't make
22 any sense.
23    We were able to trace that error to a single
24 production error for two custodians, in which they tried
25 to rush something out the door and they chopped a digit

Page 307

1  off the control number so they put a bunch of pages
2  together that didn't match. It was about 5600 pages,
3  which we redelivered to the plaintiffs last week.
4     There were additional blank documents in which the
5  vendor that TIFFed all these documents, their blank page
6  remover in their TIFF module didn't fire. I explained to
7  plaintiffs that that's a cosmetic issue. We're willing to
8  fix it, but you've got to tell us how because it's going
9  to screw up all the Bates numbering, et cetera. I don't
10 believe I received a response to that.
11 Q   Okay. If you actually look at the last full textual
12 paragraph, under the blank documents section, beginning,
13 "There are some." You see that?
14 A   Yes. "There are some technical issues about how
15 plaintiffs may want these documents produced. For
16 example, should they keep the old Bates number even if the
17 page counts will differ, or get new Bates numbers. I'd
18 like to work with your technical team to produce corrected
19 copies of these documents in a manner that will satisfy
20 plaintiffs."
21    Obviously it wouldn't do me any good to produce them
22 in a way that wouldn't satisfy them.
23 Q   What's been the fallout from that?
24 A   There was a second e-mail from me to Jonathan Jaffe
25 saying, how do you want these documents produced? We've

Page 308

1  got a page number issue here. Do you want them to replace
2  the old Bates numbers? Do you want new Bates numbers on
3  them?
4     Nobody ever answered me, so we just produced them
5  with new Bates just to be safe.
6  Q   And that was done when?
7  A   Last week.
8  Q   If you could skip to what we label, at number 11,
9  item 12CRS. Tell me what that is.
10 A   Item 12CRS is what the plaintiffs refer to as CANDA.
11 It's been extensively discussed in this Court. It's a
12 computer-assisted new drug application. It's an
13 application in which you enter information when you're
14 doing a new drug app to go to the FDA.
15    We produced that on June 8th, maybe 11th.
16 Q   Have you heard any complaints or have plaintiffs
17 brought up any issues regarding the CANDA production since
18 it was produced?
19 A   In the motion for sanction they complained it was
20 late. I don't think there's any problems with the format.
21 Q   If you could move down to item number 14 in the
22 e-mail, sir.
23 A   Yes.
24 Q   And that deals with the certification issue, correct?
25 A   Yes.

Page 309

1  Q   Can you tell me about that issue and the genesis of
2  it?
3  A   In mid April there were discussions, of which I was
4  not originally part of but became aware of later, talking
5  about certifying when it was safe for the plaintiffs to
6  depose the custodians. And that evolved into us providing
7  this certification that okay, the custodian's done, go
8  depose him if you want to.
9     The first of those certification that we gave was on
10 April 30th, and we drafted a certification that said, hey,
11 we got custodian documents from here, there and
12 everywhere, and this is the search term list we used to
13 see if they relate to Seroquel.
14 Q   Okay. And that was provided to plaintiffs when? I'm
15 sorry.
16 A   April 30.
17 Q   Mr. Dupre, I'm handing you what's been marked as
18 Defendant's Exhibit 30. I ask you to take a look at that
19 and tell me if you recognize it.
20 A   Yes. This is the April 30 certification.
21 Q   What was the plaintiffs' response to receiving that
22 certification?
23 A   Plaintiffs rejected it shortly thereafter. There was
24 a back and forth between, say, April 30th and mid May.
25 Subsequently we redrafted the certification and gave them

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 310

1  a different one that we thought met their concerns on
2  May 18. Plaintiffs rejected that one as well.
3      There was more back and forth of, hey, put
4  BlackBerrys in there, and similar things like that. We
5  gave them yet another certification draft on June 12th.
6  They sat on that one for several weeks and ultimately it
7  was rejected by Mr. Pennock in this June 27th e-mail.
8  Q   Okay. Let me make sure that I'm following you right.
9  I'm handing you what's been premarked as AstraZeneca
10 Exhibit 26. I ask you to take a look at that and tell me
11 if you recognize it.
12 A   Yes. I was the one who sent the June 12th draft
13 certification to the plaintiffs, and this is the e-mail by
14 which I did so.
15 Q   And you stated that we didn't hear anything back
16 initially?
17 A   That's right. Not until June 27, I believe. I think
18 we asked a couple times, to no response.
19 Q   Let me hand you what's been marked as Defendant's
20 Exhibit 27 and ask you to take a look at that. Tell me if
21 you recognize that.
22 A   Yes. I remember this e-mail. This is an e-mail from
23 you, Jim Freebery, to Mike Pederson, asking if they have
24 reviewed and do sign off on the revised certification
25 language.

Page 311

1  Q   And what was his response?
2  A   "Jim, we're looking it over."
3  Q   Now, one of the things that he eventually complained
4  about, at least in this e-mail, was the search terms; is
5  that accurate?
6  A   That's right.
7  Q   And why don't we talk about that, while we're on the
8  topic of search terms. Why do you use search terms?
9  A   Well, AstraZeneca --
10     MR. GORNICK: Objection. No foundation.
11     THE COURT: Overruled.
12     MR. GORNICK: This man's been a lawyer for two
13 years.
14     THE COURT: Overruled.
15     THE WITNESS: There were many millions, tens of
16 millions and millions and millions of documents that were
17 collected from the custodians. Obviously they don't all
18 just work on Seroquel. They're not sitting there only
19 using their e-mails to type Seroquel e-mails. They're
20 typing e-mails about other drugs and they're typing
21 e-mails that are meet us in the conference room for
22 birthday cake.
23     You've got to somehow -- at least we thought you have
24 to somehow limit the documents to the ones that are
25 related to this case in some way. That's why there's

Page 312

1  search terms.
2  BY MR. FREEBERY:
3  Q   And what has the list of search terms that
4  AstraZeneca implemented on the custodial production
5  yielded for the 80 custodians?
6  A   About 840,000 unique documents.
7  Q   Now, at any point after April 30, 2007, when we
8  provided plaintiffs with a list of search terms, had
9  plaintiffs suggested any other search terms that we should
10 implement?
11 A   The first time I saw any suggestion was in the motion
12 for sanctions. I'm not sure you'd qualify it as a
13 suggestion, that they said they should have used
14 quetiapine and DM. That was brought up again on
15 subsequent calls around July 17. Could you use quetiapine
16 and DM.
17 A   We agreed to search for quetiapine and DM as a result
18 of that call.
19 Q   And did we actually begin that search?
20 A   Yes. It's going on right now.
21 Q   Do you know where it is in the process?
22 A   I think it's almost done.
23 Q   And when you say almost done, what do you mean?
24 A   Well, they searched the discard pile for quetiapine
25 and DM, and they then gave those unde-duplicated documents

Page 313

1  for de-duplication.
2  Q   But that process is not finished yet?
3  A   No, I don't believe it's finished.
4      THE COURT: Do you have an understanding of why
5  it takes a while to implement that process?
6      THE WITNESS: Well, sure. They've got to search
7  for the terms in the unde-duplicated documents, so it's
8  got to crawl through the tens and tens and tens and tens
9  of millions of documents and not just a couple
10 de-duplicated documents.
11 BY MR. FREEBERY:
12 Q   Now, why did we actually begin that search for
13 quetiapine and DM?
14 A   Well, we saw it in the motion for sanctions, and then
15 it came up again in a meet and confer call around June, or
16 July 17. Plaintiffs mentioned it, so we agreed to do it.
17 Q   Are you aware of whether defendants actually asked
18 plaintiffs if they would provide additional search terms?
19 A   Yes. I was on that call. There were a lot of
20 counsel on that call, from both sides. We did ask for
21 additional searches because it doesn't make sense to do
22 the searches piecemeal. It's just as hard to search for
23 40 terms, say, as it is to search for two. You've got to
24 crawl through all the documents, and they're tens of
25 millions of them.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 314

1    So on that call I believe it may have been me who
2    said, well, are there any other terms that you want while
3    we're at it?  The response was, we can't possibly give a
4    list of -- a complete list of search terms, et cetera.
5    Q    But subsequent to that, did actually Mr. Gornick
6    provide AstraZeneca with some additional search terms?
7    A    Yes, he did.  He e-mailed them maybe two days later.
8    Q    Does July 19th, does that sound accurate to you?
9    A    Yeah, that's about right.
10   Q    And then we had Mr. Martin's list that you were in
11   the courtroom to listen to today?
12   A    Yes.  I reviewed that list as well.  The first time I
13   saw it was when it was filed to support this hearing,
14   though.
15   Q    Are you aware again whether AstraZeneca has notified
16   plaintiffs they're willing to run additional searches?
17   A    Oh, yes.  I personally notified them that we were.
18   Q    Are you aware of any other methods that plaintiffs
19   would have to obtain documents that they were interested
20   in?
21   A    Well, it's not difficult.  The plaintiffs make
22   requests for productions.  There's quite a few of them,
23   and when they make a request for production, we go get
24   documents, whether or not it has a keyword search term in
25   it.

Page 315

1    So if they believe that we missed something, they can
2    ask for it.
3    Q    Okay.  Let me jump back just for reference, back to
4    Mr. Pennock's e-mail, which is Exhibit, I believe 25, and
5    touch on the last issue, which is databases.  Do you have
6    that in front of you still, Mr. Dupre?
7    A    Yes, I do.
8    Q    Can you tell me what the issue is with the databases?
9    A    Well, there has been a breakdown of communication
10   about the meet and confer process that goes with the
11   databases.  To be very concise, we had a good dialogue
12   going about this around early June.  Some people believed
13   that the plaintiffs were kind of jerking us around a bit
14   in asking us to go get a bunch of information that they
15   should have gotten in the depositions of the IT witnesses.
16   So we called a halt to putting together this chart.
17   Subsequently we said, well, all right, we will go comb the
18   depositions and get this information and go ask people,
19   and then we gave them the chart about three days later.
20   But ever since then, the dialogue has totally broken down.
21   Q    Were you involved in the initial set of meet and
22   confers and calls on this issue?
23   A    Yes.  Although I was not in charge of this issue,
24   like I was with the tech fixes.
25   Q    And what was your understanding of how the process

Page 316

1    was going to work with respect to identifying documents
2    within databases to provide to plaintiffs?
3    A    Well, the idea is you've got to limit it somehow.  I
4    mean everybody was pretty clear that these databases don't
5    just relate to Seroquel.  For instance, some of the ones
6    they want are payroll databases.  They relate to every
7    employee in the company.
8    The idea was that we would talk and figure out what
9    plaintiffs actually really wanted, narrow down the
10   thousands of fields of databases into some
11   manageable subset of information that they really wanted,
12   and then we would go get that information from the
13   databases.
14   Q    At any time was there discussion of any kind of
15   wholesale production of databases?
16   A    No.  Because it would be absurd.  It would just
17   deluge everybody with irrelevant information.
18   Q    And plaintiffs, to your understanding, were engaging
19   and they understood the process on meet and confers on
20   databases at that time?
21   A    That's right.  Until we came to the point where we
22   said, you know, some of this information in the chart you
23   should have gotten already, why should we pay to go do it,
24   we're not going to do it, we had a really good dialogue.
25   So there was a lot of back and forth about limiting

Page 317

1    what was going to happen with the databases, trying to
2    figure out fields, trying to figure out priority.
3    Q    Let me hand you, sir, what's been marked Plaintiff's
4    Exhibit 16.23, ask you to take a look at that and tell me
5    if you recognize it.
6    A    Yeah.  This is part of the back and forth that was
7    going on.  This is an e-mail from me to plaintiffs'
8    technical team, Mike Pederson, Ron Ratliffe, Jonathan
9    Jaffe, asking for more clarification of what they wanted.
10   Q    And can you read Mr. Pederson's e-mail to you
11   beginning with the second sentence there?
12   A    Sure.  It says, "As we discussed yesterday, we would
13   like to have a few questions answered before we can
14   prioritize your production.  The spreadsheet contains some
15   of the questions we discussed yesterday.  As we explained,
16   we feel we need answers to some of these basic questions
17   before you start production of any databases.  For
18   example, if we know the size of the database compared to
19   other databases, that will help us prioritize the
20   production."
21   Q    So the plaintiffs at that time understood, too, that
22   you had to narrow these issues before you could start
23   producing these documents, the databases, right?
24   A    Yes.  At least plaintiffs' technical team, yes.
25   Q    Have you seen the list that's been spoken of?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 318

1  A   Yes.  The spreadsheet.
2  Q   Yeah.  Can you describe what is contained in those 59
3  items?
4  A   Well, there are 59 rows.  There are about maybe 20
5  columns or so of information to go with each row.  Each
6  row is populated with a putative database.  I use the term
7  in quotes.  Several are not actually databases, although
8  most are.
9  Q   What are the ones that are not databases?
10  A   They have things in there like e-mail, which is not a
11  database.  We're producing e-mail for the custodians.
12      Voice mail is not a database.  They have eRooms.
13  That's not a database.  That's just a virtual bulletin
14  board where you can pin a document.  It's not a database
15  in a manner that anybody would understand that term.
16      I think they were just trying to get us to tell them
17  that those things weren't actually databases.
18  Q   You mentioned the eRoom.  Can you tell me what the
19  eRoom is?
20  A   Well, like I said, the simplest -- it's a piece of
21  software that sort of makes a common room for people to
22  post comments and stuff.  It's like the equivalent of a
23  chat room.  You can say -- I don't know if this exists or
24  not, but say eRoom 8 was a bunch of Seroquel people, they
25  can say, hey, look at this document, and then somebody can

Page 319

1  go look at it.  It's like a bulletin board.
2  Q   Now, that issue came up during Mr. Martin's testimony
3  this morning.  Were you here for that?
4  A   Yes.
5  Q   And do you recall what type of allegation he made
6  with respect to documents from eRooms?
7  A   I believe he -- I'm sorry, I don't know specifically
8  what you're referring to.
9  Q   Did you hear him say that he didn't think that
10  documents were collected from eRooms?
11  A   Yes, he did say that.  That's not correct, though.
12  Q   I'm going to hand you what has been premarked as
13  Exhibit 50, ask you to take a look at that and tell me if
14  you recognize it.
15  A   This is an e-mail from me to Mike Pederson, Jonathan
16  Jaffe, Rhonda Ratliffe, who is another member of
17  plaintiffs' technical team, and it attaches the chart, the
18  database chart that was under dispute for four days or so.
19  Q   Are you aware of any of the databases or applications
20  that are on there that are Seroquel only?
21  A   I don't think there are any Seroquel only databases
22  at all.  I'll take a quick look again.
23  Q   What do you mean, what are you talking about when you
24  say Seroquel only?
25  A   Well, I mean, to break it up a little bit, some of

Page 320

1  these are, you know, human resource type databases,
2  payroll, accounts payable stuff, so obviously they don't
3  really have anything to do with Seroquel in the sense of
4  the word, like if there's going to be a case study in
5  there or something.
6      The others are, their drug databases say they
7  track clinical trials, but they have clinical trials for
8  dozens of AstraZeneca products that have nothing to do
9  with Seroquel.
10      The only one I see that may be Seroquel specific here
11  is this Seroquel life-cycle scientific database, and as
12  the chart indicates, we weren't really able to collect any
13  information on that at the time.  I'm not sure if
14  plaintiffs have the correct name or that's really what
15  they're asking for.
16  Q   Just to finish up on Mr. Pennock's 6-29 e-mail, when
17  was the next time we heard from plaintiffs in any way?
18  A   They filed the motion for sanctions on July 3rd.
19  Q   Now, that motion for sanctions, in addition to all
20  the issues that you thought were resolved, the technical
21  issues we spoke of, did the plaintiffs raise new issues in
22  the motion for sanctions?
23  A   Yes.  There were several issues that were not the
24  subject of my discussions throughout the month of May and
25  June.

Page 321

1  Q   When was the hearing following the motion for
2  sanctions?
3  A   July 5th.
4  Q   One of the issues -- and you're familiar with the
5  motion?
6  A   Yes, I have read it.
7  Q   Are you familiar with one of the complaints the
8  plaintiff had dealt with the IND/NDA production?
9  A   Yes.  That was the first thing in the motion, I
10  believe.
11  Q   And they complained about the formatting issues of
12  the initial production of the IND/NDA?
13  A   I don't recall if they specifically complained about
14  those formatting issues.
15  Q   Do you remember Jonathan Jaffe talking about that
16  this morning?
17  A   Yes.  Well, he talked ad nauseam about formatting
18  issues.
19      The short answer is, we discussed a wide variety of
20  technical issues, an enormous amount of formatting issues,
21  both on May 30 and June 6 and in dozens of e-mails and in
22  half a dozen at least phone calls.
23      The formatting for the IND/NDA was not an issue.  We
24  could have applied all the custodial -- the fixes that we
25  applied to the custodial productions to the IND/NDA, and

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 322

1   Jonathan Jaffe said that that was not necessary because
2   they had already normalized the data. They didn't want
3   new data for the IND/NDA because it would screw up their
4   review.
5   Q    And are you aware that the second issue they raised
6   in the motion for sanctions dealt with the CANDA database?
7   A    Yes.
8   Q    And we already discussed that, correct?
9   A    Yes. It was produced.
10  Q    How about organizational charts? Do you remember
11  plaintiffs raising the issue about organizational charts
12  in their motion for sanction?
13  A    Yes. That was also not part of any of the
14  discussions that had led up to the, or that predated the
15  motion for sanctions. We have produced a substantial
16  amount of organizational charts of which I'm aware.
17  Q    And do you know where those charts came from?
18  A    Sure. We produced some in January that were already
19  discussed. They were the Seroquel team and the corporate
20  hierarchy and that kind of thing.
21       Subsequently we produced organizational charts that
22  were exhibits to the 30(b)(6) depositions. Then again we
23  produced some more that were in response to plaintiffs'
24  request for productions.
25  Q    I'm going to hand you what has been marked -- these

Page 323

1   are Defendant's Exhibits 8 through 15, ask you to take a
2   look at them and tell me if you recognize what's in there.
3   A    Yes. These are the organizational charts that I just
4   described. As you can see, it's well over 100 pages at
5   least.
6        Exhibit 8 appears to be the first set, which was
7   about 20 pages, and then the subsequent ones grew much
8   larger.
9   Q    Are you aware of any outstanding requests for
10  organizational charts made by plaintiffs that AstraZeneca
11  has failed to respond to?
12  A    I'm not sure we have answered yet every request for
13  production that might implicate an organizational chart,
14  but I do know we have answered many that implicate
15  organizational charts.
16  Q    Now, the next issue that plaintiffs raised in their
17  motion for sanctions was globally the custodial
18  production, and in particular I want to draw your
19  attention to the claim that we were missing data.
20       To your knowledge, did the plaintiff ever raise that
21  issue prior to the motion for sanctions?
22  A    No. And this would have been obviously a very key
23  issue to raise in our technical meet and confers on May 30
24  and June 6. The fact that was never raised is very
25  obvious, because it didn't find its way into the joint

Page 324

1   statement of resolved issues. It was never talked about.
2   Q    And I'll talk about the e-mail issue in a second, but
3   that goes for the voice mail, fax attachments, track
4   changes and videos?
5   A    That's right. Those were the new issues that the
6   first time I saw them was the motion for sanctions.
7   Q    If plaintiffs had come to you, would you be willing
8   to discuss and address those issues?
9   A    Of course. I could have done it earlier, too, if
10  they were mentioned. They just weren't.
11  Q    The e-mail issues specifically, now, that was raised
12  prior, correct?
13  A    That's right. There was a hearing in early April, I
14  guess, in which it was discussed that, hey, Karen Mueller
15  doesn't have enough e-mails, or words to that effect.
16       And I believe our response was, we haven't finished
17  producing Karen Mueller. How can you say there's not
18  enough e-mails when you don't have a custodial production?
19  Q    Now, after that April hearing and in connection with
20  the May and June meet and confers, was the issue of
21  missing e-mails ever brought to your attention?
22  A    No, I don't believe it was. We subsequently got into
23  it with the motion for sanctions that was filed on June 3,
24  but it wasn't a topic on the May 30 or June 6 meet and
25  confers or any of the discussions or phone calls that went

Page 325

1   with those.
2   Q    Okay. And as a result of seeing the motion for
3   sanctions, were you able to run some searches on the
4   amount of e-mails in the, first of all, in the
5   custodial production of Bush, Meuller and Dev?
6   A    Yes.
7   Q    And then in the production overall?
8   A    Yes, we did. I should mention, when we talked about
9   this with the plaintiffs the last time before this hearing
10  on July 19, we were discussing documents in the custodian
11  file, as in Karen Mueller has two few e-mails.
12       What I heard from Mr. Martin and Mr. Jaffe today is
13  what plaintiffs really care about is not what they told
14  us, that they have too few e-mails, it's that they
15  authored too few e-mails, which is a different search.
16       But what you have on the screen there is the results
17  of the searches that I did which show e-mails in their
18  custodial files.
19  Q    Now, with respect to Kimberly Bush, did you still
20  notice after running the search an anomaly in her results?
21  A    Yes. It was pointed out by Mr. Gornick, Mr. Gornick
22  said, I believe, that Kim Bush didn't have e-mails in 2002
23  and 2003, might have been 2003 and 2004, that were
24  produced, so obviously we went to investigate that.
25  Q    What did you find out?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 326

1  A   Bush didn't work on Seroquel in those years.  She was
2  in the U.K. and she worked on a different drug.
3  Q   What was the different drug?
4  A   I believe it was Prilosec.
5  Q   Notwithstanding that, have you -- are you aware of
6  any systematic exclusion AstraZeneca does on e-mail
7  collection and production?
8  A   Well, it does the opposite of that.  There's a
9  systematic inclusion of e-mail.  E-mail is one of the -- I
10  think it's the largest type of document that we have
11  produced and we intentionally go get.
12  Q   And did you run a search to show the percentage of
13  e-mails that are included in the production?
14  A   Yes, we did.  I should say that the production is
15  about 90 percent electronic data, and e-mails make up, you
16  know, about 400,000 documents out of the 840,000 unique
17  documents in the production.  So it's half the production.
18  Q   And you mentioned that the total number of documents
19  in the production that are electronic documents, is it
20  approximately 90 percent?
21  A   That's right.  That's what you would expect.
22  Q   What you would expect by what standard?
23  A   The Sedona Principles.
24  Q   Another issue that was brought up in the motion for
25  sanction was the proxy issue.  Can you explain what that

Page 327

1  issue is?
2  A   Basically the plaintiffs complained that if a
3  secretary sent an e-mail in the name of a custodian and
4  that e-mail did not go to any other of the custodians who
5  were the people who were working on Seroquel, then they
6  wouldn't have it in the person's custodial file.  So they
7  want a custodian to equal all their delegatees.
8  Q   And have you ever heard that issue brought up before
9  by plaintiffs?
10  A   No.  I don't believe so.
11  Q   When was the first time you heard about that?
12  A   I think it was in the motion for sanctions.
13  Certainly it wasn't in the -- it wasn't a meet and confer
14  topic.
15  Q   One last series of questions on the e-mail, numbers
16  of e-mails.  Did you hear plaintiff through Mr. Jaffe
17  earlier say that there was no easy way to search for, say,
18  Michael Murray's e-mails?
19  A   I believe Mr. Jaffe said there was no easy way to
20  search for e-mails that Michael Murray had authored.
21  Q   Is that accurate?
22  A   No.  There is an author field.  So you can just put
23  Murray in the author field and go get the e-mails.  It's
24  one of the fields we provide pursuant to CMO2.
25  Q   Let's talk about the de-duplication issue that was

Page 328

1  raised in the motion for sanctions.  Was this an issue
2  that had ever been raised before, to your knowledge?
3  A   No, I don't believe that it ever had been raised.
4  Q   Was it even in the motion, do you have an idea?
5  A   No.  I read the motion.  It wasn't in there.
6  Q   When is the first time you found out about that
7  de-duplication issue?
8  A   In reading the documents that were filed in support
9  of this hearing, plaintiff's exhibits.
10  Q   And are you aware what type of de-duplication process
11  AstraZeneca employs?
12  A   Yeah.  It uses -- everybody uses MD5 hash value.
13  It's the same de-duplication that everybody else would
14  employ.
15      Mr. Martin's premise that we were using a field-based
16  de-duplication process is incorrect.  It's MD5 hash.
17  Q   You mentioned that -- just a few last points,
18  Mr. Dupre.  You mentioned earlier that plaintiffs had put
19  out requests for additional custodial files, and the
20  number I think was 25, correct?
21  A   Yes, I believes it's 25.
22  Q   Are you aware of where these custodians are located
23  physically?
24  A   Some are in the U.S. and some are in Europe, I
25  believe, in the U.K.

Page 329

1  Q   And can you tell the Court what AstraZeneca has
2  already done to begin processing these?
3  A   Well, we went through the same collection process
4  that we did with all the other U.S. custodians for the
5  U.S. people.
6      For the people that are employed by U.K., for these
7  we had to reach out to the U.K. and ask them to give us
8  the documents.
9  Q   And you're in the process of collecting those
10  documents?
11  A   Oh, yes.  They're all being collected.
12  Q   And after collecting, what kind of process do they
13  have to go through before they can be produced to the
14  plaintiffs?
15  A   They have to be delivered to a vendor who can change
16  them into the CMO2 format, which is TIFF or OCR for
17  redacted documents.  They have to have the metadata coded
18  onto them, which is described in CMO2.
19      Then they have to go through a de-duplication
20  process, so all the custodians who have that document,
21  their source names will be on them.
22      And then they have to be reviewed by AstraZeneca
23  attorneys for privilege, things like that.
24      And then they have to be run through a production
25  process in which they're given a confidentiality stamp and

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 330

1    Bates numbers and that kind of thing, and then they're
2    burned on to a hard drive and delivered to plaintiffs.
3    Q    Now, you saw in the plaintiffs' motion for sanctions,
4    they requested that the court order these productions to
5    be done in 30 days.  Do you see how that could be even
6    possibly accomplished?
7    A    Well, it certainly can't be accomplished for people
8    who are in the U.K.  I mean, we don't even have the stuff
9    that's going to come over here.
10        Even for the U.S. people, it couldn't possibly be
11   accomplished.  It couldn't make it through all those steps
12   that I just described in 30 days.  It's just not possible.
13   Q    And despite that, and what I want to do, and I'll end
14   on this note, is I really wanted to show the Court what
15   type of effort that AstraZeneca is putting into running
16   these things through the process.  If you could just give
17   a very broad overview of that.
18   A    The production vendor runs a team of about 30 people.
19   They have dragged in various sub-vendors to up that.  They
20   operate 24/7.
21        We have attorneys for reviewing documents at any
22   time.  It's up to 300 attorneys working 16 to 20 hours a
23   day.  You've got to take it offline sometimes so the
24   vendor can update the files on the production database.
25        There are dozens and dozens of attorneys like myself

Page 331

1    who are involved in managing that process.  There have
2    been hundreds of thousands of attorney hours spent on the
3    document production.
4    Q    How about the internal IT resources at AstraZeneca?
5    A    Yes.  We've pretty much maxed out the internal IT
6    resources of AstraZeneca, which was part and parcel of the
7    problem with that chart.  We've maxed them out both to go
8    collect the documents.  They've got to sit there and plug
9    into people's computers and it takes time to do.
10        We have also got substantial AstraZeneca internal
11   legal resources who go around and find all the paper
12   documents and order them out of archives and get them
13   burned to TIFF formats so they can be used and coded with
14   metadata.
15   Q    And even with all those resources, they're still
16   being able to meet the Court's production deadlines?
17   A    Yes.  Only with those resources.  It was quite a
18   massive effort to meet the June 30 deadline.
19   Q    And with those resources, continue to work with the
20   plaintiffs to fix any glitches that they perceive in the
21   production?
22   A    Yes.  We will always work with the plaintiffs.  We
23   have been, at least as long as I have been on the project.
24        MR. FREEBERY:  Nothing further.
25        THE COURT:  Cross-examination.

Page 332

1        MR. GORNICK:  Thank you, Your Honor.
2                 CROSS-EXAMINATION
3    BY MR. GORNICK:
4    Q    Good evening, Mr. Dupre.
5    A    Mr. Gornick.
6    Q    Did you do e-discovery work before you became a
7    lawyer?
8    A    I did some.  I am not holding myself out to be an
9    e-discovery expert, no.  I can only testify to my factual
10   knowledge.
11   Q    Before you became a lawyer, were you involved in mass
12   tort litigation in any way?
13   A    When I worked for the Dupont Company, I was involved
14   in the Benalate litigation.  B-E-N-A-L-A-T-E, which was a
15   fertilizer that was the subject of a mass tort litigation.
16        THE COURT:  Are you sure it's not a fungicide?
17        THE WITNESS:  Yes, it is a fungicide.  I'm
18   sorry.
19        THE COURT:  And is the correct spelling
20   B-E-N-L-A-T-E?
21        THE WITNESS:  I'm afraid I don't remember, Your
22   Honor.
23   BY MR. GORNICK:
24   Q    Were you involved in helping Dupont gather the
25   documents it produced in the Benlate litigation?

Page 333

1    A    I did some very minor support work for that.
2    Q    Were you involved in the process that resulted in
3    that company getting sanctioned millions of dollars for
4    their discovery violations?
5    A    I don't think that was me.  I was a 19-year-old
6    contractor at the time.  But I guess so.  Yes.
7    Q    Were you involved in developing the keyword search
8    for Dupont in that litigation?
9    A    No.  I wasn't a lawyer.
10   Q    Prior to this -- well, let me ask you this:  You've
11   been working on this litigation since February 28th?
12   A    Thereabouts.  I don't know if it was the 28th.
13   Q    What did you do in the year and a half before that,
14   your first year and a half in the legal profession?
15   A    Well, it's been a little bit longer than that, but in
16   working for McCarter & English, I primarily was -- I did
17   general litigation focused on environmental law.
18   Q    How many litigations have you been involved in where
19   you were integrally involved in developing a keyword
20   search that would be used to identify and produce
21   documents to the opposing side?
22   A    I have never been integrally involved in keyword
23   search.
24   Q    You've never done that, have you?
25   A    No.

Page 334

1  Q   And you didn't have anything to do with developing
2  the keyword list in this litigation, did you?
3  A   No.  It was done before I came.
4  Q   You have no idea what decisions were made in
5  developing that list, right?
6  A   I have no personal knowledge of that.
7  Q   You don't know who was involved in developing that
8  list, do you?
9  A   As I said, I have no personal knowledge of that.
10  Q   You know, we asked AstraZeneca to produce at this
11  hearing the architect of the keyword search.  Do you know
12  why that person isn't here?
13  A   That's obviously not a decision that would fall on
14  me.
15  Q   Okay.  The documents produced to us in this
16  litigation were collected before you arrived on scene in
17  February of this year, right?
18  A   Yes.
19  Q   Okay.  And given how involved you are with this
20  litigation, you have come to learn that those documents
21  were actually collected in 2005 and 2006.  Right?
22  A   Yes.
23  Q   And so when you were answering questions from
24  Mr. Dupre about the process to go get the e-mails that you
25  have produced in this litigation, you said we

Page 335

1  intentionally go out and get them, you don't have any idea
2  what AstraZeneca did to collect the documents because that
3  happened before you got on the scene in February of this
4  year; isn't that right?
5  A   No.  That's exactly incorrect.  I know exactly what
6  they did.
7  Q   Okay.  Tell me this:  Have you interviewed Vikram Dev
8  to find out why we have 47 e-mails he authored since
9  January 1 of 2004?
10  A   I can't interview him for that fact because that fact
11  is not correct, Mr. Gornick.
12  Q   Okay.  Have you interviewed Vikram Dev to find out
13  why we don't have a lot of e-mails authored by him since
14  January 1 of 2004?
15  A   Have I interviewed -- I have never interviewed Vikram
16  Dev.
17  Q   Okay.  Have you interviewed anybody to figure out who
18  their proxies might be for e-mail production?
19  A   No.  As I said, the first time I heard about proxies
20  was when you filed your motion for sanctions.
21  Q   Okay.  Did you forget about Mr. -- turn to
22  Exhibit 16.22, please.
23  A   Yes.  This is an e-mail from me to Mike Pederson
24  talking about -- this was when we were meet and conferring
25  about databases.

Page 336

1  Q   You said that you would be -- turn to page 2 of
2  Exhibit 16.22.  Do you have that in front of you?
3  A   Yes, I do.
4  Q   Is that an e-mail from Mr. Pederson to you?
5  A   Yes, it is.
6  Q   Why don't you read to us Item Number 6.
7  A   It says here, "Defense to supply documentation that
8  production searches includes all fields of custodians,
9  delegatees, those working on behalf of custodians, example
10  assistants."
11  Q   I guess you forgot that communication, didn't you?
12  A   You're correct.  This communication was in the topic
13  of databases, so when we were trying to argue about this,
14  we sort of brushed over it.
15  Q   How many people have you interviewed to figure out if
16  delegatees send and receive e-mails for the 80 custodians
17  that AstraZeneca chose as the important witnesses in this
18  case?
19  A   I just told you, Mr. Gornick, I haven't interviewed
20  anybody.
21  Q   You also have no idea how AstraZeneca chose the 80
22  custodians, do you?
23  A   No.  I have no personal knowledge of that.  They were
24  chosen before I came.
25  Q   You got involved in this litigation in late February,

Page 337

1  2007.  Documents had not only been collected, they had
2  been TIFFed, right?
3  A   I'm not sure that all of them had been TIFFed, but
4  some had.  I don't know if it was all of them.
5  Q   If it wasn't all of them, it was most of them, right?
6  A   Well, it certainly couldn't have been CANDA, for
7  instance.  So it can't have been all of them.  I assume it
8  was most of them.  I would agree with you there.
9  Q   Most of the custodians?
10  A   Yes.
11  Q   They had been TIFFed when you came on scene?
12  A   Yes, that's right.
13  Q   And you don't have personal knowledge of the
14  communications between the Sidley Austin lawyers and the
15  people on our side, including Mr. Jaffe, about page breaks
16  and that we would get the page breaks.  You weren't
17  involved in those, were you?
18  A   Oh, no.  I wasn't there yet.
19  Q   Were you involved in the negotiations for CMO2?
20  A   No.  CMO2 was signed, I believe, in late January.
21  Q   Were you involved in the decision in February to
22  reject Mr. Jaffe's proposed solution for page breaks?
23  A   No.  I hadn't been hired yet, as I said.
24  Q   What did you do to make sure that when you claim
25  AstraZeneca finished producing documents on June 25th,

Page 338

1  that the documents that had been produced were reasonably
2  searchable?  What did you do?
3  A  Well, we had several meet and confer topics about
4  that very subject, in which I gave Jonathan Jaffe
5  everything we agreed to, so what I did was provide
6  substantial technical solutions which you guys asked for
7  and we agreed.  I managed the process of getting that
8  done.
9  Q  What did you personally do to go into the data set
10  that was produced to us and make sure that it was
11  reasonably searchable, that we could do reliable searches
12  by date, by custodian, by source, basic searches?  What
13  did you personally do to go in and look at it and make
14  sure it was reasonably searchable for the lawyers on my
15  side?
16  A  I don't have access to your system, Mr. Gornick.  I
17  can't do any of those things you just described.
18  Q  The documents that your side delivered to my side,
19  what did you do before they left AstraZeneca and came to
20  us to make sure that they would provide us with reasonably
21  searchable data?
22  A  Well, for example, the Excel sheet files, which is
23  one of the technical solutions, I viewed them on the
24  production database.  Stuff like that.
25  Q  Did you run searches to find all the problems in the

Page 339

1  metadata fields, the inconsistencies, to make sure we
2  could do complete and accurate searches based on things
3  like custodians and dates?
4  A  I conducted the investigations that we agreed to that
5  appear in the joint statement of resolved issues.  I
6  believe there were two or three of those.
7  Q  That was after June 7?
8  A  Yes, it was.
9  Q  And the fixes that were implemented after June 7,
10  they were delivered, according to you, to Mr. Jaffe's
11  office on July 20th?
12  A  It was sometime last week.  I don't know if it was
13  July 20th.
14  Q  They weren't implemented in what you produced in the
15  month of June, right?
16  A  No, they couldn't possibly be.
17  Q  Okay.  And in fact, you did not deliver to Mr. Jaffe
18  or anybody on the plaintiffs' side some of the things you
19  promised?
20  A  That's not correct.
21  Q  What was that?
22  A  That's not correct.
23  Q  Okay.
24  A  What didn't I deliver?
25  Q  I'm coming to it.  I'll refer you to Exhibit 12,

Page 340

1  Plaintiff's Exhibit 12.
2  A  I'm familiar with this document.
3  Q  Page 2, please.  See the section called "Page
4  Breaks"?
5  A  Yes.
6  Q  See paragraph 2?
7  A  Yes.
8  Q  Would you like to read that?
9  A  It says, "Defendants agree to put page breaks in all
10  future productions for documents that are ten or more
11  pages in length, i.e., for all productions after IP-14."
12     We did that, Mr. Gornick.
13  Q  You didn't put page breaks in IP-15 or 16, did you?
14  A  No.  We gave it to you for all 80 custodians all at
15  once.  It would have been preposterous to do the same job
16  twice.
17  Q  Because you thought it was preposterous, you didn't
18  do what you agreed to in the filing -- the joint filing to
19  the Court on June 7th?
20  A  That's not correct.  You're just misinterpreting what
21  we agreed to.  We obviously wouldn't have agreed to do it
22  twice.  We had to do it for all 80 custodians.
23  Q  It says, "Defendants agree to put page breaks in all
24  future productions for documents that are ten or more
25  pages in length, I.e., for all productions after IP-14."

Page 341

1  Did I read that correctly?
2  A  That's right.
3  Q  And the fix --
4  A  What we just delivered -- I'm sorry.
5  Q  And the fix you agreed to deliver is actually
6  described in paragraph 1, above that, which refers to IP-1
7  through IP-14.
8  A  That's right.  I should say that the fix we delivered
9  covered those productions that you're discussing.  They
10  covered IP-15 and 16.  That's what I mean when I say it
11  would have been preposterous to do it twice.
12  Q  And even according to your version of events, what we
13  had, the plaintiffs had as of June 25th, and all the
14  metadata problems that have been discussed, and the lack
15  of page breaks, and therefore we did not have reasonably
16  searchable data as of June 25th.
17  A  Well, that's not quite correct either.  As we showed
18  with Mr. Freebery, 400,000 of those documents are e-mails.
19  The vast majority of them were one page.  It only applies
20  to lengthy documents.
21     So for over half the production, you have very easily
22  searchable data, and for the rest of it, we fixed.
23  Q  What you're referring to as applying to only lengthy
24  documents, that's the page break issue, isn't it?
25  A  Yes.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 342

1  Q   But we also had the metadata issue.  We had the
2  transposed tos and froms.  We had inconsistent dating
3  conventions.  We had documents that identified, or failed
4  to identify custodians as custodians.
5      And you didn't get those things fixed, according to
6  you, until July 20, and we can't even load what you gave
7  us.
8  A   Well, that's not quite correct.  You got a variety of
9  fixes on blank pages, on native Excel sheets, on page
10 breaks, all that.  I don't think there's -- I don't think
11 your side was saying that there were any problems with
12 those loads.
13     What you're talking about is the load files.  At
14 least that's what I heard this morning.  And I think I
15 have explained those are meant as a cross-reference so you
16 can match them to the data that Jonathan Jaffe normalized.
17 You read a normalization protocol over the underlying
18 documents and now we have given you load files that match
19 the normalization.
20 Q   At the beginning of my cross-examination, you
21 admitted you're not an expert, right?
22 A   Oh, that's right.  I'm not holding myself out to be.
23 Q   Okay.  And both Mr. Jaffe and Mr. Martin sat in that
24 chair and said they couldn't load what was delivered to us
25 on July 20, and you're sitting here saying they just don't

Page 343

1  know what they're doing?
2  A   Oh, no.  I have great respect for Jonathan Jaffe.
3  I'm saying you're mischaracterizing what those documents
4  were supposed to do.
5  Q   I think you're mischaracterizing what --
6      MR. FREEBERY:  Objection.
7      THE COURT:  Don't argue with the witness.
8  BY MR. GORNICK:
9  Q   When is AstraZeneca going to deliver the remainder of
10 blank pages?
11 A   Well, there's cosmetic blanks and there are blank
12 blanks.  What we really need to discuss is Batesing
13 nomenclature.  It needs discussion frankly.
14 Q   Okay.
15 A   I'll discuss it if somebody is on the other side.
16 Q   You said to Mr. Freebery that you were willing to
17 discuss having AstraZeneca produce missing data.  Remember
18 telling Mr. Freebery that?
19 A   I don't specifically recall that, but we're certainly
20 willing to go get whatever it is you think we need.
21 Q   Can you tell us what you have done since July 3rd to
22 figure out when you're going to be able to produce voice
23 mail for the 80 custodians?
24 A   Well, your expert in your filing was wrong about
25 voice mail, Mr. Gornick.  Your expert assumed that

Page 344

1  AstraZeneca has a Unity voice mailing system based on the
2  fact that he saw a magazine article about a Swiss
3  subsidiary of AstraZeneca.
4      To my knowledge, that is not quite the case.  But I
5  need to investigate it.
6  Q   So you haven't done any investigation to determine
7  whether or not AstraZeneca employees have voice mail in
8  their in-boxes?
9  A   I know -- well, we know that you're wrong.  How far
10 you're wrong is something that we haven't completed the
11 investigation yet.
12     We know that there was an AUDIX system rather than
13 Unity voice messaging system going back all the way to
14 2002.  When the transfer took over and which guy had AUDIX
15 and which had Unity and which business entity had what, I
16 haven't completed my investigation of that yet.
17 Q   Are you telling this Court that none of the 80
18 custodians have voice mail available in their Outlook
19 in-box?
20 A   Now or then?
21 Q   Today.
22 A   Today?  I would assume that they would.  I think
23 there was a unified voice mail system ruled out, but it's
24 after the discovery cutoff date that's on the produced
25 docs for the custodial files.

Page 345

1  Q   Are you telling us that none of the 80 custodians had
2  voice mail in their in-box one year ago?
3  A   I don't know the answer to that question.
4  Q   Okay.  Are you telling us that none of the
5  AstraZeneca custodians had voice mail in their Outlook
6  in-box 18 months ago?
7  A   I couldn't put a date on that.  What I can tell you
8  is there is a difference between an AUDIX voice messaging
9  system and Unity messaging system that was described here.
10 There was a presumption that AstraZeneca has always had
11 some kind of unified voice messaging system, and what my
12 investigation has revealed is that is not the case.
13 Q   Can you tell us when AstraZeneca's going to produce
14 voice mail that have been in the 80 custodians' in-boxes?
15 A   I frankly don't even know if there are any,
16 Mr. Gornick.  That's what I'm trying to tell you.
17 Q   I'll refer you to Exhibit 101.  Well, I'll ask you
18 this:  Have you even looked at the documents you produced
19 to figure out if the custodians have voice mail in their
20 in-box?
21 A   Me personally?  Are you asking me --
22 Q   Yes, you.
23 A   Of course I haven't read 10.3 million documents.  No.
24 Q   Has anyone on your team investigated to find out if
25 the 80 custodians have voice mail in their in-box?

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 346

1  A   The investigation's going on right now.  That's what
2  I just said.
3  Q   You just finished saying you don't know if any of
4  them have voice mail in their in-box, so when did the
5  investigation start?
6  A   When we went through this motion for sanctions
7  process.
8  Q   When do you think you will even know if any
9  custodians have voice mail in their in-box?
10  A   I couldn't give you an answer to that, Mr. Gornick.
11  I'm sorry.
12  Q   Why don't you just call them on the phone?
13  A   As a production counsel, that's not my role.  I'm
14  just supposed to get documents that are collected to you.
15  Q   This exchange we have had on voice mail would be
16  identical on fax attachments?
17  A   Yes.  It's the same misconception.  Again, it's a
18  digitized file delivered to e-mail.  I think there's an
19  assumption that it was there or it was there for all
20  custodians or this or that, and so far in my
21  investigation, which is not complete, that doesn't seem to
22  be correct.
23  Q   How many custodians have you asked the question, do
24  you have voice mail in your in-box?
25  A   Me personally, I haven't asked that question.

Page 347

1  Q   When are we going to get video attachments?
2  A   I don't know that there are any video attachments,
3  Mr. Gornick.
4  Q   What have you done to find out if there are video
5  attachments?
6  A   We started the vendor scanning through the production
7  to see.  What we're looking for are slip-sheeted documents
8  that would come up as unTIFFable.  As you know, under CMO2
9  we're supposed to provide TIFF documents.  Certain types
10  of documents, such as, say, JPEGs that are pictures that
11  might be background in an employee's e-mail aren't
12  TIFFable.
13  We're trying to figure out if any of those might have
14  been video attachments that were mischaracterized as, you
15  know, JPEGs or pictures or something like that.
16  Q   The e-mail collection process, what did the collector
17  do to figure out all the different custodians' e-mail
18  boxes?
19  A   They interviewed the custodians and asked them.
20  Q   Okay.
21  A   I think the question was more indirect than that.  I
22  think it was all the places you might have documents
23  related to Seroquel.
24  Q   Now, I'm just wondering why the Murray custodial file
25  missed over 1,000 e-mails to or from Michael Murray, but I

Page 348

1  guess you weren't involved back then, so you wouldn't know
2  the answer.
3  A   I don't substantively know the answer to that
4  question, sitting on the stand.  But I will investigate
5  it, if you ask me to.
6  Q   Well, actually, it's your obligation to investigate
7  it.  We are entitled --
8      MR. FREEBERY:  Objection.  Argumentative.
9      THE COURT:  Sustained.
10      MR. GORNICK:  I agree.
11  BY MR. GORNICK:
12  Q   Where are the native files for the 80 custodians?
13  A   They're in lots of places.  They're not unique.  You
14  would have to rephrase your question.  I mean, they're
15  saved all over the place.  By the custodians.  They're in
16  the production set.
17  Maybe you could clarify.
18  Q   Where are the native files that were collected from
19  the 80 custodians for the purposes of this litigation?
20  A   They went through the production process that I just
21  explained to Mr. Freebery, and they're up on a production
22  database.
23  Q   All that data is in a single place somewhere.
24  A   Well, it's all aggregated.  It's divvied up into file
25  folders and stuff like that.  But in a manner of speaking,

Page 349

1  yes.
2  Q   So in one place, we ought to be able to theoretically
3  go and see everything that's been gathered from all the
4  custodians from the beginning of time when the collection
5  process began; is that right?
6  A   Well, that's not quite correct.  The stuff that was
7  produced was pushed further through the pipe and there
8  would be a series of discard piles.  So they're spot,
9  spot, spot.
10  Q   Are those discard piles on servers in the same
11  physical place?
12  A   I don't know the answer to that, where the vendor's
13  server farm is located or if it's divided into separate
14  servers.  I'm sorry, I just don't know.
15  Q   Do you know why quetiapine was not on the keyword
16  search list?
17  A   No.  But we did do a search for quetiapine.
18  Q   And we're going to get the documents you found?
19  A   Yes.  I think we already agreed to produce those.
20  Q   You did a search for DM?
21  A   Yes.
22  Q   And we're going to get the documents you fond?
23  A   Yes.  I believe we already agreed on that, too.
24  Q   Do you know why DM wasn't in the keyword search list?
25  A   Like I said, I have no personal knowledge.

Page 350

1  Q   Do you know why the plaintiffs weren't involved in
2  the process of developing a keyword search list?
3  A   I'm afraid I don't know, Mr. Gornick.
4  Q   If I asked you why any of the keywords in my
5  PowerPoint this morning aren't on the list, would you know
6  the answer?
7  A   Well, the answer is a lot of them are absurd, but --
8  Q   Okay. Let's start. Diabetic, is that absurd?
9  A   No.
10  Q   Endocrine, is that absurd?
11  A   No. I should tell you, I'm not going to know all the
12  medical terms that you have. I'm not a doctor.
13  Q   Metabolic, is that absurd?
14  A   Metabolic may be in the sense that it could apply to
15  a lot of AstraZeneca drugs, as a lot of the other terms
16  you have identified.
17  Q   Did you know that claims in this case involved
18  allegations related to metabolic syndrome?
19  A   Yes, I have read the complaints.
20  Q   And you still think metabolic is absurd to be on the
21  keyword search list?
22  A   No. I didn't say that.
23  Q   Is atypical an absurd word to be on the list?
24  A   I wouldn't think so, but I would have to give it more
25  investigation.

Page 351

1  Q   Is second generation an absurd term?
2  A   It may be.
3  Q   Is it? Did you know that Seroquel a
4  second-generation antipsychotic?
5  A   Of course.
6  Q   Why is second generation an absurd term to be on the
7  search word list for an anti -- second-generation
8  antipsychotic case?
9  A   Because it doesn't say second-generation
10  antipsychotic. It says second generation, and AstraZeneca
11  may have a ton of second-generation drugs that relate to
12  cholesterol or stuff like that.
13     You need somebody like Jonathan Jaffe to answer these
14  questions. I'm not holding myself out to be that guy.
15  Q   What have you done to determine whether second
16  generation is absurd to put on the keyword search list?
17  You said it was absurd. What have you done to figure that
18  out?
19  A   I didn't say it was absurd. I said you need somebody
20  with the experience to answer that question.
21  Q   As you sit here today, are you saying you've never
22  seen any documents that your side produced that refer to
23  the second-generation drugs, the second-generation
24  competitors, the second generations as opposed to the
25  first generations? Is that all new to you?

Page 352

1  A   Oh, no. I have seen the complaints.
2  Q   Is SGA an absurd term to have on the list?
3  A   I'm really not able to answer these type of
4  questions, Mr. Gornick. I said that a couple times. I
5  don't know.
6  Q   I actually tried to shortcut it. You said a bunch of
7  the terms were absurd in my PowerPoint, so I'm going
8  through them.
9  A   Sure. The terms that are absurd, I should limit it,
10  are terms like BEST, which was ridiculous, 100 milligrams,
11  which is going to relate to every drug in the company.
12  Those are the terms to which I'm referring.
13     For example, I close all my e-mails with best regards
14  or best wishes.
15  Q   Do you disagree with Mr. Martin that AstraZeneca in
16  developing the keyword search list should have interviewed
17  the right people in the company? Is that absurd to you?
18  A   No. I don't disagree with that statement.
19  Q   Is it absurd to you that he recommended that in
20  developing a keyword search list, you talk to the other
21  side?
22  A   No. I don't think that's absurd at all.
23  Q   Do you think it's reasonable that you test and
24  fine-tune a keyword search before you go live?
25  A   I believe that was done, but --

Page 353

1  Q   Why don't you tell us how that was done? Tell us how
2  AstraZeneca tested their keyword search list to fine-tune
3  it to make sure it was a reasonable list. Tell me about
4  that process.
5  A   I'm afraid my knowledge on that is all hearsay,
6  Mr. Gornick. I only know it from --
7  Q   Tell me what you know. The Judge will tell us if
8  it's admissible or not.
9  A   They went and they took the keyword search and then
10  ran it against early custodians to see what was coming in
11  the discard pile and what wasn't. It wasn't me obviously.
12  I wasn't there yet.
13  Q   And you don't know why they didn't put quetiapine on
14  there?
15  A   No.
16  Q   The generic name for the drug in the case?
17  A   Well, the short answer I think anybody can deduce is
18  that they made an error. They put -- the generic name for
19  the drug in the case is quetiapine fumarate, which is on
20  the list. They put quetiapine fumarate when they should
21  have put quetiapine.
22     I think the short answer is it's a mistake.
23  Q   So you think AstraZeneca used an MD hash system for
24  de-duplication?
25  A   They did.

Page 354

1   Q   That's disturbing to me, because now we don't know
2   why those Murray e-mails weren't produced with him as a
3   custodian.
4   A   I would have to investigate that, Mr. Gornick.
5   Q   Because a perfect de-duplication method would not
6   have eliminated his e-mails and he would have been a
7   source; isn't that true, since you know a lot about that
8   method?
9   A   I would suspect that that is true, although I'll have
10  to investigate the particular documents.  I have been down
11  here.  I just haven't had the time.
12  Q   So if it wasn't the de-duplication, a technical
13  problem in eliminating what appeared to be duplicative
14  e-mails, there's a more -- there's a bigger problem in why
15  we didn't get those e-mails in the Murray custodial files.
16  But you don't know what that is?
17  A   I would disagree with you that it's a bigger problem.
18  The biggest possible problem would have been what
19  Mr. Martin said, is not using MD5 hash, which is the
20  industry standard for de-duplication.
21  Q   Actually I would agree with you there.  Because if it
22  wasn't the de-duplication method, it must have been
23  something else why we didn't get those e-mails in his
24  custodial file.
25      You can't give us a reason, can you?

Page 355

1   A   I have not had a chance to investigate the e-mails
2   that you said.  I have been down here preparing for this,
3   Mr. Gornick.
4   Q   Would you agree, Mr. Dupre, that when it came to
5   databases, that your intent in meeting and conferring with
6   the plaintiffs' lawyers was to have a process where
7   AstraZeneca would produce the databases informally?
8   A   Well, I'm not sure that's correct.  I don't think we
9   could do it informally because it was already formally
10  part of CMO2.
11      And I don't think we ever intended to produce
12  databases.  We were just going to produce some agreed
13  subset of information from databases that we would get to
14  through the process of the meet and confer.
15  Q   How sure are you of that?
16  A   That we would produce some subset of information?
17  Q   Yes.  Two things, are you sure that AstraZeneca
18  wasn't contemplating producing databases?
19  A   Producing --
20  Q   Is that your testimony?
21  A   Producing wholesale databases?  I don't think the
22  company intends that.  I think they intend to meet and
23  confer with you guys and get the information that you're
24  really looking for, not produce information about other
25  drugs.

Page 356

1       I mean that wouldn't make sense.  We've redacted
2   information about other drugs from the custodial
3   production, so a wholesale production of databases that
4   contains other drug information just wouldn't be logical.
5   Q   Is it also your testimony today that AstraZeneca
6   never intended to produce databases informally?
7   A   Well, I guess we could bicker about the term
8   informally, but the databases discovery is in CMO2.  I
9   don't really see how it could be informal when it's
10  ordered.
11  Q   Okay.  Would you turn to exhibit -- Plaintiff's
12  Exhibit 16.20, please.
13      THE COURT:  Counsel, how much longer do you
14  expect to be with this witness?
15      MR. GORNICK:  Ten minutes or less.
16      THE COURT:  Does defendant have any other
17  witnesses?
18      MR. FREEBERY:  No, Your Honor.
19      MR. MCCONNELL:  We have a two-minute read-in in
20  lieu of the witness we were going to use, and then we're
21  done.
22      THE WITNESS:  I recognize this document.  It's
23  an e-mail from me to Mike Pederson.
24  BY MR. GORNICK:
25  Q   Would you please turn your attention to the first

Page 357

1   e-mail in the string.  It's the e-mail on the bottom of
2   the page.
3   A   Sure.  I think I have already read this one.  It's --
4   Q   Read the first sentence of the e-mail, please.
5   A   "We would like to work cooperatively" -- excuse me.
6   "We would like to work cooperatively with plaintiffs on
7   the production of relevant databases."  That's me talking.
8   Q   Okay.  Turn to Exhibit 16.22, please.  Do you have
9   that in front of you?
10  A   Yes, I do.  I recognize this document, too.
11  Q   Is this an e-mail you sent to Mike Pederson at Weitz
12  & Luxenberg?
13  A   Yes.
14  Q   Will you read the first two sentences, please?
15  A   It says, "Good morning, Michael.  Thank you for
16  providing this list.  My goal today is to collect
17  sufficient information from plaintiffs to begin database
18  production process."
19  Q   Thank you.
20      MR. GORNICK:  No further questions, Your Honor.
21      THE COURT:  Mr. Dupre, you made reference to the
22  Sedona Principles.  Are you familiar with them?
23      THE WITNESS:  Yes.  I have read them, Your
24  Honor.  I'm afraid I don't know them as well as I know
25  some other rules, but I read them.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 358

1    THE COURT: Can you identify for me, since even
2    now you're not that person, and obviously you had no role
3    until a few months ago, who is the responsible person for
4    AstraZeneca, from the outside law firms, from inside
5    counsel and from the vendor, for assuring that the
6    document production has been appropriate under the Rules
7    of Civil Procedure, under the orders of the Court, and to
8    the extent that you were using it, consistent with the
9    Sedona Principles? Who are those people?
10    THE WITNESS: At the vendor, the project
11    manager's name is Jared Kidd.
12    At the client, I would presume that the client has
13    pretty much delegated that task to its lead counsel, so it
14    would be the lawyers at the Dechert law firm.
15    What were the other two categories?
16    THE COURT: Well, who is it for the Dechert law
17    firm since it's not you?
18    THE WITNESS: Well, I should explain. I'm a
19    mid-level project manager who reports to partner-level
20    people. Obviously I'm just an associate.
21    Production counsel is -- actually, I take it back. I
22    guess it would be a McCarter & English person whose name
23    is Tony Winchester. He's the one who signed the
24    certification.
25    THE COURT: Do you know whether there's --

Page 359

1    either the vendor or AstraZeneca has documentation as to
2    how it went about and organized to do this ESI production?
3    THE WITNESS: Maybe Your Honor could tell me
4    what you mean by documentation. I'm sure there is. I
5    just want to tell you where it is.
6    THE COURT: Well, at some point somebody, and I
7    don't know whether this goes back before the litigation
8    started or started last fall or when, made a determination
9    of how to identify the 80 people and how to tell the 80
10    people what to look for and how to interview the 80
11    people, what questions to ask them, and what to do to make
12    sure that they were looking in all the right servers and
13    backups and archives and all the different places that you
14    go look for ESI.
15    Is there a document that sets forth how that was to
16    be done?
17    THE WITNESS: There is a stock interview for the
18    custodians. I have seen it for --
19    THE COURT: I'm talking about an overall
20    document that describes the process, that says, we're
21    going to identify as many people as we need to here, and
22    here's how we're going to interview them, and here's how
23    we're going to gather their information, that we're going
24    to use a keyword search for. Here's how we're going to
25    develop the keyword search, and here's how we're going to

Page 360

1    validate and do quality control and make sure everything
2    is unique.
3    THE WITNESS: I'm afraid I'm not privy to such a
4    document, Your Honor. There may be one, but I just am not
5    privy to it. An overall --
6    THE COURT: So you haven't looked at any such
7    document to verify that it's been followed or that it
8    makes sense?
9    THE WITNESS: An overall document that touches
10    on every single thing, no. I mean, there are several
11    documents obviously that describe various forms of the
12    process that I have seen, but the type of master plan that
13    you described, I'm just not privy to that.
14    THE COURT: Do you know what the quality control
15    plan was?
16    THE WITNESS: No, Your Honor, I don't.
17    THE COURT: Do you know whether the Sedona
18    Principles suggest that the producing party have
19    documentation and QC procedures in place?
20    THE WITNESS: Yes, I do know that. That kind of
21    thing is handled hand in glove with the lawyers in the
22    firm.
23    THE COURT: But do you know what the QC plan is?
24    THE WITNESS: I haven't seen that document, Your
25    Honor. That wouldn't fall under what I have been doing.

Page 361

1    THE COURT: Well, isn't most of what you have
2    been talking about today dealing with things that didn't
3    get quality controlled?
4    THE WITNESS: What I was asked to talk about
5    today was fixing these technical issues, which I was --
6    THE COURT: Some of these were pretty
7    fundamental. I mean having data --
8    THE WITNESS: I agree, Your Honor.
9    THE COURT: You've got supposedly a top-flight
10    vendor who's designing the search and they can't even get
11    their individual supervisors to get the data fields using
12    the same format.
13    THE WITNESS: The very short answer to that,
14    Your Honor, is that the vendor really let us down on this
15    project. There's no other way to say it. In fact, we
16    fired the project manager on it during my tenure.
17    THE COURT: Well, not only did they let you
18    down, but the QC process didn't catch it until after
19    things were delivered.
20    THE WITNESS: Yes. We had to fix it.
21    THE COURT: Can you tell me sitting here today
22    what impediment there is to producing the various
23    categories of ESI that we have been talking about in
24    native format?
25    THE WITNESS: Well, we have to scrub out

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 362

1  metadata. We have to somehow -- the real problem with
2  providing it in data format is it would create an
3  authentication nightmare. I mean if we just gave them a
4  Word document and someone changed the Word document, for
5  example.
6     That's my understanding of why Sedona says TIFF or
7  searchable PDF. It's so you can agree on authentication.
8  I'm sure there are a myriad of other issues, but that's
9  the one that springs right to mind.
10        THE COURT: Do you know, based on your contact
11 with the representation here, whether AstraZeneca created
12 any kind of sales videos involving Seroquel?
13        THE WITNESS: I believe that they did, Your
14 Honor. There is another investigation being conducted by
15 the DOJ, and we were asked to produce documents that were
16 produced to the DOJ. I believe I remember there were.
17 There were some kind of marketing videos in that, but they
18 weren't the way that the plaintiffs described. They
19 weren't in digital files on somebody's computer. They
20 were actually on DVDs, I think.
21        THE COURT: Well, have any of those been
22 produced to the plaintiffs?
23        THE WITNESS: I don't know if they have yet, but
24 I think they're in the production pipeline. I think it's
25 in response to a request for production.

Page 363

1     Those would be the only videos that I have personal
2  knowledge of.
3        THE COURT: You started on this personally, this
4  representation, the end of February; is that correct?
5        THE WITNESS: Yes, Your Honor.
6        THE COURT: And what was the first time that you
7  reached out to have a technical discussion with
8  representatives of the plaintiff?
9        THE WITNESS: Well, early on it wouldn't have
10 been my role. It would have been the role of other
11 attorneys, like Mr. Freebery, for example.
12    It would have been me personally mid to late May.
13        THE COURT: At any time has anybody from the
14 vendor participated in discussions with plaintiffs'
15 representatives, to try to resolve those technical issues?
16        THE WITNESS: I'm not aware of anytime -- as you
17 said, the problems identified were fundamental. So I
18 don't think there was any problem with me taking the
19 information from Jonathan Jaffe and saying, hey, why is
20 this inconsistent? The vendor seemed to recognize that
21 problem pretty easily and fixed it.
22        THE COURT: How about any of the other issues?
23        THE WITNESS: I'm not aware of any conversations
24 between the vendor and --
25        THE COURT: Nobody from the vendor's ever

Page 364

1  participated with you in any of these meet and confers?
2  In person? Or by phone?
3        THE WITNESS: I'm not sure we ever had them ever
4  sitting on the phone to listen, Your Honor. We brought --
5        THE COURT: They've never been made available to
6  talk directly to anybody from the plaintiff?
7        THE WITNESS: Not in my tenure, no, they
8  haven't. We brought IT experts that work for the lawyers
9  to do that kind of role.
10        THE COURT: Well, you were coming up with
11 estimates on how long it was going to take to do these
12 fixes based on your conversations with the vendor, right?
13        THE WITNESS: That's right.
14        THE COURT: But no conversation between
15 Mr. Jaffe and the vendor to see whether there wasn't some
16 way to do it faster?
17        THE WITNESS: That's correct. I was a middleman
18 between Mr. Jaffe and the vendor.
19        THE COURT: Would it have been useful to have
20 the two experts talk?
21        THE WITNESS: Well, it may have. I'm sure there
22 was other issues regarding letting the plaintiffs'
23 representatives or the delegatees into the work product
24 process. I'm sure that there were issues regarding that.
25        THE COURT: That was above your pay grade?

Page 365

1        THE WITNESS: Yes, sir.
2        THE COURT: You understand under Sedona
3  Principle 6.A that it's ultimately the party's
4  responsibility for vendor errors?
5        THE WITNESS: Oh, yes, sir. I understand that.
6  We've tried to collect, or correct them as they come up.
7        THE COURT: Am I wrong -- I was under the
8  impression from the first time we had this discussion of
9  custodial files, that that was going to be AstraZeneca's
10 basic pass at producing the relevant documents in this
11 case, allowing it to choose the appropriate people and
12 which of their files were appropriate without specific
13 discovery requests, because it was supposed to be faster
14 and more accurate and more directed. Was that your
15 understanding as well?
16        THE WITNESS: Yes, Your Honor. It was my
17 understanding the --
18        THE COURT: In addition to the IND/NDA.
19        THE WITNESS: Yes. That was a separate issue
20 obviously, because it was a specific discovery request.
21 But my understanding was, we were supposed to get the
22 plaintiffs a base of documents through this custodial
23 production. You know, get them some millions of pages of
24 documents so they can figure out was going on, and then
25 they'll be able to make a request for production.

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 366

1    THE COURT: Out of the 80 custodial files and
2 the IND/NDA, comparing that to the universe of documents
3 held by AstraZeneca that relate to Seroquel, what are we
4 talking about?
5    THE WITNESS: Well, Your Honor, I can't say how
6 many documents might relate to Seroquel for people that
7 were never selected. I know just in the databases there's
8 documents that might relate to Seroquel, they're like, you
9 know, gagabytes there. The databases are enormous.
10    I really am not the right person to answer that
11 question. I'm sorry.
12    THE COURT: Do you know how large the -- what
13 you call the discard piles are, compared to what was
14 produced in the custodial files?
15    THE WITNESS: I believe the relevancy call is
16 60/40, about 40 being relevant and 60 not. I would have
17 to investigate it further, but that would be my best
18 estimate.
19    THE COURT: And you don't know what sampling or
20 quality control checking was done of the discards to see
21 whether actually they do have some stuff that's pertinent?
22    THE WITNESS: You mean beyond the keyword search
23 Your Honor? I know that --
24    THE COURT: Yeah, which you have admitted was
25 inadequate.

Page 367

1    THE WITNESS: I don't know, Your Honor. I can't
2 answer that question.
3    THE COURT: Redirect.
4    MR. FREEBERY: Nothing, Your Honor.
5    THE COURT: Step down.
6    You have a reading?
7    MR. MCCONNELL: Your Honor, given the lateness
8 of the hour, I'm not even going to do a read-in. All I'm
9 going to do is say this.
10    There are two exhibits that have been moved into
11 evidence that I want --
12    THE COURT: Let me tell you what I'm planning to
13 do with paper exhibits that have been tendered today.
14 Parties have been haphazard about moving them in. I'm
15 treating them all as admitted and part of the record, for
16 what they're worth.
17    I'm going to direct the clerk to scan those, along
18 with a listing of what they are or purport to be, and that
19 will become a docket entry as today's exhibits.
20    And what I'd like counsel to do is, once that's on
21 file, sometime, not tonight or tomorrow, because it won't
22 be there, but the next few days, double-check that to see
23 that she's got the ones on there that you offered and/or
24 used, and if so, that those will be the official record of
25 those exhibits, and then I'll direct the clerk to discard

Page 368

1 the paper.
2    So go ahead.
3    MR. MCCONNELL: Thank you.
4    The last factual matter, Your Honor, Exhibits 43 and
5 44 provided by the defendants are the volumes of
6 deposition of the testimony of John Dowling, who was
7 testifying about databases.
8    In pages 12 and 13, he lists the 13 databases that he
9 was talking about.
10    Pages 78 through 81, he goes through those databases
11 and he says not a single one of them is Seroquel specific.
12    On pages 118 through 120, he describes the very large
13 size of the Touchstone database and says it has something
14 like 3,000 tables.
15    And finally, this is in Exhibit 44, Volume 2 of the
16 deposition, pages 295 through 297, the question is asked
17 of him, "If you were to go through the databases about
18 which you're talking about, not even half of the 59
19 databases at issue, and the question were could you
20 extract the information relating to one drug from those
21 databases, how long would it take you?"
22    And he says, "About six months."
23    And we submit that.
24    And the very last thing I want to do is just because
25 I told Your Honor I was going do this, there is a case

Page 369

1 from the 11th Circuit. It's the In Re: Ford Motor Company
2 case, and it discusses the issue of whether parties can
3 get wholesale access to databases. And with the Court's
4 permission I would like to give copies to the Court and to
5 opposing counsel, and then I'm done.
6    THE COURT: All right.
7    MR. MCCONNELL: Thank you. The defense rests,
8 Your Honor. Thank you.
9    THE COURT: Anything else from plaintiff?
10    MR. GORNICK: Your Honor, we last Friday, at the
11 Court's direction, filed a document entitled something to
12 the effect of matters the plaintiffs would rely on for
13 this hearing. And in that document we listed a number of
14 cases, and it's in the record, and I would just direct the
15 Court to it.
16    But we did provide a great deal of authority to the
17 Court, I believe, that supports the implementation of
18 sanctions in this particular situation, including
19 sanctions such as -- what the cases would refer to as
20 severe sanctions, if that's how the Court would interpret
21 a sanction of striking the affirmative defense.
22    So, I just wanted to call the Court's attention to
23 the list of authority.
24    MR. MCCONNELL: Your Honor, just to close the
25 circle on the very first thing I talked about today, we

3249b3b3-8496-4be7-bb7e-7d878ed7af6f

Page 370

1  did file objections to that filing and said that it wasn't
2  the list the Court asked for, and in fact, the very part
3  of that filing that Mr. Gornick just referred to was an
4  impermissible reply brief.
5      And in response to his substantive point, the only
6  thing I'll say is there's a case that we cited in our
7  opposition to the 11th Circuit called In Re: Certain Real
8  Property, 126 F.3rd 1314, 11th Circuit, 1997, and I'd
9  suggest that it is controlling in this case and compels
10  ruling of no sanctions.  Thank you.
11         THE COURT:  All right.  I'm not going to rule
12  from the bench this evening.  And I'll make a couple of
13  observations before we break, however.
14      One is that from the testimony from AstraZeneca, and
15  obviously from the course of events, there are conceded
16  problems that developed in this production of ESI.  So I'm
17  unimpressed to the extent that the defendant comes in and
18  argues that there's nothing to look at here, in light of
19  really conceded matters.
20      Also, with respect to plaintiffs' presentation, and I
21  said this before, I am troubled by at least in some
22  respects, the -- and at various times, the nature of the
23  meet and confers that have gone on on specific issues.
24      As to some of those, I understand they're reacting to
25  certain things that have happened and frustrations and

Page 371

1  have had their own similar petulant reaction to that chart
2  request, and I've told counsel this before, that that's
3  inappropriate.
4      And the one supposedly successful effort -- not the
5  one, but one of the supposedly successful efforts that you
6  had on that, which resulted in the cancellation of the
7  prior hearing, appears to have been in paramount illusory.
8      I make these observations, and having heard what I
9  heard today, to inquire whether you want to have further
10  technical and legal discussions among yourselves before I
11  start making rulings on all the issues raised by the
12  pending motion.
13         MR. PENNOCK:  Your Honor, I think we're before
14  the Court in the morning.  Could we confer and respond to
15  the Court in the morning?
16         THE COURT:  I would make that agenda item 1 for
17  the status conference then.
18      We're in recess.
19         (Ended at 7:15 p.m.)
20
21
22
23
24
25

Page 372

1             C E R T I F I C A T E
2      I certify that the foregoing is a correct
3  transcript from the record of proceedings in the
4  above-entitled matter.
5
6
7
8
9  _____        _____
10  Sandra K. Tremel
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

3249b3b3-8496-4be7-bb7e-7d878ed7af6f