```
                 UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                      ORLANDO DIVISION

             Docket No.6:06-MD-1769-Orl-22DAB


     .  .  .  .  .  .  .  .  .  .  .  .  ..
     IN RE:                         :
     SEROQUEL PRODUCTS LIABILITY  :
     LITIGATION                     :         Orlando, Florida
     MDL DOCKET No. 1769            :         July 27, 2007
                                    :         9:30 a.m.
     ALL CASES                      :
                                    :
     .  .  .  .  .  .  .  .  .  .  .  .  .:


              TRANSCRIPT OF PRETRIAL CONFERENCE
           BEFORE THE HONORABLE DAVID A. BAKER
              UNITED STATES MAGISTRATE JUDGE
                           AND
           BEFORE THE HONORABLE ANNE C. CONWAY
              UNITED STATES DISTRICT JUDGE



     APPEARANCES:

     For the Plaintiffs:         Paul Pennock

                                 Larry M. Roth

                                 Scott Allen

                                 F.Kenneth Bailey

                                 Camp Bailey

                                 E. Ashley Cranford

                                 Dennis Canty

                                 Lawrence Gornick

                                 Lezzlie Hornsby

                                 Glenn Kramer

                                 Fletch Trammell
```

---

Page 2

1  For the Defendant
2  AstraZeneca:          Fred Magaziner
3                        Stephen J. McConnell
4                        James Freebery
5                        Robert Ciottai
6                        Shane Prince
7                        Liz Balakhani
8                        Meghen Rohling
9
10  Court Reporter: Sandra K. Tremel
11
12  Proceedings recorded by mechanical stenography, transcript
13  produced by computer-aided transcription.
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1           P R O C E E D I N G S
2       THE DEPUTY CLERK:  Case number is 6:06-MD-1769O
3  2DAB.  In re:  The Seroquel products liability litigation.
4     Counsel in the courtroom, please state your
5  appearances for the record.
6       MR. PENNOCK:  Paul Pennock for plaintiffs.
7       MR. ALLEN:  Scott Allen for plaintiffs.
8       MR. GORNICK:  Larry Gornick for plaintiffs.
9       MR. CANTY:  Dennis Canty for the plaintiffs.
10      MR. ROTH:  Larry Roth for plaintiffs.
11      MR. F. KENNETH BAILEY:  Ken Bailey for the
12  plaintiffs.
13      MR. KRAMER:  Glen Kramer for the plaintiffs.
14      MR. TRAMMELL:  Fletch Trammell for plaintiff.
15      MR. CAMP BAILEY:  Camp Bailey for the
16  plaintiffs.
17      MR. MAGAZINER:  Fred Magaziner for  AstraZeneca.
18      MR. MCCONNELL:  Steve McConnell on behalf of the
19  defendant AstraZeneca.
20      MR. CIOTTAI:  Robert Ciottai for AstraZeneca.
21      MR. PRINCE:  Shane Prince for AstraZeneca.
22      MR. FREEBERY:  Jim Freebery for AstraZeneca.
23      MS. BALAKHANI:  Liz Balakhani for AstraZeneca.
24      THE DEPUTY CLERK:  Counsel on the phone, please
25  state your appearances for the record.

---

Page 4

1       MS. HORNSBY:  Lezzlie Hornsby and Lori Siler for
2  plaintiffs.
3       MR. SMITH:  Ken Smith for plaintiffs.
4       MS. CRANFORD:  Ashley Cranford for plaintiffs,
5  Ruth.
6       MS. BROOKS:  Ruth Brooks for plaintiffs, not
7  counsel.
8       MS. NIXON:  Angela Nixon for plaintiffs, non
9  counsel.
10      THE COURT:  All right.  Judge Conway is here and
11  may chime in on an issue or two as we go forward.
12     Let's start out where we finished last night.
13  Anything counsel want to report to me?
14      MR. ALLEN:  Yes.  Scott Allen for plaintiffs.
15  At the conclusion of yesterday's evidentiary sanctions
16  hearing you put, as I understood it, issue number one
17  before the Court to us, to counsel, was should we -- would
18  we like to meet and confer concerning a resolution of the
19  sanctions motion and issues going forward.
20      We met this morning, and as the Court is aware we
21  asked for a some additional delay concerning this hearing.
22  We met with counsel for the defense concerning a
23  resolution.  Your Honor, while we did not agree on every
24  item, it was my impression that for items moving forward,
25  for moving forward we may have been close to an agreement

---

Page 5

1  on how to solve the problems moving forward.  But
2  concerning the events of the past and the prejudice that
3  we feel we have suffered and we're continuing to suffer as
4  we prepare for the depositions that are upcoming we could
5  not agree to any remedy or any agreement.  So we
6  regretfully inform the Court that while we met with
7  counsel for the defense, we were unable in the meet and
8  confer to reach any resolution of the matters.
9       THE COURT:  All right.  I'll deal with that.
10     Let's take the agenda items set forth in the parties'
11  filing from last week or earlier this week.  With respect
12  to the PMO, I looked fairly quickly at the credentials for
13  Brown Greer that you have jointly proposed.  They appear
14  to have appropriate qualifications.  I am a little
15  concerned about the cost, why we need a law firm what
16  really is almost more of a traffic cop function, at least
17  at this stage of the case.  Parties want to comment on
18  that, why you picked them, how you envision that working?
19      MR. MCCONNELL:  I think I can tell the story how
20  it is how we picked them.  The plaintiffs had proposed
21  somebody up in Philadelphia who had worked on some issues
22  like this pertaining to the Phenfen litigation.  There
23  were problems with that entity, but there was another
24  entity called Brown Greer that we had experience with, and
25  Mr. Blizzard who was in the Phenfen litigation had

---

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 6

1  experience with too, everybody's experience with Brown
2  Greer was they were incredibly responsive and efficient.
3  They are a law firm. The negative might be the cost. The
4  plus is they know what it means to depose and they know
5  what it means to depose doctors, how to schedule doctors.
6  In fact, the experience that we have all had with Brown
7  and Greer is they get things done which seems to be the
8  number one priority here. We did for once reach agreement
9  on something.
10      THE COURT: Well, I appreciated that and, you
11  know, there's something to be said for somebody who can
12  tell you where to go and how to get there in the sense
13  that you're talking about, that they know what logistical
14  problems are with depositions and will cut through some of
15  those issues. So have you had any more discussions with
16  them about the cost or -- have you had discussions about
17  the cost structure, who's going to pay what or how we're
18  going to split this up?
19      MR. MCCONNELL: I don't think we did have those
20  discussions. I thought Your Honor actually had addressed
21  that initially and that it was going to be hacked up in
22  the middle.
23      THE COURT: That was my thought, split it 50/50.
24  But, again, I hate to do things like that without an idea
25  how much it's going to be. If it's -- if it gets out of

Page 7

1  hand, then that -- and it's getting out of hand because
2  it's somebody's fault, then it's not fair to make the
3  other side pay.
4      MR. MCCONNELL: My understanding was that we
5  were all under the impression it was split 50/50 and was
6  on that basis that Mr. Blizzard and us agreed. One
7  proposal is that we go forward that way but Your Honor
8  revisits it, we see what happens.
9      THE COURT: That's what I thought. The other
10  thing we need to spread out the authority. My -- without
11  detailing it, my thought was that they -- this, the firm
12  and in particular the individual who's designated as a
13  special master will have the Court's authority, as I say,
14  to tell you where to go and how to get there and resolve
15  those things summarily. That's my expectation. And
16  obviously if there's anything that the special master
17  thinks is beyond his ability to resolve, then he will
18  bring it back to me and I'll tell you where to go and how
19  to get there.
20      MR. MCCONNELL: Maybe another plus with having a
21  law firm especially a lawyer like Warren Brown involved,
22  he has a better sense as to when he's sort of reached
23  limit of his authority and when he's got to go to a judge.
24      THE COURT: All right. We can go forward on
25  that basis and I'll do some sort of an order that empowers

Page 8

1  them and get them to submit a fee schedule and let them
2  start working with you to get the August matters going
3  forward.
4      Let's talk about the lexicon issues. I read, again
5  rather quickly because I was out of town, the filings that
6  you made on the issues that you raised at the last hearing
7  about transfer of cases, Florida connected cases. I
8  didn't read any of the legal authorities that you cited.
9  And I just -- my head was starting to turn around as I was
10  trying to figure out whether you were all in agreement and
11  at least as to the substance but maybe you differed on
12  legal rationales or maybe even agreed on that. It looked
13  to me like there was -- both sides were interested in
14  having Florida cases that weren't filed here under some
15  way transferred here for purposes of trial. Is that
16  correct?
17      MR. MAGAZINER: That's correct, Your Honor.
18      MR. TRAMMELL: Fletch Trammell for the
19  plaintiffs. I'd like to speak to that if I may.
20      I think the basic source of disagreement is who's --
21  who gets to pick the case, whether they get some role in
22  our decision to lay venue in the Middle District or how
23  that works. And Your Honor knows the Lexicon case
24  precludes the Court from undertaking a section 1404
25  analysis for cases consolidated here under section 1407.

Page 9

1  A case subsequent to Lexicon, the 11th Circuit the In Re:
2  Carbon Dioxide Antitrust Litigation which I refer to as
3  the In Re:CDIAL litigation maintains that venue, even in
4  consolidated cases, is treated the same as it is in any
5  case filed in any federal court. In other words, section
6  13 -- section 1391 governs a plaintiff's choice of where
7  he lays venue. And so what happened in the In Re: CDIAL
8  litigation was the plaintiff's chose to lay venue in the
9  Middle District of Florida in Judge Beer's Court. The
10  11th Circuit said Lexicon does not preclude a trial court
11  from trying these cases that are consolidated pursuant
12  1407 provided the plaintiff makes his choice of venue.
13  They refer to the venue principles as entirely within the
14  province of the plaintiff.
15      Their remedy if they think we lay venue here
16  improperly under section 1391 is to file a section 1404
17  motion to transfer venue, because once we lay venue here
18  under 1391, it becomes a Middle District case for all
19  purposes. They don't get a choice as to whether we decide
20  to lay venue here. And so for that matter, Your Honor, we
21  could theoretically lay venue here for any case that's
22  filed or any case that's been consolidated here or any
23  case that hasn't been consolidated here. They would at
24  that point have an opportunity to object to the venue.
25      We could work with the Court to only lay venue here

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 10

1  for Florida cases.  We have a substantial number of them,
2  but I think the basic area of contention is whether they
3  get to participate in the process of us deciding which
4  cases we lay venue in the court.
5      THE COURT:  What's the plaintiffs' position?  Do
6  you want the Florida -- the cases in which the plaintiffs
7  live in Florida, do you want them transferred here?  And
8  there's some issue about Northern District and Southern
9  District although, I expect Judge Conway would get
10  designated to hear those from Chief Judge Edmondson.  So I
11  think venue within Florida is not a problem.
12      MR. TRAMMELL:  I think for a practical matter
13  under 1931, a plaintiff has venue -- can lay venue with
14  respect to this defendant at any federal district in the
15  country because they conduct business in every federal
16  district in the country.
17      THE COURT:  Well --
18      MR. TRAMMELL:  Your Honor, we would work with
19  the Court.  Obviously once we lay venue the Court could
20  undertake a section 1404 analysis.  And so it would be
21  important to us, for us to understand which types of
22  plaintiffs you wanted us to bring to the Court.  It could
23  be any Florida plaintiff.
24      THE COURT:  I don't know anything about the
25  plaintiffs.  But if there's 127 that are Florida based,

Page 11

1  it's my -- common sense notion is they ought to be tried
2  here.  And if defendants are agreeable to that, if you're
3  agreeable to it, let's just take care of those and not do
4  picking and choosing with some characteristics of them.
5  That's enough to keep Judge Conway busy until she takes
6  senior status at some point.
7      JUDGE CONWAY:  Six years and four days.
8      MR. TRAMMELL:  I would look to be clear on our
9  part that they don't have any role in that decision.  They
10  really don't.  They have --
11      THE COURT:  Well, if they tell me that if we do
12  that they're not going to be filing motions to transfer
13  them back someplace else, that's nice to know so we can
14  just move forward with it.  Whether they have got a part
15  of initial decision or not, it's nice to know they don't
16  object.
17      MR. TRAMMELL:  I agree with you.  I'd like to
18  know they weren't going to object.
19      THE COURT:  And that's why, again, my head was
20  spinning a little bit it seems like there was some dancing
21  going on, that you were talking a little bit at cross
22  purposes.  Nobody wanted to see an authority for it.
23  Because Judge Conway could say, I don't know whether this
24  is appropriate under Lexicon and the multi-district
25  litigation statute.  She could send them back to

Page 12

1  Massachusetts or wherever they were filed with a
2  recommendation that they be immediately transferred to
3  Florida based on just, you know, convenience.
4      MR. TRAMMELL:  She could do that when the cases
5  are prepared to be remanded.
6      THE COURT:  Well, I'm wondering whether she
7  could do it now.  I'm not clear on that.
8      MR. TRAMMELL:  I'm not sure that's been done.
9  She may be able to recommend --
10      THE COURT:  Because it hasn't been done doesn't
11  mean --
12      MR. TRAMMELL:  I think how that would happen is
13  she would recommend remand to the panel.  The panel would
14  allow the case to go back with the understanding that the
15  transferor court would rule on a Section 1404 motion.
16      THE COURT:  It's up to that Court to agree.
17  But -- and I'd rather avoid getting the panel involved or
18  the transferor court involved.
19      MR. TRAMMELL:  By far the easiest way to do it
20  is for us to lay venue for Florida plaintiffs in the MDL
21  or in this Court.
22      THE COURT:  That's what you want to do?
23      MR. TRAMMELL:  We would like to -- it's our
24  responsibility to do that.  We would like to do that for
25  certain Florida plaintiffs.

Page 13

1      THE COURT:  Well, some or all?
2      MR. TRAMMELL:  Certain.
3      THE COURT:  Well -- Mr. Magaziner?
4      MR. MAGAZINER:  Very glad Mr. Trammell spoke to
5  this issue because I did not understand from the papers
6  plaintiffs filed with their positions -- apparently their
7  position is that of the 127 cases that have been filed and
8  consolidated into this MDL on behalf of plaintiffs who
9  reside in Florida, plaintiffs' counsel will pick and
10  choose among those cases and will arrange -- I'm going to
11  use that non legal term -- arrange for some of them to be
12  relocated to Florida but not arrange for others to be
13  relocated here to Florida.  That was not my understanding
14  of the question Your Honor asked.  I thought Your Honor's
15  question was do we object to a method by which all 127
16  cases filed on behalf of Florida resident plaintiffs could
17  be transferred or located in this Court.  And did we think
18  it was advisable.  Our answer in our brief on question
19  number one is, yes, we think there is a way to do it.  And
20  question number two -- and no we don't object.  And
21  question number two, do we think it is advisable to have
22  the Florida cases relocated to this Court.  But if it's
23  going to be on plaintiffs' terms, they get to pick and
24  choose which Florida cases are located here and they'll
25  only bring to this Court certain Florida resident cases

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 14

1  and not others. We will then have to respond to their
2  choices. And I have no doubt we will object to their
3  picking and choosing cases to be put in front of Judge
4  Conway for trial.
5          THE COURT: Okay.
6          MR. TRAMMELL: Can I follow-up?
7          THE COURT: Yes.
8          MR. TRAMMELL: You know, it is our choice. The
9  11th Circuit case makes it very clear. Venue is always a
10 plaintiff's choice. The Court honors -- in 1309 -- 1391
11 contemplates the Court will honor choice of venue.
12     We're not saying we're going to cherry pick cases and
13 file them here or lay venue here. In fact, I don't think
14 we're prepared to say exactly when we would file them all
15 or whether we would file some of them here or refile some
16 of them here. I just -- I think the legal point is
17 important that it is our choice. They then have the
18 remedy, but the initial choice of where we lay venue is
19 our responsibility and it's our prerogative.
20         THE COURT: You made that choice. The question
21 is whether you want to agree to change it.
22         MR. TRAMMELL: Right. And that's our choice
23 also. We can agree to change it and at that point they
24 can challenge it. And we don't know whether we would lay
25 venue here for all Florida plaintiffs. I think that's

Page 15

1  certainly a possibility, Your Honor. I have just got to
2  consult with my side. I thought that the purpose of today
3  was to make a legal point. I think that's something
4  that --
5          THE COURT: I don't want to decide that legal
6  point if I don't need to. I raised the issue last time
7  because I thought from a common sense point of view that
8  the litigation be advanced if we had a reasonable number
9  of cases here in Florida that have Florida connection that
10 Judge Conway could set for trial so we could actually see
11 some of these cases through. Because so few were actually
12 filed here in the Middle District and -- at some point
13 when you set them -- start setting them for trial there
14 would be some reasons to put one first and one last. But
15 in terms of choosing which one should be here from the
16 Court's point of view, I don't see any basis for picking
17 and choosing.
18     I'd like to you make a commitment on this whether you
19 want them all -- if you don't want them all, I'm going to
20 recommend to Judge Conway that she enter some sort of an
21 order.
22         MR. PENNOCK: No, I --
23         THE COURT: We will decide the legal issue.
24         MR. TRAMMELL: We will make a commitment one way
25 or the other. It's up to my clients. I have to get in

Page 16

1  touch with them and have them decide whether they want to
2  lay venue here.
3          MR. ALLEN: We understand the Court's request
4  and we will get back with the Court on that. Thank you,
5  Your Honor.
6          MR. MAGAZINER: I'd like to address a legal
7  issue Mr. Trammell raised.
8          THE COURT: I don't want to decide the legal
9  issue if I don't have to. And if they're going to
10 consent to all of them and you've told me you're
11 consenting to all of them, I'm going to cut through that.
12 If they start raising that legal issue, you will have a
13 chance --
14         MR. MAGAZINER: Mr. Trammell made a statement, a
15 legal proposition that I believe to be incorrect. I just
16 wanted to make sure my silence is not interpreted --
17         THE COURT: I understand.
18         MR. MAGAZINER: He said that it's up to
19 plaintiffs to decide. Plaintiffs actually laid venue in
20 the District of Massachusetts.
21         THE COURT: I understand.
22         MR. MAGAZINER: They have no right at this point
23 to transfer cases any more than any litigant that files a
24 case here can decide unilaterally --
25         THE COURT: I understand you disagree with their

Page 17

1  analysis, and I'm not sure I follow their analysis either,
2  given the posture of it. So if I don't have to resolve
3  that --
4          MR. ALLEN: We understand the Court's request.
5          JUDGE CONWAY: When are you going to tell us
6  which way you're going to go? How much time do you want?
7          MR. ALLEN: When would you like us to tell you?
8          JUDGE CONWAY: Ten days, is that enough?
9          MR. TRAMMELL: Next status conference.
10         THE COURT: Before then.
11         MR. ALLEN: Ten days, Your Honor.
12         THE COURT: Ten days.
13         MR. TRAMMELL: Thank you, Your Honor.
14         THE COURT: All right.
15     On the agenda that the parties submitted, the
16 plaintiff's got their list in as item C, so I'll take
17 those up. Although, ironically, the first one is an
18 AstraZeneca objection regarding the eligible plaintiffs --
19 discovery eligible plaintiffs list.
20     Who's going to talk about that?
21         MR. PENNOCK: Your Honor, actually, I spoke with
22 Mr. Magaziner and as to agenda number one, we decided to
23 have some additional conversations about that. And I
24 indicated I'd like to speak to him about the issues and
25 present some specific examples. So essentially it's

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

1  mooted out for today.
2      THE COURT: We will table that one.
3      Next item is issues about production for prescriber
4  information.
5      MR. ALLEN: Yes, Your Honor, Scott Allen for
6  plaintiffs. I'd like to address this matter.
7      We did send a letter to counsel for the defense,
8  AstraZeneca, on the 24th and we met this morning to
9  discuss some of these issues concerning the prescriber
10  information. The first issue we had, and I think it's
11  important for the record to get the agreement on the
12  record, otherwise it will not be enforceable, is when they
13  gave us the call note from the sales force that called on
14  the initial doctors in these first case specific
15  depositions that are coming up, call them up notes where I
16  guess what I learned is called TIFF format and they were
17  cut off. So the notes had been cut off mid sentence. I
18  did not have complete copies of the notes. We have been
19  told this morning, and we'd like to verify for the record
20  that counsel for the defense when they provide us the call
21  notes for the doctors from the sales representatives will
22  now be producing these electronically in what I understand
23  is some type of Excel spreadsheet. We will not have --
24  they'll also produce them in the format that they filed
25  them with me last week, but they'll also being producing

1  them where all the call notes are present and they read
2  across a line. Because the call notes themself not only
3  were they cut off in mid sentence, I couldn't determine
4  the date of the call or the name of the sales
5  representative that called on the doctor. I think we
6  agreed on that. Correct, Mr. Magaziner?
7      MR. MAGAZINER: We have agreed. I just want to
8  clarify one thing, Your Honor. These call notes exist in
9  databases. What we were trying to do is print the
10  database in a way that made it intelligible, but it's
11  many, many columns wide. So if it became a real printing
12  problem what we have agreed to do is give the call notes
13  in question to the plaintiffs in an electronic form so
14  they could screen it on their computer and they can
15  manipulate through the various columns.
16      What I want to clarify is that Mr. Allen is not
17  expecting us to keep fussing with the printed version of
18  it. If we give him the electronic version that gives, has
19  all the columns in it, we don't have to keep trying to
20  figure out some way to print this whole thing in a format
21  that makes it easy to read in hard copy.
22      THE COURT: Are you giving it to him in the same
23  way that's stored on your --
24      MR. MAGAZINER: Yes.
25      THE COURT: -- server.

1      MR. MAGAZINER: I don't know if it's -- I think
2  we lift it from the database and we have it in an Excel
3  spread sheet. So it's essentially the same thing and he
4  can go through all the columns of information. I'm not
5  sure if that answers Your Honor's question.
6      THE COURT: Where's Mr. Jaffe when we need him?
7      MR. ALLEN: That's exactly what I'm saying, Your
8  Honor. And I've leveled with the magistrate all along and
9  the Court I think in the last hearing, I am the person
10  that will be taking these depos, but I'm not a computer
11  person, for lack of a better word. And all I know is I
12  would like the information in a usable fashion complete
13  where I can read all the notes, determine the date and
14  determine the sales rep, determine the events that
15  transpired. And I would like it -- I think the Court had
16  a good question, is it going to be produced as it is in
17  your --
18      THE COURT: I don't know how you keep them, I
19  suspect these are going to be an extract from a database.
20      MR. MAGAZINER: Right. The reason I didn't
21  respond to Your Honor's question by saying yes is because
22  as I understand it, the way a database like this is, is a
23  very huge -- actually there are three databases, are huge
24  amounts of database. It is not kept in an Excel
25  spreadsheet format. What we do is extract it, all the

1  information --
2      THE COURT: Make it into an Excel file.
3      MR. MAGAZINER: Right. And give that
4  information to Mr. Allen, electronically to Mr. Allen and
5  other plaintiffs, of course, electronically.
6      THE COURT: You only have do it one way if it's
7  readable.
8      MR. MAGAZINER: That's all I was trying to say.
9      MR. ALLEN: If I get it readable, that will be
10  fine, Your Honor.
11      We have other issues concerning the product of the
12  call notes and the information made the subject of this
13  Court's case management order number 4, in particular, II:
14  Scope of case specific discovery.
15      As you know at the last hearing, Your Honor, I
16  brought up the issue of the fact that we believe that
17  fundamental fairness and due process in order to properly
18  examine the doctors. It was fundamentally needed that we
19  had all of the information that was provided to the sales
20  force, that was provided to the physicians and all of the
21  call notes, all of the call notes which are notes that the
22  sales representatives keep electronically on either the
23  Touchstone, SnapPharma or Compass database. They
24  literally transcribe the notes after they meet with the
25  doctor and they are sent into a database. We have all of

Page 22

1  those.  The Court agreed and in its case management order
2  number 42A, ordered the defendants to provide all
3  available documentation, footnote one, regarding contact
4  with the prescribing physician associated with that
5  plaintiff.  I'm just reading from the Court's order.
6  Footnote one says, "While the Court declines to require
7  the defendants to fill out the fact sheet, this disclosure
8  requirement includes at a minimum call notes, the account
9  payable records, the IMS information on prescribing
10  habits, and the PIR or professional information requests
11  and any nonprivileged documents relied on or available to
12  defense counsel in preparation for the deposition."
13      Your Honor, we have examples, but the first
14  depositions of the doctors are coming up and the sales
15  representatives are coming up.  Now, as the Court is aware
16  we in part of our remedy that we sought yesterday on the
17  motion for sanctions, and we still believe that this is a
18  proper remedy, we believe that the doctors' depositions
19  should not proceed as scheduled for the rest of year.  And
20  we want the Court to be aware of the fact that we do not
21  believe the depositions should proceed because the
22  unrebutted conclusive testimony of the witnesses as
23  opposed as to the arguments of counsel, the witnesses and
24  the testimony and the evidentiary hearing is we have never
25  received a searchable database of the documents of the

Page 23

1  defendants as of this day.
2      MR. MAGAZINER:  Your Honor, I object.  I didn't
3  know we were going to reargue the motion for sanctions
4  this morning but that seems to be what we're doing here.
5      THE COURT:  That's not what he's doing.
6      Go ahead.
7      MR. ALLEN:  That's not what I'm doing, Your
8  Honor.
9      We have never received those documents as of this
10  day.  When we were fixing to go take the depositions of
11  the prescribing doctors, they have been ordered by this
12  Court in CMO number 4 to also in addition to all the
13  information we should have before I go take a doctor's
14  deposition or sales rep's deposition, I need to know what
15  they knew and what the sales reps were taught.  We don't
16  have the documents.  I wasn't rearguing the sanctions
17  motion.  I was saying to the Court we're standing on
18  sanctions motion and believe we shouldn't proceed with
19  this process because I have yet to -- I'm the guy getting
20  ready.  And I still don't have all the information I need
21  to take the doctors' depositions or the sales reps'.
22      Now in the call notes they provided, they did comply
23  in part with this Court's CMO number 4.
24      THE COURT:  Let me clarify what I meant by that
25  footnote which I think was consistent with the, at least

Page 24

1  some of the -- of the arguments you were making last
2  night.  It was my intention when I put that footnote in,
3  is the depositions are going to go forward and if it turns
4  out that defendants have things it becomes obvious that as
5  they examine the witness or comes out later, that they had
6  pertinent to the appropriate examination of the witness
7  and you didn't get it in advance, then sanctions are going
8  to be imposed.  Those depositions may be stricken or other
9  sanctions will be imposed.  But it's up to the defendant
10  to give you that stuff, and if you don't have it, and it
11  turns out, like I say, they're using some things you
12  haven't seen, or it's clear that there are things, then
13  there will be a day of reckoning on it.
14      MR. ALLEN:  Yes, sir.  And let me -- and Scott
15  Allen's position on behalf of the plaintiffs, Your Honor,
16  when in fact it is apparent from the call notes themselves
17  before I begin this process, I can read the call notes and
18  I can determine that there's clearly information that they
19  shared with the doctor that they had note shared with us
20  already, it seems to me to be a futile exercise of massive
21  time and expense.
22      For the example I have here, I have to go to Ohio and
23  we have other call notes and I didn't want to sit there
24  and read call notes to Your Honor, but I have an example.
25  I can tell this Court right now from the call notes I read

Page 25

1  themselves that they clearly have the information that, A,
2  they haven't provided to me as required by CMO number 4;
3  and, B, they have not provided throughout the discovery
4  process for the reasons that this Court heard yesterday.
5      And, for example, the Court looked at I think it was
6  the witness called by the defense, the associate middle
7  level manager attorney who was admittedly not an expert
8  and asked Mr. Dupre yesterday, don't y'all have sales
9  videos?  Don't you have sales training material and
10  videos?  And why have they not produced?  As I recall the
11  answer it was something like, I don't know, Your Honor.  I
12  need to look into it.
13      Well, in the case of to Tulchulski v. AstraZeneca, a
14  selection made by the counsel for the defense, which I
15  received partial call notes on and we're fixing to have --
16  not just partially in the order that they were cut off --
17  and we're going to talk about the dates in a minute,
18  partial call notes on, the call notes I read from the
19  sales representative state as follows in part.  And bear
20  with me, Your Honor, because I have to read them.
21  Played -- this a sales rep's notes about the doctor.
22  "Played Kek (phonetic) and Nas (phonetic). " I think
23  that's short for Naswally because I read documents --
24  Naswally is and Kek is a doctor.  They're two, quote,
25  experts hired by the defense that are kind of their

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 26

1   speakers.  "Played the Kek and Nas DLN."  I do not what
2   DLN stands for but it is a video because the notes
3   continue on the very next visit.  "Doc says she's used the
4   info from the video."  She's used the info from the video.
5   "Said the tape was very educational for the staff."  It
6   goes on.  "Doctor wants" -- this is later notes -- and
7   I -- three or four -- I can't tell the dates.  Remember, I
8   didn't have the dates, but I got to assume these are
9   months later.  "Doctor wants CM video.  Gave coping
10  program video series to the doctor."
11      So I have right here, Your Honor, and in addition, I
12  might as well read the list because I need a complete
13  record, and this is just Scott Allen's review of those
14  call notes last night of materials given to this physician
15  that I do not have in my possession.  A Slim Jim which --
16  does this Court know what a Slim Jim is from other
17  litigation.  Slim Jims are kind of -- they're a term of
18  art.
19          THE COURT:  I know two different kinds of Slim
20  Jim.  I don't think they're involved here.
21          MR. ALLEN:  Slim Jim I eat on a duck hunting
22  trip.  But the Slim Jim --
23          THE COURT:  Also referred to as carjacking tool.
24          MR. ALLEN:  That's right.  This is a third Slim
25  Jim.  But these are the materials that I could glean from

Page 27

1   the call notes that were given and shared with this
2   doctor, none of which I have.  The Slim Jim on prolactin;
3   the Kek and Nas DLN; the general term promotional items;
4   the dosing cards; the SQ Slim Jim; Seroquel Slim Jim.
5   Adverse event form that was filled out by this doctor.
6   This doctor was instructed to fill out an adverse event
7   form.  I don't have that.  The bipolar dosing card; the
8   national quick list anxiety and bipolar pieces.  These
9   were information given to the doctor.  The NQL pieces on
10  anxiety and bipolar; the NQL -- and I don't know what NQL
11  stands for.  NQL patient education pieces; the education
12  trackers; the Seroquel tear off sheets; the Seeman,
13  S-E-E-M-A-N paper; and ICD9 code book.  Now I know what an
14  ICD9 code book is, but if you'd like me to explain, but it
15  may be that they did a particular one for the doctors.  A
16  pocket calendar for the patients; a geriatric rating
17  scales book; a coping program video series.
18      In addition to that, I could determine and I really
19  did quite frankly quit looking at the call notes for this
20  because it was so repetitive.  This doctor was given
21  invitations to dinner study programs before I quit
22  counting and I'll just say five times before I quit
23  counting.  And at dinner study programs, I have to feel
24  there are materials.
25      So what I'm saying is in the Court CMO order and the

Page 28

1   Court's right, sanctions would be entered, but I got to
2   think, Your Honor, why should I go out to Ohio -- I think
3   it's near Toledo.  That's expensive and time consuming.
4   And I take this deposition of a doctor when in their
5   records I know right now I don't have the stuff that they
6   gave the doctor.  And I think a better use of our time
7   should be spent in not taking these depositions until I
8   get the material.  And what I'm proposing is one of two
9   things, or two things.
10      Number one, do what the Court orders.  They should
11  have to review, as I did last night, these call notes.
12  And when they are going to send me a designation of a
13  doctor we're going to depose and their call notes disclose
14  that those materials have been given to the doctor, I
15  should get a pack of information as this is the
16  information given to the doctor.
17          THE COURT:  Are you telling me none of the 80
18  custodians include these materials?
19          MR. ALLEN:  Your Honor, let me answer that
20  question.  I am uncertain because of the fact, again,
21  Mr. Jaffe who's unrebutted expert testimony was that the
22  databases are not readily searchable.  Are not readily
23  searchable.  Your Honor, I anticipate and I would believe,
24  I bet you some of that material may be.  The problem is, I
25  can't figure it out.  I can tell you this, this Court,

Page 29

1   Your Honor, properly asked a very good question yesterday
2   when it asked Mr. Dupre whether or not they had any
3   videos.  I looked on the list of the 80 custodians and
4   remember the Court said and the promise from the defense
5   was they 80 custodians were going to get us the documents
6   quicker, faster and more information without the need for
7   normal requests for production.  Nowhere on the 80
8   custodians and nowhere in the production as conceded by
9   Mr. Dupre have we gotten any videos.  And we know for a
10  fact that the Kek and Nas videos in existence, the coping
11  program video series are in existence.  So I think -- and
12  we know by the admission of defense that we don't have
13  that.
14      Now whether or not I have a SQ Slim Jim, I don't
15  know.  But I tell you, I'm the one that took the 30(b)(6)
16  deposition of Mr. Paulson the national director of sales.
17  And I can tell you after that deposition it was clear to
18  me that we didn't have the sales information.  And I
19  personally and it's on file with the Court -- I don't
20  guess we filed it any more, but I prepared a separate
21  sales request for production which is probably due within
22  the week.  But I can tell you, Judge, to the best of my
23  knowledge for the vast majority of the information, if not
24  all of the information, no, sir, I do not have it readily
25  available if my hands.  And I'm just -- I'm asking the

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 30

1  Court to -- for the defendant to comply with the order.
2  If they have the Nas videos, the coping series video
3  program, the Slim Jim on SQ, give it to me before I begin.
4  That's number one.
5      Would you like to proceed or would you like to hear
6  the response?
7          MR. MAGAZINER: May I respond to that particular
8  item, Your Honor?
9          THE COURT: I'd like to hear everything on this
10 point.
11         MR. ALLEN: Okay.
12     That's point number one, that we believe that the CMO
13 number 4 needs to be complied with and all documents
14 should be given to us at the time of the call notes.
15     Point number two, we need readable call notes. They
16 have agreed to.
17     Point number 3 on their own in their response the
18 defendants in their call notes did not give us all the
19 call notes. This isn't an issue of cutting them off. They
20 just selected a -- they selected and they defined it --
21 it's nowhere in your order. They defined what they call,
22 quote, the relevant time period, closed quote. And they
23 gave us call notes from six months. This is what they
24 said they did. I haven't been able to go through each one
25 and make sure it's accurate. But I'm going to give them

Page 31

1  credit for being mostly accurate. They gave us call notes
2  from what they said was six months before the first
3  prescription until six months after the last prescription.
4  And they gave us not all of the call notes on this doctor.
5      Now this Court ordered all the call notes. I
6  anticipate by the use of term "all relevant call notes"
7  that the defendant is going to contend -- contrary to
8  CMO4, by the way, that, well, we chose this six month --
9  six month timeframe because anything else is irrelevant.
10     Your Honor, I did defend doctors in the past and
11 that's what I have done. My firm still does and I still
12 defend doctors. I'm fixing to get ready to go depose
13 physicians. I'm fixing to go depose physicians. A
14 physician knowledge base concerning particular drug or
15 product or medical event is not limited in time and space
16 to what somebody told them six months before a
17 prescription and six months after a prescription. We all
18 know that doctors, lawyers utilize their education, their
19 skills, their knowledge, their training and experience
20 over a period of time.
21     Let me give you just two examples of why they're
22 self-selection of a six month, six month process, contrary
23 to CMO4 which said all call notes, is not even fair nor
24 right.
25     Using the defendant's theory and using the call notes

Page 32

1  that have been provided to me which says, videos were
2  played for this doctor, that she said she utilized as she
3  said, and I'll paraphrase, I utilized and she valuable to
4  me and I showed them to my staff.
5      Assume that video which was utilized by that doctor
6  had occurred six months and one day prior to the
7  prescription of the drug to my patient. I wouldn't have
8  gotten that information. And I certainly believe that a
9  video series and educational materials that are given to
10 my client's physician who I'm going to cross-examine that
11 occurred five months and 28 days is relevant as well as it
12 occurred six months and 31 days or eight months and two
13 days or two years before the prescription, because the
14 educational material given to a doctor, just like a book,
15 the handouts they're used over a period of time. And I'm
16 entitled to know that. And so their arbitrary cut off
17 date of six months and one day has cut that information off had
18 it been six months and one day. And it is contrary to
19 CMO4.
20     Now, also there will be no -- so the Court is clear
21 -- Your Honor asks good questions all the time. You asked
22 last time, Mr. Allen, what is the doctor's attitude about
23 this drug. You said that. Good question. And of course
24 I told you and I hope I conveyed to you the doctor's
25 attitude about this drug is going to vary all across the

Page 33

1  board. I can almost promise this Court that. But I know
2  I'm going to go in there and ask these doctors questions
3  about their view of the safety and efficacy of this
4  drug -- there's no question -- and whether or not they
5  believe that the sales representatives from AstraZeneca
6  gave them a fair and proper warning. And as Mr. Magaziner
7  has told this Court on repeated occasions, he's going to
8  be asking them would they still use this drug today. And
9  he told you he's going to use this doctor's testimony as
10 against my client upon a dispositive motion.
11     Now, under their theory, I don't get any call notes
12 that occurred six months after the date of the last
13 prescription. Hypothetically assume with me that these
14 call notes concerning a particular physician on the month
15 leading up to the doctor's deposition, this sales rep took
16 this doctor to dinner, as I told you, at least five times.
17 This sales rep drove this doctor to the airport, to the
18 airport. She's a doctor. The doctor's a she. When she
19 was going to go on a trip. This sales rep gave this
20 doctor at least two video series. This sales rep gave the
21 doctor tons of information. What if the week before the
22 deposition the sales rep from AstraZeneca is in the
23 offices of the doctor I'm deposing giving this doctor new
24 and important information on whether Seroquel causes
25 diabetes. A new video, a new hand out. That doctor reads

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 34

1  it. Let's say it's bad for me, bad for my client. The
2  doctor testifies I believe Seroquel is safe. I think the
3  company's been fair, and I think the information they
4  provided tells me that there's no causation.
5      Well, I think I'm entitled to see what went on
6  between this drug company and this doctor the week
7  preceding his or her deposition. That's why this court
8  ordered all the call notes. All the call notes. Their
9  relationship with the doctor is not limited in time nor
10  space, yet they're trying to limit my right to
11  cross-examine or examine. I may have a favorable doctor.
12  But they want me to be limited in a way that they're not.
13      So I propose that this Court's order CMO number 4
14  concerning the call notes and the need to have all the
15  call notes should be put into effect. And I ask this
16  Court to order the defendants again to provide me all of
17  this information.
18      Now, the last item, I think, note that they said in
19  regard to the call notes that the relevant time period was
20  six months before the prescription and six months after.
21  Well, one of the last things this Court ordered in CMO
22  number 4 and in footnote number 1, was the IMS data. Now,
23  Your Honor just so the Court understands -- and I get
24  confused on this -- IMS is a company. And I don't know
25  what it stands for. But as the Court knows this

Page 35

1  prescription drug history, I think it might be a good idea
2  for Court to change the footnote to IMS or other
3  prescription tracking data in case there's another company
4  they use, because I remember I took a deposition of Mr.
5  Paulson, there's another company they used in addition to
6  IMS. That is just a minor point.
7      But on the call notes they chose the time period as
8  six months before and six months after. Well, in the IMS
9  data I would think that the most relevant information I
10  could receive concerning prescribing history of the doctor
11  would be the prescribing history of the doctor at or near
12  the time that my client was treated by this patient.
13  Because I want to see if, for example, right before my
14  patient -- let's pick January the 1 -- is given the first
15  prescription and prior to that time and they have this
16  available in the sworn deposition testimony of Mr. Paulson
17  and I provided the Court, prior to a time Dr. John Doe had
18  never used Seroquel. And then we see from the call notes
19  there is a plethora of contact and all of a sudden the
20  prescriptions of Seroquel jump. That would certainly be
21  evidence of the fact that the information flowing to the
22  doctor from the defendant had an effect on the prescribing
23  history. Yet in the IMS data that was provided to me in
24  this case, they have limited that information to the last
25  I think 24 months.

Page 36

1      So they didn't concentrate on giving me at IMS data
2  concerning the prescribing at the time my patient was
3  prescribed the medication. They'd given me the
4  information from the last 24 months. I think they should.
5  I think that's relevant and I think that I should have.
6  But I don't think I should be so limited. I think they
7  should give me what they have.
8      Now I anticipate this is what they're going to say
9  because I took the deposition of Mr. Paulson who was the
10  national sales director. Who didn't -- there was three
11  databases that they utilized: Touchstone, Compass,
12  SnapPharma. They also used a database called Azer
13  A-Z-E-R, and another one called Northstar or Northwind. I
14  apologize.
15      But what I do know is Mr. Paulson testified under
16  oath that before the -- before a sales rep walks in to see
17  a doctor -- I know it's right there in the testimony --
18  before they look at the prescribing history both on the
19  current prescriptions -- in other words, old patients
20  assume this half of the room had been on Seroquel. Well,
21  that will be listed under I think the abbreviation is TRX.
22  But assume this half of the room is just getting Seroquel
23  for the first time, that's NRX. New prescriptions. And
24  I -- you know the logical explanation for that is it's a
25  for-profit business and I may lose my case, but I'm

Page 37

1  entitled -- they're trying to increase their prescribing
2  of the doctors. That's why the sales reps go in there.
3  That's not what Scott Allen says. So the testimony is
4  that.
5      They didn't give me new prescribing history. They
6  just gave me the total prescriptions. And so I'm -- I
7  believe I ask this Court to order them to do what you have
8  already done in CMO number 4 is to give me both new and
9  old prescriptions of not only Seroquel but other atypical
10  antipsychotics, and this company has given me the TRX
11  which is total prescriptions I believe of the other
12  antipsychotics. And I asked Mr. Paulson why that was
13  important and I could go at length. And he told me why.
14  But they haven't given me the IMS or the prescribing data.
15      So in conclusion, Your Honor, here's what I ask for:
16  Before I go out and begin this process of taking doctors'
17  depositions and sales reps' depositions, I ask this
18  Court order that CMO number 4 be complied with in full.
19  It seems wrong to cost us time and expense to go down that
20  road without -- when it's not necessary on the face of
21  their own notes. I ask that they -- all the call notes
22  not limited in time for the reasons I have stated. I
23  asked that they give us all the prescribing data for not
24  limited in time for the reasons I stated. I ask that they
25  give us all of the videos and handouts they gave to the

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

1  doctors that are reflected in their call notes, so I can
2  know what they knew. I asked that they give us the dinner
3  program. Sometimes there's lunch and learn too. They
4  don't just limit it to dinner. But if they have CME, as
5  it has in there, Doctor wants CME video, if they give them
6  CME materials I didn't want to go through it with the
7  Court, but they did give them articles. We need to have
8  all the information. I want a fair playing field. And so
9  I'm here again asking.
10      And lastly, but most importantly I join with
11  Mr. Gornick on behalf of the plaintiffs, I believe this
12  process should stop right now. We have been prejudiced by
13  their failure to give the documents earlier. We don't
14  have a searchable database. Even if they gave us all
15  that, I haven't been able to look at the documents I need
16  to depose a doctor. And so I lastly ask that all this
17  process come to a halt until we get the documents.
18      Thank you, Your Honor.
19          THE COURT: Mr. Magaziner?
20          MR. MAGAZINER: Thank you, Your Honor.
21      I believe that what we have done in response to CMO4
22  is extraordinary and perhaps even heroic. It is a
23  Herculean task to turn around this information in five
24  days. I'm prepared to go through it item by item by item.
25  I think Your Honor will see at the end that we have

1  performed the Court's CMO4. We have given the plaintiffs
2  what they're entitled to. We're prepared to give them
3  even more. And we have acted absolutely amazingly
4  efficiently in turning around in five days what other
5  pharmaceutical companies and other litigations have been
6  given 60 days or in some cases 90 days to do. We're being
7  asked to do it in five days, and we have done it.
8      Mr. Allen put up a whole smoke screen about the
9  videos and the promotion materials, the dosing cards, et
10  cetera. Let me put that all in perspective for Your
11  Honor, please.
12      Case management order number 2 contemplated we will
13  give the plaintiff good base of documentation about
14  Seroquel by producing the 80 custodial files. It also
15  contemplated, and it's right in CM02, there's lots of
16  other information in the company's possession that is not
17  in the custodial files that the plaintiffs had asked for
18  in the fall of last year, that under CMO2 there was a
19  timetable for when they could renew their request for that
20  noncustodial file information. As of March 15 -- I
21  believe the date was maybe March 31 of this year,
22  plaintiffs were freed of all restrictions on their ability
23  to ask for noncustodial documents. As of March 31, the
24  latest, might have been the 15, but let's say the 31.
25  Again, they were freed of any restriction or limitation on

1  their right to ask for noncustodial documents. They know
2  we have a marketing department. They know we have a sales
3  department. They know that there are in those departments
4  documents, promotional pieces, videos, Slim Jims, dosing
5  cards, et cetera. And they did ask for that stuff. They
6  asked for it on July 23. So when Mr. Allen --
7          THE COURT: You're telling me none of that sales
8  and marketing material was produced as part of custodial
9  files?
10          MR. MAGAZINER: I'm not telling you that. I
11  don't know how much might have been in a custodian's file
12  but the place where it's located as they know from taking
13  depositions of 30(b)(6) witnesses.
14          THE COURT: I don't care where it's located.
15  I'm just astounded that in choosing 80 custodians -- and
16  again I just don't like that term -- that you wouldn't
17  include these basic materials. I thought the purpose of
18  choosing 80 people was to get the vast majority of
19  relevant information to the defendants -- to the
20  plaintiffs.
21          MR. MAGAZINER: That's correct, but these are --
22  it is as if -- I'm trying to think of a good analogy.
23  There is whole department where such documents are created
24  and are stored and are filed. Plaintiffs have known since
25  the outset that that -- those documents are not in a

1  custodial file. They're not the -- owned, as it were, in
2  the company by a particular sales --
3          THE COURT: How do you know that. You picked
4  the custodians. You picked what files.
5          MR. MAGAZINER: We picked the relevant
6  custodians.
7          THE COURT: You picked what documents they were
8  associated with.
9          MR. MAGAZINER: No, that's not correct, Your
10  Honor. We went into their custodial files which consists
11  of their hard copies files which, as you heard yesterday,
12  is about 10 percent and 90 percent all of the things that
13  they have in their electronic databases, if you will.
14  That's probably the wrong term. That are electronically
15  owned by them. They're in their computer, their hard
16  drive, their e-mails, their word documents, whatever. In
17  whatever -- I really shouldn't be talking about this. Jim
18  Freebery could do a better job. But the other things
19  which are associated with that custodian and the way
20  documents are kept in the regular course of business in
21  the company. And we produced all that. But plaintiffs
22  have known at the outset there are these other files which
23  are not owned by custodian. They're files maintained by
24  the company such as the file of promotional pieces. The
25  file of PIR responses. And they have known that. They

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 42

1   asked for that from the very outset.
2       What happened in CMO2 was there was a delay in their
3   right to get it because of their deficiency in fact
4   sheets.  But as of March 31, they have been entitled to
5   ask for that.  They didn't get around to asking for it
6   until July 23rd, just a few days ago.  But they have had
7   the right to ask for it and they knew it existed and they
8   knew it was not in the custodial files.  They have had the
9   right since March 31.  They just didn't bother to ask for
10  it until July 23rd.
11      They now filed a motion asking us to expedite our
12  production of the documents that they asked for on
13  July 23rd.  And we're going to do our very best.  I think
14  we're going to be able to get a lot of those documents to
15  them in less than the 30 days contemplated by the federal
16  rules which is remarkable that we're going to be able to
17  do it, but I think we are.
18      But Mr. Allen says he hasn't had access to these
19  documents.  He's -- they have never asked.  One of the
20  repeated practices of the plaintiffs' counsel in this case
21  is to come to the Court and complain that they haven't
22  given them something which they have never asked for.  And
23  we have enough to do trying to keep up with the Court's
24  very tight deadlines and producing the custodial documents
25  and responding to other orders the Court has entered, not

Page 43

1   to be sitting around thinking maybe the plaintiffs will
2   ask for something.  Let's give it to them before they ask.
3   We're trying to respond to all their requests.  We can't
4   anticipate the next request that they have never made and
5   begin producing those documents as well.  We're entitled
6   to wait for their request.
7       What is puzzling to me is why plaintiff waited for
8   March 31 to July 23rd, but that is in fact what they did.
9       Now we go into the call note database, we can see in
10  the call notes that a particular sales rep gave a Slim Jim
11  to that doctor, but there is no electronic link to that
12  Slim Jim.  There is no attachment in the call note
13  database for that Slim Jim.  It's just as if someone said,
14  I gave the doctor a copy of the Constitution of the United
15  States.  It doesn't mean it's there in the database.  It
16  means she, she the call rep, is recording what she gave
17  the doctor, whatever it may be.
18      All those things that they call sales rep gave the
19  doctor are located in the information that the plaintiffs
20  have now requested that we give them.  And we're going to
21  give them all of those things.  We will give them the Slim
22  Jim.  We will give them the videos.  We will give them the
23  prescription -- the dosing cards, whatever they have asked
24  for.  I don't want to say whatever they asked for.  They
25  may have asked for something that's objectionable.  But in

Page 44

1   general, their request for promotional materials, for
2   handouts that sales reps had available to them, for dosing
3   cards, et cetera, they have asked for that on July 23rd.
4   We will give that to them.  We will give to them as best
5   we can before the 30 days is elapsed.  But we will give it
6   all to them.  But it's not in the call notes database.  So
7   when we go into the call note database those things aren't
8   there.
9       What Mr. Allen is proposing, as I understand it, is
10  for each doctor we look in a call note database.  We make
11  a list of every item that the doctor -- the call -- I'm
12  sorry, that the sales rep says that she gave to the doctor
13  and then we go into the file where all these things are
14  kept and extract each one of them and we -- rather than
15  having them go into the file and extract, we're going to
16  give them that body of literature and they can extract it
17  just as easily as we can.  But it's not -- it doesn't
18  exist in a call note database.
19      So I hope I made that clear to Your Honor because
20  Your Honor looks like he doesn't fully understand what I'm
21  saying.
22          THE COURT:  I understand what you are saying.  I
23  just can't believe this wasn't produced as part of the
24  custodial file.  I don't understand the distinction you're
25  making that these were things within the purview of these

Page 45

1   witnesses, the heads of the marketing and sales
2   department, things they could reach out and grab and work
3   with them on a daily basis and it's not part of what they
4   produced.
5           MR. MAGAZINER:  I'll give you an example, Your
6   Honor.
7           THE COURT:  This is the basic information about
8   this drug and how it was sold and how it was used.  I'm
9   just astounded.
10          MR. MAGAZINER:  Can I give you an example of how
11  this might work?
12          THE COURT:  Well, you chose how to structure
13  what you called the custodial files for these witnesses.
14  And it's a far cry from what I thought was being done.
15  And for you to say the plaintiffs knew what was going be
16  in there, I don't know how they know what's going to be in
17  there if you're making the choices.  Based on the
18  testimony I heard yesterday, you had some protocol that
19  your witness here didn't know what it was, and you haven't
20  shared it with me or what quality control there was or
21  anything else about how it was being put together.
22          MR. MAGAZINER:  Let me explain this.  Try a
23  different approach.  I'm sorry that I'm having trouble
24  explaining this.  There's an adverse event database in
25  which all adverse events that are reported to the company

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 46

1  relating to AstraZeneca drugs are recorded in a database.
2  That database exists independently of any custodian.
3  There's no custodian who owns that database or who's
4  linked to that database. Lots of people have access to it
5  because it's a database. But it's not owned by any
6  custodian. So a custodial -- when we --
7       THE COURT: Any of the custodians you chose as
8  the ones that were sufficient to provide the basic
9  information --
10      MR. MAGAZINER: Well, yeah, we chose as some of
11 the important custodians people who work with that
12 database, but the database exists separately of their
13 custodial files.
14      THE COURT: I don't understand why if you choose
15 that person as the one, best one to talk about the
16 database that you wouldn't as part of that person's file
17 you wouldn't produce that database, the relevant part of
18 that database.
19      MR. MAGAZINER: Then we would be producing any
20 database that anyone in the company could access.
21      THE COURT: Well, the parts that are relevant to
22 Seroquel.
23      MR. MAGAZINER: Your Honor, this is -- this
24 distinction is something that the plaintiffs have
25 understood since the outset. That's why when we were

Page 47

1  here -- when I was here for the first time in front of
2  Your Honor on December 11 of 2006, the plaintiffs were
3  arguing that they should have the right to get information
4  from central files and from databases that is not linked
5  to any custodian, because they recognized back in
6  December 11 that the custodial production was not going to
7  encompass these databases or these central files or
8  repositories of information or promotional pieces or
9  whatever. We had a long argument on that on December 11.
10 It resulted in our submitting a proposed CM0 which became
11 CMO2 which contemplated that these things were not in
12 custodial files but could be requested once the plaintiffs
13 have shown some good faith responding to the fact sheets.
14 And as of March 31, the plaintiffs have been able --
15 entitled to ask for these databases, for materials from
16 central company files. And they have been asking for
17 them. They have been asking for them in a series of
18 document requests that Mr. McConnell showed you yesterday.
19 I think we're up to document request number 6. Is that
20 right? Four. They have made a series of  document
21 requests for things which they knew were not in custodial
22 files in which we reported to the Court were not custodial
23 files. They just didn't get around to asking for the
24 promotional materials, the promotional videos, the Slim
25 Jims, the dosing card until July 23rd, a few days ago.

Page 48

1  That's when they first asked for it. We're responding as
2  quickly as we can. But for Mr. Allen to say --
3       THE COURT: Are you telling me you're going to
4  be in full compliance with CMO4 prior to the depositions
5  of any of these sales reps and doctors?
6       MR. MAGAZINER: I think we're already in full
7  compliance with CMO4.
8       THE COURT: You supplied all the videos to the
9  doctors ever saw? You supplied --
10      MR. MAGAZINER: No.
11      THE COURT: All call notes related to --
12      MR. MAGAZINER: If your Honor says that -- if
13 Your Honor is saying that that's how you intended CMO4 to
14 work, we're not in compliance. That is correct. When I
15 read CMO4 it says -- maybe we misunderstood it -- but what
16 it says is all available documentation regarding contact
17 with the physician. Regarding contact with a physician.
18 A promotional piece that we gave -- the physician asked
19 for a video to show to her patient, which I understood to
20 be one of Mr. Allen's examples. I did not understand that
21 to mean that Your Honor when you said we have to give all
22 available documentation regarding contact with the
23 physician that that meant we had give them a video that a
24 sales rep gave to the physician for use with a patient if
25 that's what the sales rep gave to the patient.

Page 49

1       THE COURT: You have misunderstood the import of
2  CMO4.
3       MR. MAGAZINER: Well, we're going to turn over
4  all the promotional materials that they have requested for
5  us subject to any objections there may be for something I
6  can't now imagine. I don't want to be on record saying
7  everything because it may be a problem.
8       THE COURT: Here's what I want to do. I want to
9  give you the opportunity to produce a technical person
10 here who can tell me why -- what impediment there is to
11 providing to the plaintiffs within almost no time the
12 parts of these databases, IMS, Touchstone and SnapPharma
13 and the others that relates to the entirety of it that
14 relates to Seroquel. I don't know why you can't simply
15 mirror those over on to another hard drive and give those
16 to plaintiffs and then that shouldn't take more than a few
17 hours.
18      MR. MAGAZINER: Let me address some of the other
19 issues. As mentioned IMS -- let me first deal with
20 something else that Mr. Allen said. He talked about cut
21 off dates for the sales -- for the call note information.
22 We're perfectly happy to give him call note information
23 going back as far as we have it. Mr. Allen said he wants
24 it up until the date of the deposition. That we can't do.
25 We can't have a constantly evolving production where Your

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 50

1    Honor's order required us to give it to plaintiffs within
2    five days of the selection of the plaintiffs for
3    participation in the program. Mr. Allen says he wants
4    call note information up until the date the deposition was
5    taken which obviously is much later than five days, and
6    after the plaintiff was chosen, and would require that we
7    keep producing things constantly up until, you know -- so
8    if the deposition was taken September 19 on September 18
9    we have to make another search for call notes.
10   But with some reasonable cut off time, we will be
11   happy to provide call note information going back as far
12   we have and going up to the reasonable cut off date that
13   Your Honor might establish. We just don't can't do it up
14   until the day before the deposition. That as a practical
15   matter will not work.
16   With regard to IMS, what we said in the responses
17   that we gave to plaintiffs' counsel is that -- and I'm
18   reading from it -- the IMS data for the prescribing
19   physician is maintained for 24 months in an active file.
20   So that's because when a sales rep goes to call a
21   physician the sales rep can get a snapshot of what the
22   physician's prescribing habits have been for the previous
23   24 months.
24   We also said that IMS historical data has been
25   archived and in order to access it we are going to go

Page 51

1    through various steps to try to access this archive IMS
2    database, which the company doesn't use for any purpose
3    any more, because once it's more than two years old, it's
4    of no interest to the sales reps. I understand we're
5    going to be able to turn that over within two weeks. But
6    we told them -- we told plaintiffs' counsel not that we
7    were refusing to turn it over, only that we couldn't get
8    it within the five days that Court ordered because it's in
9    an archived file which requires different technology and
10   we had not figured out how to access it. Now we have
11   begun to figure that out and within two weeks we will be
12   able to provide that.
13   And then going forward it's not two weeks delay for
14   each doctor going forward. We have now figured that out
15   in going forward we ought to be able to provide it, all of
16   it at the same time. But it took us a little time to
17   figure out how to access the archived data. We have now
18   done that. So that's the IMS issue.
19   And I don't know if there's another issue Mr. Allen
20   raised. I don't have any other issues on my notes.
21   With regard to Your Honor's suggestion that technical
22   person explain why we can't turn over databases, is
23   that --
24   THE COURT: Right.
25   MR. MAGAZINER: As I understand it the

Page 52

1    promotional materials -- maybe one of my colleagues can
2    help me -- they're not in a database.
3    THE COURT: I understand. Those are probably in
4    warehouses someplace where you grab a DVD and a set of
5    books, and but some of it is PowerPoint presentations and
6    other sets of materials, but --
7    MR. MAGAZINER: Your Honor, they asked for it
8    July 23 --
9    THE COURT: In terms of the entire sales call
10   databases and the -- it just seems like it's going to be
11   easier instead of worrying about dates and particular
12   doctors just copy the whole thing, give it over to them.
13   MR. MAGAZINER: As we -- Mr. McConnell yesterday
14   read from the John Dowling deposition that's in evidence
15   as part of the record from yesterday's hearing,
16   Mr. Dowling testified that the marketing database is a
17   huge database. It includes information about call
18   notes -- sales calls on all the company's drugs, not just
19   Seroquel, to extract the information about Seroquel as
20   Mr. Dowling testified in the deposition that was made part
21   of the record yesterday, Mr. Dowling said it would take
22   about six months to go into that huge database and extract
23   Seroquel only information. And what we're doing is for
24   each doctor, which is much more discrete topic, much more
25   discrete search than Seroquel, we can go in for each

Page 53

1    doctor and we have, surprisingly to me, been able to
2    extract it within the five days and give it to plaintiffs.
3    And we're going to give it to them electronically which
4    will make it even more easily usable by then. But we can
5    do that for a doctor. But as Mr. Dowling testified, and
6    this is unrefuted, uncontradicted testimony, to go into
7    this humungous database and extract Seroquel information,
8    not all the information about the company's many, many
9    other prescription drugs would be a six month process.
10   As Mr. McConnell cited yesterday the 11th Circuit
11   case controlling authority says that plaintiffs are not to
12   be given access to databases. It's In Re: Ford Motor
13   Company 345 F. 3rd 1315, 11th Circuit 2003.
14   So we still do not think that there is an obligation
15   that we turn over databases of the plaintiffs. But we are
16   extracting the relevant information about the doctors and
17   we have been able to do that. But it is not in that
18   database, the warehouse where the promotional things are
19   stored is not in that database. It's a separate physical
20   location where promotional pieces are kept. And we're
21   going to go in and get those things that they requested
22   four days ago and we're going to get them in less than 30
23   days contemplated by the federal rules.
24   And, Your Honor, I see your disappointment. I really
25   think when we are able to respond to their requests even

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 54

1  more quickly than the rules require or contemplate, I'm
2  pretty proud that we can do that. I don't know why Your
3  Honor is disappointed with us. But we're going do it as
4  quickly --
5        THE COURT: I'm going to bait you on whatever
6  hook you find yourself with respect to these first five or
7  15 doctors. And I warn you now that it sounds to me like
8  you have misinterpreted CMO4. And with respect to those
9  cases, if the depositions go forward and there's not been
10 compliance, as I said at the last hearing and in the
11 order, there will be a day of reckoning on that.
12       MR. MAGAZINER: I understand that. To be
13 perfectly clear, our lawyers who are taking those
14 depositions are not going to be having access to anything
15 other than what we have given plaintiffs. It's not like
16 we have some secret trove of information about these
17 doctors that's going to be available to our lawyers
18 deposing the lawyers and not available to the plaintiffs.
19       THE COURT: None of your deposing lawyers have
20 looked at any of the sales or marketing materials?
21       MR. MAGAZINER: I would think that's probably
22 true, yes. I don't know that none of our deposing lawyers
23 have ever looked at a single sales or marketing material.
24 Our lawyers -- are we in a position now when we take a
25 deposition of a doctor on August 20 to give to our lawyer

Page 55

1  the sales and marking materials that the call notes
2  reflect were given to the doctor? We can do it exactly
3  the same way plaintiffs are going to be able do it, which
4  is to go in the information or the documents we're
5  providing plaintiffs and try to match up what the sales
6  rep said with some video. If the sales rep said gave them
7  the -- what's that video for patient use?
8        MR. ALLEN: Whatever the call notes reflect, it
9  was -- one tape was called the Kek and Nas DLA. That's
10 one of them.
11       MR. MAGAZINER: Okay. We're going to turn over
12 the promotional materials that plaintiffs have requested.
13 The Kek and Nas video exists. We're going to turn it
14 over. They'll have exactly the same ability, exactly
15 precisely the same ability that our layers will have to
16 look at the Kek and Nas video. We're not going to be
17 going through and giving our -- feeding to our lawyers
18 something different than what we're giving the plaintiffs.
19 Absolutely not. Unequivocally not, Your Honor.
20       THE COURT: I'll leave it to another day to
21 resolve what I anticipate is going to happen.
22       MR. ALLEN: Can I respond? I have to correct --
23 I believe it's important to correct the record because
24 we're not just talking about CMO4, Your Honor. We're
25 talking about CMO2 and the motions for sanctions that you

Page 56

1  just -- that was heard yesterday. The Court again asked
2  the right question. And it said are you telling me that
3  in all of the custodians that have been produced none of
4  these materials have been produced? I quite frankly never
5  heard an answer from Mr. Magaziner but I have to mark
6  now --
7        THE COURT: I heard the answer. They have not.
8  He never contemplated that was going to be part of it.
9        MR. ALLEN: But to suggest that somehow -- and
10 then he said this: The plaintiffs have known all along
11 that that material was not going to be produced. Your
12 Honor, I do need to mark this as an exhibit. This is a
13 list of the custodians. This exhibit --
14       THE COURT: Make it Plaintiff's Hearing Exhibit
15 1 for this hearing.
16       MR. ALLEN: Plaintiff's -- we will mark it.
17 Plaintiff's Hearing Exhibit No. 1 is a list of
18 custodians -- only copy I have, sorry. Mr. Magaziner.
19   Just for the record, they gave us a list of 32
20 marketing custodians, and while the Court asks the
21 question I made a list of one of them -- of some of them
22 just where we believe this material would be produced.
23 Kristin Bucklin, brand manager, consumer Seroquel; Donald
24 Wire, brand director; Terri Lawrence, promotions manager,
25 Seroquel healthcare professional promotions; professional

Page 57

1  promotions, Jim G. Minick. Director, brand
2  communications, central nervous system, Ed Repp; brand
3  communications director, Paul Zimmerman, brand insight
4  director, healthcare professionals.
5    So for Mr. Magaziner to tell the Court that we were
6  under the impression that we would not be getting this
7  material, I can assure the Court that's incorrect. The
8  designations of the custodians lead us to believe, as it
9  lead the Court to believe, the only one that didn't
10 believe it was the defense that we were getting this
11 material.
12   Now Mr. Magaziner -- and the Court asks -- always
13 asks good questions, says has anybody had access to this?
14 I heard his answer. They have the same access we do.
15   It's like yesterday didn't happen. The totality of
16 all the testimony, they called not one expert yesterday.
17 This isn't just about CMO4. The totality of the evidence
18 as asked by the Court directly to Mr. Dupre: Has any of
19 the material been produced? And he said no. And for him
20 to imply that we're on equal footing. The unrebutted
21 expert testimony of Mr. Martin and Mr. Jaffe is we have
22 right now unsearchable databases.
23    I know that the Court remembers this but it's
24 important. I'm supposed to go take -- he wants you to
25 believe that their lawyers have not reviewed the marketing

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 58

1   material.  I really don't think he meant to say that.
2        Now, look, he says, well, we're not -- he may say
3   now, we're not going to ask the doctor at the depo about
4   it.  Well, you know what?  I mean, I'm a lawyer.  They may
5   not ask the doctor about the depo because in the example I
6   gave you, and I showed you this, she's a product champion
7   for the company.  I'm pretty sure they think she's going
8   to go ahead and give them favorable testimony, and they
9   don't need to go over the documents they shared with her
10  over the past five years.
11       So the fact that they're not going to ask the doctor
12  about it doesn't mean I shouldn't get the information.  So
13  I'm telling you, this Court, and you're right we should
14  get the databases.  We don't want -- for them to suggest
15  that we're just trying to get broad databases.  We want
16  the Seroquel database.
17       Let me tell you one more thing on that point, Your
18  Honor.  Remember one of the people on the marketing
19  database that we thought we were getting was this Kim --
20  what was her name?  Kim Busch.  Kim Busch.  You heard her
21  talked about a lot at the hearing yesterday.  And guess
22  what they told you at the hearing?  We told the Court we
23  don't have any e-mails from Kim Busch.  You know what they
24  told you in response to the lack and paucity of e-mails
25  for Kim Busch?  Well, they even investigated the matter.

Page 59

1   And we went back and looked and Kim Busch didn't work on
2   Seroquel in the relevant time period.  So we know by their
3   own admissions of yesterday that many of the custodians
4   that they provided us were not likely to provide
5   information.
6        THE COURT:  I have heard enough of this now.
7        MR. MAGAZINER:  May I address --
8        THE COURT:  No.  I had an enough.
9        MR. MAGAZINER:  I'd like to correct something I
10  said, Your Honor.
11       THE COURT:  All right.  I'll always give you a
12  chance to do that.
13       MR. MAGAZINER:  Because my colleagues have been
14  correcting me.  If I could borrow your exhibit, Mr. Allen.
15       Mr. Allen read off names of various custodians such
16  as Kristen Bucklin, brand manager consumer Seroquel.  What
17  I'm informed and I'm sorry I mislead the Court, sorry I
18  didn't know this is that in the custody files we have
19  produced for custodians who are involved in marketing, and
20  there are 32 involved in marketing.  If that custodian had
21  in his or her files either hard copy or electronic form
22  any of these promotional materials, they have been turned
23  over.  I'm informed we have turned over lots of
24  promotional materials that were found in custodial files.
25  What we could not systematically do and represent to the

Page 60

1   plaintiffs is we turned over all promotional materials.
2   We turned those over that were in custodial files.
3        So as Your Honor says there is a warehouse with all
4   these promotional materials.  We could no represent that
5   by producing the custodial files we produced all the
6   promotional materials out there because it would depend on
7   what is in that custodian's files.  But among the 32
8   custodians that we selected from the marketing function of
9   the company, 32, we believe that among those custodial
10  documents are many, many of the promotional materials that
11  Mr. Allen is talking about.  But we can not represent to
12  him or to the Court that all the promotional materials
13  available to sales reps are contained in those custodial
14  files.  That's why plaintiffs -- plaintiffs have known
15  that all along and that's what their July 24 request is
16  directed to.  They want all the promotional materials, not
17  just those found in custodial files.
18       But to answer Your Honor's question, I answered it
19  wrong before, so I'll correct it.  Yes, we have turned
20  over great quantities of promotional materials as part of
21  custodial production.
22       MR. ALLEN:  Your Honor --
23       THE COURT:  Let's move on to the next issue.
24       MR. ALLEN:  Thirty seconds.
25       THE COURT:  No.  Let's move on to the next issue

Page 61

1   which you've identified as scheduling depositions, AZ
2   witnesses.
3        MR. ALLEN:  Scott Allen again for the
4   plaintiffs.
5        I did try to meet and confer, talk to counsel for the
6   defense this morning on this matter.  I have taken the
7   30(b)(6) along with other lawyers, but myself and Mr. Ed
8   Blizzard, who's not present, Mr. Tom Pirtle and I know
9   Mr. Pennock, but my group, three of us kind of in charge
10  of coordination of those.  A defense lawyer with the law
11  firm of Baker Botts whom I've known for many years, a good
12  partner, a well-respected lawyer represents AstraZeneca
13  and has taken charge of those 30(b)(6) that's Mr. Richard
14  Joseson (phonetic) for the defense.  Mr. Joseson sent me
15  e-mails, called me personally and Mr. Blizzard, and said
16  can you give us -- give me, he said give me a list of the
17  people you want to depose.  Non 30(b)(6) witnesses.  Mr.
18  Blizzard complied last week.  And we received a letter
19  from the defense that said -- so we sent it Mr. Joseson a
20  list -- I think they had it yesterday -- and we said we
21  would like to depose these people.  Their response, I
22  think it's changed today, but I want to make sure we have
23  a clear record on this, their response was, don't send to
24  it Mr. Joseson.  You need to send it through a formal
25  channel, to some formal CMO mechanism, which I thought was

1 unfair. I talked to them about it this morning and they
2 now say we have got the list and we're going to start
3 giving you depositions, if we request a date. If we
4 request a date.
5     I'm back to where I started, Your Honor. How am I
6 supposed to take depositions with an unsearchable
7 database? I know -- I respect this Court. I'll sit down.
8 But it's what I do every time. I can't take depositions
9 when I don't have searchable databases. And so I keep on
10 harping back to this issue of sanctions and remedy for us.
11 And I would urge the Court to grant us some relief. Our
12 clients -- and I'll finish within 30 seconds -- our
13 clients who provided a fact sheet -- there seems some
14 inequity here and had all the information on it. Case not
15 set for trial but didn't sign the fact sheets. They say
16 case dismissed. Case dismissed. File motion after
17 motion.
18     They haven't given us searchable databases that I can
19 get ready for a deposition. They haven't done it. And
20 they say, that's okay, they're not harmed.
21     I'm asking for help. I'm pleading on behalf of my
22 clients. There is inequity in this courtroom.
23         MR. MAGAZINER: Your Honor, let me first address
24 the issue that is listed here: Scheduling depositions of
25 AstraZeneca witnesses. I have no idea what Mr. Allen's

1 problem is. All that has happened is that he sent a list
2 to -- or Mr. Blizzard, one of the others sent a list to
3 Mr. Joseson who's one of our colleagues at Baker Botts
4 representing AstraZeneca. We asked him to send the list
5 to us. That's the only thing that happened. I did not
6 ask for some CMO compliant request. I said, please send
7 those lists to me because we're in charge of the MDL and
8 getting witnesses for depositions; don't send them
9 Mr. Joseson. That's all that happened in that end.
10     Then I said Mr. Allen, tell us who you want to depose
11 and when you want to depose them. We will see if we can
12 arrange the deposition. I don't know what his problem is
13 with that. I don't know what this agenda item is. But to
14 me there is no issue here. The only issue that may arise
15 Mr. Allen gave us a list of some 46 deponents and there is
16 an order I think of CMO2 which limits them to 25 non
17 30(b)(6) witnesses unless there's showing of good cause is
18 made. So there may be an issue there because they've
19 asked for more. But there is no issue of scheduling that
20 I know. Mr. Allen said he wants to start taking these
21 depositions in the fall. We said to him, tell us the
22 dates in which you want to take them, we will see if we
23 arrange it. We're being a cooperative as we possibly can
24 be. I don't know what this agenda item is.
25     Now as to the searchable databases, we heard

1 testimony yesterday that the databases are not perfect and
2 that it is there not 100 percent reliability with them.
3 Are they unsearchable? No. That's completely false. We
4 have large groups of young lawyers, some of them are
5 sitting in the courtroom today, who have been going
6 through the databases, exactly the same databases that we
7 give plaintiffs, finding out information, trying to piece
8 together the story, going back to old documents,
9 preapproval days before 1997 when Seroquel was approved.
10 Same documents we're giving them, we have people going
11 through them, piecing together the stories trying to
12 inform the lawyers what happened. We have lots of lawyers
13 working with these databases day in and day out. And the
14 way we find documents on some relevant topic that we're
15 trying to piece together is by going into the databases
16 and searching them.
17     So when he says they're not searchable, that's just
18 not so. They may not be as perfect as he would like, but
19 they're certainly searchable and usable, and we're using
20 them every time. As a matter of fact, there have been
21 hearings in which plaintiffs displayed some document they
22 thought were particularly inflammatory and they found
23 those by going through our databases that we turned over
24 to them, the document databases that they have, and
25 finding documents that they wish to show to the Court. So

1 it's not like you can't manipulate these databases. It's
2 just that there are some imperfections. But they are
3 usable.
4     Mr. Allen, I dare say, could take a very hard
5 hitting, very impressive deposition of an AstraZeneca
6 witness tomorrow based on documents that he has already
7 extracted from the database on one topic or another,
8 whatever he searched for.
9     Coming back to item number 3 and their list, there is
10 no issue that I know of.
11         THE COURT: Move on to item four.
12         MR. PENNOCK: Your Honor, Paul Pennock for the
13 plaintiffs.
14     Item number 4 relates to witnesses/custodians as they
15 have been called. We have identified them as persons
16 likely to have information that's relevant to this case.
17 I think there are 25 additional custodians that we
18 identified as discussed quite a bit, that custodians that
19 were selected by the defendants was something of an
20 imperfect list. Item number 4 relates to the -- simply
21 the issue of when will we receive and hopefully this time
22 in proper form these additional custodial files. Needless
23 to say we're anxious to get these materials as quickly as
24 possible. And sort of the timelines that under which the
25 first 25 custodians were produced is not something that we

Page 66

1  think would be acceptable to the Court or the schedule the
2  Court has set. The first 25 custodians were essentially
3  disclosed to us over a period of six months. And that's
4  not a type of timeline that this -- the schedule we have
5  would allow. So we're asking that these custodians be
6  disclosed to us. They have had the list now I think a
7  week or two, two weeks. In any event we're asking that
8  these custodians, that all these files be produced to us
9  something within a few weeks of today's hearing or a date
10 that Your Honor may think is appropriate, but we do want
11 to get an order to date for that so that hopefully we can
12 avoid the ongoing delays.
13     That's number 4.
14     MR. MAGAZINER: Plaintiff sent us a little bit
15 ago names of five additional custodians beyond the 80 and
16 then a little after that they send us an additional 20.
17 So there is 25 additional custodians beyond the original
18 80. The plaintiffs have asked us to produce documents
19 from those. We can get the five within 45 days, maybe
20 more quickly. We can get the remaining 20 within 90 days,
21 maybe more quickly. The reason I'm saying 45 and 90
22 rather than earlier, I don't want to be in court dealing
23 with the issue of I promised 20 and it took 25 days. I
24 promised 30 and it took 40 days. We're comfortable with
25 45 days for the first five additional and 90 days for the

Page 67

1  remaining 20 additional.
2      I'm sorry. That are for the U.S. documents. The
3  foreign documents we have an additional problem that I can
4  describe briefly to the Court this morning which is there
5  are laws in the European Union that have to do with the
6  production of e-mails and confidentiality and privacy
7  concerns. In other litigations involving European
8  companies, over time the parties, with the Court's
9  assistance, have been able to work through those problems
10 so that the documents can be produced. But we're going to
11 have to work through those, get some sort of orders from
12 the Court in order to produce documents which would be
13 illegal for us to produce. If we produce them without
14 doing more, we would be violating the laws of the various
15 countries where these documents are located. But with the
16 U.S. --
17     THE COURT: So you will submit to me Monday the
18 order that you need signed to free those documents up?
19     MR. MAGAZINER: I don't know that we can do it
20 Monday. We can do it by a week from today, Your Honor.
21     THE COURT: All right. I guess I don't
22 understand why it would take more than 30 days to get
23 these custodial files put together.
24     MR. MAGAZINER: It's a very elaborate process.
25 Your Honor has heard -- Your Honor is very familiar with

Page 68

1  the problems we ran into. We're trying as best we can to
2  make sure there are fewer and fewer and fewer problems.
3  As you know we have been producing things in a much more
4  rapid clip recently by going to the people who are in
5  charge and saying, give me dates that I can tell the Court
6  that I'm going to be comfortable defending later on.
7  We're not going to say 20 days and have it turn out to be
8  35. So I'm telling you first five of the additional
9  within 45 days, the remaining 20, which is a big chunk,
10 within 90 days. And we're going to try every way we can
11 to move this along more quickly. But I don't want to tell
12 the Court -- I don't want to promise the Court something
13 that I'm not confident that we can keep.
14     MR. PENNOCK: Just to wrap up number 4, I mean,
15 we do agree with the Court's suggestion that this should
16 happen within 30 days. We hope it's not the elaborate
17 process that we have been suffering through or at least
18 alleged to the Court we have been suffering through for
19 months now with respect to the other custodians. So
20 again, we ask the Court to order them to produce these
21 custodians in a very short timeframe.
22     As to number 5 I think this has to do with a discover
23 demand that was served.
24     MR. MAGAZINER: Excuse me, Your Honor. I had one
25 more number 4 I would like to share with the Court,

Page 69

1  discuss with counsel, if I may.
2      THE COURT: All right.
3      MR. MAGAZINER: I think we need some process,
4  Your Honor, to agree on the search terms that we're using
5  to extract documents from the custodian files with these
6  additional 25 custodians. Your Honor, of course, is well
7  aware of the significant controversy over search terms.
8  What we would to suggest to the Court is that we will put
9  together a list of additional search terms that will be
10 used. Plaintiffs can put together their list of search
11 terms. We will try to agree on the search terms that will
12 be used, we don't have to have this constant criticism
13 of the search terms. We would like to agree. If we
14 cannot agree we will submit to the Court our list.
15 They'll submit their list. We can each submit whatever
16 briefing we want on why a particular search term is or is
17 not a good idea and the Court can decide which of the two
18 lists to use. But it would be -- what we don't want to do
19 is be producing these documents from an additional
20 custodians only then to be criticized for not having
21 searched, use the right key word searches in extracting
22 the documents from the files.
23     THE COURT: Which is why you consulted with the
24 plaintiffs before you produced the first 80 about the
25 search methodology.

18  (Pages 66 to 69)

Page 70

1    MR. MAGAZINER:  As Your Honor well knows we did
2  not consult with the plaintiffs and I regret that, but we
3  did not.  But I would like to rectify that situation this
4  time, Your Honor.  I don't want to go down the same road
5  again.  But if we consult with the plaintiffs and do not
6  reach agreement, and do not reach agreement, I would like
7  there to be some mechanism by which the Court can resolve
8  the disagreement so that we don't have to go forward
9  producing documents only to have them criticized the way
10  that the documents were collected.
11    THE COURT:  Well, Rule 26 which applies in the
12  Sedona principles which are instructive in this Court's
13  practice is that process should have taken place and
14  should take place with respect to any selection of
15  documents of ESI that you're making.  So you need to do
16  that posthaste.
17    MR. MAGAZINER:  May we have a mechanism to bring
18  it to the Court if we disagree so the Court --
19    THE COURT:  You can file a motion and I'll rule
20  on it.
21    MR. MAGAZINER:  Thank you, Your Honor.
22    THE COURT:  I won't be pleased if I have to do
23  that but I'll do it.
24    MR. MAGAZINER:  You'll only have do it if
25  parties can't reach agreement.

Page 71

1    THE COURT:  That's what I'm saying.  I'm
2  assuming that the bulk of the items under number 5 are
3  really covered by the discussion we had with respect to
4  the --
5    MR. PENNOCK:  That's correct,  Your Honor.
6    THE COURT:  -- discovery.
7    MR. PENNOCK:  Just one point of clarification,
8  if I may.  That is item number 5 relates to a discovery
9  notice that was served.  I think as Mr. Allen pointed out
10  about a week ago, in all of the sales information
11  vis-a-vis the specific doctors was demanded -- contrary to
12  what was said -- was demanded about seven or eight weeks
13  ago in the proposed defendant fact sheet that we submitted
14  to Your Honor that Your Honor already ruled upon.  So the
15  specific sales information that the doctors, I just wanted
16  to correct, was not only demanded on July 23rd but it was
17  closer to, I think June 10th or June 15.
18    MR. ALLEN:  By the way, we keep on saying
19  July 23.  That's not accurate.  So we have an accurate
20  record, I think we made the sales request three weeks ago
21  and it's due a week from now.  The record will reflect.
22    MR. PENNOCK:  As to item number six, Your Honor
23  these relate to documents of one of the defendant's
24  custodians that for lack of a better description, they're
25  e-mails, business e-mails that incorporate certain

Page 72

1  personal tractions with this female person, and that was
2  running their clinical trials.
3    So I think this issue, frankly, is one that we're
4  going to have to make a motion on because we feel that
5  these -- the relationship that this gentleman had with the
6  person running the business -- the clinical trials is
7  important and relevant to the validity of those trials or
8  may have somehow compromised integrity of those trials.
9  We think it's certainly relevant information that we
10  should --
11    THE COURT:  Bring your motion on that.  That
12  sounds like a pretty big problem.
13    MR. MAGAZINER:  I take it you don't want me to
14  address that today?
15    THE COURT:  No.
16    You'll have had a chance to respond -- well, there
17  will be a 301G and then the motion and then you will have
18  a chance to respond.
19    I need to take a lunch recess at this point before we
20  turn to the items that AstraZeneca wants to address.
21  Mr. Magaziner, how long do you think that will take to
22  cover your issues?
23    MR. MAGAZINER:  Your Honor, has already resolved
24  issue number 3.
25    THE COURT:  Right.  Judge Conway did.

Page 73

1    MR. MAGAZINER:  Or Judge Conway did, excuse me.
2    I would think 10 or 15 minutes including the
3  plaintiff's response.
4    THE COURT:  All right.  Let's reconvene at 1:15.
5    (Luncheon recess)
6    THE COURT:  Judge Conway has elected not to
7  rejoin us this afternoon.  So let's proceed with the
8  issues that AstraZeneca has listed.
9    MR. MAGAZINER:  Thank you, Your Honor.
10    Issue one is as follows:  As Your Honor knows by a
11  substantial number of plaintiffs in this litigation also
12  were plaintiffs in litigation against Eli Lilly involving
13  the drugs Zyprexia in which they alleged that it was their
14  use of Zyprexia that caused them to develop diabetes.
15  Contrast it to the allegations in this case that the use
16  of Seroquel can cause them to develop diabetes.
17    THE COURT:  What's the -- are their pay outs
18  occurred -- what's the status of that?
19    MR. MAGAZINER:  There have been several tranches
20  of settlements, Your Honor.  I don't -- I have seen a
21  newspaper with what the numbers are how much Eli Lilly
22  paid in each tranche.  I don't know the status of
23  payments, what they agreed to pay or have actually paid.
24  I don't know the answer to that.
25    THE COURT:  Is the court administering that or

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 74

1  are the parties?
2       MR. MAGAZINER:  There's a settlement
3  administrator.  As a matter of fact, I think that was a
4  subject we addressed in the motion in response to Mr.
5  Feinberg.
6       THE COURT:  Yes.  Go ahead.
7       MR. MAGAZINER:  In any event we didn't believe
8  there's any legal issue as to our right to obtain from
9  Lilly documents about these plaintiffs.  The plaintiffs
10  submitted to Lilly the factual statements.  The plaintiff
11  submitted plaintiff fact sheets, other submissions,
12  medical records pertaining to the plaintiffs.  We're going
13  to need an order from the Court, however, we can give to
14  Lilly which allows them to give us those documents,
15  because otherwise they would have an obligation not to.
16  We discussed this with plaintiffs' counsel.  Plaintiff's
17  counsel first said they would agree.  More recently I
18  think they have said they'll not agree.  Plaintiff's
19  counsel can address on their own.  That is what we're
20  seeking in issue number one.
21       Someone from plaintiffs may wish to address it.
22       MR. ALLEN:  I will, Your Honor.
23       Briefly, first of all I can answer your questions
24  concerning the status of Zyprexia settlement, and, others
25  if I'm incorrect, correct me.  There was a round one

Page 75

1  settlement that took place about two years ago, and I
2  think that money to my knowledge has all been distributed.
3       There was a round two settlement that mostly they
4  settled at the very last day in December, early
5  January 2'06, 2'07.  That money has not been distributed.
6  And there is -- there was a settlement master.  But
7  concerning distribution of the settlement funds that's
8  left through the settlement process between counsel and
9  their client.  And that has not been completed, at least
10  for most of the firms I'm aware of, including Mr. Bailey's
11  firm with whom I work.  So that's your answer to that
12  question.
13       Concerning the issue of getting Seroquel -- I mean
14  Zyprexia documents on particular plaintiffs, I don't have
15  a specific objection to that, but I don't know the breadth
16  of what they're seeking.  So in other words, I'll have to
17  see the order or some motion or some letter to me
18  identifying what documents they're seeking before I could
19  agree or disagree.  That was the nature of my hesitancy to
20  agree.
21       Secondly, I think -- I know because I took the
22  Zyprexia depositions, there are documents in Eli Lilly's
23  file pertaining to their analysis and interactions
24  vis-a-vis sales forces.  It's called counter detailing.
25  There's Seroquel documents.  So what I would propose is

Page 76

1  whatever order is drafted maybe we should go meet and
2  confer on that.
3       THE COURT:  Maybe you should.
4       MR. ALLEN:  Yes, sir.  That's where I agree.
5  It's their proposal.  I'm willing to meet and agree, but I
6  can't agree unless I have a meet and confer in more
7  definition.
8       MR. MAGAZINER:  We will have a meet and confer
9  on that, Your Honor, and if we can't agree we will submit
10  a motion.
11       THE COURT:  Presumptively you're going to be
12  entitled to it.
13       MR. KEN BAILEY:  Just to advise the Court that
14  some of these people who were plaintiffs in Zyprexia have
15  differing law firms who represented them during that deal.
16  And I couldn't really hear what Mr. Magaziner was speaking
17  of.  But I just wanted to advise the Court that we did not
18  represent all those people.
19       THE COURT:  I understand.
20       MR. MAGAZINER:  Issue number two is this, Your
21  Honor.  We are engaging attorneys to take depositions in
22  the case specific discovery program that the Court has
23  ordered.  Many of these attorneys are not presently --
24       THE COURT:  I don't have any problem with that
25  as long as they're admitted to a district court somewhere.

Page 77

1       MR. MAGAZINER:  All right.
2       THE COURT:  And whatever it was we put in the
3  order about resolving disputes that arise, they should
4  just follow that.
5       MR. MAGAZINER:  We will confer with plaintiffs'
6  counsel and submit an order that covers both defense
7  counsel participating in depositions and any additional
8  plaintiffs' counsel that they wish to.
9       THE COURT:  All right.
10       MR. MAGAZINER:  Issue number three has already
11  been resolved.  The Court has withdrawn the designation of
12  Brenda Eckles' case and substituted another case in its
13  place.
14       The issues regarding case specific depositions.  Of
15  the 15 cases selected, Your Honor, three of the plaintiffs
16  named two prescribers in their plaintiff fact sheet.  That
17  presents a problem for us because we don't really know
18  which of the prescribers is the one with the most
19  pertinent information until we depose a plaintiff.  So
20  there are different things that we think we might be able
21  to do to get around the problem.  One would be to select
22  prescriber after the plaintiff is deposed, which would be
23  fine with us.  And we would only get to depose one
24  prescriber as the court order suggests.  Another thing we
25  could do is to depose both prescribers.  Or the third

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 78

1  thing we could do is agree or the Court can order that
2  plaintiffs who list two prescribers on their fact sheet
3  are not eligible for the case specific discovery program.
4  Any of those three would be fine with us.  What we don't
5  think we can work with is two prescribers where we don't
6  have to select a prescriber in advance of deposing the
7  plaintiff when we don't really know which prescriber we
8  would like to depose.
9       THE COURT:  Are you in general more interested
10  in the first prescriber or the prescriber with the
11  mostest?
12       MR. MAGAZINER:  It really depends on what the
13  plaintiff is going to tell us about the relations between
14  the plaintiff and the prescriber.  The first prescriber
15  might -- I'm not trying to be difficult, Your Honor, but
16  the first prescriber might have written a prescription for
17  a month or maybe there was no other Seroquel use for
18  years, then there may be another prescriber that
19  prescribes a lot of Seroquel.
20       This problem is compounded by the fact that we have
21  very incomplete medical records from many of these
22  plaintiffs because the fact sheets where they list
23  treaters don't list all the treaters.  So we don't really
24  know -- presumably don't list all the prescribers either.
25  It's very hard to figure out exactly which doctors have

Page 79

1  treated the plaintiffs for which conditions and who
2  prescribed the Seroquel, and do we have the complete list.
3  Nonetheless we are going forward with scheduling
4  depositions for prescribers who are listed as a sole
5  prescriber for a given plaintiff.  And we hope that it
6  turns out when we depose that prescriber that in indeed
7  that was a prescriber who had the bulk of the contacts
8  with the plaintiff with regard to use of Seroquel.  But
9  when the plaintiff lists two, we're kind of in a quandary
10  and we don't really know what we're doing.  And if we
11  had -- and we don't have medical records sufficient to
12  allow to us to figure that out.
13       So to me the easiest way to do would be simply to
14  agree and have the Court order the plaintiffs who list two
15  prescribers in their fact sheet are not eligible for this
16  program.  It doesn't mean they won't be subject to
17  discovery at a later point in the litigation, but not for
18  this program.  This is a very expedited and confined
19  program.
20       MR. ALLEN:  Can I respond?  Do you mind if I
21  stand here?
22       THE COURT:  All right.
23       MR. ALLEN:  Again, that seems like a matter of
24  meet and confer.  I had not considered these issues.  I
25  would be glad to consider them.  I would point out to the

Page 80

1  Court we on our side face the same problem.  There's
2  multiple sales representatives.  I am limited to one.  I
3  have to pick the sales representative out at my own peril.
4  So under this theory of the case, I would not want to take
5  the sales representatives' depo or be required to
6  designate them until after the doctor's deposition has
7  been completed.  But the Court has ordered me to designate
8  a sales representative blindly, which is -- I'm not
9  complaining, but if we're going to start engaging in this
10  battle, I should be able to take the doctor's deposition
11  and then decide which sales representative had the most
12  dealings with the doctor.  And so these are issues, I
13  guess, I could discuss with Mr. Magaziner.
14       I would also point out to the Court that was my
15  understanding that the purpose of this program of taking
16  depositions was to do three depositions recognizing at all
17  times as we told the Court there are many other doctors
18  that treated the plaintiff; there's many other issues, and
19  we're going to try to get it done in a 30 day window.
20       Under the theory raised by Mr. Magaziner, this is a
21  never ending process and seems to defeat the entire
22  purpose as what I understood the program was.  Because I
23  assured the Court on multiple times, and we can look at
24  the hearing transcripts, that it was our -- going to be
25  our position that the -- at the conclusion of this one,

Page 81

1  one and one, which is one prescriber, one plaintiff, and
2  one sales rep, that there's probably a lot of information
3  that would need to be gathered before the case was ready
4  and complete.
5       So I think we ought to just stick with the program we
6  have is my inclination unless Mr. Magaziner wants to meet
7  and confer with me recognizing, as we recognized all
8  along, there's a lot more information that we're going to
9  need.
10       THE COURT:  How many of the plaintiffs are going
11  to have multiple prescribers?
12       MR. ALLEN:  You know, Your Honor, I haven't
13  looked at that but I can tell you from experience that is
14  not uncommon.  And what else is not uncommon, and we have
15  heard this from Mr. Magaziner and I want the Court to
16  understand, that what we find is there is more doctors as
17  we take the plaintiffs' deposition.  I know I brought this
18  up in court one other time and the Court didn't need to
19  hear it at that time, but it is really not uncommon.  And
20  I think if people think about their own personal lives,
21  and they say, can you tell me the doctors you saw and the
22  date you saw them.  People can't really do that off the
23  top of their head.  I honestly -- in my experience when
24  you fill out the forms -- I have surgery I always forget.
25  I have an umbilical hernia.  But if you ask me today, I

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 82

1   forget it.  So this theory that we find out additional
2   information is what you find out in every lawsuit.
3        And the Court recognized that before we began this
4   process.  And we knew there was one doctor, one plaintiff,
5   and one sales rep.  But to answer the Court's question, I
6   don't know specifically but I would anticipate it is not
7   uncommon.
8        MR. MAGAZINER:  It also impacts, Your Honor, our
9   five day obligation because if there are two prescribers,
10  I don't know if that means we're -- we want to depose two,
11  which I would be happy to do that -- we would have to turn
12  over twice as much information, which is already
13  difficult.
14       THE COURT:  Here's what you should do.
15       MR. MAGAZINER:  Okay.
16       THE COURT:  For each month, once you got the
17  list of plaintiffs, identify the ones where there is
18  multiple doctors that fit the category.  You can either
19  pick one, or what I would suggest you do is talk to
20  plaintiff's counsel, ask them to designate the one that
21  they think has the most pertinent information, as I say.
22  And sometimes it might be the first prescriber because
23  that sets the course of treatment or it might be, as I was
24  trying to be a little bit jocular -- the prescriber with
25  the mostest.  If it as you suggest there's a gap and

Page 83

1   somebody else, you know, 40 prescriptions after the other
2   guy just did two, that may be much more significant.
3        Let the plaintiff pick and you're done.  You know, we
4   have set a schedule, but, you know, if that particular
5   plaintiff, if it turns out that wasn't a very good
6   designation, and you can justify an extra deposition for
7   that plaintiff, you know, confer.  If you can't agree,
8   come on back.
9        MR. MAGAZINER:  That will be fine.
10       THE COURT:  We will be here.
11       MR. MAGAZINER:  I know that.  Thank you, Your
12  Honor.
13       The related issue is this:  Two of the plaintiffs
14  have been selected did not identify any treaters at all in
15  their fact sheets.  Zero treaters.  So we're supposed to
16  select a treater to depose.  We don't have a treater in
17  the fact sheet.  If the plaintiffs -- well, people who
18  submitted fact sheets in January or February and collected
19  most of the medical records, might be able to go through
20  those records and identify a treater, even though the
21  plaintiff has not given us any information, if the
22  plaintiff submitted a fact sheet in May or June, we most
23  likely don't have any records let alone a complete set of
24  records.  So it very difficult to select a treater when
25  the plaintiff has not given us a name, and we don't have

Page 84

1   medical records which will allow us to find the name of
2   the treater.
3        What we would like to do in cases like that, Your
4   Honor, would be to depose the plaintiff, find out from the
5   plaintiff who the most important treaters were and then go
6   and select that treater for deposition.
7        THE COURT:  Is there some impediment in those
8   two cases or five or however many there are to your
9   calling Mr. Allen or Mr. Bailey and saying who's the
10  treater?
11       MR. MAGAZINER:  I was going to say if we follow
12  Your Honor for the previous issue, we could do this the
13  same way.  We could say to them, give us the name of the
14  primary treater.  They can give us the name of the
15  primary treater and then who can notice the deposition.
16  That would be fine with us.
17       THE COURT:  Again, what I picture, and you're
18  going to have the help of the project management special
19  master to do this, but this is going to be part of the
20  process as you sit down each month and plan out your
21  torture schedule.  I don't mean torturing the witnesses.
22  I mean torturing yourselves and your fellow counsel.  I
23  know this is slightly daunting undertaking.  But those are
24  all issues that you're going to work out.  Who are the
25  actual physical beings that need to be summoned and put

Page 85

1   under oath.  So it will be a back and forth process.  And
2   it may well be that there will be more work for this
3   project management special master to help you get through
4   issues just exactly like this.  But you should, you know,
5   common sense will answer most of these, and when it
6   doesn't or where you come to loggerheads we will take care
7   of it.
8        MR. MAGAZINER:  That's fine, Your Honor.  Thank
9   you.
10       The next issue is this:  Some of the providers, the
11  doctors have said they'll not release medical records
12  based on the authorizations that we sent to them but
13  instead they want their own form to be signed.  We sent
14  those forms to the plaintiffs and asked that they get to
15  the plaintiffs' counsel and ask they get their client to
16  sign the doctor specific form.  Some of the doctors where
17  institutions require -- we in some cases waited months and
18  months to have those come back.  Sometimes they haven't
19  come back at all.  I would just like the Court to express
20  its view, if Your Honor is so inclined, that plaintiffs'
21  counsel should act with all deliberate speed when they get
22  that request to try to obtain their client's prompt
23  signature on those doctor specific or institution-specific
24  releases.
25       THE COURT:  Is there anything to justify these

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 86

1  medical professionals wanting a different release form?
2       MR. MAGAZINER:  In my view no, but it's quite
3  common, as Mr. Allen can tell you, in litigation like
4  this.  They say, wait a minute.  I don't recognize this
5  form and I have my own form.  I'm going to need to have my
6  patient sign this form.
7       THE COURT:  I think they might recognize my form
8  which says do it under penalty of contempt of Court.
9       MR. MAGAZINER:  That would be fine.  I don't
10 know how practical that would be for somebody who's not in
11 this district.  We're willing to work with the PMO on
12 that, see if we can get --
13      THE COURT:  I got magistrate judge friends all
14 over the country.
15      MR. MAGAZINER:  That would be fine, Your Honor.
16 All I was asking is if the Court would express to
17 plaintiff's counsel its desire that plaintiffs' counsel
18 get these forms signed by their clients as promptly as
19 possible.  I think that would be very helpful.
20      THE COURT:  Well, that needs to be done as part
21 of the back and forth that -- those are the things that
22 should run smoothly.
23      MR. MAGAZINER:  Yes, sir.
24    The last issue is this:  To clarify an issue on the
25 case specific discovery program that we discussed this

Page 87

1  morning, I have confirmed over lunch we have already
2  produced a great number of promotional materials as part
3  of the custodial production.  I can't give you a quantity,
4  a quantitative number, but it's a great, great deal of it.
5  And more important than that, I have confirmed that within
6  three weeks we ought to be able to turn over to
7  plaintiff's counsel all of the promotional materials that
8  was the subject of discussion this morning.  The entire
9  universe of materials that was available to sales reps
10 throughout the United States when they called on doctors
11 to promote Seroquel.
12    I would include videos, that would include slim jims,
13 dosing cards, would include whatever materials the company
14 provided to its sales reps and for them to go out to give
15 to doctors as they saw fit in promoting Seroquel to those
16 doctors.
17    Once we do that, it would be my understanding that we
18 have then complied as to that part of CMO4.  But the
19 clarification we need is this:  Mr. Allen suggested, as I
20 understood him, a different process which is that once we
21 produce -- we have extracted call notes relating to the
22 doctor and for a particular doctor -- it could be this
23 thin or this much depending on over what period of time --
24 how many sales rep call on the doctor, et cetera.  As we
25 go through the call notes, we make a note of every

Page 88

1  promotional piece that the sales rep mentions, such as
2  the, whatever the name of that video was, or particular
3  slim jim number 15 or whatever, and that we then, if I
4  understand Mr. Allen's request, go to this compilation
5  that we're about to produce to the plaintiffs, find those
6  promotional pieces and give them to the plaintiffs as part
7  of our response.
8       THE COURT:  You don't need to put together a
9  specific package for each -- that was this sales rep's
10 gunnysack for that doctor.  But I would hope and urge you
11 as you produce the universe of sales materials that they
12 have identifiers that match as closely as possible.  And
13 there will be sales reps, I'm sure, that use other
14 terminology or who make mistakes, but as closely as
15 possible match how people call them and, you know, give
16 dates that, you know, we used these slim jims during
17 these, this six month period and these during this nine
18 month period.  So that as best everybody can when you talk
19 about something, you're talking about the same thing.  And
20 it won't be a difficult task for them to do the matching.
21 You don't do the matching for them.  You don't need to
22 pull it, like I say, into a package for them for each
23 deposition, but it ought to be in a format that doesn't
24 make it that hard for them.  It should make it easy for
25 them to do their own homework.

Page 89

1       MR. MAGAZINER:  Understood, Your Honor.
2       THE COURT:  And take out as much ambiguity as
3  possible.  I suppose it's possible some material no longer
4  exists and can just be talked about and other things that
5  are like it.  And there's -- there may be six different
6  versions of a DVD video that changed overtime, and there
7  may be some doubt about which one was used in a particular
8  time for a particular contact.  That's going to happen.
9  You just deal with that.  But, again, take out as much
10 ambiguity as possible, give them labels that are as close
11 as possible to how people really referred to them.
12      MR. ALLEN:  Your Honor, on that point, because
13 that's -- if that would be done, that would be fine.  But
14 Mr. Magaziner said he confirmed with you over lunch --
15 confirmed with his client over lunch that a great number
16 of the promotional materials have been produced.  I assume
17 that if he has made that confirmation that he has
18 confirmed where in the database and in the Bates numbers
19 where this material is.  And as I told you, we can't find
20 it.  He says it's been produced.  He's confirmed it's been
21 produced.  I would ask the Court to order the defendants
22 to identify by Bates numbers where we can locate this
23 promotional material, because as we stand now, I can't
24 find it.  I can stumble across it by accident when
25 reviewing a custodial file, but it is not centrally

23  (Pages 86 to 89)

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 90

1  located in a searchable database as the testimony
2  yesterday.
3      So you also raise -- the Court was right.  It said,
4  I'm sure there are ID numbers.  There are.  Based on
5  documents I have looked at, there are ID numbers on their
6  promotional material.  If a sales rep ran out of a slim
7  jim, the sales rep didn't just write into the company and
8  say send me slim jims.  They had a call number, for lack
9  of a better word.  So I think the defendants ought to be
10 able to identify for me now, because I'm telling you when
11 I go to Ohio next week I have no idea where to find this
12 material.  It's not in existence.
13     So they ought to identify for us, since they have
14 confirmed over lunch that it's been produced, the specific
15 Bates ranges where this material is.  They should give us
16 the ID numbers.  As the Court properly said there's ID
17 numbers on this.  And they should tell us where to find
18 it.
19     Also even though they haven't produced the videos,
20 which we know are in existence, Mr. Dupre testified
21 yesterday they had given them to the Department of
22 Justice.  So I think we ought to get the videos now.  So
23 Your Honor is correct.  Mr. Magaziner's proposal is fine
24 if I could find -- but tomorrow if I had to take a
25 doctor's deposition in Ohio or Florida or Tennessee, I

Page 91

1  wouldn't know where to find a slim jim, a video, a
2  promotional document, one.
3      MR. MAGAZINER:  Our people who've processed
4  these 10 and a half million pages of documents have told
5  us they reviewed many, many, many, many tons of
6  promotional pieces.  We can find them now no more easily
7  than Mr. Allen can find them.  To get the Bates numbers we
8  would have to do a word search just as Mr. Allen does, go
9  into the materials we produced to plaintiffs, which we
10 have on computers just like they have on them on
11 computers, and do searches and try to find them.
12     But more to the point, we are going to be producing a
13 discrete set just of promotional materials within three
14 weeks.  It will duplicate many things we have already
15 produced as part of custodial production but it's going to
16 include in one place all of the promotional materials.
17     THE COURT:  Are they going to be cross
18 referenced and Bates numbers?
19     MR. MAGAZINER:  They will be -- well, they'll
20 have Bates numbers on them of course, but they --
21     THE COURT:  But to the extent that it's
22 duplicative of what you claim you have already produced --
23     MR. MAGAZINER:  We're planning not to de-dupe
24 them so that we could give to the plaintiffs a compilation
25 of all the promotional pieces, just promotional pieces.

Page 92

1  They could look at that production and say this production
2  includes all the promotional pieces that were made
3  available to sales reps throughout the United States.  It
4  doesn't include e-mails --
5      THE COURT:  For the whole time period?
6      MR. MAGAZINER:  Yes, sir.  Yes, sir.
7      THE COURT:  I mean, if that happens on a timely
8  basis, then that should solve the problem.  It leaves open
9  the question as to whether they have already been produced
10 and how to find them.  But -- just trying to keep things
11 moving here.
12     MR. ALLEN:  Yes, sir.  And I can anticipate
13 what's next but I'm going to take this doctor's deposition
14 up in Ohio, and later on they may determine they can find
15 slim jim X that is in the current production.  I'm telling
16 the Court, and we -- based on the evidence, not
17 Mr. Magaziner or Mr. McConnell's statement that they
18 talked to somebody over lunch -- the evidence in the case
19 is that we don't have searchable databases.  And so by
20 some manipulation by 300 attorneys I can go look for it.
21 That's not my burden.  It's Sedona principle number 6:
22 Responding parties are best situated to evaluate the
23 procedures, methodologies and technologies appropriate for
24 preserving and producing their own information.
25     So I'm just asking until such time as we get this

Page 93

1  full compilation of promotional materials -- see, we're
2  starting down this road in like two weeks.  And so when I
3  go take this doctor's deposition, I'm just telling the
4  Court straight out --
5      THE COURT:  I'm going to wait and see and you
6  can file your motion after you -- if you haven't had
7  reasonable access to what you need, you know, something
8  will be done.
9      MR. ALLEN:  Yes, sir.  I appreciate that.  Let
10 me ask one more thing.  I appreciate that.
11     Since Mr. Magaziner has confirmed over lunch, can I
12 just get Bates numbers right now?  What's so hard?  They
13 confirmed --
14     THE COURT:  He doesn't know the Bates number.
15 The people he confirmed don't know the Bates number.  He
16 talked to somebody that says it's in there somewhere.
17     Now I would hope as professionals who are dealing
18 with nonprivileged documents that everybody acknowledges
19 are part of the core of the case that people way below the
20 billing level sitting here and maybe not even lawyers
21 would be able to sit down and talk and say here's -- we
22 found this, and go back and forth as Mr. Jaffe said he
23 tried to do on some occasions.  He wasn't allowed to talk
24 to anybody that actually spoke his language.  I don't
25 understand that.  It seems odd to me.  To me those

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 94

1  conversations ought to be going on so that neither side
2  has to do the other's homework.  You ought to be working
3  off the same page.
4         MR. ALLEN:  I agree.  I just -- I agree with you
5  on everything you just said.  But as the testimony
6  evidence is, that's not occurred.  So we're at a distinct
7  disadvantage.
8         THE COURT:  I understand it has not happened so
9  far, and I'll deal with that in terms of my ruling based
10  on what I heard yesterday.  And if it comes up again, if
11  that's one of the sources of impediment, then I'll take
12  that into account.
13         MR. ALLEN:  Your Honor, if you don't mind --
14         THE COURT:  I think I know what's going on here.
15         MR. ALLEN:  I think you do.
16     Your Honor, while we're here, and I brought this up
17  last time, we're going to meet with Mr. McConnell.  I know
18  Mr. McConnell's talked to Mr. Blizzard.  I don't know if
19  you met my counterpart that I'm working with.  There is
20  one other issue that was not on the agenda but I'll just
21  bring it up to the Court because I think you need to know
22  about this.  We are engaged -- and we're going to talk to
23  Mr. McConnell.  I know he has e-mails on third-party
24  discovery.  We are already encountering large resistance.
25     I want to give the Court these letters.  I just

Page 95

1  showed them to Mr. McConnell.  I want the Court to have
2  marked as two and three the letters that -- from Harrison
3  who was involved in marketing surveys and things of that
4  nature written to us concerning they're not giving us the
5  documents.  And our response letter -- just so you can get
6  a flavor of what's going on, because as Mr. Magaziner
7  talks to you about coming back to the Court concerning
8  these issues, I'm going to tell you that -- Court right
9  now we're not going to get these documents without Court
10  intervention.  And I want the Court to kind of start
11  getting a flavor.  And the third parties we're not getting
12  the documents from are the vendors that work with
13  AstraZeneca.  And so we would hope that the Court would
14  just get a flavor of this and be prepared -- just to keep
15  you updated on what's going on.  That's all I'm doing.
16  Anything else?
17         MR. MAGAZINER:  I have no comment on that, Your
18  Honor, because it was not on the agenda.
19         MR. ALLEN:  It wasn't.
20         MR. MAGAZINER:  Despite a meet and confer about
21  what should be on the agenda.  Mr. Allen chose not to
22  raise it when we decided what to put on the agenda.
23         MR. ALLEN:  I apologize, Your Honor.  It was not
24  a contested matter.
25     Mr. Roth reminded me of one other thing.  The issue

Page 96

1  of custodial files.  It was on the agenda.  It was
2  discussed this morning.  And what we needed is we felt the
3  ruling, if there was one or maybe you will do an order
4  like you usually do when they're produced, these other
5  custodial files, the time period.  I don't know if the
6  Court --
7         THE COURT:  I'm going to rule on it.
8         MR. ALLEN:  Okay.  Thank you very much.  And we
9  have -- do we have anything further?
10         MR. KEN BAILEY:  Your Honor, this is Ken Bailey.
11     I can't understand why the video that they gave to
12  the DOJ, something that important, has not been kept in a
13  location that they can easily put their hands on.
14         THE COURT:  I'm sure it is.  The question is how
15  they produce it in a way that everybody knows what it is
16  and how to talk about it.  I mean that's the issue when
17  you're dealing with -- I got to say I'm -- counsel for
18  AstraZeneca, most of them when they speak, like to use
19  eight digit numbers when they're talking about
20  production.  That frankly doesn't impress me very much.
21  The question is what's being produced that's helpful and
22  how's it compared to what is really needed here.
23     But the fact is this is a case involving all kinds of
24  discoverable information, and you can't just say, well,
25  it's in Peoria, come on down, here's the address.  You

Page 97

1  need to be cataloged in an appropriate way, and that
2  doesn't happen by itself.  So we're all aware of that.
3     So -- but it shouldn't be and Mr. Magaziner said not
4  just those videos but the whole universe of like material
5  will be cataloged, then produced in a way that can be
6  uniquely identified and referred to and relied on.  So
7  it's going to happen in three weeks.  That, you know, like
8  I say it should have happened in September last year, but
9  here's where we are.
10     So the -- I guess I thought based on our discussions
11  last fall that there might -- for things like that where,
12  again, there's no doubt that an awful lot of this material
13  was going to be needed to be produced that at least -- I
14  thought there would be discussions between counsel and
15  say, look, informally we would like to get some of this
16  stuff so we can start analyzing it ourselves and feeding
17  it to our experts and we know this isn't going to count as
18  the official production but why don't you get some of
19  these things.  I guess that didn't happen.  People are in
20  a far more adversarial posture than we even allow that
21  kind of professional courtesy.  So that's not the course
22  of this case so...  And there may have been some
23  misunderstandings on other specifics, but -- and some more
24  and more things are going to be done in formal document
25  demands and formal responses and agendas for these

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 98

1  hearings.
2       MR. KEN BAILEY: Mr. Magaziner asked the Court
3  to instruct us to get right on something. I would ask him
4  rather than waiting until three weeks to get us a big pile
5  of documents that that's readily available, he ought to be
6  able to roll it out pretty quick to us.
7       THE COURT: It may well be that he could provide
8  you with a courtesy copy but he can't give it to you as a
9  production matter unless it's cataloged.
10      MR. KEN BAILEY: Yes, Your Honor.
11      MR. MAGAZINER: One other issue that we would
12  like to propose or to raise. As Your Honor just said, the
13  relation between the parties are more adversarial than in
14  a litigation like this. I don't know why that is but it
15  is a fact. We think it might be beneficial to the process
16  if Your Honor would consider appointing a special master
17  who could meet with the parties in all the meet and
18  confers that need to occur on the various issues. I don't
19  think necessarily in the case specific discovery because I
20  think in some way the Brown and Greer folks may sort of
21  help in that regard and all the other issues. And the
22  fees of the special master would be decided by the special
23  master in accordance with his or her view of which party's
24  conduct made it necessary to have a special master preside
25  over these meet and confers. We think that that would be

Page 99

1  very beneficial to the process because the meet and
2  confers that have occurred to date have been in many
3  instances quite unproductive. We believe the presence of
4  a special master would make them far more productive and
5  ease the burdens on the Court.
6       MR. ALLEN: Speaking of things not on the
7  agenda, but since he brought it up, I want to tell the
8  Court we would need to meet on confer on that but we're
9  also very opposed. This Court is fully aware of what's
10  going on in this litigation. This Court hasn't always
11  ruled for me, but I tell you, I wouldn't want to go
12  anywhere else. You have heard -- you know what's going
13  on. And all of a sudden we bring a motion for sanctions,
14  this Court's going to have to rule whatever the way the
15  Court rules, but I don't want to have to go through a
16  learning curve again. We think this Court is capable,
17  competent, and we would like to we would like to continue
18  before this Court. And certainly I cannot fully respond
19  since I haven't had an opportunity to meet and confer.
20      Now last thing on meet and confers since it was
21  brought up: I have never met and conferred so much in one
22  case in my entire life. The thing that most concerned us
23  yesterday was this Court's indication that we hadn't met
24  and conferred. Your Honor, look at the evidence and the
25  testimony, not to statements of the lawyers. Mr. Jaffe,

Page 100

1  the record, the testimony and the evidence, not the
2  statements of the lawyers. We have met and conferred,
3  Your Honor. We have begged. We have asked. We have
4  given solutions. They were not -- they were rejected.
5  Then they were accepted. The documents didn't come. Then
6  they came.
7       Your Honor, I want the Court to fully understand we
8  have met and we have conferred and we're now before this
9  Court. We respect this Court. We want to remain before
10  this Court. We do not think a special master is
11  necessary.
12      MR. MCCONNELL: Your Honor, just to wrap it up,
13  Mr. Magaziner asked me to address this because it's based
14  on something that I submitted yesterday and based on
15  something that I witnessed this morning. We actually did
16  meet and confer on the issue of whether we should have a
17  special master for meet and confers. We did that this
18  morning. We had a meet and confer session this morning
19  that I would characterize as somewhat abusive. I believe
20  the presence of a special master would change that. The
21  parties would behave themselves. We'd treat each other
22  more civilly. We'd actually get some things done. As to
23  the tenor of the meet and confers, I would simply say
24  this: Look at the Defense Exhibit 6 that we filed
25  yesterday. And that is in evidence.

Page 101

1       MR. ALLEN: Well, Your Honor, this is just
2  debate.
3       THE COURT: No, no.
4       MR. ALLEN: Right. Right, exactly.
5       THE COURT: I said this -- most of the hearings
6  we have had, I am troubled. You all have impressive
7  backgrounds, resumes and training and you have all done
8  this before. You know how to do it right. And there's
9  something that's keeping you from doing it. I would
10  consider it an admission of -- I don't want to use a more
11  charged word than I mean to -- but admission of failure,
12  professional failure if -- and to some extent a failure of
13  the Court if a special master were needed to supervise
14  your meet and confers. I almost, and this will sound
15  terrible, but I almost -- this will sound terrible --
16  rather send some of you to jail for contempt before we
17  have to resort to such a thing. I have only done that
18  with an attorney couple of times and not in this context.
19  Well, once in this context. Something I can do. Very
20  briefly. And I haven't imposed any real sanctions,
21  although I have been -- I have -- I'm going to say,
22  Mr. Allen, you said you have done more meet and confers in
23  this case -- I have done more screaming in this case than
24  I've ever done from the bench I think in the totality of
25  my 15and a half years sitting here and I yelled at both

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 102

1  sides because of what I consider to be inappropriate
2  things.
3      And, you know, we had this discussion in September
4  and I thought things were going to go a different way. I
5  had representations, a lot of people that were there
6  aren't here now. I'm not sure the people that were there
7  did exactly what I thought they were meaning by what they
8  said. I am loathe to -- because it's very difficult from
9  where I sit even with -- I read e-mail exchanges and
10 listen to accounts who was discourteous to whom about this
11 and that, who lost their temper and who got petulant. And
12 it's hard to single out who was responsible for even one
13 side's stance because there's so many of you involved for
14 both sides, and there's so much back and forth. There's
15 so many issues that you -- well, many things you do agree
16 on but there's many things you bicker about unnecessarily,
17 and things that you make unnecessarily difficult for
18 yourselves and for the other side. I have been amazed at
19 it.
20     Both sides are paying a substantial price for that,
21 and it's the parties are -- certainly the defendant is
22 paying out of pocket for billable charges and the
23 plaintiffs are paying in terms of the burden on counsel.
24 I don't think you ought to practice law this way. And
25 I'll give you some words of advice I use when I swear in

Page 103

1  new lawyers to bar of this Court. We have a local rule
2  about a meet and confer on the case management order.
3  You're familiar with it. Doesn't really apply here but --
4  we're serious about that you as professional colleagues,
5  members of the bar that you get your arms around the
6  case -- this is a tough case, set of cases to get your
7  arms around. But this case is hard enough dealing with
8  some very difficult legal issues, some very difficult
9  plaintiffs and complicated histories and the large
10 numbers. And why do you make it harder for yourselves? I
11 just don't understand it. I don't understand why you
12 think there's a litigation advantage to that and think
13 about how you're coming across and how that's going to
14 play out as the case goes forward. It's amazing to me.
15     Mr. Magaziner, if you want to file a motion for
16 appointment of a special master after a thorough 301G,
17 there will a response and I'll deal with it.
18     MR. MAGAZINER: I think in light of Your Honor's
19 comments we're not likely to file that motion.
20     THE COURT: Well, it may come to that. I
21 certainly have given it a thought, but -- I do view it as
22 my job, not one that -- in terms of having to bang heads,
23 it's not how I thought we were going have to do this.
24     I urge you again to take all this to heart and see if
25 you can't work together for the things that shouldn't

Page 104

1  really -- I mean both sides are representing clients, you
2  know. Making it easier for each other to be able to look
3  at each other's documents and find out who the relevant
4  witnesses are, that's not something you should be fighting
5  about. You should be working together about that.
6      Now let's set another hearing. Did I tell you last
7  time what our move schedule was?
8      MR. ALLEN: You told us you were moving in about
9  two weeks from now, I think.
10     THE COURT: Well, the clerk's office will be
11 moving physically the week of the 13th of August as I
12 understand it, starting the middle of that week and
13 however long it takes. The judges will start moving the
14 week of the 26th. I'm toward the end of that week which
15 has -- I can -- I'll tell you joke on myself. Last time I
16 moved a house down -- when I moved down to Orlando many
17 years ago, drove down with the family and got to the house
18 and unloaded the car and that Monday morning as the movers
19 pulled up with the van, I went to the airport and flew
20 back to Chicago to argue a case in 7th circuit. I thought
21 in-house counsel was going to handle it. My wife still
22 speaks to me, but she still remembers that day. I could
23 do that again for the move of chambers. I could. Except
24 that the same people I would be relying to make the move
25 are the ones sitting here. We probably ought not meet

Page 105

1  that day.
2      MR. ALLEN: I'm not saying I'm critical to the
3  hearing, but on that point my son, I have given him a 21st
4  birthday present and he and I are supposed to go out of
5  town on the 16th and 17th of August. Is that Thursday and
6  Friday? And so, if you schedule it, that's fine, but if
7  for some reason it could not be the 16 and 17th --
8      THE COURT: What about --
9      MR. ALLEN: But if that's the day, that's the
10 day.
11     MR. MAGAZINER: Lot of people are likely to have
12 vacations.
13     THE COURT: I was looking at the 15th.
14     MR. MAGAZINER: That's the day I come back from
15 vacation, Your Honor. I'll be overseas.
16     MR. ALLEN: We would like to have a hearing
17 though, Your Honor, because we -- with all your comments
18 and mine we do have pending matters, we do have
19 depositions, and we do have document requests that we are
20 waiting on. And so we need to be back before this Court.
21     THE COURT: Have you set any of the individual
22 discovery dates yet?
23     MR. CAMP BAILEY: The week of the 13th through
24 the 17th of August is the week on our behalf, the 11th to
25 the 15th plaintiffs that we represent are all being

27 (Pages 102 to 105)

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa

Page 106

1  presented that week.  The week after that, you know,
2  doctors' depos may be going forward.  There's always going
3  to be something going on.
4        THE COURT:  I mean, that's going to be a
5  constant throughout.  I was thinking whether it was
6  advantageous to have a little bit of that under your belt
7  before we meet again to see what other difficulties have
8  arisen.
9        MR. ALLEN:  Our plaintiffs the 13, 14, 15, 16,
10 17.
11       MR. MAGAZINER:  Your Honor, how about the week
12 of the 20th?
13       THE COURT:  I'm thinking the 21st, Tuesday.
14       MR. ALLEN:  Yes, sir, that's fine with us.
15       MR. MAGAZINER:  That's fine for our side, Your
16 Honor.
17       THE COURT:  Well, I've got a 10:00 criminal
18 competency hearing that is unique which may or may not go
19 forward there.  They're trying to -- there's a program to
20 see if the defendant can be made ready to enter a plea of
21 guilty.  It's an odd situation.  And that may or may not
22 go forward.  We can set it for either 11:00 or do it in
23 the afternoon.
24       MR. MAGAZINER:  Afternoon would be ideal.
25       THE COURT:  Why don't we start at 1:30 then.

Page 107

1        MR. ALLEN:  21st, Your Honor?
2        THE COURT:  Yeah.
3        MR. ALLEN:  Thank you, Your Honor.
4        THE COURT:  We're in recess.
5          (end at 2:30 p.m.)
6          C E R T I F I C A T E
7        I certify that the foregoing is a correct
8  transcript from the record of proceedings in the
9  above-entitled matter.
10
11
12
13
14 _____        _____
15 Sandra K. Tremel
16
17
18
19
20
21
22
23
24
25

c08cbaf5-9dd1-43ad-aefa-dceec563fbfa