1

```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION

 3              Docket No.6:06-MD-1769-Orl-22DAB

 4     . . . . . . . . . . . . . . ..
       IN RE:                       :
 5     SEROQUEL PRODUCTS LIABILITY   :
       LITIGATION                    :        Orlando, Florida
 6     MDL DOCKET No. 1769           :        September 11, 2007
                                     :        9:30 a.m.
 7     ALL CASES                     :
                                     :
 8     . . . . . . . . . . . . . .  :

 9

10                TRANSCRIPT OF PRETRIAL CONFERENCE
              BEFORE THE HONORABLE DAVID A. BAKER
10                UNITED STATES MAGISTRATE JUDGE

11

12     APPEARANCES:

13     For the Plaintiffs:          Paul Pennock

14                                  Larry M. Roth

15                                  Scott Allen

16                                  F. Kenneth Bailey

17                                  Camp Bailey

18                                  Lawrence Gornick

19                                  Richard Laminack

20                                  Buffy Martines

21                                  Kenneth Smith

22                                  Jonathan Sedgh

23                                  Holly Wheeler

24                                  Dennis Canty (by phone)

25
```

```
 1   For the Defendant
 2   AstraZeneca:                 Fred Magaziner
 3                                Stephen J. McConnell
 4                                James Freebery
 5                                Shane Prince
 6                                Robert Pass
 7                                Robert Ciotti
 8
 9   From Project Management
10   Office:                      Orran Brown (by phone)
11
12   Also Present:                Angela Nixon (by phone)
13                                Jonathan Jaffe (by phone)
14
15   Court Reporter:  Sandra K. Tremel
16
17   Proceedings recorded by mechanical stenography, transcript
18   produced by computer-aided transcription.
19
20
21
22
23
24
25
```

```
1              P R O C E E D I N G S
2          THE DEPUTY CLERK:  The case number is
3  6:06-MD-1769-Orl-22DAB, in re: The Seroquel Products
4  Liability Litigation.
5       Counsel for plaintiff please state your appearances.
6          MR. PENNOCK:  Paul Pennock, Weitz & Luxenberg in
7  New York for the plaintiffs.
8          MR. ROTH:  Larry Roth for plaintiffs.
9          MR. GORNICK:  Larry Gornick for plaintiffs.
10          MR. KEN BAILEY:  Ken Bailey, plaintiffs.
11          MR. ALLEN:  Scott Allen, plaintiffs.
12          MR. CAMP BAILEY:  Camp Bailey for the
13  plaintiffs.
14          MR. LAMINACK:  Rick Laminack for the plaintiffs.
15          MR. SMITH:  Ken W. Smith, plaintiffs.
16          MS. WHEELER:  Holly Wheeler, plaintiffs.
17          MS. MARTINES:  Buffy Martines, plaintiffs.
18          MR. SEDGH:  Jonathan Sedgh, plaintiffs.
19          THE DEPUTY CLERK:  Counsel for the defendants,
20  please state your appearances.
21          MR. MAGAZINER:  Fred Magaziner for the defendant
22  AstraZeneca.  Good morning.
23          MR. MCCONNELL:  Steve McConnell on behalf of the
24  defendant AstraZeneca.
25          MR. PASS:  Robert Pass, P-A-S-S, also for the
```

4

```
 1   defendants AstraZeneca.

 2             MR. PRINCE:  Shane Prince, AstraZeneca.

 3             MR. CIOTTI:  Robert Ciotti for AstraZeneca.

 4             MR. FREEBERY:  Jim Freebery for AstraZeneca.

 5             THE DEPUTY CLERK:  And counsel on the phone

 6   please state your appearances for the record.

 7             MS. CRANFORD:  Ashley Cranford for plaintiffs.

 8             MR. JAFFE:  Jonathan Jaffe for plaintiffs, not

 9   counsel.

10             MR. CANTY:  Dennis Canty for plaintiffs.

11             MS. NIXON:  Angela Nixon for plaintiffs, not

12   counsel.

13             MR. BROWN:  Orran Brown from the Project

14   Management Office.

15             THE COURT:  All right.  Welcome to the new

16   facility.  We're still sort of running into some

17   technology problems, so bear with us on that.

18       I will say this.  The easy parts of it work quite

19   well.  I had trial last week and plaintiff's counsel was

20   doing it all the way back and forth to the witness and

21   asking him to go ahead and use the exhibit camera, and he

22   looked at it as if it was going to attack him and decided

23   to give it a try and within four seconds had it mastered.

24   It did speed up the trial.

25       And I want to apologize, at least in part.  I have
```

1    had less time to focus on this case than I had thought I

2    would since our last meeting because of the move, and we

3    did have a trial and some final pretrial conferences and

4    some other matters.

5         So I haven't gotten a couple things done that I hoped

6    I would have done, but it also appears that the parties

7    haven't gotten done quite what I hoped in terms of getting

8    some help on the technology side.

9         You did apparently meet and try to discuss coming to

10   agreement on a person but weren't able to do so.  I have

11   two other names that I got from my contacts out at Sedona,

12   and my thought would be to expose those names to you, see

13   if you know these people and if you considered them.  If

14   not, to invite you to do so.

15        I have got copies of their CVs, which I'll give each

16   side here.  The two names are James Daly and Greg Ball.

17   One of them is a Houston or Austin, Texas based lawyer and

18   technologist, and I believe he's had some contact with

19   some of the lawyers, some of the Houston lawyers.  But I

20   don't think he has any overt conflicts.

21        Mr. Daly has also been active in the Sedona process

22   and he's based in Kansas City.  His background is in Iowa.

23        These names familiar to anybody?  I have some nods?

24   My thought would be again, it's my preference if we can

25   all agree, that's better than if I just pick somebody,

1    although if I have to, I will.  My thought was to give you

2    these two names and let both sides talk to them in the

3    next day or so and see if you can agree on either or both,

4    one or both of them.

5              MR. PENNOCK:  Very good.

6              MR. MCCONNELL:  Thank you, Your Honor.

7              THE COURT:  I have spoken to them very briefly,

8    just to make sure they're interested and willing, and they

9    both seem to have done this sort of thing in one version

10   or another in a number of other cases.

11       Okay.  So we can probably move that forward pretty

12   quickly, I hope.  When we wrap up today, I'll come back to

13   that issue and we'll figure out when we can report back on

14   that.

15             MR. MCCONNELL:  Your Honor, sorry.  Just one

16   question.  I just want to get a sense from you as to the

17   scope of what it is that we're supposed to be talking with

18   these folks about.

19             THE COURT:  Well, my thought would be that

20   somebody from your side and somebody from the plaintiffs'

21   side have a phone conversation with each of them to sound

22   them out about their backgrounds, and if you have any

23   concerns about potential conflicts or lack of capability,

24   you could just interview them, in effect.

25       And then when you're done with that, the two of you

1   talk and say, yes, both of these guys are fine, or I think

2   this guy is better, and then report back to me.

3        Or if you both say neither one of them is acceptable

4   or -- and tell me why, or one side says this guy is

5   acceptable.  You know, I mean, frankly, I wasn't -- I

6   didn't look at every detail of plaintiff's objections to

7   your choice, but it didn't seem to me those conflicts were

8   real conflicts.  On the other hand, I'm not sure what your

9   objection was to plaintiff's choices either.  Neither one

10  of them seemed to me to be that well founded.

11       But I thought it would be worth taking another stab

12  at finding somebody that you can both agree on.

13            MR. MCCONNELL:  Your Honor, may I propose that

14  we do these calls very soon, and can we do them jointly?

15            THE COURT:  That's what I'm saying.  Each side

16  pick a representative and like I say interview them.  And

17  I told both Mr. Daly and Mr. Ball that I was going to

18  expose their names to the parties and they should expect

19  contact from you.

20            MR. MCCONNELL:  So there would be, for

21  example -- I'm a little dense.  There would be one phone

22  call with, say, for example, Mr. Gornick and myself on the

23  call together calling these folks.

24            THE COURT:  Right.  Spend 15 minutes, a

25  half-hour talking to them.  I assume you will do a little

```
1    research about them before you do that.  But this should
2    happen in the next day or two.
3                MR. MCCONNELL:  Great.  Thank you.
4                THE COURT:  Okay.  Let me turn next to
5    third-party discovery issues.  How many and where are
6    there motions to compel for protective order?
7                MS. WHEELER:  Your Honor, Holly Wheeler for the
8    plaintiffs.  I'll address that.
9         We're preparing several motions to compel, but at
10   this point we're still working with the attorneys for
11   these various third parties to come to an agreement which
12   would allow them to feel comfortable to produce these
13   documents.  We are preparing a few right now, but we're
14   also still in talks with them.
15               THE COURT:  Well, let me tell you what my
16   position is.  I think it's at least arguable under the MDL
17   authority that I could directly deal with those motions.
18   I'm not inclined to take on that fight because it's not
19   clear.
20        I think it's also not crystal-clear, but I think
21   there's certainly precedent that the Courts, where the
22   witnesses have been subpoenaed, can defer any such motions
23   back to me, and it's up to them, it's up to those judges,
24   but knowing how I would react, I think most of them would
25   defer them back to me because of the complexity of this
```

1   case.

2        So if you tell me where they are, I will contact

3   those judges and let them know that I'm available to take

4   them back, but I don't want to override their authority.

5   So that's how I'm planning to proceed with that.

6        So it would be my expectation that to the extent

7   there are those motions to be resolved, I will encourage

8   the other judges to send them back to me for resolution.

9        Like I say, I think there's ample authority for that,

10  although specifically you can read Rule 26 that way.

11  Rule 45 really doesn't read that way, and I understand

12  it's legal, but I feel comfortable with that.

13             MR. MAGAZINER:  Your Honor, I would think it's

14  possible that in the course of litigation, either

15  plaintiffs or we might be filing motions in other courts

16  from time to time.  I would ask how the Court would like

17  us to inform Your Honor that we have done so.  Because I

18  know the Court doesn't encourage correspondence.  This

19  would not be a motion that is filed in this Court.

20       I would think the thing to do is just to add Your

21  Honor to the service list, if that would work, so that if

22  Miss Wheeler files a motion in the District of Nebraska,

23  it would be served on you.  If we file a motion in the

24  District of Washington --

25             THE COURT:  How are you going to serve it on me?

1   I'm just asking.

2           MR. MAGAZINER:  I don't know the answer, but I

3   know in other situations like this where --

4           THE COURT:  I'll tell you what you can do is

5   serve it by sending an electronic copy to the chambers

6   e-mail address, which you have used for some other things.

7           MR. MAGAZINER:  All right.  Without any cover

8   letter or anything?  We would just --

9           THE COURT:  Yeah.  Just put it there so we can

10  see it.

11          MR. MAGAZINER:  Okay.  Thank you, Your Honor.

12          MS. WHEELER:  Your Honor, if I can say one

13  thing.  One of the reasons why we have not started filing

14  the motions to compel is because the biggest holdup

15  appears to be the confidentiality.

16      If we could get some kind of confidentiality order in

17  place to protect these third-party documents, I don't

18  think it will be necessary to file many of these motions.

19          THE COURT:  That's why I was apologizing.

20  That's my fault at this point.

21      Okay.  Just given the preface that you just made, in

22  general are things proceeding?  Are you getting anything?

23          MS. WHEELER:  We have gotten two sets of

24  documents from two third parties.  As I said, a lot of

25  them just want some kind of confidentiality in place and

```
 1    they have already agreed that they'll give up their

 2    documents.

 3        And then the last issue that's really causing a bit

 4    of delay is costs.  So that's really going to be what the

 5    motions to compel focus on.

 6            THE COURT:  Okay.  Well, they're certainly

 7    entitled to be heard about that.

 8        Okay.  I'll get that confidentiality order out.

 9            MS. WHEELER:  Thank you, Your Honor.

10            THE COURT:  Mr. Brown.

11            MR. BROWN:  Yes, Your Honor.  Good morning.

12            THE COURT:  Good morning.  I'm up to you now.

13    How are things going?

14            MR. BROWN:  Your Honor, if you have time, I can

15    give you a brief report on what we've accomplished since

16    our last status conference on the 22nd of August.  And

17    then it would also give us the context for the items

18    listed on your agenda, which concerns an order that we

19    feel is necessary to aid in implementing your

20    case-specific discovery plan.

21        We have a written report that the Court had asked us

22    to file on the 15th of each month, so that is forthcoming

23    soon.  But I think to understand the issues that are on

24    the agenda, we need to take a little bit of time and tell

25    you what we have accomplished since the 22nd.
```

1          And I'll go through it in as much detail as the Court

2     and parties would like, and please stop me if it is -- if

3     you do not have the time for this much information at this

4     stage.

5          We -- since the last call, we have been working, I

6     have been working with counsel for each side in the case

7     and have established contact counsel with Ms. Martines

8     from the Laminack, Pirtle & Martines firm for the

9     plaintiffs, and with Mr. Russell Stewart from the Faegre &

10    Benson office in Denver as our contact persons to address

11    all case-specific discovery issues.

12         We have established a schedule with them for a weekly

13    status and update call Friday of each week at a set time

14    where we take up progress on the actual work of scheduling

15    discovery and any open issues among the parties relating

16    to this case-specific discovery, problems, logistical

17    issues that I think and the parties think I can help

18    resolve either by consensus or by direction.

19         And those are progressing well each week.  Here we

20    have established the process as necessary for us to assist

21    the parties in scheduling physician depositions, which are

22    the treaters and the prescribing physicians, as the Court

23    directed in its order appointing this office.

24         We have trained a scheduling team here that is

25    actually making calls to the physicians' offices and

1   physicians themselves to arrange deposition schedules and

2   also to discuss with them the important piece of obtaining

3   their patient files relating to each of the plaintiffs

4   that are designated as ready each month for case-specific

5   discovery.

6       We have set up the processes here, trained those

7   persons to work on a script, to educate the physicians on

8   why we're calling and who we are and why it's important to

9   get this scheduled by agreement and get it behind us.

10      We have also established the process here necessary

11  to deal with the physician records, to obtain them from

12  the physicians, who will send us copies here.  Then we

13  will make a set for the plaintiffs and have a set for the

14  defendants and forward them out to counsel.  And the goal

15  obviously there is to get the complete file copy from the

16  physician in advance of the deposition so that the

17  depositions can take place as scheduled and be meaningful

18  and complete and finished on the date scheduled.

19      We're not assisting in scheduling plaintiffs'

20  depositions or sales representatives' depositions.  The

21  parties are still handling the actual scheduling of the

22  plaintiffs themselves and the sales representatives for

23  depositions.

24      They notify us of that schedule so that we can know

25  what days they're occupying, and also we are placing that

1    information on a master calendar that will be available to

2    the parties from a secure website so that they can view

3    all the plaintiffs, physicians and sales representatives

4    depositions that are set and will be able to access

5    information about where, when, what office.

6         And then we will archive that information and be able

7    to show it historically as to which ones are completed.

8    We're rolling out that automated master calendar we think

9    this Friday.  So the parties can start using it to keep

10   track of the case-specific depositions.

11        We have set up a process to obtain from the parties

12   the plaintiffs designated each month as ready for

13   case-specific discovery.  We first received from

14   Mr. Stewart's office, and with 20 plaintiffs that are

15   designated by the parties, and then a little bit after

16   that then the ten plaintiffs that are designated by the

17   Court, and at that point Mr. Stewart's office gives us the

18   information on those parties' prescribing physicians and

19   the contact information that they're taking from the

20   plaintiff fact sheets about the identity and how to reach

21   the prescribing physicians.

22        It takes the parties, the defense counsel a little

23   bit longer to dig out from the information they have the

24   treating physicians, and they provide them piecemeal to us

25   as soon as they determine which treater they would like to

1    depose.

2        We keep all of that information together in one

3    master application, and as soon as we have the information

4    on the physicians to be deposed, our scheduling team

5    starts calling them, trying to reach them to take a

6    deposition.

7        Obviously we stepped into this, receiving the first

8    information late August, early September for the September

9    cases, so we have obviously focused on scheduling

10   physicians for depositions in September for September

11   plaintiffs.

12       We have received a total of 53 physician names for

13   the September cases.  We have contacted all of those

14   offices and have actually locked in dates on 18 of the 53,

15   and some of the issues we will talk about in a moment as

16   to why they're not all locked in.

17       But we are being fairly relentless in contacting the

18   offices, and if we receive a lot of voice mail, answering

19   machines that we leave messages on, we have a system if we

20   don't hear back from them in 24 hours, we call them again.

21   It takes, as all the parties know and the Court knows, a

22   lot of relentless effort to actually reach the proper

23   person in the physician's office to schedule a deposition

24   and work the deposition schedule to make it happen in the

25   month that we need it to happen.

 1          And our first approach to all of that obviously is to

 2     beg and plead and impress upon them the importance of it

 3     and try to work within their schedules to get it done in

 4     the month that it has to be done.

 5          And also to go over with the physicians the

 6     importance of securing copies of the records, which we're

 7     asking them to make copies, make a set of copies, send

 8     them to us here within seven days after our first call.

 9          If we do not have those records after we approach the

10     deposition, we have the process to go back to them and

11     keep essentially nagging them for the records so that the

12     parties can have them before the depositions occur.

13          We are already -- we have received the names of the

14     treating physicians or prescribing physicians for October

15     and have begun scheduling, making calls to schedule

16     physicians for October cases as well.  We relay all of the

17     scheduling information to our contact counsel, Miss

18     Martines and Mr. Stewart, so that they can then inform

19     their crews as to what dates we have arranged for the

20     physician depositions.

21          We have assembled a packet to send to each

22     physician's office consisting of a notice of deposition, a

23     Rule 45 subpoena that we are preparing and filling out

24     here, a copy of the medical authorization and release form

25     that the counsel have obtained from each plaintiff, so the

1    physicians can have that as well to permit them to release

2    information and eventually testify, and an explanatory

3    letter to each physician explaining to them why this is

4    important and how they submit any request they have to be

5    reimbursed for copy charges or for deposition time, fees

6    for deposition times.

7         And that gets us to really the item on the agenda.

8    So far the process is, we hit the ground running after

9    August 22nd working very well with these representatives

10   for the parties who are also working hard to make this

11   coordinated effort work efficiently, and we have scheduled

12   a number of these depositions and will keep the pressure

13   on to make them happen in the month they're supposed to

14   occur.

15        We are encountering the usual logistical hurdles that

16   the parties have encountered up until now, and that you

17   always encounter when you're attempting to schedule any

18   depositions, and in particular depositions of physicians.

19        We obviously have -- the first hurdle is actually

20   reaching the right person.  Physicians are away, they're

21   on vacation in August.  That was one issue in the summer.

22   They are out of the country.  We have to give calls back.

23        So there are initial contact hurdles, and we think

24   the usual things, like physicians who don't want to be

25   involved, don't understand it, don't want to be bothered

1   with discovery depositions.  Some want their lawyer

2   involved.  The things you normally deal with when you're

3   dealing with witnesses who are not really at stake, have

4   something at stake in the litigation.

5        The idea about an order covers several issues that it

6   seem to me were needed to codify or formalize in an order

7   from the Court that would assist in the scheduling efforts

8   and obtaining the documents and make it uniform and more

9   efficient across the board for all of our case-specific

10  discovery of these physicians.

11       And I think that in the Court's power to implement

12  its case-specific discovery orders of June 11 and Case

13  Management Order 4 from July 6, it would be helpful, as an

14  administrative matter, to have an order that addresses

15  several issues.

16       And we wanted to go over with the Court today the

17  idea of the content of that order, and also talk about the

18  process to put it before the Court for its consideration

19  and possible entry.

20       We have reviewed this with the parties, the

21  representatives of the plaintiffs and defendants, and the

22  parties agree that this is a good idea and might help us,

23  and our goal is to have an order that we can show the

24  physicians to show them that they are the folks that do

25  this and directed to cooperate with us.  And also to

1    regularize and make uniform the manner in which physicians

2    will request reimbursement for copy costs and deposition

3    time fees for deposition time.

4         The order itself would say that the special master is

5    authorized to contact them, that the doctors are

6    authorized to discuss with them the individual patients

7    and the schedule, the depositions and production of

8    documents.

9         It would impress upon the physicians that they have a

10   duty to cooperate in that effort, and that they are to

11   return calls, because sometimes we have a problem of

12   leaving messages and never getting a call back.  We'd like

13   to send this to them and say, you really have to call us.

14        On deposition fee time, we're seeing a wide range of

15   potential charges for deposition time, some of which seem

16   very near ordinary customary rates for patient services,

17   and some of which seem sort of inflated for actual

18   deposition time.

19        And it would be a very efficient helpful measure if

20   we could set a limit, a maximum limit on physician

21   compensation time, and have reviewed this with the parties

22   and we were -- we'll suggest to the Court that we fix a

23   maximum limit of $300 per hour for physician time at a

24   deposition.  That is a rate that actually exceeds most of

25   the sort of standard industry rates, I think, for mental

1    healthcare or psychiatric care, which is what a lot of

2    these physicians are, where the charges are 100, 150, 200,

3    250, 300 dollars an hour for counseling sessions or

4    treatment.

5        We have some benchmarks for the 300-an-hour limit.

6    In the diet drug litigation, the Fen-Phen diet drug

7    litigation, the Court some nine years ago set cardiologist

8    rates at $300 an hour, and cardiologists generally have

9    higher per-hour rates than a psychiatrist.

10        But it would -- we're seeing some physicians that are

11   asking for $800 an hour or flat rates that exceed 500 or

12   600 dollars an hour or so many -- or charges for every

13   20 minutes, and it would assist, I think, the parties and

14   our effort a lot if we could standardize the rate at which

15   physicians would be paid.

16        The same thing goes for production of copies of

17   records.  We're generally getting per-copy page charges

18   that range from 10 cents to 50 cents to a dollar.  Some

19   offices have flat fees.  It would help control and manage

20   discovery if we could set a uniform not to exceed copy

21   charge of, say, a dollar a page or a flat minimum of $50

22   to make it the same for all physicians.

23        The idea behind the order is to help regularize and

24   make this more efficient.  It would also appoint me as

25   authorized to sign the Rule 45 subpoenas.  Under Rule 45

1   an attorney authorized to practice in your court can sign

2   a subpoena issued from the -- in the name of the Court

3   where the physician is located, which is how we're doing

4   it, and I think this order would remove any doubt that I

5   am authorized to sign those subpoenas as an attorney

6   authorized to practice in your court within the meaning of

7   Rule 45.

8        The idea behind the order rests upon the Court's

9   subject matter jurisdiction to implement its already

10  existing discovery plan.  There is obviously some question

11  about personal jurisdiction over these physicians that I

12  think would really have two issues there.

13       One is if push really came to shove and a physician

14  failed to or we were unable to achieve compliance by

15  agreement, the enforcement of the actual subpoena would

16  have to occur, I think, from the Court where the physician

17  is located, and there may be instances where we appeal to

18  Your Honor to reach out to those courts to help us enforce

19  a subpoena if it ever came to that.  We're working very

20  hard to avoid having to use that weapon in the process.

21       The order itself we think would help minimize the

22  instances of noncompliance, if we just had an order that

23  set all this out at the Court's direction so that we could

24  show it to the physicians and to the physicians' lawyer,

25  if need be, to try to elicit -- enlist their support

1  without having to actually have a proceeding to compel

2  attendance or compel production.

3      That covers the proposed order, the general framework

4  Your Honor, and we were wanting some guidance from the

5  Court as well as to the method by which to present that to

6  the Court for its actual consideration and possible entry,

7  which we can do by filing a motion with supporting

8  memorandum and serving it and then having a -- treating it

9  as any other contested motion.  This one is really not a

10 contested motion.  The parties agreed to it.  It is more a

11 administrative matter, and I was curious as to whether the

12 Court would entertain its submission to the parties and to

13 the Court as an administrative matter within your inherent

14 jurisdiction, not as an adversarial contested motion under

15 the normal motion rules.

16      THE COURT:  All right.  Let me ask -- I'll come

17 back to that.  Let me ask a couple questions first.

18      Would it be of assistance to you in keeping things on

19 schedule if we required the parties to designate the

20 specific plaintiffs earlier?  In other words, if we,

21 instead of going month by month, having them go out

22 several more months so that you could -- obviously some

23 people won't -- the doctors won't be identified until they

24 get identified, but I'm not sure that there's any reason

25 to hold back all the plaintiffs until -- because you have

1    got such a compressed schedule to get all the players in

2    place.  Is that something you thought about?

3             MR. BROWN:  I think, Your Honor, more time is

4    always better.  We -- under the system as it exists now,

5    we would normally receive information on the plaintiffs'

6    cases and their physicians at the beginning of a month, to

7    schedule the depositions for the following month, so that

8    under the model we have now, we're receiving in early

9    September contact information for physicians to start

10   contacting them and asking them for depositions about

11   30 days away.  And so far we have only had one set of that

12   information on that schedule to work with.

13       Thirty days away or a little bit longer, if we go

14   deeper into the following month, is -- seemed to be far

15   enough out to be able to get on a physician's schedule.

16       I don't think we would need it more than 60 days in

17   advance, if the Court were to consider directing the

18   parties to designate plaintiffs for case-specific

19   discovery sooner than they are now.

20       I think doing it two months away is plenty, because

21   we generally can get on a doctor's schedule within that

22   time period and get their documents within a 60-day

23   period.

24             THE COURT:  Okay.  Because I raise this because

25   I'm worried about Thanksgiving and Christmas holidays, and

1    the end of the year is going to get tricky during those

2    months, I think.  I'll take that up with the parties to

3    see if they object and they have reasons they don't want

4    to do it.

5        What other bottlenecks have you identified so far, in

6    terms of --

7            MR. BROWN:  Bottlenecks are -- let's go down

8    what I think are the main bottlenecks.

9        One is just making sure that we have accurate

10   physician contact information.  And it is -- in some

11   instances the telephone numbers are stale or the

12   physicians have left the practice and we have to spend

13   some time tracking down people.  When that happens, we

14   relay the information to the parties and they make the

15   first efforts to make sure they have the right phone

16   number or the right doctor's name and try to find, locate

17   the person.

18       If the doctor has changed practices and if they're

19   not successful, then we try to start Googling and finding

20   people to try to make that happen.

21       So one issue is just having accurate information

22   about the physician's name and contact information.

23       The second issue has been just the inability to

24   contact physicians where we get answering machines, and

25   it's very much akin to how difficult it is to make a

1  doctor's appointment, that you have to go through the

2  right channels of scheduling and get on the schedule.

3  We're trying to work with them to do it after patient

4  hours so they're later in the afternoons.  We have not yet

5  seized a weekend date, but we and the parties have agreed

6  that we will do that if necessary.

7      So part of it is just making the contact and getting

8  the right person, and the solution to that is really just

9  relentless pressure.  We keep calling.  If we don't hear

10  back, we call again.

11      And one idea behind this order is if we cannot get a

12  call back, we fax them the order and say politely, you

13  really have to call us back.

14      The third thing is just the normal scheduling,

15  physicians' schedules.  These doctors have patient hours

16  during the daytime.  They -- in the late afternoons they

17  tend to do -- take their notes from their sessions during

18  the day, so they pretty much have their time locked up,

19  and we have to try to work around that.

20      The parties have been very accommodating meeting

21  dates that we have been able to see, to grab from the

22  physicians.  There's not a lot that we can do about that

23  except impress upon the physicians the importance of

24  getting this done and getting it behind them, and the

25  order, we think, would be -- that we could show them would

1  sort of formalize that message that we're giving them

2  orally.

3       I think the last thing is just sort of built-in

4  physician reluctance.  They are concerned about releasing

5  personal plaintiff information.  We have had some issues

6  about the adequacy of the release or the staleness of a

7  release that we're dealing with, the medical authorization

8  form.

9       We have -- we're sending them Rule 45 subpoenas and

10  trying to make them understand that that is essentially a

11  court order and that they really have to comply and give

12  us the records.  A lot of physicians, you have to get them

13  past that hurdle of talking about very personal

14  information that's in their files of the plaintiffs.

15       And then it's just the logistical issue about who

16  does the copying and how quickly they can get it done for

17  us, that we are again applying basically relentless

18  pressure to make that happen so that we get them on time.

19       And some doctors just don't have any date available

20  in the month that we need, and we have slipped a little

21  bit to the first of the next month or the first two days

22  of the next month, just because we could not get a weekend

23  or a date or anything, and that's really happening in the

24  September cases where we started calling in September for

25  depositions in September.

1    The other logistical problems really are the fees,

2  and some doctors want payment in advance.  They want a

3  minimum payment in advance.  In this order, we're going to

4  ask the Court to direct that every physician gets paid

5  after a deposition by submitting a statement to us for

6  actual deposition time, which will, we hope, eliminate

7  requests for advance payment, and then the complication of

8  refunding amounts if the full deposition time is not used.

9          THE COURT:  Are you getting the records in

10  paper, on paper or electronically?

11          MR. BROWN:  We're getting them on paper, Your

12  Honor.  We have asked the physicians to make a photocopy

13  set, hard-copy photocopy set of their records, and send

14  that photocopy set to us by overnight delivery using a

15  Federal Express number that we provide to them.

16    But what we have seen so far is that most of these

17  physicians are not technologically adept.  Very few of

18  them even use e-mail to send material back and forth or

19  receive material, and so the only real mechanical method

20  for them to provide us records is to just the

21  old-fashioned way of making hard copies, photocopies, and

22  sending them to us, and then we are just photocopying

23  them, and we will photocopy them and send them out to the

24  parties.

25    We're not currently planning on scanning them or

1  keeping scanned retained images, because it did not seem

2  that that time and cost was really cost-effective in this

3  context, where we just basically want to get these

4  documents in the hands of the parties, and then they can

5  do with them what they normally are doing internally to

6  retain them.

7       THE COURT:  I'll leave that to your judgment and

8  the parties' desire.

9       I guess it's right.  I'm thinking back.  My

10 experience has been a little bit dated now, but this

11 branch of the medical profession is probably the least

12 automated, and it's very uneven across different

13 specialities, and in even in different parts of the

14 country.

15      All right.  In terms of your proposed order, I don't

16 have any problem with that.  If you can draft one up and

17 pass the specific language through the parties and then

18 just submit it as a proposed stipulated order, I could

19 enter it very quickly.  I might modify it a little bit,

20 but addressing the issues that you talked about.

21      I would ask that you put a preface in it to -- not

22 long, but put some -- just some language about recognizing

23 the -- as you have in your dealings with them, with your

24 scripts and so on, the importance.  We recognize the

25 importance of their time and the difficulties of their

1    schedules, but also describing in a few sentences the

2    complexity of this case and the importance to the parties

3    who are -- at least the plaintiffs are their patients, and

4    AstraZeneca is an important part of their practice as

5    well.  So that the parties here on both sides deserve

6    their cooperation even apart from the legal requirements.

7         So you sort of give them a reason, that we recognize

8    the importance of their time, and that they need to

9    recognize the importance of our process as well.

10        Then I would ask that you not put in that order the

11   monetary matters, because I have a feeling that if you say

12   compensation is capped at $300, suddenly the minimum will

13   be $300, and we could do that by separate order that you

14   could use when you get a doctor who's asking for $500 an

15   hour, that could be -- he can just be advised that unless

16   he wants to give an application to the Court, that the

17   $300 is the maximum.

18        But if you've got other doctors coming in at 150 or

19   200 dollars, we can go ahead and pay them.  The same thing

20   with the copying costs.  We can set a maximum.  And I

21   think the doctors do have a due process right to object to

22   that, but we don't know what they would come up with that

23   would justify it, but I would foreclose that possibility

24   in an individual case.

25        You follow what I'm saying?

1              MR. BROWN:  Yes, Your Honor.  I think I heard

2     most of that.

3         On the physician fees and the copy costs, is it your

4     direction not to put in an actual dollar amount maximum

5     and to leave both of those issues on an ad hoc basis if we

6     end up with someone --

7              THE COURT:  No.  I'll enter that as a separate

8     order, that absent, you know -- I'm just -- if we put it

9     in the order that we give them, that will then become

10    their minimum.  I don't want to do that.

11             MR. BROWN:  Yes, sir.

12             THE COURT:  But I'll have on record this is the

13    presumptive maximum, unless they can show some substantial

14    justification for a charge above that, and if you get an

15    individual doctor that's giving you trouble, then you can

16    use that order and say, here's the maximum unless you want

17    to see the judge.  And most of them won't want to do that.

18             MR. BROWN:  I understand.  Would you like for us

19    to submit a sketch of that proposed order as well?

20             THE COURT:  Sure.

21             MR. BROWN:  For the Court's review.

22             THE COURT:  Sure.

23        Okay.  Anything either party wants to address to

24    Mr. Brown at this stage?

25             MR. MAGAZINER:  Your Honor, is this the time

1    when you would like to discuss Your Honor's suggestion

2    that it might benefit the process if we selected cases

3    earlier than 30 days in advance?

4              THE COURT:  Okay.

5              MR. MAGAZINER:  My view of that, Your Honor, is

6    that it will be a plus for the process, and I would

7    encourage the Court to consider that suggestion further.

8    The only caution from our point of view would be that the

9    transition period has to be managed somehow to avoid

10   placing with us the burden of providing the information

11   that we're required to give the plaintiffs within five

12   days after case selection for two months at one --

13             THE COURT:  The idea behind this would be to

14   make that less of a burden.

15             MR. MAGAZINER:  I understand that.

16             THE COURT:  That's what I was thinking.

17             MR. MAGAZINER:  All I'm saying, if Your Honor

18   were to adopt the 60-day proposal and say that at the end

19   of September we were to select cases for both October -- I

20   mean for November and December, as long as we don't have

21   to do twice as much work in the same timeframe during that

22   transition month, that would be fine.

23        But thereafter, once the transition has been fully

24   accomplished, it would be the same situation from our --

25   in terms of the burden on us as it is now.  It's just the

1   transition month I'm worried about.

2          THE COURT:  Well, the other advantage I was

3   thinking of is, I'm sure for some of these it's harder

4   than for others.

5          MR. MAGAZINER:  Yes, sir.

6          THE COURT:  The ones that are hard, it gives you

7   a little more breathing room.  If you're not going to meet

8   the deadline, it won't have the same drastic consequences.

9          MR. MAGAZINER:  That would be fine, Your Honor.

10  I think that would benefit both parties and the whole

11  process.

12         THE COURT:  And it may -- well, it may be that

13  she needs a little backup of names, too.

14         MR. PENNOCK:  Your Honor, it certainly seems to

15  make sense in a program as difficult as this to have a

16  little more time rather than less time.  That's certainly

17  my first reaction.

18      My second reaction is, this is a program that the

19  defendants begged for.  We don't need to go back to that,

20  but the fact is, it lasted -- that request came back again

21  and again and again, and now they're essentially saying

22  that -- well, Mr. Brown has said it, but the defense are

23  saying we can't get it done, and that does raise some

24  concerns.

25         THE COURT:  I mean, I raised this.  I'm just --

1    I was worried about these tight deadlines when I set this

2    schedule or we set this schedule, and listened to

3    Mr. Brown, and it's -- he's dealing with these doctors,

4    which we all anticipated would be difficult to deal with.

5    I'm just trying to give everybody a little more breathing

6    room, unless there's any outside --

7              MR. PENNOCK:  Excuse me.  May I just consult?

8              THE COURT:  Sure.

9              MR. PENNOCK:  In any event, Your Honor, I agree

10   with you it does seem that based on how this is

11   transpiring, more time may be required for these

12   defendants.

13       We'd like to -- there may be other issues that we

14   have that we would like to suggest at a later conference

15   as to how do we also manage this in terms of the numbers

16   of cases and how much time is required for different

17   things.

18       Thank you, Judge.

19             THE COURT:  All right.  Mr. Brown, go ahead and

20   draft up your orders, run them by the parties, submit it

21   to me as proposed stipulated orders, and I'll deal with

22   it.

23             MR. BROWN:  Yes, Your Honor.

24             THE COURT:  All right.  Thank you for your

25   continuing service.

1       All right.  Let me turn to the agenda items listed by

2  the parties, to the extent we haven't already covered

3  them.

4       Plaintiffs raise some general issues regarding

5  continuing problems with a claim of production from

6  AstraZeneca.

7            MR. GORNICK:  Yes, Your Honor.  If I may address

8  that.  We have a number of ongoing issues, and I'm sad to

9  report that we just -- we haven't seen an increase in the

10 urgency or an increase in the pace.  Virtually all of the

11 issues we identified as problematic at the sanctions

12 hearing on July 26 remain outstanding.

13      The areas, the complete areas that we had not

14 received information remain outstanding.  Only on Friday

15 were we told by AstraZeneca that with respect to a number

16 of those areas, we were right, that there is relevant ESI

17 that we simply don't have.  But we don't know when we're

18 going to get it.

19      So that applies to track changes.  They have

20 confirmed we did not get the electronic track change data.

21 That they're writing a program to extract it.  And that

22 once that is done, the data will have to be reviewed by

23 lawyers.  We don't know when we're going to get that.

24      They have confirmed that there is voice mail that we

25 don't have.  Very troubling to us, it appears from their

1   communications that the only voice mail that they have or

2   at least that they have collected to date is voice mail

3   that was on the custodians' hard drives.  It appears that

4   there has been no effort to collect voice mail in the

5   Audix system, which is the primary place that the company

6   has their voice mail.

7       With respect to the search terms, Your Honor, on

8   August 3rd, ordered the parties to meet and confer

9   post-haste to involve a technically sophisticated

10  representative from AstraZeneca's vendor.  On August --

11  that was a Friday.  The following Tuesday we asked for a

12  meet and confer with that technically sophisticated

13  vendor.  On Thursday, August 9, we had a meet and confer,

14  but it was not with a technically sophisticated vendor.

15      We then insisted on having that meeting with a

16  technically sophisticated vendor.  We didn't get that

17  meeting until August 15.  That meeting was actually very

18  productive.  We figured out a number of things that we

19  couldn't figure out the week before.

20      We submitted our final new keyword list to

21  AstraZeneca on the 17th.  They would not agree to just run

22  the list.  They said they would run a report which would

23  show whether or not our terms were overbroad, and that

24  after we had the report, we would meet and confer on the

25  final list to be run.

1    We were supposed to have that list within a week of

2    August 17th.  We didn't get it until August 30th.

3        We took a look at the list.  Some of our terms

4    weren't on it.  We asked AstraZeneca about that.  They

5    told us those terms weren't on it because there were no

6    hits.  Within two hours of getting that explanation from

7    AstraZeneca, Mr. Jaffe proved that to be an impossibility.

8        On Friday of last week, AstraZeneca confirmed that

9    Mr. Jaffe was right.  They have confirmed to us that they

10   have technical issues with how they ran the report, making

11   it completely useless.  Meaning we could not even meet and

12   confer with them last week about the search terms to be

13   used.

14       We were supposed to get the new report yesterday.  I

15   don't believe we have it yet.  So as we sit here today, we

16   don't even have the ability to reach an agreement with

17   AstraZeneca on the new search words.

18       The report that we received on the search words did

19   reveal that there are thousands of documents, relevant

20   documents that we do not yet have.  Their vendor told us

21   those numbers that were on the flawed report will

22   increase.

23       So this isn't some theoretical exercise.  We're

24   talking about finding thousands and thousands of documents

25   we should have had many months ago that we don't have yet.

1    Another thing we discovered, technical issues, it's

2  very troubling, there were documents, Your Honor, from the

3  original search word list, such as "Seroquel," that are in

4  the discard pile.  In other words, they were collected,

5  they were looked at, using their original search word

6  list, not produced.  There are hundreds of documents with

7  the word "Seroquel" in the discard file.

8    They gave us an explanation for that in an e-mail

9  maybe ten days ago or a week ago.  They said it was --

10  they've run it down, they've limited -- they were able to

11  confirm it was this group of 600 documents, something like

12  that.

13    We had the opportunity to talk to their vendor on

14  Friday.  I talked to him personally.  And over the course

15  of that discussion, that vendor confirmed that they had

16  not yet begun to investigate how those documents got into

17  the discard pile and they didn't know the magnitude of the

18  problem.  That was Friday, September 7th.

19    So it's just -- it's incredibly frustrating and

20  troubling that virtually every item that we brought to the

21  Court's attention on July 26th is not only unresolved, but

22  there's no date for resolution.  There are problems that

23  haven't even been looked into.

24    And so now we are weeks and weeks behind on multiple

25  fronts just in the last six weeks.  More weeks we have

1    lost on every front.  And that's why we believe, Your

2    Honor, we need a technical adviser who is technically

3    sophisticated who will go in and actually investigate and

4    find facts and report facts to you and the parties.

5        We don't -- we've literally met and conferred by

6    e-mail or conference call every day for the last month,

7    I'm certain with including e-mails it's multiple times a

8    day.  It's not meet and conferring that's our problem.  As

9    the problem with the search word term list reveals, we

10   meet and confer, we get information, we call out problems

11   to AstraZeneca's attention, they go off, come back and

12   tell us they have investigated.  They give us what they --

13   what they think the answer is, and they're wrong.

14       If we didn't have technical people on our side like

15   Mr. Jaffe and Mr. Martin investigating their explanations

16   for problems, we would just be missing, I don't know how

17   many thousands of documents.

18       So we have huge problems, and the pace has not

19   increased.  The sense of responsibility from AstraZeneca's

20   side does not appear to have changed, which is just

21   shocking to us, given the fact of this Court's order.  And

22   frankly we're at a loss.  We do need that technical

23   investigator to find facts.

24       And at some point soon, we hope that investigator

25   will be able to report facts so then we could finish our

39

1   motions to compel, our motions for sanctions, seek

2   remedies from Your Honor, because nothing's changed.

3            MR. MCCONNELL:  Your Honor, I agree with about

4   half of what Mr. Gornick said, which perhaps is another

5   reason why, as he also said, we do need the IT expert in

6   place sooner rather than later.

7        And one function of that IT expert besides engaging

8   in fact finding and helping us arrive at solutions is

9   also, much as the way the PMO did today, I think it would

10  be very helpful for Your Honor to have an unvarnished,

11  unbiased presentation of what the facts are and what has

12  really gone on between the parties.

13       So, for example, Mr. Gornick said that they wanted

14  the actual search to be run on all these search terms,

15  including search terms that were disputed between the

16  parties, like "FDA."  That's not true.

17       What the plaintiffs proposed, which I actually

18  thought was a sensible approach, was to run a search and

19  just come up with a report.  That was their proposal and

20  that's what we're doing.

21       Now, it's true that we ran the searches and then we

22  found out on Friday from the vendor that there was a human

23  error by the vendor in the way they put together the

24  search, and that's got to be fixed, and we said that we

25  would rerun it, and we said we would rerun it and we

1  wanted to talk again on Monday.  And yesterday our side,

2  Mr. Dupre, sent an e-mail to the plaintiffs and said ready

3  to talk and never got a response.

4      But it's correct the search wasn't done correctly and

5  it needs to be done correctly, and that's another area

6  where the IT expert is going to be important to come in

7  and help us fix -- I mean, I think the emphasis really is

8  that the IT expert needs to come in and help us fix the

9  problem, and the IT expert needs to have a kind of

10  capacity not only to address technical issues, but also to

11  have a litigation understanding, because as Your Honor

12  said in the last hearing, one thing that the IT expert

13  should do is have an understanding as to what's doable and

14  how hard it is to do things, too.  I think that's part of

15  the analysis for Your Honor to consider.

16      But there is an increased urgency, and let me explain

17  what's going on.  We have had a lot of meet and confers.

18  Mr. Gornick is right about that.  We have been very frank

19  and transparent and been willing to talk as much as

20  possible, and are still willing to do that.

21      In addition, you have heard a lot about vendors.

22  Your Honor has correctly cited the Sedona Principles, that

23  we're on the hook for whatever our vendors do.  You're

24  absolutely right about that.

25      What we've done is, we have actually added another

1    vendor.  We think we have already selected what even the

2    plaintiffs' expert says was a top five vendor.  We've got

3    another if not top five vendor, maybe top one vendor, and

4    that's FTI.  We have added FTI and we've got Mr. Bill

5    Adams.  He's here in the courtroom, and he's already

6    helping us investigate the issue and put together

7    solutions.

8        In addition, as Your Honor perhaps noticed at the

9    outset, when the lawyers introduced themselves, we have a

10   added a new members of our team, and that's Mr. Robert

11   Pass, who's with the Carlton Fields firm in the

12   Tallahassee office and is a member of the Sedona

13   Conference.

14       So we are doing everything we can to get on top of

15   these issues.  We're proactive and we're trying to solve

16   them.  We haven't solved all the problems yet, but we're

17   trying to, and with the help of our new technical experts

18   and FTI and Mr. Pass and with the IT expert, I hope we

19   will be able to do that.

20       While on the subject, Your Honor, I did mean --

21   something I should have raised before, but we are going to

22   have to talk with these people that you've proposed to us,

23   Mr. Daly and Mr. Ball, who on paper seem very well

24   qualified.  We need get to back to you, and I presume this

25   week, and I just want to understand how you want us to do

1  it, whether it's formally, informally, a letter or

2  stipulation, but we do need to do that.  However you want

3  us do it, that's how we'll do it.

4      Your Honor, with your permission, I would just like

5  Mr. Pass to come up and introduce himself very briefly for

6  the record.

7          MR. PASS:  Good morning, Your Honor.  I will be

8  brief.

9      I haven't previously been involved in this case.  I

10  have been involved for about I think nine days, as I stand

11  here today.

12      Just a follow-up on what Steve was saying, so you

13  know what I hope to bring to help this process along.  I

14  formed and am the head of the e-discovery task force that

15  oversees all of our firm's seven offices of electronic

16  discovery and all kinds of litigation.  I have been doing

17  that for several years now.

18      I am a member of the Sedona Conference, the working

19  group on electronic, ESI retention and production

20  principles.  I've published in the field, spoken in the

21  field.  I've advised clients around the country on

22  e-discovery compliance.

23      One of the steps that AstraZeneca has taken that

24  involves me is to establish in the last ten days or so a

25  special technical committee within the company which I am

1  chairing.  It had its first meeting late last week, which

2  involves not only representatives of the existing defense

3  legal team, but in-house IT technical experts, the new

4  vendor, FTI Consulting, that were introduced two months

5  ago.

6       And one of the other steps that we're taking is to

7  interview and retain a technical expert to advise the

8  committee, to assist in the meet and confers, which I will

9  be taking over, and in appearing in court as may be

10  necessary, and to work as necessary with whoever the Court

11  ends up appointing as the special master consultant,

12  whatever it may be.

13       So that is what we are doing.  I am working very hard

14  to get up to speed very rapidly.  I hope to be able to

15  assist in this process and make an impact and a difference

16  very quickly, because I read transcripts and I understand

17  the Court's directions in that regard.

18            MR. GORNICK:  Since we segued into the concept

19  of an IT adviser, may I follow up on that?

20            THE COURT:  All right.

21            MR. GORNICK:  Your Honor, the problems we have I

22  do not believe require the assistance of people who know

23  what the Federal Rules say.  I don't think we need the

24  assistance of people who can advise the parties on what

25  their obligations are.  I think that AstraZeneca knows

44

1  what the obligations are.  I think this Court is probably

2  uniquely qualified on this particular subject matter, as

3  far as I can tell in my experience.

4      What we need is somebody who can figure out how we

5  get the voice mails out of the Audix system and how long

6  it will take, how big the databases are, what it means to

7  extract the data, how long it will take, what the unique

8  problems might be with legacy databases, what the issue is

9  with those alternate e-mail boxes which AZ denies the

10 existence of that we believe we have proved the existence

11 of.

12     We have hard-core technical issues that are keeping

13 us from moving forward, and we need technical people who

14 could go, look, and report on the facts.  We don't need

15 help on figuring out what the law says.  We don't need

16 help on figuring out what the Sedona Principles mean.

17     We truly need the technical people to roll up their

18 sleeves, get inside AstraZeneca, look at their quality

19 control documents, look at their blueprints for how they

20 collected data in the past and decided to produce it, to

21 look at their databases, to look at their e-mail systems.

22     We need that technical fact finder to investigate and

23 report, and I just don't see how we will move forward

24 without that kind of adviser.

25     That brings me to the forms of order.  Your Honor has

competing forms of order for the technical adviser.  We

attached ours to our motion.  AstraZeneca attached their

and ours to their motion.

And essentially the difference in the proposals is,

we're asking the Court to give the technical adviser,

whoever that may be, clear direction on the issues that

need to be investigated, and the issues that we address in

our order are the issues we proved at the sanction

hearing.  The e-mails, the voice mails, the fax

attachments, the track changes.  To look at those issues.

The databases.

Another point of difference between our order and the

AstraZeneca order is our proposed order would give the IT

adviser clear authority to investigate, clear authority to

have unfettered access to the appropriate people inside

AstraZeneca.  Clear authority to see the quality control

documents, the collection and production blueprints, if

you will.

We are on an incredibly compressed schedule.  Every

week that goes by, the plaintiffs are losing time.  The

prejudice is compounding.  A way to jump-start this is to

give the IT adviser the documents which AstraZeneca has.

Mr. Dupre described them on July 26th, describing the

collection blueprints, the quality control documents.

That's the jump-start.  Unfettered access to the

1    AstraZeneca IT people who will give the adviser a

2    jump-start on the investigation.

3        So we would ask this Court to consider our proposed

4    order, the detailed direction to whoever the IT adviser

5    is, and we would also ask whoever that adviser is going to

6    be, that needs to be someone who either has the technical

7    people or the ability to investigate facts, technical

8    facts, or someone who has those people in his or her

9    employ immediately available.

10       Thank you.

11           MR. MCCONNELL:  Your Honor, just very briefly.

12   I'm not going to rehash what's in the papers, because it's

13   pretty clear to me that you read the papers.

14       I think an IT expert should be technically adept.

15   It's pretty hard to believe that the two people that Your

16   Honor proposed wouldn't fit into that category.

17       It does seem to me that Mr. Gornick has a rather

18   crabbed view of what it is the IT expert is supposed to do

19   in this case.  As I went back and looked at the

20   transcript, read Your Honor's words, of course I was

21   there, I think that Your Honor's view of the IT expert's

22   role is a little bit more holistic than Mr. Gornick's.

23       And frankly, listening to Mr. Gornick talk and

24   reading his papers, it almost appears as if the plaintiffs

25   view the IT expert to be an extension of them.  Namely,

47

```
 1    that he's supposed to come in and document the case for

 2    sanctions, and just to give the plaintiffs whatever it is

 3    they want.  That's not quite the way Your Honor put it.

 4    That's not quite the way we proposed it, and that's not

 5    quite the way that any reasonable IT expert would

 6    function.

 7        In fact, I think that the PMO that Your Honor

 8    appointed in this case provides a good model.  This is

 9    really supposed to be somebody who's supposed to make the

10    process work and to fix things.  That's what we want to

11    do.

12        Obviously to fix things, you have to understand what

13    went wrong.  But you also have to be in a position not

14    only to have the technical expertise, but you have to have

15    some litigation sense as to what's really possible.

16        We're not asking for an IT expert to make legal

17    decisions.  That's for you.  But we do need somebody to

18    come in and be able to make assessments and judgment

19    calls, and I think that's the track that Your Honor is on,

20    and I think that's the track that we ought to proceed on.

21        Thank you.

22            THE COURT:  All right.  Let's move on to the

23    next issue raised by the plaintiffs, which was some

24    reference to getting specific information about the

25    detailers.
```

1           MR. MAGAZINER:  I think that Mr. Bailey and I

2    have agreed that both that issue and the issue that we

3    raised under D1 related to case-specific discovery, those

4    issues are being resolved with the assistance of the PMO,

5    and I don't think that we need to trouble the Court with

6    them at this time.

7           THE COURT:  All right.  The next item on the

8    list, some issues about the plaintiff eligible list.

9           MR. PENNOCK:  Your Honor, we have come to an

10   agreement with the defendants, if it's agreeable to the

11   Court, that every two months the eligible list will be

12   updated with cases that both sides now agree should be

13   back on the eligible list.

14      In the interim, the plaintiffs will be able to put

15   cases on if it has become agreed that it's eligible, let's

16   say after four weeks.  We can still select it to go

17   forward for deposition, but the list will actually be

18   updated for the Court's selections every two months, if

19   that's agreeable to the Court.

20           THE COURT:  Okay.

21      And you had an issue about you don't want to pay the

22   doctors if you're not asking any questions.  Is that what

23   I understood that to be?

24           MR. PENNOCK:  Your Honor, that is an issue that

25   Ms. Martines, who's dealing with the CMO or the PMO, I

```
 1   believe that issue is being resolved through the PMO.

 2           THE COURT:  All right.  Then we've got

 3   AstraZeneca's issue about getting the Zyprexa

 4   settlement --

 5           MR. MAGAZINER:  Number one is off the table.

 6   I'll explain it.  The Zyprexa issue, we're making very

 7   good progress on that, I'm happy to report.  I think we're

 8   very close to resolution and to the moment when we will be

 9   able to present the Court with a stipulated order.

10           THE COURT:  All right.

11       Okay.  Here's what I had in mind, which is between

12   the parties.  You -- that the parties report back to the

13   Court by Friday about these two individuals that I've

14   suggested.

15       Obviously you don't agree as to the exact scope of

16   duties and the form of order.  I'll deal with that.  But

17   in terms of the individuals, after you've had a chance to

18   do this joint interview, if you could submit, I hope, a

19   joint statement as to your positions as to acceptability,

20   preference or whatever, or objections, if you've got a

21   specific objection you want to pose for some reason, set

22   that forth, and then I'll take that along with the

23   proposals from the parties and I'll appoint somebody.

24       My thought was -- and I'll have a form of order for

25   that which will direct that person to get right on it and
```

1    report back before the end of the month on the issues that

2    I directed him to report on, and my thought is that that

3    would accomplish, start to accomplish a great many

4    purposes, including the improved flow of information, but

5    also -- which is the main goal here, but also providing

6    the plaintiffs with enough information to -- for problems

7    that aren't resolved, to put those forward if they think

8    they're entitled to another motion to compel, or to finish

9    dealing with the issues that were raised in my order on

10   sanctions, that all of that will be teed up, if not in

11   that report, at least very close to being so, so we can go

12   forward for the rest of the case.

13       I have not talked to Judge Conway about this.  It

14   seems evident to me, based on the problems we have had,

15   some of which I've meted out some responsibility, and

16   others that are just circumstances, that we have got some

17   problems with our schedule.

18       So I will talk to Judge Conway about that and see

19   what she's thinks.  It was her probably vain hope that

20   this MDL would be done before she assumes the duty of

21   Chief Judge in the district, which she's scheduled to do

22   next August.  She's going to have a lot on her hands.  Let

23   me just put it that way.

24       That's something to think about between now and our

25   next status conference, which I'm thinking about having on

 1    October 2nd.  Hearing no objections.

 2              MR. PENNOCK:  That's fine, Your Honor.

 3              MR. MAGAZINER:  Fine for defendants, Your Honor.

 4              THE COURT:  All right.  Set that for 10:00.  The

 5    petty offense docket immediately precedes that.

 6       All right.  That's where I'm heading.  Any thought or

 7    issues from the plaintiffs?

 8              MR. PENNOCK:  I don't think there are any

 9    further issues that the plaintiffs need to present at this

10    time, Judge.  Thank you.

11              MR. GORNICK:  Just for scheduling, do you

12    anticipate that to be a 10 to 12 or an all-day event, on

13    the 2nd?

14              THE COURT:  Well, as of now, I don't have

15    anything else on the calendar except petty offense docket

16    that will precede it.  I do have a trial later that week,

17    but we won't go until then.

18              MR. MCCONNELL:  Your Honor, one last thing, if I

19    may.  It does seem that these status conferences over time

20    have acquired this aroma of it being a vehicle for the

21    parties to snipe at each other.  I'm not sure that's

22    really appropriate.  I want to say --

23              THE COURT:  There was less sniping today than

24    we've had in the past.

25              MR. MCCONNELL:  I agree with you, and I do want

1   to say, to report sort of the other side of things, I took

2   a deposition of one of the plaintiffs last week at the

3   Bailey firm in Houston, and it was -- the facilities were

4   excellent.  The lawyers there from the plaintiff's side

5   were very courteous.  It went like clockwork.  We started

6   early.  Everything went very well.

7       So I did want to thank the plaintiffs' attorneys for

8   making the process work so well, and I hope a lot more of

9   that happens.

10          MR. PENNOCK:  Judge, we will do what we can to

11  fix that.

12          THE COURT:  As I said last time, there's an

13  awful lot about this case that's very hard and justifiably

14  contentious, but there are other things that are not.  So

15  let's -- for the things that are not, let's make the most

16  of those and make the best of the rest.

17      All right.  We're in recess.

18              (End at 10:54)

19              C E R T I F I C A T E

20      I certify that the foregoing is a correct

21  transcript from the record of proceedings in the

22  above-entitled matter.

23

24  _____          _____

25  Sandra K. Tremel