```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       ORLANDO DIVISION

 3             Docket No.6:06-MD-1769-Orl-22DAB
      . . . . . . . . . . . . . . . ..
 4    IN RE:                          :
      SEROQUEL PRODUCTS LIABILITY     :
 5    LITIGATION                      :        Orlando, Florida
      MDL DOCKET No. 1769             :        October 2, 2007
 6                                    :        10:00 a.m.
      ALL CASES                       :
 7                                    :
      . . . . . . . . . . . . . . .:
 8
                  TRANSCRIPT OF PRETRIAL CONFERENCE
 9            BEFORE THE HONORABLE DAVID A. BAKER
                  UNITED STATES MAGISTRATE JUDGE
10

11    APPEARANCES:

12    For the Plaintiffs:        Paul Pennock

13                               Richard Laminack

14                               F. Kenneth Bailey

15                               K. Camp Bailey

16                               D. Renee Baggett

17                               Craig Ball

18                               Buffy Martines

19                               Holly Wheeler

20                               Angela Nixon

21    Court Reporter:  Sandra K. Tremel

22

23

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer-aided transcription.
```

```
1    For the Defendant

2    AstraZeneca:                    Fred Magaziner

3                                    Stephen J. McConnell

4                                    James Freebery

5                                    Robert Pass

6                                    Robert Ciotti

7                                    Liz Balakhani

8

9    Special Master:  Orran Brown

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2         THE DEPUTY CLERK:  The case number is
 3   6:06-md-1769-Orl-22DAB, In Re: Seroquel Products Liability
 4   Litigation.
 5      Counsel in the courtroom, please state your
 6   appearances for the record.
 7              MR. PENNOCK:  Paul Pennock for plaintiffs.
 8              MR. CAMP BAILEY:  Camp Bailey for plaintiffs.
 9              MR. LAMINACK:  Rick Laminack for plaintiffs.
10              MS. WHEELER:  Holly Wheeler for plaintiffs.
11              MR. KEN BAILEY:  Ken Bailey for plaintiffs.
12              MS. MARTINES:  Buffy Martines for plaintiffs.
13              MS. BAGGETT:  Reneé Baggett for plaintiffs.
14              MR. MAGAZINER:  Fred Magaziner for AstraZeneca.
15              MR. MCCONNELL:  Steve McConnell for
16   AstraZeneca.
17              MR. PASS:  Robert Pass for AstraZeneca.
18              MR. FREEBERY:  Jim Freebery for AstraZeneca.
19              MR. CIOTTI:  Robert Ciotti for AstraZeneca.
20              MS. BALAKHANI:  Liz Balakhani for AstraZeneca.
21              THE DEPUTY CLERK:  Counsel on the phone, please
22   state your appearances.
23              MR. BROWN:  This is Orran Brown the special
24   master and PMO.
25              MR. BALL:  This is Craig Ball.  I believe I have
```

1   been appointed special master for IT matters.

2          MS. CRANFORD:  Ashley Cranford for the

3   plaintiffs.

4          MS. NIXON:  Angela Nixon, noncounsel for

5   plaintiffs.

6          THE COURT:  Anybody else on the phone?

7      All right.  Let me start first, see if Mr. Brown, PMO

8   has any comments.  I know your formal report is not due

9   for a couple weeks.  So any quick thoughts?

10         MR. BROWN:  Yes, Your Honor.

11     If I heard you correctly, quick thoughts on where we

12  stand and we did want to discuss with the Court a plan we

13  have been working for transitioning to designation of

14  cases for case-specific discovery 60 days in advance

15  rather than the 30 days in advance that CMO4 has

16  implemented thus far.  It's an issue that came up in our

17  last status conference, and I have been working with the

18  parties' representatives since then to come up with a

19  program that we wanted to review with you.

20         As a highlight of a report on how it's going, we have

21  been working with the representatives of the plaintiffs

22  and defendant to schedule physicians depositions, and

23  parties are still scheduling the plaintiff and the sales

24  representatives' deposition witnesses for depositions each

25  month with 30 cases a month.  And as I reported last time,

1    and as reported in our first written report, we are making

2    a lot of headway in getting these schedules and trying to

3    reach solutions to any of the logistical impediments that

4    we're having primarily with the physicians about their --

5    some of -- they range, as you can imagine, from witnesses

6    who are fully cooperative in providing the records to

7    witnesses who do not do depositions if they can avoid it.

8    And we're generally able to work through those problems.

9        And as I reported last time, continue to encounter

10   outdated contact information from physicians that we have

11   to update with the parties' assistance.  We have some

12   physicians who are deceased and we have to usually find

13   replacement physician to serve as a witness.  We have some

14   physicians that we are really unable to locate, and

15   generally that means that the parties need to select

16   another potential physician from the fact sheets to

17   designate as a witness.  And we have the processes in

18   place working with the parties to make that happen as

19   fluidly as possible.

20       We have not yet been successful in scheduling every

21   physician deposition for the month in which the case has

22   been designated partly because for the September cases, we

23   came onboard right as that was on the cusp of being

24   scheduled.  So we were calling people in September for

25   September depositions which made that a little difficult,

1    but we were successful in scheduling a lot of them in

2    September and ultimately most of the rest of them in

3    October or thereabouts.  We still have some cases from

4    September that we're trying to schedule.  For example,

5    about eight of them where we're unable to locate the

6    doctor or there's some issue that, logistical issue that

7    is holding us up.  But we have a full court press on with

8    the parties, and the parties do -- to make those

9    scheduling -- solve those scheduling problems and to work

10   through them.

11       For October we have gotten designations for a total

12   of 48 physician witnesses.  We have successfully scheduled

13   17 of them thus far.  We have 10 of them that have

14   problems with a deceased physician or contact information

15   bad that we're working through.  We have the other 21

16   we're in the processes of talking to the doctors, getting

17   a date, waiting for return calls.

18       And we have developed internally here with the

19   parties' approval steps to keep the pressure on in a

20   relentless way to make that scheduling happen.  And what

21   we're seeing many times is that the physicians do not

22   respond to phone calls, do not return them.  And so if

23   we -- we have a schedule where we call them.  If we don't

24   hear back in 24 hours, we call them again.  If we don't

25   hear back in 48 hours from them, we send them, because we

1   usually have fax numbers, we send them the Court's order

2   that the Court recently entered at our request which

3   impresses upon them the importance of returning a call and

4   their duty to cooperate with us.  And that is more than

5   half of the time finally getting a reaction from the

6   physicians, and we're getting calls back.  There are still

7   some witnesses even after that that we do not hear back

8   from.  And we have a rule thus far that if we have not

9   gotten a call back from a physician's office within 10

10  days of the first calls, 24 hours, 48 hours send a

11  package, we go out to 10 days.  We send them a deposition

12  notice and a subpoena that we have completed and we pick a

13  date.  And thus far that is generally getting a call back

14  finally from a physician or a physician's lawyer.

15      As we work through the initial set of cases for

16  September and in October, we think we will hit the point

17  where we are successfully scheduling cases in the month in

18  which they are intended to be scheduled.  That is

19  definitely the goal.  And we think that one of the things

20  we're going to discuss about today in terms of designating

21  cases 60 days in advance will help us achieve that goal.

22      We have done -- we have modified some of our

23  processes and talking about further modifications about

24  obtaining medical records, because in each instance, thus

25  far, we are asking the plaintiffs -- the physician's

1    office to provide us medical records for either the

2    prescribing physician during the time that the product was

3    prescribed or a treating physician who's currently

4    treating the patient, the plaintiff, to provide those

5    medical records.  That process is working fairly well,

6    although we're discussing with the parties whether in some

7    instances it is somewhat redundant because the parties

8    collectively using a national collection service record

9    track have already canvassed most of these physicians and

10   have gotten medical records at some point before now.

11        And so we're studying the issue about whether we can

12   identify the instances where it may be redundant where we

13   cannot go through the step of asking for the records

14   again.  Maybe in some instances asking only for an update

15   or maybe not asking for them at all if parties recently

16   have obtained them through their other collection service.

17   We're trying to avoid duplication of any redundant effort

18   or any unnecessary costs.

19        The other issue that we wanted to make sure we

20   previewed with the Court today was the transition from

21   designating cases 30 days in advance, as CMO4 requires, to

22   designating cases 60 days in advance.  The 60 days in

23   advance we think will help us a lot getting the doctor's

24   attention first of all and then getting all their

25   calendars in the month in which they're supposed to be

1    deposed.  That requires a transition period moving from 30

2    days out to the 60 days out because we have phase-in

3    double tracking designations to get us to the point where

4    we can designate 60 days -- the parties and the Court can

5    designate cases 60 days out.

6         The parties and the Court are right now making their

7    designations on September and the early part of October

8    for the November cases which is the 30-day-out model.

9    We're working on making additional designations in October

10   for December cases and then shortly thereafter making

11   designations for the January cases which will then get us

12   60 days out.  And then starting the designations that are

13   being made in late November, they will be making

14   designations for February which will then put us on

15   60-day-out schedule.

16        That requires working with the parties to make sure

17   that we phase in the designations in a manner that they

18   can handle because parties have to designate their 10

19   cases and then their -- the other 10 cases from the

20   plaintiffs, and then the Court designates 10, and then

21   those designations trigger dates for defendants to

22   disclose documents relating to contact by the prescriber

23   with a sales representative which requires that the

24   defendants to dig through records and identify and round

25   those up and disclose those documents.  Case Management

1  Order 4 requires those disclosures within five business

2  days after the cases are designated.

3      And then the plaintiffs have to designate a sales

4  representative as a deponent they want to depose based

5  upon those document disclosures.  And Case Management

6  Order 4 says that occurs within two business days after

7  disclosure of the records.

8      So those dates have to be phased in along with the

9  designations to get us to the point of doing a 60 days

10  out.  And if we're double tracking designations starting

11  in October to catch, to phase in the cases for December

12  and January, those dates are also going to be doubled up.

13  So there's a lot of work the parties have to do to make

14  this happen, to phase it in the 60 days out.

15      We have been working with the plaintiffs' designated

16  representatives and defendant's counsel to make that

17  happen.  And we think that during the transition phase

18  while they're double tracking this, the five business days

19  for the defendants to disclose the sales representative

20  contact records should be extended to seven, and that the

21  plaintiffs should have four business days rather than two

22  to pick a deponent witness because they're going to be

23  doing so much of this at the same time.

24      We have been considering a transition phase that will

25  allow that to happen, changing the five to seven and two

1    to four.

2        We wanted to preview that with the Court and get the

3    Court's reaction to it.  And then we also have been

4    considering when to kick this off because we have been

5    working on a couple of models that would require, one of

6    which would require designations and the end of October as

7    normal for the December cases, and then about a week later

8    in November, early November, designating for the January

9    cases.  And we had talked about starting that with the

10   normal designations on the 26th of October.  We have also

11   talked about trying to accelerate that and do it a little

12   earlier if the parties can and if the Court has the

13   opportunity to consider this between now and then, to

14   start doing it on the middle of the month, on the 15th of

15   October, which would start getting us designations a

16   couple weeks sooner for the November -- the December and

17   January cases.

18       We have -- we will come up with a proposed order that

19   we can send the Court by the end of this week that would

20   express within that order the modifications that would be

21   required to Case Management Order 4 to make this happen

22   for the double tracking designations to get us to the

23   point of 60 days out, so that by the designations in late

24   November, it will be occurring for February cases.  That

25   will give us the cases sooner.  We will start on the

1   physicians sooner.  We think that will help.  And the

2   order that the Court will see this week, and we'll

3   contemplate phasing in the double designations in a

4   somewhat staggered manner so that it can be achieved.  And

5   then for the transition period, allowing the defendant's

6   disclosure of sales rep documents, seven business days

7   instead of five, plaintiff designating the sales rep

8   witnesses four business days after that instead of two

9   during the transition period.

10      We are also constantly working with parties to come

11   up with any other steps that we can to enhance the

12   efficiency of this process to make it work smoothly and

13   cleaner or faster, more with less cost.  And we don't yet

14   have a whole lot of experience to be able to identify any

15   other areas that we would change.  We think that right now

16   we should accomplish this transition 60 days out, and then

17   continually evaluate what else we can do, like the change,

18   perhaps, in the document collection that we're studying.

19   The parties now see if the documents that we're receiving

20   are redundant or they're helpful.  But it's a constant

21   process of reevaluating to see if there is a better way to

22   do this.  And if we come up with things, then we will

23   present those ideas to the Court as well.

24      The last thing worth mentioning, I think, Your Honor,

25   is that we do have a master calendar up in place.  We set

1    that up two week ago.  We forwarded to the Court a manual

2    to explain how to use it and assigned you a user name and

3    password should you choose to view it.  That is up and

4    running.  We're listing all the depositions and keeping

5    the master calendar.  We're also refining and improving

6    that as we go along.  Now working on the option to make it

7    searchable by case name, plaintiff name, and doctor names

8    so that if you're looking for a particular case in all the

9    depositions that have ever been done or assigned to in the

10   future, you can research it and it will show you each one.

11   And also if you're looking for a particular doctor's name

12   or witness's name you can search it and it will take you

13   to each one.  That's a feature that we're adding this

14   week.

15        So that's a quick report, Your Honor.  Maybe not as

16   quick as Court intended.  But we are going to present to

17   the Court an order to effect this transition to the

18   60-day-out change.  If that meets with the Court

19   expectations, we can present that this week.

20             THE COURT:  Do you anticipate that that order

21   will be agreed in all respects?

22             MR. BROWN:  Yes, Your Honor, I do.

23             THE COURT:  All right.  Then I don't have a

24   problem.

25             MR. BROWN:  Like we did before, it will be a

1  joint unopposed motion for an order to change that

2  schedule to make that happen.

3        THE COURT:  All right.  I'll look forward to

4  seeing that when it arrives.

5     I'd like you to stay on the phone. I'm going back to

6  an issue that may affect your role here later on --

7        MR. BROWN:  Yes, Your Honor.

8        THE COURT:  -- on the agenda.

9     Mr. Ball, let me welcome you to the courtroom here,

10  and ask whether since I talked to you last week, have you

11  had any further contact with the parties or were you just

12  waiting for today's hearing?

13        MR. BALL:  Waiting for today's hearing, Your

14  Honor.

15        THE COURT:  All right.  Parties have each

16  submitted at the Court's direction proposals with respect

17  to the scope of your duties.  I'm going to sift through

18  those disparate proposals and come up with an order and

19  turn the nuts and bolts of the ESI over to you, and,

20  hopefully, you will be able to solve some problems the

21  parties have been unable to solve.  And I'll -- we will

22  have you participate again in the next status conference.

23     I may require that you submit some sort of a report

24  as to the status of things.  And then I expect I'll be

25  hearing from either or both sides about -- as we move

1    through that, whether issues about your role ought to

2    change.

3         I'm going to ask parties very briefly to comment on

4    anything beyond what's in your written submissions that I

5    really don't want to argue at this point, but just

6    anything else that you want to comment on.  I'll get that

7    order out in the next day or two.

8              MR. PENNOCK:  Paul Pennock for the plaintiffs.

9    The only comment is timing.  In the next -- by

10   December 31, three months, we have third party discovery,

11   corporate witness discovery, database discovery.  We, of

12   course, have to review all those documents and get our

13   initial round of expert reports in.  And at this juncture,

14   we feel that we still, as the Court knows, don't really

15   have much to begin with.  And we're -- we feel very

16   handcuffed.  We feel that we have been prejudiced.  We're

17   continuing to be prejudiced.  And the only thing that

18   really disturbs me about the defendant's proposal, and I

19   agree with you, they're very disparate, and you can

20   probably combine the two and come up with what would be

21   the appropriate order.  But the thing that bothered me the

22   most, Judge, was the statement regarding monthly reports.

23   I kind of wanted to ask what planet have they been living

24   on for the last few months.  This is a monthly report.  We

25   have to have this stuff done this month and certainly by

1   next month.  And even next month is too far out.  And that

2   is the thing that concerned us the most is their kind of

3   just failure to recognize the very difficult timing

4   situation we're in.  But other than that, I think -- our

5   proposals, we discussed them at length and the problems,

6   and the proposals are before the Court.

7            THE COURT:  Anything from the defendants?

8            MR. PASS:  Your Honor, Robert Pass.  It's only

9   my second time here, I don't know if you remember who I

10  was.

11       Let me just address very quickly Mr. Pennock's

12  observations.  The inclusion of a reference to monthly

13  reports in our proposed job description is not intended in

14  the least to suggest or betray any desire to drag this out

15  at all.  We're ready to start meeting with Mr. Ball as

16  promptly as possible.  We want to move this forward.  This

17  was our idea in the first place to try to get things fully

18  on track and resolved.  So there simply needed to be some

19  sort of procedure by which there will be periodic reports

20  and we simply chose monthly.

21       Mr. Ball can report as frequently as the

22  circumstances allow.  So there's nothing suggested by that

23  in terms of delay.

24       The only other thing I would remark about is I'd like

25  to comply with the Court's order which directed that we

1    identify a lead attorney contact and a lead technical

2    representative.  I'll be the lead attorney contact, and

3    here in the courtroom today is the lead technical contact

4    which will be Carmen Field.  And I'd ask her just -- so

5    you know who she is.  Ms. Field is the person I referred

6    to when we were here last who is part of AstraZeneca's

7    response to the Court's order which included the formation

8    of special technical committee that I chair, the bringing

9    onboard of the new electronic discovery, additional new

10   electronic discovery vendor FTI Consultants and Ms. Field

11   who is with Daylock (phonetic) Forensic and Advisory in

12   New York City, is the information technology expert

13   adviser to AstraZeneca in connection with this case and

14   will work also with Mr. Ball.

15        THE COURT:  Okay.  Let me turn to the pending

16   motions that are in my bailiwick.  Number 492 is

17   AstraZeneca's motion regarding documents to be obtained

18   from Eli Lilly.  What's the plaintiffs' problem with the

19   proposed order with that?

20        MR. CAMP BAILEY:  On the motion they filed, we

21   have a disagreement as to the appearance that the only

22   issue being disputed is just the language of the order.

23   We said on the record last time we were down here that we

24   did not have a problem in assisting them in getting

25   plaintiff's medical records and other things that the

```
1    HIPAA authorization would allow them to otherwise get.
2        I think Buffy and the special master -- actually,
3    Orran Brown has been dealing with that and I know that
4    they have been in contact with Pepper Hamilton, the
5    lawyers for Eli Lilly, and they have some very strong
6    thoughts on disclosing any of information related to the
7    settlement amounts and the settlement documents and
8    submissions related to the settlements.  And Buffy may
9    want to add something as far as her conversations with the
10   PMO.
11       MS. MARTINES:  Good morning, Your Honor.  Buffy
12   Martines on behalf of plaintiffs.
13       The concern I have with the motion is that there may
14   be some overlap in what we're trying to do with Special
15   Master Brown and this particular motion.  The motion that
16   I reviewed calls for three things to be produced from
17   Lilly:  Medical records, litigation documents such as fact
18   sheets, pleadings, et cetera, and Section C which seems to
19   imply documents underlying settlements.  And Section C is
20   the concern.
21       What we have been trying to do with Special Master
22   Brown, and he can jump in any time he'd like, is that
23   Lilly does have very strong feelings about the
24   confidentiality of Zyprexa settlements and the documents
25   underlying them.  The Special Master has already
```

1   undertaken in camera review of the confidentiality

2   language of those settlements.  And I believe, and I'll

3   allow him to jump in, I believe he agrees that the

4   confidentiality provisions are very strong.  So I don't

5   believe the parties are very far apart on the production

6   of the medical records and perhaps the litigation

7   documents.

8        But Section C which discusses the underlying

9   documents related to settlements can be a sticking point.

10  I have also provided to the Special Master's office a

11  contact person from Lilly, and they would like to speak

12  with him on this matter.

13       So I think the biggest problem is there may be some

14  overlap between what we're trying to do with the Special

15  Master's office and this motion.  And I don't know if

16  Special Master Brown has a comment on that.  But I believe

17  within the next week he will be able to talk to the folks

18  at Lilly and hopefully try to figure this thing out.

19            MR. BROWN:  This is Orran Brown.  Would it be

20  helpful if I added to that?

21            THE COURT:  Well, let me ask defendants first.

22  I thought you had an agreement with Lilly they didn't

23  object to this?

24            MR. MAGAZINER:  This form of order has been

25  submitted to counsel for Lilly at Pepper Hamilton.  And as

1    recently as yesterday afternoon, counsel for Lilly

2    confirmed to me that they have no problem with the order

3    that we have submitted to the Court.

4         Now, the order does not contemplate, as Your Honor

5    will see, that Lilly will tell us the amount of a

6    settlement that has been made with the plaintiff.  What

7    the order contemplates is Lilly will give us any

8    submissions made by individuals who are plaintiffs in this

9    litigation in support of their efforts to settle their

10   claim against Lilly.

11        That's right on the face of order.  Lilly does have

12   an issue with our obtaining from plaintiffs, not from

13   Lilly, from plaintiffs, information about the amount that

14   was paid to a plaintiff or has been agreed to be paid to a

15   plaintiff to settle the claim against Lilly.  But that's

16   not covered by this order.

17        As to that latter subject, we intend to ask

18   plaintiffs, as we have already done in depositions taken

19   to date, how much they have been paid by Lilly or how much

20   Lilly has agreed to pay them.  If Lilly has a problem with

21   that, and I understand that they do have a problem with

22   that, then Lilly is going to have to raise that problem in

23   some appropriate forum which I take it might be in this

24   Court, could be in Judge Weinstein's court, could be in in

25   front of the special master, we will have to see how that

1    resolves.  Special master, meaning the PMO, Mr. Brown.

2    But that's not covered by this order.

3        So as to this order that we have submitted, Lilly's

4    counsel has --

5            THE COURT:  I want this resolved, and I'm going

6    to renotice this motion with Lilly being served and get

7    their response on the record.  I don't understand.  I

8    mean, I don't want to prejudge anything, but just because

9    they want to keep it secret -- it has an affect on this

10   litigation.  We have got to find out what's going on.

11           MR. MAGAZINER:  I certainly agree with that,

12   Your Honor.  It seems to me it's fundamental that we're

13   entitled to find out how much someone has been compensated

14   for an injury that --

15           THE COURT:  That's at least arguably related to

16   the injury -- the claim here.

17           MR. MAGAZINER:  Absolutely.  And I understand

18   Lilly has secured from each of the plaintiffs a promise

19   that the settlement amount would be kept confidential.

20   And that creates an issue to me.

21           THE COURT:  It's a dilemma for the plaintiffs

22   which -- well, I mean you know my general attitude about

23   confidentiality on this thing.  I mean, I'm just --

24           MR. MAGAZINER:  As Your Honor said, it creates a

25   dilemma for the plaintiffs.  But I do ask if the Court

1    would approve the order that we have submitted, it would

2    at least get us started.  And I don't understand even from

3    what Ms. Martines said there is any issue with this order.

4    This order does not require that plaintiffs divulge or

5    Lilly divulge the amount of any settlement between the

6    plaintiff and Lilly.

7             THE COURT:  All right.  Next is defendant's

8    motion for extension of time to complete some more of the

9    custodial production.  What's plaintiffs' position?

10            MR. LAMINACK:  Rick Laminack for plaintiffs,

11   Your Honor.

12       It's our position -- I guess if they need to file a

13   motion on everything they produce because it's our

14   position that we've never been given from day one adequate

15   documentation.

16       Here's the situation we're in so the Court knows.  We

17   start general liability depositions next week.  First up

18   is the person in charge of direct to consumer marketing.

19   As one might suspect, their promotional materials would be

20   relevant to that deposition.  Unfortunately, we don't have

21   those.  Or more accurately, we don't have them in a format

22   that we can access the information.

23       So in a week we're supposed to depose the person with

24   most knowledge of the documents involving Lilly --

25   AstraZeneca's promotional materials and we don't have

1    them.  And we can sit here all day and cite examples of

2    this.  As we depose doctors -- you heard Mr. Brown talking

3    about how difficult it is to schedule doctors.  One of the

4    key things we asked for in doctor's depositions prior to

5    the deposition is how much money has AstraZeneca paid you.

6    And time after time we get sworn affidavits from

7    AstraZeneca lawyers saying nothing only to find out that

8    that's not true.

9        So we are taking depositions without correct

10   information.  We are about to begin taking depositions

11   without the necessary information.  And obviously what

12   we're going to need -- and I want to make it real clear to

13   the Court, we do not want to postpone these depositions.

14   That would be rewarding their bad behavior.  We are going

15   to need time, additional time to file reports because we

16   don't even have the documents necessary to show our

17   experts.  We're probably going to take more than the 25

18   general liability experts because what we know now is we

19   have had to pick the 25 in the dark without the benefit of

20   the documents.  So I have no doubt that they need more

21   time.  But you see the problem that creates for us.  And

22   want to emphasize we don't want them to benefit by

23   problems of their own making by postponing these

24   depositions.

25        Thank you, Your Honor.

1           MR. MCCONNELL:  Your Honor, I'll be very brief,

2    Your Honor, because I actually didn't hear much discussion

3    of the motion.  And I get the strong sense that Your Honor

4    reads these motions pretty careful and I'm not going to

5    repeat what we said.

6           We just -- because of the issues with European

7    privacy laws, and we had problems being able to process

8    the documents for the Canada custodians.  Three domestic

9    custodians is just sort of a puzzle why we can't find the

10   stuff.  We're trying to find it.  That's why asked for the

11   extension because we just were unable to produce the

12   documents by the October 1 date, and that remains the

13   case.

14          I don't even know where to begin to address

15   Mr. Laminack's points which are things that we have heard

16   before.  I will say that he made a reference to sworn

17   affidavits from AstraZeneca lawyers about nonpayment to

18   doctors.  I don't know what he's talking about.  It's

19   absolutely not true.  And I will say this, I can only talk

20   about what I know from personal experience.  I was at a

21   deposition last week of two doctors in one of these cases.

22   The PMO did a great job getting them scheduled.  We showed

23   up.  The inquiry by the plaintiffs' attorney was

24   searching, comprehensive, effective, made use of the --

25   all the call notes and those materials.  I did not observe

1    any disability.  Granted that's only one deposition.  And

2    that's really all I have to say about those other points

3    raised by Mr. Laminack.

4            THE COURT:  Well, at some point we're going to

5    have to come to grips with the effects of the issues that

6    we have had to date completing the opening rounds of

7    discovery and how that affects parties' ability to prepare

8    the rest of the case.  I'll simply make the observation

9    that most of the issues that are raised in the motion is

10   justification for not being able to meet the deadline.  It

11   really seems to me to be things that from a year ago,

12   really now over a year ago, could have and should have

13   been anticipated so that they weren't coming up as an

14   impediment now.

15       I'll make a ruling on that motion.

16       All right.  Let me -- next item on my agenda is the

17   issue of what I'll call Florida-related cases.  Plaintiffs

18   filed a list of cases that they have indicated plaintiffs

19   agreed to have transferred here.  I suspect the defendant

20   has other cases that they think are Florida related that

21   ought by the same consideration be transferred here.  I'm

22   back to the issue I raised a couple months ago is how we

23   accomplish the actual transfer of the ones plaintiffs have

24   agreed and for the ones that AstraZeneca wants to add to

25   that list, how we tee that up for either this Court's

1   consideration or the panel or the transferor court.

2       Let me ask plaintiffs, with respect to the ones that

3   you listed, who do you think is required jurisdictionally

4   to accomplish the transfer?

5           MR. CAMP BAILEY:  Under my understanding if the

6   parties agree and the plaintiffs agree to lay venue here

7   directly in the Middle District of Florida, we can either

8   file an amended complaint or we can have an order allowing

9   us to file, in essence, a new original complaint which

10  relates back to the original complaint laying venue in

11  this Court and proceed forward as it were an original

12  filed case in this jurisdiction and go forward as if it

13  was a --

14          THE COURT:  Without any order from the

15  transferor courts or from the multidistrict panel?

16          MR. CAMP BAILEY:  That's my understanding is if

17  we agree as parties to the litigation to lay venue here as

18  an original matter, it's treated as an original matter as

19  opposed to a 1407 transfer.

20          THE COURT:  Mr. Magaziner, do you want to

21  address what I anticipate to be your position based on

22  what we discussed earlier?

23          MR. MAGAZINER:  Yes, sir.

24      Just to dispel any confusion here maybe, we're not

25  going to agree or consent to the filing of amended

1    complaints in a handpicked group of cases.

2              THE COURT:  I assumed that.

3              MR. MAGAZINER:  So Mr. Bailey's suggestion is

4    correct, that if we were willing to agree by agreement, we

5    could no doubt effect a transfer or create new cases here

6    and dismiss cases that have been filed elsewhere with some

7    such procedure, if we agree.  But we're not going to agree

8    to a selective transfer.

9         So Mr. Bailey might address the question of what --

10   how cases would be transferred in the absence of our

11   agreement since that is in fact the state.  Now what we --

12             THE COURT:  What I'm interested in is, quite

13   frankly, getting the Florida cases here and not just hand

14   selected ones.  I really want any that -- and there may be

15   some on the margin where there's a debate about whether

16   they're really Florida cases or has moved, but for the

17   ones that somebody decides have a Florida connection, I

18   think they ought to be here.  How many do you think are in

19   that universe?

20             MR. MAGAZINER:  My recollection is that there

21   are something like 200, in the neighborhood of 200, Your

22   Honor.

23             THE COURT:  And plaintiffs have listed 100

24   something or --

25             MR. MAGAZINER:  No.  They have listed 34.

1         MR. CAMP BAILEY:  I think there's 160 some odd

2    that are not subject to a motion for dismissal that are

3    actually still live cases in the MDL.  And I think 38 or

4    so were on the list.

5         MR. MAGAZINER:  I don't --

6         MR. CAMP BAILEY:  They consented now to an

7    immediate transfer or to voluntarily lay jurisdiction

8    directly here in this Court.

9         MR. MAGAZINER:  I don't want to either agree or

10   disagree with Mr. Bailey's numbers because I'm not exactly

11   sure.

12        THE COURT:  Ballpark here.

13        MR. MAGAZINER:  But it is a ballpark of, let's

14   say, between 160 and 200 Florida resident cases.  There

15   may be some of them in which the Florida resident recently

16   moved here and all the pertinent events occurred somewhere

17   else.

18        THE COURT:  That's what I'm saying.  Those are

19   ones that maybe shouldn't be transferred.

20        MR. MAGAZINER:  Right.  But as to the rest, we

21   would think that they should all be transferred here and

22   we think we can do that by filing a forum non conveniens

23   motion asking the Court to transfer those cases.  The

24   Court has jurisdiction over those cases now because

25   they're part of MDL and they could be transferred to this

1    Court forum non conveniens basis.

2            THE COURT:  But who has to that under lexicon?

3    The transferor court?  The panel?  Or can this Court?

4            MR. MAGAZINER:  I -- we briefed that issue

5    before.  I'll be happy to brief it again -- or actually,

6    review the briefs we filed before and reeducate myself.

7    But I think that what lexicon clearly prohibits is a

8    transfer to this Court of a case that has nothing to do

9    with Florida other than for the purpose of trying it here.

10   I don't know that lexicon --

11           THE COURT:  I'm not sure it speaks to it either.

12   That's why I'm a little bit at sea myself.

13           MR. MAGAZINER:  Lexicon prohibits this Court

14   from transferring a case on a forum non conveniens basis

15   that it would be consistent with transfers that courts

16   usually make where the -- all the events at issue occurred

17   in the forum different from the forum where the case was

18   filed, which would be the case here because all of these

19   cases that we're talking about are -- almost all been

20   filed in Massachusetts which has nothing to do with any of

21   the events at issue.  So we would contemplate filing an

22   appropriate motion to transfer all of the Florida cases

23   from the district in Massachusetts to the Middle District

24   of Florida.

25           THE COURT:  Well, here's what I would look do to

1    tee this up.  And there's a reason I'm doing all of this.

2    I'll explain in just a moment.

3         I want you to go ahead and file that motion to -- and

4    since, as you just discussed Mr. Bailey's proposal

5    doesn't work unless you agree and you're not going to

6    agree to their selection of the ones.  And whether that's

7    lawyers or plaintiffs, I don't really care.  I certainly

8    understand your point on that.  So you would be moving to

9    transfer the 160 or the 200 or however many it is based on

10   your reading of Lexicon.  And then plaintiffs could

11   respond and say, "We think lexicon prohibits that.  We

12   think if you're going do it, you have to do it this way or

13   you can't do it, or we can't do it until everything is

14   over," whatever your position is.  I'm not telling you

15   what your position is, but I'll -- and then if there's

16   also some of them on the 160 to 200 that you just don't

17   think fit even under their theory of forum non conveniens,

18   if they're not really Florida cases, you can raise that as

19   to the specific ones.  And I'll review -- I don't know

20   whether I'm going to do that or Judge Conway, but one of

21   us will look at the -- ultimately I think if I have do it,

22   it would be on a report and recommendation.  If Judge

23   Conway does it, obviously an order.  But we will look at

24   those issues and then make a determination whether we can

25   do it in our view of the law and the facts of what I'll

31

1    call the marginal cases.

2          MR. CAMP BAILEY:  And I'm not an expert on

3    lexicon, but I do think we would -- we think that the

4    lexicon decision would prohibit a voluntary transfer by

5    this Court to itself under the Lexicon decision.

6          THE COURT:  Well, that's certainly one reading

7    of the tenor of lexicon.  But this set of facts is not

8    what was before the Court in Lexicon.  So I think that's

9    an open issue.  What I'm leaning towards, and I'll be

10   frank about it, again without prejudging anything or at

11   least I'm not prejudging it, it's my goal to get, if we

12   can, consistent with the law, the truly Florida related

13   cases here as Middle District of Florida cases.

14       And I'm fudging a little about the fact that Florida

15   has three judicial districts.  But leaving that aside for

16   the moment, that that gives us a separate set of cases and

17   not the two or three we had originally, but a real number

18   of cases that we could at least consider pulling out for

19   trial here.  And Judge Conway's prepared, if necessary, to

20   tap some of her colleagues and do a bunch of these trials.

21   So that's where we're going.

22       How long do you need to file your motion to

23   accomplish your purpose?

24          MR. MAGAZINER:  Ten days, Your Honor.

25          THE COURT:  All right.  Then the response.

1          MR. MAGAZINER:  With the Court's permission,

2   Your Honor asked us to file the Lexicon motion but what

3   I'd like to do is file a motion based on Lexicon or

4   whatever other authority we think would be appropriate.

5          THE COURT:  I'm referring to Lexicon as

6   shorthand.

7          MR. MAGAZINER:  Thank you, Your Honor.

8          THE COURT:  Whatever method is sustainable.

9          MR. CAMP BAILEY:  And I would just say as an

10  aside, in the Zyprexa litigation the way it was

11  accomplished there is that plaintiffs filed 27 cases

12  originally in Judge Weinstein's court.  He took those up

13  as a big enough subset to do case-specific discovery and

14  those ultimately we're going to be the trial pool to go

15  forward on and that took, I think, a year and a half to

16  get through those 27 cases before that even got to trial

17  is when the whole settlement occurred and the whole --

18         THE COURT:  I understand that.

19         MR. CAMP BAILEY:  -- thing went away.

20         THE COURT:  We don't have that pool right now,

21  and I just don't choose to proceed that way.

22      All right.  To your agenda, counsel has already

23  touched on this a little bit, but plaintiff indicates some

24  issue about corporate witnesses.

25         MS. WHEELER:  Yes.  Good morning.  Holly

1    Wheeler.

2         To give you an update where we are on that ties in

3    with what Mr. Laminack has already said.  We have

4    requested 25 corporate witness depositions this time.  We

5    have received dates for 17 of those depositions, and those

6    have been noticed for October and November and December.

7    So we're still waiting upon a few.  We just wanted to make

8    the Court aware of where we are on that, and also just

9    impress upon the Court, again, the need for the materials

10   that have been the subject of so much debate of late.  So

11   that's pretty much all we needed to say on that.

12             THE COURT:  Okay.  Third party discovery.

13             MS. WHEELER:  Since we were here last we

14   actually made quite a bit of progress on this.  We have

15   received documents from three of the third parties.  Five

16   of the third parties have told us that they are ready to

17   go.  We just have very minor issues with respect to the

18   protective order that was entered on September 19.  They

19   need clarification on one of the sentences in that order.

20        Some of them have very, very minor cost issues.  We

21   have asked AstraZeneca to share not only the copying costs

22   incurred by those third parties but also any location cost

23   and possibly attorney's fees associated with those

24   subpoenas.  Some of the parties -- most of the parties

25   have in fact provided pretty detailed estimates to us

1    regarding those costs.  We are still waiting on those

2    estimates.  But five are just about ready to go.

3         We have filed motions to compel against six of the

4    third parties.  Four were combined into one motion that is

5    now pending in the Southern District of New York.  Two

6    were combined in one motion that is now pending in Eastern

7    District of Pennsylvania.  I know where the New York

8    motion has been assigned.  I don't know yet about

9    Pennsylvania.

10         THE COURT:  Just for your information, I did as

11   I indicated I might, send out an e-mail to all magistrate

12   judges in the country alerting them that such motions

13   might be coming and inviting them to defer the motions

14   back here.  There's -- in response to that, I got a copy

15   of an order that was entered up in Boston by one of my

16   colleagues accomplishing the same purpose in a different

17   case by taking a different tack.  It was during the MDL

18   authorization to -- which we have talked about which I

19   agree with.  But just an issue I didn't particularly want

20   to bite off.  But assuming in the transferee court the

21   authority to make rulings in other -- in effect in other

22   districts, some of you may be aware of that order.

23         So I'll see if the judge in New York or Pennsylvania

24   will refer those back to me, and, if so, I'll pick them

25   up.

1           MS. WHEELER:  Just to let you know, we did

2    provide quite a thorough analysis of the case law

3    permitting transfer of those matters to the MDL.  I don't

4    know if the Court has had an opportunity to review the

5    motions we have filed.  We did --

6           THE COURT:  I didn't look at the substance of

7    them.

8           MS. WHEELER:  We did e-mail to your chambers.

9           THE COURT:  I saw it was there and didn't really

10   look at it.  Who was the judge in New York?

11          MS. WHEELER:  Judge Victor Marrero.

12      Now Par Excel (phonetic), one of the other third

13   parties, has filed a motion to quash in the District Court

14   of Connecticut.  That has been assigned to Judge Hall.

15   Docket number 3:07MC264.  And we have a response prepared

16   to file in that.  We have had some issues locating

17   Connecticut counsel.  The court's there require that we do

18   have local counsel.  We have been unable to locate one of

19   at this point.  So our intention is to file a motion for

20   pro hac vice which time we will then be able to file the

21   response.  But we intend to address that this week.

22          THE COURT:  All right.

23          MS. WHEELER:  That's the problem.  We're trying

24   to locate attorneys.  We have got a couple leads.  So

25   we're working on that.

1          Let's see, Your Honor.  The issue with the protective

2     order, paragraph 8, indicates that the nonparties may

3     designate discovery materials as confidential so long as

4     the nonparty has a written agreement to be subject to and

5     governed by the requirements of this order.  Many of the

6     third parties have asked me what does that mean.  I know

7     that the Court provided an endorsement with the protective

8     order, but the way that it's worded doesn't necessarily --

9     doesn't really mesh with the third parties.  So we need

10    some direction about what needs to be done there.  Do we

11    need to draft an order that's similar to the endorsement

12    that those third parties can sign when they turn over the

13    documents or does the Court envision something else?

14          THE COURT:  Well, the endorsement was a form

15    submitted by AstraZeneca, I guess.  If it's creating a

16    problem, we can create a second form of endorsement.

17          MS. WHEELER:  It's not necessarily a problem.

18    It's just the way that I read the endorsement is it's

19    parties who receive or who view the documents that have

20    been designated as confidential or bound by the order.  In

21    this case we obviously got third parties who are producing

22    and designating materials as confidential and they need

23    some language that would require them to be bound by the

24    order.  I don't think it would be a difficult thing.  But

25    I'll be happy to draft it.  It would probably be very

1    similar to the endorsement that's already with the

2    protective order.

3              THE COURT:  Why don't you see if you could get

4    it in the next day or so.

5              MS. WHEELER:  I'm sorry?

6              THE COURT:  See if you can get that in the next

7    day or so.

8              MS. WHEELER:  That would be easy.  They just

9    need clarification on that.

10        And the last issue I want to address very quickly is

11   the cost.  That's, I think, going to end up being the

12   primary issue.  Most of the parties and the plaintiffs

13   have been able to narrow the scope of the subpoena.  It's

14   really the costs that seem to be the problem.  Some of the

15   third party costs could be very reasonable.  Others have

16   estimated costs in excess of 100,000 or $200,000.  That's

17   where we're really running into some problems.  And so I

18   anticipate that will be the primary issue that the Court

19   will need to address when those motions are transferred to

20   this Court.

21             THE COURT:  Talking about a photocopy cost or

22   search cost?

23             MS. WHEELER:  No.  Search costs and attorney's

24   fees.  The photocopying costs are not the problem.

25             THE COURT:  All right.  I'll address those then.

1    Some of those things bears cost of doing business in the

2    big world.

3        So sales force and marketing databases.

4            MR. PENNOCK:  Your Honor, in further considering

5    this issue that's on the agenda, we think it's probably

6    going to fall under the purview of what Mr. Ball will be

7    looking at.

8            THE COURT:  That's what I thought.  If we get in

9    some substantive legal issues about the scope, it will

10   come back to me.  If it's just a matter of mechanics and

11   logistics, he will be able to bring to bear his expertise

12   along with the designees of parties to solve that.

13           MR. PENNOCK:  Very good.  Thank you, Judge.

14           THE COURT:  There was a rather vague designation

15   by AstraZeneca about issues on a specific discovery.  I

16   don't mean that pejoratively.  I just don't know what

17   you're talking about.

18           MR. PENNOCK:  Neither do we, Judge.

19           MR. MAGAZINER:  And in light of the conversation

20   the Court has had with Mr. Brown and his report, we don't

21   have any issues.  We thought the 60-day transition might

22   be something to be discussed.

23       With Your Honor's permission go back to the question

24   of Florida transfer.  Your Honor entered an order, which

25   unfortunately I can't seem to find in my notebook, that

1   require plaintiffs to list the cases that they wanted to

2   have transferred and then for us to respond by October 5th

3   to their designation.

4       With Your Honor's permission what I would suggest is

5   that we file a motion 10 days from now.

6           THE COURT:  All that's folded in what we're just

7   talking about.

8           MR. MAGAZINER:  Okay.  Thank you.

9           THE COURT:  All right.  Next issue I wanted to

10  broach with you, and I don't know if you're going to want

11  to give me anything firm here today, but maybe able to

12  give me some initial responses and then you can try to

13  bring this back down to earth in the future, plaintiffs

14  have expressed, and it's obvious from the nature of things

15  that there may be some issues about meeting -- the

16  parties, both sides, their ability to meet the previous

17  set deadlines.  I'd like to you give some global thought

18  as to the overall goals for this MDL as to, for example,

19  how far should each case be -- we talked about this a

20  little bit.  We alluded to it, for the cases to be

21  prepared prior to remand.  There are a lot of choices.  We

22  can ramp up the case-specific discovery on a limited basis

23  to starting in January to 100 or a 1,000 cases a month to

24  get all of those done within some timeframe.

25      We could pick some cases for full discovery, whether

1  those are the selection from the Florida cases leading to

2  a trial schedule, which has a certain appeal to me, and

3  how many of those we do and how we select them are obvious

4  issues.  And I don't know what Judge Conway's views are,

5  frankly, as to how far she wants to take all these cases.

6       So whether she wants them, as we have discussed, is

7  one possibility to do it all, however many cases survive

8  various motions, when we're done with it it should be

9  ready for final pretrial conference and a trial in the

10  transferor districts or whatever district transferor court

11  may ultimately send them to.  Do we -- is it our goal

12  simply to resolve global issues that we have scheduled

13  that you had arguments on for some of the issues and other

14  deadlines coming up next year, to get those resolved and

15  then send the cases back for routine final discovery at

16  trial.

17       Those are all possibilities.

18       Some of this will relate back to something we talked

19  about last time which is anticipation from the defendants

20  of some motions to dismiss based on the case specific

21  discovery.  You -- Mr. Magaziner, do you have just a

22  ballpark figure as to how many -- based on what you have

23  done so far, how many of those you would have ready to do

24  in the next month or if you chose to do them now?  I'm

25  just trying to -- talking about a tenth of them, a third

1  of them?

2          MR. MAGAZINER:  They fall into various

3  categories.  We're studying very closely to figure out

4  what would make sense.  There are some, and it's a very

5  small number of cases, where the discovery suggests that

6  there is a very clean statute of limitations motion, for

7  example, or a very clean motion based on nonusage, for

8  example, which we're hoping maybe when we bring these to

9  the attention of plaintiffs' counsel who are involved in

10  those particular cases, they will decide this is not a

11  case they wish to pursue.  But there are a very small

12  number of them.  There are a larger group of cases which

13  we're studying much more carefully in trying to decide can

14  these be teed up now?  Do we need to take some further

15  discovery?  Do we need to see what the plaintiffs' experts

16  have to say.  We will report back to the Court.

17          THE COURT:  You have got a strategic decision

18  whether it's -- they're really appropriate to take that

19  shot at them now or you want to wait and get all your

20  arrows together on them.

21          MR. MAGAZINER:  I would like the opportunity,

22  perhaps a month from now when we see Your Honor, to report

23  to the Court on where we are and perhaps we will have

24  filed some motions by then.

25          But unfortunately --

1          THE COURT:  You asked last time for some

2    guidance on how to do that, and I did talk to Judge Conway

3    about that, and the best we can do is similar to the

4    thought process you're going through which is just do any

5    kind of logical way.  We would prefer if you can group

6    them in some logical way.  I'm not going to tell you which

7    logic because it's going to depend on your strategy which

8    you're entitled to do.  But for the -- for your

9    convenience, for the plaintiffs' convenience and the

10   Court's convenience, if -- however you can group them

11   either in time or subject matter or otherwise, and I know

12   some of them overlap, so it won't be an easy decision for

13   you but I'll just ask that you -- to the extent you can

14   group them in a logical fashion --

15          MR. MAGAZINER:  We're going to try to do that.

16      Just so Your Honor understands why I can't say more

17   now than I have said, the number of cases, despite the

18   heroic efforts of parties and -- both parties and the PM0,

19   the number cases that have been fully discovered, that is

20   where all four of the depositions have --

21          THE COURT:  Fully limited discovery.

22          MR. MAGAZINER:  Yeah.  The limited discovery has

23   been completed is a relatively small number.  So trying to

24   extrapolate in those relatively small numbers say, okay,

25   how are we going to proceed with the motion practice, what

 1    we anticipate to be a large number of cases, is very

 2    difficult.  But next month I think we will have

 3    sufficiently large number of cases that have been -- in

 4    which the limited discovery has been completed that I can

 5    say something more useful than I'm able to say today.

 6            THE COURT:  While I got you on that particular

 7    spot, let me ask you, because one of the purposes of this

 8    was to do exactly what you're talking about but also to

 9    feed into the consideration of ADR or settlement

10    discussions.  In terms of data gathering that was part of

11    your client's processing of that, where do you stand?

12            MR. MAGAZINER:  To speak very frankly --

13    Mr. Pennock or Mr. Bailey may disagree -- the cases we

14    have seen to date do not seem to us to be cases that we

15    would ever consider settling.  That isn't to say there may

16    not be some such cases.  As a matter of fact, we have

17    counseled among ourselves with the client what sort of

18    fact person would we want to see which would perhaps

19    suggest that something should be considered for

20    settlement.  But what we have seen to date, and it may

21    just be because the numbers are so small that they're not

22    representative, maybe that they're all like this, we don't

23    know, but what we've seen to date are cases in which if I

24    were to provide the Court the details of the testimony of

25    the plaintiffs and the doctors I think the Court would

1   understand these are not cases that have frankly any

2   value.

3        And, again, I'm not saying that that's true of all

4   plaintiffs' cases.  I'm saying the cases that have been

5   fully discovered when we take into account the plaintiff's

6   testimony and doctor's testimony, and the sales rep's

7   testimony, they don't seem to us to be going anywhere.

8        We have cases where the plaintiff, for example, was

9   diagnosed with diabetes long before the first Seroquel.

10  Not likely a kind of case we would consider settling.  We

11  have cases where the plaintiff was on Risperdal and

12  Zyprexa and Seroquel and other antipsychotics during the

13  entire period where the plaintiff doctor has testified

14  that the plaintiff had numerous risk factors for diabetes

15  before ever taking any antipsychotics, where the plaintiff

16  has a long and troubled tragic history of medical problems

17  which in and of themselves create more risk factors for

18  diabetes.  Those are -- that is not a case where -- which

19  at present juncture we would think we ought to consider

20  settlement.

21       So again, I'd like to be able to say something more

22  to the Court on that score next month.  I know the Court's

23  interest in that subject, and as we said we have not -- we

24  are not ruling out the possibility of ADR and appropriate

25  cases.  But we have not seen cases to date from this very

1   limited number that have been subject to limited discovery

2   and completely discovered in a limited way.  We haven't

3   seen cases that seem to us worthy of consideration.  But

4   next month, if I may, I would like to report further to

5   the Court on that subject.

6        I'll step down unless Your Honor has further

7   questions.

8              THE COURT:  No.  That's --

9              MR. PENNOCK:  Your Honor, to address the Court's

10  initial sort of question regarding globally where do we go

11  or do we change anything.  There's one thing that I think

12  is for sure, and that is that nothing can be remanded

13  until the general discovery and any general matters are

14  dealt with.  And, you know, it's no secret that our

15  position all along that should be the primary focus of

16  what we're all doing and we --

17             THE COURT:  Yeah, that clearly is the big --

18  that's the easy obvious goal to do that.  An MDL does

19  nothing else it has to do that.

20             MR. PENNOCK:  And the Court's making strides for

21  getting that done with everything the Court's been doing.

22       As far as ratcheting up case-specific cases, I mean,

23  this is just off the cuff, I would suggest that the

24  relatively small morass in which we have found ourselves

25  despite the defendant's commitments and promises, even

1    despite this Court putting together PMO, is just a small

2    morass to where we would be if we start ratcheting up

3    case-specific discovery at any time, let alone starting

4    again.  So we would be strongly opposed to that.  I think

5    we have very strong factual basis now that we have seen

6    what's transpired.  As opposed to our prediction of a

7    morass, and our prediction that the defendants might not

8    be able to fulfill getting these things done despite their

9    hundreds of lawyers, we actually have a factual record for

10   that, and we would like to discuss that further if the

11   Court wants to explore it further and perhaps brief it and

12   lay that out.

13       In terms of ADR there are a few observations, if the

14   Court doesn't mind, I'd like to make.  Number one, I

15   believe I can go back to a transcript and find where

16   Mr. Magaziner said that after we see 100 cases, we will be

17   prepared to go to ADR.  I think what I'm now hearing is

18   well, now, what I meant to say is after I see -- and

19   again, I'm not attempting to disparage Mr. Magaziner but

20   it sounds as though the position has changed.  And it's

21   now, well, after I see 100 cases that I might want to

22   settle maybe we will go to ADR.  You know, ADR or

23   discussions regarding settlement I don't think ever should

24   come from a posture of we're only going to settle the

25   cases -- we're only going to discuss cases that you can

1   win.

2       In any mass tort there are cases that the plaintiffs

3   will have great difficulty winning and plaintiffs that

4   will -- defendants will have a great difficulty winning.

5   And what you typically do to get to a resolution, if

6   that's the direction you intend to go as opposed to

7   scorched earth and try every case, is that all cases are

8   discussed and there are, you know, for lack of a better

9   term, but a term that is used frequently in this business,

10  there is significant discounting that occurs depending

11  upon the circumstances.

12      Mr. Magaziner mentioned three categories of cases.  I

13  would like the opportunity between now and the next

14  hearing to perhaps show the Court that I don't think those

15  are categories that they have been seeing, but individual

16  cases.  In other words, he's mentioned three examples.  I

17  think there are only three examples or close to three

18  examples for what has been mentioned as the type of cases

19  they're seeing.  I think that we on our side between now

20  and the end of the month could give the Court sort of a

21  report on, well, here are the rest of the cases or here

22  are 25 cases or 30 or 40 that they have taken discovery in

23  where there aren't these blatant and obviously very

24  significant impediments to discussions.  So I'd ask the

25  Court's permission to submit that by the next hearing.

1        Even in terms of the cases that he mentioned, they

2    are all imminently triable and the reason is as with any

3    type of toxic exposure and drug exposure, there is the

4    gasoline on the fire theory.  And the very person that you

5    don't give a drug to that you know or should know could

6    cause a problem, is a person that's already seriously

7    predisposed to that.

8        So notwithstanding any predisposition in a plaintiff

9    to having a particular disease or ailment, I think that

10   those cases can be tried and should be discussed if we are

11   able to get to discussing these cases.

12       I also would like to mention to the Court that in New

13   Jersey where I'm one of the leading players for the

14   plaintiffs in the state court litigation, with Judge

15   Happas, she's the new coordination judge there, formerly

16   Judge Garruto until last month, I have served on the

17   defendants formal demands or offers of judgment for dozens

18   of cases, and I have asked them to respond to that

19   command.  I think these commands are imminently reasonable

20   in terms of the dollar value.  And I just wanted to

21   mention that to the Court.

22       We have our first conference with Judge Happas is on

23   October 10th, and we will see that perhaps we may end up

24   with a mediation program in New Jersey based on those

25   offers of judgment that we make here.

1        And that kind of ties me back into the request for

2    the Lilly settlement money.  You know, unless and until

3    the defendants say, yes, we're ready to move forward to

4    mediate cases, I don't understand why they need to know

5    those dollars aside from the confidentiality issues.  What

6    possible benefit did they obtain at this juncture from

7    knowing how much our client settled for.  Now, if we were

8    going to trial or verdict, of course it would be a

9    different issue in terms of offset.  But right now it

10   seems to me that this is just a grab at information to

11   help them strategize with respect to the mediation.  But

12   if they're telling us that they're going to mediation and

13   they're willing to mediate every case, then I would agree

14   that maybe this is something that we would want Lilly to

15   come in here and explain.  But short of that, I don't

16   think they should be getting it.

17       In any event, Your Honor, we would like that

18   opportunity to explain to the Court why ratcheting up the

19   case-specific discovery is not a good idea.  We're willing

20   to do that by the next hearing.  And if I may suggest,

21   Your Honor, I would ask that the next hearing be before

22   the end of this month.

23       There are two motions that I met and conferred with

24   the defendants that I know I have to make because they

25   won't agree.  I'm planning on making those motions this

1    week.  And there is an additional motion that I need to

2    speak to them about.  I don't know what their position is,

3    but I'd like to get that teed up if they don't agree to

4    that.

5         We have the Florida issue and if we can't resolve

6    that, which I think there is still a possibility for that,

7    we need to get that taken care of.

8         And so as this Court has been typically doing, I'd

9    ask for a short date for the next hearing so that those

10   motions that we're going to file this week could be heard.

11        Thank you, Judge.

12             THE COURT:  All right.  I'll note also there's a

13   motion pending to file a reply on some of the motions that

14   were argued last week.  I'm going to leave that for Judge

15   Conway to look at.  It was just filed yesterday.

16        In terms of next status conference, I was looking at

17   30th of October which is a Tuesday and also it's -- also

18   it's a week that I have criminal duty assignments, so

19   again might not be able to go as long as we have in some

20   prior hearings, but we can do it in an hour and a half.

21   30th sound all right?

22             MR. PENNOCK:  That's perfect, Judge.

23             THE COURT:  Start that at 10:30 on 10/30 is

24   that -- because I have got a 10:00.  10:30 on 10/30.

25        Let me review where we are.  Special Master Brown is

1   going to submit a proposed order by the end of the week

2   regarding the transition to earlier designation and timing

3   changes on matters within his consideration.  Special

4   Master Ball is going to be meeting with the designated

5   representatives of parties immediately and I'll get him a

6   more specific order about the scope of his duties but he

7   can go ahead and start meeting and talking before then.

8         I will issue an order directed to Eli Lilly to

9   provide me with any thoughts they have got about the scope

10  of issues they may claim confidentiality on.

11        Let me ask Mr. Magaziner that after the hearing you

12  provide the clerk or my law clerk with a -- whoever their

13  designated person is from Reed Smith, whoever their

14  counsel.

15              MR. CAMP BAILEY:  Pepper Hamilton.

16              MR. MAGAZINER:  I've communicated to them.  I

17  have been speaking to Andrew Rogoff.

18              THE COURT:  You can do that later.

19              MR. KEN BAILEY:  Your Honor, that's a different

20  person that's at Pepper Hamilton that has been designated.

21              THE COURT:  Well, talk amongst yourselves,

22  figure out who it is.  Otherwise, we will just serve on

23  him.

24              MR. MAGAZINER:  Actually, I don't care which

25  Pepper Hamilton lawyer we talk to.  I assume they're

1    working together.

2          THE COURT:  Within 10 days AstraZeneca will file

3    its motion and response regarding all Florida-related

4    cases, and plaintiffs can respond to that.

5          I'll take a look at these motions that have been

6    filed in the districts and see what's going on with those.

7    Next, by the end of the week plaintiff will submit,

8    hopefully, agreed language to be provided with third

9    parties for their endorsement of the confidentiality

10   order.  And I'm going to enter an order directing the

11   parties to submit their positions with respect to these

12   scheduling and ADR type issues.  I'll flesh that out a

13   little bit.  But it will be -- it will track what we have

14   just been talking about as to your views on what the goals

15   for the MDL should be in light of how things have

16   developed.  And assuming we do identify some cases for

17   trial this court can try, what we're going to do with

18   that, how far we should go with limited case discovery,

19   and how that dovetails in with the settlement

20   considerations.  I think that's where we are.  But let me

21   ask each side in turn to anything else?

22         MS. WHEELER:  I just learned that the

23   Pennsylvania motion to compel has been assigned to Judge

24   Thomas O'Neill.  So I just wanted to let you know that.

25         THE COURT:  Anything else from plaintiffs?

1          MR. PENNOCK:  No, Your Honor.  Thank you.

2          THE COURT:  Defendant?

3          MR. MAGAZINER:  No, Your Honor.

4          THE COURT:  All right.  We're in recess.

5                    (End at 11:15 a.m.)

6                C E R T I F I C A T E

7          I certify that the foregoing is a correct

8    transcript from the record of proceedings in the

9    above-entitled matter.

10

11

12

13

14    _____              _____

15    Sandra K. Tremel

16

17

18

19

20

21

22

23

24

25