1

```
 1                  UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION

 3            Docket No.6:06-MD-1769-Orl-22DAB
      . . . . . . . . . . . . . . . ..
 4    IN RE:                        :
      SEROQUEL PRODUCTS LIABILITY    :
 5    LITIGATION                     :      Orlando, Florida
      MDL DOCKET No. 1769            :      November 15, 2007
 6                                   :      10:30 a.m.
      ALL CASES                      :
 7                                   :
      . . . . . . . . . . . . . . . .:
 8
                  TRANSCRIPT OF PRETRIAL CONFERENCE
 9            BEFORE THE HONORABLE DAVID A. BAKER
                  UNITED STATES MAGISTRATE JUDGE
10

11    APPEARANCES:

12    For the Plaintiffs:          Paul Pennock

13                                 Richard Laminack

14                                 F. Kenneth Bailey

15                                 K. Camp Bailey

16                                 Buffy Martines

17                                 Angela Nixon

18                                 Robert Cowen

19                                 Dennis Canty

20                                 Lawrence Gornick

21                                 Bill Adams

22                                 Holly Wheeler

23    Court Reporter:  Sandra K. Tremel

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer-aided transcription.
```

```
 1                                  Larry Roth

 2                                  Fletch Trammell

 3                                  Elizabeth Williams

 4                                  Scott Allen

 5                                  D. Renee Baggett

 6     For the Defendant

 7     AstraZeneca:               Fred Magaziner

 8                                  Stephen J. McConnell

 9                                  James Freebery

10                                  Robert Pass

11                                  Robert Ciotti

12                                  Russell Stewart

13                                  Chris Coutroulis

14

15     Special Master:  Orran Brown

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2          THE DEPUTY CLERK:  The case number is
 3  6:06-MD-1769-ORL-22DAB, In Re: The Seroquel Products
 4  Liability Litigation.
 5      Counsel in the courtroom, please state your
 6  appearances for the record.
 7              MR. PENNOCK:  Paul Pennock for the plaintiffs.
 8              MR. CAMP BAILEY:  Camp Bailey for plaintiffs.
 9              MR. GORNICK:  Larry Gornick for the plaintiffs.
10              MR. TRAMMELL:  Fletch Trammell, plaintiffs.
11              MS. MARTINES:  Buffy Martines, plaintiffs.
12              MR. LAMINACK:  Rick Laminack, plaintiffs.
13              MR. ROTH:  Larry Roth for the plaintiffs.
14              MR. KEN BAILEY:  Ken Bailey, plaintiffs.
15              MS. WILLIAMS:  Elizabeth Williams, plaintiffs.
16              MR. COWEN:  Robert Cowen, plaintiffs.
17              MS. WHEELER:  Holly Wheeler, plaintiffs.
18              MR. ALLEN:  Scott Allen, plaintiffs.
19              MR. MAGAZINER:  Fred Magaziner for AstraZeneca.
20              MR. McCONNELL:  Steve McConnell for AstraZeneca,
21  Your Honor.
22              MR. PASS:  Robert Pass for AstraZeneca.
23              MR. STEWART:  Russell Stewart for AstraZeneca.
24              MR. CIOTTI:  Robert Ciotti for AstraZeneca.
25              MR. FREEBERY:  Jim Freebery for AstraZeneca.
```

1              MR. PRINCE:  Shane Prince for AstraZeneca.

2              MR. COUTROULIS:  Chris Coutroulis for

3    AstraZeneca.

4              THE DEPUTY CLERK:  Counsel on the phone please

5    state your appearances for the record.

6              MR. BROWN:  Good morning.  Orran Brown, the

7    special master for case specific discovery.

8              MS. NIXON:  Angela Nixon for plaintiff.

9              MR. CANTY:  Dennis Canty for plaintiffs.

10              MR. ADAMS:  Bill Adams.

11              MS. BAGGETT:  Renee Baggett.

12              MR. BROWN:  Your Honor, those are all the

13    appearances that are on the telephone appearing by

14    telephone.

15              THE COURT:  All right.  We have an extensive and

16    detailed report from Special Master Brown.

17          Anything you want to add to that at this point?

18              MR. BROWN:  No, Your Honor.  I have nothing

19    really to add to that, unless the Court has some questions

20    of us.

21          We're still working on three pending discovery

22    matters that we plan to have resolved by consensus or rule

23    or suggestive rule by this Friday.  We have made headway

24    on those three matters.

25          And from the scheduling standpoint, the reports we

```
 1   attached, I think, tell where we are on case specific
 2   discovery scheduling and how that's going.
 3        And we are now in the midst of transition in the
 4   order the Court approved that doubled up on designations
 5   so that we could get 60 days out so long as this program
 6   continues, in that process the parties have worked very
 7   well at making their designations to double-up to catch up
 8   to 60 days in advance.  And that process is working well.
 9        So unless the Court has some questions of me or the
10   parties, we'll stand on the report.
11             THE COURT:  All right.  We'll probably be coming
12   back to -- I'll have some questions about the outstanding
13   discovery issues, but we'll come back to that.
14             MR. BROWN:  Yes, Your Honor.
15             THE COURT:  Special Master Ball is not available
16   to be on the call with us today.  We did get his report
17   and there's issues have been raised in filings yesterday
18   about a fee allocation.
19        Let me say that the report that he filed was -- filed
20   by the parties with respect to efforts to timely complete
21   discovery, that while it's not all bad news, it's
22   certainly disappointing, and we're going to have to deal
23   with that.
24        My initial reaction to -- as an overall matter is
25   that given the representations made by AstraZeneca and the
```

1    observations of the special master suggests that we might

2    be better off simply ending the case-specific discovery as

3    quickly as it can be wound down so the parties can focus

4    more on the efforts to get the substantive fact discovery

5    completed.  There's some very troubling aspects to the

6    difficulties that have been unearthed.

7         That said, as I've referred to in the past, and

8    parties seem to have understood what I was saying, even

9    though I was a little bit oblique, it is clear to me that

10   we're going to need to change the schedule for completing

11   discovery.

12        There may be other consequences to that, but without

13   putting too fine a point on it, both sides have some due

14   process concerns that are legitimate in terms of -- and

15   the goal here is not to see how many documents can be

16   produced and how fast they can be produced.  That's not

17   the goal of litigation.  That's a means to an end which is

18   to allow both sides to appropriately discover their case

19   and prepare it for presentation to the Court in either the

20   pretrial proceedings or at trial.  We need to keep our eye

21   on that.

22        And the same thing with deadlines and other

23   requirements, that we're not doing this simply for their

24   own sake, but so that the parties can achieve that.

25        And I said some bleak things just now.  I want to

1    commend the parties to at least some degree with the

2    efforts that you've made to -- that at least I see

3    reflected in the filings to talk about the schedule for

4    2008 in a cooperative way that shows a lot of agreement

5    and obvious compromise on both sides in terms of doing

6    that and in particular, the documents you filed yesterday

7    on the Florida trial procedures, pretrial procedures was

8    presented in a fashion that made it easy for me to review.

9        It was a joint document, so I know was harder to

10   produce, but both the way you did it and obviously the

11   conversations that you had to come up with that, even

12   though you had disagreements, but you laid those out in a

13   way that made it easy to look at.  So I do appreciate that

14   when you can do it that way.

15       Having said those things is sort of an introduction.

16   I think I'd like to hear from AstraZeneca kind of an

17   overview of where you see 2008 taking us and with what I

18   have just said in mind.

19           MR. MAGAZINER:  Your Honor, would you like us

20   first to address the discovery being directed toward

21   AstraZeneca and then address the discovery, the procedures

22   regarding the plaintiffs or vice versa?

23           THE COURT:  Well, I'd like to hear you talk

24   about AstraZeneca's production, and whether that -- and

25   we'll treat it fairly separately from the case specific

1    discovery.  But as I say, it seems to me that just

2    allocation of resources suggests that maybe it's time to

3    put everything you've got on that and then also how --

4    your thoughts on how it's all going to impact 2008, then

5    we'll deal with the Florida issues separately.  I've got

6    some questions for both sides on that.

7                MR. MAGAZINER:  With Your Honor's permission,

8    then Mr. Pass will address the production of documents

9    issue.  And we will figure out which of us is going to

10   address the question of whether that impacts case specific

11   discovery.

12               THE COURT:  All right.

13               MR. PASS:  Your Honor, as you know, we filed a

14   fairly extensive notice relating to the projected date by

15   which we can certify substantial completion of documents

16   including ESI discovery in 2008 as well as some before the

17   end of this year with sworn declarations accompanying

18   them.

19        And I'm going to assume, unless you tell me

20   otherwise, that you have had at least a chance to look

21   those over.

22        Basically we took to heart, of course, your charge to

23   us at the last status conference to go back and take a

24   very aggressive and serious, but not wildly optimistic,

25   overly inflated view of what could be done to complete ESI

1    discovery, and have worked through that in a number of

2    conversations with Special Master Ball and with the

3    plaintiffs.

4        We have, as you have seen in the declarations and in

5    the memoranda filed yesterday, added significant amount of

6    resources to the already substantial resources being

7    applied before.

8        I believe the number of attorney reviewers, for

9    example, of documents have now effectively tripled.  There

10   has been a dedicated new team, which I believe consists of

11   about 11 people, focusing on the extraction of information

12   from databases which has been the subject of, I believe,

13   about 40 meet and confers, meaning the ones -- the

14   informal proceedings by which the plaintiffs informally

15   interrogate AstraZeneca personnel to learn the subject

16   matter of what's contained in databases and what can be

17   extracted from them and so forth.

18       We have added additional resources in terms of sites,

19   locations for review and processing of ESI, and more and

20   more attorneys being added to simply try to address and

21   solve ESI problems as they arise?

22       I think it's fair to say that AstraZeneca is probably

23   doing more relative to the size of the case than has ever

24   been done at this point in any mass tort litigation to

25   respond to electronically stored information discovery.

1          That said, the bottom line works out as follows:  We

2    think that the ability of AstraZeneca to do what you

3    asked, which is to come up with a date by which we can

4    certify the substantial completion of pending documents,

5    and I'm including ESI paper and ESI in that, is

6    principally driven by two things.  The first one is our

7    desire to address, solve, and resolve pending issues that

8    have been lingering for sometime over the existing, that

9    is the previous production of TIFF images, which I think

10   at this point is roughly 12-and-a-half million pages of

11   TIFF images.

12         And second, the extraction of informing from

13   databases.  All of the other pending discovery is rather

14   minor in terms of ESI compared to that and does not

15   present any significant issue as to when discovery can be

16   substantially completed.

17         What we have concluded is that the only way by which

18   we can stand before you today and tell you when we will

19   substantially complete ESI discovery, apart from databases

20   in light of the issues that have been raised concerning

21   existing problems of a not completely defined and not

22   completely isolated set of issues in the prior production,

23   is to move to a reproduction of that prior TIFF production

24   in native format.

25         If we had months to go through all the prior

1   production to isolate and to find the extent of the

2   issues, then we wouldn't have to do that.  But Your

3   Honor's message to us is that we don't have months and

4   months to figure that out, but to be here today to tell

5   you when we can finish production.

6        By moving to native format, we eliminate those

7   issues.  By moving to native format to reproduce all of

8   that, we eliminate the issues that relate to the so-called

9   blank page errors, we eliminate issues related to

10  questions about extracting text.  We eliminate all of

11  those issues.  And we also have a process with which our

12  vendor, particularly our new vendor, FTI Consulting, is

13  extremely skilled and familiar, allows us to get rid of

14  those problems and have confidence in a substantial

15  completion date.

16       The proposal in our filing yesterday is that we move

17  to native production, reproduce all of those prior TIFF

18  images, produce going forward on a native basis, except

19  for where there have been redactions which will still have

20  to be in TIFF, and that that can be substantially

21  completed by February 14 of 2008, with rolling production

22  prior to that.  In other words, obviously we wouldn't

23  produce at all before February 14, 2008.

24       We think that has a lot of advantages, is the only

25  way that we can do what you asked us to do, which is

1   certify a date in which we have confidence.

2       The second driver of the substantial completion date

3   is databases.  The meet and confers, as I said, are up

4   to -- and I may be off because they're going on I think as

5   we speak, to moving target -- but the number's around 40,

6   I think, where we have meet and confers.  We had received

7   as of last Friday, which is the date I had to use to say

8   I've got to work with what I have now to get this all

9   figured out with something we can tell Judge Baker next

10  week.

11      We have specific follow-up written requests for

12  production from the plaintiffs as to 23 of those

13  databases.  We worked over the weekend, worked basically

14  seven days a week, including in ex parte conference with

15  Master Ball, all of the afternoon on Saturday.  We've

16  challenged assumptions, we've rechallenged assumptions,

17  and we've come to the conclusion that for the 23 as to

18  which we actually have specific requests from the

19  plaintiffs at this point, and as to which there will be

20  disputes, as I'm sure you understand over the precise

21  scope of what they ought to really get, in which I would

22  note that in his report Mr. Ball noted that he believes

23  that the plaintiffs are asking for more than they need to.

24      Subject to what ultimately is the determination of

25  the proper scope of those, we can complete those

1    extractions from those 23 databases by January 20, 2008,

2    with extractions occurring on a rolling basis prior to

3    that, and that those extractions can be produced to the

4    plaintiffs, again, on a rolling basis after January 20 by

5    March 14, 2008.

6         There are, of course, additional database interviews

7    going on and the plaintiffs will presumably continue to

8    serve us with written requests as to what they're going to

9    want out of them.

10        I believe Master Ball has proposed and indicated in

11   his report that he believes that a -- I think he referred

12   to it as a mediation, sort of a nobody leaves the room

13   until it's over thing, as I read it, for those would be

14   appropriate to narrow those down.

15        I think he indicated he thought a little more time

16   was needed to get to that point.  But we have indicated

17   that while we cannot tell you when we can complete that,

18   which we haven't been asked for yet, which are the --

19   those beyond the 23, that consistent with what I've

20   already told you today and what is in the declarations

21   that were filed, AstraZeneca intends to place every

22   resource possibly available to it into completing the

23   extractions and to the production of whatever is

24   appropriate from those requests and those databases from

25   which requests have not yet been received, and will do

1   everything in its power to try to accomplish that

2   extraction and production perhaps by the same date,

3   March 14, 2008, as the 23 databases that are referred to.

4        That is obviously subject to and has to be subject to

5   a number of qualifications, starting with, we don't have

6   all of those requests, Mr. Ball thinks plaintiffs are

7   asking for more than they need, and there need to be

8   substantial discussions and limitations placed on those.

9        But that is -- those are the dates that we think

10  drive the completion of documentary and ESI discovery

11  here, the outside date of what we have in hand so far for

12  substantial completion, March 14, 2008, with rolling

13  productions all in between.

14       We would also complete the production of a couple of

15  pending matters substantially prior to then.  There is a

16  production coming up that is the result of agreements

17  mediated with the help of Special Master Ball over

18  additional search terms, roughly 100 that were agreed to

19  out of, I think, like 170-something where the --

20  AstraZeneca agreed to add a great number of search terms.

21  Mr. Ball turned back the plaintiffs on a great number of

22  search terms.

23       Those are being run, that data set identified.  We

24  expect to produce the new documents that are responsive to

25  those newly agreed, universally agreed search terms by the

1    end of '07.

2        There is one other pending matter which is, as

3    Mr. Ball indicated in his report, the contents of a

4    Seroquel -- Seroquel litigation hold collection mailbox

5    that AstraZeneca's counsel discovered, as Mr. Ball

6    indicated, self-reported to Mr. Ball, which is being

7    processed and will also be produced in the very near term,

8    certainly no later than the end of the year, maybe much

9    earlier than that.

10        So that is -- that is what we stand here today to

11    tell you, Judge Baker.  I would suggest to you that we

12    really have tried to come to these numbers without

13    building in fluff and fudge factors.

14        These are aggressive dates.  We think they are doable

15    dates for substantial completion.  If pressed to do it

16    earlier than that, I would suggest to you and I think

17    perhaps Mr. Ball alluded to this in his last verbal report

18    to the Court at the last status conference, that it would

19    be not only not doable but counter-productive because this

20    is as fast as these enormous resources can move, and to

21    push it or try to push it earlier to that is only likely

22    to result in new problems.

23        This is an enormous amount of data, enormous amount

24    of documents, trying to push it earlier to that is going

25    to create new problems.

1      So that is our -- that is a summary of our report,

2  where we stand on custodial collections, the pending RFPs,

3  the database extraction.  I can't address case specific

4  discovery.  Mr. Magaziner or Mr. McConnell will have to do

5  that.

6           MR. MAGAZINER:  Your Honor, you asked what we

7  think can reasonably be accomplished in the year 2008.

8  And Mr. Pass has addressed the question of how promptly

9  can AstraZeneca provide to plaintiffs the ESI that

10  plaintiffs are entitled to receive from AstraZeneca.

11      The schedule for the -- that we have proposed to the

12  Court for the Florida cases takes into account the

13  substantial completion date that we have proposed or

14  notified the Court in our filings that Mr. Pass has just

15  described to Your Honor earlier.

16      We told plaintiffs a few days ago what date we were

17  going to be using in our notice.  And we all had that in

18  mind in the last several sessions of negotiation that we

19  conducted on the Florida plan, which negotiations lasted

20  until midnight last night.

21      We believe the Florida plan that we presented is

22  something that can be accomplished within the scope of the

23  plan as proposed and is consistent with our simultaneously

24  meeting the obligations that we have to plaintiffs with

25  regard to ESI in AstraZeneca's possession.

1      The resources that will be used in processing,

2  discovering, litigating the Florida cases are resources

3  that are almost entirely completely independent from the

4  resources that are being used in responding to ESI

5  requests and demands.

6      The resources for discovery are lawyers who are not

7  otherwise involved at all in the litigation but are

8  focused solely on the discovery of plaintiffs and doctors

9  and fact witnesses, et cetera.  There's just no overlap.

10      The -- we have tried in the Florida plan to be

11  realistic and to that end, for example, Your Honor, as you

12  may have noticed, we are proposing that the non-Florida

13  case specific discovery end with the cases that have been

14  selected for December.

15      We have allowed the month of January for the wrap up

16  of any of those depositions that could not have -- could

17  not be completed because of scheduling difficulties in the

18  month of December.  So that by the time we get to the end

19  of January, the non-Florida case specific discovery

20  program as we propose it in this plan that we presented to

21  the Court in the wee hours of the morning, so that that

22  discovery will be ended.  And we can then direct all of

23  our focus for the next several months on the Florida

24  cases.

25      And we do think it's feasible to do both the Florida

1    work that we proposed and the ESI work that Mr. Pass has

2    described.

3         We also hope in 2008 to accomplish some further

4    culling and winnowing of the cases that are not going to

5    be the focus of discovery, that would be the non-Florida

6    cases.

7         The Florida cases number something like 120 or 125 as

8    I recall.  There are 5,700 or so other cases still pending

9    before the Court.  And we hope to go through a number of

10   procedures which will have the effect of winnowing down

11   the number of case that's will be left in the litigation

12   so that we're left only with cases that have some arguable

13   merit, perhaps, rather than cases which clearly have no

14   business being in any Court anywhere.

15        The -- while I have the floor, Your Honor, I wanted

16   to point out one very small mistake we made in the Florida

17   submission, which is in paragraph R.  As you'll see, we

18   disagreed on the dates by which dispositive motions would

19   be filed.

20        In the description of our position, we said,

21   dispositive motion shall be filed by November 26, 2008,

22   with responses to be filed by December 12.  What we

23   actually should have said is:  With responses to be filed

24   two weeks after we filed the dispositive motion.  We would

25   hope to file dispositive motions, many of them long before

1   November 26.  So we didn't intend if we filed a motion in

2   August for plaintiffs to respond in December.

3       That's an -- even reading it with fresh eyes this

4   morning, I think that's the only thing that we found that

5   made its way into the final without our noticing it needed

6   to be changed.

7       I hope I have answered Your Honor's questions about

8   whether we can -- whether we have the resources to do both

9   the case specific discovery, which largely focuses on

10  Florida, at the same time as we're doing the ESI, I think

11  we do.  I think those resource do not overlap at all.

12      But if you have any questions, I would be happy to

13  try to address them.

14          THE COURT:  Let me hear plaintiffs reflections

15  on the subject.

16          MR. PENNOCK:  Your Honor, do you want to first

17  hear reflections regarding the general discovery?

18          THE COURT:  However, you want to address it.

19          MR. ALLEN:  Your Honor, Scott Allen.  Good to be

20  back.

21      Our first reflection, Your Honor, we have to be

22  honest here, is that the Court is correct in its

23  assessment that we have been denied due process during the

24  last year.  We have indicated to the Court on multiple

25  occasions that we believe moving forward with case

1  specific discovery would be a wasted exercise because we

2  did not have the evidence to which we were entitled.  We

3  indicated that the blank pages that were missing in

4  production we believe contained substantive information

5  concerning the issues involved in Seroquel.

6       We were assured and the Court was assured in hearing

7  after hearing after hearing that the blank pages did not

8  contain missing information, that we'd receive all that we

9  needed and that if we will just be patient they would

10  produce millions of pages.

11      We brought it to the Court's attention on multiple

12  occasions that we believed there were missing e-mails.  We

13  gave the Court examples.  I'm sure the Court recalls.

14  Vickram Dev.  I don't recall the specific number, Your

15  Honor, but we believe that somebody in safety surveillance

16  had more than 100 or so e-mails.

17      I brought to the Court's attention, I know, that a

18  witness I'd reviewed had less than 100 e-mails.  We were

19  told that we had the production.  We have now learned

20  after we've done extensive case specific and we're

21  engaged, as I speak, in general discovery, there was an

22  entire Seroquel e-mail box that has not been provided to

23  us.  As reflected in Mr. Ball's report, who this Court

24  appointed, and Mr. Ball has reported in regard to the

25  missing Seroquel e-mail box, the failure to produce this,

1    the oversight can't be as easily attributed to a vendor,

2    but appears to be a project management failure by

3    AstraZeneca or its counsel.

4         This court ordered on November 1 that by

5    November 13th the defendant should file a notice providing

6    a firm date by which it will be able to certify

7    substantial completion of its production of documents.  In

8    the written response to which Mr. Pass referred, which

9    they noted was quite extensive, here is what they say in

10   the filing with the Court:  At this point AstraZeneca can

11   offer only a prediction, not a certification and they go

12   on.

13        They even say in their filing concerning the issue of

14   substantial completion, this is their words, "completion

15   of what?"

16        Your Honor, for the record, on behalf of the

17   plaintiffs, who we contend were injured by Seroquel, the

18   due process concerns that we have is that we were denied

19   the ability to prepare for the depositions both specific

20   and general, that we were denied fair notice of the actual

21   contents of materials that they had.

22        We believe as the Court has indicated and as I hear

23   Mr. Magaziner now tell us, the case specific discovery

24   should stop but we think it should stop now.  We do not

25   believe we should be forced to continue with a process

1   when in the words -- and I'm paraphrasing Mr. Ball -- we

2   have received sub silentio production of missing blank

3   pages we always knew contained information.

4        What I heard today on the issue of due process is

5   that what we have been saying, we on the plaintiff's side

6   for the past 10 to 11 months, is correct, that the way to

7   solve this problem is to start over with rolling

8   production.  We heard start over with rolling production.

9        Your Honor, due process that affects us greatly.

10  They have talked to you about the millions of pages they

11  have produced and as the Court, as pointed out previously,

12  and as pointed out by Judge Ball -- Mr. Ball, it's not the

13  number of pages, it's what's been produced and can be time

14  and expense that we have incurred on our side.

15       Mr. Jaffe, Mr. Gornick, Mr. Canty, myself, in trying

16  to prepare for depositions without the evidence on behalf

17  of injured clients is not fair.  The time and expense

18  incurred on our side we believe is significant.

19       As I speak to you right now, Your Honor, case

20  specific discovery and depositions is taking place, people

21  are in Philadelphia taking depositions, and I have been

22  there, of witnesses whose files have still not been

23  completely produced.  And now we hear we're going to get

24  the millions of pages back at us in a rolling production.

25       I hope everyone understands, I think it's

1   self-evident, it's not just the production of millions of

2   pages, and I mean this literally, I have to read them.

3   It's one thing to say by March 14th, which is only a

4   prediction, we will get you these documents.  We have to

5   read those documents.

6       We believe, Your Honor, there is a Southern District

7   of Florida in the case of United States v 199 47-foot

8   Mountain Motor Vessel as stated:  It seems simple, really,

9   when a Court enters an order, that order should be

10  followed.  It should not be viewed as an advisory opinion

11  that one chooses to follow or not at his or her own whim

12  or convenience.

13      Your Honor, the standard in this case has not been

14  set by us.  It has been set by AstraZeneca, who has stood

15  before this court and has filed multiple pleadings against

16  injured parties, individuals who lack the time and

17  resources of AstraZeneca who have substantially completed

18  a fact sheet in which they, then go through the fact sheet

19  and find marginal errors or a failure to have a signature.

20      Your Honor, I took the deposition of Dr. Jamie

21  Mullen, a Board certified psychiatrist, the Seroquel

22  global physician, the director of their clinical studies

23  who testified to me under oath -- and I will get you this

24  testimony if you need it -- that schizophrenia by

25  definition, and that's what this drug is for, by

1   definition, is someone who has lost touch with reality.

2       In our system of justice, Your Honor, those

3   individuals are entitled to come before this Court.  And I

4   am not embarrassed to say on behalf of my clients, the

5   schizophrenics who we represent have lost touch with

6   reality.  And when we have a substantial fact sheet and

7   they don't sign it, these individuals have moved

8   successfully to dismiss their cases.  Dismiss them.

9       Your Honor, the standard has been set.  The

10  defendants have failed to produce the documents, not in my

11  words but in Mr. Ball's words, the blank pages contained

12  information and you were here and we were told it didn't.

13  Not any word from Mr. Ball, an entire e-mail box that

14  would obtain the information we need has not been

15  produced.  As we told the Court.  We told the Court we

16  didn't think we needed to go -- to do case specific

17  production because it would be -- in discovery it would be

18  fruitless.

19      Your Honor, truly as an attorney practicing for some

20  23 years, I haven't been in this position before.  We

21  think a rolling production to start again it's up to the

22  Court what it wants to do, but I don't want to say I'm

23  speechless.  We think our due process rights -- our

24  clients' due process rights have been denied.  We have

25  incurred substantial time and expense.

1      And we ask the Court to do what it thinks fair,

2  keeping in mind the standard, that AstraZeneca has said

3  dismissal.  Thank you, Your Honor.

4          THE COURT:  Can you specifically comment on the

5  issue of the native format production?

6          MR. ALLEN:  The data format production,

7  Mr. Gornick, on the native format.  I know that we have

8  been told -- and if Mr. Gornick needs to add anything --

9  that it would be very timely and cost intensive.  And

10  Mr. Gornick is best able to answer that question.

11          MR. GORNICK:  Your Honor, I'm happy to go into

12  that.  Our issue with that is cost.  And then I also have

13  some specifics about the timing of what we would like to

14  do to complete what we need to do in terms of depositions.

15  I'm not sure if you want to hear that right now.

16          THE COURT:  I do want to hear that.  I mean --

17          MR. ALLEN:  We, of course, don't think we should

18  bear any cost for any of this.

19          THE COURT:  I understand all that.  I'm not sure

20  what the right word is.  When I saw the suggestion that

21  they go back to production in native format, I sort of

22  checked the calendar and was wondering is this 2006 or

23  2007.  Because I had initially thought back in 2006 that

24  native format was probably the way to go, be faster,

25  easier and less controversial.  And we're back there

1   again.

2       So I would like to hear your thoughts about that, now

3   that we're close to the end of 2007.

4           MR. ALLEN:  Thank, Your Honor.  I'll let

5   Mr. Gornick address that.

6           MR. GORNICK:  Your Honor, about a year ago, I

7   believe this week, we proposed native production.

8   AstraZeneca refused that request.  So for the past year,

9   we've been laboring to process their documents and to host

10  their documents in the form they wanted to give them to

11  us.

12      And I'm not going to belabor all the things Mr. Allen

13  just said, but it's clear from what we presented at the

14  sanctions hearing, what we presented since and what

15  Mr. Ball has reported, that what AstraZeneca gave us was

16  essentially worthless.  But all this time our team has --

17          THE COURT:  Well, let's avoid the overstatement.

18  I mean, you've gotten lots of information.  What you

19  haven't gotten is any sense that it's complete, which

20  undermines the valve and I understand that.

21      But you've gotten lots of information about how the

22  drug was developed and marketed and sold and tested and

23  all of that.  You've got lots of that stuff, plenty -- and

24  I understand, it's not enough just -- again, we're -- the

25  point is not to see how much cost we can generate for both

1    sides to produce documents.  It's getting to the

2    information that you need to develop your theory of the

3    case and for them to develop their theory of the case.

4         And so you've got a lot to chew on.  But I understand

5    that not having it with any sense that even the defendant

6    says it's complete much less that you're willing to accept

7    that for purposes of having your experts analyze it and

8    for you to shape your arguments.  So it's not worthless.

9    It's been a lot for you to work with.  But I understand

10   that it's not satisfactory.

11        MR. GORNICK:  I could cut to the bottom line.

12   Our views on native, we will accept -- we can, we have

13   figured out how we can work with native, how we can shift.

14   To shift to native will be extremely expensive.  And what

15   I was leading up to in an inartful way was the fact that

16   here in late 2007, we have borne an incredible cost, both

17   in terms of money and time to collect and process the

18   production AstraZeneca has given us.

19        As we stand here today, we should have a almost

20   perfectly functioning complete database, but we're going

21   to start over.  For a lot of reasons, we don't believe we

22   should bear the cost associated with starting over.

23        The reasons why we're going to have to start over are

24   not ours.  We haven't caused this problem.  In fact, we

25   have done all the work to ferret out the problems just to

1   have AstraZeneca deny their existence.

2        The Court will remember in July, we proposed that the

3   fastest and most efficient way to get to closure was to

4   start over.  That was Mr. Martin's conclusion.  We were

5   mocked.  But it turns out we were right.  And in the

6   intervening four months, we have labored through.

7        And it would cost us -- we have obtained bids from

8   vendors, like AstraZeneca uses vendors, it would cost us

9   somewhere between 5-and-a-half million and $10 million, we

10  refined the numbers since earlier in the week, it would

11  cost us between five-and-a-half and $10 million just

12  writing checks to vendors to take in, process and host the

13  data.  And that will be completely unnecessary expense,

14  100 percent unnecessary expense.  We should already be

15  there.

16       And I could go through Master Ball's report, I could

17  outline all the ways that AstraZeneca's shortcomings have

18  lead to this point.  But the bottom line is if we are

19  forced to pay and we have been sanctioned for

20  AstraZeneca's misconduct and, Your Honor, AstraZeneca

21  claims this is all their vendor's fault.  They fired two

22  vendors for incompetence, they've claimed that they're

23  victims of vendor deceit, so they have a remedy.

24       Every dollar they have to pay our vendors they can

25  recover from their vendors.  They have, according to them,

 1    the basis for a very good lawsuit.  We should not bear

 2    that burden.

 3              THE COURT:  You will testify for them?

 4              MR. GORNICK:  We'll put up experts.  They have

 5    Mr. Ball's report.  And I mean, there's some related

 6    issues to the vendor misconduct that will probably come up

 7    later today, but that's our position is that we will do

 8    everything we can to shift over so we can move this

 9    litigation quickly.  After all, at the end of the day, we

10    want to do everything possible to go quickly.

11              THE COURT:  Talk to me about the -- that

12    subject -- if we've got that certification of substantial

13    completion, I saw what you put in your file, but talk me

14    through it a little bit.  How much more do you need in

15    terms of depositions and really getting your experts

16    ready?

17              MR. GORNICK:  Your Honor, we have been

18    soldiering through.  We've been taking the general

19    depositions because we had a deadline and so we were doing

20    our best.  I think we've taken five depositions, that

21    might be off by one or two.  We've identified perhaps five

22    other people that we would take their depositions of

23    before substantial completion.  There are 15 other

24    corporate witnesses that we don't want to take their

25    depositions before substantial completion.

1          And so what we proposed is that we have until May 15

2     to complete our discovery which would include those

3     corporate depositions, would include third-parties, and we

4     think there might be about five depositions of third

5     parties that we'll need to do.  So --

6               THE COURT:  What kind of third parties?

7               MR. GORNICK:  The third parties that we obtained

8     documents from.  Some of them we think we'll need to take

9     some testimony from.

10         So really it's actually -- the reason why we propose

11    just that two-month window from the time they

12    substantially complete -- there are a couple of reasons.

13    The paramount reason is we know this Court wants this

14    thing done.  Another reason is we need to get it done.

15    We're not going to wrap this litigation up without an

16    intensely focused schedule.

17         So, Your Honor, that's 60 days to review everything

18    they give us.  Oh, the third thing is we assume they truly

19    are this time going to give us a true rolling production

20    and not a drip, drip, drip in the entire bucket on the

21    last day like they did last time.

22         But if we get that rolling production we'll work

23    through it.  And to do all this, everything we need to do

24    to complete what we need to do in 60 days from the day

25    they certified completion, that will require a huge amount

1    of resources.

2        Because as Mr. Allen said, we have to look at the

3    stuff.  And they're starting over and what this blank page

4    exercise revealed and really the way it went down was not

5    only did we get -- and this is relevant, I'll do it

6    quickly.  Not only didn't we get substance where there

7    were blanks and we thought -- and they told us it was just

8    going to be more blanks, we got new docs -- we got changes

9    to documents that never had blanks.  Some documents we

10   thought were complete that were, let's say, five pages

11   long all of a sudden were 50.  And that lead us to believe

12   there might be problems with the entire data production.

13       Mr. Jaffe in a painstaking way went through this.

14   There was some push-back, but ultimately the other side

15   agreed they couldn't be sure about the rest.

16       And so as we get this native production in, we're

17   going to have to literally search it and analyze it.  And

18   following up on what you were saying earlier that we

19   already have a lot of stuff, I'd like to tick off what we

20   don't have.  And it's a large volume.

21       There are the 86,000 documents we've never seen

22   before that the new search term show to be relevant that

23   we're not going to get until the end of this year.

24   Mr. Pass didn't mention the 40,000 documents that

25   AstraZeneca just found that should have been collected in

1   the original search through the original custodians.  I'm

2   not sure if we're getting that today or tomorrow or at the

3   end of the year.  It wasn't in the report.

4       There's 20,000 track change documents that I assume

5   we won't see the track changes until we get the native.

6   Vickram Dev they found his PST, it was misplaced, they

7   just found it, his biggest PST from 2000 and to 2002.  So

8   we're going to get, what I assume to be, a pretty good

9   chunk of e-mails.

10      That's special Seroquel e-mail box that's created

11  just for this litigation for just relevant data, 2.5 or

12  2.8 gigabytes, it been reported differently in different

13  places.  They say it's all e-mail.  My people tell me if

14  it's mostly e-mail or all e-mail, it's probably 100,000

15  pages of e-mail that we won't get until the end of the

16  year.

17      And then the databases, obviously a lot of stuff, and

18  then our searches that we've done to date have to be

19  redone.  So we have just an absolutely flabbergasting

20  amount of work to be done.  And really, it won't even

21  begin as far as I can tell until December 31.  And it

22  sounds like we're not going to get the first database

23  until after January 20.

24      So I don't think we could be more aggressive in

25  compressing our schedule and committing to be able to do

```
 1   what we need to do than to say 60 days from the day they

 2   substantially complete which it sounds like, assuming

 3   they're prediction becomes a deadline, that that would be

 4   May 14.

 5            THE COURT:  How does this dovetail with your

 6   motions to compel?

 7            MR. GORNICK:  We're assuming that we will be

 8   able to resolve those motions to compel in a timely way.

 9   If we can't, we may need to ask for some relief in some

10   limited ways.  But given that it's the middle of November,

11   I assume we're going to be able to get through those

12   motions to compel in a way that will allow us to complete

13   our third party efforts by the middle of May.  But the

14   Court does -- I mean, it's a very good point, and I

15   suppose that that's a slight wild card in the mix since it

16   is third parties, but we intend to do everything in our

17   human power --

18            THE COURT:  Well, no, I was talking about the

19   motions to compel with the document request.

20            MR. GORNICK:  Oh, on the RFPs?  Given the

21   Court's prior speed with things, I assume we're going to

22   get that done.  And so I mean, we can only work as fast as

23   we can obtain orders, one way or the other, but it is six

24   months.  So my bet is that's not going to be a problem,

25   but I would hate to be presumptuous.
```

1           MS. WHEELER:  Your Honor, I'll be more than

2   happy to address the motion to compel the RFPs.  There are

3   some items in there that were very, very specific and

4   obviously very relevant to the depositions we're taking

5   now.  And so we would like to see those documents before

6   February 14, 2008.

7           THE COURT:  Well, there's a couple of different

8   issues:  One is the RFPs, the other is the case specific

9   motions to compel and issues that, as I understand, you're

10   still working with Special Master Brown on, you've got

11   some things scheduled today and tomorrow, I guess, to try

12   to work through those.  Is that still true?

13           MR. GORNICK:  Yes, that is, Your Honor.

14           THE COURT:  All right.

15       All right.  I think I've heard enough on this.  What

16   I'm planning to do is the following on this subject:

17   Would be to prepare a report recommendation to Judge

18   Conway recommending with respect to the case specific

19   discovery that we set a date for its termination with

20   allowance for some spillover to complete things that are

21   already under way.  And I'll -- that'll be in my report.

22       That -- I'm going to recommend a new schedule for the

23   completion of discovery and for motion practice on the

24   global issues.  My thought would be to, with respect to

25   the motions to compel that I was just talking about,

1    the -- not the ones that are case specific, that I set a

2    hearing on those giving you and directing you to undertake

3    further meet and confer and honing of what those issues

4    are given the current circumstances with respect to what

5    has been produced and what's important, but then we'll

6    have a definite day for that to be resolved within the

7    next month.

8         Then and also set a hearing, evidentiary if

9    necessary, to wrap up the sanctions issue.  I say wrap up.

10   There may be some live issues that go forward because of

11   the nature of things, but to wrap it up based on whatever

12   the circumstances are at the time.  And that would

13   encompass everything that was alluded to in my prior order

14   as well as the problems that have surfaced since.  That

15   would be your opportunity to present your requests for

16   imposition of costs and other matters, and I would set

17   that either in December or January.

18        I'm going to recommend to Judge Conway that under the

19   circumstances, that consideration of any motions to

20   dismiss plaintiffs cases be suspended until all of this is

21   taken care of, that will -- it's not directly related, but

22   there's certainly an element of fairness there in terms of

23   playing field.  And we'll give those plaintiffs who have

24   been having difficulty providing full and complete

25   information further time to correct any deficiencies.

1          That's my plan on that.

2          Let me move on to the case specific discovery issues.

3     Apparently you are still talking about that.  Is it the

4     well-founded hope that those are going to be resolved so

5     we don't need a hearing on the 27th?

6               MR. GORNICK:  I could address that very quickly

7     on what you just mentioned about setting a date for the

8     sanctions hearing.  We intend to take depositions that go

9     to that.  We think it's very important to figure out where

10    the deceit lay.

11         So we would like to take depositions of the two

12    vendors who've been accused of misrepresenting and

13    concealing facts and Mr. Andrew Dupre, who gave us the

14    guarantee that those blank pages were non-substantive.

15    And so we'll be getting deposition notices out on those.

16         We just wanted to bring that to the Court's attention

17    in the event that we could talk about it a little bit

18    today so we could get them done in the event that

19    AstraZeneca is going to push back on those.

20              MR. McCONNELL:  Your Honor, we would push back

21    on those.  I think that Your Honor's already gone over the

22    law, the Sedona principals doesn't matter internally

23    whether it was vendors or somebody else under that we have

24    to answer to.  So it seems to me that that's something of

25    a frolic and detour.

1      But while we're talking about discovery that would go

2   to the issue of sanctions, we have to have some discovery

3   going to the issue of prejudice, obviously.  And we've

4   heard a lot of representations from the plaintiffs' side

5   about the lack of searchability.  We don't think that's

6   true.  We think it's at a minimum an exaggeration.

7      So we would intend to take some discovery perhaps of

8   Mr. Jaffe or whoever else internally on the plaintiffs'

9   side to get at the issue of the systems used and whether,

10  in fact, there has been any disability in the way of

11  searchability.

12     In terms of the date for the sanctions hearing, Your

13  Honor, just two things:  One, Your Honor did say December.

14  I'll just tell you, I probably would play a role at that

15  hearing.  I can't make it in December for medical reasons,

16  but I also think that's too soon because --

17          THE COURT:  Well, I said December or January.

18  And I'm leaning toward January.

19          MR. McCONNELL:  And I would just say, even

20  January, I think, is too early and I'll tell you why.  I

21  think the most significant issue at the sanctions hearing,

22  as I understand it, is the issue of prejudice and cost.

23     I don't think a lot of those issues are going to be

24  ripe by January because our position is going to be that a

25  lot of the discovery that's going to be produced,

1    certainly up through February 14, possibly even March 14,

2    is going to remove a lot of the prejudice, especially when

3    it comes to are the plaintiffs being hindered in their

4    ability to depose people.

5         And Mr. Gornick's schedule that he proposed, which

6    actually I think is very sensible, would involve

7    depositions of company personnel up through the middle of

8    May.  Seems to me it's pretty hard to assess the extent to

9    which plaintiffs really have been prejudiced in their

10   ability to take depositions until you've actually had

11   those depositions.  Our position is going to be, by then

12   we don't think there is going to be a prejudice.

13        So, I just offer that in the way of having what I

14   think is the Court's aim to have a full final sanctions

15   hearing and put this issue behind us.

16        And I think you need to schedule that at a point when

17   all the facts, as opposed to rhetoric, the facts actually

18   are there to be developed for you to make findings.

19             MR. GORNICK:  Your Honor, we'd be happy to

20   submit the bids for more vendors to convert to native as

21   soon as you want to see them.  Bottom line is that we're

22   going to have to start writing checks to vendors for

23   millions of dollars.

24             THE COURT:  I understand.  I'll hear it based on

25   what I set it, based on what's known at the time.  And

```
 1   I'll make a provision for what -- how to handle discovery

 2   with respect to that so that you can -- both sides can

 3   properly prepare for that hearing.

 4            MR. MAGAZINER:  Your Honor, you asked

 5   Mr. Gornick a question about whether the issues of case

 6   specific discovery that are now in front of Special Master

 7   Brown are likely going to be resolved over the next

 8   several days or whether you need to keep the 27th on your

 9   calendar as the date for potential evidentiary hearing.

10   Mr. Gornick then started talking about a discovery they're

11   going to take.

12        I think Mr. Gornick was not addressing the question

13   that Your Honor asked but addressing the question of

14   discovery needed on the sanctions motion.

15        Is that correct, Mr. Gornick?

16            MR. GORNICK:  I believe that's how I prefaced my

17   comments.  And I quickly had to follow up on something and

18   I get to the --

19            THE COURT:  He took a couple of detours.

20            MR. GORNICK:  If I mumbled or had marbles in my

21   mouth, I apologize.

22            MR. MAGAZINER:  All right.  Because I -- On the

23   couple of issues that Special Master Brown or the PMO or

24   Mr. Brown is dealing with, Mr. Stewart is on the line --

25   telephone line and he can address that.  It is my
```

1    understanding that Mr. Brown is optimistic that those

2    issues will be resolved over the next several days based

3    on where the parties are and the cooperative nature of the

4    discussions that have been ongoing.

5         So Mr. Brown could address that and Mr. Russell can

6    address it for AstraZeneca's position, if Your Honor

7    please.

8              THE COURT:  I really just wanted to confirm the

9    parties are realistically optimistic that that will be

10   resolved.  Is that --

11             MR. GORNICK:  Your Honor, I -- we do have

12   another hearing tomorrow with Master Brown.  I don't want

13   to mislead the Court.  There is a chance things will be

14   resolved, but I don't want to tell this court that it's

15   pretty certain --

16             THE COURT:  I'm leaving things on.  I'm just --

17             MR. GORNICK:  I mean, I'm happy -- I'm more than

18   happy to move the 27th to give this process a chance.  I

19   just don't want the Court to take that as an indication

20   that it's going to happen.  But we're happy to move things

21   a week or two to give the process a chance.

22             THE COURT:  All right.  I'll just ask Special

23   Master Brown, either tomorrow if it's appropriate or early

24   next week, file a brief report on whether it's been

25   resolved or there's still progress to be made and whether

1    in his view going forward on the 27th makes sense or

2    postponing it would make sense.

3            MR. GORNICK:  Your Honor, one last thing on the

4    general discovery schedule, this might be a dovetail into

5    the Florida trials schedule.  You had asked about

6    deadlines for the plaintiffs getting the general expert

7    reports done and we have that in the trial schedule for

8    Florida.  And the parties have agreed, I believe, on an

9    August 15 deadline for the plaintiffs general expert

10   reports.  Again, we think we could do that.  And that

11   would be challenging for us given how much data we're

12   going to get late in the day.

13       And so if there is that substantial completion in the

14   middle of March, can we have those 60 days to then

15   complete all our general discovery.  We can get that done,

16   get all our expert reports done by the middle of August

17   and we would request that the Court grant us that time.

18           THE COURT:  All right.  Let me talk to you

19   briefly about the Florida schedule that you proposed.  I

20   haven't run all the dates.  And again, my plan would be to

21   either confer with Judge Conway or do a report

22   recommendation to her about that.

23       The one concern that I did have -- again, I want to

24   commend you for your -- what I'm confident was difficult

25   for both sides in terms of working out as many things as

1    you did here.

2        If we only do full discovery in 20 cases and if, as I

3    am confident, defendant will be hacking away at as many of

4    those as it can, how many will be left for trial, assuming

5    that defendant's successful in some of those endeavors,

6    and which seems, based on the history of such cases, at

7    least some of them are likely to disappear for one reason

8    or another.

9        I'm just wondering whether that's enough, if that

10   gives us a reasonable assurance of having enough left to

11   try to be meaningful.

12           MR. PENNOCK:  Your Honor, Paul Pennock for the

13   plaintiffs.

14       To put it, I think, maybe in some good context, even

15   if there were a reduction, and I agree there may very well

16   be, but even if it were by half and we ended up with 10

17   cases to try, that would be double the number of cases

18   that the Vioxx MDL tried in the entire span of that MDL.

19   That number of cases being tried would almost equal the

20   number of Vioxx cases tried across the country in state

21   and federal venues throughout that entire course of that

22   six or seven-year litigation.

23       So I do think that based upon the experience of prior

24   MDLs and the success of those running both ways, that

25   having even 10 cases is a substantial number of cases and

43

1  would be, I think, an amazing success for this Court to

2  have achieved, preparing 10 cases for trial even within, I

3  guess, at that point the two-and-a-half years that we will

4  have been here.

5      So I do think -- and I've spoken with the defendants

6  on this -- that this -- you know, the number that we will

7  eventually boil down to, if it's 20, that will be

8  stunning.  If it's ten to 15, that will be nearly stunning

9  and certainly more than enough to flesh out all of the

10  issues that need to be fleshed out in a complex litigation

11  such as this.

12      THE COURT:  How long do you think each trial is

13  going to run?

14      MR. PENNOCK:  I think, Your honor, the first

15  trials would run longer -- if they were not being tried

16  simultaneously, assuming that there were an initial trial

17  to flesh things out, how these trials work, that would

18  certainly be much longer than the tenth trial after the

19  parties become acclimated to the ins and out of trying a

20  Seroquel case.

21      But, you know, I would be very surprised if we could

22  try a case of this complexity, with the damages that are

23  lifelong and so forth, in less than four or five weeks I

24  think is what you're looking at, certainly for the initial

25  trial.

1    I mean, you know, one other thing defendants and

2    plaintiffs, I think, usually agree on in these litigations

3    is that neither one of us want to be too truncated in the

4    initial trials because we're trying to sort things -- the

5    first case trying to sort out things.

6         But I think you're looking at four or five weeks as a

7    very reasonable proposition given the complexity of these

8    cases and ultimately probably boiling down to a little bit

9    less than that.

10        THE COURT:  All right.  I have not spoken to

11   Judge Conway about what her preference is going to be.

12   Let's assume we had whatever number set for trial, whether

13   she -- I'm reasonably confident she's not going to want to

14   try them all.  I'm reasonably confident she'll be willing

15   to try more than one of them.  My suspicion is that she

16   will -- particularly since she'll be chief judge by that

17   time, call upon her colleagues throughout the Middle

18   District to take some.  But how she would do that -- and

19   again, I don't know that that's what she has in mind --

20   but it stands to reason that that's what would happen.

21        And whether any of them would be done simultaneously

22   or not, that's a very difficult question for the parties

23   and the witnesses, so on the other hand, if we're setting

24   them we may -- that's certainly not impossible.

25   Difficult, but not necessarily impossible.

1        Let me ask you your thoughts on the role -- or

2   potential role of using the services of the PMO some more

3   on coordinating the Florida specific discovery, something

4   you think you need --

5        MR. PENNOCK:  I think the PMO has been

6   tremendously helpful and we'd like to continue with the

7   services the PMO for the Florida specific discovery.

8        THE COURT:  If you're discovering that many

9   cases at the same time, it seems to me that it's a

10  different set of services from the PMO, but of like kind

11  that would probably make life easier for you.

12       Any thoughts from defendants on this subject -- Well,

13  before I do that, with respect to the points of

14  disagreement in your joint notice, anything else

15  plaintiffs -- I see your respective positions, but I'll

16  listen to any --

17       MR. PENNOCK:  Your Honor, yeah, I think that the

18  points as you noted were fairly minimal.

19       THE COURT:  You've got disagreements about how

20  much discovery?

21       MR. PENNOCK:  Yes, I think that, you know,

22  clearly you need a lot of depositions to get one of these

23  cases prepared.  We think that the federal rules was a

24  fairly well-thought-out body of procedural law, and the 10

25  deposition limit that's set forth in those rules is a good

1  per part, per side.  It is a good presumptive limit to

2  move forward with these cases.  The rule permits by leave

3  of court, additional depositions as needed.

4       And in my experience, the 20 fact depositions in one

5  of these types of cases is more than enough.  I can tell

6  the Court that I have never done a case where there were

7  more than 25 or 26 depositions total, including all the

8  experts.  So, I think 20 depositions will be more than

9  enough.

10      But in the event that the defendant perceives there's

11  some doctor somewhere that absolutely has to be deposed

12  beyond that, A, if we've already hit 20, I'm suspicious

13  that we'll probably agree to go do another couple and, B,

14  they can obviously come to the Court and make their case

15  if we have some disagreement on that.

16      So I believe that putting that limit on just makes

17  sense.  That's why it's in the federal rules that were

18  wisely crafted.

19      I think there was a disagreement on the situation

20  with mediation.  We do feel that if we're going to mediate

21  these cases, it should happen earlier in the process

22  rather than at the end of the process after literally

23  several hundred thousand dollars have been spent per case

24  to prepare each case.  Because, again, in my experience,

25  to take a case like this from the nascent point to trial

1   jury selection is about a 3 to $400,000 proposition.  And

2   then the additional money for trial.  That's just the way

3   it is.

4       So we think that, you know, mediation at the end of

5   the process probably isn't going to be very fruitful, just

6   given the fact that for our clients to recover, which is

7   what for us this is all about, it's not very likely given

8   the expenses that will have occurred.

9       I will note that the Court in New Jersey has ordered

10  that mediators be selected and the defendants already

11  selected a mediator, and submitted that to the judge in

12  New Jersey.  We've selected a mediator, and we will be

13  preparing those mediators up in New Jersey for moving

14  forward with mediations, giving them the information they

15  need and so forth to learn about the case.  We're going to

16  have a joint presentation to them.  We're getting the

17  mediation process established there for early mediation.

18  The judge in New Jersey has contemplated ordering, I

19  think, five mediations to start with to see how it goes.

20      The defendants have said obviously they'll comply

21  with the order, but they are not interested in mediating

22  any cases yet.  But I think relevant to this point here is

23  that when you get parties at a table and you have a

24  mediator shaking the tree, you know, things can happen.

25  And we think the same should happen here with early

 1   mediation.

 2        The -- a very fundamental difference, I think,

 3   between the two orders, probably the most substantial area

 4   of disagreement relates to the number of cases that will

 5   actually go through the entire expert deposition process.

 6        We have suggested that after the completion of all of

 7   the factual discovery that at that point we cull down to

 8   the trial cases and move through with all the expert

 9   depositions on the 10 trial cases rather than doing all

10   the expert depositions in all 20 cases.

11        You know, obviously this is a -- there's a cost and

12   time issue.  The cost of expert depositions is enormous,

13   both in preparation of the experts and in the expert

14   attending the deposition, the cost for each expert is, you

15   know, literally 10s of thousands of dollars to go through

16   the deposition process.

17        So we would reduce the number of expert depositions

18   by half.  And we think that would be an important thing to

19   do, also because of the timeliness that we're dealing

20   with.  We are in a fairly unprecedented and extremely

21   aggressive discovery trial preparation process for an MDL

22   that, as I said earlier, it will be, I think, quite a

23   success when this is all done next year.  But

24   nevertheless, it is very, very aggressive.

25        And to do what I would estimate to be at least 60

1  expert depositions, say, two or three experts per side per

2  20 cases -- I'm sorry, 120 expert depositions, is just

3  something that is going to wreak a lot of havoc that's

4  unnecessary, since the end of the day we're only looking

5  to have 10 cases ready for trial by December.  And there's

6  nothing stopping us from picking up those other 10 cases

7  and doing the expert depositions if the first 10 don't

8  resolve things one way or the other.

9      So this is an area of substantial disagreement.  It

10  involves an issue of millions of dollars in costs and,

11  therefore a substantial issue.  And we really think it

12  would be -- we're -- both sides are behooved to just

13  finish the fact discovery, select the cases, cull down to

14  the 10, and then move through that very complicated,

15  difficult and costly expert discovery process.

16      The defendants, if I wasn't clear, Judge, want to do

17  the discovery process on all 20.

18      We also had a fairly minor issue regarding the

19  dispositive motions and when they should be filed.  I

20  don't even think this is much of an area of dispute.  It's

21  simply that -- and Mr. Magaziner sort of clarified their

22  position a little bit for me earlier.

23      I had suggested that there are certain dispositive

24  motions that could be made very early on and if so, they

25  should make them.  For example, if somehow they think

1   they're able to be successful on a statute of limitations

2   motion, you know, I would think that could be made pretty

3   early on after a plaintiff deposition or a physician

4   deposition that's relevant on that.

5        And so we'd like to see any dispositive motions that

6   they can make or think they can make to be made earlier in

7   the process and we can deal with those on a more rolling

8   basis.  Again, timing and aggressive schedule is the issue

9   here.

10       I'm sure they will be making the Daubert motion, and

11  that's, as the Court is undoubtedly aware, an extremely

12  difficult, complex motion to deal with and we'll need a

13  lot of time during that month of November of 2008, and

14  undoubtedly in early December of 2008, to address those

15  motions.  There will probably be a general motion, there

16  will be case specific Daubert motions.

17       So to the extent these dispositive motions can be

18  made on a rolling basis, I think, will be very helpful for

19  everyone concerned.  There may be ones that they have to

20  wait until the end that they do.  We've suggested that

21  they file those at the same time as the Daubert motions

22  where we have more than two weeks to respond to a

23  dispositive motion on the entire litigation.

24       Other than that, I think I've hit the areas of

25  disagreement between the parties.  And I'm glad that the

1    Court recognized the time and effort that went into this,

2    because despite these areas of disagreement, we did spend

3    hours and hours banging out the details that we're hopeful

4    Your Honor -- we tried to do it in accordance with what we

5    thought Your Honor would want.

6        We went back to the transcripts to look at Your

7    Honor's comments.  And we're hopeful that other than these

8    areas of disagreement they need to resolve that it's an

9    acceptable concept to Your Honor.  Thank you.

10           MR. MAGAZINER:  I thought I was going to have a

11   very rare opportunity, Your Honor, to say something that

12   I've never said before in this Court, and that was up

13   until the time you asked Mr. Pennock to address the areas

14   of disagreement in the order.

15       What I thought I was going to be able to say is that

16   I agreed with everything Mr. Pennock had just said about

17   the scope of this program, the number of cases --

18           THE COURT:  Let's note that the areas of

19   disagreement are really pretty small compared to what you

20   did agree on.  I mean --

21           MR. MAGAZINER:  But I also was going to --

22           THE COURT:  Not saying they're not important,

23   but there are a lot of important things that you did agree

24   on.

25           MR. MAGAZINER:  Indeed there are.  And I was

1    also going to say that I agreed with Mr. Pennock's

2    observations about the number of cases and how many would

3    be left.  Of course, from the defendant's point of view,

4    it is not by any means unsatisfactory to us if we start

5    with all these cases the plaintiffs identify their very

6    best cases after discovery has taken place on a limited

7    basis and after full discovery has then taken place, if

8    they then say there are only 10 cases -- or that here are

9    their five best cases, if all five of those cases

10   disappear on dispositive motions, of course, that may

11   leave nothing for Judge Conway to try, but it is very

12   telling.

13           THE COURT:  Well, I assume there's a certain

14   amount of strategy going on here.  I mean, every case

15   ultimately will be resolved on its own merits.  But the

16   timing is important to both sides in terms of how things

17   are perceived and how things are going and momentum and if

18   there are settlement discussions or mediations, how -- the

19   dynamics of that.

20       And I sort of think it presents an interesting

21   dilemma for each side as to how to choose those cases.

22   And I'm assuming that plaintiffs will choose their best

23   and you will choose the ones you think are weakest, but

24   then you've got a choice, you're probably going to try to

25   knock them off pretrial or you'd like to try a couple of

1    what you think are the weak cases and get a verdict.

2         I mean, I'm just hypothesizing about how both sides

3    thought processes are working, so --

4              MR. MAGAZINER:  And there's a lot of accuracy in

5    what Your Honor was hypothesizing I'm sure.

6         In terms of the length of the trials, when you asked

7    the question of Mr. Pennock, I thought to myself, how

8    would I answer that and I came up with five weeks.  And I

9    was not surprised to hear him say four to five weeks.  I

10   think that's realistic.

11        I think in Vioxx, which is somewhat similar, it's --

12   Vioxx cases resemble these cases in some ways more than

13   some other mass tort cases do.  I think the first Vioxx

14   trials in New Jersey were six weeks, as I recall, and then

15   the more recent ones were about two weeks.  Is that right?

16             MR. PENNOCK:  Not in New Jersey.

17             MR. MAGAZINER:  In the MDL they were two weeks,

18   so that gives you a range.  We're not in much disagreement

19   on that.

20        As to the areas of disagreement, the number of

21   depositions, Mr. Pennock notes what the Federal Rules of

22   Civil Procedure provide as to number of depositions.  Of

23   course, when it came to the depositions of AstraZeneca

24   personnel, Mr. Pennock said, well, the federal rules

25   really have nothing to do with this.  This is a much more

1    complicated matter than the typical matter and we should

2    be entitled to take depositions for two days not one and

3    we agree to that.  So it's interesting that he now thinks

4    the federal rules should control the number of

5    depositions.

6         The reason -- Mr. Pennock said that 20 depositions is

7    about the most that are taken in cases like this.  And

8    that may be so, but it is often the defendant that takes

9    15 of those and the plaintiff might take five.  So

10   Mr. Pennock has cleverly shifted it and saying 20 is about

11   right, so each side gets 10.

12        The reason the defendant takes more typically in a

13   case like this, Your Honor, is that one of our jobs is to

14   ferret out all the information about the plaintiffs'

15   pre-existing medical condition.  Because often what that

16   discovery reveals is that the plaintiff had before ever

17   ingesting the drug in question, already had the medical

18   condition at issue.

19        That's going to be particularly true with a medical

20   condition that is as commonplace as diabetes is.  It was

21   true in Vioxx, for example, because that involved heart

22   attacks which are very common, as Your Honor knows, and

23   risk factors for heart disease are very, very prevalent in

24   society.

25        So often what the defendant has to do is pursue every

1    avenue into the medical records through the various

2    providers, even people who saw the plaintiff only briefly,

3    to see whether there is evidence that the plaintiff, in

4    fact, had diabetes before ever ingesting Seroquel or

5    whether the plaintiff at the same time that she says she

6    was only taking Seroquel was actually taking Zyprexia and

7    Risperdal simultaneously in greater quantity than

8    Seroquel, for example.

9         And our investigation of the case often requires that

10   we depose many healthcare providers and particularly when

11   the plaintiff may have seen 15, 20 are 30 different

12   doctors over a period of time.

13        So what we've suggested is that either side be

14   permitted to take depositions of any doctors or other

15   healthcare providers with the goal of thoroughly

16   investigating the plaintiffs medical condition and the

17   plaintiffs use of other medications and then limits to be

18   placed on additional depositions of fact witnesses.

19        I don't know that there's more I need to say about

20   that, Your Honor.  But I do think it's not -- it's a

21   little disingenuous for Mr. Pennock to say 20 is about

22   normal and, therefore, there should be 10 per side,

23   because I think Mr. Pennock would agree where there are 20

24   depositions taken, it's usually the defendants who take

25   the bulk of them.

1    With regard to the expert depositions, I'm a little

2  confused by what Mr. Pennock said, because paragraph M of

3  our proposed -- our jointly proposed order provides that

4  we will get reports and can depose all the experts in the

5  20 cases.  Mr. Pennock then, after having agreed to that

6  in the order that was submitted to the Court, has just

7  presented to Your Honor in argument why the agreed upon

8  order should not apply.

9    So I'm a little mystified about what's happening

10  here, because I thought we had agreed on it and it is

11  provided in paragraph M and N exactly the way we had

12  agreed to it.

13    In any event, it does seem to us that in order to

14  select the 10 cases for trial, we should -- both sides

15  should have the benefit of expert reports and depositions

16  of the 20 cases that have been fully worked up so we each

17  have the best sense possible what we would be dealing with

18  at the time of trial.

19    Mr. Pennock said something about mediations.  In our

20  negotiations leading up to this, we agreed that we would

21  not address the subject of mediations unless the Court

22  after a lot of back and forth and we agreed, that the best

23  thing was not to address mediations and we have not

24  addressed mediations in this report, not even to put our

25  separate positions forth.

1           The Court, I know, is interested in mediations.  We

2    could perhaps come back to the Court at some later date

3    and discuss that.  I think at this point here in November,

4    it's way too early to figure out what would be the best

5    time to mediate and how many of the cases should be

6    subject to mediation.  But we do understand the Court's

7    interest in that.

8           As I said earlier, Your Honor, I think this schedule

9    that we proposed and negotiated painstakingly with

10   plaintiffs is a realistic schedule, and I think it will

11   achieve the Court's goals and objectives.

12           THE COURT:  Recognize this may be premature, do

13   you have a feeling with respect to the Daubert motions

14   that you anticipate filing -- again, it's premature

15   because you haven't got the expert reports or the evidence

16   that's underneath them, whether an evidentiary hearing

17   would be necessary to resolve any Daubert issues?

18           MR. MAGAZINER:  It depends what kind of Daubert

19   motions they're talking about, Your Honor.

20           There -- there are not uncommonly in mass tort

21   litigation reports submitted by plaintiffs that are on

22   their face such that we can file a Daubert motion and the

23   Court will grant it.  I don't expect that to be happening,

24   if we've narrowed this down to a few cases that the

25   plaintiffs think are particularly trial worthy, that

1    they're going to be submitting in support of those cases

2    are reports that could be resolved on the papers -- or

3    reports that are susceptible to Daubert motions that can

4    be resolved on papers.

5         Of course, we will also be selecting some cases and

6    we will, I'm sure, select cases where we think there's no

7    plausible expert opinion available.  And who know what's

8    the plaintiffs' reports will be in those cases.  And some

9    of those motions may be susceptible to being resolved on

10   the papers.

11        My guess is most of the Daubert motions will require

12   evidentiary hearings, although they won't necessarily be

13   lengthy evidentiary hearings, probably the kind of things

14   that could occur in a day or a day-and-a-half.

15            THE COURT:  The reason I ask is if that is

16   contemplated, we need to allow some time for it.  And

17   Judge Conway will have to decide whether she wants to hear

18   those or wants me or someone else to hear them.  I have

19   heard such motions in the past and the district judge

20   conducted those hearings themselves.  It just depends on

21   any number of things.

22            MR. MAGAZINER:  Not to answer Your Honor's

23   question at all, but just to provide some -- to describe

24   some experience that counsel in the room have had in other

25   cases like this, there are no doubt going to be Daubert

1    motions challenging some of the general experts, depending

2    on what it is the general experts opine.

3        Those motions, I think, will look different and will

4    occupy different -- will require a different amount of the

5    Court's attention than the motions that will be filed with

6    regarding -- with regard to case specific experts.

7        And I think as Your Honor and Judge Conway think

8    about this, you might think in terms of two different

9    kinds of expert reports and two different kinds of Daubert

10   motions and different requirements for each.

11           THE COURT:  Okay.  All right.  I will work

12   through all that.

13       Next let me talk with you briefly with respect to the

14   motions that have been referred down here from Connecticut

15   and New York.  I don't want to get into the substance of

16   those because we don't have the witnesses represented

17   here.  It's my thought to schedule a telephone conference

18   with all interested parties.

19       I've just glanced at what came in.  What I'm

20   wondering is whether it would be -- whether you have any

21   thoughts about whether it would be useful to have -- at

22   least as to some of the issues which appear to relate to

23   trying to solve some technical issues and minimize cost,

24   whether having Special Master Ball work with you on it

25   would be useful.

1              MS. WHEELER:  Your Honor, I imagine that could

2     be useful to a certain agree, but I think the primary

3     issues with some of these third parties really has to do

4     with scope and costs not so much the technical issues.

5              THE COURT:  All right.  Then what I'll do is set

6     a hearing -- a telephone conference hearing and give

7     notice to the counsel for witnesses and we'll talk through

8     the issues and I'll make some rulings.

9              MS. WHEELER:  Your Honor, if I could just make

10    you aware of one thing.  The motion that was filed in

11    Pennsylvania, Judge Thomas O'Neill declined to transfer it

12    to this Court because there was really only one issue

13    remaining and that was with respect to attorney's fee.  He

14    did indicate that he is going to review the invoices of

15    the attorneys fees, issue an order and then suggested that

16    I present that order to you to decide how those fees

17    should be allocated.

18              THE COURT:  All right.

19              MS. WHEELER:  Thank you.

20              THE COURT:  All right.  Do you have a sense

21    whether people would want to have that telephone

22    conference I'm talking about next week?

23              MS. WHEELER:  Your Honor, it's been a while

24    since I spoke with some of these attorneys.  I know that

25    they are anxious to get it resolved, so they may be

1   amenable to that, but I'll need to speak with them first.

2            THE COURT:  All right.

3            MS. WHEELER:  You know, maybe a week or two.

4            THE COURT:  I mean, I'd definitely like to get

5   it done before the end of the month.  Next week is a

6   little -- if we do it by telephone, it's not quite as bad,

7   but --

8            MS. WHEELER:  I'm sure they would really

9   appreciate that.  They didn't show much desire to come to

10  Florida to deal with this.  So --

11           THE COURT:  Maybe in January.

12           MS. WHEELER:  -- maybe so.  The way the things

13  are going, getting those documents, I guess, it really

14  wouldn't make too much of a difference since we're still

15  missing so many other documents.  Thank you.

16           THE COURT:  I mean, we could persuade them to

17  come down here in person in January.

18           MS. WHEELER:  Oh, yeah, that as well.

19           THE COURT:  Traveling Thanksgiving week is not

20  an ideal situation.

21       All right.  With respect to the motion to lodge

22  documents, how much of that material do you anticipate

23  really wanting to file and why?

24           MR. GORNICK:  Your Honor, that's the

25  confidentiality.

1          THE COURT:  Right.

2          MR. GORNICK:  Those documents are directly

3    relevant to our motion for sanctions related to the case

4    specific discovery violations, and the defendants have

5    opposed our motion, I believe.  You could get a sense of

6    what those documents are by looking at the Gechell

7    documents we attached.

8       For some reason, we challenged the confidentiality of

9    those and AstraZeneca didn't object at all.  And so

10   there's no confidentiality attaching to those anymore.

11   And now they say that equivalent documents for other

12   plaintiffs are confidential.

13      So last time we were here, you wanted to leave that

14   issue until you knew whether or not you were going to hear

15   the motion, but I think it is before you so we can -- I'm

16   not sure what you want to --

17          THE COURT:  Well, what volume of stuff are you

18   talking about for filing?

19          MR. GORNICK:  It's probably about this much

20   stuff.

21          THE COURT:  Let me ask defendant, with respect

22   to these payments to the doctors --

23          MR. McCONNELL:  Yes, Your Honor.

24          THE COURT:  -- the documents about that,

25   information about it, as I read through there, a

1   suggestion was that some of those were payments made

2   informally without any written agreement, some may have a

3   written agreement.

4       Is there any agreement that they were supposed to be

5   kept secret?

6           MR. McCONNELL:  I don't think there was an

7   agreement between the company and the doctor that they

8   were to be kept secret.  I actually don't know.  Our

9   papers argued that whether or not that's the case, there's

10  still a confidentiality that applies and there's case law.

11          THE COURT:  I understand.

12          MR. McCONNELL:  I don't know the answer to your

13  question.

14          THE COURT:  All right.  I'll resolve that.

15          MR. McCONNELL:  Your Honor, just one quick

16  thing, if I may, just a response to something Mr. Gornick

17  said on the Gechell issue.  We actually did send a letter

18  to the plaintiffs objecting to disclosure of the Gechell

19  documents, it was a little late and then that was the end

20  of it.  There was no further meet and confer.

21      We had sent a letter notifying them of our objection

22  and that's where it stopped.  And it does occur to me this

23  actually ties in with one of the arguments that we made in

24  opposition to the plaintiff's motion that this issue of

25  confidentiality of documents that the process has some

1    glitches in it, that the way in which it works, I think,

2    as the plaintiffs' say, we don't think that these

3    documents are confidential.

4        And so far, all they've done is say, it's a big pile

5    of documents, we don't think these are confidential and

6    then we're supposed to write some sort of response back

7    within a certain amount of time and then presumably

8    there's supposed to be some sort of meet and confer which

9    there really hasn't been and then somebody is supposed to

10   file a motion with the Court.

11       I do think, and we say this in our paper, this may be

12   a process where we benefit from the PMO.  To make sure

13   that there really is some sort of reasonable discussion,

14   we may be able to head off some these issues from going to

15   the Court.

16       For example, with respect to this, we withdrew our

17   designations with respect to two categories.  With respect

18   to the remaining three categories, Your Honor, I take it

19   Your Honor is going to render a decision.

20       I would say, if I were in my old days as a federal

21   prosecutor, I would just stand up and say, submit on the

22   papers, because I think what's in the papers is pretty

23   one-sided, the authority is all on one side.

24           MR. PENNOCK:  Which side?

25           THE COURT:  All right.  Last issue I have is

1    just to hear from you about the hearing that Judge

2    Weinstein has scheduled for next week on Zyprexia.  I'm

3    not planning to sit in on that.  I don't know what I would

4    do if I could, I can't, but --

5           MR. MAGAZINER:  I don't know if Your Honor has

6    had a chance yet to read the response that AstraZeneca

7    filed in front of Judge Weinstein.

8           THE COURT:  I glanced at it this morning.  I

9    won't say I read it through thoroughly.

10          MR. MAGAZINER:  Well, I don't think I can add to

11   what we said there, that is our position.  Our position

12   that I will be arguing to Judge Weinstein on Tuesday is

13   that much of what the plaintiffs have asked for is moot or

14   not ripe because it attacks requests that we never made.

15          THE COURT:  That's what was puzzling me.

16   Because we went through this once.  And I was a little

17   surprised that you backed off some of the requests you did

18   and I guess you did that to avoid bringing it to a head

19   before you needed to.

20          MR. MAGAZINER:  No.

21          THE COURT:  I don't mean you withdrew it, but

22   you withdrew it for the time.

23          MR. MAGAZINER:  Well, the plaintiffs make it

24   sound like we had been trying to get or are going to try

25   to get the documents that relate to the calculation of

1    plaintiffs' claims, documents that relate to the

2    evaluation of the plaintiffs' claims, documents that

3    relate to how these special master and the Zyprexia

4    litigation process the plaintiffs claims.  And that's a

5    strawman that the plaintiffs put up and then knocked down.

6    We never asked for that and we have no interest in that.

7              THE COURT:  I'll leave this to Judge Weinstein.

8    And I don't know that we're going to come to loggerheads,

9    but if -- whatever he rules, he rules, and if there's --

10   if as a result of that, you think you're entitled to

11   relief from this Court, you know where to find me.

12             MR. PENNOCK:  Your Honor, if I may, first if I

13   could just obtain some clarification.  When Mr. Magaziner

14   says the plaintiffs' position before Judge Weinstein.

15   We've not taken a position contrary to what this Court has

16   ruled.

17             MR. MAGAZINER:  The plaintiffs steering

18   committee in the Zyprexia litigation --

19             THE COURT:  The Zyprexia claim.

20             MR. MAGAZINER:  -- took the position --

21             THE COURT:  Okay.  I understood --

22             MR. MAGAZINER:  All right.  Yes.

23             MR. PENNOCK:  Your Honor, I will be appearing

24   before Judge Weinstein and I have many times and, you

25   know, our position is in accordance with Your Honor's

1    order, so we've not taken a contrary position.  I wanted

2    to make that clear.

3            MR. MAGAZINER:  That is clear, although some of

4    the -- there are lawyers -- there's a lot of

5    overlap that --

6            MR. PENNOCK:  We've not had any communication

7    with anyone on the Zyprexia PSC.  I have not, I don't

8    think anyone has regarding this issue.

9            THE COURT:  No.  You've got clients that are

10   also members of that -- or who have claims in that

11   litigation.

12           MR. PENNOCK:  Yes.  But I just want -- I want

13   the Court to understand, we have not somehow orchestrated

14   an opposition by the plaintiffs PSC in Zyprexia.  We've

15   just -- we've left the issue, Your Honor ruled, and we

16   left it there and that's where it stands.

17           MR. MAGAZINER:  And our papers do not suggest

18   that there was any such orchestration.

19           THE COURT:  All right.

20           MR. MAGAZINER:  But to be clear, Your Honor,

21   what we have asked for and what Your Honor ordered be

22   produced, among other things is a submissions that the

23   plaintiffs made to support their claims.  And Your Honor's

24   order that was entered by consent says that we're entitled

25   to get whatever submissions plaintiffs made to support

 1    their claims, factual submissions, documentary

 2    submissions, et cetera.

 3         The Zyprexia plaintiffs steering committee is

 4    apparently taking the position that we should not be

 5    entitled to get those submissions that were made to

 6    support the claims, and also that we should not be

 7    entitled to get all the underlying claim processing and

 8    evaluation materials.  And as to the latter, that's a

 9    strawman, we never asked for it, we have no interest in

10    it, we don't care to get those materials.

11         But the submissions, of course, we do very much care

12    about, because the plaintiff submitted in support of the

13    Zyprexia claim, a statement that the plaintiff was using

14    only Zyprexia before the plaintiff developed diabetes.

15    That would be of some considerable significance to us if

16    that same plaintiff is now suing us and saying that she

17    used only Seroquel before developing diabetes.  So, yes,

18    we are going to press that upon Judge Weinstein.

19              THE COURT:  All right.

20              MR. ALLEN:  Your Honor, there may be one other

21    matter.

22              THE COURT:  Yeah, I was just going to ask

23    whether plaintiffs have any other matters they want to

24    raise.

25              MR. ALLEN:  Well, if Rick doesn't, then I have

1    a --

2          MR. LAMINACK:  Yes, Your Honor, we do.  Rick

3    Laminack, plaintiffs, Your Honor.  This is actually item

4    B2, it's entitled deposition issues.  It actually deals

5    with documents.  And it kind of goes back to one of the

6    things Your Honor said about the number of documents that

7    we've gotten.

8          And I want to make it real clear to the Court what

9    our position is with respect to the documents we've been

10   given.  Everybody on this side of the room has been

11   involved in practically every major piece of drug

12   litigation that has happened in this country in the past

13   20 years.

14         We do not believe by any stretch of the imagination

15   that we've been given anywhere near the relevant documents

16   that we've been entitled to.  As a result, we've done our

17   best, we find documents that we have been given them, we

18   know, based on that, there are other documents, so we send

19   RFPs as the Court suggested we do.  We ask about the

20   existence of other documents in depositions.  We tried to

21   do everything in our power to get to the documents that we

22   know exist but haven't been provided.

23         To that end, there's a particular problem that is

24   coming up constantly in the deposition of the corporate

25   people we've been taking, and I can't imagine why it's a

1    problem, but it goes something like this:  We start the

2    deposition, as I did last week of a corporate witness, by

3    saying, have you reviewed any documents in preparation for

4    the testimony you're about to give.  Yes, I have.  What

5    documents have you been reviewed?  And the witness is

6    instructed not to answer on the basis of attorney/client

7    privilege.

8        I don't agree with that.  I've never been involved in

9    a piece of litigation where we're not provided the

10   documents that a witness reviews in preparation of

11   testimony.  In fact, when AZ takes the plaintiff's

12   deposition, they ask the plaintiffs in each deposition

13   what documents have you been reviewed with your lawyers,

14   have you reviewed any documents, yes, I looked at this,

15   this and this.  Can we have those documents?  And as one

16   of the lawyers responsible for training all the lawyers

17   that produce our plaintiffs, we've instructed them across

18   the board that those documents are discoverable and they

19   are to be supplied to the defense lawyer asking the

20   question.

21       At the last deposition, it happened last week of the

22   corporate people of AZ, we asked AZ's lawyer to make it

23   clear on the record what AZ's position was regarding this

24   subject.  And they made it very clear that they have no

25   intention ever of producing documents that a witness has

 1    been reviewing in preparation for the deposition

 2    testimony.

 3         So we've indicated to AZ that we were going to bring

 4    this to your attention and get it resolved one way or the

 5    other.  I think the rules are clear, I think the federal

 6    rules not only say that such documents are discoverable,

 7    they're admissible.  So they're certainly discoverable.

 8         And I just can't imagine any basis -- and this goes

 9    back to this whole document thing.  If a corporate witness

10    is reviewing a particular document in preparation and to

11    help prepare for their deposition testimony, it's

12    certainly relevant, it's certainly discoverable, and I

13    think it's Rule 612, it's admissible into evidence.

14         So for the life of me, I don't understand.  We never

15    asked what did your lawyer tell you, you know, what did

16    y'all talk about relative to this document, we don't want

17    to know any attorney/client communications, we just think

18    we're entitled to the documents.

19              MR. McCONNELL:  Your Honor, I'm a little puzzled

20    that Mr. Laminack is so puzzled because the rules are very

21    clear.  There's ample case law, and I'll cite some of it

22    to Your Honor.

23         In the case of Midtronic -- I'm sorry.  Let me cite

24    the In Re: Managed Care Litigation case from the Southern

25    District of Florida, 415 F Sup 2d., 1378, this is a

1    February 2006 case.  Issue came up and here's what the

2    Court in the Southern District of Florida said:  According

3    to the leading appellate decision discussing Rule 612 --

4    so Mr. Laminack is right, Rule 612 is where the action

5    is -- the rule requires proponents of discovery to meet

6    three conditions before they may obtain documents used by

7    a witness before testifying.  One, the witness uses the

8    writing to refresh his memory.  Two, the witness uses the

9    writing for the purpose of testifying.  And three, the

10   Court determines that production is necessary in the

11   interest of justice.

12       And the case that's cited by the Southern District of

13   Florida is a very, very well known case, and I'm sure all

14   these highly experienced lawyers are familiar with, that's

15   the Sporck case, S-P-O-R-C-K, Sporck v Peel, 759 F2d.,

16   312, 317 is the jump site, that's Third Circuit 1985.

17   That's a case that's been cited repeatedly over the years

18   that specifically addresses the issue about whether

19   documents that are shown to a witness in preparing for a

20   deposition are discoverable.

21       And what the Third Circuit said in Sporck is that

22   obviously the selection of documents by the lawyer is in

23   itself work product because it shows the mind processes of

24   the lawyer, the selection that's being used, it says,

25   according to the Third Circuit, because identification of

1    the documents as a group will reveal defense counsel's

2    selection process and thus his mental impressions,

3    petitioner argues that identification of the documents as

4    a group must be prevented to protect defense counsel's

5    work product.  We agree.  That's what the Third Circuit

6    said.

7         So I think the rules are clear.  I think the Third

8    Circuit got it right.  I think the Southern District of

9    Florida is correct that the way it's supposed to work is

10   as follows:  If in preparing a witness for deposition

11   lawyers select documents and use those with the witness,

12   those documents are not discoverable, they are protected

13   by work product, unless a foundation is established at the

14   deposition that those documents meet the three -- all

15   three tests that are set out in the managed care

16   litigation and Sporck cases, that is, that the document

17   was actually used to refresh the recollection of the

18   witness, the witness' using it for the purpose of

19   testifying and that the interest of justice serve such

20   revealing of the document to the other side.

21        In the depositions that have been taking place thus

22   far in this case, I'm not even sure that the plaintiff

23   attorneys have attempted to establish the foundation.  If

24   they do establish the foundation, and meet those three

25   tests, then, yes, the documents have to be produced.

1            THE COURT:  I'm going to direct that to the

2    extent plaintiff wants to get a ruling on this, that you

3    file a memorandum of law in support of a motion to compel

4    and your memorandum be limited to 10 pages and file it by

5    Wednesday, the 21st and then the defendant can respond in

6    10 pages by the 30th.

7        Something else by the plaintiffs?

8            MR. ALLEN:  Yes, Your Honor.  Scott Allen again.

9        I heard the Court indicate that the -- on this issue

10   of case specific discovery you were going to refer that to

11   Judge Conway to make a decision and you'd be consulting

12   with her.  And I was remiss in my initial comments of

13   telling the Court something I think is critically

14   important when making the decision about stopping case

15   specific discovery.

16       And presumably the purpose of case specific discovery

17   is to get good discovery.  And I want the Court clear

18   based on what we've learned, we believe we're going to

19   have to go back, if any of those cases ever go to trial,

20   and take it again.

21       We believe that at the outset, we believe it more

22   strongly so now, and the Court should know, that in the

23   depositions that I took within the last 14 days, it has

24   been discovered that AstraZeneca has amended its package

25   insert warnings and adverse reactions on hyperglycemia and

1  diabetes in the physician package insert in October of

2  this year, but has not sent a dear-doctor letter to

3  physicians to notify them of the significant change on

4  hyperglycemia and diabetes.

5      And certainly, if I was -- if Scott Allen was in a

6  doctor's office today, in a case specific ruling trying to

7  make a determination either on causation, knowledge and

8  awareness of the clinical data that AstraZeneca had and

9  whether or not the internal clinical data of AstraZeneca

10  supported causation, I would want the new warnings and

11  adverse reaction section on hyperglycemia included within

12  the data and information in the new label that has not

13  been provided to the doctors they're deposing, is the

14  culling of existing clinical trial data that's been in the

15  hands of AstraZeneca for years indicating that when

16  Seroquel's compared to a placebo, there was, in fact,

17  elevations of blood sugar in the patients at a level

18  consistent with diabetes.  There's evidence in the -- that

19  was never reported in any prior insert.

20      So when a doctor today testifies -- assume that it's

21  a very adverse doctor to me, I don't believe it can

22  cause -- Seroquel in general and I don't believe it caused

23  it in this patient.  Doctor, were you aware of the recent

24  package insert change in which AstraZeneca for the first

25  time has acknowledged that their clinical trial data did,

1    in fact, indicate a potential causation?  It concluded

2    within the new package insert the study 125 information,

3    which is a study they conducted in response to this

4    litigation, in which AstraZeneca's product, Seroquel, was

5    compared to -- and Your Honor, I'm not -- and there's a

6    lot of information I've gathered over the last month, let

7    me -- I may misstate this -- but the clinical trial data

8    of 125 was compared to Olanzapine, which is Zyprexia and

9    was compared to, I believe -- and they can tell me --

10   Haldol or Risperdal, I can't remember.  But nevertheless,

11   when I questioned and more importantly when they

12   questioned, on their own lawyer, questioned Dr. Jamie

13   Mullen, Seroquel global physician, director of clinical

14   studies, their lawyer asked Dr. Mullen, AZ's current

15   employee, what does the new insert mean to you?  His

16   answer under oath, both through his lawyer and to me, said

17   it means to me that patients in clinical studies who were

18   on Seroquel had greater incidents of hyperglycemia than

19   those who were on placebo.

20        And I asked him -- and then it's reported in the

21   package insert that the elevation in blood sugar is

22   126 milligrams per decaliter.  What that means, Your

23   Honor, is diabetes.

24        I asked their witness what it meant, he had never

25   seen the insert himself, they had not provided it to him

1    before his deposition, he said he did not know.

2         So, when we're making a decision, everything kind of

3    rolls off the tongue a lot around here, we're going to

4    proceed, we can get this done.  It is a fundamental denial

5    of due process to my client that a doctor is going to be

6    deposed and this evidence hasn't been provided.

7         And so, if I'm going to go to trial, I'd be right

8    back here before you, as I said nine months ago.  So I

9    think that that ought to be taken into consideration when

10   we're asking us to spend -- you know, this airfare, this

11   is hotel rooms, gasoline, meals, and expenses.  And guess

12   who it comes from?  Oh, yeah, punishes us, right down to

13   the lawyers, comes out my hip pocket.  But ultimately it

14   comes from the people that are injured.

15        So we don't need to do this anymore.  And I think

16   that should be taken into consideration.  I appreciate it.

17              THE COURT:  Other issues from the defendant?

18              MR. McCONNELL:  Yeah, well, one response, Your

19   Honor.  I'm not even sure to what extent we just heard is

20   contained on the agenda anywhere, but sort of a stream of

21   consciousness presentation and jury argument.  But there

22   are a couple of points there that merit a response.

23        Mr. Allen said he learned in the last 14 days that

24   there was a label change.  That label change took place in

25   summer, was a matter of public record.  When we filed a

1    brief in this Court regarding preemptions, we mentioned

2    that label change in the footnote.

3         With respect to the deposition of Jamie Mullen, Jamie

4    Mullen hasn't been working on Seroquel for a while.  So

5    the fact that he wouldn't know it is of no moment.  But

6    also, the documents that would pertain to the label change

7    are obviously documents that would come after the July '06

8    discovery cutoff that the parties agreed upon.  And I sent

9    an e-mail to the plaintiffs counsel saying, obviously with

10   events moving, this is a drug that's still on the market,

11   there may be issues after July '06 that the parties would

12   be interested in, but we have to come up with a way of

13   producing those documents.  And it's another whole

14   mountain of stuff.

15        And I sent an e-mail to the other side and didn't get

16   a response, and then during a meet and confer with Special

17   Master Ball and Mr. Gornick was on, that came up again,

18   the issue of post July 6 documents.  It's obviously

19   something we've got to talk about.  We can't really get

20   anything done until we talk about it.

21        Mr. Allen sort of jazzy rip that just finished, I'm

22   not sure what the conclusion of that was supposed to be,

23   but if it goes to the issue of case specific discovery, I

24   thought that the parties had arrived at an agreement as to

25   when that would terminate.

1    So that's our response to whatever Mr. Allen had to

2    say.

3         MR. MAGAZINER:  Can I just add to that, because

4    I was a negotiator of this agreement, Your Honor.  We have

5    provided jointly in the proposed order that the current

6    limited case specific discovery program shall end with the

7    cases selected for December.  That was the agreed upon

8    order that was submitted to the Court.

9    So I was a little surprised that Mr. Allen gets up

10   and suggests that something that was agreed upon is no

11   longer offered.

12        MR. ALLEN:  Your Honor, what I -- In response,

13   what I had to say was neither a stream of consciousness

14   nor a jazzy rip.

15   The package insert that I questioned Dr. Mullen on is

16   dated October, 2007, and was located on the website during

17   the course of the deposition.  Dr. Jamie Mullen is no --

18   quote, no longer working on Seroquel.  He worked -- he was

19   the director of their clinical studies and the global

20   Seroquel physician.  And he was one of the witnesses who

21   was asked what documents did you review in preparation for

22   your deposition and we did not get them.

23   So for Mr. McConnell to sit here and say, well,

24   Dr. Mullen doesn't know anything.  We have this Exhibit

25   35, that's what exhibit number it is.  This is not a

1    stream of consciousness, it's Exhibit 35 in Dr. Mullen's

2    deposition and the date on the package insert was October

3    of this year.

4            MR. McCONNELL:  It was July?

5            THE COURT:  I've heard enough.

6            MR. BROWN:  Your Honor, this is Orran Brown and

7    I have three quick things to mention, if the Court still

8    has a moment.

9            THE COURT:  Sure.

10           MR. BROWN:  First, I'll continue with the

11   parties on the case specific discovery motions.  We have

12   two calls set for tomorrow.  And I think we need to

13   resolve them, because one aspect of it looks backward to

14   see if there was some prejudice in cases that have already

15   been discovered and then secondly, as you proceed with the

16   Florida cases, however they are done and when they're

17   done, I think we need the same detailed rules about the

18   contact disclosures that we're working out currently on

19   the cases that we're dealing with the case specific

20   discovery.  And if it's satisfactory with the Court, I

21   would like to file the supplemental report Monday, because

22   one of those calls is not until noon tomorrow and I'm

23   afraid it may last a while and I may not be able to do it

24   justice by getting a report in tomorrow.

25           THE COURT:  All right.

1          MR. BROWN:  Second thing is, I heard what the

2    parties have recommended and I think the Court said that

3    you're going to enter an order or report and

4    recommendation to Judge Conway on when the case specific

5    discovery will stop and you'll move -- transition to the

6    Florida cases.

7          I'll discuss this with the party representatives

8    tomorrow what we might -- and we can await your written

9    ruling on this, and keep doing what we're doing until

10   then, but currently the parties are designating cases for

11   January and I think the Court will be called upon in the

12   next day or so to designate cases for January and then we

13   will be hold scheduling efforts for those January cases if

14   that's satisfactory until we see the Court's ruling on

15   whether we will actually continue with those January cases

16   or we can proceed exactly as we're doing and just keep

17   doing what we're doing until there is an order that tells

18   us to do something otherwise.

19         The last thing I wanted to mention, Your Honor, was

20   clearly it goes without saying that whatever the parties

21   and the Court would like our assistance on as the PMO or

22   special master for discovery on the cases that you are

23   preparing in Florida for trial and scheduling help or

24   calendaring or keeping -- setting depositions and handling

25   documents or document production, we're delighted to do

 1   that and stand ready to do whatever the Court and parties

 2   would like for us to do.

 3             THE COURT:  All right.  I'm not sure anybody

 4   wanted to proceed with January at this point.

 5             MR. MAGAZINER:  No.  What we had agreed was that

 6   we would end with the December cases, but we left the

 7   month of January --

 8             THE COURT:  For spillover.

 9             MR. MAGAZINER:  -- for spillover, exactly, Your

10   Honor.

11       And Your Honor asked about Mr. Pennock earlier how he

12   felt about having a PMO involved in the Florida discovery

13   process, and Mr. Pennock said that he was delighted.  And

14   that would also be our response.  We would be very pleased

15   to have the PMO involved.

16             THE COURT:  All right.  Anything else from the

17   defendants for the day?

18             MR. MAGAZINER:  No, Your Honor.

19             THE COURT:  Need to pick a date for our next

20   status conference or general conference separate from the

21   other issues we talked about that may have specific

22   hearings.

23       I'm thinking December 18.  It's a Tuesday.

24             MR. MAGAZINER:  Mr. McConnell, know he's not

25   going to be available that day.  That works fine with my

1   schedule, Your Honor.

2          MR. PENNOCK:  That's fine with our schedule,

3   Judge, in the morning.

4          THE COURT:  Right.  All right.  We'll send out a

5   notice.

6       And we're in recess.

7                  (End at 12:28 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     C E R T I F I C A T E

2           I certify that the foregoing is a correct

3   transcript from the record of proceedings in the

4   above-entitled matter.

5

6

7

8

9   _____              _____

10  Sandra K. Tremel

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25