# Exhibit C

Confidential - Athena Ruhl

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

- - -

| | |
|---|---|
| IN RE: SEROQUEL | : CASE NO. |
| PRODUCTS LIABILITY LITIGATION | : 6:06-md-01769-ACC-DAB |
| | : |
| MDL Docket No. 1769 | : |

- - -

November 7, 2007

- - -

Oral deposition of ATHENA RUHL, taken pursuant to notice, was held at the offices of Golkow Technologies, Inc., One Liberty Place, 51st Floor, 1650 Market Street, Philadelphia, Pennsylvania, beginning at 9:12 a.m., on the above date, before Margaret M. Reihl, RPR, CRR, CCR, CLR and Notary Public for the Commonwealth of Pennsylvania.

- - -

C O N F I D E N T I A L

GOLKOW TECHNOLOGIES, INC.

One Liberty Place, 51st Floor

1650 Market Street

Philadelphia, Pennsylvania  19103

(877) 370-3377

Confidential - Athena Ruhl

Page 6

1        THE VIDEOGRAPHER: Good morning. Today
2   is the 7th day of November, 2007. It's 12 minutes
3   after 9:00 a.m. and you are on the record, Mr. Pirtle.
4            ... ATHENA RUHL, having been duly
5        sworn as a witness, was examined and
6        testified as follows ...
7            MS. DODD: Mr. Pirtle, I mentioned
8   before we went on the record, just so we're all clear,
9   this deposition is being done under the
10  confidentiality order, so it should be treated as
11  confidential. I don't know who all we have in the
12  room yet.
13           Likewise, the exhibits, to the extent
14  that they were produced from Astra Zeneca's files,
15  under confidentiality, will continue to be treated
16  that way.
17           MR. PIRTLE: I don't know what the
18  current ongoing controversy is regarding the
19  confidentiality. I'm certainly going to regard the
20  documents as confidential until ordered otherwise by
21  the court. And before we get going, I have a
22  statement I want to make.
23           Having reviewed the documents for this
24  witness, as well as others, not this witness specific,

Confidential - Athena Ruhl

Page 7

1   it is my strong feeling that there is a problem with
2   the document production. I think that's going to be
3   addressed in other places, so I'm not going to get
4   into it. What I will say, that I don't believe that
5   we have complete documents on this witness or any
6   other witness for that matter. I have examples, but
7   it would be no use in citing them here.
8              So although we're going to move forward
9   with this deposition, I have strong suspicion that we
10  may be back here again at some point in time pending
11  production of other documents in this case, but
12  there's a lot of work that I can get done now with
13  what I've got and I want to go forward with that. And
14  now I believe pursuant to the deposition protocol,
15  we're all supposed to introduce ourself.
16             MS. DODD: Can I just respond, though,
17  to your concern?
18             MR. PIRTLE: Sure.
19             MS. DODD: I am not intimately
20  familiar, involved with the document production, but I
21  do understand that a letter was sent to plaintiffs'
22  liaison counsel, perhaps a week to ten days ago,
23  inviting plaintiffs' counsel, that if they felt they
24  had incomplete documents for any witness that was on

Golkow Technologies, Inc. - 1-877-370-DEPS

Page 8

1  the schedule, that we would be willing to reschedule
2  that witness. It's our position that each witness be
3  deposed once, and if you are electing to go forward
4  today, we'll take the position that this is your one
5  opportunity to talk with Ms. Ruhl and that you had the
6  opportunity to forego the deposition if you felt that
7  you had incomplete documents at this time and that we
8  were willing to reschedule.
9           MR. PIRTLE: Fair enough. That will
10 have to be decided somewhere else.
11          MS. DODD: Sure.
12          MR. PIRTLE: Pursuant to the protocol,
13 my name is Thomas W. Pirtle, I'm with the Houston law
14 firm of Laminack Pirtle Martines, and I represent MDL
15 plaintiffs.
16          MR. HUNGER: Chuck Hunger, Laminack
17 Pirtle Martines for the plaintiffs.
18          MR. LAMINACK: Rick Laminack for
19 plaintiffs.
20          MS. MARTINES: Buffy Martines for
21 plaintiffs.
22          MR. AZAR: Frank Azar for plaintiffs.
23          MS. MEYEROV: Viktoriya Meyerov for
24 Janssen.

Confidential - Athena Ruhl

Page 11

1  try to refrain from doing that if you will, all right?
2  A.      I will.
3  Q.      Next, I want to remind you this test -- your
4  testimony you are giving is under oath, it's as if you
5  were in front of the judge in this case and a jury;
6  you understand that?
7  A.      I understand.
8  Q.      And lastly, if you need an opportunity to take
9  a break, I'm not a big one on protocols that have been
10 established, if you need to, and there's not a
11 question pending, just let me know and you can take a
12 break.
13 A.      I will, thank you.
14 Q.      All right.  How long have you been employed
15 with Astra Zeneca?
16 A.      A little over 22 years.
17 Q.      You started in 1985?
18 A.      That's correct.
19 Q.      Has that basically been your sole employment
20 during your adult life?
21 A.      After I graduated from college, I attended
22 grad school and held other employment at a hospital
23 prior to joining Stuart Pharmaceuticals at the time.
24 Q.      And you went to work for a company called

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Athena Ruhl

Page 12

1  Stuart Pharmaceuticals that later became Astra Zeneca?
2  A.     That's right.
3  Q.     Tell you what, one other thing I want to go
4  over. I will refer -- I know there's a number of
5  Astra Zeneca entities, and if it becomes important to
6  make a distinction, please point it out to me, all
7  right, but for the most part, I will just refer to the
8  company as Astra Zeneca or AZ; is that okay?
9  A.     That's okay.
10 Q.     And if you need to make the distinction, you
11 do that, all right?
12 A.     Okay.
13 Q.     Prior to coming in here to give your
14 deposition, did you do any preparation?
15 A.     I met with my attorneys.
16 Q.     When you say your "attorneys," who are you
17 referring to?
18 A.     I met with, at various times, the three folks
19 here in the room, Jan, Peter and Kim.
20 Q.     Now, these lawyers represent Astra Zeneca; you
21 understand that?
22 A.     Yes, I do.
23 Q.     Are you personally represented here today?
24 A.     I'm sorry, I don't understand your question.

```
1   Q.      Are any one of these lawyers representing you
2   personally, in other words, have you hired them as
3   your lawyers?
4   A.      No, I have not, personally, hired anyone.
5   Q.      So you met with counsel for your employer
6   Astra Zeneca?
7   A.      That's correct.
8   Q.      And what periods of time did you meet with
9   them in terms of how many days and when and where?
10  A.      We met at the Astra Zeneca offices, and you
11  asked how many periods of time, I would say we met
12  over a period of several days.
13  Q.      The Astra Zeneca offices are in Wilmington,
14  Delaware?
15  A.      Yes, they are.
16  Q.      So the lawyers came in to Wilmington, Delaware
17  and met with you at your office --
18  A.      That's correct.
19  Q.      -- or a conference room?
20  A.      Right.
21  Q.      And you say it was over a period of days?
22  A.      Yes.
23  Q.      During what time frame did these meetings
24  occur?
```

Confidential - Athena Ruhl

Page 14

1   A.     Within the last three weeks or so.

2   Q.     And approximately how many days did you meet?

3   A.     I think it was over a period of five or six
4 days, not full days.

5   Q.     Was it five or six half days, full days,
6 that's what I was going to ask?

7   A.     A couple half days and a couple full days.

8   Q.     So is it fair to summarize that you've met
9 with AZ's lawyers for approximately three days in
10 preparation, couple half days and a couple full days?

11   A.     That's fair.

12   Q.     All right. Now, during these meetings, did
13 you review any materials?

14   A.     Yes, we did.

15   Q.     What types of materials did you review?

16   A.     We looked at various documents.

17   Q.     How many?

18   A.     I don't remember.

19   Q.     A little or a lot?

20   A.     Somewhere in between. In terms of "a lot,"
21 can you be more specific?

22   Q.     Sure. More than 100 or less than 100?

23   A.     Less than 100.

24   Q.     More than 50 or less than 50?

Confidential - Athena Ruhl

Page 15

1  A.      That might be in the range, but I'm
2  speculating at this point, sir.
3  Q.      Is it fair to say somewhere around 50, best
4  you can do now?
5  A.      I would say somewhere less than 50, that's the
6  best I can do now.
7  Q.      How about 50 to 30 or 30 to 50?
8  A.      That feels right, but, again, I'm speculating.
9  I do not remember.
10 Q.      What type of documents were there?
11              MS. DODD:  I'm going to object at this
12 point and invoke the privilege.
13 BY MR. PIRTLE:
14 Q.      The Astra Zeneca lawyer has asserted the
15 attorney-client privilege, and what I'm doing now is
16 I'm going to make a record.  So I'm going to ask you,
17 are you going to follow the Astra Zeneca lawyer's
18 instruction?
19 A.      Yes, I am.
20 Q.      All right.  So let me be clear:  You've
21 reviewed some number of documents and we've pinned it
22 down somewhere between 30 and 50 you think, right?
23 A.      That's about right.
24 Q.      And just let me state very clearly on the

Confidential - Athena Ruhl

Page 16

1  record. Tell me what specific documents you reviewed
2  in preparation for this deposition?
3           MS. DODD: And the same objection.
4  I'll instruct her not to answer.
5           MR. PIRTLE: Fair enough.
6  BY MR. PIRTLE:
7  Q.    Now, other than the body of documents that
8  we're talking about, the 30 to 50, did you -- have you
9  reviewed anything else?
10 A.    No, I have not.
11 Q.    Have you reviewed any deposition transcripts?
12 A.    No, I have not.
13 Q.    Have you reviewed any summaries of deposition
14 transcripts?
15 A.    No, I have not.
16 Q.    During these meetings, was there any other
17 people present other than either these three lawyers
18 or one or two of these three lawyers?
19 A.    At one meeting, there was a young woman from
20 the firm, I believe her name was Rebecca, but I was
21 not personally interacting with her, but she was with
22 my attorney at the time.
23 Q.    During any of these meetings, were there any
24 other Astra Zeneca personnel present at any time?

Golkow Technologies, Inc. - 1-877-370-DEPS

Confidential - Athena Ruhl

Page 17

1   A.   No, there were not.
2   Q.   Other than these three lawyers and
3   representatives from these three lawyers' firms, did
4   you meet with any other people who would be
5   categorized as, like, consultants for either the law
6   firm or Astra Zeneca?
7   A.   No, sir.
8   Q.   All right. In preparation for your deposition
9   or at any time prior to, have you ever done any
10  document search or document review to either refresh
11  your recollection of a past event or at the request of
12  any person?
13  A.   No, I have not.
14  Q.   So in terms of your personal files, you never
15  went through them yourself for this litigation?
16  A.   That is correct, yes.
17  Q.   Have you talked to any other Astra Zeneca
18  personnel, outside the context of these lawyers, about
19  this litigation?
20  A.   Not about the content of the litigation, no,
21  sir.
22  Q.   When you say "the content," I worry about
23  qualifying words. How about any type of discussion
24  about the litigation?

Page 18

1  A.     There are a few people who are aware that I'm
2  away here today to be part of it, but that's the
3  extent of those conversations.
4  Q.     Fair enough.  What is your current role at
5  Astra Zeneca?
6  A.     My current role is the vice president of
7  merging brands.
8  Q.     And you've held that role since November of
9  '06?
10 A.     That is correct.
11 Q.     If your CV is correct, I think that's correct.
12 A.     Yes, that's correct.
13 Q.     Now, is that a role in senior management?
14 A.     Yes, it is, sir.
15 Q.     And is that your first role in senior
16 management?
17 A.     Can I pause for a second?
18 Q.     Sure.
19 A.     I believe it was November of '05.
20 Q.     It might be.
21 A.     This is coming on two years --
22 Q.     Okay.
23 A.     -- sorry.
24 Q.     Is that your -- is this your first role in

Confidential - Athena Ruhl

Page 19

1  senior management?

2  A.    How would you define, "senior management"?

3  Q.    Well, I don't know how Astra Zeneca defines

4  it, so we've got a problem. Is it -- do you consider

5  it your first role in senior management?

6  A.    No, I do not.

7  Q.    What do you consider your first role in senior

8  management?

9  A.    I would likely consider my first role in

10 senior management to be the first executive director

11 role that I held, which was when I returned from

12 Switzerland in 2001, executive director of business

13 analysis and intelligence.

14 Q.    I see. June of 2001, executive director of

15 business analysis and intelligence?

16 A.    That's correct.

17 Q.    Now, the vice president role is higher than

18 that in the hierarchy?

19 A.    Yes, it is.

20 Q.    All right. Tell me currently what your job

21 responsibilities are.

22 A.    I lead the teams of people who are involved in

23 providing the US input and planning for products that

24 are currently in our development pipeline.

Page 20

1  Q.     I was fixing to say I've heard the term,
2  "pipeline." You're the person that is now, at least
3  in the US, the leader for the pipeline products?
4  A.     For US input into products in the portfolio,
5  so in various stages of development.
6  Q.     This would be pre-market products --
7  A.     Correct.
8  Q.     -- or pre-launch, I guess?
9  A.     Exactly.
10 Q.     I guess a simpler way of putting it, new drugs
11 that haven't been marketed yet?
12 A.     Potential new products is how I would think
13 about them, yes.
14 Q.     All right. So is it safe to say that as of
15 today -- and you're right November of '05 -- you don't
16 have anything to do with the product Seroquel?
17 A.     That's correct.
18 Q.     I want to show you what I'm going to mark as
19 Exhibit 1, and we'll call it Ruhl 1, probably
20 something that is familiar to you. I'll hand it to
21 you. It's a copy of your Curriculum Vitae, I believe.
22           (Document marked for identification
23       as Ruhl Deposition Exhibit Number 1.)
24           THE WITNESS: Yes, it is.