UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

| | |
|---|---|
| In Re:  Seroquel Products Liability Litigation<br>MDL Docket No.  1769<br><br>DOCUMENT RELATES TO ALL CASES | Case No. 6:06-md-01769-ACC-DAB<br><br>**PLAINTIFFS' MOTION TO COMPEL IDENTIFICATION AND PRODUCTION OF "INTERMEDIATE DATA" FROM ASTRAZENECA'S "GEL" DATABASE** |

# CONTENTS

**I.**   **INTRODUCTION**                                                    3

**II.**  **BACKGROUND FACTS**                                                3

**III.** **ANALYSIS**                                                        9

    A.  Plaintiffs' Request Reaches the Intermediate Data AstraZeneca Removed
       From GEL                                                     9

    B.  AstraZeneca Must Identify and Produce the Intermediate Data Removed
        From GEL                                                    10

    C.  FRCP 37(e) Does Not Apply                                       12

**IV.**  **RELIEF REQUESTED**                                                15

**V.**   **L.R. 3.01(g) CERTIFICATION**                                      16

# AUTHORITIES

*Flury v. Daimler Chrysler Corp.* 427 F. 3d 93, 9449 (11th Cir, 2005)        11

*Golden Yachts, Inc. v. Hall,* 920 So. 2d 777, 781 (Fla. 4th DCA 2006)       11

Federal Rule of Civil Procedure  37(e)                                     12, 13, 15

## I.     INTRODUCTION

By way of this motion, plaintiffs seek to compel the identification and production of data that AstraZeneca has removed from its Global Electronic Library ("GEL").  GEL is AstraZeneca's central database of documents related to the safety, efficacy and regulation of Seroquel.  For example, GEL, contains AstraZeneca's submissions to, and communications with, regulatory agencies, changes to warnings and other labeling information, Safety Evaluation and Review Meeting (SERM) minutes, SERM discussion documents, Periodic Safety Update Reports, and information related to clinical trials and studies.  Unfortunately, AstraZeneca has removed from GEL many drafts, revisions, annotations and commentary ("intermediate data") related to these critical documents.  AstraZeneca destroyed some of this intermediate data and scattered much of the remainder throughout the company.

AstraZeneca refuses to identify the intermediate data it destroyed and refuses to produce the intermediate data removed from GEL which still exists.  AstraZeneca claims that: (a) plaintiffs' requests for GEL data do not reach the intermediate data which AstraZeneca removed from GEL; and (b) even if they did, it should not have to identify or produce that data because it would be overly burdensome to do so.  Plaintiffs seek an order compelling identification and (to the extent possible) production of all relevant intermediate data which existed in GEL.

## II.     BACKGROUND FACTS

On October 16, 2007, plaintiffs conducted an interview of technical representatives designated by AstraZeneca as knowledgeable concerning the GEL database.[1]  During the

---

[1] This was one of a series of database interviews ordered by the SM-ESI to inform plaintiffs' formal requests for production of databases.

interview, plaintiffs learned that, through that very day, AstraZeneca was continuing to remove intermediate data from GEL.

Plaintiffs raised the issue with the SM-ESI the following day.  The SM-ESI directed AstraZeneca to determine what efforts were made to preserve the intermediate data, whether it could be recovered, and, if so, where it was located. The SM-ESI directed AstraZeneca to provide this information by October 23.

During an October 23, 2007 teleconference, AstraZeneca reported that no relevant intermediate data had been lost, because all of it had been retained by Kathy Bradley, one of the original custodians identified by AstraZeneca as having documents relevant to the litigation. AstraZeneca further indicated that it had produced all relevant intermediate data as part of Ms. Bradley's custodial file.  The SM-ESI then directed AstraZeneca to obtain from Ms. Bradley a declaration, describing in detail how she retained such materials, the measures she employed to ensure that all such materials were saved, and listing the Seroquel related materials she retained, providing Bates numbers for documents produced.

AstraZeneca produced Ms. Bradley's declaration on October 30, 2007.  (Canty Decl., Exh. A.)  In many respects, Ms. Bradley's declaration was not what AstraZeneca led plaintiffs and the SM-ESI to believe it would be.  Most importantly, Ms. Bradley's responsibilities related only to U.S. labeling, and she would therefore have encountered only a small fraction of the documents contained within GEL.  It was thus impossible for Ms. Bradley to account for most of the relevant intermediate data which had been removed from GEL.

After reviewing the Bradley declaration, the SM-ESI directed AstraZeneca to determine whether GEL contains a log of deleted intermediate data.  AstraZeneca replied on November 5 that it does not.  (Exh. B)  However, this reply contradicts the GEL Technical Specifications, which indicate that GEL indeed does log the destruction of intermediate data.  (Exh. C.)

4

Through early November, AstraZeneca continued to assure plaintiffs and the SM-ESI that GEL intermediate data had in some fashion been preserved and retained.  AstraZeneca indicated it would identify and acquire declarations from a limited number of additional custodians from whom the intermediate data could be obtained.  But, with each additional SM-ESI teleconference, the number of additional custodians continued to grow.  As the SM-ESI later noted:

> When pressed to produce the promised affidavit, it came to light that Ms. Bradley could not so attest and that there were multiple persons—perhaps 20, 30 or 40-- with ownership in the GEL database. Over the course of weeks of inquiry concerning GEL, it now appears that thousands of AstraZeneca employees have permission to access, author, edit, revise, or comment on documents in GEL, so it would seem that the comments and contributions of legions may have been "non-retained" and may need to be reconstructed—a task made immensely more difficult because AstraZeneca reportedly kept no record of what Seroquel related content the GEL database administrators relegated to "non-retained" status.

SM-ESI Third Status Report, Exh. D, p. 3.

In response to further inquiries by the SM-ESI, AstraZeneca issued a December 4, 2007 memorandum (Exh. E),[2] regarding the GEL database and preservation of intermediate data.  In that memorandum, AstraZeneca admitted (*inter alia*):

(a)  more than 126,000 Seroquel-related documents have been created in GEL (p. 1);

(b)  documents can be created, edited and commented on directly in GEL (p.2);

(c)  documents can be created, edited and commented on outside of GEL, and later imported into it (*Id*.);

(d)  this intermediate data is entered by thousands of AstraZeneca employees in many different departments, including Regulatory Affairs, but also Clinical Development, Drug Safety and Study Delivery (*Id*.);

---

[2] This memorandum was initially submitted to the SM-ESI on an *ex parte* basis, and the information contained in it was not fully disclosed to plaintiffs until January 2, 2008, when it was filed as an exhibit to AstraZeneca's "Objection" to the SM-ESI's Third Amended Status Report.

(e)  intermediate data is deleted upon finalization of a document; (*Id*.) and

(f)  finalization of documents and deletion of intermediate data is accomplished with the

approval of such action by authorized users; (*Id*., p. 2-3)

Following these admissions, in mid-December, the SM-ESI accurately summarized

AstraZeneca's investigation into the preservation of GEL intermediate data in his Third

Amended Status Report, Doc. 743 (Exh. D.)

> AstraZeneca's approach to the GEL investigation has been frustratingly circular.
> It denies that data has been purged from GEL, but concedes that it has been "non-retained." It was there one day, but the next, someone's business-as-usual actions
> made it "non-retained."  AstraZeneca insists that nothing was purged, but keeps
> no record of what it "non-retains." It argues a cascading legal hold (that hopefully
> reached GEL contributors) was a sufficient substitute for preserving relevant GEL
> content, but so far declines to ascertain whether anyone actually retained GEL
> contributions outside of GEL. AstraZeneca assumes that GEL content was
> somehow preserved outside of GEL by individual contributors, but can offer no
> explanation how comments and drafts created within GEL might find their way
> out of GEL to a contributor's local hard drive or network storage area.

AstraZeneca's obtuse refusal to refute or confirm the apparent destruction of Seroquel

related ESI in GEL is an impediment to fashioning a cost-effective approach to mitigate loss of

relevant and discoverable ESI. Over the next month, AstraZeneca remained unresponsive and

evasive. On January 22, the SM-ESI issued his Fourth Status Report, stating:

> In my last report, I detailed my concerns regarding data that was non-retained in a
> critically important Astra Zeneca database called GEL. I still harbor those
> concerns and remain frustrated at the prolonged lack of responsiveness to my
> efforts to determine what, if any, information created within GEL is truly gone;
> that is, whether it does not exist anywhere on Astra Zeneca's far-flung network.
> However, I've been assured that the information I've sought is forthcoming, and
> Astra Zeneca has lately been laudably cooperative in exploring ways it might
> reasonably recover other accessible data that was non-retained following the onset
> of the company's preservation duties for this litigation.

SM-ESI Fourth Status Report, Doc. 812, Exh. F.

6

Clearly, AstraZeneca's theory – that all relevant intermediate data had been preserved outside of GEL by its contributors – had at least one obvious and critical flaw: it failed to account for the intermediate data which had originated within GEL (as opposed to content which originated with a contributor outside of GEL and had been imported). The SM-ESI made a distinction between these two types of content – "GEL-contributed" and "GEL-originated" – and independently pursued resolution of the issues presented by each.

With respect to GEL-contributed content, the SM-ESI suggested that AstraZeneca provide a plan to identify the "non-retained" ESI which may have been preserved outside of GEL. On January 28, 2008, AstraZeneca forwarded a "Proposed Plan for Reasonable Identification and Production of Material Seroquel GEL Drafts." (Exh. G.) The Proposed Plan: (a) enumerates certain specific categories of key documents for which AstraZeneca would seek drafts; (b) generally describes a process for interviewing individuals who may have contributed content to those documents; and (c) provides for review of the files of those potential contributors for GEL content. The Proposed Plan failed to address SM-ESI's many requests (the first of which was in October of last year) for AstraZeneca to first *identify* the ESI which at one time existed, and *determine* whether it has been retained. The Proposed Plan also notably excludes plaintiffs from the selection of document categories and individuals to be interviewed, and provides no transparency to the interview process.

On February 5, plaintiffs responded to AstraZeneca's Proposed Plan (Exh. H) with several observations and suggestions. Plaintiffs rejected the unsupported assumption that GEL contributors retained everything (a flawed premise) and the proposition that AstraZeneca's obligations extend only to the location and production of that which still exists. Plaintiffs proposed an alternative plan, in which plaintiffs would participate in the selection of categories

of documents, and in the identification, selection and interviews of GEL users in an effort to identify all relevant ESI, whether it currently exists or has been destroyed.

On February 15, 2008, AstraZeneca responded to plaintiffs' counter-proposal (Exh. I), indicating (at paragraphs 2 and 3) that it would not agree to identify ESI which it destroyed, and indicating (at paragraph 18 and 19) that it would not agree to plaintiffs' participation in the selection of users for interview or in the interview process.

With respect to GEL-<u>originated</u> content, on January 23, 2008, the SM-ESI posed questions to AstraZeneca on an *ex parte* basis.  AstraZeneca's February 7 response confirmed the existence of GEL-originated intermediate data, but was typically evasive concerning its retention or non-retention. (Exh. J)  AstraZeneca advanced no theory under which GEL-originated content was retained, nor proposed any plan for its identification or production.

Following this "response," on February 12, the SM-ESI directed the parties to propose a sampling protocol to determine the extent, relevance and composition of this ESI.  (Exh. K.)  To aid in the creation of a sampling protocol, the SM-ESI directed that "AstraZeneca furnish to the plaintiffs sufficient information about the size and composition of the GEL tape backup collection to enable the plaintiffs to fashion a properly targeted and effective sampling proposal." (Id.)  The SM-ESI also directed AstraZeneca to deliver the backup tape information to plaintiffs on or before February 20, and the parties to submit proposals for a sampling protocol on or before February 27.

AstraZeneca delivered information on some backup tapes on February 20.  Then, during a February 26 teleconference with the SM-ESI, the day before protocol submissions were due, AstraZeneca advised that the information it had previously provided was incomplete; that AstraZeneca maintained backup tapes which had not been disclosed in its prior submission; and

that AstraZeneca still lacked sufficient information regarding those tapes to make a proper disclosure.  AstraZeneca then requested that the submission of sampling protocols be postponed.

On February 21, the Court issued an Order (Doc. 869) granting, in part, plaintiffs' motion to compel production of certain documents.  With respect to certain materials that may have at one time existed in (but were removed from) the GEL database,[3] the Court referred the matter to the SM-ESI, specifically referencing information thought by the SM-ESI to have been "forthcoming."[4]   Unfortunately, the information has not been "forthcoming," due to misinformation and lack of cooperation by AstraZeneca. In fact, despite the SM-ESI's considerable efforts to fashion a resolution, AstraZeneca has taken the position that the "initial question in production analysis" – whether AstraZeneca must identify and produce the destroyed intermediate data – must be answered by the Court, not the SM-ESI.  (Memorandum, Exh. E, p. 6; Proposed Plan, Exh. G, p.1.)

## III.    ANALYSIS

A.  <u>Plaintiffs' Request Reaches the Intermediate Data AstraZeneca Removed from GEL</u>

On November 5, 2007, plaintiffs served upon AstraZeneca a Rule 34 request for production (Exh. L).  Plaintiffs requested (*inter alia*) "all relevant Seroquel and Seroquel related data from GEL (Global Electronic Library) including the tables and fields identified below…" (*Id*., p. 7.)  Plaintiffs' request also included a request for identification and description of responsive documents lost or destroyed (*Id*., p. 2.)  Plaintiffs' request for production "includes

---

[3] These materials - drafts of package inserts, patient information sheets and DHCP letters - are but a small portion of the intermediate data which is the subject of the present motion.

[4] The court referred the matter for a determination of whether "other accessible data that was non-retained following the onset of the company's preservation duties for this litigation" exist (quoting the SM-ESI's Fourth Status Report). Plaintiffs believe that the SM-ESI's mention of "*other* accessible data" with which AstraZeneca had "lately been laudably cooperative" was a reference to data other than GEL material.

documents within the meaning of FRCP 34 as amended effective December 1, 2006, and particularly includes 'electronically stored information.'" (*Id.*, p. 5.)

AstraZeneca's response, dated December 10, 2007, indicated that (subject to its various objections) it "will produce Seroquel-related GEL documents from the United States" and associated information from database fields.  (Exh. M, p. 6.)

AstraZeneca now refuses to identify or produce Seroquel-related intermediate data which it removed from GEL.  AstraZeneca claims the information is not responsive to plaintiffs' requests for data from GEL, since the information is no longer in GEL.  Analogizing, plaintiffs requested all documents from the file cabinet in which AstraZeneca stores the files of central relevance to the litigation.  AstraZeneca retained some documents in the file cabinet, but removed some of the most relevant. AstraZeneca claims that the removed documents are now scattered throughout the company.  However, it appears fairly certain that some of the removed documents have been destroyed.  AstraZeneca claims that it should not be required to identify or produce the removed documents because it would be too burdensome to do so now that they are no longer in the file cabinet.  Such a shell game turns discovery in civil litigation on its head.

Plaintiffs' requests identify the documents sought with reasonable particularity pursuant to FRCP 34(b), and clearly extend to all Seroquel-related GEL intermediate data – whether or not AstraZeneca has changed its location or "non-retained" it.

B.  <u>AstraZeneca Must Identify and Produce the Intermediate Data Removed From GEL</u>

Through its regular business operations, AstraZeneca assembled and maintained ESI of indisputably high relevance in a central location.  Had AstraZeneca fulfilled its duty to preserve relevant evidence, the GEL intermediate data would still exist in that central location.  But AstraZeneca failed to preserve the intermediate data in GEL.  AstraZeneca claims that it is not

guilty of spoliation, because the data might possibly be retrieved from the files of thousands of GEL users across the company.  In the same breath, AstraZeneca also objects to retrieval of the data as unduly burdensome.  Through its spoliation of evidence, AstraZeneca has <u>created</u> a burden, which it now employs as a discovery shield.  This type of tactic should not be permitted.

Plaintiffs do not seek to establish spoliation by way of this motion (though such a motion may ripen), but the court should be aware that this is precisely what has occurred.  On October 17, 2007, when plaintiffs first surfaced the destruction of GEL intermediate data, the SM-ESI directed plaintiffs to provide AstraZeneca with a "rough sketch" of a spoliation motion.  Plaintiffs provided AstraZeneca with that sketch on October 23 (Exh. N), citing authority with which the Court is familiar.  While spoliation sanctions are governed by federal law, the 11th Circuit does not set forth specific guidelines for determination of spoliation.  Therefore, the court may rely on appropriate state law authority in determining spoliation and issuing appropriate orders.  *Flury v. Daimler Chrysler Corp. 427 F.3d 93, 9449* (11th Cir.2005.)  Florida courts consider the following factors:

1.  Whether the evidence existed at one time;

2.  Whether the spoliator had a duty to preserve the evidence; and

3.  Whether the evidence was critical to an opposing party being able to prove its prima facie case or a defense.

*Golden Yachts, Inc. v. Hall*, 920 So.2d 777, 781 (Fla. 4th DCA 2006.)

It is undisputed that GEL intermediate data existed, and was destroyed by AstraZeneca upon finalization of GEL documents.

AstraZeneca's duty to preserve this evidence may have arisen as early as the year 2000, with an inquiry by the U.S. Government into its illicit marketing practices, which culminated in a

June 2003 Corporate Integrity Agreement.  But according to AstraZeneca's December 8, 2006 opposition to plaintiffs' motion for a preservation order (Doc. 99), its preservation duty admittedly began no later than September 2003.  (Exh. O.)  Despite this fact, AstraZeneca nevertheless created or revised the "delete draft" module used to destroy GEL intermediate data in September of 2003, approved the revision in December of 2003, and updated it in March 2006.  (GEL Tech. Specs., Exh. P.)  At the very least, AstraZeneca's continued destruction of GEL intermediate data through December of 2007 is certainly a violation of Section IV of CMO2, which orders preservation of evidence which may be relevant to the litigation.  (Exh. Q.)

By AstraZeneca's descriptions, GEL intermediate data unquestionably contains evidence of the state of AstraZeneca's knowledge regarding the safety and efficacy of Seroquel at the time of its disclosures to regulatory agencies, physicians and consumers.  These documents reflect (among other things) AstraZeneca's choices in how to design studies, as well as what and what not to reveal about Seroquel.  They are clearly relevant to plaintiffs' case-in-chief, as well as AstraZeneca's affirmative defenses, including the defense of preemption.

C.   FRCP 37(e) Does Not Apply

On January 2, 2008, AstraZeneca filed an Objection to the SM-ESI's Third Amended Status Report (Doc. 767, Exh. R),  accusing the SM-ESI of "mischaracterizing issues" related to the preservation of GEL intermediate data.  However, it is AstraZeneca that has continued to mischaracterize the design and operation of the GEL database, portraying the destruction of relevant evidence as an important and unavoidable business process.  This mischaracterization is AstraZeneca's attempt to find safe harbor in FRCP 37(e), which provides relief from sanctions for the loss of ESI through "routine, good faith operation" of computer systems.  The facts belie AstraZeneca's portrayal, and the exception does not apply.

12

FRCP 37(e) provides as follows:

(e) Failure to Provide Electronically Stored Information. Absent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good-faith operation of an electronic information system.

The 2006 Advisory Committee Notes applicable to that section (then 37(f)) provide (in pertinent part, emphasis added) as follows:

Rule 37(f) applies only to information lost due to the "routine operation of an electronic information system"--the ways in which such systems are generally designed, programmed, and implemented to meet the party's technical and business needs. The "routine operation" of computer systems includes the alteration and overwriting of information, **often without the operator's specific direction or awareness**, a feature with no direct counterpart in hard-copy documents. Such features are essential to the operation of electronic information systems.

Rule 37(f) applies to information lost due to the routine operation of an information system only if the operation was in good faith. **Good faith in the routine operation of an information system may involve a party's intervention to modify or suspend certain features of that routine operation to prevent the loss of information, if that information is subject to a preservation obligation.** A preservation obligation may arise from many sources, including common law, statutes, regulations, or a court order in the case. **The good faith requirement of Rule 37(f) means that a party is not permitted to exploit the routine operation of an information system to thwart discovery obligations by allowing that operation to continue in order to destroy specific stored information that it is required to preserve**. **When a party is under a duty to preserve information because of pending or reasonably anticipated litigation, intervention in the routine operation of an information system is one aspect of what is often called a "litigation hold."** Among the factors that bear on a party's good faith in the routine operation of an information system are **the steps the party took to comply with a court order** in the case or party agreement requiring preservation of specific electronically stored information.

AstraZeneca's description of GEL is intended to cast the deletion of intermediate data as a routine operation designed and implemented to meet the company's business needs.

AstraZeneca reported to the SM-ESI that "GEL was designed to serve as a repository of finalized regulatory documents; it was never designed – nor has it ever operated – to house drafts of those documents in perpetuity or even after finalization of the documents." (Memorandum; Exh E, p.

13

5.) AstraZeneca's Objection reiterates that "the purpose of the GEL database is to store *final* information for submission to regulatory bodies."  (Objection, Exh. R, at 11-12.) These statements are misleading and inaccurate for a variety of reasons.

First, GEL contains much more than "regulatory submissions."  AstraZeneca states that "[a]mong the most significant departments whose employees author or edit documents on GEL are Chemical Manufacturing and Control, Non-Clinical Affairs and Safety Assessment, Clinical Development and Regulatory Affairs.  Numerous departments such as Drug Safety and Study Delivery author documents on behalf of Clinical Development.  Currently, 1,183 GEL users have access to draft clinical Seroquel GEL documents alone." (Memorandum, Exh. E, p. 2). AstraZeneca's Proposed Plan further identifies categories of documents, including Safety Evaluation Review Meeting Minutes and Discussion Documents, and Clinical Overview Documents, which constitute AstraZeneca's internal deliberations on the subjects most relevant to this litigation.  (Proposed Plan, Exh. G, p. 3.)

Second, GEL was *not* designed merely to serve as a repository of finalized documents. GEL Technical Specifications indicate GEL is designed to "provide a common user interface to all GEL document and submission management processes and data," including the ability to (*inter alia*): author documents; create documents with multiple "virtual" components; store documents, maintain and access information about documents, view documents, search for documents, manage the lifecycle of documents, and maintain an audit record for documents. (Tech. Spec., Exh S.)  Furthermore, AstraZeneca developed tools and functionality specifically for the creation of annotations within GEL.  (Tech. Spec., Exh. T)   Documents can be created, edited and commented on directly in GEL, or imported to GEL with such intermediate data.

(Memorandum, Exh E, p. 2.)  GEL was thus designed not merely as a repository, but as a workspace for collaboration on and evolution of documents.

Third, GEL *does* operate to house intermediate data after finalization.  In fact, Mr. Draper indicates (in his declaration supporting AstraZeneca's Objection) that, *"As a result of litigation*, U.S. Clinical Document Management Specialists have routinely halted the default overwrite function to save drafts of Seroquel Clinical Development documents in GEL."  (Draper Decl., ¶14, Exh. U, *emphasis added*.)  This demonstrates that it was possible and feasible for AstraZeneca to properly preserve the intermediate data it destroyed.

The Advisory Committee Notes to FRCP 37(3) contemplate that "routine operation" of systems includes "the alteration and overwriting of information, **often without the operator's specific direction or awareness**, a feature with no direct counterpart in hard-copy documents." (emphasis added).  On February 26, AstraZeneca provided further information regarding the process by which GEL drafts are "non-retained."  AstraZeneca disclosed that, at the time GEL documents are "approved," select GEL users with appropriate permissions receive a computer generated prompt, in which the users are presented with an option – to retain or delete the intermediate data. (Exh. V.)  In other words, each time a GEL document was finalized, AstraZeneca employees had the option to retain or to spoliate evidence, and chose spoliation.

FRCP 37(e) does not apply to AstraZeneca's removal of intermediate data from GEL.

IV.    RELIEF REQUESTED

AstraZeneca's approach to the investigation of destroyed GEL intermediate data has been "frustratingly circular."  As set forth above, at every turn, AstraZeneca has hampered the investigatory process by providing false, misleading or incomplete information to plaintiffs and the SM-ESI.   So as to enable the identification and (to the extent possible) production of all

15

relevant intermediate data which existed in GEL, and to ensure transparency of the process, plaintiffs ask the Court to effect their counterproposal to AstraZeneca's Plan, and order that:

1) AstraZeneca identify and produce all Seroquel-related intermediate data which have been removed from GEL;

2) AstraZeneca produce all logs of the deletion of Seroquel-related intermediate data from GEL from January 1, 2000 to the present, and any documentation related to implementation of the logging process;

3) AstraZeneca produce a list of all users with permissions to enter or import Seroquel-related intermediate data in GEL from January 1, 2000 to present, identifying such users by name, title, permissions, and date permissions held;

4) Plaintiffs be given leave to take depositions upon written questions of such users on the subject of GEL intermediate data; and

5) Plaintiffs be given leave to take depositions upon oral examination of up to ten (10) witnesses on the subject of GEL intermediate data.

## V.     L.R. 3.01(g) CERTIFICATION

As set forth in the exhibits to the accompanying Canty Declaration, the parties have met and conferred extensively on the issues presented by this motion, and have been unable to resolve them.

Dated:  February 27, 2008                    LEVIN SIMES KAISER & GORNICK LLP

                                              _____/s/ Dennis J. Canty_____
                                              Lawrence J. Gornick (CA State Bar No. 136290)
                                              Dennis J. Canty (CA State Bar No. 207978)
                                              44 Montgomery Street, 36th Floor
                                              San Francisco, CA  94104
                                              Telephone:  415-273-8138
                                              Facsimile:  415-981-1270
                                              E-mail:        lgornick@lskg-law.com
                                                             dcanty@lskg-law.com