# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**IN RE:  Seroquel Products Liability Litigation**

**MDL DOCKET NO. 1769**

_____

**This Document Relates to ALL CASES**

### OBJECTIONS OF ASTRAZENECA LP AND ASTRAZENECA PHARMACEUTICALS LP TO SPECIAL MASTER'S AMENDED THIRD STATUS REPORT

Pursuant to Rule 53(f)(2) of the Federal Rules of Civil Procedure, Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals LP ("AstraZeneca") object to the Amended Third Status Report of Craig Ball, Special Master – ESI ("Report") based on (1) numerous factual inaccuracies and misstatements of law contained therein that must be corrected to preserve a complete and accurate record of these discovery proceedings and (2) tone and commentary that are improper in a report from a neutral officer appointed by the Court.  *See* Fed. R. Civ. P. 53(f)(2).

Although these problems permeate the Special Master's Report, they are most apparent in his treatment of preservation issues pertaining to AstraZeneca's Global Electronic Library ("GEL") database and production of redacted spreadsheets in TIFF. On both topics, the Special Master criticizes AstraZeneca for taking actions that, although consistent with the law and widely accepted principles of electronic discovery, fail to

1

meet the far higher standards the Special Master would prefer the law to impose.[1]
AstraZeneca is working hard to expedite document production and remedy deficiencies
where they exist. The Special Master, however, makes the process more difficult – rather
than assisting in the resolution of existing disputes – when he seeks to impose
extraordinary document production standards that exceed legal requirements and abuses
AstraZeneca for actions that conform with applicable standards and law.

Therefore, as detailed at length below, the Court should disregard the
aspects of the Special Master's Report to which AstraZeneca objects and reaffirm that the
Special Master's role in these proceedings is to facilitate production of documents
consistent with current legal standards and accepted electronic discovery practices, not
with his personal view of how e-discovery should proceed in this litigation.

## I.       BACKGROUND

On September 27, 2007, this Court appointed Craig Ball as the Special
Master to manage issues relating to discovery of electronically stored information ("SM-
ESI"). *See* Order Appointing Craig Ball, Esq. as Special Master for Elec. Disc. (Sept. 27,
2007) (Doc. No. 511). On October 5, 2007, the Court issued an order to define generally
the scope of the SM-ESI's role and authority in this litigation. The Court stated that the
SM-ESI's "primary duty" was "to *assist* and, when necessary, *direct* the parties in

---

[1] For instance, the law requires that parties preserve documents, but not that they be required to
modify their general business operations merely because it has been sued. The Report,
however, intemperately asserts that AstraZeneca is acting inappropriately by failing to
preserve in GEL working drafts that would not exist as separate documents in the
ordinary course of AstraZeneca's business operations. Similarly, the Special Master
criticizes AstraZeneca for producing redacted spreadsheets in TIFF when that form of
production is exactly how Plaintiffs demanded such production in their discovery
requests, consistent with industry practice.

completing required discovery of electronically stored information with reasonable dispatch and efficiency." Order as to Duties for Special Master Re Electronically Stored Info., at 1 (Oct. 5, 2007) (Doc. No. 546) (emphasis in original). Importantly, the Order granted to the SM-ESI the power to determine "[i]ssues as to means and methods for efficiently obtaining discoverable ESI," reserving for the Court "issues as to the scope and subject matters for discovery." *Id.* The Court ordered the SM-ESI "to determine where such [electronically stored] information is stored and how it can most effectively be accessed and made available" and authorized him "to resolve issues as to search terms and protocols, formatting and other technical matters." *Id.* at 2.

Further, the Court, careful not to abrogate its proper role and authority in resolving discovery matters, stated at the MDL status conference on October 2, 2007, "If we get in some substantive legal issues about the scope, it will come back to me. If it's just a matter of mechanics and logistics, [the SM-ESI] will be able to bring to bear his expertise along with the designees of parties to solve that." Transcript of Pretrial Conference Held on 10/2/07, at 38 (docketed Oct. 4, 2007) (Doc. No. 539) (attached as Ex. 1). Since that time, AstraZeneca has engaged in numerous meet-and-confer sessions with Plaintiffs and the SM-ESI regarding the most efficient manner in which to preserve and produce responsive documents in this litigation. Despite its good faith efforts, AstraZeneca repeatedly has been challenged by the SM-ESI to assume obligations that exceed those required by law. AstraZeneca sets forth here a brief factual background to provide important context for its objections to the SM-ESI's Report.

Over a four-week period beginning on October 17, 2007, the parties participated in meet-and-confer sessions regarding more than 50 AstraZeneca databases.

For each meet and confer, AstraZeneca made available at least one, and sometimes as many as four, technical resources to answer questions regarding the databases. These technically knowledgeable people were made available to Plaintiffs for approximately two hours for each database with little or no restriction regarding the topics or scope of inquiry. From November 5 through November 27, 2007, Plaintiffs served 49 sets of Requests for Production of Documents ("RFPs"), pursuant to Rule 34, seeking additional information relating to these databases and systems. The Instructions to Plaintiffs' RFPs specifically requested that, when AstraZeneca chose to redact information residing on databases, "[a]ll redactions shall be printed in TIFF format . . . ." *See, e.g.*, Pls.' Req. for Produc. of Docs. No. 54 (Nov. 27, 2007) (attached as Ex. 2) [hereinafter Pls.' RFP 54]. Accordingly, AstraZeneca's March 14, 2008, deadline for "substantial completion" of its document production was at all times based on the premise that it would redact all documents in TIFF.[2]

On December 4–5, 2007, the parties participated in a formal mediation with the SM-ESI on the subject of databases in New York City. Prior to the mediation, AstraZeneca provided Plaintiffs with a written statement of its position with respect to each of the databases for which Plaintiffs had served RFPs. For 24 of these databases, AstraZeneca advised Plaintiffs that it would produce all non-objectionable Seroquel-related content. *See* AstraZeneca's Pre-Mediation Position Paper on Remaining Requests for Production of Databases (Dec. 2, 2007) (attached as Ex. 3). At the mediation, counsel

---

[2] Plaintiffs served 23 RFPs before AstraZeneca filed its "substantial completion" papers on November 13, 2007. Plaintiffs served an additional 7 RFPs after AstraZeneca filed its papers but prior to entry of Magistrate Judge Baker's Report and Recommendation on November 16, 2007. The remaining 19 database RFPs were served after Magistrate Judge Baker issued the Report and Recommendation that formally established the March 14, 2008 "substantial completion" deadline.

for AstraZeneca advised the SM-ESI that there were several databases on which there was little anticipated disagreement and asked that those systems be discussed first in an effort to try to agree to as many databases as possible and to gain momentum that might carry the parties into the more difficult aspects of the mediation process. The SM-ESI refused this request, insisting that the parties discuss only databases for which there was "intractable" disagreement between the parties. As a result, during the first ten-hour day of the mediation, the parties were able to discuss only two databases.

Moreover, the SM-ESI insisted that the parties come to an "agreement" on each database discussed at the mediation. For instance, AstraZeneca advised the SM-ESI that it was willing to produce from its Global Electronic Library ("GEL") database all relevant Seroquel documents from the United States and certain foreign countries (subject to a prior agreement between the parties) in native format and produce the redacted documents in TIFF. As explained in more detail below, the SM-ESI deemed AstraZeneca's proposal unacceptable. Rather, the SM-ESI demanded to know how AstraZeneca intended to meet what he characterized as the "Gold Standard" of production – i.e., replication of the database such that Plaintiffs were granted the same usability as an AstraZeneca employee. Although AstraZeneca expressed at the time that the SM-ESI's standard of production was inconsistent with the Federal Rules and widely accepted principles of electronic discovery that required "reasonable usability," the SM-ESI's insistence that AstraZeneca find a "solution" that would reach his ideal standard resulted in the discussions taking several additional hours.[3] On the second day of the

---

[3] Notably, despite the SM-ESI's insistence that AstraZeneca replicate employee usability, when AstraZeneca did produce a database in the same format used by AstraZeneca's own employees, both the SM-ESI and Plaintiffs objected to the production and demanded a re-

mediation, when the SM-ESI finally allowed the parties to discuss other databases, the parties were quickly able to reach agreement on those systems. *See* E-mail from Craig Ball to Andrew Dupre et al. (Dec. 12, 2007) (attached as Ex. 6) (transmitting certain database agreements). The issue regarding form of production was not resolved at the database mediation. During a call on December 12, 2007, AstraZeneca advised the SM-ESI that each of Plaintiffs' RFPs instructed AstraZeneca to redact in TIFF and that AstraZeneca intended to honor Plaintiffs' request regarding form of production. *See, e.g.,* Pls.' RFP 54.

On December 14, 2007, the SM-ESI sent correspondence to the parties indicating that, with respect to redactions in TIFF, he was "not content to report that we used industry standard methods to produce useless, corrupted evidence." *See* E-mail from Craig Ball to Dennis Canty et al. (Dec. 14, 2007) (attached as Ex. 7). On December 15, 2007, the SM-ESI filed his Third Status Report, which was subsequently amended for typographical and grammatical errors on December 17, 2007. *See* Am. Third Status Report of SM-ESI (Dec. 17, 2007) (Doc. No. 747) [hereinafter SM-ESI's Report]. On December 17, 2007, AstraZeneca filed notice papers with the Court indicating its intention to file formal objections to the SM-ESI's Third Status Report. *See* Notice of Intent to File Objections and Mot. Regarding the SM-ESI's Third Status Report (Dec. 17, 2007) (Doc. No. 746). In response to this filing, the SM-ESI sent e-mail correspondence to AstraZeneca's counsel, stating "Thank you. Quite a provocative document, I've never seen a *notice* of intent to object. I usually just plunged ahead and objected. I look

---

production in a different format. *See See* Letter from Kevin T. Kerns to Larry Gornick (Dec. 20, 2007) (attached as Ex. 4); E-mail from Larry J. Gornick to Kevin Kerns et al. (Dec. 21, 2007) (attached as Ex. 5).

forward to reading the ways in which I've been inappropriate, inaccurate and misleading." *See* E-mail from Craig Ball to Benjamin Barnett et al. (Dec. 17, 2007) (attached as Ex. 8) (emphasis in original).

## II.      DISCUSSION

Pursuant to Rule 53(f)(2) of the Federal Rules of Civil Procedure, AstraZeneca objects to the SM-ESI's Report because it includes numerous factual inaccuracies and misstatements of law as well as tone and commentary that are improper from a neutral officer appointed by the Court. *See* Fed. R. Civ. P. 53(f)(2).[4]

   A.      SM-ESI's Report Includes Factual Inaccuracies That Must Be Corrected
           For The Record

           1.      *Mischaracterization of nature and extent of collection and*
                   *production issues recently discovered by AstraZeneca*

The SM-ESI's Report mischaracterizes the nature and extent of AstraZeneca's collection and production issues, giving the impression that AstraZeneca's efforts have resulted in several "failures" to satisfy its discovery obligations. The Report overstates the severity of any issues and fails to acknowledge that this very discovery was the result of AstraZeneca's own investigation to confirm the quality of its collection and production efforts – through Carmen Field and AstraZeneca's Special Technical Committee – that began prior to appointment of the SM-ESI. For example, references in the SM-ESI's Report to "the shortcomings in AstraZeneca's handling of ESI [that] continue to prove deeper and broader" in relation to "large swaths of clearly relevant

---

[4] All findings of fact are to be reviewed *de novo* by this Court. *See* Fed. Civ. P. 53(f)(3) ("The court must decide *de novo* all objections to findings of fact made or recommended by a master. . . ."); *see also Swoboda v. Pala Mining, Inc.*, 844 F.2d 654, 659 (9th Cir. 1988)

ESI," SM-ESI's Report at 1, are vague, overstated, and rhetorical, giving a flawed picture regarding the nature and extent of collection and production issues discovered by AstraZeneca.  Likewise, the SM-ESI's conclusory statement that these purported failures were a result of unspecified "internal mismanagement and inadequate oversight at AstraZeneca" is objectionable for the same reason.  SM-ESI's Report at 1.

Further, the SM-ESI's comment that the "candor and unflinching introspection into this deeply flawed history" by AstraZeneca's technical advisor, Carmen Field, SM-ESI's Report at 8, is ultimately an unfair criticism of AstraZeneca.  The Report fails to acknowledge that Ms. Field's work reflects AstraZeneca's *own* decision to continue to investigate and confirm the quality of its productions as part of an ongoing and enhanced quality assurance plan, to volunteer that information to Plaintiffs, and to correct any prior errors that were detected.  Indeed, Ms. Field is an expert in e-discovery technology who was retained (along with other experts) by AstraZeneca for this very purpose – to provide additional e-discovery support to AstraZeneca's existing IT resources – even prior to involvement by the SM-ESI.  The Report not only fails to acknowledge this fact, but appears to imply that prior errors in the collection process had to be somehow uncovered by Ms. Field through "detective work" despite AstraZeneca, rather than by carrying out the very assignment AstraZeneca initiated.  *Id.* at 7.

Indeed, it is not surprising that Ms. Field has found some imperfections during her quality-assurance review.  This was a very large production carried out in a very short period of time.  In making its original productions in this case, AstraZeneca

---

(affirming district court's decision overruling findings of fact contained in special master's report due to failure to reference evidentiary support in the record).

produced over 10 million pages of documents (and reviewed millions more) in just over four months. With such a large-scale production over such a compact period of time, some margin of error is clearly inevitable. S*ee, e.g.*, *PSEG Power N.Y., Inc. v. Alberici Constructors, Inc.*, No. 1:05-CV-657 (DNH/RFT), 2007 WL 2687670, at *8 (N.D.N.Y. Sept. 7, 2007) ("We acknowledge that discovery production is rarely perfect or ideal. . . ."); *The Sedona Principles, Second Edition: Best Practices, Recommendations & Principles for Addressing Electronic Document Production* cmt. 14.a (The Sedona Conference Working Group Series, 2007), *available at* http://www.thesedonaconference.org [hereinafter *Sedona Principles*] ("Due to the complexity of modern electronic information systems, the large volumes of electronically stored information, and the continuing changes in information technology, there exists a potential for good faith errors or omissions in the process of identifying, preserving and producing relevant electronically stored information, which involves both humans and technology."). This is precisely why AstraZeneca retained Ms. Field—to review its production for completion. Meanwhile, the types of problems that Ms. Field has identified to date are the types of limited and unintentional oversights caused by human error that one would expect to find in such a large and comprehensive production.

2.    *Mischaracterization that AstraZeneca somehow caused the database mediation to be less productive than it should have been*

The SM-ESI's Report gives the impression that little was accomplished at the database mediation because the parties reached agreement on only a small number of databases.[5] The SM-ESI's Report improperly suggests that this failure was due, in part,

_____

[5] The SM-ESI's Report also seeks to recharacterize a good-faith attempt by both parties to mediate the issue of database production into a cause for concern or criticism relating to

to the fact that AstraZeneca's counsel "withdrew" too often to consult with in-house counsel or vendor representatives.  SM-ESI's Report at 2.  To the contrary, any perceived inefficiency or delay at the mediation was engendered by a flawed process established by the SM-ESI to resolve database issues, and not AstraZeneca's participation in that process.  Given the limited time available to discuss over 49 databases, the SM-ESI's insistence that the parties first address the most "intractable" databases all but guaranteed slow progress from the very beginning.[6]  Although the SM-ESI indicated that it was his view that it would be better to reach agreement on a few difficult databases than on a larger number of "easy" ones, it is patently unfair to then criticize AstraZeneca for not having reached agreement on a larger number of databases in a situation, described above, that was not of its own creation and whose nature all but assured less, not more, agreement on databases.

Further, the SM-ESI's Report cites AstraZeneca's "withdrawing a number of times to consult with in-house counsel or vendor representatives" as a source of delay, SM-ESI's Report at 2, but this comment fails to recognize that AstraZeneca's counsel was actually seeking to *resolve* matters by conferring with its own in-house counsel and internal AstraZeneca IT representatives (erroneously portrayed as third party "vendors" in the Report) when matters reached an apparent impasse or sticking point in the mediation room.  Indeed, that is how mediations normally work, and it is an important, useful aspect of mediations, not an impediment to agreement.

---

AstraZeneca.  It defies the spirit and purpose of such a mediation for the mediator to file a report thereafter singling out one of the parties for positions taken and ultimate failure to reach agreement.

It is axiomatic that outside legal counsel must be able to consult with their client during a mediation for it to be effective—that is precisely why three rooms were reserved and used at the database mediation: so the attorneys would be in a position to vet completely any negotiation sticking points with their clients without waiving privilege during "breakout sessions." The SM-ESI's Report also gratuitously observes that "absent strict deadlines, [the SM-ESI is] concerned that insufficient attention may be directed to the response of ESI within databases." SM-ESI's Report at 2. That observation is simply speculation with no foundation in fact.[7]

      3.     *Mischaracterization of issues relating to preservation of certain materials in the GEL database*

The SM-ESI's Report completely distorts the function of AstraZeneca's Global Electronic Library ("GEL") database and AstraZeneca's representation to the SM-ESI about that database. *See* Memorandum from Robert Pass to Craig Ball, SM-ESI, Re: AstraZeneca/Seroquel Litigation: Proposed Plan Regarding Drafts of Documents Housed on GEL (Dec. 12, 2007) (initially submitted *ex parte*) (attached as Ex. 9) [hereinafter AstraZeneca's GEL Memorandum and Proposal]. AstraZeneca's GEL database is, as its name denotes, a company-wide electronic library designed to house submissions to United States, foreign, and international regulatory agencies for all products, not just Seroquel. *See* Decl. of Darryl Draper ¶ 4 (attached as Ex. 10). The purpose of the GEL

---

[6] The SM-ESI specifically rejected the suggestion of AstraZeneca's counsel that the parties first address a number of databases that counsel believed could be resolved quickly to establish momentum for the remaining databases slated for discussion at the mediation.

[7] The SM-ESI's Report fails to articulate the basis for such a statement, and AstraZeneca's counsel similarly cannot conceive of one. AstraZeneca has not failed to meet a deadline under its "substantial completion" production plan, nor does the SM-ESI have any basis of which AstraZeneca is aware to predict such a failure.

database is to store *final* information for submission to regulatory bodies. *See id.* ¶ 5. The database was not designed to house permanently drafts, revisions, and comments relating to those documents. Accordingly, under routine practice at AstraZeneca, once the submission was finalized, "intermediate" materials were typically not retained in the GEL database in the ordinary course of business. *See id.* ¶ 6. AstraZeneca does not dispute that certain documents were not retained *in GEL* after they were finalized for regulatory submission by business personnel. The SM-ESI's Report, however, mischaracterizes the nature and operation of the GEL database and creates the impression that GEL improperly deletes data that is otherwise relevant in this litigation.

GEL is a Documentum database, which functions as a document management system. *See id.* ¶ 10. Thus, GEL contains documents, not data. One of the standard features of a Documentum database is that it can be configured to delete drafts and commentary regarding documents once they have been finalized. *See id.* ¶ 11. This very functionality of such a widely used form of database underscores its routine nature. For AstraZeneca, this function was employed to avoid the confusion of potentially submitting an incorrect prior version to a regulatory body and to maintain a clean database without the clutter of obsolete drafts that were no longer relevant to the business and regulatory purposes of the GEL database. *See id.* ¶ 12. GEL has been operating in this manner since before the Seroquel product liability litigation commenced. *See id.* ¶ 13. Importantly, however, AstraZeneca has implemented a "litigation hold" policy to retain Seroquel-related documents relevant to the claims in this litigation. The hold implemented by AstraZeneca, therefore, would have encompassed GEL draft documents that were not otherwise maintained in the GEL database itself, advising that such

documents be preserved locally by the individuals who created them.  *See* AstraZeneca's GEL Memorandum and Proposal.

The SM-ESI's Report also appears to take the position that AstraZeneca must specifically identify "purged" Seroquel-related drafts preserved outside of GEL and produce them.  *See* SM-ESI's Report at 3.  Such statements are premature, however, in that Plaintiffs never served a Request for Production seeking such a variety of draft GEL material residing outside of GEL, and AstraZeneca will likely have valid objections if such an overreaching request were made.[8]  *See* AstraZeneca's GEL Memorandum and Proposal.  At minimum, AstraZeneca should be afforded the protections set forth in Rule 34 and be given an opportunity to fully litigate, *inter alia*, the relevance and burdensomeness of such a request.  The commentary in the SM-ESI's Report regarding AstraZeneca's "obtuse refusal to refute or confirm the apparent destruction of Seroquel-related ESI in GEL," SM-ESI's Report at 3, is not only inappropriate, for reasons set forth below, but also inaccurate given that AstraZeneca had already advised the SM-ESI that:  (1) GEL deletes some drafts in some groups; (2) AstraZeneca reasonably relies on its "litigation hold" to have worked as it was designed to do; and (3) the overwhelming burden of going to every person who may have relevant "purged" drafts outside of GEL is premature until the appropriate scope of that discovery has been determined by the Court.  *See* AstraZeneca's GEL Memorandum and Proposal.

---

[8] AstraZeneca also notes that the SM-ESI's involvement in this area seems also to intrude upon a matter pertaining to the "scope" of discovery that was properly retained by the Court. *See* Order as to Duties for Special Master Re Electronically Stored Info., at 1 (Oct. 5, 2007) (Doc. No. 546).

4.  *Mischaracterization that AstraZeneca has "ignored" the SM-ESI's guidance regarding production of redacted spreadsheets*

The SM-ESI's Report creates the impression that, as a routine matter, AstraZeneca has implicitly or explicitly "ignored" the SM-ESI's guidance relating to the production of redacted spreadsheets.  *See* SM-ESI's Report at 4, 7.  There are two fundamental problems with the SM-ESI's statements on this topic.  First, the SM-ESI has not directed AstraZeneca how it ***should*** produce spreadsheets – or anything else for that matter – but rather only advised how AstraZeneca should ***not*** produce them – i.e., in Tagged Image File Format ("TIFF") where redactions are present.  Second, with statements like "but the defendant will not comply," the SM-ESI's Report suggests that AstraZeneca has somehow simply ignored the SM-ESI's position.  This characterization fails to acknowledge that AstraZeneca specifically advised the SM-ESI that it intended to make productions of redacted spreadsheets in TIFF, its basis therefore, and that, should it be necessary to do so, AstraZeneca was prepared to take the matter to the Court for judicial resolution, using the appropriate procedure under Rule 53.  *See* E-mail from Kevin Kerns to Craig Ball (Dec. 14, 2007) (attaching Letter from Kevin Kerns to Craig Ball (Dec. 13, 2007)) (attached as Ex. 11).  Although the SM-ESI is free to disagree with this standard production format, AstraZeneca is well within its rights to seek *de novo* review by the Court regarding the SM-ESI's recommendation.  *See* Fed. R. Civ. P. 53(f)(3) ("The court must decide *de novo* all objections to findings of fact made or recommended by a master. . . .").  Meanwhile, AstraZeneca never was disrespectful to the SM-ESI, never failed to acknowledge the SM-ESI's instructions, and never left any ambiguity as to its position on this subject.

5.  *Mischaracterization that AstraZeneca has adopted an unusual or controversial plan for production of redacted spreadsheets*

The Report goes to considerable lengths and employs extravagant rhetoric inappropriate to the setting and forum, *see* SM-ESI's Report at 5 (referring to spreadsheets redacted and produced in TIFF as a "redacted carcass"), to give the inaccurate impression that AstraZeneca's plan for the production of redacted materials is outlandishly inappropriate.  The Report identifies (but overstates out of context in this action) historically well-known challenges involved in producing spreadsheets in TIFF. They are common knowledge among experienced counsel practicing in the area of e-discovery.  AstraZeneca understands them.  So, undoubtedly, does Plaintiffs' counsel and their technology consultant.

Given these inherent difficulties, it has been AstraZeneca's consistent practice, since late July 2007, to accommodate Plaintiffs by producing non-redacted spreadsheets in native format, while continuing (as it has done from the inception of the litigation) to produce those that required redaction in TIFF along with a load file.  *See* Case Management Order No. 2 at III.A. (Jan. 26, 2007) (Doc. No. 129) ("AstraZeneca shall produce all responsive hard copy and electronic documents in single-page Tagged Image File Format ('TIFF') with an accompanying load file, an extracted text file of electronic documents that are unredacted, and an Optical Character Recognition ('OCR') text file of unredacted portions of redacted documents and hard copy documents."). Although the SM-ESI's Report criticizes AstraZeneca's approach for production of redacted spreadsheets, *see* SM-ESI's Report at 4–7, AstraZeneca's plan represents standard litigation practice, *see infra* section B.2, and the SM-ESI has proposed no reasonable alternative.  Indeed, while condemning them, the SM-ESI acknowledges that

15

the production of redacted spreadsheets in TIFF is an "industry standard method[]"—albeit one with which he is not content—yet the Report goes no further to identify what the SM-ESI believes to be "reasonable cost-effective alternatives" to the method employed by AstraZeneca.  SM-ESI's Report at 6–7.  It is unclear, therefore, why the SM-ESI's Report so intensely castigates AstraZeneca for employing mainstream technology to effect its production of redacted spreadsheets.  *See infra* at section B.2.

The simple fact is that AstraZeneca is providing Plaintiffs with redacted spreadsheets in *exactly the format in which they were requested*.  In each of the 49 database-related Requests for Production of Documents ("RFPs") served on AstraZeneca, Plaintiffs specified production in TIFF for all redacted material, including spreadsheets.  Instruction No. 9 of each set of RFPs provides, "All redactions *shall be printed in TIFF format*, Bates-numbered, with an accompanying OCR, metadata (indicating redaction reason) and load file.  The value of any field redacted should be changed to REDACTED:<BATES NUMBER>."  *See, e.g.*, Pls.' RFP 54 (emphasis added).  The SM-ESI's Report dismisses the express terms of Plaintiffs' own request regarding form of production of redacted documents as "boilerplate language" and insists that AstraZeneca should be obligated to do more than what was requested by Plaintiffs.[9]  SM-ESI's Report at 7.  AstraZeneca can think of no way in which the technical terms of Plaintiffs' initial request might be perceived as "boilerplate language" unless, of course,

---

[9] Plaintiffs subsequently filed a Response in Opposition to AstraZeneca's Motion for Clarification and/or Reconsideration of Report and Recommendation Regarding the Amended Schedule for General Discovery and Trial and Case Management of Florida Cases (Dec. 3, 2007) (Doc. No. 728), stating that they now seek documents and data in whatever format recommended by the SM-ESI.  *See* Pls.' Resp. in Opp'n to Defs.' Mot. for Recons. and/or Clarification and Defs.' Objections to Magistrate Judge Baker's Report and Recommendation (Dec. 14, 2007) (Doc. No. 742).

the SM-ESI meant simply that the request was repeated 49 times in each set of discovery served by Plaintiffs.

The SM-ESI's Report also mischaracterizes the current state of AstraZeneca's document production: "defendant seeks to capitalize on the plaintiff's boilerplate language concerning TIFF redaction and a Case Management Order issued to govern a now-abandoned TIFF production." *Id.* The Report, thus, appears to suggest that AstraZeneca is attempting to justify the use of TIFF to produce redacted spreadsheets based on the Case Management Order that was issued when TIFF was the general format of production in the case. However, that is simply wrong. As discussed above, since late July 2007, AstraZeneca has produced non-redacted spreadsheets in ***native*** format to avoid the difficulties inherent in TIFF-formatted spreadsheets, and AstraZeneca continues to produce non-redacted and redacted spreadsheets in the manner set forth above. That is to say, the SM-ESI's Report fails to acknowledge that AstraZeneca has, for over five months, accommodated Plaintiffs by producing non-redacted spreadsheets in native format and those that require redaction in TIFF along with a load file.

More importantly, perhaps, the SM-ESI's Report argues against AstraZeneca's production of redacted spreadsheets in TIFF, but such advocacy ignores the more fundamental realities of this particular litigation. This is a product liability action pertaining to the use of a pharmaceutical drug, not a securities, patent, or other type of case that would typically involve an accounting of numbers and figures. Indeed, experience in numerous other pharmaceutical and products liability matters suggests that it is doubtful that spreadsheets will ever have any relevance in this litigation, and

AstraZeneca is unaware of Plaintiffs proffering any purported use of spreadsheets for the prosecution of their claims.

Further, Plaintiffs did not just begin this month demanding and reviewing spreadsheets. Meanwhile, tens of thousands of spreadsheets have been produced – approximately thirty thousand apparently redacted and in TIFF. AstraZeneca is not aware of any instances, to date, where Plaintiffs have asked for a redacted spreadsheet to be reproduced in native format or sought some other workaround for what was perceived by Plaintiffs to present a legitimate problem warranting their attention. This fact, on its face, underscores the fact that TIFF production of redacted spreadsheets is standard and appropriate, that Plaintiffs know it, that they asked for it 49 times, not by oversight or the use of "boilerplate" language, but by design, and that they only began objecting to the format specified in their own requests once the SM-ESI began to suggest that they should do otherwise.

Ultimately, the most appropriate and practical way to proceed is to produce spreadsheets *as they have been produced for many months* and *as Plaintiffs have repeatedly specified they be produced.* If Plaintiffs identify specific redacted spreadsheets that they can make a showing they need reproduced in native, the parties and the Court can address those documents on a case-by-case basis.[10] This approach is made all the more critical by the fact that this Court required AstraZeneca to certify the "substantial completeness" of its document production by March 14, 2008—warning of

---

[10] If the Court adopts such an approach, AstraZeneca respectfully requests that it makes clear that any subsequent reproduction of specific spreadsheets in some other fashion than that requested by Plaintiffs will not count against AstraZeneca's "substantial completion" obligation, which would otherwise be satisfied by its initial production of redacted spreadsheets in TIFF.

substantive sanctions for failure—and AstraZeneca did (and should be entitled to) rely on what Plaintiffs were actually asking in their Rule 34 requests at the time AstraZeneca made this commitment.[11]  *See* Order and Am. Report and Recommendation Regarding the Schedule for General Disc. and Trial and Case Mgmt. of Fla. Cases, at 4 (Dec. 21, 2007) (Doc. No. 759).  On this background, it makes no sense to suddenly require the production and re-production of tens of thousands of redacted spreadsheets in some other (unspecified) manner and thus jeopardize, if not ensure the failure of, AstraZeneca's "substantial completion" deadline.

B.     SM-ESI's Report Includes Erroneous Legal Conclusions That Must Be Corrected For The Record

The SM-ESI's Report includes erroneous legal conclusions relating to AstraZeneca's preservation and production obligations.  These misstatements by the SM-ESI must be corrected for purposes of maintaining a complete and accurate record of these proceedings.

1.     *The SM-ESI's conclusions regarding AstraZeneca's preservation obligations are incorrect as a matter of law*

The SM-ESI takes issue with AstraZeneca's position with respect to preservation of certain draft documents contained in its Global Electronic Library

---

[11] It is unclear whether the SM-ESI's Report implicitly requires AstraZeneca to reprocess the tens of thousands of previously produced redacted (TIFF) spreadsheets in native format in addition to those spreadsheets to be produced from databases in the future.  Either requirement is extremely burdensome and would make it impossible for AstraZeneca to meet the March 14, 2008 deadline for "substantial completeness" of its document production.  Moreover, because it is unclear exactly what format the SM-ESI expects AstraZeneca to redact in, it will hamper AstraZeneca's ability to begin to review and produce from its databases until the SM-ESI clarifies and approves an acceptable format.  AstraZeneca's representation that it could substantially complete its discovery obligations

("GEL") database.[12]  *See supra* section A.3.  According to the SM-ESI's Report, "[i]t appears that, notwithstanding its preservation obligation, AstraZeneca made a business decision to continue its practice of discarding or 'non-retaining' Seroquel-related drafts, revisions, comments and annotations from within GEL."  SM-ESI's Report at 2.  The Report further states, "AstraZeneca takes the position that because plaintiffs asked for 'relevant Seroquel and Seroquel related data from GEL,' plaintiffs have not asked for production of ESI *purged* from GEL.  Consequently, AstraZeneca denies it has an obligation to locate or produce the Seroquel ESI it 'non-retained.'"  *See id.* at 3 (emphasis in original).[13]  Based on these and other statements, the SM-ESI has erroneously reported to the Court that AstraZeneca has somehow failed to satisfy its preservation obligations with respect to certain materials in the GEL database.  As explained above and incorporated by reference herein, the purpose of the GEL database is to store *final* information approved for submission to regulatory bodies; it was not designed to permanently house drafts, revisions, and comments relating to those documents.  *See supra* section A.3.  AstraZeneca does not dispute that certain documents were not retained *in the GEL database* after they were finalized by business personnel.  The SM-ESI's Report, however, seeks to characterize this routine business practice as a violation

---

by March 14, 2008 assumed that AstraZeneca could rely on Plaintiffs' written discovery requests and begin the production process immediately.

[12] The SM-ESI's Report appears to conflate issues relating to "preservation" with those of "production" of certain materials in AstraZeneca's GEL database.  *See* SM-ESI's Report at 3.  Because it appears that "non-retention" of certain materials in GEL is the SM-ESI's primary concern, AstraZeneca focuses here on issues relating to the SM-ESI's erroneous conclusions of law relating to AstraZeneca's preservation obligations.

[13] AstraZeneca notes that the SM-ESI here goes beyond what Plaintiffs themselves are requesting and appears only to be advocating an overly aggressive preservation obligation.

of what the SM-ESI has portrayed as a clear legal obligation to preserve such information in GEL, which is legally erroneous and must be corrected for the record.

The law imposes no obligation on AstraZeneca to preserve everything that was on GEL after any preservation obligation arose, much less to preserve it within GEL itself. [14] An underlying principle of electronic discovery is that "it is unreasonable to expect parties to take every conceivable step to preserve all potentially relevant electronically stored information." *Sedona Principles* Principle 5; *see also Miller v. Holzman*, No. 95-01231, 2007 WL 172327, at *6 (D.D.C. Jan. 17, 2007) ("'The obligation to preserve electronic data and documents requires reasonable and good faith efforts to retain information that may be relevant to pending or threatened litigation. However, it is unreasonable to expect parties to take every conceivable step to preserve all potentially relevant data.'") (quoting *Sedona Principles* 44 (2004 Annotated Version)); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) (Scheindlin, J.) ("What is the scope of the duty to preserve? Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every e-mail or electronic document, and every backup tape? The answer is clearly, 'no.'"). [15] Further, the Commentary to the *Sedona Principles* notes that "[s]atisfaction of this [preservation]

---

[14] In any event, the scope of AstraZeneca's preservation obligation and what information is relevant in this litigation is a legal matter for review by the Court, not the SM-ESI.

[15] *See also* Thomas W. Burt and Gregory S. McCurdy, *E-Discovery of Dynamic Data and Real-Time Communications: New Technology, Practical Facts, and Familiar Legal Principles*, 115 Yale L.J. Pocket Part 166, 169 (2006), *available at* http://www.thepocketpart.org/2006/08/burt_and_mccurdy.html ("While users technically can record every change, addition, and deletion to a memo or database during its life, that generally is not necessary, practical, or legally required – nor should it be. . . . Most enterprises could not even contemplate preserving the vast quantity of data that would be required to determine the exact state of a dynamic database at any moment, days, months, or years earlier.").

obligation must be balanced against the right of a party to continue to manage its electronic information in the best interest of the enterprise, even though some electronic information is necessarily overwritten on a routine basis by various computer systems." *Sedona Principles* Comment 5.a. The Commentary also recommends that "[a] reasonable balance must be struck between (1) an organization's duty to preserve relevant evidence, and (2) an organization's need, in good faith, to continue operations." *Id.* (*citing* Fed. R. Civ. P. 37(f) (2006) (current version at Fed. R. Civ. P. 37(e))).

The SM-ESI's Report states that the "[SM-ESI] would prefer [the parties] treat [his] directives concerning matters squarely within [his] area of responsibility as issued in [the Court's] stead until [the Court] otherwise direct[ed]." SM-ESI's Report at 7. Absent a ruling by the Court, however, AstraZeneca is not under an obligation to preserve everything in the GEL database simply because the SM-ESI – without any substantive knowledge of the underlying litigation – believes that relevant evidence might possibly be contained therein. *See In re Ford Motor Co.*, 345 F.3d 1315, 1317 (11th Cir. 2003) (holding that a producing party's plan to review its own database was an adequate preservation plan, and that the database should not be subject to further search by the requesting party absent a showing of extraordinary circumstances) (citing Fed. R. Civ. P. 34(a)); *800 Adept, Inc. v. Murex Sec., Ltd.*, No. 6:02-cv-1354-Orl-19DAB, 2007 U.S. Dist. LEXIS 70861, at *9–*11 (M.D. Fla. Sept. 25, 2007) (overruling the plaintiff's objection to a discovery order that declined to grant discovery of a subject database based on "mere 'suspicions'" that the defendants were in contempt); *Sedona Principles*, Comment 8.a ("The mere suspicion that a source may contain potentially relevant information is not sufficient to demand the preservation of that source 'just in case.'");

*see also Diepenhorst v. City of Battle Creek*, No. 1:05-cv-734, 2006 U.S. Dist. LEXIS

48551, at *10 (W.D. Mich. June 30, 2006) ("The discovery process is meant to be

extrajudicial, and relies upon the responding party to search his records to produce the

requested data. In the absence of a strong showing that the responding party has

somehow defaulted in this obligation, the court should not resort to extreme, expensive,

or extraordinary means to guarantee compliance."). Indeed, the Federal Rules Advisory

Committee has also noted that Rule 34 encompasses a direction for the district court to

"protect respondent with respect to preservation of his records, confidentiality of

nondiscoverable matters, and costs." Fed. R. Civ. P. 34 Advisory Committee's Note on

1970 Amendment, Subdivision (a).[16]

Moreover, in public statements unrelated to this litigation, the SM-ESI has

made clear that he personally believes in a higher standard for preservation that is beyond

the legal standard – an approach that the SM-ESI has recognized is inconsistent with the

obligations set forth in the Federal Rules of Civil Procedure:

> [T]he proposed rules don't expressly impose an obligation to preserve
> items identified as inaccessible pending the court's consideration. The
> delay then serves as an opportunity to migrate evidence from inaccessible
> to gone. If the proposed amendment to Rule 26(b)(2) is not abandoned,
> the better approach would be an express requirement to preserve all data
> claimed to be inaccessible pending the court's determination whether good
> cause exists for production.

---

[16] Although not specifically addressed in the SM-ESI's Report, AstraZeneca also notes that any
recommendation tantamount to direct access to the GEL database by Plaintiffs, the SM-
ESI, or a third party would be similarly improper as a matter of law. *See* Fed. R. Civ. P.
34 Advisory Committee's Note on 2006 Amendment, Subdivision (a) ("Courts should
guard against undue intrusiveness resulting from inspecting or testing such systems."); *In
re Ford Motor Co.*, 345 F.3d 1315, 1316-17 (11th Cir. 2003) ("Rule 34(a) does not grant
unrestricted, direct access to a respondent's database compilations. Instead, Rule 34(a)
allows a requesting party to inspect and to copy the product – whether it be a document,
disk, or other device – resulting from the respondent's translation of the data into a
reasonably usable format.").

Letter from Craig Ball to Peter G. McCabe, Sec'y, Comm. on Rules and Procedure, Admin. Office of the U.S. Courts 3 (Jan. 18, 2005), *available at* http://www.uscourts.gov/rules/e-discovery/04-CV-112.pdf; *see also* Comm. on Rules of Practice and Procedure, Judicial Conference of the U.S., Public Hearing on Proposed Amendments to the Federal Rules of Civil Procedure (Feb. 12, 2005), Transcript at 115–16, *available at* http://www.uscourts.gov/rules/e-discovery/CVHearingFeb2005.pdf [hereinafter Rules Committee Public Hearing Testimony].  The SM-ESI has also acknowledged that *total* preservation is too disruptive to be practicable.  *See* Craig Ball, *The Perfect Preservation Letter*, *in* 6 on EDD:  Six Articles on Electronic Data Discovery 54 (2007), *available at* http://www.craigball.com/Six_on_EDD-February_2007.pdf ("[Y]ou don't want your preservation letter to appear to demand anything more onerous than maintaining evidence in the way it's kept in the ordinary course of business.").[17] Therefore, the statements in the SM-ESI's Report relating to AstraZeneca violating its preservation obligations with respect to certain materials in GEL is contrary to the law and widely accepted principles of e-discovery.

The SM-ESI's Report creates the impression that AstraZeneca has done nothing with respect to preserving potentially relevant materials housed in the GEL database.  To the contrary, in contemplation of discovery in litigation, AstraZeneca implemented a litigation hold in September 2003, including a directive to the primary recipients that the hold be cascaded by those recipients to other personnel known to the recipients to potentially relevant information.  AstraZeneca's Legal Department routinely

---

[17] *See also* Craig Ball, *Ten Common E-Discovery Blunders*, *in* Ball, *supra*, at 103, 104 ("Don't let an irrational fear of sanctions rob you of your good judgment.  Clients don't have to keep

reminds employees to preserve relevant documents.[18]  Still, these very efforts to retain

certain materials that would not otherwise be maintained in the ordinary course of

AstraZeneca's business do not suddenly make those materials relevant for litigation

purposes, nor does that effort suggest that AstraZeneca's standard procedure relating to

the GEL database was somehow inconsistent with widely accepted legal standards for

preservation of documents.

        Moreover, it is legally sufficient and entirely appropriate for AstraZeneca

to rely on a reasonable litigation-hold policy to effect the preservation of documents that

it was designed to achieve.  *See Sedona Principles* cmt. 6.a ("Typically, the producing

party identifies and informs the key individuals likely to have relevant information of the

specific need to preserve all available relevant information – this instruction is sometimes

referred to as a 'litigation hold notice.'  . . . A producing party should not be required to

undertake more heroic efforts merely because the party seeking discovery is suspicious of

the efforts undertaken by the producing party.").  Indeed, AstraZeneca has effected such a

---

everything.  Judges aren't punishing diligent, good faith efforts gone awry.  [The
attorney's] job is to help manage risk, not eliminate it altogether.")

[18] AstraZeneca has developed a clearly defined plan to preserve drafts of GEL documents and
produce to Plaintiffs those that are responsive to legitimate discovery requests.  First,
AstraZeneca implemented a plan to retain drafts maintained in GEL going forward.
Second, as of December 21, 2007, in an effort to address concerns of overwriting because
of human error, AstraZeneca implemented a plan to export drafts from GEL on a daily
basis to be preserved in an alternative environment outside of GEL.  Third, AstraZeneca
is currently refining and enhancing this export function to preserve annotations.  Fourth,
AstraZeneca will produce documents, including drafts, from GEL responsive to
Plaintiffs' Request for Production of Documents #8 on a rolling basis to be completed by
March 14, 2008.  Finally, with regard to other requests for drafts of certain categories of
regulatory documents, AstraZeneca is producing – and continues to produce – the
requested drafts except for those to which it has specifically asserted reasonable grounds
for objection.

reasonable preservation plan with regard to GEL. *See* AstraZeneca's GEL Memorandum and Proposal at 4.

AstraZeneca has therefore implemented a litigation hold historically and, at the request of the SM-ESI (and without in any way conceding that such a procedure was legally necessary) has also implemented a technological tool to capture on a going-forward basis copies of Seroquel materials placed on GEL in a readily accessible medium. However, not only is the appropriate scope of discovery into materials once resident on GEL undetermined in this case, but Plaintiffs have served no Request for Production seeking them. Rather, Plaintiffs have served one specific and narrow such request directed to certain labeling drafts, to which AstraZeneca has objected, and the matter has been argued and is pending before the Court. *See* Pls.' Am. Req. for Produc. of Docs., at Request No. 14 (June 11, 2007) (attached as Ex. 12); Mot. to Compel Defs.' Resps. to Reqs. for Produc. of Docs. (Oct. 30, 2007) (Doc. No. 629); Resp. in Opp'n Re Mot. to Compel Defs.' Resps. to Reqs. for Produc. of Docs. (Nov. 12, 2007) (Doc. No. 662); Order Deferring Ruling on Mot. (Nov. 16, 2007) (Doc. No. 688).

> 2. *The SM-ESI's conclusions regarding AstraZeneca's production obligations are incorrect as a matter of law*

The SM-ESI's Report distorts the plain meaning and spirit of the *Sedona Principles* in claiming it as legal support for the demand that AstraZeneca should not be entitled to produce redacted spreadsheets in TIFF. *See* SM-ESI's Report at 6. The law is to the contrary. As the SM-ESI acknowledges, the *Sedona Principles* – the only authority cited in the Report – specifically acknowledge that the parties are entitled to agree on the form of production, that the production need only be made in a "reasonably

usable" form, and, importantly, that the needs of a specific case shall dictate whether it is important or necessary for particular materials to be produced in native format:

> "**Absent party agreement or court order** specifying the form or forms of production, production should be made in the form or forms in which the information is ordinarily maintained or in a reasonably usable form, taking into account the need to produce reasonably accessible metadata that will enable the receiving party to have the same ability to access, search, and display the information as the producing party **where appropriate or necessary in light of the nature of the information and the needs of the case**."

SM-ESI's Report at 6 (quoting *Sedona Principles* Principle 12) (emphasis added). The Commentary to Principle 12 endorses TIFF as the widely accepted and utilized format for production:

> In current practice, many parties, local rules and courts have endorsed the use of image production formats, principally the Tagged Image File Format ("TIFF") and Adobe Document Format ("PDF") formats. Standing by themselves, image file productions are the equivalent of printed pages from the screen. They have the advantage of a static format that can be Bates numbered and redacted, and, compared to native files, it is harder (but not impossible) to alter the data inadvertently or deliberately.

*Sedona Principles* cmt. 12.b. Further, in his own published writings, the SM-ESI has noted the challenges and limitations of production in native format:

> [N]ative production is not without its drawbacks. The native applications required to view the data in its native format may be prohibitively expensive or difficult to operate without extensive training (e.g., an Oracle or SAP database). Additionally, reviewers must take care not to change the native data while viewing it. . . . An Outlook post office (.PST) file can hold both discoverable e-mail and privileged attorney-client communications, but as it's a unified and complex database file, it's very difficult to produce the former without also producing the latter. Another risk to defendants is that native data (like Word .DOC files) can also contain embedded, revealing metadata. Native production is also less amenable to Bates numbering.

Ball, *supra*, at 34–35.  More importantly, perhaps, the SM-ESI has previously noted that

TIFF is an ideal format for redaction:

> Perhaps the better approach is to either use third-party tools or recognize
> that those characteristics making .tif a poor medium for EDD (i.e.,
> converting to .tif strips away the searchable data layer and all the
> metadata) make it an ideal intermediary for redaction. You can safely
> redact a Word document with Word's drawing tools when the redacted
> document is saved to .tif.  The .tif then easily converts to PDF without any
> need to muck about with obscure settings in Acrobat and without fear that
> the .tif will carry forward anything but a picture of the redacted page.

Craig Ball, *Live by EDD's Golden Rule*, Law Tech. News (N.Y.), Apr. 4, 2006, *available*

*at* http://www.law.com/jsp/ihc/PubArticleIHC.jsp?id=1145885176455.

Production of electronic documents in TIFF, along with a load file and

searchable metadata, is also consistent with standard practice today in other complex

litigation, particularly products liability cases, involving voluminous documents.[19]  Such

production is "reasonably useable" and, therefore, satisfies AstraZeneca's responsive

discovery obligations under Rule 34(b).  *See* Fed. R. Civ. P. 34(b).  Indeed, courts have

held that production of electronic documents in TIFF with accompanying metadata is

sufficient under Rule 34.  *See, e.g.*, *In re Priceline.com, Inc. Sec. Litig.*, 233 F.R.D. 88,

91 (D. Conn. 2005) (ordering production of electronic documents in TIFF or PDF format

---

[19] *See, e.g.*, *In re Priceline.com, Inc. Sec. Litig.*, 233 F.R.D. 88, 91 (D. Conn. 2005) (explaining
that TIFF or PDF format is the most secure format for production of electronic
documents); *In re Zyprexa Prods. Liab. Litig.*, No. 1:04-md-1596, 2004 WL 3520246, at
*1 (E.D.N.Y. July 22, 2004) (same); Case Management Order No. 13, *In re Fosamax
Prods. Liab. Litig.*, No. 1:06-md-1789 (S.D.N.Y. November 14, 2007) (ordering
production of documents in single-page TIFF format); Pretrial Order No. 17A, *In re
Vioxx Prods. Liab. Litig.*, No. 2:05-md-01657-EEF-DEK (E.D.L.A. June 21, 2005)
(ordering production of documents, including spreadsheets, in TIFF format); Pretrial
Order No. 19, *In re Baycol Prods. Litig.*, No. 0:01-md-01431-MJD (D.Minn. May 9,
2002) (ordering production of electronic documents in multi-page TIFF format).

with searchable metadata).[20]  Courts, in fact, have permitted the production of electronic

documents in formats less useable than a production solely in TIFF format with

accompanying metadata.  *See, e.g.*, *India Brewing, Inc. v. Miller Brewing Co.*, 237 F.R.D.

190, 194 (E.D. Wis. 2006) ("If a party produces its electronic information in a hard copy

format that mimics the manner in which that information is stored electronically, then

that party has not disobeyed Rule 34.") (internal citation omitted).

      The SM-ESI's Report invokes the *Sedona Principles* as support against

AstraZeneca's production of redacted spreadsheets in TIFF.  *See* SM-ESI's Report at 6.

However, the excerpt of Principle 12 quoted in the SM-ESI's Report distorts the principle

cited by taking it out of context and quoting it selectively.  For example, in its analysis,

the SM-ESI's Report ignores the key introductory phrase of Principle 12, "***Absent party***

***agreement or court order*** specifying the form or forms of production . . . ."  *Sedona*

*Principles* Principle 12 (emphasis added).  The SM-ESI's Report rejects the true intent of

the *Sedona Principles* by failing to acknowledge that there was, in fact, "party

agreement" in this case as to the form of production.  As the Commentary to Principle 12

makes clear,

> [w]hat constitutes a "reasonably usable" form will depend on the
> circumstances of a case, given that the need for email, documents,
> spreadsheets, or dynamic databases can all vary.  As noted earlier,
> selection of a "reasonably usable" form ***is best handled by an agreement***
> ***between the parties regarding the distinct categories of electronically***
> ***stored information sought in a case***.

---

[20] *See also* Ad Hoc Comm. for Elec. Discovery, U.S. Dist. Court for the Dist. of Delaware,
Electronic Discovery Default Standard ¶ 6 (stating default rule is that "electronic
documents shall be produced to the requesting party as image files"), *available at*
http://www.ded.uscourts.gov/OrdersMain.htm.

*Sedona Principles,* cmt. 12.b (emphasis added). Plaintiffs (without assistance of the SM-ESI) have been involved in the substantive aspects of this litigation for two years and have reviewed thousands of spreadsheets, including those that have been redacted and produced in TIFF. Accordingly, it is perfectly consistent with Principle 12 of the *Sedona Principles* that a "party agreement" that has worked without issue in the particular circumstances of this litigation not be disturbed at this juncture by professed adherence to what appears to be a skewed reading of that very source.[21]

The SM-ESI's Report also selectively quotes from the Commentary to Principle 12 and misleadingly integrates the SM-ESI's own argument into the relevant statement: "The commentary to Principle 12 expressly addresses the effort to substitute a TIFF and load file for multidimensional data, observing, 'it does not work well for certain types of electronically stored information such as spreadsheets and dynamic databases.'" SM-ESI's Report at 6.

In presenting the argument in this fashion, the SM-ESI's Report distorts the language of the Commentary to convey the impression that Principle 12 condemns production of redacted spreadsheets in TIFF and considers such an approach as some sort of improper "substitution" for the preferred native format of the original.[22] To the

---

[21] It is especially appropriate that such "party agreement" be honored in light of the SM-ESI's own acknowledgement that Plaintiffs' technology advisor, Jonathan Jaffe, is more than qualified to enter into an informed agreement with AstraZeneca regarding sophisticated electronic discovery issues. *See* First Status Report of Craig Ball, Special Master – Electronically Stored Information, at 3 (Oct. 26, 2007) (Doc. No. 613) ("I'd also be remiss if I didn't acknowledge the enormously helpful contribution of Mr. Jaffe for the plaintiffs. In his mastery of the intricacies of the electronic evidence and cooperative creativity, he has no equal.").

[22] Although the SM-ESI's Report accurately states that the Commentary acknowledges TIFF "does not work well" for spreadsheets, the SM-ESI's Report fails to highlight that the

contrary, this part of the Commentary is simply noting that selecting the appropriate format of production is a "balancing" exercise in many cases in which the pros and cons of different formats are evaluated, including, among other considerations, the intrinsic limitations on each and their likely importance in the substantive case. *See Sedona Principles*, cmt. 12.b. As already noted above, the Commentary to the *Sedona Principles* emphasizes that critical to this analysis is the agreement of the parties as to the form of production. In short, while purporting to adhere to Principle 12 of the *Sedona Principles*, the SM-ESI's Report actually treats the central point of Principle 12 (i.e., party agreement) as trivial and seeks to substitute the SM-ESI's personal opinion in place of that agreement.

    C.    <u>Tone And Commentary Of The SM-ESI's Report Are Improper For A Neutral Officer Appointed By The Court</u>

The tone and commentary of the SM-ESI's Report are not appropriate for a Special Master appointed by the Court as a third party to manage technical complexities of preservation and production of electronically stored information for purposes of discovery. Given that the SM-ESI's Report is the primary means by which the SM-ESI communicates with the Court and the parties, it is improper for such an important quasi-judicial writing to contain impertinent language or anything inappropriate in either tone or substance. *See* Fed. R. Civ. P. 53 Advisory Committee's Note on 2003 Amendment, Subdivision (f) ("The report is the [special] master's primary means of communication with the court."). Moreover, special masters are held to the same standard of professional conduct as any member of the judiciary. *See id.* at Subdivisions (a)(2) and (3) ("Masters

---

Commentary also notes contemporaneously that "information produced natively may be difficult or impossible to redact or Bates number." *Sedona Principles*, cmt. 12.b.

are subject to the Code of Conduct for United States Judges. . . .").  The Code of Conduct

for United States Judges demands that "[a] judge should respect and comply with the law

and should act at all times in a manner that promotes public confidence in the integrity

and impartiality of the judiciary."  Code of Conduct for United States Judges Canon 2A

(2007).  The Code also requires that "[a] judge should be patient, dignified, respectful,

and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge

deals in an official capacity, *and should require similar conduct of those subject to the*

*judge's control*. . . ."  *Id.* at Canon 3A(3) (emphasis added).

Although its constituent parts cannot do justice to the inaccurate and

unfair representation of AstraZeneca's efforts created by the SM-ESI's Report as a

whole, several particularly notable instances of improper tone and commentary warrant

the attention of the Court:

- "AstraZeneca proposes to (actually or virtually) lay the redacted carcass on a scanner and employ OCR to synthesize a semblance of the electronic searchability the Rules require."  SM-ESI's Report at 5 (commenting on AstraZeneca's agreement with Plaintiffs' request to produce redacted documents in TIFF).

- "This is the condition in which AstraZeneca proposes to produce readacted [sic] ESI to the plaintiffs:  Usability:  gone.  Searchability:  crippled.  Integrity:  gone. Content:  affirmatively misrepresented."  *Id.* at 6 (same).

- "As I expressed it to counsel:  'The contemplated redaction is a miracle drug with one minor side effect:  it kills every patient who takes it.'"  *Id.* at 6 (same).

- "Willfully pursuing a course of conduct that, beyond doubt, alters evidence and destroys its utility is, at best, a sharp practice evincing a lack of good faith.  We are officers of the court and owe more than a smirk and a snicker to the integrity of process."  *Id.* at 7 (same)

- "I trust just a reminder will be sufficient to move the parties to rectify the problem.  I know I wouldn't want to be put in the posture of fighting for the right to corrupt and cripple evidence when I can well protect my clients' legitimate interests without so doing."  *Id.* at 7 (same).

- "AstraZeneca's obtuse refusal to refute or confirm the apparent destruction of Seroquel-related ESI in GEL is an impediment to fashioning a cost-effective approach to mitigate loss of relevant and discoverable ESI." *Id.* at 3 (commenting on AstraZeneca's investigation relating to preservation of certain materials in the GEL database and its good-faith efforts to fashion a workable solution that would satisfy the SM-ESI).

- "AstraZeneca is now doing a fine job fashioning locks for the door, but insists the barn isn't empty and the cows aren't gone. The herd was simply 'non-retained.'" *Id.* at 3 (same).

The foregoing represents a sample of what appears to be a more fundamental problem with respect to the SM-ESI's approach towards AstraZeneca during the course of these discovery proceedings and now reflected in the SM-ESI's Report.[23] The SM-ESI's tone and commentary are inappropriate, and may even suggest actual hostility and a lack of neutrality. At the very least, they present an ***appearance*** of hostility and lack of neutrality that is fundamentally counterproductive to ensuring a fair and efficient resolution of these discovery proceedings.[24]

## III.    CONCLUSION

For the foregoing reasons, AstraZeneca objects to the Amended Third Status Report of Craig Ball, Special Master – ESI based on numerous factual inaccuracies and misstatements of law as well as inappropriate tone and commentary contained therein. Consistent with these objections, as set forth in detail above, the Court should disregard the aspects of the SM-ESI's Report to which AstraZeneca objects and reaffirm

---

[23] AstraZeneca reserves its right to make a more formal record regarding the SM-ESI's conduct and activities beyond the scope of his written report.

[24] The portion of the SM-ESI's Report in which AstraZeneca's purported position is characterized as a "miracle drug with one minor side effect:  it kills every patient who takes it" is a particularly insensitive (if inadvertent) and outrageous (if intentional) comment for the SM-ESI to make in the context of litigation concerning a pharmaceutical drug that plaintiffs allege caused serious adverse side effects in those taking it.

that the SM-ESI's obligation in these proceedings is to facilitate production of documents consistent with current legal standards and accepted electronic discovery practices.

DATED:     January 2, 2008        Respectfully submitted,

*/s/ Fred T. Magaziner*
Fred T. Magaziner
Stephen J. McConnell
Eben S. Flaster
DECHERT LLP
2929 Arch Street
Philadelphia, PA  19103
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
fred.magaziner@dechert.com

*Counsel for AstraZeneca Pharmaceuticals LP and AstraZeneca LP*

## CERTIFICATE OF SERVICE

I hereby certify that, on January 2, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system through which all participating parties are deemed served. I further certify that, by using the CM/ECF, the foregoing has been served on Plaintiffs' Liaison Counsel, who is charged with serving any non-CM/ECF participants on the attached Service List.

*/s/ Brian Decker*