## ASTRAZENECA RESPONSE TO CERTAIN QUESTIONS POSED BY SPECIAL MASTER BALL CONCERNING GEL

## FEBRUARY 7, 2008

## DESIGNATED CONFIDENTIAL UNDER SEROQUEL MDL PROTECTIVE ORDER

Mr. Ball, this responds to the questions concerning GEL set out in your January 23, 2008, email and the questions you posed verbally on our conference call with you and plaintiffs on January 30, 2008. Questions 1 through 4 are taken verbatim from your *ex parte* email to me.

I would note at the outset that I understand the point of your questions to be, as you noted in your email, not to opine on Rule 37(e) issues (the "applicability of that rule is not for me to determine"), but to "stick to the technical concerns of figuring out what and how much is gone and, as warranted, where and how vestiges might yet be preserved or recovered in the most reasonable and cost-effective manner."

### Responses To Questions Posed In Your January 23, 2008 *Ex Parte* Email

"1. There was content created within GEL, using tools that are part of the GEL user interface; that is, there were items in GEL *not* originating *outside* GEL and brought into GEL, but which instead constituted modifications of GEL documents (drafts) and commentary/annotations, all "born" within GEL. For simplicity, I'll call this "GEL-originated content."

*Response*: That is correct.

"2. GEL-originated content is not retained within GEL when the document that is the subject of the draft and annotation effort is finalized, except to the extent that some GEL-originated content may become part of the final document. All GEL-originated content is otherwise purged from GEL's data stores."

*Response*: This is not correct as a blanket statement. As we have previously explained, AstraZeneca's U.S. Clinical Development has been retaining drafts in GEL since March 2006. Otherwise, as previously indicated, GEL itself does not generally retain drafts once a document is approved for regulatory submission. This is, of course, a different question from whether individual custodians and others retain them.

"3. Some of the GEL-originated content may find its way into the final document, and some may not. There is no simple or reliable way to determine whether or to what extent this occurred."

*Response*: The first statement is essentially a truism as to the drafting of any document, whether involving GEL or not. To the extent prior drafts of a document are not incorporated into the final document, by definition they do not appear in the final document.

As I believe I have previously indicated, I think the second sentence is phrased somewhat argumentatively. As to GEL material that is not retained on GEL, it is correct that one could not literally determine what language appearing in prior drafts made its way into the final document without viewing the prior drafts and comparing them to the final. This should not be taken to indicate, however, that we believe such an exercise is necessary. There is no substantial basis, if any basis at all, to believe that every (or even most) drafts contain anything material to this case.

"4. Users of GEL who originate content within GEL have a mechanism available to save their work to PDF (and to print same, if desired) before the document is finalized."

*Response*: It is correct that they have such a mechanism available to save and retain their work to PDF, as well as other formats including native.

**Questions re: 4:**

"Would I be correct in concluding that:

a) GEL users weren't *required* to use this PDF save or print feature to retain drafts and annotations,"

*Response*: We do not know whether, as a matter of business practice, GEL users who originated content within GEL were expressly required to retain all drafts and annotations in this fashion. Making that determination would involve a laborious inquiry. Again, as to U. S. Clinical Development, all drafts have been retained on GEL since March 2006. See the discussion of the litigation hold, *infra*, in addition.

"b) Astra Zeneca doesn't have any simple or reliable way to determine who saved such content and who didn't, and"

*Response*: I think this question is also phrased somewhat argumentatively. That aside, we know of no technological way to determine who saved what material (except for U.S. Clinical Affairs starting in March 2006, which routinely saved its drafts on GEL) without making inquiry of all individuals with access to GEL who worked on Seroquel matters.

We would regard asking individuals as "reliable," to use your term, in that we have no reason to expect that they would not respond truthfully. However, we do not regard undertaking such a process as "simple" -- but rather as unnecessary and burdensome -- if applied to all such users. As you know, we believe the plan for the identification and production of material from GEL set out in my January 28, 2008, memo provides a reasonable plan to identify truly relevant Seroquel material retained by users.

2

"c) Neither does AZ have a ready mechanism to know whether those who saved content did so in a through manner or simply according to their own inclination and discretion?"

*Response*: I think this question is also posed somewhat argumentatively. However, I think it is apparent from the information provided previously and in our January 23, 2008, *ex parte* email attachment that if you are speaking of some form of technological function that would provide such information, none exists of which I am aware. I am not sure what you mean by "thorough manner" (I assume you meant "thorough" although your email uses the term "through"). However, the means by which individuals retained such content would ultimately be determined by asking them.

As we have previously stated, however, we do not believe such an exercise is necessary for all GEL users who worked on Seroquel matters. Our proposed plan sets out an appropriate process for identifying and producing relevant Seroquel content retained by individuals (other than custodians, whose files have already been produced, and U. S. Clinical Development on and after March 2006).

"d) Astra Zeneca did not, prior to December 21, 2007, *expressly* instruct GEL users to save Seroquel-related GEL-originated content to avoid its loss when documents were finalized in GEL?

*Response*: Again, as to U.S. Clinical Affairs on and after March 2006 all Seroquel drafts have been retained on GEL itself."

We are not aware of an express instruction as a matter of business operating procedures, to save all Seroquel-related content, other than the instruction provided to U.S. Clinical Development in March 2006. We know there were at least some individual emails from business unit management that expressly referred to GEL content. However, determining that for all users would be a burdensome undertaking. That said, the AstraZeneca litigation hold notices issued by AstraZeneca's Legal Department, while not expressly referring to GEL content, are phrased in terms of preserving electronically stored information in any form that is relevant to the litigation. As we have repeatedly stated, we believe the proper inquiry is whether AstraZeneca directed its employees to preserve relevant, substantive categories of documents, and it would therefore be inappropriate to focus on whether such a directive referred to particular document management systems.

I note also that the final paragraph of your January 23, 2008, email[1] does not appear to call for a response, since it is not a question. It instead appears to be an expression of your "sense" as to certain matters and reiterates that your inquiry is limited to determining "how

---

[1] "Reading your response, I'm still left with the sense that an unknown but possibly substantial corpus of unique, Seroquel-related GEL-originated content is unrecoverable as a consequence of a deliberate decision to not depart from GEL's default operation each time an Astra Zeneca employee undertook to finalize a document. It pretty clearly seems to have the makings of an FRCP Rule 37(e) dispute, but I think we both happily agree that the applicability of that rule is not for me to determine. I'm content to stick to the technical concerns of figuring out what and how much is gone and, as warranted, where and how vestiges might yet be preserved or recovered in the most reasonable and cost-effective manner."

3

much" Seroquel related material (if any) is "gone" and how any might be preserved or recovered "in the most reasonable and cost-effective manner."  Since this is not posed as a question, I do not respond to it in full.  I would, however, note a few things.

I do not read this to be a question but an observation on your part, and to therefore not call for or require a response.  We do agree, as you note, that any issue as to the application of Rule 37(e) would be a matter for the court, not the SM-ESI.

Although I am not undertaking to respond to your observations in this email, I would note again that we have set out what we believe to be an appropriate, reasonable plan for the identification and production of relevant Seroquel material not retained on GEL in our memo of January 28, 2008, and that AstraZeneca does not agree that there has been any material failure to preserve information relevant to this litigation.  Nothing in this response is, of course, in any way intended to modify the content of that memo.

## **Responses To Questions Posed In Our January 30, 2008, Conference Call With Special Master Ball And Plaintiffs**

In our January 30, 2008, call you also asked us the questions set out below, with responses.

1. Whether there are backup tapes for GEL and, if so, how far back do they go?

*Response*:  Monthly disaster recovery tapes exist for GEL from November 2006 to the present.  By this response I am simply answering the question you posed.  I do not understand your question to go further and undertake to direct or even contend that AstraZeneca is under an obligation to restore any material from such tapes.  Indeed, I believe you have expressly indicated on our calls that you agree that it is not within your purview (as opposed to the Court) to make any such directive.   As I believe I have previously indicated, AstraZeneca would not agree that there is any need to undertake such backup tape restoration. We believe that the plan proposed in our January 28, 2008, memo sets out an appropriate plan for the identification and production of relevant GEL material, without the need to resort to backup tapes.

2. Whether GEL material not currently on GEL may be maintained in locations (other than individual custodians or non-custodians' files) such as in a "prior iteration" of GEL.

*Response*:   There is no GEL material maintained in locations (other than individual custodians' and other individual's files) other than GEL, except to the extent there are disaster recovery backup tapes for GEL (discussed above).  A system known as "Central Repository" was migrated into GEL (and then decommissioned) in approximately 2001.  Another system, "DOMINO," was decommissioned in approximately 2001 following a substantial period of non-use.  It had never been part of GEL at the time of its decommissioning.  GEL was already in existence when these systems were decommissioned.

4

We are advised that DOMINO was used as a system to store final documents and therefore did not contain drafts.  DOMINO materials are currently electronically available to AstraZeneca Regulatory Affairs (in html or PDF form).  I am not certain at this time whether the DOMINO material available to Regulatory Affairs represents the entire contents of DOMINO at the time of its decommissioning.  Initial indications are that these former DOMINO materials available to Regulatory Affairs total less than 2000 documents.  I do not presently know whether those documents are substantially or entirely duplicative of material produced in this litigation from other sources.

We are determining whether there are disaster recovery backup tapes for Central Repository and DOMINO, without agreeing that these systems are relevant or that there is any need to go to such backup tapes.  It is apparently doubtful that they exist. However, I am advised that, even if such tapes exist, they would likely be tapes that backed up the system as of the date of their respective decommissioning, meaning they would be roughly between six and seven years old at this point, if not somewhat older, and their condition, content or utility (if they exist) is not known.  Finally, I am advised that, in any event, AstraZeneca does not have the now obsolete hardware or software to use the tapes even if they exist and are in pristine physical condition for use.

I provide this information with the observation that AstraZeneca does not agree that there is any reason to attempt to restore such backup tapes, if they exist.