# PASS DECLARATION EXHIBIT H

**From:** Kerns, Kevin
**Sent:** Tuesday, February 12, 2008 6:07 PM
**To:** Balakhani, Elizabeth
**Subject:** FW: Seroquel MDL: GEL Proposal

**Attachments:** GELProposal.pdf



GELProposal.pdf
(53 KB)

```
-----Original Message-----
From: Pass, Robert W. [mailto:RPass@CarltonFields.com]
Sent: Monday, January 28, 2008 6:28 PM
To: Larry J. Gornick; Dennis Canty
Cc: Craig Ball; Kerns, Kevin; Jim Freebery; Adupre@mccarter.com
Subject: Seroquel MDL: GEL Proposal

 <<GELProposal.pdf>>
      Dennis and Larry, I attach our GEL Proposal.  I look forward to
hearing back from you concerning it.

      Regards, Bob



Robert Pass
Attorney at Law
Carlton Fields, P.A.
215 S. Monroe Street, Suite 500
Tallahassee, FL 32302
Phone (850) 513-3608
Fax (850) 222-0398
e-mail: rpass@carltonfields.com
www.carltonfields.com
```

1

# CARLTON FIELDS
MEMORANDUM

---

To: Larry Gornick, Dennis Canty

cc: Craig Ball, Special Master-ESI, Seroquel MDL, Kevin Kerns, James Freebery, Andrew Dupre

From: Robert Pass

Date: January 28, 2008

Re: Proposed Plan For Reasonable Identification And Production Of Material Seroquel "GEL Drafts"

---

## ASTRAZENECA'S PROPOSED PLAN FOR REASONABLE IDENTIFICATION AND PRODUCTION OF MATERIAL SEROQUEL "GEL DRAFTS"

### A.   Introduction

Larry and Dennis, as you know in our January 22, 2008, call, we indicated that we would be proposing a plan that appropriately balances issues of relevance and burden for identifying and producing drafts of Seroquel documents finalized on GEL but not currently housed on GEL. This has been the subject of discussions in our conference calls with Special Master Ball, who has suggested that any such plan should describe (a) what AstraZeneca would produce according to such a plan; (b) why AstraZeneca believes the plan is be reasonable; (c) how AstraZeneca would go about such a production; and (d) AstraZeneca's rationale for limiting its production in the fashion described. This plan addresses each of those categories.

In advancing this plan, AstraZeneca is not agreeing to implement the plan, absent plaintiffs' agreement to it as a resolution of a dispute between the parties over the proper scope of discovery as to GEL materials relating to Seroquel.[1] This plan is also described herein without waiver of, or prejudice to, AstraZeneca's previously stated position (*e.g.*, as set out in AstraZeneca's *Objections* to the SM-ESI's Amended Third Status Report) that it has no obligation to identify or produce any Seroquel related materials until and unless plaintiffs serve a Request for Production of Documents under Rule 34, Fed.R.Civ.P., seeking such documents, and, if served, until the Court has resolved any objections as to the scope of such discovery. Moreover, because any such Rule 34 Request would be a new request, any production of such documents would not be subject to the March 14 "substantial completion" deadline. However,

---

[1] We note that the SM-ESI has not directed that AstraZeneca commit to or make such a production. As we have previously indicated, while we are submitting this plan in an attempt to resolve an existing dispute, we believe the issues of what draft GEL documents, if any, AstraZeneca should identify and produce to be a scope of discovery issue whose resolution is reserved solely to the Court by the Order appointing the SM-ESI.

AstraZeneca would make reasonable efforts to produce any such agreed categories of documents as expeditiously as feasible, although after March 14. See also, Part E of this memo, which discusses a plan for good faith consideration of additional documents requested by plaintiffs after plaintiffs' review of the documents produced under this plan.

### B.  What AstraZeneca Would Produce and Why

Before outlining our plan, we note (as we have before) that the U.S. Clinical Development department has routinely saved, on GEL, its drafts of Seroquel documents finalized in GEL since approximately March 2006, or for nearly two years (and since before the start of the instant MDL proceedings).[2] Those materials will be produced directly from GEL as part of AstraZeneca's "database extraction" no later than March 14, 2008.

It should be noted at the outset that AstraZeneca believes that, at this point in discovery, GEL drafts not in the possession of the 103 custodians for which production has already been made (or which will be produced as part of the database extraction) lie, at best, at the outer margins of discovery of information plaintiffs reasonably need in this case. After all, the 103 custodians were chosen (either by AstraZeneca or plaintiffs) because they were believed to be the individuals most likely to maintain the key documents related to plaintiffs' litigation claims. AstraZeneca has already produced files from the 103 custodians. Notably, AstraZeneca did not refuse *any* of the plaintiffs' requests for the files of additional custodians. Plaintiffs have had ample opportunity to determine which AstraZeneca employees have documents that they believe are relevant to the issues in which they are interested, and selected only the additional 23 custodians. Moreover, as already noted above, AstraZeneca will be producing all Seroquel related drafts currently housed on GEL (along with all final documents). As noted above, U.S. Clinical Development has maintained drafts of Seroquel related GEL documents for nearly 2 years.

Plaintiffs have represented that they are not interested in engaging in a "fishing expedition," but only seek the production of documents that are directly relevant to their claims. Taking this representation at face value, AstraZeneca stated in its previous memorandum to the SM-ESI (filed as Exhibit 9 to AstraZeneca's *Objection* to the SM-ESI's Amended Third Status Report, and incorporated herein in its entirety by reference) that any such plan for production would focus on drafts of specific categories of key documents that are relevant or likely to lead to the discovery of relevant evidence, specifically, key regulatory submissions and safety documents maintained on GEL and which relate specifically to plaintiffs' failure to warn claims. Any drafts that are privileged would be noted on AstraZeneca's privilege log or redacted as appropriate.

Those documents consist of drafts of:

(i) U.S. label changes;

---

[2] AstraZeneca believes the Clinical Development folder on GEL will contain the lion's share of key 2006 forward documents related to the Seroquel product risk/benefit profile.

2

(ii) Core Data Sheets (which include, *inter alia*, baseline safety information and labeling for all global product labeling);[3]

(iii) Safety Evaluation and Review Meeting (SERM) minutes;[4]

(iv) SERM Discussion Documents;[5]

(v) SERM Clinical Overview Documents;[6]

(vi) Periodic Safety Update Reports; and

(vii) Safety Position Papers.[7]

(The materials in categories (i) through (vii) are referred to collectively herein as "Potential Production Documents").

### C. How AstraZeneca Would Locate Such Documents

AstraZeneca would locate Potential Production Documents by engaging in a targeted interview process. The AstraZeneca departments most likely to possess Potential Production Documents are Drug Safety (which is involved in the drafting of SERM documents) and Regulatory Affairs (which includes the U.S. labeling team). We would interview employees in those departments at sufficiently high levels to identify the individuals who would be reasonably likely to have had substantive drafting input on the Potential Production Documents. Based on these interviews, AstraZeneca would then interview those employees identified as reasonably likely to have substantive drafting input on the Potential Production Documents and review their files for Potential Production Documents.[8]

### D. The Rationale For Limiting Documents To The Potential Production Documents Described Above

---

[3] The Core Data Sheet contains the medically and scientifically documented, relevant and most current information on an AZ product for inclusion in the global product labeling for that product.

[4] From the time of their first use in man, all AstraZeneca products are regularly reviewed through the SERM process in order to identify any issues potentially affecting patient safety.

[5] A Discussion Document presents a topic for discussion at a SERM meeting. Often drafts of Discussion Documents were prepared solely for legal review by the AstraZeneca Legal Department before being distributed to a larger group, and thus are subject to the attorney-client and/or work product privilege.

[6] A Clinical Overview Document, previously known as a "Justification Document," supports a recommended change to core product information, such as that contained in the Core Data Sheet, and contains the rationale for clinical and regulatory sign-off of that change as well as providing a documented record within AstraZeneca as to why that change was made.

[7] A Safety Position Paper records the rationale for making a "no change" decision for a Core Data Sheet, if such documentation of the decision is considered necessary. A Safety Position Paper is not always required.

[8] This targeted process for identifying Seroquel related GEL drafts no longer on GEL would similarly be applied to identify drafts of such documents captured by the export utility that has been used to capture Seroquel related GEL draft documents deleted in the ordinary course from GEL since December 21, 2007.

AstraZeneca believes that the process described above best balances the applicable relevance and burden considerations and provides the most reasonable plan in that it focuses on the documents most relevant to plaintiffs' claims while not being unreasonably intrusive and burdensome or causing undue business disruption.

A less targeted plan would strike the wrong balance and portend the production of an inappropriately large number of non-relevant documents. This is particularly the case with respect to any plan not focused on specific categories of documents that go to the heart of plaintiffs' claims.

It must be remembered that GEL is not a Seroquel-specific database, and that it was designed to support global[9] regulatory submissions, not this litigation. Thus, any production plan that uses the inclusion of a document on such a massive document management system as a proxy for substantive relevance would be flawed and inherently overbroad.

Moreover, a large number of the Seroquel-related documents created on GEL involve documents relating – to take but a few illustrative examples -- to such trivial (in relation to this litigation) or irrelevant to this litigation matters as:

- manufacturing quality control, (there is no negligent manufacturing claim in the litigation),
- manufacturing sites,
- inactive ingredients,
- bulk substances before incorporation into the final product,
- packaging sites,
- the selection of the drug's generic name and trademark,
- the color and appearance of the tablets,
- the design and label of the product carton,
- drug shelf life,
- appropriate storage temperature,
- extensive details concerning the chemistry of the product.

Any plan that would include the review for and production of every draft of such documents would be overbroad. Even with respect to Seroquel-related GEL documents, the final versions of some of which arguably may be relevant to the litigation, the drafts of those documents may contain innocuous changes that do not bear at all on the issues in dispute.

It is obvious that numerous categories of draft GEL documents are of trivial, if any, importance. A plan that attempts to identify and produce all draft Seroquel documents once on GEL is facially one that amounts to a search for an entirely hypothesized "needle in a haystack" document, or constitutes the proverbial "fishing expedition," involving parsing potentially through untold thousands of utterly routine documents on the speculation that among them will be something of true importance.

---

[9] Over 80 countries have approved Seroquel for market.

4

The very magnitude of the draft generating process on GEL underscores this point. For example, GEL itself currently houses thousands of Seroquel documents, including both final versions and drafts, the latter including both documents not approved as a final submission and drafts maintained in recent years by U.S. Clinical Development. See Exhibit 9 to AstraZeneca's *Objections* to the SM-ESI's Amended Third Status Report. This implies that drafts of Seroquel documents once housed on GEL comprise a substantial number. Yet, it is clearly not the case that there are thousands of truly relevant such Seroquel draft documents. Far more likely is that such a broadly cast net will simply retrieve – after the expenditure of considerable time and effort, detracting from other discovery and production activities – untold numbers of routine drafting exercises of no significant value to these cases.

In addition, some documents on GEL are so large that, in this circumstance, it would be unduly burdensome to produce every iteration and comment prior to final. As you know, the NDA and IND submissions for Seroquel were hundreds of thousands of pages long. Clinical Study Reports alone can consume thousands of pages each and can often go through numerous drafts before being finalized. In sum, any production plan proposed must be targeted to specific categories of key documents for which the underlying *drafts* are colorably relevant to plaintiffs' claims, and AstraZeneca believes its proposed plan fully meets that criterion.

### E. Follow Up For Specific Documents Plaintiffs Claim Directly Relevant After Production From GEL

We believe AstraZeneca's proposed plan strikes the right balance between relevance and burden. However, if plaintiffs – after reviewing documents produced from GEL – believe specific drafts central to their case have not yet been produced, they will be free to request the production of such drafts in the normal course of the litigation. If that occurs, AstraZeneca will consider any such requests in good faith and investigate the location of Potential Production Documents, although of course, it would reserve the right to object to particular requests. AstraZeneca would expect that any such requests would include a reasonable articulation of the basis for the request, including identification of what documents previously produced cause plaintiffs to believe that specific drafts central to their case have not been produced.