# PASS DECLARATION EXHIBIT P

## Pass, Robert W.

| | |
|---|---|
| **From:** | Bogdonoff, Michael [michael.bogdonoff@dechert.com] |
| **Sent:** | Friday, March 07, 2008 10:53 AM |
| **To:** | Craig Ball |
| **Cc:** | Larry J. Gornick; Dennis Canty; Kerns, Kevin; Pass, Robert W.; Coutroulis, Chris S. |
| **Subject:** | Seroquel MDL |
| **Attachments:** | Revised Sampling Protocol - Clean.pdf; Revised Sampling Protocol - Markup.pdf |

Mr. Ball:

Attached for your review is AstraZeneca's revised proposed sampling protocol regarding GEL backup tapes and comments regarding plaintiffs' proposed protocol.

For ease of reference, I have included both a clean copy and a markup identifying changes.

Mike Bogdonoff

---

Michael A. Bogdonoff, Esq.
Dechert LLP
Cira Centre
2929 Arch St.
Philadelphia, PA 19104-2808

Office:  215.994.2891
Fax:     215.655.2891
Cell:    267.679.7461

**michael.bogdonoff@dechert.com**
www.dechert.com


This e-mail is from Dechert LLP, a law firm, and may contain information that is con

3/14/2008

**Confidential**

### DEFENDANT ASTRAZENECA'S REVISED PROPOSED SAMPLING PROTOCOL REGARDING GEL BACKUP TAPES SUBMITTED PURSUANT TO THE ESI-SPECIAL MASTER'S 2/12/08 DIRECTIVE AND COMMENTS REGARDING PLAINTIFFS' PROPOSED PROTOCOL

AstraZeneca submits this revised sampling protocol regarding GEL backup tapes pursuant to the Special Master's February 12, 2007 Directive ("the Directive"), and incorporates comments concerning plaintiffs' proposed sampling protocol. This revision reflects (a) responses to issues raised by the Special Master; (b) new and/or refined information regarding implementation of the within-described restoration efforts; and (c) AstraZeneca's good faith commitment to undertaking this sampling protocol, as described herein.

Introduction

As set forth in the Directive, the primary purpose for this sampling protocol is to assess the extent, relevance and composition of ESI, if any, formerly in GEL but which was not retained in that database. The Directive establishes the principle that this effort is to be a sampling proposal, and is not to be a broad-based restoration process. We note that while the Directive also provides, [i]f the samples reveal that <u>relevant</u> data was lost but can be cost-effectively recovered from tape, a subsequent or broader sample may be warranted," the Directive also makes clear that it does not direct that any tapes be restored, but rather seeks only a proposal for sampling at this point.

AstraZeneca has designed the within sampling protocol with the intent, also expressed in the Directive, that it "be narrowly tailored to meet the primary purpose of <u>assessing</u> the probable extent, relevance and composition of non-retained GEL ESI."

The Directive states six goals to be achieved by such sampling protocol:

1. It should target areas of GEL deemed more likely than not to contain Seroquel-related content relevant to the issues in this cause.

2. It should minimize or eliminate duplication of GEL content preserved by AstraZeneca's U.S. Clinical Development Group after March 2006.

3. It should minimize or eliminate duplication of GEL content preserved after December 21, 2007.

4. It should provide an efficient, reliable mechanism (e.g., hash analysis or other techniques) to <u>compare</u> the contents of potentially-relevant areas of GEL where ESI was non-retained with the corresponding areas and content on the sampled tapes reflecting intervals prior to non-retention.

5. The protocol shall identify ESI found on the sampled tapes but now absent from GEL and catalogue all such items, by file name, file type and relevant metadata (including hash value, if calculated). It must encompass both ESI in the nature of documents and in other potentially relevant forms (e.g., communications, annotations, objects and the like).

6. Any potentially-relevant non-retained content restored from tape should be preserved in a readily accessible manner.

1

**Confidential**

AstraZeneca submits that the within protocol meets the above stated goals. Accordingly, in good faith, AstraZeneca has commenced the technical preparations necessary to implement the within protocol. It has also commenced the preparation of necessary deliverables to plaintiffs to facilitate their selection of a monthly backup tape set pursuant to this protocol. Indeed, should the Special Master find this protocol reasonable and appropriate, AstraZeneca is prepared to implement it, subject to the potential impact of technical feasibility, developing implementation information, and as yet unforeseen issues, which AstraZeneca may then need to raise with the Special Master. Although the Directive is clear in this regard, AstraZeneca does not waive, and expressly reserves, its right to object to implementation of any other sampling protocol, together with its right to pursue cost shifting or cost sharing, as appropriate, in connection with the implementation of such other sampling protocol or any follow-up activity, if any, related thereto.

While the parties have not yet discussed the timing and manner of production of any such GEL content derived from implementation of the sampling protocol, subject to the reservation of rights stated above, any such production would be made pursuant to a schedule to be developed following good faith discussions involving the plaintiffs and the Special Master, taking into consideration the volume of GEL content at issue. Notwithstanding the foregoing, and in furtherance of its good faith efforts hereunder, AstraZeneca will provide the Special Master as soon as practicable upon receipt the de-duplicated raw intermediate GEL content derived from the restored tapes on an ex parte basis to enable the Special Master to evaluate such GEL content contemporaneous with AstraZeneca's review and production process.

Background

This sampling protocol is the second phase of the Directive. During phase one, AstraZeneca undertook a rigorous investigation to identify existing, useable backup tapes that might contain GEL content. The results of that investigation have been provided to plaintiffs and the Special Master and are summarized briefly as follows:

Available Backup Tapes:

UK: In its transmittal dated February 20, 2008, AstraZeneca identified 499 GEL backup tapes maintained in the UK by IBM.[1] These include several daily backups which, because of their incremental nature and their cycling schedules, are unlikely to yield GEL content consistent with the Directive. However, these UK tapes include 13 full backups that may contain Seroquel-related data for the period February, 2007 to the present. In the UK tapes, AstraZeneca believes that Seroquel content would be located on backup tapes for server ███ and metadata associated with such content would be located on backup tapes for ███ server ███.

---

[1] IBM has determined that at least three tapes are not readable due to either physical damage or I/O errors, including CT0250L1, CT0294L1 and CT0012L1.

2

**Confidential**

Sweden: In its transmittal dated February 28, 2008, AstraZeneca identified 1,055 backup tapes maintained in Sweden by IBM that are derived from AstraZeneca's disaster recovery ▓▓▓▓. The Swedish tapes include 21 full backups of GEL for the period commencing November 2005 to the present. AstraZeneca believes that Seroquel related content and associated metadata would be located on the Swedish backup tapes for server ▓▓▓▓.

All tapes were backed up by IBM using the ▓▓▓ backup program, using tape types LTO1, 2 or 3.

Sampling Protocol[2]:

In consultation with IBM representatives in both the UK and Sweden, AstraZeneca has determined that it is not possible to ascertain the specific content of GEL backup tapes without restoring them. Therefore, it is proposed that GEL content be sampled by the following general protocol:

1. AstraZeneca will identify the dates on which the 13 UK full backup sets and the 21 Swedish full backup sets would have completed their backup of GEL content potentially containing Seroquel content. This information will be provided to plaintiffs on or before March 14, 2008.

2. AstraZeneca will prepare a list of Seroquel documents approved during the period for which full backup tapes are available, November, 2005 through February, 2008. This information will also be provided to plaintiffs on or before March 14, 2008.

3. Plaintiffs will select from the list provided in (2) above a date or closely proximate dates on which Seroquel documents of interest were approved.

4. AstraZeneca will then restore the GEL backup set rendered closest in time to the approval date(s) selected by plaintiffs.

5. Once restored, the resultant GEL content will be extracted by AstraZeneca and transferred to FTI for processing.

6. FTI will then compare such newly extracted GEL content, consistent with the above identified goals regarding de-duplication, to identify intermediate data (i.e. drafts and annotations) related to approved Seroquel documents derived from the restored backup set.

7. Plaintiffs and AstraZeneca will then confer regarding the volume of such restored intermediate data for each of the approved Seroquel documents within the restored backup to select the approved Seroquel document(s) for which intermediate data will be produced, taking into account the objective

---

[2] This protocol involves systems in the UK, Sweden and the United States as well as complex implementation and other issues for which information is still being gathered. As such, AstraZeneca reserves the right to modify this protocol as may be necessary as such additional information is obtained.

3

**Confidential**

of efficiently and expeditiously reviewing and producing the intermediate data derived and avoiding unreasonable burden on AstraZeneca in doing so.

Implementation Details

Details concerning the timing and manner of restoring such a full backup set are set forth below.

Methodology:

The AstraZeneca protocol for sampling GEL backup tapes requires first that the documents and metadata be restored from a full backup tape set. To do so, AstraZeneca will have to create a system environment into which the data can be restored. Such an environment requires a ▇ server with 1 terabyte of available storage to maintain the restored data, together with compatible tape drives. AstraZeneca intends to use existing Disaster Recovery ("DR") hardware in ▇ to expedite this effort. It will install and build ▇ on a separate operating environment from the DR system to house the data. This separate operating environment is necessary in the event of a disaster requiring the availability of the DR system during the implementation of this restoration process. Restoration of Swedish backup tapes to this environment will not require acquisition or installation of additional hardware. Restoration of UK tapes into the Swedish operating environment raises several issues that are currently under investigation by AstraZeneca and IBM. For example, because the data on the UK backup tapes was not derived from the Swedish servers, attempts to restore such UK data to the Swedish servers may, without more, cause corruption of existing Swedish backup indices and live data. In addition, IBM in Sweden used a different version of the Legato backup program than that used by IBM to backup data in the UK. To prevent risk of corruption or other data management issues, should plaintiffs select a UK backup set for restoration pursuant to protocol step 3, above, IBM will need to configure a Swedish server to create a wholly separate UK Legato restoration environment.

If the ▇ facility is, for unforeseen reasons, unavailable for this purpose, addition time will be necessary to (a) purchase a ▇ server, 1 TB of storage space and necessary software and licences; (b) build the server and install Oracle; and (c) build and validate the Documentum installation on the server.

To restore data, a new Documentum docbase will be created into which the documents and metadata will be loaded. Once all the data is restored, this new Documentum docbase will be brought online and validated.

The data will be extracted from the Documentum docbase using the same tool used by AstraZeneca to extract draft and approved documents from the GEL production system that are being produced by March 14. This newly extracted data will then be transmitted to FTI for further processing.

Timing:

System development: AstraZeneca estimates it will require approximately 10 days for the system environment to be built and validated on the existing ▇ hardware such that restoration of

4

**Confidential**

backup tapes may commence. This effort is scheduled to commence early next week. Note that AstraZeneca will contemporaneously undertake the creation of an appropriate Swedish operating environment to enable UK backup tape restoration, should that need arise.

Restoration of a full backup set: AstraZeneca estimates it will require approximately 25 days to restore data from a single set of full backup tapes, with required activities including (a) restoration of the chosen tape set; (b) validation and reactivation of docbase; (c) database extraction; (d) migration to FTI's environment; and (e) data de-duplication.

Any production of documents or data derived pursuant to this protocol will be subject to AstraZeneca's review process, including determinations regarding privilege, confidentiality and, as appropriate, redaction.

Comments Concerning Plaintiffs' Sampling Protocol:

Several elements of plaintiffs' protocol are congruent with AstraZeneca's protocol and should cause plaintiffs to support that protocol. First, plaintiffs devote one full page of their two page protocol to the identification and definitions of certain approved Seroquel documents for which they seek GEL content. Conceptually, this is consistent with AstraZeneca's proposed protocol in that plaintiffs would select a month in which a 'critical mass' of preferred documents were approved, based on a roster of approval dates to be provided by AstraZeneca, and AstraZeneca would restore that month's backup tapes and provide, following de-duplication, any non-retained GEL content derived from the restoration regarding specified documents of interest, subject to production practicalities described infra. Second, plaintiffs express interest in the dates on which Seroquel documents were approved, as follows:

> AstraZeneca shall (to the extent not included in metadata) supply all audit trails or logs for documents found in Sampling Paths, and any other information sufficient to determine the date such documents were "approved."

As set forth above, AstraZeneca has agreed to provide such information to plaintiffs pursuant to its protocol.

However, AstraZeneca urges the rejection of plaintiffs' plan for implementing the sampling of backup tapes for the reasons that follow. First, plaintiffs protocol radically deviates from information well known about the time period for which backup tapes. Plaintiffs demand the restoration of "backup events of September 2005." However, September 2005 is simply not among the 34 available full backup sets. There are four September 2005 tapes representing an incomplete set and it is unclear whether the data resident on those tapes represents backup of Seroquel content. What makes this demand especially frustrating that well before plaintiffs' protocol was transmitted, in a recorded call before the Special Master, AstraZeneca made it clear that the first month for which full backup of GEL content was available was November 2005. Second, plaintiffs protocol disregards statements made by the Special Master's to the plaintiffs during that same conference call (and confirmed by AstraZeneca) that backup data was only accessible for the monthly sets after full restoration of all tapes in a particular tape set. The Special Master made such statements in response to a series questions by plaintiff counsel exploring file path-level detail regarding Seroquel information. Notwithstanding the Special Master's assurance that such granular level of inquiry was unnecessary in

5

**Confidential**

light of the fact that AstraZeneca can only access a monthly backup by fully restoring a particular month's tapes, plaints have reverted to this emphasis on file-level detail in their protocol. Third, plaintiffs' protocol fails to consider the technical and practical realities of working with computer backup media. For example, plaintiffs' protocol includes several demands related to GEL metadata to somehow be delivered by AstraZeneca separate and apart from its underlying content. Such demands are not possibly met absent requiring the very wholesale restoration that the Special Master specifically admonished the parties to avoid. Plaintiffs apparently believe that such metadata will provide some form of menu directing them to documents of further interest. That is simply not what the metadata from backup tapes provides. Fourth, plaintiffs protocol would result in an enormous and unreasonably burdensome restoration that is inconsistent with the Directive. Plaintiffs initially seek two restorations: September 2005 and November 2007. The first is demonstrably incomplete backup, which fact is well known to plaintiffs. The latter, November 2007 is inexplicable in light of the fact that AstraZeneca has extracted and is currently in the process of producing an extract of GEL in the middle of December 2007. As noted above, the restoration of multi-tape monthly backups is a time, labor and hardware intensive process. Ignoring the practicalities of restoring complete copies of an entire global database, plaintiffs cavalierly suggest that in addition to the September 2005 and November 2007 backup sets, they intend to select "up to five additional backup tape "events" for restoration." Since plaintiffs well know that AstraZeneca can only restore tapes on the complete monthly basis described above, a reasonable interpretation of plaintiffs protocol is that they seek restoration of seven (7) full monthly backup sets out of the total available data. This would require a massive commitment of hardware, review labor and expense without any demonstration that the resultant GEL content is in any way material to issues in the cases at bar, and, in any event, is not consistent with the concept of a "sampling" that the Special Master has ordered.

.