# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**IN RE: Seroquel Products Liability Litigation**

**MDL DOCKET NO. 1769**

_____

**This Document Relates to ALL CASES**

### ASTRAZENECA'S RESPONSE TO THE MARCH 11, 2008 ORDER
### REGARDING CERTAIN PRIVILEGE LOG ENTRIES

Pursuant to the Court's March 11, 2008 Order, AstraZeneca today is "fil[ing] under seal the . . . challenged documents and the corresponding privilege log entries (and supporting materials) for those . . . documents . . . for *in camera* inspection."  Order (Doc. 893) ¶ 1.  In addition, AstraZeneca submits this separate memorandum to provide the Court and plaintiffs with the legal predicate for withholding documents submitted for *in camera* review.

To date, AstraZeneca has claimed privilege in its privilege log for approximately 22,000 documents, fewer than 1% of the 3.3 million documents it has produced in the MDL.  AstraZeneca has long offered to meet and confer with plaintiffs to address any concerns they might have regarding the documents listed on its log, to reassess any claim of privilege, and to withdraw that claim if appropriate.  *See* AstraZeneca Opposition to Privilege Motion (Doc. 842) at 4-7.  To minimize disagreements, and of its own volition, AstraZeneca in recent months has renewed its privilege log review and released numerous additional documents, either in whole or redacted, that had been on the log.  Over the past week, AstraZeneca further worked with plaintiffs to ensure that none of the documents released in their entirety was among the 100 designated by plaintiffs for *in camera* review.  Of those 100 hand-picked documents, and based upon further review, AstraZeneca has decided to release 25 additional documents and to continue to withhold 75.

To facilitate this Court's *in camera* review of the 75 documents that remain in dispute, AstraZeneca has prepared a manila folder for each document, identified by the document control number.  Inside each folder is a short cover sheet that cross-references this brief and the declarations submitted *in camera*;[1] a copy of the document itself on colored paper; and any additional documents necessary to place the document in its proper context.  The document folders are organized by declarant; all privilege claims supported by a particular declaration will be in a redweld folder marked with the name of that declarant, and the relevant declaration will be at the front of the redweld.

As demonstrated below and in the *in camera* submissions, AstraZeneca's privilege claims are reasonable and appropriate in scope.  First, many of the withheld documents involve the most

---

[1] We are submitting declarations on behalf of Laura J. Davies, Michelle T. Dillione, Julia W. Manning, and Enid R. Stebbins under seal for *in camera* review because they disclose the substance of the privilege claim asserted.  This is standard practice in cases in which *in camera* review takes place:

> Generally, when supporting affidavits are filed they must be served on the opposing party so that the opposition is given an opportunity to challenge the factual basis of the claim. . . .  *If, however, the supporting affidavit must disclose the substance of the privilege claim asserted, the courts have accepted ex parte submissions*—affidavits that have not been served on the opposing party and to which that party, therefore, has no meaningful opportunity to respond (occasionally referred to as in camera affidavits). . . .  Although there is an element of adversarial unfairness in this process, because the opponents cannot make factual arguments about materials they have not seen—the courts feel justified in following this procedure when they are faced with the undesirable alternatives of sacrificing the confidentiality of the communication or leaving the issue unresolved. . . . Courts have agreed that these ex parte/in camera affidavits do not violate a parties right to due process of law. . . .

*See* Paul R. Rice, 1 *Attorney-Client Privilege in the United States* § 11.11 (2d ed. 2008) (citations omitted) (emphasis added).  These declarations are based on the declarants' personal knowledge of documents and/or company policies.  *See FTC v. GlaxoSmithKline*, 294 F.3d 141, 144, 147 (D.C. Cir. 2002) (holding that an affidavit supported privilege where the attorney affiant relied on corporate policy to establish confidentiality of documents even though the description of the affidavit and the affiant make clear that the affiant did not have personal knowledge regarding each document for which privilege was claimed); *see also CSC Recovery Corp. v. Daido Steel Co., Ltd.*, 1997 WL 661122, at *2 (S.D.N.Y. Oct. 22, 1997) ("affidavits by the authors and recipients of the documents are not invariably required, particularly where the context in which the documents were created, or the documents themselves, leave little doubt as to whether a privilege has been properly asserted.").

fundamental kind of attorney-client communication:  AstraZeneca's in-house counsel being

asked for legal advice by, or relaying legal advice to, their AstraZeneca clients about a broad

range of legal topics.  For example, compliance with the extensive statutory and regulatory

requirements applicable to prescription drugs requires legal advice at every stage of

development, including pre-marketing clinical trials, preparing and gaining approval of the new

drug application with FDA, and post-marketing issues with respect to labeling and marketing

(§ A).  Additionally, in-house attorneys provide legal advice regarding product safety and

efficacy issues and related scientific developments, which have profound legal implications for

risk assessment and analysis, as well as regulatory advice, and advice regarding actual or

potential litigation.  Many of the *in camera* documents also are protected work product,

including those pertaining to Seroquel-related litigation filed against AstraZeneca.

Second, draft documents that seek or convey legal advice are privileged, even if final

versions of those documents are later made public (§ B).  This is in keeping with a critical

function of the attorney-client privilege:  to encourage the free flow of information between

attorney and client, and to ensure freedom for the attorney to advise the client when it can matter

most, before the client acts.  Third, "mixed purpose" communications, meaning those sent both

to legal and non-legal personnel for simultaneous legal and non-legal review, are protected

where the transmission seeks or conveys legal advice (§ C).

Fourth, privilege protects documents created and disseminated to facilitate legal advice

where (as here) the client is a corporation.  This includes documents widely disseminated within

the corporate structure to responsible parties (§ D.1), as well as to third-party agents and

consultants assisting counsel in providing a legal response (§ D.2).  Privilege also reaches

corporate committee communications involving legal advice (§ D.3).  It also extends to the

communication of otherwise non-privileged information to counsel—even if the underlying

factual information itself is not privileged (§ D.4).  Finally, the work product doctrine applies,

both in the traditional litigation context as well as in the regulatory context (§ E).[2]

## ARGUMENT

"The attorney-client privilege is the oldest of the privileges for confidential

communications known to the common law."  *Upjohn Co. v. United States*, 449 U.S. 383, 389

(1981).  As the Supreme Court has recognized, the purpose of the privilege

> is to encourage full and frank communication between attorneys and their clients
> and thereby promote broader public interests in the observance of law and
> administration of justice.  The privilege recognizes that sound legal advice or
> advocacy serves public ends and that such advice or advocacy depends upon the
> lawyer's being fully informed by the client.

*Id.* at 389-90.  Significantly, such protection extends beyond the litigation context to regulatory,

contractual, and other settings.  *See Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 607 (D.

Nev. 2005) ("Attorney-client privilege applies to communications between lawyers and their

clients when the lawyers act in a counseling and planning role, as well as when lawyers represent

their clients in litigation.").

### A. Communications Seeking Or Relaying Legal Advice Between In-House Counsel And Company Personnel Are Quintessentially Privileged, Whether They Involve Litigation Matters Or Legal Analysis  Of Safety, Scientific, Technical, And Regulatory Matters.

It is axiomatic that when in-house attorneys are asked to provide, or are relaying, legal

advice with respect to their client—the corporation or its agents—those communications are

protected by the attorney-client privilege.  *See* Paul R. Rice, 1 *Attorney-Client Privilege in the*

*United States* § 3:14 (2d ed. 2008) ("The confidential communications between in-house counsel

---

[2] We are separately filing a supplement to this response, which cross-references the withheld documents submitted for *in camera* review with the applicable sections of this brief.

and th[e corporation] client are privileged to the same extent as communications between outside retained counsel and the clients who have consulted him for legal advice or assistance."); *United States v. Rowe*, 96 F.3d 1294, 1296 (9th Cir. 1996) (in assessing privilege, there is no distinction between inside and outside counsel).  In-house counsel at AstraZeneca often are called on to provide legal advice about a broad spectrum of legal issues, ranging from the legal ramifications of safety, scientific, technical and regulatory developments, to preparing for and reacting to a range of civil, criminal, and regulatory matters.

AstraZeneca's privilege claims must be evaluated, for example, in light of the central role lawyers necessarily play in the FDA regulatory process for prescription medications like Seroquel.  The Supreme Court has cautioned that the realities facing corporations navigating complex regulatory waters bears heavily on any analysis of privilege:

> The narrow scope given the attorney-client privilege by the court below not only makes it difficult for corporate attorneys to formulate sound advice when their client is faced with a specific legal problem but also threatens to limit the valuable efforts of corporate counsel to ensure their client's compliance with the law.  In light of the vast and complicated array of regulatory legislation confronting the modern corporation, corporations, unlike most individuals, constantly go to lawyers to find out how to obey the law, . . . particularly since compliance with the law in this area is hardly an instinctive matter.

*Upjohn*, 449 U.S. at 392 (internal quotation omitted).  Accordingly, "[d]ocuments created in the context of seeking FDA approval, an inherently legal process, present a circumstance virtually necessitating legal representation, as the FDA approval process requires close supervision by legal counsel."  *In re CV Therapeutics, Inc. Secs. Litig.*, 2006 WL 1699536, at *5 (N.D. Cal. June 16, 2006) (internal quotation omitted).  Because "correspondence pertaining to FDA review or approval occur[s] in an inherently legal context, . . . the need for and importance of legal advice can fairly be implied."  *Id.*

Virtually everything a pharmaceutical company says about its products is governed by statutes and regulations, and therefore must be reviewed and approved by counsel before it is made public.  For example, under the Federal Food, Drug, and Cosmetic Act (FDCA) and other statutes, the federal government regulates:

(1)     the initial wording of, and all revisions to, the package insert, *see* 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. §§ 314.50(c)(2)(i), 314.70; *MacPherson v. Searle & Co.*, 775 F. Supp. 417, 419 (D.D.C. 1991) ("the contents of the 'physician prescribing information' . . . is subject to the approval of the U.S. Food and Drug Administration");

(2)     all product advertising, *see, e.g.*, 21 U.S.C. § 352(n); 201 C.F.R. pt. 202;

(3)     creation and distribution of "written, printed, or graphic" promotional materials considered labeling under the FDCA, *see, e.g.*, 21 U.S.C. § 321(m); 21 C.F.R. 202.1(l)(2);

(4)     oral promotional activities, including presentations to physicians and other healthcare professionals by either the company or a third party on behalf of the company, *see, e.g.*, FDA, Final Guidance On Industry-Supported Scientific And Educational Activities, 62 Fed. Reg. 64,074 (Dec. 3, 1997);

(5)     distribution to physicians of reprints of scientific articles or textbook chapters, *see, e.g.*, FDA, Draft Guidance for Industry:  Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices (Feb. 2008), *available at http://69.20.19.211/oc/op/goodreprint.html# introduction* (notice at 73 Fed. Reg. 9342); and

(6)     issuance of press releases to investors either before or after product approval.

Similarly, much of what a pharmaceutical company learns about its product is reported to regulatory authorities, typically under very strict requirements as to timing and content.  Much of this involves an analysis of the legal ramifications of patient safety and scientific information and developments, as FDA closely regulates, among many other things, the design and conduct of clinical studies of investigational new drugs, *see* 21 U.S.C. § 335(i); *Public Citizen Health*

*Research Group v. FDA*, 185 F.3d 898, 901 (D.C. Cir. 1999), and the pharmaceutical company's reporting to FDA of adverse drug events (ADEs), *see* 21 U.S.C. § 355(k)(1); 21 C.F.R. § 314.80.

Counsel must be closely consulted on such matters to ensure that all legal requirements are met. Legal advice on such matters is particularly important because violations of the FDCA and related statutes and regulations can result in criminal penalties and other serious ramifications. *See*, *e.g.*, 21 U.S.C. §§ 352(a); 331(a), (b), (k); 333; *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810-12 (1986). Legal considerations therefore are an essential focus of the company's deliberations and the communications on these matters. In addition to FDA regulatory considerations, prescription drug companies must constantly navigate a number of additional complex legal regimes, including, *inter alia*, federal securities, trademark, anti-kickback, "best price," and privacy (including HIPAA) laws, state consumer protection and product liability laws, and countless numbers of equally complex foreign laws and regulatory regimes.

As explained in the accompanying declarations, the complicated environment in which pharmaceutical companies like AstraZeneca operate requires in-house attorneys to provide ongoing legal input on a broad spectrum of matters. Furthermore, because the legal requirements and their implications in this industry are extremely complex and subject to frequent change, there are often occasions when lawyers familiar with those requirements often will offer legal advice on their own initiative to ensure compliance. Counsel in turn benefit from receiving information from clients regarding ongoing commercial, regulatory, and/or scientific activities in which they do not participate directly on a regular basis—but which form part of requests for advice and which enable counsel to provide informed advice. *See generally Astra Aktiebolag v. Andrx Pharms., Inc.*, 208 F.R.D. 92, 105 (S.D.N.Y. 2002) (holding that attorney-client privilege

7

applies to documents that "contain scientific information, including reports, analyses, and other scientific data communicated between internal [company] scientists and [company] in-house lawyers and forwarded to [outside counsel] or between internal [company] scientists and [outside counsel]" pertaining to legal advice).

To be sure, ordinary business communications are not privileged merely because a copy is sent to a lawyer—and AstraZeneca has not claimed privilege on such grounds.  However, when information in a communication is provided to a lawyer for the purpose of facilitating that lawyer's ongoing obligation to provide legal advice on regulatory or litigation issues, or when a lawyer communicates such advice, the communication is protected from disclosure.

### B.      Draft Documents Seeking Or Conveying Legal Advice Are Privileged.

Several documents submitted for *in camera* review are internal confidential drafts sent to attorneys for legal review, or received from attorneys and reflecting their legal review, before being finalized and later released outside of the attorney-client relationship.  Some confidential drafts were never made public and always remained within the company.  Plaintiffs contend that draft marketing materials, reports, memoranda, training materials and study protocols are categorically unprivileged.  *See* Plaintiffs' Privilege Motion (Doc. 789) at 13-17.  That is incorrect, as the case law makes clear that draft documents that are otherwise privileged remain privileged regardless of whether the final version of the document is sent outside the corporation.  As one court explained:

> [T]he fact that the document is a draft of what will be a public document does not mean that the communications relating to the draft should not be protected from disclosure.  Drafts often contain information and communications relating to the subject matter of the document, including, for example, proposed material to be included, suggested additions and deletions, and comments on the contents, all of which are intended to be considered confidential between attorney and client and not intended for public disclosure.

*Rohm & Hass Co. v. Brotech Corp.*, 815 F. Supp. 793, 796-97 (D. Del. 1993) (holding draft application and attorney's notes on the draft were privileged).[3]

Nor is there any basis to limit this privilege to draft *litigation* documents.  *See* Rice, *supra*, § 5:13 ("Confidential attorney-client communications in all nonlitigation settings are no less deserving of the protection of the privilege simply because their *contents* are ultimately disclosed.").  Indeed, courts have recognized that this protection can extend to a variety of different draft documents, including draft marketing materials, *see The Diversified Group, Inc. v. Daugerdas,* 304 F. Supp. 2d 507, 514 (S.D.N.Y. 2003) ("The disclosure to an attorney of drafts of documents ultimately intended to be released to the public is protected by the attorney-client privilege where th[e] [drafts] reflect client confidences [and] the legal advice and opinions of attorneys, all of which is protected by the attorney-client privilege.") (internal quotation omitted, alterations in original); draft internal investigation reports, *see In re Kidder Peabody Secs. Litig.*, 168 F.R.D. 459, 474 (S.D.N.Y 1996) ("The public release of [a] report does not waive the

---

[3] *See also In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1037 (2d Cir. 1984) ("although some of the documents appear to be drafts of communications the final version of which might eventually be sent to other persons, and as distributed would not be privileged, we see no basis in the record for inferring that [the company] did not intend that the drafts—which reflect its confidential requests for legal advice and were not distributed—to be confidential" and therefore privileged); *In re Brand Name Prescription Drugs Antitrust Litig.*, 1995 WL 557412, at *2 (N.D. Ill. Sept. 19, 1995) ("The mere fact that the final version of these documents may have been intended for public dissemination does not take them out from under the protection of the privilege, if the drafts of these documents were intended to be confidential communications concerning legal advice.  Preliminary drafts of documents which were not distributed, and which reflect confidential communications regarding legal advice are privileged.") (internal citations omitted); *Guy v. United Healthcare Corp.*, 154 F.R.D. 172, 178 (S.D. Ohio 1993) ("Preliminary drafts of communications subsequently sent to third parties, to the extent they reflect legal advice, are covered by the attorney-client privilege."); *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989*, 133 F.R.D. 515, 518 (N.D. Ill. 1990) ("Most courts have held, however, that simply because a final product is disclosed to the public (or a third person), an underlying privilege attaching to drafts of the final product is not destroyed."); *Lee v. Engle*, 1995 WL 761222, at *5-6 (Del. Ch. Dec. 15, 1995) (holding that drafts of documents the final versions of which are intended to be disclosed to third parties or the public are privileged); *cf. In re Hillsborough Holdings Corp.*, 176 B. R. 223, 236-37 (M.D. Fla. 1994) (holding that the accountant-client privilege is not waived as to draft analyses by the accountant, even though the final versions were intended to be used in a publicly disseminated audit opinion).

privilege for the drafts if they were otherwise protected by the privilege.  A client may intend to direct or permit the release of the final version of a document while still intending that his communications with his attorney prior to the finalization of the document remain confidential."); draft contracts, *see Upsher Smith Labs., Inc. v. Mylan Labs., Inc.*, 944 F. Supp. 1411, 1445 (D. Minn. 1996); and draft press releases, *see Macario v. Pratt & Whitney Canada Inc*., 1991 WL 6117, at *1 (E.D. Pa. Jan. 17, 1991) ("Because the [draft press] release was contingent on [the attorney's] approval and subject to his revision, it is reasonable to assume that [the client] intended the document to remain confidential until a final draft was achieved, and thus the second draft would fall within the attorney-client privilege."); *Alexander v. F.B.I.*, 186 F.R.D. 154, 162 (D.D.C. 1999).

As a leading treatise explains, these principles further the goal of the attorney-client privilege "to encourage a free flow of communications between attorney and client."  Kenneth S. Broun, 1 *McCormick on Evid*. § 91 (6th ed. 2006).  Accordingly, "preliminary conversations and drafts reflecting those conversations ought to be protected" so that the attorney and client can discuss "the precise terms of the disclosure, including drafting wording reflecting the best way to communicate the information, without the risk that matters ultimately determined not to be disclosed would be unprivileged."  *Id*.  Any contrary approach "would frustrate the purpose of the privilege, by stifling the attorney's ability to advise the client at the time when the attorney's advice is most useful—*i.e.*, before the client takes an action."  *Ideal Elec. Co. v. Flowserve Corp.*, 230 F.R.D. 603, 608 (D. Nev. 2005).[4]  Thus, "[e]ven after dissemination [of a final draft],

---

[4] As explained in AstraZeneca's Opposition to Privilege Motion (Doc. 842) at 13-14, two decisions from the *Vioxx* litigation cited by plaintiffs do not support their position.  *In re Vioxx Prods. Liab. Litig*., 501 F. Supp. 2d 789 (E.D. La. 2007), recognizes that sending drafts to attorneys is privileged if the purpose is to seek the attorney's legal advice.  *Id*. at 806 ("There are instances, of course, where legal advice is the primary purpose behind lawyers' comments and where these comments are complemented by

*continues . . .*

the drafts that were not approved for disclosure should remain confidential. . . . The privilege

protection should continue to apply to drafts circulated to the attorney, regardless of what is

contained in the draft—whether they contain information or comments not included in the final

version that was distributed."  Rice, *supra*, § 5:13.[5]

### C. "Mixed Purpose" Communications Seeking Or Conveying Legal Advice Are Protected.

"Mixed purpose" or "dual purpose" communications—transmissions sent to legal and

non-legal personnel for simultaneous legal and non-legal review—are privileged where, as with

many of the documents submitted for *in camera* review, legal advice is sought or conveyed.  The

fact that non-lawyers may be copied on a communication does not negate or minimize the fact

that the attorney has been brought in to serve in an attorney role and to provide legal (not

business) advice.  *See TVT Records, Inc. v. Island Def Jam Music Group*, 214 F.R.D. 143, 150-

51 (S.D.N.Y. 2003) (documents, including "e-mail communications," that were "at least copied

to counsel for the purpose of allowing counsel to respond to ongoing developments with legal

advice," are "appropriately protected as privileged"); *see also* AstraZeneca Opposition to

Privilege Motion (Doc. 842), at 14-15.

---

. . . *continued*

grammatical and editorial changes that could reasonably be considered inextricably intertwined with the advice.").  *In re Vioxx Prods. Liab. Litig*., 2007 WL 854251, at *3 (E.D. La. Mar. 6, 2007), merely recognizes that "the work-product doctrine 'does not protect materials assembled in the ordinary course of business, pursuant to regulatory requirements, or for other non-litigation purposes.'"  *Id.* (quoting *Carroll v. Praxair, Inc.,* 2006 WL 1793656, at *2 (W.D. La. June 28, 2006)).  It does not address how the attorney-client privilege operates in the regulatory sphere when an attorney's legal review of a non-final document is sought.

[5] Certain courts have held that "if the draft is prepared with attorney assistance, and contains words or language that do not appear in the final version, those words may be protected[,] . . . [b]ut if the final version sent to a third person contains the revisions made on the draft, those revisions are not privileged."  *Gutter v. E. I. DuPont de Neumours & Co*., 1998 WL 2017926, at *6 (S.D. Fla. May 18, 1998).  This approach has been roundly criticized, however, "because the fact that the drafts contain no additional information or comments from either the client or the attorney [itself] reveals substantive information about the content of the attorney-client communication."  Rice, *supra*, § 5:13 (citing cases).

"[T]he mere fact that a document is sent to many non-legal and few legal personnel is not determinative of whether it is privileged.  The principal consideration is the nature of the document:  whether it primarily requests or gives legal or business advice."  *Baxter Travenol Labs.*, *Inc. v. Abbott Labs.,* 1987 WL 12919, at *5 (N.D. Ill. June 19, 1987).  Thus, a document sent for legal and non-legal review at the same time is privileged if the legal review sought is significant.  *See*, *e.g.*, *Muro v. Target Corp.*, 2007 WL 3254463, at *13 (N.D. Ill. Nov. 2, 2007) ("There is no requirement that the communication involved only 'legal issues,' and factual communications made for the purpose of facilitating legal representation are also protected."); *McCook Metals LLC v. Alcoa, Inc.*, 192 F.R.D. 242, 254 (N.D. Ill. 2000) (material privileged that "simultaneously ask[ed] for or relay[ed] legal advice while updating the business people responsible for the operating unit").  For many of the documents submitted for *in camera* review, an important purpose of the communication is to facilitate the provision of legal advice by soliciting comments of AstraZeneca's non-lawyers for the benefit of AstraZeneca's counsel, who need the widest range of relevant comments to render sound legal advice and to ensure that their client complies with the complex legal regime under which it operates.  *See generally Upjohn*, 449 U.S. at 391-92.

Moreover, "a large corporation may have a number of individuals who should properly be kept informed of communications to and from counsel on a particular subject matter."  *In re Buspirone Antitrust Litig.*, 211 F.R.D. 249, 253 (S.D.N.Y. 2002).  Accordingly, "[w]here a document is being provided to such individuals for the purpose of informing them that legal advice has been sought or obtained, that act is not inconsistent with the underlying communication being for the 'purpose' of obtaining legal advice."  *Id.*  In addition, a privileged "implied request" for legal advice occurs "when an employee sends information to corporate

12

counsel in order to keep them apprised of ongoing business development[s], with the expectation that the attorney will respond in the event that the matter raises important legal issues." *In re Pfizer Inc. Secs. Litig.*, 1993 WL 561125, at *6 (S.D.N.Y. Dec. 23, 1993) ("An implied request is privileged to the same extent as an explicit request."); *see also CV Therapeutics*, 2006 WL 1699536, at *3-5 ("the critical question is the extent to which the communication solicits or provides legal advice or functions to facilitate the solicitation or provision of legal advice") (citing *In re Grand Jury Subpoena*, 357 F.3d 900, 908 (9th Cir. 2004)).

*CV Therapeutics* is instructive in this regard. It involved company documents that were "not expressly directed at legal counsel in order to secure legal advice" and that were "widely distributed to both business personnel and legal counsel." 2006 WL 1699536, at *4. As declarations made clear, however, it was "common practice" for "'employees to make an implied request for legal review and advice from [the company's] attorneys, by sending or copying communications and documents to the attorneys, even where such communications or documents do not expressly solicit legal review or advice.'" *Id.* (quoting declaration). While this general policy standing alone was insufficient to establish privilege as to specific documents, "the fact of this practice of implicitly soliciting legal comment combined with the content and context of the documents provide the Court with a basis for discerning the role of particular documents in obtaining legal advice." *Id.* Consequently, the privilege protects documents that:

> involve either client communications intended to keep the attorney apprised of continuing business developments, with an implied request for legal advice based thereon, or self-initiated attorney communications intended to keep the client posted on legal developments and implications, including implications of client activity noticed by the attorney but with regard to which no written request for advice from the client has been found.

*Id.* (internal quotation omitted). The court also considered the extent to which the "legal purpose so permeates any non-legal purpose," the breadth of the recipient list in assessing the centrality

of potential legal advice generated by the communication, and whether a communication

explicitly sought advice and comment. *Id.*

Applying this framework, the court held that a "majority of the documents at issue are

privileged," including:

- draft versions of FDA filings circulated to both legal counsel and non-lawyer recipients that were "created in the context of seeking FDA approval" because "the need for review and guidance of counsel permeates these communications";

- draft prescription drug labeling and contemplated FDA submissions sent to the "core team" because "correspondence pertaining to FDA review or approval occur[s] in an inherently legal context, and the need for and importance of legal advice can fairly be implied"; and

- draft investor question and answer documents circulated by the company's chief financial officer to legal and non-legal recipients for review that contains "handwritten notes demonstrating that the document was actually received and reviewed by legal counsel as intended by the client"—thus reflecting "an implied request for legal advice and that in fact that advice was given."

*Id.* at *5.[6]

> ### D. Documents Created And Disseminated To Facilitate Legal Advice In The Corporate Context Are Privileged.
>
> #### 1. Privilege applies to documents widely disseminated within the corporate structure to further the purpose of the privilege.

Privilege in the corporate context is not limited to top decisionmakers. The Supreme

Court has squarely *rejected* the so-called "control group" approach under which privilege

extends only to corporate employees who are "in a position to control or even to take a

---

[6] *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d at 798, does not warrant a different result. That court looked to the nature of counsel's participation, asking "whether counsel was participating in the communications primarily for the purpose of rendering legal advice or assistance" and requiring that "[t]he lawyer's role as a lawyer must be primary to her participation." *Id.* The court's rejection of a privilege claim for mixed-purpose documents turned on its inability to discern the factual context of a given document on the record before it, because the defendant did not submit supporting affidavits with its *in camera* submission of the documents. *See id.* at 800 ("Factual questions like this were what [the company] was expected to explain and document through affidavits, if necessary, from individuals with personal knowledge of the communications in question."). Here, by contrast, the accompanying *in camera* materials fully explain the factual context of each document that supports the claim of privilege.

substantial part in a decision" of the corporation.  *Upjohn*, 449 U.S. at 390.  In so doing, the

Court emphasized that "sound legal advice or advocacy serves public ends and [] such advice or

advocacy depends upon the lawyer's being fully informed by the client."  *Id.* at 389.  The control

group approach "frustrates the very purpose of the privilege" by improperly discouraging

communication between employees of the client and attorneys seeking to render legal advice to

the corporate client.  *Id.* at 392.  As the Court explained:

> In the corporate context, . . . it will frequently be employees beyond the control
> group . . . —"officers and agents . . . responsible for directing [the company's]
> actions in response to legal advice"—who will possess the information needed by
> the corporation's lawyers.  Middle-level—and indeed lower-level—employees
> can, by actions within the scope of their employment, embroil the corporation in
> serious legal difficulties, and it is only natural that these employees would have
> the relevant information needed by corporate counsel if he is adequately to advise
> the client with respect to such actual or potential difficulties.

*Id.* at 391.  Given that the attorney-client privilege "only protects disclosure of communications"

and not underlying facts, rejecting the control group approach does not prejudice the adversary in

litigation because it "puts the adversary in no worse position than if the communications had

never taken place."  *Id.* at 395.

Thus, simply because a communication was widely disseminated within the corporation

does not undermine its privileged status, provided that those who received the document may

have "relevant information" that could facilitate or benefit the lawyer's analysis of the legal

issue.  *Id.* at 391 (explaining that "[a] lawyer should be fully informed of all the facts of the

matter he is handling in order for his client to obtain the full advantage of our legal system," and

that "it is for the lawyer . . . to separate the relevant and important from the irrelevant and

unimportant") (internal quotation omitted); *see also In re Buspirone Antitrust Litig.*, 211 F.R.D.

at 253 ("a large corporation may have a number of individuals who should properly be kept

informed of communications to and from counsel on a particular subject matter"); *Shriver v.*

*Baskin-Robins Ice Cream Co.*, 145 F.R.D. 112, 114 (D. Colo. 1992) ("communications between corporate counsel and company personnel are privileged so long as they concern matters within the scope the employee's corporate duties").

In addition to the lawyer needing flexibility to gather the information necessary to render legal advice and to ensure that the advice is heeded, the company-client also needs flexibility to disseminate that legal advice to those who need to know it.  Thus, "a privileged communication does not lose its status as such when an executive relays legal advice to another who shares responsibility for the subject matter underlying the consultation.  Management personnel should be able to discuss the legal advice rendered to them as agents of the corporation." *Weeks v. Samsung Heavy Indus. Co., Ltd.*, 1996 WL 341537 at *4 (N.D. Ill. June 20, 1996).

### 2. Privilege extends to third-party agents and consultants assisting attorneys in providing a legal response.

In keeping with the principles of *Upjohn*, the attorney-client privilege extends not only to the company's employees, but also to third-party consultants assisting attorneys in providing a legal response.  *See*, *e.g.*, *In re Copper Market Antitrust Litig.*, 200 F.R.D. 213, 219 (S.D.N.Y. 2001) ( "there is no reason to distinguish between a person on the corporation's payroll and a consultant hired by the corporation if each acts for the corporation and possesses the information needed by attorneys in rendering legal advice").  Accordingly, confidential communications between third parties and the company or its counsel "made for the purpose of facilitating the rendition of legal services to [the company] can be protected from disclosure by the attorney-client privilege." *Id.*; *accord FTC v. GlaxoSmithKline*, 294 F.3d 141, 148 (D.C. Cir. 2002) ("the attorney-client privilege extends also to those communications that [the company] shared with its public relations and government affairs consultants" on a confidential basis related to its work); *Wells v. Xpedx*, 2007 U.S. Dist. LEXIS 29610, at *9 (M.D. Fla. Apr. 23, 2007) ("Where counsel

seeks and obtains outside consulting services, such as investigators or accountants, the attorney-client privilege has been extended to such third parties employed to assist a lawyer in the rendition of legal services . . . . where the consultative services are closely tied to the giving of legal, rather than business, advice."); *see also* AstraZeneca Statement Regarding Edelman Documents (Doc. 719) at 3 & nn. 2-3 (citing cases addressing the application of the attorney-client privilege and work product doctrine to consultants).  In keeping with these cases, AstraZeneca has claimed the attorney-client privilege *only* where the third-party consultant has *directly* assisted AstraZeneca's counsel in providing legal advice.

### 3.    Privilege applies to corporate committee communications involving legal advice.

Courts take a functional approach to applying the attorney-client privilege to communications involving corporate committees.  Particularly informative is *In re Ford Motor Co.*, 110 F.3d 954 (3d Cir. 1997), which involved a company meeting addressing safety concerns about a product "in the early stages of its development," including "the legal implications of some of those concerns" and the attorney's proposed "course of action."  *Id.* at 966.  The district court concluded that the meeting minutes "'disclose only factual material, contain no legal discussion, were not created in anticipation of litigation . . . , and contain no communication to counsel which was intended to be kept confidential" and simply memorialized "essentially business and safety decisions.'"  *Id.* (quoting district court).  The Third Circuit reversed, reasoning that the minutes were privileged because:

> The documents do not contain merely factual material nor do they detail mere business decisions . . . . Certainly, the ultimate decision reached by the Policy and Strategy Committee could be characterized as a business decision, but the Committee reached that decision only after examining the legal implications of doing so.  Even if the decision was driven, as the district court seemed to assume, principally by profit and loss, economics, marketing, public relations, or the like, it was also infused with legal concerns, and was reached only after securing legal advice.  At all events, disclosure of the documents would reveal that legal advice.

*Id.* at 966.

Likewise, in *Great Plains Mut. Ins. Co., Inc. v. Mutual Reinsurance Bureau*, 150 F.R.D. 193 (D. Kan. 1993), the court held that meeting minutes reflecting legal advice are protected even if the purpose of the legal advice was to assist in making a business decision.  Although the court recognized that "the mere fact that an attorney was present during the board of directors' meetings does not, in and of itself, shield disclosure," and "communications by a corporation with its attorney, who at the time is acting solely in his capacity as a business advisor, would not be privileged," where the company's attorney is "acting in his capacity as an attorney during the relevant portions of the board meetings," those portions are privileged.  *Id.* at 197.  The fact that legal advice also may have business implications does not destroy the privilege:

> [T]he information sought by [the company] appears to directly relate to legal advice rendered by its attorney in his capacity as legal advisor. While it is possible that the advice rendered by [the company's] attorney could conceivably affect [the company's] success (or failure) as an ongoing entity, this possibility does not convert the legal advice rendered by its attorney into discoverable "business advice"—such a construction of the attorney-client privilege would eviscerate the privilege and essentially render it a nullity in this factual context.

*Id.* at 197.[7]

---

[7] Numerous courts have upheld the assertion of the attorney-client privilege and denied discovery of legal advice or information conveyed by a corporation's attorney to a corporate committee.  *See, e.g.*, *In re Grand Jury 90-1*, 758 F. Supp. 1411, 1413 (D. Colo. 1991) (corporate president's letter to the board of directors discussing legal advice given to president by attorney was privileged; corporation was client, and the president relayed the information to the board of directors as means of making legal advice available to the corporation); *Shriver*, 145 F.R.D. at 114 (an otherwise privileged communication by a lawyer to a corporate agent does not lose its protected status simply because the agent then conveys the attorney's opinion to a corporate committee charged with acting on such issues); *Welch v. Board of Dirs. of Wildwood Golf Club*, 146 F.R.D. 131, 139 (W.D. Pa. 1993) (defendant properly asserted attorney-client privilege regarding portions of minutes of its board of directors' meetings, as board was seeking legal advice in regard to potential litigation); *Eastern Techs., Inc. v. Chem-Solv, Inc.*, 128 F.R.D. 74, 77 (E.D. Pa. 1989) (after *in camera* review of the unredacted minutes of the board of directors' meeting where the corporation's attorney was present, court concludes that pertinent portions of minutes are protected by the attorney client privilege).

Following these principles, AstraZeneca has not claimed privilege where a lawyer is involved in a non-legal capacity.  Rather it claims privilege only where the lawyer is participating in his or her capacity as an attorney.  For example, some of the withheld documents involve scientific analyses for which the lawyer gives no business or scientific advice, and the *only* basis for including the lawyer on the communication is to seek or receive legal advice.

> 4.    **Privilege extends to the communication to a lawyer of otherwise non-privileged information.**

Communication to a lawyer of otherwise non-privileged information is privileged, even if the underlying information itself is not privileged.  As the Supreme Court explained in *Upjohn*:

> [T]he protection of the privilege extends . . . to *communications* and not to facts.
> A fact is one thing and a communication concerning that fact is an entirely
> different thing.  The client cannot be compelled to answer the question, 'What did
> you say or write to the attorney?' but may not refuse to disclose any relevant fact
> within his knowledge merely because he incorporated a statement of such fact
> into his communication to his attorney.

449 U.S. at 395-96 (internal quotation omitted); *see also Muro*, 2007 WL 3254463, at *12 (under *Upjohn* "the fact that non-privileged information was communicated to an attorney may be privileged, even if the underlying information remains unprotected"); Rice, *supra*, § 5:1 (although "a client is not shielded from compelled disclosure of information simply because it was previously communicated to the attorney, . . . . [t]he client and his attorney would . . . be protected from revealing that those same facts had previously been communicated by the client to the attorney").  AstraZeneca has not claimed privilege with respect to otherwise non-privileged underlying factual information or documents—only with respect to the fact that such information was conveyed to counsel in confidence.

One circumstance in which this principle comes into play concerns e-mail chains or strings.  For example, in some instances, the an in-house lawyer serving as legal counsel to a company committee or ad-hoc group may receive a forwarded copy of an underlying e-mail

about some business or scientific matter that itself would not be privileged, and is asked to give legal advice about the matter.  Because it comprises a request for legal advice, the communication is plainly privileged even though the underlying e-mail, in and of itself, would not be.  In such a case, "[i]t is well established that the attorney-client privilege extends . . . to information and queries submitted to [the lawyer] by his client."  *Vaughan v. Celanese Ams. Corp.*, 2006 WL 3592538, at **3-4 (W.D.N.C. Dec. 11, 2006) (citing *Upjohn*, 449 U.S. at 390).

E.   **The Work Product Doctrine Is Appropriately Invoked In AstraZeneca's Privilege Log.**

The work product doctrine, which is broader than the attorney-client privilege, protects from disclosure the work-product of an attorney, or an attorney's agent, prepared in anticipation of litigation.  *In re Grand Jury (Impounded)*, 138 F.3d 978, 980-81 (3d Cir. 1998).  The doctrine "extend[s] to material prepared by an attorney's agent, if that agent acts at the attorney's direction in creating such documents."  *Id*. at 981.  Work product is protected from discovery regardless of whether the materials were prepared in anticipation or furtherance of this litigation or other litigation.  *See Federal Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 25 (1983) (Rule 26(b)(3) "protects materials prepared for *any* litigation or trial as long as they were prepared by or for a party to the subsequent litigation.") (emphasis in original).  Indeed, a document does not need to be created in response to a specific claim to enjoy work product protection.  *See In re Sealed Case*, 146 F.3d 881, 887 (D.C. Cir. 1998).

While the party resisting discovery must make the predicate showing that the materials in question were prepared in anticipation of litigation, the party seeking to discover work product has the burden to establish a "substantial need of the materials" and "undue hardship" in obtaining equivalent information.  Fed. R. Civ. P. 26(b)(3)(A); *see Lockheed Martin Corp. v. L-3 Commc'ns Corp.*, 2007 WL 2209250, at *9 (M.D. Fla. July 29, 2007).  In addition, even if the

requesting party makes those showings—which plaintiffs have not even attempted to do here—
"a court ordering discovery must still 'protect against disclosure of the mental impressions,
conclusions, opinions, or legal theories of a party's attorney or other representative concerning
the litigation.'" *In re Seroquel Prods. Liab. Litig.*, 2008 WL 591929, at *2 (M.D. Fla. Feb. 28,
2008) (quoting Fed. R. Civ. P. 26(b)(3)(B)); *see also United Kingdom v. United States*, 238 F.3d
1312, 1322 (11th Cir. 2001) (opinion work product is "almost always protected from
disclosure"); *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1422 (11th Cir. 1994)
("opinion work product enjoys a nearly absolute immunity and can be discovered only in very
rare and extraordinary circumstances") (internal quotation omitted).

Work product protection extends to a number of documents, including those "created
because of anticipated litigation, which tend[] to reveal mental impressions, conclusions,
opinions or theories concerning the litigation." *United States v. Adlman*, 134 F.3d 1194, 1195
(2d Cir. 1998).  The document may relate to present litigation, or to litigation that lies "just over
the horizon." *EEOC v. Lutheran Soc. Servs.*, 186 F.3d 959, 969 (D.C. Cir. 1999).  Moreover, a
document "does not lose work-product protection merely because it is intended to assist in the
making of a business decision influenced by the likely outcome of the anticipated litigation."
*Adlman*, 134 F.3d at 1195.

"Where a document was created because of anticipated litigation, and would not have
been prepared in substantially similar form but for the prospect of that litigation, it falls within
Rule 26(b)(3)." *Id.*; *see also Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 586
n.42 (D.C. Cir. 1987) ("the testing question is 'whether, in light of the nature of the document
and the factual situation in the particular case, the document can fairly be said to have been
prepared or obtained because of the prospect of litigation'") (quoting 8 Charles A. Wright &

Arthur R. Miller, *Federal Practice and Procedure* § 2024 at 198 (1970)).  Thus, in addition to extending to a variety of traditional legal analyses about anticipated or existing litigation, the work product doctrine also applies, for example, to counsel working with the company to prepare draft public statements about actual and potential litigation.  By definition, such statements "would not have been prepared in substantially similar form but for the prospect" of this litigation.  *Adlman*, 134 F.3d at 1195.  (Such drafts also may be covered by the attorney-client privilege.  *See* § B, *supra.*)

Moreover, it is well established that the work product doctrine applies with respect to material prepared not only in anticipation of traditional civil litigation, but also in response to an agency's investigation or inquiry into a party's compliance with regulations.  *See*, *e.g.*, *In re Grand Jury Subpoena*, 357 F.3d at 907-10 (materials prepared in response to EPA investigation for violation of federal waste management laws constituted work product); *In re Grand Jury Subpoena Dated November 8, 1979*, 622 F.2d 933, 935-36 (6th Cir. 1980) (applying work product doctrine to testimony about materials prepared in response to FDA investigation and observing that "[t]he questions seek information on drafts of submissions to the FDA and memoranda of interviews, which the courts have uniformly classified as work product."); *see also In re Grand Jury Subpoena*, 220 F.R.D. 130, 155-57 (D. Mass. 2004) (recognizing that "an attorney's notes of conference calls between a client and a regulatory agency are the sort of materials that the work product doctrine protects," but concluding that the doctrine did not apply in that case because the corporation failed to show that it "reasonably believed that either an FDA enforcement action or a products liability suit was likely").[8]

---

[8] *See also Pacamor Bearings, Inc. v. Minebea Co.*, *Ltd.*, 918 F. Supp. 491, 513 (D.N.H. 1996) (an "'[i]nvestigation by a federal agency presents more than a remote prospect of future litigation, and provides reasonable grounds for anticipating litigation sufficient to trigger application of the work product *continues . . .*

## CONCLUSION

For these reasons, and those detailed in our separate *in camera* submissions with respect to each document, AstraZeneca's claims of privilege and work product protection are well-founded and should be upheld.

DATED: March 20, 2008                              Respectfully submitted,

                                                    */s/ Stephen J. McConnell*
                                                    Stephen J. McConnell
                                                    DECHERT LLP
                                                    2929 Arch Street
                                                    Philadelphia, PA  19103
                                                    Telephone: (215) 994-4000
                                                    Facsimile: (215) 994-2222
                                                    *stephen.mcconnell@dechert.com*

                                                    Steven B. Weisburd
                                                    DECHERT LLP
                                                    300 West 6th Street, Suite 1850
                                                    Austin, Texas  78701
                                                    Telephone: (512) 392-3000
                                                    Facsimile: (512) 394-3001

---

*. . . continued*
doctrine'") (quoting *Martin v. Monfort, Inc.*, 150 F.R.D. 172, 173 (D. Colo. 1993)); *Motisola Malikha Abdallah v. Coca-Cola Co.*, 2000 U.S. Dist. LEXIS 21025, at *17 (N.D. Ga. Jan. 25, 2000) ("Litigation may generally be expected from agency investigations. . . . An investigation by an agency represents more than a remote possibility of future litigation, and provides reasonable grounds for anticipating litigation"); *Garrett v. Metropolitan Life Ins. Co.*, 1996 U.S. Dist. LEXIS 8054, at *10 (S.D.N.Y. June 12, 1996) ("Regulatory investigations by outside agencies present more than a mere possibility of future litigation, and provide reasonable grounds for anticipating litigation."); *In re LTV Secs. Litig.*, 89 F.R.D. 595, 612 (N.D. Tex. 1981) ("Investigation by a federal agency presents more than a 'remote prospect' of future litigation and gives grounds for anticipating litigation sufficient for the work-product rule to apply.").

Susan A. Weber
Gary Feinerman
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Rebecca K. Wood
SIDLEY AUSTIN LLP
1501 K St., N.W.
Washington, DC  20005
Telephone:  (202) 736-8000
Facsimile:  (202) 736-8711

*Counsel for AstraZeneca Pharmaceuticals LP
and AstraZeneca LP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 20th of March, 2008 I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system through which all participating parties are deemed served.  I further certify that, by using the CM/ECF, the foregoing has been served on plaintiffs' liaison counsel, who is charged with serving any non-CM/ECF participants on the attached Service List.

<u>**/s/ Michael W. Davis**</u>

## SERVICE LIST

**In Re: Seroquel Products Liability Litigation**
**MDL Docket No. 1769**

| | |
|---|---|
| Paul J. Pennock, Esq.<br>Michael E. Pederson, Esq.<br>Weitz & Luxenberg, P.C.<br>180 Maiden Lane - 17th Floor<br>New York, NY 10038<br>Telephone: (212) 558-5500<br>Ppennock@weitzlux.com<br>MPederson@weitzlux.com<br>***Plaintiffs' Lead Counsel*** | Camp Bailey, Esq.<br>Michael W. Perrin, Esq.<br>Fletcher Trammell, Esq.<br>Bailey Perrin Bailey LLP<br>The Lyric Centre<br>440 Louisiana, Suite 2100<br>Houston, TX  77002<br>Telephone: (713) 425-7240<br>cbailey@bpblaw.com<br>mperrin@bpblaw.com<br>***Plaintiff s' Lead Counsel*** |
| Larry Roth, Esq.<br>Law Offices of Larry M. Roth, P.A.<br>Post Office Box 547637<br>Orlando, FL  32854-7637<br>Telephone: (407) 872-2239<br>LROTH@roth-law.com<br>***Plaintiffs' Liaison Counsel*** | Tommy Fibich, Esq.<br>Fibich, Hampton & Leebron, L.L.P.<br>1401 McKinney, Suite 1800<br>Five Houston Center<br>Houston, TX  77010<br>Telephone: (713) 751-0025<br>tfibich@fhl-law.com |
| Matthew E. Pawa, Esq.<br>Law Offices of Matthew E. Pawa, P.C.<br>1280 Centre St., Suite 230<br>Newton Centre, MA 02459<br>Telephone: (617) 641-9550<br>Mp@pawalaw.com | Robert L. Salim, Esq.<br>Robert L. Salim Attorney at Law<br>P.O. Box 2069<br>Natchitoches, LA 71457-2069<br>Telephone: (318) 352-5999<br>robertsalim@cp-tel.net |
| Keith M. Jensen, Esq.<br>Jensen, Belew & Gonzalez, PLLC<br>1024 North Main<br>Fort Worth, TX  76106<br>Telephone: (817) 334-0762<br>kj@jensenlaw.com | Scott Allen, Esq.<br>Cruse, Scott, Henderson & Allen, L.L.P.<br>2777 Allen Parkway, 7th Floor<br>Houston, Texas 77019<br>Telephone: (713) 650-6600<br>sallen@crusescott.com |
| Matthew E. Lundy, Esq.<br>Lundy & Davis, LLP<br>333 North Sam Houston Parkway East<br>Suite 375<br>Houston, TX  77060<br>Telephone: (281) 272-0797<br>mlundy@lundydavis.com | E. Ashley Cranford<br>Whatley Drake & Callas<br>2001 Park Place North, Suite 1000<br>Birmingham, AL 35203<br>Telephone: (205) 328-9576<br>ACranford@wdklaw.com |

| | |
|---|---|
| Robert L. Ciotti, Esq.<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard<br>Suite 1000<br>Tampa, FL 33607-5736<br>Telephone: (813) 223-7000<br>rciotti@carltonfields.com<br>**Attorney for Defendants AstraZeneca**<br>**Pharmaceuticals, LP, and.AstraZeneca LP** | Gregory P. Forney, Esq.<br>Shaffer Lombardo Shurin<br>911 Main Street, Suite 2000<br>Kansas City, MO 64105<br>Telephone: (816) 931-0500<br>gforney@sls-law.com<br>rbish@sls-law.com<br>**Attorney for Defendant,**<br>**Marguerite Devon French** |
| Randy Niemeyer<br>22442 Pike 309<br>Bowling Green, MO 63334-5209<br>**Pro Se** (via U.S. Mail) | Eric B. Milliken, Esq.<br>3 Sir Barton Ct.<br>Newark, DE 19702<br>**Pro Se** (via U.S. Mail) |
| Catherine Solomon<br>3100 N.E. 83<br>Gladstone, MO 64119<br>**Pro Se** (via U.S. Mail) | Louisiana Wholesale Drug Co. Inc.<br>C/O Gayle R. White<br>Registered Agent<br>Highway 167N<br>Sunset, LA 70584<br>**Pro Se** (via U.S. Mail) |
| Aaron C. Johnson, Esq.<br>Summers & Johnson<br>717 Thomas<br>Weston, MO 64098<br>Telephone: (816) 640-9940<br>firm@summersandjohnson.com | Robert A. Schwartz, Esq.<br>Bailey & Galyen<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744<br>bschwartz@galyen.com |
| Todd S. Hageman, Esq.<br>Simon and Passanante, PC<br>701 Market St., Suite 1450<br>St. Louis, MO 63101<br>Telephone: (314) 241-2929<br>thageman@spstl-law.com | Mark P. Robinson, Jr., Esq.<br>Robinson, Calcagnie & Robinson<br>620 Newport Center Drive, 7th Floor<br>Newport Beach, CA 92660<br>Telephone: (949) 720-1288<br>mrobinson@robinson-pilaw.com |
| Thomas F. Campion, Esq.<br>Steven M. Selna, Esq.<br>Drinker Biddle & Reath, LLP<br>500 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>Telephone: (973) 360-1100<br>Thomas.Campion@dbr.com<br>steven.selna@dbr.com<br>**Attorneys for Defendants Janssen**<br>**Pharmaceutical Products and Johnson &**<br>**Johnson Co.** | Michael Davis, Esq.<br>James Mizgala, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone: (312) 853-7731<br>mdavis@sidley.com<br>jmizgala@sidley.com<br>**Attorneys for Defendants AstraZeneca LP**<br>**and AstraZeneca Pharmaceuticals, LP** |

27

| | |
|---|---|
| Elizabeth Raines, Esq.<br>Baker, Sterchi, Cowden & Rice, LLC<br>2400 Pershing Road, Suite 500<br>Kansas City, MO 64108<br>Telephone: (816) 471-2121<br>raines@bscr-law.com | Timothy Reese Balducci, Esq.<br>The Langston Law Firm, PA<br>P.O. Box 787<br>100 South Main Street<br>Booneville, MS 38829-0787<br>Telephone: (662) 728-3138<br>tbalducci@langstonlaw.com |
| Kenneth W. Bean, Esq.<br>Sandberg, Phoenix & von Gontard<br>One City Centre<br>15th Floor<br>St. Louis, MO 63101-1880<br>Telephone: (314) 231-3332<br>kbean@spvg.com<br>**Attorney for Defendant Dr. Asif Habib** | John Driscoll, Esq.<br>Brown & Crouppen; PC<br>720 Olive St.<br>St. Louis, MO 63101<br>Telephone: (314) 421-0216<br>Jdriscoll@brownandcrouppen.com<br>asmith@brownandcrouppen.com<br>blape@brownandcrouppen.com |
| Aaron K. Dickey, Esq.<br>Goldenberg and Heller, PC<br>P.O. Box 959<br>2227 S. State Road 157<br>Edwardsville, IL 62025<br>Telephone: (618) 650-7107<br>aaron@ghalaw.com | Matthew J. Hamilton, Esq.<br>Pepper Hamilton<br>3000 Two Logan Square<br>18th & Arch Street<br>Philadelphia, PA 19103<br>Telephone: (215) 981-4000<br>hamiltonm@pepperlaw.com |
| Justin Witkin, Esq.<br>Ken Smith, Esq.<br>Aylstock, Witkin & Sasser, PLC<br>4400 Bayou Boulevard<br>Suite 58<br>Pensacola, FL 32503<br>Telephone: (850) 916-7450<br>Jwitkin@AWS-LAW.com<br>ablankenship@aws-law.com<br>ksmith@aws-law.com<br>noverholtz@aws-law.com | David P. Matthews, Esq.<br>Lizy Santiago, Esq.<br>Matthews & Associates<br>2905 Sackett Street<br>Houston, TX 77098<br>Telephone: (713) 222-8080<br>dmatthews@thematthewslawfirm.com<br>lsantiago@thematthewslawfirm.com<br>msalazar@thematthewslawfirm.com |
| Howard Nations<br>Lori A. Siler<br>Howard L. Nations Attorney At Law<br>4515 Yoakum Blvd.<br>Houston, TX 77006-5895<br>Telephone: (713) 807-8400<br>nations@howardnations.com | Mary B. Cotton<br>John K. Giddens, P.A.<br>226 North President Street<br>P.O. Box 22546<br>Jackson, MS 39225-2546<br>Telephone: (601) 355-2022<br>betsy@law-inc.com |

| | |
|---|---|
| Salvatore M. Machi<br>Ted Machi & Associates PC<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744<br>(via U.S. Mail) | Jona R. Hefner, Esq.<br>3441 W. Memorial, Suite 4<br>Oklahoma City, OK 73134-7000<br>Telephone: (405) 286-3000<br>attorneyokc@hotmail.com |
| David Dickens<br>Miller & Associates<br>105 North Alfred Street<br>Alexandria, VA 22314-3010<br>(703) 519-8080<br>ddickens@doctoratlaw.com | Pete Schneider, Esq.<br>Grady, Schneider & Newman, L.L.P.<br>801 Congress, 4th Floor<br>Houston, TX 77002<br>(713) 228-2200<br>pschneider@gsnlaw.com |
| Fred T. Magaziner<br>Marjorie Shiekman<br>A. Elizabeth Balakhani<br>Shane T. Prince<br>Eben S. Flaster<br>DECHERT LLP<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA 19103<br>(215) 994-4000<br>fred.magaziner@dechert.com<br>shane.prince@dechert.com<br>marjorie.shiekman@dechert.com<br>eben.flaster@dechert.com<br>elizabeth.balakhani@dechert.com | Lawrence J. Gornick, Esq.<br>William A. Levin, Esq.<br>Dennis J. Canty, Esq.<br>Levin Simes Kaiser & Gornick LLP<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 646-7160<br>lgornick@lskg-law.com<br>dcanty@lskg-law.com<br>lsimes@levins-law.com<br>jkaiser@lskg-law.com<br>echarley@lskg-law.com<br>ddecarli@lskg-law.com<br>bsund@lskg-law.com<br>astavrakaras@lskg-law.com |
| Scott Burdine, Esq.<br>Hagans Burdine Montgomery<br>Rustay & Winchester, P.C.<br>3200 Travis, Fourth Floor<br>Houston, TX 77006<br>Telephone: (713) 222-2700<br>sburdine@hagans-law.com | Lowell Finson<br>Phillips & Associates<br>3030 North 3rd Street<br>Suite 1100<br>Phoenix, AZ 85012<br>(602) 258-8900, ext. 259<br>lowellf@phillipslaw.ws |
| Gale D. Pearson<br>Stephen J: Randall<br>Pearson, Randall & Schumacher, P.A.<br>Fifth Street Towers, Suite 1025<br>100 South 5th Street<br>Minneapolis, MN 55402<br>(612) 767-7500<br>attorneys@outtech.com | Robert H. Shultz<br>Heyl, Royster<br>103 West Vandalia Street<br>P.O. Box 467<br>Edwardsville, IL 62025<br>(618) 656-4646<br>rshultz@hrva.com<br>bwallace@hrva.com |

| | |
|---|---|
| Ellen R. Serbin<br>Perona, Langer, Beck, Lalande & Serbin<br>300 San Antonio Drive<br>Long Beach, CA 90807-0948<br>(562) 426-6155<br>davidhwang@plblaw.com | Scott Armstrong<br>1719 West Main Street<br>Suite 201<br>Rapid City, SD 57702<br>(605) 399-3994<br>scottarmstrong1235@earthlink.net |
| Linda S. Svitak<br>Faegre & Benson, LLP<br>90 South 7th Street, Suite 2200<br>Minneapolis, MN 55402-3901<br>(612) 766-7000<br>lsvitak@faegre.com<br>wjohnson@faegre.com | James Freebery<br>McCarter & English, LLP<br>919 N. Market Street, 18th Floor<br>Wilmington, DE 19801<br>(973) 622-4444<br>jfreebery@mccarter.com<br>tpearson@mccarter.com |
| Richard D.Hailey<br>Ramey & Hailey<br>3891 Eagle Creek Parkway<br>Suite C<br>Indianapolis, IN<br>(317) 299-0400<br>rhailey@sprynet.com | B. Andrew List<br>Clark, Perdue, Arnold & Scott<br>471 East Broad Street, Suite 1400<br>Columbus, OH 43215<br>(614) 469-1400<br>alist@cpaslaw.com<br>lcollins@cpaslaw.com |