UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

| | |
|---|---|
| In Re: Seroquel Products Liability Litigation<br>MDL Docket No. 1769<br><br>DOCUMENT RELATES TO ALL CASES | Case No. 6:06-md-01769-ACC-DAB<br><br>**PLAINTIFFS' BRIEF RE PRESERVATION OF INTERMEDIATE DATA IN ASTRAZENECA'S "GEL" DATABASE** |

## I. INTRODUCTION

"[A]nyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary. 'While a litigant is under no duty to keep or retain every document in its possession . . . it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request.' (citations) Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (D.N.Y. 2003)

Applying this rule to the undisputed facts, AstraZeneca's duty to preserve GEL intermediate data arose no later than September 4, 2003. On that date, AstraZeneca was a party to litigation involving claims substantially identical to those of plaintiffs in this MDL. GEL intermediate data were evidence of central relevance to those claims, the data were accessible, and there was no cost or burden associated with preservation. AstraZeneca was legally required to preserve GEL intermediate data.

1

AstraZeneca continues to this day to deny its obligations to preserve this critically relevant information. As reported by the SM-ESI on April 8, "AstraZeneca contends that at no time prior to the end of 2007, did it have a legal duty to preserve potentially-relevant, Seroquel-related intermediate GEL content." (Doc. 939, p. 4, para. 18). AstraZeneca is wrong.

**II.    ANALYSIS**

   A.    <u>AstraZeneca Was A Party To An August 2003 Lawsuit Alleging Nearly Identical Claims</u>

AstraZeneca's duty to preserve GEL intermediate data certainly arose in connection with the August 2003 filing of the class action complaint in *Zehel-Miller v. AstraZeneca Pharmaceuticals, LP* (Exhibit 1), which asserts claims nearly identical to those asserted by the many individual plaintiffs in the MDL.[1] As this court will recall, central to AstraZeneca's defense of that action was its motion for denial of class certification. Essentially, AstraZeneca asserted that the claims alleged in that action were precisely the claims that should have been brought by these individual plaintiffs in this litigation. AstraZeneca cannot therefore argue that this litigation was not then anticipated.

AstraZeneca admitted as much in opposing plaintiffs' early motion for a preservation order in this MDL, indicating that related litigation holds had been cascaded to its employees as of September of 2003 (Exhibit 2). The attached September 4, 2003 email between members of AstraZeneca's Seroquel Brand Team confirms recognition of the magnitude of plaintiffs' claims, indicating that two "project teams" were created to handle related issues (Exhibit 3). So does the statement contained in AstraZeneca's 2004 Annual Report (Exhibit 4):

---

[1] The question is whether a preservation duty arose earlier. AstraZeneca's June 2003 Corporate Integrity Agreement with the Office of the Inspector General, and information contained in its March 2003 Annual Report regarding a subpoena received from the MA Attorney General, both give reason to believe that the duty to preserve ESI arose much earlier. Further discovery on these issues is warranted.

>Seroquel (quetiapine fumarate)
>AstraZeneca PLC and AstraZeneca Pharmaceuticals LP have been named as defendants in the case of Susan Zehel-Miller et al. v. AstraZenaca [sic], AstraZenaca Pharmaceuticals, LP [sic], a putative class action suit filed in August 2003 in the US District Court for the Middle District of Florida. The named plaintiffs are seeking damages and injunctive relief on behalf of a purported class "consisting of all persons in the United States who purchased and/or used Seroquel ". Although the scope of the allegations in the complaint is very broad, the primary focus appears to be the contention that the Company failed to provide adequate warnings in connection with an alleged association between Seroquel and the onset of diabetes. AstraZeneca denies the material allegations of the plaintiffs' complaint and is vigorously defending the litigation.

B. <u>GEL Intermediate Data Were Clearly of Central Relevance</u>

GEL intermediate data were put squarely at issue by the 2003 Zehel-Miller complaint (if not before then, by other litigation or governmental investigation). The allegations of the complaint tender not merely what AstraZeneca told regulators about the efficacy and safety of Seroquel, but what AstraZeneca specifically decided to **withhold**; not merely what it included in its periodic safety reports, but what it *failed* to include; not merely what it decided to include in its warnings, but what it decided to *omit*; not merely the final results of clinical trials and studies, but their *adequacy*, in terms of how they were constructed, interpreted, reported (and indeed sponsored). (Exhibit 1, paragraphs 25, 38, 48, 51, *inter alia*.)

In response to the complaint, AstraZeneca asserted affirmative defenses – among them, preemption. AstraZeneca itself tendered issues of whether or not it had disclosed all available safety information, and whether or not its testing of the drug was adequate. (Answer, Exhibit 5, affirmative defenses 6 and 10, *inter alia*.)

GEL, including its intermediate data, is AstraZeneca's central repository for evidence of internal deliberations and collaboration regarding the matters at issue in this litigation: what and what not to tell regulators, how to spin results of clinical trials, instructions to employees to omit

3

certain language because it sounds too "causal" (see Exhibit 6, Slide 21-25, from plaintiffs' March 24 presentation; Exhibit 7, submitted at the April 10 hearing; see also plaintiffs' Supplemental Statement, filed April 4, 2008, Exhibit 4). GEL intermediate data is central, not peripheral, to the issues framed by both parties.

AstraZeneca admits the same. When asked by the SM-ESI to propose a method for retrieval and production of deleted data, AstraZeneca itself identified "drafts of specific categories of key documents that are relevant or likely to lead to the discovery of relevant evidence, specifically, key regulatory submissions and safety documents maintained on GEL and which relate specifically to plaintiffs' failure to warn claims." (Exhibit 8, p. 2) Though AstraZeneca's enumerated categories of relevant drafts are limited, they include: "U.S. Label Changes; Core Data Sheets (which include, *inter alia*, baseline safety information and labeling for all global product labeling); Safety Evaluation and Review Meeting (SERM) minutes; SERM Discussion Documents; SERM Clinical Overview Documents; Periodic Safety Update Reports; and Safety Position Papers." (*Id*., at 2-3).[2] Thus, AstraZeneca acknowledges the central relevance of GEL intermediate data.

*The Sedona Conference® Commentary on Legal Holds, August 2007 Public Comment Version* provides as follows (underlined for emphasis):

> **Guideline 6: When a duty to preserve arises, <u>reasonable steps should be taken to identify and preserve relevant information</u> as soon as is practicable. Depending on the circumstances, a written legal hold (including a preservation notice to persons likely to have relevant information) may be issued.**
>
> Once the determination has been made that there is a duty to preserve, the organization should identify what information should be preserved. The obligation to preserve electronic data and documents requires reasonableness and good faith efforts, but it is "unreasonable to expect parties to take every conceivable step to preserve all potentially relevant data."[fn] <u>The organization

---

[2] In Exhibit 10, AstraZeneca also provides a description of the significance and relevance of each category.

4

should consider all sources of information within its "possession, custody, and control," as defined by Fed. R. Civ. P. 34 and its state equivalents, that are likely to include relevant, unique information. The most obvious of these sources is information which the organization physically has in its possession or custody – for example, the file cabinets of documents in its office, the e-mails that reside on its servers located in its corporate headquarters— but also includes sources such as thumb drives and PDAs used by employees.

Given its significance as AstraZeneca's self-styled "mission-critical" database, any reasonable steps to identify and preserve relevant information should have begun with GEL; preservation of GEL intermediate data should have been one of the very first steps in AstraZeneca's preservation plan.

AstraZeneca's argument, that it somehow satisfied preservation obligations by cascading a legal hold to certain key custodians who presumably would have retained intermediate data outside of GEL, is absolutely untenable. In light of the facts – that there were thousands of GEL contributors, for whom there existed no policy or protocol for saving content to local drives (see sealed transcript of March 24, 41:6-42:32) – reliance on such a method of preservation cannot be viewed as reasonable.

C. GEL Intermediate Data Were Encompassed In Prior Discovery Requests

AstraZeneca received its first litigation requests specifically encompassing GEL intermediate data in August of 2004 (Exhibit 9), in the *Zehel-Miller* case. These requests define "Document" to include electronic documents, and include drafts, and seek (*inter alia*):

> **REQUEST FOR PRODUCTION NO. 13:**
> All clinical trial transcripts/reports/abstracts related to Seroquel, as well as all documents related in any way to the clinical trials of Seroquel.
> **REQUEST FOR PRODUCTION NO. 16:**
> All documents related to the labeling and label changes for Seroquel, including the reasons for any changes, the information relied upon for such changes and the person(s) involved in the decision-making process.
> **REQUEST FOR PRODUCTION NO. 18:**

5

All documents related to the Japanese labeling change regarding Seroquel (Quetiapine) and the contraindication in patients with diabetes or a history of diabetes.

**REQUEST FOR PRODUCTION NO. 29:**

All documents related to the occurrences of the onset of diabetes mellitus, type I and type II, and hyperglycemia, ketoacidosis, and pancreatitis, in individuals that have used Seroquel since its launch in the United States market.

**REQUEST FOR PRODUCTION NO. 32:**

All documents related to communications between the FDA and AstraZenaca regarding adverse events, such as those listed above, and any other adverse event that may occur.

**REQUEST FOR PRODUCTION NO. 37:**

All information contained in the AstraZenaca Pharmaceuticals adverse event database and all other database(s) containing any information and/or data from or associated with Seroquel adverse event reports.

AstraZeneca also received requests in connection with another similar case, *Balser,* no later than March of 2005 (Exhibit 10).  These include (*inter alia*):

11.  All clinical trial transcripts/reports/abstracts related to Seroquel, as well as all documents related in any way to the clinical trials of Seroquel.

13.  All documents related to the labeling and label changes for Seroquel, including the reasons for any changes or decisions not to change the labeling, the information relied upon for such changes and the person(s) involved in the decision to make or not make any proposed or suggested change.

15.  All documents related to foreign labeling and label changes for Seroquel (quetiapine fumarate), including the reasons for any changes or decisions not to change the labeling, the information relied upon for such changes and the person(s) involved in the decision to make or not make any proposed or suggested change.

71.  Documents reflecting any warnings, advertisements, cautions, and/or directions provided to physicians and/or users of the Product from the initial introduction of the Product to the present date and documents concerning any decision to provide any such warnings, advertisements, cautions, and/or directions to the purchaser/user/bystander of the Product.

If there was any doubt concerning AstraZeneca's duty to preserve GEL intermediate data in September of 2003, it was requested by plaintiffs in related litigation in August of 2004, and yet again in March 2005.

    D.  <u>There Was No Burden Associated With Preserving GEL Intermediate Data</u>

As reported by the SM-ESI on April 8, 2008 (Doc. 939), AstraZeneca employees were routinely presented with an "option to preserve intermediate content," "[t]he effort required of Document Management Specialists to retain intermediate GEL content is trivial," and preservation may be undertaken with "a single mouse click." AstraZeneca claims that, as of March 2006, its "U.S. Clinical" users have been doing just that. AstraZeneca's preservation obligations may also have been fulfilled at a programming level, by circumventing or suspending the option to delete, or extracting the information before deletion. Certainly in comparison to the importance of the evidence and the potential exposure, there was relatively little cost to implementing such a solution. When AstraZeneca was caught destroying intermediate data in late October 2007, in response to an SM-ESI directive, it implemented a cost-effective solution to extract the ESI prior to deletion in less than 60 days. There was simply nothing burdensome or costly associated with preservation of GEL intermediate data.

### III. CONCLUSION

AstraZeneca's duty to preserve this ESI arose no later than September of 2003. Despite the obvious central relevance of the information, despite repeated requests for the information in related litigation, and though there was no associated burden or cost, AstraZeneca failed to preserve it.

Dated: April 15, 2008                    LEVIN SIMES KAISER & GORNICK LLP

                                                  /s/ Dennis J. Canty
Lawrence J. Gornick (CA State Bar No. 136290)
Dennis J. Canty (CA State Bar No. 207978)
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
Telephone: 415-273-8138
Facsimile: 415-981-1270
E-mail:     lgornick@lskg-law.com
             dcanty@lskg-law.com