UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  **Seroquel Products Liability Litigation**

**MDL DOCKET NO. 1769 (ALL CASES)**               **CASE NO. 6:06-md-1769-ORL-22DAB**

_____

**ASTRAZENECA'S MEMORANDUM OF LAW CONCERNING
DUTY TO PRESERVE INTERMEDIATE DATA ON THE GEL DATABASE**

Pursuant to the Court's directive at the April 10, 2008 hearing, AstraZeneca LP and

AstraZeneca Pharmaceuticals LP ("AstraZeneca") respectfully submit this memorandum of law

concerning the point in time at which AstraZeneca's duty to preserve relevant intermediate data[1]

*on GEL*[2] arose.  AstraZeneca acknowledges that a general duty to undertake reasonable efforts

to preserve Seroquel-related materials relevant to the claims in this MDL arose in the Fall of

2003 with the filing of the first Seroquel diabetes lawsuit.  AstraZeneca submits, however, that

this general duty did *not* require AstraZeneca to undertake efforts to determine how drafts and

other intermediate data were treated on its many databases, and to rewrite its databases and alter

---

[1]     "Intermediate data" is used herein to distinguish it from the final documents that AstraZeneca concluded were accurate and complete and thus were approved for submittal to regulators.  Intermediate data includes earlier, tentative iterations of such documents and comments on documents (known as "annotations") while they are being developed for regulatory submission.  Suggested edits, language and other comments that are deemed accurate and appropriate for inclusion in the final document are effectively reflected in the final document.  Final GEL documents related to Seroquel, which often contain massive amounts of information and data, have been produced.  Intermediate language and comments not deemed accurate and appropriate for submission to regulators are, by definition, not contained in the final, submitted document.  Notably, GEL creates a new, numbered version of a document each time it is saved regardless of whether any significant changes were made.  Accordingly, although there are often dozens of versions of a document containing intermediate data, the changes from version to version are not necessarily substantive.

[2]     As AstraZeneca has frequently noted, intermediate data also appears in the files of the 103 "custodians" whose Seroquel related materials, including GEL intermediate data, have already been produced.

its routine business practices to store information differently.  More specifically, this general duty did not require AstraZeneca to take company-wide steps to identify and preserve Seroquel-related intermediate data stored on GEL.

Rather, the point at which an obligation to undertake a detailed and specific investigation and to implement special preservation efforts for intermediate data stored on GEL did not occur prior to 2007.  Specifically, AstraZeneca respectfully submits that such an obligation arose for the first time in the late Fall of 2007, because it was only then that the MDL plaintiffs first specifically identified and articulated a demand for all GEL intermediate data and, accordingly only then when AstraZeneca first anticipated that such data was viewed by plaintiffs as relevant and discoverable.  At the earliest, however, such an obligation would not have attached prior to the entry of CMO No. 2, which contains a general preservation provision.  CMO No. 2 was entered in January 2007.

As set forth below, the legal standard for determining the scope of a preservation duty is one of reasonableness.  The answer to the question--"When did a specific preservation duty arise"--is not, in every case and as to every possible source of information, a simplistic, bright line point in time as to which there can be no reasonable differences of opinion.  Rather, inherent in the "reasonableness" standard is the principle that the duty to preserve *specific* subcategories of information existing within large organizations with far flung, enormous and varied sources of information, including dozens of different databases, is affected by a number of factors and the overall context in which the question is posed.  In this instance, AstraZeneca's position, for all the reasons set forth below, is that the logical parameters for when a specific duty to preserve intermediate GEL data attached lies between the entry of CMO No. 2 in January 2007 and the

2

late Fall of 2007.  Because the late Fall of 2007, not the earlier date of entry of CMO No. 2 in January of that year, reflects the point in time at which AstraZeneca could have reasonably anticipated that plaintiffs would seek the production of intermediate GEL data and that such data systematically should be preserved, the late Fall of 2007 reflects the most logical point at which any such duty should reasonably be seen as attaching.

CMO No. 2 speaks only to the generalized preservation of databases, and GEL was preserved in this regard.  GEL was not decommissioned or destroyed, and no final, approved documents – the documents which *are* routinely maintained on GEL – were discarded.  CMO No. 2 did not, however, give rise to a specific duty to "drill down" into the specifics of each of AstraZeneca's many databases to determine the specific content and potential relevance, if any, of each category or item of information that may be contained in them, and to institute specific alterations in normal operations to maintain all forms of such material.   This is particularly the case with intermediate data on GEL because the business premise on which GEL operates is that such intermediate data is not important or relevant once the final, approved document – *which is always maintained* – is submitted to the regulators.

## The GEL Database

As the Court is aware, GEL is an electronic library that contains the global regulatory submissions and SERM (Safety Evaluation and Review Meeting) documents for AstraZeneca's many products.[3]  GEL is not designed, meant or used as an archive or repository for intermediate data.  Its objective is to arrive at *final* regulatory submissions and to maintain those submissions

---

[3]      A wide range of Seroquel regulatory documents on GEL have absolutely nothing to do with the issues in this litigation.  *See Doc. 904, at p. 5.*

thereafter.  Those submissions reflect the company's ultimate, best determination of what is accurate and appropriate data and information concerning each particular drug that is the subject of a regulatory submission.  While the specifics will of course vary from one submission to another, significant portions of intermediate data will find their way into the final submissions and effectively be reflected there.

Once a document is finalized on GEL, the intermediate data is essentially of two types: (a) that which is reflected in the final document as accurate and appropriate, and (b) that which was determined in the process of developing the final document to *not* be of that nature for a variety of reasons that can range from the intermediate data's being incorrect to its being unclear in language.  As a result, GEL does not maintain intermediate data after the final document is approved, and it would be contrary to the premise on which GEL operates for the company to simply assume that such intermediate data is important to anyone once the final documents are agreed upon, stored on GEL, and submitted to the regulators.[4]

---

[4]   At the March 24, 2008, Status Conference the Court asked a hypothetical question about why a company that decided the size of a bolt should be smaller rather than larger would not want to retain a record of how it arrived at that decision.  AstraZeneca's counsel responded that, by analogy, there are numerous sources by which that kind of information can be ascertained when applied to GEL, without the need to maintain every iteration from intermediate data on GEL. These sources include the memories and custodial files of those involved.  Counsel also suggested that every company would be quickly overwhelmed in ESI and/or paper records if it felt constrained to maintain every draft, note or comment considered in reaching each decision.  However, an important point should be added here as well.  The final submitted documents in connection with a regulatory submission concerning a drug cannot only be very large, often thousands of pages long, and detailed, but by their nature set out the supporting rationale and science for each such decision.  Thus, the final approved document contains that information in the most accurate and complete form needed for regulatory scrutiny and for understanding the basis for the conclusions.  This underscores why the normal operation of GEL does not consider intermediate data not incorporated into the final versions of the documents and supporting information as something that would be of particular interest or relevance to the Company or anyone:  the final versions of the documents contain the relevant data.  Moreover, AstraZeneca operates in a closely-regulated environment, and the regulators certainly can ask for more data if they wish.  That the regulators do not require the preservation of intermediate data is an instructive fact in putting the question in perspective here.

As the Court is aware, notwithstanding the foregoing reasons as to why intermediate data is not routinely maintained on GEL, in a spirit of cooperation in the discovery process, AstraZeneca has developed an extensive plan for identifying and producing such intermediate data not previously produced to plaintiffs as part of the vast productions already accomplished. Defendants have detailed that extensive additional plan to the Court in two separate filings, *see Docs. 906-9, 926*, as well as at the March 24, 2008 hearing on Plaintiffs' Motion to Compel and at the April 10, 2008 Status Conference. AstraZeneca refers the Court to those filings for more information about the GEL database and its functionality. AstraZeneca continues to work actively and cooperatively under the auspices of the SM-ESI to implement its plan, expand it even further as may be appropriate, and complete the production of GEL-related documents to Plaintiffs, as they have requested, as efficiently and quickly as possible.

### The Law Governing the Duty to Preserve Documents

There is no bright line test for determining when a duty to preserve relevant information is triggered. A general duty to preserve evidence relevant to plaintiffs' claims arises when a party has notice that the evidence is relevant to litigation or should know that the evidence is relevant to future litigation. *See, e.g., Zubulake v. UBS Warburg, LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. Oct. 22, 2003). Determining when the duty to preserve is triggered is typically a fact-specific inquiry that will be unique to each case and situation. *See, e.g., id.* at 216-217.

The attachment and extent of this duty in a given context must be informed by several guiding principles. First, the discovery of ESI presents unique problems that are not presented by the discovery of paper documents. *See Zubulake*, 220 F.R.D. at 214; *The Sedona Principles:*

*Best Practices Recommendations & Principles for Addressing Electronic Document Production (2004 Annotated Version)* 3-7 (Jonathan M. Redgrave, ed. 2004).

Second, requiring companies, such as AstraZeneca, to institute a company-wide freeze on the destruction of *all* documents automatically whenever a lawsuit is filed "would cripple large corporations." *Zubulake*, 220 F.R.D. at 217. Generally, parties are under an obligation only to make reasonable and good faith efforts to preserve potentially discoverable information and tangible things pending discovery. *See The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production*, Principle 5 at 23 (Jonathan Redgrave, ed.) (July 2005) ("The obligation to preserve electronic data and documents requires reasonable and good faith efforts to retain information that may be relevant to pending or threatened litigation. However, it is unreasonable to expect parties to take every conceivable step to preserve all potentially relevant data.").

Courts have held that even when corporations have recognized the threat of litigation, they are not required to "preserve every shred of paper, every e-mail or electronic document, and every backup tape." *Zubulake*, 220 F.R.D. at 217. Nor is a corporation required to take extraordinary measures to preserve all potentially relevant ESI. *Wiginton v. Ellis*, 2003 WL 22439865, at *4 (N.D. Ill. 2003). As noted in the Sedona Principles:

> A party's preservation obligation does not require "freezing" of all electronically stored information, including all e-mail. Organizations need not preserve "every shred of paper, every email or electronic document, and every back-up tape," nor do they have to go to extraordinary measures to preserve "all" potentially relevant evidence.
> …
>
> Theoretically, a party could preserve the contents of waste baskets and trash bins for evidence of statements or conduct. Yet, the burdens and costs of those acts are apparent and no one would typically argue that this is required. There should

be a similar application of reasonableness to preservation of electronic documents and data.

*The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic*

*Document Production (2d Ed.)* 34 (Jonathan M. Redgrave,  ed. 2007).

In determining what constitutes "reasonableness" in assessing the scope of a duty to preserve, courts and commentators have identified a number of factors, including the burden to the company of overbroad preservation, the impact to ongoing business operations, and, importantly, the nature and scope of the litigation.  *See Fennell v. First Step Designs, Ltd.* 83 F.3d 526, 532 (1st Cir. 1996) (in determining whether material is 'discoverable' the court should consider the burdens and expenses entailed in locating material).  The Sedona Principles articulate two additional factors that are especially relevant in articulating when AstraZeneca's specific duty to preserve relevant intermediate data on the GEL database may have begun:  the party's experience in similar litigation and the amount in controversy.  *The Sedona Conference Commentary on Legal Holds*, Guidelines 7 (Sept. 2007) ("In determining the information that should be preserved, the nature of the issues raised, experience in similar circumstances, and the amount in controversy are factors that should be considered.").

### How AstraZeneca Complied With Its Preservation Obligations

As noted, AstraZeneca recognized a *general* duty to preserve relevant Seroquel documents beginning in late August 2003, with the filing of the *Zehel-Miller* class action case. Under the governing law, however, that filing did not trigger a monolithic obligation whose scope required detailed steps to ensure that every piece of potentially relevant data, particularly in electronic format, be identified and retained.  A more general approach as to scope was

required, appropriate to the situation and context that then existed.  AstraZeneca fully complied with its obligation by promptly putting a general litigation hold in place.

AstraZeneca's legal department sent memos directly to key employees instructing them to preserve their Seroquel-related documents, later expanding the list of individuals receiving such memos as the number of Seroquel cases increased in 2006, and asking key individuals to "cascade" the hold memos to other individuals in the Company who may have relevant Seroquel documents.  These hold memos were re-issued periodically to remind individuals and reinforce their obligations.  The memos did not specifically exempt categories of documents from their reach, but generally asked recipients to retain relevant Seroquel information.  AstraZeneca's approach was well within what the law required and satisfied its legal obligations.

Insofar as intermediate data on GEL (one of AstraZeneca's numerous databases) was specifically concerned, AstraZeneca had no extraordinary obligation to audit the company's global[5] ESI to determine how drafts and other intermediate data were routinely treated, and to then take company-wide steps systematically to change the normal course of doing business with regard to the retention of intermediate data.  See *The Sedona Principles: Best Practices Recommendations & Principles for Addressing Electronic Document Production supra* at 34. That remained true until the late Fall of 2007.   Indeed, there was no preservation order entered by any court handling Seroquel litigation against AstraZeneca until this Court's CMO No. 2, and no order has been entered specifically requiring the retention of intermediate data that AstraZeneca considers superfluous and expendable as a routine business matter.  In fact, this

---

[5]      GEL is developed and maintained in the United Kingdom and is used in 75 sites in over 50 countries.

Court declined to enter the preservation order proposed by plaintiffs in November 2006 that would have prevented the deletion of any data in databases, indicating (as AstraZeneca acknowledged) that AstraZeneca was already under an obligation to preserve documents in accordance with governing law. The stipulated Case Management Order (CMO No. 2) entered in this MDL in January 2007, which contained general provisions regarding preservation, did not contain extraordinary provisions regarding databases or the suspension of routine erasures of computerized data pursuant to existing protocols. It did not address GEL specifically or require procedures to maintain drafts or other intermediate data on GEL.

The point is not about whether AstraZeneca made an advertent decision regarding the preservation of drafts on GEL. Indeed, the fact that U.S. Clinical Development, as discussed below, elected to preserve Seroquel intermediate data on GEL beginning in March 2006 is consistent with the conclusion that there was *no* systematic action taken by AstraZeneca not to retain this data. The point is that AstraZeneca had no duty to go beyond its already broad, general litigation hold protocols (which did not exempt categories of documents) and determine all of the particulars of the specific working operations concerning intermediate data on the GEL database worldwide, then systematically change that approach notwithstanding the associated expense and practical business reasons underlying why the default protocols were set up to delete intermediate content upon finalization of the associated documents in the first place. AstraZeneca's specific obligation to preserve all intermediate content from GEL only ripened in the late Fall of 2007, when this became a specific focus of attention in meet and confer sessions with the Plaintiffs and the SM-ESI.

**AstraZeneca's Specific Duty With Respect to Intermediate Data
On GEL Did Not Attach Prior to the Late Fall of 2007**

Although plaintiffs contend that AstraZeneca's specific preservation duty regarding GEL intermediate content arose much earlier as a result of other litigation, a fair examination of the specific circumstances surrounding those earlier cases, in light of the principles discussed above, clearly demonstrates that such a conclusion is unwarranted.  Moreover, although presenting a closer question, even the entry of CMO No. 2 in late January, 2007, which required preservation of certain broad categories of documents and databases generally, did not implicate a specific duty with respect to intermediate data on GEL, including a specific duty to identify and change the normal, business-based operations of GEL as to specific intermediate data.  As noted above, AstraZeneca continued to maintain GEL's normal operations.  It did not, for example, take any steps to decommission GEL, transfer its functions to another database, or alter GEL so that it would no longer maintain all final, approved documents.

    a.    **Prior Litigation**

Although prior litigation (the first in late 2003) gave rise to the above-described general preservation duty, early Seroquel litigation was hardly of the scope or nature sufficient to trigger the sort of extensive, detailed and specific preservation inquiry that arose once AstraZeneca found itself in true multidistrict "mass tort" litigation and in which the plaintiffs themselves articulated, or gave AstraZeneca a reason to anticipate, such a theory of preservation and relevancy as to GEL intermediate data.[6]

---

[6]     AstraZeneca would be glad to supply the Court with specific citations and/or supporting materials relating to the prior Seroquel litigation should the Court desire.

AstraZeneca first encountered Seroquel-diabetes litigation in late August, 2003, in *Zehel-Miller et al. v. AstraZeneca Pharmaceuticals LP*, Case No. 6:03-CV-1258-ORL-22JGG (M.D. Fla.). *Zehel-Miller* was a purported class action brought by four plaintiffs, none of whom had even been diagnosed with diabetes. As discussed below, the case was wholly lacking in merit. Nonetheless, AstraZeneca circulated a litigation hold memorandum to its employees upon the filing of Zehel-Miller. The first hold memorandum was sent in the Fall of 2003 and memoranda have been regularly circulated since that time. AstraZeneca thereby complied at that time with its general duty to make a reasonable, good faith effort to preserve relevant information in general, and reiterated those preservation directives thereafter.

This does not mean, however, that AstraZeneca had a duty to undertake a preservation program involving a detailed survey of all its databases, including GEL, to determine what specific information might be maintained in them, what routine procedures might be in place to delete from these databases information which the company, for valid business reasons, had determined was not worth the cost of maintaining, and then undertake to change the routines already in place, with the potential disruption and burden that might entail. None of the four plaintiffs in *Zehel-Miller* had even been diagnosed with diabetes. Plaintiffs sought, *inter alia*, medical monitoring, and claimed they were at a significantly increased risk of diabetes as a result of their alleged Seroquel use. Two of the plaintiffs, however, voluntarily dismissed their claims at a relatively early stage of the litigation. In addition to not having diabetes, the remaining two plaintiffs had never been advised by a physician that they were even at an increased risk of diabetes as a result of their alleged Seroquel use.

Plaintiffs served discovery requests in August 2004, while their motion for class certification was pending. Later that same month, Judge Conway denied the motion for class certification. *Zehel-Miller v. AstraZeneca Pharmaceuticals*, LP, 223 F.R.D. 659 (M.D. Fla. 2004). In September 2004, AstraZeneca served its responses and objections to plaintiffs' discovery requests. AstraZeneca offered to make the Seroquel IND/NDA available for inspection, but objected to plaintiffs' requests as vastly overbroad on the basis that plaintiffs sought information better suited to a nationwide class action and that was not confined to the individual medical monitoring and refund issues that remained in the case.

Tellingly, in October, 2004, in moving to stay district court proceedings pending a request for permission to appeal the denial of class certification, plaintiffs told the court that the denial of certification would be the "death-knell" of the litigation and further admitted that "[t]he discovery allowed, and ultimately taken would differ significantly depending on the result of the Plaintiffs' Rule 23(f) petition." *See* Plaintiffs' Motion for Stay or in the Alternative, Motion for Extension of Time (Doc. 71-1), at 2-4. Plaintiffs never took AstraZeneca up on its offer to inspect the IND/NDA and never moved to compel in response to AstraZeneca's discovery objections. In March 2005, following AstraZeneca's moving for summary judgment, the remaining plaintiffs agreed to voluntarily dismiss their claims with prejudice. In these circumstances, neither the filing of the *Zehel-Miller* case nor the propounding of overbroad discovery in that case followed by the denial of class certification triggered a specific duty to either investigate or direct the retention of intermediate data housed on GEL. AstraZeneca complied with its preservation obligations in that case with its general litigation hold memos.

In addition to *Zehel-Miller*, the Company also faced three individual products liability suits allegedly related to diabetes from 2003 through 2005. In *Wright v. Eli Lilly*, *et al.*, originally filed in Virginia state court in November, 2003, the plaintiff alleged that her decedent was injured and subsequently died as a result of her ingestion of Zyprexa and Seroquel. Although plaintiff's complaint included a conclusory allegation that Seroquel causes diabetes, this was, in fact, a pancreatitis case. Plaintiff, in June 2005, sought a stay of the action pending resolution of settlement negotiations with Eli Lilly. The settlement was eventually finalized and approved, and AstraZeneca was dismissed with prejudice in November 2006.

In *Balser v. AstraZeneca Pharmaceuticals LP*, filed in the Eastern District of Louisiana in July of 2004, the plaintiff filed an action on behalf of a minor. Plaintiff claimed the minor's use of Seroquel caused her to develop Type 1 diabetes, an autoimmune disorder which is not caused by medicine, but rather by the person's immune system. Discovery also demonstrated that the minor had elevated glucose readings prior to her use of Seroquel and that she had a significant family history of diabetes. Plaintiff's causation expert, a pediatric nephrologist, testified that the likelihood that Seroquel caused her diabetes was less than 50 percent. AstraZeneca moved for summary judgment in August 2005 and plaintiff voluntarily dismissed her claim with prejudice in December 2005. When these factors are all considered, under the legal principles discussed above, neither *Wright* nor *Balser* triggered any preservation obligations beyond those that AstraZeneca already had in place.

In *Sonnier v. AstraZeneca Pharmaceuticals LP*, filed in Louisiana state court in May 2005 and then removed to the Western District of Louisiana, plaintiff alleged that her use of Seroquel caused her to develop Type 2 diabetes. Plaintiff had served discovery requests before

13

AstraZeneca had answered or removed to federal court.  Upon removal, these requests became moot, as they were served before the time allowed by Fed.R.Civ.P. 26.  Following removal, no substantive activity occurred until plaintiffs filed their motion to transfer and consolidate pursuant to 28 USC § 1407 on February 7, 2006.  The action was subsequently transferred to this MDL.[7]

In short, prior to this MDL, the scope, nature, degree of merit, substance, magnitude and frequency of the Seroquel claims brought against AstraZeneca were insufficient to compel the conclusion that multidistrict mass tort litigation was then likely.  In such a setting, it is certainly not required that a company go well beyond general litigation hold efforts and launch specific database investigations and special preservation efforts regarding intermediate database material.  It also should not be assumed, using post-hoc 20/20 hindsight, that it would somehow necessarily follow that intermediate data that AstraZeneca routinely discards in the normal course of its business as of limited utility when documents are finalized and retained (as they always are) would become important and relevant for litigation.  It is simply inappropriate now to look backwards in light of Plaintiffs' recent demands here and conclude that these early, failed claims somehow signaled litigation and discovery requests of such a magnitude and scope as to trigger a highly specific form of preservation of expendable, non-final GEL database data.

---

[7] Approximately 40 cases were also filed in Missouri on the eve of Missouri's tort reform implementation in late August 2005, but there was nothing to indicate these cases were brought for any reason other than to preserve the ability to avoid a fundamental change in Missouri law should those plaintiffs choose to prosecute the cases to conclusion. Indeed, these cases had no significant activity prior to plaintiffs' moving for MDL consolidation in 2006. The majority of these cases have been dismissed, and more dismissals are expected.  The Missouri cases did not change the landscape insofar as the scope of AstraZeneca's preservation requirements was concerned.

To this must be added the fact that AstraZeneca had never been ordered to produce – and had never produced in any litigation – GEL intermediate data, nor had issues regarding the retention of such data ever been specifically raised and become the subject of meet and confer sessions in prior litigation.  Prior to December 2007, AstraZeneca's document production in products liability litigation consisted of the IND/NDA for the drug in question, relevant correspondence with the FDA, and occasionally related files from Drug Safety.  Such a production was never found to be inappropriate and the company had never been ordered to produce intermediate data from any of its databases.

All considered, AstraZeneca respectfully suggests that it would have been unreasonable to expect the company to engage in an expensive, time-consuming and burdensome IT audit to first catalogue the functionality of its many databases and then, once it became cognizant of GEL's default setting regarding intermediate content, locate and preserve all potentially relevant GEL intermediate data in the 2003-2006 timeframe.

### b.      The MDL and CMO No. 2

Although admittedly presenting a closer question, AstraZeneca further submits that no specific preservation obligation attached with respect to intermediate GEL data until the Fall of 2007, notwithstanding the creation of the MDL in the Summer of 2006 and the entry of CMO No. 2 in late January 2007.  In January 2006, a number of Seroquel suits were filed, and in February 2006 plaintiffs filed for MDL consolidation.  MDL 1769 was created in July 2006 and, as noted above, only at that point did the Seroquel diabetes litigation become a mass tort with substantial overall amounts in controversy.  Still, the overwhelming majority (more than 90%) of these plaintiffs and those who filed between the petition for consolidation and the MDL Panel's

granting of same in July 2006 did not even allege that they had diabetes or any specific injury of any kind.  Even recognizing the evolving nature of the litigation AstraZeneca then faced and the potential impact of the scope of litigation on a party's preservation obligations, in light of these facts and in accordance with the legal principles discussed above, it still was not the case that AstraZeneca's preservation duties were fundamentally impacted.  AstraZeneca continued to circulate and cascade litigation hold memos.  But it was not until the late Fall of 2007, when plaintiffs expressly and specifically articulated their interest in intermediate data and annotations of GEL materials, that AstraZeneca could have reasonably anticipated that plaintiffs would seek such information, thus fairly triggering a preservation obligation for that information, and then only to certain relevant categories of intermediate data.  *See, e.g., Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, 247 F.R.D. 567, 570 (D. Minn. 2007) (holding that because a database belonging to plaintiff "would have been relevant to virtually any litigation involving Best Buy because of the quantity and nature of the information it contained," plaintiff was not under an obligation to preserve the database "[a]bsent specific discovery requests or additional facts suggesting that the database was of particular relevance" to the action).

Plaintiffs have contended that, at a minimum, AstraZeneca's specific duty with respect to intermediate data on GEL attached in January 2007, upon the entry of CMO No. 2 in this case. While CMO No. 2 provided that information on databases in general be preserved, those provisions must be evaluated in context to determine whether this imposed a specific duty on AstraZeneca with respect to GEL intermediate data, as opposed to a requirement to maintain the GEL database and keep intact all final documents contained on it.  CMO No. 2 was the first preservation order entered in any Seroquel products liability action.  As noted, the plaintiffs, in

16

November 2006, moved for the Court to enter a more stringent preservation order than what was ultimately entered as part of CMO No. 2. Plaintiffs' proposed order was not entered. Instead, at the Court's direction, the parties negotiated and jointly submitted CMO No. 2, which did not address GEL specifically or set forth procedures or requirements to maintain drafts on GEL and modify its normal operation.

Additionally, after CMO No. 2, the plaintiffs were afforded the opportunity to interview individuals who could speak to AstraZeneca's individual databases. Plaintiffs first conducted interviews of two of AstraZeneca's personnel from IT, Darryl Draper and Jon Dowling, in January 2007. Then, in May 2007, plaintiffs also took two 30(b)(6) depositions of the same individuals regarding databases, including GEL, but made no demands or assertions that (1) intermediate data on GEL was important to their claims or, (2) more importantly, that AstraZeneca should alter the normal operations of GEL to preserve intermediate data. Nor did plaintiffs discuss with AstraZeneca whether specific procedures needed to be put in place regarding GEL drafts.[8] It was not until the late Fall of 2007 that plaintiffs made specific demand for the routine retention of all draft documents and intermediate data on GEL. They made that demand following their October, 2007 GEL "meet and confer" interview of Daryl Draper and Kevin Casey. At that time, it was also determined that deleted non-final documents may be available on backup tapes. It was shortly thereafter that AstraZeneca began to discuss

---

[8]     Indeed, prior to the Fall of 2007, plaintiffs' discovery requests did not specifically request GEL intermediate data. AstraZeneca produced the Seroquel NDA and IND files in November 2006, which contain many of the regulatory files that are housed on GEL, but plaintiffs did not request or even inquire about the non-final iterations of any of these documents. Likewise, plaintiffs served approximately 300 very specific Rule 34 requests for production, including subparts, on AstraZeneca in the Spring and Summer of 2007. With few exceptions, plaintiffs did not specifically request non-final iterations of clinical or regulatory documents, and on the few occasions in which they did, the requests were narrow and discrete.

prospective plans for systematically preserving GEL intermediate data with Plaintiffs and the SM-ESI, leading to the creation of an "export utility" in December 2007 that exports all Seroquel drafts to another location and save them going forward, a procedure that is currently in effect.

Based on the foregoing facts and circumstances, while AstraZeneca may earlier have had a general duty to preserve relevant information -- a duty it fulfilled by issuing and re-issuing litigation holds to an expanding number of individuals as the litigation progressed and asking those individuals to cascade them further to others at the Company as appropriate -- it was only beginning in the late Fall of 2007 that AstraZeneca had a specific obligation to deal with this particular class of documents – (*i.e*., GEL intermediate data) – in some special and specific way. AstraZeneca's specific duty with respect to intermediate data on GEL attached at that point, not earlier.

### Plaintiffs' Arguments Regarding AstraZeneca's Specific Duty With Respect to Intermediate Data Should be Rejected

Plaintiffs have advanced several arguments in an attempt to impose a specific duty with respect to GEL drafts at an earlier point in time.  These arguments should all be rejected.

Plaintiffs have suggested, for example, that the duty to preserve GEL intermediate data concerning Seroquel began in 2003, as the result of a "consent decree" entered into by AstraZeneca with the federal government.  Plaintiffs' suggestion is patently without merit.  The agreement with the federal government in 2003 resolved an investigation into the distribution of free samples of Zoladex® (goserelin acetate implant) – a prostate cancer drug – to urologists from 1994-1996.  The agreement was accompanied by a related civil settlement of a False Claims Act lawsuit relating to Zoladex® pricing and a Corporate Integrity Agreement with the Department of Health and Human Services Office of Inspector General.

18

These investigations did not involve Seroquel, clinical trials, drug safety, product labeling or any of the marketing issues raised by plaintiffs in this litigation, and did not implicate, in any way, the types of regulatory or clinical documents that are drafted and housed on GEL. Moreover, the Corporate Integrity Agreement does not impose any document retention obligations on AstraZeneca relating to clinical or regulatory documents. Nothing in connection with the government's Zoladex investigations could have put AstraZeneca on notice of the need to preserve any documents relating to Seroquel, let alone GEL intermediate data. GEL intermediate data was simply not relevant to the Zoladex® investigation, nor did the 2003 Corporate Integrity Agreement put AstraZeneca on notice that GEL intermediate data might be relevant to future litigation. The existence of the Corporate Integrity Agreement adds nothing to the question under consideration here.

Plaintiffs have also argued that the specific duty attached at the time of the filing of the first Seroquel lawsuit in 2003 (*Zehel-Miller*) and the document requests propounded in that litigation in 2004, as well as the additional suits filed in 2004 and 2005. For all the reasons stated above, however, plaintiffs' argument lacks merit. These lawsuits were few and short-lived; they involved minimal discovery. *Zehel-Miller, Wright,* and *Balser* were all dismissed with prejudice. GEL intermediate data was not specifically put in issue or discussed, and was never produced. It is simply not reasonable to impose a duty going beyond the circulation of litigation hold memoranda, which AstraZeneca undisputedly did. Those earlier suits did not impose a specific duty with respect to investigating the Company-wide operation of the GEL database and discovering the information needed to consider, let alone make, an affirmative decision to retain GEL intermediate data on that database.

19

Plaintiffs point to the fact that one unit of AstraZeneca, U.S. Clinical Development, beginning in March of 2006, did save intermediate data on GEL.[9]  For a company as large and complex as AstraZeneca, however, the question of when a preservation obligation arises, and the specific materials encompassed by such an obligation, is not determined by what some individuals in the company did, but rather must be evaluated in light of what actions may have been reasonably expected of the company as a whole.  The retention of Seroquel intermediate data by U.S. Clinical Development does not indicate that AstraZeneca concluded that there was an obligation to do so at that time.  It is not uncommon in litigation that a company may go beyond its preservation obligations in certain circumstances for a host of reasons.  That does not mean that every time an individual or department takes preservation steps beyond what is legally required, the company has in effect admitted a broader duty to preserve or that such an approach was generally required.  It simply indicates a decision taken by that person or that department at that time to take some action in response to general litigation hold directives.  The retention of intermediate data by U.S. Clinical Development cannot reasonably be interpreted as an admission of any company-wide duty to preserve GEL intermediate data or even as an admission of such a duty on the part of U.S. Clinical Development.

Finally, while plaintiffs have argued that the creation of the MDL in July 2006 and the entry of CMO No. 2 in early 2007 imposed a specific duty on AstraZeneca to preserve drafts on

---

[9]     Clinical Publishing Document Management Specialists, a small group within the greater Clinical Development function, checks or unchecks the box for deletion of drafts when a document on GEL from U.S. Clinical Development is finalized.  Document Management Specialists do not have substantive input into the documents (*i.e.* drafting or commenting responsibilities), but rather format the PDF versions of them into their final form to ensure that the links are electronically navigable according to regulatory submission requirements.  It was the group of Document Management Specialists that began saving drafts of Seroquel U.S. Clinical Development documents on GEL in March of 2006.

GEL, when all the facts and circumstances discussed above are considered, including the lack of entry of plaintiffs' proposed preservation order, the course of discovery, and database interviews and meet and confer processes in this case, that is not a fair conclusion and is not correct.

It remains only to note that, notwithstanding all of the foregoing, AstraZeneca is going beyond what it believes its preservation and production obligations are in this case. Draft GEL documents have been retained by AstraZeneca on backup tapes, and those backup tapes are being restored and reviewed, notwithstanding the burden and expense. And draft GEL documents have been and are being produced from the files of key individuals, including the 103 custodians from whom production has already been made and other individuals who are being interviewed and their GEL draft documents collected. In sum, AstraZeneca has not failed to preserve GEL intermediate data. It has fully complied with, and in fact gone beyond, its preservation obligations under the law.

Respectfully submitted,

/s/ Fred T. Magaziner
Fred T. Magaziner
Benjamin R. Barnett
Stephen J. McConnell
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19103
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
fred.magaziner@dechert.com

/s/ Chris S. Coutroulis
Florida Bar Number 300705

21

Robert Pass
Florida Bar Number 183169
Robert L. Ciotti
Florida Bar Number 333141
Carlton Fields, P.A.
Corporate Center Three at International Plaza
4221 W. Boy Scout Blvd.
Tampa, Florida  33607
Telephone:  (813) 223-7000
Facsimile:  (813) 229-4133
ccoutroulis@carltonfields.com
rciotti@carltonfields.com

*Counsel for AstraZeneca Pharmaceuticals LP
and AstraZeneca LP*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 15, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system through which all participating parties are deemed served.  I further certify that, by using the CM/ECF, the foregoing has been served on plaintiffs' liaison counsel, who is charged with serving any non-CM/ECF participants on the attached Service List.

/s/ Chris S. Coutroulis

## SERVICE LIST

**In Re: Seroquel Products Liability Litigation**
**MDL Docket No. 1769**

| | |
|---|---|
| Paul J. Pennock, Esq.<br>Michael E. Pederson, Esq.<br>Weitz & Luxenberg, P.C.<br>180 Maiden Lane - 17th Floor<br>New York, NY 10038<br>Telephone: (212) 558-5500<br>Ppennock@weitzlux.com<br>MPederson@weitzlux.com<br>*Plaintiffs' Lead Counsel* | Camp Bailey, Esq.<br>Michael W. Perrin, Esq.<br>Fletcher Trammell, Esq.<br>Bailey Perrin Bailey LLP<br>The Lyric Centre<br>440 Louisiana, Suite 2100<br>Houston, TX 77002<br>Telephone: (713) 425-7240<br>cbailey@bpblaw.com<br>mperrin@bpblaw.com<br>*Plaintiffs' Lead Counsel* |
| Larry Roth, Esq.<br>Law Offices of Larry M. Roth, P.A.<br>Post Office Box 547637<br>Orlando, FL 32854-7637<br>Telephone: (407) 872-2239<br>LROTH@roth-law.com<br>*Plaintiffs' Liaison Counsel* | Tommy Fibich, Esq.<br>Fibich, Hampton & Leebron, L.L.P.<br>1401 McKinney, Suite 1800<br>Five Houston Center<br>Houston, TX 77010<br>Telephone: (713) 751-0025<br>tfibich@fhl-law.com |
| Matthew F. Pawa, Esq.<br>Law Offices of Matthew F. Pawa, P.C.<br>1280 Centre St., Suite 230<br>Newton Centre, MA 02459<br>Telephone: (617) 641-9550<br>Mp@pawalaw.com | Robert L. Salim, Esq.<br>Robert L. Salim Attorney at Law<br>PO Box 2069<br>Natchitoches, LA 71457-2069<br>Telephone: (318) 352-5999<br>robertsalim@cp-tel.net |
| Keith M. Jensen, Esq.<br>Jensen, Belew & Gonzalez, PLLC<br>1024 North Main<br>Fort Worth, TX 76106<br>Telephone: (817) 334-0762<br>kj@kjensenlaw.com | Scott Allen, Esq.<br>Cruse, Scott, Henderson & Allen, L.L.P.<br>2777 Allen Parkway, 7th Floor<br>Houston, Texas 77019<br>Telephone: (713) 650-6600<br>sallen@crusescott.com |
| Matthew E. Lundy, Esq.<br>Lundy & Davis, LLP<br>333 North Sam Houston Parkway East<br>Suite 375<br>Houston, TX 77060<br>Telephone: (281) 272-0797<br>mlundy@lundydavis.com | E. Ashley Cranford<br>Whatley Drake & Callas<br>2001 Park Place North, Suite 1000<br>Birmingham, AL 35203<br>Telephone: (205) 328-9576<br>ACranford@wdklaw.com |

23

| | |
|---|---|
| Robert L. Ciotti, Esq.<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard<br>Suite 1000<br>Tampa, FL 33607-5736<br>Telephone: (813) 223-7000<br>rciotti@carltonfields.com<br>***Attorney for Defendants AstraZeneca***<br>***Pharmaceuticals, LP, and AstraZeneca LP*** | Gregory P. Forney, Esq.<br>Shaffer Lombardo Shurin<br>911 Main Street, Suite 2000<br>Kansas City, MO 64105<br>Telephone: (816) 931-0500<br>gforney@sls-law.com<br>rbish@sls-law.com<br>***Attorney for Defendant,***<br>***Marguerite Devon French*** |
| Randy Niemeyer<br>22442 Pike 309<br>Bowling Green, MO 63334-5209<br>***Pro Se*** | Eric B. Milliken, Esq.<br>3 Sir Barton Ct.<br>Newark, DE 19702<br>***Pro Se*** |
| Catherine Solomon<br>3100 N.E. 83<br>Gladstone, MO 64119<br>***Pro Se*** | Louisiana Wholesale Drug Co. Inc.<br>C/O Gayle R. White<br>Registered Agent<br>Highway 167N<br>Sunset, LA 70584<br>***Pro Se*** |
| Aaron C. Johnson, Esq.<br>Summers & Johnson<br>717 Thomas<br>Weston, MO 64098<br>Telephone: (816) 640-9940<br>firm@summersandjohnson.com | Robert A. Schwartz, Esq.<br>Bailey & Galyen<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744<br>bschwartz@galyen.com |
| Todd S. Hageman, Esq.<br>Simon and Passanante, PC<br>701 Market St., Suite 1450<br>St. Louis, MO 63101<br>Telephone: (314) 241-2929<br>thageman@spstl-law.com | Mark P. Robinson, Jr., Esq.<br>Robinson, Calcagnie & Robinson<br>620 Newport Center Drive, 7th Floor<br>Newport Beach, CA 92660<br>Telephone: (949) 720-1288<br>mrobinson@robinson-pilaw.com |
| Thomas F. Campion, Esq.<br>Heidi E. Hilgendorff, Esq.<br>Drinker Biddle & Reath, LLP<br>500 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>Telephone: (973) 360-1100<br>Thomas.Campion@dbr.com<br>Heidi.Hilgendorff@dbr.com<br>***Attorneys for Defendants Janssen***<br>***Pharmaceutical Products and Johnson &***<br>***Johnson Co.*** | Michael Davis, Esq.<br>James Mizgala, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone: (312) 853-7731<br>mdavis@sidley.com<br>jmizgala@sidley.com<br>***Attorneys for Defendants AstraZeneca LP***<br>***and AstraZeneca Pharmaceuticals, LP*** |

| | |
|---|---|
| Elizabeth Raines, Esq.<br>Baker, Sterchi, Cowden & Rice, LLC<br>2400 Pershing Road, Suite 500<br>Kansas City, MO 64108<br>Telephone: (816) 471-2121<br>raines@bscr-law.com | Timothy Reese Balducci, Esq.<br>The Langston Law Firm, PA<br>P.O. Box 787<br>100 South Main Street<br>Booneville, MS 38829-0787<br>Telephone: (662) 728-3138<br>tbalducci@langstonlaw.com |
| Kenneth W. Bean, Esq.<br>Sandberg, Phoenix & von Gontard<br>One City Centre<br>15th Floor<br>St. Louis, MO 63101-1880<br>Telephone: (314) 231-3332<br>kbean@spvg.com<br>***Attorney for Defendant Dr. Asif Habib*** | John Driscoll, Esq.<br>Brown & Crouppen, PC<br>720 Olive St.<br>St. Louis, MO 63101<br>Telephone: (314) 421-0216<br>Jdriscoll@brownandcrouppen.com<br>asmith@brownandcrouppen.com<br>blape@brownandcrouppen.com |
| Aaron K. Dickey, Esq.<br>Goldenberg and Heller, PC<br>P.O. Box 959<br>2227 S. State Road 157<br>Edwardsville, IL 62025<br>Telephone: (618) 650-7107<br>aaron@ghalaw.com | Matthew J. Hamilton, Esq.<br>Pepper Hamilton<br>3000 Two Logan Square<br>18th & Arch Street<br>Philadelphia, PA 19103<br>Telephone: (215) 981-4000<br>hamiltonm@pepperlaw.com |
| Justin Witkin, Esq.<br>Ken Smith, Esq.<br>Aylstock, Witkin, Kreis & Overholtz<br>803 N. Palafox St.<br>Pensacola, FL 32501<br>Telephone: (850) 916-7450<br>Jwitkin@AWS-LAW.com<br>ablankenship@aws-law.com<br>ksmith@aws-law.com<br>noverholtz@aws-law.com | David P. Matthews, Esq.<br>Lizy Santiago, Esq.<br>Matthews & Associates<br>2905 Sackett Street<br>Houston, TX 77098<br>Telephone: (713) 222-8080<br>dmatthews@thematthewslawfirm.com<br>lsantiago@thematthewslawfirm.com<br>msalazar@thematthewslawfirm.com |
| Howard Nations<br>Lori A. Siler<br>Howard L. Nations Attorney At Law<br>4515 Yoakum Blvd.<br>Houston, TX 77006-5895<br>Telephone: (713) 807-8400<br>nations@howardnations.com | Mary B. Cotton<br>John D. Giddens, P.A.<br>226 North President Street<br>P.O. Box 22546<br>Jackson, MS 39225-2546<br>Telephone:  (601) 355-2022<br>betsy@law-inc.com |
| Salvatore M. Machi<br>Ted Machi & Associates PC<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744 | Jona R. Hefner, Esq.<br>3441 W. Memorial, Suite 4<br>Oklahoma City, OK 73134-7000<br>Telephone: (405) 286-3000<br>attorneyokc@hotmail.com |

| | |
|---|---|
| David Dickens<br>Miller & Associates<br>105 North Alfred Street<br>Alexandria, VA  22314-3010<br>(703) 519-8080<br>ddickens@doctoratlaw.com | Pete Schneider, Esq.<br>Grady, Schneider & Newman, L.L.P.<br>801 Congress, 4th Floor<br>Houston, TX  77002<br>(713) 228-2200<br>pschneider@gsnlaw.com |
| Fred T. Magaziner<br>Marjorie Shiekman<br>A. Elizabeth Balakhani<br>Shane T. Prince<br>Eben S. Flaster<br>DECHERT LLP<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA  19103<br>(215) 994-4000<br>fred.magaziner@dechert.com<br>shane.prince@dechert.com<br>marjorie.shiekman@dechert.com<br>eben.flaster@dechert.com<br>elizabeth.balakhani@dechert.com | Lawrence J. Gornick, Esq.<br>William A. Levin, Esq.<br>Dennis J. Canty, Esq.<br>Levin Simes Kaiser & Gornick LLP<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 646-7160<br>lgornick@lskg-law.com<br>dcanty@lskg-law.com<br>lsimes@levins-law.com<br>jkaiser@lskg-law.com<br>echarley@lskg-law.com<br>ddecarli@lskg-law.com<br>bsund@lskg-law.com<br>astavrakaras@lskg-law.com |
| Scott Burdine, Esq.<br>Hagans Burdine Montgomery<br>Rustay & Winchester, P.C.<br>3200 Travis, Fourth Floor<br>Houston, TX  77006<br>Telephone:  (713) 222-2700<br>sburdine@hagans-law.com | |