```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                      ORLANDO DIVISION

 3            DOCKET NO. 6:06-MD-1769-ORL-22DAB

 4
           . . . . . . . . . . . . . .
 5    IN RE:                        .
      SEROQUEL PRODUCTS LIABILITY .
 6    LITIGATION                    .        ORLANDO, FLORIDA
      MDL DOCKET NO. 1769           .        JUNE 24, 2008
 7                                  .        2:00 P.M.
      ALL CASES                     .
 8                                  .
           . . . . . . . . . . . . . .
 9

10

11

12             TRANSCRIPT OF STATUS CONFERENCE
           BEFORE THE HONORABLE DAVID A. BAKER
13             UNITED STATES MAGISTRATE JUDGE

14
      APPEARANCES:
15
      FOR THE PLAINTIFFS:           (IN COURTROOM)
16
                                    SCOTT ALLEN
17
                                    CAMP BAILEY
18
                                    F. KENNETH BAILEY, JR.
19
                                    PAUL PENNOCK
20
                                    FLETCH TRAMMELL
21
                                    LARRY ROTH
22
                                    BRIAN MCCORMICK
23

24

25    COURT REPORTER:  H. WILLIAM JONES, RPR.
```

```
 1    APPEARANCES CONTINUED:

 2    FOR THE PLAINTIFFS:          (TELEPHONICALLY)

 3                                 DAVID DICKENS

 4                                 CHRISTOPHER KIRCHMER

 5                                 JONATHAN SEDGH

 6                                 DENNIS CANTY

 7

 8

 9    FOR THE DEFENDANT

10    ASTRAZENECA:                 (IN COURTROOM)

11                                 FRED T. MAGAZINER

12                                 STEPHEN J. MCCONNELL

13                                 SHANE PRINCE

14                                 ROBERT PASS

15                                 CHRIS COUTROULIS

16                                 (TELEPHONICALLY)

17                                 J. RANDAL WEXLER

18                                 MARC RAVEN

19                                 KRISTOFOR HENNING

20                                 GARY FEINERMAN

21                                 COLLEEN KENNEY

22                                 ORRAN BROWN, SPECIAL MASTER

23                                 CRAIG BALL, SPECIAL MASTER

24

25
```

```
 1                P R O C E E D I N G S
 2          The Clerk:  This is the matter of, in re:
 3     Seroquel products liability litigation.  Case
 4     number 6:06-MD-1769-ORL22DAB.
 5          We'll start with the plaintiff's table for
 6     appearances.
 7          Mr. Allen:  Scott Allen for the plaintiff.
 8          Mr. Bailey:  Camp Bailey for the
 9     plaintiffs.
10          Mr. Pennock:  Paul Pennock for the
11     plaintiffs.
12          Mr. Bailey:  Ken Bailey for the
13     plaintiffs.
14          Mr. Roth:  Larry Roth, liaison counsel for
15     the plaintiffs.
16          Mr. Trammell:  Fletch Trammell for the
17     plaintiffs.
18          Mr. McConnell:  Good afternoon, your
19     Honor.  Steve McConnell on behalf of defendant,
20     AstraZeneca.
21          Mr. Magaziner:  Fred Magaziner for
22     AstraZeneca.
23          Mr. Coutroulis:  Chris Coutroulis for
24     AstraZeneca.
25          Mr. Pass:  Robert Pass for AstraZeneca.
```

1          Mr. Prince:  Shane Prince for AstraZeneca.

2          The Clerk:  Counsel needs to speak into

3     the microphones, please.

4          Over the telephone, please enter your

5     appearances.

6          Mr. Brown:  Good afternoon, your Honor.

7     This is Orran Brown, the Special Master for

8     case-specific discovery.

9          Mr. Ball:  This is Craig Ball, the Special

10    Master for electronically stored information.

11         Mr. Sedgh:  This is Jonathan Sedgh for the

12    plaintiffs.

13         Mr. Kirchmer:  Christopher Kirchmer,

14    plaintiffs.

15         Mr. Raven:  Marc Raven for defendant.

16         Mr. Feinerman:  Gary Feinerman for the

17    defendants.

18         Ms. Kenney:  Colleen Kenney for

19    defendants.

20         Mr. Wexler:  Randy Wexler for defendants.

21         Mr. Canty:  Dennis Canty for plaintiffs.

22         Mr. Henning:  Kristofor Henning for

23    AstraZeneca.

24         Mr. Dickens:  David Dickens for the

25    plaintiffs.


1          Mr. Brown:  Those are all the counsel we

2          have on line this afternoon.

3              The Court:  All right.  I'm gonna take

4          things in no particular order other than how I

5          wrote them down.

6              Earlier in Mr. Brown's report there's

7          reference to recommendation number six from May

8          involving Janice Brown.  And I didn't know what

9          he was referring to.

10             Mr. Brown:  Your Honor, this Orran Brown.

11         It was reported on a report and recommendation

12         that I issued to the parties concerning the

13         question of a redeposition by plaintiff named

14         Janice Burns.

15             And that is an issue that came up before

16         us where the parties weren't able to agree as

17         to whether a plaintiff who had been deposed

18         once in the discovery trial pool could be

19         redeposed, as AstraZeneca requested, because a

20         lot of the information and documents that

21         AstraZeneca felt were necessary in her

22         plaintiff's fact sheet were incomplete and had

23         not been provided in advance of her deposition.

24             So, the parties were unable to agree on

25         whether she could be redeposed to cover ground


1          that had not been covered -- or documents not

2       covered in the first session.  And it really

3       boiled down to because her case became a trial

4       pool case, it boiled down to the issue of not

5       whether she could be redeposed, because she

6       could obviously be redeposed in the trial pool

7       case, but whether -- if she were deposed,

8       whether it counted as one of AstraZeneca's ten

9       permitted depositions.

10          And the purpose of this being in my report

11      to the Court was just to report on this fact

12      that issue had come up, that I had issued to

13      the parties, at least, my decision on what I

14      thought should happen with that issue; and that

15      was that she if being redeposed, that

16      AstraZeneca gets another two hours to cover

17      ground not covered in the first session.

18          If they use less than two hours -- two

19      hours or less, it would not count as one of

20      their ten; if they exceeded two hours, then it

21      does count as a deposition in the trial case.

22          And that's where the matter ended since

23      May 19th when I issued that report and

24      recommendation to the party.  I don't think

25      either party has asked the Court to review it


1       or take it up or alter that ruling.  And it was

2       in my report to the Court as solely for

3      informational purposes and I did not see, at

4      least from my prospective, that it required any

5      action by the Court unless you were to look at

6      it and decide that you wanted to issue a

7      different ruling on it even in the absence of a

8      request by the parties.

9          The Court:  I just wanted to verify there

10     was nothing before the Court on that and, until

11     the parties bring it here, I'll just leave it

12     where it is.

13         Mr. Brown:  Yes, your Honor.

14         The Court:  All right.  The next issue I

15     wrote down that was of some great concerns to

16     the parties is the issue of selecting cases for

17     actual trial and the potential replenishment of

18     the pool of cases for trial.

19         There are divergent views of the parties

20     on that.  I'm not going to decide that issue.

21     I will be advising Judge Conway what my

22     thoughts are after I hear from counsel today in

23     addition to the written filings.

24         I was gonna here first from the plaintiff,

25     but Mr. Magaziner --


1          Mr. Magaziner:  I was gonna make a report

2      on behalf of all of us.

3          The Court:  Well, I sort of sensed from

4     your standing as you did, because we have had

5     that situation before where you are able to

6     report at least on narrowing of issues or what

7     the separation is.

8          Mr. Magaziner:  It's a very short report.

9          Several of us met for some time this

10    afternoon and we are exploring the possibility

11    of coming back to the Court later this week

12    with a recommendation jointly on how to order

13    the cases for trial and some slight change to

14    the schedule for the development of experts in

15    cases to be tried later down the road, as

16    opposed to the cases to be tried at the outset.

17         In our conversation this afternoon, I

18    think we made a lot of progress and we are

19    optimistic that we will be able to come back

20    with a joint proposal to the Court later this

21    week.

22         The Court:  So, you want me to just leave

23    that for now until you can report back whether

24    you have reached agreement or fail to?

25         Mr. Magaziner:  I think that would be the


1     right thing to do.  To be clear, we did not

2     talk about replenishing, but, apparently, we're

3     talking about ordering the cases now in the

4          initial trial pool and how that order might be

5          determined and what should be done and the

6          consequences of our agreement.  We will come

7          back to the Court later this week with a joint

8          recommendation, I believe.

9               The Court:  I think I can alert you to a

10         couple of things that may be of significance to

11         you.  One is that Judge Conway, in addition to

12         taking on duties of Chief Judge in less than

13         two months, is also -- was assigned a criminal

14         case, which normally wouldn't affect anything

15         going on in February, except this case that

16         she's got, the Government estimates the trial

17         will take anywhere from two to four months and

18         the defendants currently are on our August

19         trial calendar.

20              I was only assigned the case yesterday,

21         the other two magistrate judges having recused

22         themselves, so I don't know too much about it

23         except that one of the defendants invoked his

24         right to self-representation yesterday.  And I

25         had a Faretta hearing and granted his request.


1               He's also declining, he says, to waive his

2          speedy trial rights; whereas, the other

3          defendants have all moved for continuances in

4          the trial.  This presents some -- well, it gets

5          more complicated because the defendant, who is

6          now representing himself, is in custody and the

7          Government's case is all on -- it's all one

8          trial.

9              He currently does not have access to a

10         computer, so his preparation for trial is gonna

11         be interesting and be subject to further

12         proceedings.

13             My point is that we have no idea whether

14         Judge Conway is gonna have to try it case twice

15         or whether she can group this defendant with

16         the other defendants, all of that.  So, she's

17         got some case management issues with that and

18         that may affect the schedule here.

19             She is, nonetheless, as I understand it,

20         determined to try the first case out of this

21         multi-district litigation beginning

22         February 2nd.  So, you should plan on that,

23         regardless of how we select them, how --

24         whether and how we replenish them or anything

25         else.  Last time I talked to her, which was

1          some time ago, she was planning to personally

2          try the first "X" number, single digit number,

3          but the first "X" -- that may change, but

4          before she starts soliciting other judges for

```
5        trial.
6               So, that's part of the lay of the land
7        that you need to be aware of that's out there
8        that we are dealing with on our end.
9               Okay.  So, we will defer on that.
10              What's the status of production of
11       documents that have been claimed as privileged?
12              Mr. Coutroulis:  Your Honor, I will be
13       speaking to that.
14              The Sidley review team and a number of
15       members of that law firm are on the phone have
16       been hard as work.  And, as I understand it,
17       all of the 27,000 documents that were logged
18       and not produced as privileged will have been
19       re-reviewed by tomorrow.  These are all of the
20       documents that were subject to plaintiff's
21       motion and the Court's ruling and guidance at
22       the ex-parte.
23              Let me be specific on the dates and the
24       amount of production.  Of the 27,000 logged
25       documents, approximately half or so either have


1        been produced or will be produced, many of them
2        in redacted form, but they will be produced.
3               The first such production was delivered to
4        plaintiffs yesterday.  It consisted of 5,257
```

5          documents and 30 call back documents as well

6          were reproduced yesterday.  We expect the rest

7          of the documents that will come off the log,

8          about 8,000, to be produced by Monday, this

9          coming Monday, June 30th, and, at the absolute

10         latest, by the 4th of July holiday next week.

11              The re-review of those documents, as I

12         said, will be completed by the Sidley team

13         tomorrow, but several days are required for

14         processing by FTI.  And that's the reason for

15         the subsequent production tomorrow.

16              So, all 27,000 documents reviewed and

17         production of about half in redacted format

18         finished next week.

19              Your Honor, there are two other related

20         projects regarding privilege that were not the

21         subject of the motion that the plaintiff's

22         filed, but are nonetheless being undertaken by

23         AstraZeneca in light of the Court's privilege

24         ruling in the ex-parte guidance that we

25         received.


1               The first relates to documents that were

2          previously produced, so they're not on the

3          withhold log, but they were produced with

4          redactions, it's about 13,000 documents.  And

5          all of those documents are being re-reviewed;

6      specifically, the redactions on those in light

7      of the principles that the Court has given us,

8      and any additional production of those

9      previously produced or redacted documents will

10     take place by July 15th.

11          And the second project relates to

12     documents withheld from production by third

13     parties based on privilege grounds.  Those

14     documents are also being voluntarily

15     re-reviewed by the Sidley team in light of the

16     Court's guidance and any subsequent production

17     of those will take place in July as well,

18     probably by July 22.

19          So, in short, the 27,000 documents that

20     were the subject of the motion, that will be

21     done next week.  There was an installment

22     yesterday and the rest next week.

23          If the Court has specific questions, I

24     know the Sidley people are on and can answer

25     those, but that's the basic status.


1           The Court:  Well, let me perhaps pretermit

2      what plaintiffs might want to say.  I

3      anticipate from what you have said that there

4      will be a request from the plaintiffs for

5      further review, but I don't want to see that

6          until they have had a chance to review all, or

7          at least substantially what you are producing,

8          but it sounds like they are going to want to

9          contend there's other things that should be

10         produced.  I anticipate that.

11             Let me just give some guidance to the

12         plaintiffs.  Assuming I'm correct that you do

13         plan to do that, that you figure out how to

14         time that so that you really can talk about

15         specifics based on what they have produced and

16         what it looks like either the redactions or

17         what remains unproduced so that we can have a

18         little meet on that since we are getting late

19         in the case and we have been through it already

20         a little bit.

21             Mr. Allen:  Your Honor, one of the things

22         that strikes me on this redaction issue, number

23         one, shouldn't they -- if they're going to

24         redact something, shouldn't they discuss why

25         it's being redacted as opposed to just -- you


1          know, we have that on the agenda today and, of

2          course, we're going to get to it and I think

3          it's largely taken care of today, but, you

4          know, when I get a document that's redacted,

5          like that, you know, it doesn't do me any good

6          to try to make a determination of whether I

7         think it's fair or not fair.

8             So, clearly they have a reason for the

9         redaction.  Shouldn't they be required to

10        specify what that reason is so we can make a

11        judgment?  That's my first question.

12            My second question I had was this issue of

13        ex-parte guidance.  I understood there was an

14        ex-parte hearing for the reasons and I

15        understand.  Should we -- and maybe I'm

16        mistaken.  I want to make sure I understand

17        what's going on here.

18            Shouldn't we have from the Court what that

19        ex-parte guidance is that he gave the Court?

20        Not the substance of the conversation that they

21        claim was privileged, but so when I'm reviewing

22        the document, how am I to determine from a

23        reacted document with no reason stated for the

24        reaction concerning an ex-parte guidance,

25        whether or not that document should be subject


1         to further motion?

2             The Court:  Well, I can see why that would

3         be useful.  The guidance I gave defendant was,

4         in some cases, document by document or even

5         paragraph by paragraph.  It was consistent with

6         the written ruling.

7           The -- and the difficulty, which is what

8      we are leading to, which I anticipated, is that

9      it relied on defendants then to take that

10     guidance along with the ruling and do exactly

11     what is being done, but applying it to a

12     different set of documents is not necessarily

13     easy and be -- and be opaque, obviously, to the

14     plaintiffs.

15          There are a couple possibilities.  We

16     could -- Mr. Coutroulis, what do you think

17     about these options as possibilities:  One

18     would be to have you write up what you think my

19     guidance was in a way that doesn't reveal any

20     of the things that were privileged, but let's

21     them know what you thought I said and that was

22     the basis for the review that's been ongoing,

23     and you can share that with them.

24          Alternatively, we could get a redacted

25     transcript of that ex-parte hearing.  I don't


1      think it's been transcribed.  I don't remember.

2      I didn't order it.

3           Mr. Coutroulis:  I believe we do have a

4      transcript.

5           The Court:  You could take extracts from

6      that that -- where I sort of gave some general

7      guidance and share that with the plaintiffs or

8          I could do that from the transcript.

9              And I don't know at this point how big a

10         burden it would be to categorize the

11         redactions.  I'm sure some of them -- I know

12         that they are and I'm sure there's a fair

13         number of them that would fit into certain

14         categories that we talked about.

15             Mr. Coutroulis:  Well, your Honor, just a

16         couple of reactions.  I haven't given specific

17         thought to that, but certainly we found the

18         ex-parte to be very helpful in terms of

19         clarifying some of the principles that were in

20         the order.

21             If there was a need or it was considered

22         desirable to try to reduce some of those

23         principles to a statement, I think it would be

24         a fairly brief statement.  We have the benefit

25         of the ex-parte transcript to use as a basis to


1          do that.  I think that's one thing that's

2          possible.  I would like to get Mr. Feinerman's

3          view of that as well.

4              Obviously, we are sensitive about the

5          privilege, but what I understand the Court to

6          be saying is could we articulate without

7          revealing privileged information some further

8      elaboration of the principles that we used and

9      I think that's certainly something that we

10     could talk about doing.

11          I can tell you, and the folks from Sidley

12     may want to elaborate, that we took every one

13     of those principles, and this has been a

14     document by document review of the 27,000

15     documents on that list, to try to apply them

16     right.

17          It's a complex, very document specific

18     undertaking.  And I certainly understand the

19     need for plaintiffs to, you know, be informed

20     as to what principles are being used, but I

21     looked at the ex-parte as an elaboration and

22     specific context of what the Court had said,

23     how those principles apply to specific

24     documents and then take that as a jumping off

25     point to apply that to the others and that's


1      what we have been doing.

2           Mr. Feinerman, I don't know if you want to

3      comment on the redactions that are being made

4      or what's being indicated or have any thoughts

5      on this you might want to add.

6           Mr. Feinerman:  Yeah.  I think we would be

7      very happy to reduce what we understand the

8      Court's principles to be to run and share that

```
 9        with the plaintiffs.
10            Mr. Pennock:  Your Honor, Paul Pennock for
11        the plaintiffs.  Because we will be -- we want
12        to embark and reviewing these documents very
13        quickly.  And, as they had mentioned, we got
14        the first major part last night, we will need
15        to, I think, have that guidance very quickly so
16        that -- because we really don't want to start
17        the review until we have a statement of those
18        principles.
19            The Court:  That should take, what, a
20        couple days?
21            Mr. Coutroulis:  We could do it promptly.
22            Mr. Allen:  And based upon Mr. Coutroulis'
23        statement, and the attorneys on the phone, they
24        said it's been a very detailed analysis
25        concerning the redactions.  I would assume,


 1        since it's been that detailed, that they have
 2        by each paragraph by paragraph, I think was the
 3        statement, or line by line, come up with a
 4        reason for the redaction, as opposed to simply
 5        a redaction.  It seems like -- and I've been on
 6        that side of the docket before, for lack of a
 7        better word, that when these kinds of reactions
 8        take place, generally they have the reaction
```

9        and they have the copy that's unredacted and

10       they have the reason themselves for the

11       redaction; they have gone through this

12       analysis.

13            And I think we should have the benefit of

14       the analysis, redacted due to the fact that --

15       and I'm making this up -- attorney/client

16       conversation.  Redacted due to the fact -- I

17       don't know what this would be -- but discussion

18       regarding another drug.  So we can have some

19       basis as to whether or not we -- you know,

20       here's what we have right now.

21            And I think the Court understands and I

22       can tell, but we have an ex-parte hearing with

23       an ex-parte ruling with redacted documents that

24       we don't see what's behind the redaction and we

25       don't have any explanation for why it's

1        redacted.

2             I mean, that's the equivalent of playing

3        blind man's bluff in the dark with a blindfold

4        on and your ears closed and then trying to

5        identify what's wrong.

6             I mean, I think if anybody was in my shoes

7        and said, well, Mr. Allen figure it out, that

8        would be a pretty tough job.  And then figure

9        it out with 27,000 documents and figure it out

10          quickly.

11              So -- and maybe we can get a new log.  You

12          know, they can take the privilege log that they

13          have and they can create log for them.  I'm

14          just trying to come up with a solution and I

15          think we have a real problem.

16              I'm not trying to create problems.  I'm

17          trying to avoid problems.  And I'm trying to --

18          I'll do what the Court says, of course, but

19          look at what we have.

20              The Court:  How big a burden is it to

21          identify each reaction, whether it's a claim of

22          request for legal advise, you know,

23          attorney/client conversation?

24              Mr. Coutroulis:  I'm going to ask

25          Mr. Feinerman to respond to that specifically,


1           but just one general point to keep in mind.

2           The 27,000 that were on the log, these are

3           documents that previously weren't produced at

4           all.  These are not documents that were

5           produced in some redacted form.  About half of

6           those documents now are gonna be produced to

7           you.  Some of those documents are gonna have

8           redactions, so I assume your question relates

9           to those, Mr. Allen?

10          Mr. Allen:  Yeah.  I guess my question

11    would obviously relate to the 13,000 that are

12    being produced with redactions.  I think we are

13    entitled --

14          The Court:  Some were redacted.

15          Mr. Allen:  Well, some -- yeah, the ones

16    with the redactions I think we are entitled to

17    an explanation.  For the ones being withheld, I

18    think we should, I guess, have a new log which

19    would say these are still being withheld.  I

20    mean, my analogy, the only one I can think of,

21    but I'm really kind of in the dark trying to

22    figure out what's going on.

23          And I know the Court, I respect the Court,

24    but an ex-parte hearing with an ex-parte ruling

25    with redactions I don't know, it leaves me a


1     little nervous, I guess, is the word.

2          The Court:  Mr. Feinerman, how have you

3     organized your team to do this?  Have you

4     got -- were you working off of a privilege log

5     and adding another column or were you starting

6     a whole new one?

7          Mr. Feinerman:  No, we were deleting -- we

8     were taking documents that had been on the

9     privilege log and taking them off the privilege

10    log.  The documents that are being produced in

11      redacted form will have metadata indicating the

12      basis for the privilege.

13          In addition, the context, the part of the

14      document being produced.  So, in many, if not

15      most, instances, the context will make it very

16      clear what the basis for the work product or

17      privilege call was.  But, no, we have not made

18      an extra column on the privilege log to

19      re-indicate that.

20          The Court:  What you refer to as the

21      metadata on the basis for doing the reaction,

22      is that something you are going to produce to

23      the plaintiffs?

24          Mr. Feinerman:  We have produced that,

25      yes.


1       The Court:  All right.  How are you

2       producing these documents, on CDs or drives?

3           Mr. Feinerman:  They are on DVD.

4           The Court:  Okay.  And just as a point of

5       curiosity, how are you doing the redactions

6       electronically?

7           Mr. Feinerman:  The way it comes out, I

8       wasn't -- I'm not intimately familiar with the

9       computer aspects of it, but the way it comes

10      out is that the redacted portions are blacked

11          out and, I believe, the word "redacted" is

12          superimposed on the black part in a little

13          white box.

14               The Court:  The reason I ask is I saw a

15          story recently of yet another embarrassment of

16          what somebody thought was redacted got filed

17          and he downloaded the thing off PACER and then

18          loaded it into either Adobe or Word and just

19          erased the black box and there was the text.

20               Mr. Allen:  We'll accept that, your Honor.

21               The Court:  Well, it's happened before in

22          some very high profile cases.  The Justice

23          Department had an incident a couple years ago

24          involving materials relating to Barry Bonds

25          grand jury out in San Francisco.  There was no


1           issue the stuff was supposed to be under seal

2           and they didn't do it right in that case.  And

3           it's happened -- the Justice Department has had

4           it happen several times and private parties

5           have, too.

6                So, what looks black on the screen may not

7           be electronically black, particularly, if

8           you -- it didn't take much computer science to

9           figure out how to undo that, so be aware of

10          that.

11               All right.  Well, produce it with that

12          metadata and then, like I say, I'm pretty
13          confident we're gonna have to revisit the
14          question in due course.  And I think I've given
15          plaintiffs an idea and they recognize the
16          partial dilemma they are in in having to review
17          things quickly and try to put things in
18          categories when they don't have full
19          information, but that's the nature of this
20          particular beast.  All right.
21              Mr. Trammell:  Your Honor, there's one
22          other issue.  Fletch Trammell for plaintiffs.
23          And that is, we are happy to have these
24          documents, we're glad they're being produced
25          now.  Evidently, half the documents that we are


1           on the privilege log that we made an issue of
2           shouldn't have been there in the first place.
3           Again, we are happy to have them and we will
4           review them.  The point is, we will get them
5           next week.  The discovery cut-off in this case
6           is the 30th, which is next Monday.  So, what
7           use do we make of them?  We can't use them to
8           examine witnesses.
9               The Court:  We'll figure all that out.
10              Mr. Trammell:  Okay.  I just need to make
11          a record of it and let the Court know that it's

12        an issue.

13            The Court:  Okay.  What's the status of

14        recovery of the Gel database information?

15            Mr. Allen:  Your Honor, Scott Allen.  You

16        all have that.  Whoever is going to address

17        that for us is on the phone.

18            Mr. Pennock:  Dennis Canty.

19            Mr. Allen:  Dennis Canty.  Mr. Pass and

20        Mr. Canty.

21            Mr. Pass:  Your Honor, the status is as

22        follows:  As you may recall, in addition to the

23        production of the Gel database, as part of the

24        so-called March 14th production, we had

25        indicated to the Court that we were going to be


1        restoring available Gel back-up tapes and that

2        we are also going to be doing a parallel course

3        of attempting to locate and collect from

4        non-custodial, meaning, those who weren't part

5        of the original 103 custodians, additional Gel

6        intermediate data, drafts and annotations that

7        may be in their possession.

8            We had, I think it was, 19 back-up tape

9        sets in existence going back to November, 2005

10        and running through November of 2007, which is

11        the month just before the extraction of Gel

12        itself was made for the March 14th production.

13          Those tapes have been, and those tape sets

14     and production, been in constant restoration,

15     review and production since then and have been

16     produced on a rolling basis.

17          We have produced, I believe, 13 of the 19

18     tape set contents to date consisting of about

19     28,000 comprising about 925,000 pages.  And

20     these are unique documents, not duplicates,

21     obviously.

22          We have remaining to produce three back-up

23     tape sets that will be produced, meaning, the

24     material in them will be produced by the 1st of

25     July.  We have one back-up tape set that will

1      be produced by July 7th.  And we have the last

2      remaining Gel back-up tape set, which will be

3      produced by July 20th or 21st.  And that will

4      complete the production of all of the Gel

5      intermediate data from all 19 of the existing

6      Gel back-up tape sets.

7           In addition to that, there have been four

8      rolling productions of the, I'll call them,

9      custodial intermediate data -- intermediate

10     draft documents since we announced that to the

11     Court.  There will be a fifth production of

12     that, which we anticipate occurring by the end

13          of the month.

14              As to those, we have produced to date

15          about 8,000 unique draft documents of Gel

16          intermediate data.  We don't know the volume of

17          the remaining fifth wave at this point, but we

18          will assume it will be somewhere in the

19          neighborhood of 3,000 more unique documents,

20          probably taking that up to about 11,000

21          documents.

22              When you put all that together, we are

23          looking at somewhere in the neighborhood of

24          40,000 additional unique pieces of Gel

25          intermediate data in addition to the Gel


1          production made on March 14th.

2              In addition to that, we have already

3          completed the production pursuant to a

4          negotiated agreement with the plaintiffs for an

5          update of the Gel database through May 15th and

6          have already made an additional production of

7          all finalized and intermediate data created

8          since the extraction date in December of '07

9          for the Gel database and May 15th.

10              That's already done, so they have all of

11          that in addition to all those other things.

12              These really complete the original planned

13          additional projects to supplement the Gel

14        extraction itself.

15             I would add that we are taking one

16        additional look at whether there are any

17        signals or significant indicators in the Gel

18        metadata from the Gel extraction as to

19        potential significant Gel contributors that we

20        may have overlooked in any of this.

21             At this point, I don't have any particular

22        reason to think there will be, but we've told

23        the Court before that when we got through all

24        of this, we are going to take one more look to

25        see if there was anything further from the


1         so-called custodians, the 903 original

2         custodian people to be produced.

3              So, that is where that stands currently.

4         We are down to the very end of it.  As I said,

5         we will have produced about 40,000 unique

6         documents, not counting the Gel update, all of

7         which are intermediate data from Gel.

8              I have more if your Honor wanted to hear

9         about remaining productions, because we really

10        are down to the end of the planned productions.

11        We have an update that -- we are going to be

12        making an updated production through May 15th

13        of what's called the PubSub submission

14      database.

15          We negotiated that with the plaintiffs as

16      a parallel to the negotiated May 15th update to

17      the Gel database.  We will have the PubSub

18      update out the door to the plaintiffs by the

19      9th of July.

20          So, all that is where we stand right now.

21      As I said, all of this will be completed on the

22      dates that I indicated with the one exception

23      being whether we identify through the -- go

24      back and look at the metadata assessment to see

25      if there were any other indicated significant


1       contributors that we would need to produce and

2       we would obviously advise the plaintiffs of

3       that if we identify any.

4           And I believe, your Honor, that with those

5       that I have outlined here -- and, of course,

6       whatever documents are going to be

7       de-designated as privileged and produced, that

8       should wind up the planned productions that are

9       outstanding at this time.  I don't think there

10      are any others in the works.

11          Mr. Canty:  Your Honor, Dennis Canty.

12      With respect to -- I'm gonna confine my

13      remarks, obviously, to Gel.  I don't disagree

14      with anything Mr. Pass has just said.

15          I think the recitation has been pretty
16     factual.  I think it just needs some context.
17     Remember, that we did not see the first of the
18     restoration tapes until April 30th.
19          And when we hear that we are near end,
20     realize the projected end has been July 20th.
21     So, we're constantly receiving new documents.
22     And it looks like maybe they will exceed 40,000
23     documents between April 30th and July 20th.
24     Remember, that these are documents which are --
25     which concern intermediate data, drafts of


1     documents that are final.
2          So, these documents, when reviewed are
3     properly reviewed together with other documents
4     as they may be restored.  So, in other words,
5     we may get -- you know, we may have a final in
6     one production, but we don't have the drafts
7     until a later production.
8          So, this really is an assessment that
9     can't begin until the production is complete
10    first.
11          Second, remember that the back-up tapes,
12    as far as I know, go back to November of 2005.
13    And I don't have any reason to believe that
14    there will be complete recovery of any

15          information prior to November of 2005.

16          Analysis of what exactly is missing will -- we

17          will have to conduct when the production is

18          complete.

19              I don't expect to recover documents from,

20          say, the 2003/2004 timeframe when we know there

21          was significant activity.  So, the plaintiffs

22          will need to present to you the impact of that

23          missing information and we will only be able to

24          do that after we have an opportunity to review

25          what we have.


1               The Court:  Well, just to recap my

2           anticipation in all this, which was, as we

3           discussed last time, leaving the burden on the

4           defendant, which they have carried out as they

5           have seen fit to do, to do the best they can,

6           and then at the end of the day there will be a

7           further reckoning to see whether there is much

8           of substance missing.  And, if so, how

9           substantial it is and what we do about it.  I

10          made reference to them in the order that I

11          entered earlier this afternoon.

12              So, that's what I'm anticipating.  We will

13          just see how important it is, weigh it against

14          all the other circumstances, including when the

15          duty arose and how strong a duty it was.  And

16      then looking at the efforts that have been

17      made and then we will substantively -- the

18      burden now is on plaintiffs, as Mr. Canty

19      recognizes, to do that analysis and present it

20      and both sides can be heard on that issue as to

21      where we are on all that at the end of the day.

22          So, I will wait to see that in due course

23      and we will do whatever needs to be done to

24      preserve both sides' rights on it.

25          Mr. Pass:  Your Honor, could I make a


1       couple of additional observations based on

2       Mr. Canty's comments.  I won't get into the

3       issues he was raising that your Honor

4       addressed, but, just to be clear, if we just

5       take the back-up tapes, that began production

6       on April 30th and there were productions in the

7       Gel back-up tape -- full tape sets on April 30,

8       May 7, May 9, May 21, May 16, May 29, 6/5 and

9       6/17.  This has been a very evenly disbursed

10      and constant rolling production.

11          I would also note that as part of the

12      process with the SMESI, the plaintiffs agreed

13      to provide us with a log showing when they had

14      loaded onto their review platform materials

15      that were produced to them.

16          And, as of the latest one we received from

17      them, which was May 27th, which post-dated a

18      number of these Gel back-up tape set

19      productions, as well as the rolling waves of

20      production from the Gel, quote, custodial

21      productions, their own log showed that they had

22      not bothered to load any of those productions

23      onto their review platform as of May 27th,

24      despite production going back two and three

25      weeks earlier than that.


1           So, I suspect that should we ever reach

2       the point at which the plaintiffs do want to

3       address with the Court a claimed prejudice from

4       the Gel situation that we will have a lot to

5       say about that, as well as a lot to say about

6       the pervasiveness and comprehensiveness of the

7       production.

8           Mr. Allen:  Your Honor, before Mr. --

9           The Court:  I'm confident both sides will

10      have a lot to say.

11          Mr. Allen:  Yeah, we've been kind of busy

12      taking depositions day in and day out.

13          The Court:  Don't get out ahead of

14      yourself.  I know you both have strong views on

15      that.  I'll hear it all in due course.

16          Let's turn to plaintiffs motion in docket

17          number 1016, the deposition of Dr. Reinstein at

18          this time.  The defendant indicates the issue

19          is now moot; is that true?

20              Mr. Allen:  No, sir, it's not at all moot.

21          I will say -- let me begin my remarks

22          concerning Dr. Reinstein in this motion.

23              The first thing that struck me today is

24          that how much things have improved between my

25          side and the other side in our relationships in


1          dealings.

2              We have generally been able to work

3          everything out; this one, we disagree upon

4          vehemently, including, but not limited to, the

5          fact that while they would like to claim that

6          this issue is moot, they have only tried --

7          they have really painted over the issue to --

8          for it to appear to be moot and I would like to

9          go into this in some detail, your Honor.

10              We have been in the process -- I have been

11          involved and Mr. Fletch Trammell is here with

12          me who was at the deposition of Dr. Reinstein

13          and taking depositions, as you know, of

14          corporate witnesses, but not only corporate

15          witnesses that are direct employees of the

16          company, but third party witnesses who are --

17          and I think their response to our motion, they

18          said -- I think they used the term "so-called

19          KOL's."

20              KOL stands for key opinion leader.  It is

21          not a term I created.  It is a term that is

22          throughout their documents.  Dr. Reinstein was

23          under contract to AstraZeneca.  This is in his

24          deposition testimony and I have it if you would

25          like to see it.  I'm sure counsel would agree


1          that is -- I would like to forego telling you

2          the pages, it's 164 to 165, 167 to 168.

3              I think the counsel has enough respect for

4          me to know I won't misrepresent the record, but

5          Dr. Reinstein had been under contract with

6          AstraZeneca, had received close to $500,000.00

7          in payment for AstraZeneca over about a

8          ten-year period for his services, has -- his

9          material, Dr. Reinstein had, in fact -- and I

10          would like to provide the Court a copy of where

11          we are on this.  I've highlighted it and

12          given -- I have a highlighted copy for the

13          other side, so we can put this in context what

14          we are dealing with.

15              Dr. Reinstein had conducted clinical

16          trials and case studies for AstraZeneca

17          pursuant to his contract.  His material, as I

18        have highlighted -- that's just some of the

19        material -- has AstraZeneca's logo concerning

20        Seroquel on it; this material was handed out to

21        physicians during -- and other healthcare

22        professionals.

23            His material, and I'll paraphrase what his

24        material says:  It says, there's no weight gain

25        or diabetes problem with Seroquel, which is our

1         complaint, as the Court knows, that the product

2         causes weight gain and causes diabetes.  My

3         clinical trial, in fact, says it causes -- it

4         reverses and causes weight loss and cures a

5         diabetic situation.

6             That's -- now, he is a key opinion leader

7         under contract despite the fact that the

8         defendants, and I think we discussed this, did

9         not agree to produce him voluntarily.  We put

10        one of our counsel on this matter.  We had to

11        get letters, interrogatories or subpoenas

12        issued out of the Court in Chicago, in

13        Illinois, to get his deposition scheduled.

14        This literally took us months, months to get

15        this done.

16            Dr. Reinstein, by the way, in addition to

17        all that, is -- it's in the deposition or in

18        the documents, and Mr. Trammell can correct me

19        if I'm wrong, was either the number one

20        prescriber of Seroquel in the United States or

21        the number five -- within the top five

22        prescribers.  And, lastly, his contract with

23        AstraZeneca that he had had a confidentiality

24        requirement within it.

25            We then proceed, after literally months of


1        scheduling Dr. Reinstein for deposition, we go

2        to take -- Mr. Trammell here, and we have the

3        transcript.  The Court has a protective order,

4        as it knows, with requires the witness to

5        either sign the protective order or state on

6        the record they agree to be bound by the

7        protective order.

8            Dr. Reinstein is represented by counsel.

9        Now, I would suggest to you, your Honor, and

10        I'm not casting aspersions, but I have 25 years

11        of experience and I think it is beyond the

12        scope of credibility to believe a person under

13        contract -- and he did testify the contract had

14        been up for two or three months prior to his

15        deposition.  He had been under contract since

16        like '97.  Don't know what happened, but I know

17        that these lawyers and the lawyer for

18        Dr. Reinstein have cooperated.  I believe that

19          to be the case.

20              I believe that they are in contact and the

21          subsequent response they filed proves my point.

22          Nothing wrong with it, but that's what

23          occurred.

24              We go take the deposition of

25          Dr. Reinstein.  We have internal documents,


1          including, but not limited to, a June, 2000,

2          safety position paper.  And I have for the

3          Court, which I will not burden the Court with

4          now, but out of the millions -- and, literally,

5          we heard today, millions of pages, we had come

6          up with this set of documents from the internal

7          files of AstraZeneca we would like to discuss

8          with Dr. Reinstein.

9              One of those documents was a June, 2000,

10          safety position paper within the company where

11          the Seroquel safety physician in charge of

12          safety surveillance wrote a report that

13          specifically says there is reasonable

14          evidence --

15              Mr. McConnell:  Your Honor, real quick.

16          One, objection.  It doesn't really go to the

17          motion.  Two, I think this is a document that's

18          been marked confidential and I think he's

19          needlessly getting into it and is creating a

20          confidentiality issue right here as we speak.

21          This happened, I remember, when we argued this

22          issue before your Honor several months ago and

23          I know your Honor entered an order.

24               I would request you again, although I

25          would also make the point that this is utterly

1          unnecessary.

2               Mr. Allen:  Well, see, I don't believe

3          it's unnecessary, your Honor.  And that's

4          what -- here's the point:  They're trying to

5          say these documents under their mootness point,

6          which we are going to get to in a minute, they

7          tried to say this is untethered to litigation.

8          This is their response.  That our motion is

9          untethered to litigation, does not -- they

10          tried to propose an order.

11               Their proposal in their order says if it's

12          litigation related.  And they're trying to

13          contend to this Court that the documents we

14          seek to utilize with not only Dr. Reinstein,

15          but -- and I'm going to get -- I'm not close to

16          finished, that we're -- we need to utilize with

17          treating physicians, with expert witnesses --

18          and let me just skip to that really quickly,

19          your Honor.

20          Today, within the last three hours before
21     we came to this courtroom, we consulted with a
22     consulting expert in the case.  The consulting
23     expert indicated to us that he or she -- and I
24     don't think that should be required to identify
25     their sex -- that he or she was interested in


1      helping us; he or she believed that we were
2      correct; he or she wanted to see documents that
3      would verify his or her opinion, but when we
4      told this witness that you had to sign a
5      protective order, their response was much like
6      Dr. Reinstein's; this is their consultant under
7      contract.  He said the protective order makes
8      me very -- this is his sworn testimony -- makes
9      me very uncomfortable.
10          It says there could be a court sanction if
11     I ever discuss this with somebody.  And, you
12     know, for whatever reason, it may be in
13     somebody's interest to discuss this with them.
14          He goes on to say -- this is their person
15     under contract about the protective order.
16     "There may be material I would want to discuss
17     with my patients", and he goes on.  Basically,
18     the protective order, Dr. Reinstein, their
19     consultant says, I'm too scared to sign it.  I

20          don't want to be subject to sanctions.

21              Now, quite frankly, we were surprised

22          after months of setting the deposition up,

23          their guy under contract with half a million

24          dollars, flying to Chicago, preparing for the

25          deposition and he says, I'm not gonna sign it,


1           he would not agree, and I can go on, to aver on

2           the record he would be bound by it.  This Court

3           has said in its Court order back in February,

4           the Court concurs with AstraZeneca's

5           description of the situation.  Under the

6           protective order, plaintiffs have full -- and

7           this is the key phrase -- full access to the

8           confidential documents for litigation.

9               Now, I suggest to you, the Court, when it

10          meant full access, it didn't mean physical

11          possession of the documents, which we have, it

12          meant full use.  These -- the defendants can

13          take their documents and go out and meet with

14          the same expert that we met with this morning,

15          utilize any document they wish at any time.

16              They can do what they have attempted to do

17          after Dr. Reinstein's deferment that he would

18          not be bound and after -- and only after we

19          filed a motion they can attempt to say, well,

20          Dr. Reinstein, we waive the requirements.

21          That's what they're doing.

22              After we filed the motion to come to this

23      Court, they are waiving the requirements for

24      Dr. Reinstein.  They can -- they can go out and

25      meet with a treating physician -- and this is


1       what the defense has said repeatedly in this

2       case; that they will be filing motions

3       asserting under the learned intermediary

4       defense, which I know a lot about.  That's what

5       I did for 20 years is represent doctors.  And

6       the learned intermediary defense is what they

7       are going to say.

8               They are going to say, well, that the

9       physician who prescribed this drug has

10      testified either, A, we gave an adequate

11      warning; or, B, we would have prescribed the

12      drug any way.

13              Now, we represent the plaintiff.  We

14      should be entitled to go talk to the

15      prescribing doctor and show them the documents,

16      which we contend -- and this is the documents

17      which I will read again.  And I think I'm

18      entailed to read this in Court.  You cannot

19      make a ruling absent context.  You're asked to

20      make a ruling in the dark.

21          The Court:  Well, Mr. Allen, I take as a

22     given that there are documents that defendant

23     has claimed to be confidential, which you want

24     to use with witnesses.  And they're -- it's

25     appropriate for you to use with witnesses.


 1          Mr. Allen:  Well, okay.  Here's --

 2          The Court:  I take that as --

 3          Mr. Allen:  That not what occurred, your

 4     Honor.  I was first -- that's why it's not

 5     moot.  I was in California.  This Court is not

 6     just -- the MDL is being followed, as the Court

 7     wanted to, as they suggested happen.  It's

 8     being followed by the States.

 9          I was in California -- this is absolute

10     God's truth:  They noticed the deposition of a

11     prescribing doctor and questioned the doctor

12     for -- it's my recollection from approximately

13     9:00 in the morning until 2:30 in the afternoon

14     with an hour for lunch, 2:30 or 3:00 concerning

15     their conduct and how good their drug was.

16          I had this document, documents like this

17     that I tried to show the witness to ask if the

18     company ever -- I can get you the transcript.

19     They said I could not utilize those documents

20     with the witness.  I could not show the witness

21     those documents.  I could not examine the

22          witness with those documents unless the witness

23          agreed to be bound by the protective order.

24              The witness -- you have witnesses in these

25          depositions -- you look at the protective


1           order.  I didn't have a copy with me, because I

2           didn't -- this is -- let me get this,

3           substantive and procedural due process.  I have

4           clients.  They go take a deposition and they're

5           are not gonna let me examine the witnesses with

6           their internal documents, but yet they are

7           going to file a motion based upon that

8           witness's testimony.  Now, your Honor --

9               The Court:  Let me bring you back to the

10          ground, Mr. Allen.  I've got a motion with

11          respect to Dr. Reinstein with a response saying

12          he's agreed and will answer the questions.  I

13          don't have a motion to modify the protective

14          order.

15              Mr. Allen:  You have on your agenda under

16          C(2) the issues of further depositions of third

17          party witnesses and key opinion --

18              The Court:  Well, I try to take these

19          things one at a time.

20              Mr. Allen:  Well, your Honor, let's look

21          at this as what's come up -- and this doesn't

22        just pertain to Dr. Reinstein.  And this was

23        not a -- by the way, which their motion

24        implies, and they know I'm telling the truth --

25        this was not a set-up by the plaintiffs'


1         counsel to bring this motion to the Court.

2              As a matter of fact, the deposition in

3         California occurred before the Reinstein

4         deposition and I'd hope it correct itself.

5              The Court:  My point is, I can only rule

6         on the motions that are in front of me.

7              Mr. Allen:  Yes, sir.

8              The Court:  The motions for Dr. Reinstein,

9         I'm going to rule on that.  If you have a

10        specific motion to modify the protective order

11        or a procedure for invoking the protective

12        order, I need to have that with 3.01(g) and

13        proposed language and I'll deal with it.

14             Mr. Allen:  Yes, sir.  And Mr. Pennock

15        will say something -- first of all, I think if

16        you look at our motion -- I've been handed a

17        note, because I -- it was not limited to

18        Dr. Reinstein, because we recognize the ongoing

19        nature of the problem.

20             You know, the day after tomorrow, we're

21        going to be deposing a Dr. Herschfeld (sp).

22        Some time in the next five days, we're going to

23          be deposing a Dr. Suppes, S-U-P-P-E-S.  We

24          deposed last week, which I need to talk about,

25          it's on the agenda, Dr. Carol Tamminga,


1          T-A-M-M-I-N-G-A, all of whom were on

2          AstraZeneca's speaker bureau or key opinion

3          leaders, not so-called key opinion leaders.

4          The reason we're deposing them is because we

5          knew from their documents.

6               We went to the deposition of Dr. Tamminga.

7          Her lawyer cut off -- and I can -- you can take

8          my word for it or they can admit that I'm

9          telling the truth and I'm paraphrasing what her

10          lawyer said, you can't ask Dr. Tamminga any

11          opinions.  We're not going to look at any

12          documents.  You're limited to three hours.  We

13          don't care what the Court said.  And, remember,

14          all of these -- all of these deposition,

15          Judge -- and I'm telling you the truth -- took

16          us months to schedule.

17               Mr. McConnell:  Your Honor, it's not on

18          the agenda.  The Tamminga thing is not on the.

19               Mr. Allen:  Yes, it is.  It's C (2).  It's

20          about key opinion leaders' depositions and

21          other issues.

22               Your Honor, this -- and if you look at our

23          motion, it's directed, and their response is

24          directed, to the fact that they claim that

25          these documents should remain confidential and


1          are not litigation related.  I'm telling you --

2               Mr. McConnell:  Your Honor, Tamminga had

3          nothing to do with confidentiality, nothing to

4          do with confidentiality.  Because we

5          couldn't --

6               Mr. Allen:  Your Honor -- I wouldn't

7          interrupt you.  You can come up and correct me.

8          I would ask, your Honor, that I be allowed to

9          finish and then he can correct every

10         misstatement that he claims I have made.

11              Mr. McConnell:  Well, your Honor, I'd just

12         object to the extent it's a filibuster that's

13         going way beyond the agenda and way beyond the

14         matter at hand.

15              Mr. Allen:  Why is what I say -- your

16         Honor, I would like to direct my comments to

17         the Court.  A filibuster?  Yes.  You know what,

18         if it's a filibuster, I'm begging and pleading

19         with this Court.  I am informing this Court as

20         an officer and I am not misrepresenting a fact

21         that we do not have equal use to these

22         documents; that it is interfering with our due

23         process --

24          The Court:  Mr. Allen, you haven't heard

25     what I said.


1          Mr. Allen:  Okay.

2          The Court:  I'm trying to deal with the

3     agenda my way.  And my way was to deal with

4     this motion, which, while it makes some

5     reference to collateral relief, deals with Dr.

6     Dr. Reinstein.  Is the issue with respect to

7     Dr. Reinstein moot?

8          Mr. Allen:  No, sir, because here's what

9     else we have.  In the letter that they have --

10     they have with their lawyer, they have now

11     restricted the time.  See, we were put in the

12     horns of a dilemma.

13          Mr. Trammell was -- and Mr. Matthews, who

14     were there for us, were on the horns of

15     dilemma.  What do we do?  We walk away and

16     don't depose him not knowing what the Court

17     would do concerning the issue of Dr. Reinstein?

18     They didn't volunteer to step in at that point

19     and, quote, waive the confidentiality.

20          We didn't know if we would ever have

21     enough chance to talk to Dr. Reinstein in our

22     entire life.

23          So, we used our approximately -- and I am

24          saying approximately -- four and a half hours

25          to depose Dr. Reinstein.  And, now, they're


1           saying, well, we now agree you can question the

2           witness on the documents.

3                Now, let's put yourself in our shoes.  We

4           had to give them the documents in advance.

5           They're now prepared for our examination.  It's

6           a wonderful system they have set up.  And they

7           are saying you only have two and a half hours.

8                We believe we should have a -- whatever

9           amount of time we need to conduct an

10          examination of Dr. Reinstein who has done

11          clinical trials, who has prepared documents

12          that where distributed to doctors, who has been

13          paid $500,000.00, who was under contract to

14          their company, we shouldn't, after all of our

15          work, say here's the documents, you've got two

16          hours, two and a half hours.

17               At least we should have the relief,

18          regarding Dr. Reinstein, to go back and let

19          fine lawyers, who have prepared extensively,

20          question the witness on these documents and not

21          allow AstraZeneca and Dr. Reinstein's lawyer to

22          benefit by their instructions and tell him not

23          to answer.

24               So, it's not solved.  They haven't agreed

25          to a full day, for one.  And I'm telling the

1           Court -- I hear the Court, I respect the Court,
2           but here's what they said to us in a letter
3           right before we walked into the courtroom on
4           Dr. Reinstein, which they say is solved, which
5           makes me concerned.  Signed by Louise Moyer of
6           the law firm of Dechert:  Pursuant to the
7           protective order, we hereby respond to your
8           challenge via motion, document number 1016 --
9           docket number 1016, to the confidentiality of
10          various AstraZeneca documents allegedly
11          relevant to the deposition of Dr. Reinstein.
12              As set forth in more detail below in
13          AstraZeneca's opposition to your motion,
14          AstraZeneca believes that plaintiffs have not
15          specified any true litigation driven need for
16          challenging the confidential status of this
17          documents, as required by the Court's order.
18              This is what they are saying in this
19          letter.  They're telling us they stand by it.
20          Now, in their response to the motion -- In
21          response to the motion, they say the matter is
22          solved.
23              They're telling us still in a letter that
24          they're saying that they're allegedly relevant,

25          the plaintiffs have not specified any true

1          litigation need.

2               Your Honor, it should not be up to them to

3          do this to us when we go --

4               The Court:  I don't know if there's any

5          posturing any more than you're posture, Mr.

6          Allen?

7               Mr. Allen:  Posturing?  It wasn't

8          posturing.  This is what happened.

9               The Court:  Well, there's some posturing

10         going on now.  Looks to me like, primarily, as

11         to Dr. Reinstein, the issue is moot.  I'm going

12         to allow you five hours to finish his

13         deposition using these documents.

14              Mr. Allen:  And what should we do about

15         the other witnesses and the same problem

16         occurs?

17              The Court:  You know, let me follow my

18         list, please.

19              Mr. Allen:  Okay.  Thank you, your Honor.

20         I appreciate it.

21              The Court:  All right.  There's an issue

22         in the agenda, item submitted by the parties

23         regarding some of the cases that we're calling

24         the Florida cases regarding possible doubts

25         about choice of law.  Have you gotten any

1      further on that?

2          Mr. Magaziner:  Yes, your Honor.  I think

3      this is, at this point, kind of a non-issue, as

4      it relates to another agenda item, which is

5      where we said we want to discuss with the Court

6      procedures that the Court would like us to use

7      for dispositive motions.

8          The reason that the choice of law relates

9      to that issue is this:  Of the 30 cases in the

10     initial trial pool, we have stipulated with

11     plaintiffs that 26 of them are governed by

12     Florida law.

13         There are four cases that plaintiffs have

14     said they would like to discuss further with us

15     because they have reviewed the factual record

16     and think there are enough contacts with States

17     other than Florida that might justify, under

18     Florida choice of law rules, the application of

19     the substantive law of that other State rather

20     than Florida.

21         Our hope was that if we could get an

22     agreement that all 30 -- either an agreement or

23     a ruling that all 30 cases are governed by

24     Florida law, we would might then be able to

25     bring some motions before your Honor and before

```
 1          Judge Conway that would deal with issues of
 2          Florida law that pertain to all the cases.  And
 3          that's something to be put on the agenda later
 4          when we said we would like to talk about --
 5               The Court:  What are you going to need to
 6          do to either resolve or tee up the issues on
 7          those other fours cases?
 8               Mr. Magaziner:  I think colleagues of ours
 9          are having discussions about those four cases.
10          I think those discussion are not yet completed.
11               If we cannot reach agreement, I think what
12          we will want to do is submit briefs
13          simultaneously perhaps explaining why we
14          believe the law of Florida applies to certain
15          cases, and plaintiffs will say they think the
16          law of some other State, Massachusetts or Idaho
17          or whatever, applies.  If we get the Court's
18          ruling --
19               The Court:  Can I give you a deadline for
20          that?
21               Mr. Pennock:  Judge, may I just make a
22          comment?  I'm a little concerned, because I
23          know with certain issues, it depends on the
24          issue, what law might apply.  And, you know, my
25          position on it usually is if you have a
```

```
1         motion -- a substantive motion you need to

2         make, make your motion and make your argument

3         in your motion as to which law is supposed to

4         apply to that particular issue and we can

5         either consent to it in our opposition or give

6         some reason why it is a different law we should

7         apply and here's the body of that law.

8             Because, I mean, it really is a fact

9         sensitive issue in some instances -- I'm sorry,

10        an issue sensitive issue in some cases.

11            The Court:  Well, as to these four cases,

12        I assume the issue is plaintiff may have lived

13        in more than one place or been treated in more

14        than one place or some such thing as that.

15            Mr. Pennock:  True.  Sometimes, for

16        example -- there may be rulings -- I mean,

17        there may be -- the defendants may take a

18        position that the law as to the defendants'

19        conduct should be from one particular state;

20        whereas, the law of damages may be from a

21        different state or we may take such a

22        position --

23            The Court:  Well, that's what I want to

24        bring to Earth, because, as a practical matter,

25        for the cases that come to try in this
```

1          District, there's going to be much less

2          interest in doing cases that are not applying

3          non-Florida law.  It will have more meaning for

4          Judge Conway if she's trying Florida law cases

5          than Tennessee, Georgia or Massachusetts.

6               Mr. Pennock:  That what I understand was

7          our original plan.  I guess, I'm just

8          suggesting that -- or maybe I can speak with

9          Mr. Magaziner on it, but it seems to me that I

10         would need to know what type of motion they

11         were making and what law it was they were

12         contending applied in order to --

13              The Court:  Well, all I'm saying is, if

14         you have disagreement on the other four, I

15         would like to set a deadline for determination

16         of -- I mean, damages may be one thing, but,

17         otherwise, the choice of law doesn't usually

18         pick out a lot of different things on --

19         different issues of liability.

20              I mean, the cases get too complicated if

21         you do that.  It's not a favored principle.

22         So, I would like to give you ten days, two

23         weeks, to finish your discussions on those

24         four.  If you can't agree, then come up with

25         a -- hopefully, an agreed statement of the

1   background facts and then make your legal

2   arguments as to the choice of law.

3        Mr. Magaziner:  Well, I think that's fine,

4   your Honor.  I would ask, and perhaps

5   Mr. Pennock would agree with this, if we could

6   have a little more time than you would

7   otherwise be inclined to give us.  With

8   vacations, I don't want to commit to what

9   people, other than myself, are going to be

10  doing.

11       I want to live when I get back to the firm

12  rather than have people say, what did you agree

13  to, and I'll write a brief when I'm on

14  vacation.  So, if you could give us a month to

15  do that.

16       The Court:  How is July 25th?

17       Mr. Magaziner:  That's fine.  That makes

18  sense.

19       The Court:  Okay.  Dispositive motion

20  procedure, what do you have in mind, Mr.

21  Magaziner?

22       Mr. Magaziner:  Well, thank you, your

23  Honor.  That does relate to this issue.  With

24  regard to the 26 cases, as to which we have

25  stipulated Florida law applies to all issues,


1   our inclination would be to file a motion that

2        says that the breach of warranty claims

3        asserted on behalf of those 26 plaintiffs

4        should be dismissed, because, under Florida

5        law, that claim is not viable.

6            There may be other claims also asserted on

7        behalf of all 26 plaintiffs, which we believe

8        are not viable, just as a matter of Florida

9        law, without getting further into analysis of

10       the individual cases.

11           On the other hand, in previous status

12       conferences, and in some previous orders, the

13       Court has expressed its desire to avoid any

14       multiple summary judgment issues on a

15       particular case.  So, for example, if a case

16       has a learned intermediary issue, which we

17       think will be ripe for summary judgment after

18       we complete the discovery or might be ripe for

19       summary judgment after we have completed

20       discovery, we don't want to be foreclosed from

21       filing that summary judgment by reason of

22       having including it in the, what I call,

23       omnibus motion addressing all the 26 cases as

24       to which Florida law has been stipulated to

25       apply.


1            So, there is no right or wrong way to do

2        this.  What we would like to do is figure out a

3        way to do it that would be most convenient for

4        the Court, but that would avoid the filing of

5        unnecessary motions.  And we think if we could

6        address some of these issues on a multi-case

7        basis without being precluded from later coming

8        back and filing a second summary judgment

9        motion that is fact specific, that would

10       probably be best for all the parties and the

11       Court, but we didn't want to do that without

12       getting the Court's guidance.

13            The Court:  Well, as you say, there are

14       different ways to organize this in terms of

15       different -- I'll call them different logics.

16       And I think I alerted you that Judge Conway as

17       a predilection not to like multiple or

18       piecemeal motions; on the other hand, we

19       recognize that some cases require.  Also

20       recognize in some cases, it's beneficial to

21       have, in effect, a master motion that uses a

22       certain number of pages and supporting

23       documents to lay out the essential parts and

24       then you file subsidiary motions to the effect

25       that make reference to that master document or


1        set of documents.

2            Part of the issue is timing, part of the

```
3        issue is how you want to group things legally,

4        some issues of trying to figure out how they

5        apply to individual cases or you lay out a

6        global argument and then you file a supplement

7        on individual cases and say we're incorporating

8        that argument, you know, C(2), with respect

9        here and here's two paragraphs as to why it

10       applies.  There's lot of different ways to do

11       that.

12            What I guess I'd like to see for Judge

13       Conway's benefit, because these motions are not

14       going to fall to me, as far as I know, is your

15       proposal as to how you want to, in effect

16       package it.  And I don't mean that in a

17       disparaging way, but to -- like I say, there's

18       different ways, there's different logics to it.

19       And, you know, the first instance, you should

20       be able to control how you want to do it.  Way

21       back before you were in the case, we had a

22       different approach.  My predecessor counsel

23       would have taken the case in a different

24       direction and -- and I just reference that in

25       there are different ways to do things in terms


1        of -- in a way you think on these 30 the best

2        thing is to have emphasis on learned
```

3          intermediary and how much emphasis you want to

4          have on preemption or how much emphasis you

5          want to have on other FDA issues or all those

6          different issues that might come up.

7               But you -- whatever you propose needs to

8          be following some logic and -- that

9          recognizing, as you say, trying to reduce the

10         burden on the Court and opposing counsel to

11         present the issues without duplicating things

12         that don't need to be duplicated.  That was a

13         worse problem in the old days when everything

14         was filed on paper, but even now it's easier to

15         open up several windows on our computer on look

16         at things or print out a master thing and keep

17         that on our desk or a piece of paper copy,

18         which we sometimes do, and then make reference

19         to it, I guess, as a master.  So, that's a

20         suggestion to you.

21              What I think Judge Conway will not want to

22         see is is a cascade of motions that -- where

23         you want to file one and then wait for a ruling

24         and then file another and so on.  That's not

25         gonna work.  Even though I recognize some of


1          these, either as partials or, as you view them,

2          as preliminary, you're going to need to present

3          them logically and with a description of --

```
4        obviously, for some of the issues the page
5        limitation of the rules aren't gonna work, but
6        that doesn't mean that you can file a 150-page
7        brief either.  So, you are gonna need to
8        present that as to really how much space you
9        are gonna need for various arguments.  And I
10        think having sort of a master document that you
11        refer back to will make it a little easier to
12        do that to fit things in shorter arguments if
13        you have got that all set and it may be easier
14        for the plaintiffs to respond to.  So, I don't
15        know if you have anything specific you want to
16        put forward today --
17            Mr. Magaziner:  No, I think what I would
18        like to say today is that we appreciate your
19        Honor's guidance and we will get together and
20        endeavor to present to the Court, probably by
21        the time of the next status conference, our
22        expectation of how we would file these things
23        so that the Court would have a chance to say,
24        no, that's no good; that seems like the right
25        thing to do.


1            The Court:  I have mentioned this to Judge
2        Conway, again, because I'm not contemplating
3        I'm gonna be deciding these issue; that's gonna
```

4          be her decision.  I would give her a

5          recommendation either down the hall or on the

6          record, but -- and plaintiffs will be heard on

7          that as well.

8               Mr. Magaziner:  Of course.

9               Mr. Pennock:  Thank you, Judge.  In fact,

10         I was going to ask that the defendants give us

11         whatever proposal they are contemplating before

12         they provide it to the Court so that we can

13         have some opportunity to look at it before we

14         get here.

15              The Court:  They may have some suggestion

16         that you may agree with.

17              Mr. Pennock:  Exactly.  That's right.

18              Mr. Magaziner:  It hasn't happened up

19         until now, but there's always hope.

20              The Court:  It's happened a couple times.

21              Mr. Magaziner:  That's fine, your Honor,

22         we'll do that.

23              The Court:  All right.  Okay.  I have some

24         other things that have drifted in here.

25         Plaintiffs want to now talk about the


1          deposition of opinion leaders and some

2          reference to exhibit 49 of the Guter (ph)

3          deposition.  We have defendant's motion to make

4          a small modification to the confidentiality

5      order.

6           The defendant's motion indicated there had

7      been -- subject had been broached with

8      plaintiffs, but no real response had been

9      received.  Do you know what I'm talking about?

10     It's docketed as number 1027.  Make it a little

11     easier to -- for people to agree to protective

12     orders is the way I read that.

13          Mr. Bailey:  I think that was just filed

14     yesterday.

15          Mr. Allen:  It was just filed yesterday.

16          The Court:  What do you want me to do?

17     Have you had a chance to think about it?

18          Mr. Allen:  Yes, sir, I have had an

19     opportunity to think about it.

20          The Court:  What do you think?

21          Mr. Allen:  It's an improvement.  It will

22     not solve our problems.

23          The Court:  I didn't think it would solve

24     the problem.

25          Mr. Allen:  It's an improvement.


1           The Court:  We can do that.

2           Mr. Allen:  But I don't want to be on

3      record saying my problem is solved.

4           The Court:  No, I didn't -- I didn't sense

5          that.

6              Mr. Allen:  I'm sorry, your Honor, about

7          earlier if you think I was trying to get out of

8          order.  I thought these were related matters.

9              The Court:  Well, I know you did, but I

10         try to take them as they come.

11             Mr. Allen:  I gotcha.

12             The Court:  When there's this many things

13         and strings floating around, it's the best way

14         I can keep track of things.

15             Mr. Allen:  Yes, your Honor, I understand.

16         I was just trying to tell you, as you're saying

17         many strings, some of these strings are tied

18         together, but it's an improvement.  And I guess

19         what we would say is we would ask the Court to

20         enter that, because it is an improvement, but

21         we do not agree it's an ultimate solution.  But

22         if the Court is inclined and the defendant's

23         agree, we certainly don't want to stand in the

24         way of that improvement, recognizing it doesn't

25         solve all the problems.  So, if they are


1          agreeable, we ask the Court to sign that order.

2          And we are gonna bring -- I've been asked to

3          say this, I don't know if it's necessary under

4          your Court's order -- we are going to bring a

5          motion on this whole issue of confidentiality,

6          because I am telling you it is -- it is

7          tethered to the litigation and it is

8          interfering with our ability to both hire

9          witnesses and examine -- hire witnesses and

10        examine witnesses.

11            The Court:  Well -- and I understand your

12        point.  I guess what I would like to see, so I

13        can rule on it, is a specific motion where you

14        can tell me what it is that you need modified

15        about the order or if there is some other

16        relief that let's you use the information and

17        documents with people -- your consultants, your

18        testifiers and your deponents, if there's some

19        way, either by modifying language of the order

20        itself or some other order that I enter that

21        covers it, that -- you know, if I have to, I'll

22        review whether things are confidential.  I

23        dread that prospect, but -- because that's why

24        we have the confidentiality order and -- but if

25        we have to do that, I'll do that.


1            Mr. Pennock:  Your Honor, if I may.  The

2        issue that I think we will be making a motion

3        on is essentially getting back to the

4        confidentiality order that we negotiated and

5        agreed with and the Court originally entered,

6         which set forth procedures.  They were allowed

7         to mark documents confidential, but if there

8         really was no -- under the law, there was no

9         basis for them to be confidential, having no

10        requirement of being tethered to the litigation

11        or litigation need, we agreed and they agreed

12        that if we said we don't think this document is

13        entitled to confidentiality, it's not a

14        trademark, it's not a trade secret, so forth,

15        you have to look at it and tell us what your

16        opinion is, whether we're right or wrong.  And,

17        then, we get to bring the documents to the

18        Court and the Court can look at them to see

19        whether they are or aren't confidential.

20             And we do not, in that agreement that we

21        made some almost two years ago, agree that we

22        had to show a litigation need.  That wasn't the

23        issue.  It was never the issue.  It was, are

24        the documents, under the law, entitled to some

25        type of trade secret or other confidential

1         protection.

2              We think that the documents that have been

3         marked at deposition, some 500 of them, and, as

4         we discussed, some 18 million pages of

5         documents, we've got it boiled down to 500

6         documents or so that we think are not

```
 7          confidential under the law.  And we think that

 8          those documents and the deposition testimony

 9          that has been taken to date, all of which will

10          become unconfidential at the time of trial,

11          because it's gonna be in open Court several

12          months from now, we think that the time is ripe

13          now in order to just allow us to move swiftly

14          through -- the massive amount of effort we need

15          to put in over the next six months, that the

16          time is now ripe to just allow -- to order --

17          look at those documents, the Court can look at

18          those documents, say I don't see a trade secret

19          here, I don't see a trade secret here, I don't

20          know why this is confidential under the law.

21          There's no reason why we should all be burdened

22          even having these discussions.  And that will

23          alleviate everything.  And that, I think, is

24          the motion that we would like to make to the

25          Court before the next conference.


 1              The Court:  Well, that's a possibility,

 2          too.  I warned you before and I would warn you

 3          again, that's, to me, sort of a last resort,

 4          because that is a terrible burden on the Court.

 5              Mr. Allen:  Yes.

 6              The Court:  And it creates some unfairness
```

```
 7          to both sides in a sense that, if we can do it
 8          another way that let's you accomplish what you
 9          need to accomplish, I prefer that.  And --
10          because if I'm wrong and some things get out in
11          the public domain that shouldn't be there,
12          that's not fair to defendants.  And if -- on
13          the other hand, if I keep things confidential,
14          we still have the problem of how to get the
15          witness -- you're still entitled to talk to
16          witnesses about it if it's pertinent to the
17          litigation.
18              Mr. Allen:  And not just --
19              The Court:  We have to figure out a way
20          for that to happen.
21              Mr. Allen:  And not just -- I totally
22          agree with everything that Mr. Pennock said.
23          And that's right.  One of my issues, you know,
24          we had -- they had an ex-parte issue on
25          privilege.  I would be glad to take the 500


 1          documents, or less, if we have to come up with
 2          them -- and, really, think about it, we have
 3          heard 18 million pages or something.  We have
 4          done a pretty good job and we got them down to
 5          500 documents or so that we are aware of.
 6              I could easily highlight what we consider
 7          the most relevant portions of the documents,
```

8          agree to come to Orlando, agree to sit down

9          with the law clerks to go over -- I was a law

10         clerk one time -- and go over these issues, to

11         have them look at the documents and make a

12         report to the Court.  What we're telling you

13         is, your Honor -- and Mr. Pennock is completely

14         correct, that they are not confidential to

15         begin with.  What we are also telling the

16         Court, unless I'm not telling the truth, but I

17         submit to the Court that I am, that the

18         procedure that is in place denies my client's

19         due process.  It certainly does not allow me

20         today to go to a witness and say, have you seen

21         this, would this make a difference?  The

22         procedure -- that's why this -- the procedure

23         allowing amendment, if you look at the

24         amendment to the protective order, it

25         changes -- what happened to me in California


1          would not happen now, but it would not allow me

2          to discuss the document with the witness off

3          the record.  It would not allow the witness to

4          review his or her transcript.  In this case, it

5          was a female physician and review the document

6          before signing the deposition to make sure it's

7          accurate.  It says you can only see it in the

8   deposition.  They can't review the document

9   again.  They cannot retain a copy of it.  They

10   can't even look at it when they're signing

11   their deposition.

12        So, I -- to the Court's direction, I ask

13   the Court to do at least one thing; number one,

14   sign the amendment.  It's an improvement.  It

15   does not solve the issue, because Mr. Pennock

16   has pointed out what the issue is.  And I offer

17   the Court my oath as a lawyer that it's

18   interfering with my ability to get ready.  But

19   they can go into the same doctor -- assume they

20   have the same consultant and tell them anything

21   they want to.  It's just not working.  So,

22   we -- so, your Honor, it is tethered to the

23   litigation.  I am telling you that as an

24   officer of the Court.  So, we are going to file

25   a motion.  But, if you want us to start with a

1   stack of the 42 -- I think it was 42 documents,

2   I can sit down with the -- with you --

3        The Court:  Well, I'm not gonna tell you

4   what motion to file.  I would urge you to talk

5   some more with the other side, see if you can

6   come up with modifications to either the

7   substance or the procedures of the

8   confidentiality order that help you solve this

9       problem.  I'm not sure you are gonna get a cure

10      and then you can ask for further relief --

11          Mr. Allen:  Right.

12          The Court:  -- with what you disagree on

13      it, put that in your motion.  And then if you

14      think that, no matter what the ruling is on

15      that, that you are still gonna be hamstrung to

16      a degree that's unacceptable to you and that

17      you need rulings on the confidentiality of

18      these 500 documents, bring it on.

19          Mr. Allen:  Okay, your Honor.  Thank you.

20          The Court:  I'm not shuting the door.

21          Mr. Allen:  I hear you.  Your Honor, we do

22      ask, though, that the order that they submitted

23      this amendment, which I think that they

24      supplied in response to the Reinstein motion is

25      at least a Bandaid on the problem that we


1       ask -- and they obviously agreed to it, we ask

2       it be entered at this time.

3           The Court:  I'll take care of that.

4           Mr. Allen:  Okay.  Now, the other issue is

5       KOL depositions.  I think -- is this now the

6       time for that?

7           The Court:  Okay.

8           Mr. Allen:  The KOL -- and that is a term

9          of art.  It's a term of pharmaceutical art, not

10         plaintiff art.  It's called key opinion

11         leaders.  And the testimony is in the record in

12         this case and in every case that the reason

13         pharmaceutical companies hire key opinion

14         leaders is because their title is what they

15         are.  If they can get, let's called it,

16         renowned academicians, well respected doctors

17         on faculty to, in essence, become part of their

18         speakers bureau, they can lead the opinion of

19         others.  These people are paid fees.  Their

20         traveling expenses are paid.  They're agents of

21         the company for this purpose.  They utilize

22         slide preparations that are prepared, in part

23         or in whole, by the defendant when they go

24         speak at medical society meetings.  They even

25         go to individual doctors' office at times to

1          give lunch and learns.  They work for the

2          company.  We have had to schedule these

3          depositions.  I can promise you it's taken a

4          lot of effort to issue subpoenas.  And then we

5          go to the deposition of Dr. Tamminga, a key

6          opinion leader, who has written an article in

7          this case.  And if I mess up with the article,

8          but it's called Practical Treatment of

9          Schizophrenia.  She wrote in the article after

10          a study called the CATIE, C-A-T-I-E.  It's an

11          acronym for clinical anti-psychotic trial.  It

12          was sponsored by the National Institutes of

13          Mental Health study, the CATIE study, acronym.

14          I read her article.  She also wrote two

15          articles in the American Journal of Psychiatry

16          entitled -- and I'm paraphrasing the title,

17          called BIAS, B-I-A-S, concerning how

18          pharmaceutical money to doctors can bias

19          doctors.

20             In her article following the CATIE study,

21          I am paraphrasing, she said that the second

22          generation anti-psychotics, including Seroquel,

23          carry a heavy side effect burden, including

24          skyrocketing discontinuation rates and

25          metabolic side effects, which require constant


1          monitoring.  Those are our claims in this case,

2          your Honor, that those matters were not

3          adequately disclosed to the public.  They are

4          her -- their key opinion leader.

5             We go to her deposition and we're told,

6          first of all, prior to the deposition, that the

7          lawyer for -- for Dr. Tamminga, Carol Tamminga,

8          who is a key opinion leader for the company at

9          one time, that she will not answer this

```
10        question:  Does Seroquel cause diabetes?

11        Objection by counsel for AstraZeneca first.

12        Counsel for the key opinion leader says I have

13        objections.  She's not gonna give you anything

14        but facts.  She's not gonna give opinions.

15        She's not gonna testify about her publications.

16        She's not gonna answer this -- this question:

17        Have you ever stated that second generation

18        anti-psychotics, Seroquel is one, have serious

19        side effects, including metabolic side effects?

20        Don't answer that question.

21            We are also told, as you know in

22        Dr. Reinstein's -- we're cognizant at this

23        point at Dr. Reinstein's deposition that we

24        can't utilize documents because the witness

25        hasn't signed a protective order.  We are told


 1        we are not gonna give you opinions about

 2        causation.  We are not gonna testify about what

 3        our opinions were.  And I don't think I need to

 4        tell the Court how highly relevant that is.  If

 5        a key opinion leader of the company holds the

 6        opinion that their drug causes diabetes or

 7        metabolic side effects, that would be highly

 8        relevant.

 9            The Court:  Where is Dr. Tamminga?

10            Mr. Allen:  Dr. Tamminga is in Dallas,
```

11          Texas.

12              The Court:  Did you move to compel?

13              Mr. Allen:  Well, your Honor, this

14      deposition took place on June 19th and we put

15      it on the agenda, so it was -- was

16      that Thursday -- Wednesday, last Wednesday.  It

17      was less than a week ago.  We didn't have time

18      to do anything, but this is what's going on.

19      We're talking Dr. -- is it Carol Suppes,

20      S-U-P-P-E-S.

21              The Court:  Well, let me tell you.  I

22      frankly thought I would be hearing some of this

23      a long time ago.  I assumed that we would have

24      disputes like this back when we first set the

25      schedule in the case.  I've been pleasantly


1       surprised there's been relatively little of it,

2       but I'm not surprised to hear that there is

3       some.  Again, to me, the remedy, keep things so

4       that I can deal with them and the rest of the

5       Court system can deal with it.  You know,

6       sounds like you are raising some serious issues

7       with respect to Dr. Tamminga.  You know, you

8       file a motion to compel.  She can respond and

9       if the judge in Dallas wants me to decide it,

10      I'll decide it.

11          Mr. Allen:  I appreciate that.  Let me

12     tell you, your Honor -- and I've been -- of

13     course, you saw counsel was whispering to me

14     and I've been asked -- I understand.  Here's --

15     I hear it.  I'm gonna sit down, but we want you

16     to know that discovery cut off -- what is it,

17     next Tuesday?  It's a week from today.  It's

18     Monday, next Monday.  So, these problems are

19     occurring and they're going to carry over.  And

20     that's -- and I guess what we were trying --

21          The Court:  That doesn't surprise me

22     either.

23          Mr. Allen:  Well, okay.  Your Honor, I'm

24     glad you're not surprised.  And, you know, I

25     would also --


1          The Court:  I'm not gonna open things

2     carte blanche, but I, again, always anticipated

3     there were gonna be need for brooms, mops and

4     make-up calls.

5          Mr. Allen:  Well, I appreciate that and I

6     appreciate the Court's comments.  And

7     Mr. Pennock obviously has something to say.

8          Mr. Pennock:  Maybe it's a Swifter issue,

9     but there are a couple other things that may

10     need to mopped up, judge.

11          The Court:  I'm old school.

12          Mr. Pennock:  I wanted to just preview, if

13     I may.  I'll be very brief.  The first issue is

14     that there is -- there is a document that

15     was -- that was signed off on by Dr. Wayne

16     Gellar.  He was a physician in charge of global

17     safety surveillance for the company from 2000

18     to 2002.

19          The Court:  This is exhibit 49.

20          Mr. Allen:  It's the same person.

21          Mr. Pennock:  So, what happens is, they

22     hear -- they draft up this document for the

23     Dutch, excuse me --

24          Mr. Magaziner:  Is this on the agenda?

25          Mr. Pennock:  Yeah, it is.  It's under C.


1     This has to do with the issues regarding

2     privilege log, claims of confidentiality and

3     other document production issues will have an

4     impact on impending deadlines and I'm bringing

5     it up with respect to the June 30th deadline.

6          It's very simple, judge.  The company,

7     through Dr. Gellar here in the states, signed

8     off on a submission to the Dutch authorities

9     saying a number of things, including that there

10     is a reasonable association between Seroquel

11     and diabetes.  That was in 2000.  That

12      statement, we believe, easily required them by

13      U.S. law to put a warning in their label.  As

14      soon as the company believes that there is a

15      reasonable -- or evidence to support a

16      reasonable association, you've got to put a

17      warning in your label.

18          Now, we know they didn't do that, but

19      that's what they told the Dutch.  So, we find

20      the document with the statement and we say,

21      well, we find e-mail -- an e-mail dated

22      October 3rd where -- sorry, e-mail

23      September 20th:  Hi, Dorothy -- this is from

24      Dr. Gellar.  The document is 11 pages.  I can

25      fax a signed copy to you or mail one.  If you


1       prefer the latter, please sent me address, et

2       cetera.

3           And Ms. Veitch (sp) writes back:  Dear

4       Wayne, thank you for your fax, which I sent to

5       the local authorities.

6           So, we know -- at least we think we know

7       he signed it.  We know -- we think we know it

8       went to the Dutch authorities.  The defendant's

9       say that this signed document no longer exists

10      in anywhere they have looked.  That's fine.  We

11      will take them at their word that they have

12      looked, they can't find the signed document.

13          We're surprised that this signed

14     submission to the Dutch doesn't exist in some

15     discreet filing with the Dutch FDA.  But, in

16     any event, they don't have it.  And our motion

17     to preview, your Honor, will be that they have

18     to go to the Dutch authorities and get that

19     document that's on file with the Dutch.  We

20     have tried to and we have been unable to.

21     Frankly, probably due just to a lack of

22     sophistication with how to navigate through the

23     Dutch -- you know, getting disclosure, these

24     types of things from the Dutch.

25          But, in any event, we think they can


1      readily obtain it and we are going to be making

2      a motion to compel, which, I believe will come

3      in after next Monday and that's why I wanted to

4      preview it to the Court.

5           There's another area of discovery that has

6      arisen over the last couple months that -- and

7      from my vantage point, even over the last

8      several weeks that I do want to preview.  This

9      is a discreet area of discovery, Judge.  It's

10     factual discovery.  You will not -- I do not

11     foresee that this will effect the expert

12     deadlines in any way.

13          But, as you know, there were two doctors,

14      one of whom was a Ph.D, one was a physician,

15      Dr. Bornsen and Dr. Diamond.  Diamond was the

16      Ph.D.  And these guys, as you may remember,

17      Judge, were engaged by AstraZeneca to do

18      clinical trials before the drug was approved.

19      And those clinical trials were going to be

20      included in the new drug application and were,

21      in fact, included in the new drug application

22      initially.  These were very important trials,

23      subsequently cited by AstraZeneca employees in

24      presentation they gave.

25          Those two gentlemen were arrested and


1       convicted of clinical trial fraud involving

2       stealing money and perhaps not actually

3       conducting the trials that they did -- they did

4       trials for many, many, drug companies and they

5       were sent to prison in Georgia.

6           So, there they sat in jail.  And,

7       apparently, we have learned that AstraZeneca

8       allegedly went out and audited Bornsen's and

9       Diamond's clinical trial results to see, well,

10      okay, they're frauds and they're in jail, but

11      maybe their clinical trial results for us

12      aren't all that bad after all, maybe they're

13      still valid.  And they came to the conclusion,

14          AstraZeneca did, apparently, from this audit

15          that, yeah, these results are still good.

16          Whatever they were doing wrong and for whatever

17          reason they are in prison with respect to

18          clinical trials, didn't effect the clinical

19          trials we had.

20               We -- you know, this is an issue that has

21          come up here at the later stages of discovery

22          and I would like to preview the Court.  I'm

23          gonna be making a brief motion to allow us some

24          very specific discovery as to that audit, the

25          nature of that audit, who conducted that audit,

1          where the data is on that audit, what -- you

2          know, did they go out and interview all the

3          thousands of patients and say, hey, by the way,

4          you got paid to take Seroquel for that clinical

5          trial.  Did you really take Seroquel for that

6          clinical trial?  I want to see how they

7          confirmed that this data was still good data,

8          and so I preview for your Honor that motion

9          that I will have to make even though the

10          deadline for discovery is pending.  There may

11          be a couple of other discreet areas that we're

12          trying to sort out here at the end of this

13          process.  And I thank the Court for

14          appreciating that some of this mop up work

15          would be necessary.

16               Mr. Allen:  And to follow up on that --

17          and I know Mr. McConnell and Mr. Magaziner are

18          anxious to speak.  I guess what I hear the

19          Court saying today, and I appreciate it, is the

20          Court knows how hard we have worked.  I think

21          at least anything, the Court understands we

22          have worked hard and deadline is Tuesday.  We

23          are still getting production.  We have these

24          KOL deposition problems.  We have these issues

25          of production problems.  And we were worried


1          that if we didn't come before the Court and

2          identify these issues before the Court, the

3          Court would say to us, you know, for lack of a

4          better word, tic-toc, game locked.  And I hear

5          the Court today saying that we have the right

6          and, in fact, I'm pleased to hear you -- you

7          understood there may be things to broom up, mop

8          up.  So, we appreciate the Court's time and we

9          will have further motions and we will have

10          further motion to -- on some limited areas

11          either to redo the deposition of the KOL's or

12          obtain additional discovery concerning the

13          documents that we have received.  Thank you

14          very much.

15          Mr. McConnell:  Your Honor, I would like

16      to first address the last two points, which

17      pertain to the Bornsen and Diamond issue and

18      the Gellar document that was faxed to the

19      Netherlands.  We don't think either of those

20      two items were in the agenda at all.  And it's

21      a little exasperating because it was the

22      plaintiffs who came to us some time ago and

23      said that they didn't want these status

24      conferences to become status conference by

25      ambush where issues get raised, they weren't


1       really surfaced before and the parties didn't

2       have an opportunity to consider them.  So, your

3       Honor ended up signing an order on -- based on

4       a joint motion -- a joint motion -- that we

5       filed on April 8, 2008.  And you stated in that

6       order that at least seven business days prior

7       to the conference lead counsel shall exchange

8       proposed agendas listing every issue that's not

9       the subject of a pending motion, but that the

10      parties might raise at the conference.  The

11      proposed agenda items shall be listed with

12      enough detail and specificity that the opposing

13      party will be able to meaningfully consider

14      each issue.  Didn't happen with respect to

15          Bornsen, Diamond and Gellar.

16               I'm asking is in the future can we please

17          actually have a discussion about these things

18          if we plan on raising them at the agenda.   I

19          will briefly discuss those two issues, however.

20               On Bornsen and Diamond, what came up in

21          the depositions, and it's come up in a number

22          of depositions, the plaintiffs raised the

23          Bornsen and Diamond issue with a number of the

24          company witnesses.   What came up was there was,

25          in fact, certainly financial fraud committed by


1          Bornsen and Diamond.   In fact, AZ was a victim

2          as much as anybody else, but what AZ did was

3          take the data related to the various trials and

4          take out the Bornsen and Diamond data to see if

5          it made any difference.   And it didn't.   That

6          was all submitted to the FDA.   They want to

7          make a discovery request, they want to file a

8          motion, they're going to do it, but that's the

9          story.

10               With respect to the Gellar document, it's

11          become an issue of almost theoretical majesty

12          as to what Mr. Gellar wrote, what was real,

13          what was a draft, what was not.   It's a dispute

14          between the parties, we understood that.   So,

15          I'm not assuming that there is a signed

16          version, but my understanding is that we're

17          looking for it.  If we want to talk some more

18          about that, how we are looking for it, what

19          they want to do, that's fine.

20              With respect to some of the issues that

21          actually were on the agenda, let me address the

22          notion of the confidentiality order.

23              I first want to, actually, apologize to

24          Mr. Allen.  I did interrupt him.  I thought I

25          had a good reason for it, but it doesn't alter

1          the fact that it was rude and I regret that.

2              But, what I want to say about the

3          confidentiality order is, first of all,

4          confidentiality orders are absolutely standard

5          and the restriction that you have to get other

6          parties to sign off on it, including expert

7          witnesses, that's absolutely standard and I

8          can't conceive of any Court finding that that

9          would be some sort of impingement on due

10          process rights.  That's just the way it's

11          supposed to work.  But the fact is, we do hear

12          the complaints from the plaintiffs.  We

13          listened.  That's why we submit the proposed

14          amendment, which I take the plaintiffs agree

15          to, to try to make it easy so that even if a

16          doctor won't sign the agreement or won't affirm

17          it on the record, that there's a mechanism

18          where they can still use the document, the

19          restrictions are that the document can't be

20          left with the doctor.  But what we're trying to

21          do is protect our legitimate expectation of

22          confidentiality.  At a lot of these

23          depositions, your Honor, lawyers from Eli Lilly

24          and Janssen show up.  I'm not terribly happy

25          about that, but they do show up and we have


1          competitive concerns about both our scientific

2          and marketing documents and we think we've got

3          a legitimate interest in protecting it.

4               But, a little background, your Honor, what

5          happened, when Mr. Pennock was talking about

6          the original order and how things played out

7          and how things were supposed to play out, what

8          ended up actually happening, your Honor, is we

9          would do these depositions and there would be a

10          number of exhibits and the plaintiffs would

11          wait a while and then, all of a sudden, we'd

12          get a letter saying we reject your

13          confidentiality designations for all the

14          exhibits in the following depositions.  And

15          we'd, in one fell swoop, be hit with trying to

16          justify confidentiality of a large number of

17        documents.

18              And, so, what we would have to do, given

19        the compressed time frames that were in the

20        order, as opposed to responding to a rather

21        focused challenge -- we never got focused

22        challenged, we got wholesale challenges, as

23        your Honor knows, because we file these papers

24        with the Court.  We have to justify the

25        confidentiality of all those documents.  And


 1        that would involve not just briefing, but it

 2        would involve supplying declarations.  And this

 3        happened a number of times in this Court, your

 4        Honor.  And I think your Honor, rightly, being

 5        confronted with that, issued the order that you

 6        issued in February, which is this is absolutely

 7        madness; this is inefficient.  And the only

 8        reason to examine the confidentiality of a

 9        document is that there is a legitimate

10        litigation need.

11              Now, maybe a witness refusing to look at

12        it, to sign the order, that's an issue that

13        required us to address it and we did.  That's

14        why we had the amended order.  But the rule

15        still makes sense that there needs to be some

16        sort of protective order.  There needs to be

17          restrictions on who can see it and what they

18          have to do to be able to see it.  And there is

19          absolutely no basis to suggest that that's got

20          to be thrown out wholesale.  And if Mr. Pennock

21          is suggesting that you basically undo your

22          February 21, 2008 order, we obviously oppose

23          that because we think that that would be

24          inefficient and really doesn't do much more

25          than impose an enormous obligation on us.


1           We are now up to the point where we have

2           1,111 exhibits that have been used in the

3           various depositions and, now, plaintiffs say

4           that they're going to challenge only about half

5           of them.  That's an enormous undertaking for

6           us.  It's very easy for the plaintiffs to write

7           a letter saying we don't think they're

8           confidential.  That's --

9               The Court:  It's also very easy for the

10          defendant to label something as confidential

11          without a lot of thought.

12              Mr. McConnell:  That party is easy.

13          Justifying it is not easy, your Honor, for us

14          to then go --

15              The Court:  Well, it shouldn't be done

16          unless there's a serious reason for doing that.

17              Mr. McConnell:  I agree with that.  I

18     think what's gonna happen when we do end up

19     confronting this issue when there is a

20     legitimate litigation need, I think you're

21     going to rule for us.  I hope you're going to

22     rule for us more than you rule against us, but

23     a lot of these calls are difficult.  It's

24     difficult to make the call and it's gonna be

25     difficult to justify it and it's a huge onerous


1      process.  But we will do it.

2           The other point I want to make, your

3      Honor, though, is with respect to the

4      depositions of the key opinion leaders.  What

5      has gone on here is -- and, in fact, at the Dr.

6      Reinstein deposition, even when Dr. Reinstein

7      was saying, I don't know about this protective

8      order, I'm not gonna sign it, even at that

9      deposition, my understanding is the AstraZeneca

10     lawyer said, you know what, if they're

11     documents that actually were authored by or

12     sent to Dr. Reinstein, go ahead and use it.

13          And that's not what the plaintiffs were

14     interested in, because Mr. Allen is right.

15     He's got this big stack of documents.  The

16     documents largely had nothing whatsoever to do

17     with the KOL.  And what the plaintiff wanted to

18          do is they want to trot these documents out,

19          say, did you know about that?  Did you know

20          about that?  What does that mean?  Would that

21          effect your opinion?

22              I submit to you, your Honor, if that ever

23          came to a Court in a trial that that would

24          be -- all those questions would be met with

25          objections for lack of foundation, calls for


1          speculation and those objections would be

2          sustained.

3              So, all I'm saying is I don't see this as

4          a hardship that the plaintiffs feel that in

5          some cases they were disabled from asking

6          absolutely inappropriate questions.  And,

7          sometimes, the questions involved putting a

8          document in front -- and I know, because I went

9          to one of these KOL depositions.  Taking an

10          internal document, which somebody inside the

11          company criticized the KOL, putting that in

12          front of the KOL and, basically, just trying to

13          create enmity with the KOL.  It's sort of fun

14          for the plaintiffs to do, but it doesn't

15          actually address any issue that's relevant to

16          the case.

17              But, in any event, your Honor, I submit,

18          that the confidentiality issue at this point

19      isn't creating any hardship; that the amendment

20      will get rid of any legitimate problems that

21      the plaintiffs face.  And I don't think that

22      they have any legitimate basis for creating an

23      absolutely ridiculous burden on the defendants.

24          But, now, the Tamminga deposition, which

25      is not on the agenda -- and, by the way, there


1       was no notice supplied to Dr. Tamminga's

2       lawyer.  It does seem to me, your Honor -- I

3       know you already made the order about the

4       Reinstein deposition.  It seems to me it would

5       make sense for the plaintiffs if they are going

6       to talk about what they can and cannot do with

7       respect to these third party witnesses, they

8       ought to supply notice to the lawyers for the

9       those witnesses and those lawyers ought to have

10      an opportunity to represent their clients and

11      say whatever it is they are going to say in

12      Court.  I don't know what they would say.

13          But Dr. Tamminga's lawyer was not notified

14      about this.  I have got the transcript.  Dr.

15      Tamminga --

16          The Court:  That's why I said if he wants

17      to compel that, there's a procedure and follow

18      that procedure.

19        Mr. McConnell:  But I do need to tell,

20    your Honor, that Dr. Tamminga has agreed to

21    comply with the confidentiality order.  So, the

22    only issue that came up in the Tamminga

23    deposition was that when questions were asked

24    of her that weren't fact based, that basically

25    asked her to render opinions, Dr. Tamminga's


1     lawyer instructed Dr. Tamminga not to answer.

2     We didn't instruct her not to answer.  We can't

3     do that.

4         But Dr. Tamminga's lawyer said, she's not

5     here as your free expert.  She's not here to

6     speculate.  She's here to talk about facts.

7         Now, your Honor raised a pretty good

8     point, which is you thought that there might be

9     disputes like this at depositions.  And, in

10    fact, that was contemplated in CMO3.  And what

11    CMO3 provided is that, if the course of

12    deposition there is a dispute about whether or

13    not a witness has to answer a question, what

14    the lawyers should do -- and I think you said

15    that you were okay with this -- is pick up the

16    phone and try to contact the Court and a prompt

17    ruling at that time might have solved the

18    problem one way or the other.

19        And this is not inconsequential because

20          that deposition was in Texas.  One of our
21          lawyers from Chicago flew there.  And what
22          happened was, after Dr. Tamminga's counsel said
23          that Dr. Tamminga isn't going to answer those
24          sorts of questions, the plaintiff lawyer just
25          blew up the deposition and said that's it.


1          They didn't try to ask other questions.  They
2          didn't try to make any sort of record and they
3          certainly didn't call the Court.  They just
4          blew up the deposition, everybody had to fly
5          home.
6                Now, there may be another deposition.
7          They may file a motion, but I don't think that
8          that's the way the process is supposed to work.
9                And, by the way, with respect to the issue
10          of time limits, your Honor, what's happened
11          with respect to a number of these key opinion
12          leaders is that time limits have been worked
13          out between the plaintiff lawyers and the
14          lawyers representing the third party witnesses.
15          So, for example, with respect to Dr. Tamminga,
16          I believe there was an agreement to a
17          three-hour limit.  I think there was also a
18          three-hour limit with respect to Dr. Suppes.
19          And, if I'm wrong, I'll stand corrected.  But,

20      that is what happened with respect to Dr.

21      Tamminga's deposition.  It wasn't a

22      confidentiality issue at all.  It was a dispute

23      about what sorts of questions needed to be

24      answered and which ones don't.  And there's a

25      process for resolving that.  And my suggestion

1       is that we actually follow that process.

2           If your Honor has any questions you want

3       to address to me about the confidentiality

4       order issues or the KOL depos, I'll be happy to

5       answer them.

6           The Court:  I'm going to wait for things

7       to ripen on that respect.

8           The other matter that I'm aware of is a

9       motion that was filed today with respect to a

10      deposition noticed for tomorrow.

11          Mr. McConnell:  Yes.  We filed that

12      motion, your Honor, as an emergency motion

13      today.  If I could grab my paperwork.

14          The Court:  Well, I understand your

15      motion.  I don't know whether plaintiffs have

16      had a chance to look at it.  It's a 30(B)(6)

17      deposition.

18          Mr. McConnell:  If I could just give you a

19      very brief background on this, your Honor.

20          The Court:  On the consensus

21      development --

22          Mr. McConnell:  Yes.  What that is

23      referring to is the ADA, American Diabetes

24      Association issued a consensus statement at the

25      end of 2003.  It actually was published in the


1       literature in 2004.  And it was a consensus

2       statement that looked at atypical

3       anti-psychotics, and Seroquel is one, and

4       looked to see the extent to which these

5       atypical anti-psychotics would be associated,

6       would even cause weight gain or diabetes.  And

7       that particular consensus statement found that

8       certain atypical anti-psychotics, such as

9       clozapine or olanzapine were associated with

10      weight gain and with diabetes.  But that other

11      atypicals, the record was mixed and it couldn't

12      be said that that was the case.  So, that

13      was -- and that was true for Seroquel.  So,

14      it's obviously a significant document.

15      AstraZeneca thinks it's a very, very helpful

16      document.

17          And what the plaintiffs did was, about a

18      week or so ago, they issued a 30(b)(6)

19      deposition notice for a witness at AstraZeneca

20      who could talk about the consensus statement

21          and AstraZeneca's role with respect to the

22          finding.  Our points are this:  Your Honor

23          issued an order about 30(b)(6) depositions.

24          Typically, 30(b)(6) depositions come at the

25          outset of the discovery.  And that, in fact, is


 1          what happened.  There were a large number of

 2          30(b)(6) depositions that the plaintiffs took

 3          on a wide variety of areas.  Your Honor set

 4          forth a deadline of March 31, 2007 for the

 5          plaintiffs to issue 30(b)(6) notices.

 6          Plaintiffs did so.  Those depositions took

 7          place.

 8              For the plaintiffs now, June 16, 2008,

 9          about 14 months after the deadline, to ask for

10          a 30(b)(6) deposition is somewhat

11          extraordinary, but that extraordinariness is

12          heightened by the fact that it's absolutely

13          unnecessary, because it turns out, your Honor,

14          that the witness at AstraZeneca who would be

15          that person most knowledgeable, who would talk

16          about the ADA consensus statement and whatever

17          it was that AZ did with respect to it, is being

18          deposed tomorrow and the day after.  That's

19          Dr. Ron Leong (sp).

20              So, what we said to the plaintiffs was,

21          first of all, we don't think your 30(b)(6)

22          notice is appropriate because of the timing,

23          but it's also not necessary because you can ask

24          all your questions about the consensus

25          statement tomorrow and the day after.


 1              I think that that's where it should lie;

 2          that the 30(b)(6) notice should be quashed.  At

 3          a minimum, it seems to me, your Honor, the

 4          smart thing to do would be to say, let them

 5          take the deposition of Ron Leong tomorrow and

 6          the day after and then see where we are.  I

 7          know the plaintiffs asked questions about the

 8          documents.

 9              Whatever documents we have produced, we

10          have produced.  And I think, as I understand

11          it, where the discussion ended between the

12          plaintiffs and defendant was that the

13          plaintiffs wanted us to do the search for them

14          to find the documents, which struck us as not

15          entirely appropriate since they can undertake

16          that search just as well as we can.

17              But there's one other issue, your Honor,

18          which makes it even more extraordinary that

19          this 30(b)(6) notice was filed on June 16th

20          with respect to the ADA consensus statement;

21          and that is that the ADA consensus statement is

22         so clearly important in this litigation and is

23         so obviously important, that's been known for a

24         long, long time.  And it seemed to me there

25         just couldn't be any way that the plaintiffs'

 1         lawyers didn't know about the ADA consensus

 2         statement many, many months, if not years ago.

 3               As Mr. Allen said before, he hopes by now

 4         we have gained some respect for him, which we

 5         have --

 6               Mr. Allen:  Did I say that?

 7               Mr. McConnell:  And, your Honor, it turns

 8         out that Mr. Allen gave an opening statement in

 9         his Zyprexa trial in March of 2008.  And one of

10         the main components of that opening statement

11         was the discussion about the ADA consensus

12         statement.  And he talked about clozapine and

13         olanzapine being deemed risky and causing

14         weight gain and diabetes, as opposed,

15         contrasted with, the other atypical

16         anti-psychotics, which would include Seroquel.

17               Moreover, your Honor, in January of 2008,

18         Mr. Blizzer (sp) took a deposition of one of

19         the company witnesses and asked about the ADA

20         consensus statement.  And, in fact, the

21         plaintiffs took depositions of doctors in the

22         Florida cases in fall of 2007.

23          Mr. Allen:  We stipulate and agree we knew

24      about the consensus statement.  You're putting

25      up a straw man to cut down.


 1          Mr. McConnell:  I'm done on that point.

 2      Your Honor, all I would suggest is that the

 3      30(b)(6) notice is procedurally improper and

 4      unnecessary given the very witness that they

 5      are going to be deposing tomorrow and the day

 6      after.

 7          The Court:  Plaintiffs haven't had a

 8      chance to respond in writing to that motion.

 9      Do you plan to go ahead and take Dr. Leong's

10      (sp) deposition tomorrow and Thursday?

11          Mr. Allen:  Yes.

12          The Court:  Do that and file your response

13      to the motion to quash the 30(b)(6) aspect of

14      it by Monday after you have taken that

15      deposition and then I'll decide.

16          Mr. Allen:  We have -- by Monday?  Your

17      Honor, we do have a holiday coming up.  I mean,

18      I know -- Monday is -- can I file it some time

19      before the next hearing and take it up before

20      the next hearing?

21          The Court:  Well, I'm assuming there's at

22      least a chance it's going to be effectively

23          moot.  But if the emergency aspect of it

24          disappears, because you are going to be taken

25          Mr. Leong -- Dr. Leong, whatever he is, any


 1          way, then I guess I don't care.  You can file a

 2          response in the ordinary course.

 3               Mr. Allen:  Yes, sir.  We'd like to -- can

 4          I attempt to respond to anything that was said

 5          about my case and what we are saying here,

 6          because I think it's important moving forward.

 7          And I honestly do.  And this is --

 8               The Court:  I'm not sure it's necessary.

 9               Mr. Allen:  Well, it may or may not be,

10          your Honor, but here's what I have learned long

11          ago, maybe I have just had bad training.  If

12          you leave some of these matters on the table,

13          they're assumed to be true what they're saying.

14          And I just want the Court to know that my

15          silence is not assent.  And I will tell the

16          Court --

17               Mr. McConnell:  We'll stipulate to that,

18          your Honor.

19               Mr. Allen:  Okay.  Good.

20               The Court:  I have observed that before.

21          Both presented as argument and I take it in

22          that --

23               Mr. Allen:  Okay.  Right, I gotcha.  Okay,

24          I just don't want my silence to assent.  I do

25          not agree with the statements Mr. McConnell


1           made.  I will agree that I gave an opening

2           statement in another case in February or March

3           of this year.  I agree I was informed of the

4           American Diabetes Association consensus

5           statement.  And I can quite frankly tell the

6           Court that the issue of the 30(b)(6) notice was

7           a matter of my choosing, based upon long

8           discussions with counsel across the country.

9           And, as the Court has indicated today, there is

10          matters to brush up or mop up at the end of

11          litigation and that's why it was done.

12              And I will tell the Court, we will file a

13          response on Leong, but we will have a response

14          and we -- I have instructed counsel who is

15          taking the deposition, who is older and

16          supposedly wiser than me, to cover some of

17          these areas.  But Dr. Leong has other functions

18          for which he's being deposed.  He was the

19          safety surveillance coordinator physician from

20          2002 to -- to the current date on Seroquel.

21              So, a 30(b)(6) notice is different than

22          what we're asking for.  So, I just don't want

23          the Court to be left with the impression that

24          Scott Allen has misrepresented anything to this
25          Court, that I wasn't aware of it and I'm

1           telling you that I was.  It was a judgment call
2           and it was made after much discussion.  And it
3           was made in order, as the Court said today, to
4           mop things and clean things up.  And it wasn't
5           because I'm inattentive, unknowledgeable or was
6           trying to pull a fast one.
7               Mr. McConnell:  By the way, your Honor, I
8           don't think I ever suggested Mr. Allen was
9           unknowledgeable or trying to pull a fast one.
10              The Court:  When do you want to meet
11          again?
12              Mr. Allen:  Tomorrow afternoon?
13              The Court:  I'll be hear.
14              Mr. McConnell:  July 28th, 29th, 30th,
15          somewhere in that area?
16              Mr. Allen:  We probably need sooner.
17          Don't you think sooner?  Your Honor, because we
18          have a lot of disputes, obviously, now.  Maybe
19          we can work them out, but I just think we are
20          starting to push them down the road and I'm
21          telling you we are going to have some problems
22          if we don't get some things worked out.
23              Mr. McConnell:  Maybe we need more time to
24          work it out.

25          Mr. Allen:  That's not gonna happen.  They

1    are not going to agree --

2          The Court:  Time heals some wounds and

3    wounds some heals, so -- I'm gonna be out the

4    week of the -- I have to give a speech on

5    managing multi-district litigation to other

6    magistrate judges.  None of you are invited to

7    that discussion.

8          Mr. Allen:  We could serve as experts on

9    your behalf.

10         The Court:  Well, we actually gave some

11   consideration -- well, I'll leave that for

12   another year.

13         Mr. Allen:  I gotcha.  I'll testify,

14   whatever.

15         The Court:  We could, at some date in the

16   future, perhaps do a more sociable panel

17   discussion, could be enlightening to all, but

18   not just yet.

19         Mr. Allen:  All right.

20         Mr. Magaziner:  Could we look at the week

21   of the 21st, your Honor?

22         The Court:  What's that I'm looking at.

23         Mr. Pennock:  Could I suggest July 18th?

24         The Court:  Well, no.  You can suggest it,

25          but it won't work.  It's -- it will have to be


1          the week of the 21st.

2               Mr. Allen:  Can you give us a second to

3          talk, because I have some people whispering in

4          my ear that maybe they agree with your original

5          suggestion of theirs on the 28th.  Can we

6          caucus for one second?  Can we caucus?

7               The Court:  Go ahead.

8               Mr. Magaziner:  Before we do that, are the

9          29th and 30th dates available to your Honor?

10              The Court:  Yeah.  I may have a trial on

11         the 28th and 29th, but if I do, it will be a

12         bench trial and I haven't heard from the

13         people.

14              Mr. Magaziner:  Can we take a moment to

15         talk with counsel?

16              The Court:  Talk amongst yourselves.

17              (A brief recess was taken, after which the

18         following proceedings were had.)

19              Mr. Magaziner:  We have an agreement.

20              The Court:  Tell me what you are thinking.

21              Mr. Magaziner:  Afternoon of the 29th.

22              The Court:  All right.  If I need to

23         interrupt the trial, I can carry them over to

24         the next day or something.  And it's still

25         penciled in.

1          Mr. McConnell:  2:00 o'clock, your Honor?

2          Mr. Allen:  What day of the week is that?

3          Mr. McConnell:  That's a Tuesday.

4      Mr. Allen:  That's good for us.  And, your

5      Honor, again, I -- you know, I want you to

6      know, because I feel compelled to say:  You

7      have done a magnificent job.  This thing has

8      been tough.  I did not mean to jump ahead to

9      today, but I just see these problems coming and

10     I didn't want us to go down the road thinking

11     everything was fine and I agree.  I thank the

12     Court for its patience.

13         The Court:  Just as we close, I want to

14     call everybody's attention to what, at least, I

15     learned the first day of civil procedure, and I

16     assume most of you have, too.  It's Rule 1 of

17     the Federal Rules.  The rules governing

18     procedure in all civil actions and proceedings

19     in these Courts and they should be construed

20     and administered to secure the just, speedy and

21     inexpensive determination of every action and

22     proceeding.  That's Rule 1.  Still applies.

23     So, keep that in mind.

24         Mr. Allen:  Thank you, your Honor.

25         The Court:  We are in recess.

1                    (Hearing concluded at 4:00 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    COURT CERTIFICATE

 2
     STATE OF FLORIDA  )
 3   COUNTY OF ORANGE  )

 4          I, H. WILLIAM JONES, REGISTERED PROFESSIONAL
     REPORTER, CERTIFY THAT I WAS AUTHORIZED TO AND DID
 5   STENOGRAPHICALLY REPORT THE FOREGOING PROCEEDINGS AND THAT
     THE TRANSCRIPT IS A TRUE AND COMPLETE RECORD OF MY
 6   STENOGRAPHIC NOTES.

 7        DATED THIS 27TH DAY OF JUNE, 2008.

 8

 9

10

11              _____

12                    H. WILLIAM JONES, NOTARY PUBLIC,
                      STATE OF FLORIDA AT LARGE,
13                    REGISTERED PROFESSIONAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25
```