Page 1

1           IN THE UNITED STATES DISTRICT COURT

2               MIDDLE DISTRICT OF FLORIDA

3                   ORLANDO DIVISION

4

5    IN RE:  SEROQUEL PRODUCTS )
                               )
6    LIABILITY LITIGATION      ) Case No.
                               )
7                              ) 6:06-md-01769-ACC-DAB
     MDL Docket No. 1769       )
8    _____  )

9                    - - -

10                 CONFIDENTIAL

11                   - - -

12          The videotaped deposition of

13   MICHAEL JAY REINSTEIN, M.D., called by the

14   Plaintiffs for examination, taken pursuant to the

15   Federal Rules of Civil Procedure of the United

16   States District Courts pertaining to the taking of

17   depositions, taken before CORINNE T. MARUT, C.S.R.

18   No. 84-1968, a Notary Public within and for the

19   County of DuPage, State of Illinois, and a

20   Certified Shorthand Reporter of said state, at the

21   offices of Fraterrigo, Beranek, Feiereisel &

22   Kasbohm, Conference Room 525, 55 West Monroe

23   Street, Chicago, Illinois, on the 28th day of May,

24   2008, commencing at 8:57 a.m.

Confidential - Michael Jay Reinstein, M.D.

Page 2

```
 1   PRESENT:
 2       MATTHEWS & ASSOCIATES
         2905 Sackett Street
 3       Houston, Texas 77098
         713-222-8080
 4       BY: DAVID P. MATTHEWS, ESQUIRE
         dmatthews@thematthewslawfirm.com,
 5
           - and -
 6
         BAILEY PERRIN BAILEY LLP
 7       440 Louisiana, Suite 2100
         Houston, Texas 77002
 8       713-425-7100
         BY: FLETCH TRAMMELL, ESQUIRE
 9       ftrammell@bpblaw.com,
10         - and -
11       FREESE & GOSS, P.L.L.C.
         3031 Allen Street, Suite 200
12       Dallas, Texas 75204
         214-761-6610
13       BY: RICHARD A. FREESE, ESQUIRE
         richfreese@aol.com,
14       TIM K. GOSS, ESQUIRE
         tim@freeseandgoss.com,
15
             appeared on behalf of the Plaintiffs;
16
         SHELLER, P.C.
17       1528 Walnut Street, 3rd Floor
         Philadelphia, Pennsylvania 19102
18       215-790-7300
         BY: KENNETH W. SMITH, ESQUIRE
19       ksmith@sheller.com,
20           appeared on behalf of the Plaintiffs
             in the New Jersey litigation;
21
22
23
24
```

Page 3

```
 1   PRESENT (Continued):
 2       SIDLEY AUSTIN LLP,
         One South Dearborn
 3       Chicago, Illinois 60603
         312-853-7000
 4       BY: EUGENE A. SCHOON, ESQUIRE
         eschoon@sidley.com
 5       JAMES W. MIZGALA, ESQUIRE
         jmizgala@sidley.com
 6       GRETCHEN M. PAINE, ESQUIRE
         gpaine@sidley.com
 7
             appeared on behalf of AstraZeneca;
 8
         FRATERRIGO, BERANEK, FEIEREISEL & KASBOHM
 9       55 West Monroe Street, Suite 3400
         Chicago, Illinois 60603
10       312-782-9255
         BY: SCOTT D. HAMMER, ESQUIRE
11       shammer@fbfk.com,
12           appeared on behalf of the Deponent,
             Dr. Michael Jay Reinstein.
13
14   VIDEOTAPED BY:
15
         ERIC RUKIN
16
17
18   REPORTED BY: CORINNE T. MARUT, C.S.R. No. 84-1968
19
20
21
22
23
24
```

Page 4

```
 1       THE VIDEOGRAPHER:  Good morning.  We are now
 2   on the record.
 3           This is the videotaped deposition of
 4   Michael Jay Reinstein, M.D., being taken on
 5   May 28, 2008.  The time is now 8:57 a.m., as
 6   indicated on the video screen.
 7           We are located at 55 West Monroe Street,
 8   Suite 525, Chicago, Illinois.
 9           This deposition is being taken on behalf
10   of the Plaintiffs, in re Seroquel Products
11   Liability Litigation.  The Case number is
12   6:06-MD-01769, filed in the U.S. District Court,
13   Middle District of Florida, Orlando Division.
14           My name is Eric Rukin, Certified Legal
15   Video Specialist, representing Legal Media,
16   Incorporated, with offices at 1602 Washington
17   Avenue, Houston Texas, 77007.
18           The Court Reporter today is Corey Marut.
19           Will counsel at this time identify
20   yourselves for the record, please.
21       MR. TRAMMELL:  Fletch Trammell, Plaintiffs.
22       MR. MATTHEWS:  David Matthews, Plaintiffs.
23       MR. SCHOON:  Gene Schoon on behalf of the
24   Defendants.
```

Page 5

```
 1       MR. MIZGALA:  James Mizgala on behalf of the
 2   Defendants.
 3       MS. PAINE:  Gretchen Paine on behalf of the
 4   Defendants.
 5       MR. HAMMER:  Scott Hammer on behalf of the
 6   witness, Dr. Reinstein.
 7       THE VIDEOGRAPHER:  And will the reporter
 8   please swear in the witness.
 9           (WHEREUPON, the witness was duly
10           sworn.)
11       THE VIDEOGRAPHER:  Please proceed.
12       MICHAEL JAY REINSTEIN, M.D.,
13   called as a witness herein, having been first duly
14   sworn, was examined and testified as follows:
15           EXAMINATION
16   BY MR. TRAMMELL:
17       Q.   Good morning, Doctor.  My name is Fletch
18   Trammell.  I represent Plaintiffs in multi-district
19   litigation related to the drug Seroquel.  Do you
20   understand that?
21       A.   Yes.
22       Q.   Will you please state your name for the
23   record.
24       A.   Dr. Michael Reinstein.
```

Confidential - Michael Jay Reinstein, M.D.

Page 6

1    Q.   And you and I have never met before, is
2  that correct?
3    A.   That's correct.
4    Q.   Do you understand that your deposition
5  has been noticed here in association with certain
6  personal injury cases brought by people who claim
7  they were injured by Seroquel?
8    A.   I do.
9    Q.   And you've been subpoenaed in this case
10  to produce certain documents and to appear here
11  today, is that correct?
12    A.   That's correct.
13    Q.   And you've brought your attorney?
14    A.   I did.
15    Q.   Have you had any conversations with
16  defense counsel prior to today?
17    A.   No.
18    Q.   Have you ever spoken to a lawyer for
19  AstraZeneca?
20    A.   Just once.
21    Q.   When was that?
22    A.   Approximately December of '07.
23    Q.   What was that about?
24    A.   She was notifying me that I'd be

Page 7

1  depositioned in this case and she wanted my
2  attorney's phone number.
3    Q.   So, she just called you to schedule or
4  to notify you that you would be deposed and to get
5  the phone number and nothing else?
6    A.   That's correct.
7    Q.   There was no other conversation?
8    A.   No.
9    Q.   And that's the only lawyer you've ever
10  talked to?
11    A.   That's correct.
12    Q.   And who was that?
13    A.   Don't remember her name.  She was in
14  Philadelphia, but I don't recall her name.
15    MR. TRAMMELL:  This is a copy of the subpoena
16  that we sent to you.
17    We will mark this as Exhibit 1.
18    (WHEREUPON, a certain document was
19    marked Reinstein Deposition Exhibit
20    No. 1, for identification, as of
21    05-28-2008.)
22  BY MR. TRAMMELL:
23    Q.   Have you ever seen this document?
24    MR. HAMMER:  Give me one second, please.

Page 8

1    There are several parts to the document.
2  So, look through it.
3    (WHEREUPON, Kenneth W. Smith, Esq.
4    entered the deposition
5    proceedings.)
6  BY MR. TRAMMELL:
7    Q.   Have you ever seen Exhibit 1, Doctor?
8    A.   I have.  I don't know if I've seen
9  every page in here, but I have seen the
10  exhibit.
11    Q.   Did you understand it when it was sent
12  to you?
13    A.   Yes.
14    Q.   Can you turn to page 1, please, of the
15  subpoena.
16    MR. HAMMER:  That would be the top page?
17    MR. TRAMMELL:  What's that?
18    MR. HAMMER:  Would that be the top page?
19    MR. TRAMMELL:  No.  It's the -- it's
20  numerically marked page 1 at the bottom of the
21  page.
22  BY THE WITNESS:
23    A.   I have it.
24    MR. SCHOON:  Perhaps we should have Mr. Smith

Page 9

1  identify himself for the record.
2    MR. SMITH:  Ken Smith, Sheller PC in
3  Philadelphia, for the New Jersey litigation.
4  BY MR. TRAMMELL:
5    Q.   Doctor, according to the subpoena, you
6  were required to produce all documents known or
7  reasonably available to you regardless of whether
8  such documents were in your possession, custody or
9  control or in the possession, custody or control of
10  your agents, consignees, representatives or
11  investigators or your attorneys or their agents,
12  employees, representatives or investigators.
13    Have you done that, to the best of your
14  knowledge?
15    A.   Yes.
16    Q.   And you understood that instruction?
17    A.   Yes.
18    Q.   If you'll turn to page 4, please.
19    The first request is, "Any and all
20  contracts or agreements between AstraZeneca and
21  Dr. Michael Jay Reinstein related to Seroquel."
22    Did I read that correctly?
23    A.   Yes.
24    Q.   Did you understand that request?

3 (Pages 6 to 9)

Confidential - Michael Jay Reinstein, M.D.

Page 10

1    A.   Yes.
2    Q.   And have you complied with it?
3    A.   Yes.
4    Q.   Second is, "Any and all communications
5    between AstraZeneca and Dr. Michael Reinstein
6    relating to Seroquel."
7         Did you understand that request and have
8    you complied with it?
9    A.   Yes.
10   Q.   Did you understand all these requests
11   and have you complied with all of them?
12   A.   Yes.
13   Q.   If you'll turn to page 7. It's a
14   definition of a term that's included in the
15   request, "clinical trials." There are three or
16   four explanations of what's required in the request
17   for documents related to clinical trials.
18        Did you understand those definitions and
19   have you complied with them as far as you know?
20   A.   Yes.
21   Q.   If you'll go to the end of the subpoena.
22   There is an attachment, which is the protective
23   order issued in -- issued by the Middle District of
24   Florida, United States District Court by Magistrate

Page 11

1    Judge Baker.
2         Do you see that document?
3    A.   Yes.
4    Q.   Have you read that document today?
5    A.   I've not read it today, no.
6    Q.   Attached to that document is an
7    agreement or an endorsement of the protective
8    order. Have you read that document?
9    A.   No, I have not.
10   THE VIDEOGRAPHER: I'm sorry, doctor. I'm
11   going to need you to speak up for the video record.
12   I'd appreciate that. Thank you.
13   BY MR. TRAMMELL:
14   Q.   You haven't read these documents but
15   it's your -- you've made the decision not to sign
16   them. Is that correct?
17   A.   On advice of legal counsel I have not
18   signed them.
19   Q.   And why is that?
20   A.   That's -- that's on advice of legal
21   counsel.
22   Q.   Is there a reason that you haven't
23   signed it?
24   MR. HAMMER: Objection; asked and answered.

Page 12

1    He just said so.
2         You can answer again.
3    BY THE WITNESS:
4    A.   Advice of legal counsel.
5    BY MR. TRAMMELL:
6    Q.   Is there anything in the substance of
7    this document that you object to?
8    MR. HAMMER: Just for the record he said he
9    never read it. So...
10   BY MR. TRAMMELL:
11   Q.   Would you take a minute to review it,
12   please.
13   A.   Okay, I've read it.
14   Q.   You've read the protective order?
15   A.   Yes.
16   Q.   And the endorsement?
17   A.   Yes.
18   Q.   And it's your decision not to sign the
19   endorsement, is that correct?
20   A.   That's correct.
21   MR. SCHOON: Object to form.
22   BY MR. TRAMMELL:
23   Q.   What is it about the protective order
24   that prevents you from being able to sign the

Page 13

1    endorsement?
2    MR. HAMMER: Also object. I think he
3    testified based upon legal counsel's advice he is
4    not going to sign it and that pervades the
5    discussion he and I had outside ten minutes ago
6    outside in the hallway.
7    BY MR. TRAMMELL:
8    Q.   I'm not asking you about anything that
9    you talked to your lawyer about.
10        Is there anything about this document
11   that's objectionable to you?
12   MR. HAMMER: Objection as to form.
13   MR. SCHOON: Object to form.
14   BY MR. TRAMMELL:
15   Q.   You can answer.
16   A.   Makes me very uncomfortable. It says
17   there could be a court sanction if I ever discuss
18   this with somebody; and, you know, for whatever
19   the reason, it may be in somebody's interest to
20   discuss it with them.
21   Q.   Is there any other reason?
22   A.   No.
23   Q.   Why would it be in your interest to
24   discuss confidential materials with other people?

4 (Pages 10 to 13)

Page 14

1    MR. HAMMER:  Objection; form.
2    MR. SCHOON:  Objection.
3  BY THE WITNESS:
4    A.   I don't know.  There may be material
5  that I would want to discuss with patients if there
6  were certain data produced that I thought it was in
7  my patient's best interests to discuss with them.
8    MR. MATTHEWS:  We'd like to reserve the
9  retaking of this deposition pending a ruling by the
10  Court as to the confidentiality agreement.
11    We will proceed on the basis of
12  Dr. Reinstein not signing the confidentiality
13  agreement, but we may be retaking this deposition
14  in the future concerning documents that are
15  confidential.
16  BY MR. TRAMMELL:
17    Q.   Yeah, and, Doctor, I just want to be
18  clear.  We have to create a record.
19    We are going to request to take
20  your deposition again, and we'll be filing motions
21  related to the confidentiality designation of
22  certain documents; and, so, it's important that we
23  understand your reasons for not signing this
24  document and the reasons that you find the

Page 15

1  protective order objectionable.
2    And my understanding from you is that
3  you're uncomfortable with being inhibited from
4  discussing unknown confidential material with
5  patients, is that correct?
6    MR. HAMMER:  I'm going to object.  That
7  mischaracterizes his testimony plus there is
8  attorney-client communications between me and him.
9    You can -- you could answer the
10  question, Doctor.
11    MR. SCHOON:  I join in the objection.
12  BY THE WITNESS:
13    A.   That's -- that's my answer.
14    MR. TRAMMELL:  I'd also like to get on the
15  record, and I will get this on the record
16  throughout the deposition, that not being able to
17  show the doctor documents that have been designated
18  confidential does prejudice our rights to conduct a
19  meaningful examination here today.
20    And as Mr. Matthews said, we will be
21  requesting an opportunity to conduct such an
22  examination with the use of documents that have
23  been designated confidential either pursuant to
24  some order of the court or after those documents

Page 16

1  have been re-designated.
2    Nevertheless, we will be back here doing
3  this again.
4  BY MR. TRAMMELL:
5    Q.   You understand that?
6    A.   I understand.
7    MR. SCHOON:  As I said off the record, I don't
8  have any objection to your examining him about
9  documents that came from his files that he received
10  or that he authored.
11    MR. HAMMER:  I also said that I have no
12  objection to you asking questions about things we
13  produced pursuant to your subpoena, documents he
14  authored, documents he received.
15  BY MR. TRAMMELL:
16    Q.   Doctor, what does it mean to be ethical?
17    MR. HAMMER:  Objection; form.
18    You may answer.
19  BY THE WITNESS:
20    A.   That one acts and behaves appropriately.
21  BY MR. TRAMMELL:
22    Q.   What does it mean to act and behave
23  appropriately?
24    MR. SCHOON:  Object to form.

Page 17

1  BY THE WITNESS:
2    A.   I think what's designated to be
3  appropriate behavior.
4  BY MR. TRAMMELL:
5    Q.   What does it mean to be an ethical
6  psychiatrist?
7    MR. HAMMER:  Objection; form.
8    You may answer.
9    MR. SCHOON:  Objection; form.
10  BY THE WITNESS:
11    A.   To act appropriately on behalf of one's
12  patients.
13  BY MR. TRAMMELL:
14    Q.   Is it ethical to put financial
15  considerations ahead of the best interest of the
16  patient?
17    MR. SCHOON:  Objection; form.
18  BY THE WITNESS:
19    A.   No, it is not ethical.
20  BY MR. TRAMMELL:
21    Q.   Have you ever done that?
22    A.   No.
23    Q.   Have you ever told anybody that you did
24  that?

Confidential - Michael Jay Reinstein, M.D.

Page 18

1     A.    No.
2     Q.    Are you aware of whether anybody has an
3   opinion about whether you've done that?
4         MR. HAMMER:  Objection; form and foundation.
5   You may answer.
6   BY THE WITNESS:
7     A.    I am not aware.
8   BY MR. TRAMMELL:
9     Q.    What does it mean to be an ethical
10   clinical researcher?
11    A.    That one --
12        MR. SCHOON:  Objection; form.
13   BY THE WITNESS:
14    A.    That one does research that's
15   appropriate and in the best interest of the patient
16   population that's being studied.
17   BY MR. TRAMMELL:
18    Q.    Is it important to get informed consent
19   in the process of doing clinical research?
20    A.    Yes.
21    Q.    Are there any exceptions to that?
22        MR. SCHOON:  Objection; form.
23   BY THE WITNESS:
24    A.    Not that I'm aware of.

Page 19

1   BY MR. TRAMMELL:
2     Q.    Is it important to have an
3   investigational plan in the process of clinical
4   research?
5     A.    Yes.
6     Q.    Is it important to follow that
7   investigational plan?
8     A.    Yes.
9     Q.    Are there any exceptions to that?
10    A.    Not that I'm aware of.
11    Q.    Is it important to keep accurate records
12   during the process of performing clinical research?
13        MR. SCHOON:  Objection; form.
14   BY THE WITNESS:
15    A.    Yes.
16   BY MR. TRAMMELL:
17    Q.    Are there any exceptions to that?
18    A.    No.
19    Q.    If a clinical researcher doesn't adhere
20   to those three requirements, does that affect the
21   quality of the research?
22        MR. SCHOON:  Objection; form.
23   BY THE WITNESS:
24    A.    It possibly could.

Page 20

1   BY MR. TRAMMELL:
2     Q.    What opinions do you have of
3   AstraZeneca?
4         MR. SCHOON:  Objection; form.
5   BY THE WITNESS:
6     A.    I have some mixed feelings about them.
7   BY MR. TRAMMELL:
8     Q.    What do you mean?
9     A.    I think -- I've only dealt with them in
10   terms of Seroquel and I think they did some things
11   very good with this product and other things I had
12   some concerns about.
13    Q.    What concerns do you have?
14    A.    I would have liked to have seen more
15   research studies being done by the company in
16   regard to Seroquel.
17    Q.    What kind of studies?
18    A.    Studies of efficacy with higher
19   dosages of Seroquel.
20    Q.    What studies do you know have been done
21   on high dose -- efficacy with higher doses of
22   Seroquel?
23    A.    I'm only aware of a small study that was
24   done by Uptown Research.

Page 21

1     Q.    Done by whom?
2     A.    Uptown Research.
3     Q.    And what is that?
4     A.    It is a research entity that is owned by
5   Dr. John Sonnenberg.
6     Q.    What's your relationship with
7   Dr. Sonnenberg?
8     A.    I am the medical director of Uptown
9   Research.
10    Q.    Do you have a professional relationship
11   with Dr. Sonnenberg?
12    A.    Just that I'm the medical director of
13   Uptown Research.
14    Q.    And he's employed by Uptown Research?
15    A.    He owns it.
16    Q.    So, he owns the -- it's a research
17   entity that he owns that you're the medical
18   director of?
19    A.    That's correct.
20    Q.    And that's the only study that you know
21   of as far as efficacy of higher doses, the study
22   performed by Dr. Sonnenberg?
23    A.    That's correct.
24    Q.    Do you know anything about studies

6 (Pages 18 to 21)

Confidential - Michael Jay Reinstein, M.D.

Page 22

1  performed by AstraZeneca on the efficacy of high
2  dose of Seroquel?
3      A.   No.
4      Q.   What do you consider to be a high dose?
5      A.   1,200 milligrams or possibly more.
6      Q.   Do you know what the indicated dosing
7  range is?
8      A.   The approved dosing range is a maximum
9  of 800 milligrams a day.
10     Q.   For any indication?
11     A.   That's my understanding.
12     Q.   Have you reviewed the label recently?
13     A.   No.
14     Q.   Have you ever read it?
15     A.   Previously.
16     Q.   Do you recall when?
17     A.   Maybe a year ago.
18     Q.   Do you know whether the dosing range on
19 the label is representative of studies done by
20 AstraZeneca?
21     A.   I'd have to review the -- the current
22 dosing range.  I don't know if it's changed or not.
23 When I reviewed it last, it was 800 milligrams.
24     MR. TRAMMELL:  Objection; non-responsive.

Page 23

1  BY MR. TRAMMELL:
2      Q.   Do you know whether the dosing range on
3  the label is representative of or based on studies
4  done by AstraZeneca?
5      MR. SCHOON:  Objection; form, foundation.
6  BY THE WITNESS:
7      A.   It presumably is.
8  BY MR. TRAMMELL:
9      Q.   Have you ever read those studies?
10     A.   I have read them previously.  I have not
11 read them recently.
12     Q.   Which studies are they?
13     A.   I believe that was the Quest Study.
14     Q.   It's your opinion that the dosing range
15 on the label is based on the Quest Study, is that
16 correct?
17     A.   And perhaps other studies as well.
18     Q.   Do you know any other studies?
19     A.   Not offhand.
20     Q.   Do you know whether the dosing range on
21 the label is based on pre-marketing clinical trials
22 performed by AstraZeneca?
23     MR. SCHOON:  Objection; form.
24 BY THE WITNESS:

Page 24

1      A.   It's possibly a consideration and that
2  there may be other considerations as well.
3      Q.   What might those be?
4      A.   I believe the Quest Study was a
5  post-marketing study and it may be based on that as
6  well.
7      Q.   Can you identify any dosing studies or
8  any efficacy studies related to dosing other than
9  the Quest study and Dr. Sonnenberg's study?
10     A.   Not offhand, no.
11     Q.   And you don't know of any studies done
12 by AstraZeneca other than Quest on that issue?
13     MR. SCHOON:  Objection; form.
14 BY THE WITNESS:
15     A.   No.  Not without further review.
16 BY MR. TRAMMELL:
17     Q.   Nevertheless, it's your opinion that
18 there aren't enough, is that correct?
19     A.   That's correct.
20     Q.   Are there any other types of studies
21 you'd like to see AstraZeneca do?
22     A.   Yes.  I'd like to see studies of how
23 well the drug works with anxiety and with sleep
24 disturbances.

Page 25

1      Q.   Other efficacy studies, is that correct?
2      A.   That's correct.
3      Q.   Any other types of studies?
4           Well, first, do you have any knowledge
5  of whether they have ever done studies on efficacy
6  in sleep and anxiety?
7      A.   I'm not aware of any.
8      Q.   Have you ever asked to see any?
9      A.   No.
10     Q.   Have you ever been told by any
11 representative of AstraZeneca whether or not such
12 studies exist?
13     A.   No.
14     Q.   Have you ever discussed that subject
15 with anyone at AstraZeneca?
16     A.   I've -- in previous years I've discussed
17 with them the need to do these studies.
18     Q.   Any other studies you'd like to see them
19 do other than the efficacy studies you've
20 mentioned?
21     A.   Yes.  Different studies for treatment of
22 chronic refractory schizophrenics using either very
23 high dose Seroquel or Seroquel in combination
24 with -- with other medications for refractory

7 (Pages 22 to 25)

Confidential - Michael Jay Reinstein, M.D.

Page 26

1  patients.
2      Q.   And you've no idea whether those studies
3  have been done by AstraZeneca, is that correct?
4      A.   That's correct.
5      Q.   And you've never had any communications
6  with anybody at AstraZeneca on that subject?
7      A.   No.
8      Q.   Any other types of studies other than
9  the efficacy studies you've mentioned?
10     A.   I'd like to see some more metabolic
11  studies being done, too, regarding weight gain,
12  diabetes and lipid profiles, particularly with
13  patients on higher dosages of Seroquel.
14     Q.   Have you ever discussed that subject
15  with anyone at AstraZeneca?
16     A.   Yes.
17     Q.   When?
18     A.   At least on several occasions with their
19  research liaisons.
20     Q.   In person?
21     A.   Sometimes in person, yes.
22     Q.   How else have you discussed that
23  situation with them?
24     A.   Possibly by telephone as well.

Page 27

1      Q.   By e-mail?
2      A.   Not by me.  I don't -- I don't
3  use e-mail.
4      Q.   By regular mail?
5      A.   I haven't.  Dr. Sonnenberg may have,
6  but I have not.
7      Q.   Has anyone at AstraZeneca ever told you
8  that those studies have or have not been done?
9      A.   When we discussed it with them, they
10  were considering doing them.  As far as I know,
11  they have not been done.
12     Q.   And when was this?
13     A.   Maybe four or five years ago.
14     Q.   And you have no knowledge of whether
15  such studies have been done?
16     A.   As far as I know they've not been done.
17     MR. TRAMMELL:  I suppose this is another
18  opportunity to object to the confidentiality
19  designation of documents that would aid in the
20  examination of this witness.  There are documents
21  that are pertinent to this topic.
22         However, those documents have been
23  designated as confidential by the Defendant.
24  Because the witness hasn't signed the agreement or

Page 28

1  the endorsement to the agreement, Plaintiffs are
2  unable to examine this doctor on the subject of
3  those studies.
4      MR. SCHOON:  By not responding to your
5  comment, Mr. Trammell, it doesn't mean I agree with
6  it.  I don't think that this is the time for any
7  kind of colloquy on it, but you've made your
8  record.
9  BY MR. TRAMMELL:
10     Q.   Doctor, any other safety studies you'd
11  like to see the company do?
12     MR. SCHOON:  Object to form.
13  BY THE WITNESS:
14     A.   I've already mentioned the ones
15  concerning metabolic issues.
16  BY MR. TRAMMELL:
17     Q.   Has anyone from AstraZeneca told you
18  that those studies have not been done?
19     A.   No.
20     Q.   Have you ever asked to conduct such
21  studies?
22     A.   I personally haven't.  The research
23  staff of Uptown Research may have, but I personally
24  have not.

Page 29

1      Q.   Do you have any other criticisms of
2  AstraZeneca?
3      MR. SCHOON:  Object to form.
4  BY THE WITNESS:
5      A.   I think that covers it.
6  BY MR. TRAMMELL:
7      Q.   What do you think AstraZeneca's opinion
8  of you is?
9      MR. SCHOON:  Object to form.
10  BY THE WITNESS:
11     A.   I have no idea.  I mean, AstraZeneca is
12  thousands of people.  Some people may like me.
13  Some may not.
14  BY MR. TRAMMELL:
15     Q.   Do you have any knowledge of whether
16  anyone at AstraZeneca likes or dislikes you?
17     MR. SCHOON:  Object to form.
18  BY THE WITNESS:
19     A.   I mean, some of the reps have been very
20  appreciative of my lectures.  They seem to have
21  liked them.
22  BY MR. TRAMMELL:
23     Q.   Have you ever heard of anyone at
24  AstraZeneca being critical of you in any way?

8 (Pages 26 to 29)

Confidential - Michael Jay Reinstein, M.D.

Page 30

1    A.   Not personally, no.
2    Q.   Have you ever heard of anyone at
3  AstraZeneca criticizing your --
4    A.   No.
5    Q.   -- research capabilities?
6    A.   No.
7    MR. SCHOON:  Object to form.
8  BY MR. TRAMMELL:
9    Q.   Have you ever heard of anyone at
10  AstraZeneca criticizing your competence as a
11  psychiatrist?
12    MR. SCHOON:  Object to form.
13  BY THE WITNESS:
14    A.   No.
15    MR. TRAMMELL:  I'll again note for the record
16  that the designation of confidentiality on certain
17  documents inhibits my ability to adequately examine
18  this witness.
19    MR. SCHOON:  Again, I'm not going to engage in
20  any colloquy.  I'm not going to respond anymore,
21  Mr. Trammell.  Just have an understanding that my
22  not responding doesn't mean that I agree with
23  anything you say.
24    MR. TRAMMELL:  I certainly understand that.

Page 31

1    MR. SCHOON:  Fair enough?  Okay.
2  BY MR. TRAMMELL:
3    Q.   Doctor, this is Plaintiff's Exhibit 2.
4    (WHEREUPON, a certain document was
5    marked Reinstein Deposition Exhibit
6    No. 2, for identification, as of
7    05-28-2008.)
8  BY MR. TRAMMELL:
9    Q.   Doctor, do you recognize Plaintiff's
10  Exhibit 2?
11    MR. HAMMER:  Just give us one second, please.
12    MR. TRAMMELL:  Sure.
13    MR. HAMMER:  Thank you.
14  BY MR. TRAMMELL:
15    Q.   Do you recognize this document, Doctor?
16    A.   Yes.
17    Q.   I'll represent to you this is a document
18  that you produced to us in response to this
19  subpoena.  It appears to be an agreement between
20  you and AstraZeneca related to their engagement of
21  you to speak on their behalf, is that what it is?
22    A.   That's correct.
23    Q.   It's dated January the 1st, 2007, is
24  that correct?

Page 32

1    A.   That's correct.
2    Q.   This is the only speakers services
3  agreement that we received.  Are there others as
4  far as you know?
5    A.   There were, but I don't have them
6  anymore.
7    Q.   Do you know where they are?
8    A.   I personally don't have them.
9  AstraZeneca may.  I only kept this one because it's
10  current.  There were previous agreements, but there
11  was no need to retain them because this one became
12  the current one.
13    Q.   Were those documents destroyed?
14    A.   I presume so.
15    Q.   Do you have a document destruction
16  policy at your business?
17    A.   No.  We dispose of stuff that we don't
18  need.  There's no policy on it.
19    Q.   There is no standard amount of time to
20  keep any document?
21    A.   No.
22    Q.   And there is no distinction among
23  documents; some are kept longer, some are disposed
24  of?

Page 33

1    A.   No.  We're overflowing with things at
2  our office, so we have to get rid of things.
3    Q.   So you just go through and throw stuff
4  away as you see fit, is that right?
5    A.   Well, probably when the current
6  agreement came in, there was not felt a need to
7  keep the previous agreement.
8    MR. TRAMMELL:  This is Plaintiff's 3.
9    (WHEREUPON, a certain document was
10    marked Reinstein Deposition Exhibit
11    No. 3, for identification, as of
12    05-28-2008.)
13    (WHEREUPON, discussion was had off
14    the record.)
15  BY MR. TRAMMELL:
16    Q.   Doctor, is this a document --
17    MR. HAMMER:  Give me one second, please.
18    Thank you.
19  BY MR. TRAMMELL:
20    Q.   Do you recognize this document, Doctor?
21    A.   Yes.
22    Q.   It's a document you prepared?
23    A.   My wife prepared it.
24    Q.   Does your wife work for you?

9 (Pages 30 to 33)

Page 34

1    A.    She -- yeah, she does my
2  bookkeeping.
3    Q.    Is she a nurse?
4    A.    No.
5    Q.    Is this a -- what is this document?
6    A.    In response to your subpoena, I asked
7  her to tabulate all the checks that were received
8  from either Zeneca or AstraZeneca; and this is the
9  compilation that she came up with.
10   Q.    And does this account for both the U.S.
11  and Canadian entities' payments to you?
12   MR. SCHOON:  Object to form.
13  BY THE WITNESS:
14   A.    I would assume it does, yes.
15  BY MR. TRAMMELL:
16   Q.    It only goes through September of '07.
17  Have there been payments since?
18   A.    It's possible.  I'm not sure why it
19  weren't covered if it didn't.
20   Q.    You keep a ledger like this for payments
21  from every pharmaceutical company?
22   A.    No, we don't keep a ledger from any
23  pharmaceutical company.  We just keep a ledger of
24  all our deposits.

Page 35

1    Q.    Did you compile this for purposes of
2  complying with the subpoena?
3    A.    This document was compiled for that
4  reason, yes.
5    Q.    Which other pharmaceutical companies do
6  you do work for?
7    A.    Most recently just Teva and Azure
8  Pharmaceuticals.
9    THE REPORTER:  I'm sorry.
10   THE WITNESS:  A-z-u-r-e, Pharmaceuticals.
11  BY MR. TRAMMELL:
12   Q.    I just want to ask you a question about
13  this ledger.  You said your wife compiled it.  Is
14  that right?
15   A.    That's correct.
16   Q.    What did she base these entries on?
17   A.    Out of -- she makes a ledger of each
18  deposit.  So that she went through all our deposits
19  for the period and compiled this list.
20   Q.    So, there's a -- there's a ledger dating
21  back to October of '97 of all the payments by whom?
22   A.    By anybody.
23   MR. SCHOON:  Object to form.
24  BY THE WITNESS:

Page 36

1    A.    Patients or anybody else.
2  BY MR. TRAMMELL:
3    Q.    So, these -- this document is based
4  on a master ledger of all payments made to you
5  or to your practice since 2000 -- or since
6  1997, is that right?
7    A.    That's correct.
8    Q.    Do you keep copies of the checks?  Do
9  you copy them?
10   A.    No, we don't keep copies of the checks.
11  We just keep the ledger.
12   Q.    Do you keep copies of the Form 1099s?
13   A.    No.
14   MR. TRAMMELL:  Plaintiff's 4.
15       (WHEREUPON, a certain document was
16        marked Reinstein Deposition Exhibit
17        No. 4, for identification, as of
18        05-28-2008.)
19  BY MR. TRAMMELL:
20   Q.    These are two Form 1099s that you
21  produced to us.  So evidently you keep some 1099s?
22   A.    We only had these because they were
23  current.  We don't keep them from previous years.
24   Q.    What do you mean they were current?

Page 37

1    A.    For the year 2007.
2    Q.    You list 11 payments in 2007 and you
3  produced two 1099s.  Is there any reason for that?
4    A.    I think that the discrepancy is that one
5  was paid to my Social Security number, which of
6  course my accountant frowns on, and the others were
7  paid to my tax ID number.  So that's why there
8  seemed to be two 1099s.
9    Q.    I don't understand.  One of these
10  documents lists in the recipient's ID number your
11  Social, which is the -- I'm not going to read it
12  into the record, but it's the top document; and the
13  second document lists as your ID number your tax ID
14  number?
15   A.    That's correct.
16   Q.    And, so, was it your intention to
17  produce a representative of both?
18   MR. HAMMER:  Objection as to form.
19       You can answer.
20  BY THE WITNESS:
21   A.    It was to produce whatever 1099s we
22  could locate, and this was the only one that we
23  were able to locate.
24  BY MR. TRAMMELL:

Confidential - Michael Jay Reinstein, M.D.

Page 38

1    Q.   Did you send these 1099s in when you
2  completed your tax return?
3    MR. SCHOON:  Objection; form.
4  BY THE WITNESS:
5    A.   Probably the originals were sent in by
6  our accountant.
7  BY MR. TRAMMELL:
8    Q.   You keep copies of your tax return?
9    A.   My accountant does, but I don't think he
10 retains these 1099s.  He tells us to throw out the
11 corporate ones, that he doesn't need them.
12   Q.   Has he told you to -- has he told you
13 that he doesn't keep them?
14   A.   He doesn't -- he doesn't ask us to keep
15 them, no.
16   Q.   So you don't know whether he has a copy
17 of them?
18   A.   I don't think he does, but I don't know
19 for sure.
20   Q.   Have you produced copies of every
21 document you've ever generated at the behest of
22 AstraZeneca?
23   A.   That we were --
24   MR. SCHOON:  Object to form.

Page 39

1  BY THE WITNESS:
2    A.   That we were able to locate, yes.
3    MR. TRAMMELL:  It's Plaintiff's 5.
4        (WHEREUPON, a certain document was
5        marked Reinstein Deposition Exhibit
6        No. 5, for identification, as of
7        05-28-2008.)
8    MR. TRAMMELL:  1099s were 4.
9    MR. HAMMER:  Thank you.
10 BY MR. TRAMMELL:
11   Q.   What is this document, Doctor?
12   MR. SCHOON:  Which -- just give me one second.
13       Thank you.
14 BY THE WITNESS:
15   A.   This was a copy of a paper that was
16 published in a clinical drug investigation in
17 August of 1999.
18 BY MR. TRAMMELL:
19   Q.   Doctor, were you born and raised in
20 Chicago?
21   A.   Yes, I was.
22   Q.   Did you go to school here?
23   A.   Yes, I did.
24   Q.   Where did you go to college?

Page 40

1    A.   Northwestern.
2    Q.   Where did you go to graduate school?
3    A.   I went to medical school at Northwestern
4  and I took my psychiatric residency at the
5  University of Illinois.
6    Q.   Have you ever had any education in
7  England?
8    A.   No.
9    Q.   Have you ever spent a considerable
10 amount of time there?
11   A.   No.
12   Q.   Have you ever been there?
13   A.   Yes, I have been there.
14   Q.   On vacation?
15   A.   Yes.
16   Q.   How do you spell the word "analyze"?
17   MR. SCHOON:  Objection; form.
18 BY THE WITNESS:
19   A.   A-n-a-l-y-z-e-d.
20 BY MR. TRAMMELL:
21   Q.   How do you spell the word "favor"?
22   A.   Favor, f-a-v-o-r.
23   Q.   Did you write this article?
24   A.   It was written by myself and the

Page 41

1  other -- the other people who are named in the
2  article.
3    Q.   Did anyone ever send you a draft of it?
4        (WHEREUPON, Tim K. Goss, Esq.
5        entered the deposition
6        proceedings.)
7  BY THE WITNESS:
8    A.   Can't recall.
9  BY MR. TRAMMELL:
10   Q.   You don't know whether you've ever seen
11 a draft of this article before it was published, is
12 that right?
13   A.   I probably did, but I can't recall that
14 I did.
15   Q.   You don't have any record of that, do
16 you?
17   A.   No.
18   Q.   Who is Larissa Sirotovskaya?
19   A.   She was a research associate that was
20 employed by the Forest Foundation.
21   Q.   And what is the Forest Foundation?
22   A.   Forest Foundation was a branch of
23 Forest Hospital that did research.
24   Q.   What is your relationship with Forest

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Michael Jay Reinstein, M.D.

Page 42

1   Foundation?
2       A.   I have none now since the hospital and
3   foundation have closed.
4       Q.   What relationship did you have with the
5   foundation in 1999?
6       A.   I was employed by them for several years
7   as their director of research.
8       Q.   Did you know this woman?
9       A.   Yes.  She worked with us on our
10  research.
11      Q.   Who is Lynne Jones?
12      A.   Lynne Jones is a nurse who works for me.
13      Q.   What does Lynne Jones do as your nurse?
14      A.   She also works as our office manager.
15  She handles phone calls.  She supervises our
16  billing staff.
17      Q.   What role did Lynne Jones have in the
18  authorship of this article?
19      A.   I can't recall.
20      Q.   Does she have any expertise in glycemic
21  control or the pharmacological effects of clozapine
22  and quetiapine?
23      A.   She is a very competent nurse who's
24  helped me treat a large number of patients.

Page 43

1       Q.   What are her qualifications to author
2   papers on clinical trials?
3       A.   She probably has more experience
4   treating this population than any other nurse.
5       Q.   Has she ever published any other
6   articles?
7       A.   She has assisted in publication of other
8   articles.
9       Q.   Were you associated in the publication
10  of those articles?
11      A.   I can't speak to all of them.  We have
12  been on some of them.
13      Q.   Who is Sangarapillai Mohan?
14      A.   He's a psychiatrist who's worked in our
15  practice for over 20 years.
16      Q.   And who is Maxim Chasanov?
17      A.   He is a psychiatrist that worked for us
18  for a number of years and he's also an AstraZeneca
19  speaker.
20      Q.   All these people work for you, is that
21  correct?
22      A.   No.  None of them -- Lynne Jones works
23  for me.  The others do not.
24      Q.   Do you know which of these people wrote

Page 44

1   the first draft of this paper?
2       A.   I can't recall.  That's almost ten years
3   ago.
4       Q.   Do you know whether any of them wrote
5   any of this paper?
6       MR. SCHOON:  Object to form.
7   BY THE WITNESS:
8       A.   I can't recall.  It's so long ago.
9   BY MR. TRAMMELL:
10      Q.   Do you have any idea who wrote this?
11      MR. SCHOON:  Object to form.
12  BY THE WITNESS:
13      A.   I don't recall.  It's almost ten years
14  ago.
15  BY MR. TRAMMELL:
16      Q.   You know that you didn't write it, is
17  that right?
18      A.   I know I assisted in writing it.
19      Q.   And how did you assist in writing it?
20      A.   By reviewing the data and going over
21  the conclusions.
22      Q.   So you did review the data?
23      A.   Yes.
24      Q.   Do you know where these people were

Page 45

1   patients who were the subjects of this study?
2       A.   Yes.  They were at a nursing home in the
3   Chicago area.
4       Q.   Is it a nursing home where you practice?
5       A.   Yes.
6       Q.   Who is the doctor that prescribed the
7   clozapine and quetiapine to these patients over the
8   course of the trial?
9       A.   Myself, Dr. Mohan and Dr. Chasanov.
10      Q.   So, any drugs that were prescribed to
11  these study participants over the course of the
12  trial would have been prescribed by either you,
13  Dr. Mohan or Dr. Chasanov?
14      A.   Presumably, yes.
15      Q.   Could anyone else have prescribed those
16  drugs?
17      A.   I don't believe they did.
18      Q.   Is this a study that was open label, is
19  that correct?
20      A.   Yes.
21      Q.   Do you know what that means?
22      A.   Yes.
23      Q.   What does it mean?
24      A.   It means that the data was available to

Confidential - Michael Jay Reinstein, M.D.

Page 46

1   the reviewers, that the reviewers were not blinded.
2       Q.   It also means that the reviewers knew
3   the drugs that every study participant was on,
4   right?
5       A.   That's correct.
6       Q.   It was non-randomized, is that right?
7       A.   That's correct.
8       Q.   Do you know what that means?
9       A.   It was limited to patients who were on
10  this combination of treatment.
11      Q.   And, so, I'm trying to understand what
12  you did.  You went through all the charts at this
13  specific nursing home and found 65 charts that met
14  the criteria for the study?
15      A.   That's correct.
16      Q.   And you did this retrospectively, is
17  that right?
18      A.   That's correct.
19      Q.   And every patient was on Clozaril for
20  six months, is that right?
21      A.   At least six months, yes.
22      Q.   And every one of those patients was on a
23  dosing range of 200 to 800 milligrams of Clozaril a
24  day, is that right?

Page 47

1       A.   Initially, yes.
2       Q.   And only Clozaril, is that correct?
3       A.   That's correct.
4       Q.   And every one of those patients was
5   subsequently on ten months of Clozaril-quetiapine
6   combination therapy, is that right?
7       A.   That's correct.
8       Q.   And how many charts did you have to
9   review to find these 65?
10      A.   There were -- there's over 400 patients
11  in the nursing home.  I don't know if all 400 were
12  reviewed.  I believe they were and out of the over
13  400 patients in the nursing home, 65 patients
14  qualified to be in the retrospective study.
15      Q.   And did you review any of those charts?
16      A.   I did.
17      Q.   Did any of the other authors review any
18  charts?
19      A.   I presume they did, yes.
20      Q.   So, out of 400 charts you were able to
21  find 65 who had taken six months of Clozaril
22  monotherapy between 200 and 800 milligrams a day
23  and then followed that with ten months of
24  combination therapy?

Page 48

1       A.   That's correct.
2       Q.   Did you keep any record of the titration
3   of the dose of Clozaril after the initiation of
4   quetiapine therapy?
5       A.   It would have been in the nursing home
6   records.
7       Q.   And which nursing home was this again?
8       A.   Lydia, L-y-d-i-a.
9       Q.   And do you recall the period of time in
10  which this study took place?
11      A.   Would have been the late 1990s.
12      Q.   You can't be any more specific than
13  that?
14      A.   Well, it probably varied with different
15  patients, but it would have been from 1997 to 1999.
16      Q.   So, over the course of two years --
17  well, this was published in August of '99.  The
18  study required 16 months of treatment.  I suppose
19  six months of that treatment, the Clozaril portion,
20  could have been before the approval of quetiapine.
21  But you had to have ten months after approval of
22  quetiapine in 1997 to fulfill the study
23  requirements, is that right?
24      A.   That's correct.

Page 49

1       MR. SCHOON:  Object to form.
2   BY MR. TRAMMELL:
3       Q.   So, sometime after 1997 plus ten
4   months --
5       A.   From the time the quetiapine became
6   available till 1999 is when the second phase of the
7   study was done, and it would have been six months
8   either of late 1996 or early 1997 that the patients
9   qualified to be on clozapine before quetiapine.
10      Q.   You said all the records of the data
11  generated in that study are at the nursing home?
12      MR. SCHOON:  Object to form.
13  BY THE WITNESS:
14      A.   They were at the time.  I don't know
15  that the nursing home now ten years later has
16  retained them.  But at the time they were available
17  at the nursing home.
18  BY MR. TRAMMELL:
19      Q.   Did you retain any records of that
20  study?
21      A.   No, they would have been maintained by
22  the Forest Foundation.  I don't know what the
23  Forest Foundation has done with them.
24      Q.   Were any records ever sent to the

13 (Pages 46 to 49)

Page 50

1  publication that published this article?
2      A.   I don't believe anything more than the
3  paper was sent there.
4      Q.   So, any records that exist of the data
5  associated with this study would be at the nursing
6  home, if anywhere, is that right?
7      MR. SCHOON:  Object to form.
8  BY THE WITNESS:
9      A.   That's correct or -- I don't know what
10 the Forest Foundation has done with their records
11 since they've closed.  They may have some of these
12 records, too.
13 BY MR. TRAMMELL:
14     Q.   Would any data have been kept in a
15 computerized form?
16     A.   I'm not aware of it.  There might be
17 records of the Forest Foundation retaining them,
18 but I'm not aware of that personally.
19     Q.   Who recorded the weight of these
20 patients over the course of this study?
21     A.   I believe it was either primarily --
22 well, the weights were recorded by the nursing
23 staff of the nursing home who records them every
24 month --

Page 51

1      Q.   Is that a --
2      A.   -- which is a Public Health requirement
3  that is done at every nursing home.
4      Q.   It's a standard practice?
5      A.   Standard practice at every nursing home.
6      Q.   So, at that nursing home today they're
7  recording every patient's weight every month?
8      A.   They should be, yeah.
9      Q.   What were the results of this study?
10     MR. SCHOON:  Object to form.
11 BY THE WITNESS:
12     A.   The results of the study were basically
13 that patients on the clozapine-quetiapine
14 combination therapy had better weight and blood
15 sugar control than patients who were just on
16 clozapine.
17 BY MR. TRAMMELL:
18     Q.   Were you surprised that they all lost
19 weight?
20     A.   I -- quite frankly, I was, yes.
21     Q.   Why?
22     A.   I didn't think the results would be as
23 good as they were.
24     Q.   Why not?

Page 52

1      A.   I was surprised and I even went back
2  and double-checked some of them and it was
3  accurate.
4      Q.   Do you keep any record of the specific
5  doses of clozapine over the course of titration?
6      A.   Those would have been in the nursing
7  home record.
8      Q.   You don't remember -- you don't remember
9  whether certain patients who experienced more
10 weight gain were on lower doses of -- or less
11 weight -- or more weight loss were on lower doses
12 of Clozaril to start with?
13     A.   I can't recall that.
14     Q.   Were you actually treating the patients
15 that were the subject of the study?
16     A.   The three psychiatrists, myself,
17 Dr. Mohan and Dr. Chasanov, were the treating
18 psychiatrists were the only three who at that time
19 were going to that nursing home.
20     Q.   Did you ever tell anyone at AstraZeneca
21 that the patients in the study were being switched
22 from olanzapine monotherapy to combination therapy
23 with quetiapine?
24     MR. SCHOON:  Object to form.

Page 53

1  BY THE WITNESS:
2      A.   Olanzapine was not an issue in this
3  study.
4  BY MR. TRAMMELL:
5      Q.   You never told anyone at AstraZeneca
6  that this study involved patients on olanzapine?
7      A.   No.
8      Q.   No?
9      A.   No.
10     Q.   If anyone said that, that would be
11 untrue?
12     A.   Yes.  This was only patients who were on
13 clozapine.
14     Q.   I understand.  But you never had a
15 meeting or a discussion with anyone at AstraZeneca
16 in which you told them it was actually olanzapine
17 patients?
18     A.   No, these were clozapine patients.
19     Q.   Are you aware of what the Seroquel label
20 says regarding weight gain?
21     A.   I'd have to review it.  I can't speak to
22 it right now.
23     Q.   You've never looked at it?
24     A.   I've looked at it, but I can't remember

Confidential - Michael Jay Reinstein, M.D.

Page 54

1   the exact wording of it.
2       Q.   Do you know whether it says Seroquel is
3   associated with weight gain or weight loss?
4       MR. SCHOON:  Object to form.
5   BY THE WITNESS:
6       A.   I -- I'd have to look at the label.  I
7   can't speak to it since I don't remember it.
8   BY MR. TRAMMELL:
9       Q.   But you don't know either way?
10      A.   I'm not aware at this moment what the
11  reading is.
12      Q.   Have you ever seen any data that says
13  Seroquel causes weight gain?
14      A.   I have seen data, yes.
15      Q.   Have you ever asked the company for any
16  data on Seroquel's association with weight gain?
17      A.   Yes.
18      Q.   And what did they send you?
19      A.   I have asked several times.  In fact,
20  they sent me something maybe in January of this
21  year, which supposedly was the latest data on it.
22      Q.   Did you produce that to us?
23      A.   Yes.
24      Q.   Do you remember what it says?

Page 55

1       A.   Well, it's about 20 pages.  It would be
2   hard to sum up briefly.
3       Q.   Was your conclusion in this study that
4   Seroquel causes weight loss?
5       A.   The only conclusion that could be made
6   from our study is that switching patients to
7   cloz' -- from clozapine and lowering the dose of
8   clozapine and adding Seroquel seemed to offer a
9   hope for weight control with -- which was a
10  devastating problem with our clozapine patients.
11      Q.   What other conclusions did you reach in
12  the study?
13      A.   That switching patients from clozapine
14  alone, lowering the dose of the clozapine and
15  adding quetiapine seemed to help with blood sugar
16  control.
17      Q.   How does it do that?
18      A.   Well, we weren't sure if the benefit was
19  lowering the clozapine or adding the Seroquel.  Our
20  suspicion was that anything that could lower the
21  clozapine would help with weight and blood sugar
22  control since clozapine is so problematic with
23  both issues.
24      Q.   During the course of the trial who did

Page 56

1   you discuss these issues with?
2       A.   The different people in the study.
3       Q.   Who specifically?
4       A.   The four people named.  Larissa, Lynn,
5   Dr. Mohan and Dr. Chasanov.
6       Q.   All four of those people?
7       A.   Yes.
8       Q.   How did you discuss it with them, in
9   person?
10      A.   We would have practice meetings once a
11  month where we would review what we were observing.
12      Q.   Is any record kept of those meetings?
13      A.   No, they're all verbal.
14      Q.   Did you have any e-mail correspondence
15  with anyone about this study?
16      A.   No, I didn't.  I've never really used
17  e-mail much.
18      Q.   If there's no records currently being
19  maintained at the nursing home, is there any record
20  at all other than this published paper that the
21  study ever occurred?
22      MR. SCHOON:  Object to form.
23  BY THE WITNESS:
24      A.   You'd have to get them from the Forest

Page 57

1   Foundation.  The Forest Foundation was supposed to
2   maintain the records.
3       Q.   If the Forest Foundation doesn't have
4   them, is there any record at all that the study
5   ever occurred?
6       MR. SCHOON:  Objection; form.
7   BY THE WITNESS:
8       A.   The study was done.  The records should
9   have been maintained by the Forest Foundation.
10  BY MR. TRAMMELL:
11      Q.   You don't have any records or you don't
12  know of any records other than records at the
13  Forest Foundation that might prove in any way that
14  the study ever occurred?
15      A.   The study did occur and the Forest
16  Foundation would be the custodian of those records.
17      Q.   I understand.  But you don't have any
18  documentation independent of what's kept at the
19  Forest Foundation related to the study?
20      A.   I personally don't, no.
21      Q.   And you don't know of anyone that does?
22      A.   No.
23      Q.   Was this the first quetiapine study that
24  you did?

15 (Pages 54 to 57)

Confidential - Michael Jay Reinstein, M.D.

Page 58

1    A.   We were also involved in the Quest
2 Study, and that may or may not have been done
3 before.  I believe the Quest Study was done first.
4    Q.   Were you -- were you paid to do this
5 effect of clozapine-quetiapine combination therapy
6 study?
7    MR. SCHOON:  Objection; form.
8 BY THE WITNESS:
9    A.   I believe the Forest Foundation got a
10 grant of $10,000 to do it.
11 BY MR. TRAMMELL:
12    Q.   From whom?
13    A.   From AstraZeneca or I believe then it
14 was Zeneca.
15    Q.   Did they send you that before or after
16 they saw a draft of the manuscript?
17    MR. HAMMER:  Objection; form.  You can answer.
18 BY THE WITNESS:
19    A.   I don't know.  You'd have to ask the
20 people who ran the Forest Foundation.
21 BY MR. TRAMMELL:
22    Q.   Do you know whether AstraZeneca wrote
23 this paper?
24    MR. SCHOON:  Objection; form.

Page 59

1 BY THE WITNESS:
2    A.   AstraZeneca didn't write the paper.
3 Our -- it was written by the staff of the Forest
4 Foundation.
5 BY MR. TRAMMELL:
6    Q.   But you don't know who?
7    MR. SCHOON:  Objection; form.
8 BY THE WITNESS:
9    A.   I cannot remember all the details.  I
10 know that all of us probably contributed to the
11 writing of this.
12 BY MR. TRAMMELL:
13    Q.   So, the original draft of this paper was
14 generated by someone at the Forest Foundation?
15    A.   Yeah, I think it was probably Larissa
16 who put the final form on this.
17    Q.   Is Larissa English?
18    A.   No, she's Russian.
19    Q.   Has she ever published anything else?
20    A.   I'm not aware of whether she has or
21 hasn't.
22    Q.   Have you ever seen anything else that
23 she's written?
24    A.   Not that I can recall.

Page 60

1    Q.   Does she still work for the Forest
2 Foundation?  It doesn't exist anymore, does it?
3    A.   The Forest Foundation doesn't exist.
4    Q.   Where does she work now?
5    A.   I have no idea.
6    Q.   When was the last time you talked to
7 her?
8    A.   Maybe seven years ago.
9    Q.   You don't know whether she's still
10 involved in clinical research?
11    A.   No.
12    Q.   When was the first time you remember
13 being contacted by AstraZeneca about Seroquel?
14    A.   I believe it was the first medical
15 director, and I can't recall his name, but he
16 wanted to meet with me; and he came to Chicago and
17 he talked to me about the product.
18    Q.   Go back to the study, the 1999 study.
19        If you go look at the references, do you
20 know who compiled this list of references?
21    A.   My presumption was it was Larissa who
22 was our research associate.
23    Q.   Have you ever read any of these
24 articles?

Page 61

1    A.   I did at the time, yes.
2    Q.   You read them all?
3    A.   Yes.
4    Q.   Did you ever discuss them with her?
5    A.   With her?
6    Q.   Yeah.
7    A.   Probably did, yes.
8    Q.   Do you know whether any contract
9 research organization or any third party
10 contributed at all to the authorship of this
11 article?
12    A.   I don't believe they did the authorship,
13 no.
14    Q.   Did they contribute at all to the
15 article?
16    A.   I have no recollection of their doing
17 so.
18    Q.   So, either this or the Quest Study was
19 the first study you remember doing for AstraZeneca,
20 is that right?
21    MR. SCHOON:  Objection; form.
22 BY THE WITNESS:
23    A.   As best as I can recall, yes.
24 BY MR. TRAMMELL:

16 (Pages 58 to 61)

Confidential - Michael Jay Reinstein, M.D.

Page 62

1    Q.    I'm going to talk about Quest in a
2    minute. But what was the next study you did
3    after the study that generated the paper we
4    just talked about?
5    A.    We -- I know about four years later we
6    also -- I gave that copy to my attorney. We gave
7    a -- we did a -- another paper that was published
8    which kind of expanded a bit on this study to a
9    thousand patients.
10    Q.    Well, at some point you did a high dose
11    study?
12    A.    Yeah, I believe that was presented at
13    the APA perhaps in 2001, and that was our high dose
14    study.
15    Q.    And where was that study done?
16    A.    That was done on patients in Chicago.
17    Q.    Do you know at which clinics?
18    A.    Can't recall if it was nursing home
19    patients or office patients. It may have been some
20    of both.
21    Q.    Is there some record of that?
22    A.    I believe that was done by Uptown
23    Research. So, if there is any records, they would
24    be with Uptown Research.

Page 63

1    Q.    And what is Uptown Research again?
2    A.    That is an entity that is owned by
3    Dr. Sonnenberg that does psychiatric research.
4    Q.    If the document or if the study was done
5    in association with Forest Foundation, that's an
6    entity different from Uptown Research, isn't that
7    right?
8    A.    Yeah, I can't recall if it was done
9    still at Forest or it was done with Uptown
10    Research.
11    Q.    If it was done by Forest or with Forest,
12    where would those patients have been?
13    A.    Again, they -- they may have been
14    office patients or they may have been nursing home
15    patients or it may have been some of both.
16    Q.    If it was done by Forest, where would
17    the records be?
18    A.    If it was done by Forest, it would be
19    with the Forest Foundation, wherever those records
20    have been maintained.
21    Q.    The Forest Foundation is defunct, is
22    that right?
23    A.    Yes, it is.
24    Q.    And do you know what happened to those

Page 64

1    records?
2    A.    No, I don't personally.
3    Q.    Did the Forest Foundation become
4    something else or did it just cease to exist?
5    A.    As far as I know, it just ceased to
6    exist.
7    Q.    Who owned the Forest Foundation?
8    A.    Morris Squires.
9    Q.    Did you work there?
10    A.    We worked there before it closed,
11    yes.
12    Q.    And who did you say owned it again?
13    A.    Morris Squires.
14    Q.    Is Mr. Squires still in Chicago?
15    A.    I'm not aware whether he is or isn't.
16    Q.    Do you know how he can be reached?
17    A.    I personally don't, no.
18    Q.    Did you ever ask to have any of the data
19    from these studies after he closed
20    Forest Foundation?
21    A.    No.
22    Q.    Do you have any understanding of what
23    happened to the data?
24    A.    I have no understanding.

Page 65

1    Q.    Do you know what opinion AstraZeneca had
2    of the high dose study?
3    MR. SCHOON: Object to form.
4    BY THE WITNESS:
5    A.    Well, again, by saying AstraZeneca, you
6    know, you're talking about a large number of
7    individuals. I know some people wanted the study
8    to go forward, but the company apparently decided
9    not to go forward with the study.
10    BY MR. TRAMMELL:
11    Q.    Who wanted the study to go forward?
12    A.    Some of the research people.
13    Q.    Like who?
14    MR. SCHOON: Object to form.
15    BY THE WITNESS:
16    A.    Can't remember the names. This is seven
17    or eight years ago.
18    BY MR. TRAMMELL:
19    Q.    Do you have any recollection of why the
20    company decided not to proceed with the study?
21    MR. SCHOON: Objection; form.
22    BY THE WITNESS:
23    A.    No.
24    BY MR. TRAMMELL:

17 (Pages 62 to 65)

Confidential - Michael Jay Reinstein, M.D.

Page 66

1    Q.   Who is Shephali Patel?
2    A.   She's -- Shephali Patel. She's a
3  psychiatrist who works in our practice.
4    Q.   Did you have any role in the authorship
5  of this paper?
6    MR. HAMMER:  Objection. Which paper are we
7  talking about?
8    MR. TRAMMELL:  I can't give it to you. It's
9  the high dose paper.
10   MR. HAMMER:  Thank you. Just so he knows.
11  BY THE WITNESS:
12   A.   I can't recall very much. This is
13  seven or eight years ago. I know I was part of
14  the study.
15  BY MR. TRAMMELL:
16   Q.   Did you present this study at the APA
17  conference? Was that what you said?
18   A.   I believe it was presented at an APA
19  meeting about seven years ago.
20   Q.   You don't know whether you contributed
21  to the authorship of this study?
22   A.   As best I recall I did.
23   Q.   You did?
24   A.   Yes.

Page 67

1    THE VIDEOGRAPHER:  Five minutes remaining on
2  the videotape.
3    MR. TRAMMELL:  We can take a break.
4    THE VIDEOGRAPHER:  This concludes Tape 1 of
5  Dr. Reinstein. We're off the -- Reinstein. Excuse
6  me.
7         We are off the video record at 10:11
8  a.m.
9         (WHEREUPON, a recess was had
10          from 10:11 to 10:20 a.m.)
11   THE VIDEOGRAPHER:  This is the beginning of
12  Tape 2 of Dr. Michael Jay Reinstein. We are on the
13  video record at 10:20 a.m.
14  BY MR. TRAMMELL:
15   Q.   Doctor, we've just taken a short break,
16  but we are back on the record. And you understand
17  that you're still under oath, correct?
18   A.   That's correct.
19   Q.   Now, the high dose study that you
20  authored, you understand you are listed as the lead
21  author on that paper, is that correct?
22   A.   Yeah. I can't find a copy of it. So,
23  I'm going on memory. But as best I can recall, I
24  was.

Page 68

1    Q.   What does it mean to be an author of an
2  academic publication?
3    A.   That you're involved in the performance
4  of the study and the writing of the study.
5    Q.   It means something different than being
6  an author in other contexts, doesn't it?
7    MR. SCHOON:  Objection; form.
8  BY THE WITNESS:
9    A.   Well, I suppose the difference is you do
10  a study and write about it.
11  BY MR. TRAMMELL:
12   Q.   It doesn't mean you wrote it, is that
13  right?
14   A.   Well, you're responsible for the writing
15  of it.
16   Q.   And what does that mean?
17   A.   That you've reviewed everything and that
18  you're in agreement with it.
19   Q.   But so the jury understands, there are
20  authors of works that people understand like the
21  author of Moby Dick is Melville. People understand
22  what an author means in normal contexts. In a
23  scientific paper, it means something different,
24  doesn't it?

Page 69

1    MR. SCHOON:  Object to form.
2  BY THE WITNESS:
3    A.   Well, again, Melville might have had
4  somebody assist him. But he was primarily
5  responsible for the publication and the thoughts,
6  and as the primary author you're the primary one
7  responsible for what's written.
8  BY MR. TRAMMELL:
9    Q.   Do you write these studies in the way
10  that Melville wrote Moby Dick?
11   MR. SCHOON:  Object to form.
12  BY THE WITNESS:
13   A.   I don't know how mobile -- how Melville
14  wrote Moby Dick.
15  BY MR. TRAMMELL:
16   Q.   Do you think he just reviewed a final
17  draft?
18   A.   You know, I can't --
19   MR. SCHOON:  Object to form.
20  BY THE WITNESS:
21   A.   I have no idea. I was not alive when
22  that was written.
23  BY MR. TRAMMELL:
24   Q.   Which part of this manuscript do you

18 (Pages 66 to 69)

Confidential - Michael Jay Reinstein, M.D.

Page 70

1 think you contributed to most?
2     A.   I can't recall specifics.
3     Q.   Do you recall having a discussion before
4 the study was done about the study design?
5     A.   Yes.
6     Q.   With whom?
7     A.   With Dr. Sonnenberg and the staff of --
8 who was involved with writing the study.
9     Q.   And who particularly do you think wrote
10 the first draft of the study?
11     A.   I can't recall.
12     Q.   Do you have any idea?
13     A.   No.
14     Q.   Do you have any idea who might have
15 written any part of it?
16     A.   I have no recollection.
17     Q.   Do you know who gave it to you?
18     A.   No.
19     Q.   How did you receive it?
20     A.   I don't recall that either.
21     Q.   Was it given to you by e-mail?
22     A.   Probably not by e-mail.
23     Q.   Would it have been mailed to you?
24     A.   I don't know.  I don't know that there

Page 71

1 was any mailing involved.  I think it was done
2 internally.
3     Q.   So, someone would have just walked up
4 and given you a copy?
5     A.   No.
6     Q.   No?
7     A.   No.
8     Q.   Would you have gotten it at a meeting on
9 the study?
10     A.   If it was -- it was a -- probably a team
11 effort and I don't remember who prepared the final
12 form of it.
13     Q.   Does the fact that you never had a copy
14 in your files mean that you never got it?
15     MR. HAMMER:  Objection as to form.
16         You can answer.
17 BY THE WITNESS:
18     A.   No, because it was presented by me at
19 the APA meeting.
20 BY MR. TRAMMELL:
21     Q.   I understand.  But you've never had a
22 copy of any draft of this study in your files, is
23 that correct?
24     A.   I'm -- I don't know if I had them in my

Page 72

1 files.  But I did have a draft of it and it was
2 presented at an APA meeting.
3     Q.   Well, is it your testimony, then --
4 because you've already testified that you gave us
5 all documents that -- all documents of the category
6 in which this document falls.
7         It's your testimony that you just
8 disposed of any copy you ever had?
9     MR. SCHOON:  Objection; form.
10 BY THE WITNESS:
11     A.   I can't find any copies of it.
12 BY MR. TRAMMELL:
13     Q.   Where did you look?
14     A.   We looked where we keep all the papers
15 that we've done and I could not find that
16 particular one.
17     Q.   Is it an electronic file or is it a
18 physical file in your office?
19     A.   Physical file.
20     Q.   Do you keep any documents on your
21 computer?
22     A.   No.  We just mainly use our computer for
23 billing purposes.
24     Q.   Does your co-author/office manager keep

Page 73

1 any documents on her computer?
2     A.   She keeps some.  She reviewed her
3 computer for all requests of documents and anything
4 we had on our computer we produced for you.
5     Q.   So, she did search her computer for
6 documents that were responsive to the subpoena?
7     A.   Yes.
8     Q.   And did you do the same?
9     A.   Well, we have a personal computer at
10 home and I asked my wife to produce any documents
11 that were on our personal computer, and those also
12 we gave to you.
13     Q.   You did.  You took your wife a copy of
14 the subpoena and asked her to produce the documents
15 that were responsive to it?
16     A.   I don't know that I gave her a copy of
17 the subpoena, but I did ask her to produce any
18 documents with AstraZeneca.
19     Q.   And what did you tell her?
20     A.   That I needed the documents in response
21 to a subpoena.
22     Q.   Do you recall what the format of the
23 high dose study was?
24     A.   The format was there were 30 patients,

19 (Pages 70 to 73)

Confidential - Michael Jay Reinstein, M.D.

Page 74

1   and I believe 15 received 600 milligrams of
2   Seroquel a day and 15 received a thousand -- I'm
3   sorry -- 1,200 milligrams of Seroquel per day.
4       Q.   And how do you know that?
5       A.   That's from memory.
6       Q.   Do you recall whether it was
7   single-blinded, non-blinded, double-blinded?
8       A.   Can't recall.  It would be covered in
9   the paper, but I can't find a copy of the paper.
10      Q.   Do you recall whether it was randomized
11  or non-randomized?
12      A.   Can't recall.
13      Q.   And how long was the study?
14      A.   Can't recall that.
15      Q.   Was it a retrospective or prospective?
16      A.   I don't remember without a copy of the
17  paper.
18      Q.   What was the goal of the safety -- or
19  the study?
20      A.   The goal was that we had noted in our
21  clinical practice, we have a large number of very
22  refractory chronic schizophrenics who don't do as
23  well as we'd like on the maximum recommended
24  dosages of Seroquel, which at one time were 600 and

Page 75

1   then went up to 800, and seemed to do better on
2   higher dosages like 1,200 milligrams a day.
3       Q.   Which adverse events did you monitor
4   for?
5       A.   Can't recall all the details.
6       Q.   Did you monitor any?
7       A.   I'm sure we did.
8       Q.   Did you record the patient's weight?
9       A.   I can't recall.
10      Q.   And, again, any records on that issue or
11  on the results of the study in general would be at
12  Forest Foundation, is that right?
13      A.   If Forest Foundation was the sponsor,
14  which I believe they were, that would be correct.
15      Q.   And no other place, is that correct?
16      A.   To the best of my knowledge, that's
17  correct.
18      Q.   So, if there are no records at
19  Forest Foundation, there is no record at all of the
20  study ever having been done other than your APA
21  presentation, is that right?
22      MR. SCHOON:  Object to form.
23  BY THE WITNESS:
24      A.   That's correct.

Page 76

1   BY MR. TRAMMELL:
2       Q.   Do you recall whether the results of the
3   study were ever published?
4       A.   Can't recall if it was published or not.
5       Q.   Was it submitted for publication?
6       A.   Can't recall that either.
7       Q.   Who would know that?
8       A.   I don't -- I think Dr. Sonnenberg may
9   have been involved with it.  He might have better
10  answers.  I just can't remember.
11      Q.   Did AstraZeneca ever make any payments
12  directly to Dr. Sonnenberg, do you know?
13      A.   If it was done through the
14  Forest Foundation, then the payments would have
15  gone to the Forest Foundation.
16      Q.   I know.  But did they ever make any
17  payments to Dr. Sonnenberg as far as you know?
18      A.   I'm not aware of any.
19      Q.   Outside the context of this study?
20      A.   I can't speak to it.  You'd have to
21  ask him.
22      Q.   You don't know?
23      A.   I don't know.
24      Q.   Has he ever told you that they did?

Page 77

1       A.   Not that I can recall.
2       Q.   Where were these study participants
3   patients, do you know?
4       A.   Can't recall.
5       Q.   Would they have been patients of yours?
6       A.   They would have been patients of our
7   practice, yes.
8       Q.   Who would have been the doctors that
9   prescribed the drugs to them?
10      A.   The doctors in the practice who would
11  have been named in the study.
12      Q.   So, all of these patients would have
13  gotten their prescriptions from doctors who are
14  listed on this -- well, from either you, Dr. Mohan,
15  Dr. Chasanov, Dr. Patel and that's it, right?
16      A.   That's correct.
17      Q.   No other person would have prescribed
18  the drugs?
19      A.   No.
20      Q.   Would there be records of the
21  prescriptions to these patients at the practice at
22  which they were seen?
23      A.   Yeah, if I had the names of the
24  patients, there should be records and we could

20 (Pages 74 to 77)

Confidential - Michael Jay Reinstein, M.D.



Page 78

1  probably look up in our computer at what site they
2  were seen and try to obtain those records.
3      Q.   And treatment history, right?
4      A.   That would be correct.
5      Q.   How long do you all maintain those
6  files?
7      A.   I think the State law is seven years.
8  I'm sure we have them for at least seven years, all
9  our patient records.
10     Q.   Do you destroy them after seven years?
11     A.   We destroy them eventually, yes.
12     Q.   Do you have a written policy on that?
13     A.   We have a HIPAA policy in terms of how
14 records are destroyed.
15     Q.   Did you produce that to us?
16     A.   I don't believe -- I don't know that
17 that was requested.
18     Q.   Do you know whether AstraZeneca ever had
19 any intention of publishing the high dose study?
20     A.   I can't speak to that. I don't know.
21     Q.   Do you know if they ever had any role in
22 editing it?
23     A.   Not that I'm aware of.
24     Q.   Did you ever have any discussions with

Page 79

1  Faith Yao about the study?
2      A.   I don't believe I did. I think
3  Dr. Sonnenberg may have had some discussions with
4  her.
5      Q.   About this study?
6      A.   Yeah.
7      Q.   What makes you think that?
8      A.   Because I -- he wanted, as did I, some
9  expansion of the study to be a multi-site study.
10 But the company decided not to do it.
11     Q.   Which sites did he want to expand to?
12     A.   I don't know he had specific sites other
13 than that it be a multi-site.
14     Q.   Was it his intention to expand the study
15 to other sites within your practice?
16     A.   No. Not our practice so much as
17 probably other practices to authenticate the
18 results.
19     Q.   You have no idea why the study was never
20 published or whether it was?
21     A.   No.
22     Q.   No?
23     A.   No.
24     Q.   Did you keep copies of the APA poster?

Page 80

1      A.   I didn't, no.
2      Q.   No?
3      A.   No.
4      Q.   Were they available through your office?
5      A.   We don't have them at the office.
6      Q.   Is there any reason that people would be
7  told to contact you about getting copies of the APA
8  poster?
9          MR. SCHOON: Objection; form.
10 BY THE WITNESS:
11     A.   I'm not sure. It may have been that
12 they were available at one time through the
13 Forest Foundation.
14 BY MR. TRAMMELL:
15     Q.   Is that a customary thing to do, to
16 maintain copies of papers you author for
17 distribution?
18     A.   Yeah. Of course, sometimes we run out
19 of them, too, and we stop getting requests. But we
20 do maintain them.
21     Q.   Who prints them?
22     A.   The journal that publishes them.
23     Q.   And they send you copies?
24     A.   If you request them, I think they do,

Page 81

1  yes.
2      Q.   Who pays for it?
3      A.   Who pays for it? I think the journal
4  will send you so many and then if you need more,
5  you probably have to pay for it.
6      Q.   Have you ever ordered more than they
7  sent you voluntarily?
8      A.   Can't recall.
9      Q.   Do you know if AZ has any opinion or had
10 any opinion at the time of the scientific integrity
11 of this study?
12         MR. SCHOON: Objection; form.
13 BY THE WITNESS:
14     A.   No. And, again, I don't -- I don't know
15 who would be AZ. But I think some people did want
16 to go forward with it. But for whatever the
17 reason, they decided not to.
18 BY MR. TRAMMELL:
19     Q.   Do you know if Jamie Mullen had any
20 opinion about the scientific integrity of the
21 study?
22         MR. SCHOON: Objection; form.
23 BY THE WITNESS:
24     A.   I have no idea.

Confidential - Michael Jay Reinstein, M.D.

Page 82

BY MR. TRAMMELL:

1  BY MR. TRAMMELL:
2      Q.   Did you ever talk to him about it?
3      A.   I believe I did and I encouraged them
4  to go forward with a multi-site study of the
5  higher -- higher dosing.
6      Q.   Who did you tell that to?
7      A.   I believe I did talk to Jamie Mullen
8  once, yes.
9      Q.   And what was his response?
10     A.   That he was going to review it with
11 other people in the company.
12     Q.   Did you ever talk to anyone else at AZ
13 about it?
14     A.   Probably did, but I can't remember who.
15     Q.   Did anyone ever give you a final
16 decision from the company about the publication of
17 the study?
18     A.   Not that I can recall, no.
19     Q.   And nobody ever told you that they
20 thought the study lacked scientific integrity?
21     A.   Nobody told me to, no.
22     Q.   Do you think it did?
23 MR. SCHOON:  Object to form.
24 BY THE WITNESS:

Page 83

1      A.   I think it was what we said it was.
2  A small pilot study that needed further
3  replication.
4  MR. TRAMMELL:  Okay.  This is a document
5  that's marked confidential, but it's a letter from
6  the doctor to AstraZeneca.
7          Do you object to using this document.
8  MR. SCHOON:  Let me take a look at it.
9  Probably not.
10 MR. HAMMER:  It's from Dr. Reinstein.
11 MR. TRAMMELL:  It's from Dr. Reinstein.  It's
12 this one.
13 MR. SCHOON:  Okay.
14 MR. MIZGALA:  This one right here.
15 MR. SCHOON:  Is it two pages?
16 MR. TRAMMELL:  It is.
17 MR. SCHOON:  Yeah, that's fine.
18          (WHEREUPON, a certain document was
19          marked Reinstein Deposition Exhibit
20          No. 6, for identification, as of
21          05-28-2008.)
22 MR. SCHOON:  This is Exhibit 6.
23 MR. TRAMMELL:  It is.
24 BY MR. TRAMMELL:

Page 84

1      Q.   Doctor, what is this?
2      A.   This is a letter that our practice sent
3  to Mr. Brennan of AstraZeneca in October of 2001.
4      Q.   Why did you send it to David Brennan?
5      A.   Because we were very frustrated with the
6  company.
7      Q.   Do you know David Brennan?
8      A.   I don't know him personally.
9      Q.   Have you ever talked to him?
10     A.   No.
11     Q.   Did you send it to him because he was
12 the CEO?
13     A.   That's correct.
14     Q.   Was sending it to the CEO intended to
15 manifest your level of frustration with the
16 company?
17     A.   I think that's a good answer, yes.
18     Q.   In this letter you write that you have
19 been told by salespeople that you are the largest
20 prescriber of Seroquel in the world.  Do you recall
21 being told that?
22 MR. SCHOON:  Objection; form.
23 BY THE WITNESS:
24     A.   I think I remember hearing that, yes.

Page 85

1      Q.   Who told you that?
2      A.   I can't recall who.
3      Q.   But it was an AstraZeneca salesperson?
4      A.   I believe so, yes.
5      Q.   And that's just -- that's what they told
6  you, you're the largest Seroquel prescriber in the
7  world?
8  MR. SCHOON:  Object to form.
9  BY THE WITNESS:
10     A.   I believe that's what we were told, yes.
11 BY MR. TRAMMELL:
12     Q.   In what context did they tell you that?
13     A.   Possibly on a sales visit.
14     Q.   Do you know whether that's true?
15     A.   No, I'd have to see the data.
16     Q.   Do you have that data?
17     A.   I personally don't, no.
18     Q.   Did they ever show it to you?
19     A.   I don't recall seeing any actual data.
20     Q.   You also say you've consistently taken
21 an active role in promoting Seroquel.  What does
22 that mean?
23     A.   I was going around speaking all over the
24 country for about five years about Seroquel.

Confidential - Michael Jay Reinstein, M.D.

Page 86

1    Q.   Were you a speaker for Seroquel before
2  it launched?
3    A.   I don't remember if it was before it
4  launched or not.
5    Q.   Do you know when you started speaking on
6  behalf of AZ about Seroquel?
7    A.   My guess is it was 1997.
8    Q.   And that was the year the company
9  initiated marketing the drug, is that right?
10    A.   That's correct.
11    Q.   What experience did you have with
12  Seroquel at the time it was launched?
13    A.   We had been in the Quest study.
14    Q.   Was the Quest study a pre-marketing
15  study?
16    A.   I don't remember if it was pre-marketing
17  or marketing, post-marketing or both actually.
18    Q.   You were involved as a speaker for AZ
19  related to Seroquel at the outset of marketing,
20  weren't you?
21    A.   Probably, yeah.
22    Q.   Do you recall when they approached you
23  about serving in that capacity?
24    A.   I can't remember when, no.

Page 87

1    Q.   Do you recall whether you had ever
2  prescribed Seroquel before you spoke about it?
3    A.   We had -- I had prescribed it I'm sure
4  before I spoke about it, yes.
5    Q.   To how many patients?
6    A.   Probably a large number, but I can't
7  recall how many.
8    Q.   And over how -- how long a period of
9  time before you gave your first talk about
10  Seroquel?
11    A.   Maybe six months.
12    Q.   Do you know when you gave your first
13  Seroquel-related talk?
14    A.   Can't remember where or when, no.
15    Q.   Is there some record of that?
16    A.   The company may have a record.  I
17  personally don't.
18    Q.   The first record of a payment I have
19  from AZ to you from your master journal is
20  October of '97 for $750.  Is that a normal
21  speaker's fee?
22    MR. SCHOON:  Object to form.
23  BY THE WITNESS:
24    A.   Yes.

Page 88

1  BY MR. TRAMMELL:
2    Q.   Do you think that's the first time you
3  ever spoke on behalf of AZ related to Seroquel?
4    A.   As best as I can remember, yes.
5    Q.   Do you know when you first treated a
6  patient with Seroquel?
7    A.   Probably early 1997, perhaps late 1996.
8    Q.   What was your first talk on?
9    A.   Can't recall that either.
10    Q.   So you gave a speech about Seroquel that
11  you don't recall the content of after having
12  treated patients for under a year with the drug, is
13  that correct?
14    A.   As best as I can remember, yes.
15    Q.   How many talks did you give on behalf of
16  AZ related to Seroquel between 1997 and 2001?
17    A.   It was a large number.  I can't recall
18  the specific number.
19    Q.   What got you so excited about Seroquel?
20    MR. HAMMER:  Objection; form.
21    MR. SCHOON:  Object to form.
22    MR. HAMMER:  You may answer.
23  BY THE WITNESS:
24    A.   I think it's a very exciting drug.

Page 89

1  There aren't a lot of options for treating
2  schizophrenia.  The two that it's most similar to
3  are clozapine and Zyprexa, which have terrible
4  results on weight control, diabetes and lipids.
5    So, the idea of a drug that was similar
6  to those two products that didn't seem as bad with
7  weight control, diabetes and lipid profile was very
8  exciting.
9    THE VIDEOGRAPHER:  Doctor, I'm sorry.  When
10  you put your hands on your mouth, your answer is
11  muffled.
12    THE WITNESS:  Okay.
13    THE VIDEOGRAPHER:  I'm sorry to interrupt.
14    THE WITNESS:  Sorry.
15  BY MR. TRAMMELL:
16    Q.   Is it your opinion that Seroquel is
17  effective in treating patients with psychosis?
18    A.   Yes, it is effective.
19    Q.   What do you base that opinion on?
20    A.   Treating thousands of patients with it.
21    Q.   Your clinical experience, is that right?
22    A.   Yes.
23    Q.   Is that opinion based at all on clinical
24  studies?

23 (Pages 86 to 89)

Confidential - Michael Jay Reinstein, M.D.



Page 90

1    A.    Some on clinical studies and some on
2  our clinical experience.
3    Q.    Which studies?
4    A.    Quest Study was one.
5    Q.    Your opinion that Seroquel is effective
6  at treating psychosis is based on the Quest study
7  and your clinical experience, is that right?
8    A.    Yes.
9    Q.    Any other studies?
10   A.    That's the major background.
11   Q.    How many patients do you treat with
12  Seroquel?
13   A.    It's a large number.
14   MR. HAMMER:  I'm sorry.  Was that currently or
15  in the past -- I didn't know what the question was.
16   MR. TRAMMELL:  Currently.
17  BY THE WITNESS:
18   A.    It's a large number.  I couldn't say
19  how many.
20  BY MR. TRAMMELL:
21   Q.    Has it been consistent since the drug
22  began -- since promotion of the drug?
23   A.    I would think so.
24   Q.    Is it over a thousand patients at any

Page 91

1  given time?
2    A.    I wouldn't be surprised if it was.
3    Q.    Is it over 2,000 patients?
4    A.    I can't say that.
5    Q.    How many patients do you treat?
6    A.    We treat several thousand.
7    Q.    You don't have any idea what percentage
8  of your patient population is on Seroquel?
9    A.    It's a significant percentage, but I
10  couldn't give you exact numbers.
11   Q.    Do you promote any other atypical
12  antipsychotic?
13   MR. SCHOON:  Objection; form.
14  BY THE WITNESS:
15   A.    If you mean promote, I do speeches for
16  FazaClo and clozapine.
17  BY MR. TRAMMELL:
18   Q.    You do speeches for clozapine and who?
19   A.    FazaClo.
20   Q.    What is that?
21   A.    FazaClo is the orally dissolvable form
22  of clozapine.
23   Q.    Who markets clozapine, Novartis?
24   A.    Novartis used to.

Page 92

1    Q.    It's gone generic now?
2    A.    It has gone generic.
3    Q.    When did it go generic?
4    A.    I would guess about four or five years
5  ago.
6    Q.    2002?
7    A.    Approximately.
8    Q.    Do you continue to give talks on
9  Clozaril?
10   A.    I have given some for Teva
11  Pharmaceuticals who manufactures the generic form
12  of Clozaril.
13   Q.    You said your opinion that Seroquel is a
14  good drug is also based on the negative side effect
15  profile of Zyprexa and Clozaril, is that right?
16   A.    That's correct.
17   Q.    Do you have any opinion of the side
18  effect profile of Seroquel?
19   MR. SCHOON:  Object to form.
20  BY THE WITNESS:
21   A.    In terms of the problem areas of
22  clozapine and Zyprexa, it is not as problematical.
23  BY MR. TRAMMELL:
24   Q.    And what problem areas are those?

Page 93

1    A.    Well, with Zyprexa and clozapine there's
2  weight gain, there's diabetes and there is lipid
3  profile problems.
4    Q.    Is it your opinion that Seroquel is not
5  associated with those issues?
6    A.    I wouldn't say not associated, but it's
7  not as severely associated as the other two.
8    Q.    And what is that opinion based on?
9    A.    Treating thousands of patients with it.
10   Q.    Your clinical experience?
11   A.    Yes.
12   Q.    Any clinical trials?
13   A.    I'm more impressed with our clinical
14  experience.
15   Q.    Are you aware of any clinical trials on
16  that issue?
17   A.    I think there have been some studies
18  that are consistent with what we see clinically.
19   Q.    Have you ever read a study saying
20  Zyprexa causes weight gain and diabetes?
21   A.    I don't know that there is a study.
22  There was certainly litigation that was settled out
23  of court where the company acknowledged that it --
24  that it did.

24 (Pages 90 to 93)

Confidential - Michael Jay Reinstein, M.D.

Page 94

1    Q.   So, your opinion that Zyprexa causes
2    diabetes and weight gain is based on your clinical
3    experience and the fact that there is litigation
4    that's been settled?
5    A.   Well, the company admitted to it.
6    Q.   If AstraZeneca admitted that Seroquel
7    caused diabetes, would you share that opinion?
8    MR. SCHOON:  Object to form.
9    BY THE WITNESS:
10    A.   No.  I would disagree that it
11    significantly causes diabetes.
12    BY MR. TRAMMELL:
13    Q.   If they were -- what do you mean
14    "significantly"?
15    A.   That there's a significant incidence of
16    diabetes as a result of patients being on Seroquel.
17    Q.   What do you consider significant?
18    A.   Significant percentage, diabetes
19    above what one would find with placebo.
20    Q.   You mean statistically significant?
21    A.   Yes.
22    Q.   Are you aware of any studies showing
23    that there is a statistically significant incidence
24    of new onset diabetes with patients taking Seroquel

Page 95

1    as opposed to placebo or other atypical
2    antipsychotic?
3    A.   Studies I have seen are similar to our
4    clinical practice that there does not seem to be a
5    significant increase in diabetes of patients who
6    are on Seroquel versus not on Seroquel.
7    Q.   Have you ever asked AstraZeneca for any
8    data on weight gain and diabetes?
9    A.   Yes, I have several times.
10    Q.   And what has their response been?
11    A.   They have sent me what they have and I
12    produced the latest results that they sent me for
13    this subpoena.
14    Q.   Are you aware that there is a warning on
15    the Seroquel label describing its association with
16    weight gain and diabetes?
17    A.   I'm aware of the warning.
18    Q.   Are you aware that the label was changed
19    in 2007 to enhance that warning?
20    A.   I'm aware of the label change, yes.
21    Q.   Do you know what that label change is
22    based on?
23    A.   It's based on the FDA's opinion that
24    there is some risk of all six of the newer

Page 96

1    antipsychotics increasing the rate of diabetes.
2    Q.   Who told you that?
3    A.   I probably read it in some journal and I
4    can't remember which one.
5    Q.   You read that the FDA required that
6    label change?
7    A.   Yes.
8    Q.   The 2007 label change?
9    A.   Yes.
10    Q.   Do you know where you read that?
11    A.   No, I can't remember where.
12    Q.   You say in this letter also that the
13    promotion of Seroquel in 2007 lacked medical
14    direction.  What did you mean by that?
15    A.   That they weren't doing enough research
16    studies.
17    Q.   They weren't doing enough studies?
18    A.   That's correct.
19    Q.   What kinds of studies did you think they
20    needed to do?
21    A.   Well, at the time Janssen was doing
22    about 10 or 20 for every one that AstraZeneca was
23    doing.
24    Q.   Was it that you wanted to do more

Page 97

1    studies?
2    A.   No, we wanted the company to do more
3    studies.
4    Q.   You didn't want your practice to do
5    more?
6    A.   Not specifically, no.
7    Q.   Did you ever ask to do any more?
8    A.   I didn't, no.
9    Q.   You never made a request of AstraZeneca
10    to do studies?
11    A.   I personally don't recall doing that,
12    no.
13    Q.   Do you know whether Dr. Sonnenberg did?
14    A.   He may have.
15    Q.   Did you ever tell anyone, any
16    salesperson or anyone at AstraZeneca that if they
17    didn't allow you to do more studies and pay you to
18    do them that you'd switch your patients to Zyprexa?
19    MR. SCHOON:  Object to form.
20    BY THE WITNESS:
21    A.   Not to Zyprexa, no, no.
22    BY MR. TRAMMELL:
23    Q.   So, if someone said that, they wouldn't
24    be telling the truth, is that right?

25 (Pages 94 to 97)

Confidential - Michael Jay Reinstein, M.D.

Page 98

1     MR. HAMMER: Objection; form.
2  BY THE WITNESS:
3     A.   No.
4     MR. SCHOON: Object to form.
5  BY THE WITNESS:
6     A.   Don't recall.
7  BY MR. TRAMMELL:
8     Q.   You don't recall?
9     A.   No. I wouldn't have switched people to
10 Zyprexa.
11    Q.   Do you know whether you would have ever
12 told anyone that if AstraZeneca didn't pay you to
13 do studies you'd switch your patients to Zyprexa?
14    A.   I personally have never said that, no.
15    Q.   Would that be an ethical thing to do?
16    A.   It certainly would be unethical and I've
17 never done it.
18    Q.   If anyone at AstraZeneca said that you
19 said that, they would be lying, is that right?
20    MR. HAMMER: Objection; form.
21    MR. SCHOON: Objection; form.
22 BY THE WITNESS:
23    A.   That's correct.
24 BY MR. TRAMMELL:

Page 99

1     Q.   You say also that your dosing practices
2  and research indicate that for a large number of
3  patients the therapeutic dose of 1,200 milligrams a
4  day is needed. What research are you talking
5  about?
6     A.   The research we've talked about already,
7  which was our -- I believe our APA presentation,
8  which was done in 2001 on the 1,200 milligram a day
9  study.
10    Q.   So, your own study?
11    A.   That's correct.
12    Q.   A study you wrote?
13    A.   That's correct.
14    Q.   You say the perception of most
15 psychiatrists is that Seroquel lacks efficacy.
16 What do you -- what do you base the opinion that
17 that perception exists on?
18    A.   I had been going around the country
19 talking to psychiatrists about Seroquel from 1997
20 through the period when the letter was written.
21    Q.   Did you ever tell Don Beamish that you
22 wanted to become more involved in Seroquel
23 research?
24    A.   I can't even recall who this person is.

Page 100

1     Q.   You've never heard of Don Beamish?
2     A.   I can't recall the name, no.
3     Q.   Have you ever heard of James Pusey,
4  P-u-s-e-y?
5     A.   Can't recall that name either.
6     Q.   How about Georgia Tugend, T-u-g-e-n-d?
7     A.   I remember that name, yes.
8     Q.   Did you ever tell Ms. Tugend that you
9  wanted to become more involved in Seroquel
10 research?
11    A.   I can't recall any specific
12 conversations with her.
13    Q.   Did you ever tell David Brennan that you
14 wanted to be more involved in Seroquel research?
15    A.   Never talked to him.
16    Q.   Was that the implication of your letter?
17    A.   No, the implication was what the letter
18 says, that we were -- we had certain concerns about
19 the marketing of this drug, which we strongly
20 believe in, that it was not being marketed
21 appropriately.
22         (WHEREUPON, Mr. Richard A. Freese,
23         Esq. entered the deposition
24         proceedings.)

Page 101

1  BY MR. TRAMMELL:
2     Q.   You never told anybody that you wanted
3  to be more involved in Seroquel research, is that
4  right?
5     A.   I can't recall any of those
6  conversations.
7     Q.   Did anyone at AstraZeneca ever tell you
8  that they didn't want you to do more research
9  because the research you had already done was
10 scientifically illegitimate?
11    MR. SCHOON: Objection; form.
12 BY THE WITNESS:
13    A.   No, never had that conversation.
14 BY MR. TRAMMELL:
15    Q.   Did you ever get the impression they
16 were trying to manage your expectations about doing
17 future research projects?
18    A.   No, I don't have an opinion on that.
19    Q.   You recall receiving a letter from
20 Ms. Tugend in response to your letter to
21 Mr. Brennan?
22    A.   Don't recall getting a letter, no.
23    Q.   Do you know whether Dr. Sonnenberg ever
24 reached out to AZ about performing more research on

26 (Pages 98 to 101)

Confidential - Michael Jay Reinstein, M.D.

Page 102

1  Seroquel?
2      A.   I can't speak to it.  I don't know.
3      Q.   Did you ever have a discussion with him
4  about it?
5      A.   Not specifically, no.
6      Q.   Why would he want to do more research?
7      A.   Well, assuming he did, I think we're all
8  believers in this drug and I think he wanted more
9  research done to move the drug in the direction
10  that we felt it should be going.
11      Q.   Do you all volunteer your time when you
12  do that research?
13      A.   Sometimes we do and sometimes we're paid
14  for it.
15      Q.   Were any of these payments in this
16  ledger related to research done for AZ?
17      A.   I don't believe so.  I think it was all
18  for lectures I gave.
19      Q.   Did you ever tell anyone associated with
20  AZ that because you prescribed so much Seroquel,
21  you're entitled to do the research related to
22  Seroquel?
23      A.   Can't recall having that conversation.
24      Q.   If someone said that, they'd be lying?

Page 103

1      MR. HAMMER:  Objection; form.
2      MR. SCHOON:  Objection; form.
3  BY THE WITNESS:
4      A.   I can't recall having the -- the
5  conversation.
6  BY MR. TRAMMELL:
7      Q.   You don't know whether you said that or
8  didn't?
9      A.   I can't recall ever having it.
10      Q.   Do you think being a high prescriber of
11  Seroquel entitles or makes someone appropriate to
12  do research on the drug?
13      A.   Yes and no.  I think people who are high
14  prescribers would be more knowledgeable about the
15  drug.  On the other hand, it shouldn't be looked at
16  as a payment for using the drug.
17      Q.   There's more that goes into research,
18  though, than just prescribing the drug, right?  I
19  mean, you have to have qualifications to be a
20  clinical trialist, isn't that correct?
21      A.   Well, you have to -- there is a lot that
22  goes into it and that's part of it.
23      Q.   Has your or Dr. Sonnenberg's ability to
24  conduct a legitimate clinical trial ever been

Page 104

1  criticized, to your knowledge?
2      MR. HAMMER:  Objection; form.
3      Go ahead and answer.
4  BY THE WITNESS:
5      A.   He would know that better than I because
6  any criticisms would probably go to him.
7  BY MR. TRAMMELL:
8      Q.   Has yours ever been criticized, your
9  ability?
10      A.   Not that I'm aware of, no.
11      Q.   And no one at AZ has ever told you of
12  any criticisms that they have of your ability to
13  conduct research?
14      A.   Not that I'm aware of, no.
15      Q.   And, again, you never told anybody that
16  if you didn't get research funding, you'd switch
17  patients that were currently on Seroquel to
18  competitive agents?
19      A.   I'm not aware of that conversation, no.
20      Q.   Do you think you said that?
21      MR. SCHOON:  Objection; form.
22  BY THE WITNESS:
23      A.   I don't believe so, no.
24  BY MR. TRAMMELL:

Page 105

1      Q.   If you said that, would that be ethical?
2      MR. SCHOON:  Objection; form.
3  BY THE WITNESS:
4      A.   If I said that?  Yes, it would not be
5  ethical.
6  BY MR. TRAMMELL:
7      Q.   It's not ethical to have payments from
8  drug companies dictate your treatment decision
9  about decisions about patients, is it?
10      A.   That's correct.
11      Q.   And so if somebody said you said that,
12  they'd be lying, right?
13      MR. HAMMER:  Objection; form.
14      MR. SCHOON:  Objection; form.
15  BY THE WITNESS:
16      A.   I can't recall ever having that
17  conversation.
18      MR. TRAMMELL:  Objection; non-responsive.
19  BY MR. TRAMMELL:
20      Q.   Are you saying you did not say that?
21      A.   I cannot recall having it.  I don't --
22  and I don't believe I ever would have had it.
23      Q.   Can you say whether anyone who would
24  make the accusation that you said that would be

27 (Pages 102 to 105)

Confidential - Michael Jay Reinstein, M.D.

Page 106

1 telling the truth?
2     MR. SCHOON: Objection; form.
3 BY THE WITNESS:
4     A.   I cannot recall and cannot imagine that
5 I said anything like that.
6 BY MR. TRAMMELL:
7     Q.   So you don't know. You may have said
8 it?
9     MR. SCHOON: Objection; form.
10 BY THE WITNESS:
11     A.   As I say, I don't believe I ever did.
12 BY MR. TRAMMELL:
13     Q.   Do you believe you've always acted
14 ethically?
15     A.   Yes.
16     Q.   Do you believe that you would ever have
17 research funding conditioned -- do you believe you
18 would ever condition research funding, have that be
19 a condition for treatment of your patients?
20     A.   No.
21     MR. SCHOON: Objection; form.
22 BY MR. TRAMMELL:
23     Q.   Did they ever offer you -- did AZ ever
24 offer you any funding for retrospective chart

Page 107

1 reviews in an attempt to pacify you?
2     MR. SCHOON: Objection; form.
3     MR. HAMMER: Objection; form, foundation.
4       You can answer.
5 BY THE WITNESS:
6     A.   I'm not aware of it, no.
7 BY MR. TRAMMELL:
8     Q.   Did they ever offer you any funding for
9 retrospective chart reviews after you sent your
10 letter?
11     A.   I can't recall, no.
12     Q.   Did they ever offer you any funding to
13 do a controlled double-blinded trial?
14     A.   I can't recall that, no.
15     Q.   Have any of your clinics ever
16 participated in a controlled double-blinded trial?
17     A.   I don't know. You'd have to ask
18 Dr. Sonnenberg if he has. I can't recall any that
19 we've done.
20     Q.   Why do you think that is, that you all
21 are the largest prescribers in the country but AZ
22 doesn't want you to participate in any trials?
23     MR. SCHOON: Objection; form.
24 BY THE WITNESS:

Page 108

1     A.   Well, we have participated in AZ trials.
2 BY MR. TRAMMELL:
3     Q.   Which trial?
4     A.   The Quest study.
5     Q.   Other than that, no studies?
6     A.   That's the only one of theirs that I
7 can recall being in.
8     Q.   Was that a double-blinded prospective
9 trial?
10     A.   Again, I can't recall. That study was
11 done over ten years ago.
12     Q.   You have no opinion as to why they want
13 you to do chart reviews but not prospective
14 studies?
15     MR. SCHOON: Objection; form.
16 BY THE WITNESS:
17     A.   I have no opinion, no.
18 BY MR. TRAMMELL:
19     Q.   Why do you think that is?
20     MR. HAMMER: Objection; form.
21     MR. SCHOON: Objection; form.
22     MR. HAMMER: Asked and answered.
23       You can answer it again.
24 BY THE WITNESS:

Page 109

1     A.   I have no opinion if that statement is
2 true and I have no opinion, if it is true, why that
3 would be the case.
4 BY MR. TRAMMELL:
5     Q.   And no one's ever told you it's because
6 they think that you can't adhere to good clinical
7 practices?
8     MR. SCHOON: Objection; form.
9 BY THE WITNESS:
10     A.   I'm not aware of that conversation.
11 BY MR. TRAMMELL:
12     Q.   Do you know whether AZ is of the opinion
13 that you are held in poor regard by your peers in
14 Chicago?
15     MR. SCHOON: Objection; form.
16 BY THE WITNESS:
17     A.   I don't know that I am held in poor
18 regard by my peers in Chicago.
19 BY MR. TRAMMELL:
20     Q.   Do you know whether AZ has that opinion?
21     A.   I have no idea. I've given talks for
22 them in Chicago. So...
23     Q.   Has AZ ever hired you to give a talk in
24 Chicago?

28 (Pages 106 to 109)

Page 110

1    A.    Yes.
2    Q.    Are most of your talks in Chicago or
3  outside of Chicago?
4    A.    Well, for obvious reasons, most of them
5  were out of Chicago.  But I've done a number in
6  Chicago which, you know, were well attended.
7    Q.    Has anyone ever told you what the value
8  of your practice is to AstraZeneca's Seroquel
9  business?
10    A.    No.
11    MR. SCHOON:  Objection; form.
12  BY MR. TRAMMELL:
13    Q.    No?
14    A.    No.
15    Q.    Have you ever asked?
16    A.    No.
17    Q.    Did you do any studies for Lilly related
18  to Zyprexa in 2001 or subsequent to this letter you
19  sent to Mr. Brennan?
20    A.    Dr. Sonnenberg has done some studies
21  with Uptown Research with Zyprexa.
22    Q.    Were you ever paid to give any talks
23  related to Zyprexa?
24    A.    At one time I was.  I haven't done any

Page 111

1  talks for them in several years.
2    Q.    Do you know whether you in fact switched
3  patients who were on Seroquel to Zyprexa after you
4  wrote this letter?
5    A.    No.
6    Q.    You don't know?
7    A.    I don't believe we did, no.
8    Q.    There are records of that, though,
9  aren't there?
10    MR. SCHOON:  Objection; form.
11    MR. HAMMER:  Objection; form.
12  BY THE WITNESS:
13    A.    You'd have to go through patient charts,
14  but I -- Zyprexa is a drug we have not been using
15  very much because of our concerns about the
16  diabetes issue.
17  BY MR. TRAMMELL:
18    Q.    Did you ever express to anyone
19  dissatisfaction with the pace of publishing the
20  Quest study?
21    A.    I believe I did, yes.
22    Q.    What is the nature of your
23  dissatisfaction?
24    A.    I can recall one conversation with Jamie

Page 112

1  Mullen that we felt it was a good study and it
2  should be published and that the company for
3  whatever the reason wasn't able to get it together
4  to publish it.
5    Q.    What was Mullen's response?
6    A.    That he was working on it.
7    Q.    Did you think he was telling you the
8  truth?
9    MR. HAMMER:  Objection; form.
10    You can answer.
11    MR. SCHOON:  Yeah, objection; form.
12  BY THE WITNESS:
13    A.    I hope he was telling the true.
14  BY MR. TRAMMELL:
15    Q.    Why do you think they were dragging
16  their feet?
17    MR. SCHOON:  Objection; form.
18  BY THE WITNESS:
19    A.    We didn't find it a very efficient
20  company.  We were kind of disappointed with it.
21  BY MR. TRAMMELL:
22    Q.    But why did you think they were dragging
23  their feet?
24    MR. SCHOON:  Objection; form.

Page 113

1  BY THE WITNESS:
2    A.    I think it was a problem of their
3  internal organization.
4  BY MR. TRAMMELL:
5    Q.    You didn't think it was any comment on
6  the merits of the study, is that right?
7    MR. SCHOON:  Objection; form.
8  BY THE WITNESS:
9    A.    I personally felt it was a good study.
10  BY MR. TRAMMELL:
11    Q.    What role did you have in that study?
12    MR. SCHOON:  Objection; form.
13  BY THE WITNESS:
14    A.    We enrolled patients in the study.
15  BY MR. TRAMMELL:
16    Q.    How did patients qualify for that study?
17    A.    I'd have to review the study.  I can't
18  remember the details on it.
19    Q.    Do you know what the purpose of the
20  study was?
21    A.    It was to assess the efficacy, safety
22  and tolerability of Seroquel.
23    Q.    Was there a comparator drug?
24    A.    I believe it may have been Haldol.

29 (Pages 110 to 113)

Confidential - Michael Jay Reinstein, M.D.

Page 114

1    Q.   How long did the study last?
2    A.   Can't recall that.
3    Q.   Was yours the only study center?
4    A.   No.  There were centers around the
5    country.
6    Q.   Was it non-blinded or double-blinded or
7    single-blinded?
8    A.   Can't recall that.
9    Q.   You just know it was a study to assess
10   the efficacy of Seroquel?
11   A.   Yeah.
12   Q.   Do you know what Quest --
13   A.   Efficacy, safety and tolerability.
14   Q.   Do you know what Quest stands for?
15   A.   I think quetiapine efficacy, safety and
16   tolerability.
17   Q.   And you're the author of that study,
18   aren't you?
19   A.   I don't think it was ever published.
20   I think I participated in presenting it at one of
21   the APA meetings.  But I don't remember authoring
22   a paper on it.
23   Q.   What analysis of the data did you do?
24   A.   Before it was presented at the APA I was

Page 115

1    involved with the analysis of it.
2    Q.   Did you write your presentation poster
3    for the APA presentation?
4    A.   I participated in drafting it, yes.
5    Q.   What does that mean?
6    A.   That I reviewed it and went over it and
7    helped put it into the final form.
8    Q.   With whom?
9    A.   There were probably several people.
10   One I recall specifically was Jamie Mullen, the
11   medical director.
12   Q.   Who is Mohammed Bari?
13   A.   Don't recall the name.
14   Q.   Have you ever heard of Lawrence
15   Ginsberg?
16   A.   Lawrence Ginsberg I believe is a
17   psychiatrist in Texas.
18   Q.   How about Nat Sandler?
19   A.   I think he was another psychiatrist in
20   the Quest study.
21   Q.   Did you ever discuss this study with any
22   of those people?
23   A.   Yeah, we had several investigators
24   meetings.  I remember particularly Dr. Ginsberg was

Page 116

1    there, probably the others were too.
2    Q.   Where were those meetings?
3    A.   Can't recall specifically where.
4    Q.   Do you recall the results of the study?
5    A.   The results were favorable to Seroquel.
6    Q.   Were you surprised by that?
7    MR. HAMMER:  Objection; form.
8    You can answer.
9    BY THE WITNESS:
10   A.   Not at the time it was presented because
11   we were using Seroquel a lot then.
12   BY MR. TRAMMELL:
13   Q.   Do you practice at Riveredge Hospital?
14   A.   Yes.
15   Q.   Still?
16   A.   Yes.
17   Q.   Did you in 2001 practice at Riveredge
18   Hospital?
19   A.   That might be about the time I started
20   there, yeah, around 2001.
21   Q.   Have you ever heard of a woman named
22   Laura Stanischek?
23   A.   Can't recall the name.
24   Q.   Could she be a sales representative?

Page 117

1    A.   It's possible.
2    Q.   How about Mona Farmakis, Monica
3    Farmakis?
4    A.   Can't recall the name.
5    Q.   Have you ever heard of a person named
6    Bob Wishner?
7    A.   No.  I can't recall the name.
8    Q.   Do you know whether he's the chief of
9    pharmacy at Riveredge Hospital?
10   A.   I don't know his -- the name of the
11   person.
12   Q.   What kind of a facility is Riveredge
13   Hospital?
14   A.   Riveredge is a freestanding psychiatric
15   hospital.
16   Q.   And who's treated there?  What types of
17   patients?
18   A.   Patients who are mentally ill.
19   Q.   Kids?
20   A.   They treat kids, adolescents and adults.
21   Q.   Isn't it primarily a child and
22   adolescent facility?
23   A.   It's a mixture of child, adolescent and
24   adult.

30 (Pages 114 to 117)

Confidential - Michael Jay Reinstein, M.D.

Page 118

1    Q.   Is it primarily a child and adolescent
2  facility?
3    MR. SCHOON:  Objection; form.
4    MR. HAMMER:  Asked and answered.  Go ahead.
5  BY THE WITNESS:
6    A.   I know we have two adult units and there
7  is maybe three or four child and adolescent units
8  there.
9  BY MR. TRAMMELL:
10    Q.   You can't account for the proportion
11  of --
12    A.   Well, probably about a third roughly of
13  the patients there are at any one time are adult.
14    Q.   So, it's primarily a child and
15  adolescent facility?
16    MR. SCHOON:  Objection; form.
17  BY THE WITNESS:
18    A.   If two-thirds makes it primarily, then
19  two-thirds makes it primarily.  I'm not sure if I
20  would call it primarily.
21  BY MR. TRAMMELL:
22    Q.   You wrote your letter to Mr. Brennan
23  October 23.  Do you recall whether in December at
24  Riveredge you switched all your patients from

Page 119

1  Seroquel to Zyprexa?
2    A.   No, I --
3    MR. SCHOON:  Objection; form.
4  BY THE WITNESS:
5    A.   I don't think we did.
6  BY MR. TRAMMELL:
7    Q.   You don't think you did?
8    A.   No.
9    Q.   That's something we can find out from
10  the records, is that correct?
11    A.   I guess --
12    MR. SCHOON:  Objection; form.
13  BY THE WITNESS:
14    A.   You'd have to get the records from
15  Riveredge.  I --
16  BY MR. TRAMMELL:
17    Q.   If we found out that happened, can you
18  think of any reason that you would have done that?
19    A.   No.
20    MR. SCHOON:  Objection; form.
21  BY MR. TRAMMELL:
22    Q.   Do you recall whether you were starting
23  all new patients on Zyprexa at that time?
24    A.   I can't recall.

Page 120

1    Q.   Would that have been an unusual thing to
2  do?
3    A.   Yeah, we have not been using Zyprexa
4  that much.
5    Q.   Is it normally your practice to start
6  new patients on Seroquel?
7    MR. SCHOON:  Objection.
8  BY THE WITNESS:
9    A.   We start a lot of new patients on
10  Seroquel and always have.
11  BY MR. TRAMMELL:
12    Q.   Do you start new patients on Zyprexa?
13    A.   Not very many, no.
14    Q.   So, it would be unusual for you to start
15  all new patients on Zyprexa?
16    MR. SCHOON:  Objection; form.
17  BY THE WITNESS:
18    A.   Yes.
19  BY MR. TRAMMELL:
20    Q.   At any time.
21    A.   Yes.
22       I think what you're referring to, there
23  was a period when -- and it may have been 2001 that
24  Seroquel was not available.  They ran out of stock

Page 121

1  and it was around December, and I'm pretty sure the
2  year was 2001.
3       But there was one period where Seroquel
4  was not available for a lot of pharmacies, and
5  there was one -- that was the only period where we
6  had to cut back on our Seroquel.  The suppliers
7  couldn't get it for whatever the reason.
8    Q.   Who told you that?
9    MR. SCHOON:  Objection; form.
10  BY THE WITNESS:
11    A.   It was probably some AstraZeneca reps
12  and pharmacists.
13  BY MR. TRAMMELL:
14    Q.   Told you that there was -- that they had
15  run out of Seroquel?
16    A.   They ran out of Seroquel.
17    Q.   And so you started prescribing Zyprexa?
18    A.   Well, we probably started using other
19  drugs including Zyprexa.
20    Q.   Did you ever admit to Georgia Tugend
21  that you had run poor trials or your trials were
22  poorly run?
23    MR. SCHOON:  Objection; form.
24  BY THE WITNESS:

31 (Pages 118 to 121)

Page 122

1     A.   Don't remember that conversation, no.
2 BY MR. TRAMMELL:
3     Q.   If she says you told her that, is she
4 lying?
5     MR. SCHOON:  Objection; form.
6     MR. HAMMER:  Objection; form.
7 BY THE WITNESS:
8     A.   I can't recall.  I can't say whether
9 she was or wasn't.  I don't recall the
10 conversation.
11 BY MR. TRAMMELL:
12     Q.   You may have told her that, is that
13 right?
14     MR. SCHOON:  Objection; form.
15 BY THE WITNESS:
16     A.   I doubt if I did, but I can't recall
17 that I did or I didn't.
18 BY MR. TRAMMELL:
19     Q.   Do you have any opinion as to whether
20 any of the trials you've run have been poorly run?
21     A.   I wouldn't use the word "poorly."  I
22 think the trials we have done have been limited to
23 often having to do retrospective studies because of
24 limited budget.

Page 123

1         Now, whether that makes them poor or
2 not, I don't know.  But a better quality would be
3 to do prospective studies.
4     Q.   Have you ever done a prospective study?
5     A.   With Uptown Research I have, yes.
6     Q.   What study is that?
7     A.   Well, we've done -- we've done probably
8 30 or 40.
9     Q.   Any on Seroquel?
10    A.   I -- none on Seroquel, no.
11    MR. TRAMMELL:  This is Plaintiff's 7.
12        (WHEREUPON, a certain document was
13        marked Reinstein Deposition Exhibit
14        No. 7, for identification, as of
15        05-28-2008.)
16 BY MR. TRAMMELL:
17    Q.   Doctor, you've been given a copy of
18 Plaintiff's Exhibit 7.  If you will turn to the
19 second page.  Yours is the third name listed, is it
20 not?
21    A.   Yes.
22    Q.   I'll represent to you that this is a
23 document downloaded from the FDA's web site
24 entitled "Clinical Investigator Inspection List."

Page 124

1 The date on this -- of the entry related to you is
2 8th of November, 2000.
3         There are three deficiency codes listed
4 at the far right column, 03, 05 and 06.  Do you see
5 those?
6     A.   Yes.
7     Q.   If you go to the back, the last two
8 pages of this document, 03 is identified as
9 "Inadequate informed consent form," which is a
10 violation of 21 Code of Federal Regulations 50.25.
11        05 is "Failure to follow an
12 investigational plan," which is a violation of
13 21 CFR 312.60.
14        And 06 is "Inadequate and inaccurate
15 records," which is a violation of 21 CFR 316.62.
16        Why were you cited for these violations
17 of the CFR?
18    MR. SCHOON:  Objection; form.
19 BY THE WITNESS:
20    A.   I can't remember all the details.  My
21 assumption is that Forest Foundation must have had
22 an inspection and they were considered deficient in
23 the areas mentioned.
24 BY MR. TRAMMELL:

Page 125

1     Q.   They cited you by name.  You don't
2 recall that?
3     A.   Probably because I was the medical
4 director of the Forest Foundation research.
5     Q.   Did they ever tell you what specifically
6 you had done wrong?
7     A.   I don't recall.  You know, we've had
8 many of these inspections and I don't recall the
9 specific issues with this one.
10    Q.   Did they send you a letter?
11    A.   They may have.
12    Q.   Did you throw it away?
13    A.   It's probably filed somewhere with the
14 Forest Foundation records.
15    Q.   Which may or may not exist, is that
16 right?
17    A.   They probably exist somewhere.
18    Q.   You didn't keep a copy of any letter
19 that you got?
20    A.   No.
21    Q.   Do you recall whether you did anything
22 about this?
23    A.   Well, as we've always done when there
24 have been deficiencies, we've rendered to make the

32 (Pages 122 to 125)

Confidential - Michael Jay Reinstein, M.D.

Page 126

1  necessary improvements.
2      Q.   Were these violations related to any
3  trials that you were doing on Seroquel?
4      A.   Yes.  This is seven or eight years ago,
5  so I have no recollection what -- what they
6  involved.
7      Q.   Did you communicate with anybody about
8  this?
9      A.   I don't recall.
10     Q.   Did you ever tell AZ about this?
11     A.   I don't recall.
12     MR. SCHOON:  Objection; form.
13 BY THE WITNESS:
14     A.   I don't recall.
15 BY MR. TRAMMELL:
16     Q.   Did they talk to you about it?
17     A.   I have no recollection.
18     Q.   You told me it was impossible to do good
19 clinical research without obtaining informed
20 consent following an investigational plan and
21 keeping records, is that correct?
22     A.   That's correct.
23     Q.   Is your research operation -- your
24 research operation is deficient in those areas,

Page 127

1  isn't it?
2      MR. SCHOON:  Objection; form.
3  BY THE WITNESS:
4      A.   May have been at one time and if it was,
5  I'm sure we made the necessary corrections.
6      MR. TRAMMELL:  Let's take a break.
7      MR. SCHOON:  I have -- before we go off the
8  record, I think under the rule of optional
9  completion the statement indicated with regard to
10 this document should be a part of the record, which
11 indicates that the violation was a VAI, "Voluntary
12 Action Indicated.  Objectionable conditions were
13 found but the problems do not justify further
14 regulatory action.  Any corrective action is left
15 to the investigator to take voluntarily."
16     I make that just because I think the
17 examination is otherwise highly misleading.
18     MR. TRAMMELL:  Well, I think the document
19 speaks for itself and it's part of the record.
20     THE VIDEOGRAPHER:  This concludes Tape 2 of
21 Dr. Michael Jay Reinstein.  We are off the video
22 record at 11:22 a.m.
23         (WHEREUPON, a recess was had
24          from 11:22 to 11:43 a.m.)

Page 128

1      THE VIDEOGRAPHER:  This is the beginning of
2  Tape 3 of Dr. Michael Jay Reinstein.  We are on the
3  video record at 11:43 a.m.
4  BY MR. TRAMMELL:
5      Q.   Doctor, we took a short break.  You
6  understand you're still under oath, is that right?
7      A.   That's correct.
8      Q.   I have a few more questions for you and
9  then I'm going to pass you to Mr. Matthews.
10     After you did the -- after you wrote the
11 first article on weight loss and Seroquel's ability
12 to cure diabetes, were you aware that a marketing
13 piece was created by AstraZeneca based on that
14 article?
15     MR. SCHOON:  Objection; form.
16     MR. HAMMER:  I was going to object to form.
17 He can answer.
18 BY THE WITNESS:
19     A.   Well, first of all, I'd want to correct.
20 I don't think we ever told anybody we thought
21 Seroquel would cure diabetes.
22 BY MR. TRAMMELL:
23     Q.   Well, you wrote an article in which
24 every single patient had symptoms of diabetes

Page 129

1  alleviated and lost weight after the initiation of
2  Seroquel therapy, right?
3      MR. SCHOON:  Objection; form.
4  BY THE WITNESS:
5      A.   I still would disagree that that states
6  that I told anybody that Seroquel cured diabetes.
7  BY MR. TRAMMELL:
8      Q.   Wasn't that the implication of the study,
9  though?
10     MR. SCHOON:  Objection; form.
11 BY THE WITNESS:
12     A.   No.  The implication was that people who
13 were on clozapine and became diabetic did better in
14 terms of their weight and their diabetes with the
15 addition of Seroquel and the cessation of
16 clozapine.  There was no indication that we told
17 anybody that Seroquel cured diabetes.
18 BY MR. TRAMMELL:
19     Q.   Do you think clozapine causes diabetes?
20     A.   It contributes to the development of
21 diabetes.
22     Q.   How does it do that?
23     A.   I don't think anybody knows that.
24     Q.   How do you think it does it?

33 (Pages 126 to 129)

Confidential - Michael Jay Reinstein, M.D.

Page 130

1    A.    I don't know how it does it.  But I
2  know it does contribute; that significant people
3  -- significant numbers of patients on clozapine
4  will develop diabetes.
5    Q.    Does it have anything to do with weight
6  gain?
7    A.    Sometimes but not all the time.
8    Q.    Do you have any opinion about whether
9  weight gain can contribute to the new onset of
10  diabetes?
11    A.    In some patients it could, yes.
12    Q.    Does it generally?
13    A.    Not all the time.  Some people have
14  developed diabetes without gaining weight.
15    Q.    Weight gain is a risk factor for
16  diabetes, though, isn't it?
17    MR. SCHOON:  Objection; form.
18  BY THE WITNESS:
19    A.    It is.
20  BY MR. TRAMMELL:
21    Q.    An antipsychotic's propensity to cause
22  weight gain can contribute to new onset diabetes,
23  can't it?
24    MR. SCHOON:  Objection; form.

Page 131

1  BY THE WITNESS:
2    A.    Can contribute, right.
3  BY MR. TRAMMELL:
4    Q.    That's really the implication of the
5  study, right, is that because Seroquel causes less
6  weight gain or in fact causes weight loss, it's
7  less associated with new onset diabetes, right?
8    A.    No, that's not the implication of the
9  study.  The implication of the study is that if you
10  have patients on clozapine who have gained weight
11  and/or have become diabetic and you reduce their
12  clozapine and add Seroquel that you get a -- it
13  seems to reduce the tendency of these people to
14  gain weight and have elevated blood sugars.
15  That's the only implication.
16    Q.    Is weight gain an issue with Seroquel?
17    MR. SCHOON:  Objection; form.
18  BY THE WITNESS:
19    A.    In my experience some patients have
20  gained weight.  Some have lost weight.  Some
21  weights have stayed about the same.
22  BY MR. TRAMMELL:
23    Q.    If someone said weight gain is not an
24  issue with Seroquel, would that be true?

Page 132

1    MR. SCHOON:  Objection; form.
2    MR. HAMMER:  Objection; form.
3  BY THE WITNESS:
4    A.    Again, it's not true for all patients.
5  BY MR. TRAMMELL:
6    Q.    If someone just made the statement
7  "Weight gain is not an issue with Seroquel," is
8  that true?
9    MR. SCHOON:  Objection; form.
10  BY THE WITNESS:
11    A.    It depends in what context, if you're
12  talking about a large number of patients sampled or
13  if you're talking about individual patients.
14  BY MR. TRAMMELL:
15    Q.    In any context, to say as a matter of
16  principle that weight gain is not an issue with
17  Seroquel, is that true?
18    MR. SCHOON:  Objection; form.
19  BY THE WITNESS:
20    A.    It -- I can't answer that in the context
21  it's asked.
22  BY MR. TRAMMELL:
23    Q.    Well, how about this.  Is weight gain an
24  issue with Seroquel in any context?

Page 133

1    MR. SCHOON:  Objection; form.
2  BY THE WITNESS:
3    A.    It could be with individual patients.
4  BY MR. TRAMMELL:
5    Q.    Do you recall reporting to AstraZeneca
6  the results of Seroquel treatment in one case study
7  that you had done?
8    A.    I believe they wanted a case study of a
9  patient whose metabolic symptoms seemed to benefit
10  from Seroquel and we supplied them with -- with
11  that case.
12    Q.    They asked you for such a case?
13    A.    Yes.
14    Q.    When?
15    A.    Can't remember when.  Maybe 1997 or
16  1998.
17    Q.    And who asked you?
18    A.    Can't recall specifically.
19    Q.    Did somebody call you?
20    A.    Can't recall that.
21    Q.    Did they write you a letter?
22    A.    Can't recall.
23    Q.    And what did they tell you they wanted?
24    A.    They wanted a case study of a patient

Confidential - Michael Jay Reinstein, M.D.

Page 134

1  who seemed to benefit metabolically from a
2  transition to Seroquel.
3      Q.   Did they tell you why they wanted that?
4      A.   No.  I don't recall.
5      Q.   Did you ask?
6      A.   Don't recall.
7      Q.   Did they offer to pay you?
8      A.   Don't recall if there was payment or
9  not.
10     Q.   Why do you think they asked you for
11  that?
12     A.   I think they wanted to use it for
13  marketing purposes.
14     Q.   Why?
15     MR. SCHOON:  Objection; form.
16  BY THE WITNESS:
17     A.   I mean, you'd have to ask their
18  marketing department, but they -- I assume it was
19  for marketing purposes.
20  BY MR. TRAMMELL:
21     Q.   Why would no weight gain be helpful in
22  marketing Seroquel?
23     MR. SCHOON:  Objection; form.
24  BY THE WITNESS:

Page 135

1      A.   Well, I don't think this patient
2  that was the issue.  The issue is very specific,
3  that this is somebody whose metabolic status
4  benefited from being switched from Zyprexa to
5  Seroquel.
6  BY MR. TRAMMELL:
7      Q.   So, they wanted a case study in which
8  someone was switched from Zyprexa to Seroquel and
9  lost weight?
10     MR. SCHOON:  Objection; form.
11  BY THE WITNESS:
12     A.   Lost weight and I believe also had
13  improvement in diabetes.
14  BY MR. TRAMMELL:
15     Q.   They had to satisfy those two criteria?
16     MR. SCHOON:  Objection; form.
17  BY THE WITNESS:
18     A.   As best as I can recall.  You know, this
19  was ten years ago.
20  BY MR. TRAMMELL:
21     Q.   Why do you think the person had to lose
22  weight and have their diabetes symptoms alleviated?
23     MR. SCHOON:  Objection; form.
24  BY THE WITNESS:

Page 136

1      A.   I don't know.  You'd have to ask the
2  marketing department why the request was made.
3  BY MR. TRAMMELL:
4      Q.   Did anyone ever tell you from AZ that
5  weight was associated with diabetes or weight gain?
6      A.   I can't recall anybody telling me that
7  specifically.
8      Q.   And why is weight management important
9  for these patients?
10     A.   Tremendous incidence of diabetes in this
11  population and as well as lipid profiles, early
12  death from metabolic events and hypertension.  And,
13  so, weight management is important to prevent these
14  conditions.
15     Q.   So, a drug that causes less weight gain
16  is less likely to be associated with diabetes, is
17  that right?
18     MR. SCHOON:  Objection; form.
19  BY THE WITNESS:
20     A.   It's a fair statement.
21  BY MR. TRAMMELL:
22     Q.   That's the implication of the marketing
23  piece, though, isn't it?
24     MR. HAMMER:  Objection; form.

Page 137

1  BY THE WITNESS:
2      A.   You'd have to ask the marketing
3  department.
4  BY MR. TRAMMELL:
5      Q.   Well, it's your face and name on this
6  marketing piece.  Are you aware of that?
7      A.   Yes.
8      MR. SCHOON:  Objection; form.
9  BY THE WITNESS:
10     A.   It's a presentation of one patient and
11  that's all it is.
12  BY MR. TRAMMELL:
13     Q.   And what's the clinical significance of
14  this information?
15     MR. SCHOON:  Objection; form.
16  BY THE WITNESS:
17     A.   The clinical information is this is a
18  case report on a patient whose metabolic status was
19  improved by switching the Zyprexa to Seroquel, and
20  I suppose the implication if other doctors have
21  patients who have become diabetic on Zyprexa, that
22  they might consider switching their patients to
23  Seroquel and seeing if they get this good a result.
24  BY MR. TRAMMELL:

35 (Pages 134 to 137)

Confidential - Michael Jay Reinstein, M.D.

Page 138

1    Q.   Did you have an opinion that it was
2   because you switched the patient to Seroquel that
3   the weight was affected positively?
4    A.   I think it was more a factor that we
5   were able to get the patient off Zyprexa.
6    Q.   Do you have the records that support
7   this case study?
8    A.   I doubt if we still do.  This would be
9   more than ten years ago.
10    Q.   Did you ever send the records to AZ?
11    A.   Can't recall that.
12    Q.   Did they ever ask for them?
13    A.   Can't recall.
14    Q.   Have you ever had a patient whose
15   diabetes went away after the initiation of Seroquel
16   treatment?
17    A.   I think we've had people where it went
18   away because we took them off Zyprexa and clozapine
19   and started them on Seroquel.
20    Q.   Is that because you started them on
21   Seroquel that the diabetes went away?
22    A.   More likely that we were able to wean
23   them off clozapine or Zyprexa.
24    Q.   And how does Seroquel cause weight loss?

Page 139

1    MR. SCHOON:  Objection; form.
2   BY THE WITNESS:
3    A.   I don't know.  I can only tell you what
4   I've seen clinically, that some people gain weight,
5   some lose weight and some stay about the same.
6   BY MR. TRAMMELL:
7    Q.   Have you ever seen any data supporting
8   the idea that Seroquel causes weight loss?
9    MR. SCHOON:  Objection; form.
10   BY THE WITNESS:
11    A.   The only data I've seen is that Seroquel
12   is relatively weight neutral in a large sampling of
13   patients.
14   BY MR. TRAMMELL:
15    Q.   Where did you hear that?  Where did you
16   hear that term "weight neutral"?
17    A.   I said relatively weight neutral, and I
18   think there was some studies in the last mailings
19   that I got from AstraZeneca that I included in the
20   subpoena I received.
21    Q.   That say that Seroquel is weight
22   neutral?
23    A.   Relatively weight neutral, yes.
24    Q.   And what's the significance of that?

Page 140

1    A.   That it will prevent all these terrible
2   consequences of the metabolic syndrome, diabetes,
3   hypertension, lipid problems.
4    Q.   Which are associated with weight gain,
5   right?
6    A.   Yes.
7    MR. SCHOON:  Objection; form.
8   BY MR. TRAMMELL:
9    Q.   Yes?
10    A.   Yes.
11    Q.   And, so, the implication is that if
12   Seroquel is less associated with weight gain than
13   its competitors, it's got a better safety profile
14   than its competitors because it's less likely to
15   cause these metabolic issues, right?
16    MR. SCHOON:  Objection; form.
17    MR. HAMMER:  Objection.
18   BY THE WITNESS:
19    A.   Better than two of its competitors,
20   Zyprexa and clozapine.
21   BY MR. TRAMMELL:
22    Q.   And you gave speeches on this topic,
23   didn't you?
24    A.   Yes, I talked about the metabolic

Page 141

1   syndrome a lot.
2    Q.   Who prepared the slides that you used in
3   those speeches?
4    A.   I did.
5    Q.   You did?
6    A.   Yeah.
7    Q.   On a computer?
8    A.   No.  I would write them up and somebody
9   would put them on a -- in the form of a slide and
10   then --
11    Q.   Who --
12    A.   -- later they were put into -- they were
13   put into PowerPoint.
14    Q.   Who would have done that?
15    A.   Might have been my office manager.  I'm
16   not sure.
17    Q.   You don't know?  The office manager?
18    A.   I can't remember.  It may have been.
19   She may have had somebody else do it.
20    Q.   And you searched that computer in
21   response to the subpoena, is that right?
22    A.   She did, yeah.
23    Q.   Were your slides approved by AstraZeneca
24   before your talks?

36 (Pages 138 to 141)

Confidential - Michael Jay Reinstein, M.D.

Page 142

1    A.   I -- they were submitted to people in
2  AstraZeneca.
3    Q.   Every time?
4    MR. SCHOON:  Objection; form.
5  BY THE WITNESS:
6    A.   No.
7  BY MR. TRAMMELL:
8    Q.   Did you ever give a presentation using
9  slides that AstraZeneca hadn't seen?
10   MR. SCHOON:  Objection; form.
11 BY THE WITNESS:
12   A.   I can't recall whether they had seen or
13 hadn't seen them.
14 BY MR. TRAMMELL:
15   Q.   Was it your standard practice to submit
16 your slides to AstraZeneca?
17   A.   They were usually submitted to the drug
18 rep where the presentation was going to be given.
19   Q.   I see.  So, a drug rep would be your
20 liaison with the company.  They would tell you when
21 and where to go talk and what to talk about?
22   A.   Well, not what to talk about but to
23 schedule the talks.
24   Q.   Did they ever raise any concerns about

Page 143

1  the content of any of your slides with you?
2    A.   Can't recall that they did, no.
3    Q.   Did they ever make suggestions about
4  things to add?
5    A.   No.
6    Q.   Have you ever heard of Lisa Arvinitis?
7    A.   I believe she is somebody that worked
8  for AstraZeneca.
9    Q.   What did she do?
10   A.   Can't recall that.
11   Q.   Do you know which trials you relied on
12 or which studies you relied on in coming to the
13 conclusions you came to that are evidenced by this
14 marketing campaign?
15   MR. SCHOON:  Objection; form.
16 BY THE WITNESS:
17   A.   Personal studies which I have done,
18 talking with other doctors and my own clinical
19 experience.
20 BY MR. TRAMMELL:
21   Q.   Have you ever heard of Seroquel
22 Trial 13?
23   A.   Can't recall hearing about it.
24   Q.   Have you ever read it?

Page 144

1    A.   Can't recall reading it.
2    Q.   You don't know what the conclusions of
3  that study were or that trial were?
4    A.   Can't recall, no.
5    Q.   Have you ever seen any data on file for
6  Trial 13?
7    A.   Can't recall.
8    Q.   Do you know why you would have said you
9  relied on such data in coming to the conclusions
10 you came to in these publications?
11   A.   Can't recall.
12   MR. SCHOON:  Objection; form.
13 BY MR. TRAMMELL:
14   Q.   Did you just make it up?
15   MR. SCHOON:  Objection; form.
16 BY THE WITNESS:
17   A.   I can't recall.  This is ten years ago.
18 BY MR. TRAMMELL:
19   Q.   You don't remember whether you just made
20 it up?
21   MR. SCHOON:  Objection; form.
22 BY THE WITNESS:
23   A.   I can't recall.
24 BY MR. TRAMMELL:

Page 145

1    Q.   You also wrote a paper in 2003 called
2  "The use of quetiapine to manage patients who
3  experienced adverse effects with clozapine."
4    MR. TRAMMELL:  Do you have a clean copy of
5  this?
6  BY MR. TRAMMELL:
7    Q.   Oh, and just so I'm clear.  Tell me if
8  this is what happened.
9         They asked you do you have a patient who
10 fits this profile, they have to have lost weight
11 and had symptoms of diabetes improve and have been
12 switched from Zyprexa to Seroquel and you sent them
13 patients' records, is that what happened?
14   MR. SCHOON:  Objection; form.
15 BY THE WITNESS:
16   A.   I don't remember if we sent a record or
17 a summary of the record.
18 BY MR. TRAMMELL:
19   Q.   If you sent a summary of the record, who
20 would have written that?
21   A.   I may have or my office manager may
22 have.  I don't honestly remember.
23   Q.   Did they communicate with you or your
24 office manager?

37 (Pages 142 to 145)

Confidential - Michael Jay Reinstein, M.D.

Page 146

1    A.   The communication was to me.
2    Q.   You don't know whether you ever
3  summarized those records or sent them, is that
4  right?
5         MR. SCHOON: Objection; form.
6  BY THE WITNESS:
7    A.   I don't recall specifically.
8  BY MR. TRAMMELL:
9    Q.   And you don't have any record of it?
10   A.   No.
11   Q.   You don't have a summary, for example?
12   A.   No, I wouldn't save that.
13   Q.   And, so, you would have sent them a
14 summary and then they would have generated the case
15 study, is that right?
16   A.   It's very possibly what's --
17        MR. SCHOON: Objection; form.
18 BY THE WITNESS:
19   A.   -- what happened.
20 BY MR. TRAMMELL:
21   Q.   And then you take the case study and
22 then go give talks on it, is that right?
23   A.   Not on the case study per se.
24   Q.   But on the issue?

Page 147

1    A.   On the issue, yes.
2    Q.   And is that also what happened with
3  these studies, they would send you a copy of a
4  study and you would decide whether you would put
5  your name on it or not?
6         MR. SCHOON: Objection; form.
7  BY THE WITNESS:
8    A.   I don't recall anything like that
9  happening.
10 BY MR. TRAMMELL:
11   Q.   You don't recall ever having been sent a
12 draft of a study by AstraZeneca?
13        MR. SCHOON: Objection; form.
14 BY THE WITNESS:
15   A.   Don't recall it, no.
16 BY MR. TRAMMELL:
17   Q.   If someone at AstraZeneca said they sent
18 you a draft of these studies that you say you
19 wrote, would they be lying?
20        MR. SCHOON: Objection.
21 BY THE WITNESS:
22   A.   Again, I can't recall what -- this
23 happening or not.
24 BY MR. TRAMMELL:

Page 148

1    Q.   If someone said that no member of your
2  group wrote any part of these studies, would that
3  be a lie?
4         MR. SCHOON: Objection; form.
5  BY THE WITNESS:
6    A.   I'd have to know what study you're
7  referring to, and I don't have any memory of this
8  happening.
9  BY MR. TRAMMELL:
10   Q.   Either the 1999 weight loss study or the
11 2003 weight loss study, if someone at AstraZeneca
12 said that no member of your group wrote any part of
13 those studies, would that be a lie?
14        MR. SCHOON: Objection; form.
15 BY THE WITNESS:
16   A.   I know I was involved in the
17 drafting of both of those documents.
18 BY MR. TRAMMELL:
19   Q.   In what sense?
20   A.   Of analyzing the data and writing out at
21 least part of it.
22   Q.   And what record do you have of that?
23   A.   I don't have any records.
24        MR. SCHOON: Objection; form.

Page 149

1  BY MR. TRAMMELL:
2    Q.   And there is no record of that data, is
3  there?
4    A.   It would be in the clinical charts, and
5  the second paper was done through Uptown Research.
6  So, any records of that would be stored through
7  Uptown Research.
8    Q.   Do you recall whether the second paper
9  was based on a retrospective or prospective study?
10   A.   As I recall, that was retrospective as
11 well.
12   Q.   Was it blinded?
13   A.   As I --
14        MR. SCHOON: Objection; form.
15 BY THE WITNESS:
16   A.   As I recall, it was not blinded.
17 BY MR. TRAMMELL:
18   Q.   Was it randomized?
19   A.   It was not randomized because it
20 involved the patients who were in that category.
21   Q.   And, again, can you spell the word
22 "randomized"?
23        MR. SCHOON: Objection; form.
24 BY THE WITNESS:

38 (Pages 146 to 149)

Page 150

1      A.   R-a-n-d-o-m-i-z-e-d.
2   BY MR. TRAMMELL:
3      Q.   Are any of the authors on these articles
4   with you Englishmen?
5      MR. SCHOON:   Objection; form.
6   BY THE WITNESS:
7      A.   Some of them may have been trained in
8   England.
9   BY MR. TRAMMELL:
10     Q.   Do you know which ones?
11     A.   Dr. Mohan was for one.
12     Q.   Was trained in England?
13     A.   Yes.
14     Q.   Where did he grow up?
15     A.   Grew up in Salam.
16     Q.   Do you think Dr. Mohan wrote this
17  article, the 2003 article?
18     A.   He probably was involved in writing it.
19     Q.   Do you think he wrote the first draft?
20     A.   He may have written part of it.
21     Q.   But you really don't know, is that
22  right?
23     A.   I can't recall.  It's years ago.
24     Q.   It was five years ago.

Page 151

1      MR. SCHOON:   Objection; form.
2   BY MR. TRAMMELL:
3      Q.   And, so, for this trial you just looked
4   back at -- looked back at charts, a thousand
5   charts, looking for patients taking Clozaril alone
6   and having been switched to a combination of
7   Clozaril and Seroquel, is that right?
8      A.   Right.
9      Q.   And were all these patients treated by
10  your clinics?
11     A.   By our practice, yes.
12     Q.   And who would have prescribed the
13  Clozaril and Seroquel to these patients?
14     A.   The doctors that are mentioned in the
15  study.
16     Q.   So, there is some record of that
17  somewhere?
18     A.   Probably with Uptown Research.
19     Q.   Which is a going concern?
20     A.   Yes.
21     Q.   So, you're saying the data that supports
22  this study is at Uptown Research?
23     A.   It could be.
24     Q.   Is there any other place it could be?

Page 152

1      A.   Not that I would know of, no.
2      Q.   It would also be in the treatment files
3   of these patients, correct?
4      A.   Yes.
5      Q.   And what is Uptown Research?
6      A.   Uptown Research -- I've answered
7   before -- it's a private research entity that's
8   owned by Dr. Sonnenberg and it's located in the
9   uptown area of Chicago and they do a lot of
10  psychopharmacological research.
11     Q.   And you're the medical director?
12     A.   That's correct.
13     Q.   Is it customary for doctors in your
14  practice to treat patients with Clozaril
15  monotherapy?
16     A.   We have treated a lot of patients with
17  clozapine monotherapy.
18     Q.   In the 1999 retrospective study you
19  concluded that patients were more likely to develop
20  metabolic side effects on Clozaril monotherapy than
21  they are on Clozaril and Seroquel combination
22  therapy, isn't that correct?
23     A.   That's correct.
24     Q.   So, why four years later are you still

Page 153

1   treating patients with Clozaril monotherapy?
2      A.   Because not all patients develop the
3   side effects.
4      Q.   Do you currently treat patients with
5   Clozaril monotherapy?
6      A.   Yes.
7      Q.   Is there some record of you having ever
8   prescribed Clozaril that you know of?
9      A.   Records --
10     MR. SCHOON:   Objection; form.
11  BY THE WITNESS:
12     A.   My prescriptions would be in the
13  patient's charts.
14  BY MR. TRAMMELL:
15     Q.   When was the last time you remember
16  prescribing it, Clozaril?
17     A.   Yesterday.
18     Q.   Yesterday?
19     A.   Yes.
20     Q.   Do you know which studies you relied
21  upon in your 2003 study or paper?
22     A.   The references would be at the back of
23  the study.
24     Q.   You don't recall any of them?

39 (Pages 150 to 153)

Confidential - Michael Jay Reinstein, M.D.

Page 154

1    A.    Not offhand, no.
2    Q.    Do you recall anything significant about
3  literature that you reviewed that contributed to
4  the conclusions you reached in this study?
5    A.    I think you'd have to look at the
6  references in the study.  The study was done five
7  years ago and written.  I can't recall which
8  specific references we used.
9    Q.    When was the last time you spoke on
10 AstraZeneca's behalf?
11   A.    About three months ago.
12   Q.    And what did you talk about?
13   A.    I did a teleconference to a hospital in
14 New York State and talked about our usage of
15 different medications.
16   Q.    Did you talk about the weight issue?
17   A.    Probably did.
18   Q.    Did you reference your studies?
19   A.    May have.
20   Q.    Did you read them before you referenced
21 them?
22   A.    I didn't read them before this
23 presentation.
24   Q.    When was the last time you read any of

Page 155

1  the studies you've done?
2    A.    Yesterday.
3    Q.    You read these studies yesterday?
4    A.    Yeah.
5    Q.    And you don't recall any of the
6  references that you used?
7    A.    I didn't look at the references.
8    Q.    But you rely on other studies in coming
9  to the conclusions that you come to in these
10 studies, isn't that correct?
11   A.    Yes.
12   Q.    Do you know whether the studies you're
13 relying upon were paid for or done by AstraZeneca?
14   A.    I'd have to look at the studies.  I
15 don't think the majority, if any, were paid for by
16 AstraZeneca.
17   Q.    You don't think any were?
18   A.    I couldn't say any, but I would say I'm
19 sure the majority were not.
20   Q.    One of the studies that you relied on
21 and you've referenced earlier in your deposition is
22 a study that was performed by Martin Brecker who
23 worked at AstraZeneca when he did the study.  Do
24 you recall relying on that study?

Page 156

1    A.    Don't recall that study specifically.
2    Q.    Have you ever heard of Martin Brecker?
3    A.    I remember meeting him.  He was a
4  psychiatrist who worked for AstraZeneca.
5    Q.    Have you ever read his study?
6    A.    Probably did at the time, yes.
7    Q.    At what time?
8    A.    When we made the reference.
9    Q.    Is it significant that a study is funded
10 by a drug company?  Does that have any implication
11 about potential bias in the results of the study?
12   MR. SCHOON:  Objection; form.
13 BY THE WITNESS:
14   A.    I would hope not.
15 BY MR. TRAMMELL:
16   Q.    You would hope it doesn't but does it?
17   MR. SCHOON:  Objection; form.
18 BY THE WITNESS:
19   A.    I can't say that it never has.  I can
20 only say that I hope it doesn't.
21 BY MR. TRAMMELL:
22   Q.    In other words, you don't consider those
23 studies inherently less reliable, is that right?
24   A.    Not necessarily, no.

Page 157

1    Q.    It says that the 2003 study was funded
2  by Novartis, is that correct?
3    A.    I can't recall.  It's possible.  I
4  remember having discussions with Novartis and they
5  were interested in different ways of controlling
6  the side effects of clozapine.
7    Q.    Oh, I see.  And, so, in this study you
8  don't recommend that anybody get off Clozaril; just
9  that they use Clozaril in combination therapy?
10   MR. SCHOON:  Objection; form.
11 BY THE WITNESS:
12   A.    We have had difficulties when we have
13 totally stopped clozapine.  So, as a general rule
14 we would not recommend people be totally stopped on
15 their clozapine.
16 BY MR. TRAMMELL:
17   Q.    And, again, the data that supports is
18 this study is at Uptown Research?
19   A.    If it's anywhere, that's where it would
20 be, yes.
21   Q.    If it's not there, there is -- why
22 wouldn't it be there?
23   A.    My assumption is it is there.
24   Q.    If it isn't there, can we assume it

Confidential - Michael Jay Reinstein, M.D.

Page 158

1  doesn't exist?
2      MR. SCHOON:  Objection; form.
3  BY THE WITNESS:
4      A.   I don't know.  You'd have to ask
5  Dr. Sonnenberg what he's done with it.  He may have
6  stored it somewhere.
7  BY MR. TRAMMELL:
8      Q.   Aren't you listed as the author of this
9  study?
10      A.   Yes.
11      Q.   Isn't it your responsibility, the data?
12      A.   It's --
13      MR. SCHOON:  Objection; form.
14  BY THE WITNESS:
15      A.   It's the responsibility of Uptown
16  Research.
17  BY MR. TRAMMELL:
18      Q.   It's not your responsibility when you
19  put your name on the study?
20      MR. SCHOON:  Objection; form.
21  BY THE WITNESS:
22      A.   It's -- the final responsibility is
23  Uptown Research.
24  BY MR. TRAMMELL:

Page 159

1      Q.   Aren't you representing that these are
2  your scientific conclusions?
3      A.   Yes.
4      MR. SCHOON:  Objection; form.
5  BY THE WITNESS:
6      A.   But Uptown Research was responsible for
7  doing this steady so, therefore, they are
8  responsible for the data storage.
9  BY MR. TRAMMELL:
10      Q.   But you're responsible for whether data
11  actually exists that supported these conclusions,
12  right?
13      A.   Well, it was done by Uptown Research.
14  It's -- you know, it's basically their
15  responsibility.
16      Q.   You said you did review the data,
17  though?
18      A.   I reviewed the data, yes.
19      Q.   Did you talk to Sonnenberg about it?
20      A.   He was involved with it, yes.
21      Q.   Did you ever go to Wilmington to visit
22  AstraZeneca?
23      A.   Don't recall ever going there.
24      Q.   Did you ever meet with anyone from an

Page 160

1  entity called Parexel?
2      A.   I can't recall what Parexel is.
3      Q.   You don't know what Parexel is?
4      A.   No.
5      Q.   Do you know what a ghostwriter is?
6      MR. SCHOON:  Objection; form.
7  BY THE WITNESS:
8      A.   I've heard the term.
9  BY MR. TRAMMELL:
10      Q.   And what does it mean?
11      A.   It means somebody writes something in
12  somebody else's name.
13      Q.   Have you ever been a party to any of
14  that?
15      A.   Not that I'm aware of, no.
16      Q.   You don't consider these articles to
17  have been ghostwritten?
18      A.   No.
19      Q.   How did you get the idea to write
20  studies about weight loss with Seroquel?
21      MR. SCHOON:  Objection; form.
22  BY THE WITNESS:
23      A.   Our clinical observations that it was
24  better metabolically than Zyprexa or clozapine.

Page 161

1  BY MR. TRAMMELL:
2      Q.   Are you testifying that you contacted --
3  you initiated contact with AstraZeneca about these
4  projects?
5      A.   I don't think I was asked that
6  question.
7      Q.   Did you?  Did you contact them or did
8  they contact you?
9      MR. SCHOON:  Objection; form.
10  BY THE WITNESS:
11      A.   I can't recall.  I don't even know that
12  AstraZeneca was involved with the 2003 paper, and
13  the 1999 paper was done through the Forest
14  Foundation.
15  BY MR. TRAMMELL:
16      Q.   Did they contact you about doing the
17  1999 paper or did you contact them?
18      A.   I think --
19      Q.   The first contact.
20      A.   I think the Forest Foundation made the
21  request for a grant from them to do that study.
22      Q.   Is there some record of that?
23      A.   Not that I'm aware of.  There may be.
24      Q.   Have you ever reviewed the NDA for

Confidential - Michael Jay Reinstein, M.D.

1 Seroquel?
2     A.   I have reviewed it, yes.
3     Q.   You have?
4     A.   Yeah.
5     Q.   When?
6     A.   I don't know.  A long time ago.
7     Q.   Do you know what it says about
8 Seroquel's association with weight gain?
9     A.   I can't recall specifically.
10     Q.   Do you know that it says that -- do you
11 know that it says that patients are almost four
12 times more likely to gain a statistically
13 significant amount of weight over the short term
14 with Seroquel than with placebo?
15     MR. SCHOON:  Object to form.
16 BY THE WITNESS:
17     A.   I can't recall reading that, no.
18 BY MR. TRAMMELL:
19     Q.   Do you know that it says that weight
20 gain is dose related?
21     MR. SCHOON:  Objection; form.
22 BY THE WITNESS:
23     A.   Again, I can't recall that, reading
24 that.

1 BY MR. TRAMMELL:
2     Q.   Are those two things that are important
3 in analyzing the safety of Seroquel?
4     A.   There is many things that are important
5 in analyzing, and certainly any new data I would
6 always look at.
7     Q.   Are you aware of any study finding that
8 Seroquel is superior to placebo?
9     A.   I know the Quest study showed that.
10     Q.   Seroquel -- the Quest study compared
11 Seroquel to placebo?
12     A.   Compared it with placebo and Haldol, if
13 I remember correctly.
14     MR. TRAMMELL:  I'm going to pass the witness
15 to Mr. Matthews.
16         EXAMINATION
17 BY MR. MATTHEWS:
18     Q.   Dr. Reinstein, my name is David
19 Matthews.  You and I have never met, is that
20 correct?
21     A.   That's correct.
22     THE VIDEOGRAPHER:  I'm sorry.  Mr. Matthews,
23 can you put your microphone up closer.  All the way
24 up.  Thanks.

1     MR. MATTHEWS:  Test 1, 2.
2     THE VIDEOGRAPHER:  A little bit higher.  I'm
3 sorry.  Thank you.
4         Thank you.
5 BY MR. MATTHEWS:
6     Q.   Looking at the Exhibit No. 2, which is
7 the Speaker Services Agreement.  Do you see that
8 there?
9     A.   I have it.
10     Q.   You signed that agreement, is that
11 correct?
12     A.   That's correct.
13     Q.   Within that agreement on page 2 is a
14 confidentiality acknowledgment that you agreed to
15 keep confidential documents that you were given by
16 AstraZeneca, correct?
17     A.   Well, there is some exclusions here,
18 too.  So, in a general sense, yes, but there are
19 some significant --
20     Q.   And you --
21     A.   -- exclusions.
22     Q.   And you still will not sign the
23 confidentiality agreement today that has been
24 presented to you, is that correct?

1     MR. SCHOON:  Objection.
2 BY THE WITNESS:
3     A.   It would be advice of my attorney.  But
4 it looks like this agreement that I signed is
5 different from what I was requested to sign this
6 morning.
7 BY MR. MATTHEWS:
8     Q.   I can't hear you.  You're going to have
9 to speak up if you don't mind.
10     A.   Okay.  For two reasons.  One, on advice
11 of counsel and, two, the agreement that I signed
12 previously looks significantly different than the
13 agreement I was asked to sign this morning.
14     Q.   Well, for the record I have a stack of
15 documents that are AZ documents that I intended to
16 ask you about.  I'm going to continue with this
17 examination, but I think I am prejudiced by my
18 inability to request information concerning these
19 documents that I have in front of me and there are
20 many.
21         Has my office worked with you in
22 scheduling this deposition and worked around your
23 schedule?
24     MR. SCHOON:  Objection.

Confidential - Michael Jay Reinstein, M.D.

Page 166

BY MR. MATTHEWS:
1
2     Q.    Do you know the answer to that question?
3     A.    They worked with my attorney on it.
4     Q.    All right. Well, I think they have.
5 And you've given us the time that you are available
6 and we have come here to Chicago to take your
7 deposition.
8           It's still your position you're not
9 going to sign this confidentiality agreement, is
10 that correct?
11    A.    On advice of legal counsel I have to
12 decline to sign the agreement. If my legal counsel
13 advises me to sign it, I will sign it.
14    MR. MATTHEWS: Again, for the record, I am not
15 waiving the right to retake his deposition and use
16 these documents I have previously marked as
17 exhibits.
18    MR. SCHOON: And for the record, as I said to
19 your colleague, I'm not going to respond to this
20 because this is not the time for colloquy on this.
21 But we don't accept your position.
22    MR. MATTHEWS: Okay.
23 BY MR. MATTHEWS:
24    Q.    Dr. Reinstein, you have been a speaker

Page 167

1 for Seroquel since 1997 to the present, correct?
2     A.    That's correct.
3     Q.    You are on the Seroquel Speakers Bureau,
4 correct?
5     A.    I'm not anymore. I was.
6     Q.    When was that relationship terminated?
7     A.    About two or three months ago.
8     Q.    Why was that?
9     A.    You'd have to ask the company.
10    Q.    They did not renew your Speakers Bureau
11 relationship, is that correct?
12    A.    That's correct.
13    Q.    But you were being paid from 1997 till
14 2008 and a summary of those payments has been
15 marked as Exhibit 3, correct?
16    MR. SCHOON: Objection; form.
17 BY THE WITNESS:
18    A.    I recall seeing Exhibit 3 and it is
19 correct.
20 BY MR. MATTHEWS:
21    Q.    All right. So I'm clear, and I have
22 added up those figures, there are approximately 480
23 some thousand dollars.
24           Is it your testimony that that has been

Page 168

1 paid to you, those figures in Exhibit 3, those
2 dollar amounts have been paid to you since 1997 to
3 the present from AstraZeneca?
4     A.    That's correct.
5     Q.    All right. Now, so the jury is clear,
6 as a speaker for AstraZeneca, specifically for
7 Seroquel, on the Seroquel Speakers Bureau, you have
8 traveled around the country talking about the
9 benefits of Seroquel, have you not?
10    A.    I have -- I've talked about various
11 medications that were -- on talks that were
12 sponsored by AstraZeneca.
13    Q.    I'm talking about Seroquel. It says in
14 your CV -- I'm going to have it marked as
15 Exhibit 8. Give you a copy of that.
16           (WHEREUPON, a certain document was
17            marked Reinstein Deposition Exhibit
18            No. 8, for identification, as of
19            05-28-2008.)
20 BY MR. MATTHEWS:
21    Q.    Is Exhibit 8 a current copy of your CV
22 or resume?
23    A.    Yes.
24    Q.    Is it complete?

Page 169

1     A.    To the best of my knowledge, yes.
2     Q.    Page 9, it says from 1997 to 2008 you
3 were on the Seroquel Speakers Bureau. My questions
4 are confined just to Seroquel.
5           Is it true, sir, that you have spoken on
6 behalf of AstraZeneca around the country, as your
7 words were earlier, concerning the benefits of
8 Seroquel?
9     MR. SCHOON: Objection; form.
10 BY THE WITNESS:
11    A.    Well, I support the attorney's
12 objection. I have spoken on many topics that --
13 talks that were AstraZeneca-sponsored.
14    Q.    Concerning Seroquel?
15    MR. SCHOON: Objection; form.
16 BY THE WITNESS:
17    A.    Seroquel and other medications.
18 BY MR. MATTHEWS:
19    Q.    All right. And you have been paid
20 consistently since 1997 to the present from
21 AstraZeneca, correct?
22    MR. SCHOON: Objection; form.
23 BY THE WITNESS:
24    A.    Well, I received the payments that we

43 (Pages 166 to 169)

Confidential - Michael Jay Reinstein, M.D.

Page 170

1    have noted.
2    BY MR. MATTHEWS:
3       Q.    The only document concerning tax returns
4    or 1099s that you have produced in this litigation
5    pursuant to subpoena is Exhibit No. 4, correct?
6       A.    That's correct.
7       Q.    All right.
8       MR. HAMMER:  Mike, put your hand down.
9    BY MR. MATTHEWS:
10      Q.    I want to be clear about something.
11            Before you would give your talks
12    concerning Seroquel, you would submit slides or
13    information you were to present at these talks to
14    AstraZeneca, correct?
15      A.    Sometimes, yes.
16      Q.    Well, that was contemplated in your
17    agreement that you signed, the Speakers Services
18    Agreement, that you were to do that prior to giving
19    the speeches, correct?
20      A.    When requested I did, yes.
21      Q.    All right.  And to your knowledge, there
22    was never any objection about any slides or any
23    presentations you made by AstraZeneca, correct?
24      A.    That's correct.

Page 171

1       MR. SCHOON:  Objection; form.
2    BY MR. MATTHEWS:
3       Q.    So, to your knowledge, everything that
4    you were speaking about since you presented that
5    information to AstraZeneca, they had blessed as
6    okay for you to speak about, correct?
7       MR. SCHOON:  Objection; form.
8    BY THE WITNESS:
9       A.    Or they didn't have any objections to
10   it.
11   BY MR. MATTHEWS:
12      Q.    All right.  Is it true, Dr. Reinstein,
13   that in 1996 you had discussed with Janssen, the
14   maker of Risperdal, a particular study -- a
15   retrospective study concerning 750 to a thousand
16   patients who were taking Clozaril that were
17   switched to Risperdal?
18      A.    I can't recall the details.  That's 12
19   years ago.
20      Q.    Did you ever conduct a study concerning
21   Risperdal?
22      A.    Can't recall doing any on Risperdal.  I
23   may have.  But I don't recall doing any.
24      Q.    Well, did you ever publish a paper

Page 172

1    concerning Risperdal?
2       A.    Can't recall doing that, no.
3       Q.    Do you know what happened to that study?
4    If one was proposed and it was not finished, do you
5    know why it wasn't?
6       A.    I can't recall.
7       Q.    I'm going to take you back to 1997 when
8    you were first being paid as a speaker for
9    AstraZeneca.
10            At that time, in 1997, prior to the
11   paper that you wrote about weight gain and diabetes
12   mellitus, did AstraZeneca, anyone at AstraZeneca,
13   tell you that they had found in a series of studies
14   that the proportions of patients with clinically
15   significant weight gain at 52 weeks who take
16   Seroquel is about 45 percent, that is, all patients
17   in clinical trials, there had been studies that
18   AstraZeneca had performed that there was a
19   45 percent rate of clinically significant weight
20   gain prior to the time that you had ever thought
21   about writing a paper concerning weight gain?
22      MR. SCHOON:  Object; form.
23   BY THE WITNESS:
24      A.    I can't recall that discussion.

Page 173

1    BY MR. MATTHEWS:
2       Q.    That's important information if you're
3    going to have a balanced paper that you're going to
4    write about weight gain, it would certainly be
5    important for you to know about what AstraZeneca
6    had found prior to your paper being written,
7    correct?
8       MR. SCHOON:  Object to form.
9    BY THE WITNESS:
10      A.    Yes, if that was available at that time.
11   I don't recall that it was available.
12   BY MR. MATTHEWS:
13      Q.    In fact, if it was available, you would
14   have expected AstraZeneca to give you that
15   information, correct, sir?
16      MR. SCHOON:  Objection; form.
17   BY THE WITNESS:
18      A.    I would presume so, yes.
19   BY MR. MATTHEWS:
20      Q.    Well, it's -- it's -- strike that.
21            It is important, is it not,
22   Dr. Reinstein, because you treat schizophrenics and
23   they are at risk for developing diabetes mellitus,
24   correct?

44 (Pages 170 to 173)

Confidential - Michael Jay Reinstein, M.D.

Page 174

1    MR. SCHOON: Objection; form.
2    BY THE WITNESS:
3       A.   That's correct.
4    BY MR. MATTHEWS:
5       Q.   That is important because you need to be
6    at a heightened awareness as a clinician, one who
7    is doing a study about weight gain and diabetes
8    mellitus in a schizophrenic population, you need to
9    be of heightened awareness concerning any knowledge
10   that AstraZeneca had concerning weight gain in that
11   population, correct?
12      MR. SCHOON: Objection; form.
13   BY THE WITNESS:
14      A.   That would be correct.
15   BY MR. MATTHEWS:
16      Q.   Diabetes mellitus is a condition that
17   can kill you, correct?
18      MR. SCHOON: Objection; form.
19   BY THE WITNESS:
20      A.   It can contribute to death, yes.
21   BY MR. MATTHEWS:
22      Q.   Heart disease?
23      A.   Also, yes.
24      Q.   Stroke?

Page 175

1       A.   Yes.
2       Q.   Affects over 20 million people in this
3    country, correct?
4       MR. SCHOON: Objection; form.
5    BY THE WITNESS:
6       A.   Yes.
7    BY MR. MATTHEWS:
8       Q.   Did they ever tell you about any studies
9    whatsoever they had that concluded that Seroquel is
10   associated with weight gain and diabetes mellitus?
11      MR. SCHOON: Objection; form.
12   BY THE WITNESS:
13      A.   I can't recall.
14   BY MR. MATTHEWS:
15      Q.   Well, as we sit here today has anybody
16   from AstraZeneca ever told you that Seroquel is
17   associated with weight gain and diabetes mellitus?
18      MR. SCHOON: Objection; form.
19   BY THE WITNESS:
20      A.   They have given me information, the last
21   of which I have submitted in response to the
22   subpoena, which I believe compared with placebos
23   shows perhaps a slight tendency of weight gain and
24   a slight tendency to raise up blood sugars.

Page 176

1    BY MR. MATTHEWS:
2       Q.   When is the first time that you were of
3    the opinion that Seroquel can cause weight gain and
4    diabetes in a population?
5       MR. SCHOON: Object to form.
6    BY THE WITNESS:
7       A.   Well, I don't know what you mean by
8    population. I think --
9    BY MR. MATTHEWS:
10      Q.   In some people.
11      A.   We have seen it in individual patients
12   that they have gained weight or developed diabetes
13   on it.
14      Q.   When is the first time, Dr. Reinstein,
15   that you were of the opinion that Seroquel is
16   associated with weight gain and diabetes?
17      MR. SCHOON: Objection; form.
18   BY THE WITNESS:
19      A.   Probably the first time we had a patient
20   gain weight or develop diabetes who was on
21   Seroquel.
22   BY MR. MATTHEWS:
23      Q.   Well, when was that?
24      A.   I don't know. 1997 or 1998.

Page 177

1       Q.   So, you had knowledge as of 1997, 1998
2    that Seroquel is associated with weight gain and
3    diabetes?
4       MR. SCHOON: Objection; form.
5    BY THE WITNESS:
6       A.   In occasional patients, yes.
7    BY MR. MATTHEWS:
8       Q.   And you discussed this information with
9    AstraZeneca, correct?
10      MR. SCHOON: Objection; form.
11   BY THE WITNESS:
12      A.   We notified them when we had patients
13   become diabetic that we did.
14   BY MR. MATTHEWS:
15      Q.   Sir, you had systematic and regular
16   discussions with AstraZeneca employees from 1997 to
17   2008 because you were a speaker on their Speakers
18   Bureau, correct?
19      A.   That's correct.
20      MR. SCHOON: Objection; form.
21   BY MR. MATTHEWS:
22      Q.   And during these systematic contacts you
23   had with AstraZeneca, you clearly had
24   communications with them that Seroquel was

Confidential - Michael Jay Reinstein, M.D.

Page 178

1  associated with diabetes and weight gain, correct?
2      A.   In --
3      MR. SCHOON:  Objection; form.
4  BY THE WITNESS:
5      A.   In occasional patients.
6  BY MR. MATTHEWS:
7      Q.   Well, that's my point.  You communicated
8  with AstraZeneca about that information for many
9  years, correct?
10     MR. SCHOON:  Objection; form.
11 BY THE WITNESS:
12     A.   It -- what I said.  We had Speakers
13 Bureau meetings every six months, maybe every year.
14 And our clinical experience was discussed with the
15 different psychiatrists who were there.
16 BY MR. MATTHEWS:
17     Q.   Well, as a clinician you would expect
18 AstraZeneca to warn doctors in the PDR and in the
19 product insert about the association between
20 Seroquel, weight gain and diabetes as soon as they
21 knew of a potential association, correct?
22     MR. SCHOON:  Objection; form.
23 BY THE WITNESS:
24     A.   If there appeared to be a significant

Page 179

1  association, I would assume they would.
2  BY MR. MATTHEWS:
3      Q.   Well, and significant to you is
4  certainly subjective, correct?  And that's not my
5  question.
6          My question is:  Once they knew there
7  was a potential association between Seroquel,
8  weight gain and diabetes, it was incumbent upon
9  that company, AstraZeneca, to warn doctors in the
10 field, correct?
11     MR. SCHOON:  Objection; form.
12 BY THE WITNESS:
13     A.   If there is an association.  I mean I
14 think there was data that was put out that
15 indicated that occasionally people had become
16 diabetic on Seroquel.
17 BY MR. MATTHEWS:
18     Q.   I'd like to ask you about a patient case
19 study that AstraZeneca had made up into a pamphlet
20 that you or they were using in their sales force.
21 Are you familiar with that?
22     A.   I'd have to see it to be --
23     Q.   Unfortunately, I can't show you this.
24         I'm just asking you if -- do you recall

Page 180

1  that there was a pamphlet being used by the
2  AstraZeneca sales force that was a patient case
3  study from the files of Michael Reinstein, MD?  Do
4  you recall that?
5      MR. SCHOON:  Objection; form.
6  BY THE WITNESS:
7      A.   I recall that there was a case study
8  that I had submitted to them of a patient who --
9  whose diabetes resolved when they were transferred
10 from Zyprexa to Seroquel.
11 BY MR. MATTHEWS:
12     Q.   And you used this patient case study
13 when you would give talks around the country when
14 you were talking to other physicians, correct?
15     MR. SCHOON:  Objection.
16 BY THE WITNESS:
17     A.   I don't know that I used it.
18 BY MR. MATTHEWS:
19     Q.   I'm sorry?
20     A.   I don't know that I used it in my talks.
21 I think reps may have used it.
22     Q.   Well, do you recall there was a Seroquel
23 insignia on the pamphlet that was used by the sales
24 force?

Page 181

1      A.   I can't recall that.
2      Q.   Now, this would be known as anecdotal
3  evidence, correct?
4      MR. SCHOON:  Objection; form.
5  BY THE WITNESS:
6      A.   It's what it is.  It's one case
7  report.
8  BY MR. MATTHEWS:
9      Q.   A case report by definition is
10 anecdotal, correct?
11     A.   I'm not sure if that's a correct
12 definition or not.
13     Q.   All right.  Well, what is anecdotal
14 information?
15     A.   I'm not familiar with the term.
16     Q.   You're not familiar with "anecdotal"?
17     A.   No.
18     Q.   Well, was it in your contract that you
19 were not supposed to speak about anecdotal -- I'll
20 refer you to -- strike that.
21         I will refer you to your Speakers
22 Services Agreement on the fourth page.
23     MR. HAMMER:  I got it.
24 BY MR. MATTHEWS:

46 (Pages 178 to 181)

Page 182

1    Q.   109 at the bottom.  It says,
2  "Supplemental anecdotal clinical experience and
3  unsupported opinion will not form a significant
4  part of your presentation, and disease state
5  information must be based on complete and accurate
6  discussion of science generally accepted in the
7  medical community."
8       Do you see that?
9    A.   Yes.
10   Q.   I looked up "anecdotal" in the Webster's
11 Dictionary here.  Under the third definition, it
12 says, "Based on personal observation, case study
13 reports or random investigations rather than
14 systematic scientific evaluation; anecdotal
15 evidence."
16      Would you agree with me that if this was
17 used in the sales, that is, this pamphlet we are
18 talking about, that this would be just that, a case
19 study or anecdotal evidence that was used in the
20 sale of this product?
21   A.   Well --
22   MR. SCHOON:  Objection; form.
23 BY THE WITNESS:
24   A.   Well, first of all, I don't recall using

Page 183

1  it in my talks.  But, secondly of all, if I did use
2  it, it certainly was never a significant part of my
3  presentation.  So, I believe I did honor the
4  contract.
5  BY MR. MATTHEWS:
6    Q.   Is this the type of information, this
7  pamphlet we're talking about, that you presented to
8  AstraZeneca for approval prior to any use?
9    MR. SCHOON:  Objection; form.
10 BY THE WITNESS:
11   A.   I can't recall.  I can only state I
12 don't recall using it in presentations or if I did,
13 it was not a big part of my presentation.
14 BY MR. MATTHEWS:
15   Q.   Well, you didn't make these into a
16 pamphlet, did you?  That is, you, Dr. Reinstein,
17 did not take the time to put this into a foldout
18 pamphlet, did you?
19   A.   I didn't.  I just supplied the case
20 report.
21   Q.   To AstraZeneca?
22   A.   That's correct.
23   Q.   What they did with it you don't know?
24   A.   Well, I know they did make that brochure

Page 184

1  up.  But what they did with the brochure, I really
2  don't know.
3    MR. SCHOON:  Just so we are clear,
4  Mr. Matthews, I have no objection to your using
5  that document with this witness.  He testified that
6  he saw it before.  And as I said to Mr. Trammell,
7  if the witness wrote it or received it, saw it, I'm
8  not going to object.
9    MR. MATTHEWS:  Mark it as 8.
10   MR. SCHOON:  I think it's 9, actually.
11   MR. MATTHEWS:  9.
12       (WHEREUPON, a certain document was
13        marked Reinstein Deposition Exhibit
14        No. 9, for identification, as of
15        05-28-2008.)
16 BY MR. MATTHEWS:
17   Q.   Is this the pamphlet we've been talking
18 about?
19   A.   It's a copy of it, yes.
20   Q.   Exhibit 9?
21   A.   Yes.
22   Q.   On the third page, there is a quote from
23 you.  It said, "This patient demonstrated some
24 classic negative symptoms."

Page 185

1       Second sentence it says -- I'm sorry.
2  The third, it says, "We chose Seroquel for the
3  patient because in our experience it provides
4  excellent results with negative psychotic symptoms
5  and weight gain with Seroquel hasn't been an
6  issue."
7       And this was printed I believe in 1999.
8       Is that quote your quote?
9    A.   I believe it's my quote, yes.
10   Q.   All right.  Well, this was used by
11 AstraZeneca.  Do you know what information they had
12 concerning weight gain in 1999?
13   MR. SCHOON:  Objection; form.
14 BY THE WITNESS:
15   A.   I can't speak to what they had in 1999.
16 BY MR. MATTHEWS:
17   Q.   The next page, it says, "Blood glucose
18 levels were brought under control permitting the
19 substitution of an oral hypoglycemic agent for
20 insulin treatments."
21       Now, talking about your study that you
22 had in 1999 that you published.  It's my
23 understanding that you had 65 patients that were
24 initially on clozapine and were switched --

Confidential - Michael Jay Reinstein, M.D.

Page 186

1    titrated to 25 percent Seroquel, is that correct?
2         MR. SCHOON:  Objection; form.
3    BY THE WITNESS:
4         A.    Initially, yes.
5    BY MR. MATTHEWS:
6         Q.    And you found the same thing there, that
7    the folks with high blood glucose had a decrease in
8    the blood glucose over time?
9         A.    That's correct.
10        Q.    And all of the patients, all of the
11   patients, all 65 in that study, lost weight, is
12   that correct?
13        A.    That was our finding, yes.
14        Q.    Not 62, not 63, not 64.  65 out of 65
15   lost weight in the study, is that correct?
16        A.    That was our finding, yes.
17        Q.    And all of the patients that had
18   developed diabetes on clozapine, all had an
19   improvement in their diabetes when they were
20   titrated on 25 percent Seroquel, is that correct?
21        A.    Initially 25 percent and then
22   50 percent.
23        Q.    Not most of the patients that were
24   diabetic, but all of the patients that were

Page 187

1    diabetic improved their blood glucose when they had
2    25 percent Seroquel?
3         MR. SCHOON:  Objection; form.
4    BY MR. MATTHEWS:
5         Q.    Is that correct?
6         A.    Again, it was initial titration of
7    25 percent and then 50 percent titration of
8    Seroquel with a 50 percent reduction in clozapine.
9         Q.    And I understood that was a
10   retrospective study, correct?
11        A.    That's correct.
12        Q.    That means you went out and found
13   patients that actually were on clozapine for at
14   least six months and then were switched to
15   25 percent, and only 25 percent, Seroquel and then
16   all of them had gained weight on clozapine and then
17   were tritiated, all of them lost weight on
18   Seroquel, is that correct?
19        A.    That was our finding, yes.
20        Q.    Do you believe that's credible?
21        MR. SCHOON:  Objection; form.
22   BY THE WITNESS:
23        A.    Well, you know, even our own study
24   proposes that there should be more studies.  Being

Page 188

1    the fact this was one nursing home, it's vulnerable
2    to certain factors, a change in the cook there,
3    possibility of problem with scales.
4         And, actually, to make this credible,
5    which we think it is credible, we proposed that
6    this be done on a multi-site basis, not involving
7    our practice, and that's in the recommendations
8    that we make in the 1999 paper.
9         MR. MATTHEWS:  Object as non-responsive.
10   BY MR. MATTHEWS:
11        Q.    You recall the study and that's been
12   marked I believe as Exhibit 5.  Do you have that in
13   front of you?
14        A.    I have it.
15        Q.    Do you have that in front of you, sir?
16        A.    Yes.
17        Q.    Of the people that -- strike that.
18        Of the patients retrospectively that you
19   looked at that developed diabetes on clozapine, how
20   many of those folks were actually insulin
21   dependent?
22        I'm going to refer you to the second
23   page under "Methods."  The fifth paragraph
24   under "Methods."

Page 189

1         MR. HAMMER:  Did you say second page?
2         MR. MATTHEWS:  Second page.
3         I'm going to mark as Exhibit 10 the same
4    study in a different format.  I think it's more
5    readable.
6         (WHEREUPON, a certain document was
7          marked Reinstein Deposition Exhibit
8          No. 10, for identification, as of
9          05-28-2008.)
10   BY THE WITNESS:
11        A.    Okay.
12   BY MR. MATTHEWS:
13        Q.    I show you Exhibit 10, if you would,
14   sir.
15        A.    It says each of the 13 patients had been
16   on regular insulin.
17        Q.    So we're clear on this, of the patients
18   that developed diabetes, all of them were insulin
19   dependent?
20        A.    In this group, yes.
21        Q.    Is that correct?
22        A.    As best as I can recall, that is
23   correct.
24        Q.    So, none of them were medication -- were

48 (Pages 186 to 189)

Confidential - Michael Jay Reinstein, M.D.

Page 190

1   using medication. But all of the folks that became
2   diabetic during the clozapine use were insulin
3   dependent?
4       A.   In this group.
5       Q.   Is that credible?
6   MR. SCHOON: Objection; form.
7   BY THE WITNESS:
8       A.   I think it is credible, yes.
9   BY MR. MATTHEWS:
10      Q.   And so we're clear, all of them improved
11  with the use of Seroquel during the Seroquel phase
12  of the study, retrospective study?
13      A.   That was our findings, yes.
14      Q.   Getting back to the pamphlet, did you
15  ever have discussions with anybody at AstraZeneca
16  about this pamphlet that you recall?
17      A.   I can't recall.
18      Q.   I'm sorry?
19      A.   I can't recall.
20      Q.   Well, who put it in a pamphlet form?
21      A.   I presume somebody from AstraZeneca.
22      Q.   Did they talk to you about it?
23      A.   I don't recall. I think I knew they
24  were going to -- they were thinking of putting it

Page 191

1   into a pamphlet form.
2       Q.   Well, did they tell you what they were
3   going to do because you're quoted here throughout
4   this --
5       A.   Yeah, I think they sent me the quotes
6   to review and at that time I knew that it was going
7   to be in a pamphlet form.
8       Q.   So you knew they were going to use this
9   in their sales force, correct?
10      A.   Well, I knew they were going to probably
11  make a pamphlet describing this case.
12      Q.   Would you -- if -- would you expect them
13  to have a fair and balanced pamphlet concerning
14  weight gain and diabetes?
15  MR. SCHOON: Objection; form.
16  BY THE WITNESS:
17      A.   Well, I think this is what it is. It is
18  a case report on one patient.
19  BY MR. MATTHEWS:
20      Q.   All right. Would you expect any
21  pamphlet that's used in the sales force to be fair
22  and balanced?
23  MR. SCHOON: Objection; form.
24  BY THE WITNESS:

Page 192

1       A.   I would presume, yes.
2   BY MR. MATTHEWS:
3       Q.   I want to talk about this
4   Forest Foundation for a second. What is the
5   Forest Foundation?
6       A.   As I said already, the Forest Foundation
7   was the research arm of Forest Hospital to enhance
8   the reputation of Forest Hospital. They did
9   research studies.
10      Q.   And Forest Hospital is no longer?
11      A.   It closed.
12      Q.   And the person -- the name that you had,
13  what was his -- I forget his name.
14      A.   Morris Squires was the owner of both
15  Forest Hospital and the Forest Foundation.
16      Q.   And Forest Foundation, I understood your
17  testimony that they were paid $10,000 for this
18  study, correct?
19      A.   To the best of my knowledge, that's
20  correct.
21      Q.   What did Dr. Reinstein receive?
22      A.   I received nothing.
23      Q.   And this study or at least the data
24  behind the study, to your knowledge, was in the or

Page 193

1   under the control of the Forest Foundation?
2       A.   Yes.
3       Q.   And the second study that we talked
4   about, the high dose study, that was under the
5   control of who?
6       A.   I believe Forest Foundation.
7       Q.   I'm sorry?
8       A.   I believe it was Forest Foundation.
9       Q.   Didn't you tell us it was from Uptown
10  Research?
11      A.   If I did it was a mistake because I
12  think it was Forest Foundation, but I don't
13  honestly remember. It was one or the other.
14      Q.   Was it a for-profit foundation?
15      A.   I can't speak to that. I don't know.
16      Q.   Were you a shareholder?
17      A.   No.
18      Q.   Medical director?
19      A.   Medical director of the research for
20  Forest Foundation.
21      Q.   The patients that you had on the high
22  dose, those patients were all in the nursing home,
23  is that correct?
24      A.   I can't recall specifically if they were

49 (Pages 190 to 193)

Confidential - Michael Jay Reinstein, M.D.

Page 194

1   all nursing home patients or some or all of them
2   were office patients.
3       Q.   Didn't you tell us they were all from
4   the Lydia Nursing Home?
5       A.   That was the first study, the one we did
6   in 1999.
7       Q.   So, some of these patients were in
8   nursing homes, most of them?
9       A.   I can't recall.
10      Q.   Can you tell us about that?
11      A.   You know, I'd have to read the study,
12  what the proportion was.
13      MR. SCHOON: Your Exhibit 10, Mr. Matthews,
14  has some handwriting on it. I don't know if you
15  intended to give that to us or if you had a clean
16  copy.
17      MR. MATTHEWS: Sorry about that. I do have a
18  clean one for you.
19      MR. SCHOON: Okay. I didn't want to interrupt
20  your examination. We'll substitute it.
21      MR. MATTHEWS: Thanks.
22      MR. SCHOON: Sorry.
23  BY MR. MATTHEWS:
24      Q.   In 2000, after your study concerning

Page 195

1   weight gain and diabetes, did anyone from
2   AstraZeneca tell you that there was reasonable
3   evidence to suggest Seroquel can cause impaired
4   glucose regulation, including diabetes, in certain
5   individuals?
6       MR. SCHOON: Objection; form.
7   BY THE WITNESS:
8       A.   I don't recall the discussion.
9   BY MR. MATTHEWS:
10      Q.   Again, as a speaker on a speaker bureau
11  where you traveled around the country talking with
12  other doctors, that's information you would want to
13  have, correct?
14      MR. SCHOON: Objection; form.
15  BY THE WITNESS:
16      A.   If it was available, I would want to
17  have it.
18  BY MR. MATTHEWS:
19      Q.   If AstraZeneca had it, you would expect
20  that they gave it to you, correct?
21      MR. SCHOON: Objection; form.
22  BY THE WITNESS:
23      A.   Again, if it were available, I would
24  have liked to have had it.

Page 196

1   BY MR. MATTHEWS:
2       Q.   Did you have any IRB or institutional
3   review board in your studies?
4       A.   Yes. Both -- both organizations use
5   IRBs.
6       Q.   Who were the IRBs?
7       A.   I can't recall. You'd have to ask
8   Dr. Sonnenberg who he used for the last paper.
9       Q.   Sonnenberg was in charge of the IRBs?
10      A.   Yes.
11      Q.   And you're sure they were involved in
12  both of the studies that you had published,
13  correct?
14      A.   Yes.
15      Q.   Did you have a statistician involved in
16  your studies?
17      A.   I can't recall whether we did or we
18  didn't.
19      Q.   An epidemiologist?
20      A.   I doubt if we did. I can't recall,
21  though.
22      Q.   Who put the evaluations together
23  concerning the medical records from the raw data?
24      A.   The different research associates.

Page 197

1       Q.   Who would that be?
2       A.   Well, for the first one, it was Larissa
3   and the second I believe Dr. Sonnenberg employed
4   some people.
5       Q.   So, if we subpoena their records, if I
6   wanted to go find out who did the evaluations of
7   the raw data, I would go to these two individuals.
8   Anybody else?
9       MR. SCHOON: Objection; form.
10  BY THE WITNESS:
11      A.   I assume that's who could give it to
12  you.
13  BY MR. MATTHEWS:
14      Q.   Is it your testimony that you actually
15  reviewed the data yourself?
16      A.   Yes.
17      Q.   You looked at the medical chart and
18  found 65 patients that were on clozapine for at
19  least six months, then switched to 25 percent
20  Seroquel for at least ten months and all of them
21  gained weight on clozapine, all of them lost weight
22  on Seroquel and you, Dr. Reinstein, actually looked
23  at every one of those medical records, is that your
24  testimony?

Confidential - Michael Jay Reinstein, M.D.

Page 198

1      MR. SCHOON: Objection; form.
2   BY THE WITNESS:
3      A.   I didn't look at all of them.  I looked
4   at a sampling of them.
5   BY MR. MATTHEWS:
6      Q.   I'm sorry?
7      A.   I looked at a sampling of them.
8      Q.   So you didn't look at all of them?
9      A.   No.
10     Q.   How many did you look at?
11     A.   Maybe 20 percent.
12     Q.   So, out of 65, that's maybe 12, 13 that
13  you looked at?
14     A.   That's correct, to the best of my
15  memory.
16     Q.   And that was sufficient for you to write
17  a scientifically credible article concerning weight
18  gain and diabetes on a very important issue
19  concerning schizophrenics?
20     A.   I still stand by my study.
21     Q.   Were you provided any PubMed writers
22  from CDC or Parexel or anybody else that were
23  supplied to you by AstraZeneca?
24     MR. SCHOON: Objection; form.

Page 199

1   BY THE WITNESS:
2      A.   I can't recall that.
3   BY MR. MATTHEWS:
4      Q.   You might have been, you might not have
5   been; you just don't recall?
6      A.   Well, again, you keep saying
7   AstraZeneca, but our second paper I don't even
8   think was AstraZeneca-sponsored.
9      Q.   All right.  Well, let's talk about the
10  first one.
11         Do you recall if you were lent or you
12  borrowed any MedPub writers, whether it was
13  Parexel, CDC or any other group that AstraZeneca
14  supplied to you?
15     MR. SCHOON: Objection; form.
16  BY THE WITNESS:
17     A.   I can't recall.
18  BY MR. MATTHEWS:
19     Q.   Do you prescribe Seroquel for other
20  conditions?
21     MR. SCHOON: Objection; form.
22  BY MR. MATTHEWS:
23     Q.   Including insomnia?
24     A.   I have used it off label for insomnia --

Page 200

1      Q.   Depression?
2      A.   I -- it's no longer off label for
3   depression now.  It was at one time.  Now they do
4   have an indication for bipolar depressed, but I
5   have used it off label before it got the FDA
6   designation.
7      Q.   There is a difference between bipolar
8   depression and just depression, correct?
9      A.   Yes.
10     Q.   What about just for depression or
11  anxiety?
12     A.   I have used it off label for those
13  purposes.
14     Q.   What about high dose therapy?
15     A.   I have used it off label.
16     Q.   The study where you had used up to 2,000
17  milligrams on nursing home patients, did you obtain
18  informed consent from those folks?
19     A.   Yes.  They were aware that it was an
20  off-label usage of the drug.
21     Q.   So, you told them that you were going to
22  give them five times the recommended labeled dose
23  and they all agreed to that in the informed consent
24  procedure?

Page 201

1      A.   Well --
2      MR. SCHOON: Objection; form.
3   BY THE WITNESS:
4      A.   It's never five times.
5   BY MR. MATTHEWS:
6      Q.   Four times?
7      MR. SCHOON: Objection; form.
8   BY THE WITNESS:
9      A.   It's never four times.
10     Q.   I'm sorry?
11     A.   It was never four times.
12     Q.   Well, what was the -- what was the
13  greatest milligram use that you applied in your
14  study?
15     A.   2,000.  That would be two and a half
16  times the recommended use.  But it was done with
17  informed consent.
18     Q.   So, that was a prospective study?
19     A.   It -- I believe it was -- the 1,200
20  milligrams, as best as I can remember, was a
21  prospective study.  But without the study, I can't
22  comment further.
23     Q.   Well, you can't have informed consent on
24  a retrospective study, can you, sir?

51 (Pages 198 to 201)

Confidential - Michael Jay Reinstein, M.D.

Page 202

1    A.    You have to get informed consent to use
2  the data of the patient.
3    Q.    All right.  In terms of whether they use
4  2,000 or high dose?
5    A.    We would have had to get a consent
6  because we were using it off label as a higher dose
7  form.
8    Q.    How is it you learned about off-label
9  use for the Seroquel?
10    A.    Sometimes from conversations with other
11  doctors who were using it and indicated that it was
12  beneficial.
13    Q.    Who were your contacts at AstraZeneca
14  other than the sales reps that would call on you?
15    A.    The medical director.
16    Q.    I'm sorry?
17    A.    The medical director.
18    Q.    Who's that?
19    A.    Well, I forget.  There was a
20  gentleman, I forget his name.  And then it was
21  Jamie Mullen.
22    Q.    Did Jamie Mullen come and visit you in
23  Chicago?
24    A.    He did.

Page 203

1    Q.    When was that?
2    A.    Can't recall when.  Maybe 1999, but
3  that's just a guess.
4    Q.    Did he tell you at that time that he was
5  appreciative of all the Seroquel you had been
6  prescribing?
7    A.    I don't remember him making that
8  statement.
9    Q.    Did he tell you that you were not
10  respected in the Chicago area by your peers?
11    MR. SCHOON:  Objection; form.
12  BY THE WITNESS:
13    A.    He did not make that statement.
14  BY MR. MATTHEWS:
15    Q.    Would that surprise you to find out that
16  the medical director for AstraZeneca who calls on
17  you personally, Jamie Mullen, had discussions with
18  others at AstraZeneca that they did not respect you
19  professionally in the Chicago area?
20    MR. SCHOON:  Objection; form.
21  BY THE WITNESS:
22    A.    I'd be surprised.  But if that's his
23  opinion, it's his opinion.
24  BY MR. MATTHEWS:

Page 204

1    Q.    Assuming that to be true, sir, do you
2  have any idea why AstraZeneca, with the opinion
3  that you were not respected in the Chicago area by
4  your peers, would continue to use you on their
5  Speakers Bureau and pay you handsomely for over
6  eight years?
7    MR. SCHOON:  Object to form.
8  BY THE WITNESS:
9    A.    You'd have to ask them.  I don't
10  know what you say is true.  But if it is, you'd
11  have to ask them why they did it.
12  BY MR. MATTHEWS:
13    Q.    Would you be surprised to learn that
14  they believed the fact that you had a study with 65
15  patients without any adverse events was hard for
16  them to believe, in other words, they didn't
17  believe it?  Would that surprise you?
18    A.    It was hard --
19    MR. SCHOON:  Objection; form.
20  BY THE WITNESS:
21    A.    It was hard for me to believe so I can
22  well understand it.
23    THE VIDEOGRAPHER:  There's four minutes
24  remaining on the videotape.

Page 205

1  BY MR. MATTHEWS:
2    Q.    I want to talk to you about a
3  Congressional inquiry that was started in the House
4  of Representatives and ask you if you are aware of
5  that, there was a Congressional inquiry concerning
6  Seroquel?
7    MR. SCHOON:  Object to form.
8  BY THE WITNESS:
9    A.    I'm not aware of it.
10  BY MR. MATTHEWS:
11    Q.    Have you ever been requested by your
12  attorneys or AstraZeneca to provide them with
13  documentation of what you had been paid by
14  AstraZeneca over the years concerning the drug
15  Seroquel?
16    MR. HAMMER:  Besides your request in the
17  subpoena that we produced?
18    MR. MATTHEWS:  Yea, I'm talking about a
19  Congressional inquiry.
20    MR. HAMMER:  Well, that wasn't your question
21  as far as I understood it.
22    MR. MATTHEWS:  I'm not asking about what I
23  requested.  I'm talking about something else.
24    MR. HAMMER:  I understand that now, but I

Confidential - Michael Jay Reinstein, M.D.

Page 206

1   don't think that was your question.
2       MR. MATTHEWS: All right. Well, I'll rephase
3   it.
4   BY MR. MATTHEWS:
5       Q.   Has any lawyer or anybody from
6   AstraZeneca requested documents from you concerning
7   a Congressional inquiry and what payments were made
8   to you by AstraZeneca?
9       A.   No.
10      Q.   You didn't even know one was occurring,
11  is that correct?
12      A.   That's correct.
13      MR. MATTHEWS: I think we are about to take a
14  break to change this tape.
15      THE VIDEOGRAPHER: This concludes Tape 3 of
16  Dr. Michael Jay Reinstein. We are off the video
17  record at 1 o'clock p.m.
18          (WHEREUPON, a recess was had
19              from 1:00 to 1:05 p.m.)
20      THE VIDEOGRAPHER: This is the beginning of
21  Tape 4 of Dr. Michael Jay Reinstein. We are on the
22  video record at 1:05 p.m.
23  BY MR. MATTHEWS:
24      Q.   Dr. Reinstein, we took a short break.

Page 207

1   Are you ready to go?
2       A.   Yes, I am.
3       Q.   All right. Again, just so I'm clear, I
4   only have one 1099 from 19 -- I'm sorry -- from
5   2007 that was produced in this litigation.
6       MR. SCHOON: Two.
7       MR. MATTHEWS: 2002?
8       MR. SCHOON: No, two. You have two 1099s.
9       MR. MATTHEWS: I'm sorry?
10      MR. HAMMER: Exhibit 4 has two pieces of
11  paper.
12      MR. MATTHEWS: I stand corrected.
13  BY MR. MATTHEWS:
14      Q.   Exhibit 4 has two pages which are 1099s
15  from AstraZeneca, and to my knowledge that's been
16  the only thing that's been produced by you.
17          Is that the only information that you
18  have in your files concerning your tax returns that
19  reference AstraZeneca?
20      A.   That's correct.
21      Q.   Did you report income from AstraZeneca
22  to the tune of 480 plus thousand dollars --
23      A.   Everything --
24      Q.   -- from 1997 to 2008?

Page 208

1       A.   All my earnings were reported to the
2   IRS. We do a corporate tax return every year.
3       Q.   Getting back to the study, and I think
4   I've marked it as Exhibit 10, it states at the top
5   "Effect of Clozapine-Quetiapine Combination Therapy
6   on Weight Gain and Glycemic Control."
7           I want to talk about this study and who
8   designed it.
9           Were you the designer of this study?
10      A.   The five people mentioned were involved
11  with discussions about the study.
12      Q.   You were the primary investigator,
13  correct?
14      A.   That's correct.
15      Q.   Were you the primary designer of this
16  study?
17      A.   I think it was a group effort. I can't
18  say I was primary in that regard.
19      Q.   Tell me who was it that designed this
20  study.
21      A.   I think all five of the names mentioned
22  took part in designing it.
23      Q.   Reinstein, Sirotovskaya, Jones, Mohan,
24  Chasanov?

Page 209

1       A.   That's correct.
2       Q.   Now, if we look at the method, it
3   says -- first, in the "Objective" it says this is a
4   non-randomized study, correct?
5       A.   That's correct.
6       Q.   What does that mean to you?
7       A.   That we had to find 65 patients or, for
8   that matter, it was probably all the patients in
9   the nursing home who met the criteria to be in the
10  study.
11      Q.   So, in other words, you looked at the
12  dosing requirements in your design of the study,
13  whoever it was that designed it, this particular
14  aspect of it, that is, you were looking at
15  somebody -- a patient in the nursing home that had
16  been on clozapine for at least six months and had
17  gained weight and then it was titrated off
18  100 percent clozapine to 75 percent clozapine and
19  25 percent Seroquel, that once they got titrated to
20  that amount for ten months, then they lost weight
21  or had their diabetes improved.
22          That is the population we're talking
23  about?
24      A.   Well, this is a retrospective --

53 (Pages 206 to 209)

Confidential - Michael Jay Reinstein, M.D.

Page 210

1      MR. SCHOON:  Object to form.
2  BY THE WITNESS:
3      A.   -- study of patients who we began using
4  the strategy with.  To be -- to get quetiapine in
5  those patients who had been on clozapine, had to
6  have gained weight and/or had diabetic issues, and
7  that led to them being partially transitioned to
8  quetiapine; and those patients who stayed on the
9  quetiapine combination for ten months became part
10  of the study.
11      Q.   So, how many charts did you look at to
12  come up with 65?
13      A.   All the patients in the nursing home.
14      Q.   So, you looked at one nursing home,
15  correct?
16      A.   415 or so patients in that nursing home.
17      Q.   So, better than 25 percent of the
18  patients in that nursing home happened to be on
19  clozapine for at least six months and then happened
20  to titrate down to 75 percent clozapine and
21  25 percent Seroquel, correct?
22      A.   The initiation of this treatment, there
23  were over 300 clozapine patients in the nursing
24  home.

Page 211

1      Q.   All right.  And of the 65 that you
2  found, do I understand this correctly, that all of
3  those people gained weight on clozapine, correct?
4      A.   The group who had been transitioned
5  to quetiapine from clozapine had gained weight or
6  had issues with diabetes, and that's why they
7  were transitioned to quetiapine.
8      Q.   And all of those folks lost weight
9  and/or had improvement in their diabetes, right?
10      A.   That's what our finding was.
11      Q.   And you looked at about, I think your
12  testimony was, approximately 20 percent of these
13  case report forms or charts, medical charts of
14  these people.  Who looked at the other 80 percent?
15      MR. SCHOON:  Object to form.
16  BY MR. MATTHEWS:
17      Q.   If you know.
18      A.   Primarily Larissa Sirotovskaya.
19      Q.   Where is she now?
20      A.   I have no idea.
21      Q.   When you see some patients in your
22  clinical practice that have clozapine or take
23  clozapine for some period of time and develop
24  diabetes, what percent of those patients in your

Page 212

1  clinical practice, if you'd give us a ballpark, are
2  actually insulin dependent?
3      A.   It's a pretty high percentage.
4  Schizophrenics often need insulin much younger
5  than non-schizophrenics, and there's actually
6  been articles about this.
7      Q.   What percentage would that be?
8      A.   It's very high.  I don't know.  It's --
9  I'm just thinking about my office patients and a
10  very large number of them are on insulin.
11      Q.   Is it also your testimony,
12  Dr. Reinstein, that every one of those patients in
13  the nursing home retrospectively looking at their
14  charts had adequate weight measurements, weight
15  taken on a monthly basis the preceding at least 16
16  months?
17      MR. SCHOON:  Objection; form.
18  BY THE WITNESS:
19      A.   If they were in the home for 16 months,
20  then there should have been 16 months of weight
21  data that it was done every month by the nursing
22  home staff.
23  BY MR. MATTHEWS:
24      Q.   Do you recall what percentage of the

Page 213

1  population was white, Caucasian?
2      A.   A large majority of the patients are
3  African-American.
4      Q.   Did anybody develop diabetes on
5  Seroquel, that is, in your clinical study?
6      A.   In my clinical practice, we have seen
7  people develop diabetes on Seroquel.
8      Q.   What about in your study?
9      A.   This study?
10      Q.   Yes.
11      A.   Well, none of the 52 who were not
12  diabetic to my knowledge developed diabetes while
13  they were on the Seroquel.
14      Q.   And all of the 52 improved in symptoms,
15  whether it was blood glucose, whether it was being
16  weaned off of insulin or being taken off of
17  medications for diabetes?
18      MR. SCHOON:  Object to form.
19  BY MR. MATTHEWS:
20      Q.   Correct?
21      A.   The improvement was in the areas of
22  weight and blood sugar control.
23      Q.   My question was:  All the 52 that had
24  developed diabetes had improvement when on

54 (Pages 210 to 213)

Confidential - Michael Jay Reinstein, M.D.

Page 214

1  Seroquel, is that your testimony?
2      A.   In terms of their blood sugars?  I don't
3  think we studied the group who was not diabetic in
4  terms of their blood sugars.  I don't recall that
5  being an issue.
6      Q.   The Uptown Research group that you were
7  talking about, do you have access to their records?
8      A.   I would have to ask Dr. Sonnenberg for
9  them.
10     Q.   Aren't you the medical director?
11     A.   Yeah, but he -- he's the custodian of
12 them.
13     Q.   The records that you produced in this
14 litigation, are you the custodian of those records?
15     A.   I'm not sure what you're referring to.
16     Q.   I'm referring to the subpoena that was
17 issued to you and the documents that you produced
18 pursuant to that subpoena.  Are those your business
19 records that you are custodian of?
20     MR. SCHOON:  Object to form.
21 BY THE WITNESS:
22     A.   I gave you all the records that I had in
23 my possession.
24 BY MR. MATTHEWS:

Page 215

1      Q.   Are you the custodian of those records?
2      A.   Of which records?
3      Q.   The records you produced pursuant to the
4  subpoena.
5      A.   What I gave you is what I assume I'm the
6  custodian of, yes.
7      Q.   You have a lawyer here, personal lawyer
8  today, is that correct?
9      A.   That's correct.
10     Q.   Are you paying this lawyer?
11     A.   My insurance carrier is paying him.
12     Q.   Is AstraZeneca contributing in any way?
13     A.   No.
14     Q.   Have you ever been sued?
15     A.   Yes.
16     Q.   How many times?
17     A.   Maybe five times over 30 years.
18     Q.   Do you have any indemnity agreement with
19 AstraZeneca in this litigation, to your knowledge?
20     A.   I'm not aware of any.
21     Q.   Do you read labels concerning risks of
22 adverse events for drugs?
23     A.   Yes.
24     Q.   Is that important to you as a physician?

Page 216

1      A.   Yes.
2      Q.   Do you expect them to be complete?
3      A.   Yes.
4      Q.   Do you expect them to include all the
5  potential risks and benefits of a drug --
6      MR. SCHOON:  Objection.
7  BY MR. MATTHEWS:
8      Q.   -- that the company knows about?
9      MR. SCHOON:  Objection; form.
10 BY THE WITNESS:
11     A.   It should, yes.
12 BY MR. MATTHEWS:
13     Q.   Dr. Reinstein, as a speaker for Seroquel
14 and the fact that you knew in your clinical studies
15 as well as your clinical practice that Seroquel is
16 associated with weight gain and diabetes, you would
17 expect AstraZeneca as early as 1999 to include that
18 in a label, would you not?
19     MR. SCHOON:  Objection; form.
20 BY THE WITNESS:
21     A.   You know, I'm not sure what the criteria
22 is to label something, if it's one case, if that
23 means they should label it.  I know there was
24 mention of cases of people developing diabetes on

Page 217

1  Seroquel.
2  BY MR. MATTHEWS:
3      Q.   Assuming that the requisite is if the
4  company has reason to believe there is a potential
5  of an association of risk from a particular drug,
6  in this case, weight gain and diabetes, that they
7  had the responsibility to warn doctors in a
8  label -- that would be what is the law to my
9  knowledge -- would you have expected them or would
10 you --
11     A.   It is -- if there was --
12     Q.   -- expected them -- let me finish the
13 question.
14     MR. HAMMER:  Let him finish the question.
15     THE WITNESS:  Yeah.
16 BY MR. MATTHEWS:
17     Q.   Would you have expected them to warn the
18 consumers as well as the doctors early as 1999 when
19 they knew there was an association between Seroquel
20 and weight gain and diabetes?
21     MR. SCHOON:  Object to form.
22 BY THE WITNESS:
23     A.   I have to respect his objection because
24 I'm not sure that it's ever been proven there is a

55 (Pages 214 to 217)

Confidential - Michael Jay Reinstein, M.D.

Page 218

1  risk of weight gain or diabetes with -- with
2  Seroquel.
3  BY MR. MATTHEWS:
4      Q.   Well, as we sit here today do you
5  believe that it causes weight gain and diabetes?
6      MR. SCHOON:  Object to form.
7  BY THE WITNESS:
8      A.   In a general population, probably not.
9  In isolated individuals, it possibly could.
10  BY MR. MATTHEWS:
11      Q.   I'm not sure I understood that.  Let me
12  just ask you, Dr. Reinstein.
13          Do you believe that Seroquel is
14  associated with weight gain and diabetes?
15      A.   I personally --
16      MR. SCHOON:  Object to form.
17  BY THE WITNESS:
18      A.   I personally don't.
19  BY MR. MATTHEWS:
20      Q.   And you've read the NDA I think you
21  testified?
22      A.   Yeah.
23      Q.   Correct?
24      A.   Yes.

Page 219

1      Q.   How many documents were in the NDA?
2      A.   I can't recall.
3      Q.   How many pages?  Any idea?  Can you give
4  us an estimate?
5      A.   It's a long time since I've read it.
6      Q.   You've read multiple articles concerning
7  Seroquel, correct?
8      A.   Yes.
9      Q.   You've been on the Speakers Bureau for
10  some nine years, correct?
11      A.   Yes.
12      Q.   And as you sit here today you don't
13  think that Seroquel is associated with weight gain
14  and diabetes?
15      MR. SCHOON:  Object to form.
16  BY THE WITNESS:
17      A.   I don't think there is a significant
18  association.
19  BY MR. MATTHEWS:
20      Q.   That wasn't my question.  My question
21  is:  Do you believe there is an association?
22      MR. SCHOON:  Objection; form.
23  BY THE WITNESS:
24      A.   I cannot answer that.  I don't have

Page 220

1  an opinion.
2  BY MR. MATTHEWS:
3      Q.   You were also on the Speakers Bureau for
4  Eli Lilly and Zyprexa, correct?
5      A.   Yes.
6      Q.   And when is the first time that you
7  believe that Zyprexa causes weight gain and
8  diabetes?
9      A.   1996.
10      Q.   And what about clozapine?
11      A.   About the same time.
12      Q.   Your testimony today is that you have
13  never switched patients from Seroquel to Zyprexa,
14  correct?
15      A.   No, I would not say that.  We had -- we
16  have switched some patients from Seroquel to
17  Zyprexa.
18      Q.   How about the vast majority of your
19  patients, have you ever switched them to Zyprexa at
20  any given time?
21      A.   I think the only time it may have been a
22  significant was when we were told Seroquel was not
23  available.
24      Q.   Okay.  And I think your testimony was

Page 221

1  they ran out of or they were out of stock of
2  Seroquel in 2001, correct?
3      A.   Yeah, I remember it was December and I
4  think the year was 2001, but there was a period
5  from December to January of two months, possibly
6  more, where a lot of the suppliers could not get
7  Seroquel.
8      Q.   And you found this information out from
9  the sales reps?
10      A.   Sales reps and pharmacists.
11      Q.   Have you ever used other atypical
12  antipsychotics?
13      A.   We've used all of them.
14      Q.   Geodon?
15      A.   Yes.
16      Q.   Do you know what the risk profile is for
17  Geodon concerning weight gain and diabetes?
18      A.   Well, it carries the same FDA warning
19  that the other five anti -- new antipsychotics do.
20      Q.   Do you still use Geodon --
21      A.   Occasionally --
22      Q.   -- in your practice?
23      A.   -- yes.
24      Q.   Clozapine?

56 (Pages 218 to 221)

Confidential - Michael Jay Reinstein, M.D.

Page 222

1    A.    Yes.
2    Q.    Zyprexa?
3    A.    Yes.
4    Q.    Seroquel?
5    A.    Yes.
6    Q.    Risperdal?
7    A.    Yes.
8    Q.    Was it your testimony earlier that in
9    your clinical practice you have seen patients on
10   Seroquel that gained weight and became diabetic on
11   Seroquel, correct?
12   A.    That is correct.
13   Q.    And you've seen patients that have been
14   on Seroquel and became diabetic while on Seroquel
15   but didn't gain weight, is that correct?
16   MR. SCHOON:  Objection; form.
17   BY THE WITNESS:
18   A.    I'm not sure on that.  I mean, we've had
19   people become diabetic who have not gained weight.
20   But whether they were on Seroquel or not, I really
21   can't honestly answer.
22   BY MR. MATTHEWS:
23   Q.    If we look at the Exhibit 3.  Could you
24   look at that, please.

Page 223

1          Do you have that in front of you?
2    A.    I have it.
3    Q.    I'm looking through the years here and I
4    see that in 1997 you had three payments from
5    AstraZeneca to you.  1998 looks like over a dozen.
6    I'd like to put your attention on 1999.  Do you
7    have that?
8    A.    Yeah.
9    Q.    There are several payments of $1500,
10   $2,000 and there is an $8,000 payment on 6/7/1999.
11         Can you tell the jury exactly why
12   AstraZeneca is paying you these types of dollars,
13   whether it's 1,500 or whether it's $8,000?
14   A.    Well --
15   MR. SCHOON:  Object to form.
16   BY THE WITNESS:
17   A.    It's very simple.  As we wrote to
18   Mr. Brennan, their -- their financing and
19   reimbursement for speakers was just a mess.  We'd
20   have to send in our request to reps who would have
21   to send it to somebody else who would have to send
22   it to somebody else.  And there were several times
23   when there is a very significant backlog of
24   payments.

Page 224

1    BY MR. MATTHEWS:
2    Q.    To give the jury some sense of what you
3    were doing flying -- when you'd fly around the
4    country, you were paid an honorarium or stipend or
5    you were paid a dollar amount for the appearance at
6    some type of discussion, correct?
7    A.    Yes.
8    Q.    You were also paid your travel expenses?
9    A.    Yes.
10   Q.    You were paid your hotel accommodations?
11   A.    Yes.
12   Q.    You were paid for your meals?
13   A.    Yes.
14   Q.    And you would literally travel all over
15   the country, correct?
16   MR. SCHOON:  Objection; form.
17   BY THE WITNESS:
18   A.    Traveled very widely, yes.
19   BY MR. MATTHEWS:
20   Q.    New York, Florida, California?
21   A.    Been to all of them.
22   Q.    I'm sorry?
23   A.    Yeah, I've been to all of those states.
24   Q.    Internationally?

Page 225

1    A.    Canada.
2    Q.    You flew business class, correct?
3    A.    No.  Usually coach.
4    Q.    Did you travel by yourself all the time?
5    A.    Just about all the time.  My wife may
6    have gone on one or two of the trips, but almost
7    all the time by myself.
8    Q.    You stayed at nice hotels?
9    A.    Sometimes.  Sometimes, you know, not so
10   nice.
11   Q.    And you were paid on every one of these
12   trips, whether it was 1500 or $2,000, you were
13   always paid, correct?  Even if it was -- if they
14   were slow in paying you, you got the paid?
15   A.    Well, I think we were, but it was hard
16   keeping track of it because the payments were very
17   slow.
18   MR. MATTHEWS:  I'm going to mark as Exhibit 11
19   the yearly totals as I have totaled up from the
20   documents that you gave us.
21         (WHEREUPON, a certain document was
22          marked Reinstein Deposition Exhibit
23          No. 11, for identification, as of
24          05-28-2008.)

57 (Pages 222 to 225)

Confidential - Michael Jay Reinstein, M.D.

Page 226

1    MR. SCHOON:  This is a document you created?
2    MR. MATTHEWS:  That's right.  If I'm wrong,
3  I'm sure somebody will point it out.
4  BY MR. MATTHEWS:
5    Q.   But in 1999 you were paid approximately
6  $68,000, whereas in 1998 you were only paid
7  $10,000.  Can you tell us why this large leap in
8  dollar amounts AstraZeneca was paying you from one
9  year to the next?
10    A.   I think there was more requests for
11  speaking engagements in 1999 than in 1998.
12    Q.   One of the reasons that you were paid
13  more is because you were speaking about the paper
14  you had published in August of 1999, is that
15  correct?
16    MR. SCHOON:  Objection; form.
17  BY THE WITNESS:
18    A.   Well, the paper was published in August,
19  but it looks like most of the or a good percentage
20  of the engagements were before the paper was
21  published.
22  BY MR. MATTHEWS:
23    Q.   All right.  But it's true, is it not,
24  Dr. Reinstein, that one of the things you did when

Page 227

1  you published that paper is you went and spoke
2  about that paper around the country at the behest
3  of AstraZeneca, correct?
4    MR. SCHOON:  Object to form.
5  BY THE WITNESS:
6    A.   That was part of my presentation after
7  it was presented.  It couldn't be talked about
8  before.
9  BY MR. MATTHEWS:
10    Q.   Well, in part, that's why this leap from
11  $10,000 to $68,000 in 1999, in part, correct?
12    MR. HAMMER:  I'm going to object; asked and
13  answered.  But you can answer again.
14  BY THE WITNESS:
15    A.   I'm not sure.  You'd have to ask the
16  company and the people who asked me to speak why
17  they asked me to speak.
18  BY MR. MATTHEWS:
19    Q.   Well, from 1999 it leaps from 68,000 to
20  $172,000.  Is that correct?
21    MR. SCHOON:  Objection; form.
22  BY MR. MATTHEWS:
23    Q.   And, again, if my calculations are
24  wrong, I'm sure someone will point it out.  But

Page 228

1  that's what I did when I added these up.
2    Do you know why it increased almost
3  threefold from one year to the next, 1999 to 2000?
4    A.   I can only assume there were more
5  requests for speaking engagements and maybe I had
6  more time during that year to honor the requests.
7    Q.   I'm having a hard time hearing you.
8    Is it true, sir, that in 2000 you were
9  continually speaking about the study that you
10  conducted concerning weight gain and diabetes?
11    A.   Among other issues, I was talking about
12  that, yes.
13    Q.   I'm sorry?
14    A.   Among other issues, yes.
15    Q.   That's something you continued to speak
16  about in 1999, 2000, correct?
17    MR. SCHOON:  Object to form.
18  BY THE WITNESS:
19    A.   It was part of my presentation.
20  BY MR. MATTHEWS:
21    Q.   In the year 2000, did you provide
22  AstraZeneca all of the information you were
23  presenting at your talks?
24    A.   Yes.

Page 229

1    Q.   It says AstraZeneca Canada.  Tell us
2  what that is.
3    A.   AstraZeneca Canada is the Canadian
4  division of AstraZeneca.
5    Q.   Where did you speak in Canada?
6    A.   All over Canada.
7    Q.   There is one payment on 9/20/01 for
8  $10,000.  Do you recall what that is?
9    A.   Yeah, that trip I won't forget.  That
10  was during 9/11/01 so it was my trip for the week
11  of 9/11/01.
12    Q.   Did anybody at AstraZeneca during the
13  years 1999, 2000, 2001 ever say something to the
14  effect of, "Dr. Reinstein, I'm not sure it's
15  appropriate to say that Seroquel contributes to
16  weight loss and lessening of diabetic symptoms and
17  I don't think it's appropriate for you to be saying
18  that in your talks around the country"?
19    MR. SCHOON:  Object to form.
20  BY THE WITNESS:
21    A.   I don't recall having that conversation
22  with anybody.
23  BY MR. MATTHEWS:
24    Q.   Did anyone at AstraZeneca ever tell you

58 (Pages 226 to 229)

Confidential - Michael Jay Reinstein, M.D.

Page 230

1 that they were struck by how consistent the data
2 was across all 15 clinical trials they had at their
3 disposal in 1997?
4     A.   I don't recall that conversation.
5     Q.   Did they ever tell you that it seems to
6 be consistent that there is weight gain throughout
7 a year use of Seroquel, not just in the short phase
8 of the drug, but continuing on for a year, 52
9 weeks --
10    MR. SCHOON:  Objection; form.
11 BY MR. MATTHEWS:
12    Q.   -- of drug use.  Did they ever tell you
13 that?
14    A.   No.
15    MR. SCHOON:  Object to form.
16 BY THE WITNESS:
17    A.   No.
18    MR. HAMMER:  I --
19    MR. MATTHEWS:  To -- I'm sorry.
20    MR. HAMMER:  It's very close to 1:30.  The
21 doctor has clinical hours.
22    MR. MATTHEWS:  All right.  Well, we'll take a
23 break.  We will have to reconvene.
24    MR. HAMMER:  You will have to do what you have

Page 231

1 to do.
2     MR. MATTHEWS:  Okay.  Thank you.
3     MR. HAMMER:  But he's got to leave to go see
4 patients.
5     MR. MATTHEWS:  I understand.
6     THE VIDEOGRAPHER:  This concludes Tape 4 and
7 today's deposition, Volume 1 of Dr. Michael Jay
8 Reinstein.  We're off the video record at 1:31 p.m.
9         (WHEREUPON, at 1:31 the videotaped
10        deposition of DR. MICHAEL JAY
11        REINSTEIN was adjourned sine die.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 232

1 STATE OF ILLINOIS )
2             ) SS:
3 COUNTY OF DU PAGE )
4     I, CORINNE T. MARUT, C.S.R. No. 84-1968,
5 a Notary Public within and for the County of
6 DuPage, State of Illinois, and a Certified
7 Shorthand Reporter of said state, do hereby
8 certify:
9         That previous to the commencement of the
10 examination of the witness, the witness was duly
11 sworn to testify the whole truth concerning the
12 matters herein;
13        That the foregoing deposition transcript
14 was reported stenographically by me, was thereafter
15 reduced to typewriting under my personal direction
16 and constitutes a true record of the testimony
17 given and the proceedings had;
18        That the said deposition was taken
19 before me at the time and place specified;
20        That the reading and signing by the
21 witness of the deposition transcript was agreed
22 upon as stated herein;
23        That I am not a relative or employee or
24 attorney or counsel, nor a relative or employee of

Page 233

1 such attorney or counsel for any of the parties
2 hereto, nor interested directly or indirectly in
3 the outcome of this action.
4         IN WITNESS WHEREOF, I do hereunto set my
5 hand this 9th of June, 2008.
6
7
8
9         CORINNE T. MARUT, C.S.R. No. 84-1968
10        Notary Public, DuPage County, Illinois.
11        My commission expires August 15, 2009.
12
13
14
15
16
17
18
19
20
21
22
23
24

59 (Pages 230 to 233)