**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**IN RE: Seroquel Products Liability Litigation**

**MDL DOCKET NO. 1769**

**This document relates to:**

| | |
|---|---|
| **Linda Guinn** | **6:07-cv-10291** |
| **Janice Burns** | **6:07-cv-15959** |
| **Richard Unger** | **6:07-cv-15812** |
| **Connie Curley** | **6:07-cv-15701** |
| **Linda Whittington** | **6:07-cv-10475** |
| **Eileen McAlexander** | **6:07-cv-10360** |
| ~~**Sandra Carter**~~ | ~~**6:07-cv-13234**~~ |
| ~~**Clemmie Middleton**~~ | ~~**6:07-cv-10949**~~ |
| ~~**Hope Lorditch**~~ | ~~**6:07-cv-12657**~~ |
| **David Haller** | **6:07-cv-15733** |
| ~~**Charles Ray**~~ | ~~**6:07-cv-11102**~~ |
| ~~**William Sarmiento**~~ | ~~**6:07-cv-10425**~~ |

---

## ASTRAZENECA'S MOTION TO EXCLUDE THE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' GENERIC AND CASE-SPECIFIC WITNESSES AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rule of Evidence 401, 402, 403, 702 and 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals LP ("AstraZeneca") hereby move to exclude the general causation testimony of Plaintiffs' experts Laura Plunkett, Ph.D., Donna Arnett, Ph.D., and William Wirshing, M.D.[1]

---

1 Plaintiffs also identified five specific causation witnesses, Drs. I. Jack Abramson, Jennifer Marks, Bruce Perry, Brian Tulloch, and Mitchell Young, whose specific causation opinions are addressed in a separate motion. To the extent those witnesses offer any general causation opinions, this motion also seeks the exclusion of that testimony. *See infra*, section F.

# I. INTRODUCTION[2]

The testimony of Plaintiffs' general causation[3] experts that scientific evidence demonstrates that Seroquel causes diabetes flies in the face of a general consensus in the scientific community to the contrary. In 2004, a joint panel of the American Diabetes Association, the American Psychiatric Association, the American Association of Clinical Endocrinologists, and the North American Association for the Study of Obesity concluded that scientific evidence does not establish that Seroquel causes diabetes and published this conclusion in the peer-reviewed journal *Diabetes Care*.[4] The panel's conclusion followed a review of the scientific literature as well as presentations to the panel from fourteen leading experts and the Food and Drug Administration ("FDA"). Two years later, on November 16, 2006, after extensive review and analysis, the FDA agreed: "it has not been established whether Seroquel causes diabetes."[5] In light of this evidence, Plaintiffs, who bear the burden of proof, cannot establish that "the medical community generally recognizes the toxicity of the drug or chemical at issue." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005) (identifying two "broad categories of cases," those in which the medical community "generally recognizes the toxicity of the drug" and those in which the medical community does not). Thus, the

---

2 All of the scientific and deposition materials referenced herein are attached as separate tabs in the Notice of Filing filed herewith and will be cited below as at "NF Tab___" respectively.

3 "General causation" addresses the question "whether the drug or chemical *can* cause the harm plaintiff alleges." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005) (emphasis in original).

4 *Consensus Development Conference on Antipsychotic Drugs and Obesity and Diabetes*. Diabetes Care 27(2):596-601 (2004) ("ADA Consensus") (NF Tab 1) (The ADA Consensus describes the data regarding Seroquel as "discrepant" and notes that "[t]he risk in patients taking...quetiapine [Seroquel] is less clear; some studies show an increased risk for diabetes, while others do not."

5 Letter from Robert Dean, Regulatory Review Officer, FDA, to James L. Gaskill, Director, Promotional Regulatory Affairs, AstraZeneca (Nov. 16, 2006) (NF Tab 2).

Court must "undertake an extensive Daubert analysis on the general toxicity question,"

*Id.*, that includes "***an exacting analysis*** of the proffered expert's methodology."

*McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (emphasis added).

In performing its "exacting analysis" of Plaintiffs' general causation experts, Drs. Plunkett, Arnett and Wirshing, the trial court may "properly [view] with skepticism" any proffered opinion that has obtained minimal support in the relevant scientific community. *McClain,* 401 F.3d at 1251; *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315-16 (11th Cir. 1999) (noting that a court may properly scrutinize anomalous conclusions and reject expert opinion if the expert fails to identify the reasons why his scientific methodologies yielded novel results) citing *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). "Courts should particularly pay close attention" when expert witnesses depart from generally accepted principles; if an expert "embark[s] upon a sea of scientific uncertainty, the court may appropriately insist that he ground his departure in demonstrable and scrupulous adherence to the scientist's creed of meticulous and objective inquiry." *Allen v. Pennsylvania Eng'g Corp.,* 102 F.3d 194, 197 n. 4 (5th Cir. 1996), quoting *Braun v. Lorillard Inc.*, 84 F.3d 230 (7th Cir. 1996).

The general causation opinions of Plaintiffs' experts cannot survive such scrutiny. As a threshold matter, all of these experts fall well short of demonstrating the existence of three fundamental factors necessary to reliably opine that Seroquel can cause diabetes – a biologic mechanism, a dose-response effect and general acceptance of their opinions. These failings alone render their opinions inadmissible.  In addition, none offers a shred of science to support a claim that low doses of Seroquel have any impact on either weight

gain or diabetes, precluding any opinion that ingestion of Seroquel at such doses is a cause of diabetes.

While these experts' common failings are addressed initially below, their additional, individual methodological flaws also require the exclusion of their proffered opinions:

***Dr. Plunkett***: Dr. Plunkett's proffered testimony is inadmissible because she adopts a weight of the evidence methodology that has been rejected by the courts. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 n. 5 (1997) (reversing Eleventh Circuit decision that found "weight of the evidence" methodology admissible); *Allen*, 102 F.3d at 198 (excluding weight of the evidence methodology used to support claim that chemical caused brain cancer). Dr. Plunkett frankly admits that she included in her report only scientific articles that she believes support her opinion. Her failure to explain *the cherry-picked evidence* she chose to include in her report and her complete omission of contrary data render her entire opinion inadmissible. *See McClain*, 401 F.3d at 1248 (excluding expert and noting that drawing "unauthorized conclusions from limited data" lacks scientific rigor); *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp.2d 584, 607 (D.N.J. 2002) (excluding opinions based on a "weight-of-the-evidence" methodology because the expert did not employ "***a scientific method of weighting that is used and explained***") (emphasis added), *aff'd,* 68 F. App'x 356 (3d Cir. 2003); *In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, 524 F. Supp.2d 1166, 1176 (N.D. Cal. 2007) ("cherry-picking" studies that support an opinion, and rejecting the weight of the contradictory evidence, "is not 'good science;' it is therefore inadmissible.").

***Dr. Arnett:*** Dr. Arnett's proffered testimony is inadmissible because she formed an opinion and submitted her report before she had time to "extensively review all of the published literature."[6] *McClain*, 401 F.3d at 1248 (leaping "to specific conclusions about causation or toxicity from incomplete evidence" is not proper scientific methodology). She spent at least three days reviewing literature after filing her report in an attempt to bolster her previously submitted litigation opinion. *See Claar v. Burlington N.R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("[c]oming to a firm conclusion first and then doing research to support it is the antithesis of the [scientific] method."). Having based her opinions on incomplete evidence, Dr. Arnett fails to apply the same level of intellectual rigor required of experts outside the courtroom. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (requiring that expert "employ[]...the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"). In addition, her methodology is scientifically flawed and therefore inadmissible because she bases key elements of her opinion on statistically insignificant data and on studies that she herself admits are confounded, while failing to offer any analysis or explanation of the data that do not support her opinion. *See Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp.2d 1347, 1371 (N.D. Ga. 2001) (an expert "cannot lump together lots of hollow evidence in an attempt to determine what caused a medical harm."), *aff'd sub nom., Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1196 (11th Cir. 2002) ("the district court correctly applied the principles established in the *Daubert* trilogy, without modification"); *Joiner*, 522 U.S. at 145 (rejecting reliance on non-statistically significant results); *In re Accutane Prods. Liab.*, 511 F. Supp.2d 1288, 1291 n. 2 (M.D. Fla. 2007) ("[I]t is critical to determine

---

6 Arnett Dep. 68:19-69:14 (NF Tab 3).

whether the association is causal or the result of confounding...Failure to recognize confounding can introduce a bias-error into the findings of the study."); *Magistrini*, 180 F. Supp.2d at 604 ("[T]he researcher or scientist ***must*** account for the roles of bias, confounding factors, and the likelihood that the observed association is due to chance.").

***Dr. Wirshing:*** Dr. Wirshing's proffered testimony is inadmissible because he is improperly extrapolating from an accepted premise – that *obesity* can cause diabetes – to an unfounded claim – that any amount of *weight gain* over any period of time will cause diabetes. *Brown v. Bray & Gillespie III Mgmt. LLC*, No. 606-CV-661, 2008 WL 2397601, at *2 (M.D. Fla. June 10, 2008) ("[W]hether an accepted premise is being extrapolated to an unfounded claim" has become a key part of the *Daubert* analysis.). Dr. Wirshing ignores the scientific evidence related to Seroquel and diabetes and substitutes instead evidence related to Seroquel and weight gain. Dr. Wirshing then concludes that diabetes will necessarily develop from *any* source of weight gain in *any* amount over some *undefined* period of time. Because Dr. Wirshing fails to provide evidence to support his unfounded leap from this undefined weight gain on Seroquel to diabetes, his opinion is unreliable and inadmissible.

Moreover, as with Drs. Plunkett and Arnett, Dr. Wirshing fails to address the data that contradict his opinions. He admits that the observational epidemiologic studies do not support his opinion, yet he makes no effort to address that body of science, nor does his report even mention any clinical trial data on the alleged association between Seroquel and diabetes. Dr. Wirshing's attempt to turn a weight gain opinion into a diabetes causation opinion cannot survive *Daubert* scrutiny. *See Allison*, 184 F.3d at 1314 ("leaping from an accepted scientific premise to an unsupported one" is not proper

methodology); *Cano v. Everest Minerals Corp.*, 362 F. Supp.2d 814, 851 (W.D. Tex. 2005) ("failure to consider both positive and negative associations in the literature is not reliable methodology").

In summary, even well before the Court applies the required "exacting analysis" to the proffered opinions of Drs. Plunkett, Arnett and Wirshing, it becomes clear that Plaintiffs' experts fail to apply reliable scientific methodologies. Offering an opinion that has not been generally accepted, these experts uniformly ***did not*** do what both science and Rule 702 demand: collect *all* of the available evidence, consider it *before* forming an opinion, *analyze* the evidence based on type and quality, *explain* confounded and contrary evidence, *account* for mechanism and dose, and *then* submit a reasoned analysis. Because Drs. Plunkett, Arnett and Wirshing do not apply reliable scientific methodologies as defined by the controlling Eleventh Circuit authority, the Court should exclude the Plaintiffs' proffered opinions that Seroquel causes diabetes.[7]

## II. SCIENTIFIC BACKGROUND[8]

Seroquel (quetiapine fumarate) is an antipsychotic medication indicated for the treatment of certain debilitating mental illnesses including schizophrenia and bipolar disorder.[9] The FDA originally approved Seroquel in September 1997 to treat manifestations of psychotic disorders, including specifically schizophrenia.[10] Seroquel was approved for additional indications: (i) in January 2004, to treat acute manic episodes

---

7 As discussed *infra* in section F, any general causation opinions offered by Plaintiffs' specific-causation witnesses also result from flawed methodologies and should be excluded.

8 This scientific background briefly summarizes the relevant background facts on Seroquel and diabetes and examines the scientific literature in humans addressing the alleged association between them. A more detailed review of the science is contained in the Declaration of Jeffrey P. Koplan, M.D., M.P.H. (attached as NF Tab 4) and in the Declaration of William S. Weintraub, M.D. (attached as NF Tab 5).

9 ADA Consensus at Table 1 (2004) (NF Tab 1).

10 Letter from Robert Temple, Director, Office of Drug Evaluation I, FDA, to Dr. J.W. Kennedy, Zeneca Pharmaceuticals (Sep. 26, 1997) (NF Tab 6).

associated with bipolar disorder,[11] (ii) in October 2006, to treat depressive episodes associated with bipolar disorder,[12] and (iii) in May 2008, for maintenance treatment of bipolar disorder as an adjunct therapy to a mood stabilizer.[13]

Seroquel is included in a group of drugs known as second generation antipsychotics (SGAs).[14] A "mainstay of treatment," SGAs reduce the incidence of disabling side effects[15] associated with an earlier generation of drugs known as the "first generation" antipsychotics.[16] Plaintiff's expert, Dr. Wirshing (the only psychiatrist among the Plaintiffs' three generic experts) regularly prescribes Seroquel as much as any other antipsychotic.[17]

Type II diabetes, the kind of diabetes alleged in this litigation, is a syndrome characterized by abnormally high blood sugar resulting from insufficient levels of the hormone insulin.[18] The disease typically develops over a period of ten to twelve years.[19] The Centers for Disease Control has characterized the rapid increase in diabetes in the United States as an epidemic. According to the Centers for Disease Control, in 2007 there were 23.6 million cases of diabetes in the United States; this represents

---

11 Letter from Dr. Russell Katz, Director, Division of Neuropharmacological Drug Products, Office of Drug Evaluation I, FDA, to Gerald L. Limp, Director, Regulatory Affairs, AstraZeneca (Jan. 12, 2004) (NF Tab 7).

12 Letter from Dr. Thomas P. Laughren, Director, Division of Psychiatry Products, Office of Drug Evaluation I, FDA, to Gerald L. Limp, Director, Regulatory Affairs, AstraZeneca (Oct. 20, 2006) (NF Tab 8).

13 Letter from Dr. Thomas P. Laughren, Director, Division of Psychiatry Products, Office of Drug Evaluation I, FDA, to Gerald L. Limp, Director, Regulatory Affairs, AstraZeneca (May 13, 2008) (NF Tab 9).

14 ADA Consensus at Table 1 (2004) (NF Tab 1).

15 These side effects are referred to as extrapyramidal side effects and are characterized by severe and permanent movement disorders; involuntary muscle movements and spasms; muscle rigidity; and tremors.

16 ADA Consensus at 596 (2004) (NF Tab 1).

17 Wirshing Dep. 89:18-90:13 (NF Tab 10).

18 Koplan Dec. at ¶¶ 9-10 (NF Tab 4).

19 *Id.* at ¶ 12 (NF Tab 4).

approximately 7.8% of the total U.S. population.  The CDC estimates that 5.7 million of those cases were undiagnosed.[20]

Obesity is a known cause of diabetes.  In fact, the association between obesity and diabetes is as at least as strong as the association between lung cancer and smoking, and at higher levels of body mass index, it is much stronger.[21]  However, obesity must be maintained over a number of years to increase the risk of developing diabetes.  Scientific data confirm that weight gain over a short period of time does not increase the risk of diabetes, and additional weight gain in someone who is already obese does not materially change the risk of developing diabetes.[22]  In addition to obesity, there are many other factors, including family history, sedentary lifestyle, diet, hypertension and serious mental illness that increase the risk of developing diabetes.[23]

Recent studies have estimated the prevalence of diabetes among people with serious mental illness exceeds two to four fold that of the general population.[24]  Rates of obesity also are elevated in this population, which is well known to have sedentary lifestyles and poor diets, factors that are associated with the development of diabetes.[25]  The high rates of diabetes among the mentally ill were reported before the introduction of even the first generation antipsychotics.[26]  As discussed below, these characteristics

---

[20]  *Id.* at ¶ 8 (NF Tab 4).

[21]  *Id.* at ¶ 28 (NF Tab 4).

[22]  *Id.* at ¶¶ 34-35 (NF Tab 4).

[23]  *Id.* at ¶¶ 36-45 (NF Tab 4).

[24]  *See Id.* at ¶ 45 (NF Tab 4); Arnett Dep. 102:22-103:10 (NF Tab 3).

[25]  Koplan Dec. at ¶ 33 (NF Tab 4).

[26]  *'Schizophrenia and Diabetes 2003' Expert Consensus Meeting, Dublin, 3-4 October 2003: Consensus Summary.* British Journal of Psychiatry, 184[suppl 47]: s112-s114 (2004) (NF Tab 11).

increase the difficulty of studying the potential causes of diabetes in a mentally ill population.

Seroquel has been studied extensively. Over seventy randomized clinical trials of this drug have been conducted.[27] Clinical trials provide the best means available to reduce or eliminate confounding or bias[28] because the design of a clinical trial includes the random assignment of the subjects to each arm of the study.[29] The Seroquel clinical trials examined blood glucose and other laboratory parameters as well as weight gain.[30]

One of these studies, "Study 125"[31] was designed specifically to determine the effect of Seroquel and other antipsychotics on blood glucose levels, as measured by a highly sensitive oral glucose tolerance test, as the primary endpoint. The protocol adopted in Study 125 required the randomization of patients by body mass index at baseline; hospitalization of the patients prior to glucose testing to ensure fasting; a study duration of six months; and the use of the gold-standard validated oral glucose tolerance test (OGTT) to determine changes in glucose metabolism. Study 125 determined that Seroquel did not cause a statistically significant change in glucose metabolism as

---

27 Koplan Dec. at ¶ 22 (NF Tab 4).

28 *Id.* at ¶ 20 (NF Tab 4); "A confounding factor is both a risk factor for the disease and a factor associated with the exposure of interest." Fed. Jud. Ctr. *Reference Manual on Scientific Evidence* 369 (2d ed. 2000). The presence of confounding factors (or bias) can result in an erroneous association. Therefore, even when an association is observed, researchers must determine whether the exposure caused the disease or whether the exposure and disease are caused by a confounding factor." *See generally id.* at 369-370.

29 Koplan Dec. at ¶ 20 (NF Tab 4); Fed. Jud. Ctr. *Reference Manual on Scientific Evidence* 338 (2d ed. 2000).

30 Koplan Dec. at ¶ 22 (NF Tab 4).

31 Study 125's complete title is: A 24-Week, International, Multi-centre, Open-label, Flexible-dose, Randomised, Parallel-Group Phase IV Study to Compare the Effect on Glucose Metabolism of Quetiapine, Olanzapine, and Risperidone, in the Treatment of Patients with Schizophrenia. *See* Koplan Dec. at n. 10 (NF Tab 4). Because of Study 125's volume, Defendants have not filed a copy of this study but will do so upon the Court's request.

measured by the OGTT.[32] In addition to Study 125 and the other AstraZeneca clinical trials, numerous outside investigators also have investigated Seroquel in clinical trials.[33]

In June of 2008, at the request of the FDA, AstraZeneca compiled metabolic data from all clinical trials involving Seroquel monotherapy (Seroquel unaccompanied by any other drug). This massive compilation of data (20,021 adult patients treated with Seroquel) established that there was no evidence of a consistent and clinically meaningful alteration in glucose metabolism related to Seroquel.[34] The FDA Submission also summarizes information regarding weight gain. In the placebo-controlled trials, Seroquel-treated subjects gained a moderate amount of weight: an average of 2.6 pounds compared to 0.44 pounds among the placebo group over a median exposure of about 6 weeks.[35]

In addition to the randomized clinical trials, twenty observational epidemiologic studies have examined a potential association between Seroquel and diabetes.[36] Observational epidemiologic studies suffer from many sources of potential bias and confounding not present in randomized clinical trials.[37] Most of the studies examining a potential association between Seroquel and diabetes were conducted using data from claims databases collected by insurance companies, which are not maintained for the

---

[32] Koplan Dec. at ¶ 23 (NF Tab 4).

[33] *See, e.g.*, Henderson, et al., *Glucose Metabolism in Patients with Schizophrenia Treated with Olanzapine or Quetiapine: A Frequently Sampled Intravenous Glucose Tolerance Test and Minimal Model Analysis*, J. Clinical Psych 67:5 (2006); Emsley, et al., *Effects of Quetiapine and Haloperidol on Body Mass Index and Glycaemic Control: A Long-Term, Randomized, Controlled Trial*, Intl. J. Neuropsychopharmacology, 8:175-182 (2005) (NF Tab 12).

[34] Koplan Dec. at ¶ 22, ¶ 27 and n. 12 (NF Tab 4).

[35] *See* AstraZeneca, *Metabolic Parameters Response*, FDA Submission, Jun. 26, 2008 ("FDA Submission"); Koplan Dec. at n. 12 (NF Tab 4). Defendants have not filed a copy of the 2008 FDA Submission because of its volume but will do so upon the Court's request.

[36] Koplan Dec. at ¶ 25 (NF Tab 4).

[37] *Id.* at ¶ 21 (NF Tab 4); Weintraub Rep. ¶¶ 53-55 (NF Tab 5); *see also supra*, note 28.

purposes of scientific inquiry.[38] Because of the limitations inherent in these databases, the investigators often lack critical information about the study subjects. For example, in some studies, the authors could not reliably determine whether the subjects had diabetes before they took Seroquel, and only one of the twenty studies was able to take into account the subjects' body mass index.[39] Studying diabetes without controlling for baseline body mass index is like studying lung cancer without controlling for smoking.[40] Plaintiffs' experts concede that these studies are confounded.[41] Even with these weaknesses, the results do not support Plaintiffs' causation opinion. Twelve of the twenty show no statistically significant increased risk of diabetes associated with Seroquel, and the studies that do report an association suffer from significant problems with confounding.[42]

Fundamental principles of science require a review of all of the data before reaching a conclusion as to causation. Here, in order to draw a conclusion that Seroquel causes diabetes, a scientist would, at a minimum, have to explain away the results in Study 125, the numerous other controlled trials, and the fact that the majority of the observational epidemiologic studies demonstrate no statistically significant association between Seroquel and diabetes. Plaintiffs' experts Drs. Plunkett, Arnett and Wirshing make no attempt to "explain away" these results. In fact, they did not even read much of

[38] Koplan Dec. at ¶ 25 (NF Tab 4).

[39] *Id.* at ¶ 25 (NF Tab 4).

[40] *Id.* at ¶ 25 (NF Tab 4).

[41] *See* Arnett Dep. 291:13-292:2 (NF Tab 3); Plunkett Dep. 233:8-13; 241:3-242:18 (NF Tab 13); The FDA-mandated warning label applicable to all second-generation antipsychotics also recognizes that "[a]ssessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood." (NF Tab 13).

[42] Koplan Dec. at ¶ 25 (NF Tab 4); *see supra* note 28.

this scientific evidence before forming their opinions. For that reason, and as a result of the other methodologic flaws discussed below, the general causation expert opinions offered by Plaintiffs must be excluded.

## III. ARGUMENT

### A. *Daubert* Requires This Court To Act As A "Gatekeeper" And To Ensure That Plaintiffs Satisfy Their Burden Of Establishing The Admissibility Of Their Proffered Expert Opinions.

Plaintiffs, as the proponents of these witnesses' general causation opinions, bear the burden of proving the admissibility of that proposed testimony under *Daubert*. *See McClain*, 401 F.3d at 1238; *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). Plaintiffs' burden is substantial. *McCorvey*, 298 F.3d at 1256-57.

In *Daubert*, the Supreme Court charged federal district courts with the "duty" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589. Accordingly, the Eleventh Circuit mandates a strict gatekeeping role "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey*, 298 F.3d at 1256; *Cayenta Canada, Inc. v. Orange County, Fla. Bd. of Cty. Comm'rs*, No. 01-CV-1231, 2002 WL 34373972, at *4 (M.D. Fla. Nov. 20, 2002) (Conway, J.).[43] Given the potential impact of expert testimony upon the jury, "the importance of *Daubert's* gatekeeping requirement cannot be overstated." *Frazier*, 387 F.3d at 1260 (11th Cir. 2004).

The "exacting analysis" required by the Eleventh Circuit, *McCorvey*, 298 F.3d at 1257, insures that the expert "'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *McClain*, 401

---

43 *See also Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

F.3d at 1237 (quoting *Kumho*, 526 U.S. at 152). "[T]he expert's conclusions must be based on sound scientific principles," *Rider*, 295 F.3d at 1197, because "'[t]he courtroom is not the place for scientific guesswork, even of the inspired sort.'" *McClain*, 401 F.3d at 1247 (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) (Posner, J.)).

The Eleventh Circuit has stressed the vital role district courts must play as gatekeepers against the admission of scientifically unreliable or irrelevant evidence:

> The Daubert trilogy… has greatly improved the quality of the evidence upon which juries base their verdicts. Although making determinations of reliability may present a court with the difficult task of ruling on matters that are outside of its field of expertise, this is "less objectionable than dumping a barrage of scientific evidence on a jury, who would likely be less equipped than the judge to make reliability and relevance determinations.

*Rider*, 295 F.3d at 1197 (quoting *Allison*, 184 F.3d at 1310); *see also McClain*, 401 F.3d at 1237-38 (district court abused its discretion in concluding that it lacked sufficient knowledge about the scientific subject matter to exclude the testimony presented). Accordingly, this Court has recognized that it "must take care to weigh the value of [expert testimony] against its potential to mislead or confuse." *Brown*, 2008 WL 2397601, at *2 (citation omitted). The standards that district courts are to apply to the *Daubert* analysis are well-established and were summarized aptly in *Brown*:

> The *Daubert* Court set forth a non-exhaustive list of relevant factors to consider in determining whether the methodology employed is reliable…The factors include whether the methods can be tested or have been subject to peer review, the potential rate of error, and whether the methods are generally accepted…Since *Daubert*, other courts have looked at additional factors, including whether an expert has properly accounted for alternative explanations…whether the conclusions were reasoned as

> carefully as they would have been outside of litigation...and whether an accepted premise is being extrapolated to unfounded claims.

*Brown*, 2008 WL 2397601, at *2 (citation omitted).

AstraZeneca respectfully submits that the general causation testimony of Plaintiffs' witnesses cannot survive this Court's careful and rigorous application of these established standards for the admissibility of expert testimony, and the proffered opinions should be excluded in their entirety.

**B. The General Causation Testimony Of Plaintiffs' Experts Is Unreliable And Inadmissible.**

The opinions of all of Plaintiffs' general causation experts bear the fundamental hallmarks of unreliability that require strict scrutiny by the Court and ultimately exclusion: the failure to supply reliable evidence of a biologic mechanism or of a dose-response effect and the inconsistency of their causation opinions with the general consensus expressed by the scientific community. This Section B addresses these common failures. Sections C, D, and E address additional methodological flaws specific to each generic expert providing independent grounds for excluding their opinions. Section F addresses the unreliability of the general causation opinions of Plaintiffs' case-specific witnesses.

**1. Plaintiffs Lack Reliable Evidence Of The Mechanism By Which Seroquel Allegedly Causes Diabetes.**

None of Plaintiffs' causation witnesses satisfy the Eleventh Circuit's finding in *McClain* that "[t]he underlying predicates of any cause-and-effect medical testimony are that the medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur." 401

F.3d at 1253 (quoting *Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir. 1999); *see also Cartwright v. Home Depot U.S.A., Inc.*, 936 F. Supp. 900, 903 (M.D. Fla. 1996). Plaintiffs' experts posit two alternative biological hypotheses for their causation opinions—(i) a direct effect of Seroquel (on the pancreas or the insulin sensitivity of the body's cells) and (ii) an effect mediated through weight gain – but fail to show that medical science understands, much less accepts, either as the physiological process by which Seroquel supposedly causes diabetes.

Dr. Arnett concedes that she is not an expert on the mechanism by which antipsychotics allegedly cause diabetes or weight gain.[44] Dr. Plunkett plainly admits that she cannot identify a direct mechanism by which Seroquel can cause diabetes[45] and further concedes that she has no evidence showing that Seroquel is directly toxic to the pancreas (the organ that produces insulin).[46] Dr. Wirshing also readily concedes that any claim of a direct effect of Seroquel on the pancreas remains purely speculative,[47] and that he is relying entirely on weight gain as the alleged mechanism:

> Q: So the mechanism, in your view, is just simply weight gain?
> A: That's the – I think the most parsimonious explanation for what we see.[48]

The consequence of the failure to provide any evidence of a direct mechanism is dramatic in this mass tort context. Proceeding on a weight gain only mechanism means that Plaintiffs' specific causation experts must rule out all of the alternative causes of *both* weight gain and diabetes in each individual, a burden ignored by Plaintiffs' specific

---

44 Arnett Dep. 54:23-25; 55:1-4 (NF Tab 3).

45 Plunkett Dep. 150:14-151:15 (NF Tab 14).

46 *Id.* 150:24-151:1 (NF Tab 14).

47 Wirshing Dep. 40:9-20 (NF Tab 10).

48 *Id.* 40:21-24 (NF Tab 10).

causation witnesses. *See Hall v. Baxter Healthcare Corp.*, 947 F. Supp. 1387, 1413 (D. Or. 1996) ("the expert must 'rule in' the suspected cause as well as 'rule out' other possible causes"), quoting *Cavallo v. Star Enterp.*, 892 F. Supp. 756, 771 (E.D. Va. 1995), *aff'd in part, rev'd in part* 100 F.3d 1150 (4th Cir. 1996)).[49]

Plaintiffs' weight gain mechanism is equally speculative, because Plaintiffs' experts have no basis for opining that any weight gain associated with Seroquel causes diabetes. As Dr. Wirshing admits, weight gain and obesity[50] are not equivalent in terms of their relationship to a person's risk for developing diabetes.[51] Dr. Plunkett agrees: "[o]besity has been linked to diabetes. Weight gain itself, I think, it would depend on how much weight gain."[52] But Dr. Plunkett admits the she cannot identify any particular amount of weight gain associated with Seroquel,[53] and that she does not know how much weight gain is needed or how long the weight gain must be maintained to increase the risk of diabetes.[54] Moreover, according to Dr. Wirshing, there is a "pathophysiologic process that has to occur" before weight gain will lead to diabetes and that process "might take a long time."[55]

In other words, Plaintiffs' causation opinion rests on the theory that any amount of weight gain, large or small, *could* – *possibly* – lead to diabetes *if* the weight is maintained long enough and *if* the weight gain is sufficient to trigger in an individual the

---

49 *See also* AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses.

50 Obesity is typically defined on the basis of body mass index (BMI). A BMI ≥25 is considered overweight and ≥30 is considered obese. *See* Koplan Dec. at n. 21 (NF Tab 4).

51 Wirshing Dep. 210:17-23 (NF Tab 10).

52 Plunkett Dep. 171:15-19 (NF Tab 14).

53 *Id.* 169:8-171:11 (NF Tab 14).

54 *Id.* 172:25-173:24 (NF Tab 14).

55 Wirshing Dep. 210:24-211:7 (NF Tab 10).

"pathophysiologic process" that causes diabetes. Accordingly, Plaintiffs' theory "is not unique to Seroquel-induced weight gain;" it is equally applicable to "cheeseburger-induced weight gain."[56] Plaintiffs' weight gain mechanism is nothing but pure speculation. Plaintiffs cannot demonstrate that, in general, any amount of weight gain associated with Seroquel causes diabetes. Plaintiffs' epidemiologist, Dr. Arnett admits that she has not seen any observational studies or clinical trials that correlate weight gain on Seroquel to diabetes.[57] When confronted with the relevant data from clinical trials of Seroquel, Dr. Plunkett admitted that there is no real correlation between weight gain and increased fasting glucose.[58]

Dr. Plunkett nicely sums up Plaintiffs' experts' opinion on mechanism: "We don't know everything in the world that we need to know about how diabetes itself is even caused let alone how a drug might induce it."[59] Plaintiffs, therefore, offer no admissible evidence on mechanism, an "underlying predicate" of a causation opinion in the Eleventh Circuit. *McClain*, 401 F.3d at 1253.

**2. Plaintiffs Lack Reliable Evidence Of A Dose-Response Effect Or Of Any Effect At Low Doses.**

Plaintiffs violate another Eleventh Circuit bedrock causation principle by failing to provide reliable evidence of a dose-response effect. [60] The Eleventh Circuit requires "careful attention to the expert's testimony about the dose-response relationship.... The

---

[56] *Id.* 247:3-13 (NF Tab 10).

[57] Arnett Dep. 207:22-209:10 (NF Tab 3).

[58] Plunkett Dep. 514:16-:515:22 (NF Tab 14).

[59] *Id.* 479:19-480:4 (NF Tab 14).

[60] "A dose-response relationship means that the more intense the exposure, the greater the risk of the disease. Generally, higher exposures should increase the incidence (or severity) of disease." Fed. Jud. Ctr. *Reference Manual of Scientific Evidence* 377 (2d ed. 2000). "[A]nother important characteristic of the biological action of a chemical [is] ... the no observable effect level ... sometimes ... called a threshold, [*i.e.*, the level] ... below which no toxicity is observed." *Id.* at 407 (referring to animal studies).

expert who avoids or neglects this principle of toxic torts without justification casts suspicion on the reliability of his methodology." *McClain*, 401 F.3d at 1241-42 (excluding opinion supporting alleged injury from the dietary supplement Metabolife). The flawed dose-response opinions of these experts include the failure to support a hypothesized effect at low doses, which the Eleventh Circuit requires because "for most types of dose-response relationships following chronic (repeated) exposure, thresholds exist, such that there is some dose below which even repeated, long-term exposure would not cause an effect in any individual." *Id.* at 1242; *see also In re Accutane*, 511 F. Supp. 2d at 1293-94 (same; excluding expert who had conducted no analysis to determine whether threshold dose existed). Accordingly, to prevail in a toxic tort case "'a plaintiff must demonstrate the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover.'" *McClain*, 401 F.3d at 1241 (internal citation omitted).

Dr. Plunkett testifies very simply that she does not know whether there is a dose-response relationship between Seroquel and diabetes.[61] Dr. Wirshing's opinion rests solely on his weight theory and thus he does not even address dose-response as to diabetes directly; he concedes however that the data are conflicting as to any dose-response relationship between Seroquel and weight gain.[62] Dr. Wirshing confirms that the available Seroquel studies involve doses over 300 mg and that there is not any reliable evidence showing an association between weight gain and Seroquel at doses as low as 50 mg.[63]

[61] Plunkett Dep. 214:14-215:8 (NF Tab 14).

[62] Wirshing Dep. 282:16-283:6 (NF Tab 10).

[63] *Id.* 106:1-5 (NF Tab 10).

Dr. Arnett purports to give a dose-response opinion, but it amounts to nothing more than a theory based on unsupported extrapolation from higher doses. She concedes she lacks any evidence that Seroquel causes diabetes or hyperglycemia at doses of 200 mg or below,[64] and she admits a lack of evidence that Seroquel causes weight gain at doses of 25, 50 or 200 mg.[65] *See In re Bextra and Celebrex,* 524 F. Supp.2d at 1180-81 (excluding opinion based on unsupported extrapolation from 400 mg to 200 mg dose of Celebrex). Consistent with those admissions, Dr. Arnett does not even attempt to evaluate the existence of a dose threshold, *i.e.*, a level below which there is no association between Seroquel and diabetes,[66] apparently applying instead a no-threshold theory that extrapolates alleged effects at higher doses (which have not been demonstrated here) to effects at lower doses. Dr. Wirshing's opinion shares this infirmity, as noted above. Plaintiffs' no-threshold dose-response theory cannot substitute for actual scientific evidence. *Cano*, 362 F. Supp.2d at 849 (discussing scientific unreliability of no-threshold theory).[67]

### 3. Plaintiffs Cannot Demonstrate General Acceptance.

As noted above, "[c]ourts should particularly pay close attention" when expert witnesses depart from generally accepted methodologies. *Allen,* 102 F.3d at 197 n. 4; *McClain*, 401 F.3d at 1251 (reversing failure to exclude expert witness and noting that

---

64 Arnett Dep. 285:19-286:1 (NF Tab 3).

65 Arnett Dep. 156:7-16; 157:4-16 (NF Tab 3).

66 Arnett Dep. 211:2-6 (NF Tab 3).

67 *See also Wills v. Amerada Hess Corp.*, 379 F.3d 32, 49 (2d Cir. 2004) (affirming exclusion of no-threshold causation theory); *Sutera v. Perrier Group of Am., Inc.*, 986 F. Supp. 655, 666 (D. Mass. 1997) (rejecting no-threshold analysis); *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995) (criticizing no-threshold hypothesis because it has no known or potential rate of error and cannot be falsified or validated); *Johnston v. United States*, 597 F. Supp. 374, 393-94 (D. Kan. 1984) (no-threshold hypothesis is regulatory assumption used because it is more prudent to overestimate risk than to underestimate risk but "does not justify a court of law in using speculative hypotheses to determine that one person has caused harm to another").

"he has shown no proof for support of his opinions by the scientific community"). Here, the ADA Consensus Panel and the FDA have not concluded that the scientific evidence establishes that Seroquel causes diabetes. Dr. Arnett concedes that she cannot identify any professional organization that has determined that Seroquel causes diabetes.[68] Clearly, Drs. Plunkett, Wirshing, and Arnett stand far from the mainstream scientific community. When expert opinion is not generally accepted, the court must strictly scrutinize the admissibility of those opinions. *See McClain,* 401 F.3d at 1251; *Allen*, 102 F.3d at 197 n.4; *Medina v. Louisville Ladder, Inc.*, 496 F. Supp.2d 1324 (M.D. Fla. 2007) (Conway, J.) (rejecting conclusions of warnings experts that were not generally accepted); *Lust*, 89 F.3d at 598.

The complete failure of these experts to explain their departure from the generally accepted wisdom of the medical community and the absence of reliable evidence of mechanism or dose-response requires the exclusion of Plaintiffs' experts' general causation opinions. Multiple – and equally fatal – additional methodological flaws are discussed below.

### C. This Court Must Exclude The General Causation Opinions Of Laura K. Plunkett, Ph.D.

Dr. Plunkett, a pharmacologist and toxicologist without a medical degree, proposes to testify that Seroquel "can cause adverse metabolic effects that include, but are not limited to an increased risk of clinically significant body weight gain, hyperglycemia, altered glucose metabolism, and an increased risk of diabetes and diabetes-related complications."[69] Dr. Plunkett employs an unreliable "weight of the

---

[68] Arnett Dep. 205:14-17 (NF Tab 3).

[69] Plunkett Rep. at ¶ 30 (NF Tab 15). Dr. Plunkett has testified 41 times in the past four years and never has testified on behalf of a drug manufacturer. Plunkett Dep. 88:3-89:9 (NF Tab 14). *See Daubert,* 43 F.3d at

evidence" methodology, cherry-picks the studies that favor her conclusion-oriented opinion, and relies on classes of scientific evidence courts repeatedly have rejected. As discussed above, she can not identify any direct mechanism of action by which Seroquel leads to diabetes nor provide any evidence of a dose-response between Seroquel and weight gain or diabetes. For these reasons, her opinion is inadmissible.

**1. Dr. Plunkett's "Weight Of The Evidence" Methodology Is Scientifically Unreliable.**

Dr. Plunkett's causation opinion rests entirely on a "weight of the evidence" methodology other courts have squarely rejected.[70] *See Allen*, 102 F.3d at 198; *Magistrini*, 180 F. Supp.2d at 607. Under this "methodology," Dr. Plunkett allegedly reviews the totality of the science, both those data that support causation and those that do not. The fatal flaw in Dr. Plunkett's method is that she fails to explain *how and why she gave more weight to the evidence allegedly favoring causation than to the contrary evidence*. Without an explanation of her alleged process, Dr. Plunkett's methodology is revealed as a "mere conclusion-oriented selection process":

> In order to ensure that the "weight-of-the-evidence" methodology is truly a methodology, rather than a mere conclusion-oriented selection process that weighs more heavily those studies that supported an outcome, **there must be a scientific method of weighting that is used and explained.**

*Magistrini*, 180 F. Supp.2d at 607 (emphasis added); *see also McClain*, 401 F.3d at 1248 (holding that "intellectual rigor" required for admissible opinion demands that expert not "leap to specific conclusions about causation" based on "incomplete evidence"); *Cano*, 362 F. Supp.2d at 851 ("failure to consider both positive and negative associations in the

---

1317 (court may not ignore fact that scientist's normal workplace is lab or field, not courtroom or lawyer's office).

[70] Plunkett Rep. at ¶ 29 (NF Tab 15); Plunkett Dep. 148:1-149:10 (NF Tab 14).

literature is not reliable methodology."); *Colon v. Abbott Labs.*, 397 F. Supp.2d 405, 415 (E.D.N.Y. 2005) (excluding expert who failed to adequately explain "scientific findings that contradict his opinions").[71]

Here, Dr. Plunkett's conclusion-oriented selection process is apparent because she only includes studies in her report that she claims support her opinions:

> Q. Did you cite to any of those studies in your report?
> A. I wouldn't because of the fact that I'm stating here for you in very clear terms my weight of the evidence, the data that I believe is consistent with my finding and that's the data that I'm giving you here.[72]

Dr. Plunkett pays lip service to the substantial evidence contradicting her opinion by including some of it in her "reference list," but she fails to cite those studies in her report, much less attempt to discredit them or even discuss any methodological approach for weighting or otherwise analyzing them.[73] *See Magistrini,* 180 F. Supp.2d at 607 (excluding expert because he did not "sufficiently discredit other studies that found no association or a negative association with much more precise confidence intervals, nor sufficiently explain why he did not accord weight to those studies").

The "conclusion-oriented selection process" that renders her methodology inadmissible is apparent throughout Dr. Plunkett's report. For example, there are twenty observational studies in the published peer-reviewed literature that assess rates of diabetes in Seroquel-treated patients. Consistent with her flawed methodology, Dr. Plunkett does not cite or discuss the twelve out of the twenty observational studies that

---

71 In terms of clinical trials, Dr. Plunkett formed her opinions before she even read Studies 125, 126 or 127. Plunkett Dep. 505:13-19 (NF Tab 14).

72 *Id.* 251:11-15 (NF Tab 14).

73 *Id.* 251:5-253:10 (NF Tab 14).

found *no* relationship between Seroquel and diabetes, and she does not offer any justification for ignoring them.[74]

Dr. Plunkett's blatantly biased selection of the scientific evidence is also apparent from her citation to a 2005 study by Henderson ("Henderson 2005")[75] to support her claim that Seroquel can cause insulin resistance. In Henderson 2005, the authors studied *clozapine*- and *olanzapine*-treated patients, not Seroquel-treated patients, but Dr. Plunkett nevertheless relies on the study because of the alleged chemical similarity between the different drugs. Incredibly, Dr. Plunkett does not cite, and appears to have never seen, a 2006 paper (i) by the same investigators; (ii) applying the same methodology to Seroquel-treated patients; and (iii) concluding that *Seroquel is not associated with greater insulin resistance*.[76]

Moreover, Henderson 2005 is not the only example of Dr. Plunkett relying on papers investigating other antipsychotics while ignoring contrary results for Seroquel. Dr. Plunkett cites three papers by Melkersson (2000, 2003, and 2004) to support her claim that other antipsychotics could affect basal insulin levels in mice and, therefore, Seroquel could do the same.[77] Again, however, Dr. Plunkett fails to cite a fourth Melkersson paper (2005) actually *investigating Seroquel – the drug at issue in* ***this*** *litigation* – and demonstrating that Seroquel does not have the same effect.[78] Her explanation for this omission is striking:

---

[74] *See* Koplan Dec. at ¶ 25 (NF Tab 4).

[75] Plunkett Dep. 468:2-471:19 (NF Tab 14).

[76] *Id.* 472:18-478:23 (NF Tab 14).

[77] *Id.* 198:22-201:23 (NF Tab 14).

[78] *Id.* 206:2-207:2 (NF Tab 14).

Q. Right. You didn't cite to it in any of your materials, did you?
A. No. It's not cited in my report because, again, it doesn't have a finding that would lead to the description in my report.[79]

Clearly, the same flaws that have led multiple courts to exclude opinions based on cherry-picked data are present here, and Dr. Plunkett's methodologically bankrupt causation opinion should be excluded. *See In re Bextra and Celebrex*, 524 F. Supp.2d at 1176 ("cherry-picking observational studies that support [the expert's] conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion .... does not reflect scientific knowledge, is not derived by the scientific method, and is not 'good science;' it is therefore inadmissible."); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 563 (S.D.N.Y. 2004) ("[The expert]'s selectivity in defining the universe of relevant evidence thus violated his own standard of proper methodology that '[a]ll evidence should be taken into account'").

**2. Dr. Plunkett Relies On Scientific Evidence Courts Routinely Reject As Unreliable.**

The allegedly favorable evidence that Dr. Plunkett does discuss in her "weight of the evidence" assessment is, in and of itself, decidedly unreliable because Dr. Plunkett places significant stock in scientific evidence that cannot reliably support a causation opinion under the law of this circuit. An expert "cannot lump together lots of hollow evidence in an attempt to determine what caused a medical harm." *Siharath,* 131 F. Supp.2d at 1371. Rather, the "culmination of evidence will clearly only lead to a valid result if the various elements of proof which are brought together each have some individual validity in and among themselves." *Id.* (citation omitted); *see Caraker v. Sandoz Pharm., Corp.*, 188 F. Supp.2d 1026, 1040 (S.D. Ill. 2001) (excluding expert

[79] *Id.* 206:22-207:1 (NF Tab 14).

causation opinion that "amount[ed] to a hollow whole of hollow parts"). In short, hollow bricks make a hollow wall, and Dr. Plunkett's unsupported opinion should be excluded.

**a. Dr. Plunkett Extrapolates Improperly From Data Involving Other Drugs.**

As discussed above, Dr. Plunkett repeatedly relies on studies of other antipsychotics to support her opinion while ignoring identical studies of Seroquel by the same investigators that reach directly contrary results. Her reliance on studies of other drugs is flawed for the additional reason that "even small differences in chemical structure can sometimes make very large differences in the type of toxic response that is produced." *McClain*, 401 F.3d at 1246; *see also Rider*, 295 F.3d at 1201 (same); *In re Accutane*, 511 F. Supp.2d at 1294 ("while Accutane is . . . derivative of vitamin A, the human body reacts to Accutane and vitamin A in different ways"). Dr. Plunkett, in fact, admits in her own report that "there are apparent differences among anti-psychotic drugs in terms of risks of diabetes, weight gain and other adverse health effects," and that "side effects arising through the consumption of Seroquel cannot be described as a 'class effect' for all atypical anti-psychotic drugs."[80] In light of those concessions and the contrary evidence she ignores, Dr. Plunkett's reliance on alleged "chemical similarities" to other antipsychotics as support for her causation opinion cannot survive scrutiny under *McClain*, *Rider* and *In re Accutane*.

---

[80] Plunkett Rep. at ¶ 32 (NF Tab 15).

**b. Dr. Plunkett Relies On Case Reports And Case Series.**

Case reports and case series[81] of individuals who experience an adverse event coincident with drug use do not provide reliable scientific evidence of causation. "Case reports raise questions; they do not answer them." *McClain*, 401 F.3d at 1254; *see also Rider*, 295 F.3d at 1197; *In re Accutane*, 511 F. Supp.2d at 1298. Nonetheless, more than twenty percent of the articles Dr. Plunkett identifies in her report as the basis for her "weight of the evidence" assessment are either case reports or adverse event reports,[82] and they unquestionably form one of the "hollow bricks" holding up her opinion.[83]

**c. Dr. Plunkett Relies On Animal Studies.**

As the court explained in *In re Accutane*, animal studies have significant disadvantages when cited as evidence of causation in humans, emphasizing that "the high doses customarily used in animal studies require consideration of the dose-response relationship and whether a threshold no effect dose exists. These matters are almost always fraught with considerable, and currently unresolvable, uncertainty." 511 F. Supp.2d at 1292. Dr. Plunkett also acknowledges in her deposition that "you really have to rely on what the human experience tells you because animals aren't always predictive of humans."[84]

---

[81] A case report is a simple observation that a patient has a disease, syndrome or other condition following drug ingestion, an environmental exposure or other event. A case series is simply a series of individual case reports. Fed. Jud. Ctr. *Reference Manual on Scientific Evidence* 480 (2d ed. 2000).

[82] Plunkett Rep. at ¶ 29 (NF Tab 15).

[83] *See* Plunkett Dep. 354:13-355:25 (relying on case reports for alleged capacity of Seroquel to exacerbate pre-existing diabetes), 465:8-466:14 (relying on case reports for alleged capacity of Seroquel to cause diabetes directly), 480:12-24 (relying on case reports for alleged capacity of patients on Seroquel to shift to fasting glucose levels greater than or equal to 126 mg/dL) (NF Tab 14).

[84] *Id.* 95:11-14 (NF Tab 14).

Ignoring her own advice, Dr. Plunkett relies in her "weight of the evidence" assessment on animal studies,[85] including, for example, an animal model that showed weight gain in mice receiving 60mg/kg/day, or 4200 mg for the average 70 kg human, much more Seroquel than a human would ever ingest.[86] In the study, mice receiving 30mg/kg/day (2100 mg for the average 70 kg human, still much more than a human would ever ingest) did not gain weight.[87]

**d. Dr. Plunkett Relies On Confounded Data.**

Dr. Plunkett acknowledges that the observational epidemiologic studies upon which she relies are confounded[88] in that most fail to control for baseline obesity and family history of diabetes[89] or for mental illness, which she squarely acknowledges is independently associated with increased diabetes risk regardless of drug use.[90] It is well-recognized that "[t]he downside to observational studies is that because the investigators do not control who participates in the study, it is more difficult to control for confounding factors such as .... obesity and the like." *In re Bextra and Celebrex*, 524 F. Supp.2d at 1173. Because confounding is such a serious problem in observational epidemiology, "[w]hen researchers find an association between an agent and a disease, it is ***critical*** to determine whether the association is causal or the result of confounding ... that is, [whether] the observed association of a factor and disease is actually the result of an

---

[85] *Id.* 96:12-14 ("Q. Well, as part of your opinion that Seroquel causes diabetes, you rely on animal studies, correct? A. Yes.") (NF Tab 14).

[86] Notably, while seeking to rely on animal studies that she contends supports her causation opinion, Dr. Plunkett acknowledges that she has not considered the dozens of animal studies conducted by AstraZeneca as part of its preclinical submission to FDA. *Id.* 94:11-18 (NF Tab 14).

[87] Plunkett Rep. at ¶ 29 (NF Tab 15); Cope, et al., *Antipsychotic Drug-Induced Weight Gain: Development of an Animal Model*, Intl J Obesity (2005) 29, 607-614 (NF Tab 21).

[88] Plunkett Dep. 233:8-13; 241:3-242:18 (NF Tab 14); *see supra* note 28.

[89] *Id.* 241:23-242:18 (NF Tab 14).

[90] *Id.* 225:5-7; 233:3-7 (NF Tab 14).

association with a third, confounding factor. Failure to recognize confounding can introduce bias – error – into the findings of the study." *In re Accutane*, 511 F. Supp.2d at 1291 n.2 (emphasis added). Dr. Plunkett, however, makes absolutely no effort to account for such confounding anywhere in her analysis, which is fatal to her opinion. *See Joiner*, 522 U.S. at 146 (rejecting reliance on study reporting a statistically significant increased incidence of lung cancer deaths in a PCB-exposed group where the subjects "had been exposed to numerous potential carcinogens"); *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 252-54 (6th Cir. 2001) (failure to account for confounding factors in cohort study of alleged PCB exposures rendered opinion unreliable); *Magistrini*, 180 F. Supp.2d at 604 ("[w]hen evaluating the internal validity of a study, the researcher or scientist ***must*** account for the roles of bias, confounding factors, and the likelihood that the observed association is due to chance.") (emphasis added).

In short, Dr. Plunkett's proffered opinion is infected with numerous methodological failings recognized by the Eleventh Circuit and other courts around the country. Her unreliable general causation opinion is inadmissible.

**D. The Court Must Exclude The General Causation Opinions Of Dr. Donna Arnett.**

Dr. Donna Arnett, an epidemiologist with a Ph.D. but no medical degree, proposes to testify that Seroquel "leads to clinically significant and relevant metabolic risk, including weight gain and other metabolic complications, including but not limited to hypertriglyceridemia, insulin resistance, and diabetes."[91] Dr. Arnett's opinion is riddled with the consequences of her admission that she filed her report in this case before her work was done and that she did not review or properly analyze the key clinical

---

91 Arnett First Rep. at 3 (NF Tab 16).

trial data. Dr. Arnett fails to address those data that contradict her opinions, relying instead on non-significant results and confounded observational epidemiology.

**1. Reaching Her Conclusions Before Completing Her Review Of The Relevant Scientific Evidence, Dr. Arnett Fails To Apply The Same Level Of Intellectual Rigor Practiced By Scientists Outside Of The Courtroom.**

Elementary methods of science in and out of the courtroom require a scientist to review and analyze all relevant data before a conclusion is reached. *See McClain*, 401 F.3d at 1248 (experts may not "leap to specific conclusions about causation...from incomplete evidence...."); *Kumho*, 526 U.S. at 152.[92]

Dr. Arnett confirmed in her deposition that she reached her conclusions and submitted her expert report ***before*** she reviewed all of the relevant scientific literature because she simply "ran out of time."[93] In fact, after submitting her report, Dr. Arnett felt the need to go back and spend at least three 8-hour days reviewing additional science because she had not extensively reviewed the published literature:

> Q. How much more time have you spent working on this case since you issued your first report?
> A. 25 hours.
> Q. Doing what?
> A. Doing additional PubMed searches and reviewing articles related to case control and cohort studies of diabetes outcomes.
> Q. You did that after you submitted your first report?
> A. Yes.
> Q. Why?
> A. Because when I -- I was on a short time frame to get the first report done, ***and I hadn't had time to extensively review all of the published literature. I'd reviewed some of it. So I thought I needed more detail.***
> Q. So at the time you prepared your first report, you didn't extensively review the published literature; you reviewed some subset of it?
> A. Yes.[94]

---

92 Koplan Dec. at ¶ 19 (NF Tab 4).

93 Arnett Dep. 177:19-178:2 (NF Tab 3).

94 *Id.* 68:19-69:14 (emphasis added) (NF Tab 3).

Although she acknowledges that randomized clinical trials are the best method to test the hypothesis that Seroquel causes diabetes or weight gain,[95] Dr. Arnett did not review the actual clinical study reports on those trials which were provided to her.[96] More particularly, she failed to review in detail AstraZeneca's Study 125, discussed above. That omission is particularly significant because Study 125 was specifically designed to evaluate changes in glucose metabolism measured by the gold-standard validated OGTT as a primary endpoint, collected data over 6 months, and *failed to find a statistically-significant change* in results of the OGTT.[97] Dr. Arnett's apparent time crunch also caused her to fail to review the 2008 FDA Submission[98] and caused her not to review the full set of studies from the government-funded CATIE trials,[99] another source of clinical trial data she claims is important to her opinions.[100]

Failing to read and understand the most important data before reaching a conclusion is a telltale sign of an opinion that does not meet scientific standards and should be excluded. Dr. Arnett's admitted effort to shore up her opinions with significant work after she submitted her report confirms this conclusion. *See Claar*, 29 F.3d at 502-03 ("[c]oming to a firm conclusion first and then doing research to support it is the antithesis of this [scientific] method.").

---

95 *See Id.* 291:17-292:2 and 255:7-14 (NF Tab 3); and Koplan Dec. at ¶ 20 (NF Tab 5).

96 *See* Arnett Dep. 91:7-24; 187:13-16; 166:1-4 (NF Tab 3).

97 Koplan Dec. at ¶ 23 (NF Tab 5).

98 Arnett Dep. 97:4-13 (NF Tab 3).

99 The Clinical Antipsychotic Trials of Intervention Effectiveness (CATIE) is a government-funded study addressing antipsychotic drugs. *See* Koplan Dec., Exhibit 1, at 16 (NF Tab 5).

100 Arnett Dep. 263:17-23 ("Q. Did you review all of the CATIE studies and the follow-up studies? A. Every CATIE follow-up study? Q. Yes. A. Not every CATIE follow-up study. Q. Why not? A. I didn't have sufficient time." ) (NF Tab 3).

### 2. Dr. Arnett Relies On Scientific Evidence Courts Routinely Reject As Unreliable.

As with Dr. Plunkett, Dr. Arnett attempts to build her opinion by "lump[ing] together lots of hollow evidence in an attempt to determine what caused a medical harm." *Siharath*, 131 F. Supp.2d at 1371. For her part, Dr. Arnett starts by casually dismissing the generally accepted epidemiologic principle that a causal inference cannot be made on the basis of a statistically non-significant relative risk:

> Q. Good. When a relative risk is not statistically significant, can you draw any causal inference from that relative risk?
> A. Yes.
> Q. Do you draw causal inferences when you write your articles based on relative risks that are not statistically significant?
> A. Yes.[101]

Dr. Arnett's position cannot be squared with accepted principles of epidemiology nor with the position of numerous courts, including the Supreme Court, that have rejected reliance on statistically insignificant results. *See Joiner*, 522 U.S. at 145 (rejecting reliance on a study reporting an increased incidence of lung cancer deaths because the increase "was not statistically significant"); *Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp.2d 672, 681 (M.D.N.C. 2003) ("[s]tatistically insignificant results do not constitute proof"); *Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp.2d 434, 533 (W.D. Pa. 2003) ("Courts have emphasized that epidemiologic proof must be statistically significant.").[102]

Here, a non-statistically significant result lies at the heart of Dr. Arnett's opinion. Dr. Arnett relies upon a relative risk of 2.02 (RR 2.02, p=0.49, 95% CI 0.31-12.04) for

---

[101] *Id.* 20:6-13 (NF Tab 3).

[102] *See also Magistrini*, 180 F.Supp.2d at 605 ("[s]tatistical methods are required to determine the precision with which risks have been estimated."); *Siharath*, 131 F. Supp.2d at 1356 (rejecting reliance on epidemiologic study reporting 8.4 relative risk of stroke associated with drug use, where finding was not statistically significant); *Caraker*, 188 F. Supp.2d at 1034 (rejecting experts' opinions "inasmuch as they rely on selective use of statistically insignificant data from epidemiological studies").

Seroquel and diabetes, drawn from the AstraZeneca clinical trials,[103] which she believes to be the most important evidence of causation. Dr. Arnett agrees that this number is not statistically significant, which is an understatement. A statistically significant association has two components: (i) a confidence interval that does not include 1.0 and (ii) a p-value ≤0.05.[104] Dr. Arnett's confidence interval (0.31 to 12.04) indicates that the true risk might be anywhere between 0.31 on the low end - which would mean the opposite of an association, *i.e.*, that people exposed to Seroquel are less likely to develop diabetes – and 12.04 on the high end. The p-value of 0.49 indicates that there is approximately a 50% chance (a coin flip) that the observed result is due to chance alone; generally, a p-value of ≤0.05 is considered to be statistically significant, indicating that the results are only 5% likely to be due to chance. Dr. Arnett relies on multiple other statistically insignificant results.[105]

Dr. Arnett's assertions that the power of a study somehow permits reliance on risks that do not reach statistical significance confirm the lack of scientific methodology underlying her opinions.[106] Epidemiologists perform "power calculations" to help improve the chances of generating statistically significant results by determining the appropriate number of subjects and other parameters of study design at the study's inception.[107] After a study is complete, the results are either statistically significant or

---

[103] *See* Arnett First Rep. at 10 (NF Tab 16); Arnett Dep. 286:15-287:2 and 227:5-20 (NF Tab 3).

[104] Koplan Dec. at ¶ 15 (NF Tab 4); *see also* Arnett Dep. 20:17-22 (agreeing that the generally accepted criteria for statistically significance are a p-value of less than 0.05 and a confidence interval that does not cross one) (NF Tab 3).

[105] *See* Arnett Dep. 153:14-155:6 (calculating relative risk of weight gain which is not statistically significant at standard $p < 0.05$) and 164:4-165:4 (comparison of weight gain > 7% which is not statistically significant at standard $p < 0.05$) (NF Tab 3).

[106] *See, e.g.*, *Id.* 164:13-18; 227:17-20; 228:19-23 (NF Tab 3).

[107] Koplan Dec. at ¶ 16 (NF Tab 4).

they are not.[108] Thus, even assuming a study were not sufficiently powered to detect a given result, that fact does not magically allow Dr. Arnett to rely on statistically insignificant data.[109] More importantly, Dr. Arnett *did not perform any retrospective power calculations* and, therefore, has no basis to opine that power calculations would somehow justify her violation of bedrock epidemiological principles:

> Q. What's your basis for this 2.02 calculation? Do you know?
> A. The basis for this was the -- as cited in the June 2007 clinical overview, these were data derived from that clinical overview.
> Q. Okay. Now, the P value, .49, do you see that?
> A. Yes.
> Q. That's not statistically significant, is it?
> A. No.
> Q. Now --
> A. But, again, this wasn't powered to detect that significant finding either.
> Q. ***Did you calculate that power?***
> ***A. Not yet.***[110]

Dr. Arnett's willingness to opine that a study is not sufficiently powered *before* she does a power calculation further confirms the unreliability of her opinions.

### 3. Dr. Arnett's Methodology Is Flawed Because She Cherry-Picks Data Supporting Her Opinion And Disregards The Scientific Evidence To The Contrary.

As noted above, the principles of *Daubert* – and of scientific method – prohibit an expert from cherry-picking data supporting an opinion while rejecting contrary science without explanation. *See In re Bextra and Celebrex*, 524 F. Supp.2d at 1176; *Cano*, 362 F. Supp.2d at 851 ("failure to consider both positive and negative associations in the literature is not reliable methodology"); *see also McClain*, 401 F.3d at 1248 (drawing

---

[108] *Id.* at ¶ 16 (NF Tab 4).

[109] *Id.* at ¶ 16 (NF Tab 4).

[110] Arnett Dep. 153:25-155:6; 164:10-18 (NF Tab 3).

"unauthorized conclusions from limited data" lacks scientific rigor); *Magistrini,* 180 F. Supp.2d at 607.

Dr. Arnett concedes that she does not know of any randomized clinical trials— which she deems most important in determining causation— that establish that Seroquel causes diabetes.[111] Therefore, she turns to observational epidemiology to support her opinion, but, just like Dr. Plunkett, Dr. Arnett simply cites those studies she likes and ignores the rest. Out of the twenty observational studies in the published literature, Dr. Arnett fails to discuss nineteen in her original report.[112] Recognizing her own deficiencies, Dr. Arnett attempted to remedy the situation in her amended report[113] by cherry-picking nine studies purportedly showing evidence of an association (three of which actually report a statistically insignificant association) while continuing to ignore the remainder. Thus, Dr. Arnett's reported range of relative risks from the observational epidemiology of between 1.7 and 33[114] completely ignores the majority of the relevant studies that report no statistically significant increase in diabetic risk with Seroquel.[115] Dr. Arnett offers no explanation whatsoever for her exclusion of those studies. In fact, her claim that her literature review did not turn up any studies contrary to her opinion suggests she did not even find the studies before forming her opinion.[116] *See Colon*, 397 F. Supp.2d at 410 (excluding causation opinion where majority of epidemiologic studies did not report statistically significant increase in risk).

[111] *Id.* 206:6-13 (NF Tab 3).

[112] Arnett First Rep. at 10 (NF Tab 16).

[113] Dr. Arnett's amended report was produced after the deadline for submitting expert reports. Defendants do not waive any objections to consideration of the material in the amended report.

[114] Arnett Dep. 288:2-6 (NF Tab 3).

[115] *See* Koplan Dec. at ¶ 25 (NF Tab 4).

[116] Arnett Dep. 73:11-15 (NF Tab 3).

When questioned, Dr. Arnett refused to be more specific about her cherry-picked risks:

> Q. Can you be any more specific about the relative risk that you say applies for Seroquel when it comes to diabetes other than that it's somewhere between 1.7 and 33?
> A. Today I won't be any more specific.[117]

Because she does not provide a scientifically reliable reason for her decision to ignore the contradictory data, Dr. Arnett offers an unreliable and inadmissible opinion. *See Cano*, 362 F. Supp.2d at 851.

**4. Dr. Arnett Relies On Confounded Data Without Explanation.**

As noted above, Rule 702 requires an expert to account for confounding and bias[118] when relying on epidemiologic evidence. *In re Accutane*, 511 F. Supp.2d at 1291 n.2 ("it is critical to determine whether the association is causal or the result of confounding"); *Allison*, 184 F.3d at 1315 (noting that bias in a study can "skew[] the results and ultimately [make] its conclusion suspect"); *Magistrini*, 180 F. Supp.2d at 604 ("[w]hen evaluating the internal validity of a study, the researcher or scientist ***must*** account for the roles of bias, confounding factors, and the likelihood that the observed association is due to chance.") (emphasis added). Like Dr. Plunkett, Dr. Arnett does not provide such an accounting with regard to the observational epidemiologic studies upon which she relies so heavily.

At her deposition, Dr. Arnett admits to the severe limitations of the observational epidemiology: (i) "most are short term, both in terms of the time of exposure to Seroquel

---

[117] *Id.* 288:2-6 (NF Tab 3).

[118] *See supra* note 28.

as well as the time to follow-up of the incident diabetes;"[119] (ii) "most rely on administrative databases to define exposure to Seroquel as well as diabetes definitions, which are based on primarily either ICD9 codes or medication pharmacy records;"[120] and (iii) "they're not comparing Seroquel to nontreament."[121] Dr. Arnett admits that she did not know the relative strengths of the various risk factors for diabetes, such as obesity and smoking,[122] which could also confound these studies.[123] While she admits the existence of the confounding, Dr. Arnett offers no explanation for her reliance on these studies.

**5. Dr. Arnett Reaches Conclusions The Study Authors Do Not Reach.**

Dr. Arnett's flawed methodology ignores warnings from the study authors about the limitations of the data. *See McClain,* 401 F.3d at 1248 (noting the "lack of scientific rigor" in drawing "unauthorized conclusions from limited data -- conclusions the authors of the study do not make"). For example, she cites in her original report only a single epidemiologic study, Guo 2007,[124] but she ignores the authors' strong warning regarding sources of confounding: "*It is unclear, however, whether the diabetes in the study population is due to the use of atypicals* versus the underlying condition of bipolar disorder versus characteristics of the Medicaid population such as socioeconomic status,

---

[119] *Id.* 291:13-292:14 (NF Tab 3).

[120] Administrative databases are comprised of data primarily collected for financial and administrative purposes of health insurers and not for asking epidemiologic or health questions. Because of the nature of administrative data, important information relevant to answering the scientific question in the study often is not available to the investigators. Koplan Dec. at ¶ 25 (NF Tab 4); *see* Scientific Background, *supra*.

[121] Arnett Dep. 305:24-306:13 (NF Tab 3).

[122] *Id.* 28:14-24 (NF Tab 3).

[123] Koplan Dec. at ¶ 25 (NF Tab 4).

[124] Jeff J. Guo et al., *Risk of Diabetes Mellitus Associated with Atypical Antipsychotic Use Among Medicaid Patients with Bipolar Disorder: A Nested Case-Control Study*, Pharmacotherapy 27(1): 27-35 (2007) (NF Tab 18).

poor overall physical health, unhealthy lifestyles, and poor access to health care services."[125]

Dr. Arnett similarly ignores the authors of Vieta 2008,[126] which is the publication of the data in Study 126, one of the clinical trials on which Dr. Arnett relies. The authors were explicit: "[g]iven the absence of definitive diagnostic testing within the design of this study, reliable and accurate determination of incidence and risk for diabetes for patients enrolled in this study is not possible."[127] Dr. Arnett's decision to ignore this warning had immediate consequences in her report. Dr. Arnett claims in her report that Studies 126-127 show a substantially higher percentage of patients on Seroquel with glucose readings above 200 mg/dL as compared to patients on placebo; those calculations were based upon 17 patients using Seroquel.[128] However, Dr. Arnett cites those data as evidence that Seroquel *causes* diabetes without realizing that 14 of those 17 patients had high glucose readings *before beginning treatment.*[129] In short, Dr. Arnett's testimony demonstrates precisely why drawing conclusions about a study which are contrary to those established by the actual authors of the study is a strong indicator of unreliability. *McClain,* 401 F.3d at 1247 (an expert's "inclination to draw overreaching conclusions from self-limiting medical articles [ ] show[s] the speculative nature of his opinions"); *Colon*, 397 F. Supp.2d at 414 (same, quoting *McClain*); *Daubert,* 43 F.3d at 1317 n.4

---

125 *Id.* at 32 (NF Tab 18).

126 Eduard Vieta et al., *Efficacy and Safety of Quetiapine in Combination with Lithium or Divalproex for Maintenance of Patients with Bipolar I Disorder*, J. Affective Disorders 109(3): 251-263 (2008) (Study 126) (NF Tab 19).

127 *Id.* at 260 (NF Tab 19).

128 Arnett First Rep. at 9 (NF Tab 16); Arnett Dep. 217:5-8 (NF Tab 3).

129 *See* Arnett Dep. 217:9-23 (NF Tab 3); Koplan Dec. at ¶ 24 (NF Tab 4)

(excluding causation opinions of experts who drew "different conclusions that the scientists who performed the original work").

In summary, together with the additional short-comings discussed above, these methodological flaws pervade Dr. Arnett's opinion, and the application of the controlling *Daubert* authority demands exclusion of her proffered testimony.

**E. The Court Must Exclude The General Causation Opinions Of Dr. William Wirshing.**

Dr. Wirshing does not actually offer an opinion that Seroquel causes diabetes. Instead, Dr. Wirshing opines that Seroquel causes weight gain and, as a result, Dr. Wirshing contends "it is axiomatic" that Seroquel will lead to diabetes - eventually.[130] Asserting that a premise is "axiomatic" cannot substitute for scientific proof justifying Dr. Wirshing's leap from weight gain allegedly caused by Seroquel to the development of diabetes. An expert must supply "good grounds for each step in the analysis," *McClain*, 401 F.3d at 1245, and "leaping from an accepted scientific premise to an unsupported one," is not remotely sufficient under *Daubert*. *Allison*, 184 F.3d at 1314; *see also Brown*, 2008 WL 2397601, at *2 ("whether an accepted premise is being extrapolated to unfounded claims," has become a key part of the *Daubert* analysis); *Joiner*, 522 U.S. at 146 (holding that the "ipse dixit" of the expert is not enough to establish admissibility). Dr. Wirshing's scientific leap is particularly egregious because he ignores the substantial data that contradicts his allegedly "axiomatic" conclusion.

---

[130] Wirshing Rep. at 8 (NF Tab 20); Wirshing Dep. 40:21-24 (NF Tab 10).

**1. Dr. Wirshing Has No Scientifically Reliable Basis For Extrapolating From Weight Gain Allegedly Related To Seroquel To Diabetes.**

Dr. Wirshing's only alleged link between Seroquel and diabetes is through weight gain,[131] but Dr. Wirshing's own testimony demonstrates that whether weight gain could eventually lead to diabetes is not even remotely "axiomatic." Thus, Dr. Wirshing concedes, as he must, that there is a difference between evidence linking Seroquel to diabetes and evidence linking it to weight gain.[132] Dr. Wirshing also admits there is a "pathophysiologic process" that has to occur before weight gain will lead to diabetes and that the process could take "a good deal of time," which explains why "the data might not be there" at present.[133] Dr. Wirshing does not offer *any* evidence that people who take Seroquel actually gain enough weight and retain it for a long enough period of time to trigger the "pathophysiologic process" he claims leads to diabetes. *McClain*, 401 F.3d at 1245 ("*any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.") (emphasis added).

**2. Dr. Wirshing Ignores The Data That Contradicts His Opinion And Relies Instead On The Cherry-Picked Weight Gain Data.**

Dr. Wirshing's cherry-picking of data to support his opinion is altogether on another scale because he substitutes an entirely different endpoint – weight gain – for the endpoint in question – diabetes. *See McClain*, 401 F.3d at 1248; *In re Bextra and Celebrex*, 524 F. Supp.2d at 1176; *Magistrini*, 180 F. Supp.2d at 607. Dr. Wirshing concedes that the observational epidemiological studies do not demonstrate that Seroquel

---

[131] Wirshing Dep. 40:21-24 (NF Tab 10).

[132] *Id.* 210:17-23 (NF Tab 10).

[133] *Id.* 210:24-211:7 (NF Tab 10).

causes diabetes directly[134] and also do not demonstrate that Seroquel causes diabetes through weight gain.[135] Dr. Wirshing's report does not even reference any clinical trial data relevant to the relationship between Seroquel and diabetes. Lacking any observational epidemiological or clinical trial data to support his opinion that Seroquel causes diabetes, Dr. Wirshing simply cherry-picks the data on weight gain as a poor substitute. Because weight gain and diabetes are decidedly different endpoints, Dr. Wirshing's decision to ignore the data actually addressing the issue of diabetes, and to offer instead only his opinion that the development of diabetes in this situation is "axiomatic," renders his entire opinion inadmissible. Dr. Wirshing has leapt to an unsupported premise, relying entirely on his own "ipse dixit" to fill the scientific void. *McClain*, 401 F.3d at 1245; *Joiner*, 522 U.S. at 146.

Dr. Wirshing's weight gain hypothesis lacks a direct mechanism, lacks evidence of a dose-response, lacks evidence of the amount of weight gain necessary to trigger the "pathophysiologic process" leading to diabetes, and lacks evidence of any reliable link between weight gain in Seroquel-treated persons and diabetes. Accordingly, Dr. Wirshing's scientific leap lands well short of the standard for an admissible scientific opinion.

### F. Plaintiffs' Case-Specific Witnesses Offer No Support For Any General Causation Opinions.

Plaintiffs' case-specific witnesses do not address general causation in any methodological fashion. Nevertheless, to the extent Plaintiffs may attempt to rely upon

---

[134] *Id.* 277:24-278:5 (NF Tab 10).
[135] *Id.* 278:6-20 (NF Tab 10).

opinions of those witnesses to bolster the flawed general causation opinions of Drs. Arnett, Plunkett and Wirshing, this Court should exclude any such testimony.

Psychiatrist Dr. I. Jack Abramson (Plaintiffs McAlexander and Haller) explicitly refuses to offer a general causation opinion that Seroquel can cause diabetes, saying he "would much rather be specific than general."[136] Dr. Abramson admits that he did not read the published scientific literature on Seroquel or the Seroquel clinical trial reports.[137] Before his deposition, Dr. Abramson never even saw the "Reference Exhibit List" of studies and other materials that Plaintiffs' counsel appended to his expert reports.[138] Dr. Abramson also repeatedly concedes that he does not know the mechanism by which Seroquel allegedly causes diabetes and that the mechanism is "unknown to the medical community."[139] *See McClain*, 401 F.3d at 1253.

Psychiatrist Dr. Mitchell Young (Plaintiffs Unger and Whittington) also does not offer a general causation opinion that Seroquel causes diabetes. Instead, he appears to assert, without scientific support, that Seroquel is somehow a "risk factor" merely because "there is a temporal association between diagnosis and receipt of medication and, therefore, [he is] able to render that opinion."[140] *See McClain*, 401 F.3d at 1243. Dr.

---

[136] Abramson Dep. 91:3-9 (Dr. Abramson's deposition transcript is being filed in support of AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses. In an effort to avoid duplicative filings, Defendants refer to the Notice of Filing submitted in connection with the Specific-Causation motion, abbreviated herein as CS NF Tab 6).

[137] *Id.* 98:12-99:11 (CS NF Tab 6). Although he cites a single study by Sernyak, he admits he was "not relying on the Sernyak article one way or the other." Abramson Dep. 87:7-19 (CS NF Tab 6).

[138] *Id.* 20:25-21:20 ("Q. … Have you seen this before? A. No, sir.") (CS NF Tab 6).

[139] *Id.* 197:22-198:25; 274:17-22 ("the exact mechanism by which Seroquel and diabetes are intertwined, is unknown"); 275:3-9 ("the mechanism is not known" and "I'm not in a position to offer a mechanism within reasonable medical certainty.") (CS NF Tab 6).

[140] Young Dep. 100:4-16 (Dr. Young's deposition transcript is being filed in support of AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses. In an effort to avoid duplicative filings, Defendants refer to the Notice of Filing submitted in connection with the Specific-Causation motion, abbreviated herein as CS NF 7).

Young concedes multiple times that the scientific evidence does not demonstrate that Seroquel causes diabetes, including at the extremely low doses.[141]  Nevertheless, he offers his "risk factor" opinion because he would "rather err on the side of caution with a given patient."[142]  Dr. Young has not applied any scientific methodology to the question of whether Seroquel causes diabetes, and he does not offer admissible testimony on the issue of general causation.

Endocrinologist Dr. Brian Tulloch (Plaintiffs Unger, Whittington, McAlexander and Haller) is not qualified to give a general causation opinion because, as he admits, he lacks the expertise to interpret epidemiologic studies and assess their methodological limitations.[143]  *See Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. 655, 667 (D. Mass. 1997).  Even if he were qualified, Dr. Tulloch has no reliable basis for a general causation opinion.  His opinion that Seroquel caused individual plaintiffs to develop diabetes is based entirely on an alleged temporal relationship.[144]  He has no idea of "a dose curve for the relationship of Seroquel to diabetes,"[145] and he cannot identify *any* scientific literature showing that Seroquel is associated with diabetes at doses at or below

---

[141]  Young Dep. 233:23-234:3 (unable to identify any scientific literature concluding that Seroquel causes diabetes); 107:15-17 (data do not support causality); 139:2-17 (data are "still out ... as to whether in some individuals some of the time Seroquel causes diabetes, okay?"); 96:18-97:3 (data are discrepant); 221:4-11 (unable to identify any studies demonstrating causation at low doses). (CS NF Tab 7).

[142]  *Id.* 99:23-100:8; 92:4-10 ("We don't know in fact sitting here today about which theory is correct in terms of the association between Seroquel and diabetes for some individuals some of the time.  It is a risk."); 138:23-139:17 (CS NF Tab 7).

[143]  Tulloch Dep. 144:10-146:18 (Dr. Tulloch's deposition transcript is being filed in support of AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses.  In an effort to avoid duplicative filings, Defendants refer to the Notice of Filing submitted in connection with the Specific-Causation motion, abbreviated herein as CS NF Tab 1).

[144]  *Id.* 541:7-17; *see also* 142:16 – 143:3 (CS NF Tab 1).

[145]  *Id.* 303:13-21 (CS NF Tab 1).

400 mg[146] – the pre-diagnosis dose range of all Plaintiffs on which he sought to opine. *See McClain*, 401 F.3d at 1241-42.

Endocrinologist Dr. Jennifer Marks (Plaintiffs Guinn, Burns and Curley) also has insufficient data to form an opinion about whether Seroquel is capable of causing diabetes or weight gain. Although she did a few computer searches, she did not systematically attempt to collect all of the relevant published literature regarding Seroquel.[147] While her specific causation opinions are based entirely on the alleged temporal association between Seroquel use and short-term weight gain, Dr. Marks could cite no published study or article showing that a short-term weight gain actually increases the risk of diabetes.[148] Indeed, she "hadn't even thought about [that issue] until [counsel] just asked the question" at her deposition.[149] She is not aware of any scientific data showing how long a person has to hold any amount of increased weight for it to be a factor in the acquisition of diabetes.[150] She also knows of no direct mechanism by which Seroquel could cause someone to gain weight.[151]

Finally, Dr. Bruce Perry also has no scientific basis for any general causation opinion. Although he claims to have read "unidentified" studies, he could not name a single study in which the authors concluded that Seroquel causes diabetes.[152] He relies

---

146 *Id.* 302:8-305:14 (CS NF Tab 1).

147 Marks Dep. 39:6-43:21 (Dr. Marks' deposition transcript is being filed in support of AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses. In an effort to avoid duplicative filings, Defendants refer to the Notice of Filing submitted in connection with the Specific-Causation motion, abbreviated herein as CS NF Tab 2).

148 Marks Dep. 336:11-20; 155:22-11; 152:19-153:2 (CS NF Tab 2).

149 Marks Dep. 471:24-472:9 (CS NF Tab 2).

150 Marks Dep. 154:13-16 (CS NF Tab 2).

151 Marks Dep. 176:16-20 ("I don't know of any direct mechanism ....") (CS NF Tab 2).

152 Perry Dep. 273:20-25 (Dr. Perry's deposition transcript is being filed in support of AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses. In an effort to

on weight gain as a mechanism for his opinions, but he could not cite any study showing a link between patients who gained weight and patients who acquired a diagnosis of diabetes.[153]  He also could not identify any studies that were not confounded by a failure to control for obesity,[154] nor could he identify any studies showing that Seroquel at "low" doses of 100 mg or less is associated with weight gain or hyperglycemia or diabetes.[155]  Undeterred by the lack of evidence, he is still willing to give a causation opinion "because I think of the temporal association between taking it and the onset of diabetes."[156]

The scientifically unreliable general causation opinions of Plaintiffs' case-specific witnesses must be excluded under *Daubert*.

## IV.  CONCLUSION

The proffered general causation opinions of Plaintiffs' experts fall far short of the mark the Eleventh Circuit recently reiterated in *McClain* for the admissibility of expert testimony.  These experts gloss over fundamental questions of mechanism, dose, and general acceptance; they ignore legal and scientific principles that require an expert to consider *all* of the available data in a reasoned, and articulated, manner; and they ignore clinical trial data but embrace case reports, animal studies, flawed chemical analogies and confounded observational epidemiology.  Any one of these flaws would weigh heavily against admitting these opinions; taken together, they overwhelmingly demonstrate the

---

avoid duplicative filings, Defendants refer to the Notice of Filing submitted in connection with the Specific-Causation motion, abbreviated herein as CS NF Tab 5).

[153] Perry Dep. 274:1-5 (CS NF Tab 5).

[154] Perry Dep. 135:14-16 (CS NF Tab 5).

[155] Perry Dep. 109:20-110:3 ("No.  I don't think any of the studies actually use doses that low.") (CS NF Tab 5).

[156] Perry Dep. 130:9-15 (CS NF Tab 5).

failure to meet the established admissibility standards in the Eleventh Circuit and require this Court to exercise its gatekeeping discretion to exclude them. Accordingly, Defendants ask this Court to exclude any testimony from Drs. Plunkett, Arnett or Wirshing, or from Plaintiffs' case specific witnesses, that the ingestion of Seroquel can cause diabetes.

DATED: November 3, 2008

Respectfully submitted,

/s/ Jane F. Thorpe
Jane F. Thorpe
Scott A. Elder
ALSTON & BIRD LLP
1201 West Peachtree St.
Atlanta, GA 30309
Telephone: (404) 881-7000
Facsimile: (404) 881-7000
jane.thorpe@alston.com
scott.elder@alston.com

/s/ Chris S. Coutroulis
Chris S. Coutroulis (Fla. Bar No. 300705)
Robert L. Ciotti (Fla. Bar No. 333141)
CARLTON FIELDS, P.A.
Corporate Center Three at International Plaza
4221 W. Boy Scout Blvd.
Tampa, FL 22607
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
ccoutroulis@carltonfields.com
rciotti@carltonfields.com

Steven B. Weisburd
David Venderbush
DECHERT LLP
300 West 6th Street, Suite 1850
Austin, TX 78701
Telephone: (512) 394-3000
Facsimile: (512) 394-3001
steven.weisburd@dechert.com
david.venderbush@dechert.com

Stephen J. McConnell
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19103
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
stephen.mcconnell@dechert.com

Joe G. Hollingsworth
SPRIGGS & HOLLINGSWORTH
1350 I St. N.W.
Washington, D.C. 20005
202-898-5800
202-682-1639
jhollingsworth@spriggs.com

*Counsel for AstraZeneca LP and AstraZeneca Pharmaceuticals LP*

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 3, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system through which all participating parties are deemed served. I further certify that, by using the CM/ECF, the foregoing has been served on plaintiffs' liaison counsel, who is charged with serving any non-CM/ECF participants on the attached Service List.

/s/ ______________________________

**SERVICE LIST**

**In Re: Seroquel Products Liability Litigation**
**MDL Docket No. 1769**

| | |
|---|---|
| Paul J. Pennock, Esq.<br>Michael E. Pederson, Esq.<br>Weitz & Luxenberg, P.C.<br>180 Maiden Lane - 17th Floor<br>New York, NY 10038<br>Telephone: (212) 558-5500<br>Ppennock@weitzlux.com<br>MPederson@weitzlux.com<br>***Plaintiffs' Lead Counsel*** | Camp Bailey, Esq.<br>Michael W. Perrin, Esq.<br>Fletcher Trammell, Esq.<br>Bailey Perrin Bailey LLP<br>The Lyric Centre<br>440 Louisiana, Suite 2100<br>Houston, TX 77002<br>Telephone: (713) 425-7240<br>cbailey@bpblaw.com<br>mperrin@bpblaw.com<br>***Plaintiffs' Lead Counsel*** |
| Larry Roth, Esq.<br>Law Offices of Larry M. Roth, P.A.<br>Post Office Box 547637<br>Orlando, FL 32854-7637<br>Telephone: (407) 872-2239<br>LROTH@roth-law.com<br>***Plaintiffs' Liaison Counsel*** | Tommy Fibich, Esq.<br>Fibich, Hampton & Leebron, L.L.P.<br>1401 McKinney, Suite 1800<br>Five Houston Center<br>Houston, TX 77010<br>Telephone: (713) 751-0025<br>tfibich@fhl-law.com |
| Matthew F. Pawa, Esq.<br>Law Offices of Matthew F. Pawa, P.C.<br>1280 Centre St., Suite 230<br>Newton Centre, MA 02459<br>Telephone: (617) 641-9550<br>Mp@pawalaw.com | Robert L. Salim, Esq.<br>Robert L. Salim Attorney at Law<br>PO Box 2069<br>Natchitoches, LA 71457-2069<br>Telephone: (318) 352-5999<br>robertsalim@cp-tel.net |
| Keith M. Jensen, Esq.<br>Jensen, Belew & Gonzalez, PLLC<br>1024 North Main<br>Fort Worth, TX 76106<br>Telephone: (817) 334-0762<br>kj@kjensenlaw.com | Scott Allen, Esq.<br>Cruse, Scott, Henderson & Allen, L.L.P.<br>2777 Allen Parkway, 7th Floor<br>Houston, Texas 77019<br>Telephone: (713) 650-6600<br>sallen@crusescott.com |
| Matthew E. Lundy, Esq.<br>Lundy & Davis, LLP<br>333 North Sam Houston Parkway East<br>Suite 375<br>Houston, TX 77060<br>Telephone: (281) 272-0797<br>mlundy@lundydavis.com | W. Todd Harvey, Esq.<br>E. Ashley Cranford, Esq.<br>Whatley Drake & Callas<br>2001 Park Place North, Suite 1000<br>Birmingham, AL 35203<br>Telephone: (205) 328-9576<br>ACranford@wdklaw.com |

| | |
|---|---|
| Robert L. Ciotti, Esq.<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard<br>Suite 1000<br>Tampa, FL 33607-5736<br>Telephone: (813) 223-7000<br>rciotti@carltonfields.com<br>***Attorney for Defendants AstraZeneca Pharmaceuticals, LP, and AstraZeneca LP*** | Gregory P. Forney, Esq.<br>Shaffer Lombardo Shurin<br>911 Main Street, Suite 2000<br>Kansas City, MO 64105<br>Telephone: (816) 931-0500<br>gforney@sls-law.com<br>rbish@sls-law.com<br>***Attorney for Defendant, Marguerite Devon French*** |
| Randy Niemeyer<br>22442 Pike 309<br>Bowling Green, MO 63334-5209<br>***Pro Se*** | Eric B. Milliken, Esq.<br>3 Sir Barton Ct.<br>Newark, DE 19702<br>***Pro Se*** |
| Catherine Solomon<br>3100 N.E. 83<br>Gladstone, MO 64119<br>***Pro Se*** | Louisiana Wholesale Drug Co. Inc.<br>C/O Gayle R. White<br>Registered Agent<br>Highway 167N<br>Sunset, LA 70584<br>***Pro Se*** |
| Aaron C. Johnson, Esq.<br>Summers & Johnson<br>717 Thomas<br>Weston, MO 64098<br>Telephone: (816) 640-9940<br>firm@summersandjohnson.com | Robert A. Schwartz, Esq.<br>Bailey & Galyen<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744<br>bschwartz@galyen.com |
| Todd S. Hageman, Esq.<br>Simon and Passanante, PC<br>701 Market St., Suite 1450<br>St. Louis, MO 63101<br>Telephone: (314) 241-2929<br>thageman@spstl-law.com | Mark P. Robinson, Jr., Esq.<br>Robinson, Calcagnie & Robinson<br>620 Newport Center Drive, 7th Floor<br>Newport Beach, CA 92660<br>Telephone: (949) 720-1288<br>mrobinson@robinson-pilaw.com |
| Thomas F. Campion, Esq.<br>Heidi E. Hilgendorff, Esq.<br>Drinker Biddle & Reath, LLP<br>500 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>Telephone: (973) 360-1100<br>Thomas.Campion@dbr.com<br>Heidi.Hilgendorff@dbr.com<br>***Attorneys for Defendants Janssen Pharmaceutical Products and Johnson & Johnson Co.*** | Michael Davis, Esq.<br>James Mizgala, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone: (312) 853-7731<br>mdavis@sidley.com<br>jmizgala@sidley.com<br>***Attorneys for Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals, LP*** |

| | |
|---|---|
| Elizabeth Raines, Esq.<br>Baker, Sterchi, Cowden & Rice, LLC<br>2400 Pershing Road, Suite 500<br>Kansas City, MO 64108<br>Telephone: (816) 471-2121<br>raines@bscr-law.com | Timothy Reese Balducci, Esq.<br>The Langston Law Firm, PA<br>P.O. Box 787<br>100 South Main Street<br>Booneville, MS 38829-0787<br>Telephone: (662) 728-3138<br>tbalducci@langstonlaw.com |
| Kenneth W. Bean, Esq.<br>Sandberg, Phoenix & von Gontard<br>One City Centre<br>15th Floor<br>St. Louis, MO 63101-1880<br>Telephone: (314) 231-3332<br>kbean@spvg.com<br>***Attorney for Defendant Dr. Asif Habib*** | John Driscoll, Esq.<br>Brown & Crouppen, PC<br>720 Olive St.<br>St. Louis, MO 63101<br>Telephone: (314) 421-0216<br>Jdriscoll@brownandcrouppen.com<br>asmith@brownandcrouppen.com<br>blape@brownandcrouppen.com |
| Aaron K. Dickey, Esq.<br>Goldenberg and Heller, PC<br>P.O. Box 959<br>2227 S. State Road 157<br>Edwardsville, IL 62025<br>Telephone: (618) 650-7107<br>aaron@ghalaw.com | Matthew J. Hamilton, Esq.<br>Pepper Hamilton<br>3000 Two Logan Square<br>18th & Arch Street<br>Philadelphia, PA 19103<br>Telephone: (215) 981-4000<br>hamiltonm@pepperlaw.com |
| Justin Witkin, Esq.<br>Ken Smith, Esq.<br>Aylstock, Witkin, Kreis & Overholtz<br>803 N. Palafox St.<br>Pensacola, FL 32501<br>Telephone: (850) 916-7450<br>Jwitkin@AWS-LAW.com<br>ablankenship@aws-law.com<br>ksmith@aws-law.com<br>noverholtz@aws-law.com | David P. Matthews, Esq.<br>Lizy Santiago, Esq.<br>Matthews & Associates<br>2905 Sackett Street<br>Houston, TX 77098<br>Telephone: (713) 222-8080<br>dmatthews@thematthewslawfirm.com<br>lsantiago@thematthewslawfirm.com<br>msalazar@thematthewslawfirm.com |
| Howard Nations<br>Lori A. Siler<br>Howard L. Nations Attorney At Law<br>4515 Yoakum Blvd.<br>Houston, TX 77006-5895<br>Telephone: (713) 807-8400<br>nations@howardnations.com | Mary B. Cotton<br>John D. Giddens, P.A.<br>226 North President Street<br>P.O. Box 22546<br>Jackson, MS 39225-2546<br>Telephone:  (601) 355-2022<br>betsy@law-inc.com |
| Salvatore M. Machi<br>Ted Machi & Associates PC<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744 | Jona R. Hefner, Esq.<br>3441 W. Memorial, Suite 4<br>Oklahoma City, OK 73134-7000<br>Telephone: (405) 286-3000<br>attorneyokc@hotmail.com |

| | |
|---|---|
| David Dickens<br>Miller & Associates<br>105 North Alfred Street<br>Alexandria, VA 22314-3010<br>(703) 519-8080<br>ddickens@doctoratlaw.com | Pete Schneider, Esq.<br>Grady, Schneider & Newman, L.L.P.<br>801 Congress, 4th Floor<br>Houston, TX 77002<br>(713) 228-2200<br>pschneider@gsnlaw.com |
| Fred T. Magaziner<br>Marjorie Shiekman<br>A. Elizabeth Balakhani<br>Shane T. Prince<br>Eben S. Flaster<br>DECHERT LLP<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA 19103<br>(215) 994-4000<br>fred.magaziner@dechert.com<br>shane.prince@dechert.com<br>marjorie.shiekman@dechert.com<br>eben.flaster@dechert.com<br>elizabeth.balakhani@dechert.com | Lawrence J. Gornick, Esq.<br>William A. Levin, Esq.<br>Dennis J. Canty, Esq.<br>Levin Simes Kaiser & Gornick LLP<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 646-7160<br>lgornick@lskg-law.com<br>dcanty@lskg-law.com<br>lsimes@levins-law.com<br>jkaiser@lskg-law.com<br>echarley@lskg-law.com<br>ddecarli@lskg-law.com<br>bsund@lskg-law.com<br>astavrakaras@lskg-law.com |
| Scott Burdine, Esq.<br>Hagans Burdine Montgomery<br>Rustay & Winchester, P.C.<br>3200 Travis, Fourth Floor<br>Houston, TX 77006<br>Telephone: (713) 222-2700<br>sburdine@hagans-law.com | Lowell Finson, Esq.<br>Phillips & Associates<br>3030 North 3rd Street<br>Suite 1100<br>Phoenix, AZ 85012<br>(602) 258-8900<br>lowellf@phillipslaw.ws |
| Gale D. Pearson, Esq.<br>Stephen J. Randall, Esq.<br>Pearson, Randall & Schumacher, P.A.<br>Fifth Street Towers, Suite 1025<br>100 South 5th Street<br>Minneapolis, MN 55402<br>(612) 767-7500<br>attorneys@outtech.com | Robert H. Shultz<br>Heyl, Roster<br>103 West Vandalia Street<br>P.O. Box 467<br>Edwardsville, IL 62025<br>(618) 656-4646<br>rshultz@hrva.com<br>bwallace@hrva.com |
| Ellen R. Serbin<br>Perona, Langer, Beck, Lalande & Serbin<br>300 San Antonio Drive<br>Long Beach, CA 90807-0948<br>(562) 426-6155<br>davidhwang@plblaw.com | Scott Armstrong<br>1719 West Main Street<br>Suite 201<br>Rapid City, SD 57702<br>(605) 399-3994<br>Scottarmstrong1235@earthlink.net |

| | |
|---|---|
| Linda S. Svitak<br>Faegre & Benson, LLP<br>90 South 7th Street, Suite 2200<br>Minneapolis, MN 55402-3901<br>(612) 766-7000<br>lsvitak@faegre.com<br>wjohnson@faegre.com | James J. Freebery<br>McCarter & English, LLP<br>919 N. Market Street, 18th Floor<br>Wilmington, DE 19801<br>(973) 622-4444<br>jfreebery@mccarter.com<br>tpearson@mccarter.com |
| Richard D. Hailey<br>Ramey & Hailey<br>3891 Eagle Creek Parkway<br>Suite C<br>Indianapolis, IN 46254<br>(317)299-0400<br>rhailey@sprynet.com | B. Andrew List<br>Clark, Perdue, Arnold & Scott<br>471 East Broad Street, Suite 1400<br>Columbus, OH 43215<br>(614) 469-1400<br>alist@cpaslaw.com<br>lcollins@cpaslaw.com |