UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation

MDL DOCKET NO. 1769

This document relates to:

| | |
|---|---|
| Linda Guinn | 6:07-cv-10291 |
| Janice Burns | 6:07-cv-15959 |
| Richard Unger | 6:07-cv-15812 |
| Connie Curley | 6:07-cv-15701 |
| Linda Whittington | 6:07-cv-10475 |
| Eileen McAlexander | 6:07-cv-10360 |
| ~~Sandra Carter~~ | ~~6:07-cv-13234~~ |
| ~~Clemmie Middleton~~ | ~~6:07-cv-10949~~ |
| ~~Hope Lorditch~~ | ~~6:07-cv-12657~~ |
| David Haller | 6:07-cv-15733 |
| ~~Charles Ray~~ | ~~6:07-cv-11102~~ |
| ~~William Sarmiento~~ | ~~6:07-cv-10425~~ |

OMNIBUS LEGAL MEMORANDUM IN SUPPORT OF
ASTRAZENECA'S SUMMARY JUDGMENT MOTIONS
IN THE FLORIDA TRIAL POOL "GROUP ONE" CASES

Pursuant to this Court's Order dated August 1, 2008 (Doc. No 1059), defendants

AstraZeneca LP and AstraZeneca Pharmaceuticals LP ("AstraZeneca") submit this Omnibus

Legal Memorandum to set forth the legal framework and overarching arguments in support

of AstraZeneca's dispositive motions filed in the "Group One" Florida Trial Pool cases.

I.      INTRODUCTION

After months of considering the utility of test cases and a bellwether program, the

Court and the parties agreed to an Initial Florida Trial Pool program to gain a clear

understanding of the actual cases in this MDL.  With discovery completed in the first twelve

"Group One" Florida Trial Pool cases, it is clear that these cases are factually and legally meritless. Indeed, *five* of the twelve cases have already been *dismissed* by plaintiffs' counsel, including three only a few days before AstraZeneca's dispositive motion filings.

Each of the seven remaining plaintiffs identically asserts six claims under Florida law based on the theory that ingestion of Seroquel® allegedly caused him or her to gain weight and then suffer diabetes and related injuries. Yet the facts adduced in discovery revealed that plaintiffs either already had diabetes, or had so many pre-existing risk factors for the disease that they were already at a massive increased risk of diabetes, before they first took Seroquel. In fact, *all* of the remaining plaintiffs not only had a long history of chronic weight problems, but were *obese* before they ever ingested Seroquel. This is particularly important because long-term obesity and overweight is the overwhelming modifiable cause of diabetes and, indeed, one of the largest increased risks known to modern epidemiology. Given their pre-existing obesity, as well as multiple other diabetes risk factors (*e.g.*, family history of diabetes, sedentary lifestyle, poor diet, history of blood-glucose problems), plaintiffs cannot remotely satisfy Florida's governing causation standard and prove that *taking Seroquel* "more likely than not" caused their alleged diabetes injuries. *Gooding v. University Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984); *Colville v. Pharmacia & Upjohn Co.*, 565 F. Supp. 2d 1314, 1322 (N.D. Fla. 2008). As detailed below and in the individual motions filed herewith, AstraZeneca is entitled to summary judgment in all seven remaining Group One cases – including each of the six cases that plaintiff counsel hand selected from among the 174 eligible Florida cases – for multiple independent reasons.

First, plaintiffs' causation burden in these cases requires them to prove both *general*

medical causation (that Seroquel can cause their alleged diabetes) and *specific* medical causation (that taking Seroquel is what specifically caused each plaintiff's alleged diabetes), which must be proven by expert testimony. *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237, 1239 (11th Cir. 2005). Plaintiffs' causation testimony cannot survive AstraZeneca's *Daubert* motions, so the Court, in performing its gatekeeper function, should exclude plaintiffs' scientifically unreliable expert testimony on both general and specific causation.[1] Even apart from admissibility under *Daubert*, plaintiffs' claims fail for a fundamental lack of proof given that their putative experts do not even give testimony sufficient to satisfy Florida's governing "'more likely than not' standard of causation," including its "but for" test. *Gooding*, 445 So. 2d at 1018. Because this issue is dispositive on all claims asserted by each plaintiff, it is addressed first in the Argument section below. *See* Part V.A., *infra*.

Second, plaintiffs' core claims – *i.e.*, that Seroquel's labeling did not adequately warn of the risks of diabetes, hyperglycemia and weight gain – fail as a matter of law. Indeed, plaintiffs' state-law attacks on the adequacy of Seroquel's FDA-approved labeling are barred under the doctrine of implied conflict preemption. *See* Part V.B., *infra*. Moreover, plaintiffs' inadequate warning claims (sounding in negligence, strict liability, or fraud) also fail under Florida's learned intermediary doctrine – both because Seroquel's labeling was legally adequate under Florida law, and because the claims fail for lack of proximate cause given that plaintiffs cannot satisfy their burden to prove that their prescribers would not have prescribed Seroquel for these plaintiffs but for the allegedly inadequate warnings. *See* Part

---

[1] *See* AstraZeneca's Motion To Exclude The Specific-Causation Testimony Of Plaintiffs' Case Specific Witnesses ("*Daubert* Motion re Specific Causation"), and Motion To Exclude The General Causation Testimony Of Plaintiffs' Generic and Case-Specific Witnesses ("*Daubert* Motion re General Causation").

V.C., *supra*.  To assist the Court's evaluation of AstraZeneca's preemption and learned intermediary arguments, Part III below provides an overview of the federal regulatory framework governing prescription drugs and then sets forth the undisputed material facts concerning Seroquel's FDA regulatory history.  *See* Part III.A. & B., *infra*.

Third, plaintiffs' remaining state-law claims and related allegations – including their "fraud" and "negligent misrepresentation" claims, "design defect" claims, non-substantive "civil conspiracy" claims, and their immaterial "off label" contentions – independently fail as a matter of law for multiple additional reasons.  *See* Parts V.D., V.E., V.F., V.G., *infra*.

In short, when the Court looks past plaintiffs' mere allegations of wrongful conduct and tests the legal viability of the claims pled in their complaints in light of the undisputed material facts, it becomes clear that there is no genuine issue of material fact and that AstraZeneca is entitled to summary judgment on all claims asserted by each plaintiff here.

## II.    PROCEDURAL BACKGROUND

This MDL involves product liability claims, including principally failure-to-warn or marketing-defect claims, filed by several thousand individuals.  Plaintiffs allege that their ingestion of AstraZeneca's FDA-approved atypical antipsychotic medication Seroquel® (chemically known as "quetiapine fumarate" or "quetiapine") caused them to suffer certain alleged injuries, including primarily diabetes – a disease that, independent of Seroquel or other antipsychotic medications, has reached epidemic proportions in the United States.  This Omnibus Legal Memorandum supports AstraZeneca's dispositive motions challenging the claims of the remaining seven "Group One" plaintiffs chosen from the Florida "Initial Trial

Pool."[2]  As the parties have stipulated, Florida law governs plaintiffs' claims.

Each plaintiff initially asserted nine claims:  strict liability/marketing defect; strict liability/design defect; negligence; fraud; negligent misrepresentation; express warranty; implied warranty of merchantability; implied warranty of fitness; and civil conspiracy. Plaintiffs dismissed the three warranty claims (Doc. No. 1087), leaving six claims at issue:

- *Strict Liability/Marketing Defect*:  Plaintiffs allege that AstraZeneca failed adequately to warn both physicians and the "consuming public" about the "serious risks" of ingesting Seroquel, including principally diabetes mellitus.  *See, e.g.*, Linda Guinn's Complaint ("Guinn Compl."), ¶ 33.[3]  As part of this claim, plaintiffs allege that AstraZeneca's marketing compromised the warnings given by downplaying the risks, and claim they were injured as a result of the allegedly defective warnings.  *Id.*, ¶ 35.

- *Strict Liability/Design Defect*:  Plaintiffs assert a strict liability "design defect" claim, alleging Seroquel was "defective," and thus "unreasonably dangerous," because its risks allegedly outweigh its benefits.  *Id.*, ¶¶ 29-30.  Plaintiffs allege that they were injured as a result of ingesting Seroquel.  *Id.*, ¶ 32.

- *Negligence*:  Plaintiffs allege that AstraZeneca failed "to use reasonable care in the testing, creating, designing, manufacturing, labeling, packaging, marketing, selling, and warning of Seroquel."  *Id.*, ¶ 36.  Plaintiffs allege that such "negligence" caused their alleged injuries.  *Id.*, ¶¶ 36-37.

- *Fraud and Negligent Misrepresentation*:  Plaintiffs assert claims for "fraud" and "negligent misrepresentation," but without the particularity required by Federal Rule of Civil Procedure 9(b).  Indeed, plaintiffs broadly allege that AstraZeneca misrepresented "the character and quality" of Seroquel, and failed to disclose the "dangerous propensities" and "risks" of Seroquel, to plaintiffs and their physicians. *Id.*, ¶¶ 38, 42.  In conclusory fashion, plaintiffs allege reliance by themselves and their healthcare providers, which caused plaintiffs' alleged injuries.  *Id.*, ¶¶ 41, 43.

---

[2] The claims of five "Group One" plaintiffs – Clemmie Middleton, Hope Lorditch, William Sarmiento, Charles Ray, and Sandra Carter – have already been dismissed by plaintiffs or the Court.

[3]  Each of these plaintiffs is represented by Bailey Perrin Bailey and named in one of the multi-party complaints initially filed in the District of Massachusetts.  Because the complaints are indistinguishable, only one is cited herein.  *See* Guinn Compl. (captioned *Abeyta, et al. v. AstraZeneca LP, et al.*, No. 06-cv-10713-RWZ (D. Mass., Apr. 24, 2006)), attached as Exhibit 1 to the Notice of Filing accompanying this Memorandum.  Unless otherwise noted, the Exhibits referenced herein (*e.g.*, "Exh. 1") are attached to the accompanying Notice of Filing.

- *Civil Conspiracy*: Plaintiffs allege the existence of a "conspiracy" between and among various AstraZeneca entities, or with "captured research groups, physicians, and trade groups," to "misrepresent[] and suppress[] the truth as to the risks and dangers associated with the use of Seroquel." *Id.*, ¶ 51. Plaintiffs allege that AstraZeneca's participation in the conspiracy caused their injuries. *Id.*, ¶ 55.

Discovery has been completed in these Florida trial pool cases.[4] Pursuant to the Court's Orders, this Memorandum is filed concurrently with AstraZeneca's individual summary judgment and *Daubert* motions in each of these "Group One" Florida Trial Pool cases. The material facts for each plaintiff are set forth, along with AstraZeneca's case-specific arguments, in its concurrently filed individual summary judgment motions.

## III.   REGULATORY BACKGROUND

### A.   Overview Of FDA Regulatory Framework

Under the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), the Food & Drug Administration ("FDA") is the expert federal public-health agency charged by Congress with ensuring that (1) drugs are safe and effective,[5] and (2) their labeling adequately informs users of the risks and benefits of the product and is truthful and not misleading. *See* 21 U.S.C. § 355, 393(b); *Colacicco v. Apotex, Inc.*, 521 F.3d 253, 257-60 (3d Cir. 2008), *cert. pet'n filed*, No. 08-437 (U.S. Oct. 2, 2008); *accord* 71 Fed. Reg. 3922, 3934 (Jan. 24, 2006).

---

[4] The parties have undertaken extensive document discovery and depositions of many witnesses, including, *inter alia*, AstraZeneca employees, plaintiffs and their physicians. The parties have also exchanged expert reports for all generic and case-specific experts, and engaged in expert deposition discovery.

[5] FDA "generally considers a drug safe when the expected therapeutic gain justifies the risk entailed by its use." *United States v. Rutherford*, 442 U.S. 544, 555 (1979). As FDA has recognized, "all drugs have side effects" and none "is absolutely safe"; under the FDCA, "'safe'" means a drug's benefits "appear to outweigh" its risks in the agency's exercise of its scientific expertise. Exh. 3 (FDA Website, at *http://www.fda.gov/Fdac/features/2002/402_drug.html*).

- 6 -

NDA and sNDA Process:  FDA regulates the marketing of all drugs in the United States.  *See* 21 U.S.C. § 355(a).  Those wishing to market a drug must file a new drug application ("NDA"); FDA decides, after rigorous pre-market review, whether to approve the application.  *Id.* § 355(b).  NDAs must include, *inter alia*, full reports of investigations into the drug's safety and effectiveness, and "specimens of the labeling proposed to be used for such drug" that accurately provide risk information about possible side effects reported in clinical studies.  *Id.* § 355(b)(1); 21 C.F.R. §§ 201.56, 201.57, 201.100, 314.50(c)(2)(i).  Any company seeking approval for additional indicated uses must file a supplemental NDA ("sNDA"), *see* 21 U.S.C. § 355(b); 21 C.F.R. § 314.50, which FDA reviews with the same rigor as NDAs.  *See* 21 U.S.C. § 355(b); 73 Fed. Reg. 2848, 2851 (Jan. 16, 2008).

FDA *must deny* an NDA (or sNDA) if it finds that:  (1) the applicant's investigations "do not include adequate tests" to show whether or not the drug is sufficiently "safe" for its intended use; (2) the results of drug testing show that the "drug is unsafe" or "do not show that such drug is safe" for its intended use; or (3) based on fair evaluation of all material facts, the drug's "labeling" is "false or misleading in any particular."  21 U.S.C. § 355(d); 21 C.F.R. § 314.125(b).

If an NDA (or sNDA) is approved, it is conditioned on the applicant using the federally approved labeling "exactly as directed" by FDA.  21 C.F.R. § 314.105(b).  After a drug and its labeling are initially approved, FDA continues to "evaluate the latest available scientific information" and "incorporate information into the product's labeling when appropriate."  71 Fed. Reg. at 3934.  Manufacturers have continuing reporting obligations with respect to adverse drug reactions, 21 C.F.R. § 314.80(c), and "significant new

information … that might affect the safety, effectiveness, or labeling of the drug product,"
*id.*, § 314.81(b)(2)(i).  Failure to abide by these obligations may result in FDA withdrawing a
drug's approval.  *Colacicco*, 521 F.3d at 258-60 (detailing regulatory process).

   FDA-Approved Labeling and FDA's Misbranding Authority:  FDA's detailed
regulations dictate *the form and content* of prescription drug labeling, including any risk
disclosures and warnings.  *See* 21 C.F.R. Part 201 (dictating labeling form and content,
including specific language and format to be used in adverse reaction, precautions,
contraindications, and warnings sections).  FDA-approved "labeling"[6] is the expert agency's
"centerpiece of risk management for prescription drugs," and how FDA informs "health care
professionals about the risks and benefits of the approved product to help ensure safe and
effective use."  71 Fed. Reg. at 3934.  It not only "reflects thorough FDA review of the
pertinent scientific evidence" and "comprehensive scientific evaluation," but also embodies
the expert agency's "formal, authoritative conclusions" about what risk information should
be conveyed and how that information should be conveyed to the medical community.  *Id.*;
*accord* 73 Fed. Reg. 49,603, 49,604 (Aug. 22, 2008) (same); 60 Fed. Reg. 52,196, 52,196
(Oct. 5, 1995) (labeling "communicates the conclusions of FDA['s] review of the data"
submitted during the NDA process).

   FDA insists on strict adherence to its regulatory requirements and labeling
determinations, which strike the expert agency's careful balance of competing objectives
between underwarning and overwarning of the various risks posed by beneficial drugs:

   [L]abeling that includes theoretical hazards not well-grounded in scientific

---

[6] "Labeling" includes the label affixed to the drug and "also encompasses the written material sent to the physician and included with the drug provided to the patient."  *Colacicco*, 521 F.3d at 258.

> evidence can cause meaningful risk information to "lose its significance." Overwarning, just like underwarning, can similarly have a negative effect on patient safety and public health. Similarly, State-law attempts to impose additional warnings can lead to labeling that does not accurately portray a product's risks, thereby potentially discouraging safe and effective use of approved products or encouraging inappropriate use and undermining the objectives of the [FDCA].

71 Fed. Reg. at 3935 (internal citations omitted); *accord* 73 Fed. Reg. 49,603, 49,604-05 (emphasizing importance of "prevent[ing] overwarning" and that FDA standards ensure that only "scientifically sound information is provided in the labeling").

After initial approval, "FDA continuously works to evaluate the latest available scientific information to monitor the safety of products and to incorporate information into the product's labeling when appropriate." 73 Fed. Reg. at 2851. If FDA finds a drug's labeling in any way misleading, it can deem the drug "misbranded" and take enforcement action. 21 U.S.C. §§ 331(a), (b). A drug is misbranded if its labeling is "false or misleading in any particular," *id.* § 352(a), or lacks "adequate warnings" where use "may be dangerous to health." *Id.* § 352(f).

Changes Being Effected (CBE) Supplements: After initial labeling is approved, FDA oversees all post-approval changes and, generally, labeling changes may only be made with prior FDA approval. *See* 21 U.S.C. §§ 355(a)-(d); 21 C.F.R. §§ 314.70(a)-(d). Without prior FDA approval, manufacturers may "add or strengthen" risk disclosures in FDA-approved labeling *only* when it is scientifically warranted under FDA's "changes being effected" supplement (or "CBE") provision, 21 C.F.R. § 314.70(c).

FDA's CBE supplement procedure applies only to labeling changes that "correct concerns about *newly discovered* risks" and "make available important *new* information

about the safe use of the product."  47 Fed. Reg. 46,622, 46,623, 46,635 (Oct. 19, 1982)

(emphasis added).  It does not apply to risks *already* considered by FDA and addressed in the

agency's labeling determinations.  FDA recently reaffirmed its "longstanding view" that a

CBE supplement "is appropriate to amend the labeling for an approved product *only* to

reflect *newly acquired information*," and "may be used to add or strengthen a

contraindication, warning, precaution, or adverse reaction *only* if there is *sufficient evidence

of a causal association* with the drug…."  73 Fed. Reg. 49,603, 49,603-04, 49,608 (Aug. 22,

2008) (emphases added) (citing 21 C.F.R. § 201.57(c)(6)); *accord* 21 C.F.R. § 314.70(c)(6)

(iii).[7]  The agency "clarif[ied] FDA's existing policies" both "to ensure that scientifically

valid and appropriately worded warnings will be provided in the approved labeling," and

specifically "to prevent overwarning, which may deter appropriate use of medical products,

or overshadow more important warnings."  73 Fed. Reg. at 49,605-06.  Moreover, FDA

reviews all CBE supplements, and "may later deny approval" or take "enforcement action if

the added information makes the labeling false and misleading."  *See* 21 U.S.C. § 331(a), (b),

(k); 21 C.F.R. §§ 314.70(c)(6)(ii), (c)(7).[8]

  FDA's Use of Class Labeling:  FDA has promulgated class labeling guidelines for a

limited number of prescription drugs – either through specific labeling guidelines, *see, e.g.,*

---

[7] As FDA has stressed, the mere fact that a CBE supplement may have been done does *not* mean that
the drug "actually has caused any particular adverse event or type of adverse event," but rather just
that new data about the drug meets FDA's "standards" governing CBE supplements.  73 Fed. Reg. at
49604 (standard for CBE supplements is lower than "evidentiary standard" for causation that
plaintiffs must prove in litigation).

[8] "[T]he determination whether labeling revisions are necessary is, in the end, squarely and solely
FDA's" – so, "in practice, manufacturers typically consult with FDA prior to adding risk information
to labeling."  71 Fed. Reg. at 3934; *accord* 44 Fed. Reg. at 37,447 ("the decision as to whether a
warning is legally required for the labeling of a drug must rest with the agency").

49 Fed. Reg. 14,303 (1984) (class labeling guideline for oral hypoglycemic drugs); or by mandating the inclusion of specific labeling statements in all products in a drug class, *see* Exh. 4 (Guidance for Industry: Labeling for Human Prescription Drug & Biological Products – Implementing New Content and Format Requirements, at 17 (Jan. 2006)).  Class labeling is designed to promote consistency across products FDA deems similar, particularly with respect to risk information, but only when FDA concludes that doing so is scientifically appropriate and fulfills the agency's public health mandate.

Off-Label Use:  FDA's policy of allowing doctors to prescribe drugs for off-label uses "is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001).  The regulations give FDA authority to impose "specific warning[s]" about off-label uses if *the agency* finds the "drug is commonly prescribed" for an off-label condition and (i) "there is a lack of substantial evidence of effectiveness for that disease or condition," or (ii) "such usage is associated with serious risk or hazard."  21 C.F.R. §§ 201.57(c)(6)(i), 201.80(e).

**B.     Seroquel's FDA Regulatory History**

Seroquel is an atypical antipsychotic that FDA has repeatedly approved as safe and effective – in September 1997 to treat manifestations of psychotic disorders, including specifically schizophrenia; in January 2004 to treat acute manic episodes associated with bipolar disorder; in October 2006 to treat depressive episodes associated with bipolar disorder; and in May 2008 for maintenance treatment of bipolar disorder as an adjunct therapy to a mood stabilizer.  *See* Exhs. 5, 21, 27, 29.  Each time FDA carefully considered

the underlying science and approved Seroquel's labeling as adequate and not false or misleading in any way.

FDA's 1997 Approval of Seroquel and Its Labeling:  FDA first approved Seroquel after concluding that "adequate information has been presented to demonstrate that [Seroquel] is safe and effective for use as recommended in the enclosed marked-up draft labeling." Exh. 5 (FDA Approval Letter, at 1 (Sept. 26, 1997)).  FDA required that Seroquel's labeling "must be identical" to the FDA-approved labeling and risk disclosures. *Id.* That labeling alerted doctors that "diabetes mellitus," "hyperglycemia,"[9] and "weight gain" had been observed in clinical trials.  Exh. 6 (Nov. 1997 labeling, reproduced in *1999 Physicians' Desk Reference*, at 3430-3431).  The "Adverse Reactions" section explicitly disclosed that diabetes and hyperglycemia were "infrequent" adverse events that had been observed in short-term, placebo-controlled trials.  *Id.*

The labeling also disclosed the risk of "weight gain," explicitly stating that patients in short-term, placebo-controlled trials showed a "statistically significantly greater incidence of weight gain for SEROQUEL (23%) compared to placebo (6%)." *Id.* at 3431 (noting that "weight gain" was 2% Seroquel and 0% placebo in 3- to 6-week placebo-controlled clinical trials).  Prior to approval, FDA revised this section of the labeling to "focus" the weight gain risk information, but kept it in the "Adverse Reactions" section of the labeling.  Exh. 7 at 21 (FDA labeling mark-up (AZSER00287791)); *see also* Exh. 8 at 29 (FDA draft labeling proposal (AZSER00287831)).

FDA's Continuing Scientific Review from 1997 to 2003:  Following Seroquel's

---

[9] "Hyperglycemia" is "an abnormally high concentration of glucose in the blood." *Stedman's Concise Medical Dictionary for Health Professions* 468 (4th ed. 2001).

initial approval, FDA repeatedly and extensively monitored the developing science about

diabetes, hyperglycemia, and weight gain for all atypicals, including Seroquel.  For instance:

- In 1999, an FDA epidemiologist and safety evaluator reviewed post-marketing surveillance safety reports of diabetes in users of atypicals,[10] which disclosed that only a single case of diabetes had been reported for Seroquel in the two years since it was approved.  *See* Exh. 9 (FDACDER003799).  Noting confounding risk factors for diabetes, the reviewers concluded that whether "a causal relationship exists" between atypicals and diabetes required further study and suggested that the agency "consider increasing the prominence of diabetes" across the then-available atypicals' labeling. Exh. 10 (FDACDER003797).  FDA did not change Seroquel's labeling as a result of this review, but continued to study the issue.

- In 2000, FDA advised that it was undertaking a "comprehensive review" and "thorough assessment" of pre-clinical, clinical, and post-marketing data to "more fully evaluat[e] the possibility that atypical antipsychotics may produce disturbances in glucose regulation."  Exh. 11 at 1 (May 1, 2000 FDA Letter (AZSER00290653)). In its letter to AstraZeneca, FDA noted that while "few" cases of new onset diabetes were associated with Seroquel, FDA wanted to study "the possibility that more cases associated with Seroquel will emerge as experience [with Seroquel] accumulates." *Id.*  AstraZeneca responded in August 2000, providing extensive pre-clinical, clinical trial, and post-marketing data relating to diabetes.  *See* Exh. 12 (August 31, 2000 Response to FDA (AZSER15052651)).

- In 2001, after reviewing all of the scientific information, FDA reviewers concluded that the data "did not provide affirmative proof of a drug related effect" linking Seroquel and "glucose related abnormalities."  Exh. 13 at 1 (Medical Officer Review & Evaluation of Clinical Data (rev. completed Jan. 26, 2001, signed May 22, 2001) (FDACDER001605-12)).  Despite this conclusion, FDA continued studying the issue across all atypicals, assessing medical literature and post-marketing safety reports.

- In May 2001, after classwide review, the FDA reviewer concluded that (i) the data "stimulate many questions, but provide few answers" so "[f]urther study will be needed to elucidate the potential causality of DM [diabetes mellitus] by the atypical[s]"; and (ii) schizophrenia itself "may be associated with an increased risk for developing glucose abnormalities."  Exh. 14 at 11 (Review and Evaluation of Clinical Data, Judith A. Racoosin, MD, MPH, FDA's Center for Drug Evaluation and Research ("CDER") (May 17, 2001) (FDACDER001627-41)).  Because "issues of

---

[10] *See* Exh. 10 (Memorandum from Epidemiologist and Safety Evaluator in the Division of Drug Risk Evaluation to Director, Division of Neuropharmacological Drug Products (Dec. 17, 1999) (data for all atypicals) (FDACDER003795)); Exh. 9 (Memorandum reviewers in the Division of Drug Risk Evaluation to Director, Division of Neuropharmacological Drug Products (Dec. 16, 1999) (Seroquel-specific data) (FDACDER003799)).

causality and differential risk require additional investigation," "[d]etermining whether one or more of the atypical antipsychotic drugs causes DM [diabetes mellitus] presents many challenges" including the "confounding question of whether patients with schizophrenia have an innate elevated risk for developing DM." Exh. 15 at 7-8 (Review and Evaluation of Clinical Data, Judith Racoosin, MD, MPH, Medical Officer, CDER (May 22, 2001) (FDACDER001613-26)).

- FDA affirmatively determined to leave Seroquel's labeling unchanged, and not to act upon potential labeling changes, while its further study was ongoing – because "[a]dditional data [are] needed." Exh. 16 (Judith A. Racoosin, MD, MPH, Safety Team Leader, Division of Neuropharmacological Drug Products, CDER, "Atypical Antipsychotic Drugs and Hyperglycemia/Diabetes Mellitus:  The FDA Perspective," Presentation to Nov. 19-21, 2003 American Diabetes Association Consensus Development Conference (FDACDER003822)).

- In 2002, in a meeting with AstraZeneca about an NDA submission for a new formulation of Seroquel (SR), FDA's reviewer, Dr. Racoosin, requested a "comprehensive analysis of any effects on glucose levels." Exh. 17 at unnumbered page 4 (Minutes, Formal FDA Meeting with AstraZeneca (June 20, 2002) (SQ1ED00474655-00001 to -00005)).

- In 2003, FDA undertook another classwide "updated literature review" of recently published studies about the "issue of diabetes mellitus/hyperglycemia associated with the atypical antipsychotic drugs."[11]  In connection with this analysis, the FDA reviewer noted confounding factors, including that "schizophrenia itself is associated with impaired glucose metabolism." Exh. 19 at 15 (FDACDER001458-76).

Thus, since it first approved Seroquel, FDA continuously and carefully studied whether the evidence existing at the time relating to diabetes, hyperglycemia, and weight gain warranted labeling changes for Seroquel or the other atypical antipsychotics.

FDA's September 2003 Class Labeling Change:  In September 2003, after years of study, FDA mandated a *classwide* diabetes/hyperglycemia label change for all atypicals,

---

[11] Exh. 18 (Request for Consultation (dated Jan. 29, 2003, signed Feb. 2, 2003) (FDACDER001456-57)).  In June 2003, after completing this analysis, the FDA reviewer concluded that "[t]here is at least some evidence of an association with diabetes for virtually all the antipsychotic drugs studied." Exh. 19 at 15 (Memorandum from Andrew Mosholder, MD, MPH, Epidemiologist, CDER to Russell Katz, Director, DNDP, "Consult:  Literature review concerning the issue of diabetes mellitus/hyperglycemia associated with atypical antipsychotic drugs" (dated June 25, 2003, signed June 26, 2003) (FDACDER 001458-76)); *id.* at 1 ("On balance, the literature reviewed suggests that atypical antipsychotic drugs are associated with diabetes.").

including Seroquel:  "After reviewing the available data pertaining to the use of atypical

antipsychotic medications and diabetes mellitus adverse events, [FDA] concluded that the

product labeling for all atypical antipsychotics should be updated to include information

about these events."  Exh. 20 at 1 (Sept. 11, 2003 FDA Letter (AZSER00300586-88)).  For

the first time, FDA concluded that risk disclosure about diabetes and hyperglycemia should

be in the labeling's "Warnings" section, not the "Adverse Reactions" section where FDA

previously concluded these risks should be addressed.  *Id.* at 1-2.

     While disclosing that "hyperglycemia" has "been reported in patients treated with

atypical antipsychotics" and that "epidemiological studies suggest an increased risk of

treatment-emergent hyperglycemia-related adverse events," FDA's carefully calibrated

warning also provides the expert agency's qualifications concerning the underlying scientific

evidence about any relationship between ingestion of atypicals and diabetes or

hyperglycemia – emphasizing that (i) "the *relationship* between atypical antipsychotic use

and glucose abnormalities *is complicated* by the possibility of an increased background risk

of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes

mellitus in the general population"; and (ii) "the *relationship* between atypical anti-psychotic

use and hyperglycemia-related adverse events *is not completely understood.*"  *Id.* at 1

(emphasis added).  FDA reminded physicians to monitor patients with "established

diagnos[e]s of diabetes" or "risk factors" for the condition.  *Id.*[12]  FDA did not require a

_____

[12]  FDA's carefully calibrated diabetes/hyperglycemia warning provides (*cont'd on next page*):

*warning* about a risk of weight gain associated with atypicals.

On January 12, 2004, FDA approved AstraZeneca's revisions to Seroquel's labeling with FDA's "mandated" diabetes/hyperglycemia warning, and required that the final labeling "must be identical." Exh. 21 at 1 (Jan. 12, 2004 FDA Letter); Exh. 22 (January 2004 final approved labeling). FDA left the weight-gain disclosures unchanged and in the labeling's "Adverse Reactions" section. *See* Exh. 22 at 18, 23 (Jan. 12, 2004 labeling). Following the classwide label change, FDA continued to monitor these categories of risk for Seroquel and other atypicals.[13]

---

**WARNINGS**

. . .

**Hyperglycemia and Diabetes Mellitus**

Hyperglycemia, in some cases extreme and associated with ketoacidosis or hyperosmolar coma or death, has been reported in patients treated with atypical antipsychotics including Seroquel. Assessment of the relationship between atypical antipsychotic use and glucose abnormalities is complicated by the possibility of an increased background risk of diabetes mellitus in patients with schizophrenia and the increasing incidence of diabetes mellitus in the general population. Given these confounders, the relationship between atypical antipsychotic use and hyperglycemia-related adverse events is not completely understood. However, epidemiologic studies suggest an increased risk of treatment-emergent hyperglycemia-related adverse events in patients treated with the atypical antipsychotics studied. Precise risk estimates for hyperglycemia-related adverse events in patients treated with atypical antipsychotics are not available. . . .

Patients with an established diagnosis of diabetes mellitus who are started on atypical antipsychotics should be monitored regularly for worsening of glucose control. Patients with risk factors for diabetes mellitus (e.g., obesity, family history of diabetes) who are starting treatment with atypical antipsychotics should undergo fasting blood glucose testing at baseline and periodically during treatment. Any patient treated with atypical antipsychotics should be monitored for symptoms of hyperglycemia . . . . Patients who develop symptoms of hyperglycemia during treatment with atypical antipsychotics should undergo fasting blood glucose testing. Exh. 20 at 1-2 (Sept. 11, 2003 FDA Letter (AZSER00300586-87)).

[13] For instance, on April 8, 2004, FDA requested that all atypical manufacturers submit data related to "an association between metabolic abnormalities and the use of atypical[s]." Exh. 23 at 1 (Ltr. from R. Katz to AstraZeneca (SQ1ED00018676)). In response, AstraZeneca submitted over 1,000 pages of data and analysis. Exh. 24 (Excerpts of AZSER19731163-19732206 ). In 2005, FDA conducted another updated literature review of all atypicals. *See* Exh. 25 (FDACDER001550). The reviewing officer noted that although there had been a number of studies published since the agency's 2003 literature review, "there does not appear to be clear evidence to support changes in our position about

<u>FDA's 2006 Reaffirmation that Causation "Has Not Been Established"</u>:  On November 16, 2006, FDA both reiterated the continuing vitality of its federally mandated classwide diabetes-related warning language, and reconfirmed its view "that *it has not been established whether Seroquel causes diabetes*."  Exh. 26 at 4 (Nov. 16, 2006 FDA Letter) (emphasis added).[14]  FDA also stated that "it is infeasible to obtain an accurate percentage of all diabetes or diabetes-related adverse events associated with Seroquel based upon" post-marketing adverse event reports, so quantifications should not be provided.  *Id*. at 4-5.

<u>FDA in 2006, 2007, and 2008 Again Confirms the Adequacy of Seroquel's Labeling In sNDAs</u>:  Since 2004, FDA has confirmed the continuing correctness and applicability of its class warning when it approved sNDAs in 2006, 2007, and 2008 for new Seroquel indications – including (1) use of Seroquel for treatment of bipolar disorder, *see* Exhs. 27-28 (Oct. 20, 2006 FDA Approval Letter at 1; Oct. 20, 2006 Labeling at 3, 14-15), and bipolar adjunct therapy, *see* Exhs. 29-30 (May 13, 2008 FDA Approval Letter at 1; May 13, 2008 Labeling at 1-11); and (2) use of Seroquel XR (extended release) for treating schizophrenia, *see* Exhs. 31-32 (May 17, 2007 Labeling at 1, 6 (AZSER23141308-36); Nov. 15, 2007 Seroquel XR Labeling at 1, 9).  Each time, FDA was required by statute to review all pertinent science and confirm that Seroquel's labeling, including FDA's federally mandated classwide warning, was accurate and not misleading in any way.

---

this relationship" between atypicals and diabetes.  *Id*. at 11 (FDACDER001560-61); *id*. at 12 (determining "the absolute magnitude of diabetes mellitus risk" with atypicals and their relative risk requires further study) (FDACDER001561).

[14] This letter also addressed the manner in which risk information was displayed in certain promotional materials.  As discussed below and in AstraZeneca's case-specific motions, none of these materials has any pertinence here because there is no evidence of any nexus between these materials and the decisions by plaintiffs' physicians to prescribe Seroquel for these plaintiffs.

In June 2008, FDA deemed "approvable" AstraZeneca's July 2007 submission of a labeling supplement to disclose certain new risk-related data. The submission was based principally on recently completed clinical studies. *See* Exh. 33 (July 2007 labeling (AZSER24149237-82)). AstraZeneca continues to discuss with FDA the most appropriate way to communicate this data, as required by federal law. *See* Exh. 34 (Ltr. from Thomas Laughren (FDA) to AstraZeneca (June 25, 2008) (D339-L01165297-00001-04)).

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment must be granted where, as here, the record evidence reveals "that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c). While the defendant moving for summary judgment bears the initial burden of showing the absence of genuine issues of material fact, it does not need to negate essential elements of the plaintiff's claims but rather need only point to the absence of proof on essential elements on which the plaintiff bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 327 (1986); *Colville v. Pharmacia & Upjohn Co.*, 565 F. Supp. 2d 1314, 1319 (N.D. Fla. 2008). The burden then shifts to the plaintiff to come forward with "'affirmative evidence'" sufficient to support a rational trier of fact finding for the non-moving party; a "mere 'scintilla' of evidence" will "not suffice." *Johnson v. Fleet Fin., Inc.*, 4 F.3d 946, 948-49 (11th Cir. 1993) (citations omitted); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Conclusory allegations, speculation and conjecture, and mere legal conclusions are insufficient to defeat summary judgment. *See, e.g., Ellis v. England*, 432 F.3d 1321, 1327 (11th Cir. 2005); *Corodoba v. Dillard's, Inc.*, 419

F.3d 1169, 1181 (11th Cir. 2005); *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330,

1339 (M.D. Fla. 2006). "[S]ummary judgment is appropriate where the nonmovant 'fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial.'" *Johnson*, 4 F.3d at 948

(quoting *Celotex*, 477 U.S. at 322)).

## V.   ARGUMENT

### A.   Plaintiffs Cannot Satisfy Their Burden On The Essential Element Of Causation Under Florida Law

#### 1.   Plaintiffs' Causation Burden In These Cases Under The Governing Authorities

Causation is an essential element of each claim plaintiffs assert under Florida law.

Florida follows a "'more likely than not' standard of causation," which demands competent

proof that defendant's tortious conduct "probably caused the plaintiff's injury." *Gooding v.*

*University Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984). A mere "'possibility'" of

causation is not enough; "'speculation or conjecture'" are insufficient; and when "'the

probabilities are at best evenly balanced, it becomes the duty of the court to direct

a verdict for defendant.'" *Id.* (quoting Prosser, *Law of Torts*, § 41 (4th ed. 1971)).

Under Florida law, the requirement of causation always includes both cause-in-fact

and proximate cause. *Id.* at 1017-20 & n.1; *Stahl v. Metropolitan Dade County*, 438 So. 2d

14, 17-18, 22 (Fla. App. 1983). Florida's generally applicable standard for "cause-in-fact"

requires plaintiffs to prove their injuries probably would not have occurred "but for"

defendant's tortious conduct. *Gooding*, 445 So. 2d at 1018, 1020; *Stahl*, 438 So. 2d at 17-18

& n. 2 (citing cases); *see also* Fl. Std. Jury Instr. (Civil) 5.1(a), 5.2(a).[15]   While Florida

recognizes in concurring causation cases that defendant's tortious conduct must be a

"substantial factor" in causing or contributing to plaintiff's alleged injury and need not be its

sole cause, plaintiff *still* must establish that "but for" defendant's breach of duty, the injury

*probably* "would not have" occurred. *Gooding*, 445 So. 2d at 1018 (requiring plaintiff to

prove defendant's negligence "more likely than not constituted a substantial factor" in the

death of plaintiff's decedent such that "but for" defendant's negligence, decedent "would not

have died"); *Stahl*, 438 So. 2d at 22 (requiring plaintiff to prove in concurring cause case that

"but for" defendant's negligence, plaintiff "would not have been" injured and died).[16]   The

"proximate cause" requirement then further ensures that plaintiff's injury flows as a direct

and natural consequence of defendant's tortious conduct, unbroken by any effective

intervening cause, such that it "'produces the injury, and without which the result *would not*

*have occurred.*'" *Sakon v. PepsiCo, Inc.*, 553 So. 2d 163, 166-67 (Fla. 1989) (emphasis

added; citation omitted); *Gooding*, 445 So. 2d at 1018-20 ("proximate cause" requires proof

---

[15] It is reversible error not to give the "but-for" causation instruction (5.1(a)), including in those cases in which the concurring cause instruction (5.1(b)) may also be appropriate. *See, e.g., Owens-Corning Fiberglas Corp. v. Terwilliger*, 599 So. 2d 130, 131-32 (Fla. App. 1992); *see also* Fl. Std. Jury Instr. (Civil) 5.1(a), (b), & Note on Use.

[16] Plaintiffs cannot escape Florida's generally applicable "but for" test for cause-in-fact by arguing that their cases should be governed by the "limited 'substantial factor' exception" referenced in *dicta* in *Stahl*, 438 So. 2d at 19. That exception could apply "*only* in those concurring cause cases where each of the said concurring causes could have *alone* produced" the plaintiff's injury, "acting individually and independently of" any other potentially contributing cause. *Id.* at 18-19, 22 (emphases added). Here, there is no evidence that ingestion by plaintiffs of Seroquel *alone*, independently of any other contributing factors and pre-existing risk factors, could have caused plaintiffs' diabetes-related injuries. Hence, Florida's general "but for" standard for cause-in-fact clearly governs in these cases. *Id.*; *accord In re Hanford Nuclear Reserv. Litig.*, 534 F.3d 986, 1010-11 (9th Cir. 2008); *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 819 (W.D. Tex. 2005).

that the injury probably "would not have" occurred without defendant's alleged tort).[17]

Thus, to satisfy their causation burden under Florida law, plaintiffs must proffer competent admissible evidence proving that it is "more likely than not" that the tortiously induced ingestion of Seroquel was a "substantial factor" in producing plaintiffs' alleged injuries such that it can reasonably be said that "but for" the ingestion of Seroquel, plaintiffs "would not have" suffered those injuries. *Gooding*, 445 So. 2d at 1018; Fl. Std. Jury Instr. (Civil) 5.1(a), (b), & Note on Use, 5.2(a); *accord Stahl*, 438 So. 2d at 17-18.

In pharmaceutical personal-injury cases, it is well settled that plaintiffs' causation burden[18] requires them to prove "medical causation" – including both *general* medical causation (that the drug can cause the injuries alleged under the circumstances); and *specific* medical causation (that ingestion of the drug is what did specifically cause that particular plaintiff's alleged injuries). *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237, 1239 (11th Cir. 2005); *Miller v. Pfizer Inc.*, 196 F. Supp. 2d 1095, 1124 (D. Kan. 2002), *aff'd*, 356

---

[17] Proximate cause is one of the common law's "judicial tools" employed to preclude recovery where plaintiff's injury is *too indirect, speculative, or remote* a consequence of the tortious conduct to support liability. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268-69 (1992); *Southeast Fla. Laborers Dist. Health & Welfare Trust Fund v. Philip Morris Inc.*, 1998 WL 186878, *3 (S.D. Fla. Apr. 13, 1998); *accord Stahl*, 438 So. 2d at 20 (proximate cause bars recovery if injury "is not a direct result of" defendant's alleged tort and is "merely a possible, as distinguished from a natural and probable, result").

[18] There are several legally distinct aspects of plaintiffs' causation burden on their various claims. For instance, plaintiffs' product liability claims demand proof of "defect causation," which requires them to prove the causal nexus between some "defect" in Seroquel (*e.g.*, design defect or marketing/ warning defect) and their drug ingestion and injuries. *Baker v. Danek Med.*, 35 F. Supp. 2d 875, 881 (N.D. Fla. 1998). Under the learned intermediary doctrine, this defect-causation burden also requires proof of the "causal link" between defendant's allegedly inadequate warnings and the prescribing decision of plaintiffs' physicians, *Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1370-71 (S.D. Fla. 2007) – *i.e.*, that "but for the alleged inadequate warning," their doctors "would not have" prescribed the drug for plaintiffs. *Porter v. Ely Lilly & Co.*, 2008 WL 4138115, *1 (11th Cir. Sept. 9, 2008). Their fraud claims require a "causal link" between detrimental reliance by plaintiffs or their prescribers on AstraZeneca misstatements and each plaintiff's drug ingestion and alleged injury. *Hasenfus v. Secord*, 962 F.2d 1556, 1561-62 (11th Cir. 1992).

F.3d 1326 (10th Cir. 2004).  This type of complicated proof requires "expert testimony."

*McClain*, 401 F.3d at 1237; *Haggerty v. Upjohn Co.,* 950 F. Supp. 1160, 1167 (S.D. Fla.

1996), *aff'd*, 158 F.3d 588 (11th Cir. 1998).[19]

> **2.    AstraZeneca Is Entitled To Summary Judgment On All Of Plaintiffs' Claims For Lack Of Competent Admissible Proof On The Essential Element Of Causation**

As explained below and in AstraZeneca's summary judgment and *Daubert* motions,

plaintiffs cannot adduce evidence sufficient to satisfy their burden to prove proximate

causation and medical causation.  Hence, AstraZeneca is entitled to summary judgment.

Plaintiffs' claims fail for lack of proximate cause because they cannot establish the

requisite *causal link* between AstraZeneca's allegedly tortious conduct and each plaintiff's

ingestion of Seroquel and alleged resulting injuries.  *See* Parts V.C.2, V.D.3, V.G., *infra*.

Plaintiffs also cannot meet their burden of proving "medical causation," including

both general and specific medical causation.  *McClain*, 401 F.3d at 1237, 1239.  This burden

requires plaintiffs to both "rule in" Seroquel as a cause of their injuries (general causation)

and also to "rule out" other alternative causes (specific causation) in a scientifically reliable

and methodologically valid way.  The eight expert witnesses these plaintiffs variously offer

to satisfy their burden in their individual cases fall woefully short of the mark under *Daubert*

*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its "rigorous three-part inquiry" for

admissibility of expert testimony.  *United States v. Frazier*, 387 F.3d 1244, 1260-63 (11th

---

[19] *See also Handy v. Golden Gem Growers, Inc.*, 454 So. 2d 69, 70 (Fla. App. 1984) (plaintiffs must offer competent expert "medical testimony" based on "reasonable medical probability" that plaintiff's "injury" is "causally connected" to defendant's tortious conduct); *Marking v. Novartis Pharms. Corp.*, 2002 WL 32255405, *3 (S.D. Fla. Feb. 12, 2002) (plaintiffs must "introduce expert testimony to establish medical causation"); *cf. Atkins v. Humes*, 110 So. 2d 663, 666 (Fla. 1959).

Cir. 2004).[20]  As explained at length in AstraZeneca's *Daubert* motions (incorporated by reference), the medical causation testimony of plaintiffs' putative experts fails to survive *Daubert* scrutiny on both specific and general medical causation.

- **Specific Causation**:  Assuming *arguendo* that there were a basis to "rule in" Seroquel, the essential specific-causation testimony of plaintiffs' case-specific experts – three psychiatrists (Drs. Perry, Abramson, and Young), and two endocrinologists (Drs. Tulloch and Marks) – is clearly inadmissible under Rule 702 and *Daubert*. None of these three psychiatrists is even *qualified* to reach an affirmative conclusion that Seroquel specifically caused plaintiffs' alleged diabetes injuries, much less offer any competent diabetes-causation opinion sufficient to satisfy plaintiffs' burden of proof on specific causation.  But more fundamentally, all five of these specific-causation witnesses fail to rely on any scientifically reliable methodology or bases for their speculative *ipse dixit* opinions.  They all not only purport to rely on a mere "temporal relationship," which is impermissible, *see McClain*, 401 F.3d at 1254; *Cartwright v. Home Depot U.S.A.*, 936 F. Supp. 900, 906 (M.D. Fla. 1996), but they all failed to consider and then "rule out" the many other causes of plaintiffs' diabetes injuries, and all failed to quantify or mete out the respective roles of the various other causes – as the law requires them to do to ensure that the many other potential causes (especially pre-existing obesity and overweight) were not the "sole cause" of plaintiff's alleged injuries.  *See* AstraZeneca's *Daubert* Motion re Specific Causation.

- **General Causation**:  The general-causation testimony of plaintiffs' expert witnesses, including their generic experts Drs. Arnett, Plunkett and Wirshing, is also inadmissible under *Daubert*, because they too have failed to use any *scientifically valid methodology and reasoning* in support of their opinions that Seroquel is capable of causing diabetes in these plaintiffs that survives *Daubert* scrutiny.  *See* AstraZeneca's *Daubert* Motion re General Causation.  Hence, plaintiffs have no admissible basis even to "rule in" Seroquel as a cause of their alleged diabetes injuries.  *Id.*

These many fatal deficiencies in plaintiffs' expert opinion evidence on causation are detailed in AstraZeneca's *Daubert* motions.  Because plaintiffs lack admissible expert testimony on

---

[20] Federal Rule of Evidence 702 imposes a strict *gatekeeping* duty on district courts to "make certain" an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *McClain*, 401 F.3d at 1237 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).  This Court must apply the "exacting standards of reliability" under *Daubert* and Rule 702, *Weisgram v. Marley Co.*, 528 U.S. 440, 442 (2000); *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) – including "an exacting analysis of the proffered expert's methodology." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002).

the issues of specific and/or general causation, plaintiffs cannot meet their burden of proving

medical causation and summary judgment is warranted on *each* claim asserted by *all* of these

plaintiffs. *See, e.g.*, *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1322 (11th Cir. 1999);

*accord Haggerty*, 950 F. Supp. at 1167.

**B.      Plaintiffs' State-Law Attacks On The Adequacy Of The FDA-Approved And FDA-Mandated Labeling For Seroquel Are Barred Under The Doctrine Of Implied Conflict Preemption**

At the heart of this MDL and each plaintiff's case is the core claim that Seroquel's

labeling was inadequate under Florida law because it failed to inform physicians sufficiently

of the risks of diabetes, hyperglycemia and weight gain.  Plaintiffs contend that AstraZeneca

should be held liable under state law even though FDA (1) was aware of those risks when it

consistently approved Seroquel's labeling from 1997 onward as adequate and not misleading

in any particular; (2) actively studied and monitored the developing science about the

potential association between Seroquel and those risks; (3) made deliberate and carefully

calibrated decisions about what the Seroquel labeling should say about those risks; and (4)

mandated that AstraZeneca's Seroquel labeling be exactly as directed by FDA.  At bottom,

plaintiffs simply *disagree with the FDA*, as the testimony of their experts has made clear:

> Q: Do you disagree with the FDA's statement that it has not been established that Seroquel causes diabetes as of November of 2006?
> A: Yes.
> Q. You disagree with the agency?
> A. Yes.

Arnett Dep., at 308:24-309:5 (objection omitted) (Exh. 36); *accord* Wirshing Dep., at

220:17-24 (Exh. 38) & Plunkett Dep., at 293:6-294:22 (Exh. 40) (both disagreeing with

FDA's decision to mandate classwide labeling).  According to one of plaintiffs' generic

witnesses, FDA's federally mandated classwide label "sucks."  Wirshing Dep., at 221:12-20

(Exh. 38).

The doctrine of implied conflict preemption prohibits plaintiffs and their experts from

invoking state law to *second guess* the decisions made by the expert federal agency acting to

accomplish federal objectives, or to invite juries to do so.[21]

> **1.      Plaintiffs' Claims Are Preempted Because They Conflict With
> FDA's Regulatory Determinations In Approving Seroquel's
> Labeling – Including FDA's Carefully Calibrated Classwide
> Labeling – And Plaintiffs Cannot Second-Guess FDA Through
> State-Law Claims**

Under the Supremacy Clause (U.S. Const. art. VI, cl. 2), state laws are preempted

whenever they "'actually conflict'" with federal law.  *Geier v. American Honda Motor Co.*,

529 U.S. 861, 869 (2000) (citation omitted).  Implied conflict preemption applies when any

state law claim "'stands as an obstacle to the accomplishment and execution of the full

purposes and objectives'" of Congress or a federal agency acting within the scope of its

delegated authority – including *any* conflicts that "frustrate the accomplishment of a federal

objective" or make it "'impossible'" to comply with state and federal law.  *Id.* at 873

(citations omitted); *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707,

713 (1985); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698-99 (1984).[22]

---

[21] AstraZeneca also incorporates the arguments set forth in its prior preemption motion (Doc. No.
329), which the Court denied without prejudice to considering the arguments on summary judgment.

[22] Contrary to plaintiffs' prior arguments, no "presumption against preemption" applies here.  The
federal government has regulated drugs for more than a century, and there is no presumption against
preemption when "State[s] regulate in an area where there has been a history of significant federal
presence."  *United States v. Locke*, 529 U.S. 89, 108 (2000).  Indeed, plaintiffs' presumption-against-
preemption argument won only a single dissenting vote in the Supreme Court's most recent
examination of preemption in the FDCA context.  *See Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1013-
14 (2008) (Ginsburg, J., dissenting).  In concluding that plaintiffs' claims were preempted, the *Riegel*

Conflict preemption clearly applies where – as here – a federal agency has specifically examined an issue and determined how best to balance competing objectives.  In *Geier*, for instance, plaintiffs argued that a car was defective because it did not have airbags. But the federal agency in question had determined that manufacturers could choose among a range of safety devices, rather than mandating airbags.  529 U.S. at 875, 878-81.  The *Geier* Court held that plaintiffs' state law claims were preempted because they effectively would require an all-airbag rule, which would upset the federal agency's different balance and thus stand as an "obstacle to the accomplishment" of its federal objectives.  *Id.* at 886.  Applying these fundamental preemption principles, the Third Circuit recently held that state-law product liability claims attacking the adequacy of drug warnings were preempted where FDA had given careful attention to the risks at issue, required specific classwide labeling, and concluded that the science did not support the additional warnings sought by plaintiffs. *Colacicco*, 521 F.3d at 268-71, 275-76 (additional warnings required by state law would "directly conflict[] with the FDA's oft-repeated conclusion[s]" about what the science would support).[23]  Consistent with *Geier* and *Colacicco*, FDA itself has emphasized that its "labeling requirements are not a mere minimum safety standard, but rather strike a balance between risks and benefits," and that "State law claims that 'challenge labeling that FDA

---

majority made *no mention* of any presumption against preemption. *See id.* at 1006-08.  Regardless, even where such a presumption does apply, a conflict between federal and state law, as here, requires state law to yield. *See, e.g., Felder v. Casey*, 487 U.S. 131, 138 (1988); *see also Colacicco v. Apotex*, 521 F.3d 253, 262-71 (3d Cir. 2008).

[23] As previously shown, numerous other courts have held that state-law claims attacking FDA-approved labeling are barred under the doctrine of implied conflict preemption. *See* AstraZeneca's prior preemption motion (Doc. No. 329), at 14-16 & n.12 (collecting cases); *see also, e.g., O'Neal v. SmithKline Beecham Corp.*, 551 F. Supp. 2d 993, 1003 (E.D. Cal. 2008); *Dobbs v. Wyeth Pharms.*, 530 F. Supp. 2d 1275, 1289-90 (W.D. Okla. 2008) (same), *on appeal*, No. 08-6018, *and stayed pending Supreme Court's decision in Wyeth v. Levine* (10th Cir. Mar. 7, 2008).

approved after being informed of the relevant risk' are preempted." 73 Fed. Reg. at 49,605-06 (quoting U.S. Amicus Br. in *Wyeth v. Levine*, 2008 WL 2308908, *7 (filed U.S. June 2, 2008)); *accord* 71 Fed. Reg. at 3935.

Since Seroquel was approved in 1997, FDA was aware of the risks of diabetes, hyperglycemia and weight gain; actively monitored the developing science; and struck what it considered to be the proper federal balance in terms of risk disclosures:

- In 1997, AstraZeneca's initial FDA-approved labeling reported these risks as "Adverse Reactions" occurring during the clinical trials. *See* p. 12, *supra*. Before approval, FDA revised this section of the labeling to "focus" how weight gain information was presented, and then approved labeling disclosing the risks as "Adverse Reactions," not as warnings. *Id.*

- After initial approval, FDA carefully monitored the developing science purporting to link diabetes, hyperglycemia and weight gain to Seroquel and other atypical antipsychotics. *Id.* at 12-14. But FDA's reviewers recognized that confounding factors (*e.g.*, the possibility that schizophrenia itself creates a risk of diabetes) complicated assessments of the relationship between these risks and atypical antipsychotic medications. *Id.*

- In 2003, after reviewing data from all atypical antipsychotic manufacturers, FDA required all such drugs to contain a classwide "Warning" regarding diabetes and hyperglycemia risk. *Id.* at 14-16. FDA's post-2004 carefully calibrated classwide diabetes/hyperglycemia warning was the product of its years of experience studying these issues, promulgated from its unique vantage point across all drugs in the class. As FDA required manufacturers to state, "the relationship between atypical anti-psychotic use and hyperglycemia-related adverse events is *not* completely understood." *Id.* at 15-16 & n.12 (emphasis added). While requiring these changes, FDA left in place the existing "weight gain" discussion in the Adverse Reactions section. *Id.*

- In 2006, FDA again explicitly affirmed "that it has not been established whether Seroquel causes diabetes." *See id.* at 17. Since requiring its classwide labeling, FDA has continued to study these issues and has repeatedly approved Seroquel's labeling containing the same language in 2006, 2007 and 2008. *Id.*

Thus, since Seroquel was first approved in 1997 and continuously thereafter, its labeling has included risk disclosures regarding diabetes, hyperglycemia and weight gain that

FDA required and deemed scientifically substantiated after being informed of those relevant risks. Seroquel's labeling has at all times embodied FDA's "formal, authoritative conclusions" following "thorough FDA review of the pertinent scientific evidence" about those very risks. 73 Fed. Reg. at 49,604; *see also Levine* U.S. Amicus Br., *supra*, 2008 WL 2308908, at *7. In dictating the form and content of Seroquel's labeling, FDA affirmatively acted to strike what it determined was the proper *balance between competing objectives* – including the balance between notifying physicians of risk information FDA determined to be scientifically substantiated while not deterring beneficial uses through "overwarning." 73 Fed. Reg. at 49,605-06; 71 Fed. Reg. at 3935.

Plaintiffs' effort to have a lay jury *second guess* FDA's expert judgments and strike a *different balance* conflicts with FDA's authoritative federal determinations. *See Geier*, 529 U.S. at 873-75. Likewise, any jury's imposition of state-law liability based on AstraZeneca's use of the FDA-approved labeling for Seroquel would necessarily *stand as an obstacle* to FDA's expert determinations that its federally mandated labeling strikes the appropriate balance. If Florida tort law required AstraZeneca to use *different* labeling and provide different warnings than those approved by FDA, it would "disrupt[] the federal scheme" and FDA's balancing of competing objectives. *Riegel v. Medtronic, Inc.,* 128 S. Ct. 999, 1004, 1008 (2008) (state tort suits that would permit lay juries in individual cases to second-guess determinations of FDA experts in cost-benefit decisions on population basis "disrupt[] the federal scheme" established by Congress).[24] Thus, plaintiffs' claims are preempted: Any

---

[24] Where a federal agency's determination strikes a careful "balance" between competing considerations and "statutory objectives" within its regulatory purview, attempts to use state law to argue that a different balance should have been struck are preempted because they effectively would

other result would allow entities that complied with federal law by providing the FDA-mandated labeling to "be subjected to considerable liability based on varying [state-law] standards, with no benchmark" to follow, which "'would interfere with FDA's accomplishment of regulatory objectives.'" *Colacicco,* 521 F.3d at 267-68 (citation omitted).

### 2. Plaintiffs' Inadequate Warning Theories Are Preempted Because They Fatally Conflict With FDA's Regulatory Determinations

Plaintiffs' experts offer several theories on how AstraZeneca has supposedly breached its duty to warn of the risks associated with Seroquel. Each is preempted.

First, plaintiffs' experts suggest that Seroquel's labeling – both before and after FDA's classwide warning – was inadequate because it did not warn that Seroquel *causes* diabetes. *See* Plunkett Dep., at 147:21-149:8 (Exh. 40); *cf.* Wirshing Dep., at 210:17-212:18 (while atypicals do not directly cause diabetes, they may trigger weight gain linked to diabetes risk) (Exh. 38). This conflicts with FDA's conclusions, based on the same science analyzed by plaintiffs' experts, that (1) Seroquel's "relationship" with diabetes and hyperglycemia "is not completely understood"; and (2) it "has not been established" that "Seroquel causes diabetes." *See* pp. 14-16 & n.12, *supra.*[25] As in *Colacicco*, preemption applies here because "FDA, after its review of the aggregated data" for all drugs in a class, concluded that "there is insufficient evidence" for the warnings demanded by plaintiffs under

---

allow state law to override the agency, thus obstructing the federal scheme. *Buckman*, 531 U.S. at 348; *Geier*, 529 U.S. at 874-75, 881-83; *see Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 152 (1989); *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 321 (1981).

[25] Because FDA's years of comprehensive examination of the relevant data led it to conclude in 2006 that there is no scientific substantiation for a causation warning, it necessarily is the case that there was an insufficient scientific basis for such a warning *prior* to 2006 – including in 1997 when Seroquel came to market and the data were much more limited, or at any point thereafter during plaintiffs' Seroquel ingestion.

state law. 521 F.3d at 273. Indeed, plaintiffs' experts here go so far as to suggest that AstraZeneca violated Florida law by *complying* with FDA's federally mandated "class" labeling, which they fault as insufficient. *See* Wirshing Dep. at 220:17-221:10 (Exh. 38); Plunkett Dep. at 294:6-22 (Exh. 40). The preempting conflict is stark: State law cannot be used to override FDA's expert regulatory determinations without standing as an obstacle to the federal scheme established by Congress and enforced by FDA.

Second, plaintiffs' experts fault Seroquel's labeling because they contend (1) its risk disclosures about diabetes, hyperglycemia, and weight gain always should have been in the labeling's "Warnings" (not "Adverse Reactions") section, *see* Plunkett Dep. at 278:20-280:18 (Exh. 40); or (2) after FDA's post-2004 classwide warning, its accurate "weight gain" disclosure should have been in the "Warnings" section. Wirshing Dep., at 219:23-25 ("only criticism" is "where" weight-gain language was "placed" in labeling, not "the words that are used") (Exh. 38). These theories also are preempted. Indeed, because FDA actively regulated both the *content and placement* of these risk disclosures, plaintiffs' claims necessarily conflict with the expert agency's authoritative federal determinations governing Seroquel's labeling. Until FDA mandated its classwide diabetes/hyperglycemia warnings, FDA determined that risk information about diabetes, hyperglycemia and weight gain was *properly* disclosed in the labeling's "Adverse Reactions" section. After its classwide "Warnings," FDA adhered to its position that the weight-gain disclosure should remain in the labeling's "Adverse Reactions" section, while mandating that Seroquel's labeling "must be identical" to FDA's approved labeling. Plaintiffs' attempt to challenge *where* this risk information appeared conflicts with federal law and FDA's decisions governing the proper

*format* of Seroquel's labeling in accordance with 21 C.F.R. Part 201.

Third, one of plaintiffs' experts vaguely suggests that she believes AstraZeneca may have committed some sort of "fraud on the FDA."[26] Apart from the dispositive fact that FDA *itself* never made any such determination, this theory is preempted under *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001), which held that "state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law." *Id.* at 348-49, 351 ("fraud on the FDA claims" are preempted because "the federal statutory scheme amply empowers the FDA to punish and deter fraud against [it]"); *accord Colacicco*, 521 F.3d at 272 (*Buckman* preempts state-law claims attacking drug labeling with contention that manufacturer "manipulat[ed] or withh[e]ld" scientific data or information from FDA); *Horne v. Novartis Pharms. Corp.*, 541 F. Supp. 2d 768, 785 (W.D.N.C. 2008) (*Buckman* preempts claims that defendant "withheld" evidence from FDA or "committed [any] fraud on the FDA"); *In re Bextra & Celebrex Mktg. Sales Pracs. & Prods. Liab. Litig.*, 2006 WL 2374742, *10 (N.D. Cal. Aug. 16, 2006) (same).

### 3.   Plaintiffs Cannot Avoid Preemption By Relying On FDA's "Changes Being Effected" ("CBE") Supplement Provision

Plaintiffs cannot escape preemption by positing that their conflicting state claims are somehow consistent with federal law due to FDA's CBE procedure (*see* pp. 9-10, *supra*). Any suggestion that AstraZeneca should have used CBE supplements to provide different warnings than those risk disclosures approved and required by FDA after its review of the

---

[26] *See, e.g.*, Arnett Dep., at 79:11-22 (suggesting AstraZeneca obscured or withheld scientific data from FDA) (Exh. 36); *but see id.* at 205:4-5, 241:25-243:11, 256:7-9 (testifying to her limited review of materials submitted to FDA).  None of plaintiffs' putative experts even purports to identify *any* material scientific data supposedly withheld from FDA that *would have changed* FDA's analysis and conclusions.

pertinent science[27] would totally misunderstand FDA's CBE supplement procedure.

Decades ago, FDA made plain that its CBE supplement procedure properly applied to labeling changes made "to correct concerns about *newly discovered risks*" and to "make available important *new information* about the safe use of a drug product."  47 Fed. Reg. 46,622, 46,623, 46,635 (Oct. 19, 1982) (emphases added).  As FDA has recently confirmed, a CBE supplement is appropriate "*only* to reflect *newly acquired information*," and may be used to add or strengthen a label warning only when new scientific data provides "*sufficient* evidence of a *causal* association" between the drug and the risk at issue.  73 Fed. Reg. at 49,603-04, 49,608 (emphases added) (citing 21 C.F.R. § 201.57(c)(6)); *see also* p. 10 & n.7, *supra*.  Yet here, plaintiffs' experts point to no *new* scientific data about *new* risks; they just disagree with FDA's scientific judgments and determinations about the proper form and content of Seroquel's labeling disclosures about *risks of which FDA was aware* and based on the *same data that was submitted to FDA*.  Nor do plaintiffs even purport to identify any scientific data not submitted to FDA from 1997 to 2007 that could possibly provide the sort of "sufficient evidence of a causal association" required to support any proper CBE supplement under FDA's scientific standards and regulatory regime.  *Id.*[28]

---

[27] For instance, plaintiffs' experts suggest AstraZeneca should have disregarded the FDA-mandated form and content of Seroquel's risk disclosures and done a CBE supplement that put in the labeling's "Warnings" section diabetes-related or weight-gain risk information – such as their subjective view that Seroquel's labeling was "inadequate" by not stating that "Seroquel can cause hyperglycemia and diabetes."  Plunkett Report, ¶¶ 29, 39, 44, 45 (Exh. 39); *see also* Wirshing Report, at 9 (suggesting Seroquel's labeling was "inadequate in its warnings" about risk of "hyperglycemia" and "diabetes") (Exh. 37); Wirshing Dep. at 218:19-219:25 (conceding "accuracy" of Seroquel label's "weight gain" disclosure in adverse reactions section, but suggesting it should have been in the labeling's "warning" section) (Exh. 38).

[28] AstraZeneca submitted a CBE supplement in the summer of 2007 based on recently completed clinical studies.  FDA did not change the language of its federally mandated classwide diabetes/hyperglycemia warning in light of the new data.

In short, FDA's CBE supplements provide a means – subject to ultimate FDA review and approval, and limited by FDA's misbranding authority – for manufacturers to warn about *new* risks and *new* scientific data FDA has not considered; CBE supplements may not be used unilaterally to rewrite FDA-approved warnings about known risks FDA has already considered. By seeking to displace FDA's congressionally mandated role in determining proper warnings, and by urging that Florida law requires warnings FDA determined to be scientifically unsubstantiated, plaintiffs' claims conflict with, and would stand as an obstacle to, FDA's authoritative federal determinations with respect to Seroquel, and are preempted.

### 4. Plaintiffs Cannot Evade Preemption By Suggesting Promotional Materials Misled Their Doctors And Undermined The Warnings

Plaintiffs' prior effort to dodge preemption by suggesting some alleged AstraZeneca "promotional" efforts strayed impermissibly from the FDA-approved labeling (*In re Seroquel Prods. Liab. Litig.* (Doc. No. 644), slip op. at 5-6 & nn. 2-4 (M.D. Fla. Nov. 6, 2007)) cannot possibly assist them in these cases. As shown in the individual motions filed concurrently, discovery in each case revealed *no causal nexus* between any such promotional conduct and the independent decisions of *these plaintiffs' physicians* to prescribe Seroquel for them.[29]

\* \* \*

In sum, plaintiffs' failure-to-warn claims are preempted because they conflict with determinations of the expert agency charged by Congress with overseeing drug safety – an agency that has been actively engaged since Seroquel was approved in monitoring risks of diabetes, hyperglycemia and weight gain that may be associated with the medicine. Indeed,

---

[29] For instance, plaintiffs can adduce *no competent evidence* that their own prescribers ever even saw, much less relied upon, the promotional material that was the subject of DDMAC's Nov. 16, 2006 letter previously trumpeted by plaintiffs' counsel.

under the position advanced by the United States and FDA in *Wyeth v. Levine*, No. 06-1249

(U.S., oral argument Nov. 3, 2008), plaintiffs' claims here are preempted because "they

challenge labeling that FDA approved after being informed of the relevant risk[s]" (*Levine*

U.S. Amicus Br., 2008 WL 2308908, at *7), of diabetes, hyperglycemia, and weight gain

when FDA approved Seroquel's labeling from 1997 to the present.

**C.    Plaintiffs' Claims Fail Under The Learned Intermediary Doctrine**

Like virtually all other states, Florida follows the "learned intermediary doctrine."

*Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990) ["*MacMurdo*"]; *Felix v.*

*Hoffmann-LaRoche*, 540 So. 2d 102, 104-05 (Fla. 1989); *see also In re Norplant*

*Contraceptive Prods. Liab. Litig.*, 215 F. Supp. 2d 795, 803-04 (E.D. Tex. 2002).[30]  The

learned intermediary doctrine applies to "all" Florida claims involving *any* inadequate

warning theory – including plaintiffs' claims for "negligence, strict liability, and fraud" here.

*Beale v. Biomet, Inc.*, 492 F. Supp. 2d 1360, 1372-73 (S.D. Fla. 2007) (citing cases).

As explained below and in the individual summary judgment motions, plaintiffs'

claims fail under the learned intermediary doctrine's two-prong analysis, which requires

them to prove *both* that (1) AstraZeneca's Seroquel warnings to physicians were *inadequate*;

and (2) the inadequacy of such warnings *proximately caused* plaintiffs' alleged injuries.  *See*,

*e.g.*, *In re Norplant*, 215 F. Supp. 2d at 803-04, 823, 833-34; *accord Felix*, 540 So. 2d at 105.

First, plaintiffs' suggestion that AstraZeneca failed to warn them directly of

---

[30] This rule of law operates both to define a prescription drug manufacturer's *limited duty to warn* of drug-related risks, and to clarify the heightened nature of a plaintiff's burden to establish that any allegedly inadequate warning *proximately caused* plaintiff's alleged injury. *See, e.g., Felix*, 540 So. 2d at 104-06; *Ackermann v. Wyeth Pharms.*, 526 F.3d 203, 207-08 (5th Cir. 2008) ("learned-intermediary doctrine is not an affirmative defense"; it "delineates to whom a defendant – usually a prescription drug manufacturer – owes the duty to warn").

Seroquel's risks fails.  Under the learned intermediary doctrine, the duty to warn runs *only*

"to the physician as a learned intermediary and not to the patient," *Savage v. Danek Med.,* 31

F. Supp. 2d 980, 984-85 (M.D. Fla. 1999), "because the prescribing physician, acting as a

'learned intermediary' between the manufacturer and the consumer, weighs the potential

benefits against the dangers in deciding whether to recommend the drug to meet the patients'

needs." *Felix*, 540 So. 2d at 104; *accord MacMurdo*, 562 So. 2d at 683; *Christopher v.*

*Cutter Lab.*, 53 F.3d 1184, 1192 (11th Cir. 1995).  The doctrine's rationale is clear:

> "Prescription drugs are likely to be complex medicines, esoteric in formula and varied
> in effect.  As a medical expert, the prescribing physician can take into account the
> propensities of the drug, as well as the susceptibilities of his patient.  His is the task of
> weighing the benefits of any medication against its potential dangers.  The choice he
> makes is an informed one, an individualized medical judgment bottomed on a
> knowledge of both patient and palliative.  *Pharmaceutical companies* then, who must
> warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in
> selling prescription drugs *are required to warn only the prescribing physician*, who
> acts as a 'learned intermediary' between manufacturer and consumer."

*Buckner v. Allergan Pharms., Inc.*, 400 So. 2d 820, 822 (Fla. App. 1981) (emphasis added;

citation omitted); *accord Beale*, 492 F. Supp. 2d at 1366 (quoting *Buckner*).

It is up to the prescribing physician's "medical judgment" whether, and if so how, to

inform patients of any risk information about prescription drugs.  *Buckner*, 400 So. 2d at 823.

Thus, in an action against the drug's manufacturer, it "makes no difference" if a plaintiff

testifies that her prescribing physician "did not warn her" of the drug's risks.  *Felix*, 540 So.

2d at 105; *accord Stafford v. Wyeth*, 411 F. Supp. 2d 1318, 1322 (W.D. Okla. 2006) (plaintiff

affidavit that he would not have consented to drug ingestion if warned by physician is

immaterial under learned intermediary doctrine).  Even if the manufacturer knows physicians

are "not adequately relaying" warnings to patients, the manufacturer's duty to warn *still* runs

*only* to the physicians and not their patients. *Buckner*, 400 So. 2d at 821-24; *accord Cornelius v. Cain*, 2004 WL 48102, *3 (Fla. Cir. Ct. Jan 5, 2004). It is legally "irrelevant" whether plaintiff received the manufacturer's warnings directed at physicians. *E.R. Squibb & Sons v. Farnes*, 697 So. 2d 825, 827 (Fla. 1997); *accord Beale*, 492 F. Supp. 2d at 1370.

Second, the learned intermediary doctrine also impacts what plaintiffs must establish to prove that defendant's allegedly inadequate warning *proximately caused* the plaintiff's ingestion of the drug and alleged resulting injury. *Christopher*, 53 F.3d at 1192; *Felix*, 540 So. 2d at 104-05; *Beale*, 492 F. Supp. 2d at 1370-71. Plaintiffs must prove their physicians "would not have prescribed" Seroquel for them "but for the alleged inadequate warning." *Porter v. Ely Lilly & Co.*, 2008 WL 4138115, *1 (11th Cir. Sept. 9, 2008); *see Edgar v. Danek Medical, Inc.*, 1999 WL 1054864, *6 (M.D. Fla. March 31, 1999) (Florida law); *Beale*, 492 F. Supp. 2d at 1371; *see also Stupak v. Hoffman-La Roche, Inc.*, 2007 WL 2350561, *3 (M.D. Fla. Aug. 17, 2007).[31] As Florida precedent confirms, plaintiffs' claims fail under the learned intermediary doctrine if there is any break in the "causal link" between defendant's allegedly inadequate warning and plaintiff's drug ingestion and alleged resulting injury. *Beale*, 492 F. Supp. 2d at 1371 (causal chain "broken" where physician still would have prescribed drug despite risk information at issue); *see also Christopher*, 53 F.3d at 1192

---

[31] In this respect, Florida law is consistent with the rule articulated by the Fifth Circuit that, "in a prescription drug failure to warn case, the plaintiff must establish that an adequate warning would have convinced the treating physician not to prescribe the product for the plaintiff." *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992). "Even if the physician is not aware of the risk, the plaintiff must show that a proper warning would have changed the decision of the treating physician, *i.e.*, that but for the inadequate warning, the treating physician would not have used or prescribed the product." *Ackermann v. Wyeth Pharms.*, 526 F.3d 203, 208 (5th Cir. 2008). "Because the defective aspect of the product must cause the injury, the plaintiff must show that a proper warning would have changed the decision of the treating physician, *i.e.*, that but for the inadequate warning, the treating physician would not have used or prescribed the product." *Willett v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1098-99 (5th Cir. 1991).

(physician's "independent knowledge" of risks breaks causal chain); *Alexander v. Danek Med. Inc.*, 37 F. Supp. 2d 1346, 1350 (M.D. Fla. 1999) (causal chain broken where plaintiff failed to prove that "inadequacy of the manufacturer's warning affected [his physician's] use of the product" for him); *accord Baker v. Danek Med.*, 35 F. Supp. 2d 875, 881 (N.D. Fla. 1998); *Timmons v. Purdue Pharma Co.*, 2006 WL 263602, *4 (M.D. Fla. Feb. 2, 2006).

Here, plaintiffs' claims fail both prongs of the learned intermediary doctrine analysis.

### 1.    AstraZeneca's FDA-Approved Labeling For Seroquel Is Legally "Adequate" Under Florida Law

The "adequacy" of drug warnings may be decided as a matter of law whenever they are "accurate, clear, and unambiguous" in identifying the potential risks at issue. *MacMurdo*, 562 So. 2d at 681-82; *Felix*, 540 So. 2d at 105; *Hayes v. Spartan Chem. Co.*, 622 So. 2d 1352, 1354 (Fla. App. 1993) ("adequacy of the warning" is "somewhat easier" to establish in "learned intermediary" context "because it will be read and considered by a trained expert").

As the Florida Supreme Court has held, the "crucial question" is whether the drug manufacturer's risk disclosures are "adequate to warn a physician of the possibility that [the drug] might be causing the condition" allegedly suffered by plaintiff. *MacMurdo*, 562 So. 2d at 683.  Under this governing standard, Florida courts have repeatedly held that provision of FDA-approved labeling that discloses the very risks at issue in its adverse events or warnings sections is legally "adequate," because such risk disclosures put physicians "on notice" of the "possibility" of the side effects about which plaintiffs complain. *Id.* at 682-83; *see also E.R. Squibb & Sons, Inc.*, 697 So. 2d at 827 (affirming that "[p]harmaceutical manufacturers discharge their duty to warn the learned intermediary by way of a package insert" and labeling approved by FDA); *Cornelius*, 2004 WL 48102, at *2 (drug manufacturer "satisfies

its duty to warn by providing adequate warnings in what are known as 'package inserts' for the medication and other FDA-approved labeling for the medication") (citing *MacMurdo*).[32]

In *MacMurdo*, the Florida Supreme Court held that the defendant's package insert for injectable contraceptive Depo-Provera was "adequate" to warn of plaintiff's alleged excessive and continuous menstrual bleeding because its "ADVERSE REACTIONS" section "explicitly state[d] that breakthrough bleeding, spotting, and change in menstrual flow are adverse reactions which have been observed in women taking Depo-Provera," which thus "warned of the possibility of abnormal bleeding outside of the menstrual period."  562 So. 2d at 682-83.  "It would be unreasonable to hold Upjohn liable for not characterizing the bleeding as excessive, continuous, or prolonged," the Court held, because the warnings given were enough generally to put physicians "on notice" of the type of risks at issue. *Id*. at 683.[33] Likewise, in *Felix*, the Florida Supreme Court held that the labeling for prescription acne drug Accutane was "adequate" to warn of potential "dangerous side effects" of ingestion while pregnant – including risks of fetal injury about which plaintiff complained – because it disclosed the risk of "teratogenicity," which would be "quite clear" to the "physicians" to

---

[32] Where the drug's FDA-approved labeling identifies "specific adverse side effects" that have been observed and associated with the drug's ingestion, that puts any physician *on notice* of (i) the potential that such side effects may be experienced by any patient who may be prescribed the drug, and (ii) the physician's "need to monitor the patient and to consider alternative therapies." *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 521 (7th Cir. 2003).  Moreover, it is well settled under Florida law that any physician already has a *pre-existing* legal "duty" not only "to know the drug that he is prescribing" but also "to properly monitor the patient." *Pysz v. Henry's Drug Store*, 457 So. 2d 561, 562 (Fla. App. 1984).

[33] Notably, the Court held that the package insert was "adequate" under Florida law even though it identified the risks *only* as "adverse reactions which have been observed," not in the "warnings" section. *MacMurdo*, 562 So. 2d at 682-63.

whom the warnings were addressed even if unclear to lay persons.  540 So. 2d at 103-06.[34]

Courts applying the principles of *MacMurdo* and *Felix* have repeatedly held that other FDA-approved labeling expressly disclosing the potential risks about which plaintiffs complained were "adequate" under Florida law.  *See, e.g.*, *Beale*, 492 F. Supp. 2d at 1368-70 (package insert for prosthetic knee device held "adequate" where it disclosed various "patient selection factors to be considered" including ability to "control body weight," exercise, and diet); *Cornelius*, 2004 WL 48102, at **3-4 (package insert for prescription pain medication OxyContin held "adequate" where it explicitly warned of the drug's potential "'addictive nature" and "risks of consuming excessive amounts").[35]

Here, AstraZeneca's FDA-approved labeling and package inserts for Seroquel are legally "adequate" as well under Florida law.  Since Seroquel's initial FDA approval in 1997, "diabetes mellitus," "hyperglycemia," and "weight gain" – the risks and potential side effects about which plaintiffs complain – have *always* explicitly been included in Seroquel's labeling exactly as FDA required and deemed proper to inform physicians of the risks without understating or overstating the potential hazards, and without being false or

---

[34] *Felix* also recognized and applied the *state-of-the-art* principle that a drug manufacturer's warnings that accurately reflect known risks at the time cannot retroactively be rendered "defective" due to "subsequent" scientific developments.  540 So. 2d at 104; *accord E.R. Squibb & Sons*, 697 So. 2d at 828 (verdict for plaintiff properly vacated where defendant's warnings "accurately reflected the state of medical knowledge in 1989," *i.e.*, the time of plaintiff's drug ingestion and alleged injury).

[35] In fact, courts applying Florida law after *MacMurdo* have held that the defendant's FDA-approved labeling was legally adequate even when it failed specifically to include the risk about which plaintiff complained, so long as the labeling disclosed the *general type of risks at* issue in the manner approved by FDA.  *E.g.*, *Bogle v. Sofamor Danek Group*, 1999 WL 1132313, *5 (S.D. Fla. Apr. 9, 1999) (package insert for bone screws legally "adequate" even though it did not list "soft tissue pain" plaintiff suffered, because it "described possible adverse effects as including everything from pressure on the skin to possible death"); *Broderick v. Sofamor Danek Group*, 1999 WL 1062135, *5 (S.D. Fla. Apr. 9, 1999) (labeling "adequate" because, while not specifically listing "foot-swelling, calf-cramping or loss of bladder control" plaintiff suffered, it did not exclude those risks in its "broad categories of 'foreign body reaction' or 'loss of neurological function' as possible side effects").

misleading.  *See* pp. 6-17, *supra*.

- **1997-2003 Labeling**:  In Seroquel's initial labeling applicable from 1997 to 2003, each of these potential risks was properly listed in the "ADVERSE REACTIONS" section of the drug's FDA-approved labeling.  The inclusion of these potential risks as adverse reactions was in accordance with state-of-the-art scientific knowledge at the time, and in compliance with FDA's requirements under 21 C.F.R. § 201.80(g)(2).[36]  As in *MacMurdo*, such disclosure of these adverse reactions put physicians "on notice" of the possibility these side effects might be experienced by those ingesting the drug.  562 So. 2d at 682-83.

- **Post-2004 Class-Wide Labeling**:  After FDA's classwide label change for all atypical antipsychotics including Seroquel, diabetes and hyperglycemia were elevated to the "Warnings" section under a separate bold heading ("Hyperglycemia and Diabetes Mellitus") followed by the exact risk-disclosure information crafted and required by FDA.  Plaintiffs' experts do not genuinely challenge the accuracy of FDA's carefully calibrated classwide warning.  Remarkably, they fault AstraZeneca for *complying* with FDA's federal mandate that its classwide warning accompany all atypical antipsychotics including Seroquel, which they try to criticize on the baseless grounds that it supposedly fails to make clear its warnings apply to Seroquel or because they wish FDA's chosen warning language were less generalized.[37]

   Accordingly, this is not a "no warnings" situation.  *Ackermann*, 526 F.3d at 209.

Plaintiffs are simply wrong to suggest that the risks of diabetes, hyperglycemia, and weight gain were not in Seroquel's labeling until the 2004 FDA class-wide warning.  Those risks were at all times *explicitly* in the Seroquel labeling in precisely the manner that FDA determined to be appropriate and scientifically supported in accordance with state-of-the-art

---

[36] In compliance with 21 C.F.R. § 201.80(g)(2), AstraZeneca's 1997-2003 labeling accurately listed diabetes and hyperglycemia as "infrequent" adverse events, which FDA confirmed as consistent with state-of-the-art scientific knowledge at the time.  *See* pp. 7-9, 12-14, *supra*.  Under section 201.80(g)(2), an adverse event is accurately described as infrequent where adverse event reports reveal an incidence of between 1/1000 and 1/100.  *See also* Exh. 44 (Clinical Impact of Adverse Event Reporting, available at *http://www.fda.gov/medwatch/articles/medcont/postrep.htm* (FDA is well aware of "underreporting" issue inherent in adverse event reports)).

[37] While some plaintiff experts try to criticize the FDA's class labeling, Dr. Mohan Nair – the case-specific psychiatrist expert for plaintiff Sandra Carter (who dismissed her case entirely on October 30, 2008, right before AstraZeneca was about to file the dispositive motion it prepared in that meritless no-injury case) – testified not only that he still prescribes Seroquel for his patients today, but also that the post-2004 Seroquel labeling is "adequate."  Nair Dep., at 152:23-153:19 (Exh. 41).

scientific knowledge at the time.[38]  Thus, as a matter of law, Seroquel's labeling and package

inserts necessarily put physicians "on notice" of the possibility of the very risks about which

plaintiffs complain, which is legally adequate under Florida law.  *MacMurdo*, 562 So. 2d at

681-82; *accord Felix*, 540 So. 2d at 105; *Beale*, 492 F. Supp. 2d at 1368-70.

2. **Plaintiffs' Claims Fail For Lack Of Proximate Causation Under The Learned Intermediary Doctrine**

Even if there were a triable issue as to the adequacy of AstraZeneca's Seroquel

labeling and package inserts, plaintiffs' claims would still fail under the learned intermediary

doctrine for lack of "proximate cause."  *Felix*, 540 So. 2d at 106.

Under Florida law, *plaintiffs* bear the "'burden of proof'" on the essential element of

proximate causation.  *Gooding*, 445 So. 2d at 1018 (citation omitted); *accord Felix*, 540 So.

2d at 105; *Christopher*, 53 F.3d at 1191.  To establish proximate cause under the learned

intermediary doctrine, plaintiffs must prove that their prescribing physicians *would not have*

prescribed Seroquel for them *but for* the allegedly inadequate warnings of the risks at issue.

*Porter*, 2008 WL 4138115, at *1; *accord Ackermann*, 526 F.3d at 208.  If their physicians

*still* would have prescribed the drug regardless of the alleged warning inadequacy (*e.g.*,

---

[38] Moreover, Florida imposes no duty to warn of any "commonly known" risks.  *John Morrell & Co. v. Royal Caribbean Cruises, Ltd.*, 534 F. Supp. 2d 1345, 1351-52 (S.D. Fla. 2008) (citing cases); *Lake v. Tenneco, Inc.*, 2007 WL 4482567, **2-3 (M.D. Fla. Dec. 17, 2007).  This settled rule negates plaintiffs' contention that AstraZeneca failed sufficiently to warn specifically that *weight gain from Seroquel might increase the risk of diabetes* because, as even plaintiffs' experts concede, it is *commonly known* among physicians that weight gain from any source might increase a person's risk of diabetes and blood-glucose problems.  *Compare* Arnett Dep. at 115:3-17 (relationship between weight gain and diabetes has long been "common knowledge in the medical community") (Exh. 36); *with Meridia Prods. Liab. Litig. v. Abbott Labs.*, 447 F.3d 861, 867 (6th Cir. 2006) (drug warnings need not warn of potential secondary consequences; "'[p]hysicians are well aware of the scope of the risks associated with increased blood pressure and do not need specifics regarding the possible consequences of blood pressure increases'") (citation omitted); *accord Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 266-68 (5th Cir. 2002); *cf. E.R. Squibb & Sons v. Farnes*, 697 So. 2d 825, 827 (Fla. 1997).

because they had "independent knowledge" of the risks), then any "failure of the

manufacturer to provide the physician with an adequate warning with the risks associated

with a prescription product is not the proximate cause of a patient's injury." *Christopher*, 53

F.3d at 1192; *Felix*, 540 So. 2d at 105.  Indeed, the "causal link" between any allegedly

inadequate warning and plaintiff's injury "is broken" where plaintiff's prescriber "'would

have taken the same course of action even with the information the plaintiff contends should

have been provided.'"  *Beale*, 492 F. Supp. 2d at 1371 (quoting *Ellis v. C.R. Bard, Inc.*, 311

F.3d 1272, 1283 n.8 (11th Cir. 2002)).

　　　Under the learned intermediary doctrine, plaintiffs cannot prove the requisite *causal*

*link* between any allegedly inadequate warning and their drug ingestion and alleged injury in

any of the following judicially recognized circumstances:

- Where plaintiff's prescriber had "independent knowledge" of the risks an adequate warning would have disclosed, *Christopher*, 53 F.3d at 1192; *Felix*, 540 So. 2d at 105;

- Where the record reveals the prescribing physician "still would have prescribed" the drug for plaintiff despite the allegedly omitted information, *Porter*, 2008 WL 4138115, at *1; *Ackermann*, 526 F.3d at 212; *accord Beale*, 492 F. Supp. 2d at 1371; *Alexander*, 37 F. Supp. 2d at 1350; *Timmons*, 2006 WL 263602, at *4; *Stupak*, 2007 WL 2350561, at *3; *Cornelius*, 2004 WL 48102, at *3; *Edgar*, 1999 WL 1054864, at *6;

- Where the physician *still stands by the decision to prescribe the drug for plaintiff* in the exercise of the physician's individual medical judgment because the physician continues to believe that the benefits outweigh the risks for plaintiff, *see, e.g.*, *Beale*, 493 F. Supp. 2d at 1371; *Stupak*, 2007 WL 2350561, at *3;

- Where the record reveals that further warnings or disclosures would not have "made a difference" or "affected" the physician's prescribing decision for plaintiff, *see, e.g.*, *Baker v. Danek Med., Inc.*, 35 F. Supp. 2d 875, 881 (N.D. Fla. 1998); *Timmons*, 2006 WL 263602, at *4; *Beale*, 493 F. Supp. at 1371; *Alexander*, 37 F. Supp. 2d at 1350; *Wilson v. Danek Med., Inc.*, 1999 WL 1062129, *5 (M.D. Fla. Mar. 29, 1999);

- Where plaintiff's physician *continued to prescribe* the drug for his or her patients despite even knowing all the physician knows today from further risk information or the physician's clinical experience, *see, e.g., Colville v. Pharmacia & Upjohn Co.*, 565 F. Supp. 2d 1314, 1322 (N.D. Fla. 2008); *Stupak*, 2007 WL 2350561, at \*3; *accord Ackermann*, 526 F.3d at 206; *Ehlis v. Shire Richwood, Inc.*, 367 F.3d 1013, 1018 (8th Cir. 2004); *Madsen v. American Home Prods. Corp.*, 477 F. Supp. 2d 1025, 1036-37 (E.D. Mo. 2007);

- Where plaintiff's prescribing physician was aware of a purported risk but reached his or her independent medical conclusion that the risk did not exist, was not scientifically substantiated, was not sufficiently great, or was not germane to the particular patient, *see, e.g., Motus v. Pfizer Inc.*, 196 F. Supp. 2d 984, 995-96 (C.D. Cal. 2001), *aff'd*, 358 F.3d 659 (9th Cir. 2004); *Colville*, 565 F. Supp. 2d at 1322; or

- Where plaintiff's prescribing physician failed to read the warnings that were provided, thereby rendering inconsequential whether the manufacturer's warning was adequate or inadequate. *See, e.g., Motus*, 358 F.3d at 661; *Stanback v. Parke, Davis & Co.*, 657 F.2d 642, 644 (4th Cir. 1981); *accord Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 856 (10th Cir. 2003); *cf. Pinchinat v. Graco Children's Prods. Inc.*, 390 F. Supp. 2d 1141, 1147-48 (M.D. Fla. 2005).

Any one of these scenarios would prevent plaintiffs from proving proximate causation. But the facts in these cases reveal *multiple* breaks in the causal chain. For instance, plaintiffs' prescribing physicians repeatedly testified that they *continue* to this day prescribing Seroquel for patients – despite knowing what they know today about the possible risks of diabetes, hyperglycemia, and weight gain about which plaintiffs complain, including from FDA's 2004 classwide diabetes/hyperglycemia warning. The prescribers testified that they *stand by* their decisions to prescribe Seroquel for plaintiffs, because they continue to believe that the potential benefits of the drug outweigh its possible risks in the exercise of their professional medical judgment. In addition, many testified that they had *independent knowledge* of the potential risks of diabetes, hyperglycemia and weight gain, from their medical training, clinical experience, or other sources besides Seroquel's labeling and warnings. Moreover, the physicians repeatedly testified that they *still would have prescribed*

*Seroquel for plaintiffs* even if they had further information about the risks at issue.  As AstraZeneca demonstrates in the individual summary judgment motions filed concurrently herewith, the sworn testimony of plaintiffs' own prescribers confirms that plaintiffs cannot bear their burden to prove proximate causation under the learned intermediary doctrine.

3.    **Plaintiffs' Various Contentions Are Insufficient To Defeat Summary Judgment Under The Learned Intermediary Doctrine**

a.    **Plaintiffs' "Monitoring" Contentions Are Unavailing**

In their effort to evade summary judgment, one or more plaintiffs may suggest that a different warning might have led a particular prescribing physician to "monitor" that plaintiff's weight or blood glucose levels more closely.  But any such contentions would be insufficient to defeat summary judgment because that plaintiff would have to prove *both* that (1) his or her prescribing physician actually would have engaged in different and additional monitoring of that plaintiff; *and* (2) such additional monitoring would have *prevented* that plaintiff's alleged injuries.  *See, e.g., Vanderwerf v. SmithKline Beecham Corp.*, 529 F. Supp. 2d 1294, 1312-13 (D. Kan. 2008) (plaintiff's "monitoring" contentions held insufficient); *Reece v. AstraZeneca Pharms., LP*, 500 F. Supp. 2d 736, 751 (S.D. Ohio 2007) (same); *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1018-20 (10th Cir. 2001).[39]  Here, none of these plaintiffs has anything but speculation and conjecture on both fronts, which is insufficient as a matter of law.  *Gooding*, 445 So. 2d at 1018-20 ("speculation" insufficient to

---

[39] Given that Florida long ago imposed on physicians an *independent* "duty...to monitor" all of their patients, *Pysz v. Henry's Drug Store*, 457 So. 2d 561, 562 (Fla. App. 1984), plaintiffs' monitoring arguments here are dubious under Florida law.  Moreover, where the drug manufacturer's labeling discloses the risks at issue as adverse events that have been observed (such as in Seroquel's 1997-2003 labeling), physicians are also at that point already charged legally with the duty to "monitor the patient and to consider alternative therapies."  *Ziliak v. AstraZeneca LP*, 324 F.3d at 521.

satisfy plaintiff's causation burden); *Eck*, 256 F.3d at 1020 (affirming summary judgment under learned intermediary doctrine despite possibility that plaintiff's initial prescribing physician who "monitored" plaintiff "might" have acted differently with a more adequate warning, which might have prevented plaintiff's injury). Indeed, *nothing* in the record here provides even a scintilla of competent evidence proving that, if plaintiffs' physicians had been more fully warned, they would have engaged in any additional monitoring that *would have prevented* plaintiffs from suffering their alleged diabetes-related injuries.[40]

**b.**   **Plaintiffs Cannot Evade Summary Judgment By Reference To Any "Heeding Presumption" Or "Exceptions" To The Learned Intermediary Doctrine Which No Florida Court Has Adopted**

Plaintiffs also cannot evade summary judgment for lack of proximate causation by invoking a so-called "heeding presumption" – *i.e.*, a rebuttable presumption that, if the physician had received different warnings, that doctor would not have prescribed the drug for the plaintiff. No Florida court has *ever* applied any heeding presumption in the prescription drug context under Florida law – which is dispositive under federalism principles and governing Eleventh Circuit authority in these diversity cases.[41] Moreover, any such heeding

---

[40] *See Vanderwerf*, 529 F. Supp. 2d at 1312-13 (summary judgment granted despite plaintiff's "monitoring" contentions where "[n]othing in the record" proved that "any level of further monitoring" by plaintiff's physician actually "would have prevented [plaintiff's injury]"); *Reece*, 500 F. Supp. 2d at 751 (summary judgment granted where "no competent evidence" proved that additional monitoring, through "baseline and periodic [testing]" of plaintiff, "would have alerted her physician to the presence of [her condition] in a sufficiently timely manner to prevent [the alleged injury]").

[41] Federal courts in diversity cases are "not free" to adopt "modifications" of state law, *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975), particularly where the state's own courts have "not embraced" the legal proposition in the context at issue and there is "no assurance [those] courts will do so." *Chapman v. American Cyanamid Co.*, 861 F.2d 1515, 1520 (11th Cir. 1988); *Seaboard Surety Co. v. Garrison, Webb & Stanaland P.A.*, 823 F.2d 434, 438 (11th Cir. 1987); *see also Ackermann*, 526 F.3d at 212-13 (refusing to adopt any "heeding presumption" in diversity case governed by Texas law where "neither Texas [courts] nor federal courts applying Texas law have

presumption would not only be contrary to Florida law making clear that it is *plaintiffs* who bear the "burden of proof" on "causation," *Gooding*, 445 So. 2d at 1018, but also Florida's entire body of learned intermediary case law, which has never even *mentioned* any heeding presumption in this prescription drug context under Florida law.[42]

Nor can plaintiffs evade summary judgment by trying to invoke any "exceptions" to the learned intermediary doctrine due to alleged "overpromotion" or "direct-to-consumer" (DTC) advertising.  Indeed, there exists *no Florida authority* recognizing any such "exceptions" to Florida's learned intermediary doctrine.  *Beale*, 492 F. Supp. 2d at 1376-78.[43]  In any event, because plaintiffs cannot adduce any competent evidence establishing that their prescribing physicians *relied* on any alleged overpromotion or misstatements by sales personnel or in any Seroquel promotional materials, they cannot bear their burden under Florida law to prove that any such alleged conduct *caused* their physicians to prescribe Seroquel for plaintiffs when they otherwise would not have.  *Id.* at 1377; *accord Wilson v. Danek Med., Inc.*, 1999 WL 1062129, **3-4 (M.D. Fla. Mar. 29, 1999).

In sum, AstraZeneca has not only discharged its summary judgment burden by

---

applied [such a] presumption to pharmaceutical cases involving learned intermediaries," and Texas "dicta" invoked by plaintiffs "was not [from] a pharmaceuticals case involving learned intermediaries").

[42] Further still, given that all prescription drugs have risks, it cannot reasonably be presumed that any more adequate or specific warning of a drug's risks would change any reasonable physician's decision to prescribe a drug.  Rather, as courts have repeatedly stressed, prescription drugs often involve unavoidable risks that physicians commonly decide are outweighed by their benefits for particular patients – and, thus, a physician "heeds" a more adequate warning not by categorically refusing to prescribe the drug, but simply by *taking that additional information into account* in his or her decisional calculus.  *Ackermann*, 526 F.3d at 212-13; *Thomas v. Hoffman–LaRoche, Inc.*, 949 F.2d 806, 812-14 (5th Cir. 1992); *Odom v. G.D. Searle & Co.*, 979 F. 2d 1001, 1003 (4th Cir. 1992).

[43] Regardless, plaintiffs cannot prove that AstraZeneca did DTC advertising for Seroquel at any time relevant to these plaintiffs' claims or ingestion of Seroquel; there was no such DTC advertising.

pointing to the absence of record evidence to support plaintiff's case on causation, *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993), but it has gone well beyond that by pointing affirmatively to testimony from plaintiffs' physicians demonstrating that a different warning *would not have changed* their prescribing decisions. Plaintiffs thus must proffer specific evidence demonstrating the existence of a genuine issue on proximate causation in order to avoid summary judgment, *Dyer v. Danek Medical, Inc.*, 15 F. Supp. 2d 732, 742 (N.D. Tex. 2000), which they simply cannot do here.

### D.    Plaintiffs' Fraud And Negligent Misrepresentation Claims Fail Under Florida Law For Three Independent Reasons

Each of these plaintiffs assert claims for "fraud" and "negligent misrepresentation" against AstraZeneca, to which the learned intermediary doctrine applies under Florida law. *Beale*, 492 F. Supp. 2d at 1372-75. To maintain their fraud claims under Florida law, each plaintiff must, among other things, plead and prove (1) that AstraZeneca made actionable *misstatements of material fact* to which plaintiff or plaintiff's prescribing physicians were exposed; (2) detrimental *reliance* by plaintiff or plaintiff's prescribing physicians; and (3) that such reliance *proximately caused* plaintiff's ingestion of the drug and resulting alleged injury. *See, e.g., Hasenfus v. Secord*, 962 F.2d 1556, 1561-62 (11th Cir. 1992); *Soler v. Secondary Holdings, Inc.*, 771 So. 2d 62, 69-70 (Fla. App. 2000); *accord Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1307-09 (11th Cir. 1999); *Beale*, 492 F. Supp. 2d at 1374-75. A failure of proof on any of these essential elements entitles AstraZeneca to summary judgment. Thus, apart from the fact that plaintiffs' fraud-based claims fail because they are

not pled with the particularity required by Federal Rule of Civil Procedure 9(b),[44] the facts

adduced in discovery confirm that plaintiffs' fraud claims fail on summary judgment for lack

of proof under Florida law for three independent reasons.

        **1.**      **Plaintiffs' Inability To Identify Any Actionable Misstatement By AstraZeneca To Which Plaintiffs Or Their Prescribers Were Exposed Is Grounds for Summary Judgment**

Plaintiffs' fraud-based claims fail for the most basic reason: Their inability to prove

any *material misstatement* of fact about Seroquel made by AstraZeneca to which plaintiffs or

their prescribing physicians were exposed. Although Florida law may permit fraud-based

claims to be premised on misstatements seen or heard by either plaintiffs themselves or their

prescribing physicians, plaintiffs still must identify with particularity the *material*

*misstatements* on which the claims depend. Plaintiffs have not done so, and discovery has

confirmed that they cannot do so.[45] Thus, summary judgment is warranted. *Allison*, 184

F.3d at 1307-09 (affirming summary judgment where plaintiffs failed to prove "false

representation[s]" by defendant); *Beale*, 492 F. Supp. 2d at 1374-75 (same).

        **2.**      **Plaintiffs' Inability To Prove "Reliance" Independently Entitles AstraZeneca To Summary Judgment On The Fraud-Based Claims**

These fraud and negligent misrepresentation claims also fail because plaintiffs cannot

---

[44] Claims for fraud or negligent misrepresentation must be dismissed if not pled with the "particularity" required by Rule 9(b). *See Brooks v. Blue Cross & Blue Shield*, 116 F.3d 1364, 1371, 1380-81 (11th Cir. 1997) (reaffirming Rule 9(b)'s detailed requirements). Plaintiffs' complaints fail to plead their fraud claims with the requisite particularity. Because AstraZeneca's answers raise these defects as an affirmative defense, the clear failure to plead fraud with particularity under Rule 9(b) may be determined on summary judgment here. *Allison*, 184 F.3d at 1308-09.

[45] Indeed, as explained in the individual summary judgment motions filed herewith: (1) none of these plaintiffs can identify any AstraZeneca misstatements they personally ever saw or heard and, indeed, plaintiffs admitted at their depositions that never heard or saw any representations about Seroquel made by AstraZeneca at all; and (2) plaintiffs also cannot prove that their prescribing physicians saw, read or heard any alleged misrepresentations.

prove that they or their prescribers actually and justifiably *relied* on any material

misstatements about Seroquel made by AstraZeneca.  Under Florida law (as elsewhere),

"reliance" on defendant's alleged misrepresentations is an essential element of "intentional

and negligent misrepresentation claims."  *Hasenfus*, 962 at 1561-62; *see also Soler*, 771 So.

2d at 69-70; *Alexander*, 37 F. Supp. 2d at 1350; *Baker*, 35 F. Supp. 2d at 878.

     In *Allison*, the Eleventh Circuit affirmed summary judgment for the defendant breast

implant manufacturer on plaintiff's fraud and misrepresentation claims given plaintiff's

inability to prove "reliance."  184 F.3d at 1307-09.[46]  Plaintiff "never had any contact with"

defendant or its representatives and "never saw or read" the allegedly misleading

promotional material at issue, so she was "unable to show any reliance" on defendant's

alleged misstatements.  *Id.* at 1308-09.  The court then rejected plaintiff's argument that her

doctor was "misled" because the physician testified at his deposition that "he did not rely" on

information from defendant or its "sales representatives," but rather made treatment decisions

based on his independent medical judgment.  *Id.*

     Likewise here, the record confirms that these plaintiffs cannot prove that they or their

prescribing physicians detrimentally relied on any AstraZeneca misstatements about

Seroquel.  None of the plaintiffs could identify any misstatements they ever heard or saw,

much less relied upon.  *Pulte Home Corp. v. Osmose Wood Preserving, Inc.*, 60 F.3d 734,

743-44 & n.19 (11th Cir. 1995) (no "reliance" where plaintiff never saw or read the allegedly

misleading promotional materials).  And plaintiffs' physicians testified that they chose to

prescribe Seroquel for these plaintiffs based on their own independent medical judgment, *not*

---

[46] While the Eleventh Circuit's decision in *Allison* involved application of Georgia law, the fraud-based essential elements at issue here are identical under Florida and Georgia law.

in "reliance" on any misstatements allegedly made by AstraZeneca. *Allison*, 184 F.3d at 1307-09; *Baker*, 35 F. Supp. 2d at 878; *accord Alexander*, 37 F. Supp. 2d at 1350 (summary judgment where no evidence plaintiff's physician "heard any misleading statements" by defendant's representatives, much less "relied" on them in treating plaintiff).[47]

### 3. Plaintiffs' Fraud Claims Also Fail For Lack Of Proximate Cause

Finally, even if there were a triable issue on whether plaintiffs or their prescribers relied on any material misstatement by AstraZeneca, plaintiffs' claims would still "fail for lack of proximate cause." *Hasenfus*, 962 F.2d at 1561-62 (affirming defense judgment on fraud claim because plaintiff could not prove "causal link" between misrepresentations about plane's improved navigational system and decedent's "decision to fly" plane that crashed, where decedent would have flown plane anyway regardless of defendant's misstatements); *Soler*, 771 So. 2d at 69-70 (fraud claim failed for lack of causation where plaintiff would have signed the "release" leading to alleged injury regardless of defendant's misstatement).

Here, plaintiffs cannot prove the requisite "causal link" between any AstraZeneca misstatements and plaintiffs' Seroquel ingestion resulting in their alleged injury. Indeed, plaintiffs cannot prove any cognizable link at all. As shown above and in the individual motions filed herewith, plaintiffs cannot prove their physicians never would have prescribed Seroquel for them in the absence of any supposed AstraZeneca misstatements. In fact,

---

[47] When the record testimony of plaintiffs and their prescribers demonstrates the absence of their reliance, the law is clear that plaintiffs cannot defeat summary judgment by "submitting an affidavit that contradicts deposition testimony of the affiant." *Bailey v. Orange County School Bd.*, 2006 WL 2092267, at *5 (M.D. Fla. July 26, 2006) (Conway, J.); *accord Soler*, 771 So. 2d at 69. Nor can plaintiffs hope to defeat summary judgment by seizing on any allegedly false or misleading statement made to the prescriber and *speculating* that the prescriber *might* have been influenced by it. *Beale*, 492 F. Supp. 2d at 1370-71.

because the learned intermediary doctrine applies to "fraud" claims rooted in any inadequate warning theory, *Beale*, 492 F. Supp. 2d at 1372-73, the same breaks in the causal chain discussed above prevent plaintiffs from establishing proximate cause on their fraud claims as well. *See* pp. 41-44, *supra*; *see also Timmons*, 2006 WL 263602, at *4; *Edgar*, 1999 WL 1054864, at *6 & n.4. Finally, the other fundamental failures in plaintiffs' causation proofs, including medical causation, apply to plaintiffs' fraud-based claims as well.

### E.      Plaintiffs' Claims Involving Any "Off Label" Prescription Of Seroquel Are Not Legally Viable Under Florida Law

Finally, plaintiffs' counsel have highlighted that several of these cases involve "off-label" prescription of Seroquel by plaintiffs' prescribing physicians. Under Florida law, this is a distinction without any legal significance given the record in each case.

There is *nothing* illegal about "off label" prescription of Seroquel. As the Florida Supreme Court has confirmed, "a physician may properly prescribe a drug for a purpose other than that for which it has been approved" by FDA. *Upjohn Co. v. MacMurdo*, 562 So. 2d 680, 683 (Fla. 1990); *see also Edmonds v. Levine*, 417 F. Supp. 2d 1323, 1327 n.4 (S.D. Fla. 2006) ("'off-label' uses" are "legally permissible"); *Baker*, 35 F. Supp. 2d at 878 ("doctors frequently use products off-label if [they] the doctors, exercising independent judgment, regard the products as the best possible treatment for their patients").[48]

Plaintiffs apparently rely on the proposition that certain off-label *promotion* by a

---

[48] In fact, FDA itself has long made clear that physicians, as part of their practice of medicine, may "lawfully" prescribe drugs for uses other than those "approved" by the agency. 37 Fed. Reg. 16,503, 16,503-04 (Aug. 15, 1972); *accord Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2000); *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir. 1994); *Weaver v. Reagen*, 886 F.2d 194, 198-99 (8th Cir. 1989); *see also Washington Legal Found. v. Henney*, 202 F.3d 331, 333 (D.C. Cir. 2000) ("prescription of drugs for unapproved uses is commonplace in modern medical practice," and entirely lawful).

pharmaceutical company is not appropriate,[49] but in Florida, there exists no "private cause of

action" for alleged off-label promotion or other alleged regulatory "violations" of the FDCA.

*Blinn v. Smith & Nephew Richards, Inc.*, 55 F. Supp. 2d 1353, 1361 (M.D. Fla. 1999); *Baker*,

35 F. Supp. 2d at 878 (same); *cf. Underwood v. Rhone-Poulenc Rorer Pharms., Inc.*, 890 So.

2d 429, 430-31 (Fla. App. 2004).  In fact, plaintiffs' accusations of off-label promotion are

immaterial unless plaintiffs prove some *particularized act* of improper off-label promotion of

Seroquel by AstraZeneca to which plaintiffs' prescribing physicians were actually *exposed*

and on which they actually *relied*, which *caused* the physicians to prescribe Seroquel for

plaintiffs when the physicians otherwise would not have done so.  *See Beale*, 492 F. Supp. 2d

at 1372; *Edgar*, 1999 WL 1054864, at *6; *accord Talley v. Danek Med., Inc.*, 179 F.3d 154,

161 (4th Cir. 1999); *Samarah v. Danek Med., Inc.*, 70 F. Supp. 2d 1196, 1206-09 (D. Kan.

1999); *Sita v. Danek Med., Inc.*, 43 F. Supp. 2d 245, 264-65 (E.D.N.Y. 1999).

Here, Plaintiffs cannot make these requisite showings.  Indeed, Plaintiffs and their

experts offer nothing more than generalized assertions about AstraZeneca's allegedly

improper off-label promotion of Seroquel.  Critically, plaintiffs cannot demonstrate that their

prescribing physicians were actually exposed to and relied on *any* improper off-label

promotion by AstraZeneca.  Nor can they prove the requisite causal link between any alleged

off-label promotion and the decisions of their doctors to prescribe Seroquel for them.  The

---

[49] While manufacturers may not advertise or "recommend" drugs for uses "not in the labeling," 21 C.F.R. § 202.1(e)(4)(i)(a), many manufacturer activities related to off label uses are entirely proper and legal.  For instance, FDA "allows manufacturers to provide unapproved use information in response to an unsolicited request."  63 Fed. Reg. 64556, 64558 (Nov. 20, 1998); *see* 21 U.S.C. § 360aaa-6(a); 21 C.F.R. § 99.1(b).  Moreover, any effort to restrict the accurate dissemination of published scientific information by manufacturers about even off label uses raises grave First Amendment concerns.  *Washington Legal Found. v. Henney*, 56 F. Supp. 2d 81, 87 (D.D.C. 1999).

law is clear, however, that off-label promotion contentions fail whenever (1) the record

shows that plaintiffs' doctors made their prescribing decisions based on their "independent

medical judgment," *Talley*, 179 F.3d at 161; *accord Baker*, 35 F. Supp. 2d at 878; *Samarah*,

70 F. Supp. 2d at 1208-10; (2) where the physicians did not "rely" on the defendant's alleged

off-label promotional activities in deciding to prescribe the drug for the particular plaintiff,

*Miller v. Pfizer Inc.*, 196 F. Supp. 2d 1095, 1122-23 (D. Kan. 2002); *accord Edgar*, 1999 WL

1054864, at *6 (citing cases); *Alexander*, 37 F. Supp. 2d at 1350; or (3) where plaintiffs

cannot adduce particularized non-speculative evidence showing that the prescribing decision

of the plaintiff's own physician was actually "influenced," *Sita*, 43 F. Supp. 2d at 264, and

"affected" by some proven instance of improper off-label promotion, *Wilson v. Danek Med.,

Inc.*, 1999 WL 1062129, *6 (M.D. Fla. March 29, 1999); *accord Talley*, 179 F.3d at 161.[50]

As shown in the individual summary judgment motions filed concurrently, plaintiffs' off-

label contentions fail for one or more of these reasons here and, thus, their claims involving

"off label" prescriptions of Seroquel are not viable under Florida law.

### F.    Plaintiffs' Design Defect Claims Fail As A Matter Of Law

Plaintiffs identically assert "design defect" claims based on the allegation that

---

[50] Moreover, courts have repeatedly rejected efforts to evade summary judgment by positing "tenuous" connections between physicians' actual decisions to prescribe drugs off-label for plaintiffs and defendant's alleged promotional efforts "subtly" to brainwash the medical community in favor of off-label uses. *Sita*, 43 F. Supp. 2d at 263-64; *Samarah*, 70 F. Supp. 2d at 1208-10; *see also Beale*, 492 F. Supp. 2d at 1371 (plaintiff's "conjecture and speculation" that her prescriber "may have been influenced" indirectly by certain published articles where defendant's sponsorship and involvement was "not disclosed" held insufficient to defeat summary judgment where prescriber testified defendant's promotional activities did not influence his prescribing decision); *Miller*, 196 F. Supp. 2d at 1122-23 (rejecting plaintiff's speculative assertion that physician directly or indirectly was affected by defendant's "subtle," "subliminal" off-label marketing efforts where, *inter alia*, physician testified he does not read or rely on manufacturer promotional materials and would independently analyze any off-label information and "pick it apart" if received from any drug manufacturer).

Seroquel's *design* should be deemed "defective" and, thus, "unreasonably dangerous." According to plaintiffs, Seroquel's potential risks outweigh its benefits, as illustrated by the alleged fact that plaintiffs contracted their diabetes-related injuries after ingesting the drug.[51] The claims fail under Florida law, and would be impliedly preempted if they did not.

**1.  Plaintiffs Have No Cognizable Evidence Of Any "Defect" In Seroquel's Design That Allegedly Caused Their Injuries**

Florida law requires plaintiffs to prove that their alleged injuries were caused by some identifiable "defect" in Seroquel's *design*, *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 86 (Fla. 1976), which "must be proven by expert testimony." *Savage v. Danek Med., Inc.*, 31 F. Supp. 2d 980, 983 (M.D. Fla. 1999); *accord Blinn v. Smith & Nephew Richards, Inc.*, 55 F. Supp. 2d 1353, 1361 (M.D. Fla. 1999); *Alexander*, 37 F. Supp. 2d at 1349.[52]

Plaintiffs' experts do not provide the sort of testimony required by Florida law. They nowhere identify any defect in the "chemical composition" of quetiapine fumarate, *Timmons*, 2006 WL 263602, at **3-4, nor any other claimed "defect" in Seroquel's *design* that supposedly caused plaintiffs' injuries. *Alexander*, 37 F. Supp. 2d at 1349; *Savage*, 31 F. Supp. 2d at 983-84. This in itself is dispositive. Moreover, plaintiffs' experts nowhere even try to identify any reasonably *safer alternative design of Seroquel* that they claim AstraZeneca should have adopted, which would have prevented plaintiffs' alleged injuries. *See, e.g., Marzullo v. Crosman Corp.*, 289 F. Supp. 2d 1337, 1342-43 (M.D. Fla. 2003)

---

[51] *See, e.g.*, Guinn Compl. ¶¶ 29-32 (alleging that Seroquel's design is "defective" and "unreasonably dangerous" in that its risks "outweighed its alleged benefits," and that plaintiffs suffered diabetes-related injuries "[a]s a result of their use of Seroquel") (Exh. 1). Plaintiffs also include negligent "design[]" in their broader negligence claims. *Id.*, ¶ 36.

[52] Because causation is essential to any design-defect claim under Florida law, *see West*, 336 So. 2d at 86, the same fundamental infirmities in plaintiff's causation proofs are fatal to these claims as well. *See* pp. 19-23, *supra*.

- 54 -

(summary judgment granted where plaintiff failed to establish that any "alternative design" would have made defendant's product safer); *Adams v. G.D. Searle & Co.*, 576 So. 2d 728, 732-33 (Fla. App. 1991) ("Cu-7" contraceptive device could be defective in design after defendant in 1978 "identified polyethelyne as a safer alternative" than its "Cu-7 polypropylene withdrawal string" but failed "to replace the polypropylene string as soon as possible"); *accord Edic v. Century Prods Co.*, 364 F.3d 1276, 1279-80 n.2 (11th Cir. 2004).[53]

What plaintiffs' experts do say is clearly insufficient, to the extent it does not entirely undermine plaintiffs' design defect claim – like Dr. Wirshing, who testified that he *currently* prescribes Seroquel for 15-20% of his patients taking antipsychotic drugs, and responded "of course not" to the question of whether Seroquel's risks outweigh its benefits.  Wirshing Dep. at 90:14-21, 109:12-17 (Exh. 38).  Without identifying any actual defect in Seroquel's design, plaintiffs' other putative experts try to rely on the *temporal association* of Seroquel ingestion and adverse event reports of weight gain, diabetes and hyperglycemia to support their contention that those who ingest Seroquel are at a higher "increased risk" of such adverse events than those who ingest certain (but not all) other antipsychotic medications.[54] It is settled, however, that plaintiffs cannot establish any design defect under Florida law

---

[53] As the Eleventh Circuit has held, a product is "defect[ive] in design, under Florida law, 'when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design and its omission renders the product not reasonably safe.'" *Edic*, 364 F.3d at 1279-80 n.2 (citation omitted); *accord Kohler v. Marcotte*, 907 So. 2d 596, 599-600 (Fla. App. 2005); *Warren ex rel. Brassell v. K-Mart Corp.*, 765 So. 2d 235, 237-38 (Fla. App. 2000); *but see Liggett Group, Inc. v. Davis*, 973 So. 467, 475-77 (Fla. App. 2007), *review granted*, 978 So. 2d 160 (Fla. 2008).  This is consistent with the legal definition of "design defect," which is the failure to employ "a reasonable alternative design" that "could have reduced or avoided a foreseeable risk of harm" and rendered the product "safe[r]."  BLACK'S LAW DICTIONARY, at 450 (8th ed. 2004);

[54] Plaintiffs' experts mention various first or second generation antipsychotics, *see* Arnett Report, ¶¶ B-D (Exh. 35); Wirshing Report, at 5 (Exh. 37); Plunkett Report, ¶ 33 (Exh. 39), but do not explain how any *design* defect in Seroquel is what supposedly causes the side effects referenced in their reports, nor how Seroquel's claimed risks could be avoided while preserving the drug's efficacy.

based on (1) a mere "temporal relationship" between use of the product and injury, *Baker v. Danek Med.*, 35 F. Supp. 2d 875, 879 (N.D. Fla. 1998); *Alexander*, 37 F. Supp. 2d at 1350, or (2) the assertions of experts either that defendant's product "can cause" injury or death, *Blinn*, 55 F. Supp. 2d at 1361, or that the reported "rate" of injuries from use of defendant's product "is significantly higher than the rate" of injuries from use of other competing products. *Edgar*, 1999 WL 1054864, at **2, 4; *Cornelius*, 2004 WL 48102, at *5 (summary judgment on "design defect" claim; all drugs have "certain risks," but that does not make them "defective").

Plaintiffs' experts suggest that Seroquel has not in their view been proven "more effective" than other FDA-approved first and second generation antipsychotic drugs, and that they believe other competing FDA-approved antipsychotic drugs "may" have a lesser reported risk of weight gain, diabetes and hyperglycemia.[55] Yet even plaintiffs' experts do not dispute that prescribing physicians *need to have a wide array* of different antipsychotic medications available as *options* to treat patients' serious mental illnesses and other conditions due to the tremendous variance in patient responses to different antipsychotic drugs.[56] Moreover, plaintiffs' prescribers repeatedly testified in deposition that they *continue to prescribe* Seroquel for many patients because, in their independent medical judgment, its

---

[55] Plunkett Report, at 9-10 (Exh. 39); *see also, e.g.*, Marks Dep., at 435:13-436:5 (other atypical antipsychotics "might" have been better choices because they "may not have the same metabolic effects as Seroquel") (Exh. 45).

[56] For instance,    **REDACTED**

*See* Deposition of Dee Burke, dated Aug. 9, 2008, at pp. 43:4-56:22, 99:11-100:7, 114:2-115:5 (Exh. 42). Remarkably, *plaintiff's counsel* told Mr. Haller to stop taking Seroquel, even though it was the only drug that helped him control his anti-social behavior, because they said it would "hurt [his] case if [he] stayed on Seroquel." Deposition of David Haller, dated July 15, 2008, at 111:22-112:17 (Exh. 43).

*benefits outweigh its risks.* Tellingly, even plaintiffs' experts do not think that Seroquel

should be taken off the market, nor is it even their opinion that no reasonable physician

would ever prescribe Seroquel for any patient or any class of patients. *See, e.g., Beale*, 492

F. Supp. 2d at 1369 n.11 (summary judgment granted on Florida "design defect" claim where

plaintiffs "acknowledged that the product is appropriate for some patients"); *see also* REST.

(3D) OF TORTS: PRODUCTS LIABILITY § 6(c) (1998) (FDA-approved prescription drug can be

defective in design only if no reasonable health care provider would prescribe it "for *any*

class of patients") (emphasis added).

       At bottom, plaintiffs and their experts cannot use Florida design-defect law to impose

their preferred cut-off line for the level of reported diabetes-related risk that each FDA-

approved antipsychotic drug must not pass lest it be deemed "defective" in design.  Indeed,

FDA approved first generation antipsychotics and the entire class of atypical antipsychotic

medications, including Seroquel, as sufficiently "safe and effective" to be sold in the United

States *despite* their reported weight gain and diabetes-related risks. *See* pp. 6-17, *supra*.

### 2. Plaintiffs' Design Defect Claims Are Barred Under Implied Conflict Preemption

       Even if plaintiffs' design defect claims were somehow viable under Florida law, they

would be impliedly preempted by federal law.  Design defect claims under state law are

impliedly preempted where they would permit lay juries to second guess FDA's cost-benefit

analysis in determining that a drug was sufficiently "safe and effective" to be sold in the

United States. *See, e.g., In re Bextra & Celebrex Mktg. Sales Practices & Prods. Liab. Litig.*,

2006 WL 2472484, **2-3 (N.D. Cal. Aug. 24, 2006); *O'Neal v. SmithKline Beecham Corp.*,

2008 WL 1721891, **5-6 (E.D. Cal. Apr. 10, 2008).  As FDA itself has insisted, allowing

"lay judges and juries to second-guess the assessment of benefits versus risks of a specific drug to the general public" would usurp "the central role of the FDA" in our federal scheme. 71 Fed. Reg. 3922, 3935 (Jan. 26, 2006); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (stressing that FDA's determination that drugs are "'safe' and 'effective'" is "one of the [FDCA's] core objectives").

The policy-based preemption reasoning of the U.S. Supreme Court in *Riegel v. Medtronic, Inc.*, 128 S. Ct. 999 (2008), an express preemption case, confirms the correctness of this conclusion. *See, e.g., BIC Pen Corp. v. Carter*, 251 S.W.3d 500, 508-09 (Tex. 2008) (applying *Riegel*'s "policy analysis" to hold state-law design defect claim impliedly preempted). As the *Riegel* Court held in the context of FDA-approved medical devices that complied with the FDA-approved design and had gone through FDA's "rigorous" pre-market approval process (comparable to FDA's prescription drug approval process), it would "disrupt[] the federal scheme" to allow lay juries considering state common law design-defect claims to *second guess* the determination of "the experts at the FDA" that a particular medical device is sufficiently "safe" and "effective" to be sold in the United States. *Riegel*, 128 S. Ct. at 1002, 1008.[57] The same reasoning applies with full force here. Like the medical device in *Riegel*, Seroquel was approved by FDA as sufficiently "safe and effective"

---

[57] Under the Supreme Court's policy-based analysis in *Riegel*, it is FDA alone that does and should make the cost-benefit/risk-utility calculation and determination, on a population basis, of what prescription devices and drugs are sufficiently safe and effective to be sold in the country – *not* lay juries applying state design-defect law in the context of a single plaintiff that claims to have suffered injury. 128 S. Ct. at 1008 (state design-defect law under "negligence or strict-liability" would "disrupt the federal scheme" by allowing "jury" to denounce FDA-approved product under its own cost-benefit analysis or some other standard different than that "applied by the experts at the FDA"); *see also BIC Pen Corp.*, 251 S.W.3d at 508-09 (holding that "common law" design-defect claims are "impliedly preempted" by federal law under *Riegel*'s "policy analysis," because federally mandated "safety testing" required for pre-market approval "is not merely a safety floor, but a balancing of factors that ensure the product meets carefully prescribed safety standards").

after the same sort of extensive and rigorous pre-market review, and the drug's approval is

contingent upon compliance with continued reporting and review obligations. *Compare id.*

at 1003-05 (discussing pre-market approval and continuing reporting obligations for medical

devices); *with* 21 U.S.C. §§ 335 *et seq.* (same for prescription drugs); *see also* pp. 6-17,

*supra*. Accordingly, plaintiffs' design defect claims would be preempted even if they did not

so clearly fail for lack of proof under Florida law.

### G.  Plaintiffs' Non-Substantive "Conspiracy" Claims Fail Under Florida Law

Finally, while plaintiffs include a separate "Civil Conspiracy" count in their

complaints, the claims fail under Florida law.  Indeed, it is well settled that civil conspiracy is

*not an independent tort* under Florida law. *Rivers v. Dillards Dept. Store, Inc.*, 698 So. 2d

1328, 1333 (Fla. App. 1997).[58]  Hence, plaintiffs' non-substantive civil conspiracy claims

necessarily fall along with their other legally infirm claims. *Davis v. Hilton*, 780 So. 2d 974,

975-76 (Fla. App. 2001).

## IV.    CONCLUSION

For the foregoing reasons, and as explained in the individual summary judgment

motions and accompanying legal memoranda filed concurrently herewith, AstraZeneca

should be granted summary judgment on all claims asserted by each of the remaining Florida

---

[58] While this is dipositive, plaintiffs' claims also fail to the extent (1) they are premised on any
supposed "conspiracy to commit negligence," which is not viable under Florida law, *Sonnenreich v.
Philip Morris Inc.*, 929 F. Supp. 416, 419-20 (S.D. Fla. 1996); and (2) they are based on some
supposed agreement among AstraZeneca entities or employees; conspiracy in Florida requires proof
of "an agreement between two or more parties" to act unlawfully, *Lipsig v. Ramlawi*, 760 So. 2d 170,
180 (Fla. App. 2000), and the "two or more parties" requirement cannot be satisfied by "members of
a single economic unit." *Bryant Heating & Air Cond. Corp., Inc. v. Carrier Corp.*, 597 F. Supp.
1045, 1054 (S.D. Fla. 1984) (parent and its subsidiaries "cannot constitute the requisite combination
of 'separate economic groups or forces' necessary to establish the Florida tort of conspiracy") (citing
*Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1029 (Fla. App. 1981)).

"Group One" plaintiffs; or, in the alternative, partial summary judgment on each claim or aspect of any claim as to which AstraZeneca is properly entitled to judgment as a matter of law.

DATED: November 3, 2008             Respectfully submitted,

                                    */s/ Steven B. Weisburd*
                                    Steven B. Weisburd
                                    DECHERT LLP
                                    300 West 6th Street, Suite 1850
                                    Austin, TX  78701
                                    Telephone: (512) 394-3000
                                    Facsimile: (512) 394-3001
                                    steven.weisburd@dechert.com
                                    david.venderbush@dechert.com

                                    Stephen J. McConnell
                                    DECHERT LLP
                                    2929 Arch Street
                                    Philadelphia, PA  19103
                                    Telephone: (215) 994-4000
                                    Facsimile: (215) 994-2222
                                    stephen.mcconnell@dechert.com

                                    Chris S. Coutroulis (Fla. Bar No. 300705)
                                    Robert L. Ciotti (Fla. Bar No. 333141)
                                    CARLTON FIELDS, P.A.
                                    Corporate Center Three at International Plaza
                                    4221 W. Boy Scout Blvd.
                                    Tampa, FL  22607
                                    Telephone: (813) 223-7000
                                    Facsimile: (813) 229-4133
                                    ccoutroulis@carltonfields.com
                                    rciotti@cartlonfields.com

                                    *Counsel for Defendants AstraZeneca LP and*
                                    *AstraZeneca Pharmaceuticals LP*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 3, 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system through which all participating parties are deemed served.  I further certify that, by using the CM/ECF, the foregoing has been served on Plaintiffs' liaison counsel, who is charged with serving any non-CM/ECF participants on the attached Service List.

*/s/ Eliot J. Walker*

## SERVICE LIST

### In Re: Seroquel Products Liability Litigation
### MDL Docket No. 1769

| | |
|---|---|
| Paul J. Pennock, Esq.<br>Michael E. Pederson, Esq.<br>Weitz & Luxenberg, P.C.<br>180 Maiden Lane - 17th Floor<br>New York, NY 10038<br>Telephone: (212) 558-5500<br>Ppennock@weitzlux.com<br>MPederson@weitzlux.com<br>***Plaintiffs' Lead Counsel*** | Camp Bailey, Esq.<br>Michael W. Perrin, Esq.<br>Fletcher Trammell, Esq.<br>Bailey Perrin Bailey LLP<br>The Lyric Centre<br>440 Louisiana, Suite 2100<br>Houston, TX 77002<br>Telephone: (713) 425-7240<br>cbailey@bpblaw.com<br>mperrin@bpblaw.com<br>***Plaintiffs' Lead Counsel*** |
| Larry Roth, Esq.<br>Law Offices of Larry M. Roth, P.A.<br>Post Office Box 547637<br>Orlando, FL  32854-7637<br>Telephone: (407) 872-2239<br>LROTH@roth-law.com<br>***Plaintiffs' Liaison Counsel*** | Tommy Fibich, Esq.<br>Fibich, Hampton & Leebron, L.L.P.<br>1401 McKinney, Suite 1800<br>Five Houston Center<br>Houston, TX 77010<br>Telephone: (713) 751-0025<br>tfibich@fhl-law.com |
| Matthew F. Pawa, Esq.<br>Law Offices of Matthew F. Pawa, P.C.<br>1280 Centre St., Suite 230<br>Newton Centre, MA 02459<br>Telephone: (617) 641-9550<br>Mp@pawalaw.com | Robert L. Salim, Esq.<br>Robert L. Salim Attorney at Law<br>P.O. Box 2069<br>Natchitoches, LA 71457-2069<br>Telephone: (318) 352-5999<br>robertsalim@cp-tel.net |
| Keith M. Jensen, Esq.<br>Jensen, Belew & Gonzalez, PLLC<br>1024 North Main<br>Fort Worth, TX 76106<br>Telephone: (817) 334-0762<br>kj@kjensenlaw.com | Scott Allen, Esq.<br>Cruse, Scott, Henderson & Allen, L.L.P.<br>2777 Allen Parkway, 7th Floor<br>Houston, Texas 77019<br>Telephone: (713) 650-6600<br>sallen@crusescott.com |
| Matthew E. Lundy, Esq.<br>Lundy & Davis, LLP<br>333 North Sam Houston Parkway East<br>Suite 375<br>Houston, TX 77060<br>Telephone: (281) 272-0797<br>mlundy@lundydavis.com | W. Todd Harvey, Esq.<br>E. Ashley Cranford<br>Whatley Drake & Callas<br>2001 Park Place North, Suite 1000<br>Birmingham, AL 35203<br>Telephone: (205) 328-9576<br>THARVEY@whatleydrake.com<br>ACranford@wdklaw.com |

| | |
|---|---|
| Robert L. Ciotti, Esq.<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard<br>Suite 1000<br>Tampa, FL 33607-5736<br>Telephone: (813) 223-7000<br>rciotti@carltonfields.com<br>***Attorney for Defendants AstraZeneca***<br>***Pharmaceuticals, LP, and AstraZeneca LP*** | Gregory P. Forney, Esq.<br>Shaffer Lombardo Shurin<br>911 Main Street, Suite 2000<br>Kansas City, MO 64105<br>Telephone: (816) 931-0500<br>gforney@sls-law.com<br>rbish@sls-law.com<br>***Attorney for Defendant,***<br>***Marguerite Devon French*** |
| Randy Niemeyer<br>22442 Pike 309<br>Bowling Green, MO 63334-5209<br>***Pro Se*** | Eric B. Milliken, Esq.<br>3 Sir Barton Ct.<br>Newark, DE 19702<br>***Pro Se*** |
| Catherine Solomon<br>3100 N.E. 83<br>Gladstone, MO 64119<br>***Pro Se*** | Louisiana Wholesale Drug Co. Inc.<br>C/O Gayle R. White<br>Registered Agent<br>Highway 167N<br>Sunset, LA 70584<br>***Pro Se*** |
| Aaron C. Johnson, Esq.<br>Summers & Johnson<br>717 Thomas<br>Weston, MO 64098<br>Telephone: (816) 640-9940<br>firm@summersandjohnson.com | Robert A. Schwartz, Esq.<br>Bailey & Galyen<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744<br>bschwartz@galyen.com |
| Todd S. Hageman, Esq.<br>Simon and Passanante, PC<br>701 Market St., Suite 1450<br>St. Louis, MO 63101<br>Telephone: (314) 241-2929<br>thageman@spstl-law.com | Mark P. Robinson, Jr., Esq.<br>Robinson, Calcagnie & Robinson<br>620 Newport Center Drive, 7th Floor<br>Newport Beach, CA 92660<br>Telephone: (949) 720-1288<br>mrobinson@robinson-pilaw.com |
| Thomas F. Campion, Esq.<br>Steven M. Selna, Esq.<br>Drinker Biddle & Reath, LLP<br>500 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>Telephone: (973) 360-1100<br>Thomas.Campion@dbr.com<br>steven.selna@dbr.com<br>***Attorneys for Defendants Janssen***<br>***Pharmaceutical Products and Johnson &***<br>***Johnson Co.*** | Michael Davis, Esq.<br>James Mizgala, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone:  (312) 853-7731<br>mdavis@sidley.com<br>jmizgala@sidley.com<br>***Attorneys for Defendants AstraZeneca LP***<br>***and AstraZeneca Pharmaceuticals, LP*** |

| | |
|---|---|
| Elizabeth Raines, Esq.<br>Baker, Sterchi, Cowden & Rice, LLC<br>2400 Pershing Road, Suite 500<br>Kansas City, MO 64108<br>Telephone: (816) 471-2121<br>raines@bscr-law.com | Timothy Reese Balducci, Esq.<br>The Langston Law Firm, PA<br>P.O. Box 787<br>100 South Main Street<br>Booneville, MS 38829-0787<br>Telephone: (662) 728-3138<br>tbalducci@langstonlaw.com |
| Kenneth W. Bean, Esq.<br>Sandberg, Phoenix & von Gontard<br>One City Centre<br>15th Floor<br>St. Louis, MO 63101-1880<br>Telephone: (314) 231-3332<br>kbean@spvg.com<br>***Attorney for Defendant Dr. Asif Habib*** | John Driscoll, Esq.<br>Brown & Crouppen, PC<br>720 Olive St.<br>St. Louis, MO 63101<br>Telephone: (314) 421-0216<br>Jdriscoll@brownandcrouppen.com<br>asmith@brownandcrouppen.com<br>blape@brownandcrouppen.com |
| Aaron K. Dickey, Esq.<br>Goldenberg and Heller, PC<br>P.O. Box 959<br>2227 S. State Road 157<br>Edwardsville, IL 62025<br>Telephone: (618) 650-7107<br>aaron@ghalaw.com | Matthew J. Hamilton, Esq.<br>Pepper Hamilton<br>3000 Two Logan Square<br>18th & Arch Street<br>Philadelphia, PA 19103<br>Telephone: (215) 981-4000<br>hamiltonm@pepperlaw.com |
| Justin Witkin, Esq.<br>Ken Smith, Esq.<br>Aylstock, Witkin & Sasser, PLC<br>4400 Bayou Boulevard<br>Suite 58<br>Pensacola, FL 32503<br>Telephone: (850) 916-7450<br>Jwitkin@AWS-LAW.com<br>ablankenship@aws-law.com<br>ksmith@aws-law.com<br>noverholtz@aws-law.com | David P. Matthews, Esq.<br>Lizy Santiago, Esq.<br>Matthews & Associates<br>2905 Sackett Street<br>Houston, TX 77098<br>Telephone: (713) 222-8080<br>dmatthews@thematthewslawfirm.com<br>lsantiago@thematthewslawfirm.com<br>msalazar@thematthewslawfirm.com |
| Howard Nations<br>Lori A. Siler<br>Howard L. Nations Attorney At Law<br>4515 Yoakum Blvd.<br>Houston, TX 77006-5895<br>Telephone: (713) 807-8400<br>nations@howardnations.com | Mary B. Cotton<br>John D. Giddens, P.A.<br>226 North President Street<br>P.O. Box 22546<br>Jackson, MS 39225-2546<br>Telephone: (601) 355-2022<br>betsy@law-inc.com |

| | |
|---|---|
| Salvatore M. Machi<br>Ted Machi & Associates PC<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744 | Jona R. Hefner, Esq.<br>3441 W. Memorial, Suite 4<br>Oklahoma City, OK 73134-7000<br>Telephone: (405) 286-3000<br>attorneyokc@hotmail.com |
| David Dickens<br>Miller & Associates<br>105 North Alfred Street<br>Alexandria, VA 22314-3010<br>(703) 519-8080<br>ddickens@doctoratlaw.com | Pete Schneider, Esq.<br>Grady, Schneider & Newman, L.L.P.<br>801 Congress, 4th Floor<br>Houston, TX 77002<br>(713) 228-2200<br>pschneider@gsnlaw.com |
| Fred T. Magaziner<br>Marjorie Shiekman<br>A. Elizabeth Balakhani<br>Shane T. Prince<br>Eben S. Flaster<br>DECHERT LLP<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA 19103<br>(215) 994-4000<br>fred.magaziner@dechert.com<br>shane.prince@dechert.com<br>marjorie.shiekman@dechert.com<br>eben.flaster@dechert.com<br>elizabeth.balakhani@dechert.com | Lawrence J. Gornick, Esq.<br>William A. Levin, Esq.<br>Dennis J. Canty, Esq.<br>Levin Simes Kaiser & Gornick LLP<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 646-7160<br>lgornick@lskg-law.com<br>dcanty@lskg-law.com<br>lsimes@levins-law.com<br>jkaiser@lskg-law.com<br>echarley@lskg-law.com<br>ddecarli@lskg-law.com<br>bsund@lskg-law.com<br>astavrakaras@lskg-law.com |
| Scott Burdine, Esq.<br>Hagans Burdine Montgomery<br>Rustay & Winchester, P.C.<br>3200 Travis, Fourth Floor<br>Houston, TX 77006<br>Telephone: (713) 222-2700<br>sburdine@hagans-law.com | Lowell Finson<br>Phillips & Associates<br>3030 North 3rd Street<br>Suite 1100<br>Phoenix, AZ 85012<br>(602) 258-8900, ext. 295<br>lowellf@phillipslaw.ws |
| Gale D. Pearson<br>Stephen J. Randall<br>Pearson, Randall & Schumacher, P.A.<br>Fifth Street Towers, Suite 1025<br>100 South 5th Street<br>Minneapolis, MN 55402<br>(612) 767-7500<br>attorneys@outtech.com | Robert H. Shultz<br>Heyl, Royster<br>103 West Vandalia Street<br>P.O. Box 467<br>Edwardsville, IL 62025<br>(618) 656-4646<br>rshultz@hrva.com<br>bwallace@hrva.com |

| | |
|---|---|
| Ellen R. Serbin<br>Perona, Langer, Beck, Lalande & Serbin<br>300 San Antonio Drive<br>Long Beach, CA 90807-0948<br>(562) 426-6155<br>davidhwang@plblaw.com | Scott Armstrong<br>1719 West Main Street<br>Suite 201<br>Rapid City, SD 57702<br>(605) 399-3994<br>scottarmstrong1235@eathlink.net |
| Linda S. Svitak<br>Faegre & Benson, LLP<br>90 South 7th Street, Suite 2200<br>Minneapolis, MN 55402-3901<br>(612)766-7000<br>lsvitak@faegre.com<br>wjohnson@faegre.com | James J. Freebery<br>McCarter & English, LLP<br>919 N. Market Street, 18th Floor<br>Wilmington, DE 19801<br>(973) 622-4444<br>jfreebery@mccarter.com<br>tpearson@mccarter.com |
| Richard D. Hailey<br>Ramey & Hailey<br>3891 Eagle Creek Parkway<br>Suite C<br>Indianapolis, IN<br>(317) 299-0400<br>rhailey@sprynet.com | B. Andrew List<br>Clark, Perdue, Arnold & Scott<br>471 East Broad Street, Suite 1400<br>Columbus, OH 43215<br>(614) 469-1400<br>alist@cpaslaw.com<br>lcollins@cpaslaw.com |