08-1-99343 sh

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

IN RE:   Seroquel Products Liability Litigation

MDL DOCKET NO. 1769

This document relates to all Group One Trial Cases:

| | |
|---|---|
| Janice Burns v. AstraZeneca LP, et al. | Case No. 6:07-cv-15959 |
| Sandra Carter v. AstraZeneca LP, et al. | Case No. 6:07-cv-13234 |
| Connie Curley v. AstraZeneca LP, et al. | Case No. 6:07-cv-15701 |
| Linda Guinn v. AstraZeneca LP, et al. | Case No. 6:07-cv-10291 |
| David Haller v. AstraZeneca LP, et al. | Case No. 6:07-cv-15733 |
| Hope Lorditch v. AstraZeneca LP, et al. | Case No. 6:07-cv-12657 |
| Eileen McAlexander v. AstraZeneca LP, et al. | Case No. 6:07-cv-10360 |
| Clemmie Middleton v. AstraZeneca LP, et al. | Case No. 6:07-cv-10949 |
| Charles Ray v. AstraZeneca LP, et al. | Case No. 6:07-cv-11102 |
| William Sarmiento v. AstraZeneca LP, et al. | Case No. 6:07-cv-10425 |
| Richard Unger v. AstraZeneca LP, et al. | Case No. 6:07-cv-15812 |
| Linda Whittington v. AstraZeneca LP, et al. | Case No. 6:07-cv-10475 |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

LAURA M. PLUNKETT, Ph.D., DABT

October 2, 2008

Volume 1

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

1

08-I-99343 sh

### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This document relates to all Group One Trial Cases:

| | |
|---|---|
| Janice Burns v. AstraZeneca LP, et al. | Case No. 6:07-cv-15959 |
| Sandra Carter v. AstraZeneca LP, et al. | Case No. 6:07-cv-13234 |
| Connie Curley v. AstraZeneca LP, et al. | Case No. 6:07-cv-15701 |
| Linda Guinn v. AstraZeneca LP, et al. | Case No. 6:07-cv-10291 |
| David Haller v. AstraZeneca LP, et al. | Case No. 6:07-cv-15733 |
| Hope Lorditch v. AstraZeneca LP, et al. | Case No. 6:07-cv-12657 |
| Eileen McAlexander v. AstraZeneca LP, et al. | Case No. 6:07-cv-10360 |
| Clemmie Middleton v. AstraZeneca LP, et al. | Case No. 6:07-cv-10949 |
| Charles Ray v. AstraZeneca LP, et al. | Case No. 6:07-cv-11102 |
| William Sarmiento v. AstraZeneca LP, et al. | Case No. 6:07-cv-10425 |
| Richard Unger v. AstraZeneca LP, et al. | Case No. 6:07-cv-15812 |
| Linda Whittington v. AstraZeneca LP, et al. | Case No. 6:07-cv-10475 |

*******************************************************************

ORAL DEPOSITION OF

LAURA M. PLUNKETT, Ph.D., DABT

October 2, 2008

Volume 1

*******************************************************************

## 2

          ORAL DEPOSITION of LAURA M. PLUNKETT, Ph.D.,

DABT, produced as a witness at the instance of the Defendants,

and duly sworn, was taken in the above-styled and numbered

cause on the 2nd of October, 2008, from 9:10 a.m. to 6:11 p.m.,

before Shanon M. Hair, CSR in and for the State of Texas,

reported by machine shorthand, at the office of Bailey Perrin

Bailey, The Lyric Centre, 440 Louisiana, Suite 2100, Houston,

Texas  77002, pursuant to the Federal Rules of Civil Procedure

and the provisions stated on the record or attached hereto.

## 4

INDEX
(Continued.)

EXHIBITS

NO.  DESCRIPTION                                          PAGE

11..............................................246
    Article entitled "Incidence of New-Onset
    Diabetes Mellitus Among Patients Receiving
    Atypical Neuroleptics in the Treatment of
    Mental Illness"

12..............................................256
    Document entitled "P.2. Psychotic disorders
    and antipsychotics"

13..............................................258
    Report entitled "Antipsychotic exposure and
    type 2 diabetes among patients with
    schizophrenia: a matched case-control study of
    California medicaid claims"

14..............................................262
    Article entitled "Antipsychotic Induced
    Diabetes in Veteran Schizophrenic Patients"

15..............................................263
    Article entitled "Diabetes Risk Associated
    with Use of Olanzapine, Quetiapine, and
    Risperidone in Veterans Health Administration
    Patients with Schizophrenia"

16..............................................269
    Document entitled "Consensus Development
    Conference on Antipsychotic Drugs and Obesity
    and Diabetes"

17..............................................278
    1999 Physicians' Desk Reference listing for
    Seroquel

18..............................................294
    2005 Physicians' Desk Reference listing for
    Seroquel

100 through 165..............................235

## 3

INDEX

Appearances................................4
LAURA M. PLUNKETT, Ph.D., DABT
    Examination by Mr. Brown.............6
Signature and Changes....................317
Reporter's Certificate...................319

EXHIBITS

NO.  DESCRIPTION                                          PAGE

1..............................................24
    Expert Report

2..............................................46
    Invoices

3..............................................47
    Amended Notice of Deposition of Laura M.
    Plunkett, Ph.D., D.A.B.T.

4..............................................187
    Goodman & Gilman's The Pharmacological Basis
    of Therapeutics, Eleventh Edition, Chapter 18

5..............................................200
    Article entitled "Clozapine and olanzapine,
    but not conventional antipsychotics, increase
    insulin release in vitro"

6..............................................205
    Article entitled "The atypical antipsychotics
    quetiapine, risperidone and ziprasidone do not
    increase insulin release in vitro"

7..............................................211
    Article entitled "Abnormalities in Glucose
    Regulation During Antipsychotic Treatment of
    Schizophrenia"

8..............................................215
    Document entitled "CNS Drugs Supplement"

9..............................................224
    Document entitled "Metabolic Syndrome and
    Mental Illness"

10..............................................237
    Article entitled "Association of Diabetes
    Mellitus With Use of Atypical Neuroleptics in
    the Treatment of Schizophrenia"

## 5

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    T. Scott Allen, Jr., Esq.
    CRUSE, SCOTT, HENDERSON & ALLEN, LLP
    2777 Allen Parkway, 7th Floor
    Houston, Texas  77019-2141
    (713) 650-6600, fax (713) 650-1720
    sallen@crusescott.com

             -and-

    Sarah Culver, Esq.
    BAILEY PERRIN BAILEY
    The Lyric Centre
    440 Louisiana, Suite 2100
    Houston, Texas  77002
    (713) 425-7100, fax (713) 425-7101
    sculver@bpblaw.com

FOR THE DEFENDANTS:

    Arthur E. Brown, Esq.
    KAYE SCHOLER LLP
    425 Park Avenue
    New York, New York  10022-3598
    (212) 836-8592, fax (212) 836-8689
    abrown@kayescholer.com
             -and-
    Meghan Rohling Kelly, Esq.
    DECHERT LLP
    Cira Centre
    2929 Arch Street
    Philadelphia, Pennsylvania  19104-2808
    (215) 994-4000, fax (215) 994-2222
    meghan.rohling@dechert.com
             -and-
    Eric G. Lasker, Esq.
    SPRIGGS & HOLLINGSWORTH
    1350 I Street, NW
    Washington, DC  20005
    (202) 898-5800, fax (202) 682-1639
    elasker@spriggs.com

6

1          (9:10 a.m.)
2          LAURA M. PLUNKETT, Ph.D., DABT,
3     having been first duly sworn, testified as follows:
4              EXAMINATION
5     BY MR. BROWN:
6        Q.   Good morning, Dr. Plunkett.
7        A.   Good morning.
8        Q.   My name's Arthur Brown.  I introduced myself to you
9     before we began, correct?
10       A.   Yes.
11       Q.   You've been an expert in pharmaceutical litigation
12    many times?
13       A.   Yes.
14       Q.   You testified many times at depositions, correct?
15       A.   Yes, several dozen.
16       Q.   And you testified at trial a number of times, too?
17       A.   Yes, I've done trial testimony.
18       Q.   About how many times have you testified at trial?
19       A.   I've given you a list, I know, of -- for the last
20    four years, and I believe it's probably been half a dozen
21    times.  That's my guess though because I don't tend to keep
22    that in my mind, differences between deposition and trial.
23       Q.   Okay.  And the oath you've taken here today, you
24    understand that oath?
25       A.   Yes, I do.

7

1        Q.   You're going to tell me the truth in response to all
2     my questions today?
3        A.   Yes.
4        Q.   And you tell the truth when you testify in front of
5     juries; is that right?
6        A.   Yes, absolutely.
7        Q.   When you assess whether or not a drug causes a
8     particular injury, when you're asked to look at that issue, do
9     you approach that with a sense that you have to do a thorough
10    job researching the sort of scientific or medical issue?
11       A.   Well, any project I do I have to do what I consider
12    to be thorough.  And everybody has a different opinion of what
13    that is, but I have a method that I use routinely for looking
14    at causation issues for drug litigation.  And I may have a
15    different approach if it's a case-specific opinion versus
16    general causation.  And in this case where we're looking at
17    general causation, it's an approach I've used before for other
18    litigation.
19       Q.   And what is that approach?
20       A.   It's to gather first all of the different types of
21    information that are available.  I always start -- I'm a
22    pharmacologist, so I start with pharmacology information.  And
23    I don't tend to get asked to look at a drug that I'm not
24    familiar with, so I already have a basic understanding usually
25    of the use of the drug and the basic mechanism.  And I'll go to

8

1     the published literature as far back as the drug is available.
2     I look at animal data, human data that's in the published
3     literature first.
4          And usually after I've done sort of an initial
5     review of that, I would agree or not agree to take a litigation
6     area, because I have -- when I'm called, I sometimes turn down.
7     If I'm asked to look at something, I might say, "No, I don't
8     believe there's enough support for that," and I won't take the
9     case.
10       Q.   So, it's that point after you do your --
11       A.   Basic review, exactly.  And then after that normally
12    in order to form my full opinions, I'm provided with maybe some
13    clinical trial information on a drug or preclinical data from
14    the IND, depending on the issue in the case that I might not
15    have been able to get except through discovery of documents
16    from the defense.  I'm also sometimes given some additional
17    information from international files that would be difficult
18    for me to get to, global safety information, things like that.
19    Again, just depends on the case.
20          But I put all of that together, the spontaneous
21    adverse events, the published literature -- human, animal --
22    the basic mechanistic data, pharmacology; and that, with my
23    training and experience, I'll come up to what I call a weight
24    of the evidence causation assessment using sort of as a guide
25    the Bradford Hill criteria.  And that's laid out in my report,

9

1     I believe, for you in one of my paragraphs.
2        Q.   You identify the weight of the evidence list you go
3     through, and we'll talk about that a little bit later.
4        A.   Yes.  In the report, I've given you a list of the
5     documents.  And, again, it's an example.  For example, under --
6     if you look at that list, under human data, I've tried to
7     identify for you what I've considered the most important
8     clinical data or epidemiological data; but I certainly haven't
9     listed every piece of information that is possible.  In fact, I
10    know in this case there's some clinical data from the company
11    itself that may not be listed in that case --
12       Q.   Have you looked at --
13       A.   -- that certainly would be used that I've looked at.
14          MR. ALLEN:  Hold on.  Let's not talk over -- you
15    hadn't finished your answer and he tried to ask another
16    question.  Let's try to stop that.  Go ahead.  Let's just wait
17    for another question.
18       Q.   (BY MR. BROWN)  There was -- you said -- we're going
19    to go back over this.  You were talking for a while.  We're
20    going to need to go back and break this down a little bit.
21          You said there was clinical trial data that you
22    looked at recently; is that right?
23       A.   Yes.  I was provided with in June of this year --
24    I've done two reports in the Seroquel litigation.  One was for
25    Canada, and that was done in November of 2007.  And at that

point in time -- again, a general causation opinion -- there was some information that I had not been provided that I've since been provided.
**Q. Okay.**
A. So, June of this year, I was given a large report, which I've brought here -- it's this thick Redrope folder -- which is an internal report from AstraZeneca where they've discussed some specific clinical trials as they relate to glucose disregulation. So, that's additional information that's certainly relied upon for my opinions.
**Q. For that one document you just pointed to that summarizes the clinical trial data, how long have you had that document in your possession?**
A. Since June of 2007.
**Q. And you relied upon that for forming your opinions here today?**
A. Yes.
**Q. Did you identity that anyplace in your report that you recall that you prepared in this case?**
A. I don't recall if I did or didn't. I probably did not. I don't remember identifying any company-specific documents or non-published sources other than the PDR labeling for the drug in my report.
**Q. So, when you -- strike that. We'll come back to it.**
**You mentioned that you start collecting five**

**categories of information before you make your original decision whether to work with a particular lawyer on looking at a drug relationship with an event; is that right?**
A. I don't think five categories. I collect published information before I agree, and it usually falls into different categories.
**Q. Okay.**
A. But sometimes -- it doesn't always five categories; but, yes.
**Q. Let me see if I can get the list, then you can add.**
**So, before you decide whether or not you're going to work for a plaintiff's lawyer and give an opinion on causation, you look first at the published literature, correct?**
A. Yes.
**Q. And as part of the published literature, you'll look at animal study data that's published, correct?**
A. I would look for that, yes.
**Q. Pharmacology data that's published, correct?**
A. Yes, which would sometimes be animal data, sometimes something else.
**Q. The toxicology data that's published, correct?**
A. Yes, which could -- usually is animal data.
**Q. Any sort of epidemiology data, correct?**
A. If available, yes.
**Q. And any sort of clinical trial data?**

A. If available, yes.
**Q. Before you decide whether or not you're going to offer an opinion in a litigation, are there any other categories of information above and beyond those five that I've identified that you would look at before you go to the next level?**
A. Well, it's really highly dependent upon the litigation area. For example, if a drug had already been removed from the market, I might actually look at the FDA website, too, to see what might have been said. And that has happened in some cases, I've been contacted after a drug has been already removed from the market. But in most of the cases recently, I would say no. It's usually an issue of not looking at the FDA website but sticking with what I would consider peer-reviewed published articles.
**Q. And at that point you'll make a decision on whether or not you think there's a relationship between the drug and the adverse event of interest, correct?**
A. Yes. And as a result of that, whether or not I feel I could support whatever the attorney has asked me can I support or not. I mean, they usually call me and they say, "I have, you know, a drug litigation area and these are the kind of injuries. I think you might be interested. Would you be?" And then I look and then I go back to them and say I can help or I can't help.

**Q. And so when you approach these questions of whether or not a drug caused an adverse event, as here, you don't come to it with a preconceived notion that there's a causal relationship, correct?**
A. Usually not. I will say that there was one particular instance where I did, and that's because I was very familiar with a lot of the literature before I was even asked, and that was phenylpropanolamine litigation. I was actually very aware of the risk of stroke and heart attack and cardiovascular events well before I was asked, and so that was different. So, when they called me, I said, "Oh, absolutely I can help you because I'm already familiar with this area." But that's the exception to the rule. Normally not.
**Q. Okay. Aside from the PPA example, you don't approach these issues, whether or not a drug caused an event, with a preconceived notion?**
A. That would be the general rule, yes.
**Q. And when you were asked to work in Seroquel litigation and examine the relationship between Seroquel and metabolic disorders, you didn't come to it with a preconceived notion, correct?**
A. Well, I would actually say maybe a little different with Seroquel because I had actually worked on Zyprexa first. And in the Zyprexa litigation, I reviewed Seroquel documents or -- well, a lot of the studies that looked at Zyprexa or

14

1   olanzapine also looked at Seroquel, risperidone, several of the
2   other antipsychotics.
3           So, I would say that even though I had -- I did
4   not have a preconceived notion when I was asked to work on it.
5   I did have more of a background than when I was asked to look
6   at Zyprexa, okay? So, Zyprexa would have sort of -- that look
7   at the literature provided me with some of the -- for example,
8   some of the articles I cite in my report here which were on
9   antipsychotics as a class or head-to-head studies which looked
10  at olanzapine, risperidone, quetiapine together or, you know,
11  some combination of those drugs.
12          So, I mean, even though I didn't have a
13  preconceived notion, I did have more background. So, this is a
14  little different than another area that I might have worked on
15  that -- where I had never looked at drugs in that class or that
16  particular adverse event profile before.
17      Q.  When you were asked to serve as an expert in Zyprexa
18  litigation, you focussed at that time on literature that looked
19  at the relationship between Zyprexa and diabetes; is that fair?
20      A.  That was the focus, although I was also looking
21  for -- I also dissected out antipsychotics in general.
22      Q.  And when you dissected out the antipsychotics, did
23  you come to a determination when you were first retained in
24  Zyprexa that Seroquel caused diabetes?
25      A.  I would say that I had the impression after look --

15

1   after forming my opinions on Zyprexa, I had the impression that
2   there was more than one drug that was a problem for diabetes.
3   It was not just Zyprexa. I felt that it was Zyprexa, also
4   Seroquel and also Risperdal and also clozapine. So, those are
5   the four that I felt had data to indicate that there was a link
6   between those adverse events.
7           And then in order to fill out my opinions for
8   this litigation, I had not done a formal weight of the evidence
9   at that point, so I went and looked for more information when I
10  was asked to do Seroquel. So, I looked for more animal data
11  because I hadn't necessarily pulled out animal data. All the
12  case reports, I hadn't pulled those out. So, I focussed
13  differently once I was asked to look at Seroquel versus
14  Zyprexa.
15      Q.  So, when you looked at the weight of the evidence for
16  Zyprexa, even before you looked at some of the additional data,
17  like animal data specific to Seroquel, you were confident at
18  that point that Seroquel caused diabetes?
19      A.  Could cause diabetes, yes.
20      Q.  So, you arrived at that conclusion before you did
21  your preliminary weight of the evidence published literature
22  search in this case?
23      A.  I think I had that impression, yes, but I certainly
24  hadn't come to that formal opinion yet; and I would not until I
25  had looked at -- for example, if -- when I did my Zyprexa

16

1   review and I kept seeing Seroquel and risperidone also showing
2   up as being mentioned as potentially having increased risk in
3   some of the epidemiological studies, when I saw that, to me, it
4   was an issue of that epidemiological data indicates there's an
5   association and that's where I guess I was at that point in
6   time.
7           But in order to fill it out with causation, I
8   needed to look at a larger pool of information. And, for
9   example, if I had found in that larger pool of information when
10  I looked at Seroquel that there was something distinct about
11  its mechanism of action that would preclude it from causing
12  that, then I may have come to a different opinion. Or, for
13  example, if I had found that -- when I looked at the
14  information on Seroquel that there was only one study that
15  implicated it and there were 50 that said it wasn't a problem,
16  I might have had a very different opinion, even though the one
17  study was the one I might have pulled up under Zyprexa.
18      Q.  Okay.
19      A.  So, that's why I say "could." I -- so, maybe the
20  word to use is I believe that there was an association shown by
21  the information I had looked at, but I hadn't done a full
22  weight of the evidence.
23      Q.  So, when you were asked to serve as an expert in the
24  Seroquel litigation, you were already of the opinion that
25  Seroquel was at least associated with diabetes; is that fair?

17

1       A.  I would -- I don't know if I'd word it that way, but
2   I certainly would say that I had an impression that there was a
3   risk of diabetes with the ingestion of Seroquel, as well as
4   Risperdal, as well as olanzapine; and those three, to me,
5   looked different than some of the other drugs in this class,
6   some of the other atypicals, and that was my impression. But
7   as far as coming to a specific causation, I had not until I did
8   the full assessment.
9       Q.  You said earlier that you don't come to these -- you
10  don't approach these issues of whether or not a drug causes an
11  event with preconceived notions generally. But in this case,
12  it's true that you approached the issue whether Seroquel causes
13  diabetes with a preconceived notion because of the impression
14  you described, correct?
15          MR. ALLEN: Objection. Let me -- Doctor, I've
16  told you earlier, just this is the first time it's going to
17  happen. I may need to object to some questions. I'll try not
18  to object very often. I certainly will object less than I've
19  seen other lawyers do.
20          Objection. Form.
21      A.  I think I've tried to answer for you the best I can.
22  Essentially, yes. Unlike -- for example, I worked in the Paxil
23  litigation. I have never worked on another antidepressant and
24  link with birth defects before. So, when I went into that
25  litigation, I had not reviewed the literature on

18

1    antidepressants and birth defects. Certainly though with
2    Seroquel, I had reviewed the literature in antipsychotics and
3    diabetes, hyperglycemia, and weight gain and I had seen
4    head-to-head comparisons of Seroquel with olanzapine. So, I
5    certainly had an idea that there was an association.
6         When you say "preconceived notion," I mean, I
7    don't know that -- maybe you can use those words, maybe you
8    can't, but that's -- to be truthful with you, that's what my
9    feeling was. I would never have written a causation report
10   after only doing that review of Zyprexa. I would have to look
11   beyond that, which is what I did in this review.
12        For example, I have not done a formal caution
13   report for Risperdal litigation -- I haven't been hired to do
14   that -- although I gave a presentation on what I believe was
15   there with Risperdal and I believe that there is enough
16   evidence to put together a cause-and-effect association with
17   Risperdal based on the PowerPoint presentation I provided you.
18   You can have that and you can see. But I have not gone to the
19   same depths with Risperdal as I have with either Zyprexa or
20   Seroquel because, for example, I haven't looked at all the
21   clinical trial data for some of that and I have a lot more
22   clinical trial information for these other two drugs.
23        Q. (BY MR. BROWN) So -- withdrawn.
24        When you're asked to serve as an expert and
25   examine whether or not a drug causes an event, is it important

19

1    for you to look for information that both supports your opinion
2    and doesn't?
3         A. Absolutely. I do a literature search with general
4    broad terms. I pull it up and I have -- I believe if you look
5    at my reference list, you'll see some studies that are listed
6    that have non-statistically significant -- for example, on epi
7    studies -- odds ratios for Seroquel and I cite review articles
8    that talk about data that both supports and does not support.
9         So, yes, I look at both sides.
10        Q. And we're going to get to some of that. But as a
11   general matter, you look for all of the relevant evidence,
12   whether it supports your opinion or not, correct?
13        A. Yes. That would be my -- my goal is to gather the
14   complete database and then I screen it to determine what I
15   believe the database says to me.
16        Q. Okay. So, you -- if I understand you correctly, you
17   try to collect all the relevant evidence, then you put it
18   through a screen to determine which one was relevant for your
19   opinions, correct?
20        A. Well, I put it through a screen to determine what it
21   says to me. And it's not that it's most relevant to my
22   opinions. That's a different process. That is when I write
23   your report, I'm going to cite to you the documents that I
24   believe are relevant to my opinions, okay? So, I may not cite
25   every document I've reviewed, which is why you're given a

20

1    reference list that is much more complete than what is cited in
2    my report.
3         Q. We're going to get to what's cited in your report in
4    a minute, but I want to make sure I understand. So, when you
5    do the search, you look for everything that -- whether it
6    supports you or not, correct?
7         MR. ALLEN: Objection. Form.
8         A. I look for all the information I can glean on the
9    toxicity/pharmacology of these drugs -- of the drug in
10   question. And it -- and I don't know what that information's
11   going to be until I read it. So, when I do a lit search, I get
12   a bunch of titles. I ask for those titles based upon what they
13   say. In other words, if I do a screen -- for example, in this
14   litigation, I did a big search just "quetiapine" by itself
15   first and I got hundreds of articles. Then I added the term
16   "toxicity" or "toxic" with a question mark, and then I -- I get
17   a much smaller search.
18        And I actually had hundreds of articles I
19   screened and I read the titles and the abstracts, and from that
20   I decide which ones look like they deserve further review. And
21   the ones that deserved further review were either clinical
22   trials, epidemiological studies, animal data, in vitro data
23   that inform on hyperglycemia, diabetes, weight gain, the
24   endpoints that I was interested in looking at in this
25   litigation. I don't necessarily call for every review article

21

1    because I want to form my own opinions based on the data, not
2    necessarily on what another reviewer says.
3         Q. (BY MR. BROWN) Okay. I forgot what my question was.
4         Let me ask you this: When you testify at trial
5    in front of a jury, do you try to give your objective analysis
6    on whether or not a drug causes an event?
7         A. I would hope my analysis is objective. It's my
8    analysis and my opinion, and I think that's always very clear
9    to the jury that this is what I believe.
10        Q. And you want to talk to the jury when you testify in
11   a case like this whether Seroquel causes diabetes about the
12   evidence that both supports you and doesn't so the jury has a
13   fair understanding of the evidence, correct?
14        A. It depends upon what the testimony is. I present my
15   opinions and I present the information that supports my
16   opinions. And there's always going to be information out there
17   which on cross-examination is brought up and we talk about it.
18   But certainly in trial testimony, it's not -- you can't go to a
19   jury like we do in deposition and go through every paper
20   because it's going to be beyond what the jury is going to be
21   able to grasp in the hour or hour and a half I might be on
22   direct.
23        So, what you do is I provide usually a
24   PowerPoint that summarizes the information and lists the
25   studies or the citations that support my view and I go through

22

1   those. And I'm usually asked a question during direct, "Is
2   there other information out there?" And it's absolutely
3   there's other information out there, but I've tried to present
4   for the jury what I believe is important, and then the defense
5   puts on their expert and they may have a different set.
6        Q.   And if you testify in the Seroquel case in this
7   litigation and you're asked about evidence that goes against
8   your overall opinion that Seroquel causes diabetes, you're
9   going to tell the jury about that, correct?
10          MR. ALLEN: Objection. Form. In a minute, I'm
11  going to instruct her not to answer. That's conjecture and
12  speculation. As a matter of fact, don't answer that question.
13  Don't answer that question.
14       Q.   (BY MR. BROWN) You're going to follow your lawyer's
15  advice, don't answer that question?
16          MR. ALLEN: Yes, she is.
17       A.   Yes, I guess so.
18          MR. ALLEN: What's she going to do at trial,
19  that's --
20       Q.   (BY MR. BROWN) Well, let me ask you, when you've
21  testified at trial in the past, have you always tried to give
22  the jury a sense of the evidence that supports you and doesn't?
23          MR. ALLEN: Objection. Form. You can answer
24  that.
25       A.   I don't -- I have to really sit and think about that.

23

1   I mean, I certainly -- I always try to give the jury a view of
2   the evidence that provides them an understanding for where my
3   opinions came from, okay? So, that supports my opinions. And
4   I try to show them that it's reliable information, that I'm not
5   the only person that thinks this, you know, that I have
6   peer-reviewed information or reliable sources of information
7   that -- upon which I build my causation assessment.
8          And on direct, I'm always asked -- on direct --
9   on cross, I'm always asked about some other study that somebody
10  else can pull up because there -- I would tell you I can't
11  think of a case I've ever worked on where -- and this is
12  science. You're never going to have a hundred percent of the
13  information out there be totally in agreement. You're always
14  going to have some percentage of information that's going to
15  spin something a different way. And that spin can be due to a
16  bias of the author or it can be something else totally and so I
17  can't, you know, tell you how that's going to happen.
18          Again, my duty at trial is to give a truthful
19  summary of what I believe my opinions are that are relevant to
20  the case, and that's what I do.
21       Q.   (BY MR. BROWN) And you also try to give a truthful
22  summary of the information that supports your opinions,
23  correct?
24          MR. ALLEN: Objection. Form. Asked and
25  answered.

24

1        A.   Well, the information I'm providing is the
2   information that is supportive of my opinions, absolutely. And
3   some -- and then, like I said, on cross, I'm often asked to
4   interpret studies that I might not have mentioned and I do that
5   to the best of my ability. Usually, they're studies I have
6   seen before. Every once in a while, something comes up that I
7   haven't seen and we have to talk about that.
8        Q.   (BY MR. BROWN) Okay. You're appearing as an expert
9   for the plaintiffs today?
10       A.   Yes.
11          MR. BROWN: Let's mark the report.
12          (Plunkett Exhibit No. 1 marked.)
13          (Discussion off the record at 9:33 a.m.)
14       Q.   (BY MR. BROWN) Dr. Plunkett, I've just handed you
15  what is marked as Exhibit No. 1. Can you identify that for me?
16       A.   Yes. It's the report I prepared early in September
17  relevant to this litigation. And appended to the back of it is
18  the -- my CV and a reference list and -- with the date on it.
19  And then also a list of testimony, I believe, is back here,
20  too.
21       Q.   And this report in Exhibit No. 1 is dated September
22  6, 2008, correct?
23       A.   Yes.
24       Q.   And you signed this report?
25       A.   Yes, I did.

25

1        Q.   You've attached a list of all the testimony you've
2   given, whether deposition or trial, for the last four years,
3   correct?
4        A.   Yes. And there is one additional one that happened
5   right at the time this report was being written which isn't on
6   here, I think.
7        Q.   And what's the name of that case?
8        A.   Oh, the name of the case.
9        Q.   Well --
10       A.   It's a Baycol case and it was in Mississippi and it
11  was a trial and it was the week I was writing this report. So,
12  I don't know what the date was.
13       Q.   How long did it take you to prepare this report
14  approximately?
15       A.   I have my bills and you can look and get the exact
16  number. This report was generated in a -- sort of in pieces.
17  In other words, I first wrote a report in Canada which formed a
18  basis for where this came from, so you have to take part of the
19  Canadian time as well. So, I would guess -- I don't know -- 80
20  hours. That's my guess.
21       Q.   Okay. So, you spent about 80 hours between the
22  Canadian litigation and your preparation for the report you
23  have in front of you that's Exhibit No. 1?
24       A.   Oh, I spent more time than that, but that -- as far
25  as sitting down to have to actually write reports and fiddle

26

1   with literature to get ready to write a report, that's a guess.
2   I spent a lot of time in my bills on preparation for training
3   day for a judge in New Jersey. And that was last -- May, June?
4   I forget the date of it. Last --
5         MR. ALLEN: They know the date.
6         A. It's in my bills. Anyway, so there was a time -- a
7   good deal of time spent for that and I don't know the number.
8   You can get it from my bills.
9         Q. (BY MR. BROWN) We'll talk about the bills in a
10  second. When did you start to prepare the report that you've
11  marked as Exhibit No. 1?
12        A. When did I actually sit down to write this specific
13  report?
14        Q. That -- yes.
15        A. Probably the week before this date, which is
16  September 6th. So, the very end of August.
17        Q. And how many hours did you put in just for
18  preparation of this report as --
19        A. To type this one in?
20        Q. Yeah.
21        A. Probably -- maybe 20, 24 hours, 20 hours maybe.
22        Q. Okay. And go to -- go to Paragraph 7, if you could,
23  with me. Paragraph 7 is a summary of your information
24  reviewed; is that right?
25        A. Yes.

27

1         Q. And it says "During the course of this case, I
2   reviewed the following materials," semicolon. Do you see that?
3         A. Yes.
4         Q. And it lists three categories of information. First
5   category says "Scientific literature relating to the
6   pharmacology and toxicology of antipsychotic drugs in general
7   and quetiapine in particular," correct?
8         A. Yes.
9         Q. "B, labeling for Seroquel as provided by the
10  Physicians' Desk Reference," correct?
11        A. Yes.
12        Q. And you also reviewed regulations from the FDA
13  relating to development, approval, labeling, and marketing of
14  prescription drug products, correct?
15        A. Yes.
16        Q. Also attached to your report towards the back is
17  reliance materials.
18        MR. ALLEN: Is it titled "Reliance Materials"?
19        A. It's titled "Reference List."
20        MR. ALLEN: Yeah.
21        Q. (BY MR. BROWN) Okay. Let me just clean that up.
22        So, towards the end of the report, it says
23  "Dr. Laura Plunkett Seroquel Reference List." You see that?
24        A. Yes.
25        Q. And that's dated October 11th, 2007?

28

1         A. Yes.
2         Q. And that lists some of the materials you relied upon
3   in preparing your report, correct?
4         A. Yes. And you should have an updated list. I
5   prepared a new list for you early -- over the weekend, which
6   was a 2008 list which will be more extensive than this --
7         Q. Okay.
8         A. -- so that you have that as well, which I believe you
9   should have been provided with.
10        Q. Yeah. We haven't been provided that, but we'll deal
11  with that in one second.
12        MR. ALLEN: Okay. We'll deal with it. I may be
13  a little confused myself, but go ahead.
14        Q. (BY MR. BROWN) So, can we agree that the material
15  identified in this report, Exhibit No. 1, is not everything you
16  looked at in arriving at your opinions regarding Seroquel,
17  correct?
18        A. I don't -- I can't answer -- I would say it probably
19  is not every -- every scrap of document, but it's -- certainly
20  I have provided you -- I've -- with everything that I was asked
21  to bring for the subpoena, which is certainly everything.
22        Q. Okay.
23        A. So -- but, I mean, I know that this reference list
24  was updated because I did it myself last weekend, so -- and
25  this date, I can tell you -- that's why I'm looking at it --

29

1   that the date is wrong.
2         Q. And did you provide the updated reference list to the
3   lawyers in this case?
4         A. Absolutely. As soon as I was told of the day of my
5   deposition being set, I do what I normally do at that point,
6   which is provide -- start gathering the materials that I'll be
7   asked to bring to deposition. So, I -- and I didn't get the
8   date to my deposition, I don't believe, until last week
9   sometime. And I don't remember the date, but last week I was
10  told that it was set for this day. And I was actually out of
11  town, which was a problem, too.
12        Q. What --
13        MR. ALLEN: Arthur, just for the record, if we
14  have that, I'll get it to you. I'm not -- I know, just for
15  myself, that I don't have that and I'm going to try to locate
16  it and I just -- we'll talk about it with Dr. Plunkett at the
17  break. I've given you -- and I have a box behind me of
18  everything we brought in response to the subpoena. So, I just
19  don't want a record getting started that I'm hiding anything.
20  I will look. I looked at my file right here and all I have --
21        MR. BROWN: Well, whether it's hidden or not, we
22  don't have it at all --
23        MR. ALLEN: Well, we'll talk about -- I won't
24  argue with you. What I'm telling you on the record, there's an
25  additional reference list. We'll provide it. I'm telling you

30

1   on the record we brought the material, as I said, in this box
2   behind us right here.
3       Q.  (BY MR. BROWN) Dr. Plunkett, when did you complete
4   the updated reference list you described?
5       A.  I think Sunday.
6       Q.  And who did you send it to?
7       A.  April Thompson.
8       Q.  Did you send it by fax?
9       A.  No.  By e-mail.  It's an electronic file.
10      Q.  And did you put a date on that list of materials?
11      A.  I'm not sure.  You have to tell me.  I believe it
12  does.  I mean, it's in this box, so we can look at it.  I
13  believe I have a date on it.
14      Q.  Dr. Plunkett, you referred to a box of material
15  that's behind you, correct?
16      A.  Yes.
17      Q.  Did you bring that with you today?
18      A.  I -- well, it was carried by somebody else, but the
19  material I brought yesterday to a meeting with the attorney to
20  show him what I was bringing to the deposition and then this
21  was left here and then we brought it down the hall today for
22  you.  Or, actually, I think he made copies because most of
23  the -- I have my originals here and he made copies for you of
24  what my originals were.
25      Q.  Based on your report -- your report that you have in

31

1   front of you marked as Exhibit No. 1 seems limited to published
2   information; is that correct?
3       A.  No.  It -- well, I mean, my -- I certainly had
4   reviewed more than published information when I wrote the
5   report, but I think this reference list, for example, is
6   probably just -- at this point in time would have been just
7   published information --
8       Q.  Yeah.
9       A.  -- from 2007.
10      Q.  That's what I'm trying to get at.  From the list --
11  the October 11, 2007, Plunkett reference list, that's limited
12  to published information, correct?
13      A.  Let me look, but I believe it's all published
14  information.  Published or textbook.
15      Q.  Okay.  And in the box behind you that you brought
16  with you yesterday, there is --
17      MR. ALLEN:  Well, let's make the record clear.
18  She didn't --
19      MR. BROWN:  Scott, don't --
20      MR. ALLEN:  Well, wait a minute.  No.
21      MR. BROWN:  Please, in the middle of my
22  question, do not cut me off.
23      MR. ALLEN:  Well, wait before you answer this
24  question.
25      MR. BROWN:  Yes.

32

1       Q.  (BY MR. BROWN)  You testified a minute ago that you
2   took -- you brought a box here with you yesterday, correct?
3       MR. ALLEN:  No.  She -- and don't answer that
4   question.  Arthur, she told you she brought this material, I
5   made copies, and we brought the box down here.
6       MR. BROWN:  She can tell me if I'm wrong.
7   You're not here to tell me I'm wrong.  Let her answer the
8   questions.
9       MR. ALLEN:  Don't misrepresent her testimony.
10  She had this material.  I made copies for you and put them in a
11  box.
12      MR. BROWN:  Your remedy is "Objection.  Form."
13  That's your remedy.
14      MR. ALLEN:  Well, no, it's not if you're going
15  to be misleading, but go ahead.
16      MR. BROWN:  I'm not being misleading, Scott.
17      MR. ALLEN:  Go ahead.  I'm sorry.  Go ahead.
18      Q.  (BY MR. BROWN) Dr. Plunkett, the box behind you,
19  that contains more information than is described in your
20  report, Exhibit No. 1, correct?
21      A.  It's certainly more information than is on this
22  reference list, that is correct.
23      Q.  And is the material in the box that we have here
24  today -- is that material itemized or identified in the report,
25  Exhibit No. 1?

33

1       A.  Oh, I'm sure it's not.  I would never -- I never do
2   that in my reports.  I don't itemize material in the report.
3   Again, I cite examples of material that support the statements
4   that I make in my report and then always provide a deposition
5   to the attorney -- a compilation of all the materials that I
6   have reviewed that support my opinion.
7       Q.  When you gave your opinion in the -- and prepared
8   your report in the Canadian litigation that Seroquel causes
9   diabetes, had you reviewed anything other than published
10  literature?
11      A.  Yes.
12      Q.  What had you reviewed besides published literature in
13  arriving at your opinion that Seroquel causes diabetes in the
14  Canadian litigation?
15      A.  I had been provided with some internal company
16  documents that were -- Dear Doctor letter to Japan, some
17  correspondence around that.  So, I don't remember exactly -- I
18  can't tell you how many.  I don't think I -- they're -- they
19  should be provided to you on the CD, but certainly whatever
20  documents went with the Dear -- the changes in the labeling in
21  Japan.
22      I would have also provided -- I was also
23  provided, I believe, with a letter from a French authority at
24  the time and I was provided with product insert material
25  relating to the Canadian product.  So, Seroquel in Canada.

**34**

1   Canadian has consumer information and physician information
2   documents that are different than our Physicians' Desk
3   Reference document, so I was provided with that.
4   Q.   Then can you --
5   A.   And -- let me think. I'm also -- I believe I was
6   provided with some documents that were identified as S-E-R-M,
7   SERM, documents which I believe -- it's my understanding it's a
8   committee within the company that meets that looks at safety
9   issues, and there were some of those. Some of those I was
10   provided later after the Canadian report, but some of those
11   were before. And that's what I can recall off the top of my
12   head.
13   Q.   Why didn't you identify them in your report, all
14   those materials you just described?
15   A.   I -- that's not how I normally draft my reports.
16   Again, I draft the report based upon -- well, depends what the
17   report's talking about. This report was generally -- was --
18   has different sections. There's a general section on
19   causation, okay? And, again, I try to cite the documents that
20   I believe are most important in describing my opinions, but
21   it's not every document. So, that's why I always give you a
22   reference list and give you a bigger box of materials that are
23   things I reviewed and relied on but may not have cited in my
24   report. It's just how I write my reports.
25   And then there's a section on warnings and

**35**

1   labeling usually, and in this litigation there is. And
2   normally in that, I have reviewed some internal company
3   documents or I've reviewed labeling documents. And I don't
4   cite them necessarily, but I provide you statements and then
5   give you an idea of what it is that I base that upon by --
6   based upon what I've reviewed, and then usually in deposition
7   we talk about them.
8   Q.   Is there any way I could tell, for example, in your
9   report that you reviewed SERM documents?
10   MR. ALLEN:   Objection. Form.
11   A.   I don't know if I've cited them. I doubt I have.
12   Let me look and see.
13   I haven't cited them specifically, no, but
14   certainly some of the statements I make in the -- in the
15   document -- in the report are supported by some of the
16   information that I reviewed in the SERM document.
17   Q.   (BY MR. BROWN)   Why don't you identify the statement
18   that you're referring to that would indicate to me that you
19   reviewed SERM documents?
20   MR. ALLEN:   Objection. Form.
21   A.   I think I've already told you. I said I don't cite
22   them specifically, but I -- if we want to -- if you want to go
23   through my report as we go through my opinions, I can try to
24   tell you which opinions I believe the SERM documents support.
25   Q.   (BY MR. BROWN)   We're going to --

**36**

1   A.   Or how I -- how the SERM documents, to me, were
2   relevant to the opinions I've expressed. I can certainly
3   provide you with that as we're here today in the deposition.
4   Q.   And we're going to do that. We're going to walk
5   through the report. But as you sit here today, can you point
6   to me in your report -- I'm using the SERM documents as an
7   example -- where I could be able to tell that you looked at
8   these SERM documents?
9   MR. ALLEN:   Objection. Asked and answered.
10   Don't answer the question further. She's answered it already.
11   Let's move on.
12   MR. BROWN:   Are you going to order her not to
13   answer that question?
14   MR. ALLEN:   I'll let her answer it one more
15   time, but it's -- objection. Form. Asked and answered.
16   A.   I have told you I have not cited -- I can't find you
17   a parentheses that says "SERM" after it to indicate that that
18   document goes with that statement. But, certainly, I believe
19   I've done what I always do in litigation, which is I've given
20   you documents I reviewed and I've given you my opinions and
21   then we discuss those. So, I -- you know, again, this is
22   what -- this is my normal process or procedure for how I write
23   a report.
24   MR. BROWN:   Scott, can we look at the -- can I
25   mark that box?

**37**

1   MR. ALLEN:   Yes, you certainly can. As a matter
2   of fact, I want you to mark the box. That's why I brought it.
3   Let's you and I go off the record, talk about the best way to
4   do it, and then we'll get back on the record, figure it out.
5   (Recess from 9:49 a.m. to 10:14 a.m.)
6   Q.   (BY MR. BROWN)   Dr. Plunkett, I think we've
7   established -- and you can correct me if I'm wrong -- that
8   there is a group of documents that are in the box behind you
9   that we're going to mark later on in the day that aren't
10   specifically identified in your report; is that correct?
11   A.   That's true.
12   Q.   And it's my understanding that you've received the
13   materials in the box -- and I think there's 4 or 5 inches of
14   materials -- over time; is that right?
15   A.   Yes. I've received some over -- well over a year
16   ago, and some as early as June of this year.
17   Q.   And you think you did an updated reliance list that
18   will identify at least some of the materials in that box; is
19   that correct?
20   A.   Yes. In fact, most, if not all. I mean, I
21   specifically did that list this weekend and I identified
22   everything, I believe, that I could find, but --
23   MR. BROWN:   Okay. I'm going to put a statement
24   on the record.
25   There's a new box of material that was produced

## 38

1  to us this morning. There's a copy of it in the room. We're
2  going to specifically mark the individual documents. I've
3  looked through them for about 30 or 45 seconds. I have a sense
4  of what they are. It looks like there's some additional
5  articles there and internal company AstraZeneca documents,
6  including at least one SERM document which you've talked about.
7         We would like to come back for a second day.
8  We're going to accomplish what we can accomplish today. We're
9  going to work all day and we'll do the best we can to get
10  through that. Obviously, some of the stuff we won't be able to
11  get to in there and we want to reserve our right to come back.
12  And we'll try to find a time, subject to an agreement with
13  Mr. Allen, to come back and finish the dep on the new material
14  not previously produced before this deposition.
15         MR. ALLEN: Let me just say I generally agree
16  with that, Arthur. And I do agree with what you said
17  concerning if there's new material, you can come back. I
18  definitely agree with that. I will tell you, just for the
19  record -- and I've -- part of it due to the fact I'm not a
20  computer person, but I have a series of e-mail transactions
21  with -- there's a lot of people involved in this litigation --
22  that they provided your side zip files, zip disks, or some type
23  of -- e-mail type of correspondence.
24         It's my belief that some of the material that is
25  in this box is, in fact, within the material. It's my belief

## 39

1  that some of the material in this box, some of it, is
2  referenced in the report. I'm thinking of, like, the Japanese
3  letter, for example, but I don't need to go through each one.
4  It's my belief that the material here, none of which -- none of
5  it is new to you, it's my belief, but I don't argue with your
6  need, if you need to, on material that is new, I guess, for --
7  quote, new, close quotes -- new to your knowledge of what she
8  had reviewed --
9         MR. BROWN: Right.
10         MR. ALLEN: -- to come back. I don't disagree
11  with that.
12         I want to say that what prompted all this -- and
13  I think -- so it's not later painted as bad faith but, in fact,
14  good faith -- was my efforts when I reviewed the subpoena in
15  the case with the doctor yesterday and the doctor's efforts
16  when she came -- we had material and I made a copy of it for
17  you because I don't -- I'm not a zip file/zip drive person, so
18  I didn't have time or the wherewithal or the ability to compare
19  the written stuff with the zip file. I couldn't have done
20  it -- Scott Allen couldn't have done it if he wanted to, and so
21  I just said I'm going to copy the material and bring it here.
22         So, it was a good faith effort to comply with
23  your subpoena and comply with the rules. That being said, so
24  it's clear it's good faith not bad faith, I will allow you to
25  continue the deposition on matters that you claim are, quote,

## 40

1  new, close quotes. And we can discuss that. I'm not standing
2  in your way. I want to be forthcoming, and that was -- our
3  intent was to be forthcoming.
4         And, lastly -- and I think the doctor will
5  confirm this -- none of the, quote, new, close quotes,
6  materials have changed her opinions in this case. There's
7  nothing that's altered her opinions, in other words, and I
8  think that's important. There's no new opinion created by the,
9  quote, new, close quotes, documents. That's it.
10         MR. BROWN: Okay. I don't think there's any
11  more thing to say about more at this point. If there is, I'll
12  put a statement on the record.
13         Q. (BY MR. BROWN) I think you testified in Zyprexa
14  litigation that you always do your own literature searches when
15  you're retained as an expert; is that correct?
16         A. Yes.
17         Q. And you did that in this case, Seroquel?
18         A. Yes.
19         Q. And you started to describe earlier how you did the
20  searches here. Can you just describe for me how you went about
21  searching literature when you were asked to be an expert in
22  Seroquel?
23         A. Sure. I do -- what I would generally do is I
24  start -- in a case like this where you have a drug name that's
25  a specific issue, I would start by going to usually PubMed. I

## 41

1  also subscribe to Dialogue. So, I use those two services and I
2  do two separate searches. I search usually by the drug name
3  first and I see how large the database is that I'm dealing
4  with. And then I usually take that search and limit it either
5  to the specific event, like diabetes or hyperglycemia. In this
6  case, I started out by just limiting it to "toxic" with a
7  question mark, which would pick up "toxicity." And that was
8  pretty large still, but not so large that I didn't feel I
9  wanted to go through all the titles, and that's what I did.
10         I've done other searches after that first
11  search. I've also then gone back in writing my reports because
12  I want to try to make sure I have an understanding of, for
13  example, are there any other case reports on quetiapine and
14  either diabetes or ketoacidosis or hyperglycemia. I know I did
15  a search on the drug name with those search terms and "human"
16  so that I would identify human cases. And -- I'm trying to
17  think. I also, I think, did another search on animal data with
18  quetiapine, just "quetiapine" with the word "animal" because
19  that's a much smaller group of literature out there.
20         And I'm trying to think what other key words.
21  Those are the ones I remember, but, you know, just kind of key
22  words a pharmacologist or toxicologist without put in.
23         Q. Every time you ran one of those searches -- and you
24  described a couple, but there could be others -- did you
25  attempt to review at least an abstract of the hit you got?

42

1    A.  If it was available, yes.  And -- but when I say "if
2    it was available," a lot of times with old literature, you're
3    not.  So, if you go back to literature -- luckily, for this
4    drug, we don't go back that far.  But, like, when I've worked
5    on -- we talked about phenylpropanolamine.  That drug went back
6    to the 1950s.  So, a lot of the literature from, let's say,
7    1980 back have no abstracts.
8         But in this case, I think, except for editorial
9    opinions that would have been shown up, I probably had an
10   abstract.
11   Q.  Okay.  I think you've also testified in Zyprexa
12   litigation that you do sort of monthly searches or updates on
13   second-generation antipsychotic literature; is that right?
14   A.  Yes.  I -- and that's not specific to any one drug.
15   I do "antipsychotic" and I sometimes use "atypical" as a term
16   with that and just look at what came out new this month, yes.
17   Q.  And you're still doing that?
18   A.  Yes.  And -- but now I'm not doing just "atypical."
19   I probably now do the search for -- in fact, I know I do.  I've
20   done just "Seroquel" by itself, just as a term, and don't even
21   do "antipsychotic" because I knew I had upcoming events,
22   depositions and things like that to look at and writing
23   reports.  Any time -- for example, end of August when I wrote
24   the report, I did a search to see what had happened since my
25   last search for sure, even though it wasn't a month.  Because I

43

1    did another search early August, but I did another one just to
2    see.
3    Q.  So, you did a search on updated Seroquel literature
4    in early August and then again shortly before this deposition?
5    A.  No.  Before the report, which would have been the
6    very end of August.  So, not even quite a month.
7    Q.  You indicated that when you go through, you look at
8    at least the abstract and then decide whether you want to go to
9    the next level of review, correct?
10   A.  Yes.
11   Q.  Are there things that you have looked at when you've
12   gone to the next level of review, the full paper, and said this
13   doesn't add much to me and you discard it?
14   A.  I don't discard it, but I would make that judgment,
15   doesn't -- nothing new to add.  And I may not, for example,
16   update a report to add a new citation.  It just depends.  I
17   mean, it depends on whether or not I'm -- I feel I need to
18   strengthen something in my report.  But I would put that -- if
19   it's an article that is supportive of my opinions, I would
20   certainly put it in my reference list.  So, that's why --
21   again, which is why I always update my reference list before
22   deposition because usually there's some time period from
23   drafting of the report to the deposition where some literature
24   may or may not have shown up.  So, I at least look to see if I
25   need to add to it.

44

1    Q.  And if you find an article in your next -- in your
2    second-level review that contradicts your opinion -- in this
3    case, Seroquel causes diabetes -- would you include that in
4    your reference list, your updated reference list?
5    A.  It would depend.  It certainly would depend on
6    whether or not I thought it was -- I -- my reference list does
7    not have every hit or every abstract I've looked at; but if I
8    went and pulled the full article and reviewed it in detail, it
9    should show up on my reference list.
10   Q.  Okay.
11   A.  But a lot of times from the abstract I can tell that
12   it's something that isn't going to change my opinions or isn't
13   going to be something I need to investigate further, so it
14   wouldn't show up on my reference list.
15   Q.  Okay.
16   A.  So, that would maybe be things that don't support my
17   opinion.  It's possible, yes.
18   Q.  All right.  There's things -- in your second-level
19   review, there might be things that don't support your opinion
20   that Seroquel causes diabetes and you may leave that off your
21   reference list?
22   A.  Yes.  It's possible.
23   Q.  How much -- what's your current hourly rate to work
24   as an expert witness?
25   A.  In this case, it's $300 an hour and then 400 for

45

1    testimony.
2    Q.  Does $400 for testimony include today, deposition?
3    A.  Sitting here, yes, and talking to you on the record,
4    yes.
5    Q.  Okay.
6         MR. BROWN:  Scott, do you have a copy?  Is this
7    the only copy of the billing records?
8         MR. ALLEN:  There's one in the box.  Do you
9    want -- the infamous box.  I can get you another copy.  Why
10   don't I get the copy out of the box.
11        MR. BROWN:  Yeah.
12        MR. ALLEN:  Because I gave you my copy, didn't
13   I?
14        MR. BROWN:  Yeah.
15        MR. ALLEN:  Okay.  I'm really not trying to be
16   funny.  I consider the box like trying to get you everything I
17   could possibly get my hands on in response to your subpoena.
18   Here it is.  Okay.  You want to mark it?
19        MR. BROWN:  Yeah.
20        MR. ALLEN:  Okay.  Let's mark this.
21        MR. BROWN:  Right.  Okay.
22        MR. ALLEN:  And then I --
23        MR. BROWN:  I won't write on this.
24        MR. ALLEN:  Go ahead and say you're fixing to
25   mark her billing and that was part of the material which was in

46

1   the box but will no longer be in the box.
2          MR. BROWN: Uh-huh.
3          (Plunkett Exhibit No. 2 marked.)
4      Q.   (BY MR. BROWN) Dr. Plunkett, I'm going to show you
5   what's been marked as Exhibit No. 2.
6      A.   Yes.
7      Q.   Does this appear to be your billing records for all
8   the work you've done on Seroquel?
9      A.   Up until September 1st of 2008, yes.
10     Q.   Okay. This was produced to us this morning, first,
11  in copy from Mr. Allen and then the copy you're looking at from
12  the box of newer material.
13     A.   Actually, I need to -- this says "September 23rd."
14  So, you have through the 23rd of September, not the 1st of
15  September.
16     Q.   Okay. And just to go over this briefly, it looks
17  like the billing starts March 25th, 2007, correct?
18     A.   Yes.
19     Q.   And you billed in the March bill from late February
20  to early March; is that right?
21     A.   Yeah. I tend to bill from the 25th to the 25th of
22  the month. So, 25th of -- that would be a bill that would be
23  February 25th or after through the 25th of March, yes.
24     Q.   Uh-huh. And over the course of the last, I guess, 16
25  or 17 months, you've -- hold on one second -- you've accurately

47

1   kept all of your time records for Seroquel?
2      A.   Yes.
3      Q.   And we could do the math later on, but this is looks
4   like it's somewhere north of $40,000 you've billed working as
5   an expert for the plaintiff lawyers in Seroquel litigation; is
6   that right?
7      A.   I would estimate between 40 and 50, yes.
8      Q.   Did you also bring any billing records for your work
9   on any other second-generation antipsychotic?
10     A.   No. I didn't know I needed to do that.
11     Q.   Did you see a copy of the deposition noticed that had
12  a list of materials that we wanted to see?
13     A.   Yes. I -- yesterday, we -- I saw a copy of it.
14         MR. BROWN: Let's mark as Exhibit No. 3 the
15  actual deposition notice.
16         (Plunkett Exhibit No. 3 marked.)
17     Q.   (BY MR. BROWN) It's a copy of the deposition notice
18  in this case. Have you seen that before today?
19     A.   Yeah. I saw it yesterday for the first time.
20     Q.   You see Schedule A on Page 4?
21     A.   Yes.
22     Q.   Did you review it before you got here this morning,
23  the -- actually Schedule A?
24     A.   I did not read through Schedule A. I saw the
25  deposition notice and we talked about what was on Schedule A

48

1   verbally yesterday.
2      Q.   Do you have on your computer or in your files, your
3   billing records, the amount of time that you spent working on
4   Zyprexa litigation?
5      A.   Yes, I would.
6      Q.   And do you also have that for any other antipsychotic
7   you worked on?
8      A.   I think the only one you would have would be Zyprexa.
9   I don't think I've billed anything that would have to do with
10  Risperdal, with the exception of the New Jersey Education Day
11  which I provided you because it dealt with all -- it dealt with
12  Seroquel, so I gave it to you, but it certainly talked about
13  the other drugs as well.
14     Q.   Approximately how much money have you made working as
15  an expert in Zyprexa litigation?
16     A.   I would -- I don't know I could really give you a
17  number, but my estimate would be similar to Seroquel because I
18  only did one deposition and one report in Zyprexa.
19         MR. BROWN: We're going to make a request for
20  the records specifically requested in Item No. 4.
21         MR. ALLEN: Okay. Just --
22         MR. BROWN: "The records" being Zyprexa billing
23  records.
24         MR. ALLEN: Just for the record, I'll look at
25  that. I thought I did a good job. I brought the New Jersey

49

1   Education -- let me tell you this: We're going to sit here all
2   day. I swear to God I worked as hard as I could to get you
3   everything and that's what I'm telling you. I thought I did a
4   good job because I know there was New Jersey Education Day on
5   here. So, I will take that under advisement also.
6      Q.   (BY MR. BROWN) Dr. Plunkett, did you prepare any
7   notes when you were reviewing any of the -- your reliance
8   materials for Seroquel litigation?
9      A.   I brought you everything that I have and I don't have
10  any handwritten notes, no.
11     Q.   On your copy, do you make notes or highlighting?
12     A.   I sometimes do. It just depends, and so I've brought
13  you some of my hard copies here. I don't always do that
14  though. Depends because I have to make them available
15  sometimes for recopying and highlighting makes it difficult.
16         MR. BROWN: Scott, just so I'm clear, is the
17  material in front of her a Redwell and then additional 3
18  inches of document -- is that the -- are those the documents
19  that are in the box?
20         MR. ALLEN: Yes, first part of that answer. And
21  I'm trying to be careful so no one claims I'm -- the answer to
22  that is, yes, this material that is sitting by Dr. Plunkett was
23  copied and placed in the box. There may be, Arthur, maybe --
24  because I haven't -- additional material in the box, but I --
25  this material was copied and is in that box. And she brought

50

1  this because this is the material she reviewed and I copied it
2  for you and I put it in that box.
3       MR. BROWN:  Okay.
4       Q.  (BY MR. BROWN)  And the work you've done on the
5  Canadian litigation is also included in your billing records
6  Exhibit 3, correct?
7       A.  Yes.
8       Q.  You consider yourself an expert in pharmacology?
9       A.  Yes.
10      Q.  And can you give me the short explanation of what
11  pharmacology is?
12      A.  It's the study of drug actions on the body.
13      MR. ALLEN:  Good job.  That's short.
14      Q.  (BY MR. BROWN)  And do you consider yourself an
15  expert in toxicology?
16      A.  Yes.
17      Q.  And can you give me the short explanation of what
18  toxicology is?
19      A.  It's the study of adverse effects of chemicals on the
20  body.
21      Q.  And do you consider yourself an expert in any other
22  discipline?
23      A.  Yes.
24      Q.  And what other disciplines do you consider yourself
25  an expert in?

51

1       A.  I have expertise in pharmacokinetics.  I have
2  expertise in risk assessment; and as applies to drugs,
3  risk-benefit.  I have expertise in FDA regulatory matters, and
4  that include pretty much all aspects of the regulations as they
5  pertain to the development and marketing of pharmaceuticals.  I
6  also have expertise in -- I have specific expertise as well in
7  certain subdisciplines within those general areas, but those
8  would be the large general areas.
9       Q.  All right.  We'll put pharmacokinetics aside.  I
10  consider that related to pharmacology.  I want to talk about
11  the other three.  You consider yourself an expert risk
12  assessor; is that fair?
13      A.  Risk assessment, yes.
14      Q.  Is that different -- and you also consider yourself
15  an expert in risk-benefit analysis, correct?
16      A.  Yes.
17      Q.  Are those different concepts or the same?
18      A.  Risk-benefit, to me, is a subdiscipline within risk
19  assessment.  When you do a risk-benefit analysis, you're doing
20  risk assessment and you are weighing both benefits and adverse
21  events or risks of a drug.  That's specifically what you're
22  doing.  You can also do risk-benefit for things other than
23  drugs.  You can do it for food additives, you can do it for
24  pretty much anything you wanted to do.  I mean, if you --
25  that's regulated by the federal government.  You definitely do

52

1  that when you look at pesticide products.  It's the benefit of
2  the product versus the risk to the public.
3       Q.  So, when you do a risk-benefit analysis, you need to
4  know about the effectiveness of the medicine, correct?
5       A.  Efficacy, yes.
6       Q.  And you need to understand the population or the
7  people taking the medicine, correct?
8       A.  Yes.
9       Q.  And you need to understand, for example, what their
10  background risk is for different diseases, correct?
11      A.  You would -- depending upon the assessment you were
12  doing, that could be a part of your equation or your scope of
13  your assessment.
14      Q.  And when you're doing a risk-benefit analysis, would
15  you also need to understand the comorbid conditions of the
16  disease the drug attempts to treat?
17      A.  Depends.  I think that's a highly -- highly dependent
18  depending on the type of drug and the -- but certainly in many
19  cases when you're doing risk-benefit, you're looking at the --
20  I guess to boil it down is you're looking at the patient
21  population being treated, and it can be a very varied
22  population or can be a very distinct population.  And so you
23  certainly consider that as part of the overall assessment.
24      Q.  And you'd also consider, obviously, any adverse
25  effects the drug may have, correct?

53

1       A.  Well, that's the risks that you're looking at, yes.
2       Q.  Okay.  And that's a subset of risk assessment,
3  correct?
4       A.  That's one application -- to me, risk-benefit
5  assessment is an application of risk assessment, which is a
6  tool; and in a risk-benefit analysis, you use risk assessment.
7       Q.  Okay.  And can you tell me generally what risk
8  assessment is?
9       A.  Well, depends -- the -- in general -- very general
10  terms risk, assessment is an analysis of the adverse events or
11  harm that can be caused by either a chemical or a series of
12  events.  So, you could have risk assessment that could be
13  applied to driving a car, which is an event, versus risk
14  assessment applied to benzene in the air or risk assessment as
15  it pertains to Seroquel.
16      Q.  Are you going to be offering a risk assessment
17  opinion in the Seroquel litigation?
18      A.  As it pertains to the -- I've done that with my
19  causation opinion.  That is a risk assessment opinion in some
20  aspect of it, but certainly not -- certainly, if you want to
21  define "risk assessment" only in the way that it's defined by
22  the National Academy of Sciences, I've done parts of that
23  process with Seroquel; but parts of that aren't necessarily
24  applicable.  For example, I can't do quantitative dose response
25  assessment because I don't have the data that allows me to

54

1  determine the threshold of events, okay? So, that's part of
2  the distinction that you might do -- for example, benzene in
3  air -- versus you usually can't do for chemicals. You can come
4  up with a -- sort of a range but maybe not a dose.
5      Q. We'll talk about those standards in a minute, but is
6  it fair to say that your report summarizes your risk assessment
7  opinion?
8      A. I hope it does. That's my intent.
9      Q. Are you also going to offer a distinct opinion on the
10  risk-benefit profile of Seroquel in this case?
11      A. I think that's in my report. I mean, I've tried to
12  talk about -- when I talk about failure to warn and health
13  risks, in that part of my section, I'm talking about the -- I
14  have a couple paragraphs on the efficacy and the comparative
15  efficacy and the fact that there may be safer alternatives.
16  That's part of risk-benefit.
17      I have not done for Seroquel, as I have not done
18  for any of the drug litigation I've worked on, the same type of
19  risk-benefit assessment that an FDA regulator does because I
20  don't have access to every piece of data from the NDA and the
21  IND as they would do it.
22      Q. And you also can't do a risk-benefit assessment like
23  a medical doctor would do, correct?
24      A. Well, I'm not a medical doctor. I do a risk-benefit
25  assessment as a pharmacologist, toxicologist, and a regulator

55

1  might do it because many regulators are pharmacologists and
2  toxicologists.
3      Q. You also consider yourself an FDA expert?
4      A. Yes.
5      Q. Are you going to be offering in this case any expert
6  opinions regarding FDA regulations?
7      A. I may. I mean, it depends upon how the questions are
8  asked. Certainly, the FDA regulations that come into play here
9  would be the labeling regulations and certainly also
10  potentially the -- if asked or if it comes up -- it hasn't so
11  far -- about the adequacy of the data that was submitted,
12  things like that. But that's an opinion that I have not formed
13  at this point in time and would not be laid out, but I could do
14  that if asked.
15      Q. Okay. As you sit here today, are there any opinions
16  based on what you know and what's in your report that you would
17  describe as FDA regulatory opinions that you intend to give in
18  this case?
19      MR. ALLEN: Objection. Form. And let me just
20  let me state for the record -- because the question calls maybe
21  for a legal conclusion -- her opinions are contained in this
22  report. And, as I said, the additional material, alleged new,
23  does not alter those opinions and we will say her opinions are
24  contained within her report.
25      MR. BROWN: Let me just ask this question,

56

1  Scott. This might make it easier. Do you intend when you
2  offer her at trial as a witness to qualify her as someone who's
3  an expert in FDA regulations?
4      MR. ALLEN: Yes, to the extent that it's dealing
5  with the issue of failure to warn which is described in her
6  report and throughout her report and those opinions concerning
7  warning and failure to warn.
8      In essence, I'm telling you, Arthur, we intend
9  to offer her as an expert in the opinions and areas she
10  discusses in her report which you marked as Exhibit 1, in
11  addition to those matters that would have been included within
12  the -- which I brought for you and I know you-all already
13  had -- I hope you had -- the slide presentation that was done
14  in the New Jersey -- was it New Jersey Science Day? Those
15  slide shows, in addition to the report that should have been
16  provided and you-all would have had in Canada. So, those areas
17  discussed.
18      And I think -- well, I know this: Exhibit No. 1
19  is not an attempt to trick or hide anything. I think her
20  opinions are expressed in here and every obviously -- as you
21  do in any deposition, you're welcome to question her on these
22  opinions and have her amplify it.
23      MR. BROWN: Well, thank you very much. I
24  appreciate it.
25      MR. ALLEN: Okay.

57

1      Q. (BY MR. BROWN) You've never worked for the FDA, have
2  you?
3      A. As an employee, no.
4      Q. Have you ever been hired by the FDA as a consultant?
5      A. No.
6      Q. Have you ever been asked by the FDA to review
7  individual adverse event reports or groups of adverse event
8  reports?
9      A. Not the FDA, no.
10      Q. Have you ever been asked by the FDA to review any
11  sort of case reports or anything? Strike that. Case reports.
12      A. No.
13      Q. Have you ever been asked by the FDA to give any
14  opinions on labeling issues?
15      A. By the FDA, no.
16      Q. You ever published anything in the peer-reviewed
17  literature on FDA regulations?
18      A. There's -- it -- there's -- I'll point you to it.
19      Q. Okay.
20      A. In my CV, there's a chapter on -- book chapter on
21  food additives that was peer reviewed. And the miscellaneous
22  document, the Environ report -- it's not peer reviewed by the
23  outside scientific community but was peer reviewed within the
24  company. It used to be a journal that the company I used to
25  work for used to put out to their clients.

15 (Pages 54 to 57)

**58**

```
 1        Q.  And that dealt with prescription medicines?
 2        A.  It dealt with the safety of silicone gel-filled
 3   breast implants, so it would be a medical device.
 4        Q.  Let me ask you more specifically.  My question might
 5   have been poorly worded.  Have you ever published anything in
 6   the peer-reviewed literature regarding prescription drug
 7   regulations?
 8        A.  I don't believe so, no.
 9        Q.  And have you ever published anything in the
10   peer-reviewed literature regarding the prescription drug
11   process, approval process of the FDA?
12        A.  No.  I've done presentations, but I don't believe I
13   have a journal article on that area.
14        Q.  Okay.  Have you been asked to give your risk-benefit
15   assessment for a prescription drug medicine outside of the
16   context of litigation?
17        A.  Yes, in some context.  Not exactly the same way I do
18   it in litigation, but, yes, in some context.
19        Q.  Okay.  Let's focus first on -- describe for me what
20   risk assessment is generally here, the overall risk assessment.
21   Have you ever been asked by anyone besides a plaintiff's lawyer
22   to give the overall risk assessment opinion that you give in a
23   case like Seroquel?
24        A.  As a consulting expert at Environ, yes.
25        Q.  And can you identify the prescription medicine that
```

**59**

```
 1   you did the overall risk assessment for?  Yes.
 2        A.  I -- I have trouble with this question because I have
 3   signed confidentiality agreements with Environ.  It was
 4   consulting work.  I can tell you it's an antibiotic.  I can
 5   give you the general class.  And I've answered that question
 6   before many times, been asked that question.
 7        Q.  Besides the antibiotic, are there any other
 8   prescription medicines -- by the way, did that antibiotic get
 9   approved by the FDA?
10        A.  It was actually a drug on the market and the
11   company -- the issue we had was looking at, after approval,
12   some adverse events in post-marketing.  And actually the drug
13   was eventually removed from the market.
14        Q.  When you were asked to give your opinions in that
15   case -- we'll call it the antibiotic case; is that fair?
16        A.  Yes.
17        Q.  When you were asked your opinions in the antibiotic
18   case, was it to assess whether or not the benefits of the drug
19   outweighed the risks?
20        A.  No.  That wasn't the exact question, although that
21   was part of what we did, but that wasn't the exact question I
22   was being asked.  That's why I said "in some context."  It's
23   not the exact same context.
24        Q.  Give me the exact question you were asked, to the
25   extent you recall.
```

**60**

```
 1        A.  Could the events being seen post-market be predicted
 2   based on the -- all of the data that was gathered in
 3   development of the product; and based upon that, should the
 4   drug -- should the drug remain on the market or not.
 5        Q.  The antibiotic company, did they retain you
 6   particularly or Environ generally?
 7        A.  They retained Environ and I was the expert person
 8   within the company, with one other person.  There were two of
 9   us who worked on the case.
10        Q.  What part of the case did you work on?
11        A.  I was -- I worked on all parts of it.  The two -- it
12   was a huge endeavor where we had to go through the entire files
13   of the NDA -- all the animal studies, all the clinical
14   studies -- looking for mentions of a particular adverse event.
15   So, it -- we -- I looked at all parts of it.  We just did it
16   together.
17        Q.  Were you -- have you ever given advice to anyone
18   outside of litigation on events that should be included in a
19   warning, for example?
20        A.  Yes.
21        Q.  Can you identify that circumstance for me?
22        A.  That's with -- I worked with a medical device company
23   and helped them develop standard operating procedures for their
24   adverse event reporting system.  As things came in, how they
25   would decide what things would go into reporting to the agency
```

**61**

```
 1   and potentially could impact the product insert, which is --
 2   you know, a device has a label.  It's not the same type exact
 3   of label because it's looked at by the doctor as he takes the
 4   device out of the product.  In this case, it was a
 5   surgical-type device, so would be looked at by the physician as
 6   he's using the device; not in a PDR, for example.
 7        Q.  Let me see if I understand.  So, you helped develop
 8   SOPs for --
 9        A.  I --
10        Q.  -- for reporting adverse events to the FDA for this
11   medical device company, correct?
12        A.  Yes, and then whether or not -- and also as part of
13   that, they had some events and we were looking at whether or
14   not the current labeling for the device was reflective of what
15   they were seeing or not seeing.
16        Q.  Who was the medical device manufacturer in that case?
17        A.  Weldon Guest is the guy that runs the company.  It's
18   a cadaverous implant.  And I'll -- if you need the name, I can
19   get it for you.  I just don't remember off the top of my head
20   the name of the company.  I haven't worked with him for, like,
21   three years.
22        Q.  When did you prepare these SOPs?
23        A.  2004.
24        Q.  Were you -- in that case, in the medical device case,
25   were you asked specifically whether or not adverse events the
```

62

1  company were receiving should be put in particular sections of
2  the label?
3      A.  That wasn't the question because these were going to
4  be -- these were things that were going to end up in the
5  warnings because of what was happening.  So, it was -- I guess
6  I -- that wasn't the question being asked me, but certainly
7  that was something that you looked at when you were getting the
8  events.  They were getting some events that had to do with
9  severe life-threatening type reactions.
10     Q.  Okay.
11     A.  So, whole different -- you know, very specific where
12  that would end up.  It wasn't a question of trying to dissect
13  it out.  But certainly the standard operating procedures we put
14  together talked about how you had to determine where things
15  went or how things were reported to the agency.
16     Q.  What was the adverse event of interest?
17     A.  In -- in the --
18     Q.  In the medical device case, the cadaverous --
19     A.  This was failure of the -- this is a -- this was a
20  cadaverous piece of tissue that is being put into a living
21  human and, if it fails, it could be life threatening or also
22  require more surgery, which is also always a risk to the
23  patient.
24     Q.  When you were retained in that case, was there
25  already a warning on that medical device label?

63

1      A.  I don't remember that.  I can't answer that question.
2  I would have to go back and look.
3      Q.  Were you asked by the medical device manufacturer in
4  that case whether or not the adverse event should be included
5  in the warning section?
6      A.  That wasn't -- again, that was not -- there was no
7  question that it was something that was happening was -- would
8  fit there, so that wasn't the question we were being asked to
9  answer.
10     Q.  Besides -- I apologize for that.  Besides that
11  medical device manufacturer, have you ever been asked by a
12  prescription drug manufacturer labeling advice on whether or
13  not an adverse event should go into a warning section, for
14  example?
15     A.  I don't know if I've been asked that specific
16  question.  I -- to -- it may be best if I just summarize -- do
17  you want me to summarize the labeling experience that I've had?
18  Would that help you or --
19     Q.  Let me ask this question first before you do that:  I
20  think I have a sense of some of it, but is there -- has any
21  prescription drug manufacturer ever asked you, "We have this
22  adverse event.  Here's the evidence about it.  Where does it go
23  on our label?"
24     A.  No.  I don't believe I've ever been asked that.  And,
25  again, I wouldn't expect to be because that's usually things

64

1  that are kept within the company as far as the company
2  employees are making those decisions, for a marketed
3  prescription drug product at least.
4      Q.  And, also, the FDA makes those decisions, correct?
5      A.  Well, the company drafts the label and makes the
6  changes to the label.  Sometimes it can be requested by FDA,
7  but normally it's initiated by the company and the agency will
8  then approve or disapprove the changes that are being suggested
9  by the company.  It's a negotiative process.
10     Q.  Okay.  You're not a medical doctor -- we've discussed
11  that -- correct?
12     A.  I'm not a physician, that is correct.
13     Q.  You have an undergraduate degree in zoology?
14     A.  Yes.
15     Q.  And a Ph.D. in pharmacology?
16     A.  Yes.
17     Q.  Which includes that pharmacokinetic stuff and
18  pharmacology stuff, correct?
19     A.  Yes, but I'm also board certified in toxicology
20  separately.
21     Q.  Okay.  You don't treat patients, right?
22     A.  No, I don't.
23     Q.  You don't write prescriptions?
24     A.  No.
25     Q.  You don't have any specific training in psychiatry?

65

1      A.  Not trained as a psychiatrist, no.
2      Q.  You've never treated mentally ill patients, correct?
3      A.  No.
4      Q.  You wouldn't be qualified to diagnose someone with
5  mental illness, correct?
6      A.  I don't diagnose people with any illness.  That's not
7  my job.
8      Q.  No specialized training in diabetes; is that right?
9      A.  I'm not a diabetologist, but certainly I have
10  training in human physiology, where in my graduate degree
11  diabetes was a disease that was studied and discussed to a
12  great extent.  And I had -- a good friend in my lab that I
13  worked in, her animal model was an animal model of diabetes.
14  So, I had direct exposure to looking at those aspects of
15  studying diabetes, how -- the pathogenesis and different drugs
16  that she was interested in looking at mechanisms behind which
17  you could manipulate and be able to change the outcome in the
18  animal.
19     Q.  Do you consider that specialized training in
20  diabetes?
21     A.  I consider that much more specialized -- that's why I
22  answered the question the way I did.  I certainly have direct
23  experience looking at animals developing diabetes and have
24  actually done -- had specific courses where that was something
25  I had to study and investigate separately from this litigation.

66

1      And there are other areas, for example, that I
2  worked on before -- maybe the first exposure I might have had
3  to that adverse event might be in the litigation, but not in
4  this case.  I have -- I am certainly well aware of the
5  pathogenesis of diabetes, what diabetes is, the types of drugs
6  that are used to help treat the disease or help people with the
7  disease, and then I certainly was well aware of the
8  relationship of the fact that different pharmaceuticals over
9  the years have been -- you know, may or may not have been
10  associated with development of diabetes.  There are drugs that
11  can precipitate the disease and -- apart from antipsychotics.
12      Q.  Let me take a detour.  You raised a good point.
13      So, you're familiar with drugs that are actually
14  used to treat diabetes?
15      A.  Yes.
16      Q.  Insulin, for example?
17      A.  Yes.
18      Q.  Sulfanurias?
19      A.  Yes.  Metformin.
20      Q.  Metformin.  All those drugs cause weight gain,
21  correct?
22      A.  I would say that you probably can get weight gain
23  with all of them.  I couldn't opine for you today -- I couldn't
24  tell you what percentage or how common it is though because I
25  haven't -- I would have to go back and look.

67

1      Q.  But you would agree with me that those drugs used to
2  treat the diabetic condition are associated with weight gain,
3  correct?
4      A.  I am aware of the fact that in some cases that is
5  true.  I am not aware of the fact though -- I couldn't tell you
6  whether or not it's a common event with any of those drugs.
7      Q.  And those drugs, to the extent they cause -- strike
8  that.
9      Those drugs, to the extent they are associated
10  with weight gain, they don't cause diabetes, they're used to
11  treat diabetes, correct?
12      A.  They're certainly used to treat diabetes.  And weight
13  gain, as I've said in my report, is not a necessary factor for
14  the fact that a drug would have the propensity to cause
15  diabetes.
16      Q.  You've never prescribed a second-generation
17  antipsychotic, correct?
18      A.  No.  Again, I don't diagnose and don't prescribe.
19  I'm not a physician.
20      Q.  You've never been asked by a patient to do a
21  risk-benefit analysis of a drug, have you?
22      A.  By my own family members, I have.  I'm asked many
23  times.
24      Q.  How many times a year do you -- are you asked by
25  family members to make a risk-benefit analysis of a medicine?

68

1      A.  Gosh.  At least a dozen times a year, if not more.
2      Q.  Doctors make risk-benefit assessments every day as
3  part of their practice in considering prescription drug
4  medicines, correct?
5      A.  Yes.
6      Q.  And you would agree with me that medical doctors are
7  more qualified to give risk-benefit assessments on drugs than
8  you are, correct?
9          MR. ALLEN:  Objection.  Form.
10      A.  I don't know if they're more qualified or not.  I've
11  taught medical students, so I can tell you this:  Certainly,
12  it's not something that I hang my hat on as doing on a daily
13  basis for the general public.  Again, when family members call
14  me, I give them my opinion based on risk-benefit for the drug
15  for the person that I know, but my answer to them is always:
16  "You need to talk to the doctor because the doctor needs to
17  give you his opinion because he knows your condition better
18  than I do."
19      Q.  Let me see if I can rephrase it.  Do you think you're
20  more qualified than a medical doctor to give a risk-benefit
21  assessment of a medicine?
22          MR. ALLEN:  Objection.  Form.
23      A.  I think it depends on the doctor.  For example, if
24  you're talking about a pediatrician and then you're talking
25  about a drug that they never prescribe, I may know more about

69

1  the risk-benefits of that drug, in a general sense.  But,
2  certainly, for any one individual patient, the doctor needs to
3  make that decision for that patient.
4      Q.  (BY MR. BROWN)  Okay.  Let me help clear the
5  question.  So, for any individual person taking the
6  prescription medicine Seroquel, you would agree with me that
7  that doctor is in a better position to make a risk assessment
8  presentation than you are, correct?
9          MR. ALLEN:  Objection.  Form.
10      A.  I would hope he would be; but, again, I've seen
11  examples from my family members where that is not necessarily
12  the case.
13      Q.  (BY MR. BROWN)  You don't have a degree in
14  epidemiology, correct?
15      A.  I don't have a degree, that is correct, but I
16  certainly have expertise in the principles and I use it as a
17  tool in my risk assessment practice all the time.
18      Q.  We talked about all the areas you're an expert in a
19  few minutes ago and we'll come back to some of them.  Do you
20  consider yourself an expert in epidemiology as well?
21      A.  I don't hold myself out as a testifying expert in
22  epidemiology; but as I've said on the stand when asked under
23  voir dire, I use it as a tool every day and it certainly is
24  something that, as a pharmacologist, I have training in.  So,
25  it's a tool I use.  But I, for example, don't perform

18 (Pages 66 to 69)

70

1  epidemiological studies on a routine basis.
2  I have designed Phase 1 clinical trials before,
3  which is a type of epidemiological investigation; but I, again,
4  would turn you to -- for example, if you wanted to analyze a
5  particular epidemiological study in here and tear it apart, I
6  would refer you to someone who does that on a daily basis and
7  has a Ph.D. in either epidemiology or biostatistics.
8      Q.  You've never conducted an epidemiological study
9  looking at the effects of second-generation antipsychotics,
10  have you?
11     A.  No.
12     Q.  Have you conducted an epidemiology -- epidemiological
13  study of --
14         MR. ALLEN:  What was that word?  Better rephrase
15  it.
16     Q.  (BY MR. BROWN)  Do you understand my question?
17     A.  You need to repeat it.  I'm sorry.  You mumbled into
18  your pen.  I'm sorry.
19         MR. ALLEN:  The word was --
20     Q.  (BY MR. BROWN)  Let me rephrase the question.  I got
21  caught up in the "epi, epi, epi."  Have you ever conducted an
22  epidemiological study looking at the mentally ill population?
23     A.  No, I have not.
24     Q.  You're not -- in these cases, you're not going to
25  offer any specific causation opinions, are you?

71

1      A.  That is correct, I am not.
2          MR. ALLEN:  Let me make sure --
3          MR. BROWN:  I'll ask --
4          MR. ALLEN:  She is here to offer opinions on
5  general causation, so I don't -- I want to make sure the record
6  is clear on that.
7          MR. BROWN:  Let me ask a few more questions.
8          MR. ALLEN:  That's exactly one of the areas
9  she --
10     Q.  (BY MR. BROWN)  You're not here to opine that
11  Seroquel caused an injury in a particular person, correct?
12     A.  That is -- that's how I define "specific."  That is
13  correct.  I'm here in the litigation area to give causation
14  opinions about the relationship between Seroquel and its
15  propensity to induce metabolic effects; specifically,
16  hyperglycemia, diabetes.
17     Q.  So, you haven't looked at any medical records for any
18  individual plaintiff, correct?
19     A.  Not in this litigation, that's correct.
20     Q.  And in this litigation, you haven't, like, met with
21  or interviewed any of the individual plaintiffs, correct?
22     A.  That is correct.
23     Q.  I'm not sure I asked this question, but has the FDA
24  ever asked you your expert advice on what a warning should look
25  like in a prescription drug product?

72

1      A.  No.  And I, again, would be highly shocked if they
2  did.  It's not -- again, they have people within their own
3  agency that do that on a daily basis.
4      Q.  You've been disqualified as a labeling expert on a
5  couple of occasions, right?
6      A.  Yes, and in some cases not.  For example, two weeks,
7  three weeks ago, I talked about labeling in Baycol in
8  Mississippi.
9      Q.  You've been excluded in another Baycol trial right
10  here in Texas, haven't you?
11     A.  I was -- I was excluded from making particular
12  statements, yes.  I mean, not on everything.  I testified in
13  the case, but certainly there were specific things the judge
14  did not want me to talk about.
15     Q.  And one of those things the judge in that case didn't
16  let you talk about were the warnings; is that right?
17     A.  I don't know specifically.  I know I didn't talk
18  about warnings.  I've been asked this question before and I
19  said I don't remember what the judge's ruling stated.  I just
20  know when I went to that case, I talked about the pharmacology
21  and toxicology of Baycol and I talked about -- I made some
22  general takes statements about the FDA regulations, but I was
23  not allowed to make statements about what a physician --
24  whether or not it was adequate for a physician to read
25  something, and that's what -- the judge had a problem because I

73

1  was not a physician.
2          So, in current cases when I go and talk about
3  labeling, I make it very clear that I'm talking about labeling
4  from my perspective as a pharmacologist and a toxicologist and
5  the type of people that write labels but not somebody who uses
6  it because, again, I'm not a physician.
7      Q.  In that Baycol trial in Texas in 2004, what
8  methodology did you apply before you came to trial?
9      A.  The Baycol trial?
10     Q.  The Baycol trial.
11         MR. ALLEN:  Hold on a second.  You're not
12  through with your question yet?
13         MR. BROWN:  No.
14         MR. ALLEN:  Go ahead and finish your question.
15         MR. BROWN:  Let me withdraw.  I'll try to
16  rephrase it.
17         MR. ALLEN:  Hold on before you answer.
18     Q.  (BY MR. BROWN)  In the Baycol trial from 2004 that
19  we're discussing, what methodology did you use in assessing
20  adequacy of the warnings in that case?
21         MR. ALLEN:  Objection.  Form.
22     A.  I used -- I don't know that it's a specific
23  methodology.  It's my training and experience.  When you're
24  talking about adequacy to warn, that's different than a
25  causation assessment where, as I said, I was using a specific

74

```
 1    methodology.  In a failure to warn case or warnings on a label
 2    case, I'm using my training and expertise as a pharmacologist
 3    and a toxicologist and an understanding of whether or not the
 4    information -- in that case, in Baycol, was the information in
 5    the label consistent with what was known within the company
 6    about the drug.  That was my key issue.  There was information
 7    the company had that was not reflected in the label that the
 8    physicians were seeing.
 9          And so that's sort of -- that's part of the
10    method.  It's what does the company know, what does it say?
11    What is the physician seeing in the label?  Do those two things
12    match or not?
13       Q.  (BY MR. BROWN)  In that 2004 trial, were you
14    permitted to give that opinion or was that precluded?
15          MR. ALLEN:  Let me object.  And, Doctor, I'm
16    going to tell you you can answer these questions, but I think
17    they're calling for legal conclusions and also matters that are
18    years ago about a judge's ruling.  I'm just going to tell you
19    for the record, I object to all these questions on form.  I'll
20    let her do her very best, but the judge's ruling is --
21    presumably would be on a record somewhere and we can have that
22    and -- so, go ahead and do your best, but don't guess or
23    speculate if you don't recall.
24       A.  I don't know specific -- again, it's my same answer I
25    had before.  I don't know specifically what the judge said I
```

75

```
 1    could or couldn't do and I don't recall everything I talked
 2    about.  I do know I touched on FDA issues in that trial or that
 3    deposition -- I think it was a trial -- but I don't recall
 4    specifically everything I said from five years ago.  And I
 5    thought -- because I thought it was 2003.  Maybe it was 2004.
 6       Q.  (BY MR. BROWN)  Well, you were precluded from
 7    testifying on warnings in another case, too, correct?
 8          MR. ALLEN:  Objection.  Form.
 9       A.  There was another case in Mississippi where I was
10    allowed to talk about some things but not everything, that's
11    exactly right.
12       Q.  (BY MR. BROWN)  Did -- you've described your general
13    methodology in assessing the adequacy of the warnings, correct?
14       A.  I guess I have.  I mean, I tried to explain to you
15    that I don't know there's a general methodology.  It's the
16    question being asked in the case.  Sometimes I'm being asked is
17    the warning adequate?  But in cases where there is no warning
18    at all, it's a whole different assessment; it's what
19    information they have and should they have warned?  Did they
20    have enough information to add it to the warning if it was
21    never there?
22          And then in other cases, I'm asked to look at
23    the issue of, you know, adverse event reports that have come in
24    and did enough information come in that indicated that
25    something that isn't in the labeling should have been added?  I
```

76

```
 1    mean, all different questions are asked.
 2          So, the methodology I use is pharmacology and
 3    toxicology, what I know about the drug, what I know about the
 4    regulations, about the fact that you, know, there are certain
 5    things that have to be added to labels, certain things that
 6    have to be reported to FDA, certain procedures available under
 7    the regulations that allow companies to make changes or not
 8    make changes.  So, that's the method I use.  I use that context
 9    to the question being asked.
10       Q.  And do you know as you sit here today what the FDA
11    regulation is regarding when an event has to go into the
12    warning section of a label?
13       A.  Are you -- I need you to clarify.  Are you asking me
14    can I cite for you the section, like 201 --
15       Q.  Don't need the section number.  That would be
16    difficult.  It's not a memory test.  I want to know as you sit
17    here today what's the standard that the FDA applies in deciding
18    whether or not an event is included in the warning section?
19       A.  Okay.  And you mean specifically in the section
20    labeled "Warnings"?
21       Q.  That's correct.
22       A.  Okay.  In the section labeled "Warnings," it's a
23    reasonable association standard.  And I think that's actually
24    the -- that may even be the wording.  I've actually brought
25    that section to you here, a printout of that.
```

77

```
 1       Q.  And what's the current standard --
 2          MR. ALLEN:  Let the record reflect -- the record
 3    reflect she pointed at the material we provide for you --
 4          MR. BROWN:  Okay.  Fair enough.
 5       Q.  (BY MR. BROWN)  What is the current standard for
 6    whether or not -- I mean, FDA standard for whether or not an
 7    event should go into the precaution section of a label?
 8       A.  I don't know the exact wording -- I'd have to go back
 9    and look at the regulation -- but it's a lower standard than
10    that.  Essentially, there's different standards based upon the
11    way the label is set up; warnings being more serious -- more
12    evidence, more serious-type reactions; precautions, a little
13    bit less evidence, a little bit less serious of an issue; and
14    adverse reactions, which can just be an observational -- where
15    you really don't even know necessarily, in some cases, whether
16    or not something is associated or not but you've seen it and
17    you have to report it because you see it more than once and
18    you're seeing it in your clinical trials.
19          And then you can also, within that section, take
20    things and dissect it further by frequency, a frequent versus
21    an infrequent event, things like that.
22       Q.  So, there's --
23       A.  And then there's also contraindications.  That's
24    another section -- well, that has to do with warnings, where
25    that standard is -- it's telling the doctor do not do this;
```

78

1  whereas, in some of these other sections, it's giving the
2  doctor information that they weigh.
3      Q.  Okay.
4      A.  But if a contraindication statement is put in, it's
5  put in to tell the doctor to absolutely not do this.
6      Q.  When you are asked to assess whether or not a
7  particular warning should have been on a product, do you apply
8  the FDA standard?
9      A.  I do certainly apply the reasonable association
10  standard, yes.  I'm looking for more than just a haphazard
11  observation.  I'm looking -- I'm going to do -- if I'm going to
12  make that statement, I will do some type of a causation
13  analysis on my own to identify how much information there is
14  there -- animal data, human data -- and try to get sort of a
15  global understanding of the evidence that's available.  Of
16  course, association is not causation, so there is a different
17  standard there.
18      So, just because I may do a causation
19  assessment -- and if I don't find that there's enough
20  information for me to say causation, if I have enough
21  information to association, that would be a labeling standard
22  versus a standard of some other issue that might be related to
23  this litigation where I'm saying I have an opinion that this
24  drug causes hyperglycemia, diabetes, and these metabolic
25  effects.

79

1      Q.  We'll come back to warnings in a little bit.
2          Integrative Biostrategies, is that your company?
3      A.  That's the name of the company, yes.
4      Q.  Are you the only employee?
5      A.  No.
6      Q.  How many employees do you have?
7      A.  Two.
8      Q.  Two besides you?
9      A.  No.  Myself and one other.
10      Q.  Is that person a partner or an employee --
11      A.  We're both paid salaries and -- it's a partner
12  because it's the -- he is the chief financial officer of the
13  company essentially.  He does all of the money issues and I do
14  all of the technical work.
15      Q.  What's his name?
16      A.  It's my husband, James Plunkett.
17      Q.  Okay.  He draws a salary, too?
18      A.  Yes.  We both draw a salary.  He has his own clients
19  apart from mine, so -- he does some computer consulting, but he
20  also supports me and he also does all of the financial things
21  with the company.
22      Q.  Do you receive a 1099 from Integrative Biostrategies?
23      A.  I believe I do, yes.  We have to fill out paperwork.
24  I think that's one of the pieces of paperwork that has to be
25  signed.

80

1      Q.  Is that in the magic box behind you?  Did you bring
2  1099s?
3          MR. ALLEN:  No, it's not.  I didn't interpret
4  your subpoena to ask for that.  And if I did, I would object to
5  her providing it.
6          MR. BROWN:  Okay.  The subpoena asked for it
7  specifically.
8          MR. ALLEN:  I didn't interpret it as such,
9  but --
10          MR. BROWN:  Okay.
11          MR. ALLEN:  But it -- we're going to -- you
12  know, I'm inclined to object, but we can talk about it later.
13          MR. BROWN:  Okay.
14      Q.  (BY MR. BROWN)  What's your salary from Integrative
15  Biostrategies?
16      A.  You know, I don't know the exact amount.  I
17  apologize.  I think I draw $120,000 a year as a salary, and
18  then we take draws throughout the year depending on the
19  profitability of the company.
20      Q.  Does Jim Plunkett decide when you're going to get
21  paid?
22      A.  Yes, he does.  He tells -- I don't have anything to
23  do with writing checks.  He tells me if there's money.  In
24  fact, sometimes I don't take a salary because there's some
25  months -- you know, it's a small company -- that the inflow --

81

1  my clients aren't paying and so I have to -- no, no, I have not
2  had any problems with Mr. Allen or Seroquel, but there are --
3  sometimes that happens.
4      Q.  Aside from -- by the way, when you're retained as an
5  expert in a litigation like this, are you paid directly or are
6  you paid through Integrative Biostrategies?
7      A.  Paid through Integrative -- well, my money that goes
8  into me is -- Integrative Biostrategies pays me, so
9  everything -- checks are paid to Integrative Biostrategies,
10  they go to the bank account, and then I'm paid a salary or I
11  then can write myself a check for a draw.
12      Q.  Besides the plaintiffs' lawyers, like Mr. Allen, what
13  types of other clients --
14          MR. ALLEN:  Let me just object.  I'm a lawyer,
15  and I've tried to explain that -- and people all over the
16  world -- all lawyers need to understand.  I'm a lawyer.  I
17  didn't get a degree in plaintiff's law or defense law.  I just
18  happen to be a lawyer, but go ahead.
19          MR. BROWN:  If my characterization as
20  plaintiff's lawyer is offensive, I'm --
21          MR. ALLEN:  It's not offensive at all, but it --
22  just to me, I think more lawyers ought to think like I do.  I'm
23  a lawyer.
24          MR. BROWN:  Okay.
25          MR. ALLEN:  But go ahead.  I'm sorry.

21 (Pages 78 to 81)

82

1    Q.  (BY MR. BROWN)  Okay.  When -- aside from the
2  plaintiffs' lawyers who have used you in the past, can you give
3  me an rundown of the type of clients you have currently?
4    A.  Yes.  I have three basic areas of practice within my
5  company.  I'm a patent agent and I work on patent prosecution.
6  I am a regulatory consultant and I have clients that I work
7  with on issues related to their products -- either in
8  development or already on the market -- as they pertain to FDA,
9  EPA, Consumer Products Safety Commission, a variety of other
10  regulatory bodies within the United States.  And then I have
11  litigation, and litigation is split into the kinds of work I
12  have done with plaintiff attorneys and I also work with defense
13  attorneys.
14    Q.  Have you ever been --
15    A.  I also work with -- I'm sorry.  And I -- the other
16  areas -- I also do insurance company -- I work for insurance
17  companies in litigation.  So, three types of litigation
18  clients.
19    Q.  What percentage of your income is derived from
20  litigation, plaintiff or defense?
21    A.  It's highly variable on a month-to-month basis.  Some
22  months zero, some months it's my entire month because, again,
23  I'm mainly a sole practitioner as myself doing that technical
24  work.  I would say that it averages over the year probably
25  about a third, a third, a third.  So, 30 percent would be

83

1  litigation, 30 percent consulting, and 30 percent patent work.
2  But that's not the same as the time I spend.  That's because I
3  charge different rates depending on the type of client I have.
4    Q.  What do you charge your patent clients per hour?
5    A.  Much less.  And I don't actually have a set rate.
6  It's variable.  Around $150 an hour probably, but it depends
7  upon the client.  Universities and small startups can sometimes
8  be set fees, but not by the hour; like, I write something for a
9  thousand dollars and however much time it takes, I have to
10  write it for a thousand dollars.
11    Q.  And so the range of your hourly rate for your work as
12  a consultant in patent cases is 100 to 150 bucks an hour?
13    A.  I would say the range is from 100 to 200.  It just
14  depends.  And, again, sometimes in patent cases I'm acting as
15  an expert, providing a declaration, so I charge more.  50
16  percent of my time is spent usually on patent work.
17    Q.  50 percent of your time during the course of a normal
18  year is spent on patent work?
19    A.  50 percent of my time working in the office, I'm
20  working on patent work normally.
21    Q.  When you're a regulatory consultant, what do you
22  charge as an hourly rate?
23    A.  Depends on the client.  I have some older clients
24  that I have agreed not to change my rate for.  All my clients
25  now are being charged as of -- I've increased my rates this

84

1  year, $300 an hour; but I have some that are still at 250 an
2  hour.  I have one client, old client, that I've had since '97
3  that I still charge, I think, $200 an hour or 195.
4    Q.  How much money did you make last year?
5    A.  Personally or the company?
6    Q.  Let's talk personally.
7    A.  I can't tell you personally because I honestly don't
8  fill out the tax returns.  I'd have to go and get that for you.
9  The company brought in, as a whole -- which is my husband and
10  myself -- I think just shy of $300,000, and part of that is
11  paid out in expenses.  The majority of it is salary though
12  because the majority of what I do is working on an hourly
13  basis.
14    Q.  That was for the calendar year 2007?
15    A.  Last tax season.  So, 2007, yeah.
16    Q.  And what percentage of that $300,000 did you derive
17  from testifying against pharmaceutical companies?
18    A.  I couldn't tell you.  I'd have to go and pull that
19  out.  I have no idea.  Last year was not a big year for
20  pharmaceutical litigation for me.  Other years, much larger.
21  So, I can't tell you the number.
22    Q.  How much -- what was your income in 2006?  When I say
23  "your income," I mean Integrative Biostrategies.
24    A.  The company in 2006 was about $320,000, and 2005 was
25  360.  I had a significant decline in the last couple years due

85

1  to a drop-off in pharmaceutical litigation.
2    Q.  What was your best year for -- in terms of the money
3  you made for pharmaceutical litigation?
4    MR. ALLEN:  I'm going to -- go ahead, Doctor.
5  I'm going to let you answer that, if you want to.  It's your
6  matter.  It's personal business.  But at some point, I'm just
7  going to stop.
8    A.  I was going to say, I can't answer that.  I'd have to
9  go back and pull the numbers.
10    MR. BROWN:  Scott, please don't coach the
11  witness.
12    MR. ALLEN:  I didn't.  I was telling you.  I
13  said if she feels comfortable, she can answer the question.
14  I'm telling you at some point I'm going to stop it.
15    Doctor, you can answer the question.
16    MR. BROWN:  But her comment --
17    MR. ALLEN:  I'm not going to debate you.  Let's
18  move on.  My statement speaks for itself.
19    MR. BROWN:  I'm going to ask the same question
20  again.  Let's see if you object.
21    Q.  (BY MR. BROWN)  What percentage of your income -- I'm
22  sorry.  Strike that.
23    What was your most productive year from a
24  revenue standpoint from money you got working for
25  pharmaceutical litigation?

86

```
1        A.  I can't answer that.  I'd have to go back and look.
2   I can tell you it was not last year, but other than that -- and
3   probably not even the last two years, but I couldn't tell you
4   the year.  I'd have to go back and look.  I can find that for
5   you, but I don't have it on -- readily available here today.
6        MR. BROWN:  Scott, in the Appendix A, we request
7   tax returns.  I'm going to put that request on the record that
8   we get tax returns for the last -- I think it was four years in
9   the Schedule A.  And we'll take 1099s in lieu of that.
10       MR. ALLEN:  I'd like to have Dr. Geller's and
11  Macfadden, if you don't mind, so I guess we'll talk about that
12  later.
13       MR. BROWN:  Well, I mean, I'll run through the
14  Schedule A at the end of the day and then we'll see what you
15  have and don't have.
16       MR. ALLEN:  I can save you a lot of trouble
17  running through Schedule A.  The box I brought you and the zip
18  files -- I couldn't be any more clear.  It's there.  What we
19  brought is in this box and it's in the zip files or disks that
20  were sent to you, okay?  I couldn't make it more clear.
21       MR. BROWN:  So, let me try to put a fine point
22  on it.  So, anything that's not in the box you've been talking
23  about that is otherwise requested here but not in the box,
24  you'll produce to me?
25       MR. ALLEN:  No, I don't agree.
```

87

```
1        MR. BROWN:  Okay.
2        MR. ALLEN:  I agree that I made every effort to
3   comply with the Exhibit A, as I understood it, and it's in the
4   box or it's within in the zip files or zip drives, whatever the
5   technical word.
6        MR. BROWN:  Okay.
7        MR. ALLEN:  That's what I brought, that's what
8   I'm going to bring.  Be glad to talk to you after the
9   deposition.
10       MR. BROWN:  Well, we can run through it after
11  the witness goes and see what we have and we don't have; is
12  that fair?
13       MR. ALLEN:  It may not be fair, but I won't
14  necessarily disagree with that.
15       Q.  (BY MR. BROWN)  Now, you talked about the fact that
16  you haven't been as busy recently in pharmaceutical litigation,
17  correct?
18       A.  Yes.
19       Q.  Take a look -- go back to your report for a second.
20       A.  I don't think I have your copy.  Mine has "Exhibit."
21       Q.  Okay.  Attached to this report is a list of all your
22  testimony in the previous, I guess, four years, right?
23       A.  Yes.
24       MR. ALLEN:  Just for the record, she had also
25  said previously today that I think she testified within the
```

88

```
1   last month and I think that's not on there, if I recall her
2   testimony.
3        Q.  (BY MR. BROWN)  Okay.  I counted these up.  It looks
4   like you've testified 40 times over the course of the last four
5   years, excluding your September of 2008 Baycol testimony.  That
6   sound about right?
7        A.  That -- I said several dozen, so it sounds about
8   right.
9        Q.  Okay.
10       A.  You can count them here.
11       Q.  I did.  It came out to 40, plus the one that you
12  mentioned earlier, okay?  What I wanted to do is -- can you
13  point to me in the context of pharmaceutical litigation any of
14  the times you've testified for a pharmaceutical manufacturer
15  from this list?
16       A.  In this list from 2004, you won't find that, no.  My
17  work on behalf of pharmaceutical manufacturers was when I was
18  with Environ, and that would be up through 1997.
19       Q.  Is it fair to say that over the last four years,
20  every time you've testified in a pharmaceutical case you've
21  testified for the plaintiff?
22       A.  As far as -- as far as testimony, that's correct.
23       Q.  In a product liability pharmaceutical case like this,
24  have you ever testified in your professional career on behalf
25  of a pharmaceutical company?
```

89

```
1        A.  Product liability specifically, no.  I've done patent
2   infringement work on behalf of a pharmaceutical company and
3   I've been a consulting expert many, many times supporting a
4   testifying expert with Environ on behalf of a pharmaceutical
5   company.
6        Q.  But you've never served as a testifying expert in a
7   product liability case involving a prescription medicine?
8        A.  Not that I'm aware of.  Maybe I was named and I
9   didn't actually give testimony, but I'm not aware of that, no.
10       Q.  I haven't gone through the box of documents yet but
11  I'll be given that chance sometime after today, but I want to
12  ask a few questions.  And if you can -- if it's in the box,
13  just tell me that and we'll turn to the box.
14       Have you reviewed the Seroquel IND?
15       A.  Not the IND specifically, no, I have not.
16       Q.  What is an IND?
17       A.  Investigational new drug application.
18       Q.  And what are the constituent parts of an IND?
19       A.  They generally contain all of the preclinical -- what
20  I call preclinical.  It's mostly animal data or in vitro data
21  that the company has developed in order to support the product.
22  And there's very specific types of tests that they have to do
23  in order to get a pharmaceutical product approved.
24       Q.  Is the IND the vehicle that's used to get a drug
25  approved?
```

23 (Pages 86 to 89)

## 90

1       A.  It's the first step and it's the vehicle that's used
2   to allow the company to test the drug on humans, and that's --
3   it's sort of a milestone within the development process.  You
4   submit the IND to the FDA; and if they find it acceptable, they
5   can give you approval to then put your drug into human clinical
6   trials.
7       Q.  What are the specific animal and in vitro studies
8   that are required by FDA regulations?
9       A.  I couldn't give you the whole list off the top of my
10  head, but generally you have to have some chronic -- acute
11  toxicity testing, some chronic toxicity testing, dermal
12  irritation, ocular irritation testing.  You will have some kind
13  of chronic study -- usually up to about one year -- in least
14  one species, usually two, and usually dogs and rats.
15      You will also need to have usually at least
16  started before the IND a reproductive toxicity study, although
17  often those are done before the IND -- those are being
18  completed even after the IND has been submitted, those are in
19  process, with the then proviso that the drug will not be put
20  into pregnant women and things like that if they're going to be
21  tested.  Most companies nowadays finish the repro test first;
22  but in older cases, I've seen cases where that hasn't happened.
23      You may have to do a cancer study as well, and
24  that often goes on after the drug because it depends on whether
25  you're looking at chronic administration or short-term

## 91

1   administration of the drug and whether that's appropriate.  And
2   then the in vitro tests are usually studied -- they're not
3   prescribed specifically, but the FDA expects to see mechanistic
4   data.  They want you to at least tell them something about how
5   the drug is expected to work at least as a class.
6       So, there's usually receptor binding data or
7   some cell culture data that talks about the fact that, you
8   know, this drug binds to -- well, in the case of this class,
9   binds to dopamine receptors, serotonin receptors, you know, the
10  kinds of things you expect to see to classify the drug as an
11  atypical antipsychotic in this case.
12      Q.  When was the Seroquel IND submitted?
13      A.  I can't give you the date.  It would have been in the
14  early Nineties, but I can't give you the date.
15      Q.  Have you reviewed the Seroquel NDA?
16      A.  Only some of it.  I have seen some of the clinical
17  studies; and I've provided those to you here, some of the
18  summaries that I've seen.  I've also gone on to the AstraZeneca
19  website and looked at some of the clinical trials that are
20  listed on there that were part of the NDA.  But I haven't
21  reviewed the entire NDA, for sure, and I certainly haven't even
22  seen every clinical study, I'm sure, that -- in detail that's
23  been submitted.
24      Q.  You pointed to the documents next to you.  We'll talk
25  about that next time we meet when I go through the documents,

## 92

1   but can you give me a sense of how many clinical trials you've
2   actually reviewed?
3       A.  Well, I -- if you want -- I can tell you exactly if
4   you want me to look at at least the table of contents here real
5   quick.
6       Q.  Yes.  When you refer to the table of contents, are
7   you referring to a particular document?
8       A.  Yes.
9       Q.  Okay.  I want to identify that document.
10      A.  Okay.
11          MR. ALLEN:  I think it will be -- go ahead.
12      A.  It's the discussion document, "Seroquel and Glucose
13  Disregulation," dated June 2007.
14      Q.  (BY MR. BROWN)  Okay.
15      A.  And it -- you want the authors?
16      Q.  Well, first of all -- yes, go ahead, identify the
17  authors.
18      A.  The authors are Lisa -- I'll have to spell it --
19  B-o-o-r-n -- as in Nancy -- a-z-i-a-n, et al.  There's three
20  authors.
21      Q.  Was that part of the NDA?
22      A.  No, but the -- there's trials in here that were --
23  are part of supplemental NDAs or part of drugs that are
24  performed during development of the product.  These three --
25  the three trials in here I'm looking at probably were not part

## 93

1   of the original NDA but probably part of a supplemental NDA, is
2   my guess.
3       Q.  Have you reviewed -- I'm sorry.
4       A.  And in addition to that, on the documents that I -- I
5   can list you the three -- I think there's three or four in
6   here; and then in addition to that, I've seen some of the
7   summaries of -- study reports that appear on the AstraZeneca
8   website for -- I'd have to go back and look at the numbers, but
9   there's particular studies that I just kind of glanced through
10  to look at whether or not I saw discussion of this endpoint,
11  hyperglycemia, or the kinds of endpoints that may or may not
12  have been monitored; and sometimes they were and sometimes they
13  weren't.
14      Q.  Which -- put that document aside.  You said you --
15          MR. ALLEN:  Let's make sure to get it back in
16  order.  And just for the record -- because I want the record to
17  be clear -- she was referring to the document that begins Bates
18  No. AZSER 14868252.  And I think -- by the way, you keep on
19  making that assumption and I've been -- you may prove me wrong
20  or I may prove you -- that every document here that's sitting
21  to her left that's in the box you had not previously been
22  provided.  I'm telling you that's not necessarily my belief.
23          And I'm not trying to interrupt you, but I tried
24  to do my best to make sure that I had everything today, but I
25  think -- you know, I'm pretty dang sure actually that some of

94

1   these materials you know about. But that's -- just trying to
2   be -- really, I am trying to be helpful, but go ahead.
3      Q. (BY MR. BROWN) In -- let's take a step back for a
4   moment on the IND. What portions of the IND did you review?
5      A. I said I'm -- I did not specifically review the IND
6   that I'm aware of. I don't remember seeing any documents that
7   were summaries of the IND in the documents that I've reviewed.
8   So, again, I don't recall that. Maybe in that list of
9   documents there's a document from the IND. I certainly have
10   not seen the whole submission, for sure, in one place.
11      Q. How many individual study reports have you seen
12   describing the preapproval animal studies?
13      A. I can't recall. Maybe one or two at the most, if
14   that. I'm not even sure -- I can't tell you that I've seen a
15   preapproval animal study for sure. I'd have to go back and
16   look. That was not a focus of my assessment at this point in
17   time. The animal data that I looked for was in the published
18   literature.
19      Q. Okay.
20      A. And then I -- when I looked through the documents
21   that were provided to me, I don't recall seeing any documents
22   that had animal studies that related to diabetic endpoints, but
23   I can't answer that for sure.
24      Q. If there were studies in the preclinical
25   investigation of the drug that looked at glucose effects in

95

1   rats or mice or other animals, would that be something you'd
2   want to look at?
3      A. I would certainly always like to see any additional
4   information that's available, and I assume that I will. The
5   other thing you have to understand, in this litigation, as in
6   many drug litigation areas I've worked in, certain documents
7   don't become available to me until sometimes after my
8   deposition or -- and maybe just even up to trial date and I may
9   look at them as they become available.
10      At this point in time, I haven't looked at the
11   IND. I didn't ask to look at the IND either because animal
12   studies are part of the causation assessment but you really
13   have to rely on what the human experience tells you because
14   animals aren't always predictive of humans. In the Zyprexa
15   litigation, the animal studies that were useful to me were not
16   studies in the preclinical area from the IND but mechanistic
17   studies done after the fact where the investigators in open
18   literature, scientists, were trying to understand why they were
19   seeing certain things with olanzapine that they may not have
20   seen with another drug and sort of investigative studies after
21   the fact.
22      Q. Did you look at any of the receptor binding work that
23   AstraZeneca did that was in the IND?
24      A. Not an IND description of it, no. I've seen
25   description of receptor binding work that has been in sort of

96

1   summary documents, either through reviews -- there's a couple
2   of reviews in the published literature on quetiapine, one of
3   which was written by -- can't think of the name of the journal,
4   but it's a journal that often writes a summary of the
5   pharmacology and the toxicology, preclinical and clinical, of a
6   drug for -- to get it out there for physicians to see it's a
7   new drug. And I can't think of the name of the journal, but
8   it's -- it's not Drug Safety, but it's something like that.
9      Q. All right.
10      A. Maybe drug archives or -- I don't know -- some type
11   of drug abstracts.
12      Q. Well, as part of your opinion that Seroquel causes
13   diabetes, you rely on animal studies, correct?
14      A. Yes.
15      Q. And as part of your opinion that Seroquel causes
16   diabetes, you rely on receptor binding literature, correct?
17      A. Yes.
18      Q. But you would agree with me that you have looked at
19   none of the animal studies that are in the IND or any of the
20   separate receptor binding work in the IND; is that correct?
21      MR. ALLEN: Objection. Form.
22      A. I think what I've said to you is I don't recall
23   having looked at an IND submission document, but I can't tell
24   you that what I've seen may not -- some of the documents I may
25   have seen include summaries or discussions of that type of

97

1   data.
2      Q. (BY MR. BROWN) Well --
3      A. So, again, as I said, I do know that there's at least
4   one summary paper that discusses what was seen in preclinical
5   studies, but I don't -- again, I've not looked at the
6   individual study reports for the IND, that is correct.
7      Q. You gave me an exhaustive description of what's in
8   the IND earlier, correct?
9      A. Well, I don't know it was exhaustive. I gave you a
10   description of what is generally included in an IND.
11      Q. And you're a pharmacologist and a toxicologist,
12   right?
13      A. Yes.
14      Q. And preclinical data is important, correct?
15      A. For development of the drug, that is correct. It's
16   what is used to help determine how you test it in humans.
17      Q. Right. And you know for every single drug that's
18   approved by the FDA, there's a corresponding IND, correct?
19      A. Yes, there should be.
20      Q. And they'll have lots of animal studies, correct?
21      A. They should.
22      Q. And those animal studies will look at lots of things,
23   correct?
24      A. Yes. In fact, they're meant to be sort of what I
25   call broad scope because they try to pick up, you know, things

98

1  that may be even unexpected.
2      Q.  And they look at the effects of a product on certain
3  animals in short-term and long-term studies, correct?
4      A.  Active ingredient in short and long-term, yes.
5  Because, again, sometimes they're not always formulation
6  studies.  Sometimes they're just the active ingredient because
7  they may be given intragastrically in an animal versus given as
8  an oral tablet in a human; but at some point, you have to test
9  the formulation as well.
10     Q.  Now, I've gone through your report pretty well, and
11  you can prove me wrong, but there wasn't more than half a dozen
12  cites to animal studies.  Do you agree with that?
13     A.  I would agree that's probably true.
14     Q.  And you know that AstraZeneca, like every other drug
15  company is required to submit an IND, did a lot more than six
16  animal studies, correct?
17     A.  Well, I -- the animal studies that I'm referring to,
18  I don't believe, were -- I don't believe that those are part of
19  the IND.  I may be wrong, but I don't believe they are.  And I
20  certainly am aware of the fact that they have to do a set
21  series of studies; and if they haven't been done, I don't
22  expect they would have gotten an NDA.
23     Q.  Right.  So, you know they exist.
24     A.  Yes.
25     Q.  And you didn't look at them in arriving at your

99

1  conclusions here today, correct?
2      A.  That is correct.
3      Q.  Now, when you get the IND approved, it's a big
4  meeting between the company and the FDA, correct?
5      A.  Well, I don't know a big meeting.  There's certainly
6  a meeting of some kind, yes, to discuss the design usually of
7  clinical trials, things like that.
8      Q.  And does -- well, tell me about -- do you know what
9  that meeting's called?
10     A.  You'd have to tell me what you -- I don't really --
11  can't off the top of my head tell you what it might be called.
12  I just know that there is a meeting.
13     Q.  Is there a meeting between a company and the FDA
14  after an IND is submitted?
15     A.  Possibly there is.  It depends upon the product and
16  the company.  There's normally -- there's often meetings before
17  that, too.  Sometimes there's a pre-IND meeting before you even
18  submit the IND to discuss what studies are going to go into the
19  IND that you're going to do.  Sometimes there's a meeting with
20  a really small manufacturer first time through even
21  before they do their first animal study, even before they think
22  about it, to talk about whether or not they know what they're
23  supposed to be doing to meet the FDA regulatory criteria.
24     Q.  Was there a pre-IND meeting in this case?
25     A.  I don't know.  I didn't do a search for what meetings

100

1  there were.  I can't tell you that.
2      Q.  Where'd you get that document, that June 2007
3  discussion document we've talked about?
4      A.  All of the documents that are internal company
5  documents were provided to me by one of the plaintiffs'
6  attorneys that I've interacted with in this case.  This
7  document came through the office of Fibich, Hampton & Leebron.
8      Q.  For all the documents that you've seen -- and I'm not
9  sure what those are yet -- that are what we'll call internal
10  AstraZeneca documents, who selected those for your review?
11     A.  I don't know who specifically did.  They certainly
12  were coming from plaintiffs' attorneys to me, so I assume
13  someone within the firm or -- I mean, it may be that they've
14  sent me, you know, things that were selected by someone else.
15  I don't know.
16     Q.  Did you select any of those documents that we'll
17  describe as internal company documents?
18     A.  Are you asking me did I select them from a roomful of
19  documents?
20     Q.  Yes.
21     A.  No, I did not.  I certainly have asked -- as I always
22  do, I will let the attorneys know the kinds of documents that I
23  would like to see, if available, and so they know that list and
24  so they would then send me things responsive to that.
25     Q.  Did the animal studies and the receptor binding work

101

1  that the company did not make that list?
2      A.  I think initially I asked for any documents they had
3  that described either human data or animal data that related to
4  the endpoints of concern, and they -- I did not -- was not -- I
5  can't remember being sent the IND itself and I certainly don't
6  remember seeing any actually study reports that labs produce,
7  which is normally what is put in with the IND, so -- but I did
8  see -- like I said, I've seen some sort of summaries of their
9  history of the -- what was in -- what they did on their drug by
10  these sort of survey papers, but not the studies themselves.
11     Q.  I'm going to make a request, if you could identify
12  the survey paper that describes the background on the animal
13  studies that you say exists.  It might be in the new materials.
14  I just haven't seen it.
15     A.  Okay.
16     MR. ALLEN:  Well, that's a request and we'll
17  take it under advisement.  Again, we brought the box, we
18  provided you zip files.
19     Q.  (BY MR. BROWN)  Well, Dr. Plunkett, do you know which
20  study -- who the author is, what the name of the study is that
21  summarize that data?
22     A.  No.  I'd have to actually go to my computer and my
23  PDF files and look for it for you.  I can't tell you the name
24  of it.
25     Q.  When the FDA approves a prescription drug product,

102

1  there's a bunch of different folks at the FDA who have to
2  review the NDA for safety reasons, correct?
3      A.  Yes.
4      Q.  And the FDA has chemists, correct?
5      A.  They do have chemists, yes.
6      Q.  Epidemiologists, correct?
7      A.  Yes, they do.
8      Q.  Toxicologists, like you?
9      A.  They may not be exactly like me, but they do have
10  toxicologists, yes.
11      Q.  Fair enough.  Pharmacologists?
12      A.  Yes, they do.
13      Q.  They have people who specialize in clinical trial
14  design?
15      A.  Biostatisticians usually, yes.
16      Q.  Epidemiologists?
17      A.  I've already said that.  Yes.
18      Q.  And medical doctors, right?
19      A.  Yes.
20      Q.  Would you agree with me that the FDA, in reviewing
21  Seroquel's new drug application, had a lot more information
22  available at its fingertips than you do here today?
23      A.  Well, I'm -- certainly know that they've seen a lot
24  more of the studies that were developed by the company
25  themselves, absolutely.  However, I don't know -- I'm pretty

103

1  sure that they haven't seen all of the published literature
2  that I may have searched for because not necessarily -- when
3  they make a decision on efficacy and safety, they make it based
4  upon the information submitted by the company, and the company
5  sometimes submits published literature and -- but some -- not
6  everything that I've seen may have been submitted; and,
7  certainly, some of the newer stuff obviously wasn't part of the
8  discovery back in the late 1990s when the drug was under
9  review.  So, anything that happened after the approval date of
10  '97 wasn't part of the original NDA consideration process.
11      Q.  Is there any document or category of documents that
12  you've looked at that you don't think the FDA has seen?
13      A.  Are you asking about at the time they approved the
14  drug in '97 or are you asking about ever seen?
15      Q.  Ever.
16      A.  I don't know.  I would imagine they have not seen
17  every published study -- literature study that I have seen
18  because I would imagine that they had different questions on
19  their mind than I did on my mind.  They weren't trying to look
20  at a specific issue the way I have tried to look at it in a
21  weight of the evidence assessment because that's not their job.
22  Their job is to look at the safety and efficacy of the drug put
23  before them in the context of the regulatory environment, which
24  is different than what my assessment is.
25      Q.  When -- did you -- you know what a medical officer

104

1  review is?
2      A.  Medical review officer, yes.
3      Q.  No.  A medical officer review, actually.
4      A.  A document that they produce, yes.
5      Q.  Tell me what that is.
6      A.  It's a -- well, it depends upon the -- the context,
7  but normally there's a summary document put together by the
8  over -- they have -- usually have one medical officer who is
9  put in charge of the submission and that person will write a
10  general sort of summary document, integrated -- sometimes it's
11  called an integrated efficacy or integrated summary document
12  that describes sort of the risk-benefit profile for the drug
13  based upon that medical officer's opinion, and it's something
14  that has to be done before the drug is approved.
15      Q.  Have you seen the medical officer review that was
16  prepared for Seroquel in 1996?
17      A.  I don't know.  If it's in the documents, again, the
18  list that I got together and provided, which you may or may not
19  have seen, but, you know, it's -- I would have to go back and
20  look.  I don't recall that document, but I don't know.  Maybe
21  it was there and I haven't focussed on it.
22      Q.  You understand there's a whole separate review at the
23  FDA of pharmacology and toxicology, correct?
24      A.  Yes.
25      Q.  And you know that there was -- there exists a

105

1  pharmacology and toxicology review of Seroquel, correct?
2      A.  I would assume there does.  I haven't seen it that I
3  can recall, but I assume that there is such a thing.
4      Q.  Have you -- in this list of materials you asked the
5  plaintiffs' lawyers for, did the medical officer review make
6  that list?
7      A.  I would have never said "medical officer review"
8  specifically.  I normally would ask for -- and I don't know
9  whether I did in this case, but I would normally ask for
10  documents describing FDA opinions about decisions made during
11  the approval process, summary documents.  Because normally I
12  would look at the company's submission, their integrated safety
13  and efficacy documents that sort of summarize their data in the
14  NDA, and then I would like at the review opinions that come
15  from the FDA on the efficacy side and the safety side, maybe
16  the overall opinion of the medical review officer.
17          And then sometimes I'm also given -- in that
18  request, I might be given informational -- information requests
19  from the FDA where they've corresponded and asked for more
20  information and then we see how the company responds.  So, sort
21  of the ongoing correspondence.
22      Q.  All right.  You identified a number of things there.
23  You identified integrated safety -- integrated summary of
24  safety, correct?
25      A.  And efficacy, yes.

27 (Pages 102 to 105)

106

1    Q.  And efficacy.  Is -- have you reviewed those
2    documents in this case?
3    A.  The company's documents, no.
4    Q.  You also mentioned the fact that you normally review
5    the summary opinions discussing the integrated summary of
6    efficacy and safety, correct?
7    A.  I would normally ask for those things, and I may or
8    may not get them.  It depends upon what's available during
9    discovery.
10   Q.  Did you ask for those documents in this case?
11   A.  I don't recall if I did or not.  If I did, I would
12   have asked for them last year, and I don't recall if I did or
13   not.
14   Q.  Well, you said a lot of these things are sort of
15   normal and customary requests of yours, correct?
16   A.  Yes.  And sometimes -- and often I don't even have to
17   ask.  If I've worked with an attorney before, he knows the
18   kinds of things I ask for.  So, in fact, in this case, it may
19   very well be that was the case because I was approached by
20   Mr. Fibich and I'd already worked with him on the Canadian
21   report -- actually, not with him, but the attorneys that I'd
22   been referred to.  And I know when I had those initials
23   discussions with Mr. Fibich, I asked him if this was going to
24   involve a report based on the U.S. and he said, "Probably."
25   And I said, "Well, then at that point in time,

107

1    there will" -- "you know the kinds of things you normally would
2    send me."
3    And he said, "Absolutely."  And I do believe
4    that was the conversation here because I had also worked with
5    him on Zyprexa and he knew the kinds of things I needed.
6    Q.  But he didn't send you the things you normally look
7    at, did he?
8    A.  I certainly have not seen all of the things that I
9    have sometimes provided.  Some cases I'm not.  It really
10   depends on the case.  And it also depends upon what kinds of
11   opinions I'm being asked to provide in a case as well, like on
12   adequacy of the testing.  I'm not asked that here.
13   Q.  Okay.
14   A.  You know, like, for example, in fen-phen litigation
15   where I worked, I was actually asked to answer some questions
16   about the adequacy of the testing that was done and the --
17   Q.  And the clinical trial?
18   A.  Yeah, clinical trial submissions that were done, and
19   I actually went through a series of, you know, analyses based
20   on the FDA regulations, much different kind of testimony than
21   I've been asked to provide here.
22   Q.  And you're not offering any opinion in this case on
23   the adequacy of AstraZeneca's clinical trials?
24   A.  I have not been asked at this point in time, no.
25   Again, I've strictly been asked to look at the issue of

108

1    causation and then the issue of failure to warn.
2    Q.  Well, if the integrated summary of safety and
3    efficacy and the FDA's summary documents of those are normally
4    what you ask for for review, why didn't you review them in this
5    case?
6    A.  No particular reason.  Again, it's based on what is
7    available to me at the time I'm asked to write the report.  In
8    this particular case, I'm not being asked -- I'm -- the issue
9    related to metabolic effects is not something that's unexpected
10   with antipsychotics.
11   So, unlike Paxil litigation where it was very
12   important that I look at those things because the issue of
13   birth defects is something that I know I could see picked up in
14   a preclinical teratology study, in this case, you don't
15   normally screen animals in preclinical studies for changes in
16   glucose.  You may do some clinical chemistry, but it's not a
17   focus of the studies.  You would be able to look at some target
18   organ toxicity.  But, again, I also don't have an indication
19   based upon the human data they have that this compound is a
20   severe or potent toxicant to the pancreas.
21   So, again, I truly, in this case, when I was
22   asked -- when I looked at the information that I had and
23   whether or not I needed more, I would not have thought it was
24   critical to look at the preclinical animal studies to identify
25   something different than I had in the human experience.

109

1    Q.  Okay.
2    A.  So, that's sort of my thought process.
3    Q.  All right.  So, Mr. Fibich knows the list of the
4    stuff you normally want, correct?
5    A.  I assume he does.
6    MR. ALLEN:  Yeah.  Let me just get an objection.
7    Objection.  Form.  But you can --
8    A.  I assume he does.
9    Q.  (BY MR. BROWN)  Well, you testified you think he
10   knows the sorts of information you normally look at as part of
11   being a retained expert, correct?
12   A.  Yes.  In past experience, yes.
13   Q.  And that normally entails the integrated summary of
14   safety and efficacy and the other -- in some summary FDA
15   documents, correct?
16   A.  Yes.  And if I thought it was important -- I would
17   tell you this:  If I had felt that I needed that to make the
18   causation opinion, I wouldn't have made it without it.
19   Q.  Okay.
20   A.  And there have been cases, like the Paxil litigation,
21   where I needed to see that before I was willing to make a
22   causation opinion.  So --
23   Q.  How did you know you needed to see that?
24   MR. ALLEN:  Let her finish.  She said "so."  Go
25   ahead.

28 (Pages 106 to 109)

110

1    A.  Okay.  And I was going to say, so the reason I -- and
2    to tell you -- I already answered this question before.  The
3    reason I needed to see it was because, again, birth defects is
4    an endpoint that I expect to see looked at specifically in an
5    animal study.  In fact, there's animal an study directed at
6    that endpoint.
7        So, in that case, I really want to look at that
8    because we have information that indicates that animal
9    preclinical studies are predictive of the hazard in humans for
10   affecting babies.  Doesn't mean you'll get the same birth
11   defect.  In fact, you may get very different defects.  But if
12   you see a clean preclinical study with absolutely no effects on
13   the developing organism, then it's less likely that you're
14   going to see anything like that happen in humans.  You can
15   still get it, but it's a lot less likely.
16       So, when I did my assessment, I would want to --
17   I would have to look at the preclinical studies because there
18   is no published animal data on -- those kind of studies don't
19   get published, nobody publishes them.  And so I really wanted
20   to know what they saw.  Here, again, the human experience of
21   diabetes -- and diabetes in animals is not the same as -- as
22   perfect as diabetes in humans and the animal models that are
23   developed for diabetes, I know, are not part of preclinical
24   testing programs for antipsychotics.
25       Q.  (BY MR. BROWN)  You're sure of that.

111

1    A.  I am almost positive that you don't do the exact same
2    thing.  I will tell you that most companies explore some
3    endpoints, and potentially they did in some animal studies, but
4    I'm sure that it was not a particular focus of their
5    preclinical program based upon the guideline studies they have
6    to do.
7        Q.  If there were such studies that looked at glucose
8    values, animal studies or tests that looked at metabolic
9    effects in animals, would you want to see that?
10       A.  I would certainly welcome seeing it; but, again, I
11   don't believe I need it in order to make the opinions that I
12   have made in this case.
13       Q.  Okay.  And you didn't review any part of the actual
14   IND submission, correct?
15       MR. ALLEN:  Objection.  Asked and answered.
16       A.  I think as I told you --
17       Q.  (BY MR. BROWN)  Oh, I'm sorry.
18       A.  Yeah.  I think I said I don't recall.
19       Q.  Did I say "IND"?
20       A.  IND.  I don't recall.
21       Q.  Let me withdraw the question.
22       You didn't look at any part of the NDA
23   submission with the exception of the clinical trial reports
24   that you looked at on the AZ website, correct?
25       MR. ALLEN:  Objection.  Asked and answered.

112

1    A.  I think that -- I think that's correct.  I'm trying
2    to think if there's anything else I want to add to it.  That's
3    what I stated already, and I would agree.  I believe it would
4    be the clinical trials on their website or this -- the clinical
5    trials described in these sort of -- there's this document and
6    there's another -- there's at least one other summary document,
7    SERM document.
8        Q.  (BY MR. BROWN)  SERM document?
9        A.  Yeah, that I think talks about maybe another clinical
10   trial.  But, again, I provided those to you.  I guess they're
11   in that box now behind me.
12       Q.  Okay.  Do you know which studies you looked at on the
13   AstraZeneca website?
14       A.  I couldn't answer that for you.  I know I did look at
15   125, 126, and 127 because I wanted to see what was there versus
16   what was in this summary document that I had.
17       Q.  Okay.
18       A.  And then I did glance through some others.  Maybe --
19   15 maybe was a study I might have looked at.  I looked at some
20   of the early -- I looked at some of the low-numbered earlier
21   studies just to see what kinds of exclusion criteria were put.
22   Did they describe their patient populations?  How were they
23   looking at the drug?  So, they would have been some of the
24   earlier studies on schizophrenia patients, is mainly what I
25   would have probably looked at.  I don't think I looked at any

113

1    of the later trials that might have been part of SNDAs, with
2    exception of these trials here.
3        Q.  So, I have 15, 125, 126, 127?
4        A.  And then --
5        MR. ALLEN:  She said she thinks 15.
6        A.  Yeah, I think 15, if it's there.
7        Q.  (BY MR. BROWN)  Well, did you look at every study in
8    the AZ website?
9        A.  No, I did not.
10       Q.  Okay.  Why don't you give me a list of the studies
11   you looked, to the extent you can recall.
12       MR. ALLEN:  Objection.  Asked and answered.
13       A.  I was going to say.  That's what I just tried to give
14   you.
15       Q.  (BY MR. BROWN)  Okay.
16       A.  In low-numbered studies -- I know I looked at some of
17   the lower-numbered studies, but I can't tell you -- some of
18   them I just opened to look at what the description of the
19   patient population was and the drug dosages, but I didn't do
20   more than that.
21       MR. BROWN:  Put a statement on the record.
22   Scott, to the -- you know I'm making a request that we come
23   back.  In advance -- in a couple days --
24       MR. ALLEN:  Go ahead.
25       MR. BROWN:  -- in advance of a continued

114

1  deposition on the new material, if I could get a list of the
2  things she actually look at, if they're not already here.
3      MR. ALLEN: Let me say this, and I'll take that
4  under advisement. I think some of this, as we talked about, is
5  her general knowledge and background. And it's your website.
6  Your website, all you have to do is click it. And it changes
7  over time, and so I don't know if I can -- I'll take your
8  request under advisement, but I'll ask you to just go open up
9  your website and you can find it yourself.
10     MR. BROWN: How am I going to guess what she
11  looked at?
12     MR. ALLEN: That's exactly what she has
13  testified to. I'm not going to argue with you. She said she
14  looked at your clinical trial website and can't specifically
15  identify those. I will take your request under advisement.
16  We're not trying to hide anything from you, but I would submit
17  you and your colleagues and your company is in better
18  possession of that information than I. No need to argue. I'll
19  take you request under advisement. Let's move on.
20     MR. BROWN: Yeah.
21     Q.  (BY MR. BROWN) So, Dr. Plunkett, when you -- if you
22  recall what studies you looked actually look at at the website,
23  if you would give it to Mr. Allen. Subject to his legal
24  thinking, he'll provide that list to me in advance of the
25  follow up to this deposition, okay?

115

1      A.  That's fine.
2      Q.  Did you print out any of them, by the way?
3      A.  No.
4      Q.  Did you print out anything from the AZ website at all
5  that you looked at?
6      A.  I don't remember doing that, no.
7      MR. ALLEN: Keep going. We're not taking a
8  break.
9      MR. BROWN: No. I'm going to the bathroom.
10     (Recess from 11:55 a.m. to 12:07 p.m.)
11     Q.  (BY MR. BROWN) Dr. Plunkett, how many new --
12  supplemental new drug applications have been filed with respect
13  to Seroquel?
14     A.  I don't know the exact number, but I assume at least
15  two for new indications that I saw, and probably three. I
16  think there's been three new indications I can think of added
17  since the initial labeling, so -- and normally with a new
18  indication, there's a new supplemental NDA file.
19     MR. ALLEN: Let me say this for the record: I
20  apologize. We had that information and that was part of my
21  project last night, which I failed to do. She had seen
22  something on that and I knew -- I forgot to look for it, and we
23  will get you that, what she reviewed in that regard, okay?
24     MR. BROWN: What regard?
25     MR. ALLEN: About the number of supplemental new

116

1  drug applications. And I'm going to tell you what I was
2  thinking of that I believe she looked at or we --
3      MR. BROWN: Don't put it on the record.
4      MR. ALLEN: Okay. But I -- that was my fault
5  because that question would have been answered for you, but I
6  forgot.
7      MR. BROWN: Okay.
8      Q.  (BY MR. BROWN) So, did you -- have you looked at any
9  of the supplemental new drug applications?
10     A.  I don't recall seeing specific -- certainly not
11  specific submissions.
12     Q.  Okay.
13     A.  I have seen trials, I believe, that are part of
14  those. Like I said, I believe some of these trials here were
15  part of at least one of those.
16     Q.  Okay.
17     A.  And I know I've seen in the published literature
18  trials that I believe were part of published -- published that
19  were part of the trials that were submitted as part of
20  supplemental NDAs for bipolar, I believe, indications. But I
21  haven't done that assessment to tell you how many I've seen or
22  not, but I believe I've seen something. That's all I can say.
23     Q.  You're not sure as you sit here today which studies
24  you've seen with respect to the different supplemental new drug
25  applications?

117

1      A.  I haven't tried to like line that up. That's exactly
2  right. And I certainly -- by looking at the AstraZeneca
3  website, some of those I've looked at, very likely, or parts of
4  it. What I haven't done is I haven't asked for your SNDA
5  submission table of contents and looked at the numbers of the
6  trials that are listed there and compared those to what I've
7  looked at; which if you want that answer, that's what I would
8  have to do.
9      Q.  You said SNDA table of contents. There's a lot more
10  in an SNDA than clinical trial data that supports a new
11  indication, correct?
12     A.  Yes, but the critical data usually -- most SNDAs are
13  directed to a new indication -- some are new formulations --
14  and the new indication is usually an efficacy and safety issue.
15  So, normally, the clinical trial data is the critical data.
16  For example, there may be some animal data, but it's usually
17  new clinical data that's been collected as part of the SNDA.
18  There's also chemistry and manufacturing information that still
19  has to go in.
20          You know, there's all kinds of other things that
21  go into the application. But, to me, the reviewer is focussing
22  on what are they trying to say, and that would be the clinical
23  trial data.
24     Q.  Well, what's required by the FDA in terms of the
25  contents of an SNDA?

30 (Pages 114 to 117)

**118**

1      A. Depends upon what it is for. For example, if it's a
2 formulation change, then there could be some very specific
3 things that might be required about the chemistry of the
4 formulation and how -- what are the changes from the product
5 that's already been on the market. You would have to do some
6 bioavailability studies, you know, pharmacokinetic
7 determinations for how the formulation behaves.
8      For a new indication, the key information that
9 is going to be looked at is the trials that support the new
10 indication listing; but, of course, there's other information
11 that's there. It's an NDA, but it's abbreviated. It relies on
12 the original submission and extends it. So, when you submit --
13 that's usually what happens. So, if you submit an SNDA, you're
14 normally building upon the NDA that's already there with some
15 additional information, but it has the same general sections as
16 the original NDA.
17      Q. And how many new formulation approvals have been done
18 for Seroquel?
19      A. I don't know. I've seen some of that information,
20 but I don't -- I can't tell you the number.
21      Q. Well, identify the information you've seen on the
22 formulation changes.
23      A. I've seen a timeline at one point in time -- and it
24 should be in my files and I don't know whether it's here,
25 but -- that talks about different submittals of SNDAs by the

**119**

1 company for different things, but I can't recall where it is.
2      Q. Was the timeline created by lawyers or is it an
3 internal company document or some other source?
4      A. I can't tell you that. I don't know. I'd have to go
5 back and look. I don't know.
6      Q. When the FDA receives an SNDA, what do they do?
7      A. They review it.
8      Q. And what do they review it for?
9      A. Well, they review it just like they do for any NDA
10 that comes in. They have to make a determination of safety and
11 efficacy of the drug. Does the information submitted support
12 what the company wants to be able to do with the marketing of
13 the drug in the future? So --
14      Q. And each time that was done with Seroquel, the FDA
15 determined the drug was safe and effective; is that right?
16      A. If the SNDA was approved, they would have to make
17 that determination of safe and effective, yes.
18      Q. So -- let me rephrase it.
19      So, in the cases where they -- where the FDA
20 approved an SNDA for a new indication, for example, they make a
21 determination the drug is safe and effective, right?
22      A. For the indicated use, that's correct, and the dose.
23      Q. And the dose. Turn to Page -- Paragraph 8 in your
24 report quickly.
25      MR. ALLEN: Paragraph 8 or Page 8?

**120**

1      MR. BROWN: Yes, Paragraph 8.
2      MR. ALLEN: Okay.
3      Q. (BY MR. BROWN) In Paragraphs 8 and 9, you talk about
4 schizophrenia and bipolar disorder, right?
5      A. Yes.
6      Q. You agree with me they're mental illnesses?
7      A. Yes.
8      Q. And these can be debilitating diseases, correct?
9      A. They can be, yes, and I think I even state that.
10      Q. You describe schizophrenia as a chronic, severe, and
11 disabling brain disease, correct?
12      A. That's one way to describe it, yes.
13      Q. That's the way you describe it.
14      A. My sentence says "as a psychotic order that is a
15 chronic, severe, and disabling brain disease."
16      Q. Okay. You agree with that characterization?
17      A. Yes.
18      Q. And bipolar disorder, you say, is a major mental
19 illness, correct?
20      A. Yes.
21      Q. And bipolar has -- bipolar disorder has a hallmark of
22 manic episode; is that right?
23      A. Yes. That's one of the diagnostic criteria for how
24 you describe it.
25      Q. And you need to know the problems associated with

**121**

1 diseases like schizophrenia and bipolar disorder to give a
2 risk-benefit analysis, correct?
3      A. What do you mean -- can you define what you mean by
4 "problems"?
5      Q. Sure, sure. Do you need an understanding of the
6 severity of a disease like schizophrenia or bipolar disorder in
7 doing a risk-benefit calculation?
8      A. Well, certainly the benefit -- the benefit that you
9 derive from the use of the drugs is weighted by the type of
10 thing that you're treating. For example, if you're treating
11 cancer versus treating -- I don't know -- something -- a cut,
12 you know, an antibiotic -- an antibiotic and a cancer drug have
13 different risk-benefit assessments, okay? So, yes, that is
14 part of it, if that's what you mean.
15      But certainly within the -- certainly within the
16 group of mental disorders or diseases of the central nervous
17 system -- that can include bipolar, schizophrenia, a variety of
18 other things -- again, there would be a different criteria
19 based upon what you're treating. I would agree with you that
20 schizophrenia and bipolar are diseases that need attention and
21 need treatment.
22      Q. Okay. And second-generation antipsychotics are one
23 of a group of approved treatments for schizophrenia, for
24 example, correct?
25      A. Yes. There are a variety of drugs within that

**122**

1  general classification.
2    Q.  We talked a little bit earlier and I want to go back
3  to it about comorbid conditions associated with schizophrenia.
4  Remember we talked about that briefly?
5    A.  You mentioned that, yes.
6    Q.  Schizophrenia -- schizophrenics have a huge increased
7  risk of suicide, don't they?
8    A.  They can, yes.
9    Q.  They have a much higher rate of substance abuse,
10  correct?
11    A.  They do have a higher rate than the average person.
12  That's exactly right.
13    Q.  And they have a much higher rate of alcoholism than
14  the average population?
15    A.  I don't know the exact rate, but I do know that it's
16  more prevalent, yes.
17    Q.  And schizophrenics are much more likely to have
18  hypertension; is that right?
19    A.  I don't know "much more likely," but there's a high
20  rate of hypertension. There's a number of conditions that you
21  see more often in schizophrenics, or often -- I shouldn't say
22  "more often." There are conditions that you see in
23  schizophrenics commonly as what you call comorbid conditions,
24  and I would agree those are those types of conditions you've
25  listed.

**123**

1    Q.  And Seroquel is effective in treating some of those
2  conditions, correct?
3    A.  I wouldn't say it's effective in treating
4  hypertension necessarily.
5    Q.  Strike --
6    A.  It certainly -- Seroquel has been shown to be
7  effective to treat schizophrenia and bipolar disorder based
8  upon the studies that were submitted to the FDA, that is
9  correct.
10    Q.  When you agree with me that schizophrenics are at an
11  increased risk of diabetes mellitus?
12    A.  There is some literature that indicates that they
13  have a higher background risk, that's correct, but the
14  actual -- there's a lot of controversy over what the magnitude
15  of that increase is.
16    Q.  In Zyprexa, you quantified the magnitude of increased
17  risk in diabetes in schizophrenics of two to five times. Does
18  that sound about right to you?
19    A.  That sounds like -- I know I've read documents that
20  support those numbers, that is correct.
21    Q.  So, in the absence of taking any medicine, people who
22  are schizophrenic are at an increased risk of diabetes, to some
23  degree.
24    A.  To some degree, I would agree with that, yes.
25    Q.  Is Seroquel -- you said Seroquel's effective in

**124**

1  treating schizophrenia, correct?
2    A.  Has been shown to be effective, yes. And that's why
3  it was approved as -- by the FDA because they demonstrated
4  efficacy to the FDA.
5    Q.  When the FDA approves medicine, you've told us they
6  make a determination it's safe and effective, right?
7    A.  That's the language that is used in the approval
8  letter, yes.
9    Q.  And they actually approve the label when they approve
10  the product, don't they?
11    A.  They do a review of the labeling, yes.
12    Q.  And the determination by the FDA is the drug, when
13  they approve it, is safe and effective as long as you use it
14  the way -- and they attach the actual label the company is
15  supposed to use, correct?
16    A.  They have to use that. That's the law. That's
17  right. It's the labeling -- the safe and effective statement
18  is based upon the dose, the indications, all the things that
19  are stated within the label.
20    Q.  Schizophrenia is also effective in treating bipolar
21  disease, you said?
22    A.  Yes. There's been data, I believe, that shows that
23  it has some efficacy to do so.
24    Q.  And what types of bipolar disease is Seroquel
25  effective in treating?

**125**

1    A.  Well, it's labeled for bipolar -- bipolar with manic
2  components. And I forget -- I believe there may be even an
3  indication for maintenance, but I'm not sure. I'd have to go
4  back and look. There's two specific indications, I believe,
5  that have been gained related to bipolar disease.
6    Q.  Do you know the last time the FDA approved Seroquel
7  as safe and effective?
8    A.  I assume right around 2007, but I can't tell you if
9  that's -- I couldn't tell you the month or -- just because I
10  know there was a labeling -- there was labeling changes in
11  2007.
12    Q.  We'll talk about those labeling changes a little bit
13  later, but when the FDA approves a drug as safe and effective,
14  do they do it based on their review of either the NDA or the
15  SNDA materials that were submitted by the company?
16    A.  That's what they're required to do, yes.
17    Q.  Have you seen any internal FDA documents of the type
18  that we talk about earlier, these summary documents, that
19  describe or characterize the Seroquel data that was submitted
20  to the FDA?
21    A.  I don't recall any, no. But, again, I'd refer you to
22  this list that you're going to hopefully go through and -- if
23  there's something there, then I've seen it, but I don't recall
24  anything.
25    Q.  As you sit here right now -- and I'm going to go

126

1   through that box in detail. As you sit here right now, do you
2   recall seeing any internal analysis done by somebody at FDA on
3   Seroquel data?
4       A.  That's what I just answered.  I said I don't recall
5   it.  But, again, I'd refer you to that list to see if I've seen
6   it.  I just don't recall it.
7       Q.  You know that when the FDA receives a new drug
8   application or a supplemental new drug application, they do a
9   number of different analyses, correct?
10      A.  Yes.
11      Q.  And you know from other litigations that there's --
12  that these reports exist, right?
13      A.  There are certainly always some type of summary
14  document that summarizes the opinions of the different review
15  officers and the different components, yes, if that's what
16  you're asking.
17      Q.  Right.  In arriving at your conclusion here today,
18  don't you think it's important to look at what the FDA looked
19  at and the conclusions they came to with respect to the data?
20      A.  Not necessarily, no.
21      Q.  First-generation antipsychotic drugs, you've
22  mentioned those in your report, too, correct?
23      A.  Yes.
24      Q.  Are they effective medications in treating
25  schizophrenia?

127

1       A.  Yes.
2       Q.  Are they effective medications in treating bipolar
3   disorder?
4       A.  Are you asking -- let me just ask a question.  You're
5   asking me my opinion or -- I mean, I'm answering these
6   questions based upon the fact that they have been approved and
7   I know they're marketed, so, therefore, there's efficacy data.
8       Q.  Oh, okay.
9       A.  But if you're asking me have I done an individual
10  assessment, that's a different question, so maybe we need to
11  step back and give me your context.
12      Q.  Fair point.  Do you have an opinion independent of
13  the approval status of first-generation antipsychotic drugs
14  that they're effective, based on your review of whatever it is
15  you review, in treating schizophrenia?
16      A.  For some of the drugs, yes.  And I say "some" because
17  I've only -- I have certain clinical studies of head-to-head
18  comparisons of different classes of drugs that have been done,
19  like Seroquel versus haloperidol versus perphenazine versus
20  whatever.  And so I've seen efficacy demonstrated in those
21  studies, but I have not done systematic reviews of each of
22  those drugs to say, you know, I have done a thorough assessment
23  of efficacy for each of those drugs.  But, certainly, they are
24  approved for use and I have seen efficacy shown in clinical
25  trials head to head with Seroquel or with another drug I've

128

1   reviewed, such as Zyprexa or Risperdal.
2       Q.  When you do your risk-benefit analysis, efficacy is
3   one half of the equation, correct?
4       A.  Yes.
5       Q.  And did you search the literature for all the studies
6   that demonstrated how Seroquel is effective in treating
7   different illnesses?
8       A.  I certainly searched the literature initially for all
9   the clinical trials that were published with Seroquel, yes.  I
10  was looking for published clinical trials.  I certainly have --
11  as I've told you, have not reviewed every clinical trial that
12  has been submitted as every part of every NDA for Seroquel, no.
13  But in the published literature, I did look for that, yes.
14      Q.  Do you think Seroquel is effective in treating
15  different conditions beyond its approved uses?
16      A.  Haven't done that assessment, so I can't answer that.
17  My focus was on the approved uses for the drug.  Mainly, my
18  focus was on schizophrenia and bipolar disease because those
19  are where most of the trials have occurred.  And I believe that
20  if you look at those studies for those two particular
21  conditions, you see that it has some efficacy, but it's not
22  necessarily better than other drugs.  And, in fact, in some
23  cases, it's been shown to not even be better than placebo.  So,
24  it varies depending on the endpoints of the studies.
25      Q.  Right.  Well, compared to placebo, Seroquel is

129

1   effective in treating schizophrenia, correct?
2       A.  In most of the studies, but I do think there's some
3   where some endpoints -- in other words, in a study in
4   schizophrenics, they have different endpoints they look at.
5   And there are in some studies some endpoints of schizophrenia,
6   some measures, that have shown to not be better than placebo,
7   even with Seroquel.  So, there's varied results.
8       But, in general, FDA -- I agree FDA has made
9   that assessment that they believe there's efficacy data there;
10  and my statement is it shows efficacy, but not necessarily
11  better efficacy -- not better efficacy than other drugs that
12  are available, and that's really where sort of -- what I have
13  looked at and the studies that I have shown, that's what they
14  tell me.
15      Q.  Okay.  Can you describe for me -- let me withdraw
16  that.
17      Did you focus -- in looking at the efficacy side
18  of the equation, did you focus on any particular
19  first-generation antipsychotics?
20      A.  I focussed on the ones that I saw head-to-head
21  comparisons for.  I was interested in looking at other drugs so
22  I could do comparison directly to Seroquel.  So, I looked at
23  haloperidol to some extent and looked at -- again, I didn't go
24  back to pull the NDA for haloperidol, but I looked at what was
25  in the literature -- and mainly on the head-to-head -- and

33 (Pages 126 to 129)

130

1  looked at some of the Clozapine data because they were
2  head-to-head data. I also looked at -- now, you're talking
3  about just first generation?
4  Q.  Yeah.
5  A.  Oh, okay.  Then haloperidol was the main drug, and
6  then there are a few trials that looked at perphenazine.
7  Q.  Okay.  Do you think haloperidol is an effective
8  medication in treating mental illness?
9  A.  Yes.
10  Q.  Would you agree with me that first-generation
11  antipsychotic drugs, as a group, are associated with certain
12  movement disorders?
13  A.  Some of them, yes.  And some are worse than others,
14  but, yes.  In fact, that's how -- if you read my report, I try
15  to start out with sort of a primer on pharmacology.  And
16  Goodman & Gilman teaches that there are -- the reasons the
17  second-generations were developed was to try to improve on that
18  safety profile.
19  Q.  So --
20  MR. ALLEN:  Hold on.  Take a little break.
21  (Recess from 12:26 p.m. to 12:27 p.m.)
22  Q.  (BY MR. BROWN)  The -- so, as a group,
23  second-generations were studied and ultimately marketed because
24  they had better side effect profiles with respect to movement
25  disorders, correct?

131

1  A.  I don't know they were ultimately marketed. But that
2  was one of the impetus, looking for drugs that had less of a
3  propensity to produce some of these movement disorders.  But
4  what was interesting is if you look at the labeling for the
5  drugs, that statement is not allowed to be put into the
6  labeling.  In other words, I don't believe that the evidence
7  has shown head to head, at least to the sufficiency of the FDA,
8  that any one drug has a specific percent advantage over
9  another.
10  I would agree with you as a class, in general,
11  when you look at first generation versus second, that as a
12  general rule, you expect the second-generations to have less
13  propensity, but that doesn't mean they have no propensity.
14  Q.  Let me ask this question:  Have you -- do you have an
15  opinion with respect to whether haloperidol has a better EPS
16  profile than Seroquel?
17  A.  I haven't formed that opinion.  I believe that
18  haloperidol has a propensity to produce it and I believe
19  Seroquel does as well.
20  Q.  In doing a risk-benefit analysis, you have to
21  consider side effects, correct?
22  A.  Yes.
23  Q.  Wouldn't you need to know whether one caused EPS more
24  frequently than the other to actually make that assessment?
25  A.  It depends.  If you're doing -- it depends what

132

1  you're doing with the risk-benefit assessment.  My issue -- and
2  maybe this will help you:  When I did the risk-benefit
3  assessment here for Seroquel, I was looking for what were the
4  general -- what were the types of risks that had been
5  associated routinely with Seroquel and what were the benefits
6  that were shown?  And then when I'm looking at that drug, I
7  make an assessment based upon whether I think the risks
8  outweigh the benefits.
9  Now, I'm not saying that the risks outweigh the
10  benefits for this drug such that it should be removed from the
11  market.  That's not what I'm saying.  I'm saying that when I --
12  and if you look at what my statement is, I believe there are
13  safer alternatives.  I believe that if you look at Seroquel, it
14  should not be a first-line agent necessarily because the
15  metabolic risks of this drug are different from some of the
16  other drugs, and that is above and beyond the neuromuscular
17  risks.
18  That's not to say that there isn't a patient
19  that Seroquel could be given to safely, and it's possible that
20  it is, but I don't think it should be a first-line treatment.
21  Q.  So, it must be so, based on what you just told me,
22  that you have an understanding of the side effect profile of
23  first-generation antipsychotics, correct?
24  A.  Yes.
25  Q.  And you've researched it in forming your opinions

133

1  here today, correct?
2  A.  Yes.  In general terms, yes.
3  Q.  And do any of the materials you have brought to the
4  dep today or identified in your report discuss the side effect
5  profiles of first-generation antipsychotics?
6  A.  Many of the published articles talk about that.  My
7  textbook talks about that.  And then you also even have
8  head-to-head clinical data on Seroquel versus some of these
9  other first-generations that talk about side effect profile.
10  So, absolutely, yes.
11  Q.  And you mentioned that there are safer alternatives
12  to Seroquel, correct?
13  A.  I believe there are, yes.
14  Q.  And what are the safer alternatives to Seroquel?
15  A.  I believe that haloperidol would be a safer
16  alternative to Seroquel.  I believe that ziprasidone would be a
17  safer alternative to Seroquel, and possibly -- I can't think of
18  the generic name, but Abilify.
19  Q.  And have you carefully reviewed the side effect
20  profiles for haloperidol?
21  A.  I have reviewed the -- I don't know what you mean by
22  "carefully."  I certainly, for my perspective in forming my
23  opinions, have reviewed the side effect profile for
24  haloperidol.  And in addition to that -- I'm basing my opinions
25  in part on some of the head-to-head studies that I've provided

134

```
 1    here for you in my literature and on those disks.
 2        Q.  Okay.  Do you know what head-to-head studies you
 3    looked at that compared haloperidol to Seroquel?
 4        A.  I'd have to go through my pile to tell you.  I mean,
 5    there -- but it's certainly ones -- some of them are cited in
 6    my report and then there's others that are on the PDF files
 7    that I've given you.  But they wouldn't necessarily be cited as
 8    a head-to-head study.  I'm just telling you that there are
 9    studies that -- I know some of the ones in there have
10    haloperidol versus -- usually versus quetiapine and something
11    else as well.
12        Q.  Does haloperidol cause diabetes?
13        A.  I believe that haloperidol has been shown to have
14    some patients that have shown up with metabolic effects
15    certainly because it can produce some weight gain and some of
16    those things.  However, I have not formed an opinion in the
17    same way as I have with Seroquel.  I have formed the opinion
18    that I think that Seroquel, Zyprexa, and Risperdal -- and I've
19    been very clear on this in my presentation in the New Jersey
20    Education Day -- appear to have a greater and unique risk over
21    a drug like haloperidol and even over, like, ziprasidone and
22    some of the other second-generation drugs.
23        Q.  Did some of the epi literature you rely on quantify
24    the increased risk of diabetes with haloperidol?
25        A.  I'm sure they did because that was a comparative drug
```

135

```
 1    in some of the epi literature.
 2        Q.  Would you agree with me that there are a number of
 3    studies that show the risk of diabetes is greater for
 4    haloperidol versus Seroquel?
 5        A.  I'd have to look at the individual studies to answer
 6    that, so I don't want to agree with you or disagree with you.
 7    If you want to talk about specific numbers like that, I would
 8    want to pull the studies out.  And if you want to --
 9        Q.  We'll do it today.
10        A.  -- show me one, we can look at it.
11        Q.  Would that surprise you?  Based on your opinion,
12    would that surprise you that haloperidol had a greater risk, at
13    least in some epi studies, than Seroquel?
14        A.  Not necessarily surprise me.  I'd have to look at the
15    individual study though to interpret the data.
16        Q.  And ziprasidone and Abilify are the other two
17    products you think are safer alternatives?
18        A.  I think they could be.  Again, it's a
19    patient-specific decision.  But I think that based upon the
20    profile I see, they could be safer alternatives.
21        Q.  And as a non-medical doctor, you're never asked for a
22    particular patient what the best medication is, correct?
23        A.  I'm answering this as a pharmacologist.  So, if you
24    ask me as a pharmacologist, based upon the information I see,
25    that's how I answer the question, right.  I'm not a physician,
```

136

```
 1    so I don't -- I would not make that decision for an individual
 2    patient.
 3        Q.  Would you agree with me that all drugs have some
 4    risk?
 5        A.  Yes.  I would say that that's a common -- common
 6    thing for anything I can think of.  Even water has a risk.
 7        Q.  So, no drug's a hundred percent safe, correct?
 8        A.  That's right.
 9        Q.  All drugs have some level of side effects to varying
10    degrees?
11        A.  Yes, some levels, and they differ in severity and
12    occurrence rates.
13        Q.  Medical doctors consider the risks of a medication
14    when they prescribe it, correct?
15        A.  I assume they do and I would hope they do, and I
16    certainly taught my medical students in pharmacology that they
17    should do that.
18        Q.  So, a medical doctor in his or her office today here
19    in Houston, if they're making a determination about what
20    medication's appropriate -- Seroquel, haloperidol,
21    ziprasidone -- they should be doing -- looking at the side
22    effects and the possible benefits and making a determination
23    based on that with that particular patient?
24        A.  Well, again, I think you'd have to ask a doctor what
25    they do.  But I certainly would expect my doctor to be familiar
```

137

```
 1    with the side effect profile, as well as the efficacy profile,
 2    for any drug that he was to prescribe or attempt to prescribe
 3    for me.
 4        Q.  Would you agree with me based on your review of all
 5    this literature that mentally ill patients are difficult to
 6    treat?
 7        A.  What do you mean by "difficult to treat"?
 8        Q.  That often doctors -- would you agree with me that
 9    doctors often need to try a number of different medications in
10    the schizophrenic population -- let's talk about those folks
11    for one minute -- before they can find one that will work?
12        A.  I'm, again, not a physician.  I can only speak from
13    what I have read.  And certainly from what I have read, I see
14    that doctors often switch patients from one to another.  In
15    other words, there's a discontinuation.  Doesn't work, you try
16    a different drug, yeah.
17        Q.  Okay.  Turn to Paragraph 16 in your report.
18        A.  16?
19        Q.  Yeah.
20            MR. ALLEN:  Okay.  I didn't understand you.  Did
21    you say --
22            MR. LASKER:  16.
23            MR. ALLEN:  16?  I thought -- I thought somebody
24    said "60."  I didn't remember there being that many.
25        Q.  (BY MR. BROWN)  Dr. Plunkett, I wanted to look at
```

138

1    Paragraph 16 with you, particularly after the list of the
2    different antipsychotic medications, okay?
3        A.  Yes.
4        Q.  In the very last sentence, you refer to a number of
5    factors that go into the consideration in making a prescribing
6    decision, correct?
7        A.  I have a sentence that talks about things that the
8    physician would -- on how to choose an optimum therapy, yes.
9        Q.  Okay.  It says "The optimum therapy for treating
10   schizophrenia and bipolar disorder is chosen for each patient
11   based on the patient's medical history," correct?
12       A.  That's how it should be done, yes.  And, actually, I
13   should qualify this.  This sentence is how I think it should be
14   done, okay?  So, I don't think it's done that way all the time,
15   but I certainly think this is how it should be done.
16       Q.  Okay.  So, the optimum therapy for treating
17   schizophrenia and bipolar disorder is chosen for each patient
18   based on the patient's medical history, correct?
19       A.  Yes.
20       Q.  That's what the doctor does -- one thing the doctor
21   does in the perfect world in prescribing a medicine, correct?
22       A.  He should do that, yes.
23       Q.  And you can't do that, can you?
24       A.  I don't prescribe drugs.  So, again, I -- that's not
25   something I do.  I certainly could look at a patient's medical

139

1    history and tell you whether in any opinion as a pharmacologist
2    it makes sense to administer that drug; but, again, I'm not a
3    physician and a physician is going to make that final call.
4        Q.  Right.  The American Medical Association won't let
5    you do that, would they?
6        A.  I don't know.  I don't think they would.  I never
7    checked with them.
8            MR. ALLEN:  It was a rhetorical question anyway.
9    It was intended to be flamboyant, rhetorical, but of no
10   consequence today or --
11       Q.  (BY MR. BROWN)  The second part of the sentence says
12   that the physician should also include an assessment of the
13   known side effects of the drug, correct?
14       A.  Yes.
15       Q.  And the last part -- third part says "The patient's
16   response to the drug in relation to the drug's efficacy in
17   adverse events," correct?
18       A.  That's what it cites, yes.
19       Q.  So, these three factors are the three factors that
20   should go into a doctor's risk-benefit analysis when he or she
21   prescribes a medicine, correct?
22       A.  Well, I would say the first two go into the initial
23   risk-benefit analysis.  The third one is going to be gleaned
24   after you see how the patient responds.  So, it may not be the
25   initial analysis, but certainly -- you do the first two things,

140

1    look at the patient and then look at the side effects of the
2    drug.  That's how, to me, I would determine -- you know that
3    it's been approved to be effective.
4            You could try something.  And then after that,
5    you may have to tweak the therapy, either by dose or different
6    agent, depending upon whether or not you get the desired effect
7    in that patient or you get adverse events that are something
8    that you want to avoid in that patient.
9        Q.  So, in Paragraph 16, the way you've described the
10   risk-benefit analysis for a doctor, you're not qualified to
11   perform this particular type of a risk-benefit analysis.
12       A.  I would not, as a physician, ever do this.  I
13   certainly could do this for myself.  I would be qualified to
14   look at my own medical history -- and I do this all the time.
15   I make my own judgments based upon what I believe is
16   appropriate for me to take.  But, certainly, I don't do this
17   because I'm not a physician.  A physician is normally the one
18   who's going to do this.
19           Sometimes -- in today's world, however, in
20   addition to a physician, a physician's assistant/licensed nurse
21   practitioner, can also do these things.
22       Q.  You're not a licensed assistant nurse practitioner,
23   are you?
24       A.  No, I'm not.
25       Q.  Paragraph 19 in Section 5 of your report discusses a

141

1    number of other types of -- I'll call them adverse events, and
2    I want to -- is that right?
3        A.  Well, I would say -- I would call these described
4    adverse effect profile of the drug, yes.  Because "adverse
5    event" or "adverse reaction" or "warning" are very specific
6    regulatory definitions.  This -- what my intent in this
7    paragraph is to do is to lay out what I call the toxicology
8    profile of the drug.
9        Q.  Okay.  I wanted to stay in Paragraph 19, but flip
10   over to Page 6.  It continues onto the next page.  I see
11   hypoglycemia identified there; is that right?
12       A.  Yes.
13       Q.  What is hypoglycemia?
14       A.  Low blood sugar.
15       Q.  Do you think Seroquel causes low blood sugar?
16       A.  I would agree that it is a listed adverse -- in the
17   adverse effect profile both in Goodman & Gilman, as well as in
18   the PDR.  I haven't performed any opinions based on any kind of
19   weight of the evidence, but it's a common thing that happens,
20   but certainly I agree that it's observed.
21       Q.  Okay.  I didn't ask about observed.  Does Seroquel
22   cause hypoglycemia?
23       A.  I haven't formed that opinion.  I can't answer that.
24   To me, when you asked me that question, that's the type of
25   analysis I've done here which I haven't done for that endpoint.

142

1    Q.  Aside from diabetes, have you formed an opinion that
2   Seroquel causes any of the other adverse events listed in 19,
3   Paragraph 19?
4    A.  I think if you read my report, you'll see that I list
5   diabetes and hyperglycemia for sure.
6    Q.  Okay.
7    A.  And I may have listed weight gain in my paper, very
8   last conclusion section.
9    Q.  Do you have your report in front of you?
10   A.  Yeah, I do.  Let me just look at the last paragraph.
11   Q.  Weight gain is listed.
12   A.  Yeah.  So, weight gain as well.
13   Q.  All right.  So, in Paragraph 19 -- why don't you just
14   take a look at Paragraph 19.  Did you read it through?
15   A.  Yes, I did.
16   Q.  Okay.  Aside from diabetes, weight gain,
17  hyperglycemia, are there any other events listed in Paragraph
18  19 for which you think there's a causal relationship based on
19  your review and analysis of the data?
20   A.  I can't make that statement based on the same kind of
21  analysis I've done here for those other three.  I can tell you
22  that I know that there are frequent reports -- when I say --
23  and I'm not giving "frequent" a number, not a regulatory
24  number, but I see that over and over again for some of these
25  other things.

143

1       For example, I've seen a good deal of discussion
2   in the literature about the fact that even though it's not
3   common, you can get these other -- these movement disorders,
4   even with Seroquel.  Even though it's not as common as some of
5   the first-generations, you do get it occurring.  And I also
6   know that there has been some issues related to -- I don't know
7   if it's on here or not, but the orthostatic hypotension.  I
8   don't know if I listed that or not, but that's another one that
9   also has been shown to occur due to the alpha-blocking activity
10  of the agent.  But I haven't done any specific assessments of
11  any of the others other than those particular endpoints.
12   Q.  The second sentence lists adverse effects -- says
13  "Its adverse effects" -- referring to Seroquel -- "include but
14  are not limited to," and then you list -- one, two, three,
15  four, five, six, seven -- I think eight, if I counted right --
16  eight adverse events.  Did you get that from the adverse event
17  section of the label?
18   A.  No.  Those would have been gleaned from my reading of
19  the literature as a whole and probably the pharmacology text.
20  But if you look at that list, you'll notice that they are.
21  There's a list of events that I was focussing on, things that
22  had to do with metabolic.  For example, blindness is a -- is
23  something that can result from diabetic complications.
24  Increased thirst is a symptom often of diabetes.  Ketoacidosis
25  is a symptom -- or is a symptom or -- not a symptom, but a

144

1   condition that you can get from having uncontrolled diabetes.
2       So, those were sort of focussed out as a group
3   that I was focussing on first when I did my literature
4   searches, and then also looking at what was described in the
5   pharmacology text.
6    Q.  So I'm clear -- and I want you to correct me if I'm
7   wrong -- for purposes of your testimony in this case, you're
8   only going to opine that Seroquel causes diabetes, weight gain,
9   or hyperglycemia, correct?
10   A.  I'm only going to present results of a causation
11  analysis for those three, but if I was asked to -- if I was
12  asked to talk initially, like I often am in trial on direct,
13  about the basic pharmacology and toxicology of Seroquel, other
14  things like this would be mentioned because they're taught in
15  textbooks or mentioned in the labeling, okay?  So -- and
16  depending on where they're mentioned in the labeling, they give
17  me more confidence that what I'm seeing is a real event, not
18  just something that was observed.
19       So, for example, if it's in the warning section
20  of the Seroquel label, such -- then -- I believe neuroleptic
21  malignant syndrome is mentioned in the warning section -- then
22  there is reasonable association; and that, to me, would be
23  enough to describe it as part of the pharmacology and
24  toxicology of the agent.
25   Q.  Okay.

145

1    A.  So, if asked that question to introduce it, I would
2   do that.  But I have not done and I don't want you to think I
3   have -- I have not done any detailed causation analysis for
4   endpoints other than the ones I list specifically in my report.
5    Q.  Okay.  I don't know if I understand you completely.
6       Let me try it this way:  Go back to the
7   beginning of Paragraph 19 where you say "Seroquel is associated
8   with deaths that have been attributed to severe liver, kidney,
9   and pancreatic damage."  Do you see that?
10   A.  Yes.
11   Q.  Okay.  Do you plan to offer opinions in this case
12  based on your review and analysis that Seroquel causes liver
13  damage?
14   A.  I haven't been asked to opine on endpoints other than
15  the endpoints I have focussed on in my causation analysis.
16  However, again, it is an endpoint -- when you talk about the
17  general profile, there have been deaths attributed to that, but
18  I haven't certainly been given the task of doing a causation
19  analysis for liver damage.
20   Q.  Do you think --
21   A.  But it's in the spectrum of the toxicology of the
22  drug.
23   Q.  Do you think based what you've done to date -- and
24  we're going to discuss the methodology now for each one of
25  these -- based what you've done to date, you can conclude today

146

1  that Seroquel causes liver damage?
2      A.  I can't answer that for you today.
3      **Q.  You haven't done enough research into that issue,**
4  **have you?**
5      A.  Well, I can tell you that there are authoritative
6  sources that state that there's -- that it's within the
7  toxicological profile of the agent, but I -- and I even believe
8  there's some preclinical animal data on liver damage and
9  Seroquel.  However, again, it wasn't what I was asked to assess
10  from a more rigorous level.
11          I consider what I've done more rigorous than
12  just reviewing what textbooks may say about a drug, and that's
13  where -- again, this paragraph that I wrote, 19 -- let's see.
14  Paragraphs 18, 19, 20, 21, those four paragraphs are what I
15  call my "orient the pharmacology and toxicology of the drug"
16  paragraphs.  They're coming from review papers and textbooks,
17  things that I have seen described over and over again by
18  people.  And I'm going from something as severe as death to
19  something that's much more minor.
20          So, I'm trying to show you that this drug has a
21  spectrum of toxicity from something like death due to different
22  endpoints that have been linked to why the death has occurred
23  down to, you know, other things that are more minor.  So, the
24  risk-benefit profile is not just rash.  It can be things more
25  severe than that.

147

1      **Q.  I'm not that smart.  I really didn't understand that.**
2          MR. ALLEN:  I do.  But, Arthur --
3          MR. BROWN:  Could you short-circuit it?  I mean,
4  it might be --
5          MR. ALLEN:  I'll talk to you on the break.  I'm
6  not going to short-circuit it here on the record.  I think I
7  can short-circuit this, but --
8          MR. BROWN:  Can we go off the record for one
9  second?
10          (Discussion off the record from 12:50 p.m. to
11          12:51 p.m.)
12      **Q.  (BY MR. BROWN)  Okay.  You hold a number of opinions**
13  **with respect to the relationship between Seroquel and metabolic**
14  **disorders, correct?**
15      A.  Yes.  The ones that are outlined in my report, yes.
16      **Q.  And you rely on a number of different lines of**
17  **evidence?**
18      A.  Yes.
19      **Q.  We've talked a little bit about them, we're going to**
20  **talk more about them in a few minutes, but I want to make sure**
21  **I understand the opinions.  Is it your opinion that Seroquel**
22  **causes diabetes?**
23      A.  Yes.
24      **Q.  Type 2 diabetes?**
25      A.  Yes.

148

1      **Q.  And how is it that you believe Seroquel causes Type 2**
2  **diabetes?**
3      A.  Okay.  Well, that's my report.  That's the weight of
4  the evidence assessment that I have done.  So, that is an
5  opinion based upon looking at the -- the scientific literature
6  and going through that scientific literature looking at all the
7  available lines of evidence, whether or not there's animal
8  data, whether or not there's human data, whether or not there's
9  epidemiological versus clinical data, whether or not there's
10  biologic plausibility.  Is there some understanding why this
11  could happen that makes some sense?
12          All of those things are in the Hill criteria,
13  and I -- that's outlined for you in Paragraph -- I tried to do
14  that in somewhat of a fashion for you in Paragraph --
15      **Q.  In the weight of the evidence paragraph?**
16      A.  Yeah.  It's a long one.
17      Q.  29.
18      A.  Okay.  There you go.  That's right.  Yes, right,
19  exactly.  And, again, this is not every study.  That's why I've
20  said "e.g." after some of these.  For example, under clinical
21  data, I say, "e.g.," for example, and I've listed some of the
22  ones that jump out at me as being very important.
23          But, for example, under clinical data now, you
24  could also -- if I was going to cite some internal company
25  documents, I would also cite some of the information found in

149

1  the clinical trials and this document that was produced -- or
2  was prepared as part of the SERM meeting within the company,
3  things like that as well.  But that's where my opinion comes
4  from.
5          And, to me, all of that evidence put together
6  forms this story which tells me that this drug can cause
7  diabetes and it can cause hyperglycemia and it can cause weight
8  gain.  And, again, if you want to talk about each individual
9  study, that's a lot of work, but we can do that.  If you want
10  to pull the individual ones out, we can do that.
11      **Q.  Well, we're going to talk about a lot of the**
12  **individual studies after lunch, but I want to make sure I**
13  **understand your methodology.  So, you applied the weight of the**
14  **evidence analysis; is that correct?**
15      A.  Yes.  In other words, as any problem you look at --
16  and as you indicated earlier, there's going to be some studies
17  that show positive results and some studies that show negative
18  results.  What I'm looking at is what is the overall weight,
19  what does the evidence as a whole tell me, and I have to be
20  able to see that this evidence fits together.
21      **Q.  So, is your -- can you quantify what "weight of the**
22  **evidence" means?**
23      A.  What do you mean by "quantify"?
24      **Q.  Is it more probable than not?  What is the weight of**
25  **the evidence standard that you're employing in this?**

150

1      A.  Well, it would definitely be more than 50 percent, if
2   you want to put a quantitative -- it's more probable than not.
3   In legal terms, I think I've described it with scientific
4   certainly, you know, reasonable certainty.  I mean, there's all
5   different ways legally, I know, that they can define it.  To
6   me, it's well more than 50 percent in this case.  I mean, in
7   some cases when I've done weight of the evidence, you know,
8   might be that it's closer; but in this one, it's well more than
9   50 percent of the studies and the information that I looked at
10  lead me down the same path.
11      Q.  Okay.  So, the weight of the evidence standard that
12  you apply generally, not this case, is more probable than not?
13      A.  Yes.
14      Q.  What are the -- can you tell me or identify the
15  theories -- the mechanistic theories by which you think
16  Seroquel causes diabetes?
17      A.  Well, we don't know.  No one knows.  And I think I
18  lay that out in my report.  We don't know how it happens, but
19  there's some ideas, and I have a section on mechanism.  And
20  there is some information on chemically-similar drugs that --
21  mechanistically that I think is useful and applicable and
22  that's the idea of the drug having effect on insulin resistance
23  potentially.
24      I don't believe that Seroquel is a potent direct
25  toxicant to the insulin-secreting cells.  I don't think the

151

1   data shows that.  But, instead, what we're looking at is some
2   underlying perturbations in the homeostatic mechanisms that
3   lead to changes in insulin resistance, and I think that's
4   what's going on, which is why I've been very specific in my
5   causation statement talking about Type 2 diabetes.
6       However, as I also stated, exacerbating --
7   causing hyperglycemia, increasing blood glucose levels, in a
8   Type 1 can exacerbate the disease.  Doesn't mean that it
9   produces Type 1, but it certainly can exacerbate the underlying
10  condition.
11      Q.  Let me make sure I understand it.  You said a lot
12  there.  You would agree with me you're not really sure what
13  mechanism is at play in how Seroquel may cause diabetes?
14      A.  I would -- as I said, no one knows at this point in
15  time, that's correct.
16      Q.  So -- right.  So, this --
17      A.  And not just Seroquel --
18      Q.  Right.
19      A.  -- but the others as well.  Zyprexa's the same story.
20  We don't know exactly how it happens.
21      Q.  And I want to focus on Seroquel.  For Seroquel, as
22  you sit here today, you're not sure what the mechanism is that
23  permits Seroquel to cause diabetes, correct?
24      A.  The exact molecular mechanism, that is correct.
25      Q.  And it's your testimony that no one knows the exact

152

1   molecular mechanism by which Seroquel causes diabetes, correct?
2       A.  That's my understanding of the information I have
3   reviewed.
4       Q.  And you've identified in your testimony and your
5   report a couple of possible mechanisms and I want to make sure
6   I understand it, okay?  You've identified the possibility that
7   Seroquel affects insulin secretion directly, correct?
8       A.  Yes, and can lead to essentially the insulin
9   resistance by the fact that the receptor numbers down-regulate
10  and you get a series of events.
11      Q.  And you also think that Seroquel can effect insulin
12  sensitivity directly?
13      A.  It's -- I don't know.  I said it's possible.  I think
14  it's one of the other mechanisms that has been put out in the
15  literature, but I don't think that data's specific to Seroquel.
16  That's why I said I believe it's an analogous.
17      Q.  Okay.
18      A.  Let me look at what I stated to remind myself.
19  Believe that's right.  I think the Melkersson paper is not a
20  Seroquel-sensitive paper.  So, I would say -- that's a chemical
21  analogy.
22      Q.  Okay.  Do any of the papers you cite in your
23  mechanism theory study or identify -- study Seroquel and look
24  at possible mechanism for Seroquel?
25      A.  I don't think so, but I don't -- I'd have to go back

153

1   and look.  I don't think any of them have a Seroquel group.
2   It's unfortunate.  It would be nice if they did, but I don't
3   believe I've seen that.
4       Q.  And we'll look at it in the afternoon.
5       Do you think in order for someone to experience
6   diabetes, they need to have an increase of blood glucose?
7       A.  Yes.  That's -- for diabetes, that's one of the --
8   that -- well, that's the hallmark criteria for whether or not
9   it's occurring or not.
10      Q.  How much does Seroquel increase blood glucose?
11      A.  In any one individual?
12      Q.  Yes.
13      A.  Well, there's individuals that have had increases in
14  blood glucose to above 126, which is the diabetic threshold
15  with a fasting level.  I don't think I can tell you what it --
16  I don't think anybody has quantified exactly how much it is
17  going to reliably raise blood glucose, but there's case reports
18  that show people that have become diabetic from being -- from
19  having measures before Seroquel that were in the normal range.
20  So, that would be going from some value -- probably less than a
21  hundred -- to some value above 126.
22      Q.  All the case reports you rely on are all confounded
23  by patients having other risk factors for diabetes, correct?
24      MR. ALLEN:  Object to the form.
25      A.  I'm sure that there is multiple risk factors in the

154

1  patients, yes.
2  **Q. (BY MR. BROWN) Right.**
3  A. Because if they're schizophrenics, that's another
4  risk factor.
5  **Q. As you sit here today, can you tell me based on your**
6  **review of the data what the average increase in blood glucose**
7  **is caused by Seroquel?**
8  A. I can't -- I don't think anybody can give you that --
9  that statement. I think that's an impossible statement to be
10  able to glean because you're asking in all situations and I
11  don't think anybody can give you that. I think you could look
12  at individual studies and make a -- for example, there are some
13  individual clinical trials that have looked at changes in blood
14  glucose. For example, I think these -- 125, 126, and 127 have
15  some of that data. So, in that population, you could talk
16  about those people. But, again, there's no information out
17  there that I can think of that would allow me to answer that
18  question broadly.
19  **Q. All right. So -- I know you said no one knows. I**
20  **want to find out what you know. So, is it your testimony as**
21  **you sit here today you can't tell me what the average increase**
22  **of blood glucose is caused by Seroquel?**
23  A. I can't, and no one else could either.
24  **Q. Have you done as part of your research an analysis of**
25  **other causes of diabetes?**

155

1  A. Yes.
2  **Q. What are the other causes of diabetes?**
3  A. Well, the -- a big one is genetics. Obesity is
4  another. There's some evidence for schizophrenic disease.
5  There's some evidence for certain cardiovascular diseases also
6  being linked with diabetic phenomenon. Then there's some other
7  drugs. I can't name those for you-all, though I've seen the
8  list before in some of the papers on drug-emergent diabetes
9  that I have.
10  **Q. Okay.**
11  A. Alcoholism can lead to diabetes. Those are the big
12  ones. I can't give you an exhaustive list off the top of my
13  head.
14  **Q. Would you agree with me that obesity is the single**
15  **biggest risk factor for diabetes?**
16  A. I've seen it described that way. I don't know that
17  I'd agree with that. I think genetics is probably the single
18  biggest risk factor for diabetes because obesity is also
19  genetically linked in some people. So, I think you have to
20  start with genetics and then beyond there to environmental
21  factors or factors that can be controlled.
22  **Q. Well, I presume before you came here today you looked**
23  **at the literature examining the relationship between obesity**
24  **and diabetes; is that correct?**
25  A. Yes. I have seen that literature and certainly have

156

1  reviewed part of it.
2  **Q. And is it part of the materials that you have today**
3  **or is it part of your normal work?**
4  A. I think I cite some of that. Maybe not in my report,
5  but in my -- I know I have papers in my files on obesity and
6  diabetes, so they should be on those PDF files that you have.
7  Also, it's discussed in -- not this book -- a Harrison's
8  Principles of Internal Medicine, which I can't bring to you
9  because my version is an online version of the book; but if you
10  go to the newest edition and look there, it talks about obesity
11  as well.
12  **Q. Would you agree with me that there are studies out**
13  **there showing that obesity increases the risk of diabetes**
14  **twenty-, thirty-, forty-fold?**
15  A. I couldn't give you a quantitative answer. You'd
16  have to show me the study. I would agree with you that
17  certainly it is an important risk factor.
18  **Q. But you won't agree with me it's the most important?**
19  A. No, because I think genetics is because I think
20  genetics can also control diabetes, so --
21  **Q. Okay. Do you think everyone who gets diabetes has a**
22  **genetic predisposition to get it?**
23  A. No.
24  **Q. For those folks who do not have a genetic**
25  **predisposition to get diabetes, what can cause it?**

157

1  A. Well, environmental factors like I've talked about,
2  like the alcoholism, like the different drugs that are
3  associated with it. I think that there are people that
4  probably don't have a genetic link that are obese that can get
5  it. Again, the problem I have with obesity is that there is
6  genetic components to obesity as well. So, if one leads to the
7  other, I -- that's why I think genetics is very important.
8  MR. ALLEN: Let me ask a question. Court
9  Reporter, how long have we been on the record?
10  (Discussion off the record from 1:04 p.m. to
11  1:05 p.m.)
12  **Q. (BY MR. BROWN) In any given individual,**
13  **Dr. Plunkett, is there some unique fingerprint that would allow**
14  **a doctor to be able to determine that Seroquel caused a case of**
15  **diabetes?**
16  A. Are you asking me -- when you say "unique
17  fingerprint," are you asking for a medical test they could do
18  or --
19  **Q. Well, is there any molecular marker?**
20  A. I don't believe there's a molecular marker, no.
21  **Q. So, in any individual patient, there's no sort of**
22  **unique molecular marker that you could look at to determine**
23  **that Seroquel caused a particular case of diabetes?**
24  A. No. To me, the marker you would have would be if you
25  had a challenge/rechallenge in the patient. That would be, to

158

1  me, very good evidence that the person's diabetes was
2  contributed by the Seroquel. But that -- you know, that's not
3  a molecular marker. That's why I asked you what did you mean
4  by "marker"? Marker could be that kind of test.
5      Q.  You know what a molecular marker is, right?
6      A.  Yes. To me -- well, I'll tell you what I think it
7  is. To me, a molecular marker is either a level of protein or
8  a change in blood chemistry or a gene, something that's turned
9  off or on, something that changes when there's exposure to the
10  drug that's unique to that drug.
11     Q.  And there's no such unique marker in this case that
12  would permit a doctor to be able to tell if Seroquel caused the
13  case of diabetes, correct?
14     A.  At this point in time, that's correct. Doesn't mean
15  something won't be shown in the future, but I have seen nothing
16  at this point in time.
17     Q.  Would you agree with me that some people who take
18  Seroquel and go on -- there are some people -- strike that.
19  That was a lousy question.
20           Would you agree that there are some people who
21  take Seroquel and go on to develop diabetes in whom Seroquel
22  was not the cause?
23     A.  It's possible. It's possible, although it would
24  certainly be something that would be difficult to have to rule
25  out knowing what I -- knowing what I believe about the

159

1  causative nature of it; but you could try to rule it out, yes,
2  absolutely.
3      Q.  Well, is there any instance -- if you knew two
4  factors, someone took Seroquel and someone got diabetes, could
5  you ever rule out Seroquel as the cause?
6      A.  Possibly.
7      Q.  And how would you do that?
8      A.  I mean, it's possible if you had something about the
9  person that you knew from beforehand, from medical tests
10  beforehand, before they started the Seroquel. Maybe they had a
11  prediabetic state that went undiagnosed and you weren't paying
12  attention to it and you go back and look at their blood test
13  and now, all of a sudden, "Wait a minute. That person was well
14  on the road." I mean, it's possible.
15           I think it's very difficult to rule out the
16  Seroquel based on what I know if all you're doing is just
17  saying after the fact is it obesity, is it this, is it that?
18  Because the issue may not be is it Seroquel alone. It may be
19  the combination of Seroquel plus the obesity plus the genetics.
20  It's the straw that breaks the camel's back issue, which is
21  what makes the drug more dangerous for people that have -- the
22  screening is so important, that you know what people have
23  beforehand, what types of factors do they have that put them at
24  risk for diabetes? And then you want to put them on Seroquel,
25  too, that's a problem; whereas, there may be other drugs that

160

1  don't have that same propensity to induce those metabolic
2  effects with that patient's risk profile factor.
3      Q.  But the decision on what drug to put a patient on is
4  a doctor's, correct?
5      A.  Doctor should make that decision, yes.
6      Q.  Right.
7      A.  Well, the doctor and the patient together.
8         MR. ALLEN:  Yeah.
9      A.  That is true. I mean, I should say that because in
10  this case, it may very well be that the patient is more willing
11  to accept one type of risk over another, and that discussion
12  should be had.
13     Q.  (BY MR. BROWN)  Right. In some cases, people who are
14  mentally ill might say, "You know what? I might gain a few
15  pounds and an increase in blood sugar is okay with me."
16         MR. ALLEN:  Object to the form. Instruct you
17  not to answer.
18         MR. BROWN:  You're going to instruct her not to
19  answer?
20         MR. ALLEN:  Yeah.
21         MR. BROWN:  Okay.
22     Q.  (BY MR. BROWN)  Would you agree with me that there
23  are people who will experience diabetes while on Seroquel
24  that -- that the case of Seroquel was not -- strike that. I'm
25  going to get this right one day.

161

1         MR. ALLEN:  I know what you want to say.
2         MR. BROWN:  No, no, no.
3         MR. ALLEN:  And I've got the answer for you, but
4  go ahead.
5      Q.  (BY MR. BROWN)  Is it your opinion that -- we'll come
6  back to it. Is it your opinion that Seroquel exacerbates
7  diabetes if someone already has it?
8      A.  Yes. I believe that the evidence shows that as well.
9      Q.  How do you define "exacerbation"? Define that for
10  me.
11     A.  If there are -- exacerbation can be a variety of
12  things. It can be taking someone who was prediabetic and on
13  the way and all of a sudden they become -- have levels in their
14  blood of glucose that are diabetic, or defined as diabetic by
15  the medical community.
16           There's the case of the fact that anybody who
17  already is diabetic and you give them a drug that alters blood
18  glucose and causes hyperglycemia, that -- that's in my
19  paragraph about -- it's -- I don't think anybody -- any doctor
20  would disagree that that's a bad thing. It's a common sense
21  issue. It's the fact that if you have somebody who needs to
22  control their blood glucose and you give them a drug that
23  alters blood glucose in the wrong direction, that's an
24  exacerbation of their state.
25     Q.  So, do you think -- have you seen any evidence in the

162

1    clinical trial data where someone who had elevated blood
2    sugars, we'll say, north of a hundred experienced increases in
3    blood glucose that you could contribute to Seroquel?
4         A.   I couldn't answer without going back and looking at
5    the trials because that's a very specific question.  I haven't
6    focussed on that.
7         Q.   Well, let me ask a broader question.
8              Have you seen any evidence in the clinical
9    trials that people who had elevated blood sugars before they
10   took Seroquel experienced additional increases after taking
11   Seroquel?
12        A.   Are you asking me just the clinical trial data?
13        Q.   Yes.
14        A.   And are you asking for just the AstraZeneca clinical
15   trial data?  I can't answer that without looking at them,
16   couldn't answer that.
17        Q.   Does Seroquel increase the level of glucose at a
18   different rate in people who are already diabetic versus
19   someone who was not already diabetic?
20        A.   I have no idea.  I haven't focussed to look at that
21   issue.  I doubt you'd have the data to be able to answer that
22   based on the data I know that's out there.
23        Q.   Is it possible that Seroquel could cause an increase
24   in one group and not the other?
25        A.   One group of what?

163

1         Q.   Let me ask a better question.
2              Is it possible that Seroquel could cause an
3    increase in glucose blood glucose, for example, in someone who
4    has a normal glucose value and not cause an increase in someone
5    who has an elevated value?
6              MR. ALLEN:  Objection.  Form.
7         A.   Haven't thought about that.  Don't know.  I can't
8    answer from the data that I have.  Almost anything is possible,
9    I would say, in science, but I can't answer that question
10   without looking at the data to be able to define it for you.
11        Q.   (BY MR. BROWN)  Can you -- what data have you looked
12   at that's examined someone who is already diabetic and
13   experienced an increase in blood glucose?
14        A.   I believe there's some case reports that talked about
15   people that have histories of some elevations -- and I don't
16   know whether they're diabetic.  That's why I said -- I kept on
17   saying to you "prediabetic."  I don't know if I have a case
18   report of a diabetic being put on Seroquel, but it's very
19   possible that that did occur.  In fact, the reason I say that
20   is I know in the Zyprexa litigation that I reviewed documents
21   that talked about how it was very common that doctors who had
22   diabetics put their patients on second-generation agents,
23   thinking they were safe, but can't answer that specifically at
24   this point in time.
25        Q.   Besides the case reports, have you seen any other

164

1    data or can you point me to any other data that shows that
2    someone who came -- who before Seroquel use had an elevated
3    blood sugar, had an additional increase in blood glucose after
4    taking Seroquel?
5         A.   To me, I'd be looking at case reports for that
6    information, so I don't know -- I mean, are you asking me has a
7    clinical trial been done specifically with that endpoint?  I
8    don't believe I've seen one.  There are ones on glucose
9    disregulation, but I don't believe that they've studied just
10   diabetics because I think that would be a hard one to prove.
11        Q.   Do you need to have a clinical trial whose endpoint
12   is exacerbation to reach your opinion that Seroquel exacerbates
13   diabetes?
14        A.   Not necessarily, based on the biologic mechanism that
15   I think is occurring.  And if you look at the way I have
16   described in my statements about exacerbation of diabetes, I
17   don't believe I have cited it in the same way as I have cited
18   the causation opinions for diabetes causing diabetes de novo
19   essentially, causing hyperglycemia.  If you cause hyperglycemia
20   in a diabetic, again, that's a not a good thing.  It's against
21   what the treatment for the patient is trying to do by bringing
22   down the blood glucose.
23        Q.   No.  I understand what you mean that it's not a good
24   idea to increase blood glucose in someone who has diabetes
25   already.  I understand that.  What I want to know is all the

165

1    evidence in the world you're pointing to in this case, just
2    this case, that shows that Seroquel increases blood glucose in
3    someone who is already diabetic when they start taking it.
4         A.   Well, if you ask me that question in our next
5    meeting, I will see if I can find it.  That's not a question I
6    was trying to answer in my initial analysis.  You're asking me
7    to subset the data and I didn't do it that way.  I mean, I'd
8    have to look at only the people that were already prediabetic
9    or diabetic in order to answer that question, so --
10        Q.   Let me help clean up one thing.  It's your opinion
11   that Seroquel exacerbates diabetes, correct?
12        A.   I believe it can exacerbate diabetes, yes, and I --
13   but, again, if you look -- that's a separate opinion from can
14   it cause diabetes.  My assessment was directed at can it cause
15   diabetes.  And then when I talk about exacerbation in that
16   paragraph, if you read the way I'm stating it, it's not stated
17   in the same way as my opinions on causation.
18        Q.   Okay.  Let me -- maybe I understand this.  So, we
19   understand that you believe that Seroquel causes diabetes,
20   correct?
21        A.   Yes.
22        Q.   But you're not saying that Seroquel causes an
23   exacerbation of diabetes in someone who was already diabetic
24   before they took the medication.
25        A.   That's something I haven't done the analysis for at

166

1  this point in time, that's correct. But now that you've stated
2  that, maybe before the next deposition, I'll see if I can
3  subset it.
4      Q. As you sit here today --
5      A. I haven't done that subset analysis, that's correct.
6  When I say "subset," taking the studies I have and dissecting
7  them apart that way.
8      Q. The other opinion you had was Seroquel causes weight
9  gain, correct?
10     A. Yes.
11     Q. How does Seroquel cause weight gain?
12     A. No -- again, any of the things Seroquel does, even
13 how it treats schizophrenia, we don't know the exact mechanism.
14 But there is data on receptor binding and occupancy that shows
15 that it affects receptors that have been associated with
16 appetite and mood, and I think I even have a paragraph on that
17 in here. Yeah, Paragraph 36, where I talk about the fact that
18 it's well established that Seroquel has effects on
19 neurotransmitter systems that affect appetite.
20     Q. Where is that?
21     A. Paragraph 36. Starts on the top of Page 11.
22     Q. Yeah. Where's the statement you just read from?
23     A. That these mechanisms for increased body weight gain
24 are consistent with the fact that Seroquel has effects on
25 neurotransmitter systems in the brain that affect appetite and

167

1  mood.
2      Q. That's the Gothelf paper, which is G-o-t-h-e-l-f,
3  right?
4      A. Well, no. That statement there is just the -- that's
5  not necessarily the Gothelf paper. The Gothelf paper has to do
6  with decreased energy expenditure and this is antipsychotics in
7  general, an increased appetite, okay? But what I'm saying to
8  you is if you go to the labeling for Seroquel and look at the
9  receptor systems that have been shown to be affected by it, in
10 the general rule, those receptor systems are ones that have
11 been linked to changes in appetite.
12     And other people -- if you look at the
13 literature on body weight and obesity, they talk about appetite
14 centers in the brain. And so that's what I'm talking about,
15 the fact that this drug can affect some of those centers and
16 that's what people believe -- you know, the best people that
17 you read on this area, that's what they believe is responsible
18 for the weight gain of atypical antipsychotics.
19     Q. We're going to come back to that in a second, but
20 what I'd like to know is what the receptors are that affect
21 weight gain that you've described?
22     A. Well, there's serotonin receptors involved, for sure.
23 And beyond that, I'd have to go back and look at my -- look at
24 my papers on -- the serotonin system is one, for sure.
25     Q. All right. So, it's your opinion that Seroquel

168

1  causes weight gain, correct?
2      A. Yes. Can cause weight gain, yes.
3      Q. But with respect to that relationship, you're not
4  sure what the exact mechanism is, correct?
5      A. Just like every effect of Seroquel, no one knows what
6  the exact molecular mechanisms are.
7      Q. But you do think that there's at play here a number
8  of receptors that could be responsible for the weight gain,
9  correct?
10     A. Yes, just like it is for their effects in
11 schizophrenia and bipolar disease. We believe that certain
12 receptor systems in the brain are linked to the
13 pharmacological -- are the basis for the pharmacology of the
14 drug, but we don't know the exact mechanism.
15         MR. ALLEN: Okay. Why don't we take a lunch
16 break.
17         MR. BROWN: Okay.
18         MR. ALLEN: Think it's a good time.
19         (Recess from 1:19 p.m. to 2:14 p.m.)
20     Q. (BY MR. BROWN) Dr. Plunkett, we're back after lunch.
21 Are you ready to resume?
22     A. Yes.
23     Q. We were talking about your opinion that Seroquel
24 causes weight gain before lunch. You recall that?
25     A. Yes.

169

1      Q. And I'm not sure I asked you, but what -- how much
2  weight does Seroquel cause?
3      A. Depends. There's studies that show they -- some
4  people gained -- let's see. In kilograms -- say maybe 10
5  pounds, 20 pounds. Sometimes they gained 3 or 4 pounds.
6  Depends on the study you look at. There's different studies
7  that have measured different endpoints.
8      Q. What's your opinion -- do you have an opinion on how
9  much weight Seroquel can cause?
10     A. Specific poundage or --
11     Q. Yes.
12     A. No, not a specific. I just -- I believe it causes
13 statistically significant changes in weight gain that can be
14 measured in the clinical studies.
15     Q. And when you say "statistically significant," what do
16 you mean?
17     A. That means if you were to compare the -- among the
18 different groups that are looked at, there's statistical
19 difference between, say, placebo and Seroquel or Seroquel and
20 other drugs. So, the patients show -- there's a change in the
21 patients that can be different from their own baseline on the
22 drug or also differences among groups. A lot of the
23 comparisons are drugs before Seroquel and their own baseline
24 levels and whether or not they gain weight after they're on the
25 drug. And so that would be p<.05 statistical significance, I

170

1    guess. That's the criteria that's looked at in most of the
2    comparisons.
3        Q.  And does that statistical significance description
4    you're referring to refer to the difference in patients on
5    Seroquel and patients not on Seroquel or in the actual weight
6    gained?
7        A.  If they're statistically -- when I say "statistically
8    significant" -- I don't think I quite understand your question,
9    but --
10           MR. ALLEN:  Well, if you don't understand it --
11       A.  Rephrase the question then --
12       Q.  (BY MR. BROWN)  Sure.
13       A.  -- because I'm not sure -- I think you're missing --
14       Q.  I might be.  That's possible.
15       A.  That's fine.
16       Q.  Help me out.  In the studies you looked out that
17   found a statistical difference between the weight gain in the
18   Seroquel group and the comparative group, we'll call it, was
19   that based on the amount of weight gained?
20       A.  Pound -- kilogram change, right, yeah.
21       Q.  Okay.
22       A.  It was not usually pounds.  Usually kilogram change.
23       Q.  And did those studies report a numerical value for
24   the average increase in weight?
25       A.  Some did that I can remember and some didn't.  I

171

1    couldn't give you those numbers without looking at the studies.
2    If you're saying numerical value, like a 5 percent increase or
3    a 2 percent increase or a 5-kilogram increase, I think they
4    were mostly in pound -- kilogram change, like an average; or
5    may even be individual measurements of individuals, but usually
6    an average among a group.
7        Q.  Okay.  Do you have an opinion to a reasonable degree
8    of scientific certainty on what the range is of weight gain for
9    Seroquel usage?
10       A.  I'd have to look at the studies to give you that.  I
11   can't answer that.
12       Q.  Can weight gain cause diabetes?
13       A.  By itself?
14       Q.  By itself.
15       A.  Obesity has been linked to diabetes.  Weight gain
16   itself, I think it would depend on how much weight gain.  So, I
17   think that you'd have to be able to link the weight gain to
18   some clinical condition that changes the underlying physiology
19   of the person.
20       Q.  All right.  We'll come back to that in a second, but
21   obesity causes weight -- I mean -- I'm sorry.  Obesity causes
22   diabetes, correct?
23       A.  Obesity is associated with diabetes -- with the
24   induction of diabetes, yes.
25       Q.  And when you say "obesity," how are you defining it?

172

1        A.  By BMI, the BMI values under the literature -- I
2    think if BMI is greater than 25 or BMI is greater than 30.
3    Different patients -- different papers have different values
4    for that.
5        Q.  So, do you think -- is it your opinion that a BMI
6    over 25 qualifies as obesity?
7        A.  It can in some papers.  Others call it BMIs greater
8    than 30.
9        Q.  So, obesity is at least north of a BMI of 125,
10   correct?
11       A.  Of 25.
12       Q.  25, right.
13       A.  BMI being basal metabolic index, which is a
14   consideration of weight, height, body structure.
15       Q.  Okay.  All right.  Let's talk about plain old weight
16   gain.  In someone who's not obese, how you've defined it, does
17   weight gain less than that level cause diabetes?
18       A.  Haven't -- I haven't looked to be able to answer that
19   question for you.  I'd have to go back to the studies and see
20   if I could support that or not.  I don't know.
21       Q.  Let me ask this question:  Let's say someone weighed
22   180 pounds and gained 2 pounds for four months.  Would that
23   increase their risk of diabetes?
24       A.  Can't answer that.
25       Q.  Is there a minimum amount of weight gain that's

173

1    associated with an increased risk of diabetes?
2        A.  I'd have to do an analysis to see if that could be
3    gleaned from the literature.  I can't answer that.  I would be
4    surprised if that value could be gleaned from the literature,
5    but I could try.  I just haven't looked for that.
6        Q.  As you sit here -- in preparing your report in
7    arriving at your conclusion, you don't know that today?
8        A.  I did not focus on trying to determine a threshold at
9    which weight gain becomes important, that's correct.
10       Q.  How long does someone need to hold a certain level of
11   weight gain before -- for it to affect their risk of diabetes?
12       A.  I don't think I can answer that without seeing what
13   the -- the data that analyzes that.  Again, don't forget, can
14   also occur without weight gain.  So, the literature shows you
15   can get Seroquel-induced diabetes both with and without weight
16   gain.
17       Q.  Right.  I'm talking generally on the weight gain
18   literature right now, without respect to diabetes, without
19   respect to second-generation antipsychotics.  We'll come back
20   to that in a second, but have you looked at any studies that
21   attempted to quantify the relationship between a certain level
22   of weight gain and a corresponding increased risk of diabetes?
23       A.  No.  I haven't looked in the literature in that way,
24   no.
25       Q.  Are you familiar with the term "short-term weight

174

1  gain"?
2      A.  I know what it would mean to me.  I mean, I -- if you
3  have another definition for it --
4      Q.  Why don't you tell me your definition of "short-term
5  weight gain."
6      A.  To me, short-term weight gain is weight that's gained
7  for some period that's well defined as short and then it's lost
8  again.  So, it's not a condition that hangs on with you for
9  months and months.  A short-term weight gain could be something
10  that's gained due to -- you know, over a month or over several
11  weeks and then lost again.  Could be due to some environmental
12  cause or some change in an activity.  Somebody breaks their
13  leg, has to be inactive for a month, gains some weight, gets
14  active again, loses the weight.
15      Q.  Okay.  Let's say weight gain of four weeks.  Does any
16  level of weight gain over four weeks increase your risk of
17  diabetes?
18      A.  Can't answer that.  Haven't done that analysis.
19      Q.  What about any level of weight gain over six months?
20  Does that increase your risk of diabetes?
21      A.  I can't answer that.  I have not broken -- to maybe
22  short-circuit your questions, I have not broken an analysis
23  down by a certain period of time that is absolutely required
24  for a short-term weight gain or for any type of weight gain and
25  what that specific threshold would be.

175

1      Q.  Is it your opinion that Seroquel can cause diabetes
2  in someone who gains no weight?
3      A.  Yes.  There's evidence to support that.  And not just
4  Seroquel.  There's some of the other antipsychotics that the
5  literature indicates also have that issue.
6      Q.  And is it your opinion that Seroquel can cause
7  diabetes in someone who doesn't gain or lose weight, the weight
8  remains the same?
9      A.  Well, that's what I meant by no weight gain.
10          MR. LASKER:  That's what you just asked.
11      A.  I thought that was the same question.
12          MR. ALLEN:  And I object to form.  I agree with
13  your co-counsel, which I --
14          MR. BROWN:  Thank you, Mr. Lasker.
15          MR. ALLEN:  -- which I agreed at the time, but
16  I -- see, sometimes I let you ask it twice.
17      Q.  (BY MR. BROWN)  Is it your opinion that AstraZeneca
18  should have known about the diabetic risk of Seroquel before it
19  was approved for marketing in 1997?
20      A.  The potential diabetic risk, yes, due to the chemical
21  similarity with olanzapine and clozapine.  The data -- the data
22  that I have gathered or the -- or the analysis that I have done
23  indicates that by 1999, for sure -- and I think I stated this
24  in my Canadian report, that by 1999 there was enough
25  information out there to allow you to see the association

176

1  between Seroquel and diabetes.
2      Q.  And is it your testimony that the association
3  occurred in 1999 or 1997?
4      A.  You had enough information by 1999, and that's the
5  date that I have gone on record for.  In order to look at 1997,
6  I would have to go back and redo my analysis, but --
7      Q.  Well, I think you've given an opinion on this
8  already.  Turn to Paragraph 45.
9      A.  That's what I thought I said, '99.
10      Q.  No, I don't think so.  Might be reading it wrong.
11  This is in your conclusion section on Paragraph 45.  Says -- it
12  says there that your opinion --
13      A.  Oh, okay.  Oh, I see what you're saying.  No, no.
14  Okay.  Absolutely.  Absolutely.
15      Q.  Okay.  Let me ask the question.
16      A.  Go ahead.
17      Q.  So, it's your opinion in Paragraph 45 that Seroquel
18  can cause hyperglycemia and diabetes, correct?
19      A.  Yes.
20      Q.  Then you go on to say the adverse health effects,
21  including adverse metabolic effects, associated with the
22  consumption and use of Seroquel are predictable based on the
23  known pharmacological profile of the drug and would have been
24  predicted prior to approval of Seroquel based on the structural
25  similarities to, I guess, other antipsychotic drugs, correct?

177

1      A.  Yes.
2      Q.  Are you talking about second-generation antipsychotic
3  drugs there?
4      A.  I'm talking about second-generation antipsychotic
5  drugs and also -- and specifically there, the issue would be
6  with clozapine, what we knew about clozapine at that point in
7  time.
8      Q.  Okay.  What I want to know is -- find out the basis
9  of what was available in 1997 on clozapine to support this
10  statement.  What are you relying on?
11      A.  I can't give you a particular document.  I'd have to
12  go back and look at my documents and try to pull them out by
13  date for you.  Certainly, there was information in the
14  literature about antipsychotics, and I believe clozapine
15  specifically, before that time.
16          And then there was also -- there also, by the
17  way, are some documents that I've provided to you here which
18  are -- from the internal company documents that talk about --
19  trying to remember the -- whether they -- if you want me to
20  pull it out and see if I can find it for you, some things that
21  were dated in 1997 from the internal files, as well, talking
22  about statements about metabolic -- the association of
23  metabolic effects with Seroquel and similar antipsychotics.
24      Q.  Yeah.  Why don't you identify that document for me.
25      A.  Okay.

45 (Pages 174 to 177)

**Q. I'd like to see that document and then we'll mark it and we'll either discuss it at the end of the day today or we'll discuss it when we come back.**
A. But if you -- as far as the literature goes, I'd have to go back and look at my literature in order to pull it out by date like that for you.
**Q. Well, based on your statement --**
MR. ALLEN: Hold on. Hold on. What are we doing, one of two things right now?
A. Okay. You want me to look first -- yeah. I'm sorry.
**Q. (BY MR. BROWN) Go ahead. Go ahead.**
A. I just wanted to preface that by --
MR. ALLEN: I don't care. We can quit looking and you can ask more questions. We're not going to do both at the same time.
A. Okay. There's a document in the 1997 documents, an e-mail series.
**Q. (BY MR. BROWN) Okay.**
A. Talks about weight gain from Seroquel.
MR. BROWN: Dr. Plunkett has handed me a Lisa Arvanitis e-mail dated August 13th, 1997, AZSER 10612514.
MR. ALLEN: I think it was -- just for the record, because I don't -- there's so many numbers on stuff, it looks like it was also marked at one time as Ruhl Exhibit No. 20, Ruhl being R-u-h-l.

A. Yeah.
**Q. (BY MR. BROWN) Dr. Plunkett, is that one of the documents you're relying on in your -- to support your opinion that --**
MR. ALLEN: Hold on a second.
A. Yeah. That's one of them.
THE WITNESS: I'm sorry. Go ahead.
MR. BROWN: She's looking over -- go ahead.
MR. ALLEN: What we're doing -- and I don't care. We can stop looking at documents or we can look. I just don't want two things going on at once. And I'm not being critical of you, but we just can do one thing at a time.
A. I was looking for the original labeling for Seroquel, too, and I thought I had it here.
**Q. (BY MR. BROWN) You don't.**
A. I don't have a copy of it.
**Q. You have a 1999 version.**
A. Yeah. It looks like I have a 2000 version here.
**Q. We're going to talk about that label.**
A. Yeah. I believe the original labeling had some discussion about antipsychotics and metabolic effects, but I may be wrong, so I need to look at that. But this one I would also identify, yes.
**Q. All right. So, you've identified one document that you think supports the fact that AstraZeneca should have known**

**about the possible metabolic effects of Seroquel based on its structural similarity to another SGA you've identified as clozapine, correct?**
MR. ALLEN: One internal document.
A. One internal document, right, and -- but, yeah, the issue is "predicted." I'm not saying that I had -- the issue for me was that they should -- this effect would have been predictable based on the pharmacology of the drug, the class it fell into, the effects it has, the -- being a second-generation atypical versus first-generation. And then the other issue would be some documents like this, and then also I -- like I said, for some reason, the original label that I -- I don't have it here to look at, so I have to pull it out.
**Q. (BY MR. BROWN) We're going to talk about the original label. The 1999 version is the same as the original label.**
A. Okay.
**Q. And we're going to talk about that and we'll talk about what your thoughts are on that label -- we'll get to that later on in the afternoon -- but is it your opinion that the original label was inadequate in describing metabolic effects for Seroquel?**
A. Certainly, none of the label -- the labeling up until the very last label change that was made, none of those describe the position that we're in today, which is what I

believe the evidence shows today. But now you're asking me to go back in time. I don't think I've done the analysis in the original label based only on what was in the literature to make that statement. My failure to warn opinions have been based upon more the progression since 1999. So, looking at the literature at 1999 and the events and the things that I had at that point in time. So, to go back beyond that, I'd have to do that again --
MR. ALLEN: And I'll state --
A. -- to answer that question.
MR. ALLEN: -- for the record, that that's -- the report does not address any failure to warn claim prior to '99, so --
MR. BROWN: Okay. Okay.
**Q. (BY MR. BROWN) So, just so we're clear, nothing in this Paragraph 45 should be read to mean that the original label, 1997, was inadequate with respect to metabolic risks, correct?**
A. Well, certainly, I was addressing -- I've been addressing with the failure to warn the 1999 and beyond, yes.
**Q. Okay. So, the answer's yes?**
A. Yes, but I would say to you I do believe that based upon -- in '97, based upon what we know about the class of drugs, I believe -- and the chemical similarity, I believe that you might be able to make some predictions about that. That's

182

1  why I was pointing to this issue on weight gain and then, like
2  I said, the literature; but I'd need to go back to the
3  literature and look at what documents I have and point you to
4  those.
5      Q.  Well, you have no criticism of the Seroquel label
6  before 1999, correct?
7      A.  I have not developed an opinion on that, that is
8  correct.
9      Q.  And we'll come back to the other labeling.
10         Now, labeling issues aside, you talk about the
11 predictability of the metabolic effects based on the structural
12 similarity of Seroquel with the other second-generation
13 compounds, correct?
14     A.  Some of them, yes.
15     Q.  Okay.
16     A.  It's more similar to some compounds than others.
17     Q.  But you would agree with me that there are
18 differences between the second-generation antipsychotics with
19 respect to their ability to induce weight gain, correct?
20     A.  Yes, there appears to be differences among that.
21     Q.  And the same is true for diabetes.  In other words,
22 drugs in this class, to varying degrees, I guess, in your
23 opinion, induce diabetes, correct?
24     A.  Well, in fact, I've stated that.  I don't believe it
25 is necessarily a class effect.  I think that there are ones you

183

1  can pick out -- I think I've stated that very clear in my
2  report -- that have this risk as an important risk and others
3  in the class that may not.
4      Q.  Turn to Page 7 and Paragraph 22.
5      A.  Page -- Paragraph 7 or --
6      Q.  Nope.
7      A.  I'm sorry.
8      Q.  Paragraph 22.
9      A.  Oh, I'm sorry.
10     Q.  And it runs over to Page 7, goes for two pages.
11     A.  Oh, okay.  Yes.
12     Q.  Okay.  Now, the fact that there are structural
13 similarities between drugs don't mean they operate the same,
14 correct?
15     A.  Not necessarily; however, it's one of the first
16 principles of pharmacology.  The structural similarity can be
17 predictive, and so you can start there.
18     Q.  Okay.  And in this case, you've looked at how similar
19 these molecules are to one another; is that right?
20     A.  I did do that.  One of the first things I looked at,
21 right, when I started my assessment -- and I even have an
22 overhead in my New Jersey presentation on that point.
23     Q.  By the way -- are you talking about that little
24 diagram that shows how the receptors work?
25     A.  No.  There's three structures.  I think I show the

184

1  structure of three different drugs.  I thought I did.  If I
2  didn't, I thought I did, so -- and it's also in my
3  Goodman & Gilman text as well.
4      Q.  We're going to talk about that in a second, but
5  looking down to the middle of that paragraph, top of Page 7 --
6  and we have -- still on Paragraph 22, you said, "Because the
7  difference is apparent among different antipsychotic agents in
8  terms of risks of diabetes and weight gain, the effects of
9  Seroquel cannot be considered simply a class effect for
10 atypical antipsychotic drugs," correct?
11     A.  Yes.
12     Q.  And you agree with that?
13     A.  Yes.
14     Q.  And then you go on to say that different
15 antipsychotic drugs, including second-generation atypical
16 antipsychotics, have different toxicological profiles.
17     A.  Yes.
18     Q.  And you believe that Seroquel's toxicological profile
19 is different than Zyprexa and clozapine?
20     A.  I think it's closer to those than it is to some of
21 the others; but, yeah, there are -- all of the -- I think all
22 the compounds will have some differences, be it qualitative or
23 quantitative; and so the tox profile can be qualitatively the
24 same but the risk can be much larger for one versus the other,
25 like a rare versus a more frequent event.

185

1      Q.  Right.
2      A.  My sentence here takes both of those -- you have to
3  look at both those issues, qualitative and quantitative.
4      Q.  Right.  Just so I understand, you talk about
5  structural similarities, but you're not saying they're
6  structurally identical, correct?
7      A.  No, they're not.
8      Q.  And there are differences between the compounds as a
9  class, right?
10     A.  Yes.  And that's why each of them have their own
11 unique development program because, obviously, it is a unique
12 chemical entity.
13     Q.  And you agree here that because of those differences,
14 they induce weight gain and diabetes at different levels,
15 correct?
16     A.  I'm not saying it's necessarily only due to those
17 chemical differences, but I think you would certainly look at
18 the chemical differences to expect that there might be some
19 differences among the propensity because those chemical
20 differences can, for example, affect receptor occupancy and
21 receptor stimulation ability, potency, and all of those things
22 could correspond to a change in the tox profile.
23     Q.  I want to talk about the receptors.  You relied on
24 Goodman & Gilman?
25     A.  That's one of the sources, yes.

186

1    Q.  And what do you rely on Goodman & Gilman for
2    generally?
3    A.  It would be the chapter I have marked here.
4    Q.  And what chapter is that?
5    A.  Should be cited.
6    Q.  18?
7    A.  Yeah, Chapter 18.
8        MR. BROWN:  Mark it.
9    A.  And my use of this chapter and the reliance on it was
10    just the basic principles behind the uses of antipsychotic
11    drugs, the different -- sort of the history behind how the
12    different drugs have been developed.  Also, the chemical
13    structures of the drugs are in here as well, and then there's
14    also some descriptive text or a table possibly even -- well,
15    there's a nice little -- I've used this before in presentations
16    to describe mechanism, potential mechanism.
17    Q.  (BY MR. BROWN)  What are you referring to there?
18    A.  I'm sorry.  Figure 18.1, which is sort of a neuron
19    showing the proposed mechanism of how certain antipsychotics
20    and neuroleptic agents may act.  Even though we don't know the
21    exact mechanism, they believe this is how things are happening
22    pharmacologically.
23    Q.  Let's talk about 18.2.
24    A.  Okay.  And then 18.2.  18.2, the table which shows
25    receptor occupancy or receptor binding potency of different

187

1    receptors with the different drugs.
2    Q.  Okay.  Why don't we let the court reporter mark it.
3        (Plunkett Exhibit No. 4 marked.)
4        (Discussion off the record from 2:38 p.m. to
5        2:39 p.m.)
6    Q.  (BY MR. BROWN)  Dr. Plunkett, I want to direct your
7    attention to Table 18.2 in Goodman & Gilman's Chapter 18, okay?
8    A.  Yes.
9    Q.  And here we see a listing at the top of -- one, two,
10    three, four, five, six, seven, eight, nine -- nine receptors or
11    receptor ratios, correct?
12    A.  Well, eight receptors and one ratio.
13    Q.  And on the left-hand column, we have a list of drugs,
14    right?
15    A.  Yes.
16    Q.  And among those drugs are drugs like risperidone,
17    correct?
18    A.  It should be on here.  I'm looking for it.  Yes, it's
19    there.
20    Q.  And you see olanzapine and quetiapine and clozapine,
21    correct?
22    A.  Yes.
23    Q.  And the values given in the chart are expressed in
24    Ki.  What does that mean?
25    A.  It's an inhibition constant.  So, essentially what

188

1    you're looking at here is a measure of the ability of the drug
2    to inhibit the receptor.  So, a smaller number means a more
3    potent drug; a larger number means a less potent.  When I say
4    "potent," I mean the ability to inhibit.
5    Q.  When I looked at this chart, it appeared to me -- and
6    I want to ask if you agree -- that the receptor binding of any
7    of these drugs are wildly different.  Would you agree with
8    that?
9        MR. ALLEN:  Objection.  Form.
10    A.  I wouldn't say "wildly" -- "wildly," w-i-l-d?  I
11    wouldn't say "wildly different."  I'd say they're different as
12    expected based as a pharmacologist.  There certainly are
13    several orders of magnitude difference between any one
14    individual receptor you look at.
15    Q.  (BY MR. BROWN)  Let's look at some.  Let's look at --
16    is the first column there D2?
17    A.  Yes, dopamine.
18    Q.  What's that D2 receptor do?
19    A.  Well, it does a lot of things, but it's one of the
20    receptors that -- it appears to be linked to the mechanism of
21    actions and affects the mood that you get with antipsychotics.
22    So --
23    Q.  Does it --
24    A.  So, if you affect this receptor, you're affecting the
25    release -- or the ability of dopamine to circulate within the

189

1    brain or the activity and the level of dopamine within the
2    brain.
3    Q.  And it looks like -- if you look down about ten
4    spaces from the bottom, look at olanzapine, olanzapine has a Ki
5    constant of 11.  Do you see that?
6    A.  Yes.
7    Q.  That's, in orders of magnitude, a much higher binding
8    affinity than quetiapine, correct?
9    A.  Yes.  Olanzapine -- and, in fact, I think I state
10    this in my report that olanzapine and risperidone are more
11    potent at D2 -- and, I believe, also serotonin receptors --
12    than quetiapine.
13    Q.  Let's look at 5-HT2.  Olanzapine has a Ki constant
14    value of 4?
15    A.  Yes.
16    Q.  And that's a very high binding affinity, correct?
17    A.  It's a -- it's a fairly potent drug, if that's what
18    you're asking.  Is that what you're asking me?
19    Q.  Yeah.
20    A.  Yes.
21    Q.  And quetiapine is not nearly as impotent -- nearly as
22    potent at 5-HT2 as olanzapine, correct?
23    A.  Right.  All it tells me is I have is to give more
24    quetiapine to get the same level of effect as I give the
25    olanzapine.  It's a dose issue.

190

1    Q.  Do D2 and 5-HT2c -- do those factor into the metabolic
2    effects of these drugs, or do you know?
3    A.  Well, the serotonin system is thought to be involved
4    in some of the appetite issues.  As far as the other issues, I
5    don't think anybody -- I don't think anybody has an idea
6    whether or not there is any specific link or not.
7    Q.  And if you look across through olanzapine across the
8    row and quetiapine across the row for D1/D4 receptors, the
9    muscarinic receptors, those numbers are all very different,
10   right?
11   A.  Every drug in here should have unique values, that is
12   correct.
13   Q.  Now, some are closer than others on this chart,
14   correct?
15   A.  Yes.
16   Q.  Like, for example, clozapine and olanzapine have
17   values that seem very close, looking at Table 18.2, correct?
18   MR. ALLEN:  Objection. Form. Again, I'm going
19   to ask you to rephrase it or be more specific.
20   Q.  (BY MR. BROWN)  Well, I want you to look across the
21   row for olanzapine, quetiapine, and clozapine and look at their
22   binding affinities at the eight receptors identified in the
23   chart, okay?
24   A.  Yes.
25   MR. ALLEN:  All he's asking you to do is look.

191

1    Now see what his question is.
2    Q.  (BY MR. BROWN)  Have you done that?
3    A.  I'm looking, but I need your question before I know
4    how difficult -- how hard I need to look, so go ahead.
5    Q.  Based on your expertise as a pharmacologist and a
6    toxicologist, would you agree with me that the binding
7    affinities for clozapine and olanzapine are a lot closer
8    together than Seroquel is with either one?
9    A.  Not necessarily, and the reason being --
10   Q.  How is that?
11   A.  -- the reason being clozapine and quetiapine have a
12   very similar D2 receptor number, but olanzapine is much more
13   potent.  When you look at the serotonin number, the quetiapine
14   is different.  The clozapine now is more similar to olanzapine
15   than quetiapine.  So, depending on the receptor you're looking
16   at -- then when you put the ratio together, you even get a
17   different pattern depending upon how that is.  There, the
18   clozapine is an order of magnitude greater than olanzapine.
19   So, it's different than both of them.
20   So, on those things alone, again, you have to
21   look at -- when you look at structural similarity and you look
22   at receptor occupancy, I would expect to see differences among
23   those things. But certainly what's important is then what you
24   see as far as the response in the animal and also the dose you
25   give because you can adjust some of this by -- in other words,

192

1    if you have a drug that's more potent in a receptor, you can
2    give more of it than you give of the other drug and get a
3    similar response pharmacologically.
4    Q.  Are you able to tell -- strike that.
5    What do the differences in the receptor binding
6    profiles of olanzapine, risperidone, quetiapine, and clozapine
7    tell you from -- if anything, from this data in Table 18.2 in
8    Goodman & Gilman?
9    A.  Well, I think I have one statement I put in my
10   report, and I think I stated that I thought that olanzapine and
11   clozapine were more potent in efficacy than quetiapine.  And I
12   think I would predict that based upon the difference -- the
13   different 5-H2/D2 (sic) ratios you get.  In other words, the
14   highest number was quetiapine and then clozapine was two orders
15   of magnitude lower and olanzapine was an order of magnitude
16   lower, more than an order of magnitude, but essentially there's
17   that differential there.
18   And then we could look at some others.  Let's
19   look across.  If I remember correctly --
20   Q.  What are the first two you mentioned?  What were the
21   first two receptors you mentioned, D2 --
22   A.  Looking at the ratio of the 5-HT2A, I think -- I can't
23   read it because it's dark, but that's a --
24   MR. ALLEN:  That's --
25   A.  The third column.  Look at the third column.

193

1    Q.  (BY MR. BROWN)  You can open the book.  It's in front
2    of you.
3    A.  That's okay.  I think I even have a statement in my
4    report about this, about the efficacy issue, that clozapine and
5    olanzapine are more potent than -- I thought it was quetiapine.
6    Might have been risperidone.  Let me --
7    Q.  Why don't you look in your report, see if you can
8    find that for me.
9    A.  Okay.  Well, I was comparing olanzapine, risperidone,
10   and Seroquel.
11   Q.  What paragraph are you at?
12   A.  Paragraph 21.  But, again, that's one way you could
13   use these numbers is to look at what you would predict.  But,
14   again, what you predict and what you get depends upon the dose
15   of the drug that you give as well because you can overcome --
16   you might have a less potent receptor inhibitor, but if you
17   give a much higher dose of it than you do of the other drug,
18   you could also equilibrate that difference.  In other words,
19   the difference may not appear to be there when you look at the
20   response in the animal.
21   Receptor occupancy and receptor inhibition in a
22   cell and the response that you get in animals can be different
23   depending upon the number of receptors that have to be
24   stimulated or inhibited in order to change a homeostatic
25   response or a response in animal.

49 (Pages 190 to 193)

194

1    Q.  In discussing the difference between Seroquel,
2  clozapine, and olanzapine, you pointed to the ratio which is
3  Column 3 --
4    A.  Yes.
5    Q.  -- right?
6    A.  Yes.
7    Q.  Why did you use that column as a discussion point?
8    A.  Well, if you look at the description in the text of
9  Goodman & Gilman, they talk about that ratio as having --
10  something that has to do with the way the drugs act in efficacy
11  and the -- it's the balance of the two systems that may be
12  important.  And so, again, this is the idea.  We don't know
13  exactly how you get your efficacy with the drug, but these
14  things seem to be related.
15        So, you look at not only the -- so, when you're
16  screening for a new drug, a new antipsychotic, you want to have
17  activity at the dopamine receptor, activity at the serotonin
18  receptor, but the ratio may be just as important.  For example,
19  as -- look at the last drug in the column, remoxipride.  You
20  have 275 to greater than 10,000, but you still have a ratio
21  that's low.
22        So, again, it's -- it's -- you don't want to
23  take this kind of data and try to translate it into predicted
24  clinical efficacy, but you can use this to help screen drugs
25  for the potential to have activity if you test them in an

195

1  animal, for example.
2        MR. ALLEN:  Let me help the court reporter out.
3  Remoxipride --
4        THE WITNESS:  I'm sorry.
5        MR. ALLEN:  That's okay.  I just know she's
6  going to want to know later and let's save her some time.
7  R-e-m-o-x-i-p-r-i-d-e.
8    Q.  (BY MR. BROWN)  Would you agree with me then that
9  it's difficult to extrapolate from these receptor binding
10  numbers what actually happens in humans?
11    A.  It can be difficult, and that's not what you would
12  try to do with this information.  To me, this information is
13  important to -- in two ways.  It's important as a drug
14  development person in screening drugs and deciding which ones
15  I'm going to test further, okay?  Because if you get no
16  activities in a pattern that you want to see from a class of
17  drugs -- let's say in this case if we had such that the ratio
18  was way off of where -- of drugs that were expected to have
19  activity or, you know, had no dopaminergic activity, then this
20  is not something I might screen further.
21        But then the other use of this is you can go
22  back -- and this is how I have used this data in this case, but
23  also other cases.  You can go back and try to put together sort
24  of biologic patterns for what you see and whether or not that
25  makes sense based upon what you see here in potency.  That's

196

1  the only way that I've used it is just looking at what we know
2  about potency of a drug.
3        And, again, it's not just potent -- it's an
4  overall potency of the drug as it's -- not at just one
5  particular receptor type; but when I'm talking about potency,
6  it's the efficacy of the drug, the amount of the drug you have
7  to give in order to get a therapeutic benefit of the patient.
8    Q.  You pointed to the third column, the 5-HT2A/D2 ratio.
9  You see that?
10    A.  Yes.
11    Q.  And you -- olanzapine has a value of .036, right?
12    A.  Right.
13    Q.  Clozapine is .01.  See that?
14    A.  Uh-huh.
15    Q.  That means -- the lower the number, the higher the
16  potency, correct?
17    A.  Yes.  The less of the drug you have to give to
18  inhibit.
19    Q.  And quetiapine's 1.84; is that right?
20    A.  In the ratio, yes.  Well, actually -- and the ratio
21  is not -- okay.  That's okay.  The ratio is not necessarily how
22  much of the drug.  That's a ratio of the differences between
23  the inhibitory potency of the two different receptors we're
24  comparing.  That's a little bit different.  And then you can
25  see that example from the last one I just gave you, the

197

1  remoxipride.  But, essentially, it is an idea -- it has a
2  concept with potency, yes.
3    Q.  Okay.  Well, you used this earlier in your testimony.
4  You pointed to this column and you talked about efficacy.  Is
5  this ratio, in your expert opinion, a ratio that can be used to
6  measure efficacy?
7    A.  Not to measure efficacy, but to be predictive of what
8  you might expect to see.
9    Q.  So, based on --
10    A.  Measure -- you would only ever measure efficacy with
11  a real endpoint in a patient.  So, you would want to look at
12  some symptomology change in schizophrenia or, you know,
13  something like that.  I mean, you would never use this as --
14  and I hope drug development never gets to the point where cells
15  are telling us what to people in people.
16    Q.  So, based on this column, it would look like
17  clozapine is the most potent medication followed by olanzapine
18  and then quetiapine, correct?
19    A.  Yes, that's what I would say.  And then risperidone,
20  if you look at -- see the number there?  If you look at that
21  and compare with my statement, I think that makes some
22  sense with why I made the statement I did in Paragraph 21.
23    Q.  Okay.  Let's turn to Paragraph 38.
24    A.  In my report?
25    Q.  Yes, please.  It's your opinion that observational

198

1    data has shown that atypical antipsychotics that are
2    structurally similar to Seroquel -- for example, clozapine and
3    olanzapine -- can exert direct effects on glucose insulin
4    homeostasis by induction of hyperinsulinemia?
5        A.  Yes, based upon the results of those papers.
6        Q.  Okay.  And you also in the next two sentences below
7    refer to in vitro data that was done in -- with olanzapine --
8        A.  Yes.
9        Q.  -- on pancreatic islet cells?
10        A.  Yes.
11        Q.  Okay.  Now, this is the paragraph that discusses some
12    of the possible mechanisms by which you think Seroquel can have
13    an effect on glucose, correct?
14        A.  Yes.
15        Q.  And --
16        A.  Well, let me just state I think there's another
17    paragraph, too; but, yeah, this is one of them.
18        Q.  Okay.  And on the direct effect on glucose insulin,
19    you cite to the Melkersson paper; is that right?
20        A.  Which sentence are you pointing me to?
21        Q.  Sure.  The one you just read a minute ago.
22        A.  Oh, the direct effects -- yes, that -- I'm pointing
23    to two papers, yeah, both Melkersson papers; one in 2003 and
24    one in 2000.
25        Q.  Did either one of those Melkersson papers deal with

199

1    Seroquel?
2        A.  I'd have to pull them out to look.  I don't believe
3    they do based upon the way I've worded the sentence because,
4    again, I'm referring you to data on structurally similar --
5    pharmacologically similar compounds.  So, I think that's true
6    that they do not.
7        Q.  Look at the next sentence where it says "The
8    increased levels of insulin lead to decreased insulin
9    sensitivity in tissues and could lead to an insulin-resistant
10    state."  Do you see that?
11        A.  Yeah.
12        Q.  And there you cite to a third Melkersson paper?
13        A.  Yes.
14        Q.  What's the significance of that finding?
15        A.  Well, all of these papers by Melkersson are dealing
16    with trying to understand whether or not these drugs have some
17    activity that they can observe either in cell or animal model
18    that would link -- that would tie into the effects that are
19    being seen in humans.
20        So, again, it's just one piece of the puzzle.
21    It's not this specific paper is the paper that proves
22    mechanism.  It's just that it's additional information on the
23    changes in glucose homeostasis or metabolic regulatory pathways
24    related to glucose that are affected by -- and I think this
25    paper also is dealing with olanzapine or clozapine.

200

1        Q.  Okay.  Let's look at it.
2        (Plunkett Exhibit No. 5 marked.)
3        Q.  (BY MR. BROWN)  Dr. Plunkett, I've handed you
4    Exhibit No. 5.  This is an article entitled "Clozapine and
5    olanzapine, but not conventional antipsychotics, increase
6    insulin release in vitro," correct?
7        A.  Okay.  Well, this is not the Melkersson paper from
8    the sentence before, but that's okay.  I mean, this is one I
9    sent that comes with the next sentence.
10        Q.  Right.  We just read the next sentence.  So, I want
11    to refer to the part of this paragraph --
12        A.  I didn't think we'd read that sentence.  That's why
13    I'm confused.  I'm sorry.
14        Q.  Okay.  You did.
15        A.  I thought we had read into the record the sentence
16    before about Melkersson and Dahl, 2004.  So, I apologize.
17    That's fine.  I can see my next sentence.
18        Q.  Right.  So, you cite to the Melkersson '04 paper,
19    which is Exhibit No. 5, for the proposition that the increased
20    levels of insulin lead to decreased insulin sensitivity in
21    tissues and could lead to an insulin-resistant state, correct?
22        MR. LASKER:  It's the next sentence.
23        A.  No.  This paper has to do with in vitro data have
24    shown --
25        Q.  (BY MR. BROWN)  I'm reading the wrong sentence,

201

1    Dr. Plunkett.  That's my mistake.
2        A.  This paper is support for the statement in my report
3    of in vitro data have shown that olanzapine stimulates insulin
4    release from pancreatic islet cells.
5        Q.  Right.  What's the significance of this paper,
6    Exhibit No. 5?
7        A.  Again -- it's, again, one -- in this paragraph, I am
8    trying to describe the literature that I was able to identify
9    of chemicals that are -- well, I didn't have a paper on
10    Seroquel, but chemicals that are -- allow me to make some
11    prediction about what I might get with Seroquel and the
12    relationship between these types of antipsychotics and effects
13    on glucose homeostasis in some ways.  So, that's looking at do
14    they effect insulin release?  Do they effect insulin
15    sensitivity?  Do they effect glucose levels themselves?  What
16    happens?
17        So, again, I'm just giving you the -- a
18    description of the types of data that are there and what they
19    say.  None of them -- none of these papers portends and none of
20    these could be used to say I know the exact molecular
21    mechanism -- which is what the next sentence says -- that is
22    occurring in any patient with Seroquel or even any patient with
23    olanzapine, for that matter.
24        Q.  All right.  So, the papers that you refer to, the
25    Melkersson papers, we'll call them -- there's a group of

202

1    them -- they should not be used for the purpose of trying to
2    determine what will happen in people?  Is that what you're
3    saying?
4        A.  No.  I'm saying that they shouldn't be used to state
5    that this is exactly what you expect to happen in a person, but
6    they can be used.  And the way I'm using them is sort of this
7    understanding of what I call biologic plausibility.  It's the
8    idea that there's some data that indicates that these drugs
9    have effects that would be important to a mechanism that could
10   underlie hyperglycemia, diabetes of Type 2.  I mean, those
11   kinds of things.  So, again, it's do we have any
12   observational -- any data that's at all mechanistic to be able
13   to support this proposition?
14       Q.  Exhibit No. 5, the Melkersson 2004 paper, this is an
15   in vitro study, correct?
16       A.  Yes.
17       Q.  And it says "This study was undertaken to examine the
18   influence of conventional and atypical antipsychotics on
19   insulin release in vitro," correct?
20       A.  Yes.
21       Q.  And the drugs studied were clozapine and olanzapine,
22   correct?
23       A.  Well, they also studied two others.  They studied
24   haloperidol, I think, and -- I can't pronounce the next one --
25   two other, what they call, conventional antipsychotics.

203

1        Q.  And they actually found that clozapine and olanzapine
2    increased basal insulin; is that correct?
3        A.  Yes.
4        Q.  And turn to Page 118 with me of the paper, of
5    Melkersson '04.  If you look down in the right-hand column --
6            MR. ALLEN:  What page are we looking at?  I'm
7    sorry.
8            MR. BROWN:  118.
9            MR. ALLEN:  Okay.  Sorry.  I just didn't hear
10   you.
11       Q.  (BY MR. BROWN)  The last paragraph says "The
12   molecular mechanisms underlying the effects of atypical and
13   conventional antipsychotics on insulin release in vitro are not
14   well understood."  You agree with that proposition?
15       A.  Yes.
16       Q.  "In conclusion," the paper goes on, "although the
17   mechanisms of action remain largely unclear, this study shows
18   that atypical and conventional antipsychotics differ in their
19   effects on insulin release in vitro," correct?
20       A.  That's what it said, yes.
21       Q.  And then it reiterates the conclusion in the abstract
22   that clozapine and olanzapine did have an effect on insulin
23   release, correct?
24       A.  Yes, and they also conclude that -- well, in the
25   abstract, they conclude that this may be supported by recent

204

1    clinical findings.  So, they're trying to tie the clinical
2    findings in with -- again, with what I was describing,
3    something that they mechanistically could study.
4        Q.  And Seroquel was not studied by Melkersson in '04,
5    was it?
6        A.  They didn't administer Seroquel to their cells, no.
7        Q.  Did you look very carefully at this issue?
8        A.  Which issue?
9        Q.  The issue of whether or not clozapine, olanzapine, or
10   other second-generation antipsychotics directly affect the
11   release of insulin.
12       A.  I -- for -- in my report and my work on olanzapine
13   itself, I looked in detail at some of -- there's some
14   additional data on olanzapine and there's even some, I think,
15   some human data where they looked at this issue for olanzapine
16   itself.  So, yes, I have looked at additional -- when you say
17   "very carefully," I don't know what you mean by that, but I
18   certainly have done -- I certainly looked at additional studies
19   relating to olanzapine.
20       Q.  Based on your review of Exhibit No. 5, do you agree
21   that clozapine and olanzapine increase basal insulin?
22       A.  I -- they -- the results are what the results are.  I
23   don't disagree with her results.  I mean, that doesn't make
24   sense.  I mean, she has a finding and she puts an importance on
25   it or a link to what she believes her data means and I take

205

1    that data as she describes it.  I will say that I looked at her
2    study and I don't see a critical flaw in the way she performed
3    her study to make me think that there was something odd about
4    what she did.  I mean, I have enough background in cell work to
5    know how to at least look at the study and determine if there's
6    something critical that's missing.
7        Q.  And this study was, by your review, a well-done
8    study?
9        A.  I don't know about "well-done."  I don't see a
10   critical flaw in it.  I don't think I try to judge well done or
11   not well done.
12       Q.  Okay.
13       A.  It's useful, it's peer reviewed, provides information
14   that lends to biologic plausibility.
15       Q.  Are you aware of any study that looked at Seroquel --
16   Seroquel's effect on pancreatic islet cells, like Melkersson
17   '04?
18       A.  If I had seen it, I would have put it in here.  So,
19   no, that -- I'm not aware of it.
20           (Plunkett Exhibit No. 6 marked.)
21       Q.  (BY MR. BROWN)  Dr. Plunkett, I've just handed you
22   Exhibit No. 6.  It's an article entitled "The atypical
23   antipsychotics quetiapine, risperidone, and ziprasidone do not
24   increase insulin release in vitro," done by yours truly,
25   Kristina Melkersson of Exhibit No. 5 fame.  Do you see that?

206

```
 1        A.  Yes.
 2        Q.  The objective of -- I'm going to refer to this
 3   paper -- I may refer to it as "Melkersson 2005," but the
 4   objective of this paper was to essentially replicate the study
 5   that you've just discussed with clozapine and olanzapine,
 6   correct?
 7        A.  Yes.
 8        Q.  And if you look down to the introduction section on
 9   the first page, first full paragraph, it says "In in vitro
10   studies, we have recently demonstrated that the atypical
11   antipsychotics clozapine or olanzapine have a stimulatory
12   effect on basal insulin release from isolated pancreatic islet
13   cells."  See that?
14        A.  Yes.
15        Q.  And that's that paper we just discussed, correct?
16   So, these very same authors went out and wanted to do a
17   different study looking at different second-generation
18   antipsychotics, correct?
19        A.  That's what I gathered when I read -- I have read
20   this paper, yeah.  That's what I gathered when I read the
21   paper.
22        Q.  Right.  You didn't cite to it in any of your
23   materials, did you?
24        A.  No.  It's not cited in my report because, again, it
25   doesn't have a finding that would lead to the description in my
```

207

```
 1   report.
 2        Q.  I bet that's true.  We'll talk about it.
 3            And the aim of this study was to look at the
 4   effects of, among other things, quetiapine on basal and
 5   glucose-stimulated insulin release, correct?
 6        A.  Yes.
 7        Q.  Turn to the -- Page 207.  It says here in the top of
 8   the discussion section in the left-hand side of Page 207, "The
 9   present finding that the atypical antipsychotics quetiapine,
10   risperidone, and ziprasidone had no significant effect on
11   insulin release in vitro stands in clear contrast to our
12   previous results showing increased basal insulin release in the
13   presence of both atypical agents clozapine and olanzapine,"
14        A.  Yes.  That's what is stated.
15        Q.  Why didn't you include this in the materials you
16   looked at, if you looked at them?
17        A.  Well, I mean, it is one of the papers on my computer
18   and it's one of the papers that should be on those zip files
19   for you; and if it's not, then somebody hasn't given you
20   everything I have.  I have this paper.  I've seen this paper,
21   so --
22        Q.  Because I'm going to represent to you it wasn't in
23   the box today and it's not on your reliance list that we've
24   gone over.
```

208

```
 1        A.  Well, as I've told you, that list was an old list.
 2   So, this very well could be something that I gathered after my
 3   initial report for Canada in 2007.
 4        Q.  I thought you told me just a few minutes ago before I
 5   showed you the paper that there wasn't such a study on
 6   Seroquel.
 7        A.  Well, I thought your question was:  Was there a study
 8   that showed the increase that you saw?  I'm not aware of a
 9   study that shows this result.
10        Q.  Right.
11        A.  That was -- I really -- that's what I thought your
12   question was -- and if it wasn't, I apologize --
13        Q.  Okay.
14        A.  -- because I certainly am aware of this study and it
15   doesn't show the same result.  That's how I was answering your
16   question.  I'm not aware of a study that shows that Seroquel
17   has the same effects as clozapine and olanzapine had in this
18   model.
19        Q.  This is the Seroquel report, right?
20        A.  Yes.
21        Q.  And for the Seroquel report, you cited to the
22   clozapine and olanzapine Melkersson paper but somehow didn't
23   discuss the Melkersson paper on Seroquel?  Is that your
24   testimony?
25        A.  My testimony is this was not included in my Seroquel
```

209

```
 1   report, that's correct, for a very good reason; and that is the
 2   studies that I'm using from Melkersson are not being used to
 3   prove causation, they're not being used to prove that what I
 4   expect to see in this in vitro study is going to be seen in
 5   people.  It's used to provide an understanding of what
 6   potentially could be occurring with these drugs.
 7        Q.  To the extent that this direct effect on insulin is a
 8   mechanism or the mechanism by which Seroquel causes diabetes,
 9   the Melkersson 2005 would not support your conclusion, correct?
10        A.  That study would not support the conclusion of that
11   particular result from that particular model, I would agree
12   with you, that's correct.
13        Q.  And if I was to look at your report that you prepared
14   here for today, I wouldn't be able to tell that you actually
15   looked at or considered the Melkersson paper looking at
16   Seroquel's effect on pancreatic islet cells, correct?
17        A.  I would agree that it's not cited in this paragraph,
18   yes.
19        Q.  Go back to Paragraph 22 for a minute.  Okay.  Give me
20   one second.
21            We've talked about this statement -- this goes
22   on to Page 7 now, still in Paragraph 22 -- which is the
23   statement that the effects of Seroquel cannot be considered
24   simply a class effect.  Remember that?
25        A.  Yes.
```

53 (Pages 206 to 209)

210

1    Q.  You cite to Dr. Newcomer's paper in 2005, right?
2    A.  Yes.
3    Q.  And you've written -- and you've also cited to
4  Newcomer in 2002 in the statement before that.  Do you see
5  that?
6    A.  Well, it's a different statement, but that has to do
7  with the issue of with and without changes in weight gain, body
8  weight, and the effects that you can get, hyperglycemia and
9  diabetic complications.
10    Q.  Okay.  So, you cite Dr. Newcomer a couple of times, a
11  couple of different papers, in Paragraph 22 for two different
12  propositions, correct?
13    A.  There's actually three papers, two different
14  statements.
15    Q.  Okay.
16    A.  Oh, I'm sorry.  One paper's the same.  I apologize.
17  I see three citations.
18    Q.  Okay.  So, it's Newcomer 2002 and Newcomer 2005.
19  Those are the two cites in your Paragraph 22, right?
20    A.  Yes.
21    Q.  Who's Dr. Newcomer?
22    A.  I don't know him personally.  He's a well -- he's
23  a -- a scientist who I see well-published in the area of
24  antitypical drugs -- I mean, atypical antipsychotic drugs.  I
25  assume he's a psychiatrist, but I don't know.  I don't know him

211

1  personally.
2    Q.  Did you look at and review Dr. Newcomer's 2002
3  article?
4    A.  The one on Archives in General Psychiatry that I
5  cited?
6    Q.  Yeah.
7    A.  Yes, I reviewed it.
8    Q.  Do you recall why you relied on that paper?  This is
9  Newcomer 2002.
10    A.  Well, I'd have to look at it again, but there -- I
11  believe that there was a discussion in the paper about the
12  changes in hyperglycemia and diabetic complications with and
13  without weight gain.
14    (Plunkett Exhibit No. 7 marked.)
15    Q.  (BY MR. BROWN)  I'm going to hand you what's been
16  marked as Exhibit No. 7, which is Dr. Newcomer's 2002 article
17  appearing in the Archives of General Psychiatry entitled
18  "Abnormalities in Glucose Regulation During Antipsychotic
19  Treatment of Schizophrenia."  Do you see it?
20    A.  Yes.
21    Q.  And you're familiar with it?
22    A.  Yes.
23    Q.  You see the method section that says here that
24  Dr. Newcomer looked at 48 schizophrenic patients, correct?
25    A.  Yes.

212

1    Q.  And measured glucose values of clozapine, olanzapine,
2  or risperidone; is that right?
3    A.  I think there were more drugs in that, but --
4  involved.  That's why I was looking.
5    Q.  Well, Seroquel wasn't one of them, was it?
6    A.  No, I don't believe it was.  But they also looked --
7  I believe they also had some people that had been receiving
8  typical antipsychotics, too.
9    Q.  The test that was employed here was the oral glucose
10  tolerance test, OGTT.  Are you familiar with that?
11    A.  Yes.
12    Q.  Is that a good measure when looking at Seroquel, or
13  sensitive measure?
14    A.  It's not the most sensitive measure you can use, but
15  it is a measure that is used.
16    Q.  So, is this -- is this a well-done study, in your
17  opinion?
18    A.  I think it's an appropriately done study.  I don't
19  like to say "well done" or "poorly done."  I like to say -- I
20  mean, it is what it is.  It uses a method that is accepted and
21  people use to examine glucose regulation in patients.  So, it's
22  something that -- he's not the first one to do it.  It's done.
23    Q.  So, the OGTT test is an acceptable way --
24    A.  Yes.
25    Q.  -- to look at glucose?

213

1    And we can agree that this paper did not study
2  Seroquel's effect on glucose, correct?
3    A.  That -- I don't believe Seroquel was used, that's
4  correct, and I don't think I state it was in my report either.
5    Q.  Just wanted to make sure I understood.
6    You also cite to Newcomer 2005; is that right?
7    A.  Yes.
8    Q.  And you rely on Newcomer 2005 for which proposition
9  in your report?
10    A.  It's cited both times.  So, there's a discussion, I
11  know, in there about this issue of being able to have
12  antipsychotic treatments, both with and without weight gain,
13  being associated with hyperglycemia and diabetic complications.
14  And then I also cite it about the issue of a class effect
15  that -- not being a simple class effect, that there's
16  differences between drugs.
17    Q.  And in Newcomer 2005, that's a review article that
18  looked at all the second-generation antipsychotics, correct?
19    A.  It looked at all of them at the time, yes.
20    Q.  And you're familiar with that paper, correct?
21    A.  Yes, I'm familiar with it.  I haven't looked at it in
22  about a week; but, yes, I am familiar with it.
23    Q.  Would you agree with me that there -- to the extent
24  Seroquel's associated with weight gain, there's no dose
25  response?  Do you agree with that statement?

214

1     MR. ALLEN: There's no dose response?

2     MR. BROWN: Uh-huh.

3     A.  I don't know if I'd agree or disagree.  I would have

4  to look back.  It's not something I remember off the top of my

5  head.

6     Q.  (BY MR. BROWN)  Did you --

7     A.  I was going to say, he may have that in his paper.  I

8  know he looked at that issue.

9     Q.  Before I show you the paper, do you have an

10  independent opinion on whether or not the weight gain seen with

11  Seroquel is dose related?

12     A.  Not at this point in time, I don't.  I haven't

13  studied it in my report either.

14     Q.  Do you have an opinion on whether or not the glucose

15  increases observed with Seroquel are dose related?

16     A.  I don't think I have enough data to indicate whether

17  it's dose related or not.  And, actually, the same thing would

18  actually also apply to the weight gain.  I don't know that we

19  have enough data on a dose -- dose response data to be able to

20  say that there's definitely or not a relationship.  I think --

21  and I think that's probably because of the fact that weight

22  gain is a -- sort of what I call a gross endpoint.  When you

23  measure weight gain in studies, there's a lot of things you'd

24  really need to control for in order to determine if it's a

25  specific drug effect only.

215

1     And so you see changes with a drug and it's

2  consistently seen with a drug, but to be able to dissect out

3  dose effect might be very difficult because of that.

4     Q.  Well, whether or not anyone in the world can look at

5  the literature or not on dose response, you don't have an

6  opinion today.

7     A.  I haven't done that analysis and I haven't formed an

8  opinion at this point in time, that is correct.

9     (Plunkett Exhibit No. 8 marked.)

10     Q.  (BY MR. BROWN)  Okay.  Let me show you what's been

11  marked as Plunkett Exhibit No. 8.  This is the Newcomer 2005

12  reference in your report, and I know you're familiar with it.

13  And if you turn to Page 65, you'll see the section dedicated to

14  quetiapine.

15     A.  Yes.

16     Q.  Okay.  You see the first section, Section 9.1, on

17  body weight?

18     A.  Yes.

19     Q.  And Dr. Newcomer refers to the results of some

20  short-term weight gain data which he says is not dose related.

21  Do you see that?

22     A.  Well, he says a short-term treatment is associated

23  with modest weight gain which does not appear to be dose

24  related across the antipsychotic dose range, and those are all

25  important qualifiers; but, yes, I see with that.

216

1     Q.  Do you agree with that statement or do you not agree

2  or do you not have enough information?

3     A.  I don't agree -- I haven't done an analysis to agree

4  or disagree with that.  I believe the data that I have looked

5  at indicates that there is an association with weight gain, but

6  I haven't tried to determine a dose response relationship.

7     Q.  Okay.  Turn to Page -- the next page, 66, left-hand

8  column.  And here, Dr. Newcomer's talking about long-term

9  weight gain.  Do you see that?

10     A.  Well, he's talking about long-term treatment.

11     Q.  Right.

12     A.  Difference between long-term weight gain and

13  long-term treatment.  But he's talking about long-term

14  treatment here, yes.

15     Q.  Right.  But the -- if you look down, it discusses the

16  weight gain observed during the longer-term treatment.

17     A.  Yes.  That's what this paragraph is about.

18     Q.  Okay.  And do you see that he refers to a couple of

19  different ranges of weight gain from 1.38 kilograms to 3.83

20  kilograms after 9 to 12 months?  See that?

21     A.  Yes.

22     Q.  Do you know the clinical significance of weight gain

23  in that range?

24     A.  Depends on the person, how big -- how -- how heavy

25  they were to start with.  If you have a 90-pound woman and they

217

1  gain 4 kgs, that's a lot.  If you have a 250-pound person, they

2  gain 3 kgs, that may not be as much, but -- it depends upon the

3  person's body size and frame to start with.

4     Q.  I think you told me earlier you can't estimate what

5  the impact of weight gain is, whether short-term or long-term,

6  on the increased risk of diabetes, correct?

7     A.  Not on diabetes.  I can tell you that I know from the

8  obesity literature I've looked at in the past that a -- drugs

9  that have been used to treat obesity, if they get a 2- or

10  3-kilogram decrease, that's considered a positive result for

11  the clinician.  So, you know, I think it all depends.  I

12  haven't done the analysis that you're asking, but certainly I

13  think it all depends upon the comparison of the population.

14     Q.  Turn to Page 70 for me.

15     A.  70?  70?

16     Q.  Yes, 70, under Section 9.4, Dr. Newcomer's

17  discussion.  Do you see that?

18     A.  Yes.

19     Q.  Dr. Newcomer says, "The limited amount of data

20  evaluating the metabolic effects of quetiapine therapy and the

21  contradictory nature of some results preclude definitive

22  assessment of the metabolic risks associated with its use."

23     Do you agree with that statement?

24     A.  I don't, based upon the assessments that I have done.

25  But I don't necessarily agree or disagree with his statement.

218

1   His statement is what it is based upon what he felt when he
2   reviewed, and his assessment is not exactly the same as my
3   assessment.
4       Q.  So, reasonable minds can disagree on this issue?
5       A.  I don't know that it's reasonable minds disagree.
6   You have to look at what he's done, the data he's looked at,
7   compared with what I've done and the data I've looked at.  It's
8   a different analysis.
9       Q.  I don't think we need to guess.  I mean, he lists his
10  references here and he has -- Dr. Newcomer, that is -- he has
11  298 references.  Did you read those 298 references?  Did you
12  think it was important to go get them and look a them?
13      A.  Well, first of all --
14          MR. ALLEN:  Hold on.  I just object to the form
15  of that question and I object to the colloquy beforehand and I
16  ask you to rephrase it before you -- you made a bunch of
17  statements.
18          MR. BROWN:  Are you going to tell her not to
19  answer that question?
20          MR. ALLEN:  I'm not precluding you from asking
21  your question, but it's almost the exact same question.  I
22  heard a lot of statements in there.  I'm not clear on it and
23  I'd like to hear it phrased again.
24      Q.  (BY MR. BROWN)  Did you hear it?
25          MR. ALLEN:  Well, it doesn't matter.  I'm

219

1   instructing her don't answer that question.
2           MR. BROWN:  I just want to know.  If you're
3   instructing her not to answer it, then I'll --
4           MR. ALLEN:  I'm not stopping you from asking the
5   same question --
6           MR. BROWN:  Read it back then.
7           MR. ALLEN:  The whole -- the question or all the
8   stuff that went before it?
9           MR. BROWN:  The question.
10          MR. ALLEN:  Because here's where it started out:
11  There's something --
12          MR. BROWN:  I'll reask it.
13          MR. ALLEN:  That's okay.  I mean, just reask it.
14  That's all I'm asking you to do.
15      Q.  (BY MR. BROWN)  First off, did you look at any of the
16  references that Dr. Newcomer has in what I call Newcomer No.
17  5 -- Newcomer 2005 which you relied upon?
18      A.  I have looked at -- I haven't looked at all 298
19  because they don't all deal with quetiapine.  I looked at the
20  references that dealt with quetiapine, and I've also look at
21  the references in here that dealt with olanzapine and I -- and
22  most of the references that have dealt with Risperdal.  That
23  was not for this case, but New Jersey -- the New Jersey
24  Education Day, I had used this paper as sort of a starting
25  point for identifying whether or not my literature search had

220

1   picked up, for example, all the case reports, most of the
2   important clinical studies, things like that, to make sure that
3   there was not something here that I had missed and vice versa.
4       Q.  You're confident that you have looked at all the
5   references here that Dr. Newcomer cites with respect to
6   quetiapine and Zyprexa?
7       A.  That dealt with metabolic effects, yes.
8       Q.  Okay.
9       A.  Now, there may be some that don't deal with -- I
10  didn't do the lipid -- I didn't look at the lipid profiles
11  information that he discusses, but -- so, the weight gain and
12  the -- whatever he describes it as, I think hyperglycemia or
13  diabetes.
14      Q.  Turn to Page 71, right above the conclusion section.
15  See that last sentence there?  It says -- Dr. Newcomer states,
16  "Conclusions that quetiapine is associated with higher risk
17  than would be predicted from the modest weight gain profile
18  seem to rely on rather limited information suggesting that more
19  data, particularly more prospective randomized trials, are
20  needed before drawing firm conclusions about the risk of
21  metabolic adverse events associated with quetiapine."
22          Did I read that right?
23      A.  Yes.  You read the sentence correctly.
24      Q.  Do you agree with Dr. Newcomer's characterization in
25  Exhibit 8?

221

1       A.  I don't necessarily agree or disagree because I don't
2   think I've addressed this point specifically in my report, but
3   his -- he is -- he states what he believes and -- based upon
4   his review.  I --
5       Q.  Go to Page 70 -- sorry.  I cut you off.
6       A.  I was going to say, my use of his paper is as a
7   resource -- not so much do I agree with his findings or not,
8   but to look at what information he provides and, you know,
9   whether or not his conclusions are similar to mine, but not
10  that I can agree with every word that he puts into his article.
11      Q.  Okay.  Well, whether or not there's a relationship
12  between Seroquel and diabetes is the issue in the case,
13  correct?
14      A.  Yes.  Well, I mean, it's -- different way of
15  attacking it; but, yes, he's -- and -- because what he's really
16  doing is he's reviewing the published literature and presenting
17  the findings based upon -- I think he's limiting it mainly to
18  the clinical studies that he said he's looking at in the case
19  reports.  And, of course, I'm looking at more than that.  I'm
20  looking at other information that I might have, including
21  information from the company's own files, which may or may not
22  be in here.
23      Q.  Based on --
24      A.  Don't believe they are.
25      Q.  Based on Dr. Newcomer's review -- materials he

222

1 reviewed on Page 72, next page, he says "Quetiapine therapy is
2 not associated with a consistent increase in the risk of
3 developing diabetes or dyslipidemia." See that?
4    A.  Yes.
5    Q.  And do you agree with that statement?
6    A.  (Witness shakes head negatively.)
7       Well, I don't know about the dyslipidemia
8 because I didn't do that analysis, but I don't -- no, I don't
9 agree with the statement about not associated with a consistent
10 increase in the risk of developing diabetes. I believe it can
11 cause diabetes and I believe that -- certainly with the limit
12 of association, I believe there's definitely an association
13 with an increased risk of diabetes and hyperglycemia.
14    Q.  So, you think he got it wrong?
15    A.  I'm not saying he got it wrong. I would state it a
16 different way.
17    Q.  You would state it the opposite way.
18    A.  Not the opposite way. I say I think quetiapine --
19 first off, there's an issue of what does he mean by "consistent
20 increase." I say I believe that quetiapine therapy is
21 associated with an increase in the risk of developing diabetes
22 and hyperglycemia, also, an increased weight gain, and also
23 believe that quetiapine can cause diabetes and hyperglycemia
24 and weight gain. That's not really what he's doing, but that's
25 how I would state it, and I think that's consistent with how

223

1 I've stated it in my report.
2    Q.  You rely on epidemiology in this case, don't you?
3    A.  Yes.
4    Q.  Have you done a metanalysis? In other words, have
5 you taken all the epi studies and dumped it into a larger study
6 and done a metanalysis?
7    A.  No.
8    Q.  Did you review all the observational epidemiology
9 that exists out there on Seroquel?
10    A.  I should have, unless -- I mean, it's possible I
11 missed something, but I certainly looked at what he had in here
12 and I looked at -- I think I found some additional things
13 beyond what he had in here that were later than this date,
14 because I think his -- he wrote this in 2005 and I think he
15 doesn't have many papers beyond 2003 -- maybe a few 2004s --
16 and there's additional information beyond that.
17    Q.  Now, you said earlier today that you're pretty
18 careful about doing regular reviews of literature; is that
19 right?
20    A.  I try to do them, yes. I mean, I do do them, yes. I
21 don't know about careful about doing them, but I do do reviews
22 of the literature on the areas that I'm actively working in.
23    Q.  So, Seroquel is one of the areas currently?
24    A.  Yes.
25    Q.  And you would hope to have all of the relevant

224

1 literature to help form your opinions, correct?
2    A.  I would hope that I would have identified it, yes.
3       MR. ALLEN: Let's see Exhibit 9.
4    Q.  (BY MR. BROWN) You know Dr. Newcomer has done a lot
5 of work subsequent to the 2005 paper we discussed as Exhibit
6 No. 8. You know that?
7    A.  I know he has additional publications, yes.
8    Q.  And you're certainly familiar with those, aren't you?
9       MR. ALLEN: Well, we need to be -- I object to
10 form.
11    A.  I'm familiar with some of his publications, yes. I
12 don't know if it's one particular you're referring to or not.
13    Q.  (BY MR. BROWN) It will be.
14       (Plunkett Exhibit No. 9 marked.)
15    Q.  (BY MR. BROWN) Before we talk about that paper, in
16 the body of the epidemiology that exists out there on Seroquel,
17 there's a number of different study designs and approaches,
18 correct?
19    A.  Yes.
20    Q.  And the epidemiology studies attempt to compare the
21 risk of diabetes with people who take second-generation
22 antipsychotics, correct?
23    A.  Yes.
24    Q.  To different comparative groups, correct?
25    A.  Well, depends on the study, yeah. There are --

225

1 different studies have different kinds of comparators.
2    Q.  And some of the studies you rely on actually use a
3 healthy population as a comparative group; is that right?
4    A.  I believe some of them do, yes.
5    Q.  And we agree that people who are mentally ill are at
6 an increased risk of diabetes; is that right?
7    A.  They can be, yes.
8    Q.  So, the better comparative group would be comparing
9 people with mental illness to people with mental illness, as a
10 general matter, correct?
11    A.  If you could ethically do that study, yes, but the
12 thing is you really -- most the time with mental illness,
13 you're going to want to treat the patient -- you're going to
14 treat the patient with an antipsychotic and do a
15 head-to-head -- a drug you know works because it would be
16 unethical to not treat somebody who needed treatment.
17    Q.  Would it be --
18    A.  So, that's why the studies are done that way.
19    Q.  Sorry about that.
20       Would it be unethical to do a prospective trial
21 giving a -- some mentally ill patients medicine and not giving
22 some patients -- giving patients no medicine, like a placebo?
23    A.  I think it could be. It would depend upon the mental
24 illness that you're talking about. There's certain severe
25 forms of schizophrenia that I think would be not a good thing

226

1  to do. I would have a problem with the design of that study.
2  Now, whether or not you could talk some kind of review board
3  into letting you do it is possible.
4      Q.  But as a general matter, at least in your expert
5  opinion, you would not design a study that would use a
6  comparative group of mentally ill people with schizophrenia and
7  leave them untreated with placebo?
8      A.  That's exactly right. I would not do that.
9      Q.  And the -- let's take it back to the epidemiology.  A
10  lot of the epidemiology you relied on is retrospective.  It's
11  not prospective, correct?
12      A.  A lot of it is, yes.
13      Q.  So, if someone -- an investigator looking at some
14  people and then going back in time and comparing to some other
15  people who got the drug and some who didn't, correct?
16      A.  Yes.  You can design the study that way.  You
17  normally do it with -- you either do one of two ways.  You
18  either do it with case record reviews where you actually don't
19  see the patient.  You can also do it where you're
20  retrospectively actually looking at the patient populations and
21  retrospectively assessing exposure information on them.
22      Q.  You would agree with me that to the extent that
23  mentally ill folks are at an increased risk for diabetes,
24  they're the best comparative group if you want to find out what
25  a second-generation's effect is on glucose, correct?

227

1      A.  They would be an ideal -- could be an ideal group.
2  But, again, because of the way studies are done, that's why
3  these study are done comparing agent to agent, more than
4  likely.  For -- at least for the severely ill schizophrenics,
5  that's how you'd do it.  I could see with some other
6  indications where you might be able to intervene with
7  behavioral therapy.  Some other types of mental illness, like
8  anxiety or things like that, you might be able to have a
9  placebo controlled study, but --
10      Q.  Take a look at Exhibit No. 9.  This is Dr. Newcomer's
11  report entitled "Metabolic Syndrome in Mental Illness"
12  published in the American Journal of Managed Care.
13          Do you recognize this document?
14      A.  No.  I haven't seen this one.
15      Q.  Take a minute and look at it.
16          You know the American Journal of Managed Care is
17  a peer-reviewed journal?
18          MR. ALLEN: Objection. Form.
19      A.  I assume it is.  I don't know that I have -- I don't
20  know that I have actually ever seen this journal myself before.
21      Q.  (BY MR. BROWN)  I want to turn you to Page --
22          MR. ALLEN:  Hold on.  You said you want her to
23  take a look at it, or do you just want her to look at certain
24  sections?  What do you want her to do?  You said take a look at
25  it.

228

1      Q.  (BY MR. BROWN)  Well, let me turn you to Page 174.
2  If you need more time to look at it, let me know.
3          MR. ALLEN:  I'm going to tell you, she -- you
4  just handed it to her and I think her testimony is she doesn't
5  recall reviewing it.  So, if you want her to read it, we'll
6  read it.  If you just want to direct her attention to
7  something -- what do you want?
8      Q.  (BY MR. BROWN)  I want to direct your attention to
9  Page 174, S-174, the first full paragraph, left column, where
10  it refers to a meta-analysis.
11      A.  Yes.  I see the paragraph.
12      Q.  Okay.  Now, I know you told us you didn't do a
13  meta-analysis on the epidemiology.  Did you know one existed?
14      A.  I believe there's more than one, but, yes.
15      Q.  Okay.
16      A.  Yes.
17      Q.  You didn't know this one existed, however.
18      A.  Well, this one -- this is a review paper.  This is
19  not a metanalysis.  This review paper, I have not seen, but I'd
20  have to look at the citation of the metanalysis to tell you if
21  I've seen that.  If you want me to look, I can tell you,
22  possibly.
23          Okay.  The -- unfortunately, he's citing an
24  abstract.  An abstract is not a peer-reviewed publication, so I
25  wouldn't have seen 41.

229

1      Q.  Didn't you tell me earlier today that you always look
2  at the abstract first?
3      A.  That's different.  This is a paper that was only
4  presented at a meeting as an abstract.
5      Q.  Okay.
6      A.  So, never went through a journal peer-review process.
7  The abstract I'm talking about is the abstract like here that's
8  published on an online database of a paper that -- describes a
9  paper that's been peer reviewed.  So, I'm saying that he's
10  referring to an unpublished meta-analysis, unless it's -- maybe
11  he's going to publish it, but I haven't been to that meeting
12  and so I couldn't peer review it there and I have not seen that
13  at this point in time.
14      Q.  So, you don't know if it's published or not as you
15  sit here today, as a peer-reviewed paper, you don't know.
16      A.  I have not caught it in my searches, so I find it
17  difficult to believe it has been, but it's always possible.
18      Q.  Well, you didn't catch this paper, did you?
19      A.  Well, it's different.  You're talking about -- this
20  paper is talking -- a review paper on metabolic syndrome and
21  mental illness.  Doesn't have "antipsychotic drugs" in the
22  title.  When I see a paper like this one, "Insulin-Resistant
23  Metabolic Risk During Antipsychotic Treatment," that shows a
24  paper, I would definitely call for the paper.
25      Q.  So, you didn't search for any materials using

230

1    "metabolic syndrome" or "mental illness" when you did your
2    searches?
3         A.   Not by themselves.  I would key those words into
4    drugs or "antipsychotic" or "atypical antipsychotic," because
5    my interest was looking at how the drugs were related to the
6    description of that.  Now, I did do a review of my internal
7    medicine text that I use all the time that discusses this
8    issue, and there's also some papers in there that I have then
9    reviewed, but I don't do continuing searches on this general
10   topic anymore.  I may have done a search -- in fact, I know I
11   did a search early on with Zyprexa, but haven't -- I wouldn't
12   follow that on a monthly basis.
13        Q.   What's an odds ratio of one mean?
14        A.   Means that there's a -- when you compare the two,
15   when you compare -- whatever two events you're comparing, it
16   means that the likelihood that it was either larger or smaller
17   is nonexistent.  Essentially, they're the same.
18        Q.   They're the same.
19        A.   And you normally want to see an odds ratio greater
20   than one in order to say that there was an effect being seen by
21   the two treatments you're comparing.
22        Q.   If you see an odds ratio of one, that would typically
23   mean to you no increased risk between the treated group and the
24   untreated group, correct?
25        A.   Or decreased risk, because sometimes you're looking

231

1    for an odds ratio of less than one.  Like when you do a study
2    to look at whether or not eating oat bran protects against
3    cardiovascular disease, you would want to actually see the odds
4    ratio go down versus go up if the endpoint was disease.
5         Q.   And you know from looking at this paper and the cites
6    that many of the epi studies you rely on made it into the
7    meta-analysis described by Dr. Newcomer, correct?
8         A.   I have to look.  I don't know that.
9         Q.   I'll help you.  They're References 24 through 28, 32
10   through 39, and No. 30.  And I recall you saying that you
11   thought you reviewed all the epidemiology.
12        A.   Well, I haven't seen the abstract in 34 because,
13   again, it's not a paper, if you said 32 through 39.  All the
14   others look familiar.
15        Q.   Okay.
16        A.   That -- 34 does not, by Grogg, G-r-o-g-g.
17        Q.   And if you look back to Page 174 on the left-hand
18   column, Dr. Newcomer describes the meta-analysis that was done
19   looking at the effect of atypical antipsychotics?
20        A.   If you're going to ask me questions about this, can I
21   read the --
22        Q.   Sure.
23        A.   You want me to read this paragraph --
24        Q.   Yeah, if you would read this paragraph.
25        A.   Okay.  That would be great.  Thank you.

232

1         Q.   No problem.
2              MR. ALLEN:  We're going to go about another
3    two-and-a-half minutes, then we're going to take a break.
4    We've been going for about an hour and 40 minutes
5    approximately.  We'll take a break and try to come back and go
6    until 5:30.
7         A.   Okay.  I see that -- I've read the paragraph.
8         Q.   (BY MR. BROWN)  Okay.  You agree with me that
9    clozapine increased the risk of diabetes, correct?
10        A.   Yes.
11        Q.   And Dr. Newcomer describes the metanalysis, which
12   concluded the same thing essentially, correct?
13        A.   That's what he states, yes.
14        Q.   And the odds ratio reported there is 1.37 when you
15   look at conventionals versus clozapine, correct?
16        A.   That's the number, yes.
17        Q.   And then when you look at clozapine versus no medical
18   treatment, the odds ratio is 7.44, correct?
19        A.   Yes.
20        Q.   And you know from looking at the studies that are
21   referenced here that the people who didn't receive
22   antipsychotic treatment were healthier than the people who were
23   receiving them, right?  You know that from your review.
24        A.   Well, I don't remember -- I don't know -- you're
25   talking about what I specifically remember about each.  I know

233

1    that most of the time when it was no antipsychotics with
2    healthy controls, yes, that's correct.
3         Q.   And healthy controls don't share the same risk of
4    diabetes as people with mental illness.  We talked about that.
5         A.   We don't -- I don't know that I can quantify it for
6    you, but I would agree that there's a background risk that
7    comes from the fact that they have schizophrenia, yes.
8         Q.   So, epidemiology studies that use healthy populations
9    as a comparative group in looking at the issue of diabetes,
10   that's a built-in bias to find an association, correct?
11        A.   It certainly is a confounder.  That's what I'd like
12   to call it.  And, certainly, it's something that you have to
13   consider if -- when you're evaluating the data.
14        Q.   Okay.  For olanzapine, the odds ratio reported is
15   1.26 when you compare olanzapine to mentally ill people treated
16   with conventionals.  See that?
17        A.   Yes.
18        Q.   And that was statistically significant?
19        A.   Yes.  Well, it doesn't tell me that.  It says "was
20   also associated," and I assume it was because of the fact
21   that -- I'm looking at the competence level and they have 95
22   percent, so --
23        Q.   Right.  And the metanalysis also reported odds ratios
24   for quetiapine, right?
25        A.   Yes.

234

1    Q.  And for quetiapine, when compared with conventional
2    antipsychotics, the odds ratio was 1.22.  You see that?
3    A.  Yes.
4    Q.  But that's not statistically significant, is it?
5    A.  Well, if you -- if you take the inclusion of one or
6    less than one, yes, I would agree that that would not meet that
7    p<.05 level, just as some of -- the olanzapine versus none
8    didn't either and -- so --
9    Q.  And there's also a second analysis for quetiapine
10   when you look at the risk of diabetes in people who took
11   Seroquel and compare them with people who received no
12   antipsychotic treatment, correct?
13   A.  Yes.  That was the second number, yes.
14   Q.  And that odds ratio was 1.00?
15   A.  Yes.
16   Q.  And just like you told me earlier, 1.00 means that
17   the Seroquel group had no increased risk of diabetes; is that
18   correct?
19   A.  Based on his analysis, that's correct.  That's what
20   he's finding.
21        MR. ALLEN:  This is a good point to take a
22   break, isn't it?
23        MR. BROWN:  Okay.
24        MR. ALLEN:  Isn't it?
25        MR. BROWN:  Yeah, yeah.

235

1        MR. ALLEN:  That's what I'm asking.  All right.
2    We'll take a break.
3        (Recess from 3:43 p.m. to 4:02 p.m.)
4        (Exhibit Nos. 100 through 165 marked.)
5        MR. ALLEN:  Okay.  Are we back on?  It is now --
6    let me just say, so there's no confusion later, it's now 4:00
7    o'clock.  We're going to go to 5:30.  We're going to break.
8    Then you can come back and question her on matters that I
9    produced in this box which we marked as 100 through 165, okay?
10   So, I'm telling you if you want to talk about her current
11   material that you have, you have until 5:30.
12        MR. BROWN:  Right.  Okay.  I'll talk to you
13   before 5:30.
14   Q.  (BY MR. BROWN) And Exhibit No. 9, Dr. Newcomer's
15   paper, you say you hadn't seen it because the search terms
16   weren't in the title of the paper.  Do you recall that?
17   A.  Well, if it did turn up, when I would read this, I
18   would have likely seen the title and I would have opened it,
19   but I don't remember turning this one up.  And I don't search
20   by author, like, I don't just say everything Newcomer.  I
21   always search by the drugs and then add other search terms.
22   And I'm usually not using "metabolic syndrome."  I'm usually
23   using "hyperglycemia" and "diabetes."
24   Q.  Well, those words appear in here pretty regularly.
25   Would your searches not pick up the actual words in the body of

236

1    the document?
2    A.  I have no idea.  I have not seen this document
3    before, so either it didn't show up or, when I glanced at it,
4    it was not something that I thought was useful.  But --
5    Q.  Either way, you didn't see it before.
6    A.  No, I did not.
7    Q.  One of the studies cited by Dr. Newcomer in his 2007
8    paper is an epi study done by Sernyak; is that right?
9        MR. BROWN:  Sernyak's S-e-r-n-y-a-k.
10       MR. ALLEN:  You're talking about 28, just to
11   save us time, Arthur?
12       MR. BROWN:  Yeah.
13       MR. ALLEN:  Reference 28?
14       MR. BROWN:  Reference 28.
15   A.  Yes, he mentioned that.
16   Q.  (BY MR. BROWN) And that's a study that you cited to
17   in your report and it's a study you rely on, right?
18   A.  Yes.
19   Q.  You mention it in Paragraph 29.
20   A.  It's first in 25.
21   Q.  And then in 29.
22   A.  And I'm sure it's in 29 if it's in 25, yes.
23   Q.  And Sernyak is a well-done study?
24   A.  It's a study that appeared to me to not have any
25   reason to not consider it as being a reliable study.  I mean,

237

1    well-done study -- I don't like using "well" or "poorly."  To
2    me, it's a study that I can rely upon, and I felt it was a
3    study I could rely upon.
4    Q.  And the authors here were Sernyak, Leslie -- Alarcon
5    is the third author, A-l-a-r-c-o-n.
6    A.  I -- I'd have to see it.  I only have "Sernyak, et
7    al," on here.
8    Q.  The last author is Rosenheck.
9        (Plunkett Exhibit No. 10 marked.)
10   Q.  (BY MR. BROWN) This is Exhibit No. 10.  This is a
11   paper done by Sernyak, Leslie, some others, including
12   Rosenheck, entitled "Association of Diabetes Mellitus With Use
13   of Atypical Neuroleptics in the Treatment of Schizophrenia."
14   A.  Yes.
15   Q.  Published in the American Journal of Psychiatry in
16   April of 2002, correct?
17   A.  Yes.
18   Q.  And you rely on this paper for your opinions here
19   today?
20   A.  Yes.
21   Q.  And if you turn to Table 2 on Page 564, it breaks out
22   odds ratio by age groups, correct?
23   A.  Yes.
24   Q.  And if you look at the odds ratios for quetiapine, it
25   doesn't appear that the findings are statistically significant

238

1   for anyone over age 50.  You see that?
2       A.  Yes, and that's what's interesting and important
3   about -- to me about the relationship for quetiapine.
4       Q.  And is it your opinion that quetiapine does not
5   increase the risk of diabetes in people over 50?
6       A.  No, it's not my opinion that it doesn't increase over
7   50, but I would indicate that this study shows that there seems
8   to be a particular sensitivity of people less than 40, 40 to
9   49.  You see in all ages statistically significant odds ratio
10  when you put them altogether, but -- and this is -- there is
11  other literature also that talks about this issue that -- the
12  fact that the younger person may be more at risk.
13          And what's interesting is, for schizophrenics
14  especially, it's a disease that has an onset usually at --
15  onset of young adulthood.  So, it's a disease of younger
16  people.  So, again, somebody with schizophrenia is going to
17  fall into that age range -- a lot of them are going to fall
18  into that age range of less than 49 years of age.  Doesn't mean
19  you're not going to have a 50-year-old schizophrenic; but many
20  of the ones that are being treated, at least for the first
21  times for sure, are in the younger age group.
22      Q.  The odds ratio reported for the three groups over 50
23  years old are all less than one, correct?
24      A.  Yes.
25      Q.  And based on what you told us earlier, that would

239

1   suggest there's no increased risk of diabetes in patients
2   taking Seroquel; is that right?
3       A.  Well, looking at that particular finding by itself,
4   yes.  But, again, I'd point you to the fact that the study as a
5   whole for all ages found a statistically significant increase.
6       Q.  Well, this subanalysis is valid, would you say?
7       A.  Well, that depends.  There's a really small number of
8   patients, and I think the author even talks about the fact that
9   it's a small number -- and if not this author, someone else
10  does when they're talking about this data about the small
11  number of patients.  For example, he had 49 people in the
12  greater than 70 years of age, but he had 368 people being
13  treated between 40 and 49.
14          So, as we all know, in epidemiological studies,
15  you have to have the power to detect.  And I believe that if
16  you were to ask a statistician -- specifically, an
17  epidemiologist, which I believe there is one in this litigation
18  working -- you should ask him about the power of this study to
19  be subgrouped down that way to being able to see even -- expect
20  to see a significant result when you only have 49 exposed
21  people.
22      Q.  What did you rely on this paper for?
23      A.  I relied on this paper for two things, to -- as I
24  stated in my first use of it, to say that there's an increased
25  risk of diabetes with exposure to certain antipsychotics, and

240

1   quetiapine is one of them.  There's an increased risk shown for
2   all ages here, less than 40, 40 to 49.  And then I also -- if I
3   remember correctly, it's cited as one of the epidemiological
4   studies that supports my weight of the evidence cause and
5   effect association as well --
6       Q.  Okay.
7       A.  -- for the same reason.
8       Q.  You testified in other litigations, Zyprexa
9   particularly, that epidemiological studies looking at
10  second-generation antipsychotics and diabetes mellitus, it's
11  important control for certain risk factors, correct?
12          MR. ALLEN:  Let me object to the form of that
13  question.  That's improper use of a -- if you're using prior
14  testimony, the witness is supposed to be given the opportunity
15  to review the testimony, and so I'm objecting to the form.
16      Q.  (BY MR. BROWN)  Well, do you agree with me that
17  epidemiological studies looking at second-generation
18  antipsychotics and diabetes, it's important to control for risk
19  factors like obesity, age, and family history?
20      A.  If you can.  It depends upon the design of the study.
21  Some studies you can control for those things and some you
22  can't, which is why you want to look -- for example, I would
23  not feel very confident if I only had one study.  That's the
24  whole point.  You don't want to have just one study that shows
25  something.  You want to have multiple pieces of evidence,

241

1   hopefully multiple studies looking at different populations,
2   that come to the same conclusion.
3       Q.  Let me take a step back.  But you agree with me if
4   you can control for these other risk factors -- like obesity,
5   age, and family history -- in an epidemiological study, you
6   should do that when you're studying second-generation
7   antipsychotics; is that right?
8           MR. ALLEN:  Object to the form of the question.
9       A.  I would say to you that it would -- ideally it would
10  be nice to control, yes, but certainly -- I'm just telling you,
11  this is a retrospective study, if I remember correctly.  I
12  think it is.  And in these retrospective studies, it's really
13  difficult to control for all of those factors in this kind
14  of -- and, again, that's something that you weigh when you look
15  at the piece of information.  And you want to have, again,
16  other studies under different populations, and what do they
17  show?
18          I would agree with you, however, that you should
19  consider the confounding factors when you interpret any study.
20  And if you only had this one study, that would be something
21  that you would be very concerned with, trying to control for
22  that one result.
23      Q.  Let's focus on this one study.  You agree with me
24  that Sernyak, Leslie, and Rosenheck did not control for obesity
25  or family history of diabetes; is that right?

242

1    A.  Let me look.  I --

2      MR. ALLEN:  Let's take your time and --

3    A.  Because -- I believe you're correct, but let me see

4 what they said.  I don't believe they could have gleaned -- for

5 example, I don't think they could have gleaned the family

6 history from the records.  And I didn't see any discussion of

7 BMI, so --

8      MR. ALLEN:  This is not a speed contest, so take

9 your time and --

10    (Sotto voce discussion.)

11    A.  Okay.  To answer your question, I don't see them

12 collecting the information so they can control for it on family

13 history and I don't see any discussion in here of a description

14 of the groups based on BMI or body weight, either one.  So --

15    Q.  (BY MR. BROWN)  Those would be confounding factors?

16    A.  Those would both be confounding factors when you

17 would look.  They did look for other types of issues here that

18 they gathered information on, but that they did not.

19    Q.  Turn to Page 565, first full paragraph for me, in the

20 discussion of methodological limitations.  Do you see that?

21    A.  Yes.

22    Q.  The first methodological limitation that Sernyak

23 describes is the fact that this study is a virtual

24 cross-sectional study.  Do you see that?

25    A.  Well, he says he has a -- he's actually talking about

243

1 the narrow time frame as one of the limitations, yes.

2    Q.  Right.  I know you're not an expert in epidemiology,

3 but you understand it.  What does "virtual cross-sectional

4 sample" mean?

5    A.  I don't know exactly what he means.  And, again,

6 you're right, I'm not an epidemiologist.  But to me what did it

7 mean, it was more of a snapshot in time.  But, again, I don't

8 know exactly what he means by that.

9    Q.  Well, doesn't he say that because this study looked

10 at such a short window, four months, it precluded a

11 determination of the temporal relationship between the

12 prescription of neuroleptics and the development of diabetes?

13    A.  That's what I mean by a snapshot in time.  What I'm

14 saying is he's not going to be able to make any -- maybe I

15 should have been more verbose.  He's not going to be able to

16 make any conclusions about whether or not there has to be a

17 certain duration of exposure that's related to that because he

18 doesn't have -- he also -- well, let me finish.  And he also

19 necessarily may not know something about that every person was

20 exposed -- that the onset of diabetes corresponded with after

21 or before the exposure due to the time frame of the sample,

22 which is a snap -- also part of being a snapshot in time.

23    Q.  So, we can agree in Sernyak 2002, he's not even sure

24 if the people developed diabetes after they took Seroquel,

25 correct?

244

1    A.  Well, I would disagree.  I would say that he has done

2 the best he can to try to -- I mean, he talks about what he's

3 done to select people that he believes are -- exposure is

4 related to event, but what he's saying is he doesn't have a

5 hundred percent certainty that that's occurring and so that is

6 a limitation to his study.

7    Q.  Temporality is the touchstone or the cornerstone of

8 opinions regarding causation, correct?

9    A.  Well, that's a different issue, but, yes.  But

10 certainly temporality is one of -- it's not necessarily a

11 touchstone, but it's one of the important criteria among the

12 criteria that I look at.

13    Q.  Is it the most important?

14    A.  I don't know if it's most important, but it is very

15 important.

16    Q.  Well, let's at least -- in order for there to be a

17 relationship between a drug and an event, you need to take the

18 drug first and then have the event for there even to be a

19 possibility, correct?

20    A.  For drugs, I would agree with you, yes.

21    Q.  So, Sernyak doesn't preclude the possibility that

22 many of his so-called diabetes patients took the medication

23 after they were diagnosed with diabetes, correct?

24    A.  He's telling you that it's one of the things that he

25 doesn't -- he can't have a surety that that happened in all

245

1 cases, that's exactly right.

2    Q.  Okay.  Now, Sernyak, Leslie, Rosenheck, these folks

3 went out and did more studies, correct?

4    A.  Yes.

5    Q.  And you're familiar with those studies?

6    A.  Show me which ones and I'll tell you if I am.  I

7 have others cited on my reference; but, again, you

8 might have a study that I'm not aware of.

9    Q.  Right.  Let's find out if that's true.  But you

10 certainly cited to Leslie in Paragraph 29, right, as one of the

11 epidemiological studies you cite to?  And this is Leslie and

12 Rosenheck in 2004 in Paragraph 29.

13    A.  Yes.

14    Q.  Okay.  And do you remember that study?

15    A.  I'd have to see it.  I -- I don't necessarily know

16 them by author.  When I see the front page, I often know them.

17    Q.  Well, it was certainly a study that was reliable

18 enough for you to consider in your opinions, correct?

19    A.  Any of the studies here I consider reliable for

20 inclusion, yes.

21    Q.  You would never exclude a study from your reliance

22 materials just because the odds ratio was one or less than one,

23 would you?

24    A.  I wouldn't necessarily exclude it from having

25 reviewed it, if that's what you're asking.

246

1   Q.  Sure.

2   A.  But, certainly, how -- whether it was cited as

3   support would depend upon the study itself.  I'd have to look

4   at it to answer that question.  For example, there have been

5   times when I've talked in litigation areas about the fact that

6   it's not so much the statistical significance but the trends in

7   the odds ratios.  And in a study that didn't have a lot of

8   power, the trends can be just as important as having the

9   statistical significance if the study was never powered enough

10  to be able to detect the event.

11  Q.  You know that Leslie and Rosenheck did another study

12  that you don't cite to in your report, 2005, don't you?

13  A.  There are several studies that I know I haven't

14  listed, yes.  I don't know if it's Leslie and Rosenheck, but --

15      (Plunkett Exhibit No. 11 marked.)

16  Q.  (BY MR. BROWN)  You've just been handed Exhibit No.

17  11, which is a study done by authors Miller, Leslie, and

18  Rosenheck.  Do you see that?

19  A.  Yes.

20  Q.  And I'm going to call it the Miller paper.  Is that

21  okay?

22  A.  Yes, that's fine.

23  Q.  It was published in June 2005 in the Journal of

24  Nervous and Mental Disease?

25  A.  Yes.

247

1   Q.  Peer-reviewed journal?

2       MR. ALLEN:  Objection.  Form.

3   A.  Yes.  Excuse me.

4   Q.  (BY MR. BROWN)  And the title of this article is

5   "Incidence of New Onset Diabetes Mellitus Among Patients

6   Receiving Atypical Neuroleptics in the Treatment of Mental

7   Illness"; is that right?

8   A.  Yes, evidenced from a privately-insured population.

9   Q.  And if you turn to the next page, second full

10  paragraph down, the authors describe the purpose of the paper.

11  In an effort to understand better the risk of new onset

12  diabetes mellitus among patients prescribed antipsychotic

13  medications, they sought to replicate this VA study in a

14  privately-insured population; is that right?

15  A.  Yes.

16  Q.  And the other study we just spoke about a few minutes

17  ago was from a public health system, correct?

18  A.  I assume it's the same Leslie and Rosenheck study

19  that I cite, but let me look.  Hold on.

20  Q.  Okay.

21  A.  Yes, it's the same one.

22  Q.  Turn to Table 2 with me.  In Table 2, Miller provides

23  the hazard ratio of new onset diabetes.  Do you see that?

24  A.  Yes.

25  Q.  And it lists odds ratios for all of the

248

1   second-generation antipsychotics.  Well, not all, but

2   clozapine, olanzapine, quetiapine, and risperidone.  Do you see

3   that?

4   A.  Yes.

5   Q.  And the quetiapine odds ratio is 0.74.  Do you see

6   that?

7   A.  Yes.

8   Q.  And what that translates to in epidemiological terms

9   is a 26 percent decreased risk of diabetes actually, right?

10  A.  I don't know how the study was designed, but you

11  could interpret it that way.  But, really, I was going to say,

12  to me, I think they interpret it by talking about having lower

13  risk versus decrease of risk.  If you read his report --

14  Q.  Well, you would agree with me that the Miller

15  paper -- well, you didn't cite to this paper in your report,

16  did you?

17  A.  I don't think I did, no.

18  Q.  And it wasn't part of the reliance materials you've

19  produced here today, was it?

20  A.  It should have been on my CD.  And if it wasn't,

21  again, I don't understand why not, but I will rectify that

22  problem before we meet again because I have articles on my

23  computer which should have shown up in the reference list and,

24  if they haven't, something's wrong.

25  Q.  Let me mark -- it's already marked.  Let me show you

249

1   what's been marked as Exhibit 164.  Exhibit 164 comes from the

2   additional materials that were brought to the deposition today

3   that have been premarked by plaintiffs' counsel --

4   A.  Yes.

5   Q.  -- 100 through 165.  No. 164 is a reference list

6   dated September 29th, 2008.

7   A.  Which, by the way, I know is also not complete

8   because I've already looked at this in the box.  So, again,

9   there's a problem with the reference list and I don't know why.

10  Q.  Who prepared that reference list?

11  A.  It was prepared partially by Scientific Evidence

12  under my direction.  And I sent them additional citations for

13  them to include and what has happened from what I can see is

14  those additional citations haven't appeared on here.

15  Q.  So, you --

16  A.  Some have, but not all.

17  Q.  So, the paper we just discussed -- Miller, for

18  example -- is not on the reliance list that you prepared, what,

19  two days ago?

20      MR. ALLEN:  Well, I object to the form of the

21  question.  It's called a reference list and --

22      MR. BROWN:  That's fair, Scott.

23      MR. ALLEN:  -- not a reliance list.

24      MR. BROWN:  Let me correct it.

25  Q.  (BY MR. BROWN)  Just so we're clear, this Miller