250

1  paper we just discussed isn't on the updated reliance list in
2  Exhibit No. 164?
3       MR. ALLEN: Same objection. It's the reference
4  list.
5       A. I would agree with you that the Miller paper is not
6  listed on my Seroquel reference list that you're showing as
7  Exhibit 164, and I'm telling you I already knew there was a
8  problem. I told you that this morning. There's references
9  that don't seem to be on here, and I will rectify that. I will
10  find out why not, because I have the Miller paper on my
11  computer at home.
12      Q. (BY MR. BROWN) So, the Miller paper we just
13  discussed, you were aware of before today?
14      A. Yes.
15      Q. And you considered as part of your opinions?
16      A. It was something that I reviewed, yes.
17      Q. And you knew it showed an odds ratio of 0.74, right?
18      MR. ALLEN: Objection to the form of the
19  question.
20      A. I couldn't tell you -- if I could -- I certainly
21  couldn't by memory tell you what the odds ratio was. I
22  certainly was aware of this paper, I reviewed this paper, and
23  it's not the only paper; but the weight of the evidence is a
24  large group of papers which teach the opposite of this paper.
25      Q. (BY MR. BROWN) How many of these epidemiological

251

1  studies show an odds ratio below one that you looked at?
2       A. I couldn't tell you that. I have to look.
3  There's --
4       Q. If you --
5       A. I believe that there's this one and there may be
6  another, but I'm not sure. The majority of the evidence, in my
7  view, points towards the weight showing that there is a
8  statistically significant relationship between ingestion of
9  Seroquel and either hyperglycemia or diabetes complications or
10  diabetes itself.
11      Q. Did you cite to any of those studies in your report?
12      A. I wouldn't because of the fact that I'm stating here
13  for you in very clear terms my weight of the evidence, the data
14  that I believe is consistent with my finding, and that's the
15  data that I'm giving you here.
16      Q. Okay.
17      A. My reference list is meant to be things that I have
18  reviewed, which would be things that I may have used and cited
19  and things that I may not have cited. And it's very typical
20  that you will find studies -- especially in epidemiological
21  literature, studies that find something that another study
22  doesn't have; and it can be due to the design of the study, the
23  power of the study, lots of things. I would encourage you to
24  talk about it with the epidemiologist in the case because I
25  know he has opinions on each of these studies.

252

1       Q. Right, but just so we're clear, the -- your report,
2  you said, only includes things that support your opinion. Is
3  that what you testified to?
4       A. I think what I tried to tell you was I laid out my
5  opinion and the information that I relied on to develop those
6  opinions. And, of course, if I rely on it to develop that
7  opinion, it had better be consistent with my opinion. Would
8  you not agree?
9       Q. So, anything that's inconsistent with your opinion
10  would not be included in your report?
11      A. It would not necessarily be cited as evidence for the
12  statement I'm making. That doesn't mean it wouldn't
13  necessarily be something that I considered because I did.
14  Certainly, this paper was part of my -- what evidence; but,
15  again, I'm looking at the weight of the evidence. And there
16  is, again, in every litigation, papers that may not agree with
17  every other paper in the group.
18      Q. So, everything that does not directly support your
19  opinion and end up in your report should end up in your --
20  what's called your updated reference list?
21      MR. ALLEN: Objection. Form.
22      Q. (BY MR. BROWN) Is that fair?
23      MR. ALLEN: "Everything" is overly broad. I
24  think this is published information, if I'm reading the
25  reference list correctly.

253

1       A. Any peer review -- for this list, it's meant to be
2  peer-reviewed literature -- any peer-reviewed literature that I
3  have reviewed in full, okay? Whether it is a paper cited in my
4  report or not, that's what this is meant to be. There is also
5  a body of other internal company documents that also support my
6  opinions. Those would not be included on the reference list.
7  I actually had a separate list of those, which you also don't
8  appear to have had, which I will also remedy. Because, again,
9  I prepared it last weekend, so I don't understand where it
10  went, but it apparently disappeared.
11      Q. (BY MR. BROWN) Dr. Plunkett --
12      MR. ALLEN: Let me say, Arthur -- because I
13  don't want to come under attack later. That's why I did my
14  best. We also produced -- and it's marked 100 through 165 --
15  some of them are not journal articles, but there's other
16  articles. I have not made an attempt nor have I asked
17  Dr. Plunkett to make an attempt to review the articles that we
18  have produced today to the reference list. I didn't even make
19  that attempt, but we have produced additional articles and
20  materials. So, that comparison can be done.
21      And as Dr. Plunkett has said, that the reference
22  list -- there is some error in that, but we have the material
23  here, and so I just want -- so, I don't -- I don't want this
24  reference list to become some type of debating point. We've
25  been very forthright about it, is my point.

## 254

1  MR. BROWN: It's not a debating point, what
2  she's relied on and what she hasn't.
3  MR. ALLEN: There's a difference between relied
4  upon and reviewed in supporting her opinions and not.
5  MR. BROWN: Whatever we're discussing is no
6  accusation against you.
7  MR. ALLEN: Thank you.
8  MR. BROWN: Fair?
9  MR. ALLEN: Good, yeah. Me or my side, we --
10 I've made and Dr. Plunkett has made a good faith attempt and I
11 just want -- thank you very much. Let's move on. I'm --
12 Q. (BY MR. BROWN) Dr. Plunkett, you mentioned the fact
13 that -- ask the epidemiologist, they have some opinions on it.
14 What epidemiologist are you referring to?
15 A. It's my understanding from a conversation with
16 Mr. Fibich, who's another attorney working in the case, that
17 there is an epidemiologist working in this case.
18 Q. And who's that?
19 A. I believe it's Dr. Moyer. However, I have not spoken
20 with Dr. Moyer, I have not seen any work product from
21 Dr. Moyer. I just heard that discussion. And that -- and as a
22 result -- the reason I asked that question is because when I
23 come to depositions like this and I'm looking at
24 epidemiological studies, if there is not an epidemiologist in
25 the case, then I may spend more time in my report trying to

## 255

1  actually discuss pros and cons of individual studies. But when
2  I know that there's an epidemiologist in the case who can
3  handle that area, they usually are the person you should talk
4  to because they can do the power calculations, they can do the
5  meta-analysis or, you know, those kind -- if that was to be
6  done, you know, those kinds of exercises, which I would not do.
7  Q. Dr. Plunkett, you relied on an abstract done by
8  Dr. Lambert, you mentioned, in Paragraph 26; is that right? 26
9  of your report.
10 A. I'm looking -- oh, 26. I'm sorry. Yes. I have
11 reviewed and I have cited an abstract by Lambert, yes.
12 Q. And you think it's perfectly appropriate to cite to
13 an abstract?
14 A. I think it's appropriate to cite it in the context I
15 am putting it forth, which is a -- in this series of paragraphs
16 from Paragraph 23 through Paragraph 28, I'm laying out a time
17 line of when certain information has occurred that people in,
18 like, the drug company would be aware of based upon the public
19 information, and that's what those paragraphs are meant to be.
20 So, I think it's appropriate to do that.
21 I certainly would never rely upon an abstract by
22 itself to be the only piece of evidence I would then make a
23 discussion of evidence, in the same way that Dr. Newcomer has
24 used a couple of abstracts here and threaded them into the mix.
25 You would never use it by itself, but I have seen people do

## 256

1  that. I wouldn't necessarily use an abstract in a
2  meta-analysis necessarily unless I had the details on the
3  abstract, the quantitative details to be able to put it into
4  the calculation. But, you know, that's his choice. Every
5  person conducts their own analysis the way they do.
6  Q. And the Lambert abstract, you're familiar with it,
7  right?
8  A. I have seen the Lambert abstract, yes. I couldn't
9  tell you what it says off the top of my head today, but --
10 Q. Was the finding in the Lambert abstract statistically
11 significant with respect to Seroquel?
12 MR. ALLEN: Objection. Form. And I instruct
13 you not to answer unless you provide her the material.
14 A. I'd have to see it. Again, I can't answer that
15 without seeing it. I would say that I made a statement that
16 they found there was an increased risk of developing Type 2
17 diabetes, but -- in patients exposed to Seroquel. So, there
18 must be some support for that or I wouldn't have cited it.
19 (Plunkett Exhibit No. 12 marked.)
20 Q. (BY MR. BROWN) I'm handing you what's been marked as
21 Exhibit No. 12, which is the Lambert abstract from 2002. See
22 that?
23 A. Uh-huh.
24 Q. And says the purpose of the study was designed to
25 examine the risk of development, new onset Type 2 diabetes, in

## 257

1  people with schizophrenia exposed to select antipsychotic
2  drugs, correct?
3  A. Yes.
4  Q. And the odds ratio reported for quetiapine was what?
5  A. 1.45. Confidence interval, 1.11 to 1.9. And he
6  concludes -- it's compared to typicals and he concludes that
7  compared to typicals, the olanzapine, clozapine, and quetiapine
8  significantly increased the risk of new onset Type 2 diabetes.
9  Q. Can you tell from this abstract if it's a well-done
10 study?
11 MR. ALLEN: Objection. Form.
12 A. I -- I can only tell you what I can see based upon
13 this. And, again, I would say that I believed it was a
14 reliable abstract; but, again, I wouldn't use it in the same
15 way as I would use -- if this, again, was my only piece of
16 evidence, it would be a very different use of this versus if I
17 had a full paper to rely upon.
18 Q. (BY MR. BROWN) If you had a full paper to rely on?
19 Is that what you said?
20 A. In other words, if I had this same study in a
21 peer-reviewed journal versus the abstract form, it might have
22 weight all on its own. But, again, this by itself, you have to
23 have other information, in the same way Dr. Newcomer does that.
24 You've got to have other information to look at as well.
25 Q. What did the final paper say?

**258**

1  A. I don't know if I have the final paper in front of
2  me, but if you show it to me, we can look at it. I know I have
3  a paper by Lambert in here somewhere cited in my documents.
4  Q. Do you think it's the follow-up to that abstract?
5  A. Let me look at it and I can tell you if it is or not.
6  Q. Do you think it's important, where it's available, to
7  actually look at the full paper upon which an abstract --
8  A. If I can line them up, yes, you can do that. I mean,
9  I don't know that I did that in this case.
10  (Plunkett Exhibit No. 13 marked.)
11  Q. (BY MR. BROWN) I'm handing you what's been marked as
12  Exhibit No. 13, which is a paper authored by Lambert, Bruce L.
13  Lambert, entitled "Antipsychotic exposure in Type 2 diabetes
14  among patients with schizophrenia," colon, "a matched
15  case-control study of California Medicaid claims."
16  Do you see that?
17  A. Yes.
18  Q. And this is the final study that corresponds to the
19  abstract we just discussed?
20  A. A different authorship, but that's why I'm looking to
21  compare it.
22  Q. Okay.
23  A. Some of the authors are different, so I'm looking to
24  see if there's additional data or additional time periods.
25  Yes, they have a different time period they're looking at, so

**259**

1  it's not the exact same study. So, again --
2  Q. Is it based on the -- was the abstract based on the
3  initial phase of the study and there's more people in the final
4  paper?
5  A. Well, there's a different time period, so I would
6  assume a different -- there's a larger time period in the paper
7  and a shorter time period in the abstract. So, it's a
8  different -- so, again, it's a different analysis. So, it is a
9  different study because any time you add people, you're -- it's
10  a whole different population that you're comparing. You have
11  another two years of data from this study versus this study.
12  This is January '95. This is '97.
13  Q. Well, would you agree with me that the findings in
14  Exhibit No. 13 by Dr. Lambert were not statistically
15  significant with respect to quetiapine?
16  A. I have to look.
17  Q. Table 1.
18  A. Well, crudes odds ratio would be statistically
19  significant for what he calls low, greater than 250 -- less
20  than 250 milligrams. When he adjusts, it was not. So, he's
21  showing a trend, but it's not showing the same result as he
22  got -- well, different population, so a different result than
23  his abstract.
24  Q. So, when he looked at the relationship between
25  Seroquel and diabetes in patients with schizophrenia, were any

**260**

1  of the adjusted odds ratios statistically significant?
2  A. The adjusted odds ratios don't appear to be, but,
3  again -- they show an increase in trend, but they don't appear
4  to be different. There's also different results for other
5  drugs as well. It's not just -- different odds ratios and
6  different results for the other ones as well.
7  Q. Right, but I want to talk about quetiapine. The
8  quetiapine, for all the patients studied, the odds ratio was
9  1.2, with a lower bound of confidence of 0.8, correct?
10  A. I'm sorry. I lost track. Yes.
11  Q. And that's not statistically significant, correct?
12  A. You would not -- you would expect that not to be,
13  that's right, because it includes one, or it's actually less
14  than one. It overlaps one.
15  Q. Look at the conclusion on the next page.
16  Dr. Lambert, Dr. Bruce Lambert, in his 2005 paper concludes
17  that among people with schizophrenia in the California Medicaid
18  system --
19  A. Could you point me to where you are? I'm sorry.
20  Q. Sure. Conclusion, upper right-hand corner.
21  A. Oh, sorry. Okay. Go ahead. I'm sorry.
22  Q. Yeah. So, Dr. Lambert concludes, "Among people with
23  schizophrenia in the California Medicaid system, exposure to
24  clozapine or olanzapine, but not quetiapine or risperidone, was
25  associated with an increased risk of developing Type 2 diabetes

**261**

1  where compared to atypical antipsychotic medications, correct?
2  A. Compared to typical antipsychotic.
3  Q. Right.
4  A. I would agree that that's a correct reading.
5  Q. Right. Correct reading on this paper was that
6  Seroquel was not associated with diabetes, correct?
7  A. Not a statistically significant association, that's
8  correct.
9  Q. You rely on a Wall Street Journal article in your
10  report, don't you?
11  A. For a timeline issue, yes, only.
12  Q. So, you wouldn't rely on that article, right?
13  A. I don't rely on the article to -- I'm not relying on
14  the Wall Street Journal as a source of a study itself, I'm not
15  using it in my cause and effect assessment, but I'm certainly
16  using it for my timeline, which is why it's laid out here like
17  it is.
18  Q. What --
19  A. Now, it refers to a study that you could go in and
20  pull out the literature, but I don't rely on the article itself
21  other than for that purpose.
22  Q. You wouldn't normally rely on a newspaper article for
23  your opinions, right?
24  A. I rely -- often rely on news articles, if you're
25  talking just about an issue of information exchange, and that's

**Page 262**

1  what I'm relying on it for. Certainly, I would not rely on a
2  newspaper article normally for Paragraph 29. You wouldn't see
3  that necessarily stated there.
4     Q. And the -- what you referred to -- the study referred
5  to in the Wall Street Journal article is the Cunningham study,
6  correct?
7     A. I don't know. I would have to see the study to
8  compare it because I have not done that, or the article, one of
9  the two.
10       (Plunkett Exhibit No. 14 marked.)
11     Q. (BY MR. BROWN) I'm showing you what's been marked as
12  Exhibit No. 14. It's an abstract with a lead author of
13  Francesca Cunningham. It's entitled "Antipsychotic Induced
14  Diabetes in Veteran Schizophrenic Patients." Do you see that?
15     A. Yes, I see that title.
16     Q. The odds ratio reported for quetiapine toward the
17  very bottom right above the conclusion section is 3.34; is that
18  correct?
19     A. Yes.
20     Q. That 3.34 was statistically significant, correct?
21     A. I would expect it to be, yes.
22     Q. And you can see from the lower bound of confidence,
23  it -- the low bound of confidence was more than one, correct?
24     A. Yes.
25     Q. And you actually cite that 3.34 in your report, don't

**Page 263**

1  you? You actually put the -- in Paragraph 28, you actually
2  report the odds ratio.
3     A. Yes, because that's the -- this is the article --
4  this is the copy of the abstract, yes.
5     Q. What were the actual results of the final paper?
6     A. We would have to pull it out and look at it.
7     Q. Did you look at it before you came today?
8     A. You have to show it to me. I believe I have. I
9  believe I've seen a full paper by Cunningham or by this group
10  of authors on a Veterans database, but you need to show it to
11  me, let me see if I've seen it.
12       (Plunkett Exhibit No. 15 marked.)
13     A. It's the Lambert paper, yes.
14     Q. (BY MR. BROWN) So, Exhibit No. 15 is the Lambert
15  paper entitled "Diabetes Risk Associated with Use of
16  Olanzapine, Quetiapine, Risperidone in Veterans Health
17  Administration Patients with Schizophrenia." Do you see that?
18     A. Yes.
19     Q. And Lambert's identified, as is Francesca Cunningham,
20  correct?
21     A. Those are two common authors. Well, actually,
22  there's three. Donald Miller is there as well, and Gregory
23  Dalack.
24     Q. And this was the final analysis of what was presented
25  in the abstract, the Cunningham abstract we discussed as

**Page 264**

1  Exhibit No. 14, correct?
2     A. It seems --
3       MR. ALLEN: Objection.
4     A. -- to be -- I'm checking to see if it's the exact --
5  if they've added any more patients to it. But it's certainly
6  by the same group. It's like the last one, but I'm not sure
7  it's the exact same numbers.
8     Q. (BY MR. BROWN) Well, turn to Page 679. In the
9  acknowledgment section, it says "A preliminary version of these
10  findings were presented, the 19th International Conference on
11  Pharmacoepidemiology, International Society for
12  Pharmacoepidemiology, in Philadelphia in August of 2003."
13  Do you see that?
14     A. Yes.
15     Q. Now, you know for sure that this is the final version
16  of the abstract presented in August 2003 that you discussed in
17  your report, correct?
18     A. Yes. Well, I guess what I was trying to identify is
19  I didn't know whether they added more patients or not. That's
20  what I was trying to figure out. Because there's a difference
21  between the same analysis with the same data set and then
22  additional patients added, which becomes a different analysis.
23     Q. And in the final paper here, the final analysis, they
24  report a hazard ratio that's half of what was reported in the
25  abstract; isn't that right?

**Page 265**

1     A. I have to look. I can't remember those off the top
2  of my head.
3     Q. If you look at the abstract on Page 1, you'll see the
4  quetiapine hazard ratio about three-fifths of the way down.
5     A. Well, they have a variety of ratios on Table 2. They
6  have some in different age groups that are almost at three and
7  they have others that are -- they have unadjusted at 1.66, they
8  have an adjusted at 1.67, they have by age group 2.98 for less
9  than 45 years of age. I mean, there's different -- I assume
10  that's probably the difference here is maybe the way they broke
11  it down.
12     Q. Why don't you look at the front page with me.
13       MR. ALLEN: Why don't we look at the -- why
14  don't you read the study, Doctor, read the abstract of the
15  paper before you begin to answer questions about it -- it may
16  be helpful -- as opposed to letting Mr. Brown tell you what he
17  thinks it says.
18     A. Well, I certainly can read the abstract, but I
19  normally would go to the table to look at the data set.
20     Q. (BY MR. BROWN) Okay.
21     A. That's what I did. So, certainly, I would agree with
22  you that in the abstract, they report only one of the odds --
23  or one of the hazard ratio that are reported in the table on
24  Page 676. There are other hazard ratios that are closer to
25  three. But, certainly, I would agree with you that it's still

**Page 266**

1  statistically significant, but it's less than it was reported
2  in the abstract. I would agree with you.
3  Q. Did you discuss this anyplace in your report, the --
4  did you discuss the Lambert final paper anyplace in your report
5  or the odds ratio?
6  A. Give the specific odds ratio, I doubt I have, but let
7  me see if I've cited it. It's cited under Lambert 2006. So,
8  it's under my evidence of my epidemiological data.
9  Q. What was the cite for it in your --
10 A. In other words, I cited this one under cause and
11 effect assessment.
12 Q. What was the cite you give in your report?
13 A. Lambert 2006, et al, 2006 American Journal of
14 Epidemiology.
15 Q. Okay.
16 A. So -- and, again, this one was only cited -- I was
17 using this as a timeline paper, notice paper. To explain to
18 you the way this report was put together in my Canadian --
19 well, no. This is important that you understand.
20 Q. Oh, no. I was looking at Mr. Allen.
21 A. In the Canadian report, I was asked because of
22 Canadian law to put together a timeline. And when I drafted
23 this report, I left some of those elements in. The most
24 important paragraph in weight of the evidence is Paragraph 29.
25 These other paragraphs before were setting context.

**Page 267**

1  Q. Would you agree with me that the epidemiology
2  describing Seroquel and its relationship to diabetes is
3  inconsistent, just the epidemiology?
4  A. Not that it's inconsistent. I think there is -- when
5  you do an assessment of the body as a whole, I do not believe
6  it's inconsistent. I agree with you that there's some studies
7  that show a statistically significant association and some
8  studies that do not. But, to me, the weight of the evidence
9  leans toward the statistically significant association.
10 Q. Now, you said you looked at some metanalyses. You've
11 looked at some of those, right?
12 A. I'm trying to remember whether there's one for this
13 litigation area. I may be confusing it with Zyprexa. But if
14 there is one that I have cited, I have looked at it. And I
15 can't remember, to tell you the truth.
16 Q. If that metanalysis showed an odds ratio of one,
17 would you still testify that the weight of the evidence is that
18 Seroquel causes diabetes?
19 MR. ALLEN: Well, I object to form, but --
20 A. Well, I -- here's my issue with metanalyses: I'm not
21 an epidemiologist, but it's my understanding from epidemiology
22 texts and epidemiologists that I have spoken to in past that
23 metanalysis is not something that I would rely upon, that I
24 would rely instead upon the individual studies as a whole. So,
25 that's what I tend to do.

**Page 268**

1  However, that doesn't say that I didn't cite a
2  meta-analysis as being consistent or inconsistent, but I tended
3  to go back to the individual studies. And that's why I went
4  back, like, with the Newcomer paper and pulled each of those
5  studies out and looked at them individually because I'm not an
6  epidemiologist to do my own.
7  So, I have issues -- I believe there's
8  significant issues with the way metanalysis can be used; so, as
9  a result, they're something that I will look at, but I tend not
10 to rely -- I certainly wouldn't rely upon it to make my opinion
11 by itself. I would certainly make my own opinion based upon
12 the individual studies first.
13 Q. (BY MR. BROWN) If you add all the epidemiology up
14 that you looked at, what percentage show a statistically
15 significant relationship --
16 MR. ALLEN: Objection. Form.
17 MR. BROWN: Let me finish my question, then you
18 can object all you want.
19 MR. ALLEN: I thought you did. I think I've
20 been pretty good about not objecting today.
21 MR. BROWN: You've been pretty good.
22 MR. ALLEN: I thought you were finished. Go
23 ahead.
24 Q. (BY MR. BROWN) Of all the observational epidemiology
25 that you reviewed, that is published, what percentage of those

**Page 269**

1  studies showed a statistically significant relationship between
2  Seroquel and diabetes?
3  MR. ALLEN: Objection. Form.
4  A. I can't answer that. I haven't done that
5  calculation.
6  Q. (BY MR. BROWN) Would it matter to you? Does it
7  matter to you?
8  A. The percentage? Not necessarily, no. It -- it's not
9  something I do. I don't try to figure out the percentage. I
10 try to look at the body in front of me and determine what that
11 body of evidence says to me, and I believe that the evidence
12 tells me that there is a relationship, a reliable relationship
13 between the two.
14 Q. One of the documents you rely on is the ADA consensus
15 statement, we call it; is that right?
16 A. Yes. It's one that I have reviewed and -- I don't
17 know if I cite it in here, but I know I cited it in my New
18 Jersey presentation.
19 Q. I'm going to hand it over to you.
20 (Plunkett Exhibit No. 16 marked.)
21 Q. (BY MR. BROWN) I'm handing you Exhibit No. --
22 MR. ALLEN: I'll tell you a story about it
23 someday.
24 Q. (BY MR. BROWN) -- Exhibit No. 16, which is the ADA
25 consensus statement dated February 2004, right?

270

1  A. Yes.
2  Q. Okay. This is -- if you look down on the first
3  column, this was -- 14 experts were brought together to
4  consider the relationship between antipsychotic drugs and
5  obesity and diabetes; is that right?
6  A. Yes.
7  Q. And those experts specialized in psychiatry, obesity,
8  and diabetes; is that correct?
9  A. Yes, those were the three areas.
10  Q. You're not an expert in any of those areas, are you?
11  A. I'm not a psychiatrist and I don't only deal with
12  obesity and I certainly am not a diabetologist. I certainly
13  have expertise and training in the issue of, as we've already
14  talked about, diabetes and things like that. But, no, I'm not
15  one of those three by a label.
16  Q. Let's go to Page 598. There's a section in the
17  consensus conference devoted to diabetes. Do you see that?
18  A. Yes.
19  Q. And a couple paragraphs into the section, it talks
20  about the large retrospective cohort studies that have reported
21  that the estimate -- the prevalence of diabetes in patients
22  using SGAs. Do you see that?
23  A. Yes.
24  Q. Is SGA the second-generation antipsychotics?
25  A. Yes, that's what that refers to.

271

1  Q. And in the middle column, the consensus panel
2  discusses the findings with respect to clozapine, olanzapine,
3  and risperidone and quetiapine. Do you see that in the middle
4  of that top paragraph?
5  A. Yes.
6  Q. It says "Despite limitations in the study design, the
7  data" -- referring to the large retrospective studies --
8  "consistently show an increased risk of diabetes in patients
9  treated with clozapine and olanzapine compared with patients
10  not receiving treatment with first-generation antipsychotics or
11  with other SGAs." Do you see that?
12  A. Yes.
13  Q. And you agree with that, there's -- you agree that
14  the epi -- the epidemiologic literature shows a consistent
15  relationship between clozapine and olanzapine and diabetes?
16  A. I don't know what they mean, "consistent," but I can
17  tell you that I believe that there is certainly a great deal of
18  literature talking about clozapine and olanzapine. And I
19  believe olanzapine has a greater propensity than quetiapine to
20  produce diabetes, and I've said that -- I've been on the record
21  to say that. To me, it's worse than Seroquel in that area.
22  Q. And then the next sentence says "The risk in patients
23  taking risperidone and quetiapine is less clear. Some studies
24  show an increased risk for diabetes while others do not."
25  Do you see that?

272

1  A. Yes, I do.
2  Q. Do you agree with that conclusion by the ADA
3  consensus group?
4  A. I don't now if I would say it's not clear. I would
5  say that I agree that there are studies that show an increased
6  risk and, as we follow through, there's some that do not.
7  Q. Turn to Table 2 on Page 597. It discusses SGAs,
8  second-generation antipsychotics, and metabolic abnormalities.
9  See that?
10  A. Yes.
11  Q. There's sort of a list there of the six SGAs,
12  correct?
13  A. Yes.
14  Q. And the middle column there is a risk for diabetes.
15  A. Yes, I see that column.
16  Q. And for clozapine and olanzapine, there's a plus
17  sign, which according to the legend below means increased risk,
18  correct?
19  A. Well, increased effect.
20  Q. Increased effect, correct?
21  A. Yes.
22  Q. And you agree with that position?
23  A. I don't agree or disagree. I certainly agree that
24  there is an increased risk and an increased effect for both of
25  those drugs, yes.

273

1  Q. Okay. And for quetiapine, the ADA consensus
2  conference says the data is discrepant. Do you see that?
3  A. Yes.
4  Q. Do you agree with their conclusion that the data was
5  discrepant with regard to Seroquel in its relationship with
6  diabetes?
7  A. No, I don't agree with that.
8  Q. Do you believe that in February 2004?
9  A. Did I believe what? I'm sorry.
10  Q. Yeah. Let me rephrase.
11  Did you believe that -- based on your review of
12  all the evidence and literature, that in February 2004, the --
13  the data -- the epidemiological data on the relationship
14  between Seroquel and diabetes was discrepant?
15  A. I haven't done that analysis. I can't answer that.
16  I probably would not agree with that. And, also, don't forget
17  that this paper probably had a data lock before February 2004
18  because the meetings were held, I believe, in 2003.
19  Q. In November 2003. You're right.
20  A. So -- but I -- again, I haven't done the analysis to
21  data lock it at, you know, that particular date, so I can't
22  answer that. I believe that there was enough evidence, as I've
23  already gone on the record, to indicate that there was
24  definitely an association in 1999, enough to warn. And then as
25  far as the issue of causation, my causation assessment takes

274

1  into account the literature I have looked at, which is
2  literature -- some of it beyond that date.
3       Q. Okay. You mention that --
4       A. Much of it before, but --
5       Q. I didn't mean to --
6       A. I'm sorry.
7       Q. No. You mentioned your position that the company
8  failed to warn about the risk of diabetes; is that right?
9       A. Yes.
10      Q. And you said, I think, it's your opinion that the
11 company should have warned about the risk of diabetes in 1999.
12 Is that your testimony?
13      A. I believe there was enough there to show there was an
14 association; and by the labeling language, yes, that would
15 indicate there should have been a risk -- I mean, a statement
16 to warn, yes.
17      Q. In arriving at your opinion that the -- a warning
18 should have existed on the Seroquel packaging insert with
19 respect to diabetes, what standard did you apply?
20      A. The labeling standard, which is a reasonable
21 association.
22      Q. Yeah. So, tell me what the standard was for the
23 warning section in 1999.
24      A. I believe it's a reasonable association. That's my
25 understanding of the reading of the regulation.

275

1       Q. And is that -- reasonable association between what
2  and what?
3       A. Well, in this case, if I'm making a warning on
4  diabetes and Seroquel, it would be an association between
5  diabetes and Seroquel. At the -- at the least, there was an
6  association between diabetes and antipsychotics -- atypical
7  antipsychotics, but I believe there was evidence at that point
8  in time that also would indicate there would be an association
9  with Seroquel as well.
10      Q. The label. Do you understand the label is designed
11 to inform doctors about the risk or benefits of a drug?
12      A. Yes.
13      Q. Turn to Paragraph 41. Paragraph 41 in your report
14 says "AstraZeneca failed to warn the FDA," comma, "physicians,"
15 comma, "other health care professionals," comma, "and patients
16 of the adverse metabolic effects associated with the
17 consumption of Seroquel at the time these risks were first
18 identified." Read that right?
19      A. Yes, you did.
20      Q. Do you have an opinion that the -- that AstraZeneca
21 failed to inform the FDA of something?
22      A. I would certainly believe that at the time in 1999,
23 and certainly after that time period, if -- if AstraZeneca
24 has -- and I believe I have documents to support they
25 understood that association, based on these internal documents,

276

1  between diabetes and their drug and it isn't something that
2  they request to change within the FDA, which they can do --
3  and, in fact, I have documents to show that they did do it
4  for -- later on in the lifetime of the drug -- but, yes, that's
5  a failure to warn the FDA.
6           Now, the warning label of the drug -- or the
7  warning on the label and the label itself is not for FDA
8  purposes, it's for the physician who then passes it on to the
9  consumer. But certainly -- so, maybe I -- my language could be
10 more precise in this sentence. But certainly, to me, they
11 don't have to wait -- and I guess that's what I'm trying to
12 convey. There's no duty for them to wait until the FDA tells
13 them to change the warning, but when they have information to
14 indicate that a warning should be in place, they can take --
15 the company can take action, either by a change -- special
16 changes to be effected or by going to the FDA with a proposed
17 labeling change.
18      Q. Do you know about -- have you seen any correspondence
19 or meeting minutes from 1999 until today between AstraZeneca
20 and the FDA discussing label -- labeling issues or the Seroquel
21 package insert?
22      A. I don't recall, other than a warning letter I have
23 seen regarding promotional materials and statements about this
24 issue. But I don't recall -- if I have, it's in those
25 documents that you'll get the list of or in the box. But I

277

1  don't believe that that's there, no.
2       Q. And so you don't know if any dialogue occurred
3  between the FDA and the company on what should or shouldn't be
4  in the warning between 1999 and today?
5       A. I haven't seen a document that indicated a dialogue
6  went on, no, so -- or didn't. I mean, I believe it didn't
7  because I haven't seen a document. Certainly, if it has gone
8  on, we can look at the documents and then we can talk about
9  those.
10      Q. And if that -- if those discussions took place, you'd
11 hope your plaintiffs' lawyers would show you those documents,
12 right?
13      A. I would expect to be provided with those documents if
14 something was stated in my report that's incorrect because of
15 that, yes. I mean, they saw my report, so -- and they know
16 what I have relied on.
17      Q. Tell me what you think the warning should have looked
18 like in 1999.
19      A. I haven't drafted -- I mean, I would never try to
20 draft a specific label. I've been asked that before. I can
21 just tell you, to me, at that point in time, there was a
22 reasonable association with antipsychotics, for sure, and these
23 metabolic disturbances, and I believe even data on Seroquel
24 itself. So, how the specifics of the label warning would go
25 would be a negotiation between the company and the agency.

### Page 278

1 I certainly think that in the -- even up to
2 today in the language -- if you want, we can talk about the
3 labels over time. Even the language today is confusing to me
4 about what they're really trying to say to the physician. So,
5 I believe that even the language labeling as of today where
6 there is a warning isn't necessarily telling me what I would
7 need to know as a pharmacologist about what the real risks --
8 and based upon the documents I've seen about what the risks
9 are.
10 Q. What is it you need to know about the risks of a
11 product as a pharmacologist if you don't prescribe medicines?
12 A. I use medicines. I read Physicians' Desk Reference
13 and product inserts every time. I also do projects where I am
14 asked to assess human health risks, like in this case. So,
15 labeling is something that I use and certainly something that
16 pharmacologists use all the time.
17 Q. Let me show you the 1999 Seroquel label from the PDR.
18 This came from your files. This was sent to us on Monday.
19 (Plunkett Exhibit No. 17 marked.)
20 Q. (BY MR. BROWN) I'm handing you Exhibit No. 17, which
21 is a copy of the Seroquel label from 1999. You see that?
22 A. Yes.
23 Q. And this is the same label that existed in 1997 --
24 I'll represent that to you -- with respect to the adverse
25 reaction sections, okay?

### Page 279

1 A. Okay.
2 Q. Can we turn to the adverse reaction section?
3 Would you agree with me that there was a section
4 here in the adverse reaction section directed to weight gain?
5 Far right-hand column, two-thirds of the way down.
6 A. That's what I was looking for. I know it's there. I
7 wanted to find it. Yes, I am aware that there is one in the
8 adverse reaction section, yes.
9 Q. It says the proportion of patients meeting a weight
10 gain criterion of greater than 7 percent of body weight were
11 compared in a pool of four three- to six-week
12 placebo-controlled trials, revealing a statistically
13 significant greater incidence of weight, Seroquel 23 percent,
14 versus 6 percent. See that?
15 A. Yes.
16 Q. A four-fold difference approximately in the incidence
17 of what the label described as clinically significant weight
18 gain?
19 A. Yes, I see that.
20 Q. Do you think 7 percent of body weight is clinically
21 significant? Do you have an opinion on that?
22 A. I think that that would -- I believe that would be;
23 but, again, I would refer you to a physician if you're going to
24 talk about clinically significant. I believe it is a
25 significant increase in body weight, based upon my own, you

### Page 280

1 know, knowledge of the literature, that I've seen increases in
2 body weight much less than that can be talked about as being
3 clinically significant.
4 Q. If a doctor read this label, he would see that
5 information regarding weight gain, correct?
6 A. Well, I would argue this isn't a warning. This is a
7 listing in the adverse reaction sections. And as we talked
8 earlier, there's -- when I'm talking about warning, I'm talking
9 about putting something that the doctor is going to see as up
10 front under the warning section, not necessarily something in
11 the adverse reaction section that is buried. So, I -- I have a
12 little disagreement.
13 I agree with you it's there, but I don't think
14 it carries -- to me -- actually, how these labels are written,
15 that does not carry the same weight as a warning does to a
16 physician when he reads them. If you read the labeling
17 guidelines about how things are put in, that's what it tells
18 you.
19 Q. Have you done a survey or some sort of analysis of
20 how doctors read labels, a study?
21 A. I have read -- I haven't done my own analysis, but I
22 have read some documents that were prepared, either by the GAO
23 or FDA themselves, talking about changes four or five years ago
24 they were going to make to labeling regulations and studies
25 that they did and talked about how doctors interpret or don't

### Page 281

1 interpret.
2 And that's why the new regulations have come
3 into play with drugs after 2006 where the information is put
4 into a mode that allows the physician to more easily glean what
5 risks are, what information they need to find; whereas, these
6 old labels were criticized for just that kind of information,
7 things that the doctor has to pay attention to and it's a long
8 document and they're looking for the important information up
9 front.
10 Q. Let me ask my question again.
11 So, if a doctor wanted to know about weight
12 gain, there's a section here dedicated to weight gain in the
13 label, correct?
14 A. Under adverse reactions, yes.
15 Q. Do you think the FDA was wrong in putting the weight
16 gain data where it is in this label?
17 MR. ALLEN: Objection. Form.
18 A. I haven't opined -- formed any opinion about whether
19 or not the FDA -- that's not my job to say if the FDA was right
20 or wrong. I believe that -- however, that I have an opinion
21 based upon what I -- whether this label tells me what I would
22 need to know based on the information I had at the time. My
23 issue with -- not so much the weight gain is the issue with
24 the -- what we know that the weight gain can lead to, and
25 that's the metabolic complications beyond that.

Page 282

Q. (BY MR. BROWN) Do you think doctors understand metabolic complications associated with weight gain?

MR. ALLEN: Objection. Form.

A. I would assume they do, but I'm not a physician. You'd have to ask a physician. I know that I understand the implications, but that doesn't mean the physician does. Again, the physician is looking for the information that -- in the warning section that's pertinent to them to be able to prescribe the drug to their patient.

Q. (BY MR. BROWN) Do you think it was generally understood in the scientific community that Seroquel caused diabetes in 1999?

MR. ALLEN: Objection. Form.

A. I can't -- I can only answer based upon my assessment. I can't answer --

Q. (BY MR. BROWN) What's your assessment?

A. My assessment is that there certainly was understanding based on the documents in 1999 that there was an association -- I believe the literature told me there was an association between Seroquel ingestion and weight gain and also Seroquel ingestion and hyperglycemia and complications of weight gain, but with or without. So, I believe that that information was there from my perspective and my reading, but I don't know what other physicians -- a physician may have done, if they read all that literature. I doubt they could go

Page 283

through and do the same assessment I have done for each drug they prescribed.

Q. But you haven't asked any physicians, have you?

A. I haven't asked the question, but I can tell you I would be shocked to find that a physician would have the time to sit down and do -- spend the hours that I have spent on this issue for this drug, when most physicians prescribe dozens of drugs in their practice.

Q. Would you expect the doctors who prescribe medicines to actually look at the label?

A. I would expect the doctor to look at some of the information in the label; but, again, my answer to you would be you should ask a doctor that question. I will tell you that knowing the labeling regulations, if I was a physician, I would be looking at the information based on contraindications and warnings first because that would have the most impact on what I would look at as far as risks.

Q. So, should the label in 1999 have -- should have had a warning or a contraindication, or both?

A. I don't know about contraindication. A warning. I think there should have been a warning about diabetes, at least for the class, in 1999.

Q. And --

A. Whether or not you took it to Seroquel specifically, that could maybe be argued.

Page 284

Q. Could AstraZeneca, in its own volition, add a class warning to its label?

A. Well, I think AstraZeneca can go to the -- not a class warning, but they can certainly go to the FDA with what they know about their drug -- and I believe there was a reasonable association with their drug, and I -- I'm saying to you I imagine somebody could argue that they don't believe that -- but that certainly is not what they've done. They haven't gone to the agency to warn the physicians about what they knew at that point in time.

Q. I know you haven't drafted what the labeling language should say, but can you give me, in sum and substance, what you think the warning should have included in 1999 with respect to metabolic parameters?

A. Well, I think if you look at the later language, some of that language is appropriate and some is not. I think you need to mention specifically complications of hyperglycemia and diabetes or complications of diabetes being associated with the use of Seroquel, and I think that needs to be in the -- somewhere as a warning to the physician. How you word it, whether or not you describe it and put it in context, that can be done sometimes; but that at least needs to appear up there -- up front under the warnings for the drug.

Q. Hyperglycemia and diabetes are both identified as adverse events in the adverse event section of the label,

Page 285

correct?

A. I know they are. I don't know about this particular one because I haven't seen this one in a while, but let me look back. They are, I know, in later one.

Q. If you turn to Page 3431, middle column, there's a section entitled "Metabolic and Nutritional Systems" and it reports hyperglycemia happened infrequently. Do you see that?

A. Yes, I see that. And, again, I would disagree with the way that's presented. I think that you're burying it under a list of infrequent metabolic consequences, when I believe there was much more data to indicate there was much more than an infrequent metabolic consequence that should be buried in this section.

Q. Well, the frequency is actually defined in this label, isn't it, to the left-hand side there? It defines "infrequent" as occurring in 1 in 100 to 1 in 1,000 patients.

A. Yes, and this is based upon clinical trials usually. That's what the definition is based upon. But, again, I think you have to look at what other information was out there at that point in time, and there was more than that.

I -- again, to me, the issue in this is that you have listed here in these same paragraphs weight loss, you have hyperglycemia, and you have this listed as infrequent metabolic consequences. And if you look at all these other things that are listed here under adverse reactions, a doctor looks at all

## 286

1  these observed during the premarketing of Seroquel, you see
2  things that they may or may not understand the nature of the
3  association; to me, which is more than just an observation in a
4  clinical trial.
5  But I'm saying to you, I can look at the
6  literature and say I believe there was an association, and I
7  think some of the company's own documents and some of the
8  discussions of documents were put together in the '99-2000 time
9  frame for the company shows that they understand the
10  association for their drug. So, you know, we can go through
11  those the next time, if you want.
12  Q. What's the --
13  MR. ALLEN: Hey, Arthur? Arthur, it's 5:06. I
14  said we're going to quit at 5:30, but I have to take a call
15  here real quick, so -- now it's --
16  MR. BROWN: I may be -- I have to talk to my
17  folks here. I might try -- if we can stay a little late, I
18  might just try to finish so I don't have to come back.
19  MR. ALLEN: Well, we'll talk about it off the
20  record. It's 5:07 now actually, so I've got 23 minutes left
21  for you today and we can talk off the record. And I'll give
22  you the additional time that I'm off taking care of this
23  problem, okay? So, in other words, assume we come back -- I'm
24  making it up -- at 5:10, three minutes from now, you get to
25  5:33, but I need to do something.

## 287

1  MR. BROWN: Yeah. I understand.
2  MR. ALLEN: Okay. Thank you.
3  (Recess from 5:12 p.m. to 5:32 p.m.)
4  MR. ALLEN: When we left, we had 23 minutes
5  until 5:30. I'm giving counsel today 23 more minutes to
6  conclude today, which will put us at 6 hours and 43 minutes of
7  testimony today. If counsel told me that they could finish the
8  entire deposition in seven hours, I would let them have the
9  additional 17 minutes to do 40 minutes. And if they can tell
10  me they'll be done with her deposition completely in 40
11  minutes, we'll go 40 more minutes. If not, we're going to be
12  done in 23 minutes.
13  My witness has been here -- you know, she's been
14  at this office since 8:00 this morning. She sat here -- I will
15  say -- and the record will reflect -- and I've been in a lot of
16  depositions in this case -- with the fewest number of breaks I
17  can possibly remember, hours of questioning. I've been fair.
18  I've agreed -- as I said this morning -- I don't
19  know if we were on the record or off -- I've agreed that
20  you-all can come back and redepose Dr. Plunkett on the, quote,
21  new, close quotes, material. I don't want to get into a debate
22  right now what that, quote, new, close quote, material is, but
23  I did bring materials today in response to the subpoena and my
24  efforts to make sure we gave you what we had. And so I'll
25  agree to let her be, quote, redeposed, close quotes, on that

## 288

1  material plus 17 minutes to make 7 hours. And with those
2  understandings, we can continue. And let me do one other thing
3  please off the record.
4  (Recess from 5:33 p.m. to 5:34 p.m.)
5  MR. BROWN: Let me make a quick statement --
6  this doesn't count against my time -- which is, we -- Mr. Allen
7  and I spoke off the record. We can't go through the material
8  that we saw for the first time today, about 165 documents, in
9  20 or 30 minutes. We haven't had time to go through it.
10  Mr. Allen agreed Dr. Plunkett will be made available in the
11  next couple of weeks. We agree to take her deposition in about
12  two weeks; and as part of that agreement, Dr. Plunkett won't
13  look at any of the defense expert reports or depositions that
14  may occur between now and then.
15  MR. ALLEN: I agree to that, and I've told you
16  also the deposition will take place sometime within the next
17  two weeks, which would constitute -- and I don't have a
18  calendar in front of me, so I'll -- what is today, the 2nd?
19  That's the 3rd, the 4th -- the 6th -- the week of the 6th or
20  the week of the 13th, in that time period. If you delay and
21  decide to take it later, I'm not making that promise. She's
22  going to look at whatever I want her to look at, expert
23  report-wise.
24  MR. BROWN: And we agree to that. As long as
25  Dr. Plunkett, within the next two weeks, doesn't look at any

## 289

1  defense expert reports or testimony, we'll come back and finish
2  up.
3  MR. ALLEN: I've also told you, if necessary,
4  that the dates that are not currently available for her
5  deposition are the 8th, the 16th and the 17th. However -- and
6  there's no promises here and this would -- I've been informed
7  the 16th and the 17th may open up.
8  A. I would know next week.
9  MR. ALLEN: And so those are the dates. I've
10  also indicated -- you've indicated that you want to be the one,
11  Mr. Brown, to finish this deposition up; is that correct?
12  MR. BROWN: Yeah. To the extent it goes
13  forward, I think it would makes sense for me to finish it.
14  MR. ALLEN: Well, if that's the case, then I'd
15  ask you -- and we're on the record -- to coordinate it through
16  me so you and I can handle it so there's no miscommunication
17  and I will handle the matter. So, me, I'm not asking for
18  another e-mail change between -- with no disrespect to anybody,
19  whatever other lawyer there is in the case. I think there's a
20  thousand. Just talk to me and I'll talk to Dr. Plunkett and
21  we'll arrange it.
22  Q. (BY MR. BROWN) And before we start back on the final
23  leg of today, we can agree that everything you rely on or will
24  rely on is in this room right now and marked, with the
25  exception of Miller.


## Page 290

MR. ALLEN: Don't -- don't testify to that. You can --

MR. BROWN: Yeah. It wasn't a question. It was --

MR. ALLEN: Well, you know, I have a problem with that. And we can talk about it and then -- I'll talk to you off the record, then we can get a statement on the record. I know that we attempted to gather the materials responsive to the subpoena. I also know from being a lawyer for 25 years that when anybody says "everything" at all, it never, ever -- that can't be done.

For example, I'm telling you one of the things that Dr. Plunkett testified today is that she had seen a time line, but she did not find it in here, concerning the labeling. As you went through the box, it's not in there. I have located the timeline. So, you're -- you didn't want it marked. This was an off-the-record statement. She indicated that.

So, there's additional materials that she may have seen, and I -- and, also, I think the agreements that have been entered or at least discussed -- I think it will apply to your experts as well -- doctors/experts also have a general body of knowledge that they develop. She's talked about the AstraZeneca website, the clinical trials website. She doesn't have a copy of that here today, but she's referenced that for you and you know that.

## Page 291

So, there's -- those are two examples of things that, I guess, are not literally in this room that she's testified about. She's also -- she's testified about Goodman & Gilman's. It's sitting in this room, but it's not in the box. You-all had a chapter.

So, I don't -- I think we made a good faith effort. We have the material. We've also talked about the reference list and she's been candid that she believes some things are not on the reference list that should be on the reference list that, due to clerical error or mistake -- and we're going to -- I'll talk to Dr. Plunkett after this deposition and we're going to update the reference list.

So, that being said, I think if you take the body of evidence and the totality of the circumstances, we've done a good job. I'm just not prepared to say -- and I just think of the example of the AstraZeneca website, the timeline, and the reference list are three things that will have to be supplemented that I can think of -- and I'm not even sure we're going to supplement the AstraZeneca website. You know what that is. It's you-all's website -- and the general body of knowledge.

MR. BROWN: We could go back and forth all night.

MR. ALLEN: We could.

MR. BROWN: I don't want to do it. You know,

## Page 292

you like to get the last word. That's your style. I've been doing this with you long enough and -- talk, talk, talk, but let me just say this: There's an agreement in this case -- there's an order entered on what's required and what's not, and people are required to produce four days in advance of the dep all the stuff they've looked at -- "reviewed" is the word.

MR. ALLEN: I disagree that that's an order in this case or an agreement in the case, but I will tell you that we have complied with your subpoena, used good faith efforts, and the material is here. I could not have worked harder to get it here. And so let's just move on and we can take this argument up. And by the way, it is now, according to my watch, 5:36, and so we're going to go 23 more minutes at the most because her ride is picking her up at 6:00 o'clock.

MR. BROWN: Okay.

Q. (BY MR. BROWN) Dr. Plunkett, you -- we were talking about warnings -- before all the speeches took place, we were talking about warnings.

MR. ALLEN: Wait a minute. Those weren't speeches. Those were statements for the record, much like you make.

MR. BROWN: You through now?

MR. ALLEN: Oh, yes, I am.

MR. BROWN: All right. I'm going to proceed for my last 23 minutes --

## Page 293

MR. ALLEN: Yes, sir.

MR. BROWN: -- that you have set aside for me.

Q. (BY MR. BROWN) Dr. Plunkett, did you look at the class warning that was imposed by the FDA in January of 2004?

A. Yes.

Q. And you understand that that class label was directed by the FDA to appear on the Seroquel label. You understand that?

A. Yes.

Q. Do you think the FDA made a mistake with describing the warning as it did and required to appear on the Seroquel label?

A. I would say it's not necessarily a mistake. I -- again, I'm not here to say whether the FDA made a mistake. I think that the FDA class label is the class label. But I think certainly, by that period of time, the Seroquel manufacturer had information that would have -- could have strengthened that labeling for the physician and the understanding of the information specific to Seroquel that was not necessarily shown in the class label itself.

Q. What part of the class label do you think is deficient?

A. Well, let's get it in front of us and we can talk about it. I mean, I don't know if I can, off the top of my head, tell you.

294

1   MR. ALLEN: And I would say part of it's in the
2  material that's here today, which you have.
3   A. Yeah. That was --
4   MR. BROWN: Get -- let's mark it.
5   (Plunkett Exhibit No. 18 marked.)
6   Q. (BY MR. BROWN) Dr. Plunkett, I just handed you a
7  copy of the 2005 PDR which contains the class warning language
8  from 2004. It's in the bottom of the third page.
9   A. My issue with the class warning is the issue of the
10  fact that it's a class warning. And even though it says
11  "treated with atypicals, including Seroquel," it doesn't speak
12  to me the issue at this point in time that showed that -- from
13  the literature that Seroquel was different than some other
14  members of the class.
15   Olanzapine was also different at this point in
16  time than other members of the class. So, I would also have an
17  issue, I'm sure, with the olanzapine label. I don't remember
18  if this testimony was sought from me in that case that I worked
19  on, but certainly I would have an issue with olanzapine and the
20  Seroquel labeling, the fact that it's -- it is listed as a
21  class issue when, to me, those drugs had issues that were --
22  made it different than all the members of the class.
23   Q. Who are the other members of the class affected by
24  this label?
25   A. Anything that was on the market at that period in

295

1  time, and I can't give you the entire list of that. I know
2  that you would be talking about Zyprexa, Seroquel -- 2004 --
3  risperidone -- I don't know who else would have been.
4  Clozapine. I don't know whether Abilify was on the market yet.
5  I'd have to look at the approval dates for those.
6   Q. Compared to olanzapine and clozapine, quetiapine
7  actually has a favorable risk-benefit profile when it comes to
8  diabetes. That was your testimony this morning?
9   A. I said that I thought olanzapine was worse than
10  Seroquel, yes, absolutely. But olanzapine is still -- I
11  mean -- sorry. Seroquel is still worse than some of the other
12  members of the class. For example, I think Seroquel is
13  actually worse than risperidone. I think if I was going to
14  take those three drugs and put them in an order, I'd put
15  olanzapine, Seroquel, then risperidone.
16   Q. I know you haven't drafted an additional warning, but
17  what language would you add to the class warning that the FDA
18  didn't require?
19   A. I guess what I'm saying is I wouldn't necessarily --
20  I can't tell you what I would change about the class warning.
21  But in addition to having a class warning, to me, there should
22  be a warning that is more specific to Seroquel itself and
23  reflective of the information that the company was aware of at
24  that point in time related to their drug.
25   Q. This section's entitled "Hyperglycemia and Diabetes,"

296

1  correct?
2   A. Yes.
3   Q. And the class -- that's the title in the class
4  warning, correct?
5   A. Yes.
6   Q. And the class warning, it mentioned Seroquel in the
7  first sentence, correct?
8   A. It says "treated with atypicals, including Seroquel,"
9  yes.
10   Q. Right. So, the hyperglycemia and diabetes section
11  actually mentions Seroquel specifically, right?
12   A. Yes, and I -- I would assume it also does for the --
13  and I don't remember. I'm sure it does for olanzapine. I'm
14  sure it does for the others of the class at the time.
15   Q. And the doctor who was prescribing Seroquel, looking
16  at the warning section for Seroquel, he would see a
17  hyperglycemia and diabetes warning section, right?
18   A. He would see hyperglycemia and diabetes for the class
19  in the warning section, that's correct.
20   Q. And Seroquel identified in the third line.
21   A. But, again, it's a class warning. It's not the same
22  way you would word a warning if you were talking about Seroquel
23  by itself, and that's all I'm saying. But to me -- and I think
24  that's consistent with what I say in my report. I think I
25  specifically talk about the fact that -- about the issue of a

297

1  class warning or a member of a class, in general, versus
2  Seroquel by itself.
3   Q. Which standard did you apply in your determination
4  that somehow the warning -- the class warning was inadequate?
5   A. The issue of there being a reasonable association
6  with Seroquel itself, apart from the fact that there may be a
7  reasonable association for the class. Again, to me, the issue
8  is knowing specifically about that drug and its risks.
9   Q. Do you know what the FDA considered in terms of data
10  or evidence when it decided to impose a class warning on
11  Seroquel and some of the other second-generation
12  antipsychotics?
13   A. I don't think I've seen that discussion, no. I
14  believe I've seen some documents that talked about that issue,
15  but I have not seen the specific discussion documents from the
16  FDA, no.
17   Q. Have you seen any part of the NDA or IND for
18  clozapine?
19   A. No.
20   Q. And --
21   A. Well, if there's a clinical trial in the published
22  literature that was part of the NDA, I've seen that, but I have
23  not looked at the NDA documents through either FOI or discovery
24  or IND documents either.
25   Q. Have you looked at internal FDA discussions or

298

1 analyses on second-generation antipsychotics?
2  A. I have not -- I cannot recall a document that's a
3 specific internal FDA discussion, no.
4  Q. Would you agree with me that the FDA has far more
5 expertise at labeling with the staff of its people than you?
6  A. I believe it has a much larger staff that deals with
7 labeling, absolutely, and I would agree that they have a lot of
8 experience. Again, that's not my issue. My issue -- I'm not
9 criticizing -- I'm not saying that FDA should have done it
10 differently. I'm saying the company has a duty to tell what
11 they know about their drug. And that's my issue on failure to
12 warn, that the company has information specific.
13  Now, whether or not the FDA had all the
14 information the company does, I don't know, but certainly I
15 believe there was information there that I have seen from that
16 point in time that indicate it warranted a specific mention of
17 the risks of Seroquel itself.
18  Q. You applied the FDA warning standards in 2004 in
19 coming to your conclusion on the adequacy of this label?
20  A. Well, I'm applying the standard for how it lists as a
21 warning, and that's the standard.
22  Q. And that's the same standard the FDA employs and
23 follows, right?
24  A. I assume they do; but, again, I don't know what FDA
25 discussions were held or what data they reviewed in order to

299

1 make their decisions about Seroquel itself. I don't know.
2  Q. We've talked about your weight of the evidence
3 analysis. We've talked about the standards and things you
4 consider. Just a couple of quick follow-up questions: Case
5 reports by themselves aren't evidence of causation, correct?
6  A. Unless it's an extraordinarily -- as I've testified
7 before, there's always the potential you can have the
8 extraordinary complete case report. But, yes, in general, I
9 would agree case reports by themselves would not be enough to
10 prove causation. They could prove association, but not
11 necessarily causation.
12  Q. Have you seen any of those extreme case report
13 examples in Seroquel?
14  A. No.
15  Q. You also rely on adverse event reports in the paper
16 by Koller, correct?
17  A. Yes.
18  Q. Did Koller work at the FDA?
19  A. I believe he did at one point in time.
20  Q. And these are a collection of adverse events that
21 were either reported in literature or sent to the FDA, correct?
22  A. Yes. I believe he -- I believe those were his two
23 sources.
24  Q. And adverse events, by themselves, aren't typically
25 evidence of causation, correct?

300

1  A. Not by themselves. Again, maybe there would be an
2 extraordinary one; but, yes, again, I would not normally
3 consider them by themselves.
4  MR. ALLEN: Is it me or is it Memorex, but is
5 Koller a he or she? Maybe I'm thinking of something different.
6  THE WITNESS: I thought it was Burt, but I may
7 be wrong.
8  MR. ALLEN: I was asking Mr. Brown. He doesn't
9 know. Never mind. Neither do I. I just -- for some reason --
10  MR. BROWN: Yes. It's a woman.
11  Q. (BY MR. BROWN) I told you that earlier.
12  A. Oh, I'm sorry. I thought it was a man.
13  MR. BROWN: I'm shocked you don't know that.
14 The record must be mistaken.
15  MR. ALLEN: I know you said "he." I was
16 thinking in my mind it was a she. I'm proud of myself.
17  Q. (BY MR. BROWN) Dr. Plunkett, I know we're running
18 out of time and I think we've clarified this, but am I correct
19 that in this case, with respect to medical issues, you're only
20 going to give opinions on causation with respect to diabetes,
21 hyperglycemia, and weight gain? Is that correct?
22  A. Yes, with exception of I did indicate -- I think in
23 my report I talk -- I may mention complications of diabetes --
24 diabetic complications as being part of the spectrum of
25 information that I reviewed and relied on. And certainly, for

301

1 example, there are some reports of ketoacidosis, which is
2 associated with diabetes, but -- and so I want to be able to
3 talk about that information as part of the process that I went
4 through and used as evidence.
5  Q. All right. Just so we're clear, there was -- you're
6 not going to offer a causation opinion on liver damage,
7 correct?
8  A. No. I have not done that analysis, no.
9  Q. Not going to offer a causation opinion on
10 pancreatitis, correct?
11  A. I have not done that analysis at this point in time,
12 that's correct.
13  Q. And you're not going to offer a causation opinion on
14 kidney disease or damage?
15  A. Not at this point in time, I have not done that, that
16 is correct.
17  Q. Talked about animal data briefly. Animal data
18 generally isn't evidence of causation; is that right?
19  A. Normally, you would not take a piece of animal data
20 by itself, that is correct, but it's all part of the
21 information that's relied upon to perform such an assessment.
22  Q. You mentioned off-label issues in your report at
23 Paragraph 15. Are you going to give any opinions on what you
24 think AstraZeneca did with respect to off-label promotion?
25  A. I haven't seen documents that would allow me to form

302

1  those opinions at this point in time.
2      MR. ALLEN: She's not being offered on that
3  topic.
4      Q. (BY MR. BROWN) And are you going to offer any
5  opinions on how Seroquel was marketed?
6      A. Only from the perspective -- not an opinion on
7  marketing, but I certainly have seen information that's related
8  to marketing in some of the documents, but it's not -- I'm not
9  a marketer and I'm not here to offer marketing opinions. But
10  it certainly is information about company procedures, conduct,
11  things like that that I have seen and it's certainly helped --
12  helped -- it's certainly part of the information that's in my
13  mind as I formed my opinions. But any documents that are
14  marketing that I would have reviewed, you would be aware of
15  what those are and --
16      Q. They're in the box?
17      A. Well, they're either in the box or on my list, which,
18  again, I think that in the box it's everything that's on my
19  list. So --
20      Q. All right. So, you don't plan to testify in this
21  case that AstraZeneca engaged in improper marketing?
22      MR. ALLEN: We're not -- she's not being offered
23  as a marketing expert.
24      Q. (BY MR. BROWN) Is that correct?
25      A. Not at this point in time. And can I clarify -- do

303

1  you want me to get you -- to give to defense by, let's say,
2  Monday my corrected reference list? I can't do it by tomorrow,
3  but I could certainly do it over the weekend and get it to you
4  Monday.
5      MR. ALLEN: We'll talk about it.
6      THE WITNESS: Just let me know what I need to
7  do.
8      MR. ALLEN: It depends on what they say to me.
9  They hinted for a minute that I gave a speech, which wasn't a
10  speech at all, which was a statement about all our agreements
11  of today. So, let me just see what they say.
12      MR. BROWN: You wouldn't know what to do with
13  yourself if I was nice to you all day. Come on.
14      MR. ALLEN: I'm going to tell you now you've got
15  six minutes. And quite frankly, I'll give you those six
16  minutes on the redeposition. So, if it's a good point to
17  break --
18      MR. BROWN: Let me just run off the clock.
19      Q. (BY MR. BROWN) In your weight of analysis section of
20  your report, you refer to clinical trial data at Paragraph 29,
21  correct?
22      A. I believe I do. Let me look.
23      MR. ALLEN: Talking about Paragraph 29?
24      A. Well, I say "clinical data," yes.
25      Q. (BY MR. BROWN) Clinical data, right.

304

1      MR. ALLEN: Are we on 29?
2      MR. BROWN: 29.
3      MR. ALLEN: Sorry. I will say it's getting late
4  for me. 29. Go ahead. I'm sorry.
5      Q. (BY MR. BROWN) In the clinical data, you cite there
6  eight different sources, right?
7      A. Yes.
8      Q. And looking at those eight sources, were you able to
9  determine how much weight gain was associated with Seroquel?
10      MR. ALLEN: Objection. Form. Asked and
11  answered.
12      A. I was going to say, I think I told you before I
13  haven't done an analysis for that. I certainly could, but I
14  have not done that. And I would also add to you, of course,
15  that I brought to you today other clinical data that deals with
16  this issue -- and these other documents, internal company
17  documents as well -- and this is the published data that I
18  would also rely on.
19      Q. (BY MR. BROWN) Let me ask you, I know we haven't
20  talked about some of those trials, but you understand what a
21  normal glucose value is, right?
22      A. I understand there is a definition --
23      Q. A level.
24      A. -- for non-diabetic or -- I mean, everybody has their
25  own, quote/unquote, normal; but a normal range, yes.

305

1      MR. ALLEN: And while I'm thinking of it -- and
2  I -- this 20 seconds won't count against you. She pointed to
3  the stack and you talked about Koller and it's been my position
4  all day that most of this -- all this material's not new.
5  Dr. Koller's article is one of the items in the box. I think
6  it's good evidence that not all of it is new.
7      MR. BROWN: No. I mean, if you want me to walk
8  through it --
9      MR. ALLEN: I just -- I was just trying to make
10  a point here that just dawned on me when you pointed to Koller,
11  when you looked at Koller. Koller is part of the box.
12      MR. BROWN: Because all day today you told me
13  what a good guy you are and all the effort you went through,
14  and none of this -- the fact that we got a lot of these
15  documents today, I'm not suggesting for a minute that you
16  intentionally withheld documents in violation of all these
17  agreements and surprised us today I'm not suggesting that.
18      MR. ALLEN: I'm not going to say anything. I'm
19  just going to let you move on.
20      A. Was there a question? I --
21      Q. (BY MR. BROWN) No.
22      MR. ALLEN: No. It's about time to break.
23      MR. BROWN: I think I have several more minutes.
24      MR. ALLEN: Okay.
25      MR. BROWN: Think that's right.

306

1  MR. ALLEN: You do, but, I mean --
2  Q. (BY MR. BROWN) Are you going to testify when you
3  come to trial about foreign labels, foreign labels of Seroquel
4  in Japan or France or anyplace else?
5  A. I've certainly seen foreign -- Japan label, yes. I
6  have seen the Japan label. So, I may be -- depending upon what
7  I'm asked to testify about, that could -- and that certainly is
8  covered in my report. I don't know if I've seen the French
9  label, but --
10  MR. ALLEN: There is no French label.
11  THE WITNESS: Yeah, because it was denied.
12  A. So, certainly, I have to -- I don't know what other
13  labels I've seen. I know I've seen the Japan -- I've seen
14  Canadian -- the Canadian labeling information. So, if asked
15  about that, I'd certainly -- and, again, that's in my Canadian
16  report which I've provided to you, so you know my opinion on
17  that.
18  Q. (BY MR. BROWN) Do you consider yourself an expert in
19  Japanese regulatory affairs?
20  MR. ALLEN: Let me just clear -- you're wasting
21  some time. She's not an expert in Japanese regulatory affairs.
22  We'll agree to that.
23  MR. BROWN: Okay.
24  MR. ALLEN: Unless you are that I don't know of.
25  Q. (BY MR. BROWN) Are you --

307

1  A. No, I'm not, but I certainly --
2  MR. ALLEN: But I want to -- so it's clear for
3  the record, as reflected in the report and the materials she's
4  reviewed, she is going to testify about reasonable evidence of
5  an association to put a company on notice to warn, and that --
6  and part of the body of knowledge that the company had, and
7  that would include the French rejection, the Japanese label,
8  and other labels that she's discussed and -- including her
9  Canadian --
10  Q. (BY MR. BROWN) Anything else that you plan to rely
11  on at trial that isn't identified in your report with respect
12  to foreign regulatory issues, besides Japan and France?
13  A. And Canada.
14  Q. And Canada.
15  MR. ALLEN: And --
16  A. Well, the Canadian report, I talk about the product
17  insert and the consumer documents.
18  MR. ALLEN: And there are additional documents
19  contained within the files which she has reviewed that discuss
20  the fact that AstraZeneca obviously was aware of their European
21  label change, and that's --
22  A. That's true, yes.
23  MR. BROWN: That's the new documents we got
24  today?
25  MR. ALLEN: They're not --

308

1  MR. BROWN: I mean, they were produced to us
2  today --
3  MR. ALLEN: Yes.
4  MR. BROWN: -- and we were informed that she's
5  going to rely on those materials.
6  A. And I don't specifically mention -- I'm not sure. I
7  don't think I did. So, yes, absolutely, there is some
8  information on the European union, yes.
9  Q. (BY MR. BROWN) Okay.
10  MR. BROWN: Give me one minute off the record,
11  then I think I have, like, two minutes left and that's it.
12  MR. ALLEN: Sure.
13  (Recess from 5:58 p.m. to 5:59 p.m.)
14  Q. (BY MR. BROWN) In the last couple minutes, I want to
15  finish up a topic we discussed this morning, which is a safer
16  alternative. You identified several safer alternatives, in
17  your opinion, that would be a better option for doctors than
18  Seroquel based on Seroquel -- because of Seroquel's metabolic
19  profile; is that right?
20  A. Yes.
21  Q. And you -- I think you identified three or four
22  different medications; is that right?
23  A. I think -- well, I don't remember how many. I
24  mentioned haloperidol, I mentioned ziprasidone -- ziprasidone.
25  I think that's correct.

309

1  MR. ALLEN: Geodon.
2  A. Geodon, exactly. And there's -- I don't remember
3  what I mentioned. There's also literature -- the literature or
4  the study that was done where perphenazine was compared with
5  the other drugs as well. I would also mention that. I don't
6  know whether I mentioned that one or not.
7  Q. (BY MR. BROWN) Can you give me three -- list two or
8  three --
9  A. Oh, one more. And I think I said Abilify.
10  MR. ALLEN: Yes.
11  A. Yeah, that was the other one.
12  Q. (BY MR. BROWN) Can you -- is there one or two or
13  three significant side effects of any of those four medications
14  that you can tell me about right now?
15  A. Well, certainly haloperidol can produce the -- just
16  like the other drugs, the extrapyramidal side effects. That
17  would be true for all of those drugs, to some extent. I would
18  say that as far as distinguishing another one off the top of my
19  head, no. I'd have to look at the -- and I have looked at the
20  labels for -- the current labeling for those drugs. I haven't
21  done historical comparison, but I did look at my -- the year I
22  have in my office is the 2007 PDR, I believe, or six.
23  Q. I know you don't have the labels in front of you
24  today, but at some point in time you sat down and you were very
25  conversant in all the adverse events associated with those four

**Page 310**

1  products and you stacked them up with Seroquel and it was your
2  determination that these four were better alternative for
3  Seroquel; is that right?
4  A. That -- not just on the label comparison, but that I
5  did, and then looking at what the published literature said.
6  For example, the perphenazine example was one where I think I
7  cite you an article that talks about where a doctor has done a
8  study comparing those and then looks at the cost-effectiveness
9  issue, as well as the efficacy issue for the drug. So, that
10 comes into play -- that comes into play in my mind, at least,
11 but certainly I have also done that exercise of looking at what
12 is there.
13     They don't all have the exact same toxicity
14 profile. But, to me, my issue is the metabolic profile is a
15 very important side effect profile based -- especially based
16 upon the type of patient we're talking about, one which -- as
17 we talked about earlier this morning, a schizophrenic who isn't
18 necessarily going to have a good diet, isn't necessarily going
19 to be able to inject themselves daily or take another drug
20 daily if they needed to. There's a lot of things about the
21 disease that might make it difficult to control diabetes. So,
22 to me, that's an important component.
23     MR. BROWN: I just have a couple more.
24     MR. ALLEN: I'm not agreeing to --
25     MR. BROWN: Can I ask one more question?

**Page 311**

1     MR. ALLEN: I'll give you one more. Because I
2  was going to cut you off. This is your last question of the
3  day.
4     MR. LASKER: Got 27 parts.
5  Q. (BY MR. BROWN) Dr. Plunkett, did you do the same
6  level of research into the side effect profiles of the other
7  four so-called safer alternatives as you did for Seroquel?
8  A. Probably didn't spend as much time, no; but I
9  certainly looked in the same type of resources, yes.
10 Q. Okay.
11     MR. ALLEN: Thank you. That will --
12 A. Well, in fact, I know I didn't spend as much time. I
13 mean, I know I didn't spend as much time.
14     MR. ALLEN: We'll be done for the day. And
15 if -- I don't think we have our agreements -- and I'm not
16 trying to be -- you're done.
17     Take Dr. Plunkett --
18     MR. BROWN: Let's go off for one second.
19     (Recess from 6:03 p.m. to 6:04 p.m.)
20     MR. ALLEN: This is Scott Allen. I'm going to
21 state what we believe to be our agreements. It is not my
22 intention to misstate what I believe our agreements are.
23     AstraZeneca and its counsel have used almost
24 seven hours today. Probably in the neighborhood of six hours
25 and 45 minutes, and I'll just take that as the number. Could

**Page 312**

1  be a little more, could be a little less, but six hours and 45
2  minutes. I'm certainly agreeable to giving AstraZeneca an
3  additional 15 minutes for the seven hours. And also, you know,
4  quite frankly, if you approach me, I would consider giving you
5  a little additional time. However, I think we've agreed you've
6  essentially exhausted the initial examination time.
7     I agreed, as I did this morning before we
8  started, as of my recollection, that I would give you
9  additional time on the, quote, new, close quotes, documents and
10 I will give you additional time with documents when you come
11 back. I will not give you, quote, additional time, close
12 quotes, on the old documents or the report. So, it's not a
13 whole new deposition. It will be a deposition on the, quote,
14 new, close quotes, documents.
15     MR. BROWN: Couple things.
16     MR. ALLEN: And I've agreed that she will not
17 review any expert report --
18     MR. BROWN: Or deposition.
19     MR. ALLEN: -- or deposition in the next two
20 weeks, which starts the 6th. Is that right, the 6th is Monday?
21     MS. KELLY: Yeah. It's Monday the 6th.
22     MR. ALLEN: The week of the 6th or the week of
23 the 13th, provided you take her deposition during that time
24 period. I'm sure you want to. But, for example, if you-all
25 decided, no, "I'm going to wait until November," I'm not going

**Page 313**

1  to make that agreement. So, during those two weeks, she won't
2  review those matters.
3     I have further told you that the -- lost it.
4  Well, it's somewhere on the record. I finally lost the piece
5  of paper. She had three days she could not do it, and I can't
6  remember what they are now. The 8th was one she could not. I
7  know that she couldn't.
8     MR. LASKER: 16th and 17th.
9     MR. ALLEN: I think there's two days in a latter
10 week that she cannot, but you can call me. I've also said that
11 the material I produced today with Dr. Plunkett and was
12 previously produced in what I understand to be e-mail, zip
13 drive, zip files was my good faith attempt.
14     I will tell you, as I said already on the
15 record -- I'm not going to repeat it all -- she was candid
16 about the reference -- was it reference list? And we're going
17 to try to obviously correct that. We're going to try to
18 correct that. And I've identified to you two things that are
19 not, quote, in the box -- and I don't think I'm necessarily
20 required to put them in the box. I don't know how I could --
21 which would be the AstraZeneca clinical trials website, and
22 then I've told you -- she told you she has reviewed a timeline
23 concerning Seroquel's approval. That's not in the box.
24     I'll be glad to give you what she reviewed
25 today, if you like it. As I understand, we were going to go

**314**

1  look -- and I've tried to -- as a matter of fact, I better not
2  make that agreement, but I think I know what she reviewed. She
3  told you it wasn't in there and we were looking for it.
4      MR. BROWN: Couple things.
5      MR. ALLEN: Okay.
6      MR. BROWN: To the extent we need to redepose
7  Dr. Plunkett on the material we got today, we'll agree to do so
8  in the next couple of weeks in accord with what Mr. Allen said,
9  with the following caveat, which is: To the extent that some
10 of the newer material in the significant volume impacts the
11 report, we may need to reference the report and discuss the
12 report.
13     Secondly, Dr. Plunkett mentioned an additional
14 list she had of company documents that was prepared -- that she
15 prepared; and to the extent that exists, I would like that
16 produced.
17     MR. ALLEN: To the extent it exists, it will.
18 You know -- and I heard that, by the way, and I made a note of
19 that. I will say, again, in case any other lawyers -- I know
20 you, Mr. Brown, would not do it. There's nothing nefarious
21 here. Sometimes witnesses say things that doesn't quite jibe
22 with -- it certainly doesn't jibe with my recollection, but she
23 said that. We're not hiding anything. I think -- as I heard
24 the context, I have a feeling she may not have, quote, that
25 list because of the way the context of it was. But if there's

**315**

1  such a list, I'll give it to you.
2      MR. BROWN: Right. The last thing I want to say
3  on the record is there was some new documents produced this
4  morning despite, I'm sure, a lot of efforts; but I can
5  represent that I've gone through personally the zip files and
6  many of Exhibits 1 through -- 100 through 165 weren't on that.
7      MR. ALLEN: Okay.
8      MR. BROWN: And it's my understanding from
9  today's deposition that there are other items that Dr. Plunkett
10 may have looked at because she said her reference list was not
11 accurate, even her updated one. And so I'm just going to ask
12 that you would just add that -- and we can deal directly,
13 Scott -- you will add whatever it is that she may have seen
14 that's not on the new reference list, that you would let me
15 know.
16     MR. ALLEN: You need to consult with me off the
17 record on that because I -- you and I may be having a
18 difficulty on this reference list versus what you sometimes
19 call reliance list. And I don't necessarily agree with that
20 terminology, so you'll have to talk to me.
21     Let me say something. Whether it was produced
22 in zip file or not -- I didn't try to make a comparison, but
23 one of the articles that was cited in the report, as you said,
24 was Koller. Well, that was the top article that was sitting by
25 her all day that was in her file that I produced in the box and

**316**

1  it's one of the 100 through 165 articles. Koller may not have
2  been in a zip file, but Koller was cited in her report. And I
3  submit to you that many of the documents, quote, in the box,
4  close quotes, were also cited in her report.
5      And also I submit to you that there's no
6  document in her box, in at least my definition, that would
7  constitute surprise. You're familiar with all of them.
8      MR. BROWN: You know, we could be here all
9  night. I don't want to be here all night. I think because
10 Mr. Allen has ceased the deposition, then the dep's over and
11 we're going to call it a day.
12     MR. ALLEN: Well, let me just say something.
13 Mr. Allen -- you didn't mean that. I didn't cease the
14 deposition. It was clear we went six -- we've been here since
15 9:00 this morning. It is now ten after 6:00. We've been here
16 nine hours. The evidence will reflect what it reflects. We've
17 sat here any longer than any witness I'm aware of. 9:00 to
18 6:00 is good enough for me. All right. Thank you.
19     (Deposition recessed at 6:11 p.m.)

**317**

    CHANGES AND SIGNATURE
PAGE   LINE   CHANGE     REASON

3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24     I, LAURA M. PLUNKETT, Ph.D., DABT, have read the
25 foregoing deposition and hereby affix my signature that same is

318

true and correct, except as noted above.

_____
LAURA M. PLUNKETT, Ph.D., DABT

THE STATE OF _____ )
COUNTY OF _____ )

Before me, _____, on this day personally appeared LAURA M. PLUNKETT, Ph.D., DABT, known to me (or proved to me under oath or through _____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

319

STATE OF TEXAS
COUNTY OF HARRIS

I, the undersigned certified shorthand reporter in and for the State of Texas, certify that the facts stated in the foregoing pages are true and correct.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken and, further, that I am not a relative or employee of any counsel employed by the parties hereto, or financially interested in the action.

The amount of time used by each party at the deposition is as follows:
ARTHUR E. BROWN, ESQ. - 6:43

SUBSCRIBED AND SWORN TO under my hand and seal of office on this the _____ day of _____, 2008.

_____
SHANON M. HAIR, CSR
Certified Shorthand Reporter
In and for the State of Texas

Certificate No. 6513
Expiration Date: 12-31-09
Firm Registration No. 03