# NF TAB 2

08-I-99343 sh

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This document relates to all Group One Trial Cases:

| | |
|---|---|
| Janice Burns v. AstraZeneca LP, et al. | Case No. 6:07-cv-15959 |
| Sandra Carter v. AstraZeneca LP, et al. | Case No. 6:07-cv-13234 |
| Connie Curley v. AstraZeneca LP, et al. | Case No. 6:07-cv-15701 |
| Linda Guinn v. AstraZeneca LP, et al. | Case No. 6:07-cv-10291 |
| David Haller v. AstraZeneca LP, et al. | Case No. 6:07-cv-15733 |
| Hope Lorditch v. AstraZeneca LP, et al. | Case No. 6:07-cv-12657 |
| Eileen McAlexander v. AstraZeneca LP, et al. | Case No. 6:07-cv-10360 |
| Clemmie Middleton v. AstraZeneca LP, et al. | Case No. 6:07-cv-10949 |
| Charles Ray v. AstraZeneca LP, et al. | Case No. 6:07-cv-11102 |
| William Sarmiento v. AstraZeneca LP, et al. | Case No. 6:07-cv-10425 |
| Richard Unger v. AstraZeneca LP, et al. | Case No. 6:07-cv-15812 |
| Linda Whittington v. AstraZeneca LP, et al. | Case No. 6:07-cv-10475 |

************************************************************

ORAL DEPOSITION OF

LAURA M. PLUNKETT, Ph.D., DABT

October 2, 2008

Volume 1

************************************************************

with literature to get ready to write a report, that's a guess. I spent a lot of time in my bills on preparation for training day for a judge in New Jersey. And that was last -- May, June? I forget the date of it. Last --

MR. ALLEN: They know the date.

A. It's in my bills. Anyway, so there was a time -- a good deal of time spent for that and I don't know the number. You can get it from my bills.

**Q. (BY MR. BROWN) We'll talk about the bills in a second. When did you start to prepare the report that you've marked as Exhibit No. 1?**

A. When did I actually sit down to write this specific report?

**Q. That -- yes.**

A. Probably the week before this date, which is September 6th. So, the very end of August.

**Q. And how many hours did you put in just for preparation of this report as --**

A. To type this one in?

**Q. Yeah.**

A. Probably -- maybe 20, 24 hours, 20 hours maybe.

**Q. Okay. And go to -- go to Paragraph 7, if you could, with me. Paragraph 7 is a summary of your information reviewed; is that right?**

A. Yes.

**Q. And it says "During the course of this case, I reviewed the following materials," semicolon. Do you see that?**

A. Yes.

**Q. And it lists three categories of information. First category says "Scientific literature relating to the pharmacology and toxicology of antipsychotic drugs in general and quetiapine in particular," correct?**

A. Yes.

**Q. "B, labeling for Seroquel as provided by the Physicians' Desk Reference," correct?**

A. Yes.

**Q. And you also reviewed regulations from the FDA relating to development, approval, labeling, and marketing of prescription drug products, correct?**

A. Yes.

**Q. Also attached to your report towards the back is reliance materials.**

MR. ALLEN: Is it titled "Reliance Materials"?

A. It's titled "Reference List."

MR. ALLEN: Yeah.

**Q. (BY MR. BROWN) Okay. Let me just clean that up. So, towards the end of the report, it says "Dr. Laura Plunkett Seroquel Reference List." You see that?**

A. Yes.

**Q. And that's dated October 11th, 2007?**

A. Yes.

**Q. And that lists some of the materials you relied upon in preparing your report, correct?**

A. Yes. And you should have an updated list. I prepared a new list for you early -- over the weekend, which was a 2008 list which will be more extensive than this --

**Q. Okay.**

A. -- so that you have that as well, which I believe you should have been provided with.

**Q. Yeah. We haven't been provided that, but we'll deal with that in one second.**

MR. ALLEN: Okay. We'll deal with it. I may be a little confused myself, but go ahead.

**Q. (BY MR. BROWN) So, can we agree that the material identified in this report, Exhibit No. 1, is not everything you looked at in arriving at your opinions regarding Seroquel, correct?**

A. I don't -- I can't answer -- I would say it probably is not every -- every scrap of document, but it's -- certainly I have provided you -- I've -- with everything that I was asked to bring for the subpoena, which is certainly everything.

**Q. Okay.**

A. So -- but, I mean, I know that this reference list was updated because I did it myself last weekend, so -- and this date, I can tell you -- that's why I'm looking at it --

that the date is wrong.

**Q. And did you provide the updated reference list to the lawyers in this case?**

A. Absolutely. As soon as I was told of the day of my deposition being set, I do what I normally do at that point, which is provide -- start gathering the materials that I'll be asked to bring to deposition. So, I -- and I didn't get the date to my deposition, I don't believe, until last week sometime. And I don't remember the date, but last week I was told that it was set for this day. And I was actually out of town, which was a problem, too.

**Q. What --**

MR. ALLEN: Arthur, just for the record, if we have that, I'll get it to you. I'm not -- I know, just for myself, that I don't have that and I'm going to try to locate it and I just -- we'll talk about it with Dr. Plunkett at the break. I've given you -- and I have a box behind me of everything we brought in response to the subpoena. So, I just don't want a record getting started that I'm hiding anything. I will look. I looked at my file right here and all I have --

MR. BROWN: Well, whether it's hidden or not, we don't have it all --

MR. ALLEN: Well, we'll talk about -- I won't argue with you. What I'm telling you on the record, there's an additional reference list. We'll provide it. I'm telling you

on the record we brought the material, as I said, in this box behind us right here.

**Q. (BY MR. BROWN) Dr. Plunkett, when did you complete the updated reference list you described?**

A. I think Sunday.

**Q. And who did you send it to?**

A. April Thompson.

**Q. Did you send it by fax?**

A. No. By e-mail. It's an electronic file.

**Q. And did you put a date on that list of materials?**

A. I'm not sure. You have to tell me. I believe it does. I mean, it's in this box, so we can look at it. I believe I have a date on it.

**Q. Dr. Plunkett, you referred to a box of material that's behind you, correct?**

A. Yes.

**Q. Did you bring that with you today?**

A. I -- well, it was carried by somebody else, but the material I brought yesterday to a meeting with the attorney to show him what I was bringing to the deposition and then this was left here and then we brought it down the hall today for you. Or, actually, I think he made copies because most of the -- I have my originals here and he made copies for you of what my originals were.

**Q. Based on your report -- your report that you have in**

**front of you marked as Exhibit No. 1 seems limited to published information; is that correct?**

A. No. It -- well, I mean, my -- I certainly had reviewed more than published information when I wrote the report, but I think this reference list, for example, is probably just -- at this point in time would have been just published information --

**Q. Yeah.**

A. -- from 2007.

**Q. That's what I'm trying to get at. From the list -- the October 11, 2007, Plunkett reference list, that's limited to published information, correct?**

A. Let me look, but I believe it's all published information. Published or textbook.

**Q. Okay. And in the box behind you that you brought with you yesterday, there is --**

MR. ALLEN: Well, let's make the record clear. She didn't --

MR. BROWN: Scott, don't --

MR. ALLEN: Well, wait a minute. No.

MR. BROWN: Please, in the middle of my question, do not cut me off.

MR. ALLEN: Well, wait before you answer this question.

MR. BROWN: Yes.

**Q. (BY MR. BROWN) You testified a minute ago that you took -- you brought a box here with you yesterday, correct?**

MR. ALLEN: No. She -- and don't answer that question. Arthur, she told you she brought this material, I made copies, and we brought the box down here.

MR. BROWN: She can tell me if I'm wrong. You're not here to tell me I'm wrong. Let her answer the questions.

MR. ALLEN: Don't misrepresent her testimony. She had this material. I made copies for you and put them in a box.

MR. BROWN: Your remedy is "Objection. Form." That's your remedy.

MR. ALLEN: Well, no, it's not if you're going to be misleading, but go ahead.

MR. BROWN: I'm not being misleading, Scott.

MR. ALLEN: Go ahead. I'm sorry. Go ahead.

**Q. (BY MR. BROWN) Dr. Plunkett, the box behind you, that contains more information than is described in your report, Exhibit No. 1, correct?**

A. It's certainly more information than is on this reference list, that is correct.

**Q. And is the material in the box that we have here today -- is that material itemized or identified in the report, Exhibit No. 1?**

A. Oh, I'm sure it's not. I would never -- I never do that in my reports. I don't itemize material in the report. Again, I cite examples of material that support the statements that I make in my report and then always provide a deposition to the attorney -- a compilation of all the materials that I have reviewed that support my opinion.

**Q. When you gave your opinion in the -- and prepared your report in the Canadian litigation that Seroquel causes diabetes, had you reviewed anything other than published literature?**

A. Yes.

**Q. What had you reviewed besides published literature in arriving at your opinion that Seroquel causes diabetes in the Canadian litigation?**

A. I had been provided with some internal company documents that were -- Dear Doctor letter to Japan, some correspondence around that. So, I don't remember exactly -- I can't tell you how many. I don't think I -- they're -- they should be provided to you on the CD, but certainly whatever documents went with the Dear -- the changes in the labeling in Japan.

I would have also provided -- I was also provided, I believe, with a letter from a French authority at the time and I was provided with product insert material relating to the Canadian product. So, Seroquel in Canada.

34

Canadian has consumer information and physician information documents that are different than our Physicians' Desk Reference document, so I was provided with that.

**Q. Then can you --**

A. And -- let me think. I'm also -- I believe I was provided with some documents that were identified as S-E-R-M, SERM, documents which I believe -- it's my understanding it's a committee within the company that meets that looks at safety issues, and there were some of those. Some of those I was provided later after the Canadian report, but some of those were before. And that's what I can recall off the top of my head.

**Q. Why didn't you identify them in your report, all those materials you just described?**

A. I -- that's not how I normally draft my reports. Again, I draft the report based upon -- well, depends what the report's talking about. This report was generally -- was -- has different sections. There's a general section on causation, okay? And, again, I try to cite the documents that I believe are most important in describing my opinions, but it's not every document. So, that's why I always give you a reference list and give you a bigger box of materials that are things I reviewed and relied on but may not have cited in my report. It's just how I write my reports.

And then there's a section on warnings and

35

labeling usually, and in this litigation there is. And normally in that, I have reviewed some internal company documents or I've reviewed labeling documents. And I don't cite them necessarily, but I provide you statements and then give you an idea of what it is that I base that upon by -- based upon what I've reviewed, and then usually in deposition we talk about them.

**Q. Is there any way I could tell, for example, in your report that you reviewed SERM documents?**

MR. ALLEN: Objection. Form.

A. I don't know if I've cited them. I doubt I have. Let me look and see.

I haven't cited them specifically, no, but certainly some of the statements I make in the -- in the document -- in the report are supported by some of the information that I reviewed in the SERM document.

**Q. (BY MR. BROWN) Why don't you identify the statement that you're referring to that would indicate to me that you reviewed SERM documents?**

MR. ALLEN: Objection. Form.

A. I think I've already told you. I said I don't cite them specifically, but I -- if we want to -- if you want to go through my report as we go through my opinions, I can try to tell you which opinions I believe the SERM documents support.

**Q. (BY MR. BROWN) We're going to --**

36

A. Or how I -- how the SERM documents, to me, were relevant to the opinions I've expressed. I can certainly provide you with that as we're here today in the deposition.

**Q. And we're going to do that. We're going to walk through the report. But as you sit here today, can you point to me in your report -- I'm using the SERM documents as an example -- where I could be able to tell that you looked at these SERM documents?**

MR. ALLEN: Objection. Asked and answered. Don't answer the question further. She's answered it already. Let's move on.

MR. BROWN: Are you going to order her not to answer that question?

MR. ALLEN: I'll let her answer it one more time, but it's -- objection. Form. Asked and answered.

A. I have told you I have not cited -- I can't find you a parentheses that says "SERM" after it to indicate that that document goes with that statement. But, certainly, I believe I've done what I always do in litigation, which is I've given you documents I reviewed and I've given you my opinions and then we discuss those. So, I -- you know, again, this is what -- this is my normal process or procedure for how I write a report.

MR. BROWN: Scott, can we look at the -- can I mark that box?

37

MR. ALLEN: Yes, you certainly can. As a matter of fact, I want you to mark the box. That's why I brought it. Let's you and I go off the record, talk about the best way to do it, and then we'll get back on the record, figure it out.

(Recess from 9:49 a.m. to 10:14 a.m.)

**Q. (BY MR. BROWN) Dr. Plunkett, I think we've established -- and you can correct me if I'm wrong -- that there is a group of documents that are in the box behind you that we're going to mark later on in the day that aren't specifically identified in your report; is that correct?**

A. That's true.

**Q. And it's my understanding that you've received the materials in the box -- and I think there's 4 or 5 inches of materials -- over time; is that right?**

A. Yes. I've received some over -- well over a year ago, and some as early as June of this year.

**Q. And you think you did an updated reliance list that will identify at least some of the materials in that box; is that correct?**

A. Yes. In fact, most, if not all. I mean, I specifically did that list this weekend and I identified everything, I believe, that I could find, but --

MR. BROWN: Okay. I'm going to put a statement on the record.

There's a new box of material that was produced

this because this is the material she reviewed and I copied it for you and I put it in that box.

MR. BROWN: Okay.

**Q. (BY MR. BROWN) And the work you've done on the Canadian litigation is also included in your billing records Exhibit 3, correct?**

A. Yes.

**Q. You consider yourself an expert in pharmacology?**

A. Yes.

**Q. And can you give me the short explanation of what pharmacology is?**

A. It's the study of drug actions on the body.

MR. ALLEN: Good job. That's short.

**Q. (BY MR. BROWN) And do you consider yourself an expert in toxicology?**

A. Yes.

**Q. And can you give me the short explanation of what toxicology is?**

A. It's the study of adverse effects of chemicals on the body.

**Q. And do you consider yourself an expert in any other discipline?**

A. Yes.

**Q. And what other disciplines do you consider yourself an expert in?**

A. I have expertise in pharmacokinetics. I have expertise in risk assessment; and as applies to drugs, risk-benefit. I have expertise in FDA regulatory matters, and that include pretty much all aspects of the regulations as they pertain to the development and marketing of pharmaceuticals. I also have expertise in -- I have specific expertise as well in certain subdisciplines within those general areas, but those would be the large general areas.

**Q. All right. We'll put pharmacokinetics aside. I consider that related to pharmacology. I want to talk about the other three. You consider yourself an expert risk assessor; is that fair?**

A. Risk assessment, yes.

**Q. Is that different -- and you also consider yourself an expert in risk-benefit analysis, correct?**

A. Yes.

**Q. Are those different concepts or the same?**

A. Risk-benefit, to me, is a subdiscipline within risk assessment. When you do a risk-benefit analysis, you're doing risk assessment and you are weighing both benefits and adverse events or risks of a drug. That's specifically what you're doing. You can also do risk-benefit for things other than drugs. You can do it for food additives, you can do it for pretty much anything you wanted to do. I mean, if you -- that's regulated by the federal government. You definitely do

that when you look at pesticide products. It's the benefit of the product versus the risk to the public.

**Q. So, when you do a risk-benefit analysis, you need to know about the effectiveness of the medicine, correct?**

A. Efficacy, yes.

**Q. And you need to understand the population or the people taking the medicine, correct?**

A. Yes.

**Q. And you need to understand, for example, what their background risk is for different diseases, correct?**

A. You would -- depending upon the assessment you were doing, that could be a part of your equation or your scope of your assessment.

**Q. And when you're doing a risk-benefit analysis, would you also need to understand the comorbid conditions of the disease the drug attempts to treat?**

A. Depends. I think that's a highly -- highly dependent depending on the type of drug and the -- but certainly in many cases when you're doing risk-benefit, you're looking at the -- I guess to boil it down is you're looking at the patient population being treated, and it can be a very varied population or can be a very distinct population. And so you certainly consider that as part of the overall assessment.

**Q. And you'd also consider, obviously, any adverse effects the drug may have, correct?**

A. Well, that's the risks that you're looking at, yes.

**Q. Okay. And that's a subset of risk assessment, correct?**

A. That's one application -- to me, risk-benefit assessment is an application of risk assessment, which is a tool; and in a risk-benefit analysis, you use risk assessment.

**Q. Okay. And can you tell me generally what risk assessment is?**

A. Well, depends -- the -- in general -- very general terms risk, assessment is an analysis of the adverse events or harm that can be caused by either a chemical or a series of events. So, you could have risk assessment that could be applied to driving a car, which is an event, versus risk assessment applied to benzene in the air or risk assessment as it pertains to Seroquel.

**Q. Are you going to be offering a risk assessment opinion in the Seroquel litigation?**

A. As it pertains to the -- I've done that with my causation opinion. That is a risk assessment opinion in some aspect of it, but certainly not -- certainly, if you want to define "risk assessment" only in the way that it's defined by the National Academy of Sciences, I've done parts of that process with Seroquel; but parts of that aren't necessarily applicable. For example, I can't do quantitative dose response assessment because I don't have the data that allows me to

determine the threshold of events, okay? So, that's part of the distinction that you might do -- for example, benzene in air -- versus you usually can't do for chemicals. You can come up with a -- sort of a range but maybe not a dose.

**Q. We'll talk about those standards in a minute, but is it fair to say that your report summarizes your risk assessment opinion?**

A. I hope it does. That's my intent.

**Q. Are you also going to offer a distinct opinion on the risk-benefit profile of Seroquel in this case?**

A. I think that's in my report. I mean, I've tried to talk about -- when I talk about failure to warn and health risks, in that part of my section, I'm talking about the -- I have a couple paragraphs on the efficacy and the comparative efficacy and the fact that there may be safer alternatives. That's part of risk-benefit.

I have not done for Seroquel, as I have not done for any of the drug litigation I've worked on, the same type of risk-benefit assessment that an FDA regulator does because I don't have access to every piece of data from the NDA and the IND as they would do it.

**Q. And you also can't do a risk-benefit assessment like a medical doctor would do, correct?**

A. Well, I'm not a medical doctor. I do a risk-benefit assessment as a pharmacologist, toxicologist, and a regulator

might do it because many regulators are pharmacologists and toxicologists.

**Q. You also consider yourself an FDA expert?**

A. Yes.

**Q. Are you going to be offering in this case any expert opinions regarding FDA regulations?**

A. I may. I mean, it depends upon how the questions are asked. Certainly, the FDA regulations that come into play here would be the labeling regulations and certainly also potentially the -- if asked or if it comes up -- it hasn't so far -- about the adequacy of the data that was submitted, things like that. But that's an opinion that I have not formed at this point in time and would not be laid out, but I could do that if asked.

**Q. Okay. As you sit here today, are there any opinions based on what you know and what's in your report that you would describe as FDA regulatory opinions that you intend to give in this case?**

MR. ALLEN: Objection. Form. And let me just let me state for the record -- because the question calls maybe for a legal conclusion -- her opinions are contained in this report. And, as I said, the additional material, alleged new, does not alter those opinions and we will say her opinions are contained within her report.

MR. BROWN: Let me just ask this question,

Scott. This might make it easier. Do you intend when you offer her at trial as a witness to qualify her as someone who's an expert in FDA regulations?

MR. ALLEN: Yes, to the extent that it's dealing with the issue of failure to warn which is described in her report and throughout her report and those opinions concerning warning and failure to warn.

In essence, I'm telling you, Arthur, we intend to offer her as an expert in the opinions and areas she discusses in her report which you marked as Exhibit 1, in addition to those matters that would have been included within the -- which I brought for you and I know you-all already had -- I hope you had -- the slide presentation that was done in the New Jersey -- was it New Jersey Science Day? Those slide shows, in addition to thereport that should have been provided and you-all would have had in Canada. So, those areas discussed.

And I think – well, I know this: Exhibit No. 1 is not an attempt to trick or hide anything. I think her opinions are expressed in here and you're obviously -- as you do in any deposition, you're welcome to question her on these opinions and have her amplify it.

MR. BROWN: Well, thank you very much. I appreciate it.

MR. ALLEN: Okay.

**Q. (BY MR. BROWN) You've never worked for the FDA, have you?**

A. As an employee, no.

**Q. Have you ever been hired by the FDA as a consultant?**

A. No.

**Q. Have you ever been asked by the FDA to review individual adverse event reports or groups of adverse event reports?**

A. Not the FDA, no.

**Q. Have you ever been asked by the FDA to review any sort of case reports or anything? Strike that. Case reports.**

A. No.

**Q. Have you ever been asked by the FDA to give any opinions on labeling issues?**

A. By the FDA, no.

**Q. You ever published anything in the peer-reviewed literature on FDA regulations?**

A. There's -- it -- there's -- I'll point you to it.

**Q. Okay.**

A. In my CV, there's a chapter on -- book chapter on food additives that was peer reviewed. And the miscellaneous document, the Environ report -- it's not peer reviewed by the outside scientific community but was peer reviewed within the company. It used to be a journal that the company I used to work for used to put out to their clients.

**Q. And that dealt with prescription medicines?**

A. It dealt with the safety of silicone gel-filled breast implants, so it would be a medical device.

**Q. Let me ask you more specifically. My question might have been poorly worded. Have you ever published anything in the peer-reviewed literature regarding prescription drug regulations?**

A. I don't believe so, no.

**Q. And have you ever published anything in the peer-reviewed literature regarding the prescription drug process, approval process of the FDA?**

A. No. I've done presentations, but I don't believe I have a journal article on that area.

**Q. Okay. Have you been asked to give your risk-benefit assessment for a prescription drug medicine outside of the context of litigation?**

A. Yes, in some context. Not exactly the same way I do it in litigation, but, yes, in some context.

**Q. Okay. Let's focus first on -- describe for me what risk assessment is generally here, the overall risk assessment. Have you ever been asked by anyone besides a plaintiff's lawyer to give the overall risk assessment opinion that you give in a case like Seroquel?**

A. As a consulting expert at Environ, yes.

**Q. And can you identify the prescription medicine that**

**you did the overall risk assessment for? Yes.**

A. I -- I have trouble with this question because I have signed confidentiality agreements with Environ. It was consulting work. I can tell you it's an antibiotic. I can give you the general class. And I've answered that question before many times, been asked that question.

**Q. Besides the antibiotic, are there any other prescription medicines -- by the way, did that antibiotic get approved by the FDA?**

A. It was actually a drug on the market and the company -- the issue we had was looking at, after approval, some adverse events in post-marketing. And actually the drug was eventually removed from the market.

**Q. When you were asked to give your opinions in that case -- we'll call it the antibiotic case; is that fair?**

A. Yes.

**Q. When you were asked your opinions in the antibiotic case, was it to assess whether or not the benefits of the drug outweighed the risks?**

A. No. That wasn't the exact question, although that was part of what we did, but that wasn't the exact question I was being asked. That's why I said "in some context." It's not the exact same context.

**Q. Give me the exact question you were asked, to the extent you recall.**

A. Could the events being seen post-market be predicted based on the -- all of the data that was gathered in development of the product; and based upon that, should the drug -- should the drug remain on the market or not.

**Q. The antibiotic company, did they retain you particularly or Environ generally?**

A. They retained Environ and I was the expert person within the company, with one other person. There were two of us who worked on the case.

**Q. What part of the case did you work on?**

A. I was -- I worked on all parts of it. The two -- it was a huge endeavor where we had to go through the entire files of the NDA -- all the animal studies, all the clinical studies -- looking for mentions of a particular adverse event. So, it -- we -- I looked at all parts of it. We just did it together.

**Q. Were you -- have you ever given advice to anyone outside of litigation on events that should be included in a warning, for example?**

A. Yes.

**Q. Can you identify that circumstance for me?**

A. That's with -- I worked with a medical device company and helped them develop standard operating procedures for their adverse event reporting system. As things came in, how they would decide what things would go into reporting to the agency

and potentially could impact the product insert, which is -- you know, a device has a label. It's not the same type exact of label because it's looked at by the doctor as he takes the device out of the product. In this case, it was a surgical-type device, so would be looked at by the physician as he's using the device; not in a PDR, for example.

**Q. Let me see if I understand. So, you helped develop SOPs for --**

A. I --

**Q. -- for reporting adverse events to the FDA for this medical device company, correct?**

A. Yes, and then whether or not -- and also as part of that, they had some events and we were looking at whether or not the current labeling for the device was reflective of what they were seeing or not seeing.

**Q. Who was the medical device manufacturer in that case?**

A. Weldon Guest is the guy that runs the company. It's a cadaverous implant. And I'll -- if you need the name, I can get it for you. I just don't remember off the top of my head the name of the company. I haven't worked with him for, like, three years.

**Q. When did you prepare these SOPs?**

A. 2004.

**Q. Were you -- in that case, in the medical device case, were you asked specifically whether or not adverse events the**

**company were receiving should be put in particular sections of the label?**
A. That wasn't the question because these were going to be -- these were things that were going to end up in the warnings because of what was happening. So, it was -- I guess I -- that wasn't the question being asked me, but certainly that was something that you looked at when you were getting the events. They were getting some events that had to do with severe life-threatening type reactions.
**Q. Okay.**
A. So, whole different -- you know, very specific where that would end up. It wasn't a question of trying to dissect it out. But certainly the standard operating procedures we put together talked about how you had to determine where things went or how things were reported to the agency.
**Q. What was the adverse event of interest?**
A. In -- in the --
**Q. In the medical device case, the cadaverous --**
A. This was failure of the -- this is a -- this was a cadaverous piece of tissue that is being put into a living human and, if it fails, it could be life threatening or also require more surgery, which is also always a risk to the patient.
**Q. When you were retained in that case, was there already a warning on that medical device label?**

A. I don't remember that. I can't answer that question. I would have to go back and look.
**Q. Were you asked by the medical device manufacturer in that case whether or not the adverse event should be included in the warning section?**
A. That wasn't -- again, that was not -- there was no question that it was something that was happening was -- would fit there, so that wasn't the question we were being asked to answer.
**Q. Besides -- I apologize for that. Besides that medical device manufacturer, have you ever been asked by a prescription drug manufacturer labeling advice on whether or not an adverse event should go into a warning section, for example?**
A. I don't know if I've been asked that specific question. I -- to -- it may be best if I just summarize -- do you want me to summarize the labeling experience that I've had? Would that help you or --
**Q. Let me ask this question first before you do that: I think I have a sense of some of it, but is there -- has any prescription drug manufacturer ever asked you, "We have this adverse event. Here's the evidence about it. Where does it go on our label?"**
A. No. I don't believe I've ever been asked that. And, again, I wouldn't expect to be because that's usually things

that are kept within the company as far as the company employees are making those decisions, for a marketed prescription drug product at least.
**Q. And, also, the FDA makes those decisions, correct?**
A. Well, the company drafts the label and makes the changes to the label. Sometimes it can be requested by FDA, but normally it's initiated by the company and the agency will then approve or disapprove the changes that are being suggested by the company. It's a negotiative process.
**Q. Okay. You're not a medical doctor -- we've discussed that -- correct?**
A. I'm not a physician, that is correct.
**Q. You have an undergraduate degree in zoology?**
A. Yes.
**Q. And a Ph.D. in pharmacology?**
A. Yes.
**Q. Which includes that pharmacokinetic stuff and pharmacology stuff, correct?**
A. Yes, but I'm also board certified in toxicology separately.
**Q. Okay. You don't treat patients, right?**
A. No, I don't.
**Q. You don't write prescriptions?**
A. No.
**Q. You don't have any specific training in psychiatry?**

A. Not trained as a psychiatrist, no.
**Q. You've never treated mentally ill patients, correct?**
A. No.
**Q. You wouldn't be qualified to diagnose someone with mental illness, correct?**
A. I don't diagnose people with any illness. That's not my job.
**Q. No specialized training in diabetes; is that right?**
A. I'm not a diabetologist, but certainly I have training in human physiology, where in my graduate degree diabetes was a disease that was studied and discussed to a great extent. And I had -- a good friend in my lab that I worked in, her animal model was an animal model of diabetes. So, I had direct exposure to looking at those aspects of studying diabetes, how -- the pathogenesis and different drugs that she was interested in looking at mechanisms behind which you could manipulate and be able to change the outcome in the animal.
**Q. Do you consider that specialized training in diabetes?**
A. I consider that much more specialized -- that's why I answered the question the way I did. I certainly have direct experience looking at animals developing diabetes and have actually done -- had specific courses where that was something I had to study and investigate separately from this litigation.

82

**Q. (BY MR. BROWN) Okay. When -- aside from the plaintiffs' lawyers who have used you in the past, can you give me an rundown of the type of clients you have currently?**

A. Yes. I have three basic areas of practice within my company. I'm a patent agent and I work on patent prosecution. I am a regulatory consultant and I have clients that I work with on issues related to their products -- either in development or already on the market -- as they pertain to FDA, EPA, Consumer Products Safety Commission, a variety of other regulatory bodies within the United States. And then I have litigation, and litigation is split into the kinds of work I have done with plaintiff attorneys and I also work with defense attorneys.

**Q. Have you ever been --**

A. I also work with -- I'm sorry. And I -- the other areas -- I also do insurance company -- I work for insurance companies in litigation. So, three types of litigation clients.

**Q. What percentage of your income is derived from litigation, plaintiff or defense?**

A. It's highly variable on a month-to-month basis. Some months zero, some months it's my entire month because, again, I'm mainly a sole practitioner as myself doing that technical work. I would say that it averages over the year probably about a third, a third, a third. So, 30 percent would be

83

litigation, 30 percent consulting, and 30 percent patent work. But that's not the same as the time I spend. That's because I charge different rates depending on the type of client I have.

**Q. What do you charge your patent clients per hour?**

A. Much less. And I don't actually have a set rate. It's variable. Around $150 an hour probably, but it depends upon the client. Universities and small startups can sometimes be set fees, but not by the hour; like, I write something for a thousand dollars and however much time it takes, I have to write it for a thousand dollars.

**Q. And so the range of your hourly rate for your work as a consultant in patent cases is 100 to 150 bucks an hour?**

A. I would say the range is from 100 to 200. It just depends. And, again, sometimes in patent cases I'm acting as an expert, providing a declaration, so I charge more. 50 percent of my time is spent usually on patent work.

**Q. 50 percent of your time during the course of a normal year is spent on patent work?**

A. 50 percent of my time working in the office, I'm working on patent work normally.

**Q. When you're a regulatory consultant, what do you charge as an hourly rate?**

A. Depends on the client. I have some older clients that I have agreed not to change my rate for. All my clients now are being charged as of -- I've increased my rates this

84

year, $300 an hour; but I have some that are still at 250 an hour. I have one client, old client, that I've had since '97 that I still charge, I think, $200 an hour or 195.

**Q. How much money did you make last year?**

A. Personally or the company?

**Q. Let's talk personally.**

A. I can't tell you personally because I honestly don't fill out the tax returns. I'd have to go and get that for you. The company brought in, as a whole -- which is my husband and myself -- I think just shy of $300,000, and part of that is paid out in expenses. The majority of it is salary though because the majority of what I do is working on an hourly basis.

**Q. That was for the calendar year 2007?**

A. Last tax season. So, 2007, yeah.

**Q. And what percentage of that $300,000 did you derive from testifying against pharmaceutical companies?**

A. I couldn't tell you. I'd have to go and pull that out. I have no idea. Last year was not a big year for pharmaceutical litigation for me. Other years, much larger. So, I can't tell you the number.

**Q. How much -- what was your income in 2006? When I say "your income," I mean Integrative Biostrategies.**

A. The company in 2006 was about $320,000, and 2005 was 360. I had a significant decline in the last couple years due

85

to a drop-off in pharmaceutical litigation.

**Q. What was your best year for -- in terms of the money you made for pharmaceutical litigation?**

MR. ALLEN: I'm going to -- go ahead, Doctor. I'm going to let you answer that, if you want to. It's your matter. It's personal business. But at some point, I'm just going to stop.

A. I was going to say, I can't answer that. I'd have to go back and pull the numbers.

MR. BROWN: Scott, please don't coach the witness.

MR. ALLEN: I didn't. I was telling you. I said if she feels comfortable, she can answer the question. I'm telling you at some point I'm going to stop it.

Doctor, you can answer the question.

MR. BROWN: But her comment --

MR. ALLEN: I'm not going to debate you. Let's move on. My statement speaks for itself.

MR. BROWN: I'm going to ask the same question again. Let's see if you object.

**Q. (BY MR. BROWN) What percentage of your income -- I'm sorry. Strike that.**

**What was your most productive year from a revenue standpoint from money you got working for pharmaceutical litigation?**

A. It's the first step and it's the vehicle that's used to allow the company to test the drug on humans, and that's -- it's sort of a milestone within the development process. You submit the IND to the FDA; and if they find it acceptable, they can give you approval to then put your drug into human clinical trials.

**Q. What are the specific animal and in vitro studies that are required by FDA regulations?**

A. I couldn't give you the whole list off the top of my head, but generally you have to have some chronic -- acute toxicity testing, some chronic toxicity testing, dermal irritation, ocular irritation testing. You will have some kind of chronic study -- usually up to about one year -- in least one species, usually two, and usually dogs and rats.

You will also need to have usually at least started before the IND a reproductive toxicity study, although often those are done before the IND -- those are being completed even after the IND has been submitted, those are in process, with the then proviso that the drug will not be put into pregnant women and things like that if they're going to be tested. Most companies nowadays finish the repro test first; but in older cases, I've seen cases where that hasn't happened.

You may have to do a cancer study as well, and that often goes on after the drug because it depends on whether you're looking at chronic administration or short-term

administration of the drug and whether that's appropriate. And then the in vitro tests are usually studied -- they're not prescribed specifically, but the FDA expects to see mechanistic data. They want you to at least tell them something about how the drug is expected to work at least as a class.

So, there's usually receptor binding data or some cell culture data that talks about the fact that, you know, this drug binds to -- well, in the case of this class, binds to dopamine receptors, serotonin receptors, you know, the kinds of things you expect to see to classify the drug as an atypical antipsychotic in this case.

**Q. When was the Seroquel IND submitted?**

A. I can't give you the date. It would have been in the early Nineties, but I can't give you the date.

**Q. Have you reviewed the Seroquel NDA?**

A. Only some of it. I have seen some of the clinical studies; and I've provided those to you here, some of the summaries that I've seen. I've also gone on to the AstraZeneca website and looked at some of the clinical trials that are listed on there that were part of the NDA. But I haven't reviewed the entire NDA, for sure, and I certainly haven't even seen every clinical study, I'm sure, that -- in detail that's been submitted.

**Q. You pointed to the documents next to you. We'll talk about that next time we meet when I go through the documents,**

**but can you give me a sense of how many clinical trials you've actually reviewed?**

A. Well, I -- if you want -- I can tell you exactly if you want me to look at at least the table of contents here real quick.

**Q. Yes. When you refer to the table of contents, are you referring to a particular document?**

A. Yes.

**Q. Okay. I want to identify that document.**

A. Okay.

MR. ALLEN: I think it will be -- go ahead.

A. It's the discussion document, "Seroquel and Glucose Disregulation," dated June 2007.

**Q. (BY MR. BROWN) Okay.**

A. And it -- you want the authors?

**Q. Well, first of all -- yes, go ahead, identify the authors.**

A. The authors are Lisa -- I'll have to spell it -- B-o-o-r-n -- as in Nancy -- a-z-i-a-n, et al. There's three authors.

**Q. Was that part of the NDA?**

A. No, but the -- there's trials in here that were -- are part of supplemental NDAs or part of drugs that are performed during development of the product. These three -- the three trials in here I'm looking at probably were not part

of the original NDA but probably part of a supplemental NDA, is my guess.

**Q. Have you reviewed -- I'm sorry.**

A. And in addition to that, on the documents that I -- I can list you the three -- I think there's three or four in here; and then in addition to that, I've seen some of the summaries of -- study reports that appear on the AstraZeneca website for -- I'd have to go back and look at the numbers, but there's particular studies that I just kind of glanced through to look at whether or not I saw discussion of this endpoint, hyperglycemia, or the kinds of endpoints that may or may not have been monitored; and sometimes they were and sometimes they weren't.

**Q. Which -- put that document aside. You said you --**

MR. ALLEN: Let's make sure to get it back in order. And just for the record -- because I want the record to be clear -- she was referring to the document that begins Bates No. AZSER 14868252. And I think -- by the way, you keep on making that assumption and I've been -- you may prove me wrong or I may prove you -- that every document here that's sitting to her left that's in the box you had not previously been provided. I'm telling you that's not necessarily my belief.

And I'm not trying to interrupt you, but I tried to do my best to make sure that I had everything today, but I think -- you know, I'm pretty dang sure actually that some of

these materials you know about. But that's -- just trying to be -- really, I am trying to be helpful, but go ahead.

**Q. (BY MR. BROWN) In -- let's take a step back for a moment on the IND. What portions of the IND did you review?**

A. I said I'm -- I did not specifically review the IND that I'm aware of. I don't remember seeing any documents that were summaries of the IND in the documents that I've reviewed. So, again, I don't recall that. Maybe in that list of documents there's a document from the IND. I certainly have not seen the whole submission, for sure, in one place.

**Q. How many individual study reports have you seen describing the preapproval animal studies?**

A. I can't recall. Maybe one or two at the most, if that. I'm not even sure -- I can't tell you that I've seen a preapproval animal study for sure. I'd have to go back and look. That was not a focus of my assessment at this point in time. The animal data that I looked for was in the published literature.

**Q. Okay.**

A. And then I -- when I looked through the documents that were provided to me, I don't recall seeing any documents that had animal studies that related to diabetic endpoints, but I can't answer that for sure.

**Q. If there were studies in the preclinical investigation of the drug that looked at glucose effects in**

**rats or mice or other animals, would that be something you'd want to look at?**

A. I would certainly always like to see any additional information that's available, and I assume that I will. The other thing you have to understand, in this litigation, as in many drug litigation areas I've worked in, certain documents don't become available to me until sometimes after my deposition or-- and maybe just even up to trial date and I may look at them as they become available.

At this point in time, I haven't looked at the IND. I didn't ask to look at the IND either because animal studies are part of the causation assessment but you really have to rely on what the human experience tells you because animals aren't always predictive of humans. In the Zyprexa litigation, the animal studies that were useful to me were not studies in the preclinical area from the IND but mechanistic studies done after the fact where the investigators in open literature, scientists, were trying to understand why they were seeing certain things with olanzapine that they may not have seen with another drug and sort of investigative studies after the fact.

**Q. Did you look at any of the receptor binding work that AstraZeneca did that was in the IND?**

A. Not an IND description of it, no. I've seen description of receptor binding work that has been in sort of

summary documents, either through reviews -- there's a couple of reviews in the published literature on quetiapine, one of which was written by -- can't think of the name of the journal, but it's a journal that often writes a summary of the pharmacology and the toxicology, preclinical and clinical, of a drug for -- to get it out there for physicians to see it's a new drug. And I can't think of the name of the journal, but it's -- it's not Drug Safety, but it's something like that.

**Q. All right.**

A. Maybe drug archives or -- I don't know -- some type of drug abstracts.

**Q. Well, as part of your opinion that Seroquel causes diabetes, you rely on animal studies, correct?**

A. Yes.

**Q. And as part of your opinion that Seroquel causes diabetes, you rely on receptor binding literature, correct?**

A. Yes.

**Q. But you would agree with me that you have looked at none of the animal studies that are in the IND or any of the separate receptor binding work in the IND; is that correct?**

MR. ALLEN: Objection. Form.

A. I think what I've said to you is I don't recall having looked at an IND submission document, but I can't tell you that what I've seen may not -- some of the documents I may have seen include summaries or discussions of that type of

data.

**Q. (BY MR. BROWN) Well --**

A. So, again, as I said, I do know that there's at least one summary paper that discusses what was seen in preclinical studies, but I don't -- again, I've not looked at the individual study reports for the IND, that is correct.

**Q. You gave me an exhaustive description of what's in the IND earlier, correct?**

A. Well, I don't know it was exhaustive. I gave you a description of what is generally included in an IND.

**Q. And you're a pharmacologist and a toxicologist, right?**

A. Yes.

**Q. And preclinical data is important, correct?**

A. For development of the drug, that is correct. It's what is used to help determine how you test it in humans.

**Q. Right. And you know for every single drug that's approved by the FDA, there's a corresponding IND, correct?**

A. Yes, there should be.

**Q. And they'll have lots of animal studies, correct?**

A. They should.

**Q. And those animal studies will look at lots of things, correct?**

A. Yes. In fact, they're meant to be sort of what I call broad scope because they try to pick up, you know, things

that may be even unexpected.

**Q. And they look at the effects of a product on certain animals in short-term and long-term studies, correct?**

A. Active ingredient in short and long-term, yes. Because, again, sometimes they're not always formulation studies. Sometimes they're just the active ingredient because they may be given intragastrically in an animal versus given as an oral tablet in a human; but at some point, you have to test the formulation as well.

**Q. Now, I've gone through your report pretty well, and you can prove me wrong, but there wasn't more than half a dozen cites to animal studies. Do you agree with that?**

A. I would agree that's probably true.

**Q. And you know that AstraZeneca, like every other drug company is required to submit an IND, did a lot more than six animal studies, correct?**

A. Well, I -- the animal studies that I'm referring to, I don't believe, were -- I don't believe that those are part of the IND. I may be wrong, but I don't believe they are. And I certainly am aware of the fact that they have to do a set series of studies; and if they haven't been done, I don't expect they would have gotten an NDA.

**Q. Right. So, you know they exist.**

A. Yes.

**Q. And you didn't look at them in arriving at your**

**conclusions here today, correct?**

A. That is correct.

**Q. Now, when you get the IND approved, it's a big meeting between the company and the FDA, correct?**

A. Well, I don't know a big meeting. There's certainly a meeting of some kind, yes, to discuss the design usually of clinical trials, things like that.

**Q. And does -- well, tell me about -- do you know what that meeting's called?**

A. You'd have to tell me what you -- I don't really -- can't off the top of my head tell you what it might be called. I just know that there is a meeting.

**Q. Is there a meeting between a company and the FDA after an IND is submitted?**

A. Possibly there is. It depends upon the product and the company. There's normally -- there's often meetings before that, too. Sometimes there's a pre-IND meeting before you even submit the IND to discuss what studies are going to go into the IND that you're going to do. Sometimes there's a meeting with a small -- a really small manufacturer first time through even before they do their first animal study, even before they think about it, to talk about whether or not they know what they're supposed to be doing to meet the FDA regulatory criteria.

**Q. Was there a pre-IND meeting in this case?**

A. I don't know. I didn't do a search for what meetings

there were. I can't tell you that.

**Q. Where'd you get that document, that June 2007 discussion document we've talked about?**

A. All of the documents that are internal company documents were provided to me by one of the plaintiffs' attorneys that I've interacted with in this case. This document came through the office of Fibich, Hampton & Leebron.

**Q. For all the documents that you've seen -- and I'm not sure what those are yet -- that are what we'll call internal AstraZeneca documents, who selected those for your review?**

A. I don't know who specifically did. They certainly were coming from plaintiffs' attorneys to me, so I assume someone within the firm or -- I mean, it may be that they've sent me, you know, things that were selected by someone else. I don't know.

**Q. Did you select any of those documents that we'll describe as internal company documents?**

A. Are you asking me did I select them from a roomful of documents?

**Q. Yes.**

A. No, I did not. I certainly have asked -- as I always do, I will let the attorneys know the kinds of documents that I would like to see, if available, and so they know that list and so they would then send me things responsive to that.

**Q. Did the animal studies and the receptor binding work**

**that the company did not make that list?**

A. I think initially I asked for any documents they had that described either human data or animal data that related to the endpoints of concern, and they -- I did not -- was not -- I can't remember being sent the IND itself and I certainly don't remember seeing any actually study reports that labs produce, which is normally what is put in with the IND, so -- but I did see -- like I said, I've seen some sort of summaries of their history of the -- what was in -- what they did on their drug by these sort of survey papers, but not the studies themselves.

**Q. I'm going to make a request, if you could identify the survey paper that describes the background on the animal studies that you say exists. It might be in the new materials. I just haven't seen it.**

A. Okay.

MR. ALLEN: Well, that's a request and we'll take it under advisement. Again, we brought the box, we provided you zip files.

**Q. (BY MR. BROWN) Well, Dr. Plunkett, do you know which study -- who the author is, what the name of the study is that summarize that data?**

A. No. I'd have to actually go to my computer and my PDF files and look for it for you. I can't tell you the name of it.

**Q. When the FDA approves a prescription drug product,**

there's a bunch of different folks at the FDA who have to review the NDA for safety reasons, correct?
A. Yes.
Q. And the FDA has chemists, correct?
A. They do have chemists, yes.
Q. Epidemiologists, correct?
A. Yes, they do.
Q. Toxicologists, like you?
A. They may not be exactly like me, but they do have toxicologists, yes.
Q. Fair enough. Pharmacologists?
A. Yes, they do.
Q. They have people who specialize in clinical trial design?
A. Biostatisticians usually, yes.
Q. Epidemiologists?
A. I've already said that. Yes.
Q. And medical doctors, right?
A. Yes.
Q. Would you agree with me that the FDA, in reviewing Seroquel's new drug application, had a lot more information available at its fingertips than you do here today?
A. Well, I'm -- certainly know that they've seen a lot more of the studies that were developed by the company themselves, absolutely. However, I don't know -- I'm pretty

sure that they haven't seen all of the published literature that I may have searched for because not necessarily -- when they make a decision on efficacy and safety, they make it based upon the information submitted by the company, and the company sometimes submits published literature and -- but some -- not everything that I've seen may have been submitted; and, certainly, some of the newer stuff obviously wasn't part of the discovery back in the late 1990s when the drug was under review. So, anything that happened after the approval date of '97 wasn't part of the original NDA consideration process.
Q. Is there any document or category of documents that you've looked at that you don't think the FDA has seen?
A. Are you asking about at the time they approved the drug in '97 or are you asking about ever seen?
Q. Ever.
A. I don't know. I would imagine they have not seen every published study -- literature study that I have seen because I would imagine that they had different questions on their mind than I did on my mind. They weren't trying to look at a specific issue the way I have tried to look at it in a weight of the evidence assessment because that's not their job. Their job is to look at the safety and efficacy of the drug put before them in the context of the regulatory environment, which is different than what my assessment is.
Q. When -- did you -- you know what a medical officer

review is?
A. Medical review officer, yes.
Q. No. A medical officer review, actually.
A. A document that they produce, yes.
Q. Tell me what that is.
A. It's a -- well, it depends upon the -- the context, but normally there's a summary document put together by the over -- they have -- usually have one medical officer who is put in charge of the submission and that person will write a general sort of summary document, integrated -- sometimes it's called an integrated efficacy or integrated summary document that describes sort of the risk-benefit profile for the drug based upon that medical officer's opinion, and it's something that has to be done before the drug is approved.
Q. Have you seen the medical officer review that was prepared for Seroquel in 1996?
A. I don't know. If it's in the documents, again, the list that I got together and provided, which you may or may not have seen, but, you know, it's -- I would have to go back and look. I don't recall that document, but I don't know. Maybe it was there and I haven't focussed on it.
Q. You understand there's a whole separate review at the FDA of pharmacology and toxicology, correct?
A. Yes.
Q. And you know that there was -- there exists a

pharmacology and toxicology review of Seroquel, correct?
A. I would assume there does. I haven't seen it that I can recall, but I assume that there is such a thing.
Q. Have you -- in this list of materials you asked the plaintiffs' lawyers for, did the medical officer review make that list?
A. I would have never said "medical officer review" specifically. I normally would ask for -- and I don't know whether I did in this case, but I would normally ask for documents describing FDA opinions about decisions made during the approval process, summary documents. Because normally I would look at the company's submission, their integrated safety and efficacy documents that sort of summarize their data in the NDA, and then I would like at the review opinions that come from the FDA on the efficacy side and the safety side, maybe the overall opinion of the medical review officer.
And then sometimes I'm also given -- in that request, I might be given informational -- information requests from the FDA where they've corresponded and asked for more information and then we see how the company responds. So, sort of the ongoing correspondence.
Q. All right. You identified a number of things there. You identified integrated safety -- integrated summary of safety, correct?
A. And efficacy, yes.

**Q. And efficacy. Is -- have you reviewed those documents in this case?**

A. The company's documents, no.

**Q. You also mentioned the fact that you normally review the summary opinions discussing the integrated summary of efficacy and safety, correct?**

A. I would normally ask for those things, and I may or may not get them. It depends upon what's available during discovery.

**Q. Did you ask for those documents in this case?**

A. I don't recall if I did or not. If I did, I would have asked for them last year, and I don't recall if I did or not.

**Q. Well, you said a lot of these things are sort of normal and customary requests of yours, correct?**

A. Yes. And sometimes -- and often I don't even have to ask. If I've worked with an attorney before, he knows the kinds of things I ask for. So, in fact, in this case, it may very well be that was the case because I was approached by Mr. Fibich and I'd already worked with him on the Canadian report -- actually, not with him, but the attorneys that I'd been referred to. And I know when I had those initials discussions with Mr. Fibich, I asked him if this was going to involve a report based on the U.S. and he said, "Probably."

And I said, "Well, then at that point in time,

there will" -- "you know the kinds of things you normally would send me."

And he said, "Absolutely." And I do believe that was the conversation here because I had also worked with him on Zyprexa and he knew the kinds of things I needed.

**Q. But he didn't send you the things you normally look at, did he?**

A. I certainly have not seen all of the things that I have sometimes provided. Some cases I'm not. It really depends on the case. And it also depends upon what kinds of opinions I'm being asked to provide in a case as well, like on adequacy of the testing. I'm not asked that here.

**Q. Okay.**

A. You know, like, for example, in fen-phen litigation where I worked, I was actually asked to answer some questions about the adequacy of the testing that was done and the --

**Q. And the clinical trial?**

A. Yeah, clinical trial submissions that were done, and I actually went through a series of, you know, analyses based on the FDA regulations, much different kind of testimony than I've been asked to provide here.

**Q. And you're not offering any opinion in this case on the adequacy of AstraZeneca's clinical trials?**

A. I have not been asked at this point in time, no. Again, I've strictly been asked to look at the issue of

causation and then the issue of failure to warn.

**Q. Well, if the integrated summary of safety and efficacy and the FDA's summary documents of those are normally what you ask for for review, why didn't you review them in this case?**

A. No particular reason. Again, it's based on what is available to me at the time I'm asked to write the report. In this particular case, I'm not being asked -- I'm -- the issue related to metabolic effects is not something that's unexpected with antipsychotics.

So, unlike Paxil litigation where it was very important that I look at those things because the issue of birth defects is something that I know I could see picked up in a preclinical teratology study, in this case, you don't normally screen animals in preclinical studies for changes in glucose. You may do some clinical chemistry, but it's not a focus of the studies. You would be able to look at some target organ toxicity. But, again, I also don't have an indication based upon the human data they have that this compound is a severe or potent toxicant to the pancreas.

So, again, I truly, in this case, when I was asked -- when I looked at the information that I had and whether or not I needed more, I would not have thought it was critical to look at the preclinical animal studies to identify something different than I had in the human experience.

**Q. Okay.**

A. So, that's sort of my thought process.

**Q. All right. So, Mr. Fibich knows the list of the stuff you normally want, correct?**

A. I assume he does.

MR. ALLEN: Yeah. Let me just get an objection. Objection. Form. But you can --

A. I assume he does.

**Q. (BY MR. BROWN) Well, you testified you think he knows the sorts of information you normally look at as part of being a retained expert, correct?**

A. Yes. In past experience, yes.

**Q. And that normally entails the integrated summary of safety and efficacy and the other -- in some summary FDA documents, correct?**

A. Yes. And if I thought it was important -- I would tell you this: If I had felt that I needed that to make the causation opinion, I wouldn't have made it without it.

**Q. Okay.**

A. And there have been cases, like the Paxil litigation, where I needed to see that before I was willing to make a causation opinion. So --

**Q. How did you know you needed to see that?**

MR. ALLEN: Let her finish. She said "so." Go ahead.

A. Okay. And I was going to say, so the reason I – and to tell you – I already answered this question before. The reason I needed to see it was because, again, birth defects is an endpoint that I expect to see looked at specifically in an animal study. In fact, there's animal an study directed at that endpoint.

So, in that case, I really want to look at that because we have information that indicates that animal preclinical studies are predictive of the hazard in humans for affecting babies. Doesn't mean you'll get the same birth defect. In fact, you may get very different defects. But if you see a clean preclinical study with absolutely no effects on the developing organism, then it's less likely that you're going to see anything like that happen in humans. You can still get it, but it's a lot less likely.

So, when I did my assessment, I would want to -- I would have to look at the preclinical studies because there is no published animal data on – those kind of studies don't get published, nobody publishes them. And so I really wanted to know what they saw. Here, again, the human experience of diabetes -- and diabetes in animals is not the same as -- as perfect as diabetes in humans and the animal models that are developed for diabetes, I know, are not part of preclinical testing programs for antipsychotics.

**Q. (BY MR. BROWN) You're sure of that.**

A. I am almost positive that you don't do the exact same thing. I will tell you that most companies explore some endpoints, and potentially they did in some animal studies, but I'm sure that it was not a particular focus of their preclinical program based upon the guideline studies they have to do.

**Q. If there were such studies that looked at glucose values, animal studies or tests that looked at metabolic effects in animals, would you want to see that?**

A. I would certainly welcome seeing it; but, again, I don't believe I need it in order to make the opinions that I have made in this case.

**Q. Okay. And you didn't review any part of the actual IND submission, correct?**

MR. ALLEN: Objection. Asked and answered.

A. I think as I told you –

**Q. (BY MR. BROWN) Oh, I'm sorry.**

A. Yeah. I think I said I don't recall.

**Q. Did I say "IND"?**

A. IND. I don't recall.

**Q. Let me withdraw the question.**

**You didn't look at any part of the NDA submission with the exception of the clinical trial reports that you looked at on the AZ website, correct?**

MR. ALLEN: Objection. Asked and answered.

A. I think that -- I think that's correct. I'm trying to think if there's anything else I want to add to it. That's what I stated already, and I would agree. I believe it would be the clinical trials on their website or this -- the clinical trials described in these sort of -- there's this document and there's another -- there's at least one other summary document, SERM document.

**Q. (BY MR. BROWN) SERM document?**

A. Yeah, that I think talks about maybe another clinical trial. But, again, I provided those to you. I guess they're in that box now behind me.

**Q. Okay. Do you know which studies you looked at on the AstraZeneca website?**

A. I couldn't answer that for you. I know I did look at 125, 126, and 127 because I wanted to see what was there versus what was in this summary document that I had.

**Q. Okay.**

A. And then I did glance through some others. Maybe -- 15 maybe was a study I might have looked at. I looked at some of the early -- I looked at some of the low-numbered earlier studies just to see what kinds of exclusion criteria were put. Did they describe their patient populations? How were they looking at the drug? So, they would have been some of the earlier studies on schizophrenia patients, is mainly what I would have probably looked at. I don't think I looked at any

of the later trials that might have been part of SNDAs, with exception of these trials here.

**Q. So, I have 15, 125, 126, 127?**

A. And then --

MR. ALLEN: She said she thinks 15.

A. Yeah, I think 15, if it's there.

**Q. (BY MR. BROWN) Well, did you look at every study in the AZ website?**

A. No, I did not.

**Q. Okay. Why don't you give me a list of the studies you looked, to the extent you can recall.**

MR. ALLEN: Objection. Asked and answered.

A. I was going to say. That's what I just tried to give you.

**Q. (BY MR. BROWN) Okay.**

A. In low-numbered studies – I know I looked at some of the lower-numbered studies, but I can't tell you -- some of them I just opened to look at what the description of the patient population was and the drug dosages, but I didn't do more than that.

MR. BROWN: Put a statement on the record. Scott, to the – you know I'm making a request that we come back. In advance -- in a couple days --

MR. ALLEN: Go ahead.

MR. BROWN: – in advance of a continued

A. Depends upon what it is for. For example, if it's a formulation change, then there could be some very specific things that might be required about the chemistry of the formulation and how -- what are the changes from the product that's already been on the market. You would have to do some bioavailability studies, you know, pharmacokinetic determinations for how the formulation behaves.

For a new indication, the key information that is going to be looked at is the trials that support the new indication listing; but, of course, there's other information that's there. It's an NDA, but it's abbreviated. It relies on the original submission and extends it. So, when you submit -- that's usually what happens. So, if you submit an SNDA, you're normally building upon the NDA that's already there with some additional information, but it has the same general sections as the original NDA.

**Q. And how many new formulation approvals have been done for Seroquel?**

A. I don't know. I've seen some of that information, but I don't -- I can't tell you the number.

**Q. Well, identify the information you've seen on the formulation changes.**

A. I've seen a timeline at one point in time -- and it should be in my files and I don't know whether it's here, but -- that talks about different submittals of SNDAs by the

company for different things, but I can't recall where it is.

**Q. Was the timeline created by lawyers or is it an internal company document or some other source?**

A. I can't tell you that. I don't know. I'd have to go back and look. I don't know.

**Q. When the FDA receives an SNDA, what do they do?**

A. They review it.

**Q. And what do they review it for?**

A. Well, they review it just like they do for any NDA that comes in. They have to make a determination of safety and efficacy of the drug. Does the information submitted support what the company wants to be able to do with the marketing of the drug in the future? So --

**Q. And each time that was done with Seroquel, the FDA determined the drug was safe and effective; is that right?**

A. If the SNDA was approved, they would have to make that determination of safe and effective, yes.

**Q. So -- let me rephrase it.**

**So, in the cases where they -- where the FDA approved an SNDA for a new indication, for example, they make a determination the drug is safe and effective, right?**

A. For the indicated use, that's correct, and the dose.

**Q. And the dose. Turn to Page -- Paragraph 8 in your report quickly.**

MR. ALLEN: Paragraph 8 or Page 8?

MR. BROWN: Yes, Paragraph 8.

MR. ALLEN: Okay.

**Q. (BY MR. BROWN) In Paragraphs 8 and 9, you talk about schizophrenia and bipolar disorder, right?**

A. Yes.

**Q. You agree with me they're mental illnesses?**

A. Yes.

**Q. And these can be debilitating diseases, correct?**

A. They can be, yes, and I think I even state that.

**Q. You describe schizophrenia as a chronic, severe, and disabling brain disease, correct?**

A. That's one way to describe it, yes.

**Q. That's the way you describe it.**

A. My sentence says "as a psychotic order that is a chronic, severe, and disabling brain disease."

**Q. Okay. You agree with that characterization?**

A. Yes.

**Q. And bipolar disorder, you say, is a major mental illness, correct?**

A. Yes.

**Q. And bipolar has -- bipolar disorder has a hallmark of manic episode; is that right?**

A. Yes. That's one of the diagnostic criteria for how you describe it.

**Q. And you need to know the problems associated with**

**diseases like schizophrenia and bipolar disorder to give a risk-benefit analysis, correct?**

A. What do you mean -- can you define what you mean by "problems"?

**Q. Sure, sure. Do you need an understanding of the severity of a disease like schizophrenia or bipolar disorder in doing a risk-benefit calculation?**

A. Well, certainly the benefit -- the benefit that you derive from the use of the drugs is weighted by the type of thing that you're treating. For example, if you're treating cancer versus treating -- I don't know -- something -- a cut, you know, an antibiotic -- an antibiotic and a cancer drug have different risk-benefit assessments, okay? So, yes, that is part of it, if that's what you mean.

But certainly within the-- certainly within the group of mental disorders or diseases of the central nervous system -- that can include bipolar, schizophrenia, a variety of other things -- again, there would be a different criteria based upon what you're treating. I would agree with you that schizophrenia and bipolar are diseases that need attention and need treatment.

**Q. Okay. And second-generation antipsychotics are one of a group of approved treatments for schizophrenia, for example, correct?**

A. Yes. There are a variety of drugs within that

general classification.

**Q. We talked a little bit earlier and I want to go back to it about comorbid conditions associated with schizophrenia. Remember we talked about that briefly?**

A. You mentioned that, yes.

**Q. Schizophrenia -- schizophrenics have a huge increased risk of suicide, don't they?**

A. They can, yes.

**Q. They have a much higher rate of substance abuse, correct?**

A. They do have a higher rate than the average person. That's exactly right.

**Q. And they have a much higher rate of alcoholism than the average population?**

A. I don't know the exact rate, but I do know that it's more prevalent, yes.

**Q. And schizophrenics are much more likely to have hypertension; is that right?**

A. I don't know "much more likely," but there's a high rate of hypertension. There's a number of conditions that you see more often in schizophrenics, or often -- I shouldn't say "more often." There are conditions that you see in schizophrenics commonly as what you call comorbid conditions, and I would agree those are those types of conditions you've listed.

**Q. And Seroquel is effective in treating some of those conditions, correct?**

A. I wouldn't say it's effective in treating hypertension necessarily.

**Q. Strike --**

A. It certainly -- Seroquel has been shown to be effective to treat schizophrenia and bipolar disorder based upon the studies that were submitted to the FDA, that is correct.

**Q. When you agree with me that schizophrenics are at an increased risk of diabetes mellitus?**

A. There is some literature that indicates that they have a higher background risk, that's correct, but the actual -- there's a lot of controversy over what the magnitude of that increase is.

**Q. In Zyprexa, you quantified the magnitude of increased risk in diabetes in schizophrenics of two to five times. Does that sound about right to you?**

A. That sounds like -- I know I've read documents that support those numbers, that is correct.

**Q. So, in the absence of taking any medicine, people who are schizophrenic are at an increased risk of diabetes, to some degree.**

A. To some degree, I would agree with that, yes.

**Q. Is Seroquel -- you said Seroquel's effective in**

**treating schizophrenia, correct?**

A. Has been shown to be effective, yes. And that's why it was approved as -- by the FDA because they demonstrated efficacy to the FDA.

**Q. When the FDA approves medicine, you've told us they make a determination it's safe and effective, right?**

A. That's the language that is used in the approval letter, yes.

**Q. And they actually approve the label when they approve the product, don't they?**

A. They do a review of the labeling, yes.

**Q. And the determination by the FDA is the drug, when they approve it, is safe and effective as long as you use it the way -- and they attach the actual label the company is supposed to use, correct?**

A. They have to use that. That's the law. That's right. It's the labeling -- the safe and effective statement is based upon the dose, the indications, all the things that are stated within the label.

**Q. Schizophrenia is also effective in treating bipolar disease, you said?**

A. Yes. There's been data, I believe, that shows that it has some efficacy to do so.

**Q. And what types of bipolar disease is Seroquel effective in treating?**

A. Well, it's labeled for bipolar -- bipolar with manic components. And I forget -- I believe there may be even an indication for maintenance, but I'm not sure. I'd have to go back and look. There's two specific indications, I believe, that have been gained related to bipolar disease.

**Q. Do you know the last time the FDA approved Seroquel as safe and effective?**

A. I assume right around 2007, but I can't tell you if that's -- I couldn't tell you the month or -- just because I know there was a labeling -- there was labeling changes in 2007.

**Q. We'll talk about those labeling changes a little bit later, but when the FDA approves a drug as safe and effective, do they do it based on their review of either the NDA or the SNDA materials that were submitted by the company?**

A. That's what they're required to do, yes.

**Q. Have you seen any internal FDA documents of the type that we talk about earlier, these summary documents, that describe or characterize the Seroquel data that was submitted to the FDA?**

A. I don't recall any, no. But, again, I'd refer you to this list that you're going to hopefully go through and -- if there's something there, then I've seen it, but I don't recall anything.

**Q. As you sit here right now -- and I'm going to go**

**through that box in detail. As you sit here right now, do you recall seeing any internal analysis done by somebody at FDA on Seroquel data?**

A. That's what I just answered. I said I don't recall it. But, again, I'd refer you to that list to see if I've seen it. I just don't recall it.

**Q. You know that when the FDA receives a new drug application or a supplemental new drug application, they do a number of different analyses, correct?**

A. Yes.

**Q. And you know from other litigations that there's -- that these reports exist, right?**

A. There are certainly always some type of summary document that summarizes the opinions of the different review officers and the different components, yes, if that's what you're asking.

**Q. Right. In arriving at your conclusion here today, don't you think it's important to look at what the FDA looked at and the conclusions they came to with respect to the data?**

A. Not necessarily, no.

**Q. First-generation antipsychotic drugs, you've mentioned those in your report, too, correct?**

A. Yes.

**Q. Are they effective medications in treating schizophrenia?**

A. Yes.

**Q. Are they effective medications in treating bipolar disorder?**

A. Are you asking -- let me just ask a question. You're asking me my opinion or -- I mean, I'm answering these questions based upon the fact that they have been approved and I know they're marketed, so, therefore, there's efficacy data.

**Q. Oh, okay.**

A. But if you're asking me have I done an individual assessment, that's a different question, so maybe we need to step back and give me your context.

**Q. Fair point. Do you have an opinion independent of the approval status of first-generation antipsychotic drugs that they're effective, based on your review of whatever it is you review, in treating schizophrenia?**

A. For some of the drugs, yes. And I say "some" because I've only -- I have certain clinical studies of head-to-head comparisons of different classes of drugs that have been done, like Seroquel versus haloperidol versus perphenazine versus whatever. And so I've seen efficacy demonstrated in those studies, but I have not done systematic reviews of each of those drugs to say, you know, I have done a thorough assessment of efficacy for each of those drugs. But, certainly, they are approved for use and I have seen efficacy shown in clinical trials head to head with Seroquel or with another drug I've

reviewed, such as Zyprexa or Risperdal.

**Q. When you do your risk-benefit analysis, efficacy is one half of the equation, correct?**

A. Yes.

**Q. And did you search the literature for all the studies that demonstrated how Seroquel is effective in treating different illnesses?**

A. I certainly searched the literature initially for all the clinical trials that were published with Seroquel, yes. I was looking for published clinical trials. I certainly have -- as I've told you, have not reviewed every clinical trial that has been submitted as every part of every NDA for Seroquel, no. But in the published literature, I did look for that, yes.

**Q. Do you think Seroquel is effective in treating different conditions beyond its approved uses?**

A. Haven't done that assessment, so I can't answer that. My focus was on the approved uses for the drug. Mainly, my focus was on schizophrenia and bipolar disease because those are where most of the trials have occurred. And I believe that if you look at those studies for those two particular conditions, you see that it has some efficacy, but it's not necessarily better than other drugs. And, in fact, in some cases, it's been shown to not even be better than placebo. So, it varies depending on the endpoints of the studies.

**Q. Right. Well, compared to placebo, Seroquel is**

**effective in treating schizophrenia, correct?**

A. In most of the studies, but I do think there's some where some endpoints -- in other words, in a study in schizophrenics, they have different endpoints they look at. And there are in some studies some endpoints of schizophrenia, some measures, that have shown to not be better than placebo, even with Seroquel. So, there's varied results.

But, in general, FDA -- I agree FDA has made that assessment that they believe there's efficacy data there; and my statement is it shows efficacy, but not necessarily better efficacy -- not better efficacy than other drugs that are available, and that's really where sort of -- what I have looked at and the studies that I have shown, that's what they tell me.

**Q. Okay. Can you describe for me -- let me withdraw that.**

**Did you focus -- in looking at the efficacy side of the equation, did you focus on any particular first-generation antipsychotics?**

A. I focussed on the ones that I saw head-to-head comparisons for. I was interested in looking at other drugs so I could do comparison directly to Seroquel. So, I looked at haloperidol to some extent and looked at -- again, I didn't go back to pull the NDA for haloperidol, but I looked at what was in the literature -- and mainly on the head-to-head -- and

looked at some of the Clozapine data because they were head-to-head data. I also looked at -- now, you're talking about just first generation?

**Q. Yeah.**

A. Oh, okay. Then haloperidol was the main drug, and then there are a few trials that looked at perphenazine.

**Q. Okay. Do you think haloperidol is an effective medication in treating mental illness?**

A. Yes.

**Q. Would you agree with me that first-generation antipsychotic drugs, as a group, are associated with certain movement disorders?**

A. Some of them, yes. And some are worse than others, but, yes. In fact, that's how -- if you read my report, I try to start out with sort of a primer on pharmacology. And Goodman & Gilman teaches that there are -- the reasons the second-generations were developed was to try to improve on that safety profile.

**Q. So --**

MR. ALLEN: Hold on. Take a little break.

(Recess from 12:26 p.m. to 12:27 p.m.)

**Q. (BY MR. BROWN) The -- so, as a group, second-generations were studied and ultimately marketed because they had better side effect profiles with respect to movement disorders, correct?**

A. I don't know they were ultimately marketed. But that was one of the impetus, looking for drugs that had less of a propensity to produce some of these movement disorders. But what was interesting is if you look at the labeling for the drugs, that statement is not allowed to be put into the labeling. In other words, I don't believe that the evidence has shown head to head, at least to the sufficiency of the FDA, that any one drug has a specific percent advantage over another.

I would agree with you as a class, in general, when you look at first generation versus second, that as a general rule, you expect the second-generations to have less propensity, but that doesn't mean they have no propensity.

**Q. Let me ask this question: Have you -- do you have an opinion with respect to whether haloperidol has a better EPS profile than Seroquel?**

A. I haven't formed that opinion. I believe that haloperidol has a propensity to produce it and I believe Seroquel does as well.

**Q. In doing a risk-benefit analysis, you have to consider side effects, correct?**

A. Yes.

**Q. Wouldn't you need to know whether one caused EPS more frequently than the other to actually make that assessment?**

A. It depends. If you're doing -- it depends what

you're doing with the risk-benefit assessment. My issue -- and maybe this will help you: When I did the risk-benefit assessment here for Seroquel, I was looking for what were the general -- what were the types of risks that had been associated routinely with Seroquel and what were the benefits that were shown? And then when I'm looking at that drug, I make an assessment based upon whether I think the risks outweigh the benefits.

Now, I'm not saying that the risks outweigh the benefits for this drug such that it should be removed from the market. That's not what I'm saying. I'm saying that when I -- and if you look at what my statement is, I believe there are safer alternatives. I believe that if you look at Seroquel, it should not be a first-line agent necessarily because the metabolic risks of this drug are different from some of the other drugs, and that is above and beyond the neuromuscular risks.

That's not to say that there isn't a patient that Seroquel could be given to safely, and it's possible that it is, but I don't think it should be a first-line treatment.

**Q. So, it must be so, based on what you just told me, that you have an understanding of the side effect profile of first-generation antipsychotics, correct?**

A. Yes.

**Q. And you've researched it in forming your opinions**

**here today, correct?**

A. Yes. In general terms, yes.

**Q. And do any of the materials you have brought to the dep today or identified in your report discuss the side effect profiles of first-generation antipsychotics?**

A. Many of the published articles talk about that. My textbook talks about that. And then you also even have head-to-head clinical data on Seroquel versus some of these other first-generations that talk about side effect profile. So, absolutely, yes.

**Q. And you mentioned that there are safer alternatives to Seroquel, correct?**

A. I believe there are, yes.

**Q. And what are the safer alternatives to Seroquel?**

A. I believe that haloperidol would be a safer alternative to Seroquel. I believe that ziprasidone would be a safer alternative to Seroquel, and possibly -- I can't think of the generic name, but Abilify.

**Q. And have you carefully reviewed the side effect profiles for haloperidol?**

A. I have reviewed the -- I don't know what you mean by "carefully." I certainly, for my perspective in forming my opinions, have reviewed the side effect profile for haloperidol. And in addition to that -- I'm basing my opinions in part on some of the head-to-head studies that I've provided

134

here for you in my literature and on those disks.

**Q. Okay. Do you know what head-to-head studies you looked at that compared haloperidol to Seroquel?**

A. I'd have to go through my pile to tell you. I mean, there -- but it's certainly ones -- some of them are cited in my report and then there's others that are on the PDF files that I've given you. But they wouldn't necessarily be cited as a head-to-head study. I'm just telling you that there are studies that -- I know some of the ones in there have haloperidol versus -- usually versus quetiapine and something else as well.

**Q. Does haloperidol cause diabetes?**

A. I believe that haloperidol has been shown to have some patients that have shown up with metabolic effects certainly because it can produce some weight gain and some of those things. However, I have not formed an opinion in the same way as I have with Seroquel. I have formed the opinion that I think that Seroquel, Zyprexa, and Risperdal -- and I've been very clear on this in my presentation in the New Jersey Education Day -- appear to have a greater and unique risk over a drug like haloperidol and even over, like, ziprasidone and some of the other second-generation drugs.

**Q. Did some of the epi literature you rely on quantify the increased risk of diabetes with haloperidol?**

A. I'm sure they did because that was a comparative drug

135

in some of the epi literature.

**Q. Would you agree with me that there are a number of studies that show the risk of diabetes is greater for haloperidol versus Seroquel?**

A. I'd have to look at the individual studies to answer that, so I don't want to agree with you or disagree with you. If you want to talk about specific numbers like that, I would want to pull the studies out. And if you want to --

**Q. We'll do it today.**

A. -- show me one, we can look at it.

**Q. Would that surprise you? Based on your opinion, would that surprise you that haloperidol had a greater risk, at least in some epi studies, than Seroquel?**

A. Not necessarily surprise me. I'd have to look at the individual study though to interpret the data.

**Q. And ziprasidone and Abilify are the other two products you think are safer alternatives?**

A. I think they could be. Again, it's a patient-specific decision. But I think that based upon the profile I see, they could be safer alternatives.

**Q. And as a non-medical doctor, you're never asked for a particular patient what the best medication is, correct?**

A. I'm answering this as a pharmacologist. So, if you ask me as a pharmacologist, based upon the information I see, that's how I answer the question, right. I'm not a physician,

136

so I don't -- I would not make that decision for an individual patient.

**Q. Would you agree with me that all drugs have some risk?**

A. Yes. I would say that that's a common -- common thing for anything I can think of. Even water has a risk.

**Q. So, no drug's a hundred percent safe, correct?**

A. That's right.

**Q. All drugs have some level of side effects to varying degrees?**

A. Yes, some levels, and they differ in severity and occurrence rates.

**Q. Medical doctors consider the risks of a medication when they prescribe it, correct?**

A. I assume they do and I would hope they do, and I certainly taught my medical students in pharmacology that they should do that.

**Q. So, a medical doctor in his or her office today here in Houston, if they're making a determination about what medication's appropriate -- Seroquel, haloperidol, ziprasidone -- they should be doing -- looking at the side effects and the possible benefits and making a determination based on that with that particular patient?**

A. Well, again, I think you'd have to ask a doctor what they do. But I certainly would expect my doctor to be familiar

137

with the side effect profile, as well as the efficacy profile, for any drug that he was to prescribe or attempt to prescribe for me.

**Q. Would you agree with me based on your review of all this literature that mentally ill patients are difficult to treat?**

A. What do you mean by "difficult to treat"?

**Q. That often doctors -- would you agree with me that doctors often need to try a number of different medications in the schizophrenic population -- let's talk about those folks for one minute -- before they can find one that will work?**

A. I'm, again, not a physician. I can only speak from what I have read. And certainly from what I have read, I see that doctors often switch patients from one to another. In other words, there's a discontinuation. Doesn't work, you try a different drug, yeah.

**Q. Okay. Turn to Paragraph 16 in your report.**

A. 16?

**Q. Yeah.**

MR. ALLEN: Okay. I didn't understand you. Did you say --

MR. LASKER: 16.

MR. ALLEN: 16? I thought -- I thought somebody said "60." I didn't remember there being that many.

**Q. (BY MR. BROWN) Dr. Plunkett, I wanted to look at**

138

**Paragraph 16 with you, particularly after the list of the different antipsychotic medications, okay?**

A. Yes.

**Q. In the very last sentence, you refer to a number of factors that go into the consideration in making a prescribing decision, correct?**

A. I have a sentence that talks about things that the physician would -- on how to choose an optimum therapy, yes.

**Q. Okay. It says "The optimum therapy for treating schizophrenia and bipolar disorder is chosen for each patient based on the patient's medical history," correct?**

A. That's how it should be done, yes. And, actually, I should qualify this. This sentence is how I think it should be done, okay? So, I don't think it's done that way all the time, but I certainly think this is how it should be done.

**Q. Okay. So, the optimum therapy for treating schizophrenia and bipolar disorder is chosen for each patient based on the patient's medical history, correct?**

A. Yes.

**Q. That's what the doctor does -- one thing the doctor does in the perfect world in prescribing a medicine, correct?**

A. He should do that, yes.

**Q. And you can't do that, can you?**

A. I don't prescribe drugs. So, again, I -- that's not something I do. I certainly could look at a patient's medical

139

history and tell you whether in any opinion as a pharmacologist it makes sense to administer that drug; but, again, I'm not a physician and a physician is going to make that final call.

**Q. Right. The American Medical Association won't let you do that, would they?**

A. I don't know. I don't think they would. I never checked with them.

MR. ALLEN: It was a rhetorical question anyway. It was intended to be flamboyant, rhetorical, but of no consequence today or --

**Q. (BY MR. BROWN) The second part of the sentence says that the physician should also include an assessment of the known side effects of the drug, correct?**

A. Yes.

**Q. And the last part -- third part says "The patient's response to the drug in relation to the drug's efficacy in adverse events," correct?**

A. That's what it cites, yes.

**Q. So, these three factors are the three factors that should go into a doctor's risk-benefit analysis when he or she prescribes a medicine, correct?**

A. Well, I would say the first two go into the initial risk-benefit analysis. The third one is going to be gleaned after you see how the patient responds. So, it may not be the initial analysis, but certainly -- you do the first two things,

140

look at the patient and then look at the side effects of the drug. That's how, to me, I would determine -- you know that it's been approved to be effective.

You could try something. And then after that, you may have to tweak the therapy, either by dose or different agent, depending upon whether or not you get the desired effect in that patient or you get adverse events that are something that you want to avoid in that patient.

**Q. So, in Paragraph 16, the way you've described the risk-benefit analysis for a doctor, you're not qualified to perform this particular type of a risk-benefit analysis.**

A. I would not, as a physician, ever do this. I certainly could do this for myself. I would be qualified to look at my own medical history -- and I do this all the time. I make my own judgments based upon what I believe is appropriate for me to take. But, certainly, I don't do this because I'm not a physician. A physician is normally the one who's going to do this.

Sometimes -- in today's world, however, in addition to a physician, a physician's assistant/licensed nurse practitioner, can also do these things.

**Q. You're not a licensed assistant nurse practitioner, are you?**

A. No, I'm not.

**Q. Paragraph 19 in Section 5 of your report discusses a**

141

**number of other types of -- I'll call them adverse events, and I want to -- is that right?**

A. Well, I would say -- I would call these described adverse effect profile of the drug, yes. Because "adverse event" or "adverse reaction" or "warning" are very specific regulatory definitions. This -- what my intent in this paragraph is to do is to lay out what I call the toxicology profile of the drug.

**Q. Okay. I wanted to stay in Paragraph 19, but flip over to Page 6. It continues onto the next page. I see hypoglycemia identified there; is that right?**

A. Yes.

**Q. What is hypoglycemia?**

A. Low blood sugar.

**Q. Do you think Seroquel causes low blood sugar?**

A. I would agree that it is a listed adverse -- in the adverse effect profile both in Goodman & Gilman, as well as in the PDR. I haven't performed any opinions based on any kind of weight of the evidence, but it's a common thing that happens, but certainly I agree that it's observed.

**Q. Okay. I didn't ask about observed. Does Seroquel cause hypoglycemia?**

A. I haven't formed that opinion. I can't answer that. To me, when you asked me that question, that's the type of analysis I've done here which I haven't done for that endpoint.

**Q. I'd like to see that document and then we'll mark it and we'll either discuss it at the end of the day today or we'll discuss it when we come back.**

A. But if you -- as far as the literature goes, I'd have to go back and look at my literature in order to pull it out by date like that for you.

**Q. Well, based on your statement --**

MR. ALLEN: Hold on. Hold on. What are we doing, one of two things right now?

A. Okay. You want me to look first -- yeah. I'm sorry.

**Q. (BY MR. BROWN) Go ahead. Go ahead.**

A. I just wanted to preface that by --

MR. ALLEN: I don't care. We can quit looking and you can ask more questions. We're not going to do both at the same time.

A. Okay. There's a document in the 1997 documents, an e-mail series.

**Q. (BY MR. BROWN) Okay.**

A. Talks about weight gain from Seroquel.

MR. BROWN: Dr. Plunkett has handed me a Lisa Arvanitis e-mail dated August 13th, 1997, AZSER 10612514.

MR. ALLEN: I think it was -- just for the record, because I don't -- there's so many numbers on stuff, it looks like it was also marked at one time as Ruhl Exhibit No. 20, Ruhl being R-u-h-l.

A. Yeah.

**Q. (BY MR. BROWN) Dr. Plunkett, is that one of the documents you're relying on in your -- to support your opinion that --**

MR. ALLEN: Hold on a second.

A. Yeah. That's one of them.

THE WITNESS: I'm sorry. Go ahead.

MR. BROWN: She's looking over -- go ahead.

MR. ALLEN: What we're doing -- and I don't care. We can stop looking at documents or we can look. I just don't want two things going on at once. And I'm not being critical of you, but we just can do one thing at a time.

A. I was looking for the original labeling for Seroquel, too, and I thought I had it here.

**Q. (BY MR. BROWN) You don't.**

A. I don't have a copy of it.

**Q. You have a 1999 version.**

A. Yeah. It looks like I have a 2000 version here.

**Q. We're going to talk about that label.**

A. Yeah. I believe the original labeling had some discussion about antipsychotics and metabolic effects, but I may be wrong, so I need to look at that. But this one I would also identify, yes.

**Q. All right. So, you've identified one document that you think supports the fact that AstraZeneca should have known about the possible metabolic effects of Seroquel based on its structural similarity to another SGA you've identified as clozapine, correct?**

MR. ALLEN: One internal document.

A. One internal document, right, and -- but, yeah, the issue is "predicted." I'm not saying that I had -- the issue for me was that they should -- this effect would have been predictable based on the pharmacology of the drug, the class it fell into, the effects it has, the -- being a second-generation atypical versus first-generation. And then the other issue would be some documents like this, and then also I -- like I said, for some reason, the original label that I -- I don't have it here to look at, so I have to pull it out.

**Q. (BY MR. BROWN) We're going to talk about the original label. The 1999 version is the same as the original label.**

A. Okay.

**Q. And we're going to talk about that and we'll talk about what your thoughts are on that label -- we'll get to that later on in the afternoon -- but is it your opinion that the original label was inadequate in describing metabolic effects for Seroquel?**

A. Certainly, none of the label -- the labeling up until the very last label change that was made, none of those describe the position that we're in today, which is what I

believe the evidence shows today. But now you're asking me to go back in time. I don't think I've done the analysis in the original label based only on what was in the literature to make that statement. My failure to warn opinions have been based upon more the progression since 1999. So, looking at the literature at 1999 and the events and the things that I had at that point in time. So, to go back beyond that, I'd have to do that again --

MR. ALLEN: And I'll state --

A. -- to answer that question.

MR. ALLEN: -- for the record, that that's -- the report does not address any failure to warn claim prior to '99, so --

MR. BROWN: Okay. Okay.

**Q. (BY MR. BROWN) So, just so we're clear, nothing in this Paragraph 45 should be read to mean that the original label, 1997, was inadequate with respect to metabolic risks, correct?**

A. Well, certainly, I was addressing -- I've been addressing with the failure to warn the 1999 and beyond, yes.

**Q. Okay. So, the answer's yes?**

A. Yes, but I would say to you I do believe that based upon -- in '97, based upon what we know about the class of drugs, I believe -- and the chemical similarity, I believe that you might be able to make some predictions about that. That's

why I was pointing to this issue on weight gain and then, like I said, the literature; but I'd need to go back to the literature and look at what documents I have and point you to those.

**Q. Well, you have no criticism of the Seroquel label before 1999, correct?**

A. I have not developed an opinion on that, that is correct.

**Q. And we'll come back to the other labeling.**

**Now, labeling issues aside, you talk about the predictability of the metabolic effects based on the structural similarity of Seroquel with the other second-generation compounds, correct?**

A. Some of them, yes.

**Q. Okay.**

A. It's more similar to some compounds than others.

**Q. But you would agree with me that there are differences between the second-generation antipsychotics with respect to their ability to induce weight gain, correct?**

A. Yes, there appears to be differences among that.

**Q. And the same is true for diabetes. In other words, drugs in this class, to varying degrees, I guess, in your opinion, induce diabetes, correct?**

A. Well, in fact, I've stated that. I don't believe it is necessarily a class effect. I think that there are ones you

can pick out -- I think I've stated that very clear in my report -- that have this risk as an important risk and others in the class that may not.

**Q. Turn to Page 7 and Paragraph 22.**

A. Page -- Paragraph 7 or --

**Q. Nope.**

A. I'm sorry.

**Q. Paragraph 22.**

A. Oh, I'm sorry.

**Q. And it runs over to Page 7, goes for two pages.**

A. Oh, okay. Yes.

**Q. Okay. Now, the fact that there are structural similarities between drugs don't mean they operate the same, correct?**

A. Not necessarily; however, it's one of the first principles of pharmacology. The structural similarity can be predictive, and so you can start there.

**Q. Okay. And in this case, you've looked at how similar these molecules are to one another; is that right?**

A. I did do that. One of the first things I looked at, right, when I started my assessment -- and I even have an overhead in my New Jersey presentation on that point.

**Q. By the way -- are you talking about that little diagram that shows how the receptors work?**

A. No. There's three structures. I think I show the

structure of three different drugs. I thought I did. If I didn't, I thought I did, so -- and it's also in my Goodman & Gilman text as well.

**Q. We're going to talk about that in a second, but looking down to the middle of that paragraph, top of Page 7 -- and we have -- still on Paragraph 22, you said, "Because the difference is apparent among different antipsychotic agents in terms of risks of diabetes and weight gain, the effects of Seroquel cannot be considered simply a class effect for atypical antipsychotic drugs," correct?**

A. Yes.

**Q. And you agree with that?**

A. Yes.

**Q. And then you go on to say that different antipsychotic drugs, including second-generation atypical antipsychotics, have different toxicological profiles.**

A. Yes.

**Q. And you believe that Seroquel's toxicological profile is different than Zyprexa and clozapine?**

A. I think it's closer to those than it is to some of the others; but, yeah, there are -- all of the -- I think all the compounds will have some differences, be it qualitative or quantitative; and so the tox profile can be qualitatively the same but the risk can be much larger for one versus the other, like a rare versus a more frequent event.

**Q. Right.**

A. My sentence here takes both of those -- you have to look at both those issues, qualitative and quantitative.

**Q. Right. Just so I understand, you talk about structural similarities, but you're not saying they're structurally identical, correct?**

A. No, they're not.

**Q. And there are differences between the compounds as a class, right?**

A. Yes. And that's why each of them have their own unique development program because, obviously, it is a unique chemical entity.

**Q. And you agree here that because of those differences, they induce weight gain and diabetes at different levels, correct?**

A. I'm not saying it's necessarily only due to those chemical differences, but I think you would certainly look at the chemical differences to expect that there might be some differences among the propensity because those chemical differences can, for example, affect receptor occupancy and receptor stimulation ability, potency, and all of those things could correspond to a change in the tox profile.

**Q. I want to talk about the receptors. You relied on Goodman & Gilman?**

A. That's one of the sources, yes.

274

into account the literature I have looked at, which is literature -- some of it beyond that date.

**Q. Okay. You mention that --**

A. Much of it before, but --

**Q. I didn't mean to --**

A. I'm sorry.

**Q. No. You mentioned your position that the company failed to warn about the risk of diabetes; is that right?**

A. Yes.

**Q. And you said, I think, it's your opinion that the company should have warned about the risk of diabetes in 1999. Is that your testimony?**

A. I believe there was enough there to show there was an association; and by the labeling language, yes, that would indicate there should have been a risk -- I mean, a statement to warn, yes.

**Q. In arriving at your opinion that the -- a warning should have existed on the Seroquel packaging insert with respect to diabetes, what standard did you apply?**

A. The labeling standard, which is a reasonable association.

**Q. Yeah. So, tell me what the standard was for the warning section in 1999.**

A. I believe it's a reasonable association. That's my understanding of the reading of the regulation.

275

**Q. And is that -- reasonable association between what and what?**

A. Well, in this case, if I'm making a warning on diabetes and Seroquel, it would be an association between diabetes and Seroquel. At the -- at the least, there was an association between diabetes and antipsychotics -- atypical antipsychotics, but I believe there was evidence at that point in time that also would indicate there would be an association with Seroquel as well.

**Q. The label. Do you understand the label is designed to inform doctors about the risk or benefits of a drug?**

A. Yes.

**Q. Turn to Paragraph 41. Paragraph 41 in your report says "AstraZeneca failed to warn the FDA," comma, "physicians," comma, "other health care professionals," comma, "and patients of the adverse metabolic effects associated with the consumption of Seroquel at the time these risks were first identified." Read that right?**

A. Yes, you did.

**Q. Do you have an opinion that the -- that AstraZeneca failed to inform the FDA of something?**

A. I would certainly believe that at the time in 1999, and certainly after that time period, if -- if AstraZeneca has -- and I believe I have documents to support they understood that association, based on these internal documents,

276

between diabetes and their drug and it isn't something that they request to change within the FDA, which they can do -- and, in fact, I have documents to show that they did do it for -- later on in the lifetime of the drug -- but, yes, that's a failure to warn the FDA.

Now, the warning label of the drug -- or the warning on the label and the label itself is not for FDA purposes, it's for the physician who then passes it on to the consumer. But certainly -- so, maybe I -- my language could be more precise in this sentence. But certainly, to me, they don't have to wait -- and I guess that's what I'm trying to convey. There's no duty for them to wait until the FDA tells them to change the warning, but when they have information to indicate that a warning should be in place, they can take -- the company can take action, either by a change -- special changes to be effected or by going to the FDA with a proposed labeling change.

**Q. Do you know about -- have you seen any correspondence or meeting minutes from 1999 until today between AstraZeneca and the FDA discussing label -- labeling issues or the Seroquel package insert?**

A. I don't recall, other than a warning letter I have seen regarding promotional materials and statements about this issue. But I don't recall -- if I have, it's in those documents that you'll get the list of or in the box. But I

277

don't believe that that's there, no.

**Q. And so you don't know if any dialogue occurred between the FDA and the company on what should or shouldn't be in the warning between 1999 and today?**

A. I haven't seen a document that indicated a dialogue went on, no, so -- or didn't. I mean, I believe it didn't because I haven't seen a document. Certainly, if it has gone on, we can look at the documents and then we can talk about those.

**Q. And if that -- if those discussions took place, you'd hope your plaintiffs' lawyers would show you those documents, right?**

A. I would expect to be provided with those documents if something was stated in my report that's incorrect because of that, yes. I mean, they saw my report, so -- and they know what I have relied on.

**Q. Tell me what you think the warning should have looked like in 1999.**

A. I haven't drafted -- I mean, I would never try to draft a specific label. I've been asked that before. I can just tell you, to me, at that point in time, there was a reasonable association with antipsychotics, for sure, and these metabolic disturbances, and I believe even data on Seroquel itself. So, how the specifics of the label warning would go would be a negotiation between the company and the agency.

I certainly think that in the -- even up to today in the language -- if you want, we can talk about the labels over time. Even the language today is confusing to me about what they're really trying to say to the physician. So, I believe that even the language labeling as of today where there is a warning isn't necessarily telling me what I would need to know as a pharmacologist about what the real risks -- and based upon the documents I've seen about what the risks are.

**Q. What is it you need to know about the risks of a product as a pharmacologist if you don't prescribe medicines?**

A. I use medicines. I read Physicians' Desk Reference and product inserts every time. I also do projects where I am asked to assess human health risks, like in this case. So, labeling is something that I use and certainly something that pharmacologists use all the time.

**Q. Let me show you the 1999 Seroquel label from the PDR. This came from your files. This was sent to us on Monday.**

**(Plunkett Exhibit No. 17 marked.)**

**Q. (BY MR. BROWN) I'm handing you Exhibit No. 17, which is a copy of the Seroquel label from 1999. You see that?**

A. Yes.

**Q. And this is the same label that existed in 1997 -- I'll represent that to you -- with respect to the adverse reaction sections, okay?**

A. Okay.

**Q. Can we turn to the adverse reaction section?**

**Would you agree with me that there was a section here in the adverse reaction section directed to weight gain? Far right-hand column, two-thirds of the way down.**

A. That's what I was looking for. I know it's there. I wanted to find it. Yes, I am aware that there is one in the adverse reaction section, yes.

**Q. It says the proportion of patients meeting a weight gain criterion of greater than 7 percent of body weight were compared in a pool of four three- to six-week placebo-controlled trials, revealing a statistically significant greater incidence of weight, Seroquel 23 percent, versus 6 percent. See that?**

A. Yes.

**Q. A four-fold difference approximately in the incidence of what the label described as clinically significant weight gain?**

A. Yes, I see that.

**Q. Do you think 7 percent of body weight is clinically significant? Do you have an opinion on that?**

A. I think that that would -- I believe that would be; but, again, I would refer you to a physician if you're going to talk about clinically significant. I believe it is a significant increase in body weight, based upon my own, you

know, knowledge of the literature, that I've seen increases in body weight much less than that can be talked about as being clinically significant.

**Q. If a doctor read this label, he would see that information regarding weight gain, correct?**

A. Well, I would argue this isn't a warning. This is a listing in the adverse reaction sections. And as we talked earlier, there's -- when I'm talking about warning, I'm talking about putting something that the doctor is going to see as up front under the warning section, not necessarily something in the adverse reaction section that is buried. So, I -- I have a little disagreement.

I agree with you it's there, but I don't think it carries -- to me -- actually, how these labels are written, that does not carry the same weight as a warning does to a physician when he reads them. If you read the labeling guidelines about how things are put in, that's what it tells you.

**Q. Have you done a survey or some sort of analysis of how doctors read labels, a study?**

A. I have read -- I haven't done my own analysis, but I have read some documents that were prepared, either by the GAO or FDA themselves, talking about changes four or five years ago they were going to make to labeling regulations and studies that they did and talked about how doctors interpret or don't

interpret.

And that's why the new regulations have come into play with drugs after 2006 where the information is put into a mode that allows the physician to more easily glean what risks are, what information they need to find; whereas, these old labels were criticized for just that kind of information, things that the doctor has to pay attention to and it's a long document and they're looking for the important information up front.

**Q. Let me ask my question again.**

**So, if a doctor wanted to know about weight gain, there's a section here dedicated to weight gain in the label, correct?**

A. Under adverse reactions, yes.

**Q. Do you think the FDA was wrong in putting the weight gain data where it is in this label?**

MR. ALLEN: Objection. Form.

A. I haven't opined -- formed any opinion about whether or not the FDA -- that's not my job to say if the FDA was right or wrong. I believe that -- however, that I have an opinion based upon what I -- whether this label tells me what I would need to know based on the information I had at the time. My issue with -- not so much the weight gain is the issue with the -- what we know that the weight gain can lead to, and that's the metabolic complications beyond that.

**Q. (BY MR. BROWN) Do you think doctors understand metabolic complications associated with weight gain?**

MR. ALLEN: Objection. Form.

A. I would assume they do, but I'm not a physician. You'd have to ask a physician. I know that I understand the implications, but that doesn't mean the physician does. Again, the physician is looking for the information that -- in the warning section that's pertinent to them to be able to prescribe the drug to their patient.

**Q. (BY MR. BROWN) Do you think it was generally understood in the scientific community that Seroquel caused diabetes in 1999?**

MR. ALLEN: Objection. Form.

A. I can't -- I can only answer based upon my assessment. I can't answer --

**Q. (BY MR. BROWN) What's your assessment?**

A. My assessment is that there certainly was understanding based on the documents in 1999 that there was an association -- I believe the literature told me there was an association between Seroquel ingestion and weight gain and also Seroquel ingestion and hyperglycemia and complications of weight gain, but with or without. So, I believe that that information was there from my perspective and my reading, but I don't know what other physicians -- a physician may have done, if they read all that literature. I doubt they could go

through and do the same assessment I have done for each drug they prescribed.

**Q. But you haven't asked any physicians, have you?**

A. I haven't asked the question, but I can tell you I would be shocked to find that a physician would have the time to sit down and do -- spend the hours that I have spent on this issue for this drug, when most physicians prescribe dozens of drugs in their practice.

**Q. Would you expect the doctors who prescribe medicines to actually look at the label?**

A. I would expect the doctor to look at some of the information in the label; but, again, my answer to you would be you should ask a doctor that question. I will tell you that knowing the labeling regulations, if I was a physician, I would be looking at the information based on contraindications and warnings first because that would have the most impact on what I would look at as far as risks.

**Q. So, should the label in 1999 have -- should have had a warning or a contraindication, or both?**

A. I don't know about contraindication. A warning. I think there should have been a warning about diabetes, at least for the class, in 1999.

**Q. And --**

A. Whether or not you took it to Seroquel specifically, that could maybe be argued.

**Q. Could AstraZeneca, in its own volition, add a class warning to its label?**

A. Well, I think AstraZeneca can go to the -- not a class warning, but they can certainly go to the FDA with what they know about their drug -- and I believe there was a reasonable association with their drug, and I -- I'm saying to you I imagine somebody could argue that they don't believe that -- but that certainly is not what they've done. They haven't gone to the agency to warn the physicians about what they knew at that point in time.

**Q. I know you haven't drafted what the labeling language should say, but can you give me, in sum and substance, what you think the warning should have included in 1999 with respect to metabolic parameters?**

A. Well, I think if you look at the later language, some of that language is appropriate and some is not. I think you need to mention specifically complications of hyperglycemia and diabetes or complications of diabetes being associated with the use of Seroquel, and I think that needs to be in the -- somewhere as a warning to the physician. How you word it, whether or not you describe it and put it in context, that can be done sometimes; but that at least needs to appear up there -- up front under the warnings for the drug.

**Q. Hyperglycemia and diabetes are both identified as adverse events in the adverse event section of the label,**

**correct?**

A. I know they are. I don't know about this particular one because I haven't seen this one in a while, but let me look back. They are, I know, in later one.

**Q. If you turn to Page 3431, middle column, there's a section entitled "Metabolic and Nutritional Systems" and it reports hyperglycemia happened infrequently. Do you see that?**

A. Yes, I see that. And, again, I would disagree with the way that's presented. I think that you're burying it under a list of infrequent metabolic consequences, when I believe there was much more data to indicate there was much more than an infrequent metabolic consequence that should be buried in this section.

**Q. Well, the frequency is actually defined in this label, isn't it, to the left-hand side there? It defines "infrequent" as occurring in 1 in 100 to 1 in 1,000 patients.**

A. Yes, and this is based upon clinical trials usually. That's what the definition is based upon. But, again, I think you have to look at what other information was out there at that point in time, and there was more than that.

I -- again, to me, the issue in this is that you have listed here in these same paragraphs weight loss, you have hyperglycemia, and you have this listed as infrequent metabolic consequences. And if you look at all these other things that are listed here under adverse reactions, a doctor looks at all

**analyses on second-generation antipsychotics?**
A. I have not – I cannot recall a document that's a specific internal FDA discussion, no.
**Q. Would you agree with me that the FDA has far more expertise at labeling with the staff of its people than you?**
A. I believe it has a much larger staff that deals with labeling, absolutely, and I would agree that they have a lot of experience. Again, that's not my issue. My issue – I'm not criticizing – I'm not saying that FDA should have done it differently. I'm saying the company has a duty to tell what they know about their drug. And that's my issue on failure to warn, that the company has information specific.
Now, whether or not the FDA had all the information the company does, I don't know, but certainly I believe there was information there that I have seen from that point in time that indicate it warranted a specific mention of the risks of Seroquel itself.
**Q. You applied the FDA warning standards in 2004 in coming to your conclusion on the adequacy of this label?**
A. Well, I'm applying the standard for how it lists as a warning, and that's the standard.
**Q. And that's the same standard the FDA employs and follows, right?**
A. I assume they do; but, again, I don't know what FDA discussions were held or what data they reviewed in order to

make their decisions about Seroquel itself. I don't know.
**Q. We've talked about your weight of the evidence analysis. We've talked about the standards and things you consider. Just a couple of quick follow-up questions: Case reports by themselves aren't evidence of causation, correct?**
A. Unless it's an extraordinarily -- as I've testified before, there's always the potential you can have the extraordinary complete case report. But, yes, in general, I would agree case reports by themselves would not be enough to prove causation. They could prove association, but not necessarily causation.
**Q. Have you seen any of those extreme case report examples in Seroquel?**
A. No.
**Q. You also rely on adverse event reports in the paper by Koller, correct?**
A. Yes.
**Q. Did Koller work at the FDA?**
A. I believe he did at one point in time.
**Q. And these are a collection of adverse events that were either reported in literature or sent to the FDA, correct?**
A. Yes. I believe he -- I believe those were his two sources.
**Q. And adverse events, by themselves, aren't typically evidence of causation, correct?**

A. Not by themselves. Again, maybe there would be an extraordinary one; but, yes, again, I would not normally consider them by themselves.
MR. ALLEN: Is it me or is it Memorex, but is Koller a he or she? Maybe I'm thinking of something different.
THE WITNESS: I thought it was Burt, but I may be wrong.
MR. ALLEN: I was asking Mr. Brown. He doesn't know. Never mind. Neither do I. I just -- for some reason --
MR. BROWN: Yes. It's a woman.
**Q. (BY MR. BROWN) I told you that earlier.**
A. Oh, I'm sorry. I thought it was a man.
MR. BROWN: I'm shocked you don't know that. The record must be mistaken.
MR. ALLEN: I know you said "he." I was thinking in my mind it was a she. I'm proud of myself.
**Q. (BY MR. BROWN) Dr. Plunkett, I know we're running out of time and I think we've clarified this, but am I correct that in this case, with respect to medical issues, you're only going to give opinions on causation with respect to diabetes, hyperglycemia, and weight gain? Is that correct?**
A. Yes, with exception of I did indicate -- I think in my report I talk -- I may mention complications of diabetes -- diabetic complications as being part of the spectrum of information that I reviewed and relied on. And certainly, for

example, there are some reports of ketoacidosis, which is associated with diabetes, but -- and so I want to be able to talk about that information as part of the process that I went through and used as evidence.
**Q. All right. Just so we're clear, there was – you're not going to offer a causation opinion on liver damage, correct?**
A. No. I have not done that analysis, no.
**Q. Not going to offer a causation opinion on pancreatitis, correct?**
A. I have not done that analysis at this point in time, that's correct.
**Q. And you're not going to offer a causation opinion on kidney disease or damage?**
A. Not at this point in time, I have not done that, that is correct.
**Q. Talked about animal data briefly. Animal data generally isn't evidence of causation; is that right?**
A. Normally, you would not take a piece of animal data by itself, that is correct, but it's all part of the information that's relied upon to perform such an assessment.
**Q. You mentioned off-label issues in your report at Paragraph 15. Are you going to give any opinions on what you think AstraZeneca did with respect to off-label promotion?**
A. I haven't seen documents that would allow me to form

306

MR. ALLEN: You do, but, I mean --

**Q. (BY MR. BROWN) Are you going to testify when you come to trial about foreign labels, foreign labels of Seroquel in Japan or France or anyplace else?**

A. I've certainly seen foreign -- Japan label, yes. I have seen the Japan label. So, I may be -- depending upon what I'm asked to testify about, that could -- and that certainly is covered in my report. I don't know if I've seen the French label, but --

MR. ALLEN: There is no French label.

THE WITNESS: Yeah, because it was denied.

A. So, certainly, I have to -- I don't know what other labels I've seen. I know I've seen the Japan -- I've seen Canadian -- the Canadian labeling information. So, if asked about that, I'd certainly -- and, again, that's in my Canadian report which I've provided to you, so you know my opinion on that.

**Q. (BY MR. BROWN) Do you consider yourself an expert in Japanese regulatory affairs?**

MR. ALLEN: Let me just clear -- you're wasting some time. She's not an expert in Japanese regulatory affairs. We'll agree to that.

MR. BROWN: Okay.

MR. ALLEN: Unless you are that I don't know of.

**Q. (BY MR. BROWN) Are you --**

307

A. No, I'm not, but I certainly --

MR. ALLEN: But I want to -- so it's clear for the record, as reflected in the report and the materials she's reviewed, she is going to testify about reasonable evidence of an association to put a company on notice to warn, and that -- and part of the body of knowledge that the company had, and that would include the French rejection, the Japanese label, and other labels that she's discussed and -- including her Canadian --

**Q. (BY MR. BROWN) Anything else that you plan to rely on at trial that isn't identified in your report with respect to foreign regulatory issues, besides Japan and France?**

A. And Canada.

**Q. And Canada.**

MR. ALLEN: And --

A. Well, the Canadian report, I talk about the product insert and the consumer documents.

MR. ALLEN: And there are additional documents contained within the files which she has reviewed that discuss the fact that AstraZeneca obviously was aware of their European label change, and that's --

A. That's true, yes.

MR. BROWN: That's the new documents we got today?

MR. ALLEN: They're not --

308

MR. BROWN: I mean, they were produced to us today --

MR. ALLEN: Yes.

MR. BROWN: -- and we were informed that she's going to rely on those materials.

A. And I don't specifically mention -- I'm not sure. I don't think I did. So, yes, absolutely, there is some information on the European union, yes.

**Q. (BY MR. BROWN) Okay.**

MR. BROWN: Give me one minute off the record, then I think I have, like, two minutes left and that's it.

MR. ALLEN: Sure.

(Recess from 5:58 p.m. to 5:59 p.m.)

**Q. (BY MR. BROWN) In the last couple minutes, I want to finish up a topic we discussed this morning, which is a safer alternative. You identified several safer alternatives, in your opinion, that would be a better option for doctors than Seroquel based on Seroquel -- because of Seroquel's metabolic profile; is that right?**

A. Yes.

**Q. And you -- I think you identified three or four different medications; is that right?**

A. I think -- well, I don't remember how many. I mentioned haloperidol, I mentioned ziprasidone -- ziprasidone. I think that's correct.

309

MR. ALLEN: Geodon.

A. Geodon, exactly. And there's -- I don't remember what I mentioned. There's also literature -- the literature or the study that was done where perphenazine was compared with the other drugs as well. I would also mention that. I don't know whether I mentioned that one or not.

**Q. (BY MR. BROWN) Can you give me three -- list two or three --**

A. Oh, one more. And I think I said Abilify.

MR. ALLEN: Yes.

A. Yeah, that was the other one.

**Q. (BY MR. BROWN) Can you -- is there one or two or three significant side effects of any of those four medications that you can tell me about right now?**

A. Well, certainly haloperidol can produce the -- just like the other drugs, the extrapyramidal side effects. That would be true for all of those drugs, to some extent. I would say that as far as distinguishing another one off the top of my head, no. I'd have to look at the -- and I have looked at the labels for -- the current labeling for those drugs. I haven't done historical comparison, but I did look at my -- the year I have in my office is the 2007 PDR, I believe, or six.

**Q. I know you don't have the labels in front of you today, but at some point in time you sat down and you were very conversant in all the adverse events associated with those four**

**products and you stacked them up with Seroquel and it was your determination that these four were better alternative for Seroquel; is that right?**

A. That -- not just on the label comparison, but that I did, and then looking at what the published literature said. For example, the perphenazine example was one where I think I cite you an article that talks about where a doctor has done a study comparing those and then looks at the cost-effectiveness issue, as well as the efficacy issue for the drug. So, that comes into play -- that comes into play in my mind, at least, but certainly I have also done that exercise of looking at what is there.

They don't all have the exact same toxicity profile. But, to me, my issue is the metabolic profile is a very important side effect profile based -- especially based upon the type of patient we're talking about, one which -- as we talked about earlier this morning, a schizophrenic who isn't necessarily going to have a good diet, isn't necessarily going to be able to inject themselves daily or take another drug daily if they needed to. There's a lot of things about the disease that might make it difficult to control diabetes. So, to me, that's an important component.

MR. BROWN: I just have a couple more.

MR. ALLEN: I'm not agreeing to --

MR. BROWN: Can I ask one more question?

MR. ALLEN: I'll give you one more. Because I was going to cut you off. This is your last question of the day.

MR. LASKER: Got 27 parts.

**Q. (BY MR. BROWN) Dr. Plunkett, did you do the same level of research into the side effect profiles of the other four so-called safer alternatives as you did for Seroquel?**

A. Probably didn't spend as much time, no; but I certainly looked in the same type of resources, yes.

**Q. Okay.**

MR. ALLEN: Thank you. That will --

A. Well, in fact, I know I didn't spend as much time. I mean, I know I didn't spend as much time.

MR. ALLEN: We'll be done for the day. And if -- I don't think we have our agreements -- and I'm not trying to be -- you're done.

Take Dr. Plunkett --

MR. BROWN: Let's go off for one second.

(Recess from 6:03 p.m. to 6:04 p.m.)

MR. ALLEN: This is Scott Allen. I'm going to state what we believe to be our agreements. It is not my intention to misstate what I believe our agreements are.

AstraZeneca and its counsel have used almost seven hours today. Probably in the neighborhood of six hours and 45 minutes, and I'll just take that as the number. Could

be a little more, could be a little less, but six hours and 45 minutes. I'm certainly agreeable to giving AstraZeneca an additional 15 minutes for the seven hours. And also, you know, quite frankly, if you approach me, I would consider giving you a little additional time. However, I think we've agreed you've essentially exhausted the initial examination time.

I agreed, as I did this morning before we started, as of my recollection, that I would give you additional time on the, quote, new, close quotes, documents and I will give you additional time with documents when you come back. I will not give you, quote, additional time, close quotes, on the old documents or the report. So, it's not a whole new deposition. It will be a deposition on the, quote, new, close quotes, documents.

MR. BROWN: Couple things.

MR. ALLEN: And I've agreed that she will not review any expert report --

MR. BROWN: Or deposition.

MR. ALLEN: -- or deposition in the next two weeks, which starts the 6th. Is that right, the 6th is Monday?

MS. KELLY: Yeah. It's Monday the 6th.

MR. ALLEN: The week of the 6th or the week of the 13th, provided you take her deposition during that time period. I'm sure you want to. But, for example, if you-all decided, no, "I'm going to wait until November," I'm not going

to make that agreement. So, during those two weeks, she won't review those matters.

I have further told you that the -- lost it. Well, it's somewhere on the record. I finally lost the piece of paper. She had three days she could not do it, and I can't remember what they are now. The 8th was one she could not. I know that she couldn't.

MR. LASKER: 16th and 17th.

MR. ALLEN: I think there's two days in a latter week that she cannot, but you can call me. I've also said that the material I produced today with Dr. Plunkett and was previously produced in what I understand to be e-mail, zip drive, zip files was my good faith attempt.

I will tell you, as I said already on the record -- I'm not going to repeat it all -- she was candid about the reference -- was it reference list? And we're going to try to obviously correct that. We're going to try to correct that. And I've identified to you two things that are not, quote, in the box -- and I don't think I'm necessarily required to put them in the box. I don't know how I could -- which would be the AstraZeneca clinical trials website, and then I've told you -- she told you she has reviewed a timeline concerning Seroquel's approval. That's not in the box.

I'll be glad to give you what she reviewed today, if you like it. As I understand, we were going to go