# NF TAB 6

1

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

IN RE:
 SEROQUEL PRODUCTS LIABILITY LITIGATION
 CASE NO: 6:06-MD-01769-ACC-DAB
 MDL DOCKET NO. 1769

SEPTEMBER 26, 2008

Deposition of WILLIAM C. WIRSHING, M.D.,

held in the offices of Exodus Recovery, Inc., 3828 Delmas

Terrace, Culver City, California, beginning at 9:13 a.m.

and ending at 5:21 p.m., before MARIA A. HASAKIAN,

Certified Shorthand Reporter No. 8469.

## Page 2

APPEARANCES:

For Plaintiffs:
FIBICH, HAMPTON & LEEBRON
BY: TOMMY FIBICH
Attorney at Law
1401 McKinney, Suite 1800
Houston, Texas 77010
713.755.0025

*AND*

BAILEY, PERRIN & BAILEY
BY: KEN BAILEY
Attorney at Law
440 Louisiana, Suite 2100
Houston, Texas 77002
713.425.7240
(NOT PRESENT)

For Defendants:
BAKER BOTTS LLP
BY: EARL AUSTIN and AARON D. DAVIDSON
Attorneys at Law
2001 Rose Avenue
Dallas, Texas 75201-2980
214.953.6784

*AND*

SPRIGGS & HOLLINGSWORTH
BY: FRANK LEONE, JR.
Attorney at Law
1350 I Street, NW
Washington D.C. 200005
202.898.5800

## Page 3

INDEX

WITNESS:                                EXAMINATION

WILLIAM C. WIRSHING, M.D.
Volume 1

BY MR. AUSTIN                           5, 286

BY MR. LEONE                            273

BY MR. FIBICH                           301

EXHIBITS
DEFENDANTS'                             PAGE
EX 1    Case Studies                    5
EX 2    Invoice                         5
EX 3    Invoice                         5
EX 4    Amended Notice of Deposition    54
EX 5    Dr. Wirshing's Export Report    64
EX 6    Article                         212
EX 7    Article                         250
EX 8    Case Report                     257

## Page 4

INDEX (CONTINUED)
EXHIBITS
DEFENDANTS'                             PAGE
EX 9    Article                         280
EX 10A-D Timeline Documents             291
EX 11   Off-Label Sleep                 290
EX 12A-B Seroquel Medical Literature Binder 2 and 3  292
EX 13   Curriculum Vitae                304

## Page 5

Culver City, California, Friday, September 26, 2008
9:13 a.m. - 5:21 p.m.

WILLIAM C. WIRSHING, M.D.,
having been first administered an oath, was examined and testified as follows:

(Exhibits 1, 2 and 3 were marked for identification by the court reporter and are attached hereto.)

EXAMINATION
BY MR. AUSTIN:

Q   Good morning. My name is Earl Austin. And I represent Astra Zeneca.
    Will you tell us your name, please?
A   Yes. William, spelled conventionally. Wirshing, spelled, W-i-r-s-h-i-n-g. Middle initial C.
Q   We're here today -- what is the name of the facility where we are today?
A   Brotman Medical Center.
Q   Okay. Is this your place of employment?
A   It is.
Q   What is the name of your employer?
A   Actually, it's Exodus Recovery, Incorporated.

### Page 6

1  Q  We're here in Los Angeles in the conference
2  room in your office today?
3  A  That's correct.
4  Q  And I understand that you have been designated
5  as an expert witness on behalf of various plaintiffs that
6  have brought suits against Astra Zeneca involving their
7  medication Seroquel.
8     We correct on that?
9  A  As far as I know, yes.
10 Q  And I have a report from you both in the MDL
11 and the Florida cases and then another report from you in
12 Delaware.
13    Are you familiar with that?
14 A  No.
15 Q  Okay. Have you just prepared one report?
16 A  Yes, sir, I have.
17 Q  They are identical. And I just wanted to be
18 sure that we were dealing just with one report.
19 A  Yes. To my knowledge, I didn't send them to
20 either Florida or Delaware.
21 Q  Right. Right. I understand. I understand.
22 That's all just lawyer stuff.
23    Okay. And then you have some documents that
24 you brought with you today.
25    Can you tell me what those are and where you

### Page 7

1  got them?
2  A  Yes. I -- they are all documents of pertinence
3  to this case. And they all came from Dennis Canty,
4  C-o-n-t-i.
5     MR. FIBICH: C-a-n-t-y, I believe.
6     THE WITNESS: Okay. And in the San Francisco
7  area.
8  BY MR. AUSTIN:
9  Q  All right.
10 A  He's apparently one of the attorneys, I guess,
11 for one of the cases.
12 Q  All right. And are these all materials that
13 were provided to you by Mr. Canty and you've reviewed
14 them?
15 A  Yes, sir.
16 Q  Okay. And we -- is everything that you've
17 reviewed for preparing your report, is it here today?
18 A  That's correct. It's not only in the written
19 documents, the physical paper documents, but also in the
20 electronic ones.
21 Q  This?
22 A  Yeah, this one.
23 Q  Okay.
24 A  These don't have -- are deficient in that they
25 don't have the studies. This disk has many more studies,

### Page 8

1  literally, probably 50 studies that I reviewed. And
2  those are not in those paper documents.
3  Q  Okay. Are there -- is there any duplication on
4  the disk versus what's printed out here?
5  A  Yes. Yes. Significant duplication,
6  particularly with regard to what's called -- the term
7  being timeline, document timeline, there were a lot of
8  duplications.
9  Q  All right. In this document timeline, is this
10 something that you prepared, or something that was
11 provided you?
12 A  No, I didn't -- I did not prepare it. I do not
13 understand it. It -- it did -- the numerical
14 nomenclature is positively obscure to me, but I did go
15 through it. But I -- I presume that numbers are
16 idiosyncratic to Dennis.
17 Q  Right. It starts to No. 63 and goes up to
18 No. 124?
19 A  However, that's -- that's -- that's Volume 2,
20 if you will. No. 1 is -- check.
21 Q  I gotcha.
22 A  It's this big black one here.
23 Q  All right. So we have two volumes here?
24 A  No, I believe we have three.
25 Q  Three actually?

### Page 9

1  A  Yes.
2  Q  Okay. We'll sort out, during a break. I don't
3  want to waste a bunch of time going through those at the
4  moment. We'll look at those on a break and talk about
5  them.
6     Did you review all of these materials?
7  A  Yes, sir, not in painstaking thoroughness.
8  Q  Right.
9  A  Many of the documents, as you will find out,
10 are mind-numbingly boring e-mails that go on and on and
11 on and on and are duplicated ad nauseam. Those I would
12 flip through about as quickly as you're flipping through
13 that page right now. But I did try to review -- review
14 everything. I think I -- I'd like to think that I read
15 everything of pertinence, at any rate.
16 Q  Attached to your report is what's called
17 Reliance, a reference exhibit list. And I think it's 35
18 pages?
19 A  Correct.
20 Q  Did you -- did you have anything to do with
21 preparing this?
22 A  No.
23 Q  Okay.
24 A  I -- they -- I asked Glenda Grainger from
25 Tommy's office to prepare that from the disk and from

3 (Pages 6 to 9)

194

1 actually used --
2  A  Sure.
3  Q  -- that phrase?
4  A  Yes.
5  Q  And what was the context in which it was used?
6  A  In a bullet description of the drug.
7  Q  And in what -- what did -- is that all it said,
8 weight-neutral?
9  A  That I recall in that particular bullet.
10  Q  Have you reviewed the data on which that
11 statement was based?
12  A  I've reviewed --
13     MR. FIBICH: Object to form.
14     THE WITNESS: I've reviewed the data with
15 respect to the data and I know it's not a weight-neutral
16 drug.
17 BY MR. AUSTIN:
18  Q  Do you know the context in which that statement
19 was made in terms of what data analysis it was talking
20 about?
21     MR. FIBICH: Object to form.
22     THE WITNESS: No, I don't.
23 BY MR. AUSTIN:
24  Q  Okay. Have you looked at -- have you looked at
25 the Brecher Weight Gain Studies?

195

1  A  Yes.
2  Q  The one from 2000?
3  A  Yes. I know Martin well.
4  Q  You know Martin Brecher?
5  A  Yes, sir.
6  Q  In what context?
7  A  I used to work with Martin when Martin -- back
8 when Martin was working with Janssen for many years.
9  Q  Do you have any criticisms of Dr. Brecher?
10  A  Dr. Brecher is very smart, very ambitious, a
11 little trouble with his ethics, in my opinion.
12  Q  In what regard?
13  A  He's -- he's -- he's a businessman that wears
14 the garb of a scientist. And he has his -- he has his
15 eye firmly placed on the economic bottom line, rather
16 than, I think, truly understanding the characteristics of
17 the compound. I think he did it with risperidone and I
18 think he did it with quetiapine.
19  Q  Certainly your dealings with him were when he
20 was at Janssen?
21  A  Janssen, and to a lesser degree at Astra
22 Zeneca.
23  Q  Okay. Any particular dealings when he was at
24 Astra Zeneca?
25  A  I don't think I did any research projects with

196

1 him then, no.
2  Q  Any specific criticisms of Dr. Brecher or his
3 work in connection with Seroquel?
4  A  Yes. Yeah, I mean, I think -- I think that --
5 I think -- again, I think he was -- he was part of
6 this -- part of this whole marketing machine that
7 overemphasized the efficacy and underemphasized the true
8 toxicity of the compound.
9     Now, it's hard to know in this -- in this
10 collection of personnel who is exactly responsible for
11 that, but I think he was in part responsible for it, it
12 seemed to me. Martin is a very smart man. It's not like
13 these nuances were lost on him at all. I -- indeed, I
14 don't think any of these nuances were lost on any of
15 these very brilliant people.
16  Q  Well, when you were making speeches on behalf
17 of Astra Zeneca, did you tell doctors that, you know,
18 "Gee, I think the company is overpromoting the drug.
19 It's not nearly as efficacious as they're telling you"?
20  A  Did I -- did I make that specific criticism,
21 no, but I certainly said what I thought about the true
22 efficacy of the drug.
23  Q  And did you tell -- and Astra Zeneca certainly
24 never asked you not to give your full opinion about the
25 efficacy of the drug?

197

1  A  Yeah. I mean, you have to -- you have to --
2 that's true. You have to understand, though, that when
3 you -- I give a lecture, the person that's -- the person
4 that's sitting there is the drug rep and maybe his or her
5 district manager. And at the end -- at the end of this
6 lecture, they've got a bunch of happy people that just
7 love the fact that I don't bore the hell out of them and
8 I seem to know what I'm talking about. And they've got a
9 bunch of happy customers. And so everybody is pretty
10 happy about things.
11     The details of my discussion -- and I like to
12 think that I always tell people the truth, as I
13 understand it. The details of that discussion they might
14 not be too happy about. But the results of the evening,
15 they're generally pretty pleased with and I think that
16 that's why I work with them.
17     I even continued to work with Astra when their
18 bosses said, "You can't work with Dr. Wirshing because we
19 don't like his message very well." And so what they did
20 is they changed and they used me as an ad hoc consultant.
21 So they would still pay me to do these things, but it
22 would be under some other different form. And I wouldn't
23 have to show slides or do a presentation because that
24 would upset the bosses. But I would, in fact, say the
25 same thing.

50 (Pages 194 to 197)

## Page 198

1  Q  What is your basis for believing that at some
2  point the bosses said, "Don't use Dr. Wirshing anymore"?
3  A  They told me.
4  Q  Who's "they"?
5  A  The drug reps that I worked with.
6  Q  Who?
7  A  Tammy -- I can't remember Tammy's last name.
8  Tammy -- can't remember. Anoush, MSL I mentioned
9  earlier.
10  Q  What sort of time frame are we talking about?
11  A  Oh, that's probably five years ago.
12  Q  But you said you continued to give talks at
13  least until 2006?
14  A  No. I mean, I continue to do talks until last
15  month, but the talks were of a different sort. They
16  would no longer tolerate me doing the slide
17  presentations --
18  Q  You did --
19  A  -- because of this issue.
20  Q  But you did slide presentations all the way up
21  to 2006?
22  A  No. No, I didn't do slide presentations for
23  them. I did these talks.
24  Q  When is the last time you did a slide
25  presentation?

## Page 199

1  A  That's a good -- again, it's probably
2  five years ago.
3  Q  The talk last month, was that something that
4  you were paid to do?
5  A  Paid to -- paid to go out to dinner, paid --
6  paid for dinner and didn't do -- didn't -- didn't ask for
7  a consulting fee. That was -- I thought it was a little
8  bit inappropriate given the current circumstances.
9  Q  Inappropriate to take a fee.
10     What was the -- what was the nature of
11  discussion at dinner?
12  A  Very, very broad ranging. We talked about --
13  we talked about a whole bunch of different things:
14  Stimulants in -- in adult ADHD; we talked about anxiety
15  spectrum disorders, refractory schizophrenia and -- and
16  movement disorders.
17  Q  By going back to the weight-neutral issue, what
18  was the data that Dr. Brecher was looking at that was the
19  basis for the weight-neutral discussion?
20  A  I don't even -- I don't -- I don't specifically
21  recall.
22  Q  What was his thesis? I mean, what was he
23  saying about the data?
24  A  Saying that -- that the drug had -- had -- had
25  an insignificant impact on weight.

## Page 200

1  Q  Is that all you recall about the article?
2  A  That's all I recall about it at this time.
3  Q  Okay.
4  A  I mean --
5  Q  Do you recall there being a discussion about
6  looking across populations, that the weight gain appeared
7  to be greatest in those at the lowest BMI and least at
8  the highest BMI?
9  A  I recall that discussion when he worked at
10  Janssen.
11  Q  Okay.
12  A  I recall that discussion -- when -- when Lily
13  had it. And I recall when he did it -- when he did it
14  here.
15  Q  Well, my question is focusing on the Seroquel
16  data.
17     Do you recall his analysis of the Seroquel data
18  suggesting that the highest weight gain tended to be at
19  the lowest BMI?
20  A  That is correct.
21  Q  Okay. And do you recall in that article his
22  characterizing that observation as being weight-neutral?
23  A  That's -- that is correct. It is disingenuous
24  but it's correct.
25  Q  Well, let me ask you, based on the data that he

## Page 201

1  was looking at, do you disagree with his -- with what he
2  says the data showed, that is, greater weight gain at
3  lower BMI?
4  A  It did show that. I don't disagree with that.
5  Q  Okay. And -- and the word that he chose to use
6  -- to -- to describe that phenomenon was weight neutral?
7  A  Correct.
8  Q  Okay. So your criticism is his choice of
9  words, not necessarily the interpretation of data, is
10  what I'm trying to find out.
11  A  Exactly right.
12  Q  Okay.
13  A  That's precisely what my criticism is.
14  Q  Okay.
15  A  My criticism is -- is using what I consider, as
16  I said, a linguistics slight of hand to convey an
17  improper message. It's -- it's -- it's using the
18  contrivance of -- of biological systems. A person who is
19  skinnier has the greatest potential to gain weight. The
20  person that's fattest has the least potential to gain
21  weight. The fact of biological systems is regression to
22  the mean. That's what happens.
23     So to say -- to analyze a data set and to say,
24  it's weight-neutral and then to use that in advertising
25  is dishonest. It's because it implies that the drug

**ESQUIRE DEPOSITION SERVICES**
**(800) 640-2461**

```
                                                      202
 1   doesn't have an impact on weight, when, in fact, that's
 2   one of its most profound, predictable, consistent
 3   characteristics.
 4       Q   Which it's always been warned about in its
 5   label?
 6       A   Which has never been warned about in its label.
 7       Q   Okay.
 8       A   It has been listed in its adverse reaction
 9   section.
10       Q   Right.
11           It's been listed under the heading "Adverse
12   Reaction"?
13       A   Absolutely.
14       Q   Okay. And certainly, when you were writing
15   articles, you were always able to find it and quote it
16   your articles?
17           MR. FIBICH: Object to form.
18   BY MR. AUSTIN:
19       Q   The statements about weight?
20       A   Yeah. When -- yeah, when I was writing my
21   articles, I was usually referencing our data.
22       Q   And when you wrote your report, you were able
23   to find what the label said --
24       A   Yes.
25       Q   -- and put it in your report?
```

```
                                                      203
 1       A   Yes. I had to read it over and over and over
 2   and over again.
 3       Q   Okay. So your criticism with Dr. Brecher and
 4   his weight-neutral article was not what the data showed
 5   or his interpretation of the data, simply the words he
 6   chose to describe --
 7       A   That is correct.
 8       Q   Okay. And of course -- I mean, anything that
 9   could be said in English could be said a different way in
10   English; correct?
11       A   That's correct.
12       Q   It's always possible to criticize the words
13   that one person decides to use?
14       A   That's correct. The criticism is that it was
15   used to obscure the effect, rather than explain it.
16       Q   And the -- in the -- and the marketing
17   materials that you've seen that use that term each
18   reference that specific article?
19       A   That's correct.
20       Q   So it was not simply a statement in the
21   abstract. It was a statement referencing that particular
22   study?
23       A   With a little, tiny, superscript number that
24   you have to go back for, but yes.
25       Q   Sort of like the references you cite in your
```

```
                                                      204
 1   articles?
 2       A   Sort of like the references I cite in my
 3   articles. Mine are not advertisements, however.
 4       Q   And you've mentioned in your report the ADA
 5   consensus conference, ADA/APA consensus conference --
 6       A   Yes, sir.
 7       Q   Of 2004. American Diabetes Association,
 8   American Psychiatric Association; correct?
 9       A   Yes, sir.
10       Q   Sort of the joint consensus panel from those
11   two organizations?
12       A   Correct.
13           MR. FIBICH: Obviously, there's four
14   organizations.
15           MR. AUSTIN: Yeah.
16       Q   I think there were probably two others, weren't
17   there?
18       A   There were.
19       Q   But these were the two that get the headlines
20   but there were two others; correct?
21       A   That's correct.
22       Q   You recall the two others?
23       A   No.
24           MR. FIBICH: The Bariatric Association was one
25   of them.
```

```
                                                      205
 1           THE WITNESS: The other one had "endocrinology"
 2   in it. I don't quite remember what it was.
 3   BY MR. AUSTIN:
 4       Q   And -- and that panel was convened to look at
 5   this question of metabolic effects with antipsychotics?
 6       A   It was.
 7       Q   And I think you said that you were one of the
 8   ones that addressed that panel?
 9       A   Yeah. I was involved in the planning of the
10   convenience and provided the -- the discussion of the
11   monitoring protocol.
12       Q   Okay. Involved in the planning in what sense?
13       A   This was a thing that -- that came to fruition
14   over time. It was a process that occurred among a group
15   of us who had been lecturing about this topic. And, you
16   know, it was sort of our paths crossed. This is not a
17   group of people that hangs out together ordinarily. And
18   so we talked about doing this. And at our planning
19   session in, I think it was in Chicago, in the summer of
20   that year, 2003 and then planned on doing this in, I
21   think the conference was back East in Maryland somewhere
22   or something like that.
23       Q   Who were you working with to plan the
24   conference?
25       A   There was about 12 of us in the room.
```

**Page 218**

1  (Recess.)
2  BY MR. AUSTIN:
3  Q  Let's look at page 7 of your report, there at
4  the bottom.
5  A  (Witness complies.)
6  Q  You see where you talk about -- it says,
7  "Although the current label change"?
8  A  Uh-huh.
9  Q  Okay. You with me there?
10     "The current label change
11     implemented in 2007 does
12     direct one to a new section
13     in the adverse events section
14     that documents, to a degree,
15     some of the measured increases
16     in new onset diabetes."
17     Do you see that?
18  A  Correct.
19  Q  Certainly you agree with me that from the very
20  first day that Seroquel went on the market, it has
21  contained a statement, separate statement, in the adverse
22  reaction section, talking about the weight gain seen in
23  the clinical trials?
24     MR. FIBICH: Object to form.
25     THE WITNESS: Correct.

**Page 219**

1  BY MR. AUSTIN:
2  Q  The discussion about the 7 percent, 23 percent
3  was Seroquel versus 6 percent with placebo?
4  A  That's correct.
5  Q  Okay. And are you critical, with that
6  statement, in terms of accuracy, as accurately reflecting
7  the data from the clinical trial?
8  A  As -- as far as I know, that's a -- that's a --
9  that's a defensible data point, about 25 percent of that
10 population meets that threshold.
11 Q  All right. The majority don't?
12 A  The majority don't. I mean, it's somewhat
13 less, as we talked about, for lower doses and somewhat
14 higher for the higher doses.
15 Q  Okay. Are you -- are you critical of the
16 company's handling of the labeling in the original label
17 with regard to the -- its statement on weight?
18 A  Only so far as to where it is. And that
19 continues to be my criticism of it. I think it should be
20 a warning. 25 percent of your population gains --
21 develops a clinically significant toxicity. That should
22 be a warning, and that's -- that's my only criticism.
23 Q  Okay. So it's not so much the words that are
24 used with regard to weight. It's where they're placed?
25 A  Oh, exactly right.

**Page 220**

1  Q  Okay. And I -- is there a threshold at which a
2  drug is associated with weight gain that you think it
3  needs to be in the warning section as opposed to the
4  adverse reaction section?
5  A  Okay. Here's why -- and the answer to your
6  question is no, I have -- I have no specific -- specific
7  threshold. However, if you look at the toxic
8  characteristics of the drug, you are hard-pressed to find
9  another single characteristic that -- significant,
10 serious characteristic that applies to 25 percent of the
11 population exposed to Seroquel.
12    The only other characteristic that even comes
13 close to that is sedation. That wouldn't be what I would
14 consider serious. So the fact that the single most
15 prominent and frequent characteristic is not in the
16 warning section, that's my criticism.
17 Q  You do recognize that the FDA has treated the
18 second generation drugs as a class in terms of their
19 labeling?
20    MR. FIBICH: Object to form.
21    THE WITNESS: I am aware of that.
22 BY MR. AUSTIN:
23 Q  Okay.
24 A  I'm not pleased with it but I am aware of it.
25 Q  Okay. But there is -- but there is -- all

**Page 221**

1  right. Understood.
2     There is a regulatory, though, construct that
3  the manufacturers are operating under and that is that
4  the FDA has, since the outset, chosen to treat these
5  drugs as a class in terms of having a similar warning,
6  things of that nature?
7     MR. FIBICH: Object to form.
8     THE WITNESS: Yes. I'm aware that they -- they
9  require as a class certain warnings but they don't
10 exclude you from -- from adding to those class labeling.
11 BY MR. AUSTIN:
12 Q  The -- well, if you look at the bottom of the
13 page here, you say, first, the class warning section on
14 endocrinologic toxicities is laced with generalities,
15 disclaimers, and distracting verbiage.
16 A  Absolutely. It sucks.
17 Q  But that is the class warning that the FDA
18 imposed on everyone?
19 A  It does not suck anymore in your label than it
20 does in everyone else's label.
21 Q  All right.
22 A  I hated it from the very beginning.
23 Q  It talks about the cofounders that it occurs in
24 the general population. It may occur with greater
25 frequency in the seriously mentally ill.

## Page 222

1  And that's the sort of verbiage you're talking
2  about?
3  A  Exactly. I mean, it -- it -- it looks like it
4  was written -- pardon the expression. It looks like it
5  was written by attorneys, and it -- it -- I've
6  hated it from the very outset.
7  Q  But that language is the class warning that the
8  FDA has asked all of the manufacturers to put in its
9  inserts; correct?
10  A  Not quite. I mean, that was the -- that was
11  the -- that was the ultimate negotiated compromised
12  back-and-forth language decision among all of the
13  interested parties that was decided upon, after -- after
14  substantial back-and-forth discussions. And I'm still
15  critical of it. It's -- it's -- and -- and -- and you --
16  you can say that the -- that the -- my criticism should
17  be more appropriately aimed at other parties. Mia culpa.
18  Maybe So. But it still does not convey in a meaningful
19  way the toxic potential of the drug and it's confusing.
20  Q  You were not involved in the discussions that
21  led to the 2004 label, class label change; correct?
22  A  No, absolutely not. No.
23  Q  You've not been involved in discussions with
24  regard to anything stated in the labels for any of these
25  drugs?

## Page 223

1  A  In -- in the discussions, no. I have, you
2  know, sent in my comments to the FDA as to what I think
3  should be done but --
4  Q  Have you sent in any comments to the FDA with
5  regard to Seroquel specifically?
6  A  Only in regards abuse -- abuse potential. I
7  sent the FDA my recent -- recent reports and -- and --
8  and whatnot.
9  Q  Did you propose any specific language?
10  A  No. I've -- I've -- I've not written
11  specifically, no.
12  Q  Okay. And certainly you haven't corresponded
13  with the FDA or Astra Zeneca about specific changes that
14  you believe should be made to the label of Seroquel with
15  regard to metabolic issues?
16  A  To metabolic issues, no, sir.
17  Q  Okay. And I -- and I take it you've never
18  worked with the FDA as part of your practice and
19  professional experience, have not drafted product labels
20  or worked with manufacturers or others to do that?
21  A  I have never worked with the FDA and I have no
22  intention of ever working with the FDA.
23  Q  And you've never really been involved in the
24  actual preparation of a label?
25  A  That's correct.

## Page 224

1  Q  Okay. And well, certainly I -- you wouldn't
2  criticize the companies for putting the label in that the
3  FDA told them to put in in terms of what was stated in
4  the hyperglycemia statement in 2004?
5  A  Again, I would disagree with that because this
6  was a negotiated -- this was negotiated verbiage. And I
7  would -- I would criticize the verbiage and say that the
8  people who were involved in that, the creation of that,
9  were the FDA and the company. I would criticize them.
10  Q  Well, you were not involved in any of those
11  discussions?
12  A  I was not involved in any of those discussions
13  Q  And you don't know for a fact that anyone at
14  Astra Zeneca was involved in those discussions?
15  A  As a matter of fact, I do not know that.
16  Q  Okay. And -- and so you don't know whether, in
17  fact, Astra Zeneca simply just received a letter from the
18  FDA that said you are going to put this warning in your
19  package insert?
20  A  That's correct.
21  Q  Okay.
22  A  My knowledge about the back and forth really
23  applies primarily to the --
24  Q  Right. And we have to be careful not tar with
25  too long a brush here; correct?

## Page 225

1  A  Correct.
2  Q  And, in fact, sort of speaking of that, if we
3  look at the observational literature, the epidemiology
4  literature, were people trying to go back and look at
5  databases, VA databases and things of that nature and try
6  to look, you know, backward and see what they can divine
7  from the data.
8  It's correct, in the early days, olanzapine
9  really dominated the use, didn't it? I mean, it was a
10  very heavily used drug in -- in the early years.
11  A  You're talking about which years?
12  Q  '97, '8, '9?
13  A  Absolutely.
14  Q  Okay.
15  A  It had -- it had the VA data. It had about, in
16  those years, a parody to a little better than parody with
17  risperidone and much, much more with quetiapine.
18  Q  And I can show it to you if you'd like, in your
19  report that you did in Diproxal litigation, you said --
20  you mentioned the Cerniac Study, which is one of the Epi
21  studies.
22  A  Sure.
23  Q  And I think you know that there like 48 percent
24  of the patients were on olanzapine in that study.
25  And to the extent -- and I think you told us

### Page 230

1 about the discussions. I mean, I do -- I do have the --
2 the company documents where they go, that they went back
3 and forth to the FDA. The FDA asked them, "Don't we need
4 to have a warning about this?" And the company's
5 response was "No, we've pretty much got this covered in
6 the adverse experiences section, wherein we do say that
7 there is a significant weight gain in a certain number of
8 patients."
9   Q   Can you direct me specifically to any
10 correspondence that said what you just said?
11   A   I knew you were going to ask me that. It was
12 from Wayne Geller, G-e-l-l-e-r. It's going to take me a
13 little while to find it. As I recall, it was from Wayne
14 Geller and it was -- was 2000.
15   Q   And this is correspondence with the FDA?
16   A   Yeah, that's what I recall.
17   Q   What is your memory of --
18   A   My memory of it is that -- is that there -- the
19 question was is this adequate. And the response was yes,
20 it's -- it's adequate where it is. It does -- our label
21 does state that there is -- there was -- what was the --
22 I quoted it in my report. There is sometimes. I quoted
23 it from here. Sometimes associated with increases in
24 body weight in the -- in the adverse experiences section.
25   Q   Well, I mean, in all fairness, it said more

### Page 231

1 than that from the beginning, didn't it?
2   A   No. I was quoting from what he said.
3   Q   Okay. Because that's not what the label said.
4 The label talked about the -- using the 7 percent cutoff.
5 That's the convention that the FDA and other researchers
6 use and it gave a percentage?
7   A   23 percent. Exactly.
8   Q   So it said more than just, hey, it sometimes
9 happens?
10   A   Yeah, but, again, only in the adverse
11 experience section.
12   Q   So we're talking, again, you're not critical of
13 the content. You're critical of the placement?
14   A   Correct.
15   Q   Okay.
16   A   Correct. My point in trying to find this
17 correspondence was this was a conscious decision to leave
18 it in the adverse experiences section.
19   Q   And your recollection is that the FDA said,
20 "Should we put this in the warning section?" And you're
21 saying that Astra Zeneca told them no?
22   A   Yeah, that -- that the response was "No, it's
23 adequate where it is."
24   Q   Okay. And -- and we can't find it --
25   A   Well --

### Page 232

1   Q   -- but you think there was some correspondence
2 between Wayne Geller and the FDA?
3   A   That's what I recall.
4   Q   All right.
5   A   I'll see if I can dig it up.
6   Q   And you're looking at one of these notebooks
7 that's entitled "Document Timeline" --
8   A   That's correct.
9   Q   -- that the attorneys provided you?
10   A   That's correct. I think that's what it was.
11 I'll search away and you can ask me. There's one
12 document from Wayne dated 26 September 2003. It says --
13 that can't be quite right. But it says:
14     "There is reasonable evidence to
15     suggest that Seroquel therapy can
16     produce significant weight gain
17     in selected individuals. Seroquel
18     CDS mentions the possibility of
19     'limited,' quote, unquote, weight
20     gain associated with Seroquel
21     treatment. However, consideration
22     should be given to removing qualifier
23     'limited' based upon the post-marketing
24     of clinical safety trials."
25   Q   Do you know what the CDS is they're referring

### Page 233

1 to?
2   A   No.
3   Q   And do you know whether the label for Seroquel
4 as it appeared in the United States ever used the term
5 "limited" with regard to weight gain?
6   A   No.
7   Q   You do not know or you know it didn't?
8   A   I do not know that it did.
9   Q   Okay.
10   A   But it's in this area. It's going to take me a
11 little while to find it. But in it's this area.
12   Q   The document that you are looking at has a
13 deposition exhibit sticker on it?
14   A   Yeah, it has a 15, 1-5.
15   Q   To Geller?
16   A   5/7/08.
17   Q   Did you review Dr. Geller's deposition?
18   A   Yeah.
19   Q   Okay. Was there anything in particular from
20 Dr. Geller's deposition that jumped out at you?
21     MR. FIBICH: Object to form.
22 BY MR. AUSTIN:
23   Q   If somebody asked you what did Dr. Geller had
24 to say, what would you tell them?
25     MR. FIBICH: Object to form.

59 (Pages 230 to 233)

## Page 242

1  Q   Is there anything unique about people with
2  serious mental illness in that connection?
3  A   Not as far as I know.
4  Q   Okay. So --
5  A   Some gender issues and some genetic issues and
6  some -- some ethnic issues.
7  Q   Right.
8      So the weight gain that's associated with
9  Seroquel is going to be the same as -- in the Seroquel
10 same sort of influence across population in terms of its
11 propensity to cause truncal obesity as food in general?
12 A   One would presume.
13 Q   Okay. So the point is you can't really -- even
14 if you narrow it down to this 30 percent who gain weight
15 on Seroquel, who might be at risk for diabetes, the
16 percentage of patients who don't get truncal obesity --
17 truncal adiposity, they're not going to be at risk --
18     MR. FIBICH: Object to form.
19 BY MR. AUSTIN:
20 Q   -- for diabetes?
21 A   Again, it's going to be about two-thirds.
22 Q   Okay. Well, but there's even -- no.
23     There's -- there's also people who gain weight,
24 who gain truncal adiposity, who never get diabetes?
25 A   And there's also people who gain just regular

## Page 243

1  adiposity who get diabetes. So the one-third, I mean,
2  it's about one-third. Those are the people that are at
3  risk. And that one-third has more truncal adiposity,
4  than not, but it's got a whole bunch of other people in
5  it too.
6  Q   So -- so, again, this is just -- you're not
7  quibbling with the accuracy of the data. You're just
8  critical of --
9  A   The way it's presented.
10 Q   -- the way it's presented?
11     And then you go on to say that:
12     "The company personnel have opined
13     in depositions that the details of
14     quetiapine's measured risk of diabetes
15     and related endocrinologic disturbances
16     were unknown until the results of
17     these later done studies were completed."
18     Do you see that?
19 A   Correct.
20 Q   Tell me what is your basis that the company
21 actually said that?
22 A   Several of the guys said, "We didn't know what
23 the -- we didn't have studies to confirm specifically
24 what the measured rate of diabetes was. We put it in a
25 label when we knew it.

## Page 244

1  Q   And have you reviewed the later studies that
2  they're referring to?
3  A   For these 2 to 4 percent?
4  Q   Yes.
5  A   Sure.
6  Q   Do you remember the numbers of the studies?
7  A   No.
8  Q   All right.
9  A   I think it's -- I think it's actually in the
10 label.
11 Q   All right. Have you reviewed the metabolic
12 submission that the FDA -- that the company made to the
13 FDA this year? Was that among the materials that was
14 provided to you?
15 A   This year?
16 Q   It would be a compilation of monotherapy
17 studies that was put together at the request of the FDA
18 and provided to them earlier this year. I'll tell you I
19 didn't see it on your reliance.
20 A   Doesn't ring a bell.
21 Q   Okay. All right. And what is your criticism
22 of the company, looking at this statement, about the
23 later done studies?
24 A   Again, that it -- it's dishonest to say that we
25 didn't know what the risk of diabetes was because it

## Page 245

1  hadn't been measured, when we knew what the weight gain
2  was. It's -- it's -- it's technically correct, yes, you
3  didn't know what the specific rate of treatment emergent
4  diabetes compared to, say, placebo; true. But you are
5  aware of these general observations about weight gain and
6  diabetes. Those -- those are known, just as you said,
7  well, you gain weight, you're going to develop diabetes.
8  Q   Did -- do you believe that the company
9  inaccurately --
10 A   It's known.
11 Q   -- represented the frequency with which
12 diabetes was seen in its clinical trials? You're not
13 critical --
14 A   To Astra Zeneca?
15 Q   Yes.
16 A   No, not that I know of.
17 Q   Okay. And -- and diabetes was listed as a
18 potential adverse reaction from the clinical trials from
19 the very beginning; right?
20 A   As an adverse reaction, yes.
21 Q   Right.
22     So I mean, from the very beginning that the
23 drug went on the market, it was disclosed that, in our
24 clinical trial program, we saw diabetes at -- at a given
25 rate, depending on where it fell on the table?

ESQUIRE DEPOSITION SERVICES
(800) 640-2461

**286**

1    FURTHER EXAMINATION
2    BY MR. AUSTIN:
3        Q    Doctor, I want to go through the boxes here.
4    And, trust me, I'm not going to go through every
5    document. And I -- but I just want to get the
6    categories.
7            This -- first, let's go through this the
8    depositions that you've reviewed. Okay?
9            We have Wayne Geller; correct?
10       A    Yes.
11       Q    And as I look at it, you have the transcripts
12   but not the exhibits.
13       A    There were no exhibits.
14       Q    Okay. Then we have Joseph Calabrese.
15       A    It says Joseph Calabrese but I believe that's
16   Martin Brecher.
17       Q    You're right. Martin Brecher.
18           Again, transcript, no exhibits?
19       A    No exhibits.
20       Q    Then we have another binder labeled "Martin
21   Brecher," which is actually Joseph Calabrese's
22   deposition.
23       A    Correct.
24       Q    Okay. And, again, transcript with no exhibits.
25       A    That's also correct.

**287**

1        Q    And then we have Jeffrey, J-e-f-f-r-e-y,
2    Goldstein. Transcript, no exhibits.
3            MR. FIBICH: There was an exhibit at -- I think
4    it's right here.
5            MR. AUSTIN: Right here. Maybe two exhibits.
6            THE WITNESS: No, there was --
7            MR. FIBICH: Yeah. And a small graft paper.
8            THE WITNESS: This one.
9            MR. AUSTIN: Okay.
10       Q    What you have is Goldstein Exhibit No. 40,
11   Goldstein Exhibit No. 41, and Goldstein Exhibit No. 49;
12   correct?
13       A    Yes.
14           MR. FIBICH: Right.
15   BY MR. AUSTIN:
16       Q    And then you have -- when we walked in today,
17   you had Goldstein Exhibit No. 39 with you.
18           What is this study and what's the significance
19   of it to you?
20       A    Oh, yeah, I had it with me because I was
21   getting it Xeroxed.
22       Q    Okay.
23           MR. FIBICH: What is it?
24           THE WITNESS: But this is a -- doctor --
25   Dr. Small's -- I think it was 2000 – 1999 monograph on

**288**

1    quetiapine. I don't believe it was ever published.
2    BY MR. AUSTIN:
3        Q    Quetiapine and what aspect of it?
4        A    Efficacy, toxicity, sort of a general -- this
5    is very early, early publication on the drug, talking
6    about its profile, it's metabolic, it's toxic, it's
7    efficacious, et cetera.
8        Q    All right. Is there anything in particular
9    that you found significant about this study?
10       A    No. It -- it detailed -- detailed the
11   toxicities that had been observed, talked about the
12   logical metabolic cascade that one would anticipate from
13   a drug, you know, that causes increased weight gain of
14   certain ordinary kinds of discussion. He was scholarly,
15   thorough, appropriate.
16       Q    And at least, in terms of the profile of the
17   drugs, consistent with the things we discussed here
18   today?
19       A    Exactly right. I think it's pertinent because
20   it talks about it at a very early time in history but
21   that's all. It's nothing earth shaking or surprising or
22   startling about it.
23       Q    Okay. I don't see them but you said you
24   reviewed the deposition of Geoffrey Birkett.
25       A    Did -- that was on (indicating.)

**289**

1        Q    Okay. And the deposition of David Brennan,
2    also on the disc?
3        A    Yes. That's correct.
4        Q    Any other depositions on the disc?
5        A    No, I don't think so. I think it was just
6    those two. I don't know why but those were just the only
7    two.
8        Q    Here's what I'm trying to figure out, is -- is
9    this -- I'm just wondering if we should make a copy of
10   the disc.
11           MR. FIBICH: I thought the disc had been
12   provided to you. Is that not right?
13           MR. AUSTIN: Tommy, I just can't say. You know
14   what? Let's just be safe. Let's just mark that envelop
15   as the next exhibit.
16           THE WITNESS: Make sure I don't have any notes
17   to myself on there.
18           MR. AUSTIN: We'll do that at the end of the
19   day so you don't have to mess with it.
20       Q    I missed one deposition. There's also the
21   deposition of Jack Schwartz.
22       A    Schwartz, yeah.
23       Q    And, again, transcript, no exhibits?
24       A    As far as I remember, there's no exhibits.
25       Q    All right. Then we have -- and I think I am