# EXHIBIT 2

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Docket No.6:06-MD-1769-Orl-22DAB

. . . . . . . . . . . . . . . ..
IN RE:                          :
SEROQUEL PRODUCTS LIABILITY     :
LITIGATION                      :    Orlando, Florida
MDL DOCKET No. 1769             :    July 29, 2008
                                :    2:00 p.m.
ALL CASES                       :
                                :
. . . . . . . . . . . . . . . .:

TRANSCRIPT OF PRETRIAL CONFERENCE
BEFORE THE HONORABLE ANNE C. CONWAY
UNITED STATES DISTRICT JUDGE
AND
MAGISTRATE JUDGE DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

For the Plaintiffs:     Paul Pennock

                        Camp Bailey

                        Jonathan Sedgh

                        Dennis Canty

                        Renee Baggett

                        Lori Siler

                        Edward Blizzard

                        Larry Roth

Court Reporter:    Sandra K. Tremel, RMR/CRR

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

## Page 2

```
 1   APPEARANCES CONTINUED
     FOR THE PLAINTIFF:          Holly Wheeler
 2                               Lowell Finson
 3
 4   For the Defendant
 5   AstraZeneca:                Fred Magaziner
 6                               Stephen J. McConnell
 7                               Robert Pass
 8                               Liz Balakhani
 9                               Russell Stewart
10                               Kris Henning
11                               Gary Feinerman
12   ALSO PRESENT:
13                               Craig Ball
14                               Orran Brown
15                               Brian McCormick
```

## Page 3

```
 1              PROCEEDINGS
 2       THE COURT: Good afternoon. Could we have
 3   appearances, please.
 4       MR. PENNOCK: Paul Pennock, Weitz & Luxenberg,
 5   for the plaintiffs.
 6       MR. BAILEY: Camp Bailey for the plaintiffs.
 7       MR. BLIZZARD: Ed Blizzard, Blizzard, McCarthy
 8   and Neighbors for the plaintiffs.
 9       MR. ROTH: Larry Roth, liaison counsel for
10   plaintiffs.
11       MR. SEDGH: Jonathan Sedgh for plaintiffs.
12       MR. McCORMICK: Brian McCormick liaison for the
13   third party plaintiffs.
14       MR. MAGAZINER: Fred Magaziner for AstraZeneca,
15   Your Honor.
16       MR. MCCONNELL: Good afternoon, Your Honor,
17   Steve McConnell on behalf of defendants.
18       MR. CIOTTI: Robert Ciotti for AstraZeneca.
19       MR. PASS: Robert Pass for AstraZeneca.
20       MS. BALAKHANI: Liz Balakhani for AstraZeneca.
21       THE COURT: All right. We have just one issue
22   that you all have listed on the joint status report. Who
23   would like to speak to that?
24       MR. ROTH: Your Honor, there are some -- excuse
25   me. There are some folks on the phone. I didn't know if
```

## Page 4

```
 1   you wanted to --
 2       THE COURT: Okay.
 3       MR. BROWN: Good afternoon, Your Honor. This is
 4   Orran Brown, the special master for case-specific
 5   discovery.
 6       MR. BALL: This is Craig Ball, the special
 7   master for electronically stored information.
 8       MR. STEWART: Your Honor, Russell Stewart for
 9   the AstraZeneca defendant.
10       MS. BAGGETT: Your Honor, Renee Baggett for the
11   plaintiffs.
12       MR. FINSON: Your Honor, Lowell Finson for
13   various plaintiffs.
14       MR. FEINERMAN: Gary Feinerman for AstraZeneca.
15       MS. KENNY: Colleen Kenny for AstraZeneca.
16       MS. WHEELER: Holly Wheeler for the plaintiffs.
17       MS. SILER: Your Honor, Lori Siler for the
18   plaintiffs.
19       MR. HENNING: Kris Henning for AstraZeneca.
20       MR. CANTY: Dennis Canty for plaintiffs.
21       MR. BROWN: Those are all the counsel appearing
22   by telephone today.
23       THE COURT: All right.
24       MR. BRADY: And Scott Brady for plaintiffs.
25       MR. BROWN: Except for Scott. Thank you.
```

## Page 5

```
 1       THE COURT: Okay. Who would like to address
 2   AstraZeneca's proposal relating to the dispositive motion
 3   briefing?
 4       MR. MAGAZINER: Fred Magaziner, Your Honor.
 5   We've been working with Magistrate Judge Baker for some
 6   time trying to figure out a way to streamline the filing
 7   of dispositive motions before Your Honor. And what we've
 8   come up with is described in the submission that we made.
 9   I recognize --
10       THE COURT: Have you discussed it with
11   plaintiff's counsel?
12       MR. MAGAZINER: We have.
13       THE COURT: Is there any objection to your
14   proposal?
15       MR. MAGAZINER: There is none.
16       THE COURT: All right.
17       MR. PENNOCK: Your Honor, Paul Pennock for
18   plaintiffs. I didn't have an opportunity to discuss this
19   with Mr. Magaziner in the following issue. In terms of
20   the briefing, we were fine with it, but there was a
21   reference, I think, in the proposal regarding a
22   stipulation of an entry of judgment on the warranty
23   claims. And I think that the discussions had been that we
24   were going to withdraw those -- withdraw those claims,
25   might be a slight difference in how we were going to
```

### Page 6

1  approach eliminating those claims. So we didn't actually
2  have a discussion on entry of judgment. But in the final
3  analysis, we do agree that those claims will be withdrawn.
4  That's mentioned at page 2 of the motion that was filed
5  on, I think, Friday.
6      And also there was a reference in the papers that the
7  warranty claims would be, "eliminated from the
8  litigation." And I think what we had contemplated was
9  only that the warranty claims would be withdrawn with
10 respect to the Florida plaintiffs, where Florida law we
11 think we are in agreement with the defendants would not
12 support those claims. But many other jurisdictions,
13 should these cases ever be remand to other jurisdictions,
14 would support the warranty claims.
15     So we were withdrawing them not consenting to
16 judgment and only on the Florida cases. Other than that,
17 we don't have any objection, I think, to the briefing.
18     MR. MAGAZINER: Your Honor, with regard to the
19 last issue that Mr. Pennock admits, it was certainly not
20 our intention to suggest to the Court that there is an
21 agreement, but the warranty claims of all plaintiffs in
22 all jurisdictions would be dismissed or judgment entered.
23     THE COURT: I read that paragraph to
24 specifically relate to Florida law.
25     MR. MAGAZINER: And that is how it was intended,

### Page 7

1  Your Honor.
2      And with regard to the other issue, a colleague of
3  Mr. Pennock's and a colleague of mine have been engaged in
4  discussions about the procedure by which the warranty
5  claims governed by Florida law would disappear from
6  litigation and those discussions are ongoing. But they
7  will disappear either by dismissal or withdraw.
8      THE COURT: All right. So I understand it, what
9  you would like is a 60-page master brief?
10     MR. MAGAZINER: Yes, Your Honor.
11     THE COURT: With 20-page -- maximum of 20-page
12 brief of the 12 individual cases.
13     MR. MAGAZINER: Yes.
14     THE COURT: Sounds like a pretty good proposal
15 to me.
16     MR. MAGAZINER: Thank you.
17     THE COURT: The plaintiffs would have the same
18 page limits.
19     MR. MAGAZINER: Well, we'd actually propose that
20 they have half as many pages, if that's all right with the
21 Court.
22     THE COURT: And I'm sure they would like twice
23 as many.
24     MR. MAGAZINER: We hadn't discussed that, but I
25 think that's a fair way to do it.

### Page 8

1      THE COURT: All right. Well, is there anything
2  else we need to discuss? I am not going to extend any of
3  the deadlines. I just simply cannot do that. So --
4      MR. MAGAZINER: Both Mr. Blizzard and I would
5  appreciate an opportunity to discuss that with the Court
6  if the Court would indulge us.
7      THE COURT: Always happy to hear you.
8      MR. BLIZZARD: Your Honor, good afternoon. My
9  name is Ed Blizzard. I haven't had the pleasure of being
10 in Orlando except for one occasion and not before this
11 Court, but I have been involved in the litigation in
12 terms of planning and taking many of the corporate witness
13 depositions from AstraZeneca. I'm also involved in
14 preparing or trying to prepare the expert witnesses to
15 file reports and to give testimony. And I will be
16 involved in trials that occur here and elsewhere, not all
17 of them but certainly some of them.
18     One of the key issues in the trials of the case, of
19 course, will be what did AstraZeneca know and when did it
20 know it about the scientific information that Seroquel
21 could cause diabetes. And one of the critical pieces of
22 information about what they knew and when did they know it
23 would be located in their clinical trial database.
24     And while AstraZeneca, obviously, has had that
25 clinical trial database for years and has scientists that

### Page 9

1  have analyzed it and reanalyzed it, it was only when we
2  took the corporate witness depositions and their chief
3  scientists, which began really from mid May of this year
4  until the latter part of June of this year, that we had a
5  good understanding of what glucose data or diabetes data
6  they had in their clinical trial database that might need
7  to be analyzed by our experts.
8      So we finished -- we deposed their chief scientist on
9  this issue, Dr. Brecker, and -- between May 28 and May 30.
10 We deposed the head of drug safety for the company on
11 June 19 and 20th in the United Kingdom. And immediately
12 following the completion of our discovery, our corporate
13 discovery, we then sought out to try to locate and
14 assemble and get to our experts all the clinical trial
15 data that they would need to analyze in order to address
16 the issue of what did the company know and when did they
17 know it.
18     So if I could hand up to the Court a single sheet
19 that we've prepared. This is a listing of -- could I
20 approach?
21     THE COURT: Yes.
22     MR. BLIZZARD: Thank you, Your Honor. I have
23 another copy for Judge Baker.
24     THE COURT: Thank you.
25     MR. BLIZZARD: Your Honor, this is a listing of

3 (Pages 6 to 9)

10

1  some of the clinical study reports -- actually, all the
2  clinical study reports that we provided to some of our
3  experts, epidemiologists, who will be addressing the
4  question of what did the company know, what was in their
5  own database from their clinical studies.
6     And as the Court can see from this single sheet of
7  paper, these documents were provided on July 18 of this
8  year of 2008, and see that there are a large number of
9  these reports. All of these reports contained glucose
10 data that they gathered during the testing of the product,
11 primarily for whether it was effective or not. Only one
12 of these studies, study 125, was a study that addressed
13 the specific issue, the safety issue, of what effect does
14 it have on glucose tolerance.
15    But in all of these studies actually collecting
16 glucose data, some randomly, some fasting glucose. And
17 you can see that most of these reports are thousands of
18 pages long. For example, clinical study 127, which was
19 completed in June of 2007, is 6,434 pages long. And then
20 there's an errata list for the same study that's 8,755
21 pages long.
22    What we learned in the testimony that -- was that
23 these two studies are the reason why the company recently
24 changed its label, or I say recently, I mean in the summer
25 and fall of 2007, they changed their label and added some

11

1  language on hyperglycemia. And we had been asking
2  witnesses about this for some time, but it wasn't until
3  the summer, May and June of this year, that we actually
4  found witnesses who knew about these safety studies. And
5  so we have now been able to gather these studies as well
6  as these other studies and provide them to our experts.
7     The Court can see from this printout this is quite a
8  bit to bite off and chew and digest for any expert. And
9  to say it another way, it's a lot to ask them to analyze
10 this, to form an opinion about it, and then write about
11 it.
12    And so from talking with the experts, there is no way
13 that they can be ready to complete their analysis of this
14 data in less than a month's time. Currently our expert
15 deadline for expert reports is August 8th.
16    We provided this information as quickly as we could
17 following the completion of the corporate witness
18 depositions. We're able to pull it together by July 18
19 and get it out on disk and hard drives to these witnesses,
20 but we just simply can't get it done by August 8th.
21    Now, as this Court probably knows, the -- AstraZeneca
22 has retained a formidable line up of defense lawyers.
23 There's Williams and Conley and there's Bartlett, Beck as
24 well as the Dechert firm, Sidley and Austin, Baker and
25 Botts. They have good trial lawyers that we've faced

12

1  before in other litigations. And I assume they're not
2  doing this to scare us, they're planning to try the cases
3  and we're prepared to meet that challenge. But because
4  the parties are investing significant resources in -- both
5  from the standpoint of time and money and because we're
6  aware that the Court is going to be investing significant
7  resources in time and ruling on some of the motions that
8  will be presented as these cases get ready for -- get
9  closer to trial, we want the result to be useful, the
10 results of the trials to be useful to both the parties and
11 the Court.
12    And we think that the only way that they're going to
13 be useful to the parties and the Court and to justify the
14 investment of the Court's time and our time and resources
15 in this is if both sides are ready.
16    And I guess what I'll tell the Court and I think
17 AstraZeneca has indicated to the Court in the joint status
18 report is that both sides along with the special master
19 that has been appointed, Orran Brown, to try to schedule
20 the depositions of the -- of the treating doctors, that
21 despite the fact that everybody's worked as hard as they
22 can that we can't be ready on the current schedule.
23    So appreciate the Court listening to me after you
24 made the comments of what you couldn't or likely to do on
25 this, but I think it is the parties' firm belief that the

13

1  current schedule, despite the parties having worked --
2  having worked hard to meet it, can't be met with the
3  parties being ready to do what we need to do to
4  effectively present these cases.
5     Thank you, Your Honor.
6        THE COURT: Thank you.
7        MR. MAGAZINER: May I be heard on the subject as
8  well?
9        THE COURT: Yes.
10       MR. MAGAZINER: I'm not able either to agree
11 with or disagree with what Mr. Blizzard said about the
12 feasibility of getting information to the plaintiff's
13 expert at an earlier time. But there are many other
14 reasons why I would urge the Court, despite the Court's
15 very considerable misgivings, to consider the joint
16 submission that we made requesting that the dates be
17 changed.
18    As Judge Baker could confirm to Your Honor, this has
19 been a hard fought litigation to date and there have not
20 been very many instances when the parties have completely
21 agreed on issues, but this is one instance when that has
22 happened.
23    As we face the deadlines that are looming both for
24 the Plaintiffs and for AstraZeneca, we realize how all of
25 those deadlines were premised on the depositions of the

**Page 14**

physicians being completed by July 31. Every deadline that follows in the present orders is premised on the completion of those physician depositions.

Judge Baker alluded at the last conference of the possibility that it might be some clean-up to be done after the deadline. But what has happened, through no fault of plaintiffs, no fault of AstraZeneca, no fault of the PMO, what has happened is that a great number of the physician depositions have not yet been scheduled.

Unfortunately, despite the best efforts of the parties, the extraordinary efforts of the PMO, physicians whose depositions need to be taken have made themselves -- have not made themselves available on the schedule that the parties and the Court wish them to be deposed.

And nothing can be done about it other than to push as hard as they can be pushed, then hope that the physician depositions can be schedule.

The PMO, Mr. Brown, is on the telephone, and I'm sure he can speak to this himself. But as he said in his written report, this is through no fault of the parties, and it's certainly through no fault of the PMO himself.

As a result of these deposition not being taken, many of the facts upon which these cases may well turn are not yet known. It's not very often that one of the defense lawyers has gotten up here and said, we think the

**Page 15**

plaintiffs need more time. But I'm saying that to you today.

If the plaintiffs have to submit reports on August 12th, case specific expert reports, for example, as the present schedule contemplates, they will necessarily be submitting reports that are incomplete and that will need to be supplemented and modified down the road when more facts are known. Many of the crucial facts are not yet known.

I took a deposition yesterday -- or I cross-examined a doctor yesterday, the plaintiffs took the deposition in one of the initial trial pool cases, it's the number two case on the plaintiff's list, Burns, we learned yesterday of things that no one knew until yesterday. That case -- that deposition was done by July 31, it was yesterday. But there are other equally important depositions that are going to be in August and I dare say are going to be in September which will -- the outcome determinative or at least outcome -- of great outcome importance, let's put it that way, to these cases. And any expert reports that are submitted by the plaintiffs or by AstraZeneca about these cases when so many of the most significant facts are not yet known are flawed reports which will have to be redone later on.

And we've discussed this at length with the

**Page 16**

plaintiffs. They're the ones that feel the initial brunt of the present order because they have reports due early in August. We have reports due a month later. But both of us are in the same boat as we are submitting -- going to experts and asking them to analyze cases where all the facts are not yet known because discovery is not yet complete. We're engaged in a very flawed and wasteful and inefficient system that can only result in some sort of chaos in the fall when we come back to Your Honor, to Judge Baker and say, we now need to supplement this report. We now need to supplement the other report. We need to have new depositions. We need to have new responsive reports. And this whole schedule is going to fall into disarray, I believe.

So I -- we are well aware, and Judge Baker has pointed out to us and emphasized to us repeatedly, I'm sure Your Honor would be pleased to know this, repeatedly how extremely --

THE COURT: I've read all of the transcripts.

MR. MAGAZINER: Okay. Well, then, Your Honor knows how --

THE COURT: Those I didn't listen to in person.

MR. MAGAZINER: Well, then Your Honor knows that Judge Baker has emphasized again and again how important these deadlines are. And we have taken it to heart and we

**Page 17**

are doing everything we can.

But a great number, I would say the majority, but a very large portion of the depositions that were supposed to be completed by July 31 will not be completed by July 31. That's absolutely certain. And that's what the PMO has said in his report.

So here's how I see this, Your Honor, and I say this reluctantly because I know how disappointing this is to the Court, but we have put in place with the procedures that we negotiated and developed with the plaintiffs and that we've submitted to the Court, we put in place a process that if it's allowed to proceed will result in trials of cases that will be of significance to the Court and of significance to the litigation.

We will have trials from which the Court and the parties will learn a great deal and which will help the Court and the parties figure out how to get through this litigation and bring it to some sort of end.

But it is an orderly process that we've developed with the plaintiffs. It's a process that we believe in, and it's a process that is premised in the present schedule on fact discovery being completed by July 31.

If that premise is false, what we urge the Court to allow us to do is adhere to the process, let it work out the way we envision, but give us the continuance that

### Page 18

we've requested so that the depositions can be completed, and we can proceed in an orderly manner through expert disclosure, expert depositions, motions, et cetera, as the process contemplates.

To our mind, and I think I speak for the plaintiffs as well, it is more important that we end up trying cases that are significant having gone through pretrial proceedings that are fair and that allow all the issues to be well vetted and developed, than it is that the trial be 60 days earlier or 60 days later.

We think -- as much as the plaintiffs and we would like to have had the earlier trial date, we think it is not realistic. We think it is, in fact, impossible. And we would urge the Court to take seriously our joint submission and work with us in trying to keep this process in place as we have envisioned it and developed it over time.

Of course, Mr. Blizzard and I and other counsel will be happy to address any concerns Your Honor has or any specific questions you may have.

THE COURT: I don't have any questions. The first trial is going to start February 2nd. I will look at the dates and see what we can tweak and still give us time to rule on the motions.

MR. BROWN: Your Honor, this is Orran Brown, the

### Page 19

special master for case specific discovery. May I inform the Court just briefly on the logistics that Mr. Magaziner and Mr. Blizzard were speaking to in our efforts to conclude these depositions?

We have been relentless since the first cases were designated in April for the initial trial pool cases in scheduling the depositions of the physicians and the sales representatives, the plaintiffs, and the other witnesses that are involved in these -- this program for the trial cases.

And the parties themselves, I just want the Court to know that the plaintiffs and the defendants through their representatives, Ms. Martinez and Mr. Stewart, have really poured it on to try to make this happen. They have gone to great lengths to schedule these depositions and get people there. And whenever we run into, as we do each day, problems from the physicians' offices about schedules or amount of time they will give us, the parties have been working together delightfully to make that happen.

And the impediment for all of us collectively has been physicians schedules. They -- as I recounted in our report, we regularly have run into the normal things you run into with the doctors and their patient schedules and how much time they allow for depositions and the fees they want and getting their records and the normal things.

### Page 20

In this time of year in the summer, and particularly now that these depositions because they -- some of them de bene esse depositions and they can be videotaped and they can occupy up to a total of seven hours, it's harder to arrange that on a doctor's schedule. That has taken more time. And we're also seeing a number of the physicians, more so than in the discovery program we had before the trial pool cases, are now wanting their own lawyers involved which delays the process and slows it up because we have to convince the lawyers of the time, place and manner that these depositions are going to be done.

We have been using all the Court's orders that Judge Baker and the Court entered to assist this process to convince these physicians and their lawyers that they have to cooperate, they have to provide the time to us. We've been begging for nights and weekends, not successful much in getting physicians to help us on nights or weekends. But we have really done the most we can and the parties have, I think, to try to get these depositions in by July 31 with the harsh reality being that we have not been successful in getting all of these set by July 31. We have completed 66 depositions. We have 19 depositions that are going on between now and the end of business on the 31st on Thursday.

Because we didn't want to lose the opportunity, we

### Page 21

have set and grabbed the dates for another 34 depositions in July -- in August. So it's after the Court's deadline of July 31, but we grabbed the dates in August for fear of losing them if we didn't take them. And we have another 50 physician depositions to set in these trial pool cases that we have not been able to set yet, because we have been contacting offices trying to get dates, trying to make sure we locate them. In some instances, the addresses are out of date and it takes a while to get to the right people to schedule them.

But as a -- the harsh reality is that we have about 90 depositions total that have been designated as witnesses in these trial period -- trial pool cases that we and the parties have not been able to force schedule by July 31. And we plan, if the Court allows us, to continue the full court press to schedule them and get them done. But I think realistically it will take us all of August and perhaps September to get every single one of those depositions concluded.

And one reason I mention this at length is to say that, of course, we cannot take any depositions after July 31 in the trial pool cases without the Court's blessing, because paragraph H of CMO5 requires us to be finished by July 31.

And that's where we are today, Your Honor. I hate to

## Page 22

1  be the bearer of bad news myself, but that's the practical
2  reality that we and the parties have been facing.
3      THE COURT: All right. Well, there has not been
4  a motion filed for permission to take those depositions
5  outside the time, and certainly that motion will be
6  granted for any of the depositions that are presently
7  scheduled, but no one has filed such a motion.
8      MR. MAGAZINER: We will certainly file such a
9  motion Your Honor, but --
10     THE COURT: Well, you can consider that any
11 deposition that is scheduled for August can be taken.
12     MR. BROWN: Thank you, Your Honor.
13     THE COURT: If you want anything beyond that,
14 you should file a motion.
15     MR. MAGAZINER: May I be heard for just a moment
16 more, Your Honor?
17     THE COURT: Yes.
18     MR. MAGAZINER: Thank you. I don't want to over
19 extend my welcome. But when we talk about motions, we
20 filed a joint motion some time ago asking for a
21 modification of the then existing schedule, anticipating
22 that there were going to be problems doing as much as was
23 contemplated by CMO5. And we proposed a decrease in the
24 number of cases being worked up, and that's the first.
25 You may remember, we proposed two smaller groups of six

## Page 23

1  cases each.
2      One of the things that has made it even more
3  difficult to make as much progress as we and the Court
4  would like to be making here is that the Court did not see
5  fit to grant our motion and required us to work up 24
6  cases rather than -- or actually all 30, rather than the
7  six that we had proposed in the first group.
8      And if we could perhaps revisit with the Court the
9  feasibility of going back to something like what the
10 parties had jointly proposed involving a smaller number of
11 cases, perhaps not the exact proposal we previously made
12 but some other proposal that would take into account where
13 we are on discovery and the realities that we are now
14 facing and that would result in some smaller number of
15 cases being worked up rather than the large number as
16 presently contemplated, perhaps Your Honor would allow us
17 to make such a presentation to the Court and keep the
18 present deadline, but make it more feasible in terms of
19 the proceedings that have to occur between now and then.
20     But for the reasons that Mr. Brown has just
21 described, we have 90 depositions not yet taken which will
22 not be in the can when plaintiffs have to submit their
23 reports and may not be yet taken when we have to submit
24 our reports. As I said a few moments ago, and I won't
25 reiterate, but for this one time, but it's going to result

## Page 24

1  in reports that are not very useful.
2      MR. PENNOCK: Your Honor, Paul Pennock. May I
3  speak briefly to this --
4      THE COURT: Yes.
5      MR. PENNOCK: -- prior proposal?
6      Essentially, Judge Baker has made clear previously
7  and as you've made clear today, that the Court wants to
8  try a case on February 2nd, wants us ready for trial with
9  several cases, in case some fall out, by February 2nd.
10     And I think what Mr. Magaziner is just suggesting,
11 because I passed him a note and asked him if he would
12 agree, to go back to a prior agreement we had to have the
13 Court reconsider this. It's simply reducing the number of
14 cases, keeping the February trial date, but as the Court
15 said, tweaking some of these deadlines on the more limited
16 number of cases.
17     Because when you get right down to it, what's driving
18 this entire problem is the shear number of depositions.
19 And if we reduce the number of cases, we will consequently
20 reduce the shear number of depositions from which a lot of
21 this has been triggered.
22     So the proposal was keeping enough of a group to
23 ensure that the Court will have cases to try on
24 February 2nd. We had a three plus three, we pick three,
25 they pick three. We had an agreement on how they would

## Page 25

1  get replacements right away if for some reason their cases
2  fell out. And that agreement contemplated our reports
3  being due on September 12th, which we think, as
4  Mr. Blizzard pointed out, we would be able to meet that
5  deadline for the more limited group of cases, and then
6  there would be a shadow group, also three plus three, that
7  would shadow those six, which those deadlines I don't
8  remember those specifically, but they didn't fall much
9  behind the first group.
10     So consequently we would clearly have a group of
11 cases ready, which we now understand is fixed in stone,
12 the February 2nd date. And we would have them ready, we
13 would be ready to go to trial, we would have not just one
14 case but several cases should the Court determine after
15 trying the initial case that the Court would like to have
16 other judges involved, which I think may have been
17 mentioned at some point.
18     And then immediately behind those six, we're talking
19 February 2nd, by March or April there would be another six
20 ready. And as the Court is undoubtedly aware, if you look
21 at any MDL -- and although this MDL has moved at light
22 speed, and to our satisfaction, it has, it's moved very
23 quickly compared to most MDLs for a lot of reasons, but if
24 we ended up trying 12 cases in this MDL, that would be
25 double the number of any MDL I'm aware of that I've ever

26

1  been involved in. Even Vioxx I think there were only five
2  trials in Judge Fallon's MDL.
3      So if the Court would like us to sort of rerun that
4  proposal, knowing as we do now that February 2nd is not
5  moving, have cases ready for this Court to try, I think we
6  can get there. I think we can avoid all the problems that
7  the -- that Special Master Brown was alluding to and that
8  Mr. Blizzard was alluding to and that have been discussed
9  here today. We will have our expert reports out on
10 September 12th. We will move ahead with the same
11 timetable, essentially, that the Court has currently
12 proposed, and have the trial on February 2nd.
13     THE COURT: All right. Well, if you want to
14 come back with some proposal knowing that we're going to
15 start the first case February 2nd, I'm happy to consider
16 it.
17     MR. PENNOCK: Thank you very much, Judge.
18     MR. MCCONNELL: Your Honor, very briefly, I'm
19 Steve McConnell on behalf of defendant AstraZeneca.
20     You mentioned that there's a possibility that you
21 might tweak some of the intermediate dates. And the one
22 thing I just wanted to make sure of was that the Daubert
23 hearing process be adequately considered.
24     We don't, obviously, have that much information now
25 in terms of what experts the plaintiffs are going to

27

1  propound or what they're going to address. We have a
2  pretty good idea that in a case like this and given the
3  depositions that issues of epidemiology, biostatistics,
4  general causation, specific causation, regulatory matters
5  are all going to be in play. And I know that Your Honor
6  has had ample experience in the past with Daubert hearings
7  and you know that they can be extensive and hearings can
8  take a number of days.
9      All I would say, two things: One, to the extent you
10 tweak the schedule, that that figures in there in a
11 prominent way. And second, I'd request that possibly it
12 might make sense before the next hearing or the parties
13 perhaps to brief any topic that you would find helpful to
14 discuss the possible contours of Daubert hearings in this
15 case, which I think will be extensive. And I wouldn't
16 want that to get lost as almost an afterthought at the end
17 of the scheduling and prior to the February 2nd trial.
18     THE COURT: The Daubert hearings will be set far
19 in advance.
20     MR. MCCONNELL: Okay. Thank you, Your Honor.
21     MR. PENNOCK: Your Honor, just so I'm clear, we
22 will get back to the Court immediately with a proposal
23 that keeps the February 2nd trial date and works out all
24 these issues including -- in terms of tweaking to ensure
25 that everything happens in line. Thank you, Judge.

28

1      THE COURT: Keep in mind that it does take us
2  some time to rule on motions.
3      MR. PENNOCK: We understand. Thank you, Judge.
4      THE COURT: Is there anything else? All right.
5  Thank you.
6      MAGISTRATE JUDGE BAKER: Let me ask whether the
7  parties want to schedule another status conference in
8  August?
9      MR. MAGAZINER: We actually discussed that as
10 well, Your Honor, and talked to them. If Your Honor's
11 addressing this to Judge Baker because I assume this is
12 going to be in front of Your Honor, if Your Honor's
13 schedule allows September 3rd or 4th, that would work best
14 for the parties, rather than the last week of August.
15     MAGISTRATE JUDGE BAKER: As I was walking down
16 the hall to meet with Judge Conway, I was remarking that I
17 felt like I should be carrying a baton to pass the burden
18 of this case to her to -- although I'm confident there are
19 things left for me to do in the case.
20     Labor day is the 1st. You're talking about doing it
21 Tuesday the 2nd or --
22     MR. MAGAZINER: No, we were thinking Wednesday
23 the 3rd or Thursday the 4th if one of those dates would
24 work well for Your Honor.
25     MAGISTRATE JUDGE BAKER: Wednesday is better.

29

1      MR. MAGAZINER: Thank you, Your Honor. What
2  time would you like to do this?
3      MAGISTRATE JUDGE BAKER: I think 10:00.
4      MR. MAGAZINER: Thank you very much, Your Honor.
5      MR. BLIZZARD: Your Honor, may I ask one more
6  question in favor of the Court --
7      THE COURT: All right.
8      MR. BLIZZARD: -- before we adjourn?
9      Having heard the suggestion by Mr. Pennock and the
10 Court's response to that, I have some people who are
11 working on expert reports who are pulling their hair out.
12 And so we have this --
13     THE COURT: I don't need much time to decide
14 that motion.
15     MR. BLIZZARD: Okay. Thank you, Your Honor.
16 Because when I come back, they're going to ask me what
17 does tweaking mean and what's it mean with respect to
18 August 8?
19     THE COURT: I would like to have it done this
20 week, so --
21     MR. BLIZZARD: Okay. Thank you, Your Honor.
22     THE COURT: All right. Thank you.
23     (End at 2:39 p.m.)

```
                              30
1           CERTIFICATE
2      I certify that the foregoing is a correct
3   transcript from the record of proceedings in the
4   above-entitled matter.
5
6   s\Sandra K. Tremel  August 1, 2008
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```