# NF TAB 8

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION


MDL DOCKET NUMBER: 1769


IN RE:  SEROQUEL PRODUCTS LIABILITY

LITIGATION

---


DEPOSITION OF:

DONNA K. ARNETT, M.S.P.H

VOLUME I

**** HIGLY CONFIDENTIAL ****

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between

the parties through their respective counsel, that

the deposition of:

DONNA ARNETT, M.S.P.H.

may be taken before Lisa Bailey, Notary Public,

State at Large, at University of Alabama at

Birmingham, 1655 University Boulevard, Birmingham,

Alabama, on October 6, 2008 commencing at

approximately 1:05 p.m.

6

1     I, Lisa Bailey, a court reporter of
2  Birmingham, Alabama, and a Notary Public for the
3  State of Alabama at large, acting as commissioner,
4  certify that on October 6, 2008 pursuant to
5  Rules of Civil Procedure and the foregoing
6  stipulation of counsel, there came before me at
7  University of Alabama, Birmingham, Alabama, DONNA
8  K. ARNETT, witness in the above cause, for oral
9  examination, whereupon the following proceedings
10  were had:
11           DONNA K. ARNETT,
12  being duly sworn, was examined and testified as
13  follows:
14           EXAMINATION
15  BY MR. GOLDMAN:
16     Q.  Good afternoon.
17     A.  Good afternoon.
18     Q.  Can you state your name for the record,
19  Doctor?
20     A.  Donna K. Arnett.
21     Q.  We are here in Birmingham, Alabama,
22  where you work, right?
23     A.  Correct.
24     Q.  We're here to take your deposition in
25  the MDL proceedings concerning the Seroquel

7

1  litigation; do you know that?
2     A.  Yes.
3     Q.  Let me first start by designating the
4  deposition as confidential under the terms of the
5  protective order.
6        Dr. Arnett, I know you've been through
7  depositions before, correct?
8     A.  Two, yes.
9     Q.  In the Vioxx litigation?
10     A.  Correct.
11     Q.  Let me just remind you of some of the
12  ground rules.  You may already be aware of them,
13  but just so we're on the same page.  If you don't
14  understand my question, please ask me to rephrase,
15  and I'm happy to do that.  Okay?  Fair?
16     A.  Okay.
17     Q.  And the second rule is, the nodding,
18  it's hard to take down.  The court reporter has a
19  hard time with that, so please answer audibly if
20  you can.
21     A.  Okay.
22     Q.  If you wouldn't mind waiting until I
23  finish my questions, and I'll try to wait until you
24  finish your answers.  That works well and provides
25  a cleaner transcript.  Sometimes I take a while to

8

1  ask my questions, so please be patient with my
2  questions.  Okay?
3     A.  Okay.
4     Q.  Is there any reason you cannot give
5  complete and accurate testimony today?
6     A.  No.
7     Q.  Let me mark, Dr. Arnett, your CV as
8  Exhibit 1.  Do you recognize this?
9        (Defendant's Exhibit No. 1
10         was marked for identification.)
11     A.  Yes.
12     Q.  What is it?
13     A.  My curriculum vitae dated 10/2/2008.
14     Q.  Is it a complete and accurate
15  description of your educational background,
16  professional experience and other professional
17  related activities?
18     A.  Yes.
19     Q.  Are you an epidemiologist, Doctor?
20     A.  Yes.
21     Q.  How would you describe your expertise?
22     A.  Could you be more specific?
23     Q.  Do you hold yourself out as an expert in
24  any particular area in epidemiology?
25     A.  I hold myself as an expert in chronic

9

1  disease epidemiology, including but not limited to
2  cardiovascular and metabolic diseases, genetic
3  epidemiology, pharmacogenetics and study design
4  generally.
5     Q.  Anything else?
6     A.  No.
7     Q.  That's a lot.
8     A.  That is a lot.
9     Q.  Is your primary research interest in
10  cardiovascular genetic epidemiology?
11     A.  Would that include or not include
12  pharmacogenetics?
13     Q.  Let's include it.
14     A.  Okay.  Yes.
15     Q.  What do you mean by pharmacogenetics?
16     A.  I am involved in two different studies
17  related to whether there are genetic predictors to
18  response to, in one case, antihypertensive drugs
19  and, in another case, a triglyceride lowering drug
20  called fenofibrate.
21     Q.  Do either of those studies that you just
22  mentioned involve searching for the genetic
23  predisposition of diabetic patients?
24     A.  In the fenofibrate study, we're
25  evaluating the metabolic syndrome.  And in another

46

1   Q.   Have you ever evaluated for an
2   individual patient whether their change in fasting
3   glucose was clinically significant?
4   A.   No.
5   Q.   Nonfasting glucose levels, so --
6   withdrawn.
7          Do glucose levels fluctuate on a daily
8   basis?
9   A.   Do you mean fasting glucose, or do you
10   mean post-prandial glucose?
11   Q.   Well, let's talk with -- let's start
12   with fasting.  Does that fluctuate?
13   A.   There is some day-to-day variations in
14   glucose levels.  It's not large.
15   Q.   For nonfasting glucose levels, do you
16   agree that there is significant fluctuation on a
17   daily basis?
18   A.   It would depend on the time since the
19   last meal.  There is fluctuation.
20   Q.   Do you know that after every meal,
21   people can have their nonfasting glucose change by
22   five or more milligrams per deciliter?
23   A.   Yes.
24   Q.   Do you know that nonfasting glucose can
25   vary by 20 milligrams per deciliter just because of

47

1   stress?
2   A.   I'm not aware of that data.
3   Q.   Are you a medical doctor?
4   A.   No.
5   Q.   Have you ever prescribed medication?
6   A.   No.
7   Q.   Would that be unlawful for you to do
8   that?
9   A.   Yes.
10   Q.   Are you a statistician?
11   A.   I have a master's degree in epidemiology
12   and biostatistics.
13   Q.   Do you consider yourself a statistician?
14   A.   No.
15   Q.   Do you work in the biostatistics group
16   here at UAB?
17   A.   No.
18   Q.   Are you a psychiatrist?
19   A.   No.
20   Q.   Are you a member of the American
21   Psychiatry Association?
22   A.   No.
23   Q.   Do you subscribe to any journals in
24   psychiatry?
25   A.   No.

48

1   Q.   Are you an expert in the treatment of
2   mental illness including with treatment of
3   antipsychotics?
4   A.   No.
5   Q.   Is this the first time you've analyzed
6   the risk of antipsychotics including Seroquel?
7   A.   Yes.
8   Q.   Have you ever conducted any independent
9   research on Seroquel?
10   A.   No.
11   Q.   Is the same true for mental illness?
12   A.   Yes.
13   Q.   Have you ever written about mental
14   illness or antipsychotics?
15   A.   I have written about -- the reason I'm
16   delaying my answer is, I have published papers on
17   psychological scales in relation to cardiovascular
18   trends.  But not in relation to Seroquel.
19   Q.   Have you ever written about the
20   relationship between Seroquel and other
21   antipsychotics and weight gain?
22   A.   No.
23   Q.   Have you ever written about
24   antipsychotics and their association with diabetes?
25   A.   No.

49

1   Q.   Do you subscribe to any journals in
2   endocrinology, whether hard copy or online?
3   A.   I am an -- I am a frequent reviewer for
4   Diabetes and Diabetes Care, but I do not subscribe
5   to the journal.
6   Q.   A peer reviewer; is that what you mean?
7   A.   Yes.
8   Q.   So you don't subscribe to any journals
9   in endocrinology, true?
10   A.   True.
11   Q.   Are you a member of the American
12   Diabetes Association?
13   A.   No.
14   Q.   Have you ever diagnosed a patient with
15   diabetes or determined the cause of a patient's
16   diabetes?
17   A.   No.
18   Q.   Have you held yourself out as an expert
19   in interpreting glucose results in clinical trials?
20   A.   We had inclusion/exclusion criteria, and
21   I was on the group that establishes criteria for
22   the HyperGEN study, and for Golden, we defined
23   diabetes for that study.  So in that respect, I
24   have acted as an expert.
25   Q.   What you did was you helped determine

13 (Pages 46 to 49)

54

1    ask the question.
2    Q.   Dr. Arnett --
3        MR. BLIZZARD:  You don't have to make
4    the commentary or testimony yourself.
5    Q.   Dr. Arnett, given that you're not --
6        MR. BLIZZARD:  Please, please don't
7    interrupt me.  Okay?
8    Q.   Dr. Arnett, given that you are not a
9    pharmacologist and have never studied how
10   antipsychotics may contribute to weight gain or
11   diabetes, do you consider yourself an expert in how
12   antipsychotics including Seroquel might cause
13   weight gain or diabetes?
14       MR. BLIZZARD:  Object to the form.
15   Argumentative.
16   A.   I have reviewed the literature and
17   understand how drugs work --
18   Q.   Generally?
19   A.   -- and how Seroquel works specifically.
20   Q.   As a --
21   A.   Have I conducted my own research at the
22   bench to evaluate the effect?  The answer is no.
23   Q.   Would you, Dr. Arnett, hold yourself out
24   to the medical community as an expert in how
25   antipsychotics cause weight gain and may cause

55

1    diabetes mechanistically?
2    A.   No.  But I have evaluated literature and
3    have an understanding pharmacologically of how it
4    causes weight gain and diabetes.
5    Q.   That understanding came in the course of
6    you serving an a plaintiff's expert in the Seroquel
7    litigation, true?
8    A.   Not entirely.  I had a student who got
9    her Ph.D. dissertation looking at weight gain and
10   antipsychotics, and I served on her Ph.D.
11   committee.
12   Q.   Have you ever held yourself out to the
13   medical community as an expert in how
14   antipsychotics cause weight gain and diabetes?
15   A.   No.
16   Q.   Are you an expert in the area of obesity
17   or the causes of obesity?
18   A.   I have several publications on risk
19   factors for obesity.  We're evaluating genetic
20   predictors of obesity.  So in that context, I have
21   expertise.
22   Q.   Are you talking about the article you
23   wrote on overweight children and adolescents?  Is
24   that the one?
25   A.   Well, there's that.  I also have a

56

1    linkage paper from the HyperGEN study with respect
2    to obesity.
3    Q.   Do people consult you, Dr. Arnett, as an
4    expert in the area of obesity?
5    A.   No.
6    Q.   Have you ever worked for the FDA?
7    A.   I worked as a special government
8    employee to the FDA in the 1990s.
9    Q.   Have you ever been employed by the FDA?
10   A.   Well, I don't know what a special
11   government employee means to them.  I didn't
12   receive a paycheck from them.
13   Q.   You what?
14   A.   I didn't receive a paycheck from them,
15   but I did work with them.
16   Q.   Have you ever considered yourself an FDA
17   employee, Dr. Arnett?
18   A.   No.
19   Q.   Have you ever testified before the FDA?
20   A.   No.
21   Q.   Have you ever done any work related to
22   the approval of prescription drugs?
23   A.   Yes.
24   Q.   What work did you do?
25   A.   For three years, I worked as a clinical

57

1    coordinator for randomized clinical trials of
2    investigational drugs.
3    Q.   What three years were those?
4    A.   1985 through 1988.
5    Q.   Have you ever prepared any materials for
6    submission to the FDA as part of an NDA?
7    A.   No.
8    Q.   Have you ever done any work relating to
9    labeling of a prescription drug?
10   A.   No.
11   Q.   Have you ever drafted a label for a
12   prescription drug?
13   A.   No.
14   Q.   Are you an expert in FDA regulations
15   regarding labeling of prescription drugs?
16   A.   I teach about FDA regulations in my
17   course, and I, therefore, consider myself more
18   knowledgeable than an average epidemiologist.
19   Q.   Is the -- what course are you talking
20   about?
21   A.   I teach -- I have taught and continue to
22   teach the second in a series of methods courses.
23   Q.   Have you ever taught your students about
24   FDA regulations concerning labeling of prescription
25   drugs?

15 (Pages 54 to 57)

58

1   A.  No.
2   Q.  You don't hold yourself out as an expert
3   in FDA regulations concerning labeling of
4   prescription drugs, do you?
5   A.  I know more about --
6   Q.  Than the average person?
7   A.  Not the average person.
8   Q.  Average epidemiologist?
9   A.  Yes.
10  Q.  Okay.  About what?  Labeling?
11  A.  About labeling.
12  Q.  Do you think that knowing more than the
13  average epidemiologist about labeling makes you an
14  expert in FDA regulations concerning labeling of
15  prescription drugs?
16      MR. BLIZZARD:  Object to the form.
17  A.  I can't answer what the FDA considers an
18  expert.
19  Q.  I didn't ask what the FDA considered
20  that.  I asked what you considered.
21      Do you consider yourself an expert,
22  Dr. Arnett, in FDA regulations concerning the
23  labeling of prescription drugs?
24      MR. BLIZZARD:  Object to the form.
25  She's asked and answered the question.

59

1   Q.  Let me back up.  Withdrawn.
2       Have you ever read the FDA regulations
3   concerning labeling of prescription drugs?
4   A.  Yes.
5   Q.  What section is the labeling of
6   prescription drugs in in the code of the federal
7   register?
8   A.  I don't remember the section.
9   Q.  But it's your testimony that you have
10  actually read the FDA regulations concerning
11  labeling?
12  A.  Yes.
13  Q.  I read your report.  You're not giving
14  labeling opinions in this case, right?
15  A.  I'm giving opinions relating to the
16  scientific evidence that would go into informing
17  the label.
18  Q.  But you're not looking at the label and
19  saying the label is inadequate in some way for
20  Seroquel, true?
21  A.  Wrong.
22  Q.  Have you said that in your report?
23  A.  Yes.
24  Q.  You said in your report that the FDA
25  approved label was inaccurate for Seroquel?

60

1   A.  What I said in my report is that the
2   label did not have adequate warnings about the
3   weight gain and diabetic potential.
4   Q.  I don't remember that.  But let's look
5   at that later.  Okay?
6   A.  Okay.
7   Q.  It's there?
8   A.  In my list of my six opinions.
9   Q.  Okay.  Do you have experience in the
10  marketing of prescription drugs or training?
11  A.  Experience or training?
12  Q.  Are you an expert in the marketing of
13  prescription drugs, Doctor?
14  A.  No.
15  Q.  Are you an expert in the FDA regulations
16  for off-label use or off-label promotion?
17  A.  No.
18  Q.  When were you first contacted to get
19  involved in the Seroquel litigation?
20  A.  Sometime this summer.  I don't remember
21  the exact date.
22  Q.  What month?
23  A.  I'm not sure if it was June or July.
24  Q.  Was it before or after July 4th?  Do you
25  remember that?

61

1   A.  I don't.
2   Q.  How did you get contacted?
3   A.  By telephone.
4   Q.  Who called you to first tell you about
5   the Seroquel litigation?
6   A.  I believe it was Glenda Granger --
7   Q.  Who was that?
8   A.  -- who called me.  A person that works
9   in Mr. Blizzard's office.
10  Q.  Are you working through the Med
11  Expertise firm in this litigation?
12  A.  No.
13  Q.  When were you first retained as an
14  expert in the Seroquel litigation?
15  A.  When -- after the phone call, we had a
16  meeting here in Birmingham.  And that was sometime
17  after the phone call, so I'm guessing in July.
18  Q.  Do you have it on your calendar?
19  A.  Yes.
20  Q.  Will you check at a break to tell me
21  when your meetings were?
22  A.  If it's important to you --
23  Q.  It is.
24  A.  -- I'd be happy to.
25  Q.  It is.  Thank you.

16 (Pages 58 to 61)

66

1    Q.   When was that?
2    A.   Two or three weeks ago.
3    Q.   How long did that last?
4    A.   Two hours.
5    Q.   Have you attended any meetings with any
6  other plaintiff's expert witnesses in the Seroquel
7  litigation?
8    A.   No.
9    Q.   Have you had any discussions with any
10  other plaintiff's expert witnesses?
11    A.   No.
12    Q.   Have you read or are you relying on any
13  of the reports generated by other plaintiff's
14  expert witnesses in the Seroquel litigation?
15    A.   No.
16    Q.   Have you read any of the reports written
17  by AstraZeneca's expert witnesses in the Seroquel
18  litigation?
19    A.   I don't know who they are, so I have to
20  say no.  I haven't read any reports.
21       MR. GOLDMAN:  Now's a good time.
22       (Break held, 2:45 p.m.)
23       (Defendant's Exhibit No. 2
24       was marked for identification.)
25    Q.   I've -- Dr. Arnett, I'm handing you what

67

1  I've marked as Exhibit 2.  What is this, Exhibit
2  2?
3    A.   This is an invoice for 83.5 hours for
4  work on Seroquel.
5    Q.   Are your hourly rates $450 per hour?
6    A.   Yes.
7    Q.   Do you keep the money?
8    A.   Yes.
9    Q.   Did you spend the 83 and a half hours
10  reviewing the NDA documents, published manuscripts,
11  AstraZeneca Web site and other files and generate
12  your report during those 83 and a half hours?
13    A.   Yes.
14    Q.   Have you reviewed the correspondence
15  between AstraZeneca and the FDA over the last
16  decade?
17    A.   I don't know if I've reviewed all the
18  correspondence.  I've reviewed some correspondence.
19    Q.   The August 2000 submission, right?
20    A.   Yes.
21    Q.   You haven't reviewed any other
22  communications between AstraZeneca and the FDA,
23  have you, ma'am?
24    A.   The NDA is a communication.
25    Q.   Other than the NDA and the August 2000

68

1  submission, have you reviewed any other
2  communications between the FDA and AstraZeneca?
3    A.   I know that I saw on the FDA Web site,
4  which is part of my review, some other
5  communications, but I can't be specific about them.
6    Q.   Certainly you'd say you haven't reviewed
7  the entire regulatory file reflecting
8  communications between the FDA and AstraZeneca,
9  true?
10    A.   I can't comment on if it's the entire
11  file.  I did review a series of eight files that I
12  requested from the plaintiff's attorney that were
13  to reflect the FDA correspondence.
14    Q.   What were those eight files called?  Do
15  you know?
16    A.   File FDA one through eight.
17    Q.   And you reviewed all that?
18    A.   No.
19    Q.   How much more time have you spent
20  working on this case since you issued your first
21  report?
22    A.   25 hours.
23    Q.   Doing what?
24    A.   Doing additional PubMed searches and
25  reviewing articles related to case control and

69

1  cohort studies of diabetes outcomes.
2    Q.   You did that after you submitted your
3  first report?
4    A.   Yes.
5    Q.   Why?
6    A.   Because when I -- I was on a short time
7  frame to get the first report done, and I hadn't
8  had time to extensively review all of the published
9  literature.  I'd reviewed some of it.  So I thought
10  I needed more detail.
11    Q.   So at the time you prepared your first
12  report, you didn't extensively review the published
13  literature; you reviewed some subset of it?
14    A.   Yes.
15       (Defendant's Exhibits Nos. 3 and 4
16       were marked for identification.)
17    Q.   Let me hand you what I've marked as
18  Exhibits 3 and 4.  Do you recognize Exhibit 3 as
19  your first report that we received September 11th,
20  2008, and Exhibit 4 as your second report that I
21  received on Friday afternoon, two days ago?
22       MR. BLIZZARD:  Not two days ago.  It's
23  Saturday, isn't it?
24    A.   Well, technically, Friday was three days
25  ago.

74

1  caused or contributed to an individual plaintiff's
2  weight gain?
3      A.   Yes.
4          MR. BLIZZARD:  If you clarify that,
5  maybe I can help.
6      Q.   Are you going to come into trial and
7  tell the jury that an individual plaintiff
8  developed weight gain as a result of Seroquel?
9      A.   What I am coming to discuss will be
10  general causation.
11     Q.   Okay.
12     A.   And as epidemiology findings extend to
13  individuals, I will comment on that.
14     Q.   Do you want to clarify?
15         MR. BLIZZARD:  Yes.  For these cases,
16  she's not expressing an individualized to
17  these particular plaintiffs and whether they
18  specifically developed their disease because
19  of Seroquel.  She is here on general
20  causation.  She's not offering a specific
21  causation opinion for the first group of
22  cases.
23     Q.   Am I right, Dr. Arnett, then that while
24  you may come to testify about general causation,
25  you're not going to come testify that Seroquel

75

1  caused or contributed to an individual plaintiff's
2  weight gain or diabetes?  True?
3      A.   According to my attorney, plaintiff's
4  attorney, in the first set of cases, that is true.
5  I don't know if it will extend beyond the first
6  set.
7      Q.   If it extends beyond the first set of
8  cases, you'll let me know so that we can take
9  another deposition.  Fair?
10     A.   Fair.
11     Q.   Are you going to -- I take it you
12  haven't reviewed any medical records of any
13  plaintiff?
14     A.   No.
15     Q.   Are you going to testify that Seroquel
16  is associated with Type I diabetes?
17     A.   By "Type I diabetes," do you
18  specifically mean insulin-treated diabetes?
19     Q.   Yes.
20     A.   Okay.  Can you restate your question?
21     Q.   Yes.  Are you going to testify that
22  there's an association between Seroquel and Type I
23  diabetes, meaning insulin-treated diabetes?
24     A.   Yes.
25     Q.   And it's your opinion, ma'am, that

76

1  Seroquel is associated with Type I diabetes?
2      A.   It is my opinion that in the cases that
3  were reported, some required insulin treatment for
4  management.  So, therefore, by extension of
5  "insulin treated," I would say yes.
6      Q.   Okay.  Are you going to testify that any
7  subgroup of patients is at greater or lesser risk
8  of diabetes from Seroquel?
9      A.   I may.
10     Q.   Do you have an opinion -- and I know you
11  didn't in Vioxx, so this is why I'm asking here.
12  Withdrawn.
13         Dr. Arnett, do you have an opinion about
14  whether there's a particular subgroup of patients
15  at greater or lesser risk of diabetes from Seroquel
16  and other antipsychotics?
17     A.   I haven't evaluated that data yet.  But
18  I -- if I have access to more data and an easier
19  way to evaluate the data, I may do that because
20  there is some evidence in some publications of a
21  greater risk in older individuals.
22     Q.   You'll let me know if that -- if you
23  undertake that task.  Okay?
24     A.   Yes.
25     Q.   Are you going to testify, Dr. Arnett,

77

1  about the intent or motives of AstraZeneca
2  employees?
3      A.   Yes.
4      Q.   You feel you're an expert in the intent
5  or motives of AstraZeneca's employees?
6      A.   Because I've reviewed correspondence
7  from AstraZeneca employees relative to some of the
8  opinions that I've stated, in that way, I will
9  testify to intent or motive.
10     Q.   You're going to take documents that you
11  reviewed like e-mails from AstraZeneca and you want
12  to tell the jury based on those e-mails what
13  AstraZeneca's intent or motives were?
14     A.   I'd be happy to just quote them.
15     Q.   So you don't plan to come and testify
16  about the intent or motives of AstraZeneca
17  employees, true?
18     A.   Well, I would think that things that you
19  say in an e-mail are your intentions.
20     Q.   But that's something the jury can figure
21  out.  You don't have to provide expert testimony
22  about that?
23     A.   No.  I'm assuming the jury will figure
24  it out.
25     Q.   Are you going to testify about the state

78

1   of mind of AstraZeneca employees?
2      A.   "State of mind" means --
3      Q.   What they knew and when they knew it.
4      A.   State of mind, what they knew and when
5   they knew it?  With respect to weight gain, yes, I
6   will.
7      Q.   So you intend to testify about what you
8   think AstraZeneca employees knew about the risk of
9   weight gain from Seroquel, right?
10     A.   Yes.
11     Q.   Any other state of mind opinions that
12  you intend to give?
13     A.   I'm sure state of mind opinions mean
14  something specific legally.  So --
15     Q.   Do you intend to testify at trial --
16        MR. BLIZZARD:  Wait.  She hadn't
17  finished her question (sic) for clarification.
18     A.   So if you could clarify what "state of
19  mind" means, it's a legal --
20     Q.   Dr. Arnett, do you intend to testify
21  about what you think AstraZeneca knew about the
22  risk of diabetes from Seroquel over time?
23     A.   Yes.
24     Q.   Based on what?
25     A.   Dr. Geller's assessment in 2000 in a

79

1   position paper he wrote.
2      Q.   Anything else that you're going to use
3   to rely on to testify about that AstraZeneca knew
4   over time concerning the risk of diabetes from
5   Seroquel?
6      A.   At this moment, no.  But that may change
7   as I review more documents.
8      Q.   Are you going to express an opinion that
9   AstraZeneca withheld information or misled the FDA?
10     A.   Yes.
11     Q.   What information are you going to say
12  AstraZeneca withheld from the FDA?
13     A.   Well, for one instance, they omitted
14  weight from one of their tables that was in their
15  integrated safety report.  That's just one
16  example.
17        They withheld the distributions of the
18  various variables like weight glucose, insulin,
19  Hba1C.  The distributions were not included and, in
20  fact, Hba1C I couldn't find in the NDA, but it was
21  collected.  So that's the list I can think of right
22  now superficially.
23     Q.   Ma'am, it's my opportunity now to figure
24  out what exactly you plan to tell the jury.  Okay?
25  Are you with me?

80

1      A.   Uh-huh.
2      Q.   Other than what you've just identified,
3   do you intend to tell the jury that you think
4   AstraZeneca withheld other information from the
5   FDA?
6      A.   Beyond what I just described?
7      Q.   Yes.
8      A.   At this point in time, no.  But if I
9   continue to review more evidence, there may be
10  additional instances that arise.
11     Q.   Are you going to testify that Seroquel
12  is an unsafe or bad drug?
13     A.   Can you define "bad"?
14     Q.   Are you going to testify that Seroquel
15  is an unsafe drug?
16     A.   Yes.
17     Q.   For all patients?
18     A.   No.
19     Q.   Can you identify a single piece of
20  literature that says that Seroquel is an unsafe
21  drug?
22     A.   I can find literature that indicates
23  that it is associated with increased risk of many
24  of the metabolic parameters associated with
25  diabetes and diabetes.  So in that terminology, it

81

1   is unsafe.
2      Q.   So your opinion is because Seroquel is
3   associated with an increased risk of metabolic
4   parameters, it's therefore unsafe?
5      A.   Yes.
6      Q.   Can you cite a single piece of
7   literature that says that?
8      A.   Yes.
9      Q.   What?  Name one piece of literature that
10  says Seroquel is an unsafe drug because of the
11  effects on the metabolic parameters.
12     A.   The Koller study, Geller himself.
13     Q.   Koller 2004?
14     A.   Yes.
15     Q.   Go ahead.
16     A.   Geller's own document.
17     Q.   And there you're talking about the
18  position paper?
19     A.   Uh-huh.
20     Q.   In 2000, right?
21     A.   Uh-huh.
22     Q.   Yes?
23     A.   Yes.
24     Q.   What else?
25     A.   The ADA consensus statement.

21 (Pages 78 to 81)

82

1    Q.   What other pieces of literature do you
2  say state that Seroquel is an unsafe drug because
3  of its effects on metabolic parameters?
4    A.   The follow-up metabolic study from the
5  CATIE trial.
6    Q.   Which one?
7    A.   I've forgotten the first author's name.
8    Q.   Stroup?
9    A.   I've forgotten the name.
10    Q.   And your testimony is there's a
11  publication that deals with the follow-up to the
12  CADIE study that says Seroquel is an unsafe drug
13  because of its effect on metabolic parameters?
14        MR. BLIZZARD:  Object to the form.
15    A.   It will say that Seroquel has an adverse
16  effect on metabolic parameters.
17    Q.   What does --
18    A.   I don't know if the word "unsafe" was
19  used.
20    Q.   Dr. Arnett, the plaintiff's attorneys
21  sent us a reference exhibit list -- they've
22  actually sent us several of these -- we'll mark
23  first that we received with your initial report as
24  Arnett Exhibit 5.
25        (Defendant's Exhibit Nos. 5 and 6

83

1  were marked for identification.)
2    Q.   And then I'm going to hand you Arnett
3  Exhibit 6, which is the second amended version of
4  the reference exhibit list that we received with
5  your second report on October 4th.  Okay?
6    A.   Okay.
7    Q.   What is this second one -- let's look at
8  the second one first.  What is the second amended
9  reference exhibit list?
10    A.   What is it?
11    Q.   Yes.
12    A.   A list of all of the documents that were
13  sent to me.
14    Q.   Have you reviewed all the documents?
15    A.   And some that I asked to be added.
16    Q.   Dr. Arnett, have you reviewed all the
17  documents on Exhibit 6?
18    A.   No.
19    Q.   What documents on Exhibit 6 have you
20  reviewed and considered?
21    A.   Would you like me to go page by page or
22  talk to you in generalities?
23    Q.   No.  Would you be able to look at this
24  list that has 7,000 documents on it -- and the
25  index is 293 pages -- and be able to tell me right

84

1  now which documents you actually reviewed?
2    A.   We could spend the time, and I could.
3    Q.   Will you do me a favor?  Because I've
4  asked your attorney this because I'm entitled to
5  know what exactly you reviewed.  Will you tonight
6  take this document and circle for me each of the
7  documents that you reviewed in forming your
8  opinions?
9        MR. BLIZZARD:  I can answer that for
10  you.  No, she won't.
11    Q.   I have in front of me a 293-page
12  reference exhibit list with over 7,700 documents.
13  The documents are in excess of 396,000 pages.  And
14  your position, Mr. Blizzard, is that Dr. Arnett
15  will not identify for me, unless I spend the time
16  right now going through all 293 pages, what she's
17  actually reviewed?  Is that your position?
18        MR. BLIZZARD:  No.  Do you want to know
19  my position?  My position is that the company
20  belatedly in the summer provided us with
21  thousands upon thousands of pages of
22  documents.  We, under the Court's order, had
23  to get experts to look at these documents --
24        MR. GOLDMAN:  You know, I --
25        MR. BLIZZARD:  Don't cut me off, please.

85

1        MR. GOLDMAN:  I don't want --
2        MR. BLIZZARD:  Don't cut me off.
3        MR. GOLDMAN:  I don't -- I want this off
4  the time because this is not on the record.
5        MR. BLIZZARD:  Okay, fine.  It's not off
6  the time.  I'm telling you, though, you asked
7  why this is the way it is, and I'm explaining
8  it.
9        MR. GOLDMAN:  I didn't ask why.
10        MR. BLIZZARD:  Well, I'm going to
11  explain it anyway, whether you like it or
12  not.
13        So we provided to the witness everything
14  that we could provide that she could look at
15  to help her formulate opinions in the time
16  provided under the Court's order.  As you
17  might imagine, this was a disorganized mess
18  provided by AstraZeneca, so we did our very
19  best to sort this and provide it to the
20  witness.  We then began looking through it and
21  had additional trouble trying to make heads or
22  tails out of what the company had provided to
23  FDA and what AstraZeneca had provided to us.
24        So we provided, out of an abundance of
25  caution to you, a list of everything that we

86

1    had provided to Dr. Arnett.  Dr. Arnett has
2    reviewed a subset of this material that she
3    selected after we provided it to her without
4    any assistance from us.  She --
5         MR. GOLDMAN:  I don't want you to lead
6    the witness here.  Okay?  Just make your
7    statement and hurry up.
8         MR. BLIZZARD:  You know, Counsel, if you
9    continue to be as rude as you have been so far
10   to the witness and to me, we will end this
11   deposition.
12        MR. GOLDMAN:  Ed, I'm asking -- you're
13   making a long speech, and I'm working under
14   time constraints here.  Can you just --
15   instead of telling us what she did, just make
16   your statement.
17        MR. BLIZZARD:  I'm making my statement.
18   Please do not instruct me what to say or not
19   say.
20        So we gave this to the witness.  The
21   witness selected things that she wanted to
22   look at from this body of material.  We
23   provided you the total body of material.  The
24   witness is able to describe for you now
25   generally what she looked at so that you can

87

1    be directed to those portions of this list, if
2    you so choose.
3         She is not going to go page by page
4    through this and circle things.  I indicated
5    that to you previously, and I'm indicating it
6    to you now.
7    BY MR. GOLDMAN:
8         Q.  Dr. Arnett, can you tell me -- let's
9    start generally.  What did you review on the second
10   amended exhibit list marked as Exhibit 2?
11        A.  Generally, I went through about a third
12   of the beginning of all of the NDA documents, which
13   were not filed in any cohesive or coherent way.
14   From that, I discovered the integrated efficacy
15   report and integrated safety report from the NDA.
16   And I relied heavily on those two documents because
17   it was the only way to access the data in any way
18   at all because there were, I think, 7700 different
19   documents within the NDA itself.
20        MR. BLIZZARD:  So now you're -- now
21   you're acting frustrated that the witness is
22   giving an answer.
23        MR. GOLDMAN:  I'm not frustrated.
24        MR. BLIZZARD:  You're making faces.
25   You're making noises.

88

1         MR. GOLDMAN:  I'm not.  Dr. Arnett --
2         MR. BLIZZARD:  We're going to stop this
3    deposition unless you stop that.
4         MR. GOLDMAN:  You know what?  I
5    resent your -- I'm putting my hand over my
6    mouth.
7    BY MR. GOLDMAN:
8         Q.  I don't want you to describe how the
9    documents looked, how long it took you to look
10   through them.  I'm really trying to find out
11   something very specific, Doctor.
12        Are you able to tell me right now which
13   documents you reviewed in forming your opinions?
14        MR. BLIZZARD:  Object to the form.
15   That's what she was telling you.
16        A.  I was telling you that.
17        Q.  We're going to take it up with the Court
18   because this is taking -- I've asked on multiple
19   occasions for your counsel to be specific about
20   what you have reviewed, and he has declined to do
21   that.  So we will take it up with the Court.
22   Okay?
23        Did you take notes while you were --
24        MR. BLIZZARD:  Do you consider this
25   polite?

89

1         Q.  Did you take notes while you reviewed
2    the documents, Dr. Arnett?
3         A.  No.
4         Q.  Did you keep track of what documents you
5    reviewed as you were reviewing them?
6         A.  Yes.
7         Q.  Where?
8         A.  In a draft report, you know, I was
9    drafting.
10        Q.  Do you have a list of the actual
11   documents you reviewed in forming your opinions?
12        A.  I only included in the list pieces that
13   I directly put into my report.  So I reviewed many
14   more documents than are ultimately in my draft.
15        Q.  Okay.  We received from plaintiff's
16   counsel two CDs -- one called Expert Review
17   Documents, one called Productions 1 through 7 --
18   and two hard drives.  I'm going to ask you -- let
19   me mark this as Exhibit 7.
20        (Defendant's Exhibit Number 7
21        was marked for identification.)
22        Q.  This is one of the two CDs.  And Exhibit
23   8 is the CD called Production 1 through 7.
24        (Defendant's Exhibit Number 8
25        was marked for identification.)

90

1   Q.   And just looking at the index there that
2   we have prepared, Dr. Arnett, did you review all
3   the documents on these CDs?
4       A.   I reviewed all of the documents on 1,
5   2 --
6       Q.   And you're looking at which exhibit?
7       A.   You handed me Exhibit 8.
8       Q.   Okay.  Go ahead.
9       A.   I see there's a 7.  Do you want me to go
10  to 7?
11      Q.   After that.  Look at 8 first.
12      A.   So I looked at all the documents on 1 --
13  Production 1, Production 2, some of the documents
14  on Production 3.
15      Q.   Do you know which ones?
16      A.   The technical documents regarding weight
17  and BMI changes, the FDA approval time line are
18  ones that stick out in my memory.  I may have
19  opened others.
20      Q.   But you didn't keep track -- I don't
21  want to interrupt you, Doctor.  But did you keep
22  track of what you reviewed in the list that I just
23  provided to you?
24      A.   No.
25      Q.   We also received two hard drives,

91

1   Dr. Arnett.
2       MR. BLIZZARD:  Wait a minute.  She's not
3   finished going through this exhibit.
4       Q.   Yeah.  I don't need to know all the
5   specifics about it.  I think I've got the gist of
6   it.
7       Dr. Arnett, you were also sent two hard
8   drives:  One called Clinical Trials and one called
9   NDA Documents that had over 28,000 documents.  Did
10  you review all those?
11      A.   No.
12      Q.   Do you know exactly what documents you
13  considered in forming your opinions as you reviewed
14  those hard drives?
15      A.   In the -- the large hard drive, I didn't
16  get to.  The smaller hard drive, I reviewed.  As I
17  said, about the first 500 files, I opened and
18  scanned and then found the integrated safety report
19  and efficacy report.  And those are the two I
20  primarily relied on.
21      Q.   So you accessed some of the documents in
22  the NDA hard drive, but not the larger clinical
23  trials hard drive?
24      A.   I didn't get to them.
25      Q.   Did you review any clinical study

92

1   reports for any of the clinical trials for
2   Seroquel?
3       A.   Yes, but I can't remember which ones.
4       Q.   You mentioned the -- in your report that
5   you reviewed some depositions, right?
6       A.   No, sir.
7       Q.   Did you review any depositions?
8       A.   No, sir.
9       Q.   Did you review any internal AstraZeneca
10  documents?
11      A.   Yes.
12      Q.   Are the AstraZeneca documents that you
13  are relying on reflected in your report?
14      A.   Yes.
15      Q.   Do you normally rely on internal company
16  documents when forming opinions as an
17  epidemiologist?
18      A.   Yes.
19      Q.   And I'm talking about not as a
20  plaintiff's expert, but in your normal practice.
21      A.   Well, in my normal practice, I don't
22  have access to them.
23      Q.   In your normal practice as an
24  epidemiologist, do you rely on internal company
25  documents in forming your epidemiologic opinions?

93

1       A.   As I don't do any work with
2   pharmaceutical companies, I don't have access to
3   them --
4       Q.   So the answer is no?
5       A.   -- in my work.  Correct.
6       Q.   Did you review any foreign regulatory
7   documents in this case?
8       A.   No.
9       Q.   Are you relying on any case reports or
10  case series to support your opinions?
11      A.   Yes.
12      Q.   Which one or ones?
13      A.   Well, Koller has the combination of all
14  that had occurred up until 2004.  And then there
15  are the case series that are outlined in the safety
16  report from -- I believe it's Geller.  I don't want
17  to say for sure.  But I know in one of the summary
18  statements, they're there.  And in the integrated
19  safety report, there's a list of the actual events,
20  adverse events for diabetes.
21      Q.   Integrated safety report is part of the
22  NDA?
23      A.   Uh-huh.
24      Q.   Yes?
25      A.   Yes.

118

1  weight?
2  Q.   Does taking the pill, just taking the
3  pill Seroquel, cause weight gain in and of itself?
4  A.   In at least 27 percent or more of the
5  patients that took it, it caused clinically
6  significant weight gain.
7  Q.   You are critical of AstraZeneca for
8  reporting to the FDA mean weight changes, but not
9  median weight changes, true?
10  A.   True.
11  Q.   And it's your testimony that median
12  weight changes were higher, if they had been
13  measured for weight, than mean, right?
14  A.   According to the statistician from
15  AstraZeneca who actually saw the distributions, he
16  said that.
17  Q.   And this is the statistician that wrote
18  the e-mail --
19  A.   To Dr. Goldstein.
20  Q.   Was this an exhibit in Dr. Goldstein's
21  --
22  A.   Yes.
23  Q.   -- deposition? Did you read
24  Dr. Goldstein's deposition?
25  A.   No.

119

1  Q.   First, as to the FDA, do you know
2  whether they accept mean or median as appropriate
3  measures of central tendency?
4  A.   They accept both.
5  Q.   Did the FDA ever criticize AstraZeneca
6  for not reporting median weight gain as part of
7  their NDA submission?
8  A.   I don't know.
9  Q.   Do you know whether the FDA approved
10  labels for other second-generation antipsychotics
11  referring to mean weight rather than median weight?
12  A.   I haven't reviewed the other atypical
13  antipsychotics.
14  Q.   You haven't reviewed any of the labels
15  for any of the antipsychotics on the market, true?
16  A.   Not true.
17  Q.   Other than Seroquel?
18  A.   Other than Seroquel, true.
19  Q.   The only second-generation --
20  withdrawn.
21  The only antipsychotic label that you
22  have reviewed is Seroquel, true?
23  A.   True.
24  Q.   Your statement in your report was that
25  had the median rather than the mean change in

120

1  weight been reported, the weight findings in the
2  Seroquel clinical trials would have been even more
3  dramatic.  Is that your testimony?
4  A.   Yes.
5  Q.   Is it your testimony and opinion that
6  the weight gain that was seen in Seroquel's
7  clinical trials would have undoubtedly been much
8  higher if the median weight change was reported?
9  A.   Yes.
10  Q.   Do you hold those opinions to a
11  reasonable degree of scientific certainty?
12  A.   Yes.
13  Q.   Do you apply the same degree of
14  scientific certainty that you hold your other
15  opinions?
16  A.   Yes.
17  Q.   Did you come to the opinion about your
18  median versus mean weight gain point with the same
19  rigor as you do when you practice epidemiology in
20  the normal course of your business?
21  A.   It requires an explanation to answer
22  that question.  So is that fine?
23  Q.   Well, try to -- I'm trying to short-
24  circuit it a little bit, Doctor, because I have a
25  lot to cover.  So if you can answer yes or no,

121

1  great.  If you can't, let me know, and then I'll
2  give you a chance to explain.  Fair?
3  A.   Fair.
4  Q.   Did you apply the same type of rigor in
5  analyzing the Seroquel clinical trials when you
6  came up with this median versus mean opinion as you
7  do when you review other clinical trials as an
8  epidemiologist?
9  MR. BLIZZARD:  Object to the form.
10  A.   Yes.
11  Q.   Let me hand you what I'll mark as
12  Exhibit 11.
13  (Defendant's Exhibit Number 11
14  was marked for identification.)
15  Q.   This is the August 2000 submission to
16  the FDA, and you've reviewed this, correct?
17  A.   Yes.
18  Q.   You don't have any criticism of how
19  AstraZeneca presented the data concerning weight
20  and glucose in this submission, do you?
21  A.   I would have to review this again to be
22  able to answer that.
23  Q.   Have you formulated an opinion, as you
24  sit here today, Doctor, that the information that's
25  in AstraZeneca's August 2000 submission to the FDA

31 (Pages 118 to 121)

122

1   is inaccurate in some way?
2     A.  Interestingly, they reported median
3   weight in this, but not in their NDA.
4     Q.  My first question, Dr. Arnett, is --
5   I've read your report, and you don't criticize it
6   at all. So do you have an -- withdrawn.
7       Do you have an opinion, as you sit here
8   today, Doctor, about whether AstraZeneca's
9   submission to the FDA in August of 2000 was
10  inaccurate in any way?
11    A.  I don't have an opinion.
12    Q.  If you turn to page 17 of this
13  submission, do you see that there is an indication
14  in Table 6 -- actually, let's first turn to Table
15  C2, which is on page -- it ends 1521 at the
16  bottom.
17    A.  What page number?
18    Q.  It ends at the bottom 1521, in the
19  bottom right-hand side, the page number. Are you
20  there?
21    A.  Yeah. I've never seen this before.
22    Q.  You reviewed the August 2000 submission,
23  correct?
24    A.  Correct. But I don't know that I had
25  all of these appendices.

123

1    Q.  Do you see in Table C2, Doctor, that the
2  mean and the median weight change are reported, and
3  not only are they reported, but the mean weight
4  change is higher than the median, 1.87 to 1.20?
5    A.  I see that. But, again, let me restate,
6  I didn't see this table before.
7    Q.  Now that you've seen this table, do you
8  still think that the median weight change would be
9  more dramatic than the mean weight change?
10    A.  From the data here. But as I said, I
11  haven't reviewed this section, so I don't know
12  what's included in this material. So I don't know
13  if it's true for the overall portfolio of
14  AstraZeneca or if there's some unique pieces that
15  have been pulled out. There are only 130 people in
16  that study.
17    Q.  Dr. Arnett, have you reviewed any
18  Seroquel clinical trial data showing that the
19  median weight gain is greater than the mean weight
20  gain for Seroquel?
21    A.  Once again, as I previously testified,
22  the median weight gain was not in the NDA, so I
23  wasn't able to evaluate it. This table you've
24  handed me, Table C1, has two different columns,
25  each labeled with 130 patients each. I don't know

124

1   where the data came from, and I haven't reviewed
2  this before.
3    Q.  Is 130 patients not a lot to you?
4    A.  It's not a lot.
5    Q.  Would you rely on a study that only had
6  109 patients who took Seroquel or 130 patients who
7  took Seroquel?
8    A.  Yes. But in relation to 130 out of
9  their total portfolio, it's small.
10      (Defendant's Exhibit No. 12
11      was marked for identification.)
12    Q.  Let me hand you what I've marked as
13  Exhibit 12. And this is a technical document. You
14  reviewed the technical documents. Remember you
15  said that before?
16    A.  This says "UK."
17    Q.  Did you -- this is on your exhibit
18  list. Let me represent that to you. Okay?
19    A.  I haven't seen this.
20    Q.  You haven't reviewed the technical
21  documents at all?
22    A.  No, I haven't reviewed this document. I
23  don't know if there are other ones, but I haven't
24  reviewed this one.
25    Q.  If you'll just turn with me, Exhibit 9,

125

1   if you look at the -- you may have my sticky on
2  there -- the page that ends 1650. Do you see the
3  sticky there?
4    A.  Uh-huh.
5    Q.  And do you see what the mean weight
6  change is there?
7    A.  I do. But, again, I've not seen this.
8  I don't know where the data are from or what trials
9  are represented. I will agree with you that in
10  this table, I see a mean and a median. But as an
11  epidemiologist, I would want time to review this.
12    Q.  Before you form an opinion in a case
13  where you say that the median weight change is
14  greater than the mean, would you want to review all
15  the relevant clinical trial data before reaching
16  that opinion?
17      MR. BLIZZARD: Object to the form.
18    A.  I reviewed what I had access to. I
19  didn't see this. I had to restrict myself to the
20  NDA and what was on the FDA Web site -- AstraZeneca
21  Web site in order to form my opinion quickly and in
22  the time that I needed. So if this was in that
23  list, I've never seen it before today.
24    Q.  How quickly did you have to form your
25  opinions in this case?

1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION


MDL DOCKET NUMBER: 1769


IN RE:  SEROQUEL PRODUCTS LIABILITY

LITIGATION

_____


DEPOSITION OF:

DONNA K. ARNETT, M.S.P.H

VOLUME II

**** HIGHLY CONFIDENTIAL ****

S T I P U L A T I O N S

IT IS STIPULATED AND AGREED, by and between

the parties through their respective counsel, that

the deposition of:

DONNA ARNETT, M.S.P.H.

may be taken before Lisa Bailey, Notary Public,

State at Large, at University of Alabama at

Birmingham, 1655 University Boulevard, Birmingham,

Alabama, on October 7, 2008 commencing at

approximately 8:30 a.m.

202

1    judge.
2        MR. BLIZZARD: Go ahead. Go ahead. Go
3    ahead. Call the judge.
4        MR. GOLDMAN: Please object on form,
5    just like you've been insisting on us. So
6    please object to the form.
7        MR. BLIZZARD: I'm trying to get
8    clarification from you so we don't have to --
9    you asked the question twice. She gave you
10   the full answer the first time, and then --
11   and you're trying to rush her. You're trying
12   to tell her to answer yes or no.
13       MR. GOLDMAN: I'm not rushing her.
14       MR. BLIZZARD: You're restating in your
15   answer her answer in the wrong way.
16   BY MR. GOLDMAN:
17       Q.   Doctor, you've identified this
18   Atherosclerosis Community Study as one study that
19   you say shows this relationship between change in
20   glucose and incident Type II diabetes, right?
21       A.   Right.
22       Q.   What other studies are you aware of?
23       A.   There are a multitude of them. I'm not
24   going to list them here now.
25       Q.   It's your opinion that Seroquel causes

203

1    diabetes?
2        A.   Yes.
3        Q.   Do you know of any major medical
4    association that agrees with you?
5        A.   Can you define a major medical
6    association?
7        Q.   The American Diabetes Association.
8        A.   I haven't asked the American Diabetes
9    Association, so I can't answer that question.
10       Q.   Do you know whether the American
11   Diabetes Association has ever taken the position in
12   any literature that Seroquel causes diabetes or any
13   other antipsychotic causes diabetes?
14       A.   I haven't seen any updates since 2004
15   relative to that question from the American
16   Diabetes Association. So in the past four years,
17   there's been no update from them.
18       Q.   As of 2004, did the American Diabetes
19   Association say that Seroquel causes diabetes?
20       A.   They indicated that these agents, in
21   general, atypicals increases the risk of diabetes.
22       Q.   My question was, did the American
23   Diabetes Association in 2004 say that Seroquel
24   causes diabetes?
25       MR. BLIZZARD: Object to the form.

204

1        A.   At that point, there were few studies
2    that had evaluated Seroquel. So the answer was
3    that it was not established at that point in 2004.
4    That doesn't mean that they didn't suggest that
5    there was an effect from these agents on diabetes.
6        Q.   Doctor, as of 2004, there was no
7    statement by the American Diabetes Association that
8    Seroquel caused diabetes, true?
9        MR. BLIZZARD: Object to the form.
10       A.   I don't recall what they specifically
11   said about Seroquel. I'm recalling the general
12   tone of their publication.
13       Q.   Do you know whether the FDA has ever
14   said that Seroquel causes diabetes?
15       A.   Well, the FDA has asked -- has issued --
16   in 2000, the FDA requested additional information
17   from AstraZeneca with respect to glucose and
18   diabetes and the clinical trial portfolio.
19   Additional information was requested in 2006 or
20   2007 by the FDA. I haven't seen the FDA's language
21   with respect to -- I've seen the
22   AstraZeneca label change with respect to the
23   Seroquel.
24       Q.   Have you seen any documents in your role
25   as an expert witness here, Doctor, that indicate

205

1    the FDA has concluded that Seroquel causes
2    diabetes?
3        MR. BLIZZARD: Object to the form.
4        A.   I haven't extensively reviewed the FDA
5    documents, as I stated yesterday.
6        Q.   Have you --
7        A.   So they may have said it and I haven't
8    reviewed it.
9        Q.   As you sit here today, can you identify
10   any medical association that has said Seroquel
11   causes diabetes?
12       A.   I haven't extensively evaluated all
13   medical associations.
14       Q.   Can you identify any for me that have
15   said Seroquel causes diabetes?
16       A.   I can't identify they have or they
17   haven't.
18       Q.   What specific clinical trials do you
19   claim prove that Seroquel causes diabetes?
20       MR. BLIZZARD: Object to the form.
21       A.   It's the totality of the clinical trials
22   included in the NDA as well as the evidence
23   provided in 2000 with respect to glucose, insulin,
24   HOMA and HbA1c, as well as the totality of evidence
25   with respect to other metabolic abnormalities

7 (Pages 202 to 205)

238

1    AstraZeneca failed to warn doctors and patients
2    about the risk of weight gain and other metabolic
3    effects, right?
4        A.  Yes.
5        Q.  And your opinion on that is based on
6    your analysis of Section E on page 12 of your
7    report, right?
8        MR. BLIZZARD:  Object to the form.
9        Q.  And your --
10       A.  Yes.
11       Q.  And your criticisms here -- withdrawn.
12           Your failure to warn opinion is based
13   first on the statement here that none of the weight
14   or metabolic factors were listed in the summary of
15   risks and benefits provided at the conclusion of
16   the integrated summary of safety, right?
17       MR. BLIZZARD:  Object to the form.
18       Q.  Is that right?
19       A.  That's one of the -- one of my key
20   points in this paragraph.
21       Q.  Is it your testimony to a reasonable
22   degree of scientific certainty that none of the
23   weight or metabolic factors listed in the summary
24   of risks and benefits in the integrated summary of
25   safety were included?

239

1        MR. BLIZZARD:  Object to the form.
2        A.  Specifically I mentioned the conclusion
3    paragraph.  And I will say that with certainty.
4        Q.  So your opinion is that because there
5    was no mention of weight or metabolic factors in
6    the conclusion of the integrated summary of safety
7    report for the NDA studies, that that amounts to a
8    failure to warn patients and physicians about
9    metabolic risks?
10       MR. BLIZZARD:  Object to the form.
11       Q.  Is that your opinion?
12       A.  My opinion is that in this key document
13   to the FDA at the conclusion of a safety report
14   that integrated all of the Phase I, Phase II and
15   Phase III studies, none of the weight or metabolic
16   factors were listed in that conclusion, indicating
17   that AstraZeneca did not consider weight or
18   metabolic factors important enough to include in
19   the conclusion.
20       Q.  Doctor, my question is a little bit
21   different.  Is it your opinion that because
22   AstraZeneca did not include weight or metabolic
23   factors in the conclusion of the integrated summary
24   of safety; therefore, they failed to warn doctors
25   and patients about the metabolic risks associated

240

1    with Seroquel?
2        A.  Yes.
3        Q.  Do doctors and patients read the
4    integrated summary of safety?
5        A.  Doctors and patients rely on the FDA to
6    issue --
7        Q.  Doctor, I'm --
8        A.  -- materials that are based on that
9    report.  So indirectly, yes.
10       Q.  Is it your testimony that doctors and
11   physicians indirectly read the integrated summary
12   of safety?
13       MR. BLIZZARD:  Object to the form.
14   That's not what she said.  What I said
15       A.  That's not what I said.  What I said
16   was, these summaries are read by the FDA.  The FDA
17   then helps to draft documents that guide physicians
18   and patients.
19       Q.  Does the FDA also read more than just
20   the conclusion that is contained at the end of the
21   integrated summary of safety?
22       MR. BLIZZARD:  Object to the form.
23       A.  I can't say what the FDA does.  But I
24   can tell you that when I write a conclusion, it
25   includes the most important findings from a study

241

1    that I conduct.
2        Q.  The second reason you say AstraZeneca
3    failed to warn doctors and patients is here:
4    "Publications of the Phase II and III studies never
5    mention weight and other metabolic factors in the
6    abstract of the publication."
7        MR. BLIZZARD:  Object to the form.
8        Q.  Do you see that?
9        A.  I see that.
10       Q.  Do patients read the abstracts of
11   publications?
12       A.  I don't know if patients do, but I know
13   physicians do.
14       Q.  Do physicians also read the entire
15   article and not just the abstract when they read an
16   article?
17       A.  Typically not.  Typically they read the
18   abstract.  And that's what's present on PubMed
19   that's really available to anyone.
20       Q.  Your failure to warn opinion here in
21   Section E -- withdrawn.
22           Have you read any of the FDA medical
23   officer reviews?
24       A.  No.
25       Q.  Do you know that the FDA tracked

16 (Pages 238 to 241)

242

1    Seroquel and diabetes over time?
2        A.   In so much as they requested information
3    from AstraZeneca in 2000 -- I'm assuming that they
4    were tracking at least that much.  But in 2000,
5    they requested it.
6        Q.   Do you know whether the FDA analyzed
7    antipsychotics, including Seroquel, and the
8    potential risk of diabetes even before 2000?
9        A.   I'm not aware.
10       Q.   Do you know whether the FDA analyzed the
11   potential risk of diabetes and Seroquel from 2000
12   to the present?
13       A.   So I'm aware that the FDA utilizes the
14   MedWatch program to detect independent
15   contributions from individuals.  So in that way,
16   they tracked self-reported diabetes or physician-
17   reported diabetes.
18       Q.   Is that the only way that you believe
19   the FDA tracked the potential risk of diabetes in
20   Seroquel between 2000 to the present, is by
21   monitoring the MedWatch database?
22       A.   They also requested additional data from
23   AstraZeneca.
24       Q.   Doctor, have you read any internal FDA
25   documents to know that the FDA was actively

243

1    monitoring the potential risk of diabetes with
2    Seroquel from 2000 to the present?
3            MR. BLIZZARD: Object to the form.
4        A.   I know in 2000 and 2007 they requested
5    information.  I don't know in between 2000 and 2007
6    what was done by the FDA.
7        Q.   Have you read any internal memos by the
8    FDA showing what they were doing analyzing the
9    potential risk of diabetes with Seroquel and other
10   antipsychotics?
11       A.   I have not read that yet.
12       Q.   Section E of your report, Doctor, does
13   not provide any opinions about the Seroquel label,
14   does it?
15       A.   No.
16       Q.   And if you turn to your opinions on page
17   3 where you're summarizing them, do you see that
18   you don't identify the Seroquel label at all as
19   something you intend to testify about?
20       A.   I agree that I did not state that in my
21   report, but I have evaluated the label with respect
22   to hypertriglyceridaemia -- excuse me -- strike
23   that -- for hyperglycemia and found a statistically
24   significant increased risk of hyperglycemia within
25   the warning label of the Seroquel.

244

1        Q.   What label are you referring to?
2        A.   The most recent label.
3        Q.   Is that the only label that you've
4    reviewed for Seroquel?
5        A.   Yes.
6        Q.   And your opinion is that the -- you
7    intend to express an opinion about the accuracy of
8    the current Seroquel label?
9        A.   With respect to hyperglycemia.
10       Q.   Is it your testimony that the
11   description of hyperglycemia in the current label
12   is somehow inadequate or inaccurate?
13       A.   I will rely on the label only to provide
14   numbers that define hyperglycemia within that
15   label.
16       Q.   You're not criticizing in any way the
17   current label as being inaccurate or --
18           MR. BLIZZARD: Object to the form.
19       A.   I'm evaluating the scientific causal
20   relation between Seroquel and diabetes, and with
21   respect to that, I'm evaluating the numbers of
22   hyperglycemia reported in the label.
23       Q.   I understand you're using some of the
24   numbers in the label for your opinions, right?
25       A.   Yes.

245

1        Q.   You are not offering an opinion that
2    anything in the current label for Seroquel is
3    inaccurate or wrong, correct?
4        A.   Not at this time.
5        Q.   Let me ask you about your opinion that
6    AstraZeneca misled the FDA.  Do you remember saying
7    that yesterday?
8        A.   Yes.
9        Q.   Before I ask you that, do you know what
10   the standard is for changing -- withdrawn.
11           How did AstraZeneca mislead the FDA?
12           MR. BLIZZARD: Dr. Arnett indicates she
13   needs to take a break.  We've been going about
14   an hour and a half.
15           MR. GOLDMAN: Since I just asked her
16   that question, it's pending, and then we can
17   take a break.
18       A.   Okay.  Can you restate the question?
19       Q.   Yes.  Tell me all the ways that you
20   think AstraZeneca misled the FDA.
21       A.   That's a long answer.
22           Most of my experience comes from review
23   with respect to this opinion of the NDA.  I can say
24   that in the NDA documents themselves, that it was
25   nearly impossible to find data related to weight,

246

1  glucose, insulin, other metabolic indices because
2  they, to me as a scientist, were buried in this
3  mountain of documentation. The -- that's opinion
4  one.
5       Opinion two, data regarding weight were
6  in some cases excluded from the integrated safety
7  report.
8       Number three, they didn't include weight
9  or these other metabolic abnormalities in their
10  concluding paragraph of the integrated safety
11  report in their Phase I through III program. Those
12  are just three incidents.
13      Q.  Can you tell me all that you know where
14  you say that AstraZeneca misled the FDA?
15          MR. BLIZZARD: Object to the form.
16      A.  I'll amend my report later if I -- as I
17  continue to review documents. For now, those are
18  the three most glaring episodes that stand out.
19          MR. GOLDMAN: Let's take a break.
20          (Break held, 10:03 a.m.)
21          (Defendant's Exhibit No. 25
22          was marked for identification.)
23      Q.  I've marked, Dr. Arnett, Exhibit 25 to
24  your deposition and want to know whether you've
25  ever reviewed this document called "Quetiapine" by

247

1  Joyce Small, MD?
2      A.  Yes.
3      Q.  Is this the rough draft you see in the
4  top right corner that you rely on in your report?
5      A.  This is not the same draft.
6      Q.  This is Goldstein Exhibit 39. You see
7  in the top -- on the first page?
8      A.  Uh-huh.
9      Q.  Is this the exhibit that you reviewed
10  when you found this book chapter? And let me point
11  you to the quote. It might speed things up,
12  Doctor.
13      A.  Yeah. That's what I'm looking for.
14      Q.  Turn to the bottom right page that ends
15  245. Do you see in the top paragraph, there's a
16  statement, "As clozapine, olanzapine and quetiapine
17  cause the most weight gain"?
18      A.  Yeah. That's what I quoted, so yes.
19      Q.  Well, the statement in the draft says,
20  "As clozapine, olanzapine and quetiapine cause the
21  most weight gain, these drugs may be most likely to
22  induce diabetes." Do you see that?
23      A.  I do.
24      Q.  Do you see in your report, Doctor, where
25  you talk about Dr. Small, page 10, middle

248

1  paragraph? The way you characterize the quote, you
2  have it as "as" followed by three ellipses,
3  "quetiapine caused the most weight gain, these
4  drugs may be the most likely to induce diabetes."
5  Do you see that?
6      A.  Yes.
7      Q.  Why did you leave out clozapine and
8  olanzapine?
9      A.  Because I'm not here to testify about
10  clozapine and olanzapine.
11      Q.  Is it your opinion that quetiapine
12  causes the most weight gain of all the
13  second-generation antipsychotics?
14      A.  I haven't evaluated the others with
15  respect to weight gain, so I can't answer that.
16      Q.  Did you take any steps to determine
17  whether Dr. Small actually published this article?
18      A.  No. Because it's a book chapter, so
19  it's not easy to find.
20      Q.  Did you take any steps to find out
21  whether this book chapter was ever finalized and
22  included in the book reflected in this draft?
23      A.  No. Because it was written so long ago,
24  I didn't think it would be easy to find.
25          (Defendant's Exhibit No. 24

249

1          was marked for identification.)
2      Q.  I'm going to mark as Exhibit 24 -- and I
3  only have one copy of this -- an appendix. I'm
4  just going to ask you about Table A2 at the
5  bottom. You see where it says, "Number of patients
6  with adverse events related to diabetes, all trials
7  in safety 9.1"?
8      A.  I see the table.
9      Q.  Do you ever remember reviewing this
10  table?
11      A.  No. I'm sorry.
12      Q.  If you look at the last page, do you see
13  there's a reference to diabetes in the right
14  column?
15      A.  In the left column?
16      Q.  Sorry. The left column, yes.
17      A.  Yes.
18      Q.  And did you ever calculate a relative
19  risk based on the numbers here for quetiapine and
20  placebo concerning the adverse events relating to
21  diabetes?
22      A.  No. It would be easy to do, but I
23  haven't done that.
24      Q.  Will you tell me -- here is a
25  calculator -- what the relative risk of diabetes is

18 (Pages 246 to 249)

254

1    Q.   Doctor, I asked you whether or not
2  you've evaluated the risk of -- well, let's stick
3  with Haloperidol, for example.
4         Do you know for Haloperidol how that
5  compares to Seroquel with respect to the risk of
6  EPS?
7    A.   In the follow-up study from the CATIE
8  trial, it appears to be equivalent.
9    Q.   Is it your testimony that involved
10 Haldol?
11   A.   No.
12   Q.   Let me go back to my original question.
13 Is there a safer alternative design for Seroquel
14 that you claim AstraZeneca should have used?
15   A.   I don't -- I don't have an answer.
16   Q.   Did the vast majority of patients who
17 used Seroquel benefit from it?
18   A.   Could you be more specific by the term
19 "vast"?
20   Q.   Did the majority of the patients who
21 used Seroquel benefit from the medicine, ma'am?
22        MR. BLIZZARD:  Object to the form.
23   A.   In my opinion, no.  Because there were
24 such high dropout rates in all of the clinical
25 trials that I reviewed that it would indicate that

255

1  the vast majority had no benefit because they
2  dropped out.
3    Q.   Do you know how many patients have used
4  Seroquel since it's been brought to the market in
5  the U.S.?
6    A.   No.
7    Q.   Any idea what percentage of patients who
8  used it think it benefited and helped them?
9    A.   It's irrelevant in the aspect of the
10 question at hand regarding diabetes and metabolic
11 risk.  Because in randomized clinical trials where
12 you're using a placebo control, you can evaluate
13 benefit versus harm better than observational
14 studies post marketing.
15   Q.   The FDA had all the information, Doctor,
16 to evaluate the risk of metabolic effects from
17 Seroquel when it approved Seroquel, did it not?
18   A.   I could not find all of the metabolic
19 risks that was in the FDA, so I can't answer for
20 the FDA.  I couldn't find it.
21   Q.   Did the FDA conclude that the benefits
22 of Seroquel outweighed the risks when the drug was
23 brought to market?
24   A.   I'll make the assumption that they did.
25 I haven't reviewed their documentation.

256

1    Q.   Has the FDA repeatedly approved Seroquel
2  as safe and effective and that the benefits
3  outweigh the risks --
4         MR. BLIZZARD:  Object to the form.
5    Q.   -- since it's been brought on the
6  market?
7    A.   As I indicated earlier in my testimony,
8  I haven't extensively evaluated all of the FDA
9  documents with respect to Seroquel.
10   Q.   Do you know that Seroquel has been
11 approved for multiple indications since it's been
12 brought to the market in the United States?
13        MR. BLIZZARD:  Object to the form.
14   A.   Yes.
15   Q.   And on each of those occasions, the FDA
16 concluded the benefits outweighed the risks,
17 correct?
18        MR. BLIZZARD:  Object to the form.
19   A.   I can't define what the FDA decided.
20   Q.   You don't know what it means when the
21 FDA approves a medicine for an indication?
22   A.   Yes.
23   Q.   What does it mean?
24   A.   I'm making an assumption that it means
25 that -- actually, I'm not going to make any

257

1  assumptions.
2    Q.   So you don't know?
3    A.   I want to go and review their actual
4  criteria before I answer that question.
5    Q.   As you sit here today, you don't know
6  what it means when the FDA approves a medicine for
7  an indication?
8    A.   All I can do as a scientist is -- am I
9  bothering you by the way I'm answering your
10 question?
11   Q.   No.  I'm asking do you know --
12   A.   You're just sighing and rolling your
13 eyes at me.
14   Q.   Doctor, I'm just asking you if you
15 know.  You're answering and giving very long-winded
16 answers.  And my question is very specific.
17        MR. BLIZZARD:  No, no, no.  She was
18 giving an answer.  Now you've used the
19 opportunity where she was asking you to please
20 stop rolling your eyes to formulate some new
21 question because you didn't like the answer
22 she was about to give.  She's doing a very
23 good job of trying to be responsive to you.
24 BY MR. GOLDMAN:
25   Q.   Doctor, I'm only rolling my eyes because

20 (Pages 254 to 257)

258

1   I asked a simple question. So let me ask it
2   again. Okay? With me?
3       A.   Okay.
4       Q.   Do you know, as you sit here today, what
5   it means when the FDA approves a medicine for an
6   indication?
7       A.   The FDA reviews the data provided to
8   them by the company and reviews this data with
9   respect to efficacy and adverse events and makes a
10  determination about whether it is on balance at
11  that point in time, with that limited number of
12  subjects who have been treated, safe. But that is
13  explicitly why they create post-marketing
14  surveillance studies. Because many times, these
15  adverse events cannot be detected.
16      So while something may be approved as
17  safe at the time of approval, the FDA requires
18  follow-up studies to confirm that when administered
19  in larger populations, it's a safe drug.
20      Q.   Do you disagree with the FDA's
21  conclusion in 1997 that Seroquel should have been
22  approved for use in the United States?
23      A.   I haven't reviewed the efficacy data, so
24  I cannot -- I cannot answer. My focus has been
25  exclusively on the safety data. And with respect

259

1   to the safety data, I think there was inadequate
2   attention given in the documentation to the FDA.
3       Q.   Did the FDA continue, Doctor, to review
4   all the data for subsequent indications for
5   Seroquel after 1997?
6       A.   I haven't seen the documentation for
7   that.
8       Q.   Do you disagree with the FDA's
9   conclusion that Seroquel should be approved for
10  indications like bipolar depression?
11      A.   I haven't evaluated that literature, so
12  I can't make an opinion.
13      Q.   Let me hand you what I've marked as
14  Exhibit 26.
15      (Defendant's Exhibit No. 26
16          was marked for identification.)
17      Q.   This is an e-mail from Lisa Arvanitis
18  August 13th, 1997 to John Monyak. Do you see it
19  there?
20      A.   Yes.
21      Q.   Have you reviewed this?
22      A.   Yes.
23      Q.   How did you find it?
24      A.   I asked to see it from Glenda Granger.
25  Because I had heard -- and I don't remember where I

260

1   heard about this document, but I had heard about
2   it, so I asked to see it.
3       Q.   How did you hear about it, and when did
4   you hear about it?
5       A.   I don't recall, but sometime since I
6   starting working on this Seroquel.
7       Q.   You say in your report on page 11 when
8   you're talking about your view that the metabolic
9   derangements associated with Seroquel outweigh the
10  benefit, that in 1997, Dr. Arvanitis questioned the
11  competitive advantage of Seroquel. Do you see
12  that?
13      A.   Yes.
14      Q.   Please take a minute to read this e-mail
15  and show me where Dr. Arvanitis questions the
16  competitive advantage of Seroquel.
17      A.   It is in the -- one, two, three, four --
18  tenth paragraph. And to quote, "Therefore, I am
19  not sure there is yet any type of competitive
20  opportunity no matter how weak."
21      Q.   What Dr. Arvanitis is talking about,
22  Doctor, is a competitive advantage concerning
23  weight, true?
24      MR. BLIZZARD: Object to the form.
25      A.   In the first paragraph, it says, "Is

261

1   there a competitive advantage for Seroquel
2   regarding weight gain which we can articulate?"
3       Q.   So the e-mail that you're relying on
4   from Dr. Arvanitis deals with a discussion about
5   competitive advantages over weight, correct?
6       A.   Yes.
7       Q.   Dr. Arvanitis nowhere in this e-mail
8   says that she thinks the risks of Seroquel outweigh
9   the benefits, does she?
10      A.   The tone of the e-mail was quite
11  negative. She discusses words like "problematic,
12  substantial limitations, pretty shady." So, to me,
13  that makes her question the relative advantage of
14  quetiapine compared to other existing drugs that
15  are out there. And she was really struck by the
16  consistency of the data across all the studies.
17      Q.   Are you finished?
18      A.   Yes.
19      Q.   Does Dr. Arvanitis anywhere in her
20  e-mail say that the risks of Seroquel outweigh the
21  benefits?
22      A.   Not in this e-mail.
23      Q.   Or in any others that you know of,
24  correct?
25      A.   I can't speak to others that I haven't

262

1   read.
2       Q.   Since you asked to see this one
3   Dr. Arvanitis e-mail, did you ask to see any other
4   e-mails that Dr. Arvanitis wrote?
5       A.   No.
6       Q.   Did you ask to see how John Monyak
7   responded to Lisa Arvanitis?
8       A.   No.
9       Q.   You then say in your risk benefit
10  discussion that subsequent studies confirmed
11  Dr. Arvanitis's concern that Seroquel's benefit
12  risk profile is not superior to other drugs in the
13  class. Do you remember that? Do you see that?
14      A.   Yes.
15      Q.   First of all, Dr. Arvanitis is not --
16  withdrawn.
17          Then you talk about the CATIE study,
18  correct?
19      A.   Yes.
20      Q.   Do you know that the dosing in CATIE was
21  different for olanzapine and quetiapine?
22      A.   Different than?
23      Q.   Each other, the doses that were used.
24      A.   Can you be more specific?
25      Q.   Sure. The average dose that was used in

263

1   the CATIE study that you analyzed for quetiapine,
2   what was it?
3       A.   Well, the range was 200 to 800. I don't
4   recall the mean.
5       Q.   Do you know that for olanzapine the
6   range was 7.5 to 30 milligrams per day, which is
7   above the recommended dose for olanzapine?
8       A.   I've seen a lot of responses in letters
9   regarding this study that have debated that point.
10  Some disagree with that, and some agree with that.
11      Q.   Do you think that 30 milligrams per day
12  is above the highest recommended dose for
13  olanzapine?
14      A.   I have not reviewed olanzapine dosing
15  requirements from multiple studies, so I can't
16  answer that question.
17      Q.   Did you review all of the CATIE studies
18  and the follow-up studies?
19      A.   Every CATIE follow-up study?
20      Q.   Yes.
21      A.   Not every CATIE follow-up study.
22      Q.   Why not?
23      A.   I didn't have sufficient time.
24      Q.   The -- you give opinions -- let me just
25  ask you, are you an expert in how AstraZeneca

264

1   promoted Seroquel?
2       A.   I've reviewed some of their promotional
3   documents.
4       Q.   Are you an expert, Dr. Arnett, in how
5   AstraZeneca promoted Seroquel?
6       A.   I've evaluated the promotions and have
7   -- can speak as a scientist about their coherence
8   with the data that were available.
9       Q.   Did you review all of the materials that
10  AstraZeneca used to promote Seroquel?
11      A.   I reviewed some of them, but not all of
12  them --
13      Q.   Did you review --
14      A.   -- yet.
15      Q.   I'm sorry.
16      A.   Yet.
17      Q.   Did you review all of the 2253 forms
18  that were submitted to the FDA?
19      A.   Not all of them.
20      Q.   Do you know what a 2253 form is?
21      A.   I remember, but -- no.
22      Q.   So how do you know that you reviewed
23  some of them?
24      A.   Because I remember seeing that number,
25  but I can't tell you where because, as I said, I've

265

1   reviewed thousands of pages in the last month.
2       Q.   Did you see any statement, by the way,
3   by the FDA that they thought that AstraZeneca
4   misled them in some way concerning Seroquel?
5       A.   Yes.
6       Q.   Where?
7       A.   In a memo that's on the FDA Web site
8   where they have written to AstraZeneca complaining
9   about misleading promotional materials.
10      Q.   And there you're talking about one
11  letter from the DDMAC division of the FDA about
12  promotional material, right?
13      A.   Yes.
14      Q.   My question was, did the FDA ever say to
15  AstraZeneca that they felt AstraZeneca misled the
16  FDA, as part of the NDA application?
17      A.   I have -- I can't comment on what the
18  FDA did because, as I said, I haven't reviewed
19  every document from the FDA.
20      Q.   You've given the opinion that
21  AstraZeneca consistently withheld support for
22  studies that could demonstrate Seroquel's lack of
23  safety relative to other antipsychotics. Is that
24  your opinion?
25      A.   That is my opinion.

266

1    Q.  First of all, you don't know what the
2  studies would have shown, do you?
3    A.  I don't have a crystal ball to say what
4  the studies would show.  Although there's such
5  consistent evidence related to all of the metabolic
6  abnormalities in the entire clinical profile that I
7  have no doubt they would have shown adverse events.
8    Q.  You have no doubt that every study that
9  AstraZeneca might have done for Seroquel would have
10  shown that there would have been adverse effects
11  concerning metabolic abnormalities?
12       MR. BLIZZARD:  Object to the form.
13    A.  What I said, to be clear, is that given
14  the consistency of data, that one would expect
15  consistent findings to persist.
16    Q.  Do you know how many studies AstraZeneca
17  did find concerning the development of Seroquel?
18       MR. BLIZZARD:  Object to the form.
19    A.  Within their own program?  Can you be
20  more specific?
21    Q.  Yes.  Let's start with that.
22    A.  No.
23    Q.  Do you know how much money AstraZeneca
24  spent on studies to develop Seroquel?
25    A.  No.

267

1    Q.  Do you know how much funding AstraZeneca
2  gave to assist researchers in doing observational
3  studies?
4    A.  No.  But my opinion is specifically
5  related to metabolic studies.
6    Q.  Did you look at the -- consider the
7  studies that AstraZeneca funded that included
8  glucoregulatory data?
9    A.  I've answered that before.
10    Q.  What was your answer?
11    A.  Can you repeat the question?
12    Q.  Did you look -- did you consider all of
13  the studies that AstraZeneca funded which included
14  glucoregulatory data as part of the clinical trial?
15    A.  What I've reviewed to date is included
16  in my report.  I may amend the report to add other
17  studies.  So I doubt that I have done every
18  exhaustive study on glucoregulatory data.
19    Q.  When you reached your opinion that
20  AstraZeneca consistently withheld support for
21  studies, did you consider all the studies that
22  AstraZeneca supported --
23       MR. BLIZZARD:  Object to the form.
24    Q.  -- for Seroquel?
25       MR. BLIZZARD:  Object to the form.

268

1    A.  I'm relying on their own internal
2  documents that put to light any studies related to
3  regulatory.  It's in my report.  Let me be
4  specific.
5    Q.  Are you talking about the bottom of page
6  13, where you talk about this red light, green
7  light?
8    A.  Yes.
9    Q.  Anything else you're relying on?
10    A.  Well, there's also in 2002 the study
11  that was withheld and the quote from Dr. Goldstein.
12    Q.  Did you quote Dr. Goldstein accurately
13  and completely here in your report on page 13 in
14  the e-mail from July 18th, 2002?
15    A.  The sections that are in quotations were
16  quotes derived from that e-mail.
17    Q.  Let me hand you what I've marked as
18  Exhibit 27.  Is the July 18th, 2002 e-mail
19  that you're relying on for your opinion that
20  AstraZeneca consistently withheld support for
21  studies?
22       (Defendant's Exhibit No. 27
23       was marked for identification.)
24       MR. BLIZZARD:  Object to the form.
25    A.  This is only one.

269

1    Q.  Is this the e-mail you're referring to
2  on page 13, Doctor?
3    A.  Yes.
4    Q.  Do you see in your report you quote the
5  e-mail as saying, "This would be an interesting
6  study, but carry substantial risks that we do not
7  differentiate from olanzapine or clozapine.  This
8  would be damaging," and then you have ellipses.  "I
9  would not want to enter into a study," and then you
10  continue.  Do you see that?
11    A.  Yes.
12    Q.  What language do you leave out when you
13  look at Dr. Goldstein's e-mail, "On the other
14  hand"?
15    A.  "On the other hand, positive data would
16  be very advantageous and allow us to further
17  distance ourselves from the diabetogenic
18  atypicals."
19    Q.  Why did you leave that out of your
20  report?
21    A.  Because in later instances, they put
22  this red-light language.  So it's consistent --
23  this shows a consistent pattern of withholding
24  these kinds of studies.
25    Q.  Do you use ellipses like this when you

270

```
 1   write articles in published literature?
 2      A.   Yes.
 3      Q.   Now, do you know anything about this
 4   study from -- involving Dr. L. Platkin [phonetic]
 5   from Turkey?
 6      A.   No.
 7      Q.   Do you know whether AstraZeneca
 8   supported other studies where they gave a certain
 9   amount of samples of quetiapine to other
10   researchers to study?
11      A.   Specifically for metabolic abnormalities
12   --
13      Q.   Yes.
14      A.   -- or in general?
15      Q.   Starting with metabolic abnormalities.
16      A.   I'm not aware of any.
17      Q.   You don't know one way or the other?
18      A.   Don't know one way or the other.
19      Q.   And you don't know --
20      A.   Although -- although from 2005, they
21   have this red-light policy.
22      Q.   All you know about the red-light policy
23   is what you read in the e-mail from 2005, correct?
24      A.   There's a document --
25      Q.   Yes.
```

271

```
 1      A.   -- a fairly long document.
 2      Q.   And that's what you know about it?
 3      A.   Yes.
 4      Q.   The reason you know about the red-light
 5   policy is because that's what the plaintiff's
 6   lawyers told you?
 7      A.   No.
 8      Q.   How did you find out about it?
 9      A.   It's in the Goldstein exhibits that I
10   read.
11      Q.   Did you read all the Goldstein exhibits?
12      A.   Yes.
13      Q.   Yesterday you said that you have
14   reviewed literature that says short-term weight
15   gain increases in the risk of diabetes --
16   withdrawn.
17           Yesterday you testified that you
18   reviewed literature that says that short-term
19   weight gain increases the risk of diabetes more
20   than long-term weight gain.  Do you remember that?
21      A.   No.  I'm sorry.  We talked a lot
22   yesterday.
23      Q.   Have you reviewed literature that says
24   short-term weight gain increased the risk of
25   diabetes more than long-term weight gain?
```

272

```
 1      A.   My recollection was that my statement
 2   was short -- large amounts of weight gained over a
 3   shorter period have a greater potential for
 4   diabetes incidence.
 5      Q.   Okay.
 6      A.   And I have reviewed studies.  And I
 7   remember saying that I couldn't quote them to you
 8   and I'd have to go and review and bring you
 9   references.
10           (Defendant's Exhibit Number 28
11           was marked for identification.)
12      Q.   I'm going to mark the next exhibit as
13   Exhibit 29 -- it's just going to be a blank
14   exhibit -- and ask that you provide the literature
15   you said you would provide yesterday for the
16   proposition that short-term weight gain increases
17   the risk of diabetes more than long-term weight
18   gain.
19           MR. BLIZZARD:  Object to the form.
20   she's already said that's not what she said.
21   She said yesterday rapid weight gain, and now
22   you're trying to turn that into short-term
23   weight gain, as you did yesterday.  We'll take
24   it under advisement whether we provide
25   additional documentation to you.
```

273

```
 1   BY MR. GOLDMAN:
 2      Q.   The testimony from yesterday will say
 3   what it says.  And, Doctor, I ask that you supply
 4   the studies that you said and would be happy to
 5   give me yesterday.  Okay?
 6      A.   Uh-huh.  But my recollection again, just
 7   to clarify, was rapid short-term weight gain.
 8   There was a duration around it.
 9      Q.   Please provide those studies as well as
10   part of the Exhibit 28.  Okay?
11           MR. BLIZZARD:  Object to the form.
12      Q.   Will you do that?
13      A.   Yes.
14           MR. BLIZZARD:  I don't understand the
15   "as well" part of it.  So if I'm going to be
16   involved in this process, you need to make it
17   clear to me.
18      Q.   Doctor, will you provide to me the
19   studies that you said you would provide to me
20   yesterday concerning weight gain in the short term
21   versus the long term?  Will you do that?
22      A.   With respect to?
23      Q.   What you said yesterday.
24      A.   Would you repeat what I said yesterday,
25   what you say I said.
```

24 (Pages 270 to 273)