# NF TAB 9

arnett 20060906.txt

```
1  0001
2        IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA
3
4        CASE NO:  CV05-2316
5
6        GARY ALBRIGHT
7        V.
8        MERCK & CO, INC., et al..
9
10
11              VIDEOTAPED DEPOSITION OF:
12                 DONNA K. ARNETT
13
14            S T I P U L A T I O N S
15         IT IS STIPULATED AND AGREED, by and between
16     the parties through their respective counsel, that
17     the deposition of:
18              DONNA ARNETT,
19     may be taken before Lisa Bailey, CSR, Notary
20     Public, State at Large, at University of Alabama,
21     1665 University Boulevard, Birmingham, Alabama, on
22     September 6, 2006 commencing at approximately
23     9:15 a.m.
24
25
26
```

page 1
```
□ 1            IT IS FURTHER STIPULATED AND AGREED that the
2      signature to and reading of the deposition by the
3      witness is not waived, the deposition to have the
4      same force and effect as if full compliance had been
5      had with all laws and rules of Court relating to the
6      taking of depositions.
7            IT IS FURTHER STIPULATED AND AGREED that it
8      shall not be necessary for any objections to be made
9      by counsel to any questions, except as to form or
10     leading questions, and that counsel for the parties
11     may make objections and assign grounds at the time of
12     the trial, or at the time said deposition is offered
13     in evidence, or prior thereto.
14
15
16                     * * * * *
17
18
19
20
21
22
23
24
25
```

page 2
```
□ 1                A P P E A R A N C E S
2
3      FOR THE PLAINTIFF:
4      W. LEWIS GARRISON
5      BILL BROSS
6      Attorneys at Law
7      wlbross@hgdlawfirm.com
8      Heninger, Garrison & Davis
```
Page 1

arnett 20060906.txt

```
 9    2224 First Avenue North
10    Birmingham, Alabama  35202
11    205-326-3336
12
13         AND
14
15    BENJAMIN LOCKLAR
16    Attorney at Law
17    ben.locklar@beasleyallen.com
18    Beasley, Allen, Crow, Methvin, Portis & Mills
19    218 Commerce Street
20    Post Office Box 4160
21    Montgomery, Alabama  36103-4160
22    334-269-2343
23
24    FOR THE DEFENDANT:
25
26    HOPE FRIEWALD
27    KIRSTIN MAZZEO
28    Attorneys at Law
29    kirstin.mazzeo@dechert.com
30    Dechert LLP
31    Cira Centre, 2929 Arch Street
32    Philadelphia, Pennsylvania  19104-2808
33    215-994-4000
34         AND
35    TRIPP HASTON
36    Attorney at Law
37    thaston@bradleyarant.com
38    Bradley, Arant, Rose & White
39    One Federal Place
40    1819 Fifth Avenue North
41    Birmingham, Alabama  35203
42
```

page 3
```
 1    CHRISTY JONES
 2    Attorney at Law
 3    christy.jones@butlersnow.com
 4    Butler, Snow
 5    17th Floor, AmSouth Plaza,
 6    210 East Capitol Street
 7    Jackson, Mississippi 39225
 8
 9    ALSO PRESENT:  DOUG COOPER, videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
```

Page 2

arnett 20060906.txt

28

page 4
☐ 1                          EXAMINATION INDEX
  2
  3         DONNA K. ARNETT, Ph.D.
  4              BY MS. FRIEWALD  .  .  .  .  .  .  .   p.7
  5                           EXHIBIT INDEX
  6
  7         Arnett                                        MARKED
  8          1                                          p.8
  9          2                                          p.20
 10          3                                          p 23
 11          4                                          p.27
 12          4A                                         p.27
 13          4B                                         p.27
 14          4C                                         p.144
 15          5                                          p.68
 16          6                                          p.276
 17
 18
 19
 20
 21
 22
 23
 24
 25
 26
 27

page 5
☐ 1         I, Lisa Bailey, a court reporter of Birmingham,
  2    Alabama, and a Notary Public for the State of Alabama
  3    at large, acting as commissioner, certify that on
  4    September 6, 2006 pursuant to the Alabama Rules of
  5    Civil Procedure and the foregoing stipulation of
  6    counsel, there came before me at University of
  7    Alabama, 1665 University Boulevard,  Birmingham,
  8    Alabama, DONNA ARNETT, witness in the above cause,
  9    for oral examination, whereupon the following
 10    proceedings were had:
 11              THE VIDEOGRAPHER:  This is Tape Number
 12    One in the videotaped deposition of Dr. Donna
 13    Arnett taken by the defendants in the matter of
 14    Case Number CV-052316, Gary Albright, plaintiff,
 15    versus Merck and Company, Incorporated, et al.,
 16    defendants.  The deposition is being held at the
 17    UAB School of Public Health, Department of
 18    Epidemiology, 1665 University Boulevard,
 19    Birmingham, Alabama 35294.  Today's date is
 20    September 6th, 2006, and the time is 9:14 a.m.
 21    The court reporter is Lisa Bailey, and the
 22    videographer is Doug Cooper on behalf of Esquire
 23    Deposition Services located at 2100 Third Avenue
 24    North, Suite 420, Birmingham, Alabama 35206.
 25              Would counsel and all present please

page 6
☐ 1         introduce yourself, after which the court
  2    reporter will swear in the witness?
  3              MS. FRIEWALD:  I'm Hope Friewald from
  4    Dechert, LLC in Philadelphia.  I represent
                           Page 3

arnett 20060906.txt

```
 5   Merck.
 6            MR. JONES:  Christy Jones on behalf of
 7   Merck.
 8            MS. MAZZEO:  Kirstin Mazzeo on behalf of
 9   Merck.
10            MR. HASTON:  Tripp Haston with Merck.
11            MR. BROSS:  I'm Bill Bross with Heninger,
12   Garrison, Davis on behalf of the plaintiff,
13   Mr. Albright.
14            MR. LOCKLEAR:  Ben Locklar with Beasley
15   Allen here for the plaintiff.
16            MR. GARRISON:  Lew Garrison, Henninger,
17   Garrison, Davis for the plaintiff.
18            DONNA K. ARNETT, Ph.D.
19   being first duly sworn, was examined and testified as
20   follows:
21                      EXAMINATION
22   BY MS. FRIEWALD:
23        Q.     Doctor, again I'm Hope Friewald.  I
24   represent Merck.  We met just a minute ago.
25               I'm going to start the deposition by
```

page 7

```
 1   showing you a document that is entitled Notice of
 2   Videotaped Oral Deposition, Dr. Donna K. Arnett, and
 3   we'll mark that as Arnett 1 for the record.  Let the
 4   court reporter mark it, and then she'll hand you your
 5   copy.
 6               (Exhibit Arnett 1 was marked
 7                for identification.)
 8        Q.     Doctor, is this a document you have seen
 9   before today?
10        A.     Yes.
11        Q.     And, if you would, turn to Schedule A,
12   please, on page three.
13        A.     (Witness complies.)
14        Q.     The first item is all documents
15   evidencing your opinions and/or conclusions in this
16   case including any drafts.  Have you brought all such
17   documents with you today?
18        A.     I have.
19        Q.     Are there any documents or material of
20   any kind that you will testify are part of your
21   opinion or any of the conclusions that you reached
22   that are not here today?
23        A.     There are not.
24        Q.     And I suppose the answer would be the
25   same for question two, that any documents supporting
```

page 8

```
 1   your opinions, you have brought today?
 2        A.     I have.
 3        Q.     And the same for any documents evidencing
 4   any testimony you expect to give; it should all be in
 5   what is -- what is here with you?
 6        A.     Yes.
 7        Q.     Okay.  There's no exceptions to that?
 8        A.     If there's new data that come -- become
 9   available between now and the trial, I would
10   certainly utilize that data.
11        Q.     But everything that is available today
12   that you have looked at and that you intend to rely
13   on, you brought with you?
```

Page 4

arnett 20060906.txt

14      A.      I have.
15      Q.      Have you brought with you any letters or
16  correspondence with counsel?
17      A.      No.
18      Q.      Are there any such documents?
19      A.      There were a couple of e-mails setting up
20  dates, but only e-mails with dates.
21      Q.      Was there a -- any kind of a retainer
22  agreement with any lawyer representing plaintiffs in
23  this litigation?
24      A.      I'm -- I'm unfamiliar with the term
25  "retainer." Could you clarify it?

page 9
1      Q.      I'll use it in the loosest possible
2  sense.
3      A.      Okay.
4      Q.      Did anybody send you a letter or e-mail
5  of any kind that talked about your agreement to work
6  with them in either the Albright matter or the Vioxx
7  litigation generally?
8      A.      I have an agreement with a company called
9  Med-Expertise.
10     Q.      And what is Med-Expertise?
11     A.      They are a service that helps to identify
12  experts. And I have been meeting with Paul
13  Sizemore's firm in Montgomery, and I've met with
14  Jason from Abraham, et al. firm in Houston, but I
15  have not been named in any cases.
16     Q.      When -- ask this a little differently.
17             I assume -- correct me if I'm wrong --
18  that at some point, you gave your name to
19  Med-Expertise to put in their database of potential
20  litigation experts; is that correct?
21     A.      I -- I was contacted by them. I did not
22  volunteer to be contacted.
23     Q.      When were you contacted by them?
24     A.      April or May.
25     Q.      Of 2006?

page 10
1      A.      2006.
2      Q.      Do you recall the name of the person who
3  contacted you?
4      A.      Melissa Couch.
5      Q.      Did Ms. Couch tell you why she was
6  contacting you?
7      A.      To evaluate my expertise as a
8  cardiovascular epidemiologist.
9      Q.      Did she tell you whether she was
10  contacting you with an eye towards you working in a
11  specific litigation?
12     A.      She contacted me initially for Vioxx
13  litigation.
14     Q.      Do you know if, at the time she contacted
15  you, it was because somebody representing plaintiffs
16  in the Vioxx litigation had asked her to reach out to
17  you?
18     A.      I don't know. I can't answer for
19  Melissa.
20     Q.      Do you know how she got your name?
21     A.      I do not know how she got my name.
22     Q.      Did you do any research into what
                    Page 5

arnett 20060906.txt

```
23    Med-Expertise is or what their reputation might be?
24         A.      No, I did not.
25         Q.      Do you have any materials regarding
```

page 11
```
 1    Med-Expertise?
 2         A.      I have an initial letter they sent me.
 3         Q.      And is that something that you have in
 4    your office --
 5         A.      Yes.
 6         Q.      -- here today that you could provide a
 7    copy --
 8         A.      Yes.
 9         Q.      -- during the deposition?
10         A.      But it's -- it's not part of the Albright
11    case because I worked with Lew before that happened.
12         Q.      Fair enough.  I'm still going to ask, if
13    you wouldn't mind, if you would, during the break,
14    provide us with a copy of that letter --
15         A.      Certainly.
16         Q.      -- and we can mark that for the
17    transcript.
18                 I take it you did not know Ms. Couch
19    before she called you around April of this year?
20         A.      No.
21         Q.      And did you do any investigation into who
22    she is or what her qualifications are?
23         A.      I -- I talked to Lew about her.
24         Q.      Did he -- Lew is Mr. Garrison?
25         A.      Sorry.  Yes, Mr. Garrison.
```

page 12
```
 1         Q.      And did he know her previously?
 2         A.      He knew of her company.
 3         Q.      And is Med-Expertise a local company?
 4         A.      They're in Houston.
 5         Q.      I gather they obtain experts primarily
 6    for use by plaintiffs in litigation?
 7         A.      I do not know if they do plaintiffs or
 8    defense.
 9         Q.      If -- if I have the chain of events
10    right, after you spoke with Ms. Couch, you called
11    Mr. Garrison and asked him about this company?
12         A.      Yes.  Well, actually, I didn't call him.
13    We were meeting about Mr. Albright's case, so I saw
14    him as part of that and said, have you heard of this
15    person.
16         Q.      When did you start working with
17    Mr. Garrison in the Albright matter?
18         A.      My timing is fuzzy.  I believe it was
19    March that I was contacted.
20         Q.      So shortly before Med-Expertise called
21    you?
22         A.      Uh-huh, at least a month before.
23         Q.      And had you been working at that time
24    with Mr. Garrison in any other Vioxx litigation?
25         A.      No.
```

page 13
```
 1         Q.      Have -- as far as you know, are you today
 2    working with Mr. Garrison in connection with any
 3    other Vioxx case besides the Albright case?
 4         A.      I am not.
```

                                Page 6

arnett 20060906.txt

5      Q.      Have you ever worked with Mr. Garrison
6   with regard to a case called Crook?
7      A.      Not to my knowledge.
8      Q.      As far as you know, you've never been
9   named as an expert by Mr. Garrison in the Crook case?
10     A.      I know that there was a case that had
11  been before the Albright case, but I was never
12  brought forward as a witness.  I don't know if I was
13  named or not.
14     Q.      Nobody asked you if you would be willing
15  to be a witness in the Crook case?
16     A.      I was asked by Mr. Garrison if I was
17  willing to be part of the Vioxx litigation.  I know
18  that they were working on a case before
19  Mr. Albright's case that didn't come forward.  I
20  didn't know if I was named or not named.
21     Q.      So nobody specifically asked you if you
22  would be willing to be an expert in the Crook case?
23             MR. GARRISON:  Object to the form.
24     A.      I answered it.
25     Q.      I don't think you have.  Nobody

page 14
1   specifically asked you if you'd be willing to be an
2   expert in the Crook case; is that correct?
3      A.      What Mr. Garrison -- when Mr. Garrison
4   approached me about doing Vioxx work, it was about
5   preparing me as a witness, if I would want to do this
6   kind of work or not, generally speaking.  As to the
7   specifics of the cases I would represent at that
8   point, I was not clear.
9      Q.      Okay.  Just to be clear, nobody ever told
10  you that they were going to put your name as a
11  witness in the Crook case?
12     A.      I don't understand your question.  I've
13  answered to the best of my knowledge.
14     Q.      Nobody ever told you that they were going
15  to designate you on any list in a specific case
16  called Crook and that you would be a -- an expert in
17  this case?
18             MR. GARRISON:  Object to the form.  Asked
19     and answered.
20     A.      I've answered the question.  I was
21  working with Mr. Garrison about a case that had --
22  has not been pursued.  I don't know if the person's
23  name is Crook.  I can't answer any more fully than
24  that.
25     Q.      Have you ever looked at any records

page 15
1   specific to Mr. Albright?
2      A.      No.
3      Q.      Have you looked at any medical or other
4   records specific to any other plaintiff in the Vioxx
5   litigation?
6      A.      No.
7      Q.      Do you intend to look at any records
8   specific to Mr. Albright?
9      A.      No.
10     Q.      If I understand correctly, you agreed --
11  you received a letter from Med-Expertise.  Did that
12  require you to sign something and send back to them,
13  some kind of an agreement?

                              Page 7

arnett 20060906.txt

14     A.     Yes, it did.
15     Q.     And is that just signing the same letter,
16 counter signing the letter they sent you?
17     A.     Yes.
18     Q.     And are there terms in that letter
19 regarding how you would be compensated?
20     A.     Yes.
21     Q.     And what is your hourly rate?
22     A.     400.
23     Q.     Is it the same whether you're working
24 through Med-Expertise or whether you've been engaged
25 directly by Mr. Garrison?

page 16
 1     A.     It is.
 2     Q.     Are you working with any plaintiffs'
 3 lawyers who you were introduced to through
 4 Med-Expertise?
 5     A.     I have met, as I said previously, with
 6 Paul Sizemore and Jason -- I believe it's Webster.
 7 But I have not been named in any cases for those two
 8 firms.
 9     Q.     Do you understand yourself to be working
10 with them in connection with any case or cases?
11     A.     I -- I just answered.  I have not been
12 named in any case.
13     Q.     I understand that.  But I -- but often an
14 expert understands that they are working on a matter
15 even before their name has to be disclosed for the
16 matter.  So my question is, without telling me the
17 name of the case, do you have an understanding that
18 you are working with those lawyers in connection with
19 Vioxx cases?
20     A.     I assume, but it's an assumption that I
21 will continue to work with them and develop as cases
22 are named.  But currently, I have no commitment to
23 any case other than Mr. Albright.
24     Q.     Is there any correspondence between
25 yourself and Mr. Sizemore or the gentleman you've

page 17
 1 identified as Jason?
 2     A.     No.
 3     Q.     Including e-mails?
 4     A.     Including e-mails.
 5     Q.     Is there any correspondence between
 6 yourself and Mr. Garrison or any other lawyers you
 7 understand to be representing plaintiffs in the Vioxx
 8 litigation here?
 9     A.     No.  Other than, as I previously
10 mentioned, e-mails about setting up dates.  Bill
11 Bross and I have been the primary e-mail
12 correspondence purely date related.
13     Q.     Was there a retainer agreement or a
14 letter setting forth the terms of your engagement
15 specifically with Mr. Garrison?
16     A.     No.
17     Q.     How did you first meet Mr. Garrison?
18     A.     He called me, and we set up a meeting at
19 my office.
20     Q.     And that was back in March?
21     A.     Yes.
22     Q.     Have you ever worked with him in any
                        Page 8

arnett 20060906.txt

```
23   other litigation?
24        A.     None.
25        Q.     Have you ever been an expert in a
```

page 18

```
□ 1   litigation before the Vioxx litigation?
 2        A.     Yes.
 3        Q.     Tell me about that.
 4        A.     Okay.  I prepared -- I worked with a firm
 5   called Kay Schuler in New York for the PPA
 6   litigation.  I was working, I believe, for the
 7   company Novartis, the companies that produce cough
 8   and cold products.  I was developing an expert
 9   report, but the case -- cases were dropped or
10   settled.  So I never produced an expert report for
11   any case, and I never was deposed.
12        Q.     Do you know if your name was ever put on
13   a list of experts?
14        A.     I do not know.
15        Q.     Have you done any other litigation work?
16        A.     No.
17        Q.     Have you ever testified for any purpose?
18        A.     No.
19        Q.     And I'm using that broadly, including
20   government hearings or any kind of administrative
21   procedure.
22        A.     Not -- not that I'm aware of.  I've never
23   been sworn in before.
24        Q.     There's a first for everything.
25        A.     Yes.  I think I testified when I got
```

page 19

```
□ 1   married.  Don't you raise your right --
 2        Q.     I don't remember that.  Memory dims over
 3   time.  I remember something about promising
 4   something.
 5        A.     I do.  I do remember that.  The I do's.
 6        Q.     All right.  We were provided in advance
 7   of the deposition of a copy of your CV.  I'm going to
 8   mark that as Arnett 2.  And I have an extra copy for
 9   Mr. Garrison, if he needs it.
10                    (Exhibit Arnett 2 was marked
11                     for identification.)
12        Q.     For right now, Doctor, all I want to know
13   is if this is a current and complete and accurate
14   copy of your curriculum vitae.
15        A.     It has not been updated since -- this
16   date is 9 of 2005, so I have a new grant, and I have
17   -- probably my publications are now in the 200 range,
18   so some of my more recent publications will be
19   missing.
20        Q.     What's the new grant?
21        A.     It's the Hypergenetics of Left
22   Ventricular hypertrophy.  It's by NIH.
23        Q.     Do you have a more recent version of your
24   CV on your computer?
25        A.     Yes.
```

page 20

```
□ 1        Q.     Then I'm going to ask that when we take a
 2   break at some point, you go get me the Med-Expertise
 3   letter, and if you would also provide us with a
 4   current copy of your CV.
```

arnett 20060906.txt

```
 5              Doctor, have you ever written anything
 6     that relates to either COX-2s or traditional NSAIDs?
 7        A.    No.
 8        Q.    Are there any publications that you
 9     authored or coauthored that you believe are -- let me
10     put it this way -- that you might specifically
11     identify, if you come and testify at trial, as
12     particularly relevant to the testimony that you're
13     going to give at trial?
14              MR. GARRISON:  Object to the form.
15        A.    Currently, I have no publications
16     specific to NSAIDs or COX-2 inhibitors.
17        Q.    And what I'm really asking -- I know
18     you've done a lot of research that's generally
19     related to the subject of cardiology and the
20     epidemiology of cardiology.  But what I'm asking is,
21     is there -- is there any aspect of your academic
22     publication work that you're going to say bears
23     specifically on the opinions that you're going to
24     give related to COX-2s in this litigation?
25        A.    My publications, in general, reflect the
```

page 21
```
 1     totality of my experience as an epidemiologist, so I
 2     can't completely exclude all publications.
 3        Q.    I understand there's the general
 4     relationship.  What I'm asking you, is there anything
 5     where you're going to say, yes, this article that I,
 6     back in 1989, although it doesn't talk specifically
 7     about COX-2s, I consider it to be very
 8     closely-related research, something like that?
 9        A.    To the best of my knowledge, there's not
10     a publication on my CV that I would want to
11     specifically bring forward.  But I don't want to
12     exclude everything in the event that if I'm called to
13     question about my methodologic expertise as an
14     epidemiologist, that I couldn't go back and say,
15     well, I've published about methods of epidemiology.
16        Q.    I understand.  But in terms of specific
17     references to the specific topic, there's nothing
18     that comes to mind today?
19              MR. GARRISON:  Object to the form.
20        A.    No.
21        Q.    Let's turn -- we're going to go through
22     your CV a little bit more, particularly when we get
23     an updated version.
24              Let's turn to the documents that you
25     brought with you here today and also the list of
```

page 22
```
 1     materials that was provided to us by your counsel.
 2              Doctor, I'm going to mark as Arnett 3 a
 3     list of articles that I'll represent was sent to us
 4     by someone from Mr. Garrison's office.
 5              (Exhibit Arnett 3 was marked
 6               for identification.)
 7        Q.    I gather that you have seen this document
 8     before today; is that correct?
 9        A.    It's correct.  And, in fact, if I could
10     have my notebook, at the end of the -- the back of my
11     notebook, there is the same document.  And I've
12     checked what I've read and what I haven't.
13        Q.    I did see that, and I was going to ask
```
                              Page 10

arnett_20060906.txt

14    you to specifically look at that for me.
15              I'm going to hand you, just so the record
16    is clear -- and we'll deal with some of the paperwork
17    issues later.  You handed me before we started today,
18    among other things, a -- a plastic notebook that's
19    got three rings to it, and it contains a bunch of
20    different materials I'll describe a little bit more
21    later.  And then tucked in the back was what appeared
22    to me to be an annotated by you version of Arnett 3;
23    is that correct?
24        A.    That is correct.
25        Q.    And you wrote "NA" next to a bunch of the

page 23
0 1    entries?
 2        A.    Correct.
 3        Q.    And what does that mean?
 4        A.    It means that it's not applicable and
 5    that I didn't review the material.
 6        Q.    Were there -- do you know if you were
 7    given Arnett 3 before it was provided to us?
 8        A.    Arnett -- oh, my Exhibit 3?
 9        Q.    Yes.
10        A.    Yes, I was sent this earlier.
11        Q.    And did you make any effort to see if
12    there were documents that were not on Arnett 3 that
13    nevertheless were among what you had looked at?
14        A.    I did not do that.  I conducted my own
15    review, which I provided to you, of clinical trials
16    before I ever started working with Mr. Garrison when
17    he first contacted me.  So I haven't cross-referenced
18    that list, which you also have access to --
19        Q.    Do you --
20        A.    -- with this list.
21        Q.    Do you know what the basis was for
22    creating Arnett 3?
23        A.    It was so that I would have reference to
24    everything that had been provided to me.
25        Q.    Now, let me ask you this way.  As far as

page 24
0 1    you know, does Arnett 3 represent documents that were
 2    sent to you by counsel?
 3        A.    Yes, it does represent things sent to me
 4    by counsel.
 5        Q.    And as you've testified, I gather several
 6    of the documents that were sent to you by counsel,
 7    you didn't actually look at?
 8        A.    Many of them, I did not look at.
 9        Q.    Independent of what counsel provided you
10    with, you had your own list of materials, correct?
11        A.    Correct.
12        Q.    Is there an index anywhere of those
13    materials?
14        A.    No, other than the spreadsheet.  The
15    Excel spreadsheet I provided you has a list of
16    clinical trials that I have summarized.
17        Q.    In the back of the binder that we just
18    referenced a minute ago is a document that, by my
19    count, is one -- eight pages --
20        A.    Uh-huh.
21        Q.    -- although it's not numbered.  The pages
22    are not numbered.  And is -- is this document the --
                              Page 11

arnett 20060906.txt

23  you know what, I don't want to mark it 5 -- is this
24  document the Excel spreadsheet you were just
25  referring to?

page 25
 1          A.      It is.
 2          Q.      Is that a complete list of all of the
 3  published articles you've reviewed?
 4          A.      No.
 5          Q.      Is there a complete list anywhere of all
 6  the published articles you've reviewed?
 7          A.      If you'd like, I will go through Exhibit
 8  3 and look at them, or we can look through my
 9  notebook.
10          Q.      Okay.  If -- all I want to know for now
11  is whether there is a list somewhere of all of the
12  articles you've reviewed.
13          A.      The articles -- the articles I reviewed
14  are included in Exhibit 3.
15          Q.      And included in your spreadsheet to the
16  extent it's not duplicative?
17          A.      Yes.
18          Q.      But there may be articles you've reviewed
19  that are not on either one of those two documents?
20          A.      I have reviewed some web sites, Google
21  searches for Vioxx.  Those aren't on my list.  But
22  not scientific publications from PubMed.
23          MS. FRIEWALD:  This is -- what I'd like
24  to do, subject to somebody having an objection,
25  based on your practice here, is I'd like to mark

page 26
 1          the binder itself as whatever our next number
 2  was -- I thought it was 4 -- and then I'd like
 3  to mark Dr. Arnett's annotated copy of the
 4  materials list as 4A and the spreadsheet as 4B.
 5  And I'm not going to mark all of the other
 6  materials in here.  I just want to make a copy
 7  --
 8          MR. GARRISON:  That's fine.
 9          MS. FRIEWALD:  -- of everything.  Okay?
10          MR. GARRISON:  As long as we keep it in
11  order, and she gets her original back.
12          MS. FRIEWALD:  I will do that.  And I'm
13  going to ask the court reporter to copy it and
14  then ask somebody maybe from Mr. Haston's office
15  to make sure that all of Dr. Arnett's
16  highlights, some of which are in yellow and may
17  not produce properly, get reproduced to us.
18          THE WITNESS:  So you want this back, 4A
19  and 4B?
20          MS. FRIEWALD:  I need the court reporter
21  to mark those documents as 4A and 4B and to put
22  an Exhibit 4 tab on the binder itself.
23          (Exhibits Arnett 4, 4A and 4B
24          were marked for identification.)
25          MS. FRIEWALD:  I promise to keep it in

page 27
 1  order.
 2          THE WITNESS:  There is a method to my
 3  filing.
 4          MS. FRIEWALD:  I actually can tell that
                              Page 12

arnett 20060906.txt

```
 5       there is, and it's far more organized than most
 6     of what I do.
 7   BY MS. FRIEWALD:
 8       Q.      Doctor, I noticed that in addition to the
 9   published literature that you have in here, you also
10   have some notes.  Are those notes that you created in
11   the course of your work in this litigation?
12       A.      Yes.
13       Q.      Are any of these notes that you created
14   before you were retained by Mr. Garrison?
15       A.      No.
16       Q.      Tell me when and how you went about
17   assembling the set of documents that we've identified
18   as Arnett 4.
19       A.      In the initial period, I did my own
20   PubMed review for Vioxx.
21       Q.      What do you mean by "the initial period"?
22       A.      So -- Mr. Garrison contacted me about my
23   potential availability and willingness to work in
24   this area.  So I conducted a review of the clinical
25   trials conducted on rofecoxib to date and
```

page 28
```
 1     cross-referenced them with other trials to create a
 2   composite list, evaluated the evidence at that point
 3   before making the decision to move forward.
 4       Q.      Did you have any kind of a file on either
 5   Vioxx specifically or coxibs or NSAIDs generally
 6   before you spoke with Mr. Garrison about working as
 7   an expert for the plaintiffs?
 8       A.      No.
 9       Q.      Had you ever done any research related to
10   the coxibs or the NSAIDs before you decided to work
11   with Mr. Garrison for the plaintiffs in this lawsuit?
12       A.      I had not done specific work on COX-2.  I
13   had worked generally in cardiovascular epidemiology,
14   which would not exclude drugs affecting
15   cardiovascular risk.
16       Q.      In addition to the published literature
17   and the notes, I've also come across a couple of
18   Merck documents that were produced to plaintiffs in
19   the course of the litigation.  I assume that you
20   obtained those through Mr. Garrison?
21       A.      I did.
22       Q.      Did he give those to you -- let me ask it
23   open-ended.
24               Do you know how it was decided that you
25   would receive the particular Merck documents you got?
```

page 29
```
 1       A.      Actually, I, in part of my Google
 2   searches, identified topical areas, specific e-mail
 3   documents that are posted online, that I requested
 4   from him.  The FDA documents, I was able to download,
 5   but it's easier to just request them because they
 6   were on my list of things produced.  So in some
 7   cases, I requested them of them specifically.  But in
 8   general, I sought out the information.
 9       Q.      The -- the documents that are in Arnett 4
10   are the only internal Merck documents that you have?
11       A.      There are -- if you'll look in the back
12   of Exhibit 4, there are some diskettes.  And those
13   diskettes contain the APPROVe data, the VICTOR data,
```

Page 13

arnett 20060906.txt

14  and two or three other diskettes.  One has scientific
15  articles; one has other documents.  There's a -- some
16  Merck documents on those.
17      Q.     I'm looking at one, two, three, four five
18  diskettes -- I'll put this one in the sleeve for you
19  -- and the first is titled "Miscellaneous Documents
20  for" --
21      A.     Right.
22      Q.     -- "Dr. Arnett, 1 of 1"?
23      A.     Correct.
24      Q.     What is on this disk?
25      A.     That was after I requested specific

page 30
0 1  patent applications by Merck after some of my
 2  Internet searches, and those are on that document.
 3  There's also some clinical review forms for the 010
 4  and 017 studies.  They were very early Merck
 5  studies.  One was done in OA, and one was done in
 6  RA.  They've never been published.  I requested
 7  those -- those clinical forms so I could review those
 8  data.  So that happens to be on that disk.
 9      Q.     Did --
10      A.     And I -- I don't recall the other
11  documents.  I think the Shapiro meta-analysis I also
12  requested is on that.
13      Q.     There is a hard copy of a document titled
14  "Preliminary Meta-Analysis" by --
15      A.     Dr. Shapiro.
16      Q.     -- Dr. Shapiro.  Is that a hard copy of
17  what's on the disk?
18      A.     Correct.
19      Q.     Did you review all of the documents on
20  the disk identified as "Miscellaneous Documents for
21  Dr. Arnett" and dated 8/28/06?
22      A.     I can't tell you if I reviewed every
23  one.  I looked at the one specifically I asked for.
24      Q.     And then there is a disk that's called
25  "Scientific Articles, July 14th, 2006."  Are there

page 31
0 1  any documents on this that I don't have in hard copy
 2  on the binder?
 3      A.     Yes, there are.  There's -- on that disk,
 4  there are background information about pharmacology
 5  and basic science studies I did not review.  I'm an
 6  epidemiologist.  So those you do not have hard copies
 7  of.
 8      Q.     Are you telling me that you didn't
 9  actually review the documents on this list?
10      A.     Not the entire list of documents,
11  correct.
12      Q.     Is there an index on this list; do you
13  know?
14      A.     There is not an index on the disk.  There
15  are folders, however, which should help you.
16      Q.     Incidentally, just for the record, the
17  "Miscellaneous Documents for Arnett" is on a disk
18  that has a "Beasley Allen" label, and the "Scientific
19  Articles" is just on a plain white disk.  Then there
20  is a disk called "Confidential VICTOR Data, July
21  13th, 2006."  And what is on this disk?
22      A.     I opened it.  It's SAS files.  I couldn't
                        Page 14

arnett 20060906.txt
23  find a data dictionary.  I haven't explored it beyond
24  that.  It was not transparent.
25      Q.      Do you have an intention of doing an

page 32
 1  independent analysis of the SAS files?
 2      A.      I have not done it as of yet.  But I
 3  would be willing to do one, so I can't say in the
 4  future I won't.  But currently, I have not done an
 5  analysis.
 6      Q.      Then there are documents -- are disks,
 7  rather, labeled "Confidential APPROVe Data, Disk 1 of
 8  2 and Disk 2 of 2."
 9      A.      Uh-huh.
10      Q.      What is on these two disks?
11      A.      The APPROVe data.  There are also some
12  Merck documents related to the publication in the New
13  England Journal, notes back and forth about the -- to
14  and from the editor.
15      Q.      When you say "the APPROVe data," are you
16  talking about analysis files --
17      A.      Well, interesting --
18      Q.      -- patient level data?
19      A.      There are some patient level data, where
20  there are EKGs, et cetera.  There are SAS files, but
21  there's not a data dictionary file.
22      Q.      And do you know how these disks were
23  created?
24      A.      Like -- you mean, like putting them in
25  the computer created, or do you mean --

page 33
 1      Q.      Do you know if --
 2      A.      -- how are they generated?
 3      Q.      Yeah, how are they generated?
 4      A.      I received them from Paul Sizemore's firm
 5  and was asked to look at them.  I didn't ask him how
 6  they were generated, so I can't answer you.
 7      Q.      Have you had any discussion with any
 8  lawyers for plaintiffs about the contents of these
 9  disks?
10      A.      I expressed my frustration with the
11  contents of the disk.
12      Q.      Do you know if there was any follow-up
13  effort to help you out with these disks?
14      A.      No, there has not been.  I --
15      Q.      Do you know if there was any follow-up
16  effort to help you out with the content -- contents
17  of the disk that's called "VICTOR Data"?
18      A.      Can you clarify what you mean by "help me
19  out"?
20      Q.      See if you could get more information,
21  figure out how to use the files, do anything to make
22  them usable to you.
23      A.      I didn't request specific help.  The
24  issue for me was the absence of a clear data
25  dictionary and clear descriptor of where the data

page 34
 1  reside on those disks.  It wasn't about my ability to
 2  do the analysis.
 3      Q.      Do you know if there is a data
 4  dictionary?

Page 15

arnett 20060906.txt

5      A.      I'm sure that a data dictionary exists.
6  I was unable to identify it on these disks.  There
7  are thousands and thousands of files on those disks.
8      Q.      If you don't mind, just to speed things
9  along while we sit here, I'm going to ask Ms. Mazzeo,
10  who's sitting at the end of the table, to pop the
11  Scientific Articles and the Miscellaneous Documents
12  disks into her computer just so I can get a better
13  feel for what's on these two disks.
14      A.      Uh-huh.
15      Q.      I promise I will return them to you.
16          In addition to this plastic binder that
17  is Arnett 4, you've also given me a couple stacks of
18  documents:  an Expert Witness Report of John W.
19  Farquhar, what looks like an excerpt of a transcript
20  of some trial testimony; is that correct -- I'll show
21  it all to you in a minute -- Dr. Ray's Expert Report
22  in the Plunkett case, and a transcript dated March
23  14th, 2006 from the Cona and McDarby cases, and the
24  transcript of the videotaped deposition of
25  Dr. Farquhar.  I'll show these to you, and you can

page 35
□ 1  confirm if I've identified those correctly.
2      A.      I believe that the second one from Ray
3  was a deposition and not a trial testimony.  I don't
4  know if those differ.
5      Q.      And could you do me a favor, since I
6  failed to do it, and tell me, is there a date on that
7  transcript?
8      A.      I could not find a date on the
9  transcript.  I know that it -- it was requested, and
10  I -- I couldn't find the date.
11      Q.      It looked to me like the transcript you
12  had was incomplete as well.  Can you identify what
13  the pages are that you have there?
14      A.      I have page 315, which was the beginning
15  of the direct examination of Dr. Ray, to page 547.
16      Q.      And the first question on 315?
17      A.      By Mr. Birchfield:  "Dr. Ray, I'm going
18  to show you what's marked as Plaintiff's Exhibit 5.04
19  that is your current CV."
20      Q.      That should help us figure out the date.
21      A.      The next one is the Ray Expert Report,
22  and the next one is the Dr. Krumholz's direct.
23      Q.      From the Cona and McDarby cases?
24      A.      Yes.  Well, it says Thomas Cona and
25  Joyce Cona.

page 36
□ 1      Q.      If you look at the top --
2      A.      Oh --
3      Q.      -- it's a joint caption.
4      A.      Got it, yes.  And then the Farquhar
5  testimony of June 8th in the Barnett case.
6      Q.      When did you receive those materials?
7  And if you received them at different times, please
8  let me know.
9      A.      I received the Farquhar and the Ray
10  testimony and the Ray report early, I believe when I
11  received those black notebooks.  The -- Harlan
12  Krumholz's deposition -- or trial testimony came a
13  bit later.  And, no, I did not review the entire
                        Page 16

arnett 20060906.txt

14 testimony. It's three of these large binders. And
15 then Farquhar's most recent deposition in the
16 Beinhart [phonetic] litigation, I received about
17 three weeks ago.
18      Q.      Did you review any of those materials in
19 detail?
20      A.      Could you describe what you mean by
21 "detail"?
22      Q.      Well, did you review them carefully
23 enough that you would say that any of what you read
24 went into forming your opinions?
25      A.      No.

page 37
0 1      Q.      Are you going to rely on anything you've
2 read in any of the materials you just described in
3 support of your opinions?
4      A.      No.
5      Q.      Is there anything you learned in those
6 materials that you did not know regarding Vioxx or
7 COX-2s before you read them?
8      A.      I have read so much in the hours I've
9 worked on this now that I -- I can't say with
10 certainty that there wasn't something I picked up.
11 But I'm relying on primarily the published
12 literature, the meta-analyses conducted by Merck, the
13 studies conducted by Merck, and the FDA documents.
14      Q.      Just a minute ago, you received the --
15 you told me that you received some of the materials
16 at the time that you got the black binders that I
17 have sitting in front of me. And I have two black
18 binders identified as Volume I and Volume II Vioxx
19 Expert Information Work Product at Beasley Allen.
20 These were sent to you some months ago by plaintiffs'
21 counsel; is that correct?
22      A.      Correct.
23      Q.      Have you reviewed any of these materials?
24      A.      No.
25      Q.      And these materials include the report --

page 38
0 1 well, it looks to me like they included the report of
2 Dr. Ray, but perhaps you took Dr. Ray's report out of
3 this binder and put it in your pile of what you
4 actually looked at; is that correct?
5      A.      As I said, I'm an organized person, and I
6 don't want to carry around a big black binder.
7      Q.      Okay. And it looks like you also took
8 out the Ray testimony and reviewed that?
9      A.      Uh-huh.
10      Q.      But the report of Dr. Rayburn and the
11 testimony of Dr. Rayburn, you did not review?
12      A.      No.
13      Q.      Do you know Dr. Rayburn?
14      A.      I do not.
15      Q.      You've never met him through any of your
16 just general work at UAB?
17      A.      No.
18      Q.      Would you know him if you walked by him
19 on the street?
20      A.      Not a clue.
21      Q.      Then it also looks like you removed the
22 Farquhar report that must have come in this binder
                    Page 17

                          arnett 20060906.txt
23   originally, and now it's in your pile of what you've
24   actually looked at, correct?
25        A.      Correct.

page 39
 1        Q.      And but the -- but you were also sent
 2   Farquhar testimony, a Krumholz report, the FDA April
 3   6, 2005 memo, all of which are still in the binder
 4   untouched, correct?
 5        A.      Correct.
 6        Q.      Have you ever reviewed the April 6, 2005
 7   FDA memo?
 8        A.      Could you -- could I look at it?
 9        Q.      Absolutely.
10        A.      Because I have -- I have some things on
11   disk that I have reviewed.
12               I haven't reviewed this, to the best of
13   my knowledge.  It's not striking a bell.
14        Q.      Then there's one more tab in the back
15   there.  If you could, do me a favor and read it.  It
16   looks like you removed the document from the binder.
17        A.      I did.  It's Shari Targum, FDA Report.
18        Q.      So that's something you looked at and,
19   therefore, you took it out of the binder?
20        A.      Correct.
21        Q.      Okay.  And then there's one last pile of
22   materials that we have here.  And if I understand
23   correctly from what you said before, they include the
24   rest of Dr. Krumholz' testimony from the Cona and
25   McDarby matters --

page 40
 1        A.      Correct.
 2        Q.      -- which you did not look at?
 3        A.      Correct.
 4        Q.      Dr. Avorn's deposition testimony --
 5   correct -- from the MDL --
 6        A.      Correct.
 7        Q.      -- jointly captioned in New Jersey -- and
 8   you'll probably be able to tell me quicker than I can
 9   figure out -- another deposition transcript.  Do you
10   know whose this is?
11        A.      I do not know.  I didn't -- I haven't
12   looked at any of these documents.
13        Q.      Okay.
14        A.      I had just assumed it was a continuation
15   of Avorn.  I see the pages -- but I haven't reviewed
16   this one.
17        Q.      Have you reviewed any testimony of
18   Dr. Avorn?
19        A.      No, I have not.
20        Q.      Have you reviewed Dr. Avorn's expert
21   report?
22        A.      I have not.
23        Q.      I gather you also haven't read his trial
24   testimony?
25        A.      I have not.

page 41
 1        Q.      I also have here several published
 2   articles and review pieces.  Am I correct you have
 3   not read any of the published literature that is in
 4   the pile we just went through?
                                Page 18

arnett 20060906.txt
```
 5      A.      That is correct.  If you -- those are
 6  specifically either review articles about COX-2 or
 7  the basic science relative to COX-2.
 8      Q.      What I'm going to ask you to do, so that
 9  you're comfortable that the documents are identified
10  quickly -- properly, rather -- is just read for the
11  court reporter the half-dozen articles that are
12  here.  I don't think you have to read the whole
13  title.  But if you read the first author and the
14  journal and the date, then we will know what those
15  articles are.
16      A.      So clarify first author, journal, date?
17      Q.      Yes.
18      A.      Okay.  The author is Baigent,
19  B-A-I-G-E-N-T.  It's in Arthritis and Rheumatology
20  2003.
21              The second is by Bea, B-E-A, published in
22  Cardiovascular Research 2003.
23              The third is Caughey, C-A-U-G-H-E-Y,
24  published in Biological -- the Journal of Biological
25  Chemistry in October of 2001.  It's time to get my
```
page 42
```
 1  glasses on again.
 2              The next is by Cipollone,
 3  C-I-P-O-L-L-O-N-E, published in ATVB in 2004.
 4              The next is by Fosslien, F-O-S-S-L-I-E-N,
 5  published in the Annals of Clinical and Laboratory
 6  Science 2005.
 7              And the last is by FitzGerald in -- I'm
 8  sorry.  It's not the last -- New England Journal of
 9  Medicine 2004.
10              And the last is by Antman, A-N-T-M-A-N,
11  published in Circulation in 2005.
12      Q.      Have you reviewed any of those articles?
13      A.      I have not reviewed them.
14      Q.      And then the rest of the pile is a letter
15  from Mr. Locklar to you that looks like it was
16  enclosing the APPROVe data we discussed before and a
17  confidentiality agreement, correct?
18      A.      Correct.
19      Q.      And it says, "I will be attending next
20  week's meeting with Bill Bross."  It's dated July 6,
21  2006 --
22      A.      Uh-huh.
23      Q.      -- correct?  And then we have a -- an
24  e-mail that attaches a memo from Merck, and that
25  e-mail is most easily identified as Gertz 110.  It
```
page 43
```
 1  has a deposition exhibit sticker dated 9/28/05,
 2  correct?
 3      A.      It is dated 9/28/05.  And this is about
 4  the VALOR study discontinuation.
 5      Q.      Did you review that?
 6      A.      I glanced at this.
 7      Q.      And then the last two documents are a
 8  letter from Carlo Patrono, MRK ABC 0002199, correct?
 9      A.      (Nods head.)
10      Q.      And a Powerpoint from David Graham dated
11  February 17, 2005, Review of Epidemiologic Studies --
12      A.      Yeah, yeah, I downloaded --
13      Q.      -- on Cardiovascular Risk with Selected
                        Page 19
```

arnett 20060906.txt

14    NSAIDs?
15        A.        I downloaded that from the web myself.
16        Q.        The Powerpoint you downloaded.  And the
17    letter from Dr. Patrono was provided to you by
18    counsel?
19        A.        By Dr. Garrison (sic) -- Dr. Garrison --
20        THE WITNESS:  I promoted you, Lew.
21        MR. GARRISON:  Thank you.
22    BY MS. FRIEWALD:
23        Q.        And do you know why he gave you that or
24    when he gave you that?
25        A.        It was at a meeting sometime this

page 44
□ 1    summer.  It was in discussions about the naproxen
 2    issues related to VIGOR.
 3        Q.        I'm sorry.  Say that again.  You were at
 4    a meeting about the naproxen issues related to VIGOR?
 5        A.        No.  I was in my office.
 6        Q.        I'm not asking you what the substance of
 7    the letter is.  I'm asking you why you got that
 8    particular letter out of all the documents that have
 9    been produced in this litigation, if you know.
10        MR. GARRISON:  That's what she's
11    answering.
12        Q.        Okay.  I may have misunderstood your
13    answer.
14        MR. GARRISON:  Yeah.
15        Q.        Could you start again, because I may have
16    misunderstood something?
17        A.        Okay.  I was in my office meeting with
18    Mr. Garrison.  I was expressing concern about the
19    VIGOR interpretation of naproxen.
20        Q.        And that was the one document that was
21    given to you?
22        MR. GARRISON:  Object to the form.
23    Mischaracterization of testimony.
24        A.        I received many documents.  I found my
25    own documents on the web and through PubMed.  This is

page 45
□ 1    one of many documents.
 2        Q.        Were there any -- excluding medical
 3    literature, were there any other company documents
 4    that were provided to you related to the VIGOR data
 5    and the analysis of the impact of naproxen?
 6        A.        Honestly, I can't recall.
 7        Q.        Are there any documents that you have
 8    that we haven't identified and that aren't in this
 9    room today?
10        A.        I've brought you everything.
11        Q.        And nothing that you've downloaded
12    separately, correct, that you don't have in here with
13    you today?
14        A.        I don't print out every web page I go
15    to.  So there were web pages I visited, I -- but I
16    don't have printed copies of those.  But they -- they
17    didn't inform my opinion.
18        Q.        Fair to say that anything that you relied
19    on as in forming your opinion, you made a copy of?
20        A.        (No response.)
21        Q.        If it was something that you more than
22    just looked at and passed over, you made a copy of
                        Page 20

arnett 20060906.txt

23    it?
24         A.     As an epidemiologist, I put my strongest
25    faith in peer-reviewed literature that's in the

page 46
 1    public domain, and that has formed the basis of my
 2    opinions.  It's the totality of all of that
 3    information.  It's not one single document.
 4         Q.     As an epidemiologist, have you ever
 5    before relied on internal company documents in
 6    forming an opinion?
 7         A.     I've -- as -- this is my first ever
 8    experience at doing this kind of work.
 9         Q.     So -- so the answer is, no, you've never
10    requested or obtained internal documents from a
11    company as part of your work as an epidemiologist?
12         A.     As an epidemiologist?
13         Q.     Yeah.
14         A.     We tend -- I have not done work with
15    pharmaceutical companies, so it's -- as an
16    epidemiologist, I work in my own studies that I
17    design and create and execute.  So I've not had a
18    reason to ask for internal documents.
19         Q.     And do you know how many documents were
20    produced in the Vioxx litigation?
21         A.     I would have no idea.
22         Q.     Do you have any sense of what percentage
23    of the documents that might bear on the subject of
24    naproxen you actually were provided by Mr. Garrison?
25         A.     There are no clinical trials or placebo

page 47
 1    control on that, so I have not --
 2         Q.     No, that wasn't my question.  My question
 3    is, he gave you, it looks to me like one letter
 4    related to naproxen and VIGOR.  And I'm asking you,
 5    do you know how many other documents there are that
 6    Merck produced in this litigation that discuss
 7    naproxen and VIGOR.
 8         A.     I have no idea how many there are.  But
 9    it would not alter my opinion about the relationship
10    of naproxen and VIGOR.
11         Q.     Did you at any point ask whether there
12    were any documents that might offer different
13    opinions that you should see, or did you just decide
14    that you would rely on the published literature for
15    that?
16         A.     I relied on the published literature.  I
17    relied on the FDA cardio renal review, as well as the
18    review of the VIGOR data.
19         Q.     And the FDA documents, you obtained on
20    your own?
21         A.     I downloaded some.  I also was provided
22    some by counsel.
23         Q.     I haven't seen a lot of FDA documents in
24    what you've provided.  Is there anything -- is that
25    because it's on a disk, or is it because you've not

page 48
 1    kept all of what you were given?
 2         A.     I have kept all that I've been given by
 3    counsel.  You have it all before you.  The -- some of
 4    the FDA documents are on disks.
                              Page 21

arnett 20060906.txt
5      Q.      And those would be the disks that were in
6  the pocket in Arnett 4, correct?
7      A.      Uh-huh.
8      Q.      Before the deposition got started, you
9  mentioned to me that you had some materials on your
10 computer.  Are any of those materials different from
11 or in addition to what we've just spent an hour
12 discussing?
13     A.      I have no materials on my computer.  To
14 clarify, in case I wanted to look at disks during
15 this presentation -- deposition, I wanted to have
16 access to look at them.
17     Q.      Okay.
18     A.      So there are no -- no files on my
19 computer.
20     Q.      Fair enough.
21          MS. FRIEWALD:  Unless somebody else here
22 wants any of the material Dr. Arnett says she
23 has not particularly looked at marked as an
24 exhibit, I'm not going to do so.  I assume we
25 can get copies separate from the deposition if

page 49
1          we want it.  But I'm just going to leave it
2  identified in the record as-is of now.
3          Why don't we put Dr. Patrono's letter
4  back in your stack so that we don't mess up your
5  system of organization?  And I can give you back
6  --
7          THE WITNESS:  Thank you.
8          MS. FRIEWALD:  -- your binder.
9             (A discussion was held off the record
10            after which the following occurred.)
11         MS. FRIEWALD:  I just want to make sure
12 that the court reporter understands that in
13 addition to the paper documents in Exhibit 4, we
14 want to get a copy of all OF the CDs that are in
15 the pockets.  Everything that is in Exhibit 4
16 we'd like a copy of, including any tabs that
17 Dr. Arnett has put on those documents.  And we
18 want to make sure all the highlighting and
19 underlining is reflected and all the disks are
20 there, too.
21         THE WITNESS:  What would you like done
22 with these?  This is the stack of things I did
23 semi-review.
24         MS. FRIEWALD:  I don't think -- I'm going
25 to take a look at those and see if there's any

page 50
1          writing of substance on them.  If not, I don't
2  think I need them either.
3  BY MS. FRIEWALD:
4      Q.      Let me ask you this, though:  Dr. Ray's
5  report, did you rely on that in forming your
6  opinions?
7      A.      I did not.
8      Q.      When did you review that?
9      A.      I reviewed that in the very beginning of
10 when I began my work.  So that had to be April or
11 May.
12     Q.      Do you know Dr. Ray?
13     A.      I know of Dr. Ray.  I know he's at
                      Page 22

arnett 20060906.txt

14  Vanderbilt.  I know that he's a very well-respected
15  pharmacoepidemiologist.
16      Q.      Have you ever worked with him?
17      A.      I have not.
18      Q.      Do you know Dr. Avorn?
19      A.      I've heard of Dr. Avorn.
20      Q.      Have you ever worked with him?
21      A.      I have not.
22      Q.      Have you ever spoken with either Dr. Ray
23  or Dr. Avorn either in connection with the Vioxx
24  litigation or otherwise?
25      A.      I have not.

page 51
 1          Q.      What about Dr. Topol; do you know him?
 2          A.      I recently met him.  I don't know him.
 3  I've served on a panel with the National Institutes
 4  of Health that he chaired.
 5          Q.      Is that how you met him?
 6          A.      I met him.  I was asked to come and
 7  advise them on their strategic plan.
 8          Q.      What was the nature of the panel?
 9          A.      The panel is defining the strategic plan
10  for the National Heart Lung and Blood Institute for
11  the next five years.  And I was the expert invited
12  for coronary artery disease.
13          Q.      And when did you meet Dr. Topol?
14          A.      At that meeting.  It was June 26th, I
15  believe.
16          Q.      Have you had any discussions with him
17  regarding Vioxx?
18          A.      I've had no discussions with him
19  regarding anything other than strategic planning.
20          Q.      What about Dr. Furberg; do you know him?
21          A.      I do know Dr. Furberg.
22          Q.      How do you know him?
23          A.      He is -- was the chair of the steering
24  committee or executive committee -- and I'm not sure
25  which it was -- for the ALLHAT trial.  The ALLHAT

page 52
 1  trial is an antihypertensive and lipid-lowering trial
 2  conducted in the '90s, late '90s through the early
 3  2001, 2002.  And I have an ancillary study to do to
 4  that study called the GenHAT study -- it's listed on
 5  my CV -- Genetics of Hypertension Associated
 6  Treatment.  And I contacted Dr. Furberg as chair of
 7  that executive committee to gain permission to submit
 8  an ancillary study proposal for ALLHAT.  So that's
 9  how I know --
10          Q.      How long ago was that?
11          A.      The grant went in in '99, so in 1999.
12          Q.      Have you had any contact with Dr. Furberg
13  since then?
14          A.      Only passing at meetings, and I saw him
15  last at the American Heart Association Council and
16  Epidemiology Prevention Meeting when it was held in
17  Hawaii, which, I believe, was four years ago.
18          Q.      Have you had any communications with him
19  regarding Vioxx?
20          A.      None.
21          Q.      Or any COX-2?
22          A.      None.

                           Page 23

arnett 20060906.txt

```
23      Q.      What about Dr. Cromwell?  Is he somebody
24  you knew?
25      A.      Dr. Cromwell from Washington, University
```

page 53
```
 1  of Washington, Dick Cromwell?
 2      Q.      Oh, I'm sorry.  That wasn't who I meant
 3  to ask you about, but since we're there, sure.
 4      A.      I work with him through another study I
 5  work on with the National Institutes of Health called
 6  MESA, Multiethnic Study of Subclinical
 7  Atherosclerosis.  And he is the principal
 8  investigator for the coordinating center for that
 9  study, and I've met him through interactions with
10  that study.  I'm an investigator.  I was the
11  principal investigator of the field center at
12  Minnesota before I moved here.
13      Q.      Any communications with him related to
14  Vioxx or COX-2s?
15      A.      No.
16      Q.      What about Dr. Krumholz, which is who I
17  meant to mention.
18      A.      Okay.  Krumholz?
19      Q.      Yes.
20      A.      Yes.  I have met -- are you specifically
21  asking about my COX-2 interactions?
22      Q.      I was asking first if you knew him, and
23  then I want to know about your COX-2 interactions.
24      A.      Yes, I do know Harlan.  He and I
25  interacted with American Heart Association
```

page 54
```
 1  Committees.  I've served on the Senior Scientific
 2  Advisory Committee called SSAC for the American Heart
 3  Association and Harlan and I served on that together
 4  probably 2004, I think, and 2005.
 5      Q.      What was the nature of that committee?
 6      A.      That's the scientific oversight committee
 7  for the American Heart Association, so we deal with
 8  all matters of science relative to the broad
 9  organization of the American Heart Association.
10      Q.      Can -- can you give me an example of the
11  kinds of things that you would deal with?  Because it
12  sounds -- it's a little broad because it sounds like
13  everything science, so I don't know where you draw
14  the line.
15      A.      Actually, it is everything science.
16  There are 13 councils on the American Heart
17  Association and 3 interdisciplinary working groups,
18  and I chaired the interdisciplinary working group on
19  functional genomics and translational biology, and
20  Harlan chaired the interdisciplinary work group on
21  outcomes research.  And each of those councils
22  represents a different domain from kidney to
23  radiology to hypertension to cardiology.  So it's a
24  very broad field, and we would deal with matters of
25  policy for the organization around science.
```

page 55
```
 1      Q.      Have you been on any other committees, or
 2  have you had any other professional contacts with
 3  Dr. Krumholz other than this one oversight committee
 4  you described?
```

Page 24

arnett 20060906.txt

```
 5       A.      No.
 6       Q.      And tell me about your coxib-related
 7  communications with Dr. Krumholz.
 8       A.      I've had none.
 9       Q.      Have you talked to him at all about any
10  of your Vioxx litigation work?
11       A.      I have not.
12       Q.      Did you know that any of the people that
13  we've just gone through were working with plaintiffs
14  in the Vioxx litigation before you agreed to be an
15  expert for plaintiffs?
16       A.      I did not.
17       Q.      Did you talk to anybody about whether or
18  not you should agree to be an expert for plaintiffs
19  before you did so?
20       A.      I did not.
21       Q.      Is George Howard a colleague of yours?
22       A.      He is.
23       Q.      And is he somebody who you work with?
24       A.      Yes, although we don't have any studies
25  together.  We're not co-investigators.  But I chair
```

page 56
```
 1  the Department of Epidemiology, and he chairs the
 2  Department of Biostatistics.  So we interact more on
 3  an administrative level.
 4       Q.      Is he somebody who you respect?
 5       A.      Yes.
 6       Q.      And do you consider him to be a top-notch
 7  biostatistician?
 8       A.      I do.
 9       Q.      And do you consider him to be somebody
10  who's careful and thorough in the work that he does?
11       A.      Yes.
12       Q.      And have you ever had any criticisms of
13  his work?
14       A.      Of his scientific work?
15       Q.      Yes, his scientific work.
16       A.      No.
17       Q.      Since you hesitated, is there some other
18  type of work that you have criticisms of?
19       A.      Well, if you ask as chairs of different
20  departments, we're always sparring.  So we're always
21  competing for resources.
22       Q.      When you say you're -- you're sparring
23  and competing for resources, you mean there's --
24  there's limited grant and other funds to go around
25  and --
```

page 57
```
 1       A.      Oh, it's not about grants.
 2       Q.      Okay.
 3       A.      It's about running the department from
 4  the state funds that are given to the university and
 5  to the school.
 6       Q.      Okay.  So other than competing for scarce
 7  resources, you haven't had any areas of disagreement
 8  with him?
 9       A.      No.
10       Q.      Although, certainly it is true that
11  reasonable scientists can differ with each other with
12  regard to their scientific conclusions; fair enough?
13       A.      One of the joys of being a scientist is
```
                              Page 25

arnett 20060906.txt

14    actually disagreeing, and that's how new hypotheses
15    are generated.  But George and I have two different
16    areas.  He works primarily in the area of stroke; I
17    work primarily in the area of genetics, of
18    cardiovascular disease previously and more
19    broad-based cardiovascular epidemiology.
20         Q.       But generally speaking, certainly it is
21    the case that part of what good scientists do is
22    debate questions that are not yet fully answered,
23    often disagree with each other about questions that
24    are not yet fully answered, correct?
25         A.       It is correct that the way that we

page 58
 1    develop as scientists and develop theories is through
 2    interaction and discussion.
 3         Q.       And often there are even heated
 4    disagreements between scientists as we all learn more
 5    about different scientific areas?
 6         A.       I don't understand what you mean by
 7    "heated."
 8         Q.       Well, I'm not trying to be pejorative in
 9    any way.  I'm just -- I'm saying what I think is
10    actually probably fairly uncontroversial, is that
11    scientists can debate.  It can often be a very active
12    debate where reasonable scientists come out
13    differently on an issue.
14              MR. GARRISON:  Object to the form.
15         A.       It is -- I would agree that scientists
16    debate.  I have never debated with any of the people
17    you have previously listed as having expertise and
18    concerns.
19         Q.       As part of your committee work for
20    various organizations, have you had the experience of
21    engaging in scientific debate with different
22    colleagues?
23         A.       Yes.
24         Q.       And I imagine you've often debated with
25    scientific colleagues whose opinions you generally

page 59
 1    respect and whose expertise you respect?
 2         A.       In general, that's true.
 3         Q.       Doctor, can you tell me -- let's do this
 4    first.
 5              Did you meet with anybody to prepare for
 6    today?
 7         A.       You mean scientists?
 8         Q.       I actually meant lawyers.  But we can
 9    certainly answer the scientist question.
10         A.       I have not met with any scientists or had
11    discussions with other scientists --
12         Q.       Okay.
13         A.       -- in forming my opinion.  I have met
14    several occasions with Mr. Garrison, Mr. Bross, and
15    Paul Sizemore and Ben.
16         Q.       Have you met with Mr. Sizemore at the
17    same time as you met with Mr. Garrison?
18         A.       Once.
19         Q.       And did you have a meeting specifically
20    in preparation for today's deposition?
21         A.       By "preparation," you mean what?
22         Q.       Did you have a meeting where Mr. Garrison
                                        Page 26

arnett 20060906.txt
23   or somebody from his office said, I want to get
24   together with you to prep or to review materials
25   before your deposition?

page 60
 1        A.      We -- we did have a meeting to review
 2   materials -- excuse me -- to make sure I have
 3   everything I needed.
 4        Q.      And when was that?
 5        A.      That was yesterday.
 6        Q.      Who attended that meeting?
 7        A.      Bill, Ben and Lew.
 8        Q.      How long did that meeting last?
 9        A.      Three hours.
10        Q.      Was it here at UAB?
11        A.      It was.
12        Q.      Have any other meetings to review
13   materials for your deposition?
14        A.      We had a meeting with Paul Sizemore and
15   Ben and, I believe, Bill -- I don't believe you were
16   there -- the week before.
17        Q.      Are you able to tell me in total how many
18   hours you have spent meeting with lawyers for
19   plaintiffs in connection with Vioxx litigation?
20        A.      I could -- I can check my invoice.  I
21   would -- I believe it's -- before yesterday's meeting
22   was 12.
23        Q.      Have you, in fact, submitted invoices so
24   far?
25        A.      I have a draft invoice being reviewed by

page 61
 1   Melissa Couch.  I haven't officially sent it because
 2   she wants detail, and I don't know what level of
 3   detail.  So I haven't --
 4        Q.      Did --
 5        A.      I've sent one to review, but I don't know
 6   if it's officially submitted or not.
 7        Q.      Does Ms. Couch edit your invoices?
 8        A.      No.  I just sent an invoice with a total
 9   number of hours, and she said she needed detail.
10        Q.      What was the total number of hours?
11        A.      At that point, it was in the 50s.
12        Q.      And how long ago was that?
13        A.      That was in July.
14        Q.      So as of July, you had spent about 50
15   hours reviewing materials related to the Vioxx
16   litigation?
17        A.      Yes.
18        Q.      Any other hours that you would say went
19   into forming your opinions that you're going to give
20   at trial?
21        A.      For this deposition or for trial?
22        Q.      Well, for this deposition, with the eye
23   towards this being my chance to hear what you're
24   going to say at trial.
25        A.      Okay.  So I have -- I submitted an

page 62
 1   invoice on Saturday that was cumulative -- because
 2   I've never gotten approval for the first one -- of 72
 3   hours.  I've worked an additional 28 hours since
 4   Saturday.

                        Page 27

arnett 20060906.txt

```
 5       Q.      If I understand right, your total time
 6  spent so far is 108 hours --
 7       A.      It's not -- it's --
 8       Q.      -- give or take?
 9       A.      100 hours.
10       Q.      Okay.
11       A.      I -- 72 and 30 -- you're right.  That's
12  wrong.  It wasn't 30 --
13       Q.      You're right.  It's what?  I'm sorry.
14       A.      It was 27 --
15       Q.      I had 98 hours.
16       A.      It was 72 plus 20 because I worked
17  through Saturday night, and Sunday and Monday, I
18  spent ten hours each day, and then three hours
19  yesterday morning.
20       Q.      Okay.  Somewhere around 100 hours?
21       A.      Yeah.
22       Q.      And are there any written invoices that
23  reflect that time, how you've spent that time?
24       A.      I -- yes.  To the -- the one to Melissa.
25  But I don't know if it's official yet.

page 63
 1       Q.      Okay.  Do you have a document that goes
 2  through and breaks out how you spent the different
 3  times that you wanted to bill?
 4       A.      I have an e-mail to her that I could
 5  probably find.
 6       Q.      Okay.  I'm going to ask that we receive
 7  that e-mail and any other e-mails to or from Ms. --
 8  is it Couch or Crouch?
 9       A.      Couch.
10       Q.      Ms. Couch, or anybody else from
11  Med-Expertise.
12               Doctor, what do you understand to be, in
13  general terms, the opinions that you're going to
14  offer if this case goes to trial?
15       A.      I have three opinions.  The first is that
16  Vioxx is cardiotoxic.  The second opinion is that the
17  risk appears early and is continuous.  And the third
18  is that after the results of VIGOR were released, it
19  was reasonable to warn future patients about the risk
20  associated with Vioxx from a cardiovascular
21  perspective.
22       Q.      Let me ask a couple more questions, and
23  then we'll take a break because we've been going
24  about an hour and a half.
25               I forgot to ask you whether you know

page 64
 1  Dr. Graham or have had any contact with him.
 2       A.      I -- I have met him at study section.  I
 3  work for -- well, I don't work for.  I volunteer as a
 4  scientist to review grants for the National
 5  Institutes of Health.  And he was meeting with a
 6  colleague, and he was introduced to me.  I don't know
 7  that I could even recognize him again.
 8       Q.      Have you spoken with anybody from Pfizer
 9  in connection with this litigation?
10       A.      Not to my knowledge.
11       Q.      Have you had any -- do you do any work
12  with or for Pfizer?
13       A.      I have never worked for Pfizer.
                          Page 28
```

arnett 20060906.txt

```
14      Q.      Have you reviewed any materials related
15  to Celebrex or Bextra?
16      A.      I have not.
17      Q.      Is there anybody from the FDA or who was
18  previously with the FDA who you've spoken with in
19  connection with forming your opinions?
20      A.      There is not.
21      Q.      Anybody who I haven't thought to ask you,
22  but who you're going to -- who you would have to say
23  you have consulted with in forming your opinions?
24      A.      There is no one.
25      Q.      Now --
```

page 65
```
 1      A.      You didn't ask me about Farquhar.
 2      Q.      You're right.  I didn't.  Thank you very
 3  much.  So now I will.
 4              MR. GARRISON:  Don't do her anymore
 5  favors.
 6              THE WITNESS:  All right.
 7              MS. FRIEWALD:  This is a very helpful
 8  witness.
 9  BY MS. FRIEWALD:
10      Q.      Do you know Dr. Farquhar?
11      A.      I do not.
12      Q.      And I gather you've never communicated
13  with him regarding Vioxx or COX-2s?
14      A.      I have not.
15              MS. FRIEWALD:  Okay.  Why don't we take a
16  five-minute break.  And if you could get me your
17  updated CV, that would be a big help.
18              THE VIDEOGRAPHER:  This is the end of
19  Tape Number One in the videotaped deposition of
20  Dr. Donna Arnett to be continued on Tape Number
21  Two.  We're off the record at 10:32.
22                  (Off the record.)
23              THE VIDEOGRAPHER:  This is the beginning
24  of Tape Number Two in the continued deposition
25  of Dr. Donna Arnett.  We're on the record at
```

page 66
```
 1      10:49 a.m.
 2  BY MS. FRIEWALD:
 3      Q.      Dr. Arnett, on the break, you were nice
 4  enough to go and get me a cover letter -- actually,
 5  two cover letters from Med-Expertise, along with a
 6  document captioned "Expert Retention and
 7  Confidentiality Agreement" that appears you --
 8  appears was sent to you in March of '06.  The copy
 9  you've given me does not actually have your signature
10  on it.  Did you sign a copy of the document?
11      A.      I believe I signed a copy.  But I don't
12  have one with my signature on it.
13      Q.      The -- the document that you gave me
14  actually is stamped "Copy."  Is it possible that you
15  were given two --
16      A.      Two, yes.
17      Q.      -- versions, an original and a copy, and
18  you retained the unsigned copy, and you sent back the
19  original?
20      A.      To the best of my memory.  This is, you
21  know, six months ago, and seven grants have been
22  written since that time.  So it's possible.
```
                                   Page 29

arnett 20060906.txt

```
23            MS. FRIEWALD:  I'm going to ask the court
24     reporter to put an exhibit sticker and mark the
25     clipped document, including the cover letters
```

page 67
```
□ 1     and the confidentiality and retention agreement,
 2     as Arnett 5.
 3                  (Exhibit Arnett 5 was marked
 4                   for identification.)
 5          Q.     I apologize if I've asked this before,
 6     but I just want to make absolutely certain, you do
 7     not have a written agreement with Mr. Garrison
 8     independent of the Med-Expertise, correct?
 9          A.     I do not have a separate written
10     agreement.
11          Q.     Have you sent Mr. Garrison any bills
12     independent of the invoices you've submitted through
13     Med-Expertise?
14          A.     I have not.
15          Q.     And I don't need them today, but I am
16     going to ask that you provide to Mr. Garrison, so
17     that he can give to us, a copy of any of the invoices
18     that you have, even if they haven't been approved
19     yet, for your services in the Vioxx litigation,
20     whether -- whether submitted through Med-Expertise or
21     otherwise submitted.
22          A.     There have been no otherwise submitted.
23          Q.     The -- did you receive any materials, any
24     substantive materials from Ms. Couch or Ms. --
25     Medical Expertise?
```

page 68
```
□ 1          A.     I did not.
 2          Q.     The web sites that you referred to, were
 3     some of those lawyers' web sites?
 4          A.     The -- they were news web sites.  I know
 5     forbes.com was one.  There was newstarget.com or
 6     something like that, which actually played out all
 7     the memos that I requested, the internal Merck
 8     documents that are requested from Mr. Garrison.
 9          Q.     Do you believe the name of that was News
10     --
11          A.     Target.
12          Q.     -- target?
13          A.     I believe it was.
14          Q.     Do you know who sponsors that web site?
15          A.     I didn't -- don't know.
16          Q.     Were there any lawyer web sites that you
17     were directed to?
18          A.     One yesterday.  I have no clue who it
19     was.  Didn't -- when it was a lawyer web site, I just
20     closed it.
21          Q.     Are you able to tell me what searches you
22     did?
23          A.     The -- the search terms that I used were
24     Vioxx, cardiovascular.
25          Q.     Are you able to tell me how much time you
```

page 69
```
□ 1     spent looking on the Internet for materials?
 2          A.     Could you be more specific?  Because, for
 3     instance, I went to the FDA.  That would be
 4     considered the Internet.  So do you mean including
```
Page 30

arnett 20060906.txt

```
 5    the FDA?  Do you mean Googling?
 6         Q.       Googling.
 7         A.       Googling.  Googling, not more than an
 8    hour and a half.
 9         Q.       Are there search engines that you use in
10    your academic practice to obtain literature related
11    to cardiovascular issues?
12         A.       Yes.
13         Q.       What are they?
14         A.       PubMed and Google Scholar.
15         Q.       And are there journals that you subscribe
16    to?
17         A.       As a premium member of the American Heart
18    Association, I have access to all of their five
19    journals.  And I'm editor of the American Journal of
20    Epidemiology, so I have access to American Journal of
21    Epidemiology, but I have no subscriptions.
22         Q.       What are the five AHA journals?
23         A.       Circulation, Circulation Research, ATBB,
24    Stroke and Hypertension.
25         Q.       ATBB is atherosclerosis and vascular --
```

page 70
```
0 1         A.       Thrombosis and vascular biology.  That's
 2    why I said ATBB.
 3         Q.       That was a good move.
 4                  Do you regularly review any or all of
 5    those journals?
 6         A.       I am an editor, consulting editor for
 7    Circulation.  So I review many of the epidemiological
 8    articles from Circulation as an editor.
 9         Q.       What does that mean?  You're not on the
10    editorial board of Circulation, correct?
11         A.       I am one of -- I'm a -- what's called a
12    consulting editor.  So for conflicts with
13    epidemiology, I am sent papers, and I serve as a full
14    editor.  I've reviewed or edited for Circulation 53
15    articles in the past year.  It's not a -- it's more
16    like a regular job.
17         Q.       Just because I'm not sure that I
18    understand how all the different journals work
19    exactly, let me tell you my understanding of what you
20    said, and you tell me if I went wrong anywhere.
21                  If I open Circulation, I wouldn't see
22    your name on the editorial board, correct?
23         A.       Correct.
24         Q.       But you're called on from time to time,
25    when editorial board members have a conflict that
```

page 71
```
0 1    prevents them from reviewing articles?
 2         A.       From serving as editors.
 3         Q.       From serving as editors?
 4         A.       For that article.
 5         Q.       And are there subareas in cardiology that
 6    you specifically will edit articles for and other
 7    ones where you'll say, this is outside of my
 8    expertise?
 9         A.       I review articles that are for
10    epidemiology, so articles that are sent to
11    Circulation tend to be about cardiovascular
12    epidemiology.  And I review some in genetic
13    epidemiology within -- and pharmacogenetics within
```
                              Page 31

arnett_20060906.txt

```
14    the general cardiovascular arena for Circulation.
15         Q.     You are not, correct, a medical doctor?
16         A.     I am not a medical doctor.
17         Q.     You are trained as a nurse?
18         A.     I am no longer licensed because I became
19    -- when I became an epidemiologist, I left medical --
20    or nursing practice.
21         Q.     Were you at some point licensed as a
22    registered nurse?
23         A.     I worked five years in all aspects of
24    nursing, from neonatal intensive care, critical care,
25    surgical ICU, recovery room.
```

page 72
```
0 1        Q.     In what state were you licensed as a
2     nurse?
3          A.     Florida.
4          Q.     You were exclusively a hospital-based
5     nurse?
6          A.     For the first five years of my practice,
7     I was.  I became a research nurse for clinical
8     protocols in cardiovascular disease and clinical --
9     clinical trials in 1985.  And I did that for three
10    years.
11         Q.     Were those hospital-based clinical
12    trials?
13         A.     They were outpatient based.
14         Q.     Are they on your CV?
15         A.     No.  I was not the principal
16    investigator.  I was a research nurse.
17         Q.     Right.  I didn't know if you would have
18    listed them in any way on your CV.
19                Are nurses in Florida allowed to
20    prescribe medications?
21         A.     Nurse practitioners who are certified as
22    nurse practitioners, ANRP certification, can
23    prescribe prescriptions under the direction of a
24    physician.  They have to be oversigned.  I was not an
25    ANRP.
```

page 73
```
0 1        Q.     So you've never actually prescribed a
2     prescription medication?
3          A.     I have not.
4          Q.     It would be unlawful for you to do so?
5  -       A.     Correct.
6          Q.     And you have, however, I gather, been
7     asked by physicians to document prescriptions in
8     medical records?
9          A.     Could you be more precise?  What do you
10    mean by "document?"
11         Q.     Well, if you -- you've -- I can't imagine
12    you haven't had situations where you were working
13    with a doctor, caring for a patient, the doctor
14    prescribed the medication, and part of your job was
15    to make sure that was reflected in the medical chart?
16         A.     I worked in the hospital setting.  We --
17    only if I was -- had a call-in order did I transcribe
18    --
19         Q.     I'm not taking about take-home
20    medication.  But in the hospital setting,
21    prescription medication -- medications are prescribed
22    all the time.  The doctor might say, I want an IV
```
                              Page 32

arnett 20060906.txt

```
23  medication or I want the patient to have anything
24  from an antihypertensive to an analgesic to -- I
25  don't know -- a medicine to treat post-surgical
```

page 74
```
 1  pain.  And -- and that would get documented in the
 2  chart, correct?
 3      A.      By the medical doctor.
 4      Q.      Okay.  Would you ever be responsible for
 5  documenting that?
 6      A.      No.
 7      Q.      Would you be responsible for documenting
 8  that you had actually given the medication per the
 9  doctor's orders?
10      A.      Yes.
11      Q.      And that was something that was important
12  to do as part of the recordkeeping at the hospital?
13      A.      Yes.
14      Q.      And as part of your work as a nurse, you
15  understood that it was important to have good and
16  accurate and complete records of all the medications
17  that were provided to the patient in the hospital
18  setting?
19      A.      Yes.
20      Q.      Doctor, do we have your updated CV yet or
21  not?
22      A.      No, not yet.
23      Q.      Okay.
24      A.      I'm sorry.
25      Q.      You are currently chair of the Department
```

page 75
```
 1  of Epidemiology here at UAB?
 2      A.      Correct.
 3      Q.      And tell me a little bit of what's
 4  involved in your job as chair.
 5      A.      I administer the academic department.  We
 6  have now -- excuse me -- approximately 20 faculty, so
 7  I'm responsible for hiring new faculty, for mentoring
 8  junior faculty.  I'm responsible for maintaining a
 9  budget of about $9 million per year.  I'm responsible
10  for maintaining the administrative services in the
11  department.  I'm responsible for serving the
12  executive committee of the School of Public Health,
13  to develop and oversee the strategic direction of the
14  School of Public Health.  And I'm responsible for my
15  teaching and research as well.
16      Q.      How much time do you spend doing
17  teaching?
18      A.      I teach -- approximately ten percent of
19  my effort in terms of my total effort is spent
20  teaching.  But I -- I have taught this year almost
21  every semester.
22      Q.      Do you teach one or more than one class?
23      A.      One class a semester.
24      Q.      Have any of your classes at any time
25  related to pharmacoepidemiology?
```

page 76
```
 1      A.      I guest-lectured in the
 2  pharmacoepidemiology course that we have here last
 3  year, but not this year.
 4      Q.      What was -- "guest-lectured" means you
```
                          Page 33

arnett 20060906.txt

```
 5   gave one lecture?
 6        A.    Uh-huh.
 7        Q.    And what was your one lecture?
 8        A.    Pharmacogenomics.
 9        Q.    Explain to me what that is.
10        A.    Pharmacogenomics is a relatively new
11   field where we're utilizing information from the
12   human geno project to understand whether there are
13   genetic variations in the human geno that predict
14   response to drugs, either therapeutic response or
15   adverse responses to drugs.
16        Q.    Do you hold the opinion that there are
17   genetic reasons that explain people's responses to
18   different drugs?
19        A.    There are -- there -- there's good
20   evidence that there are some genetic variants that
21   explain response to some drugs.  That is true.
22        Q.    And is that an opinion that you hold to a
23   reasonable degree of expert certainty?
24        A.    Yes.
25        Q.    And do you believe that over time, we
```

page 77
```
0 1   will find that there are genetic responses to most
 2   drugs?
 3        A.    I'm not as certain of that.
 4        Q.    without making me take an entire course
 5   on pharmacogenetics, can you tell me why the answer
 6   to that might be no?
 7        A.    The answer, particularly in
 8   cardiovascular diseases -- and that's the area that
 9   I've predominantly dealt with -- the -- the diseases
10   are not simple mendelian diseases.  And by
11   "mendelian," I mean responsible from a single gene
12   perspective.
13              The LDL receptor mutation, for instance,
14   raises LDL cholesterol.  And in that situation, we
15   have a specific gene variant mutation that raises
16   cholesterol.
17              But for other -- for other responses to
18   drugs -- you know, I'm not a pharmacologist, so I
19   can't answer for all drugs, for all things.  It's
20   just in general, I'm not -- I'm not -- I don't have
21   medical certainty that we can say something for
22   everything.
23        Q.    Has your work in this area focused
24   primarily on drug efficacy?
25        A.    My work to date has primarily focused on
```

page 78
```
0 1   efficacy in hypertension and lipid treatment.
 2        Q.    Have you done any studies on genetic
 3   responses to drugs from the safety standpoint?
 4        A.    I have not.
 5        Q.    Do you hold an opinion as to whether
 6   there are genetic reasons why people might or might
 7   not experience adverse reactions to drugs?
 8        A.    There is good scientific evidence from
 9   the cancer field that that is true.
10        Q.    And do you believe that that is an area
11   where we need more research to understand whether
12   there are genetic variations that might lead one
13   person to take a drug safely and another person to
```
                              Page 34

arnett 20060906.txt

14   have an adverse reaction to it?
15        A.     Yes.
16        Q.     Can you tell me in three or four
17   sentences -- I hate to -- I hate to limit you that
18   way, but I just want to kind of get the top-level
19   answer first -- what your opinion is regarding the
20   genetic role of hypertension or the genetic response
21   caused by -- the genetic response to hypertension?
22        A.     Could you be more clear?
23        Q.     Sure.  That was not a great question.
24        I -- I understand -- tell me if I'm wrong
25   -- that you believe that there is a genetic role for

page 79
 1   hypertension, a genetic component to people having
 2   hypertension.
 3        A.     I -- I agree with that statement.
 4        Q.     And can you tell me how broad you've --
 5   you consider that role to be?  Do you believe that
 6   most people have a genetic component to their
 7   hypertension?  Is it limited to certain populations?
 8   Describe for me in general terms what your scientific
 9   opinions are.
10        A.     As a genetic epidemiologist, I first look
11   at whether there's heritability, and by
12   "heritability," I define the heritability to be that
13   portion of a variation within a family that could be
14   attributable to shared genetic information.  And
15   hypertension is a modestly heritable trait.  The
16   heritability estimates range about 30 to 40 percent,
17   depending on the population.  So there are both
18   genetic and environmental causes of hypertension.
19        Q.     Is genetic predisposition different from
20   family history?
21        A.     It's -- yes.
22        Q.     My understanding is that cardiologists
23   talk of family history as one of the traditional risk
24   factors for cardiovascular disease.  Do you agree
25   with that?

page 80
 1        A.     Could -- specifically, a family history
 2   of early onset disease in a first-degree relative is
 3   considered a risk factor.
 4        Q.     Okay.  Well, I don't want to quibble
 5   about the parameters of family history.  But my -- my
 6   understanding -- tell me if you disagree -- is that
 7   there are -- there's kind of a continuum of
 8   significance of family history; it's not just early
 9   in a first-degree relatives.  It may -- it may be
10   that the family history is more or less significant
11   depending upon how many relatives have been affected,
12   depending upon the severity of the effect, depending
13   upon -- I don't know -- a variety of other things
14   that might go into play.
15        A.     Family history is an independent risk
16   factor, but it's mediated much through the risk
17   factors themselves.  And disentangling how much of it
18   is the genetic component versus the environmental
19   component or other risk factor components has not
20   been well worked out in cardiovascular disease.
21        Q.     Let me go back, then, to my original
22   question, which is that just because somebody doesn't
                        Page 35

arnett 20060906.txt

```
23    have a family history of cardiovascular disease that
24    they know of, doesn't mean that they are free of any
25    genetic predisposition for cardiovascular disease?
```

page 81
```
 1        A.       I would agree with that.
 2        Q.       Much of your work, if I understand
 3    correctly, has related to arterial function and the
 4    role of genetics; is that right?
 5        A.       No.
 6        Q.       Okay.  I see that you've done research on
 7    physical activity and other behavioral aspects of
 8    cardiovascular disease; is that correct?
 9        A.       That's correct.
10        Q.       And have you done that research -- do you
11    hold an opinion as to whether sedentary lifestyle or
12    lack of physical activity is an independent risk
13    factor for cardiovascular disease?
14        A.       I would agree with that.
15        Q.       You did a study on TV watching and
16    cardiovascular disease?
17        A.       As part of the family heart study, I did.
18        Q.       And tell me about that a little bit.
19        A.       In the family heart study, where I served
20    as principal investigator for the Minneapolis Field
21    Center, we quantified within families the number of
22    hours spent watching television.  And it's shown to
23    be a good marker of physical inactivity.  The more --
24    and it's common sense -- the more television you
25    watch, the less active you are.
```

page 82
```
 1        Q.       And when you talk about "good marker,"
 2    what you're saying is, it's not that TV, per se,
 3    causes heart disease, but it tells you how much
 4    people get up and move around.  And failing to get up
 5    and move around causes heart disease?
 6        A.       Correct.
 7        Q.       Doctor, have you had any role, direct or
 8    indirect, in the Cardia study?
 9        A.       Indirectly, I -- first of all, they're
10    here in Birmingham.  The Corning Center is here.  I
11    have -- I had an ancillary study when I first started
12    my work as a cardiovascular epidemiologist in 1994.
13    My first grant from the University of Minnesota was
14    to do genotyping within the Cardia study for
15    angiotensin-converting enzyme gene.
16        Q.       Are -- you're not trained as a
17    geneticist?
18        A.       I am not.
19        Q.       What type of genotyping do you do?
20        A.       I do no genotyping.  I outsource my
21    genotyping to geneticists.
22        Q.       Okay.  So when you say you were asked to
23    do genotyping, what did that mean?
24        A.       I got a grant to pay for the genotyping
25    to be conducted in the Cardia cohort in cases in
```

page 83
```
 1    controls, I believe, with LVH.
 2        Q.       Am I right, Cardia is a very large
 3    epidemiologic study that, as you say, is out of UAB?
 4        A.       The coordinating center is out of UAB,
```
Page 36

arnett 20060906.txt
```
 5    and one of the five clinical centers is out of UAB.
 6    It's a large study, five field centers, in existence
 7    now, I think, for 20 years.
 8         Q.     And it's a long term -- it follows
 9    patients long term and looks at risk factors for
10    developing -- development of cardiovascular disease?
11         A.     Correct.
12         Q.     And it looks at a whole host of different
13    risk factors, correct?
14         A.     Correct.
15         Q.     And those would be both the traditional
16    risk factors and various lifestyle risk factors that
17    we're learning more about?
18         A.     That's correct.
19         Q.     Among other things, it tracks patients'
20    blood pressure; is that correct?
21         A.     Correct.
22         Q.     And it looks at the effect of high blood
23    pressure, borderline blood pressure, and hypertension
24    over time?
25         A.     Correct.

page 84
 1    Q.     And there are a bunch of publications
 2    that have come out of Cardia; is that right?
 3         A.     That's correct.
 4         Q.     And is that work that you've relied on or
 5    referenced in your work as an epidemiologist?
 6         A.     Yes.
 7         Q.     Doctor, what role or roles have you
 8    played, if any, in relation to the FDA?
 9         A.     You'll see on my CV that I was listed as
10    a special government employee, and that happened
11    actually when I was working as a clinical research
12    nurse.  And I was going to participate in a
13    collaborative study with the FDA.  I can't even
14    remember what it was for at this point.  That was the
15    1980s.  But they've never taken it off my CV, so I've
16    listed it.  I was asked to serve on a review panel
17    for them for biostatistics but declined because I was
18    too busy at the time.  I had a conflict for timing,
19    not because I didn't want to help the FDA.
20         Q.     Have you ever consulted for the FDA in
21    any capacities since the work you just described?
22         A.     No.  And I never formally entered a
23    consulting relationship with them.
24         Q.     Fair enough.  Have you ever testified in
25    front of the FDA?  I think the answer is going to be,

page 85
 1    no, you never testified before today.
 2         A.     That's correct.
 3         Q.     Okay.  Have you ever been called upon to
 4    give any advice to the FDA in any way?
 5         A.     Well, as I said, I was asked to serve as
 6    a biostatistical review for something in the
 7    mid-1990s, and I had a conflict with that.  I have no
 8    memory of what it was for.
 9         Q.     But you didn't actually do it?
10         A.     I didn't do it.
11         Q.     And I assume that you've also never done
12    any work with regard to the approval of a
13    pharmaceutical -- of a prescription pharmaceutical?
```
                              Page 37

arnett 20060906.txt

```
14      A.      That is correct.
15      Q.      You've never done any work related to the
16  labeling of a prescription pharmaceutical?
17      A.      That's correct.
18      Q.      You've never done any work related to the
19  advertisement or the promotion of a prescription
20  pharmaceutical?
21      A.      That's correct.
22      Q.      Your re -- if I haven't missed anything, I
23  don't -- I don't think I've seen -- I apologize if
24  I've missed something -- any of your publications
25  that actually deal with a prescription
```

page 86
```
 1  pharmaceutical; is that right?
 2      A.      They're -- that's incorrect.
 3      Q.      Well, sorry.  I guess you've looked at
 4  the efficacy of certain medications; is that correct?
 5      A.      There -- I looked -- in the GenHAT study,
 6  I had a publication this year in Circulation looking
 7  at the ACE gene in response to four drugs that are
 8  approved marketed drugs.
 9      Q.      Okay.  I'll modify the question a little
10  bit.
11              You've never done any research related to
12  a prescription pharmaceutical prior to it being
13  approved by the FDA?
14      A.      When I worked with a -- as a nurse, a
15  research nurse, I was working with Phase III
16  studies.  But I was a nurse.  I was not leading the
17  investigation at that point.
18      Q.      Did you --
19      A.      In my professional work since I graduated
20  in '92, I have not done any work of that nature.
21      Q.      And you haven't done any research on
22  approved medications for the purposes of getting them
23  further approved for new or different indications; is
24  that correct?
25      A.      That's correct.
```

page 87
```
 1      Q.      And you haven't done any research for the
 2  purpose of testing the safety of any medications,
 3  either pre-approval or post-approval; is that
 4  correct?
 5      A.      That's correct.
 6      Q.      Have you done any research work that you
 7  would consider to be research into the cardiovascular
 8  risks of a particular medication?
 9      A.      Yes.
10      Q.      Okay.
11      A.      My GenHAT study, in particular, is
12  related to genetic modifiers of drug efficacy, which
13  some could argue the alternative of efficacy is
14  adverse effects.
15      Q.      Just tell me a little more specifically
16  what that work was, what the --
17      A.      In the ALLHAT trial, we have examined 43
18  different genetic variants and evaluated the response
19  to 3 or 4, depending on whether we include doxazosin
20  or not in our comparison, the effect of these genes
21  on response to those drugs.  And by "response,"
22  specifically I mean the risk of coronary heart
```
                                Page 38

arnett 20060906.txt
```
23    disease, fatal or nonfatal, MI and other
24    cardiovascular thrombotic events.
25         Q.    So you looked at three or four drugs that

page 88
 1    were meant to provide therapeutic benefit to patients
 2    with cardiovascular disease?
 3         A.    Specifically hypertension.
 4         Q.    They were supposed to lower blood
 5    pressure?
 6         A.    Right.
 7         Q.    And you -- your research was to see if
 8    there were -- if any one or more of 43 different
 9    genetic variants affected whether people had a good
10    response to those medications?
11         A.    Or an adverse response.
12         Q.    Was the adverse response one of the
13    prespecified end points of the study?
14         A.    Yes.
15         Q.    Where would I find those results
16    published?
17         A.    The ACE insertion/deletion variant is in
18    Circulation. The adducent variant is in Nature
19    Pharmacogenomics. The Beta-2 agonist receptor
20    variants are being reviewed by American Journal of
21    Hypertension. There's one -- two other draft papers
22    that are in review by the ALLHAT steering committee.
23    And the rest are in -- in the process of publication.
24         Q.    How -- how many else are there? How many
25    others are there?

page 89
 1         A.    There will be -- I'm working on a large
 2    summary paper to put everything into one paper.
 3         Q.    That's not uncommon, I gather, that a big
 4    study will generate a lot of little papers --
 5         A.    Right.
 6         Q.    -- and then somebody does a comprehensive
 7    paper? It's all part of one study, correct?
 8         A.    Correct.
 9         Q.    Are any of these papers identified by
10    number on your CV?
11         A.    Yes. But that was 2005, I believe, and
12    these papers have come out in 2006. So in the
13    updated CV, they should be present.
14         Q.    Okay. When we get the updated CV, I'm
15    going to ask you to remind me -- show me the numbers
16    because that will help me out a lot later.
17               Were there specific adverse end points
18    that you had designated in those studies?
19         A.    Our primary outcome was fatal and
20    nonfatal CHD. We had combined end points with stroke
21    and heart failure and angina, hospitalized angina.
22    And we've evaluated them both as combined end points
23    and separately.
24         Q.    Now, in those studies, when you say that
25    you were looking at adverse effects, you were looking

page 90
 1    at situations where people had adverse effects
 2    because the drug didn't do what it was supposed to
 3    do, correct?
 4         A.    Could you restate that?
                                    Page 39
```

arnett 20060906.txt

```
 5        Q.      Sure.
 6        A.      I didn't understand exactly what you're
 7   asking.
 8        Q.      Sure.  The adverse effects that were part
 9   of the study design were adverse effects that
10   resulted from the drugs not having their intended
11   efficacy; is that correct?
12        A.      That is correct.
13        Q.      You didn't have, as a prespecified end
14   point, looking at any adverse effects that were not
15   related to an efficacy failure of those drugs?
16        A.      That is correct.
17        Q.      And was there any kind of a combined end
18   point used to look at adverse effects for those
19   studies, like APTC or --
20        A.      There was a combined end point, not like
21   APTC, that combined nonfatal and fatal CHD, nonfatal
22   and fatal stroke, unstable angina.  And I believe
23   that was the combined cardio -- PTCA or CABG, bypass
24   surgery revascularization procedures.
25        Q.      Okay.  So just to make sure I have a

page 91
 1   general correct impression of things, what you were
 2   basically doing is saying, if we give patients Drug
 3   A, will they have a reduced incidence of heart
 4   failure, reduced incidence of needing CABG surgery,
 5   et cetera, for example, correct?  And conversely, if
 6   I -- will they have an increased incidence of these
 7   things if the drug doesn't work for some reason?
 8        A.      That is not the purpose of my study.
 9        Q.      Okay.  Then correct -- tell me where I
10   went wrong.
11        A.      My study was looking at genetic modifiers
12   of that stated relationship.
13        Q.      So it was looking to see if there was a
14   genetic reason why somebody might have a better
15   outcome taking a drug or might have a worse outcome
16   taking a drug?
17        A.      Correct.
18        Q.      Because the drug either worked better for
19   them or worked less well for them than somebody else
20   who had a different genetic profile?
21        A.      Right.
22        Q.      Any other studies that you can point me
23   to where you would say that you looked at potential
24   adverse effects of a medication?
25        A.      I have one study funded by the National

page 92
 1   Institutes of Health we've named Golden.  It's the
 2   pharmacogenomics of lipid-lowering response to
 3   fenofibrate.
 4        Q.      And is that the same kind of thing where
 5   you were looking at genetic reasons why somebody
 6   might have a good effect with fenofibrate or a poor
 7   effect with fenofibrate?
 8        A.      That is correct.  In --
 9        Q.      I didn't mean to cut you off.  Go on.
10        A.      In that study, we have collected a lycrid
11   [phonetic] scale index of the severity of GI adverse
12   effects, and we'll be looking for genes that predict
13   those adverse effects.
```

Page 40

arnett 20060906.txt

14      Q.      Is fenofibrate correlated with GI adverse
15  effects?
16      A.      It -- adverse effects are a side effect
17  of ingestion of the drug in some people.
18      Q.      So in this situation, you weren't looking
19  to see whether certain people are genetically
20  predisposed to have more GI effects with fenofibrate;
21  is that right?
22      A.      That is a subbing.
23      Q.      It is a subbing.  It's a secondary or
24  third-level end point of the study?
25      A.      A third-level end point.

page 93
 1      Q.      Any other study where you -- and I'm
 2  sorry.  Is that listed on your CV?
 3      A.      It is.
 4      Q.      Can you tell me where?  I think you still
 5  have a copy, but I can give you an extra if you need
 6  it.
 7      A.      It is on page three, "Genetic and
 8  Environmental Determinants of Triglycerides."  It's
 9  the fourth grant listed on that page.
10      Q.      Is there a published paper that came out
11  of this work?
12      A.      Not yet.  We still are getting our
13  genotyping completed.
14      Q.      Any other work you've done looking at
15  adverse effects of a prescription medication?
16      A.      No.
17      Q.      Have you ever, before doing work in
18  Vioxx, been asked to offer an opinion whether a
19  particular medication was cardiotoxic, to use your
20  term, or cause other adverse effects to the heart?
21      A.      To the heart, no.
22      Q.      Is there -- you repeated back "to the
23  heart."  Is there something a little bit related to
24  that that -- where you -- where the answer would be
25  yes?

page 94
 1      A.      If you recall, when we first started the
 2  deposition, I said I'd worked for the Kay Schuler
 3  firm in a PPA litigation related to hemorrhagic
 4  stroke for Novartis, I believe, was the company.  So
 5  I was asked to provide expert opinions about the role
 6  of PPA on hemorrhagic stroke.
 7      Q.      Okay.  Anything else?
 8      A.      No.
 9      Q.      Did you at any point have any contact
10  with anyone from Merck related to Vioxx or any COX-2
11  issues?
12      A.      I did.
13      Q.      And tell me about that.
14      A.      I signed a confidentiality agreement with
15  Merck that extends seven years, so I can't discuss
16  that.
17      Q.      Are you able to discuss anything -- have
18  you discussed anything related to your work with
19  Merck with any lawyers for the plaintiffs?
20      A.      No.
21      Q.      And without getting into substance, have
22  you described for them how much work has been done,

Page 41

arnett 20060906.txt
```
23  how little work has been done, who you had contact
24  with, when the work was done, anything like that?
25      A.      I discussed the dates of the work, and
```

page 95
```
 1  that's it.
 2      Q.      Have you discussed in any way the nature
 3  of the work?
 4      A.      No.
 5      Q.      And did any of that work go into the
 6  opinions you formed in this case?
 7      A.      Absolutely not.
 8      Q.      Are there individuals at Merck who you
 9  had contact with who you've identified to the
10  plaintiffs' lawyers or who you would identify if
11  called to testify at trial in this case?
12      A.      I don't know how much -- in fairness to
13  Merck, I signed a confidentiality agreement, so
14  anything and the people I met there, I don't know
15  what fits under that confidentiality agreement, so I
16  told nothing to no one.
17      Q.      Okay.  And sitting here today, it is not
18  your intention to give any testimony along the lines
19  of, I was told something by such and such person at
20  Merck?
21      A.      I relied solely on the published
22  literature and the FDA documents and the documents
23  that you have copies of.
24      Q.      Are you going to offer any criticisms
25  based -- of Merck based upon your interactions with
```

page 96
```
 1  the company or any individuals at the company?
 2      A.      No.
 3      Q.      Are you going to offer any opinions that
 4  you feel that Merck did or did not comport itself in
 5  an appropriate scientific manner based upon your
 6  interactions with people at Merck?
 7      A.      Nothing based on my interactions with
 8  people.
 9      Q.      Or your general -- your consulting work?
10      A.      Or my consulting work.
11          MR. GARRISON:  You're talking about with
12  Merck?
13          MS. FRIEWALD:  With Merck.
14          MR. GARRISON:  Okay.
15  BY MS. FRIEWALD:
16      Q.      Are you going to offer any opinions that
17  there was any information that was not provided to
18  you that should have been provided to you?
19      A.      Could you -- I don't understand that
20  question.
21      Q.      Are you going to -- are you going to
22  speak about or offer any statements that there was an
23  -- that there were any materials that you should have
24  received in the course of your consulting work for
25  Merck that you did not receive?
```

page 97
```
 1      A.      No.
 2      Q.      Is there anybody, without identifying
 3  names, from Merck who you've had an ongoing
 4  relationship with since your consultancy ended?
```
                         Page 42

arnett 20060906.txt

```
 5      A.     No.
 6      Q.     Is there anybody who you -- who you
 7  met who was not an employee of Merck in connection
 8  with any work you did for Merck?  For example, did
 9  you meet any other outside experts?
10      A.     Yes.
11      Q.     And have you had any discussions with
12  those outside experts related to Vioxx or COX-2s that
13  you intend to include in your testimony at trial?
14      A.     No.
15      Q.     Do you have any ongoing -- have you had
16  any conversations with any of those experts about
17  Vioxx or COX-2s since your consulting work ended?
18      A.     I've had no conversations, period, with
19  them.
20      Q.     Are there any documents that you received
21  that you still have?
22      A.     No, with the exception of my
23  confidentiality agreement.
24      Q.     Were -- were there documents you were
25  given?
```

page 98
```
 1      A.     Yes.
 2      Q.     What did you do with those documents?
 3      A.     I threw them away.
 4      Q.     A long time ago?
 5      A.     A long time ago.
 6      Q.     When I looked at your copy of the Arnett
 7  materials that had all your little NAs next to it, it
 8  seemed to me that what you had not looked at were any
 9  of the animal studies; is that correct?
10      A.     Correct.
11      Q.     And that's because you consider that
12  outside your area of expertise?
13      A.     I'm an epidemiologist.  I work with
14  humans.
15      Q.     And it looked like you didn't look at any
16  of the basic pharmacology research; is that correct
17  also?
18      A.     That's correct.  I'm speaking here solely
19  as an epidemiologist.
20      Q.     You don't intend to offer any opinion as
21  to mechanism of action?
22      A.     Correct, I do not.
23      Q.     And if asked, you would not say that you
24  hold an opinion to a reasonable degree of medical
25  certainty as to the mechanism of action?
```

page 99
```
 1      A.     I'm here to speak about epidemiology.  I
 2  understand the general concept, but I am not an
 3  expert in terms of cardiology.
 4      Q.     You understand the different potential
 5  mechanisms of action have been proposed as the
 6  potential causes of alleged cardiovascular adverse
 7  events caused by Vioxx and other COX-2 inhibitors,
 8  correct?
 9      A.     I'm generally aware of mechanisms.
10      Q.     But you don't intend to offer an opinion
11  that -- that scientists have concluded what the
12  mechanism is or that you have concluded what the
13  mechanism is; is that right?
```

Page 43

arnett 20060906.txt

14      A.      That is correct.
15      Q.      Do you agree that there continues to be
16 scientific debate as to whether different proposed
17 mechanisms of action, in fact, play a role in any
18 potential adverse effects caused by Vioxx or other
19 COX-2 inhibitors?
20      A.      I don't have expertise to answer that
21 question.
22      Q.      I also did not see in any of the
23 materials you've given me any package labels for
24 Vioxx or any other COX-2 inhibitors.  I didn't miss
25 anything, did I?

page 100
 1      A.       You didn't.
 2      Q.       And I gather you haven't reviewed any of
 3 the package labels, correct?
 4      A.       That is correct.  I'm an epidemiologist.
 5      Q.       So you're not going to offer any opinion
 6 as to the appropriateness of any particular warning
 7 that was included or not included in the package
 8 label at a given time?
 9      A.       I will restrict my opinions to
10 epidemiology and the science involved in
11 epidemiology.
12      Q.       One of the three opinions that you told
13 me that you were going to give I wrote down as being
14 after the results of VIGOR were released, it was
15 reasonable to warn future patients.  Is that a
16 reasonable paraphrasing of what you said your opinion
17 would be?
18      A.      It is.
19      Q.       And what I want to know is, are you going
20 to testify that there was some particular warning
21 that should have been provided after the results of
22 VIGOR?
23      A.       As a scientist, I will argue that in the
24 scientific literature, there should have been a
25 clearer description of the findings and articulated

page 101
 1 in the medical literature.
 2      Q.       And what -- do you have some specific
 3 proposal of what that clearer articulation of the
 4 findings should have been?
 5      A.       I have not been asked to design the
 6 study, but, in general, the publications could have
 7 been explicit about the cardiovascular -- excess
 8 cardiovascular risk of Vioxx, and they were not.
 9      Q.       When you say "the publications could have
10 been explicit," what publications are you referring
11 to?
12      A.       I'm specifically referring to the VIGOR
13 publication by Bombardier published in November of
14 2000.  Actually, the results were out much earlier,
15 before the publication.
16      Q.      You have not looked, I gather, at the
17 Vioxx VIGOR label?
18      A.      I have not.
19      Q.       Are there any other publications or
20 communications that you're going to testify should
21 have been more explicit?
22      A.       There are publications that did not come
                        Page 44

arnett 20060906.txt
```
23   out that could have been published sooner relative to
24   the advantage study.
25       Q.     What are they?
```

page 102
```
□ 1       A.      So the advantage results were not
 2   published until July of '05.  Whereas, the study
 3   did -- was completed around the time of VIGOR.
 4       Q.      Just so the record is clear, when you
 5   were answering your questions, you were looking at
 6   some index cards?
 7       A.     Yes.
 8       Q.      And those were index cards that were in
 9   your binder, Arnett 4; correct?
10       A.     Correct.
11       Q.      And they reflect your notes on several of
12   the clinical trials; is that right?
13       A.      Specifically VIGOR Advantage -- do you
14   want me to list them all?
15       Q.     Sure.  That's helpful.
16       A.     Okay.  VIGOR, ADVANTAGE, APPROVe, the
17   false Alzheimer's disease study, and Konstam
18   meta-analysis.
19       Q.      And are you going to offer an opinion
20   that there were any conclusions that -- strike that.
21           You mentioned something about doing
22   further studies after VIGOR.  And what were you
23   alluding to?
24       A.     Can I strike that?
25           Actually, it's the totality of data at
```

page 103
```
□ 1   the point when VIGOR became -- the results became
 2   known that I'm drawing my opinion about the timing.
 3   So it's not simply the VIGOR and ADVANTAGE studies
 4   alone.  It's the compelling evidence of the
 5   cardiovascular risk associated with the drug from its
 6   inception.
 7       Q.      And what -- what are you putting on your
 8   list of the compelling evidence?
 9       A.      So I would start with the 010 and 017
10   studies in OA and RA that show dramatic increases in
11   blood pressure.  I would include the 023 study, which
12   confirmed the mechanism of action that reduced
13   prostacyclin with Vioxx, which tended to tip in the
14   balance towards prothrombotic states.  And I would
15   offer the patent applications of Dr. Scolnick to
16   create a combined product and the rational for that
17   combination product being increased cardiovascular
18   risk associated with unopposed COX-2 inhibition.
19       Q.     Anything else?
20       A.     No.
21       Q.      Between when you did whatever consultancy
22   work you did for Merck and when you were first
23   contacted for this litigation, did you do any
24   independent research into COX-2s or Vioxx
25   specifically or nonselected NSAIDs?
```

page 104
```
□ 1       A.     I did not.
 2       Q.      And in the course of any work you did for
 3   Merck, did you do any independent research on Vioxx
 4   or COX-2s, Google searches or reviews of the
```
Page 45

arnett 20060906.txt

```
 5   literature independently?
 6        A.      I did.
 7        Q.      But you did not keep those materials?
 8        A.      I did not.
 9        Q.      Is there a way, without violating what
10   you understand to be your confidentiality agreement,
11   that you could just describe for me generally what
12   you looked into?
13        A.      Honestly, I can't remember.
14        Q.      Did you do a search of the published
15   literature?
16        A.      Yes.
17        Q.      Did you do a search of the FDA web site?
18        A.      Yes.
19        Q.      Did you do a search of whether there had
20   been any symposia of -- you know, sponsored, for
21   example, by the American Heart Association or any
22   other respected organization?
23        A.      No.
24        Q.      Any other areas that you might have
25   looked into?
```

page 105
```
 1        A.      No.
 2        Q.      Can you give me any sense of how much
 3   literature you gathered on your own?
 4        A.      The major publications at that time for
 5   clinical trials.
 6        Q.      And did you look at -- did you limit
 7   yourself to just Vioxx, or did you look at research
 8   on selected and nonselected NSAIDs as well?
 9        A.      Restricted to Vioxx.
10        Q.      Did you look at any of the popular press
11   with regard to Vioxx at that time?
12        A.      No.
13        Q.      Did you review Dr. Topol's JAMA paper
14   from 2001 at that time?
15        A.      No.
16        Q.      Did you read that at or about the time it
17   was published in 2001?
18        A.      I did not.
19        Q.      Do you regularly read JAMA?
20        A.      No.
21        Q.      Do you regularly read New England Journal
22   of Medicine?
23        A.      In -- I read articles that are pertinent
24   to my areas of research, but I don't browse it every
25   week when it comes out.
```

page 106
```
 1        Q.      Do you subscribe to it?
 2        A.      No.
 3        Q.      Do you subscribe to Lancet?
 4        A.      I do not.
 5        Q.      Do you read it regularly?
 6        A.      I read articles relative to my field of
 7   expertise because we have online access at UAB to
 8   all -- all of the journals mentioned, so I try to
 9   conserve paper as much as I can.
10        Q.      Would the answer be the same for Annals
11   of Internal Medicine?
12        A.      Yes.
13        Q.      Are there any -- I gather there are no
```

Page 46

arnett 20060906.txt
```
14  pharmacology journals that you regularly review?
15        A.    Correct.
16        Q.    Is the -- is the UAB chairmanship
17  position a permanent position, or does that rotate?
18        A.    It's a permanent position.  I was
19  recruited here to build the department and given 12
20  new positions.
21        Q.    Is there a department of
22  pharmacoepidemiology at UAB?
23        A.    There is not.
24        Q.    Is there a subgroup of
25  pharmacoepidemiologists?

page 107
  1        A.    There is.
  2        Q.    And you do not count yourself among that
  3  group?
  4        A.    I attend meetings with them when I have
  5  time.
  6        Q.    How many people are in that group?
  7        A.    So there's Mary Bell Sellas, and she's in
  8  preventative medicine; and Elizabeth Docell, who's on
  9  my faculty; Ken Sagg, who's in rheumatology.  And
 10  there are several junior faculty that I would know by
 11  face, but not by name.
 12        Q.    And are those all people who are
 13  specifically trained in pharmacoepidemiology?
 14        A.    The only one specifically trained in
 15  pharmacoepidemiology is Mary Bell Sellas.
 16        Q.    But the others have made that their area
 17  of academic interest?
 18        A.    Yes.
 19        Q.    I gather not being a doctor, you have
 20  never diagnosed a patient; is that correct?
 21        A.    That's correct.
 22        Q.    And you've never been called upon to
 23  determine the potential cause of an adverse
 24  cardiovascular effect in a particular patient?
 25        A.    If we go back to the PPA litigation, I

page 108
  1  reviewed case report forms within that PPA litigation
  2  for that case control study that was done on PPA and
  3  hemorrhagic stroke.  And I don't know --
  4        Q.    Were you part --
  5        A.    -- where that fits.
  6        Q.    Did you do some work on the hemorrhagic
  7  stroke project, or you're talking about litigation
  8  work?
  9        A.    Litigation work.
 10        Q.    And you -- did you review plaintiff forms
 11  in the litigation, or did you review actual study
 12  participant forms from the hemorrhagic stroke
 13  project?
 14        A.    I reviewed the study participation
 15  forms.  I was working for the defense side.
 16        Q.    Okay.  From the hemorrhagic stroke
 17  project?
 18        A.    Uh-huh.
 19        Q.    And -- and that was for the purpose of
 20  assessing whether events were accurately classified,
 21  or was -- was it for the purpose of trying to class
 22  determine causation in someone?
```
Page 47

arnett 20060906.txt

23       A.      Actually, it was to determine whether or
24  not exposure was correctly classified.  I was not
25  offering an opinion about the correct classification

page 109
 1   of a hemorrhagic stroke because I'm not a medical
 2  doctor.
 3       Q.      And you weren't offering your opinion as
 4  to causation either, correct?
 5       A.      Correct.
 6       Q.      When was the first time you heard about
 7  COX-1 and COX-2?
 8       A.      Well, there was -- after the VIGOR
 9  publication.  After the VIGOR publication, I heard
10  about the concern about elevated risk.
11       Q.      Did you read VIGOR at or about the time
12  it was published?
13       A.      No.  I didn't read it until -- I don't
14  remember when I first read it.
15       Q.      You say you heard about elevated risk.
16  Were there discussions among your colleagues?
17       A.      You know, I'm on the American Heart
18  Association -- several national committees, and I --
19  it was part of one of those committee meetings.  But
20  it wasn't a particular agenda item.  It was hearing
21  people in the hallway.
22       Q.      It was something that had gotten a fair
23  amount of attention in the academic and medical
24  community?
25       A.      Right.

page 110
 1       Q.      So people were talking about VIGOR?
 2       A.      (Nods head.)
 3       Q.      Yes?
 4       A.      Yes.
 5       Q.      Sorry.  You have to say yes for the
 6  record.
 7       A.      Yes.
 8       Q.      So it was a the kind of thing that just
 9  being at conferences, you heard other doctors
10  debating what VIGOR might mean, what the significance
11  might mean from a cardiovascular standpoint; is that
12  right?
13       A.      That's right.
14       Q.      And that was a debate that went on for
15  some time after VIGOR was published, correct?
16       A.      Correct.
17       Q.      The -- I've asked you a lot about
18  prescription drugs.  I'm assuming you haven't done
19  any particular research into any over-the-counter
20  agents, have you?
21       A.      I have a publication as -- as part of the
22  Minnesota heart survey wherein we quantified the
23  prevalence of OTC use in the twin cities' population.
24       Q.      OTC use of what?
25       A.      All OTC use.  Our publication is specific

page 111
 1   to cardiovascular prevention, but that is the only
 2  research I've done.  I've worked with a
 3  pharmacoepidemiologist there to develop the forms and
 4  oversaw the conduct of the collection.

                          Page 48

arnett 20060906.txt

```
 5      Q.      Other than classifying the level of use
 6  of different OTC agents, did you try to do something
 7  with the data in terms of teasing out how that
 8  corresponded with risks or benefits?
 9      A.      We specifically looked at self-reported
10  ingestion of OTCs for cardiovascular prevention and
11  contrasted it to the actual data collection done in
12  the home for all of the OTCs that were reported to be
13  used by participants.
14      Q.      Did you draw any conclusions about how an
15  -- use of any OTC or group of OTCs affected
16  cardiovascular health?
17      A.      We didn't evaluate the exam -- or examine
18  the association between reported use and
19  cardiovascular risk.  Rather, we quantified the
20  prevalence of use.
21      Q.      And did you correlate it in any way with
22  any cardiovascular outcomes?
23      A.      No.  This was a cross-sectional study.
24      Q.      Is that in your CV somewhere?
25      A.      It should be in my updated CV.
```

page 112
```
□ 1      Q.      Now, I gather, in addition to -- you're
 2  not -- you're not a pharmacologist, you're not a
 3  biologist, correct?
 4      A.      Correct.
 5      Q.      You don't consider yourself an expert in
 6  prostaglandins, correct?
 7      A.      Correct.
 8      Q.      You don't consider yourself an expert in
 9  endothelial function, correct?
10      A.      Correct.
11      Q.      And you're not -- you're not a
12  statistician?
13      A.      Correct.
14      Q.      You've never written anything about
15  COX-2s; is that correct?
16      A.      Correct.
17      Q.      Or NSAIDs generally?
18      A.      Correct.
19      Q.      There's no pending research that you're
20  doing related to COX-2s or NSAIDs generally; is that
21  correct?
22      A.      That is correct.
23      Q.      You don't consider yourself an expert on
24  the mechanism of atherogenesis; is that right?
25      A.      That's correct.
```

page 113
```
□ 1      Q.      Or the mechanism of plaque rupture?
 2      A.      Correct.
 3      Q.      And at the risk of asking the obvious,
 4  you're not a rheumatologist or a GI doctor?
 5      A.      Correct.
 6      Q.      Okay.  You've never been asked to design
 7  any clinical trial of a prescription pharmaceutical;
 8  is that right?
 9      A.      I designed my own.  So I -- I've not been
10  asked to, but I designed my own.
11      Q.      These are the -- I'm talking about a --
12  these are the observational studies that we've talked
13  about?
```

arnett 20060906.txt

14      A.      The -- the trial I outlined to you, the
15  genetic environmental determinates of triglycerides
16  was a clinical trial with fenofibrates that I
17  designed and executed.
18      Q.      Anything else?
19      A.      I participated in the design of one that
20  was not funded by NIH.
21      Q.      That was the one where the grant wasn't
22  approved?
23      A.      Yes, correct.
24      Q.      What was it?
25      A.      It was a salt trial.  So it was a

page 114
1   behavioral trial with salt ingestion.
2       Q.      That was going to be an observational
3   study, correct?
4       A.      Well, it was an interventional study,
5   where we would intervene with salt, where we remove
6   the salt.  So the mechanisms, the methodology is the
7   same.
8       Q.      You were going to put people in some kind
9   of controlled environment where you limited their
10  salt intake?
11      A.      And then ramped up their salt intake and
12  look at their blood pressure.
13      Q.      Salt is known to be a cause of
14  hypertension?
15      A.      In some people, in some people.
16      Q.      Do you believe that there's a genetic
17  response to salt?
18      A.      There have been some studies that
19  indicate genetic variation in the angiotensinogen
20  gene, and the angiotensinogen gene may be responsible
21  for blood pressure results from salt intake.
22      Q.      As of today, you've -- am I right, since
23  the fenofibrate study isn't published yet, you've
24  never published the results from any placebo
25  controlled clinical trial?

page 115
1       A.      That is not true.  In my -- when I was a
2   research nurse, I designed an LVC study that was --
3   I'm sorry -- left ventricular hypertrophy study that
4   was ancillary to a Phase III trial.  I think it was
5   pentopril was the drug.  I designed the ancillary
6   part.  I didn't design the study itself.
7       Q.      But you weren't an author on that study?
8       A.      Yes, I was -- I was an author.
9       Q.      And you were a nurse at that time?
10      A.      I was.
11      Q.      Is that study on your CV?
12      A.      Yes.
13      Q.      Can you tell me which one that is?
14      A.      Actually, there's several during that
15  period.  That's when I first knew I wanted to be an
16  epidemiologist.  There's Publication Number Two.
17  Publication Number Three is the one I designed and
18  executed.  Publication Number Four --
19      Q.      You were -- am I saying it right -- Koehn
20  at that time?
21      A.      Uh-huh.
22      Q.      Did I say it right?

Page 50

arnett 20060906.txt
```
23      A.      Koehn
24      Q.      Okay.  I'm sorry.  Two, three, and four?
25      A.      Yes.

page 116
□ 1      Q.      Is there anything since 1989 where you
 2  have published the results of a placebo-controlled
 3  clinical trial?
 4      A.      No.
 5      Q.      What was your specific role in those
 6  trials where you -- where you were working as a
 7  nurse?
 8      A.      In one of them, I designed the ancillary
 9  study to conduct echocardiography in -- in our field
10  center and published those results.  The others, I --
11  I authored -- wrote sections of the article.  I, of
12  course, conducted the study as a research nurse.
13      Q.      Am I right in gathering that you are not
14  going to offer any opinions as to the design of any
15  of the studies that were conducted by Merck?
16      A.      That is not true.
17      Q.      Okay.  Tell me what opinions you intend
18  to offer regarding the design of any studies by
19  Merck.
20      A.      I will offer the opinion today that the
21  studies, particularly the studies in osteoarthritis
22  and Alzheimer's disease, were underpowered to detect
23  cardiovascular types of CD.
24      Q.      Alzheimer's and what else did you say?
25      A.      The OA, 069.

page 117
□ 1      Q.      Anything else?
 2      A.      Not to my knowledge, but I -- there may
 3  be something that comes to mind.
 4      Q.      Okay.  Well, if it does, you'll let me
 5  know.
 6              You've never been involved in the process
 7  of putting together or submitting an NDA; is that
 8  correct?
 9      A.      That's correct.
10      Q.      And you're not going to offer any
11  opinions as to the Merck NDAs for Vioxx; is that
12  right?
13      A.      I'm not sure.
14      Q.      You're not going to offer any opinions
15  that Merck failed to meet any standards with regard
16  to the NDA submissions, correct?
17      A.      I will offer opinions regarding
18  Villalba's memos with respect to the cardiovascular
19  safety profile.
20      Q.      So you've reviewed information that was
21  had by the FDA and that the FDA analyzed, correct?
22      A.      Correct.
23      Q.      And what opinions with regard to
24  Villalba's memos do you intend to give?
25      A.      That the FDA expressed concerns that the

page 118
□ 1  studies -- first, that there was a cardiovascular
 2  risk and that there needed to be additional research
 3  done to define those risks with placebo-controlled
 4  studies; that the Naprosyn hypothesis was not a
                          Page 51
```

arnett 20060906.txt

```
 5   salient explanation for the VIGOR finding; and that
 6   there was inadequate power to detect cardiovascular
 7   effects in the Alzheimer's disease and the OA
 8   studies.
 9            And there may be others.  I've read a lot
10   of material, and if I look through my notes, my
11   pages, I may find more.  But those are the ones that
12   come to mind.
13        Q.     Okay.  You're certainly not an expert in
14   how many patients need to be studied or for how long
15   before a drug is approved, correct?
16        A.     Oh, that's not correct.  As an
17   epidemiologist who designs studies, I regularly do
18   sample size estimates and power calculations.
19        Q.     My question was more specifically with
20   regard to the regulatory requirements.  You're not an
21   expert in what the regulatory requirements are for
22   approval of a drug in terms of how many patients
23   should be studied or how long?
24        A.     In general, I would say that's true.
25        Q.     And are you aware of the fact that, in
```

page 119
```
01   terms of the number of patients studied, Merck
 2   exceeded the regulatory requirements?
 3        A.     I can't offer an opinion about that.
 4   Because it -- they had a different objective, which
 5   was a GI objective and efficacy for OA.  So in terms
 6   of cardiovascular risk, I would say they didn't do an
 7   adequate job.
 8        Q.     I'm not asking whether you have a
 9   personal belief about whether they did an adequate
10   job or not.  My question is, you -- you're not an
11   expert in what the regulatory obligations were to
12   test safety and efficacy for Vioxx prior to the NDA
13   approval, correct?
14            MR. GARRISON:  Object to the form.  Asked
15        and answered.
16        A.     Correct.
17        Q.     Doctor, have you ever been consulted by
18   -- I've asked you about pharmaceutical companies --
19   any health care entity, an HMO, a hospital, an IRB,
20   with regard to a prescription pharmaceutical
21   decision?
22        A.     I have consulted with drug companies
23   about designs of studies for efficacy.  I can't
24   remember which companies.  It was in the '90s.
25        Q.     Are you ever called on to make any
```

page 120
```
01   recommendations with regard to any drugs for your own
 2   institutions for its -- for example, for its
 3   formulary?
 4        A.     No.
 5        Q.     Or for any hospital or health care
 6   agency?
 7        A.     No.
 8        Q.     Have you ever been a member of any ESMB
 9   or DSMB?
10        A.     I'm currently a member of a DSMB for the
11   National Institutes of Health for the Aim High study,
12   which is an intervention study.
13        Q.     Can you describe that study for me in
```

arnett 20060906.txt

```
14  just general terms?
15      A.      In general terms, it's evaluating the
16  effectiveness for coronary heart disease events of a
17  combination product with a niacin and a statin.
18      Q.      What statin?
19      A.      I should know this, shouldn't I?  I don't
20  remember which statin.  It's a market statin.  It's
21  not a new drug.
22      Q.      And the purpose is to see if the
23  combination --
24      A.      Is more efficacious than a statin alone
25  for CHD prevention.
```

page 121
```
 1              MS. FRIEWALD:  Okay.  Why don't we take a
 2  quick lunch break?
 3              (Off-the-record discussion.)
 4          THE VIDEOGRAPHER:  This marks the end of
 5  Videotape Number Two in the continued deposition
 6  of Dr. Donna Arnett to be continued on Videotape
 7  Number Three.  We're off the record at
 8  12:04 p.m.
 9              (Off the record.)
10          THE VIDEOGRAPHER:  This is the beginning
11  of Tape Number Three in the continued deposition
12  of Dr. Donna Arnett.  We're on the record at
13  12:57 p.m.
14  BY MS. FRIEWALD:
15      Q.      Doctor, isn't -- in connection with your
16  work for Circulation you've never reviewed any
17  articles related to COX-2 or nonspecific NSAIDs, have
18  you?
19      A.      I have not.
20      Q.      And that would be true in connection --
21  there's no other editorial work that you've done
22  where you've reviewed any articles on COX-2s or
23  nonspecific NSAIDs, is there?
24      A.      That's correct.
25      Q.      You've never reviewed the FDA regulations
```

page 122
```
 1  with regard to drug labeling; is that correct?
 2      A.      Not in my recent history.
 3      Q.      Same would be true if I asked you about
 4  the FDA regulations regarding submission of an NDA.
 5      A.      I reviewed documents in the '80s about
 6  submission requirements for NDAs.
 7      Q.      For a particular purpose?
 8      A.      Educational.
 9      Q.      You mean your own education?
10      A.      Yes.
11      Q.      As part of your schooling?
12      A.      Yes.
13      Q.      But since then you haven't reviewed any
14  of the FDA regulations?
15      A.      Specifically about NDAs?
16      Q.      Correct.
17      A.      I have no need to.
18      Q.      Are there any FDA regulations that you
19  have reviewed?
20      A.      I've reviewed their ethics policy.
21  That's not a regulatory document.  I was offered the
22  position of senior executive director for antigens
```

Page 53

arnett 20060906.txt
```
23    for epidemiology two years ago, and as part of that I
24    had to become familiar with some of the regulatory
25    aspects.  So I educated myself about that.  But I
```
page 123
```
 1    didn't specifically go and review documents for the
 2    FDA.
 3         Q.      That's a position you ended up not
 4    taking?
 5         A.      I ended up coming here instead.
 6                 Before we get started there were two
 7    things I wanted to clear up from before.
 8         Q.      Sure.
 9         A.      Okay.  Is now a good time?
10         Q.      Yeah, but let me just let Kirstin walk by
11    and then you can do that.
12         A.      Thanks, Kirstin.
13                 It's just my memory -- I just wanted to
14    make sure that to clarify that I did work on an
15    angioedema study that was funded by Bristol-Myers
16    Squibb.  They came to me and Eric Corwin, my
17    colleague in Houston, to look for genetic predictors
18    for angioedema in response to ACE inhibition.  So
19    that was an example of a toxic effect from a drug
20    where our goal was to identify if there was a genetic
21    cause to that toxicity.
22                 So you asked me before had I had any
23    experience, and we didn't find anything, didn't
24    publish that study, so it wasn't on my radar screen.
25         Q.      Was there something else you wanted to
```
page 124
```
 1    correct?
 2         A.      The only other thing was about expertise
 3    because, you know, I don't have a Ph.D. in drug
 4    labeling.  I have a Ph.D. in endothelial function.  I
 5    don't even know where you get that kind of label.
 6    But I certainly have broad expertise in
 7    cardiovascular system pathophysiology as an
 8    epidemiologist.
 9         Q.      I understand you have expertise as an
10    epidemiologist, and I understand you have expertise
11    in cardioepidemiology.  You don't consider yourself
12    an expert in the biology of endothelial function?
13         A.      I haven't run basic science experiments
14    about that, but in the State of Alabama an expert
15    means knowing more than the average person.  So I
16    would say I know more than the average person about
17    that.
18         Q.      Well, I think I probably know more than
19    the average person about that too.  But I wouldn't
20    hold myself out as an expert.  You have not had any
21    training in vascular biology, correct?
22         A.      I've had graduate-level courses in
23    pathophysiology.
24         Q.      Have you had any training in vascular
25    biology?
```
page 125
```
 1         A.      I've had within that course in my
 2    master's program and pathophysiology there was
 3    training about vascular biology.
 4         Q.      So there was part of one course in your
```
Page 54

arnett 20060906.txt

5  master's program?
6      A.     Yes.
7      Q.     And you've never published on the subject
8  of vascular biology?
9      A.      I've published on arterial stiffness.
10  I've published on endothelial function as risk
11  factors for cardiovascular disease.  My dissertation
12  was on something called, Ventricular vascular
13  coupling where I evaluated the effect of vascular
14  compliance in relation to cardiovascular outcomes.
15  So, yes, I have published in that area.
16      Q.     And your focus in that area has always
17  been on cardiovascular outcomes, correct?
18      A.     Correct.
19      Q.     You have not ever studied the role of
20  prostacyclin and endothelial function?
21      A.     Not specifically.
22      Q.     You've never studied on the level of the
23  vascular biology the progression of atherosclerotic
24  plaques, correct?
25      A.      That is not true.  I have.  As part of

page 126
 1   the ARIC study, Atherosclerosis Risks In Community
2  study, I have a publication about the effect of
3  systolic blood pressure on progression of carotid
4  intermedial thickness, which is the marker of
5  vascular disease.  I've coauthored papers on plaque
6  in the NHLBI Family Heart Study.
7      Q.     Again, these are all outcome studies.
8  I'm not disputing that you have papers that look at
9  the outcome measurements.  But my question is you
10  have never studied the specific -- you've never
11  studied the bio -- at the biologic level?  You didn't
12  review most of the pharmacology literature, correct,
13  because you would consider that outside your area of
14  expertise?
15      A.      I agree that the pharmacologic level and
16  of the level of being a rat doctor I've not reviewed
17  those -- that work.  As a cardiovascular
18  epidemiologist I have to have understanding about
19  mechanisms or else I can't do my job.
20      Q.     You have never offered an opinion
21  anywhere that the balance between prostacyclin and
22  thromboxane is -- explains any potential
23  cardiovascular effect of the coxibs or of Vioxx
24  specifically; is that correct?
25            MR. GARRISON:  Object to the form.

page 127
 1      A.     That's correct.
2      Q.     And most of your work has been on the
3  role of hypertension in affecting endothelial
4  function, right?
5      A.     That's incorrect.  I have very broad
6  publication base in hypertension, lipids, genetic
7  epidemiology, drugs.
8      Q.     You've studied how hypertension is
9  involved in the progression of atherosclerotic
10  disease?
11      A.     Correct.
12      Q.     And you've studied the long-term effects
13  of hypertension, correct?

Page 55

arnett 20060906.txt

14      A.      I have as one of many of my areas of
15  expertise.
16      Q.      And you agree that hypertension is one of
17  the independent risk factors for atherosclerosis,
18  correct?
19      A.      Correct.
20      Q.      And is there a -- do you have an opinion
21  as to for how long somebody needs to have
22  hypertension or elevated blood pressure and at what
23  level in order to have that affect endothelial
24  function in some way?
25              MR. GARRISON:  Object to the form.

page 128
 1      A.      Can you clarify because -- can you
 2  clarify that question?
 3      Q.      Sure.  Are you going to offer an opinion
 4  that elevated blood pressure to a particular level or
 5  for a particular period of time is needed to cause a
 6  clinically significant outcome?
 7      A.      The epidemiologic data suggests -- I have
 8  not specifically addressed timelines.  It varies.  In
 9  a population level I can address that question.  For
10  an individual, I cannot answer that question.
11      Q.      Is that a not answerable question?
12      A.      It's a not answerable question for me.
13      Q.      And at a population level what's the
14  answer you would give?
15      A.      We could look at results from Cardia
16  which you've cited before.  We could look at results
17  from the ARIC study, and there is no specific time
18  duration or natural history that would say -- that
19  would give us a specific time.  I can tell you that
20  there's a quantitative risk that increases with
21  increasing blood pressure for atherosclerosis.
22      Q.      Okay.  Are you going to say that a
23  patient who goes from a blood pressure of 130 to 132
24  systolically for a week is at clinically significant
25  increased risk of having a cardiovascular event?

page 129
 1      A.      I don't speak relative to individual
 2  subjects.
 3      Q.      Okay.  So for any individual patient you
 4  can't say that the move from one blood pressure point
 5  to another was clinically significant?
 6      A.      I'm not a medical doctor and would not
 7  offer a clinical opinion.
 8      Q.      On a population basis are you going to
 9  offer an opinion that a move from 130 to 132 for a
10  week would have a clinical impact?
11              MR. GARRISON:  Object to the form.
12      A.      I can't answer it relative to a clinical
13  impact.  I can say that graduated increased blood
14  pressure is associated with increased risk.
15      Q.      Are you prepared to say that increased
16  blood pressure at a particular level or a particular
17  -- or for a particular period of time -- let me start
18  that again.
19              At a population level are you going to --
20  do you believe that there is any incremental upward
21  change that is needed before, on a population level,
22  you would see an increased risk?

Page 56

arnett 20060906.txt

23          MR. GARRISON:  Object to the form.
24      A.      The epidemiological data would suggest
25  that there is no such number that risk is continuous

page 130
 1  over a scale of blood pressure.
 2      Q.      Well, are you -- what epidemiologic data
 3  would show that an incremental risk of let's say two
 4  or three points for 30 days would have any clinical
 5  effect?
 6          MR. GARRISON:  Object to the form.
 7      A.      There is no such data to my knowledge.
 8      Q.      Is there any data that would say that an
 9  incremental increase of four or five points for 30
10  days would have a clinically significant effect?
11      A.      I've answered your question.
12      Q.      Is there any epidemiologic data that
13  would say that an incremental risk at any level for
14  30 days would have a clinically significant effect?
15          MR. GARRISON:  Object to the form.
16      A.      Epidemiologists don't evaluate questions
17  in that way.
18      Q.      Is there any epidemiologic data that
19  would allow you to offer an opinion as to how long
20  one would need to elevate blood pressure before one
21  would expect to see a clinical impact on a
22  population?
23      A.      You'd have to define for me clinical
24  impact.
25      Q.      Some cardiovascular adverse effect.  You

page 131
 1  define for me what that would be.
 2      A.      One would -- some would argue that
 3  endothelial dysfunction leads to hypertension.  So in
 4  some ways it may be the endothelial dysfunction
 5  that's leading to the hypertension.
 6      Q.      Let's limit it to heart attack.  Is there
 7  any -- is there any epidemiologic data that would --
 8  that you would rely on to say that you need X amount
 9  of blood pressure increase for Y amount of time
10  before you would expect to see on a population basis
11  an increased risk in heart attack?
12          MR. GARRISON:  Object to the form.
13      A.      I'm not aware of that specific data.
14      Q.      Okay.  So you would say that you cannot
15  answer the question of whether one would need to see
16  a certain level of increase in blood pressure for a
17  certain period of time before one would see any
18  increased incidents of heart attacks in the
19  population?
20          MR. GARRISON:  Object to the form.
21      A.      I've answered your question relative to
22  the fact that risk is graded in terms of an increased
23  risk with increased blood pressure over time.
24      Q.      I understand that.  But at -- I think you
25  accept the fact that there is some limited increased

page 132
 1  risk for some limited period of time that's not going
 2  to have any clinical effect.  Do you accept that?
 3      A.      I've not asked the question that way.
 4  Epidemiological data don't -- are not collected in
                      Page 57

arnett 20060906.txt

```
 5   that way.  So there is no way for me to answer that
 6   question.
 7        Q.      Well, do you accept from your work as an
 8   epidemiologist in this area that people have rises
 9   and falls in blood pressure all day long?
10        A.      I would accept that.
11        Q.      Okay.  And when you talk about somebody
12   or some group of patients as having a certain blood
13   pressure, what level of measurement are you relying
14   on to say -- let me ask the question better because
15   it started off badly.
16             If Patient A's typical blood pressure is
17   120 over 70 and Patient A has a day where he's at 122
18   over 70, you're -- you wouldn't offer an opinion that
19   that would have a clinical impact, would you?
20        A.      I'm not going to offer any opinions about
21   clinical impact.
22        Q.      What about on a population basis, if you
23   had a cohort of patients who all were normally at 120
24   over 70 and for one day they went to 122 over 70, you
25   wouldn't expect that that would result in a clinical
```

page 133
```
 1   impact, would you?
 2             MR. GARRISON:  Object to the form.
 3        A.      Epidemiologists don't address questions
 4   like that.
 5        Q.      They don't address clinical outcomes?
 6        A.      They address clinical outcomes, but we --
 7   there -- I am not aware -- and there may be data out
 8   there, but I'm aware of no data that looked at
 9   day-to-day blood pressure over time in the way that
10   you're asking me the question.
11        Q.      Isn't it true, Doctor, that when
12   epidemiologists talk about incremental increases in
13   blood pressure, they're talking about some period of
14   time of years before you would expect to see an
15   increase in number of heart clinical events as a
16   result of blood pressure rises?
17        A.      Epidemiological study designs tend to
18   have intermittent re-examinations of patients or
19   participants that are on the average of a year to
20   three years in between.  So when you ask me questions
21   about day-to-day, I cannot answer them as an
22   epidemiologist.
23        Q.      Okay.  Fair to say that typically the
24   epidemiologic studies that have looked at population
25   adverse effects of blood pressure have looked at
```

page 134
```
 1   those effects over periods of years, correct?
 2        A.      The population-based epidemiologic
 3   studies have tended to look over one to three year
 4   periods.
 5        Q.      And you can't point me to any
 6   population-based study that has looked at a period of
 7   less than a year and concluded that any particular
 8   increase in blood pressure caused an adverse effect
 9   within that time period?
10        A.      I cannot agree with that because I have
11   not extensively reviewed the literature, and there
12   could be possibly some study out there that I haven't
13   seen.
```

Page 58

arnett 20060906.txt

14      Q.      My question was you haven't reviewed.
15      A.      I have not reviewed, but that doesn't
16 mean it doesn't exist.
17      Q.      Okay.  Now, are you going to offer an
18 opinion -- you accept, I gather, that all NSAIDs
19 increase blood pressure, correct?
20      A.      I cannot answer the question for all
21 NSAIDs.  I can only address what I've observed for
22 Vioxx.
23      Q.      Have you looked at any of the literature
24 on the other NSAIDs to see their effects on blood
25 pressure?

page 135
1      A.      I have not.
2      Q.      And that would be true of the COX-2s as
3 well as the nonselectives?
4      A.      That's true.
5      Q.      Have you looked at any of the studies
6 done by Merck with regard to Vioxx that use
7 comparator NSAIDs to see their effect?
8      A.      There are data in the NDA application
9 that show Vioxx's effect relative to I believe
10 ibuprofen and diclofenac and Naprosyn.
11      Q.      Have you tried to synthesize those data
12 in terms of the impact of those other NSAIDs on blood
13 pressure?
14      A.      I haven't given it the attention I've
15 given cardiovascular disease, myocardial infarction.
16 But in general Vioxx increases blood pressure more
17 than the comparators.
18      Q.      Are you going to offer an opinion as to
19 how much more?
20      A.      I didn't find it relevant in this
21 particular review.
22      Q.      Are you going to offer an opinion that
23 blood pressure increase is the mechanism of -- to use
24 your term -- Vioxx's cardiotoxicity?
25      A.      Could you restate that?

page 136
1      Q.      Are you going to offer an opinion -- put
2 it this way -- that Vioxx causes adverse cardiac
3 events by virtue of raising blood pressure?
4      A.      I will agree that Vioxx raises blood
5 pressure.  And I will agree that I will agree to
6 that.
7      Q.      That Vioxx raises blood pressure?
8      A.      Yes.
9      Q.      But you're not going to say that because
10 it raises blood pressure it causes heart attack or
11 any other cardiovascular event?
12      A.      The totality of evidence that I've
13 reviewed relative to the effect of hypertension on
14 mediating the excess cardiovascular risk associated
15 with Vioxx has been to -- has been negative, that it
16 is not the reason solely for the increased risk.
17      Q.      You said solely.
18      A.      Uh-huh.
19      Q.      Are you going to offer an opinion that it
20 -- that there is a partial effect of blood pressure,
21 or can you not say at this point?
22      A.      I can say that adjustment for blood
                        Page 59