arnett_20060906.txt

```
23              MR. GARRISON: Do you feel like you need
24       to review that whole document --
25              THE WITNESS: Yes.
```

page 277
```
□ 1               MR. GARRISON:  -- before you -- by all
 2       means, before you answer a question, feel free
 3       to review it.
 4   BY MS. FRIEWALD:
 5       Q.     What I want to know --
 6              MR. GARRISON:  -- instead of taking it
 7       out of context.
 8   BY MS. FRIEWALD:
 9       Q.     No.  Independent of this memo, have you
10   looked at the -- you have not looked at the totality
11   of the data on the nonselective NSAIDs to have an
12   opinion on how they compare to the COX-2s generally
13   or to Vioxx specifically?
14       A.     I only have data that I've reviewed in
15   conjunction with Vioxx clinical data, which included
16   ibuprofen, Naprosyn, nabumetone, and diclofenac.
17              MR. GARRISON:  Diclofenac.
18              THE WITNESS:  Thank you.
19   BY MS. FRIEWALD:
20       Q.     From the OA studies?
21       A.     Yes.
22       Q.     Fair enough.  Now, Doctor -- one minute.
23              Have you looked at the -- let me ask it
24   this way.  Do you have an opinion as to what the
25   background rate of heart attacks should be in a
```

page 278
```
□ 1   placebo population?
 2              MR. GARRISON:  Object to the form.
 3       A.     You can't answer that question.
 4       Q.     Why not?
 5       A.     You have to understand the risk factor
 6   levels of the population being evaluated, and also
 7   clinical trial participants tend to be healthier,
 8   tend to be less likely to have an event.  So there's
 9   absolutely no way I could offer an opinion about
10   that.
11       Q.     So would you expect to see that in
12   different placebo studies, you might have different
13   placebo rates?
14              MR. GARRISON:  Object to the form. -
15       A.     It would -- it would depend on the
16   population characteristics.
17       Q.     Right.  That's what I'm asking.  Would
18   you expect that in different clinical trials that
19   look at CV event rates, you might find different
20   background rates in the placebo arms of those trials?
21       A.     I would agree with that.  I -- I know
22   that the Vioxx studies were designed to have a very
23   low background rate.
24       Q.     Okay.  But -- but from one study to the
25   other, you would expect to see different background
```

page 279
```
□ 1   rates depending upon the population that you're
 2   looking at?
 3       A.     I would agree with that.
 4       Q.     And would you agree that because of that,
```
                        Page 120

arnett 20060906.txt

```
 5   there's hazards in trying to extrapolate background
 6   rates across studies?
 7        A.     No.
 8        Q.     Why not?
 9        A.     Statistically, you can control for that.
10        Q.     What do you mean?
11        A.     Well, statistically, in these
12   meta-analysis approaches, you've combined the data.
13   You're testing for whether or not the relative effect
14   differs across studies, and that's a test for
15   heterogeneity, which was not significant in the Vioxx
16   data.
17        Q.     I'm asking a different question
18   actually.  What I'm asking is would you agree that
19   you can't, say, take an aspirin trial and say the
20   placebo rate in this aspirin trial was x and,
21   therefore, that's what the placebo rate should be,
22   and I'll use that as a basis for finding out whether
23   a particular drug causes heart attacks just by
24   saying, well, the rate in the drug is higher than it
25   was in this background rate in the aspirin trial?
```

page 280
```
□ 1              MR. GARRISON:  Object to the form.
 2        A.     I don't understand what kind of trial
 3   you're designing.
 4        Q.     Okay.  Well, let's say that I designed a
 5   trial where I looked at some studies that already
 6   existed -- okay -- and that had background heart
 7   attack rates in them.  And I said in that -- in that
 8   study, there was a background rate of .5, okay?
 9        A.     .5?
10        Q.     For heart attacks.
11        A.     .5 percent, .5 --
12        Q.     .5 per whatever you want, .5 per thousand
13   patients -- okay -- for heart attacks.
14        A.     All right.
15        Q.     And you couldn't just take that number
16   and say, well, that is the objective background rate,
17   and I'm going to use that to try and decide whether a
18   particular drug that has -- that's never been tested
19   against a placebo has an increased risk.
20        A.     I'm confused about this line of
21   questioning because there weren't such studies that
22   I've reviewed.  So I don't understand its relevance
23   to what I've reviewed.
24        Q.     You've never seen that done?  Would that
25   strike you as an odd thing to do?
```

page 281
```
□ 1        A.     It's not an odd thing to do in the
 2   absence of having a placebo-controlled data, but
 3   it's -- it's not -- I don't have an opinion.
 4        Q.     Okay.  Does it run the risk of generating
 5   wrong results because you don't --
 6        A.     I don't have an opinion.
 7        Q.     Okay.
 8        A.     I haven't thought about that question.
 9        Q.     You took some notes as we were talking
10   today, and I would ask if I could just take a quick
11   look at those notes.
12        A.     I was just writing down key words.
13        Q.     I thought there were other notes earlier
```
                            Page 121

arnett 20060906.txt

```
14     in the day, but --
15        A.     Your names.
16        Q.     It's a very nice picture.
17        A.     Thank you.
18        Q.     The work that you did for Merck, are you
19     allowed to say whether you were compensated or not?
20        A.     I'm not sure, so I just won't say.
21            MS. FRIEWALD:  Fine.  I think that's all
22     I have.  Just one minute.
23            THE VIDEOGRAPHER:  Off the record.  The
24     time is 5:08.
25                  (Off the record.)

page 282
 1            MS. FRIEWALD:  I do want to ask one
 2     specific question, if I can.
 3            THE VIDEOGRAPHER:  Let me go back on the
 4     record.
 5            Back on the record.  The time is 5:08.
 6     BY MS. FRIEWALD:
 7        Q.     Doctor, I'm just looking at this Graham
 8     Powerpoint.  And did you actually -- I wasn't clear.
 9     Did you actually review this document?
10        A.     When I pulled it from the web site, I
11     skimmed through it.  I haven't looked at it recently.
12        Q.     And the published Graham study is
13     something you looked at, not carefully?
14        A.     Not carefully.
15            MS. FRIEWALD:  Fine.  That's all.  Thank
16     you.
17            MR. GARRISON:  No questions.
18            THE VIDEOGRAPHER:  This is the end of
19     Tape Number Five and concludes the deposition of
20     Dr. Donna Arnett taken on September 6th, 2006.
21     We're off the record.  The time is 5:09 p.m.
22                  (Off the record.)
23            MS. FRIEWALD:  On the paper record, can
24     we just agree that Dr. Arnett is going to give
25     us an updated CV, and we'll work it in as the

page 283
 1        last exhibit?
 2            MR. GARRISON:  Sure.  Fine.  No problem.
 3     No problem.
 4            COURT REPORTER:  Lew, do you want a copy?
 5            MR. GARRISON:  Yes.
 6            MR. LOCKLAR:  Do you send it by e-mail?
 7            COURT REPORTER:  Yes, E-trans.
 8            MR. LOCKLAR:  Can you send it to me with
 9     that?
10            COURT REPORTER:  Sure.
11            MR. BROSS:  Yeah, send it to me by e-mail
12     too.  Do you still have my address?
13            COURT REPORTER:  Yes.
14            Thank you.
15
16
17                  (End of deposition.)
18
19
20
21
22
```

Page 122

arnett 20060906.txt

23
24
25

page 284
☐ 1                         SIGNATURE OF WITNESS
2
3               I, _____, do hereby
4       certify that on this _____ day of
5       _____ 2006, I have read the foregoing
6       transcript and to the best of my knowledge it
7       constitutes a true and accurate transcript of my
8       testimony taken by oral deposition on September 6,
9       2006.
10
11
12       _____
13          DONNA ARNETT
14
15
16       Subscribed and sworn to
17       before me this _____
18       day of _____,
19       2006.
20
21
22       _____
23          NOTARY PUBLIC
24
25

page 285
☐ 1                    E R R A T A   S H E E T
2
3       PAGE     LINE        CORRECTION          REASON
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

page 286
☐ 1                    C E R T I F I C A T E
2
3       STATE OF ALABAMA  )
4       JEFFERSON COUNTY  )

                         Page 123

```
                        arnett 20060906.txt
 5
 6              I hereby certify that the above and
 7      foregoing deposition was taken down by me in
 8      stenotype, and the questions and answers thereto were
 9      reduced to computer print under my supervision, and
10      that the foregoing represents a true and correct
11      transcript of the deposition given by said witness
12      upon said hearing.
13              I further certify that I am neither of
14      counsel nor of kin to the parties to the action, nor
15      am I in anywise interested in the result of said
16      cause.
17
18
19              _____
20              Lisa Bailey, Commissioner
21
22
23
24
25

page 287
```

Page 124

```
                              arnett 20061020.txt
 1    0001
 2               IN THE UNITED STATES DISTRICT COURT
 3                    EASTERN DISTRICT OF LOUISIANA
 4
 5       CASE NO:  2:05-CV2524
 6
 7       ANTHONY WAYNE DEDRICK,
 8       V.
 9       MERCK, et al.,
10
11                   VIDEOTAPED DEPOSITION OF:
12
13                     DONNA ARNETT, Ph.D
14
15               S T I P U L A T I O N S
16            IT IS STIPULATED AND AGREED, by and
17       between the parties through their respective
18       counsel, that the deposition of:
19                    DONNA ARNETT, Ph.D.,
20       may be taken before Lisa Bailey, CSR, Notary
21       Public, State at Large, at Heninger, Garrison,
22       Davis, 2224 1st Avenue North, Birmingham, Alabama,
23       on October 20, 2006 commencing at approximately
24       9:00 a.m.
25
26
27
28
29
```

page 1
```
 1                      EXAMINATION INDEX
 2
 3       DONNA ARNETT, Ph.D.
 4          BY MS. FREIWALD . . . . . . . .    8
 5                       EXHIBIT INDEX
 6                                                 MAR
 7       Defendant's
 8       1    Notice of Deposition                   8
 9       2    Minutes, March '05 advisory           13
10       3    Excerpted comments                    13
11       4    Weaver article                        13
12       5    Zhang article                         13
13       6    Scolnick e-mail                       13
14       7    CV outcome study                      13
15       8    NIH news release                      13
16       9    Sample size printout                  13
17       10   Cards                                 16
18       11   CV                                    22
19       12   Arnett report                         24
20       13   Patent applications                  108
21       14   Index cards                          203
22       15   FDA review                           248
23       16   Arm Laceration Study                 248
24
25
26
27
```

page 2
```
 1            IT IS FURTHER STIPULATED AND AGREED that
 2       the signature to and reading of the deposition by
 3       the witness is not waived, the deposition to have
```
Page 1

```
                        arnett 20061020.txt
 4      the same force and effect as if full compliance
 5      had been had with all laws and rules of Court
 6      relating to the taking of depositions.
 7          IT IS FURTHER STIPULATED AND AGREED that it
 8      shall not be necessary for any objections to be
 9      made by counsel to any questions, except as to
10      form or leading questions, and that counsel for
11      the parties may make objections and assign grounds
12      at the time of the trial, or at the time said
13      deposition is offered in evidence, or prior
14      thereto.
15
16
17                       * * * * *
18
19
20
21
22
23
24
25

page 3
 1              A P P E A R A N C E S
 2
 3      FOR THE PLAINTIFF:
 4
 5      BENJAMIN LOCKLAR
 6      LEIGH O'DELL
 7      Attorneys at Law
 8      ben.locklar@beasleyallen.com
 9      Beasley, Allen, Crow, Methvin, Portis & Mills
10      218 Commerce Street
11      Post Office Box 4160
12      Montgomery, Alabama  36103-4160
13      334-269-2343
14
15      FOR THE DEFENDANT:
16      HOPE FRIEWALD
17      Attorney at Law
18      Dechert LLP
19      Cira Centre, 2929 Arch Street
20      Philadelphia, Pennsylvania  19104-2808
21      215-994-4000
22
23
24
25
26
27
28      ALSO PRESENT:  Karen Kelley, Videographer
29
30
31
32
33

page 4
 1          I, Lisa Bailey, a court reporter of
 2      Birmingham, Alabama, and a Notary Public for the
 3      State of Alabama at large, acting as commissioner,
 4      certify that on October 20, 2006 pursuant to the
                                       Page 2
```

arnett_20061020.txt

5  rules of Civil Procedure and the foregoing
6  stipulation of counsel, there came before me at
7  Heninger, Garrison, Birmingham, Alabama,
8  DONNA ARNETT, Ph.D., witness in the above cause,
9  for oral examination, whereupon the following
10  proceedings were had:
11            THE VIDEOGRAPHER:  We are on the
12  record.  This is Tape Number One in the
13  videotaped deposition of Donna Arnett, Ph.D.,
14  taken by defendants in the District Court,
15  Eastern District of Louisiana, Case Number
16  2:05-CV2524.  Anthony Wayne Dedrick,
17  plaintiff, versus Merck and Company,
18  Incorporated, defendants.  This deposition is
19  being held at the offices of Heninger,
20  Garrison, Davis, located at 2224 First Avenue
21  North, Birmingham, Alabama.
22            Today's date is October 20, 2006, and
23  the time is 9:03 a.m.  The court reporter is
24  Lisa Bailey and the videographer is Karen
25  Kelly, both on behalf of Esquire Deposition

page 5
☐ 1         Services located in Birmingham, Alabama.
2            Would counsel, and all present, please
3  introduce yourself, after which the court
4  reporter will swear in the witness.
5            MS. FREIWALD:  I'm Hope Freiwald.  I
6  represent Merck.
7            MR. LOCKLAR:  I'm Ben Locklar.  I
8  represent the plaintiff, Mr. Dedrick.
9            MS. O'DELL:  Leigh O'Dell.  I represent
10  the plaintiff.
11            DONNA ARNETT, Ph.D.
12  being first duly sworn, was examined and testified
13  as follows:
14                    EXAMINATION
15  BY MS. FREIWALD:
16       Q.    Dr. Arnett, I'm going to mark and hand
17  you Exhibit 1 to your deposition, which is the
18  Notice of Deposition, and ask you to take a quick
19  look at it.
20            (Defendant's Exhibit Number 1
21             was marked for identification.)
22       Q.    Have you seen this before today?
23       A.    I have.
24       Q.    Okay.  And if you would, turn with me to
25  the schedule attachment A, which asked you to bring

page 6
☐ 1  a bunch of materials with you.  And I see that you
2  do have some materials with you today.  Is there
3  anything in the pile that's in front of you that is
4  new since you and I last talked?
5       A.    There is.  And I separated them so that
6  you wouldn't have to go hunting through my notebook.
7       Q.    Thank you.  Can you show me what is new?
8       A.    Yes.  I have downloaded the meeting
9  minutes for the advisory and this is dated 3/7/05.
10  This is the FDA advisory that was held February 16th
11  2005.  And I also, adjunctive to that, abstracted
12  out the actual votes from the committee members from
13  the full report.  That's an executive summary report

Page 3

arnett 20061020.txt

14  of the vote.
15        I have a deposition of Dr. Avorn dated
16  June 29, 2006.  This is in the case, the MDL docket
17  Litigation 1657.  Do you need more information?
18        Q.    That's fine.
19        A.    Okay.  And I haven't read the entire
20  deposition, but I brought it with me.
21        Q.    You said that's 6/29/06?
22        A.    The case number 619.
23        Q.    No, the date.
24        A.    The date, yeah, 6/29/2006.
25        Q.    I don't know off the top of my head.  Is

page 7
 1   that the discovery deposition, or is that the trial
 2  preservation deposition?
 3        A.    It was videotaped, but it appears that
 4  there was both.  He was cross-examined so my guess
 5  is it was a deposition, but it was --
 6              MS. O'DELL:  It's the trial deposition.
 7              MS. FREIWALD:  It's the trial deposition?
 8  Fine.  Thank you.
 9  BY MS. FREIWALD:
10        Q.    Anything else?
11        A.    Yes.  This isn't new.  I just have two
12  copies.
13        Q.    What's this?
14        A.    This -- I apologize.  This is the -- this
15  is the memorandum from April 6, 2005 from John
16  Jenkins and Paul C. Likman. [phonetic]
17        Q.    And have you read that?
18        A.    I have read it.  These are not new.  I
19  also have downloaded a few new articles.  The first
20  is by Weaver published in Journal of Clinical
21  Rheumatology in 2006.  The second is by Zhang, which
22  is the meta-analysis of randomized trials published
23  recently in JAMA.
24              These are -- we discussed at the last
25  deposition when we were together that these were

page 8
 1   e-mails that I had requested from counsel regarding
 2  Scolnick's claims about the CV events in VIGOR.  So
 3  I have those.
 4        Q.    May I see those, please?
 5        A.    Yes, this is the VIGOR.  And also as a
 6  request from counsel, this is the CV outcome study
 7  that was canceled.
 8        Q.    And you had not read these at the time of
 9  your last deposition?
10        A.    I had read them.
11        Q.    That's what I thought.  Okay.
12        A.    And this -- I had also read and just -- I
13  brought up at the last deposition, that is the ADAPT
14  study that I pulled from the NIH Web site.  I
15  actually went back and downloaded it.
16        Q.    What it actually is a --
17        A.    Correct.
18        Q.    -- a news release about the ADAPT study?
19        A.    Correct.  And the final pieces that I have
20  redone my power calculations another time, and I
21  have the program description of the mechanisms for
22  calculating power in the power estimates from this
                        Page 4

arnett 20061020.txt

```
23   data program.
24        Q.    Have your results changed?
25        A.    No.
```

page 9
```
 1         Q.    Are the handwritten power calculations you
 2   gave me the last time different in any way from this
 3   printed document you just handed me?
 4        A.    No.
 5        Q.    Anything else?
 6        A.    That's it.
 7        Q.    So you have a blue binder in front of you,
 8   but that represents the same blue binder I got to
 9   see the last time?
10        A.    It's not the same binder because I put
11   everything in so I wouldn't have things falling
12   out.  So it's a new binder that has three hole
13   punches.
14        Q.    A new, better binder, but exactly the same
15   materials inside?
16        A.    Correct.
17        Q.    Fine.  What I'd like to do is mark some of
18   these new documents as exhibits.  And we can do it
19   one of two ways.  If you don't mind an exhibit
20   sticker on your document, I'll just mark the
21   originals, and you can just get a copy back later,
22   or we can make a copy at the break and just preserve
23   the exhibit numbers.
24        MR. LOCKLAR:  I don't think it matters if
25   it has --
```

page 10
```
 1         MS. FREIWALD:  Fine.  So let's do
 2   this.  I'm going to mark the minutes from the
 3   March '05 advisory as Arnett 2.
 4              (Defendant's Exhibit Number 2
 5              was marked for identification.)
 6         MS. FREIWALD:  I'll mark the excerpted
 7   comments, which appear to be pages 328 to 343
 8   from the transcript, as Arnett 3.
 9              (Defendant's Exhibit Number 3
10              was marked for identification.)
11         MS. FREIWALD:  The Weaver article will
12   be 4, and the Zhang article will be 5.  The
13   Scolnick e-mail will be 6 and the e-mail
14   regarding the CV outcome study dated 3/13/02
15   will be 7, and the NIH news release will be
16   8.  And the sample size printout power
17   calculation will be 9.
18              (Defendant's Exhibit Numbers 4-9
19              were marked for identification.)
20   BY MS. FREIWALD:
21        Q.    Doctor, it appears to me that you've
22   not taken any notes or done any underlining on the
23   Avorn transcript; is that correct?
24        A.    That's correct.
25        Q.    In that case I'm not going to mark it.
```

page 11
```
 1   Just note for the record that's the June 29 and
 2   June 30th testimony of Dr. Avorn.
 3              Doctor, are all the materials that you
 4   just showed me, with the exception of the two
                                            Page 5
```

arnett 20061020.txt

```
 5    Merck e-mails, documents that you either found on
 6    your own or generated on your own?
 7         A.    Yes.
 8         Q.    Is there anything else that you've
 9    looked at since your last deposition that you deem
10    to relate to the testimony you're going to give in
11    this case?
12         A.    No.
13         Q.    Have you made any additional notes
14    since we last spoke that I haven't seen?
15         A.    within my notebook, no, I have not.
16         Q.    Anywhere else?
17         A.    I added one statement on a card -- one
18    of my cards.
19         Q.    Can you show me which one, please?
20         A.    It was The Mechanism of Action card.
21    That's on the bottom.  You can see it's in
22    different pen.
23               And, Hope, these were two cards that I
24    had and didn't bring with me last time.
25         Q.    Okay.  Thanks.

page 12
□ 1               So last time I got to copy a half dozen or
 2    so index cards of notes from you.  I don't think
 3    they were marked as a separate exhibit number.  I
 4    think they were part of the composite exhibit.
 5         A.    Correct.
 6         Q.    And you just showed me that on one of
 7    those cards which was Mechanism of Action, you've
 8    now added a sentence that says Vioxx lacks
 9    antiplatelet effect of aspirin and disables the
10    body's defense against platelet aggregation, slash,
11    clumping, correct?
12         A.    Correct.
13         Q.    Okay.  And so -- and then there's a new
14    card that says Time Lines and has some text under it
15    and another card relates to protocol 023.
16         A.    Yes.
17         Q.    And why don't we mark these --
18               MR. LOCKLAR:  Why don't we get a copy of
19    those?
20               MS. FREIWALD:  Fine.
21               MR. LOCKLAR:  And we'll mark the copy.
22               MS. FREIWALD:  That's great.  We can get a
23    photocopy of them, and you can just put them
24    together, and then we'll mark them as a
25    composite exhibit -- it will be 10.

page 13
□ 1               (Defendant's Exhibit Number 10
 2               was marked for identification.)
 3    BY MS. FREIWALD:
 4         Q.    Was there a particular document, or
 5    documents, that caused you to add the thought about
 6    Vioxx disabling the body's mechanism against
 7    platelet aggregation?
 8         A.    No.  I had -- in all of my readings of the
 9    new articles, I was -- it was just a way to remind
10    myself about saying things in more simplistic
11    terms.  So clumping is an easier term to understand
12    about platelets.
13         Q.    Have there been any changes to your CV
```

Page 6

arnett 20061020.txt

14   since we last spoke?
15        A.    Yes.  I have a new copy for you.
16        Q.    And can you point me to what's different
17   on your CV?
18        A.    In the honor section I have listed that I
19   now serve as chair of the study section for
20   cardiovascular epidemiology for the National
21   Institutes of Health.  That's a new appointment
22   since October.
23        Q.    What page are we looking on?
24        A.    Page two.
25        Q.    Cardiovascular and Sleep Epidemiology

page 14
 1   study section?
 2        A.    Yes, that's a standing study section in
 3   NIH that reviews all cardiovascular epidemiology
 4   studies.
 5        Q.    Are there any studies that you are
 6   currently reviewing that relate to COX-2s?
 7        A.    No.
 8        Q.    That relate to NSAIDs?
 9        A.    No.
10        Q.    And how large of a section is this?
11        A.    This is the largest section on
12   cardiovascular -- it is the only cardiovascular
13   epidemiology section for NIH.  We reviewed about 90
14   grants in this most recent October meeting.
15        Q.    How many people sit on your panel?
16        A.    About 30.
17        Q.    Is there a list of people who sit on the
18   panel that I could find if I went on the NIH Web
19   site?
20        A.    If you go on the NIH Web site and look for
21   study sections, chartered memberships, it's CASE,
22   C-A-S-E, for Cardiovascular And Sleep Epidemiology.
23   And it's under the Health of Populations, H-O-P,
24   major category.
25        Q.    Why is sleep grouped with cardiovascular?

page 15
 1        A.    Because there was a recent
 2   reorganization.  Our prior name was Epidemiology of
 3   Chronic Disease.  And because sleep is related to
 4   cardiovascular disease, in the reorganization they
 5   moved sleep into cardiovascular and named it within
 6   that section.
 7        Q.    Sleep is related to cardiovascular disease
 8   in the sense that sleep disorders are --
 9        A.    Associated with cardiovascular disease.
10        Q.    With increased risk of heart attack and
11   arrhythmias?
12        A.    Yes.  I can't speak for arrhythmias.  But
13   increased risk of myocardial infarction.
14        Q.    Okay.  And you -- and part of what you
15   would be reviewing would be studies that look at the
16   relationship between sleep disorders including, for
17   example, sleep apnea, and acute cardiovascular
18   events like heart attacks?
19        A.    The primary studies that are reviewed in
20   CASE are cardiovascular.  I believe out of our last
21   round there may have been two relative specifically
22   to sleep.  The vast majority are cardiovascular.
                              Page 7

arnett 20061020.txt

23      Q.      Did they include stroke studies?
24      A.      There are studies that include stroke if
25  they also include cardiovascular disease.  There is

page 16
 1  a separate study section for stroke epidemiology.
 2      Q.      So if the primary endpoint of the study is
 3  one related to cardiovascular effects but it
 4  incidentally looks at strokes, that will come within
 5  you.  But if the primary goal is to look at stroke
 6  risk, that would go to somebody else; is that
 7  right?
 8      A.      Correct.
 9      Q.      Anything else new on your CV?
10      A.      I updated my publications list, and my
11  current publications are about 207 peer-reviewed
12  literature.
13      Q.      Is there anything new that you deem to be
14  relevant to what you're doing in the Vioxx
15  litigation?
16      A.      Indirectly through my expertise as a
17  cardiovascular epidemiologist, yes, but nothing
18  specifically directed at Vioxx or COX-2 or NSAIDs.
19      Q.      Anything that you'll say as to your --
20  that you would point to specifically related to
21  endothelial function, mechanism of heart attack?
22      A.      Let me review it.
23      Q.      Okay.
24      A.      For instance, I know I just coauthored a
25  paper with the first author Lakoski that evaluates

page 17
 1   the relationship of C-reactive protein in augmenting
 2  a prediction of cardiovascular disease as measured
 3  by coronary artery calcification.
 4      Q.      Can you point me to that one?
 5      A.      It's number 185.  It's titled,
 6  Implications of C-Reactive protein or coronary
 7  artery calcium score as an adjunct to global risk
 8  assessment for primary prevention of CHD.
 9      Q.      What was the conclusion of that study?
10      A.      That C-reactive protein is not an
11  important adjunct to global risk assessment, and I'd
12  have to review the -- because I read it almost a
13  year ago, I'd have -- in the authorship procedures,
14  so I would have to review the specifics about what
15  coronary artery calcification did.
16      Q.      What was your role in this study?
17      A.      I'm an investigator in the MESA study,
18  where these data were derived, and I helped edit and
19  analyze the -- review the analysis and edit the
20  manuscript.
21      Q.      What does it mean when you say you helped
22  review the analysis?  Reviewed it with regard to
23  statistical methods?
24      A.      Reviewed it with regard to tables, were
25  the tables understandable, were there more analyses

page 18
 1  that needed to be done.
 2      Q.      You didn't do any of the primary analysis
 3  yourself, did you?
 4      A.      I did not do any of the programming or the
                              Page 8

arnett 20061020.txt

5   primary analysis. We have a coordinating center at
6   the MESA study that does that.
7       Q.    Okay. Anything else?
8       A.    There was another paper that I -- that's
9   related to coronary artery calcified plaque in
10  clinical coronary heart disease. Number 201
11  published with Paul Hopkins that points to the
12  relationship between subclinical markers of
13  cardiovascular disease as measured in the
14  calcification of plaques and its relation with
15  clinical coronary heart disease. And the finding
16  was there was a positive and a strong association as
17  one would predict.
18      Q.    There was a strong association between
19  adverse clinical events and calcification in the
20  arteries?
21      A.    Specifically prevalent coronary heart
22  disease and calcification in the arteries.
23      Q.    Is prevalent disease a term of art in some
24  sense?
25      A.    In epidemiology prevalence is a term

page 19
 1   that's used to define existing cases.
2       Q.    So you're -- all right. You're using it
3   as a true epidemiology term? Fine.
4       A.    Yes.
5       Q.    You're not using it as a quantitative
6   term, which is how I misinterpreted it to begin
7   with. You're not talking about the degree of
8   atherosclerotic changes. You're talking about the
9   presence of calcification in the arteries?
10      A.    And self-report of clinical coronary
11  disease.
12      Q.    Fine. Anything else?
13      A.    No.
14      Q.    Then let's mark your new CV as 11.
15            (Defendant's Exhibit Number 11
16            was marked for identification.)
17      Q.    Doctor, I had a chance to review the
18  expert report that you produced in the Dedrick
19  case. Am I correct in understanding that the
20  opinions that you intend to offer here are the same
21  as the opinions that you offered when we spoke in
22  the Arnett [sic] case?
23      A.    The Arnett case?
24      Q.    That was the -- that's terrible. I've
25  really been sleep deprived. In the Albright case.

page 20
 1   I apologize.
2       A.    That's okay. Correct, the opinions are
3   the same as I expressed in the Albright case about
4   four weeks ago.
5       Q.    And was it only four weeks ago? It seems
6   longer than that to me.
7             And there are no changes that you intend
8   to make to your opinions; is that correct?
9       A.    As new -- as I indicated new papers came
10  out that further supported my opinions. If new
11  papers come out between now and the time we go to
12  trial, my opinion may be augmented by that new
13  information. But I currently intend -- have the
                              Page 9

arnett 20061020.txt
```
14   same opinions expressed in my report.
15        Q.     Is there any additional opinion, or
16   opinions, that you intend to offer that are not
17   expressed -- we did not discuss at -- during the
18   time of the Albright deposition?
19        A.     Today?
20        Q.     Yes.
21        A.     No.
22        Q.     And am I correct in understanding that the
23   few new articles that you brought with you today do
24   not change your opinion?
25        A.     They strengthen my belief in the opinion

page 21
 1   of Vioxx can be cardiotoxic.
 2        Q.     Are there any additional materials or
 3   pieces of evidence that you currently intend to rely
 4   on other than the ones that you've brought with you
 5   today?
 6        A.     No.
 7        Q.     Am I still correct that none of the
 8   advisory work you've done on any of the working
 9   groups you've been involved in related to COX-2s or
10   NSAIDs generally?
11        A.     I don't understand the question.
12        Q.     Okay.  Let me do this.  Let me mark as
13   Albright -- Arnett 12, I apologize, your report in
14   this case.
15                  (Defendant's Exhibit Number 12
16                   was marked for identification.)
17        Q.     And if you would look at the second page
18   of your report.  In the second paragraph you list
19   some groups or committees where you've served in
20   some capacity.  And my question is am I right still
21   that on none of those committees have you done any
22   work that specifically relates to COX-2s or NSAIDs?
23        A.     That is true.  My work on these committees
24   comes from my experience as a cardiovascular
25   epidemiologist.

page 22
 1        Q.     And with regard to your work on the
 2   editorial board of the American Journal of
 3   Epidemiology is it still true that you have not
 4   reviewed any papers related to the subject of COX-2s
 5   or NSAIDs?
 6        A.     As an editor I am assigned to diet and
 7   nutrition studies within the American Journal of
 8   Epidemiology.  So it would not be under my purview
 9   to review COX-2 papers.
10        Q.     Has that always been your assignment?
11        A.     It's my primary -- my primary assignment,
12   but I do get a lot of other manuscripts that don't
13   fit into neat categories in any other editorial
14   positions.
15        Q.     Is that because that's a significant area
16   of research interest for you generally?
17        A.     It's because I'm the newest kid on the
18   block on the editorial board.
19        Q.     Everybody else there is more senior than
20   you?
21        A.     I won't say more senior, but they have
22   been an editor longer than I have and have
```
                                    Page 10

arnett 20061020.txt
23  significantly more gray hair.  No disrespect
24  intended.
25      Q.    Looking at the third page of your report,

page 23
 1  I'm sorry, I just noticed the pages aren't
 2  numbered.  But under issues addressed and opinions
 3  am I right the categories and materials you intend
 4  to rely on are the ones we've already discussed, the
 5  published literature for Vioxx including the meta-
 6  analysis conducted by Merck, correct?
 7      A.    Correct.
 8      Q.    And you're referring to the Konstam meta-
 9  analyses?
10      A.    I'm referring to the Konstam as well as
11  the Shapiro meta-analysis.
12      Q.    That would not be a published meta-
13  analysis?
14      A.    That is correct.  To my knowledge, it was
15  not published.
16      Q.    And then the major Vioxx-related studies
17  conducted by Merck and the FDA published Vioxx-
18  related documents, correct?
19      A.    Correct.
20      Q.    And are there any studies that you're
21  considering major studies that we haven't yet
22  discussed?
23      A.    The additional study that we have not
24  discussed that I consider major is the JAMA article
25  by Zhang, which is a meta-analysis of the adverse

page 24
 1  effect of COX-2 inhibitors in renal and arrythmia
 2  events.
 3      Q.    Now, on the last time we talked, if I
 4  remember right, you mentioned that you had done some
 5  looking around the FDA Web site and you couldn't --
 6  you didn't keep everything you looked at.  So I just
 7  wanted to ask you have you previously reviewed this
 8  document, which is the background package, prior to
 9  the 3/05 advisory committee hearing dated December
10  '04?
11      A.    As part of the Web site on the FDA?
12      Q.    Well, I'll ask that question first.
13      A.    Parts of this look familiar.  But I don't
14  recall if it was from the Web site.  It doesn't
15  indicate a Web site URL on this document.
16      Q.    I didn't pull my copy off the Web site.
17  It's a document that's been produced in the
18  litigation.  But I believe it is on the Web site.
19      A.    I don't recall reading this from the Web
20  site in detail.
21      Q.    Is that a document that you reviewed in
22  connection with work you did for Merck?
23      A.    I have a confidentiality agreement with
24  Merck, and I'd be happy to discuss that if I have a
25  written waiver from them to discuss that.

page 25
 1      Q.    At this point you don't feel that you can
 2  say whether you have reviewed this or not?
 3      A.    I don't feel that because of the
 4  confidentiality agreement that I am at liberty to
                    Page 11

arnett 20061020.txt

5  say that.  I'd be happy to talk about it if Merck
6  wants me to talk about it and gives me written
7  documentation.
8       Q.    Is this document familiar to you without
9  saying from where?  Is this document familiar to
10 you?
11      A.    I really can't say for the reasons already
12 described.  My opinions, however, are based today on
13 the documentation in this blue binder, which are
14 primarily related to published articles and then
15 also the FDA documents.
16      Q.    When you say the FDA documents, what are
17 you talking about?
18      A.    Specifically the cardiovascular review of
19 the original NDA, the Medical Officer Review dated
20 5/20/99 by Dr. Villalba and Hyde.  The Medical
21 Officer Review again by Villalba of the supplemental
22 information to the NDA dated June 29th 2000 for the
23 submission date, the FDA advisory committee briefing
24 for the NDA 21042 Vioxx GI safety.  And the date on
25 this is February 8th 2001.  The Targum memo for the

page 26
1  FDA medical review for the cardiovascular analysis
2  from February of 2001, the Villalba review from
3  March of 2002 that was an addendum regarding
4  cardiovascular data and the Alzheimer's study.
5            The December 2004 Villalba memo regarding
6  the review of the NDA, again, update of the
7  cardiovascular thrombotic events in the Alzheimer's
8  studies.  There was, in addition to the study meta-
9  analysis, a study done by Ingenix sponsored by Merck
10 that supports the other observational data relative
11 to the cardiovascular toxic effects of Vioxx that
12 show it has an increased cardiovascular toxicity in
13 their population.
14      Q.    Is it still the case that you have not
15 done a full review of the observational data?
16      A.    When -- when I have clinical trial
17 evidence of an excess risk from cardiovascular
18 disease, the observational data are only supportive
19 of that finding.  So, yes, I haven't reviewed the
20 observational data with the same intensity as I did
21 the clinical trial data because I believe more
22 strongly in the inference among the clinical
23 trials.
24      Q.    Can you tell me what -- are you aware that
25 there are observational studies that show no

page 27
1  increased risk with Vioxx?
2            MR. LOCKLAR:  Excuse me.  Object to the
3  form of the question.
4       A.    Whether there are observational studies or
5  not is irrelevant given that in multiple clinical
6  trials we have evidence of an excess cardiovascular
7  risk with Vioxx.
8       Q.    I just want to know whether you're aware
9  that there are observational studies that show no
10 increased risk?
11      A.    That there may be.  It's irrelevant.
12      Q.    Are you aware that there are -- you've
13 pointed to certain observational studies as
                              Page 12

arnett 20061020.txt

14  relevant.  So I want to know whether you've looked
15  at other observational studies that may come out
16  differently.
17       A.    The only observational study I pointed to
18  as relevant was the one that Merck generated
19  themselves which was the Ingenix study.
20       Q.    And you don't know if there are other
21  observational studies that show no increased risk at
22  certain doses?
23       A.    It would be irrelevant to me.
24       Q.    And you don't know if there are
25  observational studies that show no increased risk in

page 28
0 1   short-term use?
 2       A.    Again, it's irrelevant because the
 3  clinical trial data are consistent and compelling
 4  that Vioxx is cardiotoxic.  It all --
 5       Q.    And can you tell me which clinical trials
 6  show a statistically significant increased risk of
 7  heart attack with Vioxx compared to a placebo?
 8       A.    Well, first of all, let me --
 9       Q.    No, I need you to answer my question.  Can
10  you tell me which clinical trials show a
11  statistically significant increased risk of heart
12  attack compared to a placebo?
13            MR. LOCKLAR:  Object to the form.
14       A.    The APPROVe study shows a significant
15  increase in the combined endpoint.  And let me
16  review this carefully because you're asking me a
17  different question than your prior time together,
18  which was specifically about heart attack as opposed
19  to the predefined endpoint that Merck used in all
20  the other studies.
21            So in the APPROVe study relative to
22  placebo, there were 46 confirmed thrombotic events
23  which includes fatal and nonfatal MI, which would be
24  the majority of events.  Unstable angina is included
25  as well as sudden cardiac death, fatal and nonfatal

page 29
0 1   stroke, TIA, peripheral arterial disease, and
 2  pulmonary embolism.
 3       Q.    Okay.  So the APPROVe study shows a
 4  statistically significant increased risk in heart
 5  attack compared to placebo.  Are there any other
 6  studies?
 7       A.    I didn't say heart attack.  I said
 8  confirmed thrombotic event.  I want to be specific.
 9       Q.    Do you -- my question was heart attack.
10  Do you know if APPROVe shows a statistically
11  significant increased risk in heart attack compared
12  to placebo?
13       A.    There is a -- in my review on one of the
14  disks that I brought that we copied last time, I can
15  go back to the actual clinical report that was
16  produced and speak specifically to myocardial
17  infarction.  It was not -- I can look in the article
18  too.  I don't recall it since Merck focused
19  primarily on this combined endpoint.
20       Q.    Do you know if there are any other studies
21  that show a statistically significant increased risk
22  of heart attack compared to a placebo?
                    Page 13

arnett 20061020.txt

```
23              MR. LOCKLAR:  Object to the form.
24       A.     Statistical significance is --
25       Q.     I don't want to know what you think about
```

page 30
```
 1  statistical significance.  I just want to know
 2  whether there were any other studies that you can
 3  identify that point to a statistically significant
 4  increased risk of heart attack compared to placebo?
 5       A.     With safety there is -- safety is more of
 6  a concern.
 7       Q.     I don't want to know what you think about
 8  what to make of the data.  I just want to know
 9  whether there are any studies that you can identify
10  other than APPROVe that show -- that report a
11  statistically significant increased risk of heart
12  attack compared to placebo?
13              MR. LOCKLAR:  Object to the form.
14       A.     I will not take the -- I will not answer
15  out of context.  Because with this power of any
16  other study prior to VIGOR --
17       Q.     Is the answer no?  I actually am entitled
18  to a yes-or-no answer.
19              MR. LOCKLAR:  She's permitted to answer
20       the question.
21              MS. FREIWALD:  No, she has to answer my
22       question, not ones she wants to answer.  So my
23       question I want is a yes-or-no question.
24  BY MS. FREIWALD:
25       Q.     Can you point me to any study that reports
```

page 31
```
 1  a statistically significant increased risk of heart
 2  attack compared to placebo other than APPROVe?
 3              MR. LOCKLAR:  Object to the form.
 4       A.     As an epidemiologist it would be unethical
 5  for me to answer that question out of context to
 6  studies that were inadequately powered to -- and
 7  this is about safety.
 8       Q.     Doctor, this is a litigation proceeding.
 9  I have a right -- I'm not asking you what you think
10  of the study.  I'm not asking you what conclusions
11  you wish to draw.  And your lawyer will have plenty
12  of time to let a jury one day hear the arguments you
13  want to make.  But I have an absolute right to an
14  answer to a yes-or-no question.
15              Yes or no, is it out there, can you point
16  me to any study other than APPROVe that reports a
17  statistically significant increased risk of heart
18  attack compared to a placebo?
19       A.     It is unethical for me to answer that in a
20  yes-or-no fashion as an epidemiologist.
21       Q.     Answer it yes or no, and then we can later
22  have a discussion.  Yes or no?  I want to know what
23  the data is because you've told me about the
24  consistency of the data.  I want to know what study
25  there is -- I mean, the answer is no, right?
```

page 32
```
 1  There's no other study besides APPROVe that reports
 2  a statistically significant increased risk of heart
 3  attack compared to placebo?
 4              MR. LOCKLAR:  Object to the form.
```
                              Page 14

arnett 20061020.txt

```
 5     A.     The signal --
 6     Q.     Doctor, I --
 7     A.     The power --
 8     Q.     I'm going to move to strike.  I'm going to
 9  move to strike.
10            This is a simple question.  You know what
11  the answer to it is.  It's a litigation proceeding.
12  It's a deposition.  This is not your chance to make
13  speeches.  Yes or no.  If you can't point me to
14  another study -- your lawyer can ask questions
15  later -- then just say it, and we'll move on.
16     A.     As an epidemiologist knowing the power of
17  those studies to detect that finding, I cannot sit
18  here ethically and say no unqualified.
19     Q.     I'm not asking you, Doctor, whether the
20  studies had internal flaws.  I'm not -- all I want
21  to know is can you -- when you get on the stand is
22  there any study that you're going to be able to
23  point to and say that study in addition to APPROVe
24  showed a statistically significant increased risk of
25  heart attack compared to a placebo?
```

page 33

```
 1     A.     The cardiovascular safety, the signal was
 2  present --
 3     Q.     Doctor, I want an answer to my question.
 4  This is not a time to play games.  You want to make
 5  speeches later, you can make speeches.  You can
 6  answer your lawyer's questions.  Yes or no.
 7            MR. LOCKLAR:  You know, if there's a
 8  yes-or-no answer, you're entitled to a yes-or-no
 9  answer.  If it is not --
10            MS. FREIWALD:  If --
11            MR. LOCKLAR:  Excuse me, you had your
12  opportunity.  If it's not a yes-or-no answer,
13  then you cannot compel a witness to answer with
14  a --
15            MS. FREIWALD:  But there is.  Either she
16  knows -- studies report statistically
17  significant findings.  If she wants to say she
18  doesn't want to agree with that or she wants to
19  qualify it, she can do that later.  But either
20  something exists or it doesn't.
21  BY MS. FREIWALD:
22     Q.     Is there any study other than APPROVe that
23  is in the published literature you've looked at or
24  any unpublished things you've looked at that reports
25  a statistically significant increase in heart
```

page 34

```
 1  attacks compared to placebo?
 2            MR. LOCKLAR:  Object to the form.
 3     A.     Hope, I will not answer the question in an
 4  unqualified yes or no because it would be unethical
 5  for me as a public health scientist, as a
 6  epidemiologist, to answer about statistical
 7  significance with a drug that has a safety signal of
 8  excess cardiovascular risk.
 9     Q.     Okay.  Well, you can't tell me -- sitting
10  here today you can't point me to any study -- if
11  it's out there, show me the study that shows a
12  statistically significant increased risk over
13  placebo.
```

Page 15

arnett 20061020.txt

14          MR. LOCKLAR:  Object to the form.  Asked
15     and answered.
16          A.    The studies were not designed with
17     cardiovascular outcomes as an endpoint.
18          Q.    So there's no study you can point me to?
19          A.    It's unethical for me to --
20          Q.    It's unethical for you to answer a
21     question yes or no under oath?
22          A.    Yes, it is unethical for me to answer a
23     question yes or no unqualified.
24          Q.    So you don't know --
25          A.    If you allow me to qualify my answers --

page 35
1          Q.    Tell me first whether it exists or not,
2     whether there's anything that reports it.  And then
3     we can talk lots about what you think of the data.
4     Is there any other study besides APPROVe that shows
5     a statistically significant increased risk of heart
6     attack compared to placebo?
7          A.    As a cardiovascular epidemiologist and
8     public health practitioner I will not answer that
9     question unqualified as a yes or no.
10          Q.    Okay.  Then we'll have to take that up
11     with the judge.  I'll move to strike your opinions
12     on the grounds that you're not willing to answer the
13     questions about the data that's available.
14          A.    Oh, I'm happy to answer questions about
15     the data that is available.
16          Q.    No, you only want -- you only want to
17     make the speeches you want to make, and that's not
18     what this deposition is.  I have a right to the
19     answers to my questions.  It's a yes-or-no
20     question.  You don't like the answer so you don't
21     want to give it.
22               But am I right, there is no other study
23     you can point to that reports a statistically
24     significant increased risk of heart attack compared
25     to placebo?

page 36
1          MR. LOCKLAR:  Object to the form.  It's
2     been asked and answered.  And she has the -- she
3     has the right to answer the questions -- she
4     doesn't have to give you the answer you want,
5     Hope.  She's entitled to give you --
6          MS. FREIWALD:  She has to give me a
7     yes-or-no answer to a yes-or-no question.
8          MR. LOCKLAR:  Not if there's not a yes-or-
9     no answer.
10          MS. FREIWALD:  Everybody in this room
11     knows there's a yes-or-no answer if it does
12     exist or it doesn't exist.
13          THE WITNESS:  I could see you taking this
14     completely out of context.  I won't let my
15     testimony be that because I believe the studies
16     were not designed -- I have done power
17     calculations to show they were not designed to
18     find a statistically significant effect.  And
19     statistical significance is counterbalanced with
20     power.  If you're not powered to find it, then,
21     no, you're not going to find it.
22     BY MS. FREIWALD:
                              Page 16

arnett 20061020.txt

23      Q.     Doctor, if I ask you the question are
24   there any studies that show a statistically
25   significant increased risk of heart attack in people

page 37
  1   who suffer from sleep apnea, can you answer that
 2   question, yes, no, or I don't know?
 3      A.     I can answer that I don't know the --
 4   where to point you exactly in the literature.  I
 5   have not reviewed that literature.
 6      Q.     And do you know whether the studies were
 7   powered to show the effect?
 8      A.     Yes, I do.
 9      Q.     And if -- could you answer that question
10   if this was something that you -- where there was no
11   effect seen, could you say the data don't exist?
12      A.     You'll have to --
13      Q.     As an epidemiologist have you had the
14   experience of somebody asking you a question, is
15   there any data that shows the statistically
16   significant risk of X, pick your thing, and you've
17   said the data doesn't exist?  Have you been able to
18   answer that question before?
19      A.     I've never been asked that question as an
20   epidemiologist in that way.
21      Q.     So you don't have the experience answering
22   questions about whether a study exists or doesn't
23   exist?
24      A.     If I were sitting at my computer, I would
25   go on to the PubMed and find it.

page 38
  1      Q.     It's just a question of -- it's just a
 2   factual question.  Does this study show it's
 3   significant or doesn't it?
 4      A.     As epidemiologists we were trained to
 5   pursue causation in a much broader scope than
 6   statistically significant.
 7      Q.     And that's a different question.
 8      A.     And if you --- if I'm allowed to answer in
 9   a way that lets me qualify the answer, I would.  But
10   I can't take it --
11      Q.     Just answer my question first and then you
12   can qualify it.  Is there any study that shows a
13   statistically significant increased risk in heart
14   attack compared to placebo?
15             MR. LOCKLAR:  Object to the form.  Asked
16        and answered.
17      A.     I've answered.
18      Q.     You don't want to answer even if I tell
19   you it's a yes-or-no question but then you can
20   qualify it afterwards?
21      A.     If you allow me to qualify it when I
22   answer, I will do so.
23      Q.     Okay.  I want a yes-or-no answer first,
24   and then I'll ask you a question and say if you have
25   to qualify it you can.

page 39
  1      A.     I don't -- I won't answer in a yes or no
 2   without being able to continue in my answer.
 3      Q.     Okay.  Do you not know whether there were
 4   other studies that show a statistically significant
                              Page 17

arnett 20061020.txt

 5  increased risk compared to placebo?
 6      A.    I reviewed all of the published
 7  literature, and the data that's in the FDA memos.
 8      Q.    So you know whether or not there are any
 9  other studies that show a statistically significant
10  increased risk?
11      A.    I have reviewed all the studies.
12      Q.    No, you know the answer.
13      A.    I know that there were no studies that
14  were powered to find an effect.
15      Q.    There were no studies that show an effect?
16      A.    There were no studies that were powered
17  to.
18      Q.    Fine.  There was no studies that show an
19  effect?
20          MR. LOCKLAR:  Object to the form.  I think
21      that's as clear an answer as you can get.
22  BY MS. FREIWALD:
23      Q.    Doctor, are there any studies that you say
24  show a statistically significant increased risk in a
25  combined cardiovascular endpoint compared to placebo

page 40
 1  other than APPROVe?
 2      A.    Can you restate your question?
 3      Q.    Sure.  What I'm trying to do is broaden us
 4  outside just MI because you made the point about
 5  looking at endpoints other than MI.  So my question
 6  is are there any studies other than APPROVe that you
 7  would point to that you believe would show a
 8  statistically significant increased risk in a
 9  combined cardiovascular endpoint compared to
10  placebo?
11      A.    For a safety issue, where you have --
12      Q.    It's a -- Doctor, you need to answer my
13  question.  It's a yes-or-no question.
14      A.    I cannot answer unless you let me qualify
15  it with that no studies were adequately powered to
16  find --
17      Q.    So the answer is no.  The answer is no,
18  and then you wish to add your qualification?
19          MR. LOCKLAR:  Object to the form.
20      A.    Ethically it's a safety concern where
21  there are multiple signals and the totality of
22  evidence pointing to your --
23      Q.    Doctor, you'll have --
24      A.    Based on the power --
25      Q.    Doctor -- move to strike as

page 41
 1  nonresponsive.  You'll have ample opportunity to
 2  tell me and presumably to tell a jury what you think
 3  at some point.  But I have a right to ask my
 4  questions and get answers to my questions.  And all
 5  I want to know is the answer to my question is no,
 6  isn't it?
 7      A.    As a witness I have a right to express my
 8  opinion --
 9      Q.    No, actually you don't.  You have an
10  obligation to answer questions.  And you're --
11      A.    I was --
12      Q.    Your answers -- but this is not an
13  opportunity to just state whatever opinions you wish
                          Page 18

arnett 20061020.txt

14  to state.  It's an opportunity for me to ask
15  questions and you to give answers.  And when I ask a
16  yes-or-no question, I have a right to a yes-or-no
17  answer.
18          Am I right that the answer to my question
19  is you can't point me to any studies other than
20  APPROVe that shows a statistically significant
21  increased risk in heart attack compared to placebo?
22          MR. LOCKLAR:  I'm going to object to the
23  form of the question.  And I'm going to state on
24  the record since you've told her what the rules
25  are, there is no rule that requires -- that

page 42
◻ 1          allows you to get a yes-or-no answer to a
2  question that there is no yes-or-no answer.
3          MS. FREIWALD:  There's so obviously a
4  yes-or-no answer, Ben.  So does she know if it
5  exists.  Yes, no, I don't know.  Those are the
6  only three options, not I know that it doesn't
7  exist but I'm unhappy about it.  I get to know,
8  yes, no, I don't know.
9          THE WITNESS:  I disagree with that
10  approach.
11  BY MS. FREIWALD:
12      Q.    Doctor, well, I'm sorry you disagree with
13  that approach.  But I believe that I'm entitled to a
14  yes-or-no answer to a yes-or-no question.
15          I'll do it one more time.  Are there any
16  studies -- let me put it this way.  Are there any
17  studies that when you testify you're going to point
18  to and say demonstrate an increased risk of some
19  combined cardiovascular endpoint with Vioxx compared
20  to a placebo that is statistically significant?
21      A.    I'm going to point to studies that are
22  clinically significant and meaningful in terms of
23  expressing an excess in cardiovascular risk with
24  Vioxx.
25      Q.    Numeric risk, not statistically

page 43
◻ 1  significant?
2      A.    With the safety issue numerical risk is
3  incredibly important.
4      Q.    Well, we'll talk about the magnitude of
5  numeric risk and the size of the studies you're
6  talking about later.  But you are not going to point
7  to any study that shows a statistically significant
8  increased risk?
9      A.    I'll point to plenty studies that show
10  inadequate statistical power to find any such
11  significant --
12      Q.    You're not going to point to any studies
13  that show a statistically significant --
14      A.    It's irrelevant with inadequate power to
15  find.
16      Q.    You're not going to point to it.  Because
17  I want to know.  If you're going to be able to get
18  up there on the stand and show me a statistically
19  significant study, I want to see it today.
20      A.    You're not going to be able to point me to
21  a study that has adequate power to find it either.
22      Q.    Doctor, the answer to that question is no?
                        Page 19

arnett 20061020.txt
```
23      A.    Asked and answered.
24      Q.    Doctor, with all due respect, I've enjoyed
25  your instructions on what Alabama law is.  But

page 44
01  you're not a lawyer, and you don't have a right
 2  to be a lawyer in this proceeding.
 3      A.    But I do have a right to be an expert who
 4  has reviewed this data with 25 years of
 5  cardiovascular epidemiology experience, with being a
 6  public health practitioner --
 7      Q.    Doctor, move to strike, not responsive.
 8            There wasn't a question pending.  You have
 9  -- you're not going to point me to any such study,
10  correct?  Correct?
11      A.    The totality of --
12      Q.    Doctor, yes, correct?  You're either going
13  to show me a statistically significant study or
14  you're not.  Are you going to?
15      A.    Statistical significance is irrelevant and
16  --
17      Q.    You're not going to show me a
18  statistically significant --
19      A.    I'm not going to show you a study powered
20  to find it.
21      Q.    Okay.  You're not going to show me a
22  statistically significant study?
23      A.    I'm not going to show you a study powered
24  find it.
25      Q.    We'll talk about power later.  But I won't

page 45
01  be surprised?  I'm not going to see a study showing
 2  statistically significant that I didn't know about?
 3      A.    You won't show a study powered to find it.
 4      Q.    Doctor, we have to change the tape.  And
 5  I'm going to move to strike the last response as
 6  nonresponsive.
 7            THE VIDEOGRAPHER:  This is the end of Tape
 8      Number One in the continued deposition of
 9      Dr. Donna Arnett to be continued on Tape Number
10      Two.  The time is 10:01.
11                  (Off the record.)
12            THE VIDEOGRAPHER:  This is the beginning
13      of Tape Number Two in the continued deposition
14      of Donna Arnett.  We're on the record at 10:09.
15  BY MS. FREIWALD:
16      Q.    Doctor, I want to take a look at the power
17  calculations that you gave me last time.  And I
18  don't mind using the typed one that you just
19  provided, but the one-page handwritten sheet from
20  last time I actually marked as 4C to your last
21  exhibit.  And when it got stapled for me, it got
22  stapled next -- along with the Konstam article.  So
23  it's kind of helpful because your calculations
24  relate to the Konstam article.  So we can look at
25  them that way.

page 46
01            MS. FREIWALD:  Is there -- the document
 2      that we've marked as the printed power
 3      calculation, is it on the table?  Is it over by
 4      you?
```
                            Page 20

arnett 20061020.txt

```
 5              MR. LOCKLAR:  I thought I put all the --
 6      under your arm right there.
 7              MS. FREIWALD:  Great, I have it.  The
 8      printed one is 9 for this deposition.
 9  BY MS. FREIWALD:
10        Q.     If I understand correctly, what you did is
11      you used a computer program that calculates power,
12      correct?
13        A.     I used three different computer programs
14      that calculate power.
15        Q.     And what are the names of those three
16             Different programs?
17        A.     One is called PS, Power and Sample Size.
18      The other is called STATA.  It's a statistical
19      programming package.  And the third is one that's
20      specific to proportional hazards models.  And it is
21      from SWOG.  The Web site, swogstat.org.
22        Q.     Is that an acronym?
23        A.     No, it's the Web site, the URL.
24        Q.     Okay.
25        A.     You go to this Web site and you can
```

page 47
```
 1      calculate power for proportional hazard survival.
 2        Q.     What you gave me that we marked as 4C the
 3      last time, was that done using the PS method?
 4        A.     The PS method, that's two different
 5      methods within the PS method.  One attempted to
 6      calculate exact power calculations using a Fisher's
 7      exact method and the other using a case-controlled
 8      method.
 9        Q.     Okay.  Now, I'm going to try and muddle
10      along here with my understanding, and I'm going to
11      ask you to correct me where I go wrong and to add
12      where I go wrong because I want to make sure I
13      understand what you did.
14             One of the things unique in a power
15      calculation is an alpha which represents the level
16      of statistical significance you're looking to
17      achieve, correct?
18        A.     Correct.
19        Q.     And the default alpha is .05.  P equals
20      .05?
21        A.     Correct.
22        Q.     And we talked about that as the level for
23      statistical significance all the time, right?
24        A.     Yes.
25        Q.     And then there is a beta, and what is the
```

page 48
```
 1      beta?
 2        A.     Beta is what you're attempting to
 3      calculate with the power calculation.
 4        Q.     Okay.  And -- go on.
 5        A.     Beta is the probability of the Type Two
 6      error.
 7        Q.     And what is a Type Two error?
 8        A.     It's the error in calling something a null
 9      finding when it isn't.
10        Q.     It's the risk that you will say that
11      there's no effect when you just haven't seen it?
12        A.     Correct.
13        Q.     And what is a Type One error?
```
                              Page 21

arnett 20061020.txt

14        A.    The risk -- or the probability -- it's not
15   exactly a risk.  It's a probability of calling
16   something significant when it isn't.  It's the flip
17   side of the beta.
18        Q.    So it may be that something shows up as
19   statistically significant but, in fact, it's not,
20   correct?
21        A.    The Type One error specifically is the
22   times that you would find something that is not true
23   in terms of being significant but when, in fact, it
24   isn't significant.
25        Q.    Okay.  So really a better way of asking

page 49
☐ 1   that question is it's the times that something would
 2   show up as statistically significant and you would
 3   conclude that there's a real finding but, in fact,
 4   there's not.  It falls into the range of .05, the
 5   chance that even a statistically significant result
 6   is not a real finding, correct?
 7        A.    Specifically it's .05 or smaller.
 8        Q.    But other -- but what I said is right,
 9   isn't it?
10        A.    Yes.
11        Q.    And then the flip side of that is there's
12   a risk that you don't see a statistically
13   significant result, but whatever you're looking for
14   really exists; you just haven't found it, correct?
15        A.    In that particular test.
16        Q.    In that particular test.  And that's with
17   the -- basically the .05 in lay terms margin of
18   error.  The .05 chance that you're going to see a
19   risk that's not real or not see a risk that is real,
20   correct?
21        A.    Correct.
22        Q.    Now, why don't you tell me what you did in
23   terms of putting numbers into your power calculation
24   to see if there was power in the Konstam analysis.
25        A.    Okay.  In the Konstam analysis we have a

page 50
☐ 1   number of tables that report for three various types
 2   of comparators and study designs or populations.  So
 3   in Table Three we have a pooled analysis of the APTC
 4   endpoint for Vioxx relative to placebo.  And there
 5   are three groups, the rheumatoid arthritis group,
 6   osteoarthritis group, and the Alzheimer group.
 7        Q.    I'm going to stop you for a second.  And
 8   you looked at each of those three groups separately,
 9   correct?
10        A.    Correct.
11        Q.    You looked to see if there was power to
12   find an APTC event statistically significant in each
13   patient population separately, right?
14        A.    Correct.
15        Q.    You did not at any point ask the question
16   of whether there was power if you put the three
17   groups of patients together to find a statistically
18   significant effect?
19        A.    Correct.  But there were -- the power was
20   so low I didn't see the relevance, and the
21   populations are so different I didn't see the
22   relevance in combining them.
                              Page 22

arnett 20061020.txt
23      Q.    Well, Konstam did the combined analysis.
24 He looked at all populations together, correct?
25      A.    He did both, individually and combined.

page 51
□ 1      Q.     And, in fact, you talked about Juni
 2 before.  Juni did the combined analysis.  He put the
 3 populations together, right?
 4      A.    Yes.
 5      Q.    And you've relied on Juni's combined
 6 numbers, correct?
 7      A.    I have not looked at Juni's numbers in
 8 terms of power.
 9      Q.    I understand you haven't looked at them in
10 terms of power.  But what I'm asking you is the way
11 he looked at the data was by combining the studies
12 except for he didn't include Alzheimer's studies.
13      A.    I'm verifying that because I don't want to
14 misspeak.  My recollection was, as yours, that the
15 Alzheimer's disease were not included.
16      Q.    But he aggregated the data -- I think Ben
17 will stipulate I'm right on that so we don't have to
18 spend time.
19            MR. LOCKLAR:  I think the question is
20      whether he looked at it individually or
21      combined --
22            MS. FREIWALD:  I think she's looking,
23      though, to confirm that the Alzheimer's patients
24      weren't in Juni, and I think we can agree that
25      that is true.

page 52
□ 1            MR. LOCKLAR:  Yes.
 2      A.    Yes, it was all osteo and rheumatoid
 3 arthritis.
 4      Q.    Okay.  And then you also confirmed that he
 5 looked at that -- those two populations together?
 6      A.    Yes.
 7      Q.    So Konstam and Juni both looked at the
 8 populations together.  You did your power analysis
 9 just looking at each population separately?
10      A.    Yes.
11      Q.    Then tell me what you did within any of
12 the three populations.  I'm going to assume your
13 methodology was the same for each population so you
14 can just walk me through one.
15      A.    Sure.  Let me go through Table Three.  And
16 so in Table Three you'll see that there are a total
17 of four events.
18      Q.    Right.
19      A.    And it reflects the number of individuals
20 in the population per case.  So here we had 622 --
21 sorry.  I haven't had to calculate these since I did
22 these a month ago.  So there were about 2500, 1622
23 plus 989.  And take that total --
24      Q.    I'm sorry.  What number are you looking
25 at?

page 53
□ 1      A.    Number of patients.
 2      Q.    Right.
 3      A.    For the RA, 622 on Vioxx.
 4      Q.    Right.
                              Page 23

arnett 20061020.txt

```
 5      A.    And 989 on placebo.
 6      Q.    Uh-huh.
 7      A.    So you would sum those.
 8      Q.    Uh-huh.
 9      A.    And you would divide by four because there
10   were four cases.  And that would give you the number
11   of individuals per case.
12      Q.    So you treated this as if this were a
13   case-controlled study, right?
14      A.    The only way that I could calculate power
15   in the absence of knowledge of the recruitment time
16   and follow-up time since these are aggregated data
17   was to do a test of the difference of proportions
18   essentially between the two groups.
19      Q.    You treated this as if this was a case-
20   controlled study where there were cases and controls
21   as if -- as opposed to a clinical trial in which all
22   the patients were enrolled, correct?
23      A.    I treated it as a two-by-two table and
24   evaluated the proportions.
25      Q.    What does that mean, a two-by-two table,
```

page 54
```
 1   that means as if it were a case-controlled study?
 2      A.    No.  That implies different -- something
 3   different, that it was designed as a case-controlled
 4   study.
 5      Q.    Okay.
 6      A.    The analysis was done with individual
 7   level data of cases and noncases --
 8      Q.    And you --
 9      A.    -- of Vioxx.
10      Q.    I'm sorry.  I didn't mean to cut you off.
11      A.    Vioxx and placebo.
12      Q.    You treated the three Vioxx events as
13   cases, and you treated the one event on placebo as a
14   controlled in the RA line of the table; is that
15   right?
16      A.    No.  Could you restate the question?
17      Q.    Am I right that you treated the three APTC
18   events on the RA line of Table Three as your three
19   cases, correct?
20      A.    Well, there are -- plus the other -- one
21   other case.
22      Q.    Okay.  The other case you -- was the case
23   from the placebo arm.  So you treated it as if there
24   were four cases?
25      A.    Four cases.
```

page 55
```
 1      Q.    All right.
 2      A.    And then there are 652 noncases per case.
 3      Q.    Okay.
 4      A.    And then we have the R, which stands for
 5   the relative risk, which you see here.  R equals
 6   1.78 in my table, and then the Konstam table the
 7   relative risk is 1.78.
 8      Q.    And you get 1.78 with a confidence
 9   interval that does not allow you to know whether
10   that's statistically significant or not?
11      A.    These are the actual findings.  So in
12   power you're working backwards from the actual
13   findings to derive at the power for this particular
```
                                    Page 24

arnett 20061020.txt

14    set of data with this specific point estimate of the
15    effect of rofecoxib versus placebo in the RA.
16        Q.    Okay.  If you had looked at -- did you
17    ever do the analysis where you looked at three
18    events out of 337 on the rofe arm and one out of 202
19    and combined those numbers?
20        A.    The -- essentially what this analysis is
21    doing is giving you a test of the difference in
22    proportions of cases in the rofecoxib group versus
23    the proportions of cases in the placebo group by
24    working through the relative risk estimate, the
25    number of cases and how many noncases there were.

page 56
☐ 1        Q.    Did you ever look to see what your answer
2    would -- what power you would get if you did the
3    aggregate number of patients, if you looked at all
4    of the groups together?
5        A.    I did not.
6        Q.    Okay.
7        A.    And the reason I didn't is that it was so
8    low I didn't see the utility.
9        Q.    And did you ever look to see what the
10    power would be if you assumed a five times increase
11    in heart attack which is as I understand how you
12    read the VIGOR study?
13        A.    Power -- I did not make such a calculation
14    because power is specific to the data that are
15    generated.
16        Q.    Well --
17        A.    I wasn't designing the study.  I was
18    calculating the power based on the extent of the
19    data in the Konstam article.
20        Q.    Do you assume sitting here today that the
21    five-fold disparity in VIGOR is a real finding?
22        A.    Could you define what you mean by real?
23        Q.    Do you believe that there's anybody today
24    that thinks that the relative risk with Vioxx is a
25    five times risk?

page 57
☐ 1             MR. LOCKLAR:  Object to the form.
2        A.    The VIGOR data, the best point estimate
3    that fits that data is a five-fold excess risk.
4        Q.    There's no other data that supports that
5    magnitude of risk, correct?
6        A.    I have not seen other relative risk
7    estimates of five.
8        Q.    And do you have a number that you --
9        A.    I take that back.  In the ADVANTAGE study
10    there was a comparable relative risk numerically.  A
11    numerical excess --
12        Q.    There was no statistically significant
13    risk?
14        A.    The power to detect that risk is quite
15    small.
16        Q.    Okay.  You can often have huge relative
17    risks with small numbers; do you agree with me on
18    that?  You can have a study where there's one event
19    in one arm and five in the other arm, and that
20    generates a big relative risk.  But that's because
21    you are playing with small numbers.
22        A.    Yes, that's true.  But you have then to
                        Page 25

arnett 20061020.txt
23  look at the consistency of that data with other
24  data, and in the case of ADVANTAGE the consistency
25  was equal with the VIGOR.

page 58
 1          Q.    Well, VIGOR was a study against naproxen,
 2  and you've already told me that the magnitude of the
 3  risk hadn't been replicated in any study against
 4  placebo or any other comparator?
 5          A.    I qualified it by saying that in
 6  ADVANTAGE, which had a similar comparator, there was
 7  a very comparable relative risk estimate.
 8          Q.    Well -- but not a statistically
 9  significant one?
10          A.    Was not.  Again, it wasn't powered to
11  detect that.
12          Q.    Doctor, have you -- we'll get back to
13  ADVANTAGE in a minute.  You're not going to come
14  into court and testify that the relative risk of
15  Vioxx versus placebo is in the order of five?
16          A.    The best estimate -- correct, I am not.
17          Q.    Okay.
18          A.    The best estimate that we have for placebo
19  from the APPROVe study would put it in the
20  neighborhood of two.
21          Q.    Okay.  And if it were in the neighbor --
22  if the actual risk was in the neighborhood of two,
23  do you know how much power there would be in the
24  Konstam analysis to detect that magnitude of risk?
25          MR. LOCKLAR:  Object to the form.

page 59
 1          A.    It would not be -- one cannot calculate
 2  power for estimated relative risk.  You have to
 3  calculate power from the actual relative risk for
 4  this given set of data with the Type One error of
 5  .05 in this number of cases and these number of
 6  noncases and this relative risk.  I can calculate
 7  power.  I can't make up data.
 8          Q.    Well, the reason you concluded that there
 9  was no insufficient power was because you had too
10  big a confidence band around your risk estimate,
11  correct?
12          A.    Could you restate --
13          Q.    Am I right that what you found was a
14  number that showed a risk, but there was such a
15  large confidence band around the estimate that you
16  concluded there was insufficient power?
17          A.    There's insufficient power in the RA
18  trials in aggregate in the Konstam article to detect
19  the true excess risk of Vioxx.  There were few
20  events.
21          Q.    To detect the true risk.  Well, that's
22  exactly right.  If you assumed -- you can do a
23  calculation where you make an assumption about what
24  the true risk is and ask yourself if I believe that
25  the true risk is X, should I have seen that in the

page 60
 1  study.  You can do that retrospectively, right?
 2          A.    One could do it.  As epidemiologists the
 3  best indicator of risk is the point estimate at
 4  hand.

Page 26

arnett 20061020.txt

5      Q.     Well, that's going -- you did an analysis
6  looking forward.  But if you want to verify that you
7  wouldn't have seen a result in Konstam and you're
8  sitting here today telling me that you think you
9  know what the magnitude of the risk is, wouldn't it
10  be a valid exercise to say, well, if the magnitude
11  of the risk is somewhere around two, should I have
12  seen a risk of that size in the Konstam analysis?
13      A.     As an epidemiologist I approach the data
14  as the data that are extant and ask the question
15  given these data what was the power to detect an
16  excess risk.
17      Q.     You've never done the analysis of if you
18  assume that the risk in APPROVe is what you claim,
19  would it have showed up in the Konstam analysis?
20      A.     I didn't see any, as an epidemiologist,
21  any reason to do that.
22      Q.     So I just want to be clear.  You haven't
23  done that?  You don't know what that reveals?
24      A.     I do not.
25      Q.     And you don't know what the -- what the

page 61
▯ 1  power analysis would show doing it exactly the way
2  you did it but putting the groups together?
3      A.     I did not do a combined analysis.
4      Q.     And tell me one more time so I'm clear on
5  this how you got your 652 number.
6      A.     Sure.  I added 1622, which is the number
7  of RA patients in rofecoxib, plus 989, which are the
8  number of patients on placebo.  And that total is
9  just over 2500.  I subtracted out the four cases
10  from that sum and took the residual number and
11  divided it by four to give me the number of noncases
12  per case.
13      Q.     Okay.  You didn't do an analysis where you
14  looked at the total number of patients who had
15  events compared to the total number of patients
16  identified in the denominator for each group here,
17  the 337 plus 201?
18      A.     My calculation incorporates that because I
19  define the relative risk as 1.78.
20      Q.     Okay.  And then you did the same analysis
21  for the OA and for the AD groups, correct?
22      A.     Correct.
23      Q.     What did you do on Table Four?
24      A.     On Table Four, since the RA finding was
25  significant, power was an irrelevant point there.  I

page 62
▯ 1  looked only at the OA studies.
2      Q.     You said the RA finding was --
3      A.     Statistically significant with the
4  relative risk of 1.74 for rofecoxib versus Naprosyn.
5      Q.     So there was sufficient power?
6      A.     When you have a significant finding, power
7  is irrelevant.
8      Q.     Okay.
9      A.     Because you're saying that you've
10  correctly identified the true excess risk.
11      Q.     So once you have a finding, then you don't
12  go back and ask whether the study was sufficiently
13  powered or not, correct?

                                    Page 27

arnett 20061020.txt

14    A.    Correct.
15    Q.    So you wouldn't criticize a study for
16 being insufficiently powered once it showed a
17 statistically significant result, correct?
18    A.    Correct.
19    Q.    All right.  Go on.  I think I interrupted
20 you.
21    A.    So for the OA I followed the same
22 procedure.
23          Sorry.  I was looking at Table Five.
24 Table Four.
25    Q.    I was going to ask you where you got the

page 63
 1    1.74 from.
 2    A.    Okay.
 3    Q.    You were looking at Table Five when you
 4 told me that there was a statistically significant
 5 finding in the RA group?
 6    A.    Yes.
 7    Q.    Okay.
 8    A.    In Table Four we only have data for
 9 osteoarthritis.  Again, there are 21 exposed Vioxx
10 who are cases.  There are 14 exposed in non-Naprosyn
11 NSAIDs.  The sum of those two numbers, 21 plus 14
12 equals 35.  There were a total number of patients of
13 4559 in the rofecoxib group and 2755 in the
14 non-Naprosyn NSAID group.  I summed those and
15 subtracted 35 from them, took that derived number,
16 and divided by 35 to get my end value which are the
17 number of noncases per case.
18    Q.    Okay.  So you treated it as all of the
19 people who had events were cases and all of the
20 people who didn't have events were noncases,
21 correct?
22    A.    Correct.
23    Q.    Regardless of whether they were randomized
24 to placebo -- I'm sorry, randomized to a
25 non-naproxen or randomized to rofecoxib?

page 64
 1    A.    Mathematically we get to that same
 2 answer.  So mathematically it's irrelevant.  But,
 3 no, I did not.
 4    Q.    Okay.  So as the -- there was a
 5 statistically significant finding when you looked at
 6 Vioxx compared to naproxen but not compared to the
 7 other comparators or compared to a placebo control?
 8    A.    I didn't find adequate power in any of
 9 those settings.
10    Q.    Okay.
11    A.    To detect --
12    Q.    Okay.  Now, the sample size wasn't any --
13 strike that.
14          Do you know if you had done the -- a power
15 analysis for naproxen versus rofecoxib if it would
16 have come out any differently from how you say the
17 power analyses for the data in Table Three and Four
18 came out?
19    A.    I didn't evaluate that.
20    Q.    Now, isn't it true that when you do a
21 power calculation, if you're doing it correctly, you
22 can't get a power that's less than .05?
                                        Page 28

arnett 20061020.txt

23      A.      It was interesting that when I attempted
24  to do this within the Fisher's exact, which would
25  have given me an exact probability, that the data

page 65
 1   observed in these tables were data more extreme than
 2  that observed in the tables.
 3      Q.      Isn't that an indicator you're doing
 4  something wrong?
 5      A.      The consistency of findings across four
 6  different attempts at -- four different types of
 7  analyses with three different programs is
 8  consistent.
 9      Q.      Well, isn't the problem that you set it up
10  as a case-controlled study rather than as a clinical
11  trial and so you ended up with a result that doesn't
12  make sense, it doesn't make sense to have a power
13  that's less than .05?
14      A.      The power was calculable with a Fisher's
15  exact, which would give you an exact probability of
16  a two-by-two table which is a valid estimator of the
17  proportional hazards ratio derived from the clinical
18  trial.
19      Q.      If this was a different study, but not a
20  clinical trial because this isn't a case-controlled
21  study.
22      A.      That's not true.
23      Q.      Okay.   Why is it not true?
24      A.      The two-by-two table is using count data
25  as opposed to a hazard rate data.   A cumulative

page 66
 1   incidence ratio, which would evaluate the cumulative
 2  incidence it made on Vioxx, versus the cumulative
 3  incidence on any other comparator would fall out in
 4  a two-by-two table in exactly the way that it's laid
 5  out here.   And the cumulative incidence ratio is a
 6  valid estimator of the hazard rate ratio.
 7      Q.      As a general proposition if you get a
 8  power of less than .05 isn't that an indicator that
 9  there's something wrong with the calculation method
10  you used?
11      A.      I've not heard that before, and there was
12  consistency across three different programs in my
13  estimates of power.
14      Q.      As a general proposition shouldn't you
15  expect that the lowest power calculation you ever
16  see is .05?
17      A.      Statistically speaking if you set your
18  Type One error rate, that would be true, but all of
19  my power calculations were right around the value of
20  that.
21      Q.      If you set your point one -- your Type Two
22  error rate at .05 -- is that what you said, or did I
23  mishear you?
24      A.      No.   You misheard me.
25      Q.      Okay.   Say it again.

page 67
 1   A.      If the Type One error rate -- if you're
 2  saying your Type One error rate is .05, then there
 3  should be -- theoretical, these are -- the Type One
 4  and Type Two errors are distributionally -- there is
                          Page 29

arnett 20061020.txt

5  an overlap between the distributions.
6      Q.    So if you set your Type One error rate of
7  .05, you should not see a power of less than .05,
8  correct?
9      A.    Which is probably why my -- the power
10 couldn't even be calculated under the Fisher's exact
11 test.  On some of these estimates they were .05.
12 And some were .086.  They were all very low
13 indicating that there was very low power.  There was
14 consistency across programs.  I did a sensitivity
15 analysis to make sure that I wasn't misreading the
16 numbers or misinterpreting the numbers.
17     Q.    Okay.  And just so I'm clear, isn't it
18 true, though, that if nothing -- as a general
19 proposition you would expect to see a power of at
20 least five percent, and if you get a number that's
21 less than that, the chances are that you've done
22 something wrong along the way in doing your
23 calculation?
24     A.    I disagree with that.  And that if you
25 evaluate, for instance, Table Three in the

page 68
1  rheumatoid arthritis group, there were -- there was
2  one case in the placebo group, three in the exposed
3  group.  That's a very small number of cases.  So
4  there seems to be a little bit more instability
5  around those numbers.  And that's because there were
6  few events, which means it was inadequately powered
7  to detect them.
8      Q.    So what you have here are -- strike that.
9            You are saying that there was not power to
10 see an effect based upon the calculation that you
11 did, correct?
12     A.    Let me qualify by saying I did three
13 different calculations with three different
14 programs.
15     Q.    Is there some difference in the
16 methodology from program to program that I need to
17 know about?
18     A.    No, there isn't.  But I wanted to make
19 sure that it was a spurious small --
20     Q.    What's the -- if it's -- what's the value
21 of the different programs if they all do the same
22 thing?
23     A.    That you have tested with different
24 software under different -- not circumstances in
25 terms of the numbers but --

page 69
1      Q.    Well, I'm just asking -- the numbers are
2  the numbers.
3      A.    It's just being thorough.
4      Q.    Okay.  But what I'm asking you is you're
5  going to come into court I assume, and you're going
6  to say I checked my program out three different
7  ways.  And I want to know really what value does
8  program two and three add to the mix?  All you're
9  doing is running the same numbers in the same way
10 again with a computer.  So you're not -- it's not
11 like you're checking your hand math to see if you
12 made a mistake.  What is it you're claiming you're
13 getting out of program two and three?

Page 30

arnett 20061020.txt

14    A.    If there was some kind of programming bug
15 in program one that had never been detected before
16 by any other statistician or epidemiologist that had
17 run the program, I wanted to make sure that I didn't
18 make that mistake.
19    Q.    Okay.  So, otherwise, these are
20 essentially fungible programs, and what you were
21 doing is putting your numbers into the same computer
22 the same way three times?
23    A.    With three different methods.
24    Q.    Okay.  Which you would expect would yield
25 the same result three times because it's just the

page 70
 1    computer running the same numbers according to the
 2 same methodology?
 3    A.    With the caveat that these were -- the
 4 STATA program that I most recently used is a well-
 5 respected well-utilized extant statistical analysis
 6 package used in training programs and statistical
 7 analysts throughout the country, probably the world,
 8 and I wanted something that was a well-respected
 9 tool.
10    Q.    But it does the same thing as the other
11 one?
12    A.    It did the same thing.
13    Q.    So assuming that there wasn't, as you say,
14 a programming glitch that no other epidemiologist or
15 statistician in the world had yet come across,
16 basically you were running the same numbers the same
17 way three times, and you wouldn't have expected the
18 results to change from time to time?
19    A.    I did not expect the results to change
20 from time to time.
21    Q.    Okay.  It's not like when I add -- the
22 days when I used to add up my checkbook by hand, and
23 I could get a different result every time.  The
24 computer is doing it, and the computer doesn't make
25 those kinds of changes in what it does from each

page 71
 1    time it runs the program, correct?
 2    A.    I don't -- I'm not a programmer.  I don't
 3 write code for programming.  So as an epidemiologist
 4 who applies programs I wanted to make completely 100
 5 percent sure the numbers were consistent across the
 6 packages.
 7    Q.    Okay.  But the point is just that you
 8 weren't looking at any kind of human error, you
 9 weren't really looking with the expectation of any
10 kind of programming error.  So there was no reason
11 to think that by changing programs you would have
12 increased your chance of finding a different result
13 because each program was doing the same thing as the
14 other one.
15         MR. LOCKLAR:  Object to the form.  Asked
16      and answered several times.
17    Q.    Right?
18    A.    It was calculating proportions within
19 treated versus comparator groups and with the
20 observed relative risk estimates and the number of
21 participants and calculating power.  So, yes, in all
22 three, that's how it worked.

                              Page 31

arnett 20061020.txt
```
23        Q.     And just so I'm absolutely clear, you
24   never exercised in the question -- you never asked
25   yourself the question of whether the Konstam
```

page 72
```
 1   analysis was sufficiently powered to find a relative
 2   risk on the order of magnitude seen in the APPROVe
 3   study, for example?
 4        A.     I did not.  As an epidemiologist I did not
 5   evaluate power on the basis of the observed data.
 6        Q.     And that is something that can be done,
 7   right?  You can do that formula?
 8        A.     There are graphical ways -- it could be
 9   done.
10        Q.     Okay.
11             MS. FREIWALD:  Let's just take a quick
12   break.
13             THE VIDEOGRAPHER:  We're off the record.
14   The time is 10:48.
15                  (Off the record.)
16             THE VIDEOGRAPHER:  We are on the record.
17   The time is 10:59.
18   BY MS. FREIWALD:
19        Q.     Doctor, after your last deposition you
20   gave me some CDs which had some materials on them,
21   and included in those materials were some patent
22   applications.  And I believe that you had also made
23   reference at your past deposition, as you made
24   reference in your current report, to relying on
25   certain patent applications, correct?
```

page 73
```
 1        A.     Correct.
 2        Q.     And what I did was I printed out,
 3   unfortunately just one copy, but a copy of the
 4   patent applications that were on that disk.  And I
 5   want to ask you which, if any, of these patent
 6   applications are you relying on for any opinions
 7   you're offering in the Dedrick case.
 8        A.     The first one is patent number 6136804
 9   submitted or filed on March 12th 1999 by
10   Nichtberger.  The second is -- was filed on March
11   12th 1999 by -- again, by Nichtberger.  And this is
12   patent 613680 -- that's the same one.  613680.  Same
13   one.  You have two copies.
14             And the third one was, again, by
15   Nichtberger, 6511968 filed October 23rd 2000.  And I
16   also skimmed the one by application -- this is an
17   international number.  And I'm not sure if it
18   represents the same compound.  But the international
19   number is WO, or O, 01/87343.
20        Q.     Okay.  You skimmed that one.  And there's
21   one more in your file.  Did you look at that or not?
22        A.     This one is by Scolnick with another
23   combined COX-2 with thromboxane inhibitor, and I did
24   skim this one as well.  And this number is in U.S.
25   patent application 20020016342.
```

page 74
```
 1        Q.     All right.  But it's the three Nichtberger
 2   patents that you're relying on?
 3        A.     I believe that, given that these have the
 4   same number, that the first two are one and the same
```
Page 32

arnett 20061020.txt

5  because they have the same application date.  So
6  there's one by Nichtberger dated October -- the date
7  of the patent generated was October 24th 2000.  The
8  second date of the patent generated was by
9  Nichtberger dated January 28th 2003 filed October
10 23rd 2000.
11       Q.   So the -- it's the Nichtberger patents
12 that you're relying on for your opinions?
13       A.   Yes.
14       Q.   Is that different from what you were
15 relying on at the time of the Albright deposition?
16       A.   It is not different.
17       Q.   And what I'd like you to do is take a pen,
18 if you wouldn't mind, and show me on the Nichtberger
19 patents where it is -- and now I'm reading from your
20 report -- that you believe that these patents
21 delineate the cardiovascular risk associated with
22 unopposed COX-2 inhibition consistent with the
23 mechanism -- with the above mechanism of action.
24       A.   Let me clear off my space here.
25            So in the abstract it states, This

page 75
0 1  invention provides a method for treating,
2  preventing, or reducing the risk of developing a
3  condition selected from the group consisting of
4  acute coronary ischemic syndrome thrombosis,
5  thromboembolism, thrombotic occlusion and
6  reocclusion, restenosis, TIAs, transient ischemic
7  attacks, and first or subsequent stroke in a
8  patient.  Do you want me to continue?
9       Q.   Mark that if that's language you're
10 relying on.  Does that say anywhere in a patient as
11 a result of taking Vioxx or any other COX-2?
12       A.   It does say in a patient comprising
13 administering to a patient a therapeutically
14 effective amount of an antiplatelet agent in
15 combination with therapeutic amounts of COX-2.
16       Q.   That's the patent.  That's the combination
17 product for which they're seeking a patent?
18       A.   Correct.
19       Q.   It doesn't say anything about an increased
20 risk of those events in patients taking Vioxx or
21 conventional COX-2, does it?
22       A.   What it's saying is that it's to prevent
23 that by providing something that is an antiplatelet
24 agent.
25       Q.   Where does it say in that paragraph that

page 76
0 1  it's trying to prevent an increased risk of a
2  thrombotic event in a patient consuming Vioxx or a
3  another COX-2?
4       A.   It's saying that it is combining these to
5  provide an antiplatelet effect.
6       Q.   Okay.
7       A.   In the presence of COX-2.
8       Q.   So all it's saying is that is a
9  combination product to provide a cardiovascular
10 benefit to patients who are at risk of thrombotic
11 events and are taking COX-2s?
12            MR. LOCKLAR:  Object to the form of the
13       question.

Page 33

arnett 20061020.txt

14      A.      Given that it's --
15      Q.      That's what it's saying, right?
16      A.      Well, in saying that it's combining an
17 antiplatelet agent, which is the known downside of
18 using Vioxx.
19      Q.      Where is that the known downside of using
20 Vioxx?
21      A.      In studies that were conducted by Merck --
22      Q.      Which ones?
23      A.      Including 023.  The FitzGerald Hypothesis
24 was supported in 023.
25      Q.      How does the FitzGerald Hypothesis prove

page 77
☐ 1  that Vioxx has an antiplatelet effect?
2       A.      Because of the known mechanism of action
3  of reducing prostacyclin which inhibits thromboxane
4  A2.
5       Q.      What do you think that 023 shows?
6       A.      It shows a reduction in urinary excretion
7  of prostacyclin with Vioxx administration.
8       Q.      From where?  Where was the prostacyclin
9  coming?
10      A.      From the systemic circulation through the
11 kidneys.
12      Q.      Okay.  Was there any evidence in 023 that
13 it was coming from the vasculature?
14      A.      It had to come from the body somewhere to
15 get out in the urine.
16      Q.      Do you know if there's more than one
17 possible state of prostacyclin in the body?
18      A.      Prostacyclin is ubiquitous --
19      Q.      Do you know if there's any evidence that
20 the source, or even the primary source, of
21 prostacyclin metabolite in 023 was the coronary
22 vasculature?
23      A.      We know that administration of Vioxx --
24      Q.      No, I just want to know if you know if 023
25 demonstrates that the source of the metabolites seen

page 78
☐ 1  in the urine was because of a reduction of
2  prostacyclin in the coronary vasculature?
3       A.      No.  Giving -- by giving the
4  administration of an agent known to have that effect
5  and observing --
6       Q.      How was --
7       A.      -- the downstream effect of having a
8  reduced prostacyclin --
9       Q.      Well, that --
10      A.      -- level in the kidney.
11      Q.      Doctor, that's circular.  How is the agent
12 known to have the effect?  You told me that 023 was
13 the one that showed you effect.
14      MR. LOCKLAR:   Object to the form.  I don't
15 think she said only 023 --
16      A.      Prior work by FitzGerald in the '80s had
17 led to this hypothesis about thromboxane and
18 prostacyclin balance.
19      Q.      What prior work by FitzGerald in the '80s
20 had demonstrated that COX-2s caused an imbalance of
21 prostacyclin and thromboxane?
22      A.      It was hypothesized early in the '80s.
                          Page 34

arnett 20061020.txt

23      Q.     What has showed a reduction of
24 prostacyclin prior to 023?
25      A.     To my knowledge 023 was the first clinical

page 79
1  study conducted by Merck in humans that demonstrated
2  that the FitzGerald Hypothesis worked.
3      Q.     What study was -- was conducted by anybody
4  else prior to 023 to show a reduction in vascular
5  prostacyclin in humans?
6      A.     I haven't reviewed that literature.  But
7  we do know that other evidence from the FitzGerald
8  Hypothesis were borne out in very early studies
9  relative to the dramatic elevation in blood
10 pressures that was also part of the FitzGerald
11 Hypothesis.
12     Q.     Well, I want to separate that out because
13 I think you said that you don't -- you're not going
14 to testify to whether the blood pressure effect that
15 you've talked to is a -- is related to a
16 prostacyclin mechanism or related to some other
17 mechanism, correct?
18     A.     I will testify about the blood pressure
19 elevations observed with Vioxx.  And that's what
20 I'll limit my testimony to.
21     Q.     You're not going to use the blood pressure
22 elevations as proof of reduction in vascular
23 prostacyclin?
24     A.     The mechanism proposed for that is through
25 this prostacyclin imbalance.

page 80
1      Q.     Well, no, not at all.  I mean, there's a
2  -- there's a renal explanation too, isn't there?
3      A.     In the FitzGerald Hypothesis it combined
4  all of those effects.
5      Q.     There's a renal explanation for blood
6  pressure increased with all NSAIDs, right, or don't
7  you know that because you haven't reviewed the NSAID
8  literature?
9      A.     I have not reviewed the NSAID literature.
10     Q.     And there's a renal explanation for blood
11 pressure effects with the COX-2s, or don't you know
12 that because you haven't reviewed the mechanism
13 literature?
14            MR. LOCKLAR:  Object to the form.
15     A.     I reviewed the FDA literature which
16 suggests that the renal implications -- I focus my
17 attention on Vioxx.  And there's equivocal evidence
18 that Vioxx causes elevated blood pressure.
19     Q.     Through a renal mechanism?
20            MR. LOCKLAR:  Object to the form.
21     A.     I don't know that they have defined the
22 mechanism in the FDA memos or the papers that I
23 reviewed.
24     Q.     Okay.  So you don't know what the
25 mechanism is.  You don't -- and you're not going to

page 81
1  speak to the mechanism.  You're just going to speak
2  to the evidence that you believe exists of the
3  clinical effect?
4      A.     I'm speaking as an epidemiologist about
                        Page 35

arnett 20061020.txt

5  the evidence from the studies that I reviewed which
6  are primarily the clinical trials.
7       Q.     Okay.  So we don't have to talk about the
8  blood pressure effect as being evidence of a
9  prostacyclin thromboxane imbalance because you're
10 not going to state that you're the expert to talk
11 about that?
12      A.     I'll let the cardiologist talk about
13 that.
14      Q.     And so that brings me full circle back to
15 where we were with 023.  Is there any study that you
16 know of before 023, whether Merck-sponsored or not,
17 that demonstrates that Vioxx or any other COX-2
18 causes a reduction in prostacyclin in the coronary
19 vasculature?
20      A.     The totality of evidence from the Merck
21 documents suggests --
22      Q.     Doctor, I'm going to move to strike.
23             I just need to know whether there's any
24 study.  Because at one point you said there was
25 stuff before 023.  So was there a study that you're

page 82
0 1  relying on before 023 that you say demonstrates a
2  reduction in prostacyclin in the coronary
3  vasculature?
4       A.     As a cardiovascular epidemiologist with
5  experience in endothelial function and vascular
6  significance and vascular compliance, I would -- I
7  would propose that the extreme elevations in blood
8  pressure observed in the early studies with Vioxx
9  would warrant justification of a renal effect and
10 perhaps also lead to an endothelium.
11      Q.     I'm not asking you about what questions
12 might have been raised by a blood pressure effect.
13 I just want to know -- and if you want to tell me
14 you didn't mean to say what I think you said or that
15 I understood it wrong and it wasn't what you said,
16 that's fine too.  But I'm pretty sure I heard you
17 say that there were studies before 023 that
18 demonstrated a reduction in prostacyclin in the
19 coronary vasculature.
20             So my first question is am I right you
21 said that.  And my second question is if you said
22 that, which studies.
23      A.     First, I don't recall ever saying anything
24 specific about the coronary vasculature.  I think
25 those were your words.

page 83
0 1      Q.     Then was there any study that you know of
2  before 023 that demonstrates a reduction in
3  prostacyclin in the coronary vasculature caused by
4  Vioxx or another COX-2?
5       A.     As an epidemiologist looking at the trail
6  of how studies were --
7       Q.     Doctor, I'm going --
8       A.     -- there must have been.  Because,
9  otherwise, they wouldn't have done the study.
10      Q.     Well, there's -- you're saying there's no
11 reason for the 023 study other than the existence of
12 prior studies that already proved what 023 couldn't
13 prove?

Page 36

arnett 20061020.txt

14      A.      Something made them suspicious about the
15  effect, and there was the FitzGerald Hypothesis
16  sitting out there and internal Merck documents
17  concerned about the effect.
18      Q.      Do you know when the FitzGerald Hypothesis
19  -- what we've dubbed as the FitzGerald Hypothesis
20  was originated?
21      A.      When it was originated?
22      Q.      Yeah.
23      A.      In the late '80s.
24      Q.      From what paper or what study?
25      A.      I have to be honest.  I haven't read the

page 84
 1   first paper that discussed it.  I only looked at it
 2  through the documents provided in the clinical trial
 3  publications.
 4      Q.      And are you going to testify there is any
 5  study post-023 that demonstrates a reduction of
 6  prostacyclin in the coronary vasculature in humans
 7  taking Vioxx?
 8      A.      I'm going to point to the epidemiologic
 9  evidence from the clinical trial data that exists,
10  and it doesn't speak to the prostacyclin levels.  It
11  speaks to the excess risk from Vioxx in terms of
12  cardiovascular disease.
13      Q.      So you're not going to talk about the
14  prostacyclin mechanism and say that you know that
15  prostacyclin is the mechanism that explains any
16  clinical effects that you believe to exist?
17              MR. LOCKLAR:  Object to the form of the
18  question.
19      A.      As an epidemiologist who has to understand
20  pathophysiology in order to design and interpret
21  studies, I rely on the published literature.  And to
22  the extent of the published literature in 023, that
23  would be the extent of my testimony relative to
24  prostacyclin.
25      Q.      Are you saying that 023 would be the

page 85
 1   extent of your testimony relative to prostacyclin?
 2      A.      And other published literature.
 3      Q.      What other published literature?
 4      A.      On mechanisms.
 5      Q.      What literature on mechanisms are you
 6  relying on?
 7      A.      There is the paper by FitzGerald.  There
 8  are summary reviews in the FDA memos about
 9  mechanism.
10      Q.      Is there any FDA memo that you're relying
11  on that says that prostacyclin imbalance or
12  prostacyclin reduction explains any perceived
13  cardiovascular increased risk associated with Vioxx?
14      A.      That was the hypothesized mechanism.
15      Q.      I understand it was a hypothesis.  I'm
16  asking whether you're going to tell me that there is
17  any place where the FDA says that that's been
18  proved.
19              MR. LOCKLAR:  Object to the form.
20      A.      Other than 023?
21      Q.      You and I are going to have to disagree
22  over what 023 shows.  But other than -- yes, my
                        Page 37

arnett 20061020.txt

23  question actually related to the FDA publications
24  because you had referenced them earlier.  Is there
25  any place you're going to say that the FDA has

page 86
 1   stated that the FitzGerald Hypothesis had been
 2  proved?
 3           MR. LOCKLAR:  Object to the form.
 4       A.   Not to my knowledge.  But, again, as an
 5  epidemiologist with a hypothesized mechanism
 6  corresponding with a patent application, that is --
 7       Q.   I just want to know whether there was --
 8  whether you're claiming that the FDA says the
 9  FitzGerald Hypothesis has been proved.
10       A.   In that exact language?
11       Q.   Yes.
12       A.   I will -- there is no exact language to my
13  knowledge.  But I've read thousands of pages.
14       Q.   And --
15       A.   It could be there.
16       Q.   And is there any place where
17  Dr. FitzGerald has said that his hypothesis of an
18  imbalance between prostacyclin and thromboxane has
19  now been shown to explain any perceived adverse
20  cardiovascular effect of Vioxx?
21       A.   I --
22           MR. LOCKLAR:  Go ahead.
23       A.   I recall hearing these at meetings.  I
24  haven't reviewed the papers.  But I do recall
25  hearing him say that.

page 87
 1       Q.   Where do you recall hearing him say that?
 2       A.   In -- I don't remember the context, if it
 3  was at the American Heart Association or some other
 4  adjunctive symposium with the American Heart
 5  Association.  I don't remember where I heard it.
 6       Q.   Do you know Dr. FitzGerald personally?
 7       A.   I do not.
 8       Q.   You've just heard him speak?
 9       A.   Uh-huh.
10       Q.   At a meeting or two?
11       A.   Correct.
12       Q.   And you haven't read his more recent
13  publications, correct?
14       A.   I have not.  I focused on the
15  epidemiologic literature.
16           MS. FREIWALD:  We need to change the tape.
17           THE VIDEOGRAPHER:  This is the end of Tape
18  Number Two in the continued deposition of Donna
19  Arnett to be continued on Tape Number Three.
20  We're off the record at 11:19 a.m.
21           (Off the record.)
22           THE VIDEOGRAPHER:  This is the beginning
23  of Tape Number Three in the continued deposition
24  of Donna Arnett.  We're on the record at
25  11:20 a.m.

page 88
 1   BY MS. FREIWALD:
 2       Q.   Let's go back to the patents, Doctor.  And
 3  you pointed me to the first paragraph.  Is there any
 4  other language in the patent application that you're
                        Page 38

                                    arnett 20061020.txt
 5   relying on to say the patents constitute a statement
 6   about increased cardiovascular risk with Vioxx?
 7        A.      On page three, or column three, of the
 8   March 12th 1999 patent, it states that NSAIDs have
 9   been shown to prevent production of prostaglandin,
10   which as we know is the mechanism or the enzyme
11   above the thromboxane prostacyclin.  And the recent
12   discovery that there are two iosforms of the COX
13   enzyme, COX-1, involved in physiological functions
14   which are the thromboxane.
15        Q.      I just want to --
16        A.      And COX-2 which --
17        Q.      Finish your thought and then I'll ask my
18   question.
19        A.      So while conventional NSAIDs brought both
20   forms, the identification of the inducible COX-2
21   associated with inflammation is a targeted
22   inhibition.  And it indicates that COX-1 is not
23   being involved, and then under the detailed
24   description, it says that --
25        Q.      Let me just stop you before we go on to

page 89
 1    the detailed description because I have a question
 2   about what you just read.  The reference to NSAIDs
 3   there is generic.  It's not talking about just COX-2
 4   inhibitors, correct?
 5        A.      It's talking about generic COX NSAIDs.
 6        Q.      NSAIDs that inhibit both COX-1 and COX-2?
 7        A.      Yes.
 8        Q.      And there's nothing there that talks about
 9   any adverse effect in terms of increased thrombotic
10   events as a result of COX-2 inhibition, correct?
11        A.      In the patent application itself there --
12   when I had this searchable form, it was easy to get
13   to.  But they talk about --
14        Q.      Just answer my question.  There's nothing
15   in that paragraph that talks about increased risk of
16   cardiovascular events as a result of COX-2
17   inhibition?
18        A.      In that paragraph, no.
19        Q.      Okay.  Then go on.  You wanted to point me
20   to some other language.
21        A.      In the detailed description of the
22   invention it talks about the instant -- invention
23   involves a novel combination therapy comprising
24   administration of a therapeutically effective amount
25   of a COX-2 inhibitor, which is in this case

page 90
 1    rofecoxib or Vioxx, in combination with a
 2   therapeutically effective amount of an antiplatelet
 3   agent to a mammal, and more particularly to a
 4   human.  And this combination therapy is used to
 5   inhibit platelet aggregation in mammals who are in
 6   need of such inhibition.
 7        Q.      Right.  And did you see the place in the
 8   -- well, first of all, let me ask you this
 9   question.  It doesn't say anything about needing
10   such inhibition because there is an increase in
11   platelet aggregation as a result of taking the
12   COX-2.
13             MR. LOCKLAR:  Object to the form.
                         Page 39

arnett 20061020.txt

14    Q.    Right?
15    A.    Well, we have --
16    Q.    Does it?  Does it say that?
17          MR. LOCKLAR:  Same objection.
18    Q.    Does it?
19    A.    Let me read through.
20    Q.    Well, just read where you were before.
21    A.    In that paragraph?
22    Q.    In what you just read, it doesn't say
23 anything about needing platelet inhibition because
24 you're taking a COX-2?
25    A.    It says the combination is used to inhibit

page 91
 1 platelet aggregation in people who need it.
 2    Q.    And there are people who need it who don't
 3 take COX-2s, right?  There are lots of people on
 4 aspirin, right?
 5    A.    Yes.
 6    Q.    And it's known that aspirin has -- can
 7 have a deleterious effect on the stomach, correct?
 8    A.    In high doses.
 9    Q.    And it's known that aspirin can interact
10 adversely with some NSAIDs, correct?
11    A.    I haven't reviewed that literature, but I
12 --
13    Q.    Okay.  Do you know that some NSAIDs can
14 actually offset the antiplatelet effects of aspirin?
15          MR. LOCKLAR:  Object to the form.
16    A.    I haven't reviewed that literature.
17    Q.    And so you do accept, don't you, that
18 there are patients who independent of taking a COX-2
19 need platelet inhibition, correct?
20          MR. LOCKLAR:  Object to the form.
21    A.    People at increased cardiovascular risk or
22 with risk factors depending on their gender, there
23 are different recommendations depending on gender
24 and risk factor levels for aspirin use.
25    Q.    So you have a patient who comes needing a

page 92
 1 COX-2 and also independently needs platelet
 2 inhibition because of their cardiovascular risk
 3 factors, right?
 4          MR. LOCKLAR:  Object to the form.
 5    A.    I could see that happening.
 6    Q.    Well, it's --
 7    A.    But it's the totality of evidence to date.
 8    Q.    Doctor, there's lots of -- in all the
 9 studies -- we talked about the fact that there were
10 studies that allowed patients who were aspirin
11 indicated that took aspirin.  And there were
12 patients that didn't allow -- there were studies
13 that didn't allow patients that were aspirin
14 indicated, right?
15    A.    Well, on line six --
16    Q.    Just am I right about that?
17    A.    Could you repeat it?
18    Q.    We've already talked about the fact that
19 in various studies, not just studies by Merck but
20 studies by Pfizer as well, there were sometimes
21 patients who were aspirin indicated and took aspirin
22 and sometimes patients who were not aspirin
                         Page 40

arnett 20061020.txt
23  indicated and didn't take aspirin, correct?
24      A.    Correct.
25      Q.    And that was independent of their use of

page 93
 1  the coxib.  That was because they were deemed to be
 2  in need of aspirin for cardiac health --
 3          MR. LOCKLAR:  Object to the form.
 4      A.    I don't -- I can't testify why they were
 5  taking it.  Presumably they were under the care of a
 6  physician and taking it as indicated by their
 7  physician.  I'm not a physician.
 8      Q.    Okay.  But these were patients who were on
 9  aspirin independent of their decision to take a
10  COX-2?
11      A.    I can't testify to what patients --
12      Q.    You don't know --
13      A.    -- are taking.
14      Q.    You don't know that about the studies?
15      A.    About the studies, I can testify that
16  there were -- when they started to allow aspirin
17  after the VIGOR study that there were up to 20
18  percent in some studies of aspirin use allowed.
19      Q.    And that was aspirin use because the
20  patients just happened to be taking aspirin?
21          MR. LOCKLAR:  Object to the form of the
22  question.
23      Q.    They weren't put on aspirin because they
24  were put in a study where they might have been
25  prescribed a COX-2.  They were patients who were

page 94
 1  already taking aspirin for cardiovascular
 2  prophylaxis?
 3      A.    It would be a reasonable I would think
 4  practice once the VIGOR results were out --
 5      Q.    Doctor, I'm not asking you what reasonable
 6  practice is.  Don't you know that the aspirin
 7  patients in these studies were aspirin patients just
 8  because they were taking aspirin?
 9          MR. LOCKLAR:  Object to the form.
10      A.    I don't know that.
11      Q.    You don't?
12      A.    I don't know that.
13      Q.    Okay.
14      A.    I don't know that they didn't go to their
15  doctor and say I'm thinking about going into this
16  study, and the doctor says, well, if you're going
17  into that study you need to be on aspirin because it
18  causes heart attacks.
19      Q.    Do you know -- so enroll in the study but
20  take an aspirin because I think it causes heart
21  attacks, you think that happened?  You're just
22  speculating now, right?
23      A.    Well, I happen to know in one --
24      Q.    You're just speculating?
25      A.    No, actually I have direct evidence of

page 95
 1  that, but it's irrelevant for this particular case.
 2      Q.    What direct evidence do you have, Doctor?
 3      A.    It pertains to another case.
 4      Q.    Okay.  A case that you've reviewed?
                        Page 41

arnett 20061020.txt

```
 5       A.    I did not review the medical records.
 6       Q.    Okay.  A case that is --
 7       A.    It's hearsay.  So I'll move to leave that.
 8       Q.    Is there some personal knowledge,
 9  something personal in your family or that you feel
10  you have some connection to the Vioxx litigation?
11       A.    No.
12       Q.    Okay.  Is there some friend or
13  acquaintance that you have some knowledge that you
14  think is -- bears on the testimony that you're
15  giving in this case?
16       A.    No.
17       Q.    Do you understand what aspirin indicated
18  meant in the Vioxx studies?
19       A.    Yes.
20       Q.    What is your understanding of what aspirin
21  indicated meant in the Vioxx studies?
22       A.    That if a person was on aspirin -- wanted
23  to take aspirin during the trial that they were
24  allowed to take it, up to 20 percent of those who
25  wanted to take aspirin were allowed to take it post-
```

page 96
```
 1  VIGOR.
 2       Q.    And do you know why they were taking it?
 3       A.    I'd like -- the answer is I don't know.  I
 4  would like to review the case report, the total form
 5  to contrast the risk factor levels of aspirin users
 6  versus nonusers because I'm assuming that you think
 7  they were at higher risk.
 8       Q.    My point is simply that the aspirin
 9  indicated patients were patients who were taking
10  aspirin because their doctors wanted them to be on
11  aspirin independent of their use of Vioxx.
12            MR. LOCKLAR:  Object to the form.
13       A.    In the Minnesota Heart Survey I was survey
14  director and principal investigator, we found
15  aspirin use was very common in the community for
16  cardiovascular prevention.  So it may or may not
17  have been indicated by a doctor.  That's why -- I'm
18  not trying to be evasive.  I'm just trying to be an
19  honest epidemiologist.
20       Q.    I'm not getting -- you're trying to get
21  ahead of me, frankly.  And you're trying to think
22  about issues that I'm not asking.  I'm not asking
23  you about whether there was a disparity of risk
24  level in the aspirin indicated versus the
25  nonindicated patients.  And I'm not asking you about
```

page 97
```
 1  whether or not you think there might be variability
 2  in physician prescribing habits for aspirin.
 3            All I'm asking you is a very simple
 4  factual question that in the Vioxx studies as well
 5  as in the Celebrex studies patients were allowed who
 6  were taking aspirin for cardiovascular prophylaxis
 7  independent of their use of the COX-2.
 8            MR. LOCKLAR:  Object to the form.
 9       Q.    Correct?
10       A.    I'm not testifying about Celebrex.  I
11  don't know how that came in there.
12       Q.    Okay.  You haven't read the Celebrex
13  studies to talk -- to speak to them?
```

arnett 20061020.txt
```
14      A.    No, I haven't.
15      Q.    So then I'll limit my question to the
16 Vioxx studies.  Can you answer it?
17      A.    Could you repeat it?
18      Q.    Sure.  All I have -- I think it's really a
19 uncontroversial thing so I don't know why we're
20 going round and round about this.  Isn't it true,
21 Doctor, that in the Vioxx studies, some of the Vioxx
22 studies, there were patients who were on aspirin for
23 cardiovascular prophylaxis independent of their use
24 of Vioxx or independent of their enrollment in the
25 study?

page 98
□ 1           MR. LOCKLAR:  Object to the form.
 2      A.    I can -- I can agree that there were
 3 people taking aspirin in post-VIGOR studies.  I
 4 can't tell you why they were taking aspirin.
 5      Q.    Then let's go on.  You wanted to point me
 6 to some other language in the patent.
 7      A.    In number -- on page six they get more --
 8 this is organized according to column.  They talk
 9 about what a prophylactically effective amount
10 means, that it will reduce the risk of occurrence of
11 the medical event that's -- and then in the next
12 paragraph below that they specifically define acute
13 coronary ischemic syndrome.  So they have created a
14 compound to offset the risk from the COX-2.
15      Q.    Where does it say that?
16      A.    In one of these documents it says that.
17           It says on page 23 that it's expected that
18 a combination therapy of the GT 2B 3A receptor
19 agonist was -- antagonist with orally administered
20 COX-2 could be used in response to an acute medical
21 event where inhibition of platelet aggregation is
22 needed.
23      Q.    Where does that say that the medical event
24 is caused by the COX-2?  I mean, that's what aspirin
25 does, right?

page 99
□ 1      A.    This specifically is about the GT 2B 3A.
 2      Q.    Right.  But my point is that when people
 3 have heart attacks that's why they take aspirin, and
 4 that is -- they do that whether they're taking Vioxx
 5 or not.
 6      A.    On 25, In accordance to this devention, a
 7 therapeutically effective amount of COX-2 inhibitor
 8 and a therapeutic effective amount of an
 9 antiplatelet agent can be used for preparation.
10 Medicine useful for inhibiting platelet aggregation
11 for treating, preventing, or reducing the risk of
12 developing acute ischemic syndrome in humans.
13      Q.    Okay.  But it still doesn't say caused by
14 the COX-2.  And we all know that acute ischemic
15 syndromes happen in people, right?
16      A.    As I see it as an epidemiologist, we had
17 023 --
18      Q.    Could you just answer --
19      A.    -- which was right before VIGOR came out.
20 And so certainly they knew at that point through
21 monitoring data by a Data Safety Monitoring Board,
22 and certainly there were people monitoring that
                        Page 43
```

arnett 20061020.txt
23  study that there was this excess risk.
24       Q.     And --
25       A.     They were putting together a product that

page 100
□ 1  would take away that cardiovascular risk.
 2       Q.     Do you know that if at the time there were
 3  also theories about cardiovascular protective
 4  benefits of COX-2 inhibition by reducing
 5  inflammation?
 6       A.     I'm not aware that that was ever promoted
 7  as a benefit.
 8       Q.     You don't --
 9       A.     Certainly none of the studies have borne
10  that out.
11       Q.     You don't -- you don't know if there were
12  studies that have shown that?
13       A.     There were no clinical trials that show
14  that Vioxx is protective for cardiovascular
15  disease. And, in fact, the FDA voted 32 to one --
16  to zero in a panel that it was cardiotoxic.
17       Q.     Do you know if -- that's what you think
18  the FDA vote was?
19       A.     The advisory?
20       Q.     Yes.
21       A.     Yes, it was 32 to zero.
22       Q.     That it was cardiotoxic?
23       A.     Yes.
24       Q.     That's the words you're saying the FDA
25  used?

page 101
□ 1       A.     I'll get the exact words.
 2       Q.     Okay. Well, we'll do that later. But
 3  going back, have you reviewed the literature with
 4  regard to the scientific hypothesis that Vioxx and
 5  other COX-2s could reduce the cardiovascular risk by
 6  reducing inflammation?
 7       A.     I have not reviewed that literature and it
 8  has not been in any of the publications related to
 9  the trials or the meta-analyses.
10       Q.     Have you ever as an epidemiologist before
11  you were hired to work in this lawsuit reviewed a
12  patent application in forming your epidemiologic
13  opinion?
14       A.     I've participated in patent applications
15  for my own work.
16       Q.     That's not my question.
17       A.     So, yes, that would form my opinions.
18       Q.     Have you ever relied on a patent
19  application as evidence of what was in the thought
20  process of a company before you were retained in
21  this litigation?
22       A.     I have never been involved in litigation
23  prior to this.
24       Q.     And so you haven't offered the opinions --
25       A.     So I never -- never had the need to go and

page 102
□ 1  look at patent applications.
 2       Q.     And you've never relied on a patent
 3  application as evidence of an epidemiologic
 4  conclusion before?

                    Page 44

arnett 20061020.txt

```
 5              MR. LOCKLAR:  Object to the form.
 6        A.     I haven't had to -- I've not used it, but
 7   I am writing a paper now on patent applications
 8   relative to one that I put in.
 9        Q.     What kind of patent application?
10        A.     On a patent for -- I can't disclose the
11   gene or enzyme.  But it's related to one of my
12   studies.  So I'm reviewing patent applications and
13   writing in epidemiologic treatises on this area in
14   one of my funded studies.
15        Q.     What I want to know is what does the
16   patent application have to do with an epidemiology
17   treatise?
18        A.     Because we're deriving the information in
19   the patent -- you know, patents have an abstract.
20   They have all of the rationale for the background of
21   the invention, the summary of the invention, the
22   details about the invention.  And there's a lot of
23   information in patents about the product.
24        Q.     Let me just ask an open-ended -- what is
25   it you're writing about patents now independent of
```

page 103
```
 1   this lawsuit?  In your regular work, what is it that
 2   you're writing?
 3        A.     I was asked by the editor of a journal
 4   called Cardiovascular Therapeutics to select a
 5   particular gene or protein to review patents for
 6   cardiovascular relevance.  And I selected one that's
 7   related to my work.
 8        Q.     I'm sorry.  I'm just not understanding
 9   your answer.  You were asked to select a particular
10   gene or protein and review patents related to that
11   particular gene or protein?
12        A.     Right, for cardiovascular therapeutic
13   indications.
14        Q.     And what is the epidemiologic piece of the
15   writing?
16        A.     I'm summarizing the data within those
17   patents and the purpose and looking at whether the
18   -- my particular area, where it stands in terms of
19   patents and potential therapeutic indications.  So I
20   have worked in terms of reading patents and
21   understanding them.  I've also participated in my
22   own -- two of my own patents --
23        Q.     I'm not disputing with you that in
24   medicine there are patents and that there are
25   patents that relate broadly speaking to areas of
```

page 104
```
 1   cardiovascular epidemiology.  But what I'm asking
 2   you is have you ever used a patent application in
 3   your work as evidence that a drug or a compound has
 4   a cardiovascular effect?
 5        A.     I just commented on the one that I'm
 6   doing.  I can't name the protein or gene, but I am
 7   doing one now.
 8        Q.     Is there anything else in the patent
 9   applications that you rely on as evidence that Merck
10   was acknowledging an increased risk of
11   cardiovascular events with Vioxx?
12        A.     The timing, the date of the application.
13        Q.     And why is that relevant in your mind?
```

Page 45

arnett 20061020.txt

14      A.    Because the date of the application came
15 out after the 023 trial was conducted.
16      Q.    And the 023 trial, if I understand your
17 testimony right, you don't know if that actually
18 shows reduction in prostacyclin in the coronary
19 vasculature or not, correct?
20           MR. LOCKLAR:  Object to the form.  Asked
21      and answered.
22      A.    It shows reduction in prostacyclin as
23 measured through urinary excretion.
24      Q.    Somewhere but we don't know where?
25           MR. LOCKLAR:  Object to the form.  Asked

page 105
□ 1      and answered.
2       A.    It comes out the kidneys.
3       Q.    And was there any increase in the number
4 of heart events in 023?
5       A.    They were two, three subjects, and they
6 were all healthy.  So the answer is, no, but it
7 wasn't designed to test that.
8       Q.    It was a mechanism study?
9       A.    Correct.
10      Q.    What I'd like to do is take the patent
11 applications and --
12           MR. LOCKLAR:  Does it matter if this is a
13      duplication?
14           MS. FREIWALD:  No.  If I had a duplicate
15      in there, that's fine.  What I'll do is there's
16      four patent applications, the two Nichtberger
17      ones, the international one, and the Scolnick
18      one.  And I'm going to put them together as one
19      exhibit.  And it will be 13.
20                (Defendant's Exhibit Number 13
21                was marked for identification.)
22 BY MS. FREIWALD:
23      Q.    Doctor, are there any studies before VIGOR
24 that you're going to point to where you'll say that
25 there was a numerically significant disparity in the

page 106
□ 1  number of heart attacks?
2       A.    I've done most of my assessment on the
3 combined endpoint.  And in the combined endpoint I
4 would say that I would point to studies that show a
5 numerical increase.
6       Q.    Before VIGOR which ones?
7       A.    So in the cardiovascular review of the
8 NDA, the Villalba memo dated 5/17/99 page 104 it
9 says, Evaluation of cardiovascular thromboembolic
10 events regardless of seriousness shows a numerically
11 higher incidence of ischemic thromboembolic events
12 inclusive of angina, myocardial infarction, CVA and
13 TIA, in patients taking rofecoxib versus placebo.
14      Q.    You're looking at the 5/20/99 Medical
15 Officer Review?
16      A.    5/17/99 is the date on the bottom of the
17 page in the Villalba memo.
18      Q.    What page are you looking at?
19      A.    Page 104 entitled, Thromboembolic and
20 Vascular Safety.  And presumably the NDA had the
21 totality of data.
22      Q.    Okay.  You have no reason to think that
                          Page 46

                                    arnett 20061020.txt
23    any of the data were withheld from the FDA, correct?
24        A.     I have no reason to believe that.
25        Q.     And so the FDA was aware of these -- of

page 107
 1    the numerical results of the studies at the time
 2    that the NDA was approved, correct?
 3             MR. LOCKLAR:  Object to the form.
 4        A.     They were aware, but there were concerns
 5    expressed by the officer.  And specifically that it
 6    was impossible to answer with certainty about
 7    cardiovascular and thrombotic risk --
 8        Q.     Okay.  So that --
 9        A.     -- in patients on Vioxx.
10        Q.     So that was discussed with the FDA prior
11    to the approval of NDA, correct?
12             MR. LOCKLAR:  Object to the form.
13        A.     It was in -- it was in Villalba's memo.
14        Q.     So there was a discussion with the FDA
15    about the numeric differences before Vioxx was
16    approved, correct?
17             MR. LOCKLAR:  Object to the form.
18        A.     The Villalba memo states that a larger
19    database will be needed to answer cardiovascular
20    safety.
21        Q.     Doctor, the FDA was aware of the numeric
22    differences before the NDA for Vioxx was approved,
23    correct?
24             MR. LOCKLAR:  Object to the form as to
25    what the FDA knew.

page 108
 1        Q.     Well, it's right in the FDA memo.
 2        A.     So this was a Medical Officer Review for
 3    cardiovascular disease that the safety --
 4        Q.     Okay.  So the medical officer in charge of
 5    reviewing the cardiovascular safety of Vioxx wrote
 6    an official memo, right, where she laid out the
 7    numeric results of the studies with regard to
 8    composite cardiovascular endpoints, correct?
 9        A.     Correct, and stated that it's impossible
10    to answer with certainty whether or not there was an
11    increased risk, but there was concern.
12        Q.     Okay.  So there was a question raised
13    you're saying that was known to be a question by the
14    FDA at the time that the Vioxx NDA was approved?
15             MR. LOCKLAR:  Object to the form of the
16    question.
17        A.     According to -- obviously it was approved,
18    but there were concerns expressed by the FDA about
19    the cardiovascular safety and that there needed to
20    be more patients in order to evaluate the
21    cardiovascular risk.
22        Q.     And so that was known to the FDA, and they
23    knew that they were going to need more data if they
24    were going to come to a conclusion, correct?
25             MR. LOCKLAR:  Object to the form.

page 109
 1        A.     I have what is stated by Villalba.
 2        Q.     And that's what it says?
 3        A.     And to what extent she represents the FDA,
 4    I agree with that statement.
                                    Page 47

arnett 20061020.txt

```
 5        Q.    And do you know how typical it is that at
 6   the time that drugs are approved the FDA knows that
 7   there are questions that cannot be answered except
 8   for with longer and much larger studies or exposure
 9   in the general population?
10        MR. LOCKLAR:  Object to the form of the
11   question.
12        A.    Vioxx is being approved for treatment of a
13   different condition.  Cardiovascular disease was a
14   serious adverse event.
15        Q.    All I want to know is if you know how
16   common or not common it is for the FDA to approve
17   agents knowing that there may be certain adverse
18   events that have not yet been seen and that will
19   only be seen with further follow-up or exposure in
20   the general population?
21        MR. LOCKLAR:  Object to the form.
22        A.    I cannot comment.  I know there's been
23   senate testimony by experts about the need for
24   increased regulation post-marketing because of the
25   issues with Vioxx.

page 110
 1        Q.    So you don't -- you don't know -- you're
 2   relying on what you read in the news now or see on
 3   TV?
 4        A.    NO.  I downloaded it from senate
 5   testimony.
 6        Q.    Okay.  So that's the same kind of stuff
 7   that any person could get off the Internet, right?
 8        A.    Uh-huh.  Yes.
 9        Q.    And you don't have expertise in the FDA
10   review process, right?
11        A.    I do not have expertise in the review
12   process.  Although it's --
13        Q.    But --
14        A.    -- it's apparent from the documentation
15   how reviews occur.
16        Q.    That's what I want to know.  You don't
17   know how the process works in terms of how
18   frequently there are, just as a result of the
19   limitations of the study design, questions about
20   safety or efficacy that cannot be fully answered at
21   the time that a medicine is approved?
22        MR. LOCKLAR:  Object to the form.
23        A.    That is -- that is true.
24        Q.    Now, other than the -- I should ask you
25   since you cited Villalba as one of the things you

page 111
 1   rely on.  Is there anything else in the Villalba
 2   5/99 Medical Officer Review that you would cite in
 3   support of any of the opinions you intend to offer?
 4        A.    She also at that point emphasizes the need
 5   for aspirin use for cardiovascular reasons.
 6        Q.    Can you tell me where you're reading?
 7        A.    It's on page 105 in her summary statement
 8   she says, We need a larger database.  We need
 9   patients that have indications for aspirin to
10   continue aspirin when taking rofecoxib.  And then
11   she expresses concerns that that will offset the GI
12   benefit of Vioxx.
13        Q.    Okay.  So here she's not talking about the
```

Page 48

arnett 20061020.txt

14   need to have patients who are taking Vioxx out in
15   the general world to use aspirin. She's talking
16   about the need to study Vioxx in aspirin indicated
17   patients?
18        A.    Actually, I don't agree with that
19   interpretation. Her first paragraph in the summary
20   says we need a larger database to answer this
21   important safety question. Paragraph two, Patients
22   who need aspirin for cardiovascular reasons should
23   not stop taking aspirin when taking Vioxx. That's
24   not a research question. That's a directive.
25        Q.    And it was known at that time that Vioxx

page 112
 1   didn't have the antiplatelet effect of aspirin,
 2   correct?
 3        A.    I don't know that they measured platelets
 4   in the -- I can't answer that question. There was
 5   the FitzGerald Hypothesis and 023 suggesting
 6   reduction of prostacyclin which would lead to
 7   platelet aggregation.
 8        Q.    Okay. So you don't know whether it was
 9   known at that time that Vioxx had an antiplatelet
10   effect like aspirin?
11        MR. LOCKLAR:  Object to the form.
12        A.    I think the converse was known.
13        Q.    So it was known at that time that Vioxx
14   was not a substitute for aspirin, correct?
15        A.    It was known that it would cause platelet
16   aggregation.
17        Q.    Doctor, where was it known that it would
18   cause platelet aggregation, 023?
19        A.    The hypothesized mechanism and the numeric
20   excess of cardiovascular events from the drug.
21        Q.    Well, the fact that there's a clinical
22   outcome doesn't prove the mechanism, right? So even
23   if you assume that the numeric and not statistically
24   significant excess is meaningful in some way, you
25   can't use that to back-door your way in to proving

page 113
 1   your mechanism?
 2        A.    I can't, but Dr. Villalba did.
 3        Q.    How did she?
 4        A.    Because she said you should -- you
 5   shouldn't stop taking aspirin. You should take
 6   aspirin.
 7        Q.    Well, but even if you're taking a
 8   medication that's completely neutral on platelets,
 9   you still need to take your aspirin.
10        MR. LOCKLAR:  Object to the form.
11        Q.    Patients could believe that because
12   they're taking an NSAID and aspirin is an NSAID,
13   they should stop taking their aspirin.
14        MR. LOCKLAR:  Object to the form.
15        Q.    But they can't because Vioxx doesn't have
16   an antiplatelet effect, right?
17        MR. LOCKLAR:  Object to the form.
18        A.    I can say that there's an excess numeric
19   risk of cardiovascular events in Vioxx in the NDA
20   application originally and that she recommends that
21   people not stop taking aspirin, which is a preventer
22   of cardiovascular disease through an antiplatelet
                              Page 49

arnett 20061020.txt

23   mechanism.
24        Q.     And it wasn't an excess of cardiovascular
25   risk that Dr. Villalba or the FDA thought was

page 114
0  1   significant enough to prevent the approval of the
2   medication, correct?
3             MR. LOCKLAR:  Object to the form.
4        A.     It was approved with the caveat that they
5   need to follow it for safety closely.
6        Q.     Anything else in the Villalba memo that
7   you're relying on?
8        A.     No.
9        Q.     Is there any other -- I think we've
10   already talked about 090.  And is there anything --
11   any other source of information that you're relying
12   on as evidence of an increased risk of MI with Vioxx
13   before VIGOR?
14        A.     In reviewing the data that came out from
15   the recent paper by Zhang, which was the meta-
16   analysis of all randomized trials, there's
17   compelling data about the blood pressure elevating
18   effects of Vioxx relative to other COX-2 and other
19   NSAIDs.  And from that review, I would say that
20   prior to VIGOR the studies uniformly show a much
21   greater drop-out rate for hypertension events and
22   blood pressure elevations.
23        Q.     Is there anything in Zhang that
24   demonstrates a correlation between blood pressure
25   events and increased MI?

page 115
0  1        A.     It wasn't an objective, but elevated blood
2   pressure is a known risk factor for cardiovascular
3   disease.
4        Q.     We talked about it -- we talked last time
5   about it being a risk factor over time, correct?
6        A.     Correct.
7        Q.     And most of the studies that look at it as
8   a risk factor over time being one- to three-year
9   studies, correct?
10             MR. LOCKLAR:  Object to the form.
11        A.     I'd be happy to review my testimony.
12        Q.     Well, am I right that most of the blood
13   pressure studies that show a clinical effect from
14   increased blood pressure look at a period of at
15   least one year and often more like three years?
16        A.     It depends on the outcome.
17        Q.     If you're looking for an outcome of heart
18   attack or stroke?
19        A.     I would agree that they tend to be longer
20   term trials depending on the age of the population
21   recruited and the underlying cardiovascular disease
22   rate within that population, the risk factor level
23   in the population.
24        Q.     Is there any epidemiologic data that you
25   can point me to that demonstrates an increased risk

page 116
0  1   of heart attack as a result of blood pressure
2   elevation for a period of less than a year?
3        A.     As epidemiologists we look at graded
4   levels of risk with increasing levels of blood
                              Page 50

arnett 20061020.txt

5    pressure over time.  I -- we don't typically ask
6    that year-to-year question.  In epidemiologic
7    studies we don't tend to recruit people and evaluate
8    them every year.
9          Q.    Well, what I -- my understanding and
10   correct me if I'm wrong -- is that the studies that
11   have looked at the risk of blood pressure have
12   essentially all been long-term studies.
13         A.    Can you define long-term?
14         Q.    At least a year, if not three, five, ten
15   year studies.
16         A.    The largest study done for blood pressure
17   known to date is the ALLHAT study, the
18   antihypertensive and lipid-lowering trial.  And it
19   had 42,000 subjects, and the main follow-up in that
20   trial was four years.
21         Q.    Okay.  And what I'm trying to --
22         A.    If that answers your question.  I'm sorry.
23         Q.    Well, it certainly answers by way of
24   example.  I don't think it gives -- it answers the
25   question of exclusion that I was trying to ask,

page 117
0  1  which is are there any studies that you know of that
2    were designed to look for a correlation between
3    blood pressure increase and a hard cardiac event
4    like a heart attack and that only followed patients
5    for a period of less than a year?
6          MR. LOCKLAR:  Object to the form.
7          A.    I'm -- there haven't been recent studies
8    since I became an expert in cardiovascular
9    epidemiology over the last 25 years.
10         Q.    Okay.  So that's what I want to know.  Is
11   there any data that you could point to that says
12   that epidemiologists have been able to correlate an
13   increase in blood pressure to an increased risk of a
14   hard cardiac event like a heart attack where the
15   blood pressure increase is for a shorter period of
16   time than a year?
17         MR. LOCKLAR:  Object to the form.
18         A.    I can't point you to that.  But it's a
19   well-established risk factor that there is a graded
20   increase in cardiovascular risk with increase in
21   blood pressure.
22         Q.    Right, but over time.  Not immediately.
23         A.    And, once again, Vioxx is a pharmacologic
24   agent that has a --
25         Q.    Doctor, can you just answer my question.

page 118
0  1  There is no -- there is no study that shows an
2    immediate effect?  You're talking about a huge spike
3    in blood pressure.  That usually causes stroke more
4    than heart attack, right?
5          A.    In the early -- some of the early dose
6    ranging studies --
7          Q.    Now, Doctor --
8          A.    Protocol 010 there were fairly serious
9    elevations in blood pressure --
10         Q.    Doctor, I'm not asking you about --
11         A.    -- with Vioxx.
12         Q.    -- blood pressure in patients on Vioxx.
13   I'm asking you about the epidemiologic data.  I
                    Page 51

arnett 20061020.txt

14   understand that blood pressure is a graded risk.
15   But it is a -- it is a risk that has two components,
16   right?  One is magnitude of increase in blood
17   pressure, and the other is time, right?
18              MR. LOCKLAR:  Object to the form of the
19   question.
20       Q.    Yes?
21       A.    Yes.
22       Q.    Okay.
23       A.    But it --
24       Q.    And there's no -- I want to know if
25   there's any data that I just don't know about that

page 119
 1   shows that on a population basis an increased risk
 2   of blood pressure of three points or five points, or
 3   any number you want to pick, has been correlated
 4   with an increased risk of a hard cardiac event like
 5   a heart attack within a period of time of less than
 6   a year?
 7              MR. LOCKLAR:  Object to the form of the
 8   question.
 9       A.     In epidemiologic studies I would agree.
10   But this is not.  That is a clinical trial where
11   you're intervening by giving individuals a drug that
12   is known to have --
13       Q.    I don't -- all I was --
14       A.    -- hypertensive effect.
15       Q.    -- asking you about is what the
16   epidemiologic data allows us to say.
17       A.    And recall too that the --
18       Q.    Doctor --
19       A.    What we --
20       Q.    I'm going to move to strike as
21   nonresponsive.  I just want to ask you a question
22   about what the epi studies show.  And we're in
23   agreement that there are no epi studies that you're
24   going to be able to point me to that says they
25   looked at patients for six months, and they found

page 120
 1   six months of raising your blood pressure five
 2   points resulted in an increase in heart attacks of X
 3   magnitude, right?
 4       A.    I would agree with that, but this is a
 5   drug --
 6       Q.    That's all I need.  That is --
 7       A.    I haven't been able to --
 8              MR. LOCKLAR:  No, she's allowed to answer
 9   the question.
10       A.    To finish my answers.
11       Q.    My question had nothing to do with Vioxx.
12   My question had to do with the epidemiologic data.
13              MR. LOCKLAR:  She's entitled to finish her
14   question.
15              MS. FREIWALD:  No, she's only entitled to
16   give me responsive answers.
17              THE WITNESS:  That you want to hear.
18              MR. LOCKLAR:  Excuse me, you don't need to
19   argue with her.
20              THE WITNESS:  Sorry.
21              MR. LOCKLAR:  That's my job.  She's
22   entitled to finish her answer.
                              Page 52

arnett 20061020.txt

```
23            MS. FREIWALD:  No, she's not.  She's
24       entitled to answer the question which was
25       related to epidemiologic data.  So --

page 121
 1            MR. LOCKLAR:  I tell you what I'll do.
 2       We'll make a deal.  As long as you don't stand
 3       up in front of the judge and say, Judge, this
 4       was not her -- or in front of a jury and say
 5       this was not answered in her deposition -- if
 6       you're going to cut her off, we're certainly not
 7       going to limit her when it comes to time of
 8       trial.
 9            If you want her deposition to be thorough
10       and you want it to be complete, then as an
11       expert witness she's entitled to complete her
12       answer.  So it's your choice.
13            MS. FREIWALD:  That's fine.  I'll take the
14       answer to my question.
15       BY MS. FREIWALD:
16          Q.   Now, Doctor, in any of the studies that
17       you looked at for Vioxx that you show -- say show an
18       increase in blood pressure effect, were you able to
19       correlate the increase in blood pressure effect with
20       an increase in heart attack or in any other hard
21       cardiac event?
22          A.    The data were not available to me to do
23       that.  However, we know from clinical trial evidence
24       as well as epidemiologic evidence that an increase
25       in blood pressure over time leads to an increase in

page 122
 1       events.  And recall that in these protocols that
 2       were implemented like 010 and 017 where you're
 3       getting, you know, 16 millimeters of mercury
 4       increase in blood pressure on average, there could
 5       be a range of effect from no sensitivity to blood
 6       pressure on Vioxx to maybe huge changes of 40 to 50
 7       millimeters of mercury.  So it -- when we're looking
 8       at the average population, we can't extrapolate to
 9       individuals.
10          Q.   Doctor, have you done an analysis of what
11       the blood pressure effect is with any other NSAIDs
12       either taken acutely or taken chronically?
13          A.    By analysis do you mean have I gone and
14       retrieved data and run STATA programs on them?
15          Q.   Yes, or done something comparable to what
16       you've done for Vioxx.
17          A.    I haven't but others have.
18          Q.   And when you say others, you're relying on
19       the Zhang article?
20          A.    Correct.
21          Q.   And have you done anything to look at the
22       magnitude of the effect with other NSAIDs other than
23       read the Zhang article?
24          A.    I have not.  I focused on Vioxx.
25          Q.   And that would include COX-2s as well as

page 123
 1       nonselective NSAIDs, correct?
 2          A.    It includes the comparators used in the
 3       Vioxx clinical studies.
 4          Q.    And do you know whether the methods for
```

                                    Page 53

arnett 20061020.txt

5  monitoring blood pressure from study to study were
6  the same?
7      A.    For Vioxx?
8      Q.    For any of the studies in the zhang
9  article.
10     A.    I don't know how -- I did not review each
11 individual protocol because they're not available to
12 me.
13     Q.    Do you know if any of the studies were
14 designed as blood pressure studies?
15     A.    I assume that none of them, since their
16 purpose for getting approved for Vioxx was to treat
17 OA and eventually RA, that they were designed for
18 that purpose.  I can say that every clinical trial
19 that I've been involved with has a very standard way
20 of collection of blood pressure and other
21 measurements.
22     Q.    Is there a --
23     A.    With --
24     Q.    I'm sorry.  Go on.
25     A.    With a standardized protocol.

page 124
□ 1      Q.    Is there a difference in how blood
2  pressure may be collected or measured if one of the
3  endpoints of the study is testing blood pressure as
4  opposed to if you're simply doing blood pressure
5  monitoring during the course of the study?
6      A.    There -- certainly trials designed to test
7  blood pressure, if that is their main outcome, would
8  have rigorous methodology around testing that.
9      Q.    So if --
10     A.    And I cannot answer for -- since Merck had
11 a very specific standard operating procedure for
12 cardiovascular events, I don't know whether or not
13 their blood pressure measurement was included in a
14 very standardized way as well.
15     Q.    And do you know if there's any differences
16 in how blood pressure was monitored in the Merck
17 studies for Vioxx from how it was monitored in the
18 Celebrex studies?
19     A.    I haven't reviewed Celebrex studies.
20     Q.    And do you know if there was any
21 difference in how blood pressure has been monitored
22 in any study that used any nonselective NSAID as a
23 comparator?
24     A.    I've reviewed the Vioxx literature and the
25 memos from the FDA.  There was no protocol listed in

page 125
□ 1  that.
2      Q.    Would you agree that as a general matter
3  blood pressure studies will have more rigorous
4  mechanisms for testing blood pressure than studies
5  that are not designed with the primary endpoint of
6  monitoring blood pressure?
7      MR. LOCKLAR:  Object to the form.
8      A.    I can't say that with certainty.  In my
9  studies we have very strict protocols, and they're
10 not all blood pressure studies.  So it would vary
11 depending on the protocol.
12     Q.    And what are the protocols that you use?
13     A.    In detail or in superficial?

Page 54

arnett 20061020.txt

14    Q.    Well, give me the general first.
15    A.    In general for the Minnesota Heart Survey
16   we required people to be in a quiet room with legs
17   uncrossed for five minutes with no talking prior to
18   measurement.
19    Q.    Did you require the blood pressure reading
20   always be at the same time of day?
21    A.    No.
22    Q.    Did you require that it be done with a
23   certain level of frequency?
24    A.    Usually two to three times.  In the
25   Minnesota Heart Survey it was two.

page 126
 1    Q.    And two during the time of the entire
 2   study?
 3    A.    Two during that visit.
 4    Q.    Two during the visit.  And is there any
 5   confirmation of the blood pressure that's required?
 6   Do you need a repeat measurement each time or not?
 7    A.    We follow a standardized protocol.  So
 8   there are two measurements that were taken in the
 9   Minnesota Heart Survey.
10    Q.    I'm sorry.  I'm just not following.  Each
11   visit there needs to be two readings of the blood
12   pressure?
13    A.    There's only one visit for the Minnesota
14   Heart Survey.  It's a cross-sectional survey.
15    Q.    Okay.  Maybe we're too into the details of
16   a particular study.  When you do a study and you
17   require blood pressure monitoring, do you require
18   that the reading that is done at a particular visit
19   be done twice or just once?
20    A.    If blood pressure is my primary outcome?
21    Q.    Okay.
22    A.    If blood pressure is my primary outcome, I
23   would have three readings at a minimum.
24    Q.    And what if it's not your primary outcome?
25    A.    I have had one reading.

page 127
 1    Q.    All right.  You said that you also looked
 2   at the Villalba memo from June of 2000 in forming
 3   your opinion.  Could you tell me specifically what
 4   it is you're relying on there?
 5    A.    This was in response to this supplement
 6   which included data on three new studies, 088, 85
 7   and 90.  And here they were evaluating the
 8   cardiovascular safety.  And they discussed that the
 9   cumulative rate for serious vascular and thrombotic
10   events was 1.8, this is page four, versus .6 in the
11   rofecoxib versus Naprosyn group, which is data from
12   the VIGOR study.  And they go on after this to
13   discuss subgroup analyses as well as the hypothesis
14   about the cardioprotective effect of Naprosyn.  And
15   here the FDA has raised several issues about that
16   interpretation and that's what I will be relying on.
17    Q.    Okay.
18    A.    They also recommend that patients with
19   known cardiovascular risk be given prophylactic
20   aspirin.  But they, again, state they're unsure
21   about the advantage of the GI system and they're
22   unsure about whether differences seen between
                         Page 55