arnett 20061020.txt

23   rofecoxib and Naprosyn will be meliorated by
24   aspirin.
25         Q.    And are you saying the FDA has formed any

page 128
 □ 1   conclusions at that point with regard to the
 2   protective effect of naproxen?
 3         A.    There was no conclusion summary paragraph
 4   as there was in Villalba's earlier memo.  But let me
 5   verify that.
 6              MR. LOCKLAR:  Were you asking about the
 7         time of the memo?  Is that what you were
 8         asking?
 9              MS. FREIWALD:  Yes.
10              MR. LOCKLAR:  Sorry.
11         A.    So recommendations for regulatory action
12   at that point were that they needed more data
13   particularly from the ADVANTAGE study.
14         Q.    And, in fact, the FDA had told Merck that
15   it wouldn't make a labeling change to incorporate
16   the results of the VIGOR study until it had the data
17   from ADVANTAGE, correct?
18              MR. LOCKLAR:  Object to the form.
19         A.    Correct.
20         Q.    And --
21         A.    But also note that they were -- they were
22   upset about not having received the ADVANTAGE data.
23         Q.    Where does it say that?
24         A.    Well, the study was completed in March of
25   2000, but they have not submitted the report to the

page 129
 □ 1   FDA.
 2         Q.    Okay.  And so they were waiting to get the
 3   results of the ADVANTAGE data before they would let
 4   Merck change the label for VIGOR, correct?
 5              MR. LOCKLAR:  Object to the form.
 6         A.    They requested specifically -- the FDA to,
 7   quote, Medical reviewers have requested that the
 8   complete report of study 102 be submitted for
 9   review.
10         Q.    And on page three which is the first page
11   of text, under that recommendation paragraph it
12   says, The applicant should be informed that labeling
13   changes could not be made until review of safety
14   database from the ADVANTAGE study is complete,
15   correct?
16         A.    It does say that.
17         Q.    And it doesn't say in here that the belief
18   that Merck had that naproxen explained the results
19   of VIGOR was untenable or wrong, does it?
20              MR. LOCKLAR:  Object to the form.
21         A.    Well, they say several issues are raised.
22   So to me that indicates that they're not 100 percent
23   behind the concept.
24         Q.    Okay.  So there's a question about it,
25   correct?

page 130
 □ 1         A.    They question the Naprosyn hypothesis in
 2   this specific letter.
 3         Q.    And they're aware at the time that the
 4   alternative explanation is that there's an increased
                        Page 56

arnett 20061020.txt

5  risk of Vioxx in terms of causing heart attacks,
6  correct?
7       A.    The composite inference I'll agree with.
8       Q.    You don't feel comfortable saying that you
9  can talk about VIGOR for the MI risk alone?  You
10 won't talk about VIGOR for the composite endpoints?
11           MR. LOCKLAR:  Object to the form.
12      A.    I'm happy to talk about VIGOR and the
13 myocardial risk, but I don't want to mix apples with
14 oranges.  So I just want to be very pristine about
15 which outcomes I'm defining.
16      Q.    So let me just make sure I understand
17 this.  Do you agree with me that at the time of
18 Dr. Villalba's review in June of 2000 she was
19 expressing that Naprosyn had been proposed as one
20 explanation for the disparity in the rate of MI in
21 the VIGOR study, but the FDA was also aware that
22 another explanation might be that there was an
23 effect being caused by Vioxx?
24           MR. LOCKLAR:  Object to the form.
25      A.    In fact, her point B suggests that there

page 131
1  is an effect.  And actually her review date is not
2  June 29th.  That was the submission date.  It was
3  March --
4       Q.    It's March 30, 2001.  Sorry.  I was
5  reading the top date.  Fair enough.
6            So the FDA had reviewed the VIGOR data,
7  concluded that there were -- there was more than one
8  possible interpretation of the VIGOR data, correct?
9            MR. LOCKLAR:  Object to the form.
10      A.    More than -- correct.
11      Q.    Okay.
12      A.    But there was consistency evidence in the
13 other studies, and they wanted the ADVANTAGE study
14 before making a label change.
15      Q.    Okay.
16           MS. FREIWALD:  We need to change the tape.
17           THE VIDEOGRAPHER:  This is the end of Tape
18 Number Three in the continued deposition of
19 Donna Arnett to be continued on Tape Number
20 Four.  We're off the record at 12:22.
21               (Off the record.)
22           THE VIDEOGRAPHER:  This is the beginning
23 of Tape Number Four in the continued deposition
24 of Donna Arnett.  We're on the record at 1:01.
25 BY MS. FREIWALD:

page 132
1       Q.    Doctor, you told me earlier this morning
2  that another FDA document you have reviewed was the
3  FDA briefing package from February of '01.
4       A.    Let me confirm the date, but I believe I
5  said that.
6       Q.    Does your document have a Bates number at
7  the bottom?  Not the P number that you have, But
8  there should be a MRK number on it as well.
9       A.    Yes, it is MRK ABX000, and it looks like
10 something may have been cut off.  I don't know if
11 it's more than three zeros.
12      Q.    Can you turn to the next page.  There
13 should be something that has --

Page 57

arnett 20061020.txt

14      A.      It looks like it's just ABX000.
15      Q.      No, there's some other numbers there.
16 There would have to be some kind of -- some kind of
17 an actual number.  The zeros are just placeholders,
18 but your copy may be cut off.
19      A.      I have nothing more than zeros.
20      MR. LOCKLAR:  Yeah, it's cut off in the
21 margin.
22      Q.      It doesn't matter.  You're talking about
23 the February 8, 2001 FDA advisory review document,
24 correct?
25      A.      This is the review of the cardiovascular

page 133
0 1   safety update database dated February 1, 2001 from
2 Shari Targum.
3      Q.      Can you tell me what in that document you
4 are relying on?
5      A.      Most of the document.  It's a composite of
6 the cardiovascular safety profile to that date.
7      Q.      And are you using anything in that
8 document to prove or to support any specific
9 assertion you're making?
10      A.      I'll use this document to discuss study
11 085 and 090 and the aggregate data.
12      Q.      What do you mean by the aggregate data?
13      A.      Well, it's presented in -- the beginning
14 is about the VIGOR.  But there are more tables in
15 this report than just simply in VIGOR alone.
16      Q.      This document is primarily relevant to you
17 because of the discussion of 085 and 090?
18      A.      In addition to 085 and 090, which are
19 relevant, there is also more description about
20 the -- more detailed descriptions that aren't
21 present in the VIGOR publication about the increase
22 in hypertension and edema and the increase in
23 congestive heart failure adverse events with the
24 rofecoxib group.  It's page ten.
25      Q.      And what about 085 and 090 are you relying

page 134
0 1   on from this document?
2      A.      The subgroup analyses performed relative
3 to -- this is -- you asked me specifically about
4 085.  And I have -- so I'm relying on the
5 description of the study design, the results of 085,
6 and the description of the study population and the
7 clinical adverse event summary.
8      Q.      So the FDA had the data set for 090 and
9 085 at the time of this report, correct?
10      A.      I -- there are data from 085 and 090.  I
11 don't know if it reflects the clean finalized data
12 set or not.
13      Q.      There's a discussion by the FDA as to the
14 results of 090 and 085, correct?
15      A.      So far I have lots of tables.  I haven't
16 gotten to the discussion.
17              There's a description of 085.  There are
18 results in summary form.  There are discussions of
19 who has completed the study, who were randomized,
20 and who had adverse events.
21      Q.      You agree that the FDA was aware of the
22 results of the 085 and 090 at the time of this
                            Page 58

arnett 20061020.txt

23   report?
24          MR. LOCKLAR:  Object to the form.
25      A.      Well, I can see now it doesn't jump out at

page 135
 1   you like the VIGOR results do.  You have to go
 2   hunting for it.  So I'm not sure how -- the level of
 3   detail about VIGOR in this report is much more
 4   detailed than 085 and 090.
 5      Q.      085 and 090 were smaller studies, correct?
 6          MR. LOCKLAR:  Smaller than?
 7          MS. FREIWALD:  VIGOR.
 8      A.      They were smaller than VIGOR.
 9      Q.      And they showed no statistically
10   significant increased risk in heart attack with
11   Vioxx compared to the comparators?
12      A.      090 showed a 4.4 percent incidence of
13   cardiovascular events versus 2 percent.
14      Q.      And it was not statistically significant?
15      A.      It was inadequately powered to detect
16   statistical significance.  There were only 390
17   subjects randomized to Vioxx and 392 to nabumetone
18   and 196 to --
19      Q.      Have you done a power calculation for 090?
20      A.      I have not.  But I can tell you with the
21   relative risk estimate and the number randomized it
22   would be in close proximity to the other OA studies
23   I presented earlier.
24      Q.      If you use the same method that you used
25   earlier?

page 136
 1      A.      Uh-huh.  And it's an appropriate method
 2   that I used earlier.
 3      Q.      Okay.  The -- but if you did the math the
 4   same way that you did it earlier, you think you'd
 5   get a similar result, but putting aside whether they
 6   were adequately powered or not, the fact is they did
 7   not show a statistically significant increased risk;
 8   correct?
 9      A.      Correct.  But they weren't powered to show
10   it so it's --
11      Q.      Do you agree that when you have a study
12   that isn't powered to show a result and doesn't show
13   a result, it is improper to then draw from that
14   study the conclusion that with more power the result
15   would prove to be statistically significant?
16          MR. LOCKLAR:  Object to the form.
17      A.      I can't agree to that.  What I can say is
18   assuming the power for this study is comparable to
19   the others, which is about a 10 percent at best, a
20   10 percent shot of getting it right.  You know, they
21   only had one in ten chances of finding the true
22   answer of excess risks.
23      Q.      Doctor, I want to be sure that you're
24   saying what I think you're saying because it
25   surprises me.  Are you saying that you disagree with

page 137
 1   the statement as a scientist that if a study fails
 2   to show a result it is improper to, nevertheless,
 3   make the conclusion that had the study had more
 4   power, you would have seen a statistically
                                   Page 59

arnett 20061020.txt

```
 5   significant result?
 6           MR. LOCKLAR:  Object to the form.
 7       A.    Power and statistical significance are
 8   interrelated concepts.  So as you increase power,
 9   assuming the same alpha level, you would expect to
10   see a true finding if it exists.
11       Q.    If it exists.  But you can't assume that
12   it exists from the lack of proof one way or another?
13       A.    But the totality of data to date before
14   that show that there's an excess in the
15   cardiovascular events --
16       Q.    Doctor, you keep relying --
17       A.    -- within that study -- let me finish.
18       Q.    You keep relying on the totality of the
19   data.  But the totality of the data is just other
20   studies that don't prove your point.  They're just
21   other studies that fail to show a result.
22           MR. LOCKLAR:  Object to the form.
23       Q.    So if I have -- if I have one study that
24   doesn't show a result and another study that doesn't
25   show a result and another study that doesn't show a
```

page 138

```
 1   result, I understand that one might argue that you
 2   may have a hypothesis that more data would show the
 3   result, but you're not really telling me that you
 4   can use that lack of evidence as proof that the
 5   evidence is really there, are you?
 6       A.    May I answer now?
 7       Q.    Sure.
 8       A.    You have the VIGOR finding.  You have 14
 9   events in 090, a numerical increase in 090, that's
10   consistent with the VIGOR finding.  You have the
11   totality of that evidence to date.
12       Q.    You mean the totality being two studies,
13   one against a comparator that might be
14   cardioprotective and one that's not statistically
15   significant?
16           MR. LOCKLAR:  Object to the form.
17       A.    There's no evidence that -- presented that
18   I've seen that Naprosyn is cardioprotective.
19       Q.    Well, have you seen the FDA memo in 2005
20   that says that that's still a real question that
21   Naprosyn might be cardioprotective?
22           MR. LOCKLAR:  Object to the form.
23       A.    I've seen the observational studies and
24   the ADAPT study that I presented to you that show an
25   excess risk for Naprosyn on cardiovascular disease.
```

page 139

```
 1       Q.    Has anybody shown you or have you found
 2   for yourself the ones that show that there is a
 3   decreased risk with Naprosyn?
 4           MR. LOCKLAR:  Object to the form.
 5       Q.    And some of those -- have you seen those?
 6       A.    In the meta-analyses of observational
 7   studies there's either no effect of Naprosyn or a
 8   slightly protective effect.
 9       Q.    Okay.
10       A.    On the order of 10 percent.
11       Q.    And do you know if in those studies the
12   patients were being dosed with Naprosyn the way they
13   were being dosed in the VIGOR studies, 500
```

arnett 20061020.txt

14   milligrams twice a day?
15       A.    It was a meta-analysis.  And I have not
16   reviewed, but I will, individual levels of drugs.  I
17   know I've reviewed it, but I've reviewed hundreds of
18   documents.
19       Q.    Do you know if that makes a difference
20   with Naprosyn?
21       A.    I do not know.  I have not studied the
22   Naprosyn --
23       Q.    Do you know what the -- whether the
24   platelet inhibition with Naprosyn is permanent or
25   whether it has a -- is a temporary platelet

page 140
0 1   inhibition?
 2       A.    As I just answered, I haven't studied
 3   Naprosyn.
 4       Q.    Okay.
 5       A.    But I didn't really get to finish my
 6   answer about --
 7       Q.    Well, we'll get back to 090.  But I -- but
 8   I really want to know whether you're prepared to say
 9   as a scientist that when you have a study that
10   doesn't show a result you can stand up and say -- or
11   that you would stand up and say in front of peers,
12   in a written publication, in a symposium that even
13   in the absence of evidence of the result, you can
14   conclude that the result would be there?
15             MR. LOCKLAR:  Object to the form of the
16       question.
17       A.    In using the totality of evidence as an
18   epidemiologist, I would look for consistency of
19   findings of that study.  I would look at its
20   statistical power to detect such an effect.  And
21   given the results that I know from VIGOR and seeing
22   a two-fold excess risk of cardiovascular events in
23   090, that's numerically higher in -- opposed to
24   Vioxx.  I mean, 17 events in Vioxx versus eight in
25   nabumetone.  But I would say that's very consistent

page 141
0 1   data with VIGOR.
 2       Q.    And have you had the experience as an
 3   epidemiologist of studies showing numerical
 4   disparities and then that proving to be not a real
 5   result?
 6       A.    I'm sure you could point me to such
 7   studies.
 8       Q.    And --
 9       A.    But that's not the issue here.
10       Q.    Well -- and have you ever as an
11   epidemiologist in any grant you've submitted, in any
12   paper you've written, in any course you've taught,
13   in any lecture you've given, in anything where your
14   professional reputation is on the line, have you
15   ever said this study or these series of studies have
16   not shown a statistically significant result, yet I
17   am prepared to conclude to a reasonable degree of
18   expert certainty that the result is there?
19             MR. LOCKLAR:  Object to the form.
20       A.    I would as a scientist be able to say
21   that.
22       Q.    When?

Page 61

arnett 20061020.txt

23      A.      Because when you have consistency of
24   evidence from other studies, when you have a numeric
25   increase consistent with the direction of the effect

page 142
 1   from prior studies.
 2      Q.      Have you ever said that as a scientist in
 3   your whole career, ever said I've got repeated
 4   studies that don't show a result, small numbers,
 5   that are 8 and 10, there are 3 and 8. They're
 6   whatever they are, and they don't show a result.
 7   The studies weren't powered, weren't designed to
 8   show the result, but yet I'm prepared to stake my
 9   reputation that the result is there without needing
10   anymore data, without needing any follow-up studies?
11      MR. LOCKLAR:  Object to the form of the
12   question.
13      A.      In the absence of VIGOR and that
14   significant finding, in the absence of APPROVe and
15   that significant finding, I would agree with you.
16   But here we have a totality of data suggesting that
17   the cardiovascular risks are definitely present for
18   Vioxx, and then you have the committee that
19   overwhelmingly called it cardiotoxic.
20      Q.      So you can -- I'm going to move to strike
21   because I don't think anywhere does it say
22   cardiotoxic.  But does -- so you can backtrack from
23   APPROVe to say that these earlier studies really
24   would have shown the result had they been
25   differently designed, differently powered, gone

page 143
 1   longer, had more patients?
 2      A.      You're asking me today how I would act.
 3      Q.      I'm asking you is that an appropriate
 4   thing to do, to backtrack from the results of
 5   APPROVe to say that these earlier studies, had they
 6   been differently powered, would have shown a result?
 7      A.      Yes, you could.
 8      Q.      And have you ever done that before where
 9   you've used one clinical study to say that that
10   proves that earlier studies that didn't show the
11   result should have, would have?
12      MR. LOCKLAR:  Object to the form.
13      A.      I've not conducted such grossly
14   underpowered studies in my practice as an
15   epidemiologist so I -- I've never had the occasion
16   to need to.
17      Q.      Have you ever made that conclusion of
18   other studies that are out there?  I mean, have you
19   ever drawn a conclusion from the existence of one
20   placebo-controlled study and said that proves that
21   the earlier studies which didn't show the result
22   would have as opposed to, for example, saying, well,
23   this one placebo-controlled study now furthers our
24   hypothesis and we still need to do further studies
25   and other adequately powered placebo-controlled or

page 144
 1   comparable studies?
 2      MR. LOCKLAR:  Object to the form.
 3      A.      I would say with the presence of the data
 4   from 085 and 090 coupled with VIGOR that there was
                        Page 62

arnett 20061020.txt

```
 5   compelling evidence for the cardiovascular toxicity
 6   of Vioxx.
 7          Q.     What from 085?
 8          A.     There was an increase in cardiovascular --
 9   this is from the Targum memo on page 28.  There's
10   evidence of an increase in cardiovascular disease.
11   Let me specifically state the evidence for my
12   opinion.
13              Because this is the comment by the
14   reviewer from the FDA, quote, Because of the smaller
15   sample size and event rates the study of this -- of
16   this -- the results, pardon me -- of this study do
17   not convince this reviewer that there is no safety
18   issue with rofecoxib.
19          Q.     Okay.  Well, there's a difference between
20   not proving the negative and using a study that
21   doesn't prove the negative to say that it's proof of
22   the positive.
23              MR. LOCKLAR:  Object to the form.
24          Q.     Isn't there?
25          A.     When safety is an issue -- again, safety

page 145
 1   is about signals.  And we see signals consistently.
 2   It's not about statistical significance.
 3          Q.     Well, it's about having -- you don't
 4   change your rules?  I mean, epidemiologists use
 5   rules, don't they, have --
 6          A.     Safety and public health protection, there
 7   is a difference.
 8          Q.     Doctor, you tell --
 9              MR. LOCKLAR:  She's trying to answer the
10   question.
11          Q.     Go on.  Go on.
12          A.     It's a different approach.  If you have a
13   drug that is causing cardiovascular disease events
14   in a population and there are other drugs that could
15   be used to treat the population, there is a public
16   health relevant reason to look for these signals.
17          Q.     Okay.  But you're putting the rabbit in
18   the hat, Doctor.  If you have a drug that causes the
19   event, you can't use your hypothesis as its only
20   proof, can you?  I mean, you have a hypothesis that
21   the drug causes the event, and you're trying to use
22   the fact that the question has been raised as the
23   answer to the question itself.
24              MR. LOCKLAR:  Object to the form.
25   Compound question, argumentative, asked and

page 146
 1   answered.
 2          A.     I've answered.
 3          Q.     Well, isn't that true?  Isn't that what
 4   you're doing?  You're using the question as its own
 5   answer?
 6              MR. LOCKLAR:  Object to the form.
 7          A.     I'm using that totality.  You have 023
 8   showing that effect.  You've got --
 9          Q.     Not of the heart attack effect.  We've
10   been through this, Doctor.  023 shows a metabolite
11   change and you can't tell me where.  So you then
12   have a study that doesn't show a result.  And I
13   understand that you've just read language that says,
```

Page 63

arnett 20061020.txt

14  I'll paraphrase, I can't use this study to prove
15  that there is an absence of a possible adverse
16  effect, right?  That's what he says.  That's what
17  the reviewer says there.
18           MR. LOCKLAR:  Object to the form.
19      Q.    You can't prove the negative with 085?
20           MR. LOCKLAR:  Object to the form of the
21  question.
22      Q.    Right, that's what it says?
23      A.    I can't say that --
24      Q.    Isn't that -- just answer my question.
25  Isn't that right?  That's what the statement that

page 147
01  you read is saying to me.
2       A.    The reviewer was saying that because of
3  the sample size he can't say that there isn't an
4  adverse effect, but there were 21 -- 24 in the Vioxx
5  group that discontinued versus eight in the placebo
6  group due to an adverse effect.  And serious adverse
7  events were four in the rofecoxib versus one in the
8  placebo group.
9       Q.    Nowhere does the reviewer say that you can
10  use the findings to prove that there is a real
11  adverse effect?
12           MR. LOCKLAR:  Object to the form of the
13  question.  Asked and answered.  The document
14  speaks for itself.
15      Q.    The reviewer never says that?
16           MR. LOCKLAR:  Object to the form.
17      A.    The study is too small, which was my
18  earlier point about all of the Vioxx studies.
19      Q.    And as a general matter as a
20  epidemiologist do you usually want to see more than
21  one statistically significant controlled clinical
22  trial before you say that there's cause and effect?
23      A.    For a primary outcome or for a safety
24  outcome?
25      Q.    Well, a safety outcome can be a primary

page 148
01  outcome.
2       A.    It was never a primary outcome in any
3  Vioxx study for cardiovascular disease.
4       Q.    Are you saying that the 203, the naproxen
5  trial, it wasn't a primary outcome for CV risk?
6       A.    It was not.  There was a protocol put
7  together to analyze that.
8       Q.    And there was a -- and it was an inherent
9  part of the study design to look for a
10  cardiovascular safety signal, correct?
11      A.    In 203?
12      Q.    Yes.
13      A.    They had a secondary aim of looking at the
14  cardiovascular --
15      Q.    And primary and secondary makes no
16  difference.  It was a predetermined endpoint.
17      A.    It makes a huge difference.
18      Q.    Why?
19      A.    First of all, safety.
20      Q.    No, why does it make a difference in terms
21  of generating accurate results?  It doesn't?
22           MR. LOCKLAR:  She's trying to answer your
                         Page 64

arnett 20061020.txt

```
23        question.
24        Q.      That's my question.
25        A.      Because you're focusing your entire
```

page 149
```
 1     argument in this case on statistical significance.
 2     And there are a priori rules if you're going to
 3     abide by them about primary and secondary hypotheses
 4     in accompanying corrections for p-values.
 5        Q.      Is there any rule that you're going to
 6     point me to that says for a secondary outcome you
 7     don't need statistical significance?
 8             MR. LOCKLAR:  Object to the form.
 9     Statistical significance for what?
10        A.      Statistical significance for what?
11        Q.      For the safety outcome.  You know what I
12     mean.
13        A.      No, safety outcome is a different --
14        Q.      Doctor --
15        A.      -- different -- cardiovascular disease was
16     a safety concern.
17        Q.      Doctor, you said to me -- to kind of recap
18     where I think we are, you said to me there's a big
19     difference between secondary and primary.  And I
20     said not in terms of the accuracy of the data.  And
21     you said, I'm paraphrasing, yes, there are rules.
22     And I said to you are you going to tell me --
23             This is my question now:  Are you going to
24     tell me that there are different statistical rules
25     that are written in some textbook of epidemiology or
```

page 150
```
 1     some guidance that you can point me to that say that
 2     for a secondary safety outcome you don't need to see
 3     a statistically significant result?
 4             MR. LOCKLAR:  Object to the form of the
 5     question.
 6        A.      I probably could find rules for that.  I
 7     could probably find something for safety.  I haven't
 8     gone into textbooks and identified a priori.  But
 9     safety issues are a very different concern than
10     efficacy outcomes.
11        Q.      I'm not asking about it from a policy
12     standpoint.  I'm asking about it from a science
13     standpoint.
14        A.      As a science standpoint.
15        Q.      Sitting here today you can't point me to
16     anything that says you don't need statistical
17     significance to prove or disprove a safety concern?
18        A.      Statistical significance is one component
19     when evaluating the overall value of a study.  If a
20     study is not statistically significant but has a 1
21     in 20 chance of finding a statistically significant
22     finding and truthful finding, if it exists, then you
23     could claim statistical insignificance all day.  I
24     could care less.
25        Q.      Well, isn't that the -- is it the Type One
```

page 151
```
 1     or the Type Two error where you assumed that its
 2     effect is real and it's not, and you're in a big
 3     band of likely to get it wrong?  Which one is that,
 4     Type One or Type Two?
```

arnett 20061020.txt

```
 5      A.    That's Type One.
 6      Q.    And for safety findings you worry about
 7 Type One errors, right?  Just as much for any other
 8 kind of epi work you worry about a Type One error?
 9      A.    No.  Actually you worry about a Type Two
10 error.
11      Q.    You worry about both?
12      A.    You mostly worry about a Type Two error.
13 Because if the finding is truthfully real and you
14 miss it, that's important.
15      Q.    Doctor, I'm not asking from a policy
16 standpoint because I'm assuming you're not here to
17 testify about what the FDA regulations should have
18 been or how they should have been changed.  But I'm
19 asking you from an epidemiologic standpoint.  You
20 worry about Type One and Type Two errors when you're
21 standing up and you're saying I can tell you that
22 this drug causes this effect.
23      A.    If I were to approach this problem from a
24 Bayesian statistical perspective, I could quantify
25 the prior probability of the cardiovascular risk
```

```
page 152
□ 1   from 090 into VIGOR and weigh the evidence based on
 2 prior evidence.  There are statistical methods to do
 3 that.  These clinical trials are all using the
 4 frequentist perspective which is what you are
 5 focusing on today.
 6           But, no, there -- epidemiologists and
 7 biostatisticians use prior evidence to support
 8 claims about causation.
 9      Q.    That wasn't my question.
10      MS. FREIWALD:  Can you read back my
11 question.
12           (Requested portion read.)
13      Q.    That's my question.  It's you have to use
14 statistical significance.  You have to be aware of
15 Type One and Type Two errors when you're saying that
16 any findings, whether it's a safety or an efficacy
17 finding, is real.
18      MR. LOCKLAR:  Object to the form.
19      A.    I answered the question.  I didn't answer
20 it in a simplistic layperson's terms.
21      Q.    Maybe I didn't understand it.
22      A.    There are two major approaches to
23 inference.  There's a Bayesian approach where you
24 evaluate prior probabilities.  And there's a
25 frequentist approach where you look at p-values from
```

```
page 153
□ 1   statistical tests.  And I'm saying that both are
 2 valid methods and both utilized in the practice of
 3 epidemiology.
 4      Q.    So you're saying based upon APPROVe you
 5 could give a calculation of what the probability is
 6 that 090 or 085 would have shown a statistically
 7 significant result had it been a different kind of
 8 study?
 9      MR. LOCKLAR:  Object to the form.
10      A.    You can build in a prior probability.  And
11 actually APPROVe you can -- it's working backwards.
12      Q.    The only way to test that hypothesis is to
13 do another study, right?
```

Page 66

arnett 20061020.txt

14      A.      I don't understand your question.
15      Q.      The only way to prove whether your
16  hypothesis about what the earlier study would have
17  shown is, is to do yet another study, another longer
18  study to see whether the results were real or not?
19      A.      I wouldn't have done that because as a
20  epidemiologist the data were convincing that there
21  was a cardiovascular signal.
22      Q.      At what point, Doctor?
23      A.      After 023 and 090.
24      Q.      After 023 and 090.  Okay.  So you would
25  stake your professional reputation that there was a

page 154
□ 1  cardiovascular signal with Vioxx based upon a
 2  mechanism study that showed a reduction in
 3  prostacyclin metabolism from someplace in the body,
 4  you don't know where, and a study in -- that you say
 5  was not adequately powered and didn't show a
 6  statistically significant increased risk in heart
 7  attacks?
 8              MR. LOCKLAR:  Object to the form of the
 9  question.
10      A.      It showed 17 cardiovascular events versus
11  eight, and then the nabumetone group versus six in
12  the placebo group that's a signal on top of a
13  biologically meaning hypothesis with a finding that
14  supported it.  And then you go on to VIGOR where you
15  have a five-fold excess risk of myocardial --
16      Q.      I just want to stick with -- because you
17  said that there was evidence that you would stake
18  your professional reputation on.
19              MR. LOCKLAR:  Object.
20      Q.      That Vioxx caused heart attacks based on
21  just 023 and 090?
22              MR. LOCKLAR:  Object to the form of the
23  question.
24      Q.      So I want to spend some time on that
25  because you told me last time we talked that you

page 155
□ 1  weren't sure you could say that diabetes caused
 2  heart attacks.
 3              MR. LOCKLAR:  Object to the form.
 4      Q.      So with a safety issue like whether
 5  diabetes causes heart attacks that's been looked at
 6  in hundreds of thousands of patients, right?
 7      A.      I'm not sure that there are hundred
 8  thousands of patients, but I'll say there are
 9  thousands of patients.
10      Q.      Okay.  And multiple studies have looked at
11  diabetes as a risk for heart attack, right?
12              MR. LOCKLAR:  Object to the form.
13      A.      I wouldn't say multiple.  There are some.
14      Q.      Long epidemiologic studies going out years
15  and years, right?
16      A.      That were recruited specifically among
17  diabetics?
18      Q.      No, looking at population, Framingham
19  data.
20              MR. LOCKLAR:  Object to the form.
21      A.      There are Framingham data that show
22  diabetes is a risk factor.

                         Page 67

arnett 20061020.txt
23      Q.      Okay.  You wouldn't dispute with me that
24 there's a lot more evidence about diabetes as a risk
25 for heart attack than there was for VIGOR at the

page 156
 1  time of 023 and 090?
 2      A.      For VIGOR?
 3      Q.      For Vioxx at the time of 023 and 090.
 4              MR. LOCKLAR:  Excuse me, I didn't mean to
 5  talk over you.  Object to the form of the
 6  question.
 7      A.      There was a red flag.  When VIGOR came
 8  out, that was confirmatory.
 9      Q.      So there was a -- you're now not saying
10  you're going to stake your professional reputation
11  on 023 and 090 proving that Vioxx causes heart
12  attack.  You're now saying those two studies were a
13  red flag?
14              MR. LOCKLAR:  Object to the form of the
15  question.  Argumentative.  Asked and answered.
16      A.      A red flag.
17      Q.      Okay.  And you agree with me that there's
18  a lot more evidence with diabetes than there was
19  with Vioxx at the time of 023 and 090, and you
20  wouldn't tell me that diabetes is actually even a
21  cause of heart attacks, right?
22              MR. LOCKLAR:  Object to the form.
23      A.      This is my only second deposition.  I
24  don't know that that deposition -- you've asked me
25  nothing about that deposition.  I don't know how

page 157
 1  that fits into the Dedrick case.
 2      Q.      Well, are you prepared to say that
 3  diabetes is a cause of heart attacks?  You told me
 4  it was -- that was my recollection.  But if you're
 5  -- if that's not your opinion, tell me it's not your
 6  opinion.
 7      A.      It is my opinion that in an observational
 8  study, and my prior deposition stated this, that
 9  defining cause and effect is harder.  In clinical
10  trials where you give a drug, you establish
11  temporality and you establish that the exposure
12  happens.  That to me is a very different mode of
13  causal inference than the observational studies.
14      Q.      Well, 023 wasn't a clinical trial to look
15  at an outcome.  It was a mechanism study.  We've
16  already established that, right?
17      A.      Done in a clinical study.
18      Q.      It was a mechanism study, Doctor, right?
19  You can't say that 023 shows heart attacks?
20      A.      It wasn't designed to show heart attacks.
21      Q.      And nor are most mechanism studies
22  designed to show clinical effects?  They're
23  mechanism studies?
24              MR. LOCKLAR:  Object to the form.
25      A.      In epidemiology we don't quantity these

page 158
 1  kind of mechanism studies.
 2      Q.      You don't do them, right?
 3      A.      Actually some of us do them.  I have one
 4  on influenza and C-reactive protein and looking at
                        Page 68

arnett 20061020.txt

5   the influenza vaccine on CRP.  So, yes, I've looked
6   at mechanisms in clinical settings.
7        Q.    Okay.  What's the study that you've looked
8   at?
9        A.    It's in my CV.  It's effect of taking an
10  influenza vaccine on measures of inflammation
11  defining the time duration of the inflammatory
12  response.
13       Q.    And it didn't look for a clinical outcome?
14       A.    It all depends if you define CRP and IO6
15  [phonetic] as a clinical outcome.
16       Q.    Well, are you aware that the FDA talks
17  about outcome studies and studies that are not
18  outcome studies that are just designed to show
19  biologic changes?
20       A.    Yes, I would agree with that.
21       Q.    And you're aware, for example, there had
22  been hundreds of trials on statins that show
23  reduction in cholesterol parameters, but statin
24  manufacturers haven't been allowed to make claims
25  that they actually reduce the risk of heart attack

page 159
□ 1  or other events without doing the outcome study,
2   correct?
3        A.    I won't comment on statin trials.  I've
4   not reviewed them.
5        Q.    Okay.  Are you familiar with that concept,
6   though, that in good science you may not be allowed
7   to make a claim about an outcome just by virtue of
8   effecting a biological parameter?
9        A.    I don't -- I would not agree with the good
10  science.
11       Q.    Are you aware that that's -- that the FDA
12  has not let, for example, statin manufacturers make
13  claims about a proved outcome based upon just
14  changing lipid levels?
15       A.    I've already answered I haven't evaluated
16  the statin literature.
17       Q.    So let's go back to diabetes.  Are you
18  prepared to say that diabetes causes heart attacks
19  or not?
20       A.    I'm prepared to say that diabetes is a
21  risk factor for heart attack.
22       Q.    But with the amount of data that exists
23  for diabetes you won't say it causes heart attacks.
24  But you will say -- are you saying that Vioxx is a
25  risk factor for heart attacks or that it causes

page 160
□ 1  heart attacks?
2        A.    I say that it cause -- it's a causal
3   factor because of the temporality of evidence and
4   consistency of evidence across studies and the fact
5   that the review panel voted unanimously.
6        Q.    And is it because -- you agree that
7   there's way more data out there for diabetes than
8   there is for Vioxx?
9             MR. LOCKLAR:  Object to the form.
10       A.    I would not agree with that.  I agree that
11  there's different data for diabetes.
12       Q.    You agree that diabetes had been studied
13  for many, many more years?

                        Page 69

arnett 20061020.txt

```
14      A.     I would agree that diabetes as a risk
15  factor for cardiovascular disease has been studied
16  for a number of years.
17      Q.     Many more years than the COX-2s have been
18  around?
19             MR. LOCKLAR:  Object to the form.
20      A.     I don't see the relevance.
21      Q.     Can you answer the question truthfully
22  whether you know why I'm asking it or not?
23      A.     There are different study designs and so a
24  clinical trial --
25      Q.     Doctor, it's just a question of do you
```

page 161
```
 1   know or would you agree with me that diabetes has
 2   been studied for years before COX-2s were even
 3   available?
 4       A.     I wish you wouldn't interrupt me.
 5       Q.     Well, I just need my question answered and
 6   I'm getting speeches.  It's a simple question.  Yes
 7   or no.  Are you aware that diabetes has been
 8   answered -- has been studied since way before COX-2s
 9   were available?
10             MR. LOCKLAR:  Object to the form.
11       A.     I will agree with that.
12       Q.     Okay.
13       A.     But I would put the caveat in that we
14   don't randomize people to getting diabetes or
15   inducing diabetes in them.  So the causal inference
16   is different for diabetes as a risk factor than it
17   is for Vioxx as a risk factor.
18       Q.     Are you saying there are no controlled
19   clinical trials looking at the development of
20   diabetes or looking at the correlation between
21   diabetes and heart attack?
22       A.     There are ongoing studies now with type II
23   diabetes evaluating interventions and the long-term
24   risk of cardiovascular disease.
25       Q.     It's been studied in controlled clinical
```

page 162
```
 1   trials, hasn't it?
 2       A.     No, it's only recently.
 3       Q.     There are data out there of controlled
 4   clinical trials looking at interventions for
 5   diabetes, looking at the correlation between
 6   developing diabetes and heart attacks, correct?
 7             MR. LOCKLAR:  Object to the form.
 8       A.     Only for type I diabetes.  For type II
 9   diabetes the ACCORD study is now being conducted to
10   evaluate intensive risk factor modification in
11   diabetics and its impact on cardiovascular disease.
12       Q.     Are you -- would you agree with me that
13   there's a lot more data out there for lipids and
14   hypertension than there is for Vioxx?
15       A.     Yes.
16       Q.     Are you prepared to call cholesterol
17   elevation causally related to heart attack, or are
18   you just prepared to say that it's a risk factor?
19       A.     Again, I'm not sure how much of my last
20   deposition is relevant here but -- in my last
21   deposition we discussed that there have been
22   clinical trials that lower cholesterol that show a
```
                              Page 70

arnett 20061020.txt
23    reduction in cardiovascular events.  So I claimed
24    that it was a causal relationship based on that
25    observation.

page 163
0 1         Q.     And hypertension you called causal?
 2         A.     Yes.
 3         Q.     And smoking you weren't sure if that was
 4    causal or not?
 5         A.     It didn't -- it didn't meet my criterion
 6    of being an experimentally-induced risk factor.
 7         Q.     So you would be comfortable saying that
 8    Vioxx, based upon one placebo controlled study and
 9    one study against the naproxen comparator and some
10    other studies that didn't show statistically
11    significant risk, is causal for heart attacks.  But
12    you're not yet sure if you can say that smoking is
13    causal for heart attacks?
14              MR. LOCKLAR:  Object to the form.
15         A.     It's not simply two studies, one placebo
16    controlled and one naproxen.  It's the totality of
17    the studies done with Vioxx and the cardiovascular
18    sequelae of taking Vioxx.
19         Q.     But you're prepared to say Vioxx is causal
20    and not smoking is causal?
21         A.     What I said specifically is that
22    biological factors that have -- or treatments where
23    you have an intervention and you show temporality
24    clearly before and after exposure are the strongest
25    evidence base for defining causation.

page 164
0 1         Q.     And you're not sure you can get there with
 2    smoking?
 3         A.     I'm not going to randomize anyone to
 4    smoking.
 5         Q.     Okay.  So you're not prepared to say that
 6    with smoking?
 7              MR. LOCKLAR:  Object to the form.
 8         A.     Not to the same level.
 9         Q.     And the totality of the evidence with
10    Vioxx is APPROVe, VIGOR, the mechanism study 023,
11    and then you put in several studies that don't show
12    a statistically significant result and you say we
13    are not powered to show a statistically significant
14    result, right?
15              MR. LOCKLAR:  Object to the form.  I think
16    -- object to the form.
17         A.     085, 090, ADVANTAGE.  Yes.
18         Q.     Okay.  I thought you --
19         A.     And I --
20         Q.     Go on.
21         A.     I'm not saying this in isolation.  The FDA
22    panel that reviewed the evidence agreed unanimously
23    32 to zero with that opinion.
24         Q.     We'll get back to that.  I thought you
25    told me that you had, in addition to the February

page 165
0 1    '01 Targum memo, looked at the FDA advisory
 2    committee briefing document from February '01.
 3    Something that looks like this.  Do you have that in
 4    your package?

Page 71

arnett 20061020.txt

```
 5      A.      February 8th 2001?
 6      Q.      You got it.
 7      A.      I have it.
 8      Q.      I want to ask you basically the same
 9  questions as before.  Is there any -- tell me what
10  in this document you're relying on.
11      A.      This is a longer one.  So pardon me.  In
12  the summary statement of recommendations -- let me
13  recall the recommendations to be precise.  In the
14  background of the documents the FDA states concerns
15  with cardiovascular safety.  The data pertaining to
16  cardiovascular safety presented an aggregate
17  starting on page -- not an aggregate in terms of
18  combining of 085 and 090 with VIGOR.  But there are
19  tables defining the serious adjudicated thrombotic
20  events in VIGOR.  And the second appendix described
21  them in more detail.
22      Q.      Would you agree that -- I didn't mean to
23  cut you off.  Are you finished?
24      A.      Yeah.  I was just coughing.
25      Q.      Would you agree that in February of 2001
```

page 166

```
 1   in preparation for the advisory committee hearing
 2  the FDA rereviewed the existing data that was
 3  available with regard to Vioxx including VIGOR and
 4  earlier studies that we've discussed previously?
 5          MR. LOCKLAR:  Object to the form.
 6      A.      Interestingly, though, I don't see tables
 7  with 085 and 090.  They may be here and I just
 8  haven't -- don't have them.
 9      Q.      And --
10      A.      I don't -- I don't have a complete list.
11  That's why I'm confused.  There are pages here that
12  are missing on my copy.
13      Q.      Was your copy given to you by counsel or
14  did you pull it off the Internet?
15      A.      This one was given to me by counsel.
16      Q.      Have you reviewed -- I think you told me
17  the answer to this.
18          One of the documents we marked earlier was
19  the transcript -- I'm now not remembering --
20          MR. LOCKLAR:  2005.
21          MS. FREIWALD:  2005, that's what I
22  thought.  This is not from 2001.
23  BY MS. FREIWALD:
24      Q.      Have you reviewed any of the transcript of
25  the 2001 advisory committee hearing?
```

page 167

```
 1      A.      I may have reviewed it.  It's not clear to
 2  me now.  I don't recall anything specific from it.
 3  But I'll go back to my files and look.
 4      Q.      Would you --
 5      A.      But this is what I am basing my opinion
 6  on.
 7      Q.      Would you agree that in February of 2001
 8  there was a discussion between Merck and the FDA and
 9  including outside advisors at the advisory committee
10  hearing where the question of -- was asked what is
11  the appropriate interpretation of the VIGOR results?
12          MR. LOCKLAR:  Object to the form.
13      A.      I don't have that so I can't comment on
```

Page 72

arnett 20061020.txt

14    it.
15         Q.    Are you aware that in 2001 at the advisory
16    committee hearing there was a debate about what
17    would be an appropriate warning with regard to the
18    labeling for Vioxx in light of VIGOR?
19         A.    Labeling is outside of my expertise.  So
20    I'm going to restrict my testimony to epidemiologic
21    interpretation.
22         Q.    Without asking you to pass on the quality
23    of the label itself, all I want to know is if you
24    know that there was a debate about what the labeling
25    should be with regard to the VIGOR study?

page 168
 1         A.    In fairness, I haven't focused any of my
 2    readings on issues about labeling.
 3         Q.    Fair enough.  Are you aware that different
 4    outside advisors in February of 2001 concluded that
 5    one could not draw a conclusion from VIGOR with
 6    regard to whether naproxen was cardioprotective or
 7    Vioxx was creating a cardiovascular risk?
 8              MR. LOCKLAR:  Object to the form.
 9         A.    I would want to read through the minutes
10    of that in order to make an informed opinion.
11         Q.    And you haven't done that.  You're not
12    prepared to --
13         A.    I have not.
14         Q.    You're not prepared to answer that today?
15         A.    I am not today.  But I'd like to reserve
16    the right to be able to look at it.
17         Q.    I'll leave that to the Court and the rules
18    for Judge Fallon.  I just want to know what you're
19    prepared to testify to today and what you consider
20    to be part of your report.  And as I understand it,
21    you don't consider that to be part of your report
22    today?
23         A.    Not today.
24         Q.    Have we covered the February 2001 advisory
25    committee meeting document?

page 169
 1         A.    With the exception of anything that occurs
 2    after page 26.
 3         Q.    I suppose I can only ask you questions
 4    about what you've looked at?
 5         A.    Yes.
 6         Q.    And if you don't have it, I can't ask you
 7    --
 8         A.    Unfortunately, it's the critical pieces of
 9    085 and 090 on this one.  But they were in the
10    Shapiro analysis, I believe.
11         Q.    Doctor, there was some language in your
12    report where you talk about the FDA warning Merck.
13    It's on the third page from the back.  And it's the
14    bottom paragraph.  It begins, The FDA warned Merck
15    that -- and then you have one, two, three.
16         A.    Uh-huh.
17         Q.    What's your source for that?
18         A.    The FDA documents themselves.
19         Q.    Can you tell me where in the FDA documents
20    the FDA warned Merck that there was a cardiovascular
21    risk associated with Vioxx?
22         A.    From the Targum memo on page 37.
                            Page 73

arnett 20061020.txt

```
23      Q.      Which Targum memo?
24      A.      February 1st 2001.  Specifically it
25 states, It would be helpful if the sponsor could

page 170
 1   provide further cardiovascular safety data regarding
 2 longer term, that is, greater than two months of
 3 exposure of rofecoxib.
 4      Q.      Is there any --
 5      A.      And that's in the cardiovascular
 6 recommendations.
 7      Q.      Is there any other language that you're
 8 characterizing as a warning to Merck that there was
 9 a cardiovascular risk associated with Vioxx?
10      A.      The original NDA Villalba memo where there
11 was concern expressed because of the numerically
12 higher incidence.  So there's the Villalba memo from
13 the original NDA --
14      Q.      No.  There wasn't --
15      A.      -- stating concerns.
16      Q.      I'm sorry.  I didn't mean to cut you off.
17      A.      Stating that there was a concern about the
18 higher incidence of events.
19      Q.      Okay.  Well, a concern, would you give me,
20 is different from proof of a cardiovascular risk?
21      A.      In the original NDA there was concern.
22      Q.      So did you write your own report?
23      A.      Yes.
24      Q.      Did you have any assistance writing your
25 report from any of the lawyers?

page 171
 1      A.      I ran it by them after I wrote it.  I
 2 basically abstracted from my deposition.
 3      Q.      I just want to be clear on language.  You
 4 say the FDA warned Merck that, one, there was a
 5 cardiovascular risk associated with Vioxx.  So I'm
 6 asking a really narrow question.  I'm not asking
 7 about places where the FDA discussed a possible risk
 8 or a question was raised or a hypothesis or a need
 9 for more studies.  I want to know if there is a
10 place where you say the FDA warned Merck that there
11 was a cardiovascular risk?
12      A.      Well, as an epidemiologist throughout the
13 documentation from Villalba and Targum, to me that
14 was a warning.  If I had been a drug company, I
15 would have taken that as a warning that there were
16 concerns over the cardiovascular safety.
17      Q.      Concerns over cardiovascular safety and
18 questions raised is not the same thing as a
19 conclusion, right?
20      A.      I interpret warning a bit differently than
21 you do.
22      Q.      That's fine.  You tell me how you're using
23 warning and then we'll have our vocabulary
24 straight.
25      A.      Okay.  So we have an initial NDA where

page 172
 1   they're concerned about the excess cardiovascular
 2 risk.  We have 085 and 090, both small studies, and
 3 yet showing a numeric increased risk.  And then we
 4 have VIGOR that comes out with a whopping five-fold
                          Page 74
```

arnett 20061020.txt

5    increased risk for myocardial infarction.  And we go
6    back to the FDA and there are people at the FDA
7    saying that there's concerns that there is this
8    excess risk that Naprosyn hypothesis is, in my
9    words, not salient explanation for that excess
10   risk.  And to me that's a warning.
11        Q.    There's nowhere in the documents you've
12   reviewed and are relying on where the FDA says at
13   any point before 2005 we've concluded that Vioxx
14   causes heart attacks?
15        MR. LOCKLAR:  Object to the form.
16        A.    What I -- now you're asking about 2005.
17        Q.    Well, really what I'm trying to do is take
18   you up there -- I'm not asking you about 2005.  I'm
19   trying to cover the time period before the 2005
20   advisory committee hearing so that we're not
21   throwing that into the mix.
22        A.    So in every FDA piece of documentation I
23   see there's concerns expressed about the excess
24   risk.  There's concerns expressed about not having
25   adequately powered studies to define the excess

page 173
1    cardiovascular risk even as late as the Alzheimer
2    study, which I have as my next point in my expert
3    report.  The summary discussion of the 12/18/04
4    interim review says that these studies in Alzheimer
5    were not -- they were not specifically designed or
6    powered to address CV outcomes.  And so throughout
7    that -- and, you know, in every documentation you
8    see concerns.  That to me is a warning.
9        Q.    So there were -- there was nothing that is
10   -- you're interpreting the concerns as a warning.
11   But would you give me that in all of those documents
12   there's also discussion about the need for
13   additional data and the fact that the conclusions
14   cannot be drawn based upon the data that existed at
15   the time?
16        MR. LOCKLAR:  Object to the form.
17        A.    At the same time, well, what 20 million
18   people were taking a drug that --
19        Q.    Doctor, move to strike as nonresponsive.
20   I'm just asking about the documents.  I'm not asking
21   for your speech.
22        A.    Reading it as a epidemiologist there were
23   consistent concerns raised by the FDA.
24        Q.    The FDA was well aware of issues with
25   regard to what the data showed and what the data

page 174
1    didn't show, correct, or couldn't show?
2        A.    I can't say with respect to what the FDA
3    did or did not know.
4        Q.    You just said it.
5        A.    Only through documentation.
6        Q.    Okay.  Through the documentation the FDA
7    was well aware of what the data showed and what the
8    limitations of the data were?
9        MR. LOCKLAR:  Object to the form.
10        A.    I would say that it's even stronger than
11   that.
12        Q.    Just answer that question first.
13        A.    Could you restate it?

Page 75

arnett 20061020.txt

14      Q.      The FDA was well aware of what the data
15   showed and what the limitations of the data were.
16      A.      I will say that with the caveat in this
17   memo dated -- on page 14 of 12/18/04 interim review,
18   it says, Furthermore, the FDA repeatedly requested
19   that these data be updated at the same time other
20   studies collecting placebo-controlled cardiovascular
21   safety data were being conducted.
22      Q.      Okay.
23      A.      So there's this -- reading in the FDA's
24   memos, it appears to me as an epidemiologist that
25   there was concerns about the data and them not

page 175
 1   providing data or studies to test it.
 2              THE VIDEOGRAPHER:  This is the end of Tape
 3   Number Four in the continued deposition of Donna
 4   Arnett to be continued on Tape Number Five.
 5   We're off the record at 2:02.
 6                   (Off the record.)
 7              THE VIDEOGRAPHER:  This is the beginning
 8   of Tape Number Five in the continued deposition
 9   of Donna Arnett.  We're on the record at
10   2:09 p.m.
11   BY MS. FREIWALD:
12      Q.      Doctor, just to finish up the last series
13   of questions, am I right you would agree that the
14   FDA documents up to and including the time of the
15   advisory committee hearing in 2001 reflect that the
16   FDA was reviewing the data, was asking questions
17   about the appropriate interpretation of the data,
18   and was aware of what additional data would in their
19   minds be desirable?
20              MR. LOCKLAR:  Object to the form.
21      A.      I will agree that there were consistent
22   concerns raised about the cardiovascular safety of
23   Vioxx and that they wanted additional studies done
24   and additional data delivered to them about
25   cardiovascular risk.

page 176
 1      Q.      In order to form a conclusion?
 2      A.      I won't make that assumption.  But I don't
 3   know what the FDA's intent was.
 4      Q.      Well, they were looking for more
 5   information from which they could draw a conclusion
 6   whether the risk was real and what the magnitude of
 7   the risk was if it was real, correct?
 8      A.      I can't -- I don't know what their
 9   objectives were.  As an epidemiologist, I would have
10   wanted to see additional studies, and they requested
11   additional studies throughout their reviews of
12   Vioxx.
13      Q.      You had -- you looked -- you told me
14   earlier in the day that you looked at the three -- I
15   think it was the 3/12/2002 Villalba memo; is that
16   right?
17      A.      Yes.
18      Q.      Okay.  Are we talking about the one that
19   has a rating line of cardiovascular data in
20   Alzheimer's studies?
21      A.      Yes.
22      Q.      And how are you using that document?
                                        Page 76

arnett 20061020.txt
```
23      A.      Essentially using all the documents
24 because it lists all of the data from the
25 pre-Alzheimer's studies 091, 078, and 126.  And we
```
page 177
```
 1      -- and discusses total mortality as well as
 2 cardiovascular mortality from the studies.
 3      Q.      Okay.  And do you see where on page three
 4 it refers to Dr. Targum's review?  I'm looking at
 5 the second full paragraph on page three.
 6      A.      Yes.
 7      Q.      And it says, There was no excess of CV
 8 thrombotic events, in particular no excess of
 9 myocardial infarction in the rofecoxib group upon
10 review of the data?
11      A.      I see where it says that.
12      Q.      And then if you look on the bottom of the
13 memo -- also on page three it says, If we were to
14 take into consideration those patients for which the
15 investigator --
16           MR. LOCKLAR:  Let us find out where you
17 are.
18      Q.      Sure.  I'm on the last paragraph of page
19 two.
20      A.      Yes.  My copy was printed on another
21 printer with little toner so we're having --
22      Q.      Are you going to read it?  Can you read
23 it?
24      A.      If we go slow.
25      Q.      Give me one second.
```
page 178
```
 1      A.      The last paragraph I have starts with, As
 2 noted above there was an imbalance in the number.
 3      Q.      Here I can give you a better copy if you
 4 want.
 5      Yes, we're looking at the same place.
 6      A.      Okay.
 7      Q.      In the middle of that paragraph it says,
 8 If we were to take into consideration those patients
 9 for which the investigator, the medical records, or
10 the FDA reviewer had entertained the diagnosis of a
11 myocardial infarction but there was insufficient
12 information, the numbers would still suggest no
13 increased risk of MI in the rofecoxib 25 milligram
14 group as compared to placebo in this population.  Do
15 you see where it says that?
16      A.      I see where it says that.  I don't
17 understand why they point out myocardial infarctions
18 when they have a protocol to look at the combined
19 APTC endpoint.
20      Q.      Are you aware that the statistically
21 significant result in VIGOR was the MI result?
22      A.      The overall result was statistically
23 significant.
24      Q.      Primarily driven by MI?
25      A.      There were 46 versus 20 -- fewer than half
```
page 179
```
 1  the events were MI in VIGOR, 45 Vioxx events of
 2 which 20 were MI according to the data in the paper.
 3      Q.      And the results for -- were you looking
 4 off of your card?
```
                        Page 77

arnett 20061020.txt

```
 5      A.    My card.
 6      Q.    I'll look at that.  What results are you
 7 saying were statistically significant other than the
 8 MI result?
 9      A.    The overall cardiovascular APTC, 45 Vioxx
10 versus 19 Naprosyn for a relative risk estimate of
11 2.38, confidence bound of 1.39 to 4.0.
12      Q.    Okay.  Are you aware that the primary
13 event that was noted in the VIGOR study was the
14 disparity in the rate of MI?
15      A.    I would agree that there were five-fold
16 more MIs in the Vioxx versus the Naprosyn group, but
17 -- of which resulted in a five-fold relative risk.
18 But overall there were events from other sources as
19 well, sudden cardiac death, unstable angina, stroke,
20 DVTs, et cetera.
21      Q.    Okay.
22      A.    So there were 25 events that were not MI
23 in the way that they defined it in the paper.
24      Q.    And are you aware that at the time of this
25 March 2002 memo Dr. Villalba was still debating
```

page 180
```
 1    whether the appropriate explanation was the
 2 cardioprotective effect of naproxen or a
 3 prothrombotic or otherwise cardiovascular detriment
 4 caused by Vioxx?
 5           MR. LOCKLAR:  Object to the form.
 6      Q.    Why don't you take a look at the
 7 conclusion section, Doctor.
 8      A.    You've asked me until that date.
 9      Q.    So I really -- I don't want to go back
10 over the -- what we've already looked at.  I'm
11 trying to bring us current actually.  If you'll look
12 at the conclusion section, see where it says, These
13 data support the hypothesis that the excess of MI
14 found with rofecoxib, 50 milligrams in the VIGOR
15 study as well as the trends observed in ADVANTAGE
16 and the RA database with 25 milligram dose relative
17 to naproxen may in part be explained by the lack of
18 an antiplatelet effect of rofecoxib relative to
19 naproxen.
20           MR. LOCKLAR:  Object to the form.
21      Q.    Do you see where it says that?
22      A.    I see where it says that.
23      Q.    However, the existence of a biologically
24 plausible prothrombotic effect as a known effect
25 from fluid retension, edema, hypertension, may play
```

page 181
```
 1    a role in the different cardiovascular safety
 2 profiles of rofecoxib as compared to naproxen.  Do
 3 you see where it says that?
 4      A.    I do.
 5      Q.    And you see -- so they are -- would you
 6 agree that Dr. Villalba at this point is discussing
 7 all the possible mechanisms and different
 8 explanations and has not drawn a conclusion as to
 9 which one --
10           MR. LOCKLAR:  Object to the form.
11      Q.    Would you agree?
12      A.    I will not agree that she has described
13 all of them.  And, in fact, above this she says that
                    Page 78
```

arnett 20061020.txt

14    the studies were inadequately powered.
15        Q.    Well, that --
16        A.    And my own power calculations would
17    suggest that.  And that's for MI.  And we brought --
18    do you want me to continue?
19        Q.    Well, actually, no because you -- my
20    question originally was -- strike that.
21             Part of my question originally was she's
22    discussing all the possible mechanisms, and you said
23    I won't agree she's discussing all of them.  But
24    then I think you kind of veered off away from
25    mechanism.  Is there something -- some other

page 182
 1    possible mechanism that you're saying is not
 2    discussed here?
 3        A.    The mechanisms were Vioxx in terms of
 4    overall cardiovascular disease endpoints, or
 5    outcomes, is related to the antiplatelet effect and
 6    the prothrombotic effect.  There's also an
 7    atherosclerotic effect of plaque tendency and plaque
 8    rupture.  So to me this doesn't discuss all.  It
 9    discussed the two -- the one major one at the time
10    which was thought to be the antiplatelet effect.
11        Q.    There's no clinical trial data that
12    supports an atherosclerotic effect, is there?
13        A.    It depends on if you -- I considered
14    myocardial infarction an athersclerotic endpoint.
15    So in my estimation I would say, yes, there is.
16        Q.    There's no clinical trial data that shows
17    that Vioxx increases atherosclerosis?
18             MR. LOCKLAR:  Object to the form.
19        A.    I define atherosclerosis to be outcomes
20    that are atherosclerotically based.
21        Q.    Doctor, now come on.  I mean, you can't
22    say that just because studies show more
23    cardiovascular events that that proves that those
24    events are happening because there's more
25    atherosclerosis being developed?

page 183
 1             MR. LOCKLAR:  Object to the form.  Asked
 2    and answered.
 3        A.    The number one cause of myocardial
 4    infarction is atherosclerosis.
 5        Q.    Doctor, are you really saying that any
 6    clinical trial demonstrates that Vioxx increases
 7    atherosclerosis?
 8        A.    I will say that myocardial infarction,
 9    coronary artery disease, and to some extent ischemic
10    stroke all have an atherosclerotic foundation.
11        Q.    I think we will agree with that.  And
12    would you agree -- let' see if we agree on this.
13    You agree in the absence of underlying
14    atherosclerosis you wouldn't -- even you wouldn't
15    expect to see any effect of Vioxx in terms of
16    increasing the risk of heart attack?
17             MR. LOCKLAR:  Object to the form.
18        A.    I wouldn't agree with that.
19        Q.    Are you saying that somebody who has no
20    atherosclerosis is at increased risk of a heart
21    attack with Vioxx?
22        A.    I -- yes, I would agree that you could
                        Page 79

arnett 20061020.txt

23  have an extreme elevation in blood pressure.  You
24  could strain.  You could have -- pick up something
25  too heavy and have a stroke.  That wouldn't be

page 184
□ 1   atherosclerotically placed.  There are many multiple
 2  mechanisms.
 3          Q.      It would be atherosclerotically based.
 4          A.      Not necessarily.
 5          Q.      Well, you still have to have a plaque
 6  rupture.
 7                  MR. LOCKLAR:  Object to the form.
 8          A.      For myocardial infarction or for stroke?
 9          Q.      For myocardial infarction.
10          A.      You have platelet adhesion and clumping of
11  platelets in the absence of a plaque.  I am not sure
12  that you would not have a heart attack.
13          Q.      Do you know what the likelihood is of
14  platelet adhesion in the absence of plaque and
15  platelets rushing through the coronary artery and
16  just adhering to each other?
17                  MR. LOCKLAR:  Object to the form.
18          Q.      Or are we getting outside of your area?
19          A.      I'll let the cardiologist answer that.
20          Q.      Okay.  And just to close it out a little
21  bit, do you -- if platelet adhesion in the absence
22  of plaque rupture were a real mechanism here, do you
23  know if you would expect to see more venous events?
24          A.      I'll let the cardiologist answer.
25                  Can we talk about -- never mind.

page 185
□ 1          Q.      Would you agree with me then -- I'm really
 2  trying to distinguish between studies that I
 3  understand you believe show an adverse outcome and
 4  studies that explain the mechanism for that believed
 5  outcome, okay.  I'm trying to separate them, and I
 6  think you understand there's a difference.  We
 7  talked about that earlier.  We talked about the fact
 8  there's a difference between statin trials that show
 9  LDL lowering and statin trials that show actually a
10  reduction in heart attacks.
11                  Okay.  So if we can keep that difference
12  in our minds for a minute.  Would you agree with me
13  that you have not reviewed any literature that looks
14  at and answers the question of whether Vioxx
15  increases the formation of atherosclerotic plaques?
16          A.      I have not reviewed that literature but
17  that literature does exist.
18          Q.      Are you saying that there are controlled
19  clinical trials that demonstrate that Vioxx
20  increases the formation of atherosclerotic plaque in
21  humans?
22                  MR. LOCKLAR:  Object to the form.
23          A.      Not in humans, but in animal studies.
24          Q.      Are there animal studies that fail to
25  demonstrate that?

page 186
□ 1          A.      There may be.  I have -- as I said before,
 2  I have not reviewed that literature.
 3          Q.      Are there animal studies that show that
 4  Vioxx stabilizes or reduces the formation of
                          Page 80

arnett 20061020.txt

5  atherosclerotic plaque?
6      A.    I haven't reviewed the literature.
7      Q.    And if I asked you the same questions for
8  plaque rupture, would you agree that there are no
9  studies in humans that demonstrate that Vioxx
10 increases the prevalence or the incidence of plaque
11 rupture?
12     A.    I can't completely agree with that
13 statement because the most common source of a
14 myocardial infarction is a plaque rupture.
15     Q.    Well, I --
16     A.    And Vioxx certainly showed an excess of
17 myocardial infarction.
18     Q.    Well, one possibility consistent with the
19 FitzGerald Hypothesis would be that Vioxx doesn't
20 increase plaque rupture at all, but it increases
21 clot formation after a plaque rupture, right?
22           MR. LOCKLAR:  Object to the form.
23     Q.    Do you understand that?
24     A.    I understand that.
25     Q.    Okay.

page 187
1      A.    Myocardial --
2      Q.    So you don't need -- go on. Answer my --
3      A.    The prevailing hypotheses about myocardial
4  infarction is that there is a plaque rupture, and
5  you get a thrombosis at the point of plaque rupture.
6      Q.    No disagreement with you there.  But the
7  Vioxx studies don't demonstrate that the mechanism
8  is increasing the incidence of plaque rupture,
9  correct?
10     A.    It's -- to me as an epidemiologist it's
11 irrelevant because there's a statistically
12 significant increased risk of heart attack.
13     Q.    I understand that.  I understand you're
14 focused on the outcomes.  All I want to do is make
15 sure I'm not going to hear you tell me about some
16 mechanism that as far as I know has not been
17 proved.
18           So would you agree with me putting aside
19 the outcome studies or the studies that you think
20 show an increased adverse outcome, there are no
21 studies in human beings that demonstrate that taking
22 Vioxx makes it more likely that an arterial plaque
23 will rupture?
24     A.    I don't know that such a study could be
25 designed.

page 188
1      Q.    You have not reviewed any such studies?
2      A.    I have not but I'm not sure that it would
3  be ethical or feasible.
4      Q.    All I want to know is whether you have
5  data that you could point to or not.
6      A.    I can say that there are no data, but I'm
7  not sure that it would be ethical or feasible to
8  create such data.
9      Q.    Okay.
10     A.    It would be hard to walk around with a
11 angiography constantly going as a human.
12     Q.    Well, putting aside whether you can do a
13 study or you can't do the study, I assume that
                              Page 81

arnett 20061020.txt

14  you're not going to say that you can conclude that
15  plaque rupture happens more commonly in Vioxx with
16  the absence of the data?
17          MR. LOCKLAR:  Object to the form.
18      A.    Again, here, an epidemiologist like myself
19  would use the totality of the animal data, the
20  clinical data to form that opinion.
21      Q.    Well, you're mixing apples and oranges,
22  aren't you?  Because you're mixing the outcome data
23  with the mechanism data.  I'm not asking you about
24  outcome.  I'm asking you about mechanism.  And if
25  you want to know if increased plaque rupture is the

page 189
0 1  mechanism that is causing the alleged adverse event,
2  you have to study that.  And if you don't have data
3  to show that you can't say you know it to be true,
4  can you?
5          MR. LOCKLAR:  Object to the form.
6      A.    I would say it would be irrelevant once
7  you have the statistical evidence of an excess risk
8  with Vioxx for cardiovascular disease.
9      Q.    All I want to know is, not whether you
10  think it's relevant or not, but whether you're going
11  to tell me to a reasonable degree that you know that
12  the mechanism is increased plaque rupture, and if
13  you are, what data do you have to support it.
14      A.    I can't completely exclude that I would
15  state that plaque rupture would be one of the
16  mechanisms.
17      Q.    Are you going to state to a reasonable
18  degree of expert certainty that Vioxx increases
19  plaque rupture and that you can point me towards any
20  human study that shows that?
21      A.    I will point you to studies that say that
22  plaque rupture is a cause of myocardial infarction.
23  And I will point you to studies that show that Vioxx
24  causes an excess of myocardial infarction.
25      Q.    But that doesn't prove that it's caused by

page 190
0 1  plaque rupture.
2          MR. LOCKLAR:  Object to the form.  That's
3  a legal issue.
4      Q.    It doesn't demonstrate scientifically that
5  the mechanism is plaque rupture, does it?
6          MR. LOCKLAR:  Object to the form.
7      Q.    Why are we fighting over this?  You know
8  this is true.
9      A.    Actually, I don't know that this is true.
10  As a scientist if you have a -- a hypothesized
11  effect or mechanism and you know that this in animal
12  studies happens and you put a drug in humans and
13  then you notice an excess of mycardial infarction
14  and the mechanism of myocardial infarction is plaque
15  rupture, I mean, it's not rocket science to draw
16  that causal relationship.
17      Q.    Well, the problem is, Doctor, you've
18  identified several possible mechanisms.  And you
19  can't tell me that any of them are proved or that
20  any of them are even identified by the data you
21  have.  If there was only one possible mechanism, I
22  understand you might draw the inference but even
                    Page 82

arnett 20061020.txt

23   then you wouldn't have proved it, right?  But you've
24   told -- you've identified platelet aggregation as a
25   possible mechanism.  You've identified increased

page 191
□ 1   atherosclerosis as a possible mechanism.  You've
 2   identified plaque rupture as a possible mechanism.
 3   But you've told me there's no clinical trial data on
 4   the atherosclerosis.
 5       A.   Actually, that's not what I said.  I said
 6   atherosclerosis is the leading underlying cause of
 7   myocardial infarction and other forms of
 8   cardiovascular disease which was shown to be
 9   elevated with treatment with Vioxx.
10       Q.   Yes.  But we know that people have
11   atherosclerosis who don't take Vioxx, right?
12       A.   Yes.
13       Q.   And we know that people have
14   atherosclerotic plaque rupture that don't take
15   Vioxx, right?
16       A.   Right.
17       Q.   And we know that it is possible that even
18   if Vioxx does increase the risk of a heart attack,
19   like you say it does, it doesn't have to be by
20   plaque rupture or by increasing atherosclerosis.  It
21   could be by another mechanism, whether a mechanism
22   we understand or don't, includes -- right?
23       MR. LOCKLAR:  Object to the form.
24       Q.   You just don't know?
25       A.   It's -- well -- but you've -- in this case

page 192
□ 1   when you have a risk factor that's been shown, in
 2   this case a drug, not a risk factor, a drug that's
 3   been shown to increase cardiovascular disease, to me
 4   the mechanism, it doesn't matter.  The person still
 5   had a heart attack and died or maybe lived through
 6   it and has permanent damage.
 7       Q.   I'm not asking you whether the mechanism
 8   matters or not.  I'm just asking you whether you can
 9   state to a reasonable degree of expert certainty
10   that Vioxx causes plaque rupture.  And if you're
11   going to go out and say that, I want to know what
12   controlled clinical trial on human beings actually
13   looked at that endpoint and proved that endpoint.
14       MR. LOCKLAR:  Object to the form.
15       A.   I would say that that type of study is
16   probably not feasible, and that's why we use animal
17   models for such mechanistic studies.
18       Q.   And are there any animal studies that can
19   prove or can demonstrate that Vioxx causes plaque
20   rupture even in animals?
21       A.   According to the introductions I've read
22   in these papers, yes.  I have not reviewed the
23   actual data in the papers themselves.
24       Q.   You haven't read all the animal studies,
25   correct?

page 193
□ 1       A.   Correct.
 2       Q.   And studies in animals can often not bear
 3   out in human beings?
 4       A.   I would disagree with that statement.
                    Page 83

arnett 20061020.txt

5      Q.    You think that studies in animals always
6  bear out in human beings?
7      A.    Why would we continue to test them in
8  animals?
9      Q.    Well, there are lots of reason you may not
10 want to test something in humans for starters.  Does
11 saccharin cause cancer in human beings when it
12 causes cancer in rats?
13          MR. LOCKLAR:  Object to the form.
14     A.    I don't understand the relevance of that
15 example.
16     Q.    Well, you don't understand the relevance.
17 Was saccharin shown to cause cancer in rats?
18     A.    I frequently use animal models in my
19 work --
20     Q.    Was saccharin --
21     A.    I don't know the saccharin literature.
22     Q.    You don't want to agree that humans and
23 animals are biologically different and that you
24 sometimes see results in animals that aren't
25 repeated in human models?

page 194
□ 1     A.    I would say occasionally, but it's the
2  exception, not the rule.
3      Q.    It's the exception?
4      A.    I would say it's the exception.
5  Otherwise, we would quit working with animals.
6      Q.    Doctor, isn't it true that there are all
7  kinds of reasons you work with animals?  You don't
8  want to test the drug in humans first.  You have the
9  control in an animal model.  There are all kinds of
10 reasons.  You're not actually saying to me that you
11 can say if it causes this effect in a dog or a rat
12 or a rabbit that that's the effect it's going to
13 have in a human being?
14          MR. LOCKLAR:  Object to the form.  Asked
15     and answered.  Continue to --
16     A.    I answered.
17     Q.    Are you really going to say that?
18     A.    Yes.  Otherwise, we would not continue to
19 use animal models as scientists.  It would be
20 unethical.
21     Q.    Do you do animal study?
22     A.    I have -- I have an animal study I'm
23 working with now.
24     Q.    What is your animal study now?
25     A.    For the gene that we are in the midst of

page 195
□ 1  patenting we have a transgenic rat and we were doing
2  studies with that transgenic rat.
3      Q.    To see what?
4      A.    To see what pharmacologic modification of
5  the receptor does to heart size.
6      Q.    And are you at some point going to have to
7  test that model in humans?
8      A.    We hope to.
9      Q.    And are you going to make a claim that
10 whatever works in the animals works in humans
11 without testing it first in the humans?
12     A.    That would be the purpose of the phase one
13 study.
                                    Page 84

arnett 20061020.txt

```
14        Q.    You are -- the end of phase one you're
15   going to make a claim that you saw this in animals,
16   and you then have to go forward and test it in
17   humans?
18        MR. LOCKLAR:  Object to the form.
19        A.    Phase one studies are conducted in humans.
20        Q.    I'm sorry.  The purpose of the phase one
21   study will be to see if the results you see in
22   animals are repeated in humans?
23        A.    Correct.
24        Q.    Okay.  And you're not going to make a
25   claim before you actually do the testing in humans
```

page 196
```
0 1   that the results you saw in the animals would
 2   necessarily be reproduced in humans?
 3        A.    Not until I tested it in humans.
 4        Q.    Of course not.  Okay.
 5             Doctor, I think the last FDA document you
 6   identified was the 12/18/04 interim review.  Is
 7   there anything in particular that you're relying on
 8   there?
 9        A.    There will be many parts of this report
10   that are relevant, but the particular relevance is
11   page six where they discuss the cardiovascular
12   deaths and the excess of deaths in the Vioxx groups
13   relative to placebo that were confirmed by an
14   adjudication committee.
15        Q.    Okay.  And was that a statistically
16   significant finding?
17        A.    The study had less than one in three
18   chance of finding a statistically significant
19   result.
20        Q.    Did you do that -- did you do a power
21   analysis yourself?
22        A.    I did.
23        Q.    Did you write out your power analysis
24   anywhere the way you did for the Konstam study?
25        A.    Yes.  I believe it's in the Konstam study
```

page 197
```
0 1   which I -- Konstam includes --
 2        Q.    So when I look at what you had under the
 3   Alzheimer disease column for Konstam, that's where
 4   you're getting your --
 5        A.    My notes came from the Konstam article
 6   itself.
 7        Q.    I need you to just repeat something for me
 8   because I'm not sure that I understood what you said
 9   way back when we were talking about power.
10             When I asked you, first off, if you did
11   your power analysis as if this were a case-
12   controlled study, you said something along the lines
13   of you couldn't do it another way because there was
14   some piece of data that you were missing.  Do you
15   remember that discussion?
16        A.    Yes.
17        Q.    Can you go over that one more time for me
18   so I'm sure I understand you?
19        A.    First of all, as an epidemiologic
20   principle under the rare disease assumption using
21   the actual count -- what we call count data, so it's
22   the number of people in each of the A, B, C, or D
```
Page 85

arnett 20061020.txt
```
23  cells which reflect different exposure levels and
24  different case levels, diseased or not diseased or
25  whatever outcome you've defined.
```

page 198
```
 1              Under that type of analysis under the rare
 2  disease model which most of these -- all of these
 3  studies fit into, that approximation of risk is
 4  nearly identical to the proportional hazards ratio
 5  or incidence rate ratio that's based on incident
 6  rate data.
 7              In order to calculate the incident rate
 8  data power calculations, one needs to know the
 9  number of months over which the accrual of the
10  patients occurred and the number of months, or
11  average time in this study for each person, the
12  censoring time.  So in the absence of having clear
13  -- you know, I had aggregate data.
14              Not knowing the detail data for each one
15  of the studies, I could not make those assumptions.
16  So knowing that the case control count method of
17  calculating power would give me almost virtually the
18  same answer as the other, that's the reason that I
19  used the other.
20      Q.    Okay.  Doctor, when did you first read the
21  VIGOR study?
22      A.    I don't remember when I first read it.
23      Q.    Did you read it before you were retained
24  as an expert in this litigation?
25      A.    Yes.
```

page 199
```
 1      Q.    Do you think you read it at or about the
 2  time that it was published?
 3      A.    I can't recall.
 4      Q.    Did you -- are you familiar with the
 5  Medical Letter?
 6      A.    No.
 7      Q.    Are you familiar with a publication called
 8  the Prescriber Letter?
 9      A.    It sounds familiar.  But I haven't seen
10  one.
11      Q.    Did you read what was sometimes called the
12  Mukherjee article, sometimes called the Topol
13  article, from JAMA in September of 2001?
14      A.    I've seen the Mukherjee article.  But I
15  haven't read it recently.
16      Q.    Have you read any of the popular graphs
17  that came out around the time of the VIGOR study or
18  the change in the VIGOR label with regard to -- I'll
19  limit myself to the time of the VIGOR study.  Have
20  you read any popular press that came out at the time
21  the VIGOR results were released?
22      A.    No.
23      Q.    Have you done any review of the literature
24  to look to see what existed by way of commentary or
25  editorial discussion on the interpretation of the
```

page 200
```
 1  VIGOR results in the scientific media?
 2      A.    Could you put a time frame on that?
 3      Q.    Anywhere from around November 2000 up
 4  through the spring of 2002?
```
                              Page 86

arnett 20061020.txt
```
 5        A.    No.  But during that time my research was
 6   focused on the Minnesota Heart Survey and my
 7   HyperGEN study.
 8        Q.    Sure.  Just to be clear, I'm not limiting
 9   my question to whether you looked at those
10   publications contemporaneous with their appearance.
11   I'm also asking whether in the course of your expert
12   work you've gone back and looked at those
13   publications.
14        A.    I can't recall reading the Mukherjee in
15   detail.  I know I've seen the name.
16        Q.    I want to ask you a few questions about
17   your index card notes.  So why don't we mark what
18   you gave me at the last deposition as --
19             MS. FREIWALD:  What number are you on?
20             COURT REPORTER:  14.
21             MS. FREIWALD:  14.
22                  (Defendant's Exhibit Number 14
23                  was marked for identification.)
24        Q.    And what you gave me today I thought was
25   in the pile.  I thought we marked it as 10.
```

page 201
```
 1                  (Off-the-record discussion.)
 2   BY MS. FREIWALD:
 3        Q.    On your first card on 14 where you look at
 4   the Thal publication, you note that there is a
 5   disparity in blood pressure and edema between Vioxx
 6   and placebo, correct?
 7        A.    I'm looking for -- where on the card are
 8   you --
 9        Q.    You have a line greater CV --
10        A.    Yes.
11        Q.    -- on Vioxx.
12        A.    Right.  9 --
13        Q.    And then you have two percent as right.
14        A.    Right.
15        Q.    And then you have a parenthetical, edema,
16   increased blood pressure, high blood pressure?
17        A.    Right.
18        Q.    And I'm reading that line to mean that the
19   9.4 and 6.8 refers to the parenthetical outcome,
20   edema, blood -- and increased blood pressure.
21        A.    Correct.
22        Q.    Okay.  So my question to you is do you
23   agree that you would have expected to see with any
24   NSAID a higher number of blood pressure and edema
25   events than with placebo?
```

page 202
```
 1        A.    I can't address it for all NSAIDs.
 2        Q.    Do you know that one would have expected
 3   with a COX -- with any COX-2 to see more edema and
 4   blood pressure increase than with placebo?
 5        A.    Basing only my claims on the Zhang
 6   article, the meta-analysis it would appear that the
 7   effects were worse for rofecoxib than other COX-2
 8   for blood pressure and edema-related events.
 9        Q.    You know that you wouldn't have expected
10   to see the same result with placebo with any NSAIDs
11   or any COX-2s?
12             MR. LOCKLAR:  Object to the form.
13        A.    I know there is consistency of evidence
```
                              Page 87

arnett 20061020.txt
14  from the Vioxx program since inception of an
15  increase in hypertension and hypertension-related
16  adverse events.
17       Q.    And are you aware that there is increased
18  edema and hypertension with both the COX -- the
19  other COX-2s and the nonselective NSAIDs?
20       A.    Only through the Zhang article. As I
21  said, I haven't reviewed the other literature.
22       Q.    Now, let's look at ADVANTAGE, and I just
23  want to ask you a quick question. The inclusion
24  criteria, that's your second card at least in my
25  pile. Inclusion criteria, you have OA, greater than

page 203
 1    40 years, aspirin for CVD. Does that remind you
 2  that patients who were on aspirin for controlled
 3  cardiovascular disease before they took COX-2 were
 4  enrolled in ADVANTAGE?
 5       A.    That would be what my notes suggest.
 6       Q.    Now, I gather you don't know what the
 7  Vioxx label said with regard to edema and blood
 8  pressure effects; is that right?
 9       A.    I'm not commenting on labels.
10       Q.    You don't know what the other NSAID or
11  COX-2 labels said with regard to edema and blood
12  pressure effect, right?
13       A.    I'm not commenting on labels.
14       Q.    Now, let's look at the card you did on
15  203, the combined CV outcome study. You have not
16  addressed in any of your comments in your report the
17  ViP study. Why is that?
18       A.    It's not published.
19       Q.    You were able to find that there was no
20  evidence of increased risk in ViP for Vioxx?
21       A.    I noticed that I derived much of this from
22  the internal meta-analysis from Shapiro. I think
23  it's listed which slide number. So that it wasn't
24  published I re -- pardon me, I am relying on the
25  published literature for the most part.

page 204
 1       Q.    Where it says, See slide, that's in
 2  reference to Dr. Shapiro's slides?
 3       A.    I think so. But they're not numbered.
 4  This was actually -- it's from that document PL -- I
 5  don't think it's the Shapiro meta-analysis. It was
 6  on my disks that you copied.
 7       Q.    Okay.
 8       A.    And I'm not -- I didn't print -- as I
 9  said, the things on the disks I brought you I didn't
10  print.
11       Q.    It's from PL-1238?
12       A.    On whichever disk that was on.
13       Q.    Let's look at just the last page. You
14  have a brief summary of 010 and 017, and with 010
15  you note there were no serious cardiovascular
16  events, correct, that's what your note said?
17       A.    These were my notes, not my cards. I've
18  got to switch to my notes.
19       Q.    Sorry. Somehow I got it all stapled
20  together.
21            MS. FREIWALD: Off the record.
22                 (Off the record.)
                                    Page 88

arnett 20061020.txt
```
23            MS. FREIWALD:  Just so the record is
24      clear, I said I'm going to mark as Exhibit 14
25      your cards, but I put the notes with it.  And

page 205
 1            that's fine as long as we all know what I've
 2      done.
 3       A.    Back on the record?
 4       Q.    Sure.
 5       A.    Okay.  This was a very short-term small
 6      study, six weeks in duration that was essentially a
 7      dose ranging study, one of the very early studies
 8      done.  And they found a very large increase in blood
 9      pressure with the dose ranging studies.  And while
10      there were no serious adverse -- no MIs detected or
11      APTC endpoints, they noted significant blood
12      pressure, edema, and weight gain.
13       Q.    And what was the high range of the dose of
14      010?
15       A.    125.
16       Q.    And what was the typical recommended dose
17      after Vioxx was approved?
18       A.    I'm not a labels expert.
19       Q.    Do you know whether any -- do you know
20      whether a dose of 125 milligrams was ever approved
21      by the FDA?
22       A.    I would assume that it was not.  I know
23      that the original approval was 12.5 or 25
24      milligrams.
25       Q.    So the results in blood pressure that

page 206
 1      you're saying in 010 is for a dose that's five to
 2      ten times higher than the recommended dose?
 3       A.    Actually it was dose ranging so there were
 4      people on 25 as well.  I don't know how many were on
 5      the 125 dose.
 6       Q.    Have you correlated the numeric increases
 7      in blood pressure with which patient was on which
 8      dose?
 9       A.    I have not and -- but I believe that is in
10      the -- I have a page number.  And I believe it's in
11      that same document.  I believe that there -- they
12      did that and there were greater drop-outs.
13       Q.    But you can't tell me --
14       A.    It's table 55.
15       Q.    To the extent that 010 shows a
16      particularly large increase in blood pressure
17      effects, you can't tell me how many of those
18      patients were patients who were taking five to ten
19      times the approved therapeutic dose of Vioxx?
20       A.    If I had my computer and opened the file,
21      I could tell you that.  But I don't have the data in
22      front of me now.
23       Q.    You didn't make a note of that here
24      anywhere?
25       A.    No.

page 207
 1       Q.    And on 017 can you just walk me through
 2      what it is your notes are trying to show?
 3       A.    These were not intended for public
 4      consumption.  My apologies for not being as clear as
```
Page 89

arnett 20061020.txt

5    my cards.
6         Q.    That's okay.  I understand they were
7    merely meant for your own reference.
8         A.    Protocol 017 was conducted in RA.  That's
9    what RA stands for.  It was a six-week study.  It
10   involved two different doses, 175 or 125 milligrams
11   of Vioxx.  There were -- and I don't have the number
12   of subjects.  And this I derived from table 48 of
13   that same large document.  So I'd have to go back
14   and look at the details.  There was one MI in the
15   Vioxx 125 milligram group, none in placebo.  And I
16   don't -- it says adverse CV experiences, 10.1
17   percent Vioxx versus 29 percent placebo.  I don't
18   know what the adverse cardiovascular experiences
19   were.  I'd have to go back and look at the table
20   itself.
21        Q.    And if you need the table to tell you --
22   do you know if the table would tell you at what
23   doses or how the adverse experience is distributed
24   across doses?
25        A.    I would not -- I was not specific enough

page 208
 1    to be able to answer that question.  And I didn't
 2   print a huge file out.
 3        Q.    On the card that we had marked as 10 I
 4   just have a quick question about the mechanisms of
 5   action card.  You talk about the FitzGerald
 6   Hypothesis and some of the mechanisms we talked
 7   about, blood pressure, atherosclerosis, exaggerated
 8   thrombotic response.  Is that derived from a
 9   particular publication, or publications?
10        A.    I don't recall which -- there were so many
11   publications that discussed these.
12        Q.    Have you read the FitzGerald publications
13   from 2004 or 2006?
14        A.    I have the paper.  I have not reviewed
15   it.  So I derived this mechanism of action through a
16   combination of sources, the FDA documents and the
17   published literature within the Vioxx meta-analyses.
18        Q.    Let's look at -- I want to ask you a
19   couple questions about the Juni study.  And you
20   noted that Juni tested for heterogeneity and found
21   that there was -- I always forget the way of saying,
22   but there was no heterogeneity such that it was
23   appropriate to pull from the results of different
24   studies, correct?
25        A.    That's not entirely correct.

page 209
 1         Q.    Okay.  Can you clean it up for me,
 2   please?
 3        A.    I'll clean it up for you.  She tested for
 4   heterogeneity of the facts which means that among
 5   all of these osteoarthritis and rheumatoid arthritis
 6   studies that had different comparators that there
 7   was no evidence of difference in the relative risk
 8   estimates statistically depending on the comparator.
 9        Q.    So what --
10        A.    There was one specific test of
11   heterogeneity and that was studies that were funded
12   by Merck had a larger cardioprotective effect of
13   Naprosyn.
                        Page 90

arnett 20061020.txt

14      Q.     So what he found was not the affirmative
15   that the studies were homogeneous but rather he was
16   unable to prove heterogeneity, correct?  He did a
17   test to prove heterogeneity, and he could not prove
18   it to a statistically significant degree?
19      A.     Actually he did prove heterogeneity
20   regarding a source of funding.
21      Q.     With regard to the type of study he was
22   not able to prove heterogeneity to a statistically
23   significant degree, correct?
24          MR. LOCKLAR:  Object to the form.
25      A.     Can you define what you mean by type of

page 210
  1   study.
  2      Q.     OA, RA.
  3      A.     There was no evidence for heterogeneity by
  4   type of treated disorder.
  5      Q.     And he was not able to prove heterogeneity
  6   by comparator?
  7      A.     Correct.
  8      Q.     Again, the way the question is asked when
  9   you're looking at heterogeneity is can you prove
 10   that the studies are dissimilar or heterogenous to a
 11   statistically significant degree, correct?
 12      A.     It's specifically testing whether the
 13   point estimates differ from one another.  And so
 14   it's saying that all of these -- and if you look at
 15   figure two, that these, even though these boxes
 16   which represent the point estimates are not exactly
 17   the same, that there's no evidence that one study's
 18   point estimate statistically differs from another.
 19      Q.     So when you say there's no evidence, what
 20   you're saying is that there -- you were not able to
 21   show a statistically significant difference in the
 22   point estimate, correct?
 23      A.     Specifically saying that the pooled
 24   estimate does not differ statistically from any of
 25   these individual pieces on that graph.

page 211
  1      Q.     And do you know what power Juni had to
  2   show a statistically significant difference in the
  3   point estimates?
  4      A.     I do not.
  5      Q.     Do you know if his --
  6      A.     Although, he --
  7      Q.     -- test --
  8      A.     He did find one significant one.
  9      Q.     Do you know if his test for heterogeneity
 10   was powered any better than you say the Konstam
 11   study was powered?
 12      A.     They're -- they're different study designs
 13   with different questions.
 14      Q.     Sure.  But either way if you're looking to
 15   ask yourself can I see a statistically significant
 16   effect, Juni is asking a different question.  He's
 17   asking can I see a statistically significant
 18   difference in the point estimates based upon these
 19   different studies.  You still have to ask whether
 20   you have adequate power to answer your question,
 21   right?
 22          MR. LOCKLAR:  Object to the form.
                      Page 91

arnett 20061020.txt
```
23      A.    In the -- in the Konstam article the goal
24 was to -- and the power calculation was saying given
25 this observed data and the point estimate, for

page 212
 1 instance, in the RA of 1.78, what was the power that
 2 a finding of that or finding more extreme could be
 3 detected if there was a true excess risk.
 4      Q.    That's fine.
 5      A.    And that's a different question than Juni
 6 would be asking is, does the combined point estimate
 7 differ from any individual point estimate.
 8      Q.    Sure.  I mean, epidemiologists ask all
 9 kinds of different questions.  But if you wanted to
10 know whether Juni had proved that these studies were
11 similar and appropriate for pooling or whether he
12 was merely unable to show a statistically
13 significant difference, you have to know whether he
14 had adequate power to answer the question he was
15 asking, right?
16      A.    Well, as I said earlier with -- you asked
17 me why I didn't calculate power from VIGOR.  And I
18 said once you find a significant effect power is
19 meaningless.  So he did find a significant reaction
20 for funding source.  So he obviously had power to
21 find interaction.
22      Q.    Well, Konstam found a significant effect
23 with naproxen versus Vioxx, and you weren't willing
24 to say there, well, he found a significant effect at
25 one comparator so he must have had power for all of

page 213
 1 them?
 2      A.    I said specifically that within the VIGOR
 3 study where there was evidence of a statistically
 4 significant elevated risk that power was
 5 irrelevant.  What I'm saying here is in the Konstam
 6 article one could argue that since a specific
 7 heterogeneity effect was detected for a funding
 8 source that there must be enough power to detect
 9 some interactions.
10      Q.    Well, how can you make that conclusion?
11      A.    It's simple.  They found one.
12      Q.    They found one for a funding source which
13 was driven by the results of VIGOR?
14      A.    But they didn't find it for a comparator,
15 Naprosyn versus other.
16      Q.    Do you know -- you asked yourself the
17 question whether Juni had adequate power to find if
18 there was heterogeneity?
19      A.    Frankly, once I saw the funding source,
20 significant finding, I didn't ask myself that
21 question.
22      Q.    Okay.
23      A.    Because I --
24      Q.    Do you know if the absolute numbers --
25 absolute numeric differences that Konstam found were

page 214
 1 large numeric differences?  That's a poorly asked
 2 question.
 3                MS. FREIWALD:  Let's change the tape.
 4                THE VIDEOGRAPHER:  This is the end of Tape
                                   Page 92
```

arnett 20061020.txt
```
 5          Number Five in the continued deposition of Donna
 6      Arnett to be continued on Tape Number Six.  We
 7      are off the record at 3:07.
 8                      (Off the record.)
 9                  (Requested portion read.)
10              THE VIDEOGRAPHER:  This is the beginning
11      of tape number six in the continued deposition
12      of Donna Arnett.  We're on the record at 3:15.
13   BY MS. FREIWALD:
14          Q.    Doctor, would you agree that there is a
15      meaningful numeric difference between a relative
16      risk of .79 and a relative risk of 1.69?
17          A.    Meaningful would be determined by
18      confidence bounds around those point estimates.  So
19      I couldn't say that .69 is different than 1.79 [sic]
20      in a study of two or four people.  Now, it would
21      depend on the sample size, how adequately powered
22      the study was, the true effect size.
23          Q.    Would you say that a difference of eight
24      to three was a meaningful numeric difference without
25      knowing all the things you just identified?

page 215
 1          A.    In the absence of prior knowledge of an
 2      effect from other studies?
 3          Q.    Yes.
 4          A.    I would agree to that in the absence of
 5      that.  But that's not what we have here.
 6          Q.    Okay.  Would you agree that small numbers
 7      can create misleading impressions or lead to
 8      misleading conclusions?
 9          A.    I would agree with that and that's why we
10      look at totality of evidence.
11          Q.    And would you agree that small numbers can
12      tend to magnify the risk or the benefit that is
13      seen?
14          A.    I would not agree to that.
15          Q.    Well, what I mean is that a disparity in
16      small numbers will generate a larger relative risk
17      than the same disparity in big numbers?
18          A.    I would agree there's more stability of
19      the relative risk with larger numbers, but that's
20      why we look at consistency particularly in issues
21      about safety, consistency of findings across
22      multiple studies.
23          Q.    What I'm asking is if you see a difference
24      of one to five, it's much harder to interpret what
25      that means, if anything, than a difference of 2001

page 216
 1      to 2005?
 2          A.    I would agree with that.  But in the case
 3      of Vioxx in almost uniformly across studies there
 4      were numeric excesses always falling on the side of
 5      Vioxx.
 6          Q.    All I want to know is would you agree that
 7      when you have small numbers you can generate what
 8      looks to be meaningful numeric differences and that
 9      can be misleading?
10          A.    It could only be misleading if there was
11      inconsistency in findings.
12          Q.    Well, it's mislead -- if I -- if I go out
13      to a ball field and I hit two pitches and I knock
```
Page 93

arnett 20061020.txt

14   them both out of the park, that doesn't tell you
15   that if I hit 100 pitches I'm going to knock 100
16   pitches out of the park or even 80 pitches out of
17   the park or even 20 pitches out of the park, right?
18       A.    It would depend on who the pitcher is.
19       Q.    But you need -- it might depend on who the
20   pitcher is.  It might depend on how good a batter I
21   really am which you can't tell from just two
22   pitches.  It might depend on the weather.  It might
23   depend on how I was feeling that day.  It might
24   depend on a lot of things that you can't tell from
25   just watching me take two pitches, right?

page 217
 1           A.    By if day after day, study after study,
 2   you saw an excess of hits by your team, that would
 3   point to consistency of evidence that you're a
 4   pretty darn good batter.
 5       Q.    You would need to see that in large
 6   numbers over long periods of time, right?
 7           MR. LOCKLAR:  Object to the form.
 8       A.    For a safety question I would argue no.
 9   Because here we're not dealing with simple things
10   like people hitting balls.  We're dealing with
11   people having heart attacks, and we have consistency
12   of evidence across the studies about the excess
13   numerically in cardiovascular events.
14       Q.    Have you ever submitted a grant looking
15   for a safety signal where you have said that you're
16   going to attempt to draw a conclusion whether or not
17   you achieve statistical significance?
18       A.    Yes.
19       Q.    When?
20       A.    In the fenofibrate intervention study that
21   we're working on that I'm the principal investigator
22   of that I designed, we created ways to assess safety
23   relative to liver tests and we asked multiple
24   questions about the expected GI side effects from
25   the drug.  And we collected that data and we're now

page 218
 1   looking at genetic predictors of that.
 2       Q.    Where in that mix did you say that you
 3   were going to draw any conclusion in the absence of
 4   finding a statistically significant effect?
 5       A.    It's -- our goal is description, not
 6   statistical testing.  And I know of no --
 7       Q.    So what are you -- what did your grant --
 8   I'm just trying to understand.  What did your grant
 9   propose to do?
10       A.    To measure the adverse events self-
11   reported using a likard scale type approach to
12   questions about expected side effects.  And we are
13   looking at those reported side effects in relation
14   to level of drug and to genetic predictors.
15       Q.    And what conclusions do you expect to
16   draw?
17       A.    We're in analysis mode.  I don't expect to
18   draw conclusions.  I'll report what we find.
19       Q.    Well, when you did your grant application,
20   did you say that you expected that you would be able
21   to reach some conclusion from this study?
22       A.    We -- we purely had descriptive objectives
                        Page 94

arnett 20061020.txt

23   in mind when we wrote the grant and it was funded.
24       Q.    Okay.  So if I'm getting it, your study is
25   going to end up with conclusions along the lines of

page 219
 1   in patients taking fenofibrate compared to -- is
 2   there a placebo comparator?
 3       A.    No.
 4       Q.    Is there any comparator?
 5       A.    No.  This is a mechanism study.
 6       Q.    Okay.  So your study is going to end up
 7   saying something like in patients taking fenofibrate
 8   X number of such-and-such an effect was observed?
 9       A.    And that effect correlates this amount
10   with fenofibric acid level.
11       Q.    Okay.
12       A.    Or measured liver function test.
13       Q.    And you're not going to be able to say
14   from this study that there was an excess risk
15   compared to placebo, right?
16       A.    Correct.  It's purely descriptive.
17       Q.    And you're not going to be able to say
18   from this study that fenofibrate caused any
19   particular outcome?
20       A.    We will -- actually we disagree.  We would
21   say that ingestion of fenofibrate was associated
22   with this effect, whatever, excess GI bloating, and
23   that that effect was correlated with drug level.
24       Q.    Okay.  So it was associated with.  Is
25   there any other study --

page 220
 1       A.    Let me be precise about words.  Associated
 2   with would imply that the drug didn't cause this.
 3   So we have people not on drug, they take drug, they
 4   get an effect.
 5       Q.    And these are biological effects, right?
 6       A.    Yes.
 7       Q.    They're not clinical adverse outcomes?
 8       A.    Not always.  An elevated liver function
 9   test would be considered a clinically adverse
10   outcome.  Pancreatitis is another adverse outcome
11   that we --
12       Q.    Well, you're not going to say you're going
13   to draw a conclusion from elevated liver functions
14   that fenofibrate causes liver failure?
15       A.    No.
16       Q.    You're not going to draw a conclusion that
17   fenofibrate -- what other parameters are you looking
18   at, pancreatitis you said?
19       A.    Well, we have one adverse event effect,
20   pancreatitis.  Primarily we're looking at
21   gastrointestinal side effects.
22       Q.    Is there any other study, any study
23   against a placebo comparator, for example, or
24   against another active comparator where you've
25   written a grant that was not intended to lead to a

page 221
 1   descriptive result, but that was intended to draw a
 2   causal conclusion?  And you -- your grant proposal
 3   was structured such that you said in the absence of
 4   the statistically significant results we still
                          Page 95

arnett 20061020.txt

```
 5   expect that we're going to be able to draw a
 6   conclusion that X causes or doesn't cause Y?
 7        A.    Safety outcomes are not usually the
 8   rationale for conducting a study with NIH.  It would
 9   not -- and I've done all my work with the National
10   Institutes of Health.
11        Q.    So you've never had the opportunity to see
12   if you could get a grant approved that proposed to
13   draw a conclusion as to safety in the absence of a
14   statistically significant conclusion?
15        A.    First, it would have to be a serious
16   safety issue or else the NIH I wouldn't imagine
17   would have an interest in doing it.  Secondly, it
18   would -- the cost would be excessive and beyond what
19   NIH would typically fund.
20        Q.    It would be the kind of thing that a
21   pharmaceutical company would fund?
22        A.    I'm not even sure a pharmaceutical company
23   would fund everything that needs to be done.
24        Q.    Well, pharmaceutical companies fund safety
25   studies all the time, large long-term studies that
```

page 222
```
 1   cost a great deal of money?
 2             MR. LOCKLAR:  Object to the form.
 3        A.    There was no safety -- there was no
 4   cardiovascular safety study done.
 5        Q.    Doctor, I'm not asking for a speech about
 6   Vioxx.  Pharmaceutical companies fund long and
 7   expensive safety studies all the time.
 8        A.    I would -- I will not speak to what
 9   companies do.  I can say that in the case of Vioxx
10   there was never a --
11        Q.    I asked --
12        A.    -- a safety study.
13        Q.    I'm not asking about Vioxx.  I'm asking
14   you say -- you offered that NIH can't afford to fund
15   any long-term safety studies.  I was asking that it
16   is true that a lot of these studies get done because
17   pharmaceutical companies fund them.
18             MR. LOCKLAR:  Object to the form.
19        A.    I'm not aware that there are that many
20   long-term safety studies being conducted.
21        Q.    So are you -- so the answer to my initial
22   question is that you just don't know or you don't
23   have any experience in this?  I was trying to ask if
24   you've ever submitted a grant where you proposed to
25   draw a conclusion as to safety in the absence of a
```

page 223
```
 1   statistically significant finding?
 2             MR. LOCKLAR:  Object to the form.  Asked
 3        and answered.
 4        A.    I have not conducted studies specifically
 5   designed with the primary endpoint of safety.
 6        Q.    And do you use -- are you saying that when
 7   you look at safety signals in studies you don't do
 8   statistical analyses at all, or are you saying you
 9   just don't feel constrained by absolute adherence
10   to a P of .05?
11        A.    First of all, I do a lot of NIH studies.
12   I'm in the 95 percentile of funding by NIH.  I don't
13   design studies that are using investigational
```

Page 96

arnett 20061020.txt

14    drugs.  So most of these studies for safety are --
15    that I think you're describing, and maybe I have it
16    wrong, are about safety for investigational drugs.
17    I haven't conducted those types of studies.
18         Q.    When you say that you don't need
19    statistical significance in safety studies, what
20    experience are you drawing from?
21         A.    I'll take an example from my ALLHAT GenHAT
22    study.  It's an NIH funded study to review genetics
23    of antihypertensive response to treatment using four
24    already marketed drugs.  There's a side effect
25    called angioedema that happens with ACE inhibition

page 224
 1    therapy.  In all of the ALLHAT participants, and
 2    there were 40-some-odd-thousand, 42,113 or something
 3    like that, about 8300 were randomized to ACE
 4    inhibitors.  Of those there were only, in a very
 5    long-term follow-up 4.3, 4.2 years or 4.6 years of
 6    follow-up, just over 200 cases of angioedema, which
 7    is still a large number of cases, still would not
 8    probably be statistically significant.  I'm not sure
 9    that we would have to find a statistical test around
10    that.
11         Q.    What you were you looking for?  What was
12    the hypothesis of the study?
13         A.    Of the GenHAT study?
14         Q.    Yeah.
15         A.    We were looking at genetic predictors or
16    treatment response including adverse events.
17         Q.    Well, you weren't looking -- or were you
18    looking to say there is a genetic predictor?
19         A.    Yes.
20         Q.    And were you going to draw a conclusion
21    that there is a genetic predictor in the absence of
22    statistical significance -- statistically
23    significant evidence of a genetic predictor?
24         A.    We haven't found one yet.
25         Q.    Okay.  You haven't.  So -- but your grant

page 225
 1    I'm assuming didn't say we're going to go look to
 2    see if there's genetic predictors for this bad type
 3    of ACE inhibitors, and we're going to prove that
 4    there is one even if we don't come up with
 5    statistically significant results?
 6         A.    It was not a primary nor secondary aim of
 7    our study.  And, again, out of 42,000 people there
 8    was just over 200 cases.  So there's no -- it
 9    wouldn't be feasible at all to design such a study
10    with NIH dollars.
11         Q.    Do you have any experience that would
12    allow you to say that there is any study anywhere
13    which has looked at the question of safety with a
14    prescription pharmaceutical and that has been
15    designed without regard to looking to see if there
16    is a statistically significant outcome?
17         A.    That was a very long question.
18         Q.    It was.
19         A.    Could you restate that question?
20         MS. FREIWALD:  I'm going to ask you to
21    read it back.
22              (Requested portion read.)
                        Page 97

```
                              arnett 20061020.txt
23      A.    Could you restate the question?
24      Q.    Sure.  That was not -- what I want to know
25 is if you can point me in your experience to any

page 226
 1    study that was designed to answer a question about
 2 whether a prescription pharmaceutical carried a
 3 safety risk and in its design said we're going to
 4 draw a conclusion about the safety of this
 5 medication whether or not we generate a
 6 statistically significant result?
 7      A.    I can think of one.
 8      Q.    Okay.
 9      A.    Systolic hypertension in the elderly
10 program where they were randomizing elderly
11 subjects, and by elderly they were people over the
12 age of 65 years, to Chlorthalidone, a diuretic or
13 placebo.  And there was a question about whether or
14 not isolated systolic hypertension in and of itself
15 is worth treating in the elderly because of the
16 potential adverse effects of taking a diuretic;
17 falls, hyponatremia, et cetera.  So they conducted
18 that study.  They didn't power the study based on
19 the secondary adverse outcome.  But they fully
20 intended as a public health question to validate
21 that as a secondary -- as a side question.
22      Q.    what was the secondary outcome?
23      A.    Primary outcome was total mortality.
24 Secondary outcomes were stroke.
25      Q.    And was there some conclusion reached?

page 227
 1      A.    That overall that there was -- it was
 2 protect -- that taking Chlorthalidone was protective
 3 for stroke.  There was an increased risk of falls, I
 4 believe, and low potassium levels.
 5      Q.    And were any of those still statistically
 6 significant?
 7      A.    I don't recall.  But it was not -- it was
 8 a safety concern.  There was not a focus on
 9 statistical significance.  In fact, in that paper --
10 I believe it was that paper because we used to teach
11 this as an example of bad paper -- they presented
12 all the safety data by Z scores and not by p-values.
13      Q.    It was an example -- what you just said to
14 me was an example of a bad paper?
15      A.    Well, that -- they don't even put the
16 statistical test on it.  They put the Z -- a Z is
17 the test statistic, not the p-value associated with
18 it.
19      Q.    So what was bad about the paper was that
20 it --
21      A.    It was obtuse.
22      Q.    It didn't have the statistical data in it?
23      A.    It had the statistical data in it, but it
24 obscured the data in such a way that it was hard to
25 interpret.

page 228
 1      Q.    And it would be important in that study to
 2 be able to interpret the statistical data?
 3      A.    Just like in VIGOR I complained about
 4 having no table that did the cardiovascular summary.
                              Page 98
```

arnett 20061020.txt

5      Q.     Doctor, you just told me I think about a
6  study that you're saying was bad because it was a
7  safety study, and it didn't have the statistical
8  test laid out and -- in a way that you could read
9  it?
10     A.     No.  What I said was they presented the
11  statistical test in an obscure way.
12     Q.     But they had a statistical test?
13     A.     Yes.
14     Q.     Okay.  Where was that study published?
15     A.     This was from the late 1990s.  I believe
16  it was published in JAMA.  And it was a cooperative
17  group called the Systolic Hypertension in the
18  Elderly Program.
19     Q.     So that was a safety study that did have a
20  statistically significant -- that was set up to look
21  for statistical significance with regard to a safety
22  endpoint?
23     A.     The primary question, primary outcome, was
24  stroke or total mortality.  I don't remember.  The
25  other was a secondary.  They also valuated whether

page 229
0 1   there was an effect from taking the drug in the
2  elderly population.
3      Q.     And they did a statistical analysis?
4      A.     Yes.
5      Q.     And you don't remember whether it was
6  statistically significant or not?
7      A.     I don't remember.  It's been too long.
8      Q.     And you don't remember exactly what
9  conclusions they drew in the presence or absence of
10  the statistical significance?
11     A.     They recommended at the conclusion of that
12  trial to treat elderly people with isolated systolic
13  hypertension.
14     Q.     Okay.  Doctor, in your work as an
15  editorial board member have you ever asked authors
16  to go back and put data in a table or reorganize the
17  presentation of data?
18     A.     Absolutely.
19     Q.     And is that something that editorial
20  boards or editorial board members in your experience
21  do?
22     A.     It depends on the editor.
23     Q.     But certainly when you review journal
24  articles one of the things you look for is whether
25  certain information would be better conveyed in a

page 230
0 1   table, correct?
2      A.     From my experience, having data in tables
3  makes it more transparent to the reader.
4      Q.     So you have -- I gather sometimes authors
5  put certain data in tables and sometimes they don't,
6  correct?
7      A.     Epidemiologists tend to put things in
8  tables.
9      Q.     But if you were to read articles in JAMA,
10  cardiovascular publications, Annals of Internal
11  Medicine, you would see variability in how data are
12  presented, correct?
13     A.     Very little because it takes a lot more
                          Page 99

arnett 20061020.txt
14    space to convey complex data in words than in a
15    table. And if you have a table and augment it with
16    words, it's much -- takes much less space and it's
17    much clearer.
18        Q.    Doctor, isn't it really indisputable that
19    if you were to read ten articles you would be able
20    to find in each of those articles some pieces of
21    information that were put in tables and some pieces
22    that weren't put in tables?
23        A.    I find it much more homogenous than you're
24    referring to.
25        Q.    Okay. So do you believe that journal

page 231
□ 1    editors as a general rule, when they think there is
2    evidence that -- there is some finding that's
3    important to put in a table will point that out to
4    the authors?
5             MR. LOCKLAR:  Object to the form.
6        A.    I can't speak for other editors. I can
7    only speak for myself, and I would do -- if it were
8    an important piece of data that were obscured in
9    text, I would have a table put in.
10        Q.    Okay. And have you had that experience to
11    be able to say to an author, you know, I think this
12    should really be put in a table or I think the table
13    should be presented differently?
14        A.    I've had the occasion of having tables
15    presented differently or pieces of data deleted.
16        Q.    You've had the experience of pieces of
17    data deleted?
18        A.    Of saying that a particular table isn't
19    required for the overall story that the -- that is
20    being told by the paper.
21        Q.    So sometimes you put -- you might have a
22    piece submitted and the author puts in a table and
23    then you say, you know what, we don't really need
24    the table?
25        A.    It's rare but it's happened. There are

page 232
□ 1    page limits and not only page restrictions, but
2    number of words restrictions that we have to follow
3    as editors. But generally there's more -- strike
4    that.
5        Q.    Sometimes the decisions about how data are
6    presented are driven by things like space
7    constraints?
8        A.    I'd qualify that by there are space
9    constraints, but if there are data that are not
10    critical to the message of the paper and it's over
11    the space limit, then there would be suggestions
12    about cutting. The authors can always decline, and
13    I've had that happen as well.
14        Q.    You've had authors who you've wanted to
15    put -- who you said, you know what, I think you
16    should put this information in a table and they've
17    said no?
18        A.    I've had authors that I've asked them to
19    cut tables, and they've given me a reason not to.
20    And I always abide by their reasons.
21        Q.    And what about the other way, have you had
22    authors who you wanted something in a table and they
                              Page 100

arnett 20061020.txt

23  thought that was not -- what you wanted in a table
24  was not best conveyed in a table?
25      A.    I've not had that happen.

page 233
 1      Q.    Have you ever asked anybody to -- you have
 2  asked somebody to put information in a table that
 3  they presented originally in a text, correct?
 4      A.    I have not.
 5      Q.    Oh, okay.  I thought you said that there
 6  have been times where you -- where in your review of
 7  articles you've noted that information could be
 8  better conveyed in a table and you've had that
 9  discussion with the author.
10          THE WITNESS:  Could you read back my
11      testimony?  Because I don't recall how --
12      Q.    Well, the record will speak for itself.  I
13  want you if I'm wrong just tell me --
14      A.    Well, I don't want -- you know, we've been
15  talking almost six and a half hours.  I don't want
16  to be inconsistent in my testimony just because it's
17  six and a half hours into it.
18      Q.    Well, I'm giving you -- I'll start fresh.
19  Have you had the experience of asking an author to
20  convey data in a table that the author had
21  originally presented in text?
22      A.    I -- is it okay for me to hear what I said
23  because I really want to be consistent?
24      Q.    Sure.
25      A.    It's not that I'm lying about it, but I

page 234
 1  just want to make sure.
 2              (Requested portion read.)
 3      A.    I believe your question is different.
 4      Q.    Can you clarify your answer for me?
 5      A.    Could you restate the question?
 6      Q.    You just heard your answer.  And I think I
 7  probably didn't fully understand it.  So could you
 8  just clarify your answer for me?
 9      A.    So what I -- in my statement I said there
10  have been occasions where I've asked authors to
11  delete tables in entirety or reduce parts of the
12  table.  I don't recall ever having an experience
13  where I've asked people to move something from text
14  into table.
15      Q.    Okay.
16      A.    Because epidemiologists tend to write in
17  tables.
18      Q.    And have you had the experience that
19  whether data is presented in table or text can be
20  dependent upon whether the data relates to the
21  primary endpoint of the study or whether it's
22  related to an unexpected finding or secondary
23  endpoint of the study?
24      A.    I have no experience in that respect.  For
25  data that would be important safety issues in a

page 235
 1  clinical trial, I would demand as an editor to have
 2  a table.
 3      Q.    And that's something that in your
 4  experience editors would look for, whether any
                    Page 101

arnett 20061020.txt

5   safety findings from a study were presented in a
6   table?
7       A.    I -- I would consider it usual practice.
8       Q.    Okay.  And it would be usual practice if
9   they thought it was important to ask for the
10  information to be put in a table?
11      A.    It would be my practice.  I can't speak
12  for all editors.
13      Q.    Dr. Arnett, have you taken a look at how
14  much additional time or -- you've spent working on
15  Vioxx-related work between your last deposition and
16  today?
17      A.    37 hours.
18      Q.    At your rate of -- was it $400 an hour; is
19  that correct?
20      A.    Correct.
21      Q.    Have you been paid for any of your time to
22  date?
23      A.    I have not.
24      Q.    Have you submitted any bills?
25      A.    I have submitted the bill we discussed at

page 236
□ 1  my first deposition, and I submitted a bill after my
2   deposition.  But I haven't submitted anymore.
3       Q.    Have all the bills you've submitted been
4   to Med-Expertise, or have any of them been directly
5   to a law firm?
6       A.    The latter bill was directly to Ben's law
7   firm.
8       Q.    To Mr. Locklar's law firm?
9       A.    Yes.
10      Q.    What do you mean the latter bill?
11      A.    There was only two.  So there was the one
12  sent to Med-Expertise that was around 70-something-
13  odd hours and then the one for the work prior to my
14  deposition and my deposition.
15            MS. FREIWALD:  Okay.  I'm going to ask if
16  you would produce those.  I don't know what the
17  practice is in the MDL, assuming they're being
18  produced.  I'll ask if you make them available
19  to Mark is fine with me.  I don't need to get
20  them directly.  If you would send them to Mark,
21  that would be terrific.
22            MS. O'DELL:  I'd be happy to.
23            MS. FREIWALD:  Thank you.
24  BY MS. FREIWALD:
25      Q.    Is there any author or article that you're

page 237
□ 1  relying on -- let me start that again.
2             Can you point me to any written document
3   or any author that said before the results of the
4   APPROVe study were published that Vioxx caused heart
5   attacks?
6       A.    Any study?
7       Q.    Uh-huh.
8       A.    I'm sure there is at least one published
9   study out there.  So you're asking me or any author?
10      Q.    I'm asking you.  I'm asking you if there's
11  any authority, you know, any scientist who you
12  respect or any publication that you respect that
13  you're saying said based upon what was known up to
                          Page 102

arnett 20061020.txt

14  and including VIGOR that Vioxx causes heart attacks.
15      A.    The VIGOR publication itself showed a
16  five-fold excess risk of heart attacks.
17      Q.    Yeah, but that's not what I'm asking.  I'm
18  asking you whether anybody at the time that you can
19  point to drew the conclusion from VIGOR or anything
20  that preceded it that it was known that Vioxx caused
21  heart attacks?
22          MR. LOCKLAR:  Object to the form.
23      A.    I interpreted the Villalba's memos to say
24  that.
25      Q.    Where did Villalba's memos say that?

page 238
□ 1      A.    In those specific words, "cause"?  Well,
2  in the -- you and I may disagree on interpretation.
3  But on the advisory from February 8, 2001, the
4  conclusion on page 21 states, The relative risk of
5  cardiovascular thrombotic events was twice that in
6  rofecoxib compared to Naprosyn.  And she goes on to
7  describe the cumulative instance rate.  These
8  differences were statistically significant.  Safety
9  profiles must be carefully analyzed based on events
10  of comparable severity and seriousness.  Number
11  four, the sponsor recommends that patients with
12  known cardiovascular risk should be on prophylactic
13  aid, aspirin.
14      Q.    So what that represents is there was a
15  relative risk to Vioxx compared to naproxen in the
16  VIGOR study?
17      A.    Yes.
18      Q.    Is it your testimony that the VIGOR
19  publication demonstrated that Vioxx increased the
20  risk of heart attacks?
21      A.    It did.
22      Q.    And is it your testimony that reading the
23  VIGOR publication, one would reasonably draw the
24  conclusion that Vioxx caused heart attacks?
25      A.    Only by a careful examiner.

page 239
□ 1      Q.    And the VIGOR publication, if you read the
2  VIGOR publication, you would see a disparity in
3  rates between Vioxx and naproxen, correct?
4      A.    You would see a disparity of rates, but
5  the data were presented as protective for Naprosyn
6  and not harmful for Vioxx, which was inconsistent
7  with the way they presented their primary efficacy
8  outcome.
9      Q.    And so you would say to yourself the
10  alternative, if the glass isn't half full, the
11  alternative is that it's half empty and that the
12  result is coming from VIGOR [sic] and not naproxen?
13      A.    I'm an epidemiologist with 25 years of
14  training in cardiovascular disease, epidemiology,
15  critically reviewing studies on a daily basis.  I
16  may say that.  I don't know what other scientists
17  would say.
18      Q.    Okay.  But you could discern from reading
19  the VIGOR publication that the two possibilities
20  were either Vioxx was causing heart attacks or
21  naproxen was preventing or some combination?
22      A.    That's what the authors attempted to say.
                          Page 103

arnett 20061020.txt
23   I would not agree with that.
24       Q.    Okay.  But that's what the author is
25   attempting to convey in the VIGOR publications?

page 240
□ 1       A.    What they contempted to -- contempted.
 2   Slip of the tongue.
 3            Let me be specific because I don't think
 4   they offered up that Vioxx caused heart attacks as a
 5   possible explanation.  Specifically they say the
 6   incidence of myocardial infarction was lower among
 7   patients in the Naprosyn group than among those in
 8   the rofecoxib group.  This is in the abstract.  And
 9   then buried in the general safety, The mortality
10   rate was 0.5 percent in the rofecoxib group, 0.4
11   percent in the Naprosyn group.  The death from
12   cardiovascular causes was .2 percent in both groups
13   -- I'm sorry.  I'll slow down.
14            Myocardial infarctions were less common in
15   the Naprosyn group than the rofecoxib group.  And it
16   wasn't until the end of the discussion that they
17   bring up the cardiovascular issue at all.  And there
18   they talk about platelet aggregation.
19       Q.    Well --
20       A.    And state, Our results are consistent with
21   the theory that Naprosyn has a cardioprotective
22   effect.
23       Q.    And --
24       A.    So they do not say anything about an
25   alternative explanation.

page 241
□ 1       Q.    The results of VIGOR with regard to
 2   myocardial infarction are right in the front of the
 3   abstract, right?
 4       A.    Specifically what is in the abstract,
 5   after their main efficacy finding.
 6       Q.    Which was the point of the study, right?
 7       A.    It was the point of the study.  They talk
 8   about safety first relative to GI events.
 9       Q.    That was the point of the study?
10       A.    And then they bring up the incidence in
11   myocardial infarction was lower.  Again, the first
12   statement out is lower.
13       Q.    Okay.  And then the naproxen group?
14       A.    Than in the naproxen group.
15       Q.    And it gives the numbers, right?
16       A.    It does.
17       Q.    And says the overall mortality rate of
18   death from CV causes is similar, right?
19       A.    That's what it says.
20       Q.    Okay.  And we've gone over a lot of
21   information today where the FDA discussed the
22   possibility of naproxen being cardioprotective and
23   the possibility of Vioxx causing an increased risk.
24       A.    The totality of my interpretation of the
25   FDA data is that they refute the Naprosyn

page 242
□ 1   hypothesis.
 2       Q.    Doctor, I'm not asking you for your
 3   interpretation, but we looked at a lot of data along
 4   the way today that repeatedly says that naproxen
                              Page 104

arnett 20061020.txt

5 being cardioprotective is a possible explanation,
6 correct?
7      A.    Could you restate your question?
8      Q.    We looked at multiple FDA memos today that
9 repeatedly state that naproxen being
10 cardioprotective is a possible mechanism?
11          MR. LOCKLAR:  Object to the form.
12     A.    I disagree.  And I have read in these
13 memos -- and if you would like to take the time,
14 I'll go through them -- that they did not consider
15 the Naprosyn hypothesis as a salient explanation for
16 the finding.
17     Q.    What do you mean by salient?
18     A.    Salient means valid.  Valid.
19     Q.    Well, I'm not going to go over it again.
20 I think that we reviewed earlier today several memos
21 where the FDA reviewers say naproxen may explain the
22 effect or there may be other explanations; do you
23 remember that?
24     A.    No, I do not.
25          I need to take a break too.

page 243
 1     Q.    Sure.  Actually just one second.
 2          MR. LOCKLAR:  For the record, she's
 3 looking at a complete copy of the 2001 Targum
 4 memo which was on the CD that you previously
 5 received a copy of.  I don't know why she didn't
 6 get the full copy back.  I don't know if it was
 7 a copy error when it was submitted in a previous
 8 deposition or not, but she has that in front of
 9 her.
10          MS. FREIWALD:  Okay.
11 BY MS. FREIWALD:
12     Q.    Just by way of example from the 3/12/02
13 memo, the last page under Conclusions, you may
14 remember we read earlier, "These data support the
15 hypothesis that the excess of MI found with
16 rofecoxib, 50 milligrams, in the VIGOR study as well
17 as the trends observed in the ADVANTAGE and the RA
18 databases with the 25 milligram dose relative to
19 naproxen may in part be explained by the lack of a
20 antiplatelet effect of rofecoxib relative to that
21 naproxen."
22     A.    I said that's what it stated in that
23 specific part of the FDA's review.
24     Q.    Okay.  Do you want to take a break?
25 That's fine.

page 244
 1     A.    But in this document page 34 of the Targum
 2 review, which I didn't have access to before and I
 3 kept saying I know I have read that the FDA didn't
 4 -- am I on record?
 5     Q.    Sure.
 6     A.    -- didn't buy into the Naprosyn
 7 hypothesis.  It says the hypothesis is not supported
 8 by any prospective placebo control trials.  One
 9 could further argue that no matter what the
10 attribution, the results are favorable for
11 Naprosyn.  And then they go on to, "This claim has
12 not convinced this medical reviewer the VIGOR data
13 are consistent even in patients who do not fall into
Page 105

arnett 20061020.txt

14    the aspirin indicated group."  So to me that
15    indicates that this medical examiner reviewer did
16    not buy that claim.
17        Q.    I want to take a look at that last page
18    while you take a break.
19            THE VIDEOGRAPHER:  We're off the record at
20    3:59.
21            (Off the record.)
22            THE VIDEOGRAPHER:  We are on the record.
23    The time is 4:08.
24    BY MS. FREIWALD:
25        Q.    First of all, what I want to do is I want

page 245
 1    to mark -- I have a copy of the full FDA review
 2    since you were just looking at -- Doctor, confirm
 3    that my copy is the same as you were just looking
 4    at, and then we can mark that as the next exhibit
 5    number.
 6            It could easily have different Bates
 7    numbers on it.  It wouldn't surprise me if multiple
 8    copies have been produced.
 9        A.    It has the same Merck number 0002368.
10        Q.    Fine.  So we'll just mark that as the next
11    exhibit number, okay.
12            (Defendant's Exhibit Number 15
13             was marked for identification.)
14        Q.    In the documents I pulled off the disk, I
15    found these two pages titled Arm Laceration Study,
16    and I just wanted to know if you reviewed that.
17        A.    I did not.
18        Q.    I'll mark them as 16.
19            (Defendant's Exhibit Number 16
20             was marked for identification.)
21        Q.    I believe it was in your report you
22    referred to external and internal validity of
23    clinical studies.  Can you tell me what you meant by
24    that?
25        A.    By external validity I refer to the

page 246
 1    ability to generalize to -- externally from the
 2    study to people that would be similar in terms of
 3    characteristics, clinical and demographic, of the
 4    study participants.
 5        Q.    And what about internal validity?
 6        A.    Internal validity is a host of
 7    different factors that we review as
 8    epidemiologists.  So in terms of the clinical
 9    trial we would evaluate whether it was randomized,
10    placebo controlled, whether the randomization
11    worked or didn't work in terms of distribution of
12    baseline risk factors.  We would evaluate how well
13    blinding, if it was blinding, was adhered to.  We
14    would look at the quality and adherence to follow
15    up by study participants.  We would evaluate the
16    criteria that were established for finding primary
17    endpoints, secondary endpoints.  And then in the
18    interpretation phase we would be evaluating
19    whether the analysis was done appropriately.
20    That's generally -- those are the main areas that
21    would be covered.
22        Q.    And with the internal validity am I
            Page 106

arnett 20061020.txt
23  right that one has to be cautious in extrapolating
24  the findings of one study to populations that are
25  not the same as the population that was

page 247
0 1   represented in the study?
 2       A.    That is a general -- a generally held
 3  principle of epidemiology.  In the Vioxx example one
 4  of the concerns was that most of the populations
 5  were fairly healthy and not representative of who
 6  would be taking the drug in clinical practice.
 7       Q.    Do you know anywhere where that was
 8  actually the case where anybody expressed a concern
 9  that the patients were not the kind of patients who
10  would be taking the medication?
11       A.    I know from the senate testimony I
12  reviewed for Vioxx that there was a study cited that
13  evaluated the risk factor levels among people in an
14  HMO who had taken Vioxx and they were markedly
15  higher in terms of risk factor levels than any of
16  the trial participants.
17       Q.    And have you done an analysis of how many
18  patients in the trials were hypertensive, had one or
19  more risk factor for cardiovascular disease?
20       A.    I have not but in general they were
21  healthier.  The other evidence came from the
22  Canadian study where they documented the risk factor
23  level of the people in the community and health
24  system that had taken Vioxx.  And they also have
25  much higher levels of risk factors than the trial

page 248
0 1   participants.
 2       Q.    And did you look to see whether patients
 3  who took Vioxx in observational studies tended to be
 4  less healthy than patients who were on other NSAIDs?
 5       A.    I have not seen that data.  It doesn't
 6  mean it doesn't exist.  I haven't looked for it.
 7       Q.    And with regard to other kinds of
 8  epidemiologic data, like Framingham data, for
 9  example, is it also true that one has to be careful
10  about extrapolating those results to other
11  populations?
12       A.    Can you be more --
13       Q.    One has to be careful in using Framingham
14  data, for example, in extrapolating those results to
15  other populations and drawing conclusions about what
16  the relative risk of an event would be in a
17  different kind of population?
18       A.    Interestingly the Framingham score has
19  held up consistently across populations.
20       Q.    It is true that what the Framingham risk
21  score is doing is looking to predict risk based on
22  population data in the absence of clinical diagnoses
23  of cardiovascular disease?
24       A.    Specifically the Framingham risk score was
25  derived in people without clinical disease, and

page 249
0 1   prediction equations were calculated for expected
 2  probability of an event over a specified time period
 3  based on risk factor levels in the model.
 4       Q.    And so it doesn't really apply to patients
                          Page 107

arnett 20061020.txt

5  who have known diagnosed cardiovascular disease?
6      A.    I can't say that it doesn't apply in terms
7  of the risk factor functions.  In other words, if
8  you're hypertensive -- I'm not sure if they have an
9  -- let me go back.
10          I'm not sure if the Framingham risk score
11  hasn't been evaluated in people with disease for
12  predicting recurring disease.  And I'm not surprised
13  there aren't publications out there that have done
14  that.
15      Q.    Good point for predicting recurring
16  disease.  But, for example, if you take somebody who
17  is -- who meets a certain demographic model and you
18  might extrapolate from Framingham that they had
19  let's say a 10 percent risk of having a
20  cardiovascular event over the next ten years, okay?
21      A.    Okay.
22      Q.    If you -- you couldn't apply Framingham to
23  that person if you already knew that they had
24  clinically evident atherosclerosis?
25          MR. LOCKLAR:  Object to the form.

page 250
 1      A.    I have -- I would have to -- I have not
2  reviewed that data.  I am -- I'm pretty sure that
3  that kind of question has been asked.  I just
4  haven't reviewed that data.  And so I can't answer
5  that with certainty about whether you could or
6  couldn't.  I'm sure there are equations that are.
7      Q.    Okay.  But what Framingham was designed to
8  do was look -- it started out looking at healthy
9  patients who were assumed to have not yet developed
10  disease or not yet developed any clinically
11  significant cardiovascular event and see what the
12  likelihood was that they would develop it over a
13  ten-year period, correct?
14      A.    Correct.
15      Q.    You agree that it's wrong to cherry pick
16  data?
17      A.    I don't -- define cherry pick.
18      Q.    To be selective and only rely on the
19  studies that support you and ignore the studies that
20  don't support you?
21      A.    I would agree that you look at the
22  totality of evidence stemming from all types of
23  studies and study designs and give greater weight to
24  clinical trials in terms of making an inference.
25      Q.    And do you agree that it is wrong to over-

page 251
 1  interpret data to try to argue the data stands for
2  more than what it was intended to stand for by
3  virtue of the study design?
4          MR. LOCKLAR:  Object to the form.
5      A.    I would not agree that -- what I would say
6  as an epidemiologist is I would look at the totality
7  of the data in relation to other published data,
8  other studies, particularly clinical trials that
9  have been done to make an interpretation of that
10  data.
11      Q.    Is the term over-interpreting data one
12  that you're familiar with?
13      A.    I'm familiar with that term.
                              Page 108

arnett 20061020.txt

14      Q.      And what does it mean to you?
15      A.      To me over-interpret means to go beyond
16 the meaning of the number.
17      Q.      And you agree that's something that one
18 should not do in epidemiology?
19      A.      As a careful epidemiologist I review
20 internal validity, external validity, statistical
21 power, all of the pieces that went into internal
22 validity I described before in order to interpret a
23 number. A number in and of itself has very little
24 meaning to me.
25      Q.      So it's important not to go beyond what

page 252
☐ 1   the meaning or bounds of the study were?
 2      A.      Could you be more specific?
 3      Q.      It's important -- when you say it's
 4 important not to over-interpret data, it's important
 5 not to try to make it stand for more than it
 6 reasonably stands for?
 7      A.      I don't know what reasonable means.
 8      Q.      More than it was intended to prove by its
 9 design.
10      A.      I'm not being wishy-washy here.  As an
11 epidemiologist if we designed a study, if we got an
12 equivocal answer about a particular hypothesis, we
13 would look at studies prior, we would develop
14 studies to address the limitations in that study,
15 and interpret the data as they are.
16      Q.      Do you consider a p-value of .07 to be a
17 strong signal?  Is that a meaningful p-value to you?
18      A.      It just means that that result or one more
19 extreme could have happened seven out of -- in seven
20 out of 100 attempts.
21      Q.      I guess what I'm asking is when you look
22 at statistical significance do you say it's either P
23 of .05 or it's not, or do you allow for some band
24 around that .05?
25      A.      As an epidemiologist I look at the

page 253
☐ 1   totality of evidence.  So if I had a P value of .07
 2 but I had very low statistical power to detect that
 3 finding, then I may be more inclined to give it more
 4 weight.
 5      Q.      So P of .07 under certain circumstances
 6 can be a strong indicator to you?
 7      A.      It could be.  In a case of APPROVe where
 8 you have a very large sample and have a power of P
 9 of .07 it is not as meaningful to me.
10         MS. FREIWALD:  I guess we need to change
11 the tape.
12         THE VIDEOGRAPHER:  This is the end of Tape
13 Number Six in the continued deposition of Donna
14 Arnett to be continued on Tape Number Seven.  We
15 are off the record at 4:22 p.m.
16              (Off the record.)
17         THE VIDEOGRAPHER:  This is the beginning
18 of Tape Number Seven in the continued deposition
19 of Donna Arnett.  We are on the record at 4:24.
20 BY MS. FREIWALD:
21      Q.      Doctor, do you believe that APPROVe was
22 adequately powered to find cardiovascular effect?
                        Page 109

arnett 20061020.txt

23      A.    As I stated for the VIGOR study, when you
24 have a statistically significant finding,
25 statistical power is not relevant.

page 254
 1      Q.    Did you do a power calculation?
 2      A.    I did not.
 3      Q.    And do you know what the power was to
 4 detect proportional hazard over time?
 5      A.    I do not. But there was a significant
 6 effect of Vioxx over time.
 7      Q.    Do you know -- the test for
 8 non-proportionality was -- P is .07, correct?
 9      A.    For -- it varies by different endpoints
10 selected so that it wasn't true for all endpoints.
11      Q.    And you don't know what the power was to
12 see if the results were non-proportional?
13      A.    I do not.
14      Q.    Do you know what -- whether there was a
15 relative -- an increased relative risk in the
16 Alzheimer studies in the first 18 months?
17      A.    If you give me time, I'll go back and
18 review it.
19      Q.    That's okay. Sitting here today do you
20 know?
21      A.    I don't want to sound like I'm not
22 knowledgeable about the topic. I don't recall there
23 being a difference in the effect over time.
24      Q.    Okay. Do you know if the Alzheimer's test
25 -- Alzheimer study had ended at 18 months whether

page 255
 1 you would have seen an increased risk of relative
 2 risk in Vioxx?
 3      A.    For what outcome?
 4      Q.    For MI.
 5      MR. LOCKLAR:  Object to the form.
 6      A.    Could you restate the question?
 7      Q.    If Alzheimer's had ended in 18 months do
 8 you know if you would have seen increased relative
 9 risk with Vioxx?
10      MR. LOCKLAR:  Object to the form.
11      A.    For myocardial infarction I have concerns
12 about the data quality from the Alzheimer disease
13 study because, number one, it was associated with an
14 increase in Alzheimer's disease development by their
15 definition of their endpoint, which would lead to
16 differential reporting in my estimation of
17 myocardial infarction.
18      Q.    Okay. Move to strike as nonresponsive.
19 Do you know the answer to my question?
20      A.    You'll have to restate your question.
21      Q.    Whether there was any increased relative
22 risk in the first 18 months?
23      MR. LOCKLAR:  Object to the form.
24      A.    For?
25      Q.    MI.

page 256
 1      A.    Myocardial infarction --
 2      MR. LOCKLAR:  Same objection.
 3      A.    There was an -- a significant and numeric
 4 increase in cardiovascular deaths.
                                        Page 110

arnett 20061020.txt

```
 5      Q.    Do you know about for MI?
 6      A.     As I said, as an epidemiologist I don't
 7   have confidence in the myocardial infarction
 8   reporting ability of people with cognitive decline.
 9      Q.     Doctor, have you ever had an experience
10   where you've done a study with Alzheimer's patients
11   to look for this to know whether this can be done
12   appropriately or not?
13      A.     I have evaluated studies for defining
14   outcomes in the elderly.  And there is poor
15   reporting in the elderly --
16      Q.     And there --
17      A.     -- for cardiovascular events.
18      Q.     And there are ways to do the studies,
19   right?  There are ways to do the studies that are
20   appropriate, correct?
21      A.     If you do serial electrocardiograms, if
22   you have adequate follow-up.
23      Q.     Have you looked into any of that?
24      A.     Well, I can tell you that there was quite
25   a bit more drop-out in those who were randomized
```

page 257

```
 1   with Vioxx in the Alzheimer's disease study.  There
 2   was less compliance --
 3      Q.     Doctor, have you --
 4      A.     -- and more cardiovascular outcome,
 5   adverse events for dropping out.
 6      Q.     I'm just looking for an answer to my
 7   question, Doctor.  Move to strike as nonresponsive.
 8             Did you look to see whether there was --
 9   there were appropriate measures to see if the
10   reporting was accurate in the Alzheimer's study?
11      A.     I have -- they did not publish their
12   method.  It's not reported to the best of my memory,
13   and I'll check this in the FDA memos.  But there's
14   certainly publications in the cardiovascular
15   epidemiology world and gerontology that indicates
16   that reporting differs.
17             And there's also evidence that silent
18   myocardial infarctions are as common or more
19   common.  By silent I mean asymptomatic.  And so if
20   one has cognitive decline, it would seem that
21   reporting would be differential.
22      Q.     Well, there's no evidence that there's a
23   correlation between cognitive decline and an
24   increase in silent MI.  And cognitive decline
25   doesn't block pain response, right?
```

page 258

```
 1      A.     No.  But your ability to define pain would
 2   be questionable.
 3      Q.     Doctor, you don't have any evidence other
 4   than speculation that in the Alzheimer's studies
 5   heart attacks weren't appropriately reported in
 6   patients with mild cognitive impairment?
 7             MR. LOCKLAR:  Object to the form.
 8      A.     I don't have evidence to convince me that
 9   it was either.
10      Q.     Okay.  So you want to prove that something
11   was done wrong by an absence of evidence, correct?
12             MR. LOCKLAR:  Object to the form.
13      Q.     You could be neutral on this.  You could
```

Page 111

arnett 20061020.txt

14  say you don't know.
15      A.    I'm actually not neutral about this.  I do
16  -- there was an excess of development of Alzheimer's
17  disease among those randomized for Vioxx.  And it is
18  my -- knowing what I do about the frequency of
19  misreporting of symptoms for myocardial infarction
20  in general, it is my assertion that if you have
21  cognitive decline that's increased by taking a drug,
22  that you would be more likely to misreport the
23  symptoms.
24      Q.    Is there any evidence that there's a
25  correlation between the patients who had MI and the

page 259
0 1  patients who had an increase in cognitive decline?
2      A.    I haven't looked at the -- the data are
3  not presented in that way.
4      Q.    Is there any evidence that the patients
5  had cognitive decline to a level where they would be
6  incapable of reporting a heart attack or having
7  somebody else know that they had a heart attack?
8      A.    I can't say either way.  I haven't
9  evaluated that question.
10     Q.    Fine.
11            MS. FREIWALD:  That's all I have.
12            MR. LOCKLAR:  Let me just state for the
13  record very quickly on Exhibit Number 16 this
14  looks to be attorney work product.  Dr. Arnett
15  says that she has not seen it before.  It looks
16  to perhaps be prepared for the Plunkett, Irvin
17  trial.  We're going to move to have it stricken
18  from the record.  I don't know what the process
19  necessarily will be.  But I want to make sure
20  that I state my objection and belief that it's
21  attorney work product.  I don't know how we go
22  about doing that but I just want to --
23            MS. FREIWALD:  Okay.  I pulled it off the
24  disk.
25            MR. LOCKLAR:  Which she says she's not

page 260
0 1      seen.
2            MS. FREIWALD:  Okay.  That's fine.
3            THE VIDEOGRAPHER:  This is the end of Tape
4  Number Seven and concludes the deposition of
5  Donna Arnett, Ph.D. taken October 20th 2006.
6  We're off the record at 4:32 p.m.
7            (End of deposition, 4:32 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 112

```
23
24
25

page 261                    arnett 20061020.txt
□ 1                  SIGNATURE OF WITNESS
  2          I, _____, do hereby
  3    certify that on this _____ day of
  4    _____ 2006, I have read the foregoing
  5    transcript and to the best of my knowledge it
  6    constitutes a true and accurate transcript of my
  7    testimony taken by oral deposition on October 20,
  8    2006.
  9
 10
 11    _____
 12    DONNA ARNETT, Ph.D.
 13
 14    Subscribed and sworn to
 15    me this _____ day of _____,
 16    2006.
 17
 18
 19
 20    _____
 21
 22    NOTARY PUBLIC
 23
 24
 25
 26
 27

page 262
□ 1                  E R R A T A   S H E E T
  2
  3    PAGE      LINE        CORRECTION          REASON
  4
  5
  6
  7
  8
  9
 10
 11
 12
 13
 14
 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25

page 263
□ 1                  C E R T I F I C A T E
  2
                        Page 113
```

arnett 20061020.txt

```
3    STATE OF ALABAMA   )
4    JEFFERSON COUNTY   )
5
6
7         I hereby certify that the above and
8    foregoing deposition was taken down by me in
9    stenotype, and the questions and answers thereto
10   were reduced to computer print under my
11   supervision, and that the foregoing represents a
12   true and correct transcript of the deposition
13   given by said witness upon said hearing.
14        I further certify that I am neither of
15   counsel nor of kin to the parties to the action,
16   nor am I in anywise interested in the result of
17   said cause.
18
19
20
21
22
23   _____
24        Lisa Bailey, Commissioner
25
26
27

page 264
```

Page 114