essentially equi-efficacious and seemed to share a single underlying mechanism of action, any drug that had demonstrably less efficacy might possibly work through a dissimilar mechanism. This possibility was a major motivating factor in my wanting to pursue a higher than standard dose experimental trial with the company after the drug was launched. I continue to believe that quetiapine does, in fact work through largely distinct mechanisms. Unfortunately this distinction translates into slightly less pharmacologic power on average than conventional medications. AZ has "oversold" quetiapine's efficacy in their marketing endeavors for years.

Quetiapine's Toxic Metabolic Profile
The dataset that Zeneca had compiled on quetiapine prior to its launch in 1997 clearly indicated that clinically significant weight gain was a common side effect of quetiapine. The data from Zeneca's Phase II/III trials demonstrated a clear dose related impact on weight that compellingly worsened over time. Using the FDA's definition of clinically pertinent weight gain (i.e., a 7% increase), quetiapine routinely impacted over 25 percent of the treated population (somewhat lower for lower doses of quetiapine and somewhat higher with higher quetiapine doses). The average shift in weight was 6.2 lbs over the first six months of treatment and 11 lbs after six months of treatment. This is approximately halfway between the weight gain induced by risperidone and olanzapine—quetiapine's major competitors at launch. Weight gains of this magnitude are impressively large and impact an amazingly large and consistent percentage of patients. Despite these data, which have been available to the company since before launch, the label for quetiapine has never, even to the present day, "warned" of this predictable and serious toxicity. Instead, the label has merely listed in the adverse experiences section that quetiapine is "sometimes associated with increases in body weight". Further, their marketing materials over the years have consistently touted that quetiapine is "weight neutral". This is palpably inappropriate and inadequate at best and deceptively misleading at worst. It is my opinion that this labeling deficiency rises to the legal definition of gross negligence (i.e., "willful disregard for the safety of others"). It is unconscionable that after more than a decade's time that the warnings section is still silent about the single most prominent serious toxic characteristic of the compound.

There are a number of well-known health consequences to increases in adiposity. Among these are increased risks for glucose intolerance and even frank diabetes, increases in total cholesterol and triglycerides in the blood, secondary risks for cardiovascular disease, increased rates of degenerative osteoarthritis, and even increased risks for certain malignancies (e.g., colon cancer). The fact that quetiapine use results in weight gain and therefore causes diabetes in susceptible patients cannot be rationally disputed. This was confirmed by the APA/ADA consensus conference on the metabolic toxicities of the atypical antipsychotics held in 2004. That conference of independent (i.e., non-industry) experts (at which I provided the presentation on the monitoring protocol) concluded that quetiapine use could result in significant weight gain, increased rates of diabetes, and pathologic changes in lipid profiles. Although the current label change implemented in 2007 does direct one to a new section in the adverse events section that documents, to a degree, some of the measured increases in new onset diabetes, it remains inadequate and misleading. Firstly, the "class labeling" warning section on endocrinologic toxicities is

laced with generalities, disclaimers, and distracting verbiage. It fails completely to state the measured increases in new onset diabetes that are specific to quetiapine and that are detailed in the adverse experiences section. Secondly, it fails to make the known connection between increases in adiposity and subsequent changes in glucose regulation. It gives the mistaken impression that the risks of diabetes only apply to a decidedly minor (circa 2-4%) portion of treated patients when, in fact, nearly one third of patients treated with standard doses for as little as a year are at decidedly increased risk of glucose disregulation. The company personnel have opined in depositions that the details of quetiapine's measured risk of diabetes and related endocrinologic disturbances were unknown until the results of these later done studies were completed. Such rhetoric is intellectually and clinically dishonest as it requires one to deny the clinical fact that increases in adiposity that are caused by quetiapine (and were known to the company before launch in 1997) will result in predictable increase in endocrinologic dysfunction. It is axiomatic that increases in obesity will result in subsequent increases in hyperglycemia, frank diabetes, hyperosmolar coma, and even death due to endocrinologic complications. To deny otherwise, as AZ officials continue to do to the present day, is negligently irresponsible.

Additionally, the label is virtually silent (or at least it is decidedly unclear) about quetiapine's ability to induce massive changes in circulating triglycerides and thereby lead to secondary and potentially lethal pancreatitis (i.e., marked inflammation of the pancreatitis). When a person gains significant adiposity, there is a predictable increase in the levels of circulating lipid pools (i.e., triglycerides, VLDL, LDL, etc.) because to body must manage a larger flow of fats from the gut and to and from the tissues. These changes, while potentially of long-term clinical pertinence, are usually of ordinary magnitude. Quetiapine, though, also results in massive acute elevations in triglycerides that can, on occasion, overwhelm the body's fat management system and cause secondary pancreatitis. The precise mechanisms whereby this toxicity is mediated have yet to be elucidated, however, it is likely that interference with one of the early lipid management enzymes in the liver (e.g., lipoprotein lipase A) causes a "backup" of the triglyceride transport vehicle (i.e., chylomicrons) from the gut that leads to the hypertriglyceridemia. This additional metabolic-like toxicity is unrelated to changes in weight, tends to occur during the first several months of treatment, and is markedly more acutely serious than the more pedestrian increases in the sundry lipid pools that predictably follow increases in adiposity. This toxicity has clearly emerged during the post marketing surveillance period, has been reported frequently in the case report literature, and was discussed at length at the consensus conference in 2004.

Addictive Potential
The single most consistent toxic effect of quetiapine is sedation. This property when coupled with quetiapine's low EPS profile has prompted clinicians to use the drug excessively off-label for such conditions as anxiety and insomnia. These characteristics also raise a reasonable concern that quetiapine may have some addictive potential. In fact clinical experience and a number of case reports have suggested that certain patients will abuse, divert for sale, and become physically dependent on quetiapine (Pierre, et al,

2004; Murphy et al, 2008). Despite these facts the label has been virtually silent about this reality.

Off Label Use

Quetiapine has come to dominate the atypical antipsychotic market primarily because it is used excessively off label (current estimates are about two thirds of the prescriptions are off-label). I am of the opinion that primary among the reasons for this disproportionate off label use are the facts that quetiapine is sedating and highly subjectively tolerable and the inaccurate clinical impression that it is also comparatively free of concerning toxicities and devoid of abuse potential. A secondary reason is that quetiapine's share of the on label market is reduced because it is simply not as potent an antipsychotic as other available products. While prescribing a drug for off label use is a common and often clinically reasonable practice, promoting a drug for off label use is illegal. AZ was clearly aware of the excessive off label use of quetiapine over the years. Their officials have stated repeatedly in depositions that AZ endeavored to provide label support of these "passively observed" prescriptive habits by investing heavily in confirmatory studies. Though many such studies were performed, I consider the claim largely dishonest. If true, then it would have been imperative for AZ to study the largest and most excessive off label use, to wit, insomnia. Such a study would have been logistically and economically trivial to perform, at least in comparison to the studies done in mood and psychosis based disorders. There is to date no evidence of any quality that demonstrates that quetiapine decreases sleep latency, increases total sleep time, normalizes sleep architecture, or improves daytime wakefulness. There is, in fact, ample evidence that quetiapine impairs significantly daytime wakefulness. I believe that AZ knew that any real detailed sleep study would ultimately be an indictment of clinical practice and would potentially cut the total use of their product by more than half. It is further my opinion that AZ mischaracterized the true toxic potential of their product and that this behavior has in part prompted clinicians to use their product inappropriately and excessively off label. If clinicians had been aware of the true metabolic toxicities and addictive liabilities of quetiapine then I do not believe that we would have the amount of off label usage we see today. It is my opinion therefore that AZ has been engaged in "indirect" off label marketing. While their behavior may have in fact been technically within the "letter of the law", it was and continues to be irresponsible, improper, and ethically indefensible.

Conclusions/Summary

AZ's marketing of quetiapine has consistently exaggerated the true efficacy of the compound.

AZ has been aware of the true metabolic toxicities of quetiapine since before launch in 1997. Despite this they have engaged in a marketing campaign that has minimized, obfuscated, or frankly denied these metabolic realities. Their product label has been consistently and continuously inadequate in its warnings about the impact on lipid and glucose metabolism, hyperglycemia, and diabetes. Their label continues to be wholly inadequate to the point of being decidedly misleading in its warnings about weight gain.

Additionally, the current label is inadequate regarding quetiapine's ability to markedly disrupt normal lipid metabolism and cause massive hypertriglyceridemia and secondary pancreatitis.

The current label is inadequate in its description about the abuse potential of quetiapine. AZ should have identified and warned of this abuse liability based on the clinical characteristics of quetiapine and the curious and excessive off label use patterns. Further, their tacit acceptance of the excessive use of their product for routine insomnia for the past decade without ever having investigated the effects of their product on sleep, is tantamount to passive marketing for an off label indication. This failure to investigate has been compounded by their insistence that they have behaved responsibly by investing heavily in research to establish on label support for the prescriptive patterns they knew to exist.

AZ's behavior has given prescribing clinicians an inaccurate impression of quetiapine's toxic profile and addictive potential which has robbed physicians of the ability to make informed risk/benefit analysis prior to prescribing quetiapine to a patient. This has led in part to the excessive and inappropriate off label use of the product and to injury and damage to patients who would not have otherwise ever received the medication.

My opinions as stated in this report are based on my education, training, and experience and my review of the relevant literature, internal Astra Zeneca documents, corporate depositions, and public documents and are stated to a reasonable degree of medical probability. It is my understanding that discovery is ongoing and I thus reserve my right to supplement or expound upon my opinions pending review of additional information.

My fees for work in this litigation are $500 per hour.

A list of my testimony for the past 4 years is attached.

William C. Wirshing, M.D.