# EXHIBIT 40

1

08-I-99343 sh

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This document relates to all Group One Trial Cases:

| | |
|---|---|
| Janice Burns v. AstraZeneca LP, et al. | Case No. 6:07-cv-15959 |
| Sandra Carter v. AstraZeneca LP, et al. | Case No. 6:07-cv-13234 |
| Connie Curley v. AstraZeneca LP, et al. | Case No. 6:07-cv-15701 |
| Linda Guinn v. AstraZeneca LP, et al. | Case No. 6:07-cv-10291 |
| David Haller v. AstraZeneca LP, et al. | Case No. 6:07-cv-15733 |
| Hope Lorditch v. AstraZeneca LP, et al. | Case No. 6:07-cv-12657 |
| Eileen McAlexander v. AstraZeneca LP, et al. | Case No. 6:07-cv-10360 |
| Clemmie Middleton v. AstraZeneca LP, et al. | Case No. 6:07-cv-10949 |
| Charles Ray v. AstraZeneca LP, et al. | Case No. 6:07-cv-11102 |
| William Sarmiento v. AstraZeneca LP, et al. | Case No. 6:07-cv-10425 |
| Richard Unger v. AstraZeneca LP, et al. | Case No. 6:07-cv-15812 |
| Linda Whittington v. AstraZeneca LP, et al. | Case No. 6:07-cv-10475 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

LAURA M. PLUNKETT, Ph.D., DABT

October 2, 2008

Volume 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

146

1 that Seroquel causes liver damage?
2   A. I can't answer that for you today.
3   Q. You haven't done enough research into that issue,
4 have you?
5   A. Well, I can tell you that there are authoritative
6 sources that state that there's -- that it's within the
7 toxicological profile of the agent, but I -- and I even believe
8 there's some preclinical animal data on liver damage and
9 Seroquel. However, again, it wasn't what I was asked to assess
10 from a more rigorous level.
11      I consider what I've done more rigorous than
12 just reviewing what textbooks may say about a drug, and that's
13 where -- again, this paragraph that I wrote, 19   let's see.
14 Paragraphs 18, 19, 20, 21, those four paragraphs are what I
15 call my "orient the pharmacology and toxicology of the drug"
16 paragraphs. They're coming from review papers and textbooks,
17 things that I have seen described over and over again by
18 people. And I'm going from something as severe as death to
19 something that's much more minor.
20      So, I'm trying to show you that this drug has a
21 spectrum of toxicity from something like death due to different
22 endpoints that have been linked to why the death has occurred
23 down to, you know, other things that are more minor. So, the
24 risk-benefit profile is not just rash. It can be things more
25 severe than that.

147

1   Q. I'm not that smart. I really didn't understand that.
2      MR. ALLEN: I do. But, Arthur --
3      MR. BROWN: Could you short-circuit it? I mean,
4 it might be --
5      MR. ALLEN: I'll talk to you on the break. I'm
6 not going to short-circuit it here on the record. I think I
7 can short-circuit this, but --
8      MR. BROWN: Can we go off the record for one
9 second?
10      (Discussion off the record from 12:50 p.m. to
11   12:51 p.m.)
12   Q. (BY MR. BROWN) Okay. You hold a number of opinions
13 with respect to the relationship between Seroquel and metabolic
14 disorders, correct?
15   A. Yes. The ones that are outlined in my report, yes.
16   Q. And you rely on a number of different lines of
17 evidence?
18   A. Yes.
19   Q. We've talked a little bit about them, we're going to
20 talk more about them in a few minutes, but I want to make sure
21 I understand the opinions. Is it your opinion that Seroquel
22 causes diabetes?
23   A. Yes.
24   Q. Type 2 diabetes?
25   A. Yes.

148

1   Q. And how is it that you believe Seroquel causes Type 2
2 diabetes?
3   A. Okay. Well, that's my report. That's the weight of
4 the evidence assessment that I have done. So, that is an
5 opinion based upon looking at the -- the scientific literature
6 and going through that scientific literature looking at all the
7 available lines of evidence, whether or not there's animal
8 data, whether or not there's human data, whether or not there's
9 epidemiological versus clinical data, whether or not there's
10 biologic plausibility. Is there some understanding why this
11 could happen that makes some sense?
12      All of those things are in the Hill criteria,
13 and I -- that's outlined for you in Paragraph -- I tried to do
14 that in somewhat of a fashion for you in Paragraph --
15   Q. In the weight of the evidence paragraph?
16   A. Yeah. It's a long one.
17   Q. 29.
18   A. Okay. There you go. That's right. Yes, right,
19 exactly. And, again, this is not every study. That's why I've
20 said "e.g." after some of these. For example, under clinical
21 data, I say, "e.g.," for example, and I've listed some of the
22 ones that jump out at me as being very important.
23      But, for example, under clinical data now, you
24 could also -- if I was going to cite some internal company
25 documents, I would also cite some of the information found in

149

1 the clinical trials and this document that was produced -- or
2 was prepared as part of the SERM meeting within the company,
3 things like that as well. But that's where my opinion comes
4 from.
5      And, to me, all of that evidence put together
6 forms this story which tells me that this drug can cause
7 diabetes and it can cause hyperglycemia and it can cause weight
8 gain. And, again, if you want to talk about each individual
9 study, that's a lot of work, but we can do that. If you want
10 to pull the individual ones out, we can do that.
11   Q. Well, we're going to talk about a lot of the
12 individual studies after lunch, but I want to make sure I
13 understand your methodology. So, you applied the weight of the
14 evidence analysis; is that correct?
15   A. Yes. In other words, as any problem you look at --
16 and as you indicated earlier, there's going to be some studies
17 that show positive results and some studies that show negative
18 results. What I'm looking at is what is the overall weight,
19 what does the evidence as a whole tell me, and I have to be
20 able to see that this evidence fits together.
21   Q. So, is your -- can you quantify what "weight of the
22 evidence" means?
23   A. What do you mean by "quantify"?
24   Q. Is it more probable than not? What is the weight of
25 the evidence standard that you're employing in this?

**Page 278**

1  I certainly think that in the -- even up to
2  today in the language -- if you want, we can talk about the
3  labels over time. Even the language today is confusing to me
4  about what they're really trying to say to the physician. So,
5  I believe that even the language labeling as of today where
6  there is a warning isn't necessarily telling me what I would
7  need to know as a pharmacologist about what the real risks --
8  and based upon the documents I've seen about what the risks
9  are.
10  Q. What is it you need to know about the risks of a
11  product as a pharmacologist if you don't prescribe medicines?
12  A. I use medicines. I read Physicians' Desk Reference
13  and product inserts every time. I also do projects where I am
14  asked to assess human health risks, like in this case. So,
15  labeling is something that I use and certainly something that
16  pharmacologists use all the time.
17  Q. Let me show you the 1999 Seroquel label from the PDR.
18  This came from your files. This was sent to us on Monday.
19     (Plunkett Exhibit No. 17 marked.)
20  Q. (BY MR. BROWN) I'm handing you Exhibit No. 17, which
21  is a copy of the Seroquel label from 1999. You see that?
22  A. Yes.
23  Q. And this is the same label that existed in 1997 --
24  I'll represent that to you -- with respect to the adverse
25  reaction sections, okay?

**Page 279**

1  A. Okay.
2  Q. Can we turn to the adverse reaction section?
3     Would you agree with me that there was a section
4  here in the adverse reaction section directed to weight gain?
5  Far right-hand column, two-thirds of the way down.
6  A. That's what I was looking for. I know it's there. I
7  wanted to find it. Yes, I am aware that there is one in the
8  adverse reaction section, yes.
9  Q. It says the proportion of patients meeting a weight
10  gain criterion of greater than 7 percent of body weight were
11  compared in a pool of four three- to six-week
12  placebo-controlled trials, revealing a statistically
13  significant greater incidence of weight, Seroquel 23 percent,
14  versus 6 percent. See that?
15  A. Yes.
16  Q. A four-fold difference approximately in the incidence
17  of what the label described as clinically significant weight
18  gain?
19  A. Yes, I see that.
20  Q. Do you think 7 percent of body weight is clinically
21  significant? Do you have an opinion on that?
22  A. I think that that would -- I believe that would be,
23  but, again, I would refer you to a physician if you're going to
24  talk about clinically significant. I believe it is a
25  significant increase in body weight, based upon my own, you

**Page 280**

1  know, knowledge of the literature, that I've seen increases in
2  body weight much less than that can be talked about as being
3  clinically significant.
4  Q. If a doctor read this label, he would see that
5  information regarding weight gain, correct?
6  A. Well, I would argue this isn't a warning. This is a
7  listing in the adverse reaction sections. And as we talked
8  earlier, there's -- when I'm talking about warning, I'm talking
9  about putting something that the doctor is going to see as up
10  front under the warning section, not necessarily something in
11  the adverse reaction section that is buried. So, I -- I have a
12  little disagreement.
13     I agree with you it's there, but I don't think
14  it carries -- to me -- actually, how these labels are written,
15  that does not carry the same weight as a warning does to a
16  physician when he reads them. If you read the labeling
17  guidelines about how things are put in, that's what it tells
18  you.
19  Q. Have you done a survey or some sort of analysis of
20  how doctors read labels, a study?
21  A. I have read -- I haven't done my own analysis, but I
22  have read some documents that were prepared, either by the GAO
23  or FDA themselves, talking about changes four or five years ago
24  they were going to make to labeling regulations and studies
25  that they did and talked about how doctors interpret or don't

**Page 281**

1  interpret.
2     And that's why the new regulations have come
3  into play with drugs after 2006 where the information is put
4  into a mode that allows the physician to more easily glean what
5  risks are, what information they need to find, whereas, these
6  old labels were criticized for just that kind of information,
7  things that the doctor has to pay attention to and it's a long
8  document and they're looking for the important information up
9  front.
10  Q. Let me ask my question again.
11     So, if a doctor wanted to know about weight
12  gain, there's a section here dedicated to weight gain in the
13  label, correct?
14  A. Under adverse reactions, yes.
15  Q. Do you think the FDA was wrong in putting the weight
16  gain data where it is in this label?
17     MR. ALLEN: Objection. Form.
18  A. I haven't opined -- formed any opinion about whether
19  or not the FDA -- that's not my job to say if the FDA was right
20  or wrong. I believe that -- however, that I have an opinion
21  based upon what I -- whether this label tells me what I would
22  need to know based on the information I had at the time. My
23  issue with -- not so much the weight gain is the issue with
24  the -- what we know that the weight gain can lead to, and
25  that's the metabolic complications beyond that.

71 (Pages 278 to 281)

290

1    MR. ALLEN: Don't -- don't testify to that. You
2    can --
3    MR. BROWN: Yeah. It wasn't a question. It
4    was --
5    MR. ALLEN: Well, you know, I have a problem
6    with that. And we can talk about it and then -- I'll talk to
7    you off the record, then we can get a statement on the record.
8    I know that we attempted to gather the materials responsive to
9    the subpoena. I also know from being a lawyer for 25 years
10   that when anybody says "everything" at all, it never, ever --
11   that can't be done.
12      For example, I'm telling you one of the things
13   that Dr. Plunkett testified today is that she had seen a time
14   line, but she did not find it in here, concerning the labeling.
15   As you went through the box, it's not in there. I have located
16   the timeline. So, you're -- you didn't want it marked. This
17   was an off-the-record statement. She indicated that.
18      So, there's additional materials that she may
19   have seen, and I -- and, also, I think the agreements that have
20   been entered or at least discussed -- I think it will apply to
21   your experts as well -- doctors/experts also have a general
22   body of knowledge that they develop. She's talked about the
23   AstraZeneca website, the clinical trials website. She doesn't
24   have a copy of that here today, but she's referenced that for
25   you and you know that.

291

1       So, there's -- those are two examples of things
2    that, I guess, are not literally in this room that she's
3    testified about. She's also -- she's testified about
4    Goodman & Gilman's. It's sitting in this room, but it's not in
5    the box. You-all had a chapter.
6       So, I don't -- I think we made a good faith
7    effort. We have the material. We've also talked about the
8    reference list and she's been candid that she believes some
9    things are not on the reference list that should be on the
10   reference list that, due to clerical error or mistake -- and
11   we're going to -- I'll talk to Dr. Plunkett after this
12   deposition and we're going to update the reference list.
13      So, that being said, I think if you take the
14   body of evidence and the totality of the circumstances, we've
15   done a good job. I'm just not prepared to say -- and I just
16   think of the example of the AstraZeneca website, the timeline,
17   and the reference list are three things that will have to be
18   supplemented that I can think of -- and I'm not even sure we're
19   going to supplement the AstraZeneca website. You know what
20   that is. It's you-all's website -- and the general body of
21   knowledge.
22      MR. BROWN: We could go back and forth all
23   night.
24      MR. ALLEN: We could.
25      MR. BROWN: I don't want to do it. You know,

292

1    you like to get the last word. That's your style. I've been
2    doing this with you long enough and -- talk, talk, talk, but
3    let me just say this: There's an agreement in this case --
4    there's an order entered on what's required and what's not, and
5    people are required to produce four days in advance of the dep
6    all the stuff they've looked at -- "reviewed" is the word.
7       MR. ALLEN: I disagree that that's an order in
8    this case or an agreement in the case, but I will tell you that
9    we have complied with your subpoena, used good faith efforts,
10   and the material is here. I could not have worked harder to
11   get it here. And so let's just move on and we can take this
12   argument up. And by the way, it is now, according to my watch,
13   5:36, and so we're going to go 23 more minutes at the most
14   because her ride is picking her up at 6:00 o'clock.
15      MR. BROWN: Okay.
16   Q. (BY MR. BROWN) Dr. Plunkett, you -- we were talking
17   about warnings -- before all the speeches took place, we were
18   talking about warnings.
19      MR. ALLEN: Wait a minute. Those weren't
20   speeches. Those were statements for the record, much like you
21   make.
22      MR. BROWN: You though now?
23      MR. ALLEN: Oh, yes, I am.
24      MR. BROWN: All right. I'm going to proceed for
25   my last 23 minutes --

293

1       MR. ALLEN: Yes, sir.
2       MR. BROWN: -- that you have set aside for me.
3    Q. (BY MR. BROWN) Dr. Plunkett, did you look at the
4    class warning that was imposed by the FDA in January of 2004?
5    A. Yes.
6    Q. And you understand that that class label was directed
7    by the FDA to appear on the Seroquel label. You understand
8    that?
9    A. Yes.
10   Q. Do you think the FDA made a mistake with describing
11   the warning as it did and required to appear on the Seroquel
12   label?
13   A. I would say it's not necessarily a mistake. I --
14   again, I'm not here to say whether the FDA made a mistake. I
15   think that the FDA class label is the class label. But I think
16   certainly, by that period of time, the Seroquel manufacturer
17   had information that would have -- could have strengthened that
18   labeling for the physician and the understanding of the
19   information specific to Seroquel that was not necessarily shown
20   in the class label itself.
21   Q. What part of the class label do you think is
22   deficient?
23   A. Well, let's get it in front of us and we can talk
24   about it. I mean, I don't know if I can, off the top of my
25   head, tell you.

74 (Pages 290 to 293)

**Page 294**

1  MR. ALLEN: And I would say part of it's in the
2  material that's here today, which you have.
3  A. Yeah. That was --
4  MR. BROWN: Get -- let's mark it.
5  (Plunkett Exhibit No. 18 marked.)
6  Q. (BY MR. BROWN) Dr. Plunkett, I just handed you a
7  copy of the 2005 PDR which contains the class warning language
8  from 2004. It's in the bottom of the third page.
9  A. My issue with the class warning is the issue of the
10  fact that it's a class warning. And even though it says
11  "treated with atypicals, including Seroquel," it doesn't speak
12  to me the issue at this point in time that showed that -- from
13  the literature that Seroquel was different than some other
14  members of the class.
15  Olanzapine was also different at this point in
16  time than other members of the class. So, I would also have an
17  issue, I'm sure, with the olanzapine label. I don't remember
18  if this testimony was sought from me in that case that I worked
19  on, but certainly I would have an issue with olanzapine and the
20  Seroquel labeling, the fact that it's -- it is listed as a
21  class issue when, to me, those drugs had issues that were --
22  made it different than all the members of the class.
23  Q. Who are the other members of the class affected by
24  this label?
25  A. Anything that was on the market at that period in

**Page 295**

1  time, and I can't give you the entire list of that. I know
2  that you would be talking about Zyprexa, Seroquel -- 2004
3  risperidone -- I don't know who else would have been.
4  Clozapine. I don't know whether Abilify was on the market yet.
5  I'd have to look at the approval dates for those.
6  Q. Compared to olanzapine and clozapine, quetiapine
7  actually has a favorable risk-benefit profile when it comes to
8  diabetes. That was your testimony this morning?
9  A. I said that I thought olanzapine was worse than
10  Seroquel, yes, absolutely. But olanzapine is still -- I
11  mean -- sorry. Seroquel is still worse than some of the other
12  members of the class. For example, I think Seroquel is
13  actually worse than risperidone. I think if I was going to
14  take those three drugs and put them in an order, I'd put
15  olanzapine, Seroquel, then risperidone.
16  Q. I know you haven't drafted an additional warning, but
17  what language would you add to the class warning that the FDA
18  didn't require?
19  A. I guess what I'm saying is I wouldn't necessarily --
20  I can't tell you what I would change about the class warning.
21  But in addition to having a class warning, to me, there should
22  be a warning that is more specific to Seroquel itself and
23  reflective of the information that the company was aware of at
24  that point in time related to their drug.
25  Q. This section's entitled "Hyperglycemia and Diabetes,"

**Page 296**

1  correct?
2  A. Yes.
3  Q. And the class -- that's the title in the class
4  warning, correct?
5  A. Yes.
6  Q. And the class warning, it mentioned Seroquel in the
7  first sentence, correct?
8  A. It says "treated with atypicals, including Seroquel,"
9  yes.
10  Q. Right. So, the hyperglycemia and diabetes section
11  actually mentions Seroquel specifically, right?
12  A. Yes, and I -- I would assume it also does for the
13  and I don't remember. I'm sure it does for olanzapine. I'm
14  sure it does for the others of the class at the time.
15  Q. And the doctor who was prescribing Seroquel, looking
16  at the warning section for Seroquel, he would see a
17  hyperglycemia and diabetes warning section, right?
18  A. He would see hyperglycemia and diabetes for the class
19  in the warning section, that's correct.
20  Q. And Seroquel identified in the third line.
21  A. But, again, it's a class warning. It's not the same
22  way you would word a warning if you were talking about Seroquel
23  by itself, and that's all I'm saying. But to me -- and I think
24  that's consistent with what I say in my report. I think I
25  specifically talk about the fact that -- about the issue of a

**Page 297**

1  class warning or a member of a class, in general, versus
2  Seroquel by itself.
3  Q. Which standard did you apply in your determination
4  that somehow the warning -- the class warning was inadequate?
5  A. The issue of there being a reasonable association
6  with Seroquel itself, apart from the fact that there may be a
7  reasonable association for the class. Again, to me, the issue
8  is knowing specifically about that drug and its risks.
9  Q. Do you know what the FDA considered in terms of data
10  or evidence when it decided to impose a class warning on
11  Seroquel and some of the other second-generation
12  antipsychotics?
13  A. I don't think I've seen that discussion, no. I
14  believe I've seen some documents that talked about that issue,
15  but I have not seen the specific discussion documents from the
16  FDA, no.
17  Q. Have you seen any part of the NDA or IND for
18  clozapine?
19  A. No.
20  Q. And --
21  A. Well, if there's a clinical trial in the published
22  literature that was part of the NDA, I've seen that, but I have
23  not looked at the NDA documents through either FOI or discovery
24  or IND documents either.
25  Q. Have you looked at internal FDA discussions or

```
                                                             318
 1   true and correct, except as noted above.
 2                    _____
 3              LAURA M. PLUNKETT, Ph.D., DABT
 4
 5   THE STATE OF _____)
 6   COUNTY OF _____)
 7        Before me, _____, on this day
 8   personally appeared LAURA M. PLUNKETT, Ph.D., DABT, known to me
 9   (or proved to me under oath or through _____) to
10   be the person whose name is subscribed to the foregoing
11   instrument and acknowledged to me that they executed the same
12   for the purposes and consideration therein expressed.
13        Given under my hand and seal of office this _____ day
14   of _____, _____.
15
16
17                    _____
18              NOTARY PUBLIC IN AND FOR
19              THE STATE OF _____
20
21
22
23
24
25
```

```
                                                             319
 1   STATE OF TEXAS
     COUNTY OF HARRIS
 2
          I, the undersigned certified shorthand reporter
 3   in and for the State of Texas, certify that the facts stated in
     the foregoing pages are true and correct.
 4
          I further certify that I am neither attorney or
 5   counsel for, nor related to or employed by, any of the parties
     to the action in which this deposition is taken and, further,
 6   that I am not a relative or employee of any counsel employed by
     the parties hereto, or financially interested in the action.
 7
          The amount of time used by each party at the
 8   deposition is as follows:
 9        ARTHUR E. BROWN, ESQ. - 6:43
          SUBSCRIBED AND SWORN TO under my hand and seal
10   of office on this the _____ day of _____, 2008.
11
12
13
                    _____
14              SHANON M. HAIR, CSR
                Certified Shorthand Reporter
15              In and for the State of Texas
16
     Certificate No. 6513
17   Expiration Date: 12-31-09
     Firm Registration No. 03
18
19
20
21
22
23
24
25
```