# EXHIBIT 4

Confidential - James Gaskill, Pharm.D.

Page 1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

-   -   -

IN RE:

SEROQUEL LITIGATION   : MDL NO. 1769

                      :

THIS DOCUMENT RELATES:

TO ALL ACTIONS        :

-   -   -

C O N F I D E N T I A L

-   -   -

October 25, 2007

-   -   -

Videotape deposition of JAMES
GASKILL, Pharm.D., held at the offices of
Golkow Technologies, Inc., 51st Floor,
One Liberty Place, Philadelphia,
Pennsylvania 19103, commencing at 9:00
a.m., before Linda L. Golkow, Registered
Diplomate Reporter, Certified Realtime
Reporter.

-   -   -

Golkow Technologies, Inc.
51st Floor
One Liberty Place
Philadelphia, Pennsylvania  19103

Confidential - James Gaskill, Pharm.D.

Page 92

1          A.     You mean subsequent to this

2     letter?

3          Q.     Right.

4          A.     If you are asking if we've

5     ever gotten any commentary from the FDA

6     about the language in our advertising, I

7     would say, yes, we have gotten that.

8          Q.     Okay.

9                 Commentary.  So, they sent

10    you some commentary about being

11    undermined by your promotional pieces?

12                MR. SCHOON:  Objection,

13          form.

14                THE WITNESS:  You are using

15          the word "undermined," and I don't

16          think "undermined" is the correct

17          word.  That's why I said

18          commentary.  This information is

19          in our label, and our label is

20          provided with every single

21          advertisement that we issue.

22    BY MR. BLIZZARD:

23         Q.     Okay.

24                I'm going to show you what

Confidential - James Gaskill, Pharm.D.

```
 1    has previously been marked as Exhibit 11

 2    to your deposition.

 3              MR. SCHOON:  Can I just make

 4         one quick statement?  I'm

 5         perfectly fine with you referring

 6         to prior deposition exhibits and

 7         continuing the numbering.  I just

 8         want the record to reflect that

 9         the prior deposition was a

10         30(b)(6) deposition.  This is

11         not -- he's not here as a 30(b)(6)

12         witness --

13              MR. BLIZZARD:  I understand.

14              MR. SCHOON:  -- I

15         understand.

16    BY MR. BLIZZARD:

17         Q.    Okay.

18               Is this letter to you?

19         A.    Yes, it is.

20         Q.    And were you sent this

21    letter by the Department of Health &

22    Human Services Public Health Service Food

23    & Drug Administration, Rockville,

24    Maryland?
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - James Gaskill, Pharm.D.

Page 94

1         A.    That's correct.

2         Q.    Do you remember when you

3    received it?

4         A.    I believe it is November --

5    the date is at the very back of it.  I

6    believe it is November 16th, 2006.

7         Q.    Okay.

8               Now, before we go over to

9    all of the commentary here, I want to

10   direct you over to Page 4.  Do you see

11   the next to last paragraph on the page?

12        A.    The first two bullets, that

13   paragraph?

14        Q.    Yes.

15              Starts the first two

16   bullets.  Do you see that paragraph?

17        A.    Yes, I do.

18        Q.    Okay.

19              Do you see the last

20   sentence?

21        A.    Yes, I do.

22        Q.    Does it say, "The bullets

23   are misleading and undermine the

24   warning"?

Confidential - James Gaskill, Pharm.D.

Page 95

1          A.     That's what it says.

2          Q.     Okay.

3                 So, that was FDA's word,

4     wasn't it?

5          A.     That was their opinion, yes.

6          Q.     Right.

7                 So, they did find that the

8     company, through promotional activities,

9     undermined the language in the warnings

10    section that we put up there that was in

11    the "Dear Healthcare Provider" letter,

12    right?

13                MR. SCHOON:   Objection,

14        form.

15                THE WITNESS:   That's what

16        they state in this letter.

17    BY MR. BLIZZARD:

18         Q.     Okay.

19                So, let's go back to the

20    start of the letter.

21                What does the first sentence

22    say?

23         A.     "The Division of Drug

24    Marketing," that sentence?

Confidential - James Gaskill, Pharm.D.

Page 96

1        Q.    Yes.

2        A.     "The Division of Drug

3   Marketing, Advertising and Communicaus

4   (DDMAC) of the U.S. Food and Drug

5   Administration (FDA) has reviewed a

6   professional sales aid (238110) for

7   Seroquel (quetiapine fumarate) tablets

8   (Seroquel) submitted by AstraZeneca under

9   cover of Form FDA 2253."

10        Q.    Okay.

11              And what do they say about

12   this piece?

13        A.     "This piece is false or

14   misleading because it minimizes the risk

15   of hyperglycemia and diabetes mellitus

16   and fails to communicate important

17   information regarding" --

18        Q.    I'm sorry.  You are reading

19   kind of fast.  Could you slow down a

20   little bit.

21        A.     "This piece is false or

22   misleading because it minimizes the risk

23   of hyperglycemia and diabetes mellitus

24   and fails to communicate important

Confidential - James Gaskill, Pharm.D.

Page 97

1    information regarding neuroleptic

2    malignant syndrome, tardive dyskinesia,

3    and the bolded cataracts precaution."

4              Q.    Okay.

5                    And, so, did they then find

6    that because of the fact that it is

7    misleading, that it is misbranded, the

8    product is misbranded?

9              A.    I don't know if they use

10   that word in here, but...

11             Q.    Well, look at the next

12   sentence.  Does it say, "Thus, the

13   promotional material misbrands the drug"?

14             A.    Yes.

15             Q.    What does that mean?

16             A.    It's FDA's way of saying

17   that they disagree with the labeling that

18   you've provided.

19             Q.    Okay.

20             A.    It's their statutory -- FDA

21   provides comments to you, and whenever

22   they provide comments to you in these

23   kinds of letters, they have to frame it

24   within their authority, and their

Confidential - James Gaskill, Pharm.D.

1    authority is around false, misleading,

2    misbranding.  So, that's why they are

3    using those words.

4            Q.    It's strong commentary,

5    isn't it?

6            A.    Well, it is an untitled

7    letter, it's not a warning letter.

8            Q.    I'm sorry, what?

9            A.    It is an untitled letter,

10   it's not a warning letter.

11           Q.    So, is that less of a

12   problem if it is not titled?

13           A.    FDA can provide commentary

14   in a number of different ways.  They have

15   various types of communications.  And

16   this is one of those types of

17   communications.

18           Q.    Okay.

19               Well, whatever they title

20   it, if they tell you that a piece is

21   false or misleading and that it minimizes

22   the risk of diabetes and that that leads

23   to the product being misbranded, do you

24   take that seriously?

Page 99

1          A.    We take our relationship

2     with the FDA seriously, and, yes, we do

3     take a letter like this seriously.

4          Q.    Okay.

5               And, actually, the FDA says

6     that this promotional material creates a

7     significant risk to the public health,

8     don't they?

9          A.    That's what they've said

10    here.

11         Q.    Okay.

12               The next sentence says, "The

13    promotional material raises significant

14    public health and safety concerns through

15    its minimization of the risks associated

16    with Seroquel," correct?

17         A.    That's what it says, yes.

18         Q.    Okay.

19               You keep saying this is what

20    it says.  I take it you don't agree with

21    them?

22         A.    Well, what you have to

23    understand is that FDA's comments are

24    based on their subjective opinion, and

Confidential - James Gaskill, Pharm.D.

Page 100

1    the issues that are being dealt with here

2    are essentially -- the paragraph that we

3    showed in that letter, that long -- those

4    two long paragraphs, around our

5    prescribing information that we just

6    discussed.  The issue that this letter is

7    focusing on is how much of that

8    information made it into the summary of

9    the risk information that's actually on

10   the promotional piece.  So, it is a

11   subjective decision.  So, I don't believe

12   that we did what they accused us of, no,

13   or I wouldn't have approved the piece if

14   I thought it was unacceptable.

15        Q.    Okay.

16              So, you approved the piece

17   in the first instance, right?

18        A.    Well, among other people,

19   yeah.  We agreed that we thought the

20   piece was accurate, not misleading,

21   truthful and contained fair balance.

22        Q.    Okay.

23              So, you were invested in

24   this being a fair piece because you

Confidential - James Gaskill, Pharm.D.

Page 101

1    approved it, right?

2                   MR. SCHOON:   Objection,

3         form.

4                   THE WITNESS:   I wouldn't say

5         I was invested in it, I --

6    BY MR. BLIZZARD:

7         Q.   Well, you were the one,

8    along with others in your group,

9    responsible for sending this out to

10   doctors who potentially talk to patients

11   about it, right?

12        A.   But I didn't create it, I

13   reviewed it.

14        Q.   Right.

15             And you've read the letter

16   that the FDA sent?

17        A.   Yes.

18        Q.   Describing why they felt the

19   way they felt?

20        A.   Yes.

21        Q.   Still hadn't convinced you,

22   has it?

23        A.   Our response indicated that

24   we disagreed with them and thought that

Confidential - James Gaskill, Pharm.D.

Page 102

1    what we had said was okay.

2           Q.    Did you do what they asked

3    you to do and stop doing it?

4           A.    If you mean did we comply

5    with what they recommended in this

6    letter, yes.

7           Q.    Well, they recommended in

8    this letter that you stop issuing such

9    statements, right?

10          A.    We stopped using this

11   particular piece because they asked us

12   to.

13          Q.    All right.

14                And you'd been actually

15   using that kind of piece for a long time,

16   hadn't you?

17                MR. SCHOON:  Objection,

18          form.

19                THE WITNESS:  I wouldn't say

20          that, no.  This was an isolated

21          piece that focused on the need to

22          monitor.  And it was -- I mean, if

23          you look at our response, we only

24          found four -- three or four

Confidential - James Gaskill, Pharm.D.

Page 267

```
 1           It's 28 minutes after 12:00.

 2           We're going off the record.  This

 3           is the end of Tape Number 2.

 4                 -  -  -

 5               (Whereupon, a luncheon

 6           recess was taken from 12:28 p.m.

 7           until 1:37 p.m.)

 8                 -  -  -

 9               THE VIDEOTAPE TECHNICIAN:

10           It is 37 minutes after 1:00.  This

11           is the beginning of Tape Number 3,

12           and we're back on the record.

13   BY MR. BLIZZARD:

14           Q.   Mr. Gaskill, we're back from

15   our lunch break.  Are you ready to

16   proceed?

17           A.   Yes.

18           Q.   This morning we talked about

19   a letter that you received on November

20   6th -- November 16th of 2006 from the

21   Food & Drug Administration about

22   statements that were made in a

23   promotional piece by AstraZeneca,

24   correct?
```

Confidential - James Gaskill, Pharm.D.

Page 268

1          A.    Yes.

2          Q.    Now, there have been other

3    times where AstraZeneca received letters

4    from the FDA telling them -- telling

5    AstraZeneca that promotional pieces on

6    Seroquel were false or misleading,

7    correct?

8          A.    Yes.  We have received other

9    letters from DDMAC.

10         Q.    Okay.

11               Have you ever heard the

12   phrase "not your first rodeo"?

13         A.    No.

14         Q.    Okay.  Not familiar with

15   that one, huh?  Okay.

16               This was not the first time

17   -- 2006 was not first time that

18   AstraZeneca was accused by the FDA of

19   putting out false and misleading pieces

20   on Seroquel, was it?

21               MR. SCHOON:  Objection,

22         form.

23               THE WITNESS:  By that you

24         mean, have we received letters

Confidential - James Gaskill, Pharm.D.

Page 269

1           from the FDA previously?  We have

2           received letters previously.

3    BY MR. BLIZZARD:

4           Q.    And the letters that you

5    received previously have said that

6    materials put out by AstraZeneca about

7    Seroquel were false and misleading,

8    right?

9           A.    I believe there was a letter

10   in 1999 that was specific to Seroquel.

11          Q.    I show you what was

12   previously marked as Gaskill Exhibit

13   Number 8.  Are you familiar with this

14   document?

15          A.    Yes.  I've seen this

16   document before.

17          Q.    The document has a date

18   stamp above -- actually, two date stamps.

19   One is May 6th of 1999.  The other says

20   "Received May 7 1999."  Correct?

21          A.    Yes.

22          Q.    It was sent to Anthony

23   Rogers, who was then, according to this

24   document, director of marketed products

Confidential - James Gaskill, Pharm.D.

Page 270

1    group, drug regulatory affairs, correct?

2         A.    Yes.

3         Q.    Is he still with

4    AstraZeneca?

5         A.    Yes, he is.

6         Q.    What is his position now?

7         A.    I believe his title is vice

8    president of regulatory affairs.

9         Q.    So, he's higher up the

10   ladder than you are?

11        A.    He's actually in a different

12   organization than I am.  He's in the

13   regulatory affairs group, and I'm in the

14   promotional regulatory affairs group, and

15   we don't report through Mr. Rogers.

16        Q.    Okay.

17        A.    It's just a different

18   reporting structure.

19        Q.    But he's now a vice

20   president of the company?

21        A.    Yes.

22        Q.    If you look at the letter,

23   this was sent at a time when the company

24   was known as Zeneca Pharmaceuticals; is

Confidential - James Gaskill, Pharm.D.

Page 271

1    that right?

2          A.    Yes, that's correct.

3          Q.    And that company, Zeneca

4    Pharmaceuticals, merged with Astra to

5    form AstraZeneca; is that correct?

6          A.    Yes.

7          Q.    Actually, it was about this

8    time period, wasn't it?

9          A.    It was prior to my joining

10   the company.  I believe it was '99 to

11   2000.  There was a transition period.  It

12   was around 2000.

13         Q.    Okay.

14               Do you see in the first

15   paragraph, it says, "Reference is made to

16   Zeneca Pharmaceuticals' February 9, 1999,

17   response to the Division of Drug

18   Marketing, Advertising and

19   Communications' (DDMAC) request for all

20   materials that Zeneca has continued to

21   distribute following a warning letter

22   dated November 24, 1998."  Correct?

23         A.    That's what it says, yes.

24         Q.    Okay.

Confidential - James Gaskill, Pharm.D.

Page 272

1           So, to put this in context,

2    in 1998, AstraZeneca received a warning

3    letter from DDMAC, a division of the Food

4    & Drug Administration, about Zestril and

5    some other products, correct?

6               MR. SCHOON:  Objection,

7         form.

8               THE WITNESS:  I'm aware that

9         they received a letter.  Based on

10        this, it appears it was November

11        24th, 1998 related to a number of

12        products.  Seroquel was not one of

13        those.

14   BY MR. BLIZZARD:

15        Q.    Right.  The letter was about

16   other products, but the FDA found that

17   Zeneca Pharmaceuticals engaged in false

18   and misleading advertising with respect

19   to those other products; is that correct?

20               MR. SCHOON:  Objection,

21        form.

22               THE WITNESS:  I would have

23        to read that letter, but,

24        obviously, they requested

Page 273

1          promotional materials subsequent

2          to that.

3    BY MR. BLIZZARD:

4          Q.    I'll hand you what's marked

5    as Exhibit Number 6.  Is this the warning

6    letter that was sent about Zestril and

7    other products made by Zeneca?

8          A.    Yes.

9          Q.    Do you see from this warning

10   letter that the Food & Drug

11   Administration in November of 1998 found

12   that "Zeneca promotional materials cited

13   in this letter are false or misleading

14   and lacking in fair balance in violation

15   of the Federal Food, Drug & Cosmetic

16   Act"?

17         A.    That's what it says in the

18   first paragraph, yes.

19         Q.    This was with regard to how

20   many different products?

21         A.    It appears to be five.

22   Zestril, Sular, Nolvadex, Zomig and

23   Casodex.

24         Q.    How many drugs was the

Confidential - James Gaskill, Pharm.D.

Page 274

1    company selling at that time?

2           A.    I'm not sure.

3           Q.    This was a big chunk of it,

4    wasn't it?  Five out of how many?

5                 MR. SCHOON:  Objection,

6           form.

7    BY MR. BLIZZARD:

8           Q.    You told me earlier the

9    company sold about ten drugs?

10          A.    More than ten drugs, but I

11   don't know how many products Zeneca

12   marketed at this point in time.  I didn't

13   join the company until post merger in

14   2001.

15          Q.    Okay.

16                Well, regardless of the

17   exact percentages, this is an alarming

18   number of drugs to receive a warning

19   letter about.

20                MR. SCHOON:  Objection,

21          form.

22                THE WITNESS:  I'm sorry.

23          Did you ask a question?

24   BY MR. BLIZZARD:

Confidential – James Gaskill, Pharm.D.

1          Q.    Yes.  I asked, is it an

2     alarming number of drugs to receive a

3     warning letter about from the FDA saying

4     that your promotional materials with

5     respect to that many drugs are false or

6     misleading or lacking in fair balance?

7          A.    I wouldn't say it's

8     alarming.  It's a list of multiple

9     products.  Sometimes FDA writes letters

10    about more than one product, and this is

11    about multiple products.

12         Q.    If you won't say it's

13    alarming, how about concerning?

14         A.    I would say it's broad.

15         Q.    What's broad?

16         A.    In scope.  The scope of this

17    letter is broad in that it covers

18    multiple products.

19         Q.    And there are numerous

20    findings that they make with respect to

21    each of these products, correct?

22         A.    I have to look at this

23    letter again.  This doesn't pertain to

24    any of the products I've ever worked on.

Confidential - James Gaskill, Pharm.D.

Page 276

1   So I'm aware this letter exists, but I've

2   never really studied it.  Obviously, they

3   made a comment about each of those

4   products.  I'm not sure what they are.

5            Q.    Do you see where on Page 6

6   where there's requested actions,

7   Conclusions and Requested Actions?

8            A.    There's a heading that says

9   "Conclusions and Requested Actions," yes.

10           Q.    The paragraph starts with

11  "Zeneca has disseminated promotional

12  materials that contain false or

13  misleading information, or are lacking in

14  fair balance for Zestril, Sular,

15  Nolvadex, Zomig, and Casodex.

16  Accordingly, Zeneca should propose an

17  action plan that includes."  Do you see

18  there, "Reviewing its promotional

19  materials for all of its products and to

20  discontinue or revise any materials with

21  the same or similar violations."

22           A.    Yes, that's number 2.

23           Q.    So, it was part of the

24  requested action plan by the FDA when

Confidential - James Gaskill, Pharm.D.

Page 277

1    they issued this warning letter to Zeneca

2    for them to go back and look at the

3    promotional materials on all the products

4    and to revise them to comply with FDA

5    regulations, correct?

6           A.    That's what number 2 says,

7    yes.

8           Q.    Okay.

9                 Then -- that was November of

10   1998.

11                In May of 1999, this is a

12   letter that was sent about Seroquel,

13   right?

14          A.    Yes.   This letter is

15   specific to Seroquel.

16          Q.    So, the FDA is telling

17   Zeneca through this letter that you

18   didn't do what we told you to do, right?

19                MR. SCHOON:   Objection,

20          form.

21                THE WITNESS:   It doesn't

22          specifically say that.   It

23          basically says they are providing

24          comments on a particular Seroquel

Confidential - James Gaskill, Pharm.D.

Page 278

1          piece.

2     BY MR. BLIZZARD:

3          Q.     Well, they say in the first

4     paragraph that "Zeneca has continued to

5     distribute following a warning letter

6     dated November 24, 1998," right?

7          A.     That's describing the

8     request.  They requested all materials

9     that AstraZeneca continued to distribute

10    following the warning letter.

11         Q.     Right.  They are finding

12    that some of these were still false and

13    misleading despite the warning letter; is

14    that right?

15              MR. SCHOON:  Objection,

16         form.

17              THE WITNESS:  Based on the

18         intro to this letter, they have

19         reviewed all the pieces for

20         Seroquel that were submitted in

21         response to that 1998 letter and

22         are providing comments on however

23         many pieces are in here.  It

24         appears there are several.

Page 279

1    BY MR. BLIZZARD:

2         Q.    Okay.

3              Let me see if I understand

4    this.  The warning letter goes out about

5    Zestril and the other four products in

6    1998; is that right?

7         A.    Yes.

8         Q.    And the FDA says one of the

9    things we want you to do is to look at

10   the promotional materials of all of your

11   products and make sure that those are not

12   false and misleading, right?

13        A.    Correct.

14        Q.    But the materials that came

15   to the FDA for Seroquel were -- according

16   to the FDA, some of them were false and

17   misleading, correct?

18        A.    The way I read this is that

19   in November of 1998, they asked for all

20   the materials for Seroquel that were

21   going to be used after that letter.

22   February '99 they submitted all the

23   materials, and FDA has come back and

24   provided comments on, it looks like two,

Page 280

1    possibly three.

2          Q.    Well, they didn't just say

3    submit all the materials.  They say

4    correct any materials before you submit

5    them.  Is that right?

6          A.    Let's go back.  Well, there

7    were two separate points.  One was to

8    revise the materials, and the other was

9    to submit all of those that you want to

10   continue using.

11         Q.    So, either they didn't get

12   around to it in time; or two, they didn't

13   follow the FDA's advice to revise the

14   materials, right?

15              MR. SCHOON:  Objection.

16              THE WITNESS:  Well, I wasn't

17         at the company at that point in

18         time.  I certainly don't think --

19         this is my assumption.  I don't

20         think they would intentionally

21         submit anything that they thought

22         FDA would disagree with.  My

23         assumption is that they fixed the

24         materials to the best of their

Page 281

1          ability and knowledge, submitted

2          them, and FDA still had some

3          additional comments.

4     BY MR. BLIZZARD:

5          Q.    Okay.

6                If you see --

7                When you look on the first

8     page of this letter about Seroquel in

9     1999, does it say in paragraph numeral 1,

10    "Materials" -- well, first of all, the

11    lead-in says, "DDMAC has the following

12    objections to promotional claims and

13    presentations for Seroquel?"

14               Number 1 is: "Materials that

15    minimize the potential of Seroquel to

16    cause ocular changes are misleading and

17    lacking fair balance."

18               Is that what it says?

19         A.    Yes.

20         Q.    "This risk is presented as a

21    bolded precaution in the approved product

22    labeling for Seroquel, yet Zeneca has

23    distributed materials that directly

24    contradict the precaution."  Is that what

Confidential - James Gaskill, Pharm.D.

Page 282

1    it says?

2           A.     That's what it says, yes.

3           Q.     Well, how could the company

4    not pick up on that?

5                  MR. SCHOON:  Objection,

6           form.

7                  THE WITNESS:  I wasn't

8           involved in discussions.  I have

9           no idea what the basis for them

10          doing what they did was.

11   BY MR. BLIZZARD:

12          Q.     Then it says, "These

13   materials emphasize that ocular changes

14   are probably due to other risk factors

15   common to psychotic patients (including

16   other antipsychotics) and assure doctors

17   that there is nothing to be concerned

18   about with Seroquel."  Did I read that

19   correctly?

20          A.     That's what the letter says.

21          Q.     That's exactly, exactly what

22   they're doing with Seroquel and diabetes,

23   right?

24                 MR. SCHOON:  Objection,

Confidential - James Gaskill, Pharm.D.

Page 283

```
 1          form.
 2   BY MR. BLIZZARD:
 3          Q.    Exactly what AstraZeneca was
 4   doing with Seroquel and diabetes, wasn't
 5   it?
 6                MR. SCHOON:  Objection,
 7          form.
 8                THE WITNESS:  I wouldn't say
 9          it's exactly, no.
10   BY MR. BLIZZARD:
11          Q.    Well, one of the bullet
12   points is that it may be due to other
13   risk factors, diabetes may be due to
14   other risk factors.  That's one of the
15   bullet points that was the approved
16   message sent out by your company
17   regarding Seroquel and diabetes, wasn't
18   it?
19                MR. SCHOON:   Objection,
20          form.
21                THE WITNESS:  Could you
22          repeat the question.
23   BY MR. BLIZZARD:
24          Q.    Yes.  One of the bullet
```

Confidential - James Gaskill, Pharm.D.

Page 400

1               C E R T I F I C A T E
2
3          I, LINDA L. GOLKOW, a Notary
    Public and Certified Shorthand Reporter
4 · of the State of New Jersey, do hereby
    certify that prior to the commencement of
5   the examination, JAMES GASKILL was duly
    sworn by me to testify to the truth, the
6   whole truth and nothing but the truth.
7
8
9          I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
10  testimony as taken stenographically by
    and before me at the time, place and on
11  the date hereinbefore set forth, to the
    best of my ability.
12
13
14
           I DO FURTHER CERTIFY that I am
15  neither a relative nor employee nor
    attorney nor counsel of any of the
16  parties to this action, and that I am
    neither a relative nor employee of such
17  attorney or counsel, and that I am not
    financially interested in the action.
18
19
20
21
    _____
22  LINDA L. GOLKOW, CSR
    Notary Number:  1060147
23  Notary Expiration:  1-2-08
    CSR Number:  30XI176200
24