```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         ORLANDO DIVISION

 3                     Docket No.6:06-MD-1769

 4     . . . . . . . . . . . . . . .
       IN RE:                      :
 5                                 :
       THE SEROQUEL PRODUCTS       :
 6     LIABILITY LITIGATION        :      Orlando, Florida
                                   :      January 16, 2009
 7     . . . . . . . . . . . . . .:       9:00 a.m.

 8
                      TRANSCRIPT OF DAUBERT MOTION
 9          BEFORE THE HONORABLE ANNE C. CONWAY
                      UNITED STATES DISTRICT JUDGE
10

11     APPEARANCES:

12     For the Plaintiffs:

13                             Larry M. Roth

14                             Fletch Trammell

15                             Tom Pirtle

16                             Rick Laminack

17                             Rob Cowan

18     For the Defendant

19     AstraZeneca:            Chris Coutroulis

20                             Steven Weisburd

21                             Earl Austin

22

23     Court Reporter:  Sandra K. Tremel

24     Proceedings recorded by mechanical stenography, transcript

25     produced by computer-aided transcription
```

1                    P R O C E E D I N G S

2          THE COURT:  Good morning.  All right.  Who's

3    arguing today?

4          MR. COUTROULIS:  Your Honor, good morning.

5          THE COURT:  Or who's presenting arguments?

6    Let's not have any arguing today.

7          MR. COUTROULIS:  Well, I have a suggestion to

8    the Court.  Mr. Cowan, counsel for plaintiffs, and I had a

9    discussion last night about matters on for argument today,

10   and after discussing the matter, it was our feeling --

11   obviously we'll be guided by whatever the Court would like

12   us to do -- but it was our feeling that with respect to

13   the motion to exclude noncausation expert testimony, that

14   the issues are well framed in the briefs.

15        There have been a number of issues that we raised in

16   our motion that are no longer in issue.  The plaintiffs

17   have conceded in their opposing papers the points that we

18   made on some of those.  I believe the issues that remain

19   are well framed by the submissions.

20        As a result of that, if the Court has questions, and

21   of course, would like to hear argument, we're prepared to

22   do so.  But from the standpoint of the parties, we're

23   comfortable submitting that motion on the papers and,

24   instead, arguing this morning the motion to exclude

25   specific medical causation expert testimony.  I think that

1    could be done in an hour and a half.  And then if we could

2    take up a few housekeeping matters, if it's all right with

3    the Court, I think we might be able to conclude earlier

4    than 12:00.

5        We have a number of deliverables based on what came

6    out of the pretrial conference that we're working on.

7    We're also trying to work on seeing if we could reach

8    agreement on the written questionnaire.  And so we would

9    certainly be prepared to dispense with oral argument on

10   the noncausation if it's all right with the Court.

11              THE COURT:  All right.  However you want to use

12   the time.

13              MR. COUTROULIS:  Is that all right, Mr. Cowan?

14              MR. COWAN:  Perfectly fine, Your Honor.

15              THE COURT:  Okay.

16              MR. COUTROULIS:  Thank you, Your Honor.  So

17   we're prepared to go forward, then, on the specific

18   causation medical.

19              THE COURT:  Okay.

20              MR. COUTROULIS:  Thank you.

21              MR. TRAMMELL:  Your Honor, one other thing

22   before we start, regarding mediation.  As I'm sure the

23   Court is aware, the plaintiffs and the firms that

24   represent these people are expending all available

25   resources to prepare for trial in these cases.  That being

4

1    said, we expect to delegate people to participate in the

2    mediation with authority to resolve not only the trial

3    cases but all cases involved in the MDL, and it's our hope

4    and expectation that the defendants will do the same

5    thing.

6              THE COURT:  Well, that's usually what we do at

7    mediation.  But I do need a designated individual to give

8    a name to Professor Saulzberg.

9              MR. TRAMMELL:  Yes, Your Honor.

10             THE COURT:  All right.

11             MR. COUTROULIS:  Thank you.

12             MR. WEISBURD:  Good morning, Your Honor.  Steven

13   Weisburd of Dechert again.

14        I'll be arguing the specific causation *Daubert* motion

15   this morning with respect to the three witnesses that the

16   Court heard from over the past two days:  Drs. Tulloch and

17   Marks, endocrinologists, and Dr. Abramson, a

18   psychologist -- psychiatrist.

19        Your Honor, if science cannot reliably answer and

20   resolve the questions and issues that the law requires to

21   be asked and answered, then *Daubert* requires the Court to

22   exclude that testimony.  That's what the Supreme Court

23   told us basically in 1993 with its *Daubert* decision which

24   changed the law, clarifying the law in an important

25   respect.  Because before *Daubert*, it might have been true

1   that if experts in the field engaged in certain forms of

2   speculation, if that's what they did, that's how they

3   practiced within their field, that that kind of testimony

4   might be admitted in a courtroom.  But after *Daubert*

5   that's no longer correct, and especially within the

6   Eleventh Circuit where in a series of decisions that we've

7   cited in our briefing, the Eleventh Circuit has made clear

8   that *Daubert* is a very rigorous standard and that this

9   Court's gatekeeping obligation is very rigorous as well.

10       And you have to ensure in engaging that gatekeeping

11   that the testimony, especially scientific testimony of the

12   sort that we've heard for the last two days, is

13   scientifically reliable, both the bases of the opinions

14   for the experts and the methodology that those experts

15   purport to employ, not really what the plaintiffs' counsel

16   say the methodology is, but what the Court determines the

17   actual methodology is.

18       And I think, as we're going to discuss this morning,

19   the plaintiffs have not satisfied their burden with

20   respect to their specific causation witnesses.  And I

21   don't even think it's close.

22       If a *Daubert* exclusion decision leaves the party with

23   the burden of proof on a particular issue without

24   evidence, then again the *Allison* decision make clear that

25   summary judgment follows.  And that is how we've argued in

6

1    our briefs with respect to specific causation.

2         These aren't -- contrary to what plaintiffs' counsel

3    may argue, these aren't radical or unfair propositions

4    that AstraZeneca has made up.  That's the law as

5    pronounced by a U.S. Supreme Court and by the Eleventh

6    Circuit.

7         Moreover, here, Florida law requires plaintiffs, on

8    all their claims, to bear the burden of proof on

9    causation, and that includes specific medical causation in

10   both Mr. Haller's case and Miss Guinn's case.  And as we

11   argued a few days ago, that includes Florida's governing

12   more-likely-than-not causation standard, and it's but-for

13   test, both a substantial contributing factor component and

14   a but-for test.

15        The plaintiffs' specific cause experts had to opine

16   in a scientifically reliable basis that but for ingestion

17   of Seroquel, Plaintiff Haller and Plaintiff Guinn would

18   not have suffered their diabetes injuries.

19        We again cite the *Gooding* case, the *Reeves* case, the

20   *Terwilliger* case for those propositions.  That's Florida

21   law.  We didn't hear that testimony, though.  We didn't

22   hear any but-for causation opinions.  And we will -- I

23   will reprise a couple components.  Your Honor heard the

24   testimony as well.

25        But I also want to emphasize the case that I

1   mentioned to the Court and ask the Court to rereview

2   before the hearing which is the *McDowell v. Brown* case out

3   of the Eleventh Circuit because that exclusion decision,

4   affirmed by the Eleventh Circuit, instructs that if it's

5   impossible, as the plaintiff counsel like to argue, if

6   it's impossible to quantify what a plaintiff's condition

7   would have been without the defendant's alleged wrongdoing

8   or impossible to mete out the extent to which defendant's

9   alleged wrongdoing contributed to the plaintiff's injury,

10  that means that witness, that proffered expert witness

11  giving scientific testimony, has to be excluded under

12  *Daubert*.

13        That is exactly what happened in the *McDowell* case

14  within the Eleventh Circuit.  This is clearly established

15  Florida tort law on the but-for standard, and it's clearly

16  established *Daubert* law within the Eleventh Circuit under

17  the *McDowell* case.

18        Now, again, we all heard the same testimony whether

19  elicited on direct examination or on cross-examination.

20  The experts did not give a but-for opinion.  They did not.

21  No matter how much Mr. Pirtle tried to use the but-for

22  language with Miss Marks -- Dr. Marks, Dr. Marks did not

23  testify that but for ingestion of Seroquel, that the

24  plaintiff would not have gotten diabetes.

25        Same thing for Dr. Tulloch.  Dr. Tulloch, when

1   presented with a but-for opinion said, "You're pushing me

2   too hard," was his response.  "I'm not going to go there."

3       Now, we'll talk some more today about the

4   insufficient-under-Florida-law-substantial-factor

5   testimony that the witnesses did purport to give because I

6   submit that even that legally insufficient testimony under

7   Florida law can't survive this Court's *Daubert* gatekeeping

8   scrutiny based on the actual testimony of these witnesses.

9       And why is that?  What we heard was, with respect to

10  a direct mechanism, the witnesses testified that they, in

11  both the Guinn case and the Haller case, none of the

12  experts could base their testimony to any reasonable

13  degree of medical probability or certainty on the

14  proposition that Seroquel had a direct effect on the

15  pancreas of these two plaintiffs or any other direct

16  effect on them.  That testimony was crystal clear.

17      They did testify about certain rat studies, and they

18  said there's some interesting hypotheses, but they all

19  acknowledge this is not scientific knowledge at this

20  point.  This is not -- no direct mechanism is

21  scientifically known.  That's the language out of *Daubert*.

22  That's part of the Court's gatekeeping duties, to make

23  sure that testimony is premised based on the scientific

24  method and what is scientifically known.

25      And these witnesses testified a direct mechanism is

1   not scientifically known, and they're not basing their

2   testimony on any direct effect of Seroquel on Plaintiff

3   Haller or on Plaintiff Guinn.

4        So instead, the witnesses purported to base their

5   substantial factor testimony and their specific cause

6   opinions on weight gain that they point to that Plaintiff

7   Haller and Plaintiff Guinn experienced while they were on

8   Seroquel.  That's what they did.  And as we argued in our

9   brief, we said they're really relying on a temporal

10  relationship between ingestion of Seroquel and certain

11  amounts of weight gain.

12       And as Magistrate Judge Baker's *Cartwright* decision

13  from several years back notes, as well as the Eleventh

14  Circuit's *McLean* decision, causation opinions premised on

15  a temporal relationship are dubious because they're not

16  based on the scientific method.  It's a fallacy.  Temporal

17  relationship is a fallacy.

18       You can certainly disprove causation based on a

19  temporal relationship.  If there's no temporal connection

20  between the taking of a medicine and an injury, then

21  there's no causal link.  But the mere existence of a

22  temporal connection is certainly a necessary but entirely

23  insufficient basis for a causation opinion.

24       So while identifying the temporal relationship

25  between Seroquel ingestion and certain weight gain,

1  defense counsel, on cross, directly asked the question,

2  "How much weight gain do you ascribe to Seroquel?  How

3  much weight gain that Plaintiff Guinn or Plaintiff Haller

4  experienced while they were taking the drug is it your

5  testimony was caused by Seroquel?  One pound or two pounds

6  or five pounds or 10 pounds?"

7      Both witnesses, in fact Dr. Abramson as well, said,

8  "We can't say.  We're not testifying that any amount of

9  the weight while on Seroquel was caused by Seroquel."

10     Dr. Marks was very candid yesterday afternoon saying,

11 "It could have been some by Seroquel, it could have not

12 been.  It's just my opinion.  It's really -- maybe it's

13 just a guess."

14     When asked, "What's the methodology?  Do you know of

15 any methodology for ascribing any amount of that weight to

16 have been caused by Seroquel?" Dr. Marks candidly said,

17 "No, I can't identify any methodology."

18     Well, wait a second.  *Daubert* requires the plaintiffs

19 to demonstrate, when sponsoring their expert witnesses,

20 first, that their experts employed an identifiable

21 methodology, and second, to prove that that was a

22 scientifically reliable methodology.

23     And here we have the witness, on the critical

24 linchpin of their causation opinions, the alleged weight

25 gain while on Seroquel that they've talked an awful lot

1  about, "What's your methodology to determine any of that

2  being caused by Seroquel?" and their own witness,

3  Dr. Marks, says, "I don't know of any methodology."

4      Dr. Tulloch's testimony was no different with respect

5  to weight gain while on -- Mr. Haller was on Seroquel.

6  Dr. Tulloch was also asked the question, as was

7  Dr. Abramson, "How much weight gain while the plaintiff

8  was on Seroquel was caused by Seroquel?"  Couldn't say.

9  Couldn't say whether it was all of it, none of it, some of

10 it.

11     And all three of these witnesses acknowledged that

12 there were many other factors unrelated to Seroquel that

13 could have fully accounted for that weight gain while on

14 Seroquel.

15     And in fact on cross-examination, as we'll get into

16 in a second, the witnesses acknowledge they didn't even

17 meet with the plaintiffs to test their hypothesis that

18 Seroquel had some role whatsoever in the weight gain, the

19 sole linchpin of the causation opinions ultimately.  They

20 did nothing to test whether that weight gain was fully

21 ascribed or at all ascribed to Seroquel as opposed to some

22 other factors.

23     And notably, with respect to both plaintiffs, as the

24 testimony came in cleanly, these plaintiffs gained weight

25 before Seroquel and lost weight before Seroquel.  While on

1   Seroquel, they gained weight while on Seroquel and lost

2   weight on Seroquel, and substantial weight.

3       And you might recall, again, Dr. Wershing's

4   testimony.  Dr. Wershing testified that if somebody both

5   gains and loses weight while on an atypical drug, that's

6   contrary to the theory that the drug is causing them to

7   have increased appetite and hunger that just leads to an

8   up-sloping weight curve.

9       So all of these plaintiffs, the facts, when analyzed,

10  undermine the contention that they simply gained weight

11  and therefore their weight can be ascribed to Seroquel.

12  But critically the question, "How much weight gain was

13  caused by Seroquel?" we got no answer other than "Zero,"

14  and that is purely speculative.

15      But that takes down the scientific reliability

16  entirely of these witnesses' testimony, testimony which

17  again is insufficient to satisfy Florida law's but-for

18  standard and even under the substantial contributing

19  factor test is not scientifically reliable.  It's not

20  based on the scientific method.  And that's the testimony

21  that we all heard.

22      So ultimately the bottom line here is the fundamental

23  infirmity for -- under *Daubert* is the absence of any

24  scientifically reliable methodology that are employed by

25  qualified experts through application of the scientific

1    method based on actual scientific knowledge as opposed to

2    *ipsi dixit* and speculation and subjective beliefs of

3    plaintiffs' specific cause witnesses.

4         Now in their brief, plaintiffs argued something

5    pretty remarkable on *Daubert*.  They argued that

6    AstraZeneca failed to satisfy AstraZeneca's heavy burden

7    to demonstrate that their witnesses should be excluded

8    under *Daubert*, and that clearly gets the law backwards and

9    is not the law.

10        Your Honor has written many *Daubert* opinions.  You

11   know it's the proponent of the expert testimony who bears

12   the burden of demonstrating that all the three

13   requirements of *Daubert* and the Federal Rules of Evidence

14   are required, and that includes, first, that the witness

15   is qualified, second, that the witnesses' methodology and

16   opinions are sound, scientifically reliable, and finally,

17   that the testimony is relevant and would assist the trier

18   of fact.  I think on all three of these components the

19   plaintiffs have failed.

20        First with respect to qualification, it was about

21   10 minutes of Dr. Abramson's cross-examination after he

22   went through his direct where, as I heard it, he was

23   conceding that he doesn't have a lot of experience with

24   respect to diabetes or diabetes causation.  He's a

25   psychiatrist.

1       And the plaintiffs' counsel are right that in being a

2   psychiatrist and treating people, sometimes he's presented

3   with individuals who might have diabetes or glucose

4   abnormalities.  And as plaintiffs' counsel say, it's true

5   that a psychiatrist may monitor or be encouraged by the

6   labeling to monitor, but that doesn't make a psychiatrist,

7   and certainly not Dr. Abramson, qualified to testify under

8   Rule 702 in a courtroom as an expert in diabetes

9   causation, a complex endocrinological issue.

10      Even some endocrinologists, as we'll talk about what

11  Dr. Marks and Dr. Tulloch, there's a question with respect

12  to their qualifications.  But we are not challenging these

13  two, Dr. Tulloch and Dr. Marks' qualifications, but we

14  certainly are challenging Dr. Abramson's qualifications.

15  And his testimony demonstrated he lacks the qualifications

16  needed to be admitted as an expert and testify before the

17  jury on diabetes causation.

18      In fact, at his deposition, he did not know the

19  diagnostic criteria at all for diabetes.  And on the stand

20  at the *Daubert* hearing, I think you may have heard this,

21  he got the numbers wrong, a little bit wrong.  But the 126

22  for a year and a half, every single lawyer in this

23  litigation knows that's a magic number with the two tests

24  that are necessary.  And Dr. Abramson thought it was 129

25  and had to be corrected by counsel.  I just submit he's

1    not qualified to testify in diabetes causation.

2         Now, the fundamental attack again is the

3    methodological attack and the bases, the scientific

4    reliable bases for the opinions that these experts do

5    offer.  We've got to look to *Daubert*, I believe, in the

6    first instance to see that the testimony from these

7    experts has to be based and derived from the scientific

8    method.  That's what *Daubert* tells us.

9         Scientific methodology is based, the Supreme Court

10   tells us in *Daubert*, on generating hypotheses and testing

11   them to see if they can be falsified.  That's what the

12   scientific method is.  We know that.  It's dispassionate,

13   objective analysis where you're hypothesis testing.  You

14   don't arrive at a conclusion and then backwards reason

15   looking for supports for those conclusions, even if

16   they're sincerely held conclusions.  That's not what the

17   scientific method is about.

18        You certainly don't rely on cherry-picked data and

19   information provided to you in litigation by certain

20   members of the plaintiffs' team, like Nurse -- paralegal

21   Nurse Glenda Granger.  And we demonstrated in the briefing

22   and in some of the questioning here how there were

23   significant omissions in the information that these very

24   busy professionals had.  They didn't have 51 years of one

25   of the plaintiff's medical history, information that

1    Dr. Marks herself said was very important, for instance,

2    the fact that the plaintiff had decades long history of

3    obesity.  Very relevant given obesity's overwhelming risk,

4    a causal relationship between obesity and long-term

5    health, obesity and diabetes.

6        But back to what *Daubert* says, *Daubert* requires to be

7    admissible that the testimony be scientific which means

8    it's grounded in the methods of science, and knowledge

9    which is more than subjective belief, more than

10   unsupported assumptions.  So to qualify as scientific

11   knowledge, the expert's opinion must derive from the

12   scientific method and be supported by appropriate

13   validation or good grounds based on what is known.

14       That's why that direct -- the musing about direct

15   mechanism, it's interesting, but it's not something that

16   an expert can testify before a jury in civil litigation,

17   certainly not a specific causation witness.

18       And as the Eleventh Circuit in *McLean* emphasized, the

19   plaintiffs here bear the burden of proving that each step

20   in the analysis of their experts is supported by the

21   requisite good grounds and constitutes scientific

22   knowledge such that any flaw, any gaffe in the analysis,

23   any premise, any aspect of the analysis that isn't

24   sufficiently supported by what is scientifically known

25   that involves speculation can take down the entirety of

1    the expert opinions.

2        And here I think we have demonstrated at the most

3    fundamental level the experts' opinions with respect to

4    the linkage between weight gain and these plaintiffs'

5    diabetes isn't even supported by their own opinion that

6    Seroquel caused one pound or two pounds or 10 pounds of

7    the plaintiffs' weight gain.  And the weight gain is the

8    only link to diabetes in this case.

9        *McCorvey* from the Eleventh Circuit emphasizes that

10   the Court has to perform an exacting analysis of the

11   expert's methodology to ensure that speculative and

12   unreliable expert testimony does not ever reach a jury.

13       This Court, to deny the specific cause motion that we

14   have filed, has to conclude that that testimony is

15   scientifically reliable, Your Honor, before a jury can be

16   empaneled.  I submit that that cannot be done here on this

17   record.

18       In the *Hooters* case, in fact, *HI Limited Partnership*

19   *v. WingHouse of Florida*, about four years ago, Your Honor

20   might remember, you properly excluded expert testimony as

21   highly speculative and unreliable because it wasn't the

22   product of the scientific method.  The Court emphasized in

23   that decision there was no real methodology that the Court

24   could find that supported the economic analysis of the

25   expert in that case, so that expert couldn't testify

1    before any jury.  Here, the fundamental methodological

2    problems are far more stark and severe than they were in

3    the *HI Limited Partnership* case.

4        But as in that case, you've got to -- it's hard to

5    find, to figure out what's the methodology that these

6    people are really employing, these experts.

7        The plaintiffs' counsel say, well, it's the common

8    method of differential diagnosis, that what the experts do

9    is they do what they always do in their practice.  They

10   look at some studies, they do some research, they look at

11   some data, they look at some charts and they render, as

12   Dr. Marks said, her opinion, her judgment.

13       Well, first of all, none of the witnesses at their

14   deposition testified that their methodology in support of

15   their specific cause opinions was differential diagnosis.

16   That's what the plaintiffs argue.  And we'll show how, in

17   fact, that's not what any of these witnesses did.

18       But the Eleventh Circuit in *McLean*, in a very

19   important passage, draws a critical distinction between

20   differential diagnosis on the one hand and differential

21   etiology, which in the Eleventh Circuit is what analysis

22   an expert engages in when doing a causation opinion.

23       According to the Eleventh Circuit, differential

24   diagnosis is a process of diagnosing which of several

25   conditions a person may be suffering by comparing and

1    contrasting clinical findings.

2        By contrast, in a courtroom, as the Eleventh Circuit

3    says, the more precise term is "differential etiology,"

4    the process of investigation and rigorous reasoning to

5    identify external causation of a condition through what

6    the Eleventh Circuit calls a process of elimination.

7        Citing many other cases from across the country, we

8    talk about ruling out.  That's what the process of

9    elimination is.  You carefully and rigorously analyze

10   various potential causes and eliminate the causes until

11   you're left with the most likely causes.  But in that

12   analysis, it's a dispassionate analysis based on

13   application of the scientific method.

14       Here, none of the witnesses, as I said, testified

15   that they engaged in either differential etiology, which

16   is the right method, according to the Eleventh Circuit, or

17   differential diagnosis.  Plaintiffs, on pages 23 and 24 of

18   their opposition brief, say, citing the *Westbury* case out

19   of the Fourth Circuit, they say there's five steps to a

20   differential diagnosis:  One, the expert performs physical

21   examinations of the plaintiff; two, the expert takes

22   medical histories of the plaintiff; three, the expert

23   orders and reviews the results of clinical tests; four,

24   the expert consults all pertinent medical literature, all

25   pertinent medical literature; and five, as quoted by the

1    plaintiffs in their brief, the expert assesses the roles

2    of other possible causes.

3         In fact, on that fifth point, just like the Eleventh

4    Circuit in *McLean*, even the Fourth Circuit in the *Westbury*

5    case the plaintiff cites says that the court -- the expert

6    must, quote, "determine the possible causes for the

7    patient's symptoms and then eliminating each of the

8    potential causes until reaching one that cannot be ruled

9    out or determining which of the ones that cannot be

10   excluded is the most likely."  We submit that that's the

11   right ruling out or elimination process.

12        But when we look through these five factors that the

13   plaintiffs themselves identified and we think about the

14   testimony that we heard from these three witnesses, is

15   that really what they engaged in, what plaintiffs' counsel

16   called differential diagnosis?  It's not.  It's really

17   not.

18        Because outside the courtroom, Dr. Tulloch and

19   Dr. Marks and even Dr. Abramson -- Dr. Abramson says he

20   doesn't diagnose diabetes or has no experience in that and

21   sends his patients to endocrinologists like Dr. Marks or

22   Dr. Tulloch.  But Dr. Tulloch and Dr. Marks both testified

23   that they've always -- they would personally examine the

24   witness and personally take the witness -- the patient's

25   medical history if they were in their practice outside the

1    courtroom engaging in any form of differential diagnosis.

2         They didn't do that in this case because they weren't

3    asked to do so, they said, by the plaintiffs' counsel.

4    They didn't think they had to do so.  And in fact, if you

5    look back at the testimony, plaintiff counsel, Mr. Pirtle,

6    said, "Well, the law allows you not to have done that."

7    We don't think that the law allows them not to do that

8    when it has direct implication with respect to the

9    credibility and reliability of the experts' opinions.

10        Here, Dr. -- Miss Thorp's questioning was focusing in

11   on why lots of extra facts that Dr. Marks didn't account

12   for made a difference, that if she would have met with

13   plaintiff, then she would have known of many other issues

14   that were going on in the plaintiffs' lives that would

15   have accounted for the extra weight gain.

16        And yet their witness, Dr. Marks, didn't account for

17   that, didn't talk about that in her report.  And yet she

18   still couldn't describe any, much less all, of the weight

19   to Seroquel that Plaintiff Guinn had gained.

20        But, again, outside the litigation, the *Kumho* case

21   from the Supreme Court, *Kumho Tires* is directly on point.

22   You've got to engage in the same level of rigor in the

23   courtroom that you would outside, and both of the

24   witnesses in fact testified that they didn't.

25        They did review clinical tests that were ordered by

1    others.  We recognize that that can be appropriate.  But

2    did these witnesses consult all pertinent literature?  And

3    again, I submit that they didn't.  And in fact,

4    Dr. Tulloch, it came in very quickly and effortlessly, but

5    when -- when Miss Thorp was asking Dr. Tulloch about

6    whether he consul -- one of the pieces of literature he

7    studied in his reliance list was the Resnick article, did

8    he agree with the Resnick article that said that

9    short-term extra weight gain and long-term obese

10   individuals has no effect on diabetes risk, something

11   that's in our briefing, and Dr. Tulloch agreed, "Yeah,

12   that's true.  They've already reached the threshold," he

13   said.

14        Well, yet with respect to Plaintiff Haller, the

15   reliance was on short-term incremental weight gain in an

16   individual who had been obese for many, many years, for

17   decades of his life.

18        So, again though, there were many components of the

19   literature that these witnesses did not consult, unlike

20   what the Supreme Court in *Daubert* tells us, a

21   dispassionate application of hypothesis testing to falsify

22   your hypotheses before you arrive at your opinions.

23        Finally, the ruling out process.  We submit that the

24   testimony in the deposition and in the Court is clear, the

25   witnesses could not rule out other causes of weight gain

1    which was their only linchpin to diabetes, nor could they

2    rule out the preexisting obesity and other risk factors as

3    taken together the cause of the individuals' -- both

4    plaintiffs' diabetes, getting diabetes when they got

5    diabetes.  If you took Seroquel -- that's the but-for test

6    that we've been talking about.  If you took Seroquel out

7    of the equation, would the plaintiffs still have gotten

8    diabetes?  And if not, what is your scientifically

9    reliable basis for that opinion?

10        We submit that they didn't give the testimony in the

11   first instance, and they have no scientifically reliable

12   basis for the opinion even if they would have given it.

13        In the end, though, we think on the differential

14   diagnosis point the plaintiffs are wrong saying that's

15   what these witnesses have engaged in.  *And McLean* --

16   Eleventh Circuit in *McLean* held an expert does not

17   establish the reliability of his techniques or the

18   validity of his conclusions simply by claiming that he

19   performed a differential diagnosis on a patient.  That's

20   the holding in the Eleventh Circuit.  But the *ipsi dixit*

21   of a plaintiff lawyer that that's what the witness has

22   done is a dual -- differential diagnosis clearly fairs no

23   better, certainly not within the Eleventh Circuit.

24        Briefly on temporality, clearly that is what these

25   witnesses are relying upon.  They can disavow reliance on

1    temporality, but every time they say, "This plaintiff

2    experienced weight gain while on Seroquel," that's

3    temporality.  That's what the Eleventh Circuit in *Allison*

4    called the coincidence of temporality, a particular result

5    that occurred while something else happened.

6         Reliance on temporality is a false inference, the

7    Eleventh Circuit tells us.  And what plaintiffs do in

8    their briefing on temporality is they don't deny that in

9    the Eleventh Circuit reliance on temporality is not the

10   scientific method.  What they try to say is that their

11   general causation arguments should give them -- that

12   Seroquel should be ruled in as a potential risk factor for

13   diabetes or for weight gain, somehow give them a free pass

14   and their experts a free pass to rely on temporal

15   relationships, and that's not right.

16        There really is no law, certainly no law in the

17   Eleventh Circuit that says that reliance on temporality,

18   which Magistrate Judge Baker correctly says is not the

19   scientific method, somehow becomes the scientific method

20   merely because there's general causation evidence.

21        And the case that the plaintiffs cite on the point is

22   a Fifth Circuit decision in *Curtis* which actually doesn't

23   support the plaintiffs at all.  *Curtis* is totally

24   distinguishable.  The plaintiffs in that case were

25   refinery workers who all suffered telltale cluster signs

1   and symptoms of benzene poisoning including rashes and

2   vomiting and nausea in a few days after they were soaked

3   with harmful toxic substances.

4        And it was in that context -- it was in that context

5   that the temporality between these telltale symptoms and

6   their being doused in toxic benzene substances was said to

7   be very potent temporality, very different than the

8   temporal relationship between weight gain here and

9   ingestion of Seroquel, much less the plaintiffs' diagnoses

10  of diabetes while they were on Seroquel.

11       Now I want to just conclude about the *McDowell* case

12  and the importance of quantification, especially in the

13  Eleventh Circuit.

14       The plaintiffs, in their opposition, ignore or

15  disavow our quantification arguments and their

16  quantification burden.  They literally say on footnote 140

17  of page 30 of their opposition, there is, quote, "no

18  support in the law," unquote, for AstraZeneca's

19  quantification arguments.

20       Well, the Eleventh Circuit's holding in *McDowell*,

21  squarely on point, holds that an expert must carefully

22  mete out the contributions of the various possible causes

23  of an injury and must quantify the effect of the alleged

24  causes to arrive at any scientifically sound causation

25  opinion that the defendant's conduct probably caused or

1    more likely than not caused the injury because anything

2    less is a subjective guess and it doesn't survive *Daubert*

3    scrutiny.

4         In *McDowell*, there was a -- plaintiff was an inmate

5    who advanced an aggravation theory sort of similar to the

6    aggravation theories that the plaintiffs are trying to

7    advance here.  He claimed that a chain of delays caused by

8    certain defendants in getting him treatment for a spinal

9    abscess caused or contributed to or worsened the patient's

10   paralysis.

11        And the Eleventh Circuit affirmed the *Daubert*

12   exclusion decision of the plaintiff's medical causation

13   expert testimony because the expert provided no scientific

14   basis to say that the overall delay caused worsening of

15   the plaintiff's condition or that any particular delay

16   attributable to each defendant's conduct caused any

17   worsening.

18        One expert was explicitly excluded under *Daubert*

19   because, quote, "It was impossible to mete out the

20   contribution of the defendants in the overall injury of

21   the plaintiff," and the expert failed to do so.

22        Another expert who opined that the plaintiff would

23   have suffered less injury with earlier treatment was

24   excluded because he couldn't quantify what the plaintiff's

25   condition would have been had he received earlier

1    treatment which the defendant's conduct allegedly delayed.

2         So here, contrary to *McDowell*, the plaintiffs'

3    experts have nothing, they've done nothing to try to

4    isolate or mete out or quantify the effect or contribution

5    of Seroquel on any of the plaintiffs' weight gain.  That's

6    why we were asking the questions, "What portion of the

7    weight gain while on Seroquel do you say is caused by

8    Seroquel?"  Because then we want to test that.

9         But the answers were, "I don't know.  Can't say it's

10   one, can't say it's two, can't say it's five pounds."

11        So they don't quantify how much.  They don't say how

12   much Seroquel would have accelerated the onset of the

13   diabetes.  How much sooner would the plaintiff have gotten

14   diabetes if the plaintiff didn't -- because the plaintiff

15   took Seroquel?  What's the scientific basis for that

16   opinion?  Frankly, what's the scientific basis for any

17   opinion that Seroquel contributed in any way?  Not general

18   studies that are cited, but what's the scientific basis

19   for the opinion that Seroquel played a role?

20        All the plaintiffs talk about is their general

21   causation evidence, but there's no specific facts, as

22   Judge Nimmons talked about in the *Reynard* case that we

23   discussed a few days ago, to show that their opinions are

24   nonspeculative.  And in fact, here, we don't even have the

25   causation opinions that Florida law requires.  In the end,

1    the plaintiffs just say it's impossible, it's impossible,

2    we know of no methodology whatsoever to support the

3    causation opinions.

4         Your Honor, with due respect, those opinions have to

5    be excluded under *Daubert*.

6         If I can reserve the remainder of my time for

7    rebuttal.

8              THE COURT:  Okay.

9              MR. TRAMMELL:  May it please the Court, Your

10   Honor, Fletch Trammell for the plaintiffs.

11        It's really an extraordinary motion, Your Honor.  The

12   purpose of *Daubert* is to prevent junk science or science

13   that exists entirely for the courtroom from being

14   presented to jurors because of the persuasive power of an

15   expert's testimony.

16        What defendants would have you believe and endorse is

17   that the practice of the endocrinology and the practice of

18   psychiatry and the actual treatment of patients who take

19   these drugs is somehow junk science, or conclusions based

20   on experiences treating patients with these drugs is

21   extraordinary, and testimony about that exists only for

22   the courtroom.

23        The plaintiffs submit that the experts in this case,

24   the experts that have testified before you this week, have

25   applied the methodology of differential diagnosis.  There

1    is not a District Court in the country that has found that

2    a differential diagnosis is an inappropriate methodology

3    to apply, and it is applied by practicing physicians

4    everywhere to render exactly this type of testimony.

5         What the differential diagnosis requires is clear.

6    The witnesses that have testified this week have testified

7    that they have applied that methodology.  And I'll

8    describe briefly what that methodology is and how they've

9    applied it.

10        The first thing the differential diagnosis requires

11   is that an expert, in a reliable manner, rule in the

12   alleged cause as a potential cause or plausible cause of

13   the injury.  What the experts have to do in ruling in

14   Seroquel as a cause of diabetes is review the literature,

15   which they all testified that they did.  There is no

16   requirement that they review every scrap of literature

17   that exists.

18        Indeed, Your Honor, there are thousands of studies on

19   the subject, and it would be an inappropriate standard

20   under *Daubert* to require any expert that was going to

21   discuss the causal association between Seroquel and

22   diabetes to have read every single study and be able to

23   speak intelligently on every study that exists.

24        These experts have read and analyzed the pertinent

25   literature from peer-reviewed journals, including not

1    incidentally AstraZeneca's own label, which makes the

2    concession that Seroquel -- people who take Seroquel are

3    twice as likely to have glucose disregulation, diabetes

4    level glucose disregulation, the words of their counsel,

5    than people who don't.

6        And so even if you accept, Your Honor, that the

7    studies that they relied on are not reliable or that they

8    haven't relied on sufficient studies or they haven't

9    sufficiently considered studies that say that Seroquel is

10   not associated with diabetes, which they all said that

11   they did, Seroquel's own label says that it is.

12       And so all a practicing physician has to do and all

13   practicing physicians do in their offices today and every

14   day since the new label came into effect is to review the

15   Seroquel label, analyze what it says about Seroquel's

16   association with diabetes, and the evidence is clear and

17   it is statistically significant and shows that Seroquel is

18   associated with glucose disregulation and twice as many

19   people that take Seroquel will get glucose disregulation

20   as those who don't.

21       And so it's impossible or disingenuous for

22   AstraZeneca to say that no expert -- or these experts who

23   are leaders in their field -- I mean, I think that came

24   through.  We could have discussed the qualifications, but

25   they're on their CVs and I think it's clear that

1   plaintiffs have brought leaders in their field to testify

2   on these issues, and they are capable at the very least of

3   analyzing Seroquel's label and making a conclusion that

4   Seroquel is a potential cause of diabetes in patients who

5   take it.  They've done much more than that, but if that's

6   all they did, that would be sufficient.

7       I think that point is critical because what we've

8   heard this week from AstraZeneca is that a nurse, not a

9   doctor and not someone who has, you know, years and

10  decades of training and treating these people and treating

11  these diseases, but a nurse is qualified to understand the

12  association between Seroquel and diabetes sufficiently to

13  give a warning to a patient and obtain informed consent.

14      But they can't have it both ways.  They can't say

15  that nurses are learned intermediaries and understand the

16  risks, but doctors who have been leaders in their field

17  for decades can't make that conclusion, especially when

18  it's in their label.  Your Honor, that argument is

19  entirely disingenuous and meritless.

20      Now once doctors have ruled in Seroquel as a

21  potential cause of diabetes, the methodology of

22  differential diagnosis requires them to assess other

23  possible causes and account for them.  That's all it

24  requires them to do.  They don't have to completely

25  eliminate other causes.  They don't have to statistically

1    quantify the role of other causes.

2        I would invite the Court to review the reference on

3    scientific evidence that's put out by the federal

4    judiciary.  It says exactly that.  It says exact

5    quantifications of other risk factors is not required.

6    And the reason is, as the doctors all testified this week,

7    is that that's not scientifically possible to do.  You

8    simply can't scientifically exactly quantify every single

9    risk factor.

10       What you can do is you can account for those risk

11   factors and analyze any role that they might have played

12   in the causation of the ultimate injury, and they all did

13   that.  We reviewed the weight charts for each of these

14   patients.  We reviewed the other drugs that they were on.

15   We reviewed their family history to the extent it's

16   available.  We reviewed lifestyle.  Every risk factor the

17   defendant puts forward as a potential alternative cause of

18   their diabetes, these experts reviewed as part of their

19   methodology and discussed on the stand this week.

20       They all said, you know, these people gained weight

21   over the course of their lives before they took Seroquel.

22   They had all these other risk factors to the extent that

23   they attribute them as alternative causes, and they didn't

24   get diabetes.  When they took Seroquel, all these other

25   risks -- or certain of these other risk factors got worse.

 1    They gained weight which is a common association with

 2    Seroquel, their blood glucose got worse which is an

 3    admitted association with Seroquel, and they developed

 4    diabetes.

 5          Therefore, what they said is that you can't say that

 6    any of these other risk factors is the cause or is a

 7    likely cause of the development of diabetes because they

 8    were all present before Seroquel and didn't account for

 9    diabetes, didn't cause diabetes.  In essence, Your Honor,

10    they ruled all those other risk factors out as being the

11    cause of the diabetes on the day it occurred because they

12    hadn't caused it earlier.

13          Once the -- once the doctors rule in, there's no

14    requirement, Your Honor, that the doctors physically

15    examine the patient.  In every -- in every statement of

16    the differential diagnosis methodology, it says,

17    "Differential diagnosis may but doesn't invariably include

18    an examination of the patient."  And I think it's clear

19    from the testimony of the doctors here this week that it

20    would have added nothing to their testimony.

21          They are capable and qualified, as they testified, to

22    analyze medical histories, to analyze laboratory values

23    and determine that laboratory values meet specific

24    diagnostic criteria.  That's not a statement -- or it's

25    not an opinion that requires examination of a patient.

1    And indeed, examination of the patients in these cases,

2    once you've reviewed the medical records, which they all

3    say that they did, would have added nothing to their

4    opinions.

5        That clearly, Your Honor, is a point much like almost

6    every point Mr. Weisburd made today and nearly every point

7    that was made on cross-examination is a point that goes to

8    the weight of the expert's testimony as opposed to their

9    qualifications to give it.  That -- those points are for

10   the jury to weigh.

11       And, Your Honor, in addition to reviewing the medical

12   records and the medical histories as summarized by nurses,

13   which is the practice in every medical office in the

14   country, these doctors reviewed, as I said, the scientific

15   literature, they've reviewed all significant laboratory

16   values for these patients and rendered reliable opinions,

17   Your Honor.  They may not like what the opinions are, but

18   that's not the proper subject of the *Daubert* challenge.

19   The *Daubert* challenge, of course, is intended to keep

20   people -- experts from making things up in court that they

21   wouldn't otherwise do outside of court.

22       But as we demonstrated and we elicited from these

23   experts on direct, this is what they do.  This is how they

24   practice medicine.  If they have a patient come in to see

25   them that develops some sort of injury, the way they

1    diagnose that injury, the way they differentiate between

2    possible causes is they rule in all probable causes and

3    then assess the medical history in an effort to rule out

4    nonlikely causes.  And that's exactly what they testified

5    that they did here.

6        There's nothing extraordinary about the methodology

7    of differential diagnosis, and there can't be a legitimate

8    argument, after having heard these experts, that they

9    didn't apply it.

10       One other challenge the defendant makes is that

11   plaintiffs relied too heavily on the temporal connection

12   between the use of Seroquel and the development of

13   diabetes.  I think it's important to know the principal

14   cases they cite, the *Metabolite* case, the *McNeil* case, are

15   cases where temporality was improper -- or reliance on

16   temporality was improper because there was no connection,

17   no established connection between the treatment and the

18   disease, which isn't the case here.

19       There is ample scientific evidence that Seroquel is

20   associated with diabetes.  Again, it's in their label.  I

21   mean, it's not something that's controversial, Your Honor.

22   And therefore, in the face of an established scientific

23   connection between a drug and a disease, temporality is a

24   lot stronger opinion.

25       And with that in mind, these doctors might have been

1    able to testify relying entirely on temporality, but they

2    didn't.  All these doctors said -- you know, we've got

3    temporality, which, by the way, is an essential element of

4    rendering differential diagnosis.  Of course they wouldn't

5    be able to say that the drug had caused the disease if the

6    person wasn't on the drug at the time they got it or

7    wasn't on the drug near the time they got it.  And so

8    temporality is essential.

9        But they've said not only do we have temporality in

10   this case, but once they started taking the drug, they

11   experienced the worsening of side effects that contribute

12   to diabetes that are known to be caused by the drug.  So

13   they took the drug treatment, tied it together with the

14   known side effect and then tied that known side effect

15   together with the disease.

16       It's impossible to ask more of them than that.

17   There's nothing more that's scientifically possible than

18   that.  These doctors all testified to you that, you know,

19   in the practice of medicine, they don't get into the

20   business of exactly quantifying risk factors.  It's not

21   part of medicine, it's just not what doctors do, which is

22   why the federal *Reference on Scientific Evidence* doesn't

23   require it.  Doctors don't do that in their practice.

24   It's impossible to do it for the purposes of the court.

25   None of their experts will be able to do it.  I've deposed

1    some their experts, and they can't do it.  It's simply

2    impossible.

3         All they can do is say, "These are the known risk

4    factors.  I'm analyzing the medical history.  This is my

5    opinion as to what the most likely cause of this injury

6    was."

7         With regard to whether these experts met the magic

8    words test, whether they used the words that the law

9    requires, again this is a distinction between the practice

10   of medicine outside the court and the expert testimony

11   about medicine inside the court.

12        I was discussing with my co-counsel, Mr. Pirtle, this

13   morning, he said, you know, one of the problems with

14   *Daubert* is we expect these people to act like doctors when

15   they're in the court, but we penalize them for it if they

16   talk like doctors in court because doctors don't use words

17   like "sole cause."  They don't worry about ruling out sole

18   causes.  They don't, you know, use words like "substantial

19   contributing cause."  Doctors analyze medical history,

20   analyze literature, and determine what they think the most

21   likely cause is.

22        All these doctors said, "These people would not have

23   gotten diabetes when they got it had they not been on

24   Seroquel treatment."  They all said Seroquel contributed

25   to the side effects, it contributed to their diabetes, it

1    caused them to get diabetes when they got it.  They

2    couldn't have been more clear about that.

3        If there's an issue about semantics, if there's an

4    issue about how they framed their answers, not -- I would

5    submit to the Court that their answers were clear on that

6    issue.  Dr. Tulloch said Seroquel was the straw that broke

7    the camel's back.  And the obvious deduction from that is

8    that the camel's back doesn't break without the final

9    straw.

10       If there's a semantic problem the defendants have

11   with the way that the experts frame their opinions, that's

12   an issue they need to be arguing to the jury.  The experts

13   were clear that these people got diabetes because of

14   Seroquel, they got diabetes when they got it because of

15   Seroquel, and Seroquel caused worsening of their overall

16   metabolic function that ultimately caused the injury.

17       Another issue that comes up that defendants make

18   great use of is that none of these experts could say that

19   the plaintiffs wouldn't have gotten diabetes some day had

20   they never been on Seroquel.  And, of course, the trouble

21   with that is they're asking the experts to prove a

22   negative.

23       No expert can say, no doctor can tell you that none

24   of us will not get diabetes tomorrow.  That's about five

25   negatives in a sentence.  But the idea is no doctor can

39

1    disprove the hypothesis that any of us will get diabetes

2    at any point.  It's impossible to do.  You cannot disprove

3    that negative.

4         What the doctors did is, and Dr. Tulloch was adamant

5    about this and would not back off of this when he said,

6    you know, "I can't talk about that hypothesis, one,

7    because I can't" -- and Dr. Abramson said this, too, "one,

8    because I can't disprove the negative, and, two, it's

9    totally outside the context of the facts of the case."

10        The facts are this person was on Seroquel, Seroquel

11   is associated with these side effects, they had had the

12   weight gain and all the other risk factors before and

13   didn't develop diabetes.  When they got on Seroquel, they

14   gained the weight, they had a worsening of the metabolic

15   condition, and they got diabetes.

16        It's as clear a case as -- they were as clear as they

17   could be.  Had they been treating this patient in their

18   practice, they would have diagnosed with him with diabetes

19   and they would have called the cause Seroquel.

20        I think the significance of this motion, you know,

21   shouldn't be lost on the Court because, as Dr. Marks

22   testified, every single person on Seroquel or not, walking

23   the earth, probably has some risk factor for diabetes.

24        And as I said earlier in the week, this company, when

25   they marketed the drug Seroquel, when they came up with

1    the idea, they knew that everyone they would be marketing

2    the drug to had a collection of significant risk factors

3    for diabetes.  And every plaintiff in this litigation will

4    have several risk factors for diabetes.  And they've sold

5    tens of billions of dollars on -- of Seroquel to exactly

6    these people.

7        And so having come across, you know, tens of millions

8    of puddles of gasoline and thrown lit matches into them,

9    what they'll now do is they'll say any expert that

10   testifies that Seroquel caused diabetes is giving an

11   improper opinion because, just like the fire, you can't

12   say that it wasn't the gas that was the sole cause.

13       That's not what the law requires, Your Honor.

14   Florida law doesn't require that.  And none of these

15   doctors could accurately do that.  Indeed, in any Seroquel

16   case that this Court will try or will hear *Daubert*

17   argument in, you will never find a case where there aren't

18   significant risk factors.  There will never be a doctor

19   that can sit up here and say, "I can exactly quantify

20   every single risk factor and tell you exactly how many

21   pounds somebody gained as result of Seroquel."  It will

22   never happen because it's scientifically impossible.

23       The best that they can do is review the literature,

24   review the file, and give you their opinion within a

25   reasonable degree of medical certainty that Seroquel was

1  the cause of the person getting diabetes on the day that

2  they did.

3      Your Honor should deny the motions.

4      MR. WEISBURD:  The testimony is what the

5  testimony is.  The Court heard the testimony.  I would

6  submit that when Mr. Trammell and Mr. Pirtle used certain

7  words, the witnesses didn't give them but-for causation

8  opinions.  What Mr. Trammell just said isn't what the

9  witness said.  The witness didn't testify that but for

10  taking Seroquel, Plaintiff Guinn or Plaintiff Haller

11  wouldn't have gotten diabetes when they did.  It's not

12  what they said.

13      He is right that the answer to that question when he

14  asked Dr. Tulloch was "the straw that broke the camel's

15  back."  I heard that a lot of times.  And in fact, I think

16  it's 19 times in his deposition.  It certainly is his

17  answer to all the questions.

18      The problem is what Mr. Trammell also ignored, both

19  for Dr. Marks and for Dr. Tulloch, is that the straw that

20  Dr. Tulloch was talking about in the context of Seroquel

21  was the weight gain for Mr. Haller, right?  I mean, that

22  was all he said.  He agreed there's no direct effect

23  testimony.  He's not testifying on the direct effect.

24  Just like I said, a point that Mr. Trammell didn't respond

25  to because it's true, that's what the testimony was.

1          So the weight gain while on Seroquel was, to the

2     extent Seroquel could remotely be called a straw for

3     Mr. Haller or for any other plaintiffs, was the weight

4     gain.

5          But Dr. Tulloch couldn't say that one pound of the

6     weight gain was caused by Seroquel or any of it.  He

7     didn't do a quantification analysis.  That's not a risk

8     factor, by the way.  I'll respond in a second to the risk

9     factor argument that Mr. Trammell just made.  But this is

10    an analysis of the weight gain.  The theory of causation

11    in this case is that Seroquel caused weight gain in these

12    individuals.  That's the specific cause argument.

13         Mr. Trammell was confusing the ruling-in process of

14    general causation and the ruling-out process of specific

15    causation horribly, and his brief does the same thing, as

16    to his side's briefing.

17         For the ruling-out process, when it comes to weight

18    gain, we need a rigorous, dispassionate, scientific

19    analysis of what would have caused the weight gain that

20    these people, the plaintiffs, would have experienced or

21    claim to have experienced.

22         And as Dr. Marks testified and Dr. Tulloch testified,

23    there are many other factors and things going on in these

24    plaintiffs' lives that would have accounted and could have

25    accounted for their weight gain.

1        So they couldn't testify that Seroquel caused any

2   amount of that weight gain, a point that Mr. Trammell

3   couldn't respond to and didn't touch, even though it is

4   the linchpin of the causation opinions.  And without that

5   linchpin, the causation opinions are exposed as nothing

6   but, quote, "an opinion," as Dr. Marks called it, or, as

7   we would submit, speculation ultimately and certainly the

8   kind of testimony without a sound scientifically reliable

9   foundation that is required to get past Your Honor's

10  gatekeeping obligation under *Daubert*.

11       Interesting on the straw-that-broke-the-camel's-back

12  language that Dr. Tulloch uses, that Mr. Trammell was

13  repeatedly referring to also, I again would come back to

14  the *McDowell* case.  I can't imagine a case more on all

15  fours with this circumstance presented before the Court

16  under *Daubert*.

17       Because there the Court -- you know, the process was

18  that the Court was analyzing the colloquial phrase of "the

19  sooner the better" as part of the methodology and part of

20  the analysis of the causation opinion that was ultimately

21  excluded.  And the Court said, "the sooner the better,

22  that's your methodology?"  That's a phrase.  It really

23  doesn't assist the trier of fact, to the extent it doesn't

24  confuse the trier of fact.

25       And where is the science?  Give me the science that

1    supports narrowly, in the narrow context, that's, you

2    know, before the Court, that the several-hour delay that

3    was allegedly the responsibility of the defendant, one of

4    the defendants that was responsible for that delay in the

5    back treatment, that sooner treatment would have made a

6    difference for that plaintiff, not generally before that

7    plaintiff.  And don't give me colloquial phrases like "the

8    sooner the better" or "the straw broke the camel's back"

9    when I'm doing a *Daubert* analysis.

10    And again, here, if the straw is the weight gain,

11    there's no basis in the testimony of the witness, much

12    less in science, to support that testimony as being

13    admissible under *Daubert*.

14    Now, Mr. Trammell was talking a lot about how

15    everybody has risk factors for diabetes.  A lot of people

16    have family history of diabetes.  People -- some people

17    smoke.  There's a whole bunch of risk factors.  There will

18    never be a case anywhere ever that would survive *Daubert*.

19    I would submit that that's not true, and that

20    quantification, especially in the Eleventh Circuit, is the

21    law.  It is the law.  *Reynard* made it be the nonbinding

22    law in this court, just very persuasive, in my opinion,

23    from Judge Nimmons' opinion, but the -- the Eleventh

24    Circuit in *McDowell* made meting out and quantification the

25    law in the Eleventh Circuit.  And you can't disavow the

1    law by citing to non-Eleventh Circuit, nonbinding

2    authorities.

3        But there's a reason quantification matters with

4    respect to his risk factor analysis.  As Miss Thorp was

5    cross-examining the witnesses yesterday, she said:

6        "Well, the long-term obesity of Mr. Haller put him at

7    a 40 times his BMI, he was at a 40 times increased risk of

8    getting diabetes from his obesity; isn't that right?

9        "Yes."

10       It came in very cleanly because it is true.  Very

11   established.  In fact, the obesity literature is

12   overwhelming, as we argued in our brief and supported by

13   Dr. Copeland's declaration that's, again, unrebutted

14   really in this record that the relationship between

15   obesity and diabetes isn't an association, it's causal.

16   It's recognized to be causal.  It's one of the largest

17   known associations and increased risk in modern

18   epidemiology, so much so that by virtue of their

19   longstanding obesity, these two plaintiffs were at such a

20   great risk that it dwarfed the increased risk that a heavy

21   smoker has of getting lung cancer as compared to

22   nonsmokers.  That's a 23 times increased risk.  That's the

23   big, massive one that's often cited in epidemiology in the

24   antismoking community.

25       Obesity, Mr. Haller's 40 times increased risk.  Well,

1   that's why we engage in quantification analysis,

2   especially why the Court has to enforce the quantification

3   analysis, especially under *McDowell* in the Eleventh

4   Circuit.  Because when a witness is -- an expert witness

5   on the issue of specific causation is purporting to render

6   a more-likely-than-not opinion, that's a probabilistic

7   opinion.  That's 51 percent.  "I'm stating to 51 percent

8   certainty that if I took out of the equation the drug in

9   this instance or the defendant's wrongdoing, that the end

10  result wouldn't have occurred."

11       And I have to take into account, as Mr. Trammell

12  says, but quantify the relative contributory roles of all

13  the different possible causes that could be ruled in.

14  Otherwise, as the *Magistrani* (phonetic) court held, as the

15  *Cavallo* court held, we cite numerous cases, and it's --

16  they're consistent with the Eleventh Circuit's *McDowell*

17  decision, the witness can't conclude -- can't provide a

18  probabilistic opinion because in this context with -- with

19  Mr. Haller, if you take out Seroquel, you still have not

20  just multiple other risk factors but the overwhelming

21  dwarfing risk factor of this man's very long-term obesity.

22       That's why a probabilistic opinion is scientifically

23  unreliable here, an opinion that the witness didn't even

24  get when Mr. Trammell or Mr. Pirtle tried to use the

25  language of Florida law and asked the witnesses to agree

1    and they wouldn't.  In fact on multiple occasions, they

2    tried to use the language of "Did Seroquel accelerate the

3    diabetes?  Did it worsen the diabetes?"

4         And the witnesses, you'll go through the testimony,

5    they don't agree with that.  They said that they thought

6    that was a contributing factor based again on this weight

7    gain.

8         In fact, when the question was directly put by

9    Mr. Pirtle to Dr. Marks, she testified "no" as to the

10   but-for cause question because she says, "I wouldn't know

11   what the weight gain would have been."  But then again,

12   when asked about ascribing how much weight to Seroquel as

13   being caused by Seroquel, she couldn't say, said she

14   was -- it was really just a guess.

15        So ultimately one other fact is that one thing that

16   has changed over time -- is time.  The plaintiffs' counsel

17   have been saying that the risk factors have been stable

18   for these plaintiffs, and that's not true because age,

19   though it's one of the risk factors, really that's time,

20   especially when you think about diabetes being a

21   progressive disease that the -- all the witnesses agree

22   takes 10 to 12 years to progress.

23        So the mere fact that someone who's been obese for

24   many, many years hasn't gotten diabetes yet, time changes.

25   It takes time for that weight to have its effect on the

1    body.

2        So ultimately, though, I think what the plaintiffs'

3    argument devolves into is the argument that their general

4    cause arguments on increased risk or ruling in Seroquel as

5    a potential cause should get them to a jury even on the

6    question of specific cause, even in the face of this --

7    the testimony of these witnesses, and that is, as our

8    briefing argues and as the *Cano* decision that we cite in

9    our briefing holds, and the cite is 362 F. Supp. 2d 814,

10   it's on page 846, that's called false-cause reasoning.

11       I mean, *Daubert* courts have addressed this before.

12   It's the notion that any possible cause that could be

13   ruled in as a potential increased risk can be deemed an

14   actual cause and a but-for cause and a substantial

15   contributing cause.

16       And in the *Cano* case, the Court correctly rejects

17   that.  As the Court holds, "This is a prime example of

18   false-cause reasoning.  Simply because each of the

19   possible causes preceded the cancer and therefore could

20   have caused the cancer doesn't mean that they did cause

21   the cancer in the plaintiff.  It is possible that all the

22   possible causes contributed or that only some did.  The

23   fact that exposure to ionizing radiation from uranium may

24   be a risk factor for cancer does not make it an actual

25   cause simply because the cancer developed."

1        And it's exactly the same situation here.  What is

2   the basis that these witnesses have provided for specific

3   cause testimony that ingestion of Seroquel is what did

4   specifically cause Plaintiff Haller or Plaintiff Guinn's

5   diabetes?  I submit that testimony is insufficient under

6   Florida law, and to the extent it even comes close, it is

7   scientifically unreliable, not supported by a

8   scientifically reliable methodology and must be excluded

9   under *Daubert*.

10        Thank you, Your Honor.

11             THE COURT:  All right.

12             MR. TRAMMELL:  Your Honor, I don't think I used

13   all my time.  Can I briefly respond?

14             THE COURT:  Yes.

15             MR. TRAMMELL:  Your Honor, I'll let the

16   transcript speak for itself and I think our briefing

17   speaks for itself.  I just -- it's important to point out

18   the trap the defendants are trying to lay for the Court

19   and for plaintiffs.

20        What they say we should have done is have these

21   doctors do the scientifically impossible with a case of

22   diabetes, is account for every single risk factor with

23   exact academic and mathematic certainty.  Had we tried to

24   do that, they would have then said, "Aha, we got you.

25   That's not scientifically the reliable thing to do.

1    Everybody knows diabetes is multifactorial.  Everybody

2    knows it's a progressive disease.  It's impossible to

3    account for every single risk factor to the extent you

4    have, and it's impossible to attribute any specific amount

5    of weight gain to Seroquel versus something else."

6         And so it's important to remember that although he

7    says these cases are unique, in every single case that

8    this Court has, every single Florida case, every case that

9    this Court can hear a *Daubert* motion on, there will be

10   risk factors and there will be testimony similar to what

11   we've heard today, and the method -- or this week, and the

12   methodology will be consistent, and there will never be an

13   expert that can exactly quantify for you the risk factors

14   or exactly quantify how much weight gain was related to

15   Seroquel.

16        The best that they'll be able to do, and all that

17   *Daubert* requires -- it's really much more than *Daubert*

18   requires -- is tell you that Seroquel is a cause of weight

19   gain and diabetes, which is admitted by the defendants,

20   and that this person, while on Seroquel, experienced the

21   known side effects of Seroquel treatment, got diabetes,

22   and account for the other risk factors which every single

23   doctor did this week.

24        The Court should deny the motions.

25             THE COURT:  All right.

```
 1        Anything else?
 2             MR. WEISBURD:  I'll keep going if you want to,
 3    Your Honor.
 4             THE COURT:  No, no, not on this point.
 5        I meant what next?
 6             MR. AUSTIN:  Just one housekeeping matter, Your
 7    Honor.  Earl Austin.
 8        Plaintiffs have sent us their revised exhibit list,
 9    and we've made some revisions to our exhibit list in the
10    Haller case, mainly to break up some of the medical
11    records.
12        We've gotten theirs.  They will get ours.  We would
13    like an opportunity to exchange objections and maybe file
14    those on Tuesday so we could get the complete set to the
15    Court.
16             THE COURT:  Okay.
17             MR. TRAMMELL:  That's fine.
18             MS. THORP:  Your Honor, we have one housekeeping
19    matter with exhibits from yesterday with Dr. Marks.  There
20    were two exhibits in my cross of Dr. Marks, and I
21    apologize, I did duplicate exhibits.  We have given them
22    to your clerk.  There were two Exhibit 23s.  We have
23    marked the 9/26/94 Dr. Ramsey medical records showing
24    Miss Guinn's 208-weight pound which was formally
25    Exhibit 23 as Exhibit 23A.
```

52

1      And there were two Exhibit 32s.  We have marked the

2  CATIE Lieberman *New England Journal of Medicine* article,

3  formerly Exhibit 32, as Exhibit 32A.

4      And I apologize for the error.

5           THE COURT:  Okay.

6           MR. TRAMMELL:  Your Honor, would you like us to

7  inform you as to who our delegate to provide to the

8  mediator is?

9           THE COURT:  Yes.  And then I will notify him.

10           MR. TRAMMELL:  When would you like that?

11           THE COURT:  Today.

12           MR. TRAMMELL:  I believe it's going to be Ken

13  Bailey.

14           THE COURT:  All right.  But is that a for sure?

15  Or is that just a --

16           MR. TRAMMELL:  That's a for sure.

17           THE COURT:  Okay.  What about the defense?

18           MR. COUTROULIS:  We will advise the Court today.

19           THE COURT:  All right.

20      All right.  Anything else?

21           MR. LAMINACK:  Yes, Your Honor, if I may.  I

22  have two quick points.  Rick Laminack, Your Honor, for

23  plaintiffs.

24      I don't know where the Court is on the time, the

25  length of trial, but what I would like to point out to the

1    Court is that best I could calculate, the defendants, in

2    their time alone just for *Daubert* hearings is somewhere

3    around 15 hours, just their time alone, counting the

4    hearings in Tampa and the hearings we had today.

5         And I'm not complaining about that.  Certainly the

6    Court has given them the full opportunity to do what they

7    do in their *Daubert* motions, but that's three-fourths of

8    the time they say they need to try the entire case.

9         I'd just like the Court to be cognizant of the fact

10   that I don't know how much time we're going to need to try

11   the case.  I certainly don't want to waste the Court or

12   jury's time.  But we certainly want to be afforded the

13   opportunity to thoroughly try our case given that we have

14   the burden of proof.

15        THE COURT:  All right.  We'll I'll keep it at 45

16   hours, but that means there will be no break between

17   trials, or little break between trials.  So just keep that

18   in mind.

19        MR. LAMINACK:  I understand that, Judge.

20        And one other matter, and that has --

21        THE COURT:  Although I really don't think you

22   need 45 hours.

23        MR. LAMINACK:  I hope we don't, Your Honor.  And

24   we're certainly going to be judicious.  And I don't think

25   we'll need 45 hours.  So -- but I appreciate the Court --

54

```
 1         The other thing is --

 2              MR. COUTROULIS:  May I speak just to the 45-hour

 3    point before you move to your next point?

 4              THE COURT:  Yes.

 5              MR. COUTROULIS:  Your Honor, we did some math

 6    last night as well after we had this discussion with the

 7    Court, and it just seemed to us, as Your Honor has now

 8    pointed out, that the trial days go from 10:00 to 5:00.

 9    That's seven hours with an hour for lunch, maybe one or

10    two short breaks in the morning and afternoon.  We're

11    looking at about five and a half at the most, six hours of

12    trial time a day.

13         So if there are 90 hours afforded to the parties plus

14    the time for opening statements and closing arguments, I

15    do think we are looking at a virtual four-week trial, and

16    we will be on top of the setting of the next trial.

17         And while, of course, we appreciate completely that

18    the Court wants to be fair to both sides and continues to

19    be our strongly felt view, that 45 hours for each side is

20    not necessary to try these cases.

21              THE COURT:  Well, then you don't have to use

22    them, Mr. Coutroulis.  You don't have to use as many hours

23    as the plaintiff.  Plaintiff does have the burden of

24    proof.

25              MR. COUTROULIS:  Understood, Your Honor.
```

1          THE COURT:  So --

2          MR. LAMINACK:  The other point, Your Honor, I'd

3    like to speak to is how the deposition testimony is

4    presented to the Court.  And the Court is aware of our

5    position.  And it may be important for you to know how

6    these depositions were taken.

7          You know, the evidence of liability testimony,

8    particularly the general liability testimony, lies at the

9    company and with the company witnesses.  We don't have any

10   ability to call those witnesses to trial.  We don't have

11   the ability to do anything but take their deposition.  And

12   we only get one shot at them so we don't have a

13   opportunity to go do a discovery deposition and then a

14   real neatly prepared trial deposition.  We weren't

15   afforded that opportunity.

16         But with respect to each one of these witnesses, the

17   defendants did do a real neat, well-prepared,

18   well-thought-out direct examination on the witnesses,

19   complete with exhibits and PowerPoints in some cases.  So

20   they have that testimony in the can.

21         The best we're able to do is try to patch together

22   with our discovery slash trial deposition we took, the

23   points and present it or play it to a jury, and that's a

24   very difficult task for us.  And we would be seriously

25   prejudiced if the defendant was able to water down and

1   obfuscate the points we're trying to make by playing

2   portions interspersed with the testimony we want to play.

3        It's not going to be weird or strange to the jury

4   because at the end of each one of these depositions, the

5   defendants did a nice, neat direct, and they certainly

6   have the right to play that during their time but don't --

7             THE COURT:  Well, as I told you the other day,

8   and I haven't had a chance to look at the depositions,

9   some of them are nicely marked, color-coded, some of them

10  require quite a bit of back and forth and will take a lot

11  of time, but if there's big chunks of time, then that's

12  one thing.  But if there's a lot of bouncing back and

13  forth, then we're not going do that.

14            MR. LAMINACK:  Well, but here's the problem with

15  that --

16            THE COURT:  I understand your point.  I

17  understood your point on Tuesday when you made it.

18            MR. LAMINACK:  And I -- and I promise you, as

19  smart as they are, what they have done is gone through our

20  cuts and put in things that would require bouncing back

21  and forth just for that purpose.  And you can read it and

22  see.

23        Now, if there is something where I've unfairly taken

24  something out of context, then I'll be glad to include it.

25  That's what the rule of optional completeness required.

```
 1   But I shouldn't be required to play a bunch of stuff that
 2   they want in there when they've got a whole neat direct
 3   they can play in their own time and not cover up my points
 4   with a bunch of bouncing back and forth, as you said.
 5        And that's very important to us.  This is a --
 6             THE COURT:  You've -- you made that clear on
 7   Tuesday.
 8             MR. LAMINACK:  Okay.  Thank you, Your Honor.
 9             THE COURT:  And I will spend all weekend reading
10   those depositions as soon as I finish ruling on all these
11   other motions.
12             MR. LAMINACK:  Thank you, Your Honor.
13             THE COURT:  All right.  Is there anything
14   further?
15             MR. TRAMMELL:  Nothing further, Your Honor.
16             MR. COUTROULIS:  No, Your Honor.
17             MR. LAMINACK:  Oh, yes.  One other thing, Your
18   Honor.
19        We're -- based on the discussion we had the first day
20   about the medical records, we are amending our medical
21   record list in accordance with your suggestion, and we'll
22   submit it, of course, give them the opportunity to do
23   their objections, but we are pulling a few records out as
24   you suggested, so --
25             THE COURT:  All right.  Good.
```

1          MR. COUTROULIS:  Your Honor, on behalf of all

2    counsel, we really appreciate the Court's time.

3          (Proceedings adjourned at 10:55 a.m.)

4                    C E R T I F I C A T E

5          I certify that the foregoing is a correct

6    transcript from the record of proceedings in the

7    above-entitled matter.

8

9    s\Sandra K. Tremel January 21, 2009

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25