RECEIVED

2009 FEB 13 PM 2: 02

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: Seroquel Products Liability Litigation

MDL DOCKET NO. 1769

This Document Relates to:

| | |
|---|---|
| Janice Burns | 6:07-cv-15959 |
| Richard Unger | 6:07-cv-15812 |
| Connie Curley | 6:07-cv-15701 |
| Linda Whittington | 6:07-cv-10475 |
| Eileen McAlexander | 6:07-cv-10360 |

---

ASTRAZENECA'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
ITS SUMMARY JUDGMENT AND *DAUBERT* SPECIFIC-CAUSATION MOTIONS
IN THE REMAINING FIVE FLORIDA GROUP ONE CASES

I.      INTRODUCTION

Defendants AstraZeneca LP and AstraZeneca Pharmaceuticals LP ("AstraZeneca")

file this supplemental memorandum in support of their summary judgment and *Daubert*

specific-causation motions in the remaining five cases in "Group One" of the Florida Trial

Pool filed by plaintiffs Burns, Curley, McAlexander, Unger and Whittington ("Plaintiffs").

In two orders dated January 30, and February 6, 2009, the Court granted summary

judgment to AstraZeneca in the cases filed by plaintiffs Linda Guinn and David Haller.  The

Court reasoned that plaintiffs' expert testimony on "specific medical causation" failed to

survive its *Daubert* gatekeeping scrutiny and thus must be excluded, thereby leaving those

plaintiffs with no evidence to satisfy their burdens on the essential element of causation on

all of their claims.  *See* Order, dated Jan. 30, 2009, *Guinn v. AstraZeneca Pharms., LP, et al.*,

6:07-cv-10291-ACC-DAB (Doc. No. 47) ["*Guinn* slip op."]; Order dated Feb. 6, 2009,

*Haller v. AstraZeneca Pharms., LP, et al.*, 6:07-cv-15733-Orl-22DAB (Doc. No. 50) ["*Haller* slip op."]. The same fundamental reasons supporting this Court's summary judgment and *Daubert* rulings in the first two "Group One" Florida Trial Pool cases apply to all of the claims asserted by each of these five remaining "Group One" Plaintiffs.

In these remaining "Group One" Florida Trial Pool cases, Plaintiffs have variously offered the specific-causation testimony of five case-specific witnesses:

- the two endocrinologists whose methodologies and opinions the Court addressed and excluded in *Guinn* and *Haller*: Drs. Jennifer Marks and Brian Tulloch;

- the psychiatrist whose qualifications the Court found insufficient, and whose methodologies and opinions the Court addressed and excluded in *Haller*: Dr. I. Jack Abramson; and

- two other psychiatrists: Drs. Bruce Perry and Dr. Mitchell A. Young.

None of these five witnesses offers specific-causation testimony in any of the five remaining "Group One" cases that remotely survives the Court's *Daubert* gatekeeping scrutiny.

The three witnesses whose testimony the Court has already considered and excluded in *Guinn* and *Haller* (Drs. Abramson, Marks, and Tulloch) fare no better in any of these five cases. Dr. Abramson remains unqualified to offer any diabetes-causation opinions and, in any event, his specific-causation testimony based merely on "temporal relationships" in Plaintiff McAlexander's case is just as scientifically unreliable as it was in *Haller*. Likewise, Dr. Marks' specific-causation testimony on behalf of Plaintiffs Burns and Curley suffers all of the same fundamental methodological and substantive flaws that led to exclusion of Dr. Marks' comparable testimony in *Guinn*. And there can be no question that Dr. Tulloch's specific-causation testimony offered on behalf of Plaintiffs Unger, Whittington, and McAlexander – along with his unscientific "straw/camel analogy" employed in each case – is

methodologically and substantively indistinguishable from the scientifically unreliable testimony that this Court excluded in *Haller*.

This Court's reasoning and *Daubert* analysis in its *Guinn* and *Haller* opinions also readily disposes of the specific-causation testimony of the two remaining psychiatrists – Dr. Perry (whose testimony is offered by Plaintiffs Burns and Curley) and Dr. Young (whose testimony is offered by Plaintiffs Unger and Whittington). Both psychiatrists are simply not qualified to render diabetes-causation opinions, like Dr. Abramson in *Haller*. Moreover, the substance and methodology of their causation opinions is just as scientifically unreliable and inadmissible as the testimony excluded in *Guinn* and *Haller*.

Accordingly, the Court should exclude the specific-causation testimony offered in these five cases and grant summary judgment to AstraZeneca on all claims in each case.

Finally, AstraZeneca concludes by revisiting the governing Florida causation standard. As in *Haller* and *Guinn*, this issue is not critical to AstraZeneca's pending motions in these remaining five cases, because the testimony of Plaintiffs' specific-causation witnesses is insufficient to create a triable issue of material fact under either a "but for" or a "substantial contributing factor" causation standard. *Guinn* slip op. at 11; *Haller* slip op. at 65. Still, as explained below, AstraZeneca respectfully submits that, under Florida law, *both* causation tests must be satisfied by Plaintiffs in these concurring causation cases.

## II.   BACKGROUND

On November 3, 2008, AstraZeneca filed its *Daubert* and summary judgment motions in all seven of the remaining cases in "Group One" of the Florida Initial Trial Pool. AstraZeneca's first argument in each summary judgment motion was that the specific-

causation testimony of the plaintiffs' case-specific witnesses must be excluded under *Daubert* and its progeny, thereby leaving them without evidence on the requirement of medical causation essential to all of their claims. *See Haller* slip op. at 20. After conducting a *Daubert* hearing and receiving oral argument in the two lead cases within "Group One," the Court granted AstraZeneca's motions. The Court's rulings are set forth in its Orders in each case dated January 30 and February 6, 2009.

Because the core bases of this Court's Orders in *Guinn* and *Haller* apply with full force in each of the five remaining "Group One" cases now under consideration, AstraZeneca first discusses what it believes to be the critical aspects of those Orders that support the same result being reached by the Court in each of these remaining cases.

A.    **The Court's Order In *Guinn* Granting AstraZeneca Summary Judgment Upon Excluding Under *Daubert* The Specific-Causation Testimony Of Dr. Jennifer Marks**

In *Guinn*, the Court excluded the specific-causation testimony of the plaintiff's sole remaining case-specific expert, endocrinologist Dr. Jennifer Marks.[1] *See Guinn* slip op. at 12-14. Although Dr. Marks sought to testify that Seroquel was a "substantial factor" in certain additional weight gain Plaintiff Guinn experienced while on the medicine and in Ms. Guinn's ultimate development of diabetes, the Court held that the actual substance of Dr. Marks' testimony "demonstrates that she has no scientific basis" for her opinions and conclusions. *Id.* at 12. As the Court reasoned, "Dr. Marks was unable to articulate any scientific methodology for assessing whether, and to what extent, Seroquel contributed to

---

[1] Although Ms. Guinn initially had also offered the specific-causation testimony of psychiatrist Dr. Bruce Perry, her counsel abandoned Dr. Perry's testimony in the course of the *Daubert* proceedings. *See, e.g., Guinn* slip op. at 7 n.24.

Guinn's weight gain and diabetes, ultimately forcing her to draw an entirely speculative conclusion about Seroquel's role in Guinn's disease." *Id.* at 7. Dr. Marks' "speculative" testimony had to be excluded under *Daubert* because it "amounts to nothing more than inadmissible *ipse dixit*," which is insufficient as a matter of law. *Id.*

The Court specifically highlighted the following fundamental aspects of Dr. Marks' specific-causation testimony, which required its exclusion under *Daubert* and also rendered it insufficient to raise a triable issue of material fact under Florida law.

First, Dr. Marks could not testify to any reasonable degree of medical certainty or probability about any "direct effect" by which Seroquel causes diabetes in people; thus Dr. Marks based her specific-causation testimony on the alleged indirect effect of "weight gain." *Guinn* slip op. at 12 & n.28 (emphasizing that Dr. Marks admitted "that evidence that Seroquel causes diabetes through a direct effect on the body has not been demonstrated to a reasonable degree of medical certainty") (citing Marks Dep. at 125:15-126:1).

Second, Dr. Marks was not only "unable to identify any mechanism by which Seroquel causes weight gain," but also, critically, Dr. Marks "knew of no method to determine whether Guinn's significant weight gain during the time she was taking Seroquel was actually caused by Seroquel 'as opposed to being just a normal weight gain and weight-loss cycle that Ms. Guinn has experienced over a long period of her life.'" *Id.* at 12 (quoting *Daubert* Hrg. Tr. at 195). Thus, even though the lynchpin of Dr. Marks' causation opinions was the additional incremental weight gain she said the plaintiff experienced while on Seroquel, Dr. Marks was unable to testify that Seroquel *caused* any amount of that weight gain – not 1, 2, 10, all or any of the weight gain. Moreover, the Court noted that Dr. Marks

5

herself conceded that there were many other factors unrelated to Seroquel that could have fully accounted for Ms. Guinn's weight gain while she was on Seroquel, and that Dr. Marks did not and could not rule out those other factors. *Id.* at 13 & n.34.

Third, Dr. Marks conceded that Ms. Guinn had "numerous risk factors for diabetes" – including "obesity, hyperlipidemia, family history, age, sedentary lifestyle and prediabetes" – yet "Dr. Marks admitted that she made no attempt to quantify the relative contribution of these other factors to Guinn's ultimate injury because 'it is not possible or practical' to do so." *Id.* at 13 & nn. 35-37 (quoting Marks Decl. at 8). In fact, Dr. Marks failed adequately to consider and rule out other alternate possible causes, unrelated to Seroquel, as the sole cause(s) of Ms. Guinn's diabetes; to the contrary, the Court stressed that "Dr. Marks testified that Guinn's pre-existing health conditions *alone* could have caused her to develop diabetes and that it was more likely than not, to a reasonable degree of medical probability, that Guinn would have developed diabetes whether or not she ever took Seroquel." *Id.* at 14 (emphasis in original).

Fourth, the Court emphasized that, in the end and "at best," Dr. Marks "could only speculate as to whether Seroquel actually contributed to Guinn's weight gain during the time she was taking the drug" and to Ms. Guinn's ultimate alleged diabetes injury. *Id.* at 14. Yet such speculation is inadmissible under *Daubert*, and is also insufficient to create any triable issue of material fact under Florida law. *Id.* at 14; *see also Gooding v. University Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1985) ("'A mere possibility of causation is not enough …. [nor is] speculation or conjecture ….") (citation omitted); *Reynard v. NEC Corp.*,

887 F. Supp. 1500, 1505-07 (M.D. Fla. 1995) (Nimmons, J.) (summary judgment where plaintiff failed to adduce "non-speculative" expert testimony on specific medical causation).

**B.      The Court's Order In *Haller* Granting AstraZeneca Summary Judgment Upon Excluding Under *Daubert* The Specific-Causation Testimony Of Drs. Brian Tulloch And I. Jack Abramson**

The Court expanded upon its *Daubert* specific-causation reasoning in its 68-page Order in *Haller*. The Court granted AstraZeneca summary judgment in Mr. Haller's case after excluding under *Daubert* the specific-causation testimony of his two case-specific witnesses: endocrinologist Dr. Brian Tulloch and psychiatrist Dr. I. Jack Abramson. As the Court reasoned, neither witness employed any scientifically reliable methodology in support of the specific-causation opinions they sought to offer, which (as with Dr. Marks' testimony in *Guinn*) amounted to speculative and inadmissible *ipse dixit*. In addition, the Court further excluded Dr. Abramson's testimony on the ground that he was not sufficiently qualified under Federal Rule of Evidence 702. *Haller* slip op. at 45-54, 54-61.

●      ***Dr. Tulloch***: The Court's Order extensively discusses the many infirmities in Dr. Tulloch's testimony that compelled its exclusion under *Daubert*. *Id.* at 45-54. As the Court emphasized, "there are so many *Daubert* problems associated with Dr. Tulloch's opinions that it is difficult to know where to begin" – including fatal problems with Dr. Tulloch's "methodology" as well as the unreliable and speculative nature of the "substance" of his specific-causation opinions. *Id.* at 45.

In terms of the ***methodological*** defects in Dr. Tulloch's testimony, the Court highlighted the same problems that had plagued Dr. Marks' testimony and required its exclusion. Like Dr. Marks, Dr. Tulloch purported to base a diabetes-causation opinion on

certain additional incremental "weight gain" the plaintiff had allegedly experience while taking Seroquel. *Id.* at 8, 46. Dr. Tulloch, like Dr. Marks, focused on the indirect mechanism of weight gain because he too could not testify to any reasonable degree of medical certainty or probability that Seroquel has any "direct effect" in causing diabetes in people. *Id.* at 35-36; *see also id.* at 9 (Dr. Tulloch in deposition testified that he "knew of no scientific evidence to support the conclusion that Seroquel directly affected Haller's pancreas or the cells of his pancreas, i.e., that it directly caused diabetes," and "gave the same answer to the question regarding persons in general").[2] Yet, also like Dr. Marks, Dr. Tulloch failed to articulate any reliable scientific method – in fact, any methodology at all – by which he could testify that *any* of Mr. Haller's weight gain while on Seroquel was *caused* by Seroquel. *See, e.g., id.* at 46.[3] Actually, Dr. Tulloch has admitted under oath that, "as to any of the weight gains by any of the plaintiffs in the cases in which he was testifying, he could not say how much of the weight gain was due to Seroquel and how much was due to diet, lack of exercise and other factors." *Id.* at 16 (citing Tulloch Dep. at 580:23-581:3). Indeed, Dr.

---

[2] At the *Daubert* hearing, Dr. Tulloch "admitted that he knew of no scientific evidence that would allow him to conclude that Seroquel directly affects the pancreas, or the cells of the pancreas, or has any other direct effect on people." *Haller* slip op. at 35 & n. 201 (citing *Daubert* Hrg. Tr. at 64-65). Like Dr. Marks, the most Dr. Tulloch could testify was that the *theoretical possibility* of some potential direct effect by which Seroquel might cause diabetes in people has been "'hypothesized.'" *Id.* at 36 (quoting *Daubert* Hrg. Tr. at 66). That plainly does not constitute the sort of "scientific knowledge" based on what is scientifically "known" that is required of admissible expert testimony under Rule 702. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 590 (1993).

[3] Moreover, the effort by Dr. Tulloch (and Dr. Marks as well) to rely on short-term incremental additional weight gain allegedly experienced while the plaintiffs were taking Seroquel is itself scientifically suspect given that plaintiffs Guinn and Haller were indisputably *obese* for years before they ever took Seroquel. As Dr. Tulloch testified at his deposition and again at the *Daubert* hearing, additional "weight gain" in someone like Mr. Haller who was already chronically "obese" – indeed, with a Body Mass Index ("BMI") of over 37 – simply "does not increase the risk of developing diabetes" at all in people, as science has demonstrated. *Haller* slip op. at 42-43 (citing *Daubert* Hrg. Tr. at 87-88).

Tulloch did not and could not "rule out" other alternative causes of the plaintiffs' weight gain unrelated to Seroquel as the "sole cause" of the additional incremental weight gain while on Seroquel. *Id.* at 11, 46; *see also id.* at 29-30, 36-40.

Apart from these key methodological flaws in the weight-gain "lynchpin" of Dr. Tulloch's testimony, *id.* at 46, the Court in *Haller* went on to detail the numerous additional reasons why Dr. Tulloch "employed a flawed methodology." *Id.* at 7; *see also id.* at 8-49.

First, the Court highlighted Dr. Tulloch's mere cursory review of incomplete data and information about Mr. Haller, which "led to significant errors" and cast grave doubt on the scientific reliability of his specific-causation opinions. *Id.* at 47. Dr. Tulloch merely "skimmed" the excerpts of Mr. Haller's medical records provided to him by plaintiff's counsel, while relying on mere summaries and misleading charts prepared by one of counsel's nurse paralegals, *id.* at 25, 28-29, and further:

> Dr. Tulloch admitted that before rendering his opinions in the case, he did not physically examine Haller, he did not speak with him, he did not review all of the medical records he was provided regarding Haller, he did not read the depositions of any of Haller's treating physicians, and he did not read Haller's deposition. Dr. Tulloch admitted that by not [doing so]…, he might possibly miss explanations for Haller's weight gain and diabetes other than his use of Seroquel.

*Id.* at 8-9; *see also id.* at 45-48. Further still, Dr. Tulloch did not even carefully conduct any comprehensive review of the relevant science and "medical literature" on Seroquel and its possible association with weight gain or diabetes. *Id.* at 9. Nor did he do so with respect to the science showing that *obesity* is the *overwhelming cause of diabetes* – and also showing that, as Dr. Tulloch himself admits, additional incremental weight gain in long-term obese persons does *not* increase diabetes risk, *id.* at 42-43, a scientific fact with which generic

expert Dr. Wirshing agrees.[4]  Instead, Dr. Tulloch's approach was "hurried, cursory, and incomplete," leading to "significant errors."  *Id.* at 47.  Most fundamentally, Dr. Tulloch not only missed information that he himself admitted was "important," but he made significant mistakes – including most notably his miscalculation of Mr. Haller's alleged weight gain while on Seroquel based on a starting weight recorded almost two years before Haller ever ingested Seroquel.  *Id.* at 10.

Second, contrary to how Dr. Tulloch conducts his clinical practice outside the courtroom when assessing what may have caused a patient's weight gain, Dr. Tulloch never personally met with or examined Mr. Haller, never took a careful independent medical history of him, and never in any way asked Mr. Haller even the most basic questions about his diet, caloric intake, exercise regimen, the other medications he was taking, and other aspects and circumstances in the plaintiff's life – both before and when he was taking Seroquel – to carefully investigate what may have accounted for Mr. Haller's weight gain in any scientifically rigorous and valid way.  *Id.* at 29, 38; *see also id.* at 46 ("some further inquiry concerning Haller's diet, caloric intake, and any other life activities that could have explained Haller's weight gain" was required of Dr. Tulloch).[5]  This violates the overall

---

[4] At the *Daubert* hearing, Dr. Wirshing acknowledged the results of the Wannamethee study showing that additional weight gain in people who are already obese (BMI > 28) does not increase the risk of diabetes, and Dr. Wirshing testified that the result was what he would "anticipate" and that he "agreed" with its results.  Dec. 5, 2008 *Daubert* Hrg. Tr. at 98:21-101:20.

[5] As to Mr. Haller, and all of these plaintiffs, Dr. Tulloch failed to conduct any dispassionate scientific inquiry into all the potential explanations for any additional weight gain while on Seroquel, before the arrived at his causation opinions in any of these cases.  With Mr. Haller, for instance, Dr. Tulloch did not consider or investigate the potential impact of Mr. Haller's periods of incarceration on his weight, *Haller* slip op. at 40-41, nor did he carefully assess, quantify, and rule out the impact or relative contribution of Mr. Haller's numerous pre-existing diabetes risk factors and other circumstances with respect to either Mr. Haller's weight gain or his ultimate diabetes injury.  *Id.* at 47.

"objective" of the *Daubert*'s gatekeeping requirement, which demands an expert employ in the courtroom the same level of scientific rigor that characterizes the practice of an expert outside the courtroom. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *accord Haller* slip op. at 49.

Third, the Court criticized the "moving target" nature of Dr. Tulloch's opinions – which materially changed from his expert report, to his deposition, to the supplemental declaration he filed in opposition to AstraZeneca's motion practice, to the testimony he gave at the *Daubert* hearing. *Haller* slip op. at 47. For instance, on the critical weight-gain "lynchpin" of Dr. Tulloch's causation opinions for Mr. Haller, *id.* at 46, the Court highlighted the "startling progression" in the amount of weight Dr. Tulloch testified that Mr. Haller experienced while on Seroquel, going from 21 pounds in his expert report, to 25 pounds in his supplemental declaration, and then to 65 pounds at the *Daubert* hearing. *Id.* at 47. Even more significant, Dr. Tulloch unequivocally testified at his deposition that the "sole basis" for his specific-causation opinions was "temporal relationship[s]"; then, "in direct response to AstraZeneca's motion practice" setting forth preclusive Eleventh Circuit precedent, Dr. Tulloch made "drastic changes" in his opinions and their bases in his 12-page supplemental declaration filed with Plaintiffs' opposition brief, which Dr. Tulloch tried to pass off as "mere 'fine-tun[ing].'" *Id.* at 48-49.[6] As the Court emphasized, Dr. Tulloch's

---

[6] Dr. Tulloch testified at his deposition that "[a]s to all the ... plaintiffs in these cases, the only basis" for his opinions was a "temporal relationship." Deposition of Brian Tulloch, M.D. ("Tulloch Dep."), at 541:6-17. Paragraph 21 of his supplemental declaration makes clear that his changed opinions related to all plaintiffs as to whom he was testifying ("I have reached these opinions in the cases of Eileen McAlexander, Richard Unger, David Haller, and Linda Whittington ...."), and that his improper attempt to add additional bases to support his opinions related to all cases ("My methodology with regard to each opinion was the same ...."). Tulloch Decl. at ¶ 21.

changes starkly revealed that he "reached his initial conclusions prematurely and based on incomplete data, then gathered what additional information he could to shore up his initial opinions. This approach smacks of post-hoc rationalization and is devoid of the intellectual rigor that *Daubert* demands. Put bluntly, this is not how good science is done." *Id.* at 49.

Turning to the ***substantive*** defects in Dr. Tulloch's opinion, the Court rejected his specific-causation testimony as "sheer speculation" and inadmissible "*ipse dixit*" – ultimately amounting to little more than a "guess," *id.* at 46, 52, 54, as in *McDowell v. Brown*, 392 F.3d 1283, 1300-01 (11th Cir. 2004).

First, the Court pierced through Dr. Tulloch's favorite "'straw/camel' analogy" – and his oft-repeated phrase in which he called Seroquel "the straw that broke the camel's back" – as scientifically unreliable and insufficient to meet plaintiff's causation burden. *Haller* slip op. at 54. As the Court aptly noted, Dr. Tulloch clung to that phrase religiously even when plaintiff's counsel was – by Dr. Tulloch's own description – "pushing him hard" to elicit some sort of an opinion with "the magic words 'but for' and 'substantial contributing factor.'" *Id.* at 50 (adding "the Court has not seen a clearer case of an expert being maneuvered by counsel to elicit an opinion with which he is not really comfortable"). Critically, Dr. Tulloch provided no scientifically reliable basis for his "'final straw'" hypothesis – which the Court aptly rejected as merely speculative *ipse dixit. Id.* at 54. Indeed, the Court emphasized that Dr. Tulloch could not account for or rule out "a host of things besides Seroquel" that could have caused Mr. Haller's weight gain and diabetes, *id.* at 50-51, and Dr. Tulloch provided no "logical, non-speculative reasons why they were not the sole cause of Mr. Haller's diabetes." *Id.* at 53, n.263. In the end, Dr. Tulloch had nothing

but "sheer speculation" in support of any testimony "that Seroquel was a 'but for' cause of Haller's diabetes or that [it] contributed 'substantially' to the disease." *Id.* at 50.

Second, the Court noted that, despite attempting to "shore up" his causation opinion by offering five separate bases for his conclusions, the only real basis for Dr. Tulloch's specific-causation opinion is the *temporal connection* between Mr. Haller's ingestion of Seroquel and the onset of his diabetes, which is not permitted under binding Eleventh Circuit authority. *Id.* at 51-52. Of the five bases listed in Dr. Tulloch's declaration (one of which was temporality), the Court found three of the grounds completely irrelevant to the question of specific causation in Mr. Haller's case, and explained that the fourth ground – that other risk factors had not yet caused his diabetes until Seroquel was added to the mix – was really nothing more than "temporal proximity in disguise." *Id.* at 51. Moreover, the Court stressed that there was really not even "factual and logical support for Dr. Tulloch's temporal connection opinion." *Id.* at 52. In the end, the Court found that there was "too great an analytical leap between the particular facts of Haller's case and Dr. Tulloch's specific causation opinions" and, thus, his "proposed expert testimony is both unreliable and does not satisfy *Daubert*'s 'fit' requirement." *Id.* at 49-50.

- **Dr. Abramson**: The Court excluded Dr. Abramson's testimony under *Daubert* both because he is unqualified to offer any diabetes-causation opinions under Rule 702, and because of the scientifically unreliable nature of his methodology and opinions.

First, the Court held that Dr. Abramson – a psychiatrist – was unqualified to render any opinion on the complex endocrinologic issue of diabetes causation, including what specifically caused Mr. Haller's diabetes. *Id.* at 55. Among other things, Dr. Abramson "has

13

never diagnosed diabetes in a patient" and does "not treat any of his patients for diabetes," *id.* at 56; has no "specialized training in endocrinology" and admits that "he d[oes] not have expertise in diagnosing the cause of diabetes in particular individuals,'" *id.* at 57; "admits to being unqualified to discuss 'the typical progression of diabetes in a particular individual,' or 'to evaluate whether a patient's clinical course is consistent with the typical development of diabetes,'" *id.* at 56; and sends patients of his to another physician if he observes an elevated blood sugar in one his psychiatric patients. *Id.* Hence, the Court excluded Dr. Abramson's specific-causation testimony because he "simply does not possess the requisite knowledge, skill, experience, education or training to render an opinion on the cause of Haller's diabetes." *Id.* at 57.

Second, the Court held that Dr. Abramson's testimony on its merits was independently subject to *Daubert* exclusion. Indeed, Dr. Abramson's causation opinions were scientifically unreliable given "his sole reliance on the temporal association between Haller's Seroquel ingestion and his subsequent weight gain and diabetes diagnosis," which is legally impermissible under Eleventh Circuit law. *Id.* at 57 (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1243 (11th Cir. 2005)). Despite Dr. Abramson's repeated efforts to disclaim sole reliance on temporality, the Court aptly recognized that "the record demonstrates that a temporal connection was the only evidence Dr. Abramson had to go on." *Id.* at 58. Moreover, the Court rejected as "temporal proximity in disguise" Dr. Abramson's speculative reasoning that Seroquel had some sort of contributory role in Mr. Haller's diabetes because the plaintiff's "other risk factors had not yet caused diabetes until Seroquel was added to the mix." *Id.* at 61. Finally, the Court highlighted that Dr. Abramson could not

14

rule out Mr. Haller's numerous other pre-existing risk factors as causing his diabetes without

Seroquel playing any role, and noted Dr. Abramson's testimony that "there isn't any way to

tell ... whether a risk factor was an actual cause of any particular person's diabetes." *Id.* at

60 (citing Abramson Dep. at 334:23-335:2). Moreover, Dr. Abramson conceded that he

could not say that Mr. Haller would not have gotten diabetes had he never taken Seroquel.

*Id.* at 60. In the end, the Court held that Dr. Abramson's testimony did not meet the standard

of reliability under *Daubert*, and must be excluded. *Id.* at 60-61.

## III.    ARGUMENT

### A.    The Same Fundamental Reasons Underlying This Court's Summary Judgment And *Daubert* Rulings In The First Two Cases Compel The Conclusion That Summary Judgment For AstraZeneca Should Be Granted In All Five Remaining Florida "Group One" Cases

As this Court has already correctly held, the specific-causation testimony of

Drs. Marks and Tulloch suffers from grave methodological infirmities that infect their

opinions and render their testimony merely "speculative" and "inadmissible *ipse dixit*."

*Guinn* slip op. at 7; *see also Haller* slip op. at 54. The remaining cases are no different,

where the same experts are offered to testify using the same methodology – or lack thereof.

Because the specific-causation testimony of Drs. Marks and Tulloch is neither premised on

any scientifically valid "reasoning and methodology" nor the product of any dispassionate

application of the "scientific method," *Daubert*, 509 U.S. at 590, 592, the fatal deficiencies in

their testimony are consistent throughout the Group One cases. Likewise, the diabetes-

causation testimony of the three psychiatrists offered in these five remaining "Group One"

cases – Drs. Abramson, Perry, and Young – must be excluded under *Daubert* for the reasons

this Court excluded Drs. Abramson's testimony in *Haller*: (1) they are unqualified to offer

diabetes-causation opinions under Rule 702; and (2) in any event, the specific-causation testimony they propose to offer is scientifically unreliable.

In what follows, AstraZeneca first discusses aspects of the testimony of all five of the specific-causation witnesses at issue, to illustrate further how the fundamental *Daubert* problems in their testimony are not limited to the facts of the *Guinn* and *Haller* cases and compel the exclusion of their specific-causation testimony in these remaining Group One cases as well. AstraZeneca then details, on a plaintiff-by-plaintiff basis, why it should be entitled to summary judgment in each of these five remaining cases, as in *Guinn* and *Haller*.

      1.      **The Specific-Causation Testimony Of Plaintiffs' Case-Specific Experts Suffers All Of The Same Fundamental Infirmities As In *Guinn* And *Haller***

          a.      **The Endocrinologists:  Drs. Jennifer Marks and Brian Tulloch**

In the five remaining "Group One" cases, Plaintiffs offer testimony from the very same endocrinologists – Drs. Marks and Tulloch – whose opinions the Court excluded as scientifically unreliable in *Guinn* and *Haller*.  The testimony of those two experts is similarly deficient in the remaining Group One cases because it is methodologically unsound and fails to satisfy *Daubert*'s reliability and relevance requirements.

The Court has already excluded Dr. Marks' testimony in the *Guinn* case for several reasons, which apply equally to her testimony offered on behalf of Plaintiffs Burns and Curley.  In both cases, as in *Guinn*, Dr. Marks:  (1) bases her specific-causation opinions on the indirect mechanism of "weight gain" while on Seroquel, and cannot testify to any reasonable degree of medical certainty or probability about any "direct effect" of Seroquel in causing diabetes in people; (2) can identify *no methodology* to determine whether any weight

gain Plaintiffs may have experienced while on Seroquel was actually caused by Seroquel,

and cannot testify that Seroquel actually caused any of the weight gain these Plaintiffs may

have experienced while on the medicine; (3) made no attempt to quantify the relative

contribution of each Plaintiff's many diabetes risk factors, stating that "it is not possible or

practical" to do so, and she again failed to consider and rule out those other risk factors as the

sole causes of each Plaintiff's alleged diabetes; and (4) is ultimately left with nothing but

*speculation* to support her causation opinions in each Plaintiff's case.

Indeed, the record reveals that in each of the cases in which she has offered specific-

causation opinions, Dr. Marks:

- admitted that she "know[s] of no method to prove that Seroquel caused … weight gain" in any of these Plaintiffs;[7]

- was unable to rule out other causes as the sole cause of Plaintiffs' weight gain while on Seroquel, because Dr. Marks "wouldn't know how to do that";[8]

- was unable to testify that Plaintiffs would not have gotten diabetes absent Seroquel because she knew of no methodology by which to do so;[9]

- admitted that Plaintiffs had "numerous risk factors for diabetes" yet made no attempt to quantify the relative contribution of those pre-existing risk factors because "it is not possible or practical to do so" in any case;[10] and

- actually testified that Plaintiffs' pre-existing risk factors *alone* could have caused them to develop diabetes.[11]

While the foregoing is dispositive, Dr. Marks' testimony for Plaintiffs Burns and

Curley additionally suffers from many of the problems that the Court found fatal to

Dr. Tulloch's specific-causation testimony in *Haller*.  For instance, Dr. Marks relies merely

---

[7] *Daubert* Hrg. Tr. at 195:5-12.

[8] Deposition of Jennifer Marks, M.D. ("Marks Dep."), at 294:18-25.

[9] *Id.* at 62:15-23.

[10] Marks Decl. at ¶ 14.

[11] Marks Dep. at 216:2-6 (Burns); 269:2-5 (Guinn); 411:20-23 & 430:12-15 (Curley).

on the temporal connection between the Plaintiffs' ingestion of Seroquel and their diabetes

diagnoses,[12] which is legally impermissible. *See McClain*, 401 F.3d at 1243. Dr. Marks (like

Dr. Tulloch) admitted that when trying to determine what may have caused any of her

patients' weight gain in her clinical practice, she would personally meet with and examine

the patient, take an independent medical history, and carefully ask a wide variety of questions

to investigate what might have been the cause or causes[13] – but it is undisputed that

Dr. Marks never did any of these things with any of these Plaintiffs because she "didn't think

that was what [her] job description was."[14]   Like Dr. Tulloch, Dr. Marks formed her

opinions based on incomplete reviews of plaintiffs' medical records.[15]   Also like Dr. Tulloch,

Dr. Marks filed a supplemental declaration in direct response to AstraZeneca's motion

practice in which she revised and altered her testimony.  For example, Dr. Marks testified at

her deposition that she would not offer testimony that Plaintiff Burns would not have

developed diabetes between 2003 and 2006 had she not taken Seroquel,[16] but then in fact

stated in her sworn declaration "that but for her ingestion of Seroquel, Ms. Burns would not

have developed a clear diagnosis of diabetes when she did in August 2003."[17]   For all of

these reasons, Dr. Marks' specific-causation testimony in the remaining cases is

---

[12] *See id.* at 99:22-100:12; *id.* at 414:1-21.

[13] *Daubert* Hrg. Tr. at 149:2-8, 189:1-190:4.

[14] Marks Dep. at 400:15-401:9.

[15] *See Daubert* Hrg. Tr. at 153:24-154:12; *see also, e.g.*, Marks Dep. at 453:9-12 and 458:6-16 (admitting failure to obtain information on Plaintiff Curley's weight gain pattern prior to Seroquel to usage).

[16] *See* Marks Dep. at 61:7-10.

[17] Marks Decl. at ¶ 11.

methodologically unsound and scientifically unreliable, mandating its exclusion under *Daubert*.

Dr. Tulloch employed the same demonstrably unsound reasoning and scientifically unreliable methodology in each of the remaining Group One cases that he used to support his excluded causation opinion in *Haller*. Indeed, Dr. Tulloch's deposition testimony and supplemental declaration make plain that his opinions for of all of the Group One Plaintiffs are based on the same "methodology"[18] and ultimately are just as speculative and unscientific as they were in Mr. Haller's case. In each of these cases, as in *Haller*, Dr. Tulloch:

- testified that the "only basis" for his opinions "[a]s to all the ... plaintiffs in these cases" was "temporal relationship",[19] and then identically tried to alter and shore up his opinions in direct response to AstraZeneca's motion practice in precisely the manner the Court criticized and rejected in *Haller*;[20]

- relied extensively for all Plaintiffs on "his oft-used 'straw/camel' analogy" (*Haller* slip op. at 25), in which he claimed Seroquel was the "straw that broke the camel's back" in causing or contributing to each Plaintiff's alleged diabetes injury, which the Court addressed and rejected in *Haller*;[21]

- never personally met with or examined any of the Plaintiffs, never took their medical histories, and never asked about the diet, exercise and many other aspects of their lives that may have accounted for their weight gain while on Seroquel;[22]

- relied on the same incomplete set of data spoonfed to him by Plaintiffs' counsel, as well as medical summaries and misleading charts prepared by Plaintiff counsel's

---

[18] *See, e.g.,* Tulloch Decl. at ¶ 21 ("My methodology with regard to each opinion was the same").

[19] Tulloch Dep. at 541:6-17; *see also id.* at 542:4-19.

[20] *See* Tulloch Decl. at ¶¶ 10-21.

[21] Indeed, his "'straw/camel' analogy" is apparently so critical to his opinion in all of these cases that Dr. Tulloch used the word "straw" 28 times and the word "camel" 33 times at his deposition to avoid saying that Seroquel actually caused or contributed to any of the Plaintiffs' weight gain or alleged diabetes injuries.

[22] *See* AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses and Supporting Memorandum of Law, *In re: Seroquel Prods. Liab. Litig.*, 6:06-md-1769 (M.D. Fla. Nov. 3, 2008) ("Specific Cause Brief"), at 31-32.

paralegal nurse Glenda Granger – which produced significant errors and led Dr. Tulloch to make material mistakes and to miss important information and data;[23]

- admitted that he could not testify that Plaintiffs would not have gotten diabetes if they had never taken Seroquel and, in fact, testified that "all of the plaintiffs" *would have* gotten diabetes due to their other risk factors even if they never had taken Seroquel;[24]

- was unable to rule out other causes as the sole cause of the Plaintiffs' diabetes, and admitted that each Plaintiffs' many other diabetes risk factors – including (like Plaintiff Haller) each Plaintiff's pre-existing obesity – could not be ruled out as sufficient to account for why each Plaintiff may have been diagnosed with diabetes when they allegedly were;[25]

- did not rule out other causes as the sole cause of the plaintiffs' weight gain "because [he] did not feel that [he] needed to or had to,"[26] and did not quantify how much weight was allegedly due to Seroquel and how much was due to other factors;[27] and

- admitted that other factors may have entirely accounted for any weight gain the Plaintiffs experienced while on Seroquel.[28]

Moreover, in each of these cases, Dr. Tulloch offered the same sort of revised and materially changed testimony in the *identical* 12-page declaration that the Court addressed, criticized and rejected under *Daubert. See Haller* slip op. at 24, 48-54.  As the Court is aware, Dr. Tulloch in his declaration tried effectively to disavow his prior sworn and unequivocal testimony, and purported to base his revised causation opinions in each case on the same additional bases that this Court addressed one by one and rejected in its *Haller* opinion. *See id.* at 48-54.  That same effort with the identical insufficient bases and explanations is exactly as deficient and scientifically unreliable here as the Court held it was in *Haller.*  In sum, Dr. Tulloch's specific-causation testimony in all five of these remaining

---

[23] *See id.*
[24] Tulloch Dep. at 541:18-23.
[25] *Id.* at 343:1-12; *see also* Specific Cause Brief at 28-30.
[26] Tulloch Dep. at 548:13-17.
[27] *Id.* at 133:21-24, 267:6-17, 342:21-25, 580:23-581:3; *see also* Specific Cause Brief at 29-30.
[28] Tulloch Dep. at 580:23-581:3.

Group One cases is methodologically infirm and also substantively speculative and unreliable – and must be excluded in these cases under *Daubert* just as it was in *Haller*.

### b.   The Psychiatrists:  Drs. I. Jack Abramson, Bruce Perry, and Mitchell A. Young

These five Plaintiffs also proffer three psychiatrists – Drs. Abramson, Perry, and Young – to testify about what caused Plaintiffs' alleged diabetes and diabetes-related injuries.  But just as Dr. Abramson was unqualified to testify as to the cause of Mr. Haller's alleged diabetes injuries, these psychiatrists do not have the requisite qualifications to give specific causation testimony in these cases.  The Court has already ruled that Dr. Abramson's "education, training, and experience simply do not render him qualified to express a diabetes causation opinion." *Haller* slip op. at 55.  The education, training, and experience of Drs. Perry and Young is similarly deficient.  Like Dr. Abramson, Drs. Perry and Young do not have any specific education or experience in endocrinology; they have never, or only rarely, diagnosed diabetes; they have not treated diabetes; they have written no scientific publications on diabetes or its causes; and they have never before offered opinions on what caused anyone's diabetes.[29]  Like Dr. Abramson, Dr. Young admitted that he is not an expert in diabetes causation,[30] and Dr. Perry's *ipse dixit* claim to be an expert only because he has a medical degree is insufficient, especially in light of his admitted lack of experience in

---

[29] *See, e.g.*, Deposition of Bruce Perry, M.D. ("Perry Dep."), at 77:7-17 (never diagnosed diabetes); *id.* at 283:8-16 (does not regularly prescribe medicines for diabetes, manage diabetes for patients, or monitor patients for diabetes); Deposition of Mitchell Young, M.D. ("Young Dep."), at 22:20-25 (never researched or wrote any articles on diabetes prior to these proceedings); *id.* at 23:13-21 (has rarely diagnosed diabetes, and never formally rendered a diagnosis himself); *id.* at 23:22-25 (never treated a diabetic patient); *id.* at 29:19-20 (not board certified in endocrinology).

[30] Young Dep. at 24:18-20.

diabetes issues.[31]  Thus, just as Dr. Abramson was unqualified to testify as to the cause of

Mr. Haller's diabetes, none of these psychiatrists possesses the requisite education, training,

or experience to render diabetes causation opinions in any of the remaining Group One cases.

Apart from being unqualified to render specific causation opinions in these cases, all

three psychiatrists offer testimony that suffers from the same methodological infirmities as

Dr. Abramson's testimony in *Haller*:

- Each of these putative experts impermissibly relies merely on temporal associations to reach causation opinions.[32]

- Each of the psychiatrists fails to consider and rule out Plaintiffs' other pre-existing risk factors as the sole cause of their diabetes.[33]

- None of these three psychiatrists can testify that Seroquel was the "but for" cause of Plaintiffs' diabetes,[34] and all three putative experts testified that, in all likelihood, Plaintiffs would have gotten diabetes whether or not they had taken Seroquel.[35]

---

[31] Perry Dep. at 33:21-34:4; *see also Haller* slip op. at 54-55; *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001) ("[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue.").

[32] Deposition of I. Jack Abramson, M.D. ("Abramson Dep."), at 280:7-14 (testifying there was a temporal relationship between Ms. McAlexander's ingestion of Seroquel and her weight gain); Perry Dep. at 19:10-23 ("I thought there was a solid temporal relationship between the starting of the Seroquel and the changes in weights."); *id.* at 125:9-19 ("[I]f you have all the risk factors present and then there is the addition of another risk factor and there's a temporal association then increasing weight and onset of diabetes, I think it's fair to say that that additional risk factor played a causative role."); Young Dep. at 100:9-101:12 ("[T]here is a temporal association between diagnosis and receipt of medication and, therefore, I'm able to render that opinion [that Seroquel is causing Ms. Whittington's diabetes]."); *id.* at 80:19-21 ("On a temporal basis, Seroquel caused [Mr. Unger's] diabetes.").

[33] Perry Dep. at 55:20-56:15 and 151:22-152:5 (acknowledging the importance of considering other causes of diabetes but admitting he did not undertake a differential evaluation of plaintiffs' many pre-existing risk factors); *id.* at 114:2-6, 151:22-152:25, and 258:4-10 (cannot rule out chronic obesity as cause of diabetes in Burns and Curley); Abramson Dep. at 289:12-15 (cannot rule out risk factors as sole cause of McAlexander's diabetes); Young Dep. at 75:20-78:24 (Unger); *id.* at 217:10-10 (Whittington).

[34] Abramson Dep. at 287:25-288:25 (McAlexander); Perry Dep. at 114:2-21 (Curley); *id.* at 353:4-11 (Burns); Young Dep. at 108:3-5 (Unger); *id.* at 216:8-11 (Whittington).

[35] Abramson Dep. at 287:21-24 (McAlexander); Perry Dep. at 336:17-337:5 (Guinn); *id.* at 353:4-11 (Burns and Curley); Young Dep. at 108:3-5 (Unger); *id.* at 216:8-11 (Whittington).

Because the same failings that required the exclusion of Dr. Abramson's testimony in *Haller* plague the opinions of these psychiatrists, their testimony must also be excluded as scientifically unreliable in each of the remaining Group One cases.

    2.     **AstraZeneca Is Entitled To Summary Judgment In Each Of The Five Remaining "Group One" Florida Trial Pool Cases**

    a.     **Plaintiff Janice Burns**

The testimony of Plaintiff Janice Burns' specific-causation witnesses should be excluded for the same reasons as in *Guinn* and *Haller*, and for further reasons still. Ms. Burns – like plaintiffs Guinn and Haller – had many pre-existing diabetes risk factors before she ever began taking Seroquel in 2002. As her primary care physician testified, Ms. Burns was "morbidly obese" by 1998, weighing over 211 lbs. with a BMI of "32 or 33."[36] Her last recorded weight before starting Seroquel in 2002 was 197 lbs, and it is undisputed that Ms. Burns' weight fluctuated up and down before, during, and after she took Seroquel. Ms. Burns' medical records reveal a long list of pre-existing diabetes risk factors unrelated to Seroquel – including (1) a history of chronic weight problems, including her pre-existing obesity; (2) more than 20 years of elevated glucose readings and hyperglycemia; (3) "central adiposity" (*i.e.*, an "apple shaped" figure); (4) high cholesterol, high triglycerides, hypertension, and high blood pressure; (5) sedentary lifestyle; (6) hemochromatosis; (7) metabolic syndrome; (8) hypothyroidism; (9) low birth weight; and (10) chronic fatigue

---

[36] AstraZeneca's Motion for Summary Judgment, *Burns v. AstraZeneca*, 6:07-cv-15959 (M.D. Fla. Nov. 3, 2008) ("Burns MSJ") at 3 (citing deposition testimony of Ms. Burns' physician, Dr. Rezeq Bataineh).

syndrome.[37]  Ms. Burns' medical history includes repeated use of medications known to increase blood sugar, such as the steroid Prednisone.[38]

Notably, Ms. Burns – a practicing registered nurse for more than 20 years -- herself repeatedly told her healthcare providers that she *already had diabetes in 2000*, which is two years before she started taking Seroquel.[39]  In addition, the primary care physician that diagnosed Ms. Burns with diabetes in 2003, testified that her diabetes was "brought on by the use of steroids."[40]

In her effort to establish specific medical causation, Plaintiff Burns offers the testimony of endocrinologist Dr. Marks and psychiatrist Dr. Perry -- neither of which can survive this Court's *Daubert* gatekeeping scrutiny.

**Dr. Marks**:  Like her testimony excluded in the *Guinn* case, Dr. Marks proposes to testify that Ms. Burns' ingestion of Seroquel was a "cause" of plaintiff's diabetes because it "likely accelerated the onset of diabetes in such a predisposed individual."[41]  However, Dr. Marks' testimony offered on Ms. Burns' behalf suffers all the same problems that led to exclusion of her substantially identical testimony in *Guinn*:

- Dr. Marks bases her specific-causation opinions on the indirect mechanism of "weight gain" while on Seroquel (again, she cannot testify to any reasonable degree

---

[37] *See* Burns MSJ at 3-5.
[38] Perry Dep. at 200:21-205:10 (listing Zoloft, Sinquan, Wellbutrin, and Lithium among the other medications taken by Ms. Burns).
[39] *See* Burns MSJ at 3-4 (noting Ms. Burns' statements that she had diabetes in 2000, made to both her sole Seroquel prescriber Dr. John Billingsley and her current primary care physician Dr. Laura Yauch).
[40] Burns MSJ at 7 (noting deposition testimony of Ms. Burns' primary care physician Dr. Thomas Randles).
[41] Expert Report of Jennifer B. Marks, M.D. for Janice Burns at 6.

of medical certainty or probability about any "direct effect" of Seroquel in causing diabetes in people).

- But Dr. Marks can identify *no methodology* to determine whether any weight gain Ms. Burns may have experience while on Seroquel was actually caused by Seroquel, as opposed to other factors or simply the normal weight gain/loss cycle Ms. Burns experienced before, during, and after the time she took Seroquel. In fact, Dr. Marks cannot testify that Seroquel caused Ms. Burns to gain any weight, nor can she rule out other factors as the sole cause of any weight gain Ms. Burns may have experienced while on Seroquel.

- While conceding that Ms. Burns had many pre-existing diabetes risk factors, Dr. Marks again made no attempt to quantify the relative contribution of those other factors; as in *Guinn*, she again states that "it is not possible or practical" to do so. And Dr. Marks again failed to consider and rule out those other risk factors as causing Ms. Burns' diabetes without Seroquel playing any role at all.

- Thus, as in *Guinn*, Dr. Marks is ultimately left with nothing but speculation to support her causation opinions in Ms. Burns' case.

If anything, Dr. Mark's testimony with regard to Plaintiff Burns is even more speculative and unscientific than her excluded testimony in *Guinn*:

- Dr. Marks testified at her deposition that she could not testify that Seroquel "more likely than not" contributed to Burns' diabetes, but only that it was "possible" based on a temporal association.

- Dr. Marks testified at her deposition that she would not testify that Plaintiff Burns would not have developed diabetes when she did had she not taken Seroquel.

- Like Dr. Tulloch in the *Haller* case, Dr. Marks attempted to shore up her insufficient opinion by filing a declaration that materially altered and even contradicted her sworn deposition testimony, which (as the Court recognized in *Haller*) itself calls into question the scientific reliability of the testimony.

Dr. Marks's case-specific testimony in Ms. Burns' case simply confirms that it must be excluded under *Daubert* and this Court's reasoning in *Guinn* and *Haller*. As Dr. Marks testified, Ms. Burns' many pre-existing diabetes "risk factors . . . would be more than

sufficient to explain her developing diabetes without her ever taking Seroquel,"[42] and Ms. Burns' "chronic obesity alone could explain her getting diabetes."[43]  Dr. Marks again bases her causation opinions on the temporal relationship between certain weight gain Ms. Burns experienced while on Seroquel, even though she conceded that she knows of no methodology to determine whether *any* of that weight gain was actually caused by Seroquel.[44]  Dr. Marks further admitted that she did not try to determine the relative contribution of Ms. Burns' many diabetes risk factors, as compared to this Plaintiff's weight gain while on Seroquel, in her alleged diabetes injury:

> Q:    Have you attempted to look at all the risk factors that you believe Mrs. Burns has for diabetes and say quantify the relative contribution of whatever weight gain it is you think she had during the time when she happened to be taking Seroquel?
>
> A:    No, I don't think you could really do that.
>
> Q:    You can't say what percentage role it played?
>
> A:    No.[45]

And Dr. Marks again failed to consider and rule out those other risk factors as causing Ms. Burns' diabetes without Seroquel playing any role at all.  In fact, she cannot say with any degree of medical certainty that Ms. Burns would not have developed diabetes even if she had never taken Seroquel:

> Q:    Are you going to testify that Mrs. Burns would not have developed diabetes in her life had she not taken Seroquel?

---

[42] Marks Dep. at 216:2-6; *see also id.* at 158:16-23 (testifying that she cannot "quantify the relative contribution" of Ms. Burns' various risk factors for diabetes).

[43] *Id.* at 160:6-15.

[44] *Id.* at 126:24-127:6.

[45] *Id.* at 158:16-23.

| A: | No. |
|---|---|
| Q: | Are you going to testify that she would not have developed diabetes between 2003 and June of 2006 had she not taken Seroquel? |
| A: | No. |
| Q: | Do you have an opinion that you can state with a reasonable degree of medical certainty when Ms. Burns would have developed diabetes in the absence of ever ingesting Seroquel? |
| A: | No.[46] |

Worse still, Dr. Marks could not even say "one way or another," much less with any certainty, when Ms. Burns developed diabetes – whether it was before or after she ever took Seroquel.[47] Nor could she articulate any *methodology* for determining when Ms. Burns might have developed diabetes:

| Q: | Is there any methodology that you have employed to say that would allow you to conclude that the onset of her diabetes came during the time period where she was on Seroquel as opposed to before she started Seroquel? |
|---|---|
| A: | Is there any what? |
| Q: | Methodology that you can explain to me that would allow you to form a conclusion that Mrs. Burns developed diabetes while she was on Seroquel as opposed to before she started on Seroquel? |
| A: | If I understand your question, correct, no, there is no methodology that I can give you.[48] |

In light of this testimony, it is hardly surprising that Dr. Marks was unable to testify that Seroquel "more likely than not" contributed to Ms. Burns' diabetes, and rather could only suggest that it was "possible" based on a temporal association:

---

[46] *Id.* at 61:3-15.

[47] *Id.* at 195:4-14.

[48] *Id.* at 103:10-24.

Q:    I am asking you whether you are going to say it is more probable than not that Seroquel was a cause of her getting diabetes, was a direct contributor to her getting diabetes?

A:    I think it's possible, because I can't say when she developed diabetes.

Q:    And that is based upon the temporal association between when she used Seroquel and when she got the diagnosis of diabetes?

A:    Yes.[49]

Moreover, like Dr. Tulloch in the *Haller* case, Dr. Marks' opinion was a "veritable moving target." Although she testified at her deposition that she could not testify that Plaintiff Burns would not have developed diabetes when she did had she not taken Seroquel, Dr. Marks attempted to shore up her insufficient opinion by filing a declaration that altered and even contradicted that sworn deposition testimony. But given her sworn admission that she has no idea when Ms. Burns even got diabetes, Dr. Marks cannot, by a supplemental declaration, salvage her unscientific and speculative opinion that Seroquel nevertheless somehow caused her diabetes.

In sum, Dr. Marks' opinions in the *Burns* case must be excluded for the very same reasons her opinions were excluded in the *Guinn* case. Dr. Marks applied no scientifically valid methodology in reaching her purely speculative conclusions, and her opinions are therefore unreliable and insufficient to satisfy Plaintiff Burns' burden under either *Daubert* or Florida law.

**Dr. Perry:** Plaintiff Burns has also offered Dr. Bruce Perry, a psychiatrist, to testify that Seroquel was "a causative factor" of Ms. Burns' diabetes. As explained above and in the Court's *Haller* Order, Dr. Perry – a psychiatrist with no formal education, experience, or

---

[49] *Id.* at 99:22-100:12.

training in endocrinology – is not qualified to give a specific causation opinion in Ms. Burns'

case. *See* pp. 21-22, *supra*; *Haller* slip op. at 54-61 (excluding causation opinion of

psychiatrist Dr. I. Jack Abramson). The substance of Dr. Perry's opinion is also insufficient

to survive *Daubert* scrutiny. Like Dr. Marks, Dr. Perry relies on the indirect mechanism of

weight gain to support his diabetes causation opinion in Plaintiff Burns' case but admitted

there is no way of ruling out other potential causes of her weight gain.[50]  Moreover, he

conceded in his deposition that he cannot testify that Seroquel more likely than not caused

Ms. Burns' diabetes and, on the contrary, testified it was "likely" she would have gotten

diabetes whether or not she took Seroquel.[51]  Further, like Dr. Marks, Dr. Perry cannot say

with certainty that Ms. Burns did not already have diabetes before she first took Seroquel.[52]

Finally, Dr. Perry's causation opinion for Plaintiff Burns is based solely and explicitly on a

"temporal relationship,"[53] which this Court has properly determined is inadequate under

*Daubert. Haller* slip op. at 57-61. In short, Dr. Perry's opinions in Plaintiff Burns' case are

inadmissible.

     **b.**    **Plaintiff Connie Curley**

Like Plaintiffs Burns, Guinn, and Haller, Plaintiff Curley was obese before she ever

took Seroquel. After a car accident in 1998, she gained over 40% of her body weight in just

a few years, and her weight has fluctuated "all over the place" before, during, and after

---

[50] Perry Dep. at 231:18-21.

[51] *Id.* at 352:19-353:11.

[52] *Id.* at 249:7-15.

[53] *See* Expert Report of Bruce D. Perry, M.D. for Janice Burns at 3; Burns MSJ at 9.

ingesting Seroquel.[54]  She also had numerous pre-existing diabetes risk factors, including (1)
pre-existing weight problems and obesity; (2) family history of diabetes; (3) a sedentary
lifestyle and lack of exercise; (4) high blood pressure and hypertension; and (5) a decades-
long history of heavy smoking.[55]  Plaintiff's treating physicians testified that "the most likely
causes" of Ms. Curley's diabetes are "her weight and her age and her family history,"[56] or her
pre-existing "genetic" predisposition for diabetes.[57]  In fact, Ms. Curley's mother was also
"obese" and "died from diabetes."[58]  Further, Ms. Curley took Seroquel only at very low
doses, between 25-100 mg, from January 2003 until July 2005.

     In her effort to establish specific medical causation, Plaintiff Curley offers the
testimony of endocrinologist Dr. Marks and psychiatrist Dr. Perry – neither of which can
survive this Court's *Daubert* gatekeeping scrutiny.

     ***Dr. Marks***:  Dr. Marks' testimony offered in Ms. Curley's case suffers from all the
same fundamental flaws as in the *Guinn* and *Burns* cases (*see* pp. 4-7, 16-18, 24-28, *supra*) –
and more still.

     Perhaps the most glaring inadequacy in Dr. Marks' specific causation opinion for
Plaintiff Curley is her inability – despite her reliance on the indirect mechanism of weight
gain to support causation – to say that Seroquel actually caused Ms. Curley to gain *any
weight at all* or otherwise cause her *any harm* whatsoever:

---

[54] Perry Dep. at 141:25-142:23.

[55] *See* AstraZeneca's Motion for Summary Judgment, *Curley v. AstraZeneca*, 6:07-cv-15701 (M.D.
Fla. Nov. 3, 2008) ("Curley MSJ") at 7-8.

[56] Curley MSJ at 7 (discussing testimony of Drs. Emma Ocampo and Teeresa Sisodia).

[57] *See* Curley MSJ at 7.

[58] *Id*. at 7-8.

Q:    And you can't say that the medication caused her to gain weight?

A:    No.

Q:    And you can't say therefore that the medication worsened her insulin resistance?

A:    Correct.

Q:    And you can't say that it was more likely than not that it accelerated the onset of her diabetes.

A:    Correct.

Q:    You can't say that it was more likely than not that Seroquel caused any harm to Ms. Curley?

A:    I can't say that for sure.

...

Q:    And I want to make sure I heard, you can't say that Seroquel more likely than not caused any harm to Ms. Curley; isn't that correct?

A:    No, I can't really.[59]

Indeed, when confronted with Ms. Curley's numerous pre-existing factors for weight gain and diabetes, Dr. Marks testified that she could not "rule in" that Seroquel causes any amount of weight gain in a particular individual and could not "attribute any particular number of pounds while on Seroquel to Seroquel."[60]

Moreover, as with Plaintiffs Guinn and Burns, Dr. Marks conceded that given Ms. Curley's various pre-existing diabetes risk factors she could not testify that Ms. Curley would not have developed diabetes had she not taken Seroquel.[61]  Dr. Marks opined that Seroquel

---

[59] Marks Dep. at 564:22-565:23.

[60] *Id.* at 468:24-470:1.

[61] *Id.* at 411:20-23.

may have accelerated Ms. Curley's onset of diabetes, but expressly stated that her opinion

was not based on any scientific methodology and was instead simply "just an opinion":

> Q:    Are you going to testify that it was more likely than not that she would
>        not have developed diabetes within the time period that you believe
>        she did had she not taken Seroquel?
>
> A:    Yes.
>
> Q:    And what is your methodology for reaching that conclusion?
>
> A:    Judgment.
>
> Q:    Is there any matrix you use, any published formula, any literature,
>        anywhere that you can point me to say that it was more likely than not
>        that she would not have developed diabetes within the time period that
>        you believe she did had she not taken Seroquel?
>
> A:    No, it's just an opinion.[62]

Indeed, Dr. Marks conceded that the only basis of her opinions in Ms. Curley's case

was the "temporal connection" between Ms. Curley's ingestion of Seroquel and diabetes

diagnosis:

> Q:    Is your opinion that she developed diabetes when she did based upon
>        the temporal connection between her use of Seroquel and her receiving
>        the diagnosis of diabetes?
>
> A:    In part, yes.
>
> Q:    Is it based upon a temporal connection between your belief that she
>        gained weight and then was given a diagnosis of diabetes while taking
>        Seroquel?
>
> A:    Yes.
>
> Q:    And is that the primary basis for your opinion that there was a
>        temporal connection between her use of Seroquel and her receiving a
>        diagnosis of diabetes?

---

[62] *Id.* at 412:3-16.

A:    Yes.

Q:    And is there any methodology other than that for forming your opinion that you can describe to me?

A:    No.[63]

Because she cannot articulate any methodology underlying her opinion that Seroquel somehow caused weight gain in Ms. Curley or otherwise accelerated her onset of diabetes, and *cannot even say that Seroquel caused the alleged weight gain or any other harm*, Dr. Marks' specific causation opinion in the *Curley* case must be excluded as insufficient to satisfy Plaintiff Curley's burden under either *Daubert* or Florida law.

*Dr. Perry*: Like Plaintiff Burns, Ms. Curley has also offered Dr. Perry, a psychiatrist, to testify that Seroquel was "a causative factor" of Ms. Burns' diabetes. For the same reasons articulated above and in the Court's *Haller* Order, Dr. Perry is not qualified to give a specific causation opinion in Ms. Curley's case. *See* pp. 21-22, *supra*; *Haller* slip op. at 54-61 (excluding causation opinion of psychiatrist Dr. Abramson). Nor does the substance of Dr. Perry's opinion survive the Court's *Daubert* gatekeeping scrutiny. As in the cases of Plaintiffs Burns and Guinn, Dr. Perry relies on the indirect mechanism of weight gain as the basis for his specific causation opinion in Ms. Curley's case[64] but admits there is no way of ruling out other potential causes of her weight gain, particularly since her weight fluctuations were "all over the place."[65] Nor did he even attempt to quantify the relative contribution of Ms. Curley's other risk factors to her weight gain or diabetes.[66] Moreover, he conceded at

---

[63] *Id.* at 414:1-21.

[64] Perry Dep. at 231:18-21.

[65] *Id.* at 146:23-147:11.

[66] *Id.* at 152:12-16.

deposition that he cannot testify that Ms. Curley would not have gotten diabetes if she never took Seroquel.[67] Finally, as in the cases of Plaintiffs Burns and Guinn, Dr. Perry's specific-causation opinion for Plaintiff Curley is based solely and explicitly on a "temporal relationship" between her ingestion of Seroquel and weight gain,[68] even while conceding that her weight fluctuated wildly both before and after her ingestion of Seroquel and in fact followed no temporal pattern at all.  In short, Dr. Perry's testimony in Ms. Curley's case is not grounded in scientifically reliable methodology and reasoning, and must be excluded under *Daubert*.

### c.   **Plaintiff Eileen McAlexander**

Like Plaintiffs Guinn and Haller, Plaintiff McAlexander has been obese for most of her adult life:  at 5'7" tall, she weighed nearly 260 lbs. before she began taking Seroquel in August 2001.[69]  Indeed, Ms. McAlexander's expert witness Dr. Tulloch conceded that Ms. McAlexander was "morbidly obese"[70] before ever taking Seroquel, with a BMI over 40 that indisputably put her at a massive increased risk of developing diabetes as compared to a non-obese individual.[71]  Moreover, Ms. McAlexander's weight has fluctuated before, during, and after her Seroquel use.[72]  In addition to the overwhelming diabetes risk from her morbid obesity, Ms. McAlexander had numerous other diabetes risk factors, including: (1) family history of diabetes; (2) sedentary lifestyle; (3) a long history of elevated blood-glucose

---

[67] *Id.* at 154:6-9.
[68] *See* Expert Report of Bruce D. Perry, M.D. for Connie Curley at 3; Curley MSJ at 11-12.
[69] AstraZeneca's Motion for Summary Judgment, *McAlexander v. AstraZeneca*, 6:07-cv-10360 (M.D. Fla. Nov. 3, 2008) ("McAlexander MSJ") at 3-4.
[70] Tulloch Dep. at 433:4-13.
[71] Tulloch Dep. at 437:20-438:5; *see also* McAlexander MSJ at 3.
[72] *See* McAlexander MSJ at 6-7.

levels; and (4) use of many other drugs reportedly associated with weight gain and glucose dysregulation before and during the time she was on Seroquel.[73]

In her effort to establish specific medical causation, Plaintiff McAlexander offers the testimony of endocrinologist Dr. Tulloch and psychiatrist Dr. Abramson – the same witnesses whose substantially identical testimony this Court excluded in *Haller*. Once again here, neither of these witness's testimony survives this Court's *Daubert* gatekeeping scrutiny.

*Dr. Tulloch*: In Ms. McAlexander's case, as in the *Haller* case, Dr. Tulloch not only employed a fatally flawed methodology in reaching his conclusions, but the substance of his opinion cannot withstand *Daubert* scrutiny, particularly given its constant evolution through unscientific "post hoc rationalization" that is even more egregious than in Mr. Haller's case. *See Haller* slip op. at 49. As in *Haller*, Dr. Tulloch conceded that he had never examined or communicated with Ms. McAlexander,[74] he did not read all of the medical records provided to him by plaintiffs' lawyers,[75] he did not read the depositions of any of Ms. McAlexander's treating physicians,[76] and thus he admittedly may have missed information relating to alternative explanations for her diabetes.[77] *See Haller* slip op. at 8-9. As a result of his "hurried, cursory and incomplete" review of the case information, *id.* at 47, Dr. Tulloch's expert report in Ms. McAlexander case was so riddled with massive errors[78] that, at his

---

[73] *Id.* at 3-4.

[74] Tulloch Dep. at 423:4-18.

[75] *Id.* at 417:8-11.

[76] *Id.* at 417:13-20.

[77] *Id.* at 417:21-418:5.

[78] Among other mistakes, Dr. Tulloch understated Ms. McAlexander's pre-Seroquel weight by 75 lbs, *id.* at 440:23-441:25, incorrectly stated Ms. McAlexander's initial Seroquel dosage, *id.* at 426:4-10, and was unaware of the correct date of Ms. McAlexander's initial diagnosis of diabetes, *id.* at 453:9-454:25.

deposition, Dr. Tulloch admitted that his report was unreliable and remarkably conceded that he could not give an opinion that Seroquel caused Ms. McAlexander to gain the weight that supposedly caused her diabetes:

> Q:     So you cannot give an opinion that Seroquel caused Ms. McAlexander to have a weight gain that led to her diabetes, correct?
>
> A:     I will buy that.
>
> Q:     You agree with that?
>
> A:     I agree with that.
>
> Q:     All right.  So the – your – the whole basis of your opinion in your report is wrong, correct?
>
> A:     I – without – without a data on weight that relates to the sugar of February the 19th, I would not wish to render an opinion on weight changes because that's not fair.
>
> * * *
>
> Q:     You would agree with me that your report, as it pertains to Ms. McAlexander, is unreliable?
>
> A:     Oh, I – it's wrong and I apologize for that.[79]

Dr. Tulloch then sought to fix his mistakes as to Ms. McAlexander in the same supplemental declaration that the Court criticized in *Haller*, creating an entirely new opinion for Ms. McAlexander never before presented in his expert report or at his deposition.[80] Dr. Tulloch purported to present a new basis for his opinion in Ms. McAlexander's case because, as in *Haller*, he had reviewed "supplemental records" on glucose and weight.  He then went from not being able to state any opinion to stating – for the first time – that "but for ingestion of Seroquel, Eileen McAlexander would not have developed diabetes at the time of

---

[79] *Id.* at 458:1-459:12.

[80] *See* Tulloch Decl. at ¶¶ 10-14.

her diagnosis in February 2002." Thus, to an even greater extent than in *Haller*, Dr.

Tulloch's opinion regarding Ms. Alexander is so "devoid of intellectual rigor" and must be

excluded because "he reached his initial conclusions prematurely" and based, not merely on

"incomplete data," but on so little data that even he was not willing to present a causation

opinion at his deposition.  *See Haller* slip op. at 49.

As in the *Haller* case, Dr. Tulloch also impermissibly tried to "shore up" the

deficiencies in his opinion by offering the same five new bases for his conclusion that

Seroquel caused Ms. McAlexander's alleged diabetes injuries, set forth in his declaration.

But this attempt is particularly transparent in light of his *explicit* admission at deposition that

any causation opinion as to Ms. McAlexander was based only on a "temporal relationship":

> Q:     And you would agree that what you're saying that your opinion is only
>        based on the temporal relationship between Ms. McAlexander taking
>        Seroquel and then gaining weight and then developing diabetes, right?
>
> A:     Yes, ma'am.
>
> Q:     It's that time relationship –
>
> A:     Right.[81]

Even if a temporal relationship could support his causation opinion, Dr. Tulloch's sole

reliance on temporal relationship is inconsistent with his acknowledgment that diabetes takes

"at least" 7 to 12 years to develop, but that Ms. McAlexander took a low dose of Seroquel for

only five and a half months:

> Q:     You will agree that before Ms. McAlexander tested positively for
>        diabetes in February of 2002, she was on a dose of Seroquel of 75
>        milligrams or less for only five and a half months?

---

[81] Tulloch Dep. at 439:11-17.

A:   That's correct.

Q:   Diabetes, as we've talked about before, takes 7 to 12 years to develop, correct?

A:   At least.[82]

Dr. Tulloch's late-developing reliance in his supplemental declaration on weight gain as a cause of diabetes in Ms. McAlexander (who had a BMI > 40) was inconsistent with his admission at his deposition and at the *Daubert* hearing, as noted by the Court, "that weight gain in someone with a BMI of 37.1 does not increase the risk of developing diabetes." *Haller* slip op. at 42-43.

Dr. Tulloch's testimony for Ms. McAlexander suffers from many of the other flaws identified by the Court in *Haller*.  Dr. Tulloch explicitly did not quantify Ms. McAlexander's risk factors for diabetes:

Q:   You have not quantified the contribution that each of these causes that you've identified just now have made to the development of diabetes in Ms. McAlexander, correct?

A:   No ma'am.[83]

As with Ms. Haller (*see Haller* slip op. at 31), Dr. Tulloch testified that Ms. McAlexander would have developed diabetes even if she had never taken Seroquel:

Q:   You would agree that Ms. McAlexander would have developed diabetes even if she had never taken Seroquel?

A:   Yes, ma'am.[84]

---

[82] *Id*. at 459:17-24.
[83] *Id*. at 421:15-423:1.  As the Court noted in *Haller*, Dr. Tulloch stated in his supplemental declaration his belief that such quantification "is impossible."  *Haller* slip op. at 22.
[84] Tulloch Dep. at 439:8-10.

Indeed, he admitted that in diabetics with BMIs as high as Ms. McAlexander's, 98 percent

would have diabetes because of their obesity.[85] As in *Haller*, Dr. Tulloch could not rule out

obesity as the sole cause of diabetes of Ms. McAlexander's diabetes, and when asked to

confirm that, Dr. Tulloch had no answer but to return to his analogy of the "poor camel":

> Q:    With a relative risk [sic – BMI] of 42.4 and an attributable risk of 98
>       percent like Ms. McAlexander had, how can you rule out preexisting
>       obesity as the sole cause of her diabetes?
>
> A:    Oh, I – I don't think it would be the sole cause because we have a
>       number of other risk factors, but I would accept it as a contributing –
>       as a major contributing cause, and I've listed the other causes as we
>       discussed a moment ago.
>
> Q:    You would agree that her obesity, her preexisting obesity, is an
>       overwhelmingly greater cause than her exposure to Seroquel –
>
> MR. BRUDNER:  Objection.
>
> Q:    (BY MS. THORPE) – of her diabetes?
>
> A:    I believe that it would be inappropriate to exclude Seroquel from that
>       list on – given all the information that we've shared.  And as I've said
>       earlier, it's difficult to ascribe numbers to individual data.  But
>       certainly Seroquel is an adding factor – and I'll go back to that *poor
>       camel* – which clearly contributed another component to the many
>       numbers of risk factors she had for her diabetes.[86]

Thus, for all the reasons set forth in the Court's *Haller* Order, Dr. Tulloch's methodology and

opinions satisfy neither *Daubert* scrutiny nor Florida substantive law.  As in *Haller*, Dr.

Tulloch's testimony on behalf of Plaintiff McAlexander is inadmissible and insufficient.

  ***Dr. Abramson*:**  Plaintiff McAlexander obviously cannot be permitted to present the

testimony of her other specific-causation witness, psychiatrist Dr. Abramson, whose

---

[85] *Id*. at 437:16-438:9.

[86] *Id*. at 438:10-439:7 (emphasis added).

testimony the Court has already excluded in *Haller*. As this Court has already held, "Dr.

Abramson's education, training and experience simply do not render him qualified to express

a diabetes causation opinion . . . ." *Haller* slip op. at 55-56. The same applies *a fortiori* in

Ms. McAlexander's case. Moreover, as the Court also already determined, Dr. Abramson's

methodology and testimony in *Haller* had to be excluded as scientifically unreliable, and his

testimony in Ms. McAlexander's case is indistinguishable in all material respects. Here too,

Dr. Abramson's testimony case cannot survive *Daubert* scrutiny because, *inter alia*, he relies

solely on a temporal relationship[87] and failed to rule out or quantify Ms. McAlexander's

various diabetes risk factors.[88] As in *Haller*, Dr. Abramson's testimony in Ms.

McAlexander's case is inadmissible and insufficient as a matter of law.

### d.   Plaintiff Richard Unger

Like Plaintiffs Guinn and Haller, Plaintiff Richard Unger had various significant

diabetes risk factors prior to ever taking Seroquel. Mr. Unger was "morbidly obese" before

taking Seroquel,[89] and admits that his weight problems extend back to his teenage years.[90]

Importantly, Mr. Unger suffered a debilitating work-related back injury in 1997 that

precipitated his mental problems and increasing weight gain, and testified that he uses an

electric wheelchair for transportation.[91] In all, it is undisputed that Mr. Unger had many

significant pre-existing risk factors for diabetes, including: (1) pre-existing morbid obesity;

---

[87] *See* Abramson Dep. at 280:7-14; *see also* McAlexander MSJ at 8-9.

[88] *See* Abramson Dep. at 289:5-25; *see also* McAlexander MSJ at 8-9.

[89] Tulloch Dep. at 276:9-13, 320:9-11; Young Dep. at 70:20-24, 73:2-4, 111:11-13; *see generally* AstraZeneca's Motion for Summary Judgment, *Unger v. AstraZeneca*, 6:07-cv-15812 (M.D. Fla. Nov. 3, 2008) ("Unger MSJ") at 5-7.

[90] Unger Dep. at 155:16-165:5.

[91] *See* Unger MSJ at 3, 5-7; Unger Dep. at 31:2-19.

(2) central adiposity; (3) metabolic syndrome; (4) sedentary lifestyle arising from severe back pain; (5) hypertension and hyperlipidemia; and (6) cigarette smoking.[92]

In his effort to establish specific medical causation, Plaintiff Unger offers the testimony of endocrinologist Dr. Tulloch and psychiatrist Dr. Young – neither of which can survive this Court's *Daubert* gatekeeping scrutiny.

**Dr. Tulloch:**  As in the *Haller* case, Dr. Tulloch proposes to testify that Mr. Unger's ingestion of Seroquel was "a cause" of plaintiff's diabetes.[93]  As in the *Haller* case, Dr. Tulloch could not identify any mechanism by which Seroquel could have directly caused Mr. Unger's diabetes, and instead testified that his opinion was based on a mere temporal relationship between Mr. Unger's Seroquel ingestion, weight gain, and diabetes diagnosis:

> Q:  So what you're saying is that the fact that he took Seroquel and then gained 45 pounds and then got diabetes, that time sequence of events is the basis of your opinion that he – that Seroquel caused him to have diabetes?
>
> A:  With – with reasonable medical probability, yes, ma'am.
>
> Q:  Okay.  So it's –
>
> A:  And I go back to the camel and the straw and the camel's back.
>
> Q:  So it's the – it's the sequence in time of taking Seroquel, then gaining weight, and then developing diabetes.  That is the basis of your opinion, right?
>
> A:  I believe was the best medical probability, yes, ma'am.[94]

Yet, Dr. Tulloch admitted at his deposition that he did not even know when Mr. Unger developed diabetes – which further underscores the unreliability of his opinions:

---

[92] *See* Unger MSJ at 8.

[93] Expert Report of Brian Tulloch, M.D. for Richard Unger at 11.

[94] Tulloch Dep. at 253:18-254:8.

Q:    So you do not know when Mr. Unger developed diabetes, do you?

A:    That's correct.

Q:    And you cannot say that he had – that his diabetes occurred after he took Seroquel.  You don't know?

A:    We don't have data on that.

Q:    So you don't know, correct?

A:    That's correct.[95]

Further, Dr. Tulloch could offer no methodology or explanation for excluding Mr. Unger's pre-existing and overwhelming diabetes risk factors.  Dr. Tulloch in fact admitted that "obesity of the type that Mr. Unger had before he ever took Seroquel is an overwhelming cause of his diabetes,"[96] and that "less than 3 percent of people with diabetes and BMIs of 38.4 like Mr. Unger's before he took Seroquel will have diabetes for reasons other than obesity . . . ."[97]  Yet, Dr. Tulloch did not rule out or quantify the relative contribution of Mr. Unger's obesity and various other diabetes risk factors to his diabetes.[98]  Instead, Dr. Tulloch simply conceded that, given his diabetes risk factors, Mr. Unger would have developed diabetes even if he had never taken Seroquel:

Q:    It's your opinion, then, to a reasonable degree of probability that Mr. Unger would have developed diabetes even if he had never taken Seroquel, right?

A:    Yes, ma'am.[99]

---

[95] *Id.* at 283:24-284:7.

[96] *Id.* at 331:3-7.

[97] *Id.* at 331:13-17.

[98] *Id.* at 266:14-269:1, 327:18-328:1, 409:18-411:8.

[99] *Id.* at 332:11-14.

Dr. Tulloch's opinions regarding Mr. Unger are further undermined by his failure to exercise the same level of scientific rigor that he exercises in his clinical practice. *See Haller* slip op. at 49. Dr. Tulloch never examined or spoke with Mr. Unger, did not review Mr. Unger's complete medical file, failed to consult the depositions of Mr. Unger or any of his treating physicians, and therefore could not account for other possible causes of Mr. Unger's weight gain:

Q:   And you don't know whether after he started taking Seroquel he picked up the habit of eating a gallon of Ben & Jerry's ice cream every day, do you?

A:   Ma'am, you're – you're adding to the speculation.

Q:   You don't know?

A:   We have no knowledge.

Q:   Right. Because you've never talked to Mr. Unger, right?

A:   He was not sent to me for interview."[100]

\* \* \*

Q:   You have not reviewed all of Mr. Unger's medical records, correct?

A:   That's correct.[101]

\* \* \*

Q:   You didn't read any depositions, correct?

A:   That's what I stated for Ms. Whittington, and that applies to Mr. Unger as well, yes.[102]

---

[100] *See id.* at 279:1-9.
[101] *See id.* at 225:15-17.
[102] *Id.* at 243:19-21.

Just as in the *Haller* case, Dr. Tulloch tried to materially change his sworn testimony and the stated bases for his opinions in Mr. Unger's case in the identical 12-page declaration filed in direct response to AstraZeneca's motion practice challenging his opinions. As in Mr. Haller's case, Dr. Tulloch again changed his testimony – in fact, he reversed his testimony that he could not say when Mr. Unger developed diabetes, and reasserted his conclusion that "but for" his use of Seroquel, he "would not have developed diabetes at the time he was diagnosed in September 2005."[103] Apart from the evolving nature of Dr. Tulloch's testimony, the "five" bases identified in his declaration as to Mr. Unger are identical to those addressed by the Court and rejected as inadequate in *Haller*.[104]

In sum, Dr. Tulloch offers the same flawed methodology and *ipse dixit* conclusions in Mr. Unger's case that the Court rejected in the *Haller* case. As in *Haller*, Dr. Tulloch's opinions cannot withstand *Daubert* scrutiny or meet the requirements of Florida law, and are thus inadmissible and insufficient to defeat summary judgment for AstraZeneca.

**Dr. Young:** Plaintiff Unger has also offered psychiatrist Dr. Young to testify that Seroquel was "a cause" of Mr. Unger's diabetes.[105] As the Court recognized in *Haller*, however, a witness like Dr. Young is unqualified to offer diabetes causation opinions where among other things, he has not diagnosed diabetes in patients, does not treat patients for diabetes and has no specialized training in endocrinology.[106] *See Haller* slip op. at 54-57.

---

[103] Tulloch Decl. at ¶ 15.

[104] The first and second bases boil down to the assertion of a temporal association between Seroquel and diabetes, which is insufficient, *see Haller*, slip op. at 51; the third and fourth relate to general causation and carry no relevance as to whether Seroquel specifically caused Mr. Unger's diabetes, *id.* at 52; and the fifth is no more applicable to Mr. Unger than to Mr. Haller.

[105] Expert Report of Mitchell Young, M.D. for Richard Unger at 11.

[106] *See* Young Dep. at 22:20-23:25.

Indeed, Dr. Young outright admitted that he is not an expert the relevant field: "Q: Do you hold yourself out as an expert in determining the cause of diabetes in patients? A: Per se, no."[107] As to Mr. Unger, Dr. Young testified that he based his specific-causation opinion on a mere temporal relationship,[108] he failed to rule out or quantify Mr. Unger's various pre-existing diabetes risk factors,[109] and he could not testify that Mr. Unger would not have developed diabetes had he not taken Seroquel.[110]

In short, Dr. Young's testimony regarding the cause of Mr. Unger's diabetes is inadmissible for the same reasons the Court found psychiatrist Dr. Abramson's testimony inadmissible in the *Haller* case.

    e.    **Plaintiff Linda Whittington**

Plaintiff Whittington took very low doses of Seroquel (25-50 mg) intermittently between October 2001 and February 2006 for schizophrenia, and it is undisputed that Ms. Whittington was chronically obese for many years before she began taking Seroquel.[111] Like Plaintiffs Guinn and Haller, Ms. Whittington had many pre-existing diabetes risk factors, including: (1) pre-existing obesity; (2) family history of diabetes; (3) a sedentary lifestyle and lack of exercise; (4) high cholesterol and hypertension; (5) high blood pressure; (6) an apple-

---

[107] *Id.* at 24:18-20.

[108] *Id.* at 100:9-101:12. Dr. Young's reliance on temporality was so strong that he was willing to say that Seroquel caused Mr. Unger's need for an electrical scooter, if the "time sequence" was right. *Id.* at 172:4-173:7.

[109] *Id.* at 218:19-219:4.

[110] *Id.* at 108:3-5.

[111] *See* AstraZeneca's Motion for Summary Judgment, *Whittington v. AstraZeneca*, 6:07-cv-10475 (M.D. Fla. Nov. 3, 2008) ("Whittington MSJ") at 8-9.

shaped figure; (7) smoked one-and-a-half to two packs of cigarettes per day for approximately 28 years; and (7) pre-existing metabolic syndrome.[112]

In her effort to establish specific medical causation, Plaintiff Whittington offers the testimony of endocrinologist Dr. Tulloch and psychiatrist Dr. Young – neither of which can survive this Court's *Daubert* gatekeeping scrutiny.

**Dr. Tulloch**: As in the *Haller* case, Dr. Tulloch proposes to testify that Ms. Whittington's ingestion of Seroquel was "a cause" of her diabetes.[113]  As in the other cases, Dr. Tulloch testified at his deposition that the only basis of his specific-causation opinion was a mere temporal relationship:

Q:    Is it fair to say that what you're saying because of the temporal relationship between her taking Seroquel and gaining weight, you think Seroquel is a contributing factor?

A:    Ah we're on the same wavelength.  May I shake your hand, madam?

Q:    Absolutely.  Am I right?

A:    Yeah, it's a contributing factor.

Q:    Because of the temporal relationship?

A:    Because of the temporal relationship, yeah.

Q:    All right.  And that's – that's it, right?  Yes?

A:    That's it.[114]

Yet, as with *Haller*, Dr. Tulloch's proposed temporal relationship methodology was contradicted by his own testimony regarding the facts of Ms. Whittington's case.  Dr.

---

[112] *Id.* at 3-8; *see also* Tulloch Dep. at 60:22-61:12 (discussing plaintiff's smoking).

[113] Expert Report of Brian Tulloch, M.D. for Linda Whittington at 10.

[114] Tulloch Dep. at 142:16-143:3.

Tulloch in fact admitted that Ms. Whittington "more likely than not . . . had diabetes in the [1990s]"[115] – long before she ever began Seroquel – but that in any case she "*never* met the American Diabetes Association's criteria for the diagnosis of diabetes . . . ."[116]  Further, Dr. Tulloch conceded that Ms. Whittington's pre-existing obesity was so significant that it constituted a 98 percent attributable risk for diabetes,[117] and that any of his own attempts to quantify Ms. Whittington's various risk factors for weight gain and diabetes were in fact "bad science" and merely "guess[es]" or "arbitrary choice."[118]  Dr. Tulloch also admitted that he "did not rule out alternative causes" for Ms. Whittington's "weight gain," just as he failed to do so with respect to any of the Plaintiffs on whose behalf he was offering opinions.[119]  Instead, Dr. Tulloch again resorted to his "straw/camel" analogy and explanation:

> Q:     And you cannot rule out her preexisting obesity before she took
>        Seroquel as the sole cause of her –
>
> A:     No, ma'am.
>
> Q:     – diabetes, can you?
>
> A:     I go back to the camel's saddle.[120]

Like his testimony for the other Plaintiffs, Dr. Tulloch testified that Ms. Whittington would have developed diabetes even if she had never taken Seroquel:

> Q:     You agree that to a reasonable degree of probability Ms. Whittington
>        would have developed diabetes even if she had never taken Seroquel,
>        right?

---

[115] *Id*. at 186:23-25.

[116] *Id*. at 160:7-12 (emphasis added).

[117] *Id*. at 130:11-134:2.

[118] *Id*. at 48:2-49:1, 54:15-24, 56:13-57:4, 51:12-15.

[119] *Id*. at 548:13-17.

[120] *Id*. at 140:3-7.

A:      Yes, ma'am.[121]

As in the *Haller* case, Dr. Tulloch's scientifically unreliable and speculative

testimony for Ms. Whittington is further infected by his failure to apply the same level of

scientific rigor that he exercises in clinical practice.  Dr. Tulloch conceded that he has never

diagnosed a patient with diabetes without examining the patient, and yet he did not examine

Ms. Whittington.[122]  Dr. Tulloch did not inquire regarding other possible factors of Ms.

Whittington's weight gain, such as caloric intake,[123] did not read the deposition transcripts of

either Ms. Whittington or her physicians,[124] and relied on a partial summary of data selected

by plaintiff's counsel that failed to include any medical history pre-dating 1999.[125]

Moreover, just as in the *Haller* case, Dr. Tulloch tried to materially change his sworn

testimony and the stated bases for his opinions in Mr. Wittington's case in the identical 12-

page declaration filed in direct response to AstraZeneca's motion practice challenging his

opinions.  In the declaration, Dr. Tulloch reversed his testimony that Ms. Whittington had

diabetes in the 1990s, and reasserted his conclusion – based on an alleged temporal

relationship between Seroquel, weight gain, and diabetes – that "but for" Seroquel Ms.

Whittington "would not have developed diabetes when she did . . ."[126] Once again, apart

from the evolving nature of Dr. Tulloch's testimony – which itself calls into question its

---

[121] *Id.* at 337:11-15.
[122] *Id.* at 75:5-9.
[123] *Id.* at 135:20-136:15.
[124] *Id.* at 75:17-18, 115:9-11
[125] *Id.* at 201:2-202:22.
[126] Tulloch Decl. at ¶ 18.

scientific reliability – the "five" bases identified in his declaration as to Ms. Whittington are identical to those addressed by the Court and rejected as inadequate in *Haller*.[127]

In sum, Dr. Tulloch offers the same flawed methodology and *ipse dixit* conclusions in Ms. Whittington's case that the Court rejected in the *Haller* case. As in *Haller*, Dr. Tulloch's opinions cannot withstand *Daubert* scrutiny or meet the requirements of Florida law, and are thus inadmissible and insufficient to defeat summary judgment for AstraZeneca.

**Dr. Young:** Plaintiff Whittington also offers Dr. Young's specific causation testimony in her case. As discussed above, just like Dr. Abramson in *Haller*, Dr. Young is unqualified to offer diabetes causation opinions. *See Haller* slip op. at 54-57.[128] Again, Dr. Young admitted that he is not an expert the relevant field: "Q: Do you hold yourself out as an exert in determining the cause of diabetes in patients? A: Per se, no."[129] Dr. Young's testimony as to Ms. Whittington is also scientifically invalid and unreliable because Dr. Young based his causation opinion on a mere temporal relationship,[130] he failed to rule out or quantify Ms. Whittington's various pre-existing diabetes risk factors,[131] and he could not testify that Ms. Whittington would not have developed diabetes had she not taken Seroquel.[132] Dr. Young's testimony regarding the cause of Ms. Whittington's diabetes is

---

[127] The first and second bases boil down to the assertion of a temporal association between Seroquel and diabetes, which is insufficient, *see Haller*, slip op. at 51; the third and fourth relate to general causation and carry no relevance as to whether Seroquel specifically caused Ms. Whittington's diabetes, *id.* at 52; and the fifth is no more applicable to Ms. Whittington than to Mr. Haller.

[128] *See* Young Dep. at 22:20-23:25.

[129] *Id.* at 24:18-20.

[130] *Id.* at 100:9-101:12.

[131] *Id.* at 216:20-23, 233:17-22.

[132] *Id.* at 216:8-11.

inadmissible for the same reasons psychiatrist Dr. Abramson's testimony was found

inadmissible in *Haller* case.

Because the testimony these remaining Plaintiffs' specific-causation experts must be

excluded for the reasons set forth in the *Haller and Guinn* Orders, AstraZeneca is also

entitled to summary judgment on all claims in these remaining cases, just as in *Haller* and

*Guinn*.

> **B.    Plaintiffs' Experts Cannot Survive *Daubert* By Further Altering Their Opinions In Response To Not Just AstraZeneca's Motion Practice But Now This Court's *Daubert* Rulings As Well**

Plaintiffs might try to resuscitate their cases by further revising their experts' testimony

and offering further new declarations that purport to be in accord with the Court's rulings in

*Guinn* and *Haller*. In addition to being wholly at odds with the Court's explicit directions,

*see* Jan. 28, 2009 Pretrial Conf. Tr. at 29-30, doing so would fly in the face of the experts'

prior sworn testimony. *See Haller* slip op. at 49 (decrying Dr. Tulloch's "transparent attempt

to thwart exclusion of his opinions on *Daubert* grounds" by changing his opinion in a

supplemental declaration). As this Court has recognized, experts may not fabricate new

opinions and new methodologies contorted to account for *Daubert* arguments, or worse,

judicial *Daubert* rulings, because "this is not how good science is done." *Id.* As the U.S.

Supreme Court has insisted, "[s]ince *Daubert*, ... parties relying on expert evidence have had

notice of the exacting standards of reliability such evidence must meet," and thus litigants are

not entitled to "shore[] up their cases" once their experts' testimony has been excluded under

*Daubert*. *Weisgram v. Marley*, 528 U.S. 440, 455 (2000); *see also Claar v. Burlington*

*Northern RR Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994) ("Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method.").

>   **C.    Florida Law Provides That, In These Concurring Cause Cases, Plaintiffs' Causation Burdens Require Them To Prove Both That Seroquel Was A But-For Cause And A Substantial Factor In Producing Plaintiffs' Injuries**

Finally, the *Guinn* and *Haller* Orders suggest that Florida law may be unsettled on the causation test to be applied in these concurring cause cases. It was not necessary for the Court to resolve the issue to decide the *Guinn* and *Haller* cases, nor is it necessary to do so here as these five cases fail under either the "but for" or "substantial factor" tests.

Nonetheless, under Florida law, *both* the generally applicable "but for" test in Florida Standard Jury Instruction ("FSJI") 5.1(a) *and* the substantial factor test ("contributed substantially") in FSJI 5.1(b) properly apply in all concurring cause cases, *except* in the very narrow and limited subset of concurring cause cases discussed in *Stahl v. Metro. Dade County*, 438 So. 2d 14 (Fla. App. 1983), in which each of the concurring causes at issue "could have alone" caused the plaintiff's injury by itself. *Id.* at 19. None of these Seroquel cases falls within that narrow exception and, in fact, Plaintiffs' counsel have never even argued that they do.[133] Rather, in these cases – as in the majority of concurring cause cases – it is reversible error not to give the FSJI 5.1(a) "but for" instruction in addition to FSJI 5.1(b). *Owens-Corning Fiberglas Corp. v. Terwilliger*, 599 So. 2d 130, 131-32 (Fla. App. 1992).

---

[133] Indeed, it has always been the Plaintiffs' theory of the case that Seroquel supposedly combined with each Plaintiff's pre-existing risk factors in some supposed way to produce each Plaintiff's alleged diabetes injury. They have never suggested (nor could they) that Seroquel *alone*, without combining with Plaintiff's pre-existing conditions and risk factors, caused or could have caused diabetes in any of these Plaintiffs.

The *Guinn* and *Haller* Orders refer to the *Stahl* decision as stating that "the 'substantial factor' test" embodied in FSJI 5.1(b) can properly apply *only* in those cases in which each the allegedly concurring causes could have *alone* produced the plaintiff's injury. *Guinn* slip op. at 9; *Haller* slip op. at 63.[134]  On this precise point, however, the court in *Stahl* was not referring broadly to "the 'substantial factor' test," as this Court's Orders suggest. Rather, *Stahl* was explicitly referring *only* to "the limited 'substantial factor' *exception*" to Florida's generally applicable but-for test. 438 So. 2d at 19 (emphasis added).  That exception is "applicable only in those concurring cause cases where each of the said concurring causes could have alone produced the plaintiff's injury." *Id.* ("Properly viewed, then, Florida follows the 'but for' causation-in-fact test in negligence cases, as modified by the limited 'substantial factor' exception applicable only in those concurring cause cases where each of the said concurring causes could have alone produced the plaintiff's injury."). Accordingly, in this passage, the *Stahl* court is not referring broadly to any limitation generally on the proper application of FSJI 5.1(b)'s concurring cause instruction.  To the contrary, *Stahl* recognizes that FSJI 5.1(b) is broadly applicable even in concurring cause cases in which each concurring cause could *not* alone have caused the injury at issue.  *See, e.g.*, 438 So. 2d at 19 n.5.  In the passage cited in the Court's Orders, *Stahl* is talking solely about the narrow subset of concurring cause cases – such as the examples in the passage from

---

[134] In its *Haller* and *Guinn* Orders, the Court described the *Stahl* decision as stating that the "'substantial factor' *test* was to be applicable 'only in those concurring cause cases where each of the said concurring causes could have alone produced the plaintiff's injury'" *Haller* slip op. at 63 (emphasis added); *see also Guinn* slip op. at 9 (same).

Prosser's treatise on torts quoted in the *Stahl* opinion itself[135] – in which the otherwise

generally applicable "'but for' causation-in-fact test" is *abandoned and replaced entirely* by

a substantial-factor analysis in the interests of justice. *Id.* at 18-19; *see also id.* at 22.

Stated differently, *Stahl* merely distinguishes between two separate and distinct

concepts: (1) the substantial factor *test*, and (2) the substantial factor *exception*. *Id.* at 19.

- The *substantial factor test* applies *in addition to and along with* the "but for" test in the "broader" class of concurring cause cases (which is where all of these Seroquel cases reside). *Stahl*, 438 So. 2d at 18-19 & n.5. In such concurring cause cases, Florida law requires the plaintiff to satisfy *both* tests – *i.e.*, the defendant's actions must be both the but-for cause and a substantial factor in the plaintiff's injury for the plaintiff to prevail. *See also* Fla. Std. Jury Inst. 5.1, Note on Use 1 (emphasizing that FSJI 5.1(a)'s "but for" instruction is to be given in all cases, including ordinary concurrent cause cases, and that the FSJI 5.1(b) concurring cause instruction does not state a different standard).[136]

- The *substantial factor exception*, in stark contrast, applies *alone and to the exclusion of* the "but for" test where each of the concurring causes, acting alone, could have

---

[135] As Dean Prosser explained in the passage cited in *Stahl*, "there is one type of situation in which [the generally applicable 'but for' test] fails. If two causes concur to bring about an event, and either of them, operating alone, would have been sufficient to cause the identical result, some other test [*i.e.*, besides the but-for test] is needed. Two motorcycles simultaneously pass the plaintiff's horse, which is frightened and runs away; either one alone would have caused the fright. A stabs C with a knife, and B fractures C's skull with a rock; either wound would be fatal, and C dies from the effects of both. The defendant sets a fire, which merges with a fire from some other source' the combined fires burn the plaintiff's property, but either one would have done it alone.'" *Stahl*, 438 So. 2d at 18 (quoting W. Prosser, *Handbook of the Law of Torts* § 41 at 239 (4th ed. 1971)).

[136] The numerous Florida cases applying FSJI 5.1(b) – including all of the pre-existing condition cases cited by the Court in its *Haller* and *Guinn* Orders – merely stand for the proposition that FSJI 5.1(a)'s generally applicable "but for" instruction should not be given *alone* but should be given *along with and in addition to* FSJI 5.1(b) in concurring cause cases. *See, e.g., De La Concha v. Pinero*, 104 So. 2d 24 (Fla. 1958); *Hart v. Stern*, 824 So. 2d 927 (Fla. App. 2002); *Thomason v. Gordon*, 782 So. 2d 896 (Fla. App. 2001); *Esancy v. Hodges*, 727 So. 2d 308 (Fla. App. 1999); *Zigman v. Cline*, 664 So. 2d 968 (Fla. App. 1995). Notably, none of these cases involve or address "the limited 'substantial factor' exception" discussed above and articulated in *Stahl*, 438 So. 2d at 19. Other Florida concurring cause cases explicitly require a showing of "but for" causation before liability will attach. *See, e.g., Jones v. Utica Mut. Ins. Co.*, 463 So. 2d 1153, 1165 (Fla. 1985) ("The defendant is liable when his act of negligence *combines with some other concurring or intervening cause* in the sense that, *'but for' the other case as well*, injury would not have occurred.") (emphases added); *Starling v. City of Gainesville*, 106 So. 425, 426 (Fla. 1925) (same).

caused the injury – *i.e.*, where two fires set by two different people converge simultaneously to burn down a building, or where a plaintiff is both shot by X and stabbed by Y and either wound alone would have been fatal.  *Stahl*, 438 So. 2d at 18. As *Stahl* explained, it is *only* in this narrower class of "so-called 'concurrent cause cases [where each of the concurrent causes alone could have produced-in-fact the plaintiff's injury]" that "the Florida courts have abandoned *sub silentio* the 'but for' test and have employed instead a 'substantial factor' test for the obvious reason that adherence to the 'but for' test in this limited type of case leads to anomalous and unacceptable results." *Id.* (bracket in original).

Two leading Florida cases on causation – *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015 (Fla. 1984), and *Reaves v. Armstrong World Indus,, Inc.*, 569 So. 2d 1307 (Fla. App. 1990) – underscore the correctness of this argument.  Both were concurring cause cases in which it could not be said that the defendant's conduct alone could have produced the plaintiff's injury, and the courts required the plaintiffs not merely to satisfy the substantial factor test, but also to prove that the injury at issue would not have occurred "but for" the defendant's alleged tort. *Gooding*, 445 So. 2d at 1018-20 (directing verdict for defendant in concurring cause case where Florida's generally applicable "but for" causation test was not satisfied); *Reaves*, 569 So. 2d at 1308-10 (affirming defense judgment in concurring cause case because "but for" test not satisfied).

Thus, in these concurring cause cases, Plaintiffs must prove both that the defendant's action was the "but for" cause of the alleged injury (FSJI 5.1(a)) and also "contributed substantially" (FSJI 5.1(b)) to producing the injury. *See* Fla. Std. Jury Inst. 5.1, Note on Use 1; *Terwilliger*, 599 So. 2d at 131-32.  FSJI 5.1(b)'s concurring cause instruction is given along with FSJI 5.1(a) for a limited purpose:  FSJI 5.1(b) "*only* negates the idea that a defendant is excused from the consequences of his negligence by reason of some other cause concurring in time and contributing to the same damage." *Id.* (emphasis supplied).  This

clarification was necessary *not* because the "but for" test is inapplicable in ordinary concurring cause cases, but rather because jurors in such cases might otherwise *mistakenly* confuse the notion of a "but for" cause with the "sole cause," a completely different concept.[137]  Judge (later Justice) Anstead makes this very clear in his concurring opinion in *Marinelli v. Grace*, 608 So. 2d 833, 835 (Fla. App. 1992) (Anstead, J., concurring), where he emphasized that FSJI 5.1(b) "illuminates" and makes "explicit" what is *already* in FSJI 5.1(a), to dispel any notion that a concurrent cause must be the sole cause to be actionable:

> [T]he statement in 5.1(b) illuminates the meaning of 5.1(a), and makes the proposition of legal cause set out therein more understandable.  The concept of legal cause with its "but for" test may cause some to believe the claimed negligence must be the sole "real" cause of the injury.  5.1(b) dispels that notion by correctly and explicitly informing the jury that there may be multiple causes of an injury.  This proposition is already implied by the words "contributes substantially" contained in 5.1(a).

In sum, Florida law requires all of these Plaintiffs to satisfy both the but-for and substantial-factor tests to carry their burden of proving causation.  As in *Guinn* and *Haller*, Plaintiffs cannot satisfy either test and therefore summary judgment is required in each case.

---

[137] There can be more than one "but for" cause of injury.  The facts of the *Stahl* case provide a concrete example:  as the result of a negligently maintained bicycle path, a cyclist swerved off the path into the public road and a car on the road hit the cyclist.  As the *Stahl* court observed, *each* of those causes, as well as the cyclist's own actions, may have been concurring causes of the cyclist's death.  But take any of them away, and the injury would not have occurred, even though no one of these several factors by itself would have produced the injury.  Each of the concurring causes was a "but for" cause.  The Florida Supreme Court's opinion in *Jones*, 463 So. 2d at 1165 and the other cases cited above confirm there may be concurrent causes of an injury that are also "but for" causes.

## IV.    CONCLUSION

For the foregoing reasons, AstraZeneca's summary judgment and *Daubert* specific-causation motions in the remaining five cases in "Group One" of the Florida Trial Pool, filed by Plaintiffs Burns, Curley, McAlexander, Unger and Whittington, should be granted.

Dated:  February 19, 2009                          Respectfully submitted,


/s/ Steven B. Weisburd
Steven B. Weisburd
David Venderbush
DECHERT LLP
300 West 6th Street, Suite 1850
Austin, TX  78701
Telephone: (512) 394-3000
Facsimile:  (512) 394-3001
steven.weisburd@dechert.com

Stephen J. McConnell
DECHERT LLP
2929 Arch Street
Philadelphia, PA  19103
Telephone: (215) 994-4000
Facsimile:  (215) 994-2222
stephen.mcconnell@dechert.com


/s/ Chris S. Coutroulis
Chris S. Coutroulis (Fla. Bar No. 300705)
Robert L. Ciotti (Fla. Bar No. 333141)
CARLTON FIELDS, P.A.
Corporate Center Three at International Plaza
4221 W. Boy Scout Blvd.
Tampa, FL  22607
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
ccoutroulis@carltonfields.com

*Counsel for AstraZeneca LP and AstraZeneca*
*Pharmaceuticals LP*

## CERTIFICATE OF SERVICE

I hereby certify that, on February 19, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system through which all participating parties are deemed served.  I further certify that, by using the CM/ECF, the foregoing has been served on plaintiffs' liaison counsel, who is charged with serving any non-CM/ECF participants on the attached Service List.

/s/ Chris S. Coutroulis

## SERVICE LIST

**In Re: Seroquel Products Liability Litigation**
**MDL Docket No. 1769**

| | |
|---|---|
| Paul J. Pennock, Esq.<br>Michael E. Pederson, Esq.<br>Weitz & Luxenberg, P.C.<br>180 Maiden Lane - 17th Floor<br>New York, NY 10038<br>Telephone: (212) 558-5500<br>Ppennock@weitzlux.com<br>MPederson@weitzlux.com<br>***Plaintiffs' Lead Counsel*** | Camp Bailey, Esq.<br>Michael W. Perrin, Esq.<br>Fletcher Trammell, Esq.<br>Robert Cowan, Esq.<br>Bailey Perrin Bailey LLP<br>The Lyric Centre<br>440 Louisiana, Suite 2100<br>Houston, TX 77002<br>Telephone: (713) 425-7240<br>cbailey@bpblaw.com<br>mperrin@bpblaw.com<br>rcowan@bpblaw.com<br>***Plaintiffs' Lead Counsel*** |
| Larry Roth, Esq.<br>Law Offices of Larry M. Roth, P.A.<br>Post Office Box 547637<br>Orlando, FL  32854-7637<br>Telephone: (407) 872-2239<br>LROTH@roth-law.com<br>***Plaintiffs' Liaison Counsel*** | Tommy Fibich, Esq.<br>Fibich, Hampton & Leebron, L.L.P.<br>1401 McKinney, Suite 1800<br>Five Houston Center<br>Houston, TX 77010<br>Telephone: (713) 751-0025<br>tfibich@fhl-law.com |
| Matthew F. Pawa, Esq.<br>Law Offices of Matthew F. Pawa, P.C.<br>1280 Centre St., Suite 230<br>Newton Centre, MA 02459<br>Telephone: (617) 641-9550<br>Mp@pawalaw.com | Robert L. Salim, Esq.<br>Robert L. Salim Attorney at Law<br>PO Box 2069<br>Natchitoches, LA 71457-2069<br>Telephone: (318) 352-5999<br>robertsalim@cp-tel.net |
| Keith M. Jensen, Esq.<br>Jensen, Belew & Gonzalez, PLLC<br>1024 North Main<br>Fort Worth, TX 76106<br>Telephone: (817) 334-0762<br>kj@kjensenlaw.com | Scott Allen, Esq.<br>Cruse, Scott, Henderson & Allen, L.L.P.<br>2777 Allen Parkway, 7th Floor<br>Houston, Texas 77019<br>Telephone: (713) 650-6600<br>sallen@crusescott.com |
| Matthew E. Lundy, Esq.<br>Lundy & Davis, LLP<br>333 North Sam Houston Parkway East<br>Suite 375<br>Houston, TX 77060<br>Telephone: (281) 272-0797<br>mlundy@lundydavis.com | W. Todd Harvey, Esq.<br>E. Ashley Cranford, Esq.<br>Whatley Drake & Callas<br>2001 Park Place North, Suite 1000<br>Birmingham, AL 35203<br>Telephone: (205) 328-9576<br>ACranford@wdklaw.com |

| | |
|---|---|
| Robert L. Ciotti, Esq.<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard<br>Suite 1000<br>Tampa, FL 33607-5736<br>Telephone: (813) 223-7000<br>rciotti@carltonfields.com<br>**Attorney for Defendants AstraZeneca**<br>**Pharmaceuticals, LP, and AstraZeneca LP** | Gregory P. Forney, Esq.<br>Shaffer Lombardo Shurin<br>911 Main Street, Suite 2000<br>Kansas City, MO 64105<br>Telephone: (816) 931-0500<br>gforney@sls-law.com<br>rbish@sls-law.com<br>**Attorney for Defendant,**<br>**Marguerite Devon French** |
| Randy Niemeyer<br>22442 Pike 309<br>Bowling Green, MO 63334-5209<br>**Pro Se** | Eric B. Milliken, Esq.<br>3 Sir Barton Ct.<br>Newark, DE 19702<br>**Pro Se** |
| Catherine Solomon<br>3100 N.E. 83<br>Gladstone, MO 64119<br>**Pro Se** | Louisiana Wholesale Drug Co. Inc.<br>C/O Gayle R. White<br>Registered Agent<br>Highway 167N<br>Sunset, LA 70584<br>**Pro Se** |
| Aaron C. Johnson, Esq.<br>Summers & Johnson<br>717 Thomas<br>Weston, MO 64098<br>Telephone: (816) 640-9940<br>firm@summersandjohnson.com | Robert A. Schwartz, Esq.<br>Bailey & Galyen<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744<br>bschwartz@galyen.com |
| Todd S. Hageman, Esq.<br>Simon and Passanante, PC<br>701 Market St., Suite 1450<br>St. Louis, MO 63101<br>Telephone: (314) 241-2929<br>thageman@spstl-law.com | Mark P. Robinson, Jr., Esq.<br>Robinson, Calcagnie & Robinson<br>620 Newport Center Drive, 7th Floor<br>Newport Beach, CA 92660<br>Telephone: (949) 720-1288<br>mrobinson@robinson-pilaw.com |
| Thomas F. Campion, Esq.<br>Heidi E. Hilgendorff, Esq.<br>Drinker Biddle & Reath, LLP<br>500 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>Telephone: (973) 360-1100<br>Thomas.Campion@dbr.com<br>Heidi.Hilgendorff@dbr.com<br>**Attorneys for Defendants Janssen**<br>**Pharmaceutical Products and Johnson &**<br>**Johnson Co.** | Michael Davis, Esq.<br>James Mizgala, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone: (312) 853-7731<br>mdavis@sidley.com<br>jmizgala@sidley.com<br>**Attorneys for Defendants AstraZeneca LP**<br>**and AstraZeneca Pharmaceuticals, LP** |

14159788.1

2

| Elizabeth Raines, Esq. | Timothy Reese Balducci, Esq. |
|---|---|
| Baker, Sterchi, Cowden & Rice, LLC | The Langston Law Firm, PA |
| 2400 Pershing Road, Suite 500 | P.O. Box 787 |
| Kansas City, MO 64108 | 100 South Main Street |
| Telephone: (816) 471-2121 | Booneville, MS 38829-0787 |
| raines@bscr-law.com | Telephone: (662) 728-3138 |
| | tbalducci@langstonlaw.com |
| Kenneth W. Bean, Esq. | Seth S. Webb, Esq. |
| Sandberg, Phoenix & von Gontard | Brown & Crouppen, PC |
| One City Centre | 720 Olive St. |
| 15th Floor | St. Louis, MO 63101 |
| St. Louis, MO 63101-1880 | Telephone: (314) 421-0216 |
| Telephone: (314) 231-3332 | swebb@brownandcrouppen.com |
| kbean@spvg.com | asmith@brownandcrouppen.com |
| **Attorney for Defendant Dr. Asif Habib** | blape@brownandcrouppen.com |
| Aaron K. Dickey, Esq. | Matthew J. Hamilton, Esq. |
| Goldenberg and Heller, PC | Pepper Hamilton |
| P.O. Box 959 | 3000 Two Logan Square |
| 2227 S. State Road 157 | 18th & Arch Street |
| Edwardsville, IL 62025 | Philadelphia, PA 19103 |
| Telephone: (618) 650-7107 | Telephone: (215) 981-4000 |
| aaron@ghalaw.com | hamiltonm@pepperlaw.com |
| Justin Witkin, Esq. | David P. Matthews, Esq. |
| Ken Smith, Esq. | Lizy Santiago, Esq. |
| Aylstock, Witkin, Kreis & Overholtz | Matthews & Associates |
| 803 N. Palafox St. | 2905 Sackett Street |
| Pensacola, FL 32501 | Houston, TX 77098 |
| Telephone: (850) 916-7450 | Telephone: (713) 222-8080 |
| Jwitkin@AWS-LAW.com | dmatthews@thematthewslawfirm.com |
| ablankenship@aws-law.com | lsantiago@thematthewslawfirm.com |
| ksmith@aws-law.com | msalazar@thematthewslawfirm.com |
| noverholtz@aws-law.com | |
| Howard Nations | Mary B. Cotton |
| Lori A. Siler | John D. Giddens, P.A. |
| Howard L. Nations Attorney At Law | 226 North President Street |
| 4515 Yoakum Blvd. | P.O. Box 22546 |
| Houston, TX 77006-5895 | Jackson, MS 39225-2546 |
| Telephone: (713) 807-8400 | Telephone: (601) 355-2022 |
| nations@howardnations.com | betsy@law-inc.com |
| Salvatore M. Machi | Jona R. Hefner, Esq. |
| Ted Machi & Associates PC | 3441 W. Memorial, Suite 4 |
| 18333 Egret Bay Blvd., Suite 120 | Oklahoma City, OK 73134-7000 |
| Houston, TX 77058 | Telephone: (405) 286-3000 |
| Telephone: (281) 335-7744 | attorneyokc@hotmail.com |

| | |
|---|---|
| David Dickens<br>Miller & Associates<br>105 North Alfred Street<br>Alexandria, VA  22314-3010<br>(703) 519-8080<br>ddickens@doctoratlaw.com | Pete Schneider, Esq.<br>Grady, Schneider & Newman, L.L.P.<br>801 Congress, 4th Floor<br>Houston, TX  77002<br>(713) 228-2200<br>pschneider@gsnlaw.com |
| Fred T. Magaziner<br>Marjorie Shiekman<br>A. Elizabeth Balakhani<br>Shane T. Prince<br>Eben S. Flaster<br>DECHERT LLP<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA  19103<br>(215) 994-4000<br>fred.magaziner@dechert.com<br>shane.prince@dechert.com<br>marjorie.shiekman@dechert.com<br>eben.flaster@dechert.com<br>elizabeth.balakhani@dechert.com | Lawrence J. Gornick, Esq.<br>William A. Levin, Esq.<br>Dennis J. Canty, Esq.<br>Levin Simes Kaiser & Gornick LLP<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 646-7160<br>lgornick@lskg-law.com<br>dcanty@lskg-law.com<br>lsimes@levins-law.com<br>jkaiser@lskg-law.com<br>echarley@lskg-law.com<br>ddecarli@lskg-law.com<br>bsund@lskg-law.com<br>astavrakaras@lskg-law.com |
| Scott Burdine, Esq.<br>Hagans Burdine Montgomery<br>Rustay & Winchester, P.C.<br>3200 Travis, Fourth Floor<br>Houston, TX  77006<br>Telephone:  (713) 222-2700<br>sburdine@hagans-law.com | Lowell Finson, Esq.<br>Phillips & Associates<br>3030 North 3rd Street<br>Suite 1100<br>Phoenix, AZ  85012<br>(602) 258-8900<br>lowellf@phillipslaw.ws |
| Gale D. Pearson, Esq.<br>Stephen J. Randall, Esq.<br>Pearson, Randall & Schumacher, P.A.<br>Fifth Street Towers, Suite 1025<br>100 South 5th Street<br>Minneapolis, MN  55402<br>(612) 767-7500<br>attorneys@outtech.com | Robert H. Shultz<br>Heyl, Roster<br>103 West Vandalia Street<br>P.O. Box 467<br>Edwardsville, IL  62025<br>(618) 656-4646<br>rshultz@hrva.com<br>bwallace@hrva.com |
| Ellen R. Serbin<br>Perona, Langer, Beck, Lalande & Serbin<br>300 San Antonio Drive<br>Long Beach, CA 90807-0948<br>(562) 426-6155<br>davidhwang@plblaw.com | Scott Armstrong<br>1719 West Main Street<br>Suite 201<br>Rapid City, SD  57702<br>(605) 399-3994<br>Scottarmstrong1235@earthlink.net |

14159788.1

4

| | |
|---|---|
| Linda S. Svitak<br>Faegre & Benson, LLP<br>90 South 7th Street, Suite 2200<br>Minneapolis, MN 55402-3901<br>(612) 766-7000<br>lsvitak@faegre.com<br>wjohnson@faegre.com | James J. Freebery<br>McCarter & English, LLP<br>919 N. Market Street, 18th Floor<br>Wilmington, DE 19801<br>(973) 622-4444<br>jfreebery@mccarter.com<br>tpearson@mccarter.com |
| Richard D. Hailey<br>Ramey & Hailey<br>3891 Eagle Creek Parkway<br>Suite C<br>Indianapolis, IN 46254<br>(317)299-0400<br>rhailey@sprynet.com | B. Andrew List<br>Clark, Perdue, Arnold & Scott<br>471 East Broad Street, Suite 1400<br>Columbus, OH 43215<br>(614) 469-1400<br>alist@cpaslaw.com<br>lcollins@cpaslaw.com |
| Jane F. Thorpe<br>Scott A. Elder<br>Alston & Bird LLP<br>1201 West Peachtree Street<br>Atlanta, GA 30309<br>(404) 881-7000<br>jane.thorpe@alston.com<br>scott.elder@alston.com | |