# EXHIBIT 5

Confidential - Kevin Geoffrey Birkett

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

SEROQUEL PRODUCTS LIABILTY LITIGATION

CASE NO. 6:06-md-01769-ACC-DAB

MDL DOCKET NO. 1769

------

April 24, 2008

------

CONFIDENTIAL Videotaped Oral Deposition of KEVIN GEOFFREY BIRKETT, held in the offices of Golkow Technologies, Inc., One Liberty Place, 51st Floor, Philadelphia, Pennsylvania beginning at approximately 9:00 a.m., before Ann V. Kaufmann, a Registered Professional Reporter, Certified Realtime Reporter, Approved Reporter of the U.S. District Court, and a Notary Public.

------

GOLKOW TECHNOLOGIES, INC.
One Liberty Place, 51st Floor
Philadelphia, Pennsylvania  19103
877.370.3377

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 26

1    A.   It was more based on market
2    experience than testing.
3         Q.   Okay.  And then as part of
4    marketing do you also get involved in
5    delivering the message?
6         A.   We in the global function
7    would deliver the global strategy, which
8    would lay out the key claims that we
9    felt were most important to the brand.
10   We'd also lay out the long-term plan for
11   the brand.  The local messages in the
12   U.S., China, Japan, U.K. would be done
13   by the local operating company.
14        Q.   Okay.  So you guys were
15   involved with the overall strategy for
16   developing the message, testing the
17   message, and then you would provide it
18   to the local companies in the U.S. or
19   wherever to deliver the message; right?
20        A.   We were really testing the
21   product, suggesting the optimal
22   message.  And then how the product was
23   promoted locally varied upon local
24   market circumstances and the label in

Page 27

1    that country.
2         Q.   Okay.  But there were core
3    messages that the company developed;
4    right?
5         A.   Yes.  But whether they
6    could be used in absolute and every
7    marketing company was very rare, for
8    various different reasons.
9         Q.   Okay.  But there was a core
10   message group, wasn't there?
11        A.   There wasn't a group called
12   the core message group.
13        Q.   No, I'm sorry, I wasn't
14   making myself clear.  There were core
15   messages that the company developed;
16   right?
17        A.   Yes.
18        Q.   For Seroquel?
19        A.   Yes.
20        Q.   Okay.  And then there were
21   core -- there was actually a core
22   detailing set of slides that was
23   available as well; correct?
24        A.   I don't think that's a good

Page 28

1    terminology and it's not what I'm
2    familiar with.  There was a core set of
3    messages that we were recommending the
4    marketing companies would use if the
5    clinical trials delivered the data to
6    support them.  There was no global
7    detail aid.  Detail aids are very
8    prescriptified and used in one country.
9    I think it's not valid to have a global
10   detail aid.
11             (Below-described document
12   marked Birkett Exhibit 2.)
13   BY MR. BLIZZARD:
14        Q.   I'm going to show you what
15   I'm going to mark as Exhibit No. 2.  And
16   I will hand one to your counsel.
17             MR. AUSTIN:  Thank you.
18        Q.   Could you tell me what this
19   is?
20        A.   This is an item called a
21   sales story flow.  It's not a detail
22   aid.  This is a means to say to the
23   marketing companies that as the clinical
24   results of our product unroll, we would

Page 29

1    like this to form the basis of our
2    arguments that we use when promoting
3    Seroquel in different markets around the
4    world.
5         Q.   Okay.  If you turn over to
6    the Page 3, which is the first page that
7    contains details about the -- what this
8    document is, do you see what it says
9    there?
10        A.   Yeah, a core detail flow.
11        Q.   Okay.  So this is to be
12   used with -- in detailing, isn't it?
13        A.   No.  There's a difference
14   between a detail flow and a detail aid.
15   This is to give people a guide.  A
16   detail aid is a document that's used in
17   practice.
18             This document was never
19   printed and never used in a marketing
20   company.  This was to guide people in
21   marketing companies.  The detail aid
22   would be a glossy printed item that
23   would be used to promote to doctors.
24        Q.   Okay.  Now I see what

Confidential - Kevin Geoffrey Birkett

Page 30

1  distinction you are making. You are
2  saying that this was the document that
3  originated from your group that went out
4  to all the marketing companies that
5  proposed a flow of detailing when
6  salespeople actually went into doctors'
7  offices?
8      A.  No. This was designed to
9  give to the marketing people in the
10 different markets to say to them that
11 this could be a good detail flow to use
12 if the data supports it, if your local
13 label supports it. But the ultimate
14 decision of what would be promoted
15 country by country and in some instances
16 would mirror this and in some instances
17 would be completely different.
18     Q.  Hold on a second. Who
19 prepared this?
20     A.  A global brand manager.
21     Q.  And who was that?
22     A.  Alison Wilke.
23     Q.  And did she work for you?
24     A.  She worked for somebody who

Page 31

1  worked for me, the global brand
2  director.
3      Q.  Okay. So she was under
4  your direction; right?
5      A.  Yes.
6      Q.  And actually if you look at
7  this document, doesn't this document
8  say -- give proposed things to say to
9  doctors to deliver messages to doctors
10 about Seroquel based upon data that this
11 Alison Wilke is saying is available and
12 it supports these claims?
13     A.  Yes; but every time this
14 was reviewed by an individual marketing
15 company, it would be reviewed by their
16 clinical and regulatory team. And they
17 would say this may or may not work in
18 America, France, China, or Germany.
19 They had to take global responsibility
20 based on their local data.
21     Q.  Okay. You are not trying
22 to avoid responsibility for this, are
23 you?
24     A.  No, no. I think these

Page 32

1  documents are a very good guide, but
2  they should never be used by a marketing
3  company without it being rigorously
4  approved by all of their local team.
5      Q.  Okay. Well, did you guys
6  look at this rigorously?
7      A.  This was looked at
8  rigorously by the commercial team and
9  the clinical team.
10     Q.  Okay. Within your group?
11     A.  The clinical team wasn't in
12 my group. That's a separate group.
13     Q.  Okay. Did they provide
14 support for your group?
15     A.  Yes.
16     Q.  Okay. So with the support
17 of the clinical group, this was examined
18 rigorously; correct?
19     A.  Yes.
20     Q.  And then sent out to the
21 marketing companies throughout the world
22 who were also supposed to look at it
23 rigorously; correct?
24     A.  Let me check, because the

Page 33

1  problem with this form is I don't even
2  know if this ever went to the marketing
3  companies. So from this, what you have
4  shown me here, this may have been a
5  draft document. It looks like it was.
6  And so I don't even know that this went
7  to the marketing companies.
8      Q.  Do you know it didn't?
9      A.  I don't know it did.
10     Q.  Well, do you know it
11 didn't?
12     A.  No, I don't know it didn't.
13     Q.  Okay. Well, let's look at
14 some of the things that are said here.
15 If you look at the first page, where it
16 says "The following pages represent a
17 core detail flow and backup data" --
18     MR. AUSTIN: I'm assuming
19 you mean Page 1?
20     MR. BLIZZARD: No. I
21 actually mean the third page, which is
22 the page that has the substance of --
23 where the substance of the document
24 begins.

Page 326

1  analysts.
2      Q.  Well, you are correct about
3  that, but it's not limited to
4  pharmaceuticals, is it?
5      A.  Certainly not. But it's
6  limited to the financial analyst
7  community; they are the people who
8  generally are interested in Reuters.
9      Q.  Yeah. Do you know what its
10 reach is?
11     A.  I don't know.
12     Q.  Do you know what "reach"
13 is?
14     A.  I do.
15     Q.  And what does it mean?
16     A.  It means the number of
17 people that you can reach through a
18 specific medium.
19     Q.  Okay. Is it an
20 international or worldwide service?
21     A.  Reuters is international.
22     Q.  Okay. It says in the first
23 paragraph: "I called our friend at
24 Reuters - he was very personable but

Page 327

1  equally probing - more so than usual."
2  So he was asking some tough questions?
3      A.  Yes.
4      Q.  Okay. It says: "I didn't
5  give any hard facts but said the
6  following after an intense battering of
7  questions - I stuck to my 'script.'"
8      A.  Yes.
9      Q.  So you had a script for
10 this interview?
11     A.  No. But what we tended to
12 do was that we had regular meetings with
13 the people in our corporate headquarters
14 at Stanhope Gate. We gave them the key
15 points of note on any product because
16 they like to be appraised of latest
17 developments. I just used the script
18 that we gave them so that I knew that I
19 wasn't going to go anywhere that the
20 company didn't want me to go.
21     Q.  Okay. And that's generally
22 what you did when you talked to
23 reporters; correct?
24     A.  Yes. The issue with

Page 328

1  talking to reporters, as I'm sure you
2  are aware, they can be, as I point out
3  here, extraordinarily probing and they
4  can take some of the things that you
5  tell them out of context. So I was
6  trying to be extremely careful.
7      Q.  Okay. Look over on the
8  second page. It says: "He finished
9  (sic) on why Zyprexa was doing so badly"
10 -- do you see that paragraph?
11     A.  Yes.
12     Q.  -- "and asked if it was
13 weight - I said weight - eps and a
14 number of issues where we had superior
15 offering." Do you see that?
16     A.  Yeah. And that's
17 absolutely correct.
18     Q.  Well, did you -- you had an
19 opportunity to tell him about the EPS
20 findings that you had recently learned
21 about with respect to your own product;
22 right?
23     A.  But the issue is we
24 wouldn't be comparing apples with apples

Page 329

1  if I did that.
2      Q.  Nonetheless, you had an
3  opportunity within a month of finding
4  out about these EPS findings to get the
5  word out about what the findings were;
6  right?
7      A.  It would not have been
8  appropriate. It would not have shown a
9  good balance of data across the overall
10 database for Seroquel to make that
11 conclusion at that time. That's why the
12 team were running extra studies.
13         So what I was saying here
14 very clearly was in the treatment of
15 schizophrenia and mania, which are the
16 labeled indications for Zyprexa and
17 Seroquel, because Zyprexa has much more
18 EPS and much more severe weight gain,
19 that's why we're winning and they're
20 losing, which was factually correct.
21     Q.  Well, I guess -- was
22 telling them about Seroquel's EPS
23 findings on the script?
24     A.  I don't know how the script

Page 330

1  currently reads; but up until we decided
2  to do another study from BOLDER, we
3  always said that Seroquel in the
4  treatment of schizophrenia and mania had
5  a unique EPS tolerability profile, which
6  it did, and I believe it still does.
7       Q.   That was actually the
8  cornerstone of the marketing strategy
9  for Seroquel, wasn't it?
10      A.   There was actually three
11 points to the promotion.
12      Q.   What were they besides
13 superior on EPS?
14      A.   Unsurpassed efficacy,
15 superior EPS to all other agents and
16 similar to placebo, and negligible
17 prolactin and sexual side effects --
18      Q.   Okay.
19      A.   -- which were unique.
20      Q.   And those three claims were
21 the cornerstone of the Seroquel
22 marketing strategy; correct?
23      A.   Yes.
24      Q.   Okay. Now I'm going to

Page 331

1  hand you what I'm going to mark as
2  Exhibit No. 29 to your deposition.
3       A.   Thank you.
4            (Below-described document
5  marked Birkett Exhibit 29.)
6  BY MR. BLIZZARD:
7       Q.   After you received these
8  surprise -- is it fair to say that these
9  findings on EPS in the BOLDER study came
10 as a surprise to you?
11      A.   I was surprised. I wasn't
12 shocked. And we'd always postulated
13 that when you indicate a product for a
14 new series of disease targets, you'll
15 have a different efficacy and side
16 effect profile. So to have an EPS
17 profile similar to placebo was an
18 extraordinary thing. And we weren't
19 arrogant enough to think that if we
20 indicated Seroquel in all these
21 different diseases, that would always
22 remain.
23      Q.   Right.
24      A.   So surprise; not shocked.

Page 332

1       Q.   Okay. And that's another
2  reason why you don't want to promote for
3  off-label use, correct, because the side
4  effect profile might be different in a
5  different population? Right?
6       A.   That's why we never
7  promoted off label.
8       Q.   Okay. Because that could
9  cause patient safety issues, couldn't
10 it?
11      A.   If doctors decide to use a
12 product off label, it's outside the
13 reach of the data sheet and our purview,
14 and that's why we never promoted off
15 label.
16      Q.   Okay. And whether you are
17 promoting it off label, educating people
18 about it off label, or encouraging
19 off-label use, you can run into some
20 surprise side effect profiles if you
21 have it used outside the label; right?
22      A.   Any product if used by a
23 clinician outside its label in a
24 specific country could give results that

Page 333

1  are a surprise to the clinician and the
2  company.
3       Q.   Okay. Now, when you
4  received these surprise findings about
5  EPS coming out of BOLDER, did you take a
6  look at some of the other studies that
7  had previously been done to determine
8  whether they were consistent or
9  inconsistent?
10      A.   No. But I remember that
11 the head of our clinical team at the
12 time asked for that analysis, which I
13 applauded as a very good thing to do.
14      Q.   Okay. And who was that?
15      A.   Bob Holland.
16      Q.   Okay. now, if you look at
17 the last e-mail on the first page of
18 this exhibit, do you see that this is
19 written by a -- by Martin -- actually by
20 Didier -- how do you pronounce that last
21 name?
22      A.   I think it's Didier
23 Meulien. I'm sort of --
24      Q.   French?

Confidential - Kevin Geoffrey Birkett

Page 557

1  have sworn under oath -- it's going to
2  be on the record and the jury is going
3  to see it -- that the marketing
4  department was consulted on the core
5  data sheet, and my only question is what
6  was the consultations on the core data
7  sheet involving Seroquel?  What was the
8  marketing department's role in that
9  consultation?
10         MR. AUSTIN:  Object to form.
11     A.  To be aware of the
12  discussions and the clinical and
13  scientific rationale around why the data
14  sheet may change.
15     Q.  Why did you need to know
16  that?
17     A.  Because ultimately when the
18  data sheet changed, we would have the
19  responsibility to promote the product.
20     Q.  And so, therefore, your
21  promotion and what you may say or may
22  not say could be affected by the core
23  data sheet; right?
24     A.  The core messages that we

Page 558

1  would try and deliver for any product of
2  course had to be in line with the core
3  data sheet; but the core data sheet was
4  the ultimate document and it was a
5  technically derived document.
6      Q.  So if hyperglycemia and
7  diabetes were added to the core data
8  sheet, it could affect your role in
9  marketing about what you could say and
10  couldn't say about the product; correct?
11     A.  Not necessarily.  I think
12  it's very important to just remind
13  everybody that the key rationale and
14  benefit for Seroquel in all my times in
15  AstraZeneca was unsurpassed efficacy,
16  excellent tolerability on EPS, and
17  excellent tolerability on prolactin.
18         MR. ALLEN:  We're going to
19  take a break right now.  But when we
20  come back, I want to remind you of that
21  "unsurpassed efficacy."  We're going to
22  pick that up after the break.
23         THE WITNESS:  All right.
24         MR. ALLEN:  All right.

Page 559

1  Thank you, sir.
2         THE WITNESS:  Thank you.
3         THE VIDEOGRAPHER:  It's 25
4  minutes after 10 o'clock.  Going off the
5  record.
6         (Recess.)
7         THE VIDEOGRAPHER:  It's 39
8  minutes after 10 o'clock.  It is Tape
9  2.  We're back on the record.
10  BY MR. ALLEN:
11     Q.  Ready to proceed?
12     A.  Yes, thank you.
13     Q.  "Unsurpassed efficacy,"
14  that's another one of your
15  exaggerations, isn't it?
16         MR. AUSTIN:  Object to form.
17     A.  No, it's not an
18  exaggeration.  It was our way of
19  explaining that Seroquel showed
20  excellent efficacy versus older and
21  newer agents.
22     Q.  But that wasn't true,
23  though, was it?
24     A.  Seroquel at the correct

Page 560

1  dose shows excellent efficacy, and our
2  belief is that in the correct target
3  patients it is unsurpassed.
4     Q   "Unsurpassed," what does
5  "unsurpassed" mean?  I think I know what
6  it means but I want to make sure you and
7  I are communicating.
8     A.  It means in the correct
9  patient treated for the correct
10  indication at the correct dose Seroquel
11  is highly effective and there's nothing
12  more effective.
13     Q.  Nothing more effective?
14     A.  In the right indication at
15  the right dose.
16     Q.  And the right indication
17  would be what?
18     A.  It depends, because now for
19  Seroquel we're lucky enough to have many
20  indications.
21     Q.  Oh, okay.  Well, let me
22  talk about -- let's just take
23  schizophrenia first.  Does dose have
24  unsurpassed efficacy in schizophrenia?

31 (Pages 557 to 560)

Page 561

1    A.  Seroquel in schizophrenia
2  has a completely unique profile.
3    Q.  Sir, I asked you does it
4  have unsurpassed efficacy.
5    A.  At the correct dose
6  Seroquel is highly effective for the
7  treatment of schizophrenia.
8      MR. ALLEN: Objection,
9  nonresponsive.
10 BY MR. ALLEN:
11   Q.  I didn't ask you that.
12 You made the point to Mr. Blizzard
13 yesterday and to me right before the
14 break, and I told you I was going to
15 come back to it, that Seroquel had
16 unsurpassed efficacy. And I'm asking
17 you under oath, does Seroquel have
18 unsurpassed efficacy in the treatment of
19 schizophrenia?
20   A.  At the correct dose in the
21 correct patients, yes, it does.
22   Q.  And when did you have that
23 opinion?
24   A.  My opinion was formulated

Page 562

1  after speaking to all our scientists and
2  after the research program and the
3  regulatory program.
4    Q.  So sometime in the '90s?
5    A.  I first formed the view
6  that Seroquel was an effective and safe
7  product in the '90s, correct.
8      MR. ALLEN: Objection,
9  nonresponsive.
10 BY MR. ALLEN:
11   Q.  I'm not going to let you
12 change my question, sir. When did you
13 form the opinion that Seroquel had
14 unsurpassed efficacy? When was that?
15     MR. AUSTIN: Object to form.
16   A.  I can't remember when our
17 global product team decided that that
18 was how we were going to characterize
19 Seroquel's effectiveness. I cannot
20 remember; I'm sorry.
21   Q.  "How we're going to
22 characterize." So, as you've already
23 told us, you did use, "you" being your
24 company, use the characterization of

Page 563

1  unsurpassed efficacy in your marketing
2  efforts, did you not?
3    A.  Yes, we did.
4    Q.  Thank you, sir. Do you
5  have anything else -- I'm sorry. Do you
6  have anything else you want to say about
7  that?
8    A.  All of our marketing
9  efforts were based on the labels in the
10 individual countries where the product
11 was marketed, and all of the claims we
12 made were absolutely in line with the
13 local core data sheets.
14   Q.  But isn't it a fact the
15 data didn't really look good concerning
16 that issue? And, in fact, the data
17 didn't look good at all and your
18 product, Seroquel, did not even have
19 unsurpassed efficacy over first-
20 generation Haldol; isn't that right?
21   A.  No. At the correct dose in
22 the correct patients Seroquel is highly
23 effective for the treatment of
24 schizophrenia.

Page 564

1      MR. ALLEN: I got one, I got
2  one here, but I need one without; okay?
3    Q.  Sir, I'm trying to get a
4  highlighter. This highlighter ended up
5  with ink on the end so so when you
6  highlight turns black, so I apologize.
7  It will probably happen again.
8      Do you know that your
9  company, AstraZeneca, did an analysis of
10 the studies done on Seroquel in -- as of
11 around March of 2000 and determined that
12 in fact the data didn't look good and
13 Seroquel didn't have as much efficacy as
14 even Haldol? Did you know that?
15   A.  I know you are looking at a
16 report and you are asking me a question,
17 and I don't remember a specific report
18 that made the conclusion that you are
19 referring to.
20   Q.  Did you ever -- were you
21 ever told by any individuals -- and I'm
22 paraphrasing, but I'm paraphrasing
23 pretty accurately -- concerning the
24 claim of efficacy greater than Haldol in

Page 573

1  highlighting it for you.
2      A.  Yes, I've got you.
3      Q.  Those are Bates stamps.
4  That's some lawyer term; I have never
5  known what it meant. I guess Mr. Bates
6  invented the stamping system. But
7  that's called a Bates number; okay?
8      A.  Thank you. I've been
9  wondering what it was.
10     Q.  And all I know is we call
11 it that. I don't know anything else.
12 But that's a Bates number.
13     A.  Okay.
14     Q.  I would like you to turn to
15 Bates number page, last two digits, 89;
16 okay? And it is under the heading
17 "Proportion of responders." And, again,
18 I'm not going to read that to you
19 today. We will look at it later. But I
20 want you then to turn the page --
21     A.  I'm sorry. Do you want me
22 to read this or not? I'm sorry.
23     Q.  No, sir.
24     A.  Okay.

Page 574

1      Q.  I just wanted to orient you
2  and the jury where we are. "Proportion
3  of responders."
4      A.  Okay.
5      Q.  We turn the page to Page 90
6  and it is Table 1.
7      A.  Yeah.
8      Q.  Do you see that? And then
9  in very plain English it says: "The
10 following table is an attempt to
11 simplify the claims that could be
12 obtained from these results. A check is
13 entered for those comparisons where we
14 have a statistically significant
15 benefit, be it with 'all doses' or with
16 high dose Seroquel, and be it using
17 observed cases or...last value carried
18 forward." That's LVCF. "An X marks
19 those comparisons where a comparator has
20 demonstrated significant superiority
21 compared to Seroquel." Do you see that?
22     A.  I do, thank you.
23     Q.  So a check is where
24 Seroquel wins and an X is where the

Page 575

1  comparator wins. Do you see that?
2      A.  I do.
3      Q.  Comparators are listed
4  under Table 1 and we have Placebo,
5  Haloperidol. That's Haldol, is it not?
6      A.  It is.
7      Q.  Chlorpromazine, do you know
8  what that is, ?Clozaril?
9      A.  That's not Clozaril.
10     Q.  What is that? Tell me what
11 that is; I'm sorry.
12     A.  It has a whole different
13 series of names depending on which
14 country it exists.
15     Q.  Okay. What is
16 chlorpromazine? Do you know what that
17 is?
18     A.  It has got so many
19 different trade names that it's
20 generally used by the generic.
21     Q.  You are right. And I
22 forgot. So that's an antipsychotic, is
23 it not?
24     A.  Yes. It's a 50-year-old

Page 576

1  antipsychotic.
2      Q.  That's right. And you are
3  right and I was mistaken. It is a
4  first-generation antipsychotic; correct?
5      A.  Yes, it was one of the
6  first ones.
7      Q.  Yes, sir. You are right.
8  I apologize. We have Risperidone, which
9  is Risperdal, and then other typicals.
10 Do you see that?
11     A.  I do.
12     Q.  A check is where Seroquel
13 wins and, guess what, Seroquel beat a
14 placebo; right?
15     A.  Yes.
16     Q.  And an X is where the
17 comparator wins. On Haldol we have
18 three Xs, do we not?
19     A.  Just, if you wouldn't mind,
20 if I could just study the table.
21     Q.  Yes, sir.
22     A.  Yes, it says here that in
23 this analysis haloperidol scores higher
24 on BPRS, Factor V, and Hostility.

Confidential - Kevin Geoffrey Birkett

Page 577

1  Q. Yeah. Where did Seroquel
2  score better?
3  A. It's hard to tell from this
4  analysis, and I don't like the way it's
5  presented, so --
6      MR. ALLEN: Sir, I object as
7  nonresponsive.
8  BY MR. ALLEN:
9  Q. Quite frankly, it is not
10 important whether you like it. Your
11 company wrote this document. "A check
12 is entered for those comparisons where
13 we have a statistically significant
14 benefit, be it with 'all doses' or with"
15 a high dose and "be it using observed
16 cases or...last value carried forward."
17     I'm asking you, in the
18 comparator to Haldol, where did Seroquel
19 win, according to Table 1?
20 A. From this table, from a
21 document that's eight years old that I
22 never saw that was never signed, I
23 cannot see where Seroquel is seen as
24 more effective than haloperidol.

Page 578

1  Q. And then chlorpromazine --
2  I think I'm pronouncing that right --
3  chlorpromazine, where did Seroquel win?
4  A. It looks like -- in fact, I
5  can't tell from this analysis what
6  results were gleaned for Seroquel versus
7  chlorpromazine.
8  Q. You don't see any checks or
9  any Xs; right?
10 A. No, I don't.
11 Q. That's good. So, at least
12 according to the table, Seroquel never
13 won. You don't have any checks; right?
14 A. I've already said that I
15 don't know whether this is an official
16 document. It's eight years old. I've
17 never seen it. And this could be the
18 view of one person. It might have no
19 widespread statistical validity. You
20 are asking me to guess based on a
21 document I've never seen if Seroquel on
22 this data --
23 Q. Go ahead.
24 A. -- is less or more

Page 579

1  effective than chlorpromazine when it's
2  not even marked in the document.
3  Q. By the way, Dr. Wayne
4  Macfadden was U.S. medical director for
5  Seroquel, was he not?
6  A. I don't know what his title
7  was.
8  Q. You know who he is?
9  A. I think I met him once.
10 Q. He would have far more
11 knowledge about the clinical studies
12 than you, wouldn't he?
13 A. Because he was in the
14 clinical function, he'd probably have
15 more intimate knowledge of the studies,
16 correct.
17 Q. Let's go down to
18 Risperdal. Tell me, according to
19 Table 1, where Seroquel beat Risperdal.
20 A. It looks like on this
21 analysis in this paper it seems to
22 suggest that risperidone has more
23 efficacy on these measures.
24 Q. Thank you, sir. Other

Page 580

1  typicals, where did -- in this analysis
2  in Table 1, where did Seroquel win?
3  A. You know, I'm not being
4  difficult, but I really don't see the
5  point in answering the question because
6  I don't even know what other typicals
7  are. I think it's a total waste of time
8  having that conversation. It could be
9  anything.
10 Q. Okay. Well, sir, I just
11 don't, and we will let somebody else
12 determine whether it's a total waste of
13 time.
14 A. So do you know what those
15 products are?
16 Q. Yes, sir, I actually do.
17 I'm just saying --
18 A. Could you tell me and then
19 that might help me?
20 Q. When you get to take my
21 deposition, I will tell you whatever you
22 want me to tell you.
23 A. Okay.
24 Q. I'm saying, according to

36 (Pages 577 to 580)

Page 601

1  to -- by the way, if you turn to the
2  first page, it gives you the source of
3  the data, and it's a meta-analysis that
4  was conducted at AstraZeneca. It gives
5  you the design of the trials. And then
6  if we turn back to the conclusions on
7  Page -- Bates Page 07, the last two
8  numbers 07, do you see that? What do
9  you -- right there. Do you see that,
10 07? They have a conclusion, do they
11 not?
12     A.  Yes, they do.
13     Q.  Let me just read the
14 conclusion to the jury and then ask you
15 a question about it. "Conclusions. The
16 intended claim of 'superiority versus
17 Haloperidol' is highly unlikely using
18 these data, however a claim of
19 equivalence is not ruled out." Did I
20 read that correctly?
21     A.  Yes, you did.
22     Q.  Were you ever informed of
23 that Technical Document No. 5 or its
24 conclusions?

Page 602

1     A.  I have told you twice
2  already no.
3     Q.  Okay. Do you think you
4  maybe should have been informed of this
5  information before you went around
6  making claims of unsurpassed efficacy?
7         MR. AUSTIN:  Object to form.
8     A.  No, because I took my
9  guidance from the head of clinical, the
10 disclosure committee, and the SERM
11 group.
12        By the way, how is
13 equivalence different from unsurpassed?
14        MR. ALLEN:  Objection,
15 nonresponsive.
16 BY MR. ALLEN:
17    Q.  Do you really think you
18 get to ask me questions? Is that what
19 you think this process involves, that
20 you get to ask me questions and I give
21 you answers?
22        MR. AUSTIN:  Don't argue
23 with him. Just ask questions.
24        MR. ALLEN:  He's arguing

Page 603

1  with me.
2         MR. AUSTIN:  He is trying to
3  answer your question.
4         THE WITNESS:  I'm trying to
5  answer your question.
6  BY MR. ALLEN:
7     Q.  Well, let me ask, since you
8  asked me a question, let me ask you a
9  question: "Unsurpassed," "unsurpassed,"
10 what does that mean?
11    A.  It means --
12    Q.  Nobody is better; right?
13    A.  It means equivalent.
14    Q.  So if I really -- I'm
15 trying to think of something. If I tell
16 somebody that I went to a track meet and
17 I saw an athlete that has been
18 unsurpassed, I mean he was -- her, let's
19 say her. Her ability to do the broad
20 jump and the high jump and the relays
21 were unsurpassed, and I was just so
22 impressed and I go and tell you it was
23 unsurpassed, you believe that means I'm
24 saying she was equivalent to everybody

Page 604

1  else at the meet?
2     A.  Possibly, yes. That's the
3  correct grammar. Possibly, yes. She
4  was possibly better; she was possibly
5  equivalent.
6     Q.  And if I come home and --
7  your child, you said, is 5 years old?
8     A.  I have got two.
9     Q.  How old are they? Mine are
10 22, 20, and 17. How old are yours?
11    A.  3 and 5.
12    Q.  When your child comes home
13 from school let's say from first grade
14 and says, "Daddy, I" -- well, I don't
15 think first grade. And your child may
16 be smart because you are smart. So
17 let's just go to fifth grade. Go to
18 fifth grade. "Daddy, my grade in my
19 English class was unsurpassed." What
20 are you going to say, "Congratulations.
21 You made the same grade as everybody
22 else"?
23        MR. AUSTIN:  Object to form.
24 BY MR. ALLEN:

Confidential - Kevin Geoffrey Birkett

Page 605

1  Q. Is that what you are
2  telling this jury, is "unsurpassed"
3  means the same?
4  A. Yes, it does, it means the
5  same as or better. That's exactly what
6  it means.
7  Q. So -- that's exactly what
8  it means. So when AstraZeneca -- I'm
9  glad to know this. This is interesting
10 and I'm glad we're getting this out
11 here. So when AstraZeneca made the
12 claims of unsurpassed efficacy in regard
13 to Seroquel, what they were meaning to
14 say was, "We are just the same as
15 everybody else"; is that right?
16     MR. AUSTIN: Object to form.
17 A. No, but I think we were
18 incredibly careful with the use of
19 grammar to depict what the clinical
20 studies showed and concluded.
21 Q. You were trying to be
22 tricky?
23 A. No. We were being
24 incredibly precise and using the correct

Page 606

1  language. Of course, the language
2  varied from country to country and label
3  to label. The global impression from
4  the safety and efficacy review group was
5  our efficacy was unsurpassed.
6  Q. And you said in order to
7  use that language, using your words, you
8  were being incredibly careful; is that
9  right?
10 A. No, I didn't. I said
11 "incredibly precise."
12 Q. "Incredibly precise"; is
13 that right?
14 A. Yes.
15 Q. All right. So if somebody
16 understood the term "unsurpassed
17 efficacy" to mean that you were better
18 than others, they were just being
19 incredibly what, dumb?
20 A. No. We would never make a
21 claim without showing supporting
22 documentation. So, for example, in the
23 U.S., the doctor could read the label,
24 he could read the FDA approval, and he

Page 607

1  could see the total span of facts.
2      MR. ALLEN: Objection,
3  nonresponsive.
4  BY MR. ALLEN:
5  Q. I'm not asking about the
6  label and I'm not talking about the FDA
7  approval. I'm talking about what you've
8  called at various points during this
9  deposition a slogan or a phrase used in
10 regard to Seroquel, and that was
11 unsurpassed efficacy. Are you telling
12 this jury honestly under oath that you
13 were being so incredibly precise in the
14 marketing of Seroquel that "unsurpassed
15 efficacy" really meant that "We were the
16 same as everybody else"? Is that what
17 you're telling this jury?
18 A. No. I'm saying that we
19 chose that word to explain the fact that
20 in the studies that we had done, our
21 efficacy was unsurpassed when used in
22 the right patients in the right dose in
23 the right population. You can read a
24 document like this without the context

Page 608

1  and it would be easy to be misunderstood
2  about the total conclusion for what we
3  say about Seroquel. That's why we have
4  a SERM process.
5  Q. What document did you hold
6  up?
7  A. That was the document you
8  just gave me.
9  Q. Well, tell the jury what it
10 was. You held it up. I was through
11 with that document but I -- but what was
12 the document you just held up?
13 A. This was Exhibit No. 48,
14 which was from 2000, which was in --
15 between some technical people which was
16 never signed, so it may not have been
17 official, and was just one of a gigantic
18 data set for Seroquel.
19 Q. Yes, sir. That's -- you
20 chose to get back into it. I'll deal
21 with it. 48, "Conclusions. The
22 intended claim of 'superiority versus
23 Haloperidol' is highly unlikely using
24 these data, however a claim of

43 (Pages 605 to 608)