# EXHIBIT 11

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

SEROQUEL PRODUCTS LIABILTY LITIGATION

CASE NO. 6:06-MD-01769-ACC-DAB

MDL DOCKET NO. 1769

------

May 28, 2008

------

Confidential Videotaped Oral Deposition of MARTIN BRECHER, M.D., D.M.Sc., MBA, held in the offices of Golkow Technologies, Inc., One Liberty Place, 51st Floor, Philadelphia, Pennsylvania beginning at approximately 9:00 a.m., before Ann V. Kaufmann, a Registered Professional Reporter, Certified Realtime Reporter, Approved Reporter of the U.S. District Court, and a Notary Public.

------

GOLKOW TECHNOLOGIES, INC.
One Liberty Place, 51st Floor
Philadelphia, Pennsylvania  19103
877.370.3377

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 206

1  merged entity for six to eight months
2  when I joined.
3      Q.   And you mentioned that
4  Wayne Geller came over from Janssen a
5  little bit after you; correct?
6      A.   That's right.
7      Q.   Was there any connection
8  between you going to AstraZeneca and
9  Dr. Geller going to AstraZeneca or was
10 it coincidence?
11     A.   I had given Wayne Geller's
12 name to the director of safety as
13 someone who was a good worker.
14     Q.   Okay.  So was he recruited
15 to work at AstraZeneca because of your
16 recommendation?
17     A.   Possibly.  I remember a
18 conversation with Vikram Dev.  I
19 don't -- and I don't think I would have
20 offered.  I think, my best recollection,
21 he would have asked, do you know.  So it
22 would have been along the lines, do you
23 know any good safety people.
24         And assuming that was the

Page 207

1  question, I would have said, Yeah, Wayne
2  Geller.
3      Q.   Okay.  You trusted his
4  judgment?
5      A.   Yes, I did.
6      Q.   He wasn't fired from
7  Janssen, was he?
8      A.   No.
9      Q.   When you started in
10 December of 1999, did you take some
11 period of time to educate yourself about
12 Seroquel and what had happened
13 previously?
14     A.   I tried.
15     Q.   Did you take a look at what
16 studies were out there that had been
17 done that were successful studies?
18     A.   I remember reviewing the
19 submissions to the FDA and the European
20 countries.
21     Q.   Okay.  Did you review the
22 studies that were failed studies?
23     A.   I was aware of them.
24     Q.   Okay.  Did you review any

Page 208

1  cursed studies?
2      A.   Sorry?  Any?
3      Q.   Cursed studies.
4          MR. McCONNELL:  Objection to
5  form.
6      A.   I don't know any cursed
7  studies.
8      Q.   Okay.  Do you know any
9  studies that you reviewed where smoke
10 and mirrors were used to present them?
11         MR. McCONNELL:  Objection to
12 form.
13     A.   I don't -- I heard that
14 expression in one context, I don't
15 remember which, but that -- but
16 certainly in my review of the documents
17 when I joined the company, it did not
18 include a reference to smoke and
19 mirrors.
20     Q.   Do you know about study 15?
21     A.   Pardon?
22     Q.   Do you know about study 15?
23     A.   Yes.
24     Q.   What was study 15?

Page 209

1      A.   Study 15 was a long-term
2  study comparing three doses of Seroquel
3  to haloperidol for the prevention of
4  relapse in schizophrenia.
5      Q.   Okay.  And when did you
6  first become familiar with study 15?
7      A.   I must have read about it
8  in reviewing the submission documents to
9  the FDA and the EEU because it was in
10 the package.
11     Q.   Okay.  Did you ever review
12 the weight gain data from study 15?
13     A.   I can't say.  I don't
14 believe the weight gain -- I don't think
15 there was a lot of weight gain data from
16 study 15 because, as I understand now,
17 only 28 patients actually completed a
18 year of treatment.
19     Q.   I'm going to show you what
20 was previously marked as Schwartz
21 Exhibit No. 41 and now is marked as
22 Brecher Exhibit 3.
23         (Below-described document
24 marked Brecher Exhibit 3.)

53 (Pages 206 to 209)

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 210

1  BY MR. BLIZZARD:
2      Q.  Do you see that this is an
3  e-mail or an internal memorandum that's
4  dated February 12, 1997?
5          MR. McCONNELL:  Objection,
6  foundation.
7      A.  I'm sorry, your question
8  again, please?
9      Q.  Do you see this is an
10 e-mail dated February 12, 1997?
11 Actually, strike that.
12         Do you see this as an
13 internal memorandum dated February 12,
14 1997?
15     A.  Yes.
16     Q.  It says here that it is
17 from Richard Lawrence.  Do you know who
18 Richard Lawrence is?
19     A.  I never met him, and his
20 name has come up, but he was way before
21 my time.
22     Q.  Okay.  Well, this looks
23 like it's about almost three years
24 before your time.

Page 211

1      A.  That's right.
2      Q.  It's regarding a
3  U.S./Canada investigator meeting and
4  study 15.  Do you know anything about
5  the U.S./Canada investigator meeting?
6      A.  No.
7      Q.  Did you review any of the
8  that material when you came on board at
9  AstraZeneca?
10     A.  I don't recall ever seeing
11 material specifically relating to the
12 U.S./Canada investigator meeting.
13     Q.  Do you see that this
14 distribution of this e-mail went to Don
15 Stribling?
16     A.  Yes.
17     Q.  Do you know who Don
18 Stribling is?
19     A.  I knew him when he worked
20 in Japan.  He once came to a meeting
21 that we had with our Japanese
22 collaborators.  And he subsequently was
23 the head of regulatory affairs.
24     Q.  So he was pretty high up

Page 212

1  the corporate totem pole, wasn't he?
2          MR. McCONNELL:  Objection to
3  form.
4      A.  I don't know what position
5  he had in 1997.
6      Q.  Well, when you knew him, he
7  was fairly high up the corporate totem
8  pole, wasn't he?
9      A.  Yes.
10         MR. McCONNELL:  Objection to
11 form.
12     A.  Yes.  He was the --
13     Q.  Let me try corporate
14 ladder.
15     A.  In his role as the head of
16 regulatory affairs for the company,
17 that's a responsible and senior position
18 within the clinical development
19 organization.
20     Q.  Okay.  Now, do you see in
21 this -- first of all, that this was CC'd
22 to a Lisa Arvanitis?
23     A.  Yes.
24     Q.  Do you see that?  Do you

Page 213

1  know who Lisa Arvanitis is?
2      A.  Lisa Arvanitis was the
3  medical leader for Seroquel probably at
4  the time of the writing of this e-mail.
5  She had been gone from the company for
6  some time when I arrived.
7      Q.  So was she in your job as
8  of the time of this e-mail?
9      A.  To the extent -- I think
10 she was the medical leader for Seroquel
11 at the time.  I think that's a fair
12 guess on my part.  Obviously I wasn't
13 there, but I was aware that Lisa
14 Arvanitis was leading the quetiapine
15 effort, and so I think that she had a
16 job roughly analogous to mine.
17     Q.  Okay.  Do you see where it
18 says in the e-mail here that:  "I am not
19 100% comfortable with this data being
20 made publicly available at the present
21 time....however I understand that we
22 have little choice....Lisa has done a
23 great 'smoke and mirrors' job!"  Do you
24 see that?

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 330

1  Q. Okay. So he wasn't happy,
2  was he?
3      MR. McCONNELL: Objection to
4  form.
5  A. Well, I think his e-mail
6  speaks for itself. I think he was --
7  expressed concern, I would say. As he
8  said he questioned the rationale for
9  distributing it to the marketing people
10 for, quote, informal review.
11 Q. And your response is to say
12 I don't see a problem with marketing
13 knowing where we're going; correct?
14 A. Yes.
15 Q. Were you trying to lobby
16 the marketing people to support you in
17 the decision to keep "limited" in the
18 core data sheet?
19 A. I don't think that's where
20 that e-mail is going at all. I think
21 all I'm saying there is I didn't see a
22 problem with marketing knowing what our
23 position was. And that's what I said
24 before, before you showed me this

Page 331

1  document, I said I didn't see a problem
2  with the marketing people seeing the
3  discussion documents prior to the
4  meeting.
5  Q. Well, do you see a problem
6  with soliciting their comments to the
7  discussion document?
8  A. I think that this -- it
9  would be inappropriate if a drug safety
10 person would ask for marketing comments,
11 and I don't think that ever happened.
12 This --
13 Q. Well, you were -- I'm
14 sorry. Go ahead.
15 A. This discussion document,
16 as I said, immediately after you showed
17 it to me, is unusual in that it's being
18 produced by a member of the Seroquel
19 team. And I have offered a possible
20 explanation why. And clearly the writer
21 wanted to get marketing's view on the
22 content.
23 Q. Well, did you -- you were
24 on the e-mail that was sent by Emma

Page 332

1  Witch soliciting comments of the
2  marketing folks and others; correct?
3  A. Yes.
4  Q. Okay. Did you say "Whoa,
5  Emma, don't go submitting this for
6  comment to the marketing people"?
7  A. I did not.
8  Q. Did you tell her in any way
9  that she should hold off sending this to
10 marketing for comment because it was
11 inappropriate?
12 A. I did not.
13 Q. Now, the discussion -- the
14 SERM meeting that occurred in June of
15 2000, did you attend that in person?
16 A. The June 2000 SERM, yes.
17 Q. Where did it occur?
18 A. It must have occurred in
19 Wilmington.
20 Q. Okay. But you specifically
21 have a memory of being there for the
22 meeting?
23 A. Not a strong one. You
24 know, it's clear from the earlier

Page 333

1  document that you showed me that I was
2  there. And I don't have a vivid
3  recollection of the meeting, but I do
4  have a recollection of being there.
5      (Below-described document
6  marked Brecher Exhibit 18.)
7  BY MR. BLIZZARD:
8  Q. I have handed you
9  Exhibit No. 18, and it has a number of
10 handwritten notes on it. Are those --
11 is that your handwriting?
12 A. Yes.
13     (Below-described document
14 marked Brecher Exhibit 19.)
15 BY MR. BLIZZARD:
16 Q. Before I get to what that
17 says, let me mark as Exhibit 19 to your
18 deposition -- are these draft minutes of
19 a meeting in July of 2000?
20 A. This is -- are you talking
21 about 19?
22 Q. Yes.
23 A. They are draft minutes.
24 Q. Okay. Is that a -- are the

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 334

1  minutes prepared by Emma Witch?
2     A.  Yes.
3     Q.  And is Emma Witch shown as
4  an attendee at this meeting?
5     A.  Yes.
6     Q.  Are these other people
7  involved in this meeting, SERM members?
8     A.  Wayne is a SERM member.
9         I don't know whether or not
10 Paul Duffy would have participated in
11 SERM.  He was a -- he is a toxicologist
12 and was involved in the preclinical work
13 with Seroquel.
14    Q.  Okay.  So these meeting
15 minutes do not reflect the minutes of
16 SERM, do they?
17    A.  No.
18    Q.  Okay.  This is a separate
19 meeting that relates to the preparation
20 of the FDA response to the -- on the
21 diabetes issue?
22    A.  Response to the FDA, right.
23    Q.  Okay.  Well, we will get to
24 that in a minute then.

Page 335

1         Take a look at the
2  discussion document for Seroquel.  These
3  handwritten notes that were made on this
4  document, Exhibit 18, were -- when were
5  those made?
6     A.  You know, I'm not sure what
7  document this is.  I can guess, but
8  perhaps you could tell me.
9     Q.  Well, as the title says,
10 "Diabetes Mellitis, Diabetic
11 Ketoacidosis, Non-Ketotic Hyperosmolar
12 Coma, and Hyperglycaemia."  And it is a
13 discussion document regarding Seroquel;
14 correct?
15    A.  Yes.
16    Q.  And it's prepared by Wayne
17 Geller; correct?
18    A.  Yes.
19    Q.  I believe that this
20 document was prepared in advance of the
21 SERM meeting and was discussed at the
22 SERM meeting.  That's my belief.  Do you
23 recall that?
24    A.  Are you referring to the

Page 336

1  June 2000 SERM meeting?
2     Q.  Yes.
3     A.  That's what I think as
4  well.  I just don't see a date on this
5  document.  But looking at the cover and
6  just quickly glancing through the
7  interior, I think this is the discussion
8  document or a draft of it prepared for
9  this -- as a discussion document for the
10 June 2000 SERM.
11    Q.  Okay.  What I would like
12 for you to do for me is to read your
13 handwriting.  Sometimes I can read it;
14 sometimes I can't.  And I want to make
15 sure we have an accurate rendition of
16 your handwritten notes from this
17 meeting.
18        First, on the first page at
19 the top, what does that say?
20    A.  Where it says 1)?
21    Q.  Yes.
22    A.  That's angioedema.
23    Q.  What have you crossed
24 through at 2)?

Page 337

1     A.  I think it's -- "limited"
2  is crossed out.
3     Q.  Okay.  What's No. 3)?
4     A.  It looks like
5  "hyperglycemia" and "diabetes."
6     Q.  Okay.  Do you know why
7  "limited" is crossed out in No. 2)?
8     A.  I can't recall.
9     Q.  Is it possible it relates
10 to the weight gain issue?
11    A.  I have no recollection what
12 I was thinking when I wrote these notes.
13    Q.  Okay.  So all you can do at
14 this point is read them to me; correct?
15    A.  That's right.
16    Q.  Okay.  What does the note
17 on the right-hand margin say that says
18 "OS"?
19    A.  I think that's "US."
20    Q.  Okay.
21    A.  That makes more sense to
22 me.  And I think to the right of that it
23 says "involuntary movements."
24    Q.  Okay.  And then it says

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 338

1  "CDS"?
2     A.  "Discussion."
3     Q.  What does "CDS" stand for?
4     A.  Core data sheet.
5     Q.  Okay. Then on the first
6  page out on the left-hand side under the
7  heading "All Findings Presented in This
8  Document Are to Be Subject to Further
9  Consideration at SERM," does it say "6
10 cases"?
11    A.  Yes.
12    Q.  What does it say beneath
13 that?
14    A.  Below that?
15    Q.  Yes.
16    A.  I can't make out the first
17 word. And then it says "time to onset
18 new diabetes 0.5 months." Oh,
19 "Median." "Median time to new onset
20 diabetes 0.5 months."
21    Q.  Okay. And then in the
22 middle of that, just to the right of
23 that note, what does that say? It says
24 "Wayne" at the top and that is

Page 339

1  underlined?
2     A.  Yeah. "Page 8, 2240 base
3  rates." And then it says something that
4  doesn't make sense to me, gdv or gov. I
5  don't know what that means --
6     Q.  Okay.
7     A.  -- with a question mark.
8     Q.  And then over on the right-
9  hand margin, what does that say?
10    A.  "Emma, MJ - dose
11 response." MJ would be Martin Jones.
12 And then below that --
13    Q.  Is Emma Emma Witch?
14    A.  Probably. I think that we
15 also had an Emma Westhead, but -- so I
16 don't know which Emma this is referring
17 to.
18    Q.  Okay.
19    A.  And then "Geert - 6 cases,
20 conclusions."
21    Q.  So what does "Geert" refer
22 to?
23    A.  Geert would refer to Geert
24 deVriese, who was the global product

Page 340

1  director.
2     Q.  Okay. Do you know what the
3  "6 cases" references?
4     A.  You know, I don't know if
5  it's the same six cases referred to on
6  the left.
7     Q.  Okay. And what does it say
8  beneath that? There's an arrow pointing
9  down.
10    A.  I can't quite read the
11 first word. And then the second word is
12 "CDS in line with US PI?" Oh, "bring."
13 I think it says "Bring CDS in line with
14 US PI?"
15    Q.  Okay. So there was some
16 question about whether -- or somebody
17 was raising the question of whether the
18 CDS should be brought in line with the
19 U.S. package insert; correct?
20    A.  I don't know if that was my
21 question or someone else's question.
22    Q.  Okay. And then underneath
23 that what does it say?
24    A.  "Conclusion: Keep issue

Page 341

1  under review."
2     Q.  And then under -- on the
3  bottom of the page what does it say?
4     A.  "Of 10 cases from clinical
5  trials," arrow "each source?"
6     Q.  Second page up at the top?
7     A.  "RIS labelled for diabetes,
8  DKA."
9     Q.  And that's diabetic
10 ketoacidosis?
11    A.  That's what the DKA would
12 stand for.
13    Q.  Okay. Under -- right next
14 to the "Introduction" section, what does
15 that say?
16    A.  "Criteria used in this
17 assessment." It looks like "FBS," which
18 would be fasting blood sugar, "greater
19 than 126 2 hour post, 75 grams greater
20 than 200."
21    Q.  Okay. Can you interpret
22 that note?
23    A.  Yeah. I think that -- what
24 I think it means, without confirming it

86 (Pages 338 to 341)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 342

from the text, is that the criteria used in the assessment was either a fasting blood sugar greater than 126 or a two-hour glucose value following 75 grams of glucose -- in other words, a glucose tolerance test -- with a value greater than 200.

Q. Okay. If you go turn the page to the next note that we have. It looks like it's over on Page 6.

Okay. What does that say?

A. On the top?

Q. Yes.

A. "No attribution." And then to the right of that it says "16, SPONT," probably referring to -- standing for spontaneous; "10 clinical" -- "10 CLIN trials," referring to ten clinical trials; and "2 lit reports." So what this is referring to is 16 spontaneous reported adverse events, ten clinical trial reports, and two reports in the literature, and they are pointing to no attribution.

Page 343

Q. Okay. Under "CLINTRACE Database (In House Safety Data)," there's a note that says "9 cases"?

A. "9 cases new onset, 4 DKA, 2 new onset, 2 worsening." And then below that is "NKHOC-0." And NKHOC would stand for nonketotic hyperosmolar coma.

Q. And then you've got a star next to this particular description of this event of a 43-year-old male with a history of mental illness who developed new onset diabetes. Do you see that?

A. Yes.

Q. Do you know why it was starred?

A. No. And I'm just curious whether I starred other cases.

Q. I think you did. Look over at the next page. Do you see that?

A. Yes.

Q. And this particular case is a diabetes case with weight gain; correct?

Page 344

A. Yes.

Q. And you starred that?

A. Yes.

Q. And do you know why you starred it?

A. No.

Q. I assume that you starred things that were important to you; is that correct?

A. Presumably. I certainly don't -- I'd have to pore over this document to see what were the common features of the starred cases. I don't recall that now.

Q. Okay. Look over at the next page. Do you see that there's a starred event on this page as well?

A. Yes.

Q. And the next page, "Loss of Diabetic Control, Tooth Pain, Insomnia"?

A. Yes.

Q. Do you see that that event is starred?

A. Yes.

Page 345

Q. If you look over at Page 11 --

A. Yes.

Q. -- do you see a star there?

A. Yes.

Q. Do you know anything about why that star is there?

A. I don't recall the principle leading to the starring of cases.

Q. Okay. If you look over on Page 15, there's a star next to another case of hyperglycemia?

A. Yes.

Q. Okay. On Page 16 --

A. Yes.

Q. -- could you read that handwriting for us?

A. It says "Median?" Below that "time to onset." There's text that reads "The former patient reportedly lost 30 pounds," and then there's a line from that going to a handwritten note saying "Type 1 - pattern."

Page 346

1    Below that it says "2 cases
2    of DKA - weight gain associated." And
3    then below that there's a -- it says
4    "criteria greater than 110" -- it looks
5    like greater than 110 pounds, but I'm
6    not sure what that means.
7        Q.   This relates to reports of
8    hyperglycemia.
9        A.   Oh, I'm sorry. I can --
10   this one on Page 16 on the bottom that
11   the arrow says "criteria greater than
12   110 fbs," it's for fasting blood sugar.
13       Q.   Okay. And the last page,
14   Page 17, what does the note at the top
15   say?
16       A.   "Note, Wayne impressed by 2
17   physicians noting diabetes onset with
18   dose increase."
19       Q.   Okay. So does that note
20   reflect that Dr. Geller was impressed
21   with the dose-response?
22       A.   I don't think that
23   represents a dose-response so much as
24   exactly what it says, that two

Page 347

1    physicians noted diabetes onset
2    following a dose increase. I don't
3    think that indicates a dose-response.
4        Q.   It indicates that the
5    diabetes onset occurred after the dose
6    was increased; right?
7        A.   That's right. It is
8    different from a dose-response.
9        Q.   Okay. The next item in the
10   middle of the page says what?
11       A.   "Usually no baseline blood
12   glucose. 7 taking drugs associated with
13   diabetes. Some reports - scant
14   information" -- "scant inf" meaning
15   scant information -- "no positive de,"
16   which means no positive dechallenge or
17   rechallenge.
18       Q.   What's the next note say?
19       A.   "Seroquel may cause
20   impaired glucose regulation in some
21   individuals. No signal of Type 1 ie no
22   negative impact on insulin production."
23       Q.   Okay.
24       A.   Well, that -- "Discussion:

Page 348

1    No positive re,de challenge. No
2    baseline CHO," referring to no baseline
3    glucose. "Low number of cases for a
4    common condition."
5            That's actually an important
6    point because diabetes is very common.
7    And my comment here, I think, reflects
8    the view that this is a small number of
9    cases for an illness as common as
10   diabetes, given the exposure that we had
11   by 2000.
12           "No mechanism of effect."
13           On the right it says "For
14   my part only 4 cases of DKA speaks to
15   absence of diabetogenic effect."
16           Below that: "Other
17   patients: 1., will get long term data
18   from olanz trial. 2., will" --
19       Q.   What's "olanz trial"?
20       A.   That would refer to
21   olanzapine, but I'm not -- I don't know
22   what olanzapine trial I was referring
23   to, unless -- probably given that it was
24   2000, it could either have referred to

Page 349

1    the long-term trials that Lilly
2    conducted or to the long-term trial that
3    Janssen conducted.
4            And then below that,
5    "will" --
6        Q.   "Know more?"
7        A.   "Will" --
8        Q.   -- "know more after
9    response to FDA concludes."
10       A.   I think so.
11       Q.   I may have stared at it
12   longer than you, so whatever you need to
13   do to confirm it.
14       A.   Yeah, I think that's right.
15       Q.   Okay. So in looking at
16   this, you made the -- when you started
17   talking about this discussion down here
18   below the line, you may have said, well,
19   here are a couple of important points.
20           And then there's these
21   comments above the line that you read
22   without making a comment about it.
23           Is it your memory, from
24   looking at this now, that the points

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 374

1  metabolism disorders. Dear Wayne, thank
2  you for yoy fax" -- I guess that is
3  supposed to be "your fax" -- "which I
4  sent to the local authorities."
5      A.   Yes.
6      Q.   And when he actually faxed
7  it to her, if you look at the --
8  Geller's communication on Page 2, do you
9  see where he says: "Hi, Dorothee. The
10 document is 11 pages. I can fax a
11 signed copy to you or mail one. If you
12 prefer the latter, please send me your
13 address and I will send it out at
14 once." Do you see that?
15     A.   Yes.
16     Q.   And then she sends back and
17 says thanks for the fax; correct?
18     A.   Yes.
19     Q.   Okay. So, again,
20 Dr. Geller is offering to sign this
21 document before faxing it; right?
22          MR. McCONNELL: Objection to
23 form.
24 BY MR. BLIZZARD:

Page 375

1      Q.   Let me rephrase that.
2  Dr. Geller is offering to sign the
3  document that was attached; right?
4          MR. McCONNELL: Same
5  objection.
6      A.   Wayne is offering to sign
7  the document.
8      Q.   Right. and would that
9  indicate to you, as a reasonable person
10 who conducts business in the way that
11 people typically conduct business, that
12 that is not a draft?
13          MR. McCONNELL: Objection to
14 form.
15     A.   I was not involved with
16 this correspondence between the Dutch
17 and Wayne. And if Wayne was mistaken
18 about his document, I don't think it
19 matters whether or not he signed it or
20 not. I don't know whether he knew it
21 was a draft or not. And I can't
22 comment. I just don't know his
23 procedures well enough to comment on
24 what's the implication of signing the

Page 376

1  document.
2      Q.   What is the implication
3  when you sign a document?
4          MR. McCONNELL: Objection to
5  form.
6      A.   When I sign a document, I
7  usually -- it means that I wrote this
8  document.
9      Q.   It means you are taking
10 responsibility for what's in the
11 document; right?
12     A.   Usually.
13     Q.   And that's what it would
14 mean here, wouldn't it, that he was
15 taking responsibility as a global drug
16 safety physician for the statements made
17 in the document?
18     A.   I want to say --
19          MR. McCONNELL: Excuse me.
20 Objection to form.
21     A.   I want to say two things:
22 I don't know what Wayne -- was going
23 through Wayne's mind and I don't want to
24 comment on what it meant that he signed

Page 377

1  this document.
2          Moreover, if we get back to
3  the document, I just don't feel that the
4  arguments and the data that are in the
5  document, particularly in the executive
6  summary, are supporting the
7  conclusions. So -- but, regardless, I
8  don't think that -- I just can't
9  comment -- I don't know whether this was
10 the document that was mistakenly sent
11 and I don't know --
12     Q.   How do you --
13     A.   I can't comment on the
14 interaction between Wayne and the Dutch
15 authorities because I was not involved
16 in that transaction.
17     Q.   Well, the e-mail that we
18 just reviewed clearly indicates that the
19 Dutch authorities were asking for an
20 analysis of glucose metabolism and
21 Seroquel; correct?
22          MR. McCONNELL: Objection to
23 form.
24     A.   The Dutch wanted a review

95 (Pages 374 to 377)

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 378

1  of cases or an analysis of cases of
2  diabetes and glucose metabolism that may
3  or may not have been related to
4  Seroquel.
5      Q.  Right.  And people within
6  the marketing company over in the
7  Netherlands asked Wayne Geller to submit
8  a paper, and he offered to sign and
9  faxed this safety position paper to
10 them; correct?
11     MR. McCONNELL:  Objection to
12 form.
13     A.  Wayne attempted to be
14 responsive to a request and offered to
15 sign a document.
16     Q.  Now, the Dutch authorities
17 weren't just acting as a single country
18 in Europe at the time with respect to
19 Seroquel, were they?
20     A.  The Dutch was a reference
21 member state.
22     Q.  And the reference member
23 state takes the lead for the entire
24 European Union with respect to a

Page 379

1  particular drug that they are the
2  reference member state for; right?
3      A.  Right, for those states
4  participating in the process.
5      Q.  Okay.  Do you know how many
6  states in the European Union were
7  participating in the process at the time
8  in 2000 when this paper was sent to the
9  Dutch authorities?
10     A.  Well, account -- you know,
11 there were new countries that joined the
12 European Union over time, so I don't
13 recall how many were there in 2000.
14     What I do know is that
15 France was not a part of it and we had a
16 separate registration procedure in
17 England and Italy.  So that the
18 reference member state would have -- or
19 that role as reference member state
20 would have applied to the other Western
21 European countries.
22     Q.  Okay.  Now, this document
23 that we just read the conclusion of that
24 was submitted to the Dutch, assuming it

Page 380

1  was the one that was submitted to the
2  Dutch, that contained markedly different
3  conclusions than the one that was given
4  to the FDA, didn't it?
5      A.  Well, I don't think I've
6  looked at the FDA position paper today.
7  And I think the position stated here is
8  at variance with the FDA position paper.
9      Q.  Okay.  Well, we can look at
10 the FDA position paper, and we will
11 probably do that tomorrow.  But I mean,
12 without reading it, you know that the
13 company did not write a paper to the FDA
14 saying that there's reasonable evidence
15 to -- that Seroquel can cause diabetes
16 or hyperglycemia in certain individuals?
17     A.  That's right.
18     Q.  Right.  In fact, you never
19 sent this safety position paper of
20 Dr. Geller to the FDA, did you?
21     MR. McCONNELL:  Objection to
22 form.
23     A.  I don't think this safety
24 position paper was sent to the FDA.

Page 381

1      Q.  Right.  Even today FDA
2  doesn't have this safety position paper,
3  does it?
4      A.  And I don't think that this
5  represents the view of AstraZeneca or
6  the drug safety department at that time
7  or, for that matter, now.
8      MR. BLIZZARD:  Objection,
9  nonresponsive.
10 BY MR. BLIZZARD:
11     Q.  Now, let me ask you
12 something that's really on a different
13 subject now, and I think with that I'd
14 like to maybe conclude for the day and
15 we will save some additional time for
16 tomorrow.
17     After the SERM meeting in
18 2007 there was a discussion document
19 that was actually presented at the SERM
20 meeting.  And I have a copy of it.  I'm
21 not going to attach it today, but I
22 think it's about 500 pages long.  Do you
23 recall that document?
24     A.  It was a long discussion

96 (Pages 378 to 381)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 943

1  Q. Do marketing and commercial
2  people at AstraZeneca have any role
3  whatsoever in the SERM process?
4  A. They do not.
5  Q. Doctor, as part of the
6  preparation for SERM, is safety data
7  review and analyzed?
8  A. Yes.
9  Q. Could you explain to the
10 jury what type of data is reviewed and
11 analyzed as part of the SERM process?
12 A. The SERM reviews should
13 include, and typically do include, the
14 data from clinical trials, postmarketing
15 surveillance and literature reviews, and
16 sometimes the preclinical data as well.
17 Q. Is material from the global
18 drug safety database reviewed as part of
19 the SERM process?
20 A. Yes.
21 Q. Doctor, did AstraZeneca
22 create the SERM process specifically to
23 examine the glucose issue relating to
24 Seroquel?

Page 944

1  A. Yes.
2  Q. They did that in the spring
3  of 2000?
4  A. The SERM meeting for glucose
5  was in June of 2000.
6  Q. Okay. Does AstraZeneca also
7  use the SERM process at times for other
8  drugs involving other issues?
9  A. The SERM process is used for
10 all drugs, all marketed drugs at
11 AstraZeneca.
12 Q. Does AstraZeneca convene
13 SERMs only to respond to FDA requests?
14 A. No.
15 Q. In your experience, is the
16 SERM process an effective tool to monitor
17 the safety of the drug?
18 A. Yes.
19 Q. Why?
20 A. The SERM -- a SERM meeting
21 is called whenever a question or an issue
22 is raised around the safety of marketed
23 medicine. So that could happen whether
24 concerns are raised from within the

Page 945

1  company or in response to a request from
2  a regulatory agency.
3  Q. Does the SERM process play a
4  role in determining whether the core data
5  sheet should be changed?
6  A. Yes.
7  Q. What is the core data sheet?
8  A. The core data sheet is the
9  best description of the safety profile of
10 the drug and represents the core items
11 that have to be included in every product
12 label. So it's that -- those facts about
13 the safety of the drug that must be
14 included in every label around the world.
15 Q. When AstraZeneca does
16 convene a SERM, does the SERM always
17 conclude that the core data sheet should
18 be changed?
19 A. No, it doesn't.
20 Q. Does the SERM always
21 conclude that the core data sheet should
22 not be changed?
23 A. No, it doesn't.
24 Q. What explains the difference

Page 946

1  in those different kinds of decisions?
2  A. The critical point is
3  whether the label accurately reflects the
4  safety profile of the drug as we
5  understand it.
6  Q. Does the SERM decision as to
7  whether or not to change the core data
8  sheet depend in any way upon the
9  available data?
10 A. The SERM decision to change
11 the core data sheet depends entirely on
12 the data.
13 Q. Is the SERM process the only
14 way that AstraZeneca monitors the safety
15 of Seroquel?
16 A. No.
17 Q. What other procedures are in
18 place at AstraZeneca to monitor the
19 safety of Seroquel?
20 A. The drug safety department
21 is monitoring safety on a continuous
22 basis. And so are the clinical trials
23 people. Clinical trials people are
24 monitoring safety as the clinical trials

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 947

1   are ongoing.
2        Q.   Does anyone or any
3   department at AstraZeneca monitor adverse
4   events?
5        A.   Primarily drug safety and
6   also the clinical group.
7        Q.   Does AstraZeneca submit
8   periodic safety updates to the FDA?
9        A.   Yes.
10       Q.   In your experience, did
11  AstraZeneca closely monitor the safety of
12  Seroquel?
13       A.   Yes.
14       Q.   Now, you've discussed the
15  SERM process generally. Are there
16  documents that are associated with the
17  SERM process?
18       A.   Yes. Prior to a SERM
19  meeting there's a discussion document.
20  Following the SERM meeting there is
21  either a position paper or justification
22  document that's prepared.
23       Q.   What's the purpose of a
24  discussion document for SERM?

Page 948

1        A.   A discussion document is
2   written so as to inform the discussions
3   at SERM of all the relevant facts.
4        Q.   What's the purpose of a SERM
5   position paper?
6        A.   A SERM position paper is
7   that -- is a paper that is written after
8   a SERM meeting when the core data sheet
9   is not changed on a particular issue.
10  And it reflects the reasoning as to why
11  the core data sheet is not changed on
12  that point.
13       Q.   Now, we talked about the FDA
14  request in May of 2000 regarding glucose
15  data. Did you participate in a SERM in
16  2000 regarding glucose issues?
17       A.   Yes.
18       Q.   Was there, in fact, a
19  discussion at AstraZeneca at the SERM
20  regarding glucose data?
21       A.   Yes.
22       Q.   What did that SERM conclude
23  regarding whether there was reasonable
24  evidence of an association between

Page 949

1   Seroquel and hyperglycemia or diabetes?
2        A.   SERM decided to keep those
3   issues under review, but not to change
4   the core data sheet.
5        Q.   What did SERM conclude as to
6   whether there was a causal link between
7   Seroquel and hyperglycemia or diabetes?
8        A.   SERM did not conclude that
9   there was a causal link between Seroquel
10  and hyperglycemia or diabetes.
11       Q.   What did SERM conclude in
12  2000 as to whether the data demonstrated
13  reasonable evidence of an association
14  between Seroquel and hyperglycemia or
15  diabetes?
16       A.   SERM concluded that the data
17  did not show a reasonable evidence of an
18  association.
19       Q.   I want you to take a look at
20  a document that the plaintiffs' lawyers
21  put in front of you. It's Exhibit 18.
22  Could we get a look at that?
23            Doctor, first of all, do you
24  remember taking a look at Exhibit 18, I

Page 950

1   don't know if it was yesterday or the
2   day -- I think it was the day before
3   yesterday?
4        A.   Yes, I remember.
5        Q.   Could you turn to the last
6   page, please?
7        A.   Yes.
8        Q.   Do you see handwritten notes
9   on that page?
10       A.   Yes.
11       Q.   And that's your handwriting.
12  Is that right?
13       A.   Yes.
14       Q.   I want to direct your
15  attention to the handwritten notes that
16  are underneath the typed section of the
17  page. Do you see what I'm talking about?
18       A.   Yes.
19       Q.   All right. Do you recall
20  testifying on Wednesday that those notes
21  were your reflections on reading the
22  document?
23       A.   Yes.
24       Q.   I want to get you to focus

46 (Pages 947 to 950)

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 1015

1  questions now about another trial, it's
2  one that you've been asked some questions
3  about. I want to give you an opportunity
4  to describe it to the jury. That's trial
5  125. Were you involved with trial 125?
6      A.  Yes.
7      Q.  Could you explain to the
8  jury what trial 125 is?
9      A.  Trial 125 was an effort by
10 AstraZeneca to understand the effects of
11 Seroquel on glucose metabolism. And to
12 do that we used a more sensitive assay
13 even -- than even the fasting glucose.
14 We used the glucose tolerance test.
15 That's very important because the glucose
16 tolerance test becomes abnormal earlier
17 in the course of diabetes than the
18 fasting blood sugar so it was a sensitive
19 test for the emergence of diabetes.
20 We --
21     Q.  Would it be -- I'm sorry,
22 keep going.
23     A.  We measured the area under
24 the curve for the two hours of the

Page 1016

1  glucose tolerance test, and that, too, is
2  a sensitive measure of whether there's an
3  effect of a drug on glucose regulation.
4  That was -- that's one important point.
5          The second important point
6  was that we hospitalize the patients
7  overnight both at baseline at week 12 and
8  at week 24. And, therefore, we could be
9  sure or as sure as one could reasonable
10 want that the patients had not eaten
11 prior to the exam both at baseline and at
12 week 24.
13         Third, we were able to find
14 patients who had not been previously
15 exposed to atypical antipsychotics, so we
16 were measuring -- we were studying
17 relatively naive patients, and so we were
18 able to look at results independent of
19 what the patients had been on before.
20 And lastly, the study was a long study,
21 it was 24 weeks, and so we were able to
22 have a good assessment of what the
23 prolonged effect of treatment was on
24 patients' glucose metabolism.

Page 1017

1      Q.  Would it be absolutely
2  accurate to describe trial 125 as a
3  diabetes study?
4      A.  No, it was not a diabetes
5  study. It was an attempt to look at the
6  effects of Seroquel on glucose metabolism
7  measured by the two-hour glucose
8  tolerance test.
9      Q.  I just asked you about
10 whether you can call 125 a diabetes
11 study. Are there any ethical constraints
12 to conducting a study that a scientist
13 would actually be able to call a diabetes
14 study?
15     A.  I think it will depend on
16 the design. There are a lot of different
17 design possibilities, and one -- it would
18 depend -- you know, ethical issues in the
19 study would depend on what was actually
20 being done. One point about this study
21 was that every patient received active
22 medication. We could not use a placebo
23 in this trial because it would have been
24 unethical to deprive patients of

Page 1018

1  medication for 24 weeks.
2      Q.  Did the FDA or any other
3  government body require AstraZeneca to
4  conduct trial 125?
5      A.  This was done on our
6  initiative.
7      Q.  When did AstraZeneca decide
8  to start designing and planning trial
9  125?
10     A.  The decision to conduct that
11 trial was made in November 2002.
12     Q.  Why then?
13     A.  That was shortly after we
14 had received a strong label change in
15 Japan and -- requiring us to provide
16 warnings and I believe a contraindication
17 for the use of Seroquel in patients with
18 diabetes. And we recognized that we did
19 not have sufficient data to address
20 concerns that other regulatory agencies
21 might have, and, therefore, we wanted to
22 collect data that could establish, as
23 best we could, the fact that Seroquel did
24 not cause diabetes or it is not

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 1019

1  associated with glucose metabolism. And
2  conversely, if Seroquel was associated
3  with disorders of glucose metabolism, we
4  wanted to know and we wanted to have the
5  data in which to -- to be sure that that
6  was the case so we could write the label
7  accordingly.
8      Q.  Why did AstraZeneca include
9  Risperdal in trial 125?
10     A.  We wanted to compare
11 Seroquel to the two other comparators --
12 to two competitors on the market. We
13 wanted to make sure that everybody got
14 medication. The study was, therefore,
15 able to compare all three drugs for their
16 effects on glucose metabolism. And the
17 study was able to look at the effects on
18 each drug relative to the others as well
19 as the change in each drug compared to
20 baseline.
21     Q.  Why didn't AstraZeneca start
22 planning trial 125 prior to the year
23 2002?
24     A.  We -- prior to the Japanese

Page 1020

1  action, we thought that our -- that the
2  data that we had gathered, particularly
3  the summary prepared for the FDA in
4  August of 2000, had established that
5  Seroquel was not associated with diabetes
6  or abnormalities in glucose metabolism.
7      The Japanese regulatory
8  action made it clear that our data was
9  not persuasive, at least to them, and so
10 we wanted to do two things as I just
11 said, gather data that would allow us to
12 persuade another regulatory agency that
13 might have had a concern; or conversely,
14 if there was than effect of Seroquel on
15 glucose metabolism, we wanted to show and
16 demonstrate it to ourselves.
17     Q.  Prior to the planning of
18 trial 125, in your mind, had the
19 preclinical and clinical studies that
20 supported the FDA initial approval of
21 Seroquel revealed any evidence that
22 Seroquel could cause glucose
23 dysregulation?
24     A.  The evidence that we had at

Page 1021

1  that time did not show -- did not provide
2  any evidence that Seroquel caused
3  diabetes or abnormalities in glucose
4  regulation.
5      Q.  Prior to the planning of
6  trial 125, did the postmarketing
7  surveillance data reveal evidence of a
8  causal link between Seroquel and diabetes
9  or hyperglycemia?
10     MR. PIRTLE: Leading.
11     THE WITNESS: The
12 postmarketing data did not provide
13 data showing a causal link between
14 Seroquel and diabetes.
15 BY MR. McCONNELL:
16     Q.  At the time that you started
17 planning trial 125 in the fall of 2002,
18 were you aware of any trial like it that
19 any company had ever done?
20     A.  I was not aware of any such
21 trial. I thought this was innovative on
22 our part.
23     Q.  And in terms of numbers of
24 patients, was trial 125 a large clinical

Page 1022

1  trial?
2      A.  Yes. We enrolled 500
3  patients, a little over 500 patients, and
4  that's a moderate to large size trial,
5  especially for one that's going for 24
6  weeks.
7      Q.  Did AstraZeneca consult with
8  outside experts on the design of trial
9  125?
10     A.  I believe so.
11     Q.  Who did you consult with?
12     A.  I'm not sure. I don't
13 recall precisely who we consulted with.
14 Probably -- I think we consulted with
15 Woolf and Goldstein. I don't recall for
16 sure. Possibly consulted with John
17 Newcomer. Again, I don't recall for
18 sure.
19     Q.  Does it take a long time to
20 get a trial --
21     A.  Let me finish.
22     Q.  I'm sorry, go ahead.
23     A.  We probably also consulted
24 with endocrinologists within the company.

64 (Pages 1019 to 1022)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 1031

1  A. That result is an important
2  one. The primary result of the trial as
3  stated in the protocol was the area under
4  the curve from zero to two hours of the
5  glucose -- of the glucose values
6  following the ingestion of 75 grams of
7  glucose. And what you can see in Table
8  S4 is that the change from baseline for
9  Seroquel was not statistically
10 significant at week 24 compared to
11 baseline, while the change from baseline
12 from both olanzapine and risperidone was
13 statistically significant.
14      So in terms of the area
15 under the curve of the glucose tolerance
16 test, both olanzapine and risperidone
17 showed a statistically significant
18 worsening, whereas quetiapine did not.
19      Also in Table S5 when you
20 compare the change from baseline in the
21 area under the curve, the difference
22 between quetiapine and olanzapine was
23 statistically significant, obviously
24 olanzapine was worse, and the

Page 1032

1  olanzapine-quetiapine difference was
2  statistically significant in favor of
3  quetiapine. The difference between
4  quetiapine and risperidone was not
5  statistically significant.
6  Q. At week 24, can you tell if
7  there was a -- what sort of increase, if
8  any, there was from baseline and fasting
9  glucose for people who were using
10 quetiapine?
11 A. We have to go -- it's not
12 here. That -- the answer to that
13 question I don't think is in the summary.
14 I'm going to have to go into the body of
15 the document to find that.
16      MR. McCONNELL: Go off the
17 record for a second.
18      VIDEOGRAPHER: Off the
19 record at 2:41.
20      - - -
21      (A recess was taken from
22 2:41 p.m. to 2:52 p.m.)
23      - - -
24      VIDEOGRAPHER: The beginning

Page 1033

1  of tape number four. We're back
2  on the record at 2:52.
3  BY MR. McCONNELL:
4  Q. Doctor, did you manage to
5  find the fasting glucose results for
6  Seroquel?
7  A. Yes.
8  Q. What were the results?
9  A. The change from base --
10      MR. PIRTLE: Could you point
11 me to the page? It's a big
12 document.
13      THE WITNESS: Page 156. The
14 change at week 24 in the
15 quetiapine group was .177
16 millimeters per liter.
17 BY MR. McCONNELL:
18 Q. In the context of all the
19 results of trial 125, did you find the
20 results reassuring or not in terms of
21 whether there was a connection between
22 Seroquel and glucose dysregulation?
23 A. We found it very reassuring.
24 Q. Why is that?

Page 1034

1  A. Because the change in the
2  area under the curve, which is the
3  primary assessment, was not -- did not
4  change significantly between baseline in
5  week 24, and also because there was no
6  change at all in the two-hour value, that
7  is the blood glucose value two hours
8  after glucose challenge showed no change.
9  That value typically begins to go up as
10 diabetes emerges. And the fact that
11 there was no change in that value after
12 24 weeks on Seroquel was also reassuring.
13 Q. Doctor, I want to direct
14 your attention to other studies now,
15 studies 126 and 127. My first question
16 to you is, did AstraZeneca collect
17 fasting glucose samples in trials 126 and
18 127?
19 A. We attempted to and we
20 also -- and we collected the time since
21 the last meal, which will enable us to
22 ascertain whether -- reasonably ascertain
23 whether the sample was fasted or not.
24 Q. Can you explain to the jury

67 (Pages 1031 to 1034)

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 1035

1  what it was that was studied in trials
2  126 and 127?
3      A.   Trials 126 and 127 were
4  designed to show that Seroquel could
5  prevent relapse in patients with bipolar
6  disorder. It was a complicated trial
7  insofar as we studied patients who
8  either -- had recently had or were having
9  either a manic episode or an episode of
10 depression and who had recovered on
11 Seroquel and the mood stabilizer. And
12 then we randomly assigned patients to
13 continue on the combination or on the
14 mood stabilizer alone. It was a -- it
15 took a long time to recruit the number of
16 patients. And it was a long time to
17 accumulate the number of relapses. And
18 we conducted that study twice in order to
19 be sure of the result.
20     Q.   What was the primary
21 endpoint of 126 and 127?
22     A.   The primary endpoint was
23 relapse of -- having a relapse of either
24 a manic episode or a depressed episode.

Page 1036

1      Q.   Were trials 126 and 127
2  designed to determine if Seroquel can
3  cause hyperglycemia?
4      A.   No.
5      Q.   Nevertheless, did
6  AstraZeneca collect fasting glucose
7  samples from the patients to monitor the
8  glucose issues?
9      A.   Yes.
10     Q.   What were the efficacy
11 results of trials 126 and 127?
12     A.   Both 126 and 127 were
13 robustly positive showing the decrease in
14 relapse rates to both manic events and
15 depressive events.
16     Q.   Has AstraZeneca submitted
17 the results of trials 126 and 127 to the
18 FDA?
19     A.   We submitted to the FDA and
20 the indication was approved about two
21 weeks ago.
22     Q.   Prior to the submission of
23 the results of 126 and 127 to the FDA,
24 did there come a time when you analyzed

Page 1037

1  the glucose results from those studies?
2      A.   Yes.
3      Q.   Did you, in fact, do an
4  extensive reanalysis of the results?
5      A.   We did extensive additional
6  analyses of the results of the glucose
7  parameters.
8      Q.   And why did you do that
9  extensive reanalysis?
10     A.   What we found in the pooled
11 safety results was changes in blood
12 glucose of similar magnitude that we had
13 observed before. We also saw similar
14 changes in hemoglobin A1c of the
15 magnitude we had seen before. But in
16 this trial, there were seven reports,
17 seven adverse event reports of diabetes,
18 six of which occurred in the Seroquel
19 patients and only one occurred in the
20 placebo patients. And that could have
21 been a matter of chance, but we wanted to
22 investigate whether or not there was a
23 relationship between Seroquel and the
24 emergence of diabetes. And we undertook

Page 1038

1  an extensive analysis of all of the data
2  in that trial.
3      Q.   Did that extensive
4  reanalysis involve endocrinologists
5  employed by AstraZeneca?
6      A.   Yes.
7      Q.   Did that reanalysis involve
8  an endocrinologist who is not employed by
9  AstraZeneca?
10     A.   After extensive review and
11 discussion internally, we presented the
12 results to an external endocrinologist.
13     Q.   And after an external
14 discussion and after getting the results
15 from the endocrinologist, was there a
16 consensus among the SERM team about what
17 the data revealed?
18     A.   There was consensus among
19 the clinical team that we took to SERM
20 and we -- the data showed that there was
21 an increase in the -- of about twofold in
22 the rate of emergent hyperglycemia in
23 patients who took Seroquel and a mood
24 stabilizer compared to those that took a