# EXHIBIT 19

Confidential - Wayne K. Geller, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

- - -

IN RE: SEROQUEL         : CASE NO.
PRODUCTS LIABILITY      :
LITIGATION              : 6:06-md-01769-ACC-DAB
                        :
MDL Docket No. 1769:

- - -

May 7, 2008

- - -

C O N F I D E N T I A L

- - -

Videotape deposition of WAYNE K. GELLER, M.D. taken pursuant to notice, was held at the offices of Golkow Technologies, Inc., One Liberty Place, 51st Floor, 1650 Market Street, Philadelphia, Pennsylvania 19103, commencing at 9:00 a.m., on the above date, before Linda Rossi Rios, RPR, CCR and Notary Public.

- - -

Golkow Technologies, Inc.
One Liberty Place, 51st Floor
1650 Market Street
Philadelphia, Pennsylvania  19103
877.370.3377

Confidential - Wayne K. Geller, M.D.

Page 454

1  Dorothee Wientjens...," I'm sure I'm
2  mispronouncing that, "...to respond to
3  the Dutch Authorities regarding
4  quetiapine and glucose metabolism." Did
5  I read that correctly?
6      A.   Yes.
7      Q.   So you knew that the
8  information you were giving to Ms.
9  Wientjens, if I'm pronouncing that
10 correctly, was going to be turned over to
11 the Dutch authorities. Right?
12     A.   I was under the impression
13 that it would be. However, I was
14 responding to her request.
15     Q.   And you understood that her
16 request was for information she could
17 turn over to the Dutch authorities.
18 Right?
19     A.   Well, again, I know that
20 there was a request that came from
21 Dorothee Wientjens, I believe is the way
22 she pronounces her name, and I don't have
23 that e-mail in front of me to answer your
24 question with the accuracy that I would

Page 455

1  like to.
2      Q.   All right, sir. And then
3  you said, "I sent Dorothee a copy of the
4  recent Seroquel Safety Position Paper on
5  DM and related disorders." True? That's
6  what you said?
7      A.   Yes. And, again, I was
8  referring to the document which was
9  termed a position paper, which had -- was
10 unofficial and, in fact, was not a
11 position paper on this topic.
12         MR. ALLEN: Sir, object to
13     that as nonresponsive.
14 BY MR. ALLEN:
15     Q.   You refer to it as a
16 "Seroquel Safety Position Paper on DM and
17 related disorders." Right?
18     A.   Again, to make sure that
19 we're taking this in the right -- in the
20 correct context, this so-called Seroquel
21 safety position paper, as it was titled,
22 was not, in fact, an official company
23 document and did not reflect our view and
24 our knowledge of diabetes at that time,

Page 456

1  sir.
2         MR. ALLEN: Okay. Object to
3     that as nonresponsive.
4  BY MR. ALLEN:
5      Q.   And then you go on and you
6  apologize. What are you apologizing for,
7  sir?
8      A.   Well, being relatively new
9  to the company, it occurred to me, right
10 afterwards it was brought to my attention
11 that Ms. Wientjens' request appropriately
12 should have gone through the global
13 regulatory affairs director who then
14 should have contacted myself and others
15 in order to respond to the Dutch
16 regulatory agency.
17     Q.   So you made a mistake by
18 letting the safety position paper go out
19 to the regulatory authorities?
20         MR. RABER: Objection to
21     form.
22 BY MR. ALLEN:
23     Q.   Sir?
24     A.   I made a mistake by

Page 457

1  submitting a document which was not
2  correct, number one. And number two, I
3  did so through an individual that was
4  someone who I should not have given the
5  document directly to.
6      Q.   Who -- what department did
7  Dorothee work in?
8      A.   I don't know.
9      Q.   Who was she?
10     A.   I don't know.
11     Q.   Okay. But Exhibit 17 is a
12 document that you believe, at least you
13 believe this is one of the documents that
14 the Dutch authorities received in
15 advertently. Is that correct?
16     A.   I believe this is the
17 document.
18     Q.   You believe it is this
19 document. Thank you, sir.
20         We got this from y'all's
21 files and you authored Exhibit 17, did
22 you not?
23     A.   Yes, I did.
24     Q.   And do you agree with the

Page 458

1  fact that based upon your review of the
2  information you had available, if you
3  look on page 11, the last page, do you
4  agree --
5      A.  I'm sorry, 11 out of --
6      Q.  Yes, sir, I see that.  It's
7  the last page.  Are you at the last page?
8      A.  Yes.
9      Q.  Do you agree with the
10 statement that you drafted, "While there
11 were no reports of positive dechallenges
12 and rechallenges, there is reasonable
13 evidence to suggest that Seroquel therapy
14 can cause impaired glucose regulation
15 including diabetes mellitus in certain
16 individuals."  Do you agree with that
17 statement?
18     A.  No, I disagree with that
19 statement, sir.
20     Q.  Okay.  Why did you write it?
21     A.  That statement was an
22 artifact of an earlier discussion
23 document which was a draft discussion
24 document for the June 2000 SERM, and did

Page 459

1  not reflect my view of diabetes at the
2  time that I presented at SERM in June
3  of 2000.
4      Q.  Well, in fact -- so you were
5  the presenter at SERM in June of 2000?
6      A.  Yes, I said that previously.
7      Q.  Was Dr. Brecher there?
8      A.  He was on the telephone, I
9  believe.
10     Q.  Did you in June of 2000 as
11 presenter specifically state that
12 Seroquel may cause impaired glucose
13 regulation in some individuals?  Isn't
14 that what you did at that meeting?
15         MR. RABER:  Object to the
16     form.
17 BY MR. ALLEN:
18     Q.  Isn't that what you said?
19     A.  I think to be absolutely
20 correct, I need to see a copy of the
21 discussion document that was circulated
22 for the June 2000 SERM.
23     Q.  Now, when did you prepare
24 Exhibit 17, sir?  After the SERM meeting,

Page 460

1  isn't it, in June of 2000 you prepared
2  this?
3      A.  Exhibit 17 would have been
4  prepared sometime in the fall of 2000, I
5  believe.
6      Q.  If the database that we have
7  that was given to us in the production
8  says this document was dated August the
9  10th, 2000, does that sound about right
10 to you?
11     A.  No, it doesn't.
12     Q.  Can you give me or the jury
13 any help by telling us why that database
14 which we were provided which said
15 August the 10th, 2000, is incorrect?
16         MR. RABER:  Object to the
17     form.
18         THE WITNESS:  It certainly
19     would not have coincided with the
20     request on the MEB.  However, I
21     failed to consider the possibility
22     that I started to prepare a
23     position paper after the June SERM
24     that discussed the issue of

Page 461

1  diabetes mellitus and Seroquel
2  therapy.  And, in fact, I recall
3  specifically using as a template a
4  draft discussion document which
5  contained the same language that
6  you just read, sir.
7  BY MR. ALLEN:
8      Q.  And by the way, sir, that's
9  not a true statement, that there are no
10 reports of positive dechallenges, that's
11 just not a true statement, is it?
12         MR. RABER:  Objection to
13     form.
14 BY MR. ALLEN:
15     Q.  There's positive
16 dechallenges throughout the adverse
17 experience database in regard to Seroquel
18 and diabetes and hyperglycemia, aren't
19 there, sir?
20         MR. RABER:  Objection to
21     form.
22         THE WITNESS:  I can state
23     that when the discussion document
24     was prepared, which would have

Confidential - Wayne K. Geller, M.D.

Page 462

1   been in May, roughly May of 2000,
2   that that statement was correct
3   and accurate.
4   BY MR. ALLEN:
5       Q.   You also on that same -- at
6   or about that same time, prepared --
7   following the June 2000 SERM meeting, you
8   prepared Exhibit 18, the justification --
9           MR. RABER: Hang on. You
10  said we were going to do one more
11  document --
12          MR. ALLEN: Right.
13          MR. RABER: -- and we were
14  going break.
15          MR. ALLEN: Yes, sir. And
16  I'm wrong because based upon his
17  answer, there's one more question
18  I want to ask about Exhibit 18.
19          MR. RABER: I just want to
20  know when we're going to break?
21          MR. ALLEN: And I told you
22  my best --
23          MR. RABER: You told me and
24  you told me wrong.

Page 463

1           MR. ALLEN: I was mistaken.
2   I did not know the witness'
3   answer. And I'm showing him
4   Exhibit 18. I'm not trying to
5   cause any trouble. And I'd ask
6   him to look at Exhibit 18, which
7   is a justification document that
8   he also prepared concerning
9   reasonable evidence and then we
10  will be done.
11              - - -
12          (Exhibit Geller-18,
13  Justification Document, was marked
14  for identification.)
15              - - -
16  BY MR. ALLEN:
17      Q.   Sir, I'm handing you what's
18  been marked as Exhibit 18, which is
19  another document from the database that
20  you said was prepared by you on or about
21  August the 10th, 2000. Did you prepare
22  this justification document on Seroquel
23  and weight gain?
24      A.   I am listed as the author in

Page 464

1   the document. However, I wish to point
2   out that this document, too, is a draft
3   document.
4           MR. ALLEN: Yes, sir.
5       Object to that as nonresponsive.
6   BY MR. ALLEN:
7       Q.   Sir, did you prepare Exhibit
8   Number 18?
9       A.   My name is listed as the
10  author on this document, and I recognize
11  the fact that it is a draft that I
12  prepared.
13      Q.   Yes, sir. Okay. And by the
14  way, did you review Exhibit 17 in
15  preparation for your deposition?
16      A.   Yes.
17      Q.   And you've already testified
18  you reviewed Exhibit 16 in preparation
19  for your deposition, or not, I can't
20  recall, to be honest with you?
21      A.   Yes, I believe so.
22      Q.   Did you -- have you reviewed
23  Exhibit 18 in preparation for your
24  deposition? The justification document

Page 465

1   on Seroquel and weight gain.
2       A.   I don't believe I have.
3       Q.   Okay. Now, you've already
4   testified earlier today any documents you
5   reviewed in preparation for your
6   deposition in this -- these 15 or 20
7   volumes occurred during the time you were
8   meeting with counsel. Right?
9       A.   Yes.
10      Q.   You never reviewed these
11  documents outside of the presence of
12  counsel. Correct?
13      A.   Correct.
14      Q.   Okay. All right, sir. And
15  in the justification document on Seroquel
16  and weight gain you wrote, Exhibit 18,
17  didn't you also state that "While there
18  were no reports of positive dechallenges
19  and rechallenges, there is reasonable
20  evidence to suggest that Seroquel therapy
21  can produce significant weight gain in
22  select individuals. The Seroquel CDS
23  mentioned the possibility of 'limited'
24  weight gain associated with Seroquel

117 (Pages 462 to 465)

Confidential - Wayne K. Geller, M.D.

Page 525

1 safety position paper draft prepared by
2 you, and let's -- let me stop here and
3 it's my fault. You started working in
4 the safety surveillance department of
5 AstraZeneca in May of 2000. Is that
6 correct?
7   A.  Actually in April.
8   Q.  I'm sorry, April. So in
9 other words, your conclusions that we've
10 seen in regard to weight gain, you were
11 able to reach those conclusions between
12 the time you started working in April and
13 by the time you prepared the document.
14 True?
15   A.  The document was prepared
16 in -- for the June SERM, which meant that
17 that data was looked at between my
18 join -- in the time between my joining
19 the company and the discussion document.
20   Q.  Thank you, sir. Now, in
21 this Exhibit 17, safety position paper,
22 you state, Safety data derived from
23 clinical trials and spontaneous reports
24 often containing limited information may

Page 526

1 represent a weak signal linking Seroquel
2 with impaired glucose regulations --
3 regulation, including occasional reports
4 of new onset diabetes mellitus. None of
5 these reports are absolutely steadfast
6 (i.e., there are no clear index cases and
7 there were no reports of positive
8 dechallenges/rechallenges) and most have
9 either incomplete information or other
10 explainable causes. Although the number
11 of reports is fairly sizable, it was felt
12 that there is insufficient evidence at
13 present to warrant an amendment to the
14 Seroquel Core Data Sheet. Did I read
15 that correctly?
16   A.  Yes.
17   Q.  You go on to state,
18 "However, it was agreed that the topic
19 will be kept under ongoing review and
20 will be reassessed at a later time." Did
21 I read that correctly?
22   A.  Yes.
23   Q.  Why did you say the number
24 of reports is fairly sizable?

Page 527

1   A.  Well, it was my impression
2 at the time that we conducted our
3 pre-SERM activities, which would have
4 been sometime in May 2000, that
5 relatively speaking, that meeting,
6 looking at a frequency table of all
7 adverse events that had been reported in
8 the postmarketing realm in the serious
9 clinical trial adverse event reports,
10 that compared to, for instance, compared
11 to bone fractures, for instance, that the
12 numbers seem fairly sizable. However, I
13 have to confess that at that particular
14 time, I had no idea how many patients had
15 been exposed to Seroquel. So it was a
16 statement of relative comparison, sir.
17   Q.  Of course, when the document
18 we saw yesterday was prepared to the FDA,
19 you did not tell the FDA, you being
20 AstraZeneca, that you had a fairly
21 sizable number of diabetes cases, did
22 you?
23   A.  We presented all the data
24 that we had from all sources, including

Page 528

1 clinical trial sources, including the
2 literature, including the postmarketing
3 sources that were contained in this
4 particular document. So in answer to
5 your question, I believe we provided them
6 with more than what was provided here.
7      MR. ALLEN:  Objection.
8   Nonresponsive.
9 BY MR. ALLEN:
10   Q.  You did not tell the FDA
11 that the number of adverse experience
12 reports concerning diabetes mellitus, you
13 did not use the term that they were
14 fairly sizable, did you, sir?
15   A.  Sir, FDA requested the data.
16 We provided them with every piece of data
17 they requested. We provided them with
18 our own analysis. And I have to confess
19 that once I learned what the exposure,
20 meaning how many patients had been
21 exposed to Seroquel, which would have
22 happened sometime between the preparation
23 of the draft discussion document, from
24 which this was based, until the SERM, it

13 (Pages 525 to 528)

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 529

1  became apparent to me that the number of
2  cases -- of reported cases of diabetes
3  was not so sizable.
4      Q.   In fact, you not only did
5  not tell the FDA that there was a fairly
6  sizable number of reports, you told the
7  FDA, you being AstraZeneca, that there
8  were very few cases of diabetes mellitus,
9  didn't you?
10     A.   I don't recall that
11 specifically, sir.
12     Q.   If it's reflected in the
13 document that you provided to the FDA,
14 you don't recall reviewing that document
15 in preparation for your deposition?
16     A.   I reviewed the document. I
17 don't have photographic memory
18 unfortunately, sir.
19     Q.   I don't expect you to. And
20 I'm just asking you whether or not -- and
21 no one has a -- well, some people have
22 some photographic memory. Some people
23 do. But do you recall in reading the
24 document that your company submitted to

Page 530

1  the FDA in August of 2000, that your
2  company told the FDA that there were very
3  few cases of diabetes mellitus and
4  hyperglycemia? Do you recall that or
5  not?
6      A.   I don't recall that.
7  However, I know that at the time we
8  submitted the document to FDA, we had
9  exposure figures to put -- to put these
10 number of reports into context.
11     Q.   Do you recall that when your
12 company submitted the document to the MEB
13 in January of 2001, your company told the
14 MEB that there was a relatively small
15 number of postmarketing reports of
16 glucose dysregulation? Do you recall
17 that?
18     A.   I don't recall the specific
19 language, sir.
20     Q.   Nevertheless, you would
21 agree that in the documents you prepared,
22 the safety position paper, Exhibit 17,
23 that you prepared, you said that the
24 number of reports is fairly sizable? Do

Page 531

1  you agree with that?
2      A.   This draft so-called safety
3  position paper does indeed contain that
4  statement, and, again, was written
5  without having any contextual information
6  as far as exposure was concerned.
7      Q.   Now, at the last page of
8  Exhibit 17, the safety position paper
9  that was prepared by you, do you see the
10 final paragraph?
11         MR. RABER:  Object to form.
12         THE WITNESS:  Yes.
13 BY MR. ALLEN:
14     Q.   And you state, do you not,
15 sir, While there were no reports of
16 positive dechallenges and rechallenges,
17 there is reasonable evidence to
18 suggest -- let me start again.
19         You state in writing, "While
20 there were no reports of positive
21 dechallenges and rechallenges, there is
22 reasonable evidence to suggest that
23 Seroquel therapy can cause impaired
24 glucose regulation including diabetes

Page 532

1  mellitus in certain individuals.
2  Consideration should be given to adding
3  diabetes mellitus to the core data sheet
4  based upon postmarketing and clinical
5  trial safety data." That's your
6  language, is it not, sir?
7      A.   Yes.
8      Q.   Was diabetes -- and do you
9  agree with that statement, by the way,
10 that you wrote?
11     A.   No, I completely disagree
12 with that statement. As I indicated
13 yesterday, this statement was an artifact
14 from a draft discussion document which
15 was not the basis for the June 2000 SERM
16 discussion document. So this was my --
17 this happened to be the statement which I
18 felt was not factually correct in this
19 document.
20     Q.   Now, did you testify that --
21 let me come back to that in a minute.
22         So your testimony at this
23 juncture is that final paragraph
24 Exhibit -- of Exhibit 17, which says that

Page 1121

1    Q.   That's right.
2    A.   No.
3    Q.   Did you rewrite -- strike
4  that. Let me back up.
5         I think you said that you
6  used as a template for Exhibit 17 an
7  older draft of a discussion document; is
8  that right?
9         MR. PIRTLE: Objection,
10     form.
11        THE WITNESS: Yes, I did.
12 BY MR. RABER:
13   Q.   And is --
14        To the best of your
15 knowledge, is Defendant's Exhibit 202 the
16 template that you used when preparing
17 Exhibit 17?
18        MR. PIRTLE: Objection to
19     form.
20        THE WITNESS: Yes, it is.
21 BY MR. RABER:
22   Q.   It appears if you look at
23 Geller Exhibit 17, the one on the right,
24 that you rewrote that summary and

Page 1122

1  conclusions paragraph; is that right?
2    A.   Yes.
3    Q.   Did you rewrite the last
4  paragraph on Defendant's Exhibit 17 -- I
5  mean Geller Exhibit 17?
6    A.   No. It's exactly the same
7  as the one in Defense Exhibit 202.
8    Q.   When you say you made a
9  mistake, is that the mistake you made, by
10 leaving in that paragraph from this old
11 template?
12   A.   Yes, it is.
13   Q.   Did the paragraph that got
14 left in by mistake accurately reflect
15 what had happened at the SERM meeting in
16 June of 2000?
17        MR. PIRTLE: Objection to
18     the form.
19        THE WITNESS: No, absolutely
20     not.
21 BY MR. RABER:
22   Q.   As we sit here today, do you
23 recall whether or not you ever completed
24 a final safety position paper after the

Page 1123

1  June 2000 SERM?
2    A.   I don't recall there being a
3  final position paper.
4    Q.   Can you explain why you
5  don't recall one of those final documents
6  existing?
7    A.   It is my belief, as was
8  then, that the FDA document, which was
9  prepared at the same time that the
10 initial discussion document was being
11 written, that that FDA response document
12 really served exactly the same purpose of
13 a position paper in that it provided all
14 the necessary information to the reader
15 to see that there was insufficient
16 evidence to suggest a causal relationship
17 between Seroquel therapy and diabetes.
18   Q.   And in the fall of 2000, did
19 you have another SERM meeting coming up
20 to consider this glucose and diabetes
21 issue again?
22   A.   Yes.
23   Q.   Were you drafting documents
24 relating to that?

Page 1124

1    A.   Yes.
2    Q.   What were you drafting in
3  preparation for that?
4    A.   I was drafting an update --
5  a new discussion document, but it was
6  updated from the previous one with new
7  data.
8    Q.   Did anybody at AstraZeneca
9  need to have a safety position paper
10 relating to the June SERM to take any
11 action of any kind?
12        MR. PIRTLE: Objection,
13     speculation.
14        THE WITNESS: No, not at
15     all.
16 BY MR. RABER:
17   Q.   If SERM is going --
18        If there's going to be a
19 change in the core data sheet, what kind
20 of document gets prepared, a
21 justification document or a safety
22 position paper?
23   A.   A justification document,
24 which sometimes now goes under the name

Confidential - Wayne K. Geller, M.D.

Page 1125

1  of a clinical overview.
2      Q.  All right.
3          Dr. Geller, I want to just
4  talk about a few more things here.  I
5  want to have you keep Geller Exhibit 17
6  in front of you, and I also want to show
7  you Geller Exhibit 30.
8          Now, you've testified in
9  response to questions that you believe
10 that Geller Exhibit 17, which is also
11 attached to Geller Exhibit 30, is a draft
12 of a position paper; is that right?
13         MR. PIRTLE:  Objection to
14 the form.
15         THE WITNESS:  Yes.  I
16 already alluded to that, I
17 believe, in my testimony.
18 BY MR. RABER:
19     Q.  Do you recall yesterday when
20 Mr. Pirtle leaned forward in his chair
21 and said, I don't believe you that it's a
22 draft.  Do you remember that?
23     A.  I do, sir.
24         MR. PIRTLE:  Form.

Page 1126

1  BY MR. RABER:
2      Q.  I want to talk with you a
3  little bit about why you believe that
4  this safety position paper that's in
5  front of you was not a final document.
6  Okay?
7      A.  Yes.
8      Q.  All right.
9          Let's look at Exhibit 17,
10 Geller Exhibit 17.
11         If you look at the page
12 numbering on the bottom, do you see that?
13     A.  Yes.
14     Q.  What do you see when you
15 look at the page numbering on the bottom?
16     A.  I see in this case "Page 2
17 of ?."
18     Q.  What does the presence of a
19 question mark in the page numbering
20 indicate to you about whether or not that
21 is a final document?
22     A.  It indicates that it is not
23 a final document.  It indicates that it
24 is a draft.

Page 1127

1      Q.  In fact, the preliminary
2  draft of your June discussion document, I
3  think it's Defense Exhibit 202, can you
4  tell us whether or not that draft has
5  question marks in the page numbering?
6      A.  Yes.  This says "Page Auto,"
7  A-U-T-O, separate word "Page," P-A-G-E,
8  "of?"
9      Q.  Now does --
10         Is there any question in
11 your mind that Defense Exhibit 202 is a
12 draft document?
13     A.  I'm sorry.  Please repeat
14 the question.
15     Q.  Is there any question in
16 your mind that that's a draft?
17     A.  There's no question, sir.
18     Q.  All right.
19         Does the word "draft" appear
20 anywhere on Defense Exhibit 202?
21     A.  No.
22     Q.  Let's go back, then, to
23 Geller Exhibit 30, which is the e-mails
24 with your draft position paper attached.

Page 1128

1  In your e-mail, you write to Janet Spiers
2  attaching a "position paper and
3  justification document for diabetes, et
4  cetera and weight gain."
5          Do you see that?
6      A.  Yes.
7      Q.  Then you say "Vikram."
8  Who is Vikram?
9      A.  Vikram is Vikram Dev, who
10 was my supervisor at the time.
11     Q.  "Vikram has not reviewed
12 either document as his father recently
13 passed away and he is in India."
14         Do you see that?
15     A.  I'm sorry.  Can you please
16 tell me the page number?
17     Q.  Please look at the very
18 first page, the e-mail from you -- at the
19 bottom from you to Janet.
20     A.  Here we go.  I'm sorry.
21 Yes.
22     Q.  "Vikram has not reviewed
23 either document as his father recently
24 passed away and he is in India."