# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

Case No. 6:07-cv-15959
Case No. 6:07-cv-15701
Case No. 6:07-cv-10291

IN RE: Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This Document Relates to:

Janice Burns v. AstraZeneca, LP, et al.
Connie Curley v. AstraZeneca, LP, et al.
Linda Guinn v. AstraZeneca, LP, et al.

---

Miami Beach, Florida
October 6, 2008
8:30 o'clock a.m.

\- - - - - - - - -

DEPOSITION

OF

JENNIFER B. MARKS, M.D.

\- - - - - - - - -

VOLUME I

JOB NO: 958074
Reported By:
Evan A. Ferguson, RPR
Notary Public, State of Florida
Esquire Deposition Services
Fort Lauderdale Office
Phone 954-331-4400

APPEARANCES:

LAMINACK, PIRTLE & MARTINEZ, LLP.
BY: THOMAS PIRTLE, ESQUIRE,
5020 Montrose Boulevard, 9th Floor
Houston, Texas 77006
713.292.2750
Appearing on behalf of the Plaintiff.

DECHERT, LLP.
BY: HOPE S. FREIWALD, ESQUIRE,
BY: KIRSTIN MAZZEO, ESQUIRE,
2929 Arch Street
Philadelphia, Pennsylvania 19103
215.994.4000
Appearing on behalf of the Defendant.

WILLIAMS & CONNOLLY, LLP.,
BY: STEPHEN D. RABER, ESQUIRE,
725 Twelfth Street, N.W.
Washington, D.C. 20005
202.434.5538
Appearing on behalf of the Defendant.

ALSO PRESENT: CHARLES HUNGER, Paralegal.

I-N-D-E-X

| WITNESS: | PAGE: |
|---|---|
| JENNIFER B. MARKS, M.D. | |
| DIRECT EXAMINATION BY MS. FREIWALD: | 6 |

E-X-H-I-B-I-T-S

| "MDL"BURNS NO. 6:07-cv-15959 | FOR IDENTIFICATION |
|---|---|
| NO. 1 | 11 |
| NO. 2 | 20 |
| NO. 3 | 24 |
| NO. 4 | 32 |
| NO. 5 | 33 |
| NO. 6 | 71 |
| NO. 7 | 75 |
| NO. 8 | 86 |
| NO. 9 | 80 |
| NO. 10 | 92 |
| NO. 11 | 105 |
| NO. 12 | 106 |
| NO. 13 | 107 |
| NO. 14 | 108 |
| NO. 15 | 111 |
| NO. 16 | 114 |
| NO. 17 | 162 |
| NO. 18 | 168 |
| NO. 19 | 140 |
| NO. 20 | 143 |
| NO. 21 | 170 |
| NO. 22 | 171 |
| NO. 23 | 177 |

--------

Deposition of JENNIFER B. MARKS, M.D., a witness of lawful age, taken by the Defendant, for the purpose of discovery and for use as evidence in the above-entitled cause, wherein IN RE: Seroquel Products Liability Litigation, and This Document Relates to Burns v. AstraZeneca, LP, et al., [Janice Burns 6:07-cv-15959] [Linda Guinn 6:07-cv-10291] pending in the UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION, pursuant to notice heretofore filed, before EVAN FERGUSON, a Notary Public in and for the State of Florida at Large, at the Ritz Carlton Hotel Board Room, One Lincoln Road, Miami Beach, Miami-Dade County, Florida, on the 6th day of October 2008, commencing at 8:30 o'clock a.m.

MR. PIRTLE: I was talking to Steve, although I guess there is some case management order agreement I guess we are by the Federal Rules, so I want to make formal objections reserving anything besides form at the time of trial.

MS. FREIWALD: That is fine. I actually don't think that there is an agreement other than operating under the Federal Rules for the time of the deposition, but certainly your objections are reserved.

MR. PIRTLE: And the only reason why I say I thought there has been some exchange of material back and forth, although I wasn't involved in negotiation, I will tell you it's my understanding, the witness has brought up that it's her CV together with some medical articles that she had looked at and then correspondence between ourselves and then some notes I think that you need to ask her.

MS. FREIWALD: My comment was simply meant to say that I didn't think that there was an agreement as to the time of the deposition. There absolutely is an agreement that covers some aspects of the expert report and disclosure with regard to the expert report, and we had asked for pursuant to that agreement.

I also think subject to the notice of deposition Dr. Marks is to bring her file with her today, and we will go through once we start the questioning what it is that she has brought and we will cover it that way.

MR. PIRTLE: Okay, fair enough. There is a possible exception by the way, since we are talking about this, and it has come up in the other expert depositions, the doctor does have an outline that

was reviewed not by me, but by another lawyer, another law firm of the medical records in the three cases, it is not here if it's not on this disk, it's not been produced, but I will guarantee you by in the morning it certainly will be.

MS. FREIWALD: I will represent that it has not been produced to us. It was not on the disk so I would greatly appreciate it.

MR. PIRTLE: She used it before in specific reports. I believe under that context you have a right to it under the rules and I want to assure you that you are going to get it.

-------

Thereupon:

JENNIFER B. MARKS, M.D.,

A witness named in the notice heretofore filed, being a witness of lawful age, and being first duly sworn in the above cause, testified under oath as follows:

DIRECT EXAMINATION

(BY Ms. Freiwald)

BY MS. FREIWALD:

**Q Good morning, Dr. Marks, my name is Hope Freiwald, I represent AstraZeneca in this litigation. Have you ever been deposed before?**

A Yes.

**Q How many times?**

A Twice I think.

**Q Can you tell me very brief the nature of those depositions?**

A One was when I was a resident 20 years ago and I don't remember, it was a case that everybody that was involved was being deposed, I don't remember the details of the case.

The other time was last year in a case that was brought at the VA Hospital in Miami.

**Q Were you a Defendant in both of those cases?**

A Yes.

**Q And the first case, can you tell me what the nature of the claim was?**

A I don't remember, I really don't.

**Q Do you remember what happened with the lawsuit?**

A I think it was settled.

**Q It was settled on your behalf as well as on behalf of other doctors?**

A I don't think it was settled on my behalf.

I don't know what you call it when people are removed.

**Q Do you believe that your insurance carrier paid some amount of money to get you dismissed from the case?**

A No.

**Q And in the VA case, was the case settled on your behalf, by which I mean did your insurance company or you personally pay some amount of money to get out of the case?**

A I believe that the issuance for the VA Hospital paid something.

**Q Do you remember the nature of that lawsuit?**

A Yes, it was a patient that was involved in a research study of which I was the principal investigator who alleged that he developed complications in his eyes related to lack of good care that he received during the study.

**Q Which study was that?**

A It was the VA Cooperative Study Number 465 on glycemic control on Type 2 diabetes.

**Q The VADT studies?**

A Yes.

**Q Do you remember where that suit was brought, meaning what court?**

A No, I don't know that.

**Q Was it brought in Florida?**

A Yes.

**Q In Federal or State court, do you know?**

A I would assume it was Federal.

**Q In the Miami area?**

A Yes.

**Q Okay. And about how long ago was that?**

A Less than a year.

**Q Was this a patient who alleged that he was randomized to the less aggressive control group and developed complications, or do you not even know what group he was in?**

A I know what group he was randomized.

He alleged that because inadequate care in the study that he developed eye complications.

**Q And the nature of your defense was?**

A That he had had very poor control of his diabetes for a number of years prior to entering the study, and that was most likely the reason why he developed the eye complications.

**Q So was that a situation where your defense was that because of the lack of the control before you ever got involved it would be unscientific to assert that your role played a substantial role in his development of complications?**

A Can you repeat that?

**Q Sure, that wasn't very well asked.**

Am I understanding correctly the basic defense you had was this patient was so poorly controlled before I ever got involved in his care, or the VA ever got involved in his care, that essentially his course was set and whatever control he had while he was part of this VA study couldn't have been a substantial factor in determining his outcome?
A Yes, that was correct.
Q Okay. Have you ever testified as an expert before?
A No.
Q I am going to ask you questions today, and I am going to assume that you will answer those questions to the best of your ability, fair enough?
A That is fair enough.
Q And I am also going to assume that if I ask you a question and you answer it, you have understood it and are answering to the best of your ability, okay?
A Okay.
Q If you don't understand a question I would ask you to do exactly what you already did, which you have asked me to rephrase it and I will be happy to do so.
A Okay.
Q The only other thing is that it helps the court reporter out a lot if I don't speak over you and

you don't speak over me, which is a little bit difficult because that is not how people normally converse, so I'm going to ask you to try for today.
A I will do my best.
Q And you have been doing a good job so far, but you have to verbalize your answers. The court reporter can't take down shrugs of the shoulders or nods of the head.
A Right.
(Whereupon, the below referred to document was marked as Defendant's Exhibit No. 1.)
(BY Ms. Freiwald)
BY MS. FREIWALD:
Q I'm going to mark as Exhibit 1 the Notice of Deposition, and ask you to take a look at this document, Dr. Marks, and would you tell me if you have seen it before today?
A I haven't seen it before today, no.
Q Has anybody discussed with you any of the items that are on Schedule A which we requested you bring with you to your deposition?
A What do you mean by discussed?
Q Has anybody told you that you would be expected to bring certain things to your deposition today?

A I was shown this list before, the Schedule A list, and that's why I brought the current CV, et cetera.
Q Now, essentially what we have asked for is your entire file in this case. And my understanding is that we have been provided a CD that was an electronic copy of the documents that I understood that the Plaintiffs' lawyers gave you to review; did you get a look at that CD or what was on that CD before it was sent to us?
A I don't know if I looked at it before it was sent to you, but I did receive a CD.
Q Is it your understanding that the CD that was sent to us is identical to the CD that was sent to you by the Plaintiffs' lawyers?
A Yes, to my understanding.
Q Did you print out any of the documents that were given to you on that CD?
A Yes, I did.
Q And did you annotate any of them in any way?
A I didn't, I was provided with a sort of an outline of the medical cases by another attorney's office.
Q What kind of outlines of medical cases were you given?

A It's kind of a time line that just goes through what happened to each of the cases.
Q And did you use that in preparing your report?
A Yes, I did.
Q How many pages was that outline for each case roughly?
A I would say six to ten.
Q Do you know who prepared that document?
A Yes, I do.
Q Who?
A Glenda Grainger.
Q She is a nurse?
A Yes.
Q Did you have any conversations with Ms. Grainger about the accuracy or completeness of that outline?
A No, I don't believe so.
Q Did you ever ask her what process she used to obtain the information on that outline?
A No.
Q Did you ever crosscheck that outline against any of the medical records to see if it was accurate or complete?
A Yes, I did.
Q And did you find any mistakes or omissions on

that outline?

A No, I didn't.

Q Did you take any notes on the outline?

A I may have taken a couple of notes on the outline.

Q You hand wrote notes on to the outline itself?

A Not substantial amounts, but there may have been a notation here and there.

Q Did you make any notations or markings on any of the other documents that were sent to you on the CD?

A No, I don't believe so.

Q Were you sent any documents other than the outline for the Guinn, Curley and Burns case, and then the CD of documents?

A I was sent some articles from the medical literature.

Q The CD just contained a mix of articles and also company documents; is that correct?

A Yes.

Q The articles that you were sent separate from the CD, were they sent to you in electronic form or in paper form?

A Electronic form.

Q Did you print those out?

A Yes, I did.

Q Are those the articles that you brought with you to the deposition today?

A No, these were articles that I subsequently found myself.

Q So there are articles that you were sent that were not provided to us because they were not on the CD; is that right?

A I don't know if they were provided to you or not, they weren't on the CD.

MR. PIRTLE: Hold on, just so that it's clear, the pile that you have underneath your left hand she may have pulled something off Medline on that, I don't know if they were on the CD, but that's her stack of stuff.

MS. FREIWALD: I understand that. As I understand the Doctor's testimony, in addition to the CD she received, she received some medical literature in an electronic form, and I am asking if she knows whether that additional medical literature was provided to us.

MR. PIRTLE: Go ahead.

THE WITNESS: I don't know that.

MR. PIRTLE: And to be honest with you I don't either, so.

THE WITNESS: I assumed it was because we

prepared a bibliography of all the articles, except for the three or four that I brought today.

(BY Ms. Freiwald)

BY MS. FREIWALD:

Q And with regard to those additional articles that you were sent electronically, did you make any notes or underlinings on those articles?

A It's possible.

Q Do you have those in paper copy at your office?

A Yes, I do.

Q Do you have paper copies of the medical records that you printed out?

A Some of them.

Q And did you make any notes or annotations of any kind on those?

A No.

Q Which of the medical records, if you are able to tell me in any kind of category, did you print out?

A I printed out most of the medical records that I received early on, and frankly I got tired of printing them out so I stopped after awhile.

Q I want to make sure I understand your testimony. Did the medical records that you received come on the initial CD that we have been discussing, or

did you get the medical records in waves in some different format?

A They came in waves on different CDs.

Q How many CDs do you have from the Plaintiffs' lawyers?

A Probably six or eight.

Q And did those CDs reflect the dates on which you received them?

A I don't think so.

Q Is there any kind of email or correspondence that reflects the date on which you received them?

A No, I believe they each came with a letter that may or may not have a date on it.

Q Do you still have that letter?

A Yes.

Q And can you tell me how long ago you got the medical records for the Burns case or some medical records for the Burns case?

A Let me think about it for a minute. Probably somewhere around June.

Q Did you get all of them at that time or did you just get some of them?

A I got the medical records all at that time. What I subsequently got were some additional medical records, I don't remember on which of the cases, and

also some copies of the subsequent depositions.
Q You got what you thought were essentially all of the medical records for Burns, Curley and Guinn in June?
A Yes.
Q And since then you have also gotten depositions?
A Yes.
Q For all of the cases?
A I believe it was all of the cases, yes.
Q Have you reviewed those depositions?
A Uhm-hum, yes.
Q All of them?
A Briefly, yes.
Q Did you review any or all of those depositions before you prepared your written report?
A No, I didn't.
Q When did you review those depositions?
A Actually it was very recently.
We have been -- I think I just received them about six weeks ago.
Q Are there any materials that you have pulled yourself in the process of preparing your expert report that you did not bring with you to the deposition today?
A Yes, there are, I provided them to Glenda. We

exchanged whatever we had with each other so she has everything I had.
Q Can you tell me what those materials would be?
A Just medical literature, articles.
Q Do you believe they are captured on your list of materials reviewed?
A Yes.
Q And how much time did you spend independently pulling materials in preparation for your report?
A Several hours.
Q Two, three?
A Can I look at the tally that is in there of my time?
Q Go right ahead.
MS. FREIWALD: Just for the record the Doctor is pointing to a Redweld folder, and in the Redweld folder, and we will mark later, is a one page handwritten sheet that has some annotations about time spent.
THE WITNESS: I would say probably eight to ten hours.
BY MS. FREIWALD:
Q For all three cases?
A Yes, looking up articles and then reviewing them.

Q Is there any work-product that you prepared as part of the process of preparing your report, I'm not asking about draft reports, but charts, spreadsheets, anything like that that you prepared in the process of putting your report together?
A No.
Q Aside from that handwritten sheet that you just pulled out, it reflects time spent, do you have any other records of the hours that you have logged working on the three cases that we are here today to discuss?
A No.
Q I think what I am going to do is mark as Exhibit 2, this one page, but it's two-sided handwritten document that says Time Log on it, and I gather it's written in your handwriting, Dr. Marks?
A Yes, it is. Can I retain a copy of it?
Q Absolutely. I hope you don't mind if it just has an Exhibit sticker on the top of it.
A No, that's fine.
(Whereupon, the above referred to document was marked as Defendant's Exhibit No. 2.)
(BY Ms. Freiwald)
BY MS. FREIWALD:
Q I'm going to have to share with you since there is just one copy.

If I look at it, it reflects that you had an initial discussion with some Plaintiffs' lawyers that lasted an hour in February of this year, correct?
A That is correct.
Q And then you have some time noted two entries in March, two entries in July - I'm sorry, three entries in July; is that correct?
A Yes.
Q Five entries in August?
A Eight entries in August.
Q One, two, three, four, five, I'm sorry, I didn't see the right hand column. Eight entries in August - actually nine entries in August?
A None of us can count, one, two, three, four, five, you're correct.
Q And I have one in September and two in October?
A That's right.
Q And this Exhibit 2 is the only record you have time spent on this case?
A That's right.
Q Have you submitted any bills to counsel for the Plaintiffs?
A No, not yet.
Q Have you received any money for any of your

time spent?
A No.
Q What is your hourly rate?
A $600.
Q Do you expect to bill them at that rate for all of the time that you have on Exhibit 2?
A Yes.
Q Is there any time that you have spent that you have not recorded on Exhibit 2?
A Can I see it? Other than today, no.
Q And does this Exhibit 2 fairly and accurately reflect how you have spent your time on each of the days where you have recorded some time in connection with this litigation?
A Yes, it does.
Q And does it fairly and accurately reflect the amount of time that you have spent on each of the days that you have recorded time in connection with this litigation?
A Yes, it does.
Q I'm sorry, did I ask you when that VADT lawsuit was?
A Yes, it was sometime within the last year.
Q Have you had any communications with any other witnesses who are serving as an expert for the

Plaintiffs in this lawsuit?
A No.
Q Have you had any communications with any of the Plaintiffs themselves?
A No.
Q Have you ever asked to do an exam of any of the Plaintiffs themselves?
A No.
Q Have the Plaintiffs' lawyers ever offered you the opportunity to do a physical exam?
A No.
Q Prior to this litigation, have you ever rendered an opinion about the health status of a patient or their prognosis without seeing that patient personally?
A No.
Q Have you attended any seminars or training sessions of any kind with the Plaintiffs' lawyers in connection with this litigation?
A No.
Q Web conferences, anything like that?
A No.
Q Do you have a written retention agreement?
A No, I don't.
Q One of the other things you brought with you

today is what you have represented to me as an updated copy of your CV, it has a date of September 2008 on it, correct, Dr. Marks?
A Yes.
Q And while we were waiting to start today you identified a few additional entries - I'm not going to take the time to go with them - but as I gather that you essentially filled in some blanks from 2007 and 2008?
A That is correct.
Q And you believe that the CV you provided today is more current than the one that we were given at the time that your report was provided to us?
A Yes.
(BY Ms. Freiwald)
MS. FREIWALD: Can we mark her CV as Exhibit 3, please?
(Whereupon, the above referred to document was marked as Defendant's Exhibit No. 3.)
(BY Ms. Freiwald)
BY MS. FREIWALD:
Q Now, if I understand correctly the articles that are in the red jacket that you brought with you today are articles that you personally pulled as opposed to articles that were provided to you by the Plaintiffs' lawyers?

A That is correct.
Q And there is also a label for Seroquel, did you pull that yourself?
A Yes.
Q It's the 2003 label, were you not provided that by Plaintiffs' lawyers?
A No.
Q Were you provided any labels by the Plaintiffs' lawyers?
A No.
Q Have you looked at any labels for Seroquel other than the 2003 label?
A No.
Q Did you ask for any labels for Seroquel other than the 2003 label?
A No. I don't know what the date of that is; do you know what that is?
Q I looked at the back page and it says AstraZeneca 2003 on it, fair enough?
A Fair enough.
Q There are two copies of the same 2003 label. Did you get the label off of the AstraZeneca website?
A Yes, I think so.
Q And did you look for or pull off anything else from the AstraZeneca website?

A No.

Q I also have in the red jacket you have provided it looks like three copies unsigned of your expert report; are these identical to the final version that was produced?

A Yes, they are.

Q There is some hours noted on the right corner of one, what does that mean?

A It was one day last week when I was doing some reviewing of some articles and I didn't have the sheet with me that I keep the log on, so I just wrote down the hours.

Q So these hours ultimately got transferred to Exhibit 2?

A Yes.

Q So the articles that you have, just so I don't have to copy all of them, unless somebody wants to do it differently I'm just going to read them quickly.

It looks to me like you have come here today with the ADA Consensus document publication from Diabetes Care in February of 2004, correct?

A That's right.

Q Was this not provided to you by the Plaintiffs' lawyers?

A I already had that article before I ever got

involved in this case.

Q The copy I have has three holes in it, did it come in a binder from somebody?

A No, my secretary punched holes in this and put it in a file folder for me.

Q Do you have a binder somewhere with other articles related to this litigation?

A There are possibly two or three other articles that I don't have here, yes. I took these out recently because I wanted to review them again.

Q Are the other articles you have ones the Plaintiffs lawyers gave you and that you would expect to see those on the CD?

A Some of them were from the Plaintiffs' lawyer.

Q What I am trying to understand is that binder you have in your office, do you know if it includes anything beyond what we have been produced on CD?

A No, everything should be on the list of the bibliography that you were given attached to my report, except for a couple of these articles which I have found over the past week.

Q Okay. The ADA Consensus document you already had?

A Yes.

Q Then I have Newcomers November 2000

publication from AJMC, correct?

A Yes, and could I correct something I said before?

Q Sure.

A That came from -- Glenda sent me that, I didn't get that myself, she sent it to me just a couple days before.

Q Had you seen it before?

A No, I hadn't.

Q Do you know why Glenda sent it to you?

A I think she just came upon it and thought it would be something that I should read.

Q Did you review it?

A Yes.

Q Miller's article from 2008 British Journal of Psychiatry on extrapyramidal side-effects; is that something you pulled yourself?

A No, Glenda just pulled that for me.

Q Within the last couple of days?

A That is correct.

Q So you didn't have it when you prepared your report?

A That is correct.

Q Then I have McNeely Case Study: Atypical Antipsychotic Use Associated With Severe Hyperglycemia,

November 2002, Clincal Diabetes; where did this come from?

A I pulled it myself a few days ago.

Q You didn't have it when you prepared your report?

A No.

Q Did you rely on any case studies in preparing your report?

A No.

Q Then I have a Lambert abstract assessing the risk of antipsychotic-induced Type II diabetes among schizophrenics: A matched case-control study, and it has a number 12 on the top of it; where did this come from?

A Glenda sent me that.

Q When was that?

A Within the last week.

Q You did not have this when you formed your opinions in this litigation?

A That's right.

Q Then we have survey of reports of Quetiapine Associated Hyperglycemia and Diabetes Mellitus, again with three holes, this is part of the binder you have in your office?

A Yes.

Q Do you know where this came from?
A I think I pulled that article myself.
Q Where did it come from?
A I either pulled it myself or Glenda sent it to me in the original articles that she sent me.
Q You either pulled it yourself or it was sent with the original articles; did you have this at the time that you did your report?
A Yes.
Q Then there is Schwartz: What CATIE found from Psychiatric Services May 2008, when did you get this?
A I pulled that just the other day.
Q Is there some PubMed or MEDLINE search that you used in pulling this or any of the other articles?
A Yes, I would have used PubMed for some of the articles. This one I had pulled this because I already have this, I went to look the other day to see if they had published any results, and when I was going back through my papers I realized that by now they may have published some of the results of that trial, so I went to PubMed and found that.
Q So the record is clear, because it won't understand this and that, you were pointing to another article in your pile, which was called: Introduction to the CATIE Special Section by Marvin Schwartz, May 2008.

And your testimony if I understand it is that you had this introduction article before you wrote your report; is that right?
A Yes, I did, I thought it was older than 2008, but that is correct, I had it before.
Q But you did not have the What CATIE Found article and you pulled yourself in an attempt to follow-up?
A That is correct.
Q Did you review the Meyer 2008 CATIE publication before you wrote your report?
A Is that the Meyer?
Q No, this is Schwartz.
A I don't know if I reviewed the Meyer 2008.
Q Are you familiar with the Meyer?
A I don't know.
Q And then the last article I have in the pile is Llorente: Diabetes, Psychiatric Disorders and the Metabolic Effects of Antipsychotic Medications from Clinical Diabetes, November 2006; where did you get this?
A I pulled that the other day myself.
Q I'm sorry, there are two more articles, there are a couple of duplicates in here, I'm really not making note of that since they don't have any

annotations on them.
There is Lieberman: Effective Antipsychotic Drugs in Patients with Chronic Schizophrenia; when did you get this article?
A Can I see it?
Q Sure.
A This I pulled just within the past week, it's another report of the results of the CATIE investigation.
Q This Lieberman September 2005 article, your testimony is your did not have the Lieberman study at the time that you wrote your report?
A That is correct.
Q There is one little highlighting on this, and that's on page 1220, you have highlighted where it says: Weight gain greater than 7 percent, the numbers in the Quetiapine column 49/305, and I am just going to mark this one, you have a duplicate of it, I will mark this one as Exhibit 4 since it has some highlighting on it.
(Whereupon, the above referred to document was marked as Defendant's Exhibit No. 4.)
BY MS. FREIWALD:
Q The last one: Risk of Diabetes Mellitus Associated with Atypical Antipsychotic Use Among Medicaid Patients with Bipolar Disorder: A nested

Case-Control Study. Pharmacotherapy 2007; did you have this article, Doctor, before you wrote your report?
A Yes.
Q Did you review it before you wrote your report?
A Yes.
Q Is it your testimony that you had not reviewed any of the follow-up studies from CATIE dealing with metabolic effects before you issued your opinions in this litigation?
A That is correct. The only CATIE article I had was the article that introduced the study, the design, et cetera.
(Whereupon, the below referred to document was marked as Defendant's Exhibit No. 5.)
(BY Ms. Freiwald)
MS. FREIWALD: Okay. What I would like to do now is I would like to mark as Exhibit 5 your report in the Burns case, and we will use that as the model.
If I understand correctly, tell me if I'm wrong about this, Mr. Pirtle, the list of reference materials is identical for each of the three case reports, with the exception of the case specific materials?

MR. PIRTLE: I think that is correct.
MS. FREIWALD: So I am going to use Burns as the template.
MR. PIRTLE: I think the general stuff is the same as all three.
(BY Ms. Freiwald)
BY MS. FREIWALD:
**Q I am going to hand you your report with the reference list, and what I would like you to do first, please, is turn to the reference list and tell me when did you first see this reference list?**
A I think the first time I saw this reference list was actually just last week when I was shown it, when I met with him.
**Q Am I correct that you did not see this reference list before it was attached to your report and produced to us?**
A I think Glenda might have sent it to me, but I am not sure that I really took a good look at it.
**Q This reference list was prepared by Glenda or somebody under her direction?**
A Yes, that is correct.
**Q Did you compile any aspect of this reference list yourself?**
A I sent her a list with some articles that I

had read that she had not sent me.
**Q What I would like you to do is go through in Exhibit 5, you can use my red pen, and I would like you to put a check if you can next to each of the documents that you asked Glenda to add to this list.**
A This isn't necessarily going to be a hundred percent accurate, this is just to the best of my memory.
**Q Doctor, you have handed me back Exhibit 5, and it looks to me like you put about five checkmarks on the document you have asked Glenda to add: Smith "First versus Second-Generation Antipsychotics and Risk for Diabetes in Schizophrenia" from The British Journal of Psychiatry 2008; that was an article that the Plaintiffs did not give you, you pulled on your own?**
A I think so.
**Q "Economic Costs of Diabetes in the U.S. in 2002", that was something you pulled on your own?**
A Yes.
**Q The Lieberman (CATIE) study from September 2005, you were just talking about a moment ago, that was not provided to you by the Plaintiffs' lawyers?**
A It may have been provided to me by her as well, but I think I sent her some things that she had already sent me before I had a chance to see everything that she had sent me.

As a matter of fact now looking at that list I realize there is a lot of things there that I never looked at.
**Q You are one question or two questions ahead of me, and we will get to that.**
A Sorry.
**Q That's okay. But as far as you know, the Lieberman article was not on your reference list until you asked that it get on your reference list?**
A I don't know that.
**Q You put a check next to that?**
A I think I provided it to her, but I think she also provided it to me.
**Q Guo, that was something that you provided to the Plaintiffs' lawyers or they provided to you?**
A I think both.
**Q There is a check next to that, though?**
A You asked me to put checks next to the articles that I recalled providing to her.
**Q Fair enough.**
**Do you have any knowledge how Glenda decided what literature she should provide to you in forming your opinions that would become the basis for the three reports that you issued in this litigation?**
A No.

**Q Did you ever ask her what searches she did to see if the article she was providing you fairly and accurately represented the totality of the medical literature on the topics about which you were opining?**
A No, I did not.
**Q Did you do anything yourself to see if the articles you were provided fairly and accurately represented the totality of the medical literature about the topics on which you were opining?**
A Well, I did my own searches and pulled my own articles.
**Q Which are the articles that we have discussed that you brought with you today?**
A Yes, plus some of the ones that I have checked there to the best of my memory.
**Q The articles you pulled were the ones you physically brought with you today and that I read the titles of, and the articles that you have checked on Exhibit 5?**
A Yes, to the best of my memory.
**Q To the best of your memory is there anything sitting in your office that constitutes your own research on the topics about which you are opining that you haven't identified to me in some way, either by bringing me a physical copy of the article or by having**

it on the list on Exhibit 5?
A No, I don't believe so.
Q Is there any way that you could tell me what search you did to see the literature you -- Strike that, that was terrible.
Is there any way you can tell me what search you did to determine whether the literature that you had reviewed represented the totality of the science on the subjects about which you were opining?
A I used MEDLINE.
Q What I am asking is what searches did you run, do you know?
A You mean what words did I type in?
Q Yes.
A I don't recall specifically.
Q Do you have any sense of how many documents, how many articles they turned up?
A There were a lot. I restricted it to recent years.
Q What year restrictions did you put on it?
A 2004 or 2005, I think.
Q Did you do any search to try to obtain for example all of the observational data related to Quetiapine?
A Can you define what you mean by observation?

Q Whether you are talking about cohort studies, retrospective studies, case studies, anything that would not be a randomized controlled clinical trial.
A No, I pulled some articles that represent things that are not randomized controlled trials.
Q What I am asking is did you do anything to try to figure out what is the universe out there in the medical literature of non-randomized controlled trials that relate to Quetiapine?
A No.
Q That was a really bad sentence, so I am going to try that again.
Did you do anything to try to figure out what the totality of the medical literature is by way of observational data, epidemiologic studies on Quetiapine?
A Not specifically.
Q Generally?
A If I understand you correctly, I just looked for what literature was out there and took allcomers.
Q What I am asking you is did you ever say yourself do I have everything on Quetiapine, everything that has been done in clinical trials, everything that has been done in observational studies, and I was starting just with the observational studies, but we can do it it altogether if you want.

A No.
Q Do you know how many observational studies have been published that involve some number of patients on Quetiapine?
A No.
Q Do you know how many clinical trials there are that involve patients on Quetiapine?
A No.
Q Did you make any attempts to see if you had reviewed all of the literature that compared Quetiapine to other second generation antipsychotics?
A I assumed that what I got out of my searches was representative of most of the literature.
Q Do you know what percentage of the literature your reference list on Exhibit 5 and the other articles you have identified represents?
A No.
Q Do you know whether it's 10 percent, 20 percent, 30 percent?
A No, I don't.
Q Did you make any attempt to find out whether you were missing anything that was of significance?
A I did, I did several searches. I did another search just last week to see if there was anything new.
Q You restricted yourself to 2004 and since?

A Last week I did 2007 and 2008.
Q Have you ever made an attempt to look to see from 1999 forward whether there is anything related to Quetiapine that would be relevant to the opinions you are offering and that you have not pulled?
A No.
Q Do you know what percent of the controlled clinical trial data you have reviewed related to quetiapine?
A No.
Q Have you made any effort to identify and pull and review the clinical trial data or the observational data that addresses, that compares Quetiapine to first generation antipsychotics?
A I am sorry, I lost track of the question.
Q Sure. Have you made any attempt to identify the universe of medical literature that compares Quetiapine to first generation antipsychotics?
A No.
Q Do you know if there are controlled clinical trials or observational studies that compare Quetiapine to first generation antipsychotics that you have not reviewed?
A No, I don't.
Q Did you at any time ask Glenda or anyone else