1

JOB NO. 99344

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This Document Relates to:

David Haller v. AstraZeneca, LP, et al.     Case No. 6:07-cv-15733
Eileen McAlexander v. AstraZeneca LP, et al. Case No. 6:07-cv-10360
Richard Unger v.  AstraZeneca LP, et al.     Case No. 6:07-cv-15812
Linda Whittington v. AstraZeneca LP, et al.  Case No. 6:07-cv-10475


ORAL DEPOSITION OF
BRIAN R. TULLOCH, M.D., FRCP, FACP
OCTOBER 2, 2008



     ORAL DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP,

produced as a witness at the instance of the Defendant and

duly sworn, was taken in the above styled and numbered cause

on Thursday, October 2, 2008, from 4:31 p.m. to 8:01 p.m.,

before RENE WHITE MOAREFI, CSR, CRR, RPR in and for the State

of Texas, reported by machine shorthand, at Laminack, Pirtle &

Martines, 5020 Montrose Blvd., 9th Floor, Houston, Texas,

pursuant to the Federal Rules of Civil Procedure and the


provisions stated on the record herein.

**2**

1    A P P E A R A N C E S

2

FOR THE PLAINTIFF:

3       TOM PIRTLE, ESQ.
        LAMINACK, PIRTLE & MARTINES

4       5020 Montrose Blvd., 9th Floor
        Houston, Texas  77006-6533

5       713.292.2750

6

FOR THE DEFENDANTS:

7       JANE THORPE, ESQ.
        LUCAS PRZYMUSINSKI

8       DECHERT, L.L.P.
        2929 Arch Street

9       Philadelphia, Pennsylvania  19104
        215.994.2398

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

**3**

1    I N D E X

2                                    PAGE

3

4    APPEARANCES...................... 2

5       BRIAN R. TULLOCH, M.D., FRCP, FACP

6    EXAMINATION

        By Ms. Thorpe..................... 4

7

8    CORRECTION PAGE........................ 152

9    SIGNATURE PAGE....................... 153

10   REPORTER'S CERTIFICATION............. 154

11

12              E X H I B I T S

     NO.    DESCRIPTION            PAGE

     1   Notice of deposition        4   5

13   2   Expert Report of Brian Tulloch,
         M.D. re Linda Whittington     4   16

14   3   CD                          4   17

     4   Reference material           4

15   5   Printout from the Cleveland
         Clinic                      42

16   6   Report of the Expert Committee on
         the Diagnosis and Classification

17       of Diabetes                 63

     7   Screening Adults for Type 2

18       Diabetes, a Review of the
         Evidence for the U.S.

19       Preventative Services Task Force   80

     8   Plaintiff's Second Supplemental

20       Fact Sheet                  83

     9   Medication log              85

21   10  Glucose test results dated
         2-16-06                    101

22   11  Laboratory test dated 9-16-93   114

     12  General Clinical Psychiatric

23       Evaluative Interview        116

     13  Nursing Assessment Forms    117

24   14  Medical record             117

     15  Medical record             126

25   16  Material pulled from witness'

---

**4**

1       (Exhibit Nos. 1 through 3 marked.)

2       THE REPORTER:  Stipulations or agreements

3    for the record?

4       MR. PIRTLE:  We're by the Rules, reserving

5    all objections save form and responsive for the time of

6    trial.

7       MS. THORPE:  Let's just go by the Federal

8    Rules of Civil Procedure.

9       MR. PIRTLE:  That's it, by the Rules.

10      MS. THORPE:  By the Rules.

11      MR. PIRTLE:  And I am reserving all

12   objections save form and responsiveness until the time

13   of trial.

14      MS. THORPE:  I'm not agreeing to anything

15   except for the Federal Rules of Civil Procedure.

16      And you can swear the witness, please.

17      BRIAN R. TULLOCH, M.D., FRCP, FACP,

18   having been duly sworn, testified as follows:

19      EXAMINATION

20   BY MS. THORPE:

21      Q.  Dr. Tulloch, my name is Jane Thorpe, and I

22   represent AstraZeneca in this litigation, and I'm going

23   to be asking you a number of questions today.

24      I understand you've given deposition

25   testimony before; is that correct?

---

**5**

1       A.  I have, Jane, yes.

2       Q.  And so you know that you need to give a verbal

3    answer, right, instead of a shake of the head?

4       A.  That's correct.

5       Q.  Okay.  If at any time I ask you a question that

6    you do not understand or I'm not communicating with you

7    in a way that makes sense to you, you'll let me know.

8    Is that all right?

9       A.  I will do that.

10      Q.  Okay.  I'm going to show you what's been marked

11   as Exhibit 1 to your deposition, and it's the notice of

12   this deposition.  And it has an attached -- Schedule A

13   attached to it.  And I see that you have before you a

14   number of documents that you've brought with you today.

15      A.  Yes.

16      Q.  Okay.  I'd like to mark the whole stack, if we

17   can, as Exhibit 4.

18      (Exhibit No. 4 marked.)

19      Q.  (BY MS. THORPE)  You brought those copies for

20   me, right?

21      A.  Yes, indeed.

22      Q.  So let's just stack them all up.

23      A.  Okay.  I'll be using them through the duration

24   of the discussion, but if -- let's assume that --

25      Q.  If you need any of them, I --

6

```
1        A. Let me give you a top one to put on, would you
2   like?
3        Q. No, I'll—
4        A. Use the top one off?
5        Q. No, I'll manage —
6        A. Why don't we use that one, then.
7        Q. That's fine.
8            So we're going to put Exhibit 4 on the
9   collect — as a collective exhibit —
10       A. Which will be the contents of that envelope,
11  which will —
12       Q. Dr. Tulloch, I can tell we're going to have a
13  problem. I need to finish my question before — I
14  should have told you that — before you give an answer.
15           MS. THORPE:  I am marking a stack of
16  documents.  The top one is "Economic Costs of Diabetes
17  in the U.S. in 2007" that Dr. Tulloch has brought with
18  him to the deposition.
19       Q. (BY MS. THORPE)  Okay.  And did you bring, sir,
20  the documents in Exhibit 4 in response to Exhibit A of
21  this notice?  Let — let me do it this way.
22           What is Exhibit 4?  What are the materials
23  you've brought with you today?
24       A. Yeah, I have brought my list of — of the legal
25  work that I've done with this and other groups, and I
```

7

```
1   have brought this as the information that we'll be
2   working from.
3        Q. Okay.  What is the information we will be
4   working from?
5        A. What I have here is a selection of references
6   which relate to the content of today's assumed
7   discussion.
8        Q. Have you brought with you, sir, all materials,
9   including all original documents that relate to Seroquel
10  which you have reviewed prior to or since you were
11  retained as an expert in the litigation?
12       A. Yes, I have.
13       Q. Have you brought all materials you've
14  considered as well as those on which you relied to
15  support your opinions in the Seroquel litigation and in
16  this case?
17       A. Yes, I have.
18       Q. Have you brought all work product, including
19  any that you intend to present at trial, notes, and
20  memoranda you have prepared in the Seroquel litigation
21  or any other litigation involving atypical
22  antipsychotics including — excluding drafts of your
23  expert report?
24       A. Yes, I have.
25       Q. Have you brought all documents reflecting time
```

8

```
1   you have spent as an expert witness in the Seroquel
2   litigation?
3        A. Yes, I have.
4        Q. Have you brought all documents reflecting time
5   you have spent as an expert witness in any other
6   litigation involving atypical antipsychotics like
7   Zyprexa?
8        A. Those have been listed in the — in the back
9   of — of this, yes, ma'am.
10       Q. Okay.  Did you bring invoices that you have
11  submitted for payment in the Zyprexa litigation?
12       A. Zyprexa litigation?
13       Q. Yes.
14       A. No, I referred those to Dr. Nations —
15  Mr. Nations because when that case was settled, I turned
16  everything back to that law firm.
17       Q. Okay.  And that's Howard Nations?
18       A. Howard Nations, that's correct.
19       Q. And so you don't have any records of how much
20  money you made in the Zyprexa litigation?
21       A. I sent them all back to Mr. Nations.
22       Q. Okay.  Do you have any work product, notes, and
23  memoranda that you prepared in connection with Zyprexa
24  that you still have?
25       A. No, I don't.  I turned them all back.
```

9

```
1        Q. So you literally have no piece of paper related
2   to the Zyprexa litigation —
3        A. No.
4        Q. — in this action?
5        A. May I explain?
6        Q. No.  I'll ask for — I'm trying to move very
7   quickly through this, and I'll come back and we can
8   talk — we'll talk more about some of this stuff.
9            A list of — you've given me a list of all
10  cases in the past four years in which you've testified
11  about any topic, right?
12       A. That's correct.
13       Q. And you didn't have any transcripts?
14       A. No.
15       Q. Have you in your — did you bring with you any
16  communications including but not limited to e-mails and
17  expert witness reports in litigation involving Zyprexa
18  or any other atypical antipsychotic litigation?
19       A. I returned those to Mr. Nations.  The ones that
20  relate to this product I have the final work product
21  here.  And I did not bring any rough copies, because
22  when I made the final work products, I deleted the
23  earlier products.
24       Q. Do you have any e-mails relating to Zyprexa on
25  your computer in your office?
```

3 (Pages 6 to 9)

**10**

1  A. Not to Zyprexa.

2  Q. Do you have any e-mails relating to Zyprexa on

3  your computer at your home?

4  A. No, ma'am.

5  Q. So you literally have no computer materials of

6  any sort, any electronic materials regarding Zyprexa in

7  your office or home?

8  A. I am not very sophisticated with a computer,

9  and if anybody wishes to search my hard drives, I'm

10  happy to share them. I have one right here. So -- but

11  at the level of my ability to get in there, the answer

12  is no.

13  Q. Okay. You don't have a folder on your

14  computer --

15  A. No.

16  Q. -- with --

17  A. No.

18  Q. -- materials relating to Zyprexa --

19  A. No.

20  Q. -- correct? Okay.

21  A. My main reason for that -- if this is the time

22  to answer -- I'll go on.

23  Q. I'm just trying to cook through this list.

24  A. Never mind.

25  Q. Do you have any communications -- strike that.

**11**

1  Do you have any documentation of any kind

2  of independent medical examination of any of the

3  plaintiffs in the Seroquel litigation?

4  A. No. The -- the --

5  Q. You never --

6  A. I hesitated for a moment because I did see the

7  four Zyprexa plaintiffs that relate, but I did -- I have

8  not seen any of the four Seroquel plaintiffs physically.

9  Q. Okay. Have you had any conversation with any

10  of the four Seroquel plaintiffs?

11  A. I have not.

12  Q. Do you have any communications including but

13  not limited to e-mails that you have had with any

14  witness in the Seroquel litigation?

15  A. No.

16  Q. Have you talked to any witness in the Seroquel

17  litigation?

18  A. No.

19  Q. Have you talked to anyone at AstraZeneca about

20  Seroquel?

21  A. No.

22  Q. Have you made any speeches, presentations,

23  written any articles, do you have any manuscripts,

24  reviews, editorials, or other writings other than your

25  expert report concerning Seroquel?

**12**

1  A. No, ma'am.

2  Q. How about Zyprexa?

3  A. No, ma'am.

4  Q. Do you have a retention agreement with any

5  lawyer in connection with either Seroquel, Zyprexa, or

6  any atypical antipsychotics?

7  A. No, ma'am.

8  Q. So you have no letter or written agreement of

9  any sort?

10  A. No, ma'am.

11  Q. It's all oral?

12  A. Oral.

13  And if I again may explain. These people

14  are my duck hunting friends. We relate in a number of

15  nonacademic contexts and I trust them, they trust me.

16  Q. Where do you go duck hunting?

17  A. Just about 15 miles west of Freeport. We own

18  some marsh down there, and we go down there and fish and

19  duck hunt.

20  Q. So that's how you got to know these folks?

21  A. Yes, ma'am, about 25 years ago.

22  Q. All right. So -- and you have given us all

23  records of the fees for your time that you've spent

24  consulting with or testifying at the request of

25  plaintiffs' lawyers involving Seroquel, right?

**13**

1  A. Yes, ma'am.

2  Q. Now, have you got any other records of payment

3  or records of fees for time you have spent consulting

4  with plaintiffs' lawyers about testifying against other

5  pharmaceutical companies?

6  A. I'm -- let me -- let me make a statement that a

7  good 70 if not 80 percent of my time is actually spent

8  in defense. The Texas Medical Liability Association,

9  TMLT, is a group that defends doctors, and I give them a

10  lot of time. A fair amount of it is done almost at a

11  casual level.

12  For those in which I do charge, I have

13  included my exhibit with the expert witness report.

14  Q. You've given a list of what your fees -- what

15  your hourly rate is --

16  A. Right.

17  Q. -- and what depositions you've given, sir. But

18  I'm asking you how much money you've made, whether

19  you -- strike that.

20  What I want to know is whether you have

21  brought with you today as requested by Schedule A, which

22  has been marked as Exhibit 1 to this deposition --

23  A. Yes, ma'am.

24  Q. -- whether you brought with you records of

25  payments or records of fees for time that you've spent

14

1   consulting with or testifying at the request of
2   plaintiffs' lawyers against pharmaceutical companies.
3     A. Okay.
4     Q. That's it. You did or you didn't.
5     A. Okay. I did not — the only two which I have
6   given are to the two products which you have just
7   mentioned. I have been on the defense —
8     Q. I don't — I —
9     A. — for pharmaceutical companies.
10     Q. — really don't want to hear about —
11     A. Okay.
12     Q. I'll ask you about your testimony in a little
13   while.
14     A. No problem.
15     Q. I just want to know. You didn't bring it?
16     A. I didn't bring it.
17     Q. All right.
18     A. And they were only the two — and the two
19   products which are the atypicals.
20     Q. All right. Do you have records of payments and
21   records of fees for time you spent consulting with or
22   testifying at the request of plaintiffs' lawyers against
23   pharmaceutical companies?
24     A. I believe they are with the companies that I
25   have sent the bills to. I don't personally keep copies

15

1   of those bills. When they're paid I strike them off.
2     Q. How about 1099 forms?
3     A. 1099 forms I have. I can produce my — my —
4   actually, they're all listed — most of my income is
5   from defense or from lectures, and the 1099 form relates
6   to — to those. I can produce those. I do not have
7   those today.
8     Q. Okay. Exhibit 4 is literature that you've
9   brought with you?
10     A. Yes, ma'am.
11     Q. Okay. Is — does Exhibit 4 reflect the
12   literature that is on the list of literature that is
13   attached to your expert witness report?
14     A. Yes, it does.
15     Q. Is there anything in that stack that isn't on
16   your list of literature?
17     A. No.
18     Q. Okay. So it's one in the same?
19     A. But I —
20     Q. Is that right?
21     A. I — I leave a — a paragraph at the bottom of
22   each discussion — and I believe it's on here — which
23   means that anything I offer can be superseded by new
24   information becoming available.
25     Q. I'm really asking you — let me show you what's

16

1   been marked —
2     A. Okay.
3     Q. — as Exhibit 2. This is your report in this
4   case, right?
5     A. Yes, ma'am.
6     Q. Okay.
7     A. And that list is —
8     Q. And you've got your —
9     A. — is current as of the 2nd of October.
10     Q. All right. And you looked at — in Exhibit 2
11   there's a document that is — begins on page 1, and it's
12   17 pages long, and it's a list of literature and
13   documents and medical records you've reviewed, correct?
14     A. Yes, ma'am, that's correct.
15     Q. And you have no corrections or changes that you
16   want to make to pages 1 through 17 of your report
17   today —
18     A. That's correct.
19     Q. — is that right?
20     A. Yes, ma'am.
21     Q. And the documents that you have stacked in
22   front of you that have been marked as Exhibit 4 are
23   the — is the medical literature that's on — described
24   on pages 1 through 17 —
25     A. That's correct.

17

1     Q. — of your report? Okay.
2     I received in the overnight mail last night
3   a DVD that's been marked as Exhibit 3. Did you produce
4   that or how did that come to be?
5     A. Firstly, I didn't produce it. My belief, it
6   would have come from Mr. Fibich's office. Do you know
7   what the contents are?
8     Q. I know that it's got medical records on it.
9   And I quite frankly have not had time to look at it
10   since I got it at about —
11     A. Okay.
12     Q. — 11:00 o'clock this morning.
13     A. Okay. So without — firstly, I did not
14   generate it. My belief — well, let's — we can put it
15   in the computer and find out what it has in a moment.
16     Q. Okay.
17     MR. PIRTLE: I can tell you what it's
18   supposed to be.
19     MS. THORPE: Okay.
20     MR. PIRTLE: It's supposed to be everything
21   he'd been provided, the production to you, and you're
22   supposed to receive it as per our stipulation.
23     MS. THORPE: Okay. Which I didn't,
24   but . . .
25     A. I apologize on all of our behalf that it came

18

1  so late.
2      Q. (BY MS. THORPE)  So what I'm getting at is did
3  you bring medical records with you today?
4      A. I brought a disk which includes the medical
5  records of the patients which we will be discussing.
6      Q. Okay.  All right.  Okay.  So —
7      A. May I make a comment?
8      Q. Sure.
9      A. Okay.  I'm here to share information.  I've
10  never had a problem with sharing any of the information
11  that's available.  And the contents of that folder there
12  is available to you to be copied at any stage.
13      Q. Great.
14         So you have —
15      A. I've never been based on medical.
16      Q. Great.  I really genuinely appreciate that.
17         And do you have a — another folder?  Is
18  that what you're saying?
19      A. No, I have what I hope is there.
20      Q. Okay.
21      A. Which are the medical records as they were sent
22  to me over the last multiple months.
23      Q. Okay.  All right.
24         MS. THORPE:  Just for — I assume when we
25  started — did you note the time of the deposition?

19

1  Okay.  Thanks.
2      Q. (BY MS. THORPE)  Why don't we take a look at
3  the folder so I can see what it is.
4         MR. PIRTLE:  I think it's a disk.
5         MS. THORPE:  Okay.  It sounded like it was.
6         MR. PIRTLE:  We can do this off the record.
7         (Discussion off the record from 4:48 to
8  4:48.)
9      Q. (BY MS. THORPE)  The report that has been
10  marked as Exhibit 2, that is your report for — for
11  Ms. Whittington, right?
12      A. Yes, ma'am.
13      Q. And you prepared Exhibit 2?
14      A. Yes, ma'am.
15      Q. And I take it you have no additions or changes
16  you want to make to Exhibit 2 today?
17      A. Within the limitations of that last paragraph,
18  yes, ma'am.
19      Q. Today, though, you don't have any —
20      A. That's correct.
21      Q. — that you know of, right?
22      A. That's correct.
23      Q. And Exhibit 2 fairly and fully reflects your
24  opinions in this case, right?
25      A. To the best of my knowledge as of October the

20

1  2nd, yes, ma'am.
2      Q. And the report is, as best you could do, an
3  accurate and careful summary of your opinions?
4      A. Yes, ma'am.
5      Q. And —
6      A. Subject to the last — the last paragraph at my
7  statement, yes.
8      Q. And the report is an accurate and careful
9  summary of the medical and scientific facts in the —
10  and excuse me — in the Whittington case, right?
11      A. Yes, ma'am.
12      Q. Now, the paragraph — point out the paragraph
13  again that you keep citing as the —
14      A. It's the last full paragraph which basically
15  says, "The observations based on medical
16  interpretation of the data as available in the charts of
17  the medical facilities listed.  It is my understanding
18  that the document and record production is ongoing and I
19  thus reserve the right to supplement my opinions pending
20  the review of any additional information."
21      Q. Okay.
22      A. So that leaves us — new information's coming
23  out all the time and —
24      Q. How do you know new information is coming out?
25      A. Every now and again, I run a MedEd review and

21

1  put in the products which we're discussing.
2      Q. In terms of the medical — the medical records
3  on Ms. Whittington, you don't have any understanding
4  that there are going to be additional medical records
5  coming in, do you?
6      A. Other than new information that comes out when
7  her physicians interview her.  Sometimes new issues come
8  up about family history of diabetes and whatever.  But
9  no.  My main reservations held in that are the academic
10  information about endocrinology and how the atypical
11  antipsychotics would relate in this particular context.
12      Q. Well, to the extent that your report — any
13  opinion in the report is affected or influenced or you
14  revise your opinion in any way based on additional
15  literature, we would expect you to revise your report
16  and we would expect the opportunity to take an
17  additional deposition.
18      A. It would be my pleasure.  No problem.
19      Q. All right.  So let's imagine, Dr. Tulloch, that
20  you have a group of 100 people who have taken
21  Seroquel —
22      A. Yes, ma'am.
23      Q. — and then thereafter developed diabetes.
24  Okay?  Are you with me?
25      A. I'm with you.

6 (Pages 18 to 21)

22

1    Q. And would you say, Dr. Tulloch, that in that
2  scenario Seroquel caused or contributed to the
3  development of diabetes in all those 100 people?
4        MR. PIRTLE: Objection, form.
5        Go ahead.
6    A. Ma'am, I think -- I think it would be a naive
7  statement if I were to do that.
8    Q. (BY MS. THORPE) You would not do that?
9    A. I certainly would not do that. No.
10   Q. What would be the characteristics of the people
11 in whom Seroquel was not a cause or contributor to the
12 development of diabetes in those 100 people?
13       MR. PIRTLE: Same objection.
14       Go ahead.
15   A. May I make a general statement?
16   Q. (BY MS. THORPE) I'd like you to answer my
17 question.
18   A. Okay. If you're putting it specifically to the
19 100 patients, I would have to know more about the
20 background of each individual patient. I would have to
21 know what proportion of them had a family history of
22 diabetes. I would have to know what proportion of them
23 were on other diabetic -- diabetogenic medications. I
24 would have to know the weight patterns of the patients
25 that had lived before the first atypical, then what

23

1  happened when they got the first atypical, and then if
2  Seroquel was a subsequent atypical -- because, remember,
3  it only came out in 1998 -- what happened to the weight
4  pattern when the patient got Seroquel.
5        And then if the -- there was any change in
6  glucose physiology, my cautious review would relate to
7  were there any other diabetes -- diabetogenic
8  medications what were given synchronously with Seroquel,
9  and then I would try to proportion the context. As I
10 said earlier, I try to be a fair dispassionate assessor
11 of risk.
12   Q. Okay. So let's try to go at it this way.
13 Well, let me -- let me go back a second.
14       The list that you just gave of family
15 history, other diabetogenic medications, weight patterns
16 before the first atypical antipsychotic was taken, was
17 Seroquel a subsequent atypical, what happened to the
18 weight pattern, all of those things, are there any other
19 characteristics or questions that you would want to know
20 about those 100 people before you attributed causation
21 to Seroquel?
22   A. Well, I -- I wouldn't interpret -- I wouldn't
23 attribute causation to Seroquel, but I would have it as
24 part of a balance of all of the other factors. I mean,
25 what you heard me say was people are people. Psychotic

24

1  people are psychotic people who by being psychotic
2  already inherit the possibility of diabetes
3  statistically. And then people have a family
4  background, which can include a racial preponderance
5  towards diabetes. We're here in Texas.
6  Mexican/Americans have a very high prevalence of
7  diabetes. If we were in Phoenix, Arizona, the Pima
8  Indians have a 50 percent prevalence of diabetes by the
9  age of 50.
10       So you can hear why I'm not going to give
11 you a simple answer. There's so many factors out there.
12 But if all other factors were standard and then the
13 patient had normal sugar at the time -- let's take one
14 patient of your hundred -- had normal sugar at the time
15 of being given quetiapine and six months later had
16 gained 40 pounds in weight and now had a high blood
17 sugar, my belief that there could be an etiological
18 factor at work in that context over that six months.
19   Q. So what you're -- you're saying in that
20 situation is that Seroquel would be a risk factor --
21   A. Would be --
22   Q. -- for the development of diabetes?
23   A. -- a contributing factor. There's a biblical
24 parable about the soil and the seed. And if you sow
25 seed on stoney ground, it will not germinate; if you sow

25

1  seed on fertile ground and water, it will germinate.
2  And if that's perhaps too obtuse, let me come back to
3  the facts.
4        The facts are that diabetes will evolve in
5  people at risk, and diabetogenic factors can bring out
6  that diabetes by many, many years.
7        Ma'am, did you read my deposition for
8  Zyprexa?
9    Q. You know, I'm not here to answer questions,
10 unfortunately.
11   A. May I --
12   Q. I'd love to see your copy of your transcript if
13 you have it.
14   A. May I pick that up if it --
15   Q. You know what, Doctor --
16   A. It would --
17       THE REPORTER. One at a time.
18   A. -- accelerate our discussion tonight.
19   Q. (BY MS. THORPE) I can already tell,
20 Dr. Tulloch, that we're going to have to just kind of
21 move crisply --
22   A. Madam, you are in charge.
23   Q. I've taken a lot of depositions in my life, and
24 I already know that if you don't want to do this for the
25 rest of your life --

26

1    A. I understand and you are in charge, ma'am.

2    Q. — I have to have a question and an answer.

3    A. Okay.

4    Q. So let me — let me go back to my original

5 premise. We're talking about these 100 people.

6    A. Okay.

7    Q. If someone — some — one or more of those

8 people had no weight gain at all after they ingested

9 Seroquel and thereafter developed diabetes, is it

10 correct that you would conclude that Seroquel was not a

11 cause or a contributor to the development of diabetes?

12    A. No, ma'am.

13    Q. That's not correct?

14    A. There are some --

15    Q. Is that -- just -- you can say yes or no and

16 then you can explain.

17    A. The answer's no. And if you ask me why, I'll

18 tell you why.

19    Q. Well, tell me why that is.

20    A. Some of the atypicals and I believe — I

21 believe Zyprexa definitely is one, and I believe

22 Seroquel is another -- cause insulin resistance. And

23 what we're talking about is the exhaustion of a pancreas

24 which has a limited capacity by a number of factors.

25 The atypicals can cause weight gain which can

27

1 precipitate diabetes in a fertile ground.

2    Q. I want — I want to know what evidence — what

3 scientific literature that you rely on for the

4 proposition that Seroquel causes insulin resistance in

5 the pancreas. Just tell me the cite on your reliance.

6    A. There are references in this pile which show a

7 rise --

8    Q. You've got a list —

9    A. -- in insulin level with the administration of

10 Seroquel.

11    Q. Tell me which ones. You can just look at your

12 list. It's on —

13    A. It will take me a while to find them, but let

14 me -- and then --

15    Q. I just want you to find that and answer that

16 question.

17    A. Okay. Ma'am, it will take me a while to find

18 it, but if -- let me tell what I'm looking for.

19 There are summaries of patients --

20    Q. I just want to know —

21    A. Well, there are summaries of patients in these

22 references which include patients having been given

23 quetiapine and there is a rise in the level of insulin

24 in those patients in --

25    Q. I just need to know the name of the study.

28

1    A. Okay.

2    Q. Or studies.

3    A. Give me a moment to find it, then.

4    Okay. I am holding a reference by Helliner

5 and Vestri — Helliner S. Vestri, et al. It looks at

6 the direct effect of atypical antipsychotics on adipose

7 cells in vitro. These are 3T3-L1 cells.

8    Q. I don't need an explanation of the article. I

9 just need you to identify the article. Give me the

10 author and the date of the journal.

11    A. The author is Vestri. The journal is

12 Neuropsychopharmacology. And I can give you the

13 reference if you need it.

14    Q. I don't need the reference. I just need the —

15 that's fine.

16    Is that it? Is that all of them?

17    A. That's -- that's one. If you --

18    Q. I want to know all of the article — basically

19 what you're saying is that Seroquel has a direct effect;

20 is that right?

21    A. On insulin action in isolated fat cells in

22 vitro —

23    Q. All right.

24    A. — yes, ma'am.

25    Q. I want to know all evidence that you're relying

29

1 upon that Seroquel — the mechanism by which it works is

2 a direct effect. Go — just tell me what you got there.

3    A. Okay. It's going to take a while because what

4 we look at at the level of patient studies is the

5 context of your hundred patients. And in your hundred

6 patients, what you see is the odds ratio, which is a

7 representation of the risk of developing diabetes in

8 that hundred patients that you asked us to -- to review.

9 That risk ratio varies from 1.3 to 3.4.

10    That means if they were given quetiapine

11 for a length of time under the context of these studies,

12 the chance of them — those hundred patients that you

13 asked me to think about developing diabetes was

14 3.34-fold greater than were they to be on a placebo or

15 nonatypical.

16    Q. Dr. Tulloch, I asked you to tell me the names

17 of the journal articles that you rely on for Seroquel

18 having a direct effect.

19    A. Yes, ma'am.

20    Q. So —

21    A. I gave you Vestri.

22    Q. — if you don't have — I just need the names

23 of the articles.

24    A. Okay.

25    Q. I don't need any other response.

30

1     A. Okay. May I -- I think this will take a lot of
2   time, ma'am, because what I'm trying to do is to take
3   science and convert it into a way that would answer your
4   question better. Let me start --
5     Q. I just need to know the name --
6     A. -- with Vestri. This is in my view the most
7   concrete evidence that quetiapine has a direct effect in
8   reversing insulin action.
9     Q. What I need to know from you, Dr. Tulloch, is
10  the -- whether or not the Vestri article is the only
11  article upon which you rely to establish that Seroquel
12  has a direct effect on the pancreas.
13    A. No, ma'am. You're taking my -- my argument out
14  of context.
15    Q. I'm giving you the opportunity to tell me
16  anything else you're relying on.
17    A. In here there's references which show there's a
18  rise in circulating --
19    Q. Sir, I'm asking for the names of the journal
20  articles.
21    A. Oh, okay. It will take me a while to find
22  them.
23        MR. PIRTLE: If it takes a while, just do
24  it.
25    A. Okay. And I'm going to save us some time. I'm

31

1   going to have to give you as they come up in random.
2         Leslie Citrome, the year 2004, the odds
3   ratio for quetiapine associated with diabetes in 13,000
4   patients who got antipsychotics --
5     Q. (BY MS. THORPE) No, all I need was the --
6     A. -- was 3.89.
7     Q. I need the title.
8         And you're saying that that is an article
9   that shows the direct effect of Seroquel on the
10  pancreas?
11    A. No, ma'am.
12    Q. That's what I'm asking you for, sir.
13    A. Okay.
14    Q. I'm asking you for articles that show the
15  direct effect of Seroquel on the pancreas. You've given
16  me Vestri. Are you also giving me Citrome?
17    A. Ma'am, I apologize. I misheard your question.
18  What I -- I have offered you with Vestri was a direct
19  effect of quetiapine on insulin action in fat cells.
20  That's not the pancreas. And I apologize if you -- if
21  that was the original question. I do not --
22    Q. Let me just -- let me just -- since you're
23  going through these articles, let's just do it this way.
24  Is it your contention that Seroquel -- the mechanism by
25  which Seroquel causes or contributes to diabetes is a --

32

1   that there is a direct effect on the human body apart
2   from weight gain?
3     A. What I've shown you -- to make a statement like
4   that, one has to think of the components. So the first
5   component --
6     Q. So you can't --
7     A. -- is the pancreas.
8     Q. -- answer the question?
9     A. Yes, we've looked at one component of the human
10  body, which was the isolated fat cell. I have offered
11  to you a second context, which was that when patients
12  are given quetiapine, the insulin levels rose. That can
13  be interpreted as the medication causing an insulin
14  resistance.
15        And we as endocrinologists see patients
16  with high levels of circulating insulin and insulin
17  resistance ultimately causing their pancreas to burn
18  out. And we discussed a number of contexts in which
19  that would occur.
20    Q. All right. Let me change horses here and --
21    A. Okay.
22    Q. -- let me ask you to turn to page 16 of your
23  reliance list. And on that page you list the medical
24  records that you reviewed; is that right?
25    A. Yes, ma'am.

33

1     Q. And it was your intent to review all of the
2   plaintiff's medical records that exist, correct?
3     A. Ma'am, I have a limited number of time. I'm a
4   busy clinician. So what -- what I did was look at the
5   endocrine aspects of these patients, which were their
6   diabetes, their weight, the other factors which might
7   affect their blood sugar.
8         And if you're showing me page 16 which
9   lists a -- I looked at the records or a summary thereof
10  of a number of these from the viewpoint of an
11  endocrinologist. I did not look at the psychiatric
12  aspects of these patients. So, again, I hope that helps
13  you.
14    Q. Well, I need to know exactly what you read.
15  So --
16    A. Okay.
17    Q. -- did you read -- tell me which of the medical
18  records on this list that you did not read.
19    A. What I read is --
20    Q. That's a easier way to go at it. I just need
21  to know what you read. But you can tell me what you
22  didn't read or what you -- or what you did read.
23    A. We're looking at Linda Whittington and we're
24  looking at page Opinions Relating to Ms. Linda
25  Whittington, which is two-thirds of the way through

9 (Pages 30 to 33)

34

1  there.
2  Q. Yes.
3  A. I reviewed the items which are listed in the
4  first paragraph.
5  Q. Okay. So you did not review all the records
6  that are on the page 16 —
7  A. Page 16, that's correct.
8  Q. — of the —
9  A. Yeah. And that's what I said. I — I'm an
10  endocrinologist, not a psychiatrist.
11  Q. Okay. Well — and is it your testimony that
12  all of the records that you did not read were
13  psychiatric records?
14  A. To the best of my understanding, yes.
15  Q. And so if there were glucose levels in those —
16  the psychiatrists had ordered lab tests —
17  A. I got those.
18  Q. — you got those?
19  A. Yeah. They were summarized for me, yeah.
20  Q. And who summarized the records for you?
21  A. They'll be on there.
22  One of the office workers for Mr. Fibich.
23  Q. Summarized the records?
24  A. Yeah. I believe you'll have them on that disk.
25  Q. Okay. So were these, like, memos about what

35

1  the medical records showed?
2  A. They were a list, a seral — when those blessed
3  folk went through and they summarized all the lab, so
4  you can have — you can eyeball the sugars and you can
5  eyeball the weights.
6  Q. Just like a medical chronology prepared by a
7  paralegal or something like that?
8  A. That's correct.
9  Q. And how long was that document? Was it very
10  thick?
11  A. Multiple pages for these patients who were
12  looked after for some years.
13  Q. Did you actually look at the labs yourself or
14  did you rely on the medical chronology?
15  A. Both, both. I went through the items which
16  were listed there. And then you know what a chart looks
17  like, there's multiple areas and then somewhere down
18  there is the lab. And then one of those souls had
19  pulled all the lab and then collated them.
20  Q. All right. Did you have — within that summary
21  were there — for example, was there a list of the
22  weights —
23  A. Yes, ma'am —
24  Q. — for Ms. Whittington?
25  A. — a list of body weights. I said they listed

36

1  the medications, the weights, and the context.
2  Q. Okay. And the context?
3  A. The —
4  Q. The context?
5  A. Yeah. If they had an acute infection, they
6  were given drug X for period Y.
7  Q. All right. What other kinds of information was
8  in this medical chronology that Mr. Fibich's office
9  prepared for you? Is that right?
10  A. That's about it. But you have — you have
11  access to it.
12  Q. Okay. I honestly don't think it's on there.
13  A. Okay.
14  Q. But I —
15  A. Ma'am —
16  Q. Am I hearing correctly that in preparing your
17  report, you relied on that medical chronology?
18  A. Yes, ma'am. I said you had access to it. It's
19  in your colleague's hands right now.
20  Q. Good. Okay. Well, I just got here this
21  afternoon.
22  A. I don't withhold data, ma'am.
23  Q. Okay. Well, unfortunately, I didn't have it
24  before today. So that's why I'm asking you these
25  questions.

37

1  MR. PIRTLE: We'll certainly get it for you
2  if we owe it to you.
3  MS. THORPE: Okay.
4  A. Let me be on record — I'm here to be kind to
5  my colleagues, and you are one of my colleagues.
6  Q. (BY MS. THORPE) I appreciate that.
7  All right. So — so the kinds of medical
8  records that you wanted to review you described as the
9  endocrine aspect, diabetes, weight, and blood sugar
10  records?
11  A. Blood fats, cholesterol, triglycerides, special
12  circumstances, yes, ma'am.
13  Q. Okay. And did you undertake a review of
14  these — well, let me — strike that.
15  As you reviewed the medical records, you
16  needed to know what — the pattern of weight gain and
17  weight loss Ms. Whittington had before she took
18  Seroquel, right?
19  A. Yes, ma'am.
20  Q. And you needed to know her pattern of weight
21  gain and weight loss while she was on Seroquel, right?
22  A. And subsequent to that as well, ma'am, yes.
23  Q. And — and why did you need to know that?
24  A. Again, should there be any mitigating
25  circumstances and should there be any tendencies — some

10 (Pages 34 to 37)

38

1   of the psychiatric patients have binge and bust habits
2   which are totally independent of their medication.
3   So, again, to be fair to everybody, what I
4   tried to do was establish whether this pattern was part
5   of that particular person's behavior.
6   Q. Okay. So — so those weight gain and weight
7   loss patterns before Seroquel and after Seroquel were
8   key to your opinion —
9   A. Yes, ma'am.
10   Q. — correct?
11   And so if after — well, let me strike
12   that.
13   Is weight loss that occurs after Seroquel
14   ingestion important to you? Excuse me. Let me reask
15   the question.
16   Is weight loss after someone stops taking
17   Seroquel important to your opinion?
18   A. Yes, ma'am. We — you by your requirement —
19   Q. Why is that?
20   A. — are fixated on Seroquel. But of the
21   atypicals —
22   Q. Yes, I'm only —
23   A. — there's a group of patients which will gain
24   weight on some medications and not on others, and there
25   are two atypicals which are not associated with weight

39

1   gain and diabetes. And I'm a clinician, I'm not in
2   charge of Seroquel. So I look for the patterns and try
3   to relate them to the medications.
4   Q. So if there is weight loss after Seroquel is
5   stopped, what does that say to you as a clinician?
6   A. Well, it may mean that the medication which
7   caused the weight gain has been terminated and the
8   weight loss may relate to the termination of her
9   weight-inducing substance.
10   Q. And —
11   A. On the other hand, if there had been five years
12   of boom and bust when it came to weight and they were
13   unrelated, then clearly I would also accept that this
14   might have been a boom and bust phenomenon.
15   But if we had multiple patients — and you
16   gave me a hundred to play with — that had all gained
17   weight and had high sugars while taking Seroquel and
18   lost weight and had normal sugars while not taking
19   Seroquel and you promised me to have a hundred, then the
20   etiology would become more likely.
21   Q. And if there was weight gain after a patient
22   stopped taking Seroquel, would that be important to your
23   opinion?
24   A. Yes, ma'am. But it would also be important,
25   you know, what other medications they've been given.

40

1   Q. All right. Why would it be important to you
2   that there was weight gain after a patient stopped
3   taking Seroquel?
4   A. Because my field is total bricks. So I'm not
5   obsessed only by Seroquel. There are other factors and
6   other medications which can cause weight gain and weight
7   loss.
8   Q. Would you infer from the fact that a patient
9   gained weight after stopping Seroquel that perhaps the
10   Seroquel did not cause weight gain while the patient was
11   on Seroquel, that it could have been some other factors?
12   A. No, ma'am. I believe if a hundred of the
13   patients you offered me had all gained weight on
14   Seroquel, that it was more likely than not due to the
15   Seroquel.
16   Q. If — if you would look at your opinions
17   relating to Ms. Whittington.
18   A. Yes, ma'am.
19   Q. And look at the last paragraph. You say,
20   "Based on reasonable medical probability, it is my
21   opinion that Seroquel was a cause of Ms. Whittington's
22   diabetes"?
23   A. Yes, ma'am.
24   Q. Do you see that?
25   Is that your opinion today?

41

1   A. Please go on with the next sentence. "The
2   major weight gain of 40 pounds was noted while on
3   Seroquel. At 5'5", an ideal body weight is 125 pounds
4   plus or minus 10 percent."
5   And we saw that while she was taking
6   Seroquel, there was an increase in weight of whatever
7   those pounds are there. We go from 204 pounds from
8   240 pounds.
9   Q. All right. Let me ask you: Is it your opinion
10   that Seroquel was a cause of Ms. Whittington's diabetes?
11   A. Yes, ma'am.
12   Q. All right. Now, when you say "a cause," are
13   there other causes of Ms. Whittington's diabetes?
14   A. Yes, ma'am.
15   Q. What are the other causes of other diabetes?
16   A. The sixth line down on clinical facts records
17   that she had a family history of diabetes mellitus.
18   Q. Okay.
19   A. The seventh line down records that she received
20   another atypical antipsychotic which is associated with
21   weight gain and diabetes. And then all of the contents
22   of the next paragraph relate to the doses of Seroquel
23   which she had got.
24   Q. I'm just asking —
25   A. The second but last relates to a atypical that

11 (Pages 38 to 41)

42

1   does not cause weight gain and diabetes on the best
2   current evidence which is Geodon and later to another
3   one which does not cause weight gain and diabetes which
4   is Abilify.
5       Q.  Okay.  Doctor, I'm asking you to tell me the
6   causes of Ms. Whittington's diabetes.
7       A.  Yes, ma'am.
8       Q.  Just list them.  You said family history —
9       A.  Family history —
10      Q.  — and Zyprexa.
11      A.  — Zyprexa —
12      Q.  What else?
13      A.  — and Seroquel.
14      Q.  Okay.  Anything else?
15      A.  As I saw the chart, no.  And I specifically
16  excluded Geodon and Abilify because the problems we've
17  discussed with Zyprexa and Seroquel do not — do not
18  seem to be shared by Geodon and Abilify.
19          (Exhibit No. 5 marked.)
20      Q.  (BY MS. THORPE)  So at this point after
21  reviewing these records, the only causes of
22  Ms. Whittington's diabetes that you have identified are
23  family history, Zyprexa use, and Seroquel use?
24      A.  To the context of this paragraph, yes, ma'am.
25      Q.  All right.  I'm going to show you a document

43

1   that's been marked as Exhibit 5 for identification.
2       A.  Thank you, ma'am.
3       Q.  And if you look at the middle —
4           MR. PIRTLE:  Are you going to let me have a
5   copy?
6           MS. THORPE:  I do have a copy for you, Tom.
7   I'm sorry.
8       Q.  (BY MS. THORPE)  And in the middle of the page,
9   you see that the Cleveland Clinic has listed risk
10  factors for type 2 diabetes?  Do you see that?
11      A.  Yes, ma'am.
12      Q.  Do you agree with that list of risk factors?
13      A.  For type 2 diabetes, I would disagree with two,
14  four, six — the seventh cause.  The data on autoimmune
15  etiology for type 2 is — is not very strong.  But I
16  think it's reasonable to agree with everything else.
17      Q.  Okay.  And is there anything that you would add
18  to the Cleveland Clinic's list that's been marked as
19  Exhibit 5?
20      A.  Yes.  Actually, if you look at the context of
21  these, in — in a number of these references, it
22  includes people with depression and psychosis.  They
23  have two and a half to threefold incidence of diabetes.
24      Q.  Okay.
25      A.  So that's not on this list.

44

1       Q.  All right.  Now —
2       A.  So I would strike the seventh and add
3   depression and psychosis, especially psychosis.
4       Q.  Okay.  So is Seroquel — have you quantified —
5   strike that.
6           Have you quantified Seroquel's contribution
7   to Ms. Whittington's diabetes?  You say there's three
8   causes.  Have you quantified Seroquel's contribution?
9       A.  No, ma'am.  I — I think it's a major risk
10  factor because of the extent of the weight gain in her
11  context.  I go back to my analogy of the soil and the
12  seed.  She was a fertile soil on which Seroquel,
13  quetiapine, then planted seeds and made a fertile
14  context for the development of diabetes.
15      Q.  So is the answer to my question that you have
16  not quantified Seroquel's contribution to
17  Ms. Whittington's diabetes?
18      A.  I think it's — in the context of the time that
19  we are looking at it, it's probably a major factor.  But
20  if you're asking me if it's 63 percent or 75 percent or
21  82 percent, I feel it's bad science to — to put a
22  number on it.  But I would think it's more than
23  50 percent.
24      Q.  Okay.  And what is the basis for your
25  conclusion that it's more than 50 percent?

45

1       A.  The basis for the conclusion is the fact that
2   she gained the number of pounds weight that we've
3   discussed and a — two references which I will share.
4           Let me give you Helaine Resnick, March
5   2000, who looked at multi-thousands of patients and
6   calculated that for every kilogram weight gained over
7   ten years, the diabetes risk was increased by 49 percent
8   over the next ten years.  For every kilogram lost over
9   ten years, the diabetes risk was reduced by 33 percent.
10      Q.  And then you said you had a second reference?
11      A.  And I — and the second reference I've related
12  to and I've brought and — in the materials shared with
13  your contact — with your patient which — I beg your
14  pardon — your friend to your left and that relates to
15  the Australian study, which was a very nice study.  They
16  took the likes of Ms. Whittington, 60, 70 of them, and
17  half of them were sent to the surgeon who summarily put
18  them on — summarily put them on a surgical procedure.
19  And I'm showing to the Court the surgical procedure
20  which was that.
21      Q.  Okay.  Let's just get that — all I need is the
22  title of the article so we can really just move quick —
23  I'll take a lot less of your time, Dr. —
24      A.  It's referred to, ma'am.
25      Q.  So it's the second article that supports your

46

1   opinion that Seroquel had a greater than 50 percent
2   contribution to —
3       A. Over this —
4       Q. — the development of diabetes —
5       A. Over this period of time secondary to the
6   weight gain, yes, ma'am.
7       Q. — is the Resnick article and then an article
8   by John Dixon and others appearing in JAMA January 23,
9   2008, entitled "Adjustable Gastric Banding and
10  Conventional Therapy for Type 2 Diabetes," right?
11      A. That's correct, yeah.
12      Q. Any other articles?
13      A. Those are examples.
14      Q. Well, I need to know everything that you're
15  relying on for this opinion.
16      A. I would stop with those.
17      Q. Okay. Now, what contribution was made by
18  family history?
19      A. It would be significant. And, again, it is not
20  science to put a — put a number on it. But if — there
21  are — and let me go from Ms. Whittington and — and
22  tell you why I can't answer the question but give you an
23  analogy.
24          There are B subjects who do not have
25  diabetes at all. Our belief is that they have unlimited

47

1   pancreatic reserve. There are subjects who gain weight
2   and develop diabetes, and I've given you some examples.
3   And those patients had limited pancreatic reserve and
4   the weight gain precipitated the diabetes. Anything
5   that causes weight gain in that context in that group of
6   patients caused the diabetes in my view.
7       Q. Dr. Tulloch, my question to you is: Have you
8   quantified the contribution of family history to the
9   development of Ms. Whittington's diabetes?
10      A. Yes, ma'am.
11      Q. You have —
12      A. I've said it was present. I said earlier that
13  it was not good science to put an exact number. But if
14  you're pushing me —
15      Q. So all you have to say is you haven't —
16      A. If you're pushing me to give you a number, I'll
17  give you a number 33 percent with the weight gain at 66
18  percent. In other words, it's a factor. But the weight
19  gain is the major — is the more important factor. And
20  I've given you data on which that sort of statement is
21  based.
22      Q. Okay. So 33 percent for family history and 66
23  percent for weight gain?
24      A. Yes, ma'am.
25      Q. All right.

48

1       A. And —
2       Q. And what are the data that show 33 percent for
3   family history?
4       A. You heard me say earlier that folk who have
5   obesity without family histories don't tend to get
6   diabetes. So a requirement for the development of
7   diabetes with weight gain in most subjects is a limited
8   pancreatic reserve.
9       Q. All right. What I'm asking you is an
10  identification of the scientific literature supporting
11  your 33 percent number.
12      A. Oh, I told you before, it's bad science to give
13  an exact number. You pushed me to give a number; I gave
14  you —
15      Q. I want you to give me the truth.
16      A. I pulled a number out of the —
17      Q. Let's just have an understanding between the
18  two of us.
19      A. Yeah.
20      Q. When you give me information, I'm going to
21  count on it as being true and accurate. Okay?
22      A. Okay.
23      Q. So is the 33 percent number not true and not
24  accurate?
25      A. Thirty-three percent number is a best guess

49

1   under the circumstances of this patient. In other
2   words, it is unlikely for an obese patient to become
3   diabetic unless they have a limited pancreatic reserve.
4   In the presence of a limited pancreatic reserve, weight
5   gain is a major contributing factor.
6           So those were the facts behind my statement
7   to you. The statement to you was related to the only
8   two factors we were discussing, which were weight gain
9   and family history. And I gave you a number that weight
10  gain would probably be two-thirds as important as family
11  history.
12      Q. And you've given me two articles that you say
13  are the only two articles that support it, Dr. Resnick's
14  article and the John Dixon article, right?
15          MR. PIRTLE: Objection, form.
16      Q. (BY MS. THORPE) Right?
17      A. No, ma'am.
18      Q. Is that correct?
19      A. No, ma'am.
20      Q. I want to know the articles that you are
21  relying on that support your — your quantification that
22  that weight gain is two-thirds as important as family
23  history. I want to know what scientific data published
24  in the peer-reviewed literature supports your opinion.
25      A. Okay, ma'am.

13 (Pages 46 to 49)

**50**

1    MR. PIRTLE:  Objection, form.
2    A.  We have the whole of science to draw from.
3    Q.  (BY MS. THORPE)  I —
4    A.  I have given you an article which looked at
5    weight gain and calculated the importance of weight
6    gain —
7    Q.  Are you talking about Dr. Resnick's article?
8    A.  — generally.
9        And that's Dr. Resnick's article.
10   Q.  Okay.
11   A.  I've given you an article that showed the
12   importance of weight loss and conversely implied the
13   importance of weight gain in Dr. Dixon's article.
14   Q.  What else?
15   A.  It would be inappropriate to quote those as the
16   only articles in the literature.  And as I said in my
17   last paragraph, it would be naive for me to tell you
18   those were the only two articles that would —
19   Q.  I want to know the articles that you are
20   relying on —
21   A.  Okay.
22   Q.  Let's put it that way.
23   A.  Okay.
24   Q.  — for the proposition that — that weight gain
25   is 66 percent and — responsible for Ms. Whittington's

**51**

1    diabetes.
2    A.  I don't — I stop with those because that's
3    what we have this afternoon.
4    Q.  Now, when you say 66 percent, what do you mean
5    by that?
6    A.  What I mean by that is it's more important —
7    in somebody who has a family history of diabetes, weight
8    gain is more important than other factors.
9    Q.  What does the number mean?  How did you derive
10   that number?  Is it a relative risk, is it —
11   A.  Yeah.
12   Q.  Okay.  Where — what's the — what's the risk
13   that you're relying on to get to 66 percent?
14   A.  What I — what I said for you is it's my
15   arbitrary choice more likely than not.  Remember the
16   probability we're discussing is just 51 percent.  You're
17   trying to get me to be more specific than that.
18       More likely than not, 51 percent, the
19   weight gain in the presence of somebody with family
20   history of diabetes precipitated the diabetes at that
21   time.  And in my —
22   Q.  Let me just —
23   A.  — best ability to quantify that for you, I've
24   given you data which have then related it to the general
25   population.

**52**

1    Q.  All right.  What is the — have you quantified
2    the contribution that Zyprexa made to the development of
3    diabetes?
4    A.  I would relate it to the weight changes at the
5    time.  And to be — give you an accurate answer to that,
6    I would need to go back to the weight charts that
7    related to the time that she was taking Zyprexa.  I
8    believe that's out of today's context.  But if you need
9    it, I will bring it to you the next time we meet.
10   Q.  All right.  Tell me what weight chart you mean.
11   A.  Okay.  A moment ago we were talking about a
12   chart which related blood sugars and body weight.
13   Q.  But the medical —
14   A.  And your friend on the left holds that chart
15   right now.
16   Q.  Okay.
17   A.  And with a little bit of time, I will go
18   through and we'll produce the information.  So we are
19   limited in time and I have offered to you to produce it
20   given a little more time.
21   Q.  Well, let me just ask you this question:  Have
22   you quantified the contribution Zyprexa has made to the
23   development of Ms. Whittington's diabetes, just have you
24   done it?
25   A.  No, ma'am.

**53**

1    Q.  Okay.
2    A.  The — my main reason for doing that was that
3    her principal weight gain in this context was not when
4    she was taking Zyprexa and the development of her
5    diabetes was at the time when she was taking quetiapine,
6    Seroquel.
7    Q.  Well, you say that she gained 20 pounds while
8    she was on Zyprexa, right?
9        MR. PIRTLE:  Objection, form.
10   A.  I beg your pardon, ma'am.  I believe it was
11   40 pounds.  204 pounds October 1st and 244 pounds by
12   February the 26th.
13   Q.  (BY MS. THORPE)  On Zyprexa?  So she gained 40
14   pounds on Zyprexa?
15   A.  Yes, ma'am.
16       MR. PIRTLE:  Now we've got a misnomer.  Are
17   you talking about Zyprexa or Seroquel, because I
18   misheard it, too.  She's talking about Zyprexa.
19   A.  Oh, I beg your pardon.  Okay.  Why don't we go
20   back to the paragraph on the first page relating to
21   Linda Whittington.  And we're looking at one, two,
22   three — the fourth.  And in that context we're looking
23   at Zyprexa and a body that started at 184 and reached
24   204, 20 pounds.
25   Q.  (BY MS. THORPE)  Okay.

14 (Pages 50 to 53)

54

1  A. At that time she was switched to Seroquel. At
2  that time the urine glucose was normal and she had no
3  evidence of diabetes.
4  Q. All right. So how would you —
5  A. At the time she was then switched to Seroquel,
6  the weight was 244 pounds.
7  Q. All right. Dr. Tulloch, I just asked you
8  how — what the weight gain was on Zyprexa —
9  A. Okay.
10 Q. — okay? So if you — let's try to focus on
11 the question —
12 A. Okay.
13 Q. — and we'll move along more quickly.
14 A. Okay. Twenty pounds.
15 Q. Okay. And what contribution — strike that.
16     Have you quantified the contribution that
17 the 20 pounds of weight gain on Zyprexa made to the
18 development of Ms. Whittington's diabetes?
19 A. No, I think it's a reasonable thing to discuss.
20 Q. Okay. What does that mean?
21 A. I — let's make it 15 percent of that
22 60 percent.
23 Q. All right. And, again, you're just guessing?
24 A. I'm just guessing.
25 Q. All right.

55

1  A. May I come back to my original attempt to make
2  this easy for you?
3  Q. You know what, I've got to do this, you know —
4  A. Do your thing.
5  Q. — as they say —
6  A. As I —
7  Q. In the end they'll say she did it her way.
8  A. Understood.
9  Q. Okay. All right. Now, you have identified —
10 agreed to the list of risk factors that the Cleveland
11 Clinic gave that we've marked as Exhibit 5?
12 A. Yes, ma'am.
13 Q. And you've added psychosis as another risk
14 factor, right?
15 A. Yes, ma'am.
16     MR. PIRTLE: And removed autoimmune
17 disease.
18 Q. (BY MS. THORPE) And removed autoimmune
19 disease.
20     And if I — let me just ask you: Did
21 Ms. Whittington have any of these risk factors?
22 A. In the third paragraph, I reviewed the
23 background to her clinical situation, and we note that
24 she had hyperlipidemia, hypertension, tobacco abuse, and
25 a family history of diabetes.

56

1  Q. Okay.
2  A. And so each of those should be factored into
3  that family history.
4  Q. All right. So we've identified family history,
5  Zyprexa, and Seroquel as causes. Do you agree that
6  hyperlipidemia, hyper — and hypertension are causes of
7  Ms. Whittington's diabetes?
8  A. Yes, ma'am. They're part, in fact — well —
9  Q. You said —
10 A. You go on.
11 Q. — yes; is that right?
12 A. Yes.
13 Q. Have you quantified the contribution of her
14 hyperlipidemia and hypertension to the development of
15 her diabetes?
16 A. It's a stable presence. It would be a
17 contributing factor, and I would list it in amongst the
18 family history. She was — she inherited that as part
19 of her family background.
20 Q. Have you quantified it?
21. A. Yes, ma'am.
22 Q. Okay. What is it?
23 A. You asked me for a number; I gave you
24 33 percent.
25 Q. So it's mixed in with family history?

57

1  A. Yes.
2  Q. And, again, you're more or less making a guess?
3  A. More likely than not, yeah. I only have to get
4  1 percent.
5  Q. Okay. Now, does she have any of — based on
6  your review of the portion of the records that you
7  actually reviewed, did — does she have any other risk
8  factors for diabetes?
9  A. I do not recall her having any more. And I
10 hedge that because one of these patients — and I'll
11 have to go back and look — one of these patients had
12 asthma and was given glucocorticoid, that's Prednisone.
13 But I do not believe it was this one.
14 Q. So that in your mind she had hyperlipidemia,
15 hypertension, a family history of diabetes, and Zyprexa
16 usage and Seroquel usage?
17 A. And psychosis.
18 Q. And psychosis.
19     She had all of those things, and all of
20 those are causes of diabetes, right?
21 A. Yes, ma'am.
22 Q. And as best you know, she has no other risk
23 factors or causes of her diabetes, correct?
24 A. To the best of my memory, yes, ma'am.
25 Q. All right. So —

15 (Pages 54 to 57)

---

**58**

1   MR. PIRTLE: When you get an opportunity,
2   I'd like to stop here — we're at an hour — for, like,
3   five minutes, but I don't want to interrupt your flow
4   either.
5   MS. THORPE: That's fine. We can take a
6   break.
7   (Short recess from 5:38 to 5:44.)
8   Q. (BY MS. THORPE) Doctor, if you would say on
9   the record what you just said off the record.
10   A. Ma'am, what — what I've tried to do as
11   somebody who explains diabetes at great length to lay
12   people is to give the context that if somebody has a
13   family history of diabetes, they will more likely than
14   not develop diabetes during their lifetime. If they
15   incur by their lifestyle the contents of this list from
16   the Cleveland Clinic, then they may develop type 2
17   diabetes by the age of 25. If they adopt a lifestyle
18   which is healthy and vigorous and have a lean body mass,
19   they will still get diabetes but it may be at the age of
20   105.
21   And so they, the patient, and we, their
22   medical advisors, are beholden to give them the best
23   advice that the diabetes will occur as late in their
24   life as possible. And with that background, every
25   patient has the ability to choose their method of

**59**

1   lifestyle.
2   Q. Well — and when we were off the record, you
3   talked a little bit about what your testimony was in the
4   Zyprexa litigation?
5   A. Yes, ma'am.
6   Q. Do you want to finish saying that?
7   A. And what I said was in that context if all the
8   worst case scenario had been advanced, in other words,
9   if they did everything on that list —
10   Q. If the patient did everything on the Cleveland
11   Clinic list?
12   A. On the Cleveland Clinic list. — then they may
13   develop type 2 diabetes by the age of 25. If they did
14   nothing on that list, they may develop type 2 diabetes
15   by the age of 105.
16   And so I as a clinician view anything that
17   modifies their life pathway as a risk factor for
18   diabetes, and that includes medications which alter
19   their insulin resistance and cause them to gain weight.
20   Q. So if a person gains weight, let's say a lot of
21   weight, let's say they gain a hundred pounds without
22   regard to taking any drug, you would — in your mind
23   that person would be accelerating diabetes?
24   A. If that patient has diabetic history.
25   Q. Okay.

**60**

1   A. I go back to remind all of us — remember we
2   started with somebody who has a family history of
3   diabetes. There are 500-pounders out there with normal
4   blood sugar. So the analogy that I brought relates to
5   somebody who inherits a family history of diabetes.
6   Q. Let's take Ms. Whittington specifically.
7   You've identified family history, Zyprexa use, and her
8   psychosis as — and her hypertension and her
9   hyperlipidemia and also her smoking as causes of her
10   diabetes, right?
11   A. Yes, ma'am, contributing factors, yes.
12   Q. But also causes, right?
13   A. Yes, ma'am.
14   Q. And in the presence of those causes, even if
15   she had not taken Seroquel, you would expect her at some
16   point in her life to develop diabetes, correct?
17   A. To the best of my knowledge, yes, ma'am.
18   Q. And so in your mind, the role of Seroquel is
19   accelerating what was going to happen anyway?
20   A. To the best of my understanding of type 2
21   diabetes, yes, ma'am.
22   Q. Okay. Now, I want to talk to you about —
23   well, let me back up a second because we didn't talk
24   about smoking before very much.
25   She's one-and-a-half to two-pack a day

**61**

1   smoker for about 28 years; isn't that right?
2   A. She is, ma'am, yes.
3   Q. And how — have you quantified the contribution
4   of smoking to her diabetes?
5   A. No, I haven't. And my main reason for doing
6   that is I have not found a good reference that does
7   that. I've offered you one that tries to put numbers on
8   weight gain, and I was delighted to find one. I hadn't
9   seen it before.
10   But I haven't seen any good data that
11   relates to quantity. And with the current background,
12   we're seeing less and less smoking in our community.
13   Q. Now, is it — so you haven't reviewed any
14   literature that quantitates the risk of developing
15   diabetes in a smoker?
16   A. No, ma'am.
17   Q. And you haven't —
18   A. I haven't seen it, which is — I believe it's
19   not — it may not be there.
20   Q. Okay. And you haven't seen any literature
21   other than the Resnick article quantifying the risk
22   associated with weight gain of developing diabetes; is
23   that right?
24   A. No, I — I don't want to be on the record for
25   that. There are multiple numbers. What I liked about

**16 (Pages 58 to 61)**

62

1    the Resnick article is that it tries to quantitate the
2    quantity — the number of kilos related over ten years
3    and put a number on it as related to diabetes risk.
4    That — that's a very sophisticated way of doing it.
5    I — there's only 1900 patients, so one has to hedge it
6    a little bit.  It's 2,000 people, it's not 20,000
7    people, but it's more than a hundred people.
8        Q.  All right.  Now, Doctor, tell me how you
9    diagnose diabetes.
10       A.  The American Diabetes Association chose a
11   number, and it was based on what happens to the eyes in
12   people after ten years of abnormal blood sugar.  And
13   what they found was ten years after a blood sugar test,
14   there were changes in the eyes of people who had a
15   two-hour blood sugar after a glucose load of 220.  And
16   so the decision was made to make the upper limits of
17   normal 10 percent less than that.
18       So 200 after a glucose load was chosen.  So
19   you understand why they did that, they looked at the
20   eyes of people who developed changes that relate to
21   diabetes and they looked back ten years.  And we can
22   give you more information if you need it.
23       Q.  So you followed the American Diabetes
24   Association criteria —
25       A.  No, ma'am.

63

1        Q.  — for diagnosing —
2        A.  I go back to the original data on which these
3    figures were based.  But if you're asking, the American
4    Diabetes Association took those biological
5    observation — and they're now agreed round the world —
6    and the numbers are fasting sugar of 126 after a glucose
7    load, a two-hour sugar of 200 and one number between
8    zero and two hours of greater than 200.
9        (Exhibit No. 6 marked.)
10       A.  But more and more because of practicalities,
11   the fasting sugar is taken as the more important
12   predictor of the presence of diabetes.
13       Q.  (BY MS. THORPE)  I'm going to show you what's
14   been marked as Exhibit 6 for identification and show you
15   a table I'm sure you're quite familiar with that
16   contains the criteria for the diagnosis of diabetes.  Do
17   you see that?
18       A.  Yes, ma'am, I think —
19       Q.  And you're very familiar with Exhibit 6, right?
20       A.  Yes, ma'am.
21       Q.  And it is the report of the expert committee on
22   the diagnosis and classification of diabetes?
23       A.  Yes, ma'am.
24       Q.  And it was this report that became the basis of
25   the American Diabetes Association criteria for

64

1    diagnosing diabetes, right?
2        A.  Ma'am, the work I'm talking to you goes back 30
3    years before this.
4        Q.  Right.  But —
5        A.  And I explained why they got to those numbers.
6    But, yes, ma'am, let us accept these are the current
7    criteria.
8        Q.  All right.  And you agree and follow them in
9    your practice, right?
10       A.  Yes.
11       Q.  And you followed the criteria that are
12   contained in Table 3 —
13       A.  Yes, ma'am.
14       Q.  — in your office, right?  You treat patients
15   in your office, right?
16       A.  Yes, ma'am.
17       Q.  And so I want to talk to you about the criteria
18   in Table 3.  I first want to focus on the second item on
19   Table 3, which is fasting plasma glucose.
20       A.  Yes, ma'am.
21       Q.  Do you see that?
22       Tell me what — how you take a fasting
23   plasma glucose.
24       A.  It's taken after an overnight fast.
25       Q.  Is it also possible to fast for eight hours

65

1    during the day?
2        A.  There are change — the — the — again, one
3    has to be standardization.  One has to remember that
4    normal curve.  And what you're trying to do is put a
5    line on what is in essence a shoulder.  So it is best to
6    be under most standardized conditions.  And an overnight
7    fast gives you standard levels of cortisol.  We have
8    high levels of cortisol in the morning which are
9    different later on in the afternoon.  So if one has to
10   split hairs because of somebody's life insurance policy,
11   you want to make it under the most standard conditions.
12       Q.  And so the —
13       A.  May I — may I offer that we leave it as an
14   overnight fast?
15       Q.  Okay.  I hear you.  I believe the fasting
16   should be overnight.
17       And that's because of — in part because of
18   the variability in people's glucose levels in their
19   blood at different times of day, correct?
20       A.  Yes.
21       Q.  Have I said that right?
22       A.  Different times of day and also because the
23   levels of cortisol are different throughout the day.
24       Q.  And people's plasma glucose levels vary from
25   day to day and week to week, don't they?

66

1     A. Not a great deal. Maybe a little but not a
2 great deal.
3     Q. So you would expect the numbers for, you know,
4 someone's plasma glucose -- fasting plasma glucose to be
5 within 10 milligrams per deciliter or --
6     A. Five to 10 percent.
7     Q. And do you agree with the definition of fasting
8 as defined as no caloric intake for at least eight
9 hours? I realize you say it should be overnight.
10     A. Yes, ma'am.
11     Q. Okay. So, then, Item No. 3 is the oral glucose
12 tolerance test --
13     A. Yes, ma'am.
14     Q. -- right?
15     And we're still looking at Table 3 of
16 Exhibit 6?
17     A. Yes, ma'am.
18     Q. In that test can you describe what -- how it's
19 done?
20     A. Yes. I'm glad you asked -- give me the
21 opportunity. There is such a thing as fasting
22 hyperglycemia. A person who is not seeing carbohydrates
23 tends to have -- to lose the ability to make a ready
24 spurt of insulin in response to oral glucose. So when a
25 patient is about to have an oral glucose test, we advise

67

1 them for the three days prior to that to have at least a
2 certain amount of carbohydrate. And then the oral
3 glucose is given after the fasting sugar is taken, and
4 blood sugars are measured at standard times. They're
5 usually 30, 60, 90, and 120 minutes.
6     Q. Okay. And the one that is diagnostic of
7 diabetes is the two-hour glucose measurement at greater
8 than 200 milligrams per deciliter?
9     A. That's correct, fasting and greater than 200.
10     Q. All right. And a patient who has the oral
11 glucose tolerance test actually drinks a substance
12 called glucola; is that right?
13     A. Yes, ma'am. It's a carbohydrate that's mostly
14 glucose that's 75 grams.
15     Q. And then the plasma glucose levels are measured
16 at the time increments you described, right?
17     A. Yes, ma'am.
18     Q. And if there's a two-hour plasma glucose at
19 greater than or equal to 200 milligrams per deciliter,
20 then -- then that's what you're looking for in terms of
21 having a tentative diagnosis of diabetes, correct?
22     A. That's correct.
23     Q. So -- and for fasting plasma glucose, you're
24 looking for a reading of greater than or equal to
25 126 milligrams per deciliter --

68

1     A. Yes.
2     Q. -- right?
3     Now, underneath Table 3 the proponents of
4 these criteria say that they must be confirmed by repeat
5 testing on a different day, correct?
6     A. That's correct.
7     Q. So you have to -- in order to be diagnosed with
8 diabetes, you have -- under the ADA criteria or under
9 the criteria of this expert report that we've marked as
10 Exhibit 6, there must be two fasting glucoses greater
11 than or equal to 126 or two oral glucose tolerance tests
12 or one -- or either one of them could confirm the other,
13 correct?
14     A. Yes, ma'am. And I also -- if I may, are you
15 going to come to No. 1 or shall we --
16     Q. I am going to come to No. 1.
17     But I guess what I'm stressing is you must
18 have a second confirmatory test of either the fasting
19 plasma glucose or the two-hour plasma glucose during an
20 oral glucose tolerance test, correct?
21     A. I think that's reasonable. And the reason for
22 that being the moment one puts diabetes on a patient's
23 chart, their life insurance and all of their other
24 insurance rates go up. It does not change the way we
25 treat a patient -- clearly, if they have the family

69

1 history we've been discussing and if the tendencies are
2 all there. But if the diagnosis has to be made and if
3 the numbers are very close to borderline and we've
4 looked at where the borderlines are, in the patient's
5 best interest one asks for at least two different
6 numbers.
7     Q. All right. And there are consequences beyond
8 just the insurance consequences that require -- that
9 are -- make confirmation important such as you're going
10 to potentially put the patient on medication for the
11 diabetes, right?
12     A. Yes, ma'am.
13     Q. And there are risks and benefits associated
14 with all drugs, isn't that correct, including diabetes
15 medicines --
16     A. Yes, ma'am.
17     Q. -- right?
18     And so before you would -- in fact --
19 strike that.
20     In fact, some of the diabetes medications
21 carry a risk of weight gain; isn't that correct?
22     A. Only one.
23     Q. Okay.
24     A. And there are a whole lot of issues that we can
25 discuss, but they're probably outside of today's

70

1  discussion.
2      Q.  So in your mind only one product used to treat
3  diabetes is associated with weight gain?
4      A.  Of the early oral medications, yes, ma'am.
5      Q.  All right.  And what one is that?
6      A.  The group called thiazolidinedione, TCD.
7      Q.  Okay.
8      A.  Of which the one survivor is probably Actos.
9  There's another one called Avandia, and there was a
10  third one called Rezulin.
11     Q.  And, in fact, you testified in the Rezulin
12  litigation —
13     A.  You have a good memory.
14     Q.  — is that correct?
15          The — and insulin itself is associated
16  with weight gain, correct?
17     A.  I hedged that by saying amongst the oral
18  medication.
19     Q.  I know, I heard that.
20          And insulin — injectable insulin is
21  associated with weight gain, correct?
22     A.  Yes, ma'am.
23     Q.  All right.  So it's a serious decision and
24  requires two confirmatory tests before you diagnose
25  somebody with diabetes, right?

71

1      A.  I think that's reasonable.
2      Q.  That's the method you follow in your clinic —
3      A.  Yes.
4      Q.  — correct?
5          When — when a patient comes in for
6  evaluation in your clinic for diabetes, what are the
7  things that you do?
8      A.  Well, firstly, our clinic is attended by
9  patients that may have traveled up to 150, 200 miles.
10  So Category 1 is often the one that is practical.  So
11  we're looking at a random sugar and it being greater
12  than 200.
13     Q.  All right.  Well, let's talk about Category 1,
14  then, for just a second and then I'll come back to what
15  you do.
16     A.  Okay.
17     Q.  In — Table 3 of Exhibit 6 talks about fasting
18  plasma glucose, two-hour plasma glucose with the oral
19  glucose tolerance test, and then third, a casual or
20  random glucose concentration of greater than
21  200 milligrams per deciliter, right?
22     A.  Right.
23     Q.  And casual, which is the same thing as random,
24  right?
25     A.  Yes, ma'am.

72

1      Q.  Is defined as any time of day without regard to
2  time since the last meal, right?
3      A.  That's correct.
4      Q.  And you have to have with it classic symptoms
5  of diabetes, including polyuria, polydipsia, and
6  unexplained weight loss, right?
7      A.  That's correct.
8      Q.  And polyuria is frequent urination?
9      A.  Yes, ma'am.
10     Q.  And polydipsia is thirst?
11     A.  Drinking a lot of water, yes.
12     Q.  And unexplained weight loss is clear what it
13  is.
14          So — now, if you have somebody that comes
15  in with a random glucose over 200, that also has to be
16  confirmed by a subsequent test, right?
17     A.  Yes, ma'am.
18     Q.  Now, confirmation has to occur within a few
19  days, right?  You can't confirm it two years later?
20     A.  Yes.
21     Q.  You'd have to start all over again?
22     A.  Yes, ma'am.
23     Q.  Okay.  So what is the time period in which you
24  have to have a confirmatory test?
25     A.  Well, I go back to what we've discussed because

73

1  if a patient came in with a blood sugar of 230 and the
2  symptoms of polyuria, polydipsia, and weight loss, your
3  question was how would I handle that if a patient had
4  driven 200 miles.  I would give them a home glucose
5  monitor, ask them to check their sugars over the next 36
6  hours, and if they were all in excess of 200, we would
7  consider that they have diabetes.  The issue being a
8  practical one, the issue being what we discussed earlier
9  of that lifestyle we had discussed.  This was the time
10  that her pancreas finally gave up and said that's it.
11  And so delaying by a day or two for the niceties of
12  diagnosis is impractical.
13     Q.  So — but you're talking about you would get a
14  confirmatory test on the home blood glucose —
15     A.  Right.
16     Q.  — right?
17          Is that right?
18     A.  Yes, ma'am.
19     Q.  You would not have a confirmatory test?
20     A.  That's correct.
21     Q.  All right.  And you would do it in a matter of
22  days?
23     A.  My reason for doing that is all of us are
24  exposed to the risks of random laboratory error.  The
25  most common laboratory error is mislabeling, so it could

19 (Pages 70 to 73)

74

1 be possible that that lady's blood -- that lady's name
2 got onto the tube of somebody else's blood. So one
3 always asks for a second confirmation to exclude
4 laboratory error.
5     Q. Okay. Now, when somebody comes in to your
6 office to be diagnosed with -- or to be evaluated for
7 potential diabetes, do you do a history and physical?
8     A. Yes, ma'am.
9     Q. Have you ever diagnosed somebody with diabetes
10 without doing a history and physical?
11     A. Yes. That would be in the context of an
12 emergency room where the patient was brought in with
13 polyuria, polydipsia, and sugar so high that they'd gone
14 into ketoacidosis. When they're in ketoacidosis,
15 they're often in coma and the history does not occur.
16     Q. And -- I got it.
17         And so --
18     A. At that time the sugar is 1,000 or 2,000 --
19     Q. Right.
20     A. -- and the diagnosis is not in doubt.
21     Q. With the exception of DKA in an ER --
22     A. Yes.
23     Q. -- you have -- you do a history and physical,
24 right?
25     A. With a rational patient, one gets all the

75

1 information possible.
2     Q. And then you do the labs and get the
3 confirmatory labs?
4     A. Yes, ma'am.
5     Q. Have you ever diagnosed a patient with diabetes
6 without examining the patient?
7     A. No, ma'am.
8     Q. You have not examined Ms. Whittington?
9     A. No, ma'am.
10     Q. And so you're not here to diagnose her with
11 diabetes, right, or are you here to diagnose her with
12 diabetes?
13     A. Ma'am, in this context Ms. Whittington is not
14 my patient. I am not required to treat her, and I
15 offer to the Court my best interpretation of the data
16 available.
17     Q. Have you read her depositions in this case?
18     A. No, I have not.
19     Q. And you've -- I think you said you've not had a
20 conversation with her?
21     A. No, ma'am. I've read everything she told to
22 the physicians that were at the clinics that were listed
23 on the top paragraph, and that's not the same as taking
24 a history from her but it's -- it's pretty close.
25     Q. And you have not read -- have you been given

76

1 any of her fact sheets that she's filled out for this
2 case?
3     A. No.
4     Q. I didn't see them.
5     A. No, I saw this -- I saw the summary that we
6 discussed earlier which was weight, sugar, et cetera.
7     Q. All right. Now, is it fair to say that you
8 believe that Ms. Whittington developed diabetes after
9 she started taking Seroquel?
10     A. With the best available evidence, yes, ma'am.
11 What -- what we looked at was blood sugars and body
12 weight. And the number which I had in Paragraph 4 was a
13 sugar which was just in excess of the fasting sugar at
14 126.
15         May I extend that? I'm not in charge of
16 that lady, so I had to assume that was the diagnosis.
17 But clearly if she was my patient, I would have had her
18 measure some more sugars to make sure that that number
19 was valid for her in a broader context of maybe the next
20 48 hours.
21     Q. Well, we'll come back to that in just a second.
22 So -- so your opinion -- is your
23 opinion -- well, strike that.
24         You agree that for Seroquel to cause
25 Ms. Whittington's diabetes Seroquel would have to be

77

1 taken before the diabetes begins, right?
2     A. Before and during, yes, ma'am.
3     Q. Okay. In other words, a temporal relationship
4 has to be there as -- as is necessary for causation,
5 not --
6     A. Yes.
7     Q. -- sufficient but necessary --
8     A. Yes, ma'am.
9     Q. -- right?
10         How can -- well, strike that.
11         Diabetes takes a long time to develop,
12 doesn't it?
13     A. No. An acute type 1 diabetic can develop
14 diabetes in 72 hours.
15     Q. Let's talk about --
16     A. Type 2.
17     Q. -- type 2 diabetes, because we're talking about
18 Ms. Whittington. Ms. Whittington has type 2 diabetes,
19 right?
20     A. Yes, ma'am.
21     Q. So type 2 diabetes takes a long time to
22 develop, doesn't it?
23     A. Again, if there was a summation of risk
24 factors, which included weight gain, plus illness. We
25 didn't have illness -- acute illness on this list. But

78

1  I would add that, too.  I'm pointing to the Cleveland
2  Clinic list.  There's no acute illness there.  An acute
3  illness which caused a major metabolic stress can
4  produce abnormal sugars in somebody with marginal
5  physiology within 72 hours.
6      Q.  Ms. Whittington doesn't have an acute illness,
7  right?
8      A.  No, no.  If -- I apologize.  I thought your
9  question --
10     Q.  I was being broad.
11     A.  -- was global.  And if we're specific to
12 Ms. Whittington, if her conditions were all otherwise
13 stable, then the context would be that it could take
14 some time.
15     Q.  And outside the context of the acute illness
16 you described, type 2 diabetes takes a long time to
17 develop, right?
18     A.  Let me go back to -- I -- the reason why I'm
19 hesitating is because of the physiological changes we
20 described earlier.
21     Q.  Maybe I can help you out here.  If you look at
22 page 7 of your report, you'll see where I'm going, I
23 think.  You can just count seven pages and look at the
24 last paragraph on the seventh page.
25     A.  Thank you.

79

1          This --
2      Q.  Can you see your --
3      A.  -- type 2 diabetes is a progressive condition
4  in which the pancreatic steadily loses insulin secretory
5  capacity; is that correct?
6      Q.  Yes --
7      A.  Yes.
8      Q.  -- that's where I am.
9          Over how long?
10     A.  Over 5 to 15 years.
11         May I expand on that?
12     Q.  Yes.
13     A.  We go back to that magic number of 126.
14 Clearly, there's not quite good data that prediabetes,
15 which is when people have a sugar greater than a hundred
16 and less than 126, carries many of the risk factors
17 which we ascribe to diabetes.  So if I hesitate at all,
18 it's because the adverse metabolic conditions which are
19 associated with diabetes are often present before
20 subjects fulfill the criteria for diagnosis.
21         So if we can go back to -- an answer to
22 your question, certainly somebody who has a family
23 history of diabetes, their blood sugar would rise from
24 normal, which I would call 80 to 125 over a period of
25 time.

80

1      Q.  Can you sort of take us through the steps by
2  which diabetes -- type 2 diabetes occurs and then as to
3  each step say how long that it would take to -- to go
4  through that stage or step of development?  Does that
5  make sense?  Do you understand what I'm asking?
6      A.  I'm trying to think of the best published data.
7  There is good data that by the time the patient's -- by
8  the time the patient's blood sugar is 110, their loss of
9  pancreatic function is greater than 70 percent.  The
10 rate of loss of pancreatic function up to 70 percent --
11 I started off with a simple analogy -- could be by the
12 age of 25 or by the age of 105 dependent on all of the
13 other criteria.
14     Q.  Well --
15     A.  So if we're -- if you ask me to limit my
16 comments to a lady who weighed 244 pounds -- are you
17 hearing my difficulty?  The slope of -- of sugar rise
18 can depend on all of the other issues we discussed.  So
19 may I come back and take your question to relate to a
20 lady who weighed 10 -- 244 pounds, which is this lady?
21 Does that help?
22     Q.  No.
23     A.  Okay.
24         (Exhibit No. 7 marked.)
25     Q.  (BY MS. THORPE)  So let me -- let me just show

81

1  you what's been marked as Exhibit 7 for identification.
2  I'm going to direct your attention to the first column
3  of -- of this paper which has been marked as Exhibit 7.
4  And it's entitled "Screening Adults for Type 2 Diabetes,
5  a Review of the Evidence for the U.S. Preventative
6  Services Task Force."
7          Let me ask you first if you ever read this
8  paper before.
9      A.  Not -- not well enough that I remember its
10 context.  June of 2008, no, ma'am.
11     Q.  Look at the second paragraph in the first
12 column and tell me if you agree with the statement that
13 type 2 diabetes often goes undiagnosed for many years
14 because hyperglycemia develops gradually and may not
15 produce symptoms.
16     A.  Ma'am, I -- I agree with that.  And I think if
17 you replay what I was saying earlier, that that -- I
18 was, in fact, saying something very similar --
19     Q.  Okay.
20     A.  -- yes.
21     Q.  And then in the second column, the first real
22 paragraph, tell me if you agree with this statement:
23 "Diabetes has a long preclinical phase estimated at 10
24 to 12 years on the basis of the progression of
25 microvascular complications, and valid and reliable

21 (Pages 78 to 81)

82

1  tests can detect type 2 diabetes during this
2  asymptomatic period."
3       Do you —
4       A. Yes, ma'am, I think —
5       Q. — agree with that statement?
6       A. — if you — if you replayed what I was saying
7  earlier about how long it takes to — to lose up to 60
8  to 70 percent of pancreatic reserve, I think we were
9  saying the same sort of thing, yes, ma'am.
10      Q. And you agree that there are about 23.6 million
11 people in this country who have diabetes as of 2007?
12      A. Yes, ma'am, that's a pretty good estimate.
13      Q. And you agree that over 25 percent of those
14 people have undiagnosed diabetes?
15      A. About one-third, yes, ma'am.
16      Q. Okay. Thirty-three percent, right?
17      A. Uh-huh.
18      Q. Now, the — in your report, Doctor — I'm going
19 to kind of change topics here for just a second.
20      In your report you say that plaintiff began
21 taking Seroquel in October of 2001, right?
22      A. Yes, ma'am.
23      Q. And you got this information from that medical
24 record summary or what — how did you —
25      A. Yes, ma'am. If you —

83

1       Q. — how did you find out when she —
2       A. — if you look through the Jackson Heart
3  Center, the north Florida Bernard — well, Saleh,
4  Jacksonville, Charles Haddad, and Jacksonville Family
5  Practice, you'll see annotations when the use of the
6  different antipsychotics is referred to. And then in
7  the summary chart, those have been summarized beside the
8  sugar, the body weight, and the patient's psychiatrists.
9       (Exhibit No. 8 marked.)
10      A. Yes, ma'am.
11      Q. (BY MS. THORPE) All right. I'm going to show
12 you what's been marked as Exhibit 8 for identification.
13 And this is the plaintiff's second amended fact sheet in
14 this case. And I'm going to ask you if you've seen this
15 Exhibit 8 before among the materials you were given.
16      A. I believe it was on the list of papers that was
17 given to me, yes.
18      Q. All right. You see that it says that she began
19 to use Seroquel on January 2, 2002, and that she stopped
20 using Seroquel on December 7, 2005?
21      A. Yes, ma'am.
22      Q. That's not what your report says; is that
23 correct?
24      A. I believe that's correct. I hadn't annotated
25 the two. The — my report relates to what I took off

84

1  the clinical chart.
2       Q. Okay.
3       A. And —
4       Q. And so my question to you is: How did you
5  pick —
6       A. I picked the clinical chart over the memory of
7  a psychotic patient, but others might disagree with that
8  choice.
9       Q. All right. Well, let me —
10      MR. PIRTLE: No, that's funny.
11      Q. (BY MS. THORPE) And you dismissed reading her
12 deposition because she was — because of her mental
13 illness. Is that why you didn't read it?
14      A. Just time, just time.
15      Q. Just time.
16      And so you don't know that she said in her
17 deposition — you don't know what she said about when
18 she took Seroquel?
19      A. No, ma'am, I do not know what she said. If it
20 becomes relevant to the case, I'd be happy to read it by
21 the time of the court appearance.
22      Q. Well, whenever you read anything new and you
23 change any substance of this report, I want to know and
24 I want to depose you.
25      A. I'll refer to the last paragraph of my opinion,

85

1  ma'am, yes.
2       (Exhibit No. 9 marked.)
3       Q. (BY MS. THORPE) So what part of the chart told
4  you that she started taking Seroquel in October of 2001?
5       A. I would go back to whichever of those clinical
6  charts listed in the top paragraph and ascribe it to
7  that particular context. There are — each time she
8  arrived, there's a date, a list of what the patient was
9  talking about, and the patient's review, and then the
10 medication that the patient was given.
11      Q. Okay. I'm going to show you what's been marked
12 as Exhibit 9 for identification and ask you if you've
13 ever reviewed this chart before.
14      A. What I'm looking at is Owen's Pharmacy relating
15 to Linda Whittington.
16      Q. And if you see at the bottom, it tells you what
17 chart it came from.
18      A. It stated Center for Medicine and Psychiatry.
19      Q. My question is: Did you review that before you
20 formed your opinion?
21      A. No, ma'am. What I did was I looked at the
22 clinical chart. What you're looking at here is a
23 medication log from Owen's Pharmacy, and Owen's Pharmacy
24 is not on this list, so I believe I did not see that.
25      Q. Okay. This is a record out of the Center For

22 (Pages 82 to 85)

86

1    Medicine and Psychiatry —
2      A. Right.
3      Q. — from Dr. Saleh's office.  Did you read this?
4      A. I saw — I have Dr. Saleh's chart as this list,
5  yes.
6      Q. Okay.
7      A. So if it was in there — if this was in
8  Dr. Saleh's chart, then I saw the pages, I skimmed
9  through that.
10      Q. All right.
11      A. And I did see lists of medication.
12      Q. And you see that she began taking — there's a
13  note that she got a Seroquel dose pack in October of
14  2001.  Do you see that?
15      A. 10th of October, yes, ma'am.
16      Q. Yes.
17          And do you see the note beside it and the
18  arrow?
19      A. "Patient does not wish to take."
20      Q. What's the date on that note?
21      A. 10-12-01.
22      Q. All right.  And then look down to January 2,
23  2002.
24      A. Yes, ma'am.
25      Q. What does it say?

87

1      A. It says, "Seroquel, 25 milligrams, twice a
2  day."
3      Q. Okay.  According to your report, what is the
4  highest dose of Seroquel that this plaintiff was on
5  after January 2, 2002?
6      A. Of what — from my report, which I got from
7  that chart summary, it's listed in the third paragraph,
8  and I go through the different medications.  I list that
9  she was on Zyprexa.
10      Q. I just want to know the highest dose of
11  Seroquel.
12      A. Okay.  And what it has here, initially up to
13  200 milligrams twice daily.
14      Q. At — where does it say that in your report?
15  Oh, I see.  She was initially up to 200 milligrams.
16      A. The eighth line of the — of the third — yes,
17  ma'am.
18      Q. Okay.  All right.  If you will look at
19  Exhibit 9 —
20      A. Nine.
21      Q. — which I just gave you, you would agree with
22  me that this log of her medications indicates that the
23  plaintiff does not wish to take the Seroquel dose pack,
24  right?
25      A. Right.

88

1      Q. Do you know — and this Exhibit 9 indicates —
2  consistent with the fact sheet that's been marked as
3  Exhibit 8 that she started on Seroquel at 25 milligrams
4  twice a day, right?
5      A. Yes, ma'am.
6      Q. In — and that was in January?
7      A. Six lines down in my report, it says her
8  Seroquel dose was later reduced to 25 milligrams twice
9  daily and then was altered to 50 milligrams.  And I give
10  dates.
11      Q. Okay.  So let's just be sure that we're clear
12  because I don't know where you got your facts from.  But
13  reviewing Exhibit 9 and reviewing the fact sheet, do you
14  now concur that she started taking Seroquel in January
15  of 2002?
16      A. Yes.  If — if the — if this comment here was
17  that she had not taken the 200 milligrams, we then come
18  back to match up my statement of four lines down, which
19  was her Seroquel dose was later reduced to 25 milligrams
20  twice daily and that relates to January the 2nd,
21  25 milligrams twice daily.
22      Q. Okay.
23      A. So, yes, ma'am.
24      Q. All right.  So it looks like she began to take
25  Seroquel in January of 2002 at a dose of 25 milligrams

89

1  twice a day, which will be 50 milligrams, right?
2      A. Yes, ma'am.
3      Q. And then she — am I correct that she never has
4  a dose of Seroquel greater than a total of 50 milligrams
5  a day the entire time she's on Seroquel?
6      A. Yes, ma'am, I think that's reasonable.  And
7  it's pretty much in agreement with what I'd said.
8      Q. I'm not saying you didn't say that.
9      A. If you negated the 200 milligrams, which is a
10  lot, I think the 25 milligrams and then 50 milligrams at
11  bedtime pretty well matches with Exhibit 9.
12      Q. All right.  So the best evidence reviewing her
13  chart and your opinion from your review of the chart is
14  that the highest dose of Seroquel Ms. Whittington ever
15  took was 50 milligrams a day?
16      A. I think that's reasonable.
17      Q. All right.
18      A. Yes.
19      Q. Now, I showed you her fact sheet that — where
20  it says she quit taking Seroquel on December 5th — I
21  mean, December of '05.
22      Do you have any reason — and that record
23  shows what?  You have in front of you.
24      A. No, ma'am.  I have January 20th of '06.  And I
25  still see Seroquel, 25 milligrams at bedtime and —

23 (Pages 86 to 89)

90

1  well, I stop at that.
2      Q.  Okay.  So you — you're saying that the last
3  time that you see a prescription is January of '06,
4  right?
5      A.  January the 20th of '06.  And she was given 30,
6  so that would take her to February the 20th of '06.
7      Q.  All right.  And I don't mean to be — I just
8  want to be clear on what the record shows.  So the fact
9  sheet that I gave you that she has sworn under oath
10  to —
11     A.  Uh-huh.
12     Q.  — that's been marked as Exhibit 8, she says
13  she stopped in December '05, stopped taking Seroquel in
14  December of '05, correct?
15     A.  Yes, ma'am.  But I didn't agree with that
16  because I didn't believe it.
17     Q.  You didn't believe it?
18     A.  I think — we don't believe it now either.
19     Q.  And so you have rejected what the — the
20  patient says because of your assessment that her
21  psychosis interfered with her —
22     A.  Remembrance of the facts.
23     Q.  — understanding the facts?
24     A.  Yes.
25     Q.  And the — okay.

91

1            And so it would not matter to your opinion
2  that she said in her deposition that she quit taking
3  Seroquel because she had seen an ad on television
4  telling her she — that, you know, bad things about
5  Seroquel?
6      A.  No, ma'am.
7      Q.  That wouldn't matter to you at all?
8      A.  Psychotic patients are hearing voices telling
9  them to do all sorts of things all the time.
10     Q.  And so you're — you just made an assumption
11  that she's just wrong about when she took the medicines?
12     A.  I'm — when did you last take aspirin, ma'am?
13     Q.  Yeah.
14     A.  You know, one's memory — one has to be gentle
15  even with our own memory in the context of some years
16  back.
17     Q.  And you —
18     A.  And I think the best validity for what she
19  actually took is in Exhibit 9 assuming that she was
20  taking the medication under medical supervision.
21     Q.  All right.  And you — so your date that she
22  stopped that you're using is February 20, 2006, right?
23     A.  March the — well, it was last given on
24  February the 20th, and she got 30 tablets.
25     Q.  Okay.  So March 20th —

92

1      A.  So it would need to be March the 19th or the
2  20th, yes, ma'am.
3      Q.  All right.  Of 2006?
4      A.  Yes, ma'am.
5      Q.  Now, her — because she was psychotic and
6  had — she had schizophrenia, right?
7      A.  Yes, ma'am.
8      Q.  And she was disabled from schizophrenia and
9  from a motor vehicle accident in 2001, right?
10     A.  Yes, ma'am.
11     Q.  Because she had a terrible neck injury, right?
12     A.  Yes, ma'am.
13     Q.  That disabled her, correct?
14     A.  Yes, ma'am.
15     Q.  Just before she started Seroquel?
16     A.  I take your word for that, yes.  I have to
17  match up the dates, but, yes, ma'am.
18     Q.  You say she started Seroquel in October of
19  2001.  We know that it was actually January of 2002 now,
20  but —
21     A.  Right.
22     Q.  — but she had a car wreck — actually a couple
23  of car wrecks, right?
24     A.  That's right.
25     Q.  She had two car wrecks before she started

93

1  Seroquel, correct?
2      A.  Yes, ma'am.  In my — and I'm having to work
3  from my written because my memory is clouded.  Neck pain
4  secondary to an injury from motor vehicle accident.  It
5  says in 2001.  And her first dose of Seroquel, okay, is
6  early —
7      Q.  January —
8      A.  Well, putatively December 2001.  But if she
9  actually started on the lower dose was 2nd of January of
10  2002.  Yeah, we're in agreement.
11     Q.  All right.  Now, I want you to — well, strike
12  that.
13            You said she was psychotic and might not
14  remember when she stopped taking Seroquel.  It's also
15  correct that people with psychosis often don't take
16  their psychiatric medicines, isn't it?
17     A.  Yes, ma'am.  And that's why I said if she had
18  been taking it under medical supervision.  One hedges a
19  lot of these things.
20     Q.  You don't know how much of her Seroquel she
21  actually took, do you?
22     A.  No, ma'am.
23     Q.  And you noticed as you reviewed the chart that
24  there were many, many statements by doctors that she was
25  noncompliant?

24 (Pages 90 to 93)

94

1   A. Yes, ma'am.
2   Q. And there were statements by both her
3   psychiatrists that she didn't take her psychiatric
4   medicines, right?
5   A. Yes, ma'am.
6   Q. And there were statements by her cardiologist
7   that she didn't take her hypertensive medications,
8   right?
9   A. Yes, ma'am.
10   Q. So you have no idea whether she took any of the
11   Seroquel that was prescribed or some portion of it,
12   right?
13   A. No, ma'am.
14   Q. Is that right?
15   A. I think that's a reasonable statement. On the
16   other hand, if she had improved clinically and this was
17   the mechanism of her clinical improvement, then one
18   would also look for a clinical effect of each
19   medication.
20   Q. Okay.
21   A. So if the blood sugar came down —
22   Q. But you're not a psychiatrist.
23   A. No. But, likewise, in those charts would be
24   measured — blood pressure would be measured, lipids.
25   And so if the measured blood pressure was down, if the

95

1   measured lipids were reasonably controlled, then one
2   might reasonably assume that she was taking her
3   medication.
4   Q. All right. Now, tell me: During the time that
5   Ms. Whittington was on Seroquel, what tests were run —
6   laboratory tests that were — would meet the criteria of
7   the ADA for diagnosing diabetes?
8   A. Well, I give the best data. And, remember, I
9   hedged it because you go with what you've got. And the
10   best data —
11   Q. What do you mean by saying "you go with what
12   you've got"?
13   A. Many psychiatric units don't do a lot of
14   medical tests and a lot of patients aren't weighed
15   and — or certainly go back ten years aren't weighed as
16   much. Clearly now that these issues have become
17   important, there's a little bit more.
18   But in some of the earlier Zyprexa
19   medication, we found very rare cases of blood sugar
20   measurement and body weight measurement. In this
21   context these patients have fairly good data, relatively
22   speaking.
23   The best data I had on this lady were that
24   she had a normal urine glucose and we have several body
25   weights and then the best blood sugar abnormality which

96

1   I have to offer in excess of the criteria which we
2   agreed to on — I think it was Exhibit 9 — was the
3   fasting sugar of 131, which I believe was February of
4   2006.
5   Q. What — what I need to know from you,
6   Dr. Tulloch, is during the time that Ms. Whittington was
7   taking Seroquel, which you've said is January 2002 to
8   approximately March —
9   A. 20th of March —
10   Q. —20th of 2006, what laboratory tests that
11   measure her blood glucose were done?
12   A. Okay. The best I have to offer is a blood
13   sugar of 131 from February 2006. And that's the best
14   data I have.
15   One then looks for other evidence. And
16   from August of 2007 —
17   Q. Okay. I'm only talking right now —
18   A. Okay.
19   Q. Let's stay focused on — I'm talking about
20   while she's taking Seroquel —
21   A. Okay.
22   Q. — I want to know what blood glucoses she had.
23   A. That's all I have at this time.
24   Q. All right. Was that blood glucose of the
25   fasting value of which was 131 milligrams per deciliter,

97

1   that was — that was taken in February of 2006, right?
2   A. That's correct.
3   Q. And you saw no other blood glucoses between
4   January of 2002 and March of 2006 in your review of the
5   medical records you were given by the plaintiffs?
6   A. I think that would not be correct. I didn't
7   note any other blood sugars. I — for that to be
8   totally valid, I would need to go back and review that
9   summary shot.
10   Q. Okay. Here is the material you gave me. I
11   need to know all the blood glucose tests she had while
12   she was on Seroquel.
13   A. Okay. With your permission, ma'am, I'm taking
14   Exhibit 3 and putting it in another computer and seeing
15   if I can find it from your data.
16   Q. Okay. That's your data. That's not mine.
17   That's what I was given.
18   A. The data that was given to you —
19   Q. Okay.
20   A. — at some ungodly hour last night.
21   Q. It was given to me today.
22   A. That's a more civilized time.
23   Somewhere there's a nice review that has it
24   all. And it's called Linda Whittington summary or
25   something like that. I'll look through here.

98

1    Ma'am, I -- to save time, I do not have a
2  headline that includes Linda Whittington summary. And I
3  apologize. I thought it should be on one of our disks.
4  It was the nice summary that has everything and which
5  would give us an immediate colation.
6       Q. Okay. Well, let's --
7       A. I think in the interest of time, we will be
8  having other meetings together. May I promise that I'll
9  bring it to you because it will save us a lot of time.
10      Q. I think that's a great idea.
11           And so let's just make the record clear on
12 this. As we sit here today, you can't tell me what her
13 lab tests were during the time that she was taking
14 Seroquel other than the one that's in your report from
15 February of 2006, right?
16      A. That's correct, ma'am. But I --
17      Q. And you have them on a summary that was
18 prepared by the plaintiff's law firm, correct?
19      A. Right. And it does summarize her weight, her
20 sugar -- well, the available weight, the available
21 sugars, and the medications as we've looked at on
22 Exhibit 9.
23      Q. And you're looking at a disk that has medical
24 records on it that were produced to me this morning
25 that's been marked as Exhibit --

99

1       A. At 11:15 this morning.
2       Q. -- Exhibit 3, right?
3       A. (Witness nods.)
4       Q. Right.
5       A. Yes, ma'am.
6           MR. PIRTLE: If mine's correct, I have a
7  few depos on here.
8           MS. THORPE: I haven't looked at it, Tom,
9  so you're ahead of me.
10          MR. PIRTLE: Well, I didn't know what was
11 on it either.
12          MS. THORPE: I knew it had some medical
13 records.
14          MR. PIRTLE: Although I am quote/unquote
15 the plaintiff, I was not in charge of this production.
16 We will certainly get that. I think it's more efficient
17 to give that than to have him trudge through to try to
18 reconstruct it.
19      Q. (BY MS. THORPE) And so you can't go to the --
20 as you sit there with those medical records, you're not
21 able to go in to them to find the laboratory values for
22 when she was on Seroquel?
23      A. That's correct, ma'am.
24      Q. All right.
25      A. And in the interest of time, what I have chosen

100

1  to do was a bullet search because I know there's a nice
2  summary which has the sort of issues which would make
3  our decisions easier because of its relationship to --
4  relationship to --
5       Q. Okay. So I'm going to -- I'm sorry, I didn't
6  mean to cut you off there. Did you --
7       A. No problem. We were identifying the correct
8  disk. That is your disk, Exhibit 3, and I'll get back
9  mine.
10          MR. PIRTLE: That's not yours.
11          THE WITNESS: Oh, okay.
12      A. And we have promised to produce on all the
13 patients we're discussing in the interest of simplicity
14 and time a nice time line which collates weight,
15 medication, and clinical state. And it's a review of
16 the charts which are listed at the beginning of each
17 report.
18      Q. (BY MS. THORPE) All right. And that was
19 something that was prepared by someone in the
20 plaintiff's office?
21      A. Yes, ma'am.
22      Q. And you relied upon it, right?
23      A. Yes, ma'am.
24      Q. And without it, you really can't get to those
25 labs --

101

1       A. Well, in the interest of time --
2       Q. -- to give me the results, right?
3       A. -- it can be got but it would mean looking at
4  every -- sat every individual meeting.
5           (Exhibit No. 10 marked.)
6       Q. (BY MS. THORPE) The one glucose level that you
7  have in your report that you think she had while she was
8  taking Seroquel is dated February 16, 2006, right?
9       A. That's correct.
10      Q. And it's -- I've just marked it as Exhibit 10,
11 correct?
12      A. Exhibit 10.
13      Q. Now, in this test she had a fasting blood
14 glucose of 131, right?
15      A. That's correct.
16      Q. And she had a -- then she had an oral glucose
17 tolerance test as well, correct?
18      A. Yes, ma'am.
19      Q. And at the second hour is the -- is the hour of
20 the test where one determines whether the test is
21 diagnostic of diabetes, correct?
22      A. Yes, ma'am.
23      Q. And her result is 181, correct?
24      A. That's correct.
25      Q. So her oral glucose test in February of 2006

102

1  indicates that she had impaired glucose --
2      A. Tolerance.
3      Q. -- tolerance, correct?
4      A. Right.
5      Q. It does not indicate that she has diabetes,
6  correct?
7      A. Well, no, not really.  You heard me say earlier
8  that we put greater credence on the fasting sugar than
9  on the two-hour sugar.  But it -- this is a nice
10  highlight why you need to do more than one test.
11  Because in here a fasting sugar -- had we not done the
12  oral glucose tolerance test, the fasting sugar would
13  have diagnosed her as having diabetes.  It's a little
14  bit more than 126.  If we'd only done the two-hour test,
15  which is done in some of the pregnancies where they load
16  them, they look at the one-hour test, we'd have looked
17  at 181.
18          From what you understand at the time zone,
19  it just meant that somewhere over the next few months
20  her pancreas was about to -- no longer able to normalize
21  blood sugar.  And so certainly in this context a fasting
22  sugar was defined as having had diabetes and a two-hour
23  sugar on her glucose load would define her as having
24  impaired glucose tolerance.  And you heard me say that
25  by the time they get to impaired glucose tolerance, they

103

1  have lost probably 70 to 80 percent of their pancreatic
2  reserve.
3      Q. And so let me just stop you there.  If you
4  have -- if you have an impaired fasting glucose as
5  opposed to an impaired glucose tolerance but let's say you
6  have an impaired fasting glucose, does that same
7  statement -- that statement that you just made hold
8  true?
9      A. Yes, ma'am.
10      Q. So say it with regard to impaired fasting.
11      A. What we now know is that subjects who have let
12  us say a sugar of 124 do not fulfill the criteria for
13  diabetes as defined by the American Diabetes Association
14  as we discussed.  But when the pancreas is tested -- and
15  there are ways of doing that -- it is apparent that by
16  the time the blood sugar is anything much above -- as
17  low as 110 and certainly by 124, they have lost more
18  than two-thirds of their pancreatic reserve.
19      Q. And if someone has an impaired fasting glucose
20  of 123, they would have lost more than 75 percent of
21  their pancreatic reserve --
22      A. Exactly.
23      Q. -- of insulin?
24      A. Yes, ma'am.
25      Q. Okay.  Now, Exhibit 10, which is the -- is

104

1  the --
2      A. Oral glucose test.
3      Q. -- the test on February 16, 2006, you would say
4  does not satisfy the ADA criteria for diagnosing
5  diabetes, correct?
6      A. By glucose tolerance test, although it does by
7  a random sugar.
8      Q. Well, actually --
9      A. I'm sorry, by a fasting sugar.  Strike
10  "random."
11      Q. You -- you must be very clear about this,
12  Dr. Tulloch.  Is there a confirmatory test of the tests
13  that are contained in Exhibit 10?
14      A. You mean do we have another sugar, then?  We
15  don't, ma'am.
16      Q. Okay.  Let me just --
17      A. So --
18      Q. And you agree that to satisfy the ADA criteria
19  for diagnosing diabetes, you have to have a confirmatory
20  test, correct?
21      A. Ma'am, if you're splitting hairs, yes.  But if
22  you're asking me about the management of this patient, I
23  would point out that by August the 23rd of 2007, her
24  physician gave her Metformin, which is a management
25  medication for type 2 diabetes.

105

1          So we would be looking at evidence that
2  other sugars had appeared that were in excess of 131
3  fasting which caused the doctor who wrote this
4  prescription on the 23rd of August to write the
5  prescription for Metformin.
6      Q. Isn't it correct, Dr. Tulloch, that this
7  patient has never had two laboratory tests, an initial
8  one and a confirmatory test, that established either a
9  fasting glucose over 126 or a two-hour oral glucose
10  tolerance test over 200?
11      A. Ma'am, if we are relating -- if we're looking
12  at the numbers I have available here, that's correct.
13  We have only one fasting sugar that's 131, which is
14  diagnostic of diabetes, but it is paired with a load
15  sugar at two hours of 184.
16      Q. Exhibit 10 --
17      A. So --
18      Q. -- the lab testing from February of 2006 is
19  ambiguous because of the two tests and it requires
20  confirmation, correct?
21      A. That's correct.  And until that --
22      Q. And it never was confirmed, correct?
23      A. Until that, she has impaired fasting glucose,
24  which as you heard is a stage in the progression of type
25  2 diabetes.

106

```
 1          MR. PIRTLE: If you get to a spot, we're
 2   better than an hour.
 3          MS. THORPE: I'm not quite to a spot.
 4          MR. PIRTLE: I understand. I'm not pushing
 5   on you.
 6          MS. THORPE: I appreciate it.
 7       Q. (BY MS. THORPE) Now, did you review her
 8   glucose testing before she — Ms. Whittington took
 9   Seroquel?
10       A. I believe it's on that summary. And when we
11   have the summary, I'll be able to point them to you as
12   they run all the way down.
13       Q. But you made every effort to review all of her
14   labs before she started taking Seroquel, right?
15       A. Yes, ma'am.
16       Q. Then you put in your report that's been marked
17   as Exhibit 2 no blood glucose levels other than the one
18   taken in February of 2006, right?
19       A. Yes, ma'am.
20       Q. You did not include in your report her glucose
21   testing before she started taking Seroquel, right?
22       A. That's right. I do that in the belief that
23   they were normal. But, again, when we have the summary,
24   I'll be able to point them out to you.
25       Q. You believe — and it was — you believed that
```

107

```
 1   she had normal blood glucose levels before she started
 2   taking Seroquel, right?
 3       A. To the best of my belief. And as you saw —
 4   trying, then, to split culpability, the best data I
 5   could get on her after she'd taken another atypical,
 6   Zyprexa, the only thing I could find was a urine
 7   glucose. And I said earlier we don't see — as
 8   physicians who care for diabetic patients, we would love
 9   to have seen more data on these psychiatric patients,
10   but our colleagues clearly are faced with other aspects
11   of patient care.
12       Q. Now, thinking about the — the causes that you
13   said she had for diabetes, for example, let's start with
14   hypertension and hyperlipidemia.
15       A. Family history.
16       Q. Well, let's just start with hypertension and
17   hyperlipidemia. And let me just ask you: There are
18   people who have hypertension and hyperlipidemia who
19   develop diabetes who never take Seroquel, right?
20       A. Yes, ma'am.
21       Q. And hypertension and hyperlipidemia could be a
22   sole cause of diabetes, correct?
23       A. Well, if — if I can explain this. A
24   condition —
25       Q. Do you agree with that statement?
```

108

```
 1       A. I'm trying to put it in a correct context.
 2       Q. Well, you're going to talk about metabolic
 3   syndrome. But first I want to ask you about
 4   hypertension and hyperlipidemia, the two things that
 5   Ms. Whittington, you said, had before she took Seroquel.
 6   Could those two causes of diabetes in and of itself
 7   have caused her to develop diabetes without regard to
 8   Seroquel?
 9       A. I — I think there are other — they're
10   indicators of a condition which you just mentioned,
11   which is the metabolic syndrome, and that's the co —
12   the co-metabolism or the cooperative presence of several
13   risk factors which end up with adverse cardiovascular
14   disease. And these run — they almost seem to run
15   together. So it's truncal obesity, it's hypertension,
16   it's high triglycerides, low HDL, and it's abnormal
17   blood sugar. And truncal obesity is measured and there
18   are numbers which are diagnostic.
19       Q. Did Ms. Whittington have metabolic syndrome?
20       A. She given her body weight would have fulfilled
21   the truncal criteria. She also had hypertension and
22   hyperlipidemia. So she had — and you only needed three
23   of the five components. So by definition this lady had
24   the metabolic syndrome.
25       Q. She had metabolic syndrome before she took
```

109

```
 1   Seroquel, correct?
 2       A. She inherited metabolic syndrome from her two
 3   parents.
 4       Q. Right.
 5          Well — and her parents — she has a family
 6   history of hypertension and hyperlipidemia, right?
 7       A. That's correct.
 8       Q. And a family history of diabetes, right?
 9       A. They're all three grouping together.
10       Q. Right.
11          So her family had metabolic syndrome, she
12   had metabolic syndrome. And my question to you — let
13   me just ask it this way.
14          Did — could her metabolic syndrome which
15   she had before she — strike that. I screwed this all
16   up.
17          She had metabolic syndrome before she took
18   Seroquel, right?
19       A. Yes, ma'am.
20       Q. Her metabolic syndrome could have caused her
21   diabetes even if she had never taken Seroquel, right?
22          MR. PIRTLE: Objection, form.
23       A. Ma'am, what — what I — I go back to my life
24   pattern that we discussed about an hour ago. Let us say
25   that if she didn't have any of the issues we discussed,
```

28 (Pages 106 to 109)

**110**

1   she was going to get type 2 diabetes at the age of 105.
2   And let us say that she lived the lifestyle she had
3   listed in the first and she got two different atypicals,
4   each of which cause insulin resistance and weight gain.
5   And so we take that onset of type 2 diabetes from 105
6   and we push it down to the age of 44-1/2.
7       Q. (BY MS. THORPE)  I hear — I heard you when —
8       A. You're asking me —
9       Q. — you said it.  But now I'm asking you —
10      A. You're asking me to say which was the major
11  contributing factor.  And — and with respect, what I
12  offer you is she had her genes and we — we the
13  physicians who gave her the two atypical antipsychotics
14  pushed that — that onset of diabetes down lower in her
15  lifespan by what the medications did to her, and this
16  was the weight gain and the insulin resistance.  And I
17  stand offering no culpability to any of us.  We each do
18  the best we can in the management of our patient.
19      Q. So your testimony is that the fact that she had
20  metabolic syndrome before she ever took
21  Seroquel increased —
22      A. Or Zyprexa.
23      Q. — or Zyprexa increased her risk — greatly
24  increased her risk of developing diabetes, right?
25      A. Ma'am, when I gave you that description of the

**111**

1   lifespan and diabetes at 25 or 105, I was talking about
2   somebody who might have inherited the metabolic
3   syndrome.  It's a nice way of summarizing it.
4       Q. Somebody who — who had metabolic syndrome like
5   Ms. Whittington did, when would you have expected her to
6   develop diabetes?
7       A. I have to simplify this to give a — if all
8   things have been perfect —
9       Q. Actually —
10      A. — at the age of 105 —
11      Q. — let me withdraw that question and ask it —
12      A. Yeah.
13      Q. — a different way.
14          Someone who had a family history of
15  diabetes, who had metabolic syndrome, who was obese, and
16  who smoked and who took — and let's just leave out the
17  Zyprexa at this moment — when would, in your scale, you
18  expect that person to get diabetes?
19      A. At any time that she had a further major weight
20  gain.  And that was why I tried so hard to find some
21  numbers.  And I offer you the Resnick paper because it
22  gives numbers.  Anything else is just a guess.
23      Q. Okay.
24      A. But start with the analogy.
25      Q. Always have to have those numbers, don't you?

**112**

1       A. 105 or 25.  And if she does everything bad,
2   she'll get it at 25; if she does everything right,
3   she'll get it at 105.  And we, her caregivers, can help
4   her push that to the late range group.
5       Q. But I'm asking you:  If she hadn't — somebody
6   with her picture that you've described, with a family
7   history of diabetes and metabolic syndrome before she
8   started taking Seroquel and obesity, at what age would
9   you have expected her to develop diabetes?
10          MR. PIRTLE:  Objection, form.
11      A. Without major weight gain?  Because what we
12  have to go was by her weight.  Her weight when she
13  started was 184 pounds.  Her weight when she finished
14  the second atypical was 244 pounds.
15      Q. (BY MS. THORPE)  So it would depend on her
16  weight gain?
17      A. There's a 60-pound weight gain there.  And I
18  offer the Resnick paper as a for instance.  And in the
19  Resnick paper, it says each kilogram —
20      Q. I don't need you to read me —
21      A. — over ten years —
22      Q. — the Resnick paper, sir.
23      A. — increases the risk by 49 percent.  So —
24      Q. Okay.
25      A. — you're asking me to — to choose a number

**113**

1   and I'm coming back to you with showing you my thought
2   process because —
3       Q. Well, if you can't choose — you know what, if
4   you can't answer the question, it's fine to say that you
5   can't answer the question —
6       A. Okay.
7       Q. — all right?
8          MR. PIRTLE:  Objection.
9       A. Let me answer it this way, that anything that
10  she did that made her gain 60 pounds in weight, which is
11  an eyeball from 184 to 244 — is that 60 pounds or is it
12  50 pounds?  It's 60 pounds.
13      Q. (BY MS. THORPE)  Well —
14      A. She gained —
15      Q. — the same is true at 50 pounds, right?
16          THE REPORTER:  One at a time, please.
17      Q. (BY MS. THORPE)  Anything that caused her to
18  gain 50 pounds of weight would have — if she has
19  metabolic syndrome and a family history of diabetes, in
20  your opinion, that would be enough to be — to cause her
21  to have diabetes, right?
22      A. Massively accelerate the probability that she
23  would develop diabetes within the next six months.
24      Q. Gaining 50 pounds would massively accelerate
25  the possibility that she would get diabetes in six

114

1  months?
2      A. The next six months, yes, ma'am.
3      Q. I assume it's also correct that if she had on
4  top of all this impaired fasting glucose with her
5  metabolic syndrome and her obesity and her family
6  history, that she would — you would expect her to have
7  diabetes —
8      A. Then we —
9      Q. — in a short amount of time, right?
10     A. At that time we would invoke the final straw
11 that breaks the camel's back.
12         (Exhibit No. 11 marked.)
13     Q. (BY MS. THORPE) All right. I'm going to show
14 you a laboratory test that's been marked as No. 11. And
15 this is a lab taken from her on September 17, 1993. And
16 you see there that she has a glucose of 123?
17     A. I do indeed.
18     Q. All right. Now, that is an elevated glucose,
19 isn't it?
20     A. Well, are we assuming it's fasting or are we
21 assuming it's random?
22     Q. Well, I'm going to ask you. How do you — you
23 don't know, do you?
24     A. We don't, no.
25     Q. And have you ever seen this blood test before?

116

1          MR. PIRTLE: Good.
2          (Exhibit No. 12 marked.)
3      Q. (BY MS. THORPE) I'm going to show you what's
4  been marked as Exhibit 12 for identification and ask you
5  if you've read this medical record dated August 31,
6  1993.
7      A. I'm reading right now. I saw all of the
8  earlier stuff some months back. Yes, ma'am, I'm looking
9  at it now.
10     Q. And it's the Mental Health Center of
11 Jacksonville, right?
12     A. Uh-huh.
13     Q. And this is the order for the test that
14 Ms. Whittington had on September 16, 1993, right?
15     A. Okay. And down at the bottom it says fasting.
16     Q. Right.
17     A. No. 4.
18     Q. Right.
19         So from your review of these records, you
20 would agree that the tests she had on September 16,
21 1993, is a fasting blood glucose, correct?
22     A. Yes.
23     Q. More probably than not, the lab on September
24 16, 1993, is a fasting blood glucose, correct?
25     A. That's correct.

115

1      A. If it was in that summary, I will have seen
2  that number. And when I was skimming through the charts
3  of this patient's physicians, I looked at the lab. So I
4  probably did. What you'll also see — well, go on,
5  you're talking about sugar and how —
6      Q. And you didn't put this — you didn't include
7  this value in your report, right?
8      A. No, ma'am.
9      Q. And you have actually — well, on your reliance
10 list, Ms. Whittington's treating physician's deposition
11 is on there. Did you read it?
12     A. No, I didn't.
13     Q. Would you disagree with him when he testified
14 that he thought that as early as 1993 she could have had
15 diabetes?
16     A. Well, as early as 1993, if this is her fasting
17 sugar, she had impaired glucose tolerance.
18     Q. Okay.
19     A. More than that, she had a fatty liver, she had
20 hypercholesterolemia, and she had high triglycerides if
21 these are fasting numbers.
22     Q. Okay.
23         MR. PIRTLE: Again, when you get to a
24 stopping point.
25         MS. THORPE: Almost there.

117

1      Q. So she had impaired fasting glucose before she
2  started taking Seroquel, right?
3      A. Before she started taking Zyprexa.
4      Q. Right.
5          Or Seroquel, correct?
6      A. Yes, ma'am.
7      Q. All right.
8          MS. THORPE: Do you want to — shall we
9  take a break now?
10         MR. PIRTLE: Sure.
11         (Short recess from 7:06 to 7:14.)
12         (Exhibit Nos. 13 and 14 marked.)
13     Q. (BY MS. THORPE) I'm going to show you what's
14 been marked as Exhibit 13 and 14 for identification. So
15 Exhibit 13, if you look at it, shows — is dated
16 September 28, 1990, right?
17     A. I'll take your word for it. Show me where the
18 date is.
19     Q. It's right up in the — right there.
20     A. Okay. Gotcha.
21     Q. That's the correct date?
22     A. 28th.
23     Q. September 28, 1990?
24     A. September 28, 1990.
25     Q. She weighed — if you look on the left-hand