JOB NO. 99406

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This Document Relates to:

David Haller v. AstraZeneca, LP, et al.     Case No. 6:07-cv-15733
Eileen McAlexander v. AstraZeneca LP, et al. Case No. 6:07-cv-10360
Richard Unger v.  AstraZeneca LP, et al.     Case No. 6:07-cv-15812
Linda Whittington v. AstraZeneca LP, et al.  Case No. 6:07-cv-10475

ORAL DEPOSITION OF
BRIAN R. TULLOCH, M.D., FRCP, FACP
OCTOBER 8, 2008
VOLUME 2

ORAL DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP,

produced as a witness at the instance of the Defendant and

duly sworn, was taken in the above styled and numbered cause

on Wednesday, October 8, 2008, from 4:05 p.m. to 8:24 p.m.,

before RENE WHITE MOAREFI, CSR, CRR, RPR in and for the State

of Texas, reported by machine shorthand, at Laminack, Pirtle &

Martines, 5020 Montrose Blvd., 9th Floor, Houston, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record herein.

156

1
2        A P P E A R A N C E S
3    FOR THE PLAINTIFF:
     TOM PIRTLE, ESQ.
     RUSS BRUDNER, ESQ.
4    LAMINACK, PIRTLE & MARTINES
     5020 Montrose Blvd., 9th Floor
5    Houston, Texas  77006-6533
     713.292.2750
6
7    FOR THE DEFENDANTS:
     JANE THORPE, ESQ.
8    BRENDAN KRASINSKI, ESQ.
     ALSTON & BIRD, L.L.P.
9    1201 West Peachtree Street
     Atlanta, Georgia  30309-3424
10   (404) 881-7000
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

157

1               INDEX
2                        PAGE
3
4    APPEARANCES............................ 156
5
     BRIAN TULLOCH, M.D., FRCP, FACP
6
     CONTINUED EXAMINATION
7    By Ms. Thorpe.......................... 158
8    CORRECTION PAGE........................ 309
9    SIGNATURE PAGE......................... 310
10   REPORTER'S CERTIFICATION.............. 311
11
12             E X H I B I T S
13   NO.   DESCRIPTION                PAGE
     17    Laboratory Report dated 11-20-96    172
     18    Whittington Weight/BMI Chart        184
14   19    Whittington time line               187
     20    Medical record dated 3-24-08    190 195
15   21    Expert Report of Brian Tulloch,
           M.D. re Richard Unger               224
16   22    Unger time line                     224
     23    Article titled "Quetiapine
17         Overdose and Severe
           Rhabdomyolysis"                     235
18   24    Article titled "Quetiapine:
           Pancreatitis and
19         thrombocytopenia"                   235
     25    Records authorization               248
20   26    Letter dated 5-9-08                 249
     27    Medical notes from Dr.
21         Cabeda-Rovirosa                     285
     28    Progress Note dated 10-2-06         287
22   29    Progress Note dated 1-6-04          290
     30    Progress Note dated 1-5-05          290
23
24
25

158

1         (Please refer to Volume 1 of the deposition
2    of Brian R. Tulloch, M.D., FRCP, FACP for the agreements
3    of counsel.)
4         BRIAN R. TULLOCH, M.D., FRCP, FACP,
5    having been duly sworn, testified as follows:
6              CONTINUED EXAMINATION
7    BY MS. THORPE:
8         Q. Dr. Tulloch, we're going to continue your
9    deposition.  And lessons learned from the last
10   deposition are that we need to not talk over each other.
11   So if you'll let me complete my question before you
12   respond, we'll get along better.  Okay?
13        A. I promise to do that --
14        Q. All right.
15        A. -- every time I remember it.
16        Q. Okay.  And then secondly, if you will try to
17   answer -- listen very carefully to the question I'm
18   asking you and answer that question.  Okay?  Is that all
19   right with you?
20        A. I will do that.
21        Q. Okay.  Now, I want to talk further about
22   Ms. Whittington.
23        A. Okay.
24        Q. We agreed the last time we were together that
25   Ms. Whittington never met the American Diabetes

159

1    Association's criteria for the diagnosis of diabetes,
2    correct?
3         A. We never found a repeat number on any of the
4    criteria, yes, ma'am.  We found single numbers that
5    would fulfill that.  And certainly in clinical practice
6    I doubt I have any other patients in whom I get a second
7    reading if it is apparent that they will need treatment
8    and in circumstances similar to this lady.
9         Q. Dr. Tulloch, I need a yes or no answer.  Do you
10   agree -- let me ask my question.
11        A. Yes.
12        Q. Do you agree that Mrs. Whittington never met
13   the American Diabetes Association's criteria for the
14   diagnosis of diabetes?
15        A. I also -- well, the answer's yes to that
16   statement because we had agreed earlier that the
17   criteria includes two independent numbers.
18        Q. Okay.
19        A. But I've also said that as a clinician if
20   somebody comes to me with one of the criteria that
21   would -- would tell me -- and I go back to the analogy
22   of 25 to 105 time of onset of type 2 diabetes in
23   somebody who's likely to get that -- I don't wait for a
24   second before I start treating them.
25        Q. Okay.

160

1    A. So it would not change —
2    Q. So you agree —
3    A. Let me finish because I was going to finish
4  that one.
5        So it would not change the way I treated
6  that patient were she my patient.
7    Q. But you agree that Mrs. Whittington never met
8  the American Diabetes Association's criteria for the
9  diagnosis of diabetes in that she did not have
10 confirmation of a positive lab test for diabetes,
11 correct?
12   A. Yes, ma'am.
13   Q. Now, tell me the tests — well, strike that.
14       Let me ask you this: Is it your opinion
15 that Mrs. Whittington has diabetes?
16   A. Yes, ma'am.
17   Q. All right.
18   A. And I — as I've explained —
19   Q. Okay. There's no question.
20   A. — in the context of how one treats these
21 patients, one doesn't split hairs unless there is a
22 medical/legal or insurance related issue that would
23 require it.
24   Q. Dr. Tulloch, I want you to point me to the
25 tests you rely on for the diagnosis of diabetes in

161

1  Ms. Whittington.
2    A. A fasting sugar in excess of 126.
3    Q. All right. I want to show me the test.
4  I'm going to show you what's been marked as Exhibit 11
5  and ask you if that is the test you're relying on for
6  your diagnosis of Ms. Whittington.
7    A. No, ma'am. Exhibit 11 is dated 1993 and —
8    Q. I'm sorry. That's the wrong one.
9    A. — and it's a fasting sugar of 123.
10   Q. All right.
11   A. So that does not fulfill the criteria.
12   Q. Okay. I'm sorry. That's fine. I pulled out
13 the wrong — here it is. Excuse me.
14       Let me show you what's been marked as
15 Exhibit 10 and ask you if that's the test that you rely
16 on for your diagnosis of Ms. Whittington with diabetes.
17   A. Yes, ma'am, this is a fasting sugar in excess
18 of 126. She has a single one — zero to two-hour sugar
19 greater than 200. She misses the third component of the
20 criteria, which is a two-hour sugar, does not make 200.
21       As I explained a moment ago, in somebody
22 with this clinical picture, I would initiate the
23 appropriate treatment for diabetes in this case were she
24 my patient, so —
25   Q. Is — is Exhibit 11 the only test that you rely

162

1  on — excuse me. What's the number?
2    A. Ten.
3    Q. Is Exhibit 10 the only test you rely on for
4  your diagnosis of Ms. Whittington with diabetes?
5    A. In this context, yes, ma'am. It's the only
6  data I have. But as we agreed in an earlier discussion,
7  the psychiatric charts are not loaded with blood sugars.
8    Q. So Exhibit 10 is the only test you rely upon
9  for your diagnosis of Ms. Whittington's diabetes?
10   A. The only data I have available to me, yes,
11 ma'am.
12   Q. Now, the oral glucose tolerance test that you
13 referred to in your prior answer that has a one-hour
14 glucose of 261 —
15   A. Yes, ma'am.
16   Q. — also contains a two-hour glucose, correct?
17   A. Yes, ma'am.
18   Q. And it is the two-hour glucose that doctors
19 look to to establish whether or not someone has
20 diabetes, correct?
21   A. No, ma'am. What you heard me say was we put
22 greatest load on the fasting sugar. And when we
23 discussed all that sometime ago, a — glucose tolerance
24 tests are not as frequently done now as they were in the
25 past. But if the patient does progress to a two-hour

163

1  glucose tolerance test, we look at both the fasting
2  sugar and the two-hour sugar. And one of the criteria
3  in days gone by was also that one other number between
4  zero and two hours was required to be in excess of 200.
5    Q. Okay. Dr. Tulloch, Exhibit 10 has a fasting
6  glucose on it of 131, correct?
7    A. Yes, ma'am.
8    Q. And as we've discussed, that is the only result
9  you rely on to establish a diagnosis of diabetes in
10 Mrs. Whittington, correct?
11   A. That's correct.
12   Q. Also on Exhibit 10 are the results of an oral
13 glucose tolerance test, correct?
14   A. Yes, ma'am.
15   Q. And that oral glucose tolerance test as
16 reflected in Exhibit 10 reports a number for three
17 different hours of the test, correct?
18   A. To agree let me just check. That's correct, we
19 looked at 1, 2, and 3, yes, ma'am.
20   Q. All right. The American Diabetes Association
21 criteria base their analyses of oral glucose tolerance
22 tests on the second hour of the glucose tolerance test,
23 correct?
24   A. Yes, ma'am, we've agreed on that.
25   Q. All right. And the result on Exhibit 10 for

3 (Pages 160 to 163)

164

1  the second hour of the oral glucose tolerance test is
2  181, correct?
3      A. Yes, ma'am.
4      Q. That result of 181 is not indicative of -- or
5  does not demonstrate that Ms. Whittington had diabetes,
6  that test alone?
7      A. That's correct.
8      Q. In fact, what it shows is that she has -- she's
9  in the range of impaired glucose tolerance at 181,
10  correct?
11      A. Yes, we agreed on that before --
12      Q. All right.
13      A. -- yes, ma'am.
14      Q. And the -- so in toto, in Exhibit 10 you have
15  an -- a fasting glucose that you're relying on in and of
16  itself by itself of 131 for your diagnosis of her
17  diabetes --
18      A. Yes, ma'am.
19      Q. -- correct?
20          And the oral glucose tolerance with its 181
21  at the second hour indicates impaired glucose tolerance,
22  not diabetes --
23      A. That's correct.
24      Q. -- correct?  All right.
25          Now, it's your testimony, I take it, that

165

1  in your practice as a clinician, you do not require
2  confirmation of a -- when you get a positive fasting
3  glucose test over 126?
4      A. If -- unless there -- as I explained a moment
5  ago, unless there's a medical/legal or insurance
6  required criterion which is necessary, it would not
7  alter my treatment of that lady.  And my belief is this
8  physician probably had the same idea in mind because I
9  note that she was immediately treated with Metformin,
10  which is -- the trade name for which is Glucophage.  So
11  I think this -- this doctor thinks the way I do, lady's
12  got this sort of risk factors -- and we talked about
13  that -- family history, weight gain, psychosis, et
14  cetera, we've now got a fasting of 131; this lady
15  doesn't fully fulfill the criteria for diabetes but she
16  needs to be treated.
17      Q. Okay.  So what you're saying is that because
18  she had one test -- fasting glucose test over 126, it
19  was fine clinically to go ahead and start her treatment
20  even though it was -- she did not have a diagnosis of
21  diabetes that met the ADA standard?
22      A. Yes, ma'am, I think it's good medicine to be
23  proactive in a setting like that, particularly as we
24  mentioned earlier because of all of her other risk
25  factors, and we enumerated them earlier on, I won't

166

1  bring them back again.
2      Q. And so in your clinical practice when somebody
3  has one fasting glucose, you go ahead and start treating
4  them with diabetes medications?
5      A. Yes, ma'am.  I -- well, usually I -- I -- I
6  give them whatever I consider appropriate for that
7  patient.
8      Q. But my question for you is:  Is it your general
9  practice in your clinic that when somebody has a fasting
10  glucose over 126 one time that you go ahead and start
11  diabetes medications before you get a confirmatory test?
12      A. I think it's a reasonable proactive clinical
13  approach.
14      Q. I want to know what you do.
15      A. Oh, and it is what I -- I've said twice already
16  that that's what I do, and now I'm defending it.  And
17  let me go a step further because I said earlier on we
18  are dependent on the most recent of data.  Within the
19  last six months, there has been a conference on impaired
20  glucose tolerance.  And the American Society of
21  Endocrinologists, of which I am one, have looked at data
22  which showed that by the time the patients reach the
23  impaired glucose tolerance step, they probably already
24  lost 70 to 80 percent of their insulin reserves.  So
25  proactive therapy for people in this group will probably

167

1  be forthcoming within the next few years.
2          But I'm standing here saying my proactive
3  approach would be to treat a single sugar in excess of
4  126, and I'm also defending it with new data which is
5  coming out all the time.
6      Q. All right.  Now, you agree that the American
7  Diabetes Association criteria that require a
8  confirmation reflect the general consensus of the
9  scientific community?
10      A. Yes, ma'am.  And I'm a member of the American
11  Diabetes Association.  I have given it plenty of time in
12  the past.  And I think that's a reasonable requirement
13  in the setting that we discussed.
14      Q. The confirmation is a reasonable requirement?
15      A. Confirmation is always sensible.  You never
16  know it's fasting.  There are certain conditions where
17  even fasting sugars can be elevated.  But in a special
18  case like this one with all of the risk factors which
19  we've enumerated, positive family history,
20  hyperlipidemia, psychosis, hypertension, et cetera, I
21  would not fault a physician for making the decision that
22  this lady's doctor did, which was to give her Metformin.
23      Q. And I'm not asking you to assess fault one way
24  or the other.  That wasn't the question, sir.  So let
25  me -- let me come back to my original --

4 (Pages 164 to 167)

168

1    A. Yes, ma'am.
2    Q. -- question. And I'd ask you to answer my
3  question because I'm not asking you to assess whether
4  the doctor treated her in accordance with the standard
5  of care --
6    A. Okay.
7    Q. -- okay? That's not my interest.
8        You would agree that you cannot say to a
9  reasonable degree of medical probability that she
10  actually had diabetes based on one fasting glucose test
11  that has not been confirmed?
12    A. No, ma'am, I'm -- I'm afraid I can't agree to
13  that. I have accepted that this lady had an increased
14  fasting sugar and a two-hour sugar that did not make
15  200. I have pointed out that she had many risk factors
16  that would make her at severe risk for the development
17  of type 2 diabetes. And my belief is that this lady had
18  an abnormal fasting sugar at this time, and a second one
19  that might have been done a week -- ten days, two weeks
20  later would have probably also been in excess of 126.
21    Q. So --
22    A. More likely than not, a repeat blood sugar
23  would have been in excess of 126. That -- that it
24  wasn't done, I cannot fault the physician who made these
25  decisions for the reasons we have just discussed.

169

1    Q. And so your opinion is based on -- your opinion
2  that Ms. Whittington has diabetes is based on the lab
3  test that she had in Exhibit 10 along with an assumption
4  that if she had a test a week or two later, it would
5  have shown a 126 -- 126 or greater again --
6    A. Yes, ma'am.
7    Q. -- is that right?
8    A. More likely than not with the risk factors
9  which we have enumerated, I would -- I would put -- I
10  would almost put odds of 9 to 1, 10 to 1 that the repeat
11  sugars would have been abnormal.
12    Q. And you are willing to make that assumption as
13  a basis of your more probably than -- more probable than
14  not opinion without actually having a lab test -- a
15  confirmatory lab test performed --
16    A. Yes, ma'am.
17    Q. -- correct?
18    A. I think that's a reasonable approach for us all
19  to try to keep the costs down. But you also remember I
20  had a clause and the clause was that if it ever became
21  an issue for insurance or any other criteria that a
22  second number was required, it would be reasonable to do
23  it.
24        Now, in retrospect, we have that reason in
25  this case. We didn't or the physician who gave her

170

1  Metformin didn't have that reason at that time. I'm
2  defending my colleague. I apologize if it's
3  inappropriate.
4    Q. So -- so in a nutshell, Dr. Tulloch, you're
5  willing to conclude that more probably than not she has
6  diabetes based on your belief that a lab test that has
7  not been performed on her would exceed 126?
8    A. The second time, yes. We have a first time.
9    Q. Okay.
10    A. And the second time more likely than not would
11  be a repeat of the first time given --
12    Q. But it hasn't been done --
13    A. Given --
14    Q. -- correct?
15    A. Given all the risk factors --
16    Q. Sir, it hasn't --
17    A. Given all the risk --
18    Q. -- been done?
19        MR. PIRTLE: Y'all can't talk over each
20  other.
21    Q. (BY MS. THORPE) It hasn't been done?
22    A. We agreed that we were not going to talk over
23  one another. And at the time I had the -- the stand and
24  I will yield it to if you need it right now.
25    Q. The second laboratory test that is -- that

171

1  you're basing your opinion on has not been conducted,
2  correct?
3    A. That's correct, we have agreed on that.
4    Q. Now, you recall that Ms. Whittington, in
5  Exhibit 11, had a fasting blood glucose in 1993 of 123,
6  right?
7    A. Yes, ma'am.
8    Q. And tell me, sir, if someone in your practice
9  had a fasting blood glucose of 123, would you start them
10  on diabetes medications and perhaps put them on a ADA
11  diet?
12    A. Ma'am, I -- I think in that context this is a
13  lady who is ten years younger than she was at the time
14  we were discussing the second set of numbers, '93 and
15  2006; is that right? Yes. So 11 years before, she
16  would have been 11 years younger. I would need to look
17  back on the time line to see her weight at the time, but
18  I believe that number would certainly be one indicative
19  of advice for a patient to be given a calorie- and
20  carbohydrate-restricted diet, the encouragement to
21  exercise and to take the appropriate nonpharmacological
22  measures, and then I would expect a reasonable
23  physician, both family practitioner and endocrinologist,
24  to follow her up and watch that blood sugar carefully.
25    Q. So it would be appropriate in 1993 to have

172

1  started Ms. Whittington on American Diabetes Association
2  diet of 1800 calories?
3      A.  Depending on her weight.  I think 18's probably
4  a bit more than she needed, maybe 12, maybe 16, which
5  tends --
6      Q.  Okay.  Eighteen -- 1200 or 1600 calories
7  down --
8      A.  Twelve to 1500 calories, yes, ma'am.
9          (Exhibit No. 17 marked.)
10     Q.  (BY MS. THORPE)  All right.  I'm going to show
11  you what's been marked as Exhibit 17 for identification.
12  And let me find one for Tom here.
13     A.  No. 17.  Okay.
14     Q.  And you have before you a November 20, 1996
15  laboratory test on Linda Whittington, correct?
16     A.  Yes, ma'am.
17     Q.  Did you see Exhibit 17 before you formed your
18  opinions in this case?
19     A.  I -- I don't recollect it.  I'll check and see
20  if it was on the time line.
21         MS. THORPE:  Do we have the time line?
22         MR. PIRTLE:  Yes, you do.
23         MS. THORPE:  Okay.  Can we have a copy of
24  the time line printed out?
25         MR. BRUDNER:  How long did you say they

173

1  were?
2          THE WITNESS:  I -- it comes through on the
3  computer.  It's very long, indeed.  But she can put it
4  up on the computer.
5          MS. THORPE:  No, I want a copy of the -- I
6  want a copy -- let me just -- let me just put on the
7  record that it is impossible to examine the witness
8  without having the materials he relied upon in forming
9  his opinion.  I understand that he relied upon some sort
10  of time line or a medical chronology in the cases, and
11  I've asked for them before the deposition began so that
12  I could prepare for the deposition and not waste time,
13  and I still don't have them.  We're into the second day
14  of the deposition, and so I'm going to try to move as
15  efficiently as I can, but if -- I may need more time,
16  Tom, because I don't -- still don't have them.
17         MR. PIRTLE:  Let me respond.  We have --
18  and I have in all honesty about 30 seconds ago handed
19  you a disk across the table that I believe contains time
20  lines for all three.  You've asked me to print them out.  I'm
21  sorry.  You've asked me to print them out.  I've sent my
22  person into my office work space to actually print them
23  out in hard copy form.  I would have liked to have
24  gotten them to you quicker than I did, but that wasn't
25  my responsibility at the time to do that.

174

1          MS. THORPE:  It was somebody's
2  responsibility --
3          MR. PIRTLE:  Well, certainly --
4          MS. THORPE:  -- it's not my responsibility.
5          MR. PIRTLE:  Certainly it was.  And there
6  was some discussion as to whether or not those -- I know
7  internally within my group as to whether or not those
8  should rightfully be produced.  My position was they
9  should and I have won that debate and you've got the
10  time lines.  I wish you could have had them sooner.
11         MS. THORPE:  Well, I'm going to keep going,
12  but I'm just saying that I -- we may need more time
13  because I've got to read the document that he relied on,
14  and I'm going to have more questions about that
15  document --
16         MR. PIRTLE:  Fair enough.
17         MS. THORPE:  -- and all those documents.
18  So -- and I'm sitting here in the middle of the
19  deposition and I still don't have it.  And when I ask
20  him if he's seen something, he doesn't know, and I need
21  to know if he's seen it.
22         Q.  (BY MS. THORPE)  So let me ask you,
23  Dr. Tulloch:  You are -- when you refer to a time
24  line -- I don't want to look at it -- I can't mark your
25  computer?

175

1      A.  Okay.  No problem.  Yes, ma'am, please,
2  continue.
3      Q.  Dr. Tulloch --
4      A.  Yeah.
5      Q.  -- when you refer to a time line, can you tell
6  me what that is?
7      A.  What we have shared today is a very great deal
8  of data.  What I've tried to do as an endocrinologist
9  focusing pretty well mostly on the issues related to
10  this lady's metabolic abnormalities, not to her
11  psychiatric abnormalities, is I have tended to focus on
12  endocrine-related criteria such as her blood sugar, her
13  hyperlipidemia, her body weight.  And what was put
14  together for us to understand the progress -- because
15  we're looking at fairly long sequences -- was a summary
16  which had a date, weight, laboratory tests, the
17  antipsychotic medications that this patient was on and
18  any other extenuating circumstances.
19         So what it does is it takes a large pile of
20  data and it summarizes that data from the components of
21  what I would be interested in as an endocrinologist.
22  And I offer it to you -- I apologize it didn't came.  I
23  understood it was in the material that was given to you
24  nearly a week ago.  When I discovered this afternoon
25  that it was not in that material, I made it available to

6 (Pages 172 to 175)

176

1   you as soon as possible, and I apologize for the delay.
2        Q. Shall we refer to this document as a time line?
3   Will you know what I'm talking about when I say that?
4        A. Yeah, I think that's perfectly reasonable.
5        Q. Who prepared the time line?
6        A. It was prepared by the colleagues in
7   Mr. Pirtle's office.
8        Q. And the — when did you receive the time lines
9   for Ms. Whittington's case, the time line for
10  Ms. Whittington's case?
11       A. I believe I got it at a — the same time as I
12  got all of the other material.
13       Q. And you're putting your hand on Exhibit 4 or —
14       A. Sixteen.
15       Q. The articles that you're talking about?
16       A. All the articles which I shared with you, yes,
17  Exhibit 16.
18       Q. And when did you receive those — all those
19  materials?
20       A. My best guess would be about 12 months ago.
21       Q. All right. And you received the materials for
22  Mr. Unger at the same time, the time line and the
23  articles?
24       A. Subject to a few months one way or the other,
25  yes.

177

1        Q. And did you receive — well, how many months?
2        A. A few would be two to three.
3        Q. Okay. And did you receive a time line for
4   Ms. McAlexander?
5        A. Yes, ma'am. I — when I say —
6        Q. And was that at the same time?
7        A. — this applies to this patient, the same
8   comment applies to all four patients.
9        Q. Okay. So you received Mr. Haller's time line
10  about 12 months ago?
11       A. To the best of my memory, yes.
12       Q. And — okay. So let's go back to what's been
13  marked as exhibit — is it 17?
14       A. Seventeen.
15       Q. Yeah, Exhibit 17. And have you seen this
16  before?
17       A. The answer is no.
18       Q. All right. Can you tell me if you've seen
19  Exhibit 11 before, before your deposition last week?
20       A. Correct. The answer to that is no.
21       Q. So before you formed your opinions in this
22  case, you had not seen the —
23       A. Eleven and 17.
24       Q. The fact that Ms. Whittington had a fasting
25  blood glucose of 123 and a glucose of 137 on November

178

1   20, 1996 — that had been marked as Exhibits 11 and 17,
2   correct?
3        A. That's correct, yes.
4        Q. Now, the Exhibit 17 is a glucose of 137 which
5   is high, correct?
6        A. It is high.
7        Q. If that were a — if that were a fasting plasma
8   glucose, that would mean that she had, under your
9   diagnostic criteria, diabetes, correct?
10       A. Without any doubt.
11       Q. All right. Do you know whether Exhibit 17 is a
12  fasting glucose?
13       A. We don't have data on that.
14       Q. You can't rule out that it's fasting, can you?
15       A. No, ma'am.
16       Q. You can't rule in that it's fasting?
17       A. Well, the only reason why I think it may not be
18  fasting is the time which I refer to on the top left
19  corner and you'll see that that time is 5:00 p.m. My
20  suspicion is that a psychotic patient even if told to
21  fast would probably not still be fasting at 5:00 p.m.
22       Q. Isn't it correct, sir, that the collection time
23  was 1:30 p.m. on Exhibit 17?
24       A. Okay.
25       Q. Do you agree with that?

179

1        A. I see two — I had not read that as a time.
2   But, yeah. So we have a 5:09 p.m. at the top right and
3   halfway across we have a number which is, in fact,
4   1:30 p.m., so — yeah, so this could have been collected
5   at 1:30 p.m.
6        Q. All right. In fact, the title above the
7   1:30 p.m. says collection date and time, doesn't it?
8        A. Your — your print is better than mine.
9        Q. You can't read that?
10       A. I can't read that.
11       Q. And you see on the right-hand side of
12  Exhibit 17 it says — it says report date, 11-21-96,
13  time 5:09 p.m.?
14       A. Okay. I'll accept that. This original — this
15  copy here does not — it doesn't allow that to be read.
16       Q. Isn't it correct you don't know one way or the
17  other whether this is fasting?
18       A. That's correct.
19       Q. All right. Now, this lady presents with —
20  strike that.
21            These two exhibits, exhibit —
22       A. Exhibit —
23       Q. — Exhibit 11 and 17, make it more likely than
24  not that Ms. Whittington had diabetes as early as 1996;
25  isn't that correct?

180

1    A. Ma'am, I think the second one makes it very
2  probable that she had diabetes if that was a fasting
3  sugar, yes, correct.
4    Q. In November of 1996?
5    A. On the date in '96, yes, ma'am.
6    Q. All right. And that was long before she ever
7  took Seroquel, correct?
8    A. Yes, ma'am.
9    Q. Now, tell us, Dr. Tulloch, when in your opinion
10  her diabetes -- Ms. Whittington's diabetes actually did
11  begin.
12    A. And, again, with -- with the best probability,
13  what I have to provide is -- is at a time when any
14  two -- any two numbers -- if we need to be strict by
15  definition, as I said earlier, one -- often as
16  clinicians makes a decision before the formal
17  definition. Any time that two fasting sugars were
18  greater than 126, she would be labeled, undoubtedly,
19  diabetes. Any single fasting sugar she would be labeled
20  probably having diabetes if she had a number of other
21  criteria which fitted the issues we discussed. And as I
22  said earlier, I would not fault a clinician for treating
23  her as having diabetes on a single number because of the
24  importance of getting it under control.
25    Q. Well, I guess what I'm getting at is you would

181

1  agree with me that a laboratory test that someone has
2  gone in to the doctor and gotten a lab test, the fact
3  that that test is positive on a given day doesn't mean
4  that that's when the diabetes began, right?
5    A. No.
6    Q. Right?
7    A. That's correct.
8    Q. That's just -- that's just -- they went to the
9  doctor and had the test?
10    A. Yes, ma'am.
11    Q. The diabetes more likely than not, to use your
12  terminology, began before that test, right?
13    A. Yes, ma'am.
14    Q. The test is just a diagnostic test, right?
15    A. It's a time when the abnormality was brought to
16  the physician's notice, yes, ma'am.
17    Q. And you would agree with me that you cannot
18  state with any kind of scientific or medical probability
19  any kind of precise date of the -- the onset of
20  diabetes; science can't pinpoint this is the day it
21  started in an individual?
22    A. That's correct.
23    Q. All right.
24    A. I go back to the analogy we shared long ago
25  because it helps us understand. We agreed that a lady

182

1  with these sort of risk factors would get diabetes
2  sometime between the age of 25 and 105, and the
3  variables in her life would pinpoint the date that I
4  arrived.
5    Q. And in this lady we agree that more likely than
6  not Ms. Whittington developed diabetes, at the very
7  latest, sometime in the Nineties, correct?
8    A. We are looking at a number which is potentially
9  diagnostic were it fasting, the date of 11-21 --
10  11-20-96.
11    Q. And you agree that more likely than not she was
12  diabetic in the Nineties?
13    A. If that's a fasting sugar that fulfilled the
14  criteria, yes, ma'am.
15    Q. And you don't know whether or not it is a
16  fasting sugar?
17    A. No. We agreed it was taken at 1:30 midday on
18  one day, and now I can see a clearer version. It was
19  reported at 5:00 in the afternoon on the following day,
20  so the time that it was collected was 11-20 of '96.
21    Q. Okay. You've got better eyes than I.
22    A. And it was recorded 11-21 at 5:00 p.m.
23    Q. So what -- so what you're saying, Dr. Tulloch,
24  is -- let's just say that you had Exhibit 11 and the 123
25  high result, which is a, clearly, fasting glucose,

183

1  you've agreed. If that were the only test that
2  Ms. Whittington had, would you conclude that it was more
3  likely than not that she had diabetes?
4    A. I -- I go back to my analogy, but I come back
5  specifically in a setting like that with her strong
6  family history, her obesity, her psychosis, the
7  difference between 123 and 126 is not a great distance.
8  So if you added anything, a few pounds in weight or a
9  few months or years in age, the possibility of her
10  reaching type 2 diabetes would be quite strong.
11    Q. All right. Well, my question is, though: If
12  one -- if Exhibit 11 and the 123 were the only fasting
13  glucose she had in the Nineties, based on what you know
14  from your review of her medical records, would you say
15  that it's more likely than not that at that point she
16  had diabetes?
17    A. No, I wouldn't push it that. But I would go
18  one step before that that more likely than not she was
19  in significant danger of developing type 2 diabetes
20  within a reasonable time span after that.
21    Q. Okay. And what would that reasonable time span
22  be?
23    A. I knew you'd ask that, and I don't have the
24  answer, but it would be maybe years or maybe pounds.
25  Remember the -- we have a number of variables in a

8 (Pages 180 to 183)

184

1  patient like this.  If she'd gained 20 pounds, I suspect
2  that sugar would go up to above 126 or if we added a
3  couple of years, we -- we -- or as we saw later, or if
4  she was given medication, the final straw could have
5  been applied.  And I go back to the analogy of the final
6  straw.
7       (Exhibit No. 18 marked.)
8       Q.  (BY MS. THORPE)  All right.  Let me show you
9  what's been marked as Exhibit 18 for identification.
10 And this is a chart of Ms. Whittington's weights.  And I
11 want you to tell me if you believe that to be a correct
12 listing of her weights.
13      A.  Thank you.  I am looking at Exhibit 18, and
14 it's -- if I may call it a weight time line, if we
15 agreed that serial numbers would be called time lines.
16 And the earliest date for which we have numbers is
17 September of 1990.  And there are one, two, three, more
18 times and dates which antedate the time line that you
19 have been given.  So you have four numbers which are
20 earlier than what will be called Exhibit 19 which is the
21 time line that you've been given.  So, yes, ma'am, these
22 are data.  If they relate to the patient, they are data
23 which I did not have because my time line starts at the
24 date which you're reading there, and it would be
25 analogous to your date No. 5.

185

1       Q.  Dr. Tulloch, this will be unintelligible on the
2  record, so I'm going to have to ask you a few questions
3  about it.  Okay?
4       A.  Okay.  No problem.  Anything you need to
5  clarify it, yeah.
6       Q.  I want you to assume with me that the medical
7  records for the dates on Exhibit 18 for September of
8  1990, November of 1996, January of 1997 are, in fact,
9  recorded in the medical chart.  Okay?
10      A.  Yes, ma'am.
11      Q.  For Ms. Whittington.
12      A.  Yes, ma'am.
13      Q.  All right.  Now, we were talking about her
14 blood glucose that's reflected in Exhibit 11 of 123,
15 which was fasting, right?  You remember that's where we
16 were?
17      A.  Yes.
18      Q.  And you said that if she put on a few pounds,
19 she would likely become diabetic in a short amount of
20 time, correct?
21      A.  More likely than not, yes.
22      Q.  And you can see by Exhibit 18 that in 1990
23 Ms. Whittington weighed 145, right?
24      A.  That's correct.
25      Q.  And by November 20th of 1996, she's gone up to

186

1  194 pounds, correct?
2       A.  Yes, ma'am.
3       Q.  She has a BMI of 31.3 as of November 20, 1996,
4  correct?
5       A.  Yes, ma'am.
6       Q.  And you would agree that that gain in weight
7  over that period of time would be enough to push
8  Ms. Whittington into diabetes during the Nineties more
9  probably than not, correct?
10      A.  I would say better than that.  You have
11 produced Exhibit 17 which relates to the time line 11-20
12 of '96, which would be your second date on Exhibit 18,
13 and that difference in weight is more likely than not
14 responsible for the sugar difference which went from 123
15 to 137.
16      Q.  That's reflected in Exhibit 17, correct?
17      A.  Yes, ma'am.
18      Q.  And so you would agree that more probably than
19 not Linda Whittington had diabetes in the Nineties,
20 correct?
21      A.  Had numbers which were compatible with
22 diabetes, yes, ma'am.
23      Q.  Okay.  And you would agree that more likely
24 than not she had diabetes in the Nineties?
25      A.  Yes, ma'am.

187

1       Q.  All right.
2       (Exhibit No. 19 marked.)
3       Q.  (BY MS. THORPE)  Now, I have marked, as you
4  anticipated, Exhibit 19 for identification, which is
5  your time line for Ms. Whittington, correct?
6       A.  That's correct.
7       Q.  And this is -- do you know specifically who
8  prepared this?
9       A.  Staff from Mr. Pirtle's office.  I know there
10 are several nurse practitioners in there, but I do
11 not -- or nurse paralegals, but I do not know the names.
12      Q.  Okay.  Now, is it -- you relied on Exhibit 19
13 for your opinions?
14      A.  Yes, ma'am, I -- I relied it as a succinct
15 summary when I started making my conclusions, yes,
16 ma'am.
17      Q.  And you've already observed that Exhibit 19
18 does not contain any weights before 1999, correct?
19      A.  That's correct.
20      Q.  And it does not contain citations to the
21 medical records in terms of, you know, a record cite so
22 that you can go find the record where the information
23 described in the chart appears in the actual medical
24 record, correct?
25      A.  Yes, ma'am.  What I had said was Exhibit 18 is

9 (Pages 184 to 187)

188

1    numbered on individual dates, and numbers 1, 2, 3, and 4
2    are dates which antedate the time line which I had which
3    was Exhibit 19.
4        Q.  If you will look at the last page of
5    Exhibit 19, you see that the last entry is on December
6    4, 2007, correct?
7        A.  Yes.
8        Q.  And, in fact, your report on Ms. Whittington
9    which has been marked as Exhibit 1 -- well, excuse me,
10   it's not Exhibit 1.
11       Your report on Ms. Whittington which has
12   been marked as Exhibit 2 has a statement in it that the
13   last weight recorded is 236 pounds.  Do you see that?
14       A.  Yes, ma'am.
15       Q.  And you got that information from Exhibit 19,
16   didn't you, sir?
17       A.  Yes, ma'am.
18       Q.  And Exhibit 19 shows a weight of May 24, 2006,
19   correct?
20       A.  That's in the last line of my statement, and it
21   relates to the last observed weight which is on page 13
22   of Exhibit 19.
23       Q.  And so you -- you directly relied on Exhibit 19
24   for that statement in your report that the last weight
25   recorded on this patient was -- was 236 pounds on May

189

1    24, 2006, right?
2        A.  That's correct, for which I had data.  As I
3    recall, we --
4        Q.  Let me just ask you just to -- and the data you
5    had was what was in this chart that's been marked as
6    Exhibit 19, right?
7        A.  That's all I had, yes.
8        Q.  And you were given -- let's pull out your
9    report again here.  In Exhibit 2 on page 16, there's a
10   list of medical records you were given, right?
11       A.  Yes, ma'am.
12       Q.  And you didn't read all those medical records,
13   right?
14       A.  I said in an earlier statement I had not.  I
15   listed the ones which I had and -- there in the
16   introductory paragraph on my report on this lady.
17       Q.  And one of the -- one of the medical records
18   you were given that's on page 16 of 17 were the records
19   of Dr. Harold Boyd, right?
20       A.  Yes, ma'am.
21       Q.  And you didn't read those records, did you?
22       A.  I do not -- if I did not have them listed on my
23   report, then I did not read those records.  I listed all
24   the reports that I read.
25       Q.  And you say in Exhibit 2 in your report that

190

1    after she went off Seroquel, Ms. Whittington lost
2    8 pounds, right?
3        (Exhibit No. 20 marked.)
4        A.  Yes, ma'am.
5        Q.  (BY MS. THORPE)  And you wanted people to think
6    that she lost those 8 pounds because she went off
7    Seroquel, right?
8        A.  I stated it as a fact.  I don't have any
9    ulterior motive to that statement.
10       Q.  Well, why is it relevant to her -- why is it
11   relevant to your report?
12       A.  Well, we had been discussing some atypical
13   antipsychotic side effects of which were weight gain.  I
14   had done a review of atypical antipsychotics and pointed
15   out there were at least two whose -- do not have side
16   effects of weight gain.  And since learning about those
17   as an endocrinologist talking to psychologists,
18   psychiatrists, really, I am inclined to encourage them
19   where possible to make use of atypical antipsychotics
20   that have less side effects.
21       So it's part of what I teach general
22   physicians and general psychiatrists when I speak to
23   them.
24       Q.  All right.  You mentioned that -- so -- strike
25   that.

191

1        In Exhibit 2 when you say that there is a
2    loss of 8 pounds, are you or are you not trying to tell
3    the reader of your report that that loss of 8 pounds
4    after Ms. Whittington stopped taking Seroquel is an
5    indication that Seroquel caused her weight gain while
6    she was on it?
7        A.  My best belief is that when she comes off a
8    atypical antipsychotic which causes weight gain, I would
9    expect her to lose weight.  If there was clinical data
10   to support that, I would point that out.  I would have a
11   similar content -- comment if she was switched from one
12   of the atypicals that caused weight gain to the two that
13   do not, which are Abilify and Geodon.  And if this lady
14   had been switched to Abilify and Geodon and lost weight,
15   I would say to the physicians, "Look, she went to
16   product X and her weight came down."
17       Q.  All right.
18       A.  And that's --
19       Q.  And so you're saying that the fact that her
20   weight came down after she came off Seroquel was a
21   factor that -- that tends to make it more likely than
22   not that Seroquel was causing her weight gain.  That's
23   what you're saying?
24       A.  Yes, ma'am.
25       Q.  All right.

192

1     A. I'm just —
2     Q. Now, you agree with — you said you know
3  Dr. Wirshing, right?
4     A. No, ma'am. I have read his deposition in the
5  Zyprexa case.
6     Q. Oh, okay.
7     A. I have not yet read his deposition in this
8  case, but I — I was — I thought it was a very good
9  deposition in the Zyprexa case.
10    Q. Okay. I think he's an expert on
11  antipsychotics.
12    A. Oh, I — yes, ma'am, I think we'd agreed to
13  that earlier.
14    Q. Okay. Now, would you — I want to read you
15  what Dr. Wirshing said and see if you agree or disagree
16  with this. "For any of these drugs and including
17  Seroquel, is there any evidence if the patient stops
18  taking the drug they will continue to gain weight?"
19  Okay, that was the question.
20         And Dr. Wirshing asked, "As a consequence
21  of having consumed the drug?"
22         And the next — and the question was
23  "Exactly."
24         And the answer was "No?"
25         "And if they do you'd have to look at

193

1  other — lifestyle, diet, all the other things one would
2  look at in you or I to figure out why they might be
3  gaining weight?"
4         And Dr. Wirshing replied, "Absolutely.
5  It's difficult to lose weight, but continuing to gain
6  weight in the absence of your suspected cause of the
7  weight gain, really, I think has great doubts on whether
8  or not that was the cause."
9         Do you agree with that statement?
10    A. I think that's a perfectly reasonable
11  statement.
12    Q. So if you continue to gain weight after you
13  stopped taking Seroquel, it really casts doubt on
14  whether Seroquel is the cause of the weight gain?
15    A. Ma'am, we're talking about one specific
16  patient. If we also then look at the literature and
17  look at the —
18    Q. First, tell me if you —
19         MR. BRUDNER: You're interrupting him.
20         MS. THORPE: I'm sorry. There can only be one
21  person objecting —
22         MR. PIRTLE: You are interrupting.
23         MS. THORPE: If you want to object — or
24  whoever's in charge can object, but I'm not going to
25  have two people objecting while I'm taking the

194

1  deposition.
2         MR. PIRTLE: All right. You're
3  interrupting. Let him finish.
4     Q. (BY MS. THORPE) Finish your answer. But
5  you're not answering my question.
6     A. I believe we agreed we weren't going to
7  interrupt one another. But what I was saying was if the
8  literature is — associates a number of — and remember,
9  I'm not a psychiatrist, so I would — I would be
10  comfortable to have Dr. Wirshing's input to this.
11         But if there's — literature suggests there
12  is weight gain associated with a group of antipsychotics
13  and not with others and the patient was either
14  terminated on those or switched to another, I would
15  expect to observe weight loss. If weight loss was
16  present as it was in this case, it would be tempting to
17  ascribe more likely than not to the patient coming off
18  that appetite stimulant and losing weight as being the
19  reason why they lost weight.
20         We have a similar analogy when patients are
21  given Prednisone and other medications like that. When
22  you stop the Prednisone, they start to lose weight.
23    Q. Dr. Tulloch, this is my question. It requires
24  a yes or no answer. And if you'll give me a yes or no
25  answer, then you may explain. Okay?

195

1     A. Okay.
2     Q. Do you agree that continuing to gain weight
3  after stopping Seroquel casts great doubts on whether or
4  not Seroquel caused weight gain to begin with?
5         MR. PIRTLE: Objection, form.
6     A. No, ma'am, I would not agree with that. What I
7  would have to say was — do you want me to condition
8  that as to why?
9         MR. PIRTLE: You can finish.
10    Q. (BY MS. THORPE) Go ahead.
11    A. We agreed there were a number of causes of
12  weight gain and one of them would be an atypical
13  antipsychotic. If somebody continued to gain weight
14  when the atypical antipsychotic was stopped, then it is
15  quite possible the atypical antipsychotic was not the
16  sole cause and that there were other causes. But — but
17  the data in favor of atypical antipsychotics causing
18  weight gain of the group that we referred to is fairly
19  strong.
20    Q. I'm going to show you what's been marked as
21  Exhibit 20 to this deposition and ask you if —
22         MR. PIRTLE: Do you have a copy?
23         MS. THORPE: I don't have an extra copy of
24  that one. You can look on.
25    Q. (BY MS. THORPE) Can you tell me what weight

196

1 Ms. Whittington had on March 24, 2008?
2    A. I -- if this is later than I had in my time
3 line -- I think we've looked at this one before, and I'm
4 already on record as giving you that date -- that
5 weight, rather, and we had to find it under the
6 physicals -- it's on the second page, page 2 of 3, and
7 the weight is 255 pounds.
8    Q. So the highest weight that Ms. Whittington had
9 in her life that we know of occurred after she went off
10 Seroquel, correct?
11    A. Yes, ma'am.
12    Q. Dr. Tulloch, in May of 2008, two and half years
13 after Ms. Whittington stopped -- well, strike that.
14 Strike that.
15    Are you -- have you read any medical
16 records that go past December 4, 2007, as reflected in
17 the time line by --
18    A. No, ma'am.
19    Q. -- that's marked as Exhibit 19?
20    A. No. I think we agreed on that before, that I
21 had not seen Exhibit 20. We talked about this earlier
22 on.
23    Q. Okay. So you -- you're -- your medical review
24 ends on December 4, 2007?
25    A. That's correct.

197

1    Q. All right. Now, what -- what I want to know,
2 if you'd look in Exhibit 2 of this -- on page 16,
3 your -- the list of medical records you were given.
4    A. Yes.
5    Q. I want you to look down the list on Exhibit 2
6 and tell me which of the ones that you actually read.
7 It's harder to figure out than you might think when I
8 look at your report and when I look at this list.
9    A. Okay.
10    Q. So I need to know exactly what you read.
11    A. To the best of my knowledge, when I was
12 preparing this report, I listed the data which I looked
13 at, and they are listed on Exhibit 2 under the heading
14 Opinions Related to Ms. Linda Whittington, and it
15 includes Mental Health Association Jacksonville,
16 Jacksonville Heart Center, Baptist Hospital --
17    Q. Can we just stop for a minute?
18    If you look at page 16 on your report of
19 the reliance -- of the long list of medical records --
20    A. Yes, ma'am.
21    Q. -- I don't see Mental Health Association
22 Jacksonville.
23    A. Okay.
24    Q. I've tried to do this exercise. That's why I'm
25 asking you.

198

1    A. Okay. I will need to go back to the disks when
2 I was preparing the report. I took the titles off the
3 disks which you were provided with. If it doesn't
4 match, I apologize for that. They may be in there under
5 a slightly different heading. For example, this one
6 we've just looked at, Exhibit 20, were I to list that, I
7 would list it as Baptist Primary Care, but others might
8 list it as chart of Dr. Harold Dale Boyd who's the
9 signatory on page 3. So there may be some descriptive
10 differences there.
11    Q. I'll tell you what, I'd like you to take a pen
12 and just circle the ones on page 16 that you've actually
13 reviewed. If you want to use my copy to look at, it
14 might make it easier. You can turn -- you'll have --
15    A. Okay. What I found were the Baptist
16 Hospital's, which are listed up high; the imaging
17 center, Jacksonville Heart Center, North Florida OB/GYN.
18 I'm looking for Dr. M. Saleh, Jacksonville, and
19 Dr. Charles Haddad, Jacksonville Family Health Center
20 and those I do not find on the listing of page 16. But
21 I -- I put them there because I read them off -- off the
22 titles of what -- when I was preparing the -- the
23 report.
24    And what we agreed was -- not on the list
25 were Dr. Harold and Dale Boyd because those were

199

1 subsequent to the time line which I was working from and
2 the chart which I was relating to that time line.
3    Q. So when you say they're not on the list, you
4 mean on your -- your list about doctor -- about
5 Ms. Whittington, you're not referring to page 16 of your
6 report, correct?
7    A. Yes, I'm referring to the group that I reviewed
8 when I put the report together, which is on the first
9 paragraph under opinions relating to Ms. Whittington.
10    Q. Okay. So you have now circled on -- I hope you
11 did it.
12    A. On your --
13    Q. If you would, please, just put them on the
14 exhibit.
15    A. I have ticked them and they are there.
16    Q. This isn't the exhibit. You have the exhibit
17 in front of you. Flip the -- this is Exhibit 2, Doctor.
18 And we have to do it on the copy that we're attaching to
19 the deposition.
20    A. Ah, okay.
21    Q. So I just want you to be very quick, just
22 mark --
23    A. Mark it on this --
24    Q. Yes.
25    A. -- second copy? Okay. No problem.

**200**

1        Okay.  I have listed six which relate to —
2  to the numbers, and I have put them on a copy exhibit
3  which I'm returning to you, and I have the original
4  here.
5        Q. All right.
6        A. To the best of my knowledge, they are —
7        Q. Thank you.
8        A. — identical in marking.
9        Q. So on Exhibit No. 2 you have identified the
10  medical records that you have reviewed on the list
11  that's — that's page 16 of your report, right?
12        A. That's correct, at the time I made the report,
13  yes, ma'am.
14        Q. Now, looking back at Exhibit 20, which is
15  the — let me ask you this, Doctor.
16        Did you — did you actually read those
17  medical records that you've checked on Exhibit 2?
18        A. Yes, ma'am, I read them on disk and I — when I
19  was making the list, I hand copied the titles — I gave
20  them an example of how there might have been a
21  discrepancy because of the title and the signature at
22  the bottom.  But the data which I put in the report
23  related to those listed on that paragraph.
24        Q. I need the time line is what I'm looking for.
25  You've got it in front of you.  Thanks.  No, this is

**201**

1  fine.
2        So on Exhibit 19 you did not have any
3  glucose levels that you looked at before you formed your
4  opinion regarding Ms. Whittington that predate her use
5  of Seroquel, right?
6        A. What I had said was I had no data listed before
7  the reference number 5 on Exhibit 18 which is March the
8  8th of '99.
9        Q. Okay.  So — so you didn't have any glucose
10  levels that predated 1999 —
11        A. That's correct.
12        Q. — on Ms. Whittington, right?
13        A. That's correct.
14        Q. And you didn't have any weights that predated
15  1999 on Ms. Whittington, right?
16        A. That's correct.
17        Q. And for the hard numbers, labs, weights, any
18  kind of numerical data, you relied on — on what we're
19  calling the time line that's been marked as Exhibit —
20        A. Nineteen.
21        Q. — 19, right?
22        A. Ma'am, I — I — at the time I looked at the
23  disks, you will find they also had summaries like this.
24  But, yeah, to — when — when I was comparing weights to
25  sugars to dates, the best relationship to those were on

**202**

1  Exhibit 19.
2        Q. All right.  But you relied on the numbers that
3  somebody from the — the plaintiffs' lawyer's office
4  wrote down in Exhibit 19?
5        A. That's correct.
6        Q. And so that would be true for the cholesterol
7  numbers, right?
8        A. That's correct.
9        Q. So you relied on what the plaintiffs' lawyers
10  said in Exhibit 19 about triglycerides, right?
11        A. In the summary — and when I was putting it
12  together — remember what I said, I also looked through
13  the disks which had these copies of — I'm holding up
14  examples of physicians' office charts and laboratory
15  values.
16        Q. But when you —
17        A. — when I was doing the report.  So I could say
18  on this date this was the weight, this was the lab.  I
19  worked from Exhibit 19.
20        Q. But you have listed on Exhibit 2, page 16, all
21  of the medical charts that you looked at, right?
22        A. That's correct.
23        Q. Okay.  Is —
24        MR. PIRTLE:  When you get to a stopping
25  point.

**203**

1        MS. THORPE:  Yeah, I'll be done with this
2  in just — as best I can in just a minute.
3        Q. (BY MS. THORPE)  Dr. Tulloch, on Exhibit 19, if
4  you'd look at the first page of it, there's a section
5  entitled Past Medical History, right?
6        A. Yes, ma'am.
7        Q. And it begins with tobacco abuse and
8  schizophrenia and esophageal reflux, so on.  Do you see
9  that?
10        A. Yes, ma'am.
11        Q. And you used that list in — in your writing of
12  your report, the third paragraph relating to
13  Ms. Whittington, right?
14        A. Yes, ma'am.
15        Q. In fact — and there's also a section entitled
16  Risk Factors for Diabetes Mellitus, right, on
17  Exhibit 19?
18        A. Yes.
19        Q. And it says, "Family history of diabetes,
20  hypertension, and elevated lipids."
21        Do you see that?
22        A. Yes, ma'am.
23        Q. And you have a virtually identical sentence in
24  your report that's been marked as Exhibit 2 where you
25  say, "There is a family history of diabetes mellitus,

204

1  hypertension, and hyperlipidemia," right?
2      A. That's correct.
3      Q. You basically took that sentence and plugged it
4  into your report?
5      A. Well, it summarized what I'd seen on the disks
6  which related to those references which I'd ticked on
7  page 16, yes, ma'am.
8      Q. And those were causes of diabetes that predated
9  her use of Seroquel as we discussed last time around,
10  right?
11      A. Yes, ma'am.
12      Q. It does not — you do not include in that list
13  her obesity that preexisted her diabetes, right?
14      A. Yes, ma'am, because I — I then talked about
15  the weight in a separate paragraph. But certainly for a
16  lady of this height, she was obese from fairly early on
17  in this report.
18      Q. After the February 2006 laboratory test that's
19  been marked as Exhibit 10, you would agree from your
20  review of the records that the blood sugars that were
21  tested using the A1c test on Ms. Whittington were all
22  normal?
23      A. Yes, ma'am.
24      Q. You would agree with that?
25      A. May I put a little explanation on that?

205

1      Q. Well, first, you would agree — first — yes,
2  you may. But first agree with me —
3      A. Yes.
4      Q. — that all the A1cs after February of 2006
5  were normal?
6      A. That's correct.
7      Q. Okay.
8      A. If we define normal as between 4 percent and 6
9  percent. And I put a little rider on that. The
10  problems with — hemoglobin A1c is an excellent cross
11  check, but there are — there are patients that have
12  abnormal hemoglobins. And so we train our medical
13  students that if a hemoglobin A1c doesn't fit the blood
14  sugar, the blood sugar's more likely to be correct.
15      I explain that because somebody from the
16  Mediterranean area who has thalassemia, that kind of
17  hemoglobin runs in a different pattern in the tests by
18  which one derives hemoglobin A1c, and so you can't get
19  meaningful data. And there are a number of patients out
20  there who have discordant hemoglobin A1cs when you look
21  at blood sugar. So in that setting the blood sugar is
22  the more important value.
23      Q. Would you agree that after — during the time
24  that Ms. Whittington was taking — strike that.
25      Would you agree that after February of 2006

206

1  Ms. Whittington's blood sugars were under control?
2      A. I think that's a reasonable statement, yes,
3  ma'am.
4      Q. You understand she was hospitalized many times
5  for her mental health, right?
6      A. Yes, ma'am.
7      Q. She's never been hospitalized for diabetes,
8  correct?
9      A. She's never had numbers that were sufficiently
10  discordant to make that necessary, yes, ma'am.
11      Q. So she's never been in the hospital for
12  diabetes?
13      A. Yes, ma'am.
14      Q. And she's taking oral glucose medications, not
15  insulin?
16      A. That's correct.
17      Q. And having not had — well, let's — let me ask
18  you this.
19      Ms. Whittington has had no complications
20  that you have seen from her diabetes?
21      A. I think that's a reasonable statement, yes,
22  ma'am.
23      Q. And you know nothing about her condition after
24  the last date of Exhibit 19, which is —
25      A. Can I help you? December the 7th.

207

1      Q. December —
2      A. December the 4th.
3      Q. 2007 —
4      A. Yes.
5      Q. — right?
6      A. That's correct.
7      Q. All right.
8      MS. THORPE: This would be a good time to
9  take a quick break.
10      (Short recess from 5:19 to 5:30.)
11      Q. (BY MS. THORPE) Dr. Tulloch, you would agree
12  with me that there is no scientific or medical evidence
13  that Seroquel exacerbated Ms. Whittington's diabetes
14  that she had back in the Nineties? Let me ask that a
15  better way. That's a long and too windy question.
16      You would agree with me that there is no
17  medical or scientific evidence that taking Seroquel
18  exacerbated Ms. Whittington's diabetes that you have
19  said you believe she had all the way back in the
20  Nineties?
21      A. Ma'am, I think we — we need to be careful
22  about facts. What I'm comfortable with agreeing with
23  you — and we need to agree on the best medical data
24  is — we have found a sugar which was high before the
25  earliest data that I had available to me in my report.

208

1    And if that was a fasting sugar, it is compatible with
2    a -- a diagnosis of type 2 diabetes. We have also noted
3    that she received two different atypical antipsychotics
4    during which time she gained a lot of weight. And I
5    have given the opinion, which I'm modestly able to stand
6    up to, that she gained that weight and that she probably
7    more likely than not had her blood sugar physiology made
8    adverse by that weight gain.
9         But I'm quite comfortable to admit that if
10   that fasting glucose about the mid-1990s was fasting, we
11   have a definition -- we have a time when she definitely
12   had what we would define as diabetes were we to find a
13   second one which antedated either of the atypical
14   antipsychotics. I'm -- I'm --
15        Q. So let me get this straight, Dr. Tulloch. Now
16   you're saying that for the 1990s you have to have two
17   tests confirming --
18        A. No, ma'am.
19        Q. -- her diabetes, correct?
20             MR. PIRTLE: Objection, argumentative.
21        Q. (BY MS. THORPE) Is that what you just said?
22             MR. PIRTLE: Argumentative.
23        A. No, ma'am.
24        Q. (BY MS. THORPE) So you don't think you have to
25   have two tests?

209

1         A. We have agreed that a definition of a fasting
2    sugar greater than 126 is maximum probability of
3    diabetes. A second number is useful if there would be
4    any doubt for any of the reasons we discussed earlier.
5    We have agreed that we found a sugar which antedated her
6    getting either of the atypical antipsychotics which was
7    compatible if fasting with type 2 diabetes, a single
8    number. And I have said that if she had that, she
9    probably had diabetes.
10        What I've also said was the content of my
11   report related to weight gain during her administration
12   of two atypicals. And I'm defending my report for
13   saying that weight gain probably contributed to the
14   abnormal blood sugar which we saw on the date which we
15   agreed.
16        You have taken my comments, which are very
17   reasonable given the position you're needing to take,
18   that she already had diabetes in the early 1990s. It
19   would depend on that sugar taken at 1:30 at midday being
20   fasting. And I don't wish to agree or disagree, I just
21   leave a question mark over the validity of a 1:30 p.m.
22   sugar as being fasting, and neither of us can do
23   anything more than speculate.
24        Q. All right. Let me go back to the original
25   question I started with.

210

1         A. Yes, ma'am.
2         Q. Is it your opinion that taking Seroquel
3    exacerbated preexisting diabetes in Ms. Whittington?
4         A. And what you heard me say was a clarification
5    of my position.
6         Q. I'm just --
7         A. Do you need me to redo that?
8         Q. No. I need to you say yes or no.
9         A. The answer is no, because I'm not certain about
10   the nature of that 1:30 p.m. blood sugar. If the
11   1:30 p.m. blood sugar was definitely fasting, then she
12   had preexisting diabetes.
13        What you put into my mouth and which I'm
14   not comfortable with leaving it without an explanation
15   is that she definitely had diabetes on a fasting sugar
16   taken at 1:30 midday. That's my problem.
17        Q. Now, tell me, Doctor: You said somewhere in
18   this answer that her weight gain had an impact on her
19   blood sugars, her weight gain while she was on two
20   antipsychotics have an impact on her blood sugars,
21   right?
22        A. I'm just quoting the literature and quoting
23   the --
24        Q. That's what you said, right?
25        A. Yes, yes, I did.

211

1         Q. All right. Now, I want you to point to me to
2    the blood sugar or blood sugars that you say her weight
3    gain had an impact on.
4         A. Well, what -- what we have discussed is a
5    weight gain which occurred and which we agreed and an
6    abnormal sugar which was defined as right at the
7    marginal level on February the 16th of 2006.
8         Q. What do you mean? So you're talking about
9    exhibit -- Exhibit 10, right?
10        A. Yes, ma'am.
11        Q. So Exhibit 10 is the only blood sugar that
12   you're contending that weight gain from two
13   antipsychotics, Zyprexa and Seroquel, had an impact
14   on --
15        A. To the --
16        Q. -- because of weight gain, right?
17        A. Yes, to the best of -- of the data -- my
18   interpretation of the data in front of us. This was
19   clearly a glucose tolerance test. And I think it is
20   reasonable to suppose that she was fasting on that day.
21   What I'm putting doubt on is a 1:30 p.m. sugar of 137
22   and wondering if it's really fasting.
23        Q. My question to you was: You made a statement
24   that two antipsychotics, Seroquel and Zyprexa, caused
25   her to gain weight and have an impact on her blood

15 (Pages 208 to 211)

212

1   sugar, right?
2       A. More likely than not, yes, ma'am.
3       Q. All right. And the only data that you're
4   relying on for that opinion in terms of the blood sugar
5   is Exhibit 10, correct?
6       A. Exhibit 10, yes, ma'am.
7       Q. And the only number on Exhibit 10 you're
8   relying on is the fasting glucose of 131, right?
9       A. That's correct.
10      Q. All right. Now -- so what you're saying
11  that her weight gain in -- I don't need you to hand me
12  that. Okay?
13          What you're saying is that her weight gain
14  that occurred after Zyprexa and after Seroquel led to
15  the 131. And my question to you is: What led to the
16  123 that she had in 1993?
17      A. The best weight I have for her in 1993 is not
18  in 1993. I'm -- may I offer you Exhibit 18, because we
19  don't have data. In Exhibit 18, which was data I did
20  not have -- do you want me to share it with you?
21      Q. No. You just go ahead and answer the question.
22      A. We have a weight from 1990, which is quite
23  modest for her height, and a BMI of 23.4, a weight of 11
24  of 1996, which is 194 by which time her BMI is in the
25  obese range.

213

1           So we don't know from '90 to '93 what she
2   weighed because we don't have the data, unless it's
3   present on a medical chart that relates to that blood
4   sugar.
5           What can I do to help you?
6       Q. I'm looking for the 123. It's disappeared.
7       MR. PIRTLE: What is it?
8       MS. THORPE: I'm looking for the exhibit
9   that has the 123, the 1993.
10      THE WITNESS: From 1993 a sugar of 123.
11      MS. THORPE: Look over on your side of the
12  table.
13      MR. PIRTLE: I don't have it.
14      A. It must be floating around here. Right in
15  front of you.
16      Q. (BY MS. THORPE) Oh, thank you.
17      A. In my house there lives a gremlin called
18  Murphy. Murphy is capable of many things.
19      Q. So -- so what you're saying, Dr. Tulloch, is
20  that -- is not that weight gain following Zyprexa and
21  Seroquel caused her to have diabetes, right? You're not
22  saying that?
23      A. What I'm saying is that she had abnormal blood
24  sugars on the 2nd of -- on February the 16th of 2006,
25  which was after she had had fairly significant weight

214

1   gain independent of what -- what the cause. We have
2   another sugar which was taken in the mid-Nineties of 123
3   and another one in the 130s a little bit later. And you
4   took my statements and asked me to agree with you that
5   she hadn't developed diabetes as a result of the
6   atypical antipsychotics. And I couldn't.
7       MS. THORPE: Move to strike --
8       A. I couldn't accept --
9       MS. THORPE: -- as nonresponsive.
10      A. -- I couldn't accept -- we agreed we weren't
11  going to speak over one another. I couldn't accept the
12  statement the way you'd taken it. I'm happy to have you
13  rephrase it in such a way that I can agree, but
14  otherwise I'm -- I'm waiting for the next question.
15      MS. THORPE: Can you read my question back,
16  please.
17      THE WITNESS: It will be several minutes
18  ago.
19      MS. THORPE: Yes, it will be.
20      (Requested portion was read as follows:
21      "QUESTION: So -- so what you're saying,
22  Dr. Tulloch, is that -- is not that weight gain
23  following Zyprexa and Seroquel caused her to have
24  diabetes, right? You're not saying that?")
25      THE WITNESS: There's an earlier one where

215

1   she said --
2       Q. (BY MS. THORPE) No, that's the question.
3       A. Okay. What I'm saying is that in a person with
4   diabetes in the family, any weight gain of 60 pounds is
5   more likely than not to contribute to abnormal blood
6   sugars. If the abnormal blood sugars are compatible
7   with the definition of diabetes, my belief is that
8   weight gain contributed to the arrival of diabetes. I
9   then took your question and --
10      MS. THORPE: Sir, I'm going to move to
11  strike --
12      A. If you want me to stop, I'll stop.
13      MS. THORPE: -- as nonresponsive.
14      MR. PIRTLE: You cut him off.
15      Q. (BY MS. THORPE) You agree --
16      MS. THORPE: Yes, I can get an answer to my
17  question --
18      MR. PIRTLE: No, you cannot cut him off.
19  And I will --
20      MS. THORPE: -- and then he can answer.
21      MR. PIRTLE: -- stop this deposition if you
22  cut him off.
23      MS. THORPE: You know, Tom, he can
24  answer --
25      MR. PIRTLE: I will stop this deposition --

16 (Pages 212 to 215)

216

1      THE REPORTER: One at a time, please.
2      MR. PIRTLE: -- if you cut him off.
3      MS. THORPE: I am not cutting him off. I'm
4  trying to --
5      MR. PIRTLE: I'm putting you on fair
6  notice.
7      MS. THORPE: I'm putting you on notice --
8      MR. PIRTLE: All right. Just keep --
9      MS. THORPE: -- that this is a waste of
10  time.
11      MR. PIRTLE: -- on doing it.
12      THE REPORTER: I can't take two people
13  talking at the same time. My hands are off the writer.
14      (Discussion off the record from 5:43 to
15  5:43.)
16      Q. (BY MS. THORPE) Dr. Tulloch, I want to know
17  whether it is your opinion in this case that
18  Ms. Whittington has diabetes more probably than not as a
19  result of the ingestion of Seroquel --
20      MR. PIRTLE: Objection, asked and answered.
21      Q. (BY MS. THORPE) -- or is it just a
22  possibility.
23      A. My -- and I'm trying to be scientific and go
24  with the best available data. My belief is that the
25  60-pound weight gain that she incurred prior to the

217

1  definition of diabetes, which was on the date that we
2  discussed, was a terminal contributing factor to her
3  development of diabetes, in other words, as I recalled
4  earlier, the last straw that broke the camel's back.
5      You had an earlier question which I was
6  referring to, you had another question which said did I
7  agree that she hadn't -- that she had diabetes in the
8  early Nineties, and that was relating to her blood sugar
9  of 137. I will let you ask that question again so that
10  we're both comfortable with my answer.
11      Q. I'll ask the questions I need to ask, sir --
12      A. Okay.
13      Q. -- okay? I don't need your direction.
14      A. Okay.
15      Q. And I want to ask you, then: Is it your
16  opinion as a scientist, sir, that the results that are
17  expressed in Exhibit 10, which is a fasting glucose of
18  123, and a result that's expressed as a 137 in
19  Exhibit 17 are different from a scientific standpoint
20  than the fasting -- a single fasting glucose that's been
21  marked as Exhibit 10?
22      A. Yes, ma'am. What I --
23      Q. So what's the difference?
24      A. What I had said and I'll say it again is -- may
25  I have exhibit -- the two exhibits so that we're

218

1  comfortable with them. Okay -- is Exhibit 17 was taken
2  at 1:30 p.m. and Exhibit 11 has a time 1430 p.m. on it,
3  which I would understand to be 2:30 p.m. So my concern
4  is that these two at midmorning and early afternoon
5  sugars may not be fasting. What I then said was --
6      Q. Can you identify them by exhibit numbers,
7  please?
8      A. We agreed we weren't going to speak over one
9  another.
10      Q. Can you identify them by exhibit numbers,
11  please --
12      A. Yes.
13      Q. -- so the record will be clear.
14      A. The exhibit -- fasting sugar of 123 was
15  Exhibit 11, blood sugar taken at 1430, which is 2:30 in
16  the afternoon. Exhibit 17, blood sugar of 137, a blood
17  sugar was taken at 1:30.
18      What I'm doing as a physician is
19  contrasting these two numbers which are above or very
20  near the defining level of diabetes as maybe not being
21  fasting. This one, as I said earlier, because it's a
22  glucose tolerance test and the requirements are for the
23  patient to be fasting -- this is Exhibit 10 -- in my
24  belief are the first definite fasting sugar. I offer
25  those as medical probabilities.

219

1      My interpretation, therefore, are based on
2  the Exhibit 10 with a fasting sugar of 131 during her
3  glucose tolerance test as definitely being fasting. The
4  earlier sugars taken midmorning and early afternoon I am
5  not sure are fasting, and so any conclusions you ask me
6  to draw from those numbers, Exhibit 11 and Exhibit 17, I
7  would hedge with maybe be -- not be fasting.
8      So when you then asked me to say she had
9  diabetes before the early 1990s, which is what I
10  understood from your question, I will have to say maybe
11  but I'm not sure because I'm not sure those two numbers
12  are fasting, ma'am. That's all I was trying to offer to
13  you.
14      Q. And so you're -- well, let me ask you.
15      Exhibit 12, which is the order for
16  Exhibit 11, says that it was ordered as a fasting
17  glucose, correct?
18      A. Yes, ma'am, we agreed on that.
19      Q. Yes, we did.
20      And you agree that it's more likely than
21  not that Exhibit 11 reflects a fasting glucose, right?
22      A. My only concern is the time of the day.
23      Q. Do you agree that it's more likely than not
24  that Exhibit 11 is a fasting glucose?
25      A. I -- you've heard me express concern. Any

17 (Pages 216 to 219)

220

1  number which is as late as 1:30 in one case and 2:30 in
2  another case I would wonder if they were fasting.
3      Q. And —
4      A. I leave my doubts on record and I wish them to
5  remain on record.
6      Q. And so what you're saying now is that you
7  personally don't know whether 11 — Exhibit 11 is a
8  fasting glucose even though the order was for a fasting
9  glucose —
10     A. That's correct.
11     Q. — as reflected in Exhibit 12, correct?
12     A. That's correct, ma'am.
13     Q. And so it would be pure speculation on your
14 part to conclude it was anything other — that
15 Exhibit 11 was anything other than a fasting glucose,
16 correct?
17     A. That any number taken at 1:30 in one case and
18 2:30 in the other case were fasting, yes, ma'am.
19     Q. Now, where on Exhibit 11 do you see that it was
20 taken at 2:30?  Will you look at the collection time and
21 tell us on Exhibit 11 what the collection time is?
22     A. Okay.  I'm looking at the top row on Exhibit 11
23 and I see a date and I see the number 1430 after that.
24     Q. Well, sir, let me —
25     A. I have interpreted that as the time, but I'm

221

1  happy to be corrected.
2      Q. Do you see that I'm pointing to the letters
3  COLL colon?
4      A. Correct.
5      Q. And it says 9:15, doesn't it?
6      A. Okay.  We have two dates — two times on this,
7  and one of them says 9:15 and the other one says 1430.
8  And I stand corrected.  The COLL we'll have to assume is
9  collected and, therefore, 9:15 is the probable date.  I
10 stand corrected and thank you, ma'am.
11     Q. And so you would agree that Exhibit 11 more
12 likely than not reflects a fasting glucose, correct?
13     A. Taken at 9:30 in the morning, yes, ma'am.
14     Q. All right.  So let me ask you my question
15 again.
16     A. Okay.
17     Q. When we have a fasting glucose of 123 and
18 another glucose taken several years later of 137 in a
19 patient who has gained in the neighborhood of 50 pounds
20 during that time frame, can you tell me whether or not
21 it is more likely than not that she had diabetes at —
22 in the 1990s?
23     A. We're hedging on the 137.  I certainly think
24 that it is possible she had impaired fasting glucose
25 because that's a sugar 123 taken at 9:15.  The main

222

1  problem is the date with the value of 137 which we
2  agreed was taken at 1:30 p.m. with the order for it to
3  be taken fasting, and I'm just not certain about a
4  1:30 p.m. fasting.
5      Q. And so —
6      A. However, if it were fasting, there's no doubt
7  the lady had diabetes by our definition.
8      Q. So how do you rule out that she had diabetes in
9  the 1990s?
10     A. We don't have the data to rule that out.  As I
11 mentioned, sugars are rare in the charts of the
12 psychiatrists.  If the blood sugar of 137 was validated
13 by other numbers, she might well have had diabetes
14 before she got the first of the atypical antipsychotics.
15     Q. You — you mean if it was confirmed by other
16 tests?
17     A. Yeah.
18     Q. If there was a second test, right?
19     A. (Witness nods.)
20     Q. Is that right?
21     A. Yes, ma'am.
22     Q. And so how do you rule out that she got the 131
23 in 2006 — the 131 fasting glucose in 2006 simply
24 because this was a person who already had impaired
25 glucose tolerance, probably already had diabetes before

223

1  she ever had that test in February '06?  How do you rule
2  that out?
3      A. No, I think we are in agreement, ma'am.  My —
4  my — the content of my report was that she had gained
5  60 pounds in weight and whatever her sugar status had
6  been before I would expect the sugars to be higher
7  because of the weight gain.
8      Q. How do you rule out, Dr. Tulloch, that this
9  woman was in a state of either preexisting before
10 Seroquel, before Zyprexa, impaired glucose tolerance or
11 diabetes before she ever took those drugs?  How do you
12 rule that out?
13     A. Ma'am, I — I agree.  I believe she did at best
14 have impaired glucose tolerance.
15     Q. And at worse she had diabetes?
16     A. At worse if the higher number is correct, she
17 might have had diabetes, that's correct.
18     Q. And you cannot rule out that she had those
19 conditions before she ever took Seroquel; isn't that
20 right?
21     A. We are in agreement, ma'am, yes.
22     Q. All right.  So let's talk about Mr. Unger.
23         Oh, I've got to go back to Ms. Whittington.
24 And let me just say I've got to read carefully
25 Ms. Whittington's — this time line that you're relying

18 (Pages 220 to 223)

224

1    on -- on Ms. Whittington.  And I may have additional
2    questions about Ms. Whittington because --
3         MR. PIRTLE:  Well, I don't see any problem
4    during the course of what you're doing if you feel like
5    you need to go back and ask some more about that.  I
6    have now in hard copy form provided to your colleague
7    what I believe to be the outlines that the doctor looked
8    at for each of the four individuals.
9         MS. THORPE:  Thank you.
10        MR. KRASINSKI:  Is this -- the disk, is
11   this on the disk, also?
12        MR. PIRTLE:  I believe it is on disk, too.
13        (Short recess from 5:54 to 6:05.)
14        (Exhibit No. 21 marked.)
15   Q.  (BY MS. THORPE)  All right.  Dr. Tulloch, we're
16   going to talk about Richard Unger.  Okay?
17   A.  Okay.
18   Q.  I'm going to show you what's been marked as
19   Exhibit 21 for identification.  And that's your report
20   in the Unger case, right?
21   A.  Yes, correct.
22        (Exhibit No. 22 marked.)
23   Q.  (BY MS. THORPE)  And I'm going to show you
24   what's been marked as Exhibit 22 for identification and
25   ask you if that is your time line on Mr. Unger.

225

1    A.  That's correct.
2    Q.  Now, you prepared this report on Mr. Unger
3    yourself?
4    A.  Yes, ma'am.
5    Q.  Do you have any additions or changes you want
6    to make to this report?
7    A.  Not at this time.
8    Q.  This report that's been marked as Exhibit 21
9    fairly and fully reflects your opinions?
10   A.  As of this time, yes, ma'am.
11   Q.  And you -- it contains an accurate and careful
12   summary of the medical and scientific facts in your
13   opinion?
14   A.  Yes, ma'am.
15   Q.  You have not reviewed all of Mr. Unger's
16   medical records, correct?
17   A.  That's correct.
18   Q.  How did you decide what to read and not to read
19   of his medical records?
20   A.  I read the records which are listed on page 10
21   of Exhibit 21 and those I considered to be the most
22   clinically absorbing ones.
23   Q.  What does that mean?
24   A.  Related to his -- to his clinical care and
25   yielding of the best data on blood sugar, blood lipids,

226

1    blood pressure, et cetera.
2    Q.  Can you turn to page 16 of the list of medical
3    records that were provided to you -- strike that.
4         Look at in exhibit -- look in exhibit --
5    A.  Ma'am, I have Exhibit 21, page 16, if that
6    helps you.
7    Q.  Okay.  And is that a list on page 16 of all
8    medical records that were provided to you with regard to
9    Mr. Unger?
10   A.  That's correct.
11   Q.  Can you go through page 16 and put a check with
12   a pen by those records that you reviewed.
13   A.  Yes, ma'am.  What I'll be doing is transferring
14   the list from page 10 and collating them with the list
15   on page 16.
16        Okay.  I have a listing for Memorial
17   Hospital Pembroke Pines on page 10 which I do not see on
18   page 16.  I have a listing for Medicaid which I do not
19   see on page 16.  I have a listing for Norman A. Bloom,
20   Dr. Norman A. Bloom, which I do not see on page 16.
21        I have a list of -- listing for Dr. Ares
22   Romero on page 10.  And on page 16 there's a listing for
23   Dr. Patricia Romero.  I'd point out the differences.  I
24   have a listing for Dr. Marie Williams on 10 which I do
25   not see on page 16.

227

1         Okay.  I have 12 ticks on page 16 which are
2    my best matching of page 10.
3    Q.  If you -- Dr. Tulloch, let's put the exhibit
4    back together so that we don't get confused later.  Have
5    you got the clip there?
6    A.  Yeah, I have a clip here which I'll put on it.
7    Q.  Now, by not reading all of Mr. Unger's records,
8    you are likely not going to be aware of all of his
9    charted weights; isn't that correct?
10   A.  That's a reasonable possibility, ma'am, yes.
11   Q.  By not reading all of his records, you may have
12   missed some of his blood sugar readings?
13   A.  I accept that, ma'am, yes.
14   Q.  By not reading all of his records, you may have
15   missed some of his glucose readings before he took
16   Seroquel, correct?
17   A.  That is correct.
18   Q.  By not reading all of his records, you may have
19   missed laboratory results that reflect high cholesterol
20   or high triglycerides, including such labs before he
21   took Seroquel?
22   A.  That is correct.
23   Q.  And by not reading all of his medical records,
24   you may have missed some alternative explanations for
25   his weight gain?

228

1    A. Each of those are reasonable comments.
2    Q. By not reading all of his medical records, you
3 may have missed some other causes of diabetes that you
4 did not -- that you just didn't know about, right?
5    A. They would be -- if there were any, they would
6 be other items on the saddle of the camel, yes, ma'am.
7    Q. Okay. Are you -- in your -- this analogy you
8 keep using, Mr. Unger is the camel?
9    A. No. There's a -- there's an analogy which
10 refers to the final straw that broke the camel's back.
11 So when a disaster happens, you generally find a stack
12 of issues and then the last thing that happens is the
13 final straw that breaks the camel's back.
14    Q. And you're saying --
15    A. So I use that analogy because most of these
16 patients have multiple risks for their diabetes. And I
17 would not wish the Court to have me ascribe any single
18 cause to their diabetes. Some can be more important
19 than others. And if the temporal relationship is close
20 to the time when the blood sugar became abnormal,
21 clearly more likely than not they were more important,
22 and that's there -- there's the analogy for the final
23 straw.
24    Q. How -- if I understood you correctly, you
25 described the records that you chose to read as being

229

1 those that you believe bear on his endocrine --
2 endocrinological condition; is that correct?
3    A. Yes, ma'am, to the best of my interpretation at
4 the time. I had a large number of records and a limited
5 amount of time and I tried to be cost effective with my
6 time.
7    Q. And how did you know that the records that you
8 chose to read contained all of the information about his
9 endocrinology -- his endocrinological condition?
10    A. I looked at the -- usually this comes in
11 history of present information, so you'll see the -- in
12 any arriving clinical set of data one sees what -- in
13 the first three or four lines, there's usually a summary
14 of the reason for that patient's arrival.
15    Q. Well, did you use the time line that's been
16 marked as Exhibit 22 or exhibit -- what did we mark the
17 time line as? Here it is, Exhibit 22. Did you use
18 Exhibit 22, Dr. Tulloch, to help you decide what medical
19 records you should look at?
20    A. I actually looked at the medical records before
21 I looked at the time line. What I -- as I said in the
22 previous patient, the advantage of the time line is it
23 has a direct association between the -- the date, the
24 time, the laboratory tests, and the medications that the
25 patient was receiving. It doesn't tell me a lot about

230

1 the patient at the time. So I skimmed through the
2 reason why he was going to see the physicians at the
3 different times and then I got down to when I had to put
4 it all back together again to make the report. That's
5 when the time line became useful, because it -- it
6 related the temporal relationship between the
7 biochemical abnormalities and the body weight.
8    Q. For none of the plaintiffs whose records you
9 looked at did you attempt to collect yourself the
10 weights of these patients or their glucoses or other
11 laboratory data, correct?
12    A. On my own, no, ma'am.
13    Q. You just completely relied on the time lines,
14 this one in the case of Mr. Unger, Exhibit 22, right?
15    A. Exhibit 22, yes, ma'am.
16    Q. Okay. Now, Dr. Tulloch, on -- in Exhibit 21,
17 your report, we've referred several times to this long
18 spreadsheet of medical records and scientific literature
19 and various documents that is numbered pages 1 through,
20 I think, 17. Can you turn back to that spreadsheet?
21    A. Oh, okay. I have it, entitled Reference
22 Exhibit List, yes, ma'am.
23    Q. Okay. Did you prepare the reference exhibit
24 list?
25    A. No, ma'am. This was done for me by the

231

1 plaintiffs' attorneys' department.
2    Q. Did you collect the materials that are on the
3 references in that list and then give them to the
4 lawyers?
5    A. I had many of them myself, and others I used in
6 the preparation of these patients, yes, ma'am.
7    Q. Okay. So you collected -- it's your testimony
8 today that you collected the materials that are listed
9 on Exhibits 1 through 17 yourself?
10    A. No, ma'am.
11    Q. Okay.
12    A. Most of the ones relating to the patient and to
13 the science were collected by me or obtained by me. I
14 ran a Index Medicus thing, the computer study. Others
15 were provided to me by the plaintiffs' attorney, and
16 some of them were patient -- were references which came
17 over from the Zyprexa issue.
18    Remember the Zyprexa case had a number of
19 references in which Zyprexa was not the only medication
20 that the patients were given.
21    Q. Well, let me -- let me just sort of cut to the
22 chase here. This identical list appears on the reports
23 of Drs. Perry, Young, Nair, Abramson, Marks, and
24 Kendrick as well as your report.
25    A. Okay. I don't know any of those people. Who

20 (Pages 228 to 231)

232

1   are they, ma'am?
2        Q. They're experts testifying in this case.
3        A. Oh, okay.
4        Q. And so my question to you is:  Did you collect,
5   you know, based on your review -- your Index Medicus
6   review and other efforts these materials and then hand
7   them over to someone at the plaintiffs' firm and then
8   they typed up the reference exhibit list or did they
9   hand you materials that they typed up and put in this
10  reference exhibit list?  What's the genesis of this
11  list?
12       A. The -- a large number of these patient -- of
13  these references antedate the Seroquel literature.  What
14  I said earlier was I did some work with Zyprexa, so --
15  and those ones were references which I gained together.
16  The scientific references which I was interested in I
17  got from a computer-based search.  I looked through
18  Seroquel and side effects and I got some references.
19  Those headlines I got and I gave to the plaintiffs'
20  attorney and I said, "Please get me copies of these
21  references."  So the science was generated by me and the
22  hard copy which you're holding today was provided by the
23  plaintiffs' attorneys' offices.
24       That they be common references for other
25  physicians, I don't know, but if that's cost effective

233

1   for an office to have one batch of references, I can
2   understand why they would.
3        Q. So -- so you did -- so what happened was you
4   did a literature search, you got the cites, and you gave
5   them to the plaintiffs?
6        A. Yes, ma'am.
7        Q. And all of the cites that you found on Index
8   Medicus that you thought were supportive of your opinion
9   you put in -- you gave to them and they put in this
10  reference list that's pages 1 through 17 --
11       A. One through 17, yes, ma'am.
12       Q. -- is that right?
13       A. (Witness nods.)
14       Q. Now -- hang on one second.
15       There are a total of 32 scientific articles
16  that appear on this reference list.  Do you generally
17  agree with that number?
18       A. I didn't count them.  I'll accept your word for
19  it.
20       Q. Does that accord with what you remember from
21  your Index Medicus search?
22       A. I think to ask me how many -- because we're
23  talking over a period of a year.  Issues have come up
24  that were relevant to Seroquel which were present in the
25  early years and I dug them up.  For example, I remember

234

1   specifically pancreatitis.  All of the cases of
2   pancreatitis that I've been aware of have been related
3   to another product.  So I then ran the issue over
4   pancreatitis and Seroquel and bingo, out came several
5   related to Seroquel.  So these were ones which I had
6   added in because they clearly were relevant for this
7   particular product.
8        Q. And you have said in your report that Seroquel
9   causes pancreatitis, haven't you?
10       A. Yes, ma'am.  I said that having found the
11  references.
12       Q. All right.
13       A. Yes.
14       Q. And the references you found are an article by
15  Gropper, and that reports on three cases -- three case
16  reports; is that right?
17       A. The name -- your memory for names is better
18  than mine.  As I recall --
19       Q. Well, why don't you just tell me --
20       A. -- there were -- two groups of cases were both
21  from Canada.  If you'd like to look them up -- they were
22  both from Canada.  They were temporally, not directly
23  related.
24       Q. What do you mean they were temporally, not
25  directly related?

235

1        A. Well, they weren't -- they weren't exactly the
2   same time, which meant I felt they were probably not the
3   same case.
4            (Exhibit Nos. 23 and 24 marked.)
5        Q. (BY MS. THORPE)  Okay.  Doctor, I'm going to
6   show you what's been marked as 24 and 25 -- I've already
7   marked that one -- gosh, let me start that over.
8            Doctor, I'm going to show you what's been
9   marked as 23 and 24 for identification.  And I want to
10  ask you if those are the two articles or two documents
11  that you've identified as being supporting your opinion
12  that Seroquel causes pancreatitis.
13       A. Yes, ma'am.  Let me start by saying -- it's a
14  little misleading because the first page on page 23
15  relates to muscle damage from Seroquel.  The
16  pancreatitis starts at the bottom right-hand side and
17  goes on to the other -- to the next pages, yes.
18       Q. And is this all of the scientific literature
19  that you have identified in your search supporting your
20  opinion that Seroquel causes pancreatitis?
21       A. It is what came up at the time that I ran the
22  literature search about four months ago, yes, ma'am.
23       Q. And Exhibits 23 and 24 reflect the totality of
24  the scientific literature upon which you rely for your
25  opinion that Seroquel causes pancreatitis?

236

1     A. As of this time, yes.
2     Q. And you will agree with me that Exhibit 23 is a
3  case series involving three cases, correct?
4     A. That's correct.
5     Q. And you will agree with me that Exhibit 24 is
6  a — is similarly a case series, correct?
7     A. Yes, ma'am, I see 11 reported cases in that —
8  in that reference.
9     Q. And you will agree with me that there is —
10 that pancreatitis occurs in people who don't take
11 Seroquel, correct?
12    A. Oh, yes.
13    Q. There's a — this is a chronic disease that
14 occurs in the population, generally?
15    A. No, ma'am. I think if we need a brief treatise
16 on pancreatitis, let me be brief. But there is —
17 chronic pancreatitis which you're referring to is
18 usually considered a slightly different condition. It's
19 often associated with alcohol, sometimes it's associated
20 with autoimmune conditions. Acute pancreatitis is
21 something which has been reported after some
22 medications, and sometimes it's seen after presence of
23 gallstones causing bile to go up the pancreatic duct.
24    Q. So your — your opinion is that Seroquel causes
25 acute pancreatitis?

237

1     A. I — that's — as I read these cases here, yes,
2  ma'am.
3     Q. In 23 and 24?
4     A. Yes, ma'am, in references 23 and 24.
5     Q. These case reports?
6     A. Yes, ma'am.
7     Q. Okay. And you will agree with me that acute
8  pancreatitis occurs in people who don't take Seroquel,
9  right?
10    A. I said that it can happen with gallstones, yes,
11 ma'am.
12    Q. And so in order to determine whether or not
13 Seroquel causes pancreatitis, you would agree with me
14 that you would have to have a study that has a control
15 group that controls for the fact that pancreatitis
16 occurs in people who don't take Seroquel?
17    A. Ma'am, I think — I think we're getting a
18 little bit confused here.
19    Q. If you can tell me whether you agree or
20 disagree with that statement, you can just say yes or
21 no. If you don't agree, that's fine.
22    A. When an adverse effect comes out, one cannot
23 produce a case control study for every adverse effect.
24 Let me go to one that I spent quite a lot of time on,
25 which is Rezulin and toxic hepatitis.

238

1     Q. Let me just make my record here —
2     A. Okay.
3     Q. — and then you can finish, Dr. Tulloch.
4     A. Okay.
5        MS. THORPE: I move to strike your answer
6  as nonresponsive because that's not at all what I asked
7  you.
8     A. Okay. Well, let me answer your question, then.
9  Your question was for my statement to be correct, there
10 would have to be a case control study. And my answer is
11 no. And I gave you an example which you have refused,
12 and I accept your refusal.
13    Q. Dr. Tulloch, do you agree that in order to
14 establish whether or not Seroquel causes pancreatitis,
15 you need to have a control study, either a cohort study
16 or a case control study or some other study, that has a
17 control group that accounts for the fact that acute
18 pancreatitis occurs in people who aren't taking
19 Seroquel?
20       MR. PIRTLE: Objection, asked and answered.
21    A. Ma'am —
22       THE WITNESS: Do you want me to answer?
23       MR. PIRTLE: Yes, go ahead and answer.
24    A. What I have to start with by saying is in
25 medical field there are isolated aberrant case responses

239

1  which are reported in the literature. Some of them are
2  so rare that we have to accept them as unique to the
3  combination of that particular patient and that
4  particular medication.
5        And I now bring back, if I may, the Rezulin
6  example. Toxin hepatic necrosis occurs in 1 patient in
7  80,000. It would not be possible to get enough numbers
8  for a case control study to prove that Rezulin caused
9  hepatitis of that magnitude without accepting case
10 studies.
11    Q. (BY MS. THORPE) Let me ask you —
12    A. Many other causes of acute hepatitis occur.
13 This one was nailed to Rezulin and stuck.
14    Q. And — well, let me ask you, Doctor: What is
15 the prevalence of acute pancreatitis?
16    A. Without looking it up, I couldn't give you the
17 answer. It's a relatively rare condition as seen by me
18 in the emergency room. However, globally in the country
19 there's probably a case occurring once or twice a week
20 if not more frequently. So —
21    Q. Do you have any data at all on the prevalence
22 of pancreatitis?
23    A. Haven't looked it up because —
24    Q. You have no idea?
25    A. — all I needed was association between it and

240

1  another atypical antipsychotic. And time will educate
2  us. As we get more experienced with these cases of --
3  with these medications, we'll know better.
4      Q. You agree that there is an association reported
5  in two case series that have been marked as 23 and 24,
6  correct?
7      A. We are in agreement with that.
8      Q. And you understand that an association reported
9  in a case series is not the same thing as causation?
10     A. Absolutely.
11     Q. Looking at Exhibit 23 -- well, strike that.
12         Nevertheless, in spite of knowing that an
13  association is not causation, you were willing to write
14  in your report that's been marked as Exhibit 22 --
15  exhibit?
16     A. Twenty-one.
17     Q. Strike that.
18         In spite of knowing that an association is
19  not the same thing as causation and that an association
20  in a case series is not the same thing as causation, you
21  were willing to write in your report that's been marked
22  as Exhibit 21 that Seroquel is a cause of pancreatitis,
23  correct?
24         MR. PIRTLE: Objection, form.
25     A. To the best available data as I interpret it,

241

1  yes, ma'am.
2      Q. (BY MS. THORPE) And you are aware, are you
3  not, that no one in the world's literature on Seroquel
4  has said that Seroquel causes pancreatitis?
5      A. Ma'am, may I ask you to go back to my report on
6  page 9?
7      Q. Yes.
8      A. Okay. The wording which I used, which I quote,
9  "Moreover, administration of Seroquel has been shown to
10  be associated with the development of acute and fatal
11  pancreatitis." Those were my words.
12     Q. I'm going to direct your attention to the first
13  paragraph on page 9 under the atypical antipsychotics
14  and diabetes.
15     A. Okay.
16     Q. If you look at the sentence that is the -- the
17  third sentence of that paragraph, do you see the
18  sentence that says, "After reviewing the medical
19  literature, I am of the opinion that Seroquel can cause
20  weight gain, dyslipidemia, diabetes, and pancreatitis."
21     A. Okay.
22     Q. Do you see that sentence?
23     A. Yes, ma'am.
24     Q. Is that misstated?
25     A. Well, I guess it's -- it's misinterpreted,

242

1  then, because I then went back to the next sentence --
2  or two sentences down and clarified the association of
3  acute and fatal pancreatitis.
4      Q. So --
5      A. So I guess the earlier statement could be --
6  could be interpreted as being clarified by the
7  pancreatitis sentence.
8      Q. Well, let's just get it clear on the record
9  here in this deposition.
10     A. Okay.
11     Q. It is your opinion that Seroquel is associated
12  with pancreatitis, but there's not enough evidence to
13  say that it is a cause of pancreatitis. Do you agree
14  with that statement?
15     A. I think that's a reasonable statement on the
16  best available data.
17     Q. All right. I apologize if I've asked you this
18  question. But have you reviewed any reports of any of
19  the other expert witnesses --
20     A. No, ma'am.
21     Q. -- in any of these cases?
22     A. I think we've asked that before.
23     Q. I did.
24     A. And that's okay.
25     Q. And I apologize.

243

1      A. Don't worry about it.
2      Q. I couldn't remember.
3          Before forming your opinions about
4  Mr. Unger, you did not review his deposition or his
5  wife's deposition --
6      A. No, ma'am.
7      Q. -- correct?
8          And you did not review the deposition of
9  his endocrinologist, Dr. Quintero; is that right?
10     A. That's correct.
11     Q. And you did not review the deposition of his
12  internal medicine doc, his --
13     A. That's correct.
14     Q. -- internist, right?
15     A. That's correct.
16     Q. And you didn't review any of his psychiatrists'
17  depositions, correct?
18     A. That's correct.
19     Q. You didn't read any depositions, correct?
20     A. That's what I stated for Ms. Whittington, and
21  that applies to Mr. Unger as well, yes.
22     Q. Okay. Now, in -- on the -- in the second
23  paragraph on page 11 of your report on Mr. Unger, you
24  say, "Based on reasonable medical probability, the
25  excess weight gain Mr. Unger experienced as a result of

23 (Pages 240 to 243)

244

1 the administration of the atypical antipsychotic
2 Seroquel was a cause of his developing diabetes," right?
3     A.  Yes, ma'am.
4     Q.  The mechanism by which you're contending that
5 Seroquel caused diabetes in Mr. Unger was gaining
6 weight, right?
7     A.  That's the best explanation that we have at
8 this time.  One of the other atypicals does seem to have
9 a direct insulin resistance-inducing effect.  And
10 clearly, I will be looking for other data that might
11 relate Seroquel to a similar secondary effect besides
12 weight gain.
13     Q.  Okay.  But in — let's just focus on Mr. Unger
14 for a minute.  The only mechanism by which Seroquel
15 caused diabetes in Mr. Unger, as far as you know today
16 as we sit here, was through weight gain, right?
17     A.  Yes.
18     Q.  You're not contending that there is any
19 evidence anywhere that there was a direct effect of
20 Seroquel on Mr. Unger that would have caused him to have
21 diabetes other than through the mechanism of weight
22 gain?
23     A.  That's correct.
24     Q.  All right.
25     A.  But I left that paragraph at the bottom of all

245

1 of these reports, which is if something does turn up
2 between now and — and court, I reserve the ability to
3 bring that out.
4     Q.  And you and I have an agreement that because of
5 your paragraph, that if something does come up, you'll
6 let Mr. Pirtle know and you'll give me the opportunity
7 to examine you about any — any information like that,
8 right?
9     A.  We will indeed, ma'am, yes.
10     Q.  And you know that if you — if I don't hear
11 about it when and if this case ever goes to trial, I
12 will say to you on the stand that I wanted to know if
13 you had any additional information as reflected in that
14 paragraph.  You understand that — that you'll — I'll
15 ask you about that later —
16     A.  Yes, ma'am.
17     Q.  — right?
18     A.  And we agree that my approach to these issues
19 is to share data as much as possible.
20     MR. PIRTLE:  And you understand I'll
21 probably object when that happens.
22     Q.  (BY MS. THORPE)  I'm just telling you.
23     Now, you're saying that weight gain — let
24 me just ask you the same question about Ms. Whittington
25 just to go back for a minute.

246

1     The mechanism by which you contend Seroquel
2 caused diabetes in Ms. Whittington was weight gain,
3 right?
4     A.  To the best of my understanding, yes, ma'am.
5     Q.  And you're not making the argument that there
6 was some sort of direct effect on the pancreas in either
7 Ms. Whittington or Mr. Unger by Seroquel, correct?
8     A.  By Seroquel, yes, ma'am.  Remember, the
9 previous patient had had Zyprexa.
10     Q.  Right.
11     A.  So on current best available knowledge —
12     Q.  Right.
13     A.  — yes.
14     Q.  And as to Ms. Whittington, because she took —
15 well, strike that.
16     You believe that Zyprexa has a direct
17 effect on the pancreas, correct?
18     A.  There was one study.  Clearly, I only quote one
19 study because we don't have any more.  So it's — it's
20 only that single study.
21     Q.  And you included that single study in your
22 reliance list, did you not?
23     A.  It's — it's present, yes.
24     Q.  It's —
25     A.  Because sometimes —

247

1     Q.  If you identify the study —
2     A.  Yes, ma'am.
3     Q.  — on page — I think it's on page —
4     A.  I will — I'll find it for you.  It's page 16.
5     The reason for it being — it seems that
6 these atypicals include two which are different from all
7 of the others.  So I am cognizant of Eben Blucher's work
8 and would look for somebody else to take the trouble to
9 repeat it with other atypicals, and if that study were
10 to be done, then I would reserve the right to bring it
11 up.  It hasn't so far been done.
12     Q.  All right.  Tell me the name of the study that
13 shows that Zyprexa had a direct effect on the pancreas
14 that's included in your reference list that's part of
15 Exhibit 21.
16     A.  Yes, ma'am.  The name of the gentleman is Eben
17 Blucher, E-b-e-n B-l-u-c-h-e-r.  And it's on page 16,
18 the fifth reference down.
19     Q.  And you can not rule out in Ms. Whittington
20 that Zyprexa had a direct effect on her pancreas that
21 ultimately caused her to have diabetes, correct?
22     A.  I cannot rule it out.  I think that's correct,
23 yes.  If — I'm looking for double negatives in your
24 question.  It is possible that an Eben Blucher
25 phenomenon was relevant in Ms. Whittington.

24 (Pages 244 to 247)

248

1    Q. And —
2    A. But we do not have any data that Seroquel has
3  the same features as Zyprexa. So I leave -- as a
4  scientist, when I say look at the best data and ask if
5  all rats have tails, therefore, would all tails belong
6  to rats.
7    Q. Now, you said there were two -- two drugs that
8  were different from Seroquel, I think --
9    A. Yes, ma'am.
10   Q. -- in one of your -- dialing back a few minutes
11 ago.
12   A. Yes, ma'am.
13   Q. What are those two drugs that you are --
14   A. Those are Abilify and Geodon. They do not seem
15 to cause weight gain, they do not seem to cause
16 diabetes, they do not seem to cause, et cetera. And,
17 again, I would leave the statisticians in this world to
18 give you better data on that.
19   Q. The -- you cannot rule out that the direct
20 effect of Zyprexa was the sole cause of
21 Ms. Whittington's diabetes, correct?
22   A. I -- I would agree with that, yes.
23   Q. Now --
24         (Exhibit No. 25 marked.)
25   Q. (BY MS. THORPE) -- let me show you what's been

249

1  marked as Exhibit 25 for identification. And in your
2  list of medical records that you say you've reviewed,
3  you said you reviewed records of Memorial Hospital
4  Pembroke, right?
5    A. Yes, ma'am, if it was on the list I did.
6    Q. Isn't it correct that there are no records of
7  Memorial Hospital Pembroke regarding Mr. Unger?
8    A. I -- I see that what you gave me is nothing but
9  a RecordTrak.
10   Q. Well, it says there are no records, right?
11   A. That's correct.
12   Q. Do you -- can you look on your disk and tell if
13 there are any records for Mr. Unger from Memorial
14 Hospital Pembroke?
15   A. Yes. But would you give me time. I mean,
16 let's do it on another evening. I have a number of
17 disks in here. I would have to find --
18   Q. Okay.
19   A. -- all the Unger ones.
20   Q. We're going to see each other tomorrow. Would
21 you check that? That would be great. So that will be
22 your homework. Okay. Is that all right?
23   A. Yes, teacher.
24         (Exhibit No. 26 marked.)
25   Q. (BY MS. THORPE) Okay. I'm going to show you

250

1  what's been marked as Exhibit 26 for identification.
2    A. Hang on, ma'am, let me just catch up.
3  Memorial -- Richard Unger and Memorial, that's what I'm
4  looking for?
5    Q. Right. Here I gave you 26.
6         Let me show you what's been marked as
7  Exhibit 26 for identification. And that's a letter from
8  Medicaid, right?
9    A. Yes, ma'am.
10   Q. And it says there are no records from Medicaid
11 for Mr. Unger, right?
12   A. Yes, you're correct on that. And I have it
13 listed. Let me see if I have it on this list, Medicaid,
14 yes. So I -- I worked through a list of -- of
15 references. And, again, I'll need to look on the disk
16 and see if there's anything on that.
17   Q. Okay. If you can do that.
18   A. So Memorial and Medicaid, yeah.
19   Q. All right. Thank you. So we'll take that up
20 tomorrow --
21   A. Yeah.
22   Q. -- evening.
23         So -- so in your opinion in your report
24 when you say, "Excess weight gain caused Mr. Unger to
25 develop diabetes," you say it's a cause of his diabetes,

251

1  right?
2    A. Yes.
3    Q. That Seroquel is -- let me get the exact
4  wording.
5         You say that Mr. Unger -- based on
6  reasonable medical probability, the excess weight gain
7  Mr. Unger experienced as a result of his -- of the
8  administration of the atypical antipsychotic Seroquel
9  was a cause of his developing diabetes, right?
10   A. That's correct, ma'am.
11   Q. All right. So tell me what the other causes
12 are of his diabetes.
13   A. I go back to page 10. I'll refer you to the
14 second paragraph. And we would start with he was
15 getting treatment for hypertension, hyperlipidemia.
16 Those would be the two. I do not remember seeing a
17 family history of diabetes in this man. So there was --
18 he was a cigarette smoker. That was the other thing.
19         So hypertension, hyperlipidemia, cigarette
20 smoker, psychosis would be four reasonable ones that I
21 can pull up immediately.
22   Q. Okay. So are those all of the conditions that
23 Mr. Unger had before he took Seroquel that you believe
24 are causes of diabetes?
25   A. Contributing causes, yes, ma'am.

25 (Pages 248 to 251)

## 252

1    Q. Okay. That's the whole list?

2    A. All I have at present.

3    Q. And have you — how do you rule out those

4 conditions that you just named, hypertension,

5 hyperlipidemia, cigarette smoking, and psychosis, as

6 causes of his — as sole causes of his diabetes?

7    A. Well, again, we come back to the parable of the

8 camel. If he had all of those when he weighed weight X

9 and six months later he weighs X plus 100 pounds, still

10 has all those conditions but has developed diabetes, my

11 contention would be the two issues that would have

12 contributed to diabetes would have been the weight gain

13 and the passage of six months of time.

14    Q. So — so you're saying that if you have a

15 significant — if a person has a significant weight gain

16 and they are hypertensive, they have hyperlipidemia,

17 they're cigarette smokers, and they have psychosis,

18 within six months they'll have diabetes?

19    A. No, ma'am, no. What I took was the example.

20 I'm sorry, you took my example and turned it upside

21 down.

22    Q. I'm trying to understand it.

23    A. What I said was if a patient was weight X and

24 six months later after having been given a medication he

25 weighed X plus 100 pounds and all of the other

## 253

1 conditions were stable, on the best available evidence,

2 my comment in that hypothetical case would be that the

3 cause of his diabetes was six months of additional

4 age — remember age is a factor — plus the hundred

5 pounds that he gained in weight. Those are the only two

6 variables which have occurred that we were able to

7 identify in this hypothetical case.

8    Q. Well, I'm not asking —

9    A. Now, we'll come to this case. And what I tried

10 to do for the Court on the bottom of page 10 was to look

11 at the weight issue and to look at the gain in weight,

12 which by my calculation was 45 pounds, and say in my

13 view on reasonable probability, the addition of

14 45 pounds, plus if Seroquel has any, let us call it,

15 Zyprexa-like effect, the initiation of his diabetes

16 was — those were the two variables that came in during

17 that time span.

18    Q. So what you're saying is that the fact that he

19 took Seroquel and then gained 45 pounds and then got

20 diabetes, that time sequence of events is the basis of

21 your opinion that he — that Seroquel caused him to have

22 diabetes?

23    A. With — with reasonable medical probability,

24 yes, ma'am.

25    Q. Okay. So it's —

## 254

1    A. And I go back to the camel and the straw and

2 the camel's back.

3    Q. So it's the — it's the sequence in time of

4 taking Seroquel, then gaining weight, and then

5 developing diabetes. That is the basis of your opinion,

6 right?

7    A. I believe was the best medical probability,

8 yes, ma'am.

9    Q. Okay. So I go back to my question that I asked

10 a minute ago. How do you rule out hypertension,

11 hyperlipidemia, cigarette smoking, and psychosis as the

12 sole causes of Mr. Unger's diabetes?

13    A. I go back to my analogy. To the best of my

14 belief, those were present and stable during his time of

15 weight gain. He still had hypertension, he still had

16 hyperlipidemia, he was still psychotic. The changes

17 that occurred during the time that we're reviewing were

18 the presence of another medication and the presence of a

19 total gain in weight of 45 pounds and the fact that the

20 medication under review is associated with the

21 development of both weight gain and diabetes.

22    Q. So if Mr. Unger came into your clinic and he

23 had hypertension, hyperlipidemia, he was a cigarette

24 smoker, and he was a psychotic and he had never taken

25 Seroquel by history and he had diabetes, what would you

## 255

1 say was likely the cause of his diabetes?

2    A. In that case the maximum medical probability

3 was the period of time — remember, age is one of

4 them — and the weight gain, whatever its cause, and the

5 cause may have just been change in diet or change in

6 physical activity.

7    Q. Okay.

8    A. I mean, what I tried to do is give you my

9 interpretation of the best available data.

10    Q. Well, I'm — I'm — let's postulate there's no

11 change. He comes in, he has — do you have — let me

12 just ask you this.

13    Do you have patients who are hypertensive,

14 have hyperlipidemia, smoke cigarettes, and who have

15 diabetes?

16    A. Do you mean have diabetes or develop diabetes

17 during a period of time? Because the answer to both is

18 yes.

19    Q. Okay. Well, you — right. That's fine.

20    And you have patients that meet those —

21 that have those conditions who aren't taking Seroquel,

22 right?

23    A. That's correct.

24    Q. All right. So if in a patient like that who

25 comes into your clinic who has hypertension,

**26 (Pages 252 to 255)**

256

1  hyperlipidemia, and smokes cigarettes, setting aside
2  psychosis, just -- just those three things --
3      A.  Yes, ma'am.
4      Q.  -- and they're not taking Seroquel and they
5  develop diabetes, what do you tell them caused their
6  diabetes?
7      A.  I go back to what we've -- we've discussed.
8  In -- in somebody with a family history of diabetes --
9      Q.  I'm asking you those three things.
10     A.  -- time is a major issue.
11     Q.  Dr. Tulloch --
12     A.  We go back to time.  Time is a major issue,
13  because as we said, I go back to my early analogy, and
14  you can pull it in any time you like.  Somebody who
15  develops -- who inherits family history of type 2
16  diabetes might get it at the age of 105 or get it at the
17  age of 25.  And if you stack in all of those numbers,
18  the likelihood of them developing it at 25 becomes much
19  higher.  If none of those numbers are present and he has
20  that gene pool, he might develop type 2 diabetes at the
21  age of 105.
22     Q.  How long did Mr. --
23     A.  Does that help you understand?  I'm trying to
24  make it simple.
25     Q.  I think I understand perfectly what you're

257

1  doing.
2          How do you -- how long did Mr. Unger have
3  hypertension?
4      A.  I can't give you that data offhand.  I would
5  have to look back at the chart.
6      Q.  Here you go.  Look at your chart that's been
7  marked as Exhibit 22 and you tell me how long he had
8  hypertension.
9      A.  Okay.  What we have -- at least at the start of
10  the time line, which is the 2000 -- February of --
11  07-02-02, he was already on medications for blood
12  pressure.
13     Q.  Do you know how old he was -- actually, to be
14  fair, you've got --
15     A.  We have his age, we have his date of birth.
16     Q.  Dr. Tulloch, you failed to go to the first page
17  of your time line.
18     A.  Okay.
19     Q.  So let me just help you out here.
20     A.  Sorry.
21     Q.  I think your first record is January 25, 2001;
22  is that right?
23     A.  January 25th?
24     Q.  Uh-huh.
25     A.  Yes, ma'am.

258

1      Q.  That's the first time that you have any
2  information about --
3      A.  This man.
4      Q.  -- this fellow.  And Mr. Unger was 52 years old
5  then, wasn't he?
6      A.  Forty-nine to -- that's correct.
7      Q.  And so you're missing a half century of medical
8  history on Mr. Unger, aren't you?
9      A.  In his -- it would be in his past medical
10  history in the chart, but that's correct.
11     Q.  Right.  Tell me anything you know about
12  Mr. Unger before 2001.
13     A.  Right now I have summarized what I have here.
14  For anything earlier I would need to go to the charts of
15  the physicians listed and pull out the past history.
16     Q.  Do you -- do you know right now as you sit here
17  whether you know anything about Mr. Unger from a medical
18  record that predates January 25, 2001?
19     A.  Yes, ma'am, and I summarized that on page 10.
20     Q.  I want you to find me a medical record before
21  January 25, 2001.
22     A.  2000 and --
23     Q.  One.
24     A.  -- one.  Okay.
25          What I have summarized on page 10 is that

259

1  he sustained a back injury in 1997, and it gives the
2  levels which were injured.  It describes that he later
3  had a problem with infection in an area of his back, and
4  he then had a cervical fusion in 1990.  So all of these
5  antedate the date that you mention.
6      Q.  That's not my question, Dr. Tulloch, just to
7  save you the energy.  My question is:  Do you have any
8  medical records that are dated before 2001?
9      A.  Okay.  I -- without looking at the chart, I
10  can't --
11     Q.  Okay.
12     A.  -- tell you.
13     Q.  Can you make a note to find that out?  I
14  promise I won't give you any more assignments.  That
15  will be my last --
16     A.  Okay.  Earliest Unger records.
17     Q.  Right.
18     A.  Okay.  I have Memorial data, Medicaid data, and
19  earliest records on Unger other than -- well, I have to
20  point out that when a patient tells you this happened in
21  this year and this happened in that year, that's the
22  patient's medical history.  Sometimes that's all we get,
23  because they don't --
24     Q.  Right.
25     A.  -- have medical records come with them.

260

1    Q.  You didn't talk to Mr. Unger?
2    A.  I have to have the secondhand from the
3    physicians who saw him.
4    Q.  So you — other than what you wrote about in
5    your report in Exhibit 2 about his —
6    A.  Past medical history.
7    Q.  No.  Other than what — let me finish my
8    question.  Okay?
9          Other than what you wrote in your report
10   about his back injury in 1997, you don't know anything
11   about his 50-year history, do you?
12   A.  Ma'am, I — I tell you all I have is what's
13   written there.
14   Q.  Okay.  And so I'm correct, right?
15   A.  To the best of my knowledge, that's correct.
16   Q.  All right.  So would you agree with me that
17   hypertension, hyperlipidemia, psychosis, and cigarette
18   smoking can be the sole causes of diabetes in people —
19   in some persons?
20   A.  In the absence of any other contributing
21   factor, yes.
22   Q.  And it's only if — okay.  That's — strike
23   that.
24          What is the — have you quantified the
25   contribution of hypertension to Mr. Unger's diabetes?

261

1    A.  No, ma'am.  And for the Court I would leave it
2    at — just at that.  I will — for our science there was
3    a paper by a Italian man called Feranini who looked at
4    adult Italian males with hypertension and showed they
5    had significant insulin resistance.  So I believe the —
6    for our understanding of this statement, it's through
7    the mechanism of insulin resistance.
8    Q.  Okay.  But I'm asking you if you have
9    quantified the contribution of this cause to Mr. Unger's
10   diabetes.
11   A.  No, ma'am.  As I said, it's one of the factors.
12   And I go back to the camel's — camel's saddle.
13   Q.  So you can't put a number on it?
14   A.  No, ma'am.
15   Q.  And you have not looked in the science to see
16   what relative risks are associated with hypertension and
17   diabetes?
18   A.  Other than the article of Feranini which was
19   interesting for our understanding the mechanism, no.
20   Q.  Does it report a relative risk?
21   A.  No, because I think we go back to the camel.
22   It would depend on the level of all the other factors
23   that relate to the patient when they develop diabetes,
24   how much —
25   Q.  Does Feranini talk about camels?

262

1    A.  He talked about high blood pressure and insulin
2    resistance.
3    Q.  All right.  Does he give a relative risk?
4    A.  No.  He talks about a mechanism.
5    Q.  Right.  Did you run your Index Medicus
6    search look for the relative risks for any other kind of
7    numerical quantification of the contribution of
8    hypertension to diabetes?
9    A.  No, ma'am, because to my knowledge, the main
10   issue related to the atypicals was weight gain and the
11   development of diabetes and then the other complicating
12   factors.
13   Q.  But you understand Mr. Unger —
14   A.  I agree —
15   Q.  — had hypertension before he took Seroquel?
16   A.  I understand that —
17   Q.  Right.
18   A.  — and I do not have data that would quantify
19   it.
20   Q.  Okay.  So if you — if you don't have data that
21   quantifies the contribution of — of hypertension to
22   diabetes, how can you conclude that Seroquel was the —
23   was a cause of his diabetes?
24   A.  My main basis —
25   Q.  Let me rephrase that question because that

263

1    wasn't a good question.
2    A.  Okay.
3    Q.  Is it your opinion in Mr. Unger that Seroquel
4    more likely than not caused Mr. Unger to have diabetes?
5    A.  Yes, ma'am.
6    Q.  So you understand that's a quantitative kind of
7    opinion, right?
8    A.  Yes, ma'am.
9    Q.  So if you don't know the contribution that
10   hypertension made to diabetes, how do you know — how do
11   you know that hypertension wasn't a hugely bigger cause
12   than Seroquel?
13   A.  What we have available in the way of data on
14   this man was that during the time he took Seroquel,
15   there was a total increase in body weight of 45 pounds.
16   All the other factors, as far as I understood from the
17   chart, were stable.
18          So I go back to my analogy.  If a patient
19   is point X, weight gain of 45 pounds, point X plus 45,
20   develops diabetes, all other conditions have been the
21   same, the two factors that would have been relevant in
22   the development of that person's diabetes is the time
23   from the first observation to the second observation and
24   the medication which he took if it's of the groups that
25   cause the onset of diabetes.  And we have a number of

264

1 them. Tonight we're discussing Seroquel.
2 Q. So what you're saying is that there was a
3 temporal relationship between the Seroquel and the
4 weight gain and then the diabetes —
5 A. That's —
6 Q. — is that right?
7 A. — correct —
8 Q. And that's —
9 A. — the best of my interpretation of this data,
10 yes, ma'am.
11 Q. All right. And you say that his hypertension
12 and hyperlipidemia were stable, right?
13 A. I said that to the best of my knowledge, they
14 were, ma'am, yes.
15 Q. All right. Let me ask you to point to me in
16 your Exhibit 22, this time line that you rely upon, any
17 reference to the stability of his blood pressure or that
18 allows you to conclude that his blood pressure was
19 stable.
20 A. Okay. What we have is a list of his
21 medications on page 2, which include Norvasc and
22 Maxzide.
23 Q. Okay. How does that show that his hypertension
24 is stable?
25 A. No, it just lists his medications.

265

1 Q. Okay. I want to know what on Exhibit 22 shows
2 you that his hypertension was stable.
3 A. Okay. No, I do not have data on that. I would
4 have to go back and look at the references which relate
5 to his physicians' visits as they were listed on page 10
6 and look at the levels of blood pressure.
7 Q. What is the contribution of — I'm sorry. Say
8 that last — what you just said again.
9 A. Look at the levels — your question was was his
10 blood pressure stable. Stable blood pressure is one
11 which measures in an adequate level for treatment by our
12 definition of an adequate blood pressure. And I have
13 not focused on that as a variable other than that he had
14 high blood pressure and has constant treatment for that.
15 If you need an answer to that question, I
16 would need to find the blood pressure numbers and chart
17 them out like we charted out the body weights.
18 Q. And you didn't do that?
19 A. I have not done it.
20 Q. All right. So what is the basis of your
21 opinion that his blood pressure is stable?
22 A. In my belief that when I looked through the
23 chart, there was no major periods which his blood
24 pressure was registered as wildly abnormal and the fact
25 that his medications were not significantly altered

266

1 during the time of this weight gain.
2 Q. And that's why it's important to know when you
3 first started looking at the medical — what the first
4 medical record you have is for doctor — for Mr. Unger,
5 because it's my belief you don't have any records before
6 January of 2001. So —
7 A. 2001?
8 Q. Yes.
9 A. Okay.
10 Q. And I want to know how — what period of time
11 you know his blood pressure was stable. Okay? So
12 that's why I need you to check.
13 A. Oh, okay.
14 Q. So is it fair to say that you have not
15 quantified the contribution of the causes of
16 hyperlipidemia, cigarette smoking, and psychosis to
17 Mr. Unger's diabetes?
18 A. I have not considered them to be other than
19 stable during the duration of these — the time when he
20 gained 45 pounds in weight under the administration of
21 the atypical antipsychotic Seroquel, yes, ma'am.
22 Q. So you have not quantified the contribution of
23 those conditions to causing his diabetes?
24 A. Yes, ma'am. And what I said, in my view it was
25 reasonable medical probability to assume that they were

267

1 stable. There had not been major comments in the
2 change, but if the issue becomes under question, I'm
3 happy to review that.
4 MS. THORPE: Move to strike as
5 nonresponsive.
6 Q. (BY MS. THORPE) Mr. Tulloch — I mean
7 Dr. Tulloch, I want to know whether or not — yes or
8 no — have you quantified the contribution of
9 hyperlipidemia, cigarette smoking, and psychosis to
10 Mr. Unger's diabetes.
11 A. Ma'am, I have said that they were an additive
12 and contributing factor. You're asking me to say were
13 they 60 percent, 80 percent, or 99 percent —
14 Q. Or you haven't done it.
15 A. I do not have that data.
16 Q. Okay.
17 A. I do not believe it's there.
18 Q. Okay.
19 A. I did bring you two nights ago our best
20 estimate from a clinical study on the risk relationship
21 between gaining weight, and that's there in the record.
22 And we'll leave it in the record. I don't want to dig
23 it up again.
24 Q. All I need to know is whether you're — you
25 have a number that you've attached —

268

1    A. Okay. No, I —
2    Q. No, you haven't —
3    A. No.
4    Q. — right? For hyperlipidemia, cigarette
5 smoking, and psychosis, you have not attached a number?
6    A. No, ma'am.
7    Q. Now, you did attach a number for
8 Ms. Whittington the other night. You said 33 percent.
9 Do you remember that?
10    A. Yes, ma'am.
11    Q. Okay. You're not doing that for Ms. Unger?
12    A. I'm not willing to do that unless you push me
13 to — unless you insist I have to produce a number. I
14 don't think that —
15    Q. I'm asking you what you've done.
16    A. Yes.
17    Q. If you say no —
18    A. No.
19    Q. — that's —
20    A. What I said was —
21    Q. No, I'm not asking you what you said. I'm
22 asking you as to hyperlipidemia, cigarette smoking, and
23 psychosis and Mr. Unger you've not come up with a number
24 contribution —
25    A. No.

269

1    Q. — correct? All right.
2       Now, how — you're saying that because
3 these conditions in your opinion more likely than not
4 were stable, the hypertension, hyperlipidemia, cigarette
5 smoking, and psychosis were stable in Mr. Unger, that
6 they could not be sole causes, right?
7    A. Yes, they were more likely than not were not
8 likely to be or were — let's take away the double
9 negative — that they were unlikely to be the sole
10 causes.
11    Q. Because they were stable?
12    A. Yes, ma'am.
13    Q. Why does being stable make it more likely than
14 not that they weren't causes?
15    A. Well, because the one big variable which is
16 apparent during the time line during which he developed
17 diabetes was a 45-pound weight gain.
18       MS. THORPE: Move to strike as
19 nonresponsive.
20    Q. (BY MS. THORPE) Dr. Tulloch, I don't
21 understand and I want you to tell me why the fact
22 that — let's just take one of them — hypertension is
23 stable in someone. What does that mean?
24    A. What that means is that under the medications
25 which he was receiving, a blood pressure which had

270

1 previously been high remained at a clinically acceptable
2 level for the standards of good medical care.
3    Q. So you mean normal? His hypertension — he
4 wasn't hypertense?
5    A. High blood pressure for normal — nondiabetic
6 subjects is defined as in excess of 140/90. Adequate
7 blood pressure would be defined as less than 130 over
8 less than 80 or 85. And if all of his numbers in his
9 chart were of the second category while he was
10 maintained on the medications listed, in my view, those
11 were — the blood pressure was well controlled.
12    Q. What do you mean by psychosis is stable, that
13 the psychosis was stable?
14    A. You're reading too much in my data. It's — as
15 far as I understood, he was — there was no major change
16 in his mental state during the time that he was under
17 treatment.
18    Q. Under treatment for what?
19    A. What we had —
20    Q. Under treatment with what?
21    A. When we were going — during the time that he
22 had gained 45 pounds in weight. What I'm trying to do
23 is isolate out one major contributing factor —
24    Q. I know that.
25    A. — during this time and the —

271

1    Q. I get that.
2    A. — contributing factor is 45 pounds in weight
3 gain which occurred while he was taking an atypical
4 antipsychotic.
5    Q. All right.
6    A. I will be happy to grant you that all of the
7 other factors are out there.
8    Q. All right. Let me ask you —
9    A. And I will be happy to — let me finish. And I
10 will be happy to speculate on their quantitation but not
11 be pinned down to numbers because I don't believe the
12 numbers would be anything other than illustrative.
13    Q. I want you to tell me if there were any other
14 causes of Mr. Unger's weight gain other than, in your
15 opinion, Seroquel.
16    A. In my view, again — and you being — asking me
17 how to define stable — in my view, there was not a
18 major change in the other factors that relate to weight
19 gain. In other words, I did not read in his chart at
20 that time an exacerbation of his previous damage to his
21 back or his cervical spine and had, therefore, read that
22 as those were present, contributing to his risk for
23 diabetes but not major contributing factors in the
24 presence of 45 pounds in weight gain.
25    Q. Okay. So what was the period of time that the

272

1 45-pound weight gain occurred in?
2     A. We have -- and I'm reading from the last
3 paragraph on page 10. His weight is recorded in June
4 2003 as 2,000 -- 282. He then was on several doses of
5 Seroquel. And so I rounded them all off to a total
6 increase of 45 pounds. So on the various doses of
7 Seroquel, he gained 45 pounds.
8     Q. Looking for the time, sir.
9     A. And the time interval would be from 4 of '04 to
10 9 of '05.
11     Q. It's during that period of time you think he
12 gained 45 pounds?
13     A. Forty-five pounds.
14     Q. Okay. And is it your testimony that from April
15 of '04 to September of '05, there was no exacerbation in
16 his spine or cervical spine in that period?
17     A. To my best reading of the chart, yes.
18     Q. All right. And --
19         MR. PIRTLE: When you get to a point.
20     Q. (BY MS. THORPE) Are there other causes of
21 Mr. Unger's weight gain besides Seroquel?
22     A. Other contributing causes -- no, not to my
23 knowledge during that period of time.
24     Q. So the only cause that you know of in your --
25 your review, your extensive review that you've -- you

273

1 believe you've undertaken of Mr. Unger's medical records
2 is Seroquel?
3     A. Yes, ma'am.
4     Q. You can't think of anything else during the --
5 this -- the period of time that Mr. Unger was taking
6 Seroquel that would account for a 45-pound weight gain?
7     A. Other than -- well, we acknowledged the passage
8 of time to be a contributing factor to diabetes but not
9 necessarily for the weight gain.
10     Q. I'm focused on weight gain.
11     A. Weight gain. Focus on --
12     Q. My question is yes or no. You can't think of
13 anything else during the time that Mr. Unger was taking
14 Seroquel that could account for his Seroquel -- account
15 for his weight gain -- let me start that over.
16         You can't think of anything else during the
17 time that Mr. Unger was taking Seroquel that could
18 account for his weight gain other than Seroquel?
19     A. That's correct.
20     Q. All right.
21         MS. THORPE: We can take a break.
22         (Short recess from 7:19 to 7:29.)
23     Q. (BY MS. THORPE) Dr. Tulloch, I want to
24 understand something you said before the break about
25 your report and this period of time between April of

274

1 2004 and September of 2005 as being the period of the
2 45-pound weight gain.
3     A. Yes, ma'am.
4     Q. I don't think that's borne out by the language
5 of your report, so I'm trying to find out what you
6 really mean. According to your report, he weighed
7 310 pounds on April 29, 2004, right?
8     A. Yes, ma'am.
9     Q. And then he -- in September of 2005, he weighed
10 325 pounds, right?
11     A. Right.
12     Q. That's a 15-pound weight gain?
13     A. Yeah. What -- what -- if you go back --
14     Q. I just want to know the dates.
15     A. Okay. Yeah, go back to the first half of that
16 sentence. What I said was his weight in January of 2001
17 was 260. He was given Seroquel; the rate -- the weight
18 was then 282. And I gave you the
19 dates. And then at the increased dose, it rose to 325.
20 So those.
21     Q. So aren't you --
22     A. -- are the numbers as I -- as I read them.
23     Q. Aren't you comparing June 2003 to September of
24 '05? I mean, it comes out to be 43 pounds instead of
25 45, but I assume you rounded up. Is that -- is that

275

1 what you're -- you're really saying -- I mean --
2     A. Yes.
3     Q. -- I'm really trying to find out. I think you
4 just misspoke. It's not April of '04, it's June 2003,
5 isn't it? The time period --
6     A. Yeah.
7     Q. -- of the weight gain that you were concerned
8 about?
9     A. That's right. What I said, the weight is
10 recorded in June '03 of 282. We go from 82 to 325.
11 That's 43.
12     Q. Okay. And is that where you get your
13 45-pound --
14     A. That's where I get my 45.
15     Q. Okay. All right.
16     A. And I believe he was on Seroquel all that time.
17     Q. All right. So -- so what you're -- you're
18 telling me is that you can't think of anything between
19 June 2003 and September 6, 2005, that happened to
20 Mr. Unger to make him cause weight other than taking
21 Seroquel, right?
22     A. Reasonable medical probability, yes, ma'am.
23     Q. All right. Now, the first weight you have for
24 Mr. Unger, according to your time line -- the time line
25 that was prepared for you by the plaintiffs' law firm,

31 (Pages 272 to 275)