1

08-I-99342 sh

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This document relates to:

Janice Burns v. AstraZeneca LP, et al.   Case No. 6:07-cv-15959
Connie Curley v. AstraZeneca LP, et al.   Case No. 6:07-cv-15701
Linda Guinn v. AstraZeneca LP, et al.   Case No. 6:07-cv-10291

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

BRUCE D. PERRY, M.D., Ph.D.

October 8, 2008

Volume 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of BRUCE D. PERRY, M.D., Ph.D.,

produced as a witness at the instance of the Defendants, and

duly sworn, was taken in the above-styled and numbered causes

on the 8th of October, 2008, from 9:05 a.m. to 3:38 p.m.,

before Shanon M. Hair, CSR in and for the State of Texas,

reported by machine shorthand, at the office of Fibich,

Hampton & Leebron, L.L.P., 1401 McKinney Street, Suite 1800,

Houston, Texas  77010-9998, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record or

attached hereto.

**2**

INDEX

Appearances ...........................................5
BRUCE D. PERRY, M.D., Ph.D.
   Examination by Mr. McConnell .....6
Signature and Changes ...................267
Reporter's Certificate .......................269

EXHIBITS
NO.  DESCRIPTION            PAGE

1. .................................................................6
   Notice of Deposition of Bruce D. Perry, M.D., Ph.D.

2. .................................................................6
   Preliminary Summary of Opinions (Curley)

3. .................................................................6
   Preliminary Summary of Opinions (Burns)

4. .................................................................6
   Preliminary Summary of Opinions (Guinn)

5. ...............................................................54
   08-21-00 document entitled "RE: Mary Lou Hunter"

6. ...............................................................94
   Practice Guideline for the Treatment of Patients with Acute Stress Disorder and Posttraumatic Stress Disorder

7. .............................................................106
   Article entitled "Effects of adjunctive antidepressant therapy with quetiapine on clinical outcome, quality of sleep and daytime motor activity in patients with treatment-resistant depression"

8. .............................................................112
   01-21-00 laboratory report (Curley)

9. .............................................................119
   Article entitled "Effectiveness of Clozapine Versus Olanzapine, Quetiapine, and Risperidone in Patients With Chronic Schizophrenia Who Did Not Respond to Prior Atypical Antipsychotic Treatment"

**3**

INDEX
(Continued.)

EXHIBITS
NO.  DESCRIPTION            PAGE

10. ...........................................................119
   Article entitled "Effectiveness of Olanzapine, Quetiapine, Risperidone, and Ziprasidone in Patients With Chronic Schizophrenia Following Discontinuation of a Previous Atypical Antipsychotic"

11. ...........................................................133
   Article entitled "Consensus Development Conference on Antipsychotic Drugs and Obesity and Diabetes"

12. ...........................................................140
   01-05-03 Tampa General Hospital record (Curley)

13. ...........................................................142
   03-30-04 Follow-Up Visit note (Curley)

14. ...........................................................144
   01-07-03 Headache Patient Staffing Report (Curley)

15. ...........................................................172
   Document entitled "Connie Marie Curley AKA Gray - Seroquel Patient"

16. ...........................................................172
   Document entitled "Janice Elaine Burns AKA Ashby, Scoggins - Seroquel Patient"

17. ...........................................................175
   05-27-98 Emerald Coast Psychiatric Care Progress Notes (Burns)

18. ...........................................................177
   12-28-98 Bay County Behavioral Health Center Physician's Progress Note (Burns)

19. ...........................................................180
   10-14-98 Emerald Coast Psychiatric Care Progress Notes (Burns)

20. ...........................................................183
   12-21-98 Bay Medical Center Consultation (Burns)

21. ...........................................................192
   12-11-06 Application for Voluntary Admission of an Adult (Burns)

22. ...........................................................199
   08-01-02 Progress Note (Burns)

**4**

INDEX
(Continued.)

EXHIBITS
NO.  DESCRIPTION            PAGE

23. ...........................................................201
   1994 Physicians' Desk Reference listing for Prozac

24. ...........................................................206
   10-14-02 Progress Note (Burns)

25. ...........................................................214
   03-09-01 Disability Physical Done for Disability Determinations on Janice Burns

26. ...........................................................215
   01-30-03 Progress Note (Burns)

27. ...........................................................216
   04-24-03 Progress Note (Burns)

28. ...........................................................217
   10-20-03 Initial Back Examination (Burns)

29. ...........................................................233
   04-22-94 Discharge Cumulative Trend Report (Burns)

30. ...........................................................237
   08-11-00 laboratory report (Burns)

31. ...........................................................238
   12-29-00 laboratory report (Burns)

32. ...........................................................238
   08-02-00 Progress Note (Burns)

33. ...........................................................240
   08-25-00 Progress Note (Burns)

34. ...........................................................242
   Document entitled "Medical History; Janice E. Ashby Burns"

35. ...........................................................244
   Document entitled "Medical History of Janice E. Burns"

36. ...........................................................263
   01-15-08 Office History and Physical (Burns)

37. ...........................................................265
   05-02-08 Brain & Spine Center, L.L.C., record (Burns)

**5**

A P P E A R A N C E S

FOR THE PLAINTIFFS:

Tommy Fibich, Esq.
FIBICH, HAMPTON & LEEBRON, L.L.P.
1401 McKinney Street, Suite 1800
Houston, Texas 77010-9998
(713) 751-0025, fax (713) 751-0030
tfibich@fhl-law.com

FOR THE DEFENDANTS:

Stephen J. McConnell, Esq.
Lauren Cates, Esq.
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104-2808
(215) 994-4000, fax (215) 994-2222
stephen.mcconnell@dechert.com
lauren.cates@dechert.com

-and-

Robert C. "Mike" Brock, Esq.
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Montgomery, Alabama 36104
(334) 206-3100, fax (334) 481-0801
rcb@rsjg.com

**6**

1    (Perry Exhibit No. 1 through 4 marked.)

2    (9:05 a.m.)

3    BRUCE D. PERRY, M.D., Ph.D.,

4    having been first duly sworn, testified as follows:

5    EXAMINATION

6    BY MR. McCONNELL:

7    Q.  Good morning, Doctor.

8    A.  Good morning.

9    Q.  Could you please state your full name for the record?

10   A.  Bruce Duncan Perry.

11   Q.  Doctor, my name is Steve McConnell and I'm one of the

12   lawyers representing AstraZeneca in this litigation, and maybe

13   it would make sense for us to go around the table and have

14   everybody introduce themselves.

15   MS. CATES:  Lauren Cates, AstraZeneca.

16   MR. BROCK:  Mike Brock for AstraZeneca.

17   MR. FIBICH:  Tommy Fibich for plaintiffs.

18   Q.  (BY MR. McConnell)  Doctor, you've been deposed

19   before, haven't you?

20   A.  Yes, sir.

21   Q.  Approximately how many times?

22   A.  Probably somewhere between 10 and 12.

23   Q.  Fair to say that you're pretty familiar with the

24   procedures of a deposition?

25   A.  Yes, sir.

**7**

1    Q.  You don't need me to go through in mind-numbing

2    excruciating detail the rules?

3    A.  No, sir.

4    Q.  You know you're under oath, right?

5    A.  Yes.

6    Q.  You also know that if there's anything about my

7    questions that's in any way unclear, you have the right to ask

8    me to explain or rephrase the question?

9    A.  Yes, sir.

10   Q.  And you won't be shy about doing that, will you?

11   A.  No.

12   Q.  Good.  Have you ever testified before about diabetes?

13   A.  No, sir.

14   Q.  Have you ever testified before about hyperglycemia?

15   A.  No.

16   Q.  Have you ever testified before about Seroquel?

17   A.  No.

18   Q.  Have you ever testified before about any

19   second-generation antipsychotic?

20   A.  Not that I -- no, I don't think so.

21   Q.  Have you ever testified before about any

22   antipsychotic, any case involving an antipsychotic, where that

23   was relevant to the case?

24   A.  I've testified about psychopharmacology in context of

25   other issues, but not really in a psychopharmacology litigation

**8**

1    case.

2    Q.  And just for the sake and to provide some mercy to

3    the jury, if you could explain what psychopharmacology is,

4    please, I'd appreciate it.

5    A.  Certainly.  Psychopharmacology is a broad term that

6    refers to the use of medications in the treatment of mental

7    health problems.

8    Q.  Okay.  And in some cases, the use of medications in

9    the treatment of mental health problems is perfectly

10   appropriate, true?

11   A.  Yes.

12   Q.  Okay.  In those cases where you have testified

13   regarding psychopharmacology, did any of those cases relate to

14   antipsychotics, as far as you know?

15   A.  Antipsychotics were not a central element of those

16   cases.

17   Q.  Okay.  Have you ever testified in any prior case

18   about weight gain resulting from psychopharmacology?

19   A.  No.

20   Q.  All right.  What I'd ask now is that the court

21   reporter put before you what's been premarked as Perry

22   Exhibit 1.

23   Doctor, what's been placed before you as Exhibit

24   1 is the notice of deposition in this case.  Have you seen it

25   before?

**9**

1    A.  No.

2    Q.  Could you take a look at Schedule A?

3    (Sotto voce discussion.)

4    Q.  (BY MR. McCONNELL)  All right.  And my question is:

5    Have you seen this before?

6    A.  No.

7    Q.  Are you keeping a file for your work that you're

8    doing in these cases relating to these three plaintiffs?

9    A.  Yes, sir.

10   Q.  All right.  Do you have separate files for the three

11   plaintiffs?

12   A.  No, I don't.

13   Q.  What's in your file?

14   A.  I have letters of correspondence, I have a copy of

15   the letter of agreement, and I have a copy of the invoice to --

16   for services to date.

17   Q.  Do you have copies of any materials that you reviewed

18   to help you formulate your opinions in these cases?

19   A.  Not in the file, but I -- you know, I have CDs that

20   have those materials on them.

21   Q.  All right.  As generally as you can phrase it, what

22   do you have on those CDs?

23   A.  The CDs include medical records for the three

24   plaintiffs, include depositions of the plaintiffs and many of

25   the treating physicians and Allied mental health professionals.

3 (Pages 6 to 9)

**10**

1  There are depositions of several drug representatives from
2  AstraZeneca. There's the deposition of — I think he's the CEO
3  of AstraZeneca.
4      Q.  Do you recall his name?
5      A.  Brennan. Is that correct?
6      Q.  Okay.
7      A.  I think that's it. There are a number of e-mails and
8  memorandum regarding — internal memorandum about weight gain
9  and there are a number of academic articles, including the
10  consensus statement about second-generation antipsychotics and
11  weight gain and diabetes. There are — gosh, trying to think
12  of what else. That — as far as I recall, that's sort of the
13  broad list of things.
14      Q.  How did you obtain these CDs?
15      A.  They were provided by the plaintiffs' attorneys.
16      Q.  How many CDs do you have?
17      A.  I — probably 10 or 12.
18      Q.  Who was the particular attorney or attorneys who
19  provided you with these CDs?
20      A.  They — I mean, I have the letters of correspondence,
21  if you want to look at those and see. My assumption — I was
22  working with Tommy, but there are other attorneys from a
23  different firm, Bailey Perrin & Bailey, I guess.
24      Q.  Where is it that you keep your file physically?
25      A.  In my office and — I've got the CDs here if you'd

**11**

1  like to see them.
2      Q.  Oh, okay. Could you show them to us? Great.
3          MR. FIBICH: Who is deposing Mitch Young next
4  week?
5          THE REPORTER: Do you want this on the record?
6          MR. BROCK: No.
7          (Discussion off the record at 9:12 a.m.)
8      Q.  (BY MR. McCONNELL) Just — looking at what you just
9  put on the table, Doctor, let me just confirm — I'll count the
10  CDs. I'm counting about 20. Does that seem about right?
11      A.  If that's what you got, then — I trust you.
12      Q.  All right. And these CDs, they say on them — it
13  says "Bailey Perrin Bailey" on them, correct?
14      A.  Correct.
15      Q.  They all do. When did you receive these CDs?
16      A.  Starting in — gosh. I'd have to say around — my
17  recollection's around February of the — would it be of last
18  year? Can I look —
19      Q.  Of course. Absolutely. You're free to look at
20  anything you need to help you testify, Doctor.
21      A.  Starting in February of '08.
22      Q.  Okay. I take it then you didn't receive, for
23  example, all 20 of these CDs at the same time. They came in
24  over time. Is that fair to say?
25      A.  That's correct.

**12**

1      Q.  All right. Just for the purpose of the record, are
2  you testifying in this litigation about just three plaintiffs,
3  as far as you know?
4          MR. FIBICH: Yeah. Let me help you out.
5          THE WITNESS: Yes.
6          MR. FIBICH: There's only three plaintiffs that
7  he's had so far.
8          MR. McCONNELL: Okay.
9      A.  That's correct.
10      Q.  (BY MR. McCONNELL) And what are the names of those
11  three plaintiffs?
12      A.  Last names are Burns, Guinn, and Curley.
13      Q.  Okay. And when were you first retained by
14  plaintiffs' counsel to testify in the cases of those three
15  plaintiffs?
16      A.  I was first contacted and retained in February on —
17  but I think it was a couple of months later that it was — I
18  received materials on those plaintiffs.
19      Q.  Who contacted you in February?
20      A.  Mr. Fibich.
21      Q.  Okay. And what did you discuss at that time of the
22  initial contact?
23      A.  He asked me if I would be willing to review some
24  cases where, you know, there were — antipsychotics had been
25  used and there were issues of weight gain and diabetes and —

**13**

1      Q.  All right.
2      A.  — so I said I would.
3      Q.  Can I see that file for a second? Or maybe you could
4  just take a look at it, if you don't mind. What I'd like to do
5  is very briefly go through Schedule A, and basically the
6  questioning is going to be: Is the stuff on Schedule A — is
7  there stuff that exists and is it contained in the materials
8  that you just provided to us?
9          So, if you could just — you could actually just
10  sort of read this to yourself instead of me belaboring the
11  record. Just take a look and let me know as you go through
12  each category if you have materials that would be included
13  there.
14      A.  As far as I know, all the clinical materials and sort
15  of corporate materials and legal materials are included in
16  the — in this. There may be some articles that I've read and
17  referenced that I may bring up that I didn't specifically store
18  as part of that record.
19      Q.  If I can just jump in for a moment, is there any
20  material on any of these CDs that you stored as opposed to was
21  placed on the CD by the plaintiffs' counsel?
22      A.  No.
23      Q.  Okay. You can continue. Thanks.
24      A.  I don't have — I don't — I didn't take any notes.
25  I don't have any other sort of materials, you know,

14

1  memorialized about previous expert testimony about
2  antipsychotics. I think I did — I haven't testified about
3  Seroquel or other antipsychotics. There are e-mails that are
4  not — you know, that are essentially communications about
5  scheduling, timing of reports and so forth that are not in the
6  record, and if — I guess I can provide those, if that's
7  something that —
8      Q.  Just to be clear, they're certainly not in the CDs,
9  right?
10     A.  That's correct.
11     Q.  And they're also not in the folder that you brought
12 today?
13     A.  That's correct.
14     Q.  Could you bring those in tomorrow?
15     A.  Yeah. I think I could probably do that.
16     Q.  Okay. Thanks. Keep going.
17     A.  I've had no communications with the witnesses or
18 family members. The — I don't really know that I have — that
19 there are independent medical examinations that I have access
20 to or that I was provided. I haven't given any speeches or
21 presentations or written anything specifically about Seroquel
22 or antipsychotics. My retainer agreement is in there.
23 Litigation — I don't know what scientific evidence or med
24 expertise is. And then I — my CV, I think, was provide as —
25     Q.  Yes.

15

1      A.  — part of my reports. And the two pay stub — or
2  the check stubs for the checks I received are in the file.
3      Q.  Olkay. One of the items that's captured in these
4  categories is time records. Do you have time records in this
5  case?
6      A.  I do. I have a — it's handwritten, and then it's —
7  there's a version of — on the invoice, there's —
8      Q.  Oh, okay. So — and I'll — I guess I should
9  probably try to make a copy of this. I don't — this is your
10 original, right?
11     A.  Correct.
12     Q.  I don't want to take your original. Maybe we can
13 find a way here to make a copy —
14        MR. FIBICH: Sure.
15     Q.  (BY MR. McCONNELL) — then we'll have this marked,
16 but — I think as you just said, on the inside flap of the
17 yellow folder, it appears to be time records.
18     A.  Correct.
19     Q.  Is that right?
20     A.  Correct.
21     Q.  And I do see here — it says — I can — you're a
22 doctor, so your writing is what it is, but I think it says
23 "Review Materials." I see "Depositions." I also see here
24 "Review Rosas."
25     A.  Correct, a separate case.

16

1      Q.  That's another case that you were working in?
2      A.  That's correct.
3      Q.  And so the numbers on the side — you have a date and
4  then you have the number and the number reflects the number of
5  hours that you spent, correct?
6      A.  Correct.
7      Q.  And mostly what you were doing is you were —
8      A.  Reviewing materials. I'm sorry.
9      Q.  I'm sorry for cutting you off. If I ever — by the
10 way, if I ever cut you off, let me know because you're entitled
11 to finish your answer —
12     A.  Sure.
13     Q.  — and I apologize. And I just did it again.
14     A.  Sure.
15        MR. McCONNELL: If we can get a copy of that,
16 I'd appreciate it.
17        MR. FIBICH: Keep going.
18     Q.  (BY MR. McCONNELL) In some of the other depositions
19 in this case some, of the witnesses received a timeline from
20 plaintiffs' counsel. Did you receive any such timeline?
21     A.  There was sort of an abstract of the medical record
22 that was provided by Glenda Grainger, and that — it — I
23 believe that it's in — if it's not on one of those CDs,
24 it's — it's in one of the e-mails that sent.
25     Q.  Okay. And by the way, these CDs, these are also your

17

1  original CDs?
2      A.  Correct.
3      Q.  So, we need to figure out a way we can get copies of
4  these things. Maybe there's some service around here we could
5  do it, or I'll ask Tommy when he gets back. Maybe you guys can
6  just send us copies.
7      A.  I'm not sure, but I was under the understanding that
8  that was — they already provided copies of these. I don't
9  know.
10     Q.  It's possible. I kind of don't think so, but it's
11 possible. We'll check.
12        With respect to the timeline, did you ever ask
13 Ms. Grainger what methodology she used to create that timeline?
14     A.  I didn't ask her, but I believe that it was just a
15 review of the medical records and abstracted information. That
16 was my understanding.
17     Q.  And the timeline included references to certain
18 events in the medical history of these plaintiffs, correct?
19     A.  Correct.
20     Q.  I mean, it certainly wasn't a list of every event,
21 true?
22     A.  Correct.
23     Q.  Did you inquire as to what the selection process was
24 by Ms. Grainger as to what she chose to include and what she
25 chose to omit?

18

1   A. Well, no. I -- I did not have any discussion with
2   her about her methods for putting that together.
3       Q. Were you able to take the timeline and look at the
4   medical records and ascertain the extent to which the timeline
5   was accurate or complete?
6       A. I did not -- I didn't do it for every single item,
7   but as I was reviewing the records, I looked at the timeline
8   and was, you know, essentially looking for correspondence
9   between what I was seeing in the report records and what she
10  had recorded in her Excel spreadsheet, and there appeared to be
11  good correspondence.
12      Q. Okay. Did the timeline include references to the
13  various weights of the plaintiffs?
14      A. Yes, sir.
15      Q. And did you check to see the extent to which those
16  references to the weights were accurate and complete and fairly
17  representative?
18      A. I looked at -- I did not do that for every single
19  weight I did that for several representative weights and then,
20  you know, as I moved forward, I just was focussing on just
21  reviewing the charts and --
22      Q. Did the timeline make reference to various blood
23  glucose measurements of the plaintiffs?
24      A. In some cases, it did.
25      Q. And, again, did you make any effort to see whether

19

1   the blood glucose references on the timeline were accurate and
2   complete and fairly representative of the blood glucose
3   measurements for that plaintiff?
4       A. Again, it was more of a sampling of -- when there was
5   a clear indication of a finding in the medical record, I would
6   check and look and see. And as far as I recall, there was good
7   correspondence. It wasn't -- if -- I don't believe that that
8   record included every single glucose or every single weight,
9   but there appeared to be reasonable correspondence.
10      Q. Well, one of the things that you say in your expert
11  report is that there was a temporal relationship between the
12  ingestion of Seroquel and certain consequences, right?
13      A. Correct.
14      Q. To what extent did you check the timeline against the
15  full record to see if such a temporal relationship was
16  confirmed or refuted?
17      A. Well, I paid most attention to the medical record
18  around the onset of taking the Seroquel and looked at changes
19  in weights over time after the medication was started, and I
20  thought there was a solid temporal association between the
21  starting of the Seroquel and the changes in weights. And it
22  did correspond with what was in -- what had been recorded in
23  her timeline.
24      Q. But to arrive at that conclusion of the temporal
25  relationship, wouldn't you also want to see what happened

20

1   beforehand and also afterwards?
2       A. Sure.
3       Q. And did you do that?
4       A. I did and I saw, you know, in some cases, waxing and
5   waning of weights and --
6       Q. Uh-huh.
7       A. Yeah.
8       Q. Was that relevant to your opinions?
9       A. Yeah. To some degree, yeah, yes.
10      Q. All right. And we'll talk about that in more detail.
11  I also want to have placed in front of you, if you don't mind,
12  what's been premarked as Exhibits 2 through 4. And what they
13  are is -- Exhibit 2 is your expert report for Curley, Exhibit 3
14  for Burns, and Exhibit 4 for Guinn; is that right?
15      A. Yes, sir.
16      Q. And you mentioned before that you had provided us
17  with your CV. Is your CV, in fact, attached to each one of
18  these expert reports?
19      A. Yes, I believe so.
20      Q. And could you just confirm for us that that's your
21  current CV?
22      A. There are some new things, but it's fairly
23  representative of a current CV.
24      Q. Well, what are -- are there any new things that are
25  relevant to this case?

21

1       A. Not really.
2       Q. All right. Nothing regarding antipsychotics or
3   diabetes or hypertension or Seroquel?
4       A. No.
5       Q. All right. What did you do to prepare for this
6   deposition, if anything?
7       A. I went back and reviewed the records, read through
8   the materials again and read a few -- you know, reread and
9   reviewed several of the articles that I had reviewed previously
10  and met with Mr. Fibich for about an hour yesterday and then
11  for maybe 15 minutes this morning.
12      Q. What did you discuss yesterday?
13      A. Just talked about -- mostly about the deposition, you
14  know, what to expect and, you know, things that might come up.
15  There -- he shared with me -- and this is one thing that is not
16  in the record -- a deposition of Dr. H. -- I forget his name.
17  He was recently deposed.
18          MR. FIBICH: Wirsching, Bill Wirsching.
19      Q. (BY MR. McCONNELL) So, you've read the Wirsching
20  deposition?
21      A. I did. I read it last night.
22      Q. Was there anything within the Wirsching deposition
23  with which you disagreed?
24          MR. FIBICH: Object to form. You can go ahead
25  and answer that.

22

1   A.  Nothing jumps to mind that I sort of said, "Oh,
2   that's just not accurate."
3   Q.  (BY MR. McCONNELL)  Okay.
4   A.  Not that I recall.
5   Q.  Have you read any of the other depositions in this
6   case of the plaintiff experts; for example, Dr. Plunkett or
7   Dr. Nair?
8   A.  I don't think so.
9   Q.  Or Dr. Marks?
10  A.  No.  I don't think I read those.
11  Q.  Okay.  Do you recall in the Wirsching deposition that
12  Dr. Wirsching said that he believed AstraZeneca scientists
13  acted professionally and honestly?  Do you remember him saying
14  that?
15  A.  I do remember some discussion about ethics and that
16  he basically felt that -- you know, that the scientists had
17  acted in a reasonable way, yeah.
18  Q.  Do you disagree with Dr. Wirsching?
19  A.  No.
20  Q.  Do you recall Dr. Wirsching saying that Seroquel can
21  be an appropriate medicine for many patients with serious
22  mental illnesses?
23  A.  Yes.
24  Q.  And do you agree with that?
25  A.  Absolutely.

23

1   Q.  Do you recall Dr. Wirsching testifying that Seroquel
2   is a better choice than other second-generation atypical
3   antipsychotics for patients under many circumstances?
4   A.  I recall him saying that.
5   Q.  Do you agree with that?
6   A.  I have to say with the recent evidence that I
7   can't -- I don't agree with that necessarily.  I think that the
8   efficacy data is -- would suggest that it's equivalent and not
9   superior.  However, there are individual differences in the way
10  people respond to medications.  So, it may be that one patient
11  would be more responsive to one second-generation as opposed to
12  another; but, in general, I think that it's essentially been
13  demonstrated to be equally effective.
14  Q.  And when you say "equally effective," for what
15  indications do you mean?
16  A.  Well, for schizophrenia is essentially where that's
17  been looked at in most detail.
18  Q.  What about for bipolar disorder?  Hasn't there been
19  research showing that Seroquel can be superior than the other
20  SGAs?
21  A.  Well, I think that there is -- I think, yes, there's
22  been those, but not necessarily in other treatments for
23  bipolar.
24  Q.  What about for patients for whom the doctor believes
25  that a sedative effect would be beneficial?  Do you agree that

24

1   the record shows that Seroquel can be superior to the other
2   SGAs?
3   MR. FIBICH:  Object to form.
4   A.  Well, I would certainly agree that Seroquel has a
5   sedative effect.
6   Q.  (BY MR. McCONNELL)  And do you agree that that can be
7   beneficial for some patients?
8   A.  In some cases, yes.
9   Q.  Do you recall Dr. Wirsching in his deposition also
10  saying that Zyprexa and clozapine are associated with
11  substantially more weight gain than Seroquel?
12  A.  Yes, sir.
13  Q.  Do you agree with that?
14  A.  That's what the data seem to show.
15  Q.  And do you agree with Dr. Wirsching when he said that
16  Seroquel has a better profile for prolactin and EPS than other
17  antipsychotics?
18  A.  I recall him saying that.
19  Q.  Do you agree with that?
20  A.  I have to say my interpretation of what's out there
21  doesn't suggest that that's necessarily the case, so --
22  Q.  When you say it's not necessarily the case, can it be
23  the case for some patients?
24  A.  Well, it's very hard to -- I don't think that you can
25  go from that general data and say that just because a patient

25

1   doesn't have that specific response, that it -- that it's
2   superior.  So, I -- you haven't done an individual case study
3   with a given clinical patient.  So, if you have a patient that
4   doesn't have that response, that's -- you know, that may be
5   fine.  It doesn't mean that it's -- that they wouldn't -- that
6   they would with another agent not have the same response also.
7   Q.  All right.  Do you agree that the studies overall
8   show certainly that Seroquel is superior to first-generation
9   atypicals in terms of EPS and tardive dyskinesia?
10  A.  No.
11  Q.  You don't agree with that?
12  A.  That's not what the Katy study suggests.
13  Q.  All right.  We'll talk about that later.
14  In terms of the prolactin profile, do you agree
15  that the studies show that Seroquel is superior to risperidone
16  and Zyprexa?
17  A.  Well, I have to say I don't recall specifically about
18  that, but I -- if that's what the data show, that's what the
19  data show.
20  Q.  Okay.  Where is it that you currently work, Doctor?
21  A.  I work at the Child Trauma Academy.
22  Q.  And how long have you worked there?
23  A.  In one form or another, for 20 years.
24  Q.  What's your job title there?
25  A.  I am the senior fellow.

7 (Pages 22 to 25)

26

1    Q.  And what are your responsibilities as senior fellow?
2    A.  I have a range of responsibilities that have to do
3    with teaching and program development and some clinical work,
4    but it's — basically, it's a leadership role in a large
5    interdisciplinary working group.
6    Q.  Are you the owner of the Child Trauma Academies?
7    A.  No.  It's a not – not-for-profit organization, so —
8    Q.  Do you report to anybody?
9    A.  Well, I'm — have to report to my board and my
10   executive director.
11   Q.  All right.  I'll go very briefly through your
12   education.
13   A.  Sure.
14   Q.  You took your undergraduate degree from Amherst; is
15   that right?
16   A.  I never received the — I never graduated from
17   college.
18   Q.  But you did graduate from medical school.
19   A.  Right.
20   Q.  How did you pull that off?
21   A.  Well, it's a long story.  I just applied — I took
22   some time off as an undergrad.  And then when the time came to
23   apply to medical school with my — sort of my cohort, I decided
24   I was going to apply to medical school and only filled out
25   applications to places that didn't ask me specifically if I was

27

1    going to graduate, so I got in.
2    Q.  And that was at Northwestern?
3    A.  Correct.
4    Q.  In Chicago?
5    A.  Correct.
6    Q.  You later did a fellowship in child and adolescent
7    psychiatry at the University of Chicago; is that right?
8    A.  Yes, sir.
9    Q.  When was it that you developed an interest in
10   focussing on child and adolescent psychiatry?
11   A.  I was interested in development and developmental
12   issues from the time I was actually an undergraduate at
13   Stanford, so I — it's — I always had a sense that I would do
14   something in development and work with kids probably.
15   Q.  You're currently licensed to practice medicine, I
16   take it.
17   A.  Yes.
18   Q.  And in what states are you licensed?
19   A.  In Texas.
20   Q.  Okay.  Are you licensed in Canada at this time?
21   A.  I have a — it's — I forget what they call it, but
22   it's kind of like a professorial license.  It's — I can't — I
23   forget the name of it, but I — I'm not licensed to practice
24   medicine, but I can teach and provide consultation.
25   Q.  Have you ever been licensed to practice medicine in

28

1    Florida?
2    A.  No.
3    Q.  Has any of your — have any of your medical licenses
4    ever been revoked or suspended?
5    A.  No.
6    Q.  Have you ever been asked to leave a position?
7    A.  No.
8    Q.  These are pro forma questions.  I apologize.  There's
9    no implication intended.
10   Have there ever been any investigations against
11   you?
12   A.  No.
13   Q.  Have you ever been sued for malpractice?
14   A.  No.
15   Q.  Have you ever been a defendant in a civil lawsuit?
16   A.  Yeah, I guess I have.  I have, yeah, yeah.
17   Q.  Just tell me briefly about that.
18   A.  I actually was sued by a guy who was doing — this is
19   a long story.  I was sued by a guy — I was contacted by the
20   State of Colorado about somebody who was practicing therapy
21   with sexually abused boys by having them strip naked and
22   reenact the sexual act with dildos while he was there, and I
23   said — I didn't know who it was, didn't know who the guy —
24   didn't know his name.  I said, "Well, that's not therapy.
25   That's abusive.  And if you were doing that in any other

29

1    context, you'd get reported to the police."
2    And based upon that statement, he sued me for
3    defamation.  And basically ended up settling it, but I — the
4    attorney general of Colorado had me as one of the key witnesses
5    in testifying against this person.  He had his license revoked
6    and — but he — and turned around and sued me.  It ended up
7    essentially being settled out, so —
8    Q.  Have you ever been a defendant in any other civil
9    lawsuit?
10   A.  No.
11   Q.  Have you ever been sued for malpractice?
12   A.  No.
13   Q.  Have you ever been a defendant in a criminal lawsuit?
14   A.  No.
15   Q.  You're currently board certified in psychiatry?
16   A.  Yes.
17   Q.  Are you board certified in anything else?
18   A.  Child and adolescent psychiatry.
19   Q.  That's a current board certification?
20   A.  Yes.
21   Q.  It hasn't lapsed?
22   A.  No.
23   Q.  All right.  Are you board certified in endocrinology?
24   A.  No.
25   Q.  And you know what endocrinology is, right?

30

1     A.  Yes.
2     Q.  Can you just tell the jury what it is?
3     A.  It's a field of medicine that focusses on
4  understanding the endocrine system and treating diseases of the
5  endocrine system.
6     Q.  Which would include diabetes, correct?
7     A.  Right.
8     Q.  Have you ever published any articles about
9  endocrinology?
10    A.  Actually, a lot of the articles that I've published
11  have to do with the stress response, have to do with the -- you
12  know, how stress influences hormones, including adrenaline;
13  which is a counterregulatory hormone, very important for
14  diabetes and a whole bunch of other disease processes.  So, you
15  know, I think -- tangentially, I think, yeah.  I mean, it's --
16  the work that I've done has -- could be considered
17  neuroendocrinology.
18    Q.  Stress can play a role with respect to blood glucose,
19  can't it?
20    A.  Certainly.
21    Q.  Are there any articles you've written that actually
22  talk specifically about diabetes?
23    A.  I've been a co-author in an article that was a large
24  epidemiological study on the impact of adverse childhood
25  experiences on the development of physical health problems,

31

1  including diabetes, but it wasn't really focussed on diabetes.
2     Q.  Which -- if you have your CV in front of you, if you
3  could, just tell us which article or book chapter that is.
4     A.  It's the article that -- the first author is Bob
5  Anda.  It should be in there -- in here somewhere.  It's No. 46
6  on Page 14.
7     Q.  Okay.  "The enduring effects of childhood abuse and
8  related experiences: a convergence of evidence from
9  neurobiology and epidemiology."  Is that it?
10    A.  Uh-huh.
11    Q.  And it does discuss -- by the way, you said "uh-huh."
12  You mean "yes"?
13    A.  Yes.
14    Q.  And that does discuss diabetes?
15    A.  Diabetes is one of the adverse outcomes that is
16  tracked in that epidemiological set of studies.
17    Q.  Could you just briefly explain how that could be?
18    A.  How what could be?
19    Q.  How diabetes could actually be an adverse experience
20  from childhood abuse or childhood trauma?
21    A.  Well, the adverse experience is abuse, neglect,
22  chaos, or whatever happens in development.  And the outcomes
23  that are tracked are physical health outcomes, social
24  functioning outcomes, emotional functioning outcomes; and among
25  the outcomes that is increased risk following early

32

1  developmental trauma is diabetes.
2     Q.  You know, by the way, that some of the plaintiffs for
3  whom you're opining today are plaintiffs who have undergone
4  some degree of child abuse and trauma.
5     A.  Yes.
6     Q.  And would you say in those cases that that child
7  abuse and trauma is at least a risk factor for diabetes?
8     A.  Yes.
9     Q.  Okay.  To what extent?  Can you quantify that?
10    A.  I think that there are -- and I don't know them
11  offhand, but I think there are odds ratios about the increased
12  risk depending upon the number of adverse events.  But I
13  couldn't do that with these clients because, you know, I don't
14  have a quantification of their subject -- you know, their
15  subjective reporting of adverse experiences.
16    Q.  But if you were to try to quantify the increased --
17  the odds ratio of the relative risk, one of the variables that
18  would be relevant would be the number of abusive experiences?
19    A.  Yes.
20    Q.  How about also the extent of the abusive experience?
21    A.  Well, that can be a factor, but that wasn't something
22  that was -- in the adverse childhood experience studies, that
23  wasn't something that they tracked.  They probably should have,
24  but they didn't.
25    Q.  I mean, for example, rape by a relative would

33

1  certainly be a childhood abusive experience that would be
2  pertinent in this regard, true?
3     A.  Certainly.
4     Q.  Are there any other articles or book chapters you've
5  written that would specifically have addressed diabetes,
6  whether as an adverse outcome or anything else?
7     A.  Not specifically.
8     Q.  Okay.  Same question with respect to hyperglycemia.
9     A.  Nothing.
10    Q.  Same answer --
11    A.  Yes.
12    Q.  -- right?  Okay.  Have you ever taught any classes
13  about endocrinology?
14    A.  Well, I -- you know, I've certainly taught at the
15  medical school level about neuroendocrinology and, you know,
16  the HPA axis and the effects of different neuropsychiatric
17  conditions on endocrine profiles and so forth, but -- so --
18    Q.  Have you ever taught any class about how certain
19  medicines can affect endocrinology?
20    A.  No.
21    Q.  Do you hold yourself out as an expert in
22  endocrinology?
23    A.  I'm not a neuro -- I'm not an endocrinologist, but I
24  think that compared to, you know, Joe Public, I -- I would have
25  the expertise that a -- someone trained as a physician and

34

1  practices in my field would have.
2      Q. You're a doctor, so you know more about medicine that
3  most non-doctors.
4      A. Usually.
5      Q. Maybe all non-doctors. All right. Do you consider
6  yourself an expert in bariatrics?
7      A. Again, I don't -- you know, I'm not a bariatric
8  physician, but I -- you know, I have a -- I think a physician's
9  understanding of the issues related to weight gain and weight
10  loss. I have a -- you know, there are aspects of the
11  neurobiology of that that are of interest to our group and,
12  again, related to how satiety and eating and feeding problems
13  are part of the constellation of issues that are impacted by
14  developmental trauma and stress.
15      Q. And have you concluded that childhood trauma can have
16  an effect on the extent to which people feel satiety or the
17  extent to which they have eating disorders?
18      A. Well, it's something that we are looking at and
19  something we talk about, think about, and -- yeah, but I -- you
20  know, it's a very complex set of issues, but we're very
21  interested in satiety, what makes people actually seek out food
22  as a form of reward.
23      Q. All right. Do you hold yourself out as an expert in
24  toxicology?
25      A. Well, I -- I have a Ph.D. in pharmacology and studied

35

1  prenatal exposure to a variety of agents. So, yeah, I think I
2  have expertise in neurotoxicology, you know, what makes
3  neurons, you know, impacted by various factors, including
4  classic toxic agents.
5      Q. Are you board certified in toxicology?
6      A. No.
7      Q. Are you board certified in pharmacology?
8      A. I'm not aware that there is -- and there may be a
9  clinical pharmacology board, but I don't think they have board
10  certification in pharmacology.
11      Q. If they do, you don't have it.
12      A. I don't.
13      Q. Okay. Dr. Perry, do you sit on the editorial boards
14  of any medical journals?
15      A. I do.
16      Q. Which ones?
17      A. I'm on the editorial board of the Journal of Child
18  and Adolescent Trauma. I'm on the editorial board of the
19  Cultic Studies Journal, which really isn't a medical journal,
20  but it's got some medical issues. And those are the editorial
21  boards that I'm on.
22      Q. What medical journals do you read on a regular basis?
23      A. I read the Journal of the American Academy of Child
24  and Adolescent Psychiatry. I generally read the Green Journal,
25  you know, the American Journal of Psychiatry. I will --

36

1  depending on the -- I read science, nature. There's a Journal
2  of Traumatic Stress Studies, the -- and then I will --
3  typically, I have a process that searches various publications
4  for issues -- for articles that are relevant to my primary area
5  of research.
6      Q. Are those typically Medline searches?
7      A. They're like Medline searches, yeah.
8      Q. Have you done Medline searches or any similar sort of
9  search to help you develop your opinions in these cases?
10      A. Well, I didn't do a specific Medline search, but I
11  did look at a few articles, did do a few searches for
12  quetiapine and -- just to see that the articles that were
13  provided to me were representative of what was out there.
14      Q. What key words did you use to undertake those
15  searches?
16      A. You know, I used "Seroquel," and then look at
17  Seroquel and diabetes, Seroquel and weight gain. And, you
18  know, usually by doing that, you can go from article to
19  article.
20      Q. You certainly would agree, wouldn't you, that you
21  haven't read every article ever written about Seroquel?
22      A. I would certainly agree on that, yes.
23      Q. And is it also fair to say that you have not read
24  every article about Seroquel and glucose disregulation?
25      A. That's fair.

37

1      Q. Do you have any idea what percentage of the
2  literature you have read in that area?
3      A. Oh, gosh. I probably read 10 percent. That's -- you
4  know, and maybe even less. I mean, I know that there are -- so
5  many of the articles -- I mean, there's a lot of articles. I
6  feel like I've read the key articles and representative
7  reviews.
8      Q. How would you know that?
9      A. Just by looking at the references and the citations
10  in the articles that I read, which appear to be very
11  comprehensive. And, you know, I don't think I need to read the
12  eight case reports that, you know, were published in the
13  early -- you know, from 1998 to 2005 if they're adequately
14  summarized in a good review.
15      Q. We were talking about the things that you typically
16  read. Do you typically read the PDR?
17      A. I'll read the PDR when it -- you know, there's a
18  medication that I'm about to prescribe that I'm either
19  unfamiliar with or feel like I need to get updated on.
20      Q. Do you look at any online journals, medical journals?
21      A. Well, a lot of the journals that I read are available
22  online, so that's what I'll -- I frequently use that mechanism.
23      Q. Do you typically consult websites, such as the FDA or
24  the National Institute of Mental Health?
25      A. I do on occasion, yeah.

38

1    Q.   Are you a member of the AMA?
2    A.   No, I'm not actually.
3    Q.   Are you a member of the APA?
4    A.   No.
5    Q.   Just for the record, can you tell the jury what the
6    APA is?
7    A.   The American Psychiatric Association.
8    Q.   I guess I'm a little surprised you're not a member of
9    that.  Is there any reason why?
10   A.   I was a member of the APA and, when I started
11   practicing in Canada, there were — you know, they had a — I
12   think — I can't remember exactly, but it's basically that
13   there was residency differences and I had to pay X — you know,
14   large amount of money.  I said, "Just forget it.  I'll just get
15   the journal.'"
16   Q.   Are you a member of the American Diabetes
17   Association?
18   A.   No.
19   Q.   Have you ever been?
20   A.   No.
21   Q.   I had asked you a couple of questions about the Child
22   Trauma Academy.  Can you just very briefly tell us what the
23   mission of the Child Trauma Academy is?
24   A.   It's a not-for-profit organization that is focussed
25   on trying to develop and disseminate innovations in the area of

39

1    child maltreatment.
2    Q.   And you were a founder of it, weren't you?
3    A.   Essentially, yeah.
4    Q.   Do you draw a salary from the Child Trauma Academies?
5    A.   The way it's set up is that I'm an independent
6    contractor, and that just was the easiest way for us to set it
7    up in the beginning.  I'm essentially an independent contractor
8    and if I do, you know, a service and that generates revenue for
9    the Child Trauma Academy, then I'll take some portion of that.
10   Q.   What amount of money did you receive last year from
11   the Child Trauma Academy?
12       MR. FIBICH:  Hold on.  Hold on.  I don't think
13   that that's an appropriate question.  Tell me why you need to
14   know that.
15       MR. McCONNELL:  Well, I sort of need the
16   denominator to then ask the numerator about how much he's made
17   as an expert witness to see the extent to which being an expert
18   witness is playing a big role in terms of Dr. Perry's financial
19   situation.
20       MR. FIBICH:  Dr. Perry, I don't know that this
21   is something you need to tell.  I think — if that's your
22   inquiry, I'd rather do it on a percentage basis as opposed to
23   asking —
24       MR. McCONNELL:  That's fine.
25   Q.   (BY MR. McCONNELL)  Right now, this year, in 2008,

40

1    what percentage of your income comes from serving as an expert
2    witness?
3    A.   Probably less than 5 percent.
4        MR. McCONNELL:  But just so the record's clear,
5    you did instruct not to answer on that; is that right?
6        MR. FIBICH:  Yes.
7    Q.   (BY MR. McCONNELL)  Okay.  Are you still a senior
8    consultant at the Alberta Ministry of Children's Services?
9    A.   Yes.
10   Q.   And what's your role in that position?
11   A.   I provide program development input, consultation on
12   specific high-profile cases, teaching, participate in policy
13   revision process with the minister and all of the ministers —
14   people that work within the ministry.
15   Q.   Are you a resident in Canada for some portion of the
16   year?
17   A.   I'm not given — I'm essentially deemed a
18   nonresident, although I spend a lot of time up there.
19   Q.   In the summer?
20   A.   In the summer.
21   Q.   Do you draw a salary from that post?
22   A.   Again, I'm an independent contractor with them and
23   I — I will get paid based upon the amount of work that I'll
24   do.
25   Q.   And I'll again ask the question, how much you made

41

1    from them last year.
2        MR. FIBICH:  I mean —
3    A.   I don't know.  I think it was maybe 75, $80,000.
4        MR. McCONNELL:  Well, if he answered for that,
5    why can't he answer for the Child Trauma Academy here in
6    Houston?
7        MR. FIBICH:  Well, I just think it's a little
8    personal and a little invasive.  I don't think it bears upon
9    the questions.  I'm going to give you great latitude today to
10   ask questions.  I personally don't think these experts ought to
11   be asked what they make, so —
12       MR. McCONNELL:  I've got to tell you, I agree
13   with you, it is personal.  And I don't particularly like this
14   aspect, but a lot of personal questions were asked about our
15   people about what they made, and I think for a paid witness
16   it's even more pertinent.
17       And, also, you can mark this as confidential,
18   but — I mean, if that's your instruction, that's your
19   instruction.  That's fine.  I'm not going to argue with you
20   about it, although I just did.  But I'm done, all right?
21   Q.   (BY MR. McCONNELL)  Doctor, do you do any teaching
22   currently?
23   A.   I do.  I do.
24   Q.   What percentage of your time do you spend teaching?
25   A.   Probably spend about 15 to 20 percent of my time

11 (Pages 38 to 41)

42

1   teaching in one form or another.
2       Q.  And have you ever taught regarding diabetes or
3   hyperglycemia?
4       A.  Not specifically, no.
5       Q.  Have you ever taught regarding the use of Seroquel?
6       A.  Not specifically, no.
7       Q.  All right.  How about generally?
8       A.  I do teach about psychopharmacology quite a bit and
9   the use of medications in neuropsychiatric disorders.
10      Q.  Have you taught regarding the use of
11  second-generation antipsychotics?
12      A.  As part of that overall process of agents that may be
13  used in specific situations, yes, but never -- I've never
14  really, you know, had a lecture or been asked to come and
15  specifically talk about, you know, second-generation
16  antipsychotics.
17      Q.  Do you have any course syllabus or any materials
18  written up that would contain, in summary fashion, your
19  discussion of second-generation antipsychotics?
20      A.  No.
21      Q.  Do you have tenure for teaching?
22      A.  I did have tenure, but I -- that organization that
23  I -- you know, it's not a conventional academic organization,
24  so they don't -- we don't have tenure.
25      Q.  All right.  Just going backwards from where you are

43

1   now to when you got out of medical school, if you could just
2   summarize the various employment positions you've had.
3       A.  Sure.  Prior to my current position, I was the chief
4   of psychiatry at Texas Children's Hospital and the vice
5   chairman for research in the department of psychiatry at Baylor
6   College of Medicine.  Prior to that, I was an assistant
7   professor at the University of Chicago in the departments of
8   pediatrics, pharmacology, and psychiatry.  And prior to that, I
9   was a fellow at -- in child psychiatry at Yale University.
10      Q.  All right.  Is it fair to say you specialize in child
11  psychiatry?
12      A.  Yes.
13      Q.  All right.  Do you recall you were deposed in a case
14  involving somebody named Laura Tee vs. Baylor?
15      A.  I do.
16      Q.  And you were asked what it is you do, and you said
17  you are a child adolescent psychiatrist.  Is that a fair
18  statement?
19      A.  Yes.
20      Q.  Still true?
21      A.  Yes.
22      Q.  Just for the jury, can you explain what it means to
23  be a child adolescent psychiatrist?
24      A.  I think I probably said child and adolescent
25  psychiatrist, but --

44

1       Q.  Some court reporters miss words.  This one never does
2   though.
3       A.  A child and adolescent psychiatrist is someone who
4   has specialized training in working with children and families
5   with -- where the child or adolescent has mental health issues
6   and -- that -- I'm not sure I need to elaborate too much more.
7       Q.  Is it fair to say, Dr. Perry, that you've made it
8   your life's work to understand how trauma affects children and
9   to develop innovative ways to help them cope with it?
10      A.  I --
11          MR. FIBICH:  Object to form.
12      A.  You know, I think that's at the core of what I do,
13  yes.
14      Q.  (BY MR. McCONNELL)  Did that phrase sound familiar to
15  you at all?
16      A.  Yeah.
17      Q.  All right.  Is it from your book, "The Boy Who Was
18  Raised As a Dog"?
19      A.  It very well may be.
20      Q.  Yes.  Do you currently see patients?
21      A.  I do.
22      Q.  How often?
23      A.  Well, it's -- I see patients probably once a week and
24  I do consultation with colleagues about patients where I'm part
25  of a treatment group also probably two or three -- probably at

45

1   least -- probably the best way to do it is by month, but maybe
2   six or seven new case per month.
3       Q.  How many patients are you currently treating?
4       A.  Well, as the only clinician, probably 20, 25.  Our
5   practice model is very different than a conventional clinical
6   setting though.  We have -- usually work with families and
7   children as an interdisciplinary group where I will be part of
8   a team that is working with the child and family.  So, if you
9   take that into consideration, there's probably maybe 80 or 90
10  active cases.
11      Q.  Are all of your patients children or adolescents?
12      A.  No, no.
13      Q.  How many adult patients do you have?
14          MR. FIBICH:  Currently?
15          MR. McCONNELL:  Yes.  Thank you.
16      A.  I'd say four or five.
17      Q.  (BY MR. McCONNELL)  Okay.  How is child psychiatry
18  different from adult psychiatry?  And you can't answer by
19  saying one deals with children and one deals with adults.
20      A.  Well, I think the major difference is that when you
21  do child psychiatry, you actually have to deal with the whole
22  family, which means you end up dealing with the child and the
23  adults who are part of the child's life.  And even though the
24  adults may not be the identified client, very often you do as
25  much mental health work with them as you do with the child.

46

```
1        Q.  Is it fair to say that the overwhelming majority of
2    articles and book chapters you've written pertain to child or
3    adolescent psychiatry?
4        A.  That's correct.
5        Q.  Have you ever done any speaking for a pharmaceutical
6    company?
7        A.  I have given presentations -- I've given grand rounds
8    where the major sponsors have been pharmaceutical companies,
9    but I haven't been -- you know, I've been approached by several
10   pharmaceutical companies to be part of their speakers bureau
11   and I've basically turned them down, so --
12       Q.  What company-sponsored the grand rounds speaking
13   tours that you did?
14       A.  Tell you the truth, I've done it so many times that I
15   wouldn't -- I can't -- I have no idea.
16       Q.  Okay.  Have you ever done any speaking engagement
17   specifically about second-generation antipsychotics?
18       A.  No.
19       Q.  All right.  Have you ever done a speech on diabetes
20   or hyperglycemin?
21       A.  No.
22       Q.  If you look at your CV at Page 31, Doctor, there's a
23   reference under Training/Education (local) --
24       A.  Yeah.
25       Q.  I'm sorry.
```

47

```
1            MR. McCONNELL:  Which one is this, schizophrenia
2    one.
3        Q.  (BY MR. McCONNELL) I'm sorry.
4    National/international.  You were an invited speaker -- this is
5    for The Discovery Channel -- Recent Advances in the Treatment
6    of Schizophrenia, 1991.  Do you see that?
7        A.  Yeah.
8        Q.  Just generally, what was that about?
9        A.  To tell you the truth, what they wanted was somebody
10   who was good at communicating.
11       Q.  Right.
12       A.  And since I was viewed as good teacher, I was part of
13   a panel with a number of other people who were more
14   fundamentally, you know, focussed -- whose clinical work was
15   more fundamentally in work with schizophrenia.  But, you know,
16   I -- as it's -- I've had experience working with people who
17   have schizophrenia and it's not unusual -- at the time I was --
18   you know, I've worked with -- actually, on occasion, still do
19   work with individuals that have schizophrenia, so --
20       Q.  Did you talk in that speech at all about the
21   psychopharmacology of schizophrenia?
22       A.  You know, I may have.  I may have, you know, but I
23   don't think it was anything specific about -- my understanding
24   and my recollection, this was more for the general population
25   as opposed for my colleagues.
```

48

```
1        Q.  Did it actually appear on The Discovery Channel?
2        A.  I have -- I hate to -- I'm embarrassed to say, but I
3    have no -- I can't remember.
4            MR. FIBICH:  It was 17 years ago.
5        A.  I've been on TV so much, I don't have a clue.
6        Q.  (BY MR. McCONNELL) All right.  I had asked you
7    before about when you were retained as an expert in this case,
8    and I think you said February of 2008; is that right?
9        A.  Correct.
10       Q.  How do you see your role as an expert?  And by that,
11   what I mean is do you see yourself as being charged with a duty
12   to be impartial or do you see yourself taking a side in these
13   cases?
14       A.  Well, I'd like to -- you know, I try to be as
15   impartial as I can.  I think it's important for the process
16   that the experts, you know, try to fairly judge the material
17   that comes before them.
18       Q.  And do you think it's important for you to try to
19   look at a fair representation of the material and not to look
20   at just material supporting one side as opposed to another
21   side?
22       A.  Sure, yeah.
23       Q.  I mean, you haven't tried, have you, in this case
24   just to look at information that's helpful to the plaintiffs,
25   have you?
```

49

```
1        A.  No.  I mean, I -- you know, I feel that the academic
2    articles and the research articles I read were -- they were not
3    generated, you know, with the intention of being part of this
4    process.
5        Q.  Is it fair to say -- we'll get to the articles more
6    specifically later.  But, for example, on issues of weight gain
7    associated with Seroquel, is it fair to say that there are
8    articles on both sides?
9        A.  Well, you know, there were articles where there were
10   sort of not as robust changes in weight.  But from what I could
11   see, the majority of them -- and, you know, from what I saw
12   from the internal documents from AstraZeneca, that weight gain
13   was a significant issue.
14       Q.  Are you saying that you saw no articles finding that
15   there was no statistically significant change in weight gain
16   between a placebo and Seroquel?
17       A.  I have to say I don't recall reading those, no.
18       Q.  Okay.  Same question with respect to effects on
19   glucose.  Did you see articles that found no effect on glucose
20   blood tests from the use of Seroquel as compared with placebos?
21       A.  I saw them referred to in articles, you know, that
22   the -- as part of the -- you know, commenting about the
23   meta-analysis of studies about that, but I didn't read those
24   articles.
25       Q.  Why not?
```

**50**

1    A.  Because the — you know, if they're incorporated in
2    the meta-analysis and, you know, I — you know, I — you could
3    read 25 articles and if there's sort of equivocal findings,
4    it's easier to look at the review and see where the consensus
5    of the data has gone.
6        Q.  Did you yourself perform a meta-analysis in this
7    case?
8        A.  No.
9        Q.  You were also an expert in the fen-phen litigation
10   weren't you?
11       A.  I was in some, yeah.
12       Q.  All right.  And do you agree that before diagnosing
13   and treating patients, doctors must perform a thorough
14   assessment of that particular patient's individual history and
15   condition?
16       A.  I'm sorry.  Could you repeat that?  Before what?
17       Q.  Diagnosing and treating patients, doctors must
18   perform a thorough assessment of that particular patient's
19   individual history and condition.
20       A.  I think for diagnosis and treatment, yes, that's
21   important.
22       Q.  All right.  And in order to assess a mental or
23   neurological disorder, do you agree that there has to be a
24   detailed inquiry into the presenting symptoms and complaints,
25   including their onset, duration, exacerbating circumstances,

**51**

1    response to treatment, and other particulars?
2        A.  Sure.
3        Q.  All right.  And do you think that a doctor should
4    perform a mental status examination to evaluate cognitive
5    status, attention, concentration, quality of thought, affect,
6    and other mental functions?
7        A.  As part of their clinical evaluation of someone,
8    sure.
9        Q.  Right.  And do you think that a doctor should
10   undertake an inquiry into the patient's general medical
11   conditions?
12       A.  Again, all these questions are as part of a clinical
13   assessment?  Is that —
14       Q.  Right.  Well, before diagnosing and treating a
15   patient.
16       A.  Yeah.  I think that would be useful.
17       Q.  All right.  Well, do you believe in this case that
18   you've furnished a diagnosis of any of these plaintiffs?
19       A.  No.
20       Q.  All right.  You're not — so, you're not purporting
21   to undertake a diagnosis?
22       A.  No, nor to treat them.
23       Q.  Right.  Well, I was going to ask you that.  You're
24   not in the process of treating any of these plaintiffs, are
25   you?

**52**

1        A.  No.
2        Q.  Have you asked to do that?
3        A.  No.
4        Q.  Have they asked you?
5        A.  No.
6        Q.  And you haven't met any of these plaintiffs, correct?
7        A.  Correct.
8        Q.  Have you talked with any of their doctors?
9        A.  No.
10       Q.  Typically when you do diagnose a plaintiff, you
11   actually examine that particular plaintiff, don't you?
12       A.  If I'm being asked to diagnose — give a diagnosis,
13   yes.
14       Q.  Have you ever been an expert witness in another case
15   where you did not actually meet the party at issue?
16       A.  I've been asked in some — at times to provide
17   opinions about some issue in a case where I did not see the
18   plaintiff, so I'd have to say yes.
19       Q.  Have you ever testified about a plaintiff's condition
20   and what caused that condition without having examined the
21   plaintiff?
22       A.  Yeah.  I mean, I have taught — I have actually given
23   opinions about a factor or an element of a person's clinical
24   presentation or problem, you know, based upon the assessments
25   and the clinical work of other people.

**53**

1        Q.  Which cases were those?
2        A.  Well, there was a case — there was a whole series of
3    cases in Australia, children who were in a — essentially, in a
4    cult and I was asked to provide input about the — you know,
5    the mental health issues that they may be struggling with and
6    what the role of some of the manipulative and abusive practices
7    of the group might have been on their current mental status,
8    without — and I didn't see them.
9            MR. FIBICH:  When you get to a stopping point, I
10   need a bathroom break.
11           MR. McCONNELL:  Right now.
12           MR. FIBICH:  Okay.
13           (Recess from 10:06 a.m. to 10:15 a.m.)
14       Q.  (BY MR. McCONNELL)  Doctor, we were talking about
15   some of the other work that you've done as an expert.  I was
16   asking you questions about what sort of work you do in order to
17   formulate your opinions in cases typically.  You recall that,
18   just generally?
19       A.  Yes.
20       Q.  There have been cases in the past where you've been
21   an expert witness and you had to make a determination as to
22   whether there was a causal link between the drug at issue and
23   the plaintiff's alleged injury, true?
24       A.  Yes, I think so.
25       Q.  All right.  And do you agree that before even

14 (Pages 50 to 53)

54

1    considering a causal link between the drug at issue and the
2    plaintiff's alleged injury, that you need clear documentation
3    that no other potential cause is present?
4        A.  If you're considering it as the only cause.
5        Q.  Is that right, even if it's -- if the consideration
6    is just whether there is a causal link, you don't think that
7    you need clear documentation that no other potential cause is
8    present?
9        A.  Well, a lot of -- there are a lot of -- well, it
10    depends on the outcome.  But if there is an outcome where there
11    are multiple potential factors involved, I think that you,
12    know, it's useful to know those potential factors, but that
13    doesn't exclude -- you know, it doesn't -- you know, the
14    presence of one risk factor doesn't exclude the impact of
15    another risk factor.
16        MR. McCONNELL:  Can we get this marked as the
17    next exhibit, please, Exhibit 5?
18        (Perry Exhibit No. 5 marked.)
19        MR. FIBICH:  Exhibit 5, because this was 2, 3,
20    and 4?
21        MR. McCONNELL:  Yeah.  The expert reports were
22    2, 3, and 4.
23        Q.  (BY MR. McCONNELL)  Doctor, what's been placed in
24    front of you as Exhibit 5 is a document at the top that says
25    "RE:  Mary Lou Hunter," dated August 21, 2000, and which bears

55

1    your signature on the second page; is that correct?
2        A.  Yes.
3        Q.  All right.  And do you recall in what respect you
4    gave this report?
5        A.  I think it was a case about mental health problems
6    following the use of fenfluramine.
7        Q.  Right.  And did you give a causality opinion in that
8    case?
9        A.  I did.
10        Q.  And --
11        A.  Well, I gave a preliminary report.
12        Q.  Right.  And this is your report, Exhibit 5?
13        A.  It looks like it is.
14        Q.  All right.  And if we could look at the second page,
15    you wrote that determining causality for neuropsychiatric
16    symptoms is a complex process, correct?
17        A.  Yes.
18        Q.  And do you stand by that statement?
19        A.  Yes.
20        Q.  And you say, "Documentation of normal pre-drug
21    emotional, cognitive, social, and behavioral functioning and
22    clear documentation that no other potential cause (for example,
23    other medications drugs of abuse, endogenous neuropsychiatric
24    disorder, traumatic or psychosocial stressors) of
25    neuropsychiatric disorder are present are required before even

56

1    considering a causal link between use of any neuroactive drug
2    and chronic neuropsychiatric symptom."
3        Do you see that?
4        A.  Yes, I do.
5        Q.  And do you stand by that statement?
6        A.  I do, for neuropsychiatric symptoms and chronic
7    neuropsychiatric symptoms.
8        Q.  All right.  But you don't think that that applies if
9    you're talking about a symptom such as weight gain or blood
10    glucose disregulation?
11        A.  I think the general principle of incorporating all
12    other risk factors as part of the consideration should be taken
13    into consideration, yes, but I don't think -- again, I don't
14    think that that -- that you can exclude the -- another risk
15    factor as not being part of that process.
16        Q.  In this case, did you attempt to determine whether
17    there were other potential causes of weight gain or diabetes or
18    hyperglycemia for these particular plaintiffs?
19        A.  I have to say that my recollection is that I looked
20    at their clinical records and -- but I can't -- honestly, I
21    don't recall beyond that.  I don't believe that I evaluated
22    this person.
23        Q.  Okay.  In the case of the plaintiffs in this case,
24    Burns, Curley, and Guinn --
25        A.  Yes.

57

1        Q.  -- did you identify whether or not there were other
2    potential causes for the weight gain or hyperglycemia or
3    diabetes?
4        A.  Well, I certainly saw the presence of other risk
5    factors.
6        Q.  And is that true for all three plaintiffs?
7        A.  To a varying degree, yes.
8        Q.  All three had multiple alternate risk factors for
9    weight gain and diabetes and hyperglycemia, did they not?
10        A.  Well, for diabetes --
11        Q.  Okay.
12        A.  -- and -- yeah.
13        Q.  Not for weight gain?
14        A.  Well, it's -- I mean, to the degree that review of
15    the history could document the fact that they were already
16    overweight and -- you know, I didn't see an extensive review of
17    their physical activity, aside from the fact that they were --
18    their physicians recommended that they exercise; but the risk
19    factors that I saw were risk factors for the development of
20    diabetes.
21        Q.  And we'll talk about those in more detail as we go
22    through the plaintiffs.
23        A.  Right.
24        Q.  In this case, in the case of Mary Lou Hunter, you
25    talked about needing to exclude other potential causes before

**58**

1  even considering a causal link between use of any neuroactive
2  drug and chronic neuropsychiatric symptoms.  I just want to
3  focus on your phrase "even considering a causal link."
4        What did you mean by "causal link"?
5    A.  I meant that — the claim that the use of this
6  medication alone caused a very complex neuropsychiatric symptom
7  and —
8    Q.  Is that right, that in this fen-phen case all that
9  you were testifying was that the fen-phen couldn't have alone
10  caused it; or were you, in fact, not being asked to opine that
11  it could not be said that the fen-phen played a causal role at
12  all?
13    A.  I'm sorry.  Can you clarify?  I'm —
14    Q.  I'll try, and I apologize for that.  I just want to
15  ascertain — based upon what you just said, you're making it
16  sound like all that you were saying in this fen-phen case is
17  that it wasn't fen-phen alone that caused the injury.  Is that
18  right?  Is that what you're saying?
19    A.  No.  I was saying that I don't believe in this
20  situation that the — given the other factors that were
21  present, that fen-phen caused this woman's problems.
22    Q.  And just to put a finer point on it, in this fen-phen
23  case where you rendered an opinion, you were saying, were you
24  not, that it could not be concluded that fen-phen played any
25  causal role in causing the injury at issue?

**59**

1    A.  In this case and based upon my review of this
2  individual plaintiff and my awareness of the mechanism of
3  action of fen-phen and what was known about what it does to the
4  brain.
5    Q.  All right.  Did you actually examine Ms. Hunter?
6    A.  I do not believe I did.
7    Q.  Did you know what the mechanism of action was for
8  fen-phen?
9        MR. FIBICH:  Fen-phen?
10        MR. McCONNELL:  Yeah.
11    Q.  (BY MR. McCONNELL)  I'm not asking you to describe —
12  the question is "yes" or "no."  Did you know in this case what
13  the mechanism of action was?
14    A.  Well, we — I knew a little bit about the
15  neurotoxicity and the impact of fen-phen on the serotonergic
16  systems in the brain.
17    Q.  Do you know what the mechanism of action is for
18  Seroquel?
19    A.  Not — well, I know that it — again, I — on a
20  microchemical level, we know a little bit about what it does at
21  certain receptor sites, but the specific mechanism of action is
22  not understood.
23    Q.  With respect to the expert reports that you prepared
24  in this case — and they're before you — did you write these
25  reports?

**60**

1    A.  Yes.
2    Q.  All right.  And you reviewed them before you signed
3  them, correct?
4    A.  Yes.
5    Q.  You paused there.  Why did you pause, Doctor?
6    A.  Seems like an odd question.
7    Q.  Well, let me elaborate a little bit.  Did you review
8  them to make sure that they were accurate and complete?
9    A.  Yeah.  I mean, I may have made a typo or I may have
10  made a — you know, but I did kind of go — you know, I did go
11  through them, yeah.
12    Q.  And as somebody who's been an expert witness in other
13  cases, you have an understanding as to what the role of an
14  expert report is, do you not?
15    A.  Well, I think I do.
16    Q.  Tell me what you think it is.
17    A.  I think it's to provide a summary of my opinions in a
18  specific case.
19    Q.  And you understand it's to provide people like me
20  fair notice of what your opinions in this case are likely to
21  be, right?
22    A.  Yes.
23    Q.  Okay.  You didn't omit anything on purpose from your
24  expert report, did you, that you would intend to opine about at
25  trial?

**61**

1    A.  Nothing unless somebody asks me about some other area
2  or some issue that I didn't write on here.
3    Q.  Are there any errors in your reports that you're
4  aware of?
5    A.  Not that I — you know, not that I know right now.  I
6  mean —
7    Q.  But you seem eager to get to them.
8    A.  Yes.  I'm sure that you found errors in my report, so
9  let's go.
10    Q.  I don't know if this is an error.  I actually wanted
11  to ask you about the reference exhibit list that's attached at
12  the end of these expert reports.
13    A.  Yes.
14    Q.  You see that?  It looks like it's actually in some
15  sort of table format.
16    A.  Yes.
17    Q.  Is this a document that you prepared?
18    A.  No.  This was a document that was prepared by
19  Ms. Grainger, I believe.
20    Q.  Does it fairly capture what it was that you referred
21  to in forming your opinions in these cases?
22    A.  Yeah.  This is — looks like a fair review of the
23  majority of things that I had an opportunity to look at.
24    Q.  Have you read everything that's listed in this
25  reference exhibit list?

62

1     A.  No, but my understanding was that this was supposed
2  to be a list of things that I would potentially draw upon to
3  form my opinions.
4     Q.  Can you indicate perhaps — on Exhibit 2 perhaps
5  indicate by a — drawing a line across those documents that you
6  did not review?
7     A.  How about if I review things that I know for sure
8  that I reviewed.
9     Q.  That's even better.  You want to just check —
10  perhaps you could, with a pen, check the things that you did
11  review that are on this reference exhibit list.
12     A.  I would be happy to do that.
13     Q.  Thank you.
14        THE WITNESS:  May I borrow a pen?  Thank you.
15     A.  Do you want me to do it with a pen or a marker?
16     Q.  (BY MR. McCONNELL)  Whatever you feel more
17  comfortable with.
18     A.  Okay.  So, if you make copies with this, this won't
19  show up.
20     Q.  Use a pen.  Thank you.
21     A.  All right.  So, I did — all these PDR versions, I
22  did look at.  I did look at this.  I didn't — I'm not sure
23  this was the article that I read, but I read something about
24  that study.
25     Q.  Which one are you on?

63

1     A.  I'm at the Antipsychotic-Induced Diabetes in Veteran
2  Schizophrenic Patients.  I'm not sure if that was the article I
3  read or whether it was —
4     Q.  What page are you on, Doctor?
5     A.  2 of 17.
6     Q.  Okay.
7     A.  I don't think I read that whole thing.
8     Q.  All right.
9        MR. McCONNELL:  Can we just go off the record
10  for a minute?
11        (Recess from 10:28 a.m. to 10:31 a.m.)
12     A.  Gosh, I don't know.  Some of these, I don't think
13  I've — there may be some of these things that I don't recall
14  reviewing that might — I don't think they're in those
15  materials because I — but there's a lot of these things that I
16  don't — I did not get, a lot of these internal e-mail — I
17  think I only got a couple of those internal e-mails, so I don't
18  really — then I think I got all of this plaintiffs' records
19  stuff.
20     Q.  (BY MR. McCONNELL)  What page are you on, Doctor?
21     A.  17.
22     Q.  Okay.
23     A.  16 and 17.  So, I mean, I got — as I look through
24  some of this stuff, I have to say I don't recall reviewing a
25  lot of these things, particularly — I didn't look at a lot of

64

1  the clinical study report synopses.  Some of the articles, most
2  of the e-mail, internal e-mails — but — I think this is a
3  fair representation, but there may be a few things that I
4  didn't check that are in the records.  If they're in the
5  records, I did look at them at some point, even though I may
6  not remember specifically the title of the document.
7        So, here's —
8     Q.  Okay.  Thank you.
9     A.  Sure.
10     Q.  There is a listing on this reference list of
11  depositions of people from AstraZeneca — it's on — you can
12  actually look at your other report.  It's on Page 9 — and it
13  looks like you checked that you had read the depositions of
14  Brennan and then the two volumes of Geoffrey Birkett; is that
15  right?
16     A.  Right.
17     Q.  But you did not read the deposition of Jeffrey
18  Goldstein, correct?
19     A.  That's correct.
20     Q.  Okay.  Did you read any other depositions of
21  AstraZeneca personnel?
22     A.  I do believe that in — that there were some other
23  drug representatives that were — whose depositions I did
24  review and I don't recall their names offhand, but they should
25  be in those disks.

65

1     Q.  Is it fair to say if they're not in the disks, you
2  didn't read them?
3     A.  Correct.
4     Q.  Did you read the deposition of Martin Brecher?
5     A.  I don't remember that.
6     Q.  Okay.  Did you read any articles that were provided
7  to you by the plaintiffs' counsel where you ended up either
8  disagreeing with the article's conclusion or thinking that the
9  methodology was insufficiently robust?
10     A.  Well, you know, all articles have, you know, some
11  methodological issues.  That's just part of the process.  So —
12  not that I had any major objections.  I tried to read them as
13  they were presented and, you know, tried to take into
14  consideration the context within which they were doing the
15  work, what data they had available at the time, you know, the
16  methodological limitations, what was a reasonable conclusion
17  based upon what they could look at and so forth.
18     Q.  In a good article in a peer-reviewed journal,
19  typically the authors are very forthcoming at the end about
20  whatever limitations exist for that article, correct?
21     A.  Typically, yes.
22     Q.  And you took that into account in formulating your
23  opinions in these cases, correct?
24     A.  I did.
25     Q.  Did you ask the plaintiffs' lawyers for any

17 (Pages 62 to 65)

66

1  additional materials after you received whatever it was you
2  received from them?
3     A.  No, not that, you know — no.
4     Q.  I'll just ask a couple of more specific —
5     A.  Yeah.
6     Q.  — questions as a follow-up, even though they may be
7  unnecessary based on what you just said, but just to see if I
8  can prompt your memory.
9     A.  Right.
10     Q.  Did you ask for any additional clinical trial data
11  concerning Seroquel?
12     A.  No.
13     Q.  Did the plaintiffs' lawyers represent to you that
14  they had to provided you with all of the clinical trial data
15  concerning Seroquel?
16     A.  No, I don't think so.  I mean, that would be volumes
17  and volumes of material.
18     Q.  It would be a lot to read, wouldn't it?
19     A.  Yeah.
20     Q.  Have you read the IND for Seroquel?
21     A.  I'm sorry?
22     Q.  Do you know what an IND is?
23     A.  If you say it out loud — I mean, if you —
24     Q.  Investigative new drug application.
25     A.  Oh, yeah, I know what those are.  No, I did not read

67

1  it.
2     Q.  Did you read the NDA in this case?
3     A.  No.
4     Q.  And you know what the NDA is, right?
5     A.  Yeah.
6     Q.  Just for the purposes of the jury, what's an NDA?
7     A.  That's the — what — what do you call it?
8     Q.  New drug application.
9     A.  Right.
10     Q.  So, you didn't read that in this case?
11     A.  No.
12     Q.  And do you have an understanding what the volume of
13  that would be?
14     A.  It would be huge.  I mean, it would be — I mean, it
15  takes groups of people months to review and — so —
16     Q.  Right.  Have you read any of the SNDAs regarding
17  Seroquel?
18     A.  No.
19     Q.  Do you know how many SNDAs there are for Seroquel?
20     A.  I would be surprised if it wasn't dozens, but I —
21  you know.
22     Q.  I want to ask you about your experience as a doctor
23  in prescribing antipsychotics.  Have you ever done that?
24     A.  Yes.
25     Q.  In fact, you have prescribed Zyprexa, haven't you?

68

1     A.  Yes.
2     Q.  During what time period did you or are you
3  prescribing Zyprexa?
4     A.  You mean in the years that I —
5     Q.  Correct.
6     A.  I probably — you know, from now — from this — I'm
7  not doing — I don't have anybody on Zyprexa currently, but I
8  probably — you know, starting six, seven years ago, you know,
9  on occasion.  The way I typically end up with having patients
10  that are on medications like Zyprexa is that because we're a
11  tertiary care center, children and adolescents or adults get
12  referred to us and they usually come to us on medication.  You
13  know, they've — other prescribing physicians usually have
14  started the medication and we will typically — until we get to
15  know the client and know the situation, we'll maintain them on
16  whatever they come in on.  So, that's generally where we've had
17  clients that are on Zyprexa.
18     Q.  What was the most recent occasion on which you
19  prescribed Zyprexa?
20     A.  Oh, I — it's probably been seven or eight years ago.
21     Q.  Okay.  When you prescribed Zyprexa, were you aware
22  that it could cause weight gain?
23     A.  I have to say at the time I don't think it was a big
24  consideration in — you know, it wasn't one of the things that
25  I was most concerned about.  I mean, I was most concerned

69

1  about, you know, the other — you know, EPS and, you know, the
2  potential for NMS and things that are more serious than — at
3  that point.
4     Q.  Were you at least aware at the time, even seven or
5  eight years ago, that antipsychotics showed some sort of
6  association with weight gain, potential weight gain?
7     A.  Yes, yes.
8     Q.  Okay.  You've also prescribed Risperdal?
9     A.  I have.
10     Q.  And during what time period generally did you do
11  that?
12     A.  Kind of the same time period, you know, the last
13  eight — seven or eight years.
14     Q.  Your risk-benefit analysis that you sort of alluded
15  to a few moments ago, was it the same for Risperdal as Zyprexa?
16     A.  Well, I mean, in general, the population that we work
17  with is adolescents and children and we try to have a very,
18  very high threshold for actually resorting to the use of
19  antipsychotics, just because of the side effect profile and the
20  lack of known efficacy in those populations.  But there — as I
21  said, there have been children who have come to us and the
22  parents are, you know, absolutely convinced that this — the
23  medication works and we try to give that a fair reading and —
24  but typically when we — we usually have a period every year
25  with a client where we taper them off whatever medication

70

1 they're on, just to see whether or not there is a difference
2 between their functioning on or off the medication, and we very
3 often find that the children are able to manage without the
4 medication.
5     Q.  But that isn't always the case though, is it?
6     A.  No, it's not always the case.
7     Q.  And you said that typically the prescriptions that
8 you've written for Zyprexa and Risperdal were in the form of
9 maintenance prescriptions, true?
10    A.  Correct.
11    Q.  But that wasn't always the case, was it?
12    A.  No.  There have been times when we've actually
13 started people on those medications ourselves.
14    Q.  And when you've done that — you've been talking in
15 the first person plural —
16    A.  Right.
17    Q.  — but I want to ask you about first person
18 singular —
19    A.  Sure.
20    Q.  — what you yourself have done.
21        When you have done that, when you've written
22 prescriptions for Zyprexa or Risperdal, what generally has been
23 the risk-benefit analysis that you've undertaken?
24    A.  Well, in the few cases where we have — and I say
25 "we" because I have always practiced as part of a group.  When

71

1 I was at Texas Children's, it was typically a resident who was
2 the — being supervised by me in the psychopharmacology clinic
3 or there was other — another clinician who was part of the
4 group, but when that has been used as a primary medication,
5 it's been after other medications have failed to manage
6 whatever the target symptom is.
7        Typically, with the children that we've done
8 this with, there's been some sort of acute psychosis, acute
9 psychotic symptom, and accompanied typically by very
10 significant behavioral disturbance.  So, aggressive behaviors
11 and combative behaviors.  Kids that are unmanageable in the
12 home, for example, would have to be brought to the ER or
13 brought into the hospital.
14        And, you know, sometimes — and so that has
15 usually been the situation, very, very significant symptoms
16 that are within the plausible range of something that this
17 medication has been shown to be effective for in adult
18 population or with other children in, you know, open case
19 reports; and then you weigh that against the potential risks
20 which can go along with whatever the medication is.
21    Q.  Fair to say that that sort of risk-benefit
22 analysis — even though I've asked you to state it in general
23 terms, it's actually case by case.  It's specific, isn't it?
24    A.  Yes.
25    Q.  And there have been some cases where you deemed it

72

1 appropriate and I take it there were some cases where you
2 deemed it not appropriate?
3     A.  Correct.
4     Q.  Do you typically find that the person in the best
5 position to make that decision is the person who actually is
6 treating the patient?
7     A.  Well, if the person treating the patient, you know,
8 understands the true risks and the true benefits, yes; but
9 sometimes the prescribing physician is not aware of, you know,
10 the plausible mechanisms, you know, real — you know, actual
11 risks, actual efficacy and so forth.  So, there are — and I —
12 you know, and I don't want to be broadly critical of my
13 colleagues, but, you know, the practice of psychopharmacology
14 is something that takes a lot of diligence and I think that
15 there are times that — you know, and there are clinicians who
16 don't go through that process as carefully as others.
17    Q.  Let me jump ahead real quick.  This was an issue I
18 was going to get to later, but with respect to the three
19 plaintiffs that you're opining about here today, are you
20 offering an opinion that their prescribing physicians engaged
21 in malpractice?
22    A.  No.
23    Q.  You're not saying that those prescribing physicians
24 did not undertake the appropriate risk-benefit calculation, are
25 you?

73

1     A.  No.  I'm basically saying that I don't believe that
2 they had all of the information that would have allowed them to
3 make that analysis.
4     Q.  Okay.  Well, I mean, you — certainly you haven't
5 asked them that, have you?
6     A.  No.
7     Q.  But you have read their depositions, haven't you?
8     A.  I have.
9     Q.  Okay.  We'll talk about that later.  Their
10 depositions do speak to what it was that they knew and
11 understood at the time, don't they?
12    A.  Exactly.
13    Q.  Okay.  You alluded to this a little bit before, that
14 when you did prescribe Zyprexa and Risperdal, you were
15 typically doing it for children, correct?
16    A.  Adolescents or children, yes.
17    Q.  Whether it's adolescents or children, that would be
18 considered an off-label prescription, correct?
19    A.  Exactly.
20    Q.  And there's nothing wrong with that, is there?
21    A.  Well, no.  Off-label use of medications is something
22 that is not uncommon and, if practiced prudently, is
23 appropriate.
24    Q.  All right.  Let me — what you seem to suggest in
25 your expert reports — and we'll get to this in more detail —

74

1 is that that may be a role -- the off-label nature maybe a
2 consideration in the risk-benefit analysis but it doesn't --
3 certainly doesn't halt the risk-benefit analysis.
4    A.  Exactly.
5    Q.  And there are cases where, if you engage in an
6 appropriate risk-benefit analysis, that an off-label
7 prescription of an antipsychotic can be perfectly appropriate.
8    A.  Yes.
9    Q.  Have you ever prescribed Seroquel?
10   A.  I have.
11   Q.  And what was the time period during which you
12 prescribed Seroquel?
13   A.  Again, the last seven or eight years I've had
14 patients on Seroquel.
15   Q.  Were they all maintenance prescriptions or were there
16 some that you initiated the Seroquel prescription?
17   A.  I have to say I do not think that I've actually ever
18 really taken a new client in and said, "Let's start this child
19 on Seroquel."
20   Q.  Approximately how many cases roughly have you
21 furnished maintenance prescriptions for Seroquel?
22   A.  Probably half a dozen.
23   Q.  And for those half a dozen cases, have you made a
24 decision that for those patients Seroquel was an appropriate
25 pharmacologic treatment?

75

1    A.  I made the decision that it -- at present, that the
2 client was not exhibiting any of the major risk issues and the
3 family was convinced that the medication was helpful.  And I
4 have to say honestly that in essentially all cases except one,
5 we've tapered the person off -- the clients off of Seroquel and
6 have been able to manage in about half the cases with no
7 medication and in other cases with alternative medications.
8    Q.  And that's a similar experience that you've
9 encountered with other antipsychotics as well, correct?
10   A.  Yes.
11   Q.  Before for those Seroquel cases, what sorts of
12 indications were being treated?
13   A.  Most of the children that we inherited -- and we -- I
14 still have -- in fact, I did a consultation on a child that was
15 on Seroquel last week, and almost all of them are given
16 Seroquel for punitive bipolar disorder.  Some of them have been
17 given Seroquel for management of disruptive behavior that was
18 felt to be potentially part of a pre-bipolar presentation.
19   Q.  All right.  And was Seroquel effective for those
20 indications?
21   A.  It's not clear actually.  The behaviors -- you know,
22 the reason they ended up getting referred to us is that the
23 problems essentially persisted, so --
24   Q.  Did those particular patients experience weight gain?
25   A.  Some of them did, yes.

76

1    Q.  Not all?
2    A.  No, not all.
3    Q.  Have you ever prescribed Geodon?
4    A.  No.
5    Q.  Is there any particular reason why you haven't
6 prescribed Geodon?
7    A.  Well, when we use antipsychotics, we typically start
8 with a first-generation antipsychotic at a very low dose and
9 we'll move, you know, to other antipsychotics if that first
10 step in the process is ineffective.  And, honestly, that
11 doesn't happen that much, so --
12   Q.  Do you have any concerns about Geodon in particular
13 in terms of sudden death QT interval?
14   A.  Well, not -- you know, that's not why we haven't
15 selected it, but we just haven't had any need to use many of
16 the second-generation antipsychotics.
17   Q.  Have you ever prescribed Abilify?
18   A.  No, but we've had, again, clients who have been on
19 Abilify that we have inherited or consulted to.
20   Q.  When you prescribed Seroquel to your patients, were
21 there any particular warnings that you provided to those
22 patients or their family?
23   A.  You know, talked with them about EPS, talked with
24 them about NMS, talked with them about weight gain and that
25 they needed to track the weight gain and work with their

77

1 pediatrician to track their glucose.
2    Q.  For these patients, would you expect that their PCPs
3 would basically administer blood tests in any event?
4    A.  Well, typically, they wouldn't be -- normally be
5 seeing their pediatrician or their personal physicians, and so
6 we ask them to do that and have these things checked out.
7    Q.  Have you yourself ever diagnosed diabetes in any of
8 your patients?
9    A.  Gosh.  Well, I do remember -- I remember when I was
10 at Texas Children's Hospital, there were -- you know, there
11 were consultations on children that we were asked to come see
12 where their neuropsychiatric problems were essentially a
13 manifestation of undiagnosed or uncontrolled diabetes.  But we
14 didn't really diagnose it.  We just basically were part of a
15 clinical team and said that this is -- "This isn't classical
16 neuropsychiatric problems.  You need to check out some of these
17 other things."
18   Q.  Would you -- for purposes of diabetes, would you
19 defer to some other doctor on the team?
20   A.  Yes.
21   Q.  Okay.  Endocrinologist or a GP?
22   A.  Well, a lot of the times, it was just a general
23 practice pediatrician.
24   Q.  Okay.  I just want to follow up on the time period
25 when you prescribed Seroquel.  You said over the -- was it over

20 (Pages 74 to 77)

78

1  the last seven or eight years that you've been prescribing
2  Seroquel?
3      A.  In general, yeah.
4      Q.  Okay.  So, certainly you've been prescribing Seroquel
5  at least -- certainly after 2004, correct?
6      A.  Correct.
7      Q.  All right.  When you say you warned the patients
8  about weight -- possible weight gain, what is it that you would
9  say to them?
10     A.  I'd say that this is a medication that people
11 typically gain weight on and that if that happens, just -- you
12 know, let's track it and we'll -- you know, let me know and
13 we'll -- just weigh yourself on a regular basis, talk with your
14 pediatrician, make sure they're in the loop on this process.
15     Q.  Did you provide the same warning about possible
16 weight gain for prescriptions of Zyprexa and risperidone?
17     A.  Honestly, it's part of the -- you know, we have a
18 consent and an assent form that we have parents and kids sign
19 as part of the -- you know, if they're -- if we're going to put
20 them on medications and it's in there and -- and we usually, in
21 addition to giving them this thing to sign, will talk with them
22 about these specific things.  So, I -- it was broadly the same.
23     Q.  So, it's broadly the same for all the SGAs that you
24 prescribed?
25     A.  Yeah, about those major, you know, potential effects,

79

1  yes.
2      Q.  You also said that you typically start off by
3  prescribing small doses of first-generation antipsychotics,
4  true?
5      A.  Yes.
6      Q.  Like clozapine?
7      A.  No.  Well -- no.  You know --
8      Q.  All right.  Which ones do you mean?
9      A.  Well, we'll use -- sometimes we'll use Haldol,
10 sometimes we'll use perphenazine.  But, you know, it's -- I
11 have to say, we do not use antipsychotics that much.  We try to
12 target the symptoms with using other more specific agents.
13     Q.  For those cases where you would prescribe the
14 first-generation atypicals, would you also give a possible
15 weight gain warning?
16     A.  Yeah.  I think that's part of the --
17     Q.  Same form?
18     A.  You know, part of the form.  I mean, it's -- it is
19 something that happens with some of the antipsychotics,
20 first-generation.
21     Q.  I had asked you before if you had ever diagnosed
22 diabetes in any of your patients, and I think what you said is
23 for that you'd defer to somebody else.
24     A.  Yeah.  We've certainly seen the manifestations of
25 undiagnosed diabetes and referred them to our colleagues or

80

1  walked them down the hall and said, "Listen, I think this
2  kid's, you know, in diabetic crisis."
3      Q.  Have you ever treated diabetes in any of your
4  patients?
5      A.  No.
6      Q.  It's not what you do.
7      A.  Correct.
8      Q.  Do you have a marketing degree?
9      A.  A marketing degree?
10     Q.  Marketing degree.
11     A.  Huh.  No.
12     Q.  Do you have an MBA?
13     A.  No.
14     Q.  Have you ever published any articles about the
15 marketing of pharmaceuticals?
16     A.  No.
17     Q.  Have you ever worked for a marketing company?
18     A.  No.
19     Q.  Have you ever designed a marketing plan for any
20 product, including a pharmaceutical drug?
21     A.  No.
22     Q.  These answers are not surprising, Doctor.
23     A.  Okay.
24     Q.  The questions may be, but the answers are not.
25         Have you ever worked in the marketing department

81

1  of a pharmaceutical company or any company?
2      A.  No.
3      Q.  Do you hold yourself out as an expert in FDA
4  regulations?
5      A.  No.
6      Q.  Do you hold yourself out as an expert in the
7  regulatory requirements of drug-related agencies in foreign
8  countries?
9      A.  No.
10     Q.  Okay.  Have you ever written a peer-reviewed article
11 where you tried to interpret internal pharmaceutical company
12 documents?
13     A.  No.
14     Q.  All right.  Do you agree that if you were to try to
15 determine what a pharmaceutical company was doing or intending
16 to do, that you'd want to know the full context of whatever the
17 issue is?
18     A.  Well, obviously, whenever you know the full context
19 and have all the data available, you can make better decisions.
20     Q.  You said, for example, earlier that you've looked at
21 some internal company e-mails; is that right?
22     A.  Correct.
23     Q.  Would you want to know what the response, for
24 example, to those e-mails was?
25     A.  Sure.  If you have it, I'm happy to look at it.

---

**82**

1    Q.  Well, did you ask for such things from the
2    plaintiffs' lawyers?
3    A.  No.
4    Q.  Would you want to know whatever was actually done by
5    the pharmaceutical company in response to whatever e-mail or
6    internal communication was that you were looking at?
7    A.  Sure.
8    Q.  Would you want to know if the document was a draft,
9    for example, as opposed to a final document?
10   A.  That might be helpful.
11   Q.  You certainly know that you have not read all of the
12   internal AstraZeneca documents regarding Seroquel and weight
13   gain or glucose, fair?
14   A.  That's very fair, yes.
15   Q.  How do you know that what you looked at was a fair
16   representation?
17   A.  Well, I assume it wasn't a fair representation.  I
18   mean, I assume that it was -- I mean, I -- you know, when you
19   do this, you know that the materials provided to you are
20   provided for a purpose and you just keep that in mind.
21   Q.  All right.  What rate are you charging for your
22   expert opinions in these cases?
23   A.  I get -- I charge $500 an hour.
24   Q.  And does that cover review of documents as well as
25   testimony?

---

**83**

1    A.  Yes.
2    Q.  All right.  What rate do you charge when you testify
3    at trial?
4    A.  Essentially, the same thing.  If I have to go
5    someplace for a day and be gone, you know, I ask for $12,000 a
6    day, plus expenses.
7    Q.  Okay.
8    A.  Which, by the way, is actually less than I get paid
9    to go teach.  So, it's not like I'm -- truth is doing legal
10   work is a loss for the --
11   Q.  It's a hardship for you.
12   A.  It's a pain.  No.  It is not comfortable, that's for
13   sure.
14   Q.  How much have you billed thus far in these three
15   cases?
16   A.  I guess I would have to fairly sort of take out of
17   this a lot of the initial work because it was on that other
18   case, and I think it probably -- I think -- and this doesn't
19   include in the last month or so, but it -- I'd say it --
20   probably about $30,000.
21   Q.  That's $30,000 for the Burns, Curley, and Guinn
22   cases, correct?
23   A.  Yeah, I think that's correct.
24   Q.  I asked that because I saw an invoice in the amount
25   of $41,500.

---

**84**

1    A.  Right.  There were -- I spent about 20 hours on the
2    initial case and reviewing materials for the Rosas case.
3    Q.  Now, you said that the $30,000 would not include work
4    that you've done over the last month; is that right?
5    A.  The last date that I billed for was, like, 9-6 and
6    I've done work since -- about 10, 20 -- about 20 hours up to
7    today, 20 additional hours.
8    Q.  So, that would be another $10,000 approximately?
9    A.  Roughly, yeah.
10   Q.  So, that means, as we sit here today, we're around
11   $40,000 for these three cases?
12   A.  Correct.
13   Q.  Do you have people working for you on these cases,
14   some sort of research assistant or somebody who helps you out?
15   A.  Not me, but I -- you know, Ms. Grainger has -- you
16   know, she provided that abstracted spreadsheet for the cases,
17   but that's about it.
18   Q.  Is the spreadsheet the same thing as the timeline
19   that we talked about?
20   A.  Correct, correct.
21   Q.  And those are timelines that are specific to each of
22   these three particular plaintiffs, correct?
23   A.  Correct.
24   Q.  Have you received any other information?  I'm not
25   talking about primary documents or articles from plaintiffs'

---

**85**

1    counsel, but any other information from them.
2    A.  No.  I -- is there -- of what sort?
3    Q.  I don't have anything particular in mind, Doctor.
4    A.  No, no.
5    Q.  Open-ended question.
6    A.  No, I don't believe so.
7    Q.  Great.  You've testified as an expert in court
8    before; is that right?
9    A.  I have.
10   Q.  Have you testified in the past for Mr. Fibich or his
11   firm?
12   A.  I have.
13   Q.  Have you testified before for Mr. Bailey's firm or
14   Mr. Blizzard's firm?
15   A.  No.
16   Q.  Have you worked with Glenda Grainger in the past?
17   A.  No, no.
18   Q.  All right.  Has your testimony as an expert ever been
19   rejected by any court?
20   A.  Actually, in Canada, I was -- I wasn't rejected as an
21   expert, but my testimony was disallowed because the judge
22   perceived that what I was going to testify about was common
23   sense, which -- I don't know if that's the same thing, but --
24   Q.  It may be rejection, but it's kind of praise, too,
25   isn't it?

86

1    A.  I guess.
2    Q.  Have you ever written on — hang on a second.
3        Have you ever written anything on epidemiology?
4    A.  No, no.
5    Q.  Do you hold yourself out as an expert in
6    epidemiology?
7    A.  No.
8    Q.  All right.  I want you to focus on your expert
9    report, please, for Connie Curley, which I believe is Exhibit
10   2.
11       MR. BROCK:  Can we take, like, one minute, just
12   give me one minute?
13       MR. McCONNELL:  Sure.
14       (Recess from 11:02 a.m. to 11:03 a.m.)
15       MR. FIBICH:  What exhibit number is Curley?
16       THE WITNESS:  Two.
17       MR. McCONNELL:  Two.
18   Q.  (BY MR. McCONNELL)  Doctor, do you have Exhibit 2 in
19   front of you?
20   A.  Yes, sir.
21   Q.  And I want you to look at Page 3 of your report.
22   Actually, I don't think the pages are numbered, but it's the
23   third page of the report.  It's Paragraph No. 2.  Do you see
24   that?
25   A.  Yes.

87

1    Q.  And you say, "Seroquel was prescribed for an
2    off-label use in the case of Connie Curley.  Ms. Curley was
3    prescribed Seroquel for sleep and headaches.  Primary
4    neuropsychiatric symptoms were not the target symptoms for
5    Seroquel."
6        My question for you is:  Do you agree that
7    Ms. Curley does, in fact, suffer from psychiatric issues?
8    A.  Yes.
9    Q.  In your opinion, based upon your review of the
10   medical records and the depositions, what do you believe are
11   Ms. Curley's psychiatric issues?
12   A.  Well, I think — you know, I mean, if I had to put a
13   label on it, I think she's got some posttraumatic stress
14   symptoms.  She was exposed to domestic violence.  I think she
15   has — you know, I'm not sure I can give it a diagnosis, but I
16   think affect regulation problems.  That's kind of the — what
17   came out at —
18   Q.  You're done?
19   A.  That's — I'm — I mean, I — you know, it's — based
20   upon what I read, there were lots of things that were in there,
21   but — you know, it's —
22   Q.  Well, let me ask you, do you believe that she suffers
23   from depression?
24   A.  Well, that's kind of an affect regulation problem,
25   yeah.  It sounds — she does sound like she has depressive

88

1    symptoms.
2    Q.  Do you agree that she suffers from major depressive
3    disorder?
4    A.  You know — I mean, if that's one of the diagnostic
5    labels that her clinicians have given her, I think that's
6    probably pretty accurate, although I don't — that was not, to
7    my recollection, why she was given the Seroquel though.
8    Q.  No.  At this point, I'm just asking you what
9    psychiatric issues you think she has.
10   A.  Yeah.  Okay.
11   Q.  So, you agree that she has major depressive disorder?
12   A.  Well, I think she certainly has affect regulation
13   problems, which may meet criterion for major depression.
14   Q.  Does Ms. Curley suffer from anxiety?
15   A.  I would say that that's one of her symptoms, yeah.
16   Q.  Did she ever report having several anxiety attacks
17   per day?
18   A.  As I recall, she did.  And I think she also even used
19   the term "panic attack," but —
20   Q.  And she'd actually hyperventilate?
21   A.  As I recall, yeah, that was one of the things that
22   she would do.
23   Q.  You mentioned that you think that Ms. Curley has
24   posttraumatic stress disorder.
25   A.  Well, symptoms.  I mean, I — you know, like I — I

89

1    don't feel comfortable giving her a diagnosis, but I think that
2    based upon the review of her history and the symptoms that
3    she's presenting with and that are throughout — sort of
4    peppered throughout the records, that that's consistent with a
5    posttraumatic set of symptoms.
6    Q.  I mean, as you said earlier in the deposition,
7    actually to diagnose somebody, you'd want to see them, right?
8    A.  Correct.
9    Q.  Is it fair to say that at least her clinicians
10   diagnosed her as having PTSD?
11   A.  Yes, I think so.
12   Q.  Is it fair to say she's had symptoms of PTSD since at
13   least her 1998 car accident?
14   A.  I think that's where she traces that back to.
15   Q.  Okay.  Can PTSD affect sleep habits?
16   A.  Yes.
17   Q.  Did Ms. Curley complain of nightmares?
18   A.  To my recollection, that was one of the — she
19   complained about a lot of stuff.
20   Q.  And nightmares was one of them?
21   A.  Was one of them, yes.
22   Q.  Can nightmares be a symptom of PTSD?
23   A.  Yes.
24   Q.  Isn't it a fact that PTSD can lead to obesity?
25   A.  Well, people who have posttraumatic stress disorder

90

1  can have a host of physical health problems, including weight
2  gain.
3      Q.  I mean, you've written to that effect, haven't you?
4      A.  Well, you know, weight gain.  I mean, I don't believe
5  that I've ever written that posttraumatic stress disorder
6  causes obesity, but definitely stress can influence the way
7  people eat and the way people self-sooth and so forth using
8  food.
9      Q.  You've actually published quite a lot about PTSD,
10  haven't you?
11     A.  Yeah.
12     Q.  And is PTSD classified in the DSM as an anxiety
13  disorder?
14     A.  Yes.
15     Q.  All right.  Typically with PTSD, was there some sort
16  of exposure to a traumatic event, a stressor?
17     A.  Yes.
18     Q.  And then there's a persistent reexperience in the
19  form of flashbacks or nightmares?
20     A.  That's part of the constellation of symptoms, yes.
21     Q.  You're familiar with the DSM constellation, right?
22     A.  Yeah.
23     Q.  And you agree with them, right?
24     A.  Yeah.  It is what it is.
25     Q.  Okay.  Do you agree that PTSD can result in

91

1  significant impairment in social, occupational, or other
2  important areas of functioning?
3      A.  Yes.
4      Q.  All right.  And typically for PTSD, how long do the
5  symptoms last?
6      A.  They can be chronic and last a lifetime.
7      Q.  And in Ms. Curley's case, is it fair to say it
8  appears to be chronic?
9      A.  From my review of the records, the symptoms are
10  pretty persistent.
11     Q.  Is disrupted sleep a symptom of PTSD?
12     A.  It can be, yes.
13     Q.  Also a sense of unreality?
14     A.  That can be as well, yes.
15     Q.  Heightened startled response?
16     A.  Can be, yes.
17     Q.  Hypervigilance?
18     A.  Can be, yes.
19     Q.  Does that sort of fit with what you saw in the
20  medical records for Ms. Curley?
21          MR. FIBICH:  Object to form.
22     A.  I did see throughout the record elements of, you
23  know, different posttraumatic symptoms such as you've just
24  articulated.
25          MR. McCONNELL:  Do we have the book here?

92

1          MS. CATES:  Yes.
2      Q.  (BY MR. McCONNELL)  I'm just going to read you
3  something from your book, which I'm sure is always a pleasant
4  experience.  Must be nice to have people do responsive readings
5  from your own words.
6          MR. FIBICH:  We're just glad you bought it.
7          MR. McCONNELL:  That's right.  I've already made
8  my contribution.
9      Q.  (BY MR. McCONNELL)  It's a good book.
10          Anyway, Page 3, you write the following and I
11  just want to see if you stand by this.  You say "Roughly
12  one-third of children who are abused will have some clear
13  psychological problems as a result and research continues to
14  show how even seemingly purely physical problems, like heart
15  disease, obesity, and cancer, can be more likely to affect
16  traumatized children later in their lives."
17          It's down there, if you want to take a look.
18     A.  Yeah.  No.  I believe you.
19     Q.  You still agree with that?  Your views haven't
20  changed since you wrote that, right?
21     A.  Sure, sure.
22     Q.  My question to you is:  How is it that children who
23  are abused or exposed to some trauma -- how is it that can
24  actually result in seemingly purely physical problems, like
25  heart disease, obesity, and cancer?

93

1      A.  You want to know the mechanism?  I mean, is that --
2      Q.  This won't take hours, will it?
3      A.  It could.
4      Q.  Briefly, if you can.
5      A.  Well, the systems in the brain that are involved in
6  mediating the stress response are also the systems that are
7  involved in regulating the autonomic nervous system and the
8  neuroendocrine system and they influence the way your body's
9  physiology works.  So, people who have alterations and abnormal
10  stress response systems in the brain also will have altered
11  physiological regulation in the rest of the body, and that can
12  manifest in a lot of different ways.
13     Q.  And how can it manifest in terms of obesity, which is
14  the word that you used in your book?
15     A.  Well, it's -- one of the things that is potentially
16  involved in individuals who gain weight following traumatic
17  events is that they use food to sooth themselves, to calm
18  themselves, and so that's -- you know, that's one of the
19  suggested mechanisms.  It's essentially an observation, you
20  know, that there is an increased incidence of obesity in
21  individuals who have had developmental trauma.  So, the
22  mechanism is -- it's probably multiple mechanisms, but one is
23  potentially the -- using food to self-sooth.
24     Q.  Do you believe that PTSD can be a serious condition?
25     A.  Yes.

24 (Pages 90 to 93)

94

1   Q.  Can it be appropriate to treat PTSD with
2   pharmaceuticals?
3   A.  Sure.
4   Q.  Which ones?
5   A.  Well, a lot of it depends upon the constellation of
6   symptoms that somebody presents with.  If they have sleep
7   problems, you can use a narcoleptic.  If they have depressive
8   symptoms, you can use an antidepressant with good efficacy
9   sometimes.  Some people us antianxiety agents if the anxiety is
10  one of the prominent symptoms.
11  Q.  Are you familiar with the APA's recommendation for
12  what pharmaceuticals can be used in treating PTSD?
13  A.  I'm familiar with the API -- APA guidelines, but I
14  haven't -- I don't know the list of medications that they're
15  putting in there.  I suspect it's pretty -- sure it includes
16  sertraline.
17  MR. McCONNELL:  Can we get this marked?
18  (Perry Exhibit No. 6 marked.)
19  Q.  (BY MR. McCONNELL)  Doctor, what's been placed before
20  you as Exhibit 6 is the APA's practice guideline for the
21  treatment of patients with acute stress disorder and
22  posttraumatic stress disorder, correct?
23  A.  Yes.
24  Q.  And feel free to flip through as much of this as you
25  need to if you need context, but I am going to direct your

95

1   attention to Page 13.
2   A.  Okay.
3   Q.  Heading 4 says "Specific Treatment Strategies," and
4   letter (a) is psychopharmacologies.  So, we're talking about
5   medicines in that case, right?
6   A.  Yes.
7   Q.  If you look at the last paragraph, it says "In
8   addition to being indicated in patients with comorbid psychotic
9   disorders, second-generation antipsychotic medications (for
10  example, olanzapine, quetiapine, and risperidone) may be
11  helpful in individual cases with PTSD."  Do you see that?
12  A.  Yes.
13  Q.  Do you agree with that statement by the APA?
14  A.  No.  Basically, what they're saying is that if
15  there's a comorbid psychotic disorder, that those
16  antipsychotics agents can be helpful.  And as far as I could
17  tell, Ms. Curley didn't have a comorbid psychotic disorder.
18  Q.  You're reading the APA to say that it would be
19  appropriate to prescribe SGAs only if there's a comorbid
20  disorder?  That's how you read that?
21  A.  That's what it says.
22  Q.  Isn't it saying that second-generation antipsychotic
23  medications, in addition to being indicated in patients with
24  comorbid psychotic disorders, can also be helpful in patients
25  with PTSD?

96

1   A.  Well, I mean, that's -- my interpretation of that is
2   that they're suggesting that if you have comorbid psychotic
3   disorders, that that would be a useful agent.  I have to say
4   that there are absolutely no controlled studies demonstrating
5   the efficacy of those agents in PTSD.
6   Q.  Now, Ms. Curley did receive psychiatric treatment for
7   PTSD and depression, didn't she?
8   A.  Yes, I believe she did.
9   Q.  She actually had relatively few psychiatric visits in
10  her medical history, true?
11  A.  That's correct.
12  Q.  Only five visits in 2000 and 2001?
13  A.  I don't remember the number, but I remember that she
14  was -- did not have a very significant mental health history,
15  treatment history.
16  Q.  She certainly had several psychiatric visits before
17  she ever took Seroquel, true?
18  A.  I think that's true, yes.
19  Q.  And it was before she ever took Seroquel that she was
20  diagnosed with depressive disorder.  Do you agree with that?
21  A.  I think that's true.
22  Q.  And we talked before about having problems sleeping.
23  You agree that Ms. Curley has a history of having problems
24  sleeping?
25  A.  Correct.

97

1   Q.  And, in fact, her psychiatrist actually prescribed
2   medicine to help her sleep, right?
3   A.  Honestly, I don't recall, but I trust your -- if
4   that's --
5   Q.  Well, let's not go crazy here, but -- you don't have
6   to trust me.  I'll show you the records if you want.  I'm just
7   going to ask if you recall whether she was ever prescribed
8   trazodone for sleep.  Does that ring a bell?
9   A.  That does actually, yeah.
10  Q.  Can it be important when treating a patient with
11  psychiatric problems to try to help them get sleep?
12  A.  Sure.
13  Q.  Can helping them get sleep and improving their sleep
14  architecture play some role in addressing their more serious
15  psychiatric symptoms?
16  A.  Sure, but -- trazodone wouldn't be the drug to do
17  that, but --
18  Q.  Well, I mean, it -- Dr. Marlene Hart did, in fact,
19  prescribe trazodone for sleep.
20  A.  Correct.
21  Q.  If that's -- do you think that was a mistake?
22  A.  I think that the use of trazodone for sleep is not
23  effective.  Trazodone doesn't really -- doesn't change latency
24  to onset of sleep, doesn't increase REM sleep.  It really --
25  with all of the available effective narcoleptics, it seems odd

**98**

1 that people would use trazodone for —
2 Q. And, in fact, in the case of Ms. Curley, you're
3 exactly right. The trazodone didn't really help her sleep, did
4 it?
5 A. That's — that's correct.
6 Q. Before she got the prescription, she was sleeping
7 only able four hours per night, Ms. Curley was. Does that seem
8 right to you?
9 A. That sounds accurate. That's —
10 Q. Dr. Hart increased Ms. Curley's trazodone, and that
11 didn't work either.
12 A. Correct.
13 Q. Dr. Hart then prescribed Paxil to Ms. Curley. Do you
14 remember that?
15 A. I do.
16 Q. All right. And did the Paxil work?
17 A. Not very effectively, no.
18 Q. Do you recall whether Ms. Curley was ever prescribed
19 Prozac?
20 A. Honestly, I don't recall.
21 Q. Let me just go through this list. I'll just
22 represent to you — so, you don't recall whether she was
23 prescribed Prozac, but you do recall she was prescribed Paxil,
24 correct?
25 A. I do.

**99**

1 Q. And we mentioned trazodone. Do you also remember
2 that she was prescribed Xanax?
3 A. Do remember that, yes.
4 Q. How about Zoloft?
5 A. Gosh, I have to say, I didn't memorize her treatment
6 history, but I remember she was tried on a lot of different
7 antidepressant medications.
8 Q. How about Zoloft? Do you remember her being
9 prescribed Zoloft?
10 A. If you represent that that's accurate, I trust you.
11 Q. All right. In fact, let me go through this. I'll
12 represent to you this is a list of medications that I know were
13 prescribed —
14 A. Sure.
15 Q. — to Ms. Curley, and they are: Prozac, Paxil,
16 trazodone, Xanax, Zoloft, Elavil — I don't know if I've got
17 that right. Elavil?
18 A. Elavil, correct.
19 Q. And Vistaril.
20 A. Yeah.
21 Q. All of those medications have side effects, don't
22 they?
23 A. Correct.
24 Q. And haven't every one of those medications has been
25 associated with, among other things, potential weight gain?

**100**

1 A. Honestly, I don't know how much they have been. I
2 have to say, I don't know about the weight gain with Prozac.
3 In our experience with Zoloft, I think it's relatively minor,
4 but —
5 Q. Let me rephrase it. Do you know whether weight gain
6 is listed in the labels of all those drugs as a potential side
7 effect?
8 A. I think it is, and I think it probably is listed as a
9 potential side effect in 60 percent of the neuropsychiatric
10 medications.
11 Q. Okay. Is it possible to rule out that some or all or
12 some subset of all those drugs could have played some role in
13 attributing to Ms. Curley's weight gain?
14 A. Well, it's my understanding of the course of
15 medication — treatment with those agents that they — she was
16 not concurrently taking them when she started on the Seroquel.
17 Q. I mean, that's a good point. She took some of those
18 drugs before she took Seroquel, correct?
19 A. Correct.
20 Q. And you mentioned in your expert report that you
21 identified a temporal relationship between Ms. Curley's taking
22 of Seroquel and weight gain, correct?
23 A. Correct.
24 Q. Did you look to see if there was any temporal
25 relationship between her ingestion of any of those other drugs

**101**

1 and weight gain?
2 A. Not specifically, no.
3 Q. Has Ms. Curley ever attempted suicide?
4 A. I think so.
5 Q. How many times?
6 A. I can't recall.
7 Q. Just to see if this refreshes your recollection, do
8 you recall that she attempted suicide in 1977 and the year
9 2001?
10 A. I knew there was an earlier one and one that was just
11 before the time that she started on Seroquel.
12 Q. Her suicide attempts did not occur while she was
13 taking Seroquel, did they?
14 A. No.
15 Q. Do you agree that suicide attempts reflect an
16 impaired mental state?
17 A. Yes.
18 Q. Do you think that suicide attempts are a significant
19 part of one's medical history?
20 A. Yes.
21 Q. All right. Do you recall after she attempted suicide
22 in 1977 that she was hospitalized, Ms. Curley was, for 30 days
23 for that attempt?
24 A. I didn't recall the specific days, but I know that
25 she was hospitalized for —

102

1  Q.  Does that seem out of bounds?
2  A.  Not really.
3  Q.  And she was diagnosed with a likely personality
4  disorder after the suicide attempt in 1977.  Do you recall
5  that?
6  A.  Yes.
7  Q.  And isn't it the case that on September 11th, 2001,
8  Ms. Curley took four 100-milligram trazodone pills, three to
9  four hours ago, she said, in an attempt to kill herself while
10  in distress over her boyfriend.  Do you recall that from the
11  medical records?
12  A.  Yes.
13  Q.  And that as she was being brought to the hospital,
14  she tried to strangle herself on the gurney.  I mean, that is
15  something you'd remember from the medical record, isn't it?
16  A.  Yes.
17  Q.  Would you characterize those suicide attempts as
18  being serious?
19  A.  Yes.
20  Q.  You don't mention Ms. Curley's suicide attempts at
21  all in your report.  Is it – do you?  Is it referred to
22  anyplace there?
23  A.  No, I don't believe I did.
24  Q.  In your expert report on Page 3, Paragraph 2, you
25  say, "Seroquel is not indicated for use for either of these

103

1  problems," and you're talking about Ms. Curley's problems,
2  sleep and headaches.  "Off-label use of medications is not
3  unusual in medicine."  You agree with that right, obviously?
4  A.  Correct.
5  Q.  You wrote it, you say it.  "However, use of any
6  psychiatric medication should be based upon either documented
7  or plausible efficacy."
8  And my question to you is:  What do you mean by
9  "documented efficacy"?
10  A.  Well, a documented efficacy would be, you know, a
11  case report that says we tried this medication for sleep and,
12  you know, it really helps and it's – you know.  And plausible
13  efficacy is something similar to what I talked about earlier,
14  that a non-indicated – for example, using a medication in a
15  population that – like children; it's plausible that a
16  medication that has been documented to be effective in adults
17  may work in children.  That's a plausible – plausible thing.
18  Q.  What about – I'm sorry.  I want you to finish.
19  A.  I mean – and so you want to have some rationale to,
20  you know, try the medication.
21  Q.  What about the prescribing doctor's own clinical
22  experience?  Would that give rise to plausible efficacy?
23  A.  It can.
24  Q.  Okay.  Do you recall who the doctor was who
25  prescribed most of Ms. Curley's Seroquel?

104

1  A.  My recollection, it was a – I want to say
2  neurologist.
3  Q.  Right.  Do you remember the name?
4  A.  No.
5  Q.  Maria Wilson?
6  A.  Okay.
7  Q.  Did you read Maria Wilson's deposition?
8  A.  I did.
9  Q.  Okay.  I'll just read to you something she said.  And
10  we can get it if you want for – to see more context or
11  anything, but the question was to Dr. Wilson:  "You prescribe
12  atypical antipsychotics for some of your patients?"
13  Answer:  "I do prescribe atypical antipsychotics
14  for a lot of our patients."
15  Question:  "And why is that?"
16  Answer:  "The reasons is atypical
17  antipsychotics – and this is an off-label indication – has
18  shown in the medical literature to be effective in a variety of
19  situations for patients with headaches."
20  My question to you is:  Do you agree or disagree
21  with that statement by Dr. Wilson?
22  A.  You know, I have no doubt that there have been case
23  reports that people have used these things for people that have
24  headaches.
25  Q.  And then she says about Seroquel, "It was a good drug

105

1  with a good hypnotic effect for those patients that have
2  intractable insomnia that have difficulty either falling asleep
3  or staying asleep at night."
4  My question is:  Do you agree or disagree with
5  that statement of Dr. Wilson's?
6  A.  Well, if she made it, you know, that's her
7  experience.
8  Q.  I mean, if that was her experience, wouldn't that
9  constitute plausible efficacy, at least in that particular case
10  for that doctor with that patient?
11  MR. FIBICH:  Object to form.
12  A.  Yeah.  I mean, I think that – you know, I'm not
13  critical that she made that choice.  That's her choice.
14  Q.  (BY MR. McCONNELL)  Do you agree that Seroquel is
15  known for having a sedative effect?
16  A.  Yes.
17  Q.  And does Seroquel's sedative effect help with sleep
18  in patients who have not had success with traditional sleep
19  medications?
20  A.  Well, I know people have reported that.  I don't know
21  that that's been demonstrated in studies.  And I – you know,
22  part of the challenge that we have in clinical work is that
23  people assign, you know, efficacy to things that may not, in
24  fact, be what is really causing the – you know, the effect.
25  So, it's hard to say.

106

1    MR. McCONNELL: I'm on Page 78. Can you give me
2  the weight gain article, Folder 19?
3    Q. (BY MR. McCONNELL) While we're getting that, I'm
4  just going to tell you how this works. I'm going to put an
5  article in front of you. I have no idea if you've seen it
6  before, so we're going to show it to you and you can tell us if
7  you've seen it before.
8    A. Sure.
9    Q. Thank you.
10    (Perry Exhibit No. 7 marked.)
11    Q. (BY MR. McCONNELL) Doctor, what's been placed before
12  you as Exhibit 7 is an article. It's from a journal called
13  Human Psychopharmacology. It's an article about the effects of
14  adjunctive antidepressant therapy with quetiapine on clinical
15  outcome, quality of sleep, and daytime motor activity in
16  patients with treatment-resistant depression," and the authors
17  include Buane, Caliskan, and Todder, correct?
18    A. Correct.
19    Q. Have you seen this article before?
20    A. No, I have not.
21    Q. Are you familiar with the journal?
22    A. I've heard of the journal. I don't read it on a
23  routine basis.
24    Q. By the way, it uses the word "quetiapine" in the
25  title. You know quetiapine's the same thing as Seroquel,

107

1  right?
2    A. Yes.
3    Q. Okay. And feel free to look at as much of this
4  article as you want, but since you haven't seen it, I'm not
5  really going to ask you much about it. But I do want you to
6  take a look at Page 7 because it references other articles, and
7  I don't know if you've seen them.
8    A. Okay.
9    Q. If you look at Page 7 on the right column, the second
10  full paragraph that begins "Another strong possibility of
11  action," do you see that?
12    A. Yes.
13    Q. It says "Another strong possibility of action is that
14  adding an atypical antipsychotic may have addressed unmet and
15  untreated residual psychopathology of depressed patients. For
16  example, atypical antipsychotics, including quetiapine, are
17  shown to normalize sleep architecture," and it then cites three
18  articles. "And, furthermore, atypical antipsychotics improve
19  quality of sleep by increasing slow wave sleep and continuity
20  in selective serotonin reuptake inhibitor-resistant depressed
21  patients," then cites the Sharpley article that was cited
22  above. "It is very likely that improving the quality of sleep
23  of these depressed patients may have contributed to their
24  improved mental and physical wellbeing."
25    My question is, I guess, if you flip to the back

108

1  to the references: Have you seen any of those articles, either
2  the two articles by Sharpley or the article by Cohrs?
3    A. No, I have not.
4    Q. And, again, flip through as much of this as you need.
5  Do you have any basis to disagree or challenge what was said in
6  that article or the citations?
7    MR. FIBICH: Object to form.
8    A. No. I mean, I would certainly want to know -- for
9  example, I'd like to see the articles about how sleep
10  architecture is normalized and what population they do that in
11  and stuff like that, but I have no -- you know, looks like a
12  solid report.
13    Q. (BY MR. McCONNELL) How important, Doctor, is it, in
14  your judgment for mentally ill patients to get an adequate
15  amount of sleep?
16    A. I think it can be very important.
17    Q. Can lack of sleep cause health problems?
18    A. I think lack of sleep is associated with health
19  problems, yes.
20    Q. Can lack of sleep actually play a role in glucose
21  disregulation?
22    A. I think it does actually, it can.
23    Q. Now, Dr. Wilson testified that she used a low dose of
24  Seroquel for Ms. Curley. Do you recall that?
25    A. Yes.

109

1    Q. Do you recall what the dose was?
2    A. I think she started out with 25.
3    Q. Right. And the most she got up to was about a
4  hundred?
5    A. Yeah, not very much.
6    Q. Okay. Dr. Wilson testified that if you use a low
7  dose, you're going to be dealing with less side effects. First
8  of all, do you remember her saying something to that effect?
9    A. I don't remember that she said that, but I don't
10  dispute that.
11    Q. Right. I mean, you agree with that, right?
12    A. In general, yeah.
13    Q. Okay. And do you agree that -- you do agree that a
14  hundred milligrams or less of Seroquel is a low dose for
15  Seroquel?
16    A. Correct.
17    Q. And do you understand that Seroquel's FDA approved
18  for doses as high as 800 milligrams?
19    A. Yes.
20    Q. And we're going to get into the studies a little bit
21  more later on, the studies relating to weight gain and glucose
22  disregulation, but my question to you is: In all the studies
23  you've looked at, have you seen any studies, any peer-reviewed
24  study, showing that Seroquel at that dose, a hundred
25  milligrams, is associated with weight gain or hyperglycemia or

110

1  diabetes?
2      A.  No.  I don't think any of the studies actually use
3  doses that low.
4      Q.  Do you have any basis to challenge the decisions by
5  Dr. Wilson and -- there was another doctor -- Dr. Cases that
6  their off-label use of Seroquel for Ms. Curley was appropriate?
7      A.  No.  You know, from their perspective, where they
8  were at that point --
9      Q.  If you look at Page 2 of your report, Doctor,
10  Paragraph 1, near the bottom, you say that "Ms. Curley was
11  initially prescribed Seroquel by a neurologist in January of
12  2003.  At this time, she had a normal blood glucose.  She
13  continued on Seroquel through 2006."
14          Is the date of initial prescription important to
15  you opinions?.
16      A.  Yeah.  I mean, I think it's -- to try and make an
17  association between the medication and the onset of diabetic
18  symptoms.
19      Q.  All right.  And Ms. Curley was admitted to the
20  hospital on January 5th, 2003, to participate in an inpatient
21  headache rehabilitation program, right?
22      A.  I'm sorry?
23      Q.  You recall that Ms. Curley -- you referenced January
24  2003 in your report, and what I'm saying is isn't it true that
25  in early January 2003 she participated in an inpatient headache

111

1  rehabilitation program?
2      A.  I think that that's -- yeah, I think that's right.
3      Q.  Okay.  Now, what you said though was at that time she
4  had a normal blood glucose, and my question to you is first:
5  What do you mean by "normal blood glucose"?
6      A.  It's my understanding that her blood glucose was
7  within, you know, the acceptable range.
8      Q.  Which would be what?
9      A.  Basically, you know, 100 and less and -- maybe up to
10  110.
11      Q.  So, are you saying anything over 110 is bad?
12      A.  No, just that, you know, if you have a resting blood
13  sugar that gets to be above 110, you need to -- you know,
14  that's something that is -- something that needs to be followed
15  or tracked or --
16      Q.  What blood glucose test are you referring to in your
17  report when you say, "At this time, she had a normal blood
18  glucose"?
19      A.  I can't recall actually.  I believe it was the value
20  that was in the records when she was tested at that time,
21  and --
22      Q.  Are you saying that prior to January of 2003 that
23  Ms. Curley's blood glucose measurements were normal?
24      A.  No.  I'm -- I believe that what I'm commenting on is
25  at the time that she started, around that time, that she had

112

1  normal blood glucose values.
2      Q.  Isn't it a fact that before 2003, for years, she had
3  many blood glucose measurements that were way above normal?
4      A.  I do recall that she had some values that were above,
5  you know, 100.
6      Q.  Do you remember in the year 2000 that Ms. Curley had
7  a blood glucose measurement of 133, which was even designated
8  on the form by Dr. Acampo as being high?
9      A.  Yeah.  I didn't -- I don't -- I didn't recall it was
10  that high, but I remember that there was some values that were
11  above normal.
12          (Perry Exhibit No. 8 marked.)
13      Q.  (BY MR. McCONNELL)  Doctor, what's been placed before
14  you as Exhibit 8 is a lab report.  It says "SmithKline
15  Beecham," and looks like the date is -- of the report is --
16  looks like December of -- January 20th of 2000.
17      A.  Correct.  21st.
18      Q.  Thank you.
19      A.  Or -- yeah.
20      Q.  Thank you.  And there's a glucose measurement there.
21  It's one of the out-of-range measurements, correct?
22      A.  Uh-huh.
23      Q.  And -- that's a "yes"?
24      A.  I'm sorry.  Yes.
25      Q.  That's okay.  You've done well so far.

113

1          And it's 133, and that's high, isn't it?
2      A.  Yes.
3      Q.  Do you know why her glucose was high at the time of
4  this test?
5      A.  I do not know.  I do not know.
6      Q.  Okay.
7      A.  And that -- it may have been that she -- really
8  wasn't a fasting -- you know, I don't know.
9      Q.  Okay.
10      A.  She may have just eaten something.  Who knows?
11      Q.  And there were other glucose tests in the year 2000
12  where she had high glucose measurements, weren't there?
13      A.  Yes.
14      Q.  All right.  And, in fact, wasn't she diagnosed in the
15  year 2000 with hyperglycemia?
16      A.  I think so, yes.
17      Q.  And that's before she ever used Seroquel, isn't it?
18      A.  Correct.
19      Q.  Don't you think in forming your opinions in this case
20  that the fact that she was diagnosed with hyperglycemia three
21  years before she ever used Seroquel is kind of important?
22      A.  Well, I certainly think that, you know, her obesity
23  and her hyperglycemia are risk factors for the development of
24  diabetes, yeah, and should have been taken into consideration
25  when the doctor was trying to decide what to use for her sleep

## 114

1 and headaches.

2     Q. But isn't it also true you can't rule out her

3 preexisting hyperglycemia and her preexisting obesity as causal

4 factors for her diabetes?

5     A. Well, I would assume that they are contributory

6 factors to her development of diabetes.

7     Q. Couldn't the preexisting hyperglycemia by itself have

8 given rise to her diabetes?

9     A. It's -- I suppose that's possible.

10     Q. Can you say for sure that if Ms. Curley had never

11 taken Seroquel, that she would not have gotten diabetes?

12     A. I can't say for sure, but I think that adding an

13 additional risk factor is certainly not a wise thing to do and

14 played a causal -- was a causal factor, just like her

15 hyperglycemia and her obesity and inactivity and other

16 things -- other risk factors.

17     Q. But they could have done it on their own. For all we

18 know, her sedentary lifestyle by itself could have given rise

19 to diabetes, couldn't it?

20     MR. FIBICH: Object to form.

21     A. I'm sure that's possible.

22     Q. (BY MR. McCONNELL) In your report, you say that she

23 continued on Seroquel through 2006. And why did you put that

24 date in there? Why is it important as to when she stopped

25 taking Seroquel?

## 115

1     A. Why is it important when she stopped?

2     Q. Yes.

3     A. I think I was just making a notation of the duration

4 of her taking -- you know, that she was on Seroquel.

5     Q. Because, I mean, the fact is she actually stopped in

6 2005, didn't she?

7     A. I'd have to look at the record. I thought it was

8 2006.

9     Q. Yeah. She --

10     A. I thought she stopped once and then she was put back

11 on it.

12     Q. She asked to be tapered off in June of 2005.

13     A. Right. And then later on, she was given Seroquel --

14 she took Seroquel later on in 2006.

15     Q. Do you have -- can you tell me what record says that?

16 Because I've got her off as of June and July of 2005.

17     A. I'd have to go back and look.

18     Q. Would you agree that she completed her tapering off

19 from Seroquel in July of 2005?

20     A. Right. She did taper off Seroquel. There is,

21 however, another notation in the record that someone prescribed

22 Seroquel for her later on at a higher dose than she had been

23 put on before.

24     Q. Could you do me a favor, before tomorrow, maybe find

25 that record?

## 116

1     A. I will.

2     Q. Okay. Why did Ms. Curley stop taking Seroquel in

3 2005?

4     A. I'm not exactly positive. I seem to recall that she

5 had the sense that Seroquel might have been involved in the

6 development of her diabetes.

7     Q. Is that right? Didn't she actually stop taking

8 Seroquel because she thought it gave her a rash?

9     A. I may be -- I'm sorry. I may be missing -- it --

10 that may be. I thought that someone had told her that Seroquel

11 was involved in her developing diabetes and they tapered her

12 off of it.

13     Q. Can you find that medical record, too, if there is

14 one? I haven't -- because I'm representing to you that the

15 medical records that I've seen is she asked to go off because

16 of an allergy and a rash. She never said anything about weight

17 gain or diabetes.

18     A. Okay. Well, I knew that later on she said that she

19 had an allergy to it.

20     Q. Well, do you remember when it was that Ms. Curley was

21 diagnosed with diabetes?

22     A. I think it was between June and September of '05.

23     Q. Right. It was September 13th of 2005. Does that

24 seem right?

25     A. Yeah.

## 117

1     Q. So, if she was diagnosed with diabetes in September

2 of 2005, she wasn't stopping in June of '05 because of

3 diabetes.

4     A. Okay. I must have gotten my recollection of that

5 mixed up.

6     Q. Okay. Now, you do say on Page 3 of the report -- you

7 say that you conclude that Seroquel was a causative factor in

8 the development of diabetes in Connie Curley, correct?

9     A. Correct.

10     Q. You actually used pretty much the same statement for

11 Ms. Burns and Ms. Guinn, right?

12     A. Correct.

13     Q. And can you tell us by what mechanism Seroquel causes

14 diabetes, in your opinion?

15     A. I don't think anybody knows the exact mechanism by

16 which it causes diabetes. People speculate that it might have

17 to do with influencing the -- you know, insulin resistance. It

18 may have to do -- be an indirect factor related to the increase

19 in weight. I don't think the mechanism's completely

20 understood.

21     Q. What's the average glucose increase that you believe

22 Seroquel causes?

23     A. I would only be guessing at that.

24     Q. What percentage of people taking Seroquel have

25 increased blood sugar levels?

| | 118 |
|---|---|
| 1 | A. I don't know. I don't -- it's -- I think that it's |
| 2 | probably less than 15 to 20 percent. |
| 3 | Q. Do you agree that not everyone who takes Seroquel |
| 4 | gets diabetes? |
| 5 | A. Yes. |
| 6 | Q. And certainly not everyone who gets diabetes has |
| 7 | taken Seroquel, right? |
| 8 | A. Correct. |
| 9 | Q. In fact, most people who get diabetes have not taken |
| 10 | Seroquel. |
| 11 | A. Correct. |
| 12 | Q. Are you aware -- well, I asked you before -- I'm |
| 13 | sorry. I asked you about whether you were aware of studies |
| 14 | showing little or no increase in glucose in people taking |
| 15 | Seroquel. |
| 16 | A. Yes. |
| 17 | Q. And I think your answer was you don't -- you haven't |
| 18 | seen those studies? |
| 19 | A. No. I'm aware that there are studies where there |
| 20 | were minor and equivocal findings in increases in weight and |
| 21 | glucose. |
| 22 | Q. Have you read the McEvoy study from 2006? |
| 23 | A. I've -- what journal was it in? |
| 24 | Q. We're about to tell you. I'll show it to you. |
| 25 | A. Okay. |

| | 119 |
|---|---|
| 1 | MR. McCONNELL: Let me get this marked. |
| 2 | (Perry Exhibit No. 9 marked.) |
| 3 | A. Thank you. I did not read this study. |
| 4 | Q. (BY MR. McCONNELL) Okay. All right. How about the |
| 5 | Stroup study from 2006? Have you read that? We'll mark it. |
| 6 | A. Yeah. I'd have to see it to remember it. |
| 7 | (Perry Exhibit No. 10 marked.) |
| 8 | Q. Thank you. So, these are interrelated articles. |
| 9 | Q. (BY MR. McCONNELL) Right. And have you seen the |
| 10 | Stroup article before? |
| 11 | A. No. |
| 12 | Q. Are you aware that there have been multiple published |
| 13 | studies that have found that the incidence of hyperglycemia and |
| 14 | diabetes is significantly greater with clozapine and olanzapine |
| 15 | than with Seroquel? |
| 16 | A. Yes. |
| 17 | Q. Would you agree that people with psychiatric |
| 18 | disorders are at a higher risk of diabetes than the general |
| 19 | population? |
| 20 | A. I think that that's what the data show. |
| 21 | Q. And that was true before there even were |
| 22 | first-generation atypicals or second-generation atypicals, |
| 23 | true? |
| 24 | A. Yes. |
| 25 | Q. Would you agree that the causes of diabetes are |

| | 120 |
|---|---|
| 1 | multifactorial? |
| 2 | A. Yes. |
| 3 | Q. Can family history play a role as a risk factor for |
| 4 | diabetes. |
| 5 | A. Yes. |
| 6 | Q. Same with obesity? |
| 7 | A. Yes. |
| 8 | Q. Same with diet? |
| 9 | A. Yes. |
| 10 | Q. Same with lack of exercise? |
| 11 | A. Yes. |
| 12 | Q. Same with high cholesterol? |
| 13 | A. Yes. |
| 14 | Q. Same with high blood pressure? |
| 15 | A. Yes. |
| 16 | Q. Would you agree that the fact that a person ingested |
| 17 | Seroquel and became diabetic does not by itself mean that the |
| 18 | Seroquel caused the diabetes? |
| 19 | A. As the only causative factor, yeah, I think that |
| 20 | that's -- I don't think that you can conclude that necessarily. |
| 21 | Q. Well, I -- what I think I hear you saying is you |
| 22 | can't exclude the Seroquel, true, in that situation? |
| 23 | A. Correct. |
| 24 | Q. But my question to you is: If all you've got is the |
| 25 | fact that a plaintiff took Seroquel and sometime after they |

| | 121 |
|---|---|
| 1 | took Seroquel they became diabetic, those are all the facts |
| 2 | you've got, that that is not enough to permit you to say to a |
| 3 | reasonable degree of medical certainty that the Seroquel was |
| 4 | even a cause of the diabetes, forget about only cause. |
| 5 | A. Well, I guess the question is -- this is a |
| 6 | hypothetical question, right? |
| 7 | Q. It is. |
| 8 | A. So, you have somebody -- you're asking me whether or |
| 9 | not if you know that someone goes on this medication and then |
| 10 | they later develop diabetes, you have no basis to say anything? |
| 11 | That's what you're asking me to say? |
| 12 | Q. No. I'm saying that based on those facts alone, you |
| 13 | cannot say to a reasonable degree of medical certainty that the |
| 14 | Seroquel was a causal factor in getting diabetes. |
| 15 | A. But I think based upon all of the studies that we |
| 16 | have looked at the increased risk from that, I don't see how |
| 17 | you couldn't say that it was a potential causal factor. |
| 18 | Q. But there are people that get diabetes who never took |
| 19 | Seroquel, right? |
| 20 | A. Sure. |
| 21 | Q. So, let's say one of those persons alters their life |
| 22 | story in one way; they take Seroquel. Now they get diabetes. |
| 23 | They might have gotten the diabetes anyway, right? |
| 24 | A. Right, but if you -- the very definition of something |
| 25 | increasing risk is that it increases risk, that there -- you |

## 122

1 know, you can't call it a risk factor if there's not some
2 potential increased probability that that agent will be
3 involved in the development of a disorder.
4   Q.  Right.  But something can be a risk factor without
5 actually causing you to sustain the injury, correct?  There are
6 people who smoke who don't get lung cancer.
7   A.  Sure.  But you could never, ever then say that
8 someone who smokes and got lung cancer -- in their case,
9 smoking wasn't a risk factor.
10   Q.  Right.  But you can't say -- and I don't want to
11 linger on the smoking analogy too much, but in that case, you
12 can't say for sure without knowing more that it was the smoking
13 that caused the lung cancer.
14   A.  Well, what you can say for sure is that the smoking
15 is a likely causative factor because it's already been
16 demonstrated as a risk factor.
17   Q.  Right, in general, but you can't say for the
18 particular person.  That's what I'm talking about.  You can't
19 say -- now let's go back to Seroquel.  You can't say -- just
20 because they took Seroquel and they later got diabetes, you
21 can't say it was the Seroquel that caused the diabetes.
22   A.  Well, you can't make that statement because it's
23 highly likely to be multiple factors involved in the
24 development of whatever the -- let's say diabetes.
25   Q.  Right.

## 123

1   A.  So, I mean, I think it's -- in any given individual,
2 you -- we are not able to trace specifically the direct action
3 and mechanism of action that leads to an individual development
4 of diabetes unless there's some well-documented genetic element
5 that's present, and --
6   Q.  Well, you're familiar with confounding factors,
7 right?
8   A.  Yes.
9   Q.  I mean, there can be a confounding factor in a
10 particular case, right?
11   A.  Sure.
12   Q.  For example, when you have somebody -- as is the case
13 with these particular plaintiffs, if you have somebody who had
14 a family history of diabetes and they're obese and they have a
15 bad diet --
16   A.  Right.
17   Q.  -- and they don't exercise --
18   A.  Right.
19   Q.  -- and they have high cholesterol --
20   A.  Exactly.
21   Q.  -- and they have high blood pressure --
22   A.  Exactly.
23   Q.  -- and they take Seroquel, you don't know which among
24 those factors was what actually caused the diabetes.
25   A.  Well, what you do know is that the last thing that

## 124

1 you should do to somebody who has all those risk factors is add
2 another risk factor unnecessarily.
3   Q.  Agreed.  Agreed.  But now we're after the fact that
4 they have gotten the diabetes.  When you have that relatively
5 long list of risk factors, all of which are risk factors, as
6 you say, if that's the case -- but when it's post hoc now and
7 you're trying to come up with what was the cause, you can't say
8 for sure.
9   A.  Well, but you can say with pretty good confidence if
10 there is a temporal association with the taking of the
11 medication and the increase in weight, alterations in -- and,
12 you know, the development of the -- you know, diabetes in a --
13 that appears to be temporarily associated with it, I think that
14 you can say that it's a causative factor, it's played a role in
15 this process.
16   Q.  But I thought you also said before though that in
17 such a case, it's possible that the obesity by itself could
18 have caused the diabetes.
19   A.  It is possible that somebody who never -- who never
20 took that medication and had all of those risk factors -- it is
21 possible that over time they would have developed diabetes.
22   Q.  Accepting, as you say, that Seroquel is a risk factor
23 for getting diabetes, what is -- I don't know if we already
24 went over this before, but what is the relative risk?  If you
25 take Seroquel, how much does that increase your risk of getting

## 125

1 diabetes?
2   A.  Well, you know, depending upon the way you want to
3 interpret some of these meta-analyses, in some populations,
4 they would suggest that one-third of the new cases of diabetes
5 in a psychiatric population could be attributable to the
6 medication.  The way other people talk about it is risk is
7 increased between one-and-a-half and two times what you'd
8 expect under normal circumstances.
9   Q.  Okay.  So, let's take one-and-a-half to two times.
10 How about obesity?  If you have a BMI in excess of 30, doesn't
11 that increase your risk of diabetes by a factor of 50?
12   A.  I don't know if it's 50, but it increases
13 significantly.  But in these cases, those risk factors were
14 present, and so -- you know, the -- I don't want to talk about
15 all the cases at once, but if you have all the risk factors
16 present and then there is the addition of another risk factor
17 and there's a temporal association, then increasing weight and
18 onset of diabetes, I think it's fair to say that that
19 additional risk factor played a causative role.
20   Q.  Well, you're familiar with the Bradford Hill
21 criteria, of course, right?  You're cited them in some of your
22 work.
23   A.  I don't know if I've cited them, but I'm familiar
24 with them.
25   Q.  Right.  And temporal association is one element.

126

1    A.  Right.

2    Q.  But it's only one element, correct?

3    A.  It is one element, right.

4    Q.  There's —

5    A.  There are multiple elements, plausibility —

6    Q.  Coherence.

7    A.  It is plausible that this is played a role.  It is

8  coherent with the existing data.  You know, the strength of

9  effect — you know, in this ones, you know, the available data

10  would suggest that there is some element of dose dependence.

11  So, I mean, I think that —

12    Q.  Well —

13    A.  — reversibility is something that is — you know,

14  that's not something that you can look at in this case

15  necessarily.

16    Q.  You just mentioned the — first of all, you mentioned

17  the coherence.  There actually is discrepant data — that's

18  what the ADA says — in terms of the connection between

19  Seroquel and weight gain and Seroquel and hyperglycemia,

20  correct?

21    A.  But the ADA didn't have all the data available that

22  AstraZeneca had.  I mean, from what I can tell of reading the

23  internal memos, they themselves demonstrated weight gain, and

24  persistently gain beyond the first initial weight gain that was

25  statistically significant.  So, you know, I do think that at —

127

1  since 2004, there's probably more evidence that it's — I don't

2  think there would be — a reconvening of the same group

3  probably wouldn't conclude, given all the available information

4  now, that it — you know, Seroquel didn't cause weight gain.

5    Q.  Well, talking about the data that AZ had — we'll go

6  into more detail on that later — but can you name a single

7  piece of data that AstraZeneca had that was not produced to the

8  FDA relating to weight gain or glucose?

9    A.  I can't say that.  I don't know that they had access

10  to all the internal analysis of the weight gain data.

11    Q.  And — but you don't know, right?  You can't name

12  anything that was withheld.

13    A.  I don't know.

14    Q.  Now, with respect to the ADA —

15    A.  Right.

16    Q.  — you talk about the data that the ADA did not have.

17  I mean, what — name a specific piece of data that you would

18  rely upon in making an epidemiological judgment that was

19  withheld.  What clinical trial, what study was not provided?

20    A.  Well, AstraZeneca did not go and say to that panel,

21  as far as I'm aware — and they may have, but I'm not aware

22  that they went and said, "Hey, we've done this analysis and

23  there is this weight gain with this drug and it continues up to

24  a full year and, you know, include that in your analysis."

25    Q.  Did you read the Brecher articles from 2000 and 2007?

128

1    A.  I don't — you would have to — I don't remember them

2  by the name of first author, so —

3    Q.  We were talking about the different risk factors.

4  And you know that there are models, aren't there, for looking

5  at various risk factors that a person has for diabetes and

6  trying to work out the ways in which it will increase that

7  person's risk of diabetes?

8    A.  I'm sure there are, yeah.

9    Q.  Have you applied such a model to any of the

10  plaintiffs in this case?

11    A.  No.

12    Q.  I mean, if you had a case where a person had all

13  these other risk factors and the relative risk associated with

14  those other risk factors — like obesity, for example, or

15  preexisting hyperglycemia — is really high —

16    A.  Right.

17    Q.  — you know, 20 times whatever — and then in the mix

18  you have Seroquel and it's — the relative risk is 1.6, for

19  example — that's my hypothetical, all right?  So, this person

20  has obesity which increases their risk, you know, a lot, bad

21  diet, lack of exercise, high cholesterol, preexisting

22  hyperglycemia, and then at the tail end you have Seroquel with

23  an RR of 1.6.

24    Are you saying in that case you could still say

25  to a reasonable degree of medical certainty that the Seroquel

129

1  necessarily played a role in causing the diabetes?

2    MR. FIBICH:  Object to form.

3    A.  Well, I would say that I would still feel comfortable

4  saying that it is a causative factor.  I mean, even if it's a

5  small causative factor, it's —

6    Q.  (BY MR. McCONNELL)  For that person.  Not in general,

7  but for that person.

8    A.  Yeah.  How could you not?  I mean, how could you say,

9  "Well, in this case, this person has whatever makeup they have,

10  that they're not going to be impacted by the risk."

11    Q.  Well, wouldn't you say in that case, "I don't know.

12  They've got all these other risk factors.  I don't know what

13  did it.  Could have been any of these things"?

14    A.  Well — but I'd feel very comfortable saying that it

15  is a causative factor.

16    Q.  All right.

17    A.  I didn't put any value on how much of a causative

18  factor.  I said it's a causative factor.

19    Q.  It could be — well, what percent would you say in

20  Ms. Curley's case?

21    MR. FIBICH:  Object to form.

22    A.  I don't think I could really guesstimate what impact,

23  but I — you know, as you point out, she's had lots of other

24  risk factors.

25    Q.  (BY MR. McCONNELL)  I want to add one other thing to

130

1  the case of Ms. Curley because you sort of mentioned it before
2  when you were talking about dose response relationship, and
3  that is that in the case of Ms. Curley, she was taking a very
4  low dose of Seroquel.
5      A.  Very low.
6      Q.  How does that affect your calculation?
7      A.  Well, in general, I would think that higher doses
8  would put you at greater risk.
9      Q.  But what about the fact, as you said before, that
10  there isn't a single study out there showing that Seroquel, at
11  the dose that Ms. Curley was taking, has any connection with
12  weight gain or diabetes?  How can you then say it's necessarily
13  a causative factor for her?
14      A.  Well, because I think of the temporal association
15  between taking it and the onset of diabetes.
16      Q.  I mean, you're familiar with the concept of post hoc
17  ergo proctor hoc?
18      A.  Yes.
19      Q.  Right.  Just because something happens after
20  something else doesn't mean it was caused by the earlier thing,
21  right?
22      A.  No, it doesn't.  But in this case, the thing that she
23  took, you know, the medication, has been shown to be a risk
24  factor for the development of diabetes.
25      Q.  All right.  With respect to the ADA consensus

131

1  statement, that's something that you've read in this case,
2  right?
3      A.  Yes.
4      Q.  All right.  And we can go through the charts, but you
5  agree that the — that the ADA did differentiate between the
6  risk posed by clozapine and olanzapine with respect to weight
7  and hyperglycemia versus Seroquel, correct?
8      A.  Correct.
9      Q.  Do you agree with that distinction?
10      A.  I think that the data appear to bear that out, yeah.
11      Q.  All right.  Did you play any role at all with respect
12  to the ADA consensus statement?
13      A.  No.
14      Q.  Were you invited to do so?
15      A.  No.
16      Q.  Now, the ADA consensus statement reported on the
17  results of a conference of experts in psychiatry, diabetes, and
18  obesity, correct?
19      A.  That's my understanding, yes.
20      Q.  And are you aware that more than a dozen experts in
21  those disciplines presented data at the conference?
22      A.  Yes.
23      Q.  It wasn't just AstraZeneca presenting at that
24  conference, true?
25      A.  True.

132

1      Q.  And weren't there also FDA officials who presented
2  data at the conference?
3      A.  I'm not surprised.  I didn't know who people were
4  affiliated with, but I'm not surprised.
5      Q.  Now, the participants in the conference reviewed most
6  of the known peer-reviewed English language clinical studies
7  published in the area, correct?
8      A.  That's my understanding.
9      Q.  Including the animal studies?
10      A.  Correct.
11      Q.  And you certainly haven't reviewed all those
12  materials, have you?
13      A.  No.
14      Q.  The ADA consensus statement said that the risk in
15  patients taking risperidone and quetiapine — that is,
16  Seroquel — is less clear and some studies show an increased
17  risk for diabetes while others do not.  That's what they said
18  at that time, right?
19      A.  Correct.
20      Q.  And that was a true statement, wasn't it?
21      A.  At the time, yeah.
22      Q.  Okay.  And at the time, the ADA consensus panel
23  describes the studies of Seroquel and diabetes as having
24  discrepant results, correct?
25          MR. FIBICH:  Can you show him the document?

133

1          MR. McCONNELL:  Sure, sure.
2      A.  I think it described it as discrepant results in the
3  table.
4      Q.  (BY MR. McCONNELL)  Right.  Table 2, right.
5      A.  But I don't remember them saying that in the text.
6      Q.  Okay.
7          (Perry Exhibit No. 11 marked.)
8      Q.  (BY MR. McCONNELL)  You're right.  It's the Table 2
9  on Page 597, right, Doctor?
10      A.  Correct.
11      Q.  What does "discrepant" mean?
12      A.  My understanding is that it means that there were
13  some studies that showed an effect and some that didn't.
14      Q.  Okay.  I don't remember if I had asked you about all
15  the relative risks — stop me if I have — but I know we talked
16  about obesity, the extent to which a BMI of over 30 would
17  increase your risk of diabetes.
18      A.  Right.
19      Q.  And you don't recall exactly what it is, but it's
20  large.
21      A.  Correct, it is large.
22      Q.  It's higher than the relative risk of — we were
23  talking about cigarettes before — of cigarettes for lung
24  cancer, isn't it?
25      A.  You know, it may be.  I don't — I don't know the

34 (Pages 130 to 133)

134

1  relative risk for cigarettes.
2      Q.  To what extent does having a parent with diabetes
3  increase the risk of diabetes in the offspring?
4      A.  Significantly.
5      Q.  Ball-park number?
6      A.  I think it's —
7          MR. FIBICH:  Object to form.
8      A.  I think it's like 20 percent.
9          MR. McCONNELL:  Fair objection.
10     Q.  (BY MR. McCONNELL)  Can the risk caused by two risk
11  factors combined be quantified?
12     A.  I know that people, like I said, do modeling on that
13  stuff.  I know that it's — typically the combination of risk
14  factors increases risk.
15     Q.  And I know we said before that a preexisting mental
16  illness can be a risk factor for diabetes, correct?
17     A.  Well, I don't know that it's considered a classic
18  risk factor, but it is known that in sample populations of the
19  mentally ill, that diabetes occurs with higher frequency.
20     Q.  Sedentary lifestyle, what's the risk factor for that
21  for diabetes, if you know?
22     A.  I don't know the number but, I know that it's — I'd
23  guess 10 to 12 percent.
24     Q.  Does smoking increase the risk of diabetes?
25     A.  You know, I think indirectly, but I don't know that

135

1  it's considered one of the key risk factors.
2      Q.  We were talking before about confounding factors and
3  I know — you've looked at some of the epidemiologic studies
4  connecting Seroquel with hyperglycemia and diabetes, correct?
5      A.  Correct.
6      Q.  Can you name a single epidemiologic study that you
7  looked at that controls for the confounding factors that we've
8  just talked about; obesity, family history, sedentary lifestyle
9  smoking?  Is there a single case-controlled study out there
10  that does that?
11     A.  Well, I mean, I may have misread some of what their
12  methods were, but it was my understanding that they were
13  attempting to control for some of those confounds.
14     Q.  Can you identify a single case-controlled study that
15  controlled for obesity?
16     A.  No.
17     Q.  All right.  On weight gain, how much weight do people
18  gain on Seroquel on average?
19     A.  I think across the whole population it's 6 to 8
20  pounds, something like that.  I don't think it's — that's my
21  recollection.
22     Q.  Over what period of time?
23     A.  My understanding is that the majority of the weight
24  gain is in the initial few months.
25     Q.  You'd agree that not everyone who takes Seroquel

136

1  gains weight, right?
2      A.  Yes.
3      Q.  And do you agree that some studies show little or no
4  weight gain while on Seroquel?
5      A.  Yes.
6      Q.  And you agree there's a risk of weight gain with all
7  atypical antipsychotics, right?
8      A.  To some degree, more or less, yeah.
9      Q.  And you do write prescriptions, antipsychotics, for
10  people.  I mean, you wouldn't decide not to prescribe Seroquel
11  to somebody because of the weight gain concern if the
12  alternative is olanzapine or risperidone, right?
13     A.  Right, if that were the alternative.  I mean, if this
14  was somebody who had a lot of risk factors and already had
15  weight problems, I would try to avoid anything that would
16  increase weight if the alternative could be found.
17     Q.  And you agree that weight gain is a potential side
18  effect of first-generation antipsychotics, right?
19     A.  Correct.
20     Q.  It's also, weight gain is, a potential side effect of
21  many other psychiatric drugs, true?
22     A.  Correct.
23     Q.  And is it also true that the risk of weight gain from
24  first-generation antipsychotics has been known for decades?
25     A.  Correct.

137

1      Q.  And the risk of weight gain for atypical
2  antipsychotics has been known since they were introduced?
3      A.  Yes.
4      Q.  I know this is an odd question, but for some
5  patients, can it be true that weight gain can be an
6  improvement?
7      A.  Well, I mean, there are people who are — you know,
8  there are individuals who are nutritionally underweight that —
9  part of their neuropsychiatric syndrome is they're
10  malnourished, they don't eat appropriately.  So, changes in
11  appetite and increases in weight can be sometimes positive.
12     Q.  Can weight gain also signify an improvement in an
13  underlying psychiatric illness?
14     A.  Sometimes, if someone is very depressed and they
15  haven't been eating.
16     Q.  You're aware that multiple published articles have
17  indicated that the incidence in severity of weight gain on
18  Seroquel is less than that associated with clozapine and
19  olanzapine, right?
20     A.  Yes.
21     Q.  Do you agree that weight gain is something that a
22  doctor can monitor?
23     A.  Yes.
24     Q.  Can weight gain be managed?
25     A.  Well, you can try to manage it.

35 (Pages 134 to 137)

138

1    MR. FIBICH: I've been trying for a long time.
2    Q. (BY MR. McCONNELL) Doctor, you agree there are many
3    reasons why people gain weight?
4    A. Yes.
5    Q. Poor eating habits can be a reason why people gain
6    weight?
7    A. Yes.
8    Q. Like eating high-fat foods or fried foods?
9    A. Yes.
10   Q. Can a sedentary lifestyle cause people to gain
11   weight?
12   A. Yes.
13   Q. Can limited exercise cause people to gain weight?
14   A. Yes.
15   Q. Can stress or depression cause people to gain weight?
16   A. For some people, yes.
17   Q. All right. So, now I'm going to try it again.
18       Would you agree that the simple fact that a
19   patient ingested Seroquel and subsequently gained weight would
20   not by itself prove to a reasonable degree of medical certainty
21   that it was the Seroquel that caused the weight gain?
22   A. Well, if all those other factors have been present
23   and maintained and then the only thing that -- that appears to
24   be changing is the addition of that medication, then there is a
25   temporal association with -- in weight gain, you know, you'd

139

1    have to consider that the medication is contributing to that
2    process.
3    Q. Would you still say that if even before the person
4    took Seroquel that they actually had periods of skyrocketing
5    weight gain, then it drops down, just -- on an elevator, going
6    up and down, before they took Seroquel and after they took
7    Seroquel?
8    A. Well, you'd have to look at the baseline. I mean,
9    people always have ups and downs. But if the ups and downs are
10   higher and there's a temporal association, then, again, you
11   know, it's reasonable to conclude that the medication played a
12   role in some of that.
13   Q. All right. I want to talk about Ms. Curley's weight
14   gain. You say in the report -- on Page 3, you say, "The
15   temporal relationship between the start of Seroquel, her weight
16   gain, and subsequent manifestations and diagnosis of diabetes
17   lead me to conclude that Seroquel was a causative factor in her
18   weight gain and diabetes," right?
19   A. Correct.
20   Q. Okay. Now, how -- just tell me, how was it a
21   temporal relationship in the case of Ms. Curley between the
22   Seroquel usage and her weight gain?
23   A. Well, it looks to me as she started taking the
24   medication, that her weight started to go up, and --
25   Q. Well, you mentioned a baseline before. What was the

140

1    baseline that you used?
2    A. Well, the baseline that I could see was about 130
3    pounds.
4    Q. Right. You say that -- at the top of Page 3 of your
5    report, you talk about "A weight prior to starting Seroquel was
6    from three months earlier, in September of 2002, when she was
7    approximately 130 pounds," right?
8    A. Correct.
9    Q. All right. What's the most that Ms. Curley ever
10   weighed before she took Seroquel, if you know?
11   A. I don't know.
12   Q. What's the most that she ever weighed while she was
13   on Seroquel?
14   A. I think that she got up to about 170 pounds.
15   Q. Okay. Now, you said her closest documented weight
16   prior to starting Seroquel was from three months earlier, in
17   September of 2002, when she was approximately 130 pounds. But,
18   in fact, wasn't she -- wasn't her weight recorded the day she
19   entered the hospital and she started going on Seroquel?
20   A. It may have been. I don't recall what it was.
21       MR. McCONNELL: Can we take a look at that?
22   It's Folder 13. Thank you.
23       (Perry Exhibit No. 12 marked.)
24   A. Her weight's 144.
25   Q. (BY MR. McCONNELL) Right. So, this is closer to the

141

1    time when she started taking Seroquel, correct?
2    A. Correct.
3    Q. So, the baseline isn't 130. It's really 144, true?
4    A. That's correct.
5    Q. Does that fact by itself cause you to revisit your
6    opinion of the temporal relationship?
7    A. Well, I mean, she still does gain weight. She
8    doesn't gain as much weight, but she still gains weight.
9    Q. Well, you wrote in your report -- the next sentence,
10   you said "By January 14th, '03, she was 143 pounds," right?
11   A. Correct.
12   Q. Which in your report it makes it look like she gained
13   13 pounds from the baseline, but isn't the fact that she
14   actually lost a pound? After a week or so on Seroquel, she
15   actually dropped a pound.
16   A. I guess you could look at it that way, yeah, but
17   that's -- I'd consider that roughly equivalent weights.
18   Q. Okay. Then you write in your report "By November
19   16th, 2004, she was 151 pounds." So, that would actually be a
20   gain of weight of about 7 pounds over baseline from January '03
21   to November '04. So, not quite two years, gain of 7 pounds.
22       Does that show a temporal relationship, in your
23   judgment?
24   A. It's a weak temporal association.
25   Q. Okay. What about the intervening weights? Did you

36 (Pages 138 to 141)

142

1  look at the intervening weights to see what happened to
2  Ms. Curley's weight while she was on Seroquel?
3      A. My recollection is that I think she went up and down.
4      Q. Okay. I think that's right. Can we go through the
5  record and see about that?
6          (Perry Exhibit No. 13 marked.)
7      Q. (BY MR. McCONNELL) Doctor, what's been placed before
8  you as Exhibit 13 is another medical record for Ms. Curley,
9  correct?
10     A. Correct.
11     Q. And it's dated March 30th, 2004?
12     A. Yep.
13     Q. And what's her weight at this time?
14     A. 126.
15     Q. So, she's now lost 18 pounds from when she started
16 Seroquel to March 30th, 2004, correct?
17     A. Correct.
18     Q. How'd she do that?
19     A. Obviously, she -- I don't know. She lost weight.
20 She didn't eat as much as she had been before.
21     Q. I mean, is it possible that Ms. Curley is one of
22 those people who does not gain weight on Seroquel?
23     A. I suppose that's possible.
24     Q. And would you agree that losing 18 pounds for someone
25 who's 4-feet-9 is significant?

143

1      A. Yes. That's a significant weight loss.
2      Q. Do you recall whether or not Ms. Curley had some
3  problems in terms of her poor eating habits?
4      A. Well, that's -- I don't recall specifically.
5      Q. Do you remember if, as a result of depression or
6  stress, there were times when she would not eat until she
7  became nauseous, got a headache, and became shaky, and
8  testified that she ate only once a day during this time period
9  and didn't eat until she felt nauseous and shaky?
10     A. Yeah, I do recall that.
11     Q. Could her mental state have played a role in how she
12 lost weight?
13     A. Possibly.
14     Q. And it's not good, is it?
15     A. Her mental state and the way she was depressed?
16     Q. Yeah, and the way she ate.
17     A. No.
18     Q. Did Ms. Curley also admit that she had, at times, a
19 high-fat, high-fried diet?
20     A. Yes.
21     Q. So, she sometimes ate not nearly enough and sometimes
22 ate in excess, correct?
23     A. Correct.
24     Q. What caused that, if you have an opinion?
25     A. I couldn't say.

144

1      Q. Could her dysfunctional eating habits have played a
2  role in her weight fluctuations?
3      A. Certainly.
4          MR. McCONNELL: Can we see the one from Folder
5  17.
6          MS. CATES: Yes.
7          (Perry Exhibit No. 14 marked.)
8      Q. (BY MR. McCONNELL) Doctor, take a look at this.
9  It's Exhibit 14. It's dated January 7th, 2003, from Tampa
10 General Hospital. It's another medical record relating to
11 Connie Curley, isn't it?
12     A. Correct.
13     Q. Now, she does -- under social history, she admits --
14 it says "positive cocaine use." Do you see that?
15     A. Yes.
16     Q. Does that potentially play any role with respect to
17 weight fluctuations or, for that matter, hyperglycemia?
18     A. Sure.
19          (Sotto voce discussion.)
20     Q. (BY MR. McCONNELL) If you look, Doctor -- thank
21 you -- the third page from the back, under -- there's a
22 biofeedback section and there's a summary and there's Nos. 1
23 through 9.
24     A. Yes. Okay.
25     Q. No. 7 says "Poor nutrition, one to two meals maximum

145

1  per day"; No. 8 says "Limited exercise"; and No. 9 says
2  "Sedentary greater than 16 hours per day." Do you see that?
3      A. Yes, sir.
4      Q. Sedentary greater than 16 hours per day is about as
5  sedentary as you can get, isn't it?
6      A. Yes. It's sedentary.
7      Q. Pretty much means -- one's whole waking day, one
8  isn't really exercising, true?
9      A. Correct.
10     Q. Could that play a role with respect to her occasional
11 weight gains?
12     A. Yes.
13     Q. You're not saying, are you, that Seroquel is the
14 reason why she gained weight over time?
15     A. No.
16     Q. She has many risk factors for gaining weight, doesn't
17 she?
18     A. Yes.
19     Q. Have you reviewed Ms. Curley's --
20          (Phone ringing.)
21          MR. McCONNELL: Can we go off the record for a
22 second?
23          (Discussion off the record from 12:18 p.m. to
24          12:19 p.m.)
25     Q. (BY MR. McCONNELL) Doctor, in -- did you look at

146

1    Ms. Curley's weight from earlier time periods, say, from 1998,
2    2000, 2001?
3        A.  I read those records that were provided and I — so
4    I'm sure I saw the weights.  I didn't memorize them.
5        Q.  Now, given that she is — she's 4-feet-9, right?
6    She's quite short.
7        A.  Right.
8        Q.  And her baseline weight when she — before she
9    started Seroquel was 144 pounds, right?
10       A.  Correct.
11       Q.  Any idea what the BMI is of a 4-foot-9 woman who
12   weighs 144 pounds?
13       A.  It's probably pretty high.
14       Q.  I'll represent to you that our calculations suggest
15   that it's 31.2.  Seem about right?
16       A.  I wouldn't be surprised.
17       Q.  And that puts her in the obese category; is that
18   right?
19       A.  I believe so, yes.
20           MR. FIBICH:  Your calculation is based on a
21   height of 4'-9" and a weight of what, 144?
22           MR. McCONNELL:  144, yes.
23       Q.  (BY MR. McCONNELL)  Isn't it true if you looked at
24   her — and we can go through the records, but I just want to
25   see if you can confirm this or not.  But if you start in 1998,

147

1    from 1998 up until 2003, she averaged gaining about 10 pounds a
2    year.  Does that seem right to you?
3        A.  If that's — I'll take your word for it.
4        Q.  Okay.
5        A.  I know that she was all over the place, so — started
6    out much lower.
7        Q.  Right.  And — but if she's gaining 10 pounds a year
8    over time and then she starts on Seroquel, loses weight in the
9    first 15 months, but then proceeds to gain about 10 pounds a
10   year, how is that a temporal relationship between taking
11   Seroquel and gaining weight?
12       A.  Good point.
13       Q.  Doctor, what's the incidence of diabetes in patients
14   taking Seroquel?
15       A.  The incidence of people with diabetes — gosh, I
16   don't know.
17       Q.  What percent of people taking Seroquel have gotten
18   diabetes?
19       A.  I don't know.
20       Q.  What's the incidence of diabetes in adults in the
21   U.S.?
22       A.  I don't know for sure.
23       Q.  Okay.  What's the incidence of diabetes in adults who
24   have been diagnosed with schizophrenia?
25       A.  I don't know.

148

1        Q.  What's the incidence of diabetes in adults who have
2    been diagnosed with severe mental illness of any type?
3        A.  I don't know.
4        Q.  Does Ms. Curley have a family history of diabetes?
5        A.  As I recall, she did.  I think she had a risk — a
6    family history risk, yeah.
7        Q.  Didn't she say that her mother died from diabetes
8    complications?
9        A.  That's right, at age 68 or something.
10       Q.  Did she have high blood pressure?
11       A.  I think so.
12       Q.  Did she smoke?
13       A.  Yes.
14       Q.  She still smokes, doesn't she?
15       A.  I don't know, but I know she smoked.
16       Q.  Are you familiar with the concept of pack years?
17       A.  Yes.
18       Q.  Do you have any idea how many pack years Ms. Curley
19   has behind her?
20       A.  No, but I — probably considerable.
21       Q.  Something like 80 pack years?
22       A.  Yeah.
23       Q.  Does that sound right based on your review of the
24   medical records?
25       A.  Yeah, that sounds fair.

149

1        Q.  Is that really significant?
2        A.  That's a lot.
3        Q.  Can smoking be part of metabolic syndrome?
4        A.  You know, the — I'm not sure how they define it, but
5    I do — I'm not — wouldn't be surprised at all some of the —
6    that it's a contributing risk factor.  And the factors that I'm
7    aware of, I don't recall seeing smoking, but I wouldn't be
8    surprised at all if that was part of the constellation.
9        Q.  I showed you the medical record that referenced that
10   she was positive for cocaine use.  Do you recall that she also
11   testified that she smoked marijuana off and on from the mid
12   Seventies to the late Nineties?
13       A.  Yeah.
14       Q.  Does that play any potential role with respect to
15   weight or diabetes?
16       A.  I don't really know about diabetes, but I —
17   certainly weight can be impacted by smoking marijuana.
18       Q.  Has Ms. Curley taken other medications that can
19   increase blood sugar?
20       A.  I think that a number of the medications that she's
21   been on have the potential of influencing blood sugar.
22       Q.  She took — I may mispronounce this.  I'm sorry —
23   Clinoril for a while?
24       A.  Yeah.
25       Q.  And she took that well before she took Seroquel,

38 (Pages 146 to 149)

150

1   didn't she?
2       A.   Correct.
3       Q.   And hasn't that been correlated with a potential
4   increase in blood sugar?
5       A.   I'll take your word for it, but I would — you know,
6   I don't know that much about Clinoril.
7       Q.   She took Prempro for a while, didn't she?
8       A.   I — I don't recall that, but it — if you say she
9   did, I believe you.
10      Q.   Can Prempro play a role with respect to blood sugar?
11      A.   I think so.
12      Q.   She took Neurontin for her fibromyalgia for a while,
13  didn't she?
14      A.   Right.
15      Q.   Has Neurontin been related to potential blood
16  sugar —
17      A.   I think in some people it can influence blood sugar.
18      Q.   She took Depacon for migraine pain for a while?
19      A.   Depacon.
20      Q.   Depacon?  Sorry.  Do you remember that?
21      A.   Yeah.
22      Q.   Can that also have an effect on blood sugar?
23      A.   In some instances, I think, yeah.
24      Q.   She took Axert for migraine pain in the year 2003.
25  Do you remember that?

151

1       A.   I know she took migraine medications.
2       Q.   Can Axert play any role in affecting blood sugar?
3       A.   That I don't know.
4       Q.   She took baclofen, b-a-c-l-o-f-e-n, muscle relaxant,
5   in 2004, '05, '06, and '08, correct?
6       A.   I don't know the dates, but I show she took baclofen.
7       Q.   Can that have an effect on one's blood sugar?
8       A.   I think it's reported that it's possible, yeah.
9       Q.   She took hydrochlorothiazide?
10      A.   Right.
11      Q.   Did I even come close to getting that right?
12      A.   That's pretty good.
13      Q.   For hypertension, right?
14      A.   Yeah.
15      Q.   In fact, she's still taking it.  From 2005 to the
16  present, she's been taking it, right?
17      A.   Yeah.
18      Q.   Can that have an effect on blood sugar?
19      A.   You know, honestly, I don't know.  I don't think it
20  would be a huge effect, but I wouldn't be surprised if it's
21  reported as a possible effect.
22      Q.   Given that Ms. Curley had — now I'm going to list —
23  a history of obesity, a family history of diabetes, a history
24  of high blood pressure, a history of smoking, a history of drug
25  use, use of other medications that can cause hyperglycemia,

152

1   would you agree that based on your analysis you certainly
2   cannot rule out those factors as causative agents for her
3   diabetes?
4       A.   Well, I — of course, I agree.  In fact, I would
5   assume that they're part of the causative process.
6       Q.   All right.  So, you haven't ruled out — you
7   certainly haven't ruled out all of them and you haven't ruled
8   out any of them as causative factors, true?
9            MR. FIBICH:  Object to form.
10      A.   Well, I would anticipate that they would contribute
11  to her vulnerability and the development of diabetes.
12      Q.   (BY MR. McCONNELL) Can you — have you done any
13  analysis as to the relative risk factors from those facts in
14  Ms. Curley's medical background versus her Seroquel ingestion
15  with respect to either weight gain or diabetes?
16      A.   In terms of doing any specific analysis of that, no.
17      Q.   Okay.  Were Ms. Curley's treating physicians able to
18  rule out any of those alternative causes?
19           MR. FIBICH:  Object to form.
20      A.   Not that I'm aware.
21      Q.   (BY MR. McCONNELL) Okay.  I mean, you read the
22  depositions of the doctors, right?
23      A.   Yeah.
24      Q.   Dr. Acampo is Ms. Curley's current PCP, right?
25      A.   That's — I think that's correct, yeah.

153

1       Q.   Now, did you read Dr. Acampo's deposition?
2       A.   I think I did.
3       Q.   Okay.  Now, Dr. Acampo said, "Well, I think, for me,
4   the most likely causes for her will be more her weight and her
5   age and her family history," right?
6            Do you agree with Dr. Acampo?
7       A.   I think that there are — the risk associated with
8   those things is greater than with the medication.
9       Q.   Okay.  Now, Dr. Wilson was Ms. Curley's primary
10  Seroquel prescriber, right, her neurologist?
11      A.   Correct.
12      Q.   And Dr. Wilson is another person whose deposition
13  you've read, right?
14      A.   Yes.
15      Q.   And she was asked, "Would you suspect that her
16  Seroquel use caused her to have diabetes?"
17           And Dr. Wilson said, "I don't think anyone can
18  say 100 percent for sure whether Seroquel caused it or whether
19  it was a contributor."
20           Do you agree with that so far?
21      A.   Yeah.
22      Q.   And then Dr. Wilson says, "I would put it low in the
23  list.  I would put the family history as a more important
24  factor.  I would put her inactivity, her poor dietary habits.
25  And, ultimately, the low-dose Seroquel, I cannot say with

154

1  certainty that it wouldn't, I don't think anyone can, but I
2  would put it low in the list of risk factors."
3      Do you agree with what Dr. Wilson said?
4      A.  That's what all the — yes.  All the data suggests
5  that.
6      Q.  Okay.  Is there any scientific methodology that you
7  know of that would allow you to say whether Ms. Curley would
8  have gotten diabetes had she never taken Seroquel?
9      A.  Not that I'm aware of.
10      Q.  Now, I want to ask you about her prognosis because
11  you do mention that in your report.  And what you say in the
12  next-to-last paragraph on Page 3, Doctor, is — you say that
13  Ms. Curley's diabetes will likely result in significant
14  complications and increased medical care and expense, and my
15  question to you is:  What significant complications are you
16  referring to?
17      A.  Well, I think that people with diabetes, you know,
18  have problems with circulation, they have problems with a
19  variety of end-organ issues that can result in complex and
20  difficult-to-manage medical conditions, ranging from renal
21  problems to circulatory problems to, you know, visual problems.
22      Q.  Okay.  Anything else?  Sorry.
23      A.  Well, those are sort of the — three of the most
24  common that come to mind with — you know, complications of
25  long-term diabetes.

155

1      Q.  Can you say for certain that Ms. Curley will have
2  renal problems?
3      A.  No.
4      Q.  Can you say for certain that she'll have circulatory
5  problems?
6      A.  No.
7      Q.  Can you say for certain she'll have visual problems?
8      A.  No.  And I hope she has none of them.  I hope she's
9  well-managed and doesn't have any complications.
10      Q.  Do you agree that diabetes — it's sometimes been
11  called a lifestyle disease?  Have you heard that?
12      A.  Yes.
13      Q.  What's that mean?
14      A.  That means that if you change the way you eat and the
15  way you exercise and are very vigilant about managing your
16  sugars, you can avoid some of the complications.
17      Q.  Do you agree that if one is diagnosed with diabetes,
18  one's probably had it for four seven years?
19      A.  I think that that's what the ADA estimates based
20  upon — I don't know what, but that's what they estimate.
21      Q.  Do you agree or disagree with it?
22      A.  I think that it's likely.  You know, I think it's
23  less likely that that's the situation in people who are
24  actively involved in the medical system where, you know, you're
25  more quickly going to have things picked up.

156

1      Q.  Is Ms. Curley currently taking medication to control
2  her diabetes?
3      A.  I believe she is.
4      Q.  Okay.  What would you tell Ms. Curley to do to avoid
5  sequelae of diabetes?
6      A.  Pretty much the same stuff everybody else tells her
7  about, you know, eating better and exercising and, you know,
8  avoiding things that will exacerbate her condition.
9      Q.  You'd tell her to quit smoking, too, wouldn't you?
10      A.  Sure.
11      Q.  Have you reviewed the deposition of Ms. Curley?
12      A.  I have.
13      Q.  Now, she said that her blood sugar's under control,
14  didn't she?
15      A.  She did.  I don't know if that was accurate, but she
16  said that.
17      Q.  She said, "My sugar is 100 and my AIC number is 6,"
18  right?
19      A.  Correct.
20      Q.  I mean, if true, those are good numbers, aren't they?
21      A.  Yes.
22      Q.  Have you reviewed the testimony of Dr. Acampo
23  regarding Ms. Curley's prognosis?
24      A.  I read his deposition, yeah.
25      Q.  And he said that her diabetes — the question was:

157

1  "Has her diabetes been under control for at least the time
2  since she's seen you?"
3      And his answer was:  "Yes."
4      Do you disagree with that?
5      A.  No.
6      Q.  And he says he's pleased with her progress with her
7  blood sugar, right?
8      A.  Correct.
9      Q.  Okay.  Almost done with Ms. Curley, and I'll try to
10  do that real fast.
11      On Page 3 of your report, again, the
12  next-to-last paragraph, you say, "Further, the practices of
13  AstraZeneca related to the aggressive marketing and selective
14  inadequate disclosure to known risks of Seroquel contributed to
15  Connie Curley-developing diabetes."
16      Have you reviewed Dr. Wilson's testimony
17  regarding the extent to which he was influenced in any way or
18  not by Seroquel's marketing?
19      A.  "She" you mean, I think.
20      Q.  Dr. Wilson.  I'm sorry.  I'm getting her confused
21  with Dr. Acampo.  Dr. Wilson.  You're right.
22      A.  Yeah, and I think that she minimized the impact of —
23  that any representative had on her.
24      Q.  She said, she didn't, that she didn't make
25  prescribing decisions based on what sales rep say, right?

40 (Pages 154 to 157)

---

**158**

1   A.  Correct.

2   Q.  Do you have any reason to disbelieve her?

3   A.  No.

4   Q.  She said she relies on her own judgment and her

5   review of studies.

6   A.  Correct.

7   Q.  Do you disbelieve her?

8   A.  No.

9   Q.  And didn't Dr. Wilson also say that AZ sales reps

10  never talked to her or promoted to her about off-label uses of

11  Seroquel?

12  A.  She did say that.

13  Q.  And you don't disbelieve her on that, do you?

14  A.  No.

15  Q.  Dr. Wilson said it was her own decision to use

16  Seroquel for sleep.  I think we actually read some of that

17  testimony before.  You remember that, don't you?

18  A.  Correct.

19  Q.  And you're not challenging that, are you?

20  A.  No.

21  Q.  Now, Dr. Case (sic) testified he was aware that since

22  2004 atypical antipsychotics, like Seroquel, contained a

23  warning about diabetes and hyperglycemia, right?

24  A.  That's my recollection.

25  Q.  And you don't disbelieve him when he says that, do

---

**159**

1   you?

2   A.  No.

3   Q.  Dr. Case (sic) also said he still stands by his

4   Seroquel prescription for Ms. Curley.  Do you remember that?

5   He was asked that question.

6   A.  Yeah.

7   Q.  And do you challenge him in that regard?

8       MR. FIBICH:  Object to form.

9   A.  No, I don't challenge him.

10  Q.  (BY MR. McCONNELL)  And Dr. Case (sic) also said he

11  was never detailed by AZ sales reps to use Seroquel off-label,

12  didn't he?

13  A.  Correct.

14  Q.  And you don't disagree with that, do you?

15  A.  No.

16  Q.  All right.  You said in Page 2, the last full

17  paragraph of your report -- when you were talking about AZ's

18  conduct, their marketing and internal documents, you say they

19  reflect that the market of Seroquel involved

20  misrepresentations -- that is, the weight neutral claim -- in

21  the face of evidence that, in fact, that Seroquel caused weight

22  gain, right?

23  A.  Correct.

24  Q.  And what vehicle was that weight neutral claim made

25  such that it would affect any prescriber?

---

**160**

1   A.  My recollection of the deposition of the -- one of

2   the AZ individuals talked about the development of a slide pack

3   where there were -- used in teaching that had weight neutral

4   comparisons to other antipsychotics and tried to make -- you

5   know, tried to create a favorable profile relative to other

6   antipsychotics.

7       And -- and I believe that that was further -- I

8   think that he testified -- I may be recalling this

9   inaccurately, but I believe that he testified that he told his

10  people that he had contact with that it was a weight neutral --

11  so, I think that that's basically where I got that information.

12  Q.  On the weight neutral claim, Doctor, aren't there, in

13  fact, multiple published articles reporting that the weight

14  change on Seroquel varied depending upon whether the person had

15  a low BMI or a high BMI?

16  A.  I know that there were studies that looked at that

17  and -- but I also know that AZ apparently internally was aware

18  of the weight gain and the continuing weight gain past the

19  first few weeks and -- so, I think that it was a

20  misrepresentation to say that it was weight neutral when their

21  own findings suggested that it caused weight gain.

22  Q.  Well, I guess I'm asking you to consider weight

23  neutrality in a different sense, and that is that there were

24  articles, weren't there -- I'll just be more specific than I

25  was in my last question.  There were articles showing that

---

**161**

1   people with low BMI gained weight on Seroquel or could gain

2   weight on Seroquel while people with high BMI may lose weight.

3   There were articles that found that, weren't there?

4   A.  I trust you that there were.  I did not read those

5   articles.

6   Q.  All right.  If that's the case -- I'm just saying --

7   I understand your point about the overall weight gain --

8   A.  Right.

9   Q.  -- but if it's the case that there's data showing

10  that people with low BMI gained weight and people with high BMI

11  lost weight, I mean, can't you understand how, in terms of

12  semantics, you could call that "weight neutrality"?

13  A.  Well, that would be a semantic manipulation of that

14  data that wouldn't be the way it would be typically presented

15  to a prescribing physician.

16  Q.  Well, when you say it's manipulation, aren't you kind

17  of reading people's minds at that point?  I mean, can you say

18  for sure that there was nobody at the company who thought that

19  "weight neutrality" was a fair way to characterize that

20  phenomenon of low BMI coming up and high BMI coming down?

21      MR. FIBICH:  Object to form.

22  A.  I'm not saying that they weren't trying to come up

23  with some way to represent that, but I do know that internally

24  there was an awareness that there was overall weight gain and

25  that -- you know, it's a business.  The job of AstraZeneca is

162

1  to make money. It's — and I believe that there were efforts
2  to make their product look as favorable as possible, which —
3  and, again, I don't — that's what — there's nothing
4  necessarily wrong with that, if you don't misrepresent the
5  facts in a way that could potentially be detrimental to
6  patients.
7      Q.  (BY MR. McCONNELL)  If you really do have data
8  showing low BMI comes up and high BMI comes down, what's
9  another phrase you could come up with that accurately describes
10  that?  What's better than "weight neutrality"?  Low comes up
11  and high comes down, what's another way to —
12      MR. FIBICH:  Object to form.
13      A.  Well, as you pointed out, I don't have a degree in
14  marketing, so —
15      Q.  (BY MR. McCONNELL)  Now, with respect to that weight
16  neutrality marketing piece that you mentioned before, did any
17  of the doctors who worked on Ms. Curley's case ever see that?
18      A.  Did they ever see — I'm sorry.  Did they ever see
19  what?
20      Q.  Any marketing piece that referenced weight
21  neutrality.
22      A.  Not that I'm aware of.
23      Q.  Now, you mentioned other misrepresentations here.
24  I'll just — for this point, just so I can end the Curley
25  section, just with respect to the doctors who treated

163

1  Ms. Curley, the prescribing doctors and the treating doctors —
2      A.  Right.
3      Q.  — can you name — especially based upon the depo
4  testimony that you read, name a single misrepresentation by AZ
5  with respect to Seroquel and weight gain or glucose that any of
6  those doctors were exposed to?
7      A.  Well, I — a misrepresentation?  Well, I guess the
8  key one is that — the degree of risk associated with the
9  prescribing of Seroquel, and I think it was underpredicted
10  and —
11      Q.  In what way?
12      A.  Well, I think the labeling is softer than it should
13  be.  I think that the — it should be a — something that a
14  prescribing physician should pay more attention to and probably
15  would if the labeling in the U.S. was similar, for example, to
16  the labeling for Seroquel in Japan where, in 2002, they
17  actually represented Seroquel — someone with diabetes as being
18  contraindicated for prescribing.
19      So, I mean, I — again, I think that the
20  balancing of risk and benefit is something that depends upon a
21  fair representation of both the benefit and the risk and —
22      Q.  Well, aside from the labeling — I'm sorry.  I didn't
23  mean to cut you off.
24      A.  Go ahead.
25      Q.  Aside from the labeling — I'm just actually

164

1  referring to what you said in your report.  You said that the
2  internal documents reflect that the marketing of Seroquel
3  involved misrepresentations.  I hear what you're saying about
4  the label.  I'll ask you a couple questions to wrap that up,
5  but I just want to know, are there any misrepresentations —
6  putting aside the label, any marketing piece that you can say
7  you know of that Ms. Curley's doctors saw and relied upon?
8      A.  Well, not that they relied upon.  I mean, I think
9  that the issue is that there were things that weren't
10  represented that they should have relied upon.
11      Q.  Okay.  And you're talking about the label?
12      A.  Correct.
13      Q.  All right.  Now, with respect to the label, you
14  understand that that's — the FDA is tasked with determining
15  the risks and benefits of every medication approved for use in
16  the U.S., right?
17      A.  That's my understanding.
18      Q.  And the FDA approves a drug for marketing only after
19  it's convinced the benefits of the drug outweigh the risks.
20      A.  Correct.
21      Q.  And you know the FDA, when they make that decision,
22  they review not only peer-reviewed published literature but
23  also the clinical trial data.
24      A.  Correct.
25      Q.  And you'd agree the FDA has reviewed more data about

165

1  Seroquel than you have, right?
2      A.  Yes.
3      Q.  And you'd agree that the FDA has more experience than
4  you in analyzing the risks of medications.
5      A.  Correct.
6      Q.  And each time a drug is approved for a new
7  indication, which happened several times with Seroquel, the FDA
8  makes a determination that the drug is safe and effective for
9  that indication, right?
10      A.  Correct, for that indication.
11      Q.  And as you've testified before, you're aware the FDA
12  has determined that Seroquel is safe and effective on at least
13  six separate occasions, right?
14      MR. FIBICH:  Object to form.
15      A.  I don't know about the six.  I know of three.
16      Q.  (BY MR. McCONNELL)  Okay.  Go through them real
17  quick.  1997 label, what was the indication for Seroquel?
18      A.  Schizophrenia.
19      Q.  Well, wasn't it actually manifestations of psychotic
20  disorders?
21      A.  Okay.  That's fair.
22      Q.  What's that mean?
23      A.  That means active psychotic symptoms.
24      Q.  Okay.  Would that include schizophrenia?
25      A.  Yeah.

42 (Pages 162 to 165)

## 166

1    Q.  Schizoaffective disorder?

2    A.  Potentially.

3    Q.  Delusional disorder?

4    A.  Yeah.

5    Q.  Brief psychotic disorder?

6    A.  Could.

7    Q.  Shared psychotic disorder?

8    A.  Whatever that is. I'm not sure what that is.

9    Q.  Okay.  Substance-induced psychotic disorder?

10   A.  You know, I don't know if that's included, but it

11   wouldn't be inappropriate, I don't think.

12   Q.  All right.  And we can go through the labels, but you

13   maybe just know this:  You know that in the 1997 Seroquel label

14   that weight gain was included as an adverse event, right?

15   A.  Right.  I mean — and I — and as you-all know, and I

16   think anybody who's ever looked at the PDR, that the list of

17   adverse — potential adverse affects is, you know, long and

18   certainly not something that would jump out at the attention of

19   a prescribing physician.

20   Q.  But you — as a doctor, you read it.  It's long and

21   it may be boring, but you read it, right?

22   A.  Well, you read it and you look at it and it has the

23   same meaning as, you know, may get a rash, may get headache,

24   may lose weight, may do all kinds of stuff, and it — there's

25   nothing distinctive in that designation that makes a

## 167

1    prescribing physician say, "This is really something I need to

2    pay attention to and monitor.

3    Q.  But the fact is the 1997 label for Seroquel did state

4    that in controlled clinical trials, there was a statistically

5    significant greater incidence of weight gain in people taking

6    Seroquel than people taking placebo, right?

7    A.  Correct.

8    Q.  And didn't it, in fact, specify that in a randomized

9    clinical trial, the incidence of people gaining more than 7

10   percent of their weight was 23 percent for people taking

11   Seroquel and 6 percent for people taking placebo, right?

12   A.  Correct.

13   Q.  And you're not saying those numbers were false, are

14   you?

15   A.  No.

16   Q.  That was an accurate report.  And isn't hyperglycemia

17   included in the 1997 Seroquel label as an adverse event?

18   A.  I think it is.

19   Q.  And isn't diabetes included in the 1997 Seroquel

20   label as an adverse event?

21   A.  I think it is.

22   Q.  Now, 2001, the label was changed from "manifestations

23   of psychotic disorders" to "schizophrenia," right?

24   A.  I trust you if that's what it was, yeah.

25   Q.  Okay.  Not to repeat all the questions, but once

## 168

1    again, weight gain and hyperglycemia and diabetes were all

2    listed as adverse events on that label, right?

3    A.  Correct.

4    Q.  Okay.  2004, the label was changed to reflect that

5    Seroquel was approved for use as monotherapy in the treatment

6    of acute manic episodes associated with Bipolar 1 disorder and

7    as adjunctive therapy with mood stabilizers in treating acute

8    manic episodes in Bipolar 1 disorder, correct?

9    A.  Correct.

10   Q.  And, obviously, the FDA concluded that Seroquel was

11   safe and effective for treating acute bipolar mania in 2004,

12   right?

13   A.  Correct.

14   Q.  You don't challenge that decision by the FDA, do you?

15   A.  No.

16   Q.  And weight gain was, again, included in the 2004

17   Seroquel label as an adverse event, right?

18   A.  Yes.

19   Q.  And hyperglycemia was included in the warning section

20   in 2004, wasn't it?

21   A.  I think it was moved to the warning section.

22   Q.  And diabetes was in the warning section in 2004,

23   correct?

24   A.  Yes.

25   Q.  Okay.  Is it your opinion that the 2004 label was

## 169

1    inadequate?

2    A.  Well, you know, given the fact that there were

3    reports of potential deaths that were, you know, associated

4    with diabetic ketoacidosis and — you know, I — again, I don't

5    think it's inappropriate that it was in the warning area.  I

6    would have — you know, I would think maybe a black box warning

7    would have been more appropriate, but that's not my — you

8    know, I can tell you that I think that the regular prescribing

9    physician is probably not going to be as aware of the potential

10   risks, even though they're articulated to some degree in that

11   section.

12   Q.  I mean, do you think — do you feel that you've got a

13   basis to rewrite what the 2004 label said, which — you want to

14   offer that as an expert opinion as to how it should have been

15   rewritten?

16   A.  No.

17       MR. FIBICH:  Object to form.

18   A.  No.  But I do want to tell you that — as a

19   prescribing physician, that when you read through those things,

20   that, you know, you really — it becomes mind-numbing when —

21   something that's in the adverse section and there's 10 — you

22   know, 25 different things that are exactly the same from drug

23   to drug to drug to drug, and that — I do believe — and, you

24   know, this is — that it would be — it's very important to pay

25   attention to something that has the potential adverse effects

170

1  that this does.
2      Q. (BY MR. McCONNELL) It almost sounds like what you're
3  saying is that what can make a warning hard to read is if
4  there's too much information, it would almost be better if
5  there was less.
6      MR. FIBICH:  Object to form.
7      A. Well, the effect of having some of that stuff is
8  white noise. And I think that's why, for example, the FDA
9  says, "In some cases, we have to pull something out and
10 actually designate it as really special."
11     Q. (BY MR. McCONNELL) You were mentioning before
12 foreign labels. I mean, do you think that if the FDA says a
13 label should say a certain thing but there are foreign
14 regulatory agencies all over the world that come up with
15 different warnings, that a company should just take all —
16 every statement, every warning, every adverse event required by
17 every other foreign label and dump it all into the FDA label?
18     A. No, but I do think that if a foreign country —
19 multiple foreign countries come to the conclusion that the risk
20 is so serious that they need to make a black box designation,
21 that that should be seriously considered.
22     Q. Well, what if the — sorry.
23     A. But, again, as you said, I'm not an expert on the FDA
24 or their labeling.
25     Q. Okay. In 2006, Seroquel was approved for the use and

171

1  the treatment of major depressive episodes associated with
2  bipolar disorder, right?
3      A. That's correct.
4      Q. And do you disagree with the FDA's conclusion that
5  Seroquel was safe and effective for treating bipolar depression
6  in 2006?
7      A. No.
8      Q. 2007, Seroquel XR was approved for treating
9  schizophrenia, correct?
10     A. Correct.
11     Q. Do you disagree with the FDA's determination that
12 Seroquel XR was safe and effective for treating schizophrenia?
13     A. No.
14     Q. Are you offering an opinion in this case that
15 Seroquel's a bad drug?
16     A. No.
17     Q. Okay. In fact, for some people, it's a good drug.
18     A. Certainly.
19     MR. McCONNELL:  Okay. I have no further
20 questions on Ms. Curley. I don't know if you want to do lunch
21 now or —
22     MR. FIBICH:  Yeah. Why don't we take a short —
23 I think we've got lunch here. Let me check on that.
24     (Recess from 12:51 p.m. to 1:27 p.m.)
25     Q. (BY MR. McCONNELL) Just to sort of wrap things up

172

1  and put a little ribbon on it to end the Curley discussion, I
2  did want to just mark as an exhibit Exhibit 15, which we'll put
3  in front of you, and I'm just going to ask you to confirm that
4  that's the timeline that plaintiffs — Glenda Grainger prepared
5  and sent to you that you used in forming your opinions in this
6  case.
7      (Perry Exhibit No. 15 marked.)
8      A. Excuse me. Yes, it looks like it is.
9      MR. McCONNELL:  Okay. Why don't we mark this
10 the next one.
11     (Perry Exhibit No. 16 marked.)
12     Q. (BY MR. McCONNELL) Doctor, what's been placed in
13 front of you as Exhibit 16 is a document entitled "Janice
14 Elaine Burns AKA Ashby, Scoggins, Seroquel patient." You see
15 that?
16     A. Yes.
17     Q. And could you tell the jury what Exhibit 16 is?
18     A. Excuse me. This is a spreadsheet prepared, I
19 believe, by Glenda Grainger about this client.
20     Q. Okay. Now, when you received this spreadsheet —
21 similar question to what I asked you before about Ms. Curley —
22 did you take a look at the medical records and just sort of
23 check to see if this was an accurate and fair representation of
24 the medical records?
25     A. I did. I checked several of the entries against what

173

1  I was reading in the medical records and kept it kind of up on
2  the screen while I was reading the other stuff and —
3      Q. Did you check to see — it sounds like what you just
4  said is that you checked and you saw that what was listed in
5  this timeline, Exhibit 16, did match things that you saw in the
6  records that you were looking at, correct?
7      A. Yeah, in general.
8      Q. And — sorry.
9      A. And — but I didn't go through item by item and sort
10 of document exactly where it came from, but it — whenever I
11 had the medical record in front of me and I would see
12 something, I could sort of cross-reference it with what she had
13 entered on this spreadsheet and it was — every time I did
14 that, it was pretty accurate.
15     Q. Were there occasions when you looked at medical
16 records and they seemed relevant to you and they just weren't
17 reflected on this timeline at all?
18     A. Well, there — you know, when I read medical records,
19 you know, the mental health things that I would focus on are
20 things that might be of interest to me. She might not have put
21 them in; but, again, they may not have been germane
22 specifically to the issue in the case.
23     Q. All right. Now, in talking about the case of
24 Ms. Burns, let's start at the beginning and start with the
25 psychiatric issues. What are Ms. Burns' serious psychiatric

44 (Pages 170 to 173)

174

1   issues, as you understand them?
2       A.  Well, my understanding is that she had -- has
3   significant affect -- affective disorder, major depression.
4   The issue of posttraumatic stress disorder, I thought that was
5   raised at some point.  I can't -- I don't see it listed in
6   here, but she did have -- well, there it is, PTSD related to
7   earlier abuse.  She had anxiety disorder.  Those were the main
8   neuropsychiatric conditions that I saw in the records.
9       Q.  Has Ms. Burns ever attempted suicide?
10      A.  Yes.
11      Q.  How many times?
12      A.  Offhand, I don't recall, but I know she had one very
13  serious suicide attempt.
14      Q.  Okay.  Do you recall that there were about four
15  suicide attempts?
16      A.  That sounds roughly accurate, yeah.
17      Q.  And breaking it down more specifically, do you recall
18  that there were two suicide attempts before Ms. Burns ever took
19  Seroquel and then there were two suicide attempts after she
20  stopped taking Seroquel?
21      A.  Yeah, that sounds about right.
22      Q.  Was Ms. Burns on Prozac for several years?
23      A.  I think the list of medications that she had been
24  tried on was pretty considerable.
25      Q.  Was Prozac on that list?

176

1   been abused by a family member.
2       Q.  There was an allegation of sexual abuse?
3       A.  Correct.
4       Q.  Rape by a great granduncle?
5       A.  Yeah, something like that.
6       Q.  Okay.  Did she have problems sleeping?
7       A.  As I recall, yes.
8       Q.  Do you recall what Ms. Burns' profession was?
9       A.  She was a nurse, I believe.
10      Q.  And she said that she -- it says here that she stays
11  awake with nightmares of anxiety; is that right?
12      A.  If that's what it says.
13          MR. FIBICH:  Yeah.  Can you point it out to us?
14  You're misreading it and I'd like to follow it here.
15          MR. McCONNELL:  And I may be misreading it
16  because I can't read this all that well.
17      Q.  (BY MR. McCONNELL)  It's about here, about
18  three-quarters of the way down on this page, Doctor.  In fact,
19  I can't tell if that's "stays awake" or "stays away."
20      A.  "Avoids people, stays away."
21      Q.  "Nightmares of anxiety" --
22      A.  -- "of anxiety themes."
23      Q.  And what are the themes?
24      A.  Falling, something outside of the refrigerator --
25  falling.  That must be an example.  And then I think that

175

1       A.  It was one of the agents.
2           MR. McCONNELL:  All right.  If we can get a look
3   at Folder 1, please.
4           MS. CATES:  Yes.
5           MR. McCONNELL:  Thank you.
6           (Perry Exhibit No. 17 marked.)
7           MR. FIBICH:  I'm sorry.  This is number what?
8           THE REPORTER:  17.
9           MR. McCONNELL:  17.
10      Q.  (BY MR. McCONNELL)  Is this a medical record for
11  Ms. Burns that you've seen before?
12      A.  Yes.
13      Q.  And it does say in the handwritten progress notes in
14  the initial evaluation that she was on Prozac for ten years for
15  depression and had been diagnosed with PTSD; is that right?
16      A.  Correct.
17      Q.  And then it says "bad experiences" in quotes; is that
18  right?
19      A.  Yes.
20      Q.  And do you have an understanding from this record or
21  from any of the records that you looked at as to what was the
22  source of Ms. Burns' PTSD?
23      A.  My recollection is that she was -- I think it was a
24  family member that she had been abused by.  I don't remember
25  exactly what relation it was, but I think it was that she had

177

1   they're suggesting that milk outside of the refrigerator at the
2   store triggers an intrusive traumatic memory of seeing
3   something, an ex-something at the hospital where she worked,
4   evokes reaction.
5       Q.  Okay.
6       A.  So --
7       Q.  Did she have sleep apnea?
8       A.  Yes.
9       Q.  And it does appear on the second page there's a
10  reference to some other medications she was on, including
11  Zoloft; is that right?
12      A.  I think there was somewhere -- yeah, she had been
13  tried on multiple things.  I thought that she had said that she
14  had a pretty good response on Prozac for a while.  She stopped
15  Zoloft.
16      Q.  And it lists on the second page not only that she was
17  a nurse but it says here "former critical care nurse."
18      A.  Correct.
19      Q.  What's that?
20      A.  I assume that she worked in an ICU or a critical care
21  setting.
22      Q.  Okay.
23          (Perry Exhibit No. 18 marked.)
24      Q.  (BY MR. McCONNELL)  Doctor, is this another medical
25  record for Ms. Burns that you reviewed while you were

178

1  formulating your opinions in this case?
2  A. Yes, sir.
3  Q. And in this instance on December 27th, 1998,
4  Ms. Burns was admitted on a voluntary basis at the Bay County
5  Behavioral Health Center for her first psychiatric admission
6  following a suicide attempt by drug overdose; is that right?
7  A. Correct. That's what it says.
8  Q. And she says she had an extremely difficult situation
9  at a former job; is that right?
10  A. Yes.
11  Q. And this also then refers to the severe physical,
12  sexual, and emotional abuse by her maternal grandmother.
13  A. Correct.
14  Q. And then it says "leading to her going into treatment
15  was nightmares, shaking, problems with her balance, problems
16  with her memory, and coordination"; is that right?
17  A. Yes.
18  Q. And then it describes what it was that prompted her
19  to take, as she says, a bunch of bills; is that right?
20  A. Yes.
21  Q. 220 Tranxene, a month's supply of Tenormin, and a
22  month's supply of Vasotec. What are those drugs?
23  A. They're for hypertension, I think. The Tenormin
24  essentially is a beta blocker. I think that's what they're
25  for, for hypertension.

179

1  Q. Okay. Now, on the next page, Page 2, she talks about
2  her appetite being down and she has lost a total of 30 pounds.
3  Do you see that? Sorry. Second line —
4  A. Yes.
5  Q. — on Page 2. We're going to go through the weight
6  numbers again with Ms. Burns. Was it fair to say that, as with
7  Ms. Curley, Ms. Burns' weight fluctuated significantly, didn't
8  it?
9  A. Yes.
10  Q. If you look at Page 3, the section on emotional,
11  physical, sexual abuse history, the document says "She does
12  give history of abuse by the maternal grandmother physically
13  beating her with soap in a sock, putting her hand on a hot
14  iron, and also sexual abuse, although I did not go into details
15  of that." Do you see that?
16  A. Yes.
17  Q. Was this consistent with a potential case of PTSD, in
18  your judgment?
19  A. Sure.
20  Q. All right. On Page 4, for developmental history, it
21  says "Significant for her being premature and weighing 2 pounds
22  at birth." Do you see that?
23  A. Yes.
24  Q. Is — being premature and low birth weight, has that
25  been found to be a risk factor for diabetes or hyperglycemia?

180

1  A. You know, I don't — I do not know. It may — I
2  wouldn't be surprised if it has, but I don't know that
3  specifically.
4  Q. All right. Now, in this initial psychiatric
5  evaluation, the doctor didn't go into any details about the
6  sexual abuse; is that true?
7  A. Correct.
8  Q. Is that typical for an initial psychiatric
9  evaluation?
10  A. It can be, you know, if you — if the client clearly
11  is upset and it's very emotionally-charged content, you just
12  leave it for another time to explore.
13  (Perry Exhibit No. 19 marked.)
14  Q. (BY MR. McCONNELL) Doctor, this is a medical record.
15  It says "Emerald Coast Psychiatric Care." The date at the top
16  is 10-14-98, and then there are other dates and other entries
17  below that, correct?
18  A. Yes.
19  Q. So, this is subsequent to the record we just looked
20  at, right?
21  A. I think it's prior.
22  Q. Sorry. Prior.
23  A. Yeah.
24  Q. Okay. Now, in this case, there was a discussion with
25  the patient, Ms. Burns, about her sexual abuse early on; is

181

1  that right?
2  A. I —
3  Q. I'm looking at the entry for 10-22-98.
4  A. Well, okay. Yeah.
5  Q. She says — it says "Patient reports" — there's an
6  up arrow.
7  A. Right.
8  Q. What does that mean?
9  A. Probably means increasing.
10  Q. — "emergence of memories and dreams of being raped.
11  Now remembers it. States she did not remember it in past. Has
12  memory being raped between ages five through seven by the great
13  uncle, grandmother's brother."
14  In your experience with PTSD, is this something
15  that happens occasionally with people, they — memories emerge?
16  A. On occasion, yes.
17  Q. Now, in addition to the problems that Ms. Burns had
18  when she was quite young, did she also report problems with her
19  work environment?
20  A. Yes. I think she had some trouble at work.
21  Q. Do you recall what those troubles were?
22  A. My recollection is that — I mean — and this may be
23  inaccurate, but I thought she was accused or she felt she was
24  being accused of substance abuse problems or — that's my
25  recollection, that they reported her, she had to go through

182

1   some process of seeing whether she was an impaired health care
2   provider.
3       Q.  Do you recall also her reports of being constantly
4   bullied at work?
5       A.  Right.  She didn't get along with her supervisor.
6       Q.  And subsequent to this period of time into the years
7   '99 and 2000, is it fair to say that Ms. Burns reported having
8   almost constant suicidal ideations?
9       A.  They were an element of almost all of her mental
10  health records, yeah.
11      Q.  Do you recall she was also involved in a lawsuit
12  against the health care agency she was previously employed for?
13      A.  Yeah.  Excuse me.  Yes, I do.
14      Q.  And that seemed to be acting as a stressor for
15  Ms. Burns?
16      A.  I think that's fair, although I didn't -- you know,
17  that wasn't anything I really keyed on.
18      Q.  Well, let me follow up.  When you say you keyed on,
19  when you were looking at these cases -- and I'll just focus on
20  Ms. Burns now -- were you keying more on the psychiatric issues
21  or the endocrinological issues?
22      A.  I was looking at -- just trying to review the medical
23  records, focussing on the mental health issues and trying to
24  get a sense of the context within which the medication was
25  prescribed and --

183

1       Q.  Ms. Burns did receive psychiatric treatment for her
2   conditions over a period of several years, but beginning as
3   early as 1998, right?
4       A.  Correct.
5       Q.  And do you agree that during that period of time she
6   really was in need of psychiatric care?
7       A.  Yes.
8       Q.  And do you agree that the suicide attempts also --
9   well, first of all, do you agree that those were serious
10  suicide attempts, based on what you read in the medical
11  records?
12      A.  Yes.
13          (Perry Exhibit No. 20 marked.)
14      Q.  (BY MR. McCONNELL)  We looked at a medical record
15  from December 1998 before from Ms. Burns and I just wanted to
16  look at another one from 1998 that talks a little bit more
17  about how it was she was trying to commit suicide.  This is a
18  document you've looked at, right?
19      A.  If it's in her medical records, yeah.
20      Q.  Okay.  You read all the medical records, right?  You
21  didn't skip any?
22      A.  I read what was sent, yeah.
23      Q.  Okay.
24      A.  I didn't memorize it, that's for sure.  There's a lot
25  of stuff.

184

1       Q.  And you didn't take any notes when you were going
2   through the medical records?
3       A.  No.  What I typically do is the first time I get
4   them, I read them, just sort of as they come.  And then when
5   I'm asked to either prepare for deposition or write a report,
6   I'll sort of go back and revisit and hone in on the elements
7   that I think are important.
8       Q.  When you treat patients and you go through medical
9   records, do you take notes?
10      A.  On occasion, yeah, I do.
11      Q.  I read one deposition in another case where you
12  discussed the difference between how you -- your practice in
13  taking notes when you're acting as a doctor and when you're in
14  a forensic situation.
15      A.  Right.
16      Q.  Do you recall that?
17      A.  I don't know if I recall it, but, you know, I do take
18  notes differently when I'm doing clinical work.
19      Q.  And why is that?
20      A.  Well, the first time -- you know, I don't do this
21  stuff very often even though.  I -- you know, over the course
22  of many years, I've done it a few.  The first time I was
23  deposed, you know, I'd taken all these voluminous notes and had
24  stickers everywhere.  I mean, literally, the deposition took
25  hours and hours and hours and hours to literally go over

185

1   nothing, and about half of the questions were:  "And what is
2   the significance of this" -- "you know, this mark on the
3   paper?" and, you know, "Why did you underline that word?"
4       So, I said, you know, I'm not going to do that
5   anymore, so I don't do that.  Once in a while, I'll take, you
6   know, organizational notes to just sort of tell me where things
7   are, but that's --
8       Q.  But you made a good point though that the medical
9   records are very extensive.  They're particularly extensive in
10  the case of Ms. Burns, aren't they?
11      A.  Right.
12      Q.  And given that, how is it that you're able to sort of
13  keep all these various facts and various issues in mind to
14  enable you to formulate your opinions?
15      A.  Well, the abstracted medical record was helpful.  It
16  was helpful.  And the scope of the issue was pretty narrow.  It
17  wasn't -- I wasn't really commenting on the quality of mental
18  health or psychiatric notetaking or diagnosing or quality of
19  selection of medications.  It wasn't about the quality of the
20  care that she received from all those multiple individuals.  It
21  was more about, you know, this woman's history, the presence of
22  risk factors associated with the development of, you know, her
23  diabetes, and the context within which the medication was
24  prescribed and -- so, that -- the focus was narrower.
25      Q.  Okay.  In this record, it's reflected, is it not,

47 (Pages 182 to 185)

186

1   that Ms. Burns admitted that she had been trying to commit
2   suicide in 1998, right?
3       A.  I — I don't know if it is in this record, but if —
4   you know.
5       Q.  Well, take a look.  First paragraph.  Says "She's had
6   a prior history of depression managed by psychiatrists at Fort
7   Walton Beach."
8       A.  Yeah.
9       Q.  She admits she was trying to commit suicide.
10      A.  Yeah.
11      Q.  And you take that at face value?
12      A.  Sure.
13      Q.  Did — do you recall if she later verbalized anger
14  over the hospital's success at saving her from suicide during
15  her overdose in 1998?
16      A.  I don't specifically recall that.
17      Q.  Okay.
18      A.  But I — you know, that's — would not be an uncommon
19  thing for people that are depressed.
20      Q.  That was the suicide attempt in 1998.  And the next
21  suicide attempt was in December 2000, correct?
22      A.  Yeah.  I mean, if that's —
23      Q.  Are the — I didn't mean to cut you off.  Are the
24  suicide attempts listed in the — what you call the abstract or
25  the timeline that the plaintiffs' lawyers' nurse provided to

187

1   you?
2       A.  Yeah.  There's one in 4 of '07.  And as I recall, you
3   know, the major admissions and diagnostic labels and
4   pharmacology changes were put in that — in the middle column
5   or on the right-hand column.
6       Q.  But we just saw that there was a suicide attempt by
7   Ms. Burns in December of 1998, and we know that there was also
8   one in December of 2000.  Neither of those suicide attempts is
9   reflected in Exhibit 16, the Burns timeline, correct?
10      A.  No.  It's at the bottom of the first page; major
11  depression, single episode, psychotic features, suicidal
12  ideation, 12-98.
13      Q.  Right.  Says "suicidal ideations."  People have lots
14  of suicidal ideations without trying to commit suicide, right?
15      A.  Yes.
16      Q.  But it doesn't say that there actually was a suicide
17  attempt, does it?
18      A.  No, not there.
19      Q.  Does it say — is there anywhere in this abstract,
20  any reference to any suicide attempts by Ms. Burns?
21      A.  There is.  I mean, in four — 4-07, there's a
22  notation about a suicide attempt.  I think that's when it was.
23      Q.  Okay.  What about the suicide — the three other
24  suicide attempts?  Is there any reference to them at all?
25      A.  I don't see them.

188

1       Q.  All right.  I mean, if you want an abstract that
2   really is an abstract that fairly summarizes a person's medical
3   history, don't you think that suicide attempts are significant?
4       A.  Well, I do think they're significant and — you know,
5   but they were also a pretty prominent part of the medical
6   record, so it's — I could see them and — you know, this
7   was — as I said, I read the medical record.  This was a
8   supplement to it and this is an abstraction of elements of the
9   medical record that were helpful in helping me organize, you
10  know, the materials.
11      Q.  But isn't it the case that if I were working for you
12  at the Child Trauma Academy —
13      A.  Right.
14      Q.  — and you asked me to prepare an abstract of
15  somebody's medical history — you're still going to look at the
16  medical records —
17      A.  Sure.
18      Q.  — but you want me to prepare an abstract for you —
19  and I prepare an abstract and I leave off three of the person's
20  four suicide attempts, wouldn't you come talk to me and say,
21  "This was not such a great abstract"?
22          MR. FIBICH:  Object to form.
23      A.  Well, you know, I — again, I don't believe that this
24  was a mental-health-only review.  I think that — I can't speak
25  for what, you know, Ms. Grainger was completely focussing on,

189

1   but the way — what she did abstract was helpful for me.
2       Q.  (BY MR. McCONNELL)  But there was some significant
3   omissions.
4       A.  Well, you know, in terms of documentation of every
5   aspect, even important aspects of the mental health
6   presentation, sure, but that's — you know, the columns are
7   weight, lab values, treatment with antipsychotics.  It's not
8   mental health and — it's about treatment with antipsychotics
9   and diagnoses, and then there was some — and then there's a
10  comment section and — so —
11      Q.  I mean, you're saying it's not just mental health,
12  but I guess my question to you is:  It isn't mental health at
13  all, this abstract, if you're excluding a person's suicide
14  attempts.  It's just really about the weight and the claims in
15  the case, isn't it?
16      A.  Well, that's — that's what this abstract is about,
17  yeah.  It's about the issues that they're focussed on, yeah.
18      Q.  It's a litigation abstract, right?
19      A.  Yeah.  This isn't a clinical — you know, a thorough
20  clinical abstract of the medical records.
21      Q.  And if you were in a clinical context, this is not
22  what you would want for Ms. Burns.
23      A.  Correct.  I wouldn't really have as much concern
24  about every single weight on every single date and —
25      Q.  And you'd have, rather, more concern about her

190

1  suicide attempts.
2      A.  Correct.
3      Q.  Do you recall what the details were of Ms. Burns'
4  December 2000 suicide attempt?
5      A.  I think it was -- that was the very serious suicide
6  attempt.  I think she had to be in the ICU and intubated and --
7  actually, I don't know if she was intubated, but she was in the
8  ICU for quite a while.
9      Q.  Well, in 1998, she attempted to commit suicide by
10  taking lots and lots of pills, right?
11     A.  Right.
12     Q.  In 2000, she tried to commit suicide by slashing her
13  wrist --
14     A.  Right.
15     Q.  -- and, in fact, had to be Baker-Acted, right?
16     A.  Right.
17     Q.  Could you tell the jury what that means, to be
18  Baker-Acted?
19     A.  It's basically -- you have to be certified to be
20  hospitalized and treated against your will because you're of
21  imminent threat to yourself or others.
22     Q.  If you thought, by the way that somebody was an
23  imminent threat to themselves or others, they wouldn't be
24  released, would they?
25     A.  No.

191

1      Q.  All right.  Now, both of those suicide attempts that
2  we talked about from 1998 and from 2000 -- first of all, they
3  both occurred in December, didn't they?
4      A.  Yeah, I guess so.
5      Q.  Which is not uncommon, is it?
6      A.  Well, I think the holidays is -- people have
7  increases in suicidal ideation, yeah.
8      Q.  And both of those suicide attempts took place before
9  Ms. Burns ever took Seroquel, correct?
10     A.  Correct.
11     Q.  Now, during what period of time did Ms. Burns take
12  Seroquel?
13     A.  I think she started in 2002.  I'll have to check to
14  make sure, but --
15     Q.  And just for the record, you're looking at the
16  abstract, Exhibit 16?
17     A.  Correct.
18     Q.  Okay.
19     A.  And it looks like she started in June of 2002.
20     Q.  And stopped when?
21     A.  She was taking it all the way through 2005 and, I
22  think, maybe a little bit into 2006.  I'm not sure.
23     Q.  Okay.  Well, she certainly stopped before December
24  2006, didn't she?
25     A.  I think so.

192

1      Q.  And that was the time of her next suicide threat,
2  December 2006, correct?
3      A.  As I recall.
4      Q.  And do you remember that she was voluntarily admitted
5  to the psych unit at Bay Behavioral Health Center in 2006,
6  again, in December?
7      A.  I didn't recall the specifics, but I trust you on
8  that.
9      Q.  Do you remember what her suicide threat was
10  specifically?
11     A.  No.
12        MR. McCONNELL:  Can we see Folder 9?
13        (Perry Exhibit No. 21 marked.)
14     Q.  (BY MR. McCONNELL)  Doctor, you've looked at this
15  medical record before, haven't you?
16     A.  If I had it.  I don't know if -- I don't recall
17  this.  I think this must have been part of the appendix of the
18  hospital record.
19     Q.  She says -- Ms. Burns signed for voluntary admission
20  to the adult facility, correct?
21     A.  Right.
22     Q.  She says, "My daughter and son-in-law beat me and
23  screened calls," Actually says "scream calls,"
24  s-c-r-e-a-m, right?
25     A.  Yeah.  It looks like it, yeah.

193

1      Q.  And then her suicide threat is she says, "I want a
2  .22-guage gun to put in my mouth and point up.  It should make
3  my brain scrambled eggs," right?
4      A.  Right.
5      Q.  Do you think it was appropriate to regard that as a
6  serious suicide threat, especially given Ms. Burns' history?
7      A.  Sure.
8      Q.  And do you recall what Burns's next suicide attempt
9  was?
10     A.  No, I don't.
11     Q.  Was it -- well, just see if this refreshes your
12  recollection:  You recall that in April of 2007 she, again,
13  engaged in a drug overdose?  That's the one that's in the
14  abstract.
15     A.  Right.
16     Q.  If you were a treater, what would be the significance
17  to you of Ms. Burns' various suicide attempts?
18        MR. FIBICH:  Object to form.
19     A.  I would take that as an indication that she's a very
20  seriously disturbed person.
21     Q.  (BY MR. McCONNELL)  Would those suicide attempts
22  affect your diagnosis of what it was that she has?
23     A.  Well, it would certainly be incorporated into, you
24  know, the process of coming up with a diagnosis.
25     Q.  And the suicide attempts might affect your treatment

194

1  of Ms. Burns?
2      A.  Sure.
3      Q.  Would they affect your prognosis for Ms. Burns?
4      A.  Sure.
5      Q.  In what way?
6      A.  Well, the past history of serious suicide attempts is
7  a good predictor -- is one of the better predictors of future
8  suicide attempts and success.
9      Q.  Now, you don't refer to any of Ms. Burns' suicide
10  attempts in your expert report, do you?
11      A.  No.
12      Q.  Why not?
13      A.  I wasn't commenting on the affects of Seroquel on her
14  mental health.
15      Q.  You do agree that Ms. Burns' mental health issues
16  certainly affected the quality of her life.
17      A.  Yes.
18      Q.  They affected her ability to work?
19      A.  Of course.
20      Q.  They just affected her ability to live on a
21  day-to-day basis.
22      A.  I think that's fair.
23      Q.  And do you agree that some mental health issues are
24  very hard to treat?
25      A.  Yes.

195

1      Q.  Dr. Billingsly was one of Ms. Burns' doctors, right?
2      A.  Correct.
3      Q.  And you read his depositions?
4      A.  I did.
5      Q.  He was deposed twice, right?
6      A.  Yeah.
7      Q.  He said that Ms. Burns' major depression is a severe
8  illness.  Do you agree with that?
9      A.  Yes.
10      Q.  He also testified about the disabling nature of PTSD,
11  including sleep-related events.  We went over some of that with
12  Ms. Curley.  But you agree with that, right?
13      A.  Yes.
14      Q.  And Dr. Billingsly, didn't he testify that sleep
15  problems interfered with Ms. Burns' ability to function?
16      A.  Yes.
17      Q.  And do you agree with that?
18      A.  Sure.
19      Q.  Was it Dr. Billingsly who prescribed Seroquel for
20  Ms. Burns?
21      A.  I believe it was.
22      Q.  All right.  And -- and that happened in around June
23  of 2002, correct?
24      A.  To start with, yes.
25      Q.  And what were Dr. Billingsly's reasons for

196

1  prescribing Seroquel to Ms. Burns?
2      A.  My understanding at the time was that it was to help
3  with her sleep and affect regulation.
4      Q.  And when you say "affect regulation," you're talking
5  about depression?
6      A.  Right.
7      Q.  Okay.
8      A.  Right.
9      Q.  Was there also an issue with Ms. Burns being very
10  agitated?
11      A.  Yeah, and that's kind of part of that constellation
12  of symptoms that go with mood disorder.
13      Q.  Now -- and, again, we went over this before, so I'm
14  not going to linger on it, but you agree sleep difficulty can
15  be a very serious problem?
16      A.  Yes.
17      Q.  And it can be resistant to efforts to treat sleep
18  problems, right?
19      A.  Can be.
20      Q.  Did Dr. Billingsly try different medications and
21  levels of medications to help Ms. Burns sleep over time?
22      A.  I think he did.
23      Q.  In 1998, after the initial suicide attempt, he
24  prescribed 50 milligrams of trazodone for her, correct?
25      A.  Correct.  I don't know if that's the dose, but he did

197

1  prescribe trazodone.
2      Q.  Is trazodone the same drug that we saw was prescribed
3  for Ms. Curley?
4      A.  Correct.
5      Q.  And I think you said you didn't think that was so
6  great for sleep.
7      A.  It's -- even though it's used -- I think it's
8  probably one of the most commonly-used medications for sleep,
9  which is odd since it's not really effective for sleep.  So --
10      Q.  But we have seen in both the Curley and Burns cases
11  that doctors did prescribe trazodone for sleep, so -- and both
12  times it didn't really work --
13      A.  Correct.
14      Q.  -- so it sounds like you're right; both, number one,
15  it's commonly thought of being effective and, number two, it's
16  not always effective.  Fair?
17      A.  I think that's fair, yeah.
18      Q.  Did Dr. Billingsly subsequently prescribe Ambien to
19  Ms. Burns?
20      A.  I think he did.
21      Q.  And, yet, even after that, Ms. Burns still had
22  trouble getting to sleep, true?
23      A.  That's correct.
24      Q.  And when she would get to sleep, she'd wake up during
25  the middle of the night?

198

1   A. Correct.
2   Q. Dr. Billingsly's plan in 2001 was to start
3   prescribing Desyrel, D-e-s-y-r-e-l?
4   A. Correct.
5   Q. What's that?
6   A. It's an antidepressant.
7   Q. And is that sometimes prescribed to try to help
8   people sleep?
9   A. I think that it's not uncommon for psychiatrists or
10  physicians to try a whole host of medications that might not
11  normally be the typical narcoleptics when they have clients
12  that can't sleep, so --
13  Q. Now, when Dr. Billingsly prescribed the Seroquel to
14  Ms. Burns, how did it work for her in terms of sleep?
15  A. I don't recall actually.
16      MR. McCONNELL: Folder 18.
17  Q. (BY MR. McCONNELL) And while we're getting that, do
18  you recall Dr. Billingsly testifying that they struggled over
19  the years to help find the right medicines for her that would
20  help her achieve a higher level of functioning?
21  A. Yes.
22  Q. And based on what you saw in the medical records, was
23  it fair to say he was trying different things?
24  A. I agree.
25  Q. And we were talking before about this issue of the

199

1   risk-benefit analysis and when you prescribe a
2   second-generation antipsychotic, and I think you were saying
3   that you might want to try other things first, right?
4   A. Correct.
5   Q. And Dr. Billingsly tried, didn't he?
6   A. Yes.
7       (Perry Exhibit No. 22 marked.)
8   Q. (BY MR. McCONNELL) Doctor, Exhibit 22 is a medical
9   record from the office of Dr. Billingsly, correct?
10  A. Yes.
11  Q. It's dated August 1, 2002?
12  A. Correct.
13  Q. It's a progress note. And under the subjective
14  category where Ms. Burns reports how she's feeling, she says
15  she feels okay. "She states she's still under a lot of stress
16  from legal issues and has her good days and her bad days. She
17  finds that the Seroquel, taking 400 milligrams at night, works
18  very well for helping her sleep. She has not had to use the
19  Desyrel. She does not feel hung over in the morning and it
20  does seem to agree with her."
21      So, from that, doesn't it sound like the
22  Seroquel was working pretty well for her?
23  A. Yeah, it does.
24  Q. Do you quarrel with Dr. Billingsly's decision to
25  prescribe Seroquel to Ms. Burns in this context?

200

1   A. I don't quarrel with him, no.
2   Q. Now, some of the other medications that are used to
3   address sleep problems can be addictive, can't they?
4   A. Yeah. They can be habit-forming, yeah.
5   Q. There's no evidence that Seroquel is addictive
6   though, is there?
7   A. Well, I have to say that guy -- what's that guy?
8   What's the guy yesterday? I read that deposition. What's his
9   name?
10  Q. Wirsching.
11  A. Yeah.
12  Q. Aside from Wirsching --
13  A. He may disagree.
14  Q. Right. Aside from Wirsching saying what he said,
15  have you seen any evidence anywhere that Seroquel's addictive?
16  A. No.
17  Q. Is it common in trying to treat PTSD or major
18  depression for doctors to try multiple medications to treat
19  symptoms?
20  A. It is common.
21  Q. Okay. Now, I want to ask about the other medications
22  that were used with Ms. Burns over time, sort of as we did with
23  Ms. Curley.
24  A. Sure.
25  Q. I'm just going to ask about the side effects. We

201

1   know that Ms. Burns was on Prozac for about eight years,
2   correct? I'm sorry. Twelve years, correct?
3   A. Correct.
4   Q. And Prozac has on its label adverse events for weight
5   and for blood glucose disregulation, correct?
6   A. If it says that, I believe you.
7   Q. Okay.
8       MR. McCONNELL: Want to get the label?
9       MS. CATES: Sure.
10  Q. (BY MR. McCONNELL) I don't want you just accepting
11  what I say. I don't know how far that will take me in a case.
12  Somebody may say you were just being nice.
13  A. No. Too trusting.
14  Q. I'm going to show you that your trust was
15  well-placed.
16      (Sotto voce discussion.)
17      MR. FIBICH: At least on this issue.
18      MR. McCONNELL: On this issue.
19      (Perry Exhibit No. 23 marked.)
20  Q. (BY MR. McCONNELL) Doctor, this is the 1994 PDR
21  entry for Prozac, isn't it?
22  A. Yes.
23  Q. And you can see the -- the bottom -- after the cover
24  on the first page, the bottom left, you can see it's Prozac,
25  right?

**202**

1  A. Yes.

2  Q. Okay. And if you then look at Page — 879 is the

3  number on the top right.

4  A. Yes.

5  Q. This is the — most of this page is about adverse

6  reactions, right?

7  A. Correct.

8  Q. And then if you look in the middle column, first,

9  under digestive system, it says frequent adverse reaction,

10  increased appetite. Do you see that?

11  A. Yes.

12  Q. Which could lead to weight gain, couldn't it?

13  A. It can, yeah.

14  Q. And then under metabolic and nutritional, couple

15  entries down, it actually lists hyperglycemia, doesn't it?

16  A. And it also lists frequent weight loss.

17  Q. Right. Well, the Seroquel label lists frequent

18  weight loss — not "frequent." It lists weight loss, too,

19  doesn't it?

20  A. Yes, and this — I think in the potential adverse

21  effects.

22  Q. Right. And, in fact, we know some people on Seroquel

23  have lost weight.

24  A. I think that's probably true.

25  Q. All right. So, that's Prozac. I want to ask about

**203**

1  Elavil, also fondly known as amitriptyline.

2  A. Amitriptyline.

3  Q. Amitriptyline. Thank you. Has — is it not the case

4  that Elavil in its label also has an adverse reaction —

5  potential adverse reaction, elevation or lowering of blood

6  sugar levels?

7  A. Yes.

8  Q. We talked about trazodone. We actually talked about

9  that before. That's also been associated with weight gain, and

10  that's listed in the label, isn't it?

11  A. Yes, I think so.

12  Q. Ms. Burns was on Zoloft in 1998, right?

13  A. Yeah.

14  Q. Okay. And Zoloft has in its label references to

15  potential weight gain, pancreatitis, and hypoglycemia, correct?

16  A. Correct.

17  Q. What's Remeron, R-e-m-e-r-o-n?

18  A. It's another — isn't — I think it's another

19  second-generation antipsychotic.

20  Q. It's also in its label got references to weight gain

21  and diabetes, doesn't it?

22  A. Probably does.

23  Q. What's Sinequan?

24  A. It's another sort of atypical antidepressant, I

25  think.

**204**

1  Q. And Sinequan, doesn't that also have references in

2  its label to weight gain or effects on blood sugar?

3  A. You know, I haven't looked at that; but, again, I

4  trust that it does.

5  Q. All right.

6  A. It —

7  Q. What about Wellbutrin?

8  A. I think it probably does, yeah.

9  Q. That also has references to weight gain and —

10  A. Yeah.

11  Q. What's glycosuria?

12  A. That's sugar in your urine.

13  Q. Okay. And obviously — you know that Ms. Burns was

14  on Zyprexa, too, wasn't she?

15  A. Correct.

16  Q. And Zyprexa has been associated with weight gain and

17  diabetes, so I hear; is that true?

18  A. That's what I hear.

19  Q. All right. What's Celexa?

20  A. It's, again, kind of an antidepressant, atypical

21  pharmacology.

22  Q. And it's prescribed for depression?

23  A. Correct.

24  Q. And has Celexa also got references in its label to

25  potential adverse reactions of weight gain, glucose

**205**

1  intolerance, and pancreatitis?

2  A. I don't use it that much, but I wouldn't be surprised

3  if it does.

4  Q. Okay. The last one, mercifully, is lithium.

5  Ms. Burns was on lithium in the year 2000, right?

6  A. At some point, she was, yeah.

7  Q. And hasn't lithium got in its label references to

8  potential adverse reactions regarding weight gain or diabetes?

9  A. Yes.

10  Q. All right. So, you agree that Seroquel was helpful

11  to Ms. Burns, don't you?

12  A. She certainly subjectively reported it was good for

13  her sleep.

14  Q. Didn't she also report that it was helping her with

15  respect to the pain in her hip?

16  A. Right. She did say that. I don't know what that

17  means, but that's — she attributed it to the Seroquel.

18  Q. Well, she states that she's pretty sure that's what

19  it is because there was nothing else that changed at the time,

20  right?

21  A. That's what she says, yeah.

22  Q. Was she noting a temporal relationship between the

23  use of Seroquel and the diminishment of pain in her hip?

24  A. She was.

25  Q. All right. And you agree with that observation?