180

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:07-cv-15733
6:07-cv-10360

IN RE:  Seroquel Products Liability     )
Litigation                              )
MDL DOCKET NO. 1769                     )
                                        )
This Document Relates To:               )
                                        )
David Haller v. AstraZeneca, LP, et al. )
Eileen McAlexander v. AstraZeneca, LP,  )
et al.                                  )
- - - - - - - - - - - - - - - - - - - - x


DEPOSITION OF ISRAEL JACK ABRAMSON


Taken before Brian Gary Berkowitz, Shorthand

Reporter and Notary Public in and for the State of

Florida at Large, pursuant to notice of taking

deposition filed in the above cause.


- - -

1021 Ives Dairy Road
Building 3 - Suite 214
North Miami, Florida 33179
Wednesday, October 8, 2008
8:25 a.m. - 1:15 p.m.

181

```
 1    APPEARANCES:
 2    On behalf of the Plaintiffs:
 3       BAILEY PERRIN BAILEY LLP
         440 Louisiana Street
 4       Suite 2100
         Houston, Texas 77002
 5       BY: FLETCH TRAMMELL, ESQ.
 6    On behalf of the Defendants:
 7       DECHERT LLP
         Cira Centre
 8       2929 Arch Street
         Philadelphia, Pennsylvania 19104-2808
 9       BY: JOSEPH K. HETRICK, ESQ
         KRISTA A. SCHMID, ESQ.
10       MATTHEW DelDUCA, ESQ.
11              I N D E X
12    WITNESS     DIRECT CROSS REDIRECT RECROSS
      ISRAEL JACK ABRAMSON
13    BY MR. DelDUCA   182        317
      BY MR. TRAMMELL.   300       342
14
              EXHIBITS
15        NUMBER    PAGE
          22      183
16        23      184
          24      185
17        25      185
          26      185
18        27      189
          28      203
19        29      207
          30      242
20        31      323
          ___
21
22
23
24
25
```

182

```
 1           P R O C E E D I N G S
 2              Whereupon, ISRAEL JACK ABRAMSON,
 3              having been previously duly
 4              sworn, was examined and
 5              testified as follows:
 6           DIRECT EXAMINATION
 7    BY MR. DelDUCA:
 8       Q   Doctor, we met briefly off the record. My
 9    name is Matt DelDuca, and I represent AstraZeneca in
10    this case, as Mr. Hetrick does, and I'm going to ask
11    you questions today about your case specific
12    opinions in both the Haller case and the McAlexander
13    case. Okay?
14       A   Okay
15       Q   Before we get started, I understand you
16    brought some materials with you.
17       A   Correct.
18       Q   Why don't you -- first of all, there were
19    a couple of things, I guess, that Mr. Hetrick had
20    asked you to get, to see if you had, and bring with
21    you today, if you did, that don't necessarily relate
22    to Ms. McAlexander.
23          Why don't you tell me what you have?
24       A   This is some handwritten notes that I
25    believe I took toward the end of June 2008 that
```

183

```
 1    related to the initial call that I received from
 2    Atrium.
 3              (Whereupon, Deposition Exhibit
 4              22 was marked for
 5              identification.)
 6    BY MR. DelDUCA:
 7       Q   I've marked that as Exhibit 22. Whose
 8    notes are these?
 9       A   They're mine.
10       Q   There's also a Post-It. You've got a
11    message sticker on here?
12       A   Correct.
13       Q   Is that something that you wrote, or your
14    assistant?
15       A   No, my office manager, Pat, wrote it on
16    the twenty-fifth of June.
17       Q   June 25, '08, from Stuart at Atrium Psych.
18    Is that it?
19       A   Correct.
20       Q   I'm sorry, from Stuart to --
21       A   Well, it's from Stuart at Atrium Psych.
22    She's just writing who it was.
23       Q   What you wrote down was -- these were
24    notes you made when, during your conversation with
25    Stuart?
```

184

```
 1       A   I believe so.
 2       Q   You wrote, "Seroquel-diabetes in some
 3    patient"?
 4       A   "Some patients," I meant to write.
 5       Q   Why don't you read the rest of it for me?
 6       A   It's a challenge. "Plaintiff attorney
 7    approached them. Glenda, from the attorney's
 8    office, will call me."
 9       Q   Okay. What else have you brought?
10       A   These are the disks of records on
11    McAlexander.
12       Q   These are the disks of records that you
13    received from plaintiffs' counsel?
14       A   Correct.
15          MR. DelDUCA: I'm going to mark them in no
16    particular order as 23 -- actually, when I mark
17    them, just in case we -- they're actually taped
18    shut.
19          23 is, "Additional Medical Records,
20    Deposition Transcripts," appears to be what's
21    written, what's typed on the actual disk.
22              (Whereupon, Deposition Exhibit
23              23 was marked for
24              identification.)
25          MR. DelDUCA: 24 is "Plaintiff Eileen
```

185

1    McAlexander Deposition Transcripts and Medical
2    Records."
3         (Whereupon, Deposition Exhibit
4         24 was marked for
5         identification.)
6    MR. DelDUCA: 25 is "Plaintiff Eileen
7    McAlexander Additional Medical Records and
8    Deposition Transcripts."
9         (Whereupon, Deposition Exhibit
10        25 was marked for
11        identification.)
12   BY MR. DelDUCA:
13   Q    What else do you have?
14   A    My original McAlexander report.
15        MR. DelDUCA: We will mark it as Exhibit
16   26.
17        (Whereupon, Deposition Exhibit
18        26 was marked for
19        identification.)
20   BY MR. DelDUCA:
21   Q    Exhibits 23, 24 and 25, these disks with
22   medical records and deposition transcripts, when did
23   you get those?
24   A    They were sent in the same box as the hard
25   copy records.

186

1    Q    And that was sometime in July?
2    A    Correct.
3    Q    Did you ever get additional records after
4    that?
5    A    Yes. At some point I did get some disks
6    that were marked "Additional Information," and I
7    don't know which of these I received at what time.
8    I don't know which ones came originally and which
9    ones came separately.
10   Q    Exhibit 24 is deposition transcripts and
11   medical records for Ms. McAlexander?
12   A    Right. I'm pretty sure that one came
13   originally.
14   Q    And 23 and 25 say on them that they are
15   additional medical records and deposition
16   transcripts, and you think you got them at a later
17   time?
18   A    It's quite possible.
19   Q    Do you know when that was?
20   A    No, I don't.
21   Q    Did you receive any records after you
22   issued your report dated September 1, 2008?
23   A    I do not believe so.
24        You also asked that I bring that fee
25   schedule paragraph, but as I showed you, it was

187

1    already in the report, so I didn't bring that.
2         My office was closed when I got there, so
3    I could not find the signed Atrium letter of
4    agreement, and I didn't have the time to find that
5    E-mail with -- that the outline came with.
6    Q    We would ask you to, please, when you do
7    have some time, produce those, send them to the
8    attorney for the plaintiff, and we will --
9    A    Of course.
10   Q    -- we will request that.
11        I see you brought another document, as
12   well?
13   A    Yes. This was a time line summary similar
14   to the one for Haller and McAlexander.
15   Q    This is a summary that you received from
16   whom?
17   A    From plaintiff attorney.
18   Q    From the attorney, or was -- was it
19   directly from the attorney?
20   A    Most likely it came through Ms. Grainger,
21   but that was the question, who sent me the E-mail
22   with those outlines. That was the question from
23   yesterday that I still can't answer you on, because
24   this was sent to me as an attachment to an E-mail
25   that I printed out.

188

1    Q    Did you have discussions with Ms. Grainger
2    about the text in your expert reports?
3    A    Yes.
4         MR. DelDUCA: Fletch, I have a question
5    for you.
6         MR. TRAMMELL: Sure.
7         MR. DelDUCA: Is it your position that
8    Ms. Grainger is -- that questions regarding his
9    discussions with Ms. Grainger over drafts, are
10   not permitted under the order that's in place?
11        MR. TRAMMELL: I think it just depends on
12   whether you want that to be a two-way street.
13        MR. DelDUCA: I guess the real question is
14   whether or not you are taking the position that
15   Ms. Grainger is part of your firm, essentially.
16        I think under the document it says
17   conversations with counsel can't be asked
18   about, and if -- if you take the position that
19   this would be tantamount to conversations with
20   counsel, I'm not going to ask about it.
21        MR. TRAMMELL: She's not an attorney, but
22   she's an employee of the firm, and she's
23   certainly acting on our behalf in her dealings
24   with the doctor.
25        I think to the extent she had interaction

189

1   with the doctor, it would have been about the
2   drafting of his report and would necessarily
3   deal with prior drafts, and I guess we would
4   take the position that that's tantamount to
5   getting a look at the draft.
6       MR. DelDUCA: I'm going to mark your --
7   this document that you received, you said, via
8   E-mail --
9       THE WITNESS: Actually, if there is a
10  computer that's connected to the Internet here,
11  I could look up and see who it came from, if
12  that would answer your question.
13      MR. DelDUCA: When we take a break, I have
14  a computer, we can boot it up, and if you want
15  to do that, that's fine. I appreciate your
16  offer to do that. I'm sure you rather do
17  something else today, but -- anyway, this
18  document that is -- would you call it an
19  outline for Ms. McAlexander that you received?
20      THE WITNESS: Correct.
21      MR. DelDUCA: I'm marking as Exhibit 27.
22          (Whereupon, Deposition Exhibit
23          27 was marked for
24          identification.)
25

190

1   BY MR. DelDUCA:
2       Q   These I'm going to keep in one place, and
3   26 and 27 I'll put to one side, because we will
4   probably ask detailed questions about these later.
5       I notice on Exhibit 9, and Exhibit 26, the
6   outlines for Mr. Haller and Ms. McAlexander -- I'm
7   sorry, Exhibit 9 and 27, that there's yellow
8   highlighting.
9       A   Yes.
10      Q   Where did that come from?
11      A   From me.
12      Q   When did you put that highlighting on
13  these documents?
14      A   As I was reviewing them initially.
15      Q   So, that was all done before you drafted
16  and issued your report?
17      A   Yes.
18      Q   In these documents, both Exhibit 9 and
19  Exhibit 27, both contain detail about the respective
20  patients, Mr. Haller, Ms. McAlexander, and their
21  treatment.
22      When you did your reports, did you rely on
23  the information that was in these documents?
24      A   Somewhat, but I did go through the actual
25  medical records that I had available to me, as well.

191

1       Q   Did you do anything to verify whether the
2   information in Exhibit 9 and Exhibit 27, accurately
3   reflected what was in the particular medical
4   records?
5       A   I made the assumption that the information
6   provided to me was true and correct.
7       Q   I notice that one thing that's not in
8   either document -- I notice that although both
9   documents contain dates and information about
10  medical records, they don't actually have citations
11  to any of the medical records.
12      So, if you -- were you able to, you know,
13  go into these records and -- I'm sorry, go into
14  these exhibits and then determine exactly what
15  medical records they might refer to, any particular
16  entry?
17      A   I did not go statement by statement
18  through the medical records and try to correlate and
19  verify. That would have taken too much time.
20      Q   I want to start with Mr. Haller. Let's
21  put Ms. McAlexander to one side.
22      I would ask you to -- let's take out a
23  copy of your report. Do you have a copy in front of
24  you?
25      A   Yes.

192

1       Q   What I want to do is to make sure that I
2   understand what case specific opinions you are
3   actually giving in the case, and then I will go into
4   your basis for those case specific opinions. Okay?
5       A   Okay.
6       Q   So, with Mr. Haller, the case specific
7   opinion or the case specific discussion begins on
8   page 4 of your report. Is that right?
9       A   Yes.
10      Q   And it ends on page 6.
11      A   Yes.
12      Q   It starts with, essentially, a discussion
13  of Mr. Haller's condition, care and treatment.
14  Correct?
15      A   Correct.
16      Q   And then at the end of that, there are
17  conclusions. Is that right?
18      A   Yes.
19      Q   In the second paragraph of your
20  conclusion, you state, "It is my opinion that
21  Seroquel was a cause of his diabetes." Correct?
22      A   Correct.
23      Q   And that is an opinion that you are giving
24  in this case?
25      A   Yes.

193

1    Q   Are you giving any other case specific
2    opinions with regard to Mr. Haller?
3    A   Can you expand on that question a bit?
4    It's such a broad question, that I'm not sure how to
5    answer.
6    Q   Well --
7    A   I mean, my report does include opinions as
8    to diagnosis.  As such, there is relevance in terms
9    of prognosis.
10       So, there are other opinions in terms of
11   who he was, how he was treated.
12   Q   On the psychiatric side?
13   A   Correct.
14   Q   Are you giving an opinion regarding his
15   diagnosis of diabetes, or are you relying upon the
16   diagnosis that was given by his treating doctor?
17   A   I'm relying on the diagnosis of diabetes
18   as expressed in the medical records.  I'm not
19   opining -- I'm not evaluating his blood work and
20   saying he has diabetes or he doesn't have diabetes.
21   Q   I take it then that you are not giving any
22   opinion as to when he developed diabetes?
23   A   At what particular -- what exact date the
24   diabetes --
25   Q   Right.

194

1    A   -- showed itself?  No.  All I can say
2    is -- look at the records and say this is when he
3    was said to have diabetes or not.
4    Q   Are you giving the opinion in this case
5    that Mr. Haller's doctors did not obtain informed
6    consent with regard to the risk of diabetes when
7    they prescribed Seroquel?
8    A   The records that I have read and the
9    depositions that I have read, the doctors have
10   indicated that they did inform Mr. Haller of the
11   risks known to them at the time that they prescribed
12   the medication.
13   Q   So, going back --
14   A   Although Mr. Haller says he doesn't
15   remember being informed as to it.  The doctors do
16   say that they did inform him at particular times, of
17   the risks of diabetes.
18   Q   Do you have any reason to question those
19   treaters?
20   A   No.
21   Q   So, going back to my question, is it right
22   that you are not giving an opinion one way or the
23   other, with regard to -- I'll start the question
24   over again.
25       Is it your opinion that the doctors did

195

1    give Mr. Haller informed consent with regard to the
2    diabetes risk associated with Seroquel when they
3    prescribed it to him?
4    A   At certain points the risk of weight gain
5    was discussed with Mr. Haller, and I think that
6    after the change in label in 2004, that the
7    depositions show that those risks were discussed
8    with him.
9        I do not think -- I have to think for a
10   minute -- that that information was given to him in
11   2002 and 2003.
12   Q   Right now what I'm trying to focus on --
13   I'm going to come back to all those discussions
14   later, but right now what I am trying to figure out
15   is what opinions you are giving in your report.
16       I'm trying to focus on whether you are
17   giving the opinion and whether you expect to testify
18   at trial and give the opinion on the question of
19   whether or not Mr. Haller's mental health care
20   providers gave him informed consent with regard to
21   the risks of weight gain and diabetes, when they
22   prescribed Seroquel to him.
23       Is that an opinion you are going to give
24   in this case?
25   A   Yes.

196

1    Q   So, you've told me you are going to
2    give -- so far as I understand it, there's, I think,
3    maybe three opinions that you are going to give.
4    One is as to the cause of Mr. Haller's diabetes.
5    Correct?
6    A   Correct.
7    Q   One is to your opinion with regard to his
8    mental health status, his mental health, psychiatric
9    diagnosis?
10   A   Yes.
11   Q   And the last is your opinion with regard
12   to whether he obtained informed consent -- whether
13   he was given informed consent -- I'll start over
14   again.
15       The last is whether his treaters obtained
16   informed consent from Mr. Haller when they
17   prescribed him Seroquel, that is, informed consent
18   with regard to the risks of weight gain and
19   diabetes?
20   A   Yes.
21   Q   Are you expressing any other opinions with
22   regard to Mr. Haller?
23   A   No, I don't think so.  I think that covers
24   it.
25   Q   I want to start with your opinion that

197

1   Seroquel caused Mr. Haller's diabetes. Actually, to
2   be more precise, was a cause of his diabetes.
3      A   Correct.
4      Q   I guess the first thing I want to do is
5   make sure I understand the basic logic of that
6   opinion.
7         You recognize in your report that
8   Mr. Haller had a number of risk factors for
9   developing diabetes. Is that right?
10     A   Yes.
11     Q   I'll come back to those risk factors
12  later.
13        You also say in your report that
14  Mr. Haller started using — that after Mr. Haller
15  started using Seroquel, he gained a significant
16  amount of weight. Is that right?
17     A   Yes. That's on page 5.
18     Q   You give the opinion that Seroquel caused
19  Mr. Haller to gain weight?
20     A   I think that Seroquel was a factor in
21  Mr. Haller gaining weight.
22     Q   So, is it your opinion that when
23  Mr. Haller gained weight, his weight gain was a
24  cause of his developing diabetes?
25     A   Yes.

198

1      Q   And is that the mechanism by which you
2   give your opinion that Seroquel was the cause of
3   diabetes?
4      A   Well, the exact mechanism is unknown.
5      Q   So, in this case, what is your opinion as
6   to how Seroquel caused Mr. — was a cause for
7   Mr. Haller developing diabetes?
8      A   I don't know the exact mechanism of the
9   cause of Mr. Haller developing diabetes. However, I
10  do know that he did not have the diabetes prior to
11  taking Seroquel, and his weight was much lower than
12  it was after he started taking the Seroquel, and
13  within a short time after the prescription for the
14  Seroquel was given and he began taking the
15  medication, his weight shot up and he began to show
16  evidence of glucose disregulation, ultimately
17  culminating with the diagnosis of diabetes.
18     Q   So, is the logic of your opinion that
19  Mr. Haller gained weight and that the weight gain
20  caused the diabetes?
21     A   Well, once again, we don't know the exact
22  mechanism, so I'm unprepared to use that exact chain
23  of events, because there are issues that are unknown
24  to the medical community, exactly the mechanism for
25  the cause of the diabetes.

199

1      Q   I understand that the mechanism is not
2   known, but are you giving the opinion that in this
3   case Seroquel caused the diabetes, and I'm trying to
4   determine whether it is your opinion that that was
5   the weight gain that triggered the cause of the
6   diabetes?
7      A   Once again, you are misstating my opinion.
8   My opinion is that Seroquel was a factor, was a
9   causal factor in him developing diabetes. I
10  believe — to respond to your question, I believe
11  that the Seroquel, through some unknown mechanism,
12  caused Mr. Haller to experience significant weight
13  gain after starting it, and that, coupled with his
14  risk factors and predisposition, led to him
15  developing the diabetes
16        I feel if not for the prescription of the
17  Seroquel, it is more likely than not that he would
18  not have developed the diabetes.
19     Q   Let me focus for a minute — I'll come
20  back to that, but let me focus for a minute on your
21  statement in your report and today, that it's your
22  observation that Mr. Haller gained a significant
23  amount of weight when he went on to the Seroquel.
24     A   Yes.
25     Q   Mr. Haller was first prescribed Seroquel

200

1   on October 1, 2002. Is that right?
2      A   In late 2002. I don't remember the exact
3   date.
4      Q   Where did you obtain that information,
5   that he was first prescribed Seroquel in late 2002?
6   I noticed that it's not in the document that you
7   received from Ms. Grainger.
8      A   Likely from review of records and review
9   of the deposition.
10     Q   On the date of his — when he was first
11  prescribed, and I'll represent to you it was in
12  October of 2002, are you aware of any medical record
13  that states what his weight was on that date?
14     A   No.
15     Q   I notice that in your report, the weight
16  information that you provide is on page 5, that I'm
17  referring to, the very top of the page.
18        You say in 1996, he weighed 175 pounds.
19        Do you see that?
20     A   Yes.
21     Q   You say his first prescription for
22  Seroquel was in late 2002, and in March 2003 his
23  weighted increased to 226 pounds.
24        Do you see that?
25     A   Yes.

201

1      Q   You say in May 2003, his weight was
2    246 pounds.
3          Do you see that?
4      A   Yes.
5      Q   So, was your -- in providing that
6    information in the report, is it your opinion that
7    Mr. Haller gained the 51 pounds between 175 and 226,
8    after his first prescription of Seroquel?
9      A   Well, he had fluctuating weight all
10   through those years.  You know, it's also in the
11   summary.  If you look in January of '01, he weighed
12   230 pounds.
13     Q   So, in January of '01 he weighed
14   230 pounds.  That's actually not in your report.
15   Correct?
16     A   Correct.  I'm trying to respond to your
17   question.
18     Q   Understood.  Is there a reason why you
19   didn't put that in the report?
20     A   No.  It's highlighted.  It's one of the
21   things I highlighted in my review of the records.
22     Q   In January of '01, he weighed 230 pounds.
23   Correct?
24     A   Correct.
25     Q   And in March of '03 -- January of '01 is

202

1    well before he first was prescribed Seroquel.
2      A   Correct.
3      Q   I guess it's 18, maybe 20 months prior.
4    Correct?
5      A   Correct.
6      Q   Then after he is prescribed Seroquel, his
7    weight is actually 226, according to your report,
8    which is less.  Right?
9      A   Correct.
10     Q   So, there certainly isn't any evidence
11   that between his first prescription of Seroquel and
12   March 2003, that he gained a significant amount of
13   weight.  Is that fair to say?
14     A   Between his first prescription --
15     Q   The date he was first prescribed Seroquel
16   and March of 2003, there's no evidence that he
17   gained weight.  Right?
18     A   He says he gained weight, in his
19   deposition.
20     Q   Did you review any medical records that
21   indicate what his weights were between October 2002,
22   when he's first prescribed Seroquel, and March of
23   2003, when his weight is 226?
24     A   No.
25         MR. DelDUCA:  Let me give you a collection

203

1    of records that I'm going to mark as Exhibit
2    28.
3          (Whereupon, Deposition Exhibit
4          28 was marked for
5          identification.)
6    BY MR. DelDUCA:
7      Q   The first page of Exhibit 28 is a document
8    marked Pinellas County Sheriff's 192.  Do you see
9    that at the bottom?
10     A   Yes.
11     Q   And this is a record from, it's a little
12   hard to read at the bottom, but it's December 1996,
13   and it reflects Mr. Haller's weight at 175 pounds
14   and his height at five feet, six.
15         Do you see that?
16     A   Yes.
17     Q   From my review of the records, this was
18   the only medical record in 1996 that showed
19   Mr. Haller's weight at 175 pounds.
20         So, is this the document that you were
21   relying upon for the statement in your report that
22   in 1996, Mr. Haller weighed 175 pounds?
23     A   I believe so.
24     Q   If you could turn to the third page of the
25   exhibit, please?  It's St. Petersburg General

204

1    Hospital Document 78.
2          Do you see that at the bottom?
3      A   Yes.
4      Q   It's dated August 26, 2000.  Do you see
5    that?
6      A   Yes.
7      Q   If you go about halfway down, you will see
8    that Mr. Haller's weight is indicated.
9      A   Yes, I see it.
10     Q   The weight is listed at 220 pounds.
11   Correct?
12     A   Correct.
13     Q   So, from December of 1996 to August of
14   2000, Mr. Haller had gained, what is that,
15   45 pounds?  Right?  175 to 220.
16     A   45 pounds.
17     Q   Then the next page is Pinellas County
18   Sheriff, page 32.  Do you see that?
19     A   Yes.
20     Q   This is dated January 15, 2001, and it
21   lists Mr. Haller's weight at 230 pounds.  Correct?
22     A   Yes.
23     Q   And that appears to be the record that's
24   referred to in the -- in Exhibit 9, that you
25   received from Ms. Grainger.

205

1   A   Yes.

2   Q   Are you aware of any other records that

3   exist between 1996 and 2003, January 1, 2003, that

4   indicate what Mr. Haller's weight was?

5   A   No.

6   Q   So, this is the only record that we have.

7   Correct?

8   A   Correct.

9   Q   Then, if you look at the next page, it's a

10  record with the Bates indication at the bottom,

11  Dr. S-E-K-E-T-U-D-E-S-A-I.

12  A   It's a mouthful.

13  Q   Yes. Dr. Desai.

14      Page 48. Are you with me?

15  A   Yes. The top says 44, and the bottom says

16  48.

17  Q   The top is just, I guess, a fax page

18  number, but the bottom is page 48. It's dated

19  February 11, 2003.

20      Do you see that?

21  A   Correct.

22  Q   And that indicates that Mr. Haller's

23  weight was 243 pounds. Correct?

24  A   Yes.

25  Q   That's the first indication of

206

1   Mr. Haller's weight that we have after he's first

2   prescribed Seroquel. Right?

3   A   Right.

4   Q   Then if you could turn to the next page,

5   please, it's also a Dr. Desai record, page 46, and

6   it's dated February 18, 2003.

7       Do you see that?

8   A   Yes, I do.

9   Q   This record states that on February 18,

10  2003, Mr. Haller weighed 243 pounds?

11  A   Correct.

12  Q   Then the next page is Dr. Desai's record,

13  page 41, and it's dated February 25, 2003.

14      Do you see that?

15  A   Yes.

16  Q   It indicates that Mr. Haller weighed

17  243 pounds. Right?

18  A   Yes.

19  Q   Then we have a record — the next page is

20  again Dr. Desai, and it's dated March 11, 2003.

21      Do you see that?

22  A   Yes, I do.

23  Q   And it indicates that Mr. Haller weighed

24  246 pounds on March 11. Correct?

25  A   Correct.

207

1   Q   Then you have indicated that — all right.

2   You refer in your — you actually don't refer in

3   your report, but you identified in the outline you

4   received from Ms. Grainger, that the outline

5   indicates that Mr. Haller weighed 226 pounds in

6   March of 2003. Correct?

7       I'm not referring to the records now. I'm

8   actually referring to Exhibit 9. I'm sorry, and

9   actually I misspoke.

10      In your report, you refer to Mr. Haller

11  weighing 226 pounds in March of '03?

12  A   Correct. And it's on the summary.

13  Q   It's on the summary?

14  A   Yes.

15  Q   That's where you got that number?

16  A   Correct.

17      MR. DelDUCA: Actually, it's not in the

18  collection of records that I gave you, but

19  let's mark it now as Exhibit 29.

20      (Whereupon, Deposition Exhibit

21      29 was marked for

22      identification.)

23  BY MR. DelDUCA:

24  Q   This is a record from — it's Bates

25  numbered Directions For Mental Health 54, and it's a

208

1   record dated March 13, 2003, relates to Mr. Haller,

2   and if you look at the second page, I have

3   highlighted on this document a listing for

4   Mr. Haller which has that weight of 226 pounds.

5   A   Can I just look through the whole thing?

6   Q   Of course.

7   A   Yes, I see this. It's unknown if the

8   nurse practitioner weighed him or if this was a

9   reported weight.

10  Q   In Exhibit 29?

11  A   In Exhibit 29. This is his history. It's

12  listed under a section of history, not examination.

13  Q   So —

14  A   In other words, it doesn't appear that she

15  did any physical examination of him.

16  Q   We have in the records, several records in

17  February and then on March 11, 2003, indicating that

18  Mr. Haller's weight was 243 pounds and then

19  246 pounds.

20  A   Correct.

21  Q   On March 11. So, it's very unlikely that

22  he lost 20 pounds in two days. Correct?

23  A   Correct.

24  Q   I appreciate your volunteering that. I

25  just want to make sure it's clear for the record

209

1 that from reading these records all together, it
2 appears to you that the weight of 226 pounds given
3 on Exhibit 29, was probably something Mr. Haller
4 said as opposed to a weight actually taken at the
5 doctor's office?
6    A  Yes.
7    Q  He wasn't weighed.
8    A  Correct.
9    Q  So, the — actually, just turn to another
10 page, if you don't mind.
11    A  Which exhibit now?
12    Q  It's still in Exhibit 28, and it's the
13 next page from the one we were talking about. Turn
14 the page.
15        This is a document with the Bates number
16 Morton Plant Hospital 1817, and it has an indication
17 of May 17, 2003, a weight of 246 pounds.
18        Do you see that?
19    A  Correct. It's marked as an estimated
20 weight. I'm not sure what that means.
21    Q  If you could turn to the next page, it's
22 Dr. Desai's office again, page 40. It's dated May
23 29, 2003, and it lists Mr. Haller's weight at
24 245 pounds.
25    A  Yes.

210

1    Q  So, we have a number of records that say
2 his weight was between 243 and 245 pounds between
3 February 11, 2003 and the end of May 2003. Correct?
4    A  Yes
5    Q  And reading those records together — and
6 you can go on if you want, because there's some
7 more. The next page has it in June 2003, his weight
8 was 247 pounds.
9        Do you see that?
10    A  Yes
11    Q  Then if you turn to the next page of the
12 exhibit, on August 16, 2003, his weight was
13 236.6 pounds, and it's listed as an actual, not an
14 estimated. Correct?
15    A  Correct
16    Q  Let's just focus on the weights from
17 February to June 2003.
18    A  Okay.
19    Q  You agree with me that the medical records
20 indicate that Mr. Haller's weight at that time was
21 anywhere between 243 and 247 pounds?
22    A  Between which dates?
23    Q  February 11, 2003 and June 23, 2003.
24    A  Yes
25    Q  We have no other evidence of what

211

1 Mr. Haller's weight was at the time of his — that
2 he first took Seroquel.
3    A  Yes.
4    Q  What we do know, though, is that in 1996,
5 Mr. Haller weighed 175 pounds.
6    A  Correct
7    Q  And that in 2000, in August of 2000, he
8 weighed 220 pounds.
9    A  Correct.
10    Q  And then in January of 2001, he weighed
11 230 pounds.
12    A  Correct.
13    Q  Then in February of 2003, he weighed
14 243 pounds.
15    A  Correct.
16    Q  That series of numbers, the records
17 establishing weight gain over a period of time, do
18 you agree with me that you cannot tell from that
19 progression of weight, whether Mr. Haller gained any
20 weight at all between October of 2002, when he was
21 first prescribed Seroquel, and February of 2003,
22 when we have his first actual weight taken at a
23 doctor's office?
24    A  October '02 — I'm a little confused about
25 the dates. I'm sorry. Can you please say that

212

1 again?
2    Q  Sure. He's first prescribed Seroquel in
3 October of '02?
4    A  Correct.
5    Q  The next weight we have is in February of
6 '03?
7    A  Correct.
8    Q  I'll back up. Let me do this a little
9 differently.
10        We have a weight of 175 pounds in December
11 of '96. Right?
12    A  Can I write it down just so I can follow
13 what you are saying?
14    Q  Sure. We'll do a little math, which is
15 always dangerous for me, because it's not my
16 strength. But in 1996, December of '96, he weighed
17 175 pounds. Then in August of 2000 he weighed
18 220 pounds. In January of '01, he weighed
19 230 pounds.
20        So, from December '96 to August of 2000,
21 it's about 45 months, a little less than four years.
22 Right?
23    A  Right.
24    Q  And he gained 45 pounds. Right? 175 to
25 220 is 45 pounds.

213

1    A   Correct
2    Q   So, that's a pound a month. Right?
3    A   Correct.
4    Q   Then from August of 2000 to January of
5   '01, that's less than five months, he gained another
6   10 pounds. Right?
7    A   Correct
8    Q   So, that's two pounds a month.
9    A   Correct.
10   Q   Then the next weight we have is 243 pounds
11  on February 11, 2003. Right?
12   A   Correct
13   Q   And that's 13 months. I'm sorry, that's
14  24 months.
15   A   It's --
16   Q   It's almost 25 months.
17   A   Correct. Two years and a few weeks
18   Q   He gained 13 pounds in that two years.
19   A   Right.
20   Q   That's less than half a pound a month.
21   A   Correct.
22   Q   So, if you look at that math, you
23  certainly can't say from that, that between October
24  1, 2002 and February 11, 2003, Mr. Haller gained any
25  weight.

214

1    A   You don't know exactly when his weight was
2   gained.
3    Q   Correct.
4    A   Correct.
5    Q   In fact, it's just as possible that
6   between October 1, 2002 and February 11, 2003,
7   Mr. Haller lost weight?
8    A   That is possible.
9    Q   He certainly was gaining weight in that 24
10  month period, at a lower rate than he had gained it
11  previously?
12   A   Correct.
13   Q   Just to finish up on this math, since I
14  did it, I'll ask the question.
15       Between December of 1996 and January of
16  2001, that's actually 49 months, he gained
17  68 pounds, correct, from 175 to 243?
18   A   Between December of '96 and --
19   Q   February of '03.
20   A   Correct
21   Q   68 pounds.
22   A   Yes.
23   Q   It's a little less than 50 percent of his
24  body weight. Maybe it's 40 percent.
25   A   I would have to do the math.

215

1    Q   Very significant weight gain?
2    A   Correct
3    Q   There's absolutely no way to attribute any
4   of that weight gain to Seroquel; is there?
5        MR. TRAMMELL:  Objection
6        THE WITNESS:  No, I wouldn't agree with
7   that. He was on Seroquel and a variety of
8   other psychotropic medications, all of which
9   likely were factors
10  BY MR. DelDUCA:
11   Q   Sir, we just went through his medical
12  records. There's no record that he gained even a
13  pound between October 1, 2002 and February 11, 2003.
14       Let me start over.
15       We know that he weighed 230 pounds in
16  January of '01.
17   A   Correct
18   Q   He never took Seroquel until October of
19  '02.
20   A   Correct.
21   Q   So, we can't attribute any of that weight
22  gain.
23   A   The weight gain between December of '96
24  and January '01, correct. It's not due to Seroquel
25   Q   It's 55 pounds?

216

1    A   Correct. Whatever it is. I'm not doing
2   the math.
3    Q   It's 55 pounds. You can't attribute any
4   of that to Seroquel.
5    A   Correct.
6    Q   Then the 13 pounds that he gained between
7   January of '01 and February of '03, there is no way
8   to tell whether he gained any of that weight in the
9   few months between October 1, when he first got the
10  Seroquel, in '02, and February 11, '03.
11       There's no way to know whether he gained
12  any of that 13 pounds in that time frame; is there?
13   A   Correct.
14   Q   Therefore, there is no way to know
15  whether -- there's no way to say, you can't say, no
16  one can say, that any of the 68 pounds he gained
17  from '96 to February 11, 2003, is attributable to
18  Seroquel in any way?
19   A   It can't be said with a hundred percent
20  certainty, no.
21   Q   It can't be said with any certainty; can
22  it? You don't know how much weight he gained
23  between October 1 and February 11, '03?
24   A   Correct.
25   Q   He may have lost weight. He may have

---

217

1    stayed the same. We don't know.
2    A   Correct. But his weight continued to
3    trend upward.
4    Q   Between January of '01 and February of
5    '03?
6    A   Correct.
7    Q   Although at a lower rate than it had
8    trended upward in the past?
9    A   Yes.
10    Q   So, again, there's no way to know whether
11    he gained any weight at all between October '02 and
12    February '03?
13    A   With the data points that we have, you're
14    correct.
15    Q   Now, from February of '03, he continued on
16    Seroquel, continues to this date on Seroquel. Is
17    that right?
18    A   Correct, as far as I know. Yes.
19    Q   Since that time, his weight has
20    fluctuated. Is that fair to say?
21    A   Yes.
22    Q   He has lost weight while he was on
23    Seroquel.
24    A   Yes, he has.
25    Q   And he has gained some weight when he's --

218

1    while he's been on Seroquel? Correct?
2    A   Yes, he has.
3    Q   Do you know what he weighs today?
4    A   No, I don't.
5    Q   The last record that I have, and the
6    records are all through here, but is from March of
7    '08, that he weighed 235 pounds.
8      So, can you tell me what his highest
9    weight was between February 11, 2003 and today?
10    A   Excuse me. What did you say his last
11    weight was?
12    Q   The last record that I have is March 17,
13    '08, that he weighed 226 pounds.
14    A   Okay. In April '08, he weighed
15    230 pounds
16    Q   Thank you. What did I just say, 200 -- I
17    misspoke.
18      The last date I have is March 25, 2008, at
19    226.
20    A   Right. There's another note in the
21    record.
22    Q   That indicates -- the most recent weight
23    we have for him is what?
24    A   230.
25    Q   So, he's been on Seroquel for 5-1/2 years.

219

1    A   Correct.
2    Q   And he's lost a net of 13 pounds in that
3    time frame?
4    A   From that 243. Correct.
5    Q   He might have weighed more, he might have
6    weighed less, when he was first prescribed. We
7    don't know.
8    A   Correct.
9    Q   These records don't indicate that
10    Mr. Haller gained weight because of Seroquel; do
11    they?
12      MR. TRAMMELL: Objection.
13      THE WITNESS: Say that again, please.
14    BY MR. DelDUCA:
15    Q   These records do not indicate that
16    Mr. Haller gained weight because of Seroquel?
17    A   Correct.
18    Q   I want to ask you now -- I'll switch
19    gears.
20      In your report you say that Mr. Haller had
21    a number of risk factors for developing diabetes,
22    and I want to ask you about some of those risk
23    factors.
24    A   Go ahead.
25    Q   Some of which you may have focused on and

220

1    some of them you haven't.
2      Let's do this. If you don't mind, I'm
3    going to stick it on this pile so I don't lose my
4    way. Would you mind giving me those, too? I find
5    the exhibits get lost if we don't keep track of
6    them.
7      So, let's talk about some of the other
8    risk factors that Mr. Haller had for developing
9    diabetes.
10      One of the risk factors that he had was
11    that he had gained a very significant amount of
12    weight. Correct?
13    A   Yes.
14    Q   And he certainly was obese, classified as
15    obese, at the time of his diagnosis of diabetes in
16    September of 2004.
17      I'm sorry. Let me get my --
18      MR. TRAMMELL: August.
19    BY MR. DelDUCA:
20    Q   August of 2004. Yes.
21    A   What was the question?
22    Q   I'll start over.
23      Before he ever took Seroquel, Mr. Haller
24    was obese?
25    A   Yes.

221

1    Q   Have you ever met Mr. Haller?
2    A   No.
3    Q   Does he -- do you have any way of knowing
4    whether he is -- in addition to obesity, is there
5    also a risk factor associated with abdominal --
6    A   Girth?
7    Q   -- girth?
8    A   Yes.
9    Q   Does Mr. Haller have a risk factor for
10   abdominal girth?
11   A   I do not know his abdominal circumference.
12   I would think that a person of his stature, who
13   weighs this much, likely has a waist measurement
14   greater than 38 inches.
15   Q   You note in your report that Mr. Haller
16   was diagnosed with schizophrenia?
17   A   Correct.
18   Q   He was at an increased risk of developing
19   diabetes just by virtue of the fact that he had
20   schizophrenia?
21   A   Correct.
22       MR. TRAMMELL:  Object.
23       THE WITNESS:  Correct.
24   BY MR. DelDUCA:
25   Q   There are indications in the records that

222

1    Mr. Haller had a family history of diabetes.  Did
2    you see any?
3    A   Yes.
4    Q   A family history is a significant risk
5    factor for developing diabetes.  Correct?
6    A   Yes, it is.
7    Q   Are you aware that Mr. Haller's biological
8    father is African-American?
9    A   No.
10   Q   Mr. Haller's mother testified at her
11   deposition that Mr. Haller's biological father is
12   African-American, and is African-American heritage a
13   risk factor for developing diabetes?
14   A   Yes.
15   Q   I think you note in your report that
16   Mr. Haller also suffered from high cholesterol and
17   triglycerides?
18   A   Correct.
19   Q   And dyslipidemia is also a risk factor for
20   developing diabetes?
21   A   Yes.
22   Q   Mr. Haller had a blood sugar reading,
23   fasting blood sugar reading in 1998, of 126.
24   A   Yes.
25   Q   I'm sorry, I misstated.  128.

223

1    A   Yes, I read that in the previous
2    depositions.
3    Q   And that fasting blood sugar indicates
4    that he had some prior issue with hyperglycemia?
5    A   Correct.
6    Q   And a prior history of hyperglycemia is
7    certainly a risk factor for developing diabetes?
8    A   Correct.
9    Q   Mr. Haller also had a sedentary lifestyle.
10   Correct?
11   A   Correct.
12   Q   And a sedentary lifestyle is a risk factor
13   for developing diabetes?
14   A   Yes, it is.
15   Q   Is hypertension a risk factor for
16   developing diabetes?
17   A   I believe so.
18   Q   And Mr. Haller had been treated for
19   hypertension going back to the mid-'80s.  Correct?
20   A   Correct.
21   Q   So, he certainly had that risk factor, as
22   well, for developing diabetes?
23   A   Yes.
24   Q   And Mr. Haller is an alcoholic?
25   A   Yes.

224

1    Q   And alcoholism is a risk factor for
2    developing diabetes?
3    A   Yes.
4    Q   Mr. Haller also abused cocaine.  Correct?
5    A   Correct.
6        MR. TRAMMELL:  Objection.
7    BY MR. DelDUCA:
8    Q   And cocaine abuse is a risk factor for
9    developing diabetes?
10   A   That I didn't know.
11   Q   Mr. Haller has smoked at least a pack and
12   a half of cigarettes a day, by his own account,
13   since he was a teenager?
14       MR. TRAMMELL:  Objection.
15   BY MR. DelDUCA:
16   Q   Did you read that in his records?
17   A   Yes.
18   Q   There are studies that indicate that
19   chronic smoking is also a risk factor for developing
20   diabetes.  Is that right?
21   A   That's not -- I'm not aware of those
22   things, but I will accept them.
23   Q   And Mr. Haller also had, in many parts of
24   his life, suffered from stress, had a lot of stress
25   in parts of his life?

225

1     A   Yes.
2     Q   He had suicide attempts, incarcerations,
3  lots of other issues that created stress in his
4  life. Correct?
5     A   Yes.
6     Q   Stress is a risk factor for developing
7  diabetes, as well?
8     A   Yes.
9     Q   Mr. Haller also engaged in binge eating
10  and self-induced vomiting. Did you see that in the
11  records?
12     A   No.
13     Q   Do you know whether that behavior puts one
14  at a higher risk of developing diabetes?
15     A   I do not know if bulimia puts you at
16  higher risk for diabetes.
17     Q   Do you know whether or not binge eating
18  and vomiting affects one's blood sugars?
19     A   Yes.
20     Q   The body generates insulin when one eats a
21  large amount, especially if there are carbohydrates
22  involved?
23     A   Correct.
24     Q   When you vomit, the body has to deal with
25  that insulin that's been generated and there isn't

226

1  any food to be digested with the insulin, brought
2  into the cells with the insulin?
3        MR. TRAMMELL: Objection.
4        THE WITNESS: That's likely a simplistic
5     explanation of what's happening.
6  BY MR. DelDUCA:
7     Q   The body believes that there is
8  carbohydrates to be broken down with the -- with
9  the -- digested, essentially, with the insulin
10  that's been generated?
11     A   Is that a question? I'm sorry.
12     Q   I guess it is. In what way -- let me ask
13  it a different way.
14        In what way does binge eating and vomiting
15  affect one's blood sugars?
16     A   The body has to balance insulin secretion
17  and glucagon secretion, and it would be my
18  understanding that binging and purging might lead to
19  episodes of hypoglycemia, because the sugar is not
20  in the blood, because of the -- because of the
21  excess balance of insulin to glucagon.
22     Q   Do you know whether binging and purging
23  behavior over a long period of time, affects the
24  body's secretion of insulin and glucagon?
25     A   I don't.

227

1     Q   We've gone over a number of risk factors,
2  a large number of risk factors, that Mr. Haller had
3  for developing diabetes.
4        Do you agree that Mr. Haller was at a
5  substantial risk for contracting diabetes before he
6  ever took Seroquel?
7     A   Yes, I do.  I think he was -- the analogy
8  I would make is that he was an egg shell in terms of
9  his diabetes risk.
10     Q   But even if he had never taken Seroquel,
11  he was at a very substantial risk of developing
12  diabetes?
13     A   Yes.
14     Q   And you cannot say to a reasonable -- can
15  you say to a reasonable degree of medical certainty,
16  that Mr. Haller would not have developed diabetes
17  but for the fact that he took Seroquel?
18        MR. TRAMMELL: Objection.
19        THE WITNESS: I kind of understand what
20     you're asking, but I don't understand the way
21     you formulated the question. So, could you
22     rephrase it for me, please?
23  BY MR. DelDUCA:
24     Q   Yes. Can you say that but for the fact
25  that he took Seroquel, Mr. Haller would not have

228

1  developed diabetes?
2     A   I can say that he may very well have
3  developed diabetes even if he didn't take Seroquel.
4     Q   So that -- I want to -- I appreciate the
5  answer, but it's not quite the question I asked you.
6        The question I asked you is, can you say,
7  can you stand up in court and give the opinion to a
8  reasonable degree of medical certainty, that if he
9  hadn't taken Seroquel, Mr. Haller would not have
10  developed diabetes?
11     A   No.
12        MR. TRAMMELL: Objection.
13        THE WITNESS: No.
14  BY MR. DelDUCA:
15     Q   So, you certainly can't say that Seroquel
16  alone caused Mr. Haller to develop diabetes.
17  Correct?
18     A   Correct.
19     Q   Are you saying that it's possible that
20  Seroquel contributed to Mr. Haller's diabetes, but
21  it's also possible that it didn't?
22        MR. TRAMMELL: Objection.
23        THE WITNESS: I'm saying in my medical
24     opinion, it's more likely than not that
25     Seroquel did contribute to his developing

229

1    diabetes.
2    BY MR. DelDUCA:
3        Q   What methodology did you undertake to
4    arrive at that decision, that opinion?
5        A   I evaluated Mr. Haller's condition as it's
6    presented in the evidence, applied my knowledge of
7    atypical antipsychotic agents, including Seroquel.
8        I found Mr. Haller to be at very high risk
9    for developing diabetes, and despite this, likely
10   because his providers didn't understand the
11   connection, they prescribed a medication that put
12   him -- that elevated his risk of developing
13   diabetes.
14       Q   You said yesterday that from your review
15   of the data and the literature, you believed that
16   the data reflects that there is an association
17   between diabetes and the -- the development of
18   diabetes and Seroquel.
19       A   Correct.
20       Q   Is your opinion that because there is an
21   association between the development of diabetes and
22   Seroquel, and Mr. Haller developed diabetes, or was
23   diagnosed with diabetes anyway after he took
24   Seroquel, that you believe that the Seroquel was a
25   factor in his development of diabetes?

230

1        A   Well, it's not just my opinion.  The newer
2    labels also speak of the association between the use
3    of Seroquel and later development of elevated blood
4    sugar and diabetes, and the label also advises that
5    in patients with risk factors, the drug is to be
6    used with extreme caution.
7        Q   I understand that.  My question is, is
8    your opinion based on the fact that the label, and
9    your reading of the data, shows that there's an
10   association between Seroquel and diabetes on the one
11   hand, and the fact that Mr. Haller developed
12   diabetes after he took Seroquel?  Are those the
13   facts that lead you to conclude that Seroquel was a
14   factor in Mr. Haller's diabetes?
15       MR. TRAMMELL: Objection.
16       THE WITNESS: Those are some of the facts,
17   yes.
18   BY MR. DelDUCA:
19       Q   Is there anything else unique about
20   Mr. Haller's case, other than the fact that he
21   developed diabetes, diagnosed after he was
22   prescribed Seroquel, is there anything else about
23   Mr. Haller's case that indicates to you that in that
24   case Seroquel was a contributing factor or cause of
25   his diabetes?

231

1        A   Well, each case that I would look at would
2    be completely unique, because Mr. Haller brings his
3    own set of circumstances, premorbidities,
4    concomitant medical problems, risk factors, that
5    would not be identical to another case, for example,
6    Ms. McAlexander, that we will go on to discuss
7    later.
8        Q   You agree with me, Doctor, that there are
9    many people who have taken Seroquel who never
10   developed diabetes?
11       MR. TRAMMELL: Objection.
12       THE WITNESS: I would agree that there are
13   patients who take Seroquel who don't develop
14   diabetes.
15   BY MR. DelDUCA:
16       Q   In fact, the vast majority of patients who
17   take Seroquel do not develop diabetes?
18       MR. TRAMMELL: Objection.
19       THE WITNESS: I don't know the specific
20   answer to that question, but I would agree that
21   there are many patients who take Seroquel, that
22   don't develop diabetes.
23   BY MR. DelDUCA:
24       Q   In the data that you reviewed, what was
25   the percentage of patients overall who developed

232

1    diabetes, who took Seroquel?
2        A   I don't recall.
3        Q   Do you agree that in the population as a
4    whole, there's what's referred to as a background
5    rate for the development of diabetes?
6        A   Yes.
7        Q   So, people who have never taken Seroquel,
8    many, many, many people in the United States and
9    elsewhere, who have never taken Seroquel, develop
10   diabetes?
11       A   Yes.
12       Q   Each one, each person and their history is
13   unique?
14       A   Yes.
15       Q   So that there are people who take
16   Seroquel, who were going to take -- get diabetes
17   anyway. Correct?
18       A   Well, you're going from general
19   observations to specific cases, and that's very
20   difficult to do.
21       Statistically, that might be a valid
22   statement, but applying it to a particular
23   individual, you can't know one way or the other.
24       Q   You can't tell whether that person
25   developed -- you can't tell whether any individual

14 (Pages 229 to 232)

233

1   person, Mr. Haller, for instance, developed diabetes
2   because of the Seroquel, or whether he would have
3   developed diabetes anyway?
4        MR. TRAMMELL: Objection.
5        THE WITNESS: I already said that I
6        couldn't tell you that absent the Seroquel, he
7        would not have developed diabetes.
8        MR. HETRICK: Can we take a break?
9        MR. DelDUCA: Sure.
10       (Thereupon, a short recess was
11       taken.)
12   BY MR. DelDUCA:
13       Q   We talked about a bunch of risk factors
14   that Mr. Haller had for developing diabetes before
15   he took Seroquel.
16       Have you attempted to do any kind of
17   quantitative assessment of each of those risk
18   factors?
19       A   No, sir.
20       Q   So, put slightly differently, have you
21   attempted to determine the relative contribution of
22   each of the risk factors or potential contribution
23   of each of the risk factors, to Mr. Haller's
24   profile, if you will, before he was diagnosed with
25   diabetes?

234

1        A   Nothing more than just an empirical
2   understanding of him as a patient, at a particular
3   time.
4        Q   But you didn't, for instance, take the
5   preexisting obesity and say well, this gave him X —
6   this increased his risk by X, and take his history
7   and say this increased his risk by Y. You didn't go
8   through a mathematical analysis of those factors.
9   Is that right?
10       A   No, I did not.
11       Q   You told me earlier that you are not
12   giving an independent medical diagnosis of diabetes
13   for Mr. Haller. You are relying upon the diagnosis
14   that was indicated in the medical records?
15       A   Yes, sir.
16       Q   You are also not giving any opinion as to
17   when Mr. Haller first developed diabetes as opposed
18   to when he was diagnosed, as indicated in the
19   records?
20       A   Correct.
21       Q   Are you giving any opinion as to whether
22   Mr. Haller has diabetes today?
23       A   Well, it's my understanding when you have
24   diabetes, you have it. It's extremely rare for
25   people to lose diabetes unless they make drastic

235

1   changes in their lifestyle, their weight, that type
2   of thing.
3        Q   How would you determine whether or not
4   they had lost the diabetes?
5        A   Well, I would defer that to their medical
6   doctors, their primary care doctors or
7   endocrinologist.
8        Q   Are you aware that in this case,
9   Mr. Haller's treating doctor, Dr. Bacha, testified
10   that in his opinion Mr. Haller doesn't have
11   diabetes?
12       MR. TRAMMELL: Objection.
13       THE WITNESS: I didn't read Dr. Bacha's
14       deposition.
15   BY MR. DelDUCA:
16       Q   When Mr. Haller was first diagnosed —
17   well, let me do this differently.
18       Mr. Haller was first diagnosed in August
19   of 2004. Correct?
20       A   Yes.
21       Q   By October of 2004, that's just a couple
22   of months after he was diagnosed, Mr. Haller's
23   doctors reported that his diabetes was under
24   control. Is that right?
25       A   I believe so, yes.

236

1        Q   And then are you aware that one of the —
2   that one of the primary tests that doctors do,
3   primary care physicians, endocrinologists do, to
4   evaluate a patient's glucose control over time, is a
5   hemoglobin A1C?
6        A   Yes.
7        Q   At the time he was diagnosed, Mr. Haller's
8   hemoglobin A1C was 10.3, I believe.
9        A   Okay.
10       Q   In your report, you say that in June of
11   2006, Mr. Haller's glucose levels were normal;
12   right? June of 2006.
13       A   Yes
14       Q   Actually, in June of 2006, his hemoglobin
15   A1C was 5.6, which is a normal reading. Correct?
16       A normal reading for hemoglobin A1C is
17   below 6 for a non-diabetic. That's a normal
18   hemoglobin A1C. Is that your understanding?
19       MR. TRAMMELL: Objection.
20       THE WITNESS: I don't know hemoglobin A1C,
21       what is normal and what is not normal. I would
22       rely on the printout from the lab.
23   BY MR. DelDUCA:
24       Q   Have you looked at Mr. Haller's records to
25   see that over a period of — from the time he was

15 (Pages 233 to 236)

237

1  diagnosed until this day, his doctors order
2  hemoglobin A1Cs in order to keep track of his
3  glucose control over a period of time?
4      A   Yes.
5      Q   In February 2005, which is the next
6  hemoglobin A1C that we have, his reading was
7  actually 4.9, a normal reading, and that since that
8  date, Mr. Haller's hemoglobin A1Cs have been in the
9  normal range?
10     A   That doesn't mean it's a normal reading.
11  That means his blood sugar levels have been well
12  controlled, are well controlled.  I think to say
13  it's normal, it's a normal value, but it implies
14  good control of his sugars.
15     Q   Well, what it implies is that his blood
16  sugars have been within a normal non-diabetic range
17  over a three month period.  Correct?
18     A   That's the goal of the treatment of a
19  diabetic patient.
20     Q   Hemoglobin A1C shows what that person's
21  glucose level has been over a three month period,
22  the purpose for the test.  Correct?
23         MR. TRAMMELL:  Objection.
24         THE WITNESS:  Correct.
25

238

1  BY MR. DelDUCA:
2      Q   So, unlike a finger prick or a glucose
3  blood test that's done either in a lab or, you know,
4  with a glucometer, those tests are merely a snapshot
5  of what someone's blood sugar was at a given point
6  in time.  Correct?
7      A   Yes.
8      Q   And the A1C, the hemoglobin A1C shows
9  glucose control over a period of time?
10     A   Correct.
11     Q   So, within a few months after Mr. Haller
12  was first diagnosed, his records indicate that his
13  glucose levels have been in control, within normal
14  limits for a non-diabetic, to this day.  Correct?
15     A   Correct.
16     Q   And Mr. Haller doesn't take any medication
17  for diabetes.  Are you aware of that?
18         MR. TRAMMELL:  Objection.
19         THE WITNESS:  I'm not aware of that.
20  BY MR. DelDUCA:
21     Q   Have you reviewed his records and
22  determined that he does take medication for
23  diabetes?
24     A   No.  But that's irrelevant.  Diabetes can
25  be controlled in other ways besides medication.

239

1      Q   From your review of the records, is
2  Mr. Haller compliant with the American Diabetic
3  Association diet?
4      A   That is unknown to me.  Mr. Haller's an
5  interesting character.
6      Q   Well, he has a long history of being a
7  non-compliant patient.  Correct?
8         MR. TRAMMELL:  Objection.
9         THE WITNESS:  He has a history of
10  non-compliance in certain ways with his
11  treatment, although it does appear he's taking
12  his psychotropic medication as he's been told
13  to.
14  BY MR. DelDUCA:
15     Q   But there isn't any indication in the
16  record that he has controlled his blood sugars by
17  diet or exercise; is there?
18         MR. TRAMMELL:  Objection.
19         THE WITNESS:  I don't know.
20  BY MR. DelDUCA:
21     Q   Can you point me to anything in his
22  records that indicates that diet or exercise have
23  been the reason that his blood sugars have come
24  under control?
25     A   No.

240

1      Q   In fact, Mr. Haller has testified that he
2  is sedentary, that he doesn't exercise and he
3  doesn't intend to exercise.  Are you aware of that?
4         MR. TRAMMELL:  Objection.
5         THE WITNESS:  I read his depositions, yes.
6  BY MR. DelDUCA:
7      Q   I want to ask you some questions -- one of
8  the things that Mr. Haller has done over time, we
9  looked at this with his weight, is that his weight
10  has reduced.  He's had a lot of fluctuation in his
11  weight, but over the last several years his weight
12  has gone down?
13     A   Yes.
14     Q   Do you have an opinion as to whether that
15  is a reason for his diabetes, his blood sugars being
16  under control?
17     A   That's a possible factor.
18     Q   And if that is the reason, it's a fact
19  that that was accomplished while Mr. Haller has been
20  taking Seroquel.  Correct?
21     A   Yes.
22     Q   So, if Mr. Haller has been able to reduce
23  his weight and resolve his diabetes while on
24  Seroquel, does it indicate to you that Seroquel was
25  not a factor in his developing diabetes?

241

1      MR. TRAMMELL: Objection
2      THE WITNESS: No, I would not agree with
3   that statement
4   BY MR. DelDUCA:
5      Q  I want to ask you some questions about
6   your opinion with regard to informed consent. Okay?
7      A  Okay.
8      Q  Are you saying that it's your medical
9   opinion that Mr. Haller's doctors would not have
10  prescribed Seroquel in October of '02, if the
11  Seroquel label had contained the diabetes warning
12  that was placed in the label in January of '04?
13     A  They may or may not have prescribed it
14     Q  Well, we know that after that warning went
15  on the label in January of '04, his treaters, his
16  providers, have continued to prescribe Seroquel to
17  this day.  Correct?
18     A  Correct.
19     Q  You were asked yesterday if you had read
20  any of the testimony from his providers,
21  Mr. Haller's providers, and I think you said you
22  recalled you did read the testimony from Ms. Keene?
23     A  Correct.
24     Q  And you couldn't remember whether you read
25  the testimony from Ms. Burke, Dee Burke?

242

1      A  Correct.  I did not read Burke's
2   testimony, because I looked up the ones that I did
3   read.
4      Q  Which ones did you read?
5      A  Srenath, and Keene.
6      Q  And you did -- I asked you a question
7   earlier whether you would have any basis for
8   challenging the testimony of his treaters as to what
9   information they knew when they prescribed Seroquel
10  to -- I'll start the question over again.
11     All right.  Ms. Keene testified that she
12  discussed the risk of weight gain and development of
13  diabetes with Mr. Haller on many occasions.  Right?
14     A  Yes.
15     MR. DelDUCA: Let's see if I can pull some
16  records here.
17        (Pause.)
18        (Whereupon, Deposition Exhibit
19        30 was marked for
20        identification.)
21  BY MR. DelDUCA:
22     Q  Exhibit 30 is a set of records from Ms.
23  Keene's office.  Okay?
24     A  Yes
25     Q  The first page of the exhibit is

243

1   Directions For Environmental Health 12, and it's
2   dated April 6, 2007, and in this record, Ms. Keene
3   reports that she specifically discussed the risk of
4   Seroquel and Risperdal on lipids and diabetes, with
5   Mr. Haller.
6      A  Correct.
7      Q  The next page is Directions For
8   Environmental Health 34, which is from 2006, June of
9   2006, and, again, it indicates that Ms. Keene
10  discussed with Mr. Haller the risk of Seroquel on
11  lipids and diabetes, and that he wished to stay on
12  the medication despite the risks.  Correct?
13     A  Well, I would say that the education is
14  slightly different than it was on the first one, on
15  the 2007 note.
16     Here it doesn't really say she discussed
17  it with him.  It just says he was aware of them.
18     Q  Do you have any reason to doubt her note
19  when she says he was aware of it?
20     A  Well, there's a difference between saying
21  a patient is aware and saying, "I discussed this
22  with the patient."
23     Q  Ms. Keene -- you read Ms. Keene's
24  testimony.  Correct?
25     A  Yes.

244

1      Q  She testified that she specifically
2   recalled having numerous conversations with
3   Mr. Haller in which she discussed the risk of
4   diabetes and weight gain with Seroquel?
5      A  She did.
6      MR. TRAMMELL: Objection.
7   BY MR. DelDUCA:
8      Q  You don't have any reason to question that
9   testimony; do you?
10     A  No.
11     Q  In fact, Ms. Keene's records support that.
12  Right?
13     MR. TRAMMELL: Objection.
14     THE WITNESS: These records support a
15  discussion where Mr. Haller stated that he was
16  aware of the risks in April 2007 and June 2006.
17  However, patients are often misinformed and
18  have false awareness.
19  BY MR. DelDUCA:
20     Q  Well, are you saying that Mr. Haller had a
21  false awareness of the risk of an association
22  between Seroquel and diabetes, or are you saying
23  that he didn't know?
24     A  I'm saying that from these two notes, I
25  can't tell one way or the other.

245

1    Q   Why don't you turn to the next page, which
2    is Directions For Environmental Health Updated Meds
3    12?
4    A   Developmental Health.
5    Q   I'm sorry. Directions For Developmental
6    Health Updated Meds 12.
7    A   Is that this?
8    Q   The third page. Yes.
9        At the very top of the page, you will see
10   that Ms. Keene discusses the fact that Mr. Haller
11   told her that he's involved in a lawsuit involving
12   Seroquel?
13   A   Yes.
14   Q   And was advised by his attorneys to stop
15   taking Seroquel, that it would help his lawsuit, and
16   yet he continued -- wanted to continue taking the
17   medication.
18   A   Yes. You are paraphrasing, but
19   essentially that's correct.
20   Q   If you turn to the next page, which is
21   Directions For Environmental Health Updated Meds --
22   I said Environmental again. I'm sorry. Directions
23   For Developmental Health Updated Meds 21, and this
24   is from November of 2007, and this document again
25   documents these conversations between Ms. Keene and

246

1    Mr. Haller regarding the association between
2    Seroquel and Risperdal -- he was taking both of
3    them -- and diabetes. Correct?
4        MR. TRAMMELL: Objection.
5        THE WITNESS: Can you please repeat it? I
6    was reading the note while you were asking me
7    the question.
8    BY MR. DelDUCA:
9    Q   You agree that this note again is
10   documentation of discussions between Ms. Keene and
11   Mr. Haller regarding the risks -- the association
12   between Seroquel and diabetes?
13       MR. TRAMMELL: Objection.
14       THE WITNESS: Yes.
15   BY MR. DelDUCA:
16   Q   And the same is true of the last page of
17   the exhibit, which is Directions For Developmental
18   Health Updated 27.
19       MR. TRAMMELL: Objection
20   BY MR. DelDUCA:
21   Q   The patient is aware of the risk of
22   Seroquel and Risperdal on lipids and possible
23   diabetes?
24   A   Yes.
25   Q   You said you did not read the deposition

247

1    of Ms. Burke.
2    A   No, sir.
3    Q   Ms. Burke was one of Mr. Haller's treaters
4    who was involved in the original prescription of
5    Seroquel in October of 2002. Okay?
6    A   Okay.
7    Q   And I'm going to read some of her
8    testimony to you. I'll try to do it slowly.
9        "Question. Do you ever recall talking
10   with David specifically about a risk of diabetes or
11   weight gain associated with antipsychotics?
12       "Answer. Always.
13       "Question. From the first time you
14   treated him?
15       "Answer. I did.
16       "Question. Including this evaluation in
17   October 2002?
18       "Answer. Right. That's what's meant by
19   risk/benefits and alternatives to treatment
20   discussed.
21       "Question. So, when it says in here,
22   throughout your medical records, that would also
23   mean that on that date you actually talked with
24   David about the risk of diabetes and with the
25   antipsychotics, including Seroquel, that he was

248

1    taking. Is that correct?
2        "Answer. The way I approached this
3    metabolic issue with these antipsychotics, I will
4    tell every one of them they can have the side effect
5    of an increased appetite, and depending on what they
6    do with that, they could end up gaining weight, and
7    weight gain is an indication leading towards Type 2
8    diabetes.
9        "Question. And you told David that every
10   time it's reflected --
11       "Answer. Every time.
12       "Question -- in your records, that you did
13   a risk/benefit analysis and talked with him about
14   alternative treatment. Is that correct?
15       "Answer. Every time.
16       "Question. And David had the opportunity
17   to ask you questions about it. Isn't that right?
18       "Answer. He did.
19       "Question. And did he from time to time
20   ask you questions?
21       "Answer. No. He would want to stay on
22   his medications or whatever medication regimen he
23   felt at the time was working.
24       "Question. So, in your view, at least as
25   to the risk of what you called metabolic issues, the

18 (Pages 245 to 248)

249

1    increased appetite leading to weight gain, leading
2    to diabetes, you had told David about that as early
3    as October 2002?
4         "Answer. That's right.
5         "Question. As to the atypicals, including
6    Seroquel. Is that correct?
7         "Answer. That's right.
8         "Question. Do you have a view as to
9    whether David then had informed consent?
10        "Answer. He always had informed consent.
11        "Question. And that includes as to the
12   treatment of an atypical such as Seroquel. Is that
13   right?
14        "Answer. That includes --
15        "Question. Yes?
16        "Answer. That includes, yes."
17        End of quote.
18        So, since you hadn't read it, I wanted to
19   read you the testimony that I was relying upon.
20        Ms. Burke just testified that she
21   specifically discussed the risk of diabetes and
22   weight gain with Mr. Haller when he was first
23   prescribed Seroquel.
24        Do you agree with that?
25        MR. TRAMMELL: Objection.

250

1         THE WITNESS: Yes. It appears that she
2    did -- she elaborates a little bit in what you
3    have read to me. I don't know what else is in
4    the deposition, because I haven't read it, but
5    in what you have read, she seems to tell him
6    that the medication might increase his
7    appetite, and depending on what he does with
8    that, he might go on to develop diabetes.
9    BY MR. DelDUCA:
10        Q   And do you have any reason to question
11   Ms. Burke's veracity in her testimony?
12        MR. TRAMMELL: Objection.
13   BY MR. DelDUCA:
14        Q   And truthfulness?
15        A   No. It's not my job to weigh the
16   truthfulness of one witness against another. That's
17   not my role in this.
18        However, it is interesting to me that she
19   would inform him of the risks of diabetes when that
20   was not something that was well known to the medical
21   community in 2002.
22        Q   You testified yesterday that in -- by
23   April of 2002, the possible risk of an association
24   between Seroquel and the development of diabetes had
25   begun to emerge.

251

1         A   Correct.
2         Q   And that you were aware of that.
3         A   I was aware of the beginning of the
4    emergence of that, yes.
5         Q   And that -- I think you also said
6    yesterday that the psychiatric community in general
7    was aware of that?
8         MR. TRAMMELL: Objection.
9    BY MR. DelDUCA:
10        Q   As well, after April of 2002.
11        MR. TRAMMELL: Objection.
12        THE WITNESS: I think that
13   mischaracterizes what I said somewhat. I think
14   I said we began to become aware of this issue
15   being raised in the literature.
16   BY MR. DelDUCA:
17        Q   Well, if you had begun to become aware of
18   this possible association between diabetes and
19   Seroquel, do you have any reason to think that other
20   psychiatrists and mental health professionals like
21   Ms. Burke, would have been aware of it, as well?
22        MR. TRAMMELL: Objection.
23        THE WITNESS: I don't know what she was
24   aware of and what she was not aware of.
25

252

1    BY MR. DelDUCA:
2         Q   So, I'm just trying to make sure I
3    understand your observation earlier, a few seconds
4    ago.
5         You are not saying, are you, that
6    Ms. Burke couldn't have discussed the risk of
7    diabetes with Mr. Haller, because that information
8    was unavailable?
9         You are not saying that; are you?
10        A   No, I'm not saying that.
11        Q   I know that it's not your job to evaluate
12   the credibility of witnesses in the case, but it is
13   something that you do in your job every day, not
14   every day, but quite often, to evaluate the veracity
15   of a patient and the information he's providing to
16   you. Isn't that something that psychiatrists have
17   to do?
18        A   Yes.
19        Q   Do you agree that in Mr. Haller's records,
20   there are many indications from his mental health
21   providers, that he was or is a manipulator?
22        MR. TRAMMELL: Objection.
23   BY MR. DelDUCA:
24        Q   Did you see that in his records?
25        A   Yes. To me, it's not incompatible with my

253

1  understanding of his personality functioning.
2      Q   There are also a number of references to
3  him being a prevaricator and -- did you see that?
4          MR. TRAMMELL: Objection.
5          THE WITNESS: Yes.
6  BY MR. DelDUCA:
7      Q   Prevarication is lying.  Right?
8      A   Yes.
9      Q   He's also referred to as a poor historian
10  at times.  Is that right?
11      A   Yes.
12      Q   So, given all of those -- those
13  evaluations by his treaters, the people who actually
14  treated him, spoke with him, evaluated him, do you
15  have any reason to doubt those evaluations, that is,
16  that he at times is a manipulator, prevaricator, and
17  the like?
18          MR. TRAMMELL: Objection.
19          THE WITNESS: No.
20  BY MR. DelDUCA:
21      Q   Ms. Burke has testified that she gave
22  Mr. Haller informed consent regarding diabetes risk
23  at the time he was first prescribed Seroquel, and
24  Ms. Keene has testified that she provided that
25  information to Mr. Haller and received informed

254

1  consent from him throughout his later treatment, up
2  until 2008.  Correct?
3      A   Yes.
4      Q   So, in light of that testimony, do you --
5  is it your opinion that despite that testimony,
6  Mr. Haller did not receive informed consent
7  regarding the risk or the association between
8  Seroquel and diabetes?
9      A   It is my opinion that despite Ms. Burke's
10  testimony, she was not completely aware of the risks
11  that were known to AstraZeneca.  Therefore, she
12  could not obtain proper informed consent from her
13  patient.
14      Q   What is your basis for saying what
15  Ms. Burke knew?
16      A   Well, because this was information that
17  was not disseminated to the medical community.
18      Q   You have never spoken to Ms. Burke.
19  Correct?
20      A   No.
21      Q   Do you know who she is?
22      A   No.
23      Q   What specific information are you
24  referring to that you believe Ms. Burke had, should
25  have been able to communicate to Mr. Haller, for

255

1  Mr. Haller to give informed consent, in your
2  opinion?
3      A   It's the information that we discussed
4  yesterday.
5      Q   I would like you to be specific about
6  exactly what information you say should have been
7  provided to Mr. Haller, for him to be able to give
8  informed consent.
9      A   I think that patients in general, and
10  Mr. Haller specifically, should have known that
11  there were -- there were reports emerging of
12  diabetes associated with atypical antipsychotics and
13  Seroquel.
14          He should have known that AstraZeneca had
15  this information, that various regulatory agencies
16  were exploring the link and asking AstraZeneca for
17  information about it, including FDA.
18      Q   So, is that everything?
19      A   I believe so.  I mean, it's -- it's
20  getting a bit laborious to go over the same things
21  again.  I believe so.
22      Q   The first thing that you said was that
23  there were case reports emerging of patients
24  developing diabetes on antipsychotics, including
25  Seroquel.  Right?  That was --

256

1      A   Yes.
2      Q   What specific case reports are you
3  referring to?
4      A   I know there were case reports in the
5  literature going back as far as 2000.
6      Q   How many case reports were there?
7      A   I don't know the exact number.
8      Q   So, in order for -- is it your opinion
9  that in order for Mr. Haller to give informed
10  consent, it wasn't enough for Ms. Burke to tell him
11  that there was a risk of developing diabetes on
12  Seroquel, that she had to discuss with him specific
13  case reports?
14          MR. TRAMMELL: Objection.
15          THE WITNESS: No, I'm not suggesting she
16  had to discuss specific case reports, but as we
17  said before, Mr. Haller was a very high risk
18  guy to begin with, so you are taking a guy who
19  is high risk for developing the disease; you
20  are giving him a medication that is now
21  becoming associated with a risk for the
22  disease.  In order to give him true informed
23  consent, you have to tell him that.
24  BY MR. DelDUCA:
25      Q   Do you have any reason to think that

20 (Pages 253 to 256)

257

1 Ms. Burke was not aware of the many risk factors
2 that Mr. Haller had?
3    A  I would hope that she knew his risk
4 factors.
5    Q  So, she was aware of his risk factors, and
6 she told him that there was a possibility of
7 developing diabetes from antipsychotics.
8      What's missing? Are you saying she had to
9 discuss with him specific case reports?
10      MR. TRAMMELL: Objection.
11      THE WITNESS: No. I'm saying she has to
12    discuss with him the specific facts that were
13    known at the time. The problem is, she didn't
14    know everything at the time.
15 BY MR. DelDUCA:
16    Q  But when I asked you what it is that
17 she — you say she didn't know and she should have
18 discussed with him, you said case reports.
19      You are not suggesting she would have
20 discussed with him actual case reports; are you?
21    A  I don't think she has to say, "Look at
22 this article. It's a case report." But you have to
23 say to patients, "You're at very high risk for
24 diabetes, and associated with the use of this
25 medication there are now reports in the literature

258

1 about patients who get diabetes. We have to think
2 twice about prescribing it for you."
3    Q  How is that different from telling him
4 there's a chance of developing diabetes from the
5 medication?
6    A  I think there's a big difference.
7      THE WITNESS: Can I just stop you for one
8    moment?
9      We haven't finished the first case yet.
10    What kind of time frame are we dealing with?
11      MR. DelDUCA: Off the record.
12      (Discussion held off the
13      record.)
14 BY MR. DelDUCA:
15    Q  Doctor, as of January of 2004, information
16 about an association between atypical antipsychotics
17 and diabetes was in the Seroquel label?
18    A  Yes.
19    Q  And the records indicate, and the
20 testimony indicates, that his providers had
21 discussions with Mr. Haller about those facts after
22 the — certainly after the label was changed?
23    A  Yes.
24    Q  And that he gave informed consent to
25 continue taking Seroquel.

259

1    A  Yes.
2    Q  Despite the fact that he had previously
3 been diagnosed with diabetes, and at those points in
4 time, at least, had glucose that was under control?
5    A  Yes.
6    Q  So, is there any way that you, as a
7 doctor, as an expert, can say that had Mr. Haller
8 been given the exact same information on October 1,
9 2002, when he was first prescribed Seroquel, that he
10 wouldn't have made the exact same decision as he
11 did?
12      MR. TRAMMELL: Objection.
13      THE WITNESS: No. There is no way for me
14    to state one way or the other.
15 BY MR. DelDUCA:
16    Q  Mr. Haller was, you know, was suffering
17 from severe psychiatric problems. Is that right?
18    A  Yes.
19    Q  A long psychiatric history. Right?
20    A  Yes.
21    Q  He had taken a number of different
22 psychiatric medications?
23    A  Yes.
24    Q  Lithium?
25    A  Yes.

260

1    Q  Depakote?
2    A  Yes.
3    Q  Do you agree that he needed to take an
4 antipsychotic medication?
5    A  I think that it would fall within the
6 standard of care to give him an antipsychotic
7 medication. It would also fall within the standard
8 of care to treat him without one.
9      There are a variety of options, ways to
10 treat a patient like him, some of which include
11 antipsychotic medications.
12    Q  You are not providing an opinion in this
13 case that Mr. Haller's doctors — you are not giving
14 an opinion challenging Mr. Haller's doctors'
15 decisions to prescribe Seroquel to him; are you?
16    A  No. I'm responding to your question.
17    Q  I understand. I'm just asking it a little
18 differently.
19      You are not providing an opinion
20 challenging the decision of the doctors?
21    A  No.
22    Q  Mr. Haller was diagnosed with bipolar
23 disorder. Correct?
24    A  Yes.
25    Q  He at different times was diagnosed within

261

1    a manic phase and other times in a depressive phase.
2    Correct?
3        A  Yes.
4        Q  Is Seroquel effective in treating those
5    conditions?
6        A  Yes.
7        Q  Is it effective in treating schizophrenia?
8        MR. TRAMMELL: Objection.
9        THE WITNESS: Yes.
10   BY MR. DelDUCA:
11       Q  The records indicate that Mr. Haller and
12   his doctors concluded that Seroquel was effective,
13   that it worked well for him.  Is that right?
14       MR. TRAMMELL: Objection.
15       THE WITNESS: Yes.
16   BY MR. DelDUCA:
17       Q  Mr. Haller had a long history of violence?
18       MR. TRAMMELL: Objection.
19       THE WITNESS: Yes.
20   BY MR. DelDUCA:
21       Q  The records indicate that he beat his
22   father with a two-by-four.  Correct?
23       A  Yes.
24       Q  The records indicate that he was
25   incarcerated after he exposed himself and

262

1    masturbated in front of children.  Correct?
2        MR. TRAMMELL: Objection.
3        THE WITNESS: Yes.
4    BY MR. DelDUCA:
5        Q  That he attacked a prison guard, assaulted
6    a prison guard?
7        MR. TRAMMELL: Objection.
8        THE WITNESS: Yes.
9    BY MR. DelDUCA:
10       Q  And assaulted police officers?
11       MR. TRAMMELL: Objection.
12       THE WITNESS: Yes.
13   BY MR. DelDUCA:
14       Q  I think he testified himself that he had
15   been arrested at least 30 times?
16       A  Yes.
17       Q  So, Mr. — you agree that Mr. Haller was
18   someone who very much needed to have medication to
19   try to treat his psychiatric conditions?
20       MR. TRAMMELL: Objection.
21       THE WITNESS: Yes.
22   BY MR. DelDUCA:
23       Q  And that any doctor who was making
24   decisions about what medications to prescribe to
25   Mr. Haller, had to weigh the benefits and the risks

263

1    associated with them?
2        A  Yes.
3        Q  Did you notice in the records that
4    Mr. Haller did have — did experience side effects
5    with other medications?
6        MR. TRAMMELL: Objection.
7    BY MR. DelDUCA:
8        Q  Psychotropic medications?
9        A  I don't recall.  I vaguely remember, but I
10   don't recall specifics.
11       Q  At least he reports later that at earlier
12   times he experienced tardive dyskinesia.  Did you
13   see that in his records?
14       A  No.
15       Q  Did you see in the records that
16   Mr. Haller's doctors indicated that he reported that
17   he felt that the Seroquel improved some of his
18   hypersexuality issues?
19       MR. TRAMMELL: Objection.
20       THE WITNESS: Yes.
21   BY MR. DelDUCA:
22       Q  And that's important, an important part of
23   the treatment of a person suffering from the bundle
24   of problems that Mr. Haller experienced?
25       MR. TRAMMELL: Objection.

264

1        THE WITNESS: Yes.
2    BY MR. DelDUCA:
3        Q  You said in an answer a few minutes ago,
4    that you felt Mr. — you feel Mr. Haller could have
5    been treated without antipsychotics.
6        A  Yes.
7        Q  What course of treatment do you believe
8    could have been given to Mr. Haller without the use
9    of antipsychotics?
10       MR. TRAMMELL: Objection.
11   BY MR. DelDUCA:
12       Q  What treatment are you talking about in
13   that answer?
14       MR. TRAMMELL: Objection.
15       THE WITNESS: There are a variety of other
16   ways to treat both major mood disorders,
17   impulse control disorders, that don't involve
18   use of antipsychotic agents.  For example,
19   various mood stabilizing agents like he was on,
20   lithium and valproic acid.  There are other
21   choices as well, like Lamictal.
22       He could have been subjected to cognitive
23   behavior psychotherapy to help him control his
24   impulses and stabilize his mood.
25

265

BY MR. DelDUCA:

Q   Just dealing with the medications for a second, all of those medications, lithium, valproic acid and Lamictal, all have serious potential side effects?

A   Yes.

Q   He had been on lithium in the past. Correct?

A   Yes.

Q   Had he been on valproic acid on the past?

A   Yes.

Q   Had he ever been on Lamictal?

A   I don't believe so. I might be mixing up the two cases. I don't recall.

Q   His providers determined that the use of lithium and valproic acid and some of the other medications he was taking before he was put on second generation antipsychotics, that they weren't as effective as those providers thought his treatment would be if they added the antipsychotic. Is that right?

A   Yes.

Q   You are not here to challenge their medical decision-making on that. Right?

A   Correct.

266

Q   Cognitive behavioral psychotherapy, is that something that the patient has to agree to participate in?

A   Yes.

Q   And do you know whether that was ever offered to Mr. Haller, one way or the other?

A   I do not know.

Q   Given Mr. Haller's profile, would you have any concerns about whether he would cooperate with that type of therapy?

MR. TRAMMELL: Objection.

THE WITNESS: He may or may not cooperate. You know, there are -- there is discussion in the psychiatric literature that modalities of psychotherapy are being profoundly underused in severely impaired patients.

BY MR. DelDUCA:

Q   Is Mr. Haller a severely impaired patient?

MR. TRAMMELL: Objection.

THE WITNESS: At times, over the course of his treatment, he was very impaired.

MR. DelDUCA: Let's take a break and then we will switch over.

(Thereupon, a short recess was taken.)

267

BY MR. DelDUCA:

Q   Before I move over to Ms. McAlexander, I just want to ask a couple more questions on Mr. Haller to finish that up.

I asked this slightly differently before, but I want to ask just a slightly different question.

In light of all of Mr. Haller's preexisting risk factors for developing diabetes, is there any way that you can rule out that he would have developed diabetes even if he never took Seroquel?

MR. TRAMMELL: Objection.

THE WITNESS: No.

BY MR. DelDUCA:

Q   Let's move to Ms. McAlexander.

I'm going to start with Ms. McAlexander and just try to -- start out by just making sure that I understand exactly what your opinions are, what opinions you are giving, and then I'll break them down. Okay?

Again, I'm focusing on your case specific opinions with regard to Ms. McAlexander, and as I see it, those opinions begin on page 4 of your report and they end really on page 5. Right?

268

A   Yes.

Q   You start out by giving some of the pertinent information from her history on page 4, into page 5, and then you give your opinion. Correct?

A   Correct.

Q   Just above the word "Conclusions" on page 5, there's a single sentence paragraph that reads, "It is my opinion that Seroquel was a contributing factor to her development of diabetes."

Do you see that?

A   Yes.

Q   I notice that in the Haller opinion, you said that it was your opinion that Seroquel was a cause of his diabetes, and in Ms. McAlexander's opinion, you say it's your opinion that it was a contributing factor.

Was that an intentional -- was it intentional that you used different words?

A   I don't believe so. To me, they mean the same thing. I know that legally they might not mean the same thing, but to me they mean the same thing.

Q   In addition, in the conclusions, you say that, "From review of records it does not appear that the prescribing physicians obtained informed

**269**

1  consent in regard to the risk of diabetes associated
2  with the administration of Seroquel."
3       Are you with me?
4    A   Yes.
5    Q   Is that a medical opinion that you are
6  giving in the case, or is that merely an observation
7  that you are giving?
8    A   I'm not sure I understand what the
9  difference between an informed observation and an
10  opinion would be.
11       Based upon my review, it does not appear
12  to me that informed consent was obtained.
13    Q   Do you expect to stand up and testify that
14  to a reasonable degree of medical certainty,
15  informed consent was not given, or not obtained from
16  Ms. McAlexander?
17    A   Yes.
18    Q   Are there any other opinions that you are
19  giving, case specific opinions, with regard to
20  Ms. McAlexander?
21    A   With the caveat echoing what we discussed
22  before with the other patient, I would say no.
23    Q   I guess with the other patient you said
24  that you have opinions about what his psychiatric
25  diagnosis was.

**270**

1    A   Correct.
2    Q   And do you have similar opinions with
3  regard to Ms. McAlexander?
4    A   Yes.
5    Q   Again, you are not -- is it right -- I'm
6  going to have to repeat some of them, because I
7  don't know whether both of these cases are going to
8  be tried together, so I don't want to have an
9  unclean transcript by referring to Mr. Haller. I
10  can't necessarily rely on that. This will seem a
11  little repetitious to you.
12       Are you diagnosing Ms. McAlexander with
13  diabetes, or are you relying upon the diagnosis
14  that's indicated in the medical records?
15    A   The latter.
16    Q   Are you giving any opinion as to when
17  Ms. McAlexander developed diabetes?
18    A   No.
19    Q   Are you challenging the medical decisions
20  of any of Ms. McAlexander's doctors?
21    A   No.
22    Q   Did you ever examine Ms. McAlexander?
23    A   No.
24    Q   Have you ever spoken to her?
25    A   No.

**271**

1    Q   Or any of her doctors?
2    A   No.
3    Q   Did you read any deposition transcripts
4  from Ms. McAlexander's case?
5    A   Yes.
6    Q   Which ones?
7    A   Her three depositions, Hellfern, Valisetty
8  and Henderson.
9    Q   Did you actually read those transcripts,
10  or did you get a summary of those transcripts from
11  anyone?
12    A   I read them.
13    Q   I'm going to focus for a few minutes on
14  your opinion that Seroquel contributed to
15  Ms. McAlexander's diabetes. Okay?
16       You agree that Ms. McAlexander had a
17  number of preexisting conditions that put her at an
18  increased risk of developing diabetes?
19    A   Yes.
20    Q   Again, I will come back to those.
21       Focusing on your opinion the way that it's
22  drafted, you point out in your report that
23  Ms. McAlexander was prescribed Seroquel in August of
24  2001.
25    A   Correct.

**272**

1    Q   25 milligrams, and that moved up to 75
2  milligrams?
3    A   Correct.
4    Q   And that in February of 2002, her dose was
5  upped to -- was increased to 300 milligrams a day.
6  Correct?
7    A   Correct.
8    Q   And later was increased to 600 milligrams
9  a day. Correct?
10    A   Yes.
11    Q   You say in your report that in
12  February 2002, weight gain is indicated in her
13  medical records, and then you say her dose of
14  Seroquel was increased to 300 milligrams. Correct?
15    A   Correct.
16    Q   Now, in -- between the time she was first
17  prescribed Seroquel in August of 2001, and February
18  of 2002, when her prescription was -- the dosage was
19  increased to 300 milligrams -- focus on that for a
20  minute, okay, that time frame?
21    A   August 2001 to February 2002?
22    Q   Correct.
23    A   Okay.
24    Q   You say that she was prescribed 25
25  milligrams, it appears, sometimes she took 75

273

1   milligrams daily, and reported no side effects?
2     A   Yes.
3     Q   So, during the time that she was taking
4   the lower dosages, it's your understanding she had
5   no side effects attributed to Seroquel?
6         MR. TRAMMELL: Objection.
7         THE WITNESS:  That she reported.
8   BY MR. DelDUCA:
9     Q   Right. And did your review of the records
10  indicate that there were any side effects
11  attributable to Seroquel in that time frame?
12    A   The records show that her weight was
13  creeping up over that time, so that may have been a
14  side effect of Seroquel.
15    Q   During that time, she was also taking
16  Celexa. Is that right?
17    A   Correct.
18    Q   And on February -- in February, February
19  5, 2002, she reported she felt that her weight
20  had increased because of the Celexa.
21    A   I understand.
22    Q   And then she was taken off Celexa. Do you
23  remember seeing that in the records?
24    A   Yes.
25    Q   At least Ms. McAlexander attributed her

274

1   weight creeping up to the Celexa, not to the
2   Seroquel.
3     A   Correct.
4     Q   And weight changes are a known potential
5   side effect of Celexa?
6     A   Correct.
7     Q   Now, turning back to your opinion in this
8   case, is your opinion in this case that
9   Ms. McAlexander's diabetes, just diagnosed later,
10  was attributable to the weight gain that she
11  experienced?
12    A   I think it's multifactorial. One of the
13  factors is the weight gain.
14    Q   Let me ask it slightly differently.
15  Again, I'm trying to get my hands around the logic
16  of your opinion here.
17        Is it your opinion that Seroquel caused
18  her to gain weight, and the weight gain was a factor
19  in her developing diabetes?
20    A   That is one possibility. Again, the exact
21  mechanism by which Seroquel and diabetes are
22  intertwined, is not known.
23    Q   What is your opinion in this case with
24  Ms. McAlexander? Is it your opinion that the
25  increase in weight was a factor in her development

275

1   of diabetes?
2     A   Yes.
3     Q   Now, do you have an opinion in this case
4   that any other mechanism of Seroquel, was a
5   mechanism for her developing diabetes in this case?
6     A   Since the mechanism is not known, and the
7   updated labels reflect the mechanism is not known,
8   I'm not in a position to offer a mechanism within
9   reasonable medical certainty.
10    Q   All right. I want to ask you some
11  questions about weight.
12        Ms. McAlexander had been obese her entire
13  adult life. Right?
14    A   Yes.
15    Q   And she is five-six, or five-seven. Is
16  that right?
17    A   Yes.
18    Q   Her weight has been, I think in all the
19  medical records that I've seen, above 250 pounds?
20    A   Yes.
21    Q   In February of 2002, when her dosage was
22  increased to 300 milligrams, do you remember what
23  Ms. McAlexander weighed at that time?
24    A   In February of '02?
25    Q   Yes, February of '02.

276

1     A   I didn't note it in my report, so I don't
2   independently recollect. I would have to look in
3   the record.
4     Q   February 11 of 2002, she is listed at
5   287 pounds.
6     A   Okay.
7     Q   Now, in September 2003, so I'm moving
8   ahead now 18 months or so, I guess, it's the date
9   that Ms. McAlexander was diagnosed with diabetes.
10    A   Say that again, please.
11    Q   September 2003.
12    A   Okay.
13    Q   And in September 2003, you have this in
14  your report, her weight was listed at what,
15  289 pounds? Correct?
16    A   Correct.
17    Q   So, at least from February of 2002 to
18  September of 2003, she did not have any appreciable
19  weight gain. Is that right?
20    A   We know that her starting weight and
21  ending weight during that time, was similar.
22    Q   Yes.
23    A   Correct.
24    Q   I should say she didn't have any net
25  weight gain.

25 (Pages 273 to 276)

277

1    A   Correct.
2    Q   And have you reviewed the records of what
3  her weights were between February of '02 and her
4  diagnosis in September of '03?
5    A   I looked through the records.  I didn't
6  pay attention to every weight that she might --
7  every weighing that she might have had.
8    Q   Did you notice that her weight did
9  fluctuate some during that time frame?
10    A   Right, but that is normal.
11    Q   Were you able to tell from the records
12  whether any fluctuation, increases in her weight --
13  I think at one point she went up to 300 pounds,
14  another point maybe it was down below 287 -- whether
15  those were attributable to medical conditions
16  from which she was suffering at the time?
17    A   I don't know.
18    Q   At one point, when her weight is listed as
19  going up to about 300 pounds, she reported edema and
20  cellulitis in her legs.
21        Would edema in the lower extremities,
22  contribute to a weight gain?
23    A   In the acute episode, yes, because it's
24  retaining fluid.
25    Q   Can you -- I'm going to back up in time.

278

1  I'm sorry to do this to you.
2        From the time that she was first given
3  Seroquel in August of 2001, until February of '02,
4  you said that her weight creeped up.
5    A   Right.
6    Q   I asked you about the fact that she was
7  also on Celexa during that time.  Do you have an
8  opinion as to whether -- what was the cause of her
9  weight creeping up in that time frame?
10    A   No.
11    Q   We do know that in February of '02, Celexa
12  was removed and her dosage of Seroquel was increased
13  from 75 milligrams to 300 milligrams.
14    A   Correct.
15    Q   Yet her weight remained stable, relatively
16  stable, through September of '03.  Is that right?
17        MR. TRAMMELL:  Objection.
18        THE WITNESS:  Correct
19  BY MR. DelDUCA:
20    Q   All right.
21    A   Again, net weight.
22    Q   Net weight.  If you want, we can go
23  through the actual weights.
24    A   No.
25    Q   She did not have appreciable weight loss

279

1  or weight gain in that time frame that wasn't
2  attributed by her doctors to some other -- let me
3  start the statement over.  I don't want to misstate
4  it.
5        I'll give you some numbers and you can
6  tell me whether this is basically what we would
7  consider a normal fluctuation in weight.  Okay?
8        From February of 2002 until September of
9  2003, it appears that the highest weight that is
10  indicated in the records is 300 pounds even, and the
11  lowest weight is 285.
12        The other weights are 287, 285, 287, 285,
13  300, 290, 300, 289.  Okay?  Those are the weights
14  that I have.
15        Are those weight fluctuations what you
16  would -- what you would consider sort of normal
17  weight fluctuations?
18    A   Well, by definition, she's obese, so it's
19  not normal.  But, yes, within -- within the 285 low
20  to 300, you can see those kind of fluctuations.
21    Q   Ms. McAlexander was later -- her dose was
22  increased to 600 milligrams?
23    A   Yes.
24    Q   Were you able to tell by looking at her
25  medical records, whether you could correlate any of

280

1  the fluctuations in her weight over the years, to
2  the dosage of Seroquel she was taking?
3        So, when her dosage changed, did her
4  weight change?  Did you see any of that in the
5  records?
6    A   I did not do that analysis.
7    Q   Are you able to say that any of the weight
8  fluctuations from the time that Ms. McAlexander --
9  the dosage was increased to 300 milligrams in
10  February of '02, until Ms. McAlexander went off of
11  Seroquel, whether any of those weight fluctuations
12  were attributable to Seroquel?
13    A   No.  I can just say there's a temporal
14  correlation between being on it and the weight gain.
15    Q   I want to ask you about some, right now,
16  Ms. McAlexander's other risk factors for developing
17  diabetes.
18    A   Okay.
19    Q   Again, she's diagnosed in, I believe it's
20  September of '03 -- it is September of 2003 that
21  your report reflects.
22    A   Right.
23    Q   You don't have any opinion as to whether
24  she had diabetes prior to that.  Is that right?
25    A   Correct.

281

1   Q   Do you agree that as a general matter,
2   diabetes is a condition that develops over time?
3   Right?
4   A   Correct.
5   Q   Have you -- one of the -- Ms. McAlexander
6   had a number of elevated blood glucose readings
7   going back to before she was prescribed Seroquel.
8       Did you see that in the records?
9   A   Yes.
10  Q   A preexisting history -- a history of
11  elevated glucose readings, of hyperglycemia, is a
12  risk factor for developing diabetes.
13  A   Correct.
14  Q   So, Ms. McAlexander had that risk factor?
15  A   Yes.
16  Q   In addition, Ms. McAlexander was and is
17  obese.
18  A   Yes.
19  Q   In fact, her body mass index has been
20  above 40 for her entire adult life. Is that right?
21  A   Yes.
22  Q   And puts her well into the category of
23  morbidly obese?
24  A   Yes.
25  Q   And that is a very significant risk factor

282

1   for the development of diabetes?
2   A   Yes.
3   Q   Ms. McAlexander also has a family history
4   of diabetes. Right?
5   A   Yes.
6   Q   Her mother had diabetes?
7   A   Correct.
8   Q   Her grandfather had diabetes?
9   A   Correct.
10  Q   And a family history, especially a close
11  family history of diabetes is, again, a very
12  significant risk factor for the development of
13  diabetes?
14  A   Yes.
15  Q   So, Ms. McAlexander, unfortunately, had
16  both the genetic predisposition to diabetes and
17  physical predisposition to diabetes.
18  A   Correct.
19  Q   She is also sedentary. Correct?
20  A   Correct.
21  Q   She has been a smoker since she was a
22  teenager?
23  A   Correct.
24  Q   Being sedentary is a recognized risk
25  factor for the development of diabetes?

283

1   A   Correct.
2       MR. TRAMMELL: Objection.
3   BY MR. DelDUCA:
4   Q   She also has abdominal fat? That is, she
5   has abdominal girth that makes her at an increased
6   risk of developing diabetes?
7   A   Correct.
8   Q   Ms. McAlexander also has a long history,
9   unfortunately, of suffering from depression and
10  mental illness. Is that right?
11      MR. TRAMMELL: Objection.
12      THE WITNESS: Yes.
13  BY MR. DelDUCA:
14  Q   Are those who suffer from depression, at
15  an increased risk for developing diabetes?
16  A   I don't think so.
17  Q   Do you remember when Ms. -- do you
18  remember seeing that when Ms. McAlexander was first
19  diagnosed with diabetes, in September of '03, that
20  one of the blood tests that her -- one of the tests
21  that her doctor ordered was a test for
22  micro-albumin?
23  A   I don't recall that.
24  Q   Are you aware that elevated micro-albumin
25  is a test that doctors evaluating a patient for

284

1   diabetes, generally do?
2   A   That's beyond my area of expertise.
3   Q   Are you aware that the presence of albumin
4   in the system, so-called albuminuria, is a marker,
5   considered a marker for preexisting diabetes?
6       MR. TRAMMELL: Objection.
7       THE WITNESS: Albuminuria?
8   BY MR. DelDUCA:
9   Q   Albuminuria.
10  A   That's albumin in the urine?
11  Q   Yes.
12  A   Protein in the urine is a marker for
13  kidney dysfunction, and it can be present in
14  diabetic patients.
15  Q   Is there a difference between
16  micro-albumin and the presence of micro-albumin and
17  albuminuria?
18  A   Once again, you are asking me questions
19  about something I really don't have expertise
20  Q   Fair enough.
21      Again, some of the questions I asked you
22  before, but I have to ask again for a different
23  patient.
24      I did have another question before I turn
25  to that.

285

1    Did you see in the records that over the
2    years, Ms. McAlexander has been treated with
3    steroids for different conditions?
4    A   Yes.
5    Q   And steroids can cause an increase in
6    blood sugars?
7    A   Yes
8    Q   In fact, she was treated with steroids in
9    the spring before she was diagnosed, I think it was
10   May of 2003, she was treated for steroids -- with
11   steroids, rather?
12   A   Yes.
13   Q   Prednisone.  Did you notice that?
14   A   Yes
15   Q   And there was an increase in her blood
16   sugars at that time?
17   A   Okay.
18   Q   Is it your understanding that with the use
19   of steroids, that one's blood sugar may increase
20   with the use of steroids?
21   A   Yes.
22   Q   Did you do any evaluation to determine
23   whether Ms. McAlexander's increased blood sugars at
24   that time, were attributed to her -- to the steroids
25   that she was taking or to any other condition?

286

1    A   No, I did not.
2    Q   In the time prior to when she was
3    diagnosed with diabetes in September of 2003, with
4    the exception of the spike when she was taking
5    steroids, did you observe that Ms. McAlexander's
6    blood sugars were elevated and, using your word,
7    creeping up, over a period of time that went back to
8    before she was prescribed Seroquel?
9    A   Say that again.
10   Q   Did you observe that Ms. McAlexander's
11   blood sugars -- you told me you did see she had
12   elevated blood sugars prior to her receiving a
13   prescription for Seroquel.
14   A   Yes.
15   Q   And did you notice that from that point up
16   to the time that she was diagnosed with diabetes in
17   September of '03, there are a number of blood sugar
18   readings that are essentially creeping up, as you
19   said earlier?
20   A   No, I did not.
21   Q   Would that be, in your understanding, a
22   typical progression of the development of diabetes?
23   MR. TRAMMELL:  Objection.
24   THE WITNESS:  Once again, I already told
25   you that I'm not going to testify about when

287

1    she did or did not develop diabetes
2    So, again, you're asking me for an
3    endocrinology opinion, which is beyond my
4    expertise.
5    BY MR. DelDUCA:
6    Q   Let me make sure I understand that answer.
7    Are you telling me that her history with regard to
8    blood sugar readings over a period of years, this is
9    what I'm asking you about, is something that you
10   feel you are not qualified to evaluate whether that
11   history is consistent with a typical development of
12   diabetes?
13   A   Correct
14   Q   Because you don't treat diabetes and you
15   don't diagnose diabetes in your practice?
16   A   And I don't manage diabetes in my
17   practice.
18   Q   Now, Ms. -- we've gone over a number of
19   risk factors that Ms. McAlexander had for developing
20   diabetes.
21   Can you rule out that Ms. McAlexander
22   would have developed diabetes even if she had never
23   taken Seroquel?
24   A   No.
25   Q   A slightly different question.  Can you

288

1    say that but for the fact that Ms. McAlexander took
2    Seroquel, she would not have developed diabetes?
3    MR. TRAMMELL:  Objection.
4    THE WITNESS:  I'm having the same
5    difficulty understanding this question as I did
6    the first time you asked it.  But for the
7    fact --
8    BY MR. DelDUCA:
9    Q   That she took Seroquel, she would never
10   have gotten -- she would not have gotten diabetes?
11   A   No.
12   Q   You can't say that?
13   A   Correct.
14   Q   Then --
15   A   As best as I understand it.
16   Q   I guess I'll say it a little differently.
17   A   I was instructed if a question is
18   ambiguous and difficult to understand, I should tell
19   you.  That is a convoluted question.
20   Q   I guess I'll try to make it less
21   convoluted.
22   What I am asking you is, can you say that
23   if Ms. McAlexander hadn't taken Seroquel, she never
24   would have gotten diabetes?  Can you say that?
25   A   No, I can't.

28 (Pages 285 to 288)

289

1    Q   I'm going to ask some questions about the
2   methodology that you used for arriving at your
3   opinion that Seroquel was a contributing factor in
4   Ms. McAlexander's development of diabetes.
5        Did you do any quantitative analysis,
6   taking each of the risk factors, or any of the other
7   risk factors that Ms. McAlexander had for developing
8   diabetes, and trying to evaluate, number one,
9   whether they were factors and, if so, at what level
10  they were factors in her development of diabetes?
11   A   No.
12   Q   Did you rule out that any of these other
13  risk factors were the sole cause of her diabetes?
14   A   No.
15   Q   Or that these other risk factors in
16  combination, were the sole cause of her diabetes?
17  Did you rule that out?
18   A   Some as opposed to others?
19   Q   The constellation of other risk factors
20  that Ms. McAlexander had, other than -- and not
21  Seroquel.
22       Did you rule out it was the constellation
23  of these other risk factors and not Seroquel, was
24  the cause of her diabetes?
25   A   No.

290

1    Q   And you haven't done any assessment of the
2   relative risk of any of those other risk factors.
3   Correct?
4    A   No.
5    Q   Or the relative risk of Seroquel?
6    A   No.
7    Q   Is the logic of your opinion, of your
8   opinion with regard to Seroquel being a factor in
9   Ms. McAlexander developing diabetes, that
10  Ms. McAlexander was prescribed Seroquel, and then at
11  a later point in time she developed -- she was
12  diagnosed with diabetes?
13       MR. TRAMMELL: Objection.
14       THE WITNESS: That's an
15  oversimplification. I mean, the facts of the
16  case are that she had many risk factors for the
17  development of diabetes. Might very well have
18  developed diabetes without the Seroquel, but
19  the facts are that her risk factors were -- an
20  additional risk factor was added, which was the
21  administration of the Seroquel, and then she
22  ultimately went on to develop the diabetes.
23  BY MR. DelDUCA:
24   Q   So, you are saying that there was an
25  additional risk factor that was added, but we can't

291

1   tell whether that was a cause?
2        MR. TRAMMELL: Objection.
3        THE WITNESS: I think that, once again,
4   the cause is multifactorial, and all her risk
5   factors together can be viewed as the cause of
6   the diabetes.
7        MR. DelDUCA: Let's take five minutes.
8        (Thereupon, a short recess was
9   taken.)
10  BY MR. DelDUCA:
11   Q   I asked you this with regard to weight,
12  and I just don't remember if I asked you this with
13  regard to glucose levels.
14       I asked you whether or not you had
15  undertaken to determine whether there was any
16  correlation between any fluctuations in
17  Ms. McAlexander's weight and any changes in her
18  dosage of Seroquel. You said you didn't do that.
19   A   Correct.
20   Q   Did you undertake to determine whether
21  there were any fluctuations or changes -- any
22  correlation between Ms. McAlexander's dosages of
23  Seroquel and any changes in her glucose levels?
24   A   No, I did not.
25   Q   You talked about -- I asked you about

292

1   Ms. McAlexander's Seroquel dosages going up from 300
2   to 600 milligrams.
3    A   Yes.
4    Q   They also went down. Correct?
5    A   Yes.
6    Q   In 2005, her doctor started to titrate
7   down her dosage. Correct?
8    A   Correct.
9    Q   Down to a hundred milligrams, and then she
10  stayed on a hundred milligrams for some time.
11  Correct?
12   A   Yes.
13   Q   Did you notice any changes in her weight
14  or her glucose levels, that corresponded with that?
15   A   Not that I recall.
16   Q   Did you see in the records, however, that
17  after -- let me start -- it was in -- it was in 2006
18  that Ms. McAlexander stopped taking Seroquel
19  altogether. Correct?
20   A   Correct.
21   Q   Prior to that, after her initial
22  diagnosis, her -- did you see that her hemoglobin
23  A1C numbers were generally in the 7s?
24   A   Yes.
25   Q   Which is not normal for a non-diabetic.

293

1   Correct?
2       A   Yes.
3       Q   A lot of negatives there, but -- it's an
4   abnormal reading?
5       A   Correct.
6       Q   Did you notice that after she stopped
7   taking Seroquel in 2006, her hemoglobin A1C levels
8   went up?  Did you notice that?
9       A   No, I didn't.
10      Q   They went up into -- consistently, in the
11  8s?  Did you see that?
12      A   Okay.
13      Q   Do you correlate that increase in her
14  hemoglobin A1C ratings, her glucose levels over a
15  period of time, to the fact that she discontinued
16  Seroquel?
17      A   I do not have an opinion on that one way
18  or another.
19      Q   If her blood sugar ratings went up,
20  hemoglobin A1Cs went up, when Seroquel was
21  discontinued, does that indicate that Seroquel was
22  not affecting -- not increasing her blood sugar
23  levels when she was taking it?
24          MR. TRAMMELL: Objection.
25          THE WITNESS: I don't think that indicates

294

1   that one way or the other.
2   BY MR. DelDUCA:
3       Q   So, from your review of the records, from
4   the totality of it, you can't see that the Seroquel
5   increased her blood sugar levels or decreased her
6   blood sugar levels.  Is that right?
7           MR. TRAMMELL: Objection.
8           THE WITNESS: I can't draw the conclusions
9   that your questions are asking me to draw.
10  BY MR. DelDUCA:
11      Q   You had the records, and in those records
12  there are laboratory results and doctors' reports
13  which indicate what her blood sugar levels were in a
14  number of periods of time, before she was given
15  Seroquel -- during the time she was on Seroquel and
16  then after she was on Seroquel.  Correct?
17      A   Yes.
18      Q   And you told me that you weren't able to
19  do anything, any correlation between those blood
20  sugar levels and the dosage of Seroquel, to see
21  whether there was any relationship between the two.
22  That is, relationship between her dosage and any
23  changes in her blood sugar levels.  That I
24      A   Not that I was unable to do it.  That I
25  just didn't.

295

1       Q   You didn't do it.  All right.
2           I take it that wasn't part of your
3   thinking when you gave the opinion that you have
4   given in this case with regard to her?
5           MR. TRAMMELL: Objection.
6   BY MR. DelDUCA:
7       Q   Since you didn't think about it.  That
8   didn't contribute to your opinion in this case,
9   then?
10      A   Correct.
11      Q   I'm going to ask you sort of -- I know you
12  didn't do the review, but I'll represent to you that
13  her hemoglobin A1C levels went up after Seroquel was
14  discontinued.
15          When you have that situation, where an
16  agent is removed and you see a change, is there any
17  way that you can conclude from that, in this
18  situation, that Seroquel was causing her blood sugar
19  levels to go up?
20          MR. TRAMMELL: Objection.
21  BY MR. DelDUCA:
22      Q   Doesn't that -- from the information I'm
23  giving you -- I know you said you didn't review
24  this, but from the information I'm giving you, that
25  when she was taken off Seroquel, her A1C levels went

296

1   up, hemoglobin A1C levels went up, does that fact
2   indicate to you that Seroquel was increasing her
3   blood sugar levels?
4       A   No.
5       Q   Does that fact suggest to you that
6   Seroquel was not increasing her blood sugar levels?
7           MR. TRAMMELL: Objection.
8           THE WITNESS: No.
9   BY MR. DelDUCA:
10      Q   So, you are saying you can't draw any
11  conclusion from it?
12      A   Correct.
13      Q   Why not?
14      A   It's far too simplistic an analysis.
15  There are so many other variables that might be
16  playing a role.
17      Q   Did you -- you didn't review any of those,
18  either?
19      A   Not in response to this question, no.
20      Q   In your analysis of her -- the fact that
21  she had diabetes and the fact that she was taking
22  Seroquel, in your analysis of that, you did not
23  evaluate these fluctuations in her blood sugar
24  levels and try to correlate anything between them
25  and her use or dosage of Seroquel.  Right?

297

1   A   That's a completely different question.
2   That's correct.
3   Q   All right. I want to switch gears now for
4   a few minutes on your opinion with regard to
5   informed consent.
6   A   Okay.
7   Q   Did you read the deposition of
8   Dr. Valisetty?
9   A   Yes.
10   Q   And she diagnosed Ms. McAlexander with
11   diabetes. Correct?
12   A   Correct.
13   Q   Did you read that she testified that in
14   September of 2003, she told Ms. McAlexander that
15   there was an association between diabetes and the
16   use of atypical antipsychotics like Seroquel?
17   A   Yes.
18   Q   And that Ms. McAlexander made an informed
19   decision to continue to take Seroquel after that
20   date?
21       MR. TRAMMELL: Objection.
22       THE WITNESS: I don't recall the exact
23       exchange in the deposition.
24   BY MR. DelDUCA:
25   Q   Well, certainly Ms. McAlexander continued

298

1   to take Seroquel after that. Correct?
2   A   Yes.
3   Q   Do you have any -- are you giving the
4   opinion that as of September 2003, Ms. McAlexander
5   didn't have informed consent, didn't give informed
6   consent, as to the diabetes risk potentially
7   associated with Seroquel?
8   A   I accept that Dr. Valisetty discussed
9   atypical antipsychotics with Mrs. McAlexander, like
10   she indicated in her deposition.
11       Whether a full risk/benefit discussion was
12   held with the patient or not, I do not know.
13   Q   So, since you don't know, can you give the
14   opinion that Ms. McAlexander did not give informed
15   consent?
16   A   No.
17   Q   You said yesterday that you were aware,
18   and the psychiatric community in general was aware,
19   of an association between atypical antipsychotics,
20   second generation antipsychotics, and weight gain,
21   from the time that those second generation
22   antipsychotics were put on the market.
23   A   Yes.
24   Q   So, in this case, when Mrs. McAlexander
25   was first prescribed Seroquel, do you have any

299

1   reason to doubt that she was informed regarding the
2   potential for weight gain associated with Seroquel?
3   A   No.
4   Q   Do you agree that Ms. McAlexander also
5   had -- do you agree that Ms. McAlexander had a
6   serious psychiatric condition?
7   A   Yes.
8   Q   And that she required medication?
9   A   Yes.
10   Q   And you said you are not offering any
11   opinion challenging the treatment her doctors
12   decided to give her. Correct?
13   A   Correct.
14   Q   Is Depo-Provera -- are you familiar with
15   the medication?
16   A   Yes.
17   Q   Does that have a potential side effect of
18   weight gain, as well?
19   A   Yes.
20       MR. DelDUCA: I think I'm about finished.
21   Let me take a couple of seconds and I'll see if
22   my colleague has anything.
23       (Thereupon, a short recess was
24       taken.)
25       MR. DelDUCA: I am finished.

300

1       CROSS EXAMINATION
2   BY MR. TRAMMELL:
3   Q   Doctor, my name is Fletch Trammell. I'm
4   an attorney for Mr. Haller and Ms. McAlexander, and
5   my firm has retained you to render expert opinions
6   in those cases. Is that correct?
7   A   Yes.
8   Q   Can you describe to me what information
9   you reviewed in rendering your opinions in both
10   cases?
11   A   I reviewed everything that you sent me   I
12   consulted some relevant articles in the literature.
13   I reviewed the psychopharmacology of Seroquel,
14   specifically, and atypical antipsychotics generally,
15   and looked at some articles -- I don't recall if you
16   provided them to me or if I found them on my own --
17   related to atypical antipsychotic agents and
18   diabetes.
19   Q   Two of the things I sent you were the
20   Seroquel labeling that existed at the time
21   Ms. McAlexander and Mr. Haller began their treatment
22   with Seroquel, and the relevant medical records. Is
23   that correct?
24   A   Correct.
25   Q   Did you review those materials in

301

1  rendering your opinion?
2     A   Yes.
3     Q   You are a licensed psychiatrist. Is that
4  correct?
5     A   One is licensed as a medical doctor.
6  Psychiatry is a specialty in medicine.
7     Q   You are a licensed medical doctor with a
8  specialty in psychiatry. Is that right?
9     A   Yes.
10    Q   Does being a psychiatrist give you
11 knowledge, experience or skill superior to that of a
12 layperson in analyzing the effects of
13 psychopharmacological treatment in patients?
14    A   Yes.
15    Q   My understanding, Doctor, is that you have
16 rendered opinions in these cases. One of the
17 opinions is that the information that was given to
18 the plaintiffs' prescribing physicians about the
19 association between Seroquel and the potential
20 contraction of diabetes, was not consistent with
21 what the company knew about the risk, and that the
22 failure to warn of that risk was a cause of those
23 patients taking Seroquel and developing diabetes.
24 Is that correct?
25    MR. HETRICK: Object to the form.

302

1     MR. DelDUCA: Objection
2     THE WITNESS: Yes.
3  BY MR. TRAMMELL:
4     Q   I want to talk a little bit about these
5  cases specifically.
6        Before I do that, defense counsel asked
7  you about foreign regulatory laws as well as
8  regulatory laws here in the United States as they
9  apply to what should be in a drug's label. Do you
10 recall that?
11    A   Yes.
12    Q   You are not testifying here as an expert
13 on whether a company complied with regulatory
14 standards; are you?
15    A   No.
16    Q   This morning we went through an analysis
17 of Mr. Haller's weight, both prior to and over the
18 course of his treatment with Seroquel. Do you
19 recall that?
20    A   Yes.
21    Q   The evidence, as I recall it, was that in
22 August of 2000, Mr. Haller — there's a record that
23 he weighed 220 pounds.
24       Do you recall that?
25    A   Yes.

303

1     Q   The next available record was in
2  October — excuse me, November of 2001, at which
3  time he weighed 230 pounds. Then in October of
4  2002, at the inception of Seroquel treatment, at
5  400 milligrams a day, there is no record of his
6  weight. Is that right?
7     MR. DelDUCA: Objection to form.
8     THE WITNESS: I wrote down January 2001,
9  230 pounds, but I might be mistaken.
10 BY MR. TRAMMELL:
11    Q   I might be mistaken. I can't rule that
12 out.
13       In February of 2003, he weighed
14 243 pounds. Is that correct?
15    A   Correct.
16    Q   Which is more than the last recorded known
17 weight before the inception of Seroquel treatment.
18 Right?
19    A   Yes.
20    Q   He continued on 400 milligrams of Seroquel
21 until August of 2003, at which time his weight had
22 dropped to 222 pounds, but the Seroquel dose was
23 increased to 600 milligrams. Is that right?
24    A   Yes.
25    Q   After the Seroquel dose was increased, his

304

1  weight increased also to an all time peak weight in
2  December '03, of 251 pounds.
3        Is that your understanding of the records?
4     MR. DelDUCA: Objection, form.
5     THE WITNESS: Yes.
6  BY MR. TRAMMELL:
7     Q   At some point — it's not clear to me, but
8  at some point the dose was reduced back down to 400
9  milligrams, and his weight lowered slightly until
10 August of '04, when he was diagnosed with
11 uncontrolled diabetes. Is that right?
12    MR. DelDUCA: Objection to form.
13    THE WITNESS: Yes
14 BY MR. TRAMMELL:
15    Q   Just so I understand your opinion, you are
16 not testifying that Seroquel was the sole cause of
17 Mr. Haller contracting diabetes; are you?
18    A   No.
19    Q   Your testimony is that Mr. Haller was a
20 person who was at risk without Seroquel treatment of
21 contracting diabetes, and that Seroquel was an
22 exciting factor that pushed him over the edge, so to
23 speak?
24    MR. DelDUCA: Objection to form.
25    THE WITNESS: Yes.

305

1   BY MR. TRAMMELL:
2       Q   There was an exhibit that you were given,
3   it's Exhibit 30, I think, the top one on the pile.
4   If you look at the education paragraph, which is
5   what defense counsel focused on, it says, "The
6   patient is the aware of the risk of Seroquel and
7   Risperdal on lipids and possible diabetes."
8       Did I read that right?
9   A   Yes.
10      Q   Does that sentence provide us with any
11  evidence that the risks or the association between
12  Seroquel and diabetes was actually discussed with
13  the patient at that time?
14      MR. DelDUCA: Objection, form.
15      THE WITNESS: No, it does not.
16  BY MR. TRAMMELL:
17      Q   We also heard some testimony from a
18  Dr. Burke, who was Mr. Haller's prescribing
19  physician, or, excuse me, the nurse practitioner
20  who prescribed Seroquel to Mr. Haller.  Do you
21  recall that?
22  A   Yes.
23      Q   My recollection of the testimony was that
24  Nurse Burke testified that she had discussed the
25  diabetes risk with Mr. Haller at the time she

306

1   prescribed the drug.
2       Do you recall seeing any evidence of that
3   in the medical records?
4       MR. DelDUCA: Objection to form.
5       THE WITNESS: No.
6   BY MR. TRAMMELL:
7       Q   What's in the medical records is that she
8   discussed the risks and benefits with Mr. Haller.
9   Right?
10  A   Correct.
11      Q   There's no elaboration on that.  There's
12  no specific reference to diabetes and its
13  association with Seroquel treatment.  Is that right?
14      MR. DelDUCA: Objection to form.
15      THE WITNESS: Correct.
16  BY MR. TRAMMELL:
17      Q   Outside of AstraZeneca, and in the
18  community of people who prescribed Seroquel at the
19  time, was the understanding of Seroquel's
20  association with diabetes the same as it is today,
21  when Mr. Haller was first prescribed Seroquel?
22  A   No.
23      Q   It was significantly less.  Is that right?
24      MR. DelDUCA: Objection to form.
25      THE WITNESS: Correct.

307

1   BY MR. TRAMMELL:
2       Q   It would have been unusual for someone in
3   Ms. Burke's position to have had access to the
4   information to have been able to give that warning
5   at that time; wouldn't it?
6       MR. DelDUCA: Objection to form.
7       THE WITNESS: Correct.
8   BY MR. TRAMMELL:
9       Q   Do you recall whether, in your practice,
10  in 2001 or 2002, you were discussing the risks or
11  the association between Seroquel and diabetes with
12  patients taking Seroquel?
13      MR. DelDUCA: Objection to form.
14      THE WITNESS: I don't think I was
15  BY MR. TRAMMELL:
16      Q   Just so that we're clear that we're
17  talking about this case, because it's impossible
18  when looking at this evidence and rendering these
19  types of opinions, that you could predict the future
20  and say Mr. Haller either would or would not have
21  ever gotten diabetes under any circumstances.
22  That's impossible to say; isn't it?
23  A   Correct
24      Q   So, when opposing counsel asked you
25  whether you could say that he wouldn't, that's just

308

1   as impossible to say as he would.  Right?
2       MR. DelDUCA: Objection to form.
3       THE WITNESS: Correct
4   BY MR. TRAMMELL:
5       Q   Is it your opinion that the increased risk
6   of developing diabetes with Seroquel treatment is
7   something that was known or knowable to AstraZeneca
8   in light of the generally recognized and prevailing
9   best scientific and medical knowledge available at
10  the time Mr. Haller began his treatment with
11  Seroquel?
12      MR. DelDUCA: Objection, form.
13      THE WITNESS: Yes.
14  BY MR. TRAMMELL:
15      Q   Is it your opinion that the label, as it
16  applies to that risk, was insufficient to place a
17  prescriber on guard against the harmful consequences
18  that might result from the drug, specifically
19  diabetes?
20      MR. DelDUCA: Objection to form
21      THE WITNESS: Did you say "sufficient" or
22  "insufficient"?
23  BY MR. TRAMMELL:
24      Q   Insufficient.
25  A   Yes.

309

1    Q  Is it also your opinion that insufficient
2  warning directly and in a natural and continuous
3  sequence, produced or contributed substantially to
4  producing the diabetes at the time it was contracted
5  by Mr. Haller?
6        MR. DelDUCA: Objection to form.
7        THE WITNESS: Yes.
8  BY MR. TRAMMELL:
9    Q  So it can reasonably be said that but for
10  the inadequate warning, the diabetes would not have
11  occurred at that time?
12        MR. DelDUCA: Objection to form.
13        THE WITNESS: Say that again, please.
14  BY MR. TRAMMELL:
15    Q  So that it can reasonably be said that but
16  for the inadequacy of the warning, the diabetes
17  would not have been sustained at that time, at the
18  time it was sustained by Mr. Haller?
19        MR. DelDUCA: Objection to form.
20        THE WITNESS: Yes.
21  BY MR. TRAMMELL:
22    Q  I want to move on to Ms. McAlexander.
23  Before I do that, is it necessary for you to -- let
24  me ask you this.
25        Is it possible for you, with any degree of

310

1  medical or scientific certainty, to exactly quantify
2  the role of any particular risk factor in the
3  development of an adverse medical event?
4        MR. DelDUCA: Objection to form.
5        THE WITNESS: No.
6  BY MR. TRAMMELL:
7    Q  So, in your opinion, is it a reliable
8  methodology to develop an opinion within a
9  reasonable medical certainty, about the association
10  of a drug with an adverse event, having not done
11  that exact quantification?
12        MR. DelDUCA: Object to form.
13        THE WITNESS: Yes.
14  BY MR. TRAMMELL:
15    Q  We talked a little about the difference
16  between having diabetes and having diabetes under
17  control.
18        Is it your understanding that once a
19  diabetic controls their blood sugars, that that
20  eliminates any adverse effect that the patient has
21  sustained as a result of having gotten diabetes in
22  the first place?
23    A  No, that is not my understanding.
24    Q  Is it your practice when treating patients
25  with Seroquel, to document that you gave them a

311

1  warning about the association between Seroquel
2  treatment and diabetes?
3    A  Yes
4    Q  Is that the standard of care, as far as
5  you know?
6    A  Yes.
7    Q  In fact, that's contained, after the label
8  has changed, in some of these records; isn't it?
9    A  Yes.
10    Q  But it's not contained in Nurse Burke's
11  records; is it?
12        MR. DelDUCA: Objection to form.
13        THE WITNESS: How do I answer that, yes or
14  no? It is not --
15  BY MR. TRAMMELL:
16    Q  It is not contained in the records that
17  you reviewed; is it?
18    A  Correct.
19    Q  With respect to Ms. McAlexander, the
20  weight progression that I have gathered from the
21  records, and this may be incomplete, but in March of
22  2001, I have her weight at 255 pounds.
23        As far as you know, is that what the
24  records reflect?
25    A  Yes.

312

1    Q  In August of 2001, she started Seroquel
2  treatment.  In February of 2002, the Seroquel dose
3  is raised to 300 milligrams per day, and in August
4  of 2003, it's raised to 600 milligrams per day.  Is
5  that correct?
6    A  Yes.
7    Q  And then in September of 2003, she records
8  her first instance of elevated blood sugar since
9  starting Seroquel.  Is that right?
10        MR. DelDUCA: Objection to form.
11        THE WITNESS: Say again.
12  BY MR. TRAMMELL:
13    Q  In September 2003, her glucose reading was
14  127, which was her first elevated reading since
15  starting Seroquel, as far as I can tell.  Is that
16  right?
17    A  Yes.
18        MR. DelDUCA: Object to form.
19  BY MR. TRAMMELL:
20    Q  In September 2003, she also weighed
21  285 pounds.  Is that correct?
22    A  Yes
23    Q  So there is evidence of significant weight
24  gain between the time she started Seroquel and the
25  time she contracted diabetes.  Is that right?

313

1    MR. DelDUCA: Object to the form.
2    THE WITNESS: Yes.
3    BY MR. TRAMMELL:
4    Q   In September of 2005, her weight is up to
5    308 pounds, but the Seroquel dose is reduced to 100
6    milligrams a day. Is that right?
7    A   Yes.
8    Q   Within three months she's lost six pounds.
9    Is that correct?
10   MR. DelDUCA: Objection to form.
11   THE WITNESS: Yes.
12   BY MR. TRAMMELL:
13   Q   Then in August of 2006, she discontinued
14   Seroquel. A year later, in September of 2006, she's
15   down to 290 pounds. Is that correct?
16   A   Yes.
17   Q   The year after that she's down to 280.
18   The year after that she gets down to 274. Is that
19   correct?
20   A   Yes.
21   Q   So, there is evidence of significant
22   weight gain associated with Seroquel and then weight
23   loss once Seroquel is discontinued. Right?
24   A   Yes.
25   Q   Does that information support your opinion

314

1    that Seroquel treatment with respect to
2    Ms. McAlexander, was a substantial contributing
3    cause to producing her diabetes at the time she
4    suffered diabetes?
5    MR. DelDUCA: Objection to form.
6    THE WITNESS: Yes.
7    BY MR. TRAMMELL:
8    Q   Is there any evidence that she was
9    diabetic and not just sporadically hyperglycemic,
10   before she began Seroquel treatment?
11   A   No.
12   MR. DelDUCA: Same objection.
13   BY MR. TRAMMELL:
14   Q   We talked about whether Ms. McAlexander
15   received, or whether informed consent was obtained
16   from Ms. McAlexander during her treatment with
17   Seroquel.
18   Is there any evidence that informed
19   consent was obtained from Ms. McAlexander at the
20   time Seroquel treatment began?
21   MR. DelDUCA: Objection to form
22   THE WITNESS: Back in '01?
23   BY MR. DelDUCA:
24   Q   Right.
25   A   No.

315

1    Q   Would it have been possible using just the
2    information in the product labeling, to have
3    obtained informed consent from Ms. McAlexander in
4    2001?
5    MR. DelDUCA: Objection to form.
6    THE WITNESS: One could have obtained
7    informed consent, but it would not have been
8    complete.
9    BY MR. TRAMMELL:
10   Q   Right. Meaning that it's possible that
11   the prescriber might have had independent knowledge
12   of the risk, but using just the information that was
13   contained in the label, would it have been possible
14   to have obtained informed consent on the issue of
15   Seroquel's association with diabetes?
16   A   No.
17   Q   So then with respect to Ms. McAlexander,
18   is it your opinion that the increased risk of
19   developing diabetes with Seroquel treatment was
20   something that was known or knowable to AstraZeneca
21   in light of the generally recognized and prevailing
22   best scientific and medical knowledge available at
23   the time Ms. McAlexander began Seroquel treatment,
24   which was in August of 2001?
25   A   Yes.

316

1    MR. DelDUCA: Object to the form
2    BY MR. TRAMMELL:
3    Q   Is it your opinion that the information
4    regarding that risk that was disseminated to
5    Ms. McAlexander's prescriber through the label in
6    2001, was sufficient to put that prescriber on guard
7    as to that risk?
8    MR. DelDUCA: Objection to form.
9    THE WITNESS: No.
10   BY MR. TRAMMELL:
11   Q   Is it also your opinion that the
12   insufficient warning of the association between
13   Seroquel and diabetes directly, and in the
14   natural — and in a natural and continuous sequence,
15   produced or contributed substantially to producing
16   the event of Ms. McAlexander's contracting diabetes
17   in September of 2003?
18   MR. DelDUCA: Objection to form.
19   THE WITNESS: Yes.
20   BY MR. TRAMMELL:
21   Q   Is it also your opinion that it can be
22   reasonably said that but for the inadequate warning,
23   Ms. McAlexander would not have suffered diabetes at
24   the time she did, in September of 2003?
25   MR. DelDUCA: Object to form.

317

1    THE WITNESS: Yes.
2  BY MR. TRAMMELL:
3    Q   And you give all the opinions you have
4  given today, within a reasonable degree of medical
5  and scientific certainty. Is that correct?
6    A   Correct.
7    MR. TRAMMELL: I will pass the witness and
8  let you all decide whether you make your
9  flight.
10    MR. DelDUCA: A couple of follow-up
11  questions.
12    MR. HETRICK: We need to talk, I think.
13    MR. DelDUCA: Okay, let's talk.
14    (Thereupon, a short recess was
15    taken.)
16    REDIRECT (ISRAEL JACK ABRAMSON)
17  BY MR. DelDUCA:
18    Q   I'd like to follow up on some of the
19  questions that were just asked by Mr. Trammell.
20    A   Sure.
21    Q   One of the questions Mr. Trammell asked
22  you was about the adequacy of the label. Do you
23  remember that?
24    A   Yes.
25    Q   He wasn't specific as to time, so I want

318

1  to make sure I have the timing right. Okay.
2    Are you saying that the label for Seroquel
3  was inadequate at the time that the warning with
4  regard to association with diabetes and weight gain
5  was placed on the label in January of '04?
6    A   No.
7    Q   So, the label was adequate as of that
8  time. That's what you are saying?
9    MR. TRAMMELL: Objection.
10    THE WITNESS: Yes.
11  BY MR. DelDUCA:
12    Q   I'm going to start with Ms. McAlexander,
13  because we did her last, and then I'll go back to
14  Mr. Haller. Okay?
15    You testified earlier that when
16  Ms. McAlexander -- after she was diagnosed with
17  diabetes in September of '03, we went over the
18  testimony of her doctor, and the fact that the
19  doctor reported that she provided her information
20  about the association between diabetes and Seroquel
21  after her diabetes diagnosis in September of 2003.
22    Do you recall that?
23    A   Yes.
24    Q   And you recall that Ms. McAlexander
25  decided to continue taking Seroquel from that point,

319

1  for another three years?
2    A   Yes.
3    Q   And you are not questioning that as of
4  that point, Ms. McAlexander gave informed consent.
5  Right?
6    A   Correct.
7    Q   You're saying that you believe
8  Ms. McAlexander didn't give informed consent between
9  the time that she started taking Seroquel in August
10  of '01, and September of '03. Right?
11    A   Correct.
12    Q   With the knowledge that we have that
13  Ms. McAlexander, having given informed consent after
14  September of '03, made the decision to stay on
15  Seroquel, is there any way you can say to a
16  reasonable degree of medical certainty, that
17  Ms. McAlexander would have refused Seroquel in
18  August of '01, even if she had been given all the
19  information that was later placed on the label in
20  January of '04?
21    A   Correct. There's no way I can say that.
22    Q   Earlier I asked you some questions, a
23  whole bunch of questions, about the question of can
24  you say but for Seroquel, Ms. McAlexander would not
25  have gotten diabetes, and you said no. You can't

320

1  say that. Correct?
2    A   Correct.
3    Q   And I said it a different way. I said, is
4  there any way you can say that even if she had never
5  taken Seroquel, Ms. McAlexander wouldn't have gotten
6  diabetes, and you said no, there's no way you could
7  say that. Correct?
8    A   Correct.
9    Q   So, there isn't any way that you can say
10  that but for what you say is the inadequate warning
11  between August of '01 and September of '03, there's
12  no way you can say that but for that,
13  Ms. McAlexander would have -- I'm sorry. Let me
14  start over again.
15    There's no way you can say that but for
16  the, what you call the inadequate warning,
17  Ms. McAlexander would not have gotten diabetes in
18  September of '03; is there?
19    A   What I can say is that the warning, the
20  inadequacy of the warning, led to a misinformed
21  decision, which added the risk of the Seroquel, and
22  then she ultimately developed diabetes.
23    Q   You can't say that Ms. -- even if she
24  never took Seroquel, Ms. McAlexander could have
25  gotten diabetes in September 2003?

## 321

1    A  Correct. She might have, but those aren't
2  the facts of the case.
3    Q  And you can't say that even if
4  Ms. McAlexander had every piece of information
5  available with regard to any association between
6  Seroquel and diabetes, even if she had all that
7  information, you can't say that Ms. McAlexander
8  wouldn't have decided with her doctors to go ahead
9  and take Seroquel?
10    A  Correct. She may have or she may have
11  not.
12    Q  All right. Let's do it point by point.
13      Mr. Haller. Mr. Haller continued to take
14  Seroquel after January of 2004. Correct?
15    A  Yes.
16    Q  He continues to take it today?
17    A  Yes.
18    Q  Even though his lawyers told him to get
19  off it because it would help his lawsuit. Right?
20      MR. TRAMMELL: Objection.
21  BY MR. DelDUCA:
22    Q  That's what he reported to his doctor?
23    A  Correct.
24    Q  And you agree that Mr. Haller has given
25  informed consent to any diabetes risk associated

## 322

1  with Seroquel?
2      MR. TRAMMELL: Objection.
3      THE WITNESS: As of what time?
4  BY MR. DelDUCA:
5    Q  Since at least 2004.
6    A  Yes.
7    Q  And according to his health care
8  providers, from the very beginning, from the day he
9  was prescribed Seroquel. Correct?
10    A  According to the testimony, yes.
11    Q  And there isn't any way that you can say
12  that Mr. Haller would have decided not to take
13  Seroquel in October of 2002, if he had been given
14  all of the information that you say was known to
15  AstraZeneca at that time, and which you say was not
16  provided to health care providers. Correct?
17    A  He may or he may not have.
18    Q  You certainly can't say that he would have
19  refused to take Seroquel with that information
20  available to him.
21    A  Correct.
22    Q  Because we know he did continue to take
23  Seroquel with adequate information available to him,
24  and has done it for four years?
25      MR. TRAMMELL: Objection.

## 323

1      THE WITNESS: That's a completely
2  different set of circumstances. He had
3  already developed the diabetes and made a
4  decision to continue.
5  BY MR. DelDUCA:
6    Q  But he still -- with all that knowledge,
7  he still made a decision to continue with Seroquel
8  despite the knowledge of an association with
9  diabetes?
10    A  Correct. But I don't think that supports
11  he would have made the same decision months or weeks
12  or years earlier, when the circumstances and the
13  variables were different.
14    Q  You don't have any evidence or information
15  whatsoever, that indicates that he would have made
16  the decision to refuse Seroquel either; do you?
17    A  Correct. That's not what I said. What I
18  said was --
19    Q  It's a different question.
20    A  Correct.
21    Q  I have to ask you the same questions I
22  just asked you about Ms. McAlexander, about
23  Mr. Haller, to make a clean record.
24      I already asked you about the informed
25  consent aspect of it.

## 324

1      You testified earlier that Mr. Haller may
2  very well -- may have developed diabetes at the time
3  that he did, even if he had never taken Seroquel.
4    A  Correct.
5    Q  So, you can't say that but for the
6  Seroquel, Mr. Haller would not have developed
7  diabetes when he did. Right?
8      MR. TRAMMELL: Objection.
9      THE WITNESS: I'm trying to remember the
10  response that I gave you the first time around,
11  to be consistent.
12  BY MR. DelDUCA:
13    Q  You've been consistently a little confused
14  by the question. I think that's fair to say. I'll
15  say it again just to -- you agree that you can't say
16  that but for the Seroquel, Mr. Haller would not have
17  developed diabetes when he did?
18      MR. TRAMMELL: Objection.
19      THE WITNESS: Correct.
20  BY MR. DelDUCA:
21    Q  Mr. Trammell asked you some questions
22  about Ms. McAlexander's weights and glucose levels.
23      Do you remember that?
24    A  Yes.
25    Q  One of the things he said was that

37 (Pages 321 to 324)

325

1  Ms. McAlexander's first elevated glucose level after
2  starting Seroquel was in September of 2003, and you
3  agreed with that.
4      A   Okay.
5      Q   That's not right.
6      A   I don't recall. I mean, I'm assuming that
7  what I'm being presented with is correct
8  information.
9      Q   All right. So, when you answered that,
10  you were just assuming Mr. Trammell was getting it
11  right?
12      A   Correct.
13      MR. DelDUCA:  Off the record.
14          (Discussion held off the
15          record.)
16          (Whereupon, Deposition Exhibit
17          31 was marked for
18          identification.)
19  BY MR. DelDUCA:
20      Q   I'm giving you Exhibit 31, and page 1 of
21  Exhibit 31, which is Social Security Disability 155,
22  is the Bates number on it. It is a lab report.
23      If you look at the bottom, under
24  "Chemistry," it lists a blood glucose level on
25  July 26, 2001, of 125.

326

1      Do you see that?
2      A   Yes.
3      Q   That's prior to the prescription for
4  Seroquel. Correct?
5      A   Yes, it is.
6      Q   If you turn the page, you have a document
7  that has the Bates number Southern Dutchess Family
8  Practice 26. Am I right?
9      A   Yes.
10      Q   And this has on the bottom right-hand
11  corner, a two hour PC blood sugar of 172. Do you
12  see that?
13      A   Yes.
14      Q   That means -- "PC" means after eating.
15  Correct?
16      A   Correct.
17      Q   The date on this is, I think, in error,
18  but it's -- it says January 12, 2001, but in
19  progression, it's after the October '01, so it
20  appears to me to be '02.
21      Do you agree with that?
22      A   Yes. Or it could be December 1. Who
23  knows?
24      Q   It could be December 1.
25      A   Because the next note is December 13.

327

1      Q   Fair enough.
2      A   The next page.
3      Q   Or it could be October 12, too. I'm not
4  sure. It doesn't appear to be '01, though, because
5  that would be going backwards in time.
6      A   The next note in your progression on the
7  next page is December 13, '01. So, this is likely
8  '01.
9      Q   All right. Fair enough. Then if we think
10  that's January 12, '01, that's prior to the
11  diagnosis --
12      A   No, I don't think it's January 12, '01,
13  but I think it's between October 25, '01 and
14  December 13, '01, because that's the progression.
15      Q   Maybe a 1 is cut off. Maybe it's 11. In
16  any event, that is an elevated blood sugar.
17  Correct?
18      A   Yes. Actually, it is 11/12/01, because if
19  you look at the typed note, it says 11/12/01.
20      Q   So we have two elevated blood sugars. We
21  have this elevated blood sugar after the diagnosis
22  of diabetes. Correct?
23      A   Correct.
24      Q   I'm sorry. I said it wrong. After the
25  Seroquel prescription.

328

1      A   Yes.
2      Q   Then December 13, '01. The next exhibit
3  should be Southern Dutchess Family Practice, page
4  25. The top right corner, 6 hour PC blood sugar,
5  148.
6      A   Correct.
7      Q   The next document you should have is -- is
8  it Social Security Disability 147?
9      A   Yes.
10      Q   And it shows a blood sugar on February 11,
11  2002, of 103. Correct?
12      A   Correct.
13      Q   Which is actually a normal reading?
14      A   Correct.
15      Q   Borderline.
16      So, then the next document you should have
17  is Social Security Disability 138.
18      A   Yes.
19      Q   Middle of the page, fasting glucose, 127.
20  Do you see that?
21      A   Yes.
22      Q   And that document is dated May 25, '02.
23      A   May 28.
24      Q   Yes, you're right. May 28, '02.
25      That's prior to the diagnosis of diabetes.

329

1　Correct?
2　　A　Correct.
3　　Q　If you would turn the page -- this is --
4　we have April 24, '03. I'm sorry. The page number
5　is Southern Dutchess Family Practice page 21. It's
6　a record from April 24, 2003, and it indicates a
7　blood sugar of 152?
8　　A　That's correct. At that time she was on
9　steroids.
10　　Q　The next record is Southern Dutchess
11　Family Practice page 20, and it indicates on May 8,
12　'03, a blood sugar of 122. Correct?
13　　A　Well, there's a record in between. You're
14　skipping some days, but that's okay.
15　　Q　I'm looking at May 8, and I'm looking at
16　the blood sugar up here.
17　　A　Okay.
18　　Q　Do you see another blood sugar on there?
19　　A　No. Just that there's other records.
20　　Q　You're right. This contains records from
21　various dates. Correct?
22　　A　Yes.
23　　Q　The one I'm focusing on right now is in
24　the middle of the page, May 8, '03, and it shows a
25　blood sugar of 122?

330

1　　A　Correct. Still on Prednisone.
2　　Q　May 10, '03, fasting blood sugar of 140?
3　　A　Correct. She had been on a Prednisone
4　taper between the eighth and the tenth.
5　　Q　The next page is Southern Dutchess Family
6　Practice 36. Did I do that right?
7　　A　Yes. 36.
8　　Q　The date of it is May 20, 2003. Right?
9　　A　May 2, 2003.
10　　Q　I'm sorry. I'm trying to read it upside
11　down.
12　　A　It says "Admission" and "Discharge," so it
13　relates to a hospitalization.
14　　Q　It says a discharge date of May 2, 2003.
15　Do you see that?
16　　A　Yes.
17　　Q　In the middle of the page there's a
18　description of the laboratory studies. It says,
19　"Laboratory studies revealed a blood sugar of 184."
20　　A　Correct.
21　　Q　Again, this is -- it also goes on to say,
22　"Patient was also on Accu-Check coverage and some
23　blood sugars were over 200."
24　　A　Correct. And she had cellulitis.
25　　Q　She was on Prednisone?

331

1　　A　Correct. Both of which can raise blood
2　sugar.
3　　Q　That's an explanation for the increased
4　blood sugars?
5　　　MR. TRAMMELL: Objection.
6　　　THE WITNESS: It's a possible explanation.
7　BY MR. DelDUCA:
8　　Q　Turn the page to Southern Dutchess Family
9　Practice 19. There is a record from, I believe it's
10　June 9, it's cut off a little bit, but June 9,
11　between a May record, and the next one is also cut
12　off a little bit. It's better on my copy --
13　　A　It's actually May 19, 2003. If you look
14　at the typed note, the dates are there.
15　　Q　Fair enough. It's May 19, 2003, and
16　indicates a blood sugar of 113. Correct?
17　　A　Correct.
18　　Q　And on June 18, 2003, it indicates a
19　glucose of 121.
20　　A　Correct.
21　　Q　The next page, I'm almost finished, is an
22　actual lab report from September 8, 2003. Correct?
23　　A　Correct.
24　　Q　Just prior to her diagnosis. It shows a
25　glucose level of 127. Right?

332

1　　A　Correct.
2　　Q　If you go to the second page, it shows
3　hemoglobin A1C at 7.1. Correct?
4　　A　Correct.
5　　Q　And it shows micro-albumin, positive, at
6　20 milligrams per liter?
7　　A　20 milligrams.
8　　Q　So, there are extensive records showing
9　elevated blood sugars between the time -- both
10　before Ms. McAlexander was given Seroquel up until
11　the time that she was diagnosed with diabetes.
12　　　MR. TRAMMELL: Objection.
13　BY MR. DelDUCA:
14　　Q　We've just gone over many of them.
15　　A　Yes.
16　　Q　And they show essentially a natural
17　progression of elevated blood sugars over time.
18　　A　Well, I think that their relevance is
19　somewhat questionable. Much of the time -- many of
20　the recordings were while she was on steroids, while
21　she had an infection. A lot of them are not fasting
22　blood sugars. They are abnormal, but the exact
23　relevance of what they mean is not clear to me.
24　　Q　The relevance -- their relevance for
25　purposes of an endocrine decision, is something that

333

1  you would leave to either a primary care physician
2  who specializes in diabetes management, or to an
3  endocrinologist?
4      A  Yes.
5      Q  But it certainly can't be said that she --
6  that her first elevated glucose level from the time
7  that she was given Seroquel until the time that she
8  was diagnosed with diabetes, was in September of
9  '03. That can't be said; can it?
10     MR. TRAMMELL: Objection.
11     THE WITNESS: Correct.
12 BY MR. DelDUCA:
13     Q  Mr. Trammell also asked you about a few
14 weights, and he associated them with changes in
15 dosage of Seroquel. Do you remember that?
16     A  Yes.
17     Q  You haven't done that analysis; have you?
18     A  No.
19     Q  You have not gone through the records to
20 actually look at all of the dates and all of the
21 changes in Seroquel levels; have you?
22     A  Correct. I have not.
23     Q  I will represent to you that Mr. Trammell
24 did not give you anywhere near all of the weights
25 that were in that time frame.

334

1      A  Correct.
2      Q  So, even with the information Mr. Trammell
3  gave you and the clarification that I'm giving you,
4  that he didn't give you all the weights, there's no
5  way for you to give an opinion that correlates any
6  weight change to any change in dosage of Seroquel;
7  is there?
8      MR. TRAMMELL: Objection.
9      THE WITNESS: Correct.
10 BY MR. DelDUCA:
11     Q  The same goes for changes in blood sugar.
12 There's no way for you to give an opinion on any
13 correlation between any changes in her blood sugar
14 and any changes in her dosage of Seroquel?
15     MR. TRAMMELL: Objection.
16     THE WITNESS: Yes.
17 BY MR. DelDUCA:
18     Q  Mr. Trammell asked you some questions
19 about -- one was, is it possible to quantify the
20 exact role of a risk factor in developing a medical
21 condition, and you said no.
22     A  Yes.
23     Q  In fact, there isn't any way to tell with
24 regard to diabetes, whether a risk factor was an
25 actual cause of any particular person's diabetes?

335

1      MR. TRAMMELL: Objection.
2      THE WITNESS: Correct.
3  BY MR. DelDUCA:
4      Q  Including Mr. Haller and including
5  Ms. McAlexander.
6      A  Correct.
7      Q  Mr. Trammell asked you whether someone who
8  had diabetes and then had diabetes under control,
9  whether that would eliminate the damage -- any
10 damage done by the diabetes in the first place.
11     Do you remember that question?
12     A  Yes.
13     Q  You haven't testified today, and you
14 haven't given an opinion in your reports, as to any
15 damage done to either Mr. Haller or Ms. McAlexander,
16 with regard to their diabetes. Correct?
17     A  No, I have not, but I was able to answer
18 his question, because I know the answer to it.
19     Q  Sure. He asked you a general question.
20     A  Correct.
21     Q  His general question was, if somebody is
22 damaged by diabetes, and then later they get it
23 under control, that may not fix the damage done.
24 Right? As a general statement, you can answer that
25 question.

336

1      A  Correct.
2      Q  You can't answer that question for
3  Mr. Haller or Ms. McAlexander; can you?
4      A  No.
5      Q  Mr. Trammell asked you whether you were
6  discussing with your patients in 2001 or 2002, any
7  association between Seroquel and diabetes.
8      A  Yes, he did.
9      Q  And you said no.
10     A  Correct.
11     Q  So, you told us that in April of 2002, you
12 read the Sernyak publication, and you feel that with
13 that publication, a possible association between
14 Seroquel and Type 2 diabetes began to emerge?
15     A  Correct.
16     Q  So, with that knowledge of a possible
17 association as early as April 2002, were you
18 providing your patients with that information?
19     A  Well, I was relying on the information
20 given to me by AstraZeneca, which was that weight
21 gain may be an issue, Seroquel might in fact help
22 with the weight gain in some patients when they are
23 given atypical antipsychotic medication, but I was
24 not given any information about them as to the
25 relationship between Seroquel and diabetes.

337

1    So, I was using the information on the
2    label. I was using the information given to me in
3    my discussions with AstraZeneca pharmaceutical
4    representatives, but the issue of the diabetes was
5    just being brought to awareness.
6        So, I don't -- at least through the first
7    half of 2002, I can tell you that I don't think I
8    was talking to my patients about it. Perhaps
9    between then and the end of the year things were
10   changing. I can't remember an exact date.
11       Q   Once you got the information from the
12   Sernyak publication, did you provide that to your
13   patients?
14       A   The Sernyak article said that more
15   research was necessary to understand the connection.
16       Q   At any given time, the scientific
17   community cannot necessarily know everything that
18   could possibly ultimately be known about a
19   medication. Correct?
20       A   Correct.
21       Q   Information becomes available; it develops
22   over time.
23       A   Correct.
24       Q   It's always true that more, almost always
25   true, that more studies can be done, more

338

1    information can be obtained. Correct?
2        A   Correct.
3        Q   Studies are still done on aspirin. Right?
4        A   I don't think very many studies are done
5    on aspirin.
6        Q   So, you had additional information after
7    you got that, you read that publication. Right?
8        A   Yes.
9        Q   Are you saying because it was equivocal
10   information, you didn't provide it to your patients?
11       A   No. I'm saying that because in my
12   estimation the data was not there, I didn't discuss
13   it with my patients
14       I would have loved to have more
15   information, the information that AstraZeneca had.
16   That would have made my job much easier.
17       Q   Are you saying that if you obtained
18   information about any possible association between
19   atypicals and diabetes, before that information came
20   on the label, you wouldn't give it to your patients?
21       MR. TRAMMELL: Objection.
22       THE WITNESS: No, I'm not saying that at
23   all.
24   BY MR. DelDUCA:
25       Q   Mr. Trammell asked you whether it would

339

1    have been unusual for someone like Ms. Burke to have
2    access to that type of information in October of
3    '02, and he was referring to information about an
4    association between Seroquel and diabetes, and you
5    said yes, it would have been unusual.
6        You don't have any way of disputing
7    Ms. Burke's — you don't have any basis for
8    disputing Ms. Burke's testimony that she was aware
9    of this association; do you?
10       A   Other than I know what information was
11   available to people, to practitioners, so she had
12   information that none of us had.
13       Q   I guess what I'm just trying to get, and
14   Mr. Trammell was asking you about whether —
15   basically, was asking you whether — I'll start the
16   question over again.
17       Are you saying that Ms. Burke is lying?
18       A   No.
19       MR. TRAMMELL: Objection.
20       THE WITNESS: Not at all
21   BY MR. DelDUCA:
22       Q   Mr. Trammell asked you whether Seroquel
23   was an exciting factor that pushed Mr. Haller over
24   the edge, the edge being diabetes.
25       A   Yes, he did

340

1        Q   You said yes.
2        A   Yes, I did
3        Q   But you've also testified that Mr. Haller
4    could have developed diabetes without ever having
5    taken Seroquel.
6        A   Yes.
7        Q   So — and he could have developed diabetes
8    without taking Seroquel, and he could have developed
9    it at the time that he did.
10       A   Correct
11       MR. TRAMMELL: Objection
12       THE WITNESS: Those are all theoretical
13   guesses. The facts of the case are that he
14   developed the diabetes after taking Seroquel.
15   BY MR. DelDUCA:
16       Q   There's no way you can say he would not
17   have developed diabetes at that time, even if he had
18   never taken Seroquel?
19       A   Correct But once again, that's
20   hypothesizing and guessing, as opposed to the actual
21   facts
22       Q   The facts are that he took Seroquel and
23   later he got diabetes?
24       A   Correct
25       Q   He was diagnosed with diabetes.

341

1    A   Correct.
2    Q   Those are the facts.
3    A   Yes.
4    Q   It's only that temporal proximity, that
5    temporal relationship between taking Seroquel, and
6    getting diabetes, that is the basis for your opinion
7    then?
8    A   No. But you're asking me to agree to
9    statements that I can't say this with certainty or I
10   can't say that with certainty, but they're all
11   extremely hypothetical scenarios. And, of course,
12   you can't say the negative with certainty. You
13   can't prove a negative. That's the first thing
14   undergraduate statisticians learn in college. You
15   can't prove a negative.
16   Q   Well, you can't prove the positive,
17   either, that — can you, that — you certainly
18   aren't saying that Seroquel was the only cause for
19   Mr. Haller getting diabetes; are you?
20   A   Absolutely not.
21   Q   People like him, with his risk factor
22   profile, develop diabetes all the time?
23   A   Correct.
24   Q   Is there really any way to say that with
25   all those risk factors that he had — I mean, he had

342

1    a tremendous constellation of risk factors for
2    diabetes.
3        Do you agree with that?
4        MR. TRAMMELL: Objection.
5        THE WITNESS: Yes. He had many risk
6    factors.
7    BY MR. DelDUCA:
8    Q   That it was only the Seroquel that pushed
9    him over the edge?
10       MR. TRAMMELL: Objection.
11   BY MR. DelDUCA:
12   Q   As a medical doctor, can you say that?
13       MR. TRAMMELL: Objection.
14       THE WITNESS: No, I'm not saying that.
15       MR. DelDUCA: That's all I have.
16       MR. TRAMMELL: Just a couple of quick
17   ones.
18       RECROSS (ISRAEL JACK ABRAMSON)
19   BY MR. TRAMMELL:
20   Q   Defense counsel asked about the difference
21   between making a decision to continue a drug after
22   you've suffered the adverse event and making a
23   decision to take a drug before you have.
24       Do you recall those questions?
25   A   Yes, I do.

343

1    Q   In your experience, is that a different
2    analysis for a patient, and can you talk about how
3    the patient might analyze that choice differently
4    after they've already suffered the adverse event?
5        MR. DelDUCA: Objection to form.
6        THE WITNESS: As I responded to the
7    questions, I feel it's an entirely different
8    scenario for the patient.
9        In one they're presented with a fait
10   accompli, and that changes the entire
11   decision-making process.
12       It can change it in very many ways. A
13   patient might say, "Well, I already have this
14   complication. I can manage it. I can live
15   with it. I'm going to continue," is one
16   scenario that a patient might say.
17   BY MR. TRAMMELL:
18   Q   But the fact — in other words, just in
19   terms of, you know, kind of setting out the sequence
20   of logic that a patient might go through, it's not
21   accurate to say that just because a patient decides
22   that they can live with the side effect, means that
23   they would have decided that they would risk
24   experiencing the side effect in the first place; is
25   it?

344

1        MR. DelDUCA: Objection.
2        THE WITNESS: Correct.
3    BY MR. TRAMMELL:
4    Q   We also dealt at length with what might
5    have happened if the patients never took Seroquel,
6    if Mr. Haller and Ms. McAlexander never took
7    Seroquel, might they have gotten diabetes anyway.
8    You indulged defense counsel in answering those
9    questions, but your opinions are based on the facts
10   of the case, and in the real world they did take
11   Seroquel. Right?
12   A   Correct.
13   Q   Is there anything the defense counsel
14   asked you, where in answering his questions, that
15   changes the testimony you gave in response to my
16   questions earlier?
17   A   No.
18       MR. DelDUCA: Object to the form.
19   BY MR. TRAMMELL:
20   Q   No?
21   A   No.
22       MR. TRAMMELL: That's it.
23       MR. DelDUCA: Okay.
24       THE REPORTER: Mr. Trammell, do you want
25   the disks copied and attached to your

### 345

1  transcript?
2  MR. TRAMMELL:  No, I don't need the disks.
3  THE REPORTER:  I'll attach the other
4  exhibits to the transcript.
5  MR. TRAMMELL:  Okay.
6  (Witness excused.)
7  (Thereupon, at 1:15 p.m., the
8  deposition was concluded.)
9  -----------

### 346

1  C E R T I F I C A T E
2  - - - - -
3
4  STATE OF FLORIDA    )
5  COUNTY OF MIAMI-DADE )
6
7  I, hereby certify that I have read the
8  foregoing transcript of my deposition by me given,
9  and that the statements contained therein are true
10  and correct to the best of my knowledge and belief,
11  with any exception of any corrections or notations
12  made on the errata sheet, if any.
13
   Dated this _____ day of _____ 2008.
14
15
16  _____
   ISRAEL JACK ABRAMSON
17
18
19
20  The foregoing certificate was subscribed to
21  before me this _____ day of _____ 2008.
22
23  _____
   Notary Public-State of Florida
24
25

### 347

1  ISRAEL JACK ABRAMSON
   c/o FLETCH TRAMMELL, ESQ
2  440 Louisiana Street
   Suite 2100
3  Houston, Texas 77002
4            October 10, 2008
5  RE: SEROQUEL LITIGATION
6  Please take notice that on the 8th day of
   October, 2008 you gave your deposition in the
7  above-styled case  At that time, you did
   not waive your signature. It is now necessary that
8  you sign your deposition.
9  Please call our office at the below listed number
   to schedule an appointment between the hours of
10  9:00 a.m. and 4:30 p.m., Monday
   through Friday, at the Esquire office located
11  nearest to you.
12  If you do not appear to read and sign your
   deposition in thirty (30) days, the original,
13  which has already been forwarded to the
   ordering attorney, may be filed with the
14  Clerk of the Court  If you wish to
   waive your signature at this time, you may sign
15  your name in the blank at the bottom of this page
   and return it to us
16
   Very truly yours,
17
   BRIAN G. BERKOWITZ
18  ESQUIRE DEPOSITION SERVICES
   44 West Flagler Street
19  Miami, Florida 33130
   305-371-2713
20
21        Notary Public
22  I do hereby waive my signature:
23  _____
   The deponent did ( ) Did not ( )
24  appear to sign the deposition.
25        Court Reporter

### 348

1        E R R A T A  S H E E T
2  DEPOSITION OF: ISRAEL JACK ABRAMSON
3  TAKEN: October 8, 2008
4
   DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
5
   PAGE#  LINE#   CHANGE      REASON
6
7
8
9
10
11
12
13
14
15
16
17
18
19
   Please forward the original signed errata sheet to
20  this office so that copies may be distributed to
   all parties.
21
   Under penalty of perjury, I declare that I have
22  read my deposition and that it is true and correct
   subject to any changes in form or substance entered
23  here
24  DATE:_____  SIGNATURE OF DEPONENT:_____
25

349

```
 1
 2                    CERTIFICATE OF OATH
 3
 4      STATE OF FLORIDA     )
 5      COUNTY OF MIAMI-DADE )
 6
 7           I, the undersigned authority, certify that
 8      ISRAEL JACK ABRAMSON personally appeared before me
 9      and was duly sworn.  Witness my hand and official
10      seal this 10th day of October, 2008.
11
12
13           _____
                  Brian Gary Berkowitz
14                Notary Public - State of Florida
15
16
17
18
19
20
21
22
23
24
25
```

350

```
 1              CERTIFICATE
 2
 3      STATE OF FLORIDA     )
 4      COUNTY OF MIAMI-DADE )
 5
 6           I, Brian Gary Berkowitz, Shorthand Reporter, do
        hereby certify that ISRAEL JACK ABRAMSON was by me
 7      first duly sworn to testify the whole truth; that I
        was authorized to and did stenographically report
 8      the foregoing deposition in stenotype; and that the
        foregoing pages, numbered from 180 to 345 inclusive,
 9      are a true and correct transcription of my shorthand
        notes of said deposition.
10
             I further certify that said deposition was
11      taken at the time and place hereinabove set forth
        and that the taking of said deposition was commenced
12      and completed as hereinabove set out.
13           I further certify that I am not a relative,
        employee, attorney or counsel of any of the parties,
14      nor am I a relative or employee of any of the
        parties or counsel connected with the action, nor am
15      I financially interested in the action.
16           The foregoing certification of this transcript
        does not apply to any reproduction of the same by
17      any means unless under the direct control and/or
        direction of the certifying reporter.
18
             IN WITNESS WHEREOF, I have hereunto set
19      my hand this 10th day of October, 2008.
20
21           _____
                  Brian Gary Berkowitz
                  Notary Public - State of Florida
22
23
24
25
```