# EXHIBIT 7

1

08-I-99476 sh

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This document relates to:

Richard Unger v. AstraZeneca LP, et al.   Case No. 6:07-cv-15812
Linda Whittington v. AstraZeneca LP, et al.   Case No. 6:07-cv-10475

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

MITCHELL ALAN YOUNG, M.D.

October 13, 2008

Volume 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of MITCHELL ALAN YOUNG, M.D.,

produced as a witness at the instance of the Defendants, and

duly sworn, was taken in the above-styled and numbered causes

on the 13th of October, 2008, from 9:00 a.m. to 5:18 p.m.,

before Shanon M. Hair, CSR in and for the State of Texas,

reported by machine shorthand, at the office of Fibich,

Hampton & Leebron, L.L.P., 1401 McKinney Street, Suite 1800,

Houston, Texas  77010-9998, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record or

attached hereto.

**Page 2**

INDEX

Appearances ........................................................5
MITCHELL ALAN YOUNG, M.D.
   Examination by Mr. Raber.........................6
   Examination by Mr. Elder.......................194
Signature and Changes...............................236
Reporter's Certificate..................................238

EXHIBITS

NO.  DESCRIPTION               PAGE

1.......................................................................6
   Amended Notice of Deposition of Mitchell Alan
   Young, M.D.
2.....................................................................13
   File materials
3.....................................................................20
   Expert Report of Mitchell Alan Young, M.D.
   (Unger)
4.....................................................................31
   08-12-08 invoice to K. Camp Bailey from
   Mitchell Alan Young, M.D.
5...................................................................112
   Article entitled "Effectiveness of
   Antipsychotic Drugs in Patients with Chronic
   Schizophrenia"
6...................................................................115
   Article entitled "Effectiveness of Olanzapine,
   Quetiapine, Risperidone, and Ziprasidone in
   Patients With Chronic Schizophrenia Following
   Discontinuation of a Previous Atypical
   Antipsychotic"
7...................................................................129
   Article entitled "Risk of Treatment-Emergent
   Diabetes Mellitus in Patients Receiving
   Antipsychotics
8...................................................................151
   06-19-06 History and Physical  (Unger)
9...................................................................160
   12-04-06 Mercy Hospital Preadmission Record
   (Unger)

**Page 3**

INDEX
(Continued.)

EXHIBITS

NO.  DESCRIPTION               PAGE

10.................................................................165
   07-02-02 West Broward Orthopaedics & Spine
   medical record  (Unger)
11.................................................................166
   05-27-02 medical record  (Unger)
12.................................................................169
   07-14-03 letter to Dr. Rafael Mas from Terence
   Peppard, M.D., P.A.
13.................................................................176
   10-01-04 Social Security Administration
   Function Report - Adult  (Unger)
14.................................................................189
   05-03-07 letter to Helen Showers from Arnold
   S. Zager, M.D., P.A.
15.................................................................192
   12-18-07 letter to Helen Showers from Arnold
   S. Zager, M.D., P.A.
16.................................................................194
   Expert Report of Mitchell Alan Young, M.D.
   (Whittington)
17.................................................................198
   Medication Log  (Whittington)
18.................................................................199
   01-02-02 Progress Note  (Whittington)
19.................................................................201
   Medication Log  (Whittington)
20.................................................................203
   02-17-06 Lab Order Detail  (Whittington)
21.................................................................206
   Article entitled "Diagnosis and Classification
   of Diabetes Mellitus"
22.................................................................209
   09-16-93 lab report  (Whittington)
23.................................................................210
   08-31-93 General Clinical Psychiatric
   Evaluative Interview Monitoring  (Whittington)
24.................................................................213
   11-21-96 Laboratory Report  (Whittington)
25.................................................................214
   11-20-96 medical record  (Whittington)
26.................................................................225
   09-28-90 Nursing Assessment Forms
   (Whittington)

**Page 4**

INDEX
(Continued.)

EXHIBITS

NO.  DESCRIPTION               PAGE

27.................................................................226
   09-11-01 Progress Notes  (Whittington)
28.................................................................226
   02-15-02 Progress Notes  (Whittington)
29.................................................................227
   07-08-02 Progress Notes  (Whittington)
30.................................................................230
   03-24-08 medical record  (Whittington)

**Page 5**

A P P E A R A N C E S

FOR THE PLAINTIFFS:
   Tommy Fibich, Esq.
   Sara J. Fendia, Esq.
   FIBICH, HAMPTON & LEEBRON, L.L.P.
   1401 McKinney Street, Suite 1800
   Houston, Texas  77010-9998
   (713) 751-0025, fax (713) 751-0030
   tfibich@fhl-law.com

FOR THE DEFENDANTS:
   Stephen D. Raber, Esq.
   WILLIAMS & CONNOLLY LLP
   725 Twelfth Street, N.W.
   Washington, D.C.  20005
   (202) 434-5538, fax (202) 434-5029
   sraber@wc.com

       -and-

   Scott A. Elder, Esq.
   ALSTON & BIRD LLP
   1201 West Peachtree Street
   Atlanta, Georgia  30309-3424
   (404) 881-7000 fax (404) 253-8580
   scott.elder@alston.com

6

1    (Young Exhibit No. 1 marked.)
2    (9:00 a.m.)
3    MITCHELL ALAN YOUNG, M.D.,
4    having been first duly sworn, testified as follows:
5    EXAMINATION
6    BY MR. RABER:
7    Q.  Good morning, Dr. Young.  My name is Steve Raber and
8    I'm an attorney who represents AstraZeneca in the lawsuits
9    relating to the drug Seroquel.  Would you please state your
10   full name for the record?
11   A.  Good morning, sir.  My full name for the record is
12   Mitchell Alan Young, M.D.  That's M-i-t-c-h-e-l-l, middle name
13   A-l-a-n, last name Young, Y-o-u-n-g.
14   Q.  Dr. Young, you understand that you are under oath
15   today?
16   A.  Yes, sir.
17   Q.  And that the testimony you are giving today is just
18   as though you were testifying live in a courtroom?
19   A.  I understand.
20   Q.  I'm going to ask that if for some reason you don't
21   understand any of my questions today, that you please let me
22   know and give me a chance to fix it.  Is that fair?
23   A.  Will do.
24   Q.  And if you don't ask for clarification, I'm going to
25   assume that you understood my question.  Is that fair?

7

1    A.  Yes, sir.
2    Q.  If you want to take a break at any time, just let us
3    know and we'll do that, okay?
4    A.  Okay.
5    Q.  And let me ask you this:  Are you taking any
6    medication that would interfere with your ability to give
7    truthful or accurate answers today?
8    A.  No.
9    Q.  Dr. Young, what did you do to prepare for your
10   deposition today?
11   A.  Reviewed a lot of materials, and those have been
12   provided to you.
13   Q.  When did that review of those materials begin?
14   A.  Oh, gosh.  Sometime this past year.
15   Q.  I want to ask you specifically about preparing for
16   the deposition today.  Was there a time when you specifically
17   began preparing for that as opposed to preparing for your
18   report and so on?
19   A.  Yes, sir.
20   Q.  When did you first begin to prepare for your
21   deposition?
22   A.  There was a meeting with Mr. Fibich and Ms. Grainger
23   last week and then over the weekend I reviewed some materials
24   which have been provided to you, or a list of those materials,
25   and this morning I looked at my reports again.

8

1    Q.  Did you meet with Mr. Fibich this morning?
2    A.  Before coming into this room, yes.
3    Q.  For how long?
4    A.  Fifteen, 20 minutes, less.
5    Q.  How long did your meeting with Mr. Fibich and
6    Ms. Grainger last during last week?
7    A.  Let's see.  Ms. Grainger was there and then
8    Mr. Fibich came, so it was for an hour or two.
9    Q.  Who is Ms. Grainger?
10   A.  Ms. Grainger is a nurse, I believe, that works with
11   the attorneys in this matter on the plaintiffs' side.
12   Q.  Did she indicate to you why she was attending?
13   A.  To help prepare for the deposition.
14   Q.  Has she provided you with some materials in the past?
15   A.  Yes, she has.
16   Q.  What has she provided you?
17   A.  It would be hard to separate out what the attorneys
18   and what Ms. Grainger provided, but specifically what
19   Ms. Grainger provided was a timeline and treatment summaries
20   with respect to Ms. Whittington and Mr. Unger.
21   Q.  Ms. Grainger works for one of the plaintiffs' law
22   firms?
23   A.  Correct.
24   Q.  Did you rely on the timeline and treatment summaries
25   provided to you by Ms. Grainger in forming your opinions?

9

1    A.  Yes.
2    Q.  Did you do any independent review of the medical
3    records to confirm or verify the materials that Ms. Grainger
4    had provided to you?
5    A.  Yes.
6    Q.  How long did that take?
7    A.  All the documents, including medical records and
8    AstraZeneca internal documents and literature pertaining to
9    scientific research on typicals, atypicals, and diabetes,
10   probably a hundred-plus hours.
11   Q.  Have you ever examined the plaintiff?
12   A.  No, I have not.
13   Q.  And when I say "plaintiff," I mean, I guess,
14   Mr. Unger or Ms. Whittington.
15   A.  I have not personally examined either of those
16   individuals.
17   Q.  Has somebody examined them on your behalf?
18   A.  Lots of people.  Oh, on my behalf?
19   Q.  Yes.
20   A.  No.
21   Q.  Now, you mention that your review of documents took
22   on the order of a hundred-plus hours.  Can you tell me
23   approximately the total number of hours you've spent forming
24   your opinions and doing work on this litigation?
25   A.  Over a hundred hours.

3 (Pages 6 to 9)

10

1    Q.  Have you billed for any of your time yet?

2    A.  Prior to Hurricane Ike, I think I sent out a

3  statement that was misdated, and that was for about a hundred

4  hours.

5    Q.  And what is your hourly rate for your work in this

6  case?

7    A.  $425.

8    Q.  Have you been paid yet for any of that?

9    A.  No, I have not.

10    Q.  Do you have a copy of the bill that you sent in your

11  materials?

12    A.  That I don't know.

13    Q.  Okay. If you don't, Tommy, we would just ask that we

14  be provided a copy of that.

15    A.  I have a copy of the retainer check, but I don't

16  think I have a copy of —

17        MR. FIBICH:  Let me ask you this —

18    Q.  (BY MR. RABER) I didn't see it in the materials.

19  That's why I asked.

20        MR. FIBICH:  Let me ask this:  I thought the

21  statement was attached to your report.  Was it?

22        THE WITNESS:  The fee —

23        MR. FIBICH:  Fee agreement?

24        THE WITNESS:  Not a fee agreement.

25        MR. ELDER:  Schedule.

11

1        THE WITNESS:  A fee schedule was attached to the

2  report, as requested.

3        MR. ELDER:  Yeah.  We didn't get the bill.

4    A.  I don't think I provided that.

5    Q.  (BY MR. RABER) Is that something that you would be

6  able to provide, if asked?

7    A.  Sure.

8        MR. RABER:  Okay.  Tommy, we'd ask that we get

9  that.

10        MR. FIBICH:  Okay.

11  You have it here?  Okay.  Well, we'll — on a

12  break, I'll have his office fax it.

13        MR. RABER:  Thank you.

14    Q.  (BY MR. RABER) Dr. Young, we've marked this document

15  that I'm handing you as Young Exhibit 1, which is the amended

16  notice of deposition for today's deposition.  Have you ever

17  seen that or something like it?

18    A.  Before today?

19    Q.  Yes.

20    A.  I don't believe so.

21    Q.  Okay.  If you look at the last page of Exhibit 1, it

22  requests that you bring certain documents with you to the

23  deposition.  Do you see that?

24    A.  Yes, sir.

25    Q.  And have you brought documents with you today?

12

1    A.  Yes, I have.

2    Q.  Okay.  I see — just for the record, we received from

3  Mr. Fibich's office by letter dated October 9th, 2008, a stack

4  of paper that I'll estimate is maybe 2 inches thick.  And I see

5  that you have in front of you what look like originals of some

6  handwritten notes and various documents.

7        Is the pile of paper that's lying in front of

8  you the — essentially the documents that you brought with you

9  today?

10    A.  Yes.

11    Q.  Do you have any — and I also see that you have some

12  CDs in front of you as well; is that right?

13    A.  Correct.

14    Q.  Other than the documents sitting in front of you and

15  the CDs sitting in front of you, do you have any other

16  documents that relate to your work in this case?

17    A.  No, sir, other than the bill —

18    Q.  Okay.

19    A.  — that we talked about.

20        MR. RABER:  All right.  I'd like to mark then

21  the information — the copies that were provided to me as

22  Exhibit 2.  I'll just note for the record that the copy I'm

23  marking right now has some tabs on it that I've put there and

24  I've actually highlighted some things in it; but we'll make

25  arrangements to get this copied after the deposition, then I'll

13

1  take back the set that has the highlighting and stuff, if

2  that's acceptable, Mr. Fibich.

3        MR. FIBICH:  That's fine.

4        MR. RABER:  Okay.

5        (Young Exhibit No. 2 marked.)

6    Q.  (BY MR. RABER) Okay.  Dr. Young, I'm handing you

7  what's been marked as Exhibit 2, and can you just confirm for

8  us that that appears to be copies of the documents that you

9  brought to your deposition today?

10    A.  More or less.  I'm not sure what that is.

11    Q.  Okay.  I may have an answer for that, but go ahead

12  and look through it and we'll clarify.

13    A.  I don't think I produced an internet print-off of

14  diabetic socks.

15    Q.  Okay.  My — okay.  The stack you're looking at

16  appears to be materials from a rehabilitation plan that was

17  done by Mr. Deutsch and it came in the package that we

18  received.  Do you remember getting something along those lines?

19    A.  I may have gotten it, but I certainly did not review

20  that.  I don't recall seeing materials related to diabetic

21  socks and such.

22    Q.  Okay.

23    A.  That does not ring a bell.

24        MR. RABER:  Okay.  All right.  Well, then with

25  counsel's permission, I'll go ahead and remove the Deutsch

**14**

1  materials. Tommy, I don't know if they were sent as a courtesy
2  or whether they were actually in his files, but they were
3  separately bound when they came to us.
4      A.  I don't recall seeing this, the materials by Allegro
5  Medical, the shoes and such, socks.
6      (Sotto voce discussion.)
7      Q.  (BY MR. RABER)  Okay.  So, do you want to hand me
8  what you just looked at there?  And can we agree then that you
9  did not review or consider the materials you're about to hand
10  me in forming your opinions and that what's left is the set of
11  documents that you reviewed and considered?
12      A.  More or less.
13      Q.  Do you recall reading any —
14      MR. FIBICH:  Well, I think what he's asking you
15  is this stuff on the diabetic socks and all that, you didn't —
16  pull out what you didn't review.
17      Steve, you think we sent you that?
18      MR. RABER:  Yeah, that came together.  And it
19  didn't look like he had reviewed it.  It was done separately
20  and, you know, I don't know whether it was just sent as a
21  courtesy or what.
22      MR. FIBICH:  It was in my letter to you?
23      MR. RABER:  Actually, it came — that's a good
24  question.  It came to me from the counsel that you sent it to.
25  It was all put together and so I don't know for sure.  It all

**15**

1  came in one big stack and the cover letter from your firm was
2  on the top, in other words, but that was a segregated stack of
3  materials that was — had a separate —
4      MR. FIBICH:  I don't think it really matters,
5  quite frankly, but I don't think I sent it.
6      MR. RABER:  Okay.
7      MR. FIBICH:  But, you know, there's enough paper
8  in here that people could make a mistake, but —
9      A.  Rehabilitation firm of Paul Deutsch & Associates,
10  that does not ring a bell.
11      Q.  (BY MR. RABER)  Okay.
12      A.  So — let me see.  Paul Deutsch, Paul Deutsch.  I
13  think at least that.  And not sure what this is.  This looks
14  like stuff I reviewed, medical records and — this is a
15  definite maybe.  Yeah, I think I saw this.  Paul Deutsch.  I
16  don't recall — at least I don't recall the advertisements and
17  the socks and stuff like that because I would have wondered why
18  it was being sent to me, so it would have stood out.
19      And this all goes back to you, sir?
20      Q.  We'll just leave — why don't you put that
21  rubber-banded part in the bottom of that stack, and then I'm
22  going so ask you some questions about some of those things.
23      A.  Yes, sir.
24      Q.  In that stack of materials there, I see that there's
25  some handwritten notes included, correct?

**16**

1      A.  Yes, sir.
2      Q.  And are those — is that your handwriting?
3      A.  Yes.
4      Q.  What were the circumstances of taking those notes?
5  In other words, did you take notes as you read things, did you
6  take notes as you spoke to people, or how did that work?
7      A.  Initially, in reviewing the massive amount of
8  materials for this matter, I took notes.  And then it became
9  readily apparent I was not going to get through the materials
10  or the bulk of materials by doing that, and so at some point I
11  stopped taking notes of everything I read.
12      I took notes of meetings I had with Mr. Fibich
13  and Ms. Grainger; I took notes of what internet sites I looked
14  at; I took some notes off of Medscape, one of the online search
15  engines; I wrote a note about some articles I was inquiring
16  after at the Texas Medical Center library; and I took notes
17  this weekend about materials that were provided over the
18  weekend in preparation for this deposition; and I took a note
19  off of a Baylor College of Medicine newsletter from this past
20  month regarding the ongoing study of second-generation
21  antipsychotics.
22      Q.  All right.  And in Exhibit 2 there on the top,
23  there's a set of handwritten notes that I understand — the
24  first entry there, it says "Medicare" and it refers to a 2008
25  article, September 15th, 2008, "Newer antipsychotics appear no

**17**

1  better than Moban in treating child and adolescent
2  schizophrenia."
3      Did I correctly identify this stapled document?
4      A.  The heading says "Medscape."
5      Q.  Oh, Medscape.  I'm sorry.
6      A.  M-e-d-s-c-a-p-e, not "Medicare," not yet.
7      Q.  Okay.
8      A.  And the rest of it is correct, sir.
9      Q.  Okay.  And tell me what that subset of handwritten
10  notes consists of?
11      A.  Online research that came to my e-mail that I then
12  looked at and I thought might be relevant or germane to this
13  matter.
14      Q.  And the items that are written on that subset of
15  Exhibit 2, that's material that you looked at this weekend?
16      A.  Yes.
17      Q.  After you wrote your report?
18      A.  Yes.
19      Q.  And then the next attachment — or the next subset of
20  documents was another one handed to us this morning.  If you
21  look below that, it's a typewritten document that says
22  "Seroquel Product Liability Litigation Terms of Art."
23      Tell us what that is.
24      A.  If I could go back through for one moment, sir.
25      Q.  Sure.

18

1      A.  Some of these handwritten notes on that first
2  document of Exhibit 2 were materials I had relied on before,
3  the internet sites I had visited, but I don't think I had
4  previously supplied that to you-all.
5      Q.  Okay.
6      A.  Second group of documents is -- one of the things I
7  tried to do as I read the clinical, the business, the research
8  materials was to keep a separate list of acronyms or
9  abbreviations -- there were multiple in this matter, many of
10  which I was not familiar with -- as well as terms of art or
11  definitions.  And I had not previously given Mr. Fibich, when
12  he asked me for all my materials, this file which is labeled
13  "Seroquel Product Liability Litigation Terms of Art."
14     Q.  Who prepared this Seroquel Products Liability
15  Litigation Terms of Art?
16     A.  I did.
17     Q.  You typed that yourself?
18     A.  Yes.
19     Q.  And where did you find all that information?
20     A.  In part, in things that I read; in part, in
21  textbooks; in part, online.
22     Q.  When did you prepare that?
23     A.  As I went along.
24     Q.  We'll come back to those things.
25     A.  Business people are almost as bad as medical people

19

1  for abbreviations.
2      Q.  And who are the business people you're referring to?
3      A.  AstraZeneca, Birkett, and Brennan and the
4  pharmaceutical sales representatives, the marketing people, the
5  research people --
6      Q.  You think this case is about a business?
7          MR. FIBICH:  Object to form.
8      A.  In part, absolutely, yes.
9      Q.  (BY MR. RABER)  Do you consider yourself to be an
10  expert in business?
11         MR. FIBICH:  Object to form.
12     A.  I don't hold myself out as an expert in business, per
13  se, but I have been in the private or public practice of
14  psychiatry for around 30 years.  I have been the medical
15  director of Houston operations for a large managed care
16  company.  I have consulted on the -- in the public and private
17  sectors concerning mental health matters.  And my understanding
18  is that Seroquel was produced by AstraZeneca and AstraZeneca
19  is -- even with the fluctuations in the market today, is a
20  for-profit business.
21     Q.  (BY MR. RABER)  Are you aware of any not-for-profit
22  pharmaceutical businesses?
23     A.  There's a foundation, I believe, that helps support a
24  lot of research.
25     Q.  Sir, do you hold yourself out as an expert in the

20

1  pharmaceutical business?
2          MR. FIBICH:  Object to form.
3      A.  Per se, no.
4          MR. RABER:  All right.  Let's mark this next
5  document as Exhibit 3.
6          (Young Exhibit No. 3 marked.)
7          MR. FIBICH:  Have we marked 1 and 2 yet?
8          MR. RABER:  Yeah.  One was the notice of
9  deposition and 2 is the documents he brought with him, copies
10  of the documents he brought.
11     Q.  (BY MR. RABER)  Dr. Young, the court reporter has
12  marked the next document as Exhibit 3, which is entitled
13  "Expert Report of Mitchell Alan Young," dated the 2nd of
14  September, 2008.  Do you see that?
15     A.  Yes, sir.
16     Q.  And that's -- says "This document relates to:  Unger
17  v. AstraZeneca LP," correct?
18     A.  Correct.
19     Q.  Tell us what this is.
20     A.  It's a report I made.
21     Q.  How -- did you write this report yourself?
22     A.  Yes.
23     Q.  Did you get any help from anyone writing it?
24     A.  No.
25     Q.  Did you type it yourself?

21

1      A.  Yes.
2      Q.  Did you cut and paste any information in preparing
3  it?
4      A.  Yes.
5      Q.  Okay.  How long did it take you to write this report?
6      A.  I don't recall.
7      Q.  Can you estimate?
8      A.  Would be conjecture.  I can take a look at the bill
9  and it would have an indication of that.  But part of it was
10  written during review of materials and part of it was written
11  after review of materials, so I do not wish to hazard a guess
12  at this time.
13     Q.  Did the attorneys for the plaintiff provide you with
14  any source material that you used to cut and paste into your
15  report?
16     A.  No.
17     Q.  The first enclosure or attachment to your report is a
18  curriculum vitae.  Do you see that?
19     A.  Yes, sir.
20     Q.  Does the curriculum vitae attached to your report
21  truthfully and accurately set forth your experience?
22     A.  Yes, it does.
23     Q.  I noticed on your curriculum vitae -- well, let me
24  ask you this way:  Have you ever done any research in the area
25  of atypical antipsychotics?

6 (Pages 18 to 21)

**22**

1   A.  You're talking about in bringing an atypical to
2   market?
3   Q.  Any kind of research; bringing it to market,
4   post-marketing research.
5   A.  Other than research related to this matter, no.
6   Q.  So, being hired as an expert witness was the first
7   time you've done any research into atypical antipsychotics,
8   correct?
9   A.  Specifically literature reviews, correct; or
10  histories, yes.
11  Q.  I take it you've had some personal experience
12  prescribing atypical antipsychotics, true?
13  A.  Yes, sir.
14  Q.  Have you ever written any articles or published
15  anything relating to atypical antipsychotics?
16  A.  No, I have not.
17  Q.  Have you ever done any research in the area of
18  diabetes?
19  A.  Independent of this matter, no, I have not.
20  Q.  So, this litigation was the first time that you ever
21  did any research into diabetes, correct?
22  A.  Yes, sir.
23  Q.  Have you ever written any articles or published
24  anything in the area of diabetes?
25  A.  No, I have not.

**23**

1   Q.  Do you hold yourself out to be an expert in diabetes?
2   MR. FIBICH:  Object to form.
3   A.  Per se, no.
4   Q.  (BY MR. RABER)  What do you mean when you say "per
5   se"?
6   A.  I am a physician.  My training and expertise is as a
7   psychiatric physician.  Over the course of my education and
8   experience in approximately 30 years of practice, I've had
9   diabetic patients and am familiar with some issues related to
10  diabetes and have conferred over time with diabetologists or
11  endocrinologists; but I am not specifically trained or boarded
12  in the field of endocrinology, and specifically diabetology.
13  Q.  Do you diagnose diabetes in your practice?
14  A.  Rarely.
15  Q.  Have you ever?
16  A.  Yes.
17  Q.  When did you do that?
18  A.  I believe patients have presented with symptoms
19  consistent with the diagnosis and I've recommended follow-up,
20  but I did not specifically or formally render that diagnosis
21  myself.
22  Q.  In your practice, have you ever treated patients for
23  diabetes?
24  A.  Other than perhaps writing a script for an oral
25  hyperglycemic when their primary physician was out of town, no.

**24**

1   Q.  As part of your work, do you determine the cause of
2   diabetes?
3   A.  Which work, sir?
4   Q.  Your work as a psychiatrist, the work laid out in
5   your curriculum vitae.
6   A.  Have I done research with respect to the causes of
7   diabetes?
8   Q.  In your present or prior work experience, have you
9   determined the causes of diabetes in patients?
10  A.  Some of them, yes.
11  Q.  How many times?
12  A.  Gosh.  During my general medical rotations, diabetes
13  was right up there with alcoholism as a common presenting
14  complaint.  And so in taking histories and performing
15  laboratory evaluations on patients, I would consider that to be
16  diagnosing causes or -- if not diagnosing causes, a better way
17  to say that might be assessing risk factors in individuals.
18  Q.  Do you hold yourself out as an expert in determining
19  the cause of diabetes in patients?
20  A.  Per se, no.
21  MR. FIBICH:  Object to form of that question.
22  MR. RABER:  What was wrong with the form?
23  MR. FIBICH:  Well, the issue is what do you mean
24  by "expert"?  You mean somebody that specializes in a
25  particular field of medicine or are you applying the test for

**25**

1   an expert, as I understand it under the law of this case, that
2   being a person who has knowledge above that of an ordinary
3   person that would assist the jury in determining factual
4   matters in this case?
5   Q.  (BY MR. RABER)  Well, your report, Exhibit 3, is
6   captioned "Expert Report of Mitchell Alan Young, M.D."
7   Do you see that?
8   A.  Yes, sir.
9   Q.  Okay.  Using the term "expert" in that context, do
10  you hold yourself out as an expert in determining the cause of
11  diabetes in a patient?
12  MR. FIBICH:  Object to form.
13  A.  I have expertise or knowledge about those issues, but
14  do not hold myself out as a diabetologist or a researcher, per
15  se, in diabetes.
16  Q.  (BY MR. RABER)  Describe for us as fully as you can
17  the nature of your expertise in the area of diabetes.
18  A.  Over the course of 30 years of medical practice, I've
19  had a lot of patients with diabetes.  Certainly, in my medical
20  training, diabetes was a common -- an increasingly common
21  ailment people suffer.  And general medicine, internal
22  medicine, endocrinology, the subject matters that I studied for
23  this particular matter, I reviewed risk factors and current
24  thinking about causes of diabetes.
25  Q.  What are the generally-accepted criteria for

7 (Pages 22 to 25)

**26**

1  diagnosing diabetes?  Excuse me.  Can you answer that question
2  without looking at any documents?
3      A.  Yes, but not as well.
4      Q.  Well, let's try it without looking at any documents.
5  Can you tell us what the currently generally-accepted criteria
6  are for diagnosing someone with diabetes?
7      A.  Symptomatically, it has to do with increased
8  urination, increased thirst, tiredness, weight changes related
9  to increased blood glucose or insulin resistance or failure to
10  utilize glucose appropriately in the body.  There are
11  currently, I think, three accepted types of diabetes, including
12  Type 1, Type 2, and gestational diabetes.
13          What else would you like to know?
14      Q.  I'd like to know what's the generally-accepted
15  diagnostic criteria for determining whether somebody has
16  diabetes?
17      A.  That has to do with blood glucose levels.  Some
18  people would include Alpha 1 hemoglobin in that diagnosis.
19  There is some variance about when diabetes versus prediabetes
20  occurs and what the difference is.  I think you need one or
21  more fasting blood glucoses above a hundred, and then there are
22  diagnostic criteria with respect to so-called glucose tolerance
23  tests.
24      Q.  Okay.  Can you add anything to that answer?
25      A.  I would prefer to look at my documents, lest I err --

**27**

1      Q.  Would you --
2      A.  -- to refresh my memory.
3      Q.  Would you defer to an endocrinologist in answering
4  those types of questions?
5          MR. FIBICH:  Object to form.
6      A.  Not completely.
7      Q.  (BY MR. RABER)  Is there a difference between the
8  criteria for diabetes versus the criteria for impaired fasting
9  glucose?
10      A.  I think impaired fasting glucose is a laboratory
11  test.  I think diabetes is a syndrome or illness or symptom
12.  constellation.
13      Q.  Can you tell me the difference between the
14  generally-accepted diagnostic criteria for impaired fasting
15  glucose versus diabetes?  Are you able to do that?
16      A.  I think if you have a spot impaired so-called fasting
17  glucose, reported fasting, by a psychotic or mentally-impaired
18  individual, that I would not be particularly comfortable about
19  diagnosing diabetes on that basis.  My recollection without
20  refreshment by looking at the definitions is I think if you
21  have a spot fasting glucose above 150, plus/minus, that that is
22  a cause of concern, particularly if it's fasting; although that
23  may be 125.  I'd have to refresh my memory.
24      Q.  What's the difference in the numerical range for
25  blood glucose for impaired fasting glucose versus diabetes, if

**28**

1  you know?
2      A.  I'm not sure I understand your question, sir.
3      Q.  Okay.  Is there a different numerical range for blood
4  glucose that meets the criteria for impaired fasting glucose
5  than the numerical range for diabetes?
6      A.  I'm sorry.  I'm still not clear on your question.
7      Q.  Okay.  What is the numerical range that's generally
8  accepted as diagnostic for impaired fasting glucose?
9      A.  I think, generally speaking, a fasting glucose above
10  a hundred is a source of concern for clinicians.
11      Q.  Does that amount to a diagnosis of impaired fasting
12  glucose?
13          MR. FIBICH:  Object to form.
14      A.  I'm not sure.
15      Q.  (BY MR. RABER)  Okay.  What is the numerical range
16  for a finding of diabetes?
17      A.  I think there's several ways to get at that.  One is
18  several spot fasting glucoses and one is glucose tolerance
19  tests and another is -- for the broader picture is the Alpha 1C
20  hemoglobin.
21      Q.  What is the fasting glucose level that's diagnostic
22  for diabetes?
23      A.  I would ask to refresh my memory with the documents I
24  brought.
25      Q.  So, you can't answer that question without looking at

**29**

1  documents; is that correct?
2          MR. FIBICH:  Object to form.
3      A.  At this point in time, that's correct.
4      Q.  (BY MR. RABER)  What does the A1C measure?
5      A.  It's a kind of hemoglobin that's related to -- kind
6  of like a batting average -- the long-term glucose picture of
7  the person.
8      Q.  How long term?
9      A.  I would have to refer to the documents to refresh my
10  memory to specifically know the window that that reflects.
11      Q.  Is the A1C test used to diagnose diabetes?
12      A.  Yes.
13      Q.  Dr. Young, have you ever had any licenses to practice
14  medicine suspended or revoked?
15      A.  No, I have not, sir.
16      Q.  In what areas are you board certified?
17      A.  I am board certified in adult, child and adolescent,
18  and forensic psychiatry.
19      Q.  Are you board certified in endocrinology?
20      A.  No, I am not.
21      Q.  In what states are you licensed to practice medicine?
22      A.  Currently, I'm licensed to practice medicine in the
23  State of Texas.
24      Q.  Have you been licensed anywhere else before?
25      A.  Yes.

8 (Pages 26 to 29)

30

1  Q.  Where?
2  A.  Connecticut.
3  Q.  Why are you no longer licensed there?
4  A.  Because I no longer train or practice in Connecticut.
5  Q.  What were the circumstances of not being licensed
6  anymore in Connecticut?
7  A.  I had no desire to continue dual licensure in the
8  fair state of Connecticut.
9  Q.  Have you ever been the first doctor who diagnosed
10  diabetes in a patient?
11  A.  Yes.
12  Q.  How many times?
13  A.  Don't know.
14  Q.  Your attachment — let's see.  Attachment C of your
15  expert report has the heading "Archival Information Reference
16  Exhibit List."
17  A.  Yes.
18  Q.  Can you tell us what that is?
19  A.  That is a list of the materials provided to me by the
20  attorneys.
21  Q.  Did you review everything on that list?
22  A.  No, I did not.
23  Q.  Okay.  I'm going to hand you a red pen.  I'm going to
24  ask you if you would go through Attachment C and put a
25  checkmark by everything that you did review, as best you can

31

1  recall.
2  A.  That would take hours and cross-referencing what's on
3  the disk, sir.
4  Q.  Well, it's 18 pages and, you know, just do the best
5  you can.
6  MR. FIBICH:  Here's that bill we got for you.
7  MR. RABER:  Thank you, Tommy.
8  THE WITNESS:  I did provide it.
9  MR. FIBICH:  Huh?
10  THE WITNESS:  I did provide it.
11  (Young Exhibit No. 4 marked.)
12  MR. FIBICH:  While you're doing that, I'm going
13  to take a short break.
14  (Recess at 9:44 a.m.)
15  Q.  (BY MR. RABER)  Okay.  Doctor, is it easier for you,
16  you think, to identify what you did not review?
17  A.  I think what might be helpful here is putting a plus
18  by what I remembered I did review and a minus by what I
19  remember I clearly did not review —
20  Q.  Okay.  Let's do that.
21  A.  — with or without question marks for what I'm not
22  sure.
23  Q.  And if you want to — let's do it this way, if you
24  agree to this:  Put a plus by the materials you remember
25  reviewing —

32

1  A.  Yes, sir.
2  Q.  — a minus by the ones that you did not remember
3  reviewing, and a question mark if you're not sure.
4  A.  Sure.  That's fair.
5  Q.  Okay.
6  (Recess from 9:45 a.m. to 9:47 a.m.)
7  A.  Want clarification?
8  Q.  (BY MR. RABER)  Yes, sir.
9  A.  For these studies, I did not — on some of them, I
10  reviewed the whole study.  On some of them, I just reviewed the
11  abstracts or synopsis.
12  Q.  Okay.
13  (Recess from 9:47 a.m. to 10:08 a.m.)
14  Q.  (BY MR. RABER)  Okay.  Dr. Young, just so the
15  record's clear, you have gone through the Attachment C of your
16  expert report and put a plus sign next to items that you recall
17  reviewing, you've put a minus sign next to items that you do
18  not recall reviewing, and you've put a question mark next to
19  those items for which you can't remember whether or not you
20  reviewed them.  Is that a fair summary?
21  A.  Yes, sir.
22  Q.  And on a few occasions, it looks like you've drawn a
23  line.  I'm looking, for example, on Page 5 of 18 where you have
24  a question mark at the top, a question mark at the bottom, and
25  a line connecting the two.  Does that indicate that all of them

33

1  are a question mark?
2  A.  Yes, sir.
3  Q.  Okay.  If you could put that back with that
4  attachment, in that exhibit.  Here.  It's part of this one
5  here.
6  A.  Part of the same exhibit?
7  Q.  Yes.  It's an attachment.
8  MR. FIBICH:  All marked as one.
9  THE WITNESS:  This is all one exhibit?
10  Q.  (BY MR. RABER)  Dr. Young, did you see your report
11  before it was sent out?
12  A.  Yes.  I wrote it.
13  Q.  Did you see it with all the attachments?
14  A.  I attached them, yes; except for the protective
15  order, which the attorney already had.
16  Q.  But you didn't prepare Attachment C, did you, which
17  is the reliance — the reference list we just looked at?
18  A.  That's correct.  I did not prepare that.
19  Q.  Now, for some reason, one of the pages has
20  disappeared.  Is that — what's that to your right there?
21  A.  Oh, I'm sorry.  That's Page 1 of 18.
22  Q.  Dr. Young, how were you retained in this case?
23  A.  I was approached by Mr. Fibich.
24  Q.  Had you ever worked with him before?
25  A.  Yes.

9 (Pages 30 to 33)

34

1   Q.  All right.  In what context?
2   A.  Years ago on a hospital case, or cases.
3   Q.  What was the nature of the case, in general?
4   A.  I think inappropriate hospitalization or confinement.
5   Q.  How much expert witness work have you done in the
6   last ten years?
7   A.  You mean testifying, per se, or reviewing documents?
8   Q.  Well, let's start with testifying.
9   A.  Not all that much.
10  Q.  Okay.  What —
11  A.  I believe I provided a list of cases I have testified
12  to in the past —
13  Q.  Four years?
14  A.  — four years.
15  Q.  Okay.  Well, let's look at that then.  Well, let me
16  ask you this first:  Do you advertise your services as an
17  expert witness?
18  A.  No, I do not.
19  Q.  Let's look at the attachment to Exhibit 3 which sets
20  forth your list of testified cases in the past four years, and
21  I just want to ask you a few questions about that.
22  A.  Sure.
23  Q.  You've listed four cases there.  Can you describe the
24  nature of those four cases that are listed on the attachment,
25  starting with the Kelley case?

35

1   A.  Kelley — the Ford Motor Company deposition,
2   12-10-04, evaluation of children following maternal death in
3   motor vehicle accident.
4   Q.  What was the nature of your testimony?
5   A.  I believe it had to do with the effects of loss of a
6   primary caretaker on a child.
7   Q.  Their psychiatric health?
8   A.  Yes, and their academic functioning, I believe.
9   Q.  Then there's the appeal of Catherine Crump that's
10  referred to there.  Can you tell us the nature of your
11  testimony in that case?
12  A.  Yes.  It was at an administrative hearing regarding
13  insurance company or third-party payor denial of treatment
14  benefits.
15  Q.  The next case involves the Scheinbaum minor children.
16  Can you tell us the nature of your testimony there?
17  A.  Yes.  I was talking about diagnoses and relevance, or
18  lack thereof, to parenting ability.
19  Q.  And the last case listed is the Ybarra, Y-b-a-r-r-a,
20  case.  What was the nature of your testimony there?
21  A.  That was a capital habeas case.
22  Q.  Were you testifying about someone's mental capacity,
23  or what was the nature of it?
24  A.  It was an Atkins evidentiary hearing involving the
25  issue of whether the defendant was mentally retarded and,

36

1   therefore, excluded from capital sentencing.
2   Q.  Have you ever testified as an expert witness in the
3   area of pharmaceutical drugs?
4   A.  No.
5   Q.  Have you ever testified as an expert witness relating
6   to FDA rules and regulations?
7   A.  No.
8   Q.  Have you ever testified as an expert witness in the
9   area relating to the labeling of prescription drugs, either in
10  the United States or anywhere else in the world?
11  A.  No.
12  Q.  Have you ever testified as an expert witness as to
13  the cause or causes of somebody developing diabetes?
14  A.  No.
15  Q.  I want to show you a document that's been marked as
16  Young Exhibit 4.  Is that the — a copy of the bill that you've
17  sent for your work so far on the case?
18  A.  Yes, it is.
19  Q.  I notice that the statement — the bill is dated
20  August 12th, 2008.  Do you see that?
21  A.  Yes, I do.
22  Q.  I also see that there's time on that bill for work
23  done that's dated both August 21st and September 2nd, 2008.
24  Can you explain that?
25  A.  Sure.

37

1   Q.  Okay.  Please do.
2   A.  Sure.  The date is wrong.
3   Q.  Okay.  The date on the statement?
4   A.  Yes.
5   Q.  Okay.  Now, does Exhibit 4 represent the totality of
6   work that you performed in the Seroquel litigation up to
7   September 2nd of 2008?
8   A.  Yes.
9   Q.  Can you tell us how much you've — time you've spent
10  between September 2nd, 2008, and today?
11  A.  I could guesstimate.
12  Q.  What's your best estimate?
13  A.  My best estimate would be somewhere between 2 and 10
14  hours, maybe 12 hours.
15  Q.  Doctor, I want to go back to your report, and
16  specifically I want to ask you about Attachment D, which is
17  captioned "Treatment Chronology of Richard Unger."
18  A.  Yes, sir.
19  Q.  Do you see that?
20  A.  I do.
21  Q.  Who prepared Attachment D?
22  A.  My understanding is Ms. Grainger prepared that.
23  Q.  Ms. Grainger is a nurse who works for the plaintiffs'
24  law firm?
25  A.  Yes, sir, that's correct.

10 (Pages 34 to 37)

38

1    Q.  Did you provide any input into the preparation of
2  Attachment D?
3    A.  No, I did not.
4    Q.  How did you use Attachment D in forming your opinions
5  in this case?
6    A.  After I reviewed the clinical record of Richard Unger
7  and the depositions of Mr. Unger, his wife, and Mr. Unger's
8  doctors, I requested assistance with a timeline or chronology
9  in order to assist me in preparation of my report.
10    Q.  Okay.  Well, I notice the date of Attachment D is
11  June 29th of 2008.  Do you see that?
12    A.  I see that, yes, sir.
13    Q.  And that appears to be before the first notation you
14  have on your bill, which is July 2008.
15    A.  Yes, it does.
16    Q.  Okay.  So, do you know anything about the
17  circumstances under which Attachment D was prepared by
18  Ms. Grainger?
19    A.  The specific circumstances, no.
20    Q.  And did you feel like Attachment D gave you
21  sufficient information on the treatment chronology of
22  Mr. Unger in order to develop and form your opinions?
23        MR. FIBICH:  Object to form.
24    Sufficient, no; contributory, yes.
25    Q.  (BY MR. RABER)  Dr. Young, what is the nature of your

39

1  current practice?
2    A.  I am in the private practice of psychiatric medicine
3  in Houston, Texas.
4    Q.  What kinds of patients do you treat?
5    A.  I treat a broad spectrum of patients, couples, and
6  families.
7    Q.  Do you treat any patients with bipolar disorder,
8  major depression, or schizophrenia?
9    A.  Yes, all the above.
10    Q.  Do you treat children, adults, or both?
11    A.  Both.
12    Q.  How long have you been in private practice in Houston
13  doing what you're doing now?
14    A.  Approximately since 1984.
15    Q.  Dr. Young, do you currently prescribe any — well,
16  strike that.
17        Are you familiar with the class of medicines
18  known as the atypical antipsychotics?
19    A.  Yes, I am.
20    Q.  And those medicines include drugs like olanzapine,
21  risperidone, Seroquel, Geodon, and Abilify, correct?
22    A.  Yes, among others.
23    Q.  Okay.  Do you currently prescribe any of the atypical
24  antipsychotics in your work?
25    A.  Yes.

40

1    Q.  Do you currently prescribe Seroquel for any patients?
2    A.  Yes.
3    Q.  And what are the reasons for your prescribing
4  Seroquel to at least some of your patients?
5    A.  Following a risk-benefit analysis, I believe it's the
6  most appropriate medication and/or they have come to me on that
7  medication.
8    Q.  Is there any particular type of patient for whom
9  you've determined that the benefits of Seroquel outweigh the
10  potential risks?
11    A.  Yes.
12    Q.  What is that?
13    A.  Patients who've had a poor response to other
14  medications, patients who are not demented, patients who do not
15  have diabetes or prediabetes, patients who do not have family
16  histories of diabetes, patients who are not obese or morbidly
17  obese, patients who require an antipsychotic who need sedation
18  or major tranquilization, and patients who do not have
19  metabolic syndrome, dyslipidemias, or hyper- or proinflammatory
20  states.
21    Q.  Do you ever prescribe Seroquel off-label?
22    A.  Less so, but, yes.
23    Q.  Okay.  And what kinds of off-label uses do you
24  prescribe Seroquel for?
25    A.  I don't know that I'm doing that currently, but what

41

1  I used to do was sometimes prescribe Seroquel off-label for
2  people with insomnia.
3    Q.  Did you find that it was effective for that
4  particular use?
5    A.  Yes.
6    Q.  Are you offering an opinion in this case that there
7  is anything improper about using Seroquel in an off-label
8  manner like that?
9    A.  It may be improper, given the issues with respect to
10  dose-dependent weight gain or metabolic conditions or
11  conditions of hyperglycemia or diabetes or prediabetes.  That
12  would affect my risk-benefit analysis.
13    Q.  But I'm talking about the off-label, per se, as
14  opposed to all the other factors you've just identified.  Are
15  you going to offer an opinion that the prescription of Seroquel
16  for off-label purposes is, in and of itself, improper?
17    A.  No, I'm not going to offer that opinion.
18    Q.  Okay.  It would depend on the facts and circumstances
19  of each patient.  Is that fair to say?
20    A.  That's correct.
21    Q.  Now, you mentioned that you — one category of
22  patients that you at least don't or try not to prescribe
23  Seroquel for are people who have diabetes or prediabetes; is
24  that correct?
25    A.  That's correct, or family histories of.

42

1    Q.  Okay.  What anti — what atypical antipsychotic, if
2  any, do you prescribe to patients falling into those
3  categories?
4    A.  I've been moving away from the atypicals — and I
5  prefer to call them second-generation antipsychotics because,
6  over time, I think the atypicals are more typical than atypical
7  compared to the first-generation antipsychotics.
8        Within the atypicals, I've moved towards Abilify
9  and Geodon and — I don't think I've prescribed Invega, as yet.
10  It's still new to me and I'm still learning about it.  However,
11  my general trending has been to go back to the typicals, or
12  first-generation antipsychotics, because of efficacy, safety,
13  tolerability, and cost concerns.
14    Q.  Is there any particular first-generation
15  antipsychotic that you're moving toward?
16    A.  Yes.
17    Q.  Which one?
18    A.  Trilafon.  I've also prescribed Navane, or
19  thiothixine, and — let me see.  Those would be the two main
20  ones.
21    Q.  Do you understand that Abilify and Geodon carry the
22  same warning as Seroquel relating to diabetes and
23  hyperglycemia?
24    A.  I understand.
25       MR. FIBICH: Object to form.

43

1    Q.  (BY MR. RABER)  Does Trilafon carry a warning
2  relating to diabetes or hyperglycemia?
3    A.  It may be in the adverse events or reactions; but
4  whether it has a separate warning, per se, I don't recall.
5    Q.  How do you assess that information in the adverse
6  events section of the label?
7    A.  With difficulty.
8    Q.  Okay.  Explain.
9    A.  Typical product information or package insert or
10  Physician Desk Reference information is in — on average, four
11  to six pages in the Physician's Desk Reference, in small print,
12  close to the binding or not.  In the adverse event section, the
13  information is not alphabetized.  So, in attempting to compare
14  years or medications for — to compare and contrast that is
15  difficult.
16    Q.  Who sets the format for the label that you just
17  referred to, the FDA or the pharmaceutical company?
18    A.  I don't know.
19    Q.  Are there rules and regulations that apply to the
20  format of an FDA label?
21    A.  Yes, and they have changed over time, and I did not
22  take the time at this juncture to look at the history of FDA
23  regulation as it relates to this matter.
24    Q.  Do you hold yourself out as an expert in the area of
25  FDA labeling of prescription drugs?

44

1       MR. FIBICH: Object to form.
2    A.  Per se, no.
3    Q.  (BY MR. RABER)  Do you hold yourself out as an expert
4  in the area of the foreign labeling of prescription drugs?
5       MR. FIBICH: Object to form.
6    A.  No.
7    Q.  (BY MR. RABER)  Have you ever worked for the FDA?
8    A.  No.
9    Q.  Have you ever drafted an FDA label for a prescription
10  drug?
11    A.  No, I have not.
12    Q.  Have you ever dealt with the FDA in any way in —
13  with respect to the labeling of a prescription drug?
14    A.  I e-mailed the FDA in this matter to inquire as to
15  information they had about Seroquel and diabetes in their
16  consumer e-mail capacity.
17    Q.  Did you get a response?
18    A.  No.
19    Q.  I'd like to show you — I think that e-mail —
20       MR. RABER:  Tommy, do you mind if I come around
21  and show him the e-mail?
22       MR. FIBICH: No.
23    Q.  (BY MR. RABER)  Okay.  Doctor, I'm showing you what
24  looks like an e-mail from Exhibit 2 dated August 14th, 2008,
25  8:43 a.m., addressed "To Whom It May Concern," and says

45

1  "Sincerely, Mitchell Alan Young."  Do you see that?
2    A.  Yes, I do.
3    Q.  Is that the e-mail that you sent to the FDA
4  requesting information about Seroquel and diabetes?
5    A.  Yes, it is.  And I think this is the drug development
6  or regulatory cites for bringing new medication to market or
7  regulatory oversight for that, yes.
8    Q.  Okay.  In your e-mail to the FDA, you say, "To Whom
9  It May Concern:  Given considerable and increasing on- and
10  off-label usage of Seroquel, as a practicing psychiatrist, I am
11  concerned about Seroquel causing or exacerbating diabetes.  Any
12  published studies or studies in progress," question mark.
13  "Base rates of diabetes in the general or healthy population
14  versus schizophrenic versus bipolar population versus those
15  receiving atypical antipsychotics," parentheses,
16  "second-generation," close parentheses, "Seroquel, in
17  particular," question mark.  "Thank you very much.  Sincerely,
18  Mitchell Alan Young, M.D."
19       Have I read that correctly?
20    A.  Yes.
21    Q.  Now, how come you didn't tell the FDA that you had
22  been hired as an expert witness for plaintiffs in litigation
23  relating to Seroquel?
24       MR. FIBICH: Object to form.
25    A.  Didn't occur to me.

**46**

1    Q.  (BY MR. RABER)  The truth is you weren't writing that
2  as a practicing psychiatrist, you were writing that as an
3  expert witness, weren't you?
4    A.  I am a practicing psychiatrist and expert witness, so
5  I fail to understand how I could divorce those two.
6    Q.  Sir, you wrote to the FDA in your capacity as an
7  expert witness, didn't you?
8      MR. FIBICH:  Object to form.
9    A.  I think I answered your question, that I cannot
10  divorce being a practicing psychiatrist from being an expert
11  witness.
12    Q.  (BY MR. RABER)  Have you ever made a similar request
13  like that to the FDA?
14    A.  No.  What I did do and the reason I did write is I
15  thought, gee, independent of all the materials that have
16  provided me, as a practicing psychiatrist, if I wanted
17  information about these issues, what would a reasonably prudent
18  individual do?  Write them an e-mail.  So, I did.
19    Q.  Okay.  In your experience with patients for whom
20  you've prescribed Seroquel, has it been a good medicine?
21      MR. FIBICH:  Object to form.
22    A.  In some ways, yes, and some ways, no.
23    Q.  (BY MR. RABER)  Has it helped some of your patients?
24    A.  Yes.
25    Q.  Is it important for you, as a practicing

**47**

1  psychiatrist, to have a choice of medications?
2    A.  Yes.
3    Q.  Is that because some medications work better than
4  others with certain patients?
5    A.  Yes.
6    Q.  And you've made the judgment that for at least some
7  of your patients, Seroquel is their best option, correct?
8    A.  Correct.
9    Q.  What are some of the significant risks of prescribing
10  first-generation antipsychotics to your patients?  And I
11  include Trilafon in that question.
12    A.  The emphasis on the first -- of the risks of the
13  first-generation antipsychotics, also known as major
14  tranquilizers, neuroleptics, or neurologic disease-producing or
15  ataractic -- which is another way to say tranquilizer --
16  basically emphasized tardive dyskinesia, a potentially
17  irreversible movement disorder; neuroleptic malignant syndrome;
18  and extrapyramidal symptoms.
19    Q.  Are those three side effects, tardive dyskinesia and
20  neuroleptic malignant syndrome and EPS, serious potential side
21  effects?
22    A.  Yes.
23    Q.  Were they among the reasons why scientists developed
24  the second-generation antipsychotic drugs --
25    A.  Yes.

**48**

1    Q.  -- to avoid those complications?
2    A.  To attempt to avoid those, yes.
3    Q.  And do you believe that they've been successful in
4  doing that?
5    A.  No, I do not.
6    Q.  Does that put you in the minority view?
7      MR. FIBICH:  Object to form.
8    A.  Compared to whom?
9    Q.  (BY MR. RABER)  Compared to the American Diabetes
10  Association, the American Psychiatric Association, for example.
11    A.  I'm not sure --
12      MR. FIBICH:  Object to form.
13    A.  -- what the current state of the art or
14  recommendations are with my colleagues or professional
15  associations with the increasing research and data that has
16  been showing that "new and improved" is really same and
17  potentially worse.
18    Q.  (BY MR. RABER)  Has the American Psychiatric
19  Association identified the second-generation atypicals,
20  including -- or antipsychotics, including Seroquel, as
21  first-line treatment?
22    A.  Independent of the Catie study and the National
23  Institute of Mental Health data, I don't know.  I hope not.
24    Q.  But you can't say one way or the other?
25    A.  With respect to a position paper by the American

**49**

1  Psychiatric Association, in a blanket way, comparing first- and
2  second-generation antipsychotics, no.
3    Q.  Well, I didn't ask you for all those qualifiers, sir.
4  My question is very simple.  Is there an APA guide or
5  publication that recommends second-generation antipsychotics as
6  first-line therapy or treatment?
7    A.  It's not a simple question, sir.
8    Q.  Are you aware of any such guideline that exists?
9    A.  There are multiple treatment guidelines.  With
10  respect to a blanket American Psychiatric Association guideline
11  that states second-generation first, first-generation second,
12  no, I'm not aware of that.
13    Q.  In your practice, do you use the first-generation
14  antipsychotics as your first line of treatment?
15    A.  Sometimes, yes.
16    Q.  Under what circumstances?
17    A.  Under circumstances where there are -- the individual
18  is new to treatment, under circumstances where they have issues
19  with respect to metabolic syndrome or diabetes, under
20  circumstances with respect to cost.
21    Q.  Does Trilafon cause weight gain?
22    A.  It can.
23    Q.  In how many patients and in what amount?
24    A.  Don't know.
25    Q.  Is it as much as 25 percent of patients?

13 (Pages 46 to 49)

**50**

1     A. Don't know.
2     Q. What's been your clinical experience?
3     A. Weight gain with Trilafon has not been significant.
4 I haven't used it much, but the only antipsychotic I'm aware of
5 that still remains untainted with respect to weight gain --
6 and, again, predicting to the group as opposed to the
7 individual -- would be Moban, or molindone.
8     Q. And what do you mean when you say "predicting as to
9 the group as to the individual"?
10     A. Science, as a whole, is basically geared or better at
11 predicting to the group versus the individual.
12     Q. And what do you mean by that?
13     A. I think it speaks for itself.
14     Q. Are you saying then that it's difficult to attribute
15 cause of weight gain to a particular patient as opposed to a
16 large population of people, on average?
17     A. I think it's a different process.
18     Q. How does it differ?
19     A. Well, you can certainly have case studies regarding
20 individuals or groups of small individuals. You would then
21 raise issue with respect to the power/ability of that to
22 predict large groups of people. So, too, if you have large
23 case studies looking at larger ends where subjects or groups of
24 people, you can potentially apply that to the individual, but
25 you would have to take the individual considerations into

**51**

1 account.
2     You can't automatically predict to the
3 individual from a group or predict from a group to the
4 individual.
5     Q. Doctor, would you agree with me that when you're
6 looking at data from studies, that it's better to consider more
7 data as opposed to a smaller subset of data?
8     A. Generally speaking, yes, that's true.
9     Q. Are you familiar with the concept of a pooled
10 analysis or a meta-analysis?
11     A. Yes, I am.
12     Q. And would you agree with me that a larger pooled
13 analysis or meta-analysis provides better information than an
14 individual study?
15     MR. FIBICH: Object to form.
16     A. It may or may not, depending, in part, by who is
17 funding that analysis, what the internal or external biases may
18 be. And I recall recently reading one article poor-mouthing
19 meta-analyses as opposed to analyses.
20     Q. (BY MR. RABER) Are you an epidemiologist?
21     A. I'm a student of epidemiology. No, I am not holding
22 myself forth or promoting to the public that I am an
23 epidemiologist.
24     Q. In forming your opinions -- well, strike that.
25     Can you tell me what the Bradford Hill criteria

**52**

1 are?
2     A. Yes.
3     Q. What are they?
4     A. I believe Bradford Hill was a British epidemiologist,
5 and those are criteria of causation.
6     Q. Did you apply any Bradford Hill criteria in forming
7 the opinions you have in this case?
8     A. Yes.
9     Q. How did you do that?
10     A. How did I do what?
11     Q. Apply the Bradford Hill criteria. What are they?
12     A. Six, seven, eight, nine of them. They include things
13 like temporal association, coherence, specificity, scientific
14 studies, and the others I don't recall at the moment.
15     Q. Did you do that in writing anywhere?
16     A. Did I do I what in writing anywhere?
17     Q. Apply the Bradford Hill criteria in writing anywhere.
18     A. I think in my opinion that Seroquel caused diabetes,
19 yes, in my written report.
20     Q. Okay. So, to the extent you applied the Bradford
21 Hill criteria, that would be set forth in your expert report.
22 That's your testimony?
23     A. No, that is not my testimony.
24     Q. Okay. Well, what is it? Where -- if I want to see
25 how Dr. Young applied the Bradford Hill criteria, what would I

**53**

1 look at?
2     A. My report.
3     Q. Okay. Anything else?
4     A. I'm not sure what you're speaking to.
5     Q. Well, I'm just -- if I want to know how did Dr. Young
6 apply the Bradford Hill criteria to any plaintiff in this case,
7 what do I look at to determine that? You've said your report,
8 and my question is: Any other documents?
9     A. Yes.
10     Q. What?
11     A. In the material I supplied to you today entitled
12 "Seroquel Product Liability Litigation Terms of Art" --
13     Q. Okay.
14     A. -- I have listed Hill's criteria -- or Bradford --
15 Austin Bradford Hill criteria in the document I provided you.
16     Q. Okay. When did you do that?
17     A. When did I do what?
18     Q. Apply the Bradford Hill criteria.
19     A. It -- I'm not sure how I would answer that --
20     Q. Well, the document you're referring to is a document
21 you handed me today.
22     A. Right.
23     Q. And my question to you is: When did you actually
24 apply the Bradford Hill criteria in any way to either plaintiff
25 in this case?

**54**

1    A.  From the get-go 'til now, because causation is an
2    important issue in this matter, as is duty to warn or provide
3    appropriate information to prescribing physicians and
4    consumers.
5        Q.  Do you hold yourself out as an expert in warnings to
6    physicians?
7            MR. FIBICH:  Object to form.
8        A.  I'm not sure how to answer that question.
9        Q.  (BY MR. RABER)  Okay.  What's a changes being
10   effected?
11       A.  Pardon me, sir?
12       Q.  What is a changes being effected?  Do you know what
13   that is?
14       A.  A changes being effected?
15       Q.  Right.
16           MR. FIBICH:  Object to form.
17       Q.  (BY MR. RABER)  Or abbreviated as CBE.  Do you know
18   what that is?
19           MR. FIBICH:  Object to form.
20       A.  Not without a context.
21       Q.  (BY MR. RABER)  How about FDA labeling.  That's the
22   context.  Do you know what a CBE, or changes being effected,
23   is?
24       A.  In relationship to FDA labeling?
25       Q.  Right.

**55**

1        A.  Maybe.
2        Q.  What is it?
3        A.  Sounds like a work in progress.
4        Q.  Can you add to that anything else?
5        A.  Not at this time.
6        Q.  Do you hold yourself out as an expert in determining
7    what is an appropriate warning to provide to prescribing
8    physicians in the FDA system?
9            MR. FIBICH:  Object to form.
10       A.  I have expertise in that area.
11       Q.  (BY MR. RABER)  What is that?
12       A.  As a psychiatric physician in practice for about 30
13   years in one capacity or another, I rely or depend upon
14   accurate information versus misinformation versus misdirection.
15       Q.  How does that make you an expert?
16       A.  I didn't finish my answer, sir.
17       Q.  Okay.
18       A.  And for 30 years have done risk-benefit analyses,
19   both in treatment and, to the extent I've done some teaching in
20   that time, to physician and non-physician colleagues in mental
21   health and/or the community and/or schools about the use of
22   medications, and psychotropic or psychiatric medications in
23   particular, that -- and, in general, as a physician, under the
24   principle of primum non nocere -- or first of all, do no
25   harm -- that warnings are important.

**56**

1        Q.  What's the FDA standard for giving a warning about a
2    drug?
3            MR. FIBICH:  Object to form.
4        A.  The specific standard about warning and whether it is
5    black box or not versus -- in other words, absolute versus
6    relative, contraindication versus warning versus adverse event
7    and how that sorts out, my understanding is that is a
8    complicated and -- that is a complicated process that involves
9    the politics of regulation and the economics of marketeering.
10       Q.  (BY MR. RABER)  It's a complicated process about
11   which you're not an expert.  Is that fair to say?
12       A.  I do not hold myself forth as an FDA expert, that is
13   correct.
14       Q.  And particularly as it relates to labels and
15   warnings, correct?
16           MR. FIBICH:  Object to form.
17       A.  As a consumer, I will say I have -- and as a
18   prescribing physician, I say -- I would say I have considerable
19   expertise, but do not present myself as an expert, per se, or
20   advertise as such.
21       Q.  (BY MR. RABER)  Have you ever been a defendant in a
22   lawsuit?
23       A.  I don't think so.
24       Q.  Do you hold yourself out as an expert in
25   pharmacology?

**57**

1            MR. FIBICH:  Object to form.
2        A.  Yes and no.
3        Q.  (BY MR. RABER)  Okay.  How are you an expert in
4    pharmacology?
5        A.  I've been studying, practicing, and prescribing in
6    the pharmacologic area for 30-plus years.
7        Q.  Have you ever studied the topic of pharmacology in
8    terms of formal training?
9        A.  Yes.
10       Q.  Are you familiar with the pharmacology of Seroquel?
11       A.  Yes.
12       Q.  What is it?
13       A.  I wouldn't know where to begin to answer that broad a
14   question, sir.
15       Q.  Can you generally describe the pharmacology of
16   Seroquel?
17       A.  Can I generally --
18       Q.  Yeah.
19       A.  -- describe it?  Yes.
20       Q.  Okay.  What?
21       A.  The brand name is quetiapine.
22       Q.  Actually, it's quetiapine.  Go ahead.
23       A.  Please go ahead.
24       Q.  No.  Go ahead.
25       A.  After you.

---

58

1    Q. Please describe for us the pharmacology of Seroquel,
2  or quetiapine, if that's how you want to refer to it.
3    A. Quetiapine? Is that what you're telling me is the
4  proper pronunciation?
5    Q. Yes.
6    A. Okay. Say again, please.
7    Q. Quetiapine.
8    A. Quetiapine fumarate?
9    Q. Close enough.
10   A. The proper pronunciation being?
11   Q. I said it's close enough.
12   A. Okay.
13   Q. Okay. Let's hear the pharmacology of it.
14   A. It is a -- in the general class of medications known
15 as antipsychotics. It is a -- correct me on my pronunciation
16 of this, too, please, sir -- dibenzothiazepine.
17   Q. Okay.
18   A. Is that close enough?
19   Q. Close enough.
20   A. Thanks. It is currently FDA approved for the
21 treatment of schizophrenia.
22   Q. My question is the pharmacology, not what the FDA
23 approvals are. I want to know what the pharmacology is,
24 because you've said you have some expertise in pharmacology.
25   A. It is a D2 antagonist. It has some serotonergic

---

59

1  effect. It has relatively low muscarinic and anticholinergic
2  effect. It's sedating, so it has some histamine receptor
3  effects. The exact mechanism of action is not known.
4    Q. Okay.
5       MR. FIBICH: When you get a chance, I need to
6  take a restroom break.
7       MR. RABER: All right. Let's take a break now
8  then.
9       (Recess from 10:53 a.m. to 10:59 a.m.)
10   Q. (BY MR. RABER) Dr. Young, do you hold yourself out
11 as an expert in the marketing of pharmaceutical products?
12      MR. FIBICH: Object to form.
13   A. I have some specialized knowledge and experience, on
14 the one hand. On the other hand, I do not advertise or market
15 myself as an expert.
16   Q. (BY MR. RABER) What's your specialized knowledge and
17 experience in the area of pharmaceutical -- the marketing of
18 pharmaceutical products?
19   A. Back when I was medical director of Houston
20 operations for Prudential Psychiatric Management, I was asked
21 as the medical director by one of the national organizations
22 about creating or managing pharmacy benefits and was there on
23 the front end of that issue or the so-called managed pharmacy
24 or pharmacy benefit plans, and so I had some activity related
25 to the issue of marketing pharmaceuticals and costs therein.

---

60

1    Q. When did -- when was that experience?
2    A. May I refresh my memory with my vitae?
3    Q. Sure.
4    A. Was it the Nineties? Let me take a look, not guess.
5    Q. It's probably in your report, which is this right
6  here.
7    A. There we go. Thank you, sir.
8       Early Nineties, '92 to '96.
9    Q. Is that the sum and substance of the specialized
10 knowledge and experience you claim to have in the area of
11 pharmaceutical marketing?
12   A. No, that's not the sum and substance.
13   Q. What other specialized knowledge and experience do
14 you have in the area of the marketing of pharmaceutical
15 products?
16   A. I've been a recipient or targeted consumer of
17 pharmaceutical marketing for 30-plus years.
18   Q. Anything else?
19   A. No.
20   Q. What's DDMAC, D-D-M-A-C?
21      MR. FIBICH: Object to form.
22   A. Without a context, don't know.
23   Q. (BY MR. RABER) FDA is your context.
24   A. Food and Drug Administration.
25   Q. Right. What's DDMAC in that context?

---

61

1    A. Don't know.
2    Q. Do you hold yourself out as an expert in the area of
3  assessing company conduct or ethics?
4    A. I have some experience training and knowledge in
5  those areas but do not hold myself forth, per se, as an expert
6  in that area.
7    Q. Do you hold yourself out as an expert in assessing or
8  interpreting internal company documents?
9       MR. FIBICH: Object to form.
10   A. Same answer.
11   Q. (BY MR. RABER) Okay. Is Seroquel a bad drug?
12   A. What do you mean by "bad," sir?
13   Q. Is it an unsafe drug?
14   A. In some respects, yes.
15   Q. Okay. But there are some cases where you've felt
16 that it was safe and effective when you balanced the risks
17 against the benefits?
18   A. Correct.
19   Q. Do you know a Dr. Wirsching?
20   A. I know of him.
21   Q. And are you familiar with his reputation in the field
22 of psychiatry?
23   A. Somewhat.
24   Q. Is he someone whose opinions you respect?
25   A. Yes.

16 (Pages 58 to 61)

62

1    Q.  Did you read his deposition in this case?
2    A.  Yes.
3    Q.  Is there anything that stands out — I know I don't
4  want to ask you about everything.  Is there anything that
5  stands out from his deposition that you disagree with?
6    MR. FIBICH:  Object to form.
7    A.  That's a tough question.  In many, if not most,
8  respects, I agreed with Dr. Wirsching.  And certainly
9  Dr. Wirsching has areas of expertise and knowledge that I
10  have.  With respect to the issue of how things got to this
11  point, I think there was some disagreements.
12    Q.  (BY MR. RABER)  What do you mean, how things got to
13  this point?  What are you talking about?
14    A.  Although metabolic syndrome has been associated with
15  first-generation antipsychotics, I don't ever recall that being
16  an issue before — or a prominent issue before the development,
17  marketing, and consumption of second-generation antipsychotics.
18  I also think that over time the division between mind and body
19  or psychiatric and internal or physical medicine has been fast
20  eroding; and that in traditional psychiatric training, there
21  was — there was and, to some extent, continues to be a
22  division between mental disorders and physical disorders and,
23  as a result of that, psychiatrists are, at times, less
24  attentive to monitoring the physical parameters than they
25  should be.

63

1    Q.  Were Mr. Unger and Ms. Whittington monitored for
2  their blood glucose?
3    A.  Yes.
4    Q.  I want to turn, if we can, to your report.  I have
5  some questions about it.  It's Exhibit 3 right here.
6    A.  Thank you.
7    Q.  Looking at Page 2 of your report, you talk about the
8  current Diagnostic and Statistical Manual of Mental Disorders.
9  Do you see that?
10    A.  Yes, sir.
11    Q.  Now, would you agree with me that in diagnosing
12  psychiatric disorders, that the lines can sometimes be blurry?
13    A.  Just like in diagnosing in medicine in general.
14    Q.  Okay.  So, for example, someone who is in a
15  depressive cycle of manic — of bipolar disorder, that that
16  line can be maybe blurred with someone who has major depressive
17  disorder?
18    A.  Could you ask your question again, please, sir?
19    Q.  Are — just as an example of blurred lines, can major
20  depressive disorder look a lot like the depression that occurs
21  in bipolar disorder?
22    A.  They can coexist, or so-called double depression, or
23  you can have a depression — we used to call it exogenous
24  versus endogenous depression.  You can have a low-grade
25  depression superimposed — or so-called dysthymias superimposed

64

1  on bipolar disorder or so-called double depression or having
2  major and minor depression at the same time.
3    Q.  I'd like you to turn to Page 4 of your report, if you
4  would.  On Page 4 in that first big paragraph, you write
5  "Seroquel was initially approved by the U.S. Food and Drug
6  Administration in 1997 for the sole indication of treating
7  schizophrenia in adults, a relatively rare condition."
8    Do you see that?
9    A.  Yes.
10    Q.  Are you familiar with the standard that the FDA
11  applies in approving an indication for a drug?
12    A.  Somewhat.
13    Q.  Have you heard the phrase "safe and effective for use
14  as labeled"?
15    A.  Yes.
16    Q.  Okay.  And did you understand that when the FDA
17  approved Seroquel in 1997, that it was concluding that, based
18  on its judgment, Seroquel was safe and effective if used in
19  accordance with the labeling that had been approved?
20    A.  Yes and no.  I believe a truer and more accurate
21  statement would be it was initially approved for the
22  manifestation of psychotic disorders and, for reasons that are
23  unclear to me, that changed in — was it 2004 or was it
24  earlier?
25    Q.  I think you say 2003 in your report in the next

65

1  paragraph.
2    A.  2003.
3    Q.  Right.  But my —
4    A.  That's correct.
5    Q.  But my question:  Do you understand that when the FDA
6  approves a drug for an indication, that it has reached the
7  conclusion that, based on the FDA's review, the drug is safe
8  and effective if used according to the label?
9    A.  Yes.
10    Q.  Do you disagree with the FDA's decision to approve
11  Seroquel in 1997?
12    MR. FIBICH:  Object to form.
13    A.  No.
14    Q.  (BY MR. RABER)  Okay.  Do you understand that
15  Seroquel, since 1997, has been approved for several new
16  indications?
17    A.  Yes.
18    Q.  And you understand that each time the FDA concluded
19  that, in considering the data, Seroquel was safe and effective
20  if used according to the label?
21    A.  Yes.
22    Q.  Do you disagree with those conclusions by the FDA?
23    A.  In part.
24    Q.  How do you disagree with it?
25    A.  I think burying the metabolic or diabetes or weight

17 (Pages 62 to 65)

**66**

1　issue in the product information or PDR or putting it where it
2　is — and, again, I'm not familiar with in intimate detail with
3　the negotiation process between the regulator and the regulatee
4　(sic), between the pharmaceutical company and the FDA, but I am
5　most concerned about those advisements not being parsed out as
6　warnings or as contraindication or black box or at least
7　relative contraindications versus burying it in the
8　information.
9　　　So, I support the FDA's approval.  I take issue
10　with how that is communicated in a readily understandable and
11　visible fashion for the physician consumer and the patient
12　consumer.
13　　Q.  Sir, you understand that the information about
14　diabetes and hyperglycemia has been in the Seroquel label in
15　the warnings section since 2004, correct?
16　　　MR. FIBICH:  Object to form.
17　　A.  Is it 2004 or 2005, sir?
18　　Q.  (BY MR. RABER)  Well, what's your understanding?
19　　A.  Let me see what I wrote in terms of my review,
20　refresh my memory.
21　　　There was no warning of diabetes or weight gain
22　in the Seroquel labeling until the FDA required a class
23　labeling, which did not appear in the Seroquel PDR listing
24　until 2005.
25　　Q.  Do you know when that label actually was communicated

**67**

1　and provided to doctors, setting that apart from the PDR?
2　　　MR. FIBICH:  Object to form.
3　　A.  I believe there was a warning letter in 2004.
4　　Q.  (BY MR. RABER)  Okay.  And do you know whether or
5　not — and, in fact, you know that Mr. Unger's prescriber
6　received a copy of that Dear Doctor letter with the new warning
7　in January of 2004, true?
8　　A.  I believe so.
9　　Q.  And do you believe that by putting the information
10　about diabetes and hyperglycemia in the warning section that
11　AstraZeneca was somehow burying that information?
12　　A.  Through a warning letter to doctors, no.
13　　Q.  So, I take it then you're not going to offer the
14　opinion that with regard to Mr. Unger's prescriber,
15　Dr. Ares-Romero — you're not going to say that the warning was
16　buried and that she didn't know about it, are you?
17　　A.  You would have to ask Dr. Romero.
18　　Q.  Well, you've read her deposition, right?
19　　A.  Yes.
20　　Q.  And you saw that she said she knew about this warning
21　in January of 2004.  Remember that?
22　　A.  Yes.
23　　Q.  So, you're not going to offer an opinion that she
24　didn't know, are you?
25　　A.  Correct.

**68**

1　　Q.  And you're not going to offer the opinion that
2　AstraZeneca buried the warning about diabetes or hyperglycemia
3　with respect to Mr. Unger's prescriber, are you?
4　　A.  The reason that question is difficult is based on my
5　review of the marketing and internal AZ documents — in terms
6　of a general warning, the answer to your question is, no, I'm
7　not going to offer that opinion.
8　　Q.  Did you understand that the warning that was put into
9　the Seroquel label in 2004 was something that was required by
10　the FDA?
11　　A.  That is my understanding.
12　　Q.  And that that addition of a warning applied not only
13　to Seroquel but to the entire class of second-generation
14　antipsychotics?
15　　A.  Yes.
16　　Q.  Looking at Page 5 on your report, there's a paragraph
17　that says "Diabetes."  And down near the bottom of the big
18　paragraph, you write "The argument that diabetes can be tightly
19　controlled or managed for reduced mortality is in contention,"
20　comma, "if not spurious."  Do you see that?
21　　A.  Yes.
22　　Q.  What's your basis for saying that?
23　　A.  The article quoted in my report.
24　　Q.  Okay.  Are you disagreeing with the expert
25　endocrinologist who has testified that diabetes can be

**69**

1　controlled?
2　　A.  What do you mean by "controlled," sir?
3　　Q.  Meaning keeping blood sugar levels in a range where
4　the downstream consequences of diabetes are unlikely to occur.
5　　A.  Yes, but that's rather like saying, "The operation
6　was a success, but the patient died," as diabetes is one of the
7　leading and increasing causes of death in this country, and it
8　does kill you.
9　　Q.  Can you —
10　　A.  So, if you're saying control is better and you live
11　longer, yes, but —
12　　Q.  Can you —
13　　A.  — it will kill you.
14　　Q.  Can you say with reasonable certainty that diabetes
15　is going to kill Mr. Unger?
16　　A.  I cannot predict the future.
17　　Q.  Can you say with reasonable certainty that
18　Mr. Unger's diabetes is going to kill him?
19　　A.  Don't know.
20　　Q.  Can you say with reasonable certainty — strike that.
21　　　Can you identify any complications or
22　consequences of diabetes that you believe are reasonably
23　certain to occur in Mr. Unger?
24　　A.  Yes.
25　　Q.  What?

18 (Pages 66 to 69)

**70**

1    A. Cardiovascular.

2    Q. What's your basis for saying that you're reasonably

3  certain that they'll occur?

4    A. Because cardiovascular disease and diabetes are

5  leading causes of death.

6    Q. You're talking in the general population, right?

7    A. I'm talking about Mr. Unger as well; but I cannot

8  predict what will kill Mr. Unger specifically, no.

9    Q. And for that matter, specifically as to Mr. Unger,

10  you can't predict what downstream consequences of diabetes are

11  reasonably certain to occur, correct?

12    A. In a given individual, no.

13    Q. And when you say "no," you mean you cannot predict

14  that, right?

15    A. Correct.

16    Q. On Page 5 of your report, you refer to modifiable

17  risk factors for diabetes. You see that?

18    A. Yes, sir.

19    Q. And you've listed a number of them. The first one is

20  obesity. Would you agree with me that Mr. Unger was obese?

21    A. Yes.

22    Q. Would you agree with me that he was morbidly obese

23  before he ever took Seroquel?

24    A. Yes.

25    Q. You mention high blood glucose. Do you see that?

**71**

1    A. Yes.

2    Q. Did Mr. Unger have any elevated or high blood glucose

3  levels before he took Seroquel?

4    A. Don't know.

5    Q. Okay. Do you know what his blood glucose was when he

6  was in the hospital, end of August of 2002, for his diskitis?

7    A. I would have to refresh myself with the medical

8  record.

9    Q. It's not in the outline that you have, is it?

10    A. What's the date of that, sir?

11    Q. August 7th, 2002.

12    A. No, it's not.

13    Q. So, next to the risk factor of high blood glucose,

14  you would put a question mark with regard to Mr. Unger?

15    A. To more fully answer your question, I would have to

16  review my notes of -- of the medical records to see if I wrote

17  it in there.

18          What is your question, sir?

19    Q. Okay. My question is: With regard to Mr. Unger and

20  the risk factor of high blood glucose, you would have to say as

21  we sit here that you don't know one way or the other if he had

22  any high blood glucose readings before he took Seroquel. Fair

23  to say?

24    A. I don't recall.

25    Q. Okay. Hypertension. Was Mr. Unger -- did he have

**72**

1  hypertension before he started Seroquel?

2    A. Don't recall.

3    Q. Did he have abnormal lipid metabolism?

4    A. Don't recall. I'd have to refresh my memory.

5    Q. Was he physically inactive?

6    A. Yes.

7    Q. So, would you consider Mr. Unger's physical

8  inactivity a risk factor for diabetes?

9    A. Yes.

10    Q. Was he a smoker?

11    A. Yes.

12    Q. Did you consider that to be a risk factor for

13  Mr. Unger developing diabetes?

14    A. There's some debate about that. I would say yes.

15    Q. Was Mr. Unger's age a risk factor for developing

16  diabetes?

17    A. Was he older than 65? Let me see. His date of

18  birth --

19    Q. He was born in 1949.

20    A. '49. So, he's 51, plus eight now; and talking about

21  three, four, five, six years ago. If not, he's getting close.

22    Q. What's the age cut-off that is commonly accepted

23  for -- as a risk factor for diabetes?

24    A. I think 65.

25    Q. Did Mr. Unger have hyperlipidemia?

**73**

1    A. Don't recall.

2    Q. How long had Mr. Unger been morbidly obese before he

3  took Seroquel?

4    A. A good number of years.

5    Q. Do you recall seeing that his obesity dates back to

6  his teenage years?

7    A. Yes. Whether it was morbid obesity I don't think is

8  clear.

9    Q. And you remember seeing that he had actually been

10  prescribed amphetamines because of his obesity?

11    A. Correct.

12    Q. His testimony was that he had weight problems that he

13  believed were congenital. Do you remember that?

14    A. Yes.

15    Q. And do you recall his testimony that at least back as

16  far as 1997 to 1998, he had a 54-inch waist?

17    A. I don't recall the specific circumference; but, yes,

18  he had a large waist.

19    Q. Okay. Would you consider a 54-inch waist to put one

20  in the morbidly obese category?

21    A. Yes.

22    Q. Do you recall Mr. Unger's testimony that he carries

23  his weight in his midsection?

24    A. Yes.

25    Q. Is there any difference in the risk for morbid

74

1   obesity for people who carry their weight in their midsection
2   as opposed to, you know, their rear end or their arms or legs?
3       A.  Apparently so.
4       Q.  Higher risk if you carry your weight around your
5   midsection, right?
6       A.  So-called central or truncal or omental adiposity,
7   yes.
8       Q.  Would you agree with me that Mr. Unger's longstanding
9   obesity was a sufficient factor that could explain his getting
10  diabetes all by itself?
11      A.  No.
12      Q.  You don't agree with that?
13      A.  I don't agree with that.
14      Q.  Okay.  You ever heard of a Dr. Tulloch?
15      A.  I don't recall.
16      Q.  Dr. Tulloch is the expert endocrinologist who's
17  testified about Mr. Unger's case for the plaintiffs.  Have you
18  read his testimony?
19      A.  No.
20      Q.  So, if Mr. Tulloch testified that Mr. Unger would
21  have developed diabetes even if he had not taken Seroquel,
22  you'd disagree with that?
23          MR. FIBICH:  Object to form.
24          Since I haven't read — is it mister or doctor or —
25      Q.  (BY MR. RABER)  Doctor.

75

1       A.  — Tulloch's material.  You're asking me if I had
2   read it or if it were the case that Dr. Tulloch —
3       Q.  Well, let me ask you this — let me just ask it to
4   you this way —
5       A.  Sure.
6       Q.  — is it fair to say that Mr. Unger would have
7   developed — strike that.
8          Based on his risk factors for diabetes, is it
9   fair to say that Mr. Unger would have developed diabetes even
10  if he had not taken Seroquel?
11      A.  Don't know.
12      Q.  What attempt did you make in forming your opinions to
13  rule out the risk factors that Mr. Unger has for diabetes as
14  the sole cause of his diabetes other than Seroquel?
15      A.  It gets back to those Bradford Hill criteria;
16  specificity, in particular.  I don't think science is capable
17  of that.
18      Q.  So, are you saying that you did not attempt to
19  determine — let me strike that.
20          Are you saying then that you did not attempt to
21  rule out Mr. Unger's risk factors for diabetes as the sole
22  cause of his diabetes?
23      A.  I'm having a difficulty understanding your question,
24  sir, because you're referring to multiple risk factors and then
25  you're referring to a sole cause and I don't think anyone is

76

1   capable of determining a sole, s-o-l-e, cause.  Even in cases
2   of bacterial pneumonia, there are people who have the bacteria
3   who don't get pneumonia; and in the instant matter, there are
4   people who are obese that never get diabetes.  So, I don't know
5   how to answer your question —
6       Q.  Okay.  My question is just what you did.  My question
7   is:  Did you make any attempt to rule out Mr. Unger's risk
8   factors as the causes of his diabetes, with or without
9   Seroquel?
10      A.  Did I consider Mr. Unger's multiple risk factors —
11      Q.  No.  My question is — let's read it back.
12          My question is:  Did you make any attempt to
13  rule out Mr. Unger's risk factors as the causes of his
14  diabetes, with or without Seroquel?
15      A.  I'm sorry, sir.  I don't — how can I change history
16  and rule something out that has occurred in a given patient or
17  make Mr. Unger a skinny individual and then come to a
18  conclusion as to what would have occurred were he now skinny.
19  I'm not capable of doing that.
20      Q.  So, you didn't do it.  Is that fair to say?
21      A.  I didn't do what?
22      Q.  Attempt to rule out his risk factors for diabetes as
23  the sole causes of his diabetes, with or without Seroquel?
24      A.  I didn't treat Mr. Unger.
25      Q.  Sir, please answer the question.

77

1       A.  I'm answering to the best of my ability, sir.
2       Q.  What did you do to rule out Mr. Unger's risk factors
3   for diabetes as the causes of his diabetes, with or without
4   Seroquel?
5       A.  I cannot parse or rule out a given risk factor from
6   the others to meet a specificity Bradford Hill criterion in
7   this matter.  I cannot do that.
8       Q.  And, therefore, you did not do that, correct?
9       A.  If I can't do it, I didn't do it, that's correct.
10      Q.  Did you attempt to assess the relative contribution
11  of factors that caused Mr. Unger to develop diabetes?
12      A.  Did I look at them, yes.
13      Q.  Did you attempt to quantify their relative
14  contributions?
15      A.  As far as specific relative risks due to specific
16  risk factors, no.
17      Q.  Can you rule out his morbid obesity as the sole cause
18  of his diabetes?
19      A.  No.
20      Q.  Did you attempt to rule it out as the sole cause?
21      A.  No, nor can anybody else.
22      Q.  Did you — can you rule out Mr. Unger's sedentary
23  lifestyle as the sole cause of his developing diabetes?
24      A.  No, I cannot.
25      Q.  And did you attempt to do that?

78

1  A.  No.
2  Q.  Can you rule out Mr. Unger's sedentary lifestyle as
3  the sole cause of his weight gain?
4  A.  No.
5  Q.  Are you aware of any mechanism by which Seroquel
6  directly causes diabetes?
7  A.  Yes.
8  Q.  What is that mechanism?
9  A.  There are three theories and there's ongoing research
10  about these theories and there's nothing definitive at present.
11  Q.  Have any of these three theories been proven to a
12  reasonable degree of medical probability or certainty?
13  A.  No.
14  Q.  Okay.  What are these theories that you've mentioned,
15  the three theories?
16  A.  They basically fall down into direct versus indirect
17  effects.  One theory is Seroquel causes diabetes as mediated
18  through weight gain; and there's a lot in and of itself in that
19  as far as whether that's direct effects on limbic system
20  satiety centers, weight regulation, or operates through being
21  sedating and, therefore, the individual is more sedentary,
22  therefore, the individual gains weight.
23        Wirsching was disfavoring currently the opinion
24  of direct pancreatic toxicity, although that's a theory.  And
25  then there's a theory about direct effect on adipose tissues

79

1  with respect to insulin resistance.  I think those are the
2  three current leading theories.
3  Q.  Which, if any, of those three theories are you
4  relying on here?
5  A.  I think the medical record clearly shows in a
6  temporal way, accompanied by the weight gain.  And so I think
7  it is reasonable to argue or opine he would -- to a reasonable
8  degree of medical certainty, that the Seroquel -- Mr. Unger --
9  was related to the weight gain and, therefore, precipitated,
10  caused, exacerbated, or contributed to his diabetes.
11  Q.  And you're making that opinion based solely on the
12  temporal connection as you've just described it?
13        MR. FIBICH:  Object to form.
14  A.  Not solely.
15  Q.  (BY MR. RABER)  Okay.  What else?  Other than the
16  temporal connection, what else are you -- how else are you
17  connecting the dots for the Seroquel ingestion, the weight
18  gain, and the diabetes?
19  A.  In-house AstraZeneca studies about the association
20  between Seroquel and diabetes, about the dose-dependent effect
21  of Seroquel on weight gain in spite of its weight neutrality
22  spin, the -- my clinical experience with respect to patients I
23  prescribed Seroquel to gaining weight, the associated increased
24  risks of weight and diabetes, and the Japanese and Dutch
25  experience with respect to warnings about -- or

80

1  contraindications about Seroquel and diabetes.
2  Q.  Did the Dutch conclude that Seroquel causes diabetes?
3  A.  What do you mean by "cause," sir?
4  Q.  Well, you've said that, you know, to a reasonable
5  degree of medical certainty, you think Seroquel causes
6  diabetes.  My question to you:  Is it the same way?  Did the
7  Dutch conclude that Seroquel causes diabetes?
8  A.  Specifically or directly in isolation, no.
9  Q.  Okay.  Did the Japanese conclude that Seroquel causes
10  diabetes?
11  A.  No.
12  Q.  So, you disagree with the Japanese and the Dutch on
13  that?
14  A.  What do you mean by "cause"?
15  Q.  The same way you've used it in your report.
16  A.  Contributes to, exacerbates, is a risk factor for,
17  yes.  Specifically causes, in isolation of other risk factors,
18  no.
19  Q.  So, what opinion are you giving with regard to
20  Mr. Unger on causation?
21  A.  On a temporal basis, Seroquel caused his diabetes.
22  Q.  The sole specific cause?
23  A.  No.
24  Q.  Okay.  How are you using "cause" in that opinion?
25  A.  Contributes to, exacerbates, produces.

81

1  Q.  Which one?
2  A.  All the above.
3  Q.  Well, "exacerbates" would mean he already had
4  diabetes, correct?
5  A.  Exacerbates his risk factors or contributes to his
6  risk factors.  If I have somebody who has a lot of risk factors
7  for diabetes, I certainly do not want to prescribe a medication
8  that is going to tip him over the edge and ultimately may kill
9  him.
10  Q.  What does the Seroquel data show for the effects on
11  blood glucose of people who are on -- at high risk, as you've
12  just described it?
13  A.  I would have to revisit the Seroquel data in terms of
14  whether it compared high risk versus low risk people.
15  Q.  Have you seen the fairly recent submission to the FDA
16  that was requested that specifically analyzes that question?
17  A.  I'm not sure what you're referring to, sir.
18  Q.  So, you haven't seen it?
19        MR. FIBICH:  Object to form.
20  A.  I'm not sure what you're referring to.
21  Q.  (BY MR. RABER)  I'm referring to analysis of all
22  clinical trials in which Seroquel was used as monotherapy.
23  Have you seen that data?
24  A.  I don't recall.
25  Q.  Can you identify a single AstraZeneca clinical trial

21 (Pages 78 to 81)

82

1  where the data show that people with higher risk for diabetes
2  did worse on Seroquel than others?
3      A. I don't recall. I do recall recently reviewing one
4  study in which they did better.
5      Q. So, that would be inconsistent with your opinion then
6  as it pertains to Mr. Unger, wouldn't it?
7      A. Correct.
8      Q. When you mention dose-dependent data, what dose are
9  we talking about for Seroquel where the data is different?
10     A. Different than --
11     Q. Well, you said it's dose dependent. What do you mean
12  by that?
13     A. That who's dose dependent?
14     Q. The -- in your causation opinions, you mention that
15  you were relying on studies that showed a dose dependency, and
16  my question is: What were you talking about there?
17     A. There's AstraZeneca data known from 1997, I believe,
18  that there was dose-dependent weight gain.
19     Q. What -- at what doses is -- would you -- do you
20  believe there's a cut-off, where there's a difference?
21     A. I was looking at this the other day and it's not
22  coming to me.
23     Q. 400 milligrams?
24     A. I don't recall and -- because I start to confuse that
25  with the efficacy data above 300 milligrams, but that's

83

1  different than the weight gain data.
2      Q. Was Mr. Unger taking what you would consider to be a
3  low dose of Seroquel or a high dose Seroquel?
4      A. He was not being -- low dose.
5      Q. He was low dose, correct?
6      A. Yes.
7      Q. And so the dose-dependent data which shows higher
8  weight gain for people at higher doses would not apply to
9  Mr. Unger, true?
10     A. That specific data, true.
11     Q. Now, you mentioned you are relying on certain
12  in-house studies on your causation opinion. Which specific
13  in-house studies are you referring to?
14     A. Brecher's study, the studies Arvanitis was talking
15  about; and with respect to diabetes, I think it was the Geller
16  studies and/or communications --
17     Q. The Geller studies? What are those?
18     A. I think that had to do with diabetes and Seroquel.
19     Q. There's a study by Dr. Geller?
20     A. I don't recall whether there were "studies" or
21  "study" at this time.
22     Q. Are you talking about e-mails?
23     A. There were a lot of e-mails.
24     Q. And what Arvanitis study are you talking about?
25     A. I would have to refresh my memory through my notes

84

1  and the like.
2      Q. You're talking about an e-mail, aren't you?
3      A. I would have to refresh my memory in order to give
4  you my best answer.
5      Q. What Brecher study are you referring to?
6      A. The weight neutrality study.
7      Q. How does the Brecher study show or provide evidence
8  that Seroquel causes diabetes?
9      A. That would be on the theory that Seroquel causes
10  diabetes through weight gain.
11     Q. And what did the Brecher study show on weight gain?
12     A. Skinny people gain more weight. Fat people don't.
13  And the company's spin on that, in spite of the warnings in the
14  product information, is that -- the spin was that it was weight
15  neutral.
16     Q. And this spin you're referring to, that was a
17  description of the data that Dr. Brecher reported in his
18  article?
19     A. "Description" can be one way you language that.
20     Q. Okay. But the data was there that people could see
21  what the data was, right?
22     A. I don't disagree with that, sir.
23     Q. Well, in the printed study -- you knew that in the
24  published study the skinny people gained weight and the
25  heavier people lost weight. You knew that the data from the

85

1  study showed that, right?
2      A. Correct.
3      Q. And whether somebody wants to apply the term "weight
4  neutral" or "skinny people gain weight, fat people lose
5  weight," however it wants to be characterized, people are free
6  to use whatever characterizations they want of that data,
7  right?
8      MR. FIBICH: Object to form.
9      A. People are free to describe phenomena. However,
10  there is an ethical or a moral, if not legal, obligation to
11  communicate in a way that doesn't obscure the information but
12  explains the information, as Dr. Wirsching said. But more than
13  that. Primum non nocere. First of all, don't hurt people.
14      If you are branding a product -- if you are
15  branding Seroquel as a standout is or standalone or
16  distinguishing it from the other atypicals and you have your
17  pharmaceutical sales rep quoting Brecher's weight neutrality,
18  you are communicating to prescribing physicians and the
19  consuming public that weight is off the table. That does not
20  reflect the reality or the danger of the medication.
21     Q. (BY MR. RABER) Do you disagree with the data that
22  was contained in the Brecher article?
23     A. No.
24     Q. You just disagree with the way it was characterized it.
25  Is that fair to say?

22 (Pages 82 to 85)

86

1    A. No.
2    Q. Okay. What do you disagree with?
3    A. Mark Twain said there were lies, damned lies, and
4  there were statistics.
5    Q. Right. And what are you offering today?
6         MR. FIBICH: Object to form.
7    A. What I am offering today and other people have
8  offered, not just me, is it's a misdirection or
9  miscommunication, although maybe — somehow I get the feeling
10 that in this marketing stuff, they ran it by legal — that to
11 say Seroquel is weight neutral does not accurately reflect the
12 import, the effect that Seroquel has on a quarter to a third of
13 individuals, that that is a miscommunication or misdirection.
14   Q. (BY MR. RABER) Was that miscommunication or
15 misdirection that you're referring to ever made to the
16 prescribing doctors for Mr. Unger or Ms. Whittington?
17   A. Probably so, more likely than not.
18   Q. How do you know that?
19   A. Because — through the drug reps coming to my
20 office —
21   Q. Have you read —
22   A. — and saying it's weight neutral.
23        MR. FIBICH: Let him finish.
24   Q. (BY MR. RABER) Have you read the doctor's testimony
25 on that?

87

1    A. Yes.
2    Q. What did Dr. Ares-Romero say about what sales reps
3  communicated to her?
4    A. Those doctors and all the doctors would tell you that
5  they preserved an independent decision about the medication —
6    Q. I'm asking what she said, not what "those doctors"
7  do. What did Dr. Ares-Romero say about interactions with the
8  sales representatives from AstraZeneca?
9    A. Specifically, I would ask that my memory be refreshed
10 by looking at the deposition.
11   Q. You don't know, do you?
12        MR. FIBICH: Object to form.
13   A. I don't recall here today and now specifically.
14   Q. (BY MR. RABER) Are you offering an opinion that
15 Dr. Ares-Romero was misled by AstraZeneca with regard to weight
16 gain and Seroquel?
17   A. Specifically her?
18   Q. Yes.
19   A. Is it more likely than not, given the marketing and
20 branding strategy of the company? Am I able to say that
21 specifically with her? No, I'm not.
22   Q. Did you receive a complete set of the medical record
23 for Mr. Unger?
24   A. I believe so.
25   Q. Did you rely on the plaintiffs' lawyers to provide

88

1  you the medical records?
2    A. Yes.
3    Q. And they selected the medical records they sent you?
4    A. I would assume so. I also, in addition, asked for
5  any and all records or materials they deemed relevant to this
6  matter.
7    Q. Can you rule out that Mr. Unger had diabetes before
8  he started taking Seroquel?
9    A. No.
10   Q. Can you rule out that Mr. Unger had prediabetes
11 before he started Seroquel?
12   A. No.
13   Q. Now, you've — throughout your report, you've leveled
14 some criticisms towards AstraZeneca's marketing and development
15 of Seroquel. Is that fair to say?
16   A. Yes.
17   Q. Did AstraZeneca do anything right in its development
18 and marketing of Seroquel?
19        MR. FIBICH: Object to form.
20   A. Absolutely.
21   Q. (BY MR. RABER) Okay. Can you tell us some of the
22 things they did right?
23   A. Sure.
24   Q. Okay.
25        MR. FIBICH: Object to form.

89

1    A. Presumably, they wanted to help people, bring a new
2  antipsychotic or central nervous system agent to market to
3  relieve pain and suffering and disability of individuals with
4  these conditions.
5    Q. (BY MR. RABER) Anything else that they did right?
6    A. Yes.
7    Q. Let's hear it.
8    A. In terms of product development, regulatory
9  standards, research and development moneys, they spent a lot of
10 money.
11   Q. Anything else?
12   A. They devoted a lot of time and effort towards
13 bringing this medicine to market.
14   Q. Do you have any criticism of the types of studies
15 that AstraZeneca did with Seroquel?
16   A. Yes.
17   Q. Okay. What are those criticisms?
18   A. One would be — I think it was a three-week
19 open-label study that led to FDA approval to begin with. Where
20 as that meets regulatory standard, have concerns about the
21 length of that study, as well as the fact that it was open
22 label.
23   Q. Okay. Was that three-week open-label study the only
24 study that was considered when Seroquel was approved?
25   A. No.

23 (Pages 86 to 89)

90

1    Q.   Aside from your criticism of the three-week
2    open-label study, do you have any other criticisms about the
3    studies that AstraZeneca did relating to Seroquel?
4    A.   No.
5    Q.   And you have no expert opinions on that subject,
6    correct?
7    A.   Correct.
8    Q.   Was Mr. Unger psychotic at any point in time?
9    A.   Yes.
10   Q.   When do you believe he was psychotic?
11   A.   When he had the hyperosmolar state.  His psychotic
12   state was, I think, more properly medically described as
13   delirium.
14   Q.   Before his hyperosmolar state, was he psychotic?
15   A.   No.
16   Q.   Have you read the deposition of his original
17   prescriber, Dr. Cabada?
18   A.   Yes.
19   Q.   Did you see his testimony about why he prescribed
20   Seroquel to Mr. Unger?
21   A.   Yes.
22   Q.   And given that testimony, was — in your opinion, was
23   Dr. Cabada's decision to prescribe Seroquel in the manner he
24   did appropriate?
25   A.   Yes.

91

1    Q.   Okay.  And same questions as to Dr. Ares-Romero.  Do
2    you believe that her decisions to prescribe Seroquel to
3    Mr. Unger were appropriate?
4    A.   Point of clarification.  Did Dr. Romero —
5    Q.   Romero took over after Dr. Cabada closed his
6    practice.
7    A.   If I can finish, sir, my greatest concern in a
8    retrospective review of the medical records of Mr. Unger was
9    that after he had his hyperosmolar coma, he was still
10   prescribed Seroquel, and that was alarming to me.
11   Q.   Why?
12   A.   Because of the association between Seroquel and
13   diabetes.
14   Q.   Was Mr. Unger able to control his blood sugar while
15   he was taking Seroquel after the hyperosmolar state?
16   A.   Yes.
17   Q.   And how has his ability to control his blood sugar
18   compared while he was on Seroquel versus since he stopped
19   taking Seroquel?
20   A.   Don't recall.
21   Q.   Isn't that important information to know?
22   A.   Yes.
23   Q.   And given that Mr. Unger was able to control his
24   blood pressure while taking Seroquel after his hyperosmolar
25   state, why was it alarming that he was — continued to have it

92

1    prescribed to him?
2    A.   His blood pressure, did you say?
3    Q.   No.  His blood glucose.
4    A.   His blood glucose.  We don't know, in fact, sitting
5    here today about which theory is correct in terms of the
6    association between Seroquel and diabetes for some individuals
7    some of the time.  It is a risk.  Given alternate medications
8    that are potentially available to Mr. Unger, medications which
9    may not cause diabetes, medications which may not be as
10   sedating, there are alternatives available.
11   Q.   Well, did Mr. Unger need an antipsychotic medication,
12   in your view?
13   A.   No.
14   Q.   Did you read the testimony by Dr. Cabada that he was
15   concerned that Mr. Unger was about to go postal towards his
16   supervisor?
17   A.   Yes.
18   Q.   Okay.  And would an antipsychotic medication be
19   something that you would recommend under those circumstances to
20   prevent someone from harming someone else?
21   A.   You're talking about as a form of pharmacologic or
22   chemical restraint?  "Fixing to go postal," I don't think has
23   an indication.  But are these medications used as
24   tranquilizers?  Absolutely.
25   Q.   Is there anything wrong with that, in your opinion?

93

1    A.   Yes.
2    Q.   Okay.  But in Mr. Unger's case, you believe
3    Dr. Cabada's decision was appropriate under all the
4    circumstances?
5    A.   The benefit of 20/20 hindsight, yes.
6    Q.   Sir, let's go back to your report, if we can.  On
7    Page 6, you refer to the — in 2004, the American Diabetes
8    Association, the American Psychiatric Association, etcetera,
9    published a consensus statement.  Do you see that?
10   A.   Yes, sir, I do.
11   Q.   And you've read that?
12   A.   Yes, I have.
13   Q.   You've considered it in forming your opinions?
14   A.   Yes, I have.
15   Q.   Do you disagree with the ultimate findings of that
16   consensus group?
17   A.   No.
18   Q.   And you — let's mark this.  You know what?  It's —
19   I've already marked it.
20        I want to show you a document that's been
21   premarked as Defendant's Exhibit 500.  Do you recognize
22   Defendant's Exhibit 500 as the consensus statement that's
23   identified in your report?
24   A.   Yes, sir, I do.
25   Q.   Looking at Defendant's Exhibit 500, on the right-hand

24 (Pages 90 to 93)

94

1  side of this exhibit -- well, strike that.
2       Do you feel like this group of people that got
3  together was qualified to express opinions and recommendations
4  on the questions they addressed?
5     A.  Yes, sir.
6     Q.  Can you think of any group or -- or organizations
7  that would be better equipped to address these questions than
8  the ones that were involved in this consensus conference?
9     A.  No, sir.
10    Q.  Looking at the far right-hand column on the first
11 page of Exhibit 500, it says "For people who respond well,
12 antipsychotics can mean the difference between leading an
13 engaged, fulfilling community life and being severely
14 disabled." Do you agree with that statement?
15    A.  Where is that statement, sir?
16    Q.  The far right-hand column on the first page at the
17 top.
18    A.  Yes, sir.
19    Q.  Do you see where halfway down the right-hand column
20 on the first page, the group says, "In addition, all FGAs can
21 produce significant extrapyramidal effects at clinically
22 effective doses"?
23    A.  Where are you, sir?
24    Q.  About -- a little less than halfway down the far
25 right column.

96

1  particular, has a better risk profile for extrapyramidal side
2  effects than, say, Risperdal?
3     A.  Correct.
4     Q.  And Seroquel has a better risk profile for
5  extrapyramidal side effects than first-generation
6  antipsychotics?
7     A.  All of them? I don't know that.
8     Q.  Okay. Better than Trilafon, right?
9       MR. FIBICH:  Object to form.
10    A.  There was a subsequent Catie analysis which was
11 discrepant with the notion of improvement without impairment.
12 I forget whether it was the second or -- the first or second
13 Catie meta-analysis that was -- said no different than, better
14 than. I'm not sure about that. I'd have to look at that data
15 again to refresh my memory.
16    Q.  (BY MR. RABER) All right. Well, we'll come to that.
17    A.  Okay.
18    Q.  Now, you understood that the consensus group
19 concluded that the data for Seroquel and a potential
20 association with diabetes was discrepant, right?
21    A.  Correct.
22    Q.  And "discrepant" means some studies shows an
23 increased risk, other studies did not show an increased risk,
24 right?
25    A.  Correct.

95

1     A.  Yes, sir, I see it.
2     Q.  Do you agree or disagree with that statement?
3     A.  Agree.
4     Q.  Okay. It goes on to say "These side effects, which
5  include dystonic reactions, drug-induced parkinsonism,
6  akathisia, and tardive dyskinesia, can make treatment
7  intolerable for some people, leading to subjective distress,
8  diminished function, stigma, and nonadherence."
9       Do you agree with that?
10    A.  Yes.
11    Q.  Then it says "The effort to find more effective
12 medications with fewer and less-severe side effects led to the
13 development of the SGAs, often referred to as the atypical
14 antipsychotics. SGAs have fewer or no extrapyramidal side
15 effects at clinically effective doses."
16      Do you see that?
17    A.  Yes.
18    Q.  Do you agree with that statement?
19    A.  Not completely.
20    Q.  Okay. How do you disagree with it?
21    A.  Because SGAs can have and do have extrapyramidal side
22 effects for some people.
23    Q.  But not to the same extent as the FGAs, do they?
24    A.  Apparently not.
25    Q.  And you know, don't you, that Seroquel, in

97

1     Q.  And is that still the case today, that the data is
2  discrepant on that question?
3     A.  I believe so.
4     Q.  And if you look at the third page of Exhibit 500,
5  which is actually Page 598 of the article, do you see in the
6  upper left column where it says "The mechanisms responsible for
7  weight gain associated with SGA therapy are unknown"?
8     A.  Yes.
9     Q.  And do you agree with that?
10    A.  Yes.
11    Q.  Then the consensus statement goes on to say "Even a
12 small chronic imbalance between energy intake and expenditure
13 can lead to large changes in body weight over time. For
14 example, ingestion of approximately 500 calories per day more
15 than is expended can account for the largest average weight
16 gain reported with SGA therapy, 4.5 kilograms in ten weeks."
17      Do you see that?
18    A.  Yes.
19    Q.  So, we're talking there about 10 pounds in 10 weeks,
20 right?
21    A.  4.5 kilogram times 2.2 is about 10 pounds. That's
22 correct, sir.
23    Q.  Okay. So, about a pound a week?
24    A.  Yes.
25    Q.  So, at this rate, you could -- just by ingesting 500

98

1 calories a day in excess of what you're burning off, you could
2 gain 50 pounds in a year.
3    A.  Approximately, yes.
4    Q.  Okay.  And they go on to say "This amount of daily
5 increase in energy intake represents the calories in a normal
6 sized candy bar plus a soda or in an ice cream dessert."
7      Do you see that?
8    A.  Yes, sir, I do.
9    Q.  Okay.  Do you remember reading that Mr. Unger said he
10 had a weakness for ice cream?
11    A.  I don't recall that specifically.  There's a lot of
12 that going around.
13    Q.  That's a -- that's reached epidemic proportions in
14 this country, hasn't it?
15    A.  Yes, as has depression.
16    Q.  So, you would agree with the consensus statement's
17 observation that for someone who's sedentary and taking in more
18 calories than they burn off, that that alone could explain a
19 weight gain of up to 50 pounds in a year?
20    A.  Correct.
21    Q.  Did the consensus group find that Seroquel causes
22 diabetes?
23    A.  No.
24    Q.  Did the consensus group find that Seroquel
25 contributes to the cause of diabetes?

99

1    A.  It may.
2    Q.  It may?  Where does it say that here?
3    A.  I think they said numerous case reports have
4 documented the onset or exacerbation of diabetes, including the
5 occurrence of hyperglycemic crises following initiation of
6 therapy with many of the SGAs, Page 598, left-hand column under
7 boldfaced "Diabetes."
8    Q.  Right.  That doesn't refer to Seroquel, does it?
9    A.  It doesn't specifically state "Seroquel."
10    Q.  Okay.
11    A.  That's correct.
12    Q.  And, in fact, they found that -- if you look at the
13 middle column on that same page, they say "Despite limitations
14 in study design, the data consistently show an increased risk
15 for diabetes in patients treated with clozapine or olanzapine
16 compared with patients not receiving treatment with
17 first-generations or with other SGAs," correct?
18    A.  That's what they say, correct.
19    Q.  Then they say "The risk in patients taking
20 Risperidone and quetiapine is less clear.  Some studies show an
21 increased risk for diabetes where others do not," correct?
22    A.  Correct.
23    Q.  Now, do you read that as the consensus group saying
24 it's more likely than not that quetiapine causes or contributes
25 to diabetes?

100

1    A.  I read that as they don't know.
2    Q.  And that's still the case today, isn't it?
3    A.  I believe so.
4    Q.  Okay.  And so are you saying then that you disagree
5 with the consensus group on their conclusion that they don't
6 know?
7    A.  No.  I'm saying if I don't know, I'd rather err on
8 the side of caution with a given patient.
9    Q.  All right.  But if the consensus group cannot say
10 that it's more likely than not that Seroquel is causing
11 diabetes, how is it that you're able to offer that opinion in
12 this case?
13    A.  Because I think it is a risk factor.  I think there
14 is an association -- there is a temporal association between
15 diagnosis and receipt of medication and, therefore, I'm able to
16 render that opinion.
17    Q.  Is there a difference between association and
18 causation?
19    A.  Yes and no.
20    Q.  Okay.  What's the difference between association and
21 causation?
22    A.  I think, by and large, science proves correlation or
23 association versus causation and, so, too, you're going to argue
24 the temporal association does not necessarily indicate
25 causation, and that gets into what the definition of "is" is or

101

1 "causation" versus "correlation" or "association," okay?
2      It is my best professional opinion, held to a
3 reasonable degree of medical certainty, that if you have a new
4 diagnosis of diabetes in an individual who is in receipt of
5 medication, that that is a causal factor.
6    Q.  So, you're basing that on the temporal association as
7 you've just described it?
8    A.  Correct.
9    Q.  And that's -- you apply that method methodology that
10 you've just described to Mr. Unger's case and Ms. Whittington's
11 case?
12    A.  Correct.
13    Q.  I had a statistics professor who once told me the
14 eleventh commandment of statistics is that thou shall not infer
15 causation from association alone.  Do you agree with that?
16    A.  Correct.  Yes, I agree with that.  I also agree with
17 not exposing people to potential hurt or illness if there are
18 alternatives available or to taking risk factors off the table,
19 if possible, for a given patient.
20    Q.  But in some patients, there's -- well, there's risks
21 with every medication, right?
22    A.  Yes.
23    Q.  Okay.  And the doctor's job is to balance those risks
24 against the potential benefits?
25    A.  Based on reliable information.

**102**

1    Q.  And that's what Mr. Unger's doctors did, right?
2    A.  Yes.
3    Q.  And you're not disagreeing with their prescription
4  decision.  You're just saying that you believe that there was
5  some causal relationship between the Seroquel ingestion and
6  Mr. Unger's diabetes, right?
7    A.  I am saying that the notion of antipsychotics causing
8  metabolic dysfunction was not commonly known or on the front
9  burner with respect to the first-generation antipsychotics.  It
10  is now a front-burner issue with respect to the
11  second-generation antipsychotics and, given the efficacy and
12  safety data as we know it to date, that there are alternatives
13  available to Seroquel in high-risk individuals.
14    Q.  And those alternatives are — you mentioned some
15  first-generation medications earlier today?
16    A.  Sure.  Possibly Abilify.  Those studies are ongoing.
17  Possibly Geodon.  Possibly Invega.
18    Q.  Did you see Dr. Wirsching's testimony that the data
19  for Abilify actually shows that Abilify has the same weight
20  gain over time as Seroquel?
21      MR. FIBICH:  Object to form.
22    A.  I read his testimony this weekend, therefore, casting
23  doubt upon my recommendation for Abilify.
24    Q.  (BY MR. RABER)  So, would you agree or disagree with
25  Dr. Wirsching on his characterization of Abilify data?

**103**

1      MR. FIBICH:  Object to form.
2    A.  I would defer to his learned opinion.
3    Q.  (BY MR. RABER)  I want to show you a document that
4  has been marked as Defendant's Exhibit 501.  But first I want
5  to ask you, you refer to the Dutch label in 2000 providing for
6  a stronger warning than was contained in the U.S. label.
7      Do you remember that?
8    A.  Yes.
9    Q.  Do you have any knowledge as to whether or not the
10  Dutch were operating under the same rules and regulations as
11  the FDA?
12    A.  The exact same identical rules and regulations, I
13  doubt it.
14    Q.  Okay.  Do you know whether the Dutch were looking at
15  the same data that the FDA were looking at?
16    A.  Don't know.
17    Q.  Do you have any — well, strike that.
18      Do you think the Dutch got it right and the FDA
19  got it wrong?
20    A.  I think truth is probably in the middle.
21    Q.  Do you know what other European countries said about
22  Seroquel?
23    A.  Astra — AstraZeneca was also based in Britain and
24  there was some internal company documents talking about weight
25  gain or responding to the press or that sort of thing; but as

**104**

1  far as knowing their specific — European-specific warnings or
2  regulatory requirements, the answer to your question is no.
3    Q.  In how many countries has Seroquel been approved for
4  use?
5    A.  Don't know.
6    Q.  It's a lot, isn't it?
7    A.  I told you, sir, I don't know.
8    Q.  Why did you single out the Dutch and the Japanese in
9  your report?
10    A.  Because in 2000 and 2002, those countries who rank
11  above ours as far as the World Health Organization's ranking of
12  countries' health care systems sounded warnings that were not
13  sounded here.
14    Q.  Any other reasons?
15    A.  Why I mention those two?
16    Q.  Yeah.
17    A.  Well, that was provided to me by plaintiffs' counsel.
18    Q.  Okay.  What about France?  Did you mention them?
19    A.  Did I mention France?
20    Q.  Yeah.
21    A.  No, although I believe France is ranked No. 1 in the
22  World Health Organization's ranking of health care systems.
23    Q.  Okay.  And do you know what France's position has
24  been about Seroquel?
25    A.  No, I do not.  Do you know that France has never

**105**

1  approved Seroquel for use?
2      MR. FIBICH:  Object to form.
3    A.  Do I know that?
4    Q.  (BY MR. RABER)  Yeah.
5    A.  No, I do not.
6    Q.  Do you think that the FDA should defer to the French
7  health regulatory authorities and not have Seroquel on the
8  market at all?
9      MR. FIBICH:  Object to form.
10    A.  By "defer," you mean do what the French do without
11  independent consideration?
12    Q.  (BY MR. RABER)  Yeah.
13    A.  No.
14    Q.  Okay.  And do you think that — do you agree with the
15  French decision not to allow any use of Seroquel?
16    A.  If, in fact, that has been what the French have
17  decided, no.
18    Q.  Okay.  I want to show you this document marked as
19  Defendant's Exhibit 501.
20    A.  Yes, sir.
21    Q.  And this is a document that's entitled "Schizophrenia
22  and Diabetes 2003 Expert Consensus Meetings, Dublin, 3-4
23  October 2003 Consensus Summary."
24      Have you ever seen this publication before?
25    A.  I'm not sure.

106

1  Q. And this appears to be another consensus statement
2  for Europe, true?
3  A. That is correct, sir.
4  Q. All right. And do you see under the introduction
5  there, the first column on the left, little more than halfway
6  down, it says "It is thought that the pathological process that
7  leads to the development of Type 2 diabetes starts, on average,
8  10 to 15 years before diagnosis"?
9  A. Where is that, sir?
10  Q. On the left-hand column on the first page, little
11  below halfway down. Says "It is thought that the pathological
12  process that leads to the development of Type 2 diabetes
13  starts, on average, 10 to 15 years before diagnosis."
14     Do you see that?
15  A. Yes, sir.
16  Q. Do you agree with that statement?
17  A. I have no reason to disagree.
18  Q. Turn the page, if you would, please.
19  A. (Witness complies.)
20  Q. On the far left column, about halfway down the page,
21  there's a paragraph that begins "The available evidence."
22     Do you see that?
23  A. Yes, sir.
24  Q. This consensus group concluded, quote, "The available
25  evidence supports an association between antipsychotics and

107

1  impaired glucose metabolism but does not establish causality,"
2  close quote. Do you agree with that statement?
3  A. That that's what this says?
4  Q. Yes.
5  A. That's what that says, yes.
6  Q. Okay. And do you agree that that's what the evidence
7  showed when this was published in 2003?
8  A. Under what definition of "causality" in which country
9  in what context, sir?
10  Q. Are you telling me that different countries have
11  different definitions of "causality"? Let me back up. They're
12  making a distinction between "association" and "causality,"
13  aren't they?
14  A. Yes.
15  Q. Okay. And do you agree with their assessment that
16  the evidence supports an association but not causality?
17  A. In some context, that's correct, sir.
18  Q. What about the context of this case?
19  A. Product liability?
20  Q. Yes.
21  A. Causality, my understanding, is — and I'm certainly
22  not an attorney and I'm certainly not an expert on the issue of
23  legal causality, although I attempted to do some reading on
24  that related to this matter — that — it is my understanding
25  that Seroquel causes, exacerbates, or produces diabetes.

108

1  Q. In everyone?
2  A. No.
3  Q. Okay. So, can you say that if Mr. Unger had never
4  taken Seroquel, that he would not have gotten diabetes?
5  A. Of course not.
6  Q. Have you — was this Exhibit 501 among the things
7  that you considered in forming your opinions?
8  A. I don't recall whether it was one of the documents I
9  reviewed. The Dublin heading is familiar because that caught
10  my attention.
11  Q. Now —
12  A. And I also vaguely remember in the appendix looking
13  at the symptoms of diabetes where they included recurrent
14  infections, particularly mentioning thrush. That jogs
15  something in me because I don't recall seeing thrush or
16  candiditis as, per se, mentioned in the other criteria of
17  symptoms of diabetes, either ADA or Cleveland Clinic.
18  Q. Dr. Young, in your report on Page 7 —
19  Q. Do you want this back?
20  Q. Just put that with the exhibits.
21     MR. FIBICH: Here. Let me see.
22  A. And this goes —
23  Q. (BY MR. RABER) They're right here. We'll just keep
24  a little pile here. We'll keep Shanon happy.
25     On Page 7 of your report, on the second

109

1  paragraph there near the bottom, you say, "The United States
2  spends more than twice as much on each person for health care
3  as most other industrialized countries, yet it has fallen to
4  last place among those countries in preventing deaths through
5  the use of timely and effective medical care."
6     Do you see that?
7  A. Yes.
8  Q. What impact on the cost of — or expense of medical
9  care have lawsuits had on that?
10  A. I imagine a significant effect.
11  Q. Okay. And frivolous lawsuits have had a significant
12  effect on the cost of health care in this country, haven't
13  they?
14     MR. FIBICH: Object to form.
15  A. Probably so.
16  Q. (BY MR. RABER) Might that explain why the United
17  States spends more than twice as much as other industrialized
18  countries?
19     MR. FIBICH: Object to form.
20  A. I believe that is a contributory or causal but not
21  specific or sole factor.
22  Q. (BY MR. RABER) All right. Now, also on Page 7, you
23  say, "The FDA warning did not reach the PIPDR until the 2005
24  edition," correct?
25  A. Where are you, sir?

**110**

1    Q. Page 7 of your report.

2    A. Yes, sir.

3    Q. Second paragraph.

4    A. Yes, sir.

5    Q. But I think we've already — you've already agreed

6  that, in fact, the prescriber for Mr. Unger actually received

7  that warning in January of 2004 with a Dear Doctor letter,

8  true?

9    A. Yes.

10    Q. And you mention that there was not a

11  contraindication, as had been done in the Japanese label. Is

12  your opinion that the FDA should have made diabetes and

13  hyperglycemia a contraindication as opposed to a warning?

14    A. Not yet, but it's heading that way.

15    Q. Is it your opinion that they should have done that

16  with the 2004 label change?

17    A. No.

18    Q. At the bottom of Page 7, you say in the third line

19  down, "AstraZeneca waited until January 30th, 2004, to send out

20  a Dear Doctor letter to advise physicians of the warning."

21      Do you see that?

22    A. Yes, sir.

23    Q. Could AstraZeneca have sent out this Dear Doctor

24  letter any earlier?

25    A. Possibly so.

**111**

1    Q. Do you know one way or the other?

2    A. No, I don't.

3    Q. Do you know whether there were any FDA regulations

4  that controlled when and how AstraZeneca could send out that

5  Dear Doctor letter?

6    A. Do I know specifically, no, but my guess would be

7  probably.

8    Q. Looking at Page 8 of your report, you refer in the

9  third line to the — to metabolic syndrome.

10    A. Yes, sir.

11    Q. You would agree with me that Mr. Unger had the

12  metabolic syndrome before he ever took Seroquel, wouldn't you?

13    A. Yes.

14    Q. And so you're not testifying that Seroquel caused

15  Mr. Unger to develop metabolic syndrome, are you?

16    A. No.

17    Q. On Page 8 in your report, you say that — well,

18  strike that.

19    MR. RABER: When do you want to break for lunch,

20  Tommy?

21    MR. FIBICH: Whenever is convenient for you,

22  either right now or —

23    THE WITNESS: I'm needing a bathroom break.

24    MR. RABER: Why don't we just break for lunch

25  now if we're going to do that.

**112**

1    (Recess from 12:25 p.m. to 12:59 p.m.)

2    (Young Exhibit No. 5 marked.)

3    Q. (BY MR. RABER) Dr. Young, we've placed in front of

4  you a document that's been marked as Young Exhibit 5. Is Young

5  Exhibit 5 what's — it's a publication from the New England

6  Journal of Medicine dated September 22nd, 2005. Is that the

7  Catie study that you refer to, C-a-t-i-e?

8    A. Yes, sir.

9    Q. Okay. And you refer to that on Page 8 and 9 of your

10  report; is that right?

11    A. Yes, sir.

12    Q. Okay. Now, in the Catie study, that study found that

13  in terms of efficacy as measured by discontinuation rates, that

14  there was really no difference among the second-generation and

15  some of the first-generation atypical — antipsychotics, right?

16    A. Correct.

17    Q. It wasn't that the first-generation drug Trilafon was

18  better, it's just that it was found to be about the same,

19  correct?

20    A. Yes.

21    Q. All right. And the Catie study also found though

22  that Trilafon was worse than Seroquel with regard to

23  discontinuation for extrapyramidal effects, didn't it?

24    A. Let's see.

25    Q. If you look at the first page under the results, if

**113**

1  you — where — it says "Perphenazine was associated with more

2  discontinuation for extrapyramidal effects," correct?

3    A. Yes.

4    Q. And that's Trilafon?

5    A. Yes.

6    Q. So, comparing Seroquel to Trilafon, the takeaway from

7  the Catie study was that they have similar efficacy but that

8  Trilafon has a higher risk of extrapyramidal effects. Is that

9  a fair summary?

10    A. Yes.

11    Q. And the Catie study also found that olanzapine was

12  associated with more discontinuation for weight gain or

13  metabolic effects, true?

14    A. Correct.

15    Q. So, if you compared Seroquel to olanzapine, you would

16  have two drugs with similar efficacy, but Seroquel having a

17  better risk profile for weight gain and metabolic effects than

18  olanzapine.

19    A. Your question, sir?

20    Q. So, the — one conclusion from the Catie study is

21  that if you compare Seroquel to olanzapine, the two drugs have

22  comparable efficacy, but Seroquel has a better risk profile

23  with regard to weight gain or metabolic effects, true?

24    A. Yes.

25    Q. Now, did Catie show whether or not Seroquel had a

**29 (Pages 110 to 113)**

**114**

1  better or worse risk profile than Trilafon with regard to
2  weight gain or metabolic effects?
3      A.  I think the Seroquel is a plus/minus at this point.
4  Talking about which issue, sir, the weight gain?
5      Q.  Weight gain, metabolic effects.
6      A.  I'm on Page 215, weight gain and metabolic changes --
7      Q.  Yes.
8      A.  -- and I don't see it.
9      Q.  Okay.  So, there wasn't a significant enough
10 difference anyway to report any difference between Seroquel and
11 Trilafon with regard to weight gain and metabolic effects.  Is
12 that fair to infer?
13     A.  Yes.
14     Q.  And then, finally, if you're still looking at Page
15 1215, if you were to compare Seroquel to risperidone, you would
16 find that the drugs have similar efficacy but that risperidone
17 was associated with a higher increase in prolactin levels; is
18 that right?
19     A.  Correct.  It also says quetiapine was associated with
20 a higher rate of anticholinergic effects than were the other
21 drugs.
22     Q.  What page are you on there?
23     A.  1213, adverse events, last sentence of adverse
24 events.
25     Q.  And what are anticholinergic effects?

**116**

1  8 of your report.  "Results were published in the September
2  22nd, 2005, issue of the New England Journal of Medicine."
3          We just looked at that, right?
4      A.  Oh, yeah.
5      Q.  And then it says "With subsequent analyses published
6  in the American Journal of Psychiatry."
7      A.  Correct.
8      Q.  What did those subsequent analyses show about the
9  effect of Seroquel on weight gain or blood glucose levels?
10     A.  I recall subsequent analyses, there was an EPS
11 effect.  I'm trying to recall weight gain, metabolic syndrome.
12 I don't recall specifically though.
13     Q.  Okay.  Let me see if I can help you here.  I'm going
14 to show you a document that's been marked as Young Exhibit 6.
15 Does Exhibit 6 appear to be a publication from the Catie
16 investigators in the American Journal of Psychiatry with a
17 publication date in April of 2006?
18     A.  Yes, this shows that.
19     Q.  Okay.  Is this one of the subsequent analyses that
20 you were referring to in your report?
21     A.  Yes.
22     Q.  All right.  Let's look, if we can, at Table 4, which
23 starts on Page 620.  Table 4 says "Adverse events among all
24 patients in Catie Phase 2," correct?
25     A.  Yes, sir.

**115**

1      A.  Dry mouth, blurred vision, constipation, fluid
2  retention.
3      Q.  Okay.  So, can you conclude from the Catie study,
4  Exhibit 5, that Trilafon is a better choice than Seroquel?
5      A.  Under what circumstances, sir?
6      Q.  In general.  Can you make that conclusion across the
7  board?
8      A.  Across the board for each and every patient, no.
9      Q.  Can you make that conclusion across the board
10 comparing Seroquel to any of the antipsychotic drugs that were
11 studied in the Catie study?
12     A.  What conclusion about Seroquel, sir?
13     Q.  That Seroquel is not as good a choice as any of the
14 other drugs that were studied here.
15     A.  Generally speaking, across the board, no.
16     Q.  Now, you mention in your report on Page 8 a --
17 subsequent analyses published in the American Journal of
18 Psychiatry.  Do you see that at the very bottom of Page 8 of
19 your report?
20     A.  I don't see the subsequent analyses on the bottom of
21 Page 8.
22         (Young Exhibit No. 6 marked.)
23     Q.  (BY MR. RABER)  Page 8 of your report, at the bottom,
24 you say -- the last half of that sentence says "With subsequent
25 analyses published in the American Journal of Psychiatry," Page

**117**

1      Q.  And then it lists on Page -- the first page of this,
2  Page 620, it has olanzapine and risperidone at the top, the top
3  of the table.
4      A.  Correct.
5      Q.  And then if you turn the page, the table continues
6  and you see quetiapine and ziprasidone, right?
7      A.  That's correct.
8      Q.  Okay.  And among the things they looked at, if you
9  look about halfway down the table, is you see weight change
10 over course of treatment stated as pounds per month, right?
11     A.  Where are you looking, sir?
12     Q.  On Table 4, Page 620.  You see right almost in the
13 dead middle of that table, "Weight change over course of
14 treatment, pounds per month"?
15     A.  Yes.
16     Q.  Okay.  And if you -- and it lists a median and a
17 range for each drug, right?
18     A.  Yes, sir.
19     Q.  Now, if you turn the page and look in that same spot,
20 what does it say the median weight change over the course of
21 treatment was for quetiapine?
22     A.  It says zero.
23     Q.  Okay.  Would "weight neutral" be a way to describe
24 that data?
25     A.  Yes, if you were advising a 5-foot tall person that

**118**

1  the river they were fixing to cross, on average, was 5 feet
2  deep and then telling them they weren't going to drown.
3  Q. Okay. But we know more specifically that -- well, it
4  would depend on whether they could swim, too, wouldn't it?
5  A. And a host of other factors --
6  Q. Right.
7  A. -- in conjunction versus isolation.
8  Q. Right. And then it provides a range of 8 -- negative
9  8.3 to 6.1 for Seroquel, right?
10  A. Correct.
11  Q. All right. And then the next line down is the
12  average weight change over the course of treatment stated in
13  terms of pounds per month. Do you see that?
14  A. Yes, sir.
15  Q. And for the mean, what does it say it was for
16  Seroquel?
17  A. 0.1.
18  Q. Okay. Does that look like a substantial amount of
19  weight gain to you?
20  A. No, it does not.
21  Q. And, in fact, if you look at the Catie author's
22  characterization of that data on Page 618 -- do you see where
23  it says "Weight Gain and Metabolic Changes"?
24  A. Yes, sir.
25  Q. It says "Those receiving risperidone and quetiapine

**119**

1  had negligible mean changes in weight over the course of Phase
2  2." Do you see that?
3  A. Yes, I do.
4  Q. Is that spin?
5  MR. FIBICH: Object to form.
6  A. Is there some spin involved in presentation of this
7  data? Yes.
8  Q. (BY MR. RABER) Okay. So, you think the Catie
9  investigators spun the data, too?
10  MR. FIBICH: Object to form.
11  A. No. I'm saying you have data and then you have
12  interpretation of data.
13  Q. (BY MR. RABER) Okay. So, the Catie authors chose to
14  characterize a median weight change over the course of
15  treatment of zero pounds and an average weight change over
16  course of treatment, pounds per month, as 0.1 pounds -- they
17  chose to use the word "negligible" to describe that.
18  A. Correct.
19  Q. Do you think that that's an unfair characterization
20  of that data?
21  A. No, I do not.
22  Q. Would you agree with that characterization of that
23  data?
24  A. Yes, I would.
25  Q. Is that data inconsistent with the notion of Seroquel

**120**

1  causing significant weight gain?
2  A. Yes.
3  Q. Now look at the next data point under -- on Table 4
4  for quetiapine. And there's something that says "Blood
5  Chemistry Changes," and it says "Blood Glucose Milligrams Per
6  Deciliter, Mean and Median." Do you see that line across?
7  A. Yes, I do.
8  Q. And does it say for quetiapine that the blood glucose
9  mean and median changes were minus 0.2 to minus 1.0?
10  A. That's correct.
11  Q. And does that -- is that data consistent or
12  inconsistent with the notion that Seroquel causes increases in
13  blood glucose levels?
14  A. Inconsistent.
15  Q. And inconsistent with your opinion in this case?
16  A. Correct.
17  Q. How did you factor in this data from the Catie study
18  into your opinions in this case, or did you?
19  A. I did not.
20  Q. All right. I want to talk to you about another
21  study, if we can. And this particular study was in your file,
22  and it's the article by Newcomer. Let me see if I can find it.
23  A. Don't know if this was part of the exhibits or not.
24  Q. That's attached to your report.
25  A. Okay. And one of these was as well.

**121**

1  Q. That's the documents you gave me. That pile stays
2  there.
3  A. Stays? Oh, okay.
4  Q. Okay. I want to show you a document that was in your
5  file. It's a study called "Metabolic Syndrome and Mental
6  Illness" by John W. Newcomer, M.D., dated November 2007.
7  Do you see that?
8  A. Yes, sir.
9  Q. Is this an article that you considered in forming
10  your opinions?
11  A. Yes, it is.
12  MR. FIBICH: Let's go off the record just a
13  second.
14  (Recess from 1:16 p.m. to 1:17 p.m.)
15  (Mr. Fibich leaves and Ms. Fendia enters.)
16  Q. (BY MR. RABER) Dr. Young, we're looking at a
17  document that was contained within Exhibit 2. Exhibit 2 was
18  your file, we'll call it.
19  A. Yes, sir.
20  Q. And, specifically, we're looking at the article
21  entitled "Metabolic Syndrome in Mental Illness" by John W.
22  Newcomer, M.D., dated November 2007. You with me?
23  A. Yes, sir.
24  Q. Okay. And Dr. Newcomer -- did you consider this
25  article in forming your opinions?

**31 (Pages 118 to 121)**

122

1  A. I think I saw this article for the first time this
2  past weekend.
3  Q. And is this article consistent with or inconsistent
4  with your opinions?
5  A. Consistent.
6  Q. It is? Okay. Well, let's look at the first page of
7  the article and --
8  A. Well, it's consistent and inconsistent in some
9  respects, depending on how you look at the data.
10  Q. Okay. Well, let's look at the data. You understand
11  that he says here in sort of his introduction in the first
12  paragraph, "Treatment with psychotropic medications, including
13  second-generation or atypical antipsychotic medication, can
14  also be associated with adverse metabolic effects"?
15  A. Where are you, sir?
16  Q. Right-hand column, right there where it says
17  "Treatment."
18  A. Okay.
19  Q. And do you understand he's sort of teeing up the
20  issue, for lack of a better term?
21  A. Yeah. He also does that in the abstract in terms of
22  saying -- talking about non-disease-related factors, as well as
23  adverse metabolic side effects associated with psychotropic
24  medications, such as antipsychotic drugs.
25  Q. Okay. Let's look at the next page then and see what

123

1  Dr. Newcomer did about it. Do you see the first full paragraph
2  that begins "To clarify these findings"? He says, "To clarify
3  these findings, a recent meta-analysis of 14 studies -- 11
4  retrospective, 5 case control -- examined the association of
5  diabetes incidence among patients treated with atypical
6  antipsychotics compared with conventional or no antipsychotic
7  treatments." You see that?
8  A. Yes, sir.
9  Q. And would you agree that that's a useful exercise to
10  see how the second-generation antipsychotics compare, on the
11  one hand, to people taking nothing at all?
12  A. Yes.
13  Q. And that it's a useful comparison to compare how
14  people taking second-generation antipsychotics compare to
15  people taking the first-generation antipsychotics?
16  A. What are we comparing here? Talking about which
17  drugs?
18  Q. Well, let's just not get ahead ourselves. He says
19  they examined the association of diabetes incidence among
20  patients treated with atypical antipsychotics compared with
21  conventional or no antipsychotic treatment, right?
22  A. Well, again, my question would be which drugs?
23  Q. Well, he lays it out here farther on down.
24  A. Clozapine, olanzapine, quetiapine, risperidone to
25  conventionals. And does -- did he not mention any

124

1  conventionals? I think that was a question I had when I read
2  it, what the conventionals were.
3  Q. Okay.
4  A. I don't think he did.
5  Q. All right. Well, let's look at the -- what the data
6  show. The first -- you would agree that this is a
7  meta-analysis that contains more data than any single study,
8  true?
9  A. Correct.
10  Q. All right. And --
11  A. Or different kinds of data.
12  Q. Okay. And -- but presumably there are rules that
13  people follow to determine whether or not studies can be pulled
14  together, true?
15  MS. FENDIA: Object to form.
16  A. Yes.
17  Q. (BY MR. RABER) That's what statisticians do, among
18  other things, right, is determine whether you can combine data
19  or not?
20  MS. FENDIA: Object to form.
21  A. In part, that's what they do.
22  Q. (BY MR. RABER) Okay. And do you see where this
23  article says that neither risperidone versus conventional or
24  versus no antipsychotic treatment at all, nor quetiapine versus
25  conventional or no antipsychotic treatment, was associated with

125

1  an increased diabetes risk?
2  A. I'm not sure whether it was Newcomer. I know that
3  the article said that the relative risk with quetiapine was
4  1.6.
5  Q. Well, let's look at what this data shows from this
6  recent meta-analysis. What does it show about quetiapine
7  versus conventional? It shows an odds ratio of 1.22, correct?
8  A. Where are you, sir?
9  Q. At the bottom of the first column and heading over to
10  the top of the next column.
11  A. Yes, sir.
12  Q. And we know that the confidence interval is 0.92 to
13  1.61. Do you see that?
14  A. 0.92 to 1.61.
15  Q. And what does that indicate to you as to whether or
16  not this relative risk of 1.22 is statistically significant?
17  A. I don't know if it's statistically significant.
18  Q. You can't tell from looking at that?
19  A. I'm not sure where you're looking at.
20  Q. "Nor quetiapine" --
21  A. Right.
22  Q. -- "versus conventional, OR" --
23  A. Unspecified.
24  Q. -- "OR 1.22."
25  A. And the "OR" stands for what now, sir?

126

1    Q. Do you -- can you tell me what it stands for?

2    A. Odds ratio.

3    Q. Okay.

4    A. Right, 1.22. Got it. 95 percent confidence

5 interval, right.

6    Q. And the confidence interval is 0.92 to 1.61, correct?

7    A. Right.

8    Q. What does that tell you about whether or not this

9 odds ratio number for quetiapine is statistically significant?

10    A. It says it may not be.

11    Q. May not be or is not?

12    A. According to this study, not.

13    Q. Okay. And so that is inconsistent then -- this data

14 is inconsistent with the opinion you have in this case, right?

15    A. This particular statistic, yes.

16    Q. And then the next full paragraph refers to -- or I'm

17 sorry. Then let's look at the comparison where quetiapine is

18 compared to no antipsychotic. And what does it say the odds

19 ratio is there?

20    A. For quetiapine?

21    Q. Yes, versus no antipsychotic.

22    A. One.

23    Q. And the confidence interval is 0.83 to 1.2, correct?

24    A. Correct.

25    Q. And what does that say about whether this odds ratio

127

1 of 1.00 is statistically significant?

2    A. It says it's not statistically significant.

3    Q. So, at least according to this meta-analysis of 14

4 studies, would you agree that this data shows no increased risk

5 for Seroquel and diabetes compared either to conventional

6 antipsychotics or no antipsychotics?

7    A. Yes, without the conventionals being specified.

8    Q. Okay. Fair enough. But at least the data from that

9 meta-analysis of 14 studies is inconsistent with your opinion,

10 true?

11    A. Correct.

12    Q. Is it your opinion in this case that Seroquel caused

13 Mr. Unger's cholesterol to rise?

14    A. I have not previously rendered that opinion.

15    Q. You have not?

16    A. That it causes cholesterol to rise? I said it was

17 instrumental in his metabolic syndrome, if not causing and

18 exacerbating --

19    Q. Well, we know --

20    A. -- or producing.

21    Q. We know that Mr. Unger already had high cholesterol

22 before he ever started Seroquel, right?

23    A. I don't recall that.

24    Q. Well, is it your opinion or not that Seroquel caused

25 him to develop high cholesterol?

128

1    MS. FENDIA: Object to form.

2    A. I would have to refresh my memory with the data and

3 medical record, the chronology. I don't recall independently.

4    Q. (BY MR. RABER) Do you see that this Newcomer article

5 on the second page also talks about the risk of hyperlipidemia

6 among individuals with schizophrenia taking second-generation

7 antipsychotics? It's in the right-hand column where it says

8 "Lambert, et al."

9    A. Yes, sir.

10    Q. Then it describes studies that were done, and then

11 the results were reported where it says "For the 12-week

12 exposure period, olanzapine increased the risk of developing

13 hyperlipidemia compared with our other second-generation

14 antipsychotic medications." Do you see that?

15    A. Yes.

16    Q. Then it says "Exposure to clozapine, risperidone, or

17 quetiapine did not increase risk," correct?

18    A. Right.

19    Q. And it shows an odds ratio for quetiapine of 1.01

20 with a confidence interval of 0.78 to 1.32, correct?

21    A. Correct.

22    Q. That means that that 1.01 odds ratio is not

23 statistically significant, true?

24    A. That's correct.

25    Q. That data would be inconsistent with an opinion that

129

1 Seroquel caused Mr. Unger to develop hyperlipidemia.

2    A. That's correct.

3    (Young Exhibit No. 7 marked.)

4    Q. (BY MR. RABER) Showing you a document that we've

5 marked as Young Exhibit 7. Young Exhibit 7 is an article

6 called "Risk of Treatment-Emergent Diabetes Mellitus in

7 Patients Receiving Antipsychotics," with the lead author Leslie

8 Citrome, C-i-t-r-o-m-e.

9    A. Yes.

10    Q. You ever seen this article before?

11    A. "Citrome" sounds familiar.

12    Q. This one is dated October 2007 in Volume 41 in the

13 Annals of Pharmacotherapy. Do you see that at the bottom?

14    A. Correct.

15    Q. Under results, do you see where it says that a total

16 of 25 observational pharmacoepidemiologic studies were found

17 comparing antipsychotics on the outcome of diabetes mellitus?

18    A. Say again, please, sir.

19    Q. Do you see where it says under results on the first

20 page that a total of 25 observational pharmacoepidemiologic

21 studies were found comparing antipsychotics on the outcome of

22 diabetes mellitus?

23    A. Yes.

24    Q. And does that sound like data that you would be

25 interested in knowing what it says?

|  | 130 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Data from October of 2007, right? |
| 3 | A. Yes. |
| 4 | Q. Look, if you would, at Table 1. |
| 5 | A. Table 1? |
| 6 | Q. Yes. |
| 7 | A. Yes, sir. |
| 8 | Q. And that identifies the various studies that were |
| 9 | available for this analysis of 25 studies. Is that what it |
| 10 | looks like to you? |
| 11 | A. Yes, sir. |
| 12 | Q. And if you look on the page that has — starts with |
| 13 | discussion on Page — 1, 2, 3, 4 — the fifth page of this |
| 14 | exhibit, you see where the authors conclude the overall results |
| 15 | of our analysis do not demonstrate a significantly increased |
| 16 | risk of diabetes during treatment with second-generation |
| 17 | antipsychotics compared with first-generation drugs. |
| 18 | Do you see that? |
| 19 | A. Yes, I see that. |
| 20 | Q. That's inconsistent with your opinion in this case, |
| 21 | isn't it? |
| 22 | A. That's correct. |
| 23 | Q. And then it refers us to Table 3 and Figure 1, true? |
| 24 | A. Say that again, please, sir. |
| 25 | Q. That statement then refers the reader to Table 3 and |

|  | 131 |
|---|---|
| 1 | to Figure 1, right? |
| 2 | A. That's what it says. |
| 3 | Q. Okay. Let's look at Figure 1, if we can, which is |
| 4 | two pages down. |
| 5 | A. Two pages hence? |
| 6 | Q. Two pages — |
| 7 | A. Previously? |
| 8 | Q. No. Other way, towards the end. |
| 9 | A. Hence. |
| 10 | Q. I — hence. I thought "hence" meant — never mind. |
| 11 | And do you see Figure 1? |
| 12 | A. That right. |
| 13 | (Sotto voce discussion.) |
| 14 | A. I see Table 3. I see Figure 1. Here we go. |
| 15 | Q. (BY MR. RABER) Then Figure 1 lays out data which |
| 16 | shows four of the second-generation atypicals, including |
| 17 | quetiapine, true? |
| 18 | A. True. |
| 19 | Q. And do you understand how this figure works, that if |
| 20 | a dot is above the line of zero, it favors the |
| 21 | first-generation — the data favors the first-generation |
| 22 | antipsychotic; and if it's below the line, it favors the |
| 23 | particular drug listed there, but that there are also |
| 24 | confidence intervals drawn to show whether or not the |
| 25 | difference is statistically significant? |

|  | 132 |
|---|---|
| 1 | A. Yes. |
| 2 | Q. Okay. And so let's look at quetiapine. So, for |
| 3 | example, Citation — there's — does it appear to you that |
| 4 | there's one dot out of eight that appears above the zero line |
| 5 | favoring the FGA for quetiapine? |
| 6 | A. It appears that way, yes. |
| 7 | Q. And that's for Citation No. 13? |
| 8 | A. Correct. |
| 9 | Q. But you can see from the confidence interval bars |
| 10 | that that is not a statistically significant difference, true? |
| 11 | A. True. |
| 12 | Q. All right. And all of the other data points show |
| 13 | that actually quetiapine has the same as or lower diabetes risk |
| 14 | than the first-generation antipsychotics, correct? |
| 15 | A. Predominantly the same as. |
| 16 | Q. But there's one, No. 16, which is a statistically |
| 17 | significant difference in favor of quetiapine, right, |
| 18 | predominantly the same as? Do you see that? |
| 19 | A. You said the dot before was not statistically |
| 20 | significant, but the dot below is statistically significant? |
| 21 | Q. Well, look at Citation No. 16. Do you see that? |
| 22 | A. Yes. |
| 23 | Q. And do you see how the range of the confidence |
| 24 | interval is entirely below zero? |
| 25 | A. Yes. |

|  | 133 |
|---|---|
| 1 | Q. That means that that's a statistically significant |
| 2 | difference, doesn't it? |
| 3 | A. Wait. No. The bar graphs represent a confidence |
| 4 | interval. |
| 5 | Q. That's right. And because in Citation No. 16 the |
| 6 | high end of the confidence interval is below zero, that means |
| 7 | that this — that particular study showed a statistically |
| 8 | significantly lower risk of diabetes with quetiapine compared |
| 9 | to the first-generation antipsychotic. |
| 10 | A. Right. Most were neutral, one above showed diabetes |
| 11 | association, one below didn't. |
| 12 | Q. Right. But the difference is the one above, the |
| 13 | confidence interval crosses zero. And so that means it's not |
| 14 | statistically significant, correct? |
| 15 | A. And you have — says what now? Measuring what? |
| 16 | "Favors quetiapine versus favors FGA." So, that isn't a |
| 17 | measure of statistically significant. That's a — some sort of |
| 18 | measuring scale. |
| 19 | Q. You're not able to read this figure, are you? |
| 20 | MS. FENDIA: Object to form. |
| 21 | Doctor, take whatever time you need to study |
| 22 | that in answering the questions. |
| 23 | A. And the explanation for Figure 1, "Confidence |
| 24 | intervals for the attributable risk calculations pass through |
| 25 | zero for two-thirds of the computed comparisons." |

134

1    Q.  (BY MR. RABER)  That means for two-thirds of them,
2    there's no statistically significant difference, right?
3    A.  I believe so.
4    Q.  Okay.  So, let's go back to Figure 1.  And let me ask
5    it this way:  Do any of those citations there show a
6    statistically significant difference where quetiapine looks
7    worse than the FGA?
8    A.  If you're defining that as not passing through that
9    zero point on Figure 1, that's correct.
10   Q.  All right.  And if you look at the one where there
11   was a statistically significant difference that made quetiapine
12   have a lower risk than the FGA, Citation No. 16 -- do you see
13   that?
14   A.  Yes, I do.
15   Q.  And do you see the N above that?
16   A.  Yes, I do.
17   Q.  And do you know what that refers to?
18   A.  Not sponsored by a pharmaceutical company.
19   Q.  Okay.  So, the one study that's included here that
20   shows that quetiapine has a more favorable risk profile than
21   the FGA in terms of diabetes was one that was not sponsored by
22   a pharmaceutical company.  Is that what that appears to show?
23   A.  That is what that appears to show, yes.
24   Q.  That data is inconsistent with your opinions in this
25   case, isn't it?

135

1    A.  Yes.
2    Q.  All right.  We've now seen the Catie study, the
3    Newcomer study, and the Citrome study, all of which appear to
4    be inconsistent with the opinions that you hold in this case,
5    and my question to you is:  How do you reconcile those studies
6    with your opinions?
7    A.  Reasonable people can disagree.
8    Q.  Well, did you systematically go through all of the
9    available clinical trial data and epidemiological studies
10   relating to Seroquel in order to form your opinion that you
11   believe that there's a causal relationship between Seroquel and
12   diabetes?
13   A.  Reasonably so, yes.
14   Q.  Reasonably so?
15   A.  Yes.  Line by line, every word, no.
16   Q.  Okay.  Every study?
17   A.  Not every study.
18   Q.  Okay.  And, in fact, we've seen that at least two of
19   the three we just looked at, you hadn't considered, the --
20   MS. FENDIA:  Object to form.
21   Q.  (BY MR. RABER)  Right?
22   A.  I didn't say that.
23   Q.  Well, you didn't know about the -- you didn't --
24   hadn't seen the Catie follow-up data on glucose that we looked
25   at and you hadn't seen this Citrome 2007 study, right?

136

1    MS. FENDIA:  Object to form.
2    A.  Like I told you, sir, "Citrome" rings a bell.  In the
3    conclusion of the Citrome article on the first page, says "The
4    avoidance of diabetes as an outcome cannot be predictably
5    achieved with precision by choice of a second- versus a
6    first-generation antipsychotic," and to me what that says is
7    the second-generations aren't better than the first in that
8    regard.
9    Q.  (BY MR. RABER)  With regard to metabolic risks and
10   weight gain, right?
11   A.  Right.
12   Q.  I'm sorry.  This is relating to diabetes, right?
13   A.  Yes.
14   Q.  And so there -- she's concluding no difference.
15   A.  What that tells me is that new and improved is not
16   new and improved.
17   Q.  Well, have they ever said that they're new and
18   improved on the metabolic side effects compared to the
19   first-generation?
20   A.  Compared to first-generation specifically, "they"
21   being AstraZeneca?
22   Q.  No.  The promise of the atypicals was that they were
23   better on the EPS and movement-type disorders, not on the
24   metabolic issues.  Am I right about that?
25   A.  The promise of the second-generation antipsychotics

137

1    was that we would not be hurting patients, number one; number
2    two, we would be helping them; and, No. 3, there wasn't an
3    issue of pre-prescription or premedication or monitoring of the
4    patient while on the medication closely in the sense that from
5    the Catie study, 70 percent of all subjects ultimately
6    discontinued the medication; meaning, across the board,
7    medications, like other medications in medicine, not complied
8    with or taken over time.
9    Q.  Let's go back to my question.
10   A.  And --
11   Q.  You're not answering it.
12   A.  What is your question, sir?
13   MS. FENDIA:  You can finish your answer.
14   MR. RABER:  No.  He's not answering the
15   question.
16   Q.  (BY MR. RABER)  The question is --
17   MS. FENDIA:  Excuse me, sir.
18   Q.  (BY MR. RABER)  The question is --
19   MS. FENDIA:  Let him finish his answer or we're
20   going to break it.  Let him finish it and then you can object
21   to --
22   MR. RABER:  Well, I'll tell you what.  I'm
23   trying to finish this deposition.  I'm not --
24   MS. FENDIA:  Let him finish his response.
25   MR. RABER:  He's not answering the question.

138

1      MS. FENDIA:  Let him finish the response.  We're
2  not answering another question until he finishes his response.
3  How's that?  Do you want to take it up with the court?
4      MR. RABER:  Yeah, I'd like to.  I'd like to.
5      MS. FENDIA:  Okay.
6      MR. RABER:  I'd like to.
7      MS. FENDIA:  Proceed.  Finish your question --
8  finish your answer, Doctor.
9      A.  I'm sorry.  I was distracted by the lawyering.  What
10  is your question?
11      Q.  (BY MR. RABER)  My question is this:  Wasn't the
12  primary benefit that was touted for the second-generation
13  antipsychotics that they would provide similar efficacy with
14  fewer movement problems, EPS problems, tardive dyskinesia,
15  those kinds of things?
16      A.  Not --
17      MS. FENDIA:  Object to form.
18      A.  Not exactly.
19      Q.  (BY MR. RABER)  Did the second-generation
20  antipsychotics -- were they developed to have a more favorable
21  profile on weight gain and diabetes?
22      A.  I don't recall that as a primary focus.
23      Q.  Now, you mentioned that one reason that you use
24  Trilafon instead of Seroquel is because you want to put people
25  who are more at risk for diabetes on Trilafon, right?

139

1      A.  Correct.
2      Q.  That's because it's your perception that Trilafon has
3  a better risk profile for diabetes and weight gain than
4  Seroquel does?
5      A.  It may in a given individual, yes.
6      Q.  But you don't know that, do you?
7      A.  I think the data is out on that as well as to
8  whether -- still out on that as to whether in some individuals
9  some of the time Seroquel causes diabetes, okay?  And there's
10  studies being done on that.  And to the extent that I can
11  remove the risk or take it off the table in prescribing for a
12  patient, I would want to do that.
13      And with respect to the EPS to the
14  first-generation antipsychotics, there was treatment for that
15  as well.  And then the question becomes one of cost and are you
16  getting value or value added for the dollar cost of your
17  medication, and at what risk.
18      Q.  The data that we've just looked at does not support
19  the notion that Seroquel has a higher risk for diabetes than
20  conventional antipsychotics, does it?
21      A.  Correct, with the conventional antipsychotic -- with
22  the conventional -- conventional -- with the first-generation
23  antipsychotics not being specified.  In the, for example,
24  Newcomer article, they were not specified.
25      Q.  Going to show you a document that has previously been

140

1  marked as Defendant's Exhibit 107.
2      MS. FENDIA:  Thank you.
3      Q.  (BY MR. RABER)  Have you ever seen Defendant's
4  Exhibit 107 before?
5      A.  Give me a moment to review it, sir.
6      Q.  Okay.
7      A.  This is pertaining to Seroquel XR.
8      Q.  That's correct.
9      A.  I don't recall seeing this.
10      Q.  Okay.  Well, if you turn to the very last page,
11  you'll see that this is a communication from the FDA from just
12  last week on October 8th, 2008, true?
13      MS. FENDIA:  Object to form.
14      MR. RABER:  What's wrong with the form?
15      MS. FENDIA:  I'm not sure that having the name
16  Thomas Laughren here and that date and time confirms your
17  statement.
18      A.  On the last page of the document you gave me, there
19  is a date of 10-08-2008.
20      Q.  (BY MR. RABER)  Right.  From Thomas Laughren?
21      MS. FENDIA:  Object to form.
22      A.  I assume.  I don't know.
23      Q.  (BY MR. RABER)  Do you know who Thomas Laughren is?
24      A.  No.
25      Q.  Look at the third page of the Exhibit 107.  See where

141

1  he's listed as the director of the Division of Psychiatry
2  Products, Office of Drug Evaluation 1, Center For Drug
3  Evaluation and Research?
4      A.  Yes, I see that.
5      Q.  And do you see under the "Sincerely" it says "See
6  appended electronic signature page"?
7      A.  Yes, sir, I see that.
8      Q.  Okay.  Do you understand that -- well, let me ask you
9  this:  Are your opinions different for the Seroquel XR
10  formulation than they are for the regular Seroquel formulation?
11      A.  I hadn't considered the Seroquel XR formulation in my
12  opinion.
13      Q.  Is it the same active molecule?
14      A.  In some respects, it's -- the product is the same and
15  in some respects it's different.  "XR" stands for extended
16  relief (sic).  Beyond that, I don't know.
17      Q.  Okay.  Now, do you see that on the first page of
18  Exhibit 107 that the FDA is approving three new indications for
19  Seroquel XR?
20      A.  What page, sir?
21      Q.  First page.  Says "NDA 22-047S-006 provides for the
22  use of Seroquel XR as monotherapy in the treatment of bipolar
23  depression."
24      A.  New drug application.  Yes, it says that.
25      Q.  And then it refers to another one that provides for

36 (Pages 138 to 141)

142

1  the use of Seroquel XR as monotherapy in the treatment of
2  bipolar mania?
3      A. As opposed to acute mania. Yes, it says that.
4      Q. And then the next one says that it provides for the
5  use of Seroquel XR as adjunctive therapy in the treatment of
6  bipolar mania. Do you see that?
7      A. Yes.
8      Q. And do you understand that this is referring to three
9  new proposed indications?
10     A. I understand.
11     Q. And then the next paragraph says "We have completed
12  our review of your submissions as amended. They are approved
13  effective on the date of this letter for use as recommended in
14  the enclosed agreed-upon labeling text." See that?
15     A. Yes.
16     Q. And do you understand that just last week the FDA
17  approved Seroquel XR for three new indications?
18     A. Based on this document, yes.
19     Q. And that the regulatory requirement for such approval
20  is a finding that the drug is safe and effective as labeled?
21         MS. FENDIA: Object to form.
22     A. I don't see that statement in this --
23         Q. (BY MR. RABER) Okay.
24     A. -- document as yet. Maybe it's in there.
25     Q. Okay. Do you agree or disagree with the FDA's

143

1  decision to approve Seroquel for three new indications as
2  recently as last week?
3         MS. FENDIA: Object to form.
4      A. I don't have an opinion on that.
5      Q. (BY MR. RABER) Do you -- are you aware of the FDA
6  ever concluding that Seroquel causes diabetes?
7      A. Am I aware?
8      Q. Yeah.
9      A. Yes, I'm aware.
10     Q. Has the FDA made that conclusion?
11     A. No, it has not.
12     Q. Has the FDA made the conclusion that Seroquel
13  exacerbates diabetes or prediabetes?
14     A. Exacerbates as opposed to may be correlated it with,
15  thereby earning a class warning, yes.
16     Q. It's your testimony that the FDA has concluded that
17  Seroquel actually exacerbates diabetes or prediabetes?
18         MS. FENDIA: Object to form.
19     A. I don't think -- I would have to look at the language
20  of the warning, whether they use the word "exacerbates" or
21  "is -- may be associated with." They say there's a
22  relationship.
23     Q. (BY MR. RABER) Okay. What are you looking at?
24     A. The 2003 FDA required class warning.
25     Q. Okay. Well, let's look at the most recent state of

144

1  the art science here in Exhibit 107. You see that it refers --
2         MS. FENDIA: Object to the sidebar.
3      Q. (BY MR. RABER) Okay. Do you see that it refers to
4  the enclosed agreed-upon labeling text in the approval letter?
5      A. I'm sorry. Where are you --
6      Q. The bottom of the first page, "We have completed our
7  review," and it talks about the enclosed agreed-upon labeling
8  text.
9      A. Yes, I see that.
10     Q. Okay. And you see that there's actually a label
11  attached to this approval letter?
12     A. Yes.
13     Q. And on the first page of that label, there's an --
14  upper right-hand corner, there's a warning and precaution for
15  hyperglycemia and diabetes mellitus.
16     A. Yes. I see that.
17     Q. Okay. Does it say there that Seroquel causes or
18  exacerbates diabetes?
19     A. No. It says "Hyperosmolar coma" -- "ketoacidosis,
20  hyperosmolar coma, and death have been reported in patients
21  treated with atypical antipsychotics, including" --
22     Q. Quetiapine.
23     A. -- "quetiapine." Thank you.
24     Q. And then if you look at -- refers you to Section 5.3,
25  correct? At the end of that paragraph there, it says,

145

1  parentheses, "5.3"?
2      A. That's what it does.
3      Q. Okay. If you go to Page 10, which is Section 5.3,
4  you'll see that there's the warning for hyperglycemia and
5  diabetes mellitus, right?
6      A. Yes.
7      Q. And does that warning say anywhere that the FDA has
8  conclude that Seroquel either causes or exacerbates
9  hyperglycemia or diabetes?
10     A. "Causes" as distinguished from "associated with"?
11     Q. Right.
12     A. It doesn't use the word "cause," that's correct.
13     Q. Okay. In fact, it says "Assessment of the
14  relationship between atypical antipsychotic use and glucose
15  abnormalities is complicated by the possibility of an increased
16  background risk of diabetes mellitus in patients with
17  schizophrenia and the increasing incidence of diabetes mellitus
18  in the general population." Do you see that?
19     A. Yes.
20     Q. Would you agree with that statement?
21     A. Yes.
22     Q. And then it says "Given these confounders, the
23  relationship between atypical antipsychotic use and
24  hyperglycemia-related adverse reactions is not completely
25  understood." You see that?

146

1   A.  Yes.
2   Q.  Do you agree with that?
3   A.  Yes.
4   Q.  All right.  So, you have no quarrel with the FDA
5   approving Seroquel for three new indications.  Is that fair to
6   say?
7       MS. FENDIA:  Object to form.
8   A.  I have not seen this document before, was not asked
9   to opine about new indications for Seroquel Extended Release
10  and, at this point in time, I have no quarrel.
11      Correct me if I'm wrong, but I think the
12  Japanese did say -- implicate Seroquel as causing diabetes,
13  but -- I would have to refer to that document, but --
14  Q.  (BY MR. RABER)  Did I ask you about the Japanese?
15  A.  Earlier you did, sir.
16  Q.  Did I ask you about the Japanese just now?
17      MS. FENDIA:  Object to form.
18      MR. RABER:  Move to strike.
19      MS. FENDIA:  Finish your answer, Doctor, then he
20  can make his objection, like he's supposed to.
21      MR. RABER:  Look, if I ask him about the FDA and
22  he's going to talk about the Japanese, we're never going to
23  finish this deposition.
24      MS. FENDIA:  Well, then we'll just have to stay
25  until it finishes.  Let the gentleman finish his answer.

147

1       MR. RABER:  Thank you for saying that.
2   Mr. Fibich says something else.
3       MS. FENDIA:  Well, you know what, when
4   Mr. Fibich comes back, if he wants to change the rules back to
5   where you can badger this witness, cut him off, and not let him
6   finish his answers, that's up to Mr. Fibich.
7       Doctor, finish your answer, please.
8   A.  What was the question, please, sir?
9   Q.  (BY MR. RABER)  Why are you referring to the Japanese
10  label?
11  A.  It has relevance of bearing in this matter.
12  Q.  Do you know whether the Japanese were looking at the
13  same data or different data from what the FDA looked at?
14  A.  Specifically, no.
15  Q.  Do you know whether the Japanese apply a different
16  standard than the FDA in determining what gets listed as a
17  contraindication?
18  A.  Specifically, no.
19  Q.  And you know that aside from these recent XR
20  approvals that we just looked at, that Seroquel was approved
21  for new indications between January of 2004 and these most
22  recent approvals in October of 2008, true?
23  A.  Correct.
24  Q.  And do you agree or disagree with the FDA's decision
25  to approve Seroquel for those new indications?

148

1       MS. FENDIA:  Object to form.
2   A.  What was your question again, sir?
3   Q.  (BY MR. RABER)  Do you agree or disagree with the
4   FDA's decision to approve Seroquel for those new indications?
5       MS. FENDIA:  Object to form.
6   A.  I do not disagree or take issue with the FDA on that
7   matter, or those matters.
8   Q.  (BY MR. RABER)  And would you -- would it be fair to
9   say that the FDA had the benefit of reviewing more data than
10  you've had in forming your opinions here?
11      MS. FENDIA:  Object to form.
12  A.  More data and perhaps different data.
13  Q.  (BY MR. RABER)  They had data not only about Seroquel
14  but about all the other atypical antipsychotics, true?
15  A.  I do not know what data the FDA had or didn't have in
16  its approval process.
17  Q.  Okay.  It's likely, isn't it, that they had more data
18  than you've had available to you, correct?
19      MS. FENDIA:  Object to form.
20  A.  Probably so.
21  Q.  (BY MR. RABER)  And they have experts at the FDA
22  whose job it is to analyze and review data like that, don't
23  they?
24  A.  Yes.
25  Q.  They have endocrinologists, correct?

149

1   A.  I don't know.
2   Q.  Diabetes experts?
3   A.  I imagine --
4       MS. FENDIA:  Object to form.
5   A.  It would be conjecture on my part to tell you what
6   experts from what disciplines are represented at the FDA in
7   their approval process.
8   Q.  (BY MR. RABER)  Looking at Page 11 of your report, if
9   we can dig that out -- here it is here.
10  A.  We're no longer looking at the material I didn't see
11  before today?
12  Q.  We're not looking at that right now.
13  A.  Okay.
14  Q.  Do you want to look at it some more?
15  A.  Perhaps later.
16  Q.  Okay.  You'll get a copy of it.
17  A.  Thank you.
18  Q.  You can probably actually get it on the FDA website.
19      Let's look at Exhibit 3, which is your report,
20  and Page 11 specifically.  On Page 11, you state specific
21  opinions relating to Richard Unger; is that correct?
22  A.  Correct.
23  Q.  And you note in the second paragraph that his past
24  medical history includes chronic pain requiring opioid
25  medication and ambulatory assistance, correct?

38 (Pages 146 to 149)

150

1    A. Correct.

2    Q. And opioid medication -- is "narcotics" another word

3 for that?

4    A. Correct.

5    Q. Can narcotics like that be addictive?

6    A. Yes.

7    Q. And what effect do narcotics like what you refer to

8 in this report have on a person's sedation?

9    A. They can be sedative.

10    Q. Did you see evidence of that with Mr. Unger, that the

11 narcotics he was taking for his pain had a sedation effect on

12 him?

13    A. I was concerned about that.

14    Q. And his doctors were concerned as well, weren't they?

15    A. Correct.

16    Q. And do you know how the -- what impact on sedation

17 those narcotics had compared to any sedative effects of

18 Seroquel?

19    A. No, I do not.

20    Q. You mention -- in the third paragraph here, you refer

21 to diabetic risk factors for Mr. Unger. Do you see that?

22    A. Yes, I do.

23    Q. You say "Diabetic risk factors include hypertension,

24 morbid obesity, hyperlipidemia, smoking, and medications"; is

25 that right?

151

1    A. Correct.

2    Q. Does that refresh your recollection that Mr. Unger

3 had both hypertension and hyperlipidemia?

4    A. Yes.

5    Q. I think you mentioned before that you couldn't

6 remember that fact, right?

7    A. Right.

8    Q. And you say Seroquel was prescribed off-label.

9    A. Right.

10    Q. Then you say, "Insulin-dependent diabetes appears

11 treatment-emergent with ingestion of Seroquel," correct?

12    A. Correct.

13    Q. Is Mr. Unger insulin dependent as we sit here today,

14 insulin dependent?

15    A. As we sit here today?

16    Q. Yes.

17    A. Don't know. As of his last record, I thought he was

18 taking insulin, although I may be confusing him with

19 Whittington because one was insulin dependent and one was on

20 metformin. Insulin-dependent diabetes appears treatment

21 emergent.

22    Q. Bear with me just a second here.

23        (Young Exhibit No. 8 marked.)

24    Q. (BY MR. RABER) Doctor, I'm showing you a document

25 we've marked as Young Exhibit 8. And you see that this is a

152

1 medical record relating to a Rafael Mas and Mr. Unger, date --

2 bottom right -- of June 19th, 2006?

3    MS. FENDIA: Thank you.

4    A. Yes.

5    Q. (BY MR. RABER) And that's approximately nine months

6 after Mr. Unger was diagnosed with diabetes. Do you see that?

7 He was diagnosed in September of 2005, and this is nine months

8 later, right?

9    A. September 2005. Six, seven, eight, nine. Correct.

10    Q. All right. And do you see near the top there there's

11 a reference that says "NIDDM" under the history?

12    MR. RABER: Is it okay if I walk around and

13 point it to him?

14    MS. FENDIA: I can show it to him.

15    A. NIDDM.

16    Q. (BY MR. RABER) What does that stand for?

17    A. Non-insulin-dependent diabetes mellitus.

18    Q. Okay. And does that indicate to you that at least as

19 of September of -- I mean, June of 2006, his treating

20 physicians considered him to have non-insulin-dependent

21 diabetes?

22    A. That's correct.

23    Q. So, is your report incorrect here in stating that he

24 had insulin-dependent diabetes?

25    A. I'm not sure in terms of the time frame and the

153

1 records I reviewed because he did receive -- I thought he

2 received insulin. If he didn't receive insulin, then that

3 would be incorrect. If he is currently not receiving insulin,

4 then that would be incorrect.

5    Q. Now, you say in your report on Page 11, "Upon

6 discontinuation of Seroquel, Mr. Unger claims he lost 30 pounds

7 and did not need his power scooter to move from one place to

8 another." Do you see that?

9    A. Looking for it.

10    Q. Near the bottom. On -- it's about eight lines from

11 the bottom.

12    A. Yes.

13    Q. Okay. The statement there, "Upon discontinuation of

14 Seroquel, Mr. Unger claims he lost 30 pounds" --

15    A. Are you through with this, sir?

16    Q. Put that down, yes. Let's start over.

17        The statement in your report which says "Upon

18 discontinuation of Seroquel, Mr. Unger claims he lost 30

19 pounds," that statement's not correct, is it?

20    A. Mr. Unger didn't claim that?

21    Q. Did Mr. Unger lose 30 pounds upon discontinuation of

22 Seroquel?

23    A. I would have to look at the record.

24    Q. All right. Let's look at actually your report.

25 Turn, if you would, to the attachment, the medical timeline

**154**

1  that's attached — it's attached to your report. The report's
2  right there.
3      A.  I don't see the timeline.
4      Q.  Okay.  Here.  It should be right here.  This should
5  be attached to this.  Let's attach it.
6      Okay.  Specifically looking at Page 23 of the
7  timeline chronology in your report —
8      A.  One moment, sir —
9      Q.  Okay.
10      A.  — because I'm now mixed up on what's been copied and
11  yours and what's in my file and mine.
12      Your question, sir?
13      Q.  Okay.  Looking at Page 23 of this timeline,
14  chronology, whatever we want to call it, that shows that — for
15  the October 2nd, 2006, entry, it says "The patient stopped the
16  Seroquel last night," right?
17      A.  Yes.
18      Q.  And so that means he stopped it on October the 1st,
19  right?
20      A.  Yes.
21      Q.  Okay.  And just three days — three or four days
22  before that his weight was 313 pounds, right?
23      A.  About five days.
24      Q.  Well —
25      A.  Well, the night before.

**155**

1      Q.  Was the 1st —
2      A.  Four days.
3      Q.  Four days.  And that's the closest weight we have in
4  time to when he stopped Seroquel, 313 pounds, right?
5      A.  Yes.
6      Q.  All right.  And if you look about two weeks later,
7  he's been off Seroquel for 11 days.  On October 12th, 2006, how
8  much does he weigh?
9      A.  Well, it says "Seroquel," so I'm not sure on that
10  date he's on Seroquel or not.
11      Q.  Okay.  Well, we know that the record on the 2nd says
12  he stopped the Seroquel last night, right?
13      A.  But according to this, the record on the 12th per
14  Dr. Quintero says he's on Seroquel.
15      Q.  It does?  It just says "Seroquel" on this outline,
16  right?
17      A.  Yes.
18      Q.  Okay.  And you don't know what that means.
19      A.  Well, I don't know whether he's on or off the
20  Seroquel at this point according to this document.
21      Q.  Okay.  How much did he weigh — did he gain or lose
22  weight after this record indicates he had stopped the Seroquel?
23      A.  Depending on whether he's receiving Seroquel, there
24  is a 12-pound weight difference between 09-27-06 and 10-12-06.
25      Q.  So, if we interpret the note as saying he stopped the

**156**

1  Seroquel last night — meaning October 1st, 2006 — there's
2  about a 12-pound weight gain after he stopped, true?
3      MS. FENDIA:  Object to form.
4      A.  Ask your question again, please, sir.
5      Q.  (BY MR. RABER)  According to the note which says the
6  patient stopped the Seroquel last night — meaning October 1st,
7  2006 — there appears to be approximately a 12-pound weight
8  gain after he stopped using Seroquel, true?
9      MS. FENDIA:  Object to form.
10      A.  I don't know if that's true or not.
11      Q.  (BY MR. RABER)  Okay.  And that's because the
12  reference on October 12th in this summary has the word
13  "Seroquel" in it?
14      A.  Correct.
15      Q.  What was his weight on December 4th of 2006?
16      A.  Talking about a 12-pound weight gain in —
17      Q.  Two weeks.
18      A.  — three — in two weeks?  That's a lot.
19      Q.  Well, remember we saw the study that said a pound a
20  day with just a little bit of ice cream more than what you're
21  supposed to burn off, right?
22      A.  Do I remember that?  Yes.
23      Q.  Do you remember that?  Okay.
24      A.  Yes, I do.
25      Q.  And so at least according to this chronology, he

**157**

1  gained 12 pounds between September 27th, 2006, and October 12th
2  of 2006, correct?
3      A.  Correct.
4      Q.  And then on December 4th of 2006, how much does he
5  weigh?
6      A.  December 4th of 2006?
7      Q.  Yes.
8      A.  345.1.
9      Q.  So, it looks like in little over two months after he
10  stopped Seroquel, he gained 32 pounds, right?
11      A.  If the Seroquel has been stopped during this time,
12  yes.
13      Q.  That would be inconsistent, wouldn't it, with your
14  theory that Seroquel caused him to gain weight?
15      MS. FENDIA:  Object to form.
16      A.  Yes.
17      Q.  (BY MR. RABER)  And that weight that was taken on
18  December 4th, 2006, we know that that's a reliable weight,
19  don't we?
20      MS. FENDIA:  Object to form.
21      A.  I have no way of knowing.
22      Q.  (BY MR. RABER)  Okay.  You see, for one thing, it's
23  to — measured to the tenth of a pound.  Do you see that?
24      A.  Yes.  It would be unlikely for Mr. Unger to report
25  that to the tenth of a pound.

158

1     Q.  Okay.  Let's look, if we can, at — let me ask you
2  this:  When someone goes in for surgery for preadmission, do
3  they sometimes get weighed?
4     A.  Pardon me.  I was distracted by the record which
5  states he was getting insulin injections, Symlin; although I
6  was reading something about Symlin not being insulin or
7  different somehow, which would indicate he was being treated
8  with injections.
9     Q.  Well, is being treated with injections something
10  different from being insulin dependent?
11     A.  I assume that —
12     Q.  Do you know?
13     A.  I assume, if I can finish my answer —
14     Q.  Well, I'm sorry, but the — but assumptions aren't —
15     MS. FENDIA:  Let's let him finish his answer,
16  please.
17     Finish your answer, Doctor.
18     A.  I assume if he's taking injections, that means the
19  current state of his disease management is insulin dependent.
20  That is my assumption.
21     Q.  (BY MR. RABER)  Okay.  But you don't know that to be
22  true.
23     A.  Could it, in fact, be possible for an endocrinologist
24  or a diabetologist to say that a person injecting themselves
25  with insulin to treat their diabetes is not insulin dependent

159

1  because it's temporary or time limited and, therefore, not
2  dependent in a given period of time?  That's certainly
3  possible, sir.
4     Q.  Sir — sir, how do you know he's injecting himself
5  with Symlin as opposed to something else?
6     A.  It says "Symlin, ten units before meals."
7     Q.  Where does it say that?
8     A.  Page 24, bottom of the paragraph.  I don't think I
9  made up the statement in my report that he was being treated
10  with insulin injections out of whole cloth.
11     Q.  Okay.  And it's your testimony that Symlin is
12  insulin?
13     A.  No, it is not.  I raised the issue in my earlier
14  answer that I had read something about how Symlin is used to
15  treat diabetes but may not technically be insulin and did not
16  fully understand that.  However, my understanding is the guy
17  is — Mr. Unger, the patient, is being subjected to
18  prescribed — experiencing needles into his skin in order to
19  treat his condition.
20     Q.  Okay.  Now, my question is:  When somebody goes
21  through a preadmission process for surgery, is it your
22  understanding that people get weighed?
23     A.  Yes.
24     Q.  And it's — that weight is an important one because
25  it affects, for example, the anesthesia that someone gets in

160

1  surgery, right?
2     A.  That's one reason, yes.
3     Q.  Okay.  And so a weight like that would be more
4  reliable than a self-reported weight, wouldn't it?
5     A.  May be, yes.
6     (Young Exhibit No. 9 marked.)
7     Q.  (BY MR. RABER)  Okay.  I want to show you a document
8  that we've marked as Young Exhibit 9.  This is a Mercy Hospital
9  preadmission record dated December 1st of 2006.  You see that?
10     A.  Yes.
11     Q.  And —
12     A.  Well —
13     Q.  — procedure date —
14     A.  Oh, pre-admit time.  Yes.
15     Q.  Okay.  And so you understand that Mr. Unger was at
16  the hospital on December 1st of 2006 to have certain tests done
17  before a surgical procedure?
18     A.  He was having a melanoma removed, is my
19  understanding.
20     Q.  Okay.  And if you look at the patient information
21  section, the middle, you see where it says "Weight:  345.1
22  pounds"?
23     A.  Yes, sir.
24     Q.  Okay.  That's more — strike that.
25     On December 1st of 2006, Mr. Unger is not taking

161

1  Seroquel, is he?
2     A.  I would have to refresh my memory on that.  Let me
3  look at his medications because that's certainly a part of a
4  presurgical or preadmission hospital record, and if I look for
5  a list of the medications the patient is on prior to his
6  surgery — I don't see it.
7     Q.  You don't see the list of medications or you don't
8  see Seroquel?
9     A.  I don't see a list of medications on this hospital
10  preadmission record.  I'm looking for it.  Anesthesia,
11  achievement plate (sic), medical — where is meds?  That's
12  important, too, prior to surgery.
13     Q.  Well, let me ask you this:  Do you remember
14  Mr. Unger's testimony that he stopped taking Seroquel in
15  October of 2006?
16     A.  The specific date, no; that he self-discontinued
17  based on concerns he had, yes.  But there are no medications
18  listed on this pre-op form and preadmission record.
19     Q.  Okay.  Well, in looking at Exhibit 9, are you
20  assuming that he's taking Seroquel or not taking Seroquel?
21     A.  Neither.  I make no assumption.
22     Q.  Okay.  Would you agree with me that this weight of
23  345.1 pounds on December 1st of 2006 is higher than it was at
24  any time when we know that Mr. Unger was actually taking
25  Seroquel?

41 (Pages 158 to 161)

162

1    A.  Appears to be so.

2    Q.  In fact, the highest weight listed in your chronology

3   when he was definitely on Seroquel is 325 pounds, true?

4    A.  In the chronology I was supplied with, yes.

5    Q.  All right.  And so this weight on December 1st of

6   2006 is 20 pounds more than that, right?

7    A.  Correct.

8    Q.  That would be inconsistent with your theory that

9   Seroquel caused him to gain weight, wouldn't it?

10   A.  No.

11   Q.  If he's not taking Seroquel and he -- his weight

12  increases to 20 pounds above the all-time high on Seroquel, how

13  can you say that Seroquel caused him to gain that weight?

14   A.  Post hoc ergo proctor hoc.  Fluctuations in weight

15  can be due to a number of factors.  I don't know if he's on

16  Seroquel at this time or not according to this document.

17  Weight is important for presurgical procedures.  I would think

18  medications are as well.  They are not here.  This is the

19  highest weight according to the chronology.  If he is not on

20  Seroquel, then his weight gain is not due to the Seroquel.

21   Q.  And you would agree with me that the same factors

22  that caused him to gain weight off Seroquel can exist while

23  he's taking Seroquel as well?

24   A.  Yes.

25   Q.  Is it your opinion that Mr. Unger gained weight while

163

1   he was taking Seroquel?

2    A.  Yes.

3    Q.  There was a temporal association there?

4    A.  Yes.

5    Q.  Was there another temporal association with

6   Mr. Unger's weight gain other than Seroquel?

7    A.  Meaning were there other risk factors for weight

8   gain?

9    Q.  Yes.

10   A.  Yes.

11   Q.  There was a pretty significant one, wasn't there?

12   A.  Yes.

13   Q.  His injury, right?

14   A.  Yes.

15   Q.  Okay.  And, in fact, his extreme disability coincides

16  with the time he began taking Seroquel, doesn't it?

17   A.  Say that again, sir.

18   Q.  His most extreme disability coincides with the time

19  he begins taking Seroquel in October of 2002, correct?

20   A.  Yes.

21   Q.  Among other things, he had a diskitis in August of

22  2002, right?

23   A.  I would have to check the date on that, but I'm aware

24  he had diskitis.  I didn't list the date in my report, so --

25   Q.  You knew that before Mr. Unger started taking

164

1   Seroquel, he was walking with the assistance of a walker?

2    A.  Correct.

3    Q.  He described his pain as incapacitating?

4    A.  Correct.

5    Q.  He was taking significant amounts of pain medication,

6   such as OxyContin, Anexa, and Vicodin, right?

7    A.  Yes.

8    Q.  And because of those -- because of that

9   incapacitating pain, Mr. Unger was leading a very sedentary

10  lifestyle in the couple months leading up to his starting

11  Seroquel.

12       MS. FENDIA:  Object to form.

13   A.  That was one of the factors.

14   Q.  (BY MR. RABER)  And what were the others?

15   A.  His obesity.  That's one of the other factors.

16   Q.  And after Mr. Unger started Seroquel, he was

17  extremely sedentary, correct?

18   A.  Correct.  Seroquel is sedating.  It's one of the

19  reasons it's frequently prescribed.

20   Q.  Are you saying, sir, that his sedentary lifestyle was

21  because of the Seroquel?

22   A.  I'm saying the Seroquel is likely to have contributed

23  to that because one of the main reasons Seroquel is prescribed

24  versus other medications is because of its sedating quality;

25  although, I don't think for Mr. Unger that sedation was the

165

1   primary consideration in prescribing the Seroquel off-label.

2    Q.  What do you think was?

3    A.  I think at that time Seroquel was being advocated as

4   an antidepressant-type antipsychotic with utility in mood

5   disorders.

6        (Young Exhibit No. 10 marked.)

7    Q.  (BY MR. RABER)  Showing you a document that we've

8   marked as Young Exhibit 10.  Exhibit 10 is a letter -- or I'm

9   sorry.  It's a note from Dr. Neil Schechter dated July 2nd,

10  2002; is that right?

11   A.  Correct.

12   Q.  And Dr. Schechter is one of the doctors that treated

13  Mr. Unger for his back pain, right?

14   A.  Correct.

15   Q.  In this July 2nd, 2002, note, Dr. Schechter says, "He

16  has been out of work since 05-01-02 and states that the pain

17  has become more severe and incapacitating," right?

18   A.  Correct.

19   Q.  He was in that condition before he ever took

20  Seroquel, right?

21   A.  Yes.

22   Q.  So incapacitated that he couldn't even work, right?

23   A.  Correct.

24   Q.  It mentions that he was on medications for blood

25  pressure, true?

42 (Pages 162 to 165)

166

1    A.  Yes.
2    Q.  And then it says "He is also on pain medication from
3  Drs. Posner and Ramirez consisting of OxyContin, 40 milligrams
4  BID, and Anexa, two pills every four to six hours," right?
5    A.  Right.
6    Q.  That describes a sedentary person before he ever took
7  Seroquel, doesn't it?
8    A.  Yes, decidedly so.
9        (Young Exhibit No. 11 marked.)
10    Q.  (BY MR. RABER)  Want to show you a document that has
11  been marked as Young Exhibit 11.
12    A.  Pardon me.
13    Q.  You recognize Exhibit 11 as progress notes from
14  Dr. Cabada-Rovirosa?  Do you recognize those as progress notes
15  of Dr. Rovirosa?
16    A.  Yes.
17    Q.  Or Cabada-Rovirosa.
18    A.  Yes.
19    Q.  You've reviewed those before?
20    A.  Yes.
21    Q.  And looking at the entry there on August the 20th,
22  2002, he says, "Recently had a diskitis and is having severe
23  ambulatory problems which jeopardizes the quality of his
24  lifestyle."
25        Would you agree that before Mr. Seroquel —

167

1  "before Mr. Seroquel."  Would you agree that before Mr. Unger
2  ever took Seroquel, that he was so sedentary that he basically
3  had almost no quality of life?
4        MS. FENDIA:  Object to form.
5    A.  That he had no quality of life?
6    Q.  (BY MR. RABER)  Almost.
7    A.  I think that the diskitis from the discogram
8  recommended by Dr. Schechter set him back.
9    Q.  The diskitis did?
10    A.  That was one of the things, yes, recommended by
11  Dr. Schechter.
12    Q.  And it caused — he — the diskitis was recommended
13  by Dr. Schechter?
14    A.  The discogram, for Mr. Seroquel.
15    Q.  Are you saying that he was — are you trying to be
16  cute there, "for Mr. Seroquel"?
17        MS. FENDIA:  Object to form.  Let's just —
18  object to — that's a sidebar.  Let's just move on.
19    Q.  (BY MR. RABER)  Why did you say that?  Were you
20  trying to tease me about saying "Mr. Seroquel" instead of
21  "Mr. Unger"?
22        MS. FENDIA:  Don't answer that question.  Let's
23  just move on.
24    Q.  (BY MR. RABER)  You're not going to answer me?
25        MS. FENDIA:  I've lodged an objection.  You

168

1  don't need to be harassing this witness.
2    Q.  (BY MR. RABER)  Sir, are you saying that Mr. — that
3  Dr. Schechter somehow contributed to Mr. Unger's sedentary
4  lifestyle?
5    A.  No.
6    Q.  We can agree, can't we, that before Mr. Unger ever
7  took Seroquel, that he was severely sedentary in his lifestyle?
8    A.  Yes.
9    Q.  And Seroquel had nothing to do with that.
10    A.  Prior to his taking Seroquel, Seroquel had nothing to
11  do with that, correct, sir.
12    Q.  And Mr. Unger felt that it was so bad that it was
13  jeopardizing the quality of his lifestyle.
14    A.  Dr. Cabada-Rovirosa reports that.
15    Q.  And, in fact, that's why Mr. Unger came to get help,
16  right, because he was so depressed and distraught from his
17  physical incapacity?
18        MS. FENDIA:  Object to form.
19    A.  Says he is very invested into his process.
20    Q.  (BY MR. RABER)  Well, look at the July 9th, 2002,
21  entry.
22    A.  Yes, sir.
23    Q.  Do you see that?  It's on the first page.  Do you see
24  where it says "He was very distraught and very besieged by his
25  pains.  Finds a lot of difficulty finding a way out of his

169

1  situation.  Feels very hopeless and incapable of functioning."
2        See that?
3    A.  Yes.
4    Q.  And do you interpret that that Mr. Unger's major
5  depression was precipitated by these terrible pains that left
6  him almost totally physically incapacitated?
7    A.  Yes.
8    Q.  And that was before he took Seroquel?
9    A.  Yes.
10    Q.  And after he started taking Seroquel, he remained
11  sedentary, didn't he?
12    A.  Yes.
13    Q.  And his doctors were concerned about his sedentary
14  lifestyle, weren't they?
15    A.  Correct.
16        (Young Exhibit No. 12 marked.)
17    Q.  (BY MR. RABER)  Dr. Young, I'm showing you a document
18  that we've marked as Young Exhibit 12.  This is a letter dated
19  July 14th, 2003, from a Dr. Terence Peppard to a Dr. Rafael
20  Moss, with a copy to Richard Unger.  Do you see that?
21    A.  Yes, sir.
22    Q.  And Dr. Peppard says that the case — at the bottom
23  of the first page, "The case was discussed at length with the
24  patient and his supportive wife, who is a nurse here at Mercy
25  Hospital."  Do you see that?

## 170

1   A.  Yes.

2   Q.  He says, "The patient requires a comprehensive

3   approach to his pain problems.  He needs to have increased

4   physical activity, although this may increase his pain

5   symptoms.  He also needs his pain medications and psychotropics

6   tapered over a period of time as they are having a negative

7   effect on his cognition and possibly on his mood."

8        Do you agree with that assessment?

9   A.  Yes.

10   Q.  Then it says "The patient also requires a meaningful

11   weight loss program."

12        To your knowledge, what, if any, efforts did

13   Mr. Unger make to try to lose weight in response to this?

14   A.  Think in his deposition he talked about salads and

15   foods and trying to eat healthy.

16   Q.  Then on the second page of this exhibit, it says "I

17   have also stressed to the patient that his level of inactivity,

18   chronic use of significant amounts of medication, affected

19   mental status, and morbid obesity represent a significant risk

20   to his overall health."

21        Do you agree with that assessment?

22   A.  Yes.

23        MS. FENDIA:  Object to form.

24   Q.  (BY MR. RABER)  The pain for Mr. Unger got so bad

25   that he had difficulty walking even a hundred feet, right?

## 171

1   A.  Correct.

2   Q.  It got so bad that he needed an electric scooter to

3   get around, correct?

4   A.  Correct.

5   Q.  Are you saying that the Seroquel was a cause of that?

6   A.  The cause of what, sir?

7   Q.  His inability to get around to the point that he

8   needed to use an electric scooter.

9   A.  I think in conjunction with his other medications at

10   one point that the sedating nature of Seroquel may have

11   contributed to his being sedentary.

12   Q.  Okay.  But the reason for the scooter was not because

13   of the sedative effects.  It was because he was in pain, wasn't

14   it?

15   A.  The pain contributed to his difficulty with

16   independent ambulation.

17   Q.  He needed the scooter because he was in so much pain

18   that he couldn't walk more than a few steps without getting

19   fatigued and overwhelmed by the pain, true?

20   A.  He needed the scooter to transport himself.

21   Q.  Because he was in too much pain to walk, right?

22   A.  Pain was one of the issues, yes, sir.

23   Q.  Okay.  What were the other issues?

24   A.  His obesity.

25   Q.  Okay.  Anything else?

## 172

1   A.  His smoking.

2   Q.  Okay.  Anything else?

3   A.  His medications.

4   Q.  Are you saying that Seroquel played some role in him

5   needing to have a scooter to get around?

6        MS. FENDIA:  Object to form.

7   A.  What I am opining to, sir, is the fact that if you

8   are treating a mood disorder, if you are treating a person's

9   depression, and they have a problem with decreased activity

10   level, that if you prescribe a medicine to be used as an

11   antidepressant or mood stabilizer and it has a well-known

12   sedating effect, that that sedation may contribute to a

13   person's lack of ambulation.  I would not say the Seroquel has

14   an adverse side effect of scooters.  No, I'm not saying that.

15   Q.  (BY MR. RABER)  And I didn't ask you that.

16        Are you saying to a reasonable degree of medical

17   probability that Seroquel was a cause of him needing to have a

18   scooter in order to move around?

19   A.  I would have to look at the time sequence.  If he was

20   on the scooter before the Seroquel, then I would not opine that

21   the Seroquel contributed to his needing a scooter.

22   Q.  We know he was on a walker before he ever had

23   Seroquel, don't we?

24   A.  Correct.

25   Q.  And so as we sit here today, you're unable to say

## 173

1   whether -- to a reasonable degree of medical probability

2   whether the Seroquel played a role in causing him to need a

3   scooter to get around.

4        MS. FENDIA:  Object to form.

5   A.  Without knowing when he rode the scooter and when he

6   didn't and when he received Seroquel and when he didn't, that

7   is correct, sir.

8   Q.  (BY MR. RABER)  Mr. Unger's pain and incapacity got

9   so bad that he couldn't bathe himself.  Do you remember that?

10   A.  I believe that's correct at some point or points,

11   yes, sir.

12   Q.  And are you saying that Seroquel played a role in

13   causing that?

14   A.  His inability to bathe?

15   Q.  Yes.

16   A.  What I am saying, sir, what I am opining to, held to

17   a reasonable degree of medical certainty, is that Mr. Unger had

18   issues pertaining to his difficulty ambulating and sedentary

19   lifestyle; and if he was in receipt of Seroquel, that given the

20   well-known sedating effects of that medication, it may well

21   have contributed to his being sedentary.

22   Q.  My question had to do with bathing.

23        Are you saying that Seroquel played a role in

24   his not being able to bathe himself?

25   A.  That concrete and that specific, no, I'm not saying

174

1   that at all.
2       Q.  Did you make any attempt to identify the relative
3   contribution of the sedative effects of Seroquel versus the
4   many other medications he was taking at that time?
5       A.  Did I make any attempt to quantify it?
6       Q.  Yes, to say that it was the Seroquel as opposed to
7   the OxyContin or the Vicodin or any of the other narcotics he
8   was taking.
9       A.  To parse that out as one factor having more -- a
10  heavier weight than another or a relative risk or a percentage
11  of causation, no, I made no attempt to do that because I don't
12  think that's possible.  I don't think anyone can.
13      Before you ask your next question, sir, I'd like
14  to take a bathroom break, please.
15      Q.  Sure.  Absolutely.
16      (Recess from 2:46 p.m. to 2:54 p.m.)
17      Q.  (BY MR. RABER)  Okay.  I want to just go back and
18  clarify one point, if we can.  I'm going to show you Exhibit 3,
19  which is your report with the medical chronology attached to
20  it, okay?  And, specifically, we're looking at the entry on
21  05-02-07.  And you mention that -- it says "The patient is now
22  maintained on insulin injections, mainly Symlin, ten units
23  before meals."  You see that?
24      A.  I see that.
25      Q.  And is that the basis for your opinion that Mr. Unger

175

1   has insulin-dependent diabetes, that entry there?
2       A.  Yes.
3       Q.  Okay.  And that --
4       A.  That's part of my opinion.
5       Q.  Okay.
6       A.  As well as the fact that he was treating with insulin
7   in the hospital when he presented with -- in a hyperosmolar
8   state.
9       Q.  Okay.  But as far as his status in May of 2007, the
10  basis for your testimony that he is insulin dependent is that
11  entry that's there on the medical chronology, right?
12      A.  In part, yes.
13      Q.  Well, what else?
14      A.  Review of the medical record independent of this
15  chronology.
16      Q.  Okay.  That chronology that's attached to your report
17  was prepared by a nurse who works for the plaintiffs' law firm,
18  right?
19      A.  Correct.
20      Q.  And is it your testimony that Symlin is insulin?
21      A.  No.
22      Q.  What is Symlin?
23      A.  It's not insulin.  I started to do some research on
24  that.  I'm not sure.
25      Q.  Okay.  So, if all he's doing is injecting himself

176

1   with Symlin, would that be a basis for concluding that he's an
2   insulin-dependent diabetic?
3       A.  No.  It would be a basis for an opinion that he is a
4   needle-dependent diabetic.
5       (Young Exhibit No. 13 marked.)
6       Q.  (BY MR. RABER)  I want to show you a document that
7   has been marked as Young Exhibit 13.
8       A.  Thank you.
9       Q.  This exhibit is a function report for the Social
10  Security Administration dated October 1st, 2004, correct?
11      A.  Yes.
12      Q.  Have you seen that document before?
13      A.  Yes, I have.
14      Q.  Okay.  Mr. Unger was taking Seroquel at this time,
15  correct?
16      A.  There are no medications listed on this document you
17  handed me.
18      Q.  Okay.  Well, independent of that, are you able to say
19  whether he was taking Seroquel at this time?
20      A.  What was the date of that, sir?
21      Q.  October 1st, 2004.
22      A.  Discontinued the Seroquel 6-6.  And this is what
23  date?
24      Q.  10-01-04.
25      A.  There's no year on that.  Seroquel, 10-01-01.  That's

177

1   Whittington.  And the date here is 10-01-04?  I'm looking at
2   pharmacy records now.  I don't see that.  10-01-04.
3       06-03-04, he was on Seroquel, and the Seroquel
4   was discontinued 10-22-06.  So, he was on Seroquel.
5       Q.  Okay.  On Page 1 of Exhibit 13, Mr. Unger notes,
6   quote, "My only outings are to doctor appointments.  I spend
7   most of my day watching TV and falling asleep"; is that right?
8       A.  Correct.
9       Q.  Look at Page 6 of Exhibit 13, if you would, please.
10  Section C, Information About Abilities.  Are you with me?
11  Right here, Section C, Information About Abilities, Page 6, at
12  the bottom of Page 6.
13      A.  Yes, sir.
14      Q.  Okay.  You see the middle of the page, Mr. Unger
15  writes "I am unable to walk even a block with my walker, then I
16  get weak, fatigue, pain becomes unbearable."  Do you see that?
17      A.  Yes.
18      Q.  Is it your opinion that the Seroquel is contributing
19  to that situation?
20      A.  It may be.
21      Q.  May be or is to a reasonable degree of medical
22  probability?
23      A.  The patient is complaining of fatigue among -- and
24  weakness, among other things.
25      Q.  Is it your opinion to a reasonable degree of medical

178

```
1    probability that the Seroquel was causing the weakness,
2    fatigue, and pain that's being referred to here?
3        A.   Seroquel is a major tranquilizer.  It may be
4    contributing to the weakness and fatigue.
5        Q.   Please answer the question, sir.  I didn't ask you if
6    it may be.  I said, "To a reasonable degree of medical
7    probability, is it your opinion that Seroquel was, in fact,
8    contributing to the weakness, fatigue, and pain that's referred
9    to here?"
10       A.   I have answered the question to the -- your question
11   to the best of my ability.
12       Q.   You're just not going to answer it, are you?
13           MS. FENDIA:  Object to form.
14           MR. RABER:  Come on, Counsel.  You can see that
15   he's not answering my question.
16           MS. FENDIA:  I object to the comment and the
17   argument.  Just move on, please.
18       Q.   (BY MR. RABER)  To a reasonable degree of medical
19   probability, is it your opinion that Seroquel was, in fact,
20   contributing to the weakness, fatigue, and pain that's referred
21   to here?
22           MS. FENDIA:  Object to form.
23       A.   If Mr. Unger was on Seroquel at this time -- and
24   Seroquel is well-known to be a sedating major tranquilizer --
25   the answer to your question is:  Yes.
```

179

```
1        Q.   (BY MR. RABER)  And what is the scientific basis for
2    your conclusion that Seroquel causes pain?
3        A.   I think that mischaracterizes my testimony, sir.
4        Q.   I asked you if the Seroquel is contributing to or
5    causing the weakness, fatigue, and pain referred to in Exhibit
6    13.  You said, "Yes."
7        A.   Are you asking me about whether Seroquel is known to
8    cause pain?
9        Q.   I'm asking you just to give me a straightforward
10   answer to a question, sir.
11           MS. FENDIA:  Could you and I -- excuse me.
12   Could you and I chat a minute?
13           MR. RABER:  Yes.
14           MS. FENDIA:  Thank you.  Off the record, please.
15           (Recess from 3:05 p.m. to 3:06 p.m.)
16       Q.   (BY MR. RABER)  Do you stand by your answer?
17       A.   I stand by all my answers.
18           If I may, sir --
19       Q.   Go ahead.
20           MS. FENDIA:  Just respond to --
21           THE WITNESS:  I'm sorry.
22       Q.   (BY MR. RABER)  Did you want to say something?
23       A.   No, sir.
24       Q.   If Mr. Unger was able to lose weight at times while
25   he was taking Seroquel, would that be inconsistent with your
```

180

```
1    theory that Seroquel causes weight gain?
2        A.   Yes.
3        Q.   Were there periods when Mr. Unger was able to lose
4    weight while he was taking Seroquel?
5        A.   Yes.
6        Q.   How do you reconcile that then with your opinion?
7        A.   Seroquel is not the only factor involved in
8    Mr. Unger's weight gain and/or weight loss.
9        Q.   Well, how is it possible -- if Seroquel is a
10   weight-causing agent, how is it possible for Mr. Unger to lose
11   weight while he's taking it?
12       A.   The other factors may have more bearing.
13       Q.   And did you do any analysis of Mr. Unger's weight
14   cycling to determine whether or not his increases and decreases
15   in weight were caused by Seroquel or other factors that exist?
16       A.   There were multiple factors that contributed to
17   Mr. Unger's weight.
18       Q.   Did you do any sort of an analysis to try to
19   determine whether or not the weight cycling, the ups and downs
20   with Mr. Unger's weight, was related to Seroquel or other
21   factors that cause weight gain and weight loss?
22       A.   Yes.
23       Q.   What did you do?
24       A.   Looked at the time Mr. Unger was on Seroquel and
25   looked at his weights.
```

181

```
1        Q.   And there were times, however, when he lost weight on
2    Seroquel, true?
3        A.   Yes.
4        Q.   Okay.  How do you explain that then?
5            MS. FENDIA:  Object to form.
6        A.   There are multiple factors involved in weight gain
7    and weight loss --
8        Q.   (BY MR. RABER)  Okay.  So, my question is --
9        A.   -- for Mr. Unger and anybody else.
10       Q.   Okay.  So, my question then is:  How did you -- what
11   did you do to determine whether the periods of weight gain and
12   periods of weight loss were attributable to Seroquel or to the
13   other factors?
14       A.   My best professional opinion held to a reasonable
15   degree of medical certainty is that -- given the known
16   dose-dependent relationship of Seroquel at least at that time
17   and at least that being my understanding at the time my report
18   was written is that the Seroquel was contributory to
19   Mr. Unger's weight gain.
20       Q.   That's not an answer to my question, sir.
21           My question to you is:  What did you do to
22   assess or determine whether the ups and downs that occurred
23   while Mr. Unger was taking Seroquel were the result of the
24   Seroquel or the other factors that influence weight?
25           MS. FENDIA:  Object to form.
```

182

1    A.  I cannot go back in history and control the
2  parameters from the past, sir, so I did not do anything.
3    Q.  (BY MR. RABER)  So, you're unable to rule out that
4  his ups and downs are explained solely by the other factors,
5  right?
6    A.  Right.
7    Q.  Okay.  Now, let me ask you this question — let me
8  change topics here.  Do you have any knowledge today as to
9  whether or not Mr. Unger's blood glucose is under good control?
10    A.  I do not.
11    Q.  I take it then you're not in a position to express an
12  opinion about his specific prognosis given his current
13  condition, true?
14    A.  Correct.
15    Q.  You would defer to either his treating
16  endocrinologist or an expert endocrinologist?
17    A.  Yes, that's correct, sir.
18    Q.  Sir, do you agree in your experience that severe
19  mental illness can destroy families and ruin lives?
20    A.  Yes, I do, sir.
21    Q.  And do you see some evidence here that Mr. Unger's
22  mental illness substantially interfered with his family life
23  and his relationships with his wife and children?
24    A.  With his wife and daughter, yes, sir.
25    Q.  Do you feel that — would you agree that Seroquel has

183

1  helped some patients?
2    A.  Absolutely.
3    Q.  Would you agree that Seroquel filled an unmet need,
4  at least for some patients?
5    A.  Yes.
6    Q.  What knowledge, if any, do you have about how
7  AstraZeneca studied and examined the metabolic effects of
8  Seroquel during the time that it's been on the market?
9    A.  I reviewed in-house documents pertaining to weight
10  gain and the like.
11    Q.  Did AstraZeneca do anything to monitor data relating
12  to adverse events relating to the metabolic system?
13    A.  Yes.
14    Q.  Did they do any studies that were designed to
15  determine whether Seroquel has any impact on glucose
16  regulation?
17    A.  Yes.
18    Q.  And did — what did those studies show?
19    A.  I think those studies were mixed; although sitting
20  here today, I don't recall whether it was in-house or
21  out-of-house studies.
22    Q.  You're familiar with Trial 125?
23    A.  Not by that name.
24    Q.  Okay.  Do you know a study that involved an oral
25  glucose tolerance test?

184

1    A.  Not as I recall.
2    Q.  Do you know what an oral glucose tolerance test is?
3    A.  Yes, I do.
4    Q.  Okay.  What is it?
5    A.  The individual is given high concentration glucose —
6  typically it's called Glucola — to drink.  Baseline and
7  half-hourly or hourly glucose measurements are then taken of
8  the individual, two- or four-hour.  I'm trying to recall if
9  there was a six-hour, but I don't remember.
10    Q.  Do you know what result, if any, there were of that
11  test involving Seroquel?
12    A.  I do not recall.
13    Q.  Did AstraZeneca meet with outside scientists and
14  experts to get advice about the data that it had relating to
15  Seroquel and glucose regulation?
16    A.  Yes, sir.
17    Q.  Did you consider that to be a responsible thing for
18  them to do?
19    A.  Yes, sir.
20    Q.  Do you know what AstraZeneca's outside advisors told
21  them about any potential causal relationship between Seroquel
22  and diabetes?
23    A.  No, I do not know.
24    Q.  Did the FDA closely monitor diabetes-related events
25  for Seroquel?

185

1    MS. FENDIA:  Object to form.
2    A.  I don't know what the FDA did or didn't do
3  specifically.
4    Q.  (BY MR. RABER)  You ever hear of a periodic safety
5  update report?
6    A.  Periodic safety update report, PSUR?
7    Q.  Right.
8    A.  Not specifically, no.
9    Q.  Did AstraZeneca provide those to the FDA?
10    MS. FENDIA:  Object to form.
11    A.  Don't know.
12    Q.  (BY MR. RABER)  You mentioned, sir, that September of
13  2005, Mr. Unger went to the hospital in a hyperosmolar state.
14  Do you remember that?
15    A.  I went — he went to hyperosmolar state, but I'm not
16  sure of the date on that.
17    Q.  Okay.  I'll represent to you that it was September
18  6th of 2005, okay?
19    A.  Yes, sir.
20    Q.  What are the most frequent or common triggers of a
21  hyperosmolar state?
22    A.  First and foremost is elevated blood sugar.  I don't
23  know if dehydration is on that list.  I suspect so.  I'm not —
24  infection could be a factor.  Medications can be a factor.
25    Q.  Do you have an opinion to a reasonable degree of

**186**

1   medical probability as to what triggered Mr. Unger's

2   hyperosmolar state in September 2005?

3     A. There are a number of factors.

4     Q. What are they?

5     A. Certainly his blood sugar was clearly elevated and

6   all the associated risk factors that we've talked about

7   previously were present.

8     Q. Was he taking antidiuretics?

9     A. I think he was taking hydrochlorothiazide.

10     Q. You ever heard of Bumex, B-u-m-e-x?

11     A. He may have been taking that, yes.

12     Q. Was he taking antidiuretics?

13     A. I believe so.

14     Q. Okay. Do you believe that those -- I'm sorry. Hang

15   on a second. I meant to say "diuretics." I mean -- strike the

16   question about diuretics.

17     Can diuretics lead to a person being dehydrated?

18     A. Yes, sir.

19     Q. Was Mr. Unger taking diuretics when he was admitted

20   to the hospital in September of '05 in a hyperosmolar state?

21     A. Yes, he was.

22     Q. Okay. Do you believe that those diuretics triggered

23   the hyperosmolar coma?

24     A. They may be contributory, yes.

25     Q. Okay. Did Mr. Unger have any infections when he went

**187**

1   into his hyperosmolar state?

2     A. I don't recall that he had any infections. I don't

3   remember, but that doesn't stand out to me.

4     Q. Is it your opinion to a reasonable degree of medical

5   probability that Seroquel caused him to go into a hyperosmolar

6   state in September of 2005?

7     A. That is one of the risk factors he had at the time.

8     Q. Okay. It's a risk factor --

9     A. Medications, yes.

10     Q. Okay.

11     A. To include antipsychotics.

12     Q. Are you saying to a reasonable degree of medical

13   probability that, more likely than not, Seroquel was a cause of

14   him going into a hyperosmolar state on September 6th of 2005?

15     A. That's a compound question, sir, so I'm not quite

16   sure how to answer that. What I can say is that the Seroquel

17   was a risk factor at that time and was one of the causes or was

18   a contributory cause.

19     Q. Which one is it, risk factor, cause, or contributory

20   cause? You said it was a risk factor, you said it was a cause,

21   or it was a contributory cause. I'm asking you, which one was

22   it?

23     MS. FENDIA: Object to form.

24     A. I don't see those as different.

25     Q. (BY MR. RABER) Did you do anything to rule out

**188**

1   Mr. Unger's dehydration as the only cause of his going into a

2   hyperosmolar state on September 6, 2005?

3     A. There's nothing I could have possibly done to change

4   the past. The answer to your question is: No.

5     Q. Did Mr. Unger start smoking again after he was

6   diagnosed with diabetes?

7     A. Unfortunately so, yes.

8     Q. Why do you say "unfortunately so"?

9     A. Whether you're diagnosed with diabetes or not,

10   smoking is not conducive to good health.

11     Q. Now, you're familiar with cigarette packages. They

12   have a warning that basically says "If you smoke these things,

13   they can kill you."

14     A. I would hope they still have that warning, sir.

15     Q. Okay. And would you consider that warning to be

16   buried or is it obvious?

17     A. On a cigarette package?

18     Q. Yes.

19     A. It's pretty obvious, or at least it was the last time

20   I looked.

21     Q. And, yet, Mr. Unger continues to smoke.

22     A. To this day, I don't know, but as of my review of the

23   medical record and certainly after the diagnosis of diabetes,

24   yes.

25     Q. In your report on Page 11, it says near the bottom

**189**

1   "Upon discontinuation of Seroquel, Mr. Unger claims he lost 30

2   pounds and did not need his power scooter to move from one

3   place to another." Do you see that?

4     A. Yes, sir.

5     Q. This statement about the power scooter is not true,

6   is it?

7     A. I don't know.

8     Q. Well, why did you say it in your report if you don't

9   know whether it's true?

10     A. I said in my report, "Upon discontinuation of

11   Seroquel, Mr. Unger claims he lost 30 pounds and did not need

12   his power scooter to move from one place to another."

13     I believe it's true that Mr. Unger stated that.

14     Q. Okay. You don't know whether --

15     A. He stated that under oath, too.

16     Q. Well, I want to show you a document that we'll mark

17   as No. 14.

18     (Young Exhibit No. 14 marked.)

19     Q. (BY MR. RABER) Sir, I'm handing you a document that

20   we've marked as Young Exhibit 14. This is a letter from an

21   Arnold S. Zager, M.D., to a Helen Showers dated May 3rd, 2007.

22     Do you see that?

23     A. Yes.

24     Q. And, in fact, I think you've seen this letter before,

25   haven't you?

190

1    A.  Yes, I have.

2    Q.  And May -- May 3rd of 2007, that's after Mr. Unger

3  has stopped taking Seroquel, isn't it?

4    A.  Yes, it is.

5    Q.  And if we believe the records that say he stopped

6  taking it in October of 2006, this is maybe seven or eight

7  months after that approximately, right?

8    A.  Yes.

9    Q.  And it says in the first paragraph "The patient's

10  presentation was remarkable in that he ambulated with the

11  assistance of a motorized wheelchair."  Do you see that?

12    A.  Yes, I do.

13    Q.  So, Mr. Unger's statement to you that he did not need

14  his power scooter to move from one place to another after he

15  discontinued Seroquel was not correct, was it?

16    A.  Depending on the time frame, and it wasn't a

17  statement to me.

18    Q.  Well, the statement that's in your report which says

19  "Upon discontinuation of Seroquel, Mr. Unger claims he did not

20  need his power scooter to move from one place to another," that

21  statement is not true, is it?

22    A.  If he, in fact --

23        MS. FENDIA:  I'm going to object to form.  Go

24  ahead.

25    A.  If he, in fact -- and as evidenced by Dr. Zager's

---

191

1  report of Mr. Unger's statement to Dr. Zager -- is using a

2  wheelchair -- motorized wheelchair or scooter at that time,

3  then Mr. Unger has not stayed off the scooter.

4    Q.  (BY MR. RABER)  And it certainly made an impression

5  or Dr. Zager, didn't it?

6    A.  Yes.

7    Q.  He stated it in the first paragraph and said that the

8  presentation was remarkable, right?

9    A.  Correct.

10    Q.  You don't have any reason to doubt Dr. Zager's

11  observation of Mr. Unger in May of 2007, do you?

12    A.  I do not.

13    Q.  And would you agree with me that from a psychiatric

14  standpoint, Mr. Unger still has basically the same psychiatric

15  problems today than he had when he was on Seroquel?

16    A.  Basically, yes.

17    Q.  He still has what Dr. Zager refers to as a smoldering

18  depression, right?

19    A.  I recall the term "smoldering depression."  Is that

20  in this report?

21    Q.  I don't know if it's in this one or not, but do you

22  recall that?

23    A.  I recall the phrase "smoldering depression," yes.

24    Q.  Okay.

25    A.  I don't know if it's in this report that you handed

---

192

1  me.  I don't see that in this report that you handed me.

2    Q.  Like to show you a document that we'll mark as

3  Exhibit 15.

4        (Young Exhibit No. 15 marked.)

5    A.  Are we through with Exhibit 14, sir?

6    Q.  (BY MR. RABER)  We are.  Exhibit 15 is a December

7  18th, 2000 --

8    A.  Thank you.

9    Q.  -- letter from Dr. Zager to Helen Showers.  Am I

10  right?

11    A.  Yes, it is.

12    Q.  And you see in the first paragraph there it says that

13  he notes that his pain complaints unfortunately persist, as

14  does his chronic smoldering depression, secondary to his work

15  injury, correct?

16    A.  Yes, sir.  I see that.

17    Q.  And that's about the same condition he was in when he

18  first went to see Dr. Cabada back in 2002, isn't it?

19    A.  Yes, which suggests it's not a medication issue.

20    Q.  Is it your opinion that Seroquel -- the relationship

21  between Seroquel and weight gain is because Seroquel somehow

22  causes people to eat more or it has some direct effect on the

23  metabolism?

24    A.  I think there are three theories about that.

25    Q.  Well, I want to know what you think.

---

193

1    A.  I'm trying to tell you, if you'd let me answer, sir.

2    Q.  Okay.

3    A.  I think there are three theories about that.  I think

4  the exact mechanism for some people is not known.  And to be

5  fair, Dr. Wirsching opined that it may not have that effect in

6  women, I believe.  It may be even be a weight loss, although

7  that may be a difference based on how depression manifests in

8  men and women.

9    Q.  What do you think?

10    A.  I think the jury is out on that.

11    Q.  So, you can't state an opinion to a reasonable degree

12  of medical probability as to how Seroquel is associated with

13  weight gain.  Is that fair to say?

14    A.  I can state that currently I believe, to my best

15  professional opinion held to a reasonable degree of medical

16  certainty, that there are three theories about that.

17    Q.  Okay.  And have any of those theories been proven to

18  a reasonable degree of medical probability?

19    A.  No.

20    Q.  Okay, Doctor.  Thank you.  I'm going to, at this

21  time, pass the microphone to Mr. Elder here who has some

22  questions for you about the Whittington case.

23    A.  Thank you, sir.

24    Q.  Okay.  Thank you.

25        MR. ELDER:  Let's take a quick break and I'll

49 (Pages 190 to 193)

194

1  get organized and get some stickers over here.
2       (Recess from 3:32 p.m. to 3:38 p.m.)
3       EXAMINATION
4  BY MR. ELDER:
5       Q.  Dr. Young, good afternoon.  I'm going to be asking
6  you about the Whittington case in which you've also prepared a
7  report.  Before I do so, the answers that you've given up to
8  this point today that are not specific to Richard Unger would
9  apply equally for the Unger and the Whittington cases; is that
10  right?
11       A.  That's correct, sir.
12       Q.  Okay.  And let me go ahead and mark your report in
13  Whittington as Exhibit 16.
14       (Young Exhibit No. 16 marked.)
15       Q.  (BY MR. ELDER)  And I believe up until Page 11 of
16  your report, which begins "Specific Opinions:  Linda
17  Whittington," it's, in fact, identical to your report in Unger;
18  is that right?
19       A.  I believe so, sir.
20       Q.  All right.  To turn to Ms. Whittington, what was
21  Ms. Whittington's psychiatric diagnosis?
22       A.  Schizophrenia, chronic paranoid type.
23       Q.  Okay.  And in your review of the records, did you
24  agree with that diagnosis?
25       A.  Yes, I did.

195

1       Q.  And do you agree that her -- that she is a patient
2  who needed treatment with an atypical antipsychotic?
3       A.  No, I don't.
4       Q.  Okay.  Why not?
5       A.  I agree that she needed treatment with an
6  antipsychotic, not necessarily an atypical.  Pardon me.
7  Second-generation.
8       Q.  But given her diagnosis with schizophrenia, you would
9  agree that she does need treatment with an antipsychotic
10  medication?
11       A.  Yes, sir, that's correct.
12       Q.  You were asked some questions earlier about
13  diagnosing diabetes.  When you diagnosed diabetes, you would
14  agree that a single blood glucose test is not sufficient?
15       A.  Yes, sir.
16       Q.  Okay.  You need to repeat that test?
17       A.  Yes, sir.
18       Q.  And you need to repeat that test within a reasonable
19  time frame -- and by that, I mean ten days, not several
20  months -- to make sure that you get a repeat value that's
21  diagnostic of diabetes.
22       A.  Yes, sir.
23       Q.  And why is the repeat test important?
24       A.  Redundancy or repeat test is important because on a
25  given day at a given time with a given lab, you can have a

196

1  spuriously elevated blood glucose and it would be important to
2  accurately diagnose an individual before you told them they had
3  diabetes, given the import of that diagnosis.
4       Q.  Because you're going to be making medication
5  decisions --
6       A.  Yes, sir.
7       Q.  -- that could impact their life and health insurance.
8       A.  Yes.
9       Q.  How much does a person's glucose typically vary?
10       A.  It would depend on the individual.  If they eat
11  sweets or savories, it could increase.  I think normal variance
12  would be less than 150 milligrams per deciliter, or whatever
13  that unit of measurement is.  Beyond that, I think that might
14  be outside the range of normal.
15       Q.  Okay.  But how much within the range of normal would
16  a person's glucose typically vary?
17       A.  I don't know.
18       Q.  If you saw two glucose measurements on an individual
19  that were 10 percent different, could you say that that
20  person's glucose was worse?
21       MS. FENDIA:  Object to form.
22       A.  Let's say the difference between 100 and 110?  No, I
23  don't think you could.
24       Q.  (BY MR. ELDER)  What degree of difference would you
25  need to see in order to conclude that an individual's glucose

197

1  control had gotten worse?
2       A.  May I refresh my memory with materials I have before
3  me?
4       Q.  If you need to consult them, sure.
5       A.  Thank you, sir.
6       My understanding by the American Diabetes
7  Association is that a fasting plasma glucose test of 126 and
8  above, not 150 -- I stand corrected -- confirmed by repeating
9  the test on a different day.  But I don't see percentage
10  differences here in the materials I have, so I don't know about
11  percents.
12       Q.  Okay.  So, you have consulted this document that you
13  prepared and produced to us, Seroquel Product Liability
14  Litigation Terms of Art; is that right?
15       A.  Yes, sir, the document I created when I was doing
16  research on the diagnosis of diabetes.
17       Q.  Okay.  And prior to creating this document and
18  without reference to the document, you weren't familiar with
19  the numbers for the diagnostic criteria that are in here, the
20  126 standard?
21       A.  No, other than from my general medical training and
22  experience that glucose up to approximately a hundred was
23  normal.
24       Q.  And so because it's not in your document here in
25  terms of the degree to which a person's glucose would typically

50 (Pages 194 to 197)

**198**

1  vary over the course of a day or over a week, you can't answer
2  that question?
3      A.  Correct.  I believe normal glucose is 60 to a hundred
4  or thereabouts.
5      Q.  Let's see if we can get some basic facts about
6  Ms. Whittington.  There is a medical chronology attached to
7  your report.
8      A.  Yes, sir.
9      Q.  And it says "Treatment Summary - Linda Whittington"
10  at the top.
11      A.  Yes, sir.
12      Q.  And as with the chronology for Mr. Unger, was this
13  prepared by Ms. Grainger?
14      A.  Yes, sir, that's correct.
15      Q.  Did you change anything about this chart?
16      A.  No, I did not.
17      Q.  Did you have any input into its creation?
18      A.  Pardon me.  No, I did not.
19      Q.  On your chart, it indicates that Ms. Whittington was
20  first prescribed Seroquel October 10th of 2001; is that right?
21      A.  Yes, sir, that's correct.
22      Q.  And she was given — I believe it says in your
23  chart — yeah, she was given a dose pack; is that correct?
24      A.  Yes, that's correct.
25          (Young Exhibit No. 17 marked.)

**199**

1      Q.  (BY MR. ELDER)  All right.  I've marked as Exhibit 17
2  a record from Dr. Saleh.  Have you seen that record before?
3      A.  This record is from whom, sir?
4      Q.  From Dr. Saleh, The Center For Medicine and
5  Psychiatry.
6      A.  Yes, I've seen it before.
7      Q.  Okay.  And —
8      A.  Or his records.
9      Q.  And this record refers to Ms. Whittington and it's a
10  medication log.  And next to the October 10th, '01, you see
11  where the Seroquel dose pack is prescribed, correct?
12      A.  Yes, sir.
13      Q.  And then there's a note next to that that says
14  "Patient does not wish to take," and it's dated 10-12-01.
15          Do you see that?
16      A.  Yes, sir, I see that.
17          (Young Exhibit No. 18 marked.)
18      Q.  (BY MR. ELDER)  Okay.  I've marked as Exhibit 18,
19  Doctor, a record from the same set of medical records that's
20  from January 2nd, 2002; and this indicates that when
21  Ms. Whittington returned to the — to Dr. Saleh's office on
22  January 2nd, 2002, she indicated that the 100 milligrams of
23  Seroquel was too strong.  And that's also reflected in this
24  summary that was provided for you, correct?
25      A.  Yes, sir.

**200**

1      Q.  Okay.  Given those two entries, the fact that
2  Ms. Whittington apparently called in and reported that she
3  didn't want to take the Seroquel and she also reported when she
4  came back in January 2nd of 2002 that it was too strong, do you
5  know whether or not Ms. Whittington took Seroquel between
6  October 2001 and January of 2002?
7      A.  Yes.
8      Q.  And did she?
9      A.  Yes.  She took it prior to January 2nd, 2002.
10      Q.  Okay.  Could you say whether or not she took it
11  consistently over that time period?
12      A.  No, I cannot.
13      Q.  Okay.  In fact, it appears that she took it
14  inconsistently over that time period.
15          MS. FENDIA:  Object to form.
16      A.  It's difficult to know what she did or didn't take in
17  reality.
18      Q.  (BY MR. ELDER)  Okay.  And there's an indication here
19  that she didn't take everything she was prescribed during this
20  time period, correct?
21      A.  Correct.
22          MS. FENDIA:  Object to form.
23      Q.  (BY MR. ELDER)  All right.  And beginning in January
24  2nd, 2002, her dose is reduced to 50 milligrams a day; is that
25  right?

**201**

1      A.  Correct.
2      Q.  Okay.  Did Ms. Whittington ever take more than 50
3  milligrams per day after January 2nd, 2002?
4      A.  I don't see an indication of that.
5      Q.  And you don't see any indication that she took more
6  than 50 milligrams at any time; is that right?
7      A.  That's correct.
8          (Young Exhibit No. 19 marked.)
9      Q.  (BY MR. ELDER)  Let me show you what I've marked as
10  Exhibit 19, Doctor, and this is a different page of the same
11  medication log from Dr. Saleh.  And does this indicate that
12  Seroquel was discontinued on February 20th, 2006?
13      A.  Yes, it does.
14      Q.  And as far as you know, is that, in fact, the date
15  that it was discontinued?
16      A.  As far as I know, yes.
17      Q.  Okay.  The Seroquel usage that you and I have just
18  looked at here, is that your understanding of Ms. Whittington's
19  Seroquel usage?  And so we're on the same page, let me tell you
20  what I think we've established.  She was first prescribed it in
21  October of 2001 when she was given the dose pack.  We're in
22  agreement on that?
23      A.  At this clinic, yes.
24      Q.  Do you know of any other prescription earlier than
25  that?

202

1    A.   Not at this time, although I recall looking at the
2    records that she bounced back and forth between two or three
3    clinics.
4    Q.   Okay.  But as far as you know, her first prescription
5    was October 10th, 2001?
6    A.   That's correct, although there were pharmacy records
7    or I thought there were pharmacy records on here, but there may
8    not be.
9    Q.   Okay.  Do you have any different information than
10   that?
11   A.   Not at this time, no.
12   Q.   Okay.  And between October and January, we know she
13   indicated that she didn't want to take the dose pack and that a
14   hundred milligrams was too strong.  And beyond that, we really
15   don't know if she took Seroquel between those dates; is that
16   fair?
17   A.   Yes, sir, that's fair.
18   Q.   Okay.  And we know she started in January of 2002 on
19   a 50-milligram-per-day dose, correct?
20   A.   Correct.
21   Q.   Okay.  And she continued that, it appears, until
22   February of '06, at which point it was discontinued.
23   A.   Yes, sir, that's correct.
24   Q.   Okay.  Does Ms. Whittington — well, let me ask you,
25   what are the first laboratory values for Ms. Whittington that

203

1    are reported in your report here?
2    A.   10-06-04, I believe.
3    Q.   Okay.  And the values on 10-06-04, she did not have
4    diabetes at that time, correct?
5    A.   Glucose, 99.  Correct.
6         (Young Exhibit No. 20 marked.)
7    Q.   (BY MR. ELDER)  Let me show you what I've marked as
8    Exhibit 20.  Do you recognize Exhibit 20?
9    A.   Requested by Dr. Haddad.  Yes.
10   Q.   Okay.  These are laboratory values dated February
11   16th, 2006.  And do you believe that these laboratory values
12   are diagnostic of diabetes?
13   A.   Yes.
14   Q.   And why do you believe that?
15   A.   She's got an elevated fasting.  And then according to
16   parameters for glucose tolerance tests, third hour — so, it's
17   a — well, that's odd.  Why did they stop it at the third hour?
18   Huh.  I guess because the values were elevated.  And for
19   diagnosis of diabetes on a glucose tolerance test, my
20   understanding per the American Diabetic Association is —
21   that's gestational.  Let's see.  Yeah, two hours, 139 and above
22   is normal, and she's at 181.  140 to 199 is an impaired glucose
23   tolerance and 200 and above is diabetes.
24   Q.   And, Doctor, are you referring to the same document
25   that you referred to earlier in looking up the diagnostic

204

1    criteria Seroquel product liability litigation?
2    A.   Yeah.  Terms of art, yes, sir.
3    Q.   And, in fact, what you just found — and let me back
4    up.
5         In the oral glucose tolerance test, in terms of
6    diagnosing diabetes, you would agree that the two-hour value is
7    the value that's used to diagnose diabetes, correct?
8    A.   I believe that's correct.
9    Q.   Okay.  And the two-hour oral glucose tolerance value
10   of 200 or above is diagnostic of diabetes?
11   A.   That is my understanding, sir.
12   Q.   Okay.  And so in this value — in this lab value that
13   we're looking at for Ms. Whittington, her two-hour oral glucose
14   tolerance value is, in fact, not diagnostic of diabetes; is
15   that true?
16   A.   Correct.
17   Q.   Okay.  And she has a glucose fasting value of 131; is
18   that right?
19   A.   Correct.
20   Q.   Okay.  And a 131 is above the threshold for diabetes,
21   correct?
22   A.   On a glucose fasting, the criteria is — I think the
23   cutoff is 125, if it, in fact, is fasting.  What was hers, 131?
24   Hundred to 125, 126 and above, diabetes.  So, that's suggestive
25   of diabetes.

205

1    Q.   Okay.  So, on this lab, we have one test that's
2    suggestive of diabetes and one test that's suggestive only of
3    impaired glucose tolerance, true?
4    A.   Within this glucose tolerance test, yes.
5    Q.   Okay.  Now — so, this is a situation where you would
6    want a confirming test because, in fact, within the test that
7    you performed here, you have inconsistent results.
8    A.   Yes.
9    Q.   Okay.  Is there a confirming test in
10   Ms. Whittington's records?
11   A.   I hope so.  Let's see.  This is 02-16-06.
12        On 02-28-06, there's a hemoglobin A1C of 5.9.
13   That's within normal range.
14   Q.   And how long was that after the test that we were
15   just talking about?
16   A.   2-17 — well, no.  Collected 02-16-06, and this is
17   02-28-06.  So, it's within reasonable or same time period.
18   Q.   Okay.  So, about two weeks later, you have located in
19   your summary there a normal hemoglobin A1C?
20   A.   Correct.
21   Q.   Okay.  Now, let me ask you, on the criteria that
22   you're referencing and that you put in this document, did you
23   get those from the American Diabetes Association?
24   A.   Yes, sir, I did.
25   Q.   Okay.  And so you would defer to the American

| | |
|---|---|
| **206** | **208** |

**206**

1  Diabetes Association on which tests are appropriate to diagnose
2  diabetes?
3     A.  Absolutely.
4     Q.  Okay.  And do you know whether or not, according to
5  the American Diabetes Association, the A1C should be used to
6  diagnose diabetes?
7     A.  I do not recollect at this time.  I think they said
8  something about -- well, I wouldn't want to hazard a guess.
9     (Young Exhibit No. 21 marked.)
10    Q.  (BY MR. ELDER)  All right, Doctor.  Let me show you
11  what I've marked as Exhibit 21 to your deposition, and this is
12  the diagnosis and classification of diabetes mellitus published
13  by the American Diabetes Association.  And if you'll look at
14  the bottom, that was published in January of this year; is that
15  correct?
16    A.  January 2008, yes, sir.
17    Q.  Okay.  And if you'll look with me on the bottom on
18  Page -- the pages begin with an S -- S59 --
19    A.  It says "S59"?
20    Q.  Yes, on the bottom right-hand corner.
21    A.  Yes, sir.
22    Q.  Okay.  Right in the top right-hand corner of that,
23  right under position statement at the top of that column, is
24  there a sentence that reads "The use of hemoglobin A1C for the
25  diagnosis of diabetes is not recommended at this time"?

**207**

1     A.  Yes, sir, it says that.
2     Q.  Okay.  And you wouldn't disagree with the American
3  Diabetes Association on that issue, correct?
4     A.  Correct.
5     Q.  Okay.  And the A1C that you found there that was done
6  after this February '06 glucose tolerance test on
7  Ms. Whittington was normal?
8     A.  Correct.
9     Q.  Any other value in her records that you believe
10  confirms her diagnosis of diabetes?
11    A.  Not that I'm aware of.  Somehow I recall other
12  elevated fasting blood glucoses, but I don't have that at my
13  fingertips at this point in time.
14    Q.  All right.  As we sit here talking about
15  Ms. Whittington today, Doctor, do you have a basis for
16  concluding to a reasonable degree of medical certainty that
17  Ms. Whittington, in fact, has diabetes?
18    A.  I do not.
19    Q.  What did you do to assess Ms. Whittington's risk for
20  developing diabetes prior to the time that she took Seroquel?
21    A.  Reviewed her medical records.
22    Q.  Okay.  And did you summarize or characterize that
23  risk anywhere?
24    A.  I thought I did in the report.  I listed her risk
25  factors.

**208**

1     Q.  Okay.  Could you show me that in your report?
2     A.  Yes.  With -- if I may, sir, with respect to the
3  glucose issue, there was some records upon initial diagnosis
4  and I don't recall whether those had elevated glucose values or
5  not, but -- your current question is about risk factors prior
6  to Seroquel?
7     Q.  Right.
8     A.  Tobacco dependence, elevated lipids -- was she a
9  smoker?  I don't recall her being a smoker.  Yeah, tobacco
10  dependence.  So, tobacco dependence.  There was a family
11  history of diabetes mellitus, which was known prior to
12  initiation of treatment with Seroquel.  Risk factors for
13  diabetes mellitus include hypertension, elevated lipids,
14  smoking, obesity, and sedentary lifestyle associated with
15  schizophrenia, results of prior receipt of Zyprexa, and there
16  was an approximate four- to five-year history of exposure to
17  Seroquel.
18    Q.  Okay.  And you were now just then reading from Page
19  11 of your report, correct?
20    A.  Correct.
21    Q.  Okay.  And those risk factors that you gave me and
22  that you've listed there, were all of those present prior to
23  the time that Ms. Whittington took Seroquel?
24    A.  With exception of Seroquel, that's correct.
25    Q.  Did Ms. Whittington have any elevated glucose values

**209**

1  prior to the time that she took Seroquel?
2     A.  I don't recall.
3     Q.  If she had an elevated glucose value, that would be
4  another risk factor, would it not?
5     A.  Absolutely.
6     (Young Exhibit No. 22 marked.)
7     Q.  (BY MR. ELDER)  Doctor, I'm going to show you what
8  I've marked as Exhibit 22.  And Exhibit 22 is a laboratory
9  report dated September 16th, 1993, correct?
10    A.  Yes, sir.
11    Q.  Okay.  And you've seen this before, correct?
12    A.  Where is this from?  Jacksonville, Cantrell,
13  Patterson, Mental Health Street, 20th Street Center (sic)?
14    I believe so, sir.
15    Q.  Okay.  And this is -- in September -- or on September
16  16th, 1993, Ms. Whittington had an elevated glucose of 123,
17  correct?
18    A.  Yes, she did.
19    Q.  Okay.  And she also had high cholesterol?
20    A.  Yes, she did.
21    Q.  And high triglycerides?
22    A.  That's correct, sir.
23    Q.  Okay.  And, in fact -- well, let me ask you, when you
24  saw this laboratory value, did you try to determine whether or
25  not this is a fasting value?

## 210

1    A.  I wondered about that.  I don't know that it is.

2    Q.  Okay.  A fasting 123 would mean that as of September

3  16th, 1993, Ms. Whittington had impaired fasting glucose?

4    A.  If it was fasting.  The cutoff, I thought, was 125.

5  Let me check that criterion again.

6       Correct.  If it is fasting, 100 to 125 is

7  impaired fasting, meaning you didn't eat for six to eight hours

8  before the test.

9    Q.  Right.  What time were those labs collected?

10    A.  9:15 in the morning.

11       (Young Exhibit No. 23 marked.)

12    Q.  (BY MR. ELDER)  Show you what I've marked as Exhibit

13  23 in Ms. Whittington's deposition.  Have you seen that record

14  before, Doctor?

15    A.  I may have this past weekend, yes.

16    Q.  Okay.  And the date of this record is August 31st,

17  1993, correct?

18    A.  Yes.

19    Q.  Okay.  It's roughly a little more than two weeks

20  prior to the lab we just looked at?

21    A.  08-31-93 and 9-16 -- little over two weeks.

22    Q.  Okay.  And do you see in this record that we've

23  marked as Exhibit 23, under the Plan No. 4, says "Ordered for

24  the client a CBC, blood chemistry, TSH, and a T4 to be done in

25  two to three weeks, fasting"?

## 211

1    A.  Yes, sir, I see that.

2    Q.  Okay.  And the labs we looked at that are dated about

3  two weeks later, in fact, did those report a T4 and a TSH?

4    A.  Yes.

5    Q.  And a CBC?

6    A.  Yes.

7    Q.  Does it appear to you based on these records, Doctor,

8  that this lab from 09-16-93 collected at 9:15 in the morning

9  was done fasting?

10       MS. FENDIA:  Object to form.

11    A.  I know that it was requested.  We would have to ask

12  the paranoid schizophrenic whether they fasted or not prior to

13  the collection.  That information is not on here, so I don't

14  know.

15    Q.  (BY MR. ELDER)  Okay.  The records that you have

16  available to you indicate that it was ordered fasting and it

17  was collected at a time that would be consistent with fasting.

18    A.  Yes, sir, that's correct.

19    Q.  Doctor, prior to forming your opinions in this case,

20  were you familiar with metabolic syndrome?

21    A.  Vaguely.

22    Q.  So, in working on this case, did you go do some

23  reading about metabolic syndrome?

24    A.  Yes, I did, sir.

25    Q.  Okay.  What is metabolic syndrome?

## 212

1    A.  Metabolic syndrome is a group of risk factors in one

2  person: Central obesity, atherogenic dyslipidemia, blood fat

3  disorders -- mainly high triglycerides and low HDL -- plaque

4  buildup, insulin resistance or glucose intolerance,

5  prothrombotic state -- e.g., high fibrinogen or plasminogen

6  activator inhibitor in the blood -- raised blood pressure, and

7  a proinflammatory state; namely, elevated C-reactive protein in

8  the blood.

9    Q.  Okay.  And you were reading to me from your Seroquel

10  Product Liability Litigation Terms of Art document, correct?

11    A.  Yes, sir.

12    Q.  Okay.  Would it be fair to say that without reading

13  that answer, you wouldn't have been able to answer that

14  question?

15    A.  No, that wouldn't be fair.

16    Q.  Okay.  Have you investigated the relationship between

17  metabolic syndrome and the development of Type 2 diabetes?

18    A.  Yes.

19    Q.  And you would agree that metabolic syndrome is

20  strongly associated with the development of Type 2 diabetes?

21    A.  That's correct, sir.

22    Q.  Okay.  In your opinion, it's a risk factor for Type 2

23  diabetes.

24    A.  Yes, or contains within it several risk factors for

25  diabetes.

## 213

1    Q.  Okay.  So -- and the things that go into metabolic

2  syndrome are, in and of themselves, risk factors for Type 2

3  diabetes.

4    A.  Correct.

5       (Young Exhibit No. 24 marked.)

6    Q.  (BY MR. ELDER)  All right.  Let me show you what I've

7  marked as Exhibit 24.  And this is a laboratory report for

8  Ms. Whittington dated November 20th, 1996; is that right?

9    A.  Yes, sir, that's correct.

10    Q.  And have you seen this before?

11    A.  Where is it from and who's the ordering doctor?

12    Q.  Looks like the ordering doctor is Dr. -- looks like

13  D-a-i-a-c to me.

14    A.  Could be a trainee though.  It's Family Medical

15  Center of Jacksonville.  Yes, I'm fairly certain I've seen this

16  before.

17    Q.  Okay.  And on this date in 1996, Ms. Whittington's

18  glucose was high, correct?

19    A.  Yes.

20    Q.  Okay.  And her triglycerides were elevated?

21    A.  That's correct.

22    Q.  Okay.  And her HDL cholesterol was low?

23    A.  That's correct.  The collection time, however, sir,

24  was 1:30 p.m.

25    Q.  Do you know whether fasting status affects

## 214

1   triglycerides?

2   A.   That I don't know.

3   Q.   Okay.  Do you know whether fasting status affects the

4   results of low HDL?

5   A.   I don't know.

6   Q.   How much did Ms. Whittington weigh in 1996?

7   A.   I don't have an independent recollection.

8           (Young Exhibit No. 25 marked.)

9   Q.   (BY MR. ELDER)  Show you what I've marked as Exhibit

10  25.  And this is a record dated November 20th, 1996, correct?

11  A.   Yes, sir.

12  Q.   Okay.  And it indicates that her height and weight as

13  5'-5", 194?

14  A.   Yes, sir, that's correct.

15  Q.   Okay.  At that height and weight, she was obese on

16  November 20th, 1996, correct?

17  A.   That's correct, sir.

18  Q.   Okay.  You would agree that as of 1996,

19  Ms. Whittington had metabolic syndrome?

20  A.   Well, she had the obesity, she had the dyslipidemia.

21  Don't know what her abdominal girth was.  Did she have

22  hypertension?  No.

23           She had some features of it, yes, but I don't

24  know if one would say she had the whole syndrome.

25  Q.   Okay.  She had -- she was obese.

## 215

1   A.   Right.

2   Q.   She had dyslipidemia.

3   A.   Right.

4   Q.   And she had impaired glucose tolerance.

5   A.   Correct.

6   Q.   And three out of the five gets you metabolic

7   syndrome, correct?

8   A.   I believe so.

9   Q.   Okay.  So, as of 1996, Ms. Whittington had metabolic

10  syndrome?

11  A.   Yes, sir.

12  Q.   Okay.  So, we can add metabolic syndrome to her risk

13  of -- to her list of risk factors for developing Type 2

14  diabetes, yes?

15  A.   Is that a question, sir?

16  Q.   Yes.

17  A.   Yes.

18  Q.   And we can also add impaired glucose tolerance,

19  correct?

20  A.   Yes, sir.

21  Q.   Okay.  So, I believe the list we have now for risk

22  factors for developing Type 2 diabetes before Ms. Whittington

23  ever took Seroquel are family history, impaired glucose

24  tolerance, obesity, hypertension, high triglycerides, low HDL,

25  metabolic syndrome, and smoking; is that right?

## 216

1   A.   Well, yeah.  You combine the hypertension, lipids,

2   and obesity.  I didn't have the sugar in there under metabolic

3   syndrome.  That's correct.

4   Q.   Given her risk factors, how would you characterize

5   Ms. Whittington's chances for developing diabetes prior to the

6   time that she ever took Seroquel?

7   A.   Relatively high risk.

8   Q.   And you would agree that it's not your opinion in

9   this case that but for taking Seroquel, she would never have

10  developed Type 2 diabetes?

11  A.   That's correct.

12  Q.   Okay.  In fact, in all likelihood, she would have

13  developed Type 2 diabetes anyway, given her risk factors.

14           MS. FENDIA:  Object to form.

15  A.   That I don't know.

16  Q.   (BY MR. ELDER)  Okay.  But you would agree she was at

17  very high risk for developing Type 2 diabetes prior to ever

18  taking Seroquel?

19  A.   Yes.

20  Q.   Have you done anything to compare the strength of

21  association between this list of risk factors that you and I

22  just talked about in Ms. Whittington versus Seroquel?

23  A.   No.

24  Q.   One thing that we didn't talk about on this list is

25  Zyprexa.  Ms. Whittington took Zyprexa prior to taking

## 217

1   Seroquel; is that right?

2   A.   That's correct, sir.

3   Q.   Okay.  And would we then add, in your opinion,

4   Zyprexa to this list of risk factors?

5   A.   I think it's already added there in my report.

6   Q.   Okay.  So, your report says there was also -- there

7   was prior receipt of Zyprexa.  And what you mean by that is the

8   Zyprexa's also a risk factor?

9   A.   Yes.

10  Q.   Was Ms. Whittington's obesity prior to taking

11  Seroquel a cause of her Type 2 diabetes?

12  A.   Yes.

13  Q.   And are you able to rule out that it was the sole

14  cause of her diabetes?

15  A.   No, I'm not.

16  Q.   And if I asked you that for every one of those risk

17  factors that we just listed, other than Seroquel, would --

18  those two questions -- would your answer be the same?

19  A.   Yes, sir, my answers would be the same.

20  Q.   In your -- this Seroquel Product Liability Terms of

21  Art Document, you've listed the Hill criteria there.

22  A.   Yes, sir.

23  Q.   Okay.  And if you'll turn with me on Page 11, under

24  Strength -- and, by the way, where -- this -- let me back up a

25  second.

218

1    The two paragraphs that you have here and then
2  the Hill criteria, did you cut and paste those out of
3  something?
4    A. Yes, sir, off the internet.
5    Q. Okay. And do you know where they came from?
6    A. Oh, some epidemiologic website, but I don't recall
7  the specific website.
8    Q. Okay. And when did you do that?
9    A. That was added yesterday, I believe.
10   Q. And was that added at the request of any of the
11 lawyers in this case?
12   A. No.
13   Q. Going back to Paragraph 2, under Strength, it says
14 "This is defined by the size of the association as measured by
15 appropriate statistical tests. The stronger the association,
16 the more likely it is that the relation of A to B is causal."
17   Do you agree with that?
18   A. Yes.
19   Q. And have you assessed the strength of the association
20 between Ms. Whittington's risk factors for diabetes and Type 2
21 diabetes at any time?
22   A. In terms of controlling for risk factors and doing
23 tests, no.
24   Q. Okay. Well, in terms of anything. And let me make
25 sure my question is clear.

219

1    What I'm asking is — let's take obesity as an
2  example. Have you gone and assessed the strength of the
3  association between obesity and Type 2 diabetes?
4    A. No.
5    Q. Have you done that for any of her risk factors?
6    A. I reviewed through Catie studies and the like.
7  There's some documentation with respect to the medication, what
8  the — in some of the literature, what some of the risk factors
9  were for the medication or the odds ratios; but not for the
10 specific risk factors in and of themselves in comparison to
11 medications, no, sir.
12   Q. What would you consider to be a strong risk factor
13 under the Hill criteria? If you — when you assess strength of
14 association, how do you determine whether something is a strong
15 association, a weak association, or something in the middle?
16   A. I'm not sure how to answer that question. The
17 ultimate statistical criterion in clinical medicine would be
18 through double-blind crossover controlled studies on a given
19 issue, and I'm not sure — I'm pretty certain when applied to
20 neuropsychiatry or human beings, institutional review boards
21 wouldn't allow you to manipulate those variables to get clean
22 data in that there's an intention to treat. But you also
23 wouldn't want to make controls fat and see what happened, for
24 example, so —
25   Q. Okay. It was my understanding of your testimony

220

1  earlier that you've applied these Hill criteria to this case.
2  Tell me how you assessed the strength of the association under
3  the second enumerated Hill criteria in connection with
4  Ms. Whittington's case.
5    A. I believe — to clarify the matter, I looked at these
6  criteria in relationship to Ms. Whittington and the primary
7  criteria I was looking at was temporal relationship and
8  dose-dependent response of the medication. There is some
9  consistency, there is some plausibility. I did not experiment
10 with Ms. Whittington. And certainly I would consider alternate
11 explanations for her metabolic syndrome other than medication,
12 and I listed those risk factors.
13   Q. And, in fact, here, the metabolic syndrome, it
14 preexisted the Seroquel by a number of years.
15   A. Correct.
16   Q. And when you say there is some consistency, you
17 didn't sit down — well, let me back up.
18   You did not sit down and apply the Bradford Hill
19 criteria in a systematic manner to the question of does
20 Seroquel cause diabetes; is that correct?
21   A. At the time of the writing of my report, that's
22 correct.
23   Q. And you said there's some consistency. What I
24 understood you to say earlier is, in fact, the data are
25 discrepant.

221

1    A. Correct.
2    Q. Okay. And so there's some inconsistency.
3    A. Yes, sir, that's correct.
4    Q. Now, let's talk about the dose-dependent manner. We
5  agreed earlier that Ms. Whittington never took more than 50
6  milligrams of Seroquel, right?
7    A. Correct.
8    Q. Okay. Do you have any scientific studies that you
9  can point to that show that taking 50 milligrams of Seroquel
10 causes diabetes?
11   A. No, I do not.
12   Q. Same question for weight gain. Any studies that you
13 believe show taking 50 milligrams of Seroquel causes weight
14 gain?
15   A. I think there are some studies that show a
16 dose-dependent relationship with Seroquel concerning weight,
17 but I do not recall what the lower limit or dose was of those
18 studies.
19   Q. So, as you sit here, you can't refer me to any
20 particular study that you believe demonstrates weight gain at a
21 50-milligram dose of Seroquel?
22   A. Correct.
23   Q. In epidemiology, Doctor, are you familiar with the
24 term "threshold effect"?
25   A. In epidemiology, in general, no. Threshold effect, I

222

1  think I have an understanding.
2      Q.  Okay.  What's your understanding of threshold effect?
3      A.  You have to reach a certain threshold or level of
4  whatever it is you're measuring before you have an effect.
5      Q.  A certain dose?
6      A.  Or in case of medication, threshold effect would be a
7  dose at a certain level, that level being called a threshold in
8  which the effect would manifest.
9      Q.  Okay.  And with Seroquel and weight gain, do you know
10 whether or not there's a threshold effect?
11     A.  As I sit here now, I don't recall.
12         MS. FENDIA:  When you get to a break, I'd like
13 to take just a short break.
14         MR. ELDER:  Sure.  Take one —
15         MS. FENDIA:  Is this a good time?
16         MR. ELDER:  This is a good time.
17         (Recess from 4:38 p.m. to 4:44 p.m.)
18     Q.  (BY MR. ELDER)  Doctor, would you agree that some
19 risk factors are more strongly associated with the development
20 of Type 2 diabetes than others?
21     A.  Yes.
22     Q.  And what risk factors do you believe are the most
23 associated with developing Type 2 diabetes?
24         (Mr. Fibich returns.)
25     A.  The greatest risk factor, I think, would be

223

1  hyperglycemia or glucose intolerance.
2      Q.  (BY MR. ELDER)  What else would you put at the top of
3  your list?
4      A.  At this time, nothing else is on that list.
5         (Ms. Fendia leaves.)
6      Q.  (BY MR. ELDER)  Doctor, what amount of weight gain do
7  you think Seroquel causes?
8      A.  The data I reviewed suggested — well, it depends on
9  whose data you read, but I think it was somewhere 6 to 8, 9
10 pounds, 6 to 10 pounds, somewhere in that range.  And —
11     Q.  And the weight gain that you believe occurs following
12 Seroquel doesn't have a pattern?
13     A.  It does have a pattern over time.
14     Q.  And what's the pattern?
15     A.  I think it increases and then there's the plateau,
16 but I don't recall over what period of time that occurs.
17     Q.  Okay.  But you believe there's an initial increase
18 and then a plateau?
19     A.  Yes.
20     Q.  In Ms. Whittington's case, in forming your opinions,
21 did you take into account her pattern of weight gain or loss
22 before and after Seroquel?
23     A.  I looked at her weight gains and losses over time,
24 yes.
25     Q.  Okay.  And would her pattern of weight gain or loss

224

1  before and after Seroquel inform your opinion as to whether
2  taking Seroquel caused her to gain weight?
3      A.  Yes.
4      Q.  Why?
5      A.  What — what?
6      Q.  Why would that be important?
7      A.  In terms of temporal association, in terms of risk
8  factor for the development of diabetes and/or metabolic
9  syndrome or exacerbation of metabolic syndrome.
10     Q.  Well, what I asked was why would knowing her pattern
11 of weight gain before and after she took Seroquel be important
12 in developing your opinion as to whether Seroquel caused her to
13 gain weight?
14     A.  Because if she gained or lost weight when she wasn't
15 taking Seroquel, it would not be due to the Seroquel that she
16 was gaining or losing weight.
17     Q.  Did Ms. Whittington gain weight prior to taking
18 Seroquel?
19     A.  Yes, she did.
20     Q.  And for a period of time prior to that, she was
21 taking Zyprexa, correct?
22     A.  Correct.
23     Q.  Okay.  Prior to that, did she gain weight?
24     A.  Prior to taking Zyprexa?
25     Q.  Right.

225

1      A.  I don't know.
2      Q.  You didn't assess that before you prepared your
3  report in this case?
4      A.  I'm not sure I had that data.
5      Q.  Did you have her medical records?
6      A.  I believe so, although there was some medical records
7  that I looked at on Ms. Whittington this weekend which were not
8  available to me prior to the writing of my report.
9      Q.  And do you recall seeing anything in there about her
10 weight gain over time prior to the time that she took Zyprexa
11 or Seroquel?
12     A.  I don't have an independent recollection at this
13 time.
14         MR. FIBICH:  How much more you think you have?
15         MR. ELDER:  Not too much.  Pretty close.
16         MR. FIBICH:  I think we've been going seven
17 hours.  But, you know, if you can finish up, I'd like to get it
18 done.
19         (Young Exhibit No. 26 marked.)
20     Q.  (BY MR. ELDER)  Doctor, I've marked as Young 26 a
21 record from September of 1990 from the University Hospital of
22 Jacksonville.  Have you seen that record before?
23     A.  I believe so.
24     Q.  Okay.  And on this date, she weighed 145 pounds; is
25 that right?

### 226

1    A. Yes, sir, that's correct.

2    Q. Okay. And we looked at our record that we marked

3    earlier from November of '96 when we were talking about her

4    weight and she weighed 194 pounds.

5    A. Yes, sir, that's correct.

6    Q. So, over that six-year period prior to taking Zyprexa

7    or Seroquel, she gained 50 pounds?

8    A. That's correct.

9        (Young Exhibit No. 27 marked.)

10   Q. (BY MR. ELDER) Doctor, I've marked as Exhibit 27 a

11   record from Dunn Avenue Family Practice from September 11th,

12   '01. And this would reflect Ms. Whittington's weight just

13   prior to starting Seroquel; is that right?

14   A. 09-11-01?

15   Q. Yes, sir.

16   A. Yes, I believe so.

17   Q. And she weighed 204 pounds?

18   A. That's what it says.

19       (Young Exhibit No. 28 marked.)

20   Q. (BY MR. ELDER) I've marked as Exhibit 28 a record

21   from February 15th of 2002. And at this point, Ms. Whittington

22   weighs 203 pounds, correct?

23   A. Yes, sir.

24   Q. Okay. So — and she started taking Seroquel in some

25   amount in October of '01, right?

### 227

1    A. Between October of '01 and January of '02.

2    Q. Okay. So, this is in February of 2002. She's lost a

3    pound, correct?

4    A. Lost a pound compared to when, sir?

5    Q. September of '01.

6    A. Yes, sir, that's correct.

7    Q. Okay. Is that pattern of weight over the first few

8    weeks of taking Seroquel typical for people who gain weight on

9    Seroquel?

10   A. No, it is not.

11   Q. How much weight do you believe she gained on

12   Seroquel?

13   A. She was on Seroquel for a four-year period, give or

14   take, between either October '01/January '02 and February '06,

15   '02 and '06. 02-15-02, she was 203 pounds. 02-14-06, she was

16   244 pounds.

17       (Young Exhibit No. 29 marked.)

18   Q. (BY MR. ELDER) Okay. I'm going to show you Exhibit

19   29. Doctor, in Exhibit 29, this is now July of 2002. Do you

20   see that?

21   A. Yes, sir.

22   Q. And she weighs 215 pounds?

23   A. January of — no. July —

24   Q. July of '02.

25   A. Yes, sir, that's correct.

### 228

1    Q. She weighs 215 pounds?

2    A. Yes, sir, that's correct.

3    Q. Okay. And on your own chart there that's attached to

4    your report, that has some weights for Ms. Whittington on it,

5    correct?

6    A. Yes, sir.

7    Q. Okay. And what do you have for Ms. Whittington's

8    weight in March of 2003?

9    A. 215 pounds.

10   Q. Okay. So, between July of 2002 and March of 2003,

11   the medical records reflect a net change in Ms. Whittington's

12   weight of zero; is that right?

13   A. That's correct.

14   Q. Okay. Having stayed on Seroquel for that period of

15   time with no change in weight, how do you attribute any weight

16   gain after that period of time to Seroquel?

17   A. I would say there were other factors involved based

18   on that data alone.

19   Q. Does that mean that you cannot attribute weight gain

20   after that period of time to Seroquel, you would attribute it

21   to those other factors?

22   A. If, in fact, she was taking the Seroquel as

23   prescribed.

24   Q. If she was taking it as prescribed, you would

25   attribute it to other factors?

### 229

1    A. That's correct.

2    Q. And that's because — and I — is the reason that

3    you're saying that because her dose didn't change, in your

4    opinion?

5    A. Yes.

6    Q. As you sit here, are you aware of evidence that her

7    dose did change?

8    A. No.

9    Q. So, as you sit here, your opinion would be that based

10   on the evidence you are aware of, weight gain after that time

11   couldn't be attributed to Seroquel, given the period of time

12   that her weight didn't change while taking Seroquel?

13       MR. FIBICH: Object to form.

14   A. If, in fact, she took the Seroquel as prescribed,

15   correct.

16   Q. (BY MR. ELDER) Did Ms. Whittington gain weight after

17   stopping Seroquel?

18   A. The Seroquel was discontinued February '06. If I

19   compare her weight on 02-14-06 to 05-24-06, she went from 244

20   to 236.

21   Q. Okay. Did you look beyond that?

22   A. In terms of weight?

23   Q. That's right.

24   A. No.

25   Q. Did you have Dr. Boyd's records?

230

1    A. I don't have an independent recollection of that as
2  we sit here now.
3    Q. As you would look down your page there — I've handed
4  you my copy of your handwritten notes on this case — did you
5  have Dr. Boyd's records?
6    A. Yes.
7        (Young Exhibit No. 30 marked.)
8    Q. (BY MR. ELDER) Let me show you what I've marked as
9  Exhibit 30, Doctor.
10       Can I have my copy?  Thank you.
11   A. Sure.
12   Q. Exhibit 30 is a record from Dr. Boyd dated March 24th
13 of 2008.  And on the second page there, do you see that
14 Ms. Whittington weighed 255 pounds as of that visit?
15   A. Yes, sir, I do.
16   Q. Okay.  And she's been off of Seroquel — by March of
17 '08, she's been off of Seroquel over two years, correct?
18   A. Yes, sir, that's correct.
19   Q. Okay.  And 255 pounds, according to your chart that's
20 attached to your report, is that the most she's ever weighed?
21   A. Yes, it is.
22   Q. Okay.  And would you agree that the fact that she
23 attained her highest weight after she went off of Seroquel
24 casts doubt on the hypothesis that Seroquel caused her to gain
25 weight?

231

1    A. After she discontinued the Seroquel, yes.
2    Q. Before forming your opinions in this case, did you
3  review the scientific literature on the relationship between
4  weight and schizophrenia?
5    A. I reviewed some literature on schizophrenia and
6  metabolic syndrome.
7    Q. Okay.  But not weight specifically?
8    A. I don't have independent recollection of that.
9    Q. Okay.  Is it your opinion that people who suffer from
10 schizophrenia are more likely to be overweight than people who
11 do not?
12   A. I don't recall if that holds up independent of
13 treatment.
14   Q. You didn't look at that issue before writing your
15 report?
16   A. I don't have an independent recollection as we sit
17 here now of that specific issue.
18   Q. You would agree you've written it as one of your risk
19 factors in your report here that Ms. Whittington had a
20 sedentary lifestyle, on Page 11 of your report?
21   A. Thank you, sir.
22       What I wrote is "sedentary lifestyle associated
23 with schizophrenia."  I do not know how sedentary
24 Ms. Whittington was as an individual.  Nowhere in the medical
25 records did I see a description of her typical day, for

232

1  example.
2    Q. And what do you mean, "sedentary lifestyle associated
3  with schizophrenia"?  I'm not understanding the distinction
4  you're making.
5    A. My understanding, sir, is that there is a sedentary
6  lifestyle associated with — an increased sedentary lifestyle
7  associated with schizophrenia.  What I don't know is details
8  about Ms. Whittington's lifestyle.
9    Q. So, you didn't assess prior to writing your report
10 whether or not Ms. Whittington is sedentary or was sedentary
11 during the time she was taking Seroquel?
12   A. Correct.
13   Q. Did you review her medical records for possible
14 alternate causes of the weight gain during the period that she
15 took Seroquel?
16   A. Yes.
17   Q. And did you find any?
18   A. Yes.
19   Q. What did you find?
20   A. She certainly had a family history of diabetes, she
21 certainly had a history of elevated lipids, there was prior
22 receipt of Zyprexa.
23   Q. She was involved in two motor vehicle accidents?
24   A. One that I recall for sure.
25   Q. Okay.  And as a result of those, she sought medical

233

1  treatment.
2    A. That's correct.
3    Q. Okay.  Over a fairly long period of time.
4    A. Yes, sir, that's correct.
5    Q. Okay.  And she reported — in fact, at one point in
6  her records, it said she had chronic neck pain.
7    A. Yes, sir.
8    Q. Said she had several MRIs.
9    A. That's correct.
10   Q. Okay.  And she consulted a neurologist about her
11 pain.
12   A. I believe so, yes.
13   Q. Okay.  And pain — the effects of pain from those
14 motor vehicle accidents could have caused Ms. Whittington to be
15 less active.  Is that fair?
16   A. Yes, sir, that's fair.
17   Q. And you can't rule out in this case that a sedentary
18 lifestyle or physical inactivity as a result of pain or
19 whatever it was that caused her to gain weight both before and
20 after taking Seroquel was, in fact, the cause of the weight
21 gain she experienced while on Seroquel; is that true?
22   A. Yes, sir.
23   Q. Did you review any scientific literature in
24 connection with this case that concluded that Seroquel is a
25 cause of diabetes?

234

1    A. That specifically states Seroquel causes diabetes?

2    Q. That's right.

3    A. No, sir.

4    Q. In Ms. Whittington's case, would you characterize her

5    schizophrenia as severe?

6    A. Yes.

7    Q. You would agree that her mental illness has had a

8    significant impact on her life?

9    A. Yes.

10   Q. It's affected her ability to really function on a

11   daily basis?

12   A. Yes, sir.

13   Q. Are you offering any opinions in this case regarding

14   the cause of Ms. Whittington's pancreatitis?

15   A. No.

16       MR. ELDER: Let me look over my notes for a

17   minute, but I think we're about there.

18       MR. FIBICH: Okay. We'll take a break while he

19   does that.

20       (Recess from 5:13 p.m. to 5:17 p.m.)

21   Q. (BY MR. ELDER) Dr. Young, my only other question is

22   similar to what I asked you at the beginning. We talked about

23   some general issues, in addition to some Whittington-specific

24   issues, and I just wanted to confirm that your testimony would

25   apply equally in the Unger case on those issues that were not

235

1    specific to Ms. Whittington.

2    A. That's correct, sir.

3    Q. Okay. That's all I have for you. Thank you.

4    A. Thank you, sir.

5        MR. FIBICH: We'll reserve our questions.

6        (Deposition concluded at 5:18 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

236

1                    CHANGES AND SIGNATURE

2    PAGE   LINE   CHANGE        REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24       I, MITCHELL ALAN YOUNG, M.D., have read the foregoing

25   deposition and hereby affix my signature that same is true and

237

1    correct, except as noted above.

2

3            MITCHELL ALAN YOUNG, M.D.

4

5    THE STATE OF _____)

6    COUNTY OF _____)

7        Before me, MITCHELL ALAN YOUNG, M.D., on this day

8    personally appeared MITCHELL ALAN YOUNG, M.D., known to me (or

9    proved to me under oath or through _____) to be

10   the person whose name is subscribed to the foregoing instrument

11   and acknowledged to me that they executed the same for the

12   purposes and consideration therein expressed.

13       Given under my hand and seal of office this _____ day

14   of _____, _____.

15

16

17       _____

18   NOTARY PUBLIC IN AND FOR

19   THE STATE OF _____

20

21

22

23

24

25

238

1   STATE OF TEXAS
    COUNTY OF HARRIS
2
           I, the undersigned certified shorthand reporter
3   in and for the State of Texas, certify that the facts stated in
    the foregoing pages are true and correct.
4
           I further certify that I am neither attorney or
5   counsel for, nor related to or employed by, any of the parties
    to the action in which this deposition is taken and, further,
6   that I am not a relative or employee of any counsel employed by
    the parties hereto, or financially interested in the action.
7
           The amount of time used by each party at the
8   deposition is as follows:
9          STEPHEN D. RABER, ESQ. - 5:20
           SCOTT A. ELDER, ESQ. - 1:30
10
           SUBSCRIBED AND SWORN TO under my hand and seal
11  of office on this the _____ day of _____, 2008.
12
13
14         _____
           SHANON M. HAIR, CSR
15         Certified Shorthand Reporter
           In and for the State of Texas
16
17  Certificate No. 6513
    Expiration Date: 12-31-09
18  Firm Registration No. 03
19
20
21
22
23
24
25

61 (Page 238)