# EXHIBIT 24

Confidential – Jeffrey P. Koplan, M.D., M.P.H.

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

In Re:

SEROQUEL PRODUCTS

LIABILITY LITIGATION                    MDL No. 1769

~~~~~~~~~~~~~~~~~~~~~~~~~



*** CONFIDENTIAL ***

DEPOSITION OF

JEFFREY P. KOPLAN, M.D., M.P.H.


November 16, 2008

10:23 a.m. – 5:53 p.m.


15th Floor

Atlantic Center Plaza

1180 West Peachtree Street

Atlanta, Georgia


Maxyne Bursky, RPR, CRR, CCR-2547

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

## Page 2

1
2                   APPEARANCES OF COUNSEL
3   On behalf of the Plaintiffs:
4      WEITZ & LUXENBERG, PC
       ELLEN RELKIN, ESQUIRE
       180 Maiden Lane
5      New York, New York 10038-4925
       212.558.5715
6      212.363.2721  (Facsimile)
       erelkin@weitzlux.com
7
8   On behalf of the Defendant AstraZeneca:
9      ALSTON + BIRD LLP
       JANE F. THORPE, ESQUIRE
10     LUCAS PRZYMUSINSKI, M.D., ESQUIRE
       One Atlantic Center
11     1201 West Peachtree Street
       Atlanta, Georgia 30309-3424
12     404.881.7000
       404.881.7777  (Facsimile)
13     jane.thorpe@alston.com
       lucas.przymusinski@alston.com
14
       SPRIGGS & HOLLINGSWORTH
15     FRANK LEONE, JR., ESQUIRE
       1350 I Street, N.W.
16     Washington, DC 20005
       202.898.5800
17     202.682.1639  (Facsimile)
       fleone@spriggs.com
18
19  Also Present:
20     CHELSEA DURGAN
       JAYAN ZAMAN
21
22
23
24
25

## Page 3

1
2                   INDEX OF EXAMINATION
3   WITNESS:  JEFFREY P. KOPLAN, M.D., M.P.H.
4   EXAMINATION                           PAGE
5   By Ms. Relkin                         5,243
6   By Ms. Thorpe                         238
7                   INDEX TO EXHIBITS
8   Plaintiffs'
       Exhibit        Description          Page
9      1   Notice of deposition 11-12-08    18
10     2   Declaration of Dr. Koplan 11-2-08   18
11     3   Expert report of Dr. Koplan      18
12     4   Curriculum vitae of Dr. Koplan   18
13
14     5   List of materials provided to
           Dr. Koplan                       18
15
16     6   Frequency of New Onset Diabetes
           Mellitus and Use of Antipsychotic
17         Drugs among Central Texas Veterans  119
18     7   Consensus development conference on
           antipsychotic drugs and obesity and
19         diabetes                         132
20     8   A Multicenter Randomized Parallel
           Group Double-Blind Phase III
21         Comparison of the Efficacy and
           Safety of Quetiapine Fumarate to
22         Placebo, 6-19-07, Bates AZSER
           12744448-711                     144
23     9   Handwritten notes of Dr. Koplan,
           one page                         149
24
25     10  Handwritten notes of Dr. Koplan,
           one page                         150

## Page 4

1
2                   INDEX TO EXHIBITS
    Plaintiffs'
       Exhibit         Description
3
4      11  Handwritten notes of Dr. Koplan,
           one page                         149
5      12  Handwritten notes of Dr. Koplan,
           red sheet                        150
6
7      13  Multicenter Randomized Parallel
           Group Double-Blind Placebo-Controlled
8          Phase III Study of the Efficacy and
           Safety of Quetiapine Fumarate and
9          Lithium, 4-1-08, Bates
           D339-L01124072-0001 through 0018,
10         00162 through 164, 0193 through 221,
           00240 through 243               151
11     14  Q and Glucose/Diabetes chart, two
           pages                            151
12
13     15  A 24-week Multicenter Open-Label
           Randomized Study to Compare Changes
14         in Glucose Metabolism in Patients
           with Schizophrenia Receiving Treatment
15         with Olanzapine, Quetiapine and
           Risperidone                      179
16     16  Second Generation (Atypical)
           Antipsychotics and Metabolic Effects
17         by Newcomer                      232
18     17  Study 125 typewritten notes, two
           pages                            248
19
       18  Q and Glucose/Diabetes Primary data,
20         typewritten notes, two pages     248
21     19  Banker's box of documents        248
22     20  Banker's box of documents        248
23
24
25

## Page 5

1
2          Deposition of Jeffrey P. Koplan, M.D., M.P.H.
3               November 16, 2008
4
5          (Reporter disclosure made pursuant to
6   Article 8.B. of the Rules and Regulations of the Board
7   of Court Reporting of the Judicial Council of Georgia.)
8      MS. THORPE:  Just note the time on the record
9   that we are all assembled here.
10        JEFFREY P. KOPLAN, M.D., M.P.H.
11  having been first duly sworn, testifies as follows:
12               EXAMINATION
13  BY-MS.RELKIN:
14     Q.  Good morning, Doctor.
15     A.  Good morning.
16     Q.  We met off the record a few moments ago.  I'm
17  Ellen Relkin from the firm of Weitz & Luxenberg.  I
18  will be taking your deposition today.  First, I
19  understand you are familiar with the process of the
20  deposition; is that right?
21     A.  Correct.
22     Q.  You have given a number in the past?
23     A.  Yes.
24     Q.  Do you want me to refresh you on the rules or
25  do you feel that you know them?

                              2  (Pages 2 to 5)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

**Page 6**

1    A. I think I know them, but if you want to touch
2  on anything.
3    Q. Obviously, most important is that you
4  understand my question, so if for any reason you don't
5  understand the question, just tell me. I am happy to
6  rephrase it or the court reporter can repeat it back,
7  okay?
8    A. Yes.
9    Q. If you answer a question, the expectation is
10  that you understood it, fair enough?
11    A. Yes.
12    Q. If you need a break for any reason, just let
13  me know, okay?
14    A. Yes.
15    Q. Are you on any medications today that can
16  affect your ability to answer questions?
17    A. No.
18    Q. Doctor, when did you first get contacted to
19  serve as an expert in this matter?
20    A. I believe it was June, I remember May, June,
21  sometime in the late spring.
22    Q. Of 2008?
23    A. 2008.
24    Q. How did you come to get contacted?
25    A. Ms. Thorpe called me and asked whether I would

**Page 7**

1  become involved.
2    Q. Do you know why Ms. Thorpe came to call you?
3    A. We had worked together before and she felt
4  that my expertise was pertinent to this particular
5  litigation.
6    Q. You worked together before on how many
7  occasions?
8    A. I actually don't remember. We have worked
9  together on at least one occasion and -- two occasions.
10    Q. They were involving what matters?
11    A. One was involving asbestos litigation. One
12  was involving educational information activities for
13  the law firm related to pandemic flu.
14    Q. Say that again, educational information
15  regarding the pandemic flu?
16    A. Yes.
17    Q. Was that a litigated matter?
18    A. It was not.
19    Q. Anything else?
20    A. There may have been, and I am just blocking
21  it. But I believe that was it.
22    Q. How about Phen-Fen?
23    A. I may have gotten started on something. It
24  was short-lived if we did anything on that.
25    Q. You don't recall being retained by Ms. Thorpe

**Page 8**

1  and Alston & Bird to be an expert working on diet drug
2  and valvular defects?
3    A. If we did, it was for a short period of time.
4  I honestly don't remember how much we did on that.
5    Q. But you did something?
6    A. I don't remember.
7    Q. Do you remember ever reading literature about
8  diet drugs or Phen-Fen?
9    A. I do remember reading something, but I don't
10  remember whether it was in preparation or how it was
11  related to a working relationship with Alston & Bird.
12    Q. But you do remember reading literature on
13  Phen-Fen and not in the course of your work for the CDC
14  or anything else; is that right?
15    A. I do remember reading literature on Phen-Fen.
16    Q. It was not in the course of your work for the
17  CDC or your regular day job?
18    A. No, that's correct.
19    Q. Sitting here now, you just don't remember
20  whether it was Ms. Thorpe and Alston & Bird that asked
21  you to review that literature or some other law firm;
22  is that right?
23    A. What I read was for Ms. Thorpe and Alston &
24  Bird. I don't remember whether it led to any working
25  relationship of any kind of prolonged nature or any

**Page 9**

1  kind of reimbursement or anything for it.
2    Q. You don't remember whether you were actually
3  designated as an expert in any case?
4    A. I don't remember.
5    Q. Do you remember forming any opinions following
6  your review of the Phen-Fen literature?
7    A. I don't remember the circumstances, no.
8    Q. Sitting here, do you have any recollection of
9  an opinion that you formed, whether or not you believe
10  that there is adequate scientific data to conclude that
11  Phen-Fen, which is the diet drug combination, can cause
12  valvular heart defects?
13    A. I don't have an opinion at the moment. I
14  don't remember the literature at this time.
15    Q. How about the same question with regard to the
16  other adverse event of interest, primary pulmonary
17  hypertension, do you have any recollection of forming
18  an opinion one way or the other on that?
19    A. I don't have a recollection on that.
20    Q. So going back historically when Ms. Thorpe
21  first contacted you about serving as an expert in
22  asbestos litigation -- withdrawn. Let me ask it this
23  way.
24    Prior to being called to serve as an expert
25  in an asbestos matter for Alston & Bird, one of the

3 (Pages 6 to 9)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

## Page 10

1  firms that's representing AstraZeneca in this
2  litigation, had you previously done any work with
3  regard to asbestos?
4    A.  Could you be more specific in terms of work?
5    Q.  Had you previously published any studies
6  regarding the safety of asbestos?
7    A.  I had not published studies.
8    Q.  Had you previously done any research regarding
9  the safety of asbestos?
10   A.  No.
11   Q.  How was it that way back when, Ms. Thorpe came
12  to contact you to serve as an expert in litigation
13  regarding the safety of asbestos?
14   A.  I believe it was due to my expertise in
15  epidemiology and public health matters, my expertise in
16  environmental public health in particular, my
17  responsibilities at work professionally that related to
18  epidemiology, public health, environment, my
19  involvement in investigations of environmental
20  disasters and events dating back to Three Mile Island,
21  the Bhopal chemical disaster and other activities, and
22  my periodic responsibility for people who worked in
23  these areas.
24   Q.  Did she know that from looking at your CV?
25   A.  You would have to ask her.  I'm not sure how

## Page 11

1  she came to be aware of my background and experience.
2    Q.  Do you have any overlapping professional
3  personal contacts or familial contacts?
4    A.  We undoubtedly do.  We both live in Atlanta
5  and know a lot of the same people.
6    Q.  When you first got contacted by Ms. Thorpe,
7  was it a call direct from Ms. Thorpe or someone who you
8  know, a colleague or a friend, told you to expect a
9  call from her?
10   A.  I honestly don't remember.  This is quite a
11  number of years ago.
12   Q.  You indicated you undoubtedly do have some
13  overlapping contacts.  Can you tell me who they are
14  that you know, you know, you know the same person that
15  Ms. Thorpe knows?
16   A.  Walter Dowdle, who is a former deputy director
17  of CDC; Alan Hinman, who works in the Task Force for
18  Child Survival; Mark Rosenberg, who is the director of
19  the Task Force for Child Survival; Godfrey Oakley, who
20  is a neighbor of Ms. Thorpe's; Howard Ory, who is a
21  neighbor of Ms. Thorpe's.  There are probably three
22  dozen others who, if we sat down and talked through, we
23  would find we knew in common.  But those are some of
24  the common ones from my workplace.
25   Q.  There is a Dr. Ken Thorpe who is at Emory.  Is

## Page 12

1  there any connection that you are aware of?
2    A.  I know of him.
3    Q.  Do you know who he is?
4    A.  I know his office is about 20 yards from mine.
5    Q.  Do you know if he has any relationship to Ms.
6  Thorpe?
7    A.  I have no idea.  If they have one, they both
8  kept it secret from me.
9    Q.  When you first were contacted by Ms. Thorpe to
10  serve as an expert on the asbestos matter, had you
11  previously met her in any social context?
12   A.  No.
13   Q.  You went through a number of names.  You said
14  there was an Al Hinman?
15   A.  Alan Hinman.
16   Q.  Who is he?
17   A.  He works at the Task Force for Child Survival
18  on immunization activities.
19   Q.  How does he know Ms. Thorpe?
20   A.  I believe maybe through the Task Force on
21  Child Survival.  I don't know the nature of the
22  relationship, whether it is through the way we know
23  people, through children who are friends, through
24  school-related activities, through neighbor activities
25  or clubs.  I don't know.

## Page 13

1    Q.  Then the next individual that you mentioned,
2  was it Mr. Rosenberg?
3    A.  Task Force for Child Survival as well.
4    Q.  You know that he too is a friend of Ms.
5  Thorpe's?
6    A.  I believe so.
7    Q.  Mr. Oakley?
8    A.  A neighbor.
9    Q.  You said Dr. Ory.  He is also an expert in
10  this litigation; is that right?
11   A.  I believe so.
12   Q.  Have you worked on other matters where he is
13  also an expert?
14   A.  I don't remember whether he was involved in
15  the asbestos litigation or not.  I believe so.
16   Q.  The asbestos litigation that you were serving
17  as an expert for the defendant Union Carbide; is that
18  right?
19   A.  It was Union Carbide, yes.
20   Q.  You indicated you had experience years back
21  with Bhopal.
22   A.  Correct.
23   Q.  Did you form any opinions as to the conduct of
24  Union Carbide when you were working on the Bhopal
25  disaster?

4  (Pages 10 to 13)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 14

1    A. That was not a legal matter, it was a public
2  health investigation.
3    Q. From the public health standpoint, did you
4  form any opinions as to their conduct?
5    A. We did not have access to all the information
6  that would have led us to be able to judge conduct. We
7  were able to ascertain the conditions at the plant and
8  the nature of the disaster. Conduct is unclear because
9  I don't know what their intent was or how it was
10  performed so we just had the circumstances at the time,
11  and left that report with the government of India.
12    Q. We have talked in terms of your litigation
13  experience, the asbestos. Have you served as an expert
14  in any other litigated matters besides the Union
15  Carbide litigation?
16    A. Yes, I have.
17    Q. Can you tell me, please?
18    A. I was involved in three or four lawsuits as a
19  witness for the plaintiffs in acquisition of HIV
20  infection and subsequent AIDS related to blood
21  transfusions. And those exposures occurred in the
22  early to mid-80s.
23    Q. That's right up your alley. You have
24  published, you have done a lot of professional work on
25  infectious disease and HIV transmission; is that right?

Page 15

1    A. I have done, I have been involved with the HIV
2  AIDS epidemic nearly since its inception. I have not
3  published extensively on it, I have published on it.
4  And I was well aware of the events involving the early
5  days of the epidemic and the relationship with the
6  blood banking entities to public health matters.
7    Q. Other than the HIV litigation, the asbestos
8  litigation for Union Carbide, the Phen-Fen, and you are
9  not sure of the details of how involved you were, at
10  some level of involvement, what other litigated matters
11  if any have you been involved in?
12    A. I was involved in a consultation with Alston &
13  Bird with other lawyers here, not this group, involved
14  with a potential environmental exposure related to a
15  commercial company in Georgia. My involvement involved
16  reading some material and doing a one-day consultation
17  with the company. And there was no litigation that was
18  involved.
19    Q. Anything else?
20    A. Similarly, I wasn't involved in litigation,
21  but I was involved as a, in two other cases I believe
22  with Alston & Bird as well, a different set of lawyers,
23  involved in a potential inappropriate behavior by a
24  health care worker towards a patient or consumer
25  population and was involved just offering advice on how

Page 16

1  this should best be handled in a public health manner.
2    Q. That wasn't litigated, that was just
3  counseling?
4    A. That wasn't litigated. You are only
5  interested in the ones involving litigation?
6    Q. No, I am interested in all of them.
7    A. The last one involved a different law firm
8  whose name I both don't remember and I believe that
9  firm has been absorbed into some other firm at this
10  point, over ten years ago involving a food-borne
11  disease outbreak in a restaurant and the best
12  approaches to take in dealing with that outbreak from
13  a public health perspective as well.
14    Q. Again, that matter was not litigated?
15    A. No, or at least if it was, I wasn't involved
16  in it.
17    Q. Any other matters?
18    A. Not that I can think of.
19    Q. How about, there is an attorney here, Mr.
20  Leone, from the law firm of Spriggs & Hollingsworth.
21  Have you ever done any work for the Spriggs &
22  Hollingsworth law firm?
23    A. No.
24    Q. Your first introduction to Spriggs &
25  Hollingsworth was through this Seroquel

Page 17

1  litigation; is that right?
2    A. That's correct.
3    Q. Have we covered all of your experience serving
4  as an expert in litigated and non-litigated matters in
5  the legal arena?
6    A. I believe so.
7    Q. How many hours have you worked to date on
8  Seroquel litigation?
9    A. Probably 100, 110, in that area.
10    Q. That includes from the very beginning until
11  today?
12    A. Yes.
13    Q. How much do you bill per hour?
14    A. $700 an hour.
15    Q. You have been paid for how many hours so far?
16    A. None.
17    Q. What was that?
18    A. None.
19    Q. None? Have you issued a bill?
20    A. I have issued bills.
21    Q. Slow in paying?
22    A. I'm a very trusting soul up to a point, and we
23  are near it.
24    Q. Do you have a copy of your CV here?
25    A. No.

5  (Pages 14 to 17)

Confidential – Jeffrey P. Koplan, M.D., M.P.H.

<table>
<tr><td>

Page 18

1   MS. RELKIN: Let's mark some exhibits.
2 Exhibit 1 will be the deposition notice. Exhibit
3 2 will be the declaration. Exhibit 3 will be the
4 report served by the doctor in the MDL litigation.
5 Exhibit 4 is the CV. Unfortunately, the copy
6 that's here has a few markings on it. Maybe we
7 can replace it later if that's okay by agreement.
8 Nothing is going on, we have some circlings on it.
9   MS. THORPE: As long as we can note on the
10 record that they are your circlings and not the
11 witness'.
12   MS. RELKIN: I would rather if during a break
13 you can get a copy from your office of a clean CV.
14   MS. THORPE: Unfortunately, the other side of
15 our office building is closed for cleaning or
16 something. We can't get in there. So I won't be
17 able to help you out there.
18   MS. RELKIN: All right. We are marking
19 Exhibit 4 as the CV. It has some markings that
20 were done by my office, and they are of no import.
21   (Plaintiffs' Exhibits-1 through 4 were marked
22 for identification.)
23   MS. RELKIN: Exhibit 5 is going to be the
24 material reliance list.
25   (Plaintiffs' Exhibit-5 was marked for

</td><td>

Page 20

1   Q. Did you do any mathematical statistical
2 calculations?
3   A. No.
4   Q. None?
5   A. None.
6   Q. Did you do any work on your computer other
7 than reading materials?
8   A. No.
9   Q. And writing the report, did you write that on
10 the computer?
11   A. Not on my computer.
12   Q. Whose computer?
13   A. I dictated it to Lucas' computer.
14   Q. Lucas is an attorney here?
15   A. Yes.
16   Q. You literally came here and dictated it out
17 loud?
18   A. Or he came to my office and I dictated it out
19 loud and he did corrections on the screen.
20   Q. Did you bring your bills? You indicated you
21 have issued bills.
22   A. Do you want me to look through these first?
23   Q. We are still on the notice of deposition. We
24 are going through some of the items on the notice of
25 deposition.

</td></tr>
<tr><td>

Page 19

1 identification.)
2   Q. (By Ms. Relkin) First, we are just going to
3 take a quick look and just confirm that what I have
4 described I have labeled.
5   MS. THORPE: Do you understand the question?
6   MS. RELKIN: Let's go one by one.
7   Q. (By Ms. Relkin) Exhibit 1 is the deposition
8 notice. Doctor, did you see this before today?
9   A. I'm sorry?
10   Q. Did you see the deposition notice before
11 today's deposition?
12   A. No, I haven't.
13   Q. What were you asked to bring to the deposition?
14   A. Any materials that I have been using for
15 preparation for this particular litigation including
16 notes, CDs, whatever.
17   Q. There are two banker boxes here today. That's
18 what you brought; is that correct?
19   A. That's everything I've got on this.
20   Q. In the banker boxes are papers including
21 medical records, studies and a lot of CDs as well; is
22 that right?
23   A. That's correct.
24   Q. There are also some notes?
25   A. Correct.

</td><td>

Page 21

1   Item 4 asks for "all documents reflecting time
2 you spent as an expert witness in the Seroquel
3 litigation." So that would include any time sheets or
4 billing. Have you brought that?
5   A. I haven't.
6   Q. Do you have that?
7   A. I don't.
8   MS. THORPE: Let me say for the record, I
9 believe Kathy Connelly produced all those things.
10   MS. RELKIN: The actual bills?
11   MS. THORPE: Yes.
12   MS. RELKIN: When was that produced?
13   MS. THORPE: There was a series of emails last
14 week.
15   MS. RELKIN: I don't know if I have
16 necessarily seen that. Do you have them here?
17   MS. THORPE: No.
18   MS. RELKIN: Do you have access to a computer
19 here for email so I can get the benefit of that?
20   MS. THORPE: I will see what I can do. But we
21 complied with the requirements.
22   MS. RELKIN: Everything has been very hurried.
23   MS. THORPE: I understand.
24   MS. RELKIN: There are many players.
25   Q. (By Ms. Relkin) Item 6 asks for "all

</td></tr>
</table>

6 (Pages 18 to 21)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

| Page 22 |
| --- |

1   communications including but not limited to emails and
2   expert witness reports that you have had with
3   Defendants' counsel in any other atypical antipsychotic
4   litigation."
5        I trust you haven't been involved in any
6   other?
7        A.  No.
8        Q.  Exhibit-2, that is your declaration that you
9   submitted to the court, the MDL court; is that correct?
10       (Witness reviewing document.)
11       A.  Yes.
12       Q.  Was that prepared in the same manner that you
13   described the way you prepared the report, that you
14   dictated it to counsel?
15       A.  Yes.
16       Q.  And counsel typed it up?
17       A.  Yes.
18       Q.  When did you write the declaration?
19       A.  In September or early October, I believe, or
20   mid-October.
21       Q.  When you prepared the declaration, were you
22   aware that there was a parallel declaration being
23   prepared by a Dr. William Weintraub?
24       A.  No.
25       Q.  Have you read the declaration of Dr. William

| Page 23 |
| --- |

1   Weintraub?
2        A.  I have.  I'm sorry, what I read by him, I
3   don't remember whether it was a declaration or a
4   report.
5        Q.  There are two.  There's a report and a
6   declaration.
7        A.  I haven't read both.  I read one and I don't
8   remember which one it was.  Whatever it is, you have it
9   in your file.
10       Q.  I believe in your file there is a report of
11   him.  So you have seen the report.  I take it you have
12   not yet seen his declaration?
13       A.  Then I have not, no.
14       Q.  Did you know Dr. Weintraub before this
15   litigation?
16       A.  Yes.
17       Q.  Because he used to be at Emory?
18       A.  Correct.
19       Q.  Have you done any work with him
20   professionally?
21       A.  I haven't.  I have been to seminars with him.
22   He ran a professional seminar that I would attend.
23   That's the nature of the relationship.  I wouldn't
24   recognize him if I saw him.
25       Q.  Got it.  Have you spoken to him about this

| Page 24 |
| --- |

1   litigation?
2        A.  No.
3        Q.  I will get into more detail on the declaration
4   later.
5        Exhibit-3, that's your expert report in this
6   litigation; is that right?
7        MS. THORPE:  Is this the one that has your
8   marks on it?
9        MS. RELKIN:  No, 3 has no marks.  The only
10   thing that has marks is the CV.
11       MS. THORPE:  That's Exhibit 4, okay.
12       Q.  (By Ms. Relkin) Is that correct, this is your
13   report?
14       A.  Yes.
15       Q.  Your report is 36 pages.  How long did it take
16   you to dictate that?  How many sessions did you have?
17       A.  Probably three or four, and then revisions.
18       Q.  How were the revisions done?
19       A.  Same manner.
20       MS. THORPE:  There is a stipulation that
21   governs all this.  Are you familiar with that?
22       MS. RELKIN:  I haven't seen it.  I heard
23   something and then he was discussing it, so I
24   didn't know the parameters.
25       MS. THORPE:  I think the drafts, by agreement

| Page 25 |
| --- |

1   of the parties, are supposed to be off limits.
2        MS. RELKIN:  Fair enough.
3        Q.  (By Ms. Relkin) Exhibit-5 is the materials
4   that were provided to you?
5        A.  5?
6        Q.  That accompanied your report, materials
7   provided to Dr. Jeffrey Koplan?
8        A.  Yes.
9        Q.  That includes, looks like 192 numbered items
10   which are mostly articles, and 193 is an itemization of
11   case-specific medical records and depositions, correct?
12       A.  Yes.
13       Q.  That was what was provided to you.  Separate
14   from that, were there other materials that you obtained
15   on your own?
16       A.  There were other, I don't know whether they
17   coincided with things on this list or not.  I did
18   obtain other articles and materials.
19       Q.  They are not on this list?
20       A.  They may be included.  I don't know.  I
21   haven't done a cross-check of what's on it or what's
22   not on it.  I basically put all my things together and
23   read them.  But whatever stuff I've got is in your
24   boxes.
25       Q.  What I am trying to do to save time, since we

7  (Pages 22 to 25)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 26

1  did receive a CD before, but I am trying to understand
2  whether there are things in the boxes that are not on
3  the CDs.  You might not know all the mechanics of how
4  counsel sent things to us, so I am just trying to cut
5  through it to determine.
6      A.  I'm not sure whether a couple of other papers
7  may be in the box that are not on the list.
8      Q.  Would you be able to peruse the box and
9  recognize papers that you yourself acquired so
10  therefore they may not be on the list, because the list
11  refers to provided to.
12      A.  I couldn't do that quickly.  I'd have to do a
13  cross-check of each one.
14      Q.  You would have to compare it with the list?
15      A.  Exactly.
16      Q.  You wouldn't be able to say, I know this is
17  from my files, or I got this from the library?
18      A.  No, I couldn't do that.  A number of these
19  papers are already in my files that are on this list.
20  So it is not that simple.
21      Q.  Did you go to the library after you were
22  retained in this matter to do any research?
23      A.  No.
24      Q.  Can you explain to me the nature of any
25  independent research you did separate from reviewing

Page 27

1  the voluminous materials that were provided to you by
2  counsel?
3      A.  I use a graduate student in epidemiology to
4  assist me in literature searches for the papers that I
5  write and used him as well for this to do an additional
6  literature search for papers that might be relevant to
7  this subject matter.
8      Q.  What's his name?
9      A.  Chris Bond.
10      Q.  Are you paying him for his time?
11      A.  He's being paid for his time.
12      Q.  Does he bill Alston & Bird separately?
13      A.  Separately.
14      Q.  Has he issued a bill to Alston & Bird?
15      A.  I don't know.
16      MS. RELKIN:  Has that been provided to us?
17      MS. THORPE:  I don't know.
18      Q.  (By Ms. Relkin) Do you know what he is
19  charging?
20      A.  I don't.
21      Q.  The arrangement was, help me out, bill them
22  directly, they will pay you?  And you don't know the
23  details and whether he's billed them and been paid?
24      A.  I do not.
25      Q.  Is he a post-doc or is he still a graduate

Page 28

1  student?  Is he a doctor yet or a mister?
2      A.  He is in the process.
3      Q.  He is still a mister?
4      A.  Still a mister.
5      Q.  He might be a master?
6      A.  I think he completed all of his requirements.
7  It is just the degree hasn't been awarded yet, because
8  we are not in the cycle where the degrees get handed
9  out.
10      Q.  He is ABD -- not ABD, he has done his
11  dissertation?
12      A.  He has done his dissertation, he is just
13  waiting for the actual degree.  It's been approved.
14      Q.  So Mr. Bond handed you a number of articles
15  and said, here are --
16      A.  We discussed them.  Some we just looked at.
17  Some, I think most were deemed not to be particularly
18  relevant or necessary or helpful.
19      Q.  What was Mr. Bond's thesis on?
20      A.  His thesis was on, I believe it was infections
21  related to kidney dialysis work or exposure to kidney
22  dialysis activities.
23      Q.  How many articles do you recall either seeing
24  that Mr. Bond handed to you or discussed with you that
25  were not on the list from the law firm?

Page 29

1      A.  I don't remember the numbers because we tended
2  to mix up the materials.  We would look at both items
3  on the list and off the list.  But most were ones that
4  we found were also on the list actually.
5      He was largely used to do a literature review
6  on various online sources, not going to the library per
7  se, which we rarely do anymore, to see whether there
8  were articles that were pertinent that were not on
9  here.  And he found some articles, but most of them
10  weren't particularly, virtually all of them were not
11  particularly helpful to this.
12      Q.  But they are all in there?
13      A.  Everything I've got is in those boxes.
14      Q.  I am just trying to figure out a way to avoid
15  having to copy them if they are essentially the same as
16  has been sent on the CD.
17      A.  They are definitely essentially the same.  If
18  there are one or two others, it is certainly no more
19  than three other articles that are in there.
20      Q.  Sitting here, you can't identify them?
21      A.  No, I can not.  I'm sorry.
22      MS. RELKIN:  Are you able to tell me any that
23  are different?
24      MS. THORPE:  No, and I'm not here to do that
25  anyway.

8  (Pages 26 to 29)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 30

1    MS. RELKIN: I understand.
2    MS. THORPE: But I don't. In the interest of
3  cooperation, if I knew, I would tell you. But I
4  don't know.
5    THE WITNESS: I can --
6    MS. THORPE: Just wait until there is a
7  question.
8    Q. (By Ms. Relkin) Prior to getting the call from
9  Ms. Thorpe to ask if you could serve as an expert in
10  this matter, had you ever heard of the drug Seroquel?
11    A. Yes.
12    Q. In what context?
13    A. As one of a number of psychiatric medications
14  that are used. I read general medical literature, and
15  sometimes these things come up in the course of reading
16  general medical literature.
17    Q. What had you heard about Seroquel other than
18  the fact that it was a psychiatric medication on the
19  market?
20    A. Little more than it was used as a psychiatric
21  medication, seemingly one of the more recent ones that
22  were being used for very serious psychiatric illnesses.
23    Q. Had you ever read the package insert for
24  Seroquel before getting a phone call to serve as an
25  expert in this matter?

Page 31

1    A. No.
2    Q. Had you ever prescribed Seroquel?
3    A. No.
4    Q. Getting to prescribing, you are an MD and you
5  also have a master's in public health; is that right?
6    A. Correct.
7    Q. For many years, the focus of your professional
8  commitments have been in public health issues which is
9  more epidemiology, is that a fair statement?
10    A. Not entirely. Yes, my expertise is in public
11  health, but two things, one, for the last six years I
12  have been vice president for academic health affairs at
13  Emory which involves the medical school, the nursing
14  school and the public health school, and the research
15  and educational programs there.
16    So in the course of that, my exposure for the
17  past six years has been much broader than just public
18  health. It includes issues of clinical practice and
19  training and research in a wide number of areas.
20    In terms of public health itself, I'm proud to
21  have epidemiology as the fundamental science in public
22  health. It involves a wide range of other matters,
23  everything from laboratory work to health education to
24  policy issues to advocacy, et cetera.
25    Q. When was the last time that you examined a

Page 32

1  patient?
2    A. Probably last January.
3    Q. What context was that in?
4    A. A plane flight, someone was sick.
5    Q. Before that episode, when was the last time
6  you examined a patient?
7    A. You probably want a more specific --
8    Q. Other than a family member or friend who might
9  consult with you because you were a doctor, when was
10  the last time in an office setting or a hospital you
11  treated a patient?
12    A. Over 20 years ago.
13    Q. Going back to that era, can you tell me about
14  the nature of your clinical practice? Could I have
15  your Exhibit 4, your CV?
16    A. Sure.
17    I am board certified in internal medicine
18  which is a clinical practice, and for a number of years
19  thereafter, and I don't remember the exact number, I
20  was an attending physician at Emory actually, when I
21  wasn't working at Emory, but I did clinical work at
22  Emory and saw patients at an Emory outpatient clinic
23  appropriately enough in the East Lake neighborhood
24  which, you may not be aware of it but this room is
25  named after a golfer well-known who was the pro, I

Page 33

1  believe, at East Lake when he was the pro there. I
2  don't want to lose an appropriate historical moment.
3    MS. THORPE: Let the record reflect that Ellen
4  doesn't know who Bobby Jones is.
5    THE WITNESS: Nor did I before I came to
6  Emory. So we share that. I'm not a golfer.
7    In any event, I did that for a number of
8  years. I worked overseas in Trinidad and did
9  clinical work there in a similar manner, in a
10  clinic and in a hospital setting as part of my
11  duties.
12    And then when I came back to Atlanta, I
13  continued to do some clinic work then. But again,
14  it hasn't been for 20 years. It is general
15  internal medicine.
16    Q. (By Ms. Relkin) Thank you.
17    In the 20 years and older era when you did
18  some internal medicine, did you ever prescribe
19  psychiatric medications?
20    A. No.
21    Q. Generally internists don't handle most
22  psychiatric issues. They would typically refer them to
23  a psychiatrist?
24    A. I think today, nowadays, actually, internists
25  do a lot more with psychiatric issues and will handle

9  (Pages 30 to 33)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 34

1  many things and may use psychiatrists as consultants as
2  they continue to manage the patients. I think it
3  varies.
4      Q. So over time, there's been more involvement of
5  internal medicine in prescribing psychiatric
6  medications; is that fair to state?
7      A. I don't have data on it, but I think that's
8  probably the case.
9      Q. Is that perhaps in part because there's
10 generally a greater amount of psychiatric medications
11 that are prescribed now than there were 20 years ago?
12     A. I think only in part. I think it's also in
13 part that there's a much greater recognition of
14 psychiatric illness and thus more people being
15 diagnosed with it and a better educated medical work
16 force that recognizes that is something they have to
17 look out for.
18     Q. We have greater recognition of psychiatric
19 illness so it is treated more, as a result; is that
20 fair to state? If you are diagnosing more, you are
21 going to treat more?
22     A. I think probably more people are treated with
23 psychiatric illness now who are psychiatrically ill
24 than were in the past.
25     Q. And therefore more people would be getting

Page 35

1  more prescriptions for psychiatric medications than
2  they would 20 years ago?
3      A. I suspect so. I don't have the data in front
4  of me, but it seems likely.
5      Q. Do you know what the percentages are of the
6  number of patients getting prescribed now with
7  psychiatric medications than there were 20 years ago?
8      A. I don't know that piece of data.
9      Q. It might be double, triple, quadruple or
10 greater fold; you don't know?
11     A. I don't know.
12     Q. Do you have any training other than the
13 general internal medicine training in diabetes?
14     A. No.
15     Q. Have you ever been in private practice in
16 medicine?
17     A. No.
18     Q. Other than the general internal medicine
19 training, do you have any specialty training in
20 pharmacology?
21     A. No.
22     Q. Same question, other than the general internal
23 medicine training, do you have any special training in
24 toxicology?
25     A. No.

Page 36

1      Q. I take it you don't hold yourself out as being
2  an expert in diabetes?
3      A. I hold myself out as being an expert in the
4  public health and epidemiological aspects of diabetes.
5      Q. But not in the diagnosis and treatment of it;
6  is that fair to state?
7      A. They are part and parcel of the same things.
8  You can diagnose and treat individuals, but you need to
9  know diagnosis and treatment issues related to
10 populations as well. So in the individual one-on-one
11 care of someone with diabetes, I would defer to others
12 in that field. But in the population-based issues
13 related to diabetes, I consider myself competent.
14     Q. You are not an endocrinologist?
15     A. I'm not.
16     Q. You have many publications on your CV. I was
17 unable to find any that addressed drug safety issues.
18 Was I missing something?
19     A. Not that I can remember.
20     Q. So is it fair to state that you have not
21 published any articles, books or writings regarding
22 drug safety issues?
23     A. That's not entirely true.
24        MS. THORPE: She has your CV, if you would
25 like to have it.

Page 37

1        THE WITNESS: Every article that involves a
2  cost-benefit analysis involves issues of safety,
3  and I have published extensively on cost-benefit
4  analysis of vaccines and various other public
5  health measures. And one whole side of the
6  equation of cost-benefit analysis are adverse
7  effects it has.
8        So I can start running through them amongst
9  the papers, but there's a lot of them involved in
10 that. In fact, amongst the earliest papers I
11 wrote in my career, it involved safety issues
12 related to smallpox vaccinations such as in Papers
13 13, 15, 16, 11, 10 is a treatment for
14 complications of smallpox vaccination. I could
15 keep going, but of the 200 papers, a significant
16 number involve issues of safety.
17     Q. (By Ms. Relkin) Do you consider a vaccine a
18 drug?
19     A. I consider it a therapeutic agent in a class
20 of therapeutic and preventive agents. Many of the
21 issues are the same.
22     Q. But do you consider a vaccine a drug? Do you
23 consider those terminologies interchangeable?
24     A. I think they are different terms.
25     Q. My question was focused. I understand you

10 (Pages 34 to 37)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 38

1  have done a lot of publication on vaccines and the
2  infectious disease and public health issues, but my
3  question was focusing on drug safety, pharmaceutical
4  safety. Have you published any articles specific to
5  drug safety issues?
6      A. Yes, so let's go back to the similar set of
7  articles. Some of them do involve vaccines, but even
8  the ones that involve vaccines sometimes have drug
9  therapy attached to them where you are using a
10  medication.
11      For smallpox and for smallpox treatment and
12  for the complications of smallpox, there are a variety
13  of medications, drugs, if you will, used for the
14  management of them. And so those became involved in
15  and are part and parcel of those analyses.
16      Let's take some time, I will go through a
17  number of these and give some other examples. Paper
18  61, isoniazid preventive therapy involves safety issues
19  attached to INH which is a drug for tuberculosis use.
20      Even papers that might be listed assessing
21  screening as a preventive technology, the assessment
22  involves, you screen for an illness and then how do you
23  manage the illness after one gets it and with each one
24  of those illnesses, one has to look at the drugs that
25  are going to be used as to what effect they have.

Page 39

1      Q. What was the numbering on the isoniacid
2  article?
3      A. INH, that was 61. Let's see here.
4      Yes, 69, prevention of Type A influenza. It
5  involves benefits and costs of four approaches using
6  vaccination and amantadine. Amantadine is a drug, so
7  there is extensive use in taking a look at that.
8      All papers related to chronic diseases,
9  whether it is heart disease or diabetes. Obviously,
10  there are a lot of drugs used for those, and safety was
11  looked at for each one of those. So Paper 81, Paper
12  77, paper -- a number of other ones there.
13      Paper 78 which on the surface may not be
14  obvious, but when one looks at the screening processes
15  for viral cultures for pregnant women with recurring
16  genital herpes, an appraisal of that requires what
17  treatments could be used for genital herpes which
18  involved antiviral drugs.
19      Paper 83 looks at malaria mortality and drugs
20  used in it. And it is a mixture of the benefits and
21  costs of the various multiple drugs that are used for
22  malaria work.
23      In 84, which is the cost effectiveness
24  analysis of smoking cessation for pregnant women, some
25  of the approaches used for smoking cessation involve

Page 40

1  medications, drugs. So the pros and cons of drugs were
2  used in that.
3      86 on chronic diseases involves drug
4  considerations.
5      88, a review of internists' practices in
6  health promotion and disease prevention looks at what
7  medications they use and how they use them.
8      In 92, looking at malaria again, we considered
9  chloroquine treatment and alternative therapies used
10  for malaria. And that involves both safety and
11  efficacy issues.
12      Other papers on chronic diseases, 99, 100.
13  Vitamins and mineral supplements can be considered as
14  drugs when used in larger doses, and we did an
15  extensive study of the safety and efficacy of those in
16  101 with colleagues, some of which are co-authors on
17  the diabetes papers that you have in the box, not
18  co-authors, they are co-authors on this paper but also
19  authors on the diabetes papers.
20      Cost effectiveness of coronary heart disease
21  prevention, Paper 103 involves the use of medications,
22  drugs that can be used to prevent coronary heart
23  disease such as the statins, et cetera.
24      Q. Doctor, you can keep going, but I think I can,
25  you know --

Page 41

1      MS. THORPE: Let him finish answering your
2  question. If you want to withdraw the question --
3      MS. RELKIN: No, he has taken a very broad
4  approach to the question to reach an answer that
5  he's done drug safety publications.
6      Q. (By Ms. Relkin) My question is focusing
7  specifically, have you published any papers whose focus
8  is on the safety of the drug? Obviously in the context
9  of any public health issue where you are dealing with
10  an epidemic and a vaccine and you want to prevent an
11  illness, in the course of a discussion you might
12  address drugs that are used to treat the illness. But
13  that's different than an intensive focus on the safety
14  of a particular drug.
15      A. That isn't correct.
16      MS. THORPE: Wait a minute. Object to form.
17  First of all, there is no question that's been
18  stated yet.
19      MS. RELKIN: I am in the middle of it.
20      MS. THORPE: You stopped, so I thought, and
21  the witness began to respond. So if we can have
22  the question, then I will be able to assess
23  whether there is an appropriate objection. I
24  object to the commentary.
25      Q. (By Ms. Relkin) Separate from the examples

11 (Pages 38 to 41)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 42

1  you have given that were in the course of some of your
2  publications, the issue of treatment with a drug as an
3  alternative therapy for an infectious disease that
4  could be treated by a vaccine or some other type of
5  preventative health measure; separate from that one
6  isoniacid paper, Number 61, have you published any
7  articles that focus specifically, the thrust of the
8  article is the safety of a medication?
9      MS. THORPE:  I am going to object to the form
10  of the question because he was in the middle of
11  answering that question as framed previously and
12  you interrupted him, not rudely, but you started
13  down a different path.  So he did not finish the
14  response to the other, whatever the other question
15  was.  And I object to the compound nature of the
16  predicate to this question and its argumentative
17  nature.
18      MS. RELKIN:  Fair enough.  I have your
19  objection.  I'd like the doctor to answer my
20  question.
21      THE WITNESS:  I guess as a scientist in this
22  area, I have a different perspective of what you
23  are calling focusing on this.  Nothing could focus
24  on it more than the importance of the safety
25  issues attached to these agents in the very

Page 43

1  studies that I have described, because in doing
2  these benefit-risk analyses, you have to have a
3  careful epidemiologic and scientific perception of
4  the risks and the benefits of each of these
5  medications.
6      So your knowledge of the safety of these drugs
7  is premier to doing a good study.  And these
8  studies have all been published in highly
9  reputable publications.
10      As a further example, Study 112 which looks
11  specifically at long-term estrogen replacement
12  therapy, and where it says risks and benefits,
13  that's all about safety.  And it requires an
14  extensive knowledge of the total literature to do
15  that.
16      Q. (By Ms. Relkin)  What was your conclusion on
17  that?
18      A. The conclusion on that was that the
19  information available at the time, the relationship of
20  heart disease and ERT at the time was, the ERT was felt
21  to be protective against heart disease.  And the
22  conclusion was, if that was the case, then there were
23  long-term benefits to estrogen replacement therapy.  If
24  that was not the case, then it probably had more risks
25  than benefits.

Page 44

1      Q. It turns out it was not the case, right?
2      A. Right, but the crucial issue was that piece of
3  epidemiologic information which up until that time and
4  up to several years thereafter was that it was
5  beneficial.  And then subsequent studies done, many of
6  them using the nurses' study at Harvard, showed that it
7  was not protective against heart disease.
8      And as is indicated in all these articles, the
9  crucial thing is what numbers you plug in and then how
10  do you interpret them based on the data that's
11  available.
12      Q. In fact, later data showed that not only is it
13  not protective but it may even be deleterious from a
14  cardiac perspective, true?
15      A. It may be deleterious, correct.
16      Q. At the time you published that article,
17  relying on the information that was available to you
18  then, you were holding the opinion that the existing
19  evidence suggested that it was protective of the heart?
20      A. Scientific opinions can only be based on the
21  data and studies that are available at the time.
22      Q. Many of the data and studies that you were
23  relying upon up until that time were actually done by
24  Wyeth and Pfizer, the companies that made the hormone
25  replacement therapies; is that correct?

Page 45

1      A. I don't know whether that's correct or not.  I
2  don't remember the individual articles we used.
3      Q. The ultimate data that came out to disprove
4  the conventional wisdom that existed as of the time
5  that you wrote the article was data that was not
6  pharmaceutical industry-based, instead it was the
7  Harvard nurses' study, correct?
8      A. The Harvard nurses' study was the major study
9  which initially raised this issue, that it was a shift
10  in the way we looked at heart disease and its
11  relationship to ERT.
12      Q. When you published that paper, did you address
13  the safety of HRT in the context of breast cancer?
14      A. Yes.
15      Q. What was your conclusion at that time?
16      A. That it caused a slightly increased risk.
17      Q. Since that time, there's been substantial
18  additional evidence showing that it is not a slightly
19  increased risk but instead more significant increased
20  risk, is that fair to state?
21      A. I don't know whether it is or it isn't.  I
22  haven't kept up on the literature to that level.
23      Q. Do you know whether the use of hormone
24  replacement therapy has diminished greatly in recent
25  years due to subsequent data?

12  (Pages 42 to 45)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 46

1    A. It is diminished, although it is still used.
2    Q. But you are not familiar with the details as
3  to the relative risk of breast cancer from hormone
4  replacement therapy?
5    A. Not at the moment, no.
6       Keep going. There's a number of further
7  studies, I'm sure, as we go through it.
8       (Witness reviewing document.)
9       In the tobacco control articles on 148, some
10  of the issues related to tobacco control included the
11  safety issues and efficacy issues of various
12  medications used to assist people in tobacco cessation.
13       Let's see. In all the papers related to
14  bioterrorism, both the risks and the efficacy of the
15  various medications used, mostly antibiotics, are of
16  extreme importance because the recommendations are
17  often to use these medications in a large population,
18  and safety issues attached to them are quite important.
19  This is also true for pandemic influenza, the papers
20  written there, the use of the various antiviral agents
21  that could be used, how widely do you use them, what
22  adverse effects might they have, what safety issues are
23  there for the individual who receives them. So there
24  may be others, but I think that largely gives a
25  sampling of some of the safety issues.

Page 47

1    Q. Doctor, have you ever performed a clinical
2  trial involving a drug?
3    A. Yes.
4    Q. What drug was that?
5    A. Adenine arabinoside.
6    Q. What kind of medication is that?
7    A. Anti-smallpox, antiviral agent, potential
8  antiviral agent.
9    Q. Did you publish your findings on that?
10    A. I did.
11    Q. What publication was that?
12    A. Journal of Infectious Diseases, Publication 9
13  and Publication 12. 9, 11, 12 are all relevant. That
14  was in 1975.
15    Q. That was about 23 years ago. Since then, have
16  you conducted any other clinical trial with regard to a
17  medication?
18    A. No.
19    Q. You don't hold yourself out as a clinical
20  trialist, do you?
21    A. No.
22    Q. Do you hold yourself out as a drug safety
23  expert?
24    A. In public health, that perspective, I do for
25  particular drugs that I have studied.

Page 48

1    Q. But in general?
2    MS. THORPE: Is there a question?
3    Q. (By Ms. Relkin) In general, do you hold
4  yourself out as a public health expert other than in
5  the qualified context you just described?
6    A. In the context of being a public health expert
7  in this area, I consider myself an expert.
8    Q. Have you ever been asked to testify in an FDA
9  advisory committee meeting about the safety of a
10  medication?
11    A. No.
12    Q. Have you ever attended such a meeting?
13    A. Yes.
14    Q. Which one?
15    A. Innumerable ones on vaccines.
16    Q. Do you consider a vaccine a medication?
17    A. I consider a vaccine in the same class of
18  agents that you apply to people to either prevent or
19  treat them for something, and as such, I consider many
20  of the issues similar.
21    Q. They are different terms, right?
22    A. They are different terms.
23    Q. Just to avoid wasting time and having a murky
24  record, if I ask about a medication or drug, I am not
25  referring to a vaccine, okay?

Page 49

1    MS. THORPE: Are you asking for a continuing
2  definition of a term that you want to use?
3    MS. RELKIN: Yes.
4    MS. THORPE: I think that that would get very
5  complicated and it will leave the record murky.
6  So for purposes of this record, I would ask that
7  you distinguish and use the appropriate scientific
8  terminology for what you are asking.
9    MS. RELKIN: I am. A medication is not a
10  vaccine. He is pulling a vaccine and trying to
11  put it in the rubric to answer the question a
12  certain way.
13    MS. THORPE: I am not here to get into an
14  argument with you.
15    MS. RELKIN: The doctor has just acknowledged
16  that a medication is not a vaccine and a drug is
17  not a vaccine, but when I asked him questions
18  about that, he pulls in his vaccine to try to
19  answer in the affirmative.
20       So I want to work with the definition he
21  acknowledges.
22    Q. (By Ms. Relkin) Even though in a broader
23  rubric they may have overlapping issues, if I ask you a
24  question about a drug or a medication, please answer
25  with regard to that. It is my deposition, I am setting

13 (Pages 46 to 49)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

## Page 50

1 the ground rules.
2  MS. THORPE: I am here also.
3  MS. RELKIN: I understand.
4  MS. THORPE: You are speaking in a loud voice
5 and you are talking over me.
6  MS. RELKIN: No, no.
7  MS. THORPE: So let's have a ground rule there
8 that we not do that.
9  MS. RELKIN: I understand that, but you
10 interrupted me --
11  MS. THORPE: No, I didn't. And I haven't
12 gotten my objection on the record.
13  MS. RELKIN: Okay.
14  MS. THORPE: I don't want the record to be
15 confusing. And I am certain that Dr. Koplan, as
16 the former director of the CDC, is very familiar
17 with the difference between a biologic and a
18 pharmaceutical product that is a pill, if that's
19 the distinction you are drawing.
20  But I would ask that you use terminology, and
21 I'm sure the witness will ask you to clarify what
22 you mean by a term. So we are just not agreeing
23 to some blanket, broad definition that I'm not
24 sure is right anyway, as you are using it.
25  Q. (By Ms. Relkin) Doctor, if I use the term

## Page 51

1 pharmaceutical, medication or a drug, would you agree
2 those are not vaccines or biologics?
3  A. No, because pharmaceuticals can include
4 vaccines and biologics.
5  Q. Which vaccines are pharmaceuticals?
6  A. Biologics such as vaccine-immunoglobulin would
7 be a pharmaceutical. Pharmaceuticals to me would
8 include vaccines. It would be a broad cover.
9  Q. My prior question was medications. Do you
10 consider any vaccines, medications?
11  A. Actually, some, and I'm not -- this is the
12 current status of vaccinology is such that it is likely
13 an increasing number of vaccines will be used as
14 medications. So that, for example, treatment of
15 cancers, melanoma, vaccines are being used now as a
16 medication in the treatment of melanoma.
17  Probably likely for many cancers, new vaccines
18 will be used in this manner and probably for HIV the
19 new vaccines won't be traditional preventive
20 approaches, but they will be used as a medication. So
21 the definitions are in a shifting mode.
22  Q. The FDA has a separate division that evaluates
23 the safety and efficacy of vaccines than pharmaceutical
24 agents; isn't that right?
25  A. That's correct.

## Page 52

1  Q. So when I refer to a pharmaceutical, I am
2 referring to pharmaceuticals that come within the FDA
3 division that does drug safety as compared to vaccines.
4 Fair enough?
5  A. That's fair.
6  Q. Could I have your CV back, Doctor?
7  A. Sure.
8  Q. Thank you. Your position at Emory today, is
9 that a full-time position?
10  A. It is.
11  Q. Do you do any other consulting positions
12 besides your full-time position with Emory?
13  A. Could you clarify consulting?
14  Q. As opposed to sitting on a board as a
15 voluntary type of work or honorary positions and so
16 forth, do you receive income from private consulting
17 work other than the litigation work we have discussed
18 already today?
19  A. Yes.
20  Q. Can you describe that for me?
21  A. I occasionally get asked to give a lecture and
22 get honorarium for that; occasionally asked to -- well,
23 legal work occasionally. It's usually lectures or
24 participation in a seminar.
25  Q. Have you ever done any consulting work for

## Page 53

1 AstraZeneca?
2  A. No.
3  Q. Have you ever done consulting work for any
4 pharmaceutical company?
5  A. Is there a time frame in that, or ever?
6  Q. Ever.
7  A. I think twelve years ago I participated in a
8 focus group, just like a focus group discussion at
9 either Merck or Pfizer, and I don't remember which one,
10 around future needs for antibiotics. It was a
11 one-hour, two-hour discussion.
12  And probably six years -- four years ago, I
13 consulted, not consulted, I gave a lecture on obesity
14 for Novo Nordisk, the diabetes pharmaceutical firm.
15  Q. When you described your job functions now at
16 Emory, is that the same position on your CV, vice
17 president for global health?
18  A. Correct.
19  Q. From 2006 to 2008, you were the director of
20 the Emory Global Health Institute; is that right?
21  A. Correct, they are concurrent positions.
22  Q. You are still the director and the vice
23 president?
24  A. Correct.
25  Q. I know you described it, but can you go over

14  (Pages 50 to 53)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 54

1  it? You described being vice president for academic
2  affairs, I believe.
3      A. It is a little confusing.
4      Q. What do you do at Emory?
5      A. Thank you. And to clarify the title shift, I
6  have been vice president for academic health affairs
7  since coming to Emory in 2002. Two years ago, Emory
8  established a Global Health Institute of which I was
9  the director while I continue to be vice president for
10 academic health affairs. And then last February,
11 January, February we shifted my title from vice
12 president for academic health affairs to vice president
13 for global health in that 99 percent of my time was
14 being spent on global health issues.
15     Q. So when you say global health issues, that
16 includes what?
17     A. It's global. It includes most everything.
18 For Emory, at Emory, it involves a relationship with
19 all departments of the university. It's unlike my
20 previous position which was focused just in the health
21 science center which is the schools of public health,
22 medicine and nursing. This encompasses the whole
23 university.
24     We have global health programs in the law
25 school, the theology school, the undergraduate college,

Page 55

1  et cetera. The university invested considerably into
2  our Global Health Institute with me directing it to
3  provide support for these entities.
4      Q. Some of the issues?
5      A. Some of the issues, I have a major program in
6  diabetes largely focused in India led by Van Cantner
7  Ryan. We have vaccine development programs going on in
8  India. All these things have counterparts at Emory,
9  but are overseas positions so we are back and forth on
10 these things.
11     We have drug discovery, I am using it the way
12 you would like, a drug discovery program in South
13 Africa largely looking at antiretroviral agents'
14 potential for HIV. I have major programs going on in
15 Mexico and Central America on nutrition and
16 particularly focused on the dual problems of
17 under-nutrition, malnutrition, and over-nutrition
18 obesity occurring in an epidemic form in that area.
19     Programs in China related to impact of famine,
20 impact of environmental degradation and relationship of
21 birth defects to medications, diet and other factors;
22 programs in Bolivia and many parts of Africa related to
23 water and sanitation; and then major programs involved
24 in establishing CDC-like entities in countries around
25 the world.

Page 56

1      So we currently have eight new institutes of
2  public health like a CDC going on in countries
3  throughout the world. And we are about to start a
4  major program on tobacco control in China.
5      Q. You mentioned birth defects from a number of
6  causes including medications; is that right?
7      A. Yes.
8      Q. Which medications in your opinion are capable
9  of causing birth defects?
10     A. I don't have a list of them that I carry
11 around. We all know Thalidomide was capable of doing
12 that, but I don't have a list of medications that cause
13 birth defects.
14     I am not doing this particular study. It is
15 one of the ones we are supporting in the university.
16     Q. You would agree that certain medications are
17 capable of causing birth defects?
18     A. Yes. The focus of the study is actually on
19 interventions that can prevent birth defects, so that
20 some of the work being done, the use of folic acid as a
21 preventive for neural tube defects, spina bifida,
22 actually much of the information for that, the data for
23 that came out of the same group we are doing the study
24 with in Beijing, because in China there are populations
25 that, there's great variability in nutritional content

Page 57

1  amongst different parts of the country which makes it a
2  good place to ask some of these scientific questions.
3      Q. So the research in China is more preventing
4  birth defects with certain nutritional interventions?
5      A. It started that way. The folks that are doing
6  it now are looking at a wide range of influences on
7  pregnancy and birth and it includes environmental,
8  behavioral and genetic.
9      Q. You mentioned Thalidomide as being a widely
10 recognized medication that was capable of causing birth
11 defects. Would you agree that that was determined
12 without the need for epidemiology?
13     A. It occurred, I believe, before my birth or at
14 least before I was doing anything in science. I
15 remember it as a newspaper or something that's referred
16 to. I have no recollection of the scientific basis for
17 what went on with it.
18     Q. We are getting to that generic topic. In your
19 opinion, do you need epidemiology to prove that an
20 agent is causative of an unwanted health effect?
21     A. It's kind of general. Do you have some
22 specific examples?
23     Q. I am asking whether you hold that opinion.
24     A. I'm an epidemiologist. I believe epidemiology
25 is needed for most everything.

15 (Pages 54 to 57)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 58

1  Q. You don't know whether Thalidomide was
2  determined by the scientific community to be causative
3  of limb defects without epidemiological input?
4  A. I mentioned Thalidomide as one commonly
5  recognized public example of a medication in some ways
6  that started people's interest in this. I pretend no
7  expertise in Thalidomide.
8  Do you mind taking a stretch break?
9  MS. RELKIN: Absolutely.
10  (Whereupon, at 11:42 a.m., an eight-minute
11  recess was taken.)
12  Q. (By Ms. Relkin) In your report you refer to
13  the terminology, substantial contributing factor. Do
14  you recall that?
15  A. Could I see it? I brought my own copy.
16  Q. I am trying to remember whether it is your
17  report or your declaration, I'm not sure, or both.
18  A. Just tell me what you are looking for.
19  Q. If you go to your report in your summary of
20  opinion, the last sentence is, "I do not find
21  scientifically reliable evidence to support the
22  conclusion that Seroquel is more likely than not a
23  cause or a substantial contributing factor to the
24  development of Type II diabetes."
25  I just want to explore your understanding of

Page 59

1  what you mean by the term substantial contributing
2  factor and what you mean by the term cause.
3  MS. THORPE: I am going to object to the form
4  of the question as compound, and I don't think
5  there is a question there.
6  MS. RELKIN: We'll do one at a time.
7  Q. (By Ms. Relkin) When you refer to an agent
8  being the cause of a disease, how do you define cause?
9  A. I define it usually or always in scientific
10  terms, referring back to Bradford Hill's criteria for
11  causation, does it meet those characteristics.
12  Q. There is a certain amount of judgment involved
13  in applying the Bradford Hill criteria, correct?
14  A. I'm not sure what you mean by judgment
15  involved.
16  Q. You look at the different criteria and the
17  data, and you form an opinion as to whether you think
18  the agent has sufficient evidence to meet enough of the
19  criteria to satisfy your opinion of cause; is that
20  right?
21  A. You evaluate the evidence attached to the
22  various pieces or each individual criterion and then
23  come to a conclusion.
24  Q. You don't need to meet every criteria of the
25  Bradford Hill criteria to form an opinion as to

Page 60

1  causality; isn't that true?
2  A. You have to meet one of them.
3  Q. Right, temporality.
4  A. No, which is strength of association, and then
5  you have to meet, some of the others are extremely
6  important and temporality certainly is one.
7  Q. Didn't Bradford Hill say that temporality is
8  the most important because obviously if you don't have
9  the exposure before the event, you can't have causality?
10  A. He may have, but I consider strength of
11  association to be of extreme importance as well.
12  Q. To you strength of association is the most
13  important one, but with regard to some of the others,
14  you don't necessarily have to have them all?
15  A. You don't have to have them all.
16  Q. It does involve fundamentally a judgment call
17  by whoever is applying the analysis as to how they
18  weigh them to make a determination?
19  A. Judgment is involved. I'm not sure about the
20  term judgment call, but I think as in any scientific
21  analysis, it pays to be wise and judicial.
22  Q. Unlike a mathematical formula, it is not like
23  there is an absolute right or wrong answer?
24  A. It's not like a mathematical formula. That
25  doesn't mean there isn't a right or wrong answer,

Page 61

1  however.
2  Q. I take it over the years in your experience
3  with public health, there have been certain public
4  health epidemiological issues where legitimate
5  scientists look at the same data and have come to
6  different conclusions; is that fair to state?
7  A. Yes, depending on the amount of data and
8  information that's available at the time.
9  Q. Not just over different time periods, but if
10  you take a certain time period, there might be some
11  doctors who publish opinions or hold opinions at a
12  conference who think there is an association between
13  some agent and some event and others who don't?
14  A. Who don't.
15  Q. Is that right?
16  A. Yes.
17  Q. They can both be hardworking, well-respected,
18  legitimate scientists; is that right?
19  A. Yes.
20  Q. Sometimes over time, some of those folks may
21  change their opinion when new information persuades
22  them that their earlier opinion may not have been
23  correct; is that right?
24  A. Yes.
25  Q. With hormone replacement, you had an opinion

16 (Pages 58 to 61)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 62

1  at a given time, and obviously important new data came
2  out thereafter and you changed your opinion. That
3  happens in science frequently, doesn't it?
4      A. Yes.
5      Q. Going back to that sentence from your
6  conclusion of the opinion, you referred to a
7  substantial contributing factor. What is your
8  understanding of that terminology? Withdrawn.
9      Let me first ask you, is that a term that you
10  use in your practice in public health? It's Page 23.
11      A. Yes. Sure, it's a term that is used.
12      Q. How do you define a substantial contributing
13  factor?
14      A. Something that makes a significant -- I think
15  the words stand for themselves, factors, one piece of,
16  in this case we are talking about causation, so
17  something that has been shown to be causative and that
18  the substantial contributing part is that it plays a
19  large part, not a small part in being causative.
20      Q. How do you define large part? Is there a way
21  you can quantify what a large part is?
22      A. I think depending on what all the pieces are,
23  but it could be, it depends what the other pieces are.
24  If one part is 90 percent and one part is 10 percent,
25  then substantial contributing probably doesn't apply.

Page 63

1  If you got ten pieces that are ten percent each, then
2  each of them could be substantial contributing factors.
3      Q. When really multifactorial, there is a bunch
4  of contributing causes, if they are all ten percent,
5  they can each be substantial contributing factors; is
6  that right?
7      A. Could be, but if we take an outside example of
8  cigarette smoking and lung cancer, there may be other
9  things that contribute and that can be contributory to
10  causation of lung cancer, but they are dwarfed by
11  smoking cigarettes.
12      Q. Let's take an example of someone who is a
13  smoker and also had asbestos, substantial asbestos
14  exposure and also worked at a nuclear power plant where
15  there had been leaks and had known radiation exposure.
16  Would you consider radiation exposure, the asbestos and
17  the tobacco to all be substantial contributing factors?
18      MS. THORPE: Object to the form, incomplete
19  hypothetical.
20      MS. RELKIN: And the person gets lung cancer,
21  thank you.
22      MS. THORPE: Same objection.
23      Q. (By Ms. Relkin) If a patient is diagnosed with
24  lung cancer and a thorough social occupational history
25  determines that they were smokers, had exposure to

Page 64

1  excess levels of radiation from documented leaks at the
2  nuclear power plant where they worked and also had
3  occupational exposure to asbestos years earlier,
4  sufficient for latency period, would you consider all
5  three of those exposures to be contributing factors to
6  the lung cancer?
7      MS. THORPE: Object to form, same objection,
8  incomplete hypothetical.
9      Q. (By Ms. Relkin) You can answer.
10      A. I don't know whether they would be substantial
11  contributing. I think one would be very confused as to
12  which one of them had been more dominant than the
13  others in those instances.
14      It would be hard to tease out the relative
15  contributions unless you knew more. You would have to
16  know what the level of exposure to each was, over how
17  long a period of time, what was the particular
18  pathologic nature of the tumor, and did that relate
19  more to one than the other.
20      So as in many of these things, you just need
21  more information to make more of that. Are they all
22  associated with lung cancer? Yes.
23      Q. I understand you are asking for more details,
24  but if you assume in the hypothetical that they all
25  were meaningful exposures, they were a pack a day

Page 65

1  smoker, they worked on a naval ship which had friable
2  asbestos they worked at 30 years earlier and they
3  worked directly with the boiler, and then they went and
4  worked at the nuclear power plant and had documented
5  levels that exceeded OSHA permissible limits, if you
6  were a treating physician for that patient, would you
7  be able to exclude one of those as a contributing factor
8  to their lung cancer?
9      MS. THORPE: Same objection, incomplete
10  hypothetical.
11      THE WITNESS: For those three well-documented
12  entities, I'd say I couldn't conclude which was
13  dominant.
14      Q. (By Ms. Relkin) What is a risk factor?
15      A. A risk factor is a factor, a piece of
16  activity, an exposure that is associated with a given
17  outcome, usually for an unwanted outcome, health
18  outcome.
19      Q. Is a risk factor determined from
20  epidemiological data or other sources as well?
21      A. Usually epidemiological data.
22      Q. What are the three most significant risk
23  factors for diabetes mellitus?
24      A. Type I or Type II?
25      Q. II.

17 (Pages 62 to 65)

Page 66

A. Obesity, overweight is the overwhelming risk factor, and there are a number of other risk factors as well which I have listed in the table in my report.
Q. We can turn to your report, but offhand, do you know what would be Number 2 and Number 3? Are you able to rank them or not?
A. There are a number that are clustered in the same area and I don't rank them because one which has a higher relative risk, polycystic ovary disease, is not something that is widely present in the population, so age is certainly an important one and is ranked Number 2 after overweight obesity in the table for reasons of its higher rate.
Then there are a number of other items clustered around roughly in the 2, 2-plus range, and you see them listed, of diet, family history, ethnicity, presence of hypertension, inactivity, tobacco use, et cetera.
Q. Does medical science understand the cause of diabetes?
A. Medical science understands a lot of the information related to the cause of diabetes, that when you talk about the cause of these things, increasingly, these things are becoming subcellular, molecular. So all the pathways that lead to the end biologic result

Page 67

of diabetes are not worked out for diabetes or probably for any other disease, but in terms of causative elements along the pathway to getting the disease, I'd say a lot is known.
Q. A lot but not the full answer, correct?
A. We don't have the full answer to any disease.
Q. Do we have the full answer to understanding the mechanism by which obesity causes diabetes?
A. We don't have the full answer.
Q. But you don't need the full answer to understand mechanistically how obesity causes diabetes to nevertheless hold the opinion that obesity is the major cause of diabetes in your opinion?
A. That's correct.
Q. Is that true for many medical problems, that you don't necessarily understand the biochemical mechanism underlying an exposure and a disease but it is accepted that it occurs?
A. When there is adequate evidence from other sources, even without the biochemical details or genetic details.
Q. That's one of the major contributions of epidemiology, is it provides that type of information when other fields of science don't necessarily understand the mechanism; is that right?

Page 68

A. Epidemiology has largely played a crucial role in our understanding of the causes of most of the major diseases we deal with today.
Q. If you had a person who was obese, had polycystic ovary disease and a family history of diabetes, would you hold the opinion that all of those factors were substantial contributing factors to diabetes?
MS. THORPE: Object to the form, incomplete hypothetical.
THE WITNESS: If those were the three you presented with me, I would say that obesity is the overwhelming contributing causal factor. And one was polycystic ovary disease and the other was what, age?
Q. (By Ms. Relkin) Family history.
A. And I'd say the others certainly added something to the risk, but not at the level related to obesity.
Q. Would you consider them all contributory causes?
A. I'd consider all three contributory. Actually, I wouldn't consider them contributory causes. I'd consider the other two to be associated risk factors, and you should differentiate between risk

Page 69

factors and causation. They contribute to it, but the strength of that association is so disproportionately different from obesity that I consider them as different entities.
Q. If you have someone who is obese -- strike that.
Not every obese person develops diabetes; is that right?
A. That's correct.
Q. So if you have someone who is obese but they also have polycystic ovarian disease syndrome as well as the family history we talked about, would you be able to exclude the role of the polycystic ovary disease in that family history in that causal determination of the disease, or would you consider them all contributory causes?
MS. THORPE: Object to form, incomplete hypothetical.
THE WITNESS: I would consider obesity to be causative and the others to be associated risk factors.
Q. (By Ms. Relkin) If someone is obese, you believe there is a strong likelihood at some point in their life they are going to develop diabetes; is that right?

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 70

1    A. That's correct.
2    Q. Do you know whether the time in which they
3  might get diabetes would be expedited if they have
4  additional risk factors?
5    A. I don't know that that's been documented.
6    Q. Is that something that you have explored at
7  all, the role of different risk factors in terms of
8  when the diabetes becomes manifest?
9    A. I'd like to take a look at some of the studies
10 to actually answer that, because in some of them they
11 have control for those other risk factors. Even when
12 they are controlled for, the obesity is the driving
13 force and even when controlling for these other risk
14 factors, the rates are extremely high for the
15 development of diabetes.
16   Q. Let's take the risk factor of diet. On your
17 chart on Page 4, you have it as a relative risk of 2.5;
18 is that right? If someone is already obese and they
19 are so obese that the likelihood is they are not going
20 to be able to lose a substantial amount of weight,
21 would you from a public health standpoint say that
22 nevertheless they should alter their diet and go on a
23 healthier, low-fat diet to minimize their risk of
24 developing diabetes?
25   MS. THORPE: Objection, compound and

Page 71

1  argumentative.
2    THE WITNESS: I would say they should go on a
3  healthier, low-fat, high-fiber diet but not
4  necessarily for the reasons you have just
5  presented; just because it is healthier. But the
6  real emphasis would be on their overall health and
7  not necessarily with an expectation that it would
8  lower their risk of getting diabetes.
9    Q. (By Ms. Relkin) Assume hypothetically that
10 there is no other health risk. I know this is not a
11 correct hypothetical, but it is a hypothetical, that
12 there is no other health risk to a fatty diet other
13 than diabetes, exclude cardiac issues and so forth, and
14 you have a person who is already obese. Wouldn't you
15 see some health benefit from a preventive standpoint of
16 advising that patient to go on a low-fat diet because
17 they had not yet developed diabetes?
18   A. Not necessarily. I think we are talking about
19 two different things. What's being described here is
20 an increased risk from an unhealthy diet. It is a
21 different item. In some instances, altering what you
22 do as a risk factor can diminish your risk, and in
23 other things, it doesn't.
24   So it is not the reverse -- the fact that this
25 diet is associated as a risk factor with diabetes does

Page 72

1  not necessarily mean that, in the face of obesity,
2  adhering to this diet reduces your risk. It may -- and
3  even if it reduced your risk, even if it did reduce
4  your risk from this particular risk, if you remained
5  obese and had been for a period of time, you still have
6  an overwhelming risk from the obesity.
7    Q. So you wouldn't recommend to that patient that
8  they change their diet if hypothetically a high-fat
9  diet had no adverse health risks other than
10 contributing to diabetes?
11   MS. THORPE: Object to form, because "that
12   patient" is unclear, and the hypothetical is
13   woefully incomplete.
14   Q. (By Ms. Relkin) If you had an obese patient
15 who had a poor high-fat diet and the only known risk
16 from the poor high-fat diet was a 2.5 relative risk of
17 getting diabetes, is it your testimony that you would
18 not recommend to that patient that they need to alter
19 their diet to minimize either their risk of getting
20 diabetes or the date on which they might get diabetes?
21   MS. THORPE: Object to form.
22   THE WITNESS: Again, I'd separate the two
23   pieces, what I would recommend and why I would be
24   recommending it. I would recommend they go on a
25   healthy diet with both these factors and others

Page 73

1  such as low caloric content as well as
2  recommending increased physical activity, if they
3  smoked then not smoke, and to get their high blood
4  pressure under control. But I would be doing it
5  for a multiplicity of reasons.
6    Q. (By Ms. Relkin) Did you undertake to research
7  comprehensively which medications are associated with
8  diabetes?
9    A. Could you clarify that?
10   Q. Let me ask it a different way. In your
11 report, Page 5, you have on the chart, antihypertensive
12 medications. This chart is a listing of known risk
13 factors for diabetes, so you list a number of risk
14 factors at the bottom. You have antihypertensive
15 medication, thiazides and beta-blockers. Do you see
16 that?
17   A. Yes.
18   Q. In your opinion, are there any other
19 medications that are known to increase the risk of
20 diabetes?
21   A. There are. There may be others, I can't list
22 them all. I did do a look to see what other ones are
23 associated, but this list includes ones in which there
24 have been a demonstrated relative risk for it rather
25 than just an unclear association and in which the

19 (Pages 70 to 73)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 74

1  agents are used in a predictable and regular manner and
2  have widespread use in the population.
3      Q.  What are the other medications -- let me back
4  up.
5          You said you did undertake to do that, to take
6  a look at that.  How did you take a look?
7      A.  By a search which looks at diabetes and
8  medications.
9      Q.  You put in a PubMed search for diabetes and
10  medications?
11     A.  Yes, my colleague did, my grad student.
12     Q.  Do you know exactly what words he used?
13     A.  I don't.
14     Q.  Was it PubMed that he did?
15     A.  I actually put it in at one point and did it.
16  I don't remember which search engine I put it in.
17     Q.  What's your typical search engine or your
18  favorite search engine?
19     A.  I typically use the NIH search engines.
20     Q.  You put in the terms diabetes and medication?
21     A.  Diabetes and medication, and I may have put in
22  other ones to see what other things popped up.
23     Q.  So what other agents popped up in your search?
24     A.  Corticosteroids, I think there were some
25  cancer therapeutic agents that may have come up.  The

Page 75

1  one that caught my eye and I knew about was the
2  corticosteroids.
3      Q.  What did you learn about corticosteroids and
4  diabetes?
5      A.  That it is associated with increases in blood
6  sugar.
7      Q.  Pretty substantially; is that right?
8      A.  It depends on how it is used and when it is
9  used.  It is quite variable.
10     Q.  Any other medications?
11     A.  None that had the other criteria I mentioned
12  which is widespread use and some kind of demonstrated
13  relative risk attached to them.
14     Q.  You needed the quantification, relative risk,
15  as opposed to just a recognition in the literature that
16  it does it?
17     A.  The recognition in literature sometimes is an
18  association and it is hard to interpret what that
19  means.
20     Q.  So unless you saw an actual relative risk,
21  unless there was a specific study that put a number to
22  it, you didn't consider that?
23     A.  Not in this instance, because even if they had
24  them, they would have been as low or lower as the
25  thiazides and beta-blockers here.

Page 76

1      Q.  How do you know that?
2      A.  Given the numbers and the nature that they
3  were being reported.
4      Q.  The numbers of what, incidents?
5      A.  That's the point, there are occasional case
6  reports on some of these things and no population.
7      Q.  Do you know whether there is a general
8  recognition in the medical literature that
9  corticosteroids cause diabetes?
10     A.  As I said, I think there is an understanding
11  of corticosteroids, when used under certain
12  circumstances, can affect blood glucose.
13     Q.  Do you know whether corticosteroids contribute
14  to diabetes other than by affecting blood glucose?
15     A.  I have not pursued the detailed pharmacology
16  of corticosteroids.
17     Q.  Do corticosteroids also cause rapid weight
18  gain?
19     A.  They can, but not always.  Again, it is highly
20  important to know when and how they are used.
21     Q.  In medicine, everything is not always, right?
22  There is always variability?
23     A.  But the variability in this is immense because
24  people use nasal sprays with corticosteroids.  They can
25  be used one time or two times over a period of five

Page 77

1  years or they can be used in very high doses daily for
2  cancer therapy.
3          So the variability in corticosteroids is much,
4  much greater than most medical entities.  If you take
5  penicillin, you may take it for seven days or 10 or 14.
6  You may take two grams a day or one and a half grams a
7  day.  But that's real different from what we are
8  talking about in the use of corticosteroids.
9      Q.  In regard to the literature, did you review
10  any review articles about corticosteroids and diabetes?
11     A.  No.
12     Q.  What did you review?
13     A.  I can't even remember what the articles were
14  that came up.  They were abstracts and summaries in the
15  articles that came up.
16     Q.  Did you print them?  Are they in these boxes?
17     A.  No, they are not.
18     Q.  Was there some research you did that you saw
19  online or that your assistant showed you and then you
20  didn't save it?
21     A.  I saw the stuff online and didn't save it.
22     Q.  I'd like you to think back as to what you saw
23  online that you didn't print out and save, in this
24  research that we are just discussing.  What else?
25     A.  Nothing else that I can remember.

20  (Pages 74 to 77)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 78

1  Q. Was there a reason why you didn't save that
2  particular research, print it out?
3  A. I didn't think it was particularly relevant.
4  I am giving examples here of commonly associated
5  including American Diabetes Association associated
6  risks, and was quite comfortable with their expert
7  opinion as to ones that they listed, one; and two,
8  these are examples.
9  There may be other ones that aren't on here,
10  but these struck me in my opinion as the ones that were
11  most relevant to this particular litigation. I wasn't
12  writing a total review article on risk factors.
13  Q. So this chart which is on Page 4 and 5 of your
14  report was derived from an American Diabetes
15  Association report; is that right?
16  A. No, it wasn't derived from it, but I used that
17  as my reference to, and textbooks of diabetes,
18  endocrinology and diabetes which indicate what risk
19  factors they list. And a combination of those, these
20  seemed like a reasonable selection.
21  The purpose of the table is not to be
22  exhaustive in everything that can lead to elevated or
23  changes in blood sugar. But the commonly accepted risk
24  factors are what's listed in this table, and I think I
25  have included all of the commonly accepted risk factors

Page 79

1  for the general population for diabetes.
2  Q. For the general population. Are there certain
3  populations that have other risk factors that were not
4  encompassed in this chart then?
5  A. Yes, I guess if you have an advanced cancer
6  and have to take high dose corticosteroids, as we
7  mentioned, that's not a factor on this chart.
8  Q. Any other examples like that?
9  A. I think that one pretty well explains the type
10  of thing that's not included.
11  Q. What about antiepileptic medications, are they
12  associated with diabetes?
13  A. Maybe. They are not commonly listed as risk
14  factors for it. I don't have an opinion on that.
15  Q. You didn't do specific research that would
16  have encompassed that?
17  A. No.
18  Q. What about the first generation
19  antipsychotics, do you hold an opinion as to whether
20  any first generation antipsychotics are associated with
21  diabetes?
22  A. I haven't looked at that as an issue.
23  Q. I take it you have read some information in
24  the course of preparing for your report about first
25  generation antipsychotics?

Page 80

1  A. In preparing for this report, there have been
2  studies that include them as an arm in which they are a
3  comparative group, but that has not been the focus of
4  my reading.
5  Q. Did you read any discussions in background
6  material about some understanding that first generation
7  antipsychotics have certain unwanted adverse effects
8  such as the neurological effects and that's why there
9  was the development of the second generation? Are you
10  familiar with that?
11  A. In some of the articles there is an allusion
12  to the background of all this, but again, I didn't
13  focus on this as pertinent to what I was being asked to
14  look at in this litigation.
15  Q. Part of the background also discussed a
16  recognition that certain of the first generation or
17  that the first generation antipsychotics are associated
18  with diabetes. You saw that?
19  MS. THORPE: I am going to object to the form
20  of the question because of the vagueness, part of
21  the background discussed. If you are talking
22  about a particular article, is that what you are
23  doing?
24  MS. RELKIN: No, let me rephrase it.
25  Q. (By Ms. Relkin) Doctor, you obviously reviewed

Page 81

1  a lot of materials after you were retained to work on
2  this litigation. In the course of reviewing some of
3  those materials, is it fair to state you read some
4  information about the role of first generation
5  antipsychotics and its relationship to the development
6  of diabetes?
7  A. I did not focus on first generation
8  antipsychotics. My focus was specifically on one
9  particular second generation antipsychotic, Seroquel,
10  and that's where I spent my effort and energy.
11  Q. I understand that, but without my spending the
12  time, and I can do that, I have my two assistants here
13  that can find from your articles here, often in a
14  medical article there is historical background about
15  why we are exploring a certain issue. If you are
16  reading an article about schizophrenics and medication
17  and diabetes, there often is a discussion in the
18  beginning about the first generation. Is that fair to
19  state?
20  A. There often is a discussion of background
21  materials for any article.
22  Q. That's not just interesting, but that can be
23  important to put things in perspective; is that fair to
24  state?
25  A. It can be, but it depends on the quality of

21 (Pages 78 to 81)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

## Page 82

1  that information. One of the things I found in doing
2  this review is the quality of much of the literature is
3  of such poor quality that it is hard to draw some of
4  the assumptions even from these introductory paragraphs
5  without having taken a careful look at the literature
6  myself.
7     Q. I understand that you did not focus on the
8  first generation, you didn't do an exhaustive
9  literature review on that, but from what you do recall
10  about reading some of these introductory paragraphs to
11  many of these articles, is it fair to state you saw a
12  discussion that first generation antipsychotics have
13  been associated with the development of diabetes?
14     MS. THORPE: Object to form. There is no
15  article in front of the witness.
16     MS. RELKIN: I don't need to give him an
17  article. It is a general question.
18     MS. THORPE: You are asking about -- let me
19  just ask a clarifying question. Are you asking
20  about all of the medical literature and whether
21  there is a paragraph that he's read in all of the
22  medical literature and you want him to remember
23  that right now?
24     MS. RELKIN: Yes, there are some basic
25  historical things one might remember.

## Page 83

1     Q. (By Ms. Relkin) In the course of the many
2  articles you reviewed, do you recall seeing a
3  discussion in one or more articles about a recognition
4  that there is an association between diabetes and first
5  generation antipsychotics?
6     A. I don't per se. In general, I remember
7  allusions to concerns about weight, and there may have
8  been the other. I can't recapture the introductory
9  paragraphs of any of those articles at this point.
10     MS. THORPE: I'm sure Dr. Koplan would be
11  willing to go through the boxes if you want him
12  to.
13     MS. RELKIN: After the lunch break, we might
14  pull some things out or ask him to go through the
15  boxes. I have a lot of material to cover, though.
16     Q. (By Ms. Relkin) In addition to Seroquel, there
17  are a number of other second generation antipsychotics;
18  is that fair to state?
19     A. Yes.
20     Q. They are the atypicals; is that right?
21     Do you hold the opinion as to whether any of
22  the other atypical antipsychotics are associated with
23  diabetes?
24     A. I don't hold an opinion on the other
25  atypicals.

## Page 84

1     Q. One way or the other?
2     A. One way or the other.
3     Q. So you don't know sitting here whether Zyprexa
4  is associated with diabetes?
5     A. I have not focused on that in my report, in my
6  studies of this, no.
7     Q. So from what you have reviewed, you have not
8  ruled in or ruled out the question of whether Zyprexa
9  can cause diabetes in certain patients; is that right?
10     A. I have considered these as individual agents
11  with each with their own characteristics in terms of
12  both efficacy and safety and focused on the particular
13  drug that's the topic for this litigation.
14     Q. So just specifically, you have reviewed a lot
15  of articles and a good number of them included the
16  agent Zyprexa; is that right, olanzapine?
17     A. Zyprexa was usually there is olanzapine in a
18  number of the articles.
19     Q. You reviewed those articles, but sitting here
20  today, you don't form an opinion one way or the other
21  as to whether Zyprexa is a risk factor for the
22  development of diabetes; is that correct?
23     A. That's correct.
24     Q. Do you hold an opinion as to whether Zyprexa
25  is a risk factor for the development of obesity?

## Page 85

1     A. I have no opinion on Zyprexa.
2     Q. Same thing, you looked at it but didn't form
3  an opinion one way or the other?
4     A. That's correct.
5     Q. What about Risperdal, another one of the
6  agents, have you formed an opinion as to whether
7  Risperdal contributes or is a risk factor to diabetes?
8     A. I have not formed an opinion on Risperdal.
9     Q. What about Risperdal and weight gain?
10     A. I have not focused on other drugs other than
11  quetiapine, Seroquel.
12     Q. A number of the studies that you reviewed are
13  comparisons, they are studies which compare quetiapine
14  with some of the other first generation and second
15  generation antipsychotics; is that right?
16     A. Yes.
17     Q. You read the articles cover to cover?
18     A. Yes.
19     Q. But you have no opinion one way or the other
20  as to whether any of those other agents play any role
21  in the development of diabetes; is that correct?
22     A. That's correct.
23     Q. Which means you have not ruled out the
24  possibility that they may?
25     A. It means I have no opinion on it. That's not

22 (Pages 82 to 85)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 86

1 what I have been asked to do nor what my area of
2 interest is in this particular litigation.
3     Q. You are a scientist. When you review an issue
4 and there are related scientific questions, I take it
5 you like to explore them to get a full understanding of
6 the scientific issues that you are addressing; is that
7 right?
8     A. I like to explore and be familiar with
9 relevant scientific issues.
10     Q. When you have explored various vaccines and
11 you are looking at the safety and efficacy of the
12 vaccine in preventing a particular infectious disease,
13 do you look at the other vaccines that are related?
14     A. Only for a comparative basis, much like has
15 been done in these articles. But you can draw no
16 conclusions about the safety of one vaccine from
17 another vaccine.
18         You look at safety issues more broadly writ,
19 so to draw a conclusion on the safety of the
20 acellular pertussis vaccine versus the inactivated,
21 commonly used pertussis vaccine, or the mouse-based
22 rabies vaccine versus the tissue culture-based, there
23 is absolutely no grounds to conclude that whatever goes
24 on with one has any relevance to the other.
25     Q. There is concluding, making a final opinion,

Page 87

1 and then there is considering whether there are
2 overlapping issues of concern. Would you agree with
3 that?
4     A. It's usually not done that way. I guess I
5 wouldn't agree with that.
6         One looks at these various modalities first of
7 all to see, is there an advantage to using one over the
8 other or is there a problem with one where you want to
9 go to an alternative and then to begin to characterize
10 them as to how they are different. So in many
11 instances, the focus, whether it is vaccines, I think,
12 or in medications, we choose are based on
13 characterizing them both for their benefits and risks
14 and making choices based on that information.
15     Q. Is Guillain-Barré syndrome a relatively
16 well-recognized risk associated with many types of
17 vaccines?
18     A. No, it's not recognized with many types of
19 vaccines. It has become associated, in some instances
20 it has been associated with flu vaccine, but not
21 consistently. There have been articles that have
22 looked at it from both sides and some saying that there
23 is an association and some saying there isn't.
24     Q. Besides flu vaccines, is there data showing an
25 association between other types of vaccines and

Page 88

1 Guillain-Barré?
2     A. There may be. I haven't looked lately at the
3 exhaustive list of all vaccines and whether there is an
4 association from others. Guillain-Barré is a
5 relatively rare entity, and so it may come up in
6 individual cases with other vaccines. The one that is
7 most focused on is influenza.
8     Q. Besides Guillain-Barré, are there other
9 adverse events that are associated with more than one
10 type of vaccine?
11     A. With the exception of sore arm, flu-like
12 symptoms and sometimes infection, and all those are
13 due, two of them are due to the nature of the physical
14 process that's involved, there aren't a lot that
15 immediately spring to mind as to commonly associated
16 risks with a wide range of vaccines going from measles,
17 mumps, rubella, polio, et cetera. For example, a
18 potential complication of oral polio virus is for
19 someone else in the household to get polio who is
20 under-immunized for it.
21         That just isn't applicable to other vaccines
22 that are out there. So again, my view is you got to
23 take each vaccine one by one and consider both the
24 benefit side and the risk side and consider, even
25 though they are all vaccines, you can't make any

Page 89

1 generalizations because they are vaccines.
2     MS. THORPE: I don't know what you are
3 thinking for lunch, but it is a quarter of one.
4 We have been going for about an hour now.
5     MS. RELKIN: Do you want to break now?
6     MS. THORPE: I defer to you.
7     (Discussion ensued off the record.)
8     MS. RELKIN: We can break now.
9     (Whereupon, at 12:40 p.m. a luncheon recess
10 was taken.)
11
12         AFTERNOON SESSION
13             1:30 p.m.
14
15     MS. RELKIN: Would you read back the last
16 answer?
17     (Thereupon, the requested portion was read
18 back by the reporter.)
19     Q. (By Ms. Relkin) Good afternoon.
20     A. Afternoon.
21     Q. We were talking about different agents and
22 whether you have any opinions as to whether they
23 contribute to diabetes. I didn't ask you specifically
24 about Lithium. From your review of the materials you
25 have reviewed in this matter, have you read data

23 (Pages 86 to 89)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 90

1  regarding the association between Lithium and diabetes?
2      A. I haven't.
3      Q. You have not.  Do you have any opinion
4  whatsoever as to the association between Lithium and
5  diabetes?
6      A. I don't.
7      Q. This was a topic you didn't think you needed
8  to research in order to formulate your opinions here;
9  is that right?
10     A. It did not appear as a commonly listed risk
11 factor or one that came up in the materials I looked at
12 as a common risk factor for diabetes.
13     Q. Do you hold the belief that you did not need
14 to review — strike that.
15         In the epidemiology literature, there is
16 reference frequently to environmentally-related causes,
17 environmental causes; is that right?
18     A. Of what?
19     Q. Of some adverse event, some end point,
20 environmental causes.  If you were studying an end
21 point and they talk about genetic and so forth, there
22 is the term environmental; is that right?
23     A. That's correct.
24     Q. Would the ingestion of a medication come under
25 the category of environmental cause?

Page 91

1      A. Probably more likely to fall into a behavioral
2  basis, which is another area.  Sometimes behavioral is
3  included in environmental.
4      Q. Does behavioral typically have a connotation
5  that it is the independent activity of the population
6  as opposed to something a doctor is ordering them to
7  do?
8      A. It doesn't really have, it usually doesn't
9  consider either.  It merely reflects a certain amount
10 of personal preference and choice in doing something.
11 Most behavioral things are affected by environment, and
12 many environmental risks are affected by behavior.  So
13 there is a fair amount of interplay between the two.
14     Q. In the epidemiology literature regarding
15 diabetes, what are some environmental causes?  Are you
16 going to your report or declaration?
17     A. I'm going to my report, Pages 4 and 5.  There
18 is an interplay of environment, for example, in
19 inactivity, physical in activity, and to some degree
20 in tobacco use, but in public health terms both would
21 be thought of as behavioral risks.
22     Q. If there was a prescription medication that
23 hypothetically causes diabetes, would you characterize
24 that as behavioral then?
25     A. Could you maybe give an example of a type of

Page 92

1  medication and how it would be used?  Can you be a bit
2  more specific?
3      Q. On your chart you have antihypertensive
4  medications is an agent that you recognize as being a
5  risk factor for diabetes, and that's obviously a
6  prescription medication?
7      A. Yes.
8      Q. Is that behavioral?
9      A. It doesn't fit into either perfectly.  It is a
10 risk factor for diabetes.  Is it environmental,
11 behavioral?  You could lump it in.  If you had to fit
12 it into one of those categories, you might be able to
13 fit it into one of those categories.
14     Q. In terms of the environmental public health
15 literature, is there a terminology that's used to
16 describe a prescription medication that is a risk
17 factor for a disease?
18     A. Not a generic term that I can think of.  I
19 think it would be just listed for what it is, a
20 prescription medication, a drug, whatever, and not
21 lumped into a larger category.
22     Q. Would you agree with the general proposition
23 that if you are exploring the risk factors in the
24 epidemiological data with regard to the cause of a
25 disease, you end, in this hypothetical, there is a

Page 93

1  medication that's known to be associated with a disease
2  as well as other risk factors that are the more
3  conventional, environmental or behavioral, that it is
4  important to consider all causes in evaluating the
5  validity of the epidemiological studies?
6      A. You had me until your last phrase.  Could you
7  break that up?  I am just trying to focus on what your
8  actual question is.
9      Q. One thing that I think was clear from your
10 report and declaration and the literature is you need to
11 look at confounding factors.  That's certainly something
12 you look at in terms of assessing a study?
13     A. Yes.
14     Q. If a study doesn't account for a potential
15 confounding factor, that's a disadvantage of the study;
16 is that right?
17     A. Yes.
18     Q. That wouldn't necessarily rule out the study
19 as providing informative information, but it is
20 something you might criticize it for, is that fair to
21 state?
22     A. No, it frequently does rule out the study as
23 providing informative information.  The very word, a
24 confounded study, often just indicates that the study
25 is unusable.

24  (Pages 90 to 93)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 94

1    Q. Is it your opinion that if a study which is
2  large, has a large database, it shows statistically
3  significant findings, done by very reputable people,
4  published in a good journal, but it doesn't account
5  for a confounding factor, that it therefore should be
6  disregarded in its entirety?
7    A. We have hundreds of studies. I prefer to do
8  it looking at one.
9    Q. I am not even talking specifically about the
10  studies in this. I am asking your general opinions as
11  an epidemiologist.
12    MS. THORPE: Let me object to the form because
13  it in essence is a hypothetical question without
14  complete facts. So that's my objection.
15    MS. RELKIN: I think it is a generic question
16  with regard to his generic opinions on
17  epidemiology and his methodology.
18    MS. THORPE: If that's a question, I'm
19  registering the same objection.
20    MS. RELKIN: Can we go back to the question?
21    (Thereupon, a portion of the record was read
22  by the reporter.)
23    THE WITNESS: I would say if the confounding
24  factor that is the piece of it, represents a
25  large part of the risk, yes, I would discount it

Page 95

1  and the results. That's why it is important to
2  characterize it more.
3    What is the level? How important is this
4  confounding factor to the study as a whole? What
5  piece was left out by the researchers?
6    Q. (By Ms. Relkin) Even if the confounding
7  factor is something that the study arm has -- strike
8  that. I'll get to that later.
9    Is there such a thing as a perfect
10  epidemiological study in the real world?
11    A. I think that one can pursue perfection. I
12  don't think it's ever achieved in any kind of a study.
13    Q. But in epidemiological studies specifically,
14  would you agree that there are certain inherent
15  challenges that would always result in any study having
16  at least one imperfection?
17    A. When I read studies or do studies, I don't
18  expect perfection in either, but I expect competent,
19  good studies in which the crucial factor is, are the
20  conclusions made by the authors justified by the data
21  and analysis that they have done, and that makes it
22  either usable or not usable.
23    Q. Would you agree that most studies have flaws?
24    A. That doesn't really mean much. Big flaws,
25  little flaws that make them uninterpretable, flaws that

Page 96

1  you can accept?
2    Q. Would you agree with the general proposition
3  that most studies have flaws? Therefore it would
4  encompass different types of flaws.
5    A. I would say most studies are imperfect.
6    Q. Do you disagree that most studies have flaws?
7    A. What do you mean by a flaw?
8    Q. Do you understand what the term flaw means?
9    A. I do in different contexts. I would like to
10  know what you mean by it.
11    Q. Let's go to the Reference Manual on Scientific
12  Evidence and see what they say. Are you familiar with
13  the Reference Manual on Scientific Evidence?
14    A. No.
15    Q. Are you familiar with Michael Freedman and
16  Leon Gordis?
17    A. I am not personally acquainted with them. I'm
18  familiar with their names from the literature.
19    Q. They are well-recognized epidemiologists; is
20  that right?
21    A. Yes.
22    Q. I will just represent to you that this is a
23  manual that the Federal Judicial Center which is the
24  management arm of the federal court system has
25  published to guide courts on understanding science, and

Page 97

1  there is a chapter on reference guide on epidemiology.
2  In it, it says, "Assessing whether an association is
3  causal requires an understanding of the strengths and
4  weaknesses of the studies designed and the
5  implementation as well as a judgment about how the
6  study findings fit with other scientific knowledge. It
7  is important to emphasize that most studies have
8  flaws."
9    Would you agree with that statement?
10    A. Yes.
11    Q. Do you agree that some flaws are inevitable,
12  just given the limited technology and resources?
13    A. Again, it would help to be specific. I don't
14  know what the "some flaws" are.
15    Q. In a general sense, are you able to answer
16  this question? I'm not speaking about a particular
17  study.
18    A. I don't know. You know, in the hands of
19  incompetent researchers, something can be considered an
20  inevitable flaw, and in the hands of someone else, it
21  can be considered something that could have easily been
22  avoided and accounted for.
23    You come upon this all the time in doing
24  reviews of papers or in writing your own. You have to
25  recognize even from the beginning, even as you start a

25 (Pages 94 to 97)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 98

1   study, what are the potential criticisms likely to be
2   of the results of this and try to address those.
3   There may be some that you can't, but there are many
4   you can from the very beginning.
5       Q. So it is your opinion that a study that
6   doesn't consider baseline obesity from the get-go is
7   inherently flawed and should never have been conducted,
8   is that a fair statement?
9       A. When you say consider based upon obesity, tell
10  me what kind of study we are talking about.
11      Q. Let's get to your criticism of so many of the
12  studies that show an association. You criticize many
13  of the observational studies because they did not
14  control for baseline body mass index; is that correct?
15      A. Correct.
16      Q. That to you is a major, major flaw in these
17  studies; is that right?
18      A. Correct.
19      MS. THORPE: Can I ask a clarifying question?
20  You are talking about the studies, you are holding
21  the report. So the record ought to reflect that
22  you are talking about studies that are referenced
23  in his report, not just generally? I know that's
24  what you mean, but it just might be confusing.
25      MS. RELKIN: Sure. For the sake of this

Page 99

1   question, I probably did mean in a broader sense,
2   but that's fine for the sake of this question.
3       Q. (By Ms. Relkin) The studies that are
4   referenced in your report, there are 20 studies you
5   outline and you say the majority of the studies did not
6   control for baseline body mass index.
7       A. Correct.
8       Q. In fact, you say all but one of the studies
9   did not control for baseline body mass index; is that
10  right?
11      A. Of the studies I listed here, correct.
12      Q. Is it your opinion that all of those 19 out of
13  the 20 studies should be entirely disregarded because
14  it did not control for baseline body mass index?
15      A. I would say all of those studies have to be
16  considered in terms of whether their conclusions are
17  justified by the methodology and populations they have
18  used as to whether those conclusions are valid or not.
19  And if the conclusions aren't valid based on the
20  others, then the studies aren't usable.
21      Q. There are conclusions which is the author's
22  overall conclusion, then there's the data, the
23  different findings and the subsets of data, correct?
24      A. Yes, and the conclusions should be based on
25  those data.

Page 100

1       Q. But if we take away the author's conclusions
2   and we just look at the data, and there is some data
3   showing a statistically significant relative risk of
4   diabetes associated with quetiapine, is it your opinion
5   that that data should be entirely disregarded because
6   those studies did not control for body mass index?
7       A. Yes.
8       Q. Throw out the data, no point in looking at it?
9       A. It's useless data. There's two things that
10  you are describing, one of which is the epidemiology
11  and one of which is a test for significance applied to
12  that epidemiology. If the epidemiology is flawed, in
13  the term you are using flawed, if that is critically
14  flawed, then it doesn't matter what the test of
15  significance is of those results.
16      Q. So I take it it is your opinion that the
17  researchers of those 19 different papers, and some of
18  them have three, four, five, six researchers at various
19  medical centers, made really a fatal mistake at even
20  undertaking that study because they didn't control for
21  body mass index in your opinion?
22      A. It is not just controlling for body mass
23  index. That's a big piece of it, but one of the reasons
24  they were not able to do that in many of those studies
25  was the population pool that they selected from.

Page 101

1       So that there are a number of items in each of
2   these studies, more than one. But body mass index is
3   still way up on the list, and it is comparable to
4   doing, very much comparable to doing a study on lung
5   cancer and not asking people whether they smoke. It
6   would be inconceivable to use one of those studies to
7   draw a conclusion.
8       Q. I understand your opinion. I want to isolate
9   that you have other critiques here and there of the
10  different studies, but in terms of, it seems to me from
11  reading your report and your declaration, your most
12  significant criticism of saying, toss them, chuck them,
13  they don't count, the 19 out of 20 studies, is that
14  they did not control for body mass index?
15      A. I would really prefer to do these study by
16  study rather than do them as a lump sum. I didn't
17  analyze them as a lump sum. I did them one by one.
18      And I prefer if you want to raise a factor
19  with them, I am happy to. But I would like to do it
20  study by study.
21      Q. I understand that. We have a limited amount
22  of time and if I am able to draw a generalized
23  conclusion from your opinions based on what you have
24  written, I am entitled to try to explore that. So I
25  want to know --

26  (Pages 98 to 101)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 102

1    MS. THORPE: Object to the speech. Let's get
2  to the question.
3    Q. (By Ms. Relkin) In your opinion that from the
4  get-go, since the methodologies of 19 out of the 20
5  studies did not control for baseline body mass index
6  which you are saying is so critical, that those studies
7  should never have been conducted in that form?
8    MS. THORPE: Object to the form of the
9  question, mischaracterization of the testimony.
10   THE WITNESS: I would say that the number one
11  factor for many of these studies is the choice of
12  population that was chosen to do the study, and
13  from that flows a number of other errors.
14   Q. (By Ms. Relkin) Are you saying that that
15  number one factor encompasses that given the database
16  limitations, they were unable to determine for that
17  study population their baseline body mass index?
18   A. Among other things.
19   Q. So if you were asked as a reviewer for an
20  institutional review board or the NIH or a
21  pharmaceutical company whether to fund or approve a
22  study that had the methodologies encompassed in the 19
23  of the 20 studies that you dismiss, you would not have
24  agreed to approve that study, is that your testimony?
25   A. Not only wouldn't I in the theoretical, I

Page 103

1  haven't in reality. I worked for five years for the
2  Prudential Insurance Company running the health
3  services research unit.
4    We did a number of studies there, and our most
5  easily accessible data set with the very types of
6  claims data set that were used in virtually all of
7  these observational studies, and determined that they
8  permitted too much confounding on some factors that we
9  knew about, something like body mass index or whether
10  they smoked or whatever, and on some factors that we
11  didn't know about. And it made it impossible to
12  properly answer any one of dozens and dozens of
13  questions we wanted answered on multiple different
14  things including diabetes from that type of data set.
15   So we used considerably more expense, time and
16  effort to create new data sets where we could collect
17  that information. So I have actually considerable
18  experience with these data sets and their pitfalls such
19  that I would basically, unless I was looking for
20  financial information, would not use these data sets
21  myself in doing a study unless the questions asked were
22  appropriate to the data set.
23   Q. The Prudential data set isn't necessarily the
24  same as some of these other, what you referred to as
25  claims but which are also governmental health care

Page 104

1  system data sets including the VA, including European
2  databases and so forth. They are not all just claims,
3  insurance company --
4    A. They are actually very similar in that they
5  record things for purposes other than for that which
6  the study was asking questions.
7    Q. You would agree that in recent years, a large
8  amount of observational studies and research is based
9  upon these robust governmental and insurance company
10  databases which have a lot of data for a lot of
11  patients including diagnostic codes, medications that
12  are prescribed and information that isn't always
13  available in other forms. Would you agree with that?
14   A. No.
15   Q. What do you disagree with about that
16  statement?
17   A. There's a lot of different elements. One, the
18  term robust, which is totally dependent on which
19  particular data set you are talking about and what
20  particular questions you are answering. And much like
21  in the studies here, there has been, there are a lot of
22  these studies out there many of which are less than
23  interpretable. It depends which things you are asking
24  questions on.
25    It's hard to use these data sets for causality

Page 105

1  issues. Many of the studies where they have used these
2  data sets, and there may be some useful things, are
3  much more along the lines of frequency with which
4  different tests are being done, the frequency with
5  which different medications or things are being
6  prescribed. And it is very, very difficult to use
7  these studies for issues of drawing a conclusion about
8  cause.
9    Q. In recent years, you would agree that there
10  have been many publications in the peer-reviewed
11  literature with regard to drug safety issues regarding
12  many drugs that are based upon observational data from
13  health care databases which you are referring to as
14  claims databases, true?
15   A. I don't know how large that literature is, but
16  there's literature out there that uses these frequently
17  for drugs.
18   Q. One of the reasons you don't know is you are
19  not really in the drug safety business. You don't work
20  for a pharmaceutical company looking for drug safety,
21  you don't work for the FDA, and your professional
22  research activities have not been devoted exclusively
23  to drug safety issues, fair to state?
24   MS. THORPE: Object, I think I counted four
25  parts to that question. I think it was a compound

27 (Pages 102 to 105)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

| Page 106 | Page 108 |
|---|---|
| 1   question. It is probably argumentative as well. | 1   ascertain medication use, correct? |
| 2       THE WITNESS: Can you repeat that? | 2       A. No, because it can be incomplete. In a system |
| 3   Q. (By Ms. Relkin) Do you regularly review the | 3   like we have, all the data for every person is not |
| 4   drug safety literature with regard to other compounds | 4   collected on one source. |
| 5   other than -- strike that. | 5       So I'm a member of the VA. I get many of my |
| 6       Prior to your being retained in this Seroquel | 6   medications from the VA. I am a retired, on military |
| 7   litigation, separate from your research, very good | 7   retirement and yet I get other medications at other |
| 8   research, important public health research on | 8   sources because I also see other doctors outside. So |
| 9   infectious disease and viruses and your studies over | 9   when you use one of these data sets you get an |
| 10   the years, you have not been a dedicated drug safety | 10   incomplete picture of what is going on in that person's |
| 11   professional; is that fair to state? | 11   health, even in the VA. |
| 12       A. I make no claims to be a dedicated drug safety | 12       Q. In fact, if you were a schizophrenic in a |
| 13   professional as such. | 13   hypothetical situation and you got some VA benefits, |
| 14       Q. Sitting here, other than what you have seen | 14   but say the VA only would approve some generic |
| 15   from the slice of Seroquel literature, you don't know | 15   antipsychotic medication and your psychiatrist wanted |
| 16   whether dedicated drug safety professionals in recent | 16   to give you Seroquel which is not approved in this |
| 17   years rely in part frequently upon these large health | 17   hypothetical situation and you got Seroquel from a |
| 18   insurance and the country's public health such as the | 18   private pharmacy. You would be under-ascertained in a |
| 19   VA and databases? | 19   study; is that fair to state? |
| 20       MS. THORPE: Object to form, compound, vague. | 20       MS. THORPE: Object to form, vague, compound, |
| 21       MS. RELKIN: Let me rephrase it. | 21   incomplete hypothetical, incomplete facts. |
| 22       Q. (By Ms. Relkin) Sitting here, you don't know | 22       Q. (By Ms. Relkin) Hypothetically. |
| 23   whether those who are dedicated drug safety | 23       A. You could be just as likely if it is on |
| 24   professionals in recent years conduct extensive | 24   formulary to get that as opposed to something else. |
| 25   research and rely in part upon studies derived from | 25   The way the VA formularies work, you can actually get |

| Page 107 | Page 109 |
|---|---|
| 1   these databases? | 1   things that are off formulary if there is a good |
| 2       MS. THORPE: Same objection. | 2   medical need for it. |
| 3       THE WITNESS: I don't know what they do. As | 3       So first of all, I am a patient as you have |
| 4   an epidemiologist, I read a wide variety of | 4   defined me currently, so I can't give you the full |
| 5   journals and can say that the types of studies I | 5   answer. But my understanding would be if I needed that |
| 6   have criticized here are flawed. | 6   medication because it was a worthwhile medication, my |
| 7       Q. (By Ms. Relkin) What are your regular | 7   physicians at the VA could prescribe it. And I have |
| 8   journals that you read? | 8   actually had that experience. |
| 9       A. It is New England Journal, Lancet, British | 9       Q. But you do get some VA benefits, you do get |
| 10   Medical Journal, Journal of the American Medical | 10   some prescriptions you said from the VA but you do get |
| 11   Association, American Journal of Public Health, Journal | 11   others from outside sources? |
| 12   of Health Education, and then I get some abstract | 12       A. Yes. But the point I am making is not the |
| 13   service on global health and other issues and get all | 13   specifics of this kind of broad and non-detailed |
| 14   those, and Health Policy. | 14   scenario. It's that the data is incomplete. |
| 15       Q. One thing that most if not all of these, what | 15       It is not just what medications you took or |
| 16   you refer to as claims databases have in common is they | 16   didn't take. It's other factors. There may be reasons |
| 17   are able to ascertain medication use; is that fair to | 17   why people go to the VA because of a specific diagnosis |
| 18   state? | 18   and go somewhere else because of another diagnosis. |
| 19       A. No. | 19       And that's equally true of these other claims |
| 20       Q. The European ones are, correct? | 20   data sets, that in California, many of the people who |
| 21       A. Some are and some aren't. It depends on which | 21   are in the Kaiser health plan seek other private |
| 22   European ones. | 22   physicians using another insurer for other pieces of |
| 23       Q. The VA, Veterans Administration, provides | 23   it. So when you get, in the absence of a unified data |
| 24   medication to their patients. So one of the advantages | 24   set, one, you don't get a full picture; and two, even |
| 25   of some VA databases is that they are able to easily | 25   in a unified data set when it is based on claims |

28  (Pages 106 to 109)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

## Page 110

1   issues, it largely has financial and administrative
2   purposes, it doesn't necessarily capture the
3   information you want on the question you are about to
4   ask.
5       Q.  Isn't it true that in virtually every
6   observational study, there will be scenarios where some
7   data is under-ascertained or missing?
8       A.  I don't know the answer to that.  I think the
9   issue is, if you are trying to answer a specific
10  question, you need to be sure that the data that
11  answers that question is in there or not in there.
12      Q.  So you are saying for every single
13  epidemiological study you have conducted, you had
14  complete ascertainment and you never missed a patient
15  who might have fit into a certain category because you
16  had the perfect data sets, is that your testimony?
17      A.  No, I have already said that there is no such
18  thing as perfect and that would certainly apply to work
19  I do as well.  However, it is incumbent upon the
20  competent researcher to design a study, choose a
21  population, conduct the study, analyze the results
22  in a way that their conclusions are valid based on
23  those earlier findings.
24      A publication is in no way the sole judge of
25  whether that has all occurred.  There's a lot of

## Page 111

1   journals out there.
2       Q.  You basically hold the opinion that the
3   journals that published those 19 studies made a
4   mistake, as did the researchers who chose to conduct
5   the studies with their existing methodology, as did the
6   IRBs who approved those studies; is that right?
7       MS. THORPE:  Objection, totally
8   mischaracterizes what he just said.
9       MS. RELKIN:  Let's see what he says.
10      MS. THORPE:  The way you phrased the question,
11  it sounded as if you were characterizing his
12  testimony which has simply been to tell you what
13  he thinks about the flaws in response to your
14  questions.
15      MS. RELKIN:  No, there were some earlier
16  questions I am inferring and I want to hear his
17  answer without interruption.
18      Now let's go back to the question.
19      Q.  (By Ms. Relkin) Do you remember the question?
20      A.  No.
21      Q.  I will just rephrase it.  Is it your opinion
22  that the 19 journals that published those 19 studies
23  that you find fatally flawed made an error in choosing
24  to publish those studies?
25      MS. THORPE:  Same objection, same

## Page 112

1   mischaracterization.
2       Q.  (By Ms. Relkin) Is it your opinion?  It is a
3   question.
4       A.  I don't know what the criteria for publication
5   are of those particular journals.  If I was the
6   reviewer, I would have said, don't publish this or have
7   them address the following points.
8       I mean, usually there is an interchange
9   between reviewer and author.  As an author, I am right
10  now dealing with reviewers' comments on, why did you
11  say that, explain this, do you have a reference for
12  that.
13      That's part and parcel of the process.  So I
14  don't think, I am never going to accuse a journal
15  editor of saying, you have made an error, unless they
16  have refused one of my papers.  Then they have made a
17  grievous error.
18      Q.  Note for the record, laughter.
19      A.  But I would say in a generalization here that
20  many journals don't pay as much attention to the
21  epidemiology and methodology of the things they publish
22  as they should.  And indeed, what's happened over the
23  years is some journals have recognized this and heavily
24  beefed up their internal review of papers with
25  qualified epidemiologists and biostatisticians.

## Page 113

1       Good examples are journals I am well familiar
2   with, New England Journal of Medicine, JAMA, and
3   Lancet, and in particular if you look at the mastheads
4   on their authorship, they have put on it,
5   epidemiologists of some renown, Walter Willett, for
6   example, who is one of the authors we use here in some
7   of the papers.
8       Q.  If you were a reviewer, it is your testimony
9   you would not have agreed for the publication as those
10  studies were published, those 19 studies?
11      MS. THORPE:  Objection, that's a
12  mischaracterization, and asked and answered.
13      Q.  (By Ms. Relkin)  True?
14      A.  I'd have to see what the guidelines for the
15  journal are, speak to the editor.  I'm comfortable with
16  the journals I review for.  I know what their standards
17  are and what they expect.
18      I have not been a reviewer for International
19  Clinical Psychopharmacology, for the Journal of
20  Clinical Psychiatry, for Pharmacotherapy.  But I can
21  tell you as an epidemiologist that these studies are
22  fatally flawed.
23      Q.  You are not a pharmacoepidemiologist, true?
24      A.  I'm not.
25      Q.  Given the limitations that were known at the

29 (Pages 110 to 113)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 114

1  get-go that you believe is a fatal flaw, failure or
2  inability to control for baseline body mass index, is
3  it your opinion that the researchers who chose to
4  undertake those studies should not have even bothered?
5      MS. THORPE: Objection, form.
6      THE WITNESS: That's their call. They can
7  choose how they spend their time. I wouldn't have
8  bothered, but that's their choice of what they
9  choose to spend their efforts on.
10     Q. (By Ms. Relkin) The institutions that funded
11  them, whether it was the pharmaceutical companies,
12  governmental funding sources, they too in your opinion
13  threw out their money by funding those studies?
14     MS. THORPE: Object to form. You continue to
15  mischaracterize his testimony.
16     MS. RELKIN: It is a question mark. He can
17  answer yes or no or probably a longer answer.
18     MS. THORPE: You incorporated an earlier
19  question. You may not have meant to, but it is a
20  mischaracterization.
21     Q. (By Ms. Relkin) Is it your opinion that the
22  folks who funded these 19 out of 20 studies, whether it
23  be drug companies, governmental agencies or
24  non-profits, wasted their money in funding the studies
25  because of the fatal flaw you have identified?

Page 115

1      MS. THORPE: Object to form, continuing to
2  mischaracterize his testimony.
3      Q. (By Ms. Relkin) Is it your opinion that
4  failure to control for baseline body weight mass was a
5  fatal flaw in these studies?
6      MS. THORPE: Let me just say, what you are
7  doing, I will just tell you, that question you did
8  not say the only fatal flaw, but you have
9  continued to say either a single fatal flaw or
10  sometimes you switch to more flaws and it is very,
11  very confusing.
12     MS. RELKIN: Let me make it broader.
13     MS. THORPE: It is a very confusing way that
14  you are asking these questions. And then you are
15  inferring things that, it is sounding like you are
16  saying he said earlier about whether these things
17  should have been published or not or funded, as if
18  he said them before.
19     MS. RELKIN: No, I am inferring. He said he
20  wouldn't have bothered doing the studies.
21     MS. THORPE: There you go. That's an
22  objection. I object to your making those speeches
23  and sidebars.
24     MS. RELKIN: You are the one engaging in the
25  sidebars. Let me ask him questions. I have

Page 116

1  limited time.
2      MS. THORPE: Ask the question, but I have got
3  to make a record. These are unbelievably
4  mischaracterizing questions based on what he said.
5      MS. RELKIN: I disagree.
6      Q. (By Ms. Relkin) Is it correct that you hold
7  the opinion that failure to control for body mass index
8  in a study of diabetes is a very serious flaw?
9      A. It depends what the study is on. What is the
10  outcome you are looking for?
11     Q. A study of diabetes.
12     A. Study of diabetes and what?
13     Q. And the effect of a medication as to whether
14  it causes diabetes.
15     A. I think, as I said, it is an extremely
16  important element to have in it.
17     Q. With regard to the 19 specific studies you
18  criticized in your report, many of which find an
19  association between Seroquel and diabetes, is it your
20  opinion that those entities who funded the studies
21  wasted their money because of that fundamental flaw of
22  failing to control for body mass index?
23     MS. THORPE: Object to form, particularly as
24  to argumentative because buried within your
25  statement you added in an argumentative phrase, so

Page 117

1  I object to the form.
2      THE WITNESS: I believe the majority of the
3  studies actually show no relationship between the
4  use of Seroquel, and the majority of these flawed
5  studies show no relationship.
6      Q. (By Ms. Relkin) Based on the way you analyze
7  them and count them in your report, you don't say it
8  explicitly, by doing the math, you hold the opinion
9  that eight out of the 20 studies do show statistically
10  significant increased risk for Seroquel and diabetes,
11  correct?
12     A. Correct. The majority of the studies show no
13  relationship. That leaves 12 out of 20, using these
14  imperfect techniques, show no relationship.
15     Eight out of the 20 show a, draw the
16  conclusion that there is a relationship, but in all of
17  the studies, both the ones that show no relationship
18  and the ones that show a relationship, there are
19  inherent study design problems that don't permit the
20  conclusions to be valid.
21     Q. I know your opinions about the inherent design
22  problems. That's what we have been talking about. I
23  would like, because time is limited, you don't seem to
24  be able to give yes or no answers, I would like to
25  please ask you to do your best to answer the question

30 (Pages 114 to 117)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

## Page 118

1   directly and not add on additional things, because we
2   are going to be here later than we need to.
3       MS. THORPE:  Let me just say, let's don't have
4   lectures and just ask your questions in an
5   appropriate manner and the witness will respond.
6   We have been trying, we have done everything we
7   can.  So if you will just ask a proper question,
8   the witness will answer the question.
9       MS. RELKIN:  He is giving very long answers.
10      Q.  (By Ms. Relkin)  The question was, I don't
11  have the precise wording because a lot of verbiage has
12  transpired, was that, isn't it true that eight out of
13  the 20 studies, you acknowledge, show statistically
14  significant increased risk for Seroquel and diabetes?
15  Recognizing that you have many criticisms of them, they
16  nevertheless show that?
17      A.  They show statistically significant
18  differences in epidemiologically invalid studies.
19      Q.  Go to Page 10 of your declaration, the way you
20  phrase the language in --
21      A.  Of the report?
22      Q.  Page 10 of your declaration, the sworn
23  statement you filed in court.  You state, "There are 20
24  observational epidemiologic studies examining Seroquel
25  and diabetes.  Twelve of these studies bolded below

## Page 119

1   show no statistically significant increased risk for
2   Seroquel and diabetes."
3       Is it a fair reading of that to infer that
4   therefore, eight out of those 20 do show statistically
5   significant increased risk for Seroquel and diabetes?
6       A.  That's correct.
7       Q.  Thank you.
8       The one study, the one out of the 20 studies
9   that does meet your standards is the one by Barner; is
10  that correct?
11      A.  No, it's one study that addresses part of the
12  issue.  And I would like, if we are going to discuss
13  Barner, I would like to have a copy of it.
14      MS. RELKIN:  Let's mark Barner.
15      (Plaintiffs' Exhibit-6 was marked for
16  identification.)
17      (Witness reviewing document.)
18      Q.  (By Ms. Relkin)  We just marked as Exhibit 6 a
19  study by Jamie Barner, Ph.D., et al. entitled Frequency
20  of New Onset Diabetes Mellitus and Use of Antipsychotic
21  Drugs among Central Texas Veterans, and it is the
22  Journal of Pharmacotherapy, 2004; is that right?
23      A.  That's correct.  That's the paper I have in
24  front of me.
25      Q.  This was based on one of those, as you refer

## Page 120

1   to it, as a claims database; is that right?
2       A.  It is a VA database that uses administrative
3   data.
4       Q.  I will get to another study later, but there
5   is another study by Bruce Lambert and others that was
6   also based upon a VA database; is that right?  Are you
7   familiar with that study?
8       A.  I'm familiar with that.  I would want to see
9   it too, but sure.
10      Q.  That's one of the eight that does find a
11  positive association; is that right?
12      A.  I believe so.
13      Q.  So we had at least one VA study that has a
14  positive association, and then this is a VA study that
15  you applaud because it did control for body mass index;
16  is that right?
17      A.  Again, I would not characterize my phrase in
18  referring to it.  I think I said specifically as a
19  threshold issue, all but one of the observational
20  studies failed to properly control for baseline weight
21  or body mass index, and I referred to the Barner
22  article.
23      So I am singling it out as having done
24  something.  I don't think I am either particularly
25  complimentary or non-complimentary.

## Page 121

1       Q.  The language in your declaration to the court
2   says, "The Barner study which controlled for body mass
3   index reported no statistically significant association
4   between Seroquel use and diabetes."
5       Is that right?
6       A.  Which number are you reading from?
7       Q.  I'm sorry, Page 12.
8       (Witness reviewing document.)
9       A.  Yes, you have read that sentence correctly.
10      Q.  Anywhere in this declaration do you explain to
11  the court what the comparators were in this study?
12      A.  Sorry, how were you using comparators?
13      Q.  The study was comparing Seroquel users with
14  who else?
15      A.  Let me refresh myself with the study.
16      Q.  Was there a placebo?  It was not a placebo, it
17  was not a clinical trial, correct?
18      (Witness reviewing document.)
19      A.  This was not a clinical trial.  It was a
20  comparison of those taking the traditional agents
21  versus the atypical.
22      Q.  So it was comparing Seroquel users with those
23  taking the first generation antipsychotics and other
24  second generation antipsychotics, correct?
25      A.  Correct.

31 (Pages 118 to 121)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

## Page 122

1   Q. If in fact the first generation antipsychotics
2   and any of the other second generation antipsychotics
3   contributed to diabetes, would that change the way you
4   view this study?
5       A. I'm not sure of your question.
6       Q. You point out to the court, first you talk
7   about a control, it has this important control that the
8   19 other studies don't, and then you tell the court, it
9   reported no statistically significant association
10  between Seroquel use and diabetes, correct?
11      MS. THORPE: Objection. He read to you. He
12  confirmed the sentence in his report.
13      Q. (By Ms. Relkin) You do not tell the court
14  that the no statistically significant association was
15  as compared to other users of antipsychotic
16  medications?
17      A. I'm not sure what you are claiming that I'm
18  saying to the court. All I'm saying to the court in
19  both the report and in this document is I'm not making
20  any case for the great value of this study. It is just
21  this is the one study that actually controlled for
22  diabetes, and I think that's all I'm saying -- I'm
23  sorry, for BMI in there as they studied the various
24  outcomes measured. And indeed, I say in both the
25  reports, that the ones that show a relationship and

## Page 123

1   that those that don't show a relationship are all
2   flawed.
3       Q. If in fact, Doctor, I know you have not formed
4   any opinions as to any of the other antipsychotics, but
5   if in fact any of the other antipsychotics do
6   contribute to diabetes, wouldn't you agree that the
7   import of comparing Seroquel to other drugs known to
8   increase diabetes would not be a good test of answering
9   the question whether Seroquel causes diabetes?
10      MS. THORPE: Object to form, vague.
11      THE WITNESS: If one looks, it is best to read
12  what the authors think of the objectives of their
13  own study. If you look at the bottom of Page 1530
14  of the article, they list three objectives.
15      One was to determine whether the frequency of
16  new onset diabetes differed between those taking
17  atypical agents and those taking typical agents.
18  And I think part of, what I would intuit from that
19  is that for someone planning to make a, write a
20  prescription or to treat someone, they want to
21  know what the relative risk is of one to the
22  other. So there's reason for them wanting to do
23  that.
24      Q. (By Ms. Relkin) I'll let you get to the other
25  two in a second. But just, I think, to simplify it,

## Page 124

1   that's one of their goals.
2       In terms of the question presented to this
3   court, the question is not the comparative risks of the
4   different antipsychotics, but the general causation
5   question whether Seroquel contributes to diabetes. So
6   that first criteria or question asked by those authors
7   is not the same question that the court is addressing,
8   fair to state?
9       A. I think the three need to be looked at in
10  totality. If you go to the second one, it is to
11  determine whether the frequency of new onset diabetes
12  differed among those taking the different agents,
13  different atypical agents, and then to see what factors
14  influence the occurrence of new onset diabetes. And
15  those factors can include the agent used, which I think
16  addresses the question you just asked or raised.
17      Q. Except if all the agents do it, then how can
18  you compare them?
19      A. Because they are comparing them on relative
20  difference in impact. If they were all exactly the
21  same, then they would all be exactly the same.
22      It is a relative comparison. Would it be
23  better to, in this particular instance, to have a
24  different type of design? Sure. It is the reason
25  Barner is in here.

## Page 125

1       I didn't cherrypick the articles that we put
2   in this section that I criticized methodologically.
3   Barner is one of the articles I included in this
4   section of articles that I critique. Indeed, if we
5   went one by one through the other 19 articles, we would
6   find similar comparisons in the ones that purport to
7   show a relationship.
8       Q. You would agree that, as Barner was designed,
9   it would not answer the question whether Seroquel
10  causes diabetes compared to placebo or no other drug?
11      A. I think it would be difficult for the study to
12  show a causal relationship.
13      Q. So when you told the court that the Barner
14  study which controlled for body mass index reported no
15  statistically significant association between Seroquel
16  use and diabetes, you would agree that that sentence in
17  isolation does not explain that, you wouldn't expect
18  Barner to ever be able to do that as compared to no
19  other drug?
20      MS. THORPE: Object to form.
21      THE WITNESS: No, I disagree with your
22  statement and your implication. I state exactly
23  what is the case. And whether it stands alone or
24  it is in the body of context with other things, it
25  is absolutely correct and again raises the issue

32  (Pages 122 to 125)