EXHIBIT 26

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| IN RE: SEROQUEL PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>**ALL CASES** | MDL DOCKET NO.<br><br>6:06-MDL-1769-ACC-DAB |

## DECLARATION OF LAURA M. PLUNKETT, Ph.D., DABT

1.　　My name is Laura M. Plunkett. I am competent to make this declaration, and the facts stated herein are within my personal knowledge and are true and correct.

2.　　I am a pharmacologist, toxicologist, United States Food and Drug Administration ("FDA") Regulatory Specialist and principal of a consulting company known as Integrative Biostrategies, L.L.C. Based in Houston, Texas, Integrative Biostrategies is a consulting firm that works at the interface of biological science, regulatory affairs, and business decisions to provide its clients with science-based solutions to issues associated with product development and stewardship. Before joining Integrative Biostrategies in 2001, I was head of the consulting firm known as Plunkett & Associates.

3.　　I am board certified as a Diplomat of the American Board of Toxicology. I am a member of several professional organizations and have authored or coauthored numerous scientific publications. I have over 20 years of experience in the areas of pharmacology and toxicology and have worked in both government and academic research. I have taught pharmacology and toxicology at the undergraduate and postgraduate levels.

1

4.      I received a B.S. degree in 1980 from the University of Georgia and a Ph.D. in pharmacology from the University of Georgia, College of Pharmacy, in 1984. My doctoral research was focused in the area of cardiovascular pharmacology and specifically dealt with delineating neurochemical mechanisms responsible for the cardiac toxicity of digitalis glycosides.

5.      From June 1984 through August 1986 I was a Pharmacology Research Associate Training (PRAT) fellow at the National Institute of General Medical Sciences, Bethesda, Maryland. I worked in a neurosciences laboratory at the National Institute of Mental Health. My research focused on the role of various brain neurochemical systems involved in the control of autonomic nervous system and cardiovascular function.

6.      From September 1986 to June 1989, I was an Assistant Professor of Pharmacology and Toxicology in the medical school at the University of Arkansas for Medical Sciences, Little Rock, Arkansas where I performed basic research in the areas of neuropharmacology and toxicology as well as cardiovascular pharmacology and toxicology. I taught courses for both medical students and graduates students in pharmacology and toxicology as well as the neurosciences. During this time I studied drugs of all classes that affect brain function, including antipsychotic drugs. As a pharmacologist, my work was directed towards understanding the biologic mechanisms of drug actions.

7.      From December of 1989 to August 1997, I worked for ENVIRON Corporation, first in the Arlington, Virginia office and then in the Houston, Texas office. I worked specifically with the health sciences group and most of my projects dealt with issues surrounding products or processes regulated by the FDA. During my consulting career

2

(ENVIRON, Plunkett & Associates, and Integrative Biostrategies), I have worked on a variety of projects dealing with the regulation of products by the FDA including human drugs, veterinary drugs, biologics, medical devices, consumer products, dietary supplements and foods. I have advised my clients on regulatory issues and strategies for their products (relating to both Canadian and American regulations), designed preclinical and clinical studies for both efficacy and safety, advised clients on issues related to statements regarding efficacy and warnings for their products based on current labeling regulations and generally acted as a regulatory affairs staff for small companies in early stages of product development. A tool common to all my work as a consultant would be risk assessment, including many projects where risks and benefits of human therapeutics were at issue. I have attached hereto a copy of my curriculum vitae and the expert report I prepared for the Plaintiffs in this litigation, which are attached hereto as Exhibits A and B respectively, and incorporated by reference herein.

8.    In my regulatory affairs experience and work with prescription drugs, as well as through my knowledge, skill, training, and experience as a pharmacologist, I am knowledgeable about the "warning" standard established in 21 C.F.R. § 201.57(e). That section requires that drug warnings "shall describe serious adverse reactions and potential safety hazards, limitations in use imposed by them, and steps that should have been taken if they occur." Importantly, "labeling shall be revised to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved." I am also knowledgeable of the fact that, by law, a prescription

3

drug "label" includes promotional and marketing materials associated with the drug as well as the "package insert" accompanying the drug's packaging.

9.      Based on my knowledge, skill, training, and experience as a pharmacologist and toxicologist and in working with prescription drugs, I am further able to assess the risks associated with a particular drug and, in particular, identify whether the standard "reasonable association of a serious hazard with a drug" is consistent with information related to drug risks and hazards that was known or should have been known by the drug manufacturer. After my review and analysis of AstraZeneca company documents, as well as based on my review of peer-reviewed medical literature pertinent to Seroquel and other antipsychotics, I have formed the following opinions with respect to the adequacy—specifically the accuracy, clarity, and unambiguousness—of Seroquel's labeling from 1999 to present, premised on whether AstraZeneca provided a warning "as soon as there [was] reasonable evidence of an association of a serious hazard" with Seroquel.

10.     Regarding the label/package insert accompanying Seroquel from 1999 to the present, studies that I have reviewed reveal that weight gain has long been identified as a serious side effect of anti-psychotic drugs. However, it has also been recognized more recently, according to the pertinent medical literature, that there appear to be differences among the various anti-psychotic drugs in terms of their propensity for inducing weight gain. When considered as a whole in a weight-of-the-evidence assessment, the available scientific data indicate that Seroquel can cause serious health effects that pose a risk to a person's health, such as weight gain. Further, my review of AstraZeneca's own documents revealed that the company was aware of the propensity for Seroquel to cause rapid, clinically

4

significant weight gain.  For example, 1997 internal correspondence that I have reviewed show that the company's "Study 15" indicated that weight gain was "rapid," "consistent," "clinically significant," "dose related," and "doesn't stop" during Seroquel treatment. Additionally, by 1999, Dr. Joyce Small, who conducted the company's "Trial 8" for Seroquel, wrote that because the second generation antipsychotics clozapine, olanzapine, and quetiapine "cause the most weight, these drugs may be most likely to induce diabetes." By 2000, AstraZeneca's Global Drug Safety Physician had stated in a company "Safety Position Paper" that there was "reasonable evidence" to suggest that Seroquel "can cause" diabetes, as Dr. Small predicted would result by Seroquel causing clinically significant weight gain. The above constitutes reasonable evidence of an association of a serious hazard with Seroquel.

11.     It is my opinion, therefore, that the 1999-present label/package insert with respect to weight gain is inaccurate, unclear, and ambiguous because the so-called "warning" of weight gain is not contained under the "Warnings" section of the label, but appears much further into the body of the label/package insert in the "Adverse Reactions" section—literally dozens of paragraphs after the "Warnings" section, which is near the top of the label.  The weight gain information also fails to describe any of the serious, potentially life threatening side effects associated with weight gain—namely diabetes mellitus and hyperglycemia—of which AstraZeneca was aware.  Because there existed reasonable evidence of an association with Seroquel and weight gain, and the company did not revise the label to clearly, accurately, and unambiguously describe that risk as soon as the company became aware of the association, the warning is therefore inadequate.

5

12.     Moreover, the promotional and marketing materials utilized by the company with regard to weight gain also constituted "label" information that were unclear, inaccurate, and ambiguous in part because they directly contradicted the information contained, for example, in the adverse reactions section of the package insert. For example, the materials that I have reviewed, including Dr. Brecher's 2000 article and Dr. Nasrallah's 2002 article, informed doctors that Seroquel did not cause weight gain or that Seroquel had a favorable weight profile.   A handout discussing Dr. Reinstein's experiences with Seroquel in his patients, which I have reviewed, suggested that weight loss along with improvement of diabetes was a beneficial side effect of Seroquel. AstraZeneca has also repeatedly stated in sponsored literature and marketing material that I reviewed (such as the Nasrallah and Brecher articles) that there is not a dose-dependent relationship between Seroquel and weight gain. I have also reviewed other sales and marketing "messages" or "themes" that were used by AstraZeneca salespersons in direct contact with physicians during this same time period. Those "messages" or "themes" included claims that Seroquel is "weight neutral," or causes "minimal weight gain" or has a "favorable weight profile." The sales messages contradicted what AstraZeneca knew to be true about Seroquel and weight gain, but also ran counter to Seroquel's own Adverse Reactions section of the label/package insert, which showed (and still shows) that 23% of Seroquel users will experience clinically significant weight gain. For those additional reasons, Seroquel's "label" information regarding "weight gain"— including the package insert and all sales and marketing materials—are inadequate because they are inaccurate, unclear, and ambiguous with respect to warning about weight gain.

6

13.     Regarding the label/package insert accompanying Seroquel from 1999 to 2004 concerning hyperglycemia and diabetes mellitus, studies that I have reviewed reveal that, when considered as a whole in a weight-of-the-evidence assessment, the available scientific data indicate that Seroquel can cause serious metabolic effects that adversely impact health including diabetes and hyperglycemia, effects that can even become life-threatening if not treated. Further, my review of AstraZeneca's own documents reveals that the company was aware of an association with Seroquel and hyperglycemia/diabetes since at least 1999, when Dr. Small recognized after Trial 8 that Seroquel and two other antipsychotic drugs caused the most weight gain and also were likely to cause diabetes. In 2000, as noted above, the company's Global Drug Safety Physician concluded that Seroquel can cause impaired glucose dysregulation including diabetes. In addition, by November 2002, the Japanese government had evidently reached a similar conclusion, requiring that AstraZeneca send a "Dear Doctor" letter to Seroquel prescribers informing them of the increased risk of diabetes and related complications and mandating that (a) Seroquel not be administered to patients with a history of diabetes; (b) patients treated with Seroquel be monitored carefully including measurement of blood glucose levels; and (c) information regarding the severe adverse reactions that may occur, including diabetic ketoacidosis and diabetic coma, must be fully explained to the patient and family. The above constitutes reasonable evidence of an association of a serious hazard with Seroquel.

14.     It is my opinion, therefore, that the 1999-2004 label/package insert with respect to hyperglycemia/diabetes is inaccurate, unclear, and ambiguous because the so-called "warning" of diabetes and hyperglycemia is not contained under the "Warnings"

section of the label, but appears (again) in the "Adverse Reactions" section of the label/package insert. That section mentions the words "diabetes" and "hyperglycemia" once, and classifies those reactions as "infrequent." The diabetes and hyperglycemia risk is also distorted by the fact that "hypoglycemia" and "weight loss" are also listed as infrequently occurring adverse reactions. As the manufacturer of Seroquel, AstraZeneca was under a duty to revise the label as soon as there was reasonable evidence of an association with the serious health hazards of hyperglycemia and diabetes. Because there existed reasonable evidence of an association with Seroquel and hyperglycemia and diabetes, and the company did not revise the label to clearly, accurately, and unambiguously describe that risk as soon as the company became aware of the association, the warning is therefore inadequate.

15.     Moreover, the promotional and marketing materials utilized by the company with regard to Seroquel and hyperglycemia and diabetes risks during this period also constitute "label" information that was unclear, inaccurate, and ambiguous because it too downplayed the severity of the risk of hyperglycemia and diabetes associated with Seroquel treatment. For example, a study by Dr. Reinstein that was shown to, distributed to, and/or discussed with Seroquel prescribers, the integrity of which has since been discredited, implies that Seroquel patients lost weight and their diabetes was cured after taking Seroquel for ten weeks. For those additional reasons, Seroquel's "label" information regarding hyperglycemia and diabetes—including the package insert and all sales and marketing materials—are inadequate because they are inaccurate, unclear, and ambiguous.

16.     Regarding the label/package insert accompanying Seroquel from 2004 to 2007 concerning hyperglycemia and diabetes mellitus (the so-called "class warning"), studies that

8

I have reviewed reveal that, when considered as a whole in a weight-of-the-evidence assessment, the available scientific data indicate that Seroquel's effect on weight gain and blood glucose levels differed from some other members of the class of second generation anti-psychotics. Further, the class warning does not describe accurately or clearly the rate and severity of hyperglycemia and diabetes risk associated with Seroquel uniquely, as opposed to other second generation anti-psychotics generally. For example, studies and medical literature that I have reviewed indicate that Abilify and Geodon, two of Seroquel's competitors, are not associated with statistically significant weight gain or hyperglycemia/diabetes to the critical degree that Seroquel has such an association.

17. The warning contained on the 2004-2007 label simply states that hyperglycemia and diabetes "has been reported." The warning is also qualified by statements that elevations in the rates of occurrence of hyperglycemia/diabetes in the schizophrenic or general populations may be confounding factors. In addition, AstraZeneca documents that I have reviewed show the company was aware of this risk long before and during this time period. For example, before and during that time, other international regulatory bodies were requiring specific changes to Seroquel's product labeling related to risks of hyperglycemia and diabetes, but not to anti-psychotics generally—*e.g.*, the Japanese "Dear Doctor" letter. Additionally, in 2005, permission to market Seroquel in France was denied due in part to the risk of hyperglycemia and diabetes associated specifically with Seroquel, again not anti-psychotics in general. Because there existed reasonable evidence of an association with Seroquel and hyperglycemia/diabetes, and the company did not revise the label to clearly,

9

accurately, and unambiguously describe that risk as soon as the company became aware of the association, the warning is therefore inadequate.

18.    Additionally, the marketing and promotional materials utilized by the company with regard to Seroquel and hyperglycemia and diabetes risks during this time also constitute "label" information that was unclear, inaccurate, and ambiguous because it minimized the severity and frequency of the risk of hyperglycemia and diabetes associated with Seroquel treatment.  For example, I have reviewed AstraZeneca documents evidencing that the Reinstein study and the Brecher article were still being disseminated during this time period.  In 2006, the FDA Division of Drug Marketing, Advertising, and Communications (FDA DDMAC) admonished the company because it had not satisfactorily disclosed information concerning hyperglycemia and diabetes risks—in accord with the then, current "class warning"—causing the FDA DDMAC to determine that the promotional materials were "misleading" and "undermined the warning."  For those additional reasons, Seroquel's "label" information regarding hyperglycemia and diabetes—including the package insert and all sales and marketing materials—are inadequate because they are inaccurate, unclear, and ambiguous.

19.    Regarding the label that now accompanies Seroquel, that label (which was revised in or about October 2007) still fails to accurately, clearly, and unambiguously warn of Seroquel's dangers relative to diabetes.  Following the cross-reference contained in the "Warnings" section to the "Adverse Reactions" reactions section, one sees that "diabetes" is never mentioned in the Adverse Reactions section.  However, the data contained in that section shows that, in two long-term clinical trials, Seroquel users exhibited diabetes-level

hyperglycemia more than two times as often as subjects taking placebo. The fact that the Warnings section itself does not mention the disturbing rate with which Seroquel is associated with diabetes renders the warning patently unclear, inaccurate, and ambiguous.

20.    The shortcomings of the Warnings section are exacerbated by the Adverse Reaction section's characterization of diabetes-level hyperglycemia as merely "hyperglycemia" and "increased blood sugar." (Fasting blood glucose $\geq$ 126/mg/dl or non-fasting blood glucose $\geq$ 200/mg/dl, as identified in the Adverse Reactions section, is diabetes, not merely "hyperglycemia," according to my knowledge, training, and review of the medical literature identified in my report.). Furthermore, I have reviewed an AstraZeneca internal document in which Seroquel's risk of diabetes-level blood glucose dysregulation is characterized as "common." Because there exists reasonable evidence of an association with Seroquel and diabetes, yet the company failed to revise the label to state the risk of "diabetes" rather than simply "hyperglycemia," the company did not revise the label as required, and it is therefore inaccurate, unclear, and ambiguous.

21.    I have reviewed June 2008 FDA correspondence to AstraZeneca regarding the 2007 label indicating that the FDA also deems the current label inadequate. The FDA has requested that AstraZeneca modify the information in the Adverse Reactions section to explain potential design limitations in the studies from which the data mentioned in the above paragraph was drawn. The FDA states that the more than two-fold increase in Seroquel patients contracting diabetes over placebo patients in the studies should be clarified by linking the same to "[t]he mean change in glucose from baseline," which "was +5.0 mg/dl for SEROQUEL and -0.05 mg/dl for placebo," a more than five-times greater increase. The

11

FDA also requested that AstraZeneca state that the blood glucose data may be "underestimated" because of the fact that the studies pre-screened participants who could not tolerate Seroquel (including, for example, because of high blood glucose readings) in the open-label phase prior to randomization, effectively dropping those intolerant participants from the studies, and skewing the results in AstraZeneca's favor. After reviewing the current package insert on the Seroquel.com website at the time of executing this Declaration, AstraZeneca has still not adhered to the FDA's request to change the current label as described. For those additional reasons, Seroquel's current label is inadequate because it inaccurately, unclearly, and ambiguously states the risk of diabetes with Seroquel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __21st__ day of November, 2008.

Laura M. Plunkett, Ph.D., DABT