UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: SEROQUEL PRODUCTS
LIABILITY LITIGATION

This document relates to:

LINDA GUINN, JANICE BURNS,
CONNIE CURLEY

MDL DOCKET NO.

6:06-MDL-1769-ACC-DAB

## DECLARATION OF JENNIFER MARKS, M.D.

1.      My name is Jennifer Marks, M.D.  I am competent to make this declaration and the facts stated herein are within my personal knowledge and are true and correct.

2.      I am a physician licensed in the state of Florida to practice Medicine.  I graduated with a BS in Nursing from the University of Southern Maine, and subsequently an MD from the University of Miami School of Medicine.  I completed an Internship and Residency in Medicine, and a Fellowship in Endocrinology, Diabetes, and Metabolism at the University of Miami School of Medicine.  I am certified by the American Board of Internal Medicine in the specialty of Internal Medicine, and in the subspecialty of Endocrinology, Diabetes, and Metabolism.

3.      Since 1990 I have been on the faculty of the University of Miami School of Medicine in the Department of Medicine, Division of Endocrinology, Diabetes, and Metabolism.  I am currently Professor of Medicine, and am involved in medical research, provision of patient care, and training and supervision of medical students, residents and fellows.  I was until recently Interim Chief of the Division of Endocrinology, Diabetes, and

Metabolism for nearly four years, as well as Chief of the Section of Endocrinology, Diabetes, and Metabolism at the Miami VA Medical Center for eight years, where I am also Medical Director of the Diabetes Management Program.   Since 2006, I have been the Program Director, J.M. McKenzie Fellowship Training Program in Endocrinology, Diabetes, and Metabolism.

4.    I am the immediate past-Editor-in-Chief of *Clinical Diabetes*, a publication of the American Diabetes Association (ADA) and am familiar with the peer-reviewed medical and scientific literature pertaining to the causes, care and treatment of diabetes.

5.    . I have served as a professional volunteer for the American Diabetes Association for a number of years in many capacities.  I am a previous President of the Florida and South Coastal ADA Chapters, and current President of the Miami-Dade County ADA Leadership Board.  Since the mid-1990s I have served on the planning committees, and/or as Chair or Co-Chair, of the Southern Regional and Miami Health Professionals Annual Conferences on Diabetes.  I am a Fellow of the American College of Physicians.

6.    I have had continuous diabetes research funding from the National Institutes of Health since 1993, and through a VA Cooperative Studies funding mechanism since 2000. Over the past 10 years I have given some 30 invited lectures nationally and internationally and published over 30 peer-reviewed publications in the area of diabetes and metabolic syndrome and related conditions.

7.    My clinical practice involves the daily evaluation, diagnosis and treatment of patients with metabolic disorders and diseases including diabetes and glucose intolerance which involves not only my evaluation of the patient but also my review of their medical

2

records from other physicians and healthcare providers, results of lab and other diagnostic testing, review of relevant medical and scientific literature and any other relevant materials, synthesis of all of this data and formulation of opinions regarding the various facets of the patient's metabolic disease, including but not limited to risk factors, cause(s), treatments and prognosis. From time to time I am consulted by other physicians and patients for second opinions or evaluations of patients and/or records of patients with known or suspected diabetes and other metabolic abnormalities. Not all such consultations or requests involve my personal examination or interview of the patient. When performing consultations or evaluations such as these, my practice routinely includes reviewing relevant data which may include medical records, notes regarding medical histories and physical exams performed by physicians and healthcare providers, weights, lab and other diagnostic test results, and records reflecting what treatment the patient has received.  My practice also includes the research and analysis of available peer-reviewed published literature and any other documents I determine are relevant to my consultation or evaluation. Then, utilizing my education, training and experience, I formulate opinions regarding the patient's medical condition and related issues. This is the same methodology I utilized in formulating my opinions regarding Janice Burns, Connie Curley and Linda Guinn and is a method well accepted by the medical community and utilized internationally by physicians and healthcare providers.

8.     My current curriculum vitae and the reports I submitted to counsel for Plaintiffs in this litigation are attached and incorporated herein by reference.

3

9.      I was initially provided medical records on these Plaintiffs with the understanding that discovery was ongoing and supplemental records would be provided, and were. As stated in my initial reports on Janice Burns, Connie Curley and Linda Guinn, "I reserve the right to supplement my opinions as new information is available." In formulating my initial opinions regarding these individuals, I reviewed medical records provided to me, performed a literature search and review, reviewed documents produced by AstraZeneca in this litigation, and wrote a report stating opinions I had formed based on my review of these materials. Subsequent to that time, including at my depositions regarding these Plaintiffs, additional medical records have been provided to me which have included new data regarding Plaintiffs' weights and blood sugars, their use of Seroquel and the diagnosis of diabetes. The additional records produced do not substantially alter my conclusions as stated in my original reports but do provided relevant data such that I am supplementing my opinions as stated below which are stated to a reasonable degree of medical certainty.

10.     The issue or pre-existing diabetes was raised multiple times in my depositions of these Plaintiffs. It is important, given the distinction between fasting and non-fasting glucose results and their impact on a true diagnosis of diabetes, not to misuse nonfasting data or data where it is not known whether it is fasting or nonfasting in making a diagnosis of diabetes. Further, one cannot assume as the attorney for AstraZeneca did in the deposition that just because a glucose level was drawn in the morning that it was a fasting glucose. I stated such in my deposition on page 76 "I don't think you would rely upon it as a diagnostic test unless you were sure" (that it was fasting). Patients often drink liquids that could impact glucose levels and still consider themselves "fasting" because they did not consume solid

4

food, which could cause misdiagnosis of glucose intolerance or diabetes. Also, as I stated on page 72 and 73 of my 10-6-08 deposition there is some variation in glucose levels on a day to day basis and there are other factors such as stress, hospitalization, other medications such as steroids, intravenous infusions containing glucose, fever and surgery to name a few that can impact glucose levels. Thus, it is important to understand the circumstances under which a glucose level is drawn before making a diagnosis of diabetes just because the level is elevated.

11.   In the Janice Burns case, Defense showed me several blood sugars drawn in 1994 over several days that were elevated and asserted that was sufficient to diagnose diabetes. On page 73 of my 10-6-08 deposition I stated "Well, she is in the hospital at this time, likely under stress for some reason, she is admitted under the name of a general surgeon, I don't know what the circumstances were around her admission at this time. She could have had an intervenous line running in with glucose in it; she could have had a fever; she could have had surgery, all stresses that could cause hyperglycemia." Defendants also inquired about other glucose levels in July of 2000 when she had a reading of 200, suggesting that was diagnostic of diabetes. Mrs. Burns was in the hospital at that time being treated for a pulmonary condition and was receiving steroids, which are known to cause hyperglycemia. Dr. Brian Phemester noted in the records on 7-31-00 "Glucose was elevated at 200, but she was on steroids at that moment" acknowledging the impact steroids can have on a patient's glucose levels. Of note is that Dr. Phemester did not diagnose Ms. Burns with diabetes at this time nor did any other healthcare provider make that diagnosis until after she had ingested Seroquel. On page 98 of my deposition I stated "I don't think we have

5

documentation prior to her being diagnosed that she clearly had diabetes." I hold that opinion today. Ms. Burns started Seroquel in June 2002 with dosing of 600 mg per day. In April 2003 Dr. Michael Reed documents a 30 lb weight gain over the past 4 months. Weight gain of this magnitude subsequent to Seroquel ingestion is consistent with a published, biologically plausible mechanism of how this drug causes diabetes. As stated in my deposition of 10-7-08, it is my opinion that Seroquel causes weight gain (pg 289) and that the peer-reviewed literature supports that opinion. In August 2003, Ms. Burns was diagnosed with diabetes and has been treated with oral agents and insulin. Thus, based on the temporal association of Seroquel ingestion prior to the diagnosis of diabetes, the 30 lb weight gain over a short period of time, and the consistency of Ms. Burns' presentation with patients reported in the literature who demonstrated a similar clinical picture, and that her risk factor profile remained stable until the addition of Seroquel, I conclude that but for her ingestion of Seroquel, Ms. Burns would not have developed a clear diagnosis of diabetes when she did in August 2003.

12.    Glucose levels drawn from Linda Guinn were shown to me at the deposition that could be consistent with a pre-diabetic state if those glucose levels were in fact drawn while the patient was fasting. As I stated in my deposition, pre-diabetes is not a diagnosis of diabetes. It is a risk factor for developing diabetes and I would add it to Ms. Guinn's risk factor profile, but it does not confirm that she was diabetic at that time prior to ingestion of Seroquel. As stated several times in my deposition 10-7-08 regarding whether or not she had diabetes prior to Seroquel use, "Based on the data that we have there is no evidence that she had it." "I don't believe that there is evidence that she had diabetes before she started

Seroquel." (pg 329) Regarding glucose levels that were elevated during a hospitalization at the time she began Seroquel, given that the stress of hospitalization itself can cause hyperglycemia I would not make the diagnosis of diabetes based on those levels, nor did the treating healthcare providers. Records support a weight gain of 38 lb (160 lb on April 29, 2003, 3 days prior to starting Seroquel and 198 lb at the time of diagnosis in February 2006), again demonstrating a biologically plausible mechanism whereby Seroquel can cause diabetes, and a clinical presentation consistent with patients reported in the peer-reviewed published literature who ingested Seroquel and subsequently developed diabetes. As such and as stated in my report previously provided, I reaffirm "my opinion based on reasonable medical probability that Seroquel was a cause of her diabetes, requiring treatment with multiple medications."

13.    Regarding Connie Curley, I stated in my deposition that she had "fairly mild risk factors and then she began to gain weight, and in a relatively short period of time had frankly elevated blood glucoses" which support my opinion that Seroquel was a cause of her diabetes. Supplemental records support my opinions. She weighed 144 lb at the time she started Seroquel in January 2003. During the time she was on Seroquel there was some fluctuation in her weights, though overall she demonstrated a pattern of weight gain between the time she began Seroquel and the time she was diagnosed with diabetes. As I testified in my deposition there is some evidence that you can develop diabetes on medications such as Seroquel without weight gain because some people develop the diabetes within a short period of time after being started on those medications before they would have time to gain

considerable weight. Thus, her weight pattern is supportive of Seroquel's contribution to her developing diabetes. Ms. Curley had multiple normal glucose levels prior to Seroquel with a normal glucose of 96 and a Hemoglobin A1C of 5.1 in February 2000. The one elevated glucose level prior to Seroquel of 133 on 1-20-00 would be elevated if fasting but normal if non-fasting and it is unclear which it was.  However it is noteworthy that no physician diagnosed her with diabetes or ordered repeat testing based on this one lab value and she did evidence normal sugars and Hemoglobin A1C after that date and prior to Seroquel which would support that she was not diabetic prior to Seroquel exposure.

14.      Each of these Plaintiffs have risk factors for developing diabetes yet had reasonably stable risk factor profiles and no diagnosis of diabetes until Seroquel was added to their regimen. Given individual susceptibilities, comorbid conditions, circumstances of physical and emotional health prior to and during ingestion of Seroquel, it is not possible or practical to quantify the  risk of each risk factor in each individual plaintiff. While there are studies that look at quantification of risk factors using epidemiologic principles, the overall conclusions of such studies do not lend themselves with precision to single individuals given the variables described above.

15.      Regarding the issue of dosage, as I stated in my deposition Martin Brecher's, peer-reviewed paper reporting analysis of data from AstraZeneca clinical trials reports weight gain with all doses of Seroquel and concludes that "long-term treatment with quetiapine monotherapy is associated with moderate weight gain."

16.      Based on my review of the additional information provided to me at and since the time of my deposition,  the totality of the evidence including the temporal association of

8

ingestion of Seroquel with the onset of diabetes, a stable risk factor profile without the diagnosis of diabetes prior to use of Seroquel, clinical evidence of a pattern of overall weight gain while on Seroquel prior to diagnosis of diabetes, which is a biologically plausible mechanism reported in the peer-reviewed literature whereby Seroquel can cause diabetes, evidence of a significantly increased risk of diabetes as a result of Seroquel ingestion reported in the peer-reviewed literature, and the consistency in the clinical presentations of these individuals compared with those of patients in literature and clinical trials, it is my opinion that the ingestion of Seroquel by Janice Burns, Connie Curley and Linda Guinn was a substantial contributing factor in their developing diabetes.

17.          I declare under penalty of perjury that the foregoing is true and correct.


Executed on this the 24th day of November, 2008.



Jennifer Marks, MD
Jennifer Marks, M.D.

9