# EXHIBIT 9

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JANICE BURNS,

    Plaintiff,

        CASE NO.: 6:07-cv-15959

v.

ASTRAZENECA LP, et al.,

    Defendant.

    /

DEPOSITION OF:    Dr. Laura Yauch

AT THE INSTANCE OF:    The Plaintiff

DATE:    June 11, 2008

TIME:    9:00 a.m. - 11:58 a.m.

PLACE:    Best Western Suites
    1035 East 23rd Street
    Panama City, Florida 32405

REPORTED BY:    Gertrude B. Downs, FPR

Gulf Bay Reporting

P.O. Box 2131

Panama City, Florida 32402

(850) 769-4853

1-800-761-4853

### Page 18

A. I don't know if she filled it out prior to coming to our office for the first day or at the date of the first visit.

Q. Okay. And under medical history, and this is prepared by her, and this was a type of form typical in a doctor's office initial visit, hand the forms to the patient before you see them, and they fill these out.

A. That's correct.

Q. Okay. And under medical problems there's diabetes-diabetic neuropathy --

A. Yes.

Q. -- is that correct? And she's self-reported diabetes on the health history.

A. That's correct.

Q. Okay. Now, the notes I have are not exactly -- and we're working back in time, but there appears to be a May 16th, 2008, Sacred Heart Hospital lab report.

A. That is correct.

Q. And under the metabolic panel there's a glucose reading there. What is that glucose reading?

A. That glucose reading is 100.

Q. Is that a fasting glucose?

A. Yes, this is a fasting glucose. It was requested -- well, let me, let me step back. This

### Page 19

panel was obtained when she came in for a visit that she initiated. It was in the morning. We obtained these records, this information, because she had not done the previous fasting request. So as a matter of fact, I'm not sure that this is fasting or not.

Q. Okay. Now, on the third page of this lab -- lab report, a specimen was collected on May 16th, 2008, at 11:55?

A. Okay.

Q. There is a hemoglobin of A1C. Would you explain to the jury what a, what that test is for?

A. Hemoglobin A1C is a reflection of your blood sugar control over the past two to three months.

Q. And how is that important? Why would you order that?

A. You order that because you want to know if the diabetic is controlled or uncontrolled.

Q. And the test results for the sample collected on May 16th, 2008, what was that?

A. Seven point six.

Q. And how did, how do you read that?

A. That indicates that she is not well controlled.

Q. It's high?

A. It is high.

### Page 20

Q. By the way, Miss Yauch, does she receive treatments for asthma?

A. She's self reported asthma (inaudible). She has medications that are on her medication list as asthma, so that would indicate that she can self treat as she needs to.

Q. Does that include Prednisone?

A. That can include Prednisone for exacerbations if required.

Q. All right. Let's go to the office progress note, and this is for the May 16th, 2008. Is this your -- your notes from that particular visit?

A. Yes, it is.

MR. SNELL: Objection, I think you mean May 15th.

MR. DEXTER: May -- May 16th, 2008.

MR. SNELL: Can we just go off the record for a second?

VIDEOGRAPHER: Off the record, 9:30.

(Off the record.)

VIDEOGRAPHER: Back on record, 9:31.

Q. (By Mr. Dexter) Now, I referred you to May 16th, 2008. That's actually the latter office visit.

A. That's the second visit I saw her, yes.

### Page 21

Q. Second visit you saw her. And what was the, what were the chief complaints at that office visit?

A. She came in at that point because she was concerned about an area on her toe, but also on the patient agenda she was concerned about getting prescriptions for antibiotics and steroids for exacerbations of her COPD and asthma. She had a list of medications she was requesting to be refilled. She had a history and a concern about labs for poor renal function, which a previous doctor had discussed with her that she was concerned about as well.

Q. Do you know the name of the previous doctor?

A. Dr. Randles.

Q. Randles. And was there a reason that she was seeing you rather than Dr. Randles?

A. Doctor Randles I do not believe is practicing anymore.

Q. Okay. In the state of Florida?

A. I do not know where he is licensed to practice.

Q. So she was seeing you the time before this for the initial visit, moving from Dr. Randles to you?

A. That is my understanding, yes.

Q. And was that within the same Sacred Heart medical group?

22

1   A. No, sir.
2   Q. Oh, what -- what --
3   A. Dr. Randles is an independent physician.
4   Q. He was an independent physician. She moved to
5   the Sacred Heart medical group after seeing Dr.
6   Randles.
7   A. I believe so.
8   Q. Let's get back to the chief complaints. First
9   was her big toe, and then she wanted to test, her renal
10  function tested.
11  A. Uh-huh.
12  Q. Did you -- did you -- did you do that?
13  A. Yes, sir, those were the labs you brought to
14  attention previously.
15  Q. Okay. What -- what was your interpretation of
16  those labs with regard to her renal function?
17  A. The labs regarding her renal function on this
18  single test appear to be normal.
19  Q. Okay. Now, you noted that she, she's never
20  seen a podiatrist with regard to her toe injury.
21  A. By her report. That's correct.
22  Q. Okay. And what was the -- the -- the
23  significance of her toe injury?
24  A. She had an open wound on her greet toe, which
25  with diabetics can be infected. And she reported it

23

1   had been there I believe seven months. That there was
2   some unclarity on her part as far as how long it had
3   actually been there.
4   Q. What did the -- was the extent of the wounds?
5   A. One point five centimeter area pressure
6   injury.
7   Q. Was it draining?
8   A. It was oozing. It was not frankly draining.
9   Q. Is it fairly typical of an advanced wound with
10  someone with diabetes?
11       MR. SNELL: Objection, foundation.
12  Q. (By Mr. Dexter) Go ahead.
13  A. It was a pressure wound. I don't know how
14  advanced it was. I did not do further workup. I did
15  refer her for evaluation.
16  Q. And I also noted that there's concern that if
17  left untreated or not resolved that it could result in
18  an amputation?
19  A. That is --
20       MR. SNELL: Objection, leading.
21  A. What I have in my note is that if it was
22  untreated, concerns for non-healing wounds, postibly,
23  possibly osteomyelitis requiring amputation, et cetera,
24  and it would be in her best interest to deal with this
25  now rather than to wait.

24

1   Q. What is osteomyelitis?
2   A. Osteomyelitis is infection of the bone.
3   Q. And a nephrologist, do you, did you refer her
4   to a nephrologist?
5   A. No, sir, at this visit I did not. We
6   requested the laboratory values first.
7   Q. Okay. Now, under physical examination you
8   noted that she had a 99.2 temperature? Is that fairly
9   typical of someone who has an infection?
10  A. That can reflect somebody having something hot
11  to drink, smoking a cigarette, being hot outside, so
12  that's not necessarily reflective of an infection.
13  Q. Now, under the neurologic examination, if you
14  could read that for the record.
15  A. Decreased proprioception and touch sensation
16  with monofilament on both feet involving the entire
17  plantar area.
18  Q. If you would, explain what that means to the
19  jury.
20  A. She has decreased sensation to movement and to
21  touch as well as monofilament, which is a way to
22  document how sensitive you are on her feet.
23  Q. Is -- is that what we call a neuo -- neurop --
24  neuropathy?
25       MR. SNELL: Objection, leading.

25

1   Q. (By Mr. Dexter) Go ahead and answer it.
2   A. It can be associated with neuropathy.
3   Q. Okay.
4   A. It can also be associated with spinal cord
5   problems and other issues, however.
6   Q. And what is your assessment?
7   A. I'm sorry, I need clarification.
8   Q. What's your assessment at, that's recorded at
9   the end of this visit?
10  A. The assessment on this note is Type II
11  diabetes where she'd still not gotten her labs -- and
12  that was left out in the, in the transcription on
13  this -- diabetic neuropathy, hypertension, prior
14  congestive heart failure, chronic obstructive pulmonary
15  disease, hyperthyroidism, issues with frequent history
16  of pneumonia and bronchitis, insomnia, major
17  depression, post traumatic stress and issues with prior
18  abnormal renal function.
19  Q. And what was your plan?
20  A. The plan initially was to get her to see a
21  specialist for her foot, and an appointment was
22  arranged while she was there for Monday. I'm afraid I
23  don't know what day of the week this was. She was to
24  say start an antibiotic for her toe. We did refill
25  medications. She was to have antibiotics and on

Page 25

1  Q. (By Mr. Dexter) Go ahead and answer it.
2  A. It can be associated with neuropathy.
3  Q. Okay.
4  A. It can also be associated with spinal cord
5  problems and other issues, however.
6  Q. And what is your assessment?
7  A. I'm sorry, I need clarification.
8  Q. What's your assessment at, that's recorded at
9  the end of this visit?
10  A. The assessment on this note is Type II
11  diabetes where she'd still not gotten her labs -- and
12  that was left out in the, in the transcription on
13  this -- diabetic neuropathy, hypertension, prior
14  congestive heart failure, chronic obstructive pulmonary
15  disease, hyperthyroidism, issues with frequent history
16  of pneumonia and bronchitis, insomnia, major
17  depression, post traumatic stress and issues with prior
18  abnormal renal function.
19  Q. And what was your plan?
20  A. The plan initially was to get her to see a
21  specialist for her foot, and an appointment was
22  arranged while she was there for Monday. I'm afraid I
23  don't know what day of the week this was. She was to
24  say start an antibiotic for her toe. We did refill
25  medications. She was to have antibiotics and on

Page 26

1  Prednisone for any flareup of COPD, bronchitis, and
2  then to call the office, because that had been our
3  previous discussion. And that was not in the note.
4  And she was to see me no longer than three months or
5  sooner if these issues continued.
6  Q. Has she rescheduled since that time?
7  A. She rescheduled and missed the appointment,
8  sir.
9  Q. What day?
10  A. It was this past week, and I believe it was
11  Monday.
12  Q. Now, under review of systems form, is this
13  filled out by a nurse, you, or Miss Burns?
14  A. This was filled out by Miss Burns. This is
15  her handwriting.
16  Q. And under eyes, did she report blurry vision?
17  A. She has that circled, yes. But she also has
18  noted to the right not today.
19  Q. Okay. Would you consider referring her on, to
20  a specialist due, to have a retina check, checked?
21  A. Diabetics need to be checked by eye doctors
22  routinely. That's correct, sir.
23  Q. Okay. But would you consider referring her to
24  a, to a optometrist?
25  A. No, I would send her to an ophthalmologist.

Page 27

1  Q. Ophthalmologist, okay.
2  And her mouth, she said, she reported dental
3  problems, teeth -- teeth chipping, falling out,
4  cavities? Is that a condition that goes along with
5  diabetes?
6  A. More likely it goes along with poor dental
7  hygiene.
8  Q. On primary care progress sheet, and the date
9  is May 16th, 2008, it says summary sheet. I don't know
10  if this is Xeroxed on top of another sheet or what.
11  Could you read that for us and explain what that means?
12  A. This is an initial intake note taken by the
13  medical assistant or nurse for chief complaint and
14  reason that the patient is here. This indicates that
15  she's fifty-four years old, white female with a
16  non-healing wound for seven months on the tip of the
17  hallux on the left foot. It looks like it was right
18  initially. States she took penicillin for ten days
19  then took doxycycline for ten days, has been soaking
20  and elevating. Nail seems to be coming off. Dried,
21  crusted blood. States white cottage cheese discharge.
22  And underneath that there is a pain assessment which is
23  discussed with the patient. She rated her pain as six
24  out of ten. She notes that it is a dull, pressure-type
25  sensation. It is worse when her foot swells, when she

Page 28

1  walks on it, or when it gets worse, quote, unquote.
2  It's been present for seven months and relieving the
3  pain is a heating pad.
4  Q. Do you know when or where she received
5  penicillin shots?
6  A. No, sir, I do not, and it does not say shots.
7  Q. Okay. Well, the penicillin?
8  A. All it says is penicillin.
9  Q. Okay. Do you know where she received the
10  penicillin?
11  A. No, sir, I do not.
12  Q. All right, let's go to your office history and
13  physical. Date of service January 15th, 2008. Under
14  subjective what is, oh, what's the subjective section
15  of your office history and physical? What's that
16  supposed to encompass?
17  A. Subjective encompasses what the patient is
18  saying is going on.
19  Q. And what was she saying was going on?
20  A. If you refer to her notes, which are also
21  attached to this, her areas of concern are listed along
22  with her medications and her previous physicians. She
23  was here to establish. She was here because Dr.
24  Randles had, had to stop practicing. And this, and
25  subjective lists her list of problems.

Page 29

1    Q. Okay. But you've listed in here
2  hypothyroidism, hypertension, major depression --
3    A. That is what she has --
4    Q. -- with current suicide attempts?
5    A. That is what she has on, in her medical
6  history prepared by her.
7    Q. Sleep apnea, Type II diabetes?
8    A. Uh-huh.
9    Q. Okay. Now, down in past history, diagnosed
10  with hypothyroid, hypertension then situational
11  depression. What is situational depression?
12    A. Situational depression refers to depression as
13  a result of life experiences or current situations.
14    Q. Okay. Is -- does that mean that it's more of
15  an acute situation than a chronic situation?
16    A. No, it can be acute or chronic.
17    Q. Okay. Would you defer to Dr. Billingsley on
18  that?
19    A. Yes.
20    Q. Now, you also have a note in 2000 diagnosed
21  with diabetes. Is that self reported by her or is that
22  something that you derived --
23    A. That is self -- self reported by her --
24    Q. -- from records?
25    A. -- on her medical history. Three quarters of

Page 30

1  the way down on the page she lists 2000, elevated
2  fasting blood sugar and ketones in urine. Accuchecks
3  120 to 190. Confirmed by lab on multiple occasions.
4    Q. Okay. Does that say that she's diabetic?
5    A. These are her words. That would fit the
6  diagnosis of diabetes, however.
7    Q. Now, you'd mentioned before that -- that she
8  had used Prednisone for an asthma condition.
9    A. She had, by her report, used Prednisone in the
10  past for asthma and COPD exacerbations. COPD is
11  different than asthma.
12    Q. Okay. Well, for COPD she's using Prednisone.
13    A. Intermittently by her report she does use
14  Prednisone.
15    Q. Do you know the effect of Prednisone on blood
16  sugars?
17    A. It can elevate blood sugars.
18    Q. Now, under medications are there any
19  antipsychotic or second-generation antipsychotics that
20  have been reported on her January 15th, 2008 --
21    A. No, sir.
22    Q. -- office visit?
23    A. No, sir.
24    Q. And also you note that her psychiatrist is Dr.
25  Billingsley. Have you spoken to Dr. Billingsley about

Page 31

1  treating Miss Burns?
2    A. No, sir.
3    Q. Now, the assessment on the initial office
4  visits, page two of two of your notes, could you read
5  that for the record?
6    A. "Concerns of changing mole with normal
7  evaluation, chronic pain, Type II diabetes, sleep
8  apnea, major depression," quote, unquote, "asthma".
9  Behind on routine health care for mammograms. Has
10  never done a bone density either, and hypothyroidism."
11    Q. You have asthma in quotes. Is that because
12  you noted that it could be COPD?
13    A. That is correct.
14    Q. Okay. Now, you ordered a mammogram; is that
15  correct?
16    A. That is correct.
17    Q. And a bone density.
18    A. That is correct.
19    Q. Do you know the results of the bone density
20  study?
21    A. Yes, sir, in the packet.
22    Q. For the jury's benefit, what were the results?
23    A. Bone density was done on 5/1/08. She had a
24  normal qual -- quantitative bone density of the lumbar
25  spine, and she had a normal quantitative bone density

Page 32

1  of the left hip.
2    Q. And what were the results of the study -- of
3  the mammogram?
4    A. On the manneo -- on the mammogram with
5  ultrasound there was a note on the right breast of an
6  area of concern. Central, likely benign
7  calcifications. Immediately there are some punctate
8  calcifications which may be related. Correlation with
9  previous study recommended if possible. Alternatively
10  six-month right-breast mammogram followup presently
11  recommended to assure stability.
12    Q. Now, she had previously had breast reduction;
13  is that correct?
14    A. That is correct by report.
15    Q. Now, there's a primary care progress sheet.
16  It's dated January 15th, 2008, the summary sheet.
17    A. Uh-huh.
18    Q. Could you interpret the shorthand there?
19    A. Her vital signs are listed. She is noted to
20  be a 54-year old female here to establish. Chief
21  complaint: Check mole, onset one month. Signs and
22  symptoms: Has changed color and shape. Prescription
23  request: None. Dee Class, who is a licensed practical
24  medical nurse, was there and there are some notes that
25  I made during the visit.

**Page 42**

1  Q. Have you ever heard of Geodon?
2  A. Yes, sir.
3  Q. Or Abilify?
4  A. Yes, sir.
5  Q. How do you rate them with regard to being used
6  with diabetic or hyperglycemic patients?
7  A. I do not use either one of those medications.
8  They're used by psychiatrists, not me.
9  Q. Okay.
10     MR. SNELL: Objection. Note my objection to
11  the form.
12  Q. (By Mr. Dexter) So Giadonna and Abilify are
13  used by psychiatrists, but you've used Seroquel?
14  A. That's correct, sir.
15  Q. Okay. The psychiatrists use Seroquel also; is
16  that correct?
17  A. That's correct.
18     MR. SNELL: Objection, foundation.
19  A. That is correct.
20  Q. Okay. Have you reviewed any literature with
21  regard to second-generation antipsychotic drugs and how
22  they rate with regard to hyperglycemic or diabetic
23  patients?
24     MR. SNELL: Objection, form.
25  A. I have reviewed some of the drug inserts on

**Page 43**

1  the medications that I use. I do not routinely review
2  all of the antipsychotics for the medications, sir.
3  Q. Okay. Do you have samples of Seroquel in your
4  office?
5  A. Yes, sir, there are samples.
6  Q. Okay. So the sales reps have left some
7  samples with you?
8  A. That is correct.
9  Q. Do you track the -- the samples that you give?
10  A. Yes, sir.
11  Q. So you know which patients have those, have --
12  have been given Seroquel?
13  A. Every patient that receives any type of sample
14  from our office, the lot, the date and expiration date,
15  the patient, the amount is all logged in our books.
16  Q. Have you considered, with regard to depressed
17  patients, prescribing Paxil instead of Seroquel?
18  A. Paxil's associated with a lot of weight gain
19  so I try to avoid that if possible.
20  Q. Do you know if Seroquel is associated with
21  weight gain?
22  A. Yes, it can be associated with weight gain.
23  Q. Do you know if Paxil is associated with
24  hyperglycemia or diabetes?
25  A. With weight gain it can be, but it can also be

**Page 44**

1  associated with precipitation mania in a patient who is
2  bipolar.
3  Q. Do you know if Seroquel is associated with
4  tardive dyskinesia?
5  A. Antipsychotics --
6     MR. SNELL: Objection to the form.
7  A. Antipsychotics can be associated with tardive
8  dyskinesia.
9  Q. Do you know if Paxil's associated with or can
10  cause tardive dyskinesia?
11  A. I'm not familiar with that.
12  Q. Okay. Can diabetes progress?
13  A. Yes, sir.
14  Q. And when it progresses, what type of
15  conditions can it cause?
16  A. Blindness, renal failure leading to dialysis,
17  strokes, loss of limb.
18  Q. Diabetic neuropathy?
19  A. It can cause diabetic neuropathy,
20  gastroparesis, skin conditions.
21  Q. That serious? Is that a serious -- serious
22  effects of diabetes?
23  A. Uncontrolled diabetes is a serious condition,
24  yes.
25  Q. Is it worse in brittle diabetics than

**Page 45**

1  fluctuating diabetics?
2     MR. SNELL: Objection, form.
3  A. Worse in what way?
4  Q. The effects, the severity of it.
5  A. I'm sorry, you need to clarify a little bit
6  more.
7  Q. In a person that's classified as a brittle
8  diabetic, how would you, how would you differ that from
9  someone who's classified as a fluctuating diabetic?
10  A. In my mind, they are one and the same.
11  Q. Let me -- I must ask you some questions about
12  the labels that you talked about. You -- you read
13  labels on drugs; is that correct?
14  A. As far as the medication usage? Yes.
15  Q. Do you warn patients of the conditions that
16  you see outlined in those labels?
17  A. I warn patients of the conditions that I, that
18  I'm familiar with, but they also receive information
19  from the pharmacy that lists the adverse conditions.
20  Q. Do you believe the doctor should be given
21  complete, truthful and timely and accurate information
22  about significant risks and side effects for
23  prescription drugs?
24  A. Yes.
25     MR. SNELL: Objection to form.

46

1  A. Yes, sir.
2  Q. Do you need to know about all the significant
3  risks of a drug in order to assess whether the benefit
4  outweighs potential risks?
5  A. You need to know the significant risks that
6  are reasonable.
7  Q. Let me repeat the question. Do you need to
8  know about all the significant risks of a drug in order
9  to assess whether the benefit outweighs potential
10 risks?
11 A. In order --
12     MR. SNELL: Object, asked and answered.
13 Q. (By Mr. Dexter) Go ahead.
14 A. I'll go with what he said.
15 Q. Well, he just objected. You --
16 A. I -- you can -- you can look at significant or
17 potential risks for medication and the list goes on
18 adnauseum. Now, whether that is a real-life situation
19 or a theoretical situation where it happens in one in
20 one hundred thousand people, if you go through with
21 every patient a potential for risk and benefit for
22 every medication, you would not get through more than
23 one patient per day. So there is a realistic
24 limitation on how much information you can assimilate
25 and keep straight and pass on to patients.

47

1  Q. There's a lot of information in those labels;
2  is that correct?
3  A. That is correct.
4  Q. And that information is provided by the drug
5  companies; is that correct?
6  A. It is also provided in -- in other situations
7  by, you can look at the "Physician's Desk Reference".
8  You can look at other things as well.
9  Q. Right. Are you familiar with that -- are --
10 are you -- do you understand that the label information
11 is what is in the "Physician's Desk Reference"?
12 A. PDL. I do, sir.
13 Q. So when you're talking about one or the other,
14 are you talking about the same?
15 A. But there are also --
16     MR. SNELL: Objection. I'm sorry, objection
17 to form. Please let the witness answer.
18 A. There are also studies that are independent of
19 the drug companies that look at problems that are
20 reported, and there's after-market studies that come
21 along as well.
22 Q. Are you familiar with any independent studies
23 with regard to Seroquel?
24 A. No, sir, I -- I have not looked that far into
25 Seroquel.

48

1  Q. Have you studied any literature with regard to
2  Seroquel's association with diabetes or hyperglycemia?
3     MR. SNELL: Objection to form.
4  A. In the past, I have read some things, but I
5  can't tell you point black what things, what they were
6  or when they were.
7  Q. In evaluating the use of Seroquel or any other
8  drug, would you need to know all the significant risks
9  to weigh the risk and the benefits?
10     MR. SNELL: Objection to the form, asked and
11 answered.
12 A. You need to know the significant risks and the
13 significant benefits of any medication that you
14 prescribe.
15 Q. I'll take that as yes.
16 A. Okay.
17     MR. SNELL: Move to strike.
18 Q. (By Mr. Dexter) Okay. Do you need to know
19 about all the significant risks of a drug in order to
20 assess whether the benefit outweighs potential risk?
21 A. You need to know all the significant --
22     MR. SNELL: Objection, asked and answered.
23 I'm sorry.
24 A. I -- I agree. That's the same answer. You
25 need to know the significant risks and the significant

49

1  benefits.
2  Q. You have not answered my question. Let me ask
3  it again.
4  A. Yes, sir, you need to know all the significant
5  risks and the significant benefits of each drug that
6  you utilize.
7  Q. Do you agree with me that doctors rely on
8  information provided by drug companies as to potential
9  risks and side effects?
10 A. Yes, sir.
11     MR. SNELL: Objection, leading.
12 Q. (By Mr. Dexter) Do you expect drug companies
13 to make complete, truthful, timely, and accurate
14 disclosure of potential risks and side effects?
15     MR. SNELL: Objection, asked and answered.
16 A. Yes, sir.
17 Q. Would it be appropriate if a drug company had
18 reports of a serious risk and side effect yet failed to
19 warn doctors?
20     MR. SNELL: Objection to form.
21 A. Would it be appropriate? I'm sorry, restate
22 your question, please.
23 Q. Would it be appropriate if a drug company had
24 reports of a serious risk or side effect yet failed to
25 warn doctors?

Page 114

1   A. One forty-eight.
2   Q. And is that elevated?
3   A. Yes, sir.
4   Q. Do back-to-back morning-fasting blood glucose
5   levels above 125 make the diagnosis of diabetes?
6   A. Yes, sir.
7   Q. Now, we can come forward two more days. Do
8   you say April 20th, 1994, Doctor? At 8:15 in the
9   morning, Miss Burns had her blood drawn again. Do you
10  see that?
11  A. Yes, sir.
12  Q. And what was her glucose at that time?
13  A. One forty-four.
14  Q. So based upon these three different blood
15  draws in the morning on, over a span of five days back
16  in 1994, Miss Burns meets the criteria for a diagnosis
17  of diabetes, correct?
18       MR. DEXTER: Objection to form.
19  A. Yes, sir.
20  Q. And the fact that on April 21st if she had a
21  high glucose of 118, that could be her glucose
22  variability; is that correct?
23  A. Yes, sir.
24  Q. Doctor, you have no reason to believe that --
25  that you are just out there speculating with regard to

Page 115

1   Miss Burns having diabetes in 2000, are you?
2        MR. DEXTER: Objection to form.
3   A. That information's based on her report.
4   There's no reason for me to believe she lied to me.
5   Q. Okay. With regard to the nerve problems to
6   Miss Burns' lower extremities, I just want to make sure
7   that I'm clear. Have you determined that, that is
8   diabetic neuropathy, or could it be some other form of
9   neuropathy, or some other form of nerve problem from
10  her lower back, or anything else?
11       MR. DEXTER: Objection to form.
12  A. I have not personally determined that. She's
13  been under the care of a neurologist to look into that
14  problem.
15  Q. So with regard to her nerve problems to her
16  legs, you would defer to the neurologist as to whether
17  all or part of it is from her lower back, or from some
18  other form of neuropathy, or diabetic neuropathy; is
19  that correct, Doctor?
20  A. Yes, sir.
21  Q. Okay. And prior to today's deposition, had
22  you ever spoken to me?
23  A. No, sir.
24  Q. Did you know me from Adam?
25  A. No, sir.

Page 116

1   Q. Have you spoken to anyone from the law firm
2   Dechert?
3   A. No, sir.
4   Q. Have you spoken with any counsel representing
5   AstraZeneca regarding Seroquel?
6   A. No, sir.
7   Q. Did you speak to the Plaintiff's counsel?
8   A. No, sir.
9   Q. Okay. And you've come here today, and you've
10  told the truth as best you can; is that correct?
11  A. Yes, sir.
12  Q. Relying on all the information you've
13  collected in treating Miss Burns, and -- and calling
14  for her prior records, and the interactions you have
15  with the patient; is that correct?
16  A. Yes, sir.
17  Q. And you stand by your testimony I take it; is
18  that correct, Doctor?
19  A. Yes, sir.
20  Q. No further questions.
21       FURTHER REDIRECT EXAMINATION
22          BY MR. DEXTER
23  Q. One followup question on D17. Do you have it
24  before you?
25  A. Yes, sir.

Page 117

1   Q. Admission date is April 16th, 1994. Did you
2   know Miss Burns then?
3   A. No, sir.
4   Q. You know her weight?
5   A. I have no other information other than the
6   sheet in front of me, sir.
7   Q. And you admit -- do you agree with me that
8   this is a partial record for a hospital visit?
9   A. It's a single sheet, sir.
10  Q. Single sheet. Do you know why she was
11  admitted to the hospital?
12  A. No, sir.
13  Q. Do you know what type of medication she was
14  receiving?
15  A. No, sir.
16  Q. Do you know whether she was there for a COPD
17  or asthma concern?
18  A. No, sir.
19  Q. Do you agree with me that -- oh, also do you
20  know why they started a different set of labs starting
21  from, or -- or beginning April 17th that were not given
22  on April 16th, including glucose?
23  A. No, sir, I have no knowledge of that.
24  Q. Particularly this space right here.
25  A. I don't know why they ordered what they

Page 118

1  ordered on that day or the following days.
2      Q.  Do you know if these are bedside, and do you
3  know they were fasting?
4          MR. SNELL: Objection, form, compound.
5      A.  I do not know if they're bedside. I do not
6  know if they're fasting. The times and dates are
7  there. That is, that's the limit of the information.
8      Q.  Do you agree with me that in some admissions
9  there are bedside with normal intake of meals for blood
10 tests in hospital settings?
11         MR. SNELL: Objection, foundation.
12     Q.  (By Mr. Dexter) Non-fasting blood tests?
13     A.  They can be fasting or non-fasting blood
14 tests.
15     Q.  Is there anything on D17 that says whether
16 they're fasting or not?
17     A.  Not on this page, no.
18     Q.  And at the top, it says Bay Medical Center,
19 Monday April 25th, 1990...
20     A.  Four.
21     Q.  And it looks like a six or a four.
22     A.  It looks look a four.
23     Q.  Okay. And discharge cumulative trend report?
24     A.  Yes, sir.
25     Q.  Is that what it is? And it's general surgery.

Page 119

1  Do you know what type of meds were given, pain killers,
2  during that surgery?
3      A.  No, sir, no information on that at all.
4      Q.  So other than reading the number of results on
5  there that's about all you can do?
6      A.  Yes, sir. But you can see what's elevated,
7  and what's low, and what's off from the normal values.
8      Q.  Sure. Sure.
9      A.  It's indicated on that.
10     Q.  You just don't know the circumstances?
11     A.  That's correct.
12     Q.  Okay. Would you diagnose someone with
13 diabetes based on just the facts you have on that
14 sheet, the four corners of that sheet?
15     A.  The diagnosis of diabetes has to be based on
16 fasting repeated levels.
17     Q.  And do you have information within the four
18 corners of this sheet that those were fasting blood
19 tests?
20     A.  That information is not provided.
21     Q.  Okay.
22         MR. DEXTER: Pass the witness.
23         FURTHER RECROSS-EXAMINATION
24              BY MR. SNELL
25     Q.  Putting aside Exhibit D17, the labs from

Page 120

1  1994 --
2      A.  Uh-huh.
3      Q.  -- everything remains the same, right, Doctor?
4  The patient told you she had diabetes in 2000, correct?
5      A.  That's correct.
6      Q.  That's my last question.
7          MR. DEXTER: Pass the witness. Reserve
8  further question for trial.
9          VIDEOGRAPHER: Read, read, read, waive?
10         MR. DEXTER: Oh, thank you.
11         As process of taking a deposition, you have
12 the right to request a copy and review it, and make
13 any revisions to it that you would like. Do you
14 want to read and -- and make changes or do you --
15         WITNESS: Yes, sir.
16         MR. DEXTER: Okay.
17         WITNESS: And I will also forward it to Sacred
18 Heart as far as the hospital itself.
19         MR. DEXTER: You bet.
20         VIDEOGRAPHER: Deposition concluded 11:58 a.m
21 (Deposition concluded. Signature requested.)
22
23
24
25

Page 121

1  STATE OF FLORIDA
   COUNTY OF BAY
2
3
4              CERTIFICATE OF OATH
5
6      I, the undersigned authority, certify that
7  DR. LAURA YAUCH personally appeared before me June 11,
8  2008, in Panama City, Florida, and was duly sworn.
9      WITNESS MY HAND AND SEAL this 15th day of June
10 2008.
11
12      _____
             Notary Public
13 My Commission Expires:
14
15
16
17
18
19
20
21
22
23
24
25