# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE OF FLORIDA
ORLANDO DIVISION

Case No. 6:07-cv-15701

CONNIE M. CURLEY,

    Plaintiff,

vs.

ASTRAZENECA LP, et al.,

    Defendants.

DEPOSITION OF LEONARD MENNEN, D.O.

Taken on Behalf of the Plaintiff

DATE TAKEN:    July 24, 2008
TIME:    8:40 a.m. - 11:18 a.m.
PLACE:    Tahitian Inn
    600 South Dale Mabry Highway
    Tampa, Florida 33609

Examination of the witness taken before:

Joan L. Pitt
Registered Merit Reporter
Certified Realtime Reporter
Florida Professional Reporter

Dr. Leonard Mennen
July 24, 2008

Page 14

1  isn't it?
2  A. Correct.
3  Q. And you as a physician certainly wouldn't want
4  to do anything that put patients at additional risk for
5  developing type 2 diabetes, would you?
6  A. Not knowingly, no.
7  Q. Very good. Okay. When you prescribe a drug to
8  a patient, do you normally undertake some type of a
9  risk-benefit analysis for each patient?
10 A. Yes.
11 Q. And when you are making that risk-benefit
12 analysis, is it important for you to have accurate
13 information about the risks and the benefits associated
14 with the drugs that you are going to prescribe?
15 A. Yes.
16 Q. If the source of your information about a
17 particular drug has been downplayed, would that be
18 dangerous for your patient?
19 A. I don't understand the question.
20 Q. Well, if the information that you had regarding
21 a drug is not completely accurate or it's not complete
22 information about that particular drug, would that
23 affect the risk-benefit analysis that you're making?
24 A. Yes.
25 Q. And would that be ultimately dangerous for your

Dr. Leonard Mennen
July 24, 2008

Page 15

1  patient because you didn't have all of the information
2  that was available in order for you to make your
3  risk-benefit analysis?
4  A. It depends on what was lacking.
5  Q. Okay. But it could be, depending on what the
6  information was that you didn't have when you were
7  making your analysis?
8  A. As I said, it depends on what information I did
9  not have and how much risk the patient would be at
10 without that information.
11 Q. Okay. That's fair enough.
12    When you are undertaking your risk-benefit
13 analysis, where do you get the information about the
14 drugs?
15 A. You get it from many sources. As you study
16 medicine, and it's an ongoing pursuit, regardless of how
17 old you are, if you want to give the best care to your
18 patient, you're constantly reading literature, articles
19 of what we call refereed journals, not the newspaper.
20 You constantly are looking for information about the
21 diseases you're treating and what would be best for
22 those diseases.
23    Plus, your experience as a physician. Many of
24 the patients that I see have four or five different
25 diseases, so they're on numerous medications, and as you

Dr. Leonard Mennen
July 24, 2008

Page 16

1  indicated, there's a risk-benefit that you have to weigh
2  when you're giving certain drugs, and you try to make
3  sure that if you're going to use a drug that it is not
4  going to be detrimental in the treating of the patient.
5  May be on other drugs or other problems.
6  Q. Okay. And in all the sources that you
7  mentioned, you did not mention drug representatives. Do
8  you have drug representatives that visit you at your
9  office?
10 A. Yes.
11 Q. And do they provide you with information on the
12 drugs that they sell?
13 A. They attempt to.
14 Q. And why do you say they attempt to?
15 A. Well, I can state my position about drug reps.
16 Q. Okay.
17 A. In my opinion, if you're trying to help a
18 patient with samples, that's what they're good for. I
19 do not use them as a source of education, because most
20 of these people who are pharmaceutical reps had other
21 occupations that have nothing to do with medicine. They
22 could be stewardesses, working in restaurants, and they
23 get, what I always kid them, a 90-day course. And they
24 may be articulate and have the ability to be a good
25 salesperson, but as a physician, that doesn't interest

Dr. Leonard Mennen
July 24, 2008

Page 17

1  me. I only want to know information that's going to
2  help my patient. So whatever they say to me I take with
3  a grain of salt, because I don't believe they're a
4  source.
5  Q. Okay. I understand. That's fair enough.
6  Okay. Do the drug representatives that come into your
7  office ever invite you to different CMEs or other
8  informational meetings?
9  A. Yes.
10 Q. And do you attend some of those meetings?
11 A. No.
12 Q. You never attend any of those?
13 A. When you say never, that means I never in my
14 life. On a regular basis, I do not attend, quotation
15 marks, dinner meetings where they have so-called CME and
16 you get a dinner. All right? I don't attend those. I
17 have attended lunches with sales reps, because if they
18 want to tell me about a product that's coming out, I
19 don't have time while I'm seeing patients to listen to
20 their gibberish, to be honest, so we eat lunch, and I
21 like to get out of the office to eat lunch, and
22 occasionally reps will take us, my partner and I, to
23 lunch, or my partner and I and our nurse practitioner,
24 so they can present or give us samples or whatever. But
25 I have to tell you this much: They don't have more than

Dr. Leonard Mennen
July 24, 2008

Page 18

1  one minute to talk about their drug. That's one of the
2  rules if you're taking us to lunch, because I don't want
3  to listen to it. It has no meaning to me.
4  Q. Okay. So you go to the lunch meetings to hear
5  the little presentation, but you never go to any of the
6  dinner meetings to hear any of the speakers or anything
7  like that?
8  A. I would say in the -- I came to this practice
9  in 1997, January. I've probably been to two or three
10 dinner meetings in those ten years, and those two or
11 three occurred in the first year I was here.
12 Q. Okay. So it's fair to say that you really do
13 not get information regarding the drugs that you
14 prescribe from the drug reps or any of the CMEs provided
15 by the drug companies?
16 A. I didn't say I didn't get information. I don't
17 use the information. They may give it to me, but to me
18 it has very little value.
19 Q. Okay. Okay. Well, let me ask you this,
20 Doctor: When the drug reps do come in and provide you
21 with information, I know you said that you take it with
22 a grain of salt, but do you at least expect that they
23 will be providing you with accurate information?
24 A. That would -- would you rephrase that question?
25 When they do come in? Rephrase that.

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 19

1  Q. Do you expect them to be truthful when they're
2  talking to you?
3  A. Yes.
4  Q. And do you expect for them to provide you with
5  information that is the most accurate information that
6  they have available to them at that time regarding their
7  drug?
8  A. Restate the last part of that. You said when
9  they came in, do I expect them to give me the most
10 accurate, is it, information?
11 Q. Let me give you an example. If a drug rep is
12 aware that there are certain side effects to a
13 medication that they're trying to get you to prescribe,
14 would you expect for them to tell you about those known
15 side effects?
16    MR. MANZELLA: Objection.
17 A. I have to qualify my answer by saying, yes;
18 however, I don't believe they have the knowledge to know
19 what side effects mean anything, so that the fact that
20 they're blurting out the company line, as I tell them,
21 means nothing to me. I don't know -- nor do those
22 educational materials of studies, case studies that they
23 give me, mean anything to me, also, for the reason that
24 I know they pay the physicians to do those things.
25 Q. Okay.

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 20

1  A. And I was a dean and a provost and a head of
2  medicine at universities, and I know all about that
3  system of research grants and clinical studies and so
4  forth. So that's why I say what I say, that I don't
5  take much of the information they give, because every
6  salesperson who visits me has their chart and their
7  graph that shows their drug is the best. And so I
8  take -- I take all that information as useless.
9  Q. Okay. So do you even read any of the
10 literature and studies that the drug reps leave at your
11 office?
12 A. Read any? Any means anything. Occasionally,
13 but not totally.
14 Q. And even if you read it, you take it in its
15 perspective?
16 A. Yeah, I would like to recheck whatever I read
17 in a refereed journal or a qualified medical book that
18 actually has information that's been tested.
19 Q. I understand. I understand. Doctor, were you
20 aware that we're here today in reference to the drug
21 Seroquel?
22 A. Yes.
23 Q. Have you ever prescribed the drug Seroquel?
24 A. Ever? Yes.
25 Q. Is that a drug that you prescribe routinely?

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 21

1  A. No.
2  Q. Are you aware of the common side effects
3  associated with the drug Seroquel?
4  A. I believe so.
5  Q. Okay. Were you aware that we are here today
6  because the plaintiff, Connie Curley, claims that
7  Seroquel caused her to develop diabetes?
8  A. No.
9  Q. Were you aware that Ms. Curley has diabetes?
10 A. No.
11 Q. Were you aware that Ms. Curley took the drug
12 Seroquel?
13 A. Yes.
14 Q. And you have at times prescribed Seroquel to
15 Ms. Curley, correct?
16    MR. MANZELLA: Objection to the term "at
17 times."
18 A. I haven't prescribed it. I have written a
19 prescription for her that she needed because she
20 initially got the drug from the neurologist. I did not
21 prescribe it, but she needed a refill, so I gave it to
22 her, but I didn't specifically prescribe it.
23 Q. So you were not the initial doctor that made
24 the risk-benefit analysis and determined that Ms. Curley
25 needed to be on Seroquel?

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 22

1   A. Not to my knowledge, no.
2   Q. You only refilled Ms. Curley's current Seroquel
3   prescription when she was in your office and needed a
4   refill? Not to get you to go through all that specific
5   stuff.
6   A. I just want to see what I did.
7   Q. Okay.
8   A. I see here that I refilled it on 3/2/04.
9   Q. Okay. Now, back to the side effects of the
10  drug Seroquel, what side effects are you aware of that
11  result from -- that could result from taking Seroquel?
12  A. Well, one of the most serious is neuroleptic
13  syndrome.
14  Q. And what is neuroleptic syndrome?
15  A. Well, the patient can have problems with
16  mental -- their mental state. They can develop
17  cardiovascular problems. They can develop high fevers.
18  It can affect their kidneys and so forth. Those are the
19  main ones. There are other side effects of Seroquel.
20  Tardive dyskinesia, which is a side effect where they
21  have involuntary movements. But a lot of these
22  symptoms, side effects, I believe, have been seen more
23  commonly in the younger population. That's why I think
24  there's some warnings now in treating adolescents with
25  this medication, which I don't treat, but I remember

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 23

1   reading something about that.
2   Q. Okay. Are you aware of what Seroquel is
3   indicated for?
4   A. Yes. Well, I understand what it's used for.
5   Not having used it on a regular basis myself, never
6   having prescribed it myself as a drug to one of my
7   patients other than using it because the patient was on
8   it and wanted a refill of it, and apparently it was
9   working, and they were seeing other physicians for it,
10  either a psychiatrist or a neurologist. That's the only
11  reason I feel comfortable writing it.
12  Q. Okay. Are you aware that Seroquel is indicated
13  for --
14  A. Oh, you asked me what it was for. Excuse me.
15  Schizophrenia, bipolar disorder. Psychotic behavior,
16  some people use it, in conjunction with other
17  antidepressants, generally.
18  Q. Okay. Are you aware that one of the side
19  effects of Seroquel is weight gain?
20  A. Yes.
21  Q. And when patients that you have had the
22  occasion to refill their Seroquel prescription, have you
23  also had the occasion to monitor those patients'
24  weights?
25  A. Each time the patient checks in the office,

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 24

1   their weight is recorded. If I may say, this particular
2   patient you're referring to, that you're going to refer
3   to, weighed 126 on 3/30/04 and 128 on 3/2/04. So I
4   don't think the two pounds is a significant change in
5   the time I saw her.
6   Q. And we'll get to the specific time that you saw
7   Ms. Curley. How did you become aware that weight gain
8   is one of the known side effects of patients taking
9   Seroquel?
10  A. It was in journals on the drug, and on the
11  treatment of different diseases, one of the problems
12  that can occur, as was the neuroleptic syndrome, which
13  was more specifically addressed than weight gain.
14  Q. Okay. Do you recall when you became aware of
15  the side effect of weight gain?
16  A. No, I couldn't tell you.
17  Q. Okay. Do you ever receive dear doctor letters
18  from AstraZeneca?
19  A. If I do, I don't read them.
20  Q. Okay. Okay. And since you don't prescribe
21  Seroquel on a regular basis, then I would imagine that
22  you would not recall when the different label changes to
23  the Seroquel bottle happened? Or package insert.
24  A. I don't know exactly when, but I know -- this I
25  heard on the news or somewhere of the black box changes

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 25

1   of medications of these antidepressant drugs because
2   people committing suicide, young people. That I did get
3   from the newspaper, but it didn't matter, didn't make
4   any point to me. I never -- seldom use the drug. Never
5   myself prescribed the drug in 40 years of practice.
6   Q. Okay.
7   A. Other than, as I indicated, refilling
8   medication the patient was on because it apparently was
9   working and she was seeing other doctors who were
10  monitoring.
11  Q. I understand. I understand. And do you recall
12  when you became aware that that black box warning had
13  been added to the Seroquel label?
14  A. Specifically for Seroquel, no. I would say
15  six, eight months ago, maybe a year, when it was added
16  pretty much to all the antidepressants.
17  Q. Okay. I know you said you don't give the drug
18  reps very much time when they come into your office, but
19  do you ever recall times when drug reps talked to you
20  specifically about Seroquel dosing?
21  A. No, and I'll tell you why. I recall somebody
22  coming in wanting to talk to me about Seroquel, and I
23  said, I don't use the drug, so don't waste your time.
24  Q. Okay.
25  A. Go talk to one of my partners, I told them.

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 26

Q. Okay. I know that you said you don't prescribe the drug Seroquel, that you only refill the drug, but just in general, do you think that it is important to know if there are warnings that are placed on certain drugs?

A. A physician tries to know warnings on every part of the armamentarium, but, you know, if you're not using a drug on a regular basis, you only address those issues when your patient is on the drug or going to be placed on the drug. Then if you're smart you'll try to see the risk-benefit again, even though it may not be your drug. But I have patients, for example, who are on drugs that I have to weigh the risk-benefit that I'm refilling, and to me, since I only saw this -- depending on how long I'm seeing the patient will dictate.

If I feel the drug is not the best drug for the patient, then I will communicate that to the other physicians prescribing it and say, look, or I'll tell the patient, I'm not refilling this drug, you have to go back to these people because I don't like this drug, it has side effects and I wouldn't recommend you using this drug.

Q. Okay. So you would defer to the other physician's risk-benefit analysis in the prescription of drugs that your patients are already on when they come

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 27

to you?

A. If I feel there's a reason to discuss that drug. I can give you a quick example. I know, for example, I treat a lot of diabetics, and I know, for example, that Actos makes patients gain weight. That's one of the side effects. I know that. But when your sugar is elevated and you're not being -- type 2 -- not being controlled, sometimes that's the risk-benefit that you referred to before.

And I warn them, you could gain some weight, but the risk of not treating your sugar is worse than taking this medicine. Just watch your calories more, you know, so they understand it. But that's one of the side effects of a good drug.

Q. Okay. Is weight gain one of the risk factors for the development of diabetes?

A. Yes.

Q. And I understand your analogy regarding, you know, monitoring and controlling blood glucose levels, but if there were other types of drugs that caused patients to gain weight in the same way that you say that the Actos does, would you undertake the same risk-benefit analysis for that drug?

A. As I said, every drug we take the risk-benefit analysis. Patients who have type 2 diabetes are

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 28

frequently obese. That's one of the -- part of the metabolic syndrome, obesity. And any drug you prescribe could have side effects, not just weight gain, and the patient has to be part of the treatment plan. As I tell my patients, I just can't give you these pills and wave a wand over you. Part of the responsibility is yours. I can't treat, for example, a lipid problem with no cooperation from you watching your diet. There's not one pill that just you can eat anything you want and take this pill and you don't have to worry about your cholesterol anymore; just take this pill, you don't have to worry about your sugar anymore; take this pill and you don't have to worry about your depression anymore. I mean, so we can go down the line. The patient has to buy into the treatment if it's going to be effective, and that's the hardest thing to have people buy into.

Q. Absolutely. Absolutely. You sure there's no magic pill like that?

A. Well, I used to teach my students that the magic bullet for diabetes was insulin. I did teach them that years ago.

Q. Okay. Why don't we go over Ms. Curley's medical records so we can see exactly when you saw her, what you treated her for and what was going on on those days.

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 29

When was the first time that you saw Ms. Curley?

A. According to the record, it was on 3/2/04.

Q. Okay. And what did she come in for on that day?

A. According to the record, she came in to establish care.

Q. Okay. And what type of care did you provide for her on that day?

A. Well, I did a physical exam and continued some of the medications she was on for the various illnesses which she reported, referred her to the neurologist at Tampa General, because I believe she had no transportation and she wanted to go down there, which she could take the bus, as I recall, and ordered blood tests, electrocardiogram, mammogram, and she was told to go to ob-gyn for the Pap and follow up after those tests were done, because I had no information.

Q. What illnesses did Ms. Curley have when she came to see you on March 2nd that she reported to you?

A. She said she had fibromyalgia, osteoporosis, she had optical neuralgia, history of postconcussion syndrome and stress anxiety.

Q. Okay. Ms. Curley did not report to you that she was diabetic on March 2nd, 2004?

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 30

1   A. No.
2   Q. Okay. And what medications was she taking at
3   that time?
4   A. Well, the note on 3/2, which is by the MA who
5   usually writes down the drugs, said see list on file in
6   chart. I can refer to 3/30, which was the list of
7   drugs, which I assume were the same ones, but I'll read
8   them to you. Seroquel, 25 milligrams twice a day;
9   fluoxetine, that's Prozac, 40 milligrams a day; Darvocet
10  N100 PRN for pain; Skelaxin, 400 milligrams t.i.d.,
11  that's a muscle relaxant; Maxalt, ten milligrams as
12  needed, that's usually for migraines; and Neurontin, 100
13  milligrams t.i.d. three times a day, which is usually
14  used for neuralgias, neuropathies.
15  Q. For neuropathy?
16  A. Yeah. She said she had optical neuralgia. And
17  fibromyalgia, it's also used. Pain.
18  Q. What was Ms. Curley's weight on March 2nd,
19  2004?
20  A. According to my record, it was 128 pounds.
21  Q. Did you consider her to be obese?
22  A. Not according to my records.
23  Q. Do you know as of that date how long Ms. Curley
24  had been on Seroquel?
25  A. No.

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 31

1   Q. Do you know what Ms. Curley's weight had been
2   prior to March 2nd, 2004?
3   A. No. And I can quantify that. Her records may
4   have come and been available after I saw her and they
5   may be in this chart, I don't know, so that may be in
6   there, and Dr. Torralba, who saw her after I did, may
7   have known that, but I personally don't recall looking
8   at her records that may have been sent.
9      A lot of times -- not a lot. All of the time
10  we request patients' records from their previous PCP or
11  wherever they went. And she had told me she had gone to
12  the Lee Davis Clinic. I saw her on 3/2 and again on
13  3/30, I believe it was. The reason I'm bringing this up
14  is, even if we requested the records, I would not have
15  had those in that two-week time. You send them over,
16  they churn them, get somebody to copy them, send them
17  back to us. It's going to be certainly longer than 21
18  days, and I saw her within 21 days, whatever it is, so I
19  know I wouldn't have had those old records.
20  Q. Okay. Okay. I understand. You said that you
21  ordered some blood tests for Ms. Curley?
22  A. Correct.
23  Q. Did you ever get the results?
24  A. Well, let me refer you to the second time I saw
25  her.

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 32

1   Q. Okay. Which was when?
2   A. 3/30/04. And at that time I still hadn't got
3   them. She had indicated to me she has yet to get her
4   blood studies and says she takes the bus and would like
5   to go to Tampa General Hospital. That's on 3/30. So on
6   that date, I never had a blood test either.
7   Q. Okay.
8   A. Now, if you want me to go further on when they
9   came in, I can do that.
10  Q. Well, no. Was that her second and final visit
11  with you, the 3/30/04?
12  A. According to the records that I have. I said
13  this is a copy of the chart.
14  Q. I understand.
15  A. Yes.
16  Q. And on that day, why did she come back to see
17  you on 3/30/04?
18  A. For follow-up. She told me she had an
19  appointment with her neurologist April 29th. She had
20  not gone to the ob-gyn yet for the Pap. I recommended
21  strongly she do this. She will talk to Sabrina, who is
22  one of our referring people that helps people get
23  referrals, about the name of an ob-gyn doctor. Because
24  with certain kinds of insurance, a lot of doctors don't
25  take them, so our referral person tries to help people

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 33

1   who have difficulty, frequently, when it's difficult,
2   somebody with Medicaid or something like that. A lot of
3   doctors won't take them, so they make an appointment and
4   they're told they can't get an appointment. So we have
5   referral girls at that time who try to assist our
6   patients. And she has yet to get her blood studies, and
7   then I said we will try to accommodate her with the
8   laboratory, go where she wants to go so we get the
9   tests.
10  Q. And what were her current diagnoses that she
11  reported to you on March 30th, '04?
12  A. Well, you have to -- March 30th, you say?
13  Q. Were they the same complaints?
14  A. They were pretty much the same. It wasn't like
15  she reported anything new. When we do our notes, a lot
16  of times I'll just take what I have from the first note
17  as a diagnosis. We don't do a complete evaluation each
18  time to do that.
19  Q. I understand. No new complaints were reported?
20  A. Not according to my notes. I'll look on
21  the -- hold on. Yeah, on 3/30 she reported she has been
22  having sinus problems, night sweats and can't sleep at
23  night. That was her report. Okay?
24  Q. And did you keep her on the same regimen of
25  medications that she had been on?

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 62

1  A. Yes.
2  Q. Do you have any understanding of what her past
3  surgeries on her feet were?
4  A. No.
5  Q. Under physical examination, the last sentence
6  under neurological, it says: The patient has chronic
7  pains and neuropathy; do you see that?
8  A. Yes.
9  Q. Is that her reporting that to you, or is that
10 your diagnosis?
11 A. Her reporting it to me.
12 Q. So Ms. Curley is reporting to you in 2004 that
13 she has neuropathy?
14 A. Well, she didn't use the term neuropathy, but
15 she says she has chronic pain. Yes, she may have used
16 the term neuropathy. I take that back.
17 Q. Do you know what symptoms --
18 A. I think she said she had chronic pains and,
19 yeah, chronic pains, and I think the neuropathy is
20 probably my word, which has to do with chronic pain,
21 nerve pain, so forth.
22 Q. What is neuropathy?
23 A. It's a pain in -- due to inflammation of
24 nerves, usually, or irritation of nerve endings. It's
25 frequently seen in diabetes, diabetics. It's a

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 63

1  burning-type pain. Can be seen in many disorders,
2  postconcussive syndromes, traumatic injuries. You end
3  up with -- you may heal from the traumatic injury, but
4  you end up with chronic pain.
5       For example, one that you would be able to
6  relate to would be shingles. You break out in the
7  shingles, usually along the rib cage following the nerve
8  root, the blisters go away, but some people have
9  postherpetic pain, which is considered a neuropathy,
10 forever, a burning pain that's hard to control.
11 Q. And you said that diabetics often have
12 neuropathy. You're not diagnosing diabetic neuropathy
13 in this medical record?
14 A. No, I had that as an example. You said what
15 neuropathy is. I thought you could relate to that.
16 Q. And I'll represent to you that Ms. Curley
17 testifies that she was diagnosed with diabetes in 2005.
18 So just to make the record clear, this diagnosis in 2004
19 of neuropathy occurred before when she claims she had
20 diabetes, if you agree with my representation?
21 A. Well, she reported that she had optical
22 neuralgia, which is, in a sense, a neuropathy.
23 Fibromyalgia, she reported, which also has nerve pain,
24 so that's where -- her neuropathy at that time. But
25 people are like automobiles. They can have more than

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 64

1  one thing wrong with them giving them the same symptoms.
2  Q. Under the plan, you say: Presently continue
3  Neurontin?
4  A. Correct.
5  Q. What is Neurontin?
6  A. Neurontin is a drug, gabapentin, which is a
7  drug for neuropathies, to treat the pain. In a sense,
8  it's an anti-inflammatory or ability to inhibit the pain
9  neurotransmitting at the nerve endings to decrease pain
10 or burning.
11 Q. I'm not going to do this with every drug, but
12 for this one can you just tell me what your
13 understanding of some of the major risks or side effects
14 of Neurontin?
15 A. Well, there are side effects. Patient can have
16 headaches and gastrointestinal upset and dizziness.
17 Those kinds.
18 Q. Are you aware whether or not Neurontin can
19 increase blood sugar?
20 A. I'm not aware if it can.
21 Q. The second one is the Seroquel. Again, you're
22 continuing Seroquel, continuing the Seroquel
23 prescription; is that correct?
24 A. Let's go back in time. That was the first
25 visit. She was on the drug. I gave her one

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 65

1  prescription. Usually if I'm writing refills -- and I
2  don't know in this case if I gave a refill, if I had
3  refills on it.
4  Q. And I apologize. When I use the word
5  continuing, that was for me trying to be synonymous with
6  refill. We're establishing that this is a refill of a
7  Seroquel; is that fair?
8  A. Right. On the first visit, she said she was on
9  it, she needed it, apparently, I assume, and I said,
10 okay, I'll refill it, instead of making her go all the
11 way back to the neurologist. And I believe she
12 said -- and I referred her to the neurologist at Tampa
13 General, so I assume if he didn't think she should be
14 continuing. I gave her enough to get to the neurologist
15 is basically what I did.
16 Q. And your memory is that Ms. Curley asked you
17 for this refill?
18 A. No, I have no memory she asked, but I assume
19 she did, because I wouldn't have given it to her out of
20 the blue. So -- if you look at her drug record, she was
21 on the medicine, and when I wrote it, since it's not a
22 drug I always write and I wasn't taking charge of her
23 depression or any other condition she had
24 neurologically, I wouldn't have written that drug, so I
25 know I only wrote it because she was on it and somebody

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 66

1  else gave it to her and she needed a refill.
2      Q. Is it fair to assume that you believe or
3  Ms. Curley believed that the Seroquel was working for
4  her and that's why she asked for more?
5      MS. AUSTIN: Objection; form.
6      Q. Is that just a fair assumption?
7      A. No, it's not a fair assumption.
8      Q. Why not?
9      A. Because only the neurologist or a psychiatrist
10 could tell if that was a drug that was helping her, who
11 evaluated her condition. She was on Prozac. I don't
12 know if it was the Prozac that was helping and Seroquel
13 did nothing, for all I know, or vice versa. So when you
14 ask the question she assumed it was helping her, let's
15 put it this way, she apparently had no serious side
16 effects where she said, I don't want to take that
17 anymore. I've had patients come in say, Doc, I can't
18 take that medicine, I'm having dizziness, give me
19 something else, so I assume she was able to tolerate the
20 drug. I didn't say that it was helping her.
21     Q. And it's also fair to say that she's not
22 qualified to make the determination whether or not the
23 drug was helping her?
24     A. No, I didn't say that either. A patient is
25 part of the treatment plan, which I said in my opening

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 67

1  statements. When I give a patient a drug, I ask them
2  how it's working, are the side effects tolerable, do you
3  think you're improving on this drug, especially somebody
4  that has depression. If I give the drugs I usually
5  give, I will check in a month, how are you doing on the
6  drug, are the side effects bothering you. And I tell
7  them at the beginning, you're going to have some side
8  effects, you may not like them initially, but bear with
9  it. So that's what I'm trying to explain to you, that a
10 patient doesn't always know if it's helping or not
11 unless you ask them.
12     Q. In the two visits you had with her, she didn't
13 report any side effects with regards to Seroquel?
14     A. She made no comments regarding any of her
15 medicines that she was on, that they were affecting her
16 that I noted in the records, which I would have if she
17 said X drug, Y drug is giving me headaches, I'm getting
18 this, getting that.
19     Q. That is not noted in the records?
20     A. That's correct.
21     Q. Since you did the refill, is it fair to say
22 that you didn't have a problem with the neurologist's
23 decision or the neurologist's risk-benefit analysis with
24 regard to prescribing the Seroquel?
25     A. I have to qualify my answer again. I don't

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 68

1  like the drug. I don't use the drug. And somebody else
2  used it. I always say, why is he putting them on that
3  drug. I don't like that drug. But I wasn't treating
4  that. So when you say I didn't have a problem with it,
5  if I had a conference call with that guy and he asked
6  me, what do you think about this Seroquel, I'd say, I
7  don't like that drug, I never use that drug.
8      So when you said I don't have a problem with
9  it, I didn't have a problem that day, because she was
10 having no side effects that day that she came to me. If
11 I would have seen any side effects, tardive dyskinesia,
12 where she had abnormal movements, I'd say, you're
13 getting off that drug, I'm not giving you a refill. But
14 she didn't report any problems with any of her drugs.
15 The fact that another neurologist or physician gave it
16 doesn't mean I condone it. I just that's what they like
17 to use. I don't like that drug. I never have.
18     Q. And it's two milligrams, one b.i.d.?
19     A. No, 25 grams.
20     Q. Twenty-five milligrams, one b.i.d., that's
21 twice a day?
22     A. That's what she claims she was on, and that's a
23 very low dose.
24     Q. And twice a day, do you have an understanding
25 or did you tell her, should she take both pills at the

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 69

1  same time or different times?
2      A. I didn't tell her anything, because she had
3  been on the drug. She was taking it twice a day.
4  Morning -- usually when you tell a patient twice a day
5  they understand it's not two in one day, it's one in the
6  morning and one at night. I'm sure her neurologist, who
7  prescribed it, told her that. And she had no problem
8  with the dose. She never brought the dosage. She said,
9  I take one twice a day.
10     Q. She didn't tell you in what way she takes it
11 twice a day?
12     A. No, she didn't tell me she took it with water,
13 with seltzer, swallowed it after a martini, no, she
14 didn't tell me.
15     Q. You testified that's a low dose of Seroquel?
16     A. In my understanding of how high you can go,
17 never having been there, I would say that's a very low
18 dose, according to the dosage of it. Is that not
19 correct? You're the company man.
20     Q. I'll ask that question as a follow-up. Is it
21 fair to say the FDA has approved the use of Seroquel at
22 a much higher dose than just 50 milligrams?
23     A. Correct.
24     Q. Up to 800 milligrams?
25     A. Correct. Now, I will tell you if she came in

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 70

1  and she told me she was on 400 twice a day, I would have
2  not refilled that prescription.
3      Q.  But she didn't do that?
4      A.  She was only on 25. It was a very low dose.
5      Q.  So sticking with the facts in the case, you did
6  refill just the 25 because you felt that was a low
7  enough dose, or a low dose?
8      A.  I felt I would have less heartburn giving 25
9  and I would do it once until she went back to her
10 neurologist, which she said she was going I think on
11 April 29th, if my memory doesn't serve me.
12     Q.  Do you know who that neurologist is?
13     A.  Wilson, I believe was his name; is that
14 correct?
15     Q.  Dr. Wilson. It's a her.
16     A.  Oh.
17     Q.  Do you know Dr. Wilson?
18     A.  No.
19     Q.  All of these prescriptions are follow-up or
20 refill prescriptions of the drugs you're giving here?
21     A.  Yes, I did not give her any new drugs on the
22 two visits I had.
23     Q.  You did order blood tests, a mammogram and
24 instructed Ms. Curley to see a gynecologist for a Pap
25 smear; is that correct?

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 71

1      A.  Correct.
2      Q.  And we've seen from your records that she did
3  not follow up on those particular orders?
4      A.  Correct.
5      Q.  Let me show you the second visit, ask the court
6  reporter to mark it as the next exhibit, of 3/30/2004.
7          (Exhibit No. 5 was marked for identification.)
8          Doctor, the 3/30/2004 is your second and final
9  visit with Ms. Curley; is that correct?
10     A.  According to the record.
11     Q.  You do not indicate on this day that you did a
12 follow-up or a refill prescription of Seroquel?
13     A.  That is correct.
14     Q.  So as far as your records indicate, it's only
15 the one time?
16     A.  Correct.
17     Q.  Her blood pressure on the date is 134/82. Is
18 that prehypertensive?
19     A.  If you go by the new standards, it can be
20 considered borderline. In the last two years, most
21 medical physicians have been informed that the old
22 standard of 140/90 is no longer the parameters, that the
23 systolic pressure should be below 120.
24     Q.  So using those parameters, would it be fair to
25 call this a prehypertensive reading?

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 72

1      A.  Again, that's why I'm saying, everybody doesn't
2  buy into the new parameters that suggest recommendations
3  that have been given. There's no hard rule that if you
4  don't treat somebody under 140 you're doing a
5  disservice, unless -- there are others who believe you
6  are. So what I'm saying is, I'm giving you what the
7  standards have been for many years. Most of the time if
8  your systolic was 140 or below, you didn't have
9  hypertension. If it was 140, you had borderline. That
10 was the cutoff. In my mind, the cutoff has been dropped
11 to 130.
12     Q.  So using the 130, this is --
13     A.  In my mind --
14     Q.  -- borderline?
15     A.  -- I would be watching that blood pressure to
16 see if this was continuing on the rise or if this is a
17 one-time reading that would actually be lower the next
18 time. Remember, when you see your physician, it's a
19 little bit -- patients have some anxiety. They're
20 waiting, they're anticipating, they're rushing to the
21 room. The blood pressure is taken before they sit down
22 for 15 minutes, which is the recommendation, as you
23 know, to relax. You're thinking about something. You
24 don't know if that day that patient had something on
25 their mind that could have created a little adrenalin to

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 73

1  flow, vasoconstriction, and the pressure could have
2  risen. So you just can't take a number on one day and
3  ask me if that's borderline hypertension. Usually you
4  have to take three visits and then determine the patient
5  has hypertension.
6      Q.  And you didn't get the opportunity to follow up
7  on this, because she never came to see you again?
8      A.  She didn't see me. Her first blood pressure
9  was 100/58.
10     Q.  So very different in the two different visits?
11     A.  So it tells me there could have been a factor
12 there other than true hypertension.
13     Q.  Again, you're recommending her to have the
14 blood work and the gynecology?
15     A.  It's the second time I've told her to do it.
16     Q.  We've established she didn't do it either time?
17     A.  That's correct.
18     Q.  Okay. Are you aware that she had a ER visit,
19 an emergency room visit, in May of '04?
20     A.  No.
21     Q.  Let me show you that medical record.
22         (Exhibit No. 6 was marked for identification.)
23         Doctor, do you see that this is a Tampa General
24 Hospital medical record dated at the top right
25 5/12/2004?

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 94

1  considered risk factors for getting type 2 diabetes
2  under the normal circumstances?
3      A.  They can become a factor.
4      Q.  Does just getting older increase your risk of
5  diabetes?
6      A.  If you have a genetic predisposition, you're
7  more prone as you get older to develop high sugar.  If
8  you don't have a genetic predisposition, getting older
9  doesn't mean you're getting diabetes.
10     Q.  It's fair to say not everybody who gets older
11 gets diabetes?
12     A.  That's my point.
13     Q.  But is it fair to say that generally for type 2
14 diabetes, more patients are older rather than younger?
15     A.  No, because type 2 diabetes can start in the
16 40s, 30s.  And you live to 80 today, so for 50 years
17 you'll be a type 2, so it's just not older people.
18     Q.  Is type 2 diabetes a treatable condition?
19     A.  Yes.
20     Q.  And you do that in your practice?
21     A.  Yes.
22     Q.  You monitor -- when treating a type 2 diabetic,
23 you would be monitoring their blood sugar?
24     A.  Their blood sugar, their weight, their lipids,
25 their hemoglobin A1C, their renal function --

Stratos Legal Services
800-971-1127

---

Dr. Leonard Mennen
July 24, 2008

Page 95

1      Q.  If --
2      A.  -- cardiac function, peripheral vascular
3  disease and their eyes, those things we monitor, yes.
4      Q.  If a type 2 diabetic of yours is overweight,
5  you would advise them to lose weight?
6      A.  Correct.
7      Q.  If a type 2 diabetic was a smoker, you'd advise
8  them to stop smoking?
9      A.  Correct.
10     Q.  If a type 2 diabetic in your practice didn't
11 get any exercise, you would advise them to exercise?
12     A.  Correct.
13     Q.  Would you agree that type 2 diabetes is a
14 manageable and treatable condition?
15     A.  Yes.
16         MR. MANZELLA:  Thank you.  No further
17 questions.
18              REDIRECT EXAMINATION
19 BY MS. AUSTIN:
20     Q.  I just have a couple of follow-up questions.
21     A.  No problem.
22     Q.  Okay.  Today during this deposition you've been
23 asked questions regarding the refill that you provided
24 to Ms. Curley on March 2nd of 2004, correct?
25     A.  Correct.

Stratos Legal Services
800-971-1127

---

Dr. Leonard Mennen
July 24, 2008

Page 96

1      Q.  And we can all agree that you were not the
2  initial prescriber, that was indeed a refill that you
3  provided her with on March 2nd, 2004?
4      A.  Correct.
5      Q.  When you are refilling prescriptions for a
6  patient, and I think we might have already covered this,
7  but I want to make sure that we're clear for the record,
8  you don't undertake the same risk-benefit analysis for
9  that patient, correct, because the initial prescriber's
10 already done that?
11     A.  No, that's incorrect.
12     Q.  Okay.  Well, clarify that for me then.
13     A.  When I'm refilling anything, either for myself
14 or for another physician, if I thought that I saw
15 evidence that there was some detrimental effect of that
16 drug, even though the patient told me someone else was
17 giving it to her, I'll say, well, you go back and see
18 that doctor, I'm not giving it to you today, I don't
19 think you should be on it.  So I do weigh that when I
20 write it.  Being familiar with the side effects, pretty
21 much, of all the drugs she's on, that she was on, if she
22 had asked me for refills, I would have, which I did in
23 her case, given her that refill of one time.
24     Q.  Okay.  So you weigh the risk-benefits of giving
25 the refill, but you do the same risk-benefit analysis on

Stratos Legal Services
800-971-1127

---

Dr. Leonard Mennen
July 24, 2008

Page 97

1  the drug that you would have done if you had been the
2  initial prescriber?
3      A.  Yes.
4      Q.  You do?
5      A.  Yes.
6      Q.  Okay.  So when you're giving a refill, you have
7  the same discussion with that patient regarding possible
8  side effects, risks and benefits?
9      A.  Not the risks, no --
10         MR. MANZELLA:  Objection.
11     A.  -- not on a refill.  The patients I initially
12 prescribe, I would tell them what could be some side
13 effects.  The pharmacist, when they get the drug, also
14 gives them.  It's printed out of things you have to
15 worry about.
16     Q.  Yes.
17     A.  She was already informed, I assume, by her
18 neurologist, and also from the pharmacist where she got
19 her first prescriptions.  She had no question to me
20 about Seroquel other than she wanted a refill.  There
21 was nothing about, doctor, I think I'm experiencing this
22 and that or anything like that.  So that's -- I didn't
23 ask her if she was having any side effects from any of
24 the medications, because she reported none.
25     Q.  So your conversation about those drugs would

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 98

1  have been limited to her requesting refills and you
2  agreeing to provide them for her?
3      A.  If I thought I didn't see any reason not to.
4      Q.  I understand.  You were shown an exhibit of a
5  elevated blood glucose level for Ms. Curley back in
6  2000; do you recall that?
7      A.  Yes, I do.
8      Q.  Having an elevated glucose level in 2000 and
9  then another one in 2004, in your opinion, in your
10 practice of 40 years, does that equal to you indication
11 that a patient is developing diabetes?
12     A.  If you want me to comment on those two sugars,
13 I'm willing to do that.
14     Q.  Well, let me rephrase my question.  Do two
15 isolated elevated blood glucose levels equal a diabetes
16 diagnosis?
17         MR. MANZELLA:  Objection to the term isolated.
18     A.  No, without further confirmation, because if
19 you looked at those sugars, the one in 2000 was 133.
20 The one that Dr. Torralba got was 106.  So actually they
21 were going down, not up.
22     Q.  Okay.
23     A.  But that doesn't mean she didn't have diabetes.
24     Q.  Okay.  So assuming that there were no other
25 tests run and that's all that we have, the glucose

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 99

1  reading in 2000 and the glucose reading in 2004, in that
2  particular situation, if that were your patient, would
3  you at that time make a diagnosis of diabetes based on
4  those two blood glucose levels?
5      A.  No.  You're asking me just on those two things?
6      Q.  Just on those two.
7      A.  However, I would have a strong suspicion
8  because she gave me that strong family history that I
9  subsequently found out about that I felt I would say,
10 you need some further tests, hemoglobin A1C.
11     Q.  Okay.  Do you know whether the blood glucose
12 level reading in 2000 of 133 was a fasting blood glucose
13 level?
14     A.  I do not know that, but usually when you're
15 doing lipids it's on fasting, and she had lipids done, I
16 believe, at that time also, if I'm not mistaken.  Is
17 that correct?
18     Q.  Let's take a look.  (Indicating.)
19     A.  Yeah, she had lipids done in 2000.  So usually
20 the patient is told, you have to be fasting to get the
21 cholesterol.  But I will tell you sometimes technicians
22 don't ask the patient and sometimes the doctors don't
23 tell the patient, and sometimes the patients don't
24 remember and get up and have a doughnut and show up.  So
25 I'm just telling you how it works.  But if I do one and

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 100

1  I see a very strange reading between two recent tests, I
2  always ask, I say, did you do this fasting, and then
3  they sometimes will say, well, I did have a doughnut, or
4  something like that.  So there are certain suspicions
5  you get when you see the tests.
6      Q.  So more likely than not, it was a fasting, but
7  we can't be sure?
8      A.  Correct, most likely.
9      Q.  You were asked about some of the risks for the
10 development of diabetes, and you indicated that obesity
11 was one of the risks.  Ms. Curley is somewhere between
12 4'9 and 4'11.  We weren't able to determine.  On the
13 first visit with you, she was 128 pounds.  Would a
14 person --
15     A.  She was 126, if my memory doesn't serve me
16 correct.
17     Q.  One was 126 and one was 128.  The first visit
18 was 128.
19     A.  The second was 126.  So she lost two pounds.
20     Q.  She lost two pounds.  Would you consider a
21 person who was 4'9 to 4'11 and 128 pounds to be obese?
22     A.  I would say they're, in my mind, you ask me
23 what I consider, mild to moderate obesity.
24     Q.  Okay.  And then we noted on the last visit with
25 Dr. Torralba that Ms. Curley had had some weight gain

Stratos Legal Services
800-971-1127

Dr. Leonard Mennen
July 24, 2008

Page 101

1  and her weight had gone up to 141 pounds as of September
2  2nd of 2004, and you indicated that you would consider a
3  person of Ms. Curley's height at 141 pounds to be obese,
4  correct?
5      A.  Correct, I would say moderate compared to mild.
6  I thought she was obese at 128 at 4'9.  Since you look
7  at the charts that are available, that is considered
8  obesity in most charts.
9      Q.  Okay.  And I asked you before and I'll ask you
10 again to clarify, I know you didn't see Ms. Curley on
11 9/2/2004, but did Dr. Torralba attribute that weight
12 gain to anything in particular?
13     A.  He made no mention of it.
14     Q.  And as you sit here today, you're not able to
15 attribute that weight gain to anything in particular,
16 are you?
17     A.  That is correct, without knowing more
18 information.
19     Q.  And you're not able to say with any degree of
20 medical certainty whether or not Seroquel caused that
21 significant weight gain, are you?
22     A.  I cannot say that.
23     Q.  And Ms. Curley was still on Seroquel during
24 that time period, as far as we know, correct?
25     A.  Correct.

Stratos Legal Services
800-971-1127