# EXHIBIT 3

Hector Cases
August 14, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:07-cv-15701

**IN RE:** SEROQUEL PRODUCTS
**LIABILITY** LITIGATION

CONNIE M. CURLEY,

    Plaintiff,

vs.

ASTRAZENECA PHARMACEUTICAL,
L.P., and ASTRAZENECA, L.P.,

    Defendants.

DEPOSITION OF HECTOR J. CASES, MD

Taken on Behalf of the PLAINTIFF

DATE TAKEN: August 14, 2008
TIME: 1:30 p.m. - 2:45 p.m.
PLACE: Neurological, Pain & Rehabilitation
Institute
3010 East 138th Avenue, Suite 100
Tampa, Florida 33613

Examination of the witness taken before:

Linda S. Blackburn
Registered Professional Reporter
Certified Realtime Reporter
Certified LiveNote Reporter

Hector Cases
August 14, 2008

Page 10

1  they happen to have Parkinson's disease or Multiple
2  Sclerosis or Alzheimer's, I will also co-manage that.
3  Q. Okay. Do any of your -- your patients in your
4  practice suffer from diabetes?
5  A. Yes.
6  Q. Would you be able to estimate what percentage
7  of your patients suffer from diabetes?
8  A. I couldn't. I wouldn't know. I really defer
9  that to the primary care doctor.
10 Q. Okay. So although you may have patients who
11 suffer from diabetes, you're not treating them for their
12 diabetes; it's kind of another condition?
13 A. That is correct, yes.
14    (Cell phone interruption.)
15 Q. Okay. You need to get that?
16 A. No. I'm just going to put the sound off.
17 Q. And although I know that you don't treat
18 patients with diabetes, are you familiar with the risk
19 factors of diabetes and the complications resulting from
20 diabetes?
21 A. Yes, ma'am.
22 Q. Can you explain to the jury some of the risk
23 factors for the development of diabetes?
24 A. Family history, obesity are the main ones that
25 I see.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 11

1  Q. Okay. And can you also tell the jury some of
2  the complications that a patient can develop as a result
3  of being diabetic?
4  A. Sure. You can have anywheres from diabetic
5  retinopathy to diabetic nephropathy. You can have heart
6  disease, strokes, diabetic neuropathy, autonomic
7  neuropathy. There's a whole -- I mean, diabetes can
8  affect multiple organ systems over time.
9  Q. So is it fair to say that diabetes is a
10 progressive disease?
11 A. It could be if it's not treated actively by the
12 doctor and the patient doesn't participate actively as
13 well.
14 Q. Okay. And as a physician, you would certainly
15 want to avoid doing anything that would put a patient at
16 higher risk for the development or treatment of their
17 diabetes. Am I correct?
18 A. Yes, ma'am.
19 Q. Okay. Now, I want to switch gears a little bit
20 and talk about the risk benefit analysis that a doctor
21 undertakes when he prescribes a drug for a patient.
22 A. Okay.
23 Q. Okay. Prior to prescribing a drug for one of
24 your patients, do you weigh the risks and benefits of
25 that drug for that patient?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 12

1  A. Yes, ma'am.
2  Q. And is it true, Doctor, that you're only able
3  to weigh the risks and benefits that you're aware of at
4  the time you're making the prescription, correct?
5  A. Yes, ma'am.
6  Q. So if there are risks associated with the drug
7  that are not known to you, then obviously you can't
8  consider those, right?
9  A. I cannot factor those in, no.
10 Q. And it's important for you to have accurate
11 information when you're making that risk benefit
12 analysis, correct?
13 A. Yes, ma'am.
14 Q. And if a source of the information downplayed
15 the information or minimized the information, then that
16 could be dangerous to your patients, correct?
17    MR. MANZELLA: Objection.
18 Q. You can still answer.
19 A. I can still answer it? Okay. Repeat that
20 question again.
21 Q. If a source of information for you in your
22 prescribing decisions downplayed or minimized any of the
23 information that was available to you, that could be
24 dangerous to your patients, correct?
25 A. Yes, ma'am.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 13

1     MR. MANZELLA: Same objection for the record.
2  A. Yes, ma'am.
3  Q. Okay. Can you tell the jury some of the
4  sources that you use for information about the drugs
5  that you prescribe?
6  A. I use the package inserts most of the time. I
7  do some Internet searches as well. And I do go to a lot
8  of talks from pharmaceutical companies in the area from
9  lecturers who are well-versed on the medications that
10 are being exposed during the lectures.
11 Q. Do you have any AstraZeneca sales reps that
12 visit you at your office?
13 A. I do.
14 Q. Do you recall the name of your AstraZeneca
15 sales rep?
16 A. No.
17 Q. Would you recognize the sales rep if you saw
18 him or her?
19 A. Possibly.
20 Q. Yeah. They always hate to hear that.
21 A. Yeah.
22 Q. They think they're --
23 A. There's so --
24 Q. -- top of the list.
25 A. -- many companies.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 14

1  Q. Okay. Do you know whether or not your
2  AstraZeneca sales rep details you on the drug Seroquel
3  when they come?
4  A. Well, it's been a while since they -- I've been
5  talked about Seroquel here in this office. This office
6  has been here for about eight months now, so I haven't
7  had anybody come in and talk to me about Seroquel. And
8  being -- and being mostly, you know, interventional pain
9  management for the past, you know, two or three years,
10 couple years, I haven't been really doing a whole bunch
11 of headache treatments since then, so I haven't seen
12 anybody from that company for Seroquel. I do get every
13 now and then people for -- company people coming and
14 talking about Zomig for migraines.
15 Q. Okay. So is it fair to say that you don't
16 prescribe Seroquel in your practice?
17 A. Very, very -- I haven't done Seroquel in maybe
18 a couple years, two years.
19 Q. Okay. And I know that it's not routine in your
20 practice for you to diagnose mental disorders, but do
21 you treat patients with mental disorders?
22 A. Yes, ma'am.
23 Q. And in the treatment of those patients, have
24 you ever had the occasion to prescribe Seroquel to any
25 of those patients for any of their mental conditions?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 15

1  A. Yes, ma'am.
2  Q. And that would have been two years or more ago?
3  A. Yes.
4  Q. Okay. You mentioned earlier that you do attend
5  some of the meetings that are put on by the
6  pharmaceutical companies for information, correct?
7  A. Yes, ma'am.
8  Q. Okay. Do you recall ever going to any of those
9  talks regarding the drug Seroquel?
10 A. I do not recall that.
11 Q. Okay. But isn't it true that the drug
12 companies sponsor clinical trials and things like that
13 relating to the different drugs that they manufacture?
14 A. Yeah.
15    MR. MANZELLA: Objection.
16 A. Can you repeat that, please?
17 Q. You answered. You said, "Yeah." You need me
18 to repeat it?
19 A. Yeah. And I just got -- I did. I mean yes.
20 Q. Okay.
21 A. Clinical trials, yes.
22 Q. Okay. And isn't it true that those drug
23 companies strictly control what their representatives
24 and/or speakers tell to the doctors when you attend
25 those talks?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 16

1     MR. MANZELLA: Objection.
2  A. I mean --
3     MR. MANZELLA: Calls for speculation.
4     Go ahead.
5  A. Speaking from -- for doctors, I know that they
6  will -- they -- I don't think they control doctors, what
7  they say. Doctors usually will lecture on the facts of
8  clinical trials and so forth. After lectures are done
9  and official lectures are done and closed, doctors will
10 tend to talk to each other on a peer to peer level and
11 talk about experiences regarding medications and how
12 they're using it in the practice, which is usually not
13 sanctioned or -- a better word would be it's not
14 sponsored by the companies.
15 Q. Okay. Is --
16 A. And I couldn't speak for the drug reps them-
17 selves. I wouldn't know.
18 Q. Okay. Fair enough.
19    When sales reps from the drug companies come in
20 to see you, do you expect for them to inform you about
21 important changes regarding prescribing information for
22 the drugs that they're promoting?
23 A. Absolutely.
24 Q. And do you expect for them to give you truthful
25 information about the -- the drugs that they're

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 17

1  promoting?
2  A. Yes, ma'am.
3  Q. And do you expect for them to give you balanced
4  information about the drug that they're promoting? And
5  by "balanced," I mean the good things and the bad
6  things.
7  A. Yes, ma'am.
8  Q. Is there any way for you to remember each and
9  every conversation that you have with the drug reps that
10 come in to see you?
11 A. No.
12 Q. Okay. I want to talk a little about the drug
13 Seroquel. I know it's not something you use routinely,
14 and you haven't prescribed it for a while, so if you
15 don't recall that, it's okay to say that.
16 A. Um-hmm.
17 Q. Do you remember when a warning for risks
18 associated with diabetes first appeared on the package
19 insert for Seroquel?
20 A. I remember the warning. I do not recall when I
21 read it and heard it.
22 Q. Okay. Do you recall whether you heard it from
23 a sales rep, or did you read it in the package insert;
24 how did you become aware that there had been a change to
25 the package insert?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 18

1    A.  I believe it was mostly news.  Then I believe I
2  may have gotten something in the mail from the company
3  and then I reread the package insert.
4    Q.  Okay.  And when you became aware of the change,
5  did that affect any of your prescribing patterns at that
6  time?
7    A.  Well, it did.  I was a little more cautious.
8  But also probably coincided with my leaving USF and
9  going into private practice and doing mostly back pain,
10  spine pain which took me away from migraine headaches.
11    Q.  Okay.  So am I to understand that you were
12  prescribing Seroquel for migraine headaches?
13    A.  We were using it at the time for migraine
14  headaches --
15    Q.  Okay.
16    A.  -- in those hard to treat populations.
17    Q.  Were you working with Dr. Maria Wilson --
18    A.  Yes, ma'am.
19    Q.  -- in that study?
20    A.  Yes.  She actually trained me.
21    Q.  Oh, okay.  Okay.  After you guys became aware
22  of the change in the package insert, did that change the
23  way that you monitored patients who had been prescribed
24  Seroquel?
25    A.  Yes.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 19

1    Q.  Do you recall what the change was?
2    A.  Mostly for hyper -- hyperglycemia, for
3  diabetes.
4    Q.  Okay.  So what did you do differently?
5    A.  Well, like I said, it coincided with me leaving
6  USF and not really treating headaches as much anymore
7  and so forth.  I actually didn't prescribe it after
8  that.
9    Q.  Okay.  So you became aware in the midst of all
10  the changes, then you left, so you weren't an active
11  participant anymore?
12    A.  Right.
13    Q.  Okay.  Gotcha.
14       Doctor, can we agree that an ineffective
15  warning is equivalent to no warning at all?
16       MR. MANZELLA:  Objection.
17    A.  Yes.
18    Q.  Well, let me give you an analogy then to make
19  it a little bit clearer.  If your house was on fire and
20  a neighbor waited six hours later to call your office
21  and say, hey, Hector, your house is on fire, that would
22  be kind of late, wouldn't it?
23    A.  Yes.
24    Q.  And it would be really too late for you to have
25  done anything about it, correct?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 20

1    A.  That's correct.
2    Q.  So if AstraZeneca had knowledge well before it
3  changed its package insert that there was a problem with
4  the drug Seroquel, could we agree that that late warning
5  is equivalent to an ineffective warning?
6       MR. MANZELLA:  Objection.
7    A.  Yes.
8    Q.  And you testified that you do recall receiving
9  a letter from AstraZeneca informing --
10    A.  I may, but I don't recall it for certain.
11    Q.  Okay.  And you don't recall exactly when?
12    A.  No.
13    Q.  Okay.  Let's talk a little bit about
14  specifically Connie Curley.  Do you recall Ms. Curley
15  specifically?
16    A.  No, I don't.  I'm sorry.
17    Q.  That's okay.
18       But you do from your review of the records have
19  some recollection that you must have treated her --
20    A.  Yes.
21    Q.  -- at Tampa General?
22    A.  I see my handwriting on a few notes, yes.
23    Q.  Okay.  And you've been able to pull those notes
24  out for you us?
25    A.  Yes.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 21

1       (Exhibit No. 1 was marked for identification.)
2    Q.  First of all, let me show you what I've marked
3  as Exhibit Number 1.  It's the notice to the deposition.
4    A.  Um-hmm.
5    Q.  Do you recall receiving that?
6    A.  Yes.
7    Q.  And attached to the back is a request for
8  records and things like that?
9    A.  Um-hmm.
10    Q.  Did you have in your possession anything that
11  was responsive to that request?
12    A.  No.
13    Q.  So the only information that you reviewed was
14  the information that was sent to you --
15    A.  Yes.
16    Q.  -- by us?
17    A.  Um-hmm.
18    Q.  Okay.  I guess can we take a look at the notes
19  that you've pulled out that you identified from the
20  stack?
21    A.  The ones I've identified were on January 25th
22  of 2005 that I couldn't see anything else on the -- on
23  the -- in the papers that I was sent.  I have a Progress
24  Note which is in my handwriting, and I have a -- two
25  prescriptions with my handwriting and a sort of a

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008
Page 22

1  Physician Diagnosis Summary on the day that she was
2  discharged from the hospital. She apparently was
3  staying at the Tampa General Hospital Pain Clinic, the
4  inpatient program, to try to get her headaches under
5  control.
6      Q. And that was around January 25th of 2005?
7      A. It was on January 25th of 2005 when I saw her,
8  and I discharged her that day.
9      Q. Okay. Can I take a look at the notes that
10 you've pulled out?
11     A. Yes, ma'am. And that's the discharge summary.
12     Q. Okay. Doctor, I'm going to hand these back to
13 you.
14     A. Okay.
15        MS. AUSTIN: We can go off the record just a
16 second.
17        (Discussion off the record.)
18        MS. AUSTIN: Okay. Back on the record after a
19 short break.
20        (Exhibit No. 2 was marked for identification.)
21 BY MS. AUSTIN:
22     Q. Doctor, I've marked as Exhibit 2 to the
23 deposition --
24     A. Um-hmm.
25     Q. -- the records that you isolated from the stack

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008
Page 23

1  as being yours.
2      A. Um-hmm.
3      Q. And the first one is it appears to be
4  demographic record of Ms. Connie Curley dated January
5  25th of 2005?
6      A. Yes.
7      Q. A Progress Note written by you dated January
8  25th -- 25th of 2005?
9      A. Yes.
10     Q. Some prescription records written by you for
11 Connie Curley for January 25th, 2005?
12     A. Um-hmm.
13     Q. And a Physician Diagnosis Summary also dated
14 January 25th, 2005, filled out by you?
15     A. Yes, ma'am.
16     Q. Is that an accurate representation of the
17 documents?
18     A. Yes, ma'am.
19     Q. Okay. And before I get started on these, I
20 just had a question. I'm not sure if you are aware, but
21 I'll represent to you that Ms. Curley was seen back in
22 2003 in this same headache program at Tampa General
23 Hospital.
24     A. I saw that.
25     Q. Did you have occasion to treat her during that

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008
Page 24

1  hospitalization?
2      A. No, not that I can recall. I didn't see my
3  name on any notes back then. What date? January?
4      Q. It was January at that time also.
5      A. Yeah. And I got into Tampa General USF in July
6  of 2003.
7      Q. Okay.
8      A. So I was not there.
9      Q. So that would have been Ms. Curley's second
10 visit to the headache program at Tampa General?
11     A. I believe so, yes.
12     Q. Okay. If you'll turn for me to your Progress
13 Note that's dated January 25th of 2005 --
14     A. Yes, ma'am.
15     Q. -- I am having some difficulty in reading the
16 contents of this, so if you could read the record --
17 read this note onto the record, I'd appreciate it.
18     A. Absolutely. It's dated 1 -- January 25th of
19 2005. And at the top part of the page is says Meds or
20 Medication. That part was written by Karen Machado who
21 is the -- one of the nurses at Tampa General, so she
22 puts down in terms of medication the patient's taking.
23     Q. Okay.
24     A. Fluoxetine, which is Prozac, at 20 milligrams,
25 two tabs in the morning every day. Baclofen, 10

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008
Page 25

1  milligrams every eight hours. Zantac, 150 milligrams
2  once a day. Lescol XL, 80 milligrams daily. And
3  Seroquel, 25 milligrams, three tablets at night. And
4  Relpax, 40 milligrams as needed.
5        Then I come down, and I start my -- in my own
6  handwriting, my note, and state the following: Patient
7  complains of daily headaches, generalized body pain, and
8  muscle aches, period. Headache -- pain level -- head-
9  ache pain level today is eight out of ten. Not sleeping
10 very well on Seroquel 75 milligrams at night. Baclofen
11 is not helping. Flexeril was better. Patient has
12 gastro -- GI or gastrointestinal intolerance to NSAIDS,
13 which is nonsteroidal antiinflammatory drugs.
14       Then I go down into my examination. Her blood
15 pressure was 150/82; pulse was 80; respiratory was 18,
16 temperature was 98 degrees. She had tenderness in both
17 occipital nerves. She had some cervical spine
18 myofascial pain, which is muscle pain. The rest of the
19 examination is -- was normal.
20       Impression: Number one, chronic daily head-
21 aches, known as CDH. Number two, FM, which is fibro-
22 myalgia.
23       In terms of my plan, I tapered and discontinued
24 Baclofen. Restarted Flexeril at 10 milligrams at three
25 times a day. I increased her Seroquel to a hundred

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 26

1  milligrams in the evening for one week, then increased
2  it to 200 milligrams in the evening after that. And I
3  continued Relpax as needed for headaches.
4     Q.  Okay. At the time that you wrote this Progress
5  Note, do you know whether or not Ms. Curley had been
6  diagnosed with diabetes?
7     A.  I do not believe so.
8     Q.  Okay.
9     A.  I do not recall.
10    Q.  Okay. And there's nothing --
11    A.  And nothing -- in terms of her prior
12  hospitalizations, her past history was negative for
13  diabetes.
14    Q.  Okay. And, Doctor, let me just ask you, do you
15  know what Seroquel was indicated for?
16    A.  Yes. Indicated for bipolar disorder, bipolar
17  mania, schizophrenia, psychosis.
18    Q.  Okay. And the doctors at the pain management
19  program were aware that it was being prescribed off
20  label to Ms. Curley, correct?
21    A.  Yes, ma'am.
22    Q.  And can you clarify for the jury what the
23  purpose was for prescribing Seroquel for headaches?
24    A.  Sure. There's a fraction of patients with
25  headaches which are very difficult to treat and do not

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 27

1  respond very well to typical standard of care. And as a
2  neurologist in pain management, we often use medications
3  off label frequently to treat these people and try to
4  get them some help. And so -- so even though it's not
5  FDA approved for that, there is with certain medications
6  a standard of care among doctors, especially
7  neurologists, who use these medications off label for --
8  for different uses.
9         One perfect example is a medication called
10  Neurontin which came out for seizures and epilepsy, and
11  it turned out that we knew way before, you know, that it
12  was very good for neuropathic pain or nerve pain, more
13  so than it was for -- for the seizures or epilepsies,
14  and we routinely used it, and still do, for neuropathic
15  or nerve pain in patients.
16    Q.  Okay. Did you have success in prescribing
17  Seroquel for patients for headaches?
18    A.  In some patients, not all.
19    Q.  Do you recall whether or not you had success
20  with Ms. Curley prescribing Seroquel for her headaches?
21    A.  I do not recall.
22    Q.  Okay.
23    A.  And looking at her chart, she had been on it
24  for a while, and she had -- still having daily head-
25  aches.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 28

1     Q.  But as far as you know, Seroquel was prescribed
2  to Ms. Curley strictly for her headaches --
3     A.  Yes, ma'am.
4     Q.  -- and not for any mental illness?
5     A.  Not that I know of.
6     Q.  Okay. And --
7     A.  I could be wrong. I mean, I don't know if she
8  was -- had been -- when I first got on the case, she was
9  already on it. Sometimes we will use medications that
10  are being appropriately used for one condition and then
11  maximize it to treat other off label conditions like
12  headaches.
13    Q.  Okay. So because Ms. Curley had already been
14  prescribed Seroquel at the time that you started seeing
15  her, you don't know what the initial prescription was
16  for?
17    A.  Right.
18    Q.  And you don't know who made the initial
19  prescription of Seroquel to her?
20    A.  No.
21    Q.  Okay. Also included in Exhibit 2 is a copy of
22  prescriptions that you wrote for Ms. Curley?
23    A.  Yes, ma'am.
24    Q.  And is the prescription for Seroquel the same
25  as what you had indicated in your note you intended to

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 29

1  prescribe?
2     A.  Yes. I mean, the only change was, as I said,
3  one twice a day on the prescription instead of two at
4  night, but it's still the same dose, same milligrams.
5     Q.  Okay. So you prescribed her the 100 milligram
6  tabs, so she only needed to take one tab and increase it
7  to two tabs?
8     A.  Right, right. And she was at 75 milligrams
9  when I did that change.
10    Q.  Okay. And then the last page would be the
11  Physician Diagnosis Summary?
12    A.  Um-hmm.
13    Q.  And you checked off neurology pain; is that
14  accurate?
15    A.  Yes, ma'am.
16    Q.  And what is that that you wrote under principal
17  diagnosis and secondary diagnosis?
18    A.  Principal diagnosis is intractable migraine.
19  The second --
20    Q.  What exactly is a intractable migraine?
21    A.  Migraines that are ongoing. It's usually a
22  synonym for chronic daily headaches. People that have
23  near daily or daily headaches, not really responding to
24  medication.
25    Q.  And what was the secondary diagnosis?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 30

1   A. Secondary diagnosis was fibromyalgia.
2   Q. Okay. And, Doctor, in your review of that
3   large chart, I just want to be clear that these were the
4   only notes that you found where you had treated
5   Ms. Curley at Tampa General Hospital.
6   A. Yes, ma'am.
7   Q. Do you recall any other location where you
8   would have provided care and/or treatment to Connie
9   Curley?
10  A. No.
11  Q. After January 25th of 2005, did you ever
12  provide any subsequent treatment to Ms. Connie Curley?
13  A. Not that I recall.
14  Q. Okay. And you don't recall Ms. Curley
15  specifically?
16  A. No. I'm sorry. I don't.
17  Q. Okay. And you indicated that you left the
18  program at Tampa General Hospital shortly after you saw
19  Ms. Curley in 2005, correct?
20  A. No. I -- I came in -- I'm sorry. Yes. I am
21  so sorry. Yes. I left at the end of June of 2005.
22  Q. Okay.
23  A. Right.
24  Q. So you wouldn't have any knowledge past this
25  date about Ms. Curley's Seroquel usage, correct?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 31

1   A. No, ma'am.
2   Q. And you wouldn't have any knowledge about
3   whether or not your prescription of Seroquel to
4   Ms. Curley was effective?
5   A. Effective? No, not at all.
6   Q. And you wouldn't have any knowledge about
7   whether or not Ms. Curley had to be seen again at that
8   headache program?
9   A. No. I suspect she was. Patients do get
10  discharged and continue to see in follow-up in the
11  clinic with the doctor, Dr. Wilson, or one of her
12  fellows in training.
13  Q. Okay. And you don't know if Ms. Curley was
14  ever diagnosed with diabetes, do you?
15  A. Not that I recall.
16  Q. And if she was diagnosed with diabetes, you
17  wouldn't know when?
18  A. No.
19  Q. And you wouldn't know how Ms. Curley's diabetes
20  is doing today?
21  A. No.
22  Q. Okay. I'll represent to you that Ms. Curley
23  did develop diabetes, and it is her assertion that she
24  developed diabetes as a result of taking the drug
25  Seroquel, which is why we are here today.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 32

1   A. Um-hmm.
2   Q. Do you have any opinion as you sit here today
3   whether or not Seroquel causes diabetes in patients that
4   take it?
5       MR. MANZELLA: Objection.
6   A. Only from what I've read in -- in the
7   indications in the black box warning.
8   Q. Okay. And what is that opinion? That it does
9   that or that it does not?
10      MR. MANZELLA: Objection.
11  A. It can increase the risk of diabetes.
12  Q. Okay. But as we sit here today, you don't have
13  an opinion one way or another about whether Seroquel
14  caused Ms. Curley's diabetes, do you?
15  A. I do not recall if she was obese or not or
16  thin. I do not recall if she has a family history of
17  diabetes. I do not recall her -- her -- her as a person
18  or as a face, I really don't.
19  Q. Okay.
20  A. Couldn't comment on that.
21  Q. So you're not able to form an opinion today?
22  A. No, no.
23      MS. AUSTIN: Okay. I think I'm going to pass
24  the witness.
25      MR. MANZELLA: Okay.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 33

1       MS. AUSTIN: You want this?
2       MR. MANZELLA: No.
3           CROSS-EXAMINATION
4   BY MR. MANZELLA:
5   Q. Good afternoon, Dr. Cases. My name is Jeff
6   Manzella, and I represent AstraZeneca Pharmaceuticals,
7   and I have a few follow-up questions for you.
8   A. Sure.
9   Q. Is the reason you saw Connie Curley on 1-25-05
10  at Tampa General because you were on call that day or at
11  the hospital that day?
12  A. Probably.
13  Q. She wasn't a patient of yours prior to that
14  day?
15  A. Not that I recall.
16  Q. And --
17  A. And I've looked at the chart to see if I have
18  another Progress Note of when she was in the hospital.
19  So I don't -- I do not recall.
20  Q. Okay. And as far as your recollection goes,
21  she wasn't a patient of yours after that day?
22  A. That's correct.
23  Q. So just for the record, she was your patient
24  for one day on January 25th, 2005, based on your
25  recollection and the medical records?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 34

1   A. That's correct. That's correct.
2   Q. And she's testified in her deposition that
3   Dr. Maria Carmen Wilson was her neurologist and still
4   sees Dr. Wilson today.
5   A. Right.
6   Q. You're familiar with Dr. Wilson?
7   A. Yes.
8   Q. And does that time period make sense, that
9   Dr. Wilson would be the primary neurologist treating
10  Connie Curley in that 2004, 2005 time period?
11  A. That's correct.
12  Q. Were you her resident?
13  A. I was her fellow.
14  Q. Okay.
15  A. And then like I said, I stayed on after June --
16  July of '04. I became a clinical instructor at USF on
17  my way to becoming assistant professor. That's just a
18  lower appointment till I get my paperwork in.
19  Q. And what does it mean to be a fellow? Well, at
20  1-25-05, was your status a fellow?
21  A. Difficult to say.
22  Q. Okay.
23  A. And the -- and the reason for that is that the
24  fellowship is one year, but they wanted me to stay on as
25  an assistant professor, and my paperwork took several

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 35

1   months to go through, so I was actually left in limbo at
2   a fellow's pay, okay, but doing clinical instructor
3   activities after having, -- you know, back then as, you
4   know, several -- at least a decade of clinical
5   experience.
6   Q. And what does it mean to be a fellow?
7   A. A fellow is when somebody does a subspecialty.
8   A resident is when you come out of medical school and
9   then you go do training in neurology or cardiology or
10  internal medicine; that's your residence. And then if
11  you want to subspecialize in any other area after you've
12  completed your primary residency, then you're a fellow
13  for that one or two years or whatever is the training
14  period for that subspecialty.
15  Q. And when you were a fellow at Tampa General and
16  around this time period treating Ms. Curley, what was
17  your fellowship in?
18  A. Headache pain and pain management.
19  Q. And is that Dr. Wilson's specialty as well?
20  A. Yes, sir.
21  Q. Prior to plaintiff's counsel asking to have
22  your deposition today, had you -- did you have any
23  knowledge of this lawsuit?
24  A. No.
25  Q. You haven't talked to Ms. Curley for many

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 36

1   years, right?
2   A. That's correct.
3   Q. Other than that one day, 1-25-05, is it fair to
4   say that you don't know anything about the patient?
5   A. That is correct.
6   Q. And when we saw a record indicate that you had
7   prescribed Seroquel for Ms. Curley on 1-25, 2005,
8   correct?
9   A. That's correct.
10  Q. And as far as you know, that's the only time
11  you've done that for this patient?
12  A. That's correct.
13  Q. And you were treating her migraine headaches
14  with this medication?
15  A. Yes.
16  Q. Was this a refill prescription?
17  A. No. It was actually -- she had been on it at
18  75 milligrams based on review of the records at that
19  point in time, and she wasn't doing any better in her
20  headaches. She wasn't sleeping very well, so -- and she
21  was tolerating the medication very well, so that's why I
22  increased it, to try to get headaches under control.
23  Q. So she -- I'm sorry.
24  A. Go ahead.
25  Q. She would have informed you of all the

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 37

1   medications she was taking at that time?
2   A. Yes, sir.
3   Q. And that would include the Seroquel at 75
4   milligrams?
5   A. And that's actually -- at the top half of that
6   Progress Note is where the nurse had placed her on
7   medication.
8   Q. In Exhibit 2, we were looking at the list of
9   medications, and that included the Seroquel?
10  A. Correct.
11  Q. And so is it fair to say that she would have
12  informed you that she was taking Seroquel at 75
13  milligrams and it was to help with her headaches?
14  A. Yes.
15      MS. AUSTIN: Object to the form.
16  Q. And you made a decision -- and did she also
17  indicate to you that the Seroquel was not -- not as
18  helpful as she wanted it to be?
19  A. Well, she wasn't -- her headaches wasn't
20  getting better. And so in trying to get her headaches
21  under control and better, we have to manage medications,
22  and that's what I did.
23  Q. Right. What is the -- if you -- can you go
24  back to Exhibit 2? What exactly does your record
25  indicate with regard to her report to you on the

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 42

1 Seroquel caused her diabetes?
2   A. No.
3   Q. You were asked a couple questions about sales
4 reps coming in, and I think you mentioned that since you
5 have -- since you have moved practices, you haven't had
6 too much sales rep detailing on the drug Seroquel?
7   A. That's correct.
8   Q. And is that because Seroquel is not a drug that
9 fits your current patient profile?
10   A. That is correct.
11   Q. And you mentioned that you are detailed on
12 Zomig. That's another drug by AstraZeneca?
13   A. Um-hmm.
14   Q. Yes?
15   A. Yes.
16   Q. And that drug does fit your patient profile,
17 correct?
18   A. Yes.
19   Q. Is it fair to say -- or let me ask you, do you
20 agree that the sales reps when they promote or detail
21 the drug to you, they talk about on label uses for the
22 drug?
23   A. That is correct.
24   Q. You've never been detailed for Seroquel or
25 another drug for off label use?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 43

1   A. Never.
2   Q. And you understand that the sales reps and the
3 company is limited to the label because that's what the
4 FDA requires and that's what the FDA approved?
5   A. That is correct.
6   Q. In your handwritten notations marked as Exhibit
7 2, you mentioned a blood pressure I think of 150/82?
8   A. Um-hmm.
9   Q. Yes?
10   A. Yes.
11   Q. The reason I ask that is because the answers
12 have to be verbal so the court reporter --
13   A. Yes. I'm sorry.
14   Q. Is a 150/82 blood pressure an elevated blood
15 pressure?
16   A. The systolic blood pressure, which is the
17 initial blood pressure, is somewhat elevated. The
18 diastolic is normal.
19   Q. And your impressions were headaches and fibro-
20 myalgia, correct?
21   A. That's correct.
22   Q. And she probably -- is it fair to assume that
23 she reported to you that she suffers from headaches and
24 she suffers from fibromyalgia?
25   A. Yes.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 44

1   Q. And what is fibromyalgia?
2   A. Fibromyalgia is -- is a disorder which has been
3 not very well understood for many decades and it's
4 now -- finally there's studies that do suggest that it's
5 a real disorder. And it has to do with a lower what we
6 call pain threshold at the spinal cord level where the
7 patient with fibromyalgia will feel pain at much lower
8 tactile pressures than people who don't have fibro-
9 myalgia.
10     And so basically what ends up happening is
11 these patient have what we call tender points throughout
12 their body. They ache all the time. They get fatigued
13 all the time. They become depressed. It has been
14 associated with other conditions like Irritable Bowel
15 Syndrome. And that's what it is.
16   Q. And just for the record, Ms. Curley testified
17 that she's had fibromyalgia since 1983. If that's
18 accurate, then she's had problems with this pain problem
19 for quite a long time, correct?
20   A. Yes. But fibromyalgia not necessarily will
21 give you headaches.
22   Q. So it's a different kind of pain?
23   A. Yes.
24   Q. It's body pains?
25   A. Right, right.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 45

1   Q. And -- strike that.
2     And you prescribed Seroquel on this one visit,
3 1-25-05, at a hundred milligrams, and then you were --
4 you instructed her to increase it 200 milligrams?
5   A. Right.
6   Q. And you were prescribing -- is it fair to say
7 you were prescribing it mainly for headache relief?
8   A. Yes. And the reason -- the rationale behind it
9 is that, as you know, Seroquel has -- it's a D2 and 5HT2
10 antagonist, which means it blocks those receptors, and
11 antagonists and -- or blocking receptors of the 5HT2
12 tend to decrease headaches. And that's where we get
13 some relief from headaches from the Seroquel.
14   Q. Was it your goal to also help her sleep with
15 the medication?
16   A. As a benefit, the side benefit, not the primary
17 intended benefit.
18   Q. And I also represent to you Ms. Curley has
19 testified in her deposition that she never took more
20 than 100 milligrams of Seroquel a day. If that's
21 accurate testimony, you would agree that she never
22 followed your instructions to go up to 200 milligrams?
23   A. That would be correct if she didn't.
24   Q. And when you instructed her to take it twice a
25 day, what time periods is that supposed to be?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 46

1    A. Well, it's usually time periods that is in the
2    morning with breakfast and then in the evening with --
3    with dinner. Doesn't have to be every 12 hours on the
4    dot.
5       Q. You testified that you don't treat patients
6    with diabetes. But your patient population includes
7    people with diabetes; is that fair?
8       A. Yes, sir.
9       Q. Would you agree with me that diabetes is a
10   fairly common disease in the United States?
11      A. Yes.
12      Q. Would you even agree that it's getting to
13   epidemic proportions here in the United States?
14      A. Yes.
15      Q. Would you agree that the increase in diabetes
16   in the United States is linked to the increase in
17   obesity in the country?
18      A. Yes.
19      Q. Do you agree that diabetes often develops
20   slowly over time?
21      A. Yes.
22      Q. It's true that people can have diabetes and not
23   even know it; is that fair?
24      A. That's correct.
25      Q. Would you agree that diabetes is a treatable

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 47

1    and manageable condition?
2       A. Yes.
3       Q. And diabetes is a link to having high blood
4    sugar or high blood glucose, correct?
5       A. Yes.
6       Q. You testified earlier that we talked about the
7    major risk factors for diabetes; do you recall that?
8       A. Yes.
9       Q. And I believe you testified the two major areas
10   were family history and obesity?
11      A. Yes.
12      Q. And you also testified that you weren't sure
13   whether or not Ms. Curley had those two risk factors?
14      A. I do not recall her being obese. I do not
15   recall her specifically. I don't really recall her
16   family history.
17      Q. Let me just show you two medical records on
18   those issues. I'm going to mark as Exhibit 3 a medical
19   record from Tampa General Hospital dated 9-13, 2005.
20      Doctor, do you see this as a record dated 9-13,
21   2005 for Connie Curley?
22         (Exhibit No. 3 was marked for identification.)
23      A. Connie Curley? Yes, I do.
24      Q. And this is after the time that you saw her,
25   correct?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 48

1    A. That is correct.
2       Q. This is about what? Eight months afterwards?
3       A. I saw her January 25th, yes, sir. Um-hmm.
4       Q. And it's -- it's circled Sisodia. That's
5    Dr. Sisodia at Tampa General. Are you familiar with
6    Dr. Sisodia?
7       A. No, I'm not.
8       Q. Can you flip to the second page of the
9    document?
10      A. Um-hmm.
11      Q. Again, we see the date on top 9-13-05, and
12   there's a box on the right side. It says height four
13   foot, nine inches. Do you see that? The little box on
14   the very top right of the page?
15      A. Yes.
16      Q. Height, four foot nine inches?
17      A. Um-hmm.
18      Q. And weight 159 pounds?
19      A. That's correct.
20      Q. And if you go down to the middle of the page,
21   Dr. Sisodia writes the words "centrally obese." Middle
22   right side of the page. Do you see that?
23      A. Yes.
24      Q. Would you concur with Dr. Sisodia that four
25   foot nine, 159 pounds would constitute someone being

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 49

1    obese?
2       A. Yes, it would.
3       Q. So based on this record at least, she does have
4    one of your major risk factors, which is obesity,
5    correct?
6       A. That is correct.
7       Q. Let me show you a second medical record I'm
8    going to mark as Exhibit 4, a Tampa General Hospital
9    record dated 1-8, 2003.
10         (Exhibit No. 4 was marked for identification.)
11      A. Yes.
12      Q. You see this? It's a Tampa General Hospital
13   1-8, 2003 medical record?
14      A. Yes, sir.
15      Q. And reason for consultation at the top is
16   depression, nightmares, and illicit drug use, correct?
17      A. That's correct.
18      Q. And if you flip -- and, of course, 2003, this
19   is about two years behalf you started seeing her?
20      A. That's correct.
21      Q. And if you flip to the second page under Family
22   History, middle of the page, it says her father had a
23   nervous breakdown, and she says that heart disease and
24   diabetes run in her family. Do you see that?
25      A. Yes, I do.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 50

1    Q. Is that indicative of a family history of
2  diabetes?
3    A. It appears to be, yes.
4    Q. And I'll also represent to you that Ms. Curley
5  has testified in her deposition that her mother had
6  diabetes; in fact, died from complications of diabetes.
7       Doctor, if your mother has diabetes, you would
8  concur that's -- constitute a -- constitutes a family
9  history of diabetes?
10   A. That's correct.
11   Q. So based on the records you looked at,
12 Ms. Curley has both obesity and a family history of
13 diabetes?
14   A. Yes, sir.
15   Q. Based on that knowledge, would you agree that
16 those two things, a family history and obesity, likely
17 contributed to her having diabetes?
18   A. Yes, sir.
19   Q. And you can't say whether or not Seroquel had
20 any role in that?
21   A. I couldn't say, no.
22   Q. Doctor, are the answers you're giving today
23 based on your medical training, your review of
24 Ms. Curley's records, and whatever independent
25 recollection you may have of the patient?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 51

1    A. I'm sorry? Is it --
2    Q. Based on --
3    A. Yeah.
4    Q. -- your medical training, your review of the
5  medical records, and if you have any independent
6  recollection of the patient?
7    A. Yes.
8    Q. Are all the opinions that you've given
9  regarding Ms. Curley and your prescriptions and her
10 conditions based on a reasonable degree of medical
11 certainty?
12   A. Yes.
13      MR. MANZELLA: Thank you. No further
14 questions.
15          REDIRECT EXAMINATION
16 BY MS. AUSTIN:
17   Q. Doctor, I just have a few.
18   A. Sure.
19   Q. Fill in things that I forgot to ask the first
20 time. My first question is where do you currently
21 practice today.
22   A. I'm here at 3010 East 138th Avenue, Suite 100,
23 Tampa, Florida, 33613.
24   Q. And that's where we're conducting this
25 deposition, correct?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 52

1    A. Yes, ma'am.
2    Q. And what is your patient population like at
3  this practice?
4    A. At this practice, mostly neck and spine pain
5  neck and lower back pain --
6    Q. Okay.
7    A. -- and some headaches.
8    Q. Okay. So just to reiterate, you're not in the
9  headache management --
10   A. I am. And just this is a new office, and so
11 we're developing and we're growing up. We've only been
12 open up eight months. But yes, I am trained to do that,
13 and we expect to do more headache management as we go
14 along.
15   Q. Okay. In your future practice with headache
16 management patients, do you intend to prescribe Seroquel
17 to those patients in the future?
18   A. No.
19   Q. And why not?
20   A. Because of the increased risk of diabetes and
21 hyperglycemia.
22   Q. Okay. So now that you have more information
23 about that drug, you don't intend to prescribe it for
24 your patients anymore; is that correct?
25   A. Not --

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 53

1       MR. MANZELLA: Objection to the fact have more
2  information.
3       But you can answer.
4    A. No, not without having a psychiatrist on board.
5    Q. Okay. So you would defer to that specialty to
6  prescribe that classification of drugs?
7    A. Right.
8    Q. Okay. I talked to you about some of the risks
9  benefits analysis that you undertake when you prescribe,
10 as did Mr. Manzella. And when you prescribed Seroquel
11 to Ms. Curley, she was already on that drug, correct?
12   A. Yes, ma'am.
13   Q. So would you have undertaken the same risk
14 benefit analysis for her for a drug that she was already
15 taking?
16   A. Yes, ma'am.
17   Q. Okay. So even though she's already prescribed
18 that drug and already been taking that drug, you're
19 still going to do the same analysis?
20   A. Yes. Every time we manage a medication, even
21 if it's increasing or decreasing a dose, that's what we
22 do.
23   Q. Okay. And as you learn more about a drug, does
24 that change your risk benefit analysis for that drug?
25   A. Yes.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 54

1  Q. But you're only able to make that risk benefit
2  analysis based on the information that that's available
3  to you at that time?
4     MR. MANZELLA: Objection. Asked and answered.
5  A. Yes.
6  Q. So wouldn't it be fair to say that at any time
7  that you became aware of risks associated with a drug,
8  excuse me, that you prescribe and if the risks were
9  greater than you had believed them to be that you'd have
10 to go back and redo your risk benefit analysis?
11    MR. MANZELLA: Object.
12 A. Repeat that again.
13    MR. MANZELLA: Objection. Vague.
14 Q. Okay. Let me rephrase it.
15    If you had prescribed a drug to a patient,
16 let's use Ms. Curley, you prescribed Seroquel for her.
17 A. Right.
18 Q. And at the time you used the information that
19 was available to you to make your risk benefit analysis?
20 A. Right.
21 Q. If you today were to learn that there were
22 additional risks associated with that drug, you'd have
23 to go back and re-undertake that risk benefit analysis
24 in your decision about whether or not you would have
25 prescribed that drug for that patient, correct?

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 55

1  A. That is correct.
2     MR. MANZELLA: Objection. Incomplete
3  hypothetical.
4     You can answer.
5  A. That is correct.
6  Q. Okay. So isn't it also accurate to say that as
7  you become aware of more risks associated with a drug
8  that the risks may begin to outweigh the benefits of
9  prescribing that drug?
10    MR. MANZELLA: Objection. Hypothetical. Calls
11 for speculation. I'm not even sure what drug we're
12 talking about.
13    But go ahead.
14    MS. AUSTIN: We're talking -- well, let me
15 withdraw my question and reask it more specifically.
16 Q. As you become aware of more risks associated
17 with the drug Seroquel, isn't it possible that the risks
18 of prescribing that drug for your patients may begin to
19 outweigh the benefits of using that drug?
20    MR. MANZELLA: Objection. Vague. Calls for
21 speculation.
22 A. It may.
23 Q. And I'm asking in your medical opinion -- you
24 have lots of plaques on the wall. You are a very
25 experienced and it looks like well-respected physician.

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 56

1  You've been all over the place. I see awards. So I
2  believe that you are qualified to give your opinion
3  whether or not it is speculation, because I'm asking you
4  within a reasonable degree of medical certainty.
5     When you learn more information about a drug
6  that you've been prescribing for a patient, if you
7  determine that the risks outweigh the benefits of
8  prescribing that drug, it will affect your prescribing
9  patterns; isn't that correct?
10    MR. MANZELLA: Just hold on. There's numerous
11 objections. It's -- it's vague. It's compound. It
12 first talked about his qualifications, then it
13 appeared to have asked a question at the end. I
14 don't know what drug we're talking about. You
15 lowered it with -- at the end by saying the risks
16 did outweigh the benefits, so it was no longer a
17 hypothetical. You gave a declarative statement. So
18 for multiple reasons, that's an objectionable
19 question.
20    If you can answer it, Doctor, go right ahead.
21 Q. Do you remember what the question was after all
22 of that, Doctor?
23 A. Well, the gist of it is, is that if I learned
24 more of a medication and I believe that the risks
25 outweighed -- definitively outweighed the benefits,

Stratos Legal Services
800-971-1127

Hector Cases
August 14, 2008

Page 57

1  certainly I would take that into consideration and
2  discontinue the medication. If the risks are higher but
3  the benefits still outweigh the risks and the patient
4  does not have any signs of toxicity in any way, shape,
5  or form, I will continue the medication if it's helping
6  her significantly.
7  Q. Okay. But based on your past experience with
8  the drug Seroquel, you've decided that for the future in
9  your practice -- practice with headache management that
10 you want to defer to a psychiatrist to make those
11 prescribing decisions, correct?
12 A. Right. And with that medication.
13 Q. Okay.
14 A. Plus we have other medications out there that
15 are really treating headaches very efficiently as well.
16 Q. Okay. So you've done other things that you
17 believe are more effective for treating headaches than
18 the drug Seroquel?
19 A. Yes, ma'am.
20    MS. AUSTIN: I believe those are all my
21 questions. Thank you, Doctor.
22    MR. MANZELLA: I have no further questions.
23 Thank you.
24    THE COURT REPORTER: Read or waive?
25    THE WITNESS: I waive.

Stratos Legal Services
800-971-1127