# EXHIBIT 6

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: Seroquel Products Liability Litigation,
MDL DOCKET NO. 1769

This document relates to:

Curley v AstraZeneca LP, et al.
(Connie M. Curley 6:07-cv-15701)

DEPOSITION OF:TEERESA SISODIA, MD

DATE: April 2, 2008

TIME: 8:02 AM

LOCATION: 4201 Club Course Drive
Charleston, SC

TAKEN BY: Counsel for AstraZeneca
Pharmaceuticals, LP

REPORTED BY: TERRI L. BRUSSEAU,
Registered Professional
Reporter, CP, CRR

ESQUIRE DEPOSITION SERVICES

Four Penn Center, Suite 1210

1600 John F. Kennedy Boulevard

Philadelphia, Pennsylvania 19103

**Q. At the time you were treating her, would you have considered yourself to be her primary care physician?**
A. I would have.
**Q. So for those about two years from '05 to '07, you were her primary care physician?**
A. Yes.
**Q. And you'd be responsible for treating her general health?**
A. Correct.
**Q. When you were treating her between '05 and '07, in general, we'll speak about specific records in a moment, in general what were you treating her for?**
A. High blood pressure, diabetes, high cholesterol, looks like chronic pain, reflux.
**Q. You mentioned before a Dr. Reed. Is that another doctor in the Tampa facility?**
A. She was there for a brief period of time and then left after I came, yes.
**Q. So she would have seen Miss Curley a few times?**
A. Yes.
**Q. Do you have her full name?**
A. Cheryl Reed. I don't know if she has a

middle name.
**Q. Do you know where she's located now, where she's practicing now?**
A. I don't.
**Q. Do you know a Dr. Ocampo?**
A. I do.
**Q. What's his or her first name -- full name?**
A. Emma -- Emma Baptiste, I think, Ocampo.
**Q. And who is Dr. Ocampo?**
A. An internist that worked at Tampa General alongside of me.
**Q. As far as you know, is she still at Tampa General?**
A. As far as I know.
**Q. In Miss Curley's deposition she indicated that Dr. Ocampo was now her primary care physician. Did you know that?**
A. I did not know that.
**Q. You didn't know that she took over for you?**
A. There are several doctors there. When a physician leaves, the patients are, you know, shared amongst the doctors that remain and I have no way of knowing who would be assigned to whom.

**Q. So Dr. Ocampo is one of several doctors in the facility?**
A. Yes, right.
**Q. We talked about diabetes in general. Is it true that diabetes can go undiagnosed for a number of years before you actually get the diagnosis?**
A. Yes.
**Q. And generally why is that the case?**
A. People are either not screened for it and they're asymptomatic. I guess that's the biggest reason. They're just not screened for it and they don't get the symptoms until after it's been going on indolently for some time.
**Q. So it's possible to have diabetes for several years before you get officially diagnosed?**
A. It's possible to be on the course towards diabetes before you recognize it as being a danger for diabetes.
**Q. Does the disease develop sort of slowly over time?**
A. Um-hum.
**MR. HAMPTON:** Objection, form.
**BY MR. MANZELLA:**
**Q. Your answer?**

A. Yes.
**Q. Is it true that many diabetics have diabetes without knowing it?**
A. Yes.
**Q. Were you aware that Miss Curley used the drug Seroquel?**
A. I was.
**Q. And generally how were you aware of that?**
A. It's listed on her allergy list.
**Q. So she indicates that she had -- well, what does that mean, that it's listed on her allergy list?**
A. That at some point she took the medication and had some sort of adverse reaction.
**Q. Do you know any details about that alleged allergy?**
A. It's not documented.
**Q. You didn't witness any allergy?**
A. No.
**Q. To the extent you know about this, would this be because Miss Curley told you about it?**
A. I'm pretty good about documenting and I didn't document that she told me that but it's

documented as an allergy and carried across to every visit.

**Q. So you don't know where the information of the allergy came from?**

A. I don't.

**Q. You don't?**

A. I don't.

**Q. Do you know how long she used Seroquel?**

A. I have no idea.

**Q. Do you know what dosage she used?**

A. No.

**Q. Do you know what the dosage range is for Seroquel?**

A. I know it comes at 25. I don't use the medicine.

**Q. I believe it goes anywhere from 25 all the way up to 800?**

**MR. HAMPTON:** Objection to form.

**THE WITNESS:** I don't use the medicine.

**BY MR. MANZELLA:**

**Q. Is Seroquel not a medicine that fits into your practice?**

A. Seroquel is indicated for bipolar and also for schizophrenia, I believe, and those are conditions that I would treat a patient in

conjunction with the psychiatrist. Should the psychiatrist recommend that medication and the patient didn't have access to getting the script from the psychiatrist but I had documentation that said this patient should be on it, yes, I would prescribe it if that's the question.

**Q. That's fine. So it's fair to say that you would defer to the psychiatrist if he or she would want to prescribe Seroquel?**

A. Correct.

**Q. Do you recall whether or not you've ever prescribed Seroquel for a patient?**

A. I have.

**Q. And to be clear, you did not prescribe Seroquel for Miss Curley?**

A. No.

**Q. You don't know anything about her usage?**

A. I don't.

**Q. You don't know what condition she was treating with Seroquel?**

A. I don't.

**Q. You don't know if she still takes it today?**

A. No.

**Q. You don't know when she stopped?**

A. I don't.

**Q. You -- just to be clear, you never told her to stop taking Seroquel, correct?**

A. Correct.

**Q. Did you ever talk to her at all about her Seroquel use?**

A. I did not. I don't remember but it's not documented.

**Q. You certainly didn't tell her that you thought Seroquel caused her diabetes?**

A. Not her.

**Q. You can't make a determination with regard to her, is that fair?**

A. Right. Based on what's here, right.

**Q. Did you ever make any diagnosis as to what caused Miss Curley's diabetes?**

A. The etiology of her diabetes, no.

**Q. So you diagnosed that she had it but you didn't determine what caused it, is that fair?**

A. Correct.

**Q. As you sit here today, can you determine or say with a reasonable degree of medical certainty what may have caused her diabetes?**

A. Only speculate. I can only speculate. I mean, I have documented that she's obese, I've documented that she's hypertensive, that she's dyslipidemic. And there's something called Syndrome X which is also a genetic condition in which diabetes is very common and tends to have those other entities along with it but that's just me speculating.

**Q. Is it fair to say that as a doctor you believe that it's possible that her central obesity, her family history, her hyperlipidemia and some other factors may have caused her diabetes?**

**MR. HAMPTON:** Objection, speculation.

**THE WITNESS:** I don't remember her family history. It's fair to say if a patient had high blood pressure, obesity and the family history, which I don't remember on her case, that I would screen that patient for diabetes knowing that those things run commonly together.

**BY MR. MANZELLA:**

**Q. I'll represent to you that in Miss Curley's deposition she testified that her mother had diabetes.**

A. Okay.

**Q. And that her mother died from**

**complications of diabetes.**
A. Okay.
**Q. Will you accept that representation?**
A. Knowing that, I would say it's very likely that her diabetes is part of Syndrome X.
**MR. HAMPTON:** Objection, speculation.
**BY MR. MANZELLA:**
**Q. Let's go look at specific medical records and I'm going to have them marked one by one. You're free to look at my copy, you're also free to refer to the entire packet you have in front of you, is that fair?**
A. Yes. Is there any way to stop that typing for just a moment?
**MR. MANZELLA:** Off the record, is that all right?
**MR. HAMPTON:** Sure.
**MR. MANZELLA:** Off the record.
(Off-the-record conference.)
**MR. MANZELLA:** Let's mark as Exhibit 3 a September 13th, 2005 medical record.
(EXH. 3, Patient Aftercare Instructions dated 9/13/05, was marked for identification.)
**BY MR. MANZELLA:**
**Q. Let me show you Exhibit 3. First of**

**all, your name is circled so is this your medical record?**
A. Yes. This name is circled because that's the provider that should have a follow-up with the patient. See how it says return in two and a half months and then it says with what physician, that's for me. The reason I know it's my record is the next page actually is the documentation of that visit as it stood and that's my handwriting and that's my signature.
**Q. We're going to talk about specifics in the record but since it's your record, can you generally tell me what this record tells you about Miss Curley?**
A. Give me just one moment to read it, please.
**Q. Sure.**
A. Just glancing over it, this looks like a first visit with me and I know that based on how I've documented this note. And what stood out in her complaints that day was that she was obviously a diabetic with symptoms of uncontrolled diabetes and at very high risk for stroke and heart attack. Although I didn't write that here, that's how I -- I know I was thinking in that frame of mind.

**Q. And this is September 13, 2005, correct?**
A. Correct.
**Q. And you believe this is the first time she may have visited you?**
A. I'm sure it is. It says at the top, establish with primary. And then on the right, I don't write down past medical and past surgical every time a patient comes in, that's only what I do on the first visit.
**Q. Do you believe that she was already diabetic when she came to see you on this day?**
A. I believe so.
**Q. So do you recall whether it was you or somebody else that made the initial diagnosis of diabetes?**
A. I don't remember.
**Q. Okay.**
A. If I had all the labs I could trace it back and tell you but I don't think I have all the labs here.
**Q. Let's look at specifics in the record. First of all, we mentioned the record indicates allergies and there's Sulfa, Topamax --**
A. Skelaxin.

**Q. -- Skelaxin and Seroquel, correct?**
A. Um-hum.
**Q. Is that right?**
A. Yes.
**Q. And we talked about earlier you don't have any details as to why Seroquel is listed as an allergy, is that fair?**
A. Correct.
**Q. Her height is four foot, nine inches and her weight is 159 pounds at this time, is that right?**
A. Correct.
**Q. Would you consider that to be obese?**
A. Yes.
**Q. And it says smoker and it says yes, do you see that?**
A. Yes.
**Q. Down at the bottom under that assessment it says, smoking since age 13?**
A. Yes.
**Q. In this record she's 52 years old so is that fair to say that she's had almost a 40-year, 39-year smoking history at this point?**
A. Uh-huh.
**Q. Yes?**

A. Yes.
**Q. Would 39 years of smoking be a significant smoking history in your opinion?**
A. Yes.
**Q. Does a smoking history of 39 years or more indicate an increased risk for diabetes?**
A. Not necessarily, no.
**Q. Does smoking increase your risk of diabetes generally?**
A. Not that I know of.
**Q. You also mentioned in this record it says centrally obese. Can you read the rest of that for me on the right-hand side?**
A. That's on the physical. Centrally obese, positive bowel tones, hips full range of motion, no straight leg raise, motor exam three out of five.
**Q. What does that mean?**
A. That's part of the exam and it says that she was obese centrally. And when I examined her abdomen, there were bowel tones and she must have been complaining of either back or hip pain so I examined her -- sometimes back pain can present itself as a problem with mobility in the hip so that's why I say hip full range of motion, I

checked her hip. And then I checked straight leg raise to see if she had some nerve impingement in her back and it was not present. And the strength in the muscles of her legs -- I guess she must have complained of back pain. The strength in the muscles of her legs indicate that if there was any nerve damage or back damage, it wasn't severe enough to cause weakness.
**Q. And we already discussed that centrally obese indicates to you that that would be --**
A. A risk.
**Q. -- a risk for diabetes?**
A. Yes.
**Q. And then under assessment you have HTN. Is that hypertension?**
A. Yes.
**Q. Is that also high blood pressure?**
A. Yes.
**Q. Does having a history of hypertension or high blood pressure also increase your risk for diabetes?**
A. It's not that the hypertension increases the risk of diabetes but many times patients that are hypertensive will either become a diabetic or are a diabetic.

**Q. Number 2 under assessment, I think it looks like tobacco abuse?**
A. Correct.
**Q. That's indicating she smoked for a long time, is that what you're saying?**
A. That indicates she's smoking then. My notes tell you that she had smoked for a long time.
**Q. Third one is migraines?**
A. Yes.
**Q. Were you treating her migraines?**
A. It looks like a neurologist was.
**Q. Do you know who that was?**
A. I don't. I can tell, though. I can look.
**Q. Does Dr. Maria Wilson?**
A. She's a pain specialist and a neurologist, I think.
**Q. Do you know that Connie Curley also saw Dr. Wilson?**
A. I do know that.
**Q. Other than that, do you know anything about Dr. Wilson's treatment of Connie Curley?**
A. No.
**Q. Under Number 4 under assessment, what is that?**

A. Question of osteoporosis.
**Q. And Number 5?**
A. I don't see it.
**Q. Up under --**
A. Oh, here, sorry. High cholesterol.
**Q. Does having high cholesterol increase your risk of diabetes?**
A. Again, it doesn't directly increase the risk but these things seem to occur together.
**Q. And Number 6 is DM?**
A. Diabetes mellitus.
**Q. Is diabetes mellitus the same as Type 2 diabetes?**
A. There are different kinds of diabetes. I did not specify here which type she had.
**Q. Do you know which type she had?**
A. Type 2.
**Q. And the last one, I think Number 7, is hip pain, correct?**
A. Yes.
**Q. When you see a patient with a long smoking history who is currently smoking like Miss Curley, would you advise her to stop smoking?**
A. Absolutely.
**Q. Do you know whether or not Miss Curley**

A. For a diabetic, I would like their cholesterol to be 100 plus their age or less or at least under 200 so it should be under 152 ideally for her or at least under 200 if we couldn't get it that low and hers was 307.

**Q. Is that a cause for concern for you?**

A. Yes.

**Q. What else does this record indicate?**

A. She had high triglycerides which is another type of cholesterol, very commonly elevated in diabetes.

**Q. And what about the glucose?**

A. This record -- I assume this was a fasting record -- a fasting lab because lipids are generally drawn fasting and the glucose on that day was 97, which would be normal.

**Q. Does this record in 2006 indicate to you that at this point her diabetes was under control or not under control?**

**MR. HAMPTON:** Objection, form.

**THE WITNESS:** This can't -- you can't tell by this information.

**BY MR. MANZELLA:**

**Q. Then it says call patient?**

A. Yes.

**Q. Do you know why?**

A. Yes, that's actually the nurse practitioner's handwriting. She reviewed this lab and saw that the cholesterol was not controlled and took action by recommending adjustment of her meds.

**Q. And what adjustment did she recommend?**

A. She increased the pravastatin and she added a new medication to address the triglycerides.

**Q. Let's look at your next visit with the patient, have this marked as the next exhibit.**

**(EXH. 5, Patient Aftercare Instructions dated 4/27/06, was marked for identification.)**

**BY MR. MANZELLA:**

**Q. Is this also your record?**

A. It is.

**Q. Your handwriting?**

A. Part of it is.

**Q. The date is April 27, 2006?**

A. Correct.

**Q. Is she taking Seroquel at this point?**

A. I can't tell you from this.

**Q. Does it indicate she's taking Seroquel?**

A. No.

**Q. What is she taking?**

A. The only thing I can comment are the prescriptions that were written that day, which included Diovan HCTZ.

**Q. What is that for?**

A. Blood pressure control. Phenergan, 25 milligrams.

**Q. What's that for?**

A. Nausea. Neurontin, 300 milligrams.

**Q. What's that for?**

A. Used for different things. I would assume for her for her low back pain and concomitant benefit of sedation which might help her at night with her insomnia. And then Metformin, which is an insulin sensitizer used in the treatment of diabetes.

**Q. And it says stop HCTZ, what is that?**

A. HCTZ is a blood pressure medicine. If she was to continue to take that, then she would get double the dose because I prescribed her Diovan HCTZ so she was to stop that old medicine and start the new Diovan HCTZ.

**Q. If you look at the second page.**

A. That's my note. On this visit a resident actually saw the patient in conjunction with me and that's why you have three pages. The

third page is the resident's note, the second page is my documentation.

**Q. Let's stick with your documentation. Is your signature on the bottom of this page?**

A. Yes.

**Q. It indicates Miss Curley is a 53-year-old female diabetic uncontrolled, last seen September 13, 2005?**

A. Yes.

**Q. So it's been seven months since the last time you saw her?**

A. Yes.

**Q. Is that an appropriate amount of time?**

A. No.

**Q. Why not?**

A. For an uncontrolled diabetic, they would be seen maybe every month, maybe even every week, even every day depending on how poorly their control was. A controlled diabetic I will allow to see every three months but they would be controlled.

**Q. Do you know why Miss Curley took seven months to come back to see you for her diabetes?**

A. The record indicates she saw another physician.

**Q. Okay. Do you know who that was?**
A. I do not.
**Q. Suffice to say your opinion was that her diabetes was not controlled at the time?**
A. Correct.
**Q. It says followed by her neurologist for fibromyalgia and migraines. Do you see that?**
A. Uh-huh.
**Q. Yes?**
A. Yes.
**Q. What is fibromyalgia?**
A. A nebulous diagnosis with a constellation of symptoms, including fatigue and pain.
**Q. It also says psychosocial -- can you read the psychosocial record?**
A. Psychosocial. History of rape and poor relation with children.
**Q. Do you have any detail as to -- with regard to her rape?**
A. I don't.
**Q. Do you have any detail with regard to the poor relationship with her children?**
A. I may have at that time but I don't remember.

**Q. You don't recall today?**
A. I don't remember.
**Q. What's the next thing listed on the medical record?**
A. The physical exam.
**Q. Okay.**
A. Adentulous white female, morbidly obese.
**Q. What does adentulous mean?**
A. No teeth.
**Q. What does morbidly obese mean?**
A. If you were to actually plot her height and weight, you could determine something called a body mass index and if she reached a certain level, you would consider her morbidly obese. I don't know -- that's another page that I had kept on all my diabetic patients that I don't have in this record but that is -- somewhere there will be a documented BMI.
**Q. But your indication here in the record is at this time she was morbidly obese, is that fair?**
A. Yes.
**Q. In layman's terms, is morbidly obese worse than regular obese?**

A. Yes.
**Q. Is being morbidly obese even increase your risk of diabetes more?**
A. Yes.
**MR. HAMPTON:** Object to the form.
**THE WITNESS:** She was already a diabetic, though.
**BY MR. MANZELLA:**
**Q. She was a diabetic at this time, correct?**
A. Yes.
**Q. And you indicate diabetes, hypertension, correct?**
A. Um-hum. DJD.
**Q. What's that?**
A. Degenerative joint disease.
**Q. Migraines and fibromyalgia?**
A. Yes.
**Q. What else?**
A. Dermatitis.
**Q. What's that?**
A. Skin condition. Inflammation of the skin.
**Q. Because she was an uncontrolled diabetic at this time, what did you do with regard**

**to her medication to fix that?**
A. The first thing I wanted to do was find out how far off she was from control so I ordered blood work. And then medications, I added an insulin sensitizer called Metformin.
**Q. Do you consider her to be a compliant or a noncompliant patient?**
**MR. HAMPTON:** Objection, speculation.
**THE WITNESS:** I can't answer that. I don't know why she didn't come back, she saw another doctor. I just can't answer.
(The proceedings were interrupted.)
**BY MR. MANZELLA:**
**Q. Dr. Sisodia, what is your current address?**
A. 8749 Herons, H-E-R-O-N-S, Walk, North Charleston, South Carolina, 29420.
**Q. And what is the address of the facility you work at now?**
A. 316 Calhoun Street, but don't ask me the zip.
**Q. That's not a hospital?**
A. That is. That's Roper Hospital in Charleston, South Carolina.
**Q. Let me mark the next visit with the**

patient.
A. Okay.
**Q. Or what I should say is what I believe is the next visit with the patient for you.**
**(EXH. 6, Patient Aftercare Instructions dated 5/31/06, was marked for identification.)**
**BY MR. MANZELLA:**
**Q. Just to be clear on the record, there may be records missing, I don't know, so this may or -- this is the next visit I have.**
A. It's not the next visit I have in my records.
**Q. Okay. What is the next visit you have?**
A. April 27th, '06.
**Q. And is that a visit with you?**
A. Yes.
**Q. Can you --**
A. Do you want to see it or --
**Q. Why don't you just summarize for me the findings of that visit.**
A. Again -- is that the one we just did? That's the one we just did.
**MR. HAMPTON:** Yes.
**THE WITNESS:** I'm so sorry.
**BY MR. MANZELLA:**

**Q. That's fine. I didn't know either.**
A. So 5/31/06 is what I have next.
**Q. Yes, that's what I have too.**
A. Okay.
**Q. First of all, this is your medical records?**
A. Yes.
**Q. Your handwriting?**
A. Yes.
**Q. Can you just summarize generally what your findings were on 5/31/2006?**
A. Diabetes, hypertension, tobacco abuse.
**Q. On the first page, are you recommending that she lose weight?**
A. You must be looking -- yes.
**Q. And are you recommending that she stop smoking?**
A. Yes.
**Q. The last record we looked at, her diabetes was not under control, is that fair?**
A. Correct.
**Q. Has it become under control again?**
A. You can't tell by this visit. I mean you can't tell by this documentation.
**Q. Do you know one way or the other?**

A. I would assume it was uncontrolled because I wanted more labs and I've asked her to lose weight. I've also added another medication.
**MR. HAMPTON:** I'll object to the speculation.
**BY MR. MANZELLA:**
**Q. What medication were you recommending?**
A. Avandia.
**Q. What is that?**
A. Another insulin sensitizer. A diabetic medicine.
**Q. Let's look at what I believe will be the next exhibit.**
**(EXH. 7, Patient Aftercare Instructions dated 7/19/06, was marked for identification.)**
**THE WITNESS:** July -- yes.
**BY MR. MANZELLA:**
**Q. This visit is July 19, 2006?**
A. Yes.
**Q. That's the next visit with you?**
A. Yes. But what you don't have is she also brought her Accucheck sheet and I have that here.
**Q. Okay. Can you generally summarize your findings from the 7/19/2006 visit?**

A. That was a focus visit for a well woman exam so basically I recognized that she was short a mammogram and I also addressed her diabetes. I guess she brought her sugar log in and I must have reviewed it.
**Q. And it says on the second page DM labs up to date?**
A. Um-hum.
**Q. What does that mean?**
A. That means that she must have had a hemoglobin A1C within the last three months.
**Q. Let's look at the next visit.**
**(EXH. 8, Patient Aftercare Instructions dated 7/27/06, was marked for identification.)**
**BY MR. MANZELLA:**
**Q. This is the July 27, 2006 record?**
A. Correct.
**Q. This is also your medical record?**
A. Yes.
**Q. Generally what are your findings from this record?**
A. Although you can't tell, this is a pre-op evaluation -- oh, you can, at the bottom it says pre-op evaluation so this is again another problem focus visit. It's not her general, a

46

regular visit looking at diabetes, her medical problems.
**Q. What operation was she having at this point?**
A. Unfortunately, I have not indicated that clearly here.
**Q. On the second page it says sugars have been between 94 and 115. Do you see that?**
A. Yes.
**Q. What does that mean?**
A. That means that they're well controlled and that's what you want going into surgery.
**Q. So at least as of the summer -- well, July of 2006, her diabetes was under control?**
A. At least between the last visit when she had her Pap and this visit, the sugars according to her were under control.
**Q. And you indicate here centrally obese, correct?**
A. Yes.
**Q. Is it fair to say that she was central obese both before and after her diabetes diagnosis?**
A. We haven't established when she was diagnosed so I don't know.
**Q. Fair enough. Is it fair to say that**

47

**she was centrally obese during the entire time you saw the patient?**
A. Yes.
**Q. And on the bottom it says pulmonary, need to decrease tobacco?**
A. Discontinue.
**Q. So you're telling her to stop smoking. Let's look at the next visit.**
**(EXH. 9, Patient Aftercare Instructions dated 10/6/06, was marked for identification.)**
**BY MR. MANZELLA:**
**Q. This is the October 6, 2006 record?**
A. Yes.
**Q. This is your record?**
A. Yes.
**Q. Again, can you just generally tell me your findings from this medical record?**
A. Her diabetes was a little bit less well controlled. She might have been having some symptoms from the diabetes being uncontrolled, the blurry vision, and we focused on her complaints of constipation and some knee pain.
**Q. And under psyche, you check off -- well, what are your findings on psyche?**
A. It actually says she had no complaints

48

of depression, anxiety or stress on that visit.
**Q. So that was different than her first visit?**
A. It's a negative, yes.
**Q. It says patient has appointment 11/20 with Dr. Wilson, needs new referral?**
A. Yes.
**Q. Is that the doctor we were discussing earlier?**
A. I would assume so.
**Q. Do you know what Dr. Wilson was treating her for?**
A. Pain management.
**Q. Would that be pain related to fibromyalgia?**
A. It's possible.
**Q. You don't know one way or the other?**
A. I don't know. Without the consult's note. I've written down migraine on top of that little sticker. That doesn't look like a sticker here because it's Xeroxed but these are little pain stickers and I wrote down migraine so she may have been primarily seeing Dr. Wilson for migraine.
**Q. Going back to the first page, what medications is she taking for diabetes at this**

49

**point?**
A. See, this is only the medicines that I wrote scripts for so at least she was taking Avandamet 2/500 but she may have been taking other things.
**Q. Let me rephrase my question.**
A. If I had a medication list --
**Q. Let me rephrase my question. What were your prescriptions at this point with regard to treatment of her diabetes?**
A. On that day I wrote a prescription for Avandamet. Do you see what I'm saying?
**Q. I do. Are you prescribing Seroquel at this point?**
A. No.
**Q. Let's go to the next visit.**
**(EXH. 10, Patient Aftercare Instructions dated 10/23/06, was marked for identification.)**
**BY MR. MANZELLA:**
**Q. This is the October 23rd, 2006 medical record?**
A. Yes.
**Q. This is also your record?**
A. Yes.

**Q. What medications are you prescribing at this point?**

A. You ask that question, I may be prescribing many more than what's listed here. This is just the prescriptions I wrote that day. She may have had refills on other medicines and you won't know that from this but there's a list you can get that would tell you.

**Q. Okay. So to be fair, these would be new prescriptions that you're making?**

A. One is, I know, Byetta, but Feldene she may have had before and run out of and required a refill. And Xanax I don't know without seeing the medical -- the medication list. I may have prescribed that for her at some point before. She complained of anxiety, she complained of insomnia. I may have given it to her.

**Q. On this day, October of '06, you're prescribing, for example, Xanax for anxiety, correct?**

A. I'm not sure why I did, for insomnia or anxiety, and part of the record is obliterated at the bottom here.

**Q. On the first page it says Xanax 0.5 milligrams?**

A. Yes, as needed.

**Q. One at bedtime as needed for anxiety?**

A. Correct.

**Q. Would that indicate to you that she's taking Xanax for anxiety?**

A. Correct. But we also try to save time sometimes and may have also been for insomnia.

**Q. You also mentioned Byetta. What is that?**

A. Byetta is a type of medicine used for diabetes.

**Q. And again your record indicates stop smoking and decrease weight?**

A. Yes.

**Q. Is it fair to say that's a consistent instruction you're giving the patient?**

A. Correct.

**Q. On the second page of this one, this record, there's a record -- there's an indication that says that you wrote son caught on Internet problem, feels stress. Do you see that?**

A. Yes.

**Q. Do you know any of the details with regard to that?**

A. I can't remember. She felt stressed,

not -- I guess the son must have felt stressed but I don't remember what the situation was.

**Q. Can you tell whether or not her diabetes is under control from this record?**

A. No.

**Q. Let's look at the next one.**

**(EXH. 11, Patient Aftercare Instructions dated 11/7/06, was marked for identification.)**

**BY MR. MANZELLA:**

**Q. Is this the November 7, 2006 medical record?**

A. Yes, and it's mine.

**Q. Okay. Can you again generally tell me what your findings were on this day?**

A. Diabetes again, the smoking -- issue of smoking and that her healthcare maintenance was not up to date.

**Q. And what do you mean by that?**

A. There's some things that we recommend at different ages for cancer screening or for vaccination and in this case it was a colonoscopy that she was needing.

**Q. And you saw this patient at the hospital, is that right?**

A. I did not.

**Q. What facility did you see her at?**

A. The outpatient clinic.

**Q. Was that in the hospital or at some other location?**

A. It's a different location.

**Q. Do you know if this patient was on her own personal insurance or was she receiving any kind of state assistance?**

A. I don't know. But you can find out easily if you have the records.

**Q. Let's look at the next record.**

**(EXH. 12, Patient Aftercare Instructions dated 1/11/07, was marked for identification.)**

**BY MR. MANZELLA:**

**Q. Is this the January 11, 2007 record?**

A. Yes.

**Q. And this is also your record, correct?**

A. No.

**Q. This is not your record?**

A. Oh, yes, yes, yes, I'm sorry. I'm sorry, yes, it is.

**Q. What are your general findings in this record?**

A. If somebody has high blood sugars for prolonged periods. And that can happen without diabetes. Prednisone is a steroid. You put somebody on a steroid and their sugars may go up, they're not a diabetic.

**Q. Right. But for a diabetic, it's particularly dangerous, isn't it?**

**MR. MANZELLA:** Objection, vague.

**BY MR. HAMPTON:**

**Q. A patient with diabetes is particularly susceptible to damage?**

A. If a diabetic person has uncontrolled sugars, their long-term risk for stroke and heart attack, kidney failure and blindness will go high, will go up.

**Q. And I think you testified previously that it's very hard for any patients to make lifestyle changes that's necessary to maintain the blood sugar levels strictly within a safe zone?**

**MR. MANZELLA:** Objection.

**THE WITNESS:** People do it but it's a very intense process and not everybody is capable of doing that.

**BY MR. HAMPTON:**

**Q. And even if someone is capable of doing**

**it, they may not be able to do it --**

A. Succinctly.

**Q. -- every day continuously throughout the rest of their life?**

A. Correct.

**Q. Would it be fair to say people that have psychological challenges may find it more difficult to take care of their diabetes than people who do not?**

A. Yes.

**Q. I think you mentioned in one of the notes or you wrote a note in one of the notes that Connie had been raped. And I think in the first note that you -- in the first visit that you had with Connie you indicated that she was -- on a psychological that she was depressed.**

A. Yes.

**Q. In your experience, is depression a typical outcome of a patient who's been raped?**

A. I don't have a lot of experience there but, I mean, I would -- I would say that that would be reasonable -- a reasonable outcome of having that past history.

**Q. Okay. Is there anything on your first note of September 19th -- I'm sorry, September 13th**

**of '05 where she was talking to you about her psychological conditions, depression, insomnia and --**

A. Anxiety.

**Q. -- anxiety? Those -- if those are the only presenting symptoms, that would not result in a diagnosis of bipolar, would it?**

**MR. MANZELLA:** Objection, calls for speculation.

**THE WITNESS:** That wouldn't give her the diagnosis of bipolar, that might raise my suspicion to ask more questions about what type of depression she had, what type of anxiety she had.

**BY MR. HAMPTON:**

**Q. It might be a basis, a factual basis behind the depression such as rape or something like that?**

A. Not necessarily but what the pattern of that depression was, did she have difficulty maintaining her license, a job, did she have ups and downs, had she had past suicidal thoughts or attempts. If I was focusing on those symptoms, there would be a whole slew of questions that we would have, you know, delved into. The way this system was set up, we had access to psychiatry and

we didn't have time to take that type of detailed history to figure out is this patient truly bipolar or not so we would have referred this patient --

**Q. And then you would have deferred to the psychiatrist?**

A. Yes.

**Q. In this first visit on your first note on the top of the first page, HPI?**

A. Yes.

**Q. It says patient is a smoker and states that she is trying to quit. Do you see that?**

A. Yes, I do.

**Q. In her last visit, it says 54-year-old female with diabetes, smoker, trying to quit.**

A. Yes.

**Q. Do you see that?**

A. I do.

**Q. So from the first visit to the last visit with regard to her smoking, Connie was trying to quit, wasn't she?**

**MR. MANZELLA:** Objection, calls for speculation.

**BY MR. HAMPTON:**

**Q. According to your notes?**

**MR. MANZELLA:** Objection, calls for

speculation.

THE WITNESS: According to my notes she was trying to quit on that first visit, she was trying to quit on that last visit but what happens in between if you read the note it's not exactly clear. It says that her son is involved in some problem and so she is not able to quit. It does not mean that she ever forgot about quitting, it's not just clear.

BY MR. HAMPTON:

**Q. Sometimes external circumstances may overwhelm her?**

MR. MANZELLA: Objection.

THE WITNESS: It's just not clear.

BY MR. HAMPTON:

**Q. But at least on some records they indicate that she was trying to quit?**

A. Yes, that is very clear.

**Q. Is it your experience that -- you say in your clinical experience that patients that have been smoking for a long time find it very difficult to quit?**

A. It is.

**Q. Do some patients give up and even -- and just quit trying to quit smoking?**

MR. MANZELLA: Objection. Calls for speculation.

BY MR. HAMPTON:

**Q. If you know.**

A. I guess. It's hard -- the reason I hesitate is because part of the problem, you know, when you go to your physician, a rapport is developed and the patient wants to say what the physician wants to hear so if every time I'm telling you please try to quit smoking, you know, they may say I'm trying to quit smoking but it may have the better of them.

**Q. Nicotine is an addictive substance?**

A. It is.

**Q. Some people have said that it's harder to quit smoking than it may be to get off of taking drugs. Have you had any clinical experience that would indicate that?**

MR. MANZELLA: Objection as to some people, calls for speculation.

BY MR. HAMPTON:

**Q. Do you have any clinical experience --**

A. I don't.

**Q. Diabetes is a pretty terrible disease, isn't it?**

A. It is.

**Q. One of the complications associated with diabetes is damage to the nervous system?**

A. That's correct.

**Q. And I think in Connie's case there's some indication that she had some diabetic neuropathy. Can you explain to the jury what diabetic neuropathy is?**

MR. MANZELLA: Objection, assumes facts not in evidence.

THE WITNESS: Nerves also require good blood flow and over time because the vascular beds are damaged from diabetes, the nerves can be damaged. Many times diabetics will get damage to the nerves that result in a stinging, burning, tingling type of pain often first presenting in the feet.

BY MR. HAMPTON:

**Q. So it's particularly important for diabetics to be careful about their feet, is that true?**

A. True.

**Q. Now, there are several notes in your progress notes that indicate whether the diabetes was controlled or uncontrolled but I think in your**

**testimony today that you've indicated that hemoglobin A1C test is the determinative test to see whether or not the diabetes is under control?**

A. The A1C reflects the average sugar control over three months. So although it doesn't tell you over the lifetime of the patient -- for example, you could be uncontrolled for months and months and months, turn into a controlled patient and have an A1C and we could call you controlled but over a lifetime of course you weren't controlled and over that lifetime you may have already sustained damage to the brain, heart, kidney, feet, eyes.

**Q. Right. But if we have a series of hemoglobin A1C tests, that would be the best evidence as to whether or not the diabetes is under control?**

A. For the past three months. For the past three months of that test, yes.

**Q. Okay.**

**(EXH. 16, Tampa General Hospital Progress Note dated 11/28/06, was marked for identification.)**

MR. MANZELLA: I'm going to object to this record to the extent it's not a record --

MR. HAMPTON: It's not a record? You're objecting to the record that it's not a record?
MR. MANZELLA: May I finish?
MR. HAMPTON: Sure.
MR. MANZELLA: I object to the record to the extent it's not a record generated by this doctor.
MR. HAMPTON: Okay, thank you.
**BY MR. HAMPTON:**
**Q. Doctor, I'll show you Exhibit Number 16.**
A. Okay.
**Q. Up at the upper left-hand corner does that say Tampa General Hospital?**
A. It does.
**Q. Does that say progress note?**
A. It does.
**Q. Do you know a Maria-Carmen Wilson?**
A. Not personally but of her, yes.
**Q. Do you know of her that she's a treating physician for Connie Curley?**
A. Based on this, yes.
**Q. Based on Exhibit 16?**
A. Yes.

**Q. And Connie Curley is the plaintiff in this case, correct?**
A. Yes.
**Q. Was Maria-Carmen Wilson, did she have a specialty in any field of medical treatment?**
A. Pain specialist.
**Q. So this might be one of the pain specialists that would be working with Connie Curley?**
A. Correct.
**Q. Exhibit Number 16 is dated December --**
A. Received on --
**Q. What is the date of the visit, 11 --**
A. Date of service.
**Q. Okay, thank you. 11/28/2006 is the date of service. Do you see on the second line of the history of present illness, Dr. Carmen Wilson, thank you, indicates a follow-up evaluation for migraine headache and diabetic neuropathy, do you see that?**
A. Yes.
**Q. So what is diabetic neuropathy?**
A. Injury to the nerves of the feet from uncontrolled diabetes that results in those pain symptoms I was telling you about, may be loss of

sensation but burning, tingling, numbness in the feet.
**Q. And that might indicate -- that is the symptom that warns a physician that there might be a syndrome of diabetic neuropathy?**
MR. MANZELLA: Objection.
THE WITNESS: If you have the symptoms and you have them in a diabetic, the most likely scenario is to treat for diabetic neuropathy if there is no improvement to then do testing to confirm that that is what you're dealing with but other conditions can give numbness, pain, the same symptoms.
**BY MR. HAMPTON:**
**Q. Right. Diabetic neuropathy, can that lead eventually to amputations?**
A. Indirectly.
**Q. How does that happen?**
A. The neuropathy impairs the patient's sensation and so they may develop -- if they don't check their feet regularly, they may develop ulcerations on the bottom aspect of the foot. They may step on a nail, a tack and never know it because they've lost sensation in that foot. Ultimately the vasculature supply, which has

nothing to do with the nerves, but the oxygen supply to that foot can be compromised from the diabetes. If that happens in somebody that had normal sensation, they would feel pain. The diabetic may not be aware of it until their toes actually turned black and if there's an ulceration or this vascular compromise, they may end up getting gangrene or infection that leads to amputation.
**Q. Some of your progress notes indicate that Connie was keeping -- was bringing to you a home monitoring log.**
A. Correct.
(EXH. 17, Patient Record Of Home Glucose Monitoring, was marked for identification.)
**BY MR. HAMPTON:**
**Q. I'll show you Exhibit 17. Is this the type of home monitoring log that you were talking about?**
A. Yes. It doesn't have her name on it but...
**Q. Correct. Okay. When you gave the patient the home monitoring log, would they -- would the printout of the home monitoring log that was given to them have their name on it?**

A. No.
**Q. So they would just have a log and they might bring it back to you?**
A. They might.
**Q. A lot of patients don't?**
A. Right.
**Q. It's hard to create a log, isn't it? It's hard to maintain a log -- in your clinical experience have you found that the patients that have diabetes have a hard time creating or making a log like Exhibit 17?**
A. Yes.
**Q. And why is it so hard?**
A. It requires that they actually take their sugars and document what those sugars are.
**Q. And why is that hard?**
A. It's painful.
**Q. Why is it painful?**
A. Because you have to take a small lancet, wipe your finger with alcohol and actually pierce the skin to collect a blood specimen to put on the strip to get the number to record on the log.
**Q. And that's painful?**
A. It is.

**Q. When you first -- when you first saw Connie and you first realized that she had diabetes, you prescribed Metformin, is that correct?**
A. Yes.
**Q. And Metformin you said I think helps reduce insulin resistance?**
A. It's an insulin sensitizer, yes.
**Q. So at the cellular level it helps those little cells use the insulin and create energy for the body?**
A. Yes.
**Q. Towards the middle in your later visits with Connie, you prescribed Byetta?**
A. Yes.
**Q. Now, I think when you prescribed Byetta, you also -- is that an injection?**
A. It is.
**Q. So from the first time that you saw Connie until the last time that you saw Connie, she went from a treatment for diabetes of Metformin, is that correct?**
A. Yes.
**Q. And then towards the latter part, your last visit in 2000 -- what was that, 2000 -- April**

**26, 2007, she had gone from Metformin to Byetta, i.e. insulin injections?**
A. It's not insulin.
**Q. What is it?**
A. Byetta is a replanonite (ph) which basically affects mobility -- no, motility of the gut and insulin sensitivity in the level of the pancreas and your appetite.
**Q. Tell me what motility is because not everybody's going to be a doctor on the jury. Motility of the gut is what you said.**
A. It slows down motility of the gut. Normally the gut moves food in a certain fashion and if the stomach is emptied quickly, a patient will feel ready to eat, they may feel hungry. And if they eat, of course their sugar will go up, their weight may go up so what Byetta does is by slowing down the movement of food through the intestinal tract, the stomach stays expanded and the patient doesn't feel hungry. They may actually feel nauseated if they eat and so by decreasing the amount of intake, their sugars go down but not only their sugars go down, the hope is -- it's not indicated for weight loss but the hope is they will lose weight.

**Q. The primary indication is to help control blood sugars?**
A. Yes. I think they're going for that other indication but I haven't kept up with that.
**Q. Okay. The treatment though in diabetes is to prevent or delay the end term organ damage, is that correct?**
A. Correct.
**Q. Diabetes is chronic, it lasts for the rest of your life?**
A. Correct.
**Q. It's essentially noncurable, isn't that true?**
A. At this time, yes.
**Q. And it's often a cause of death?**
A. Indirectly, yes.
**Q. Diabetes can complicate a patient's condition that already has risk factors for heart disease or stroke?**
A. Yes. You have it.
**Q. Yes, I have one. Let's go through these then. I want to mark them independently if that's --**
**(EXH. 18, Vital Signs Sheet, was marked for identification.)**

90

MR. MANZELLA: I object and I would ask that you remove the -- thank you -- tag. Thank you.

BY MR. HAMPTON:

Q. Exhibit 18 looks like it's a vital signs sheet from Tampa General Hospital for Connie, is that right?

A. Yes.

Q. Is this the type of record that Tampa General Hospital keeps?

A. Yes.

Q. And would this chart be in the chart of -- the actual chart of Tampa General?

A. Yes.

Q. And a supplement to Exhibit Number 1, true?

A. Yes, true.

Q. Now, you said you monitored the BMI's. On Exhibit 18 there is a weight and there is a height but is there actually a column in here where the BMI is --

A. No.

Q. Okay. And is there a BMI calculation in your progress notes?

A. There has to be. I cannot imagine -- I

91

mean, that's something that was my own personal goal to do with all my diabetics, it was not something that the hospital required me. So if I went through every sheet in that record, I bet you I would find a BMI somewhere.

Q. But you mentioned on the note where you were reviewing Connie's -- before she was to have an operation that that particular note did not have what operation?

A. Right.

Q. So not every note contains every transaction that occurs between the patient and the doctor, is that true?

A. That's true.

Q. And on that note it was actually fairly important to some extent -- on that note it would have been nice to know what operation that you were reviewing her or comparing her for, that would have been a material medical issue, right?

A. You're right.

Q. So even when there's a material medical issue, the notes don't capture all of the information that occurs between the patient and the doctor?

A. Absolutely.

92

Q. For example, in this proceeding today, we have a Court Reporter who is actually taking down everything that everybody says whereas these medical notes are not a transcription of the visit with your --

A. You're right.

Q. And you don't remember everything that you said to Connie?

A. You're right.

Q. Or everything that Connie said to you?

A. Absolutely.

Q. We have though in Exhibit 18 an interesting chart that shows what the weights are over time?

A. Yes.

Q. Height probably stays about the same?

A. Yes.

Q. Okay. We saw them grow up to about 40 or 50 years old?

A. But we shrink.

Q. Incredibly. We see here the first visit, this looks like your note, that the weight log continues after you see her but the weight goes from 167 to 179 and then back down to 172. Do you see that?

93

A. Yes.

Q. So her weight is not constant, it's going up and then it's going down, right?

A. Yes.

Q. And in fact, on 4/27/06 her weight is 151.6?

A. Yes.

Q. So she's managed to at some level -- we can see that at some level she's managed to take your advice and lose weight and she's actually lost weight?

A. We know that she's lost weight.

Q. Okay. It's hard to lose weight, isn't it, when you're 50 years old?

MR. MANZELLA: Objection.

BY MR. HAMPTON:

Q. In your clinical experience as a doctor do you find it hard for women who are over 40 to lose weight?

A. It depends on their scenario.

Q. A patient that presents with depression that might have been sexually abused as a child, disabled because they were in an automobile accident, would it be hard for a patient like that to lose weight?