# EXHIBIT 8

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE OF FLORIDA
ORLANDO DIVISION

Case No. 6:07-cv-15701

CONNIE M. CURLEY,

   Plaintiff,

vs.

ASTRAZENECA LP, et al.,

   Defendants.

**DEPOSITION OF STANLEY S. SHAMA, D.P.M.**

Taken on Behalf of the Plaintiff

DATE TAKEN:  7/22/08
TIME:          12:23 p.m. - 2:08 p.m.
PLACE:       Ankle and Foot Associates
                232 Bullard Parkway
                Tampa, Florida 33617

Examination of the witness taken before:

Joan L. Pitt
Registered Merit Reporter
Certified Realtime Reporter
Florida Professional Reporter

Dr. Stanley Shama
Stratos Legal Services

4

Page 10

```
 1  things like that in those patients?
 2     A.  We will usually depend on the patient to do
 3  that, or their internist.  We don't actually manage
 4  their diabetes.  We manage any manifestation of diabetes
 5  in the low extremity.
 6     Q.  Absolutely.  Let me rephrase my question and
 7  make it clear.  When you have a diabetic patient who
 8  comes to your office for treatment, do you often notate
 9  anywhere in your records blood sugar levels that are
10  reported to you by the patients or maybe complications
11  that are reported to you by the patients, or are you
12  just simply concerned with diabetic foot care?
13     A.  No, we will consult with the patient and ask
14  them what their blood sugar was the last time.  Will we
15  actually document what they said?  Since it's just a
16  verbal discussion, I normally won't document it, since I
17  don't have anything written from the patient.  But
18  obviously any complications associated with the diabetes
19  in the lower extremity will be documented in the chart.
20     Q.  Okay.  I understand.  Outside of the training
21  that you've already told us about, do you have any
22  specialized training in neurology?
23     A.  We are not neurologists.
24     Q.  Okay.  And the patients that come to see you,
25  how are they normally referred to you?
```

Page 11

```
 1     A.  There's a variety of sources.  Anywhere from
 2  word of mouth, the phonebook, other internists or family
 3  physicians, health plans that have us contracted
 4  directly so the patient has to choose from a panel of
 5  podiatric physicians, previous patients that have been
 6  here before.
 7     Q.  Okay.  Specific to Ms. Curley, do you recall
 8  how she was referred to your office?
 9     A.  No, I don't.
10     Q.  Okay.  Not a problem.
11        When you have a diabetic patient that is
12  referred to your office by whatever source and you're
13  aware that they're suffering from diabetes, do you often
14  send consultative reports back to their primary care
15  physicians?
16     A.  We try to.  And I emphasize try to.  With the
17  problem with help today, reports don't always get
18  finished, they're not always accurate.  We recently went
19  to electronic medical records, so hopefully that problem
20  will be resolved.
21     Q.  Okay.  So there may have been times that you
22  might have sent reports, but not always?
23     A.  Correct.
24     Q.  Okay.  I think that is -- let me ask you some
25  questions about diabetes in general.
```

Page 12

```
 1     A.  Okay.
 2     Q.  I know that you are a trained doctor, so I'm
 3  not trying to offend you in any way.  My questions may
 4  sound very elementary, but I want to get some basic
 5  understanding of what your basic understanding is of
 6  diabetes.
 7         Doctor, can you explain to the jury, who is
 8  going to be privy to this deposition transcript, what
 9  diabetes is?
10     A.  Diabetes is a condition where a patient may not
11  process or metabolize sugar properly.  Usually there's a
12  lack of insulin production, and as a result, higher
13  blood levels of sugar develop, and I guess it would be
14  the physician's job to try to keep those blood sugars
15  under control via diet, exercise, oral or injectable
16  medications.
17     Q.  Okay.  And what types of complications can a
18  patient develop as a result of having diabetes?
19     A.  Oh, there's myriad of different complications.
20  In my practice, we see a lot of neurologic problems with
21  hyposensitivities, which result in pressure ulcers,
22  burning pain, night pain, difficulty walking sometimes.
23  But wounds and infections are probably the most
24  important that we're looking for trying to treat and
25  actually prevent.
```

Page 13

```
 1     Q.  Okay.  Let's start looking at some records
 2  specific to Ms. Curley.  And I guess, can I take a look
 3  at what you have so I can see if it's very different
 4  from what I have?
 5     A.  Absolutely.  Those are my notes that I just
 6  handed you.  This is all the correspondence
 7  from -- relating to the deposition here.
 8        MS. AUSTIN:  Okay.  This looks pretty much like
 9     what we have.  Do you want to take a look?  With the
10     exception of a couple things on the top and probably
11     the most recent visits.  The last one we have is
12     November of '07.
13     Q.  I'm going to hand that back to you.  And can
14  you tell us when the first time is that you treated
15  Ms. Curley?
16     A.  It would appear that Ms. Curley was first seen
17  at this office May 15th of 2006.
18     Q.  Okay.  And what did she present for on that
19  visit?
20     A.  There were two conditions that she was
21  concerned with.  One was basic diabetic foot care, and
22  the other was apparently she had dropped a sofa on the
23  right foot about three weeks prior to being seen
24  initially.
25     Q.  Okay.  At the time that Ms. Curley presented on
```

(Pages 10 to 13)

Dr. Stanley Shama
Stratos Legal Services

5

**Page 14**

1  her first visit, do you know whether or not she was
2  taking the drug Seroquel?
3      A. She did not report that at the time.
4      Q. Okay. Are you aware that we're here today for
5  this deposition as a result of Ms. Curley's taking of
6  the drug Seroquel?
7      A. I did not.
8      Q. Okay. Were you aware that it is Ms. Curley's
9  claim that the drug Seroquel caused her to develop
10 diabetes?
11     A. I was not aware of that.
12     Q. Are you familiar with the drug Seroquel?
13     A. I do not prescribe Seroquel regularly, so I
14 can't claim to be an expert on the medicine.
15     Q. Absolutely. Are you familiar with that class
16 of drugs?
17     A. Not really.
18     Q. Okay. Are you familiar with any of the FDA
19 warnings or anything like that that have been issued for
20 that class of drugs?
21     A. I've heard about it in the media.
22     Q. Okay. But nothing that you've had any personal
23 experience with?
24     A. No.
25     Q. Okay. On Ms. Curley's first visit on May 15th

**Page 15**

1  of 2006, did you note any complications that she was
2  suffering from as a result of her diabetes?
3      A. There were no significant what I will refer to
4  as side effects from her diabetes on that day. She had
5  some problems related to dropping the sofa on her foot,
6  which we treated that day. We reviewed what would be
7  considered proper diabetic foot care, but no severe
8  problems as a result of her diabetes.
9      Q. Okay. All right. When was the next time that
10 Ms. Curley visited your office?
11     A. About a week later, May 25th, 2006.
12     Q. And what was that visit for?
13     A. To re-evaluate what we had diagnosed as a
14 neuroma in her right foot as a result of the injury.
15     Q. And can you tell us what a neuroma is?
16     A. Neuroma is an injury sustained usually to a
17 cutaneous nerve in the foot, although a neuroma can
18 affect any nerve in the body. In her case, it was an
19 enlargement of the nerve between the third and fourth
20 metatarsals, with pain.
21     Q. And did you diagnose that as a result of her
22 dropping the sofa on her foot?
23     A. The causal relationship seemed to be there.
24     Q. Okay. Did you provide any care to Ms. Curley
25 on that day resulting -- not resulting, strike that --

**Page 16**

1  pertaining to her diabetic foot care?
2      A. No.
3      Q. Okay. When was the next time you treated
4  Ms. Curley?
5      A. Approximately three weeks later on June 15th,
6  2006.
7      Q. Okay. And what did she come in for that day?
8      A. Again a follow-up on the neuroma of her right
9  foot.
10     Q. Okay. Did you provide her any diabetic foot
11 care that day?
12     A. No.
13     Q. Had you noted any complications that Ms. Curley
14 would have been suffering from as a result of her
15 diabetes?
16     A. No.
17     Q. Okay. Your next visit?
18     A. Looks like it was on 6/19/2006.
19     Q. Okay. And what did Ms. Curley present for on
20 that day?
21     A. We were following her up for the neuroma of the
22 right foot.
23     Q. Okay. Did you provide her with any diabetic
24 foot care that day?
25     A. No.

**Page 17**

1      Q. Did you notate any complications she was
2  suffering from as a result of her diabetes?
3      A. No.
4      Q. Okay. What was the date of her next visit?
5      A. I apologize.
6      Q. Oh, it's no problem. Take your time.
7      A. My notes are not in order here. What was the
8  last date that we were discussing?
9          MR. MANZELLA: 6/19/06.
10         THE WITNESS: Have we mentioned 6/13/06?
11         MR. MANZELLA: No. 6/15 and 6/19, but not
12 6/13.
13 BY MS. AUSTIN:
14     Q. You may have something we don't have.
15     A. No, I have '07 here.
16     Q. Okay.
17     A. You mentioned 6/15?
18         MR. MANZELLA: Yes.
19     Q. Yes.
20     A. The next visit was on 6/19 --
21     Q. Okay.
22     A. -- /06.
23     Q. I believe we've talked about the 6/19, so what
24 was the next visit after 6/19?
25     A. 7/5/06.

(Pages 14 to 17)

Dr. Stanley Shama
Stratos Legal Services

7

### Page 22

1  Q. Okay. What did you attribute the burning in
2  her upper right thigh to?
3  A. We were concerned because she did have a
4  history of phlebitis, so we had ordered arterial
5  Dopplers of the legs.
6  Q. And what is phlebitis?
7  A. Phlebitis is usually an inflammation and/or
8  blockage of a deep or superficial vein, causing
9  inflammation, heat, pain, possibly infection.
10  Q. Did you attribute any of these concerns to
11  Ms. Curley's diabetes?
12  A. No.
13  Q. When was the next time that you saw Ms. Curley?
14  A. She was seen October 9th, 2006.
15  Q. And what was she seen for that day?
16  A. Postop. follow-up two months following her
17  right foot surgery.
18  Q. Did you provide her with any diabetic foot care
19  that day?
20  A. No, we did not.
21  Q. Did you note any complications resulting from
22  her diabetes?
23  A. No.
24  Q. When was the next time you saw Ms. Curley?
25  A. She was seen October 25th.

### Page 23

1  Q. And what was she seen for that day?
2  A. She had reported dropping a dresser drawer on
3  her right big toe.
4  Q. Okay. Did you provide her with any diabetic
5  foot care that day?
6  A. She was just evaluated for the contusion to her
7  right hallux, making sure there were no fractures or
8  infection, which could be complicated by diabetes. So
9  inadvertently we were evaluating her in that respect.
10  X-rays were taken. No fractures were noted. And the
11  right hallux was anesthetized, the loose hallux nail was
12  removed and a hematoma evacuated.
13  Q. Okay. So other than what you've already
14  mentioned, you didn't note any complications resulting
15  from her diabetes, just a concern because of her
16  diabetes?
17  A. Correct.
18  MR. MANZELLA: Objection.
19  Q. You can still answer. That's for the record.
20  When was the next time that you saw Ms. Curley?
21  A. On November 6th, 2006.
22  Q. And what was she seen for that day?
23  A. We were following up on the removal of her nail
24  and the I & D of her hematoma on the right foot.
25  Q. Did you provide her with any diabetic foot care

### Page 24

1  that day?
2  A. No.
3  Q. Did you note any complications resulting from
4  her diabetes?
5  A. None.
6  Q. Okay. When was her next visit?
7  A. November 13th.
8  Q. And what did she see you for on November 13th?
9  A. She was complaining of some pain on the bottom
10  of her right foot, which was eventually diagnosed as
11  plantar fasciitis.
12  Q. And what is plantar fasciitis?
13  A. Plantar fasciitis is pain localized to the
14  bottom arch area of the right foot.
15  Q. Did you attribute this condition to
16  Ms. Curley's diabetes at all?
17  A. No.
18  Q. And I see from your note -- let me back up,
19  Doctor. I notice on all of your notes you have listed
20  S, O, A, P. Can you explain to the jury what those
21  initials mean in terms of your note?
22  A. That's a basic format for a medical note. The
23  S stands for subjective, which is what the patient
24  reports, objective is normally the examiner's findings,
25  the A is the assessment or the conclusion or the

### Page 25

1  diagnosis, and the P is for the plan or what's
2  recommended or done to the patient.
3  Q. Okay. And I see on November 13th of 2006 that
4  you recommended to Ms. Curley that she follow up in
5  three weeks for her diabetic foot care, or sooner if
6  needed; is that correct?
7  A. Which date was that again?
8  Q. On November 13th.
9  A. 13th. Correct.
10  Q. Okay. When was the next time that you saw
11  Ms. Curley?
12  A. We saw her December 4th for diabetic foot care.
13  Q. Okay. And I see from your note that it says:
14  General diabetic foot care in lieu of neuropathy. Can
15  you explain to the jury what that means?
16  A. That means the neuropathy or the decrease in
17  sensorium that was determined in her feet would make it
18  a benefit for the patient to have someone evaluate her
19  feet periodically and make sure there are no
20  complications as a result of not having as much
21  sensation in the feet as the normal person.
22  Q. Okay. So you were able to diagnose that
23  Ms. Curley had some loss of sensation in her feet
24  resulting from her diabetes?
25  A. Correct.

(Pages 22 to 25)

Dr. Stanley Shama
Stratos Legal Services

8

### Page 26

1  Q. When did you make that diagnosis? Because this
2  is the first time that we actually see a note where
3  she's getting diabetic foot care and you're noting the
4  neuropathy. When did you actually make that diagnosis?
5  A. A reference to her neuropathy was made on her
6  initial visit.
7  Q. Are you referring to where you noted that she
8  was suffering from numbness in her feet?
9  A. I'm referring to the note of 5/15/2006.
10  Q. Okay. And can you tell me specifically where
11  you made a reference to her suffering from diabetic
12  neuropathy?
13  A. I don't see it documented in the note. I just
14  see it referenced in the assessment.
15  Q. Okay.
16  A. So usually we do a Semmes-Weinstein or
17  something like that to determine if there's any lack of
18  sensation. That's pretty routine when we're evaluating
19  a diabetic.
20  Q. Okay. And would you have done that on
21  Ms. Curley?
22  A. Yes.
23  Q. Would you have a notation -- strike that.
24       Would you have a report in your file showing
25  the findings from that test?

### Page 27

1  A. Normally I would.
2  Q. Okay. But in this particular case, we're not
3  able to locate it?
4  A. It's not there.
5  Q. But in the regular course of your business and
6  your practice, that's something you would have done
7  routinely?
8  A. Correct.
9  Q. And as a result of that test, you would have
10  made this note that -- under your assessment section
11  where it says: Patient would benefit from general
12  diabetic foot care in lieu of neuropathy, correct?
13  A. Correct.
14  Q. I'm going to mark your note of May 15th, 2006
15  as Exhibit 2 to the deposition.
16       (Exhibit No. 2 was marked for identification.)
17       Let's go back to your visit on December 4th of
18  2006. By this time, Ms. Curley had been in lots of
19  times, but the issues that she was having took more
20  precedence than her diabetic foot care up until this
21  time; am I correct?
22  A. Correct.
23  Q. Okay. Everything else had been more acute, so
24  you didn't really have occasion to treat her for those
25  things, although it was always a concern; is that an

### Page 28

1  accurate statement?
2  A. Correct.
3  Q. Okay. So on December 4th of 2006 is the first
4  time that we see some notation?
5  A. Correct.
6  Q. I'm going to mark the December 4th of 2006
7  visit as Exhibit 3.
8       (Exhibit No. 3 was marked for identification.)
9       When is the next time that you saw Ms. Curley
10  following that December 4, 2006 visit?
11  A. The next time she was seen was March 14th,
12  2007.
13  Q. And what did she present for on that day?
14  A. She came to the office essentially for diabetic
15  foot care on that day.
16  Q. Okay. And again on that date you noted that
17  the patient would benefit from general diabetic foot
18  care in lieu of neuropathy; did I read that correctly?
19  A. Correct.
20  Q. So again you were noting the concerns that you
21  had regarding the complications that Ms. Curley had
22  developed as a result of her diabetes, correct?
23  A. The potential problems she could --
24  Q. Potential problems, but she'd already been
25  diagnosed with some numbness in her feet, correct?

### Page 29

1  A. Correct. That's more of a symptom than a
2  problem.
3  Q. I understand.
4  A. Okay.
5  Q. I understand. Okay. I'm going to mark the
6  March 14th of 2007 note as Exhibit 4 to the deposition.
7       (Exhibit No. 4 was marked for identification.)
8       When was the next time that Ms. Curley came to
9  your office?
10  A. May 9th, 2007.
11  Q. And what did she present for on that day?
12  A. General diabetic foot care, which involved
13  thickened mycotic nails and also some pain in the area
14  just above the left ankle.
15  Q. Did you attribute any of this pain to
16  Ms. Curley's diabetes?
17  A. No.
18  Q. But you did note under the subjective section
19  that this patient presents for general diabetic foot
20  care in lieu of neuropathy again?
21  A. Yes.
22  Q. I'm going to mark the visit of May 9th, 2007 as
23  Exhibit 5 to the deposition.
24       (Exhibit No. 5 was marked for identification.)
25       And on that visit, again you were expressing

(Pages 26 to 29)

**42**

1  Q. And these are all things that you would
2  attribute to her diabetes, correct?
3  A. Partially.
4  Q. Okay. And you testified earlier that you don't
5  prescribe Seroquel, correct?
6  A. Correct.
7  Q. And you're not familiar with the drug Seroquel
8  and its indications, correct?
9  A. Correct.
10 Q. And you were not aware that Ms. Curley was
11 taking Seroquel, correct?
12 A. Correct.
13 Q. And you didn't prescribe Seroquel for
14 Ms. Curley?
15 A. No.
16 Q. And you're not the person who monitors
17 Ms. Curley's diabetic condition, correct?
18 A. Correct.
19 Q. And you're not a neurologist, correct?
20 A. Correct.
21 Q. Your sole responsibility in treating Ms. Curley
22 has been maintaining her feet and conditions relating to
23 her feet and making sure that the complications that
24 she's already developed remain stable and do not get
25 worse; is that correct?

**43**

1        MR. MANZELLA: Objection.
2  A. Correct.
3  Q. As you sit here today, do you have any
4  prognosis for Ms. Curley's condition?
5  A. Guarded.
6  Q. All right. All right, Doctor. I believe those
7  are all my questions. Do you want to take a break
8  before Mr. Manzella gets started?
9  A. I'm fine.
10       CROSS-EXAMINATION
11 BY MR. MANZELLA:
12 Q. Good afternoon, Dr. Shama. My name is
13 Jeff Manzella, and I represent AstraZeneca
14 Pharmaceuticals.
15       Just because I don't think we did it before,
16 can you state your full name for the record?
17 A. Sure. My name is Stanley Shama, D.P.M.
18 Q. And the name of your practice, please?
19 A. Ankle and Foot Associates.
20 Q. I think you testified that you've been at this
21 practice for over 20 years, correct?
22 A. Correct.
23 Q. Are you the owner of the practice?
24 A. Yes, one of them.
25 Q. Another basic question. You're licensed to

**44**

1  practice medicine, correct?
2  A. Podiatric medicine.
3  Q. And in which state are you licensed?
4  A. Florida.
5  Q. Do you have any board certifications?
6  A. Yes.
7  Q. What are they?
8  A. American Board of Podiatric Surgery.
9  Q. Do you have hospital privileges?
10 A. Yes.
11 Q. Where?
12 A. Tampa General, St. Joseph's, University
13 Community and two outpatient surgery centers.
14 Q. And you are qualified and, in fact, do perform
15 surgeries on the foot; is that correct?
16 A. Correct.
17 Q. Did you do anything to prepare for today's
18 deposition?
19 A. In what way?
20 Q. Did you look at anything, any notes or any
21 records or contact anybody with regard to the
22 deposition?
23 A. I reviewed her notes.
24 Q. And you did that today?
25 A. Correct.

**45**

1  Q. Do you understand that AstraZeneca makes the
2  drug Seroquel?
3  A. I do now.
4  Q. But before I told you, did you even know which
5  company was the producer of Seroquel?
6  A. No.
7  Q. You do understand that AstraZeneca makes lots
8  of other drugs as well; is that fair to say?
9  A. Correct.
10 Q. Do you know whether or not you use any
11 AstraZeneca drugs in your practice?
12 A. Not offhand.
13 Q. Do you work for AstraZeneca?
14 A. No.
15 Q. Have you ever worked for them?
16 A. No.
17 Q. Do you have any kind of formal affiliation with
18 AstraZeneca?
19 A. None.
20 Q. We talked about the documents you brought here
21 today in connection with the notice of deposition.
22 That's Ms. Curley's medical records with regard to her
23 foot care; is that fair?
24 A. Correct.
25 Q. Are those documents kept in the ordinary course

(Pages 42 to 45)

Dr. Stanley Shama
Stratos Legal Services

13

### Page 46

1  of business here at the facility?
2  A. Yes.
3  Q. Are they -- are they used by you to keep track
4  of her medical care and her medical history?
5  A. Yes.
6  Q. I'd like for the court reporter to simply mark
7  the entire package of his records as Exhibit 8.
8     MS. AUSTIN: Do you want to just do it 7?
9  Because I was marking what was left as 7, but we
10 could do the whole packet as everything.
11    MR. MANZELLA: That will be fine. As Exhibit 7
12 will be the entire package of Dr. Shama's records,
13 including his new visits with the patient.
14    MS. AUSTIN: That's fine.
15 BY MR. MANZELLA:
16 Q. You talked about you deal with podiatric care
17 of anywhere from infants to geriatrics, correct?
18 A. Correct.
19 Q. You said some of those people are diabetic,
20 correct?
21 A. Correct.
22 Q. Do you have any idea what percentage of your
23 patients are diabetic?
24 A. Thirty percent.
25 Q. And that includes type 1 and type 2 diabetes?

### Page 47

1  A. Correct.
2  Q. Is it fair to say that the majority of your
3  patients would be type 2 diabetes patients?
4  A. Yes.
5  Q. And you testified earlier that you don't
6  actually manage the care of the diabetes outside of the
7  care of the foot; is that fair?
8  A. Yes.
9  Q. So, for example, you're not taking blood tests,
10 blood sugar tests, and keeping track of their blood
11 sugar?
12 A. Correct.
13 Q. And you're not prescribing them the medications
14 that would control their diabetes, control their blood
15 sugar?
16 A. Correct.
17 Q. You testified a little bit about diabetic
18 neuropathy, or just neuropathy in general. Can you
19 explain what that is?
20 A. Neuropathy is a disruption of the sensory
21 nerves as a result of diabetes, usually an increased
22 blood sugar over a long period of time.
23 Q. How does one go about -- well, strike that.
24    Do you diagnose diabetic neuropathy in some of
25 your patients?

### Page 48

1  A. Yes.
2  Q. How do you go about that? What tests are
3  required for that diagnosis?
4  A. There's a variety of tests, as well as
5  subjective information that you would collect from the
6  patient. Objective findings would be, a
7  Semmes-Weinstein is probably the most common.
8  Pinpricking the area is another way of doing it. Those
9  are the basics. You know, you can do nerve conduction
10 studies and a variety of other more sophisticated tests,
11 but the basic ones usually give you the information you
12 need.
13 Q. And have you diagnosed Ms. Curley with diabetic
14 neuropathy?
15 A. Yes.
16 Q. And based on what kind of tests did you use to
17 do that?
18 A. Usually when a diabetic comes in, the first
19 thing we do is the Semmes-Weinstein.
20 Q. And what is that?
21 A. That's a small monofilament, usually plastic or
22 fine metal wire, that's used to determine the sensation
23 on the bottom of the foot.
24 Q. And you said there's other more sophisticated
25 tests. I think one of them you mentioned was the nerve

### Page 49

1  conduction test?
2  A. Correct.
3  Q. Did you perform those more sophisticated tests
4  on Ms. Curley?
5  A. No.
6  Q. And I think you testified earlier that you
7  usually do some procedures but you couldn't find the
8  records or the indications in your records with regard
9  to Ms. Curley; do you recall that testimony?
10 A. Not specifically.
11 Q. Do you have any record in your medical records
12 confirming whatever tests you did to diagnose diabetic
13 neuropathy?
14 A. You're specific to the Semmes-Weinstein? Yes,
15 I did not document that in her initial visit, but
16 that's, you know, routine for most patients initially.
17 Q. So to be clear on the record, though, you don't
18 have a physical hard copy record of a Semmes-Weinstein
19 test for her?
20 A. Correct.
21    MS. AUSTIN: Objection; form.
22    MR. MANZELLA: What's the basis of that
23 objection?
24    MS. AUSTIN: He's already answered that several
25 times that he didn't have the physical document.

(Pages 46 to 49)

**Page 86**

1  A. Correct.
2  Q. Was this a treatment related to her diabetes?
3  A. Yes.
4  Q. Do you believe that Ms. Curley will always
5  require treatment from either you or another podiatrist
6  for her diabetic condition?
7  A. It's advisable.
8  Q. So as long as she's alive, it's advisable that
9  she see a podiatrist on a regular basis?
10  A. Correct.
11  Q. You were asked questions about Ms. Curley's
12  weight; do you recall that?
13  A. Yes.
14  Q. Does being obese cause diabetic neuropathy?
15      MR. MANZELLA: Objection.
16  Q. Let me rephrase my question. You've stated
17  previously that obesity is a risk factor for the
18  development of diabetes, correct?
19  A. Correct.
20  Q. Once a person has already developed diabetes,
21  does the fact that they're overweight cause them to go
22  ahead and develop diabetic neuropathy?
23  A. I'm really not sure.
24  Q. That's fair enough. That's fair enough. And
25  let me pull out Exhibit 9. You were shown what has been

**Page 87**

1  marked as Exhibit 9. And if you will go to Page 2 of
2  Exhibit 9. You were asked some questions about whether
3  or not you see that Ms. Curley had developed some
4  numbness back in 1993, because this record is dated July
5  19th of 1993, correct?
6  A. Correct.
7  Q. Under the S, I assume that stands for
8  subjective, correct?
9  A. Correct.
10  Q. If you go down to the third line, the beginning
11  of the first full sentence, can you read that sentence
12  for the jury?
13  A. She has ongoing numbness persisting for a good
14  while, now in the left thumb at times.
15  Q. So this record and the numbness was talking
16  about her thumb, correct, it wasn't talking about her
17  feet?
18  A. Correct.
19  Q. So is it possible that this could have been
20  something that ultimately developed into her diabetic
21  neuropathy?
22  A. That I'm not sure of either.
23  Q. But we can be clear that hands and feet are
24  different, right?
25  A. Correct.

**Page 88**

1  Q. And this was a problem with her hands?
2  A. Correct.
3  Q. And the problem that you have diagnosed has
4  been in her feet, correct?
5  A. Correct.
6  Q. Okay. And you were asked some questions about
7  whether or not Ms. Curley has developed any
8  complications from her diabetes, right?
9  A. Right.
10  Q. And you testified that she hasn't?
11  A. In her feet.
12  Q. In her feet, okay. When I asked you earlier,
13  you said that she had developed some burning pain,
14  numbness and neuropathy, correct?
15  A. That's correct.
16  Q. And were you maybe just confused when you were
17  asked the question about whether or not she had
18  developed any diabetic complications?
19  A. Yes.
20  Q. Because, in fact, she has developed some
21  diabetic complications?
22  A. Correct, the ones you just mentioned.
23  Q. Thank you. And you were asked some questions
24  about the Semmes-Weinstein test that you performed on
25  Ms. Curley to diagnose her neuropathy, correct?

**Page 89**

1  A. Correct.
2  Q. And you were asked why that test is not in her
3  medical record, correct?
4  A. Correct.
5  Q. Although that test is not in her record, you
6  feel confident to say that you did perform that test on
7  Ms. Curley, correct?
8  A. Correct.
9  Q. And you were able to conclusively make the
10  diagnosis of diabetic neuropathy?
11  A. Correct.
12  Q. And you continue to treat Ms. Curley for her
13  diabetic neuropathy and all of her other diabetic care?
14  A. As relates to her feet, yes.
15      MS. AUSTIN: Thank you. I don't have any
16  further questions.
17         RECROSS-EXAMINATION
18  BY MR. MANZELLA:
19  Q. I have one or two follow-ups. Do you only get
20  diabetic neuropathy in your feet?
21  A. No.
22  Q. Can you get it in other places in your body?
23  A. More typically the hands.
24  Q. Hands and feet?
25  A. Correct.

Dr. Stanley Shama
Stratos Legal Services

24

**Page 90**

1  Q. So the fact that a record from the '90s
2  indicates she had numbness in her thumb, that doesn't --
3  it's possible she could have had diabetic neuropathy in
4  her thumb, correct?
5  A. Or carpal tunnel syndrome.
6  Q. Or carpal tunnel syndrome. And you said you
7  have not -- you evaluated her feet, so you don't know
8  whether or not she has diabetic neuropathy in her hands
9  or not?
10  A. Correct.
11  MR. MANZELLA: Thank you. No further
12  questions.
13  MS. AUSTIN: That's it.
14  THEREUPON, the deposition of STANLEY S. SHAMA,
15  D.P.M., taken at the instance of the Plaintiff, was
16  concluded at 2:08 p.m.

**Page 91**

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF POLK
    I, Joan L. Pitt, Registered Merit Reporter,
Certified Realtime Reporter, Florida Professional
Reporter and Notary Public in and for the State of
Florida at large, hereby certify that the witness named
herein appeared before me on _____, and was duly
sworn.
    WITNESS my hand and official seal this
_____.


_____
JOAN L. PITT, RMR, CRR, FPR
NOTARY PUBLIC - STATE OF FLORIDA
MY COMMISSION NO. DD771811
**EXPIRES:** 7-20-12

**Page 92**

CERTIFICATE OF REPORTER
STATE OF FLORIDA
COUNTY OF POLK
    I, Joan L. Pitt, Registered Merit Reporter,
Certified Realtime Reporter and Florida Professional
Reporter, do hereby certify that I was authorized to
and did stenographically report the examination of the
witness named herein; that a review of the transcript
was not requested; and that the foregoing transcript is
a true record of my stenographic notes.
    I FURTHER CERTIFY that I am not a relative,
employee, or attorney, or counsel for any of the
parties, nor am I a relative or employee of any of the
parties' attorney or counsel connected with the action,
nor am I financially interested in the outcome of this
action.
    DATED THIS _____ at Lakeland, Polk
County, Florida.


_____
JOAN L. PITT, RMR, CRR, FPR

(Pages 90 to 92)