# EXHIBIT 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
IN RE: Seroquel Products Liability
Litigation
MDL DOCKET NO. 1769
This Document Relates to:
Haller v. AstraZeneca LP, et al.
[David Haller 6:07-cv-15733]
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

February 11, 2008

    Oral deposition of DAVID D. HALLER, taken pursuant to Fed.R.Civ.P. 30, held at the Sheraton Suites, Orlando Airport, 7550 Augusta National Drive, Orlando, Florida 32822, beginning at 9:56 a.m., on the above date, before Denise D. Bach, a Federally-Approved Certified Court Reporter, License No. 30X10009330.

ESQUIRE DEPOSITION SERVICES
Four Penn Center
1600 John F. Kennedy Boulevard
Suite 1210
Philadelphia, Pennsylvania 19103
(215) 988-9191

18

| | |
|---|---|
| 1 | Q. What side effects do you |
| 2 | believe -- |
| 3 | A. Tremors. |
| 4 | Q. Tremors. |
| 5 | And what medication do you |
| 6 | believe caused your tremors? |
| 7 | A. Well, I'm on Risperdal |
| 8 | injections. |
| 9 | Q. Risperdal injections, |
| 10 | correct? |
| 11 | A. Yes. |
| 12 | Q. And you attribute those side |
| 13 | effects, the tremors, to Risperdal, is |
| 14 | that correct? |
| 15 | A. Yes. |
| 16 | Q. Have you filed a lawsuit |
| 17 | against the manufacturer of Risperdal? |
| 18 | A. No. |
| 19 | Q. Have you filed a lawsuit |
| 20 | against anyone other than AstraZeneca for |
| 21 | your diabetes? |
| 22 | A. No. |
| 23 | Q. Why haven't you sued the |
| 24 | manufacturer of Risperdal because you |

19

| | |
|---|---|
| 1 | believe it caused your tremors? |
| 2 | MS. HO: Objection, form. |
| 3 | THE WITNESS: I was |
| 4 | urinating 400 cc's of sugar -- |
| 5 | BY MR. ELLISON: |
| 6 | Q. You need to slow down, |
| 7 | please, sir, because the court reporter |
| 8 | is transcribing everything we're saying. |
| 9 | A. When I was diagnosed with |
| 10 | diabetes, they told me I was urinating |
| 11 | 400 cc's of sugar in my urine. I haven't |
| 12 | had any complications other than the |
| 13 | normal -- normalities of psychotropic |
| 14 | medications, shakes, tremors, so on. |
| 15 | So I couldn't bring a claim |
| 16 | against the subscriber or maker of |
| 17 | Risperdal because I've been on Risperdal |
| 18 | for a very short period of time. |
| 19 | Q. So you didn't sue the |
| 20 | manufacturer of Risperdal because you |
| 21 | thought you were on the medication for |
| 22 | too short a period of time? |
| 23 | A. No, because a short time of |
| 24 | period, I was already diagnosed with |

20

| | |
|---|---|
| 1 | diabetes in around 2004, 2005. And |
| 2 | that's -- and that's why I believe it was |
| 3 | Seroquel that caused my diabetes. |
| 4 | Q. My question was different. |
| 5 | Did you understand that, sir? |
| 6 | A. No. |
| 7 | Q. Okay. Let me repeat. If I |
| 8 | understood you correctly, you believe |
| 9 | that Risperdal caused you to develop |
| 10 | tremors, is that correct? |
| 11 | A. No. |
| 12 | Q. What do you think -- |
| 13 | A. I have tremors because of |
| 14 | Risperdal. |
| 15 | Q. So you believe that |
| 16 | Risperdal caused your tremors, is that -- |
| 17 | A. Pretty much, yes. |
| 18 | Q. Okay. Why didn't you sue |
| 19 | the manufacturer of Risperdal? |
| 20 | MS. HO: Objection, form. |
| 21 | THE WITNESS: Because the |
| 22 | medication I'm taking for the |
| 23 | tremors is doing me quite well. |
| 24 | BY MR. ELLISON: |

21

| | |
|---|---|
| 1 | Q. And you're still on |
| 2 | Risperdal today, is that correct? |
| 3 | A. Yes. |
| 4 | Q. And the reason you didn't |
| 5 | sue the manufacturer of Risperdal is |
| 6 | because you've benefited from that |
| 7 | medication, is that correct? |
| 8 | MS. HO: Objection, form. |
| 9 | THE WITNESS: Yes. |
| 10 | BY MR. ELLISON: |
| 11 | Q. And how has, in your view, |
| 12 | Risperdal helped you? |
| 13 | A. Well, I'm not as moody as I |
| 14 | used to be. I'm pretty much able to |
| 15 | function within normality. |
| 16 | Q. You're still on Seroquel |
| 17 | today, correct? |
| 18 | A. Yes. I'm slowly being |
| 19 | weaned off of it right now. |
| 20 | Q. Who is your current |
| 21 | physician? |
| 22 | A. Right now, I don't know her |
| 23 | name. She's a new doctor. I don't see |
| 24 | her till the 13th. |

**22**

1  Q. You don't know your
2  physician's name?
3  A. Well, I got another
4  physician so I don't know who it is.
5  Q. Who is the person who is
6  weaning you off Seroquel?
7  A. It started -- the doctor
8  that put me on Seroquel, who was
9  monitoring it and all, has moved on to
10 another field of work. She's no longer
11 with Directions.
12 Q. What is the name of that
13 doctor?
14 A. Dr. Nicole Keene (sic).
15 Q. Where is Dr. Keene,
16 K-E-E-N-E?
17 A. She was an employee of
18 Directions for Mental Health Services,
19 Incorporated, but she now moved on to
20 something else.
21 Q. Do you know what she's moved
22 on to?
23 A. No.
24 Q. Do you know if she's still

**23**

1  in the state of Florida?
2  A. I don't know.
3  Q. We are in the state of
4  Florida today, is that correct?
5  A. Correct.
6  Q. And this is where you
7  reside, am I right?
8  A. No.
9  Q. Where do you reside?
10 A. Dunedin.
11 Q. But that's in Florida, isn't
12 that correct?
13 A. Yes.
14 Q. So it's Dr. Nicole Keene who
15 is weaning you off Seroquel?
16 A. Yes.
17 Q. When did she begin to wean
18 you off Seroquel?
19 A. About two months ago.
20 Q. And that is long after you
21 had originally filed your lawsuit, is
22 that correct?
23 A. Yes.
24 Q. Did you ask to be weaned off

**24**

1  Seroquel?
2  A. Yes.
3  Q. Why?
4  A. I didn't -- I didn't want
5  diabetes.
6  Q. Is it your view that if you
7  stopped taking Seroquel, you would stop
8  -- your diabetes would disappear?
9  A. No.
10 Q. Did you stop taking Seroquel
11 because you were told that continuing on
12 Seroquel, while your lawsuit was pending,
13 would hurt your case?
14 A. No.
15 MS. HO: Objection, form.
16 BY MR. ELLISON:
17 Q. And you want us to
18 understand that your decision to stop
19 taking Seroquel, to wean yourself off
20 Seroquel, has nothing to do with this
21 litigation, is that what you want us to
22 understand?
23 A. Pretty much.
24 Q. You approached Dr. Keene

**25**

1  about taking yourself off Seroquel,
2  correct?
3  A. Um-hmm.
4  Q. Yes?
5  A. Yes.
6  Q. I need you to answer my
7  questions out loud. As you can see, the
8  court reporter is taking down everything
9  I'm saying. Nods of the head, shrugs of
10 the shoulders, um-hmms and unh-unhs are
11 hard for her to take down. So will you
12 do your best to answer my questions out
13 loud, please?
14 A. Yes.
15 Q. How many milligrams of
16 Seroquel are you taking?
17 A. Right now I'm taking 450.
18 Q. And you take that amount to
19 help you with your psychiatric problems,
20 correct?
21 A. Yes.
22 Q. So you're on Artane,
23 Risperdal, Seroquel. Anything else?
24 A. I'm on Norvasc for blood

**Page 74**

1  A. I don't remember.
2  Q. But they were children,
3  correct?
4  A. Yes.
5  Q. Why did you do that?
6  A. I don't know.
7  Q. Did you think that was
8  strange?
9  A. Pretty much.
10 Q. Were you able to orgasm?
11 A. Yes.
12     MS. HO: Objection, form.
13 BY MR. ELLISON:
14 Q. Were you witnessed?
15 A. I don't know.
16 Q. Did someone see you?
17 A. The kids did.
18 Q. Did you know they were
19 seeing you?
20 A. No.
21 Q. Did you see them looking at
22 you?
23 A. Yes.
24 Q. And you still proceeded to

**Page 75**

1  masturbate, is that correct?
2  A. Yes.
3  Q. Were you wearing clothing?
4  A. Yes.
5  Q. Did you just undo your
6  pants?
7  A. Yes.
8  Q. And was there more than one
9  child playing at a time?
10 A. Four of them.
11 Q. All right. So it was a
12 single instance?
13 A. (Witness nodding head.)
14 Q. Yes?
15 A. Yes.
16 Q. There was a group of
17 children playing, correct?
18 A. Yes.
19 Q. What about a group of
20 children -- strike that.
21     Did you know the window was
22 open?
23 A. The window was closed. I
24 was in the window standing, where they

**Page 76**

1  could see me.
2  Q. Were the blinds open?
3  A. Yes.
4  Q. You knew they could see you,
5  is that correct?
6  A. Pretty much.
7  Q. And that was why you were
8  doing -- masturbating in front of them,
9  is that correct?
10 A. No.
11 Q. You found it exciting, is
12 that correct?
13 A. I don't know.
14 Q. What about masturbating
15 through open blinds in front of children
16 appealed to you such that you engaged in
17 that behavior?
18     MS. HO: Hold on a second.
19 You know, you've asked him about
20 the count. I think that we can
21 move on from this. He's already
22 said that he had four counts.
23     MR. ELLISON: We absolutely
24 can't go on, because this is prior

**Page 77**

1  to the time that he was medicated
2  and, counsel, I absolutely am
3  entitled to find out how his
4  mental illness impacted on his
5  behavior and the justification for
6  his medications.
7      MS. HO: And I appreciate
8  that.
9      MR. ELLISON: You may not
10 want to hear about his
11 masturbating in front of children,
12 and I can surely understand why,
13 but I am absolutely entitled to
14 find out about his mental state.
15     MS. HO: I understand that.
16 I'm saying move it along.
17     MR. ELLISON: Are you
18 instructing the witness not to
19 answer?
20     MS. HO: No, I'm not, I'm
21 not. I'm trying to get you to
22 move along with the question.
23     MR. ELLISON: Counsel, I'll
24 use my time the way that I think

**Page 78**

1  is important to defend my client
2  in the lawsuit.
3       MS. HO: And I appreciate
4  that.
5       MR. ELLISON: I know you do.
6  You're making a record statement.
7       MS. HO: Yes.
8  BY MR. ELLISON:
9    Q.   Sir, do you have my question
10 in mind? What was it about masturbating
11 through open blinds in front of four
12 children that made you do that?
13   **A.   As I told them in 1986, I'll**
14 **tell them again in 2008, I have no idea.**
15   Q.   Did you see that behavior as
16 an aspect of your disease?
17   A.   No.
18   Q.   Did any doctor tell you --
19   A.   No.
20   Q.   -- that hypersexuality is a
21 symptom of hypomania which is an aspect
22 of bipolar disorder?
23   A.   No.
24   Q.   You have no such

**Page 79**

1  understanding?
2    A.   No.
3    Q.   That is correct?
4    A.   That's correct.
5    Q.   And is that the only time
6  you have masturbated in front of a child?
7    A.   Yes.
8    Q.   Have you engaged in any
9  other criminal activity toward children?
10   A.   No, no.
11   Q.   And this was in 1986,
12 correct?
13   A.   Yes.
14   Q.   And you were incarcerated
15 in '87, is that correct?
16   A.   No, incarcerated in '86.
17   Q.   How long were you
18 incarcerated in '86 for masturbating in
19 front of children?
20   A.   Seven years.
21   Q.   And that's a felony, am I
22 right?
23   A.   Second degree felony.
24   Q.   I'm sorry?

**Page 80**

1    A.   Second degree felony.
2    Q.   It's a felony, correct?
3    A.   Yes.
4    Q.   Are you required -- strike
5  that.
6         Do you understand whether
7  you're required to register as a sexual
8  offender?
9    A.   I am.
10   Q.   Are you registered?
11   A.   Yes.
12   Q.   And that's where?
13   A.   I don't know where.
14   Q.   All right. I will represent
15 to you that before I came to your
16 deposition, I checked the Florida
17 registry online to see if you were
18 registered and you do not appear -- the
19 name Haller appears nowhere in either
20 your hometown or elsewhere in the state
21 of Florida.
22        When was the time that you
23 registered?
24   A.   I don't remember.

**Page 81**

1    Q.   Do you know whether you are
2  currently registered?
3    A.   I do not know that.
4    Q.   Have you decided not to
5  register --
6    A.   No.
7    Q.   -- for the purpose of
8  evading the law?
9    A.   No.
10   Q.   I'm going to ask you some
11 more questions about your history in a
12 little while, but right now I'd like to
13 turn to your fact sheet.
14        Do you have that in front of
15 you?
16   A.   Um-hmm.
17   Q.   Yes?
18   A.   Yes.
19   Q.   This fact sheet, which I've
20 marked as Exhibit 1, is typed. Is that
21 correct?
22   A.   Yes.
23   Q.   Do you own a typewriter?
24   A.   No.

**Page 202**

1    THE WITNESS: It's possible.
2    I don't know.
3    BY MR. ELLISON:
4        Q.  You just don't remember one
5    way or the other?
6        A.  No.
7        Q.  Do you still go to
8    Directions today?
9        A.  Yes.
10       Q.  Do you think they're good
11   doctors there?
12       A.  I think they do a good job,
13   yes.
14       Q.  And you feel better today
15   than you did when you first went there,
16   is that right?
17       A.  Yes.
18       Q.  And so their care and
19   treatment of you has been beneficial, is
20   that right?
21       A.  Yes.
22       Q.  And that includes the
23   medications that they've chosen to
24   prescribe for you, is that right?

**Page 203**

1        A.  Yes.
2        Q.  You don't have any criticism
3    of your medical doctors at all, is that
4    right?
5        A.  No.
6        Q.  At no point in time,
7    correct?
8        A.  No.
9        Q.  And you don't challenge the
10   decision to prescribe you Seroquel, is
11   that correct?
12       A.  Right.
13           MS. HO: Objection, form.
14   BY MR. ELLISON:
15       Q.  You're not critical of your
16   doctors, in other words, you don't think
17   your doctors did something wrong by
18   giving you Seroquel, correct?
19       A.  No.
20       Q.  That is correct?
21       A.  Correct.
22       Q.  Is Directions the only
23   facility that you've been seeing for
24   mental healthcare?

**Page 204**

1        A.  On an outpatient, yes.
2        Q.  Are there any other
3    hospitals, clinics, doctors that you have
4    seen since you moved to Florida for
5    healthcare?
6        A.  Well, I've been Baker Acted
7    in a hospital before and there's doctors
8    who continued it.
9        Q.  You have been involuntarily
10   committed in a hospital because -- since
11   you've moved to Florida, is that right?
12       A.  Yes.
13       Q.  Is that the instance you
14   told me about before or is this a new
15   one?
16       A.  Well, see, in Clearwater,
17   they have hospitals that have behavioral
18   treatment, whatever you want to call it.
19       Q.  And what hospital was that?
20       A.  Morton Plant is one of them.
21       Q.  What else?
22       A.  I was in there and I was in
23   Sun Coast.  And I was in St. Anthony's.
24       Q.  You've been involuntarily

**Page 205**

1    committed in each one?
2        A.  Yes.
3        Q.  How many times have you been
4    committed to a facility against your will
5    because of your psychiatric condition?
6        A.  Twice in -- twice in Sun
7    Coast.  Once in St. Anthony's and three
8    or four times in Morton Plant.
9        Q.  So since you moved to
10   Florida -- strike that.
11           You were also involuntarily
12   committed as a kid, correct?
13       A.  Yes.
14       Q.  So since you moved to
15   Florida, when you were 22, you have been
16   committed because of your bipolar,
17   hospitalized, committed, against your
18   will, about seven or so times, is that
19   right?
20       A.  About right.
21       Q.  How much time have you spent
22   committed because of your bipolar?
23       A.  Well, in Pennsylvania as a
24   juvenile, I was there for two years.

```
                                                    206
 1    I've done a couple weeks, a couple months
 2    in other places.  I've also been in ALF
 3    also.
 4         Q.   What does that mean?
 5         A.   Assisted living facilities.
 6         Q.   And that was because of your
 7    bipolar?
 8         A.   Yes.
 9         Q.   Which assisted living
10    facilities have you been in?
11         A.   Well, I can't remember the
12    names offhand.  But one was in Gulfport.
13    One is in St. Pete.
14         Q.   And you don't remember the
15    names?
16         A.   I can remember one of them.
17    One of them was called -- I had the name
18    in my head and it went out of my head.
19         Q.   If it comes back, will you
20    let me know?
21         A.   Yeah, I'll let you know.
22         Q.   We were talking about your
23    use of Seroquel and the places that you
24    went to get it.
```

```
                                                    207
 1         If I understand, from 2003
 2    to the present, you've been using
 3    Directions for your mental healthcare, is
 4    that right?
 5         A.   Yes.
 6         Q.   And you've been, you
 7    acknowledged, committed involuntarily to
 8    a few institutions?
 9         A.   Right.
10         Q.   But you've not gone to any
11    separate hospital or clinic because of
12    your mental health?
13         A.   No.
14         Q.   Is that right?  That is
15    correct?
16         A.   That's right.
17         Q.   Are there any other -- who
18    do you see for your diabetes?
19         A.   Dr. Bacha.  She's all my
20    medical.
21         Q.   Do you consider Dr. Bacha
22    your primary physician?
23         A.   Yes.
24         Q.   How often do you see Dr.
```

```
                                                    208
 1    Bacha?
 2         A.   About every 90 days.
 3         Q.   How often -- when did you
 4    start seeing Dr. Bacha?
 5         A.   I can't remember.
 6         Q.   Has it been more than ten
 7    years?
 8         A.   No.
 9         Q.   Five years?
10         A.   Less.
11         Q.   Now, where is Dr. Bacha?
12         A.   She's at 1173 Turner Street.
13         Q.   What city?
14         A.   Clearwater.
15         Q.   How far away is Clearwater
16    from your mobile home?
17         A.   I couldn't -- I couldn't
18    recollect.
19         Q.   How do you get to your
20    medical appointments?
21         A.   City bus.
22         Q.   You don't own a car,
23    correct?
24         A.   No.
```

```
                                                    209
 1         Q.   Have you ever?
 2         A.   I had a car, but no license.
 3         Q.   You had a car when?  I'm
 4    sorry.
 5         A.   I had a car, but no license.
 6         Q.   Have you ever had a driver's
 7    license?
 8         A.   No.
 9         Q.   Have you ever applied?
10         A.   Tried three times.  Failed.
11         Q.   Failed what?
12         A.   Driving test.
13         Q.   The driving or the writing?
14         A.   The driving.
15         Q.   Have you ever had something
16    taken away from you because of your
17    bipolar?
18         A.   No.
19         Q.   Have you ever had a license
20    that you lost?
21         A.   No.
22         Q.   We're back on the Seroquel.
23    Okay?
24              I need to know every place
```

**274**

1  Q. Do you recall being
2  convicted of that felony, resisting an
3  officer with violence?
4  A. I don't recall that.
5  Q. So if the records show it,
6  those are wrong?
7  A. Pretty much, yes. My only
8  charges I have serving anywhere near nine
9  years was when they gave me seven years
10 for each count of lewd and lascivious,
11 that's four counts to run concurrent.
12 Then in 1989, I hit a corrections
13 officer, bit him, they gave me another
14 18 months on that. Then I had the
15 violation of probation on aggravated
16 stalking, they gave me 24 months on that.
17         The first incarceration they
18 gave me, they gave me supervised release
19 under conditional release.
20 Q. I'll take you through them.
21         Do you recall being arrested
22 on February 1st, 1986 for aggravated
23 battery on a police officer, here it is,
24 lewd and lascivious, child fondling. Do

**275**

1  you recall that?
2  A. No. I remember lewd and
3  lascivious. I don't remember fondling.
4  Q. Fair enough. It might be
5  part of the name of the offense. It
6  might be an option.
7  A. Okay.
8  Q. Do you recall being
9  convicted of aggravated battery on a
10 police officer?
11 A. What year?
12 Q. 1986, sir.
13 A. No.
14 Q. Do you recall being
15 convicted of lewd and lascivious?
16 A. Yes.
17 Q. And you were incarcerated
18 and then discharged on January 27, 1995,
19 isn't that correct?
20 A. What was in 1995?
21 Q. You were discharged from
22 custody in January of 1995, correct?
23 A. Okay, I'll agree with that.
24 Q. You don't dispute it?

**276**

1  A. No.
2  Q. You were arrested by the
3  Gadsden County Sheriff's Office on
4  April 26th, 1989 for aggravated assault
5  on a police officer?
6  A. I remember that.
7  Q. And that's a felony, right?
8  A. Yes.
9  Q. And you pled nolo contendere
10 to that, right?
11 A. Yes.
12 Q. What is nolo contendere?
13 A. No contest.
14 Q. So you didn't dispute that
15 you had done it?
16 A. No.
17 Q. And that's a felony?
18 A. Yes.
19 Q. You didn't put that one on
20 your sheet either, did you?
21 A. I didn't think about that
22 one.
23 Q. How many felonies have you
24 had?

**277**

1  A. Probably quite a few.
2  Q. That you haven't thought
3  about?
4  A. My history, I don't keep
5  dwelling on it, so I didn't think about
6  it.
7  Q. Did you understand that you
8  filed a lawsuit in this case and that
9  when you filled out Exhibit 1, you swore
10 that it was true and complete, but you
11 didn't think about these things?
12 A. No.
13 Q. Were you arrested on
14 September 17th, 1992 with a parole
15 violation?
16 A. Conditional release.
17 Q. So you do remember it?
18 A. Okay.
19 Q. Yes?
20 A. Yes.
21 Q. Do you remember being
22 arrested February 27th, 1995 for
23 disorderly conduct?
24 A. No.

278

1   Q.   Do you remember being
2  arrested on June 24th, 1996 for another
3  disorderly conduct?
4   A.   No.
5   Q.   Do you recall pleading nolo
6  contendere to that and getting six days
7  in jail?
8   A.   No.
9   Q.   And do you recall on
10 December 14th, 1996 being arrested for
11 aggravated stalking?
12  A.   What year?
13  Q.   1996, December 14th to be
14 precise, just before Christmas.
15  A.   No.
16  Q.   You don't recall being
17 charged with battery, aggravated stalking
18 at that time?
19  A.   No.
20  Q.   Now, I'm saying you don't
21 recall being charged because I think --
22  A.   **I remember being charged**
23 **with aggravated stalking in 1997.**
24  Q.   I think the charge was

279

1  dropped, at least at that time.
2       Now, January 15th, 1997,
3  this is about a month after what the
4  record suggests was an arrest, you were
5  charged with aggravated stalking, first
6  degree.
7   A.   No, I don't recall that.
8   Q.   This is '97 now.
9   A.   **Yeah, I know that, but my**
10 **aggravated stalking was a level one.**
11  Q.   By --
12  A.   **Count one.**
13  Q.   By the St. Petersburg Police
14 Department?  Does that refresh your
15 memory?
16  A.   **Aggravated stalking does,**
17 **but not the date.**
18  Q.   Do you remember pleading --
19 okay.  So it's your view that aggravated
20 stalking is a felony, but it's a third
21 degree felony, right?
22  A.   **Right.**
23  Q.   And you pled nolo contendere
24 to that, right?

280

1   A.   **Right.**
2   Q.   You were sentenced to two
3  years in prison on April 10th, 2001,
4  right?
5   A.   **Violation of probation.  I**
6  **did 24 months on that.**
7   Q.   That's two years in prison,
8  right?
9   A.   **Right.**
10  Q.   And you were credited with
11 317 days of time served, but you were
12 ordered to pay court costs, right?
13  A.   **Um-hmm, yes.**
14  Q.   I think that's 14 arrests.
15 Let's move on to 15, June 29th, 1998,
16 about ten years or so ago, you were
17 charged -- arrested by the St. Petersburg
18 Police Department for contempt of court,
19 violation, domestic violence.  Ring a
20 bell?
21  A.   No.
22  Q.   Do you remember being
23 charged with violating an injunction in
24 Pinellas County court as a result of that

281

1  arrest?
2   A.   Yes.
3   Q.   What was that about?
4   A.   **That's when I was five years**
5  **probation for the aggravated stalking.**
6   Q.   I have a year listed here.
7  Does that ring a bell?
8   A.   **What is the year?**
9   Q.   We're in 1998.  You were
10 sentenced September 15th, 1998, probation
11 for a year.  You pled nolo contendere to
12 that.
13  A.   **Don't recall it.**
14  Q.   Do you remember what that
15 was about?
16  A.   No.
17  Q.   You have no idea that you
18 were charged with domestic violence in
19 1998?
20  A.   No.
21  Q.   You don't know to whom?
22  A.   **Unh-unh.**
23  Q.   No?  No?
24  A.   No.