# EXHIBIT 3

Dee Burke
August 9, 2008

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:   SEROQUEL PRODUCTS LIABILITY LITIGATION,
MDL DOCKET NO. 1769

THIS DOCUMENT RELATES TO:

HALLER v. ASTRAZENECA LP, ET AL.
[DAVID D. HALLER 6:07-cv-15733]

------------------------------------

THE VIDEOTAPED DEPOSITION OF

DEE BURKE

August 9, 2008

Deborah K. Watson, RPR

STRATOS LEGAL SERVICES

1001 West Loop South, Suite 809

Houston, Texas 77027

713.481.2180 * Fax 713.583.9191

Toll Free 800.971.1127

Dee Burke
August 9, 2008

Page 17

1    Q.   Why did you call him?
2    A.   To find out what the customary charge was
3  to do a subpoena.
4    Q.   What do you mean, "customary charge"?
5    A.   For the -- for me doing this today.
6    Q.   Oh, you wanted to find out what your fee
7  was?
8    A.   Right.
9    Q.   Oh, fair enough.  You didn't ask him about
10  David Haller or the lawsuit or anything like that?
11    A.   No.
12    Q.   Is there a reason why you didn't?
13    A.   I didn't feel there was a need to.
14    Q.   Did he volunteer any information about the
15  lawsuit or other people at Directions who had been
16  deposed or anything like that?
17    A.   No.
18    Q.   Anyone else you talked to about this
19  deposition other than just to let them know you'd be
20  occupied today?
21    A.   My husband.  I mean, he knows where I'm at.
22    Q.   But you've talked to no one else about the
23  substance of this deposition; is that correct?
24    A.   No.
25    Q.   If I were to ask you all those questions

Dee Burke
August 9, 2008

Page 18

1  about the lawsuit in general, would your answers be
2  the same?
3    A.   They would.
4    Q.   Okay.  Now, my understanding is you were
5  provided with a subpoena by BrownGreer.  They asked
6  you for documents, and you provided to BrownGreer the
7  documents --
8    A.   No.
9    Q.   Do you know where the documents marked as
10  Exhibit 1 and 2 came from?
11    A.   I assumed it came from BrownGreer because
12  it came with this order.
13    Q.   Right.  You do not have copies of David's
14  records, both Exhibits 1 and 2, --
15    A.   No.
16    Q.   -- in your own?
17    A.   No.  Directions would have that, not me.
18    Q.   So your best guess is that the records that
19  we've marked as Exhibits 1 and 2 came from Directions?
20    A.   Originally.
21        MR. BARRINGER:  You want to go off the
22  record?
23        MR. ELLISON:  Yeah, let's go off the
24  record.
25        THE VIDEOGRAPHER:  We are off the record at

Dee Burke
August 9, 2008

Page 19

1  10:19.
2        (Recess from 10:19 a.m. to 10:22 a.m.)
3        THE VIDEOGRAPHER:  We're back on the record
4  at 10:22.
5    Q.   (By Mr. Ellison) Ms. Burke, I should have
6  asked you this at the beginning:  Is that how you'd
7  prefer to be addressed today?
8    A.   Call me Dee.
9    Q.   I would love to, but I -- I have to
10  maintain formality.  I thank you for that courtesy.
11  The question I was asking was more directed to the
12  nature of -- of what would be an appropriate title for
13  you as a nurse practitioner.  Are you referred to
14  "Ms. Burke"?  Are you referred to "Dr. Burke"?
15    A.   No, no.  Just call me "Ms. Burke."
16    Q.   "Ms. Burke"?  Okay.  Fair enough.  And
17  thank you for that.  Again, thank you for that
18  courtesy.  I appreciate it.
19        We had a brief discussion off the record
20  about the documents that you brought today which are
21  marked Documents No. 1 and 2, and I'll just lead
22  through this so we can get it on the record quickly.
23        It's our understanding that you obtained
24  those documents from BrownGreer; is that correct?
25    A.   That's my assumption, that they came from

Dee Burke
August 9, 2008

Page 20

1  BrownGreer.
2    Q.   Well, you were telling me that they -- they
3  sent them to you, correct?
4    A.   They did.
5    Q.   You did not have and do not have any of
6  David's medical records at your house; is that
7  correct?
8    A.   I do not.
9    Q.   The only materials that you had available
10  to you are the documents that you brought with you
11  today that we marked Exhibits 1 and 2; is that
12  correct?
13    A.   That's correct.  I have the FedEx box too
14  (indicating).
15        MR. ELLISON:  She's holding up the FedEx
16  box.
17    Q.   (By Mr. Ellison) And that's addressed to
18  you and it comes from BrownGreer; is that correct?
19    A.   I -- I would have to wear my glasses,
20  but...
21    Q.   Sorry to make you do that.  It says from --
22  from an individual at BrownGreer shipped to Dee Burke.
23  We'll just move along then.  Thank you, ma'am.
24        Now, while we were off the record, you
25  suggested that the -- there may be additional records

Dee Burke
August 9, 2008

Page 21

1    that are missing; is that correct?
2        A.   As I went through things that I found with
3    my name, and knowing that I left there in August of
4    2006, I thought that I had been seeing David up till
5    the time I left, and yet my last note is dated 12 of
6    2005. Now, there are records in there from Nicole
7    Keene in 2006. But I thought that I had seen David a
8    little bit in 2006, but the records aren't reflecting
9    that -- that I have.
10       Q.   So there is, in your view, additional
11   records that we do not have?
12       A.   I think there could be.
13       Q.   And you would believe that the best place
14   to look for those is Directions?
15       A.   At Directions.
16       Q.   You mentioned that you left Directions in
17   August of 2006. Did I hear you correctly?
18       A.   That's right.
19       Q.   When did you start?
20       A.   May of 2000.
21       Q.   And I may have asked you this: You were --
22   you were a licensed nurse practitioner in the state of
23   Florida; is that correct?
24       A.   I still am.
25       Q.   You maintain your license?

Stratos Legal Services
800-971-1127

---

Dee Burke
August 9, 2008

Page 22

1        A.   I do.
2        Q.   You are also licensed here in Tennessee; is
3    that correct?
4        A.   I am.
5        Q.   Anywhere else?
6        A.   No.
7        Q.   Did you work continuously at Directions
8    from May of 2000 through August of 2006?
9        A.   I did.
10       Q.   Were you employed by anyone else during
11   that time frame as well?
12       A.   I actually was a professional speaker for
13   Bristol-Myers Squibb, for Janssen and Janssen.
14       Q.   What did you talk about for them?
15       A.   Abilify for Bristol-Myers Squibb, and
16   Risperdal Consta for Janssen.
17       Q.   When did you first start as a speaker for
18   those companies?
19       A.   Bristol-Myers Squibb was 2002, Risperdal
20   Consta, I think 2005.
21       Q.   Now, Risperdal Consta and Abilify are both
22   atypical antipsychotics; is that correct?
23       A.   They are.
24       Q.   And that term also refers to what are known
25   as second-generation antipsychotics; is that correct?

Stratos Legal Services
800-971-1127

---

Dee Burke
August 9, 2008

Page 23

1        A.   That's correct.
2        Q.   What were the subjects on which you spoke
3    regarding Risperdal?
4        A.   You talk about the -- the label
5    indications, which for Risperdal Consta is
6    schizophrenia, and how it fits into a treatment plan
7    for a client.
8        Q.   To whom would you speak?
9        A.   Case managers, other nurse practitioners,
10   physicians.
11       Q.   And these are places other than Directions;
12   is that correct?
13       A.   Yeah. It's completely away from
14   Directions. I was a contract --
15       Q.   They paid you for your work?
16       A.   They did.
17       Q.   Janssen did?
18           Do you have any idea, as you sit here
19   today, how much you made in that capacity as a
20   speaker?
21       A.   Oh, in 2006, it was, between the two
22   companies, --
23       Q.   Yes, ma'am.
24       A.   -- $8,000.
25       Q.   You can't separate in your mind who paid

Stratos Legal Services
800-971-1127

---

Dee Burke
August 9, 2008

Page 24

1    you for what?
2        A.   Oh, I . . .
3        Q.   Not really?
4        A.   I have to think it was like $3,000 with
5    Janssen and maybe $5,000 with Bristol-Myers Squibb.
6        Q.   You've never been a speaker for
7    AstraZeneca; is that correct?
8        A.   No.
9        Q.   That is correct?
10       A.   That's correct.
11       Q.   What subjects did you address regarding
12   Abilify when you'd speak about Abilify?
13       A.   At that time, the label indication, which
14   was schizophrenia, and then they launched the bipolar
15   indication.
16       Q.   Do you recall when that was?
17       A.   I think they got the bipolar indication in
18   2004.
19       Q.   Did you also talk about risks?
20       A.   Always.
21       Q.   And this is when you were acting as a
22   speaker?
23       A.   Yes.
24       Q.   And this begins as early as 2002?
25       A.   From the very beginning, they always talked

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 25

1    about the risk.
2        Q.   Did that include the risk of waking?
3        A.   The risk of any of the metabolic issues.
4        Q.   Do I correctly understand that you believe
5    there may be a risk associated with atypicals and
6    weight gain metabolic issues and diabetes as early as
7    2002?
8        A.   At that point in time, we already knew that
9    olanzapine had issues.
10       Q.   This is in 2002?
11       A.   Right.
12       Q.   By "issues," you mean the olanzapine
13   caused --
14       A.   Was with a potential for weight gain.
15       Q.   As well as diabetes; is that correct?
16       A.   Well, weight gain leads to diabetes.
17       Q.   Fair enough.  And was it around that same
18   time frame that you came to that understanding
19   vis-à-vis the other atypicals?
20       A.   Not really.  Not really.  You know, the --
21   the research has continued on all of the medications.
22   I think that you've got a couple of them that don't,
23   at this point, show metabolic issues except maybe in
24   kids.
25       Q.   Which ones?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 26

1        A.   Abilify, in particular, --
2        Q.   Okay.
3        A.   -- seems to have weight gain in children,
4    not in adults.  Geodon has not shown anything as far
5    as weight gain.  In fact, it improves triglycerides
6    and cholesterol when you move them away from
7    olanzapine or Risperdal.  Seroquel appears to be
8    dose-related.  Risperdal seems to be very iffy.  It's
9    more so in the oral agent than it is in the injection.
10   Olanzapine definitely has its metabolic issues.
11       Q.   Let's start with Seroquel.  Did I correctly
12   infer that it's your view that a risk of weight gain
13   or diabetes is -- is dose-related?
14       A.   It appears to be dose-related clinically.
15       Q.   When did you come to the understanding that
16   it was possible that there may be an association
17   between Seroquel and weight gain?
18       A.   I think we've always been aware that there
19   was the possibility.  We just didn't see it that often
20   clinically.
21       Q.   Fair enough.  In your experience it was
22   possible, but you didn't see a lot of patients put on
23   weight because of Seroquel; is that correct?
24       A.   Correct.  I had patients lose weight on
25   Seroquel.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 27

1        Q.   Fair enough.  I was going to raise that.
2        A.   Yeah.
3        Q.   So you said "always."  By that, do you mean
4    around 2002?
5        A.   From the time I was starting to practice.
6    I can't speak for other nurse practitioners, but I
7    started in 2000.
8        Q.   So from around 2000, you understood that it
9    was possible that atypicals such as Seroquel might
10   cause weight gain, hyperglycemia, and diabetes; is
11   that correct?
12       A.   This is my view, this is my take.
13       Q.   That's all I'm asking is yours.
14       A.   Okay.  What I think we have to look at is
15   the illness itself, and that these people with bipolar
16   disorder and schizophrenia have a much higher risk for
17   inadequate dietary recommendations, they aren't able
18   to afford the better foods, the better diet, they
19   typically don't exercise.  There is a high risk of
20   substance abuse.  We have a large homeless population,
21   working in community mental health.  Therefore, then
22   you've got that in the beginning.  So what do you
23   treat?  Do you treat the illness or what?  So then
24   you've got the medications that have the potential as
25   well.  So now you've got a twofold problem going on.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 28

1        Q.   Let -- let me go through this again.  I've
2    got to do this by question and answer.  I appreciate
3    that information.
4            It's your view that the underlying patient
5    population that you're treating presents with its own
6    risk of weight gain, hyperglycemia, and diabetes just
7    because the nature of its illness; is that correct?
8        A.   No, not just my opinion.  It's researched
9    and substantiated.
10       Q.   I -- fair enough.  But again, I'm only
11   asking your view here.  You don't have to represent
12   the --
13       A.   Okay.
14       Q.   -- entire medical community.  Fair enough?
15       A.   That's fair.
16       Q.   Okay.
17       A.   But yes.
18       Q.   And in addition to that, it was your
19   understanding, from the time you began practice in
20   2000, that the medications that treat this population
21   such as Seroquel had their own potential for
22   increasing weight, hyperglycemia, and potentially
23   diabetes; is that correct?
24       A.   In the very beginning, we -- we knew that
25   they could increase the appetite.  I don't think that

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 29

1 we knew fully about the metabolic risk until
2 everything with olanzapine came out and that further
3 research started.
4     Q.   And that was around 2000?
5     A.   2000, 2001, 2002.
6     Q.   Okay.  So it was around -- what I'm trying
7 to get is a date by which you understood --
8     A.   Right.
9     Q.   -- that there may be a risk of diabetes as
10 to Seroquel.  And if I'm hearing you right, it was
11 around 2002?
12     A.   Uh-huh.
13     Q.   Yes?
14     A.   Yeah.
15     Q.   Okay.  And was that risk something that
16 factored into your -- strike that.
17         You know what a risk benefit analysis is?
18     A.   Yes.
19     Q.   And what is that?
20     A.   It means that the benefits are outweighing
21 the risk.
22     Q.   And what -- you entertain that risk benefit
23 analysis whenever you prescribe a medication for a
24 patient; is that correct?
25     A.   Every one.

Dee Burke
August 9, 2008

Page 30

1     Q.   What are the factors that enter into your
2 risk benefit analysis?
3     A.   I have to look at the risk that they're
4 going to be institutionalized; that just isn't
5 available anymore.
6     Q.   The patient's condition; is that correct?
7     A.   Right.
8     Q.   The patient's --
9     A.   The patient's health, their status in the
10 community, their functional level.
11     Q.   Their medical history?
12     A.   Their medical history, their risk to
13 themselves, their risk to others.
14     Q.   Those are all factors?
15     A.   Those are all factors.
16     Q.   And there may be more, is that correct,
17 depending on the particular patient?
18     A.   Yes.
19     Q.   Is it part of your professional practice to
20 stay abreast of developments in the areas in which you
21 practice as well as regarding the medications that you
22 prescribe?
23     A.   That's correct.
24     Q.   How do you go about doing that?
25     A.   I attend continuing education programs,

Dee Burke
August 9, 2008

Page 31

1 usually the Psychiatric Congress every two years, as
2 well as we have Internet availability.
3     Q.   So you do your own independent research?
4     A.   A lot.
5     Q.   And has that been your practice from the
6 time you began with Directions in 2000?
7     A.   From the time I became a nurse practitioner
8 in '97.
9     Q.   You also learn from colleagues; is that
10 correct?
11     A.   I do.
12     Q.   Their clinical experience, correct?
13     A.   Correct.
14     Q.   As well as your own?
15     A.   Uh-huh.
16     Q.   Yes?
17     A.   I do.
18     Q.   Could you briefly describe your educational
19 background?
20     A.   My undergrad was at Indiana University.
21     Q.   Hoosier?
22     A.   Yeah, I am a Hoosier.
23         I did 11 years of trauma nursing and then
24 entered psychiatry, and worked then in administrative
25 for several years as director of nursing, director of

Dee Burke
August 9, 2008

Page 32

1 clinical services, and then got my master's at the
2 University of Illinois in Chicago.
3     Q.   Where were you a trauma nurse?
4     A.   Methodist Hospital in Indianapolis,
5 Indiana.
6     Q.   And where did you get your, I think you
7 said, master's?
8     A.   University of Illinois at Chicago.
9     Q.   You did say that.  I'm sorry.
10         And that's where you were in
11 administration?
12     A.   I was in -- I was in administration in
13 Florida and in Illinois.
14     Q.   How did it come to pass that you ended up
15 in Florida?
16     A.   The first time, National Medical
17 Enterprises moved me there.
18     Q.   What's that?
19     A.   And they were a psychiatric freestanding --
20 they owned several hospitals.  They were Charter's
21 main competitive back in the Eighties and Nineties.
22     Q.   Did you get specialized training as a
23 psychiatric nurse practitioner?
24     A.   I did.
25     Q.   And where did you get that?

Dee Burke
August 9, 2008

Page 69

1     A.   She did.
2     Q.   Can you describe -- well, strike that.
3          What did she tell you?
4     A.   She told me he gave her the creeps.
5     Q.   Anything in particular?
6     A.   His demeanor, the words he would use, his
7  physical proximity, because he would -- he would get
8  close.  And that's when I told her, "Have the case
9  manager present.  Don't allow after-5:00
10 appointments."
11    Q.   So she came to you essentially, or you met
12 with her essentially because -- to give advice; is
13 that right?
14    A.   Correct.
15    Q.   Anything else about that visit that she
16 described as unsettling?
17    A.   No.
18    Q.   Not that that isn't enough.
19    A.   No.  That would be enough.
20         MR. BARRINGER:  Objection; form.
21    Q.   (By Mr. Ellison)  Any other ways that --
22 strike that.
23         Any other behaviors that support your
24 conclusion that David has antisocial personality
25 disorder?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 70

1     A.   His -- his use of people.
2     Q.   How do you mean?
3     A.   His demands of people, you know.  Blowing
4  whatever money he would have and then the demand for
5  someone to bring him money or to pay his electric bill
6  or to pay a phone bill or to find him a place to live
7  because he's been kicked out of another place, and
8  expecting that to happen and then becoming very angry.
9  I mean, he never, never was accountable for his
10 behavior.
11    Q.   David didn't feel the need to account, in
12 your feeling?
13    A.   He never took accountability for his
14 behavior.  There was always an -- a reason, an excuse,
15 a justification, outside of him that caused him to do
16 whatever had happened.  Or he would deny or make light
17 of what happened.
18    Q.   I'm going to jump now to David's actual
19 medical records so that we have these in front of
20 there -- I -- I see that you have Exhibit 2 in front
21 of you; is that correct?
22    A.   That's correct.
23    Q.   The -- and forgive my reach.  It's probably
24 easiest to do it this way.  The first couple of pages
25 are the medications that David was on; is this

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 71

1  correct?
2     A.   Correct.
3     Q.   This is not a complete list; is that right?
4     A.   It's not.
5     Q.   It's what -- what you were provided; am I
6  right?
7     A.   That have my name to them.
8     Q.   The very first record is a lengthy record
9  dated October 1st, 2002, which reflects your first
10 visit with David; is that right?
11    A.   That's correct.
12    Q.   And this is the first record that you have
13 in front of you, --
14    A.   Uh-huh.
15    Q.   -- that you yourself generated; am I right?
16    A.   This is a dictated record.
17    Q.   I don't have that copy.  My colleague, Bob,
18 is handing me his to look through, and I appreciate
19 that.  Let's go through this together in that it's
20 already been marked as a -- an exhibit.
21         It says: "Psychiatric Evaluation,
22 October 1st, 2002."  Am I correct?
23    A.   That's correct.
24    Q.   And it was for an entire hour, correct?
25    A.   That's correct.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 72

1     Q.   And you yourself observed David and took a
2  history; is that correct?
3     A.   That's correct.
4     Q.   Is it important to take a history?
5     A.   It is.
6     Q.   Why?
7     A.   So that you see what they've been treated
8  with, what they've been thought to have as far as an
9  Axis I in the past, how they've reacted to certain
10 things, what their functional level has been through
11 the years, if there's any legal involvement, what is
12 the family history, any medical concerns, medications
13 that have been tried and failed or tried and worked,
14 their history of compliance, and then to determine
15 what their needs are going to be.
16    Q.   Okay.  Let's start at the beginning.  It
17 says: "Identifying Data/Chief Complaint.  David is
18 here" -- strike that.
19         "David is a 40-year-old single Caucasian
20 male who is case managed here at Directions, having
21 been a former client and recently released from
22 prison."
23         Did I read that correctly?
24    A.   That's correct.
25    Q.   So David had been at Directions before you

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 73

1  first saw him; is that correct?
2      A.   He had.
3      Q.   It says he was a former client; is that
4  correct?
5      A.   Yes.
6      Q.   What do you -- what was a former client for
7  Directions?  Someone that had -- that was
8  participating in his care and treatment and then fired
9  them?
10      A.   Not always.  I mean, they may have moved
11  when he's incarcerated, if he's being treated
12  elsewhere.  Can't be treated by two people at the same
13  time.
14      Q.   Although David did that, didn't he?
15          MR. BARRINGER:  Objection; form.
16      A.   He tried.
17      Q.   (By Mr. Ellison)  It says:  "He relates
18  that he was in prison from January 13th, 2001 to
19  September 24, 2002" -- a little more than a year and
20  a half, it looks like -- "for violation of probation
21  on an aggravated stalking charge."
22          Did I read that correctly?
23      A.   Yes.
24      Q.   And that's what David told you; is that
25  correct?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 74

1      A.   That's correct.
2      Q.   And that why you recorded it, right?
3      A.   Right.
4      Q.   Do you have an understanding what the
5  nature of the aggravated stalking charge was?
6      A.   I didn't know what had -- what he had
7  actually done, no.
8      Q.   You didn't ask?
9      A.   No.
10      Q.   It says:  "David has a long-standing
11  psychiatric history and was first diagnosed bipolar
12  within the Department of Corrections in 1987."
13          Did I read that correctly?
14      A.   Yes.
15      Q.   And it's your view that one of David's
16  conditions is Bipolar Disorder Type I; am I correct?
17      A.   That's correct.
18      Q.   What is bipolar disorder?
19      A.   Bipolar is a mood disorder that can lead to
20  multiple issues --
21      Q.   Such as?
22      A.   -- to include substance abuse, memory,
23  concentration, sleep, as well as thought disorder
24  issues.
25      Q.   What are its features?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 75

1      A.   Racing thoughts, impulsive, engaging in
2  high-risk behaviors.  They have a tendency to have a
3  higher risk for suicide, they have a higher risk for
4  substance abuse, they usually cannot hold a job,
5  frequent moves, frequent relationships.  They have a
6  tendency, especially the males, to be violent.
7      Q.   Did David have all of those symptoms?
8      A.   He did.
9      Q.   Were there any others that David had?
10      A.   David also had the propensity for
11  inappropriate social interactions.
12      Q.   What do you mean?
13      A.   Meaning in his relationships, he could try
14  to be dominant, abusive, take advantage of, not regard
15  other people's needs, not regard their -- their
16  feelings.
17      Q.   Was David hypersexual?
18      A.   When I saw David, he was usually medicated,
19  which can certainly decrease sexual drive.  But his
20  history reflects hypersexual, as well as that's part
21  of Bipolar I, a hypersexuality.
22      Q.   You said bipolar is a mood disorder,
23  correct?
24      A.   Right.
25      Q.   And there are ups and there are downs; is

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 76

1  that correct?
2      A.   In Bipolar I.
3      Q.   The up -- and we're talking about
4  Bipolar I, right?
5      A.   Uh-huh.
6      Q.   Yes?
7      A.   We are.
8      Q.   That's what David has, correct?
9      A.   Correct.
10      Q.   That's characterized by both depression as
11  well as mania; am I right?
12      A.   That's correct.
13      Q.   What is mania?
14      A.   Mania is where they typically do not have a
15  required need for sleep.  They may not even have a
16  required need for food.  They're agitated, irritable.
17  They're more likely to engage in the high-risk
18  behaviors and seek adrenaline kind of thrill-seeking
19  type of things.  They may go on shopping sprees, they
20  may engage in things, stealing, lying.
21      Q.   And David did all of that; is that right?
22      A.   He did.
23      Q.   Sleep is both a cause as well as a symptom
24  of mania; is that correct?
25      A.   Correct.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 185

1 practitioner, do you treat diabetes?
2     A.   I do not.
3     Q.   Do you, as a nurse practitioner, do you
4 diagnose diabetes?
5     A.   I do not.
6     Q.   Do you, as a nurse -- nurse practitioner,
7 functioning as nurse practitioner, and as part of your
8 education, have you become familiar with diabetes?
9     A.   I have.
10    Q.   Okay.  Do you know what Type II diabetes
11 is?
12    A.   I do.
13    Q.   Can you explain to the jury what your
14 understanding of Type II diabetes is?
15    A.   It's insulin-resistant diabetes where the
16 pancreas no longer puts out enough insulin or any
17 insulin at all in order to regulate the glucose.
18    Q.   And although you don't diagnose diabetes,
19 do you know how Type II diabetes is diagnosed?
20        MR. ELLISON:  Form.
21    A.   Through lab work.
22    Q.   (By Mr. Barringer)  Do -- do you know
23 whether or not Type II diabetes is an acute disease?
24        MR. ELLISON:  Form.
25    A.   I'm -- clarify that.  What do you mean,

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 186

1 acute?
2     Q.   (By Mr. Barringer)  Sure.
3     A.   You mean something that's just going to
4 stay in place for a certain amount of time and leave?
5     Q.   Yes, ma'am.
6     A.   No.  It stays, although some people do
7 become where they don't have to take shots anymore if
8 they lose weight.
9     Q.   Do you know whether or not Type II diabetes
10 is a progressive disease?
11    A.   I understand that it's a progressive
12 disease untreated.
13    Q.   Okay.  And -- and you use the term
14 "untreated."  Do you know whether or not Type II
15 diabetes is a progressive disease, even if it is
16 treated?
17        MR. ELLISON:  Form.
18    A.   I think it can be.
19    Q.   (By Mr. Barringer)  What risks are associated
20 with Type II diabetes -- Type II diabetes, as you
21 understand it?
22        MR. ELLISON:  Form, foundation.
23        You can answer.
24    A.   Cardiovascular disease, the loss of
25 eyesight, kidney disease, and death.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 187

1     Q.   (By Mr. Barringer)  Do you know whether
2 or not amputations have been associated with
3 suffering -- with one suffering from Type II
4 diabetes?
5     A.   I think there have been.
6     Q.   Are those pretty serious risks, in your
7 opinion as a nurse practitioner?
8     A.   They are.
9     Q.   Prior to prescribing a drug to -- to one of
10 your patients, do you weigh the risks associated with
11 the drug of which you are aware against the benefits
12 you hope to achieve by prescribing the drug to the
13 patient?
14    A.   I do.
15    Q.   When you prescribed Seroquel to Mr. Haller
16 on 10-2002, what benefits did you hope to achieve by
17 prescribing Seroquel to him?
18    A.   I hoped for him to have more mood
19 stability, a higher level of functioning within the
20 community, the ability to start making better choices,
21 and to be less risk to society and to himself.
22    Q.   And -- and you again saw Mr. Haller in
23 December of 2005; is that correct?
24    A.   I did.
25    Q.   And had you -- by that point in time, had

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 188

1 your assessment changed of Mr. Haller?
2     A.   No.
3     Q.   Is it important to have accurate
4 information about the risks associated with the drugs
5 that you use in order for your risk benefit analysis
6 to work properly?
7     A.   Yes.
8     Q.   If your source for information regarding
9 the risks associated with the drug you prescribed are
10 downplayed, could that be dangerous for your patients?
11    A.   It could.
12    Q.   Earlier it was mentioned that -- that you,
13 on occasion, have been a speaker for two drug
14 companies named Bristol-Myers and Janssen.
15    A.   That's correct.
16    Q.   Do you develop the materials for which you
17 speak?
18    A.   No.
19    Q.   Okay.  Are those materials provided to you
20 by the drug companies themselves?
21    A.   They are.
22    Q.   Have you, on occasion, ever been a speaker
23 for AstraZeneca?
24    A.   No.
25    Q.   Do you know how AstraZeneca handles what

Stratos Legal Services
800-971-1127

48 (Pages 189 to 192)

Dee Burke
August 9, 2008

Page 189

1    information a speaker discusses as it pertains to a --
2    a speaking engagement?
3         MR. ELLISON: Form, foundation.
4         A.   Can you repeat that?
5         Q.   (By Mr. Barringer) Certainly. Since you
6    have experience speaking on behalf of pharmaceutical
7    companies, my question is --
8         MR. ELLISON: Form.
9         Q.   (By Mr. Barringer) Strike that. Is it --
10        MR. ELLISON: Sorry.
11        MR. BARRINGER: That's all right.
12        Q.   (By Mr. Barringer) Is it fair to say
13   that you have experience speaking on topics on
14   behalf of Bristol-Myers and Janssen?
15        A.   I do.
16        Q.   And as your experience as a speaker for
17   those companies, have you come across other
18   individuals who have spoken on behalf of AstraZeneca
19   on various topics?
20        A.   I have.
21        Q.   Are you familiar with the way that those
22   speakers have acquired the information that they speak
23   about?
24        A.   Through the company.
25        Q.   And -- and which speakers do you know that
              Stratos Legal Services
                 800-971-1127

Dee Burke
August 9, 2008

Page 190

1    worked for AstraZeneca?
2         A.   Kim Latrell and Richard Petty.
3         Q.   And -- and how do you know those
4    individuals?
5         A.   Through seeing them and meeting with them
6    at the different dinners, as well as Kim Latrell and I
7    both trained with Bristol-Myers Squibb. We were both
8    speakers. And at one point, so was Richard Petty, who
9    is her husband.
10        Q.   And no relation to Tom Petty?
11        A.   No.
12        Q.   Okay. Did you, on occasion, discuss with
13   Ms. Latrell the product Seroquel?
14        A.   We've discussed all the atypicals.
15        Q.   And you mentioned something called dinner
16   programs. Did you, on occasion, attend dinner
17   programs sponsored by AstraZeneca?
18        A.   I have.
19        Q.   Do you -- sitting here today, do you recall
20   the number of dinner programs that you have attended
21   that are --
22        A.   Less than --
23        Q.   -- that have been sponsored by AstraZeneca?
24        A.   Less than five.
25        Q.   Okay. While you were at Directions For
              Stratos Legal Services
                 800-971-1127

Dee Burke
August 9, 2008

Page 191

1    Mental Health, did you at times have pharmaceutical
2    sales reps visit you in your office?
3         A.   We did.
4         Q.   At times, during those pharmaceutical sales
5    reps encounters, did they involve a lunch program
6    where you would receive lunch and they would get an
7    opportunity to speak to you?
8         A.   Correct. We did.
9         Q.   And during those, do you recall how many
10   lunch programs from AstraZeneca that you -- you
11   attended?
12        A.   I don't know. There was a lot of times
13   there was lunch programs, and I didn't even know who
14   was sponsoring it.
15        Q.   And at these lunch programs, did -- on
16   occasion, are you handed materials, whether it's a
17   clock or a prescription pad or a notepad, from
18   pharmaceutical reps?
19        A.   Not usually.
20        Q.   Okay. Do -- at times at these meetings and
21   presentations, were you sometimes handled -- handed
22   case studies or studies regarding the medications
23   themselves?
24        A.   That would, yes.
25        Q.   Okay. Would -- were the drug
              Stratos Legal Services
                 800-971-1127

Dee Burke
August 9, 2008

Page 192

1    representatives one source for information to acquire
2    case studies and -- and -- and studies regarding
3    pharmaceutical products?
4         A.   They were.
5         Q.   And did you review, on occasion, those case
6    studies and studies handed to you by the
7    pharmaceutical sales rep?
8         MR. ELLISON: Form.
9         A.   I did.
10        Q.   (By Mr. Barringer) Did you, as a nurse
11   practitioner, receive information directly from the
12   drug companies at times, maybe to your -- your house
13   or through your office address?
14        A.   I don't remember getting things directly
15   from the pharmaceutical companies.
16        Q.   Do you recall ever receiving any letters
17   regarding warnings about pharmaceutical products from
18   any drug company?
19        A.   Not at my home.
20        Q.   What about at work?
21        A.   We did when olanzapine first started having
22   the difficulties. I do remember those.
23        Q.   And when -- what year do you recall that
24   olanzapine had those difficulties?
25        A.   It was 2001, 2002.
              Stratos Legal Services
                 800-971-1127

Dee Burke
August 9, 2008

Page 193

1    Q.   Do you recall when warnings regarding
2  Seroquel came out regarding hyperglycemia and
3  diabetes?
4    A.   Very shortly --
5        MR. ELLISON:  Form, foundation.
6        Go ahead.
7    A.   Very shortly after that, I do believe.
8    Q.   (By Mr. Barringer)  Do you recall any
9  changes to the label that -- to the -- to Seroquel
10  regarding hyperglycemia and diabetes?
11    A.   I do.
12    Q.   Okay.  Do you recall when those occurred?
13    A.   No.
14    Q.   Did you -- sometimes people attend
15  continuing medical education courses as part of
16  maintaining their license -- licensure.  Did you have
17  to do that in Florida?
18    A.   We did.
19    Q.   Did you ever attend any
20  AstraZeneca-sponsored continuing medical education
21  courses?
22    A.   I go to the psych conference, and different
23  symposiums were sponsored by different drug companies.
24  I'm sure AstraZeneca did some of those.
25    Q.   Do you recall -- you indicated that

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 194

1  sometimes, you received free information off of the
2  Internet.  Do you recall that testimony?
3    A.   Right.
4    Q.   Did you receive any course programs that
5  you can use to review pharmaceutical product
6  literature and get CME credit online?
7    A.   No.  Mine is through continuing education
8  units.  It's not sponsored by any pharmaceutical
9  company.
10    Q.   Okay.  Did you ever receive -- strike that.
11        Have you ever gone to the AstraZeneca
12  website with respect to Seroquel on the Internet?
13    A.   To download information for the patient.
14    Q.   And do you recall when that occurred?
15    A.   No.
16    Q.   Did that occur in the last two years?
17    A.   No.
18    Q.   Did that occur in the last --
19    A.   It was in the beginning.
20    Q.   Did that occur in the last four years?
21        MR. ELLISON:  Form.
22    A.   2000 to 2002, I probably used it.
23    Q.   (By Mr. Barringer)  Do you ever recall
24  attending drug company-sponsored, round-table
25  meetings in which drug companies pay doctors to

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 195

1  speak regarding a -- a specific topic?
2        MR. ELLISON:  Form, foundation.
3    A.   For AstraZeneca or for any --
4    Q.   (By Mr. Barringer)  Any -- any of them.
5    A.   Yes.
6    Q.   Okay.  Do you recall ever attending such
7  round-table groups on -- involving AstraZeneca?
8    A.   No.
9    Q.   Okay.  Do your colleagues -- strike that.
10        The -- the colleagues that you have
11  associated with and that you're -- that you've
12  befriended as a -- a nurse practitioner specializing
13  in psychiatry, do they attend the same conferences
14  typically that you do?
15    A.   Some of them.
16    Q.   Okay.  And do they also have pharmaceutical
17  sales reps visit their office, that you're aware of?
18    A.   Yes.
19    Q.   And -- and these are colleagues that go to
20  these round-table discussions?
21    A.   Right.
22    Q.   When you were at Directions For Mental
23  Health, about how many sales representatives would you
24  see on a weekly basis?
25    A.   On a weekly basis?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 196

1    Q.   Uh-huh.
2        MR. ELLISON:  In general, Bob, or just --
3        MR. BARRINGER:  Just in general.
4    A.   Ten.
5    Q.   (By Mr. Barringer)  Do you recall how
6  many of those office visits involved AstraZeneca
7  employees on a weekly basis?
8    A.   When Bob Costan [phonetic] was our rep, we
9  saw him at least weekly.  After he left, we didn't see
10  him very often.  They'd mail the -- they'd come in and
11  see how many samples we needed and mail the product.
12    Q.   And -- and did you sometimes -- you used
13  the word "samples."  Can you explain to the jury what
14  a sample is?
15    A.   A sample is the actual medication.
16  Typically, depending on the dosing, is how it's
17  packaged, so that we can start people on medications,
18  especially those that don't have any kind of
19  insurance, until we can get them onto patient
20  assistance.
21    Q.   Okay.  And do you recall Bob Costa?  Am I
22  saying his name properly?
23    A.   Consta -- Costan, yeah.
24    Q.   Constan?  Do you remember if Bob Constan
25  ever provided starter packs?  Have you ever heard of

Stratos Legal Services
800-971-1127

50 (Pages 197 to 200)

Dee Burke
August 9, 2008

Page 197

1    that term, "starter pack"?
2        A.   We do have starter packs, but I don't think
3    when Bob was the rep, those were available yet.
4        Q.   Okay.  When you titrated Mr. Haller from 50
5    to 100 to 200 to 300 and then to 400, how did
6    Mr. Haller obtain the necessary dosage to titrate up?
7        A.   Through a prescription.
8        Q.   Okay.  So you wrote a prescription that
9    would allow for one pill of 50, one pill for 100, two
10   pills of 100, I'm assuming, to get 200, and the such?
11       A.   Yeah, right.
12       Q.   Is that the way it would occur?
13       A.   Right.
14       Q.   Okay.  And would that have been on the pink
15   sheet with respect to the --
16       A.   It would.
17       Q.   And in your review of the records, did you
18   see your prescription record regarding the pink sheet
19   of Exhibit 1 and 2?
20       A.   You mean a copy of the prescription?
21       Q.   Yes.
22       A.   No.
23       Q.   Okay.  At Directions For Mental Health, was
24   there typically a way -- strike that.
25           Did -- at Directions For Mental Health, did

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 198

1    you typically retain a copy of the prescription that
2    was written and -- and handed to the patient?
3        A.   No.
4        Q.   And -- and is that true for the pink sheets
5    as well?
6        A.   It's true.
7        Q.   Okay.  What -- if -- if one were to obtain
8    a medication at Directions For Mental Health that
9    wasn't a pink sheet prescription, how would you have
10   identified it in the record?
11       A.   White.  It's pink or white.
12       Q.   Okay.  If -- if there -- it says there was
13   an indication for Seroquel, but it does not indicate
14   pink or white, do you know whether or not the patient
15   was attaining it through the pink source or from the
16   white source?
17       A.   There is a way to know, but not on these
18   records.
19       Q.   Okay.  And what is the way to know?
20       A.   Through the financial, how it -- how it's
21   being paid for.
22       Q.   Okay.
23       A.   We would be billed by Eckerd, and his name
24   would have popped up on the billing.
25       Q.   Okay.  And before you today, you don't have

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 199

1    any billing records; is that correct?
2        A.   I don't.
3        Q.   Do you -- are you familiar with the way the
4    billing records track who was prescribed a medication
5    and then subsequent -- subsequently went to Eckerd and
6    got it filled?
7            MR. ELLISON:  Form.
8        A.   Clarify that.
9        Q.   (By Mr. Barringer)  Sure.  I'll withdraw the
10   question.
11           My question is, is:  Are you familiar
12   enough with the billing records to know whether or not
13   they track the actual patient who got the prescription
14   filled?
15       A.   I believe they do.
16       Q.   Okay.
17       A.   I -- I think Eckerd did.
18       Q.   Do you know whether or not when Eckerd
19   invoiced Directions For Mental Health, whether or not
20   it would identify the patient and the prescription?
21       A.   I think it did.
22       Q.   Okay.  When you see sales representatives
23   that come out to see you from various drug companies
24   to inform you about important changes to prescribing
25   information for the -- the drug -- strike that.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 200

1            MR. ELLISON:  You've been hanging around me
2    too long, Bob.
3            THE WITNESS:  He needs a drink.
4            MR. BARRINGER:  Off the record.
5            (An off-the-record discussion occurred.)
6            THE VIDEOGRAPHER:  Let's go off the record.
7    Off the record at 1:37.
8            (Recess from 1:37 p.m. to 1:39 p.m.)
9            THE VIDEOGRAPHER:  Back on the record at
10   1:39.
11       Q.   (By Mr. Barringer)  Do you expect for the
12   sales representatives that come out to see you from
13   the various drug companies to inform you about
14   important changes to the prescribing information for
15   the drug they are promoting?
16       A.   I do.
17       Q.   Do you expect for the drug representatives
18   that come out to visit you to be truthful and to give
19   you balanced information about the drugs they are
20   promoting?
21       A.   I do.
22           MR. ELLISON:  Form.
23       Q.   (By Mr. Barringer)  And in my last question,
24   I use the term "balanced."  What do you understand that
25   term to mean?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 201

1    A.   The risk and the benefits.
2    Q.   What I would like to show you is going to
3  be marked as Exhibit . . .
4        MR. ELLISON:  5.
5        MR. BARRINGER:  5.
6        (Dee Burke Exhibit 5 was marked and is
7  attached hereto.)
8        MR. BARRINGER:  Here, I'll let you see it
9  first because I only have one copy.
10       MR. ELLISON:  Back atcha.
11   Q.   (By Mr. Barringer)  What I'd like to show you
12 is a document entitled "Managing Weight Gain and
13 Diabetes in Schizophrenia, A Patient Case Study From the
14 files of Michael J. Reinstein, M.D."  It is marked as
15 Confidential.  AZSER 10427473 through 478.
16       Do you recognize this document?
17   A.   No.
18   Q.   Is this, based on your memory and
19 experience of receiving case studies from
20 pharmaceutical representatives, is -- does this format
21 look familiar to you?
22   A.   I'll be real honest with you:  If they gave
23 us case studies, I didn't look at them.
24   Q.   Okay.  Can you go to the -- page 4 of this
25 particular case study?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 202

1    A.   Uh-huh.
2    Q.   And it says -- can you read for the record
3  what the Seroquel Dosing Regime indicates?
4    A.   Right here --
5    Q.   Yes, ma'am.
6    A.   -- where the:  "Olanzapine therapy was
7  discontinued due to weight gain and the development of
8  diabetes.
9        "Seroquel was initiated at 150 milligrams
10 for one week.
11       "The Seroquel dose was then increased to
12 300 milligrams per day where it remains."
13   Q.   Okay.  And did you ever recall the
14 pharmaceutical sales representatives indicating such a
15 dosing regime to you?
16   A.   No.
17   Q.   Do you -- can you read into the record the
18 response to Seroquel, the bullet points following
19 that?  Just underneath it.
20   A.   All of these?
21   Q.   Yes, ma'am.
22   A.   Okay.  "The patient has shown a positive
23 response to Seroquel, becoming more spontaneous, more
24 interested in his surroundings, and has demonstrated
25 improved interactions with others.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 203

1        "Blood glucose levels were brought under
2  control, permitting the substitution of an oral
3  hypoglycemic agent for insulin treatments.
4        "Metabolic stability was maintained,
5  allowing the patient to discontinue the hypoglycemic
6  agent and return to a normal diet.
7        "Not only did the patient not gain weight
8  with Seroquel, he lost approximately 8 of the 10
9  pounds gained while on olanzapine.
10       "Our laboratory data revealed a
11 normalization of serum glucose levels which is valid
12 proof of improvement of diabetes and metabolic
13 stabilization.  His psychotic symptoms were
14 well-controlled, including the negative symptoms.  The
15 patient lost weight, 8 pounds, and is very pleased
16 about this.  He is also relieved that he no longer has
17 to take daily insulin injections."
18   Q.   Do you recall claims by AstraZeneca
19 pharmaceutical sales reps along those lines?
20   A.   No.
21   Q.   Okay.  Do you see the -- the quote by
22 Dr. Reinstein in the right-hand column?  Could you
23 read that into the record.
24   A.   "We have found Seroquel to be ideal in
25 patients who have problems with weight gain and, due

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 204

1  to this, the development of diabetes.  In this
2  patient, once olanzapine was discontinued and Seroquel
3  was started, the weight was lost, the diabetes
4  resolved, and the patient was able to stop taking
5  hypoglycemic medication.  In our experience, weight
6  gain is not an issue with Seroquel, unlike some other
7  antipsychotic medications."
8        I can see where that would be true.
9    Q.   Ms. Burke, does this document appear to
10 claim that Seroquel reverses diabetes and weight loss
11 caused by Zyprexa?
12       MR. ELLISON:  Form, foundation.
13   A.   No, that isn't how I would read into that
14 at all.
15   Q.   (By Mr. Barringer)  Okay.  How would you
16 read into it?
17   A.   I would read that in this particular
18 patient, that he had improvement on those issues.
19   Q.   Did you ever attend, in one of your
20 meetings sponsored by AstraZeneca, a meeting by
21 Dr. Reinstein?
22   A.   No.
23   Q.   Do you -- do you have -- have you ever met
24 Dr. Reinstein?
25   A.   No.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 245

1 the record to change tapes.
2       THE VIDEOGRAPHER: We are off the record at
3 2:38. This is the end of Tape 2.
4       (Recess from 2:38 p.m. to 2:41 p.m.)
5       THE VIDEOGRAPHER: We're back on the record
6 at 2:41. This is the beginning of Tape No. 3 of the
7 deposition of Dee Burke.
8       Q.   (By Mr. Barringer) Okay. Do Zyprexa,
9 Tegretol, and Seroquel, are -- are they used to treat
10 personality disorders?
11      A.   No.
12      (Dee Burke Exhibit 11 was marked and is
13 attached hereto.)
14      Q.   (By Mr. Barringer) I want to hand you
15 what is going to be marked as Exhibit 11. It's
16 entitled "Consensus Development Conference on
17 Antipsychotic Drugs and Obesity and Diabetes." It's
18 from the Diabetes Care, Volume 27, No. 2, February
19 of 2004. Have you ever seen this document before?
20      A.   I don't think so.
21      Q.   Okay. Do you often -- do you subscribe to
22 Diabetes Care?
23      A.   No.
24      Q.   Are you familiar with the American Diabetes
25 Association?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 246

1      A.   I am.
2      Q.   Are you familiar with American Psychiatric
3 Association?
4      A.   I am.
5      Q.   Are you -- are you familiar with the
6 American Association of Clinical Endocrinologists?
7      A.   I knew that they've got an association. I
8 don't have any knowledge of it.
9      Q.   Okay. And you yourself aren't holding
10 yourself out as an expert in endocrinology; is that
11 correct?
12      A.   Not at all.
13      Q.   Okay. And are you familiar with the North
14 American Association for the Study of Obesity?
15      A.   Yes.
16      Q.   Okay. If you can turn to Table 1, I
17 believe my last question to you was: During this time
18 period that you saw David on 10-2002, was Abilify
19 available on the market? And in Table 1, it said that
20 there is -- assuming that the table is accurate, it
21 says that the year Abilify was approved was in 2002.
22      A.   Uh-huh.
23      Q.   Is that your recollection as to when
24 Abilify was approved?
25      A.   It was. I don't know when in 2002.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 247

1      Q.   Okay. Was Geodon available for --
2      A.   It was.
3      Q.   -- during the 10-2002?
4      A.   Right.
5      Q.   And -- and do you have experience in
6 prescribing Geodon?
7      A.   Yes. In fact, I speak for Pfizer as well
8 for Geodon.
9      Q.   Okay. So is that a third pharmaceutical
10 company that you speak for?
11      A.   Yes.
12      Q.   And how -- and tell me about the
13 relationship there with respect to -- strike that.
14      Do you get paid to speak on behalf of
15 Pfizer?
16      A.   I do.
17      Q.   Do you recall how much you, since 2000,
18 how -- or since you began speaking with Pfizer, how
19 much you've been paid?
20      A.   I just started speaking with them in the --
21 since moving to Tennessee.
22      Q.   And are both Geodon and Abilify used to
23 treat schizo-affective or schizophrenic patients?
24      A.   Geodon has label indications for bipolar
25 mania as well as schizophrenia, but nothing as far as

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 248

1 maintenance. Abilify has progressively gotten more
2 and more indications, first coming out with only
3 schizophrenia, later getting the bipolar indication
4 and bipolar maintenance, children indication. It's
5 gotten more indications than any of the others at this
6 point in time.
7      Q.   Okay. Do you feel that -- strike that.
8      In your clinical experience, have you
9 noticed any weight gain associated with Geodon?
10      A.   There have been a few that have alleged
11 they gained weight on it.
12      Q.   Now, when you say "a few," who are you
13 referring to?
14      A.   To clients.
15      Q.   Okay. And about how many clients do you
16 currently treat?
17      A.   Oh, wow.
18      Q.   That are associated during this time period
19 that you're prescribing Geodon?
20      A.   When I was at Directions, I had 1,000
21 clients. Here in Tennessee, on my caseload, there's
22 probably 600.
23      Q.   Okay. And have you had associated weight
24 gain with Abilify?
25      A.   With children.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 249

1  Q.  What about adults?
2  A.  One or two.
3  Q.  Okay.  Now, when you testify about your
4  clinical experience, you haven't done any actual
5  studies on your clinical population, have you?
6  A.  No.
7  Q.  You're -- you're testifying based on your
8  feeling as to what is occurring; is that correct?
9       MR. ELLISON:  Form.
10 A.  That's correct.
11 Q.  (By Mr. Barringer)  In other words, you don't
12 have a database with collected information where you can
13 do statistical analysis on your patients, do you?
14 A.  We took weights.
15 Q.  Okay.  We'll get to that.
16      How much, on -- on 10-1-2002, did David
17 Haller weigh?
18 A.  I don't know.
19 Q.  Would you normally weigh a patient?
20 A.  We didn't back then.  We have since become
21 to weigh patients.
22 Q.  Was weight not important back in 2002?
23 A.  It was always important.
24      MR. ELLISON:  Form.
25 Q.  (By Mr. Barringer)  Did the
Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 250

1  pharmaceutical sales representatives regarding
2  Seroquel indicate to you that you should monitor
3  one's weight while they were -- while a patient was
4  on Seroquel?
5       MR. ELLISON:  Form.
6  A.  I don't remember them talking about us
7  monitoring weight.
8  Q.  (By Mr. Barringer)  Do you recall, back
9  in 2002, whether or not -- strike that.
10      Do you recall, back in 2002, 10-1-2002,
11 whether or not pharmaceutical sales representatives
12 indicated to you that you needed to track blood sugar
13 glucose levels in patients being prescribed Seroquel?
14      MR. ELLISON:  Form.
15 A.  I don't recall that.
16 Q.  (By Mr. Barringer)  Okay.  If they had
17 back in 2002, would you have relayed that
18 information to the patient, that they needed to
19 monitor their weight?
20      MR. ELLISON:  Form, foundation.
21 A.  I always told them they needed to monitor
22 their weight.
23 Q.  (By Mr. Barringer)  Okay.  Back in 2002,
24 would you have stressed that even more so if a
25 pharmaceutical sales representative had -- detailing
Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 251

1  Seroquel had said, "Hey, when you put a person on
2  Seroquel, you need to watch his weight"?
3       MR. ELLISON:  I object.  Form and
4  foundation.
5  A.  Not necessarily Seroquel.  Any of them.
6  Q.  (By Mr. Barringer)  Okay.  Would you
7  have, back in 2002, indicated to the patient that
8  they needed to control their metabolic -- strike
9  that -- monitor their glucose levels if they were
10 being prescribed Seroquel?
11      MR. ELLISON:  Form, foundation.
12 A.  I had already done it with David because of
13 the lithium and Depakote.  That's why the lab work was
14 ordered.
15 Q.  (By Mr. Barringer)  But you did not do
16 that for -- on -- as the basis for Seroquel; is that
17 correct?
18      MR. ELLISON:  Form, foundation.
19 A.  Not just Seroquel.
20 Q.  (By Mr. Barringer)  okay.
21 A.  It was all of his meds and his illness.
22 Q.  And his illness.  Okay.
23      And then in the next office visit, you saw
24 him on 10-23-2002?
25 A.  I did.
Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 252

1  Q.  Okay.  And between 10-1-2002 and
2  10-23-2002, is it fair to say you don't know whether
3  or not Mr. Haller actually took the product as
4  prescribed?
5  A.  I would say he hadn't taken the product at
6  all because he'd lost the prescription.
7  Q.  Okay.  And sitting here today, you don't
8  recall whether or not a sample was provided to
9  Mr. Haller; is that correct?
10 A.  I would have been given the samples.  Given
11 that I wrote a pink prescription, I would not have
12 given him samples.
13 Q.  Okay.  Okay.  Is it possible that you gave
14 him a sample and you didn't write it down?
15      MR. ELLISON:  Form.
16 A.  No.
17 Q.  (By Mr. Barringer)  And this meeting
18 lasted 15 minutes; is that correct?
19 A.  The second one?
20 Q.  Yes.  10-23-2002.
21 A.  Yes.
22 Q.  Okay.  And how much did he weigh on this
23 date?
24 A.  I don't know.
25 Q.  And the next time you saw Mr. Haller was on
Stratos Legal Services
800-971-1127

64 (Pages 253 to 256)

Dee Burke
August 9, 2008

Page 253

1  11-20-2002; is that correct?
2     A.  No, that wasn't me.
3        MR. ELLISON:  It was Desai.
4        MR. BARRINGER:  Oh, we both -- we did --
5  both did that one.
6     Q.  (By Mr. Barringer)  Okay.  The next time
7  you saw this patient was on 12-18-2002?
8     A.  It was.
9     Q.  Okay.  And how long did that office visit
10  last?
11     A.  15 minutes.
12     Q.  Okay.  And at this point in time,
13  Mr. Haller was supposed to be taking Seroquel; is that
14  correct?
15     A.  He was.
16     Q.  And do you know whether or not he ever got
17  his prescriptions filled?
18     A.  I didn't do the readout, but he said he was
19  taking his medication.
20     Q.  Okay.  And you rely on your -- on your
21  patients to determine whether or not they're taking
22  their medicine, correct?
23     A.  Patients and case managers and family.
24     Q.  You have no way of actually forcing a
25  patient to take their pills at home?
Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 254

1     A.  No.
2     Q.  Do you know how much Mr. Haller weighed
3  on -- on this particular day?
4     A.  I do not.
5     Q.  And is it your testimony, Ms. Burke, that
6  the risks, benefits, alternatives discussed to include
7  maintaining lithium 600 milligrams at night, Eskalith
8  450 in the morning, Seroquel 400 milligrams at night,
9  Depakene is 500 milligrams b.i.d., is it your
10  testimony that when you write that in your notes, that
11  you continue the warning regarding his weight and
12  to -- to follow his glucose levels?
13     A.  Right.
14     Q.  But you don't document that in -- in
15  your --
16     A.  I do anymore.  I didn't back then.
17     Q.  Okay.  Likewise, do you know what his blood
18  pressure was on that day?
19     A.  No.  I'll just offer that we didn't start
20  doing that until after the olanzapine, and then it
21  started becoming routine practice to take weights and
22  blood pressures.
23     Q.  Okay.  With respect to that, is that on or
24  about the same time that you learned of the possible
25  association between Seroquel --
Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 255

1        MR. ELLISON:  Form --
2     Q.  (By Mr. Barringer)  -- and -- and -- and
3  weight gain?
4        MR. ELLISON:  I'm sorry.  Form --
5     A.  No.
6        MR. ELLISON:  -- and foundation.  Misstates
7  her --
8     A.  It's when we learned about the metabolics
9  with olanzapine.
10        MR. ELLISON:  Misstates her testimony.
11        MR. BARRINGER:  Well, I was asking her
12  regarding if it was --
13        THE REPORTER:  What was your answer?
14     A.  I said it had to do with the metabolic
15  issues with olanzapine.
16     Q.  (By Mr. Barringer)  Did you learn about the
17  metabolic issues -- strike that.
18        When did you learn about the metabolic
19  issues with Seroquel?
20        MR. ELLISON:  Form, foundation, asked and
21  answered.
22     A.  Very closely after the olanzapine.
23     Q.  (By Mr. Barringer)  Okay.  Would the
24  olanzapine be a good marker as to when you -- you
25  became aware of the metabolic profile being
Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 256

1  associated with Seroquel?
2     A.  Yeah, because it became an issue with all
3  of them.
4     Q.  And -- and sitting here today, you don't
5  know what date, --
6     A.  I don't.
7     Q.  -- hard-and-fast date --
8     A.  No.
9     Q.  But is it fair to say that the -- strike
10  that.
11        Is that -- when you became aware of the
12  olanzapine instance, that's when you began to track
13  weight?
14     A.  Right.
15     Q.  You indicated that you had ordered blood
16  work on one occasion, --
17        MR. ELLISON:  Form.
18     A.  It was ordered on more than --
19     Q.  (By Mr. Barringer)  -- on 1-16 --
20     A.  -- one occasion.  He complied with it on
21  one occasion.
22     Q.  Fair enough.
23        What was the last -- what -- what was the
24  last date I was asking about?  Lost my train of
25  thought.
Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 273

1    A.   That would have been my goal if he had
2  stayed with me, only because of compliance issues.
3    Q.   A few lines down, it says: "I told David
4  that as long as he's cooperative and follows
5  recommendations, I will see him, but if he is not,
6  then I won't."
7         Did I read that correctly?
8    A.   Yep.
9    Q.   "He states okay and then left with his case
10 manager.  The client is aware to abstain from alcohol,
11 illicit drugs, OTC preparations not approved by this
12 ARNP, to limit nicotine, caffeine, and to follow a
13 healthy diet."
14        Did I read that correctly?
15   A.   Yep.
16   Q.   "The client is aware of the different
17 facilities in the area for emergencies."
18        Did I read that correctly?
19   A.   You did.
20   Q.   "The client is aware of the suicide hotline
21 phone number and knows in extreme emergency, 911 can
22 be called for assistance."
23        Did I read that correctly?
24   A.   That's true.
25   Q.   "The client is aware that DMH is not an

Dee Burke
August 9, 2008

Page 274

1  emergency facility."
2         Did I read that correctly?
3    A.   That's right.
4    Q.   "The client is educated on indication --
5  indications, dosage, and side effects of the
6  medications and gives voluntarily verbal informed
7  consent.  We discussed alternative to treatment to
8  include no treatment.  The client agrees to
9  plan/regime today.  The treatment plan was reviewed
10 and signed."
11        Did I read that correctly?
12   A.   You did.
13   Q.   Did you weigh him on this date?
14   A.   I wouldn't have been the one to weigh.  Our
15 nurse was the one that was supposed to weigh.
16   Q.   Okay.  Where would that note be held?
17   A.   In the -- in nursing notes.
18   Q.   Okay.  Is that separate and apart from your
19 progress notes?
20   A.   It is.
21   Q.   Okay.  So if -- if we go back through
22 this -- the voluminous records of Exhibit 1 and we see
23 where the facility began to measure weights, is that
24 about the time, based on your guess, that you would
25 have began warning patients regarding the possible

Dee Burke
August 9, 2008

Page 275

1  association between Seroquel and diabetes?
2         MR. ELLISON:  Form, foundation.
3    A.   I never would have warned the patients of
4  potential of Seroquel with diabetes.  What I warned
5  the client about, whether it be olanzapine, Risperdal,
6  Seroquel, Geodon, that there are potential side
7  effects and risks and what those risks are.  And one
8  of the risks is an increase in appetite.
9         What they do with that is their choice.  If
10 they binge eat and eat bad and they don't exercise,
11 they're going to gain weight and most likely will
12 develop Diabetes Type II and what then that in details
13 [sic].  The fact remains that people with bipolar
14 illness and schizophrenia have a very high propensity
15 for cardiovascular problems and diabetes and weight
16 gain and poor diet and poor lifestyle.
17        So you have to weigh the benefits of this
18 or anything else versus the consequences.  What -- you
19 know, there is a quality versus quantity of life.
20 Chances are some of these folks are going to develop
21 diabetes whether they're medicated or not.
22   Q.   If a pharmaceutical sales representative
23 for AstraZeneca told you that Seroquel can cause
24 diabetes, would -- or is associated with diabetes,
25 would you have relayed that information to your

Dee Burke
August 9, 2008

Page 276

1  patients?
2    A.   I would.
3         MR. ELLISON:  Form, foundation.
4    A.   However, they were relayed the information
5  of the potential for the weight gain which can cause
6  diabetes, so in a roundabout way, they were always
7  educated on that.
8    Q.   (By Mr. Barringer)  And sitting here
9  today, did -- do you recall any pharmaceutical sales
10 representatives ever discussing Seroquel and
11 diabetes with you?
12   A.   No.
13        MR. ELLISON:  Form, foundation.
14   Q.   (By Mr. Barringer)  Let's talk about the
15 medication flow sheet.  You pulled out two pages of the
16 Medication Flow Sheet that you indicated some
17 involvement on.
18   A.   Uh-huh.
19   Q.   Okay.  Can -- I want to make sure I can get
20 those pages.  It's Exhibit 2, part of Exhibit 2; is
21 that correct?
22   A.   Correct.
23        MR. ELLISON:  First couple of pages.
24   Q.   (By Mr. Barringer)  First couple of pages.
25        When Mr. Haller was under your care and

Dee Burke
August 9, 2008

Page 277

1   treatment, how often did you recommend him to come in
2   and -- and -- and see you?
3       A.  At -- at first, every four weeks.  When he
4   returned in 2005, it was every eight weeks.
5       Q.  Okay.  And on 10-1-2002, what -- under the
6   Medication Flow Sheet, what did you prescribe on that
7   date?  What -- can you read that into the record?
8       A.  Yeah.  Seroquel 100 milligrams, one-half
9   tonight, then one QHS, then two, then three, then four
10  QHS.  Depakote 500 milligrams, two QHS.  Eskalith, 450
11  CR in the morning.  Lithium 300, two QHS.
12      Q.  Okay.  Under the Seroquel, does it say
13  quantity?  Does it indicate a quantity?
14      A.  It says 120.
15      Q.  Okay.  And -- and you did not provide a
16  refill; is that correct?
17      A.  No refills.
18      Q.  And it says -- there is an SF column with
19  "Pink, forward slash, White."  What does that mean?
20      A.  The pink prescriptions were coming out of
21  our budget.  White came out of whatever insurance they
22  had.
23      Q.  Okay.  And what does the "SF" stand for?
24      A.  I'm not really sure.
25      Q.  Okay.  And on 10-15-2002, was David Haller

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 278

1   supposed to appear?
2       A.  He was.
3       Q.  And did he -- did he appear?
4       A.  He was a no-show.
5       Q.  Okay.  And you saw, again, Mr. David Haller
6   on 10-23-2002?
7       A.  Correct.
8       Q.  And what was the prescription for Seroquel
9   on that date?  Can you read that into the --
10      A.  100 milligrams tonight, two second night,
11  three third night, then four QHS.
12      Q.  You also prescribed Depakote?
13      A.  Depakote again, 500 milligrams two QHS,
14  Eskalith, 450 CR in the morning, lithium 300 two QHS.
15      Q.  Okay.  And so on 10-23-2002, the quantities
16  of Seroquel would have been 120?
17      A.  Again, right.
18      Q.  And the -- and the dosage of that pill
19  would have been 100 milligrams; is that correct?
20      A.  Correct.
21      Q.  Again, on 11-20-2002, it says --
22      A.  Dr. Desai saw him.
23      Q.  Oh, okay.  On the 11-1-2002, on the
24  10-15-2002, and the 10-23-2002, are those your
25  initials under the M.D. name?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 279

1       A.  It -- correct.
2       Q.  Okay.  On 12-18, there's an entry
3   indicating prescriptions for lithium, Eskatathe [sic],
4   Depakote, or --
5       A.  Depakene.
6       Q.  -- Depakene, Seroquel?
7       A.  Right.
8       Q.  And is that your name listed under the M.D.
9   name on --
10      A.  It is.
11      Q.  Okay.  It's some sort of squiggly line and
12  going straight --
13      A.  Yeah, it's bad.
14      Q.  Okay.
15      A.  I must have been tired that day.
16      Q.  And you -- you prescribed Seroquel of 200
17  milligrams two QHS; is that correct?
18      A.  Right.
19      Q.  And for 60 pills; is that correct?
20      A.  That's correct.
21      Q.  On January 16th, there is an indication on
22  the medical flow sheet with the initials DB.  Is --
23  are -- are those your initials?
24      A.  They are.
25      Q.  Indicates that labs were ordered on that

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 280

1   particular day; is that correct?
2       A.  That's correct.
3       Q.  It indicates that Seroquel was prescribed
4   to Mr. Haller; is that correct?
5       A.  Right.
6           There was also blood work ordered by
7   Dr. Desai back in November that he didn't comply with.
8       Q.  And that's on 11-20-2002?
9       A.  That's correct.
10      Q.  And -- and is it your testimony that the
11  "B test --
12      A.  Blood test.  Yeah, that's Dr. --
13      Q.  Is that what "B test" means?
14      A.  Yeah, that's Dr. Desai.
15      Q.  Do you know what, under the Comments
16  section, what it says under "B test"?  Did you write
17  that?
18      A.  You talking about here with her name,
19  "Desai"?
20      Q.  Is that her name?
21      A.  Yeah.
22      Q.  Okay.  So Dr. Desai didn't put it under the
23  M.D. name?
24      A.  That's what that is over there, as well.
25      Q.  Okay.

Stratos Legal Services
800-971-1127