# EXHIBIT 6

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA


IN RE: SEROQUEL PRODUCTS LIABILITY LITIGATION
MDL DOCKET NO. 1769
This document relates to:
Haller v. AstraZeneca LP, et al
(David D. Haller 6:07-cv-15733)

Livesay vs. AstraZeneca LP, et al
(Debra G. Livesay 6:07-cv-15752)

      DEPOSITION OF NICOLE R. KEENE,
TAKEN AT THE OFFICES OF ESQUIRE DEPOSITION
SERVICES, SUITE 1515, 650 POYDRAS STREET, NEW
ORLEANS, LOUISIANA, ON THE 29TH DAY OF MARCH,
2008.


APPEARANCES:

REPRESENTING THE PLAINTIFFS:

      BAILEY PERRIN BAILEY
      ATTORNEYS AT LAW
      BY: JIM BRUZZESE, ESQ.
      440 LOUISIANA, SUITE 2100
      HOUSTON, TEXAS 77002
      E-MAIL: SEROQUELDEPOS@BPBLAW.COM
        (713) 425-7100

18

1  A. Correct. I am a psychiatric
2  nurse practitioner.
3  Q. No other subspecialty?
4  A. No.
5  Q. And it was in that capacity that
6  you provided care and treatment for the
7  particular plaintiffs in this litigation. Is
8  that correct?
9  A. Yes.
10  Q. Now, you said your supervising
11  physician was Dr. James Zenel?
12  A. Zenel.
13  Q. And did you have a collaborative
14  physician?
15  A. I correct myself. Supervising
16  physician and collaborating physician is
17  interchangeable. It is really termed a
18  collaborating physician is the correct term.
19  Q. Fair enough. So it would be just
20  more proper, I guess, to call Dr. Zenel your
21  collaborative physician.
22  A. Correct.
23  Q. Fair enough.
24  A. Yes.
25  Q. Does the collaborative physician

19

1  have to sign off on prescriptions?
2  A. No.
3  Q. On your full authority, you can
4  prescribe medication as a nurse practitioner
5  in Florida. Is that correct?
6  A. Yes.
7  Q. And that is what you did for the
8  plaintiffs in this litigation. Is that
9  correct?
10  A. Yes.
11  Q. Do you remember when in 2005 you
12  got your license?
13  A. No.
14  Q. Let's come back to focus on what
15  you did --
16  A. I may have it, my license.
17  Q. Ms. Keene, if I heard you right,
18  you have suggested as you reached for your
19  purse that you might have your license on you.
20  Is that right?
21  A. Perhaps.
22  Q. Are you willing to peek?
23  A. Sure.
24        I stand corrected. I got it in
25  May 2006.

20

1  Q. In what -- thank you. I
2  appreciate that. That is in Florida. Right?
3  A. Correct.
4  Q. By the way, is that license still
5  active?
6  A. Yes. Until July.
7  Q. Until July?
8  A. Until July 31st.
9  Q. Do you intend to maintain that
10  license?
11  A. No.
12  Q. No reason now that you are here
13  in New Orleans. Right?
14  A. Correct.
15  Q. And you live in the New Orleans
16  area. Is that correct?
17  A. Correct.
18  Q. I don't need your address, your
19  home address for the record. We don't need to
20  make that semi-public, anyway.
21        You worked at Directions for
22  Mental Health, and I'll get into more details
23  on that in a minute, though, prior to May of
24  2006. Isn't that correct? Would it help --
25  the witness has hesitated.

21

1        Would it help refresh your memory
2  if you eyeballed one of the records that you
3  brought with you today?
4  A. Yes. This is probably my -- yes.
5  Q. All right. Let me ask you this:
6  Is there a state licensing board for nurse
7  practitioners?
8  A. Yes.
9  Q. Do they issue new licenses on an
10  annual basis?
11  A. Yes. And that might be the new
12  license.
13  Q. So your memory is that it was in
14  2005 when you first got your license?
15  A. Correct.
16  Q. And the license that you just
17  looked at is the one from July of 2000 -- is
18  the one that expires in July of 2008. Is that
19  right?
20  A. Correct.
21  Q. So what you looked at was your
22  current?
23  A. Is my current. You are right.
24  That is correct.
25  Q. Fair enough. So at this point,

                                                              22
1    your best memory is that you were licensed
2    some time in 2005. Is that correct?
3        A.   Yes.
4        Q.   And it was in 2005 that you first
5    started at Directions?
6        A.   To my memory, yes.
7        Q.   Ms. Keene, at the beginning of
8    the dep, I should have told you something. I
9    am really not trying to make this a memory
10   test.
11            If you don't know the answer to
12   one of my questions, please just say so. I am
13   going to ask you to try to refresh your
14   recollection based on anything that you may
15   have brought with you today or, in fact,
16   anything else. Okay?
17       A.   Okay.
18       Q.   You are looking at records you
19   brought with you today.
20       A.   I am looking at records for when
21   I started with David Haller. I took him as
22   soon as I came on at Directions. And yes. It
23   was in July of 2005.
24       Q.   And as of then you were a
25   licensed --

                                                              23
1        A.   Yes.
2        Q.   -- nurse practitioner,
3    specialized in psychiatry. Is that correct?
4        A.   Yes.
5        Q.   What was your full title at that
6    point?
7        A.   Psychiatric nurse practitioner.
8        Q.   Fair enough. Thank you. Let's
9    come back to what you did to prepare for the
10   deposition today. Okay?
11       A.   Yes.
12       Q.   You said you looked at the files,
13   your medical files for the plaintiffs in this
14   case. Is that correct?
15       A.   Uh-uh.
16       Q.   Yes?
17       A.   Yes. Briefly.
18       Q.   You did not have copies of these
19   records with you. Correct?
20            Let me ask it a different way.
21   You didn't bring those records with you when
22   you moved from Florida in December of 2007 to
23   New Orleans. Correct?
24       A.   Correct.
25       Q.   How did you get copies?

                                                              24
1        A.   They were sent to me by Katie
2    Hamilton.
3        Q.   At Brown Greer?
4        A.   Of Brown Greer.
5        Q.   At no point did you contact your
6    former employer and ask for copies of any
7    medical records related to these plaintiffs,
8    did you?
9        A.   After I received the records and
10   spoke to Dr. Zenel, we went through the chart,
11   and he informed me that there were other notes
12   that had not been sent to me by Brown Greer.
13       Q.   And these are notes of treatment
14   that you provided one plaintiff, David Haller.
15   Is that correct?
16       A.   Correct.
17       Q.   Okay. And you tendered copies of
18   the documents that you received from your
19   former employer relating to visits that were
20   not included in the stack that you received
21   from Brown Greer today. Correct?
22       A.   Correct.
23       Q.   I have those here with me, and I
24   will ask you questions about that in a little
25   while.

                                                              25
1             Apart from the sum total of
2    records that you have described, did you look
3    at anything else to prepare for your
4    deposition?
5        A.   No.
6        Q.   You didn't do any independent
7    research?
8        A.   No.
9        Q.   You didn't go back and look at
10   any of the Seroquel labeling from the 2005
11   time frame?
12       A.   No.
13       Q.   Fair enough. You said you talked
14   to Dr. Zenel. Zenel?
15       A.   Yes.
16       Q.   When did you have that
17   conversation?
18       A.   About 10 days ago.
19   Approximately.
20       Q.   And was it just one conversation?
21       A.   Yes.
22       Q.   Did you initiate it?
23       A.   Yes.
24       Q.   Did you tell him that David
25   Haller had filed a lawsuit over Seroquel use?

**Page 54**

```
 1        We don't use them because of the
 2   bad side effects.  Yes.  That are available --
 3   that occur with them.
 4   BY MR. ELLISON:
 5        Q.   Have you told me of all of the
 6   side effects of first generation that you
 7   remember?
 8        A.   Yes.  I am sure there is more of
 9   them.
10        Q.   Can you give me some examples of
11   first-generation antipsychotics?
12        A.   Haldol, perphenazine.  Those are
13   the two that I use the most.  Thiothixene,
14   Navane, Thorazine, phenelzine.
15        Q.   And all of those have potential
16   side effects that you described.  Is that
17   right?
18        A.   Yes.
19        Q.   If I heard you right, you
20   prescribe, among others, Haldol.  Correct?
21        A.   Sometimes I do.
22        Q.   And you do that today.  Isn't
23   that correct?
24        A.   Sometimes.
25        Q.   So even though there are risks
```

**Page 55**

```
 1   associated with Haldol, which you have
 2   described, you nonetheless, depending on a
 3   particular patient's needs, have determined
 4   that the benefits of the medication outweigh
 5   those risks.  Isn't that correct?
 6        A.   Correct.
 7        Q.   When you decide what medication
 8   best suits a plaintiff's needs, you don't
 9   consult with plaintiff's lawyers who have
10   filed lawsuits against drug manufacturers.
11   Correct?
12        A.   Correct.
13        Q.   You rely on your care, your
14   training, your talent, your skill, your
15   expertise and consultation with your clients
16   and your education when you decide to
17   prescribe medication for a particular patient.
18   Isn't that correct?
19        A.   Correct.
20        Q.   From time to time would you
21   receive information from the various drug
22   manufacturers about their drugs?
23        A.   Yes.
24        Q.   And would you from time to time
25   meet with or talk with various drug
```

**Page 56**

```
 1   manufacturers about their medications?
 2        A.   Yes.
 3        Q.   You know that when they are
 4   talking to you, they are trying to get you to
 5   prescribe the medication.  Correct?
 6        A.   Correct.
 7        Q.   That is not a secret to you.
 8   Isn't that right?
 9        A.   Correct.
10        Q.   Have you ever relied on the sales
11   patter of a sales representative or anything
12   that a sales representative gave you or told
13   you to prescribe a particular medication for
14   any given patient?
15        A.   I do rely on some of the data
16   that they -- some of the research that they
17   provide us with, but certainly not their sales
18   pitch.
19        Q.   That is what I was asking.  They
20   would from time to time give you clinical
21   data.  Is that correct?
22        A.   Uhm-uhm.
23        Q.   Yes?
24        A.   Yes.
25        Q.   And you would rely on clinical
```

**Page 57**

```
 1   data.  Isn't that correct?
 2        A.   Yes.
 3        Q.   You wouldn't rely on their sales
 4   pitch.  Correct?
 5        A.   Correct.
 6        Q.   You can't think of any
 7   circumstance ever when you have relied on some
 8   sales representative's sales pitch in
 9   prescribing medication.  Is that correct?
10        A.   Correct.
11        Q.   And you wouldn't do that.  Isn't
12   that right?
13        A.   Correct.
14        Q.   It is your custom and practice to
15   stay abreast of developments with respect to
16   the medications that you prescribe.  Isn't
17   that correct?
18        A.   Correct.
19        Q.   And one of the ways you do that
20   is you review the PDR.  Is that right?
21        A.   Correct.
22        Q.   Do you review literature?
23        A.   I review literature, continuing
24   education.
25        Q.   Have you ever attended a
```

Page 58

```
 1  continuing education course that related to
 2  atypical antipsychotics?
 3      A.  Multiple.  Yes.
 4      Q.  Have they from time to time
 5  talked about an association between diabetes
 6  and atypical antipsychotics?
 7      A.  Yes.
 8      Q.  Do you remember when you first
 9  attended such a seminar?
10      A.  When I first attended a seminar?
11      Q.  It would have been years ago.  Am
12  I right?
13      A.  Yes.
14      Q.  Before or around the time you
15  first started treating David Haller?
16      A.  Probably around the time I was
17  treating him, my first seminar that wasn't
18  related to my own education.  Yes.
19      Q.  Are you aware that the Food &
20  Drug Administration asked all manufacturers of
21  atypical antipsychotics to include a warning
22  of a possible association between weight gain
23  and diabetes and hyperglycemia and those
24  medications around September of 2003?
25      A.  I know that the warning was
```

Page 59

```
 1  there.  I didn't know the date.
 2      Q.  And did you know the warning was
 3  implemented around January of 2004?
 4      A.  I know it was there when I
 5  started practicing.  The warning existed.
 6      Q.  So you were aware as of the time
 7  you got your license in July of 2005 that
 8  there was a possible association between
 9  hyperglycemia, diabetes and weight gain and
10  atypical antipsychotics, including Seroquel.
11  Is that right?
12      A.  Yes.
13      Q.  You didn't keep that a secret
14  from your patients, did you?
15      A.  No.
16      Q.  No.  You spoke with them about
17  those risks when you were deciding whether or
18  not to prescribe a medication to a particular
19  patient.  Is that correct?
20      A.  Correct.
21      Q.  And even if that specific
22  discussion isn't reflected in the notes, that
23  doesn't mean it didn't occur.  Isn't that
24  right?
25      A.  Correct.
```

Page 60

```
 1      Q.  The notes that I am going to be
 2  talking with you before -- or shortly that
 3  relate to David Haller included language
 4  related to the patient's education.  Am I
 5  correct?
 6      A.  Correct.
 7      Q.  And it was your custom and
 8  practice to include information in that
 9  section that you discussed with your patient
10  in terms of the risks and benefits of the
11  medication that you are considering.  Correct?
12      A.  Correct.
13      Q.  And where it says you discussed
14  the risks associated with Seroquel with that
15  patient, even if it doesn't specifically say
16  diabetes, that was something as of the time
17  that you were licensed that you did discuss
18  with the patient.  Correct?
19      A.  Correct.
20      Q.  I have talked about atypical
21  antipsychotics.  Let's talk about them more
22  generally at this point.
23          Would you agree that atypical
24  antipsychotics, the second generation,
25  revolutionized the treatment of bipolar
```

Page 61

```
 1  disorder Type I?
 2      A.  I can't speak to that.  They
 3  existed when I started practicing, so I didn't
 4  treat them before.
 5          From what I understand, they did
 6  tremendously help the treatment for Bipolar I.
 7  There are other classes that also work very
 8  well.
 9      Q.  Let's start with atypical
10  antipsychotics.  There are a number of drugs
11  in that class.  Am I right?
12      A.  Yes.
13      Q.  And that includes Seroquel.  Am I
14  right?
15      A.  Yes.
16      Q.  You began prescribing Seroquel
17  when you first got your license.  Isn't that
18  correct?
19      A.  Yes.
20      Q.  You still prescribe it today.
21  Isn't that right?
22      A.  Yes.
23      Q.  And the reason you prescribe it
24  is because you believe the benefits outweigh
25  the risks to any given patient.  Isn't that
```

(Pages 58 to 61)