# EXHIBIT 1

1

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION


IN RE: Seroquel Products Liability Litigation,
MDL DOCKET NO. 1769


Richard Unger

     Plaintiffs,

vs                Case No.
                  6:07-cv-15812

AstraZeneca L.P.

     Defendants.


Deposition of

DR. HERIBERTO CABADA

taken on

Monday, September 29, 2008


Reported by:  Thelma Harries, MBIVR, ACR

## 30

1  status.
2      Q. I notice, on that June 27th visit, your plan
3  was to increase the Paxil and increase the Ativan.
4  Do you see that?
5      A. Yes.
6      Q. What was your rationale for increasing those
7  two medicines on that visit?
8      A. He was getting more depressed, more
9  frustrated, more angry. He started to develop
10  hostile feelings.
11      Q. Hostile feelings towards anyone in
12  particular?
13      A. The supervisor.
14      Q. Looking at the next entry there on July 9th,
15  2002 you note:
16          He was very distraught and very
17          beseiged by his pains. Finds a lot
18          of difficulties finding a way out of
19          his situation. Feels very hopeless
20          and incapable of functioning."
21          Did that indicate to you whether he was
22  getting better or getting worse?
23      MS LaMACCHIA: Objection. Form.
24      For completeness, I'm going to ask if you
25  are going to read -- for the sake of completeness,

## 31

1  read the entire entry.
2  BY MR RABER:
3      Q. I left out two sentences. The first one:
4          The patient was seen on follow up
5          visit."
6          Then it says:
7          He was very distraught and very
8          beseiged by his pains. Find a lot
9          of difficulties finding a way out of
10          his situation. Feels very hopeless
11          and incapable of functioning. No
12          suicidal or homicidal ideas are
13          noticed."
14          Have I read that correctly?
15      A. Yes.
16      Q. Based on your visit with him, was it your
17  impression that he was getting worse or getting
18  better?
19      A. Actually, I perceived him a little more
20  hostile, irritable. That's why I started him on
21  Neurontin. Neurontin takes away the impulsivity, so
22  I started him also on Neurontin, which also helps
23  with pains, so I was trying to kill two birds with
24  one stone, but I did perceive him to be likely to
25  lose his cool and start getting very hostile with his

## 32

1  supervisor.
2      Q. Dr Cabada, what are some of the side effects
3  that were associated with Neurontin at that time,
4  that you were aware of?
5      A. Mostly sedation and water retention.
6      Q. How about weight gain?
7      A. Through water retention.
8      Q. Did you discuss those side effects with
9  Mr Unger when you started him on Neurontin?
10      A. Through the course of treatment, yes. As a
11  matter of fact, we discussed it because he had some,
12  some fluid retention. He showed me, I think it was
13  -- yes, he showed me his ankles and I think he had a
14  little bit of water retention.
15      Q. Did Mr Unger ever indicate to you that he
16  did not want to take Neurontin because of the
17  potential water retention or weight gain?
18      MS LaMACCHIA: Objection. Form.
19      THE WITNESS: It's been a while.
20  BY MR RABER:
21      Q. You can't say one way or the other?
22      A. I couldn't tell you accurately. If
23  I recall:
24          The patient was seen on follow up
25          visit. Is very invested into his

## 33

1      process. Recently had a diskitis,
2      and is having severe ambulatory
3      problems which jeopardizes the
4      quality of his lifestyle. No
5      suicidal or homicidal ideas are
6      noted."
7      Have I read that correctly?
8      A. Yes.
9      Q. What did you mean where you say "is very
10  invested into his process"?
11      A. That his process was becoming an
12  overwhelming issue in his life.
13      Q. His disease process?
14      A. Mmmm?
15      Q. What process are you referring to there?
16  His mental health?
17      MS LaMACCHIA: Objection. Form.
18      THE WITNESS: His thought process, the
19  disability, the physical problems. He was too
20  overtaken by the situation in general.
21  BY MR RABER:
22      Q. Based on your observations, how did his
23  severe ambulatory problems affect his lifestyle?
24      A. Severely. He had had a diskitis, which is
25  having inflammation of his disk, and that's why I

34

1    increased his Neurontin also abates pain.
2        Q.  If you turn the page, Dr Cabada, I'd like to
3    talk to you about the visit on October 17th, 2002.
4    That note says:
5            The patient was seen on follow up
6            visit accompanied by wife.  Has been
7            having a very difficult time with
8            his recently diagnosed diskitis.
9            Has been under a lot of tension and
10           has had a lot of mood fluctuations."
11           Have I read that correctly?
12       A.  Correct.
13       Q.  This refers to his wife being with him.  How
14   frequently did Mrs Unger come with him to see you?
15       A.  Rather frequent.
16       Q.  Was she present during your sessions with
17   him or was she outside waiting?
18       A.  Some she stayed outside, or she would come
19   in for a brief few minutes and leave him alone so he
20   and I could talk.
21       Q.  Now, you refer in this note to a lot of mood
22   fluctuations.  Can you describe that for us?
23       A.  Yes.  He would fluctuate between being angry
24   and getting depressed.  That was the reason why
25   I start him with Seroquel that day.

35

1        Q.  Tell us what your reasons were for starting
2    Seroquel at that time?
3        A.  The mood fluctuations, probably.
4        Q.  And did the moods --
5        A.  Also, somewhere along the line -- I probably
6    did not want to document that at the time; I started
7    perceiving and I am pulling this right off the cuff.
8        I started perceiving Mr Unger with some
9    degree of self-distortion.  I think he had a paranoia
10   that all along he, kind of, worried me that he would
11   go postal on me.
12       Q.  What were your reasons for being careful
13   about putting that down in the written medical
14   records, this degree of distortion and paranoia?
15       A.  He's a nurse.  It was there, not to the
16   degree where I could clearly document it, but it was
17   just there building up and I did not want to damage
18   his nursing license because, if that is documented,
19   then you have to act on it to some degree.
20       Q.  Did you believe, at this time, in October of
21   2002, that, because of these distortions and
22   paranoia, that Mr Unger was a potential threat to
23   others?
24       MS LaMACCHIA:  Objection.  Form.
25       THE WITNESS:  He was getting there, yes.

36

1    BY MR RABER:
2        Q.  And was that one of the -
3        A.  I wanted to nip it in the bud.
4        Q.  I've got you.  Now, when you decided that
5    you needed to prescribe Seroquel to deal with this
6    distortion and paranoia, did you consider other
7    options at that point?
8        A.  Probably, yes.
9        Q.  Did you consider prescribing any typical
10   antipsychotics at that point?
11       A.  All options are considered but you choose
12   what you believe is the less injurious medication, so
13   I chose something that would give...
14       My line of thinking for having used that
15   medication probably was -- and I'm going back now
16   six years -- it was probably because I wanted to use
17   something that would act against the mood swings and
18   would have antipsychotic properties but not very
19   strong antipsychotic properties, because he was just
20   getting ready to go postal on me and I wanted to
21   start doing that mood swing and component, but also
22   work on the self distortion.
23       Q.  Did you consider your prescription of
24   Seroquel for Mr Unger to be an off label prescription
25   at that point?

37

1        A.  I can't remember six years ago now what was
2    on label or off label.
3        Q.  I'll tell you at that time, according to the
4    FDA label, the approved medication was for
5    schizophrenia?
6        A.  I don't think at that time it was labelled.
7    In medicine, your awareness of properties sometimes
8    precedes the official enunciation that is acceptable,
9    so many times we start using it without it being
10   labelled.
11       Q.  Is that a common practice amongst
12   psychiatrists?
13       A.  Yes.
14       Q.  Would you consider it to be the standard of
15   care for psychiatrists --
16       MS LaMACCHIA:  Objection.  Form.
17   BY MR RABER:
18       Q.  -- to prescribe off label --
19       A.  Some people like to practice --
20       MS LaMACCHIA:  Objection.  Form.
21       THE WITNESS:  Some people like to practice
22   way safely.  I try to do what's best for the patient,
23   even if some risk to myself.
24   BY MR RABER:
25       Q.  Is it fair to say that off label

38

1 prescriptions are sometimes necessary in your
2 practice?
3     MS LaMACCHIA: Objection. Form.
4     THE WITNESS: In my view they're necessary,
5 but risky for you from really your standpoint.
6 BY MR RABER:
7   Q. Is it sometimes your best or only option for
8 a patient, in your experience?
9     MS LaMACCHIA: Objection. Form.
10     THE WITNESS: Sometimes it's my better
11 option, rather than bad, yes. It's a question of
12 semantics.
13     MR RABER: I'd like to mark as Exhibit
14 Number 4 the FDA approved label from 2001. Then I'll
15 just ask you a few questions about that.
16     THE WITNESS: What's good one year, it's not
17 good the other, or vice versa.
18     (Exhibit 4 marked for identification)
19 BY MR RABER:
20   Q. You know what, I'm going to, instead of
21 calling this one, Dr Cabada, Exhibit 4, I want to use
22 it, it's already pre-marked and we're doing this for
23 all the cases?
24     We're going to call this defendants
25 Exhibit 3 for the record, okay?

39

1     Dr Cabada, I'm showing you what's been
2 marked as defendants Exhibit 3. Were you --
3     MS LaMACCHIA: I still think it would be
4 appropriate to put a Cabada Exhibit 4 label on it,
5 even if you refer to it as defendants exhibit 3.
6     MR RABER: Okay, if you want to do that for
7 the record, we can. Go ahead and slap that number 4
8 on there, if we can.
9 BY MR RABER:
10   Q. Dr Cabada, I'm going to call this defendants
11 Exhibit 3. Do you recognise defendants Exhibit 3 as
12 a label for the drug Seroquel with a date of January
13 '01?
14   A. Yes.
15   Q. I'd like, if you would, to turn to page 17.
16 Do you see there is a table there that says
17 Treatment-Emergent Adverse Experience Incidence in
18 3-to-6-week Placebo-Controlled Clinical Trials?
19   A. Page 17?
20   Q. Yes, table 1?
21   A. Yes.
22   Q. It refers to certain adverse experiences in
23 placebo-controlled clinical trials?
24   A. Yes.
25   Q. Do you see about two-thirds of the way down

40

1 in that table there's a heading Metabolic and
2 Nutritional Disorders, and then it says weight gain?
3   A. Yes.
4   Q. It says 2 per cent for Seroquel and zero per
5 cent for Placebo, correct?
6   A. Yes, yes.
7   Q. On the same page there's a heading called
8 dose dependency of adverse events, do you see that?
9   A. Yes.
10   Q. Looking at that paragraph under there, does
11 that indicate that weight gain is one of the adverse
12 events that showed a dose dependency?
13     MS LaMACCHIA: Objection. Form.
14     THE WITNESS: Dose-related adverse events,
15 yes.
16 BY MR RABER:
17   Q. Does it say:
18     Logistic regression analyses
19     revealed a positive dose response
20     for the following adverse events:
21     dyspepsia, abdominal pain and weight
22     gain"?
23   A. Which part are you referring to?
24   Q. The last sentence.
25   A. Yes, okay.

41

1   Q. If you turn the page to page 18, do you see
2 there is a paragraph, about two-thirds of the way
3 down, that says weight gain?
4   A. Yes.
5   Q. It says:
6     The proportions of patients
7     meeting a weight gain criterion of
8     greater than or equal to 7 per cent
9     of body weight were compared in a
10     pool of four 3-to-6-week
11     placebo-controlled clinical trials,
12     revealing a statistically
13     significantly greater incidence of
14     weight gain for gain for Seroquel
15     (23%) compared to placebo (6%)."
16     Do you see that?
17   A. Yes.
18   Q. Now, Dr Cabada, this label is from January
19 of 2001, and we see that you prescribed Mr Unger
20 Seroquel for the first in October of 2002, is that
21 correct?
22   A. Yes.
23   Q. Was weight gain a potential side effect that
24 you were aware of when you prescribed Seroquel to
25 Mr Unger for the first time?

42

1    MS LaMACCHIA: Objection. Form.
2        THE WITNESS: Not for Seroquel alone and of
3    itself, but for all atypicals there was growing
4    suspicion that they cause weight gain in some
5    patients, others no. Like you see here, 75 per cent
6    that don't. 77 per cent don't.
7    BY MR RABER:
8        Q. Is it fair to say that you were aware, when
9    you prescribed Seroquel to Mr Unger for the first
10   time, that you were aware of the possibility of
11   weight gain with him?
12       MS LaMACCHIA: Objection. Form.
13       THE WITNESS: Most likely I was.
14   BY MR RABER:
15       Q. Looking at defendants Exhibit 3, if you
16   would turn to page 20? Do you see on page 20 that --
17   do you understand that this is a listing of certain
18   adverse events observed during studies of Seroquel?
19       A. Yes.
20       Q. Do you see there's a section called
21   Metabolic and Nutritional System?
22       A. Yes.
23       Q. If you look in there, under the infrequent
24   events, it lists hyperglycaemia, do you see that?
25       A. Hypoglycaemia, yes.

43

1        Q. Again, this was in the January 2001 label.
2    Were you aware of the potential for hypoglycaemia in
3    prescribing Seroquel to Mr Unger at that time?
4        MS LaMACCHIA: Objection. Form.
5        THE WITNESS: I couldn't recollect.
6    BY MR RABER:
7        Q. All right. Let's look at page 20. Same
8    page, down at the bottom there's a reference to the
9    endocrine system. Do you see that?
10       A. Yes.
11       Q. Do you see where it says infrequent diabetes
12   mellitus?
13       A. Yes.
14       Q. As a prescribing physician, do you
15   understand that this label is indicating that these
16   events have been observed in clinical trials, namely,
17   hypoglycaemia and diabetes mellitus?
18       MS LaMACCHIA: Objection. Form.
19       THE WITNESS: Yes.
20   BY MR RABER:
21       Q. Were you aware of at least the possibility
22   of diabetes as a potential side effect relating to
23   Seroquel when you prescribed it to Mr Unger?
24       MS LaMACCHIA: Objection. Form.
25       THE WITNESS: I don't recollect right now.

44

1    Also, most of the side effects are dose-related and
2    he was on very, very low dosages of the medication,
3    so, you know...
4        If you see the list here, it's a never
5    ending story, and just for one medication. Imagine
6    the list of medications we use and they all have a
7    list comparable to this. So you have to take some of
8    these things with a grain of salt and, since they are
9    dose-related, and I was working a very low dose for
10   Mr Unger, some of these things you have to advise him
11   in terms of the potential of development or the side
12   effect. I advised him in terms of the likelihood of
13   potential, but, if I estimated not to be a likely
14   potential, maybe I don't go over that.
15       Q. But at least you understand from defendants
16   Exhibit 3 that AstraZeneca was reporting data
17   relating to weight gain, hypoglycaemia and diabetes
18   mellitus?
19       MS LaMACCHIA: Objection. Form.
20   BY MR RABER:
21       Q. Correct?
22       A. This was a publication by AstraZeneca at the
23   time?
24       Q. The FDA approved label. AstraZeneca was
25   providing that information, correct?

45

1        A. This publication is from what?
2        Q. If you look at the first page, January 2001?
3        A. This is a publication by AstraZeneca?
4        Q. It's the FDA approved label.
5        A. The FDA proved label?
6        Q. Yes.
7        A. This was for the physicians?
8        Q. Yes, that's the FDA approved label provided
9    for physicians.
10       A. Let me see. These are twenty-five pages
11   mailed to physicians on Seroquel? These are
12   twenty-five pages of Seroquel-related side effects
13   mailed to physicians.
14       How many physicians do you think read
15   twenty-five pages of one medication's potential side
16   effects? Let's be realistic.
17       Q. I understand. Was it your understanding --
18       A. No, no, no, no, let's be clear on this.
19       If a company publishes twenty-five pages of
20   potential side effects, it's to clear their chest
21   because no physician is going to be reading
22   twenty-five pages of potential side effects from a
23   company and take it seriously.
24       Q. Was it your -- you understand that the FDA
25   sets the format for the approved label?

12 (Pages 42 to 45)

50

1  reports where somebody writes about an experience
2  with an individual patient?
3      A. They do in hospitals.
4      Q. Is that something that you rely on, in
5  making your prescription decisions, an individual
6  case report?
7      A. I listen to it. I make my own judgement
8  based on more to do with inputs.
9      Q. When you were working in Florida --
10     A. I do work in Florida still.
11     Q. You still do, okay. When you were
12  physically located in Florida, when your office was
13  there, were there times when you were visited by
14  professional sales representatives from AstraZeneca?
15     A. At that time?
16     Q. Yes.
17     A. Most likely I was. I can recollect.
18     Q. Do you remember any particular AstraZeneca
19  sales representatives who came to visit you when you
20  were there?
21     A. Only if she was a good-looking blond.
22     MS LaMACCHIA: Does that mean you're going
23  to remember me, even though I'm not a sales
24  representative?
25     THE WITNESS: Always. See, I already told

51

1  you I remember someone who looked like you.
2  BY MR RABER:
3      Q. Did you have substantive discussions with
4  those sales representatives when they came to visit?
5      A. Most likely. I had a very large practice,
6  so I was visited by a multitude of reps. Most likely
7  they visited me, but I could not recollect in
8  particular a Seroquel rep.
9      But here he is paying -- for example, they
10  visit me and they do provide me some information.
11  I listen to it but I don't consider a sales rep to be
12  at the level where I can take the information
13  provided seriously.
14     Q. So would it be fair -- let me ask you this,
15  then.
16     When you were actively practicing in Florida
17  and caring for Mr Unger, did the sales
18  representatives for AstraZeneca dictate or influence
19  your prescription decisions in any way?
20     A. No.
21     Q. You made decisions based on your independent
22  medical judgement?
23     A. Yes, discussions with my colleagues. Many
24  times we talk over "How do you like this medication?
25  What experience have you had? So many times we

52

1  discuss it among ourselves what experience we've had.
2      Q. And you don't put the sales representatives
3  in the same category as your fellow doctors, correct?
4      A. I don't. Some people are stupid enough to
5  do it.
6      Q. I'd like to return, if we could, to your
7  progress notes. Those are marked as Exhibit 2. I'd
8  like to pick up on November 12th of 2002. Are you
9  with me?
10     A. Which date? November 12th?
11     Q. November 12th, 2002?
12     A. Go on.
13     Q. This says that he was very beseiged by back
14  pains and moods changes. Do you see that?
15     A. Yes.
16     Q. Can you describe for us what mood changes
17  you were referring to there?
18     A. Probably he was alternating between
19  excitement and depression. Mostly anger. He exuded
20  a lot of anger, if I recollect right. That
21  I remember vividly. He was consumed by anger.
22     Q. It says the case was discussed at length
23  with the patient and wife?
24     A. Mmmm.
25     Q. Do you recall anything about what was

53

1  discussed at that point?
2      A. Yes. I remember that all along -- I'm
3  talking about in general terms, not for that visit in
4  particular.
5      All through the duration of treatment I was
6  trying to bring him more focused on constructive
7  thinking. He was being very destructive in his
8  thinking. As I mentioned before, he was being
9  consumed by anger and paranoia.
10     Q. I noticed on November 12th, 2002 you
11  increased the Seroquel dosage. Do you see that?
12     A. Yes.
13     Q. What was your rationale for doing that then?
14     A. The mood changes, he still was changing
15  moods, and distortion of the thinking process, which,
16  as you see, I did not document.
17     Q. On the next visit, December 10th of 2002, it
18  appears that you discontinued Ativan and started
19  Klonopin. Is that correct?
20     A. Yes.
21     Q. What was the rationale for that?
22     A. Ativan is a benzodiazapine, just like Valium
23  or Sanex. Klonopin is also benzodiazapine. But
24  Klonopin is the most potent of the benzodiazepines.
25  It's also using for what we call a coagulation,

58

1    Q. Is it fair to say that someone who is
2  sedentary can gain weight?
3    A. Yes.
4    MS LaMACCHIA: Same objection.
5    THE WITNESS: And that he was.
6  BY MR RABER:
7    Q. On your note for the visit on March 13th,
8  2003 it says:
9      The patient was seen on follow up
10     visit. Still is very depressed. Is
11     bordering on thought disassociation.
12     No suicidal or homicidal ideas are
13     noted."
14    Do you see that?
15    A. Mmmm.
16    Q. What did you mean there where you say "is
17  bordering on thought disassociation"?
18    A. That his thoughts were about to get -- how
19  do I say? -- the disassociation of thought is when
20  yours thoughts are just not cohesive and they're not
21  following a sequence. That's quite linked to being
22  psychotic. That's a very mild way of saying you're
23  about to go crazy, to put it in layman's terms.
24    Q. That was your impression of Mr Unger at that
25  time?

59

1    A. I was very carefully using words to not get
2  Mr Unger in trouble.
3    Q. And the plan there says "Increase Seroquel
4  100 mg tablets, 1 t.i.d. #90"?
5    A. Correct. That's the number of pills that
6  were in the prescription.
7    Q. What was your reason for increasing the
8  Seroquel dosage at that point in time?
9    A. The thought disassociation.
10    Q. If you turn the page with me, on April 10th
11  of 2003 it says:
12     The patient was seen on follow up
13     visit. Is a little more improved
14     with the current medications."
15    Do you see that?
16    A. Right.
17    Q. Can you describe that improvement for us?
18    A. I think he had responded to the increase of
19  Seroquel that I had done on the previous visit, and
20  that's why probably I chose to increase the Seroquel
21  a little bit more, on that basis.
22    Q. And on April 10th, 2003 it indicates that
23  you increased the dose of Seroquel again, correct?
24    A. Correct.
25    Q. That's because you felt it was working?

60

1    A. Yes.
2    MS LaMACCHIA: Objection. Form.
3  BY MR RABER:
4    Q. Let me ask it again. Why did you make the
5  decision to increase Seroquel on April 10th of 2003?
6    A. Because I thought he was about to go
7  psychotic and his thought disassociation had been
8  there and it had been impacted positively by the
9  increase in medication on the previous visit, so
10  I felt I could still improve him a little more.
11    Q. Jumping down to the note on July 3rd, 2003,
12  you note that he is very beseiged and disabled by the
13  nature of his pains. Can you describe for that us,
14  what you observed?
15    A. Pain was there all along, and that seemed to
16  be a big focus of his attention and his
17  self-perception of being incapable to be gainfully
18  employed.
19    Q. You say that his pain was the one thing that
20  seemed to affect his entire life.
21    A. Yes. He kept revolving around the pain
22  issue, and there was no way I could get him to adapt
23  to the pain or get beyond the pain -- which was a
24  pain.
25    Q. Then on September 4th of 2003 you note:

61

1      Has been doing relatively better.
2      Affect is brighter and is less
3      depressed in general."
4      Can you describe that for us a little more,
5  what you observed.
6    A. On September 4th?
7    Q. Yes.
8    A. Well, it says that he was pretty -- he
9  didn't seem to be so negativistic in that visit. He
10  seemed to be in a better state.
11    Q. Then on the next page, November 4th of 2003?
12    A. November 4th is the last visit I have.
13    Q. That's correct. You note that:
14      He has been under a fair amount of
15      stress. However, has been having
16      some problems with food retention
17      and oversedation."
18      Do you see that?
19    A. Which one?
20    Q. November 4th, 2003?
21    A. I don't have that. The last page I have is
22  September 4th.
23    MR RABER: I'm going to mark another exhibit
24  then. I'm going to mark this next exhibit as
25  Exhibit 5. Is that what we're up to?

16 (Pages 58 to 61)

62

1       COURT REPORTER:  Yes.
2       (Exhibit 5 marked for identification)
3   BY MR RABER:
4       Q.  Dr Cabada, we have marked as Exhibit 5 a
5   document that is almost entirely a duplicate of what
6   we've just been looking at.  It just has one extra
7   page at the end?
8       For the record, it's numbered
9   Runder/socialsecuritydisability/00069 through 76.
10  Specifically, I'd like you to look at the last page
11  of Exhibit 5.
12      A.  What visit?  October 17th?
13      Q.  October 4th.  The very last page, dated
14  November 4th, 2003?
15      A.  November 4th?
16      Q.  The very last page.
17      A.  Yes.
18      Q.  Does this appear to be your last visit with
19  Mr Unger?
20      A.  Yes.
21      Q.  On November 4th of 2003 your progress note
22  says that he has been having some problems with fluid
23  retention and over sedation.  Do you see that?
24      A.  Yes.
25      Q.  What did you attribute the fluid retention

63

1   and over sedation to at that point in time?
2       A.  At that time I reduced the Neurontin.
3   Neurontin causes fluid retention.  And I also
4   decreased the Seroquel to 100 mg three times a day.
5       Q.  What was your thinking that went into
6   decreasing the Seroquel at that point in time?
7       A.  Because he complained of over sedation.
8   Probably at that time he was added some pain killer
9   of some kind because he was taking strong pain
10  killers towards the end.  Sometimes they interfere
11  with my other medicines, and at that time I gave him
12  notification that I was closing my practice.
13      Q.  You closed your practice on December 31st?
14  Effective December 31st, 2003?
15      A.  Yes, I did, and then I came to Spain and
16  live happily ever after.
17      Q.  Can you just tell us, generally, why you
18  decided to close your practice in Florida to move to
19  Spain?
20      A.  Yes.  I developed a stroke about five
21  years and ago, and my doctor said that if I wanted to
22  make it to sixty -- which I did recently -- I had to
23  get off the high horse and live a more sedated life,
24  and I'm doing that.
25      Life in the US is too stressful in the

64

1   medical field.  You have to be right 150 per cent of
2   the time.  There's no margin or tolerance for error.
3       Q.  Has your stroke had any impact on your
4   memory or thought processes?
5       A.  No, it was a pencil-sized stroke.  Very
6   little.
7       Q.  You transferred your patients to Doctor
8   Patricia Ares?
9       A.  Yes.
10      Q.  Did Dr Ares have contact with the patients
11  that she took over before she actually took over?
12      A.  No.  Some.
13      Q.  Some?  Do you know whether she had any
14  contact with Mr Unger while he was still under your
15  care?
16      A.  That I couldn't tell.
17      Q.  Do you recall -- strike that.
18      Did you have any communications or
19  conversations with Dr Ares about your care of
20  Mr Unger?
21      A.  Some patients I did because she sat with me.
22      Q.  Do you recall whether you had such a
23  conversation concerning Mr Unger with her?
24      A.  That I couldn't tell you with honesty.
25      Q.  Have you had any contact at all with either

65

1   Mr Unger or Mrs Unger since you closed your practice
2   effective December 31st, 2003?
3       A.  I don't know if I may have run into her at
4   the hospital to say "Hi".  I may have on one
5   occasion.  I think I gave her a hug on one occasion
6   as I went by there, but I couldn't recollect if that
7   was before I closed or after I closed.  She works in
8   the hospital where I work.
9       Q.  You had a friendly relationship with
10  Mrs Unger?
11      A.  Yes.
12      Q.  Did you have a friendly relationship with
13  Mr Unger?  Or was it more of a patient relationship?
14      A.  He was more of a patient.  With her, yes.
15  She's a very lovely lady.
16      Q.  Do you have any knowledge of Mr Unger's
17  treatment after you closed your practice effective
18  December 31st, 2003?
19      A.  No, none whatsoever.
20      Q.  Dr Cabada, do you know a Dr Rafael Mas?
21      A.  Mas?
22      Q.  Yes, M-a-s.
23      A.  Yes, the cardiologist.
24      Q.  He's a doctor in Miami?
25      A.  Yes.

82

1    current label for Seroquel and the other atypical
2    antipsychotic drugs contains a warning relating to
3    hyperglycaemia and diabetes?
4        A. The current one?
5        Q. Yes.
6        A. From 2001?
7        Q. From after. After 2004?
8        A. Oh, yes, I am aware now that that is the
9    case. I don't remember if in 2001. There was talk
10   in the air but not to the degree of certainty that we
11   all have now.
12       Q. Currently, it's your understanding that
13   there is actually a warning for all the drugs in that
14   class?
15       A. Yes.
16       Q. Relating to hyperglycaemia and diabetes,
17   correct?
18       A. Right.
19       MS LaMACCHIA: Objection. Form.
20       THE WITNESS: But let me clarify something.
21   There have been studies of typical antipsychotics and
22   they start going back over the years, and the
23   incidents of diabetes has been identified in many
24   patients. So it's not like the atypicals. Only
25   typicals are soon going to be in the same club. So

83

1    it's not only going to be the atypical by themselves.
2    BY MR RABER:
3        Q. So it's your understanding, at least, that
4    both the typicals and atypicals have a potential risk
5    of hyperglycaemia and diabetes associated with them,
6    is that correct?
7        MS LaMACCHIA: Objection. Form.
8        THE WITNESS: I stick with that because of
9    the sedation effect and the over weight, also
10   typicals, in my view, don't tend to cause weight
11   gain.
12   BY MR RABER:
13       Q. Has this newer information that's come out
14   affected your prescribing decisions in any way?
15       A. Yes.
16       Q. How so?
17       A. Well, for example, there is a new medication
18   on the market now called Abilify, which is very much
19   devoid of these side effects, and I tend to use it a
20   lot. I haven't had much wrong with it in terms of
21   weight gain or diabetes, so I tend to use it a lot.
22       Q. Are there patients for whom Ability is the
23   best choice, in your experience?
24       A. Yes.
25       Q. Are there patients for whom Seroquel is the

84

1    best choice?
2        A. Yes, but in those patients I keep my eyes
3    like a hawk on them in terms of their weight, their
4    diabetes, and I share that with them and I make the
5    patients very conscious, and their family, that that
6    can happen.
7        Q. Is the same true with respect to Seroquel?
8        A. No, no. Seroquel went on to use the
9    atypical in general and some more than others.
10       Q. So it's an issue or a potential risk that,
11   in your practice, relates to all of those drugs in
12   that class, correct?
13       A. Yes.
14       MS LaMACCHIA: Objection. Form.
15       MR RABER: Dr Cabada, I think at this point
16   I'll hand the ball over to opposing counsel. I don't
17   know if you want to take a quick break right now?
18       THE WITNESS: I'm all yours.
19       MS LaMACCHIA: I think it would be
20   appropriate to take at least a 10-minute break, use
21   the rest room and then come back.
22       (A short recess at 6:40 p.m.)
23       (Resumed at 6:53 p.m.)
24   ///
25   ///

85

1                    CROSS-EXAMINATION
2    BY MS LaMACCHIA:
3        Q. Good evening, Dr Cabada.
4        A. Good evening.
5        Q. My name is Leslie LaMacchia and I represent
6    Richard Unger in his lawsuit against AstraZeneca for
7    the injuries he alleges he sustained as a result of
8    his ingestion of Seroquel. Do you understand that?
9        A. Yes, I do.
10       Q. Do you understand that you are not a party
11   to this lawsuit?
12       A. Yes.
13       Q. And that, even though we took a break and
14   we're back on the record, you understand you are
15   still under oath?
16       A. Yes, I do.
17       Q. Have we ever met before today?
18       A. I don't think so.
19       Q. Have you ever spoken to me over the
20   telephone before today, before meeting in person?
21       A. I spoke to your secretary, I believe.
22       Q. You spoke to my secretary?
23       A. Wasn't it your secretary who spoke?
24       Q. That's just what I want to clarify.
25       At the beginning of this deposition I wasn't

86

1  sure if you were referring to my office or the office
2  of counsel for AstraZeneca?
3      A. No, I spoke to somebody.
4          (To Mr Raber)  Or was it your office?
5      MR RABER:  Are you talking about who
6  scheduled the deposition?
7      THE WITNESS:  Yes.
8      MR RABER:  That was done by somebody that's
9  related to neither one of us.  That's the court
10 appointed office.
11     THE WITNESS:  Oh.  So I am a little ignorant
12 of the whole process, I guess.
13 BY MS LaMACCHIA:
14     Q. That's completely fair.
15         For clarification, then, you didn't speak
16 with anyone at my office before today's deposition,
17 correct?
18     A. No, I guess she wasn't from your office
19 then.
20     Q. We went through the records in which you
21 prescribed Seroquel to Richard Unger beginning in
22 2002.  What were the risks of Seroquel, the risks or
23 the side effects of Seroquel, that you were aware of,
24 associated with Seroquel in 2002?
25     A. There was a concern.  The most were the

87

1  sedation-related side effects in the short term.
2  Also the EPS, the extra pyramidal symptoms, perhaps.
3  And the long-term tardive dyskinesia but that's a
4  very unlikely side effect.
5      Q. So sedation, EPS and tardive dyskinesia.
6  Did you pass those side effects along to Mr Unger?
7      A. Yes, and his wife is also a psychiatric
8  nurse, so she had awareness of that.
9      Q. Did you document any of your discussions
10 regarding the side effects in your records?
11     A. Yes, they are in the psychiatric evaluation.
12     Q. In the very first record?
13     A. Yes, in the first interview.  Not with the
14 Seroquel, I'm sorry.
15     Q. For clarification --
16     A. I had a general one for psychoactive
17 medications.
18     Q. But that was in June of 2002 when you did
19 not begin prescribing Seroquel to Mr Unger?
20     A. No, not until late.  That was general one
21 for psychoactive medications.  Where is the --
22     MR RABER:  It's Exhibit 2.
23     THE WITNESS:  The records, where were they?
24     MR RABER:  It's Exhibit Number 2.
25     THE WITNESS:  This one here, right?

88

1  (Indicating)
2      MR RABER:  Yes.
3      THE WITNESS:  The side effects in general
4  with psychoactive medications were, basically,
5  sedation, the need to stay away from alcohol, falls,
6  caution driving or operating machinery, but not the
7  ones you're referring to.
8  BY MS LaMACCHIA:
9      Q. I didn't understand that.  Say that one more
10 time?
11     A. But not the ones that you're referring to.
12     Q. So when psychoactive medications is used in
13 this form, you're specifically referring to the
14 medications that are listed on this first psychiatric
15 evaluation form, which would have been Paxil and
16 Ativan?
17     A. Correct.
18     Q. But not Seroquel?
19     A. No, ma'am.
20     Q. Did you warn Mr Unger about the risks of
21 weight gain and diabetes before prescribing Seroquel
22 to him?
23     A. No.
24     Q. Is that because you didn't know?
25     A. I did not consider it a likelihood.

89

1      Q. Were you not aware of the risks of weight
2  gain and diabetes associated with Seroquel at the
3  time you first prescribed it to Mr Unger?
4      A. Could you run that by me again?
5      Q. Sure. Is the reason why you didn't discuss
6  the risks of weight again and diabetes associated
7  with Seroquel at the time you first prescribed it to
8  Mr Unger, was it because you weren't aware of them?
9      A. I could not recollect if I was not aware at
10 that time but, had I been aware at that time, I would
11 not think it to be a likely side effect at the
12 dosages I was contemplating on using it.  That
13 I recollect vividly we did not discuss.  I tend to
14 discuss side effects that are likely to occur.
15     Q. So are you saying that you would not have
16 considered diabetes and/or weight gain associated
17 with Seroquel because you were unaware and because of
18 the low dosages you were prescribing?
19     A. No, because I was not aware or not.  I don't
20 recollect the awareness or lack of it at that time,
21 but the likelihood of a side effect would be why it
22 would indicate me to discuss that.
23     Q. Do you recall if weight gain was listed
24 under the warnings section of the package insert or
25 the PDR in 2002?

90

1    A. It must have been because all atypicals tend
2    to produce weight gain.
3    Q. Do you recall if it was listed as a warning?
4    A. I would estimate so.
5    Q. Say that one more time?
6    A. I would estimate so.
7    Q. How about diabetes?  Do you recall if
8    diabetes was listed as a warning in the package
9    insert or the PDR in 2002?
10    A. May have been.
11    MS LaMACCHIA:  This will be Exhibit 8.
12    (Exhibit 8 marked for identification)
13    BY MS LaMACCHIA:
14    Q. Doctor, I just handed you what's been marked
15    as Exhibit 8 to your deposition.  The 2002 PDR for
16    Seroquel.
17    A. Mmmm.
18    Q. Could you explain to me what a PDR is?
19    A. The Physicians Desk Reference.
20    Q. Could you explain to me what a Physicians
21    Desk Reference is?
22    A. It's what it says.  It's a desk reference
23    for the medications for physicians.
24    Q. Would you agree with me that it is a
25    compilation of a medications FDA approved labels?

91

1    A. Yes.
2    Q. Would you have ever referred to the PDR
3    prior to prescribing Seroquel to Mr Unger?
4    A. Pardon me?
5    Q. Would you have ever referred to the PDR
6    prior to prescribing Seroquel to Mr Unger?
7    A. I don't look at the PDR every time I write a
8    prescription, otherwise I'd be reading the PDR all
9    day long.  I probably would not end up writing the
10    prescription.
11    Q. I understand, but would you have ever
12    referenced it?
13    A. Occasionally.
14    Q. Do you ever give your patients a copy of a
15    PDR or a package insert?
16    A. No, that's usually done in the pharmacist.
17    Q. If we were to flip to page 3 of Exhibit 8,
18    in the middle of the second column there's a warnings
19    section in bold, do you see that?
20    A. Warnings, yes.
21    Q. The first warning says Neuroleptic Malignant
22    Syndrome?
23    A. Yes.
24    Q. Then there is a second warning of Tardive
25    Dyskinesia?

92

1    A. Let me get a magnifying thing, because I
2    can't read it.
3    (Magnifying glass found)
4    Where?  Down the line?
5    Q. Correct.  The first warning was Neuroleptic
6    Malignant Syndrome and the second warning was --
7    A. Tardive Dyskinesia.
8    Q. Do you see diabetes or hyperglycaemia or
9    weight gain listed as a warning?
10    MR RABER:  Object to form.
11    THE WITNESS:  (Witness reviewed the
12    document) I don't see it.
13    BY MS LaMACCHIA:
14    Q. Do you remember a few minutes ago, when
15    I asked you if weight gain or diabetes was listed as
16    a warning in the package insert or the PDR in 2002?
17    A. Yes.
18    Q. You said you thought it was?
19    MR RABER:  Objection.  Form.
20    THE WITNESS:  Yes.
21    BY MS LaMACCHIA:
22    Q. I'm sorry?
23    A. Yes.
24    Q. So now you see that it's not listed,
25    correct?

93

1    A. Correct.
2    MR RABER:  Object to form.
3    THE WITNESS:  For clarification purposes, my
4    awareness of things, I don't write the specific date
5    every time I become aware of an issue.  I become
6    aware of issues as time goes by, but I cannot
7    recollect if it was October 3rd, 2002.
8    BY MR RABER:
9    Q. I understand that.
10    A. And some things precede for years the FDA
11    warning.  Some things are in the literature for years
12    before they become in the FDA warning.
13    Q. So are you aware of diabetes and
14    hyperglycaemia listed as a warning now?
15    A. Yes.  I don't tend to just follow it because
16    it's in the PDA.  There is lot of literature that
17    supports it.
18    Q. I understand.
19    A. So we need to be warned, but literature also
20    is not only because it came out by FDA.  Literature
21    covers health for years.
22    BY MS LaMACCHIA:
23    Q. Do you know or were you aware of an
24    association of atypical antipsychotics with an
25    increased risk of diabetes while you were treating

94

1  Mr Unger in 2002 and 2003?
2    A. Can you repeat the questions?
3    Q. Sure. Were you aware of an association
4  between atypical antipsychotics and an increased risk
5  of diabetes while you were treating Mr Unger in 2002
6  and 2003?
7    A. Weight gain, yes. Diabetes, I'm not 100 per
8  cent sure.
9    Q. Were you aware of an association of Seroquel
10  an increased risk of diabetes while treating
11  Mr Unger?
12    A. Seroquel with an increase of diabetes?
13  That's what I just answered.
14    Q. I asked you a general question about
15  atypical antipsychotics. Now I'm you specifically
16  about Seroquel.
17    A. I would answer in the context of atypicals
18  in general.
19    Q. Now I'm asking you about Seroquel.
20    A. I guess I would have to refer in the context
21  of atypicals. I would not consider it in most of
22  them. I don't know if that answers your question.
23    Q. Did an AstraZeneca sales representative ever
24  tell you that weight gain or diabetes was not
25  associated with Seroquel?

95

1    A. If they did, it did not impact me enough to
2  remember. They all come telling me that the
3  medication is the very best and doesn't cause any
4  problems. They all do that.
5    MR RABER: Objection. Move to strike.
6  BY MS LaMACCHIA:
7    Q. Prior to prescribing medication to a
8  patient, do you do a risk benefit analysis?
9    A. Definitely.
10    Q. For the benefit of the jury, what is a risk
11  benefit analysis?
12    A. When you have a goal you want to reach, you
13  want to use the medication that is the most
14  effective, that it gives you the most benefits to the
15  patient with the least detrimental affects upon the
16  patient.
17    Q. And you continue to do risk benefit analysis
18  each time you write a prescription?
19    A. Each time I write a prescription you analyse
20  what you are trying to achieve at the least expense
21  to the patient in terms of side effects, yes. That's
22  the purpose of meeting with the patient; to find out
23  how is the medication impacting them, how you are
24  going to achieve your goals, and how are you going to
25  achieve your goals in a way that it doesn't sedate

96

1  them too much or doesn't give them too many side
2  effects.
3    Q. So each time you weigh the risks that you
4  are aware of versus the benefits you hope to achieve
5  by prescribing that medication, right?
6    A. Run that by me again.
7    Q. Each time you weigh the risks of that
8  medication that you were aware versus the benefits
9  you hoped to achieve by prescribing them, yes?
10    A. Jointly with the patient, because I believe
11  firmly the patient needs to be also part of the
12  decision making process.
13    Q. So it's important to have accurate
14  information about the risks of that drug, correct?
15    MR RABER: Object to form.
16    THE WITNESS: Yes.
17  BY MS LaMACCHIA:
18    Q. Did you ever personally take Mr Unger's
19  weight?
20    A. No.
21    Q. Did you ever physically see his weight go
22  up?
23    A. He looked like he was gaining weight.
24    Q. Was it customary, in your practice in Miami,
25  to take a patient's weight?

97

1    A. No. In psychiatry?
2    Q. Correct.
3    A. No.
4    Q. Is it customary now?
5    A. No.
6    Q. Did you monitor Mr Unger's blood glucose
7  levels?
8    A. No.
9    Q. Did you monitor any of your patients' blood
10  glucose levels who were on atypical antipsychotics?
11    A. No.
12    Q. Do you monitor your patients' blood glucose
13  levels now, those of whom are taking atypical
14  antipsychotics?
15    A. Here in Spain?
16    Q. Yes.
17    A. Patients who are on atypical antipsychotics
18  usually are asked to be monitored by the family
19  doctor because of existing practices here, the
20  patents.
21    In Miami, most doctors tend to follow it
22  themselves, but here what is customary is to make the
23  patient aware of the risk and ask them to have it
24  monitored through the family doctor.
25    Q. You are licensed to practice both here in

98

1  Spain and in Miami, correct?
2     A. Yes, I am.
3     Q. In practicing in Miami --
4     A. I practice in Miami about a month out of the
5  year.
6     Q. How many?
7     A. A month out of the year.
8     Q. A month?  Okay.
9        When you are in Miami practicing, or if you
10  were --
11     A. But I don't do out-patient practice.  I do
12  consulting work in the hospitals?
13     Q. It's going to become difficult for the court
14  reporter to accurately put everything down if we keep
15  having interruptions, so I'll stop trying to talk
16  over you and if you can stop trying to interrupt me,
17  that will be great?
18     A. I'm not trying to interrupt.  I'm just
19  trying to answer what you asked me.
20     Q. When you are practicing in Miami -- and
21  I understand you just do consulting work -- if you
22  prescribed an atypical antipsychotic to a patient
23  there, would you monitor their blood glucose levels?
24        MR RABER:  Object to form.
25        THE WITNESS:  It's usually in the hospital

99

1  that I do it, so they're almost monitored weekly at
2  the very least, in general, so they are highly
3  monitored and I'm following their blood work, so it's
4  a different scenario all together.
5  BY MS LaMACCHIA:
6     Q. Why do you do that?
7     A. Pardon?
8     Q. Why do you do that?  Why do you monitor the
9  blood group cells?
10     A. Atypicals?
11     Q. Right.
12     A. I look at it.  Make sure it doesn't go up.
13     Q. What would be the consequence of an elevated
14  blood group?
15        MR RABER:  Object to form.
16        THE WITNESS:  The development of diabetes.
17  BY MS LaMACCHIA:
18     Q. What type of impact would diabetes or
19  elevated glucose levels have on a person's life?
20        MR RABER:  Objection to form.  No
21  foundation.
22        THE WITNESS:  Elevation of glucose levels
23  can be transitory, not necessarily diabetes.
24  BY MS LaMACCHIA:
25     Q. So what type of impact would a diabetes

100

1  diagnosis have on your patients' lives?
2        MR RABER:  Objection to form.  No
3  foundation.
4        THE WITNESS:  If there's a radical change in
5  anybody's life, you have to adjust to the medication,
6  get informed on the medication and learn how to
7  manage it.
8  BY MS LaMACCHIA:
9     Q. Would a person who has been diagnosed with
10  diabetes be at a greater risk for heart disease?
11     A. Yes.
12        MR RABER:  Object to form.
13  BY MS LaMACCHIA:
14     Q. Would a person who has been diagnosed with
15  diabetes be at a greater risk for kidney disease?
16     A. Yes.
17        MR RABER:  Object to form.
18  BY MS LaMACCHIA:
19     Q. Would a person who has been diagnosed with
20  diabetes be at a greater risk for a nervous system
21  disease?
22     A. Yes.
23        MR RABER:  Object to form.
24  BY MS LaMACCHIA:
25     Q. How about a greater risk for a stroke?

101

1     A. Yes.
2        MR RABER:  Object to form.
3  BY MS LaMACCHIA:
4     Q. Would a person who has been diagnosed with
5  diabetes be at a greater risk for amputations?
6        MR RABER:  Object to form.
7        THE WITNESS:  Yes.
8  BY MS LaMACCHIA:
9     Q. How about blindness?
10     A. Yes.
11        MR RABER:  Object to form.
12  BY MS LaMACCHIA:
13     Q. Would you consider diabetes to be a serious
14  disease?
15     A. Yes.
16        MR RABER:  Object to form.
17  BY MS LaMACCHIA:
18     Q. In your opinion, can diabetes lead to death?
19        MR RABER:  Object to form.
20        THE WITNESS:  The average diabetes shortens
21  your life span about ten years, and some
22  complications of diabetes, that can kill you.
23        I'm a diabetic myself so I'm aware of that
24  very well.
25  BY MS LaMACCHIA:

26 (Pages 98 to 101)

102

1      Q. Would you agree with me that diabetes is
2  something that should be avoided or --
3      A. It's not a blessing illness to have.
4      MR RABER: Object to form.
5  BY MS LaMACCHIA:
6      Q. What percentage of your patients are
7  diabetic?
8      A. I couldn't tell you without looking. It's a
9  significant percentage.
10     Q. More than 50 per cent?
11     A. No. But all of them who are there waited
12  before they met me, okay?
13     Q. Okay. What percentage of your patients in
14  Miami, if you can recall, were diabetic? More than
15  50 per cent?
16     A. In Miami? Probably a higher percentage
17  there. I didn't keep figures, but I could only give
18  you rough estimates. Probably 25 per cent maybe.
19  BY MS LaMACCHIA:
20     Q. How many?
21     A. Maybe about 25 per cent, because I dealt
22  with a very aged population. Very many were elderly.
23  I did a lot of geriatrics.
24     Q. Had you been aware that there was a
25  confirmation of on association between Seroquel and

103

1  blood glucose disregulation prior to and during the
2  time you were prescribing Seroquel to Mr Unger, would
3  you have monitored his blood glucose?
4      MR RABER: Object to form.
5      THE WITNESS: Yes.
6  BY MS LaMACCHIA:
7      Q. Why would you have done that?
8      A. To keep an eye on him. Probably I wouldn't
9  on an antipsychotic -- an atypical, I'm sorry.
10     Q. Do you ever recall having a conversation
11  with Mr Unger about diabetes and Seroquel?
12     A. No.
13     Q. When prescribing Seroquel to Mr Unger, did
14  AstraZeneca ever tell you or provide you with
15  information that they had a confirmation of an
16  association or relationship between Seroquel and
17  diabetes or blood glucose disregulation in 2002?
18     MR RABER: Object to form.
19     THE WITNESS: If they did, I could not
20  recollect. I was visited often by lab
21  representatives and I couldn't remember all that.
22  BY MS LaMACCHIA:
23     Q. If AstraZeneca had a confirmation of such
24  association in 2002, would that have been important
25  for you to know?

104

1      MR RABER: Object to form.
2      THE WITNESS: Yes.
3  BY MS LaMACCHIA:
4      Q. Why would that have been important for you?
5      A. I think the question itself says it all.
6      Q. Would it have been important to you in your
7  treatment and care of Mr Unger to know if the
8  medication you were prescribing him would cause
9  weight gain, elevated glucose levels and diabetes?
10     MR RABER: Object to form.
11     THE WITNESS: Yes, but I would not only take
12  the lab warning. I would go and look then at
13  different sources of information, but I think if the
14  lab was telling me that I would take it with a lot
15  more caution.
16  BY MS LaMACCHIA:
17     Q. Lab you mean?
18     A. AstraZeneca.
19     Q. Oh, so when you say the word "lab," you're
20  referring to AstraZeneca?
21     A. The medical lab.
22     Q. Okay. If AstraZeneca had a confirmation of
23  an association between Seroquel and diabetes and
24  didn't disclose that to you as a prescribing
25  physician, might that have changed your prescribing

105

1  habits of Seroquel to Mr Unger in 2002 and 2003, had
2  you known that?
3      MR RABER: Object to form.
4      THE WITNESS: Yes.
5  BY MS LaMACCHIA:
6      Q. How so?
7      A. Well, the first law of medicine is first do
8  no harm. And if you need to run a risk, you need to
9  first find an alternative that is less risky, second
10  of all if you're going to really run the risk in
11  spite of it, the patient needs to be very much aware
12  that you're running a risk, and then you have to do
13  whatever you need to do to minimise the risk.
14     Q. Had that association been disclosed to you
15  during the course of treating Mr Unger with Seroquel,
16  would you have passed that type of information along
17  to him?
18     MR RABER: Object to form.
19     THE WITNESS: Yes.
20  BY MS LaMACCHIA:
21     Q. Because, ultimately, it's a patient's choice
22  or decision to take a medication, correct?
23     A. Correct.
24     Q. So the more information that you give them
25  about the risks and/or benefits associated with that

27 (Pages 102 to 105)

150

1    MR RABER: Object to form.
2  BY MS LaMACCHIA:
3    **Q. In the packet insert?**
4    MR RABER: Object to form.
5    THE WITNESS: I heard they reduced the PDR
6  because they were worthless.
7  BY MS LaMACCHIA:
8    **Q. But you also understand the PDR to be --**
9    A. It's an excellent source for toilet paper,
10  if you asked me.
11    **Q. But you understand the PDR to be a**
12  **compilation of the FDA approval labels, the FDA**
13  **approved labels for drugs, correct?**
14    A. It has no use for practicing on a daily
15  basis.
16    **Q. I understand that, but you do understand or**
17  **do you understand that the PDR is a compilation of**
18  **the FDA approved labels of the medications?**
19    A. Yes, but most physicians don't use it any
20  more.
21    **Q. Doctor, are you an epidemiologist?**
22    A. A what?
23    **Q. An epidemiologist?**
24    A. Psychiatrist.
25    **Q. Are you an epidemiologist?**

151

1    A. No.
2    **Q. Are you a pharmacologist?**
3    A. No.
4    **Q. Are you holding yourself out to be a medical**
5  **expert as you sit here today?**
6    A. Psychiatrist. Just plain psychiatrist.
7    **Q. Are you being paid to be here today?**
8    A. I am paid for my -- I hope I am paid for my
9  professional time here.
10    **Q. How much are you being paid?**
11    A. Well, I'm charging $500 an hour. They can
12  pay me Euros, if they choose to.
13    **Q. Do you know who is paying you?**
14    A. I hope so these guys will pay me.
15    **Q. When you point to these guys, who are you**
16  **referring to?**
17    A. They representatives for AstraZeneca.
18  I thought it was you but now they told me it was
19  them.
20    MR RABER: I think you're creating the wrong
21  impression here by suggesting that we're paying for
22  his testimony.
23    MS LaMACCHIA: He just stated AstraZeneca.
24    MR RABER: Well, this is all set up through
25  the PMO and the court-appointed process, and I object

152

1  to any implication that AstraZeneca is paying him
2  anything.
3    THE WITNESS: No, no, no, not AstraZeneca.
4  The law firm that represents AstraZeneca.
5    MR RABER: And I also object to the
6  characterisation or suggestion that lawyers for
7  AstraZeneca are compensating him in a way that
8  plaintiffs are not, because these deposition are all
9  being set according to the PMO and the procedures
10  outlined by the court.
11    THE WITNESS: Well, I hope somebody does pay
12  me.
13    MR RABER: You'll get paid, Doctor.
14    THE WITNESS: Can I go for one second to the
15  bathroom?
16    MS LaMACCHIA: Sure, because I'm basically
17  done. I might have a few follow-ups.
18    MR RABER: Okay.
19    (A short recess at 8:26 p.m.)
20    (Resumed at 8:31 p.m.)
21  BY MS LaMACCHIA:
22    **Q. Doctor, while you were treating Mr Unger,**
23  **you had prescribed him Paxil, quetiapine and**
24  **Neurontin as well, correct?**
25    A. Correct.

153

1    **Q. I believe you testified earlier that one of**
2  **the side effects of Neurontin was sedation and water**
3  **retention?**
4    A. Correct.
5    **Q. Can water retention or fluid retention**
6  **precipitate the onset of diabetes?**
7    A. It can cause weight gain, and weight gain is
8  associated with diabetes.
9    **Q. How does water retention cause weight gain?**
10    A. Wait a second, let me just think.
11    The body is composed highly of water, and if
12  you have water on you the more water you have the
13  more weight you get, so the more weight you have the
14  higher your likelihood of getting more weight and
15  diabetes by itself. But water, in itself, doesn't
16  cause diabetes. It is just the weight gain.
17    **Q. Do you know if any of these medications --**
18  **Paxil, quetiapine and Neurontin are associated with**
19  **diabetes?**
20    A. Not to my knowledge. Being obese is
21  associated with diabetes.
22    **Q. Would you agree with me that just because**
23  **you are obese does not necessarily mean that you will**
24  **get diabetes?**
25    MR RABER: Object to form.

154

1  THE WITNESS: No. I mean, there are obese
2  people who do not suffer diabetes.
3  BY MS LaMACCHIA:
4  Q. Have you ever been paid any money or been
5  given anything of value by AstraZeneca in connection
6  with Seroquel or any other drug that they
7  manufacture?
8  A. No.
9  Q. Have you ever been a speaker for
10  AstraZeneca?
11  A. No.
12  Q. Have you ever received any honoraria?
13  A. By AstraZeneca?
14  Q. Yes.
15  A. No.
16  Q. Have you ever acted as a preceptor?
17  A. No.
18  Q. Do you recall in July of 2002 on two
19  occasions, July 8th and then July 22nd, acting as a
20  preceptor for two AstraZeneca sales representatives
21  at Mercy Hospital?
22  A. No. Preceptor? What is that?
23  Q. A preceptorship where the AstraZeneca sales
24  representative is allowed to come in and spend the
25  day with you, and you get paid for acting s a

155

1  preceptor by AstraZeneca?
2  A. I don't recollect.
3  Q. Have you ever been to any dinners sponsored
4  by AstraZeneca?
5  A. I may have.
6  Q. Do you ever recall speaking in Quarry Gables
7  Florida in August on two occasions in August 2002?
8  I'm sorry, they weren't in Quarry Gables. One was in
9  Tampa and the other one was in Philadelphia?
10  A. Tampa and Philadelphia? No. I've never
11  been to Philadelphia, only to visit my daughter who
12  was in college there.
13  Q. Doctor, let me represent to you that, as
14  part of this litigation, AstraZeneca provides us with
15  information as a part of the discovery programme
16  regarding the connotes of sales representatives that
17  have come to visits you and any speaker fees or
18  honoraria that AstraZeneca has paid to you.
19  I will represent to you that you did act as
20  a preceptor in July of 2002, and you were paid for
21  acting as a preceptor. And then, again, in August of
22  2002 you were paid to speak on behalf of AstraZeneca.
23  But you don't recall that, right?
24  A. I gave various lectures in Miami to
25  different labs, but cannot recollect exactly which

156

1  labs. It's very difficult for me to remember
2  precisely one lab.
3  I have given various lectures in Miami, but
4  I don't keep a tab of which labs I have spoken for
5  but, remembering, for example, some labs I spoke for
6  more frequently.
7  Q. When you say labs you mean?
8  A. Medical labs. But if I did, I could not
9  remember it.
10  Q. Have you ever --
11  A. But Tampa and Philadelphia, never in my
12  life. That I tell you for sure, sure, a hundred per
13  cent.
14  I do have a cousin who is a surgeon in Miami
15  who has the same last name, and he has lectured -- he
16  may have lectured, but not me. In Tampa for sure or
17  Philadelphia, I've never been lecturing.
18  Q. Did you ever live at 555 Biltmore Way --
19  A. That was my offices.
20  Q. In those lectures that you gave, did you
21  ever give a lecture about Seroquel?
22  A. As a principle, I have never lectured on a
23  specific medication. I have refused always to do
24  that.
25  I have mentioned a medication on occasion

157

1  while giving a lecture on a particularly related if
2  I found that that medication was advantageous. But
3  specifically on a medication, I don't, because I am
4  totally against that.
5  Q. When AstraZeneca sales representatives came
6  to your office, have they ever provided to you or
7  your staff lunch?
8  A. I could not remember. You know, people
9  would come to my office and bring pies to the
10  secretaries or sometimes bring a lunch to the
11  secretaries but I couldn't remember that. It's too
12  many times for me to remember who did that.
13  Q. Do you recall an AstraZeneca sales
14  representative ever helping you with your patient
15  history forms?
16  A. Let me check one thing. One of the labs
17  offered to print this for me (indicating) but
18  I couldn't even remember which lab it was. My
19  psychiatric evaluation forms. One of the labs
20  offered to print them for me, but I thought it was
21  the Paxil rep. If it was the AstraZeneca, I would
22  not remember.
23  Q. You don't remember an AstraZeneca
24  representative by the name of Christina Shuford?
25  They call her Chris.

158

1    A. There were so many of them, I couldn't keep
2  track.
3       Look, I had a very large practice in Miami
4  so they were all trying to get on the better side of
5  me, so they were constantly trying to do things for
6  me and I couldn't remember which ones were which.
7       I know one lab did help me with the printing
8  of my psychiatric evaluations, but some other lab did
9  print medical cards for me. Those were little token
10 things, but I don't remember who did what.
11      Q. I'm going to wrap this up but, as a
12 physician who was prescribing Seroquel to Richard
13 Unger, and still prescribes Seroquel on a limited
14 basis in your practice now, did AstraZeneca ever tell
15 you that they had a confirmation of an association
16 between diabetes and impaired glucose disregulation
17 and Seroquel in 2002?
18      MR RABER: Object to form.
19      THE WITNESS: No.
20 BY MS LaMACCHIA:
21      Q. Would you have wanted to know that?
22      A. Yes.
23      MR RABER: Object to form.
24 BY MS LaMACCHIA:
25      Q. Based on everything I have shown you today,

159

1  Exhibits 9, 10, 11 and 12, do you think you were able
2  to do an informed risk benefit analysis when
3  prescribing Seroquel to Richard Unger?
4       MR RABER: Object to form.
5       THE WITNESS: Well, in the absence of
6  concrete information about the diabetes, I don't know
7  how I would follow that category.
8  BY MS LaMACCHIA:
9       Q. I'm not understanding your answer. I'm
10 sorry.
11      A. I don't think I had all the elements to
12 follow the category of a totally informed person.
13      Q. But had you had all that information --
14 strike that.
15      Do you think if you had all the information
16 that I've presented to you here today you would have
17 been able to do an informed risk benefit analysis
18 when prescribing Seroquel to Mr Unger?
19      A. No.
20      MR RABER: Object to form.
21 BY LaMACCHIA:
22      Q. If you had had this information that
23 I've shown you today available to you at the time you
24 first prescribed Seroquel to Mr Unger, or throughout
25 the course of his treatment of Seroquel, would you

160

1  have passed this type of information along to him had
2  you had it?
3       A. Yes.
4       MR RABER: Object to form.
5       THE WITNESS: If I knew then what I know
6  now, like the saying goes.
7  BY MS LaMACCHIA:
8       Q. So do you know more about Seroquel today,
9  having sat through this deposition, than you did
10 before we started?
11      A. I wish I didn't.
12      Q. But do you?
13      A. There are more pleasant ways of knowing it.
14      Q. But do you know more today than you did
15 about Seroquel than when we started?
16      A. Than in 2000, yes. Than what I know now,
17 no.
18      I mean, I've been more aware since with
19 atypical antipsychotics. As of late -- you know,
20 every day you come across more information as you
21 read the -- you know, with the computers now, I am so
22 strapped of some services; they're always giving me
23 the very latest. So it's very easy now to keep up to
24 date with a computer.
25      In 2000 I didn't even have a computer that I

161

1  could use on my own. My secretaries had the
2  computers, but I did not use a computer himself.
3       MS LaMACCHIA: Those are all my questions.
4       MR RABER: I'll try and wrap this up if I
5  can.
6  ///
7  ///
8  ///
9  ///
10 ///
11 ///
12 ///
13 ///
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///