# EXHIBIT  1

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation

MDL DOCKET NO. 1769

This Document Relates to:

| | |
|---|---|
| Linda Guinn | 6:07-cv-10291 |
| Janice Burns | 6:07-cv-15959 |
| Richard Unger | 6:07-cv-15812 |
| Connie Curley | 6:07-cv-15701 |
| Linda Whittington | 6:07-cv-10475 |
| Eileen McAlexander | 6:07-cv-10360 |
| David Haller | 6:07-cv-15733 |

---

### AFFIDAVIT OF PAUL M. DEUTSCH Ph.D. CRC, CCM, CLCP, FIALCP

THE STATE OF FLORIDA      §
                                    §
COUNTY OF  Seminole      §

       BEFORE ME, the undersigned authority on this day personally appeared Paul M.

Deutsch, known to me to be a credible person over the age of 18 years, who being by me first

duly sworn, did depose and say that the following is true and correct:

1.        "My name is Paul M. Deutsch.  I am over 21 years of age, have never been convicted of a

crime, and am fully competent to testify.  I have personal knowledge of the facts to which I

testify herein.  The purpose of this affidavit is to explain the methodology I utilized to reach my

opinions in this case, to explain why that methodology and those opinions are reliable, and to

respond to the criticisms leveled at my opinions in "Astrazeneca's Motion and Supporting

Memorandum Under Daubert and Federal Rules of Evidence 702, 401 and 403 to Exclude or

Limit Testimony of Paul Deutsch and Frederick Raffa" (hereinafter "Defendant's Motion").

Exhibit A-1 attached hereto is a true copy of my CV, and everything on it is true and accurate.

### *My Role in the Case*

2.      "My role as an expert in this case was to "cost out" the future care the Plaintiffs would

need as a result of their diabetes, but not to opine that Seroquel caused the diabetes or to offer

medical opinions regarding the Plaintiffs' condition.  As part of this role, however, I did offer

opinions regarding the non-medical goods and services the Plaintiffs will in all probability need

as a result of their diabetes.  As discussed below, through my education, training and experience,

I have specialized knowledge beyond that possessed by a layman regarding the non-medical

goods and services needed by people with diabetes, such that I can reliably opine on that subject.

In fact, my education, training and experience has provided me with specialized knowledge of

even the medical goods and services generally needed by patients with diabetes, as explained

below.  However, in this case I have relied on other sources to determine what medical goods

and services these Plaintiffs will probably need, and have only relied on my own specialized

knowledge to the extent it enabled me to reliably analyze and evaluate these other sources, which

included the Plaintiffs' medical records; the Plaintiffs' treating physicians' responses to a

questionnaire I formulated and sent to them; published and well accepted clinical practice

guidelines for the relevant medical conditions; and published and peer-reviewed medical

literature.

3.      "In this case, I prepared a "rehabilitation plan" for each of the Plaintiffs.  A rehabilitation

plan is simply a derivative of a "life care plan," but is prepared for a person with a non-

catastrophic injury or medical condition.  A rehabilitation plan is designed to set forth the

recommended medical and non-medical goods and services that the patient will in all reasonable

rehabilitation probability require as a result of the patient's condition, and to provide the probable cost of these goods and services, within the patient's home region, over the period of time into the future that the patient will probably need them. A rehabilitation plan includes both medical elements (such as medical tests and visits, injections, medications, etc.) and non-medical elements (such as supplies, nutrition, psychological assistance, occupational and speech therapy, rehabilitation and case management).

### *My Qualifications*

4.      "I will not repeat in this affidavit the information on my CV, but simply incorporate that information herein. However, as a Board Certified Life Care Planner, Board Certified Rehabilitation Counselor, and Board Certified Case Manager with a masters degree in Rehabilitation Counseling and a Ph.D. in Counseling Psychology with an emphasis in Rehabilitation Psychology and over 36 years of experience in the field (including authoring 14 books and 95 journal articles and contributed Chapters relating to life-care planning, rehabilitation planning, case management, and related subjects, including "A Guide to Rehabilitation Counseling," a three-volume treatise covering the major medical, psychological, case management and vocational rehabilitation implications for each disability listed in the "AMA Guide to Permanent Impairments"), I have extensive specialized knowledge about the non-medical goods and services (including case-management and nutrition) that persons with catastrophic and non-catastrophic medical conditions (including diabetes) require. In fact, through my 36+ years of experience preparing life-care and rehabilitation plans and my 20+ years of experience providing case management services to persons with catastrophic injuries and chronic medical conditions, I have gained specialized knowledge of even the medical goods and services such persons typically need. Of course, as a non-physician, I cannot diagnose a

condition or illness, and I prefer to defer to other sources, such as physicians and published medical literature or clinical practice guides to determine what medical goods and services a specific patient will likely need, and to determine whether a particular patient will probably develop a specific medical complication.  Nevertheless, my education and training has included extensive instruction in the medical aspects of disability and chronic medical conditions, including diabetes, such that I do have specialized knowledge, beyond that possessed by a layman, of many of the medical goods and services typically needed by patients suffering from particular disabilities and chronic medical conditions, including diabetes.  Indeed, every day in my practice, I prepare life-care and rehabilitation plans that include these medical elements by working closely with treating health-care providers and consulting physicians, and by researching and consulting published medical literature and clinical practice guidelines.  Further, in my daily practice, this consultation with physicians and other health-care professionals is not limited to the health-care professional dictating to me what medical treatment to include in my plan.  Instead, it is a much more cooperative and collaborative process, although the health-care professional obviously has the "final say" with respect to medical treatment in the event of a disagreement.  Nevertheless, because of my education and experience, and the specialized knowledge I have gained about the medical goods and services needed by patients with disabilities and chronic medical conditions, it is quite common for me to actually be the motivating or initiating source for the inclusion of particular medical care in the plan, subject to being overridden if the physician disagrees.

5.      "Defendant is wrong when it claims that I had inadequate experience with diabetes to prepare the rehabilitation plans that I prepared in this case.  Although I had not previously prepared a rehabilitation plan that *exclusively* addressed the care necessitated by diabetes (as the

rehabilitation plans that I prepared for the Plaintiffs did), I have had many cases — probably over 200 — that included diabetes as one of the conditions for which care was included in the rehabilitation plan, and as such I had specialized knowledge about the care necessitated by diabetes when I prepared my rehabilitation plans in this case.

6.     "Likewise, I have prepared life-care and rehabilitation plans for hundreds of patients with mental disorders, both pre-existing and resulting from the onset of a range of catastrophic disabilities, including but not limited to traumatic brain injuries, spinal cord injury and multiple amputations.  In fact, I have a B.A. in Psychology and a Ph.D. in Counseling Psychology, and have been a Licensed Mental Health Counselor for over 25 years.  Mental health is a fundamental part of my practice.  Through this training, education and experience, I have acquired specialized knowledge, beyond that possessed by a layman, about the medical and non-medical goods and services needed by persons with mental disabilities like those afflicting the Plaintiffs, and how such mental disabilities interact with physical and medical conditions, including diabetes, to impact the medical and non-medical goods and services needed by the patient.  Thus, I have sufficient specialized knowledge in the relevant fields to prepare a reliable rehabilitation plan for a person with a mental disorder and the other medical conditions suffered by the Plaintiffs, and my opinions expressed through my rehabilitation plans in this case will be helpful to the jury.

### *My Methodology*

7.     "In preparing the rehabilitation plans for the Plaintiffs in this case, I utilized a published, well accepted, reliable methodology that is used by life-care and rehabilitation planners every day in both the litigation and non-litigation context.  Although one step in this methodology was to apply my specialized knowledge gained through my education and 36+ years of experience in

life-care and rehabilitation planning to the underlying data, my opinion is not purely subjective, and it is not a result of my simply asking anyone to believe it "because I say it is so." Instead, it is a testable methodology, in that another life-care or rehabilitation planner — or for that matter a physician or other qualified expert — could examine the same underlying data that I examined and apply his own clinical judgment to determine whether he agrees or disagrees with me, and would have adequate data and information about my analysis to make that independent assessment.

8.      "The methodology that I utilized in this case is actually the same methodology that I outlined in my published works "A Guide to Rehabilitation" and "Introduction to Life Care Planning." "A Guide to Rehabilitation" is a three-volume text book, and it is impractical to attach it hereto. But I have attached hereto as Exhibit A-2 a true and correct copy of "Introduction to Life Care Planning," which has been accepted and is going to be incorporated as a chapter in a future publication.

9.      "As noted in "Introduction to Life Care Planning," the very definition of a life-care plan (of which a rehabilitation plan is simply a derivation) is "[a] consistent methodology for analyzing all of the needs dictated by the onset of a catastrophic disability through to the end of life expectancy. Consistency means that the methods of analysis remain the same from case to case and does not mean that the same services are provided to like disabilities." This methodology involves deliberately and methodically collecting, organizing, evaluating, and interpreting patient-specific information to identify the patient's circumstances in order to determine what nursing/attendant care needs, equipment requirements, maintenance levels of therapy, and other medical and non-medical goods and services are required as a result of the patient's condition and to identify preventative measures that can be applied in an effort to

thwart potential medical complications, incongruencies in care, inappropriate equipment/supply recommendations, and unrealistic rehabilitation programs.

10.     "The methodology requires the rehabilitation planner to construct the plan on the basis of four foundations:  medical, rehabilitation, case management, and psychological.  The determination of what goods and services should be included in each area is determined by gathering, organizing and analyzing the data relating to the patient's medical condition and needs through the application of the rehabilitation planner's specialized knowledge to the information acquired from the underlying data.  The rehabilitation planner has a number of sources of data available, including (i) the patient's medical records; (ii) interviews with the patient and/or his family or care-giver; (iii) direct input from the treating physicians or other health-care providers; (iv) medical and psychological testing; (v) clinical practice guidelines and (vi) published research literature.  While it is not always necessary for the rehabilitation planner to consult every one of these sources, he should gather as much information as necessary to determine, in reasonable probability, what goods and services the patient will need as a result of his condition.

11.     "Once the rehabilitation planner has gathered the relevant data, he must systematically organize it and then analyze it by utilizing his specialized knowledge and experience.  Specifically, the rehabilitation planner must utilize his specialized knowledge of the physical and psychological consequences of the patient's disability or condition and the long-term care requirements necessitated by those physical and psychological consequences to determine the goods and services that will likely be needed as a result of the patient's condition.  The rehabilitation planner has four resources available to determine the patient's medical needs:  (i) treating or consulting health-care providers, (ii) the patient's medical records, (iii) published clinical practice guidelines; and (iv) published research literature.  These sources are also

available for determining the patient's non-medical needs, in addition to the rehabilitation planner's own specialized knowledge of what patients with similar conditions require. By utilizing these sources and applying his specialized knowledge and expertise, the qualified rehabilitation planner can provide a reliable outline of the medical and non-medical goods and services the patient will probably need as a result of his condition.

12.     "Of course, the methodology calls for and permits the individual rehabilitation or life-care planner to exercise his own clinical judgment based on the specific facts and circumstances of the individual case, and the fact that it does so does not make the methodology unreliable, so long as the rehabilitation planner is competent and exercises his judgment within the confines of this methodology. Indeed, a methodology that eliminated the exercise of independent clinical judgment by a competent rehabilitation planner would itself be less reliable, because it would not account for the individual circumstances of each case. For this reason, the rehabilitation or life-care planner's experience and qualifications are a very significant element of the reliability of his plan. Finally, the rehabilitation planner can "cost out" the necessary goods and services by researching the cost of such goods and services in the geographic community in which the services will be utilized.

13.     "The foregoing methodology is the methodology that is utilized by life-care and rehabilitation planners in both the litigation and non-litigation context every day all over the country, which is taught in graduate rehabilitation planning and life-care planning programs in American colleges and universities, and which is outlined in published and peer-reviewed texts and articles accepted as reliable in the field. Indeed, I myself have authored peer reviewed literature outlining this methodology, and have taught it in graduate level courses in life-care and

rehabilitation planning at the University of Florida, Louisiana State University, and Kaplan University.

14.     "I follow this same methodology in the litigation and non-litigation context, and followed this methodology in developing my opinions in this case. Specifically, I gathered the Plaintiffs' relevant medical records, had my R.N. and Social Worker systematically review and organize them, and then reviewed them carefully myself to determine the Plaintiffs' treatment regimens; their identified problems and complications; the medications that had been tried, and which had been successful and which had been eliminated; any anticipated changes in treatment; any anticipated onset of complications; any issues in management related to patient behavior; any family dynamics or behavioral issues; and any other information that may be meaningful to me in determining the patient's future needs. My staff performed an initial intake interview with the Plaintiffs, and then I performed a more detailed clinical interview with the Plaintiffs about their history, condition and complaints and administered various psychological tests. I and my staff then performed research into the applicable clinical practice guidelines and medical literature to inform my opinions. This research helps ensure that we are addressing all the issues that need to be addressed in light of the patient's condition and points us to any additional information we need to seek from the treating physicians. My staff and I then formulated questionnaires to the treating physicians to gather additional pertinent medical information about the Plaintiffs. In analyzing the data and formulating my opinions, I applied my expertise in rehabilitation, the medical aspects of disability, the rehabilitation aspects of disability and health care conditions, the long-term psychological impact of these conditions, the long-term care and support necessitated by these conditions, and case-management. In determining the cost of the modalities of treatment included in the rehabilitation plans, I accounted for the geographical

location in which the Plaintiffs would be receiving the goods or services, and searched for the lowest reasonably available cost for these services in those locations.

15.      "The application of this methodology in this case yielded reliable rehabilitation plans for the Plaintiffs.  The medical records, physicians' recommendations, clinical guidelines, medical literature, and my specialized knowledge of the types of goods and services generally needed by patients with diabetes and the effect that the other conditions from which the Plaintiffs suffer have on a patient's capabilities and capacity to comply with medical recommendations supported the recommendations I made in my rehabilitation plans in this case.  I would have approached these rehabilitation plans in the same way and utilized the same methodology had this case been in the non-litigation context, such as if a treating physician, insurance company or hospital had requested that I develop a rehabilitation plan for these Plaintiffs.

### Response to Defendant's Criticisms

16.      "Defendant generally complains that I included goods and services in my rehabilitation plans for these Plaintiffs that were not recommended by a physician, or that a physician did not determine were "solely" the result of diabetes.  My rehabilitation plans in this case project "the economic consequences of the [Plaintiffs'] diabetes into the future," so I eliminated any expenses due soley to the Plaintiffs' preexisting conditions, i.e., expenses the Plaintiffs would have incurred anyway even if they had not developed diabetes.  Of course, as explained above, I have sufficient specialized knowledge to reliably predict, with reasonable probability, the non-medical expenses the Plaintiffs will need as a result of their diabetes.  But I did not make any unilateral decisions to *include* as a cost item any particular modality of *medical* treatment that was attributable to a Plaintiff's pre-existing condition.  Instead, I relied on the treating physicians' records and responses to my questionnaire, clinical practice guidelines and medical literature to

determine what medical costs should be included because they related to diabetes, and which

costs should be excluded because they were not related to diabetes, and were related solely to

preexisting conditions.  I will address the specific items in the rehabilitation plans that Defendant

criticizes below.

17.     "I examined sufficient foundational data to reliably prepare the rehabilitation plans in this

case, even though I did not personally request all of the Plaintiffs' medical records directly from

their treating health-care providers.  There was no need for me to examine every medical record

ever generated in the care of these Plaintiffs in order to reliably prepare my rehabilitation plans

in this case.  I asked for all of the relevant medical records, and received a large volume of them,

which I thoroughly reviewed and summarized in the plans.  During this review, and also through

my interviews with the Plaintiffs and written communications with the physicians, I also

independently assessed whether there were any omissions in the records that I could detect from

the totality of the information gathered.  I did not detect any obvious omissions.  Thus, I had

adequate foundational data to reach a reliable opinion in this case, and in fact would have relied

on the very same foundational data and reached the same opinions had this case been in the non-

litigation context.  Further, although I had not read the depositions of the Plaintiffs and their

physicians at the time that I prepared the rehabilitation plans, that was not an intentional effort to

exclude consideration of the depositions.  In any event, I have now read and summarized the

following depositions of the plaintiffs and their treating physicians:  **(1) As to Eileen

McAlexander**: (a) Helfin, Gary M.D. (12/7/07; 8/29/08); (b) Henderson, Daniel Ph.D.

(7/18/08); (c) McAlexander, Eileen (11/1/07; 7/8/08); (d) Schneider, Edward M.D. (7/31/08);

and (e) Umana, Gabriel M.D. (8/8/08), **(2) As to Janice Burns**:  (a) Bataineh, Rezeq M.D.

(6/6/08); (b) Burns, Janice (2/15/08; 8/21/08); (c) DeMoya, Victor M.D. (7/25/08); (d)

Elzawahry, Kamel M.D. (8/10/08); (e) Ramirez, Jesus M.D. (6/18/08); (f) Randles, Thomas M.D. (2/19/08); and (g) Yauch, Laura M.D. (6/11/08); **(3) As to Connie Curley**: (a) Curley, Connie (2/11/08); and (b) Sisodia, Teeresa M.D. (4/2/08); **(4) As to Linda Guinn**: (a) Guinn, Linda (2/18/08); and (b) Dhruv, Nikhita M.D. (3/7/08); **(5) As to Richard Unger**: (a) Quintero, Luis M.D. (2/26/08); (b) Unger, Richard (2/16/08); and (c) Zager, Arnold M.D. (7/16/08); **(6) As to Linda Whittington**: (a) Boyd, Harold M.D. (7/31/08); (b) Haddad, Charles M.D. (3/21/08; 7/25/08); (c) Utset, Bernardo M.D. (8/27/08); and (d) Whittington, Linda (2/15/08; 8/28/08). These depositions confirmed my original opinions in the rehabilitation plans, and did not result in any alteration of my opinions.

18.    "Defendant also criticizes my rehabilitation plans because I did not send the completed plans to the Plaintiffs' physicians to get their approval.  But it would rarely if ever be appropriate to send an entire completed rehabilitation plan to the physicians for their approval, since only certain portions of the plan relate to any particular physician's area of practice.  Although there may be occasions when some physician (for example, a consulting physiatrist) will review an entire plan after it is put together, that is not a required step in the methodology.  The important step in the methodology is to obtain the physician's input before the plan is drafted, either through the physician's response to the questionnaire or through his medical records.

19.    "Defendant also criticizes my case management and nutritional recommendations on the basis that they are not based on "the results of any scientific testing," and claims that I "infused [my] own subjective medical opinions into the results."  Case management and nutritional evaluations are recommendations that come under the purview and expertise of the Board Certified Case Manager and it is improper to refer to them as "medical opinions."  I do not entirely disagree that my methodology for determining whether these services were, in

reasonable rehabilitation probability, required included a "subjective" element, to the extent that a qualified Case Manager's application of his specialized knowledge and clinical judgment may be considered the "infusion of his subjective opinion into the results." But that is an entirely appropriate and essential step in a reliable methodology. When a physician, psychologist, licensed Mental Health Counselor (as in my case), or someone with my Board Certifications consults the Standards, clinical practice guidelines and research literature while following the process laid out and accepted in our field, it is never meant to stifle the use of professional judgment. It is always necessary to consider carefully all of the information in the literature and guidelines, but individual patient differences require the exercise of professional judgment. That is exactly why we call them guidelines. They are not meant to be fixed in stone and applied in exactly the same fashion for every patient. Not every patient is created equally. Accordingly, my opinions regarding the Plaintiffs' case management and rehabilitation needs are reliable, and were derived through the application of the methodology applied in the field of case management and rehabilitation planning.

20.     "Defendant generally criticizes me for relying in part on patient history, since patients may not always be 100% accurate in their memory or interpretation of events. However, relying on patient history is universally one of the steps all physicians, psychologists, counselors, social workers, and life care planners will perform as part of their methodology. It is certainly not the only component. We use patient history along with medical records, physician input, medical literature and clinical practice guidelines, and whatever other data we can collect to assemble an accurate record. I wrote each doctor and try to clarify the record and believe the questions asked were designed to do just that. This was a reliable methodology, and consistent with accepted practice in the field.

21.     "It appears that Defendant's main objection to my opinion is that I included 2-4 hours of case management in the cost of future care for five of the six Plaintiffs.  Defendant lodges four complaints about this testimony.  First, Defendant complains that no physician recommended case management, and I am not qualified to determine whether the Plaintiffs will probably need this item of care.  But case management is a non-medical item of care, and is rarely if ever ordered by a physician.  As noted above, I am a Certified Case Manager with 20+ years of experience in case management, and 36+ years experience with life-care and rehabilitation planning.  I have specialized knowledge about case-management needs of persons with chronic medical conditions, including diabetes, so I did not require a physician's opinion to reliably opine that these Plaintiffs will, within reasonable rehabilitation probability, need case management as a result of their diabetes.

22.     "Defendant's second challenge to my case-management opinion is that these Plaintiffs might have benefitted from case management even if they had never developed diabetes, because of their preexisting conditions.  Nevertheless, the 2-4 hours of case management I included in my rehabilitation plans relates only to case management for diabetes and the effort to reduce the risk factors created by diabetes, and does not include case management of the Plaintiffs' other conditions.  In any event, the development of diabetes exacerbated the risks posed by the preexisting conditions, and conversely, the presence of the Plaintiffs' other conditions increased the risk of complications from diabetes.  (This is a very basic medical aspect of diabetes that I am well familiar with as a result of my education, training and experience, as outlined above.)  Accordingly, case management was even more critical due to the combination of the diabetes and the other preexisting factors.  Accordingly, it was appropriate for me to include these case

management expenses, and I would have done so had this case been presented in the non-litigation context.

23.     "Defendant also complains that I "could not identify a single clinical practice guideline for diabetes, a scholarly publication, or even [my] own experience or knowledge of what happens as a practical matter in the community to support [my] purported opinion in this regard." But as I explained in my deposition, the clinical practice guidelines and research literature on diabetes emphasize the importance of the patient's compliance, not only with the medical protocols but also with non-medical approaches such as nutrition, weight control and cessation of other behaviors incompatible with diabetes control, and education through case management is an effective means of ensuring patient understanding and compliance and of avoiding future complications.  Additionally case management is foundational for reducing the risk factors created by diabetes in the development future complications.  Many organizations utilize diabetes case management and education programs in the non-litigation context, including health insurance companies and hospitals.  Further, as a Certified Case Manager, I am aware that case management is appropriate for these Plaintiffs, in light of their history of difficulty and lack of success in self-management of their medical conditions and their mental disabilities.

24.     "Defendant's final complaint is that I did not opine that Plaintiff Unger should have case management, and therefore my opinion that the other Plaintiffs do need it is unreliable. Defendant claims that my decision not to include case management for Unger was based on my "subjective" interpretations from the testing and clinical interview I performed.  Of course, the clinical judgment of the rehabilitation planner or case manager is a significant element in the methodology for deciding whether case management is warranted, but that element lends reliability to the rehabilitation plan, assuming the rehabilitation planner is qualified, as I am.

Through my clinical interview with and testing of Unger, I determined that Unger was managing his diabetes effectively without case management, in that he had withdrawn himself largely from driving, was complying with his care requirements, and seemed to understand the nature of the diabetes and what he had to do to manage it to avoid further complications. The other Plaintiffs' medical records and clinical interview, however, did not reveal that they were as capable of self-management as Unger. Further, although I failed to mention it in my deposition, Unger was an RN with vocational experience as a case manager. This was another reason why I believed the case management expense could be eliminated from his plan, but not the other Plaintiffs'.

25.    "Defendant has articulated a few minor criticisms of specific elements of my rehabilitation plans in this case, and I will address these criticisms herein, and explain why the methodology I utilized reliably resulted in these aspects of the plans and why the application of my specialized knowledge to the underlying data led me to include these aspects of the plans.

26.    "Defendant criticizes my recommendations for nutritional evaluation and 2-4 follow-up physicians' visits per year for Plaintiff Guinn because I did not have her physician's order to include these items. First, nutritional evaluation is not a medical aspect of a rehabilitation plan, and I am qualified by virtue of my experience and specialized knowledge to reliably determine, in reasonable rehabilitation probability, whether a patient with diabetes requires nutritional evaluation. That is not an element of the plan that a physician is required to order or authorize, and it was perfectly acceptable and consistent with the accepted methodology for me to make that determination.

27.    "However, I concur that Guinn's endocrinologist should re-evaluate her, and if he disagrees with my projection of 2-4 follow-up visits per year, my plan for Guinn should be adjusted accordingly. However, I had a reasonable basis for including the 2-4 visits per year in

my initial draft of the plan.  Specifically, it is fundamental that some follow-up physician

appointments are required for a patient with diabetes, due to the risk of complications and the

essential nature of ensuring patient compliance.  I have sufficient specialized knowledge through

my experience to know that it would be wholly inappropriate to completely omit this element of

care.  As part of my methodology, I attempted to obtain the physician's input on this matter, but

the physician responded that she would not offer an opinion until she re-evaluated Guinn.  There

was not time to have Guinn re-evaluated and obtain the physician's input before the reports were

due, so I utilized my specialized knowledge, the clinical guidelines for diabetes, and the

information I obtained from my review of Guinn's medical records and my clinical interview

with Guinn to predict, with reasonable probability, how frequently Guinn should have follow-up

appointments.  However, as I explained in my deposition, the methodology would require me to

defer to the physician's recommendation if there were a disagreement, and I readily admit that, if

after re-evaluation, the physician disagrees with my assessment, my plan should be adjusted.

However, this does not reflect an unreliable methodology.  To the contrary, this is the

appropriate methodology, and it is because of this methodology that my plan can be easily

adjusted in the event of additional information coming to light.

28.     "Defendant also criticizes my recommendation of twelve neurologist appointments per

year for Plaintiff Burns.  This recommendation was based on the patient's history, as revealed in

his medical records.  Prior to preparing the life-care plan, I requested his physician's input

regarding the number of follow-up neurologist visits relating to diabetes and diabetic neuropathy.

However, the physician's response did not arrive prior to the deadline for providing my reports.

The letter from the doctor arrived during the second day of my deposition (October 7, 2008).  I

produced it to the defense on that same day.  It made clear that 3-4 visits were specifically for

diabetes and diabetic neuropathy, and I admitted during the deposition that my opinion would be adjusted to account for that new information.

29.     "Defendant also criticizes my inclusion of Ativan in Plaintiff McAlexander's rehabilitation plan because, they contend, she was taking this medication prior to developing diabetes.  Ativan is an anti-anxiety drug, and it is not disputed that the patient suffered from anxiety prior to developing diabetes.  Nevertheless, I included this medication in the plan based on my review of the patient's medical records and my clinical interview.  The patient indicated that she was taking this medication three times per day (and that was the dosage prescribed) and that she was taking it because of anxiety related to administering self injections of insulin.  Since this is an anxiety drug, to the extent that the patient reports that the significant cause of her current anxiety is having to administer the self injections, it appears that her use of this medication is at least in part due to the diabetes.  I have expertise relevant to these matters because of my psychology background and experience, but would defer to a physician with regard to the actual prescribing of medication.  As such, I believe it was appropriate for me to include this element in the plan, but if the treating physician disagreed, I would defer to his opinion and remove it from the plan.  Nevertheless, it was not unreasonable or contrary to accepted methodology to include this element in the plan.

30.     "Defendant also criticizes my inclusion of 4-6 podiatrist visits per year to Plaintiff Unger and 2-4 visits to the podiatrist for Plaintiff Whittington.  I included these elements based on the patients' medical records and the clinical practice guidelines for diabetes, which make very clear that regular podiatry follow-ups are essential in light of the Plaintiffs' peripheral neuropathy and future risk factors that result.  We attempted to obtain the treating physicians' input on this issue. Unger's podiatrist did not respond, although his family practitioner indicated that he needed a

podiatry evaluation annually.  However, in my clinical interview, the patient indicated that he was seeing the podiatrist 4-6 times per year, and my review of the records indicated that this was generally accurate.  Further, one podiatrist follow-up per year for a diabetic patient with peripheral neuropathy would not be sufficient under the clinical practice guidelines.  So, I used the range of 4-6 visits per year in the plan, which was consistent with my experience, the patient's report and the medical records.

31.    "With respect to Whittington, her primary care physician indicated that she needed podiatry follow-up, but did not provide a frequency, instead saying that it depended upon the symptoms the patient was displaying.  In light of the patient's symptoms, which were consistent with peripheral neuropathy, and in consulting the clinical practice guidelines, I included what was really the minimum number of follow-up visits under the guidelines (2 per year).

32.    "It would have been inappropriate to fail to include this element in these plans in light of the clinical practice guidelines for diabetes and peripheral neuropathy, and my specialized knowledge and experience in the fields of rehabilitation planning and case management permitted me to reliably synthesize the information received from the physicians, the patients, the medical records, and the clinical practice guidelines to determine the number of follow-up visits these patients would need, in reasonable probability.  Of course, if the treating physicians were to disagree, I would defer to their recommendation and amend the rehabilitation plans to conform to the physicians' opinions.

33.    "Defendants also criticize me for including disabled driver education in Plaintiff Unger's plan due to his peripheral neuropathy, because his pre-existing conditions caused him to have difficulty driving to the extent that he should probably have had a driver evaluation even before he developed diabetes.  While it was not unreasonable or methodologically unsound for me to

include this cost, since his peripheral neuropathy did warrant driver evaluation, and therefore it was at least in part attributable to diabetes, I agreed in my deposition that this item should be removed from this plan.  Nevertheless, this minor correction does not render my methodology unreliable.

34.     "Defendant also criticizes my inclusion of the cost of two medications — Methadone and Lyrica, in my rehabilitation plan for Plaintiff Burns.  I included these costs based on the patient's medical records, which indicated that she was currently taking these medications, the patient's clinical interview, in which she stated that she was taking these medications for the pain associated with peripheral neuropathy, and my own specialized knowledge that these pain medications can be prescribed for that purpose.  I had written to the treating physician to inquire whether these medications were being prescribed for the pain associated with peripheral neuropathy, but did not receive his response prior to the deadline for the report.  However, during the second day of my deposition (October 7, 2008), we received the doctor's response, in which he indicated that these medications were being prescribed 80% for the neuropathy.  So, I have indicated that the cost should be reduced by 20%.  This is a perfectly acceptable methodology, and exactly what I would do in the non-litigation context.

35.     "My rehabilitation plans in this case contained a general outline of the recognized complications of diabetes, taken from well-accepted and reliable medical literature.  I do not intend to opine that any particular Plaintiff will in fact suffer from any particular complication. However, I have opined that the Plaintiffs should receive case-management services to educate them about the disease, ensure compliance, and help them reduce the risk of future complications.  In this context, the risk of complications is certainly relevant to and supportive of my opinion that case management is warranted, even though I am not testifying that any

particular Plaintiff will likely develop any of these complications.  Costs for these complications

were not included in my report and were never intended to be a part of any economic analysis, as

I also stated in my deposition.

Further your affiant sayeth not.

Paul M. Deutsch Ph.D. CRC, CCM, CLCP, FIALCP

SWORN TO AND SUBSCRIBED before me by the said Paul Deutsch on November 21, 2008,
to certify which, witness my hand and seal of office.

Notary Public in and for the State of Florida
My commission expires:   9\5\2010



**Kay R. Brown**
Commission # DD565584
Expires September 5, 2010
Bonded Troy Fain - Insurance, Inc  800-385-7019

**PAUL M. DEUTSCH, PH.D., C.R.C., C.C.M.,CLCP, FIALCP**
*Licensed Mental Health Counselor, (FL. MH#0000117)*
*Certified Rehabilitation Counselor*
*Certified Case Manager*
*Certified Life Care Planner*
*Fellow of the International Academy of Life Care Planners*

10 Windsormere Way, Suite 400
Oviedo, Florida 32765

## PRIVATE PRACTICE

### *Paul M. Deutsch & Associates, P.A.*
- Board Certified Rehabilitation Counselor
- Board Certified Life Care Planner
- Board Certified Case Manager
- Catastrophic Case Management
- Fellow of the International Academy of Life Care Planners
- Professional Training/Teaching
- Curriculum Development/Consultation
- Research
- Software Development
- Patient and Family Education
- Consultation
- Licensed Mental Health Counselor
- Diplomate in Psychotherapy

## EDUCATION

- ***Doctor of Philosophy****-Admitted through the Department of **Rehabilitation Counseling** (Majored in a joint program of **Counseling Psychology** and **Counselor Education**. **Subspecialization-Spinal Cord Injuries**-with sub-specialization doctoral work directed by Justine Vaughan M.D. Department of Physiatry, Shands Teaching Hospital and member of my Doctoral Committee. Admitted to candidacy 1976. Completed and defended dissertation December 1982. Degree Awarded January 1983 - University of Florida - College of Health Related Professions.*

- ***Master's Degree - Rehabilitation Counseling*** - University of Florida - College of Health Related Professions- **MRC.**
  ***Minor - Behavioral Psychology and Counselor Education*** (Experimental Analysis of Behavior Program University of Florida (Degree Awarded: 1972)

- ***Bachelor of Arts Degree - Psychology*** - Rollins College (Degree Awarded: 1971)

## FELLOWSHIP/HONORS

- **Life Time Achievement Award in Rehabilitation from the International Association of Rehabilitation Professionals-2007**

- **Alumni of the Year –College of Public Health and Health Professions-(Formerly-College of Health Related Professions (-University of Florida 2006).**

- **<u>Life Time Achievement Award-Presented "In recognition of your dedication and countless contributions to the field of Life Care Planning."</u>**-Presented by the International Conference of Life Care Planners; The International Academy of Life Care Planners; The University of Florida; Virginia Commonwealth University; Kaplan University;  The American Association of Legal Nurse Consultants; and The National Rehabilitation Association -October 11, 2003

- **National Rehabilitation Educator of the Year  (International Association of Rehabilitation Professionals -IARP) -1993**

- **Alumni of the Year - College of  Public Health and Health Professions, ( Formerly College of Health Related Professions) -University of Florida (1988).**
- *E TA RHO PI - Honor Society - University of Florida - College of Health Related Professions*

- *PI LAMBDA THETA - National Honor Society for Counselor Education - University of Florida*

- *Rehabilitation Service Administration - Master's Degree – Fellowship*

**<u>Professional Interviews as original developer of Life Care Planning:</u>**

**The Case Manager**

**Nurse Week**

**Vital Signs**

**Journal Of Life Care Planning**

**Physical Therapy Today**

**Social Work Today**

**Endo Nursing**


**TEACHING**

**University of Florida-Curriculum Developer-Life Care Planning Program.**

**University of Florida-Instructor for Life Care Planning Online and On site continuing education program beginning February 1, 2006.**

**Senior Faculty- Kaplan  University Healthcare Pathway's, Life Care Planning Program.  Chairperson-Board of Advisors for the Life Care Planning Program**

**Clinical Professor of Rehabilitation Counseling- Medical College of Virginia, Virginia Commonwealth University, Department of Rehabilitation Counseling 2002 to Present.**

**Courtesy Faculty- Department of Rehabilitation Counseling- College of Health Related Professions, University of Florida 1985-Present**

**Kaplan University-Curriculum Development for Life Care Planning Training Program- Beginning July 2003**

**Kaplan University -Curriculum Development for Case Management Program in the Healthcare Pathways program, scheduled to begin April 2004.**

**Kaplan University -Curriculum Development for Geriatric Care Management Program in the Healthcare Pathways program, scheduled to begin in the summer of 2004.**

**FACULTY MEMBER- Re-contracted in 2000 with Intelicus/University of Florida to teach in this program:** Intelicus/University of Florida Certificate Program in Life Care Planning and Catastrophic Case Management - A two year post-graduate training program in medical case management and life care planning affiliated as a certificate program with the Department of Rehabilitation Counseling, College of Health Related Professions, University of Florida.

Track 1 - Introduction to and Basics of Life Care Planning (Four-Five 16 hour courses per year)
　　　　　Content includes but not limited to Basic Life Care Methodology; Research Methodology;
　　　　　Interpreting Research Literature; Ethics; Analyzing the Life Care Plan.
Annual Life Care Planning and Case Management Conference
Advanced Forensic Consultation Conference


**Professor Clinical Rehabilitation-Louisiana State University Medical Center-November 1996 to 1999).** Includes course lectures, continuing education programs, Life Care Planning Clinic development, Life Care Planning software and database development and publications.

**FACULTY MEMBER through September 1996 (1994-1995 FACULTY CHAIR)-** Rehabilitation Training Institute/University of Florida Certificate Program in Life Care Planning and Catastrophic Case Management - A two year post-graduate training program in medical case management and life care planning affiliated as a certificate program with the Department of Rehabilitation Counseling, College of Health Related Professions, University of Florida.

Track 1 - Introduction to and Basics of Life Care Planning
Track 2 - Vocational Assessment and Testing for All Disabilities
Track 4 - Rehabilitation Testimony
Track 5 - Spinal Cord
Track 6 - Brain Damage
Track 7 - Multiple Orthopedics
Track 8 - Business Principles, Malpractice, and Professional Ethics

**Faculty-** Department of Rehabilitation Counseling, University of Florida. 1976-1978 while in Doctoral program. Taught Research Methodology and Statistical Analysis for the Social Sciences in the Masters Program.

## SPECIAL TRAINING AND CONTINUING EDUCATION (PARTIAL LIST)

- Through Course attendance, teaching, submitted and peer reviewed research or peer reviewed journal articles, peer review of submitted chapter contributions, or published textbooks I have exceeded the requirement of fifty hours of continuing in 2005. This included three sixteen hour workshops presented for the University of Florida/MediPro's certificate program in Life Care Planning. Teaching in Kaplan Universities Life Care Planning Program. A Presentation on

Daubert and the Expert's Role as an Educator continuing presented at the International Association of Rehabilitation Professionals.

- International Conference on Life Care Planning- Atlanta 2006
- International Association of Rehabilitation Professionals-Annual Conference-2004 through 2006
- IARP Forensic Conference-Life Care Planning Section-2004 through 2006.
- International Life Care Planning Conference-San Francisco-September 2005
- International Life Care Planning Conference-New Orleans-October, 2004
- International Association of Rehabilitation Professionals-Arizona-May,2004
- Through Course attendance, teaching, submitted and peer reviewed research or peer reviewed journal articles, peer review of submitted chapter contributions, or published textbooks I have exceeded the requirement of fifty hours of continuing education annually in each year of practice from 1972 through 2003.
- I have researched and taught numerous courses for the University of Florida, LSU Medical Center's Department of Rehabilitation and Kaplan Univerties' Healthcare Pathways Program in the following areas over the past sixteen years:
- Introduction to Life Care Planning
- Basic Tenets and Methodology of Life Care Planning
- Life Care Planning and Case Management In:
  Spinal Cord Injury
  Brain Injury
  Pediatric Traumatic onset Brain Injury
  Birth Onset Brain Injury
  Burns
  Amputations
  Aids
  Pulmonary Impairment and Occupational Illness
  Cardiovascular Impairments
  Severe, Multiple Orthopedic Impairments
  Psychological Impairments
  Research Design and Statistical Methodology
  Understanding Research Methodology and Interpreting Research Literature
  Life Expectancy Issues and Catastrophic Disability
  Professional Standards and Ethics

A partial list of conferences and programs attended follows:

- Long term Opioid Therapy in Management of Chronic Pain-Int'l LCP Conf. '03
- Aging with Catastrophic Disability-Int'l LCP Conf. '03
- The Educators Role Continues-Meeting the Demands Under Daubert-Presentor International Life Care Planning Conference October 9, 2003.
- Medicare Set-Aside Trusts-New Orleans-June 2003
- Medical Errors (For the Mental Health Mental Health Counselor)
- Domestic Abuse (Requirement for Mental Health Licensure)
- National Institute of Health-College on Drug Dependence-Quebec-Summer 2002
- Life Care Planning Summit 2002
- Advanced Practice Conference Research Methodology for the Life Care Planner, Spring 2002
- Annual Life Care Planning Conference New Orleans (featured speaker) October, 2001
- Annual Life Care Planning Conference New Orleans (featured speaker) October, 2000
- Life Care Planning Summit 2000
- Annual Life Care Planning Conference New Orleans October 1999
- Annual Life Care Planning Conference New Orleans October 1998
- AIDS Case Management (4/1992) (Meets HIV requirements of the Mental Health Licensure)
- The International Brain Injury Symposium - New Orleans, LA (3/1991)
- National Head Injury Foundation - Chicago, IL (12/1989)
- Rehabilitation Management of the AIDS Patient - Rehabilitation Institute of Chicago (3/1989)
- First International Head Injury Symposium - Advances in Clinical Practice, Mediplex Rehab-

Bradenton (1/1989)
* First Moscow Medical Institute - 200 hours of lectures, patient demonstrations, and training in Soviet Neuropsychological Assessment Techniques (3/1988)
* National Head Injury Foundation - San Diego, CA (12/1987)
* American Psychological Association - New York, NY (8/1987)
* National Head Injury Foundation - Chicago, IL (12/1986)
* First Moscow Medical Institute - 75 hours of lectures, patient demonstrations, training in Soviet Neuropsychological Assessment and Rehabilitation (12/1986)
* CRC - Chicago, IL (7/1986)
* FARPPS - Miami, FL (5/1986)
* Course on Cerebral Palsy.  Tufts - New England University Medical Center (1985)
* Seminar on the Brain Injured Adult with Special Pediatric Session.  Medical College of Virginia (1985)
* The Challenge of the Traumatically Brain Injured.  National Head Injury Foundation, Boston (1984)
* International Symposium on the Traumatic Brain Injured Adult and Child.  Tufts University School of Medicine (1981)
* Spinal Cord Institute, American Academy of Orthopedic Surgeons (1973)
* Training Program in Prosthetics and Orthotics, Emory University Medical School (1973)
* Second Quarterly Spinal Cord Seminar, Jackson Memorial Hospital (1973)
* Seminar - Rehabilitation of the Spinal Cord Injured, Morgan Rehabilitation Center, Florida Hospital (1973)

## EXPERIENCE

**PAUL M. DEUTSCH & ASSOCIATES, P.A.**              **Orlando, Florida**
                                                    **6/1976 - Present**

Rehabilitation Counseling, catastrophic case management, life care planning professional training, patient and family disability education, mental health counseling, consultation, research, and writing represent the primary focus of this practice.

**Foundation for Life Care Planning Research Inc.**        **Orlando, Florida**
                                                           **11/2001-Present**

Associated with the Medical College of Virginia, Virginia Commonwealth University, Georgia State University and University of Florida, the Foundation was established as a nonprofit research group.  The focus is on Life Care Plan validation studies and rehabilitation research.  Also being developed in the foundation is a research mentoring program and a standards commission.  The current Board of Directors includes Paul M. Deutsch Ph.D., Roger Weed Ph.D., Terry Winkler M.D., Patti McCollom MS,RN, Chris Reid Ph.D., and Susan Riddick-Grisham RN.  Current doctoral dissertation students represent Ohio State University, Georgia State University, University of Florida and Barry University.

**Learning Applications Inc.**                      **Orlando, Florida**
                                                    **1991- 2000**

A research and development company responsible for developing Media Matrix, a multi-media, computer based tutorial system.  The system utilizes multiple depths of material presentation including text, outlines, bullet charts, video, graphics and other resources for education. The system is geared toward use in University based courses, distance education, patient and family education and textbook replacement.

**FAIRVIEW SHORES**                                 **Orlando, Florida**
**Staff Rehabilitation Counselor/Mental Health Counselor**        **6/1988 - 01/96**

Long-term Supported Living Program for the Head Injured. Facility provided both a residential and a day component with full supervision, vocational programming, supported work programs, recreational therapy and psychological support.

**PAUL M. DEUTSCH PRESS, INC.**
*Owner/Chairman*
*Orlando, Florida*
*(Sold 1992)*

Scientific publications with a focus on medicine, psychology, rehabilitation, and the health related professions. A significant emphasis had been placed on bringing research out of the former Soviet Union and publishing it for the western scientific community.

**REHABILITATION TRAINING INSTITUTE**
*Continuing Education/Training*
*Orlando, Florida*
*1986 - November 1, 1996*

Rehabilitation Professionals    (See Teaching - Faculty Chair.)

**THE HEAD INJURY REHABILITATION CENTER, INC.**
*Co-Director*
*Orlando, Florida*
*1983 - 1987*

Co-Director of a community based, group oriented head injury rehabilitation program. Involved in cognitive remediation, group and individual counseling and vocational rehabilitation. Also involved in development of a transitional employment program and placement of the brain injured. Includes responsibility for individual and group therapy as well as case management.

**THE CENTER FOR REHABILITATION, INC.**
*Director/Rehabilitation Counselor*
*Orlando, Florida*
*1977 - 1980*

Responsible for general coordination and administrative duties. Performed vocational rehabilitation evaluations and maintained responsibility for the design and administering of rehabilitation programs. Also responsible for counseling in both group and individual settings. Worked with handicapped individuals in a multi-disciplinary approach to chronic pain management. Extensive experience and research on chronic pain and chronic disability syndromes were developed through this work experience.

**REHABILITATION RESOURCES, INC.**
*Rehabilitation Specialist*
*Orlando, Florida*
*1973 - 1976*

Performed evaluations to determine capacities of handicapped individuals. Provided counseling, career guidance and general follow-up activities including job placement, development of wage and employment data, and maintenance of job data banks.

**DIVISION OF VOCATIONAL REHABILITATION**
*Counselor II*
*Orlando, Florida*
*1972 - 1973*

Caseload limited to severe disabilities, including spinal cord injured, stroke, brain injury, and amputations. Responsible for the work evaluation program at Florida Hospital, Morgan Rehabilitation Center. Responsible for review of area employers and placement of clients. Approximately forty-five clients over a fifteen month period were placed in training programs and jobs.

**VETERAN'S ADMINISTRATION HOSPITAL**
*Psychology Technician*
*Gainesville, Florida*
*1971 - 1972*

# CONSULTANT WORK

- University of Florida-Curriculum Development.  Developer of the Life Care Planning Curriculum to open on February 1, 2006.
- Kaplan University Curriculum Developer-Life Care Planning Program; Case Management Program; Elder Care Management Program.  All Part of the Health Care Pathways Program for the University.

- Consultant/Trainer for the Case Management Association in the United Kingdom - Training in Life Care Planning and Case Management - April 1994.

- Appointed by the first Deputy Prime Minister of the USSR to lead a project on the development of the first rehabilitation centers in the USSR.  This project ended with the coup and subsequent breakup of the Union.

- Liaison between the Barotoshvili Institute, Tbilisi, Georgia, USSR, and the joint University of Florida/Rollins College Program to develop joint research projects and shared graduate student training (1987-1990).

- Liaison between the University of Florida, College of Health Related Professions and Moscow State University to develop a sister university program for the health related professions (1989-1990).

- Consultant to VAAP (Soviet Copyright Agency) on Neuro-psychological Rehabilitation/Psychology Publications for the West (1986-1990).

- Consultation in litigation under the Federal Tort Claims Act and personal injury litigation (Federal and State Courts throughout the United States).

- Vocational expert under contract with the Social Security Administration and the Bureau of Hearings and Appeals (1973-1988).

## PUBLICATIONS - BOOKS

Deutsch, Paul M.; Sawyer, Horace W.: <u>A Guide to Rehabilitation</u>, **Volumes 1 , 2 & 3.** AHAB Press, White Plains, New York, 1995 with updates through 2005.

A text for the practitioner in rehabilitation psychology, rehabilitation nursing, rehabilitation counseling and physicians interested in Life Care Planning.  Covers the major medical, psychological and vocational rehabilitation implications for each disability listed in the "AMA Guide to Permanent Impairments."

Deutsch, Paul M.; Fralish, Kathleen: <u>Innovations in Head Injury Rehabilitation</u> **Volumes 1 & 2.** AHAB Press 1995-2003.

Deutsch, Paul M, McCollom, Patricia, Weed, Roger, Barens, Debbie, <u>The Experts Role As An Educator Continues: Meeting  The Demands Under Daubert.</u> 2002 AHAB Press, New York.

Deutsch, Paul M.; <u>A Guide to Rehabilitation Testimony: The Expert's Role as an Educator</u>, St. Lucie Press, Inc., Orlando, Florida, 1990.

Kitchen, Julie A.; Deutsch, Paul M.; Cody, L. Stuart; <u>Life Care Planning for the Brain Damaged Infant: A Step by Step Guide</u>.  PMD Press, Inc., Orlando, Florida, 1989.

Deutsch, Paul M.; Weed, Roger O.; Kitchen, Julie A.; Sluis, Anne: <u>Life Care Planning for the Spinal Cord Injured: A Step by Step Guide</u>, PMD Press, Inc., 1989.

Deutsch, Paul M.; Weed, Roger O.; Kitchen, Julie A.; Sluis, Anne: <u>Life Care Planning for the Head Injured: A Step by Step Guide</u>, PMD Press, Inc., 1989.

Deutsch, Paul M.; Fralish, Kathleen: <u>Innovations in Head Injury Rehabilitation</u> **Volumes 1 & 2.** Matthew Bender.

> A text for Health Related Professions working in Head Injury Rehabilitation.  Provides a practical reference and an international perspective.

Deutsch, Paul M.; Sawyer, Horace W.: <u>A Guide to Rehabilitation</u>, **Volumes 1 & 2.**  Matthew Bender, 1985 with updates through 1994.

> A text for the practitioner in rehabilitation psychology, rehabilitation nursing, rehabilitation counseling and physicians interested in Life Care Planning.  Covers the major medical, psychological and vocational rehabilitation implications for each disability listed in the "AMA Guide to Permanent Impairments."

Deutsch, Paul M.; Raffa, Frederick: <u>Damages in Tort Actions</u>, **Volumes 9, 10, & 11**. Matthew Bender, 1982 with updates through 1997.  (Now published by Lexus Nexus and updates reinitiated in 2004 and updated through 2006).

> These volumes begin with a focus on the use of vocational rehabilitation and economic experts in personal injury and wrongful death litigation.  Extensive information on the rehabilitation process from initial evaluation through completion of the rehabilitation plan is provided  They continue in the next volumes to present extensive research on the rehabilitation and economic implications of all types of personal injuries.  Both catastrophic and non-catastrophic injuries are explored in terms of their vocational ramifications with extensive guidance on all the rehabilitation and economic consequences of long-term disability by impairment using case examples of injuries and impairment to a variety of anatomical sites and functions.

## PUBLICATIONS – NEWSLETTERS

Editorial Board Member-<u>Journal of Life Care Planning, (2003,2004, 2005, 2006, 2007).</u>

Editorial Board Member- <u>Journal of Forensic Vocational Analysis</u> (2001, 2002, 2003, 2004, 2005), Journal of the American Board of Vocational Experts

Editorial Board Member - <u>Journal of Private Sector Rehabilitation, (Now Rehab Pro)</u>.

Editorial Board Member - Aspen Publishers, Inc., <u>Inside Case Management</u>.

Deutsch, Paul M., Editor, Contributor: The <u>Rehab Consultant </u>(formerly <u>Life Care Facts</u>), Paul M. Deutsch Press, Inc.   Ended 1992.

Associate Editor- <u>Journal of Forensic Vocational Rehabilitation Special Edition in Association with the Louisiana State University Medical Center. </u> (Inaugural issue of Journal of Forensic Vocational Analysis).

9

## PUBLICATIONS - CHAPTERS AND ARTICLES

Deutsch, P.M., Introduction to Life Care Planning. International Encyclopedia of Rehabilitation: *An Online Multilingual Resource:* Published jointly by the National Institute for Disability and Rehabilitation Research of the US Department of Education and CIRRIE in partnership with L'Institue de re'adaptation endificence physique de Quebec, (Quebec Rehabilitation Institute for Physical Disabilities.

Yu, Nami S., Pomeranz, Jamie L., Moorehouse, Michael D., Shaw, Linda R., and Deutsch, Paul M., Identifying a New Area of Damages: Assessing Time Loss Associated with Bowel Management, Journal of Life Care Planning, Vol. 7 Number 1, 2008. Pgs. 3-11,

Deutsch, P.M., Kendall, S. L., Raffa, F., Daninhirsch, C., and Cimino-Ferguson, S., Technologies Impact on Life Care Planning: A Pilot Study of Children with Cerebral Palsy. The Journal of Life Care Planning 206, Vol. 4 number 4, pgs.161-172.

Deutsch, P.M., Kendall, S. L., Danninhirsh, C., Cimino-Ferguson, S., and McCollom, P., Vocational Outcomes after Brain Injury in a Patient Population Evaluated for Life Care Planning Reliability. NeuroRehabilitation 21 (2006) 1-10, IOS Press.

Deutsch, Paul M., Setting the Standards in Life Care Planning:  Be on the Cutting Edge of this Sub-Specialty, Brain Injury/Professional, Volume 3 Number 2  pgs. 12-15-Special issue on Life Care Planning, 2006.

Allison, Lori, Deutsch, Paul M., "Introduction to Life Care Planning", Damages In Tort Actions, Lexus Nexus, Spring 2005 Release.

Deutsch, Paul M., Allison, Lori, and Cimino-Ferguson, Sara, "Life Care Planning Assessments and Their Impact on Quality of Life in Spinal Cord Injury", Topics in Spinal Cord Injury, Spring 2005.

Deutsch, Paul M., "In Search of Ethics: Conversations with Men and Women of Character" A Book Review, Journal of Life Care Planning, Volume 4, Number 1, January 2005.

Reid, C., Deutsch, P., & Kitchen, J. (2005). Life care planning. In F. Chan,  M. Leahy, & J. Saunders, Case management for rehabilitation health professionals (2nd ed.), Volume 1, Foundational Aspects (pp. 228 – 263).  Osage Beach, MO:  Aspen Professional Services.

Deutsch, P., & Allison, L. (Eds.). (2004). Proceedings of the life care planning Summit 2004. *Journal of Life Care Planning, 3(3),* 193-202.

Allison, Lori, McCollom, Patricia, Deutsch, Paul M., "Overview of Medicare Set-Aside Arrangements",  Journal of Continuing Care, March/April 2004 pgs. 15-17 &33.

Deutsch, P., & Allison, L. (2004). Daubert vs. Merrill Dow: Implications for the life care planner. In P. Deutsch & F. Raffa (Eds.), *Damages in Tort Actions*. Newark, NJ: Lexis Nexis.

Deutsch, Paul M.,  "Daubert VS Merrill Dow: Implications for the Life Care Planner", Case Management and Life Care Planning of the Pediatric Patient, CRC Press, Boca Raton, FL., 2004 Release.

Reid, C., Deutsch, P., & Kitchen, J. (2004). *Case management with people who have AIDS or HIV infection, health care and disability case management* (2nd ed.). Vocational Consultants' Press.

Deutsch, Paul M., Allison, Lori, Kendall, Sheri, "Research Design And Statistics: A Practical Guide To Reading Research Literature and Practice Guidelines", Chapter 9B , <u>A Guide to Rehabilitation,</u> AHAB Press., Fall 2003 Release.

Deutsch, Paul M., Allison, Lori, "An Introduction to Life Care Planning: History, Tenets, Methodologies and Principles", Chapter 5, <u>A Guide to Rehabilitation,</u> AHAB Press., Fall 2003 Release.

Deutsch, Paul M., Reid, Christine, A., "Life Care Planning: A Methodology for Catastrophic Disability Analysis". Chapter, <u>The Catastrophic Injury Handbook.</u> Kendall Hunt Publishing Co. 2003.

Sutton, Amy M., Deutsch, Paul M., Weed, Roger O., & Barens, Debra E., <u>Reliability of Life Care Plans: A Comparison of Original and Updated Plans.</u> Journal of Life Care Planning, Volume I, number 3, pages 187-194, 2002.

Kendall, Sherie, Deutsch, Paul M., <u>Research Methodology for Life Care Planners.</u> Journal of Life Care Planning, Volume 1, number 2, pages 157-168, 2002.

Countiss, Richard, Deutsch, Paul M., <u>The Life Care Planner, The Judge and Mr. Daubert.</u> Journal of Life Care Planning, Volume 1, number 1, pages 35-47. 2002.

Countiss, Richard, Deutsch, Paul M., <u>Amicus Curiae Brief: (Seventh District Court of Appeals Texas),</u> Journal of Life Care Planning, Volume 1, number 1, 2002.

Weed, R., Barens, D., Deutsch, P.M., <u>Bibliography of Life Care Planning and Related Publications.</u> Journal of Life Care Planning, Volume 1, number 1, 2002.

Reid, C., Deutsch, P., & Kitchen, J. (2001). Life Care Planning. In P. Rumrill, J. Bellini, & L. Koch (Eds.), <u>Emerging issues in rehabilitation counseling: Perspectives on the new millennium</u> (pp. 59-88). Springfield, IL: Charles C. Thomas.

Deutsch, Paul M., <u>Life Care Planning: A Historical Perspective.</u> Topics in Spinal Cord Injury, 2001.

Deutsch, Paul M., <u>Learning to Question Research: A Methodology for Analysis.</u> Chapter in process 2001 update in <u>A Guide to Rehabilitation</u> (Includes an analysis of the statistical conclusions from the National Spinal Cord Data Research Center.

Reid, C., Deutsch, P., Kitchen, J., & Aznavoorian, K. (1999). Life Care Planning. In F. Chan & M. Leahy (Eds.), <u>Healthcare and disability case management</u> (pp. 415-453). Lake Zurich, IL: Vocational Consultants Press.

Reid, C., Deutsch, P., Life Care Planning. In P. Rumrill, J. Bellini, & L. Koch, <u>Emerging issues in Rehabilitation Counseling.</u>

Deutsch, Paul M., <u>Life Care Planning Into the 21st Century: Can We Meet the Standards.</u> Journal of Forensic Rehabilitation, Louisiana State University Medical Center, Volume I Issue I. 1996

Reid, Chris, Deutsch, Paul M., Kitchen, Julie A., and Aznavoorian, Karen: <u>Life Care Planning and Case Management,</u> Chapter. 1997

Reid, Chris, Deutsch, Paul M., Kitchen, Julie A.: <u>Life Care Planning and Case Management with AIDS Patients,</u> Chapter. 1997

11

Deutsch, Paul M., Kitchen, Julie A.: Rehabilitation Technology - Chapter contribution, A Guide to Rehabilitation, 1994.

Deutsch, Paul M.: Encyclopedia of Disability and Rehabilitation: Life Care Planning, Chapter contribution. MacMillan Publishing Company, 1994.

Deutsch, Paul M., Kitchen, Julie A,: Life Care Planning, Seminars in Hearing-Volume 15, Number 3, August, 1994, pages 207-223.

Deutsch, Paul M.: Life Care Planning Future Trends, Journal for NARPPS.

Deutsch, Paul M.; Kitchen, Julie A.; Sammarco, Donald: Life Care Planning and Aids, Chapter contribution; A Guide to Rehabilitation; Matthew Bender, 1993.

Deutsch, Paul M.: "Life Care Planning: Its Growth and Development," Viewpoints: An Update on Issues in Head Injury Rehabilitation, Tangram, August 1992.

Deutsch, Paul M.: "Life Expectancy in Catastrophic Disability: Issues and Parameters for the Rehabilitation Professional," NARPPS Journal & News, Spring 1992.

Deutsch, Paul M.: "Life Expectancy in Catastrophic Disability: Issues and Parameters for the Rehabilitation Professional," A Guide to Rehabilitation, Matthew Bender & Co., Spring 1992 Release.

Profile:  Paul M. Deutsch, The Case Manager, January, February, March 1992.

Deutsch, Paul M. Chapter contribution to The Coma - Emerging Patient, "Life Care Planning," Hanley & Belfus, Inc., October 1990.

Deutsch, Paul M.; Kitchen, Julie A.; Cody, Stuart L.: "Life Care Planning and the Discharge Process," Viewpoints: An Update on Issues in Head Injury Rehabilitation, Tangram, Fall 1989, Vol. XIII.

Deutsch, Paul M.: Kitchen, Julie A.; and Morgan, Nancy:  "Life Care Planning and Catastrophic Case Management," Head Injury Reporter, New Medico, Summer 1988, Vol. I, Issue I.

Deutsch, Paul M.:  "Ventilator Dependency," A Guide to Rehabilitation, Matthew Bender, 1987.

Deutsch, Paul M.; Sawyer, Horace W.; Jenkins, William M.; Kitchen, Julie A.:  "Life Care Planning in Catastrophic Case Management," Journal of Private Sector Rehabilitation, 1986.

Deutsch, Paul M.:  "Spinal Cord Injury Update," Damages in Tort Actions, Matthew Bender, 1986.

Deutsch, Paul M:  "Burns," A Guide to Rehabilitation, Matthew Bender, 1986.

Deutsch, Paul M.:  "Cardiovascular Impairments," A Guide to Rehabilitation, Matthew Bender, 1986.

Deutsch, Paul M.:  "Pulmonary Impairments," A Guide to Rehabilitation, Matthew Bender, 1986.

Deutsch, Paul M.:  "Rehabilitation Testimony," Damages in Tort Actions, Matthew Bender, 1985.

Deutsch, Paul M.:  "Rehabilitation Testimony: Maintaining a Professional Perspective," Monograph, Matthew Bender, 1985.

Deutsch, Paul M.:  "Update and Research on Costs of Case Management," Damages in Tort Actions, Vols. 8 and 9, Matthew Bender, 1984.

Deutsch, Paul M.: "Central Nervous System Impairments: Brain Injury," <u>Damages in Tort Actions</u>, Vol. 9, Matthew Bender, 1984.

Deutsch, Paul M.: "Guide for Occupational Exploration and Dictionary of Occupational Titles Analysis: An Appendix," <u>Damages in Tort Actions</u>, Vol. 9, Matthew Bender, 1984.

Deutsch, Paul M.: "Burns," <u>Damages in Tort Actions</u>, Vol. 9, Matthew Bender, 1983.

Deutsch, Paul M.: "Career Maturity and Work Values Among the Industrial Injured," Doctoral Dissertation, August 1983.

Deutsch, Paul M.: "National Survey of Institutional Care Facilities for the Mentally Handicapped, Severely Retarded Child/Adult"

> Includes extensive data collection, on-site surveys and research correlation.  The purpose of this study has been to establish extensive data on the needs of the profoundly retarded, multi-handicapped individual. Alternative developmental models for the life-time care of this type of individual, and extensive profiles of treatment modalities in the areas of speech pathology, occupational therapy, physical therapy, education, audiological and visual services, music therapy, family counseling and education programs, psychosocial assessments, and all other pertinent therapeutic intervention specialties.  In addition, extensive reviews of equipment and accessory needs, supply needs, educational games and toys, medical services, nursing and home care services, as well as other ancillary services have been included in this research.  A review of the major State and Federal legislation, along with licensing requirements for ICF/MR facilities has also been included.

Sams, Karen; Deutsch, Paul M.:  "A Job Seeking Manual for the Industrially Injured," Copyright 1981, Monograph.

Deutsch, Paul M.: "A Trainer's Manual for Career Counseling with the Physically Disabled," Copyright 1981, Monograph.

Saxon, John P., Deutsch, Paul M.: "Occupationally Significant Transferable Skills in Rehabilitation Counseling," <u>Journal of Applied Rehabilitation Counseling</u>, August 1976.

Deutsch, Paul M.:  "The Behavioral Creation of Work," Unpublished study presented to the Southeastern Psychological Association Conference, 1972.

Deutsch, Paul M.: "Use of a UCS Reinforcer in Heart Rate Conditioning," An Operant Conditioning Study on Heart Rate Control in Rats in 1971, an unpublished Bachelor's Thesis.

## PROFESSIONAL ORGANIZATIONS

### *Professional Member of:*
- Society for Neuroscience
- American Congress of Rehabilitation Medicine
- American Psychological Association - Rehabilitation Psychology Division
- American Rehabilitation Counseling Association
- American Rehabilitation Counselors Association
- American Mental Health Counselors Association
- International Academy Of Life Care Planners **(Fellow)**
- Florida Rehabilitation Counselors Association
- American Association for Mental Deficiency
- International Association of Rehabilitation Professionals
- National Rehabilitation Association
- National Rehabilitation Counselors Association
- American Association of Disability Analyst

• American Psychotherapy Association – (Diplomate)

## ACTIVITIES/BOARDS

Chair-Educational Committee-International Symposium on Life Care Planning-2007.

Chair-Educational Committee-International Symposium on Life Care Planning-2006

Chair-Educational Committee-International Symposium on Life Care Planning-2005

Chair-Educational Committee-International Symposium on Life Care Planning-2004

Educational Committee Member-Second Semi- Annual Conference-Vocational Outcomes in Traumatic Brain Injury-Sponsored by University of British Columbia; University of Washington and the Concussion Care Center of Virginia: Vancouver, BC, May 25-27, 2007

Member-Advisory Committee to the Commission on Health Care Certification- Responsible for reviewing policy and procedures for certification of Life Care Planners and making recommendations for change.  This includes establishing procedures for redesigning the certification exam and strengthening the certification process.  Ended December, 2004.

Educational Committee Member-First Annual Conference-Vocational Outcomes in Traumatic Brain Injury-Sponsored by University of Calgary; University of Washington and the Concussion Care Center of Virginia: Vancouver, BC, April 14-16, 2005

The Foundation for Life Care Planning Research-The Foundation was established to support and foster research on reliability and validity in the Life Care Planning Process.  Working with several State Universities and coordinating between private practitioners, University Academics and doctoral students the Foundation has successfully initiated several research projects and supervises several doctoral students in the completion of their dissertation work. Member Board of Directors and President.

Coalition of Life Care Planners-a joint task force representing a diverse group of Rehabilitation Professional Associations including IARP, IALCP, CDEC and the University of Florida/Intelicus Responsibility includes a leadership role in developing and providing research and training support to Rehabilitation Professionals. Additional responsibility includes acting as liaison to the Coalitions Attorney in the development of Amicus Curiae Brief and related legal work.  Member Board of Directors.

Chair-Board of Advisors-Kaplan College HealthCare Pathways Life Care Planning Program.
Chair-Board of Advisors-Kaplan College Health Care Pathways Case Management Program.
Chair- Board of Advisors-Kaplan College Health Care Pathways Elder Care Management Program.

Member Board of Directors - American Rehabilitation Counselors Association- Council Chairmen-Council on Development and Collaboration.  Standing Committees under this Council include Program Committee; Human Rights and Advocacy Committee; Social Security Issues Task Force. Term ended 1998

Member - National Research Advisory Committee, Chicago, Foundation for Rehabilitation Research. Term ended 1997

Chairman - Rehabilitation Committee to establish the first Rehabilitation Hospital Centers (outpatient and inpatient) in the Soviet Union - Appointed by Vladimir Scherbakov, former 1st Deputy Prime Minister, USSR-Confirmed by Kremlin Congress-Worked through the Department of Health and Human Services in the US. Ended with breakup of Soviet Union.

Coordinating Board of the International Institute for the Study of Memory - Appointed by the Georgian Academy of Science. Term ended 1996

Executive Board Member, Division of Rehabilitation Psychology, American Psychological Association, 1989, 1990, 1991.

Chairman, Board of Advisors, College of Health Related Professions, University of Florida, 1989/1990, Member 1985, 1986, 1987, 1988, 1989, 1990, 1991, 1992, 1993, 1994.

Chairman of the Development Committee for the College of Health Related Professions, University of Florida, Capital Campaign - 1989-1990.

Rehabilitation Psychology - APA - Program Committee Member, 1988 National Conference.

National Head Injury Foundation - Board of Directors - 1991, 1992; Member Professional Council and Program Committee - 1987, 1988.

Canine Companions for Independence - Southeast Regional Board of Governors - 1991.

Easter Seals - Board of Directors and Advisory Committee - 1980, 1981, 1982.

Central Florida Committee for Total Employment - 1973, 1974.

National Paraplegia Foundation - Founder of Central Florida Chapter - 1973.

## PROGRAM APPEARANCES (Partial List)

Vocational Outcomes in Traumatic Brain Injury-Sponsored by University of British Columbia; University of Washington and the Concussion Care Center of Virginia: Vancouver, BC, May 25-27, 2007- Vocational Issues and Life Care Planning: The Foundation For Life Care Planning's Research with TBI.

International Association of Rehabilitation Professionals-Arizona-The Expert's Role as An Educator Continues-Meeting the Demands Under Daubert.

Chair-2004 Life Care Planning Summit-New Orleans

Pre-Conference Workshop at the Annual Life Care Planning Conference/Reno, Nevada,2002. The Educators Role Continues: Meeting the Demands Under Daubert.

Intelicus seminars for 2002-four two day programs taught for Intelicus/University of Florida.

Issues in Life Care Planning Reliability and Validation Research. Advanced Practice Seminar. Chicago, May 18, 2002

Speaker and Round Table Leader-Second National Summit on Life Care Planning-Chicago-May 19, 2002.

Featured Speaker-Sponsored by IALCP- Issues in Life Care Planning: Establishing a Medical and Case Management basis in Plan Development. Annual Life Care Planning Conference-University of Florida/Intelicus. New Orleans, LA. October, 2001

Lead Instructor- Introduction to Life Care Planning-Track I. University of Florida/Intelicus. Los Angeles. August, 2001.

Lead Instructor- Introduction to Life Care Planning-Track I. University of Florida/Intelicus. Atlanta, GA. January, 2001.

Invited Speaker on Current Issues in Life Care Planning Validation and Reliability. Annual Life Care Planning Conference University of Florida/Intelicus Conference. New Orleans, LA. October 2000.

Lead Panelist for the Coalition Task force on Life Care Planning

Lead Instructor- Introduction to Life Care Planning-Track I. University of Florida/Intelicus.Los Angeles. September 2000.

Invited Speaker-Life Care Planning Summit 2000.

Guest Lecturer-Graduate Program in Rehabilitation-Medical College of Virginia-July, 1999
    Taped for repeated use in the computer based distant education program for the Masters in Rehabilitation.

Invited Speaker-Annual Life Care Planning Conference-New Orleans, November 1999.

Featured Speaker: Rehabilitation Counseling in the Next Millennium. Conference/Seminar Louisiana State University Medical Center. June 1998.

Faculty Chair/Member Teaching an Average of 10, Three Day Seminars per year-1994/1995

Invited Speaker: Life Care Planning and Case Management for Traumatic Brain Injury. International Symposium on Brain Injury, Oxford University (England), April 1993.

Featured Speaker:  Facing the Future Financially.  National Head Injury Foundation Florida Association Sixth Annual Educational Conference, "Breaking the Barriers," Tampa, Florida, October 1992.

Featured Speaker: The Case Manager: New Directions with ADA.  Texas Association of Rehabilitation Professionals in the Private Sector Tenth Annual Conference, Houston, Texas, October 1992.

Featured Speaker: Treatment and Testimony in Head Trauma Cases.  California Association of Rehabilitation Professionals Tenth Annual Convention, San Francisco, California, September 1992.

Featured Speaker: Assessment of Head Trauma.  California Association of Rehabilitation Professionals Tenth Annual Convention, San Francisco, California, September 1992.

Featured Speaker: Establishing Standards for Medical and Health-Related Professional Services in the Transitional and Maintenance Phases of Life Care Planning. Rehabilitation Training Institute, "Life Care Planning and Case Management: Into the Next Century," Las Vegas, Nevada, September 1992.

Featured Speaker: Vocational Loss Evaluation.  1992 National Head Injury Foundation's Sixth Annual Trial Lawyers' Conference, April 1992.

Featured Speaker: Life Care Planning.  15th Annual Head Trauma Rehabilitation Conference, "Coma to Community," San Jose, California, March 1992.

Featured Speaker:  Proof of Claim for Non-Physical Injuries/Psychological Injuries, ATLA Conference, Boca Raton, Florida, January 1992.

Featured Speaker: Cost of Mild Brain Injury and Lifetime Care, ATLA Conference, Boca Raton, Florida, January 1992.

Featured Speaker: Catastrophic Disability Management in Pediatrics.  American Congress of Rehabilitation Medicine 68th Annual Session, Washington, D.C., October 1991.

Featured Speaker: Life Care Planning.   Fifth Annual Legal Assistant Seminar, Minneapolis, Minnesota, October 1991.

Featured Speaker: Case Management.  Traumatic Brain Injury Rehabilitation: Advances in Clinical Practice, Vancouver, B.C., July 1991.

Featured Speaker: Innovative Life Care Plans.  American Association of Legal Nurse Consultants, Second Annual National Conference, Atlanta, Georgia, April 1991.

Featured Speaker: Family Support for Pediatric Rehabilitation; Long Term Case Management and Life Care Planning for TBI Infants and Children; The rehabilitation Professional as an Expert Witness: Testimony and Malpractice Issues.   The International Brain Injury Symposium, New Orleans, Louisiana, March 1991.

Featured Speaker: Life Care Planning for the Client with a Brain Injury.  Fifth Annual Trial Lawyers Seminar, Orlando, Florida, February 1991.

Keynote Speaker: Trends in TBI Rehabilitation: Where It's Going.  NHIF Georgia Association Annual Statewide/Regional Conference, Atlanta, Georgia, February 1991.

Featured Speaker: Life Care Planning.  Rehabilitation Institute of Sarasota, Sarasota, Florida, January 1991.

Featured Speaker: Life Care Planning: Current Research Trends and Data Base Development. Disability Management and Vocational Rehabilitation Advances, Syracuse, New York, October 1990.

Featured Speaker: Legal Testimony.  The Transitional Care Center, Houston, Texas, September 1990.
Featured Speaker: Life Care Planning/Vocational Expert Testimony.  American Board of Vocational Experts Fall Conference, Kansas City, Missouri, September 1990.

Featured Speaker: Rehabilitation Techniques and the Individual with a Traumatic Brain Injury. Traumatic Brain Injury Conference, Birmingham, Alabama, July 1990.

Featured Speaker: Vocational Evaluation Issues of Traumatic Brain Injured Clients.  University of Northern Colorado College of Health and Human Services Summer Workshop, Denver, Colorado, July 1990.

Featured Speaker: Vocational Rehabilitation.  Claims Management Seminar, Boca Raton, Florida, June 1990.

Featured Speaker: Life Care Planning.  Rehabilitation Institute of Sarasota Spring Conference 90, Longboat Key, Florida, April 1990.

Featured Speaker: Life Care Planning.   Harmarville Rehabilitation Center, Inc., Pittsburgh Pennsylvania, November 1989.

Featured Speaker: Advanced Life Care Planning - Spinal Cord Injury.  Orlando, Florida, November 1989.

Featured Speaker: Advanced Life Care Planning - Traumatic Head Injury.  Orlando, Florida, July 1989.

Featured Speaker: Life Care Planning and Catastrophic Case Management - Comprehensive Workshop.  Orlando, Florida, May 1989; Orlando, Florida, September 1989.

Featured Speaker: Life Care Planning - Traumatic Brain Injury.  Johnson Rehabilitation Institute, Princeton, New Jersey, May 1989.

Featured Speaker: Life Care Planning.  University of California, Fresno, California, March 1989.

Featured Speaker: Advances in Clinical Practice.  The International Head Injury Symposium, Sarasota, Florida, January 1989.

Featured Speaker: Life Care Planning - Closed Head Injury.  New Orleans, Louisiana, December 1988.

Featured Speaker: Life Care Planning - Burns, Amputations & Severe Orthopedic Injuries.  Orlando, Florida, November 1988.

Featured Speaker: Current Perspectives in Rehabilitation.   The State Board of Workers' Compensation, Atlanta, Georgia, September 1988.

Featured Speaker: Life Care Planning and Catastrophic Case Management - Comprehensive Workshop.  Hilton Head, South Carolina, September 1988; San Diego, California, October 1988.

Featured Speaker: Life Care Planning - Spinal Cord Injury.  Orlando, Florida, July 1988.

Featured Speaker: Life Care Planning - The Basics.  Boston, Massachusetts, August 1987; Atlanta Georgia, September 1987; St. Louis, Missouri, October, 1987; Orlando, Florida, November 1987; Richmond, Virginia, May 1988.

Featured Speaker: Life Care Planning and Catastrophic Case Management.  GARPPS (Georgia Association of Rehabilitation Professionals in the Private Sector), Atlanta, Georgia, March 1988.
Featured Speaker: Catastrophic Case Management and Long-Term Care Planning.   AARM (American Academy of Rehabilitation Medicine), Orlando, Florida, October 1987.

Featured Speaker: The Role of the Health Related Professional in Case Planning.  International Association for Drivers Education for the Disabled, Orlando, Florida, October 1987.

Featured Speaker: Competency & Incompetency - The Right to Self-Determination.  New Medico and Halifax Hospital, Daytona, Florida, June 1987.

Featured Speaker: Catastrophic Case Management and Life Care Planning.  Harborview Medical Center, Seattle, Washington, June 1987.

Featured Speaker: Head Injury Rehabilitation.  Timber Ridge Head Injury Center, April 1987.

Featured Speaker: Life Care Planning.  New Medico Conference, Chicago, Illinois, December 1986.

Featured Speaker: The Future is Now in Rehabilitation.  University of Georgia's, Critical Issues in Rehabilitation Conference, October 1986.

Workshop Leader: Life Care Planning.  University of Georgia's Critical Issues in Rehabilitation, Conference, October 1986.

Featured Speaker: Life Care Planning in Catastrophic Injury Cases.   American Psychological Association, Washington, D.C., August 1986.

Featured Speaker: Expanding Roles for the Rehabilitation Professional.  National Rehabilitation Association Convention, Des Moines, Iowa, October 1985.

Panel Chairman and Speaker: The Expanding Role of the Rehabilitation Professional.  American Psychological Association, Rehabilitation Psychology Division, Los Angeles, California 1985.

Featured Speaker: Pre-Convention Workshop: Catastrophic Case Management and Life Care Planning.  American Psychological Association Convention Rehabilitation Psychology, Toronto, Canada, 1984.

Featured Speaker: Forensic Rehabilitation, Consultation Research and Publication.  American Psychological Association Convention, Toronto, Canada, 1984.

Featured Speaker: Catastrophic Case Assessment and Life Care Planning.  Florida Association of Self-Insurers, West Palm Beach, Florida, 1984.

Featured Speaker: Brain Injury Rehabilitation.   Florida Association of Rehabilitation Nurses, Orlando, Florida, 1984.

Featured Speaker: Catastrophic Case Planning, Life Care Analysis, and Pediatric Rehabilitation. Advanced Seminar in Rehabilitation sponsored by the University of Florida, Division of Continuing Education for the Practicing Professional, 1984.

Featured Speaker: American Psychological Association Convention (Rehabilitation Psychology Division), Anaheim, California, 1983.

Featured Speaker: Continuing Education Conferences, Sponsored by the Florida Bar Association, Orlando, Florida, 1979.

Faculty Speaker: Statewide Conference on the Care of Stroke Patients.

Faculty Speaker: Joint Conference on Florida Association of Physical Therapists and The Florida Association of Occupational Therapists, 1973.

Featured Speaker: Goodwill Sheltered Workshop Conference, 1972.

## CERTIFICATION

- Licensed under the Psychology Practices Act, State of Florida (Chapter 491) as a Mental Health Counselor (License Number MH0000117).*

- Board Certified by the Commission on Rehabilitation Counselor Certification #01993.

- Board Certified Case Manager, Certification #00345.

- Board Certified Diplomate in Psychotherapy. The American Psychotherapy Association. Identification number 001020.

- Board Certified Life Care Planner- Commission on Health Care Certification.

* Mental Health Counseling as defined under Chapter 491: State of Florida:

(9)     The "practice of mental health counseling" is defined as the use of scientific and applied behavioral science theories, methods, and techniques for the purpose of describing, preventing, and treating undesired behavior and enhancing mental health and human development.  Such practice includes the use of methods of a psychological nature to evaluate, assess, diagnose, and treat emotional and mental dysfunctions or disorders, whether cognitive, affective, or behavioral; behavioral disorders; interpersonal relationships; sexual dysfunction; alcoholism; and substance abuse.

(a)     Mental health counseling treatment includes, but is not limited to:

1.     Counseling
2.     Psychotherapy
3.     Behavior modification
4.     Consultation
5.     Client advocacy
6.     Crisis intervention
7.     Providing needed information and education to clients.

# Introduction to Life Care Planning

## By

# Paul M. Deutsch Ph.D., CRC, CCM, CLCP, FIALCP

### International Encyclopedia of Rehabilitation
*An Online Multilingual Resource*

The International Encyclopedia of Rehabilitation (IER) is a project of the Center for International Rehabilitation Research Information and Exchange (CIRRIE), which is a Knowledge Translation center sponsored by the National Institute for Disability and Rehabilitation Research (NIDRR) of the U.S. Department of Education. CIRRIE is located at the State University of New York at Buffalo. Information about CIRRIE can be seen at http://CIRRIE/buffalo

For the development of the Encyclopedia CIRRIE is partnering with http://www.irdpq.qc.ca/communication/communique_presse/Agr%C3%A9men t_2004-2007.pdfL'Institut de réadaptation en déficience physique de Québec (Québec Rehabilitation Institute for Physical Disabilities) (IRDPQ) (http://www.irdpq.qc.ca/), specifically its
Laboratory of Informatics and Terminology of Rehabilitation and Social Integration (LITRIS) (http://www.irdpq.qc.ca/soutien_scientifique/litris.html).

## Introduction

Life care planning is a relatively new sub-specialty, which has experienced tremendous growth in the last 30 years. This growth is due in part to the utilization of life care plans within the rehabilitation, insurance, and legal professions. More significantly, life care plans have proven to be valuable tools in managing catastrophic injury and illness.

The tenets and methodologies of life care planning emerged from a combination of case management practices and catastrophic disability research in the mid-1970s. The first published reference to life care planning can be found in *Damages in Tort Actions* (1981), a multi-volume text written by Paul M. Deutsch Ph.D. and Fred Raffa Ph.D. The methodology of life care planning provided professionals with a consistent process for analyzing the immediate and lifelong needs of patients necessitated by

the onset of a disability.

With its foundation in rehabilitation, life care planning attracts board certified professionals from diverse fields of practice, including rehabilitation counseling, rehabilitation nursing, rehabilitation psychology, physiatry, case management, and an other allied health professions. In addition to achieving certification in their primary disciplines, many professionals choose to pursue board certification in life care planning (CLCP) which is currently granted by the Commission on Health Care Certification.

This article presents an overview of the historical roots of life care planning, including the underlying philosophies and research, which guided its development along with the eventual establishment of its tenets and methodologies.

## Theoretical Basis of Life Care Planning

Life care planning originates from the integration of three distinct fields of practice: experimental analysis of behavior, developmental psychology, and case management.

### Experimental Analysis of Behavior

Experimental analysis of behavior, which unites the specialties of experimental and clinical psychology, involves the scientific study of behavior and changes in behavior. By understanding the mechanisms of behavior, researchers attempt to define how and why individuals react to specific situations in specific ways.

Inherent in this specialty are the principles of learning theory and behavioral psychology, which rely upon the counting and charting of discrete behaviors in order to document changes over time. Complex behaviors are deconstructed into specific actions which can be quantitatively measured and analyzed in relation to the presentation of various stimuli or as an individual reacts to given situations.

The techniques that drive behavior analysis are also critical elements of life care planning. Planners must be able to identify the short-term and long-term goals and acute needs of patients, and then clearly communicate these details to all parties involved in the case. Just as behavior charts serve as documentation of behavior change over time, life care plans serve to account for all of the medical, care, and rehabilitation needs of individuals with catastrophic injuries.

### Developmental Psychology

Developmental psychology involves the study of social, cognitive, and physical changes which occur throughout the developmental years and beyond. This area of study has defined several critical periods in human development, which, in part, determine future attitudes, behaviors, relationships, and sense of well-being. Developmental psychology attempts to identify the effects of aging by conducting longitudinal and cross-sectional research and recognizes that the human life cycle is comprised of many phases, not just childhood and adolescence.

This focus on the life cycle and phase changes throughout the aging process provide a philosophical basis for life care planning. A comprehensive plan provides continuity of care while accounting for the patient-specific characteristics which will interact

with the effects of disability over time.

In addition to providing a theoretical basis for life care planning, developmental psychology played a practical role in the development of the subspecialty. In the early stages of its history, founding researchers in life care planning were conducting research with children who had cerebral palsy. When reviewing the recommendations for future care with families, practitioners noticed that it was difficult to adequately communicate the information because of the overwhelming complexity of the children's needs. Parents, therapists, educators, physicians, and others involved in the child's care needed a structured, systematic reference tool which summarized the recommendations and provided a roadmap to follow in the future. Over time, the framework for the life care plan was laid.

The life care plan became a document that allowed practitioners to clearly identify the critical periods of need as children progressed through the developmental phases of the life cycle. This, combined with the functional limitations of the disability, guided the composition of an individualized life care plan.

## Case Management

A concept emerged in the early 1970s, as theorists in the field of case management recognized the importance of integrated, coordinated services for those with long-term medical, support care, and rehabilitation needs. The life care plan presented the necessary format for presenting comprehensive yet exceptionally detailed information regarding the manifold needs of patients with catastrophic injuries. In doing so, case managers were in a better position to offer assistance and effective, proactive strategies for patients' health and well-being.

The practices and basic principles inherent within rehabilitation counseling, rehabilitation nursing, rehabilitation psychology, and case management culminated in the establishment of the standards, tenets, and methodologies of life care planning.

# Integration of Practice

Following are several of the factors that precipitated the development of life care planning methodology:

1. **The need for a summative statement**. Individuals and their families, particularly in pediatric cases, needed to have a concise summary of a long-term plan that could be reviewed following a comprehensive evaluation, then referred to as a guideline in future.

2. **A tool of communication.** In most catastrophic cases, many professionals are involved in the care and rehabilitation effort. The effectiveness of these efforts depends upon the coordination, cooperation, and communication between all parties involved in the rehabilitation process. The life care plan provides a format for a clear, concise, and sensible presentation of the complex needs of the patient.

3. **Forethought of planning**. One of the foundations of catastrophic case management asserts that proactive, preventative measures must guide the planning process. Otherwise, crisis situations, which are neither healthy for the patient nor optimal decision-making circumstances, will dictate the resultant care plan.

4. **Analysis of complex concerns into basic components**. Life care planning methodology establishes that the most basic components of each recommendation be identified and accounted for within the plan. Once outlined, the prevention of complications becomes a more manageable goal.

5. **Plans are individualized to meet the unique needs of each patient.** Life care plans are not generic formulas applied to a patient according to their diagnosed disability or injury. Integral to the process of life care planning is a review of patient-specific records; a clinical interview; and extensive evaluation of the injury/disability, the individual's goals and preferences, the needs of the family, and an analysis of the geographical area of residence.

6. **Needs, rather than funding sources, drive the planning process.** At no time during the plan development process should budgetary concerns influence care and rehabilitation recommendations. The life care plan was designed with the intention of citing all of the items and services made necessary by the onset of a disability/injury. Once the implementation phase of the process begins, planners may collaborate with the patient, family, and other professionals to identify collateral sources of funding.

## Applications of Life Care Planning

With the basic methodology of life care planning established, it became a tool for use in consultation with patients, families, rehabilitation professionals, and catastrophic case managers. As the standards and methods gained acceptance outside of the general rehabilitation circle, insurance carriers, worker's compensation judges, circuit court judges, federal court judges, attorneys, and others involved in litigation have called upon life care planners as experts in long-term disability management. Courts have sought the specialized knowledge of life care planners so that they, and juries, are better able to understand the long-term effects of catastrophic injuries and the associated economic damages of such cases.

As may be imagined, once applied outside of the immediate arena of consultation, life care planning has experienced tremendous growth and is recognized as a valuable means of disability analysis. The research and development of life care planning effectively bridged the gap between acute care plans, ongoing catastrophic case management, and the provision of appropriate long-term care and rehabilitation services.

## A Team Approach

Life care planners do not work in isolation, but depend upon the skills and knowledge of other professionals to collaboratively determine the immediate and future needs of patients. A thoroughly researched life care plan is based upon both case management principles and medical foundations. In order to meet the standards established within the subspecialty, each of these components is necessary.

It is encouraging to note that during the early 1990s, six federal district appeals court rulings redefined the concept of the Independent Medical Examination (IME). Now, rehabilitation psychologists, nurses, and counselors were recognized as professionals qualified to conduct an evaluation and assert an opinion regarding the effects of an individual's disability, their functional limitations, and future needs. These were important rulings because they symbolized the fact that case

management and rehabilitation professionals possess a unique set of skills in analyzing disability and in educating those involved in litigation. Growing recognition of the subspecialty has induced interest in life care planning and prompted many practitioners to pursue board certification in this area.

# Original Definition of Life Care Planning

The original definition of life care planning is as follows:

"A consistent methodology for analyzing all of the needs dictated by the onset of a catastrophic disability through to the end of life expectancy. Consistency means that the methods of analysis remain the same from case to case and does not mean that the same services are provided to like disabilities." (Deutsch and Raffa, 1981; Deutsch and Sawyer, 2002)

Two components of the definition deserve additional discussion: the concepts of a consistent methodology and needs-driven recommendations.

## A Consistent Methodology

In order to most effectively, and accurately, analyze the needs of patients, life care planners must employ a consistent methodology and approach to the task. Rather than becoming overwhelmed by the complexity of the process, life care planners deliberately and methodically organize, evaluate, and interpret patient-specific information. When data is systematically collected and managed, each detail of the patient's circumstance may be identified. Preventative measures may then be effectively applied in an effort to thwart potential medical complications, incongruencies in care, inappropriate equipment/supply recommendations, and unrealistic rehabilitation programs.

As stated earlier, there are acute care situations which cannot be foreseen, but the goal of life care planning is to minimize such occurrences. When reacting to a crisis, the patient, family, and involved professionals often do not have an opportunity to judiciously consider consequences of decisions, but must take immediate action to resolve a threatening situation. In fact, most often there is little choice involved in the actions required in order to stabilize or maintain a patient's status.

## Needs-Driven Recommendations

When a consistent methodology is followed, research regarding patient outcomes may be accessed throughout the life care planning process. Recall that experimental analysis of behavior, one of the building blocks of the subspecialty, contributed the procedure of charting behaviors as one means of disability analysis. Changes in patient behaviors are used as a measure of the positive/negative effects of environmental factors, medical interventions, and rehabilitation techniques.

This type of research allows life care planners to compile an outcomes database according to the patient-specific limitations and needs identified. In addition to outcomes, short-term treatment/rehabilitation goals may be determined based on what has been established to be effective within the research literature. Nursing/attendant care needs, equipment requirements, maintenance levels of therapy, and many similar areas may be more reliably determined if based upon

established research findings.

Recommendations within the life care plan must have a basis in known medical and rehabilitation outcomes as documented within research literature. Recommendations based upon any factor other than patient need are bound to failure. This is not to suggest that unforeseen complications will not occur, but the incidence of such crises may be minimized through adherence to the established methodologies. Life care plans based upon funding considerations may endanger the health and well-being of patients who require more care, equipment, or services than financial resources allow.

Reality must impose itself at some point in the process. The plan implementation phase allows case managers to work collaboratively with professionals from numerous disciplines and community agencies to creatively resolve funding issues and identify collateral sources of support. Plan implementation is most effectively accomplished through a team approach, with consideration given to all possible avenues of funding.

## Foundational Development of the Life Care Plan

As Life Care Planning has evolved over the past thirty years it has been influenced by extensive research much of which has been sponsored by the Foundation for Life Care Planning Research.  In the most recent years it has become recognized that plans must be well supported through the development of a strong Foundation in four critical areas as appropriate to the specific recommendations involved:

    1).    Medical Foundation
    2).    Rehabilitation Foundation
    3).    Case Management Foundation
    4).    Psychological Foundation

The steps involved in establishing Medical Foundation include the following:

    1).    Establishing direct links between the medical records and recommendations in the plan.
    2).    Writing the Medical and Allied Health treatment team members with plan questions not answered in the existing records.
    3).    Utilizing consulting specialists.
    4).    Utilizing Clinical Practice Guidelines
    5).    Utilizing Research Literature

The steps in establishing the Rehabilitation Foundation are similar:

    1).    Effective use of the medical and rehabilitation records through careful linking of this information to plan recommendations.
    2).    Writing the Medical and Allied Health treatment team members with plan questions not answered in the existing records.
    3).    Utilizing consulting specialists.
    4).    Utilizing Clinical Practice Guidelines
    5).    Utilizing Research Literature

The steps in establishing the Case Management Foundation are as follows:

1). Effective use of the medical and rehabilitation records through careful linking of this information to plan recommendations.
2). Writing the Medical and Allied Health treatment team members with plan questions not answered in the existing records.
3). Writing the current case manager on the file.
4). Utilizing consulting specialists.
5). Utilizing Clinical Practice Guidelines

The steps in establishing the Psychological Foundation are as follows:

1). Effective use of the medical and Psychological records through careful linking of this information to plan recommendations.
2). Writing the Medical and Allied Health treatment team members with plan questions not answered in the existing records.
3). Writing the current Psychologist or Licensed Mental Health Counselor on the file.
4). Utilizing consulting specialists.
5). Utilizing Clinical Practice Guidelines

Regardless of the Life Care Planners specialty there it must be understood that no single practitioner of this sub-specialty has the expertise to complete a Life Care Plan without drawing upon the skills of experts from a broad range of professionals through consultation, interaction with the treating physicians and allied health team members and use of both clinical practice guidelines as well as the research literature.   Individuals with disability interact during acute treatment and rehabilitation with a broad range of medical specialist and many different allied health team members.   To expect that one single physician, Rehabilitation Counselor, nurse or psychologist or other professional working on a plan can independently determine all of the needs of any given disability without utilizing all of these treating professionals and without taking advantage of all of the available literature is to underestimate the complexity and purpose of the Life Care Planning process.

## Recognition of Life Care Planning as a Subspecialty of Practice

The current definition of life care planning is as follows:

"The life care plan is a dynamic document based upon published standards of practice, comprehensive assessment, data analysis, and research, which provides an organized, concise plan for current and future needs with associated costs for individuals who have experienced catastrophic injury or have chronic health care needs." ( International Academy of Life Care Planners, 2003)

<u>Top</u>

# Professional Organizations

The subspecialty of life care planning is built upon the contributions of experimental analysis of behavior and developmental psychology, but it draws most heavily upon the principles of case management. Because life care planning is transdisciplinary, many professional organizations recognize this area of practice as a vital component of the future health and well-being of patients.

## International Academy of Life Care Planners (IALCP)

The International Academy of Life Care Planners (IALCP) has taken a leadership role in the development of standards. It began as the American Academy of Nurse Life Care Planners which became the IALCP in November 1997. Membership was open to all practitioners so that those from divergent disciplines could come together in promoting the welfare of patients. The IALCP first published the Standards of Practice for peer review in 2000.

## Scope of Practice

Today the IALCP, in addressing the scope of practice of the life care planner, notes:

"Life Care Planning is an advanced practice which is collaborative in nature and includes the patient, family, care providers and all parties concerned in coordinating, accessing, evaluating and monitoring necessary services." (IALCP, 2003)

The Standards continue:

"The IALCP believes professionals who develop life care plans must:

1. Have a foundation of knowledge and practice.

2. Have an appropriate experience base.

3. Conduct an active practice, which demonstrates application of the appropriate professional processes.

4. Perform specific methodologies demonstrating advanced practice.

5. Participate in professional organizations.

6. Participate in community and national organizations." (IALCP, 2003)

"Life care planning is a multidisciplinary specialty of practice within a professional discipline. Each discipline brings to the function of life care planning standards of practice, which must be adhered to by the individual professional. Each professional works within specific standards of practice for his or her discipline to ensure accountability, provide direction, and mandate responsibility for the standards for which he or she is accountable. These include, but are not limited to, activities related to quality of care, qualifications, collaboration, law, ethics, advocacy, resource utilization, and research. Moreover, each individual practitioner is responsible for following the standards of practice for life care planning.

In addition, individual practitioners must examine their qualifications as applied to each individual case. Therefore, a thorough knowledge of the disability and long-

term care considerations by virtue of education and experience is a necessary component of the practitioner's competency for each individual case" (IALCP, 2003).

## Other Professional Organizations

The IALCP is not the only professional organization supportive of life care planning. Others of note include the following:

- International Association of Rehabilitation Professionals (IARP): http://www.rehabpro.org/iarpindex_msie.html
- Commission on Health Care Certification (CHCC), formerly known as the Commission on Disability Examiner Certification (CDEC): http://www.cdec1.com/
- Case Management Society of America (CMSA): http://www.cmsa.org/

The IALCP and the above-mentioned organizations joined together to sponsor the Life Care Planning Summit 2000.

## Life Care Planning Summit 2000

The purpose of the Life Care Planning Summit 2000 was to join planners from across the nation in a think tank concentrated upon the following topics:

- Professional preparation
- Basic tenets and procedures
- Reliability and validity of life care planning
- Continuing education and information dissemination

The Summit was a resounding success and underscored the collaborative, interactive spirit inherent within life care planning. Those new to the subspecialty should be encouraged by the fact that, in the 25 years since its origin, life care planning has emerged into a transdisciplinary collective, committed to providing quality care and case management for individuals with various disabilities. The Life Care Planning Summit 2002, which met with equal success and has contributed significantly to the field, followed the original Summit.

## The Foundation for Life Care Planning Research

The first planning session for the Foundation for Life Care Planning Research occurred on January 23, 2002. Over the course of the first year the Board of Directors were formed, bylaws passed and basic procedures established. Since that time the FLCPR has continued to conduct research as well s support students and professionals pursuing research in this specialty are of practice

The Foundation for Life Care Planning Research has forged associations with the University of Florida, Georgia State University and the Medical College of Virginia, Virginia Commonwealth University. In each instance these associations are with the Departments of Rehabilitation, which work with the

Foundation to achieve its primary mission statement of supporting research on the process of Life Care Planning. The Foundation was established in 2002 as a nonprofit research group, with a primary focus on research on the reliability and validity of the Life Care Planning process. Although that remains an important consideration for the Foundation the Board has broadened the scope of the mission to consider any well-developed research design in Life Care Planning that advances the field and/or makes a significant contribution to the population of disabled individuals Life Care Planners seek to serve.

In the first five years of its existence the FLCPR has helped bring to fruition three doctoral dissertations, two masters thesis and twelve published journal articles. In addition it forged agreements with the University of Florida, the International Academy of Life Care Planners, the Forensic Division of IARP and The International Association of Rehabilitation Professionals, (IARP), to jointly bring about a unified Annual International Symposium on Life Care Planning. Although the Symposium is not new the unification of these organizations in support of a single program with the FLCPR in a leadership role is new. In 2008 the fourteenth Annual ISLCP is scheduled. For those interested in seeking a grant for research in disability/Life Care Planning contact the FLCPR at www.flcpr@mac.com.

## The Rehabilitation Professional's Role as an Educator

Aside from the responsibilities incurred throughout the life care plan development process, rehabilitation professionals are first and foremost educators. As educators, planners must be able to clearly communicate the nature of a patient's disability, the residual functional limitations, and the effects of the disability throughout the patient's life expectancy.

The life care planner has a responsibility to educate others regarding:

- The physical and psychosocial sequelae of the injury or illness
- What can be expected when the effects of an injury or illness combine with the aging process over time.
- The impact of the injury or illness on the family.

Individuals and family members rely upon this information in order to make well-informed decisions, understand the phase changes expected as the patient ages, and plan for future needs. Recall that the life care plan is a communication tool, which relates a large volume of complex information in a concise, readable format.

The role of educator extends into the courtroom. Judges, juries, attorneys, insurance administrators, and others rely upon the life care planner to offer an explanation regarding the effects of an injury or illness, residual functional limitations, future needs, potential complications, and other issues to clarify with precision how the life of the patient has been impacted. The life care planner does not simply present the "bottom line" dollar figure associated with the patient's case, but educates all involved in the process so that jurors can arrive at the appropriate economic damages award.

The life care planner is an educator and the life care plan is a tool for communicating

the necessary services, time frames for implementation of each recommendation, associated costs, and potential complications of the injury/illness or noncompliance with medical and rehabilitation prescriptions. Without a clear understanding of these elements of the plan, patients and families may not feel confident in their ability to make responsible, reasonable choices.

## Suggested Readings In Life Care Planning

1. Blackwell, T. (1999). Ethical issues in life care planning. In R. Weed (ed.). <u>Life care planning and case management handbook,</u> 399-406. Winter Park, FL: CRC Press.

2. Blackwell, T.L. (1995). An ethical decision making model for life care planners. <u>The rehabilitation professional, 3</u>(6), 18, 28.

3. Bonfiglio, R. (1999). The role of the physiatrist in life care planning. In R. Weed (ed.). <u>Life care planning and case management handbook,</u> 15-22. Winter Park, FL: CRC Press.

4. Consortium for Spinal Cord Medicine Clinical Practice Guidelines. (1999). "Outcomes following traumatic spinal cord injury: Clinical practice guidelines for health-care professionals," Paralyzed Veterans of America.

5. Deutsch, P. & Reid, C. (2001). The catastrophic injury handbook. American Board of Disability Analysts. Kendall/Hunt Publisher.

6. Deutsch, P. & Sawyer, H. (1999). <u>A guide to rehabilitation</u>. Purchase, NY: Ahab Press.

7. Deutsch, P.M. (1999). <u>Learning to question research: A methodology for analysis</u>. <u>A guide to rehabilitation</u>. (Includes an analysis of the statistical conclusions from the National Spinal Cord Data Research Center).

8. Deutsch, P.M. (1996). <u>Life care planning into the 21st century: Can we meet the standards</u>. Journal of forensic rehabilitation, Louisiana State University Medical Center, Volume I, Issue I.

9. Deutsch, P.M. (1995). Life care planning. In A. E. Dell Orto & R. P. Marinelle (eds.). <u>Encyclopedia of disability and rehabilitation,</u> 436-443. New York: Macmillan.

10. Deutsch, P.M., & Kitchen, J.A. (1994).  Rehabilitation technology – Chapter contribution, A guide to rehabilitation.

11. Deutsch, P. & Fralish, K.  (1993).  Innovations in head injury rehabilitation. (2 volume text). Matthew Bender.

12. Deutsch, P.M., Kitchen, J.A., & Sammarco, D.  (1993).  Life care planning and AIDS, Chapter contribution, A guide to rehabilitation. Matthew Bender.

13. Deutsch, P.M. (August 1992).  Life care planning: Its growth and development. Viewpoints: An update on issues in head injury rehabilitation. Tangram.

14. Deutsch, P.M. (Spring 1992).  Life expectancy in catastrophic disability:  Issues and parameters for the rehabilitation professional. NARPPS journal.

15. Deutsch, P.M.  (Spring 1992).  "Life expectancy in catastrophic disability:  Issues and parameters for the rehabilitation professional. A guide to rehabilitation. Matthew Bender.

16. Deutsch, P.M. (1992).  Profile. The case manager 3(1). 60-62, 64-66, 68-69.

17. Deutsch, P.M., (Ed.)  (1991).  The rehab consultant.  Orlando, FL: Paul M. Deutsch Press, Inc.

18. Deutsch, P.M.  (1990).  A guide to rehabilitation testimony. Orlando, FL:  PMD Press.

19. Deutsch, P.M.  (October 1990).  Chapter Contribution to The Coma – Emerging Patient, "Life Care Planning," Hanley & Belfus, Inc.

20. Deutsch, P.M., Kitchen, J.A., & Cody, S.L. (Fall 1989).  Life care planning and the discharge process. Viewpoints: An update on issues in head injury rehabilitation, Vol. XIII.  Tangram.

21. Deutsch, P., Weed, R., Kitchen, J. & Sluis, A.  (1989).  Life care plans for the spinal cord injured:  A step by step guide. Athens, GA: E & F Vocational Services.

22. Deutsch, P., Weed, R., Kitchen, J. & Sluis, A.  (1989).  Life care plans for the head injured:  A step by step guide.  Athens, GA:  E & F Vocational Services.

23. Deutsch, P., Kitchen, J. & Morgan, N. (Summer 1988).  Life care planning and catastrophic case management.  Head injury reporter, 1 (1).

24. Deutsch, P.M.  (1987).  "Ventilator dependency," <u>A guide to rehabilitation</u>. Matthew Bender.

25. Deutsch, P.M. (1986). "Burns," <u>A guide to rehabilitation</u>. Matthew Bender.

26. Deutsch, P.M. (1986). "Cardiovascular Impairments," <u>A guide to rehabilitation</u>. Matthew Bender.

27. Deutsch, P.M.  (1986).  "Pulmonary Impairments," <u>A guide to rehabilitation</u>. Matthew Bender.

28. Deutsch, P.M. (1986). "Spinal cord injury update," <u>Damages in tort actions</u>. Matthew Bender.

29. Deutsch, P.M., Sawyer, H.W., Jenkins, W.M., & Kitchen, J.A. (1986).  Life care planning in catastrophic case management. <u>Journal of private sector rehabilitation, 1</u> (1), 13-27.

30. Deutsch, P.M., & Sawyer, H.W. (1985).  <u>A guide to rehabilitation</u>. (2 volume text). Matthew Bender.

31. Deutsch, P.M. (1985). "Rehabilitation testimony," <u>Damages in tort actions</u>, Matthew Bender.

32. Deutsch, P.M. (1985). "Rehabilitation testimony:  Maintaining a professional perspective," Monograph, Matthew Bender.

33. Deutsch, P.M.  (1984).  "Central nervous system impairments: Brain injury," <u>Damages in tort actions</u>, Vol. 9, Matthew Bender.

34. Deutsch, P.M.  (1984).  "Guide for occupational exploration and dictionary of occupational titles analysis:  An appendix," <u>Damages in tort actions</u>, Vol. 9, Matthew Bender.

35. Deutsch, P.M.  (1984).  "Update and research on costs of case management," <u>Damages in tort actions</u>, Vols. 8, 9, & 10, Matthew Bender.

36. Deutsch, P.M.  (1983).  "Burns," <u>Damages in tort actions</u>, Vol. 9, Matthew Bender.

37. Deutsch, P. & Raffa, F. (December 1982).  <u>Damages in tort actions.</u> Vol. 9.  Matthew Bender.

38. Deutsch, P. & Raffa, F. (1981).  <u>Damages in tort actions.</u> Vol. 8. Matthew Bender.

39. Deutsch, P.M. (1994). Life care planning into the future, <u>NARPPS Journal 9</u>(2&3), 79-84

40. McCollom, P. (2002). Guiding the way: The evolution of life care plans. Continuing Care, 21(6), 27-28.

41. McCollom, P. (2000). Proposed practice guidelines for excellence in life care planning. <u>The case manager, 11</u>(2), 67-71.

42. Weed, R. & Berens, D., (eds.). (2001). <u>Life care planning summit 2000 proceedings</u>. Athens, GA: Elliott & Fitzpatrick.

43. Weed, R, & Field, T. (2001). The rehabilitation consultant's handbook (3rd ed.). Athens, GA: E & F Vocational Services.

44. Weed, R. (In press). Life Care Planning Procedures and the Roles of Various Health Care Providers. In T. Winkler (ed). Topics in Spinal Cord Injury Rehabilitation.

45. Weed, R. (2001). Contemporary Life Care Planning for persons with amputation (cover story). Orthotics and Prosthetics Business News, 10(23), 20-22, 24, 26, 28, 30.

46. Weed, R. (Ed.). (1999). <u>Life care planning and case management handbook</u>. Winter Park, FL: St. Lucie/CRC Press.

47. Weed, R. (1999). Forensic issues for life care planners. In R. Weed (ed.). <u>Life care planning and case management handbook</u>, 351-357. Winter Park, FL: CRC Press.

48. Weed, R. (1998). Life care planning: An overview. <u>Directions in rehabilitation, 9</u>(11), 135-147. New York: Hatherleigh.

49. Weed, R. (1998). Aging with a brain injury: The effects on life care plans and vocational opinions. <u>The rehabilitation professional, 6</u>(5), 30-34.

50. Weed, R. (1997). Life care planning standards update, <u>Neurolaw letter, 7</u>(3), 17, 21.