# EXHIBIT  2

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
VOLUME I

-------------------------------------------x
IN RE:  Seroquel Products Liability       :
Litigation                                 :
                                           :
MDL DOCKET NO. 1769                        :
This Document Relates to:                  :
                                           :
PLAINTIFFS v. AstraZeneca LP, et al.       :
(Janice Burns 6:07-cv-15959;               :
Connie Curley 6:07-cv-15701;               :
Linda Guinn 6:07-cv-10291;                 :
Eileen McAlexander 6:07-cv-10360;          :
Richard Unger 6:07-cv-15812;               :
Linda Whittington 6:07-cv-10475)           :
-------------------------------------------x

Thursday, October 2, 2008

9:10 a.m. - 4:52 p.m.

Oral deposition of PAUL M. DEUTSCH,

PH.D., held at Offices of Paul M. Deutsch, &

Associates, P.A., 10 Windsomere Way, Suite

400, Oviedo, Florida, 32765, beginning at

9:10 a.m., on the above date, before Richard

Castillo, Registered Diplomate Reporter,

Commission No. DD609499 (Expiration 2/25/11)

and a Notary Public.

Esquire Deposition Services
200 East Robinson Street
Suite 425
Orlando, Florida  32801
(407)426-7676

Job No. 957479

**2**

```
 1              APPEARANCES
 2   LAMINACK, PIRTLE & MARTINES, LLP
     BY:  BUFFY MARTINES, ESQUIRE
 3   BY:  RICHARD N. LAMINACK, ESQUIRE
     5020 Montrose Boulevard
 4   Ninth Floor
     Houston, TX  77006
 5   Phone: (713)292-2750
     --Representing the Plaintiff
 6
     DECHERT, LLP
 7   BY:  JOHN J. SULLIVAN
     902 Carnegie Center
 8   Suite 500
     Princeton, New Jersey  08540
 9   Phone:  (609)955-3200
     --Representing the Defendants
10
     CARLTON, FIELDS, LLP
11   BY:  CHRIS COUTROULIS, ESQUIRE
     4221 West Boy Scout Boulevard
12   Suite 1000
     Tampa, Florida  33607-5736
13   Phone:  (813)229-4133
     --Representing the Defendants
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
 1              E X H I B I T S
 2   MARKED    DESCRIPTION          PAGE
 3     1      Curriculum vitae        13
 4     2      Case Manager Certification   35
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**3**

```
 1
              I N D E X
 2
     WITNESS               PAGE
 3
 4   PAUL M. DEUTSCH, PH.D.
 5       DIRECT BY MR. SULLIVAN      6
 6   CERTIFICATE OF OATH       140
 7   COURT REPORTER'S CERTIFICATE   141
 8   ERRATA                142
 9        - - - - -
10   NOTE:  Ellipses (...) used to reflect pauses
11   between words.
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**5**

```
 1
 2      DEPOSITION SUPPORT INDEX
 3
 4   Direction to witness Not to Answer
 5   Page Line     Page Line     Page Line
 6
 7   Request for Production of Documents
 8   Page Line     Page Line     Page Line
 9   None
10
11
12   Stipulations
13   Page Line     Page Line     Page Line
14     6  1-8
15
16
17   Question Marked
18   Page Line     Page Line     Page Line
19   None
20
21
22
23
24
```

6

1      (It is hereby stipulated
2  and agreed by and between counsel
3  for the respective parties that
4  reading, signing, sealing and
5  certification are reserved; and
6  that all objections, except as to
7  the form of the question, are
8  reserved until the time of trial.)
9
10      PAUL M. DEUTSCH, PH.D.,
11  after having been first duly
12  sworn, was examined and testified
13  as follows:
14
15      DIRECT EXAMINATION
16
17  BY MR. SULLIVAN:
18      Q   Good morning, Mr. Deutsch.
19      A   Good morning.
20      Q   My name is John Sullivan.  I'm
21  here from the law firm of Dechert.  We
22  represent AstraZeneca in the litigation in
23  which you've been asked to give expert
24  opinions.  I'm here with Chris Coutroulis

7

1  from the law firm of Carlton, Fields, also
2  representing AstraZeneca.
3      When were you first hired in
4  this litigation?
5      A   I'm going to go to any one of
6  the notebooks, if you go to the referral
7  information tab, and all the referral
8  information will be in the -- in that
9  section, 7/20 -- excuse me, 7/8/2008, was the
10  date we were first contacted.
11      Q   Who contacted you?
12      A   Buffy Martines.
13      Q   Do you have -- had you worked
14  with Buffy Martines before?
15      A   No.
16      Q   Do you have any idea how you
17  were referred to her?
18      A   Actually, I don't.  I don't see
19  anything specific in the referral notes on
20  that sheet that indicates ... how she first
21  got to us, and I don't have any recollection
22  of -- of her indicating that she may have,
23  but I don't have any recall.
24      Q   I -- as I understand it, you've

8

1  been asked to give opinions in six cases in
2  this litigation, the Guinn case, the Unger
3  case, the Curley case, the Burns case, the
4  Whittington case, and the McAlexander case;
5  is that right?
6      A   That's pretty impressive, yes.
7      Q   Are there other cases in this
8  litigation for which you've been asked to
9  give opinions?
10      A   No.
11      Q   Okay.  What -- what is the
12  opinions that you've been asked to give in
13  these cases?
14      A   Well, basically, I was simply
15  asked to review them from my area of
16  expertise, which is basically rehabilitation
17  and life-care planning.
18      Now, from a life-care planning
19  standpoint, there's a fairly ... narrow
20  analysis that needs to be done, because these
21  are not what you would consider to be
22  catastrophic disabilities.  So, from that
23  perspective, that's why I say it's a fairly
24  narrow analysis.

9

1      But what you're looking to
2  determine is the extent to which, as a result
3  of the onset of diabetes, there are future
4  needs that are associated, because most of
5  these individuals were already on disability
6  and/or retired.  There really wasn't a
7  vocational analysis, but to the extent, for
8  example, that there would have been any
9  vocational implications, that's also
10  something we would have looked at.
11      But, as I said, because in most
12  of these cases that wasn't the issue, most of
13  what I actually did was look at the
14  implications of diabetes, both from an
15  individual perspective; that is, what is
16  currently happening, as well as from a
17  research and statistical perspective, what
18  generally occurs with diabetes as you look
19  into the future.
20      Q   When you said that these are not
21  catastrophic cases, could you define what you
22  mean by "not catastrophic"?
23      A   It's really more administrative
24  term within my office, although generally

10

1  within the field of life-care planning and
2  rehabilitation, we do tend to make a
3  distinction between non-catastrophic and
4  catastrophic.
5      You know, administratively, we
6  tend to first think of that in terms of
7  catastrophic disabilities, such as spinal
8  cord injuries, severe brain injuries,
9  multiple amputations, those types of cases
10 which first and foremost require a full
11 life-care plan with all of the charting
12 that's done in life-care planning. For
13 individuals who require significant ongoing
14 needs, including attendant care or nursing
15 services, as well as very extensive kinds of
16 support care services, durable and
17 replenishable medical goods, like
18 wheelchairs, standing aids.
19     Q   And what you're describing now,
20 you're describing catastrophic cases?
21     A   Right.
22     Q   Okay.
23     A   Exactly. And they usually are
24 going to be limited, in most of those

11

1  instances, to specialized work programs. If
2  they're going to be considered for work --
3  and work generally is very therapeutic -- so
4  we try and find some approach to the world of
5  work, whether it's supported work programs,
6  transitional work programs, or for those who
7  cannot even approach that level, we'll look
8  at day activity programs.
9      Non-catastrophic cases generally
10 are individuals who incur disabilities, still
11 very much are appropriate for rehabilitation
12 and generally a return to work. And so our
13 focus is a return to the open labor market,
14 and if that's not possible, then we'll, of
15 course, still look at other types of -- of
16 therapeutic avocational pursuits, volunteer
17 work, supported work programs. But for the
18 most part, non-catastrophics tend to be more
19 open to a return to at least part-time work.
20     But more importantly, from a
21 non-catastrophic standpoint, we tend to
22 develop rehabilitation plans as opposed to
23 life-care plans, because their needs from
24 both a medical, rehabilitation, case

12

1  management, and psychological standpoint,
2  tend to be somewhat less involved,
3  considerably less involved than the
4  catastrophic cases.
5      Q   You mentioned in the
6  non-catastrophic cases that the patients
7  incurred disabilities, but that they may be
8  able to get back to work, to some sort of
9  function. What's the disabil -- is there a
10 disability in these six cases that you're
11 talking about?
12     A   Well, they happen to be
13 disabilities both -- both related and
14 non-related to the issue at hand. I mean,
15 certainly, the onset of diabetes clearly, in
16 and of itself, represents a medical
17 situation. You know, it's a chronic medical
18 need that has to be addressed. But for many
19 of these individuals, there are also
20 premorbid psychological issues and/or medical
21 issues that related to their ability to work,
22 may have related to their eligibility for
23 disability. And --
24     Q   And were --

13

1      A   I'm sorry.
2      Q   Were there premorbid issues also
3  relating to their health?
4      A   Well, of course. I mean, I
5  think, automatically, if it's a disability
6  and/or a chronic illness, either way it has a
7  relationship to their overall health picture.
8      Q   When you -- and you're
9  mentioning -- you're describing diabetes as a
10 chronic illness?
11     A   You know, probably, I would
12 refer to it as much as a chronic illness or
13 chronic health care need more than I would a
14 chronic disability.
15     Q   Would you refer to hypertension
16 in the same category?
17     A   Yes.
18     Q   Or obesity?
19     A   Yes.
20     Q   High cholesterol?
21     A   Yes.
22     MR. SULLIVAN: Okay. Let me
23 mark as an exhibit your CV, please.
24     (Whereupon, Deposition Exhibit

14

1  No. Deutsch-1, C.V. was marked for
2  identification.)
3      MS. MARTINES:  You want him to
4  look at the marked one first?
5      MR. SULLIVAN:  Just give me a
6  second.  I want to compare what you gave
7  me, Mr. Deutsch, what I have here.
8      THE WITNESS:  It is Dr. Deutsch,
9  if you're not aware of that, but you
10  know, it's whatever you would like to --
11  BY MR. SULLIVAN:
12      Q  Dr. Deutsch, that's because
13  you've earned a Ph.D.; is that correct?
14      A  That's correct.  I'm not an M.D.
15  I'm a Ph.D., but --
16      Q  When you say you're not an M.D.,
17  you're not a medical doctor, correct?
18      A  I'm not a medical doctor.
19      Q  Do your patients who you work
20  with refer to you as doctor?
21      A  Actually, I'm pretty relaxed
22  around my office.  Those who are comfortable
23  with it call me Paul.  Many are not
24  comfortable, and they call me Dr. Paul.  But

15

1  it just depends on, you know, their
2  background and, you know, some just can't get
3  relaxed, but ... and some need the doctor
4  title, especially those in the counseling
5  practice tend to need it but, you know, I'm
6  not that ... I'm not that tied to it.  But in
7  deposition, most people aren't going to call
8  me Paul, so if we're going to go with a
9  title, "doctor" is more appropriate than
10  "Mr."
11      Q  When you're working with your
12  patients, do you make each and every one of
13  them aware that you're not a medical doctor?
14      A  Oh, sure.  They all know that.
15  We go through a little orientation when we
16  start, depending upon the nature of the case,
17  as to exactly what we're going to do and why
18  they're here and what my involvement is, and
19  so, if it is forensic related, if it's a
20  litigation case, I'm very specific as to what
21  my role is and what my role can't be.
22      Q  Right.  And I understand that
23  you talk with your ... clients and patients
24  about what you can and can't do.  I was

16

1  asking more specifically, do you let each and
2  every one of them know that you're not a
3  medical doctor?
4      A  Oh, sure.
5      Q  Okay.
6      A  I mean, that's part of that.
7  When I say I'm -- I talk about my role, that
8  certainly is part of my introduction, what my
9  background is, what my training is, what
10  they're here for, how I can -- I will be
11  interacting, what my expectation is of their
12  interaction with me, so that's all part of
13  it.
14      Q  Okay.  My -- from my quick
15  review, it looks like the CV that you just
16  handed me is the same as the one that --
17      A  Yes.
18      Q  -- was produced in the
19  litigation to us?
20      A  I agree with you.
21      Q  Okay.  Do you want to -- I think
22  I have -- I can't say I have the same copy,
23  but I think I have another copy.
24      MS. MARTINES:  Oh, I'm fine.

17

1      THE WITNESS:  I have multiple
2  copies if anybody needs it.
3      MS. MARTINES:  Here, I'll take
4  one just --
5  BY MR. SULLIVAN:
6      Q  Can we talk a little bit about
7  your background and training?
8      A  What else would I say, but yes?
9      Q  Okay.
10      A  That's a very polite question,
11  but I always wanted to say, no, just to see
12  what somebody would do.
13      Q  We can go ahead and have
14  breakfast and think about it because I'm not
15  quite sure how I would respond.
16      Could you tell us -- can you
17  tell me what degrees you've attained?
18      A  Sure.  I have a Bachelor's
19  degree in psychology from Rollins College in
20  Winter Park, Florida.  I have a Master's in
21  rehabilitation counseling and a program
22  called the experimental analysis of behavior,
23  which is a joint clinical psychology and ...
24  behavioral or experimental psychology program

5 (Pages 14 to 17)

18

1    in ... or at the University of Florida,
2    excuse me. So, took a joint program there,
3    basically majoring in vocational
4    rehabilitation counseling, and minoring in
5    experimental analysis of behavior.
6        When I completed my Master's, I
7    worked for a few years and went back to the
8    University of Florida. At that time, you
9    took your -- you were admitted to the
10   Department of Rehabilitation Counseling, but
11   you had to chose a closely related program
12   for your Ph.D. They didn't have their own
13   Ph.D. program, so I went through a joint
14   program of counseling psychology and
15   counselor education, with a primary emphasis
16   in rehabilitation and a subspecialization in
17   spinal cord injuries. I wanted to really
18   focus on catastrophic disability, and you
19   have the option to choose one area of major
20   emphasis besides your primary emphasis of
21   rehabilitation. And so I chose spinal cord
22   injury as a subspecialty.
23       **Q   You mentioned that, at that**
24   **time, Florida didn't have a doctorate**

19

1    **directly in rehabilitation? Is that -- did I**
2    **understand that correctly?**
3        A   Well, no, yeah. Rehabilitation
4    counseling, voc rehab, did not have a Ph.D.
5    program. So, actually, because I was
6    originally interested in psychology, and was
7    actually admitted to the psych program, I
8    actually turned them down. I was really
9    interested in rehabilitation, so kind of
10   worked out really well for me because it
11   allowed me to emphasize rehabilitation but
12   get the Ph.D. in counseling psych. So I got
13   the best of both worlds, really, focusing
14   more on rehabilitation psychology.
15       And ... then when I left there,
16   I really started developing the whole concept
17   of -- of life-care planning. First wrote a
18   text in that area, actually a two-volume text
19   in that area in 1981, and went on in '85 to
20   publish a Guide to Rehabilitation, and so I
21   began researching and developing the basic
22   methodologies, tenets, principles of
23   life-care planning in the mid-70s.
24       **Q   You're the father of life-care**

20

1    **planning --**
2        A   Well.
3        **Q   -- is that right?**
4        A   I've been referred to as that.
5    Yes.
6        **Q   Well, you came up with the idea,**
7    **right?**
8        A   I did.
9        **Q   How many people practice that**
10   **now around the country?**
11       A   A lot. I mean, there's
12   probably ... about 11-1200 board-certified
13   life-care planners. There's probably, in the
14   U.S., probably about -- I would estimate,
15   maybe 2500 that practice the subspecialty.
16       In England, there's probably
17   four or 500 or more that are using principles
18   of life-care planning; over 1000 case
19   managers that use some aspects of it in
20   Australia. It's growing very large. It's
21   spreading pretty heavily throughout Europe.
22       We're ... you know, at this time
23   the Commission on Accreditation of
24   Rehabilitation Education, about four years

21

1    ago, five years ago, which accredits all
2    rehab programs that provide Master's or
3    Doctoral programs, public and private,
4    require that it be a part of the curriculum
5    in all state and private universities in the
6    United States. So, it's become a ... a core
7    part of rehab training.
8        **Q   You mentioned, at the beginning**
9    **of your answer, certified life-care planners.**
10   **What is the certification process?**
11       A   Right now, there's a core
12   curriculum requirement. First of all, you
13   have to be licensed in an area of -- a
14   specialty, either you have to be an M.D., a
15   nurse, a Master's in rehab.
16       **Q   This is a predicate to be able**
17   **to certify?**
18       A   Exactly. You have to hold
19   certification or licensure in a healthcare
20   specialty. Then you have to show that you
21   have gone through training in the core
22   curriculum that's required. There's 120
23   hours of core curriculum credits. There are
24   several universities through which you can

22

1  obtain that training: University of Florida,
2  Kaplan University are two examples. There
3  are a couple of others.
4       Now, you can go directly through
5  those training programs, or if you can show
6  that you have taken courses in those areas
7  that will satisfy those requirements, you can
8  do that, as well.
9       There's ... a peer-review
10  process on work in life-care planning that
11  you have to submit, and the actual reports,
12  plans, that are reviewed after you've shown
13  that you've completed the core curriculum
14  requirements, and then there's an examination
15  process.
16       And then once completed, there's
17  the usual continuing education requirements.
18  And that's handled by the Commission on
19  Healthcare Certification, although I
20  understand, very recently, they've undergone
21  a little name change and now refer to
22  themselves as the International Commission on
23  Healthcare Certification. And that's the
24  group currently that's handling

23

1  certification.
2       Q   You mentioned that there -- that
3  some life-care planners have a predicate of
4  being doctors, medical doctors?
5       A   There are some M.D.'s that have
6  gone through -- in fact, there's currently
7  several M.D.'s that are part of the
8  University of Florida program. I think
9  there's a couple that are part of the Kaplan
10  University program. There are quite a few
11  that have gone through it before.
12       I know some -- you know, and I
13  know some physicians that ... that make
14  themselves available to do life-care plans
15  that have not gone through the training,
16  don't feel they need to; just, you know -- I
17  mean, there's nothing to stop them from doing
18  it, you know. Whether they really
19  understand ... really understand the
20  philosophy behind life-care planning or not,
21  is another story.
22       But the bottom line is, there
23  are physicians that do it who have -- I think
24  quite a few more that do it that have gone

24

1  through the training than those that haven't,
2  but the bottom line is, we have physicians,
3  we have rehab psychologists, we have voc
4  rehab counselors, we have a lot of R.N.'s,
5  both rehab nurses and non-rehab nurses, we
6  have a lot of case managers that have come
7  from a variety of healthcare professions that
8  have then come into life-care planning.
9       Q   What's the importance of the
10  certification process?
11       A   Well, it's like any other
12  certification process. It's designed ... to
13  really to show that you've met at least
14  certain minimum standards. What we're -- and
15  as far as -- as training to enter into the
16  process.
17       I mean, the real goal that I
18  would have for any life-care planner really
19  comes through the training more than the
20  certification.
21       The hope with the -- the
22  certification is that you've gotten people to
23  meet the minimum training standards, and
24  through training, which you're hoping to do,

25

1  is make people aware of what the standards,
2  processes, principles, tenets, and
3  methodologies of life-care planning are.
4  It's not that you're trying to get everybody
5  to reach the same kinds of conclusions, but
6  you're trying to get everybody to use a
7  consistent process. No different than
8  physicians, for example, using clinical
9  practice guidelines.
10       There are guidelines for how you
11  approach a given -- a given medical
12  condition. Within those guidelines and those
13  standards, there are clinical judgments you
14  make. There are different choices for
15  attacking an individual patient problem. And
16  individual patient characteristics require
17  that you approach problems differently.
18       So, a professional opinion can
19  be different, based on those approaches. But
20  there are standards for how you make those
21  choices. And so what we hope is, that,
22  for example, when you go about making
23  decisions, that you have a solid foundation
24  for the decisions you make.

7 (Pages 22 to 25)

26

1    And I teach that, you know,
2  there are four fundamental foundations you
3  have to meet.  You have to have medical
4  foundation; you have to have case management
5  foundation; you have to have psychological
6  foundation; you have to have rehabilitation
7  foundation for each of those portions of the
8  plan that represent those areas.  And there
9  are specific steps for establishing
10  foundation within each of those areas.
11    Q   I missed -- medical,
12  rehabilitation --
13    A   Case management and
14  psychological.
15    Q   Psychological, thank you.
16    If I look at your C.V. that we
17  marked as Deutsch One, I see C.L.C.P.  I see
18  a whole slew of letters after your name.  One
19  of them is C.L.C.P.  Is that the
20  Certification For Life-care Planning?
21    A   Right.
22    Q   Okay.  There are others there,
23  as well.  I see ... C.R.C.  What is that?
24    A   That's the commission -- that's

27

1  Certified Rehabilitation Counselor from the
2  Commission on Rehabilitation Counselor
3  Certification.  C.C.M. is Certified Case
4  Manager, and the F.I.L.C.P. is Fellow of the
5  International Academy of Life-care Planners.
6    Q   So the C.R.C. is Certification
7  For Rehabilitation?
8    A   For vocational rehabilitation
9  counselors.
10    Q   And that's -- is that one of the
11  components that you just gave me, the four
12  foundations, was rehabilitation?
13    A   It is, that's true.  But, this
14  really is a certification more specifically
15  in vocational rehabilitation.  The
16  rehabilitation foundation that I want to see
17  in the life-care plan refers more generally
18  to, not just vocational rehabilitation, but
19  to all aspects of rehabilitation beyond just
20  vocational rehabilitation that apply to
21  whatever the specific disability is.
22    So, if we're dealing with spinal
23  cord injury, for example, I'm concerned about
24  making sure, beyond the medical, that you

28

1  understand all of ... the -- the aspects
2  of ... aging with disability, for example,
3  the declination charts, how, over time,
4  disability in spinal cord injury combine to
5  make changes in the cardiovascular system,
6  the renal system, the musculoskeletal system,
7  and of course, we're getting kind way beyond
8  the scope here.
9    But the point is that we're
10  concerned about everything from initial post
11  acute stabilization of the spinal cord
12  injury, as we move into the rehabilitation
13  process, all the way through how spinal cord
14  injury and the process of aging over time
15  impacts functionality.
16    Q   If I can -- see if I understand
17  that correctly.  What you have that
18  certification for, for vocational
19  rehabilitation, some of those skills are
20  utilized in your life-care planning, but you
21  go much broader than that?
22    A   That's true.
23    Q   Okay.
24    A   Fundamental voc rehab does

29

1  require that you learn the medical aspects of
2  disability.  But there's no question, if you
3  look at a Guide to Rehab, for example, you'll
4  see that we cover the medical aspects of
5  every condition listed in the AMA Guide of
6  Permanent Impairments.
7    The new text that's replacing
8  that goes way beyond what Guide to Rehab will
9  do.  With 5,000 pages, we have the ability to
10  cover ... an immense amount of material, and
11  we're bringing in specialists, medical
12  health-related professional, neuro-
13  psychological, psychological, surgical
14  specialists in literally every area you can
15  imagine.  I mean, it's quite a -- quite an
16  opportunity for us to provide a reference
17  that hopefully will be helpful, not just to
18  all the life-care planners, but to everybody
19  that -- that needs to understand the nature
20  of disability and its impact.
21    Q   You mentioned the certification
22  after that on your resume, the certified case
23  manager?
24    A   Right.

30

1      Q    And you mentioned, as one of the
2  four foundations of life planning, there's
3  case management?
4      A    Correct.
5      Q    Are those -- so some of the
6  skills that you bring or that you learn and
7  that you're certified for as a case manager,
8  at least some of the skills that you bring to
9  life planning; is that accurate?
10     A    Right.  And case management is
11  really a very critical area in this regard
12  but yes, you're correct.
13     Q    Could you describe case
14  management to me?
15     A    Sure.  And these days, I tell
16  you what, it's one of the most difficult of
17  the exams, if not the most difficult of the
18  examinations that are out there.
19         Case management refers to the
20  managing the -- medical, psychological,
21  rehabilitation aspects of disability from the
22  time that basically the patient enters rehab
23  through the remainder of life expectancy.
24  This is the individual who should be skilled

31

1  at coordinating entry into rehab, overseeing
2  and interacting with the rehabilitation team,
3  but on discharge, would be responsible for
4  coordinating all of the home-health services,
5  interacting with the home-health agencies, or
6  arranging for private-hire teams.
7         We tend to prefer private hire
8  here for a variety of reasons, not the least
9  of which is, it's about 40 percent to
10  50 percent cheaper than home health.  That's
11  another story all together.
12         But we also arrange all of the
13  durable and replenishable medical goods and
14  equipment, medications, bulk supplies,
15  just -- you're basically implementing the
16  life-care plan and coordinating the life-care
17  plan.
18     Q    In cases -- in these cases -- do
19  you call litigation cases forensic cases, as
20  well?
21     A    Yeah.
22     Q    Either/or?
23     A    I think, generally, if we're
24  talking about just generally doing

32

1  consultation in an office, sometimes it is
2  easier just to say, forensic consultation.
3  Individual cases we talk about, you know,
4  we're consulting in litigation.  But,
5  generally, we'll refer to it as forensic
6  consultation.
7      Q    So, in these cases -- I'm
8  talking about these six particular cases --
9  what element of case management is involved
10  in your work?
11     A    Well, there's not case
12  management here, because you have to
13  recognize, there's a general principal as
14  well as specific ethics rules.  The general
15  principal in all healthcare professions is
16  that you can't be a treater and a consultant
17  at the same time.  And both C.R.C. and
18  life-care planning ethics rules specifically
19  state that, you know, you -- you are not
20  supposed to be a consultant and a treater.
21         Now, I say they specifically say
22  that.  The new rules in C.R.C. are not as
23  specific as the old rules.  They say that the
24  new rule subsumes the old rule.  I mean, it's

33

1  still there, it's just not as clearly stated
2  as it used to be, so it's a little hard to
3  find, but the bottom line is, when I'm a
4  consultant I'm not the case manager.
5      Q    You do, in your reports in this
6  case, though, recommend certain types of case
7  management; is that right?
8      A    Sure.
9      Q    So you bring to the life-care
10  planning process that you used even in these
11  cases, an understanding and an expertise, at
12  least in what case management is and how it
13  could help the patient?
14     A    Right.  I just don't use my --
15     Q    You just don't do it?
16     A    Yeah, I'm not going to do it and
17  I don't use my rate, because, quite frankly,
18  my rate when we do case management is really
19  charged at ... anticipating that we will be
20  doing catastrophic case management on very
21  complex cases.  The rate we charged here was,
22  you know, at a much, much lower rate.
23     Q    Is case management for
24  catastrophic cases, is that what it's geared

34

1    toward?
2         A    Oh, not necessarily at all.  In
3    fact, you'll find that -- the health
4    insurance companies take case management of
5    diabetics very seriously because if you can
6    help case manage your diabetic case load, you
7    can go a long way toward avoiding future
8    complications.
9         And if you avoid future
10   complications, the health insurance companies
11   can reduce considerably the long-term costs,
12   or at least stave them off for a considerable
13   period.
14        So groups like -- well, maybe I
15   shouldn't mention specific ones -- but there
16   are specific health insurance companies that
17   have set up programs or contracted with
18   programs that specifically reach out to do
19   case management with their -- their patients
20   that they insure that have -- that have been
21   diagnosed as diabetic.  And it's everything
22   from patient education to assistance in
23   either monthly, weekly, or even sometimes
24   daily consults for management, depending upon

35

1    how serious the patients are.  And it's very
2    effective.  And education is probably the
3    single most effective aspect of case
4    management with this particular type of
5    patient, the diabetic.
6         Q    Okay.  I see -- I've noticed
7    that on your web site today, you have all
8    these same letters next to your name, the
9    C.R.C., C.C.M.C., L.C.P., and it's in the CV
10   that you produced to us with your report.
11        Are you aware that you are no
12   longer certified as a rehabilitation
13   counselor?
14        A    No, I'm absolutely not aware of
15   that.
16        Q    Okay.
17        MR. SULLIVAN:  Mark this as
18   Deutsch Two please.
19        (Whereupon, Deposition Exhibit
20   No. Deutsch-2, C.V. was marked for
21   identification.)
22   BY MR. SULLIVAN:
23        Q    Are you aware that you are no
24   longer certified as a case manager?

36

1         A    No, I am not.
2         Q    Okay.
3         A    And I'm -- as far as I know,
4    I've turned in all of my correct hours, so I
5    would assume it's an administrative error if
6    they're suggesting that I'm not.
7         Q    Let me hand you Deutsch Two.
8    And I apologize for the copy.  We're trying
9    to get a better one, but you'll see that
10   there's a ... line in the middle of the
11   page that is blackened out by someone who I
12   think put a highlighter there with an arrow,
13   so it covers up some words.  But those words
14   indicate that your dues are paid through May
15   31, 2008.  And on the second page of this
16   document, you'll see that the records show
17   that you've not paid your dues.
18        A    Well, I did do my certification.
19   Apparently, my -- my update -- apparently, my
20   office just failed -- simply overlooked
21   paying the dues, so I'll make sure that's
22   taken care of.  I appreciate your pointing
23   that out.
24        Q    When you say, you did your

37

1    certification, what do you mean by that?
2         A    I -- my continuing education was
3    submitted.  So I know that I have my proper
4    certification update.  My continuing
5    education hours were updated.
6         Q    What are the requirements for
7    continuing education to be a certified case
8    manager?
9         A    Oh, gosh.  I think they're 20
10   hours a year.  There may be more, 20 to 25
11   hours a year.  I'm confident that my hours
12   are up to date, so if they failed to pay my
13   dues, I'll make sure that gets taken care of.
14        Q    And why is it that you're
15   confident that your hours are up to date?
16        A    Because I remember them being
17   submitted.  They're submitted on -- they're
18   not submitted on an annual basis.  They're
19   submitted on an every -- some of them are
20   every four years; some of them are every five
21   years.  So I know I submitted them properly.
22   I'm confident those are up to date.  Somebody
23   just failed to pay the dues.
24        Q    When -- when did you submit

38

1    those?
2        A    I have to pull the file.
3        Q    Was it this year?
4        A    No.
5        Q    Last year?
6        A    I'd have to pull the file.
7        Q    Do you know when your time
8    period is up so you have to submit more
9    certifications of C.L.E.?
10       A    I'd have to pull the file.
11       Q    You don't know?
12       A    I know I'm up to date because we
13   follow those very closely.  But I'm -- you
14   know, so all -- and it would -- if it had
15   said that I failed to meet my continuing
16   education requirements, I think it would note
17   that, not just that my dues were failed to be
18   paid.  But, it's -- all it's indicating here
19   is that my dues were not paid on a timely
20   basis.  So --
21       Q    Could I ask that you provide to
22   us, it could be after this deposition, a copy
23   of your --
24       A    We can probably do it on a

39

1    break.  We keep files on it.  I'm sure I can
2    identify when they were last submitted.
3        Q    Have you -- do you have a copy,
4    or have you reviewed the standards of
5    professional conduct for a certified case
6    manager?
7        A    I have copies of it, sure.
8        Q    Are you aware that it's a
9    violation of the standards of professional
10   conduct to hold yourself out as a certified
11   case manager when you're not?
12       A    Sure.  But the reality is that
13   what you're pointing out is that I simply
14   failed to realize that the dues weren't paid,
15   and I did not knowingly hold myself out as
16   being up to date with my C.C.M.  You're
17   pointing it out for the first time.  I'm
18   completely unaware of it.  And I'm sure that
19   if we -- and one of the first things I'll do
20   is notify the Ethics Committee that this
21   occurred.  I've always been cautious about
22   that, never violated, and you're informing me
23   for the first time that this occurred.  It's
24   a simple error, not an ethics violation.

40

1        Q    Sorry.  I'm asking you whether
2    you're aware that it's a violation of the
3    standards of conduct for you to have served
4    this report indicating that you're a
5    certified case manager when you are not?
6        MS. MARTINES:  Object to form.
7        THE WITNESS:  Sure, I'm aware it
8    would be a violation, and I will notify
9    the Ethics Commission after we get
10   through with this deposition.  But
11   again, I will put forth to you that I
12   don't think that I've -- that the Ethics
13   Committee will find me in violation, a
14   knowing violation of the ethics rule.
15   It's a simple error, not an intended
16   ethics violation.  My office simply
17   failed to pay the dues.  It was an
18   oversight on someone's part if, in fact,
19   it was.
20       One thing we also need to find
21   out is if, in fact, a check was sent,
22   and it simply wasn't properly noticed by
23   C.C.M.  And that's the other thing that
24   we need to check.

41

1    BY MR. SULLIVAN:
2        Q    So, at least at this point, you
3    don't know whether you're certified or not?
4        A    I don't know if the dues were
5    properly paid.  And we'll need to check that
6    with C.C.M. and get them brought back up to
7    date, but I will certainly check with the
8    Ethics Committee and inform them of what
9    occurred.
10       Q    Just because I'm not sure I got
11   the answer to my question, you don't know
12   right now whether you are certified; is that
13   fair to say?
14       MS. MARTINES:  Object to form.
15       THE WITNESS:  At least in terms
16   of the dues process, that is correct.
17   BY MR. SULLIVAN:
18       Q    And you need to pay your dues in
19   order to be certified?
20       A    That's certainly true.  That
21   doesn't mean that I am not fully eligible for
22   certification and fully board eligible.  It
23   simply means that there was an error in the
24   dues.

11 (Pages 38 to 41)

42

1    Q   And you can testify under oath
2  that you're positive that your C.L.E. for
3  case management is up to date?
4    A   We're going to find that out
5  before this depo is over.  In fact, if you
6  would like, we'll take a break, and we'll
7  check on that right now.
8    Q   Okay, we can do that but, at
9  this point, you're not -- are you positive
10 that it's up to date, or you need to check?
11   MS. MARTINES:  Object, form.
12   THE WITNESS:  Well, I certainly
13 think it makes sense to check.  I'm
14 about as certain as I can be, and
15 without actually having it in front of
16 me, but I have no reason to assume it's
17 not.  I'm confident that it is.  I've
18 always submitted my -- my continuing
19 education credits on time, and I'm
20 confident that had that been an issue
21 beyond the dues issue that you're
22 raising, you would have been notified of
23 that, as well, and that's not what
24 you're notified of, which you were

43

1  noticed of, was that I simply missed a
2  dues payment.
3    (Pause.)
4  BY MR. SULLIVAN:
5    Q   You mentioned the University of
6  Florida and Kaplan University have life-care
7  planner programs?
8    A   Correct.
9    Q   And you mentioned a couple of
10 others you thought also had them?
11   A   Well, I know that -- although
12 I'm not involved with it, I know Capital law
13 school has one.
14   Q   And they offer -- it's offered
15 through the law school at Capital, correct?
16   A   It's offered through ... their
17 paralegal school, I think, which I assume is
18 part of their law school.
19   Q   And Kaplan University, is that
20 an online university?
21   A   Yes.
22   Q   They don't have a campus?
23   A   Actually, they have ... they
24 have, I believe, a campus program, but not

44

1  for their -- I think the only campus program
2  they have, although I'm not really involved
3  enough to know about their campus programs,
4  is their law school campus.  I don't think
5  they have a campus for their Bachelor's or
6  their Master's programs, or for their
7  certificate programs.
8    Q   And other than Kaplan, Capital,
9  and University of Florida, do you know of any
10 other university that offers -- and is it a
11 degree in life-care planning?
12   A   No, it's not a degree.  It's a
13 continuing education program.  It's a
14 certificate program that offers the core
15 curriculum requirements of the certificate
16 program -- of the certification program.
17   Q   So, other than those three,
18 University of Florida, Kaplan, and Capital,
19 are you aware of any others that offer that
20 program?
21   A   Right now, those are the only
22 three.  The rest are just the -- that teach
23 it are, of course, just those that teach
24 under the guidelines of what core requires,

45

1  the Commission on Accreditation of
2  Rehabilitation Education, which is not the
3  core curriculum requirements, but basic
4  education in life-care planning.
5    Q   Where is Capital University
6  located?
7    A   I -- you know, in all honesty,
8  without looking it up, I can't tell you.  I
9  have nothing to do with it.  I know they use
10 materials from a Guide to Rehab and from
11 Roger Weed's text on life-care planning and
12 disability management, but I have no clue,
13 off the top of my head as to where they are.
14   Q   Is their life-care ... program
15 also an online program?
16   A   No.  I ... don't believe so.  I
17 understand they're taking part of it online.
18 That's been discussed.  But I don't know too
19 much about it, quite honestly, not been
20 involved with it.
21   Q   The campus of Kaplan that has
22 the law school, do you know where that is
23 located?
24   A   I don't.

12 (Pages 42 to 45)

46

1     Q   Okay.
2     A   I mean, it's easy enough for me
3  to find out, but I --
4     Q   But you do work for them, right?
5     A   I -- I have built four
6  curriculums for them.  That's part of what we
7  do is, we built four different curriculums
8  for them and maintain them.  I've built one
9  curriculum for University of Florida and
10  maintain it.
11     Q   And somebody else has done that
12  for Capital?
13     A   Somebody else developed the
14  curriculum for Capital with the -- with
15  getting permissions from myself and Roger
16  Weed for use of our materials.  They use our
17  materials to build the curriculum, but -- but
18  we have not had any involvement with them.
19     Q   Okay.  Thank you for that.
20        We covered some of this.  I just
21  want to make sure I get it correctly.
22        You're not a medical doctor --
23     A   Right.
24     Q   -- correct?  You never been to

47

1  medical school?
2     A   No.
3     Q   By the way, did you consider
4  going to medical school at some point?
5     A   Nope.
6     Q   Okay.  So you're not an
7  endocrinologist; is it fair to say?
8     A   Nope.
9     Q   You have no training in
10  endocrinology?
11     A   Nope.
12     Q   You're not a cardiologist; fair
13  to say?
14     A   No.
15     Q   And you have no training in
16  cardiology?
17     A   No.
18     Q   You're not an ophthalmologist,
19  correct?
20     A   Nope.
21     Q   And do you have any training in
22  ophthalmology?
23     A   Nope.
24     Q   You're not a podiatrist; is that

48

1  correct?
2     A   Nope.
3     Q   Do you have any training in
4  podiatry?
5     A   Nope.  Nor am I going to offer
6  any opinions on causation.
7     Q   You're not offering any opinions
8  in this case as to whether the ingestion of
9  Seroquel by any of these six plaintiffs had
10  any relationship whatsoever with their
11  diabetes; is that correct?
12     A   That's true, too.
13     Q   Okay.  You're not an
14  epidemiologist, either?
15     A   No.
16     Q   Have you had training in
17  epidemiology?
18     A   No.
19     Q   Can you make medical
20  recommendations?
21     A   Not -- no, I'm not making
22  medical recommendations, which is why I've --
23  where I have medical sections here, I've
24  written to the doctors and gotten their

49

1  responses back.  I've used clinical practice
2  guidelines, research the literature.
3     Q   When you write to the doctors,
4  do you do that for the purpose of getting
5  their medical opinions; is that correct?
6     A   Right.  Although in some --
7  well, we'll get to those, I'm sure.  I don't
8  know how much to -- I don't want to go
9  overboard and volunteer any --
10     Q   Why not?
11     A   Well, 'cause it's already going
12  to be eight hours long.  What I was going to
13  simply say was, there are some instances in
14  which, for example, you know, an
15  ophthalmologist may say, I need to follow
16  this patient yearly for this reason, but if
17  they were already going to be followed
18  because of a preexisting condition, I might
19  note the recommendation, but not include
20  dollars for it.
21     Q   You're -- okay.  But
22  nonetheless -- and I'm not asking about what
23  you do with that information.  When you send
24  the letter to that doctor, what you're

13 (Pages 46 to 49)

50

1    looking for is their medical opinion?
2        A   That's true.
3        Q   Okay.  And what you just said
4    is, there may be times that a doctor will
5    say, I need a visit a year with this patient,
6    but you knew already that patient was going
7    there for other purposes for a visit, so you
8    chose not to include that as an extra cost in
9    the plan that you set out.  Did I understand
10   that correctly?
11       A   Yes.
12       Q   Okay.  And, in addition to not
13   being able to give medical opinions, there's
14   certain things, as part of your job, that you
15   can't recommend, certain medical procedures,
16   they're not procedures that you would
17   recommend; is that fair to say?
18       A   That -- that is true.
19       Q   So things like diagnostic
20   testing, you're not the person to come to to
21   recommend whether that should occur or not,
22   that's for a doctor, correct?
23       A   In most instances, but, for
24   example, in spinal cord injury, where we have

51

1    four or five different clinical practice
2    guidelines that came together to set up 33
3    separate tests that are recommended as being
4    done on an annual basis for preventative
5    care, if we haven't got -- and this happened
6    more and more because of -- of lack of
7    available Medicaid or Medicare services to
8    some of these patients, we don't have
9    treaters like a physiatrist who is following
10   the patient, we will use the clinical
11   practice guidelines to show what the
12   recommended preventative measures are, many
13   of which are pathology lab studies.
14           But then we'll try -- what we'll
15   do is go to our ... contracted physiatrist
16   and use her, along with the clinical practice
17   guidelines, but generally, we prefer a
18   treating doctor to be available to provide
19   that.
20       Q   You mentioned your physiatrist.
21   The physiatrist that you use here, or the
22   ones that you use, they are medical doctors?
23       A   Yes.
24       Q   So even in those instances you

52

1    make -- if there's a situation where you
2    can't get a recommendation from a treating
3    medical doctor, you will run the potential
4    diagnostic testing by your physiatrist, a
5    medical doctor, before you put it in the
6    plan?
7        A   Absolutely.  But our preference
8    is the treater.
9        Q   But you're not qualified to do
10   that, you need to go to a doctor one way or
11   the other?
12       A   That's true.
13       Q   And that's the same with
14   laboratory, recommending laboratory testing,
15   you're not --
16       A   Well, I thought that's what we
17   were talking about, but whether it's
18   laboratory tests, MRI, PET scans, x-rays,
19   those kinds of things, we're going to look
20   for a combination of treating physician, if
21   we have to, a consulting physician, and
22   clinical practice guidelines hopefully in
23   combination to support that.
24       Q   And is it fair to say that you

53

1    are not qualified to determine the medical
2    needs of any individual on your own?
3        A   I think that's fair to say, as
4    long as we can concur what are medical needs
5    versus what are rehab or case management
6    needs, I think that's the case.
7        Q   Why don't you tell me your
8    understanding of the difference between the
9    two?
10       A   Well, for example, we -- we
11   don't necessarily look to a physician to
12   determine that a spinal cord patient needs a
13   wheelchair.  You know that -- that's not --
14   an insurance company, a health insurance
15   company might require a physician to order a
16   wheelchair before they'll pay for it, but
17   under the law, outside of a rule by the
18   health insurance company, that is not a
19   requirement.
20           But then, again, any kind of
21   injection, a physical therapy prescription,
22   for example, is required by a physician for
23   that spinal cord patient.  O.T. and P.T.
24   occupational therapy and speech therapy are

14 (Pages 50 to 53)

54

1    not required prescriptions by a physician.  A
2    health insurance company would rule that they
3    need it to pay for it, but the law does not
4    require it.
5         Q    You've mentioned a couple of
6    times spinal cord injuries and other
7    catastrophic injuries like that.  Is that
8    where the majority of your practice is
9    devoted?
10        A    I'd say, probably -- you mean,
11   spinal cord or catastrophic?
12        Q    Catastrophic.
13        A    Catastrophic probably represents
14   between 90 and -- well, 90-plus percent of
15   the practice.
16        Q    And I've seen in -- I'm not
17   sure, either on your web site or elsewhere
18   mention that, for the most part, you accept
19   catastrophic cases, but non-catastrophic
20   cases you're -- you'll try not to accept; is
21   that fair to say?
22        A    No, I don't think that's fair to
23   say.  We certainly take non-catastrophic
24   cases.  The ... it's just that the majority

55

1    of cases we are referred are catastrophic,
2    and ... usually, those who come to us with
3    non-catastrophics are ... either ... carriers
4    and/or attorneys who know us and have been
5    using us in catastrophic, and so, you know,
6    we're always going to agree, because we work
7    with them, we're not going to turn them away.
8    Our non-litigation practice very much is
9    catastrophic.  My counseling practice, that's
10   almost exclusively catastrophic.  But within
11   the forensic arena, we -- you know, we
12   certainly do see non-catastrophics.
13        Q    So ... when you're doing a
14   non-catastrophic case, it's almost always in
15   litigation?
16        A    I'd say, for the most part.
17   There -- we do occasionally get referrals of
18   non-catastrophics outside of litigation, but
19   the vast majority of our non-litigation work
20   does tend to be catastrophic.
21        Q    And I'll try to be clear about
22   this as I go through, but I'll bet you I'll
23   fail.
24        I'm going to ask now a question

56

1    about the six plans that we're talking about
2    in this litigation.
3         In those -- in the reports that
4    you've given me, is what you have in there,
5    is that life-care planning or is that
6    rehabilitation planning?
7         A    I think that was very clear, and
8    I think it's rehabilitation planning.  If
9    they came to me as non-litigation cases, then
10   we were taking the totality of their history.
11   They probably would fall somewhere between
12   non-catastrophic and catastrophic because we
13   were dealing with all of the ... we'd have to
14   look at each individual patient, but taking
15   them as a group, you know, there's enough of
16   them that have a combination of histories of
17   healthcare, both mental and physical
18   healthcare issues that we wouldn't be doing
19   necessarily a simple rehabilitation plan.
20        But I'm looking at the diabetes,
21   and the diabetes is clearly a rehabilitation
22   plan or a health plan.  It's not a life-care
23   plan.  And I purposely didn't use life-care
24   plan pages to outline this.  I know a lot of

57

1    life-care planners would.  I just think, for
2    my practice in particular -- maybe I'm being
3    egotistical, and I don't mean to be, but I
4    think it particularly gives a message,
5    because for 36 years I've made so very clear
6    that distinction that even, particularly with
7    attorneys that know me, and companies that
8    know me, if I put it out on a life-care plan
9    page, the message seems pretty clear, I'm
10   calling it catastrophic, even when I just
11   borrow a few pages from the life-care plan to
12   organize it better.  So I'm very cautious
13   about doing that.
14        Q    Okay.  So I'm clear, and the
15   answer is very helpful, but I want to get the
16   shorter answer.
17        The reports in this case are
18   rehabilitation plans not life-care plans?
19        A    That's absolutely true.
20        Q    Okay.
21        THE WITNESS:  I've never heard
22   an attorney say they wanted to get a
23   short answer from me before, have you?
24        THE COURT REPORTER:  Oh, never.

15 (Pages 54 to 57)

58

BY MR. SULLIVAN:

Q   I do see in the reports, though, that there are mentions of ongoing treatment for things other than the diabetes.  Do you recall that?

A   There are, but I'd have to go to the individual areas and ... and address each one.  It's hard to do it in general -- I mean, there's some areas where we talk about ongoing, but put no dollars.

Q   Yes, I know that.

A   And some areas where we talk about ongoing and do put dollars, so it's kind of hard to address it.

Q   Well, I've seen those and there may be in two areas; one is, you don't put any dollars on them because it was going to occur, anyway.

A   Right.

Q   And another is because it doesn't have anything to do with the diabetes.  And it's that second part that I was asking about.

There seemed to be some

59

recommendations in these rehabilitation plans that aren't related to diabetes.

A   Well, if -- if it's something a doctor mentioned that might have relationship to the diabetes, but it looked like, to us, from looking at premorbid issues, that it was going to occur, anyway, I didn't want to ignore what the doctor said, and I didn't want to have questions raised saying, why are you ignoring what the doctor said, what gives you the right to do that.  It seemed that the more prudent approach was, address what the doctor said and explain why you didn't charge for it.

Q   Okay.

A   And ... and so it seems -- it always seems better to confront directly those kinds of questions, show them, and make clear to everyone why it doesn't belong as a cost.  That way there's no question.  The jury understands why it doesn't belong, you don't have a question about it.  If you're satisfied, plaintiffs' satisfied, seems like the jury would be satisfied, and we put it to

60

rest.

Q   And if I could ask you this, as well:  You don't make life expectancy recommendations, either, do you?

A   No.  I mean, I have testified before that if you have specific journal articles about life expectancy regarding the population of patients as a whole, I will address questions about the research article.  But I will not address those questions as it relates to specific patients.  I believe that the medical doctor has to do that by examining that patient, the totality of that patient's medical condition.  I can't examine the patient for their total medical condition, but I will address a research article, or articles, if those questions are raised.

Q   So, to narrow it down to this case, for each of the six plaintiffs for whom you've given reports, you do not make life expectancy recommendations --

A   No.

Q   -- correct?  And you're not

61

qualified to do that for each of the individual plaintiffs, correct?

A   No, I will not do that.

(Pause.)

Q   So, you are offering no life expectancy opinions in any of these cases, correct?  Is that correct?

A   That is correct.

Q   Thank you.

And one of the reasons in litigation cases that you stay away from offering medical opinions is because that allows you to get past a Daubert challenge; isn't that correct?

MS. MARTINES:  Object to form.

MR. LAMINACK:  Objection.

THE WITNESS:  I'm sorry, would you repeat that?

BY MR. SULLIVAN:

Q   One of the reasons that you avoid giving medical opinions in the reports that you offer in litigation cases is because that helps allow you to get past a Daubert challenge; isn't that correct?

16 (Pages 58 to 61)

62

1    **MR. LAMINACK:**  Objection.
2    **MS. MARTINES:**  Object to form.
3    **THE WITNESS:**  Not really.
4    **MR. SULLIVAN:**  Having you --
5    **MS. MARTINES:**  Let him answer.
6    **THE WITNESS:**  I don't do it
7    because it would be outside my area of
8    expertise.  So what you're suggesting is
9    that I'm avoiding a Daubert challenge
10   by -- by not doing it.  Well -- and if
11   it weren't for a Daubert challenge, I
12   would do it.  But that's not true.  I
13   wouldn't do it because it's not within
14   my area of expertise, and it would be
15   inappropriate and unethical for me to do
16   it.
17        The fact that, on the side, you
18   know, it avoids a Daubert challenge is
19   really not an issue for me because it
20   would be totally appropriate to raise a
21   Daubert challenge if I was going outside
22   my area of expertise.
23   **BY MR. SULLIVAN:**
24        **Q**    You certainly have shown an

63

1    **interest in the past in how life-care**
2    **planners can get past Daubert challenges; is**
3    **that correct?**
4        **A**    No.
5        **MS. MARTINES:**  Object to form.
6        **THE WITNESS:**  I think it's the
7    reverse.  I've shown an interest in the
8    past in explaining, from my
9    understanding, the issues of Daubert to
10   life-care planners, and in explaining
11   that, in my opinion, Daubert raises a
12   standard which, if met by life-care
13   planners, only improves the quality of
14   the work that they do.  And that they
15   shouldn't fear Daubert, or Frye or
16   Schreck or whatever standard is used in
17   whatever state; that they -- if they
18   would live up to those standards and see
19   it as -- as a standard, just one more
20   standard within their profession they
21   need to meet, that it is something that
22   is good for whether they're rehab
23   psychologists or neuro-psychologists or
24   nurses, it's something that -- that is

64

1    actually good for them, not something
2    for them to fear.
3        So I've never looked at it as an
4    issue of how do you get around it, or
5    how do you -- you know, you avoid a
6    Daubert challenge.  Frankly, you can
7    potentially get challenged, no matter
8    what the quality of your work is.  The
9    key is, just maintain the quality, stay
10   within your field, and you'll be fine.
11   **BY MR. SULLIVAN:**
12       **Q**    But we can agree that you have
13   **published in the past on how life-care**
14   **planners can meet Daubert and not have their**
15   **testimony stricken; isn't that true?**
16       **A**    Okay.  How they can meet
17   Daubert, yes, absolutely, I have written
18   about Daubert along with co-authors, and what
19   they need to do to remain as educators and to
20   do their job.
21       **Q**    And to not have their testimony
22   **stricken?**
23       **MS. MARTINES:**  John, I'm going
24   to ask you to let him finish his answers

65

1    before you ask another question.
2        **THE WITNESS:**  Well, I think
3    that -- I'm sorry -- I think that's a
4    natural outcome.  I don't think that our
5    primary goal is to teach them not to
6    have it stricken.  And the concern I
7    have is this, that I'm not trying to be
8    a lawyer.  I think a lawyer teaches them
9    the issues of what challenges come up
10   and how to avoid having your testimony
11   stricken.
12        What I try and teach them is,
13   from my perspective, what are the
14   questions that are asked, not just the
15   basic questions, the four that the
16   Supreme Court raised, and the two extra
17   ones that were raised in Texas, but ...
18   you know, within those questions, what
19   are the issues, from a life-care
20   planning standpoint, that may be brought
21   about and -- and, you know, what are the
22   standards that you really need to
23   maintain.
24        And one of the big things that

17 (Pages 62 to 65)

66

1    I've raised is, I think there are
2    foundations that you need to have met,
3    as life-care planners, to be making
4    recommendations that you're making, and
5    that there are -- not just the original
6    standards, tenets, principles, and
7    methodologies that we talked about,
8    the process that we believe in
9    life-care planning that has to be
10   followed, but foundations that you need
11   to meet in the recommendations that
12   you're making.
13         So, sure, I've certainly tried
14   to help, along with other leaders in the
15   field, Roger Weed and Susan Grisham and
16   Patty McCullom, who's now passed, but we
17   have both written and talked about, you
18   know, about our understanding of
19   Daubert, but we've never tried to do it,
20   and we've always stated this from a
21   legal perspective.  We're not attorneys,
22   but just from what our understanding is
23   in terms of -- of our individual areas
24   of expertise.

67

1    BY MR. SULLIVAN:
2        Q   Are you uncomfortable with
3    stating that one of the reasons you write
4    these articles, or you've written these
5    articles and spoken with, or spoken to other
6    life-care planners is so that they cannot
7    have their testimony stricken?
8         MS. MARTINES:  Object to form.
9         THE WITNESS:  Only in the sense
10   of the way I'm interpreting it.  I don't
11   want it -- I don't want to have it
12   suggested that I'm giving a legal
13   perspective.  If we keep it to the
14   suggestion that that question is from my
15   perspective as a life-care planner, so
16   when I hear the word "stricken" I -- I'm
17   interpreting it as ... more of a legal
18   discussion with these people about how
19   you avoid those legal arguments related
20   to having testimony stricken.  And that
21   makes me uncomfortable.
22        But as long as we're in
23   agreement that I'm talking to them about
24   meeting standards in life-care planning

68

1    to avoid that, strictly from a life-care
2    planning perspective, then I don't have
3    a problem with your language.
4    BY MR. SULLIVAN:
5        Q   Have you done rehabilitation
6    plans for diabetes before these six cases?
7        A   Independent, with diabetes being
8    the only issue, I don't know that I have.
9    Has diabetes been a part of other plans that
10   we've written, oh, many times.  I mean,
11   diabetes is a common secondary factor, but
12   not a common single factor unrelated to other
13   disabilities or problems.
14       Q   So, if we go back to what you
15   testified about before with regard to this
16   plan, where it's focused on diabetes, and
17   there may be other information in there
18   because the doctor has mentioned it or it's
19   in the file, but the focus is on diabetes,
20   these six cases are the first time that
21   you've ever done that?
22       A   As a primary diagnosis ... I
23   would tend to think so.  I'd probably have to
24   do a computer search to see if we had any

69

1    other where that was the primary.
2         Now, let me tell -- let me say
3    this ... we have had other cases where, as a
4    result of diabetes being the primary
5    diagnosis, we have had complications that
6    we've had to deal with, amputations, et
7    cetera, and we were dealing with diabetes
8    much further down the line.  And so we were
9    dealing with the amputation, the prosthesis,
10   these kinds of things.
11        But dealing with it at this
12   stage ... diabetes, as the primary diagnosis,
13   and we were focusing primarily on just
14   diabetic management and no other
15   complications from diabetes, I'd have to say
16   probably ... probably, yes.
17        MR. SULLIVAN:  Could you read
18   back my question, please?  I just want
19   to know what I asked.
20        COURT REPORTER:  Question:
21   "Have you done rehabilitation plans for
22   diabetes before these six cases?"
23   BY MR. SULLIVAN:
24       Q   So the end of that answer you

18 (Pages 66 to 69)

70

1   meant -- the answer is:  Probably, no?
2       MS. MARTINES:  Object to form.
3   BY MR. SULLIVAN:
4       Q   Is that right?
5       MS. MARTINES:  Same objection.
6       THE WITNESS:  I think you're
7   right.
8   BY MR. SULLIVAN:
9       Q   Okay.  Did you use -- consult
10  with your physiatrist on any of these six
11  cases?
12      A   No.
13      Q   It's not her area of specialty,
14  right?
15      A   I don't think it would be.
16      Q   She's a pain doctor, right, pain
17  medical doctor?
18      A   No.  No, she's a physical
19  medicine rehabilitation physician.  They
20  usually follow, you know, brain injuries,
21  spinal cord injury, you know, all the
22  catastrophics.
23      Q   Okay.
24      (Pause.)

71

1       Q   In these six cases, are any of
2   the management needs that you put in the
3   rehabilitation plans not medical needs?
4       (Pause.)
5       A   Well, first eliminating --
6   eliminating some of the recommendations that
7   I said were appropriate but necessary
8   premorbidly, and focusing only on those that
9   have cost --
10      Q   Sure.
11      A   -- there are a few that are
12  non-medical, like supplies.  I mean, they
13  don't require a medical doctor.  But I'd say,
14  the bulk, like the follow-up medical care,
15  the medical visits, the medications, you
16  know, the case management, and the
17  nutritional, those -- those are really more
18  in the rehab and the case management arenas
19  than they are the medical arena.
20      Q   I guess I lost you during that
21  answer.  I'm asking -- you mentioned
22  medications, follow-up Medicare?
23      A   The medical care, the
24  medications, they're all in the medical

72

1   arena.  The case management, nutritional
2   and ... I mentioned ... let's see, I said
3   case management, nutritional, any kind of --
4   of therapeutic modality, if there was some
5   counseling that was recommended, anything of
6   that nature, are really -- and, of course,
7   the supplies, are really more in the either
8   rehabilitation or case management arena.
9       Q   So, the only thing that you're
10  saying are medical needs, for which you've
11  applied costs, are the medications and the
12  follow-up care with the doctors?
13      MS. MARTINES:  Object to form.
14      THE WITNESS:  It's really not
15  that much in the way of medical, because
16  we don't include complications.  I mean,
17  we acknowledge the complications can
18  occur, but unless there's a medical
19  doctor who's going to state, within a
20  reasonable probability or a reasonable
21  medical certainty that they'll occur, we
22  don't include them.
23      Now, if they're present on a
24  specific patient -- we're talking

73

1   generalities right now -- but if they're
2   present, if somebody already has
3   peripheral neuropathy, or somebody
4   already had ... another complication,
5   that would be one thing.  But, whether
6   in a life-care plan or a rehab plan, we
7   can, for information, talk about the
8   fact that complications occur, but the
9   fact of the matter is, we don't cost
10  them out, unless a doctor is going to
11  say, within a reasonable degree of
12  medical probability or certainty, they
13  expect a complication or complications
14  with a given patient, based on what's
15  going on with that patient.
16  BY MR. SULLIVAN:
17      Q   Just want to make sure I get the
18  answer to my question correct.
19      Other than -- do I have this
20  correctly, that other than the medications
21  that you recommend and the rehabilitation
22  plans and the follow-up medical care with
23  doctors, you don't see any other
24  recommendations you make in the

19 (Pages 70 to 73)

74

1    rehabilitation plans that are medical needs?
2        MS. MARTINES:  Object to form.
3        THE WITNESS:  Well, generally,
4    that, I think is true, except in those
5    cases in which a patient has had a
6    specific additional recommendation
7    because they have an existing peripheral
8    neuropathy, and a doctor's made a
9    specific recommendation for, like, an
10    EMG, or for specific lab testing, or
11    specific follow-ups, so unless there's a
12    specific problem, if all we're doing is
13    basic diabetic management, then, in that
14    portion of the report that deals with
15    what is happening now, that is all
16    that's there.
17    BY MR. SULLIVAN:
18        Q    In the areas -- in that area, if
19    it occurs, and in those two general areas you
20    mentioned, medications and follow-up medical
21    care, in those areas, you need a doctor's
22    recommendation in order to put that in your
23    rehabilitation plan, right?
24        A    That's what we -- that's what we

75

1    would need, that's correct.
2        Q    Okay.
3        A    Well, keep in mind, if the
4    doctor -- it can also come from the doctor's
5    records. I mean, if the doctor's already
6    ordering medication that they're on, if the
7    doctor's already following up and treating,
8    we take that as a doctor's recommendation, as
9    well. I don't necessarily have to ask the
10    doctor for a separate letter to inform me of
11    what their record is already informing me.
12        Q    Did you speak to any of these
13    doctors in these six cases?
14        A    I don't call and talk to them.
15    I want it verified for my files so I write
16    them. I don't call them.
17        Q    So, the two sources for these
18    medical recommendations from doctors are
19    either the letters you get back from the
20    doctors, or the medical records that you
21    review; is that right?
22        A    Right. Please do note, though,
23    that you will see documentation in the file
24    of calls to their office, but that's to

76

1    document costs, not me staffing with them.
2        So, I don't want you to later
3    say, well, wait a second I -- I show in your
4    file that you did call them. It wasn't me
5    calling them. It was, you know, our staff
6    member that does cost verification, just
7    getting costs from their office staff; not me
8    staffing with the doctor.
9        Q    Or sometimes your staff will
10    call and remind the office to get -- to have
11    the doctor answer your letter?
12        A    Well, that, too.
13        Q    Okay.
14        A    But -- and, actually, as long as
15    we're at it, sometimes they'll call and say,
16    we can't read his handwriting, we need an
17    interpretation of what he wrote. So you
18    will, on our -- on those letters, sometimes
19    see one of my staff more clearly write
20    underneath what the doctor's written, and
21    that's where they called the staff and gotten
22    an interpretation.
23        Q    Yes.
24        MR. SULLIVAN:  Okay. Let me --

77

1    we've been going about an hour and a
2    half; do you want take a break here?
3        (Recess.)
4    BY MR. SULLIVAN:
5        Q    Outside of the litigation
6    setting, when you put together a plan for an
7    individual, how ordinarily are these
8    individuals referred to you; how do they get
9    to you?
10        A    For the non-forensics, you're
11    talking about?
12        Q    Yeah.
13        A    Variety of ways. We work with a
14    lot of rehab centers, sometimes health
15    insurance companies. Sometimes, for our
16    counseling patients, that can come word of
17    mouth from families to families. But it also
18    comes from physicians, it comes from, you
19    know, at times, from health carriers, a lot
20    of times from the rehab facilities that we've
21    sent patients to and that we've developed
22    relationships.
23        After 36 years, you know, you're
24    just kind of a network all over the country,

78

1  and so if they're sending people back within
2  a reasonable distance, then you know, then
3  reasonable dis -- geographic distance to my
4  office.
5      Q   Right.
6      A   I get a lot of calls, quite
7  honestly, from people where it's just -- it's
8  just not realistic to work with them when
9  they're -- when they're too far away.  And we
10 still help.  I mean, we'll help set them up
11 with a local case manager or a local
12 counselor, psychologist, whatever.  So we
13 never turn anybody away, and just say, I'm
14 sorry, we can't be of assistance, because we
15 have a good network of other referrals so --
16 that we can make for them, but that's
17 basically where they come from.
18     Q   And when you put a plan together
19 for a patient in that -- in those types of
20 situations, it's a plan that they then take
21 and they utilize for ongoing care?  What do
22 they do with that document?
23     A   Yeah, it depends on the
24 individual and it depends on what they're

79

1  referred for.  Let's assume for a moment,
2  though, that it's someone who's actually
3  going to get a fairly full -- they really
4  want a full plan.  The goal is that they are
5  going to utilize it.
6      We try and make clear in the
7  beginning, so it's not a waste of their time
8  and it's not a waste of ours.  We sit down
9  and start out with an orientation.  And in
10 that little orientation, we're looking for a
11 commitment from them.  We want -- we don't
12 want to discuss just what our role is.  We
13 want to make clear what we expect of them,
14 and if they're -- if they're coming from
15 outside the area, if we're not going to help
16 them implement, then we want to identify how
17 that's going to be handled before they go
18 back to their area.
19     We want to identify a case
20 manager, who will help us identify a team in
21 the local area.  And there may be different
22 ways we will handle it.  Sometimes it might
23 be a letter of agreement, letter of intent,
24 or something that outlines with them that

80

1  they sign.
2      One of the things that -- of
3  particular importance is, if we're agreeing
4  to do something on a sliding scale, because
5  there are dollar issues, I never formally
6  have published a fee ... scale that was
7  anything less than what our posted fees are,
8  but we do sliding scales.  But one thing I
9  learned very early in my practice is, if you
10 do it for free, those are the people who most
11 abuse your schedule, don't show up for
12 appointments, don't place a value on your
13 time, so we never do it for free.  We try and
14 identify a value that will make sure that
15 it's something that will be meaningful to
16 those people so they're placing a reasonable
17 value on my time and don't abuse it.  And
18 then we sit down and we work out how it's
19 going to be implemented before we ever get
20 started, 'cause otherwise it can be an
21 incredible waste of everybody's time.
22     Q   Right.  You mention that you try
23 to have agreements with them that how they'll
24 implement it and if they're out of the area,

81

1  they have a case manager.
2      So let's get to the point now
3  that you've handed -- do you hand the
4  life-care plan to the patient?
5      A   Oh, even in forensics I do that,
6  even in a litigation case.  If I'm on the
7  plaintiff's side -- obviously, if I'm on the
8  defense, I can't hand it to them, but on a
9  litigation side when I'm doing full life-care
10 plans, I send out the report, life-care plan,
11 everything to them, with the exception that
12 if I've done psychological testing and
13 there's some serious issues, I won't send it
14 to them.  They have to talk to me.  They have
15 to come in and sit down with me, or if
16 they're out of state, we have to have a
17 conference with appropriate people in that
18 conference.  I mean, if they're suicidal, for
19 example, you know, I'd contact a
20 psychiatrist, I have them involved.  There
21 are reasons why you might not send a report,
22 certain select circumstances, but 98 percent
23 of the time, 99, the report goes out.  It's
24 really not finished until I've gone over it

21 (Pages 78 to 81)

82

1  with them, they understand it, they've
2  expressed their concerns or their questions
3  or their thoughts and ideas.  You know,
4  that's -- you know, that becomes an important
5  aspect of it.
6      Q   Okay.  And in the non-litigation
7  setting, do you send it -- do you give the
8  life-care plan to anyone else, other than the
9  patient?
10     A   Well, it depends on the nature
11  of the disability.  I mean, family members,
12  with permission -- 'cause I usually don't do
13  evals unless family members are a part of it,
14  'cause I'm working with the catastrophically
15  impaired, understanding family dynamics, and
16  just unusual for me to see patients without
17  family, at least one family member involved.
18         It's hard to get a full
19  understanding of what's going on without a
20  family member who knew them premorbidly, so
21  that you have premorbid insights as well as
22  postmorbid, so you understand family
23  dynamics.  And, generally, it's -- you want
24  someone who will read that report and

83

1  life-care plan with the patient.  But you
2  have to obviously have patient permission,
3  unless they are under a guardianship.
4      Q   Outside of other family members,
5  are there others who would get it?  The
6  doctors, do you ever send it to the doctors?
7      A   Just depends on relationships.
8  Usually, we do the same kind of thing we've
9  done here.  We don't send the whole plan.  We
10  go over questions in each doctor's specialty
11  area.  But not necessarily send the entire
12  plan to the doctor.
13         Now, if there's a physiatrist
14  that's following the patient, we may go over
15  a plan with a physiatrist that's fully
16  involved, but generally speaking, we go over
17  the specific medical areas.  Most doctors
18  just don't have the time to go over and go
19  through the entire report and plan.  But
20  there are times we do.  They get the report,
21  they particularly want to know about the
22  psychological test results, and how that is
23  meaningful.  And sometimes, if the report
24  seems too long, we'll give them -- you know,

84

1  I'll write a letter and summarize to the
2  doctor.
3      Q   Is it more often than not that
4  you give the plan or part of the plan to the
5  doctors, or is that the unusual case?
6      A   I think that's probably more
7  unusual.  Usually, we write them like we do
8  here.  We'll give them a synopsis with our
9  questions.  That's usually what they prefer.
10     Q   Once you're done, and you've got
11  a plan, though, it would be unusual for you
12  then to give them the plan or parts of the
13  plan?
14     A   Yeah.  I think that's true if
15  they are post rehab.  It's not true if
16  they're in rehab.  If they're in a rehab
17  program, then giving them our recommendations
18  and plan is -- is more true than not.
19     Q   And when you say, "giving them
20  the recommendations and plans," you hand them
21  or send them the life-care plan?
22     A   Oh, no, we'll mail it.  I mean,
23  we don't hand it to them unless they're
24  local.

85

1      Q   But you give them the whole
2  plan?
3      A   That -- it's pretty reasonable
4  if they're actively in a rehab setting,
5  because we're looking for it to be part of
6  the discharge planning process.
7      Q   Do you get reactions from
8  doctors when you send them -- have there been
9  instances where doctors have said, I want to
10  change, I think you should change this?
11     A   Oh, sure.  It's not unusual at
12  all, actually.  The twelve o'clock conference
13  that we're having, that I couldn't change, is
14  a doctor who's going to go over a life-care
15  plan with us.
16     Q   Okay.  So, you'll get feedback
17  from doctors after the plan is done and the
18  plan could be changed, or it may not be
19  changed?
20     A   Well, actually, I don't consider
21  the plan done.  I mean, when I send it to
22  families, I don't consider it done until
23  we've had that staffing.  So, in those cases
24  where we know we're going to staff with a

86

1    doctor, or we know we're going to staff with
2    a family, it's not a finished plan until that
3    staffing's taken place.
4         But I see your point. For us,
5    that's just part of the process. But it's
6    still our recommendations, to the extent that
7    we've been able to gather them from the
8    different specialists, the urologist, the,
9    you know the ... the neurologist, et cetera,
10    that may be done, and now, if we have a
11    physiatrist who's kind of the overall medical
12    specialist following, we'll staff with them.
13    Now, they --
14        Q   Could you define for me what you
15    mean when you say, "staff"?
16        A   Well, usually, like with our
17    physiatrist, we'll have her review the whole
18    plan, even the components that are
19    non-medical, because she has an interest in
20    the whole thing. I may or may not agree with
21    the change, but she can -- she can debate
22    with me, 'cause she'll actually write her
23    thoughts and call and talk to us.
24        This doctor today, you know,

87

1    it's fine for him to discuss, whether it's
2    medical or whether it's psychological, my
3    area of expertise. For example, I don't have
4    a problem with his saying he agrees or
5    disagrees, and I'll come back and explain,
6    well, here's what happened on the MMPI;
7    here's what we found on the Beck series. I
8    may or may not change, based on what his
9    thoughts are in my area, but I will
10    absolutely change in the medical area, but
11    let's assume for a moment that he --
12        Q   And when you said, "my area,"
13    you're talking about psychiatry?
14        A   No. Not psychiatry, that's an
15    M.D.
16        Q   Sorry, psychology?
17        A   Yeah, I'm a licensed mental
18    health counselor under the Psychology
19    Practices Act, and if I feel there's enough
20    data to support needing six months of
21    counseling, and he said, I've seen him, you
22    know, five times, and I don't think he's
23    depressed, you know, and all the testing says
24    he is, I'm not going to, you know, to

88

1    necessarily change that. But if he said,
2    well, why don't we agree on having him see a
3    psychiatrist, I wouldn't have a problem with
4    that.
5         Now, if the urologist says, I
6    want to do this, and the physiatrist says, I
7    disagree with the urologist, I'd have a
8    problem with that. But I'm not there to make
9    a decision between two different doctors, but
10    as the urologist specializes in the
11    urological area, it's a little hard to make
12    changes when your specialist says, this is
13    how I want to handle his -- you know, his
14    follow-up renal program.
15        So, depends on what the
16    physiatrist has to say, I would generally
17    suggest to the physiatrist that he talk to
18    the urologist before he come back and make a
19    change in the urologist's recommendation
20    because I'm kind of stuck. I can't change
21    what the treating urologist says, based on
22    what a treating physiatrist says.
23        Q   But you may, if I understand
24    correctly, you may have input and do

89

1    something differently from what a treating
2    doctor says, if it's in the area of
3    psychology, because you believe you have some
4    expertise in that area?
5        A   I apologize; could you ask that
6    again?
7        Q   Sure. You mentioned that your
8    expertise -- you have an expertise in the
9    area of psychology?
10        A   Right.
11        Q   And that sometimes you're
12    dealing with doctors and talking to them
13    about psychological treatment, counseling,
14    and so forth. There may be times when you'll
15    have disagreements with the doctor in that
16    area, but you'll be comfortable going forward
17    with your recommendation because of your own
18    expertise in the area of psychology?
19        A   It happens. It depends on what
20    they're saying. If -- you know, if they're
21    going against the data, not willing to listen
22    to what the tests say, et cetera, it's not
23    often that that happens. Usually, if they're
24    talking to me, that doesn't end up happening.

23 (Pages 86 to 89)

90

1  If they just write back and say, we disagree
2  with counseling, and they've never seen the
3  test results, heard about the basis for it, I
4  usually don't pay too much attention to that.
5      Q   And you're able to bring to bear
6  your expertise in the area of psychology in
7  that situation?
8      A   And all of the data.  And if it
9  was opinion to opinion, well, you know, I'm
10  not sure what my thoughts would be, but I
11  never just give an opinion without ...
12  without underlying support for it.  I always
13  have the test results; I always have the
14  clinical interview, and I always have
15  follow-up clinical practice guidelines and --
16  and literature.  So I just don't make it in
17  the -- an opinion alone, but --
18      Q   But the relationship -- or the
19  relationship can be different, though, when
20  you're dealing with a doctor in an area of
21  expertise outside of psychology, and in those
22  situations you're much more likely to -- to
23  defer to what the doctor says?
24      A   Well, if it's in the doctor's

91

1  area of expertise, it's unquestionable.
2      Q   You have to defer to what the
3  doctor says?
4      A   No question.
5      Q   Okay.  So there are times -- I'm
6  not sure I understand completely, but I may
7  not have to -- where you will complete your
8  life-care plan here at the office, and/or do
9  what you do here at the office, but it will
10  then go out to a doctor.  And as you say,
11  staff it with a doctor, either one of the
12  doctors who works with you, or a treating
13  doctor.  And they'll look at it and you'll
14  have a consultation and talk about it, and a
15  plan may or may not change due to that?
16      A   Right.  Let's go back just ...
17  two things concern me a little bit so that
18  we're being really complete here.
19          First of all, there's not going
20  to be a complete plan that goes out if I've
21  gotten no physician input.  I'm not going to
22  put in a medical recommendation without that
23  input.
24      Q   And the input you're talking

92

1  about there is either the letter back or what
2  you see in the records?
3      A   Right.  Now, if I can't get any
4  input but I've got an opportunity for this
5  doctor to talk to me over the phone, what I
6  may -- you know, I may have clinical practice
7  guidelines and forward to him a letter
8  saying, I'd like to discuss these things over
9  the telephone.  But I'm not going to put in
10  recommendations and then --
11      Q   But there are situations -- are
12  there situations where you'll actually get
13  those recommendations from doctors, or see
14  sufficient recommendations in the record so
15  that you can create a plan --
16      A   Sure.
17      Q   -- with that support?  But then,
18  thereafter, you will still have to send it to
19  a doctor with whom you'll have some
20  consultation?
21      A   Well, there's no question.  Even
22  the same treating doctor, from his own
23  records --
24      Q   Right.

93

1      A   -- he may come back and say,
2  well, you know, we're at this point now, and
3  I'm going to make a change in those thoughts,
4  looking into the future.  And that's great,
5  we're looking for that.
6          But there was one thing that I
7  said, I want to amend just a little bit.  I
8  said, there's no question I would, whatever
9  the treating doctor said, or a doctor said, I
10  would accept.
11          There have been times that -- it
12  doesn't happen often, but there have been
13  times where the treater or consultant tends
14  to have a little bit more with consulting,
15  but I've had it with treaters, where a
16  recommendation has been ... so unusual and so
17  outside the standards in clinical practice
18  guidelines, that I was uncomfortable
19  including it in my plan.
20          Now, I can't reject it.  But, in
21  those instances, we've attached it as an
22  appendix to the plan.  But it was ... you
23  know, it's hard to give -- I mean, every time
24  I say something like that, I always think

94

1  back about an example of this doctor up in
2  Chicago that recommended what amounted to
3  essentially a research project. What he was
4  talking about was this communication system
5  for this cerebral palsy child that, you know,
6  amounted to ... well over $100,000, and I
7  mean ... I can't even say it was necessarily
8  within his area of expertise.
9       But the bottom line was, is that
10 you have to understand that plans that get
11 out there, particularly if they're
12 potentially going to go into a litigation
13 case, but even if they're not, I can't be
14 sure that, somewhere down the line, they're
15 not going to be seen. And I end up facing
16 them, when you did this in this plan, why
17 wouldn't you do it in a subsequent plan. And
18 I'm just not going to put something in there
19 that's not consistent with good practice,
20 consistent with clinical practice,
21 guidelines, outside standards of care. And
22 so although I can't necessarily reject what a
23 treating doctor or a consulting doctor
24 says --

95

1       Q   You put it in the bullpen; you
2  attach it at the back?
3       A   Not even attached to the back.
4  It's a separate appendix. So it's clearly
5  not within the plan, but I'm not rejecting
6  what the doctor says. I'm educating people,
7  here's what he says, but I'm not going to
8  allow it to be part of the plan.
9       But 99 percent of the time, if a
10 treating doctor states it, and it's not
11 outside -- wildly outside of standards of
12 practice, it's going to go in there.
13      Q   One of the answers you gave led
14 to this question, I'll cover them, but have
15 you done a plan outside of the litigation
16 setting like the one you've done here, which
17 it's not quite a life-care plan, but it's
18 just devoted to --
19      A   Sure.
20      Q   -- to a particular condition,
21 medical condition only? What you call a
22 rehabilitation plan that's directed just to
23 one condition?
24      A   Well, we certainly have -- the

96

1  majority of times, it's -- I would say it's
2  been directed to chronic pain as opposed
3  to -- and we've talked about the use of a
4  chronic pain treatment program, non-medical,
5  because I'm just not a believer in managing
6  chronic pain over time with narcotics. And
7  so I talk a lot about that.
8       Have I done it for ... you know,
9  I think we've done it on a number of
10 occasions for a cardiovascular condition.
11 And we've done it on several occasions for
12 pulmonary impairment, inhalation impairments.
13      Q   These are outside of the
14 litigation setting?
15      A   We've done it on ... on several
16 occasions for inhalation, and we've done it
17 on several occasions for cardiovascular.
18      Q   Outside the litigation?
19      A   Outside of the litigation arena.
20      Q   Okay.
21      A   And as I said, we've done it on
22 several occasions for chronic pain, and we've
23 done -- we've had probably the only area of
24 counseling that is non-catastrophic that I've

97

1  done on a repeated basis, is the chronic pain
2  area, although I try and get those people
3  moved as rapidly as I can down to the
4  University of Miami pain management program,
5  Rosomoff's program, because I really like
6  that program, and I think they do an
7  excellent job in the field. If they're not
8  willing to transition from me to a program
9  like that, then over the long term, I'm not
10 confident that I can do what they need done.
11      Q   In those situations you just
12 mentioned with the pulmonary problem and
13 cardiology problem and the chronic pain, is
14 the ultimate document that you produce were
15 the life-care plans?
16      A   No.
17      Q   Okay.
18      A   They're the same. I have the
19 same issue ... in or out of litigation, the
20 message that's being communicated. I want
21 people to appreciate my belief that,
22 ultimately, you know, what we're trying to
23 strive for here is to achieve a goal of
24 rehabilitation. And -- and ... most people

98

1   who -- I mean, an awful lot of people get to
2   me, 'cause they got through the web site and
3   they understand at least some basic
4   difference between the concept of a life-care
5   plan and my -- and what that means in
6   relation to a catastrophic impairment and a
7   non-catastrophic.
8       Q   Do you send the rehabilitation
9   plans that you put together for these six
10  cases to the plaintiffs?
11      A   In this instance ... it does not
12  look like it went to them.  It was so, you
13  know, so basic.  We talked to each of them
14  about the basic management of diabetes, and I
15  guess, it just wasn't felt like there was
16  enough beyond that.  It was so simple that
17  there was enough beyond that ... to mail to
18  it them, and so these were not sent to them.
19      Q   Okay.  And I'm assuming then, it
20  wasn't -- they were not sent to the doctors
21  of these patients, either?
22      A   No.
23      Q   The final?
24      A   No, only the questions were sent

99

1   to the doctors.
2       Q   But not the final rehabilitation
3   plan, that wasn't sent to the doctors?
4       A   Well, no, it was contained
5   within that lengthy report, and so I didn't
6   separate it out and send it to the doctors,
7   no.
8       Q   So the ...
9       (Pause.)
10      Q   Just so we're clear, I think I
11  understand the answer, but none of the
12  report, either in part or in whole, was sent
13  to the doctors, right?
14      A   Fair statement, that's correct.
15      Q   Okay.  So, at least in this
16  situation there -- by the time you served
17  your report to us, and as we sit here today,
18  there hasn't been the opportunity for the
19  type of exchange that sometimes occurs when
20  you create life-care plans or rehabilitation
21  plans outside of the litigation, where you
22  hear back from the doctor and the doctor may
23  talk to you about potential things they agree
24  with or don't; that hasn't happened here,

100

1   right?
2       A   No, here I just -- I did what I
3   normally do in these cases.  I wrote letters
4   to the doctors, I wrote my questions to the
5   doctors, and I gave them a chance to respond
6   to those questions and inputted their
7   responses into the plan.
8       Q   Right.  And we talked about that
9   before.  There was a -- when you create your
10  work product here in this office, the
11  information you get from doctors comes from
12  the letters and from the records, and we
13  talked about how there's instances when even
14  after you do that and create a plan, you'd
15  send it out to the doctors and you'd have
16  correspondence with them; you recall that?
17      A   Right.
18      Q   In this case, that didn't
19  happen, correct?  In these six cases where
20  you created these rehabilitation plans, the
21  end result, after you got the letters back
22  from them, and they looked at the records,
23  the end result of what you wrote here never
24  then got to the doctors to look at?

101

1       A   No.  And it typically doesn't
2   in -- in ... as I indicated before, that's a
3   kind of a rare instance in which they
4   subsequently read the entire report.  What
5   they normally get is, each in their
6   individual specialties of the questions
7   associated with their specialty, they respond
8   to that, tell us what their needs are, what
9   their recommendations are, not their needs,
10  I'm sorry, in their individual specialty, and
11  that gets inputted.  But then they don't read
12  the entire plan.  Much of it is outside their
13  specialty.
14      Although there's not that much
15  associated with the plan, it goes from the
16  plan, which is their current care, and then
17  there's a statistical report over --
18  generally about diabetes but, as for the plan
19  before that statistical report, it just
20  covers what the current treatment is and what
21  these doctors are saying they think needs to
22  happen in their area of specialty regarding
23  follow-up.
24      Q   Just so I'm clear for the

102

1    record, the -- in each of these six cases, if
2    the plaintiff has an endocrinologist, that
3    endocrinologist has not had the opportunity
4    at this point to see the end result plan that
5    you put together for that plaintiff, correct?
6        A    That's true.  I mean, it follows
7    along with either -- with their medical
8    record and if they wrote back whatever else
9    he put or she put in beyond their ... their
10   actual treatment plan in their medical
11   record.
12       Q    And so I don't have to ask the
13   question multiple times, that is also true
14   that they -- that the -- if the plaintiffs
15   had a podiatrist or an ophthalmologist or
16   primary care physician, none of those doctors
17   as well have had an opportunity to see your
18   completed plan, correct?
19       A    True.
20       Q    Okay.
21           (Pause.)
22       Q    We discussed earlier that you
23   have case management needs in some of these
24   plans that go beyond medical needs.  We

103

1    talked about how you considered part of it
2    medical needs and part of it to be not
3    medical needs; do you recall that?
4        A    That's true.  Actually,
5    typically, case management needs are beyond
6    medical needs.  I mean, that's something that
7    they're doing outside of what a medical
8    doctor would recommend or be involved in.
9        Q    And is it fair to say that none
10   of the doctors for any of the plaintiffs in
11   these cases have seen your case management
12   recommendations?
13       A    That's true.
14       Q    Okay.  When a patient comes in
15   to see you outside of a litigation setting,
16   they're looking for treatment; isn't that
17   true?  They're looking for how to coordinate
18   their treatment and get the right type of
19   treatment going forward; isn't that what
20   happens outside of the litigation setting?
21       A    Some.  Many are looking for
22   counseling.  They're looking for patient or
23   family education regarding disability;
24   they're looking for psychosocial adjustment

104

1    or adaptations of disability which is really
2    the number one reason for counseling.
3            They may be depressed, they may
4    be showing anxiety, but you have to
5    understand that, with respect to disability,
6    the underlying cause of that is usually
7    disability related.  So the way you deal with
8    it is different than the way you deal with
9    anxiety, depression, et cetera, in the
10   general population, 'cause it's situational,
11   and you're not going to get rid of the
12   catastrophic disability.  So there's very
13   specific ways in which I approach those
14   issues with a patient who's -- who's got a
15   disability.
16           So, those are the kinds of
17   steps, or those are the kinds of issues that
18   they're looking to deal with, even more than
19   management of an overall plan.
20       Q    And the point I'm trying to get
21   at is, when you're sitting with a patient
22   outside of litigation, and you're in a
23   situation where you're trying to put together
24   a plan for their future medical care and

105

1    rehabilitation, when they have that in mind,
2    there is -- do you have some expectation that
3    I'm going to get more accurate statements
4    from them because this, what I'm -- the end
5    result of this is going to be a plan given to
6    them about their future care?
7        A    Well ... I hope not.  I'm not
8    telling you that it doesn't happen.
9        Q    No, what I'm saying, do you have
10   some expectation that you'll get some
11   accuracy because they understand that they're
12   so -- going to be my medical treatment going
13   forward, so I better give this guy the real
14   story?
15       A    Well, I'm sorry to both of you.
16   I didn't mean to step on you, and I didn't
17   mean to make it more difficult for you.
18           When I do the orientation for
19   even those who are in a litigation, my clear
20   statement is:  Look, that's the purpose of
21   this plan.  Clearly, it's going to get used
22   at litigation, but you could make use of this
23   for that purpose.
24           But I also make clear, I have

106

1   all of the records, or the summary of all the
2   records on the right-hand side of my screen.
3   As we go through the clinical interview and
4   history, I'm going to -- I'm going to be --
5   and I don't do this as an adversarial step, I
6   don't want them to see it that way, and I
7   think I present it -- after long experience,
8   I can present it without it appearing that
9   way.
10          But I'm doing a check and
11  balance for accuracy purposes every step of
12  the way.  As we go through each of these
13  questions, I can check a lot of those
14  responses against the information I have.
15      **Q   I'm not asking the broader**
16  **question of yet, about how you check.  I'm**
17  **just asking about the responses that -- what**
18  **you expect in responses that you get from**
19  **patients.  In that situation, outside of**
20  **litigation, there's an understanding that**
21  **what they are -- the end result from you is**
22  **going to be some sort of rehabilitation and**
23  **life plan?**
24      A   But I really don't see, after 36

107

1   years, I -- the general catastrophic
2   disability population, okay --
3       **Q   Which isn't -- which aren't**
4   **these six cases?**
5       A   Right.  Let me make a
6   distinction here, okay, for just a moment.
7           I really don't see that
8   difference, okay.  Severe brain injuries,
9   spinal cord injuries, people with -- who come
10  in here with three and four limbs amputated,
11  I don't generally see a difference in the
12  accuracy, other than the fact that, for many
13  of them, it can be two and three years post,
14  and memory of early post-injury
15  hospitalizations and early post-acute
16  rehabilitation could sometimes be pretty
17  sketchy, but that's not an accuracy as a
18  result of exaggeration.  It's an accuracy
19  because it's difficult to remember those
20  early years.
21          Now, switching to ... our
22  chronic pain population, those individuals,
23  for reasons more of psychological response to
24  disability than anything else, tend to

108

1   sometimes be somewhat less accurate.  But,
2   you know, if there's any less -- if there's
3   any population I'm likely to get some
4   distortion from, or even a population where I
5   may get inaccurate history of premorbid
6   conditions, that's the one I have to be the
7   most careful about, and that's a very small
8   percentage of outright trying to hide from me
9   preexisting conditions.  Very tiny.  But it
10  happens.
11          And the population it happens
12  the most in are those with chronic pain,
13  pre-existing back conditions, things of that
14  nature.  But never my catastrophic -- I don't
15  just don't see it in my catastrophic
16  population.
17      **Q   Right.  Well, I want to ...**
18  **let's get away from catastrophic and get**
19  **toward the patients or the people you see,**
20  **like in this case, who are not catastrophic.**
21          **You'll agree with me that when**
22  **these six plaintiffs came in to see you, they**
23  **are in somewhat of a different**
24  **circumstance --**

109

1       A   Absolutely.
2       **Q   -- than when your patients**
3   **outside of litigation come in and see you; is**
4   **that true?**
5       A   Well, there's no question
6   they're in litigation, number one.
7       **Q   And you understand that, in**
8   **those litigations, they're bringing a lawsuit**
9   **looking to recover money?**
10          MS. MARTINES:  Object to form.
11          THE WITNESS:  Sure.
12  BY MR. SULLIVAN:
13      **Q   And you understand that?**
14      A   Yes.
15      **Q   Okay.  And so it -- there is --**
16  **do you take into account the possibility of a**
17  **different end motivation when the patient --**
18  **when the -- when a plaintiff comes to you in**
19  **a litigation setting, as opposed to when a**
20  **patient comes to you outside of litigation;**
21  **do you take into account the possibility that**
22  **they have a different motivation?**
23          MS. MARTINES:  Object to form.
24          THE WITNESS:  I think that's

28 (Pages 106 to 109)

110

1    always something that you're aware of.
2    And so, you know, the best I can do is
3    look for any distinction --
4    distortions -- and maybe "distortions"
5    is the wrong word -- but ... anything
6    that I see as a discrepancy between what
7    they're telling me, what I see in the
8    records, particularly the --
9    psychological test results, if I see
10   some real problems in the validity
11   scales of something like the MMPI that
12   might lead me to believe that there are
13   issues that I need to deal with.
14        So, even though, for example, I
15   knew in advance that we had a lot of
16   premorbid psychological issues, and that
17   what I was probably going to document
18   was the existence of psychological
19   issues that were likely premorbid in
20   nature, I gave it because I was still
21   interested in looking at the validity
22   scales of the MMPI, cause I would get
23   insight into presentation.  And so, I
24   still went forward with -- you know,

111

1    with my psychological battery.
2    BY MR. SULLIVAN:
3        Q   Is there any particular extra
4    attention you paid in these six cases to
5    determine whether the information you were
6    getting from the plaintiffs was accurate?
7        A   Well, I think I paid the usual
8    attention.  Maybe the extra step I took, as I
9    said, was going ahead with a battery of
10   psychological tests, even knowing that I was
11   probably going to state that I was not
12   specifically likely to identify
13   psychological ... factors that were the
14   result of the onset of the diabetes.  I knew
15   that they were premorbid psychological
16   conditions, but I was interested, more than
17   anything, in the validity scales that I was
18   going to be getting and helping me have
19   insight in the way they were approaching the
20   evaluation process.
21       Q   The validity scales from that
22   test, do they inform you as to the validity
23   of the answers that that plaintiff had given
24   in that exam?

112

1        A   Well, in the MMPI -- obviously,
2    they can only ... only give me some sense
3    of -- of how the individual might be
4    approaching the overall process.  But they're
5    really only telling me, with real accuracy,
6    how they approach the MMPI.
7            I'd be extrapolating to suggest
8    that they told me anything else, but one
9    would certainly --
10       Q   Well, let me ask it differently.
11   Maybe we can cut it off.
12       A   Sure.
13       Q   The MMPI is something that you
14   ordinarily give to patients when they come in
15   to see you; is that right?
16       A   Unless they're not capable for
17   varying reasons of taking the MMPI.
18       Q   And I understand the distinction
19   that -- your notion that you can try to
20   extrapolate from the MMPI to see if other
21   information was accurately given, or at least
22   whether they were in that frame of mind.
23           But I asked -- the question was:
24   Is there anything different that you did in

113

1    this situation with these six patients, to
2    confirm the validity of the data they gave
3    you than what you ordinarily do?
4        A   No, because what I ordinarily
5    do, particularly in litigation, is try and
6    do everything I can to ... to get at whether or
7    not I'm getting accurate information.  After
8    that, the only thing I can do is depend upon
9    the process, the litigation process.  I mean,
10   I believe I'm there as an educator, so I
11   fully expect that if the opposing counsel has
12   information, it's going to come out in
13   cross-examination.  I don't get defensive
14   about that.  If you got information that --
15   in a back-injury case, that somebody had four
16   prior back surgeries that were never revealed
17   to me, doesn't upset me when I get on the
18   witness stand.  It's just information I take
19   in, and I'll respond accordingly.  So I feel
20   that the next step is, after I've done
21   everything I can, the process will take care
22   of the rest.
23       Q   So, you rely on the lawyers in
24   litigation to vet your work and to correct

29 (Pages 110 to 113)

114

1  any mistake you've made?
2          **MS. MARTINES:** Object to form.
3          **THE WITNESS:** That's not what I
4  said. I do everything I can to get all
5  the information that I can get, but I
6  only have access to the material that
7  I'm able to obtain. I get everything I
8  can, do everything I can to get accurate
9  information from the patient. I do all
10  the testing I can to determine the
11  accuracy. I review all of the materials
12  that I'm provided. And I request all
13  the materials that I can request.
14          But I can't control all that's
15  provided to me. And if, after
16  everything I've done to screen this,
17  something's withheld, the only other
18  thing I can rely on is that if there's
19  information withheld, and you found out
20  about it, I assume you're going to ask
21  me about it. It's not that I rely on
22  you, but I can only go so far.
23          I don't -- I'm not an
24  investigator. I don't have the access

115

1  to the totality of information if it
2  fails to be provided to me, so the only
3  thing I can do is -- I'm not an
4  advocate. I'm not there to argue my
5  position. I'm there to educate. And if
6  you have additional information that
7  I've not been provided, or I don't have
8  access to, I'm more than willing to
9  consider that. That's the best I can
10  do.
11  **BY MR. SULLIVAN:**
12      **Q   Well, let's talk about -- you've
13  mentioned all the information and all the
14  material. Are you talking about all -- when
15  you say "those things", are you talking about
16  all the medical records for the plaintiff?**
17      A   Absolutely.
18      **Q   Did you try to get all the
19  medical records?**
20      A   Well, I asked for all of the
21  relevant -- no, I'm not interested in
22  liability records, because I'm not here to
23  talk about causation or lack of.
24      **Q   Well, I'm asking medical**

116

1  records. You asked for all of the medical
2  records?
3      A   I asked for all the medical
4  records.
5      **Q   Who gave you the medical
6  records?**
7      A   Well, they come from
8  Miss Martines' office.
9      **Q   So the lawyers gave you medical
10  records?**
11      A   Sure.
12      **Q   Did you ask for authorizations
13  from the plaintiffs so you could send the
14  authorizations to the doctors to get the
15  medical direct -- medical records directly
16  from the doctors?**
17      A   I asked for authorization so
18  that I can write to treating doctors for
19  the --
20      **Q   That's a different question
21  than what I asked.**
22      A   But no, I do not try and get a
23  separate set of records. You know, it's --
24  you know, if records have already been

117

1  obtained, my trying to get hospitalization
2  records or physician records when they have
3  already been obtained, doesn't make a great
4  deal of sense.
5      **Q   Why would you ask for all the
6  medical records for a plaintiff?**
7      A   Well, my interest is to try and
8  obtain all of the relevant records regarding
9  the disability that -- and/or healthcare
10  problem that I'm reviewing. I'm not
11  interested in -- in anything to do with
12  liability, as I've indicated. But I do want
13  to know about the condition that I'm
14  interested in. And, generally, I'm wanting
15  to know about -- enough about the premorbid
16  conditions for me to be able to screen out
17  conditions that I do not want to include or
18  should not include in the body of the report.
19          In this case, it wasn't really
20  necessary to have too much, because I knew
21  that the only thing I was going to screen in,
22  if you will, was going to be diabetes. So
23  anything that wasn't related to diabetes, I
24  wasn't going to include.

30 (Pages 114 to 117)

118

1    So, it was important to know if
2  they were already on disability for
3  preexisting, either physical or mental health
4  issues, but having all the records regarding
5  mental health issues, or all the records
6  regarding preexisting back conditions, for
7  example, might not be necessary because I
8  knew I wasn't going to put those into the
9  report in any instance.
10   Q   Who makes that decision as to
11  whether you get all the medical records or
12  some subset?  In these six cases, who made
13  that decision?
14   A   Well, I wrote in -- I made the
15  decision as to what went into the letter
16  requesting information.
17   Q   That's information from the
18  doctors?
19   A   No, no, this is the information
20  to -- this is the letter that went to the
21  firm asking for the records, and then how
22  that was responded to --
23   Q   Which -- you're looking at a
24  particular record right now?

119

1    A   July 10, 2008, under the
2  referral information, a letter went out to
3  Buffy Martines, basically saying that we
4  needed to receive all medical records,
5  medical bills, doctor bills, hospital bills,
6  deposition -- I'm sorry, you got that? --
7  depositions, reports of treating physicians
8  of applicable -- deposition of Janice
9  Burns -- I'm reading from that particular
10  case -- and/or spouse, if applicable.
11   This asked for tax returns for
12  the three years pre-jury and post-injury if
13  applicable.  If there's no vocational claim
14  or wage loss claim, it's not applicable;
15  employment records if applicable.  And
16  basically that's what was asked for.
17   So the determination from there
18  of what that meant would -- would be up to
19  Buffy Martines if her interpretation of all
20  records didn't include the population of all
21  of the relevant records.  Now, this would be
22  the records relevant to, you know, her
23  treatment of diabetes.
24   Q   So the decision on what you --

120

1  what was relevant or not for you to get was
2  not made by you.  It was made by attorneys;
3  is that correct?
4    MS. MARTINES:  Object to the
5  form.
6    THE WITNESS:  Well, she would
7  be -- or the firm would be the only ones
8  then that would subsequently, I guess,
9  determine ... if it was less than all
10  the records, they would know what the
11  total population of those records were.
12  So if it was less than all of the
13  records related to the diabetes, other
14  than liability.
15  BY MR. SULLIVAN:
16   Q   What do you mean by when you
17  say, "liability"?
18   A   Causation.
19   Q   Okay.
20   A   I don't want anything to do --
21   Q   I understand you.
22   A   You asked me about causation, I
23  have nothing to do with causation, so I don't
24  want somebody sending me records relevant

121

1  causation.  That's what I mean.
2    Q   When you -- when you write in
3  this letter -- this is a letter of July 10,
4  2008, from your office from you to Buffy
5  Martines, when you ask to be considered
6  retained on this file, it will be necessary
7  for us to receive the following, colon.  All
8  medical records, semicolon; medical bills,
9  comma; doctor bills comma; hospital bills,
10  comma; depositions, and reports of treating
11  physicians.  And then in parentheses you put,
12  "if applicable".
13   Who's the one who's going to
14  decide what's applicable?
15   A   Well, whenever --
16   Q   I'm sorry.  Who did in this
17  case?
18   A   Well, I can't answer that.  I
19  mean, I sent the letter to Miss Martines.  I
20  can't tell you that she didn't pass it on
21  to --
22   Q   It wasn't you, though?
23   A   It wasn't me, because I -- I
24  request the information.  I can't tell you

122

1  that someone or who in the office might
2  decide that something less than all the
3  medicals -- clearly, it's going to be
4  something less than all the medicals because
5  all the medicals could be interpreted as
6  liability and damages or treatment records.
7  What I want is all the treatment records.
8      Q   And is that the type of letter
9  you ordinarily send out asking for those
10  types of things, that language?
11     A   Right.  It may include more or
12  less, depending upon things like the age of
13  the patient.  If it's children, up to a
14  certain age, 25 usually, we'll ask -- and
15  maybe older -- we'll ask for the school
16  records, certain specific breakdown of the
17  school records.  There may be other things we
18  ask for, but --
19     Q   I wanted to understand that,
20  what I just read to you.  At the end of that
21  string, if you'll look in the letter of
22  requests, you have "if applicable" in parens?
23     A   Right.
24     Q   Does that -- does that, "if

123

1  applicable" apply just to what preceded it, I
2  think it's reports of treating physicians?
3          (Pause.)
4      A   Exactly.  Some -- it's just --
5  let's see.
6          Well, actually, I guess it
7  realistically could apply to anything after
8  the semicolon.  So if there were no hospital
9  bills, no -- no -- if there were no
10  hospitalizations, for example, then ... the
11  hospital bills wouldn't apply.
12     Q   But is it fair to say that the
13  "if applicable" that you put in there, does
14  not apply to medical records, you asked for
15  all the medical records, correct?
16     A   Yes.  That was before the
17  semicolon.
18     Q   Did you do anything to confirm
19  that you received all the medical records?
20     A   Other than calling -- you know,
21  the only thing we can do, and what we usually
22  do is, as we read through all the records, is
23  look for holes in the records.  So are we
24  missing dates, are we -- do the doctors refer

124

1  to other appointments or other doctors that
2  we are not showing?  We try and -- and review
3  it from that standpoint.
4          So if we clearly or obviously
5  are missing records that are reflected in the
6  records we're reviewing, then we'll call and
7  request those.  But if that's not clear,
8  there's not much else we can do.
9          Or, actually, the other thing
10  is, if there are doctors being listed by the
11  patient as treating doctors, and they're
12  not -- their reports are not part of the
13  records we received, then we'll request
14  those, as well.
15     Q   Am I accurate in summarizing
16  that in, what you just said, that the way you
17  will check as part of your practice as to
18  whether you received all of the medical
19  records is by reviewing them, and if there is
20  something obvious in the medical records
21  themselves that you have that indicate that
22  there's others existing that you didn't get
23  yet, then you'll ask for them; that's way you
24  check?

125

1      A   That's one step.  And then the
2  other is, of course, talking to the patients
3  and trying to get, you know, if we're seeing
4  doctors listed, dates listed that are not
5  within the records that we have, then that's
6  the next step.  But those are really the only
7  things we can do.
8      Q   Do you know whether you picked
9  up the phone or called or sent a letter
10  to ... to the attorneys to ask whether -- to
11  confirm that you got all the medical records?
12     A   You know, we -- I don't know.  I
13  mean, the reality is that we would hope that
14  the original letter made clear we wanted all
15  the records.  So following up and saying, did
16  you give us what we asked for, is not
17  something that we always will do.
18     Q   Is this the type of language
19  that you ordinarily use in your letters?
20     A   Yes.
21     Q   Have you had any difficulty,
22  generally, in getting proper responses to
23  letters like that?
24     A   No.

126

1   Q   Okay.
2      A   I mean, it does happen. We do
3   find holes in the records, and sometimes we
4   find it's because they haven't gotten all the
5   records. It depends on how far out we are,
6   and I mean, it can be a variety of reasons
7   why it doesn't occur, and we'll receive
8   additional records over time.
9      Q   Now, you've been involved in a
10  lot of -- over the years in doing this, one
11  thing you've been involved in is a lot of
12  litigation; is that fair to say?
13     A   Sure. Certainly, over 36 years,
14  absolutely.
15     Q   And having seen -- dealt with
16  plaintiffs or -- and plaintiffs who are
17  involved in litigations, you understand that
18  the plaintiff and -- sometimes a plaintiff's
19  doctors or family members are subject to
20  deposition; you understand that?
21     A   Sure.
22     Q   Have you reviewed those
23  depositions and read those types of
24  deposition transcripts?

127

1      A   Sure. Absolutely.
2      Q   Did you review any for these six
3   cases?
4      A   I don't believe I have received,
5   although I was -- you saw there, I requested
6   depositions, as well. I do not believe --
7   let me just check again my list, but I don't
8   recall receiving ... depositions.
9         (Pause.)
10     A   I'm only looking at one file
11  here, but I did receive them in this file.
12  I'd have to go to each individual file.
13     Q   If you want to check, we could
14  take a quick break and you can do it. I've
15  checked; I haven't seen them.
16     A   Yeah. And I don't think it's
17  necessary. I mean, I'm just checking the two
18  that are immediately in front of me, and I
19  don't recall -- I'm not seeing any, and I
20  don't recall seeing any. If we get to any
21  individual file, as we going through, and
22  that's different, but I don't remember. I
23  went through all these files again last night
24  and I came and --

128

1      Q   Appreciate that.
2      A   -- did just a quick backup
3   review again early this morning. I don't
4   remember seeing them.
5      Q   Why did you ask for depositions
6   in your letter requesting documents?
7      A   Well, both of the patients and
8   of the family members and/or treating
9   doctors, there's always the potential to get
10  additional information. Particularly, let's
11  go to treating doctors. Even though they may
12  have answered questions for me, and even
13  though we have treatment records, you know,
14  you're asking questions, plaintiff may be --
15  plaintiff attorney may be asking questions,
16  and so you get ... both information that may
17  not have been covered, but you also get
18  interpretive information beyond the
19  statement.
20     Q   There's a back and forth with
21  the doctor that you can't necessarily get out
22  of a letter answering a questionnaire.
23  There's an actual back and forth where you
24  explore some of the things that the doctor

129

1   believes?
2      A   Right. Well, even -- even I'm
3   getting some back and forth, but that's
4   expounded greatly in a deposition that is in
5   dialog form, that I'm not going to get out
6   of ... the record itself. And, you know,
7   probably 80 percent of that deposition may
8   not add to what I need, which would be, you
9   know, where do we -- what's the expectation
10  into the future?
11        But if 20 percent happens to
12  deal with that, or even five percent, and
13  it's beyond what I've managed to get, that's
14  important, whether it takes away or gives to.
15     Q   The ultimate plan that you put
16  together?
17     A   Exactly.
18     Q   Okay. And I've seen on your web
19  site, you have -- your web site has a ... a
20  publication that you can go from page to page
21  and follow on --
22     A   It has several of them.
23     Q   -- introduction to life-care
24  planning?

33 (Pages 126 to 129)

130

1    A   Right.
2    Q   And in there --
3    A   Actually, it's being -- there's
4  an updated intro to life-care planning that's
5  about to go on there, but the whole site's
6  being updated, but there is an older chapter
7  on the introduction to life-care planning
8  that's in there, yes.
9    Q   And in there, do you recall that
10  you say, in the forensic setting -- which
11  includes litigation, doesn't it?
12    A   Right.
13    Q   -- the planner should request
14  and review all depositions of damages,
15  witnesses, including treating physicians,
16  therapists, psychologists, and any consulting
17  professionals?
18    A   That's certainly preferential.
19    Q   And on the web site you said
20  that it should be done, right?
21    A   We certainly try and do it.
22  Absolutely.
23    Q   But on your web site, you recall
24  that it --

131

1    A   It does say --
2    Q   -- should?
3    A   It does say in the chapter it
4  should be done.  You know, if they're not
5  available to me, they're not available to me,
6  but I do believe it should be done, if at all
7  possible.
8    Q   And at least in the two cases
9  you've looked at so far, you haven't --
10  you've seen that you did not review
11  depositions?
12    A   And to the best of my
13  recollection in the remaining four, I haven't
14  seen them.
15    Q   Okay.
16    (Pause.)
17    Q   We discussed earlier that, in
18  going through your various certifications,
19  that your certification for rehabilitation is
20  for vocational rehabilitation; is that right?
21    A   That's -- that's what they are,
22  is the Commission on Rehabilitation Counselor
23  Certification.
24    Q   Is that -- and that's not a

132

1  skill that you brought to these particular
2  rehabilitation plans that you put together
3  for the plaintiffs, right?
4    A   Well, you have to remember,
5  although I didn't apply the vocational
6  aspect, rehabilitation counselors have to
7  learn the medical aspects of disability.  But
8  I, in my years through the Ph.D., went way
9  beyond the Master's degree level that's
10  involved in that particular certification.
11    Q   Let me -- let me ask it for you
12  straight out.
13    What expertise did you bring to
14  formulating the rehabilitation plans -- and
15  we agree now that they're not life-care
16  plans -- that you have submitted to us as a
17  report for the six plaintiffs in this
18  litigation?
19    A   Well, the expertise I bring is
20  the expertise related to my knowledge of
21  rehabilitation, my knowledge of the medical
22  aspects of disability, the rehabilitation
23  aspects of disability and health care
24  conditions.  My ... knowledge of the

133

1  psychological impact, the long-term care and
2  support of healthcare conditions and medical
3  aspects, and my case management expertise.
4    Q   And you're not going to be
5  performing any case management on these --
6    A   No.
7    Q   -- plaintiffs?
8    A   No, I'm not.  Because, again,
9  there's -- there's ... you know, first of
10  all, I wouldn't have anticipated it in
11  any ... instance, but there is a -- a
12  consultation versus treatment ethics rule,
13  you don't do both on cases.  And I'm the
14  consultant in these cases, so it would be
15  ethically inappropriate to also be a treater.
16    Q   So what's the purpose of the
17  plan, these six plans that you put together
18  here?  What's their purpose?
19    A   The purpose -- I keep thinking
20  you're at the end, and obviously, I'm not
21  measuring your beat very well.
22    Q   I'm sure it's me.
23    A   Well, the ... first and foremost
24  purpose clearly is because litigation is

134

1   present.  It's important, in litigation, to
2   educate all parties concerned as to the
3   outcome of the onset of healthcare or
4   disability situation.  So, to whatever extent
5   it may be, that's the first and foremost
6   purpose, is to make sure that all parties
7   understand the nature of the issue at hand as
8   far as a chronic illness or healthcare
9   problem and its long-term implications.  So
10   that's the first step.
11        Certainly, the plan is an
12   educational tool for these clients, as well.
13   They can utilize it and should.  They need to
14   be well educated.  Some of them have never
15   received proper education on -- on diabetes
16   management.
17      **Q  But you never sent them the**
18   **plan, right?**
19      A  No, I have not.  But I have
20   talked to them about it, and one of the
21   things I have talked to them about is the
22   importance of being well educated and
23   learning how to manage this over time.  Not
24   just managing their medication, but fully

135

1   managing, fully being educated on all aspects
2   of diabetes, not just what they currently are
3   experiencing, but its implications over time,
4   how to watch for symptoms, knowing the
5   symptoms, how to avoid problems so that
6   they -- they don't experience them.  There's
7   a lot that goes into managing diabetes.
8   And --
9      **Q  Do you have any**
10   **correspondence --**
11        MS. MARTINES:  John -- I'm
12   sorry.  Were you done with your answer?
13        THE WITNESS:  I think I'm --
14   that's fine.  Go ahead.
15   BY MR. SULLIVAN:
16      **Q  Do you have any correspondence**
17   **that you can point to where you've -- where**
18   **you've said to the attorneys in this case,**
19   **make sure this life-care plan or this**
20   **rehabilitation plan gets to the plaintiffs?**
21      A  No, I have not.  I've only
22   testified to you that, as part of my
23   conversation with these plaintiffs, I've
24   talked to them and went over it with them.

136

1   This is pretty basic.  This is pretty basic
2   stuff.
3        I was surprised, quite frankly,
4   that -- that only a couple of these
5   plaintiffs have actually had basic education
6   and instruction on diabetes management; that
7   more of that hasn't occurred with them.  So
8   we talked a lot about this, but the --
9      **Q  Do you know whether they've had**
10   **it since?  Do you know whether anything that**
11   **you mentioned in your plan has been followed**
12   **since it was used?**
13      A  I seriously doubt it.  They have
14   the same treaters, the same nurses, the same,
15   you know, program and follow-up, so it's
16   something that -- that I'm strongly
17   recommended, but at this point in time, I
18   doubt there's been additional follow-up, and
19   I doubt handing them this set of
20   recommendations would have changed something.
21   The only way to change it is to -- you know,
22   is to get -- either refer them to a -- a
23   management program, or an educational program
24   and/or --

137

1      **Q  And you haven't done that?**
2      A  No, I haven't done that.
3      **Q  Okay.**
4      A  And ... typically, the way to do
5   that really is to get them referred to a case
6   manager who does it, or to get the health
7   insurance company to do it, if, in fact, they
8   have one.  But there are several steps that
9   could be taken to do that, but it's not
10   something that typically would come from me.
11      **Q  Do you have any education,**
12   **training, or particular experience for making**
13   **rehabilitation recommendations in cases**
14   **involving, you know, chemical or metabolic**
15   **impairment, such as someone with diabetes, as**
16   **opposed to cases involving trauma like a**
17   **spinal-cord injury?**
18      A  Only in the fact that this
19   diabetes is something that has been a
20   secondary diagnosis in a huge number of the
21   cases that we've worked with.  So we've had
22   to deal with it on numerous occasions.  It's
23   something that we've written about as part of
24   secondary diagnosis, associated with our

138

1    disabilities, and it's just something we
2    commonly have to work with, with our
3    patients.  So, it's a common medical aspect
4    of disability and medical aspect of
5    healthcare that we cope with all the time.
6        Q   So what you're pointing to is
7    **your experience in the past in dealing with**
8    **these in much broader life-care plans, where**
9    **diabetes is one element?**
10       A   Sure.  And so we've had to work
11   with the physicians; we've had to research;
12   we've had to be part of case managing.  It's
13   a common experience for us.
14       Q   **Other than that?**
15       A   Other than that, what?
16       Q   **What -- do you have any**
17   **education in the area?**
18       A   I mean, it was certainly, I
19   think, part of early training in medical
20   aspects disability, but I think I learned far
21   more over the years, researching it for
22   writing and researching it as part of our
23   work with patients than I ever did in my
24   exposure to it in basic medical aspects

139

1    courses.
2        **MS. MARTINES:**  I'm going to --
3    since we're kind of paused, I'm noticing
4    that his clock says it's about eight
5    till 12:00.
6        **MR. SULLIVAN:**  Yeah, I was
7    actually looking to see if this was a
8    good place to pause, because I know you
9    have that meeting, and I want to get you
10   to it, and your instincts may be
11   correct.
12       (Pause.)
13       **MR. SULLIVAN:**  Yeah, why don't
14   we -- why don't we take a lunch break.
15       **MS. MARTINES:**  Okay.
16       (Whereupon, a lunch recess was
17   taken from 11:52 a.m. to 1:00 p.m.)
18       * * * * *
19       (Continued in Volume II.)
20
21
22
23
24

140

1
2
3               CERTIFICATE OF OATH
4
5    STATE OF FLORIDA          )
6                              )
7    COUNTY OF ORANGE          )
8
9        I, the undersigned authority,
10   certify that PAUL M. DEUTSCH, PH.D.,
11   personally appeared before me and was duly
12   sworn.
13
14       WITNESS my hand and official seal
15   this 6th day of October, 2008.
16
17
18
19       _____
20       Richard Castillo,
         Registered Diplomate
         Reporter
21       Notary Public, State
         of Florida at Large
22       Comm. No. DD609499
         Expiration:  02/25/11
23
24

141

1        CERTIFICATE OF REPORTER
2    STATE OF FLORIDA          )
3    COUNTY OF ORANGE          )
4    I, RICHARD CASTILLO, Professional Court
5    Reporter and Notary Public, do hereby certify
6    that I was authorized to and did
7    stenographically report the deposition of
8    PAUL M. DEUTSCH, PH.D.; that a review of
9    the transcript was requested; and that the
10   foregoing transcript, pages 6 through 139, is
11   a true record of my stenographic notes.
12       I FURTHER CERTIFY that I am not a
13   relative, employee, or attorney, or counsel
14   of any of the parties, nor am I a relative or
15   employee of any of the parties' attorney or
16   counsel connected with the action, nor am I
17   financially interested in the action.
18       DATED this 6th day of October, 2008, at
19   Orlando, Orange County, Florida.
20
21   ----------------------------------------
     RICHARD CASTILLO
22   Registered Diplomate Reporter
     Notary Public, State of Florida at Large
23   Commission No. DD609499
     Expiration:  February 25, 2011
24

36 (Pages 138 to 141)

142

```
1              E R R A T A
2         I, PAUL M. DEUTSCH, PH.D., do
3    hereby certify that I have read the foregoing
4    transcript of my deposition given on October
5    2, 2008, that, together with any additions or
6    corrections made therein, it is true and
7    correct.
8
      Page    Line
9    -------------------------------------------
10   -------------------------------------------
11   -------------------------------------------
12   -------------------------------------------
13   -------------------------------------------
14   -------------------------------------------
15   -------------------------------------------
16   -------------------------------------------
17   -------------------------------------------
18   -------------------------------------------
19
     -------------------------------------------
20    Under penalties of perjury, I declare that I
      have read the foregoing document and that the
21    facts stated in it are true.
22   _____
      Date            PAUL M. DEUTSCH, PH.D.
23
24    Job No. 957479
```

144

```
1            LAWYER'S NOTES
2    PAGE LINE
3    ____ ____  _____
4    ____ ____  _____
5    ____ ____  _____
6    ____ ____  _____
7    ____ ____  _____
8    ____ ____  _____
9    ____ ____  _____
10   ____ ____  _____
11   ____ ____  _____
12   ____ ____  _____
13   ____ ____  _____
14   ____ ____  _____
15   ____ ____  _____
16   ____ ____  _____
17   ____ ____  _____
18   ____ ____  _____
19   ____ ____  _____
20   ____ ____  _____
21   ____ ____  _____
22   ____ ____  _____
23   ____ ____  _____
24
```

143

```
1    DATE: October 6, 2008
     TO:  Paul M. Deutsch, Ph.D.
2         10 Windsomere Way, Suite 400
          Oviedo, Florida, 32765
3
     IN RE:  Plaintiffs vs. AstraZeneca
4         Case No. 6:07-cv-15959, et al
5         Please take notice that on October 2,
     2008, you gave your deposition in the
6    above-referred matter.  At that time, you did
     not waive signature.  It is now necessary
7    that you sign your deposition.
          Please call our office at the
8    below-listed number to schedule an
     appointment between the hours of 9:00
9    a.m. and 4:30 p.m., Monday through Friday at
     the Esquire office located nearest you.
10        If you do not read and sign the
     deposition within a reasonable time, the
11   original, which has already been
     forwarded to the ordering attorney, may be
12   filed with the Clerk of the Court.  If you
     wish to waive your signature, sign your name
13   in the blank at the bottom of this letter and
     return it to us.
14
          Very truly yours,
15
16        RICHARD CASTILLO
          Registered Diplomate Reporter
17        Esquire Deposition Services
          Orlando, Florida
18        (407)426-7676
19   I do hereby waive my signature.
20   _____
21   PAUL M. DEUTSCH, PH.D.
22   cc via transcript: Buffy Martines, Esquire
               John Sullivan, Esquire
23             Chris Coutroulis, Esquire
24   Job No. 957479
```

37 (Pages 142 to 144)

145

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
VOLUME II

-------------------------------------------x

IN RE:  Seroquel Products Liability      :
Litigation                              :
                                        :
MDL DOCKET NO. 1769                      :
This Document Relates to:                :
                                        :
PLAINTIFFS v. AstraZeneca LP, et al.    :
(Janice Burns 6:07-cv-15959;            :
Connie Curley 6:07-cv-15701;            :
Linda Guinn 6:07-cv-10291;              :
Eileen McAlexander 6:07-cv-10360;        :
Richard Unger 6:07-cv-15812;            :
Linda Whittington 6:07-cv-10475)        :

-------------------------------------------x

Thursday, October 2, 2008

9:10 a.m. - 4:52 p.m.

Oral deposition of PAUL M. DEUTSCH,

PH.D., held at Offices of Paul M. Deutsch, &

Associates, P.A., 10 Windsomere Way, Suite

400, Oviedo, Florida, 32765, beginning at

9:10 a.m., on the above date, before Richard

Castillo, Registered Diplomate Reporter,

Commission No. DD609499 (Expiration 2/25/11)

and a Notary Public.

Esquire Deposition Services
200 East Robinson Street
Suite 425
Orlando, Florida  32801
(407)426-7676

Job No. 957479

146

```
1                  APPEARANCES
2    LAMINACK, PIRTLE & MARTINES, LLP
     2BY: BUFFY MARTINES, ESQUIRE
3    BY: RICHARD N. LAMINACK, ESQUIRE
     5020 Montrose Boulevard
4    Ninth Floor
     Houston, TX 77006
5    Phone: (713)292-2750
     --Representing the Plaintiff
6
     DECHERT, LLP
7    BY: JOHN J. SULLIVAN
     902 Carnegie Center
8    Suite 500
     Princeton, New Jersey 08540
9    Phone: (609)955-3200
     --Representing the Defendants
10
     CARLTON, FIELDS, LLP
11   BY: CHRIS COUTROULIS, ESQUIRE
     4221 West Boy Scout Boulevard
12   Suite 1000
     Tampa, Florida 33607-5736
13   Phone: (813)229-4133
     --Representing the Defendants
14
15
16
17
18
19
20
21
22
23
24
25
```

148

|   | EXHIBITS | |
|---|---|---|
| MARKED | DESCRIPTION | PAGE |
| 3 | Connie Curley report | 239 |
| 4 | Admission document | 267 |
| 5 | Neurological Evaluation | 271 |
| 6 | June 2, 2000 record | 273 |
| 7 | Pain Management Report | 274 |
| 8 | Curley blood test report | 275 |
| 9 | Fact sheet | 278 |
| 10 | Dental History | 279 |
| 11 | Letter from Dr. O'Campo | 307 |
| 12 | FAQ printout | 312 |

147

```
1
2              I N D E X
```

WITNESS                        PAGE

PAUL M. DEUTSCH, PH.D.
    DIRECT BY MR. SULLIVAN (CONT'D) 149
CERTIFICATE OF OATH          332
COURT REPORTER'S CERTIFICATE   333
ERRATA          334

```
- - - - -
NOTE:  Ellipses (...) used to reflect pauses
between words.
```

149

```
1          AFTERNOON SESSION
2      (CONTINUED FROM VOLUME I.)
3            * * * * *
4      DIRECT EXAMINATION (CONT'D)
5    BY MR. SULLIVAN:
6      Q   Good afternoon.
7      A   Good afternoon.
8      Q   I think we left off at some
9    point talking about records and your
10   receiving records here in the office.
11         Is it important -- is it
12   important to the methodology that you
13   employed here that the records be reviewed
14   carefully?
15     A   Well, I would think, yes.
16     Q   When -- who reviews the records?
17         Well, rather than generally, in
18   these six cases, who reviewed the medical
19   records, actually laid eyes on the records
20   here in your office?
21     A   The process is -- is pretty
22   simple.  There's an R.N. that goes through and
23   sets the records up.  She starts the process,
24   and you'll see that she tabs and -- she
25   organizes the records, tabs them, does some
```

150

1 underlinings, but in the end, whenever it's a
2 litigation case, I have to finalize all of the
3 summaries, and I have to be familiar with the
4 medicals before I can go into it, so I can go
5 into deposition or trial. So she gets the
6 process started for me and helps make it a lot
7 simpler for me, but in the end, both the report
8 and the medical summary is something that I
9 complete.
10     Q   So who is this who looks at the
11 records, the first cut at the records?
12     A   I know you were going ask me.
13 She's an R.N. Her name is Shannon. I'll get
14 you her last name in just a second. I'm
15 embarrassed that I ... I don't have it off the
16 top of my head.
17     Q   Who --
18     A   Called her Shannon for so long, I
19 forgot her last name.
20     Q   How long has Shannon worked for
21 you?
22     A   Ten, 11 months. You know,
23 somebody has to be here 20 years before I get
24 to the last name.
25     Q   Oh, yeah. She's a nurse?

151

1     A   A registered R.N.
2     Q   Did you give her any type of
3 training when she came here?
4     A   Yes.
5     Q   What type of training?
6     A   Well, we have a -- a format that
7 we utilize. In fact, we even have it out there
8 for the students. We basically explain how we
9 do our medical summaries, but -- so the
10 individual who -- the social worker that we've
11 used in the past who still works here,
12 provided -- provides oversight and trained her.
13     I've worked with her, Julie
14 Kitchen, who's been with me 30 years, and
15 basically is her direct supervisor, also
16 gives her feedback. But, you know, even when
17 I'm working with the reports and I will come
18 back and talk to her about any issues that I
19 might have, and so it's a constant process.
20     Even after I feel -- you know,
21 after training, after she's been working with
22 the medicals, I may find things that I feel
23 that require her having feedback. So, it's
24 really a constant process, to get it the way
25 we want it. Frankly, it can take

152

1 sometimes ... you know, a year, a year and a
2 half or more to really -- to really have it
3 exactly like I want to have it presented by
4 the time it gets to me. Because, as I said,
5 I'm the one who finalizes all reports and
6 medical summaries.
7     Q   Is there a ... does Shannon have
8 a title or a position here at your company?
9     A   Other than the fact that she's an
10 R.N. nurse, we're not real big on titles, so
11 nobody really has a title, per se.
12     Q   Does she have job
13 responsibilities beyond summarizing or
14 reviewing medical records?
15     A   Yeah, she's in training to -- to
16 begin to get involved in other areas. But
17 right now, she's mostly working with the
18 medical records. She's been taking the Kaplan
19 course on life-care planning. She's learning
20 how to do research on medical aspects of
21 disability, learning how to research clinical
22 practice guidelines, which is a, you know, not
23 an easy thing to -- to know how to do.
24     She's learning how to do
25 literature searches. Her primary

153

1 responsibility is working with the medicals
2 right now, but she's learning a lot of these
3 other support areas in life-care planning,
4 and over time, you know, I -- I do expect
5 that she, along with at least one other
6 individual here, will learn more and more
7 about the whole process of life-care
8 planning, which includes all of the
9 standards, tenets, methodologies, et cetera
10 that we've talked about.
11     We have two people that we're
12 working on to train, but frankly, that
13 training process takes -- we just started
14 them maybe two, three months ago, and
15 generally, for us to get somebody where we
16 want them, and that's support in life-care
17 planning, not independently doing life-care
18 planning, takes about two years.
19     Q   And Shannon started 11 months
20 ago, or two or three months ago?
21     A   No, she started ten months ago,
22 but that strictly was in her position as R.N.
23 She wanted to go beyond and get involved in the
24 life-care planning process, and that portion of
25 her -- of the additional training we just

154

1    started about two or three months ago.
2        Q   When she arrived, was she given
3    any formal training on the type of review she
4    should apply to the medical records?
5        A   Yes.
6        Q   And what formal training was she
7    given?
8        A   Well, that's what -- I mean, we've
9    already talked about that. We have a specific
10   process that we go through in working with the
11   medical records, we've always gone through, and
12   over the years, we've, you know, we've further
13   evolved that process. But we took her step by
14   step through that process as it applies to, you
15   know, to the work here.
16       Q   Could you give me a broad
17   framework of the process?
18       A   I can probably ... I mean, I think
19   I have it in lecture format, so when we take a
20   break, I'll see if I can't print something out
21   for you.
22       Q   This is just for the process of
23   reviewing medical records?
24       A   Yes.
25       Q   Okay. Who --

155

1        A   I mean, obviously, giving it to
2    you as on outline is not as detailed as -- as,
3    over time, sitting down with someone, but it
4    does give you a broad outline of what our
5    expectations are. And we'll probably be more
6    detailed than what I'm going to give you in an
7    answer here.
8        Q   How long was she here before she
9    was allowed to actually review medical
10   records?
11       A   By herself? Long time. Probably
12   ... maybe, I'd say, four to six months.
13       Q   When she's reviewing medical
14   records, not by herself, could you explain
15   how that works?
16       A   What happens is that, you know,
17   she's really just reviewing the summaries that
18   have already been done in the past. She's --
19   if she's -- once she starts to review
20   everything she does, she's doing along with
21   another reviewer, and so somebody's watching
22   and supervising every step of the way.
23           It's an expensive process for us
24   because they're getting double reviewed, and
25   we can't charge for that. But I can't afford

156

1    for it to happen any other way. It's really
2    a triple review, because if somebody is going
3    through the records and underlining and
4    making notes and getting them set up, for
5    them to come to me, I'm reviewing, as well.
6    Now, we only charge one time. I don't charge
7    for what I'm doing, because I'm allowing the
8    nurse to charge for it. Or I'm allowing the
9    social worker to charge for it. So when it
10   gets to me as part of report writing, which
11   is the actual final summary, you know, I
12   can't charge a third time for that portion,
13   but it's what brings about a quality final
14   summary. And, of course, the summary only
15   serves one purpose. It keeps me from having
16   to go, every time I pick up the file, into a
17   complete medical record. But there are a lot
18   of times we still have to go back into the
19   medical record.
20       Q   During these first two or three
21   months when Shannon wasn't reviewing on her
22   own, who was reviewing with her?
23       A   Terry Teevin.
24       Q   Terry who?
25       A   Teevin, T-E-E-V-I-N. And it may

157

1    have taken longer than two or three months. I
2    think I said four to five when I originally
3    testified to you.
4        Q   Who is Terry Teevin?
5        A   Well, she's an individual who's
6    been with me about six-plus years. She's a
7    Bachelor's in Sociology, Social Work. What
8    more would you like to know?
9        Q   Is she a nurse?
10       A   No, she's not a nurse. She's --
11   like I said, she's in sociology, social work.
12       Q   Okay. Does Shannon have any
13   background in endocrinology?
14       A   Specifically or solely in
15   endocrinology beyond her general R.N., I -- I
16   doubt it.
17       Q   You don't know?
18       A   I've never asked her if she had a
19   separate background specializing in
20   endocrinology beyond her R.N. background.
21       Q   Do you know what type of work
22   experience she had as a nurse before you had
23   her here reviewing medical records?
24       A   Without going back and pulling her
25   CV, I don't recall.

4 (Pages 154 to 157)

158

1    Q   Okay.  Why is it important to do
2  a careful review of the medical records?
3        A   Well, seems kind of a ... an odd
4  question.  Why would somebody suggest that it
5  would be -- it would be more appropriate to do
6  a haphazard review?
7        I mean, clearly, you want to
8  have an accurate review of the medicals.  You
9  want to know what the treatment regimen is
10  for the patient that you're working with.
11  You want to know what specifically the
12  problems are that currently have been
13  objectively identified by the treating
14  doctors.  You want to know if there are any
15  existing complications for that patient.
16        I mean, I can go on for a while,
17  but the most important point that you're
18  making by your question is the recognition
19  that you want accuracy.  You want to be
20  careful in identifying what medications have
21  been tried; what medications have been
22  eliminated; what medications are now working;
23  whether there's any anticipation of changes
24  in a treatment regimen in the future; whether
25  any doctors are suggesting -- and, in part,

159

1  I'm answering this in relation to these
2  specific patients, that's probably obvious,
3  but whether they're anticipating specifically
4  the onset of complications, because if they
5  are stating, within a reasonable degree of
6  medical certainty, problems based on the
7  level of -- of identified issues related to
8  their diabetes, now I need to know that.
9        If they're not, if they're
10  stable, I need to know that.  If there are
11  issues in management related to patient
12  behavior, I need to know that.  If there are
13  issues that they've identified related to
14  family dynamics or psychological issues that
15  are interfering, I need to know that.
16        So anything that the doctors
17  and/or health-related professionals have said
18  within the records that would be meaningful
19  to me, these are issues that I need to know
20  about.
21        So you want to try and pick up
22  as much as possible within the records that
23  you have, that would reflect on, for me,
24  current and future treatment issues.
25    Q   And if you, if a review is not

160

1  careful and fails to pick up certain of the
2  many things you just listed, it could create
3  a flaw in the ultimate plan that you produce;
4  is that fair to say?
5        A   There's certainly no question of
6  that.  And ... you know, once again, I view my
7  role as being an educator.  So if someone
8  reveals a flaw, I'm not there to argue the ...
9  you know, the plan in the face of a flaw.  If
10  it's clearly identified and I can be shown such
11  a flaw, I'll be the first to recognize it or
12  accept it, or even if it's provided as a
13  hypothetical, you know, I will certainly
14  respond to that hypothetical.  But I certainly
15  do need documentation of the existence of that
16  flaw.
17    Q   In these six cases, you received
18  the medical records from the attorneys.  We
19  went over that already.  What other sources
20  of information about the patient and the
21  patient's medical history did you have, other
22  than the medical records that were provided
23  to you by the attorneys?
24        A   Well, the only two other sources
25  that I would have would be writing to the

161

1  treating doctors and getting responses to my
2  questions, and of course, the clinical
3  interview and history with the patient
4  themselves.
5        Or if there was an instance in
6  which there was a family member present, then
7  also the family member.  But I tried to show,
8  in each instance, where a family member
9  responded versus a patient.
10    Q   Did you do an interview with
11  each of the six plaintiffs?
12        A   Yes.
13    Q   How long do your interviews
14  generally last?
15        A   Well, here we're going to get into
16  a clear distinction.  Generally?  Generally, my
17  interviews last four and a half to six hours,
18  including testing.  That clearly was not the
19  case here, because we're dealing with -- we're
20  not dealing with a catastrophic disability, and
21  it certainly didn't take four and a half to six
22  hours to accomplish a clinical interview and
23  history here.
24        We also, for the most part,
25  we're not dealing with vocational issues, the