162

1    wage loss issues.  So, although I got some
2    basic job information, wasn't dealing with
3    the need for as much detail, if I knew in
4    advance I wasn't going to be worrying about
5    wage loss.
6            So, I would have to look it up
7    on each individual bill, but you asked it as
8    a general question, and I would say, on
9    average, I probably spent more like ...
10   clinical interview, history, and intake
11   together, probably lasted more like two to
12   two and a half hours.  Want to include
13   testing with that, then we're probably
14   saying, I would say, two to three hours with
15   testing.
16       Q    Two to three additional hours?
17       A    No, no, no, no.  Well, actually,
18   you know, most of them did take an MMPI.  So
19   two to two and a half hours for interview, and
20   an hour and a half to two hours for testing.
21   'Cause the Beck series only takes, max, about
22   ... generally, 25 to 30 minutes, and the MMPI
23   by itself, an hour and a half to -- up to two
24   hours, depending upon the individual patient.
25       Q    What type of information were

163

1    you looking for from the plaintiffs in this
2    case when you interviewed them?
3        A    Well, of course, I'm sure you saw
4    the patients, so I'm going to be, believe it or
5    not, fairly brief, and you can develop it
6    further.
7            But the intakes, you know you
8    get a general identifying information,
9    demographic information, which includes
10   height, weight, and some pre-injury history
11   of work and/or whether they were on
12   disability.
13           Then you have their best
14   recollection of the history of mental health
15   and when they started Seroquel, and when they
16   were identified as having ... diabetes.  I
17   apologize there.  I wasn't trying to do any
18   linkage.  I just wanted to know when, to your
19   best recollection, were you identified as --
20   or diagnosed, rather, as having ... diabetes.
21           Then any -- any -- the section
22   called rehabilitation program since onset,
23   what we were really looking for was, have you
24   had any training programs, any educational
25   programs on diabetes management?  Has anybody

164

1    sat down with you and really gone into detail
2    to explain to you what diabetes has -- is all
3    about; what the potential problems are with
4    diabetes; how it relates to weight
5    management; how it relates to your diet; how
6    it relates to -- without going here through a
7    two-hour training program -- has anybody sat
8    down and really taught you about diabetes and
9    all its implications, and how you should be
10   managing it.
11           Then prior medical history.
12   Went through all -- you know, asked them to
13   go through their prior medical history.  And
14   I tried to do it, not just as a general
15   question; first asking them about -- oh, I
16   did give them an opportunity to ... answer
17   it ... in something of a general statement.
18   I did try and ask them, you know, any prior
19   history of accidents, injuries, that resulted
20   in the need for medical problems; any prior
21   history of surgeries; any prior history of
22   chronic illnesses for which you were treated,
23   heart disease, lung disease, you know, were
24   you ever diagnosed prior to this with
25   diabetes, basically mental health problems,

165

1    et cetera, et cetera.
2            Then we went through chief
3    complaints in several ways.  I asked them to
4    give me their best understanding of their
5    diagnosis, their best understanding of what
6    their chronic problems are.  We went through
7    everything.  I didn't just limit them to
8    talking about their diabetes.  I gave them
9    the opportunity to just explore everything.
10   Even though, later on, I limited the case to
11   diabetes.  I wanted to hear what they had to
12   say.  And then I went --
13       Q    Was there any purpose for that
14   as it relates to your ultimate rehabilitation
15   plan, that you hear anything they have to
16   say?
17       A    Sure.
18       Q    And what's the purpose?
19       A    Similar to giving an MMPI.  I
20   wanted to get a sense of their mind set; wanted
21   to hear what their level and rate of general
22   somatic focus and concerns might be; how it
23   related to their overall condition; how it
24   might relate to their mind set regarding
25   physiological concerns, as well as mental

166

1 health concerns. I don't want to suggest it's
2 as accurate as an MMPI validity scale, but it
3 does help me with understanding patient
4 dynamics. In a similar way, observing family
5 members in a clinical interview gives me some
6 sense of family dynamics.
7     Q   But how does that information
8 that you claim you gleaned from it translate
9 into usefulness for you in developing the
10 limited rehabilitation plan that you provided
11 here?
12     A   Well, you asked me earlier about
13 issues of, for lack of any other way of
14 phrasing it, of patient credibility, accuracy.
15 It gives me insight into the patient. It helps
16 me better understand the patient I'm working
17 with.
18         If all I did is sat down and
19 said ... you know, as briefly as you can,
20 just tell me about your diabetes, how you're
21 being treated and what you know about
22 diabetes, and I walked out of there, and we
23 did the whole thing in 20 minutes, I wouldn't
24 know much about these patients, and I
25 wouldn't know much about the dynamics that

167

1 we're dealing with. And I'd have much less
2 ability to answer the questions that you
3 legitimately are asking about; how do you
4 know about the accuracy of what you're
5 getting? Do you do anything to try and
6 establish the credibility or accuracy, or
7 gain insight into these patients as it
8 relates to, not just the diabetes, but the
9 way they approach reporting mental health,
10 reporting physiological problems?
11         And so one way I do it is with
12 the testing, and one way I do it is with how
13 I approach the clinical interview and history
14 process and relate it back to what records I
15 have.
16     Q   You mentioned that one of the
17 things you asked them about was Seroquel
18 usage. We discussed that you are not giving
19 a causation opinion here. There's really
20 no --
21     A   I only want to know when they
22 started it and ...
23     Q   Let me finish my question.
24     A   Sure, I'm sorry. I apologize.
25     Q   There is really no reason or

168

1 need for you to know or give that information
2 in your report, given that you are not giving
3 an opinion with regard to causation; is that
4 fair to say?
5         MS. MARTINES:  Object to form.
6         THE WITNESS:  That's actually ...
7 I'm sure that you're actually correct.
8 There's really no way my report would
9 have changed if I had never mentioned
10 that they were on Seroquel, one way or
11 the other.
12 BY MR. SULLIVAN:
13     Q   And do you recall whether you
14 did anything to check to see whether their --
15 the dates of usage you received about
16 Seroquel from the patients were actually
17 true?
18     A   I did absolutely nothing. I can
19 tell you that right now.
20     Q   Okay.  You can tell me whether
21 you've given the full answer to this or not,
22 but of course, you weave this into one of
23 your previous answers.  I was going to ask
24 you -- what was the worth, the use, the
25 reason for using the MMPI, the exams with

169

1 some of these six plaintiffs.  Have you
2 answered that?
3     A   I believe I have, 'cause I --
4 although I wanted to get insight into the
5 patients through use of the whole MMPI, I was
6 particularly interested in the validity scales.
7 If I got validity scales that just showed, you
8 know, really elevated F scales showed
9 malingering, showed, you know, horrible, just
10 really elevated FBS, Fake Bad Scales, that I
11 just really had problems with how they
12 approached test taking, and then in the
13 dynamics in clinical interview, I was getting
14 similar kinds of characteristics, you know, it
15 would certainly give me some insights into
16 difficulties I would have in use of the
17 materials.  I'd be really more limited to
18 focusing on nothing more than the treatment
19 they were actually receiving.
20         And, for the most part, you
21 know, what I used was the treatment they were
22 actually receiving, plus the statistics, but
23 it was still important for me to understand
24 some of these dynamics.
25     Q   I've seen on your introduction

170

1    to life-care planning publication on your
2    web site, that you say that you generally
3    should conduct these clinical interviews in
4    the presence of not just the patient, or in
5    this case, the plaintiff, but a family member
6    or significant other.  Is that accurate?
7    That's accurate as a part of the methodology?
8        A    I -- I -- that was terrible.  Care
9    if I start over?
10       Q    Please.
11       A    I'd love to read that part of the
12   deposition.  It is accurate.  It is
13   particularly accurate with catastrophic
14   disabilities.  I almost always insist on
15   setting it up that way.
16            With non-catastrophics, I'm a
17   little less insistent.  And, of course, if I
18   do it outside the office, I won't see a
19   patient without a family member present,
20   because it puts me in a situation of
21   potentially being in someone's home with just
22   the patient and myself, and that's not safe
23   for them or me.  So I just won't do it.
24            But, will I see a
25   non-catastrophic without a family member?  It

171

1    happens more often than I necessarily would
2    like, because that's just the reality with
3    non-catastrophics.  But my preference is to
4    try and see patients with a family member.
5        Q    Why?
6        A    Well, first of all, the biggest
7    reason to want to have family members, and the
8    reason why it's not always as necessary with
9    non-catastrophics is because with -- with the
10   family member, you get a third party who knew
11   the patient well premorbidly, and gives you
12   very good access to premorbid data about the
13   patient.
14            With head-injury patients with
15   severe catastrophics, often they're not
16   capable of giving you as accurate a premorbid
17   history, where you can really get a
18   comparison between functional levels pre and
19   functional levels post.
20            Secondly, you get a better, or
21   you get, not a better necessarily, but you
22   get an additional party who can talk about
23   functional levels now, where sometimes, with
24   catastrophic patients, you get, more ...
25   often than not, a reflection of where they

172

1    want to be, versus where they really are in
2    terms of current functional levels.  And so
3    family members often give you a better, or a
4    different perspective at least, on where the
5    patient currently is functioning.
6            Additionally, and very
7    importantly, you get a sense of family
8    dynamics.  And sometimes it's family dynamics
9    that create a worse disability than you
10   otherwise might have to have.  And without
11   treating the family dynamics, you can't
12   really move that patient forward and that --
13   that happens in a number of different
14   situations.  I'll avoid sitting here giving
15   you examples.
16       Q    Thank you.
17       A    The ... so those are the main
18   reasons, that with non-cats, those reasons don't
19   always exist, but it's still not in the same --
20   to the same degree.  Family dynamics will often
21   exist.
22       Q    Do some of those problems,
23   though, exist in a non-catastrophic situation
24   where, such as here, each of the six
25   plaintiffs you were speaking with have

173

1    psychological and mental problems?
2        A    Absolutely.  The existence of
3    diabetes, forgetting causation here, may not be
4    as influenced by the current case.  The current
5    issues may not be as influenced by family
6    dynamics, although they can be, but a lot of
7    the other issues that are going on within the
8    patient's background, particularly mental
9    health issues, but even, for example,
10   nutritional issues and -- and issues related to
11   obesity, certainly can be influenced by family
12   dynamics.
13       Q    And, also, is it helpful to have
14   a family member there who might assist in
15   giving a proper recollection or understanding
16   of the patient's prior medical history or --
17   or physical condition before and after having
18   diabetes?
19            (Pause.)
20       A    Well, I think that might be true
21   if I was looking at causation.  But I'm not
22   sure -- if all I'm trying to do is recognize --
23   if I'm just accepting they have diabetes, and
24   I'm just looking at what are the current
25   treatment -- excuse me, let rephrase that.

174

1    What is the current treatment
2    for that diabetes and the related cost, and
3    then statistically, in the literature, you
4    know, what's the impact of diabetes, I'm not
5    sure that's -- that --
6        Q    You may be --
7        A    -- question is necessarily a yes.
8        Q    You may be helping me here then.
9    Let me get to what I'm considering.
10       A    Sure.
11       Q    Part of the report that you've
12   given us, and the opinion that you're
13   prepared to give to the Court, do you take
14   into account what life -- or what
15   rehabilitation plan could have been put
16   together for these patients, for these six
17   plaintiffs, before they got diabetes?  Let's
18   say, with the day before they got diabetes?
19       A    No, but what I try and do is pull
20   from this plan anything that should have been
21   there in any instance.  So if the plan -- the
22   plan should not include cost that would have
23   been present in any instance.  Does that -- is
24   that clear?
25       Q    The cost that would have been

175

1    present -- the plan should not include cost
2    that would have been present the day before,
3    or just before the patient got diabetes?
4        A    Right.  For example, in the case
5    of the patient who had retina detachment and
6    would have needed ophthalmological follow-up
7    anyway, the ophthalmologist stated he needs,
8    once a year, ophthalmology follow-up for the
9    diabetes.  We showed that, but we didn't put it
10   in the cost because he would have needed
11   ophthalmological follow-up resulting from the
12   retinal detachment.
13       Q    Which brings me back to my
14   initial question.  In order to be able to
15   understand what type of rehabilitation plan
16   the patient might have needed before the
17   patient got diabetes, isn't it important to
18   understand and have accurate the prior
19   medical history of that plaintiff before the
20   diabetes onset?  Don't you need to know
21   whether the plaintiff already had
22   hypertension?  Don't you need to know whether
23   the plaintiff was already obese?  Don't you
24   need to know whether the plaintiff already
25   had high cholesterol?

176

1        A    Well, I think that's true, and I
2    think, for the most part, we tried to keep
3    those things ... out of the picture unless
4    there was some clear understanding that it was
5    being recommended because it wasn't present
6    before.
7        Q    You'll agree with me that just
8    because something hadn't been recommended or
9    present before, doesn't necessarily mean it
10   wasn't needed before?
11       MS. MARTINES:  Object, form.
12   BY MR. SULLIVAN:
13       Q    Do you understand that?
14       MS. MARTINES:  Object to form.
15       THE WITNESS:  Well, I do.  And
16   more importantly, it's not in those cases
17   in which you just listed specific items,
18   if it's in the plan, and a physician
19   testifies that, in fact, they were likely
20   present more probably or more certainly
21   than not, and should not be in the plan,
22   then ... you know, it's not for me to
23   argue at that point.
24       Now, on the other hand, if a
25   treater says it should be in and a ...

177

1    and a consultant says it's not, it
2    should not, I'm also not going to be the
3    one to choose between which doctor is
4    correct and which is not.  I would
5    simply say, give me a hypothetical, I'll
6    tell you how I would respond to this
7    doctor and how I would respond to this
8    doctor, but it would be up to the jury
9    as to which doctor to listen to.  It's
10   not up to me to choose between doctors.
11   BY MR. SULLIVAN:
12       Q    Let me try to come at it a
13   different way.  When you sent letters to
14   doctors asking them for their medical
15   opinions on treatment in these six cases, did
16   you, as part of those questionnaires, ask in
17   addition, this treatment that you've just
18   recommended, is that a treatment that this
19   patient should have had in any event before
20   the patient got diabetes; did you ask that
21   question?
22       MS. MARTINES:  Object, form.
23       THE WITNESS:  No, I'd have to
24   look at each individual letter.  In some
25   instances, I know that it was not asked

178

1    that way. But I drew my own conclusion
2    based on the records from that doctor,
3    that it was clear to me that, despite
4    their statement, that their
5    recommendation was based on the diabetes,
6    the presence of the diabetes, that their
7    own records reflected conditions that
8    would have demanded a similar
9    recommendation for the premorbid
10   condition.
11      Did that -- did that make sense?
12        MR. SULLIVAN: Enough.
13        THE WITNESS: Okay. I think
14   there are other times where I felt it was
15   asked properly, but there were other
16   times I felt it wasn't clear enough where
17   the doctors wouldn't have answered it in
18   a way, and -- and I faulted my own manner
19   of asking the question.
20   BY MR. SULLIVAN:
21      Q   In ... making your own
22   determination -- well, there are case
23   management recommendations in your
24   rehabilitation plans for these plaintiffs; is
25   that fair to say?

179

1      A   Yes.
2      Q   In making your own
3   determinations, you didn't consult the
4   doctors on those cases, management, the
5   recommendations, right; that's from you?
6        MS. MARTINES: Object to form.
7        THE WITNESS: That's true. My
8   recommendation there, though, was related
9   to specifically doing a management slash
10   educational program on diabetes, not case
11   managing their mental health or any other
12   premorbid condition.
13   BY MR. SULLIVAN:
14      Q   Did you take into consideration
15   whether the patients or the plaintiffs that
16   you were recommending these case management
17   hours for, needed case management on the
18   basis of their premorbid condition before
19   they got diabetes?
20      A   I didn't, because what I was doing
21   was setting up a program modeled after what I
22   know health carriers and other programs are
23   doing for diabetic patients. It was
24   specifically a model of education and
25   management of diabetes. So it didn't matter

180

1    what other kinds of case management might be
2    applied for mental health or anything else.
3    This was specifically training and education
4    and management of a diabetic condition.
5      Q   Let me ask one other question
6    within that area. When you made your case
7    management recommendations for each of these
8    plaintiffs, did you consider whether the
9    subject of the case management discussions
10   during the hours that you've recommended,
11   would be different from the subject of case
12   management discussions that would have
13   occurred, or could have occurred for the
14   premorbid conditions before the patient had
15   diabetes?
16      Did you take into consider --
17   whether what was going to happen at case
18   management that you're recommending after
19   they got diabetes, would be any different
20   from what would be discussed at case
21   management before they got diabetes?
22      A   Certainly, I did. I mean, I've
23   been doing case management for 30-plus years.
24   I have been in this field for 36 years. I've
25   been a certified case manager for, you know,

181

1    since the third or fourth year out. I mean, I
2    know what we do in case management, and this
3    was a specific model for diabetic management
4    and -- and --
5      Q   Okay. We'll go through it. It's a
6    little hard in the abstract. We'll go
7    through it with each patient, and you can
8    tell me how it is that you made those
9    distinctions.
10      A   Okay. I mean, I specifically
11   asked each patient, you know, are you part of a
12   program, have you ever gotten, you know, an
13   educational program for diabetes?
14      Q   My --
15      A   But we'll go through it in each
16   one.
17      Q   Okay. I got sidetracked a bit.
18      A   Does that mean we got through a
19   page?
20      Q   Yeah, we've been through 11 or
21   12.
22        THE WITNESS: I'm just joking. I
23   think -- you know what, I'm actually
24   going to take my jacket off.
25

182

1    MR. SULLIVAN: Get down to
2  serious business here. Does anybody need
3  the air turned off? Mine's been off
4  since I got here.
5    THE WITNESS: I know, mine
6  hasn't. You know, I've been drinking hot
7  tea. I'm thinking maybe I need the air
8  conditioning down for that reason. Go
9  ahead, I'm sorry.
10    MR. SULLIVAN: You can turn down
11  the air conditioning if you want.
12    THE WITNESS: Is everybody
13  comfortable?
14    MR. SULLIVAN: I'm fine.
15    THE WITNESS: No, if you're fine,
16  I'm okay. Go ahead.
17    MR. SULLIVAN: We got a little
18  sidetracked. I hope to sew it up
19  quickly.
20  BY MR. SULLIVAN:
21    Q   When Shannon reviews these
22  medical records that she does -- did Shannon
23  and Shannon alone review the medical records
24  for these six cases?
25    A   I'm reasonably confident she -- it

183

1  came from her to me, but I will confirm that
2  for you, 'cause it was ... you know, a lot of
3  work, and I don't know that she enlisted any
4  assistance. But, at the same time ... that ...
5  that this came in, there was a group of 11
6  child abuse cases we were working on. I don't
7  think she was involved in the child abuse
8  cases, but I've just got to -- to confirm that
9  for you. It won't take me but a second when we
10  get a break, or I can do it right now real
11  quick.
12    Q   We could do it at a break. If
13  you want to take a break, we can take one.
14    A   No, we just got back. We'll never
15  get done if we keep taking breaks. Let me make
16  a note to do it, though.
17    Q   Thank you.
18    (Pause.)
19    A   Okay, go ahead.
20    Q   When you get -- when you got the
21  records from Shannon, am I correct in saying
22  that what you got were those records with
23  flags on them and notations possibly on them,
24  as well?
25    A   Right. I think they're more

184

1  highlights than notations, though.
2    Q   Okay. And then what do you do
3  with the records?
4    A   Basically --
5    Q   I asked that -- let me ask it
6  differently then.
7    What did you do with those
8  records?
9    A   I create -- you'll see a rough
10  summary, and then you'll see the final that's
11  in the report. And so I basically create --
12  she'll start out. She gets -- she tags or
13  flags, I should say, highlights, and she'll
14  start making notes on the computer. And then,
15  basically, it comes to me, and I finish out the
16  summary.
17    I keep the rough in the file so
18  that you see what the rough looks like, and
19  then I put it into the report that I create
20  off of my intake. My intake is in FileMaker
21  Pro, and with one button, it converts
22  automatically to the report format. And I
23  insert the summary into that, and then go
24  forward and begin making the entire report,
25  the formal report.

185

1    Q   When Shannon begins making the
2  summaries, is it all done inside the computer
3  program?
4    A   Yeah.
5    Q   Are any edits or changes that
6  are made inside that computer program, do you
7  save over the old text, or do you just save
8  it to a new version so that we could go back
9  and look at the old version?
10    A   No, the only rough you have is the
11  rough that's here. So, you know, there's no
12  way to see the -- I mean, the ... there's no
13  way to see the initial edits. But I save the
14  rough that's created at this point before I put
15  it into the report.
16    Q   Do you know whether Shannon
17  keeps any handwritten notes on a note pad or
18  elsewhere, other than what we might find in
19  the report?
20    A   Not that I'm aware of, but I'll
21  ask.
22    Q   Please, that'd be helpful.
23    (Pause.)
24    A   Okay.
25    Q   When you do the clinical

11 (Pages 182 to 185)

186

1    interview with the patient, do you take
2    handwritten notes?
3        A  No.  Everything I do is in the
4    computer.  I mean, it makes it so simple for me
5    in the program, because we write our own
6    programs, and it makes it so simple for me,
7    'cause then with one button, it goes into the
8    report format.  So I do everything in the
9    computer, and then you don't have any problems
10   reading my handwriting.
11       Q   So your -- when you're
12   interviewing the plaintiffs, when you
13   interview the plaintiffs in this case, you
14   were sitting in front of the computer and
15   typing as they spoke?
16       A   I have a laptop and -- and as we
17   talk, I'm typing.  And, frankly I find, even as
18   I'm teaching, for example, I've got a new Ph.D.
19   that's joined our staff, and he's, historically
20   has taken handwritten notes.  So I've been
21   teaching him and mentoring, and he's been
22   sitting in, and he's finding the same thing I
23   learned a long time ago, that handwritten notes
24   actually are far more distracting in the
25   interview process than doing it off the

187

1    computer is.  And I think, partly, people are
2    so used to computers, it's just ... not an
3    interference at all.
4        Q   I've seen quotation marks around
5    a lot of the statements inside of the
6    interview portion of your report.
7        A   Absolutely.
8        Q   Are you a good enough typist
9    that you believe you're getting down every
10   word that's said?
11       A   I -- anything I take as a quote, I
12   read back to the client and make sure that
13   they -- you know, that they agree that that's
14   an exact quotation.  And although I'm not as
15   good as this gentleman sitting next to you, I
16   had -- typing is a therapy for me.  I had severe
17   hand injury, three surgeries rebuilding my
18   left-hand and tendons that were transplanted,
19   and so I use typing as a therapy for years,
20   getting my hand back, and so I'm a particularly
21   good typist because that's what they
22   recommended I do, start typing all of my stuff.
23   So my assistant doesn't type my letters,
24   doesn't type my reports.  So it's, it's not
25   just my interviews that I type.  I deal with

188

1    everything, and it keeps my hand limber and
2    working.
3        Q   So the -- so we know the
4    clinical -- the interview with the plaintiff,
5    you took that down while it was occurring,
6    and eventually it was transferred over to the
7    report?
8        A   Right.  Understand, though, that
9    the clinical interview and history is mine.
10   The intake -- and I started to say this a
11   little earlier, and we got off onto something
12   else.  The intake is done either by -- I think
13   in four of these cases, by Julie Kitchen, and
14   in two of these cases by Kay Brown.  They're
15   counselors that work with me.  We always work
16   cases as a team.  And so they probably had
17   30-minute intake with the patients, and all the
18   rest was done by me as a clinical interview and
19   history.
20       Q   And then the summary of the
21   records, which was started by Shannon and
22   finished by you, is then transferred over in
23   the reports; is that correct?
24       A   That's correct.
25       Q   And in preparing your reports,

189

1    what else did you do, or your office do in
2    order to arrive at your opinions?
3        A   Once I start the report process --
4    first of all, once the clinical interview and
5    history is done, even before the report
6    process, the next step is to sit down with
7    whichever counselor is working with me on the
8    files.
9            In this case, we really did it
10   as a team because, with Julie and Kay and I
11   together, because ... it was clear right from
12   the start that we were going to use one set
13   of clinical practice guidelines, one group of
14   research articles, consistent with all of the
15   cases.  They weren't going to demand a
16   separate set for each individual case.
17           And so, the next step was to
18   talk about the areas of clinical practice
19   guidelines we felt would be appropriate and
20   what research to do with respect to that, and
21   the same with respect to research literature,
22   and we created one administrative notebook on
23   guidelines.  And that was a decision they
24   asked me to ... if I was comfortable with,
25   and I was; that instead of putting clinical

190

1  practice guidelines and research literature
2  duplicatively in every notebook, was it
3  acceptable to have one notebook for all six
4  cases.
5        Unfortunately, I was out of
6  town, Gail was out of town and Kay were all
7  at the international symposium and life-care
8  planning, so when your copies got made,
9  unfortunately, the people who made them did
10 not realize there was a separate
11 administrative notebook.  That's kind of
12 unusual.  So that's why you got your clinical
13 practice guidelines and researched literature
14 after you got the other composites, and I do
15 apologize for that.  It wasn't an intentional
16 oversight.
17        But in any case, that was the
18 next step.  And once we pulled the literature
19 and the clinical practice guidelines, and
20 we've done the clinical interview, the next
21 step is to write the letters that we're going
22 to do for the doctors, figure out what
23 questions we want to ask, write them up and
24 get them out to the doctors.  And then we go
25 ahead and start the reports even before the

191

1  plans, 'cause, you know, we've got the
2  clinical interview, I do the test
3  interpretation, we can get that part and,
4  hopefully ... you know, we get the responses
5  from the docs, but we can at least begin,
6  even while we're waiting for the docs, to do
7  two things.  We can begin to outline
8  recommendations for a plan based on what's in
9  the medical records, and in part, based on
10 what the patients have told us, is their
11 current treatment plan.  And, of course, we
12 can put together the statistics from the
13 clinical practice guidelines and the research
14 literature, and then we have to just wait for
15 responses from the doctors to see what their
16 recommendations are.  And that's essentially
17 the steps that are taken.
18     Q   Explain to me how, in these six
19 cases, you developed the clinical guidelines.
20 How'd you find them and put them together?
21     A   Well, there's one resource you use
22 which is the National Clearinghouse on Clinical
23 Practice Guidelines.  And there's several steps
24 for how a clinical practice guidelines becomes
25 a clinical practice guideline and gets entered

192

1  into the National Clearinghouse, but till you
2  ask how that happens, I'm just going to stay
3  with -- you know, we go to the -- you know,
4  it's www.clearinghouse dot -- national
5  clearinghouse.gov, or clearinghouse.gov.  I
6  think it's just clearinghouse.gov.
7        And then it's a matter of
8  knowing how to research through the National
9  Clearinghouse, 'cause there's somewhat, I
10 think, slightly over 14,000 published
11 clinical practice guidelines, and they're not
12 just medical, they're psychological, they're
13 P.T., they're O.T., they're speech, basically
14 for all the medical and health-related
15 professions.
16        And then associated with each of
17 the individual medical -- both disabilities
18 and health-related problems that you're
19 dealing with.  So if you want to know how a
20 podiatrist is supposed to be dealing with a
21 hangnail -- it's not listed as a hangnail,
22 but if you want to know how that's dealt
23 with, there's a clinical practice guideline
24 for it.  You just have to know how to
25 research, and it can get pretty complex if

193

1  you're going to get down to the specific
2  specialist and the specific problem or
3  disability that you're looking for.  And ...
4     Q   Well, what do you need to know,
5  other than that they're on that web site, and
6  that it has to do with a particular type of
7  practice, let me go in there, find that type
8  of problem inside of that type of practice
9  and print out the guidelines?
10     A   Well, a part of the problem is,
11 first of all, knowing exactly what the key
12 words are for searching that disability.  And
13 then -- and knowing how to get to it in
14 relation to the specific area of specialty.
15        For example, if I want to know
16 how many physical therapy sessions are
17 recommended based on a clinical practice
18 guideline for physical therapy, after a
19 specific surgical procedure, I need to know,
20 you know, the ICD9 code for that procedure.
21 And I need to get to, you know, the physical
22 therapy clinical practice guidelines.  It can
23 get pretty complex, you know, and I'd be
24 perfectly frank, I rely on Julie and Kay.
25 They're more skilled than I am at searching

194

1  for those clinical practice guidelines.  I
2  can muddle through it, but they do it every
3  day, and they can get to those things in
4  probably a quarter of the time that I can get
5  to it.
6      Q    Okay.  So, in order to get the
7  **clinical practice guidelines that you utilize**
8  **with these six plaintiffs, your team -- is it**
9  **Julie and --**
10     A    Kay.
11     Q    **-- and Kay went to the national**
12 **guidelines?**
13     A    National Clearinghouse on Clinical
14 Practice Guidelines.
15     Q    **And searched for the proper**
16 **guidelines and printed them out?**
17     A    Right.
18     Q    **And then what do you with those**
19 **guidelines after they're printed out?**
20     A    Well, the guidelines basically are
21 a starting place for several things.  First of
22 all, they're a starting point for us to ask
23 questions, to make sure that there are not
24 additional questions beyond what we may be
25 thinking of, for addressing the treating docs.

195

1  So, we may have a few questions based on -- on
2  future needs that we're thinking of.  The
3  clinical practice guidelines may give us, you
4  know, five additional questions for the
5  ophthalmologist or, you know, five, ten,
6  fifteen additional questions for an
7  endocrinologist.  So we're always going to
8  check clinical practice guidelines to make
9  sure, before we get letters out to these docs,
10 as to whether or not there's something else we
11 should be thinking about that we haven't given
12 thoughts to.
13         There are also a consideration
14 before we end a plan, is there anything else
15 we should be thinking about in a plan that is
16 a standard of care that we haven't given
17 consideration to?  Sometimes -- and I think
18 this is a classic example, we didn't get a
19 lot of additional recommendations out of the
20 clinical practice guidelines at all.  But,
21 once we've pulled them, we're not going
22 to ... discard them.
23         Anything we've used, anything
24 we've considered, anything that we've pulled,
25 good, bad, or indifferent, stays in our file.

196

1  We don't throw anything away.  So you've got
2  everything.  Every research article, every
3  clinical practice guideline, every note.
4  There's a post-em, whatever it is, you know,
5  it's here.
6      Q    And so you use the clinical
7  **practice guidelines in order to help**
8  **formulate the questions to the doctors,**
9  **right?**
10     A    Right.  And to consider anything
11 else in the plans.
12     Q    **Anything else in the plans you**
13 **may want to change, adjust, add, delete,**
14 **right?**
15     A    Right.
16     Q    **Do the -- you have the case**
17 **management recommendations inside of each of**
18 **these plaintiff's plans.  Do they have any**
19 **relation whatsoever to the clinical practice**
20 **guidelines, or are they guided at all by**
21 **those guidelines, or is that something**
22 **separate that you determine on the basis of**
23 **your own judgment?**
24     A    I think the overall clinical
25 practice guideline is generally about diabetes,

197

1  not the specialty areas, but generally about
2  diabetes, do make clear the importance of
3  managing diabetes through patient understanding
4  and patient ... I just lost the word I was
5  looking for -- compliance.
6         It's extremely important for
7  patients to be compliant with care.  That's
8  probably the number one way.  I mean, there's
9  a -- doesn't guarantee that you're not going
10 to have complications but a most important
11 way to avoid complications is patient
12 compliance with proper care for diabetes.
13 Excuse me.
14         And I think you certainly get
15 that -- that understanding if you read both
16 the research literature and the guidelines.
17 But is there a guideline that specifically
18 says ... you need to order case management
19 slash patient education programs?  I don't
20 think there is.  I think it just talks about
21 the overall need for, you know, patient
22 compliance.  Specifically the guideline that
23 talks about, you know, meeting these various
24 levels.
25         It talks about, you know, levels

14 (Pages 194 to 197)

198

1    A, B, C, and D, or their goals.  And when you
2    understand the goals that need to be reached
3    and what the patients need to do as their
4    part in reaching these goals, you really
5    understand the importance of patient
6    education.
7        Q    The National Clearinghouse of
8    Clinical Guidelines, is that a private or a
9    public entity?
10       A    Well, it's dot gov, so it's run by
11   the government.  The way a guide -- a clinical
12   practice guidelines becomes a clinical practice
13   guideline is that the sponsoring
14   organization -- for example, there's a --
15   the -- the -- Ohio Pediatric Association ...
16   put out a guideline on the guidelines on
17   working for -- with cerebral palsy children,
18   very specific steps that need to be taken.  And
19   it goes to the AMA.  The AMA reviews and
20   considers and approves, and then it goes up to
21   the World Health Organization.  And there's a
22   clinical practice guideline committee that
23   reviews and approves, and when it's approved,
24   it goes back and becomes a part of the National
25   Clearinghouse.  And it's -- that's maintained

199

1    and sponsored by the government.
2        Same thing, if it's O.T., P.T.,
3    psychological society, and it retains the
4    name of the original sponsoring organization,
5    so that guideline is known as the, you know,
6    the Ohio Pediatric Association Clinical
7    Practice Guideline on.  But that's the steps
8    that have to be taken before it can join or
9    be part of the National Clearinghouse.
10       Q    It -- do I take it from your
11   answer that the only reason you believe that
12   it is a public entity is because it has dot
13   gov on its internet address?
14       A    Well, my understanding is --
15       Q    I'm wondering if you have an
16   independent basis for understanding it beyond
17   that.
18       A    My understanding is that it's --
19   that the government maintains and supports the
20   Clearinghouse, but --
21       Q    Which government?
22       A    The U.S. government.  U.S.
23   government supports that.  But the -- but that
24   the ... but AMA and World Health Organization
25   are actually the organizations that approve

200

1    clinical practice guidelines.
2        Q    The American Medical Association
3    approves -- did they approve the clinical
4    guidelines that you used for these six
5    plaintiffs?
6        A    Well, it has to be approved by
7    both AMA and the World Health Organization
8    Committee, not just the AMA.
9        Q    In order to be on the -- the
10   National Clearinghouse for Clinical
11   Guidelines?
12       A    Right.
13       Q    How long have you utilized that
14   web site?
15       A    Long time.  I -- I can't tell you
16   the original starting point, but it's been a
17   lot of years.
18       Q    How did you hear about it?
19       A    Just through research.  We got --
20   we started using it through -- when we were
21   researching ... a long time ago.  I don't
22   remember the original date.  It's been well
23   over a decade that we've been using it.
24       Q    Do you go anywhere else to look
25   for clinical guidelines -- or let me ask it

201

1    specifically.
2        Did you go anywhere else in
3    these -- for these six plaintiffs, to find
4    clinical guidelines?
5        A    No.
6        Q    Did you go to the -- did you
7    look to guidelines that might be posted or
8    available through the American Diabetes
9    Association?
10       A    No, we didn't go -- well,
11   actually, I won't say we didn't research.  We
12   did actually do research with the American
13   Diabetes Association, but what we came out with
14   were articles, not clinical practice
15   guidelines.
16       Q    Did you see whether there were
17   any information on the CDC, the Center for
18   Disease Control web site, about clinical
19   guidelines for diabetes?
20       A    I don't recall whether we went to
21   CDC.  I remember specifically we went to
22   American Diabetes, because that's where we got
23   some information specifically on Avandia.  And
24   the -- well, it doesn't matter why I remember
25   that specifically, but the bottom line is, I

202

1    happen to remember that specifically, but I do
2    not recall that we went to CDC.
3        Q    Do you -- do you understand the
4    process, other than that the AMA and WHO have
5    to approve the guidelines, by which these
6    guidelines get onto the National
7    Clearinghouse of Clinical Guidelines web
8    site?
9        A    Beyond -- no, I mean, we had been
10   asked that question in a deposition probably
11   ... five, six years ago. So we went to -- we
12   contacted the National Clearinghouse, and asked
13   them how -- specifically how clinical practice
14   guidelines become clinical practice guidelines,
15   and that's how we learned that it's submitted
16   to -- by the sponsoring organization to the
17   AMA, you know. If they're accepted, fine; if
18   they're not, they go back. There may be with
19   recommendations for changes by, you know, the
20   various committees in that specialty, and once
21   they're approved at that level, they go on to
22   the World Health Organization. That's what we
23   learned, and only after those varying
24   committees approve clinical practice guidelines
25   do they enter on to the National Clearinghouse.

203

1    Beyond that, no, I don't know any further
2    information.
3        Q    Do you know what policies the
4    National Clearinghouse of Clinical Guidelines
5    may have for updating its clinical guidelines
6    on the web site?
7        A    I know that they post -- with each
8    guideline, they post information about whether
9    they're updated, when they've been updated.
10   And when new guidelines come out they talk
11   about the new guidelines. And so, I know that
12   they're updated on a regular basis, but I don't
13   know ... can I tell you, out of 14,000
14   guidelines, how often each guideline's updated
15   or -- I mean, I think that -- that within the
16   specialty, that's the responsibility of those
17   specialties to look at the need for updates to
18   those clinical practice guidelines and
19   standards of care.
20       Q    You mentioned that this was an
21   unusual case, in the fact that you created
22   one binder of clinical guidelines because you
23   decided that the guidelines would be the same
24   for each of the same, each of the six
25   plaintiffs; do you recall that?

204

1        MS. MARTINES:  Object to form.
2        THE WITNESS:  Well, yes, because
3    we were dealing -- with a focus on the
4    diabetes, and I thought you would be
5    looking at duplicative costs if we -- if
6    we didn't do it that way.
7    BY MR. SULLIVAN:
8        Q    You mentioned earlier today that
9    you had dealt with diabetes in a number -- in
10   many of your other cases.  Did you have a
11   research file of diabetes, clinical
12   guidelines here in the office?
13       A    Yeah -- not --
14       Q    Before you started this
15   research?
16       A    You know, I'd have to ask if there
17   was anything current enough to pull, but I know
18   that we did not have a comprehensive file of
19   research articles, and a broad range of
20   clinical practice guidelines that we would have
21   considered sufficiently up to date.  And it
22   doesn't take that long to pull together all
23   these articles.  And I mean, it might have
24   taken -- you know, I don't know what was
25   charged.  I'd have to look, but it can't have

205

1    taken that many hours to pull this together.
2        Q    When you're doing clinical
3    guidelines for the types of cases that you
4    do, or that you encounter very often, like
5    catastrophic cases with spinal cord injury,
6    do you have in the premises, on the premises
7    already a set of clinical guidelines in many
8    of those cases?
9        A    We do, but we're also -- anytime
10   new cases come in, we always update.  We always
11   look for updates.  So we're constantly
12   updating, but we do keep a history of, and a
13   cross reference file, both on computer and in
14   the libraries, both in individual offices as
15   well as in here, research articles, clinical
16   practice guidelines, but you constantly have to
17   update for the very reason you're asking, you
18   know, is any of the guidelines updated,
19   anything changed, 'cause you could look
20   yesterday and have, you know, an updated
21   guideline come out tomorrow or today.
22       So, you always want to check.
23   But, yes, we absolutely keep files.  Same is
24   true for all of our database research, even
25   our cost research.  We keep it by county, by

16 (Pages 202 to 205)

206

1   state, and by country, because we work all
2   over the U.S. and outside the U.S.
3       Q   So, is it fair to say that, in
4   this instance where you're developing the
5   clinical -- or finding the clinical
6   guidelines for these six plaintiffs, that it
7   was different from the usual in that you had
8   to start from scratch?
9       A   I don't know that we started
10  completely from scratch.  We had some diabetes
11  information, but we didn't have a large body of
12  clinical practice guidelines on diabetes.  I
13  will certainly agree with that.
14      Q   Did you have any?
15      A   I'd have -- I told you a few
16  seconds ago that I'd have to ask to see what we
17  had available when we started out.  But this
18  has been primarily a secondary diagnosis.  We
19  would have had some that we've used in other
20  files, but it depends on how old they were,
21  'cause there is no question, if they were even
22  three months old, we would have had -- in fact,
23  if they were a few weeks old, we would have
24  still checked to see if there were any updates,
25  but I'll be happy to ask.

207

1       Q   Please.
2           (Pause.)
3   BY MR. SULLIVAN:
4       Q   Could you point me specifically
5   to where --
6       A   Hang on one second.
7       Q   Oh, I apologize.
8           (Pause.)
9       A   Okay.  Please go ahead.
10      Q   Could you point me specifically
11  to where in the clinical guidelines that you
12  found on that web site, it calls for two to
13  four hours per month for case management to
14  improve compliance with medical care as it
15  relates to diabetes?
16      A   Well, as I told you, it wasn't so
17  much that the clinical practice guideline
18  called for the specific number of hours, but if
19  you go to -- if you go to the basic guidelines
20  for diabetes care --
21      Q   Okay.
22      A   -- and you go to the second page,
23  self management training.  Management
24  principles and complications, and you just read
25  through all of that, that's one of the

208

1   guidelines.  As I said, if you -- if you read
2   through the guidelines, it talks about how
3   important it is for patients' self compliance
4   and self management of diabetes.
5           So, although it doesn't say ...
6   you need X number of hours of case
7   management, I'm well familiar with the
8   programs that groups like Aetna Health
9   Insurance and others have for training and
10  teaching and helping people manage their
11  diabetes.  The guidelines also talk about the
12  importance of self management, and education
13  and training on compliance with self care.
14  And I simply recognize that one of the most
15  important ways to avoid future complications
16  and problems is compliance with self care and
17  management, and educating and training
18  patients on this, and assisting them in that
19  support, is really the most effective way of
20  helping avoid long-term complications.  Even
21  though that's no guarantee, it goes a long
22  way toward reducing those kinds of
23  complications, and that's why I have it in
24  there.
25      Q   You mentioned Aetna in your

209

1   answer.  What was that in reference to?
2       A   That's true.  Well, Aetna has a
3   program.  I know because that happens to be our
4   health insurance carrier, and we've got a
5   couple of people who have been, you know, been
6   contacted by Aetna about their program.
7       Q   So Aetna, you say, they have a
8   program, you're saying that they have a
9   program for case management of diabetes?
10      A   They have, they use ... they use a
11  service that has R.N.'s that contact you, if
12  you've been diagnosed, the second you're
13  diagnosed by your primary care, or by an
14  endocrinologist, whatever, with diabetes, and
15  they work to assist you in the management of
16  your diabetes.
17      Q   Do you have any information on
18  that here in the office that you could give
19  to us about this program and how often the
20  patient is told to actually attend the
21  program?
22      A   Well, I'll have to check and see.
23      Q   Did you refer to that when you
24  made your recommendation for two to four
25  hours case management to improve compliance

210

1   with medical care as it relates to diabetes,
2   for two to four hours per month?
3       A   I didn't specifically refer to
4   their program. I've been familiar with other
5   programs besides Aetna's, but I recognize that
6   they're one of many that -- carriers that do
7   this, and I believe very firmly in the
8   education program.
9           Local hospitals do the same
10  thing. They offer -- they offer educational
11  programs and -- and they offer management.
12  The fact is, is I'm surprised that it
13  actually hasn't already been offered to these
14  patients. Although, I don't know that ...
15  they have ... the coverage to have gotten it
16  offered.
17      Q   Any of these -- do you know if
18  any of these insurance companies or hospitals
19  that recommend two to four hours per month
20  for case management of diabetes?
21      A   Really, for a lot of them depends
22  on the level of diabetes and the kinds of
23  healthcare issues that are involved. You know,
24  I think that if it's fairly well managed, you
25  know, Aetna does it by telephone with, you

211

1   know, just, you know, one or two calls a month.
2   If you're healthy, you're otherwise generally
3   well managed, you have no complications, so it
4   really just depends on -- on the level of -- of
5   patient care, the overall kinds of healthcare
6   problems that patients have; if they're not
7   obese, if they're -- you know, they're
8   basically under control, they're fairly
9   well-educated patients. But I think we have
10  patients here who are going to need a lot more
11  support for self compliance, partly because of
12  their prior history.
13      Q   Do you know whether the Aetna
14  program that you've discussed pays for two to
15  four hours per month at a cost of 78 to $98
16  per hour for case management to improve
17  compliance?
18      A   You know, I don't know what
19  they're paying for their program. It's free to
20  the patient. I don't know what -- they
21  contract with a service. I have no clue as to
22  what -- what they're paying. I doubt they're
23  paying that much per hour because, you know,
24  they contract at a, you know, at an insurance
25  rate that's not a private pay rate. So I'm

212

1   sure they get it at a lot less cost per hour.
2       Q   I don't think I got an answer to
3   this question. I'll try it again. Do you
4   know --
5       A   I apologize. Let's go for it.
6       Q   Okay. Do you know of any
7   insurance company or hospital that recommends
8   two to four hours per month of case
9   management to improve compliance with medical
10  care as it relates to diabetes?
11      A   Well, I think the question is
12  asking me to name a specific.
13      Q   Yes, it is.
14      A   And -- and that, I'll have to
15  agree, I can't specifically do that, because I
16  think it really just depends on the level of
17  patient need, and I don't have a specific
18  program in mind.
19      Q   And I guess then it's fair to
20  say that you don't know of any hospital or
21  insurance company that recommends such
22  monthly case management visits for the rest
23  of the patient's life?
24          MS. MARTINES:  Object to form.
25          THE WITNESS:  I can't name one

213

1   specific. I think it really is specific
2   to the severity of the patient's
3   diabetes, the patient background, their
4   ability to manage and maintain the
5   diabetes, taking into consideration all
6   of the patient's ability to self comply,
7   and I think these patients have issues in
8   that regard.
9           (Pause.)
10  BY MR. SULLIVAN:
11      Q   Sorry about that.
12          (Pause.)
13      Q   Now, all right. We've talked
14  about the clinical guidelines. How do you
15  go -- what process do you people go by in
16  order to do the research into the disease, or
17  the disability? Strike that.
18      A   The literature?
19      Q   Let me do it differently.
20          In this case with these six
21  plaintiffs, what process did your staff and
22  you use in order to research the literature
23  on diabetes?
24      A   Basically, you know, the goal was
25  to try and pick out the key words that we were

214

1    specifically interested in, and there's --
2    there's a couple of different search engines
3    that we use.
4        We use Google Scholar.  We use
5    iBoogie.  Are you familiar with it?
6    I-B-O-O-G-I-E, which exclusively looks at
7    medical, psychological, rehab, and basically
8    health-related professional scholarly works.
9    But the way it's set up is really nice
10   because it not only looks at the key words,
11   but when it finds those articles, it searches
12   for articles within those articles.  I mean,
13   it uses the sources within those articles.
14   When those articles quote other research in
15   its bibliography, it's searching for those
16   sources, as well.  And so it's one of the
17   best search engines for scholarly research.
18       And then you look at our tabs,
19   and you can see what we basically were
20   looking for.  I mean, we look for, you know,
21   hypoglycemia, ketoacidosis and, you know, all
22   of these are -- are the kinds of search or
23   key words we were looking for.  We did, just
24   for our own interest, not for any use in
25   these reports, and I'm only saying it because

215

1    you'll find it there, we did look --
2        Q   Oh, I already saw it.
3        A   -- you know, one or two articles
4    on --
5        MS. MARTINES:  Let him finish,
6    please.
7        THE WITNESS:  -- the Seroquel.
8    But we didn't use it.  It was just our
9    own interest in finding out some
10   information.  But it ended there.
11       But we did look at ... then general
12   cost of diabetes.  We looked at ... I
13   don't know how much more detail.  I
14   mean, you could see the key words for
15   yourself:  Skin health, nutrition, you
16   know, depression, heart disease, just
17   all sorts of related issues, but we
18   wanted to relate it back to diabetes.
19   So it was heart disease within the issue
20   of, or related to diabetes.
21   BY MR. SULLIVAN:
22       Q   If your research into clinical
23   guidelines on the National Clearinghouse for
24   Clinical Guidelines is to find what you
25   believed to be the applicable guidelines for

216

1    treatment, what are you using this research
2    that you do on -- did I get it right --
3    iBoogie and Google Scholar, you start on
4    iBoogie and Google Scholar, what are you
5    using that -- what's the purpose of that?
6        A   Well, because clinical practice
7    guidelines basically take you to the standards
8    for treatment currently.  Research literature
9    looks at basically more developed information
10   about outcomes on into the future.  It looks at
11   complications; it looks at statistical analysis
12   of the impact of diabetes over time, not just
13   at what's happening with these people now.
14       There's all sorts of ...
15   information you can get out of the literature
16   that you can't get out of the clinical
17   practice guidelines, 'cause they represent
18   standards of care for, you know, basic
19   diabetes, and of course, they also looked at
20   standards of care if you ended up with
21   diabetic retinopathy, things of that nature.
22   But the research literature does develop
23   things in a way much different than clinical
24   practice guidelines develop.  So it was
25   important to take a look at that, as well.

217

1    Even though we didn't use the research
2    literature to say, we expect that each of
3    these individuals are going to have these
4    complications and, therefore, these costs
5    have to be included.
6        Q   I'm just having difficulty then
7    to understand why do the research.  Did use
8    the research literature to alter the clinical
9    guidelines?
10       MS. MARTINES:  Object to form.
11       THE WITNESS:  No, of course not.
12   But we did say, for example, that the
13   cost of -- the statistical cost for
14   diabetes is -- and we did provide that.
15   And part of what that does is help
16   substantiate the validity of the cost
17   we're seeing currently in their
18   treatment.  And it ... it does give you
19   some idea of what you can anticipate as
20   far as cost in the future.  But there are
21   aspects of it that also discuss cost of
22   complications, and that's another issue.
23   The statistics are there.  Whether or not
24   that can be used is another story.
25

218

1    BY MR. SULLIVAN:
2        Q   I'm trying to line up the
3    purposes for which you do research.  I'm
4    correct, that you don't use it, as you said,
5    to alter the clinical guidelines; you said
6    that you -- correct?
7        A   That's correct.
8        Q   You do use it, though, to
9    figure -- one of the things you use it for is
10   to determine the cost of diabetes; is that
11   correct?
12       A   Well, the statistical cost is what
13   we're seeing with each patient in line with
14   what -- you know, what the research says the
15   statistical costs are, we lower or at least
16   within line.
17       Q   What else, the purpose of the
18   research?
19       A   Well, you know, it gives us
20   insight into whether or not we are missing any
21   major area associated with diabetes that we
22   should be covering that we're not covering.
23   And we didn't see anything, but we do need to
24   know, are we missing something that the
25   research literature is discussing that we're

219

1    not.
2        Q   Double check -- so far the
3    reason you use it is for the cost of
4    diabetes, and as a double check to make sure
5    that you're looking for all the proper things
6    with regard to your ultimate rehabilitation
7    plan.  Is there anything else?
8        A   And, you know, with respect to the
9    general recommendations that are made, it's
10   another way, along with the clinical practice
11   guidelines, to substantiate the legitimacy of
12   what recommendations are made.
13       Q   Is it fair to say that you also
14   use the research to learn about diabetes?
15       A   To the extent that it adds to the
16   knowledge base, absolutely.  I mean -- and we
17   basically, I don't think there was a lot new
18   for us to learn.  I think we knew the basics of
19   diabetes, but if there was more information
20   that would have been helpful -- we did learn
21   some interesting factors that I didn't know
22   before, but I don't know that they were all
23   that helpful for this case.
24           You know, I learned that Avandia
25   increases the potential for an individual to

220

1    become pregnant, but certainly didn't have
2    any impact on --
3        Q   On these six plaintiffs?
4        A   -- on these particular six cases.
5            It did have a significant impact
6    on my 29-year-old daughter who became
7    pregnant on Avandia.  And I'm going to have a
8    grandchild, another grandchild soon.
9        Q   Well, congratulations.
10       A   But that's entirely apart from
11   these cases, and it's a factor we didn't know
12   before we started researching.  So, it would
13   have been helpful to know, but --
14       Q   You mentioned ketoacidosis.  Do
15   you know the difference between diabetic
16   ketoacidosis and hyperosmolar coma?
17       A   I can't tell you that I do, and
18   it's certainly probably more a question for
19   your medical doctors than it is for me.
20       Q   Do you know what diabetic
21   ketoacidosis is?
22       A   I have a general sense of what it
23   is, but to answer it from a medical perspective
24   wouldn't be appropriate for me.
25       Q   Could you describe for me, as

221

1    best you can, what it is?
2        A   Basically, my understanding is
3    that if an individual who is diabetic has -- is
4    allowed to slip into -- basically, their blood
5    sugar goes ... too low, if I remember
6    correctly, basically -- well ... see, I was
7    just reading this this morning, actually.  I'm
8    not going to try and define it.
9        Q   Could you -- do you have any --
10   could you give me your best understanding of
11   what hyperosmolar coma is?
12       A   I have no knowledge of the
13   definition of that.
14           MR. SULLIVAN:  Okay.  All right.
15   Let me take a short break.  I might
16   actually give you one of the plans as an
17   exhibit.  I want to get myself organized.
18   Thanks.
19           (Pause.)
20           THE WITNESS:  Well, question one
21   was, did Shannon -- does Shannon make
22   any -- and/or keep any handwritten notes?
23   And the answer is:  She doesn't make
24   them, so she certainly doesn't keep them.
25   She does everything on the computer.

222

1  And, you know, I forgot to ask her last
2  name.
3      MR. SULLIVAN:  I was going to ask
4  you that.
5      THE WITNESS:  I am going to do
6  that on the phone in just a second.
7      MR. SULLIVAN:  Okay.
8      THE WITNESS:  If I can get to
9  someone who won't rat me out.
10     MR. SULLIVAN:  Okay.
11     THE WITNESS:  Second was ... did
12 anyone else work on the medical records
13 besides Shannon?  And the answer is, no,
14 other than myself.
15     Then, third, did we have any
16 clinical practice guidelines on -- or
17 research literature on diabetes before
18 this notebook?  The answer is yes.  And,
19 specifically, here's what they were
20 limited to.
21     We had files on diabetic wound care
22 or wound care related to diabetes,
23 'cause we have a lot of wound care
24 issues around here.  Diabetic fact
25 sheets, Veteran's Department diabetes

223

1  fact sheets, podiatry diabetic foot care
2  information, clinical practice
3  guidelines related to podiatry and
4  diabetes foot care, more specifically.
5      And with respect to our renal
6  patients, we got a lot of renal,
7  particularly transplant, but also renal
8  patients related to a variety of
9  underlying etiologies.  And we had a
10 number of -- within that, we had
11 diabetes, both clinical practice
12 guidelines and fact sheets, but we
13 didn't have any -- actually, Julie did.
14 Julie had one stand-alone diabetes file,
15 but it was all related to podiatry.
16     So we did have a number of -- of
17 diabetes, clinical practice guidelines
18 and research articles, but as far as
19 whether or not they would have been
20 sufficient to support this, you can see,
21 from what I've just told you, that it
22 would not have been.  We clearly would
23 have, and did need to pull clinical
24 practice guidelines of a more general
25 nature and literature of a more general

224

1  nature because a lot of what we had was
2  just too related to complications of
3  diabetes.  We had fact sheets that were
4  general.  Most of our stuff was related
5  to complications, not related to general
6  diabetes.
7      One second.
8      MR. SULLIVAN:  I just want to put
9  on the record, since it wasn't there,
10 that we can assume just before
11 Dr. Deutsch said all of that, I said,
12 hey, what did you find out during the
13 break?
14     THE WITNESS:  I actually did
15 remember her name.  I was just afraid to
16 say it because I thought I was wrong.
17 It's Westphal.
18 BY MR. SULLIVAN:
19     Q   Shannon Westphal?
20     A   Shannon Westphal.
21     Q   I won't tell her.
22     A   Well, I appreciate that.  We just
23 won't let her read that part of the deposition.
24     Q   I do want to talk in a minute
25 about the report for Connie Curley.  I just

225

1  have a couple of tie-up questions.
2      In going over your research,
3  your general research and your guidelines
4  research, do I have it correct that the
5  research that you did was -- in its entirety
6  utilized the National Clearinghouse for
7  Clinical Guidelines web site, iBoogie search
8  engine, and Google Scholar search engine?
9      A   I'm pretty certain, but those are
10 my favorites.  I didn't ask them, while I was
11 on break, if they used any other search engines
12 besides that, and they all have their own
13 favorites. I'm an iBoogie fan.  I know they
14 like Google Scholar and ... I don't know if
15 they like any others.  And I'll be sure to ask
16 that next time we have a break.
17     Q   But this is -- is it fair to say
18 that the research that you did was all
19 research on the Internet?
20     A   As far as literature, yes.  I
21 mean, we -- I mean, I know they also used, you
22 know, MedLines and PubMed and those kinds of
23 things, too, but what they use specifically for
24 this, I'd have to ask them.
25     Q   You have to ask them what other

226

1   sites they would have used, but you're
2   confident that their search, the research
3   that was done was done on the internet?
4       A   Oh, there's no question.  We do
5   all of our literature searches on the internet.
6   I mean, we may pull articles from libraries,
7   but we even use the internet to get the
8   articles from the libraries.
9       Q   Okay.
10      A   I mean, even the privileges I have
11  as faculty member at U. of F., Kaplan and
12  Virginia Commonwealth, I use my -- I use the
13  internet to get the articles.  I wouldn't go to
14  U. of F. or even UCF to go to -- to get it when
15  you can just get it right through the internet,
16  and they'll send it to you through the
17  internet.
18      Q   We were talking earlier about
19  the two to four hours of case management per
20  month in order to improve compliance with
21  medical care for diabetes; do you recall
22  that?
23      A   Yes.
24      Q   Do you recall mentioning that
25  you apply the specific facts of every case,

227

1   along with the knowledge you learn from your
2   research and guidelines, to come up with the
3   type of case management that is needed, how
4   frequently and how long it needs to be; do
5   you recall that?
6       A   I did talk about that, yes.
7       Q   Were you aware that five of the
8   six cases for which you've given opinions in
9   this case have the exact same frequency and
10  number of hours for case management?
11      A   I am.  I remember specifically
12  staffing with Kay and Julie and explaining what
13  my thoughts were on that, why I did it, and why
14  I applied it, but yes, I am aware of that.
15      Q   Can you explain to me what you
16  explained to them?
17      A   Sure.  I mean, basically, what I
18  I've already said to you.  I mean, I explained
19  the nature of the kinds of programs that I felt
20  should be applied in terms of management, and
21  the history of these patients and why I felt
22  that not only have they not received the kind
23  of education and management that I felt they
24  needed, but why I felt that they were poor
25  candidates in terms of self management, why I

228

1   felt they not only needed the education, but
2   they also needed the assistance in oversight.
3       So there's no question that part
4   of the problem or a substantial part of the
5   problem is premorbid aspects of these
6   patients mental health and ... and condition.
7   But, the reality is that that's who these
8   patient are.  And so it was a reason that I
9   felt so strongly about their need for this
10  kind of assistance in managing diabetes so
11  that it did not become a more substantial
12  problem.  These are patients who, you know,
13  who have problems with obesity, have mental
14  health problems, have a real focus on somatic
15  issues, and who have not proven to be good
16  self managers of their healthcare.  And I
17  think part of that is their mental health
18  issues.
19      Q   What --
20      A   Or are their mental health issues.
21  You can correct my English for me please.
22      Q   For those five of the six, what
23  evidence did you have that they were not
24  doing a good job of self managing their
25  diabetes at the time you issued your report?

229

1       MS. MARTINES:  Object to form.
2       THE WITNESS:  Well, I think,
3   first of all, if ... if these individuals
4   were really doing an effective job, one
5   of the things that would be happening was
6   they would be managing their weight far
7   more effectively.  They would be managing
8   their nutrition far more effectively.  I
9   mean, they may have their basic sugar
10  under control, although in all instances
11  I'm not sure that that's actually the
12  case, but I think that managing the
13  diabetes is a lot more than just whether
14  or not they're checking their sugar and
15  they're taking their medication.  The
16  underlying issue also goes to whether
17  they're managing their diet, they're
18  controlling their weight, they're
19  responding to a lot of the underlying and
20  related health issues that they could be
21  controlling that they're not recognizing
22  and attending to.  I'm not suggesting
23  that it's easy, but I do feel strongly
24  that if they understood better some of
25  the issues that were related and were

22 (Pages 226 to 229)

230

1  given the assistance in management, that
2  they would address these more
3  effectively.
4  BY MR. SULLIVAN:
5      Q   What issues are you talking
6  about? What do you mean when you say they
7  understand the issues that are related?
8      A   Well, diet and obesity are the
9  first two that I've already mentioned that come
10  to mind, that I don't think are being addressed
11  at all.
12      Q   What else?
13      A   Well, I think we have to go to
14  each individual case and look at the kinds of
15  problems that I think are present for these
16  people. But when we start talking, generally,
17  the first two that concern me are the fact
18  that, you know, that those two issues are
19  really a commonality among the majority of
20  these six people. The rest I'd have to look at
21  on an individual basis. I'm not sure I can
22  draw a generality as specific as I can, those
23  two generalities.
24      Q   The only two common -- the two
25  common points you can think of were diet and

231

1  obesity?
2      MS. MARTINES:  Object to form.
3      MR. SULLIVAN:  Is that right?
4      MS. MARTINES:  Same objection.
5      THE WITNESS:  As far as what
6  they're lacking in management. I mean, I
7  think there were other issues as we go to
8  individual cases, but when we start
9  talking about wanting to draw general
10  issues, I really prefer to start opening
11  up the files and looking at these.
12  BY MR. SULLIVAN:
13      Q   The only reason we're on this
14  line of questioning is because your
15  recommendation as to case management is
16  exactly the same for five of these six.
17      A   For five of the six people.
18      MS. MARTINES:  Object to form.
19      THE WITNESS:  But, you know, I
20  think there were a few general issues,
21  and I've named the two that come to mind
22  immediately, along with the fact that I
23  think that -- that, you know, we're
24  dealing with, in those instances,
25  primarily with people who had some

232

1  significant mental health issues and
2  significant somatic focus. And I felt
3  that these are people who were not good
4  candidates for, you know, self
5  compliance, self management, without that
6  kind of outside assistance. And part of
7  that was reflected in those two areas.
8  BY MR. SULLIVAN:
9      Q   Isn't it true that each of these
10  patients had diet, obesity, and mental-health
11  issues before they even got diabetes?
12      A   Oh, I don't --
13      MS. MARTINES:  Object to form.
14      THE WITNESS:  I don't disagree
15  with that. And -- and but, you know,
16  the reality is that's -- I mean, I
17  mentioned that before we got started in
18  this line of questioning, that -- that,
19  unfortunately, you have to take the
20  patient as you find them. And the
21  reality is that they were clearly
22  individuals who, once we had an onset of
23  diabetes were -- and truthfully, onset of
24  any other kind of chronic healthcare
25  condition, would be at risk for being

233

1  poor candidates for managing them as well
2  as we would like to see them managed.
3      And I would make the same kind of
4  recommendation if we were trying to
5  manage, you know, a heart condition,
6  that required proper diet and loss of
7  weight and ... you know, if we were
8  looking at trying to make sure that they
9  were getting off of smoking, or getting
10  off -- whatever other issues on an
11  individual basis, would really be
12  helpful in managing the diabetes. I
13  don't think these people are going to be
14  effective at accomplishing without that
15  kind of outside help.
16      The reality is that you're
17  absolutely correct, these mental-health
18  issues, these -- these other
19  physiological issues, many of them
20  preexisted, certainly the mental health
21  and many of the other physiological
22  issues preexisted the diabetes, but that
23  doesn't change the fact that they were
24  poor at controlling them before, and
25  they're no better at controlling them

23 (Pages 230 to 233)

234

1    post, but the diabetes gets exacerbated
2    by these conditions, and the diabetes
3    exacerbates those preexisting conditions
4    in many instances, and it needs to be
5    controlled, or you run into high-risk
6    factors for complications from the
7    diabetes.
8    BY MR. SULLIVAN:
9        Q    Maybe there's something we can
10   agree on here.
11       A    Can we agree on this?  Up to this
12   six hours or so, there's nothing we could agree
13   on?
14       Q    I don't think I exactly said
15   that.
16       A    Okay.
17           MS. MARTINES:  Pretty close.
18   BY MR. SULLIVAN:
19       Q    But here, but here ... can we
20   agree that in these areas that you pointed
21   out common to each of these plaintiffs, diet,
22   obesity, mental-health problems, that
23   factored into your case management
24   recommendations, that we all -- that we now
25   agree existed pre-diabetes, that they would

235

1    also have been candidates for case management
2    with regard to those medical conditions,
3    obesity, diet, and mental health before they
4    got diabetes?
5            MS. MARTINES:  Object --
6            MR. SULLIVAN:  Can we agree on
7        that?
8            MS. MARTINES:  Object to form.
9            THE WITNESS:  I don't think
10       it's -- it's ... unreasonable to suggest
11       that case management could have helped
12       with, certainly, with some of the
13       mental-health issues.  And if one of your
14       goals had been weight reduction, then,
15       certainly, case management likely would
16       have helped.  I doubt you would have ...
17       found anybody who would have recommended
18       case management just for weight
19       reduction, but because you also have the
20       mental-health issues, you could have
21       legitimized case management related to
22       managing, helping to manage the
23       mental-health issues.  And as an aside,
24       use case management to get them into a
25       weight program and encourage them to

236

1    maintain that.
2        The problem is that diabetes, you
3    know, is so exacerbated by the weight
4    problem and runs a risk for such
5    complications that, you know, it -- it
6    creates that much more of a need.
7        But I don't disagree with you that
8    there's enough other problems
9    preexisting that you likely could have
10   justified case management for different
11   reasons in some of these cases, and for
12   similar reasons in a number of these
13   cases.
14   BY MR. SULLIVAN:
15       Q    And is it fair to say that you
16   haven't done an analysis, to this point, of
17   the amount -- the frequency or number of
18   hours of case management that one of these
19   plaintiffs could reasonably have been --
20   could reasonably have taken before they got
21   diabetes?
22       A    Or could have benefited from.
23       Q    Yeah.
24       A    No, I haven't.  My real issue was
25   that the real risk factor for increased

237

1    complications in the future, which is what was
2    my issue here, was where I was focused.  Was
3    it -- you know, I was really concerned about
4    trying to reduce what potentially were future
5    costs that I -- although I can't predict, I
6    want to make sure that the exposure to that is
7    significantly reduced by making sure that we
8    try and manage diabetes as effectively as
9    possible.  And that's where this was raised,
10   although I don't disagree with the statement
11   that you're making.
12       Q    One last thing.  And then I
13   think we can get to the report.
14           On case management, you
15   mentioned before that you don't think it was
16   unreasonable to have case management for
17   someone that had mental problems and obesity?
18       A    Given a certain level of severity,
19   and as we -- I just don't want somebody to read
20   this later in some other case and say, all
21   prior psychological problems would generate
22   case management.  But in these cases, there are
23   levels of it that obviously dictated Social
24   Security disability in many instances, and that
25   certainly is a significant level of

238

1  psychological issue.
2      Q   Is it fair to say that, as the
3  number of comorbidities increase for that --
4  for a patient, the potential need for case
5  management increases?
6      A   Yes.
7      Q   So, if you had someone with
8  mental problems and obesity, there might be a
9  need there for case management, but it's more
10 likely, if you had someone with mental
11 problems, obesity, hypertension, high
12 cholesterol, and other morbidities?
13     A   I don't disagree, but I really
14 think the mental health would be the primary
15 reason.  If you came in and said, look, you got
16 obesity and high cholesterol, and I forget what
17 else you mentioned, but those alone probably
18 couldn't justify bringing in a case manager.
19 But when you already have a significant
20 mental-health problem, and that is really the
21 limiting factor in managing these others, that
22 becomes the underlying cause which allows the
23 other comorbidities to become additional
24 reasons for suggesting that -- that it's not
25 unreasonable.

239

1      Q   In each of the reports where
2  you've recommended case management, you've
3  given a range of the hourly costs; do you
4  recall that?
5      A   True.
6      Q   Are you aware that the range is
7  different for each one of these for each one
8  of your reports?
9      A   Well, it would be specific to the
10 local area in which they live.
11     Q   That would be the difference?
12     A   That's the reason for the
13 difference.
14     Q   Okay.
15     A   You don't choose a common area.
16 If they live in different areas, you have to go
17 with the price you found in that area.
18         MR. SULLIVAN:  Okay.  I'd like to
19     mark as Exhibit Three your report for
20     Connie Curley.
21         (Whereupon, Deposition Exhibit
22     No. Deutsch-3, report of Connie Curley,
23     was marked for identification.)
24 BY MR. SULLIVAN:
25     Q   If you can refer to your --

240

1      A   I can what?
2      Q   You can refer to your record if
3  you want, but I'm letting you know which one
4  I've marked.
5      A   Yeah.  That's right.
6      Q   Before we get into the parts of
7  the report that are specific to Miss Curley,
8  I'd like to ask you about one section that's
9  in this and other reports, at least I believe
10 it is.  It starts on page 22.
11         (Pause.)
12     Q   There's a section on page 22
13 called, conclusions; do you see that?
14     A   Yes.
15     Q   And then there's a section
16 called, "Complications of Diabetes"; do you
17 see that?
18     A   Yes.
19     Q   They're part of the same
20 section; is that right?
21     A   Yes.
22     Q   Okay.  And you included that
23 exact same section unchanged in each one of
24 the six reports; is that correct?
25     A   That's true.

241

1      Q   There's a bit of introductory
2  language in the first two paragraphs under
3  conclusion, and then after that there is a
4  list that covers approximately two pages of
5  potential complications of diabetes.  Did I
6  correctly characterize that?
7      A   Yes.
8      Q   Why do you need to -- why do you
9  need to put -- why did you need to put these
10 in each of these reports?
11     A   Well, it's for educational
12 purposes, you know.  One of the things that I'm
13 making a clear statement about and have in
14 testimony, is that on one hand, within the body
15 of a plan, you cannot cost out future
16 complications, because there's no way to state
17 with accuracy the date of a complication, the
18 severity of a complication, duration of a
19 complication.  And unless a doctor is going to
20 say, within a reasonable degree of medical
21 certainty, that a specific type of complication
22 is about to occur or will occur for an
23 individual, I can't include the cost.
24         On the other hand, I am saying
25 things like, case management for purposes of

242

1    education and self compliance, assisting in
2    the compliance in management of diabetes is
3    effective in helping to significantly reduce
4    risk factors for complications.
5           To make that statement, I think
6    one of the things you want to do is provide
7    the underlying research data on what the
8    complications are, what the likelihood of
9    complications are, so it's more for helping
10   you understand what research I did on
11   appreciating the risk factors that exist for
12   complications, what the nature of the
13   complications are that support that, than it
14   is for trying to suggest that there's any way
15   for me to predict the frequency of
16   complications, or the cost, because that's
17   not something I can do.
18       Q   When you said -- when you
19   started your answer, that these are for
20   educational purposes, to educate whom?
21       A   Well, my starting point is, to
22   educate the deposition.  I have no way of
23   knowing what a judge will allow but, you know,
24   in state court, historically, I wouldn't expect
25   complications to come into play.  But it's not

243

1    for me to make a decision about that.  That's a
2    decision between the lawyers and the judge to
3    work out.
4           But, typically, even in
5    catastrophic cases in state court, I have a
6    separate page or pages attached to, but not
7    necessarily part of the life-care plan, that
8    shows complications but no cost associated,
9    with a note at the top that says, "for
10   information purposes only," and makes that
11   statement about why it can't be included for
12   costing purposes.
13          So I use it just because I do
14   the research on what those are.  And I think
15   it helps to explain why many of the programs
16   within a life-care plan are there to help
17   reduce the risk factors for complications.  I
18   think you need to know what research was
19   done, even if we're not going to subsequently
20   be showing it.
21       Q   The -- without reliving it, is
22   it fair to say there is at least a couple of
23   complications, potential complications on
24   this page that you, yourself, couldn't even
25   define within the last hour?

244

1        A   Yeah.  There's no question that --
2    that, you know, I didn't give you the medical
3    definition, even though, within the notebook I
4    had, I mean, I turned and could have, but I
5    didn't -- I didn't.  I turned to ketoacidosis
6    and had the definition right in front of me,
7    but you were asking if I could personally
8    define it.  So rather than play a game, turn
9    it, the page, it was two pages later and give
10   you, read the definition, you weren't asking me
11   to read a definition, you wanted to know, from
12   my own knowledge base, I could talk about
13   ketoacidosis and ketones and -- no, I don't
14   have that knowledge base.  And even though I
15   had it at my fingerprints to provide to you,
16   so, you know, I have all of that data, I can
17   talk about it, and within the literature, but I
18   don't have the medical knowledge, and it's
19   really going to take a medical doctor to state
20   the likelihood, and I'm really not expecting
21   that.
22       Q   So, is it fair to characterize
23   what you have here in this section as things
24   that you looked up, researched, and then
25   wrote down what you found?

245

1        A   Well, absolutely.  The same is
2    true for the statistics on cost.  I couldn't
3    have quoted the cost of diabetes on a national
4    scale off the top of my head.  That would have
5    had to come from the research literature.
6        Q   Would you agree with me that
7    a -- if we were to ask someone about the
8    potential, or if we were to look to someone
9    to tell us about the potential complications
10   of diabetes, that an endocrinologist would be
11   vastly more qualified than you?
12          MS. MARTINES:  Object to form.
13          THE WITNESS:  Well, I don't think
14   there's any question whether or not they,
15   off the top of their head, would be able
16   to quote the literature and list it out,
17   and as need a package, I'm not sure,
18   because sometimes when you're asking them
19   off the top of their head, they'll miss
20   this point or miss that point, even
21   though they have an expertise in it.
22          So I certainly think, if you ask
23   the endocrinologist, would you go down
24   the list that Dr. Deutsch has provided
25   from the literature, that might be a

246

1  very effective way for him to confirm or
2  her to confirm or not confirm. But,
3  certainly, I would defer to an
4  endocrinologist without question as to
5  what the risk factors are -- first of
6  all, what the complications are, what
7  the likely risk factors are. I have no
8  problem with that whatsoever, but I
9  certainly would argue with you that --
10  argue with you is the wrong way of
11  phrasing that -- but I certainly would
12  suggest to you that the literature that
13  we have found and placed here is
14  certainly accurate.
15       But I'm also going to say to you, I
16  would defer unquestionably to an
17  endocrinologist, not only about what the
18  complications are, but also about
19  whether or not there's a reasonable
20  probability of any of these occurring.
21  BY MR. SULLIVAN:
22     Q   Or even possibility?
23     A   Well --
24       MS. MARTINES:  Object to form.
25       THE WITNESS:  The fact of the

247

1  matter is, it doesn't matter whether
2  there's a possibility, because if someone
3  says there's a possibility, I wouldn't
4  include it. Unless they say there's a
5  probability, it's not going to go into
6  any life-care plan that I would produce
7  or any rehabilitation plan that I would
8  produce. I could only speak to
9  probabilities; I cannot speak to
10  possibilities.
11  BY MR. SULLIVAN:
12     Q   Let me -- you mentioned, in the
13  beginning of your answer, that -- off the top
14  of your head that -- off the top of the head
15  that an endocrinologist would certainly be
16  able to list complications of diabetes better
17  than you. Would you also --
18     A   That's not quite what I said.
19     Q   Would you -- well --
20       MS. MARTINES:  Object to form.
21  BY MR. SULLIVAN:
22     Q   -- regardless of that, would you
23  agree with me that an endocrinologist would
24  also be better or more qualified than you to
25  research and list out for us what the

248

1  potential complications of diabetes are?
2       (Pause.)
3     A   Look, let's leave it at this. I
4  would defer to the endocrinologist to testify
5  as to the complications and ... and the
6  probability or possibility of their occurring,
7  and I think that's probably all you really
8  need.
9       To be perfectly frank, when it
10  comes to doing literature searches and when
11  it comes to researching the cost associated,
12  I probably am not going to be willing to
13  suggest to you that an endocrinologist is
14  going to be --
15     Q   Well, we're not talking about
16  costs on these. There's no cost --
17     A   I don't care whether it's a
18  literature search or cost analysis. We do this
19  day in and day out. And I would suggest to you
20  that we'll get to that literature faster and
21  more effectively than that endocrinologist, but
22  it really doesn't matter whether we do or not.
23       The question is, who is more
24  qualified to testify to that data, and I'm
25  agreeing with you that the endocrinologist is

249

1  more qualified to testify to it. So in the
2  end, and when it comes to who's going to get
3  on the stand and testify about those
4  complications, it's going to be the
5  endocrinologist, not Paul Deutsch.
6     Q   You're not -- it's not your
7  intention to give an opinion in this case as
8  to potential complications of diabetes; is
9  that correct?
10     A   No.
11     Q   You're not going to testify to
12  the jury these are the potential
13  complications of diabetes?
14     A   Potential complications is not an
15  appropriate topic unless we have a probability,
16  and there has to be an underlying physician's
17  statement about probability. I have never
18  gotten into a courtroom and offered testimony
19  about possibilities or potential complications.
20  We always need an underlying medical opinion
21  regarding that. So --
22     Q   Just so I'm clear then, the
23  complications that you've listed on page 22
24  to 24 of the Connie Curley report, and that
25  you also have in the other five plaintiffs'

27 (Pages 246 to 249)

250

1  reports, you're not going to, if you testify
2  at trial, state to the jury or attempt to
3  state to the jury that these are possible
4  complications of diabetes?
5      MS. MARTINES:  Object to form,
6  asked and answered.
7  BY MR. SULLIVAN:
8      Q   Am I correct that you are not
9  going to do that?
10     MS. MARTINES:  Same objection.
11     THE WITNESS:  I -- number one, it
12  wouldn't be my expectation.  And number
13  two, I can't imagine a judge allowing me
14  to do it.  I've never had a judge that
15  would allow it without underlying medical
16  testimony.
17     Now, if a doctor testifies on a
18  given patient about the probability,
19  that's a different story.
20     (Pause.)
21     If a doctor says, this patient has
22  diabetic neuropathy or peripheral
23  neuropathy, rather, and this is a
24  complication that needs to be treated,
25  then I'll deal with it.

251

1  BY MR. SULLIVAN:
2      Q   In what way?
3      A   By showing whatever his
4  recommended treatment is, and what the cost
5  associated with that is.
6      Q   Are you confident that your
7  descriptions of each of these complications
8  in these two pages that I've been talking
9  with you about, is accurate?
10     A   Well, I'm confident that --
11  that -- I'm confident it's accurate, I'm
12  confident that the literature, it accurately
13  quotes the literature, but it doesn't really
14  matter, because what I'm saying is, is that if
15  a doctor specifically diagnoses a problem, and
16  says, this is how I believe it needs to be
17  treated, then I'll put it into the plan.  But
18  until that happens ...
19     Q   Let's take a look at page 24.
20     (Pause.)
21     Q   See on the third bullet point
22  down, you have ketoacidosis?
23     A   Yes.
24     Q   Is what follows the word,
25  ketoacidosis, do you believe that's an

252

1  accurate description of what it is?
2      (Pause.)
3      A   Well, probably a short summary,
4  I'll go back to -- what did we do with the book
5  on literature?
6      Q   Well, I'm asking you whether
7  what you've written in your report is
8  accurate, not what the literature says.
9      A   Well, I'd have to go back to the
10  literature and look at ... I mean, this -- that
11  really talks about both -- is really bringing
12  ketoacidosis and the hyperosmolar non-ketonic
13  coma together in one, and maybe it wasn't
14  appropriate to do so, because ketoacidosis
15  alone talks about a buildup of ketones in
16  the -- in the blood.  And ... and there's
17  several -- I mean, I've got a whole page of
18  definition of ketoacidosis, and it was just too
19  much to put in there, so the little summary
20  probably is not as accurate as it could be,
21  absolutely.
22     Q   Is it possible that it's
23  completely wrong?
24     (Pause.)
25     A   I'd have to look more closely at

253

1  the -- where it came from, and how the summary
2  was put together.
3      Q   Do you see the -- you just
4  mentioned the phrase, hyperosmolar
5  non-ketonic coma; do you see that in your
6  report?
7      A   Yes.
8      Q   Do you think that word,
9  non-ketonic, is the correct word?
10     A   I can't tell you without going
11  back and looking up where it came from.
12     Q   I ... okay.  Let me hit you with
13  a couple of questions and then maybe we can
14  bail out of this.
15     You don't know whether it's --
16  strike that.
17     You don't know that it's
18  reasonably certain that any of these
19  complications will occur to any of the
20  plaintiffs, correct?
21     A   There's no way.  In any
22  complication for any disability or any
23  associated healthcare problem, to make that
24  determination without a physician specifically
25  saying, it's either been diagnosed, or it's

254

1    going to occur within a reasonable degree of
2    medical certainty.  That's why we handle it the
3    way we do.
4         So the answer is no, I do not
5    know, unless it's already been diagnosed.
6         Q    And you did not ... adjust this
7    list of potential complications to each
8    plaintiff, did you?  You just copied and
9    pasted it into each report?
10        A    Oh, absolutely, because it is just
11   a boilerplate discussion of complications and
12   not meant to be anything other than general
13   supportive information.  It was never meant to
14   be a statement that these individuals, as a
15   whole, were going to suffer any one of these
16   complications.  It's not up to me to make that
17   statement.
18        Q    Did you know that the list that
19   you put in Connie Curley's report, there are
20   certain complications that it's not even
21   possible for her to suffer?
22        MS. MARTINES:  Object to form.
23        THE WITNESS:  Again, that's a
24   medical determination.  So, no, I don't
25   know that.

255

1    BY MR. SULLIVAN:
2         Q    Do you see the list of the first
3    one as hyperglycemia?
4         A    I see that.
5         Q    Do you know whether she had
6    hyperglycemia even before she contracted
7    diabetes?
8         A    I have to go back and look at ...
9    give me two seconds, and I'll tell you if I
10   knew that.
11        (Pause.)
12        A    I don't have it listed as a
13   preexisting condition.
14        Q    Okay.  We'll get back to that.
15        Do you see the third one you
16   listed as gum disease?  Is it a possible
17   complication or a potential complication of
18   diabetes in Miss Curley's report?
19        A    Yes.
20        Q    Do you know whether Miss Curley
21   has any teeth?
22        (Pause.)
23        A    In fact, I think I have a note in
24   there that she is the patient that does not.  I
25   think that's in the report.

256

1         Q    Do you know whether it's
2    possible for her to contract this type of gum
3    disease?
4         A    Without teeth, I don't think so.
5    But that wouldn't have changed what I -- what
6    we did as a boilerplate.
7         Q    And this is boilerplate
8    language?
9         MS. MARTINES:  Objection, asked
10   and answered.
11        THE WITNESS:  I made that clear
12   that we just -- you know, 'cause again,
13   we weren't expecting to testify to -- to
14   any one patient having these
15   complications.  We showed generally what
16   the complications of diabetes are.  And
17   it would be up to a physician to indicate
18   what might affect or might not affect any
19   one of these individual patients.
20        (Pause.)
21   BY MR. SULLIVAN:
22        Q    Take a look at page one of the
23   report.  Do you see in the history section,
24   about three-quarters of the way down of the
25   report, that you wrote that -- in the second

257

1    sentence:  She indicated she took Seroquel
2    from 2003 to 2006 for sleep aid, migraines
3    and fibromyalgia?
4         (Pause.)
5         A    Yes.
6         Q    Do you have any idea whether she
7    took -- strike that.
8         Do you have any idea whether she
9    was ever prescribed Seroquel for
10   fibromyalgia?
11        A    I have no clue.
12        Q    Did you ever --
13        A    I can only report what was said to
14   me.
15        Q    So, as far as you know, that
16   could be just untrue?
17        MS. MARTINES:  Object to form.
18        THE WITNESS:  I have no way -- I
19   can only report what was said to me.
20   There's no way for me to -- I mean, this
21   is the patient's statement of her
22   understanding.
23   BY MR. SULLIVAN:
24        Q    And you didn't read the
25   testimony of her doctors in this case,

29 (Pages 254 to 257)

258

1  correct?
2      A   Thus far, I have not.
3      Q   You haven't read the testimony
4  of anybody under oath in this case, correct?
5  In the Curley case?
6      A   I haven't heard the testimony of
7  anybody under oath; is that what you're saying?
8      Q   You haven't read the testimony
9  given under oath by any of the witnesses in
10  the Connie Curley case, correct?
11      A   That's true to date; I have not.
12      Q   Do you see, in the paragraph
13  above it, you have, well, what you describe
14  as demographic information?
15      A   Yes.
16      Q   And you list the weight
17  pre-injury of 115 pounds; do you see that?
18      A   Yes.
19      Q   Do you know whether ... that was
20  actually her weight pre-injury?
21      A   I can only give you what I'm told,
22  and so ... you know, I have no other
23  information relating to a pre-injury weight.
24      Q   Okay.  Was Miss Curley obese
25  before she ... became diabetic?

259

1      A   You know I tried to make clear
2  that I was looking for a pre-onset weight.
3  She's not describing it there.  Let me look at
4  the ... prior medical history section.  Hold
5  on.
6      (Pause.)
7      A   She's not describing ... wait a
8  second, I'm sorry.  Let me finish.
9      (Pause.)
10      A   She doesn't give me a history of
11  obesity.  But, you know, at the same time, I
12  can't tell you how accurate her recollection of
13  all of the premorbid medical record is.  You
14  know, I think she gave me as good a history as
15  she was capable of giving me.  But she doesn't
16  describe obesity as one of her problems.
17      Q   Well, you reviewed her medical
18  records, correct?
19      A   The records that I have, yes.
20      Q   The records that were given to
21  you, you reviewed?
22      A   Yes.
23      Q   Did you make any notes in there
24  as to whether she was overweight or obese or
25  what her BMI was, or any of that data?

260

1      (Pause.)
2      A   I'll go all the way back to the
3  notes I took, all the way back to 2000, and
4  whether psychological diagnostics or
5  impressions from the doctors, and nobody's
6  listed obesity as an impression.  Nobody has
7  given a weight in there in the medical records
8  that I've -- that I reviewed or took notes on.
9      Q   On your review of her medical
10  records, did you determine that she had a
11  trend to gain weight from the 19 -- the late
12  1990s onward?
13      A   I didn't have records from 1990.
14  I mean, I had records from basically about 2000
15  onward.  And ... again, no one -- no one, in
16  their impressions or in their record that I
17  saw, and I'm not saying I couldn't have missed
18  it, but no one ... gave an impression of
19  obesity, no one listed a weight that I took
20  note of --
21      Q   Let me --
22      A   -- that contradicted ... what she
23  had said to me.  I would have expected somebody
24  to at least give an impression, whether it be
25  the psychologist or whether it be some of the

261

1  doctors, to give an impression of obesity.
2      (Pause.)
3      Q   But what you're referring to is
4  the summary that you made of the medical
5  records?
6      A   Right now, that's what I'm
7  referring to.  I would have thought that
8  somewhere I would have picked up on that, but
9  you're right, that's what I'm referring to
10  right now.
11      MR. SULLIVAN:  All right.  Let's
12  mark this as Deutsch Exhibit Number Four.
13      (Whereupon, Deposition Exhibit
14  No. Deutsch-4, Tampa General Hospital
15  document dated 1/5/03 was marked for
16  identification.)
17  BY MR. SULLIVAN:
18      Q   You see that this is an
19  admission document from Tampa General
20  Hospital; do you see that?
21      (Pause.)
22      Q   The name on the bottom?
23      A   Yes.  I'm trying to find a date
24  for it.
25      Q   It's hard to read, but I think

30 (Pages 258 to 261)

262

1  those in the case can agree, if you look
2  about ten lines down on the left, there's an
3  admission date, and that date is January 5,
4  2003.
5      A   I see it.
6      Q   If you look a little further
7  down, about five lines down, all the way to
8  the right, and there are other information,
9  you see the weight of 144?
10     A   I do.
11     Q   Okay.  And if you look back at
12 your report ... you notice that you have
13 listed the date of onset of diabetes as
14 September 13, 2005, which is more than two
15 years after that weight number, correct?
16     A   Right.
17     Q   And at least, as of that date,
18 she was certainly weighing more than
19 115 pounds, can we agree?
20     A   Oh, absolutely.
21     Q   Okay.  Did you note that medical
22 record in your summary?  I guess you just
23 reviewed and you didn't see any weight
24 numbers in your summary, right?
25         (Pause.)

263

1      A   Actually ... I don't have this
2  record in my summaries.  I have Tampa General
3  Hospital from 2/20/06 to 11/27/07.  Oh, wait a
4  second.
5          No, I do.  I have a 2/21/2000 to
6  3/22/03.
7      Q   Do you have a list of Bates
8  numbers?
9      A   This is -- this is not within that
10 range.  This is -- this is prior to the 2/21 --
11 no, it's not.
12     Q   It is within that range?
13     A   Yeah, it is within that range.
14 So, hopefully, I -- you know, it's in there.
15 I'll look for it again and see, but clearly I
16 missed the weight on that ... on that
17 particular record, although I can see why I
18 would have.  Bottom line is, I did miss it.
19     Q   And there's nothing in your
20 report on her being in a trend of gaining
21 about 10 pounds a year before that time
22 period, is there?
23     A   No.
24     Q   Okay.  Do you know what the BMI
25 is for that weight at her height?  Do you

264

1  know what category that puts her in?
2      MS. MARTINES:  Object to form.
3  Why are we asking him medical questions?
4      MR. SULLIVAN:  Why does he got
5  medical stuff in his -- why are we asking
6  him medical questions?
7      MS. MARTINES:  Yeah.
8      MR. SULLIVAN:  That's a good
9  point.
10     MS. MARTINES:  He's testified
11 clearly that he not going to testify
12 about medical issues just cost issues
13 related to medicine.
14     MR. SULLIVAN:  That's not exactly
15 what he's testified to.
16     MS. MARTINES:  It is, John.  So
17 why are we asking him to calculate a BMI?
18 I'm going to object to it's outside his
19 area of expertise.  He's clearly stated
20 that he's not an M.D.  You're asking him
21 to calculate a BMI.  It's out of line.
22 BY MR. SULLIVAN:
23     Q   Do you happen to know?
24     A   No.
25     Q   Do you know whether that puts

265

1  her in the obese category?
2      MS. MARTINES:  Same objection.
3          (Pause.)
4      THE WITNESS:  I -- I don't know
5  if it would put her in the obese
6  category.  She's four foot, 11.  At 144,
7  at that point, I don't know officially
8  whether a doctor would call that obese.
9  I would certainly think she's on the
10 verge.
11     MR. SULLIVAN:  Okay.  Let's mark
12 this as Deutsch Five.
13         (Whereupon, Deposition Exhibit
14 No. Deutsch-5, Neurological Evaluation
15 of Connie Curley, was marked for
16 identification.)
17 BY MR. SULLIVAN:
18     Q   I apologize that this is not the
19 complete record, but you can tell from the
20 page what it is.  It's a neurological
21 evaluation from July 22, 1998, of Connie
22 Curley.  Do you see that?
23         (Pause.)
24     A   Yes.
25     Q   And you see halfway down under

31 (Pages 262 to 265)

266

1  Physical Examination, it lists her height as
2  four, 11, as you just mentioned, and her
3  weight as 100 pounds?
4      (Pause.)
5      A   Yes.
6      Q   So, at least as of five years
7  before that last record, she weighed about
8  44 pounds less, right?
9      A   Yes.
10     Q   Okay.  Let's see if we can track
11  over time whether she's been gaining weight.
12     A   You mean, just between those two
13  reports?
14     Q   No, I'm going to show you a few
15  more.
16     A   Because that's fairly obvious.
17     MR. SULLIVAN:  I'm going to show
18  you a few more.  Mark this as Deutsch
19  Six, please.
20     (Whereupon, Deposition Exhibit
21  No. Deutsch-6, June 2, 2000 record, was
22  marked for identification.)
23  BY MR. SULLIVAN:
24     Q   Take a look at this record up
25  top.  It has a date of June 2, 2000, a couple

267

1  of years after the last one that you saw; do
2  you see that?
3      A   Yes.
4      Q   Do you see it's for Connie
5  Curley?
6      A   Yes.
7      Q   And would you take a look about
8  halfway down on the left, do you see it lists
9  the weight for her?
10     A   118.
11     Q   So that's -- looks like she's
12  gained 18 pounds from that 100 we just talked
13  about; do you see that?
14     MS. MARTINES:  Object to form.
15     THE WITNESS:  Yes.
16  BY MR. SULLIVAN:
17     Q   Okay.  So from 1998 to 2000, she
18  went from 100 to 118; does that sound right?
19     MS. MARTINES:  Object to form.
20     THE WITNESS:  Yes.
21  BY MR. SULLIVAN:
22     Q   Okay.  Is that noted in your
23  report?
24     A   No.
25     (Pause.)

268

1      MR. SULLIVAN:  Let's mark this as
2  the next exhibit, Richard.  That's
3  Deutsch Seven.
4      (Whereupon, Deposition Exhibit
5  No. Deutsch-7, Pain Management Report,
6  June 20, 2001 was marked for
7  identification.)
8  BY MR. SULLIVAN:
9      Q   Do you see there's a page from
10  the Pain Management Report, and on the bottom
11  you'll see it's from June 20, 2001?
12     A   I'm sorry, yes.
13     Q   That's the next year, we're up
14  to 2001 now, correct?
15     A   Yes.
16     Q   Would you take a look at the top
17  near Vital Signs, in the Vital Signs section,
18  the last part indicates that she weighs 129
19  pounds; do you see that?
20     A   Yes.
21     Q   So she gained more -- another
22  10 pounds over the next year; do you see
23  that?
24     A   Yes.
25     Q   Is that anywhere in your report?

269

1      A   No.
2      (Pause.)
3      Q   And without showing the -- and I
4  have more -- you do recall that we had the
5  report from January of 2003, where she
6  weighed 144 pounds, having gained another 15
7  or so pounds, correct?
8      A   Right.
9      Q   Is it fair to say that those
10  records indicate to you a patient who is
11  gaining weight over time?
12     MS. MARTINES:  Object to form.
13     THE WITNESS:  Sure.  It seems to
14  just prove the point, though, that this
15  is an individual who's not -- you know,
16  who's got problems premorbidly.  You take
17  the patient as you find them.  So, she's
18  another individual who is, even
19  premorbidly, not in good management, and
20  the diabetes only puts her at even higher
21  risk.
22  BY MR. SULLIVAN:
23     Q   Do you know whether she had been
24  taking Seroquel during any of that time?
25     MS. MARTINES:  Object to form.

270

1    **THE WITNESS:** I don't know
2    when -- I mean, I can go back and look at
3    when I understand it began, if you want
4    me to do that.  But I can't tell you, as
5    a personal knowledge, when it began.
6    **BY MR. SULLIVAN:**
7    **Q    The source of your understanding**
8    **when it began is what Miss Curley told you?**
9    A    Basically, I have two sources.
10   One would be when -- what Miss Curley told me,
11   and I guess the other would be what I
12   understand from ... the law firm, but neither
13   is a ... personal knowledge that I verified
14   through any source.
15   **Q    We can agree, though, that the**
16   **weight that you listed on your demographic**
17   **information for Miss Curley, the pre-onset**
18   **weight, wasn't correct; is that fair to say?**
19   **MS. MARTINES:**  Object to form.
20   **THE WITNESS:**  Well, what --
21   certainly wasn't correct at -- in terms
22   of her recollection of what she weighed,
23   based on what I said.  What I requested,
24   which was, do you know your premorbid
25   weight?  Of course, I asked her, when I

271

1    said "premorbid" at the time prior to
2    your being diagnosed with -- with
3    diabetes, which would -- would have put
4    her premorbid weight, based on her
5    response to the question, somewhere
6    around mid 2005.
7    **BY MR. SULLIVAN:**
8    **Q    Do you have anything in your**
9    **records to indicate what her weight was**
10   **during mid 2005?**
11   A    No, obviously not.
12   **Q    I'm sorry.  Anything in your**
13   **summary of the records?**
14   A    No.
15   **Q    Okay.  And if you look to the**
16   **next page on your report, after the**
17   **demographic information, there's a prior**
18   **medical history.  Do you list anything in**
19   **there about weight gain or obesity?**
20   A    Well, that prior medical history
21   is her report.
22   **Q    Okay.**
23   A    And I've already answered that --
24   earlier, that from her report, she doesn't
25   indicate to me any weight gain or any obesity

272

1    problems.
2    **Q    Do you list anywhere in the**
3    **report, whether it be tracking what she told**
4    **you, or from your own review of the medical**
5    **records that she had, that she was obese, or**
6    **had a weight problem before she got diabetes?**
7    A    I don't mind answering it again,
8    but this is something we've clearly covered.
9    I've already said very clearly, she didn't
10   report it, and we've already made very clear
11   it's not in my medical summary.
12   **Q    When you put together your**
13   **rehabilitation recommendation and the costs**
14   **attributable to that, you could not have --**
15   **clearly could not have taken into account her**
16   **weight issues before she even got diabetes;**
17   **is that fair to say?**
18   **MS. MARTINES:**  Object to form.
19   **THE WITNESS:**  No.  I mean, oh,
20   that's absolutely clear to say, as I
21   said, the history of obesity before would
22   have only affirmed what my
23   recommendations are.
24       I mean, it would have made they
25   clear that like the others who had

273

1    obesity before, that this is an
2    individual who was not in control of
3    nutrition, not in control of ... you
4    know, her ability to maintain weight.
5    The obesity would have added to her
6    problems.
7    **BY MR. SULLIVAN:**
8    **Q    Do you -- do you list in your**
9    **report anywhere where Miss Curley had**
10   **hyperglycemia ... before she got diabetes?**
11   **(Pause.)**
12   A    I don't think so.  I note
13   hypertension and hyperlipidemia ... I don't
14   think --
15   **Q    Where do you note hypertension**
16   **and hyperlipidemia?**
17   A    In the documentation of
18   recommendations.  Oh, I'm sorry, you're talking
19   about in the report separate from that, because
20   we have --
21   **MS. MARTINES:**  Page two.
22   **THE WITNESS:**  Well, let's see.
23   In the medical summary, on the very first
24   page under Family Care Clinic ...
25

274

1  　　　MR. SULLIVAN:  What's the page
2  number for that?
3  　　　MS. MARTINES:  Seven.
4  BY MR. SULLIVAN:
5  　　Q　It's not listed there, though,
6  pre-diabetes, is it?
7  　　　(Pause.)
8  　　A　No, it's not listed pre-diabetes.
9  I'll see if I can find it anywhere else.
10 　　Q　Let me help you on those.  If
11 you take a look at -- in your report at page
12 21.
13 　　　(Pause.)
14 　　A　Okay.
15 　　Q　If you take a look under
16 medications prescribed according to
17 Dr. DeCampo, high blood pressure and high
18 cholesterol are not related to the diabetes;
19 do you see that?
20 　　A　We did ask him, and that was his
21 opinion.
22 　　Q　So, we can agree that
23 Miss Curley had high blood pressure and high
24 cholesterol before she had diabetes; is that
25 fair to say?

275

1  　　　MS. MARTINES:  Object to form.
2  　　　THE WITNESS:  That would
3  　　certainly appear to be the case.  I mean,
4  　　that's what his opinion -- I mean, we
5  　　asked him specifically if it was related;
6  　　he said, no.
7  BY MR. SULLIVAN:
8  　　Q　Okay.  I started this by asking
9  you whether you were aware or had known that
10 she had hyperglycemia before she had
11 diabetes.  That's not anywhere in your
12 report; is that correct?
13 　　A　Not that I recall without going
14 back and trying to review it, but I don't
15 recall it being in there.  And a quick review,
16 I don't see it listed in the medical summary.
17 　　　MR. SULLIVAN:  Let's mark that as
18 　　the next exhibit, please.
19 　　　(Whereupon, Deposition Exhibit
20 　　No. Deutsch-8, Curley Blood Test report
21 　　in 2000, was marked for identification.)
22 　　　THE WITNESS:  1/21/2000.
23 BY MR. SULLIVAN:
24 　　Q　Do you see that this is a
25 laboratory report of a blood test done on

276

1  Miss Curley in 2000; do you see that?
2  　　　(Pause.)
3  　　A　I certainly see it's a lab report,
4  yes.
5  　　Q　Do you see that it's for
6  Miss Curley?
7  　　A　Oh, yes.
8  　　Q　Okay.  And you see about ... a
9  fifth of the way down on the list of things
10 that were checked, there's a glucose reading?
11 　　　(Pause.)
12 　　A　Yes.
13 　　Q　And do you see that it reads
14 133?
15 　　A　Yes.
16 　　Q　And do you see there's an H next
17 to it for "high"?
18 　　A　Yes.
19 　　Q　Do you have an understanding of
20 what hyperglycemia is?
21 　　A　Yes.
22 　　Q　Did you make a note of this
23 reading in your summary of the records?
24 　　A　No.
25 　　Q　Is this the first time you've

277

1  been made aware of it?
2  　　A　I'd have to say, yes.
3  　　Q　Were you aware that -- I believe
4  you are aware that Miss Curley was a -- just
5  about a life-long smoker?
6  　　A　Yes.
7  　　Q　Okay.  Are you aware that she
8  has ... family history of ... diabetes,
9  obesity, hypertension, and cholesterol, high
10 cholesterol?
11 　　A　I don't know what the family
12 history of those things have been.
13 　　Q　Is that mentioned in your
14 report, anything about family history related
15 to any of those things?
16 　　A　No.  It is not.
17 　　Q　I noticed that you're writing
18 things down as we speak.  What are you
19 writing?
20 　　A　The reports that you're talking
21 about.
22 　　Q　And why is that?
23 　　A　That you're showing me.  So I can
24 go back and pull them.
25 　　Q　Why would you want to do that?

278

1      A   Why wouldn't I want to do that?  I
2   mean, you're asking questions about them.  I'm
3   certainly not going to ignore them.
4      Q   Is it possible these are
5   relevant to your review?
6      A   I think they are relevant.  I
7   mean, I've already indicated to you that noting
8   the existence of obesity before is -- actually
9   affirms my concerns about her -- her
10   difficulties in management before.  Now, I'm
11   not quite certain exactly how I would respond
12   to the existence of the hyperglycemia before.
13   That may be an issue that goes more to
14   causation and is unrelated to an issue for me.
15      So, I'm really not sure that
16   it's really something for me to respond to.
17   But I'm not going to make that determination
18   in the midst of a deposition.  But, I'm still
19   going to pull it and look at it.
20      Q   Okay.
21      A   And I certainly would think that
22   anybody who would just listen to those
23   questions and not mark it down and ignore it
24   and just politely go on, would not be doing
25   their job.

279

1      Q   I agree.
2      MR. SULLIVAN:  I'm going to mark
3   Exhibits Nine and Ten.
4      (Whereupon, Deposition Exhibit
5   No. Deutsch-9, fact sheet of Ms. Curley,
6   was marked for identification.)
7      (Whereupon, Deposition Exhibit
8   No. Deutsch-10, dental history 5/15/06,
9   was marked for identification.)
10   BY MR. SULLIVAN:
11      Q   Exhibit Nine is one page from a
12   fact sheet that Miss Curley completed in this
13   litigation.  And Exhibit Ten is ... a medical
14   history from Stanley S. Sharma [ph] -- I
15   think he is a dentist -- from May 15, 2006,
16   for Connie Curley.
17      MS. MARTINES:  I'm going to stop
18   you and object to Deutsch Number Nine.
19   It's one page out of a facts sheet and
20   doesn't indicate anywhere that it's
21   Connie Curley's fact sheet.  So I ask
22   that the entire fact sheet be put in.
23      MR. SULLIVAN:  Well, I don't have
24   it, but he can check it.
25      MS. MARTINES:  I'm going to

280

1   object to Deutsch Number Nine and ask
2   that it be stricken because it can't be
3   shown that it's Connie Curley's fact
4   sheet at this time.
5      MR. SULLIVAN:  We'll make sure --
6   and I'm sure it's very easy for you to
7   check when you get back, and if it's not
8   accurate, you'll let us know.
9      THE WITNESS:  We'll do.
10      MR. SULLIVAN:  We'll send you a
11   copy, although I think that you already
12   have one to show you that is actually the
13   fact sheet.
14      MS. MARTINES:  I stand on my
15   objection.
16   BY MR. SULLIVAN:
17      Q   I'm asking you to assume, for
18   the record, that that's a fact sheet
19   completed by Miss Curley.
20      Do see on there that it lists,
21   under Family History, obesity, hypertension
22   and high cholesterol?
23      A   I do.
24      Q   And do you see on Deutsch Ten,
25   the medical record that I have there from May

281

1   15, 2006, and under Family History, and this
2   is a medical record for Connie Curley; do you
3   see that?
4      A   Yes.
5      Q   And do you see that it lists
6   family history of diabetes?
7      A   I do.
8      Q   Were you -- were any of those
9   family histories listed in your report?
10      A   No.  I didn't have access, though,
11   to --
12      Q   To the fact sheet?
13      A   -- to the fact sheet.  And I'd
14   have to look and see if I had Dr. Sharma.
15      Q   Sure.  Let me know whether you
16   have that.
17      (Pause.)
18      A   Yeah, I do have Dr. -- let's see,
19   I do have Dr. Sharma, but I don't have the fact
20   sheet.
21      Q   Okay.  One last thing in this
22   area.  Were you aware that she lived a
23   sedentary lifestyle?
24      MS. MARTINES:  Object to form.
25      THE WITNESS:  Not so much in the

35 (Pages 278 to 281)

282

1 sense that it was specifically asked as a
2 question, but looking at history, it was
3 certainly an assumption that I made.
4 BY MR. SULLIVAN:
5 Q   Just trying to save us the time
6 of marking medical records.  That's helpful.
7 So, let's go back and review,
8 and this is with Buffy's objection about
9 having the full fact sheet.
10 A   Do you need me to keep it?
11 Q   You can keep them.  I have
12 copies.  We can put them right here.
13 What we've noted here, or at
14 least what I've showed here in the medical
15 records is that pre-diabetes, there's a
16 history of weight gain to a level that you
17 testified was converging on obese,
18 hyperglycemic reading, hypertension, high
19 cholesterol, smoking, family history of
20 diabetes and with Buffy's objection, of high
21 cholesterol and hypertension, as well as a
22 sedentary lifestyle before diabetes.  That's
23 what we just talked about, correct?
24 A   True.
25 Q   And this is a person, as we

283

1 mentioned earlier, who had mental health
2 problems, correct?
3 A   True.
4 Q   And we talked earlier about how
5 someone with mental health problems and
6 weight problems may be somebody who would
7 require case management; is that fair to say?
8 A   We did.
9 Q   And we talked about how, if
10 there are more comorbidities and that the
11 chances of the need for case management
12 increase; is that fair to say?
13 A   Well, I think we specifically --
14 MS. MARTINES:  Object to form.
15 THE WITNESS:  -- more
16 specifically said that the potential to
17 benefit from case management increases.
18 BY MR. SULLIVAN:
19 Q   Now, here we have Miss Curley,
20 before she had diabetes, with mental health
21 problems, weight gain, to the point of maybe
22 verging on obesity, hyperglycemic reading,
23 hypertension, high cholesterol, smoking,
24 family history of diabetes, as well as family
25 history of hypertension and high cholesterol

284

1 and a sedentary lifestyle.  Is that someone
2 you believe, even before she had diabetes,
3 could have benefitted greatly from your
4 recommendations of case management?
5 MS. MARTINES:  Object to form.
6 THE WITNESS:  Well, I think you
7 have to understand what case management
8 is used for.  I think that,
9 unquestionably, that the potential in her
10 instance to ... bring case management in
11 perhaps to help her from a mental health
12 standpoint, might not have been
13 unreasonable, but she is not -- she was
14 not as impaired from a mental health
15 standpoint as some of the others.  But,
16 nonetheless, she clearly had some mental
17 health problems.
18 Could we have helped her manage
19 some of her overall problems?  I'm not
20 saying that she couldn't have benefited
21 but, you know, it's not like a situation
22 where, with the diabetes, we have a
23 specific kind of educational program, a
24 specific kind of management program.
25 You know, helping her with nutrition,

285

1 using a nutritionist and diet management
2 would have been -- certainly would have
3 been of benefit.
4 Could you have used a ... a case
5 manager, at least on a short-term basis,
6 to try and put a plan together and
7 manage her overall?  I think that she
8 probably could have benefitted.  But,
9 whether or not she would have needed a
10 long-term program, as you would do with
11 a diabetes patient, I think is a little
12 more difficult to suggest.
13 But the question it really becomes,
14 it depends on how she responded.  You
15 know, if -- if you had somebody who ...
16 you know, just simply was not going to
17 be brought under effective control, get
18 off the smoking, get off the -- reduce
19 the weight, deal with the mental health
20 issues effectively, bring all of these,
21 as you're suggesting, comorbidities,
22 under some effective management, then it
23 may have been more reasonable to suggest
24 the availability of someone who ... she
25 could rely on intermittently to prod

36 (Pages 282 to 285)

286

1  her. But the reality is that, again,
2  it's not like a diabetic management
3  program.
4      You don't see these -- these health
5  companies bringing somebody in to manage
6  the range of problems that you're
7  describing, as they do with a
8  coordinated effort for diabetes.
9      And so, you know, as a case
10  manager, I'm going to suggest to you
11  that, on an acute basis, I think
12  probably she could have benefitted. I
13  don't think there's any question that
14  you could probably have helped someone
15  like this, but I just don't know that it
16  would have gone on, on a life-long
17  basis, in the way you would manage
18  someone who then has a program like
19  diabetes, that you can bring to bear and
20  ask someone to follow.
21  BY MR. SULLIVAN:
22      Q   Let's try to pick that apart a
23  little bit, if we can.
24          MS. MARTINES: I'm going to
25  object to the sidebar.

287

1  BY MR. SULLIVAN:
2      Q   Let's take a look at page 20 of
3  your report.
4      A   Absolutely.
5      Q   That's where you recommend under
6  therapeutic modalities case management; do
7  you see that?
8      A   I'm sorry. Bear with me a second.
9          MS. MARTINES: I'm sorry, what
10  page did you say you were on?
11          MR. SULLIVAN: Twenty.
12          THE WITNESS: Twenty.
13  I'm with you. I'm sorry. Please
14  go ahead with your question.
15  BY MR. SULLIVAN:
16      Q   What content of that case
17  management, what's going to happen at
18  these -- it's going to be anywhere from 24 to
19  48 hours a year, right, according to your
20  recommendation?
21      A   That's correct.
22      Q   What happens?
23      A   Well, you know, initially, what's
24  going to happen is a fairly intensive effort,
25  and that's relatively short lived, but a fairly

288

1  intensive effort to educate her about diabetes
2  and its short-term and long-term impact. So
3  she understands as much as she can learn about
4  not just managing diabetes, but its
5  implications.
6          But I then would concur with you
7  in what you're about to, I'm assuming get to,
8  that she needs to understand that managing
9  diabetes goes way beyond just checking blood
10  sugar, way beyond just taking her medication
11  and controlling it from that standpoint, that
12  she needs to -- also manage weight and
13  deal with weight loss. She needs to get --
14      Q   Cholesterol?
15      A   -- off the smoking. I'm sorry?
16      Q   Cholesterol levels?
17      A   Well, all of those things. I
18  mean, she needs to get with the program that
19  has her -- works with her doctor in managing
20  every aspect, all of these things that you've
21  talked about.
22      Q   All these pre-comorbidities we
23  just talked about; is that correct?
24          MS. MARTINES: Okay, Doctor,
25  would you stop for a second.

289

1          THE WITNESS: Sure.
2          MS. MARTINES: John, I've asked
3  for a number of times for him to be
4  allowed to finish his answer, and I would
5  really appreciate it if you would let
6  him. Can we have that -- wait, Doctor --
7  can we have that understanding again?
8          MR. SULLIVAN: I think I've been
9  very understanding. The doctor is --
10          MS. MARTINES: I think the
11  record's going to reflect that you
12  interrupted him a number of times, and
13  I'm just saying, I'd really appreciate it
14  if we could have an understanding that
15  you would let him finish his answers.
16          MR. SULLIVAN: And, again, I
17  think the doctor is very nice to talk to,
18  very easygoing, but he gives very long
19  answers.
20          MS. MARTINES: Well, John, he
21  can't help it. You ask him a general
22  question and he's going to give you a
23  general answer. He's allowed, under the
24  rules, to give a complete answer. I'd
25  appreciate it if you wouldn't cut him

290

1   off.
2       Doctor, please go ahead.
3       MR. SULLIVAN: But, you know, I'm
4   doing the best --
5       MS. MARTINES: I'd like the
6   record to reflect that opposing counsel
7   is not letting the witness finish his
8   answers.
9       MR. SULLIVAN: Or opposing
10  counsel allowing me to finish what I was
11  saying.
12      I'm doing the best I can, but we
13  only got so much time already going --
14  again, Buffy, if I can finish.
15      MS. MARTINES: Go ahead.
16      MR. SULLIVAN: We're trying to
17  complete this as quickly as we can, but
18  we're already going over into the second
19  day. I think the record will refect
20  there have been many questions where the
21  doctor has answered, for pages, questions
22  that I didn't ask. I haven't -- I
23  haven't given him any problems with that,
24  but there will come times where I'll need
25  to direct his answers a little better

291

1   than they've been.
2       But you can continue your answer if
3   you recall where it was.
4       THE WITNESS: I'm okay with
5   referring to them as managing those
6   comorbidities that we've been referring
7   to, and simplify it in that way, but I --
8   I'll qualify it by saying that I --
9   again, that I think that part of the
10  issue also is that those comorbidities
11  exacerbate the risk factors for diabetes.
12  The diabetes significantly, I think,
13  exacerbate those comorbidities.
14      I think that the problem we get to
15  is that, one, you take the patient as
16  you find them, but two, we have to
17  recognize that the onset of the diabetes
18  is a significant factor in its impact on
19  the issues that -- well, these
20  comorbidities that were raised. So
21  that's why I so strongly felt that it
22  was time to step in and manage the
23  totality of the patient's problems
24  because of the risk at which the patient
25  is placed for complications with respect

292

1   to the diabetes.
2       But I don't disagree that if you
3   could have managed these prior to the
4   onset of the diabetes, then you'd have
5   lower risk factors with the onset of the
6   diabetes.
7   BY MR. SULLIVAN:
8       Q   Or you might not have diabetes.
9       A   Well, now, that's a causation
10  issue, and I'm going to have to refuse to
11  answer that one, because --
12      Q   Well, let me ask you something
13  different then.
14      The reason that you stated
15  earlier, one of the reasons that you're
16  putting together this plan is to stave off,
17  reduce the possibility of the complications
18  of diabetes occurring, right?
19      A   You reduce the risk factors,
20  absolutely.
21      Q   And that would certainly apply
22  pre-diabetes by reducing the risk factors.
23  You reduce -- the notion would be to reduce
24  the possibility of getting diabetes.
25      A   I'm not uncomfortable with saying

293

1   you reduce risk factors, but I really want to
2   be cautious here that -- that -- I -- we
3   already agreed that I wouldn't be testifying to
4   causation, and I don't want to be drawn into
5   testifying about causation. And I'm afraid
6   that question starts to draw me in. And I
7   don't disagree that if you could reduce weight
8   before, stop the smoking before, reduce all
9   those comorbidities, that there are a lot of
10  risk factors you reduce.
11      How that impacts the issue of
12  diabetes, I would prefer then to have the
13  medical doctors to discuss rather than you're
14  asking me to discuss.
15      Q   We can agree, though, that
16  the ... that a lot of the subject matters
17  about Miss Curley's health and diet that are
18  to be -- would be discussed in the case
19  management you're recommending, addresses the
20  comorbidities that she had before she had
21  diabetes?
22      A   There's no question. I don't
23  disagree with that.
24      Q   Okay. What is your basis for
25  assuming that her doctor hadn't discussed

294

1  already with her education on the issues that
2  you want to send her for case management
3  before?
4      A   Well, I asked each of these
5  individuals the extent to which they'd received
6  education about diabetes and training in
7  compliance. That's the first basis. But even
8  beyond a doctor just in his office saying, you
9  need to take your blood sugar and giving some
10  basic instruction, we have to clearly recognize
11  that even if we assume -- we take a
12  hypothetical here, and we assume a doctor in
13  his office said, or the doctor's nurse said,
14  here are the steps you need to take, let's be
15  realis -- let's be realistic. We have all
16  these problems. They're unchanged. And
17  they -- there needs to be better management.
18  So even if we took a hypothetical, we made that
19  assumption, nothing's happened here.
20      Q   Do you know whether
21  Miss Curley's diabetes had been under
22  control?
23      A   Well, from what I understand, the
24  diabetes itself is basically under control in
25  terms blood sugar and her taking her

295

1  medication. But that's not the only issue.
2  We've talked about that. I mean ...
3      Q   So what's left? It's the
4  comorbidities that she had before diabetes
5  that you're addressing?
6      A   And the risk factors that they
7  present in significantly impacting the diabetes
8  and the diabetes significantly impacting those
9  comorbidities.
10      Q   So, if I understand correctly,
11  the main focus of your case management, with
12  her diabetes under control, is the
13  comorbidities that had existed before she had
14  diabetes, because now you're hoping to reduce
15  the likelihood of diabetes complications.
16          (Pause.)
17      A   That's not an unreasonable
18  statement, that we're looking to -- you said
19  risk factors, right?
20      Q   Yeah, the comorbidities.
21      A   For diabetes.
22      Q   The comorbidities.
23      A   Then I'm going to say, yes.
24      Q   Okay. Are you sure you asked
25  her doctor whether she'd been given this type

296

1  of education?
2      A   Well, I didn't say I asked her
3  doctor. I said I asked her.
4      Q   Okay. Thank you.
5          Did you ask her doctor?
6      A   No, I didn't. I don't think there
7  was a separate question to a doctor. I'll look
8  real quick, but I don't believe so.
9      Q   Okay.
10      A   But I'll take a quick look.
11          (Pause.)
12      A   No. No, I didn't.
13      Q   And --
14      A   I mean, I asked him if she should
15  see a nutritionist, but -- as well as some
16  other specialists, but I did not ask it to the
17  extent to which he or his office provided any
18  training.
19      Q   And when you went to get that
20  information that you just gave to me, you
21  were looking at the letter that you had --
22  the response from the letter you had sent to
23  the doctor, correct?
24      A   Right. I didn't -- just the
25  primary care. I didn't look at the other

297

1  doctors, because they wouldn't have been
2  appropriate, I wouldn't have asked them. But,
3  that's who you asked me --
4      Q   And --
5      A   -- about.
6      Q   Just so we understand, you never
7  spoke with that doctor; you're just referring
8  to the questionnaire they filled out and sent
9  back you?
10      A   Right. We established that much
11  earlier in the deposition that you did
12  everything in writing to document the file. I
13  don't call, 'cause that doesn't document.
14      Q   And since I like to point these
15  things out, again, you also, as we
16  established earlier in the deposition, didn't
17  read the testimony of the doctors to see
18  whether they gave such education to them; is
19  that fair to say?
20      A   To date I have not, that's
21  correct.
22      Q   Okay.
23          (Pause.)
24      Q   Let's take a look at some of the
25  other rehabilitation recommendations,

39 (Pages 294 to 297)

298

```
1    starting on page 20.
2         Oh, by the way, there's a -- you
3    have, under rehabilitation recommendations,
4    what appears to be a discussion of some of
5    the things you found in your search of the
6    guidelines from the National Clearinghouse
7    for Clinical Guidelines?
8    A    Where are you?
9    Q    Page 20 of the Curley report.
10        (Pause.)
11   Q    Rehabilitation recommendations.
12        (Pause.)
13   A    That's true.
14   Q    Can we ... can we agree that
15   Miss Curley had significant medical needs
16   before she got diabetes?
17   A    Significant medical needs?
18   Q    Yes.
19   A    Yes.
20   Q    Okay.  So, if you look at the
21   second paragraph, the first paragraph after
22   the bullet points where it says, Connie had
23   some medical needs, we can agree that that
24   should read, "significant", as I've seen in
25   some of your other reports?
```

299

```
1    A    That's not unreasonable.
2    Q    Okay.  Did you know she had
3    attempted suicide?
4    A    I think that ... I think there was
5    something about that in there, wasn't there?
6    Q    I don't recall whether it's in
7    your report.
8    A    Okay.
9    Q    I think it may or not.
10   A    I believe I did know.
11   Q    Okay.  Now, you have Allied
12   Healthcare evaluations, was the first
13   rehabilitation recommendation heading you
14   have; is that correct?
15   A    Correct.
16   Q    What is Allied Healthcare?
17   A    Health-related professionals.
18   Anybody other than an M.D.
19   Q    Is that a term of art?
20   A    Sure.
21   Q    Allied Healthcare?
22   A    Go to any medical school or
23   university, and basically clinical
24   psychology -- well, clinical and health
25   psychology will be found under the Allied
```

300

```
1    Health, PTOT, speech -- I'm sorry, physical
2    therapy, occupational therapy, speech therapy,
3    there usually are nine different -- if the
4    university has a college of allied health.
5    Some of the colleges of allied health, like
6    University of Florida, in the last few years,
7    changed their college of allied health to their
8    college of public health and health
9    professions.  But -- so, it's usually a college
10   of allied health or a college of public health
11   and health professions.  So it's -- but it is a
12   term of art at most universities.
13   Q    Okay.  Your first bullet point
14   is psychological, and you note that she had
15   already been required to have that before she
16   had diabetes.  So you don't give a cost for
17   that, correct?
18   A    Right.
19   Q    Then you mention nutritional
20   evaluation; do you see that?
21   A    Yes.
22   Q    And you ask -- you say that she
23   needs that once a year for $1500 a visit; do
24   you see that?
25   A    Right.
```

301

```
1    Q    Would you have recommended, in
2    your rehabilitation plan, that Miss Curley,
3    pre-diabetes, with the comorbidities we just
4    talked about, have nutritional evaluation?
5    A    Well, as far as the weight itself
6    is concerned, we probably would have ... you
7    know, hopefully gotten her into a program like
8    Weight Watchers or something of that nature and
9    let that be dealt with.  Whether or not ... she
10   would have needed a nutritional evaluation,
11   based on the other types of comorbidities ...
12   the hyperglycemia --
13   Q    High cholesterol --
14   A    I really would have had to talk to
15   her doctor about whether or not that alone --
16   the question, I think, really becomes more in
17   combination.  If the weight plus the
18   hyperglycemia plus the ... high cholesterol --
19   Q    Plus the hypertension?
20   A    -- plus the hypertension.
21        MS. MARTINES:  John, please.
22        THE WITNESS:  Any one by itself,
23   probably, no.  But in combination, would
24   it have been justified?  You know, I'd
25   have to probably do some thinking about
```

40 (Pages 298 to 301)

302

1    it, but -- 'cause there's no question
2    with the diabetes, but in combination the
3    others may well have justified it.  But
4    by themselves, no.
5    BY MR. SULLIVAN:
6        Q    And can we agree that you didn't
7    ask her doctor whether those pre-onset
8    conditions would have required nutritional
9    evaluation?
10       (Pause.)
11       A    No.  Of course, there were other
12   questions I asked him about, you know, was it
13   required pre-onset.  So we certainly knew that
14   we were looking at those things, but I did not
15   specifically ask him, would the pre-onset
16   conditions also apply to this, you know ... he
17   certainly had the opportunity to apply that as
18   well, but -- and did not.
19       But I agree with you that I did
20   not concretely apply it to every single
21   question, but it was applied to several
22   questions.
23       Q    Okay.  And you mention
24   handicapped driver evaluation and indicate
25   she doesn't need that because she doesn't

303

1    drive, correct?
2        A    True.
3        Q    And you go on to therapeutic
4    modalities, and you have two bullet points.
5    One is for individual counseling, which you
6    mentioned she had already been undergoing.
7    And the other is case management, which we've
8    beaten to death; is that fair to say?
9        A    On both counts.  Yes.
10       Q    Okay.  Medications prescribed.
11   You note that she was prescribed Avandamet,
12   or that you put in your plan that she should
13   take Avandamet twice a day, two 500, I guess
14   it's two 500 milligram tablets, and that
15   would come to 140 a month?
16       A    I'd like to phrase it just
17   slightly differently.  What I put in my plan is
18   not what I think she should take, but what the
19   doctor's prescribing her, and there were three
20   medications, only one of which Dr. O'Campo --
21   it's O apostrophe C-A-M-P-O, I guess --
22   indicated she would continue taking it
23   specifically in his response to me.  So your
24   question kind of suggested that I was
25   recommending that she should take it, and it

304

1    has nothing to do with my recommendation.
2        Q    You're just stating what the
3    doctor told you?
4        A    Right.  I mean, including in his
5    record, and it's clearly what she's taking.
6    But even at that, what I need to know is, does
7    he anticipate that this is the drug she will
8    continue to take, and that he will continue to
9    prescribe on into the foreseeable future.  And
10   he indicated, yes.
11       So the fact that she's taking it
12   now was not enough.  He had to indicate it
13   would be ... the ongoing prescription, before
14   I could put it into the plan and provide a
15   cost.
16       Q    Then, below that, you have four
17   bullet points for certain -- or I'm sorry,
18   below that you have supplies.  And there you
19   list diabetic shoes and socks, skin lotion, a
20   one-touch meter, lancets, and control
21   solution; do you see that?
22       A    Yes.
23       Q    Where did you get that
24   information?  How'd you develop that
25   recommendation?

305

1        A    Well, it -- it is what -- as
2    far -- well, each are different, but the skin
3    lotion, the one-touch meter, the lancets, the
4    control solution is what she's actually using.
5    We simply costed it out from talking to her
6    about frequency.  That is, how much in the way
7    of lancets is she using, how often does she
8    replace the packet.  Same with the control
9    solution.  And then identified the cost based
10   on where she is replacing that material from.
11   And then, we show you the diabetics shoes and
12   socks, where we got that allowance.
13       And, actually, what we showed
14   you was the comparison cost, also.  We showed
15   you the allowance we gave her, and then we
16   showed you a comparison cost, how that
17   relates to what the Department of Veterans
18   Affairs allows, so you had some reference
19   point.
20       Q    Is it possible for me to read
21   that answer?
22       COURT REPORTER:  Well, you can
23   try.
24       (Discussion off the record.)
25

41 (Pages 302 to 305)

306

1  BY MR. SULLIVAN:
2      Q   The next ... section you have is
3  medical care.  Do you see that?
4      A   Yes.
5      Q   And can we agree that the
6  recommendations you make in the medical care
7  section of this report require the opinion of
8  a doctor?
9      A   Well, I didn't make them.  I asked
10  the doctors what they wanted.  So it's their
11  recommendations.
12         All I did is get the cost in her
13  local area, and in the instance in which, for
14  example, it was the primary-care physician, I
15  do two things.  I get her primary-care doctor
16  cost, and then I check out his costs in
17  relation to other primary-care physicians in
18  her local area, which is why there's a range.
19      Q   Yeah, I just want -- I want an
20  answer to the general question first, and I
21  appreciate the rest of it, but can we agree
22  that the recommendations you put down here in
23  your plan referencing these doctors, are
24  those that require a medical doctor in order
25  for them to be made?

307

1      A   Perfectly in agreement with you,
2  and that's how they were obtained.
3      Q   You're not qualified to make
4  recommendations about this type of medical
5  care on your own, correct?
6      A   I'm perfectly in agreement with
7  it.
8      Q   Okay.  Give me a second to find
9  the copy.
10         (Discussion held off the
11  record.)
12         (Whereupon, Deposition Exhibit
13  No. Deutsch-11, letter from Dr. O'Campo,
14  was marked for identification.)
15  BY MR. SULLIVAN:
16      Q   I've marked this as Deutsch
17  Eleven, a copy of ... the letter and response
18  to and from Dr. O'Campo.
19         It's a she, by the way?
20      A   Okay.
21      Q   I meant, O'Campo.
22         Now, when you sent this letter
23  to her, one of the things you had in mind was
24  withstanding a Daubert challenge; isn't that
25  true?

308

1      A   Actually, I never gave it a
2  thought.  What I had in mind was ... getting
3  the answers to my questions.
4      Q   I say, one of the things you had
5  in mind.
6      A   In all honesty, you know, there
7  are four foundations I'm looking to establish.
8  One of them certainly is medical foundation,
9  but it's -- it's not -- I'm not sitting there
10  thinking about Daubert challenges.  I realize,
11  from a legal standpoint, that's an issue you're
12  going to be thinking about, but no, in all
13  honesty, I'm not thinking about a Daubert
14  challenge when I write these letters.
15         I'm thinking about what is it
16  that -- you know, that I believe is a
17  standard for the work I do in my field.  And
18  one of the standards, you know, is
19  establishing within the medical questions
20  that have to be answered, the medical
21  foundations.  So I'm always going to try the
22  best I can to get treaters to respond.  And
23  if I can't get treaters, and it is a
24  litigation case, I'll go to consultants.  But
25  my first effort is to get the treaters.  If

309

1  it's not litigation, I still go to the
2  treaters.  I just don't go to consultants if
3  it's outside litigation.
4      Q   Well, let's take a look at the
5  letter that you sent to Dr. O'Campo.
6      A   Sure.  All right.
7      Q   In the third paragraph you
8  write:  I would appreciate your opinion,
9  within a reasonable probability; do you see
10  that?
11      A   Where are you reading?
12      Q   The letter to Dr. O'Campo.
13      A   It's not what you gave me, it's
14  something else.
15         MS. MARTINES:  Is there a front
16  page?
17         MR. SULLIVAN:  I think it's
18  probably the last page.
19         MS. MARTINES:  Oh, okay.
20  BY MR. SULLIVAN:
21      Q   Sorry.  The cover letter that's
22  on the back instead of the front.
23      A   Okay, I got you.
24      Q   That's the way we got them.
25      A   I'm sorry.  Go ahead.

310

1    Q   So you -- if you take a look at
2  the third paragraph, the last clause you
3  write there is, I would appreciate your
4  opinion within a reasonable probability.
5    A   That's true.
6    Q   That's the standard for
7  admission in a court of law, correct?
8    A   That's true.
9    Q   In Florida, correct?
10   A   That's true.
11   Q   And that's why you asked him --
12 asked her to give you the opinion in that
13 way, correct?
14   A   Well, that's true, because I don't
15 want her to tell me what's possible. If she
16 subsequently testifies that it was only a
17 possibility, but she didn't share that with me,
18 I've got a problem. So I need to know, within
19 a reasonable probability, what her expectations
20 are.
21   Q   But isn't it your -- one of the
22 main concerns of your business, one of the
23 most frequent -- let me start that again.
24       Isn't one of the most frequent
25 concerns you have, in conducting your

311

1  business, withstanding a Daubert challenge?
2    A   Well, first of all, in this state,
3  Daubert's only in federal court. I only find
4  myself in federal court on very rare occasions.
5  It's usually a Frye standard, and so --
6    Q   But we're in federal court here.
7    A   Well, I understand that, but what
8  you asked me is, isn't my primary concern
9  withstanding the Daubert challenge? And the
10 answer is, no, it's not usually a primary issue
11 that I deal with.
12       And the fact is, you know, I --
13 you know, I end up in court on relatively
14 rare occasions. And, I mean, in the last
15 three years, last year I set a record. For
16 my entire career, I saw the inside of a
17 courtroom 14 times. The year before that it
18 was four times, I think -- I may be flipping
19 two years. The year before that it was six.
20 I just don't see it happen that often. I've
21 had maybe ... one or two Daubert challenges.
22 And one was in an ERISA case, where I would
23 assume everybody would have been, if
24 there was -- I mean, there are no experts in
25 an ERISA case, and I still didn't get thrown

312

1  out. I was accepted as an expert. It's not
2  an issue that I really typically have that
3  much ... confrontation with, so it's not my
4  first concern.
5        But meeting standards is my
6  concern, absolutely, because I think that we
7  have a standard that has to be met, whether
8  it's in court or out of court.
9    Q   I think, in your answer, you
10 changed my question from most frequent to
11 primary, and --
12   A   I'm sorry.
13   Q   Maybe we got confused, so I'll
14 try it again.
15       Isn't one of the most frequent
16 concerns you have in your practice,
17 withstanding a Daubert challenge in federal
18 court?
19   A   I still would say, no. But I'm
20 not, I don't -- first of all, I don't get into
21 federal court very often.
22       MR. SULLIVAN: Let's mark this.
23       (Whereupon, Deposition Exhibit
24 No. Deutsch-12, frequently asked
25 questions, was marked for

313

1  identification.)
2  BY MR. SULLIVAN:
3    Q   We've marked this as Deutsch 12.
4  It's a printout of frequently asked questions
5  from your web site; do you recognize it as
6  that?
7    A   Yes.
8    Q   For life-care planning?
9    A   Yes.
10   Q   You understand what a frequently
11 asked question is?
12   A   Sure.
13   Q   It's frequent concern?
14   A   Well, it's a frequently asked
15 question. I don't know if it's a frequent
16 concern or not. I mean --
17   Q   What's the heading for the
18 Number 15, frequently asked question?
19   A   Can a life-care planner withstand
20 a Daubert challenge in federal court?
21   Q   So we can agree that that's a
22 frequent concern in your business, isn't it?
23       MS. MARTINES: Object to form.
24       THE WITNESS: I disagree. I
25 don't think frequently asked questions

43 (Pages 310 to 313)

314

1    are frequent concerns. They're questions
2    that are asked. But, you know --
3        MR. SULLIVAN: Okay.
4        THE WITNESS: You know, who's
5    qualified to be a life-care planner or a
6    life-care planner is certified, those
7    aren't concerns, they're questions.
8    BY MR. SULLIVAN:
9        Q   Isn't that what you were
10   concerned about when you asked Dr. O'Campo to
11   provide you her opinion within a reasonable
12   probability; you were concerned about
13   Daubert?
14       A   I can honestly state that Daubert
15   was -- or Daubert was not even a thought that
16   occurred to me when I asked that. But I will
17   agree with you that my understanding is that
18   whenever you walk into a courtroom, you want to
19   be able to state that the opinions you hold are
20   within a reasonable probability.
21           And so, if I'm going to rely on
22   what a doctor tells me, I want to know that
23   the doctor gave me that opinion within a
24   reasonable medical certainty or probability.
25   But, in all honesty, it didn't occur to me.

315

1    I mean, the thought, I have to withstand a
2    Daubert challenge, was not in my mind when I
3    wrote that letter. It just wasn't -- it just
4    wasn't in the forefront of my mind. And I
5    know that's what you want to think, but it
6    just wasn't.
7        Q   Haven't you written articles on
8    it?
9        A   Sure I have. I wrote, along with
10   three other authors, wrote a little monograph
11   on it. And I've -- I've lectured on it in the
12   classroom, because I've indicated, even to
13   those who are doing life-care planning that has
14   nothing to do with litigation, if you can meet
15   the kinds of standards that are being asked for
16   in the courtroom, then you've met the kind of
17   standards that you should be upholding, no
18   matter what setting you apply the life-care
19   plan to.
20           And so it's reasonable to
21   consider the standards, the methodologies,
22   the tenets and principles of life-care
23   planning throughout any application of
24   life-care planning. So if you meet those
25   standards at the highest threshold, then

316

1    you'll meet them for every threshold.
2        Q   You'll agree with me, you've
3    written an article entitled, The Life-care
4    Planner, the Judge, and Mr. Daubert?
5        A   Well, actually, that was myself
6    and retired justice from the appeals courts in
7    Texas, when we -- after we had ... worked
8    together as a -- at the request of, or as part
9    of a life-care planning commission when we
10   filed an Amicus Curiae brief, and we were
11   reporting on the brief.
12       Q   So that's different from the
13   article you talked about in your last answer;
14   this one's a different one, another one?
15       A   Well, we were required to report
16   on the brief, so yes, absolutely, it's a
17   different one.
18       Q   You've written on Daubert
19   frequently, haven't you?
20       A   Maybe three times. We did the
21   monograph, and we did the brief that was filed.
22   I mean, I assisted in that brief, in an appeal
23   on another life-care planner. And then we
24   wrote in that journal ... I think we published
25   the brief at the request of that commission.

317

1    And then we published the article, which
2    explained the results of the appeals court's
3    ruling.
4        Q   Don't forget your web site.
5    You've also written on it there, as well,
6    right?
7        A   Is there an article on Daubert in
8    my web site?
9        Q   No, but written on Daubert.
10   Remember the frequently asked question?
11       A   Oh, okay. Okay. So there's what,
12   two paragraphs on Daubert in the frequently
13   asked question?
14       Q   Does it get into your curriculum
15   at Kaplan University, or at the University of
16   Florida? Daubert?
17       A   I don't think so. I don't think
18   there's anything on Daubert in either one of
19   those.
20       Q   How about Frye?
21       A   No, because ... we don't get
22   into ... well, you know, it never did, but we
23   may have, in an update this year -- let me
24   think about this. No, Daubert and Frye don't
25   directly, but the Certification Commission

318

1  changed their requirements, and in an update
2  required that ... Kaplan and University of
3  Florida have an on site, and in that on site
4  deal with the issue of testimony. So we do
5  bring in lecturers that deal with the issue of
6  testimony. And so, I'm sure, like this year,
7  Bill Goodridge was the one we used. I'm sure
8  he probably testifies -- excuse me -- lectures
9  on testimony, and I'm sure he raises the Frye
10  and Daubert issues. Well, maybe not Frye,
11  because he comes from Montana. I don't know if
12  they use Frye in Montana.
13      Q  You mentioned earlier a
14  monograph you had worked on. What was that,
15  what is a monograph?
16      A  Well, that's a -- you know, it's a
17  paperback ... there's maybe 100-page -- a lot
18  bigger than a journal article and a lot smaller
19  than a text. My texts have been 3500 to 4,000
20  pages on average, so it's hard to call
21  100-page, or 125-page publication a book. So,
22  I usually refer to that as a monograph. And it
23  was just a little treatise that Dr. Weed and
24  Patty -- Patricia McCullum and myself, and I
25  think Susan Grisham did maybe ... four or five

319

1  years ago.
2      Q  And that included a discussion
3  of Daubert, or was it devoted to Daubert?
4      A  It was devoted to testimony in
5  Daubert, but I think the leading -- gosh.
6          Well certainly ... Daubert it
7  may have discussed Frye, and it depends on
8  the states, you know -- I mean the principles
9  basically were Daubert, Frye, that kind
10  of ...
11      Q  How to withstand a Daubert
12  ruling, or how to withstand a Frye ruling?
13      A  Not so much how to withstand, but
14  what the concepts -- what are the questions
15  being asked, and how do you respond to those
16  questions.
17      Q  Well, let's take a look at
18  the ... the letter again. And I might be
19  doing some comparing of the letter to your
20  report. So if you want to have both handy,
21  that'd be helpful.
22          (Pause.)
23      Q  The first question that you ask
24  Dr. O'Campo was ... about the number of
25  visits that Miss Curley would make under

320

1  Dr. O'Campo's recommendation per year for her
2  diabetes; is that right?
3      A  Yes.
4      Q  And you start out with the
5  sentence ...
6      A  Go ahead.
7      Q  -- summarizing what Miss Curley
8  had said to you. Connie indicated that,
9  prior to the diagnosis of diabetes, she was
10  seeing a PCP only periodically as needed; do
11  you see that?
12      A  Yes.
13      Q  Are you completely confident in
14  the accuracy of what Miss Curley told you
15  about the frequency of her visits?
16      A  Well, you know ... it's the only
17  information I have, but certainly, it's
18  possible for her primary-care doctor to come
19  back and correct us, if -- if ... Connie Curley
20  is wrong. She has a record there, and I'm
21  assuming she would look at her record before
22  answering these question.
23      Q  Do you validate in any way what
24  Miss Curley had told you about her frequency
25  of her visits before you sent this letter?

321

1      A  How can I validate it? I'm
2  writing to her doctor about the frequency of
3  those visits.
4      Q  Don't you have -- if you had all
5  of Miss Curley's medical records, that would
6  be one way to validate; isn't that fair to
7  say?
8      A  Yeah, it's a pretty difficult
9  task, even with the medical records, to be able
10  to go back and be sure you've got every visit
11  she ever made to her primary-care doctor. But
12  you're writing her primary-care doctor and
13  you're saying, this is what I understand. The
14  primary-care doctor is sitting there with her
15  record.
16      Q  Did you ask the primary-care
17  doctor whether what Miss Curley had said was
18  true?
19      A  Well ... no, I didn't. Maybe it's
20  a little bit of a leap of faith, that the
21  primary-care doctor would be more than
22  intelligent enough to read that and answer the
23  question, which was, you know, how many
24  follow-up visits do you feel she needs, based
25  just on the diabetes.

**322**

1    Q   Right.  The question didn't ask
2  the doctor how many visits Miss Curley had
3  been making, or how often she had been
4  visiting before she got diabetes, correct?
5    A   No, it did not.
6    Q   So, the doctor answered just
7  your question; isn't that fair to say?
8    A   Which was specifically, how many
9  visits you want in follow-up to monitor the
10  diabetes, without regard to anything else, and
11  that's true, she answered just that question.
12    Q   So, we can't tell, from the
13  doctor's answers, whether these visits are
14  additional to visits that Miss Curley would
15  have made otherwise or not?
16      MR. LAMINACK:  Object to form.
17      THE WITNESS:  Well, you certainly
18    may ask her that.  I think it's pretty
19    clear, but if you don't, then it's an
20    easy question for you to ask her, and
21    I'll adjust accordingly.
22  BY MR. SULLIVAN:
23    Q   Do you know whether -- do you
24  know how often Miss Curley was visiting
25  Dr. O'Campo before --

**323**

1    A   You say my question -- my answers
2  are overly long.  It seems -- and I don't mean
3  to be rude, but it seems really silly for you
4  to go back and get back into what we've just
5  answered.
6      I've made it very clear what my
7  understanding is.  You want to go ahead and
8  beat that to death, we can.  We got 15
9  minutes to accomplish something additional.
10  And it just seems like a waste of time.  You
11  want to go ahead and do that, we can.
12    Q   I'm all for that.  Trust me,
13  I'll try to ask yes and no questions and if
14  you try to give yes and no answers, we can go
15  more quickly; is that fair?
16    A   That's not my point.
17      MR. LAMINACK:  And actually, that
18    wasn't the -- he is reasking the same
19    questions.
20      THE WITNESS:  Yes, repeating the
21    same question we've just answered.
22  BY MR. SULLIVAN:
23    Q   I will try to do that if you try
24  to do what I've asked, which you answer yes
25  or no to my questions; is that a fair deal?

**324**

1      MS. MARTINES:  Objection to form.
2  BY MR. SULLIVAN:
3    Q   If I ask you a yes or no
4  question.
5      MS. MARTINES:  Object to the
6    form.
7      THE WITNESS:  If you can do it, I
8    will.
9  BY MR. SULLIVAN:
10    Q   Okay.  Do you have any
11  understanding of how frequently Miss Curley
12  was visiting Dr. O'Campo before she got
13  diabetes?
14    A   Only based on what Miss Curley
15  told me.
16    Q   Do you have any understanding of
17  how many times Miss Curley is visiting
18  Dr. O'Campo every year, apart from visits for
19  diabetes?
20      (Pause.)
21    Q   Do you know?
22    A   I'll just say, no.
23    Q   Do you know whether Miss Curley,
24  when she visits Dr. O'Campo for diabetes
25  treatment, also addresses other treatments

**325**

1  and medical conditions with Dr. O'Campo
2  during those visits?
3    A   No.
4    Q   Your recommendation in your ...
5  medical care section of your rehabilitation
6  recommendation says:  Additional four to six
7  visits per year as related to diabetes only,
8  correct?
9    A   Yes.
10    Q   That information, that
11  recommendation that you put there, is based
12  solely on Dr. O'Campo's answer to your
13  question; is that correct?
14    A   Yes.
15    Q   Okay.  And that doesn't -- the
16  visits that you've put in your plan there,
17  have nothing to do with your opinion, right,
18  that's the opinion of somebody else, right?
19    A   True.
20    Q   The next -- the next set of
21  recommendations you give under medical care
22  is for laboratory tests?
23    A   Yes.
24    Q   Do you see that?  And that is
25  part of, and you've got that information from

46 (Pages 322 to 325)

46 (Pages 322 to 325)

326

1   Dr. O'Campo's answers to your second
2   question?
3       A   Yes.
4       Q   Okay.  You asked Dr. O'Campo,
5   periodic lab work to monitor diabetes
6   symptoms; do you see that?
7       A   Yes.
8       Q   And you left, you gave her a ...
9   a space to write down the test, and then a
10  space to write down the frequency, correct?
11      A   Yes.
12      Q   And the first one she wrote down
13  was hemoglobin A1C, three to four times a
14  year; do you see that?
15      A   Three to what?
16      Q   Three to four times --
17      A   Yes.  That's what it says.
18      Q   -- per year.
19          Did you ask Dr. O'Campo whether
20  Miss Curley would -- Miss Curley should have
21  had those tests done even before she had
22  diabetes?
23      A   No, it's seems implied in the
24  question.  I said, specific for the diabetes.
25  To me, that's implied in the question.  I don't

327

1   feel like I need to lead --
2       Q   What's implied in the question?
3       A   That if it was needed ... beyond
4   the diabetes, she would have said so, but
5   perhaps, you know, what you're suggesting is,
6   we need to lead these doctors by the hand
7   through that, but, the answer to your question
8   is, no, I didn't ask it as a separate question.
9       Q   Well, let's look at the next
10  one.  What's the next test that the doctor
11  lists there?
12      A   Basic metabolic urinalysis.  Basic
13  metabolic and urinalysis.
14      Q   And you write that down as a
15  basic metabolic panel in your
16  recommendations, correct?
17      A   Yes, basic metabolic panel and
18  urinalysis two to four times a year.
19      Q   Did you ask Dr. O'Campo whether
20  Miss Curley would require, would have
21  required a basic metabolic panel before she
22  got diabetes?
23      A   Same response.  I didn't ask it as
24  a separate question, only asked it as whether
25  or not it was, she needed it specific, any lab

328

1   tests specific to the diabetes, which to me
2   meant, if it was already necessary then, you
3   know, she wouldn't -- she wouldn't put it down.
4   But if ... you know, she didn't understand it
5   that way, then clearly ...
6           MR. LAMINACK:  Certainly should
7       have been doing it after she started
8       taking Seroquel.  That's for sure.  We
9       know that.
10  BY MR. SULLIVAN:
11      Q   Did -- do you have any
12  understanding as to whether she -- let me ask
13  it differently.
14          Do you know whether she was
15  taking metabolic panels for her high
16  cholesterol that she had before she had
17  diabetes?
18      A   I don't know what Dr. O'Campo was
19  doing for her.
20      Q   Is it your belief that these two
21  to four a year metabolic panels would be
22  separate and apart from metabolic panels that
23  she would have for her high cholesterol?
24      A   I don't know how frequently she
25  was giving the high cholesterol before, and

329

1   it's a question you need to ask -- excuse me.
2   I apologize.
3           I don't know how frequently she
4   was given the metabolic panels before, and
5   it's a question you're going to have to ask
6   Dr. O'Campo.
7       Q   It's not information that we can
8   glean here from her answer, correct?
9       A   That's true.  The same is going to
10  be true for the lipid panels next.
11      Q   And for the urinalysis?
12      A   That's true.
13          (Pause.)
14      Q   If you take a look at the fourth
15  question.  That one is the basis for your
16  recommendation in the medical care section
17  that she see an ophthalmologist, correct?
18      A   True.
19      Q   Anywhere in there, do you ask
20  Dr. O'Campo whether Miss Curley should have
21  been seeing an ophthalmologist ... once per
22  year before she had diabetes?
23      A   No.
24      Q   Do you know whether she had --
25  you've not read Miss Curley's testimony,

47 (Pages 326 to 329)

330

```
 1   correct?
 2       A   No, I have not.
 3       Q   Has anyone made you aware that
 4   she testified that her eye problems,
 5   including her cataracts, occurred before she
 6   got diabetes?
 7       A   I knew that she had cataracts.
 8       Q   Did you know that they -- that
 9   she testified that they occurred before she
10   got diabetes?
11       A   I was aware of that.
12       Q   Do you have any idea as to how
13   many times she was seeing an ophthalmologist
14   at that time?
15       A   I don't know how often she -- once
16   she had her cataracts out, how often she
17   followed up with an ophthalmologist before.
18       Q   Okay.  If she was seeing an
19   ophthalmologist once per year before she got
20   diabetes, this wouldn't be an additional
21   visit that you're recommending here; is that
22   fair to say?
23       A   I don't think so.  I would
24   have ... said the same thing I did with ... I
25   think it was Burns when I indicated that it
```

331

```
 1   would be a premorbid condition -- associated
 2   with a premorbid condition.
 3           MR. SULLIVAN:  Okay.  That's all
 4   for Curley.  And I would move to strike
 5   Mr. Laminack's comments a couple of
 6   questions ago.  Despite its erudite
 7   delivery.
 8       (Discussion held off record.)
 9       (Whereupon, deposition concluded at
10   4:52 p.m.)
11           - - - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

332

```
 1
 2           CERTIFICATE OF OATH
 3
 4   STATE OF FLORIDA      )
 5                         )
 6   COUNTY OF ORANGE      )
 7
 8           I, the undersigned authority,
 9   certify that PAUL M. DEUTSCH, PH.D.,
10   personally appeared before me and was duly
11   sworn.
12
13           WITNESS my hand and official seal
14   this 6th day of October, 2008.
15
16
17
18   _____
     Richard Castillo,
19   Registered Diplomate
     Reporter
20   Notary Public, State
     of Florida at Large
21   Comm. No. DD609499
     Expiration: 02/25/11
22
23
24
25
```

333

```
 1          CERTIFICATE OF REPORTER
 2   STATE OF FLORIDA      )
 3   COUNTY OF ORANGE      )
 4   I, RICHARD CASTILLO, Professional Court
 5   Reporter and Notary Public, do hereby certify
 6   that I was authorized to and did
 7   stenographically report the deposition of
 8   PAUL M. DEUTSCH, PH.D.; that a review of
 9   the transcript was requested; and that the
10   foregoing transcript, pages 145 through 330,
11   is a true record of my stenographic notes.
12       I FURTHER CERTIFY that I am not a
13   relative, employee, or attorney, or counsel
14   of any of the parties, nor am I a relative or
15   employee of any of the parties' attorney or
16   counsel connected with the action, nor am I
17   financially interested in the action.
18       DATED this 6th day of October, 2008, at
19   Orlando, Orange County, Florida.
20
21   ---------------------------------------
     RICHARD CASTILLO
22   Registered Diplomate Reporter
     Notary Public, State of Florida at Large
23   Commission No. DD609499
     Expiration:  February 25, 2011
24
25
```

48 (Pages 330 to 333)

334

```
1          E R R A T A
2       I, PAUL M. DEUTSCH, PH.D., do
3    hereby certify that I have read the foregoing
4    transcript of my deposition given on August
5    30, 2008, that, together with any additions
6    or corrections made therein, it is true and
7    correct.
8
     Page    Line
9    ------------------------------------------
10   ------------------------------------------
11   ------------------------------------------
12   ------------------------------------------
13   ------------------------------------------
14   ------------------------------------------
15   ------------------------------------------
16   ------------------------------------------
17   ------------------------------------------
18   ------------------------------------------
19   ------------------------------------------
20   ------------------------------------------
     Under penalties of perjury, I declare that I
21   have read the foregoing document and that the
     facts stated in it are true.
22
     _____   _____
23     Date             PAUL M. DEUTSCH,
     PH.D.
24
25   Job No. 3034
```

336

```
1          LAWYER'S NOTES
2    PAGE LINE
3    ____ ____  _____
4    ____ ____  _____
5    ____ ____  _____
6    ____ ____  _____
7    ____ ____  _____
8    ____ ____  _____
9    ____ ____  _____
10   ____ ____  _____
11   ____ ____  _____
12   ____ ____  _____
13   ____ ____  _____
14   ____ ____  _____
15   ____ ____  _____
16   ____ ____  _____
17   ____ ____  _____
18   ____ ____  _____
19   ____ ____  _____
20   ____ ____  _____
21   ____ ____  _____
22   ____ ____  _____
23   ____ ____  _____
24
25
```

335

```
1    DATE: October 6, 2008
     TO:  Paul M. Deutsch, Ph.D.
2        10 Windsomere Way, Suite 400
         Oviedo, Florida, 3276
3
     IN RE:  Plaintiffs vs. AstraZeneca
4        Case No. 6:07-cv-10425, et al
5        Please take notice that on October 2,
     2008, you gave your deposition in the
6    above-referred matter.  At that time, you did
     not waive signature.  It is now necessary
7    that you sign your deposition.
         Please call our office at the
8    below-listed number to schedule an
     appointment between the hours of 9:00
9    a.m. and 4:30 p.m., Monday through Friday at
     the Esquire office located nearest you.
10       If you do not read and sign the
     deposition within a reasonable time, the
11   original, which has already been
     forwarded to the ordering attorney, may be
12   filed with the Clerk of the Court.  If you
     wish to waive your signature, sign your name
13   in the blank at the bottom of this letter and
     return it to us.
14
         Very truly yours,
15
16       RICHARD CASTILLO
         Registered Diplomate Reporter
17       Esquire Deposition Services
         Orlando, Florida
18       (407)426-7676
19   I do hereby waive my signature.
20   ---------------------------
21   PAUL M. DEUTSCH, PH.D.
22   cc via transcript: Buffy Martines, Esquire
             John Sullivan, Esquire
23           Chris Coutroulis, Esquire
24   Job No. 957479
25
```