# EXHIBIT 3

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
VOLUME I

----------------------------------------x
IN RE:  Seroquel Products Liability        :
Litigation                                 :
                                           :
MDL DOCKET NO. 1769                        :
This Document Relates to:                  :
                                           :
PLAINTIFFS v. AstraZeneca LP, et al.       :
(Janice Burns 6:07-cv-15959;               :
Connie Curley 6:07-cv-15701;               :
Linda Guinn 6:07-cv-10291;                 :
Eileen McAlexander 6:07-cv-10360;          :
Richard Unger 6:07-cv-15812;               :
Linda Whittington 6:07-cv-10475)           :
----------------------------------------x

Tuesday, October 7, 2008

9:12 a.m. - 5:05 p.m.

Oral deposition of PAUL M. DEUTSCH,

PH.D., held at Offices of Paul M. Deutsch, &

Associates, P.A., 10 Windsomere Way, Suite

400, Oviedo, Florida, 32765, beginning at

9:10 a.m., on the above date, before Richard

Castillo, Registered Diplomate Reporter,

Commission No. DD609499 (Expiration 2/25/11)

and a Notary Public.

Esquire Deposition Services
200 East Robinson Street
Suite 425
Orlando, Florida  32801
(407)426-7676

Job No. 958372

2

```
 1              APPEARANCES
 2  LAMINACK, PIRTLE & MARTINES, LLP
      BY: RUSS BRUDNER, ESQUIRE
 3  5020 Montrose Boulevard
      Ninth Floor
 4  Houston, TX  77006
      Phone: (713)292-2750
 5  --Representing the Plaintiff
 6  DECHERT, LLP
      BY: JOHN J. SULLIVAN
 7  902 Carnegie Center
      Suite 500
 8  Princeton, New Jersey  08540
      Phone: (609)955-3200
 9  --Representing the Defendants
10  CARLTON, FIELDS, LLP
      BY: CHRIS COUTROULIS, ESQUIRE
11  4221 West Boy Scout Boulevard
      Suite 1000
12  Tampa, Florida  33607-5736
      Phone: (813)229-4133
13  --Representing the Defendants
14
15
16
17
18
19
20
21
22
23
24
```

4

| | EXHIBITS | |
|---|---|---|
| MARKED | DESCRIPTION | PAGE |
| 20 | Ms. Curley's fact sheet | 6 |
| 21 | List of depo transcripts | 7 |
| 22 | NGC Standards Guideline, | 19 |
| 23 | Glucose reading 114 | 22 |
| 24 | Glucose reading 109 | 22 |
| 25 | Medical record Ms. Guinn, 1/17/91 | 28 |
| 26 | Statement, ADA | 32 |
| 27 | Letter 10/6/08, Dr. Deutsch | 68 |
| 28 | Letter to Ms. McElroy | 68 |
| 29 | Letters to and from doctors | 90 |
| 30 | Society Security application | 110 |
| 31 | Document from Mercy Hospital | 117 |
| 32 | Letters re Mr. Unger | 127 |

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

3

### INDEX

WITNESS                          PAGE

PAUL M. DEUTSCH, PH.D.
    DIRECT BY MR. SULLIVAN        6
CERTIFICATE OF OATH           158
COURT REPORTER'S CERTIFICATE  159
ERRATA                        160
        - - - - -

NOTE:  Ellipses (...) used to reflect pauses
between words.

5

### DEPOSITION SUPPORT INDEX

Direction to witness Not to Answer
Page Line      Page Line      Page Line

Request for Production of Documents
Page Line      Page Line      Page Line
None

Stipulations
Page Line      Page Line      Page Line
  6  1-8

Question Marked
Page Line      Page Line      Page Line
None

6

1        (It is hereby stipulated
2    and agreed by and between counsel
3    for the respective parties that
4    reading, signing, sealing and
5    certification are reserved; and
6    that all objections, except as to
7    the form of the question, are
8    reserved until the time of trial.)
9        (Whereupon, Deposition Exhibit No.
10   Deutsch-20, fact sheet from Ms. Curley,
11   was marked for identification.)
12
13       PAUL M. DEUTSCH, PH.D.,
14   after having been duly sworn,
15   was examined and testified
16   as follows:
17
18       DIRECT EXAMINATION
19
20 BY MR. SULLIVAN:
21   Q   Just for the record, I've marked
22 as Exhibit 20, a copy of the fact sheet from
23 Connie Curley. If you recall, last Thursday
24 I presented you with one page from the fact

7

1  sheet that showed some of her risk factors.
2  And Miss Martines objected because we didn't
3  mark the whole fact sheet, so I am simply
4  putting this in the record so that we have
5  the whole fact sheets.
6    A   I do remember that.
7    Q   I also understand that you just
8  presented me with a list of depositions
9  entitled depositions received for Seroquel
10 cases, and has the title of each of the six
11 cases in which you've given an opinion, and
12 certain depositions listed under each case
13 that you've received since we last spoke; is
14 that correct?
15   A   Right and it's fine to mark
16 that. I'll just take a copy so I keep my
17 list, but you can mark the original. I don't
18 have a problem with it.
19       MR. SULLIVAN: Let's mark that
20 as Exhibit 21, please, Richard.
21       (Whereupon, Deposition Exhibit No.
22 Deutsch-21, list of deposition
23 transcripts was marked for
24 identification.)

8

1 BY MR. SULLIVAN:
2    Q   Okay. Doctor, how did you come
3 about to get these deposition transcripts
4 after the deposition, the first day of our
5 deposition on Thursday?
6    A   I believe -- of course, to be
7 honest with you, my memory is a little fuzzy
8 by the end of that deposition, but my
9 recollection is that Miss Martines indicated
10 that the materials were actually forwarded by
11 another law firm, not by her law firm, and
12 that she would contact that firm and make
13 sure that they forwarded to me the
14 depositions that she thought that they had
15 already been forwarded to me. So, the next
16 day I received -- because that was on
17 Thursday we did the deposition, right?
18   Q   Yes.
19   A   So the next day, Friday, I
20 received a large box of materials, the list
21 that you have. The problem is that I spent
22 all day Saturday, trying to catch up on case
23 work that I had to set aside to deal with
24 providing the time on Thursday, and so really

9

1 didn't have -- because I worked all day
2 Saturday and Sunday, I've only really gotten
3 through a couple of these at this point. I'm
4 just going to have to keep working away at
5 it, along with Shannon's assistance. And, at
6 this stage, the best I could do is provide
7 you with a list. But there was no way I was
8 going to be able to get through all of that
9 by today.
10   Q   So, it's fair to say, or it's
11 obvious to say that the opinions that you
12 rendered in your report in this case were all
13 reached before you ever looked at one of
14 these depositions?
15   A   Oh, that's certainly true, and
16 think we agreed on that on Thursday.
17   Q   Okay. Do you know whether you
18 received -- strike that.
19       Do you know whether the
20 depositions on this list comprise all of the
21 depositions that have been given in these
22 cases?
23   A   I certainly have no way of
24 knowing that. I think what I emphasized

3 (Pages 6 to 9)

10

1   Thursday is the importance of the current
2   treating doctors and the patients and, if
3   possible, a family member, as priorities, but
4   whether that even comprises all treating
5   physicians whose depositions have been taken,
6   there's no way for me to tell you that.  You
7   would know better than I, and of course,
8   plaintiffs' attorneys would know better than
9   I.
10      **Q    Were you told by Miss Martines,**
11  **or the other attorney at the other law firm,**
12  **whether they were attempting to give you all**
13  **the depositions of the treating doctors in**
14  **these cases?**
15      A    At this point, I just received
16  this box, and I haven't had a chance to talk
17  to Miss Martines.  And I'm not sure if she
18  knows which were sent.  So, when I get the
19  opportunity, I'll call her and go over the
20  list or fax her the list of what I've
21  received, and talk with her about what they
22  comprise versus what exists.
23      **Q    There's -- I count 25**
24  **depositions on this list.  Is it your**

11

1   **intention to read all of these?**
2       A    Oh, certainly.  If they're sent,
3   I'll read them.
4       **Q    Are you going to read them or**
5   **someone in your office is going to read them?**
6       A    What will happen here to speed
7   this process along is, Shannon will get
8   through and mark some of the more important
9   areas so I don't miss them, 'cause I do have
10  a tendency to speed read, just an old habit,
11  and so to make sure that I don't miss the
12  most important parts, she'll go through them.
13  We don't double charge.  We're very careful
14  about the amount of time she spends versus
15  me, but I will have to go through them myself
16  because it's litigation.
17      **Q    Is that similar to the process**
18  **that you and Shannon follow with the review**
19  **of medical records --**
20      A    It is.
21      **Q    -- where she flags the important**
22  **ones and you're able to focus on those when**
23  **you go back over the records; is that**
24  **correct.**

12

1       A    That's true.  And I apologize.
2   I stepped on you, I'm sorry, to the court
3   reporter, too, and I will try not to do that
4   for the rest of the depo.
5       **Q    Great.  Since we met on**
6   **Thursday, have you asked for or received any**
7   **additional medical records beyond those that**
8   **you had already received before you issued**
9   **your reports in this case?**
10      A    No.
11      **Q    Okay.  Have you checked on your**
12  **certification with the ... what's the name of**
13  **the association for case managers?**
14      A    Well, it's certified -- it's ...
15  the group you check with, actually, they
16  contract with the Commission on
17  Rehabilitation Counselor certification,
18  because they're NOCA certified.  I'm not sure
19  if you're familiar with NOCA.
20      **Q    I'm not, but --**
21      A    NOCA is the body that certifies
22  certifying bodies.  They actually certify the
23  American Medical Association and --
24      **Q    Who certifies them?**

13

1       A    -- the Bar Association.  It's
2   got to stop somewhere.
3           So, they do the bar, they do the
4   AMA, they do basically all of the major
5   certifying bodies.  And so -- but it's very
6   expensive to become certified by NOCA, so
7   they contract with CRCC, but I -- yes, I did
8   contact them, actually on break, to find
9   out -- had my staff find out what occurred.
10          First, I went back to the file.
11  And we showed that, in fact, there were three
12  people here who were due to be recertified at
13  about the same time.  Two went through just
14  fine.  My package showed it was together, and
15  I can't really tell you, we never were able
16  to determine.  Our contention is it went out.
17  Whether it was lost in the mail, whether they
18  didn't process it, they show no record of it.
19  They were switching management companies, but
20  we certainly will take the blame for it.
21          Bottom line is, they said that
22  this is a common problem, it's not a big
23  issue.  But nonetheless ... we
24  Federal-Expressed, you know, the dues check

14

1 to them, and, you know, I anticipate the
2 reinstatement as soon as the committee meets
3 this week.
4        But on my own, in addition to
5 that, I sent a letter to the Ethics Committee
6 explaining the situation. I also spoke to
7 the chair of the Ethics Committee who also
8 said, this is not an unusual situation. And,
9 normally, it's not handled through the Ethics
10 Committee, but that if I wished it to be
11 reviewed by the Ethics Committee, they would
12 do so. So they'll take a look at it this
13 week and respond accordingly.
14    Q   Is it possible for us to get
15 from you a copy of the package that you just
16 testified that your office believed had
17 already gone out --
18    A   Sure.
19    Q   -- for recertification, as well
20 as the letter that you sent to the Ethics
21 Committee?
22    A   Sure.
23    Q   Thank you.
24        Do you have the report, your

15

1 report for Linda Guinn with you?
2    A   How interesting. That's not
3 likely to happen too often.
4    Q   One out of six.
5    A   Out of this whole stack, the
6 first you pick is the one I have right in
7 front of me.
8    Q   I'd like to ask you a few
9 questions about your report for Miss Guinn.
10    A   Actually, take two seconds. I'm
11 sure that's not the last thing you're going
12 to ask for. I'd better start listing what
13 you do ask for.
14        (Pause.)
15    A   Okay. Go ahead.
16    Q   I'm going to ask you about some
17 of the risk factors or morbidities that
18 preexisted her diabetes diagnosis. And some
19 of these may be in your reports, so maybe we
20 can agree on them, and others, if not, I'll
21 see if I can put some records in front of
22 you, okay?
23    A   Certainly.
24    Q   Can we agree that before Miss

16

1 Guinn had diabetes, that she had very serious
2 mental health problems?
3    A   Yes.
4    Q   I count her having been
5 diagnosed and referenced in your report with
6 major depression, bipolar disorder, and
7 schizophrenia. Can we agree on that?
8    A   Yes.
9    Q   I also see that she's had
10 seizure problems with seizures. In
11 particular, I've seen mention of epilepsy;
12 can we agree on that?
13    A   Yes.
14    Q   And I saw a reference in her
15 records in your report, as well, of her use
16 of recreational drugs; can we agree on that?
17    A   Yes.
18    Q   I also see reference in her
19 records, and I believe in your reports, that
20 before she had diabetes she was obese; can we
21 agree on that?
22    A   Yes.
23    Q   I also see reference in your
24 records and in your report and in the medical

17

1 records, that she was a heavy smoker before
2 she -- before she was diagnosed with
3 diabetes; can we agree on that?
4    A   I'm sure we can, but I'm going
5 to turn to that section. It just doesn't
6 happen to be on my page two, so bear with me
7 one second.
8        (Pause.)
9    A   Yes.
10    Q   I've also seen in the medical
11 records, and I'm not sure whether it's
12 referenced in your report, it may be, that
13 before she had diabetes she was diagnosed
14 with hyperlipidemia?
15    A   Yes.
16    Q   We can agree on that?
17    A   Yes.
18    Q   I believe in your report you
19 even mention that before she had diabetes she
20 had been diagnosed with hyperglycemia; can we
21 agree on that?
22    A   Yes.
23    Q   Do you know what the term,
24 prediabetes means?

18

1   A   Yes.
2   Q   Could you explain your
3   understanding of what that term means?
4   A   Well, basically, I understand
5   that to suggest that she demonstrates
6   substantial risk factors for the onset of --
7   of diabetes, and many of those, without
8   repeating them, are those that we just
9   demonstrated or we just listed.  So, it would
10  suggest that although she may not actually be
11  at a point where she's diagnosable as
12  diabetes, that she's at a stage where that
13  she would be considered a prediabetic because
14  of the risk factors, the numbers of risk
15  factors for diabetes she's demonstrating in
16  testing by the doctor.
17  Q   It's my understanding the
18  definition of prediabetes is based on
19  clinical lab values that are reached on the
20  patient.
21  A   Okay.
22  Q   Are you aware of what those lab
23  values are in order -- what lab values are
24  required in blood glucose in order to be

19

1   diagnosed as prediabetic?
2   A   I'm aware of what you're talking
3   about, but I can't quote you the specific lab
4   values.
5   Q   Okay.  Do you happen to have the
6   clinical guidelines with you that you -- that
7   you had your staff --
8   A   I do.
9   Q   -- search the Internet for?
10  A   And I think the definition is in
11  there for those.
12  Q   I believe it is, too.
13  MR. SULLIVAN:  Richard, why
14  don't we mark this as the next
15  exhibit.
16  (Whereupon, Deposition Exhibit
17  No. Deutsch-22, Standards guideline
18  was marked for identification.)
19  BY MR. SULLIVAN:
20  Q   Doctor, I'll direct you to the
21  clinical guideline from the National
22  Guideline Clearinghouse that you produced to
23  us with the guideline titled, Standards of
24  Medical Care in Diabetes, Classification and

20

1   Diagnosis.
2   A   Okay.  I'm with you.
3   Q   If you have trouble finding --
4   A   No, I have it.  It's in front of
5   me.
6   Q   I have the same one in front of
7   me as Exhibit 22.  If you take a look on what
8   is my second page, you'll see that there's a
9   heading entitled, Diagnosis of Prediabetes.
10  A   I'm with you.
11  Q   And do you see it has a couple
12  of possible ways that you can be diagnosed
13  with prediabetes, one being impaired fasting
14  glucose level that comes somewhere between
15  100 milligrams and 125 milligrams per
16  deciliter; do you see that?
17  A   Yes.
18  Q   That's my understanding of
19  prediabetes, and I would assume that's the
20  understanding you have from the records, or
21  from the guidelines that you had your staff
22  take from the Internet; is that correct?
23  A   That's correct.
24  Q   Okay.  Have you looked in the

21

1   medical records to determine whether
2   Miss Guinn was prediabetic, even before she
3   took Seroquel or had diabetes, whether she
4   was within that range of 100 to
5   125 milligrams --
6   A   No.
7   Q   -- deciliter?
8   A   I'm sorry.  I keep thinking, for
9   some reason, that you're going to end, and I
10  should just wait until I hear dead silence.
11  The answer is no.  I limit
12  myself to listing all of the diagnoses that
13  were made by the doctors, but then,
14  interpreting the lab values or listing the
15  lab values, I think goes one step beyond
16  where the doctor should be taking those, and
17  then interpreting those lab values.
18  So, other than showing what the
19  criteria are within the clinical practice
20  guidelines, I really am going to defer to
21  endocrinologists and/or primary care doctors
22  to -- to make that next step in the
23  courtroom, because I don't quite honestly
24  think the judge would allow me to testify to

22

1  that, and I really don't think it's
2  appropriate for me to testify to it, so, I
3  don't go that next step.
4      I think it's -- it is
5  appropriate, up to the point where you asked
6  me to establish all of those preexisting
7  criteria that I had listed, and whether or
8  not those are risk factors, that, I think is
9  reasonable and well within my purview, but
10  beyond that, I think we're starting to just
11  move over into the physician's purview.
12      MR. SULLIVAN:  Let me mark these
13  next two exhibits, 23 and 24.
14      (Whereupon, Deposition Exhibit No.
15  Deutsch-23, glucose reading 114,
16  was marked for identification.)
17      (Whereupon, Deposition Exhibit No.
18  Deutsch-24, glucose reading 109,
19  was marked for identification.)
20  BY MR. SULLIVAN:
21      Q   Here you go, Doctor.  These are
22  laboratory results from Miss Guinn.  I
23  apologize.  I don't have but the one copy.
24      MR. BRUDNER:  You don't have --

23

1  okay.
2  BY MR. SULLIVAN:
3      Q   I'll direct your attention to,
4  if I may, as I think it's a first reading on
5  each page of each Exhibit 23 and 24 for
6  glucose; do you see that?
7      A   Yes.
8      Q   Do you see, in each of those,
9  the number, the range for glucose falls
10  between 100 and 125 milligrams per deciliter?
11      A   On Exhibit 23 it's 114; on
12  Exhibit 24 it's 109.
13      Q   So that falls within that
14  prediabetes range we just discussed?
15      A   Right.  The milligram per
16  deciliter reference range is 70 to 115 on
17  Exhibit 24, and actually, between 65 and 115
18  on -- on Exhibit 23, and so she's at 114 on
19  23 and 109 on 24, so she's within the
20  reference range of both.
21      Q   Have you looked at the dates on
22  each of those?
23      A   On 23, the date is eight ...
24  8/13/1997.

24

1      Q   That's how I see it, as well.
2      A   Okay.  I apologize.  It just
3  took me a second there.
4      And on Exhibit 24, the date
5  appears to be ... 7/31/92.
6      Q   So one of those is -- Exhibit 24
7  is over 16 years ago, and Exhibit 23 is over
8  ten years ago, correct?
9      A   Yes.
10      Q   Is it your understanding that
11  it's not unusual for clinical guidelines to
12  change as the years move along?
13      A   Not unusual at all.
14      Q   And, in fact, that's why your
15  staff, when they're looking up clinical
16  guidelines, updates them as often as they
17  can, whenever you're working on a case,
18  correct?
19      A   Always update.  Frankly, if we
20  pull clinical practice guidelines on a
21  litigation consultation case two weeks ago,
22  even ... even though we have it on file,
23  we'll still check to make sure a new one
24  didn't get released when we go to do a report

25

1  two weeks later.
2      Q   Are you confident that the
3  clinical guidelines that you utilized for
4  your reports here, with regard to diabetes
5  and diagnosis of prediabetes, are current?
6      A   They were current when we pulled
7  them.  You know, can they change between the
8  time we pulled them and the time a case goes
9  to trial?  Certainly.  Usually, we'll go back
10  and check to see if there are any changes.
11  But -- but as reference guidelines, they were
12  absolutely current the day we pulled them.
13  They were the ones online and -- and shown as
14  the current guidelines.
15      Q   Certainly, they appear to be
16  more current than the guidelines or reference
17  ranges that we see in these documents from
18  1997 and 1992; is that fair to say?
19      A   I would think so.
20      Q   Okay.  Oh, one other thing I
21  want to show you on those two documents.  If
22  you look at ... Exhibit 23, it's a little
23  difficult to see, but if you note down below
24  the date that you saw before of 8/13/1997,

26

1  two boxes below, there's the word "fasting"
2  is typed in, do you see that, just above 9:00
3  a.m.?
4      A   Yes, I do.
5      Q   Okay.  And if you look at
6  Exhibit 24, it's a little clearer on that
7  report, it's right under "Remarks," just
8  before where you see all the lab values.
9      A   Yes.
10     Q   So, at least taking these
11 reports at their word, these glucose values
12 that we just discussed were fasting glucose
13 values, correct?
14     A   Yes.
15     MR. BRUDNER:  Objection to form.
16 BY MR. SULLIVAN:
17     Q   Okay.
18     MR. BRUDNER:  Where does it say
19     that?  Okay.
20 BY MR. SULLIVAN:
21     Q   All right.  So, at least, if
22 we're to accept the guidelines that you
23 utilized for your report, these two glucose
24 values we just -- we just went over in

27

1  Exhibit 23 and 24, put Miss Guinn in 1997,
2  and again in 1992, in the prediabetes range,
3  correct?
4      A   Yes.
5      Q   Okay.  A couple of other
6  existing -- preexisting risk factors I'd like
7  to go over.
8          Can we agree that Miss Guinn,
9  before she was diagnosed with diabetes or
10 even took Seroquel had hypertension?
11     (Pause.)
12     Q   And I'm not sure I saw a
13 reference --
14     A   It's not on my list of prior
15 medical history -- identified prior medical
16 history items.  Now, it doesn't mean it's not
17 in my medical summary.  Do you want me to
18 turn to that and --
19     Q   And my notes don't indicate that
20 it's anywhere in your report.
21     A   Okay.
22     Q   If you want to, I can --
23     A   If you -- I trust your -- that
24 you scanned it pretty thoroughly, so I'm

28

1  not worried about going back at the moment.
2  I didn't -- it may be something that we
3  didn't pick up on, in addition to the many
4  others.  There are other things we do have
5  that you haven't mentioned, but they're
6  not -- but I don't specifically show the
7  hypertension.
8      MR. SULLIVAN:  Let's mark that
9  as Exhibit 25, Richard.
10     (Whereupon, Deposition Exhibit No.
11 Deutsch-25, medical record for Ms. Guinn
12 January 17, 1991, was marked for
13 identification.)
14 BY MR. SULLIVAN:
15     Q   Here you go, Doctor.  This is a
16 medical record, Exhibit 25, for Miss Guinn,
17 from January 17, 1991, over 17 years ago; do
18 you see that?
19     A   Yes.
20     Q   With regard to hypertension,
21 I'll refer you to the last sentence of the
22 first paragraph.  It reads:  Other medical
23 problems include hypertension for which the
24 patient is taking Lasix and recently KCL; do

29

1  you see that?
2      (Pause.)
3      A   Yes.
4      Q   So, at least, according to this
5  medical record for Miss Guinn, she's had
6  hypertension for close to 20 years?
7      MR. BRUDNER:  Objection to form,
8  misstates the document.
9      THE WITNESS:  Well, it clearly
10 establishes that she has it in 1991.
11 Now, whether she came off of it, or
12 continued to have Lasix -- excuse me,
13 continued to have hypertension and
14 stay on medication for that 20 years,
15 this particular report doesn't
16 establish that, but it does establish
17 that she had it at that time.
18 BY MR. SULLIVAN:
19     Q   Okay.  Can we agree that Miss
20 Guinn had a family history of diabetes as
21 well as hypertension?
22     A   I believe that is correct.  I
23 think that I had an understanding of that.
24     Q   And, lastly, can we agree that

30

1    she lived a -- I could call it a sedentary
2    life style, but either that, or that she
3    certainly wasn't in a regular exercise
4    regimen?
5         A  Yes.
6         MR. BRUDNER:  Objection, form.
7    BY MR. SULLIVAN:
8         Q   Now, you mentioned that there
9    are other preexisting risk factors or
10   morbidities that she had that are listed in
11   your report.  What are those?
12        A  I didn't -- actually, I didn't
13   say that there were other preexisting risk
14   factors.  I said there were other preexisting
15   medical conditions that we haven't
16   specifically mentioned.  Her -- her
17   neurofibroma; her history of two
18   laminectomies; removal of a small tumor in
19   the spinal cord in 2006; her total knee
20   replacement in 2007, although she reports
21   with a good recovery.  Her left shoulder
22   pain; a fractured right hip and right femur
23   with surgical repair with plate; the
24   hysterectomy in 1988; gallbladder removed in

31

1    2003; and then we've already talked about the
2    psychiatric care.
3         Now, those don't specifically
4    relate to the -- directly to diabetes, but
5    they do, I think, impact the sedentary
6    lifestyle, which has an indirect relationship
7    then to the issues that you're raising.
8         Q   Okay.  Let me try to summarize
9    as best as I can, and you can let me know
10   whether you agree.
11        We've gone through what we
12   considered to be preexisting conditions, and
13   we found mental health problems, including
14   depression, bipolar disorder and
15   schizophrenia.  We found obesity.  We found
16   heavy smoking.  We found hyperlipidemia.  We
17   found hyperglycemia.  And we have now noticed
18   at least two fasting glucose levels within
19   the prediabetic range that's set out in your
20   clinical guidelines.
21        We found that she does not
22   exercise; that she had a history of diabetes
23   at least as diagnosed in -- or at least as
24   shown in her medical records in 1991, and

32

1    that she had a family history of diabetes and
2    hypertension.
3         Can we agree on that?
4         A  Yes.
5         MR. BRUDNER:  Objection, form.
6    BY MR. SULLIVAN:
7         Q   And that those risk factors or
8    conditions preexisted her onset of diabetes,
9    correct?
10        A  Yes.
11        Q   Okay.  Is it fair to say that
12   Miss Guinn, at that point before she had
13   diabetes, could have benefited from seeing a
14   nutritionist?
15        A  I don't think there's any
16   question.  She certainly could have benefited
17   from a weight loss program.  She certainly
18   could have benefited, I think, from a good
19   nutritional program, so a nutritionist
20   outlining that program would have been --
21   would have been beneficial.
22        MR. SULLIVAN:  Let me mark this
23   as 26, Richard.
24        (Whereupon, Deposition Exhibit No.

33

1    Deutsch-26, American Diabetes
2    Association statement, was marked for
3    identification.)
4    BY MR. SULLIVAN:
5         Q   There you go, Doctor.  This is
6    something that I found on my own.  It's
7    entitled, the diagnosis and classification of
8    diabetes mellitus.  It's a position statement
9    from the American Diabetes Association from
10   January of this year; do you see that?
11        A  Yes.
12        Q   Did your office do ... any
13   research into diagnosis or treatment of
14   diabetes through the American Diabetes
15   Association?
16        A  We went to their web site and
17   did pull some materials from their web site,
18   yes.
19        I don't know if we had this
20   specific article.  I don't think we included
21   it in our list of articles.
22        Q   Do you have an understanding of
23   what a position statement is from the
24   American Diabetes Association?

34

```
1        A   I understand what a position
2    statement is, yes.
3        Q   What's your understanding?
4        A   Well, just as position
5    statements, we've actually made, from time to
6    time, on specific topics in life-care
7    planning.  A position statement is when a
8    group of individuals, professionals in a
9    given field identified as leading researchers
10   or leaders in a given topic within that
11   field, come together, carefully consider the
12   topic or position that's being addressed,
13   reach a consensus, and then issue a position
14   paper regarding that consensus and issue that
15   as the position that, in this instance, the
16   American Diabetes Association, takes on as
17   their current position in this case on the
18   diagnosis and classification of diabetes
19   mellitus.
20       Q   Would you consider the position
21   of the American Diabetes Association to be
22   relevant to your review of clinical
23   guidelines and treatment of diabetes?
24       A   Well, I certainly think so.
```

35

```
1        Q   Okay.  Take a look at the
2    second-to-last page of Exhibit 26.  You'll
3    see that, in the left-hand column, there's a
4    section beginning with the title:  Impaired
5    glucose tolerance and impaired fasting
6    glucose; do you see that?
7        A   Yes.
8        Q   And the column rolls over to the
9    second column, and if you note, the first
10   full paragraph on the second column it says
11   that impaired fasting glucose or impaired
12   glucose tolerance are synonymous with
13   prediabetes; do you see that?
14       A   Yes.
15           MR. BRUDNER:  Objection, form.
16           MR. SULLIVAN:  What's the
17   objection?
18           MR. BRUDNER:  Doesn't say that
19   they're synonymous.
20   BY MR. SULLIVAN:
21       Q   Okay.  Let's use the exact
22   terms.  I understand the objection.
23           Would you agree that they are
24   referred to -- that people who have impaired
```

36

```
1    fasting glucose or impaired glucose tolerance
2    are referred to as having prediabetes?
3        A   Yes.
4        Q   Okay.  Take a look a little
5    further down, I'd say about two-thirds of the
6    way down that very paragraph, there's a
7    sentence that begins:  It is worth mentioning
8    that medical nutrition therapy and the
9    producing five to 10 percent loss of body
10   weight, exercise, and certain pharmacological
11   agents have been variably demonstrated to
12   prevent or delay the development of diabetes
13   in people with IGT.  The potential impact of
14   such interventions to reduce cardiovascular
15   risk has not been examined to date; do you
16   see that?
17       A   Yes.
18       Q   Do you understand that sentence
19   to be discussing nutritional therapy and
20   possibly a pharmacological therapy for people
21   with prediabetes?
22       A   Yes.
23       Q   Is that information that you
24   believe is relevant to your decision on
```

37

```
1    treatment, your decisions regarding treatment
2    guidelines in these cases?
3        A   Well, I certainly think it's
4    relevant.  Of course, keep in mind that --
5    that I'm not dealing with the issue of
6    causation, nor am I -- I'm dealing with what
7    I see now.
8            I think your question, though,
9    is relevant in that it's asking, given that
10   we looked at these individuals prior to the
11   onset of diabetes, would a nutritionist
12   potentially have been beneficial in helping
13   stave off risk factors for diabetes.  And the
14   answer is ... it may well have been.
15           There's another issue regarding
16   ideology in this case that I'm not here to
17   address.  So, on one hand, I think that
18   anything you can do to reduce risk factors,
19   such as a nutritionist pre, clearly would
20   have been relevant.  I don't disagree with
21   that.  Whether or not any other etiology may
22   have interfered with the success of that,
23   though, I'm not here to answer.
24       Q   Let me try to show you where I'm
```

10 (Pages 34 to 37)

38

1  going with this. If you take a look at your
2  report for Miss Guinn on page 26, you'll see
3  that you recommend nutritional evaluation one
4  time per year, according to clinical
5  guidelines --
6      A  Absolutely.
7      Q  -- correct?
8      A  Yes.
9      Q  So that's your recommendation,
10 correct?
11     A  Yes.
12     Q  Do you make any reference to a
13 doctor making that recommendation, in your
14 report?
15     A  I don't recall that I did, no.
16     Q  Okay. So, is it fair to say
17 that whatever nutrition, whatever benefit
18 Miss Guinn would have had, or can have now,
19 due to nutritional evaluation, she also could
20 have had a benefit before she got diabetes;
21 is that fair to say?
22         MR. BRUDNER: Objection, form.
23         THE WITNESS: I think it's fair
24 to say, although I kind of answered

39

1  that a moment ago when I said, the
2  only question is whether there would
3  have been any other intervening
4  variable that might have impacted
5  that benefit. And that I'm not here
6  to answer. I can't say.
7      So, the bottom line answer to
8  your question is: Yes, I think that
9  nutritional counseling would have had
10 a benefit before. I don't disagree
11 with that at all. There's just a
12 separate issue that I can't answer,
13 and so I'm going to have to leave it
14 from my perspective of giving you a
15 yes.
16     MR. SULLIVAN: Could you read
17 that question back again, please?
18     THE WITNESS: It was a yes, with
19 some qualification, but you got a
20 yes.
21     COURT REPORTER: Question:
22 "Okay. So, is it fair to say that
23 whatever nutrition, whatever benefit
24 Miss Guinn would have had, or can

40

1      have now, due to nutritional
2      evaluation, she also could have a
3      benefit before she got diabetes; is
4      that fair to say?"
5  BY MR. SULLIVAN:
6      Q  If you take a look on page 26 in
7  your report, just below your nutritional
8  evaluation --
9      A  Let me go to it. Oh, wrong ...
10        Okay. Go ahead, I'm sorry.
11     Q  Just below the recommendation
12 for nutritional evaluation, you make
13 therapeutic modalities recommendations,
14 correct?
15     A  Yes.
16     Q  The first one has to do with
17 individual counseling. And is it fair to say
18 that, with that example or with that
19 particular recommendation, you're not adding
20 cost to your plan because it's something that
21 the patient already was undergoing and was
22 benefiting from?
23     A  Yes. Or if she wasn't
24 undergoing it, she needed it.

41

1      Q  Right.
2      A  So, in either case, it doesn't
3  belong as part of a new ... cost. What I'm
4  simply emphasizing is, she still needs it.
5  It just shouldn't add cost to the plan.
6      Q  Isn't it the same with
7  nutritional counseling, that Miss Guinn
8  needed it before she had diabetes, and she
9  needs it now, and it should not be an
10 additional cost in this plan?
11        Go ahead.
12     A  The -- the difference for me in
13 that regard is an issue of etiology. If ...
14 if one ... my hesitation is 'cause I don't
15 know how far to go here.
16        If one assumes, assumes,
17 hypothetically, that the underlying etiology
18 of the ... diabetes is Seroquel, then it's
19 reasonable to add all of those items that are
20 necessary to treat the diabetes. If one
21 assumes that all of these comorbidities that
22 represented risk factors pre-onset would have
23 and, in fact, did lead to diabetes, unrelated
24 to any outside influence, then the answer is

11 (Pages 38 to 41)

42

1 true, not just for nutritional evaluation,
2 it's true for any of the recommendations for
3 treating diabetes. They all would have
4 preexisted -- been a preexisting need.
5 **Q   And, first of all, you're not**
6 **here to answer whether Seroquel caused**
7 **diabetes, right?**
8 A   That's why I was uncomfortable
9 with exactly where to go with that.
10 **Q   Whether or not it did, the fact**
11 **remains that before Miss Guinn had diabetes,**
12 **that she was obese; she had hyperlipidemia;**
13 **she had, years ago, been diagnosed with**
14 **hypertension; she had hyperglycemia, she had**
15 **prediabetes according to the guidelines that**
16 **you've used for your report.**
17 **And regardless of whether, later**
18 **on, someone wants to believe that Seroquel**
19 **caused her diabetes, at that point in time,**
20 **she needed nutritional evaluation; fair to**
21 **say?**
22 A   I think she would have benefited
23 from a nutritional evaluation, but whether
24 that alone would have solved the problem or

43

1 whether that, coupled with all of the other
2 recommendations on -- for management of
3 diabetes, would have really been what was
4 necessary, is really what comes into
5 question.
6 But there's no question, I will
7 agree with you, I think trying to give her
8 nutritional evaluation would have been
9 appropriate. The question really becomes,
10 considering the mental health problems,
11 considering the obesity, considering all of
12 the issues that you recommend -- or excuse
13 me -- that you mentioned -- not that you
14 recommended, I'm sorry -- but that you
15 mentioned, is clearly --
16 **Q   I'm not a doctor.**
17 A   No.  Well, you wouldn't have
18 recommended somebody have obesity and all of
19 those other comorbidities, so it had nothing
20 to do with you being a doctor.  It was simply
21 a slip of my tongue, and I apologize.
22 But considering all of the
23 comorbidities that you mentioned, the
24 question really becomes, you know, was such a

44

1 difficult patient and group of patients, if
2 we talk more generalities here, how much
3 would have any one recommendation like
4 nutritional counseling really have helped.
5 Would we have seen these patients take
6 advantage of -- of one single intervention
7 strategy.
8 So, would it have been of
9 benefit -- I think it would have been of
10 necessity.  Whether or not it would have been
11 a benefit is what is -- what I'm having a
12 hard time with.  It's one reason why you
13 asked about the case management and -- as
14 associated with a diabetic management
15 program, would you do this extensive diabetic
16 management program for the average diabetic
17 patient?
18 We have a lot of diabetic
19 management programs, styles or approaches
20 available today.  Will these patients benefit
21 from a simpler program?  And the answer is,
22 but for their mental health problems and
23 their significant comorbidities, the answer
24 is, you know -- you know ... they probably

45

1 could deal with a lot less significant a
2 management program.  It's because of their
3 mental health problems, it's because of their
4 comorbidities, it's because of their long
5 history of -- of poor self compliance with
6 care, that they need such an intensive
7 management style.  So, unfortunately, you
8 take the patient as you find them.
9 **Q   And you have all of those**
10 **complexities with Miss Guinn right now, and**
11 **yet you've recommended nutritional**
12 **counseling; isn't that right?**
13 A   Well, as part of an overall
14 program, that's actually true.
15 **Q   She had all those complexities**
16 **back before she had diabetes, save the**
17 **existing diabetes, correct?**
18 A   But now we have it as part of a
19 program integrated and overseen -- integrated
20 by and overseen by this case management
21 effort, and so it's integrated into a
22 diabetic management program.  That's the
23 difference.
24 **Q   And you believe --**

46

1   A   It's not something done
2   independently.
3   Q   You believe that the nutritional
4   evaluation is more effective, or would have
5   been more effective -- nutritional
6   counseling, I should say -- with case
7   management overseeing it in this particular
8   patient?
9   A   I don't think there's any
10   question.  But before, you would have had
11   just -- you had a tougher time ... trying to
12   pull that together without a focus on
13   something like diabetes.  I mean, the fact
14   is, how you would have gotten case management
15   organized and -- and funded; how you would
16   have pulled all of that together is a little
17   bit more difficult to see.
18        But there's no question that ...
19   you know, with -- with the history that you
20   had before, these were patients who were
21   increasingly at risk.
22   Q   We just read the ADA's position
23   statement from this year saying that
24   prediabetics will benefit from medical

47

1   nutrition as well as some forms of
2   pharmacological treatment, correct?
3   A   Yes.
4   Q   That's something you would have
5   taken into account if Miss Guinn came to you
6   as a prediabetic; isn't that fair to say?
7   A   That's true.
8   Q   Would you have just ordered that
9   she -- or recommended that she get no such
10   treatment?
11   A   Oh, absolutely not.  Of course,
12   typically, somebody doesn't come to me with
13   nothing but prediabetes.
14   Q   Or, typically nobody comes to
15   you with nothing but diabetes, correct?
16   A   That's true.  Usually, I'm going
17   to have that whole constellation of --
18   Q   So we're in the same area.
19   A   -- of symptoms.
20   Q   Where it's an atypical area
21   where someone either comes to you with just
22   diabetes or just prediabetes.  And I'm saying
23   that, in that situation where someone comes
24   to you with just diabetes and you've read

48

1   what the ADA position statement has to say
2   about it, along with all her other
3   comorbidities, you wouldn't simply not
4   recommend that she have nutritional
5   counseling, would you?
6       MR. BRUDNER:  Objection, form.
7       THE WITNESS:  I would never
8   recommend that she not have
9   nutritional counseling.  And, of
10   course, you know, it's not that I
11   haven't ever -- I have family members
12   that have juvenile diabetic as a
13   family member.  I have diabetes as
14   family members.  I have a daughter
15   with -- with both diabetes and then
16   more severe gestational diabetes
17   right now.
18   BY MR. SULLIVAN:
19   Q   So you understand it's important
20   to try to stave off diabetes when someone's
21   in a prediabetic state?
22   A   There's no question.  And I have
23   plenty of diabetic conditions associated with
24   disability that we work with on a daily

49

1   basis.  It's just that you don't typically
2   see someone come to me only from a diabetic
3   condition, unless the diabetic condition has
4   resulted in amputations or significant
5   complications from the diabetes, then we see
6   them all the time.
7   Q   We agree that from the moment
8   you served your report to when we sat down
9   here, this is an unusual situation for your
10   practice?
11   A   Right.
12   Q   I don't -- I think, therefore,
13   that the discussion of prediabetes -- and
14   it's in the same bucket, it's an unusual
15   situation --
16       MR. BRUDNER:  Objection, form.
17   BY MR. SULLIVAN:
18   Q   -- correct?
19   A   What's not unusual here is the
20   fact that you're not just seeing diabetes
21   here.  You're seeing patients who have
22   significant preexisting histories with a lot
23   of mental health, a lot of comorbidities, and
24   then the diabetes, and that's not so

50

1  atypical.
2      Q   Right.  If you change what you
3  just said and insert it with, "and then" the
4  prediabetes, we have Miss Guinn before she
5  got diabetes, and having read the ADA
6  position statement, you wouldn't have let her
7  leave your office with a report without
8  recommending nutritional evaluation, correct?
9          MR. BRUDNER:  Objection, form.
10         THE WITNESS:  I don't think
11     that's incorrect at all.  I just
12     would have said exactly what I said
13     to you.  I would have expressed
14     concern as to whether or not she
15     would have, in the end, benefited
16     from the nutrition.
17         I think, probably, I would have
18     started out by calling whoever was
19     her counselor at that time and worked
20     with her counselor to try and keep
21     her on track with the nutritionist,
22     because the nutritionist alone
23     probably would not have had much luck
24     in gaining self compliance without

51

1      the support of whoever her counselor
2      was.
3  BY MR. SULLIVAN:
4      Q   And another option available to
5  you then, when she was in -- when she had
6  prediabetes before she was diagnosed with
7  diabetes, would have also been to recommend
8  for her case management; isn't that fair to
9  say?
10         MR. BRUDNER:  Objection, form.
11         THE WITNESS:  It may well have
12     been an option, but ... it probably
13     would have been pretty difficult to
14     get case management for prediabetes
15     and nutrition.  We would have had to
16     try and bring in all of the other
17     issues, the mental health issues, the
18     other -- the other ... comorbidities
19     that we've talked about, to get
20     justification for support of case
21     management.
22         Whereas, with diabetes as a
23     diagnosis, you've got a situation
24     that has the potential to lead to

52

1      more serious risk factors, and so you
2      can get justification off of diabetes
3      alone.  But without it, just the
4      prediabetes, I think it would be
5      difficult.  But if you brought in all
6      of the other factors, the
7      justification may well be there.
8  BY MR. SULLIVAN:
9      Q   And when you say, to get
10 justification, are you referring to
11 generally ... are you referring --
12     A   It's a hard word to say, isn't
13 it?
14     Q   I'll take it.  When you say, to
15 get justification, you're referring to
16 insurance companies, aren't you?
17     A   Or any other source of funding,
18 however we get it funded in our world as case
19 managers and -- and life-care planners,
20 there's a variety of ways to accomplish that,
21 and --
22     Q   I'm sure that's a big part of
23 your job, isn't it?
24     A   And it is a big part, but we

53

1  have to have -- we have to have the right
2  wording and the right justification.
3      Q   Well, and I want to get to that.
4  For this question I want to separate out the
5  insurers or the payors for the case
6  management and the nutritional evaluation and
7  just ask for your opinion.
8      A   Okay.
9      Q   If Miss Guinn had come to you
10 before she had diabetes, with all the risk
11 factors that we just discussed, is it fair to
12 say you wouldn't have -- you wouldn't have
13 let her leave your office, setting aside the
14 insurers, without giving her nutritional
15 counseling or recommending nutritional
16 counseling and some form of case management?
17     A   Well, I think that's fair to
18 say.  Knowing all we know, I would have had
19 to have a doctor say, she's either
20 prediabetic, or if I suspected it in the lab
21 tests, I would have had -- I would have gone
22 back to the doctor, because even outside the
23 forensic or litigation world, there's certain
24 things I have to have justified, I have to

14 (Pages 50 to 53)

54

1  have medical foundation for.  I can't just go
2  off on my own.  But as a case manager, there
3  are things that I am able to do that a
4  non-board-certified case manager is not going
5  to be able to do.
6        But once I have that, I've
7  talked to the primary care doctor or the
8  endocrinologist, then I would, I think, try
9  and coordinate the various types of levels of
10 care or her mental healthcare, her
11 endocrinology and PCP, primary care -- excuse
12 me.  Sorry.
13       **Q   I'm interested to see whether**
14 **you succeed.**
15       A   It's backing up, but it'll come
16 shortly.
17       **Q   There's a lot of tension.**
18       A   It does.  Sorry about that.
19 It'll come in a minute.
20       But, in any instance, I would
21 have definitely, you know, tried to
22 coordinate all of that in a plan that made
23 sense, hopefully, at that point, to avoid
24 the, what then would have been potential risk

55

1  factors for diabetes.  Whether that would
2  have succeeded or not, I can't say, but
3  that's obviously the goal always is to reduce
4  risk factors for further problems down the
5  road.
6        **Q   Promised I'd get to the**
7  **insurance company, I'll do that after this**
8  **next question, or next set of questions.**
9        **What methodology, if any, did**
10 **you employ to distinguish in the costs that**
11 **you recommend here for nutritional counseling**
12 **and case management, the cost that would have**
13 **been ... charged for case management or a**
14 **nutritional evaluation for Miss Guinn before**
15 **she got diabetes as opposed to the costs for**
16 **nutritional counseling and evaluation and**
17 **case management now that she has -- as you**
18 **recommend now that she has diabetes?**
19       A   There -- there is no
20 distinction.  The case management slash
21 diabetes management program and the
22 nutritional evaluation is all based on the
23 diabetes diagnosis post onset of diabetes,
24 and did not assume, as the individual

56

1  counseling did, and as several other areas
2  did, that she would have required it in any
3  instance.
4        The solution to that on the
5  stand is to simply ask, hypothetically, if
6  you assume the onset of nutritional
7  evaluation premorbidly -- pre-onset, would
8  there be any difference in cost?
9        Probably, the simple answer to
10 that is, no.  Because where it gets complex
11 is saying, well, if you assume she had it in
12 2000 ... or in 1997, or ... and move forward,
13 you get into the very complex issues of -- of
14 what did it cost in '97, and then start
15 having the economist move it forward.  And
16 I'm not sure that even matters, comparing --
17 trying to compare those cost differentials.
18       I think the bottom-line answer
19 is, if it had worked, if you had applied it
20 in 1997 or in 2000, and you were successful
21 in applying it, you controlled diet, and you
22 were successful in controlling obesity, the
23 question becomes ... even with the onset of
24 diabetes, even if you assume the onset of

57

1  diabetes, subsequently, if obesity were under
2  control, and she was following that
3  nutritional plan, would you still then need a
4  nutritionist now, and the answer, I think,
5  would be, no.
6        **Q   And I've seen in your web site,**
7  **and maybe it was in some of your writings,**
8  **that as a life-care planner you should assume**
9  **the success of your recommendations, is that**
10 **a tenet that you preach?**
11       A   Absolutely.  Why would you put
12 into a plan a recommendation that you thought
13 was going to fail?
14       **Q   So, is it fair to say that if**
15 **your recommendations work, and if the**
16 **nutritional counseling and evaluation and the**
17 **case management work, and you assume -- in**
18 **other words, you assume the success of those,**
19 **it's very possible and probably likely that**
20 **Miss Guinn will not need those two things for**
21 **the rest of her life.  Fair to say?**
22       **MR. BRUDNER:**  Objection, form.
23       **THE WITNESS:**  Well, that you
24       might have to ask ... the

58

1    endocrinologist.  What I can -- what
2    I ... feel comfortable in saying is
3    that my purpose in recommending them
4    is to bring stability to her -- her
5    diabetic management, and
6    significantly reduce the risk factors
7    for complications from diabetes.
8         But I'll leave it up to an
9    endocrinologist to say whether she --
10   she or any of these other patients
11   have a reasonable probability of
12   coming out of diabetes.
13   BY MR. SULLIVAN:
14        Q   There's no endocrinologist who
15   recommended this nutritional evaluation and
16   case management; that's your recommendation,
17   correct?
18        A   That's true.  But that's not
19   what I just said.  You want me to repeat what
20   I just said one more time?
21        Q   No.  Whether or not she will
22   continue to need the things that only you
23   recommended, nutritional evaluation and case
24   management, is up to you, correct?

59

1    A   Right.
2    Q   That's your opinion, correct?
3    A   But let me ... but based on the
4    question that you asked, what I said was ...
5    the purpose of using nutrition and diabetic
6    management programs is to maintain stability
7    in the diabetes for reduction of any risk
8    factors for complications.  So, as long as
9    she has diabetes, or any of these others have
10   diabetes, the goal is to keep them stable
11   with their diabetic condition and avoid risk
12   factors.
13        For a lot of patients, I would
14   agree with you, for patients who have the
15   kind of mental health history, obesity,
16   smoking, all these other comorbidities that
17   they have not had under control and are poor
18   patients for keeping these things under
19   control, I believe the kind of management
20   support they need is really designed to
21   stable -- keep the diabetes stable and avoid
22   the much more significant risk factors that
23   diabetes can lead to.
24        And I think we could be very

60

1    successful in that, which really are where
2    the high cost, statistically, of diabetes
3    lies, not in the basic management of
4    diabetes, but in the risk factors.  And
5    that's what you want to avoid.  And I think
6    that's quite possible.
7         The problems I think in diabetes
8    come with either noncompliant patients or
9    patients who are, because of other
10   comorbidities, are very poor candidates for
11   being compliant, not because they're being
12   difficult, but because they legitimately have
13   problems that make them poor candidates for
14   managing their own diabetic condition.  And
15   that's why I have it there.
16        Q   So they're more likely to need
17   ongoing management when -- a patient like
18   Miss Guinn is more likely to need ongoing
19   management because of her mental conditions?
20        A   Her mental conditions are the
21   number one reason.  I think that she shows
22   that with all of her past histories.
23        Q   If -- and we'll get into a
24   hypothetical range here.

61

1         If Miss Guinn had case
2    management, significant amount of case
3    management like you recommend here in your
4    report, before she had diabetes, and was
5    undergoing ongoing nutritional evaluations
6    before her diabetes, and she came in here and
7    you reviewed her case and you recommended
8    what you recommend here, case management,
9    nutritional evaluation, is it fair to say
10   that you would list no additional cost in
11   your report because she was already
12   undergoing those things, just as you did with
13   the mental health counseling?
14        MR. BRUDNER:  Objection, form.
15        THE WITNESS:  I'm sorry to keep
16   doing that to you.
17        I believe that ... you would
18   have at least added the diabetic
19   management portion of the program,
20   assuming that you -- let me take a
21   step back.
22        If you were not able to stave
23   off the diabetes -- you know,
24   hopefully you were -- with really

16 (Pages 58 to 61)

62

1  good management, good nutritional
2  support, weight reduction, hopefully
3  a cessation of smoking program, some
4  of these other things, the ... the
5  goal obviously would have been to
6  work toward reducing the risk factors
7  for diabetes.
8      But depending upon the etiology
9  of the diabetes, then the question
10  becomes, what do you do if the
11  diabetes occurs?  And so we would
12  have had additional costs, but if we
13  already had case management in there,
14  then, obviously, the cost of an
15  additional diabetic program,
16  management program, would not have
17  been the same.
18  BY MR. SULLIVAN:
19  Q   I think I'm with you.  The case
20  management program that you had Miss Guinn --
21  or you're recommending for Miss Guinn here,
22  addresses a lot of the preexisting risk
23  factors she has but, in addition, it's
24  intended to address the diabetes that she now

63

1  has and how to deal with that, correct?
2  A   I think we're on the same page
3  there.  The different direction we might have
4  is that I see it as addressing it because you
5  take the patient as you see them; whereas
6  you, I think, maybe feeling that we're
7  addressing ... preexisting comorbidities
8  and -- and ... and mental health problems
9  that are unrelated, I see them as making the
10  management of diabetes far more difficult,
11  and that's the nature of the patient we're
12  dealing with.  So it becomes part of the
13  problem.  Although, to me, that's not an
14  issue for me to answer.  It's just I'm making
15  the recommendation 'cause I have to deal with
16  that whole patient, and a jury is going to
17  have to decide whether it's apportioned or
18  not.
19  Q   And let me try to break it down
20  so maybe a jury can understand what we just
21  discussed.
22  A   And as soon as you break it
23  down, if I could take a short break to ...
24  Q   Absolutely.

64

1  A   -- take care of the tea I've
2  been drinking.
3  Q   In the hypothetical I just gave
4  you, where Miss Guinn had nutritional
5  evaluation and case management for all these
6  comorbidities before she had diabetes, and
7  then you recommend after diabetes, the case
8  management and nutritional evaluation that
9  you do in your report, the difference in the
10  case manage -- the difference in cost, the
11  difference in the case manage -- would come
12  from the case management end of it, where
13  there would be -- where the management would
14  address the existence of the diabetes, that
15  incremental difference, however big it is,
16  for the existence of the diabetes, otherwise
17  they're fairly similar?
18      MR. BRUDNER:  Objection, form.
19      THE WITNESS:  Right.
20      MR. SULLIVAN:  Okay.
21      THE WITNESS:  I'll just be a
22  second.
23      (Recess taken from 10:13 a.m. to
24  10:20 a.m.)

65

1      MR. SULLIVAN:  Dr. Deutsch is
2  going to put on the record some of
3  the documents that -- the medical
4  records that I showed him last week.
5  Since it's unclear at this moment
6  whether they were actually marked as
7  exhibits, after the deposition we'll
8  check, and if they weren't, we'll
9  mark them after the deposition.
10      THE WITNESS:  Okay.  The first
11  was a January 5, 2003 record, Tampa
12  General Hospital admission report
13  showing ... Miss -- showing ...
14  BY MR. SULLIVAN:
15  Q   Miss Curley?
16  A   -- Miss Curley, I'm sorry --
17  Miss Curley's record, weight of 144 pounds.
18      A July 22, 1998 neurological
19  evaluation showing a height of four foot,
20  11 inches, and a weight of 100 pounds.
21      A June 2, 2000 Tampa health
22  center record, showing a weight of
23  118 pounds.
24      A June 20, 2001 Tampa General

17 (Pages 62 to 65)

66

1   Hospital record that showed a weight of 129
2   pounds.
3           A 1/21/2000 SmithKline Labs
4   blood test showing ... what's that, 133 --
5       Q   It's going to be a glucose
6   level.
7       A   Must have been a glucose level
8   in her blood, on her blood test, showing
9   hyperglycemia.
10          And then a 5/15/06 dental record
11  from Dr. Shama, DPM, showing a family history
12  of diabetes and migraine headaches.  For a
13  total of ... six separate records.
14      Q   Okay.  Thank you for doing that,
15  Doctor.
16      A   Sure.
17      Q   Perfect timing.
18      A   These are the two items you
19  requested that went to two different
20  locations; one directly to CCMC, to be
21  forwarded on to their new management company
22  in New Jersey.  So went through Minnesota to
23  be forwarded to New Jersey.  Really kind of
24  crazy the way it's working right at the

67

1   moment.
2           And then one that went directly
3   to the chair of the Ethics Committee, care of
4   one of the management people at the new New
5   Jersey management company.
6           I don't know if you want to --
7   how you want mark those -- in reference to
8   the issue you raised of my missed -- my
9   missing my ... 5/31/08 filing for the dues
10  and update of my credential for CCM, which
11  prior to that, I held for 34 straight years
12  without managing to miss it.
13          (Pause.)
14      MR. SULLIVAN:  Okay, Richard
15  we'll mark as Exhibit 27 -- you have
16  26 over there, I think.  The
17  guidelines?
18      THE WITNESS:  Oh, yes.
19  BY MR. SULLIVAN:
20      Q   A letter dated October 6, 2008,
21  from Dr. Deutsch to Lou Veerling [ph] at --
22      UNIDENTIFIED:  I'm going to get
23  a copy of this.
24

68

1       MR. SULLIVAN:  The chair of the
2   CCM Ethics Committee.
3           And Exhibit 28 is another letter
4   from Dr. Deutsch to Melissa McElroy
5   at CCMC, enclosing information
6   regarding getting himself
7   recertified.
8           (Whereupon, Deposition Exhibit No.
9   Deutsch-27, Dr. Deutsch letter, 10/6/08,
10  was marked for identification.)
11          (Whereupon, Deposition Exhibit No.
12  Deutsch-28, letter to Ms. McElroy,
13  was marked for identification.)
14  BY MR. SULLIVAN:
15      Q   On Exhibit 27, your letter to
16  Mr. Veerling -- do you know him?
17      A   Yes.
18      Q   How long have you known him?
19      A   Actually, I worked a lot with
20  his wife before she passed away last year.  I
21  don't know Lou quite as well, except through
22  her.  He's a vocational rehabilitation
23  counselor and case manager.  But she was a
24  life-care planner, an R.N., so I've known him

69

1   through her ever since they got married.  I
2   knew her before they got married and so
3   probably known him ... I think they got
4   married about maybe seven to eight years ago.
5   She passed away last year.  So I probably
6   have known him at least seven or eight years.
7   And he did contribute a chapter on Americans
8   with Disabilities Act to one of my texts.
9       Q   Is he a friend?
10      A   He's a colleague.  I haven't
11  socialized with him, but I would certainly
12  consider him a colleague.
13      Q   Have you socialized -- did you
14  socialize with him and his wife when she was
15  around?
16      A   Well, they live in Des Moines,
17  Iowa, so there was never really an
18  opportunity to socialize.  I mean, I think
19  once or twice, at the international symposium
20  on life-care planning, we probably went out
21  to dinner together, but in terms of any
22  ongoing, regular socialization, there really
23  was never an opportunity.  I certainly would
24  have, but there just was never really an

18 (Pages 66 to 69)

70

1    opportunity because we were so far apart.
2        **Q    Okay.**
3        A    But I did go to the funeral.  I
4    did ... you know, I felt very close to Patty,
5    and Patty was a significant loss to the
6    field, and he knows that.  There is a Patty
7    McCollom Memorial Research Award at the
8    Foundation for Life-Care Planning Research.
9    And -- you know, and I do consider him an
10   important colleague in the field.  Even
11   though he's not a life care planner, he's a
12   well known vocational rehabilitation
13   counselor.
14       **Q    I promise you I'd get back to**
15   **the insurance companies.**
16       **In Miss Guinn's report, you**
17   **recommend two to four hours per month of case**
18   **management equaling 24 to 48 hours per year.**
19       **Have you ever had to justify**
20   **that amount of case management for diabetes**
21   **to a third-party payor, including an**
22   **insurance company?**
23       A    Just for diabetes?  Well, of
24   course, I'm not justifying it just for

71

1    diabetes here.  So -- and I don't know that I
2    have ever recommended it just for diabetes.
3    You're recommending it for the totality of
4    what's going on with this patient here, and
5    I'm perfectly comfortable with recommending
6    it for the totality of the issues that are
7    involved.
8        But the question you're asking
9    is more just for diabetes, and I'd have to
10   answer, no, in relation to that.  Am I not
11   correct?  You're asking just for diabetes?
12       **Q    Well, I'm thinking about your**
13   **answer.**
14       (Pause.)
15       **Q    If you're not recommending this,**
16   **just the case management just for diabetes,**
17   **why, in your report, haven't you allocated**
18   **the cost or expense only related to diabetes**
19   **as opposed to giving the complete cost?**
20       A    Well, I ... I really do feel
21   like I've answered this, but let me give it
22   one more stab because it's going to come up
23   in every single one of these cases, and I
24   hate to answer it five more times, although I

72

1    guess that's probably the reality.  Because
2    you have to face the patient that you're
3    working with.
4        I mean, the totality of the
5    problems and the real problem with management
6    of diabetes for these patients is not just
7    the diabetes.  It's the ability of these
8    patients to comply with self management.  And
9    that ability is significantly impacted by
10   their mental health problems and their other
11   comorbidities.  Their mental health problems
12   and their other comorbidities makes the
13   existence of diabetes much worse.  The
14   diabetes itself makes a lot of their other
15   comorbidities that much worse, and so I have
16   to deal in designing a plan with the totality
17   of those problems and how they interact.
18       I'm not going to predict
19   complications.  That's not appropriate.  But
20   what I have to do is try and reduce the risk
21   factors for those complications and that's
22   what we do in designing a plan.
23       But I have to confront how
24   difficult this group of patients are, even

73

1    with all of their prior histories, and maybe
2    especially, I should say, with all of their
3    prior history.
4        And that's the reason why I've
5    made the recommendation for the nutrition,
6    the case management, and it's a case
7    management slash diabetes program, diabetes
8    management program, that simply wouldn't be
9    there, quite bluntly, in the same fashion, if
10   you had the average fully functional patient
11   who just happened to have diabetes, but
12   otherwise was fully employed, well educated,
13   had no mental health problems, was fully
14   compliant with self care, you'd give them a
15   program of education, you'd get them started
16   in management.
17       Even ongoing management that a
18   lot of the health insurance carriers used
19   post education on diabetes, would largely
20   come from having a nurse contact them once or
21   twice a month and oversee it largely by
22   telephone.  You -- you would -- which would
23   never work with the kinds of patients we're
24   dealing with here who would just blow that

19 (Pages 70 to 73)

74

1  off.
2      (Pause.)
3      **Q    Do you rely on any scholarly**
4  **source for your opinion that there needs to**
5  **be different case management for a patient**
6  **with diabetes and mental health problems,**
7  **than for a patient -- for a patient without**
8  **the mental health problems who has diabetes?**
9      A   I don't know that anybody's
10  written specifically an article.  I guess I
11  have to say, no, there's nobody that I know
12  of that's written specifically an article
13  that says:  Look, we're going to study
14  patients with mental health and diabetes.  I
15  mean, there are certain things that we have
16  to recognize come from your experiences as a
17  case manager and life-care planner.
18      So, you know, I don't have a
19  separate scholarly source that's specific to
20  the issue of increasing ... disabilities,
21  increasing comorbidities, and the increasing
22  need for management.  It -- it's -- you know,
23  it's something that I think is inherent in
24  everything we do in case management to

75

1  understand that the greater the numbers and
2  complexities of problems, the more -- the
3  more ... skilled -- I think, number one, the
4  case manager needs to be, but also the more
5  important it is for the case manager to apply
6  the tools necessary to carefully organize the
7  work that we're doing, which is where life
8  care planning comes into play.
9      But in terms of a scholarly
10  work, one work I can point to that addresses
11  this issue and specifically makes the
12  statement, if you want to manage diabetes
13  when there are significant mental health
14  problems, here's how you have to address it,
15  no.  Even in my own work, over 30,000
16  published pages, I don't know that there's a
17  line that specifically addresses that topic.
18      **Q    What ... can you describe for me**
19  **what's going to happen -- what would happen**
20  **in these two to four hour visits per month**
21  **for case management?**
22      A   Well, I think what really I
23  would anticipate from the case manager, to
24  start with, is that they would, first and

76

1  foremost, working with the mental health
2  services, working with the diabetic education
3  program, working with the physicians who are
4  dealing with the other comorbidities, would
5  develop a plan, an integrated plan to address
6  all of the issues the individual had.
7      So if we have the need for
8  weight loss; if we have the need for a
9  smoking cessation program; if we have the
10  need for medication management; we have the
11  need for each specific step in diabetic
12  management, and we have specific steps in
13  psychological management, then we're going to
14  begin to integrate those.
15      We're going to work with the
16  psychologist, for example, who's providing
17  counseling to develop behavioral supports for
18  weight reduction, and to integrate whatever
19  they're being taught in -- in nutrition and
20  in weight reduction program into their home
21  environment, so that they're not just trying
22  to do this within the body of a program, but
23  they're getting support from family, they're
24  getting support in the home setting.

77

1      And same thing for the smoking
2  cessation program, we build a total
3  behavioral program that's supported by that
4  case manager.  The case manager should be
5  responsible for building a program that is
6  coordinated between the various individuals
7  working with the patient and integrated into
8  the home environment, not just handled at the
9  site of each individual program, so that she
10  goes to a weight program and then, boom,
11  that's it.  She leaves the weight reduction
12  program, and leaves all that information
13  behind, goes to a smoking cessation program
14  and leaves that behind.
15      You address each issue one at a
16  time, but you also then learn to integrate
17  what you -- what you've developed as
18  information in each of those programs, into
19  the natural environment, and you use a
20  behavioral program developed by the
21  psychologist to reinforce that in the natural
22  or home environment.
23      And the case manager becomes
24  critical to making sure that's integrated in

78

1  every other component of her life, and that
2  it's reinforced on a constant basis.
3       And so it's not just that she's
4  managing a diabetic program, but it's
5  recognizing that, to manage the diabetic
6  program, you're really managing every aspect,
7  because the diabetes is influenced by weight,
8  influenced by smoking, it's influenced by the
9  medications that she's taking.
10      So she really needs, or he
11  really needs, whoever that case manager is,
12  to understand every aspect of the drugs she's
13  taking, the -- if she's seeing an
14  endocrinologist and a primary care doc, and a
15  psychiatrist, that the psychiatrist needs to
16  be a really good psycho-pharmacologist who
17  understands the drug interaction effects of
18  how that's impacting the diabetes.
19      And all of that needs to be
20  coordinated by a solid case manager who then
21  integrates that plan and maintains it in the
22  natural environment.  That's what I see the
23  case manager doing.
24      Q   So the case manager will address

79

1  **mental health issues, as well as parts of**
2  **this plan?**
3       A   They have to.  There's no other
4  way you're going to manage that diabetes
5  program here, because that's really been the
6  problem with compliance with care for a lot
7  of these patients.
8       **Q   So the two to four hours of case**
9  **management every month is to address the**
10  **whole of the patient's ... medical and**
11  **psychological problems?**
12      A   Yes.  They're going to even
13  attend doctor's appointments.  They're going
14  to attend those initially.  They're going to
15  even attend programs with this patient so
16  that they're learning what those programs are
17  and assisting the other caregivers in
18  developing like the behavioral program, to
19  reinforce what they're learning in those
20  individual programs outside of those
21  programs, in the home environment.
22      It's not going to work
23  otherwise.  It's a waste of money to send
24  them to stop-smoking programs and obesity

80

1  programs for weight loss, and to a
2  nutritionist for counseling because, without
3  the support they need outside those programs,
4  they'll never carry that information outside
5  of those programs.
6       **Q   Have you ever successfully**
7  **justified a case management program like the**
8  **one you just described, to a third-party**
9  **payor, including an insurance company?**
10      A   Yes.  But unfortunately, it
11  comes after risk factors have developed, and
12  it's now -- we now have an amputation, or we
13  now have significant wound care problems, and
14  they realize they're going to shell out --
15  they are shelling out significant dollars.
16      Then they see case management as
17  inexpensive, and they'll pay for it outside
18  the normal policy, because normal policies
19  don't generally pick up case management.
20  Third-party payors pay for case management
21  all the time.  But they pay for it outside of
22  the normal policy coverage to save big
23  dollars within the policy, but they usually
24  won't do it until their policy is starting to

81

1  pay out so much that they recognize they want
2  to save dollars.
3       What's hard to get them to
4  justify -- although with the right adjusters
5  it works, but what's hard to get a lot of
6  them to see is that if we did it, if we
7  identified, like in cases of this nature,
8  high-risk patients, and you started to do
9  this before you had amputations, or you had
10  diabetic ulcerations, and you were dealing
11  with expensive wound care, and you could show
12  that -- and they believed you had the
13  potential to significantly reduce risk
14  factors, it would make a lot more sense.  But
15  I have to tell you that probably 99 percent
16  of the time the justification is ... post
17  onset of risk, not pre-onset of risk.
18      **Q   And the question I'm asking you**
19  **is about pre-onset.  Have you ever -- those**
20  **are the plans that we're dealing with here,**
21  **correct, in your reports?**
22      A   That's true.  But --
23      **Q   Have you ever justified -- been**
24  **able to successfully justify a case**

21 (Pages 78 to 81)

82

1  management plan like the ones here,
2  pre-onset, to a third-party payor, including
3  an insurance company?
4      MR. BRUDNER:  Objection, asked
5  and answered.
6      THE WITNESS:  It's happened but
7  it's probably one percent of the time
8  with -- with companies we have great
9  relationships with and who can, who
10  have had the experience of paying
11  very high costs, and have seen us
12  work successfully.
13      But -- and then they see this
14  increasing number of risks -- they
15  haven't had it yet, they haven't had
16  the payouts, but they see it coming,
17  and they want to stop it before it
18  happens.  But you're talking a very
19  small percentage.  It's pretty rare.
20      But, you know, you have to
21  understand, that's an insurance
22  company decision.  That doesn't
23  necessarily mean it's the right
24  decision.

83

1      And I know this isn't asked for,
2  but it is also -- there are also huge
3  differences between a third-party
4  health insurance company, what they
5  may decide to do and what an HMO
6  decides to do.
7      HMO's will hold back paying a
8  lot more than a third-party health
9  insurance company will, so what an
10  HMO decides to do doesn't make it
11  right.  And we see that when health
12  insurance companies pay, even though
13  an HMO doesn't.
14      So, the fact that ... a health
15  insurance company may not 99 percent
16  of the time versus one percent,
17  doesn't make it right, either.
18  BY MR. SULLIVAN:
19      Q   Have you ever successfully
20  justified to a third-party payor, including
21  an insurance company, two to four hours of
22  case management for diabetes alone?
23      A   I think we asked that, and I
24  said, no.

84

1      Q   The questions I have just asked
2  you about case management, you make the same
3  two to four hours per month recommendation in
4  I think just about every report.
5      Do your answers apply to all the
6  reports that you've issued here --
7      A   Yes.
8      Q   -- the reasons for, the basis
9  for your making that recommendation?
10      A   I apologize again for stepping
11  on you.
12      The answer is, yes.  And my
13  apology goes to the court reporter, as well.
14      THE WITNESS:  Does that mean we
15  could possibly get out a little
16  sooner?
17      He's not going to answer that.
18      MR. SULLIVAN:  I would love to,
19  Doctor.
20      THE WITNESS:  Well, I only said
21  that because we're two hours in, and
22  we've only gotten to one case, and
23  I'm worried that it's two hours per
24  case, we're not going to finish

85

1  today.
2      MR. SULLIVAN:  That makes five
3  of us.
4  BY MR. SULLIVAN:
5      Q   Okay.  Let's look at some of the
6  other recommendations you made on Miss Guinn.
7      Page 26, you recommend some
8  medical supplies.  What's your source --
9      A   Okay, wait a second, wait a
10  second.  Let me get -- first of all, let's
11  get --
12      (Pause.)
13      Q   Page 26 of your report for
14  Miss Guinn, you recommend, in the middle of
15  the page, medical supplies, and I'm asking
16  you, what's your source --
17      A   That's what she's actually using
18  for, as part of her diabetic testing.
19      Q   How do you know that?
20      A   Well, I went through with her
21  what she's actually ... using in terms of
22  number of lancets per month, the test strips,
23  the lancet devices, the tester that she's
24  using which -- and the alcohol wipes.

86

1    I mean, I just went through ...
2  those specifics.  I have to trust -- at some
3  point, you have to trust the accuracy of what
4  you're getting from the patient regarding the
5  numbers, but the best I can do is confirm ...
6  that with her, even though ... you know, in
7  addition to going over it with her at
8  evaluation, prior to the evaluation, I sent a
9  homework assignment to her home, so that she
10  would have all of that material with her at
11  the house.
12    And so that what you saw in the
13  composite that you got was handwritten notes
14  from her, in which she listed out exactly
15  what medications she was on.  So we got the
16  medications from her.  She listed out what
17  doctors she was seeing ... I'm not sure --
18    **Q    Let me just interrupt you,**
19  **Doctor.**
20    A    Go ahead.
21    **Q    Is the short answer to my**
22  **question that your source for the medical**
23  **supplies you're listing on page 26 of your**
24  **report, is Miss Guinn?**

87

1    A    Yeah.  Oh, absolutely.
2    Q    Okay.
3    A    And if it was wildly
4  inconsistent with what a typical diabetic
5  might use, I certainly would have tried to
6  find another way to verify.
7    **Q    What's an Ascensia lancet**
8  **device?**
9    A    The lancet is what she's using
10  to draw blood.
11    **Q    The Ascensia lancet device is**
12  **what she uses to draw blood?**
13    A    Right.
14    **Q    What's the distinction between**
15  **the Ascensia tester and the Ascensia test**
16  **strips?**
17    A    The strips are what you put the
18  blood on.  And it goes into the tester to
19  test -- to get a blood sugar level.
20    **Q    What's the difference between**
21  **the Ascensia lancet device and the lancets.**
22    **(Pause.)**
23    A    I'm sorry.  The lancets go into
24  the device.  It's like a spring loader.  So

88

1  the lancets go into the device, you pull the
2  trigger.
3    **Q    Okay.**
4    A    It shoots the lancet into the --
5  into a pre-measured distance, and so that,
6  you know, you just barely prick the finger or
7  you prick whatever area you're going to draw
8  the blood from, and you touch the test strip
9  to the blood.  The blood -- the strip goes
10  into the tester, and it gives you your blood
11  sugar reading.
12    **Q    A little further down at the**
13  **bottom of the page you mention health**
14  **strength maintenance recreation as an area of**
15  **recommendation; do you see that?**
16    A    Right.
17    **Q    You're not assessing any costs**
18  **for that?**
19    A    No.
20    **Q    Correct?**
21    A    Right.
22    **Q    Then we don't need to talk about**
23  **it.**
24    **Above that you list, medical**

89

1  **care.  And we talked about this last week in**
2  **connection with Miss Curley's report.**
3    **Medical care is an area where**
4  **you need a doctor's recommendation in order**
5  **to insert it in your report, correct?**
6    A    Correct.
7    **Q    It's not something you're**
8  **qualified to opine on, correct?**
9    A    Generally, I think that's true.
10  In this instance ... if I did not get a
11  specific recommendation back from
12  Miss Guinn's doctors, but I got
13  recommendations back from other
14  endocrinologists treating the others, then I
15  considered the clinical practice guidelines,
16  and I considered what all the other
17  endocrinologists and ... and primary-care
18  doctors said, and I considered how frequently
19  she was seeing her current treaters, and I
20  considered their reports, and used that as a
21  basis, because, in fact, her specific
22  physicians did not respond to my questions.
23    **Q    Let's take a look at the**
24  **responses and see what they did.**

23 (Pages 86 to 89)

90

1      MR. SULLIVAN:  I'll mark this as
2  the next exhibit.
3      (Whereupon, Deposition Exhibit No.
4  Deutsch-29, doctor responses to Dr.
5  Deutsch, was marked for identification.)
6  BY MR. SULLIVAN:
7      Q  Doctor, Exhibit 29 is my best
8  effort to staple together in one exhibit,
9  your letters to and responses from the
10  doctors who were treating Miss Guinn.
11      Take a quick look and see if I
12  came close to succeeding.
13      (Pause.)
14      A  I think you did.
15      Q  Okay.
16      A  Let's see if there's anybody
17  else, but I think you did.
18      No, you did.
19      Q  And I believe I've got in there
20  a letter to the ophthalmologist and a letter
21  to the endocrinologist; is that correct?
22      A  Yes.
23      Q  And you mentioned earlier that
24  you got no answer from either doctor?

91

1      A  That's correct.
2      Q  Isn't it true that you got an
3  answer from one doctor?
4      A  Well, not to my questions.  It
5  is true that ... Dr. T-H-R-U-V --
6      Q  Dr. Thruv.
7      A  Thruv -- how'd you pronounce it?
8      Q  Thruv.
9      A  Thruv?
10      Q  I'm not sure I'm right, but
11  that's what I'm going with.
12      A  Okay.  He -- he didn't actually
13  give us an answer in writing.  When we got
14  him by telephone on 7/25/08, he indicated
15  that he would have to do a reevaluation
16  of ... the patient because it had been too
17  long since he had last seen her, and ...
18  would not answer the questions until he had
19  an opportunity to do a re-eval.
20      Q  Do you believe that you are
21  better qualified to determine the number of
22  visits that Miss Guinn needs to make per year
23  to an endocrinologist and Dr. Thruv?
24      A  Certainly not.

92

1      Q  And so we're clear on the
2  record, the letter that you sent to Dr. Thruv
3  has a note on top of it referencing a
4  telephone call from July 25, 2008; is that
5  correct?
6      A  That's what I just read.
7      Q  And whose initials is on that --
8  are on that handwritten note?
9      A  Julie Kitchen.
10      Q  And it's -- and she wrote:  The
11  doctor would need to do a re-eval.  He has
12  not seen her in a while; do you see that?
13      A  That's what I just read.
14      Q  And this is a letter in which
15  you asked Dr. Thruv for ... an opinion,
16  within a reasonable probability, as to the
17  questions that you had asked, correct?
18      A  Correct.
19      Q  And the doctor's telling you
20  that it's not possible to give you the
21  answers to those questions because there
22  needs to be a reevaluation of Miss Guinn,
23  correct?
24      A  That's correct.

93

1      Q  Nonetheless, you didn't put that
2  in your report, did you?
3      A  Actually, there is a note under
4  the endocrinologist visit, saying:  Awaiting
5  specific endocrinologist recommendations.
6  However, Dr. Thruv indicated Miss Guinn
7  requires an additional evaluation prior to
8  providing an opinion regarding future care.
9      Q  But what you did put in your
10  report, that Dr. Thruv did not give to you,
11  was that you were going to recommend two to
12  four visits per year.
13      MR. BRUDNER:  Objection.
14  BY MR. SULLIVAN:
15      Q  Correct?
16      A  I did indicate two to four
17  visits per year, pending any further opinion
18  from an endocrinologist.
19      Q  And that's information that
20  Dr. Thruv did not believe is appropriate to
21  give you until she -- until the doctor had
22  seen Miss Guinn for a reevaluation, correct?
23      MR. BRUDNER:  Objection, form.
24      THE WITNESS:  He did indicate

24 (Pages 90 to 93)

94

1   that he wanted to reevaluate her,
2   based on all the questions I had
3   asked, not just based on that one
4   question.
5   BY MR. SULLIVAN:
6       Q   And isn't it fair to say that,
7   in this section of your report in which you
8   have to rely on medical opinions, that with
9   regard to visits to an endocrinologist, you
10  don't know how many Miss Thruv -- Ms. Guinn
11  should have a year, and that a doctor should
12  be giving us that number?
13      A   There's no question I would
14  defer to the doctor, but as a case -- you
15  know, 34 years in case management, I'm going
16  to tell you that to say zero visits would --
17  that there is no follow-up for diabetes,
18  would be totally inappropriate.  We certainly
19  know, from clinical practice guidelines, we
20  know from experience, we know from the
21  research literature, that she needs to be
22  followed.
23      I also know, from all the
24  responses I got in -- in those doctors that

95

1   answered in the other cases, that there's a
2   reasonable follow-up that needs to be
3   considered.
4       So to just list zero, would have
5   been ... professionally inappropriate.  So,
6   what's more appropriate is to say, look,
7   based on all that we know, this is a
8   reasonable amount but for this patient we are
9   still pending the need for an endocrinologist
10  to -- to follow up and provide an opinion.
11      Q   How about -- would this answer
12  be more appropriate?  I don't know, I'm not a
13  doctor.  Miss Guinn's doctor said that she
14  needs to come back for a reevaluation.
15  Miss Guinn should do that.
16      A   Well, I think we are indicating
17  that, in fact, that a follow-up with
18  Dr. Thruv is appropriate, or an
19  endocrinologist is appropriate.
20      But in the meantime, we know we
21  were going to come into deposition and to
22  give testimony in deposition that would
23  suggest it's going to be zero, and that the
24  economist has a zero, and then you have no

96

1   idea of what the dollars are until we come to
2   trial; that also is inappropriate.
3       And so I'm uncomfortable doing
4   something that leaves you surprised in the
5   end, 'cause we both know that the
6   endocrinologist is not going to say ... that
7   there's zero follow-up for a diabetic patient
8   on into the future, especially when we just
9   followed what consistently other
10  endocrinologists have said regarding other
11  diabetic patients when they have responded.
12      So -- and we've been consistent
13  with clinical practice guidelines.  So, I was
14  uncomfortable walking into deposition and
15  suggesting that, I'm sorry, we're just going
16  to be incomplete, and you'll hear what we
17  have to say at trial.  That's not a
18  consistent or a reasonable approach, in my
19  opinion.
20      Q   But doesn't it reflect reality?
21      A   I think the way we've done it
22  reflects reality, as well.  I understand your
23  point, but I think that following clinical
24  practice guidelines, following good case

97

1   management guidelines, and following what
2   other physicians have said in a similar
3   specialty regarding the almost identical
4   kinds of cases, reflects reality, as well.
5       And we have the medical records
6   on these patients.  We know what the
7   diagnosis is.  So, to suggest that it would
8   be a zero follow-up while we're pending ...
9   an evaluation by an endocrinologist, I don't
10  think is real -- is really reality in terms
11  of what's going to happen long into the
12  future.  It may reflect where we are in the
13  case while we're waiting, but it's really --
14  it's not realistic in terms of what's going
15  to happen long into the future.
16      Q   We're in the same situation with
17  regard to the ophthalmologist, as well, in
18  that the ophthalmologist has not answered
19  your letter.  And, again, Dr. Thruv did not
20  answer with a recommendation as number of
21  ophthalmologist visits per year, correct?
22      A   You're absolutely correct.  We
23  are in the same situation with both of them.
24      Q   After you got your response from

25 (Pages 94 to 97)

98

1 Dr. Thruv, and up to the time you gave your
2 report to the plaintiffs' attorneys, did you
3 ever have anyone contact Miss Guinn and say:
4 Hey, get to your endocrinologist, they need
5 to reevaluate you?
6    A  I do not know whether that's
7 been accomplished or not.  Although I'm sure,
8 similar to the depositions, I'm sure, on
9 hearing this, somebody's going to suggest
10 that to her.
11       MR. SULLIVAN:  Okay.  That's all
12    I have for the Guinn report.  You can
13    put that one away.
14 BY MR. SULLIVAN:
15    Q  Okay, Doctor, you served a
16 report with regard to the case for Robert
17 [sic] Unger, correct?
18       (Pause.)
19    A  Yes.
20    Q  I'd like to see if we can agree
21 again with regards to Mr. Unger as to
22 preexisting risk factors and morbidities that
23 he had, okay?
24    A  Yes.

99

1    Q  Can we agree that he -- one of
2 those risk factors was obesity?
3    A  Yes.
4    Q  And as with Miss Guinn,
5 Mr. Unger had some serious mental health
6 problems, correct?
7    A  Yes.
8    Q  Including general anxiety
9 disorder and major depressive disorder?
10    A  Yes.
11    Q  Can we agree that before
12 Mr. Unger contracted diabetes that he had
13 hyperlipidemia?
14    A  Yes.
15    Q  And that he had hypertension?
16    A  Yes.
17    Q  Were you aware that he had
18 smoked for 30 years, but had stopped a number
19 of years before you saw him?
20       (Pause.)
21    A  Well ... Ron -- Richard Unger,
22 right?
23    Q  Yeah.
24    A  I don't show that he stopped.

100

1 That's the only difference.
2    Q  Okay.
3    A  I still show him smoking one
4 pack a day as of the time that I saw him.
5    Q  Excellent.  We don't have to go
6 to the records then.
7       Can we agree that he lived a
8 sedentary lifestyle?
9    A  Yes.
10    Q  Okay.  I'm going to ask some of
11 the same questions I asked about Miss Guinn,
12 and hopefully we can get through it fairly
13 quickly.
14    A  I'm sorry, what was the last
15 thing you said before -- after the smoking?
16    Q  Sedentary lifestyle.
17    A  Oh, sedentary lifestyle.
18    Q  Before Mr. Unger got diabetes,
19 can we agree that he would have benefited
20 from a program of nutritional evaluation?
21    A  Yes, with all of the same
22 answers I just gave.
23    Q  So if he came into your office
24 for diabetes, and we can agree it's an

101

1 unusual situation for you, for someone in his
2 condition to come in for treatment of those
3 risk factors, and he had obesity and mental
4 health problems and hyperlipidemia and
5 hypertension and was a smoker and had lived a
6 sedentary lifestyle, would you have let him
7 leave here without recommending at least
8 nutritional evaluation for him?
9       MR. BRUDNER:  Objection, form.
10       THE WITNESS:  No, but again,
11    recognizing the mental health factors
12    and all of those other comorbidities
13    we just talked about, I think
14    nutrition would have to be a part
15    of ... an overall program.  I don't
16    think I would have recommended it on
17    its own, because I don't think it
18    would have done any good on its own.
19 BY MR. SULLIVAN:
20    Q  Is it fair to say that then you
21 would have also recommended some form of case
22 management for him, as well?
23    A  Exactly.  And consistent with
24 what we've discussed on ... I apologize.

102

```
 1        Q   Miss Guinn.
 2        MR. BRUDNER:  Miss Guinn.
 3        THE WITNESS:  Miss Guinn's case.
 4   BY MR. SULLIVAN:
 5        Q   And Miss Curley from last
 6   Thursday.
 7        A   And Miss Curley before.
 8        Q   Okay.
 9        (Pause.)
10        Q   Okay.  Let's move to some of the
11   recommendations that you make for Mr. Unger.
12        We've talked about nutritional
13   evaluation.  You made a recommendation there,
14   just as you did for Miss Guinn and
15   Miss Curley.
16        Another Allied Healthcare
17   evaluation though, that I hadn't seen in the
18   previous two cases that you make here, is for
19   disabled driver education; do you see that on
20   page 23?
21        A   Right.  Exactly.
22        Q   And the basis for that
23   recommendation is Mr. Unger's peripheral
24   neuropathy?
```

103

```
 1        A   Correct.
 2        Q   Do you have any idea whether --
 3   well, strike that.
 4        Do you have any idea how much
 5   Mr. Unger was driving a car before he got
 6   diabetes?
 7        A   I don't.  He said that he had
 8   significant restrictions before in terms of
 9   his limitations on sitting, and his ability
10   to bend and turn -- bend at the waist, turn
11   his neck, or bend forward.  Basically, it was
12   cervical restrictions, not the waist but the
13   neck, bending forward, turning the neck left
14   to right.  But that he did drive.
15        Now he has added problems due to
16   the lack of sensation in his feet.  He's able
17   to feel pressure on the pedals, but he had
18   less ability to feel the pedals and to feel
19   the pressure he was placing on the pedals.
20        And ... but he also has ...
21   intermittent pain that passes through the
22   feet.  And ... when you add that to the other
23   restrictions, but particularly when you have
24   problems with how well you're feeling the
```

104

```
 1   pedals, you know, there's a real question as
 2   to how safe he is to himself and to others on
 3   the road.
 4        And so I recommended he have a
 5   handicapped driver evaluation.  'Cause, quite
 6   bluntly, maybe he shouldn't be driving at
 7   all.
 8        Q   What other problems that a
 9   patient could have will lead you to recommend
10   disabled driver evaluation?
11        A   Frankly, any disability that,
12   under Florida law, would leave me to
13   believe -- lead me to believe -- let me ...
14   that would lead me to believe that a patient
15   may be unsafe to themselves or to other
16   drivers on the road, requires me frankly to
17   call up motor vehicles and have their -- have
18   their driver's license lifted.
19        Now, if it's borderline like in
20   a situation like this, my preference is to,
21   you know, strongly recommend a handicapped
22   driver evaluation.  But, you know, brain
23   injury, suspicion of a seizure disorder,
24   anything that would require hand controls --
```

105

```
 1   I have a situation right now, it's an
 2   out-of-state client, or I would -- if it were
 3   an in-state client, I would have probably
 4   called the Department of Motor Vehicles, I'd
 5   probably do so three or four times.
 6   Actually, you write them, or you don't call
 7   them.
 8        But he's an ASIAD -- A-S-I-A-D
 9   spinal cord patient.  He's a C.D.  And he ...
10   got himself a pair of used hand controls and
11   adapted them to his own vehicle.  Frankly,
12   that's just a no, no.  He doesn't know if --
13   no one knows if it's been put on properly.
14   You don't know if they're right for him.
15   It's just not the way, legally, you're
16   supposed to go.  So you don't know if the
17   vehicle is properly adapted.  You don't know
18   if he's properly trained, if they're the
19   right hand controls for him.  It's not been
20   evaluated.  He shouldn't be driving.
21        So, in this state, if he has an
22   accident, I'm liable, as much as he is, I'm
23   liable for the accident.  If I know that he
24   shouldn't be driving, and I was a -- as a
```

106

1  treating professional in that case, or as a
2  consulting professional, know that that
3  danger is out there. So --
4      Q   What if a patient came in and
5  told you that he or she felt -- repeatedly
6  felt drowsiness when driving and was
7  concerned about driving, would you recommend
8  such a patient for driver evaluation?
9      A   Well ... depends on the extent
10 of it. I mean, if they were actually losing,
11 seriously losing attentiveness to the road or
12 falling asleep at the wheel or were starting
13 to pull to the left or right, or they
14 couldn't keep the car in the lane,
15 unquestionably, you know; just depends on how
16 serious the problem was.
17     Q   How about if a patient came in
18 and told you that their pain was limiting
19 their ability to drive effectively, and that
20 they were concerned about that, would you
21 recommend that patient for driver evaluation?
22     A   I've never had ... I've never
23 had pain itself as the issue. But usually,
24 accompanying pain is narcotic management of

107

1  pain, and narcotics worries me a great deal
2  when it comes to driving. So when I have
3  people on pain pumps, where they're being
4  given Dilaudid or morphine as management, I
5  expect that of pain docs to be responsible
6  for calling for driving restrictions or
7  limitations. But if they don't, I'm not
8  beyond doing it, because they've exposed me.
9  If they failed to do it and I have a concern,
10 I am by no means unwilling to do so. So it's
11 quite possible I would.
12     Q   What if the patient came in and
13 you asked them about his or her driving, and
14 the patient said that, I really limited my
15 driving because I have fatigue problems and
16 just problems with endurance of driving my
17 car, would you recommend that patient for
18 driving evaluation?
19     A   No, I mean, if they drive -- if
20 they have a problem with endurance and
21 fatigue over time, and they've legitimately
22 restricted themselves, and family members
23 have supported the fact that they've
24 restricted themselves within tolerance

108

1  levels, they're only driving to the
2  neighborhood drugstore or grocery store,
3  they're not exceeding that endurance level, I
4  don't see that as much of a problem if their
5  record has stayed safe, and I'm much more
6  concerned about what you talked about
7  earlier, where fatigue is actually
8  representing an interference factor with
9  their ability to stay in the lane. The
10 subsequent description you gave doesn't sound
11 as ... great a concern as the earlier
12 description.
13     Q   Let's put them all together
14 then. What if a patient came in and said:
15 I've had problems with drowsiness when
16 driving; pain is concerning me in my ability
17 to drive; fatigue has been a problem and I
18 just don't know that I have the endurance to
19 drive to the point that I've only driven
20 twice in the last year. Would that patient
21 be someone you would recommend for driver
22 evaluation?
23     A   Well, I think if they'd only
24 driven twice in the last year, and because of

109

1  all those factors, then I think it's time to
2  seriously look at -- seriously look at
3  whether they should be maintaining a driver's
4  license. And at that point, a handicapped
5  driver evaluation probably makes very good
6  sense, more for the purpose of determining
7  whether they should be able to maintain --
8      Q   A license?
9      A   -- a driver's license than
10 whether or not there's any adaptations that
11 should be done. The biggest concern I have
12 here is making sure that they're evaluated
13 with all of those factors kept in mind,
14 'cause the question is, are you going to
15 catch all those factors in one evaluation.
16     So it's really important that a
17 clear report is given to the certified
18 handicapped driver evaluators, that they
19 understand, you know -- if you're catching
20 them at their best moment, you may not be
21 seeing all of these factors that are
22 interfering with their driving.
23     Q   Okay. Take a look quickly at
24 the first page of your report. You indicate

28 (Pages 106 to 109)

110

```
1   that the date of onset for diabetes was
2   September 7, 2005.
3        (Pause.)
4        Q   Do you see that?
5        A   Point me to where you are.
6        Q   It's the first page of your
7   report.
8        A   Oh, I understand that.
9        Q   Demographic information, the
10  last entry in that paragraph.
11       A   Oh, okay.
12       Q   Okay?  We agree on that?
13       A   That's what it says, yes.
14       Q   2005?
15       A   That's what it says.
16       MR. SULLIVAN:  Let's mark this
17  as the next exhibit.
18       (Whereupon, Deposition Exhibit No.
19  Deutsch-30, Social Security disability
20  application, was marked for
21  identification.)
22  BY MR. SULLIVAN:
23       Q   This is Exhibit 30, Doctor.  I
24  apologize, I have highlighting on it, so you
```

111

```
1   could see how I think now.
2        But this is a October 1, 2004 --
3   it's an application for Social Security
4   disability.  You see that?
5        A   Yes.
6        Q   Can you take a look at page four
7   under -- in the middle of the page there's a
8   question as to -- it says:  Do you drive?  Do
9   you see that?
10       (Pause.)
11       Q   So, you see --
12       A   Are you sure it's under number
13  15?  Getting around, so bear with me.
14       Q   Sure.
15       (Pause.)
16       A   I see, when going out, how do
17  you travel.  He says, he rides in a car.
18       Q   It's a little blurry.
19       A   Oh, do you drive?  I see it.
20       Q   And we agree this is an
21  application for Mr. Unger?
22       A   Right.
23       Q   What did he write next to, "Do
24  you drive"?
```

112

```
1        A   Under that it says, if you don't
2   drive -- oh, he wrote, "No."  I can't ...
3   okay.  Then under that there's the question:
4   "If you don't drive, explain why not."
5        Q   Right.  And what did he write?
6        A   Drove twice in the past year,
7   now unsure of myself due to drowsiness, pain
8   fatigue, and lack of endurance.
9        Q   If Mr. Unger came in to you with
10  those complaints in 2004, you would have
11  recommended him for driver evaluation; fair
12  to say?
13       A   For the reasons I just
14  indicated, I would express concern that, you
15  know, may just, from a practical standpoint,
16  not be appropriate to maintain a driver's
17  license.
18       Q   And that's -- that application
19  is from before he was diagnosed with
20  diabetes, correct?
21       A   It's my understanding, correct.
22       Q   So, your recommendation for
23  driver evaluation in your report is something
24  that he should have had even before he got
```

113

```
1   diabetes; fair to say?
2        A   I would say that's fair to say.
3        Q   Is that something we can strike
4   from your report as a cost attributable to
5   his diabetes?
6        A   I think you'd have to.
7        Q   Okay.
8        A   Wait, wait.  Give me a moment to
9   make a note; would you, please?
10       Q   Please.
11       MR. COUTROULIS:  Off the record.
12       (Discussion held off the
13  record.)
14       THE WITNESS:  Okay, I'm ready.
15  Let me give this back.
16       MR. SULLIVAN:  That's another
17  exhibit.
18  BY MR. SULLIVAN:
19       Q   Doctor, under medications
20  prescribed, you list some medications for
21  Mr. Unger to take for his diabetes; is that
22  correct?
23       A   What I understood he is taking,
24  that's correct.
```

114

1    Q   And you changed my question a
2  little bit, because you're not --
3    A   Oh, I'm sorry.
4    Q   Because you're not qualified to
5  prescribe this medication to --
6    A   Oh, absolutely.
7    Q   -- to Mr. Unger, correct?
8    A   Absolutely.
9    Q   You can only state what his
10 doctors have said here, correct?
11   A   Correct.
12   Q   In the middle, that being the
13 second of your three recommendations, you
14 include Symalin injection, 15 units
15 subcutaneously before each meal and large
16 snack; do you see that?
17   A   Yes.
18   Q   See it says, five times a day?
19   A   Yes.
20   Q   So you've recommended, in your
21 report, 15 units five times a day, correct?
22   A   Right.  Again, it's not me
23 recommending it.  It's what his doctors have
24 given him.

115

1    Q   Where is your support for that?
2    A   Well, that's what he's actually
3  taking.
4    Q   I need to ask a better question,
5  sorry.
6        Where is your support for him
7  having, not Symalin, but 15 units of it and
8  five times per day?
9    A   Oh.  You know, that's ... you
10 know, I have to trust that the patient's
11 giving me an accurate statement of what he's
12 actually being provided.
13       Hold on just a moment.
14       (Pause.)
15   A   In addition, I wrote to
16 Dr. Quintero, the endocrinologist, and asked,
17 is it within reasonable medical probability
18 anticipated which will remain on Symalin or
19 related injections through his life, and he
20 said, yes.  And I didn't ask what his
21 specific dosage was.  I trusted that the
22 patient was giving me an accurate dosage.
23   Q   So you didn't ask the doctor
24 about dosage or frequency, correct?

116

1    A   No, I trusted the patient's
2  statements regarding dosage and frequency.
3  So if Dr. Quintero subsequently says that's
4  not the dosage I have him on, then I'll defer
5  to what Dr. Quintero says.
6    Q   How about if ... the doctor's --
7  review of his medical records indicate that
8  he has been on drugs other than Symalin for
9  his diabetes, drugs instead of Symalin for
10 his diabetes; is that information you would
11 take into account when making this
12 recommendation?
13   A   I think -- I'm sorry.  I think,
14 historically, I've traced in the intake, and
15 I've noted it in my report, what he had in
16 terms of medications from the start, but what
17 I list in here is what he's on now, and what
18 I asked the doctor is, will he continue on
19 Symalin.  So I don't go back and list what
20 he's -- in the medication section, what he's
21 had historically that he's no longer taking.
22       MR. SULLIVAN:  I'm going to mark
23       as an exhibit the letter, the answers
24       from Dr. Quintero.

117

1        (Whereupon, Deposition Exhibit No.
2        Deutsch-31, was marked for
3        identification.)
4  BY MR. SULLIVAN:
5    Q   But it's -- that's not exactly
6  the question you asked him.  You didn't ask
7  him just whether he will remain on Symalin;
8  isn't that true?
9        (Pause.)
10   A   Well, there's -- there's a
11 two-part question.  Number one:  How many
12 endocrinology visits does he want in
13 follow-up per year.
14       And then the second part of that
15 question:  Is it within reasonable medical
16 probability to anticipate that Richard will
17 remain on Symalin or related injections
18 throughout his life.
19   Q   So you didn't ask him just
20 Symalin; you asked him, or related
21 injections, correct?
22   A   Well, of course, because there's
23 no way for me to know -- I mean, there's no
24 way for him to know that, at some point in --

118

1  that a replacement technology, a replacement
2  kind of medication might not come up.  So --
3       Q    What about an existing one, just
4  an alternative?
5       A    He may switch to insulin, I
6  don't know that he won't, but -- or he may
7  switch to another medication, another
8  injection, but --
9       Q    We --
10       A    -- he's saying he's going to
11  stay on an injectable.  All I can do is to
12  note what he's on now.  With medications,
13  there's no way to know that a change won't
14  take place, but I have to know from the
15  doctor, is it likely, more probable than not,
16  that he's going to stay on this medication,
17  or at least a reasonable -- a reasonably
18  similar medication throughout his life.
19       Q    And, in your report, did you
20  state that, or did you simply state Symalin?
21       A    I simply state what he's on.
22  I -- you know, certainly, in testimony, you
23  can ask, but I don't have another drug I can
24  talk about in the report.  So all I can talk

119

1  about is what the reality is now.
2       Q    And we've covered already that
3  you did not review his testimony, this
4  doctor's testimony, before you issued your
5  opinion, correct?
6       A    That's true.
7       Q    If you had reviewed his
8  testimony and you'd seen that, in fact,
9  Mr. Unger had been on at least two other
10  medications, instead of Symalin, how would
11  that have affected your report?
12       A    I don't know that it would have
13  affected it at all.  It's nothing unusual to
14  have one or two other medications as you try
15  and stabilize diabetes.  Once you get it
16  stable, if you're -- if the doctor is
17  generally happy with the stability that's
18  finally reached on a given drug, that's
19  usually the drug you'll stay on.
20           But it's quite possible.  I
21  can't tell you it's not, in my experience,
22  that it could change at some point in the
23  future.  But it's not really up to me to say.
24  It's up to Dr. Quintero.

120

1       So if testifies that it may
2  change in the future, the best I can do
3  is ... give you a cost of what that
4  medication would be if he gives it.  If he
5  says, well, if not, Symalin, then he's likely
6  to be on this.  But what he'll never be able
7  to do is tell me what other options might
8  develop through technological advances in the
9  future.  He can only say, look, if Symalin
10  proves not to be the most effective, our
11  current technology would give us the
12  following options.  If he wants to name two
13  or three options, I can give you the cost of
14  those options, assuming he gives me a dosage.
15       Q    You didn't -- well, if you had
16  seen in his testimony that -- in
17  Dr. Quintero's testimony, that Mr. Unger had
18  been on alternative medications, and
19  reasonably recently, couldn't you have
20  included that, those medications in your
21  calculations, as well?
22       A    Wouldn't be inclined to do so if
23  he's taking him off of those.  Not unless he,
24  the doctor, would have said, there's as

121

1  reasonable a chance for him to go back to
2  those as it is for him to stay on Symalin.
3       Q    Couldn't you have asked him ...
4  what other medications he may actually take
5  in the future, rather than simply putting in
6  the question, or related injections?
7       A    I suppose as reasonably as he
8  could have said:  I have him on Symalin now,
9  but ... you know, there is an option.  I
10  mean, I did give him a space.  It said,
11  additional comments or suggestions.  He had
12  all the option in the world to say to me, if
13  not Symalin, here are other options.  He
14  could have said it there; he could have said
15  it down below.
16           I mean, I can lead these doctors
17  by the hand, but they're very bright, most of
18  them, and you know, I -- I understand what
19  you're saying, but this is ... not that
20  difficult.
21           I mean, the truth of the matter
22  is that we're not talking huge cost
23  differentials, and the fact is that it's --
24  you know, if you have a question, it's easy

31 (Pages 118 to 121)

122

1  enough also for you to say, right now, what
2  other drugs would you like me to have costed
3  out prior to my coming to trial, I'll have
4  them available.
5      Q   The cost that you've given for
6  Symalin is $1452 a month; do you see that?
7          (Pause.)
8      Q   It's on page 23 of your report.
9      A   I'm sorry, I lost my place
10 there.
11         (Pause.)
12     I do see that.
13     Q   Do you have any idea how much a
14 month's supply of Byetta would cost for
15 Mr. Unger?
16     A   I'm sure we have it in one of
17 the other files.  Seems to me we have costed
18 it out, but I don't off the top of my head.
19     Q   Okay.
20     A   You want me to go check real
21 quick?
22     Q   If you have it somewhere else,
23 I'd be interested in hearing it.
24     A   I know there -- some of the

123

1  other patients had started out on Byetta.  I
2  just don't remember if they're still on it,
3  so I have to just check through here.
4          (Pause.)
5      A   This would be the last file.
6      Now, this is Byetta based on
7  ten -- ten MCG per 0.4 -- point zero point
8  four millimeter solution in a 2.4 milliliter
9  cartridge administered two times per day.
10 She's purchasing 2.4 milliliter cartridges
11 per month at a cost of $229.97 per cartridge.
12 So I don't know how to compare apples and
13 apples, because I don't know what his
14 prescription for Byetta would be.
15     Q   What was the monthly cost on the
16 Byetta?
17     A   For her, it was 229.97.
18     Q   Per month?
19     A   Per month, based on two
20 cartridges.  I just don't know how many he
21 would get.
22     Q   Certainly, that cost,
23 understanding your qualification, is
24 significantly less than the cost in your

124

1  report for Symalin for Mr. Unger.
2      A   Oh, no question.  I mean --
3      Q   Did you review the prescription
4  records for Mr. Unger to see whether he was
5  on any other medications for his diabetes
6  other than Symalin?
7      A   Well, he has been, yes.  I'd
8  have to go back if you bear with me just a
9  minute.  Let me get back to his file here.
10         (Whereupon, Deposition Exhibit No.
11 Deutsch-31, admission and discharge from
12 Mercy Hospital, was marked for
13 identification.)
14     THE WITNESS:  Well, he starred
15 out on an oral agent, but he couldn't
16 tell me what it was.  He went from
17 that oral agent to Byetta via
18 injection one time per day.  But then
19 he says it could have been once per
20 month, he doesn't recall.  I don't
21 think once per month was realistic,
22 but ... he said he was on that for
23 several months before he was changed
24 to Symalin.  And that's the best

125

1      recall he could give me.
2  BY MR. SULLIVAN:
3      Q   Do you have anything in your
4  records to show whether he was ever on
5  Avandia?
6      A   Well, Avandia was probably the
7  oral medication he was taking.  He just
8  couldn't recall the name of it.
9      Q   Okay.  You mentioned that he had
10 mentioned -- he couldn't tell you whether it
11 was once a month or once a day for Byetta?
12     A   I assume it was once a day, not
13 once a month.  I mean -- but ... that doesn't
14 surprise me as far as his historical recall
15 of exactly the frequency.
16     Q   Mr. Unger has, and the other
17 plaintiffs that you're dealing with in this
18 case, have mental health problems?
19     A   Right.  As far as his telling me
20 what's going on today, how many times today
21 he's taking it, or he took it yesterday,
22 that -- I don't have much concern about that.
23 But as far as going back several months or a
24 year, and giving me a history, that's -- that

126

1   might be another question.  And being
2   accurate about dosages.
3       Q   We can agree that if, as your
4   records reflect, Mr. Unger was on some oral
5   medication; records indicate to me that it
6   was Avandia and Byetta and then Symalin, that
7   it's possible in the future, or at least
8   beyond the time that you spoke with him, he
9   could be on a different medication for his
10  diabetes; is that fair to say?
11      A   You're really asking the wrong
12  person. I mean, in all honesty, that's a
13  question for his endocrinologist to answer.
14      Q   And you never actually asked the
15  endocrinologist in this case, whether
16  Mr. Unger was on Symalin, correct?
17      A   Whether he was on Symalin?
18      Q   Yeah.
19      A   Absolutely.  That's exactly how
20  the question is phrased.
21      Q   The question is phrased:
22  Symalin, open parens, or related, closed
23  parens, injection, correct?
24      A   It says:  Will he remain on

127

1   Symalin or a similar injectable.
2       Q   Okay.  So you --
3       A   So it says clearly to me that
4   he's on Symalin now.  Will he remain on
5   Symalin or a related injectable?  So it does
6   say -- in my view, it does say that he's on
7   Symalin now.
8       Q   Let's take a look at the actual
9   letter.  I've marked Exhibit 31, I'll show
10  you that in a second, but for now, let's do
11  Exhibit 32.
12      (Whereupon, Deposition Exhibit No.
13      Deutsch-32, letters re Mr. Unger,
14      was marked for identification.)
15  BY MR. SULLIVAN:
16      Q   This is, again, my best
17  compilation of the letters and the answers to
18  and from doctors, in this instance for
19  Mr. Unger.  If you want to take a look and
20  see if I got that right, I'd appreciate it.
21      (Pause.)
22      A   Yes.
23      Q   Okay.  Let's take a look at your
24  letter to ... to Dr. Quintero, in particular

128

1   the questionnaire that ... you included with
2   it.
3       (Pause.)
4       Q   Am I reading correctly that your
5   question with regard to medications in the
6   first paragraph, question number one reads
7   this way:  Is it within reasonable medical
8   probability to anticipate Richard will remain
9   on Symalin or related injections throughout
10  his life?
11      A   Yes.
12      Q   So, you'll agree with me that
13  you never asked him whether he was going to
14  remain on Symalin and Symalin only, did you?
15      MR. BRUDNER:  Objection, asked
16  and answered.
17      THE WITNESS:  No, but it's very
18  clear that it says, Symalin, and I
19  would certainly think any intelligent
20  endocrinologist, if he was not on
21  Symalin, would have said to me, he's
22  not on Symalin.
23  BY MR. SULLIVAN:
24      Q   I understand that part of your

129

1   answer.  I think, when you answered my
2   question, you anticipated it differently than
3   I wanted you to, so let me try it again, not
4   that I just want to keep asking the same
5   question.
6       Do you agree with me that you
7   never asked Dr. Quintero whether Mr. Unger
8   will remain on Symalin and Symalin only, for
9   the rest of his life?
10      A   I certainly agree with you, but
11  that wasn't my intent.  My intent was exactly
12  to ask what I asked.  Will he stay on Symalin
13  or at least some related injectable for the
14  rest of his life?
15      Q   And will you also agree with me
16  that you didn't ask Dr. Quintero, will
17  Mr. Unger stay on Symalin for the rest of his
18  life, or is there some other medication he
19  may take?  You didn't ask him that, did you?
20      (Pause.)
21      A   Versus another injectable?
22      Q   Just any other medication.  You
23  just asked him, Symalin or related product,
24  right?

130

1    A    Or related injectable.
2    Q    Right.
3    A    And which is another product.
4    But, you're correct, although he had other
5    opportunities in here, including right there,
6    'cause it says, "comment", and he could have
7    easily said in the comment, my goal is to
8    move him to an oral medication, to move him
9    back to Avandia, or move him back to -- I
10   mean, he is a physician, for God's sakes.
11   It's simple for him -- I can't anticipate
12   everything --
13   Q    It's a difficult --
14   A    -- that a physician is likely to
15   say.
16   Q    It's a difficult process to
17   communicate with a physician about treatment
18   through a questionnaire, isn't it?
19   A    But it's important to document
20   the file. And I have to assume that a
21   physician is an intelligent being, and so
22   he's -- that's why I leave open comments for
23   him, a comment section, so that, in addition
24   to the question, he can come back and he can

131

1    say, you know what, my goal is to get him off
2    Symalin and onto an oral medication. And I
3    see physicians do that all the time.
4    Q    We talked Thursday about how you
5    understand, in connection with your
6    communications with doctors, that they are
7    very busy; is that fair to say?
8    A    That's true.
9    Q    And that sometimes it's
10   difficult to get them to sit down with you
11   and have either a phone call or a meeting
12   where there's a back-and-forth exchange,
13   correct?
14   A    That's true. We certainly get
15   far more responsiveness through this style of
16   communication than we do through a request
17   for a lengthy letter, or even a request for a
18   phone conference. This gets us about an
19   85 percent response rate.
20   Q    Because it's more user friendly
21   for the doctor and takes less time for the
22   doctor, correct?
23   A    That's true. But they do give
24   us feedback. I mean, they give us their

132

1    comments in addition to just saying yes or
2    no. And so I'm confident that if
3    Dr. Quintero subsequently felt, you know,
4    it's not just an issue of Symalin, I would --
5    I have a longer-term goal of getting him back
6    onto an oral medication, he would have said
7    so. But in all due respect, if his
8    deposition turns out to say something
9    different, I will have that now, and I will
10   read it.
11   Q    Is it more important to you to
12   document the record than it is to get it
13   right?
14        MR. BRUDNER: Objection, form.
15        THE WITNESS: Clearly, the
16   importance is to get it right. But,
17   if I get a response from the doctor
18   that doesn't document the record,
19   that's problematic, as well. And my
20   assumption is, if the doctor answers
21   me in writing, that it is correct.
22        So, you know, the question
23   you're saying, presumes that the
24   doctor's going to answer me

133

1    inaccurately. And I don't -- I
2    just -- I would think that's just an
3    unreasonable reaction to the way
4    these doctors are responding to the
5    questionnaires. I just don't think
6    that's right.
7    BY MR. SULLIVAN:
8    Q    There's nothing stopping --
9    there was nothing stopping you from calling
10   Dr. Quintero after he sent you this -- this
11   answer to your questionnaire, true?
12   A    Nothing stopping me.
13   Q    And you didn't do it, true?
14   A    That's true, I didn't.
15   Q    Or -- and you didn't call any of
16   the doctors in these six cases, true?
17   A    That's also true.
18   Q    And isn't, in this case, a flaw
19   with regard to getting information from
20   Dr. Quintero on this medication, just in your
21   question, by asking him, will Unger remain on
22   Symalin or related injections for the rest of
23   his life?
24        MR. BRUDNER: Objection, form,

134

1   assumes facts not in evidence.
2   Sorry. Go ahead.
3       **THE WITNESS:** I certainly
4   recognize that that's your
5   interpretation, that it's a flaw.
6   But it's an easily fixed flaw. If
7   you have the opportunity in
8   deposition, or had the opportunity in
9   deposition to ask him, in fact, is it
10  a flaw, do you anticipate his being
11  on something like Avandia again, or
12  Byetta again, you also have the
13  opportunity to ask that at trial.
14  **BY MR. SULLIVAN:**
15      **Q** You're not asking me to do your
16  job for you, are you?
17      A   No, but the -- you're the one
18  who's claiming it's a flaw. So you're the
19  one who has the opportunity to show me that,
20  in fact, it is a flaw. I'm not suggesting at
21  all that it's your responsibility to do my
22  job. But I'm not -- I'm not suggesting, nor
23  do I believe that it is a flaw in the system.
24  I think the process works effectively, and I

135

1   don't think this is inaccurate.
2       You know, the fact is that --
3   that I'm satisfied with the process. I see
4   your expressed concern. I'll read
5   Dr. Quintero's deposition and see if he's
6   suggesting anything other than what has
7   already been suggested, based on his response
8   to me. If he doesn't in his deposition, I
9   don't intend to change it. If he does, I
10  most certainly will change it.
11      And if even after the
12  deposition, if you raise this with him at
13  trial and come back and say, Dr. Deutsch, I
14  want you to assume that on the witness stand
15  in testimony, Dr. Quintero said X, I'm not
16  going there to argue. If you -- if you
17  present a hypothetical showing, in his
18  testimony, that, in fact, assuming Symalin is
19  an inaccurate assumption for me to make, I'm
20  certainly going to be prepared to change.
21      **Q** Is there any flaw in your
22  methodology in picking the dose and frequency
23  in your report for the Symalin injections.
24      A   All I can do is pick the dose

136

1   and frequency that is currently being
2   provided to the patient. If the doctor
3   testifies --
4       **Q** Well, you said you got that from
5   the patient.
6       **MR. BRUDNER:** You got to let him
7   finish.
8       **THE WITNESS:** I understand that.
9   And that is my understanding of the
10  prescription. And bottom line is, is
11  that I do not believe that it is a
12  flaw, and until the doctor testifies
13  otherwise, that is the dosage I'm
14  going to go with.
15  **BY MR. SULLIVAN:**
16      **Q** Here's what I've marked as
17  Exhibit 31. I apologize I only have one
18  record, so I'm not hovering your shoulder for
19  any other purpose but to look at it. I'll
20  come down so I'm not over your shoulder.
21      A   I'm trying to find a date. Do
22  you see it?
23      Q   Yeah.
24      A   Oh, one -- I'm sorry.

137

1       Q   That's the birthday. Above it I
2   believe is the date.
3       A   12/04/06. Okay.
4       Q   Can you read what it -- his
5   record says about, this is admission and
6   discharge medication list from Mercy
7   Hospital. Do you see what it says about the
8   units and frequency of Symalin?
9       A   Sure, it says back in '06, he
10  was taking ten units ... does that say
11  "subcutaneously"?
12      Q   That's how I read it.
13      A   Okay.
14      Q   Prior, before meals.
15      A   Okay.
16      Q   Do you see that?
17      A   Right.
18      Q   Take a look at the next page of
19  the exhibit. This is from ... the same year
20  in May, a little earlier. It's a progress
21  note from Dr. Quintero, May 3, 2006. And do
22  you see that it says ... Symalin ten
23  units ... at meals?
24      A   I do see that.

138

1      Q    Subcutaneously at meals?
2      A    I do see that. But, again, this
3    is 2006, and we've already agreed that it's
4    nothing unusual for dosages in medications to
5    be changed. In this case, he's indicating
6    he's taking it at meals and at snacks, so
7    five times a day total. And, you know, I --
8    I'm perfectly comfortable with what he's told
9    me until I see a current ... record that
10    suggests that the dosage is wrong, or
11    Dr. Quintero says that that's not an accurate
12    dosage.
13      Q    Do you see anything in that --
14    those two documents that are part of Exhibit
15    31 that mentions snacks, to take it with
16    snacks?
17      A    It does not. But again, we're
18    dealing with 12/04/06 --
19      Q    I've got that point.
20      A    -- with two years earlier.
21    So --
22      Q    Part of your --
23      A    But you're right. It does not,
24    going back to December of '06.

139

1      Q    Part of what you do here as a
2    life-care planner is to review medical
3    records; isn't that true?
4      A    Yes.
5      Q    Part of what you did here with
6    this -- preparing these reports, was to
7    review medical records; isn't that true?
8      A    Yes.
9      Q    Can't you go to the medical
10    records yourself and determine what the
11    dosage and frequencies are listed?
12      A    But going to a dosage of '06
13    wouldn't have changed. We would have gone
14    back to the patient and still said, you know,
15    we show a dosage in '06; what is your dosage
16    now.
17      Q    Couldn't you have asked the
18    doctor?
19      A    You know, we could have tried.
20    But, frankly, getting -- getting a
21    physician's office -- you have no idea how
22    difficult it is to get a verbal response from
23    a physician's office regarding something like
24    that.

140

1      Q    Could have written a question,
2    couldn't you?
3      A    We could have tried but ...
4    getting -- you know, getting specific
5    questions like that, where he's got to go
6    back into the chart and write, "look up
7    current dosage," that's much more difficult
8    than the kind of questions that we were
9    asking for his opinion regarding labs,
10    regarding frequency of visits. It takes a
11    lot longer, it tends to slow up responses
12    when we're asking questions that have him
13    researching back into the chart history.
14      Q    Could you have looked at the
15    prescription records?
16      A    Well, if we had prescription
17    records, we could have, but usually we don't
18    get prescription records.
19      Q    Well, why would you not get
20    prescription records if it would give you
21    that type of information?
22      A    Well, when you say, prescription
23    records, I mean ... you know, it's not
24    something that normally comes as part of a

141

1    physician's record. Have you got the records
2    of every prescription that the doctor wrote?
3      Q    How about the records of every
4    prescription that your plaintiff filled;
5    couldn't you have gotten that?
6      A    Well, I don't have them. And,
7    you know, to the -- and the question, I
8    guess, let me -- I don't know that -- whether
9    we got -- and I don't think we do, but I'll
10    look and see if we ... if we have his
11    pharmacy record.
12          (Pause.)
13      A    No, I don't think we do.
14      Q    Maybe we can show this up
15    quickly; maybe we can't.
16          Is it fair to say that costs --
17    costing for ten units of Symalin, three times
18    a day, would be less than 15 units five times
19    a day?
20      A    Sure.
21      Q    Is it fair to say that costing
22    for medication, other than Symalin, be it
23    Byetta, Avandia, or another related
24    injection, would be different from the cost

1 of Symalin?
2    A  Certainly, although ... Avandia,
3 I think, was an oral medication not an
4 injectionable, but nonetheless, the answer is
5 yes.
6    Q  With that correction --
7      (Pause.)
8    Q  Okay. Further down in your
9 recommendations for Mr. Unger on page 23 of
10 your report, you mention laboratory testing;
11 do you see that?
12      (Pause.)
13    Q  I have it at the bottom of page
14 23 of your report.
15    A  Oh, yes, I've got it.
16    Q  Okay. And you took that
17 information from the answer that you received
18 from Dr. Quintero; isn't that correct?
19    A  True.
20    Q  Is it true that you did not ask
21 Dr. Quintero how many of these lab testings
22 were required that will be above and beyond
23 the testing that Mr. Unger would already have
24 had before he had diabetes?

1    A  True.
2    Q  And so is it fair to say that
3 you don't know how many of these, each of
4 these lab tests, Mr. Unger would have above
5 and beyond those that he may have had before
6 he got diabetes?
7      (Pause.)
8    A  That's a fair statement. The
9 question did ask, lab work to monitor
10 diabetes. But it didn't say, he knows his
11 medical history pre, can you separate out
12 labs you would have expected him to have
13 based on preexisting medications, et cetera,
14 or preexisting comorbidities. So it did not
15 ask him to do that, and I would need a doctor
16 to do that.
17    Q  Let me try to come at it from
18 the way a life-care planner may. I may fail,
19 but you tell me that.
20      As a life-care planner, knowing
21 the risk factors and morbidities that
22 Mr. Unger had before he got diabetes, would
23 it have been a reasonable area of inquiry and
24 research for you to look into, whether he was

1 having or should have had these types of lab
2 tests, even before he got diabetes? Is that
3 something you would have considered and
4 looked into?
5    A  Yes. You know, and tried to
6 handle it by asking the doctors, considering
7 only the diabetes, what lab tests would you
8 order for this -- what do you want, as an
9 endocrinologist, to follow this individual?
10      Perhaps a better question, as
11 we're talking now, although I don't know how
12 much Quintero knew about the prior medical
13 history, although I'm assuming he would have
14 known it, and would have understood the
15 question, because the cover letter makes
16 clear, I think, that if he read it, that we
17 were trying to separate out. But the bottom
18 line is, is that between the cover letter and
19 the question, I was hoping to get at the
20 differentiation between what he would have
21 needed pre, and what he would have needed for
22 just the diabetes.
23      But your point is certainly
24 reasonably taken. If a doctor looked at this

1 and said, based on the comorbidities, he
2 would have required at least one, or at least
3 two of this lab, and at least one or at least
4 two of this lab, in any instance, therefore
5 with the onset of diabetes, we would have
6 only had one additional CBC, or one
7 additional, you know, of this lab then, what
8 belongs in the life-care plan is only that
9 portion made necessary by the onset of the
10 diabetes. Is that clear?
11      The latter part is all you need.
12 The only thing that belongs in the life-care
13 plan is that additional made necessary by the
14 onset of the diabetes.
15    Q  And if you look at laboratory
16 testing, the second one you have there is for
17 lipids two times a year, or lipid panels two
18 times a year; do you see that?
19    A  Which is something which most
20 likely, if he had hyperglycem -- excuse me,
21 hyperlipidemia, he most likely would have
22 had --
23    Q  Already --
24    A  -- at least once or twice a year

146

1   already.
2       Q    What is CBC, SMA-20?
3       A    What is it for?
4       Q    No, what is it?  Yeah, what type
5   of test is it?
6       A    Want me to answer ... you know,
7   I get it myself on a regular basis, but if
8   you want me tell you all of the things that
9   it shows, I can't do that.
10      Q    So you don't know whether he
11  would have had those tests, Mr. Unger would
12  have had those tests before he had diabetes?
13      A    You know, I have a book at my
14  desk that tells me what all the lab studies
15  show, and I rely on looking those up, you
16  know, when I have the material in front of
17  me, but I don't -- you know, I'm not a
18  physician, and I'm not there to answer all of
19  the lab studies.
20      Q    Okay.
21      A    So, whether he would have had
22  these on the same frequency, is really not
23  something for me to answer.  It's something
24  I've got to rely on the physicians to tell

147

1   me.
2       Q    And that's -- we're in the
3   medical care section of your recommendations
4   in the -- while they're listed as part of
5   your rehabilitation recommendation plan,
6   these are things for which you needed doctors
7   to give.
8       A    Well, it says, the medical care
9   section, and I did ask the doctors, and I did
10  try and make a distinction, both with the
11  cover letter and with the way, you know, the
12  statement, what does he need related to the
13  diabetes.
14      Clearly, he gave me what he felt
15  he needs, as an endocrinologist, to follow up
16  for diabetes, but without a consideration as
17  the cover letter asked him to do, without a
18  consideration of differentiating the premorbid
19  the premorbid comorbidities and the diabetes.
20      Q    Okay.  And can we agree that in
21  the next section of your recommendations or
22  the next bullet point of recommendation in
23  the medical care section, you have an opinion
24  from Dr. Quintero, that Mr. Unger should go

148

1   to a podiatrist once a year, and you rejected
2   that opinion?
3           (Pause.)
4       A    It's not so much that I rejected
5   it, is that I looked at his opinion related
6   to just basic clinical guidelines, practice
7   guidelines versus what's actually occurring.
8   And based on the fact that -- 'cause I don't
9   know if Dr. Quintero was aware of his actual
10  peripheral neuropathy and the treatment
11  schedule or the follow-up schedule, rather,
12  that is actually being undertaken.  So, I
13  followed his actual podiatry schedule, as
14  opposed to just an evaluation.
15      So, I recognize Dr. Quintero's
16  recommendation for an evaluation, and
17  incorporated that within, but it's not so
18  much I'm rejecting it, but I'm not going to
19  reject the ... records from his podiatrist,
20  either.
21      Q    You didn't get an answer from a
22  podiatrist, did you?
23      A    No, the podiatrist didn't follow
24  up, but that doesn't mean that I can't look

149

1   at the podiatry records.
2       Q    The only answer that you got
3   from a doctor on podiatry visits was from
4   Dr. Quintero, and he said one visit per year,
5   correct?
6       A    Well, if you are --
7       Q    Is that correct?
8       A    The only answer I got to written
9   questions regarding podiatry, was from
10  Dr. Quintero, yes.  But when you say, the
11  only answer I got, that answer also comes
12  through the actual reports from these
13  doctors.  And so, I would disagree with you.
14  I don't think it's correct.  Some of those
15  answers come from reading the actual reports
16  and the podiatry reports show that he's
17  following up more frequently than a
18  once-a-year evaluation.
19      Q    How'd you determine that?  Did
20  you count the number of times he went per
21  year?
22      A    I determined it reading the
23  record and the frequency of times he's
24  following up, and the fact that he has a

150

1  peripheral neuropathy for which he's being
2  seen. And I also talked to the patient to
3  ask how often he's seeing him.
4      Q   What did you see in the records
5  as to the frequency? Was it four to six
6  times a year?
7          (Pause.)
8      A   I'd have to go back at this
9  point and look at the record, but I felt,
10 based on -- basically looking at what records
11 I had and listening to the patient tell me
12 how frequently he's seen that -- that the
13 follow-up four to six times a year was
14 consistent with what the patient was saying.
15     Q   Did you come to your conclusions
16 in this whole rehabilitation recommendations
17 section carefully?
18         MR. BRUDNER: Objection, form.
19         THE WITNESS: I believe so, yes.
20 BY MR. SULLIVAN:
21     Q   Do you feel that you did a
22 thorough review of the medical records,
23 interview of the patient and have a
24 satisfactory exchange of information with the

151

1  doctors to give these recommendations?
2      A   Yes, I do.
3      Q   Do you -- did you sit down and
4  carefully consider what you'd learned and
5  come up with these recommendations in a
6  thoughtful and careful way?
7      A   I absolutely do, and I think
8  it's consistent with the clinical practice
9  guidelines in each area.
10     Q   All right. This is the one
11 report that I see where you do not recommend
12 case management for the patient. Can you
13 explain what's different here?
14         (Pause.)
15     Q   From the other five cases?
16     A   Actually, in ... after I did the
17 clinical interview with Richard, and my
18 testing on Richard, despite the preexisting
19 psychological condition, I felt that, in his
20 particular instance, that he was capable of
21 self management training without having to
22 have the case management approach applied. I
23 felt he was capable of dealing with it, where
24 I did not feel that way with the rest of

152

1  them.
2      Q   What ... in particular, made you
3  feel that Mr. Unger was capable of dealing
4  with his diabetes care without case
5  management?
6          (Pause.)
7      A   I think part of it was just the
8  degree to which he was -- I felt he was
9  managing his injectable post onset -- even
10 though he had a peripheral neuropathy post
11 onset, my discussions with him regarding the
12 fact that he had withdrawn himself largely
13 from driving, the fact that he appeared to be
14 trying to -- to comply with care, the extent
15 to which I felt he seemed to understand the
16 nature of the diabetes and what he had to do
17 to manage it to avoid further complications,
18 just coming out a clinical interview, I just
19 did not feeling willing to -- or maybe
20 "willing" is the wrong word -- I just did not
21 come away with the same sense as I did the
22 others, that he required that level of
23 support. I felt he was capable of -- of
24 management, where I did not feel that way

153

1  with the others. I should say, self
2  management, that I did not feel that way with
3  the others.
4      Q   This is information you gleaned
5  from your interview with --
6      A   And testing.
7      Q   -- Mr. Unger?
8      A   And testing. I'm sorry. And
9  testing.
10     Q   This is information you gleaned
11 from your clinical interview with Mr. Unger
12 and the MMPI tests that you gave him?
13     A   It was -- well, of course, there
14 is more testing than -- well, I guess it was
15 just the MMPI testing with him, wasn't it?
16 The answer is, yes.
17         (Pause.)
18     Q   Is it ... essentially a question
19 of your subjective sense as to whether the
20 patient in this case, Mr. Unger, could handle
21 his diabetes treatment without case
22 management?
23     A   Well, I think you have to -- to
24 apply -- I'm clear there's a degree of

154

1  subjectivity to any time you're assessing an
2  individual from a mental health standpoint,
3  but it's a combination of the testing that
4  you do, your clinical judgment, and so you'd
5  use what objective data you have, coupled
6  with, you know, the subjective assessment
7  that comes through clinical interview.
8       But even in interpreting
9  psychological testing, there's a degree of
10  subjectivity that goes into it. So, to a
11  degree, I have to say, yes.
12      Q   What was it in the results of
13  the MMPI tests that led you to feel more
14  comfortable with Mr. Unger handling his
15  diabetes treatment without case management
16  than with the other five plaintiffs?
17      (Pause.)
18      A   Well, my comments regarding
19  the -- the MMPI, and my thoughts about it
20  were that look, you know, he has a
21  long-standing chronic pain, chronic
22  disability disorder. I recognized the
23  anxiety disorder and depression, and I felt
24  he had an adjustment disorder, but I didn't

156

1  program, where he was going to be using --
2  having a case manager, basically, over him
3  throughout life expectancy.
4       Q   That's why I asked the question
5  about the MMPI.  I was trying to isolate
6  where it is that you felt you saw the
7  difference.
8       Is it -- is there something in
9  the results of the MMPI that makes you --
10  that you look at and makes you think he's
11  more capable of self management, or was it
12  more what you -- something you gleaned from
13  the clinical interview?
14      A   Well, I think it's more what you
15  don't see in both the clinical interview and
16  the MMPI; that you don't see the bipolar
17  disorder; you don't see schizophrenia; you
18  don't see the ... the interference with
19  thought processes; you don't see the confused
20  thought disorder that comes with things like
21  manic depressive disorder, bipolar disorder
22  or schizophrenia that -- that you see with a
23  lot of the other patients that we're dealing
24  with here. And ... you know, that was ...

155

1  feel that any of those were at a level that
2  would interfere with his thought processes
3  and make it difficult or -- or really
4  interfere with his ability to ... comply with
5  self care.
6       I did not feel we were dealing
7  with ... with an individual who was, you
8  know, demonstrating problems like
9  schizophrenia, problems like bipolar
10  disorder, things that were really interfering
11  with thought patterns or thought processes.
12  And although, you know, I do recognize that
13  there are a lot of comorbidities and a lot
14  of -- and he was not -- not managing his
15  health well, that doesn't necessarily mean
16  that we had a pattern of problems from a
17  mental health standpoint, that prevented him
18  from learning how to manage. And that was
19  the biggest issue for me.
20      At least in my interview with
21  him, my personal feeling was, he had the
22  capacity to be taught disability management
23  techniques. And so my focus was on educating
24  him as opposed to giving him a management

157

1  part of what was important to me.
2       But, really, a big part of it
3  absolutely came out of clinical interview,
4  just my sense in clinical interview that he
5  seemed to have ... a better capacity for self
6  management and understanding than the rest of
7  these patients that I was interviewing.
8       MR. SULLIVAN:  Let's take a
9  break.  I think that's it for --
10      THE WITNESS:  Your lunches
11  should be here.
12      MR. SULLIVAN:  That's very nice
13  of you to get us a lunch.
14      (Luncheon recess at 12:13 p.m.
15  to 12:52 p.m.)
16          * * * * *
17      (Continued in Volume II.)
18
19
20
21
22
23
24



**158**

```
 1
 2
 3                 CERTIFICATE OF OATH
 4
 5    STATE OF FLORIDA        )
 6                            )
 7    COUNTY OF ORANGE        )
 8
 9         I, the undersigned authority,
10    certify that PAUL M. DEUTSCH, PH.D.,
11    personally appeared before me and was duly
12    sworn.
13
14         WITNESS my hand and official seal
15    this 15th day of October, 2008.
16
17
18
19                    _____
                      Richard Castillo,
20                    Registered Diplomate
                      Reporter
21                    Notary Public, State
                      of Florida at Large
22                    Comm. No. DD609499
                      Expiration: 02/25/11
23
24
```

**160**

```
 1                E R R A T A
 2         I, PAUL M. DEUTSCH, PH.D., do
 3    hereby certify that I have read the foregoing
 4    transcript of my deposition given on October
 5    7, 2008, that, together with any additions or
 6    corrections made therein, it is true and
 7    correct.
 8
      Page    Line
 9    ------------------------------------------------
10    ------------------------------------------------
11    ------------------------------------------------
12    ------------------------------------------------
13    ------------------------------------------------
14    ------------------------------------------------
15    ------------------------------------------------
16    ------------------------------------------------
17    ------------------------------------------------
18    ------------------------------------------------
19    ------------------------------------------------
20    ------------------------------------------------
      Under penalties of perjury, I declare that I
21    have read the foregoing document and that the
      facts stated in it are true.
22
                          _____
23    Date                PAUL M. DEUTSCH, PH.D.
24    Job No. 958372
```

**159**

```
 1          CERTIFICATE OF REPORTER
 2    STATE OF FLORIDA          )
 3    COUNTY OF ORANGE          )
 4    I, RICHARD CASTILLO, Professional Court
 5    Reporter and Notary Public, do hereby certify
 6    that I was authorized to and did
 7    stenographically report the deposition of
 8    PAUL M. DEUTSCH, PH.D.; that a review of
 9    the transcript was requested; and that the
10    foregoing transcript, pages 6 through 157, is
11    a true record of my stenographic notes.
12         I FURTHER CERTIFY that I am not a
13    relative, employee, or attorney, or counsel
14    of any of the parties, nor am I a relative or
15    employee of any of the parties' attorney or
16    counsel connected with the action, nor am I
17    financially interested in the action.
18         DATED this 15th day of October, 2008, at
19    Orlando, Orange County, Florida.
20
21    ---------------------------------------
      RICHARD CASTILLO
22    Registered Diplomate Reporter
      Notary Public, State of Florida at Large
23    Commission No. DD609499
      Expiration:  February 25, 2011
24
```

**161**

```
 1    DATE: October 15, 2008
      TO:  Paul M. Deutsch, Ph.D.
 2         10 Windsomere Way, Suite 400,
           Oviedo, Florida, 3276
 3    IN RE:  Plaintiffs Vs. AstraZeneca
              Case No. 6:07-cv-15959, etc.
 4
           Please take notice that on October 7,
 5    2008, you gave your deposition in the
      above-referred matter.  At that time, you did
 6    not waive signature.  It is now necessary
      that you sign your deposition.
 7         Please call our office at the
      below-listed number to schedule an
 8    appointment between the hours of 9:00
      a.m. and 4:30 p.m., Monday through Friday at
 9    the Esquire office located nearest you.
           If you do not read and sign the
10    deposition within a reasonable time, the
      original, which has already been
11    forwarded to the ordering attorney, may be
      filed with the Clerk of the Court.  If you
12    wish to waive your signature, sign your name
      in the blank at the bottom of this letter and
13    return it to us.
14         Very truly yours,
15
           RICHARD CASTILLO
16         Registered Diplomate Reporter
           Esquire Deposition Services
17         Orlando, Florida
           (407)426-7676
18
      I do hereby waive my signature.
19
20    ---------------------------
      PAUL M. DEUTSCH, PH.D.
21
      cc via transcript:  John Sullivan, Esquire
22                        Russ Brudner, Esquire
                          Chris Coutroulis, Esquire
23
24    Job No. 958372
```

162

```
1            LAWYER'S NOTES
2    PAGE LINE
3    ____ ____ _____
4    ____ ____ _____
5    ____ ____ _____
6    ____ ____ _____
7    ____ ____ _____
8    ____ ____ _____
9    ____ ____ _____
10   ____ ____ _____
11   ____ ____ _____
12   ____ ____ _____
13   ____ ____ _____
14   ____ ____ _____
15   ____ ____ _____
16   ____ ____ _____
17   ____ ____ _____
18   ____ ____ _____
19   ____ ____ _____
20   ____ ____ _____
21   ____ ____ _____
22   ____ ____ _____
23   ____ ____ _____
24   ____ ____ _____
```

163

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
VOLUME II

-------------------------------------------x

IN RE:  Seroquel Products Liability      :
Litigation                               :
                                         :
MDL DOCKET NO. 1769                      :
This Document Relates to:                :
                                         :
PLAINTIFFS v. AstraZeneca LP, et al.     :
(Janice Burns 6:07-cv-15959;             :
Connie Curley 6:07-cv-15701;             :
Linda Guinn 6:07-cv-10291;               :
Eileen McAlexander 6:07-cv-10360;        :
Richard Unger 6:07-cv-15812;             :
Linda Whittington 6:07-cv-10475)         :

-------------------------------------------x

Tuesday, October 7, 2008

9:12 a.m. - 5:05 p.m.

Oral deposition of PAUL M. DEUTSCH,

PH.D., held at Offices of Paul M. Deutsch, &

Associates, P.A., 10 Windsomere Way, Suite

400, Oviedo, Florida, 32765, beginning at

9:10 a.m., on the above date, before Richard

Castillo, Registered Diplomate Reporter,

Commission No. DD609499 (Expiration 2/25/11)

and a Notary Public.

Esquire Deposition Services
200 East Robinson Street
Suite 425
Orlando, Florida  32801
(407)426-7676

Job No. 958372

164

```
 1              APPEARANCES
 2   LAMINACK, PIRTLE & MARTINES, LLP
     BY:  RUSS BRUDNER, ESQUIRE
 3   5020 Montrose Boulevard
     Ninth Floor
 4   Houston, TX  77006
     Phone: (713)292-2750
 5   --Representing the Plaintiff
 6   DECHERT, LLP
     BY:  JOHN J. SULLIVAN
 7   902 Carnegie Center
     Suite 500
 8   Princeton, New Jersey  08540
     Phone:  (609)955-3200
 9   --Representing the Defendants
10   CARLTON, FIELDS, LLP
     BY:  CHRIS COUTROULIS, ESQUIRE
11   4221 West Boy Scout Boulevard
     Suite 1000
12   Tampa, Florida  33607-5736
     Phone:  (813)229-4133
13   --Representing the Defendants
14
15
16
17
18
19
20
21
22
23
24
```

166

```
 1            E X H I B I T S
 2   MARKED     DESCRIPTION        PAGE
 3    33   Lab reports, Ms. Burns      167
 4    34   Letter from Dr. Elzawahry   167
 5    35   Report on L. Whittington    230
 6    36   Letter from Dr. Boyd        238
 7    37   Report re L. Whittington    250
 8    38   Report on E. McAlexander    278
 9    39   Response from Dr. Helfin    284
10    40   Document by Ms. McAlexander 292
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

165

```
 1
             I N D E X
 2
     WITNESS                 PAGE
 3
 4   PAUL M. DEUTSCH, PH.D.
 5      DIRECT (CONT'D) BY MR. SULLIVAN 167
 6      DIRECT BY MR. COUTROULIS    229
 7      CROSS BY MR. BRUDNER        336
 8   CERTIFICATE OF OATH         349
 9   COURT REPORTER'S CERTIFICATE  350
10   ERRATA                      351
11         - - - - -
12   NOTE:  Ellipses (...) used to reflect pauses
13   between words.
14
15
16
17
18
19
20
21
22
23
24
```

167

```
 1         P R O C E E D I N G S
 2   (Continued from Volume I.)
 3          * * * * *
 4     (Whereupon, Deposition Exhibit No.
 5   Deutsch-33, lab reports for Ms. Burns,
 6   was marked for identification.)
 7     (Whereupon, Deposition Exhibit No.
 8   Deutsch-34, letter from Dr. Elzawahry,
 9   was marked for identification.)
10      DIRECT EXAMINATION (CONTINUED)
11   BY MR. SULLIVAN:
12      Q   Doctor, let's talk about Janice
13   Burns, and the report you issued for her now.
14          Again, I'd like to talk about
15   some preexisting conditions and see if we can
16   agree on the fact that they existed before
17   Miss Burns got diabetes, okay?
18      A   Yes.
19      Q   First is obesity.  Can we agree
20   that before Miss Burns got diabetes, she was
21   obese?
22          (Pause.)
23      A   Yes.
24      Q   Okay.  And I've marked this as
```

168

1    Exhibit 33, because this one is going to take
2    a little more than looking at your report.
3    But do you recall, from your clinical
4    guidelines, that diabetes is diagnosed by
5    doctors at something above 126, or 126 or
6    higher milligrams per deciliter?
7         A   Yes.
8         Q   Okay.  What I've got for you
9    there are a number of lab reports for Miss
10   Burns, and some other things, all as Exhibit
11   33.  The first page of Exhibit 33 is a lab
12   report from 1994; do you see that?
13        A   Yes.
14        Q   For the dates, April 21,
15   April 20, April 18, and April 17, 1994; do
16   you see that?
17        A   Right.
18        Q   We got this from the Dade
19   Medical Center.  You can see it up top as
20   well as the Bates stamp on the bottom; do you
21   see that?
22        A   Yes.
23        Q   Okay.  And do you see that they
24   have glucose readings on each of those days?

169

1         A   Yes.
2         Q   Do you see they read across
3    those four days, 118, going backward in time,
4    144, 148, and 133; do you see that?
5         A   Yes.
6         Q   Do you see -- would agree that
7    those readings are above -- or three of those
8    readings are above the 126 number of
9    milligrams per deciliter we just discussed?
10        A   Yes.
11        Q   Okay.  And this is certainly
12   14 -- over 14 years ago?
13        A   Yes.
14        Q   And it's significantly before
15   the date of onset that you have on your
16   report of August 16, 2003?
17        A   Yes.
18        Q   Okay.  I'm going through more.
19        A   Oh, I'm sorry.
20        Q   That's okay.
21        A   I'm sorry, that wasn't a yes.
22   It was an apology, but I will see if we can
23   go back to, yeses or noes.
24        Q   If you take a look at the next

170

1    lab report, it also has to do with Miss
2    Burns, and you'll see a date of August 10,
3    2000?
4              (Pause.)
5         A   I have August 11, 2000, on the
6    next one.  Am I missing what you're looking
7    at?
8         Q   Of the report date, okay.  I see
9    it.  I'll go with that, as well.
10        A   Okay.  Am I missing something,
11   or is that -- okay.
12        Q   No, give me a second here.
13   Okay.  If you look at this --
14        A   Well, I see the log-in date is
15   August 10, 2000; report date is August 11,
16   2000.
17        Q   Do you see underneath that,
18   under "Remarks" it says, "fasting hours,
19   nine"?
20        A   Yes.
21        Q   Indicating that this is a
22   fasting test?
23        A   Yes.
24        Q   Okay.  Have you seen lab reports

171

1    like this before in your review of medical
2    records, generally?
3         A   Yes.
4         Q   Okay.  Take a look at the next
5    page.  It's the second page of what you were
6    just looking at.
7              Again, it continues to mention
8    that it's fasting hours, nine hours.
9         A   Yes.
10        Q   Do you see that?  Halfway down,
11   do you see glucose reading, just below the
12   word, "Panel"?
13        A   Yes.
14        Q   Do you see that reading of 134?
15        A   Yes.
16        Q   You see the H next to it
17   indicating it's high?
18        A   Yes.
19        Q   And that falls in the diabetic
20   level under the clinical guidelines that you
21   put together for your report; is that
22   correct?
23        A   Yes.
24        Q   And you see that's three years

3 (Pages 168 to 171)