172

1  before your report has her listed as getting
2  diabetes?
3      A   Yes.
4      Q   Do you see the first page of
5  your report, just below that date of onset,
6  of August 16, 2003, there's a bit of a
7  history where you talk about her taking
8  Seroquel from 2002 to 2006?
9      A   I apologize.  I was making a
10 note of that last test.  Would you say that
11 again?
12     Q   I'm back on the first page of
13 your report, and I apologize from going from
14 that document to the report.
15     A   Okay, I'm sorry.
16     Q   But if you look under History,
17 just below the date of onset, you have a
18 section on history?
19     A   Yes.
20     Q   And do you see you wrote there
21 that Miss Burns told you she used Seroquel
22 from 2002 to 2006; do you see that?
23     A   Yes.
24     Q   We can agree that that time

173

1  period is after this 134 glucose reading
2  where we were discussing in Exhibit 34?
3      A   Yes.
4      Q   Okay.  If you take a look at the
5  next page, do you see this is an August 25,
6  2000 progress note for Miss Burns by a
7  Kenneth Greene; do you see that?
8      A   Yes.
9      Q   If you take a look about halfway
10 down, in the middle of that paragraph there's
11 a sentence that begins with the word,
12 "other".
13         (Pause.)
14     A   Yes.
15     Q   And you see it reads:  Other
16 reported reasons where associated --
17     A   "Were associated," I think is
18 what's intended.
19     Q   -- with her pain, diabetes and
20 overall psychological well being; do you see
21 that?
22     A   Yes.
23     Q   Did you have access to any of
24 the records we so far discussed in Exhibit

174

1  34, before you did your report?
2          (Pause.)
3      A   I believe at least some of them.
4      Q   Okay.
5      A   I'd have to check and see each
6  lab report individually, 'cause that's a
7  little more difficult to recall, but -- and I
8  believe Kenneth Greene, although I think I
9  may have mislabeled Kenneth Greene as -- as
10 Dr. Greene, in looking at this.
11     Q   Social worker?
12     A   I think he's a social worker as
13 opposed to Dr. Greene, but that's an
14 inadvertent error on my log sheet.  I don't
15 know that I did on my notes, but on the log
16 sheet, I did.
17     Q   There is another note from --
18 progress note from Kenneth Greene on the next
19 page I'd like to direct your attention to.
20 The third sentence begins with, "if I
21 understand"; do you see that?
22         (Pause.)
23     A   Yes.
24     Q   And, oh, by the way, this note

175

1  is from August 2, 2000, which is before she
2  indicated she started using Seroquel?
3      A   Right.
4      Q   Okay.  It reads:  If I
5  understand her correctly, she also states she
6  has had a new onset of diabetes recently, and
7  I'm not sure I needed to go into this, so I
8  redirected to other issues; do you see that?
9      A   Right.
10     Q   Did you happen to pick up on
11 this record when you reviewed her records?
12     A   I am aware, I felt that this
13 whole issue of etiology of diabetes was not
14 my issue to deal with, so I didn't address
15 either preexisting risk factors for diabetes
16 or the instance where either hyperglycemia or
17 diabetes was mentioned pre, I felt that there
18 were physician experts who were dealing with
19 that issue.
20         So, not only in this record, but
21 I think in more than just this record, those
22 issues of both hypoglycemia and diabetes
23 where they were mentioned, I felt they went
24 to etiology, which was outside my area of

176

1  expertise.
2      Q   I asked because each of your
3  reports carries with it a rather lengthy
4  summary of the medical records, and I didn't
5  see these in there, and I'm wondering why
6  they wouldn't make it into your report.
7      A   The only reason is, again,
8  because I felt they were going to be dealt
9  with as issues of -- of etiology, and not
10  issues that I should be dealing with.  So
11  that was the only reason I stayed away from
12  issues of onset.  So I just -- I just felt it
13  was not something that I should be getting
14  into.  But I am aware of them.
15      Q   Have you discussed these with
16  the attorneys for Miss Burns?
17      A   Nope.
18      Q   Have you discussed them with
19  anyone, these documents?
20      A   Just my own staff.  I mean,
21  we're all aware, and we all were aware, not
22  just of these, but of, you know, preexisting
23  risk factors.  And our feeling about it was
24  simply it's -- the issue of etiology is not

177

1  an issue we're here to address.
2      Q   And if you take a look at the
3  next three pages attached as Exhibit Four --
4  the last four pages of Exhibit 34, there is a
5  memo from disability physical, done for
6  disability determinations on Janice Burns; do
7  you see that?
8      A   Yes.
9      Q   And you see that it's dated
10  March 9, 2001?
11      A   Yes.
12      Q   If you look on the second
13  page -- well, first, again, that date is
14  before she indicated to you that she started
15  taking Seroquel?
16      A   Yes.
17      Q   In the middle of the second page
18  there's a ... an entry that reads, diabetes,
19  underlined, in bold and all caps, colon, in
20  2000, her FBS, which I believe stands for
21  fasting blood sugar, ranged from 120 to 190.
22  She is presently on no diet or medications
23  for that, and does not check her sugars; do
24  you see that?

178

1      A   Yes.
2          MR. BRUDNER:  Object to the
3  form.
4  BY MR. SULLIVAN:
5      Q   Do you recall seeing this record
6  before you issued your report?
7          (Pause.)
8      A   I don't have a recall, so I'm
9  checking my records list, and I don't see ...
10  well, I mean, I have her Medicare records,
11  Social Security records.  I'd have to look
12  back and see if I specifically have the
13  disability determination record.  You know,
14  it's so hard to remember from all six cases
15  off the top of my head every single record,
16  but ...
17      Q   I only have to remember four,
18  and I'm having trouble.
19      A   There's no question that I had
20  her Medicare and Social Security records.
21  Whether I saw this specific record, I just
22  don't recall, but I do certainly recall the
23  documentation generally of -- of preexisting
24  reports of diabetes.

179

1      Q   Let's see if we can look at it
2  this way.
3          Is it fair to say that the
4  documents that you say you've reviewed, or
5  for the most part reviewed, and certainly all
6  of the ones that are in Exhibit 34, indicate
7  that Miss Burns, before the date she gave you
8  for her start -- starting her use of
9  Seroquel -- let me start that again.
10          I've been referring to this
11  Exhibit 33.  I think it's Exhibit -- or
12  Exhibit 34, I've been referring to it as.  It
13  is Exhibit 33.  My mistake.  Thank you for
14  pointing that out.
15          Is it fair to say that the
16  documents in Exhibit 33 indicate that, before
17  the date Miss Burns told you she started
18  taking Seroquel, she had readings for glucose
19  on fasting labs that are at a blood sugar
20  level that's higher than 126 milligrams per
21  deciliter; is that fair to say?
22      A   Yes.
23          MR. BRUDNER:  Objection, form.
24

180

BY MR. SULLIVAN:
Q    And that there were records that indicated that she had said to the person who recorded it, that she had a new onset of diabetes before the date that she gave you that she started Seroquel; is that fair to say?
A   Yes.
Q    And if Miss Burns had come in to you, seeking a rehabilitation plan before this date of August 16, 2003, that you have in your report as the date of onset, if she came in before that date, are these records you would have taken into consideration when thinking about whether to put her on some sort of rehabilitation plan in connection with her blood sugar levels and some of her other risk factors?
    (Pause.)
A   If I understood that question correctly, I think the answer is yes, but I'm --
Q    Let me ask it better.
A   And I apologize.  I just may

181

have misheard something.
Q    If she came in to you before this date of August 16, 2003, and was looking for some sort of rehabilitation plan to deal with her blood sugar levels, and some of the other risk factors that she may have had, are these documents that you would have taken into consideration when coming up with a plan?
A   That's certainly reasonable, yes.
Q    Okay.  Can we agree -- oh, by the way, are you aware that Miss Burns had ... made a number of suicide attempts?
    MR. BRUDNER:  Object to the form.
    (Pause.)
    THE WITNESS:  I think that's ... yes, that's in my notes, as well.
BY MR. SULLIVAN:
Q    Okay.
A   At this point, I'm feeling like I need -- even though I thought I remembered that, I feel like I need to confirm it in my

182

notes before I --
Q    I understand.
A   -- I say it so that I don't confuse it with any other file.
Q    And we can agree that she had -- that Miss Burns, before she had her onset of diabetes, had -- or at least before August 16, 2003, I should say -- had a number of mental health disorders?
A   Yes.
Q    Major depressive disorder; do you have that?
A   Yes.
Q    Posttraumatic stress disorder; do you have that?
A   Yes.
Q    Anxiety; do you have that, as well?
A   Yes.
Q    Can we agree that before August 16, 2003, the date of onset that's listed in your report, she had high cholesterol and triglycerides?
A   Yes.

183

Q    And hypertension?
A   Yes.
Q    Okay.  And I see a number of other things in the records that I think are in your reports.  A history, a preexisting history of COPD?
A   Yes.
Q    Is it cardiopulmonary --
A   Chronic obstructive pulmonary disease.
Q    Thank you.  And sleep apnea?
A   Yes.
Q    Fibromyalgia?
A   Yes.
Q    And hyperthyroidism?
A   Yes.
Q    Thank you.
    I know in your recommendations for Miss Burns you include again nutrition evaluation four times a year.
A   Bear with me a second.
Q    Sure.
    (Pause.)
A   Yes.

184

1    Q   If Miss Burns had come in to you
2  before August 16, 2003, looking for a plan to
3  deal with her health as it related to some of
4  the risk factors -- the risk factors we just
5  discussed, is it fair to say that, in the
6  least, you would have recommended that she
7  adopt or have a nutritional evaluation?
8    A   I think that's reasonable, yes.
9    Q   In similar frequency to the way
10 you recommended in your report in this case?
11      (Pause.)
12   A   Are we assuming in that question
13 all of the things we just went over as far as
14 an assumption that she was diabetic prior?
15   Q   Well, let me -- I realize it's a
16 tricky area, so let me just ask the one
17 question that's worth asking, then we'll get
18 back to that.
19      If Miss Burns were diabetic
20 before she started taking Seroquel, then it's
21 fair to say that all of the costs that you
22 have in this report wouldn't be related at
23 all to Seroquel; fair to say?
24   A   Well, that's fair to say,

185

1  because they're related to the diabetes and
2  ... regardless of etiology.
3    Q   Okay. To get back to your
4  question about my previous question, I think
5  we can assume that the records are what the
6  records are. And so I asked you to review
7  them in the way that you ordinarily would
8  have, had you seen them, had she come to you
9  before diabetes.
10      And with that in mind, or at
11 least before the date of onset that you have
12 listed in your report, with that in mind, is
13 it fair to say that you would have
14 recommended that nutritional evaluation you
15 just mentioned you would, the similar
16 frequency as to what you've recommended in
17 this report?
18      MR. BRUDNER: Objection, form.
19      THE WITNESS: The answer is,
20 yes. But I think the reason I'm
21 having -- and I apologize, and I'm going
22 to leave it as a yes -- the reason I'm
23 having a problem hesitating -- well,
24 strike that. Let me go back a second.

186

1  It's not a problem hesitating.
2      The reason I'm having a problem
3  limiting it to a yes is because ... if,
4  in fact, what I'm faced with is the
5  existence of diabetes pre Seroquel, then
6  the question really isn't limited to the
7  nutritional. I mean, it really is a
8  whole program. It's really not
9  the nutritional in isolation. It's the
10 whole thing we talked about in the
11 earlier case where you're really talking
12 about a package of services. The
13 nutritional alone is simply not going to
14 work for this individual at that time.
15 It would have needed to be tied to a
16 coordinated program, integrated into her
17 counseling, her diabetic and disability
18 management, that's not only managing the
19 diabetes, but is working to manage the
20 mental health, that's managing the --
21 the obesity, that's managing all of the
22 components that are made worse by the
23 diabetes and that make the diabetes
24 worse.

187

1      So that's the only issue I'm having
2  in trying to answer the nutrition with a
3  yes or no, is that it's not limited to
4  the nutrition. You wouldn't do it in
5  isolation, because it all becomes part
6  of the package at that point.
7  BY MR. SULLIVAN:
8    Q   The way I'd like you to consider
9  this in my question is that what you have in
10 front of you are the medical records that I
11 just showed you, and the others that you've
12 reviewed showing the risk factors we just
13 discussed, as well as the readings that were
14 on those lab reports, and the statements that
15 were recorded in the records.
16      With that information in hand,
17 and your full review of the medical records
18 and no more, would you have recommended
19 nutritional evaluation at the frequency that
20 you have in your current report?
21      MR. BRUDNER: Object to the
22 form.
23      THE WITNESS: First, I'm going
24 to say, yes, but I can't leave it at

188

1   that, because my problem is with one
2   part of your question.  And that's the
3   two-word phrase, "risk factors" because,
4   unlike some of these other cases where
5   we clearly are talking about risk
6   factors, this one goes a little bit
7   beyond in that there are suggestions
8   that, at least at some points, even if
9   she came out of glucose readings that
10  suggested diabetes, there were times at
11  which she, in the record, actually had
12  statements that diabetes existed.
13       Now, my understanding -- and this
14  is my understanding -- is that once
15  diagnosed diabetic, you're considered
16  diabetic, even if your glucose readings
17  from that time forth are -- are under
18  control and stable and outside ...
19  the -- the clinical guidelines for a
20  diagnosis of diabetes that you never
21  actually are then considered
22  nondiabetic.  But, I'll leave it up to
23  an endocrinologist to talk about that,
24  and that's just been my understanding

189

1        with respect to diabetes.
2   BY MR. SULLIVAN:
3        Q   I think I know the answer to
4   this, but I'll ask it.
5        A   Maybe I'll give you a different
6   answer just to shake things up.
7        Q   Is it fair to say that if
8   Miss Burns had come to you before August 16,
9   2003, the date of onset you have in your
10  report, with the medical history that we just
11  discussed, including those glucose readings
12  and statements in the records, that you would
13  also have recommended to her case management
14  along the lines of what you've recommended in
15  the report in this case?
16       A   Well, the answer is yes.  And,
17  actually, we have already talked about that,
18  so --
19       Q   Okay.  I see in the report under
20  "Allied Healthcare Evaluations," one of your
21  recommendations is for a disabled driver for
22  neuropathy; do you see that?
23       A   Right.
24       Q   Do you -- do you know what other

190

1   pains she was having at -- even before she
2   developed -- or even before August 16, 2003?
3        A   You want me to just go over
4   them?
5        Q   Physical pains, yes.
6        A   I am assuming that's what you
7   meant.
8        Q   Yeah.
9        A   Well, I went over her pain as it
10  existed at the time I saw her, but I believe
11  many of these preexisted, so let me ...
12       Q   Well, let me ask you this.
13       A   Let me see if I -- oh, I was
14  going to say, let me see if I could separate
15  them here, but go ahead.  You want to ask
16  another question first?
17       Q   Are you aware that she had
18  radiculopathy before?
19       A   Sure.  And the fibromyalgia,
20  chest pain, were all talked about.  And she
21  complains, although -- I'll break it down
22  into specifics, but post, she's -- or to me,
23  on the day of evaluation, she's complaining
24  of very significant pains in her feet and

191

1   legs, her hands, and ... I can be very
2   specific in breaking that down.  But that's
3   where she's describing her most significant
4   pain, you know, some of which, you know, is
5   by description exacerbated by her peripheral
6   neuropathy.  But I think some of it, you
7   know, has to be related, and I'll leave it up
8   to the doctors to describe.  And to some
9   extent, actually, Dr. Elzawahry,
10  E-L-Z-A-W-A-H-R-Y, does that for us, because
11  we specifically tried to ask of the -- of the
12  pain medication that you're giving her,
13  what's associated with the diabetic
14  neuropathy, and what isn't.  He says 80
15  percent is associated with the diabetic
16  neuropathy.
17       And ... so ... he has an
18  opinion, at least, as to what percentage of
19  this hand, foot and leg pain is associated
20  with the diabetic neuropathy versus what
21  preexisted.
22       Q   Actually, you've ... I'll get
23  back to that because I don't want to jump
24  topics, but --

192

1    A   Sure.
2    Q   Is there anywhere in your
3  clinical evaluation with -- of Miss Burns
4  that she mentions difficulty driving?
5         (Pause.)
6    A   Under the driving category, she
7  states ... well, it's not a quote, so I'm
8  just paraphrasing her.  She can drive but
9  there are times that she feels she should not
10  drive, so she doesn't.  She had a traffic
11  accident last week -- this is referencing
12  from the time of evaluation -- a minor
13  fender-bender.
14         She usually checks her blood
15  glucose before she drives.  She does not
16  drive if she has just taken the Methadone
17  that she's on.  Thank goodness.  At least
18  she's showing commonsense there.  But, you
19  know, I think, frankly, some of the
20  medications she's on, you know, that alone is
21  reason for her to stay from behind the wheel
22  when she's just taken it.
23    Q   Is that reason alone to give her
24  a driver evaluation?

193

1    A   Well, certainly ... I don't know
2  that it's reason alone to give her the
3  driving eval.  It's reason for the doctors
4  to -- to state for her whether she should
5  drive while on that medication or not.  You
6  wouldn't give her a driver eval because of
7  that.  The driver eval is really because of
8  the extent of the peripheral neuropathy, the
9  diabetic neuropathy, and the amount of
10  problems she's having associated with that.
11         When you combine the two, you
12  have to question whether or not, between the
13  medication and the peripheral neuropathy,
14  perhaps she shouldn't be on the road.  At
15  some point, you have to start ... piling up
16  the circumstances and look at them together.
17  But the neuropathy alone is absolutely reason
18  to give her a driver eval, and then when you
19  add the medication into it, it's an
20  exacerbating factor.
21    Q   How about if you add in the
22  other physical pain that she's having, like
23  the radiculopathy, the fibromyalgia?
24    A   Yeah.  Generally speaking, pain

194

1  is not a factor for not driving.  It's a
2  distracter.  And so if you have ... you know,
3  if you have a diabetic neuropathy, and you
4  have the medications she's taking for that
5  pain, and she's upping the medication in
6  response, she's taking a PRN because of
7  increased pain, then you have a real problem.
8  Pain by itself usually isn't the issue.
9    Q   Do you know whether -- well,
10  strike that.
11         How about her mental health
12  disorders, can they also be a reason for her
13  to have a driver evaluation?
14    A   If they're serious enough,
15  certainly they can be.  If she has actual
16  thought disorders, you know, one would be
17  concerned about that.  But if she's been
18  driving and they've not, in and of
19  themselves, caused her to lose her license or
20  been a factor that's created accidents,
21  caused her to have problems with driving,
22  then it's hard to say that that would be a
23  factor for requiring a handicapped driver
24  evaluation.

195

1         But, certainly, it would depend
2  on whether or not, for example, if she had
3  depression with psychosis, she actually had a
4  psychotic break during any of those kinds of
5  problems, then I certainly would expect the
6  doctors to take her off the -- off the road.
7         But, generally speaking, with
8  her mental health history, as significant as
9  it's been, I -- I don't think it's been a
10  problem with her driving, except during times
11  when, for example, if she'd ever been
12  hospitalized for a suicide attempt, and then
13  she wouldn't be driving, anyway.
14    Q   Hospitalized for a suicide
15  attempt; I didn't understand that.
16    A   I said, if she had ever been
17  serious enough, for example, in depression
18  that she attempted suicide and been
19  hospitalized for it, she'd already be off the
20  road, so it wouldn't be an issue, but
21  generally --
22    Q   Well, we've already agreed that
23  she's had previous suicide attempts, right?
24    A   Right.  I just said that if she

196

```
1    was serious enough in terms of her depression
2    or anxiety, and that related to a suicide
3    attempt, and she was hospitalized for that,
4    she'd already be off the road.
5        So, until -- she wouldn't be
6    released until, theoretically, she was
7    better.  And the doctor would, I would
8    assume, at that point, give instructions to
9    family members as to the appropriateness of
10   driving or not driving on any medication on
11   which she was released.
12       So, at that point, I doubt that
13   anybody ordered a handicapped driver eval or
14   reported her to the Department of Motor
15   Vehicles with respect to her license.  To my
16   knowledge, that never happened and was never
17   an issue.
18       Q   Do you -- are you aware that her
19   posttraumatic stress disorder is as a result
20   of a car accident?
21       A   I can't tell you that I was
22   aware of that -- of that being the basis for
23   her diagnosis.  Although I will tell you in
24   two seconds, actually, if I took that down as
```

197

```
1    a note.
2        (Pause.)
3        A   I did not.
4        Q   Okay.  We've marked as Exhibit
5    34 -- I'll correctly refer to it as Exhibit
6    34 this time -- the letter that just came in
7    today from Dr. Elzawahry, answering some of
8    the questions that you had with regard to
9    Miss Burns.  And you just referred to the
10   answer to your second question, and the
11   question was:  Janice is currently on
12   Methadone and Lyrica.  Are these medications
13   being prescribed for the pain associated with
14   diabetic neuropathy?  And the answer is:
15   Yes, 80 percent.  Do you see that?
16       A   Yes.
17       Q   One thing that this answer
18   indicates to us is that those drugs are being
19   prescribed to Miss Burns for something else,
20   as well, correct?
21       A   That's correct.  And please
22   understand, I have not been through this
23   letter fully myself, nor have I had a chance
24   to adjust this report in relation to it.
```

198

```
1    And, clearly, for example, I'm going to have
2    to make an adjustment with respect to the
3    Methadone and the Lyrica, based on what he's
4    saying.
5        Q   If ... Miss Burns had to be on
6    Methadone for pain, regardless of the
7    percentage as allocated against diabetic
8    neuropathy --
9        A   You mean, pain medication, not
10   on pain.
11       Q   I thought I said on Methadone
12   for pain.
13       A   No, you said, if she had to be
14   on Methadone or pain.
15       Q   Oh, I'm sorry.  Let's start
16   again.
17           If Miss Burns had to be on
18   Methadone for her pain, for some reason other
19   than diabetic neuropathy, and then she got
20   diabetic neuropathy, and the Methadone helped
21   for that, as well, is there any reason that
22   you would allocate costs for Methadone to
23   diabetes?
24       A   I would not.  If she was on it
```

199

```
1    fully at the same prescription, with no
2    change, and then developed diabetic
3    neuropathy, and the doctors just continued
4    the same level of Methadone, my typical
5    approach in a life care plan, or in a
6    rehabilitation plan, 'cause that's what we're
7    working with here, would be not to add costs
8    associated with the diabetic neuropathy.
9        So, you know, my understanding
10   here was a little different.  But if it's
11   demonstrated to me that I'm wrong, that she
12   was actually prescribed Methadone and Lyrica
13   prior to the diabetic neuropathy, and it
14   remained unchanged, even though I have this
15   comment that it's 80 percent for the diabetic
16   neuropathy, then that would, in fact, have a
17   significant impact.
18       Q   Well, my question was only as to
19   Methadone, just so we're clear.
20           What evidence do you have that
21   supports your belief, if you have this belief
22   at all, that Methadone was prescribed to
23   Miss Burns only after she got diabetic
24   neuropathy?
```

200

```
 1       A   It's strictly from my -- our
 2   asking the patient what the medication was
 3   that she was receiving, and specifically the
 4   purpose of its prescription, whether she was
 5   on it before and whether or not it was -- and
 6   what it was being prescribed for.
 7           She said it was being prescribed
 8   specifically for the neuropathy, and so we
 9   wrote to the doctor and asked -- well, you
10   saw -- you could see what we asked.
11           So, I have nothing more than
12   that.  And if, in fact, it proves not to be
13   correct, that's going to have an impact.
14       Q   Where did you document in your
15   report that she told you she was taking it
16   for -- Methadone for diabetic neuropathy?
17       A   Under "Present Treatment".
18       Q   What page is that at?
19       A   Oh, I'm looking at my notes, so
20   I'll have -- I'll have to get to that.  Hold
21   on just a moment.
22           (Pause.)
23       A   Page six, under "Medication" --
24   the Methadone would be on page seven, where
```

202

```
 1   for pain, and she's taking them both for the
 2   neuropathy, so we did -- we did ask them
 3   together.  That's true.
 4       Q   And it could be that the doctor
 5   was thinking Lyrica is 100 percent for
 6   neuropathy, and Methadone is 90 percent for
 7   pain and 10 percent for neuropathy; couldn't
 8   it?
 9       MR. BRUDNER:  Object to the
10   form.
11       THE WITNESS:  Sure.  But he has
12   a large space to answer.  He came back
13   with 80 percent.  It's hard for me to
14   believe that if he had that distinction
15   he wanted to make, he wouldn't have
16   written it.  But I'll give you a yes.  I
17   mean --
18   BY MR. SULLIVAN:
19       Q   That's the way the question's
20   phrased.
21       A   But there was nothing in there
22   that said, you have to answer it and average
23   them together.  He could have -- I mean, he
24   made the -- the clear distinction of saying,
```

201

```
 1   it shows it was prescribed by Elzawahry,
 2   E-L-Z-A-W-A-H-R-Y, so you don't have to go
 3   back and look it up again.
 4           The Lyrica, the Methadone; do
 5   you see that?
 6       Q   I do.  So, in her responses to
 7   you, she attributed Lyrica and Methadone 100
 8   percent to her neuropathy; is that correct?
 9       A   She did.  Elzawahry, as you
10   know, said 80 percent.
11       Q   So the doctor had something
12   different to say from what Miss Burns told
13   you; fair to say?
14       A   Fair to say.  Not usually
15   different, but fair to say.
16       Q   Your question to Dr.
17   Elzawahry -- Janice is currently on Methadone
18   and Lyrica, are these medications being
19   prescribed for the pain associated with
20   diabetic neuropathy -- doesn't distinguish
21   for the doctor between Methadone and Lyrica,
22   but rather lumps them together in one
23   question, correct?
24       A   Well, that's true.  They're both
```

203

```
 1   I'm using pain medication 80 percent for the
 2   diabetic neuropathy and 20 percent for other
 3   pain.  He could very easily, if he thought it
 4   were appropriate, to have said, you know, the
 5   Lyrica is for nerve-based pain and that is a
 6   different percentage; and the Methadone is,
 7   you know, used for this, and that's -- that
 8   percentage is different.
 9           And I clearly think that was the
10   thought process.  If he's already breaking it
11   down, it would not have taken him but a few
12   extra pen strokes to make that clear.  But,
13   you know ... you're able to ask him.
14       Q   And you didn't ask Dr. Elzawahry
15   whether Miss Burns had been taking either of
16   these medications before she was diagnosed
17   with diabetic neuropathy, correct?
18       A   That's true.  I did not make a
19   separate question regarding that.  That's
20   absolutely true.
21       Q   So you don't know the answer to
22   that question, correct?
23       A   Other than from her, I
24   absolutely do not.  You're absolutely
```

11 (Pages 200 to 203)

204

1  correct.
2      Q   And we already know that, to
3  some extent, her answer with regard to
4  Methadone and Lyrica differs from that of her
5  doctor's answer, correct?
6      A   It's her best patient
7  understanding which can easily be different
8  than what the doctor's thinking is, because a
9  lot of doctors don't ... you know, don't
10  break it down that clearly to a patient,
11  particularly one like this, whose
12  understanding's going to be somewhat limited.
13      Q   But the doctor's understanding
14  will be better than the patient's
15  understanding?
16      A   Oh, clearly. I'm just trying to
17  make the distinction that I don't think that,
18  in this instance, her answer to me is with
19  malice or forethought.
20      Q   Well, we can agree, at least,
21  that the amounts that you have in your
22  current report for Methadone and Lyrica, need
23  to be reduced in some fashion?
24      A   Well, I would -- based on this

205

1  alone, I would reduce them by 20 percent
2  with the dollar amounts.
3      Q   Okay.
4      A   And so if you get to Dr. ... is
5  it Raffa that you're taking Thursday?
6      Q   Yes.
7      A   Okay. Well, then, clearly, you
8  would ask Dr. Raffa, you know, to do a
9  reduction of 20 percent on the Lyrica and the
10  Methadone if -- I mean, I'll try to get to
11  him before then, but --
12      MR. COUTROULIS: Well, I'm not
13  sure I can ask him to do that. Maybe
14  you should ask him.
15      THE WITNESS: I'm going to do my
16  very best. I just have to remember to
17  get that done and ... let's see if I can
18  make a note here. I just bumped a lot
19  of today to tomorrow. I have doubled up
20  tomorrow, and whether I can get to him,
21  but I'll do my best. I'll try and call
22  him tonight if I can. Let me make a
23  quick note to do that.
24      (Pause.)

206

1  BY MR. SULLIVAN:
2      Q   By the way, are you aware that
3  she was ambulating with a cane before
4  August 16, 2003, because of her hip problems?
5      (Pause.)
6      A   Well, clearly, if we included --
7  if I included a cane --
8      Q   No, that's not where I'm going.
9      A   -- in the plan, then the fact of
10  the matter is, I was not aware. So, if you
11  have it in there -- are you saying it is?
12      Q   No, not at all. I haven't seen
13  it in there.
14      A   Oh, I'm sorry.
15      Q   Nor have I seen a cane in your
16  recommendation.
17      A   Okay.
18      Q   I think I was using --
19      A   Well, no, there is a cane shown
20  prior, in prior notes.
21      Q   There you go.
22      A   But I thought you were meaning
23  that I also included it in my plan, and I
24  misunderstood the question.

207

1      Q   No, simply is an indication of
2  the extensiveness of the pain she was having.
3      A   Oh, no, I understood.
4      Q   Had you seen a note in the
5  Social Security disability document, that is,
6  the last part of Exhibit 33 where ... the
7  examiner who did the physical indicated: It
8  is extremely difficult for me to determine
9  whether or not this patients is able to work,
10  based on her psychiatric illness, major
11  complaint -- puts in paren -- and it is
12  possible that the left hip is more disabling
13  than her psychiatric illness?
14      A   Yes.
15      Q   Are you aware of the extent of
16  her physical disabilities?
17      A   Yes.
18      Q   Do you know whether she was
19  taking Methadone for pain in her hip?
20      A   I am not aware of her taking
21  Methadone for pain in her hip.
22      Q   Okay. Is there an exercise
23  recommendation that you make in your report?
24      A   In the recommendations?

208

1    Q   Yeah.
2        (Pause.)
3    A   I think there's ... just a
4  recommendation that she should be part of a
5  wellness program.
6    Q   And what is a wellness program?
7    A   Basically, it's a hospital-owned
8  -- usually it's related to a hospital --
9  owned physical fitness program.
10       Reason I recommend it for a lot
11 of patients is because, although you're not
12 getting physical and occupational therapy,
13 the programs are supervised by P.T. and O.T.
14 physical therapy and occupational therapy, so
15 you have the benefit of that instruction and
16 oversight within the facility without
17 actually paying for it.  And for a lot of
18 these patients, frankly ... it just makes
19 good sense, particularly when you have the
20 history of physical disability that a lot of
21 these patients have.
22   Q   Don't you also recommend that
23 she join the Y?
24   A   I did recommend that she join

209

1  the Y.
2    Q   For --
3    A   Because of low-impact exercise
4  that's available to her.
5    Q   Has any doctor ever recommended
6  that, that you're aware of?
7    A   I don't think any doctor ever
8  addressed the issue of needing to get these
9  people exercising and part of a coordinated
10 program.  So, no, I don't think anybody ever
11 has discussed -- I mean, they've noted the
12 obesity; they've noted a lot of the
13 comorbidities that we've talked about, but
14 has anybody ever actually sat down and said,
15 look, we need to design an overall program
16 and address it, and the answer is, I don't
17 see where it's ever been addressed.
18       So saying, look, one of the
19 things you should do is join the Y and get in
20 the pool, because it's low impact -- and for
21 her, exercise makes sense, but the reality
22 is, as we've noted, the hip and some of these
23 other issues in terms of physical injury,
24 make low-impact exercise important.

210

1        And so recognizing she needs it,
2  but recognizing that preexisting
3  comorbidities as we've been talking about for
4  her make regular exercise regimes more
5  difficult.  Using low-impact exercise in the
6  swimming pool makes good sense.  Joining the
7  Y is just commonsense.
8    Q   Well, taking it outside of, or
9  beyond just commonsense, do you know whether
10 or not there are any risks involved with her
11 doing such exercise, given ... her diabetes,
12 her diabetic neuropathy, or any of her other
13 physical conditions?
14   A   Well, there are risks if, for
15 example, she was going in the pool with an
16 open wound, a diabetic ulceration, anything
17 of that nature, certainly she should stay
18 away from it.  We'd have to have P.T. or O.T.
19 making alternative recommendations.  It's one
20 reason why I suggested that she be part of a
21 wellness center as well as part of the Y.
22 That way, we have a P.T. -- I'm sorry, for
23 the record, physical therapist available to
24 make recommendations before she would

211

1  undertake any low-impact exercises, or use
2  any machines at the wellness center.  So
3  that, clearly, if there were issues, both her
4  treating doctor and an available physical
5  therapist could make recommendations as to
6  what will work for her and what won't work.
7    Q   What are you recommending that
8  she do inside the pool at the Y?
9    A   Well, frankly, the advantage we
10 have here is, by being part of a wellness
11 center, we have a P.T. -- I keep doing
12 that -- a physical therapist who can be very
13 specific about what she does.  Because any
14 physician is going to recommend that a
15 physical therapist design a regimen for her.
16       I'm trying to find a way to do
17 it without it costing additional dollars in
18 the plan.  You know, whether it's simply
19 walking in the pool, whether it's -- you
20 know, because they have exercise bars where
21 she can hold on and flutter kick.  I mean,
22 there's all sorts of low-impact exercises,
23 depending upon what she can tolerate and what
24 they would like her to do.  So, there's a

13 (Pages 208 to 211)

212

1  range of things that can be accomplished, and
2  I think it's up to the physical therapist and
3  the doctor to make that decision.  I'm simply
4  making the opportunity available to her.
5      Q   Are you ... have you ever had an
6  instance where you recommended such physical
7  therapy for a patient with diabetes?
8      A   We do it all the time as with
9  our diabetic patients who are ... dealing
10  with diabetes as a secondary diagnosis to
11  another primary disability, or who develop
12  their primary disability as a result of the
13  diabetes.
14      In other words, they develop
15  their amputations as a result of the
16  diabetes, or who have diabetes in addition to
17  the fact that they also happen to be spinal
18  cord injured, or traumatically brain injured
19  or whatever.  So, it's something that we deal
20  with all the time in addition to other
21  associated disabilities.
22      Q   My question is not geared toward
23  patients who have other subsequent
24  complications to diabetes, or also happen to

213

1  have diabetes, but have a primary problem.
2  I'm talking about a patient for diabetes with
3  diabetes, have you ever had an instance where
4  you've recommended such wellness care and to
5  join a Y for exercise?
6      A   Well, we've already established
7  long into -- you know, whatever, 16 hours
8  ago, or 12-14 hours ago -- that I have not
9  dealt with cases before this, where we were
10  dealing with setting up recommendations
11  solely for the purpose of diabetes.
12      Of course, again, these are --
13  these are cases that also have other
14  significant complicating factors, but
15  although we've dealt often with diabetes,
16  usually we don't deal with diabetes outside
17  other complicating factors, and we've already
18  established that, so the answer has to be,
19  no.
20      Q   No, okay.
21      (Pause.)
22      Q   The non-prescription medications
23  that you recommend, are those all as a result
24  of what Miss Burns told you?  Merilax, stool

214

1  softeners, and Aspirin?
2      A   Yes.
3      Q   Well, the Aspirin you've
4  recommended on the basis of clinical practice
5  guidelines, that's on your own?
6      A   Right.  And a lot of this is the
7  result, quite honestly, of the secondary --
8  the side effects of the Methadone she's
9  taking.
10      Q   Has any doctor recommended stool
11  softeners or Merilax for Miss Burns to take
12  for side effects of Methadone?
13      A   I don't think -- I didn't ask --
14  I don't remember talking to any of the
15  doctors, asking any of the doctors about it.
16  But it's such a common side effect of any of
17  the narcotic medications, we see most of the
18  patients developing bowel motility problems
19  and getting constipated.
20      Q   Okay.  Did Miss Burns say that
21  she was having those side effects?
22      A   Constipation?  Sure.  That's why
23  she's taking the Merilax and the stool
24  softener.

215

1      Q   She's already taking those;
2  that's what she told you?
3      A   Right.
4      Q   Okay.
5      A   Oh, yeah.  I wouldn't be
6  bringing them up other than for that.
7      Q   Okay.  The equipment supplies
8  section of your report for Miss Burns, are
9  those solely based on what she told you?
10      A   Right.
11      Q   Do you see that the last one is
12  for a cane used secondary to diabetic
13  neuropathy?
14      A   Yes.
15      Q   Do you recall we already talked
16  about the fact she had already --
17      A   We did.  And, you're right.  I
18  ... I think we did have a note that she was
19  using a cane ... pre, and if -- if -- and I
20  will confirm that note and deal with that if
21  I can confirm it, and I'm pretty sure I do
22  have a note in there about that.
23      Q   And if you do, then we'll strike
24  it from the report.

14 (Pages 212 to 215)

216

1      A   Right.
2      Q   Okay.
3          (Pause.)
4      Q   And I'd like to finally ask you
5  about the medical care recommendations.
6          The first one is ... that she
7  see her primary-care physician four times a
8  year; do you see that?
9      A   I see it.  What did you ask me,
10  though?  I didn't hear it.
11      Q   I just asked you whether you see
12  that's your recommendation.
13      A   Oh, yes, I see it.
14      Q   Do you know how often she was
15  seeing her primary-care physician before
16  August 16, 2003?
17          (Pause.)
18      A   I don't.  I do know what she
19  told me was the frequency she said she's been
20  seeing her most recently, but I didn't use
21  that, either.  She said she was seeing her
22  once a month.  But Dr. Yauch -- I'm sure I'm
23  pronouncing that wrong, Y-A-U-C-H -- gave me
24  her recommendation, and I used that and tried

217

1  to -- tried to ask what she wanted
2  specifically and solely for the diabetes.
3      Q   Well, if Miss Burns was seeing
4  her PCP 12 times a year, there hardly seems a
5  need to add four additional times for
6  diabetes care that could be taken care of
7  during her other visits; fair to say?
8      A   I would say, if she was
9  averaging once every single month, and didn't
10  need -- and was incorporating her diabetes
11  care into that, and that was regular and
12  ongoing, I couldn't disagree with you.
13      Q   And then if that were the case,
14  we'd remove that cost from your report?
15      A   I could disagree with that.  I
16  mean, if Yauch had a different opinion when
17  you talked to her, if she said, no, I needed
18  these four times, or I didn't expect the
19  once-a-month to continue on an ongoing basis,
20  I'll let her deal with that.
21          But, to be perfectly frank ...
22  it seems to me that if she was seeing her and
23  expected to continue seeing her 12 times a
24  year, which seems awfully high to me, on an

218

1  ongoing basis into the future, it'd be hard
2  to believe you couldn't incorporate these
3  four visits within that.
4          (Pause.)
5      A   Let me make a note, please,
6  before you go on.
7      Q   Sure.
8      A   Because I'll never remember this
9  stuff later.
10          (Pause.)
11      A   Okay, go ahead.
12      Q   Next, you have a recommendation
13  for laboratory exams from Dr. Yauch again?
14      A   Right.  And they're repeated by
15  ... Elzawahry.
16      Q   Do you know whether Miss Burns
17  would have received any of these laboratory
18  exams before August 16, 2003?
19      A   Well, first of all, if she was
20  on any pain medications pre, as some of your
21  questions would suggest, no question, you
22  would have had to have liver function.
23          Now, I'm talking as a case
24  manager, and from my area of specialty as

219

1  a -- as a rehab expert, and not as an M.D.
2  But one would have expected liver-function
3  studies for any pain medication she was on.
4          Whether or not she would have
5  had any of the others, I'll leave to the
6  endocrinologist and Dr. Yauch.  He's
7  basically recommending ...
8      MR. COUTROULIS:  She.
9      THE WITNESS:  Elzawahry's a she,
10  also?
11  BY MR. SULLIVAN:
12      Q   No, Yauch.
13      A   No, I'm referring to
14  Elzawahry --
15      Q   Okay.
16      A   -- when I was saying "he".  And
17  he's basically recommending actually a -- a
18  couple of additional besides the one she's
19  recommending.  So I'm going to have to look
20  those up and try and get some sense of what
21  may have been related to pre ... even though
22  I asked -- periodically, I've worked the
23  Montro [ph] medication regimen and diabetes,
24  and ... we're going to probably run into some

15 (Pages 216 to 219)

220

1   similar issues as we've talked about before.
2       Q   Well, let me ask the broad
3   question then.  Maybe we can end it with
4   that.
5           Would you agree with me that it
6   would be proper not to include in your
7   costing for a laboratory exam, any exams that
8   Miss Burns would or should have undergone
9   before August 16, 2003, the date that you
10  have for onset of diabetes?
11      A   I agree, unless they've
12  increased the frequency because of the
13  diabetes.  And that's up to the doctors to
14  explain.  But if they were going to do it
15  once a year before and now need to do it
16  twice, we should include once.  But the only
17  thing that belongs in here is what
18  specifically and solely results from the
19  diabetes, based on the assumption that the
20  diabetes is a -- for lack of a better
21  phrase -- a post-morbid onset.
22      Q   Okay.  And that's true in all
23  six cases, correct?
24      A   Yes.

221

1       Q   If you take a look at Exhibit
2   34, that's the letter from Elzawahry.  How
3   often does she recommend that Miss Burns
4   visit a neurologist, that being Dr.
5   Elzawahry, every year?
6       A   Three to four times a year for
7   ongoing ... treatment of ... well, he says,
8   both monitoring the diabetes and the diabetic
9   neuropathy.  But ... it's some kind of ...
10  some kind of ... merging has to take place
11  here.  You're not going to have three to four
12  times a year with Yauch, even forgetting the
13  other issue we've already dealt with, we've
14  already discussed.
15          Let's assume Yauch said three to
16  four, and she wasn't seeing a primary care
17  before.  And he's saying, three to four,
18  we're not going to have her being monitored
19  by the neurologist three to four times a year
20  for monitoring the diabetes and the diabetic
21  neuropathy and then separately see a primary
22  care.  So you would, either because of the
23  diabetic neuropathy, move that monitoring
24  over to the neurologist and drop it from the

222

1   primary care, or you're going to have to work
2   out something.  You wouldn't end up with
3   eight visits a year.
4       Q   Right.  No double counting, or
5   no doubling up of visits for the same
6   purpose?
7       A   It would seem to me to be --
8           MR. BRUDNER:  Object to the
9   form.
10          THE WITNESS:  It would seem to
11  me to be of concern, not just because of
12  the dollars here.  That's one realistic
13  and reasonable issue to be concerned
14  about.  But you have another issue, and
15  that's the potential you have, if you
16  don't have a case manager, of ... two
17  different doctors prescribing two
18  different sets of medication, and nobody
19  monitoring what's going on.
20  BY MR. SULLIVAN:
21      Q   Well, in the real world, that's
22  a problem we have, but in this case, it's not
23  really a problem because this report has
24  never been given to a doctor or to

223

1   Miss Burns, correct?
2       A   Well, that's true, but,
3   theoretically, she's seeing both of these
4   doctors.  And so both of them are saying, I
5   want to see you three to four times a year.
6   And she does.  And she follows up and goes to
7   both of them.  Then it, in fact, could be a
8   real-world problem.
9       Q   We can also agree that even if
10  you do chip away some of those three to four
11  times a year visits, either from Dr. Yauch or
12  Dr. Elzawahry, because they're both
13  addressing diabetes monitoring, that the 12
14  times per year that you recommend in your
15  report for Miss Burns to see a neurologist,
16  is too high?
17          (Pause.)
18      A   Well, no question.  What we --
19  we understood that -- and I think it's her
20  confusion, perhaps -- we understood her to
21  say, and I think maybe she was confused, that
22  this was the frequency on which she was
23  seeing -- and it may have been initially, as
24  they were titrating narcotics, this was the

224

1  frequency she was seeing Elzawahry, and so
2  that's what we used.
3      But perhaps what we've got here
4  is Dr. Elzawahry having stabilized her on her
5  Methadone and her Lyrica, because it's not
6  unusual at all to start out with seeing
7  somebody who's on Methadone, that frequently.
8  But, no question, that he's now saying three
9  to four times a year, he's happy with.  But
10 there clearly has to be an adjustment in the
11 frequency of follow-ups between the doctors.
12      And not only just the
13 neurologist at this point, but ... the
14 neurologist, the primary care, how we're
15 dealing with the medications.  I don't know
16 whether it's best to follow-up and call Dr.
17 Elzawahry and work this out, or how we'll
18 accomplish it, but clearly, it has to be
19 accomplished.
20     Q   And the adjustment will have to
21 be downward in the number of visits, correct?
22     A   Oh, that's absolutely true.
23     Q   And when we talk about the
24 adjustment, we're talking about adjusting

225

1  downward the number of visits that you have
2  in your report, correct?
3      A   True.
4      Q   Okay.  Dr. Elzawahry, in Exhibit
5  34, recommends ... is it an annual visit to
6  the podiatrist, one time per year?
7      A   Actually, he doesn't say.  He
8  just says, podiatry based on foot condition.
9  She currently has ulcerations.  So he doesn't
10 say, frequency.  He just says, podiatry, yes.
11 Optomo -- Ophthalmology -- that's not coming
12 out right, is it?
13     Q   I'm sure Richard typed it
14 correctly.
15     A   He's typing it correctly.
16     Ophthalmology, yes, annual
17 unless there are complications.
18     Internist, he says, already
19 treating with Dr. Yauch.
20     Other, he says, psych, yes,
21 based on psych.  I'm assuming he means based
22 on previous condition.
23     Then other pain management, yes,
24 21 to ... oh, no, I'm sorry, one to two

226

1  months.
2      Q   What's that symbol before the
3  "one" in that?
4      A   I take that to be a zero.  We'll
5  call his office to clarify.  But I'm ...
6  let's see what else he says here.
7      Oh, then he talks about -- he
8  says, all diabetics would benefit from this,
9  referring to the need for a nutritionist.
10 Then he has a comment here.
11     (Pause.)
12     A   Needs good internal medicine
13 physician to be a gatekeeper and monitor
14 meds, labs, tests.  Should have only one to
15 two ... providers of medications.  Patient
16 has multiple ... doctors and ... that's kind
17 of what we've been talking about.
18     Q   Well, you haven't been talking
19 about that.  You've been talking about a case
20 manager, Dr. Elzawahry, talking about a
21 physician, correct?
22     A   Oh, no, no, I don't mean that.
23 We've been talking about multiple doctors
24 doing multiple prescriptions --

227

1      Q   Okay.
2      A   -- and needing to -- the concern
3  about too many doctors, or too many
4  prescriptions coming from multiple doctors.
5  That's what we were talking about.
6      Q   To state it differently then, we
7  can agree that Dr. Elzawahry, in the
8  additional comments or suggestions section,
9  did not recommend case management, correct?
10     A   No.  And most doctors don't
11 really understand or utilize case management.
12 That's something that insurance carriers use,
13 that whether it -- I mean, all the carriers
14 tend to use it because doctors -- frankly, a
15 primary-care doc is a good gatekeeper when it
16 comes to working with other doctors.
17     Case managers coordinate, not
18 just doctors, but all other aspects of care.
19 They make use of all components of -- of case
20 care, not just physician, but allied health
21 professionals, as well as all replenishable
22 and durable medical goods, they're
23 coordinated, all of the -- basically all of
24 the components of care, and that's why case

228

1  managers become so critical for a lot of
2  these, both personal injury and healthcare
3  carriers.
4      **Q   In fact, Dr. Elzawahry not only
5  does not recommend the case manager but
6  instead recommends that a physician be the
7  person who'd be the gatekeeper and monitor
8  meds and labs and tests; isn't that true?**
9      A   Well, first of all, it's not
10  that he doesn't recommend a case manager.  He
11  doesn't address the issue, and you're right,
12  he's recommending a primary care doctor, or
13  an internal medicine physician, but only
14  specifically to monitor the medical portion,
15  the labs, the tests, the drugs, not even
16  procedural issues, but specifically he lists
17  those three items.  I don't have a problem
18  with that, because that's not inconsistent
19  with still using a case manager.
20      **Q   We went over the complications
21  that you listed in each of the reports last
22  week a lot.  There's one question I'm not
23  sure I asked you.  There's a long --**
24      A   You got to be kidding.  There

229

1  can't be a question you didn't ask me.
2      **Q   There's a long list of
3  complications that you put down in this
4  section.  Do you have any understanding
5  of ... the percentages of -- the percentage
6  of diabetes patients who get any of these
7  complications?  Do you understand that
8  epidemiology?**
9      **MR. BRUDNER:**  Object to the
10  form.
11      **THE WITNESS:**  Actually ... I
12  would ... although there is some
13  research out there, I would tend to
14  argue that there is not sufficiently
15  accurate research to suggest any
16  reasonable probability of being able to
17  predict, with accuracy, the numbers of
18  individuals who are at risk for
19  developing specific complications, which
20  is one reason why you can't put it into
21  any kind of rehabilitation or life-care
22  plan.
23  **BY MR. SULLIVAN:**
24      **Q   My question is a little**

230

1  **different.  It's not about prediction, but
2  about your knowledge of the percentage of
3  diabetes patients who actually have gotten
4  these complications?**
5      **MR. BRUDNER:**  Same objection.
6      **THE WITNESS:**  No, I think my
7  question -- answer is that, but the
8  bottom line is, no, I don't think there
9  are accurate statistics out there.
10  There are some statistics, but I don't
11  believe that -- certainly, I can't quote
12  them.  And, again, I don't think there
13  are accurate statistics out there
14  sufficient to be able to tell us that.
15      **MR. SULLIVAN:**  Okay.  Take a
16  short break.
17      I think I'm done with Burns.
18      **THE WITNESS:**  I could certainly
19  use that.
20      **MR. BRUDNER:**  Me too.
21      (Recess taken from 2:07 p.m. to
22  2:17 p.m.)
23      DIRECT EXAMINATION
24

231

1  **BY MR. COUTROULIS:**
2      **Q   Dr. Deutsch --**
3      **THE WITNESS:**  We're done with
4  Burns, right?
5  **BY MR. COUTROULIS:**
6      **Q   We've met over the last couple
7  of days of your deposition.  I'm Chris
8  Coutroulis, and I'm going to ask you a few
9  question.**
10      **I'd like to direct those
11  questions to your report on Linda
12  Whittington.  And I have an extra copy of
13  your report here.**
14      **MR. COUTROULIS:**  Let's go ahead
15  and mark it.  I think it's Exhibit 35.
16  If you prefer to use your own copy,
17  that's fine.
18      (Whereupon, Deposition Exhibit No.
19  Deutsch-35, report on Linda Whittington,
20  was marked for identification.)
21  **BY MR. COUTROULIS:**
22      **Q   Would you identify Exhibit 35 as
23  your report on Linda Whittington?**
24      A   Yes.  Just give me one second.

232

```
1       Q   Sure.
2       A   I forgot to put Elzawahry's
3   letter in the Burns' file.
4           You want me to identify this?
5       Q   Yes, sir.
6       A   Okay.  This is more than just my
7   report.
8       Q   What else does it contain?
9       A   It contains what looks to be --
10  well, first of all, it contains my CV.  And
11  it also contains parts or a part of ... the
12  section, the referral section of ... the
13  file, on ... fee schedules.
14      Q   Does Exhibit 35 contain, among
15  other things, your complete report on Linda
16  Whittington?
17      A   Yes.
18      Q   I'd like to direct your
19  attention to the medical summary in the
20  report.  Is it fair to say, sir, that the
21  medical summary describes your observations
22  based on your review of medical records?
23      A   Yes.
24      Q   And is that section based solely
```

233

```
1   on your review of medical records?
2       A   Yes.  I mean, obviously, it's
3   just a summary, it's not all -- everything
4   contained within the records, but it's
5   designed to try and remind me to, as best of
6   my ability, of what's in the medical records.
7       Q   And do you try to list out what
8   you regard as the most important or salient
9   aspects of the medical records?
10      A   I do my best to do so, yes.
11      Q   Now, on page seven of your
12  report, would you agree, sir, that based on
13  your review of the February 4, 2007 record
14  from the Center for Medicine and Psychiatry,
15  that Miss Whittington was in denial about
16  having a psychiatric illness?
17      A   Yes.
18      Q   And that she was paranoid and
19  had persecutory delusions?
20      A   Yes.
21      Q   And, sir, based on an August 13,
22  2007 record from the Center for Medicine and
23  Psychiatry, would you agree that
24  Miss Whittington remained paranoid and that
```

234

```
1   she continued to be in massive denial of her
2   psychiatric illness?
3           (Pause.)
4       A   Yes.
5       Q   And that she was paranoid with
6   persecutory delusions and had poor insight
7   and judgment?
8       A   Yes.
9       Q   Now, sir, you note in several
10  places in your report that Miss Whittington
11  had a history of being noncompliant with
12  medical advice; is that correct?
13      A   Yes.
14      Q   And, again, directing your
15  attention to your report, for example, on
16  January 25, 2005, she was seen at Baptist
17  Medical Center for uncontrolled hypertension
18  and abnormal EKG and chest pain, but she did
19  not want to be admitted, and signed herself
20  out of the hospital against medical advice;
21  is that correct?
22      A   What page?
23      Q   And if it helps, I'm looking
24  specifically at page 11 of your report.  But
```

235

```
1   you should feel free to look at whatever you
2   like.
3       A   No, it helps me just to go ahead
4   and give me the page number.  I'll get there
5   faster, and we'll get out of here a lot
6   faster.  And yes, I agree with you.
7       Q   And would you agree, sir, and
8   directing your attention now to page 12 of
9   your report, that on May 24, 2005,
10  Miss Whittington was seen at the Jackson
11  Heart Center for hypertension, but she
12  declined any blood work and refused to
13  increase her medication for better blood
14  pressure control?
15          (Pause.)
16      A   Yes.
17      Q   And would you agree, directing
18  your attention to page six of the report,
19  that in August, 2006, Miss Whittington had
20  elevated blood pressure, but refused any
21  treatment on multiple occasions?
22      A   Yes.
23      Q   Would you agree, sir, directing
24  your attention to page seven of your report,
```

236

1  that in March of 2008, Miss Whittington went
2  to Baptist Primary Care, and the record noted
3  that she had not been following her diabetic
4  diet, exercising, or checking her blood
5  sugars at home?
6      A   Yes.
7      Q   Directing your attention to page
8  eight of your report, would you agree that
9  from May 7 through 14, 2008, she was
10  hospitalized for acute pancreatitis?
11      A   Yes.
12      Q   And is it fair, sir, that your
13  observation, based on your review of the
14  record, was that she had not been checking
15  her blood pressure or her blood sugars?
16      A   Yes.
17      Q   Directing your attention to page
18  five of your report, your report notes that
19  Mrs. Whittington hasn't been back to her
20  treating physician since her hospitalization;
21  is that correct?
22          (Pause.)
23      A   I'm sorry, where are you reading
24  from?

237

1      Q   Page six.
2      A   Oh, no wonder I can't find it.
3          That's correct.
4      Q   And on page five of your report,
5  you note that Mrs. Whittington hasn't been
6  back -- I'm sorry, strike that.
7          Let me direct your attention to
8  page five.  Your report notes that
9  Miss Whittington is off all psychotropics; is
10  that correct?
11      A   I'm sorry, again, where are you?
12      Q   Page five.
13          (Pause.)
14      Q   It's about three-quarters of the
15  way down the page.
16          You have a reference to
17  Dr. Harold Boyd --
18      A   Yes, I see it.  And yes, that's
19  correct.
20      Q   And do you know whether that
21  currently is the case?
22      A   Unless something has changed
23  since August 1st, I don't have -- I don't
24  think I have anything -- no, I don't.  I

238

1  don't have anything since -- basically since
2  August 1.
3      Q   So you don't have anything that
4  would cause you to conclude something
5  different from her being off psychotropics;
6  is that accurate?
7          (Pause.)
8      A   No, 'cause even the physician
9  response I have came in prior to that date.
10  It came in July 18, '08, so I don't have
11  anything since then that would change it, so
12  I have nothing that would suggest she's back
13  on them.
14      Q   All right.  Have you completed
15  your answer?
16      A   Yes.
17      Q   Thank you.
18          On page five of your report also
19  says that Mrs. Whittington was seeing
20  Dr. Boyd every three months for diabetes
21  treatment while she was on psychotropic
22  medication, and that she still is seeing a
23  Dr. Boyd, even though she's off psychotropic
24  medication; is that correct, and is that your

239

1  understanding?
2      A   That's my understanding.
3      Q   So, then, your understanding is
4  that she continues to see Dr. Boyd four times
5  a year, on average, for the treatment of
6  diabetes?
7      A   That's my understanding.  And
8  that is who responded to my questionnaire, is
9  Dr. Boyd.  And he also indicates that he
10  wants to see her four times a year.
11      Q   All right.  Now, let's mark the
12  response from Dr. Boyd.
13      A   Do you have it, or do you need a
14  copy?
15      Q   I do have it.  Thank you.
16          MR. COUTROULIS:  Mark this as
17  the next exhibit, please.
18      (Whereupon, Deposition Exhibit No.
19      Deutsch-36, letter from Dr. Boyd,
20      was marked for identification.)
21  BY MR. COUTROULIS:
22      Q   Can you look at Exhibit 36,
23  please.  Is that the response from Dr. Boyd
24  that you were referring to just a moment ago?

240

1    A   Yes.
2    Q   And in paragraph one, he refers
3  to follow-up of four times per year --
4    A   Yes.
5    Q   -- correct?  So, would that be
6  the same four times per year that he's
7  already seeing Mrs. Whittington, as you
8  understand it?
9    A   I assume so.
10    Q   You don't assume that he's
11  intending to convey to you that he wants to
12  see her an additional four times per year?
13    A   Oh, absolutely not.
14    Q   Now, your report discusses
15  ordinary medical expenses, and one drug
16  listed is Metropolo, which you say is not
17  related to diabetes.
18        Let me direct your attention to
19  page 19 of your report.  I just want to
20  confirm, Dr. Deutsch, that you are not
21  suggesting that the cost of that drug be
22  included in Mr. Raffa's calculations of
23  damages here, correct?
24    A   Correct.  I ... I didn't show a

241

1  cost.
2    Q   So, if you list something out,
3  but then don't show a cost, is it fair to
4  assume, based on the way you do these
5  reports, that you're not suggesting that that
6  particular item is a component on which
7  damages should be calculated?
8    A   Right.
9    Q   Now, on page 19 of your report,
10  you recommend that Mrs. Whittington receive
11  case management in the amount of two to four
12  hours per month, correct?
13    A   Right.
14    Q   And as I understand it from your
15  previous testimony, that is a diabetic
16  education function; is that right?
17    A   That's part of what -- what I'm
18  trying to include there.  As I've talked
19  about before, it's a total program of
20  coordination and integration of services that
21  is -- is, in part here, clearly to manage the
22  diabetes, but it's a recognition that because
23  of the severity of her preexisting mental
24  health and comorbidity problems, that she

242

1  just is not capable of accomplishing that on
2  her own, and the diabetes -- both is made
3  worse by all of those problems, and the
4  diabetes makes those problems that much
5  worse.
6        So, that -- the goal is to use
7  case management slash diabetes management and
8  education as a coordinated program to
9  resolve -- or work with -- you're not going
10  to resolve -- but work with all of those
11  issues.
12    Q   Is it fair to say that case
13  management has an education and a monitoring
14  component to it?
15    A   Yes.
16    Q   Now, do you know whether any
17  medical doctor recommended a case manager to
18  Miss Whittington?
19    A   No, this is clearly a
20  recommendation from me.
21    Q   The recommendation in your
22  report is solely from you?
23    A   There's no question.  I mean,
24  there's clearly a component that comes out of

243

1  the clinical practice guidelines regarding
2  diabetes management and education, but the
3  overall case management component is clearly
4  a case management slash rehabilitation
5  recommendation.
6    Q   Do you know whether any medical
7  doctor recommended a diabetic educator
8  specialist for Mrs. Whittington?
9    A   I have not seen that in any of
10  the medical reports.
11    Q   Okay.  Let's look at that
12  report, or that response from Dr. Boyd again.
13  I think it's Exhibit 36.
14        Let me direct your attention to
15  question four.  Now, let me ask you first,
16  are these your questions that you put to
17  Dr. Boyd that he is then answering?
18    A   Yes.
19    Q   So you drafted the questions?
20    A   Yes.
21    Q   And question four says:  Do you
22  recommend Linda also be seen by the following
23  specialists as it relates to her diabetes?
24  And then you have, podiatry, ophthalmology,

21 (Pages 240 to 243)

244

1  and then you have a couple of places for
2  other?
3      A  Yes.
4      Q   And do you see where Dr. Boyd
5  has said, diabetic educator?
6      A  Yes.
7      Q   And what does he recommend on
8  that?
9      A  He has "one time only."
10     Q   Do you understand by "one time
11  only," he means one time only?
12     A  Sure. He's saying that, in his
13  opinion, that as far as teaching her about
14  diabetes, that one time only is sufficient.
15        I'm talking about a much broader
16  program. And, frankly, as professionals, we
17  can disagree, but beyond that, I'm talking
18  about a much more coordinated program and a
19  far broader program than just simply sitting
20  down and teaching the patient one time only
21  about diabetes.
22     Q   Okay. And you don't see, in the
23  response from Dr. Boyd, any suggestion that a
24  broader program, along the lines that you're

245

1  recommending, is being recommended by him,
2  correct?
3      A  No, I don't see that he is
4  recommending it, but I also don't see that
5  he's suggesting that, based on a full
6  understanding of what I'm recommending, he
7  disagrees with it, either.
8      Q  Well, you haven't asked him.
9      A  No, I haven't, because --
10     Q  In fact, he's never seen your
11  report.
12        MR. BRUDNER: Whoa, whoa, whoa,
13  whoa, one at a time, right?
14        MR. COUTROULIS: Sorry. If I
15  interrupted you, I apologize.
16        THE WITNESS: That's not a
17  problem, but we certainly from time to
18  time accidentally step on each other,
19  and I don't have a problem with it. It
20  just makes it harder for the court
21  reporter.
22        MR. COUTROULIS: I'll do my best
23  not to do it and you do the same.
24        THE WITNESS: Certainly.

246

2      Q   But he hasn't seen your report,
3  correct?
4      A  No, he hasn't. And generally
5  speaking, what I try to do is gain from the
6  doctors what I need for medical foundation,
7  but I don't typically go to the doctors for
8  queries about areas that I consider within my
9  area of specialty. I don't ask them to give
10  me information or support in areas of a
11  psychological nature. I don't generally go
12  into areas of case management and
13  rehabilitation; those are generally my areas
14  of expertise.
15        But I do expect them to provide
16  full support and response in areas that are
17  theirs for expertise. So, the
18  endocrinologist, certainly for his medical
19  expertise, but I don't go to the
20  endocrinologist for something a physiatrist
21  needs to be responding. So I try and make
22  sure we stay within each area of expertise.
23     Q   I understand, Dr. Deutsch, but
24  isn't it fair to say that when you asked

247

1  Dr. Boyd and others to answer question four,
2  do you recommend Linda also be seen by the
3  following specialists, as it relates to her
4  diabetes, and then had the open-ended
5  delineation, "Other," as you do on this, that
6  certainly would have been an opportunity, had
7  Dr. Boyd been so inclined, to recommend
8  something along the lines of case management
9  that you're recommending, if he had seen fit
10  to do so?
11     A  I certainly don't disagree with
12  that.
13     Q  Okay. And he didn't.
14     A  That's true. I don't think most
15  doctors really understand or get into the
16  concept of case management. That's not their
17  area, but you're absolutely correct, he did
18  not.
19     Q   And the concept of case
20  management, as I understood your testimony
21  last week, is really something that comes out
22  of the life care planning aspect of your
23  work; is that fair?
24        (Pause.)

22 (Pages 244 to 247)

248

1      A    Well, I don't think most case
2  managers would say that to you.  I mean,
3  life-care planning really came about
4  originally as a tool to be used by case
5  managers.  Now, most case managers would say
6  that life-care planning and life-care
7  planners are more sophisticated, and what
8  they need to know goes way beyond what the
9  average case manager actually does.
10         There's about 27,000, 28,000
11  board-certified case managers, and only about
12  2500 life-care planners around the nation.
13         But, you know, I see life-care
14  planning as ... a tool of case management for
15  those who want to go beyond basic case
16  management and get into the level that
17  involves life-care planning and understanding
18  and having a knowledge of the medical aspects
19  of disability and the much more sophisticated
20  levels of understanding of disability and
21  chronic illness that life-care planning
22  requires.
23      Q    Now, you didn't discuss your
24  recommendation of ... case management with

249

1  Mrs. Whittington herself, correct?
2      A    We talked about ... the basic
3  concept of -- of a coordinated program and
4  what needs to be done.  I think the -- what I
5  felt was going to need to happen within a
6  plan to manage diabetes, but I did not
7  subsequently mail these individuals their
8  plan or their report, largely because of the
9  very extensive psychological history that it
10  was going to get into -- generally, whenever
11  there is ... a really extensive discussion of
12  things like suicide, schizophrenia, you know,
13  things of that nature, I'm very reluctant,
14  unless I can sit down with the patient and
15  actually go over it one on one, I'm
16  uncomfortable mailing that kind of history,
17  not that they don't know the history they
18  had, but, when you have a patient like this,
19  for example, who is in denial, and you're
20  talking about that lengthy history, and
21  you're not there to deal with it, it's just
22  not the kind of thing you want to put in the
23  mail.
24      Q    But you also decided, for

250

1  whatever reason, not to send Mrs. Whittington
2  or any of the other patients for whom you did
3  these reports, even the rehabilitation
4  recommendations from the reports?
5      A    That's true.  I mean, I didn't
6  separate them out.  I just -- I just made the
7  decision that the report, as a whole, wasn't
8  going to go.  So you're correct.  I didn't
9  think about trying to separate out one
10  section.  I just said the report, as a whole,
11  shouldn't go.
12      Q    Do you have any understanding of
13  Mrs. Whittington's own view of case
14  management with respect to her mental
15  illness?
16      A    I don't think she has any
17  understanding of it.
18         MR. COUTROULIS:  Let's mark that
19      next exhibit, please.
20         (Whereupon, Deposition Exhibit No.
21      Deutsch-37, document re L. Whittington,
22      was marked for identification.)
23  BY MR. COUTROULIS:
24      Q    Let me hand you Exhibit 37,

251

1  Dr. Deutsch, and first ask you if you know if
2  you've seen that before?  I do not believe it
3  was produced by you, but I don't know whether
4  or not you may have a copy of this in your
5  medical records that you assembled for
6  Mrs. Whittington.
7      A    I don't recall having seen it.
8  Do you mind if I take a moment to read it?
9      Q    Absolutely.  Please go ahead.
10         (Witness complies.)
11      A    Okay.
12      Q    Do you recognize it?
13      A    No.
14      Q    Well, I can tell you it's part
15  of the production in these cases.  And ...
16  it's part of the medical records.
17         Do you see where there's an
18  indication that Mrs. Whittington does not
19  want the assistance of a case management --
20  case manager, and the record says:  They lead
21  me down the wrong path?
22      A    Certainly, I see that.
23      Q    Do you ever have, in your
24  interview with Mrs. Whittington, any general

252

1   discussion with her about the concept of case
2   management in which she had an opportunity to
3   express her view to you?
4       A   To the best of my recollection,
5   I raised or used the term or phrase, case
6   management, with each of them.  I don't have
7   any recollection of negative comments.
8       But, you know, the reality is
9   that she also in here indicates her paranoia
10  about dentists, and I wouldn't recommend that
11  she go life long without a dentist just
12  because she has paranoid thoughts about a
13  dentist or a doctor.  What you do is try and
14  work with an individual to help them
15  understand the benefits, and you try and work
16  with them as they begin that process, and
17  through that process, so that they understand
18  the benefit.
19      If she had a bad relationship
20  with an individual case manager that she felt
21  led her down the wrong path, as she phrases
22  it, then hopefully, what you do is work with
23  her to develop a relationship she feels is
24  more positive with a case manager.

253

1       But, certainly, as on the basis
2   of one comment, you certainly wouldn't
3   eliminate the use of case management when it
4   can be so effective in coordinating a program
5   that's meaningful --
6       Q   Would it be relevant --
7       A   -- but I certainly see this.
8       Q   I'm sorry, sir.
9       It would be relevant to know,
10  though; would it not?
11      A   Oh, I don't disagree.
12      Q   And wouldn't the patient's
13  attitude about the efficacy of working with a
14  certain type of person, or the patient's
15  history of working with a case manager be
16  relevant to you in making realistic
17  recommendations for that patient?
18      A   Yes.
19      (Pause.)
20      Q   Would you agree, based on the
21  medical history that you observe for
22  Mrs. Whittington, that the benefits that you
23  see for case management with respect to her
24  diabetes were already present even before the

254

1   onset of diabetes?
2       MR. BRUDNER:  Objection, form.
3   BY MR. COUTROULIS:
4       Q   I'll restate it.
5       Based on your knowledge of the
6   medical history of Mrs. Whittington, do you
7   believe, as you see it, that case management
8   would have been appropriate for her, even
9   prior to the onset of a diagnosis of
10  diabetes?
11      A   Well, in much the same way I've
12  answered this with all the other cases thus
13  far, I think the answer is yes, there's a lot
14  of benefit that could have been derived, I
15  think, by case management.  That's only made
16  that much more necessary by the onset of
17  diabetes, but I don't think there's any
18  question these patients could have
19  benefited -- this patient could have
20  benefited, because you're asking it specific
21  to this patient.
22      Q   I am asking it specific to this
23  patient, and I'm trying to move things along,
24  and I appreciate you're trying to do the

255

1   same.
2       We can go into the specifics of
3   this patient, and I'm happy to do that if you
4   like, but --
5       A   I don't think it's necessary.
6       Q   Perhaps we don't need --
7       A   I think you asked it --
8       Q   All right.  So if this patient
9   had presented to you and come in for an
10  interview, even before having been diagnosed
11  with diabetes, and you had looked at the
12  history of this patient, the weight issues
13  with this patient, the history of mental
14  illness, all the other factors that you see
15  in the medical records, is it fair to say
16  that you would have concluded that this
17  patient would have benefited by case
18  management, even at that time?
19      A   With the -- the answer is, yes.
20  With the multiplicity of problems, when you
21  get -- when you get this number of problems,
22  trying to deal with them individually,
23  without a coordinated plan run by a case
24  management, becomes very difficult.  And it's

24 (Pages 252 to 255)

256

1   one reason why you see -- I think that you
2   see such little success. The more problems,
3   the more comorbidities, the more case
4   management becomes important, and that's even
5   more true as you add more problems, and
6   that's why the -- the issue of trying to
7   manage something like diabetes now becomes --
8   it becomes so all critical.
9       Q   Okay. Let me direct your
10  attention to page three of your report. Is
11  it correct that you note there that
12  Mrs. Whittington's treating physicians do not
13  recommend any change in her current treatment
14  regimen?
15          (Pause.)
16      A   I'm referencing the diabetes
17  there.
18      Q   Let's make sure we're looking at
19  the same thing. Are you looking at
20  anticipated treatments?
21      A   Right. And I'm referring to
22  treatment in her diabetes. I'm not referring
23  to her psychological treatment.
24      Q   Fair enough. Fair enough. But

257

1   as you understood it, her treating physicians
2   were not recommending any change in her
3   treatment for diabetes?
4       A   That's what I understood.
5       Q   Okay. And so is it fair to say
6   that, in your report, you are recommending
7   some changes?
8       A   Well, only in terms of -- of
9   coordinating and stabilizing her overall
10  condition, and educating her about the
11  diabetes. What I'm trying to do --
12      Q   But, to that extent, it's a
13  change; is it not?
14          (Pause.)
15      A   I guess it depends on how you
16  look at it. It's not a change in the medical
17  treatment. So, I guess, technically there's
18  a change in that we're educating and we're
19  coordinating her -- all of her comorbidities
20  in relation to the diabetes, but we're not
21  asking for a change in the medical treatment
22  of her diabetes.
23      Q   Is it fair to say -- and I
24  appreciate what you're saying -- but is it

258

1   fair to say that you're recommending an
2   expansion of the overall treatments that she
3   receives from what she is already receiving
4   for the treatment of diabetes?
5           (Pause.)
6       A   In a sense, I'm going to give
7   you, yes. I think, yes, because I want to
8   take into consideration all of the factors
9   that have the potential to lead to increased
10  risk, and instead of just treating the
11  diabetic symptoms, I want to make sure that
12  we deal with all of the related
13  comorbidities. So deal with the weight, deal
14  with the nutrition, deal with all of those
15  factors and not just treat the symptoms. And
16  so, I think you're right.
17      Q   All right. And in the way you
18  just answered, is it fair to say that that
19  applies, as well, to what you're recommending
20  on behalf of the other five plaintiffs on
21  who -- on who you have given opinions, as
22  well?
23      A   Well, in one sense, yes,
24  although I am not so sure that in -- with

259

1   respect to those patients, the same statement
2   regarding a doctor saying, you know, I
3   don't -- I'm not recommending any specific
4   change in her diabetic treatment, is
5   necessarily applied. But in the sense that
6   I'm adding a component from a case management
7   slash education standpoint, that is certainly
8   true from my perspective and my area of
9   expertise, I am adding a component.
10      Q   Dr. Deutsch, you recommend that
11  Miss Whittington visit a podiatrist twice a
12  year for life; is that correct?
13      A   Well, actually, I don't think
14  I'm the one making the recommendation, but it
15  is in the plan.
16      Q   Well, let's take a look at page
17  19.
18          (Pause.)
19      Q   Under medical care, it says,
20  podiatry services anticipate two visits per
21  year. Is that your recommendation or someone
22  else's?
23          (Pause.)
24      A   No. That's in part mine, based

260

1  on two factors.  Boyd said it depends on the
2  symptoms that she's demonstrating, so he said
3  yes, to podiatry, but didn't give a number of
4  visits.  So using the fact that there's no
5  way -- I either have to give a zero, which is
6  not what Boyd is saying, or using Boyd
7  coupled with the clinical practice
8  guidelines, I suggested twice a year.  I
9  certainly defer to Boyd if he wants to come
10  back and say, zero is the proper approach,
11  but I did use my best judgment, taking into
12  consideration the fact that she's
13  demonstrating neuropathy, Boyd is saying,
14  depending upon symptoms, a podiatry exam is
15  necessary, but he didn't give a number.  So
16  using the existing problems, Dr. Boyd's
17  statement, and the clinical practice
18  guidelines, I suggested we make an allowance
19  for twice a year.
20      Q   And just so we're clear, what
21  **Dr. Boyd said in response to the question you**
22  **put to him under podiatry was, quote, depends**
23  **on patient symptoms slash exam --**
24      A   Right.

261

1      Q   -- correct?
2          **He didn't recommend any specific**
3  **number of exams or any exams?**
4      A   Exactly.  That's right.  If I --
5  as I said, if I left it based on what Boyd
6  said, even with the existence of the
7  neuropathy, I'd have to leave it at zero,
8  which is just not typically what the clinical
9  practice guidelines would recommend, or any
10  experience I have in follow-up care with --
11  foot care with diabetes, which is literally
12  one of the most critical areas of follow-up
13  treatment with respect to the diabetic when
14  you have peripheral neuropathy issues.
15      Q   **Here is where I'm struggling,**
16  **though, to understand.**
17          **If the doctor says, depends on**
18  **patient symptoms, and you say, twice a year,**
19  **aren't you making a medical judgment in**
20  **rendering that recommendation?**
21      A   As a case manager, I'm
22  interpreting it this way.  The doctor is
23  saying, does the patient have -- if the
24  patient has symptoms, then podiatry is

262

1  appropriate.  The patient does have symptoms,
2  the patient has peripheral neuropathy.
3          So, at the minimum, I'm going to
4  look at a combination of what I understand
5  the patient's symptoms to be, what I hear the
6  doctor is saying, and what the clinical
7  practice guidelines say.
8          And if -- now, if we go back to
9  Boyd and ... you know, based on the direction
10  of these depositions, perhaps I have no
11  choice but to go back to Boyd and get a
12  further clarification, but I believe
13  unquestionably the one thing you cannot do is
14  go back and say, look it's zero.  We're not
15  going to give her any allowance even in the
16  face of the existence of a known peripheral
17  neuropathy.  That flies directly in the face
18  of the standards established in the clinical
19  practice guidelines.
20      Q   **Now, what is your understanding**
21  **of what symptoms she was having?  Is that**
22  **based on your interview of her?**
23      A   Certainly.
24      Q   **Is it based on anything else?**

263

1      A   I think the medical records
2  indicate that she has peripheral neuropathy,
3  as well.
4      Q   **If that's the case, wouldn't**
5  **Dr. Boyd be aware of that?**
6      A   I thought he was aware of it,
7  but maybe I'm mistaken, but bottom line is,
8  is that, you know, I'll make a note of it and
9  go back to Boyd.
10      Q   **Did you believe, based on your**
11  **interview of Mrs. Whittington, that you're**
12  **more familiar with her symptoms than Dr. Boyd**
13  **is?**
14      A   I'm certainly not suggesting
15  that.  But ... I think maybe we have a
16  different interpretation of what he's writing
17  down there, and that's what needs
18  clarification.
19      Q   **Let me just ask you, though, in**
20  **your -- in your basic modus operandi, when**
21  **you put those reports together, if you've**
22  **sent a question to a doctor like Dr. Boyd,**
23  **and he's responded in the manner he has on**
24  **the podiatry question, and you're going to go**

26 (Pages 260 to 263)

264

1    ahead and recommend two times per year, even
2    though he hasn't done that?  Would it be your
3    practice to follow up with the physician and
4    clarify or ask, or is that not something you
5    typically do?
6        A   Well, it depends on a variety of
7    factors.  You know, what I -- what I felt I
8    had here, in reviewing this and staffing it
9    with -- with my staff, was the doctor saying,
10   you know, the frequency depends on what
11   symptoms she's demonstrating, that it can
12   vary.
13            Now, we, of course, felt that
14   she was showing peripheral neuropathy.
15   Dr. Boyd knew she had peripheral neuropathy.
16   We looked at and interpreted it from a
17   different perspective than you all are
18   interpreting it, and you're asking it as a
19   different question, and, perhaps, a
20   completely legitimate perspective.
21            We just ... were seeing it from
22   a different perspective than you're seeing
23   it.  And so we're coming away in our staffing
24   with the assumption that there was

265

1    legitimately a peripheral neuropathy.  We
2    interpreted the response in that fashion.
3    And then using the clinical practice
4    guidelines, felt a minimum follow-up of twice
5    a year from a podiatrist was appropriate.
6        Podiatry standards actually
7    would suggest that when you have a diabetic
8    patient with peripheral neuropathy that, in
9    fact, it's the podiatrist that should be
10   clipping the toenails.  And so, typically,
11   once-a-month visit is what is expected.  We
12   didn't go that route.  Okay?  We didn't
13   follow podiatry standards in that regard.
14       Q   Why not?
15       A   Because I wasn't comfortable at
16   that point that I was ready to say we wanted
17   to -- in terms of Boyd's response, that I was
18   ready to say, I'm going to shift over to the
19   podiatry clinical practice guidelines.
20            But I ... but I felt that, at a
21   minimum, twice-a-year follow-up by the
22   podiatrist, and going ahead and allowing the
23   patient and/or patient family member be
24   responsible, preferably the patient -- the

266

1    problem with a family member clipping the
2    toenails is, they have no bio feedback
3    whatsoever.  They have no sensory feedback to
4    tell them what's happening.  So they have
5    much more likelihood of creating an
6    inadvertent wound, which is a bad thing to
7    have happen, even minor wounds on the toes
8    when clipping the nails become a problem.
9    And it's why the podiatry guidelines and
10   actually even the nursing home guidelines for
11   patient care do not allow anymore a nurse
12   to -- or a home health aide to -- LPN's,
13   R.N.'s, et cetera, to clip toenails on
14   patients, even nondiabetic patients, but
15   require a podiatrist come in and do it.
16            So it's become a major change in
17   the way foot care is handled in nursing home
18   centers and with elder care.  But, bottom
19   line is, is we stayed with just a
20   two-time-a-year exam so that the podiatrist
21   could at least follow up on the peripheral
22   neuropathy and make recommendations at such
23   time as they felt it was necessary.
24            But, you know, I'll go over one

267

1    further step here and contact Boyd's office
2    and see if he has any further thoughts on it,
3    or if he feels that there's -- in fact, we're
4    wrong, that there is no peripheral
5    neuropathy.
6        Q   Let me just ask you
7    hypothetically to understand better how this
8    process works.  Let's say you were to contact
9    Dr. Boyd's office, and let's just say,
10   hypothetically, he were to say, I don't think
11   it's necessary, or I think once a year is
12   fine, or something different from what you've
13   recommended, whatever it is, what then
14   happens to your recommendation; do you change
15   it --
16       A   Well, in the --
17       Q   -- or not necessarily?
18       A   I'm sorry.
19       Q   I'm finished.
20       A   I truly apologize.
21            In the discussion I would
22   clearly let him know what the clinical
23   practice guideline says.  And then if he --
24   but it's his choice, as a physician, to

27 (Pages 264 to 267)

268

1 indicate that he wants to go outside the
2 clinical practice guideline. And if he felt,
3 at that point, that she just, in his opinion,
4 did not need a follow-up with a podiatrist
5 outside his follow-up, and that he was going
6 to follow up X number of times per year -- I
7 forget what the letter says right at the
8 moment -- but he was going to follow up X
9 number of times per year, and he felt that
10 was sufficient, then I would -- I would go
11 with that.
12         But I really feel the need to
13 actually have him say, this is my basis, this
14 is my foundation for why I choose to go this
15 route, and until I am ready to make a
16 recommendation or a referral to that
17 podiatrist as the gatekeeper, I'm going to
18 hold onto the responsibility of gatekeeping.
19 And when he -- until he says that, you know,
20 I'm not going to make that change.
21     Q   But when you get a response like
22 this, in which the doctor says, depends on
23 symptoms, and you're thinking, I want to
24 recommend twice a year, why, before you put

269

1 it in your report as your recommendation,
2 don't you, as a matter of practice, then and
3 there, go back to the doctor? Why would you
4 only do that after you've already given the
5 opinion and someone has raised a question
6 about it?
7     A   Well, I think I've answered
8 that. I mean, I told you what we -- how we
9 interpreted it from our perspective when we
10 sat down and staffed the letter. We -- we
11 just saw this in a fashion different than you
12 saw it. I'm willing to give you that you saw
13 it from a different perspective and that
14 there's legitimacy to the perspective from
15 which you saw it, and it's worthy of a phone
16 call at this stage. I don't know how to give
17 you more than that.
18     Q   All right.
19     A   I'm simply saying that we
20 interpreted it differently and responded
21 based on our interpretation. I can't change
22 that.
23     Q   Let's stick with Exhibit 36 just
24 for while longer.

270

1         Is it correct that Dr. Boyd
2 indicated that Mrs. Whittington's
3 hypertension and hypercholesterolemia were
4 not caused by her diabetes?
5         (Pause.)
6     A   Well, that's correct. I mean,
7 what we expected him to do was check, no.
8 What he gave us was a little bit more
9 profound an answer, or expanded answer, but
10 it's not an answer that we weren't -- that we
11 wouldn't have known or understood.
12         I mean, he's saying no, it was
13 not caused by it, but those two areas are
14 impacted by the diabetes and change -- or,
15 excuse me, affect the goals for treatment for
16 hypercholesterolemia.
17         So nothing surprising, but
18 bottom line is, the diabetes did -- did not
19 cause either of those two areas. And what we
20 wanted him to say -- or excuse me, that's the
21 wrong thing -- it's not what we wanted --
22 what we expected him to do was just give a
23 flat-out no. But he went a little beyond
24 that.

271

1     Q   Well, and presumably when he
2 says, "does affect the goals for treatment,"
3 he's reflected that in his recommendations
4 for treatment in responding to you, fair
5 enough?
6         MR. BRUDNER:   Objection, form.
7 BY MR. COUTROULIS:
8     Q   Is that your expectation?
9     A   I don't think he -- for example,
10 he never said to us, I've increased her
11 cholesterol medication because of the
12 diabetes, and this is what the difference is.
13 We didn't include cholesterol medication as
14 part of the cost. So, it ... if he has, I
15 don't know how he has, and we haven't -- I
16 don't think we've included it anywhere. So,
17 you might -- you would have to put that
18 question to him, but it hasn't influenced us
19 in a way that I'm aware of.
20     Q   Did Dr. Boyd also say in this
21 same document that there is no need for
22 periodic diagnosis to assess for
23 complications associated with diabetes unless
24 symptoms develop?

28 (Pages 268 to 271)

272

1      A    Yes.  And we've actually had
2  that from some of the others, as well.
3      Q    You say, Dr. Deutsch, in your
4  report at page 18, that Mrs. Whittington
5  should have a nutritional evaluation, one
6  time only.  Is that right?
7         (Pause.)
8      A    On page 18?
9      Q    Yes, sir.
10         (Pause.)
11     A    Yes.
12     Q    Are you aware of the fact
13  that Dr. Beady [ph] had suggested to
14  Mrs. Whittington that she go to a dietician
15  for training on diet and basic diabetes
16  management, but that she had refused to go
17  even to that?
18     A    I don't recall it, but it sure
19  doesn't surprise me.
20     Q    Take a look at your report at
21  pages one and two.
22     A    At pages what?
23     Q    One and two.
24         (Discussion held off the

273

1      record.)
2         (Attorney John Sullivan exits.)
3      A    And I did see that, yes.
4      Q    You also recommend in your
5  rehabilitation plan that Mrs. Whittington
6  participate in a wellness program.  You
7  discussed that at page 20, correct?
8      A    Yes.
9      Q    In making that recommendation,
10  did you consider whether Mrs. Whittington
11  already exercises?
12     A    I took into consideration
13  what -- basically, yes.  I took into
14  consideration what is described by her as her
15  activity level.
16     Q    And what did you understand that
17  activity level was?
18         (Pause.)
19     A    Basically, she says that she
20  goes to libraries, she checks out some books,
21  she does some reading, she does some books on
22  tape, she watches T.V.  It's a pretty
23  sedentary lifestyle.  She doesn't report to
24  me that she's in particularly good physical

274

1  condition.  She's not reporting to me ...
2  that she's regularly exercising.  She says to
3  me that she needs to get exercise.  She
4  recognizes she probably would feel better and
5  sleep better if she got some regular
6  exercise, but she's not reporting that she's
7  doing so.
8      Q    Right.  Are you ascribing any
9  cost for this wellness recommendation?  I
10  don't see any, but I wasn't sure.
11         (Pause.)
12     A    No, I -- I didn't, based on the
13  fact that I think she's needed this for some
14  time.  I didn't put in any additional cost,
15  but I still think she should participate in
16  it.
17     Q    As I've understood your
18  testimony throughout, and correct me if I'm
19  wrong, if you concluded that one of these
20  patients needs something, but you believe or
21  concluded that that need preexisted the onset
22  of diabetes, then you did not include that as
23  an element of damage on which Raffa would
24  make his calculations; is that fair?

275

1      A    I think that's fair.
2      Q    Okay.  Now, if we could go back
3  for a second to the case management aspect of
4  your rehabilitative plan, you've described
5  that at some length, and I don't want to
6  replow all of that, but is it fair to say,
7  one of the benefits that you see from case
8  management is a monitoring function?
9      A    Fair.
10     Q    And so is it fair to say that
11  you see case management as designed to avoid
12  potential complications that the patient does
13  not already have and may never develop?
14     A    Well, there's no question that's
15  part of what occurs.  If you improve weight,
16  you get people off of smoking, you reduce the
17  obesity, you improve diet, you gain control
18  over so many of these comorbidities, as well
19  as stabilize and maintain a stabilized
20  situation of the diabetes, you significantly
21  reduce risk factors or a worsening of the
22  diabetes and any risk factors that the
23  diabetes might lead to.  And so that is a
24  positive benefit.  It's not the only reason,

276

1   but it is a positive side benefit to such a
2   program.
3       Q   Well, you're saying, one of the
4   benefits, as you see it, is your monitoring
5   for potential complications, even though the
6   patient doesn't have those complications at
7   the time, and may never develop those
8   complications?
9       A   No, I didn't say one of the
10  benefits is monitoring for them.  What I said
11  is, one of the benefits is that when you
12  bring -- if you're able to bring all of these
13  factors under control and the situation is --
14  is much more stable, that one of the side
15  benefits is, you significantly reduce risk
16  factors for complications.  That's true when
17  you use case management in developing
18  programs and managing programs for every type
19  of disability and chronic illness, is that a
20  side benefit of this is reducing risk factors
21  for complications.  And in a certain
22  percentage of patients, the reality is
23  complications do occur.  But that's not the
24  only reason for doing this.  That happens

277

1   just to be a side benefit of -- of
2   accomplishing these programs.
3       Q   And, Dr. Deutsch, I wasn't
4   suggesting that you were saying it was the
5   only reason for doing it.  But, when you talk
6   about a side benefit as being ... you may
7   avoid complications that may or may not ever
8   develop, isn't it fair to say that the way
9   you're hoping to achieve that is to monitor
10  for certain things through the case
11  management process?
12      A   Certainly ... I don't disagree
13  that with the case manager, you are going to
14  pick up on ... symptoms more rapidly than
15  you're likely to without such a program.
16  But, hopefully, monitoring is not the primary
17  benefit, by any means.  Hopefully, you
18  literally receive a benefit by reducing risk
19  factors.  But I will admit that a small part
20  of this is that you do improve monitoring.
21      Q   And I know you've covered this,
22  generally, but let me just clear it up with
23  respect to Mrs. Whittington.
24          You're not opining in any

278

1   fashion that she will develop any of these
2   complications that you've discussed generally
3   in your report?
4       A   No.
5       Q   No, you are not giving any
6   opinions on that, correct?
7       A   Correct, I'm not.
8       Q   Okay.
9       A   Did I say that wrong?
10      Q   Probably not, but sometimes the
11  record can be unclear.
12      A   Okay.
13          (Pause.)
14          MR. COUTROULIS:  I don't have
15  any other questions for Mrs.
16  Whittington.
17          THE WITNESS:  I know -- off the
18  record, can I say something?
19          (Discussion held off the record.)
20          (Whereupon, Deposition Exhibit No.
21  Deutsch-38, 07/28/08 report for
22  McAlexander was marked for
23  identification.)
24

279

1   BY MR. COUTROULIS:
2       Q   Dr. Deutsch, I'd like to ask you
3   some questions about Eileen McAlexander.  And
4   I've placed in front you Exhibit 38.  Can you
5   identify that, please?
6       A   Absolutely.  It is, first of
7   all, a copy of my July 28, 2008 report.
8       Q   And that's your report for
9   Ms. McAlexander, correct?
10      A   It is.  I just want to see if
11  it's anything else like the other exhibit,
12  but it looks to be just my 35-page report and
13  nothing further.
14          Now, did you hand me this, or
15  was that something already on my --
16          MR. BRUDNER:  That's yours.
17  That's our copy of the --
18          THE WITNESS:  It is?
19          MR. BRUDNER:  -- the fax that
20  came in.
21  BY MR. COUTROULIS:
22      Q   From your testimony, I
23  understand that you prepare your reports
24  based on the patients' medical records and

280

1  the information that you obtain in writing
2  from doctors in response to your written
3  questions; is that the case with respect to
4  this report?
5      A   And the interview with the
6  patient.
7      Q   Yes.
8      A   And the testing of the patient.
9      Q   With those two qualifications,
10 is my statement accurate?
11     A   Yes.
12     Q   Is it correct that on page three
13 of your report, you state that no new
14 treatments are anticipated, and that
15 Miss McAlexander has not experienced
16 complications from the diabetes?
17     A   Yes, it's stated slightly
18 differently than what's on the page, but it's
19 an accurate paraphrase of what's there.
20     Q   Do pages six and seven of the
21 report reflect Ms. McAlexander's current
22 treatment regimen?
23     A   As presented to me, yes.
24     Q   Where did you get your

281

1  information as to current treatment?
2      A   Six and seven comes primarily
3  from her, although it can be amended by two
4  things.
5          The medical record can amend
6  it -- actually three things. The medical
7  record can amend it. In this case, contact
8  was made with her pharmacy. If a patient
9  accurately gives me the pharmacy from which
10 they get their medication, we do make
11 pharmacy contact. In the one instance
12 earlier we were talking, I wasn't able to get
13 that. You and I weren't talking -- the other
14 attorney, John.
15     Q   You're talking about an
16 off-the-record conversation?
17     A   No, no. He was questioning
18 me --
19     Q   Oh.
20     A   -- and we -- about whether we
21 had tried to verify something with the
22 pharmacy. We didn't have the pharmacy in
23 that instance. In this instance, we did.
24         And, also, the responses from

282

1  the doctor can change, information we get,
2  but in this instance, it came from the
3  patient, contact with the pharmacy ...
4  and ... it can come from responses from
5  doctors if they -- if they were to change
6  something.
7      Q   What about review of the medical
8  records; does that enter into this?
9      A   It can. If we determine from
10 the medical record that, in fact, information
11 we were being given does not appear to be
12 accurate, then we go back to the patient
13 and/or family and try and reverify.
14     Q   Now, did you get the information
15 from the pharmacy in writing, or was that an
16 oral contact?
17     A   Usually, we call them for
18 pricing, and let's see if we got anything in
19 writing from them.
20         We'll sometimes give them a
21 release of information and see if we can get
22 a printout. I'm not sure whether that
23 happened here or not.
24         (Pause.)

283

1      A   I don't see any printouts from
2  them, so hold on one moment let me check one
3  other ...
4          (Pause.)
5      A   No.
6          (Pause.)
7      A   I think it was just two forms of
8  contact, the phone number, just a phone
9  contact. And then, subsequently, we went
10 online both with them and then with
11 competitors to compare prices and see if we
12 could get it any cheaper anywhere else.
13 'Cause there are some bulk suppliers that,
14 when there's sufficient meds, where we can
15 get things cheaper.
16     Q   Dr. Deutsch, the file that you
17 produced to us in advance of the start of
18 your deposition last week, had contained
19 correspondence from your office to Dr. Helfin
20 [ph], who I believe is Ms. McAlexander's
21 primary care physician. But there was no
22 written response produced to us from
23 Dr. Helfin. And I believe that's the
24 response that came in just today.

31 (Pages 280 to 283)

284

1    A    That's correct.
2    Q    So, let's go ahead and mark that
3    if we can.  I've got my copy of it.  Do you
4    have a copy?
5    A    I do.
6    Q    Do we have a clean copy we can
7    mark?  There were quite few of them.
8    A    We made enough of them.  We
9    should have one.
10       MR. BRUDNER:  Yeah, I think so.
11       MR. COUTROULIS:  Thank you.
12   Would you please mark this as the next
13   exhibit.
14       (Whereupon, Deposition Exhibit No.
15   Deutsch-39, response from Dr. Helfin,
16   was marked for identification.)
17   BY MR. COUTROULIS:
18   Q    Dr. Deutsch, would you please
19   identify Exhibit 39.
20   A    This is a response from
21   Dr. Helfin to the letter we sent on July 11,
22   2008, which was faxed to us today, October 7,
23   2008.
24   Q    So, it's fair to say that by the

285

1    time you received Dr. Helfin's response, you
2    had already completed your report?
3    A    That's true.  Although, in a
4    number of instances, it says, based on
5    clinical practice guidelines, pending
6    response from treating physician.
7    Q    Based on this response from
8    Dr. Helfin, is there anything that you can
9    think of, as you sit here, that you would
10   want to change about your report?
11   A    Well, will you give me a minute?
12   I haven't read the response.
13   Q    Sure.  It's a one-page response.
14   A    I know.  It won't take very
15   long, but I just have to --
16   Q    Well, take whatever time you
17   need.  I just wanted the record to reflect
18   that it is a one-page response.
19       (Witness complies.)
20   A    And the answer to your question
21   is, yes.
22   Q    Please tell me which.
23   A    Well, under "Medical Care," she
24   affirms the primary-care physician follow-up

286

1    of four times per year.  I need to go through
2    the laboratory exams, but there definitely
3    would be some changes.  Probably would have
4    to drop the blood lipids.  But she has ...
5    she has some different ... she has a much
6    higher frequency of labs.  She has some
7    slightly different labs and a much higher
8    frequency of labs than we have.
9        But I think we also need to look
10   at these labs in relation to the question
11   that's been asked, which is, what labs were
12   occurring before?  So the ... microalbu --
13   albuminuria -- M-I-C-R-O-A-L-
14   B-U-M-I-N-U-R-I-A, she has four times a year.
15       What I'd like to do before I
16   change that is see if I can get a sense of
17   the frequency that might have preexisted,
18   rather than just automatically make a change.
19   As long as we're going to investigate this in
20   relation to the others, we need to
21   investigate it across the board.  And I'm
22   going to see how we can do that.
23   Q    So that's something you're going
24   to undertake to do, now that you've gotten

287

1    this response?
2    A    Right.  Before we just
3    automatically make a change.
4        The other thing is -- the next
5    thing, though, she does, is add EMG's for the
6    lower extremities and the upper extremities,
7    one time per year each, which we don't have
8    in here.  She ...
9    Q    Is that something that you would
10   then automatically change, or is that
11   something you would consider and decide
12   whether to change?
13   A    Well, as you've suggested in
14   earlier questioning, it's not -- you know, if
15   the physician orders it, the physician orders
16   it.  It's really not up to me to ... make
17   a ... just assume that -- that the position
18   that I can say no to what a doctor says.
19       Now, how do I handle if it's
20   outside clinical practice guidelines?  You
21   know, if it's outside a standard of care,
22   then my usual approach is to write the
23   doctor and ask for a foundation, explaining
24   that basically it's outside the standard of

288

```
 1   care, try to find a very diplomatic way of
 2   phrasing it.
 3          If a doctor still insists on it,
 4   I will sometimes attach it as an appendix to
 5   a plan versus put it in the plan, because of
 6   that. So we'll check clinical practice
 7   guidelines, make sure that it's consistent
 8   with clinical practice guidelines, based on
 9   the diagnosis, but this would tend to suggest
10   that there was either a diagnosis of
11   peripheral neuropathy or a concern that
12   peripheral neuropathy was a very real issue
13   with this patient.
14       Q   Well, in connection with that
15   last response you gave, is it fair to say
16   you're making an assumption because
17   Dr. Helfin does not provide any elaboration
18   for the recommendation of one time per year?
19       A   Yeah. No, she doesn't, and
20   that's why I would have to go back and look
21   at this file and remind myself of whether
22   there is an issue of peripheral neuropathy,
23   because it's not something that we've seen in
24   any of the other responses. And, usually, in
```

289

```
 1   the clinical practice guidelines, if my
 2   memory serves me, it's something that you would
 3   normally see when you've got an ongoing issue
 4   of peripheral neuropathy, not something you
 5   do as a standard for all diabetic patients.
 6       Q   And just so the record's clear,
 7   with respect to question three, periodic
 8   diagnostics, your report had not made a
 9   recommendation for lower extremity and upper
10   extremity diagnostic testing; is that right?
11       A   Well, that's true. And I had no
12   basis for it --
13       Q   Okay.
14       A   -- until this point. Now, the
15   next thing ... one time pre-podiatry, one
16   time pre-ophthalmology is recommended.
17       Q   That's a little different from
18   what you had recommended?
19       A   So we would drop the podiatry to
20   one time a year.
21       Q   You had recommended twice a
22   year?
23       A   Based on clinical practice
24   guidelines, yes, but I would amend it. And
```

290

```
 1   ophthalmology, we recommended once a year
 2   based on clinical practice guidelines. And,
 3   you know, and we would we would change that.
 4          The next is that she recommends
 5   and supports the nutritionist. And that's
 6   really it. She didn't add any additional
 7   comments or suggestions. She didn't have
 8   anything of an aggressive nature to suggest.
 9   And I wouldn't have expected it. Actually, I
10   think, to some extent, the EMGs are a
11   little -- somewhat aggressive, but, you
12   know, I'll leave it to her to explain,
13   although I may, you know, try and see if I
14   can get a phone conference and see what she
15   says.
16       Q   And is it fair to say, she did
17   not recommend case management in the same
18   sense that you are recommending it in your
19   report?
20       A   I didn't ask about it, and she
21   didn't make a separate comment or address it.
22       Q   And it's fair to say, she did
23   not recommend it, either, right?
24       A   Well, that's -- yes, that's
```

291

```
 1   true.
 2       Q   Okay. Now, I just want to go
 3   back to one thing you said, Dr. Deutsch, to
 4   make sure I properly understood.
 5          When you testified a little
 6   while ago about the lab work, I believe you
 7   said that you would want to go back and see
 8   which of these labs may have been recommended
 9   prior to the onset of diabetes, because for
10   your purposes, you would only be interested
11   in identifying additional laboratory work
12   that is related to the diabetes. Did I get
13   that right?
14       A   Right, and I think we've kind of
15   been clear --
16       Q   We've been through that before?
17       A   -- that we needed to look at
18   that across the board.
19       Q   You mean, for all six of these
20   patients?
21       A   Exactly. We need to try and see
22   if he can establish whether this was a
23   pattern across all six, that they were
24   getting regular labs that we were -- had not
```

33 (Pages 288 to 291)

292

1 accounted for, and if they were getting them
2 once a year, and now they're getting them
3 recommended two times a year or three times a
4 year, or they were getting them twice a year
5 and now they're getting them three, or for
6 that matter, if they were getting them twice
7 and they're still being recommended twice,
8 then we need to account for that.
9     Q   Because you only pick up the
10 incremental?
11     A   That's right.
12      MR. COUTROULIS:  Let's mark this
13    as the next exhibit, please.
14     (Whereupon, Deposition Exhibit No.
15    Deutsch-40, document by McAlexander,
16    was marked for identification.)
17 BY MR. COUTROULIS:
18     Q   We've placed in front of you
19 what we've marked as Exhibit 40, Dr. Deutsch,
20 which I believe was produced by your office
21 to us through counsel.
22      Do you recognize this, and can
23 you identify it?
24     (Pause.)

293

1      A   Yeah, I think I know where that
2 came from.
3     Q   Just so the record's clear, it
4 appears to be two pages of handwritten notes;
5 is that correct?
6     A   Right.
7     (Pause.)
8     A   It is two pages of handwritten
9 notes produced by Miss McAlexander, that are
10 under the homework assignment tab, and
11 they're on larger copy sheets, but are
12 produced on a smaller lined yellow sheet that
13 are in the section I just noted.
14     Q   Is this Ms. McAlexander's
15 handwriting?
16     A   Yes. I'm assuming it is. I
17 mean, she's the one who produced it for us
18 and --
19     Q   This is the homework assignment
20 you gave her?
21     A   Right. You know, you can't
22 control when you ask -- when you send it out,
23 we actually send it out with forms. But she
24 didn't reproduce it on our forms. She

294

1 reproduced it on this small sheet of paper,
2 which is fine. We inputted it into the
3 computer, then we go over it with her.
4      The ... the ... well, I guess
5 that's all I really can comment on it. I
6 lost my train of thought there, I apologize.
7     Q   That's fine. If you recall
8 something you want to get back to it, just
9 let me know.
10     A   Okay.
11     Q   Let's look at your report at
12 page two. Is it correct that
13 Miss McAlexander is not currently involved in
14 a diabetic education program?
15      (Pause.)
16     A   True. And she's not been in one
17 previously.
18     Q   And is it correct that the
19 nurses have trained her on the use of
20 medication and management of diabetes?
21     A   That's true.
22     Q   Take a look at pages six and
23 seven of your report. Is it correct that
24 these pages reflect the doctors that Miss

295

1 McAlexander is currently seeing, the
2 medications she is taking, and the related
3 supplies?
4     A   Yes.
5     Q   I'd like to go through some of
6 them with you.
7      Now, Dr. Helfin is her
8 primary-care physician, correct?
9     A   Yes.
10     Q   And he currently sees her every
11 one to two months; is that accurate?
12     A   Yes.
13     Q   And he is the doctor treating
14 her for diabetes?
15     A   Yes.
16     Q   And it's the doctor who
17 prescribed the diabetes medications that she
18 is taking?
19     A   That's my understanding.
20     Q   And is it your understanding
21 he's the only doctor for treating her for
22 diabetes?
23     A   Yes.
24     Q   Am I also correct that, as you

296

1 report, she sees an ophthalmologist once a
2 year at Ritz Eyecare?
3      A   Yes.
4      Q   Do you know if that is related
5 to her diabetes in any fashion?
6      A   I do not.  Well, actually, wait
7 a second.  I shouldn't speak so fast.
8      Q   Okay.
9      (Pause.)
10      A   I'm sorry.  Okay.  Would you ask
11 that question one more time?  Do I know if it
12 was related to her diabetes?  I am unaware of
13 her having any kind of -- of ophthalmological
14 related problem -- didn't phrase that very
15 well.  Diabetic-related ophthalmological
16 problem is what I wanted to say.
17      Q   You're saying you're unaware of
18 that?
19      A   I'm unaware of any such history
20 where I think a couple of other patients
21 actually did have ophthalmological problems
22 that were unrelated to -- I'm not aware of
23 her even having an ophthalmological problem.
24 So, as far as I know, it's -- when she does

297

1 see them, she's been seeing them for routine
2 follow-up.
3      Q   Okay.  Your report also says
4 that Miss McAlexander is currently taking
5 Lantus, Byetta and Metformin; is that
6 correct?
7      A   Yes.
8      Q   And those are the only
9 medications related to diabetes, correct?
10      A   That's correct.
11      Q   And your report on page seven
12 indicates that she currently uses supplies
13 such as injection paraphernalia related to
14 Byetta and Lantus and glucose monitoring; is
15 that correct?
16      A   Yes.  That's correct.
17      Q   Okay.  So, is it fair to say
18 that any recommendations that are different
19 from the current treatment regimen we just
20 discussed, would be new recommendations that
21 you are making in your report?
22      A   It would depend on what we're
23 talking about.  If they're medical in
24 nature -- well, I'm going to give you a yes,

298

1 but when we get to the recommendations, we'll
2 see what we're specifically talking about.
3      Q   All right.  Well, let's put it
4 this way.  To the extent you're recommending
5 something that's not in the current treatment
6 regimen that you report on, in your report,
7 is it fair to say that that additional
8 recommendation is coming from you and not
9 from a doctor?
10      (Pause.)
11      A   I think that's probably true.  I
12 can't think of an instance right off the top
13 of my head where it would not be true,
14 although as -- as we're going to be making a
15 few changes related to Dr. Helfin, subsequent
16 to the depo, I think right now the answer is,
17 yes.
18      Q   Okay.  Now, in your
19 rehabilitative plan, you recommend that
20 Ms. McAlexander have four visits per year to
21 her primary-care physician, relating to
22 diabetes.  And I believe your report notes
23 that she's already seeing Dr. Helfin, who is
24 her primary-care physician, every one to two

299

1 months.
2      My question is:  Are you
3 suggesting that these be additional visits,
4 or are you saying that, among the visits that
5 she has with her primary-care physician, four
6 of them need to address diabetes?
7      A   I'm saying my understanding was
8 that up to four of them address diabetes,
9 were associated with the lab tests and/or --
10 and the interpretation of those lab tests,
11 and were basically medication adjustments
12 and/or whatever the doctor needed to do
13 associated with the diabetes.  And,
14 subsequently, as we know today, that's what
15 Dr Helfin did, in fact, state in the letter
16 today.
17      Q   Right.  The four times per year,
18 but just to be clear, and I think you've
19 answered the question, I apologize if I'm
20 repeating things, but I just want to make the
21 record clear.
22      If she's seeing Dr. Helfin every
23 one to two months, then that would be six to
24 12 times per year, to the extent that the

35 (Pages 296 to 299)

300

1   recommendation from that doctor is four times
2   per year for the treatment and monitoring of
3   diabetes, those four times would be included
4   within the six to 12 times she's already
5   seeing him; they wouldn't be over and above?
6        A   No, no, and I apologize.
7        Q   When you say you are agreeing --
8        A   If I said anything incorrectly
9   in the report or in my statement, I
10   apologize.  I meant that four of the visits
11   were -- were related to diabetic management,
12   and that's what I believe Dr. Helfin is
13   saying in the -- in the report we received
14   today.  So if I miscommunicated in any way
15   that idea, I apologize for that, but I'm
16   simply trying to suggest that, out of the
17   visits that she's having, four of them are
18   for diabetic management, and the balance are
19   for whatever else Dr. Helfin is doing.
20        (Pause.)
21        Q   When your report stated, in
22   connection with your ophthalmological
23   recommendation, as well as your podiatry
24   recommendation, that those recommendations

301

1   were pending response from treating
2   physician, you were talking about the
3   response we received today from Dr. Helfin,
4   right?
5        A   Yes.
6        Q   That's the treating physician
7   you had in mind?
8        A   Right.
9        Q   Are you waiting for anything
10   else to come back on this file?
11        A   No.
12        (Pause.)
13        Q   Now, on page 30 of your report,
14   you recommend that plaintiff participate in a
15   wellness program as recommended for general
16   health guidelines, and you state that
17   Miss McAlexander could benefit from access to
18   a pool for low-impact aerobic exercise, and
19   suggest a YMCA membership, and you do put a
20   cost of $528 per year, correct?
21        A   True.
22        Q   And what is the basis for that
23   recommendation?
24        A   Basically, I felt that, as I did

302

1   when I used the other YMCA membership, was
2   that I really think it's important for her to
3   start exercising.  I really think it would
4   help with weight management.  I really think,
5   based upon all of her totality of problems,
6   that low-impact exercise is going to be
7   necessary, and I think that the exercise is
8   really important related to the diabetes, the
9   Type 2 diabetes, but because of the nature of
10   her prior history, the low impact becomes
11   more important.
12        And so I use the low impact, but
13   I justified in my staffing with ... my
14   support staff here, I justified it on the
15   basis that we need the exercise for the
16   diabetes, but there's no question that what
17   makes it necessary is the prior, the
18   long-standing prior history that in reality
19   makes any other form of exercise more
20   difficult for her.
21        Q   Even walking?
22        A   Oh, I think she can -- I don't
23   think walking is unreasonable for her.
24        Q   Could she obtain the same

303

1   benefit by undertaking a walking program?
2        A   Well, you know, she has a
3   history of cellulitis of the right lower
4   extremity with foot infection.  You know, I
5   have concerns about -- I had concerns
6   about ... the lower extremities and the
7   impact of the diabetes.  She also has a
8   history of plantar fascitis of the left foot.
9   And so ... my thought had been that -- that
10   when you look at the prior history, I'm just
11   not sure that she is going to keep up a
12   walking program that's -- as well as she'd
13   keep up a low-impact program in the pool.
14        In truth, without a lot of
15   reinforcement, I'm not sure she'd keep up any
16   exercise program.
17        Q   Yeah, I was going to ask you,
18   has she shown any inclination to participate
19   in a program where she'd have to travel to a
20   YMCA or the like?
21        A   I don't think, quite bluntly,
22   without a lot of reinforcement and support,
23   you're going to get her to keep up any
24   program, whether it's low-impact exercise,

36 (Pages 300 to 303)

304

1  diabetes management on a scheduled program,
2  or any of the other things that I think need
3  to happen. That's why I think case
4  management is so important with most of these
5  patients.
6      Q    Did you discuss with
7  Miss McAlexander your recommendation for a
8  wellness program or low impact exercise at a
9  gym?
10     A    I don't think I specifically
11  mentioned either one. I think I generally
12  talked about the fact that in managing
13  diabetes, that managing weight, nutrition, et
14  cetera, et cetera, were -- were important
15  issues. And that a coordinated program to
16  accomplish this is -- is going to, you know,
17  find its way into the recommendations, but I
18  don't think in -- that I was as specific as
19  to actually talk about low-impact exercise in
20  a pool, wellness centers, things of that
21  nature.
22     Q    Okay. This is probably as good
23  a place as any to ask you a question about
24  Miss McAlexander that we've asked about some

305

1  of the others, as well.
2      But based on your review of her
3  medical history, her history of mental
4  illness, weight issues, all the other issues
5  you've seen in the medical records for her,
6  which we can go into if we need to, is it
7  fair to say that you would have recommended
8  case management for her even if she had not
9  presented with diabetes?
10     A    In exactly the same fashion I've
11  answered that for all the others, I'd have to
12  say, yes. If we were presented with the
13  totality of -- of the mental health issues
14  and comorbidities, and somebody said, you
15  know, how can we coordinate a program that's
16  meaningful, there's no question I would have
17  said that, to do so, you know, you really
18  need a case manager to help coordinate all
19  the varying aspects of -- of meeting this
20  individual's needs. And that becomes that
21  much more critical when you're dealing with a
22  problem like diabetes.
23     Q    Now, you include in your
24  rehabilitation program, under Allied

306

1  Healthcare evaluations, that she undergo
2  nutritional evaluations four times per year.
3      Is it your understanding,
4  Dr. Deutsch, that these are already a part of
5  Miss McAlexander's current regimen, or is
6  this something that you're recommending?
7      A    No, I don't think it's part of
8  her current regimen. I don't think her diet,
9  any kind of diet control, weight management,
10  I don't think that's at all a part of her
11  current regimen.
12     Q    And is it your view that that
13  service is not something that could be
14  provided by Miss McAlexander's primary-care
15  physician in the numerous visits she has?
16     A    No, I don't believe it is,
17  and -- and ... even her primary-care
18  physician says that evaluation and monitoring
19  by a nutritionist is something that would be
20  recommended.
21     Q    All right. But does not provide
22  specifics in connection with that, correct?
23     A    No, they don't -- specifics
24  aren't provided.

307

1      THE WITNESS:  If this is a good
2  place, I need one minute to be able to
3  prepare for this phone conference, and
4  then I'm going to try to keep it to a
5  ten-minute conference, as best I can,
6  and then walk out, although it's
7  scheduled for fifteen. I'm going to try
8  to get out as quick as I can.
9      MR. COUTROULIS:  That's fine.
10  If you got just a minute.
11     THE WITNESS:  Sure.
12     MR. COUTROULIS:  We're off the
13  record.
14     (Recess taken from 3:58 p.m. to
15  4:19 p.m.).
16  BY MR. COUTROULIS:
17     Q    All right. Dr. Deutsch, your
18  report from Miss McAlexander at page 28
19  indicates continued use of the drug, Byetta.
20  And Byetta is listed under present medical
21  treatment on page six of the report.
22     My question is, what is the
23  basis for stating that Miss McAlexander is
24  currently using Byetta? I don't see it

37 (Pages 304 to 307)

308

1   appear in the medical summary.  I do see the
2   reference in the handwritten note.  And I
3   would like to know if that's the sole basis
4   for this, or is there something else?
5       (Pause.)
6       A   I believe it's strictly her
7   report.
8       Q   That's Exhibit 40, the
9   handwritten note?
10      A   Well, and then our going over
11  all of the medications with her.  Let me take
12  a look at the handwritten note here.
13      Right.  It is on the handwritten
14  note, but then we sat down with her and went
15  back over everything to make sure we
16  understood what preexisted diabetes, what was
17  associated with diabetes, what was not
18  associated with diabetes, what was associated
19  with what condition.
20      So start with the handwritten
21  note, as a homework assignment, went on with
22  direct interview, but it definitely is ...
23  Miss McAlexander that is the source of that
24  information.

309

1       Q   I'm not seeing it on pages seven
2   through nine of the medical summary that you
3   prepared in the report.
4       A   That's true.  I mean --
5       Q   Why is that?
6       A   What do you mean?
7       Q   Why is it not there?  Is it
8   because she's the source and not a doctor?
9       A   Well, the medical summary and
10  the medical records usually is not the
11  source.  I mean, you could get from the
12  medical records the fact that it's been
13  prescribed, but it's kind of rare to get from
14  the medical records an up-to-date, current,
15  accurate list of not only everything that an
16  individual is taking, but the exact frequency
17  and the exact dosage that an individual is
18  taking.  So we -- you know, we wanted her to
19  get it right off the prescription bottles and
20  provide it to us.
21      Q   Did she show you a prescription
22  bottle for this?
23      A   No, she -- I mean, that's -- you
24  know, we kind of like it when they bring the

310

1   prescriptions in, and in this instance, she
2   wrote them down and came in and --
3       Q   Okay.
4       A   -- we took it from her that
5   that's what she did.
6       Q   All right.  Well, it's fair to
7   say the sole source for the Byetta is what
8   she said?
9       A   Yes.
10      Q   And wrote it down on this
11  handwritten note?
12      A   Yes.
13      Q   Exhibit 40.  Now, the
14  recommendations include on page 29, the drug
15  Ativan, three times a day, as needed for
16  anxiety, related to having to give insulin
17  injections and test blood glucose levels; is
18  that correct?
19      A   Yes, that's what it says, yes.
20      Q   And the cost of $161, I'm
21  rounding off, per month, would come to about
22  $2,000 per year; is that right?
23      A   Correct.
24      Q   Now, if Miss McAlexander only

311

1   uses ... Ativan as needed, this assumes that
2   she will use it three times a day essentially
3   forever?
4       A   If she's not using it as
5   prescribed, and ... she's building up pills,
6   then clearly ... then that's not the
7   prescription, you know, she's not following
8   it as prescribed.  Now, if it's prescribed
9   PRN, and she's not averaging taking the pills
10  as she's indicated to us, then this obviously
11  would not be the correct amount.
12      We asked, not just what the
13  prescription is, but how are you taking the
14  medication.  Our understanding is, this is
15  how she's taking the medication.
16      Q   And just so I'm clear, your
17  understanding is, she's taking it in what
18  frequency?
19      A   Three times per day.
20      Q   Three.  Okay.
21      Now, pages ... six and seven of
22  your report, list the medications that she's
23  currently taking.  And you include in that
24  list, Ativan on page seven for anxiety, and

312

1  you note it's prescribed by Dr. Falsetti,
2  correct.
3      (Pause.)
4      A   I'm sorry, where are you
5  looking?
6      Q   On pages six and seven.
7      A   Yes.
8      Q   Now, in parentheses, your report
9  states that those conditions, that is, the
10 anxiety was preexisting; is that accurate?
11     A   That is accurate.
12     Q   And that means, in this context,
13 that it preexisted the diagnosis of diabetes,
14 correct?
15     A   There's no question that the
16 anxiety preexisted.  The statement to us that
17 left us going ahead and putting it into the
18 plan, was that this was prescribed that she
19 was being -- continuing to be prescribed the
20 Ativan for the anxiety she was experiencing
21 related to the self injections.
22     Q   But there's no question that her
23 anxiety problems preexisted the diagnosis of
24 diabetes.

313

1      A   Absolutely none.  So, you know,
2  the only thing I guess we could -- that could
3  have been done, or that -- that, you know, we
4  could question is whether, in fact, she's
5  accurate in telling us the basis of the ...
6  prescription, but we accepted it at face
7  value.  I will admit to that.
8      Q   Now, is there any place in your
9  report where there is a basis for connecting
10 the anxiety, which we agree was preexisting,
11 with Miss McAlexander's having to test her
12 blood or give herself injections?
13     A   No.  Actually, that's what I
14 just indicated.
15     (Pause.)
16     Q   One second.
17     (Pause.)
18     Q   In fact, on page 11, you've got
19 a notation in connection with Dr. Falsetti
20 for August 18, 2006; do you see that?
21     (Pause.)
22     A   I'm sorry, I'm making a note.
23     Q   That's page 11, the fifth
24 notation down for August 18, 2006.

314

1      A   Yes.
2      Q   And you say she was trying to
3  cope and felt tired, Zoloft, Ativan, and
4  Ambien prescribed --
5      A   Right.
6      Q   -- correct?
7      A   Yes.
8      Q   And that notation says nothing
9  to tie Ativan to anything relating to
10 diabetes or injections, correct?
11     (Pause.)
12     A   Nope.
13     Q   So, am I correct?
14     A   You are correct.
15     Q   Now, on page 17, let's turn to
16 that for a second.  You have a summary of
17 records from Dr. Perrin [ph] from November 6,
18 2007, and the report states that Miss
19 McAlexander was suffering shortness of breath
20 and breathing difficulty at night.
21     A   Page?
22     Q   Seventeen.
23     A   Seventeen?
24     Q   Yes.

315

1      A   I'm sorry.  I keep hearing
2  seven.
3      Q   Page 17, the notation for
4  November 6, 2007 from Dr. Perrin; you with
5  me?
6      A   I'm with you.
7      Q   And that states, does it not,
8  that Miss McAlexander was suffering shortness
9  of breath and breathing difficulty at night
10 and was advised to used Ativan for shortness
11 of breath, as it is felt to be a panic
12 attack, correct?
13     A   Yes.
14     Q   And, again there, there's no
15 reference to diabetes or injections?
16     A   Correct.
17     Q   And, finally, on page 20 of your
18 report, there's a summary of additional
19 records from Dr. Falsetti, and ... your
20 report states that on May 4, of 2004 and June
21 1, 2004, Miss McAlexander felt increased
22 anxiety, and that Prozac, Ativan, and
23 Seroquel were prescribed.  And can we agree
24 again there, there is no mention of a tie to

316

1  diabetes or insulin injections?
2      A   On page 20?
3      Q   Yes.
4      A   And where were the entries, I
5  apologize?
6      Q   On May 4, and June 1.  They're
7  the very top entries.  It's a combined entry.
8      A   I see it.  Absolutely.
9      Q   Okay.  Now, you would agree,
10  Dr. Deutsch, by your own approach in this
11  report and the other reports, that if, in
12  fact, Miss McAlexander needed a certain
13  treatment prior to being diagnosed with
14  diabetes, that would not be an appropriate
15  cost item, correct?
16      A   I would agree.
17      Q   Now, is it correct, that
18  Miss McAlexander had significant medical and
19  mental health issues prior to being diagnosed
20  with diabetes?
21      A   Yes.
22      Q   She had significant medical
23  needs and issues before being diagnosed,
24  correct?

317

1      A   Yes.
2      Q   She was obese; is that right?
3      A   Yes.
4      Q   She was sedentary?
5      A   Yes.
6      Q   And she had mental health
7  issues, among other health issues, correct?
8      A   Yes.
9      Q   And so is it fair to say, and I
10  apologize for being repetitive, but since we
11  have a number of cases, I just need to do so,
12  that you would agree, that had she come to
13  you, you would have recommended case
14  management for her, even prior to the onset
15  of any diabetes?
16      A   With the same overall qualifiers
17  that I've given before, yes.
18      Q   Is there anything in particular
19  that you did with respect to Miss McAlexander
20  from the psychological profile testing that
21  you conducted?
22      A   Anything particular?  You mean,
23  different than the others?
24      Q   Yeah.

318

1      (Pause.)
2      A   No.  I stayed pretty consistent
3  with what I did because, frankly, trying to
4  do ... six different cases, I wanted to kind
5  of stay on ... a similar pattern with each.
6  So there wasn't anything different that I
7  did.
8      Q   And what's the essential reason
9  for doing the psychological testing of these
10  patients?
11      A   Frankly, number one, I stayed
12  with the MMPI.  Two, I wanted to use it to
13  give myself insight.  Knowing there was a
14  long-standing psychological history, even
15  though we were dealing with primarily an
16  issue of diabetes, I wanted to have insight
17  into what currently was going on
18  psychologically.  I wanted to have a sense of
19  not only that long standing history, but
20  currently, are we dealing with patients who
21  bring to the table continuing issues, not
22  only psychologically, but with this whole
23  problem I was concerned about with self
24  compliance, with care.  Were they going to be

319

1  able to manage their -- their health issues,
2  their diabetes issues.
3      And so one way for me to get a
4  better understanding was to have a little
5  more insight, both in terms of clinical
6  interview and at least one really good
7  personality inventory, and there's none
8  better than MMPI.
9      Q   Was there something specific in
10  the test results for Unger compared to the
11  other five that you saw that influenced your
12  judgment about case management?  And for
13  purposes of this question, I'm focusing
14  solely on the test results, not everything
15  else that you may have considered.
16      MR. SULLIVAN:  I'm going to
17  object to that, asked and answered.
18  BY MR. COUTROULIS:
19      Q   Well, I don't think it's been
20  asked in the sense of a comparison to the
21  other five, but I understand your objection.
22  Subject to the objection.
23      A   I don't know that I could say
24  that there's something separate in the test

320

1    results compared to the other -- the other
2    five, without recognizing that when you
3    interpret test results, you do so in relation
4    to your clinical interview, and it really ...
5    is so important to have that clinical
6    interview as part of it.  So --
7        **Q    But if we separate that out and**
8    **just focus on the test results?**
9        A   I am afraid, if I looked at the
10   test results alone, I probably would have put
11   case management back in there.  I mean, he
12   had some pretty significant test results.  If
13   you looked at his profile on the MMPI in
14   relation to the others, in some instances, he
15   had higher clinical elevations than the
16   others.  In some, he had lower.  But ... if
17   you used only test results, I probably
18   wouldn't have eliminated the case management.
19       So, there's no question that
20   clinical interview and judgment from clinical
21   interview played a significant role in that
22   decision and in interpreting the test
23   results, as well.
24       **Q   I have a few general questions I**

321

1    **want to ask you, and then we'll finish up.**
2        **Is it fair to say that**
3    **approximately 88 to 90 percent of the**
4    **testimony that you give in litigated matters**
5    **is for plaintiff?**
6        A   No.  Oh, the testimony?
7        **Q   Yes, sir.**
8        A   Be a little bit easier to answer
9    that if we separated deposition and trial,
10   but I'd say ... in deposition ... 80 percent
11   is plaintiff, and in trial, 90 percent is
12   plaintiff.
13       **Q   All right.**
14       A   That'd be -- although that's
15   kind of what you asked is 80 to 90 percent,
16   but that's probably a better way for me of
17   saying it.
18       **Q   Is there a difference between**
19   **plaintiffs' cases and defendant's cases, if**
20   **we were to ask the question of how often you**
21   **write a report?**
22       A   Yeah.  I probably write reports
23   for defense more often than I testify for
24   defense.  And I certainly consult for defense

322

1    far more often than I either write reports or
2    testify.  I mean, realistically, I'm sure
3    you've heard or seen testimony about my
4    number of consultations.  I mean, from '84 to
5    2002, 45.6 percent of my referrals were
6    defense, going all the way to 2005, you know,
7    just be specific, 2003, 39 percent were
8    defense; 2004 43 percent were defense; 2005,
9    right around 55 percent were defense; 2006,
10   we're back down around 48, 49 percent
11   defense.  2007 was essentially about the
12   same.  I have no idea where we are this year.
13   But I think we're running about that figure,
14   right around 47, 48 percent defense.
15       **Q   Are all those cases litigated**
16   **matters?**
17       A   We're talking about only
18   litigated matters.
19       **Q   Okay.  So there's a big**
20   **difference between your consultations as**
21   **between plaintiffs and defense --**
22       A   Sure.
23       **Q   -- and your testimony?**
24       A   No question.  Defense don't

323

1    generally ask me to testify as frequently,
2    'cause when I testify for the defendants, I
3    create a floor, and for an awful lot
4    attorneys, they don't want that floor placed
5    in the courtroom, quite frankly.
6        But, I do a lot of
7    cross-examination questions.  I do a lot
8    of -- of assistance in developing strategies
9    regarding the evaluation of opposing
10   life-care plans and damages.  And, you know,
11   it's -- frankly, it's ... nice you don't deal
12   as much with the courtroom.  And, frankly, I
13   don't end up in live courtroom very often,
14   even as much plaintiff testimony.
15       You know, last year set a huge
16   record for me.  It's the most I have been --
17   in 36 years, I've ever been in the courtroom,
18   there were 14 times.  The year before that it
19   was either four or six.  And the year before
20   that, it was whichever one.  I mean, the
21   last -- the two years prior to last year, one
22   of them was six times and one of them was
23   four times in the courtroom, which is much
24   more typical.  Although, this year's kind

324

1  of ... not too far away from last year. I
2  mean, I think I've been in either eight or
3  nine times already this year.
4      Q   What do you attribute that to?
5  Our society has just become more litigious?
6      A   No, it's not that the numbers of
7  cases, 'cause my depositions are actually
8  down. I think they just aren't settling as
9  many cases. The big -- the catastrophic
10  cases tend to settle. It's the little
11  non-catastrophics that seem to be the little
12  thorns in the side that end up in the
13  courtroom.
14      Q   Now, I have seen some
15  indications that -- and correct me if I'm
16  wrong -- that you write a report in pretty
17  much all of your plaintiffs' cases, but only
18  in about one-third to one-half of the defense
19  cases; is that accurate as an approximation?
20      (Pause.)
21      A   I'd say the one-third is
22  probably a little bit ... closer, might be a
23  little more than one-third, but I don't think
24  it's approximated one-half at this point. It

325

1  might be.
2      Q   Okay.
3      A   But I haven't really looked at
4  that.
5      Q   So, you're saying it would --
6  based on your recollection, as you sit here,
7  would it be fairer to say that you write a
8  report in pretty much all the plaintiffs'
9  cases and probably a little bit more than a
10  one-third of the defense cases, but not as
11  much as a half?
12      A   One-third to maybe a little bit
13  more than one-third.
14      Q   Okay. Why the difference
15  between plaintiffs and defense cases with
16  respect to the preparation of a report?
17      A   Well, first of all, if you're
18  consulting, defense don't -- you know, an
19  awful lot of defense attorneys aren't going
20  to want you to put something in writing
21  that's discoverable. Even if they list you
22  as a witness -- I mean, an awful lot of
23  defense attorneys will list me as a witness
24  but -- and want me to consult and have the

326

1  availability to bring me in if and when they
2  decide to do that. But if they have me write
3  a report, that becomes discoverable. So they
4  hold off on ... on reports until they make
5  the decision to hold me back as a witness, to
6  take me off the witness list. Then, after
7  that, it doesn't matter.
8      Q   Okay.
9      A   Now, those that don't list me as
10  a witness, that's a whole other story. If
11  you include those that are using me strictly
12  as consultants, and you include reports to be
13  an analysis of opposing counsel's plan --
14  excuse me, opposing plaintiff's life-care
15  plans, or just developing cross-examination
16  questions for the treating doctors, for the
17  plaintiff's life-care planner, if that's
18  included in your ... your list of reports,
19  well then we're way over 50 percent.
20      Q   Okay. That would make a big
21  difference if we were to include those?
22      A   Yes, right. When you said
23  reports initially, I kind of assumed you
24  meant a report similar to the type of report

327

1  you write with a plaintiff. But if you're
2  including anything of the nature I just
3  listed, well then we'd be well over the
4  50 percent mark.
5      Q   Let me ask you a question. With
6  respect to the six reports we've been talking
7  about over these two days, in these cases,
8  did you provide the results of your
9  rehabilitation recommendations to counsel for
10  the plaintiffs before you finalized the
11  report?
12      A   No.
13      Q   Okay.
14      A   In fact, I even tried to call,
15  'cause ... and this is no offense to you. I
16  don't mean this to be disrespectful to
17  anybody but I had a question and ... just
18  probably because of schedule, I was never
19  able to get a call back, so I just tabled the
20  question and ... sent them out.
21      Q   Now, to the extent you or
22  someone in your office here who is working
23  with you, makes a note about a particular
24  medical record or about a particular

42 (Pages 324 to 327)

328

1  plaintiff, as I understood what you said,
2  they're made directly on the computer; is
3  that correct, is that right?
4      A   With the exception of what's in
5  the notebooks, that are sitting in front of
6  you, but if we're interviewing, if we're
7  doing report work, if we're doing some
8  medical summaries, it's all done right on the
9  computer, with the exception of any
10  highlighting, tabs, that we do on medical
11  records, et cetera, which are still on the
12  medical records.
13      Q   To the extent notes were made
14  directly in the computer, have we been
15  provided with those?
16      A   Yeah, the roughs are still in
17  each file.  That's why there is a medical
18  summary tab; there's a medical summary
19  addendum tab; the documentation for
20  recommendations, those are all notes.  I
21  don't throw anything out, so we produced the
22  rough.  So, you know, on those, you just have
23  to excuse the typos, the sentence structure,
24  those aren't meant to be finished products.

329

1  Those are exactly what they are.  They're the
2  original roughs, so you got to take them the
3  way they are.
4      Q   Have you spoken with any other
5  experts retained by the plaintiffs in this
6  case?
7      A   No.
8      Q   Have you spoken with Dr. Raffa?
9      A   No, I haven't talked to -- it is
10  Dr. Raffa, and no, I haven't.  But I'm going
11  to try and call him tonight about whatever
12  that one issue was, and I have it in my
13  notes.  I just --
14      Q   Are you aware of the fact that
15  he's prepared reports in this case?
16      A   I would assume, 'cause you said
17  you were taking his deposition on Thursday.
18      Q   I am, and he has.  And have you
19  seen his reports?
20      A   No.
21      Q   Have you discussed his reports
22  with him in any way, shape, or form, whether
23  by e-mail, phone call, or any other method of
24  communication?

330

1      A   No.  And all e-mails I have are
2  printed out and put in the file.  You even
3  have the printout.
4      Q   So, is it fair to say you don't
5  know the numbers he has come up with taking
6  your rehabilitation recommendations and then
7  putting some numerics to them?
8      A   I haven't got a clue.  And to
9  tell you the honest truth, I don't, in any
10  files in any -- occasionally, somebody might
11  send me an economist's report.  I usually
12  prefer not to.
13      Q   Is there a particular reason for
14  that?
15      A   Well, because I don't want to be
16  asked questions, quite frankly, about an
17  economist's report, because I don't know how
18  to interpret, frankly, the economist's
19  reports.
20          The only time I'm interested, is
21  if it happens to be an economist I'm entirely
22  unfamiliar with, and I'm a little worried
23  sometimes about how economists -- you know,
24  there are times I've seen really overblown

331

1  reports, and I get blamed for the figures,
2  when I know they're inconsistent with how
3  people like Dr. Raffa, for example, or
4  Dr. Pettingill might evaluate, and those two
5  tend to be ... more on the reasonable side.
6          And so if I see a life-care plan
7  on a spinal cord, I've done a paraplegic, for
8  example, that comes out to be fifty million
9  dollars.  Well, I know that's not because of
10  my report.
11      Q   Okay.
12      A   That just doesn't happen on
13  paraplegics.
14      Q   We've talked a lot about your
15  therapeutic modalities, specifically case
16  management.  I don't have any more questions
17  about case management.
18          But you also have, in a number
19  of those reports, a reference to depression
20  and anxiety, counseling under therapeutic
21  modalities, and I believe your reports
22  observed that that was already called for for
23  these patients.  And so you do not provide
24  any cost estimates for that depression,

43 (Pages 328 to 331)

332

1 anxiety counseling, which I think you
2 observed could be rolled into the counseling
3 already going on; is that a fair assessment?
4      MR. BRUDNER: Objection, form.
5      THE WITNESS: That's true, I
6 don't think there's anyone I gave
7 counseling to, or psychological
8 evaluations or psychiatric evaluations.
9 BY MR. COUTROULIS:
10     Q   Right. So consistent with your
11 plan then, we should not see any calculations
12 from Dr. Raffa for depression, anxiety
13 counseling in any of these six, correct?
14     A   That's true.
15     Q   You have a number of cost
16 estimates in your reports, for example, cost
17 estimates for different drugs. How did you
18 come up with those cost estimates? And,
19 specifically, are you using list prices when
20 you do it?
21     MR. BRUDNER: Object to form.
22     THE WITNESS: Well, you have it
23 in your copies of the files. If you go
24 not to the source list, but to the

333

1 supplies.
2      MR. COUTROULIS: Um-hum.
3      THE WITNESS: You'll find that
4 we didn't just go to the drugstore where
5 we were given the drugstore, but we
6 would go to the Internet suppliers that
7 usually are less expensive. So like we
8 might go to drugstore.com, or we might
9 have gone to PMS Pharmacy Management,
10 and we usually go to more than one
11 supplier. So ... that's ... you see
12 that in the outline under equipment and
13 supplies.
14 BY MR. COUTROULIS:
15     Q   But when you go to these
16 different suppliers and you look at these
17 different sources, are you using list prices,
18 or something other than list prices?
19     A   Well, we're using their list
20 price, which is usually less than you'll find
21 in a Walgreens or a -- 'cause these are
22 not ... these don't have local retailers.
23 They're only an Internet bulk supplier.
24     Q   Are you assuming that the

334

1 plaintiffs would have to pay that full amount
2 for getting the drugs?
3      A   That's true. We're not using
4 a -- a ... well, I don't how else to handle
5 this -- we're not using Medicaid rates or
6 insurance company schedule rates, because I
7 don't know the availability of that to an
8 individual ... patient.
9          So you we have no choice but to
10 use the prevailing rate in the community in
11 which the individual lives, or in the
12 instance of supplies, durable medical
13 supplies or replenishable goods like drugs,
14 we can get that through an Internet supplier.
15 So we don't have to use the local community,
16 but we have to use resources that's readily
17 available to the average individual at the
18 best price that they can get, which is not
19 going to be as good as the Medicaid rate or
20 an insurance company rate.
21     Q   Do you consider whether any of
22 these drugs could go off patent in the future
23 and their cost be affected by that?
24     A   That's an interesting question.

335

1 No.
2      Q   Can you --
3      A   It's a reasonable question, but
4 I have no way of knowing what the
5 off-patent ... rate would be, if they're not
6 already on a generic.
7      Q   Did you consider whether the
8 cost might change on these drugs for any
9 other reason?
10     A   No. Up or down.
11     Q   Now, you've worked with
12 Dr. Raffa in the past?
13     A   Sure.
14     Q   Many times?
15     A   On both sides of cases,
16 absolutely.
17     Q   How many times would you say
18 you've worked with him on the same side in
19 the last five years?
20     A   I haven't got a clue.
21     Q   How about the last year?
22     A   I couldn't even begin to tell
23 you that.
24     Q   Is it fair --

336

1      A   I would say, on the cases where
2   I'm there as an economist, he's probably the
3   economist ... a quarter, 20 to 25 percent of
4   the time.  So, on that basis, I'd probably
5   say he's been on the same side ... it's got
6   to have been on the same side at least ...
7   you know, 15 ... 15, 20 times in the last
8   year to year and a half.
9          MR. COUTROULIS:  Okay.  I can't
10     think of any other questions I want to
11     ask you at this time.  I really
12     appreciate your time.
13         THE WITNESS:  I think you've
14     done a genuinely remarkable job.
15         MR. BRUDNER:  Dr. Deutsch, I've
16     got to follow up with a few questions.
17         THE WITNESS:  I'm sorry,
18     Dr. Deutsch left the building.
19         MR. BRUDNER:  I understand I
20     have got eight minutes.
21         THE WITNESS:  Go ahead.
22         CROSS-EXAMINATION
23   BY MR. BRUDNER:
24     Q   You were testifying about your

337

1   litigation work and the split between the
2   work that you do for plaintiffs in litigation
3   and the work that you do for defendants in
4   litigation earlier, correct?
5      A   Yes.
6      Q   Okay.  And as I heard it, you
7   were able to break down different subsets of
8   the kind of work you do.
9          My question is:  Can you
10   characterize generally litigation work, what
11   the split would be between plaintiffs and
12   defendants?
13     A   Well ... different than I
14   already --
15     Q   Well, earlier, I heard you
16   testify what was the split with respect to
17   testimony, what the split was with respect to
18   trial, what the split was with respect to --
19   for whom you write reports.  What I want to
20   know, is there an overall split?
21     A   Right.  Well, I did give that,
22   but I have gotten confused in there.  When we
23   were loading data into the foundations for --
24   for life-care planning research database,

338

1   that is all of patient files litigation or
2   none, we took the opportunity in 2002 to go
3   ahead and do an audit from 1984 through 2002.
4          So, on litigation cases, from
5   that period, '84 to 2002, 45.6 percent of all
6   litigation referrals were defense.  The
7   balance were plaintiff.
8          In 2003, 39 percent were
9   defense.  In 2004, 43 percent were defense.
10   In 2005, 55 percent were defense.  In
11   2006 ... we dropped back to around 48,
12   49 percent defense.  I'd have to go back and
13   check the computer.  And we were about the
14   same in 2007.  And I don't know where we are
15   this year.  I think we're probably running
16   right around the same, might be slightly more
17   than 50 percent in terms of our defense
18   referrals, but I think we're probably going
19   to come out right around that 47, 48 percent
20   mark, defense.
21          And one of the reasons for that
22   is because we've gotten actually three
23   separate bulk cases.  Eleven cases involving
24   child abuse that involved 11 severely abused,

339

1   developmentally delayed children, and then
2   two multi-district litigation cases, and as a
3   result, it kind of skews the curve.
4          You know, you could count them
5   as one, or you could count them as
6   individuals.  And if you count them as
7   individuals, it is definitely going to
8   suggest more plaintiff than defense.
9      Q   I see.  Have you, in the past,
10   worked for Mr. Coutroulis' firm, Carlton,
11   Fields?
12     A   I have.
13     Q   And on how many occasions?
14     A   I looked that up this morning
15   and there's been seven referrals.
16     Q   Okay.  When you do work for
17   Mr. Coutroulis' firm, do you use the same
18   questionnaires?
19     A   Well, it depends on whether I
20   see the patient.  I have a very specific
21   process for working from the defense side.
22   If I don't do an IME, if I am allowed to
23   actually see the patient, then I don't do
24   anything different, other than the fact that

340

1  I can't do a follow-up.
2         In other words, I don't -- I
3  never send the report to the patient, and I
4  can't do any kind of follow-up subsequently.
5  If I don't get to see the patient but if I'm
6  in the case early enough, then I have a very
7  specific process where I try and ask
8  questions of the plaintiff through the
9  defense attorney when he takes the deposition
10  or she takes the deposition of the plaintiff.
11  I ask family members when those depositions
12  are taken, ask their treating physicians when
13  those depositions are taken, and I try and
14  get my insight, my clinical insights by
15  making sure I get a complete copy of the file
16  of the plaintiff's life-care planner, and I
17  compare very carefully the plaintiff's
18  life-care planner's interview with what their
19  final recommendations are.
20         But, generally, their interview
21  is pretty accurate, even if they may have a
22  difference of opinion from my own, as to how
23  to apply those interview questions, but it's
24  a very specific consistent process of how you

341

1  approach this from the defense side to
2  overcome the fact that you don't have the
3  opportunity to actually interview the client,
4  if, in fact, you don't have that opportunity.
5      Q   Okay.
6         (Pause.)
7      Q   So do you have an occasion, when
8  working for defendants in litigation, to use
9  the type of questionnaires that you used in
10  these six cases?
11     A   Sure.
12     Q   Is ...
13     A   Are you referring to the
14  questionnaire you mail to the doctors?
15     Q   Right.
16     A   Oh, I can't mail questions to
17  the doctors because, you know, you don't have
18  the authority to mail questionnaires to the
19  treating doctors when you're coming from the
20  defense.  I have to ask those questions by
21  giving the questionnaires to the defense
22  attorney if we're early enough in the case,
23  and they'll ask the questions at deposition
24  for me.  So I can't mail them out, but you do

342

1  get them answered, assuming that they didn't
2  wait till three weeks before trial to call
3  me.  Of course, if they waited that long,
4  then I usually don't accept the case, or I do
5  a very limited consultation.  But, as long as
6  they got me in early enough, yes, we get the
7  questions answered.
8         (Pause.)
9      Q   Is the methodology that you
10  employ to analyze rehabilitation counseling
11  and life-care between your plaintiff's work
12  and your defendant's work?
13     A   No, and you know, I've -- look
14  after 90 peer review journal articles,
15  chapters and other texts, you know, 14 book
16  volumes and -- you don't, if you don't do
17  things consistently, you get people as
18  qualified as the -- and I'm not just being
19  realistic here -- as qualified as the
20  gentlemen who have been here for the last 18
21  hours, they're going to know very quickly
22  when you've changed your methodology from one
23  side versus the other.  You just simply don't
24  do that.  So -- you know, no methodology is

343

1  going to stay the same.
2      Q   Okay.  Have you ever testified
3  in federal court as an expert in the field of
4  rehabilitation counseling?
5      A   Many times.
6      Q   Have you ever testified in
7  federal court as an expert in the field of
8  life-care planning?
9      A   Yes.
10     Q   Has any of your testimony ever
11  been excluded as a result of a successful
12  Daubert Challenge?
13     A   Never.
14        (Pause.)
15     Q   You testified ... I heard you
16  testify a little bit, and tell me if I'm
17  right, that -- that ... plaintiff may have
18  benefited from case management services prior
19  to the onset of diabetes in at least one of
20  these cases; is that accurate?
21        MR. COUTROULIS:  Yeah, object to
22  form.
23        THE WITNESS:  I'm sorry, I
24  didn't understand.  Please ask me again.

344

BY MR. BRUDNER:

1  Q  I believe that you testified
2  earlier that, for instance, Miss McAlexander
3  may have benefited from case management
4  services prior to the onset of her diabetes;
5  is that accurate?
6  A  Yes.
7  Q  To the extent you testified in
8  any of these cases that the plaintiff may
9  have benefited from the case management
10  services prior to the onset of diabetes, does
11  that change your opinion that case management
12  is an expense attributable to diabetes for
13  that plaintiff?
14  A  No, I think what I've said
15  throughout this is that what I've recognized
16  is clearly they would have benefited -- I
17  mean, you have to recognize how severe the
18  mental health problems were, how significant
19  many of the comorbidities were, so you can't
20  deny the fact that to treat all of those
21  problems as a group, a case manager would
22  have been of benefit, but you also have to
23  recognize that with the onset of diabetes,

345

1  you have to take these patients as they come.
2  And so you have to realize that
3  to deal with these -- with the diabetic
4  condition in the most effective fashion
5  possible, you really need a coordinated
6  program that recognizes that these are
7  naturally going to be some of the most
8  difficult patients to treat from a diabetic
9  standpoint, that you really need, if you're
10  going to manage the diabetes in a really
11  effective fashion, that you're going to have
12  to recognize that they have a
13  preexisting history of significant problems,
14  the diabetes has a negative impact on a lot
15  of preexisting comorbidities, a lot of
16  preexisting comorbidities have a significant
17  impact on the diabetes, and even on their
18  self compliance with care, with the diabetes.
19  And so the need for both an educational
20  program and a case management program to work
21  with the diabetes becomes very important.
22  And so what I'm suggesting is
23  that you have to take the patients as they
24  come. So it doesn't change the fact that I

346

1  believe strongly that it is needed if you're
2  going to deal with the case management
3  problem -- excuse me -- if you're going to
4  deal with the diabetic problem.
5  Now I'm starting to get punch
6  drunk, I apologize.
7  (Pause.)
8  Q  Is it your opinion that in each
9  of these cases that case management is an
10  expense attributable to diabetes?
11  MR. COUTROULIS:  I object to the
12  form of the question.  I believe it
13  calls for a legal conclusion, among
14  other issues.
15  THE WITNESS:  Well ... I don't
16  know how to answer that differently than
17  I've answered ... you know, I recognize
18  the value of -- of the case management
19  slash diabetic management program, as a
20  result of onset of the diabetes, but
21  I've also recognized the -- the value of
22  case management absent the diabetes and
23  with the preexisting mental health and
24  comorbidity problems, so ... I'm not

347

1  sure I know how to answer it differently
2  than that.
3  Certainly, the onset of the
4  diabetes, I think, makes the issue even
5  more problematic and the need for the
6  case manager that much more serious and
7  of necessity.  And I don't know if --
8  and I think, because of the seriousness
9  of their preexisting problems, and the
10  reality that you have to take the
11  patient as you find them.
12  We recognize that the case
13  management becomes critical.  But I
14  can't deny the fact that if we never had
15  diabetes there is value ... to, if we
16  were treating all of those issues
17  previously, case management, I think,
18  would have been helpful because we have
19  to recognize we certainly don't see
20  success in what happened with them
21  before.  And ... and it's one of the
22  reasons I think why their diabetic
23  situation is made that much worse now.
24

348

1      **MR. BRUDNER:**  Thank you, Doctor.
2  Those are all my questions.
3      **MR. COUTROULIS:**  I don't have
4  anything else.
5      (Whereupon, at 5:05 p.m., the
6  proceeding concluded.)
7        - - - - -
8
9
10
11
12
13
14      CERTIFICATE OF OATH
15
16  STATE OF FLORIDA      )
17            )
18  COUNTY OF ORANGE      )
19
20      I, the undersigned authority,
21  certify that PAUL M. DEUTSCH, PH.D.,
22  personally appeared before me and was duly
23  sworn.
24

349

1      WITNESS my hand and official seal
2  this 15th day of October, 2008.
3
4
5
6      _____
      Richard Castillo,
7      Registered Diplomate
      Reporter
8      Notary Public, State
      of Florida at Large
9      Comm. No. DD609499
      Expiration: 02/25/11
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

350

1      CERTIFICATE OF REPORTER
2  STATE OF FLORIDA      )
3  COUNTY OF ORANGE      )
4  I, RICHARD CASTILLO, Professional Court
5  Reporter and Notary Public, do hereby certify
6  that I was authorized to and did
7  stenographically report the deposition of
8  PAUL M. DEUTSCH, PH.D.; that a review of
9  the transcript was requested; and that the
10  foregoing transcript, pages 167 through 348,
11  is a true record of my stenographic notes.
12      I FURTHER CERTIFY that I am not a
13  relative, employee, or attorney, or counsel
14  of any of the parties, nor am I a relative or
15  employee of any of the parties' attorney or
16  counsel connected with the action, nor am I
17  financially interested in the action.
18      DATED this 15th day of October, 2008, at
19  Orlando, Orange County, Florida.
20
21  -------------------------------------
  RICHARD CASTILLO
22  Registered Diplomate Reporter
  Notary Public, State of Florida at Large
23  Commission No. DD609499
  Expiration:  February 25, 2011
24

351

1      E R R A T A
2      I, PAUL M. DEUTSCH, PH.D., do
3  hereby certify that I have read the foregoing
4  transcript of my deposition given on October
5  7, 2008, that, together with any additions or
6  corrections made therein, it is true and
7  correct.
8
  Page    Line
9  ----------------------------------------------
10  ----------------------------------------------
11  ----------------------------------------------
12  ----------------------------------------------
13  ----------------------------------------------
14  ----------------------------------------------
15  ----------------------------------------------
16  ----------------------------------------------
17  ----------------------------------------------
18  ----------------------------------------------
19  ----------------------------------------------
20  ----------------------------------------------
  Under penalties of perjury, I declare that I
21  have read the foregoing document and that the
  facts stated in it are true.
22
  _____      _____
23  Date        PAUL M. DEUTSCH, PH.D.
24  Job No. 958372

48 (Pages 348 to 351)

352

1   DATE: October 15, 2008
    TO:   Paul M. Deutsch, Ph.D.
2          10 Windsomere Way, Suite 400,
           Oviedo, Florida, 3276
3   IN RE:  Plaintiffs Vs. AstraZeneca
            Case No. 6:07-cv-15959, etc.
4
        Please take notice that on October 7,
5   2008, you gave your deposition in the
    above-referred matter.  At that time, you did
6   not waive signature.  It is now necessary
    that you sign your deposition.
7       Please call our office at the
    below-listed number to schedule an
8   appointment between the hours of 9:00
    a.m. and 4:30 p.m., Monday through Friday at
9   the Esquire office located nearest you.
        If you do not read and sign the
10  deposition within a reasonable time, the
    original, which has already been
11  forwarded to the ordering attorney, may be
    filed with the Clerk of the Court.  If you
12  wish to waive your signature, sign your name
    in the blank at the bottom of this letter and
13  return it to us.
14      Very truly yours,
15
        RICHARD CASTILLO
16      Registered Diplomate Reporter
        Esquire Deposition Services
17      Orlando, Florida
        (407)426-7676
18
    I do hereby waive my signature.
19
20  ---------------------------
    PAUL M. DEUTSCH, PH.D.
21
    cc via transcript:  John Sullivan, Esquire
22              Russ Brudner, Esquire
                Chris Coutroulis, Esquire
23
24  Job No. 958372

353

1                   LAWYER'S NOTES

2   PAGE LINE
3   _____ _____ _____
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____