Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 118

1   directly and not add on additional things, because we
2   are going to be here later than we need to.
3        MS. THORPE:  Let me just say, let's don't have
4   lectures and just ask your questions in an
5   appropriate manner and the witness will respond.
6   We have been trying, we have done everything we
7   can.  So if you will just ask a proper question,
8   the witness will answer the question.
9        MS. RELKIN:  He is giving very long answers.
10       Q.  (By Ms. Relkin)  The question was, I don't
11  have the precise wording because a lot of verbiage has
12  transpired, was that, isn't it true that eight out of
13  the 20 studies, you acknowledge, show statistically
14  significant increased risk for Seroquel and diabetes?
15  Recognizing that you have many criticisms of them, they
16  nevertheless show that?
17       A.  They show statistically significant
18  differences in epidemiologically invalid studies.
19       Q.  Go to Page 10 of your declaration, the way you
20  phrase the language in --
21       A.  Of the report?
22       Q.  Page 10 of your declaration, the sworn
23  statement you filed in court.  You state, "There are 20
24  observational epidemiologic studies examining Seroquel
25  and diabetes.  Twelve of these studies bolded below

Page 119

1   show no statistically significant increased risk for
2   Seroquel and diabetes."
3        Is it a fair reading of that to infer that
4   therefore, eight out of those 20 do show statistically
5   significant increased risk for Seroquel and diabetes?
6        A.  That's correct.
7        Q.  Thank you.
8        The one study, the one out of the 20 studies
9   that does meet your standards is the one by Barner; is
10  that correct?
11       A.  No, it's one study that addresses part of the
12  issue.  And I would like, if we are going to discuss
13  Barner, I would like to have a copy of it.
14       MS. RELKIN:  Let's mark Barner.
15       (Plaintiffs' Exhibit-6 was marked for
16  identification.)
17       (Witness reviewing document.)
18       Q.  (By Ms. Relkin)  We just marked as Exhibit 6 a
19  study by Jamie Barner, Ph.D., et al. entitled Frequency
20  of New Onset Diabetes Mellitus and Use of Antipsychotic
21  Drugs among Central Texas Veterans, and it is the
22  Journal of Pharmacotherapy, 2004; is that right?
23       A.  That's correct.  That's the paper I have in
24  front of me.
25       Q.  This was based on one of those, as you refer

Page 120

1   to it, as a claims database; is that right?
2        A.  It is a VA database that uses administrative
3   data.
4        Q.  I will get to another study later, but there
5   is another study by Bruce Lambert and others that was
6   also based upon a VA database; is that right?  Are you
7   familiar with that study?
8        A.  I'm familiar with that.  I would want to see
9   it too, but sure.
10       Q.  That's one of the eight that does find a
11  positive association; is that right?
12       A.  I believe so.
13       Q.  So we had at least one VA study that has a
14  positive association, and then this is a VA study that
15  you applaud because it did control for body mass index;
16  is that right?
17       A.  Again, I would not characterize my phrase in
18  referring to it.  I think I said specifically as a
19  threshold issue, all but one of the observational
20  studies failed to properly control for baseline weight
21  or body mass index, and I referred to the Barner
22  article.
23       So I am singling it out as having done
24  something.  I don't think I am either particularly
25  complimentary or non-complimentary.

Page 121

1        Q.  The language in your declaration to the court
2   says, "The Barner study which controlled for body mass
3   index reported no statistically significant association
4   between Seroquel use and diabetes."
5        Is that right?
6        A.  Which number are you reading from?
7        Q.  I'm sorry, Page 12.
8        (Witness reviewing document.)
9        A.  Yes, you have read that sentence correctly.
10       Q.  Anywhere in this declaration do you explain to
11  the court what the comparators were in this study?
12       A.  Sorry, how were you using comparators?
13       Q.  The study was comparing Seroquel users with
14  who else?
15       A.  Let me refresh myself with the study.
16       Q.  Was there a placebo?  It was not a placebo, it
17  was not a clinical trial, correct?
18       (Witness reviewing document.)
19       A.  This was not a clinical trial.  It was a
20  comparison of those taking the traditional agents
21  versus the atypical.
22       Q.  So it was comparing Seroquel users with those
23  taking the first generation antipsychotics and other
24  second generation antipsychotics, correct?
25       A.  Correct.

31 (Pages 118 to 121)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 122

1    Q. If in fact the first generation antipsychotics
2 and any of the other second generation antipsychotics
3 contributed to diabetes, would that change the way you
4 view this study?
5    A. I'm not sure of your question.
6    Q. You point out to the court, first you talk
7 about a control, it has this important control that the
8 19 other studies don't, and then you tell the court, it
9 reported no statistically significant association
10 between Seroquel use and diabetes, correct?
11    MS. THORPE: Objection. He read to you. He
12 confirmed the sentence in his report.
13    Q. (By Ms. Relkin) You do not tell the court
14 that the no statistically significant association was
15 as compared to other users of antipsychotic
16 medications?
17    A. I'm not sure what you are claiming that I'm
18 saying to the court. All I'm saying to the court in
19 both the report and in this document is I'm not making
20 any case for the great value of this study. It is just
21 this is the one study that actually controlled for
22 diabetes, and I think that's all I'm saying -- I'm
23 sorry, for BMI in there as they studied the various
24 outcomes measured. And indeed, I say in both the
25 reports, that the ones that show a relationship and

Page 123

1 that those that don't show a relationship are all
2 flawed.
3    Q. If in fact, Doctor, I know you have not formed
4 any opinions as to any of the other antipsychotics, but
5 if in fact any of the other antipsychotics do
6 contribute to diabetes, wouldn't you agree that the
7 import of comparing Seroquel to other drugs known to
8 increase diabetes would not be a good test of answering
9 the question whether Seroquel causes diabetes?
10    MS. THORPE: Object to form, vague.
11    THE WITNESS: If one looks, it is best to read
12 what the authors think of the objectives of their
13 own study. If you look at the bottom of Page 1530
14 of the article, they list three objectives.
15    One was to determine whether the frequency of
16 new onset diabetes differed between those taking
17 atypical agents and those taking typical agents.
18 And I think part of, what I would intuit from that
19 is that for someone planning to make a, write a
20 prescription or to treat someone, they want to
21 know what the relative risk is of one to the
22 other. So there's reason for them wanting to do
23 that.
24    Q. (By Ms. Relkin) I'll let you get to the other
25 two in a second. But just, I think, to simplify it,

Page 124

1 that's one of their goals.
2    In terms of the question presented to this
3 court, the question is not the comparative risks of the
4 different antipsychotics, but the general causation
5 question whether Seroquel contributes to diabetes. So
6 that first criteria or question asked by those authors
7 is not the same question that the court is addressing,
8 fair to state?
9    A. I think the three need to be looked at in
10 totality. If you go to the second one, it is to
11 determine whether the frequency of new onset diabetes
12 differed among those taking the different agents,
13 different atypical agents, and then to see what factors
14 influence the occurrence of new onset diabetes. And
15 those factors can include the agent used, which I think
16 addresses the question you just asked or raised.
17    Q. Except if all the agents do it, then how can
18 you compare them?
19    A. Because they are comparing them on relative
20 difference in impact. If they were all exactly the
21 same, then they would all be exactly the same.
22    It is a relative comparison. Would it be
23 better to, in this particular instance, to have a
24 different type of design? Sure. It is the reason
25 Barner is in here.

Page 125

1    I didn't cherrypick the articles that we put
2 in this section that I criticized methodologically.
3 Barner is one of the articles I included in this
4 section of articles that I critique. Indeed, if we
5 went one by one through the other 19 articles, we would
6 find similar comparisons in the ones that purport to
7 show a relationship.
8    Q. You would agree that, as Barner was designed,
9 it would not answer the question whether Seroquel
10 causes diabetes compared to placebo or no other drug?
11    A. I think it would be difficult for the study to
12 show a causal relationship.
13    Q. So when you told the court that the Barner
14 study which controlled for body mass index reported no
15 statistically significant association between Seroquel
16 use and diabetes, you would agree that that sentence in
17 isolation does not explain that, you wouldn't expect
18 Barner to ever be able to do that as compared to no
19 other drug?
20    MS. THORPE: Object to form.
21    THE WITNESS: No, I disagree with your
22 statement and your implication. I state exactly
23 what is the case. And whether it stands alone or
24 it is in the body of context with other things, it
25 is absolutely correct and again raises the issue

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 126

1   of, one has to look at both the epidemiologic
2   content and the issue of statistical significance.
3       Barner, in the context of that, is being
4   placed in the context of the many other articles
5   involved, all of which use similar methodologies
6   and have difficulties attached to them, some of
7   which show a relationship and some of which don't.
8   And here is just one that doesn't. By controlling
9   for body mass index, it at least addresses one
10  issue.
11      Q. (By Ms. Relkin) I direct you to the last page
12  of the Barner study, it is the paragraph before the
13  limitations and the third sentence begins with
14  "although". It states, "Although our study results
15  show no difference in new onset diabetes" --
16      A. I'm sorry, I'm trying to find where you are.
17      Q. "Graphically significant".
18      A. Got you.
19      Q. "Although our study results show no difference
20  in new onset diabetes between patients taking typical
21  agents and those taking atypical agents, the overall
22  frequency in this population was 7.1 percent which is
23  higher than the 6.3 percent prevalence in the general
24  population. Thus, it is important that all patients
25  taking antipsychotic agents be monitored for symptoms

Page 127

1   of diabetes."
2       Do you disagree with Barner's last
3   recommendation, that it is important that patients
4   taking antipsychotic agents be monitored for diabetes
5   symptoms?
6       A. I think that patients taking antipsychotic
7   agents should be monitored for symptoms of diabetes.
8   There is a much higher rate of diabetes in patients
9   with psychotic diseases.
10      Q. Is it your testimony to the court that the
11  only reason why one should monitor those patients for
12  diabetes symptoms is because of the population from
13  which they are coming as opposed to any potential risk
14  of any of the antipsychotic agents?
15      A. I don't think it is the only reason. The
16  background issue is a given disease that they have
17  which is associated with diabetes. That's reason
18  enough.
19      The difference that's explained here of 7.1
20  percent and 6.3 percent prevalence is hard to interpret
21  in terms of how significant that is and whether that
22  alone is enough to have you screening for patients
23  taking these agents. In fact, if the prevalence of
24  diabetes in the population as a whole is 6.3 percent,
25  there's arguments for screening. At CDC while I was

Page 128

1   there, we issued a recommendation that all adults
2   should be screened for diabetes.
3       Q. Do you understand that a package insert when a
4   drug company makes recommendations for following
5   patients who are on a drug, that the recommendations
6   are generally derived because of concerns about what
7   the drug may precipitate as opposed to general public
8   health recommendations which are more like the CDC
9   bailiwick?
10      MS. THORPE: Object to form, vague, ambiguous.
11      THE WITNESS: I understand there are different
12  criteria by which package insert statements get
13  written that aren't used in many other parts of
14  health care and medicine.
15      Q. (By Ms. Relkin) Have you reviewed -- by the
16  way, given your earlier testimony that you have no
17  opinion and did not study the data as to whether the
18  first generation or other second generation
19  antipsychotic drugs contribute to diabetes, does that
20  in any way handicap your ability to assess the validity
21  of this study?
22      A. No, because I can read this study and see
23  which information they have used and how they have
24  interpreted it. The data speak for themselves.
25      They provide background in the study, and the

Page 129

1   data in this study indicate what's happened with
2   olanzapine and what's happened with it relevant to the
3   other atypicals being addressed. So I think one can
4   readily analyze and interpret and comment on a study
5   like this, while not having formed an opinion suitable
6   for medical or legal review in the course of so doing.
7       Q. When you read this study and you read that
8   language I just read to you about the difference and
9   frequency in the population between the general
10  population and this study's population, did that make
11  you want to take a harder look at what the data is on
12  these other antipsychotics since these are a lot of the
13  comparators?
14      MS. THORPE: Object to form.
15      THE WITNESS: The difference between 7.1 and
16  6.3 is of interest. Again, that's not what I was
17  focusing on in the study, nor is the particular
18  conclusion from Barner one that I have relied my
19  opinion on, having said several times that this
20  mix of studies, even those such as Barner that
21  found no difference, and those such as a minority
22  but eight of the others which found a difference.
23  I wouldn't rely a scientific opinion on any of
24  that body of literature.
25      Q. (By Ms. Relkin) Have you reviewed the package

33 (Pages 126 to 129)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 130

1  insert for Seroquel?
2      A.  Yes.
3      Q.  Do you disagree with any of the information in
4  the package insert?
5      A.  Can I see the package insert?
6      Q.  While you sit here, is there anything that you
7  can recall that you disagree with?
8      A.  I'm not willing to do that.
9      Q.  If I have time, I'll get back to it.
10      A.  It is a long, detailed, multi-clause package
11  insert.
12      Q.  You didn't comment about it in your report.
13      A.  I didn't feel it was necessary.
14      Q.  If I have time, we'll get to it.  You talked
15  about polycystic ovarian syndrome as one condition that
16  causes diabetes.  Are you aware of other medical
17  conditions that cause diabetes?
18      MS. THORPE:  Object to form, mischaracterizes
19  his testimony.
20      THE WITNESS:  I included as I indicated
21  before, polycystic kidney disease in this chart as
22  a comparator to recognize the risk factors for the
23  occurrence of diabetes.  There are other endocrine
24  disorders that I think are related to diabetes.
25      There are undoubtedly other health conditions

Page 131

1      which pose a risk of diabetes I'm not thinking of
2      now, but some such as tumors of the pancreas or
3      removal of the pancreas for one reason or another,
4      et cetera, et cetera.  That's the reason why I
5      reason I created this particular table, as I
6      indicated before the reasons I did it.
7      Q.  (By Ms. Relkin)  I understand.  I just wanted
8  to explore that.  What about Cushing's syndrome?
9      A.  I said there are other endocrine conditions
10  that are related.  Cushing's syndrome is an endocrine
11  disorder.
12      Q.  In your opinion Cushing's syndrome is a
13  disorder that can cause diabetes?
14      A.  I believe so, yes.
15      Q.  You don't have a relative risk for that?  Do
16  you know whether a relative risk even exists for
17  Cushing's syndrome, or is it just so generally
18  recognized in the endocrine community that --
19      A.  I think one, again, compared to one's weight,
20  age, diet, it's dwarfed by these others in terms of
21  prevalence in the population in terms of general
22  applicability.  So I don't know what the relative risk
23  is, there may be one, I don't know what the relative
24  risk is for Cushing's syndrome, but it is certainly
25  not listed as a general risk factor for the

Page 132

1  population.
2      Q.  What is the criteria for the diagnosis of
3  diabetes mellitus II?
4      A.  The ADA criteria, I actually wouldn't mind
5  having the ADA handout.
6      Q.  I will get it for you, but do you know the
7  answer offhand?
8      A.  I do.
9      Q.  Can you tell me?
10      A.  I'd like to look at it at the same time.
11      MS. RELKIN:  Let's mark that.
12      (Plaintiffs' Exhibit-7 was marked for
13  identification.)
14      MS. RELKIN:  We have marked as Exhibit 7 the
15  consensus development conference on antipsychotic
16  drugs and obesity and diabetes.
17      THE WITNESS:  This is not the ADA publication
18  criteria which usually occurs on screening
19  documents.
20      Q.  (By Ms. Relkin)  This is what I had handy.
21      MS. THORPE:  I think we have it.
22      MS. RELKIN:  I will move on because time is
23  tight.
24      Q.  (By Ms. Relkin)  Doctor, what is a clinically
25  significant change in mean fasting glucose?

Page 133

1      A.  One that would be large enough to have a
2  health impact.
3      Q.  Would that vary patient by patient, clinically
4  significant to a particular patient?
5      A.  In some circumstances.
6      Q.  Obviously, it would vary by patient, but what
7  is the range of numbers that to you, the smallest
8  number by which a particular patient could have a
9  clinically significant change in mean fasting glucose?
10      A.  I'd say changes under 5 or 10 are probably not
11  clinically significant.  But again, it depends on the
12  individual patient you are looking at and what their
13  particular blood glucose is at the time.
14      Q.  If someone's fasting blood glucose at the time
15  is 121 and then they have a change of 5, that gets them
16  to 126; is that right?
17      A.  5 and 121 is 126.
18      Q.  Is 126 the accepted number by the ADA for
19  diagnosis of diabetes?
20      A.  In two measurements.
21      Q.  So if someone has a change of 5 in two
22  measurements and they start with a baseline fasting
23  glucose of 121, would you agree that 5 for that patient
24  is clinically significant?
25      A.  It has clinical significance if that would

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 134

1  cause the doctor to alter their treatment plan.
2      Q. That would render them to be diagnosed under
3  accepted criteria as being diabetic; is that correct?
4      A. That's correct.
5      Q. Does everyone whose diagnosis of being
6  diabetic then get diabetes medication?
7      A. Most do if there is a confirmed diagnosis.
8  Some doctors like to add other tests to the glucose
9  tolerance test.
10     Q. Some doctors like to, if someone is on the
11 cusp, say they just get to 126, might try diet and
12 exercise as a way to avoid diabetes medication, is
13 that done too?
14     A. It is.
15     Q. Not necessarily everyone who is diagnosed with
16 diabetes gets diabetes medication, but many do; is that
17 true?
18     A. Rather than use the term medication, I'd
19 probably say an intervention on the part of the doctor
20 which might include medication, might include
21 behavioral modification.
22     Q. Many of the studies that you described in your
23 report of those 20 studies, they determine if someone
24 has diabetes based on the ICD-9 code; is that right?
25     A. That's correct.

Page 135

1      Q. Some of them use as an alternative the
2  commencement of a prescription of an antidiabetic
3  agent, Metformin or some other medication; is that
4  right?
5      A. I'd have to look at the individual studies.
6  Again, the nature of the studies, some define how they
7  have diagnosed diabetes or used it in the study. Some
8  haven't. Some have been more vague.
9      Q. If one of the studies used, as the surrogate
10 for ascertainment of diabetes, the prescription of a
11 diabetes medication, would you agree that it might
12 under-ascertain the incidence of diabetes for those
13 physicians who choose to first try the exercise-diet
14 route because that person would not be coded as a
15 diabetic even though they reached the criteria of 126
16 measured twice?
17     A. I thought I had you until you added that last
18 sentence.
19     MS. RELKIN: Let's repeat it without that last
20 clause. Thank you.
21     And whenever you want to break, let me know.
22     MS. THORPE: I would like to break, but I
23 don't want to interrupt your questioning.
24     MS. RELKIN: Let's get this question.
25     (Thereupon, a portion of the record was read

Page 136

1  by the reporter as follows:
2      "If one of the studies used, as the surrogate
3  for ascertainment of diabetes, the prescription of
4  a diabetes medication, would you agree that it
5  might under-ascertain the incidence of diabetes
6  for those physicians who choose to first try the
7  exercise-diet route?")
8      MS. THORPE: Object to form, vague, ambiguous.
9      THE WITNESS: My answer is I don't know the
10 answer to that, whether they are just as likely to
11 put down the diagnosis of diabetes as not, and
12 record it, because at some point they have to say
13 why are they recommending that this person do this
14 behavioral change. Normally you would say, I'm
15 doing it because I am managing a first diagnosis
16 of diabetes.
17     You are just as likely to get folks who
18 potentially are over-diagnosing diabetes on the
19 basis of only one measurement or a measurement
20 that's near that. So these are ascertainment
21 issues that crop up in any kind of study like
22 this.
23     MS. RELKIN: Want to take a break?
24     MS. THORPE: Sure.
25     (Whereupon, at 2:44 p.m., a ten-minute recess

Page 137

1  was taken.)
2      MS. RELKIN: Would you read his last answer.
3      (Whereupon, the record was read by the
4  reporter as requested.)
5      Q. (By Ms. Relkin) Do you agree that there is
6  persuasive literature that Seroquel causes
7  statistically significant weight gain amongst its
8  users?
9      A. Seroquel is associated with a two to
10 five-kilogram weight gain when one looks at the body of
11 literature.
12     Q. That's how many pounds?
13     A. Roughly four-plus to ten or twelve, probably,
14 doing the kilogram conversions in my head.
15     Q. That weight gain can commence how soon after
16 the commencement of Seroquel use?
17     A. Most of the weight gain observed occurs within
18 the first several weeks of use of Seroquel and then
19 plateaus.
20     Q. But it doesn't generally go down, fair to
21 state?
22     A. No, some people lose weight over time and some
23 gain some more. It is a distribution. The numbers I
24 gave you were the mean figures for it.
25     Q. But from a mean perspective, those who remain

35 (Pages 134 to 137)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 138

1  on it do not lose weight, although obviously with a
2  mean some people will and some people won't.
3      MS. THORPE: Object to form, compound and
4  mischaracterizes his testimony.
5      THE WITNESS: I'm sorry.
6  Q. (By Ms. Relkin) Did you hear it?
7  A. Give it to me again.
8      MS. RELKIN: Read it back.
9      (Thereupon, a portion of the record was read
10  by the reporter.)
11      THE WITNESS: That was my --
12  Q. (By Ms. Relkin) That was my question. I am
13  asking questions that sound like your answer.
14      A mean is the same as an average, correct?
15  A. Correct.
16  Q. So therefore, the numbers you gave of a mean
17  weight gain of four-plus to ten pounds or twelve pounds
18  would connote that while some people may have lost
19  weight, there is sufficient increase that you are
20  getting an average increase of the magnitude you
21  described of four to twelve pounds, fair to state?
22  A. I would say in terms of it represents a
23  distribution of weights with the mean as you have
24  described it as an average in the middle. That's where
25  the two to five kilograms are.

Page 139

1      And then it means there is a tail on either
2  side of some people that have not gained at all, some
3  may have lost, some may have gained less than two
4  kilograms and some may have gained more than five
5  kilograms.
6  Q. Some people may have gained up to twenty pounds
7  or twenty-four pounds potentially?
8  A. It is a possibility.
9  Q. Have you reviewed the literature on the
10  association between Seroquel use and triglycerides?
11  A. I have.
12  Q. Have you addressed that in your report?
13  A. I haven't emphasized triglycerides in the
14  report. The focus in this seemed to be weight and the
15  diabetes outcome.
16  Q. Is it discussed anywhere in your report, this issue
17  of triglycerides; I just don't remember offhand?
18      (Witness reviewing document.)
19  A. I am looking at the declaration.
20  Q. The report is the longer one than the
21  declaration.
22  A. Right, I know. No, I didn't. There
23  are a variety of measures or things that are used
24  to measure elements in the metabolic syndrome
25  including weight circumference and ratio and

Page 140

1  triglycerides, et cetera. I chose because this is
2  the one most commonly used in most of the literature
3  on weight or surrogate or more accurate measure of BMI.
4  Q. What, if any, role do those triglycerides have
5  in the development of diabetes?
6  A. It's unclear.
7  Q. There is some data on the role; is that right?
8  A. It is scientifically unclear what the
9  relationship is between triglycerides and diabetes.
10  Q. Is it fair to say it is an end point of
11  concern that many investigators look at triglycerides
12  as one of the tests that are performed to consider
13  metabolic factors in an agent?
14      MS. THORPE: Object to form.
15      THE WITNESS: It is a test along with several
16      others that gets ordered to assess metabolic
17      state.
18  Q. (By Ms. Relkin) Generally, high triglycerides
19  is not a good thing from a public health perspective,
20  would you agree?
21  A. High triglycerides along with other
22  alterations of your lipoprotein spectrum have to be
23  considered in terms of management care.
24  Q. Endocrinologists measure triglycerides in
25  patients because it is an end point that can have

Page 141

1  endocrinological, it is a matter of endocrinological
2  concern?
3      That's poorly worded. Let me withdraw that.
4      Why do endocrinologists look at triglyceride
5  measurement in patients?
6  A. I leave that up to them to explain. As a
7  general internist, it is a test I would get along with
8  a number of other tests. But it is an important one
9  and worth obtaining.
10  Q. What were your findings as to the association
11  between Seroquel ingestion and triglycerides?
12  A. Not all the studies look at triglycerides.
13  There's a couple that do and it might pay to -- do you
14  have a specific result that you are concerned about?
15  Q. It is a generic question I have and we could
16  start pulling out specific studies. But time is tight.
17  A. I didn't find a consistent pattern of Seroquel
18  leading to a given outcome in triglycerides that would
19  lead me to draw a conclusion based on the literature as
20  I have described it in the report that I have used.
21  Q. You did see some studies that showed a
22  statistically significant increase in triglycerides
23  among Seroquel users; is that fair to state?
24      MS. THORPE: Object to form. And let me
25      stress that this is not a memory test. If you

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 142

1    have got a study that you want to show the doctor,
2    you can do that.
3         MS. RELKIN:  It is not a memory test on my end
4    too, and I don't have every study at my disposal.
5         MS. THORPE:  Your question is, is there any
6    study?  You said some.  What do you mean?
7         MS. RELKIN:  It wasn't in his report.  He said
8    he reviewed it.  I want to get an understanding of
9    what his take is on it because it is a potentially
10   important issue.  And I don't have everything here
11   to show him.
12        MS. THORPE:  I was thinking you had an article
13   to show him.  But that's okay.
14        MS. RELKIN:  I am not a defense lawyer, I am
15   not as prepared.  What can I say.
16        THE WITNESS:  Again, in the absence of a
17   particular set of data to look at, my summary
18   conclusions from the data was that it was a mixed
19   bag and that, yes, there may have been elements of
20   it that showed an increase of, and whether it
21   reached statistical significance or not, I'd have
22   to look at the article, but it showed an increase
23   in triglycerides.
24        But there were other elements in those same
25   articles that undermined the strength of any

Page 143

1    increase and indeed questioned whether this was
2    consistent and valid.  And in fact, in one of the
3    articles, maybe I will recall as I look through my
4    own report, that even in the places where there
5    was a potential slight increase in triglycerides,
6    the blood glucose was not increased.  So in some
7    of the studies as well, and this may have been, I
8    don't remember whether it was in the FDA
9    submission.
10        Again, I'd have to see what you are looking
11   at, there was some kind of artificial divisions of
12   the data that permitted one piece of it to look
13   elevated and the other piece wasn't elevated or
14   not significant.  So it makes it very hard to
15   interpret what the meaning of that is.
16        Q.  (By Ms. Relkin)  Triglyceride levels are
17   measured in some of the clinical studies as well, is
18   that fair to say?
19        A.  It might be helpful to actually be able to
20   look at what you are referring to.
21        Q.  If triglyceride levels shifted to greater than
22   150 milligrams per deciliter in 29.2 percent of the
23   quetiapine patients as compared to 20.4 percent of
24   placebo-treated patients, would that be a finding that
25   you would find of concern?

Page 144

1         A.  Is this a hypothetical with numbers you have
2    just created?
3         Q.  No, this is from an internal summary done by
4    my office of Study 126.
5         A.  I'd really like to look at 126 and see those
6    tables if we are going to talk about it.
7         Q.  This is from your box.  This is yours.
8         A.  Great, I still need to see it.  There's a lot
9    of stuff in the box.
10        Q.  Here is 126.  This is yours.
11        (Plaintiffs' Exhibit-8 was marked for
12   identification.)
13        Q.  (By Ms. Relkin) We are calling this Exhibit 8.
14        (Witness reviewing document.)
15        Q.  Are you ready to answer that question?
16        A.  No, I would like to know where you are
17   looking.  I have got 126.
18        Q.  126, yes.
19        A.  Where are you quoting from?
20        Q.  Under the safety data section.
21        A.  Do you have a page, table number?
22        Q.  If you want to give it back to us for a
23   second, we can try to direct you to it.
24        A.  Okay.
25        Q.  While my colleague is trying to find the right

Page 145

1    page, with regard to Study 126, did you review the
2    complete, entire Study 126 or was it excerpted, do you
3    know?
4         A.  I believe if it is four inches thick, then I
5    had the complete study.
6         Q.  What we have here which came from your box --
7         MS. THORPE:  You also got discs.
8         THE WITNESS:  Yes, there are discs in that
9    stuff.
10        Q.  (By Ms. Relkin)  Did you print out all the
11   discs?
12        A.  Oh, no.
13        Q.  Did you sit at your computer and review every
14   page of those discs?
15        A.  I moved through it.  They have indexes and
16   there's lots of stuff in there that's not relevant to
17   this particular litigation and I found the things that
18   were.
19        Q.  Is triglyceride levels something that you
20   consider being relevant?
21        A.  Sure, it's in tables.
22        Q.  You would agree that Study 126 was carefully
23   controlled?
24        A.  Study 126 and 127 fall into the observational
25   epi category that we have been discussing which is that

37 (Pages 142 to 145)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 146

1  those were designed with a different purpose in mind.
2  They were designed as efficacy studies, but in so
3  doing, were collecting safety information along the
4  way. And as such they have some of the pitfalls of the
5  observational epi that we spent sometime discussing
6  already, namely, that some of the significant risk
7  factors, in particular, weight, obesity, BMI, are not
8  part of the analysis.
9      Q.  Apparently the hard copy that's here that we
10 marked as Exhibit 8 does not have the data with the
11 triglycerides, so obviously we don't have time to fire
12 up the computer and find the CD and pull it out. So
13 sitting here, you don't know what the triglyceride
14 findings were from 126 and you didn't draw any opinions
15 from that?
16     A.  As I indicated, there must be 300 pages in
17 that submission, and I have seen them more than once
18 and I have analyzed them we reviewed them. But I am
19 not prepared to talk about them without having them in
20 front of me.
21     Q.  When you reviewed them, you didn't make your
22 own notes as to triglycerides?
23     A.  I rarely make my own notes.
24     Q.  Did you review Study 144?
25     A.  Study 144, does that have a different, an

Page 147

1  alternative title?  Is that part of 126?  Look at the
2  top.  There's like a slash.  Some of these have two
3  different numbers.
4      Q.  144 is a distinct study from 126.  It is
5  entitled MultiCenter, Randomized, Parallel-Group,
6  Double-Blind, Placebo-Controlled Phase III Study of the
7  Efficacy and Safety of Quetiapine Fumarate and Lithium
8  as Monotherapy for up to 104 Weeks Maintenance
9  Treatment of Bipolar I Disorder in Adult Patients.
10     MS. THORPE:  I am going to object to this
11 question, this whole line of questioning.  As you
12 could tell by the Study Number 144, there are a
13 huge number of these clinical trials that have
14 been produced to you and they are on discs and
15 there is an FDA submission with 84 trials
16 summarized.
17     So to call out a number and ask somebody if
18 they remember if they read Study 144 when you are
19 sitting with the boxes of documents is not
20 right.  So I object.
21     MS. RELKIN:  If I ask a generic question, I'm
22 faulted for not pointing out a specific study.  So
23 now I am going to ask a specific study that I am going
24 to ask him questions about.  I gave him the study
25 number, he didn't recognize the number.

Page 148

1      MS. THORPE:  He hasn't responded to your
2  question.
3      MS. RELKIN:  So I said, here's the title and
4  then I am going to ask some follow up substantive
5  questions.  So right now you are objecting because
6  I am asking him a question because there are a lot
7  of studies and he doesn't remember them all.
8  That's the nature of your objection.  That's crazy.
9      MS. THORPE:  I have made my objections.  You
10 have characterized it.
11     Q.  (By Ms. Relkin)  Having read that long title
12 to which I got an objection --
13     A.  Snappy title.
14     Q.  Very snappy, dated April 1, 2008, do you
15 recall the study?
16     A.  I can answer this much more easily for you if
17 you are willing to hand me back my --
18     Q.  Absolutely.
19     A.  Besides that, I've got a pile of notes in
20 front of you which may indicate to me whether I --
21     Q.  Let's mark your notes, by the way.  We'll mark
22 as Exhibit 9 --
23     A.  These are not notes on all the studies.  They
24 happened to be notes I took on some of them.
25     Q.  It looks to me on Exhibit 9 there is a pad --

Page 149

1      MS. THORPE:  He has a note that I saw tucked
2  into his report too.  Be sure and get that.
3      THE WITNESS:  This is a summary that I just
4  put together for materials.
5      Q.  (By Ms. Relkin)  Was that done during the
6  break?
7      A.  No.  I did this one myself as I looked over my
8  report.  You asked a question on whatever, I can find
9  it more easily in here by knowing that.
10     Q.  Of course, that's fine.  That's great.
11     A.  I just think Number 144 may be there.
12     Q.  I am going to give it to you.  This legal pad,
13 are those patient-specific notes of the particular
14 Plaintiffs?
15     A.  They are.
16     Q.  That's what it looks like.  I will just stick
17 a tab on it.  We don't have to waste any time on it.
18     (Plaintiffs' Exhibit-9 was marked for
19 identification.)
20     Q.  (By Ms. Relkin)  This is 9.  I think the notes
21 you are probably looking for are three pages and I
22 don't know whether they all go together.  You just gave
23 me one of them.
24     A.  No, they are separate.
25     (Plaintiffs' Exhibit-11 was marked for

38 (Pages 146 to 149)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 150

1  identification.)
2      Q.  (By Ms. Relkin) Exhibit 11 is the one you just
3  handed to me that was stuck in your report that you did
4  in preparation.
5          (Plaintiffs' Exhibit-10 was marked for
6      identification.)
7      Q.  (By Ms. Relkin) Exhibit 10, I just went out of
8  order, is some other notes that you will identify.
9      A.  No.
10 you have got the copy of 144.
11         (Plaintiffs' Exhibit-12 was marked for
12     identification.)
13     Q.  (By Ms. Relkin)  Exhibit 12 is on a red piece
14 of paper with other notes.  Maybe this will help.
15     A.  I don't need that.
16     Q.  Did you take a look at that one?
17         (Witness reviewing document.)
18     A.  I don't need it.
19     Q.  These notes that you just looked at don't
20 encompass 144?
21     A.  No.
22     Q.  You have notes about 125, 126 and 127?
23     A.  Right.  But you were about to give me 144.
24     Q.  Yes.  And then I put a yellow sticky on Page
25 243 because that's where there is some discussion of

Page 151

1  the triglyceride levels, and there's a check on this,
2  this is from your file, there is a check.
3      A.  That's my check.
4      Q.  That means you read it?
5      A.  That means I read it.
6          MS. RELKIN:  Did we give this an exhibit tab
7      or not?  Here is Exhibit 13 for Study 144, or the
8      abstracted.
9          (Plaintiffs' Exhibit-13 and Exhibit-14 were
10     marked for identification.)
11         (Witness reviewing document.)
12     Q.  (By Ms. Relkin)  Doctor, obviously you can't
13 read the whole study in the time constraints we have,
14 but look at enough of it to see the introduction to
15 context and the page I directed you to on triglycerides.
16     A.  I need some more time, I'm afraid, one of the
17 reasons being that there are multiples of these studies
18 in these different populations and the methodology was
19 different in many of them.  So I just want to be sure
20 what we have got before I offer commentary.
21         (Witness reviewing document.)
22     Q.  Are you able to --
23     A.  This is not the complete thing, because there
24 is a reference to some of this data in Table 11.3.9.5-8
25 which is highly relevant to this blurb you have got

Page 152

1  here which describes it, actually.  So the data on
2  which this statement you have got here is not here.
3      Q.  This is from your files.
4      A.  It may be from my file, I am just telling you
5  that the other piece is somewhere else in the file, I
6  don't know.  But this is not complete.
7      Q.  When you say the blurb, there is text in this
8  study that discusses triglyceride levels, correct?
9      A.  Correct.
10     Q.  Do you want to read that into the record since
11 we only have one copy?
12     A.  Sure.  Can I read the other things in the same
13 section?
14     Q.  My question is devoted right now to the
15 triglycerides.
16     A.  That's exactly what I am going to read to you
17 in a second.  A difference could be observed in the
18 proportion of patients with a shift in triglycerides to
19 greater or equal to 150 milligrams per deciliter, 18.7
20 percent in the Seroquel treatment group, 13 percent in
21 the placebo treatment group, 12.9 percent in the
22 Lithium treatment group.
23         That was what you wanted.  Now, if we back up
24 a bit, "All treatment groups decreased in total
25 cholesterol, LDL and triglycerides during randomized

Page 153

1  treatment.  Decreases in lipid laboratory data were
2  smaller than the quetiapine treatment group compared
3  with the placebo and Lithium treatment groups except
4  for HDL.  However, HDL levels changed very little in
5  all treatment groups."
6      Q.  Do you know what the data is on Lithium and
7  triglycerides?
8      A.  Again, I need the table.
9      Q.  I am just saying, not from this study but just
10 as a generic matter, do you know whether there is an
11 association between Lithium used and increased
12 triglycerides?
13     A.  I don't have data on them specifically.
14         One other important thing in this study that I
15 think is very important is, it is one of those, it is a
16 study looking at efficacy.  And because other
17 antipsychotic meds weren't used, there is a placebo
18 group and a Seroquel group.
19         And there is a much higher dropout rate from
20 patients in the placebo group.  So you end up with much
21 more study time in the Seroquel group.
22         The reason is that the people in the placebo
23 group are having psychiatric episodes and have to be
24 placed on something, so they have to drop out of the
25 study.  So over the period of time of the study, and it

39 (Pages 150 to 153)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 154

1  is described here in the method, that's where I was
2  taking my time earlier to look at it, you end up with,
3  I think, a 40 percent difference in amount of time in
4  the study, and that 40 percent difference means you
5  are observing events in one group for 40 percent more
6  time than you are in the other.
7       And that permits a higher level of whatever it
8  is you are measuring. So there needs to be some
9  adjustment for that.
10      Q. Do you know whether they did adjust for that?
11      A. They didn't adjust for it in the particular
12  descriptions that both I read and you read, or that I
13  read for you.
14      Q. You referred to it as being an efficacy study,
15  but the title is Safety and Efficacy, correct?
16      A. Yes, but it was designed primarily, if you
17  look at the first 15 pages or the first set of purposes
18  of it, and we start with primary objective, look at the
19  primary objective. It's initiation, how does it treat,
20  these scores that are the young mania rating scale, the
21  depression rating scale are all efficacy studies.
22  That's the primary objective.
23      It then lists a total of nine secondary
24  objectives, and Number 9 is "To determine whether
25  quetiapine is safe and well-tolerated." So yes, it

Page 155

1  lists both, but there is a huge difference in the
2  emphasis on why this study was being done.
3      Q. You talked about dropout rates, people
4  dropping out because they were on placebo and not
5  getting treated for their psychoses. But would you
6  agree that there is also a dropout problem in other
7  studies due to the therapeutic drugs having unwanted
8  adverse effects?
9      A. Any time you get a dropout in a study, you
10  have to consider that in terms of the analysis in the
11  study.
12      Q. But if a drug makes people uncomfortable,
13  makes them lose weight, does any other number of
14  unpleasant things, some people drop out because they
15  can't tolerate the drug or don't like it?
16      A. Yes.
17      Q. To be clear, dropout is not exclusive to a
18  placebo?
19      A. None of those have a 40 percent dropout rate.
20  40 percent is a huge chunk. It is almost half of your
21  total population, so it can affect the results, as
22  opposed to three or four people or ten.
23      Q. Let's go to Study 125. That's a study you
24  talk about in your report. Do you recall Study 125?
25      A. I am getting a pile of stuff here.

Page 156

1      Q. Just put it in the middle. That's the pile.
2  We are moving on. We could spend hours on each of
3  them, but obviously we don't have it.
4       Do you recall Study 125?
5      A. Yes.
6      Q. That's a study you talk about in your report
7  that I think you find as being supportive of the safety
8  of Seroquel; is that right?
9      A. Study 125 is looking specifically, right, at
10  the relationship of Seroquel on glucose metabolism. It
11  is the one study that expressly does that.
12      Q. Do you know whether Study 125 has ever been
13  published?
14      A. Not that I know of.
15      Q. Do you know that there was a poster
16  presentation done by Ratner about that study?
17      A. I may have seen the blurb on the poster at
18  sometime.
19      Q. Do you know Dr. Newcomer? Are you familiar
20  with his name?
21      A. I know of Dr. Newcomer. I don't know him
22  personally. He is a psychiatrist at Wash U in St.
23  Louis, I believe, if he is still there.
24      Q. Do you know whether Dr. Newcomer had reviewed
25  a draft of Study 125 and made a number of substantive

Page 157

1  comments? Have you seen those?
2      A. I don't. I am familiar with his other work
3  including a very thorough review of all the
4  antipsychotic agents including Seroquel.
5      Q. Did you ask counsel to give you all the
6  documents in their files that were at all germane to
7  this issue?
8      A. Yes.
9      Q. Did you see any, other than the actual studies
10  and study reports, did you see any internal company
11  documents such as emails, memos and so forth?
12      A. I asked for all the scientific information
13  relevant to my being prepared to make comments on the
14  questions asked of me. I didn't ask for memos or
15  internal company documents.
16      Q. If physicians and statisticians within the
17  company who are very familiar with the drug and the
18  studies have done their own analysis of the studies and
19  commented, is that information you might find helpful?
20      A. I'm not quite sure what you are talking about
21  in terms of -- you mean they took the data and they
22  issued a report, they published something, or what?
23      Q. They took the data and they discussed
24  internally issues of concern, phraseology about how to
25  address certain issues, problem issues.

40 (Pages 154 to 157)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 158

1      MS. THORPE: Object to form as vague,
2   ambiguous. There's no way anybody could know what
3   you are talking about from your question.
4      Q. (By Ms. Relkin) Internal candid assessments
5   by the scientists, physicians, statisticians at
6   AstraZeneca about some of the very studies you've
7   reviewed, have you seen any of the that data?
8      MS. THORPE: Object to the form and object to
9   the characterization. If you got such documents
10  that you want the witness to look at, put them on
11  the table.
12     MS. RELKIN: If I have time, I will. I want
13  to know if at any time he reviewed it.
14     MS. THORPE: No, let the record reflect that
15  that kind of allegation that comes from that kind
16  of statement when you don't back it up with
17  something that you won't let the witness look at,
18  speaks for itself.
19     MS. RELKIN: Internal candid statements, is
20  that a bad thing?
21     MS. THORPE: The way you described it and the
22  tone of voice in which you said it, you put the
23  document on the table, and let's talk about it.
24     MS. RELKIN: Ms. Thorpe, you keep referring to
25  tone of voice. It is really inappropriate. My

Page 159

1   tone of voice is not raised.
2      I happen to be from New York, I have
3   inflexions, excuse me. I don't speak with a flat
4   affect. To criticize that is really offensive.
5      MS. THORPE: We are waiting for the documents.
6      MS. RELKIN: No, we are not waiting for
7   documents. You are not telling me how to take my
8   deposition.
9      Q. (By Ms. Relkin) Did you see such documents,
10  internal assessments of safety data that were not
11  published, that were memos between AstraZeneca
12  officials? Have you seen any?
13     MS. RELKIN: Object to the form of the
14  question, for the reasons previously stated.
15     Q. (By Ms. Relkin) When I say officials, I mean
16  scientists.
17     MS. THORPE: Same objection.
18     THE WITNESS: I have not seen internal memos.
19     Q. (By Ms. Relkin) You talked about the
20  well-done review by Dr. Newcomer. You have not seen
21  Dr. Newcomer's comments with regard to draft
22  publications of Study 125, correct?
23     A. Not that I recall.
24     Q. Going back to, the way we went from 144 to 125
25  is you highlighted the high dropout rate in 144 because

Page 160

1   of the fact that it was placebo.
2      MS. THORPE: Object to form. I think you
3   misspoke in terms of the numbers. So I think the
4   record is going to be unclear.
5      MS. RELKIN: Maybe I misspoke.
6      Q. (By Ms. Relkin) When you were talking about
7   Study 144, you made a point of stating that there was a
8   high dropout rate in Study 144 because it was a placebo
9   trial and patients were having psychotic episodes so
10  they dropped out; is that right?
11     A. They had to go on some kind of therapy, so
12  they couldn't be on no drug therapy.
13     Q. Therefore, that was a concern you had about
14  the data?
15     A. It affects the interpretation of results.
16     Q. Segway to Study 125, and Study 125 which we
17  briefly addressed is something you discussed in your
18  report, correct?
19     A. Yes.
20     Q. If you can turn to Page 21 of your report.
21     A. Yes.
22     Q. So you start talking about Study 125 on Page
23  20 of your report, right? And you describe it being a
24  randomized trial comparing alternative, atypical
25  antipsychotics conducted by AstraZeneca with the express

Page 161

1   intention of evaluating the effect of Seroquel on glucose
2   metabolism. And then you talk about some of the study
3   strengths. And then you note that the study, "Despite the
4   strong design, the study did have some limitations,
5   specifically it was not placebo-controlled and was
6   subject to a significant dropout rate."
7      Do you see that?
8      A. I do.
9      Q. Do you recall what that dropout rate was?
10     A. No, I'd have to get a copy of 125 again.
11     Q. Will you accept my representation that 59 out
12  of 168 patients on quetiapine dropped out or
13  discontinued. Would you consider as you describe a
14  significant dropout rate, is that a significant dropout
15  rate?
16     A. Sorry, I'm not imputing anything to you but
17  these studies which are thick and complicated and
18  different from each other, I feel I really need to look
19  at it once numbers start coming out. The statements I
20  make, I stand by, but when it comes to giving the exact
21  numbers, I really need to look at the numbers.
22     Q. These are your notes, great. This makes life
23  easier. Happily either you or counsel did a chart.
24     A. No, that chart was done by my sometime
25  assistant, and I really haven't used it. But I

41 (Pages 158 to 161)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 162

1  submitted it because it was part of the stuff for
2  preparation.
3      Q.  But I take it since he is your graduate
4  student you --
5      A.  Stand by everything he wrote, no.
6      Q.  You don't think he is capable of accurately
7  putting in the table, the dropout rate?
8      A.  It doesn't matter.  I would like to have the
9  125 in front of me if we are going to discuss 125.
10     Q.  It is not a perfect world.  Studies aren't
11 perfect and depositions aren't perfect, and we have
12 time and space limitations.  The best we have is your
13 own surrogate, the guy you hired who has been paid by
14 Alston & Bird who you relied upon for literature
15 search, for discussing issues.  Here is his chart which
16 was included and if you can tell me from his chart what
17 the discontinuance rate is, recognizing with your
18 qualifier that you don't necessarily accept that what
19 he did was accurate.
20     (Witness reviewing document.)
21     A.  What's here is a rather shorthand description,
22 and I'm sorry, it may not be a perfect world, but it is
23 even more imperfect not to have the document that you
24 want me to refer to in hand.  And I would rather not
25 have a secondary, cursory summary if I am going to

Page 163

1  discuss it.
2      Q.  So the summary of 59 out of 168 patients you
3  are not accepting as being accurate necessarily?
4      A.  Where do you see 59?  Where are those numbers
5  on here?
6      Q.  Go to the next page, the very top of the
7  chart.  Here is a copy of the whole study.
8      A.  I would say that I have no reason to think
9  that that isn't true if he put that down.  I apologize
10 because I was looking here for that and it is tucked in
11 over here.
12     Q.  It is actually a very handy piece of work that
13 he did.
14     Here, just for the sake of the record, is our
15 copy of Study 125.  I'm sorry, I thought we had brought
16 multiples to xerox, but referring you to Table 6.2 if
17 you want to just confirm that his summary there is
18 accurate.
19     (Witness reviewing document.)
20     Q.  The question was very simple, it is about the
21 number, 59, discontinued out of 168 quetiapine
22 patients; is that correct?
23     A.  Yes, but I like to look at numbers in context.
24 That's what makes a good epidemiologist.
25     Q.  It slows down a deposition.

Page 164

1      A.  I can't help you.  If you want a good
2  epidemiologist, you can't have a fast deposition.  You
3  can have a very fast deposition with a bad
4  epidemiologist too.
5      (Witness reviewing document.)
6      A.  59 is in here, and for the denominator, 168 it
7  is, yes.
8      Q.  Is that a dropout rate of 35 percent?  I have
9  a calculator if you want.
10     A.  Whatever 59 over 168 is, roughly.
11     Q.  Does that sound about right?
12     A.  Yes.
13     Q.  That's pretty comparable to the dropout rate
14 of 40 percent that you were criticizing.  It is a
15 little bit lower, but not that far apart from the 40
16 percent dropout rate you were criticizing in 144?
17     A.  What dropout rate contributes to the study is
18 more than just a percentage of the dropout.  It can be
19 significant for a study or not.
20     Why folks dropped out, I believe that was one
21 of the reasons I was looking a little earlier in the
22 report is that for quetiapine dropping out, for any of
23 the atypicals being used, it was listed as a worsening
24 of their schizophrenia, was the main reason for
25 discontinuation.  But there was also a dropout rate

Page 165

1  from olanzapine and risperidone.
2      Q.  For the dropout patients it wasn't terribly
3  efficacious; it made schizophrenia worse?
4      A.  I can't comment on efficacious.  That involves
5  the diagnosis that was being used before and I believe
6  the study -- excuse me a second.
7      (The witness answers the telephone.)
8      A.  Sorry.
9      Q.  No problem.  Regardless of the cause of
10 dropout, whether it is efficacy or whatever, there was
11 approximately a 35 percent dropout rate which is not
12 trivial, correct?
13     A.  Correct.
14     Q.  In your report, you state that "A small
15 clinically insignificant increase in area under the
16 curve was seen in the baseline non-diabetic population
17 at 24 weeks."
18     Do you see that?  That's Page 21 of your
19 report in the middle.  It is near the bottom paragraph
20 too.  Do you see that, Page 21?
21     A.  Right.  You are starting with "A small
22 clinically insignificant" --
23     Q.  "Increase in AUC was seen in the baseline
24 non-diabetic population at 24 weeks."
25     A.  Right.

42 (Pages 162 to 165)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 166

1    Q. If you can turn to the data to see what you
2  were describing as small, clinically insignificant.
3        MS. RELKIN: We'll mark that 125 study.
4        THE WITNESS: That's Table 11.3.7.1. It
5    doesn't look like it's in here. Can you put your
6    hands on it?
7    Q. You have it so I can't.
8    A. I will be happy to give it to you if you can
9  find it.
10   Q. If you give it back to me, I think my
11  colleague, Chelsea, can.
12   A. There is a supplementary appendix for tables
13  for many of these studies and if it is not in it,
14  that's where the tables are, unless it comes out of the
15  CDs.
16   Q. While she is looking for it, can you define
17  for me what level you determined to be a clinically
18  significant increase in area under the curve?
19   A. Again, I have to look at it.
20   Q. Do you have a threshold or standard or range
21  to be clinically insignificant?
22   A. It depends on what the mean was for the
23  distribution of that study as well, so I would like to
24  see the table. It will remind me why that statement is
25  worded as it is.

Page 167

1    Q. By the way, with regard to the mean, when we
2  are talking about clinical insignificance or clinical
3  significance, would you agree that as we talked about
4  earlier means or averages, that even if you just look
5  at the mean number, even if you are correct that it is
6  clinically insignificant, that there could be some
7  patients who are on the high end who have the highest
8  numbers where their increase might be clinically
9  significant even though it gets diluted in the average?
10   A. That is true.
11   Q. While she is looking for that, we might not
12  have it handy, I am going to move on to some other 125
13  issues. Did Study 125 control for BMI?
14   A. I believe 125 did control for BMI.
15   Q. Do you know whether it correlated those
16  controls to glucose levels?
17   A. I'm not quite sure what you mean by control to
18  glucose levels.
19   Q. Do you know whether it compared the control to
20  the particular patients?
21   A. All of that data is in the study results. You
22  can find all that in the tables.
23   Q. You believe it did do it on a patient basis?
24   A. The patients were, one of the advantages of
25  the study was that it was carefully administered and

Page 168

1  there were baseline measurements of all the appropriate
2  parameters and the measurement of glucose was based on
3  a true fasting blood sugar which is a problem with many
4  of these studies because it can't be determined. The
5  patients were hospitalized for the period of time
6  getting their glucose measured which made sure that
7  they were truly fasting.
8    Q. Is a study intended to assess whether a drug
9  causes diabetes valid, if it inadvertently includes
10  patients with preexisting diabetes in the population?
11   A. I'm sorry, say that again.
12   Q. Is a study intended to assess whether a drug
13  causes diabetes valid if it inadvertently included
14  patients with existing diabetes in the study?
15   A. I think the operative word in the question is
16  inadvertent. Ideally, you do a measure beforehand and
17  see what the blood sugars are.
18        And in this study, there are blood sugars
19  drawn prior to beginning the study. So if there were
20  patients with diabetes or prediabetes or characterized
21  as such, they could be followed thereafter knowing
22  where they started.
23        So there is no problem if it is not
24  inadvertent. In this case, if there is such a word as
25  advertent, that was it.

Page 169

1    Q. If it is mistaken, you would agree that for
2  studies such as Study 125, the design did not intend to
3  have the diabetics in the study?
4    A. No, the design was intended to characterize
5  the people that were entered into the study. It didn't
6  intend not to. In fact, and again, if we have the full
7  package of it, I think we can find in it, it pays to
8  look. Again, there are so many of these, one needs to
9  read the population selection criteria and see who was
10  excluded and who wasn't.
11   Q. Is it your testimony that Study 125 was
12  supposed to have diabetics?
13   A. I'd like to have 125 in front of me if I am
14  going to answer questions on 125.
15        MS. THORPE: Let the record reflect it is in
16  front of the lawyer asking the questions.
17        MS. RELKIN: I am going to hand it to him in a
18  second. When you said that, it literally landed
19  in front of me.
20        I didn't have it the moment before. So that
21  was a really uncalled-for statement.
22   Q. (By Ms. Relkin) I am going to hand you the
23  study in a moment, but I will just read for the record,
24  and you can check that I am reading it correctly, it is
25  Page 53 of the study, Section 5.3.4.3, incorrectly

43 (Pages 166 to 169)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 170

1  enrolled randomized patients.  "Incorrectly enrolled or
2  randomized patients were normally to be discontinued
3  from the study treatment and assessments.  During the
4  study, the central laboratory failed to automatically
5  flag for and notify the investigator on the blinded
6  glucose values that exceeded the limit of 7 for fasting
7  glucose and 11.1 for two-hour glucose which was among
8  the exclusion criteria.  According to the protocol, a
9  fax notification should have been sent out from the
10  central laboratory to notify the investigator on the
11  occurrence of such high glucose values with an
12  instruction to exclude the patients from further
13  participation.
14      "However, this procedure did not work properly
15  due to a programming error in the Covant central
16  laboratory database, and these patients were mistakenly
17  maintained in the study as long as the laboratory data
18  remained blinded.  Due to this failure on the part of
19  the central laboratory, several patients were
20  incorrectly randomized for participation in the study
21  despite the fact that they fulfilled exclusion criteria
22  at randomization."  And then it describes the listing
23  of the patients by number.
24      A.  What does it say about their --
25      MS. THORPE:  What is the question?  You are

Page 171

1  asking him if you read it correctly?  He doesn't
2  have it in front of him.
3      MS. RELKIN:  I didn't ask him that.
4      MS. THORPE:  I am just saying, what is the
5  question?
6      MS. RELKIN:  Your witness just interjected
7  something and I was going to phrase the question.
8      Q.  (By Ms. Relkin)  Do you recall reading this
9  section when you analyzed this study?
10      A.  Yes, I do.
11      Q.  Did you report this issue in either your
12  expert report or your declaration to the court?
13      A.  Again, what you have read is incomplete, so
14  one of the questions is, were these patients included
15  in the analysis and conclusions.
16      Q.  Take a look at that section.  You have the
17  study now.
18      A.  Again, sorry about this, but you can't just
19  look at the section.  You have got to look at what were
20  the criteria for exclusion and were they included in
21  the analysis eventually.
22      Q.  The text talked about they were in the
23  criteria for exclusion but were kept in.
24      A.  Right, and so one element of this is, you
25  could say it is a higher quality study when you can

Page 172

1  find your mistakes, show them in the course of the
2  thing and then eliminate those folks from further
3  analysis, if you can do that.
4      Q.  Were they eliminated from the analysis upon
5  which you rely for your opinions?
6      A.  That's what I am reviewing now.  I didn't make
7  a note of that earlier.
8      Q.  When you first reviewed this study and relied
9  upon it in your report, did you do the analysis that
10  you are doing now?  Did you look to see whether those
11  inadvertently included diabetics were contained within
12  the data?
13      A.  Yes.
14      Q.  But you don't remember the outcome one way or
15  the other?
16      A.  I don't, and even if I did, I would want to
17  check for purposes of this deposition.
18      (Witness reviewing document.)
19      MS. THORPE:  I know you are short of time, but
20  I have the table in my hand.  It is cited in his
21  report.  It is pulled out, but if you want to --
22      MS. RELKIN:  Sure, okay.  What page?
23      MS. THORPE:  I have two copies of it, Page
24  335.
25      I think you should look at everything.

Page 173

1      MS. RELKIN:  We don't have time for him to
2  look at everything.
3      MS. THORPE:  He can look at what he needs to
4  look at, but I am telling you --
5      MS. RELKIN:  This is a deposition, time is
6  tight.  There have been 10 to 15-minute gaps while
7  he looks at these studies because he doesn't
8  remember them and he didn't bring them and he
9  doesn't have summaries of them.  And he doesn't
10  want to rely on his student's summaries of them.
11      MS. THORPE:  I object to your
12  characterization.  I would say it is because of
13  the questions that have been asked, but I am not
14  going to be pejorative, as you were being.
15      MS. RELKIN:  I wasn't being.  Let's not go
16  there.
17      Does he have that?
18      MS. THORPE:  I put it there, but I think he
19  needs to look at it in the context of your
20  question.
21      MS. RELKIN:  Just for the record, when you say
22  it's in the report, he doesn't have in the report
23  the actual data?
24      MS. THORPE:  Yes, he does, he has the table,
25  he has the cite to the table.  So if you have the

44 (Pages 170 to 173)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 174

1  document, all you have to do is turn to that
2  table. It's right there.
3      MS. RELKIN: So I'd like the doctor to just do
4  that so we don't have to waste time while he reads
5  other things.
6      MS. THORPE: You know what --
7      MS. RELKIN: I am entitled to direct the
8  witness to look at the exhibit responsive to the
9  question, because we are wasting time. He is
10  coming up with other things, why 125 is a great
11  study.
12  Q. (By Ms. Relkin) Doctor, please look at the
13  table which is what you reference in your report on
14  this very issue.
15      MS. THORPE: Are you withdrawing your question
16  that he is trying to answer and are you posing a
17  new question?
18      MS. RELKIN: No, I want him to answer the same
19  question with the data that answers it, not for
20  him to review the study and come up with
21  gratuitous other stuff.
22      MS. THORPE: If you don't withdraw the
23  question, then he needs to do just what he's
24  doing.
25      MS. RELKIN: No, he doesn't. You yourself,

Page 175

1  Jane, said, here's the table that addresses this
2  issue.
3      MS. THORPE: It is one table that addresses
4  the issue that I know of. So I was trying to
5  help. But the doctor has to do what he has to do
6  to get comfortable with the question that you
7  asked.
8      THE WITNESS: I've got the table that you are
9  referring to and the summary statement I have in
10  the report on it. If I might just remind you,
11  that of course this is on Page 335 of the document
12  of which there is data on every single page and
13  multiple pieces of data. So you will have to
14  pardon me for wanting to look at it closely and
15  wanting to make sure I give you the correct
16  answers.
17      It would be easy to go to it and give you a
18  flip answer. But the answers on this require some
19  understanding of what's gone on and to memorize
20  the contents of those two boxes is rather
21  difficult and I might say it is beyond my powers
22  to do so.
23      So I am not purposely slowing you down. I am
24  trying to give you the best answers I can for your
25  purposes. So let's proceed with the question.

Page 176

1      Q. (By Ms. Relkin) Do you remember the question?
2      A. I don't.
3      MS. RELKIN: How hard is it to find it?
4      (Whereupon, the record was read by the
5  reporter as requested.)
6      Q. (By Ms. Relkin) So Were those inadvertently
7  included, the diabetics included within the data?
8      A. I would still have to look further on that.
9  That question is not answered on this particular table,
10  but what is answered on this particular table is
11  something that is not germane to the discussion.
12      And that's my comment in the book which you
13  look at non-diabetic patients in this of which there
14  were 86 on Seroquel and significant numbers in the
15  other two groups, and you looked at what was the area
16  under the curve across the three different groups.
17  Again, this has nothing to do with the excluded
18  patients. They are not in there. This is
19  non-diabetic.
20      They would have fallen into the diabetic or
21  diabetic risk categories on the basis of their numbers.
22  These numbers are not significantly different from one
23  another, and thus the basis for my statement.
24      Q. But if there were more patients who were
25  inadvertently coded as being diabetic in the other

Page 177

1  arms, in the olanzapine and risperidone arms, those
2  would show up as diabetics and therefore make those two
3  drugs look to have a worse profile as compared to
4  quetiapine, therefore making quetiapine appear to be
5  safer, true?
6      A. I don't understand why you are saying if there
7  were. Is there any reason for there to be more of the
8  other two?
9      Q. Did you do an analysis when you chose to
10  discuss this paper to determine on this issue of
11  inadvertent inclusion of diabetics whether they were
12  equally included in the three arms or whether they were
13  in fact substantially more in the olanzapine and
14  Risperdal arms?
15      A. I still don't follow you because they have the
16  numbers of what they would have and they wouldn't be
17  listed as non-diabetic patients.
18      Q. Right, they would be listed as diabetic.
19      A. Right.
20      Q. And therefore, the study would make it look
21  like quetiapine was safer than the other two agents.
22      A. I don't interpret that as what would happen.
23      Q. When you reported the statistics in your
24  report for the area under the curve, were you reporting
25  it for everyone or only for the diabetics?

45 (Pages 174 to 177)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 178

1   A.  The report itself lists, we can go statement
2   by statement here.
3       Again, "A small clinically insignificant
4   increase," and you see, this is what you had me read
5   before.
6   Q.  Right.
7   A.  "Was seen in the baseline non-diabetic
8   population at 24 weeks."
9   Q.  You referred to it in your report as the
10  patients in the baseline non-diabetic population at 24
11  weeks.  Sitting here, do you know whether those
12  patients who were inadvertently included as being
13  deemed non-diabetic were in fact the diabetics who got
14  in due to the error that was described in the study?
15  A.  Are you saying, are the patients that were
16  initially enrolled -- maybe clarify that for me.  Just
17  say that again maybe in a different phrase.
18  Q.  The sentence here in your report, when you
19  talked about, "The small clinically insignificant
20  increase in the area of the curve was seen in the
21  non-diabetic population at 24 weeks," how do you know
22  that what you are describing as the baseline
23  non-diabetic population --
24  A.  My reading in this is that they were
25  discontinued and not included in it.

Page 179

1   Q.  You are reading that they were not included or
2   that they actually did get included, they didn't cut
3   them out of the data?
4   A.  It says, "For a listing of the incorrectly
5   randomized patients, see Table 11.3.7.1.31."  If we
6   have a copy of that, we can demonstrate what happened
7   to them and where they are.
8   Q.  Do you have that table accessible?
9       MS. THORPE:  Do I?  I'm sorry, what is the
10  table?
11      MS. RELKIN:  There is a particular table the
12  doctor just read the number of.
13      MS. THORPE:  It is on the disc we gave you.
14      MS. RELKIN:  I have the disc too.  I don't
15  have the paper here.
16      MS. THORPE:  We don't have the hard copy.
17  Q.  (By Ms. Relkin) Let me show you the analysis,
18  the draft of the Newcomer manuscript with the marked up
19  change which we don't know if it's ever been submitted
20  for publication or what the status is, but we did
21  receive it in discovery with the track changes.  I am
22  marking it as Koplan Exhibit 15.
23      (Plaintiffs' Exhibit-15 was marked for
24  identification.)
25  Q.  (By Ms. Relkin) I am going to direct your

Page 180

1   attention to Page 15.  Obviously, look at the first
2   page or two to see the context of what this exhibit is.
3   A.  This is a draft of a paper being submitted
4   somewhere or what?
5   Q.  We don't know the full situation.  It was
6   recently produced in this litigation from the
7   electronic discovery.  It is a draft of Newcomer's
8   paper on Study 125.
9       (Witness reviewing document.)
10  A.  It is a draft being edited as we speak, from
11  what I can see.  So what --
12  Q.  First, I take it, you have not seen this?
13  A.  I have not seen this.
14  Q.  Then if you turn to Page 125, there is a
15  discussion of this issue.
16  A.  There is also not a date on it.
17  Q.  That's beyond my control.  There are edits
18  from John Newcomer, there's a date, different dates
19  from July of 2007 at the end, 7-29?
20  A.  So we are dealing with a draft of something
21  that may or may not have been published and if it was
22  it could be in very different form when published.
23  Q.  Do you know whether Study 125 has ever been
24  published?
25  A.  No, it is an in-house study done for FDA

Page 181

1   purposes.
2   Q.  You think it is an important study; you are
3   relying on it in your report.
4   A.  I characterize it exactly as I would
5   characterize it, which is in the absence of much direct
6   measurement of the effect of Seroquel on glucose
7   metabolism, this is one of the few things that tries to
8   do that or maybe the only thing that tries to do that
9   directly.
10  Q.  So therefore don't you think this study is
11  worthy of publication based upon your own assessment of
12  it?
13  A.  I wouldn't make that judgment.  I'm not sure
14  these type of studies done for FDA purposes are worthy
15  of publication per se.
16  Q.  Done for FDA purposes, that makes them bad in
17  some way?
18  A.  No, it is not a literature in which I can
19  determine what is the best grounds for something to be
20  published or not.
21  Q.  In part, you are really not a drug safety guy
22  so you don't know what they publish in this field.
23  That's not really your field.
24      MS. THORPE:  Object to the form.
25      THE WITNESS:  From what I have seen they

46 (Pages 178 to 181)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 182

1 publish, it is valuable in a certain framework.
2 Basically, a lot of the stuff is used for
3 hypothesis generation, and that's a perfectly
4 valid, decent thing to do. It then requires a
5 more rigorous, careful study.
6 So I have no problem with people doing this
7 work or publishing or these journals. All I am
8 saying is I am in no position to judge either the
9 observational epi where they should publish and
10 with who and why nor would I offer an opinion on
11 125.
12 Q. (By Ms. Relkin) 125 is not observational epi,
13 it is clinical trial data.
14 A. Whatever. I don't have a strong feeling one
15 way or the other as to what should be published or not
16 published. It may well serve all the purposes it needs
17 in the format it is in. If it doesn't, then
18 publication might be helpful.
19 Q. If you turn to Page 15, there is a discussion
20 of what happened at week 24. Go to the second full
21 paragraph on Page 15.
22 It says at week 24, small changes from
23 baseline and fasting glucose were seen in all treatment
24 groups, 3.18 milligrams for quetiapine, 2.33 for
25 olanzapine and 4.40 for risperidone. It is

Page 183

1 statistically significant for quetiapine and
2 risperidone.
3 Do you see that?
4 A. Yes.
5 Q. By the way, did you discuss that those
6 findings were statistically significant in your report
7 or your declaration to the court?
8 A. What findings?
9 Q. The findings I just read, the changes --
10 A. I don't know what this is I'm reading, to tell
11 you the truth.
12 Q. -- the changes from baseline and fasting
13 glucose.
14 A. You have just asked me to read an isolated
15 paragraph here. I haven't looked at anything else in
16 this paper. Where does this data come from?
17 Q. This is Dr. Newcomer. You see Dr. Newcomer,
18 Dr. Ratner, he is the one who did the poster
19 presentation.
20 A. Yes.
21 Q. Martin Brecher, he is AstraZeneca.
22 A. You may not like it, but normally, I like to
23 read the paper before commenting on one paragraph on
24 Page 15 of it.
25 Q. We have already established you have written,

Page 184

1 you told the court about Study 125. Here is some more
2 data about 125 you haven't seen before.
3 A. I didn't even know this was about 125. You
4 have asked me to turn to Page 15. I am reading the
5 third paragraph down without putting it in any context.
6 Q. From the title --
7 A. I didn't even know he did Study 125.
8 Q. Do you know who did Study 125?
9 A. I don't have the names of all the authors of
10 it, no. I believe the author listed on, I have 125
11 here, they list a head researcher, and in this case
12 it's Robin Emsley from South Africa. And then the
13 medical sponsor is Dr. Brecher.
14 Q. Do you see in this draft here we have Dr.
15 Brecher listed?
16 A. I see.
17 Q. All the names are there.
18 A. But again, a written article for publication
19 and the document I have before me are two different
20 things. Nevertheless, if, going back on Page 15, the
21 very thing you are pointing out, I can't be sure this
22 is referring to the same thing I have in my report, but
23 I believe I state, "Subjects taking Seroquel had a
24 small increase in fasting glucose from baseline."
25 Let's see here. I've got 3.19 at 24 weeks and

Page 185

1 it seems to have been modified to 3.18 in the paper you
2 just showed me.
3 Q. In your report, the way you describe it as
4 being not clinically significant, and you don't address
5 whether or not it is statistically significant,
6 correct?
7 A. That's correct. I think there are two
8 different things, as I have said a number of times.
9 Q. Of course they are, and they are both
10 important criteria. Clinical significance is
11 important, statistical significance is important,
12 right?
13 A. Right. But statistical significance is not
14 important at all unless you have valid epidemiologic
15 information up front. So as a stand-alone, it is
16 necessary, but it is not as a stand-alone.
17 Q. When you are describing it, you are only
18 describing the negative, you are pooh-poohing it
19 because it is not clinically significant. You don't
20 volunteer the fact that it does happen to be
21 statistically significant, correct?
22 A. Absolutely incorrect. That's your judgment
23 and interpretation. When I state in this document,
24 "Subjects taking Seroquel had a small increase in
25 fasting glucose from baseline," I think that's both

47 (Pages 182 to 185)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 186

1  stating the finding and indicating something that works
2  in the other direction of a small decrease or a big
3  decrease or whatever.
4        I am stating it.  There is no judgment, this
5  is a good or a bad thing, I am stating a fact.  My view
6  is --
7        Q.  We are supposed to infer from this sentence
8  that this was statistically significant even though you
9  didn't affirmatively state it because you didn't call
10  it as being not insignificant?
11        MS. THORPE:  Object to form, argumentative,
12        compound, unclear.
13        THE WITNESS:  I won't characterize whether the
14        statistical significance was including it or not,
15        but I will say that 3 milligrams, when your
16        overall blood sugar is in excess of 90, is
17        probably clinically insignificant.
18        Q.  (By Ms. Relkin) You feel qualified to say that
19  even though you are not an endocrinologist and you
20  haven't treated diabetics for well over 20 years?
21        A.  I do feel qualified to say that a 3 milligram
22  difference in blood sugar is not considered clinically
23  significant.
24        Q.  Nevertheless, in terms of ascertaining whether
25  or not this drug has an effect on fasting glucose, the

Page 187

1  fact that there is a change of 3.18 that is
2  statistically significant is a relevant piece of data?
3        A.  Absolutely relevant.  That's why I put it in
4  here.  I don't deny it.  It's there.
5        Q.  If that number is actually lower than the true
6  result because of interference by these inadvertent
7  diabetics who are coded as non-diabetics, that could
8  change the findings, true?
9        A.  I don't have information on that to comment on
10  here.  I don't believe that is the case.  If there was
11  miscoding, that is not -- in the paper you just gave me
12  which is to be published, I would think that would have
13  been explored.
14        It is in the report.  It is clearly stated,
15  and then the figures follow that.  So my assumption was
16  that those were corrected or why would you have a half
17  a page that describes this problem and the fact that
18  those were pulled from the study?
19        Here you have a paper that's being sent to an
20  editor for publication, which the authors' reputations
21  are at stake in the public arena, and basically the
22  same data is present there.  So to me, that further
23  confirms it.
24        Q.  When you publish a paper with other
25  investigators, I take it you email each other drafts

Page 188

1  with track changes and questions that you all raise
2  internally; is that fair to state?
3        A.  Yes.
4        Q.  Here do you see that this document has track
5  changes?  Just flip to, say, Page 23.  It is pretty
6  obvious there are deletions, there are inclusions?
7        A.  Yes, I see the track changes.
8        Q.  If we go back to Page 15, go to the bottom
9  paragraph, do you see there is underlining with some
10  capitals?
11        A.  Yes.
12        Q.  Does that look like a track change or perhaps
13  a comment being made?  It says, "We said earlier that
14  no one developed diabetes post-randomization.  Are
15  these just the subjects who were mistakenly let in?
16  That should be explained."
17        So it is a question being raised which wasn't
18  clear to whichever investigator was making those
19  comments; is that right?
20        A.  It looks like a point of clarification is
21  asked for by somebody.
22        Q.  Is it fair to state there is an unresolved
23  issue here?  And you obviously weren't the
24  investigator, you don't know the answer, I don't know
25  the answer.

Page 189

1        A.  Again, I think it is a bit unfair to have me
2  commenting on this without -- there are elements of a
3  paper like this that are not in 125.  So if one looks
4  even without being able to read the whole thing, and I
5  know you don't want me to, but if you look at the
6  bottom of Page 22 and read what the author is saying,
7  keep in mind that Dr. Newcomer seems to be one of the
8  authorities on this and has written multiple reviews,
9  "Small increases in HbA1c and fasting glucose were
10  observed in all three treatment groups.  However, these
11  changes remained within the normal range."
12        So it means one of the reasons I say this is
13  not clinically significant is when your mean blood
14  sugar is 94, 93 and you add the 3 milligrams, or I will
15  give you 4 milligrams or 5 milligrams and it is still
16  within the normal range, it is under 100, so that
17  underlines what clinical significance is.  It says,
18  "and there were no statistically significant between
19  group differences."
20        I'd have to read more on other things they
21  have written here.  Again, it's very hard to interpret
22  a paper in draft because I do it and every other author
23  does it, you get co-authors disputing and wanting a
24  rewrite and not liking the way this was said.  Only at
25  the end of the paper, when each author signs their name

48 (Pages 186 to 189)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 190

1  to the document, testifying that everything in it is
2  what they believe to be true and their reputation is
3  on the line, does it go to the journal and then the editor
4  makes those decisions.
5       So it would be great to see if this was
6  published somewhere and what that paper looks like.
7  And I would love to have had access to this earlier to
8  read and see what they said. But I can't comment on it
9  fully, receiving it at this moment.
10      MS. THORPE: I don't want to interrupt your
11  line on this, but we have been going about an hour
12  and a half without a break. I don't know how much
13  longer you have.
14      MS. RELKIN: I have a good bit more. I'd like
15  to keep going unless the doctor tells me he needs
16  to take a break.
17      THE WITNESS: I can take a three-minute break
18  and be right back.
19      MS. THORPE: If you want to finish this line,
20  we are not stopping you.
21      MS. RELKIN: Let me finish this line.
22      MS. THORPE: Is that okay, just to finish up
23  on this?
24      THE WITNESS: That's fine.
25      Q. (By Ms. Relkin) If you go to Page 24?

Page 191

1       A. Of the Newcomer piece?
2       Q. Yes, this Newcomer draft letter report.
3       A. I'm there.
4       (Witness reviewing document.)
5       Q. There is a discussion of measurement of plasma
6  lipid changes in the different treatment groups. I
7  refer you to the deleted part, the column on the right.
8  If you look at the deleted column, deleted bubbles, it
9  is the fourth one from the bottom where it says,
10  "deleted, significantly increased following quetiapine
11  treatment."
12      Do you see that?
13      MS. THORPE: Read the rest of it. You read
14  part of it.
15      MS. RELKIN: Right, I am just directing him to
16  that. Obviously, he needs to read the whole thing
17  in context.
18      MS. THORPE: And the rest of it says, "and
19  that olanzapine treatment was also associated with
20  significant increases in total cholesterol, LDL
21  and triglycerides." That was the whole quote.
22      MS. RELKIN: Right, that's fine. Both drugs
23  do it.
24      MS. THORPE: Object to the speech. I object
25  under the rule of incomplete.

Page 192

1       MS. RELKIN: I wasn't asking the question. At
2  this point, I was directing the question to this
3  because if I started asking a question, you would
4  have objected that, hey, you were asking the
5  question, he hasn't had a chance to review it.
6       So stop imputing bad intent. And stop glaring
7  at me, too.
8       MS. THORPE: Let the record reflect that
9  everyone is laughing.
10      MS. RELKIN: Well, you were.
11      THE WITNESS: I'm at that spot. Do you have a
12  question for me?
13      Q. (By Ms. Relkin) Yes. Do you see that in an
14  earlier version of this draft report reported
15  significant increases of plasma lipid levels in the
16  quetiapine treatment group as well as the olanzapine
17  group?
18      A. I see what's deleted.
19      Q. Did I accurately describe --
20      A. Again, it is hard to interpret. When the
21  authors remove something and replace it with something
22  else, it means that their analysis shows what they
23  replaced it with.
24      If they are willing to stand on that and
25  submit it to journal and put their careers at risk if

Page 193

1  they are putting something that's inaccurate, that's an
2  extraordinary thing to do.
3       So are you implying that they are suppressing
4  information or that what they wrote which is that, is
5  incorrect? I guess those things are possible, but I
6  would be amazed if that were the case.
7       Q. Doctor, other than that one time of many
8  years, you have never really done work for drug
9  companies that are funded by them and address
10  competitively marketed pharmaceutical products, have
11  you?
12      A. No.
13      Q. But I take it you know enough about just the
14  arena that it is a highly competitive market between
15  very lucrative products of Seroquel and Zyprexa and
16  risperidone, is that fair to state?
17      A. I imagine that it is competitive.
18      Q. You would agree that pharmaceutical companies
19  should be honest and forthcoming and not suppress data
20  that might hurt their sales but reflect poorly on the
21  safety of the drug, wouldn't you?
22      A. If the implication is that market forces would
23  alter the content of a paper written by a distinguished
24  tenured professor at the Washington University School
25  of Medicine in St. Louis, I would be shocked and aghast

49 (Pages 190 to 193)

Page 194

1   and that someone who already has a hundred-plus
2   publications would put himself on the line by changing
3   things for the benefit of a drug company is
4   inconceivable to me.
5       Q.  Have you been reading the newspaper about
6   hearings on the Hill about one of your colleagues at
7   Emory?
8       A.  All the more reason why someone doing this in
9   a paper that's in draft now, they would be hanging
10  themselves out to dry for doing something like that
11  because of all the news of what's going on in the
12  paper.
13      Q.  Do you know the name of the doctor from Emory
14  who is right now being implicated in not being
15  forthcoming on data with regard to the safety of
16  Zyprexa?
17      A.  That's not what he is being implicated for,
18  first of all.  He is being implicated for misreporting
19  dollar amounts that he received from pharmaceutical
20  companies.  Again, that's been in the news and similar
21  events have been in the news for several years.
22          So can it happen?  Sure, it can happen.  But
23  the price to pay for that is basically professional
24  suicide.
25      Q.  When you're caught.

Page 195

1       A.  So whether it could happen or not --
2           MS. THORPE:  Object to the commentary, no
3   question, just the commentary which I move to
4   strike from the record.
5           MS. RELKIN:  I withdraw it.
6           THE WITNESS:  I choose not to draw such harsh
7   judgments on folks in the field in the course of
8   doing this, but the bottom line is, those are the
9   very questions that you raise that are appropriate
10  to raise when an editor sees a paper and decides
11  whether it should be published and asks some of
12  those questions.
13          In the course of putting together a paper, you
14  can take every paper I have ever written or any
15  other person has, and find deletions, arguments
16  between co-authors, do we include this, do we
17  include that.  And I've got nothing to do with
18  drug companies in my papers.  I think it makes it
19  hard to interpret a draft to go to publication.
20      Q.  (By Ms. Relkin) Do you know whether Emory
21  University is doing any investigation of, I believe it
22  is Dr. Nemeroff, is that the name?
23      A.  I have nothing to do with what they are doing
24  and I prefer not to comment on whatever is going on at
25  Emory University related to things that I don't work on

Page 196

1   and I think it is inappropriate.
2       Q.  You would agree that investigators who are
3   studying the safety of drugs that are used by consumers
4   should be forthright with their findings?
5       A.  Absolutely.
6       Q.  You would agree that if you read the recent
7   headlines and the history of some of the blockbuster
8   pharmaceutical agents including some that are in the
9   antipsychotic arena, there have been problems of
10  investigators being forthcoming about their connections
11  to industry and about some of their findings?
12      A.  I agree.
13      Q.  You would agree that that's not a good thing?
14      A.  I agree.
15      Q.  You would hope that that's not the case for
16  Seroquel and AstraZeneca, true?
17      A.  I think it's the case for every drug company,
18  every researcher and every study done, should bank on
19  the science.  And the importance of high integrity and
20  high competence in doing these studies is of extreme
21  importance.  We all potentially are going to take these
22  medications at some time or other.
23      Q.  Do you agree that a pharmaceutical company
24  should warn physicians who are prescribing medications
25  and warn consumers of those pharmaceutical products, of

Page 197

1   important health risks of the product?
2           MS. THORPE:  Object to form because it's
3   vague.
4       Q.  (By Ms. Relkin) You can answer that.  Do you
5   agree that pharmaceutical companies should warn
6   physicians and consumers of important health risks of
7   their products?
8       A.  I think they should.
9       Q.  From your experience in public health, I think
10  you have published about this, tobacco warnings, do you
11  agree that warnings can have an impact on the use of a
12  product?
13          MS. THORPE:  Let me just say, I don't mean to
14  impute -- you have changed topic areas.  I am
15  going to say that we cannot go all night and you
16  have a plane and he did not offer a warning
17  opinion in his report.  So at this point, if you
18  want to know how I call it, you are going into
19  areas that are outside the scope of his direct and
20  you do so at your own risk in terms of your use of
21  time.
22          MS. RELKIN:  It was one question.
23          MS. THORPE:  You have asked more than one
24  question.  You have now asked three questions.
25          MS. RELKIN:  You interrupted me in the middle

50 (Pages 194 to 197)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 198

1  of a question before he answered it.
2      MS. THORPE: I have a right to make an
3  objection.
4      MS. RELKIN: Yes, but you could wait until I
5  have finished the question.
6      MS. THORPE: You finished the question.
7      MS. RELKIN: But now we have to have the
8  question reasked because I don't recall the
9  precise phraseology. I doubt the doctor does
10 either. Do you?
11     THE WITNESS: I don't think you came to the
12 end of the question.
13     MS. RELKIN: I was interrupted.
14     Can you get back to what I said?
15     THE WITNESS: Can I get rid of some of this
16 stuff?
17     MS. RELKIN: Sure.
18     (Whereupon, at 4:34 p.m., a seven-minute
19 recess was taken.)
20     MS. RELKIN: What was the last question?
21     (Thereupon, a portion of the record was read
22 by the reporter.)
23     MS. THORPE: Object to form, outside the scope
24 of the offered opinions.
25     THE WITNESS: In that this specifically refers

Page 199

1  to tobacco use, that's a perfect example, is that
2  warnings can have an influence on the use of a
3  product, particularly when they are warnings like
4  occur in Europe in which the whole pack is covered
5  and says, smoking kills. The other extreme is in
6  China where you would need a magnifying glass to
7  read the warning and it is a vague warning at best
8  and has no impact on the use of the product. It
9  depends where it is, how it is listed and who
10 reads it.
11     Q. (By Ms. Relkin) An example of warnings,
12 smoking kills from Europe, that's a clear, unequivocal
13 warning. It can have an impact on use?
14     MS. THORPE: Object to form for the reasons
15 stated above. Can I have a continuing objection
16 to all of these questions on all bases on warning?
17     MS. RELKIN: Sure.
18     THE WITNESS: Repeat the question.
19     Q. (By Ms. Relkin) I just said, when there is a
20 clear unequivocal warning, it can have an effect on
21 product use?
22     A. When the warning is clear, in the right place,
23 in the right level of visibility and has a strong
24 scientific basis, it can have an effect on product.
25     Q. Are you aware that there was a June 2008

Page 200

1  submission to the FDA?
2      A. Yes.
3      Q. And did you read that submission in its
4  entirety?
5      A. Yes.
6      Q. Have you performed any calculations of that
7  data?
8      A. No calculations.
9      Q. Did you conduct an analysis of the effect of
10 Seroquel on the end point of LDL?
11     A. I'm sorry, say that again.
12     Q. Did you conduct an analysis of the effect of
13 Seroquel on the end point of LDL levels?
14     A. I don't know what you mean by the end point.
15     Q. We already talked about the effect of Seroquel
16 on triglycerides and you said you didn't really focus
17 on that. Would that be your same answer for LDL?
18     A. Yes.
19     MS. THORPE: Let me just object to the
20 mischaracterization of what he said about
21 triglycerides.
22     Q. (By Ms. Relkin) Did you conduct an analysis
23 of the effect of Seroquel on the end point of
24 hemoglobin A1c which is also HbA1c?
25     A. I didn't do an analysis of that, but I

Page 201

1  considered all the data relevant on hemoglobin A1c and
2  the various lipoproteins prior to reading all these
3  studies.
4      Q. Would you agree that HbA1c data is useful
5  because it gives you n idea of blood sugar over the
6  past three months, so it is more than just one snippet
7  in time?
8      A. It's useful in a couple of ways. That may be
9  one, but another one is it is very useful in terms of
10 an essential of control and management of a patient
11 with diabetes.
12     Q. Do you hold the opinion that schizophrenics
13 are at a higher risk for diabetes?
14     A. Yes.
15     Q. Do you have an odds ratio for that risk?
16     A. I don't have one, no.
17     Q. You did not include it on your table in your
18 report; is that correct?
19     A. No, I didn't.
20     Q. Why is that?
21     A. Because I have it in verbal form in the
22 report, I believe. It may be in the other one.
23     Yes, Section 5 on Page 7, I am happy to read
24 it if you want.
25     Q. Sure, why don't you read it out loud.

51 (Pages 198 to 201)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 202

1     A. "Many mental health disorders are associated
2  with disturbances in eating patterns, physical activity
3  and subsequently weight." It gives us a reference of
4  McCready and Brown, two studies.
5     Q. Is there -- continue, I apologize.
6     A. Overweight and obesity, I'm sorry, you asked
7  about diabetes and this particularly addresses weight.
8  It is a little later on here.
9        I've got the wrong document, is the problem.
10  Hang on. It is at the very end of -- I'm sorry, this
11  is the declaration.
12     Q. You want your report probably.
13     A. Severe mental illness.
14     Q. What page are you on?
15     A. Page 19, Paragraph 45.
16     Q. You are on the declaration, okay.
17     A. Yes, "Severe mental illness including
18  schizophrenia and bipolar disorder are associated with
19  an increased risk of Type II diabetes. Persons with
20  schizophrenia have a two to fourfold increased
21  prevalence of Type II diabetes."
22        And that comes from this Irish expert
23  committee meeting. Bipolar disorder has a two to
24  threefold higher prevalence for Type II diabetes.
25     Q. Is that an increased risk independent of

Page 203

1  weight gain?
2     A. I'm not sure whether they did a, analyzed it
3  independent of weight or with weight.
4     Q. Can you think of a pathologic mechanism by
5  which the disorders of schizophrenia, and then a
6  separate question, bipolar disease, put a person at
7  increased risk for diabetes?
8     A. Can I think of them? Sure.
9     Q. I am not talking about social causes, that
10  they eat junk food and at the mental hospital they feed
11  them great food there too. I am talking, is there a
12  physical biological reason?
13     A. That's one of the things we don't have an
14  answer to for mental health neuropsychiatric problems,
15  which is that they clearly involve biochemical
16  disturbances, probably have a genetic basis. And we
17  are regularly finding an association of some common
18  genes of one entity with another.
19        So that whether it has intermediary steps in
20  it, whether it is a direct impact on metabolic
21  function, I don't know. I think the answer is out on
22  that. All that can be said is that there is an
23  association.
24     Q. You don't know whether the association is an
25  independent association or whether it is because of

Page 204

1  lifestyle and diet?
2     A. I believe it is an independent association.
3     Q. Sitting here, you are certain of that?
4     A. I said I believe it is. I would have to go
5  back and check on the papers.
6     Q. Is there any reason why you didn't include
7  that in the table then? I know you have it in your
8  declaration, but in terms of your expert report which
9  precedes the declaration, it was not in that table of
10  relative risks for risk factors for diabetes.
11     A. There is no particular reason why for not
12  including it one way or the other.
13     Q. Did you hold that same opinion back when you
14  wrote the report?
15     A. Yes.
16     Q. Did you consider putting it in that table?
17     A. No, I didn't.
18     Q. You say that "Beta-blockers are known to
19  impair glucose metabolism in a fashion that worsens
20  existing diabetes."
21        What are the characteristics of those
22  compounds that prompt this pathology?
23     A. I'm sorry, what do you mean by characteristics
24  of those compounds?
25     Q. You state that beta-blockers are known to

Page 205

1  impair glucose metabolism that worsens existing
2  diabetes.
3     A. There are studies that state that, correct.
4     Q. Are you able to articulate or do you know what
5  characteristics of those beta-blockers prompt that
6  finding?
7     A. You repeated it but I still don't understand.
8  When you say characteristics, what does that mean?
9     Q. What biopathological factors, why? Why
10  mechanistically?
11     A. I don't know what the mechanism is for it.
12     Q. That doesn't prevent you from holding the
13  opinion that they do impair glucose metabolism in a
14  fashion that worsens existing diabetes.
15     A. Not for those, but their having biologic
16  plausibility is a helpful determinant and a
17  particularly important one. We started off our
18  discussion some hours ago talking causation. So
19  biologic plausibility in some level of explanation is
20  an important piece of that.
21     Q. Do you have the biological plausibility on how
22  beta-blockers --
23     A. I don't, but if you also look, relative risk
24  is relatively low, it is 20 percent, 25 percent
25  increase in risk attached to beta-blockers and

52 (Pages 202 to 205)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 206

1  diabetes.
2      Q.  Nevertheless, you accept it as a legitimate
3  risk factor for the development of diabetes?
4      A.  It is one accepted by the American Diabetes
5  Association.  I put it in there.
6      Q.  Would you agree that a failure to control for
7  obesity in diabetes mellitus is akin to a failure to
8  control for smoking in lung cancer?  You said it,
9  didn't you?
10     A.  I said it.
11     Q.  You don't know sitting here for sure whether
12  or not the study you relied upon for the proposition
13  that schizophrenics and bipolar patients have a higher
14  incidence of diabetes is controlling for obesity
15  issues, correct?
16     A.  I didn't do a review of that literature.
17  There is both a relationship between schizophrenia and
18  weight and a relationship between schizophrenia and
19  diabetes.
20     Q.  With regard to the Bradford Hill criteria, you
21  don't know the biologic plausibility of schizophrenics
22  and bipolar patients having increased risk of diabetes,
23  you don't know mechanistically why it would be if
24  that's a phenomenon?
25     A.  I wasn't doing the analysis of that particular

Page 207

1  relationship, but if I was, I would get that.
2      Q.  It was certainly something you talked to the
3  court about.
4      A.  Yes, this is well established in both the
5  psychiatric literature and in the diabetes literature.
6  It is listed as a risk, an independent risk.
7      Q.  You agree that many things in medicine are
8  multifactorial?
9      A.  Some things are.  There's many, many things in
10  medicine.  As you know, I have spent some part of my
11  career in infectious diseases and on many of those, it
12  is unifactorial.
13     Q.  If we exclude infectious disease, this is not
14  what the case is about, would you agree that many
15  things in non-infectious disease medicine are
16  multifactorial?
17         MS. THORPE:  I am going to object to the
18     question.  It could be the administration of the
19     CDC as multifactorial.
20     Q.  (By Ms. Relkin) In terms of how one develops
21  disease, would you agree that the etiology of the
22  development of disease is frequently multifactorial if
23  you exclude infectious disease where we are dealing
24  clearly with an agent that causes an infection that
25  spreads to someone?

Page 208

1      A.  I think that for many disease, outcomes that
2  end up in a disease, there is often more than one
3  factor.  In some of them there is a predominant factor.
4  In other words, there is a mix of factors.
5      Q.  You state in your report that "Short-term
6  weight gain," which you define as two to three years,
7  "is not associated with an increased risk of Type II
8  diabetes."
9          Is that correct?
10     A.  That's correct.
11     Q.  It is your testimony that there is no valid
12  published writings that hold a contrary view to that
13  opinion?
14     A.  Not that I'm familiar with.
15     Q.  So if someone gained -- we talked about means
16  before.  What's the average mean weight gain of a
17  patient taking Seroquel, do you recall?
18     A.  As I said before, it's two to five kilograms.
19     Q.  Which is in terms of pounds, that can go up to
20  twelve pounds?
21     A.  Twelve pounds.
22     Q.  So some people had no change, some people had
23  lower, somebody could get a 20-pound weight gain; is
24  that right?
25     A.  That's correct.

Page 209

1      Q.  You are testifying here that someone can have
2  a 20-pound weight gain for up to three years and it
3  would not precipitate a case of diabetes?
4      A.  It is not associated with an increase in Type
5  II diabetes.
6      Q.  You rely mostly on the Mishra report?
7      A.  On the Mishra report, and in addition, there
8  are other papers that look at this both in terms of
9  many of the issues related to weight gain in terms of
10  its duration and its relationship to a baseline weight,
11  and the amount of the weight gain.  All are factors in
12  terms of the relationship with diabetes.
13     Q.  You would agree that even if someone is
14  doomed because they are in the bad genetic pool and
15  because they have had childhood obesity and they are
16  going to wind up getting diabetes at some point but
17  they don't get it statistically until a certain age,
18  that if you gave an agent that precipitated an earlier
19  case of diabetes, that would be a bad thing from a
20  public health perspective?
21         MS. THORPE:  Object to form, incomplete
22     hypothetical and vague and compound.
23     Q.  (By Ms. Relkin) Let me phrase it differently.
24  You would agree that it is best to prolong the onset of
25  diabetes, even if it is inevitable, as long as

53 (Pages 206 to 209)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 210

1  possible?
2       MS. THORPE:  Same objection, just vague.
3       Q.  (By Ms. Relkin)  You can answer it, Doctor.
4       A.  If I can rephrase it, if this is what you
5  mean, is it better to have a delayed onset of an
6  illness or a condition rather than earlier?  Usually
7  that's the case.
8       Q.  That's one of the reasons when you talk about
9  modifiable risk factors, you seek to modify them
10  particularly if you are a high-risk patient?
11       MS. THORPE:  Same objection.
12       THE WITNESS:  Again, it depends on the risk
13  factor and the condition you are dealing with.
14  All of these things are quite different.
15       Q.  (By Ms. Relkin)  You would agree that between
16  10 to 25 percent of Seroquel users gain more than seven
17  percent of their baseline weight due to the drug; is
18  that correct?
19       A.  You are reading that off of part of the
20  report?
21       Q.  It is paraphrasing from your report.
22       A.  Yes.
23       Q.  You still hold that opinion?
24       A.  Yes.
25       Q.  You hold the opinion that increased weight can

Page 211

1  be a risk factor for diabetes?
2       A.  Again, being more specific, the risk factors
3  for diabetes are a high BMI or an elevated BMI,
4  particularly in two time periods that have been looked
5  at and measures.  One is early adulthood, 18 to 20, and
6  the other is middle age.  But having a high BMI then
7  and then retaining it for a number of years places you
8  at high risk for diabetes.
9       Q.  How long do you have to retain it?  Is there a
10  scientific study?
11       A.  Most of the studies suggest something on the
12  order of seven to ten years at a minimum.
13       Q.  So it is your opinion that it can be -- are
14  you talking about obesity or just weight gain?
15       A.  Overweight or obesity, elevated BMI.
16       Q.  You can get by with having an elevated BMI for
17  six, seven years and avoid diabetes if you go on a
18  crash diet and lose the weight?
19       A.  I can't speak to studies that have that
20  particular scenario attached to them.  I don't think
21  they have been done.
22       Q.  What degree of precision are you able to
23  quantify the length of time one needs to have the
24  elevated BMI before they get diabetes?
25       A.  Epidemiologic studies done indicate that you

Page 212

1  have to carry the weight for a period of time before
2  your risk increases and that is an order of seven
3  to ten years.
4       Q.  Are you talking about Mishra?
5       A.  I am talking about Nerayan's studies, I will
6  give you all of them, the various Colditz studies,
7  Chan.
8       Q.  They all come out with the same numbers?
9       A.  That's why I said seven to ten years.  If you
10  look at these things, Venkat, Nerayan, and the nurses'
11  study papers.
12       Q.  I am going to move on to another issue at this
13  time.  You say that, "No conclusion regarding
14  association of causation can be drawn on the basis of a
15  non-statistically significant relative risk because the
16  scientific community has accepted statistical
17  significance as essential to ruling out chance as an
18  explanation for an association."
19       That's on Page 6, Paragraph 15.  Are those
20  your own words, Doctor?
21       A.  They are.
22       Q.  Have you always held that opinion?
23       A.  Yes.
24       Q.  Do you presume to speak for the entire
25  scientific community here?

Page 213

1       A.  No, I'm giving my opinions.  Nothing in here
2  speaks for the entire scientific community.
3       Q.  But you said, "The scientific community has
4  accepted statistical significance as essential to" --
5       A.  That I can speak for.  I would be hard-pressed
6  to find anyone in the scientific community who disputed
7  that statement, but I'm sure you can find someone who
8  does.
9       Q.  By statistical significance, you are referring
10  to a 95 percent confidence interval?
11       A.  I'm sorry, you are referring to what page?
12       Q.  Page 6, Paragraph 15.
13       A.  I got it.
14       Q.  When you referred to statistical significance,
15  you were referring to a 95 percent confidence interval?
16       A.  Yes, less than 0.05.
17       Q.  So if you had a large, well-done study showing
18  a relative risk of 5.0, that the confidence interval is
19  94 percent, would you simply disregard it?
20       A.  Give me those numbers again.
21       Q.  If you had a large, well-done study with good
22  investigators that showed a relative risk of 5 but had
23  a confidence interval of 94 percent, would you simply
24  disregard it because it didn't meet the threshold of 95
25  percent?

54 (Pages 210 to 213)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 214

1    A. I would not simply disregard it, but all the
2  more reason, the better and the more well-done and
3  well-designed the study is, the more value the
4  confidence interval has.  Nevertheless, in what you
5  have just described, and if those are the criteria, it
6  is one of those areas in which you would say, this
7  doesn't meet significance, but all the more reason to
8  do some more studies and see if we can learn some more
9  information.
10    Q. You might say it is awfully close, there may
11  be a real problem here?
12    A. That's not what I would say.  If it doesn't
13  meet significance, it doesn't meet significance.
14  That's what significance is all about.  But it would
15  lead me not to totally discard the hypothesis that was
16  generated and being tested and say, let's look some
17  more.
18    Q. Would you disagree with the statement that,
19  "Although 0.05 is often the significance level
20  selected, other levels can and have been used."
21    A. Usually lower.
22    Q. Have higher levels been used?
23    A. Not by competent scientists.
24    Q. Do you respect the work of Dr. Kenneth
25  Rothman?

Page 215

1    A. I know Dr. Ken Rothman.  It depends.  I have
2  to look at a particular study.
3    MS. THORPE:  I think his name is Ken.
4    THE WITNESS:  Yes, Ken.  I haven't seen papers
5  by him in many, many years.
6    Q. (By Ms. Relkin) He is a well-regarded leading
7  epidemiologist who has published textbooks that are
8  relied upon by others; isn't that true?
9    A. He taught me my first-year epidemiology
10  course.
11    Q. Has he talked about an over-reliance at times
12  on confidence levels?
13    A. Yes, but it is not downgrading the numbers, it
14  is substituting other measures of probability.
15    Q. Are you aware that the EPA, the Environmental
16  Protection Agency has used a 0.10 standard or 90
17  percent level in its study on the effects of secondhand
18  smoke?
19    A. The Environmental Protection Agency or EPA
20  uses totally different criteria by which it makes its
21  scientific judgments, frequently having to rely on
22  models and hypotheses.  I have had much contact with
23  them, given my responsibilities for environmental
24  matters at CDC.
25    Q. Were you aware that they used a 90 percent

Page 216

1  confidence level in its study on the effect of
2  secondhand smoke?
3    A. I was not aware of what confidence level they
4  used.
5    Q. Do you agree that the selection of the
6  confidence level is somewhat arbitrary?  There is
7  nothing magic about 95 percent, is there?
8    A. It's arbitrary, but has become the gold
9  standard for scientific work.
10    Q. You say on Page 10 of your report, that "In
11  the range of therapeutic doses of Seroquel, it does not
12  seem to be a consistent dose-dependent relationship."
13    I want to know how you define a therapeutic
14  range.
15    A. Therapeutic range is, in the variety of
16  studies presented, what the lowest dose that gets used
17  that were described in the particular article or the
18  highest doses that are used.
19    Q. Do you know what those doses are, sitting
20  here?
21    A. They vary.  They ends up being averages so
22  they are odd numbers, some of them.  They are not the
23  same as a particular pill has, but some of them vary
24  from under 200 to over 700 or 800.
25    Q. When you say it is not a consistent

Page 217

1  dose-dependent relationship, you would agree that there
2  certainly are some findings that show a dose-dependent
3  relationship, albeit not a hundred percent consistent?
4    A. I'm not looking at a hundred percent
5  consistent.  There are significant data sets of all the
6  things we have been talking about in other studies that
7  show absolutely no dose response effect, and I don't
8  remember directly any that do demonstrate it.
9    Q. Sitting here, would you agree that there are a
10  number of studies where you do see a dose response
11  relationship with increasing doses of Seroquel and
12  increasing weight gain?
13    A. I would have to see the studies.
14    Q. You don't recall offhand?
15    A. I don't --
16    Q. When you --
17    MS. THORPE:  Let him finish his answer.
18    THE WITNESS:  I'd be happy to look at them and
19  see what we are talking about, but I'd have to see
20  the particular study we are talking about rather
21  than a generalization.  There was no general
22  pattern of that.
23    Q. (By Ms. Relkin)  Did you do any kind of
24  systematic relationship of dose response relationship
25  where you charted it out?

55 (Pages 214 to 217)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 218

1    A. I looked for it specifically in the studies.
2    Q. But do you have any notes where you comment on
3  it?
4    A. Actually, if one wants to look at the FDA
5  submission in which there is a series of tables that
6  you can look and see what the relationship is and also
7  record studies.
8    Q. Do you think that constitutes the totality of
9  studies?
10    A. It is not the totality, there are just two
11  studies there. But looking at the other ones, there's
12  no strong relationship or one that seemed to be robust
13  enough compared to the ones here.
14    Q. So you made a point of writing down the
15  negative on dose response, that Brecher had no dose
16  response and also FDA submission. You didn't make a
17  point of writing down other studies which showed a
18  positive dose response.
19    A. If you could show me one. I don't have one in
20  hand. I can't think of a study that showed a valid
21  dose response relationship.
22    Q. You are able to testify with reasonable
23  medical certainty that there are no studies showing a
24  dose response relationship between Seroquel and weight
25  gain?

Page 219

1    A. Say that again.
2    Q. That show a dose response relationship between
3  Seroquel and weight gain.
4    A. I wouldn't say no, but I would have to see the
5  study to draw a conclusion on it.
6    Q. When I asked you whether you charted it out
7  and made a systematic analysis --
8    A. I did not chart it out.
9    Q. That's what I wanted to know. Thank you.
10    With regard to the epidemiology studies, the
11  Sachetti study, you claim it is worthless, right?
12    A. I was very fond of the country where the study
13  was done, but I am afraid the study is not particularly
14  interpretable for multiple reasons. Are we going to
15  talk about it more?
16    Q. We may.
17    A. I'd like to have a copy if we are going to.
18    Q. I don't know if I have an extra copy. Let's
19  go back to dose response.
20    Earlier we marked as Exhibit 9 a legal pad and
21  I quickly asked you if these were particular patient
22  records because in the beginning it looked like it had
23  a patient's name.
24    A. It's both.
25    Q. It looks like we have generic stuff in here

Page 220

1  too. I didn't realize that.
2    If we go to the second page, you are
3  describing the Wechsler poster in 2008 and you have
4  actually some notes on increased glucose and weight
5  with different doses; is that right?
6    A. I can't say it's right. I need to look at it.
7    (Witness reviewing document.)
8    A. Right, I've got what you are looking at.
9    Q. Do you see that as the dose increases, some of
10  those measurements increase as well?
11    A. Yes, there's only three points on it and
12  there's no test of significance, a difference of 3.6
13  and 4.5 may not be meaningful.
14    Q. Why don't you read for the record what your
15  notes reflect with regards to the doses.
16    A. One is a poster presentation, not a paper. 2,
17  the three doses, 50, 150 and 300. The increase in
18  weight is 0.6 with 50, 3.6 with 150 and 4.5 with 300.
19    Q. That does look like a dose response
20  relationship, does it not?
21    A. It looks like it could be, but it doesn't have
22  statistical significance, given the three points and
23  the numbers. Doing a dose response with three points
24  can be done, but it's difficult and a little hard to
25  interpret.

Page 221

1    Q. What about the increased glucose? That was
2  the weight gain, right?
3    A. The glucose shows no increase, the percent of
4  the population at 50, and basically the same with 150
5  and 300, 3.4 and 3.6. The placebo group had a 1.6
6  percent increase in glucose.
7    Q. But the actual number went up from 3.4 to 3.6
8  as the dose increased, true?
9    A. It's no difference from my perspective.
10    Q. When you discussed it earlier, you said it's a
11  poster presentation. In the scientific world, what
12  does that mean, does that mean it is less reliable?
13    A. It means you have less information with which
14  to interpret what you are looking at. The one page
15  which is a summary of what went on, I'm afraid it is
16  frustrating to you occasionally, it is necessary to
17  look through lots of other material to draw a
18  conclusion on the study. So again, it's interesting
19  and it would be nice to know more, but it's preferable
20  to have a full report or scientific paper on the
21  subject.
22    Q. Do you not have that full report or scientific
23  paper on the study?
24    A. I don't believe I do.
25    Q. Did you ask counsel to obtain one for you?

56 (Pages 218 to 221)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 222

1    A. I don't think there was one.
2    Q. The investigator who did the poster
3  presentation has the data somewhere, right?
4    A. I assume so.
5    Q. You don't know sitting here whether it was a
6  study that was funded by AstraZeneca and whether they
7  actually have access to that data, do you?
8    A. I would have to look at the poster. I didn't
9  write that down.
10    Q. Do you know the name of that study?
11    A. It is quetiapine for, I'm not sure, I don't
12  have the title of the study and I just identified it by
13  author and date.
14    Q. You agree that placebo-controlled blinded
15  studies is the gold standard?
16    A. They are the gold standard.
17    Q. Would you agree that the longer the study, the
18  more data makes it a better study?
19    A. Usually, it depends on what disease and
20  problem you are looking at. In some cases, the added
21  time doesn't add anything to the information.
22    Q. Do you know how long Study 125 was? Do you
23  recall how long 125 was?
24    MS. THORPE: You have it.
25    MS. RELKIN: If he doesn't recall offhand,

Page 223

1  that's okay.
2    THE WITNESS: It went out to 24 weeks.
3    Q. (By Ms. Relkin) That's a relatively
4  short-term study?
5    A. It is a relatively short-term study.
6    Q. What about Studies 126 and 127 would you
7  criticize in your report?
8    A. The other thing to keep in mind with these
9  studies in terms of their length is, particularly when
10  you are doing a placebo branch but even without it, is
11  that the length of time in the study does have an
12  effect on the treatment of these very sick people. So
13  I would like to see longer studies as you indicate in
14  many of these.
15    In some instances, I guess they felt that it
16  wasn't conducive for the therapeutic needs of
17  individual patients. I'm sorry I cut you off.
18    Q. That's all right. Studies 126 and 127, do you
19  know how long they were?
20    A. They went out to a longer period of time which
21  went as long as, close to two years.
22    Q. That's an attribute of the study?
23    A. I think it is.
24    Q. Did Study 125 control for family history?
25    A. I don't believe it did.

Page 224

1    Q. Did it control for sedentary lifestyle? I am
2  going to ask you four things.
3    A. If I am going to answer, I'm going to have to
4  find the criteria again for admission to the study.
5    Q. While you are looking, can you answer this:
6  Would you agree Study 125 did not have a placebo?
7    A. 125 did not have a placebo, and I state that
8  in the report as something that would have been
9  desirable.
10    (Witness reviewing document.)
11    A. Sorry, back to your question. You want to
12  know whether it is grounds for exclusion or not?
13    Q. Yes, first was family history.
14    A. That's what I thought was the case. Family
15  history was not a grounds for exclusion.
16    Q. What about sedentary lifestyle?
17    A. No, it was quite the opposite, they did not
18  want people in the study who were physically active and
19  that that has its own effect on glucose metabolism. So
20  they were choosing people who weren't necessarily
21  sedentary but at least who didn't exercise for 30
22  minutes a day or longer five days a week.
23    Q. You have, however, criticized other studies
24  that didn't control for sedentary lifestyle, haven't
25  you?

Page 225

1    A. I have criticized other studies for not
2  including weight in them. I'm not sure I criticized
3  studies, but it is desirable to have that information.
4  This is not sedentary lifestyle, sorry, but you have
5  mischaracterized what the inclusion is. It is not
6  sedentary lifestyle, it is quite the reverse. It is
7  people who can be considered in American terms as
8  exceptionally active.
9    Q. I heard your answer. My question was your
10  commentary with regard to other studies.
11    Did Study 125 control for gestational
12  diabetes?
13    A. No.
14    Q. You referred to there being an epidemic, you
15  have written about epidemic of childhood diabetes; is
16  that fair to state?
17    A. No.
18    Q. You haven't written about an epidemic of
19  childhood diabetes?
20    A. No, I have written about an epidemic of
21  childhood obesity.
22    Q. Have you looked at the data and seen an
23  increased incidence of childhood diabetes?
24    A. The data for that, there have been reports of
25  an increase in childhood diabetes, but the major data

57 (Pages 222 to 225)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 226

1 that run in parallel are data that are consistent with
2 Bradford Hill's criteria which is that the outbreak of
3 obesity in adults has been mirrored temporally in a
4 similar pattern of outbreak in Type II diabetes in
5 adults.
6     Q. Isn't it true that when kids used to get
7 diabetes, it was called Type I and now endocrinologists
8 and internists are observing children with Type II
9 diabetes which just wasn't something observed years
10 ago?
11    A. That's correct.
12    Q. Would that suggest to you that now there is a
13 development of Type II diabetes among kids?
14    A. It is usually adolescence where we are seeing
15 it but it is definitely earlier than previously was
16 seen. It is occurring at an earlier age. It is going
17 from middle-aged adults to adolescents.
18    Q. With regard to the latency or time it takes to
19 develop diabetes, you describe it as being an eight to
20 ten-year minimum process; is that right?
21    A. I think you would need to differentiate
22 between childhood diabetes Type II and adult diabetes
23 Type II. We don't really have all the information in
24 hand about the metabolic issues and the risks and the
25 patterns in children.

Page 227

1        It may be a totally different pattern. You
2 have different factors going on including growth
3 issues, different hormonal makeup. So the conclusions
4 that one would make about an adult population cannot be
5 applied to children or vice versa, as with many other
6 diseases.
7     Q. It can't be applied at all or it should be
8 applied with caution?
9     A. I wouldn't attempt to apply it. We don't have
10 enough information how each relates to the other.
11    Q. Therefore, your opinion that it takes eight to
12 ten years for diabetes to manifest is only with regard
13 to adults and not necessarily to kids?
14    A. And that's based on the data.
15    Q. What's the data based on kids that you believe
16 it would be a shorter period of time?
17    A. It may be the same period of time. We don't
18 have enough data one way or the other to indicate what
19 the period of time is as to when. Is it something --
20 in children it could be something that relates to
21 gestation and maternal activities. It could be related
22 to early childhood feeding practices.
23        Children, it is a different entity. There's
24 been a change and it is a clear one and a
25 well-documented change. But the reasons for it have

Page 228

1 not been well elucidated.
2     I am 25 minutes past where I was supposed to
3 leave and I'm good for about another five minutes. But
4 I really can't stay long.
5     Q. I have ten minutes and we are done because I
6 have to go too.
7        MS. THORPE: I have a couple of questions and
8 I'm going to ask them, bearing your schedule in
9 mind.
10       THE WITNESS: You can all walk me down to the
11 car if you want, but I'm leaving in five minutes.
12       MS. RELKIN: I just lost my train of thought.
13    Q. (By Ms. Relkin) If a medication is known to
14 be a risk factor for a certain disease and there is
15 epidemiology as to the causation of the disease which
16 doesn't take into account that medication, would you
17 agree that the epidemiology is imperfect?
18    A. I'm sorry, there are lots of things there.
19 Let's take them, can you...
20    Q. If it is known, let's just say suspected, if
21 it is suspected that a class of medications are known
22 to contribute to a certain unwanted event and then
23 investigators go to study other risk factors for this
24 unwanted event but don't ask or investigate as to the
25 drug usage which is a suspected other risk factor,

Page 229

1 would you agree that some of those studies are
2 imperfect because they are not considering this other
3 putative cause?
4        MS. THORPE: Object to form, compound,
5 ambiguous.
6        THE WITNESS: I really find it hard to follow.
7 Can you use like a specific example, some class of
8 this and what the disease is so that I am -- it is
9 a little hard for me to follow even coming up in
10 my own mind of an example of what you are thinking
11 of.
12    Q. (By Ms. Relkin) Let's take obesity. You have
13 published a lot about obesity, bad diet, kids not
14 getting exercise, it goes on and on in terms of
15 lifestyle reasons why we are seeing an increase in
16 diabetes.
17        And I know you haven't formed an opinion and
18 done specific research to determine about the typical
19 antipsychotics or about any of the atypicals other than
20 Seroquel, but let's assume hypothetically that you have
21 missed the fact that the typicals and the other
22 atypicals do indeed contribute to -- when I said
23 diabetes, let's make it obesity, contribute to obesity.
24 Studies that are assessing the contributory cause for
25 obesity that don't consider the incidence and frequency

58 (Pages 226 to 229)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 230

1  of the atypical drug use are missing a potentially
2  important contributory cause, wouldn't you agree?
3      MS. THORPE:  Object to form.
4      THE WITNESS:  What is the outcome that you are
5  measuring, a study that's looking at what?
6      Q.  (By Ms. Relkin) You are taking a population
7  and you want to say, here's a population and they have
8  X percentage of obesity.  Say you are comparing it to
9  20 years ago.  How do you define your time pop studies,
10  what are they called?
11     A.  It's okay, comparison over time, yes.
12     Q.  Say during that time same period there's been
13  a huge increase in drug utilization of these agents.
14  Don't you think it would be important to take that into
15  consideration?
16     MS. THORPE:  Object to form, incomplete
17  hypothetical, vague and ambiguous.
18     THE WITNESS:  Actually, a study like that has
19  been done.  In internal work at CDC in looking at
20  various hypotheses for an increase in obesity in
21  the country, a variety of things were looked at
22  from genetics to changes in drug prescribing
23  patterns to use of different things, and the
24  conclusion has been that the level of increase,
25  the population is increased in every format of

Page 231

1  life as such, that it is being driven by very
2  different things than any change in drug use.
3      In addition, in the particular example you
4  gave, there is such an overriding, the people who
5  are taking these medications have an illness which
6  has such a strong association with obesity that it
7  becomes difficult to separate those two.
8      So in studies in the US done of obesity, if it
9  were done for individuals, they might ask about
10  medication use because they are asking about lots
11  of other things as well.  But it is really not
12  felt to be a contributory factor in the epidemic
13  that we are seeing.
14     Q.  (By Ms. Relkin) Can you identify that study
15  that you just described, the CDC study?
16     A.  It was internal analyses.  I don't know
17  whether they published it or not.  It was done probably
18  five or six years ago looking for potential causes.
19     Q.  Did it look specifically for Seroquel and the
20  other psychotic agents?
21     A.  It looked at the range of medications being
22  used for all different types of diseases.
23     Q.  Do you still have a copy of that report?
24     A.  It wasn't a formal report.
25     Q.  Do you have access to that report?

Page 232

1      A.  I do not.
2      Q.  Sitting here, you can't confirm whether or not
3  it looked for the atypicals?
4      A.  No.
5      Q.  I'd like to read you, this will be my last
6  question, I'd like to read you a statement and see if
7  you agree with it.  "Demonstrated in the following
8  literature review, there is largely consistent evidence
9  that the second generation agents associated with more
10  weight gain, i.e., clozapine and olanzapine, are
11  associated with an increased risk of diabetes,
12  hyperglycaemia and dyslipidaemia."
13     Do you agree with that statement?
14     A.  I don't know what you are reading from, I
15  don't know what article.
16     MS. RELKIN:  We'll mark this as an exhibit.
17  This is from your box.
18     (Plaintiffs' Exhibit-16 was marked for
19  identification.)
20     Q.  (By Ms. Relkin) It is the Newcomer's review
21  which you applauded as being a thorough, good review,
22  and it is being marked as Koplan Exhibit 16 and it is
23  Page 17.  Do you agree with that statement?
24     A.  I agree with the general conclusions of his
25  article, so if you could hand me the paper, I will show

Page 233

1  you what I agree with.
2      Q.  I read you particular language.  Do you agree
3  or disagree with that language?
4      A.  I have no strong opinion on that language, but
5  there's much more pertinent information in that report.
6      Q.  You said you have to leave, and it is an
7  81-page report.
8      A.  It won't take long, I will find it for you.
9      Q.  We don't need for you to discuss this stuff on
10  a different issue.  I was asking you specifically about
11  that.
12     A.  We are here to discuss Seroquel and its
13  relationship to various outcomes.  This report
14  addresses Seroquel, not a general class of drugs.
15     Q.  Okay, so let's --
16     A.  One of the points -- you need to be familiar
17  with the article.  And the article makes a point not
18  that there is a lump sum of all these different agents,
19  but that they are quite different from each other.
20  Otherwise they wouldn't write an article on all these
21  different things.
22     Q.  And, Doctor --
23     MS. THORPE:  Let the witness finish his
24  response.
25     MS. RELKIN:  He finished.

59 (Pages 230 to 233)

Confidential - Jeffrey P. Koplan, M.D., M.P.H.

Page 234

1    MS. THORPE: No, you talked over him.
2    Do you have anything else to say?
3    THE WITNESS: That will do.
4    Q. (By Ms. Relkin) Doctor, I asked you earlier,
5  the quote I read you was referring to two other agents.
6  It didn't mention Seroquel and I wanted to know if you
7  agreed with the two other agents because you have
8  already testified earlier today you have no opinion
9  despite what you have read as to those two agents. So
10  I want to know therefore whether you disagree as to
11  those two agents and weight gain.
12    A. I hear his opinion. It sounds reasonable, but
13  based on my review of the literature with a particular
14  focus on Seroquel, it causes me to be concerned about
15  the quality of the literature in general.
16    So I would say I respect this fellow's work.
17  I think he does a good job and that more likely than
18  not I would agree with his conclusions on that without
19  having to look further.
20    Q. The conclusions, I said weight gain but he
21  also addressed its impact on diabetes.
22    A. Right, in that that's a review article of all
23  the different medications and one of them that's
24  reviewed is Seroquel. Why not take a look at what he
25  says on Seroquel.

Page 235

1    Q. Here is Seroquel. On Page 66, "Package insert
2  data for quetiapine report that almost one quarter of
3  patients, 23 percent, gained at least seven percent of
4  body weight after three to six weeks of quetiapine
5  treatment compared with six percent of those receiving
6  placebo, suggesting three to four times the placebo
7  rate. Findings from individual clinical trials are
8  consistent with these data."
9    Do you disagree with that?
10    A. That's referring to the package insert.
11    Q. Right, and then he said the findings are
12  consistent with the clinical trial data as well.
13    A. I agree with what he says there, but in this
14  report he treats each second generation antipsychotic
15  as their own entity.
16    MS. THORPE: Can you tell us where you are
17  reading, since you failed to give him the
18  reference?
19    MS. RELKIN: I did, Page 69. I did give him
20  the reference. I beg your pardon.
21    MS. THORPE: But you didn't give him the
22  document and he had to find it himself.
23    MS. RELKIN: Page 69.
24    MS. THORPE: You didn't provide him a copy.
25    MS. RELKIN: This was from his file. I didn't

Page 236

1  bring it.
2    MS. THORPE: You were given these documents
3  before. You were sent all these.
4    MS. RELKIN: A day ago we got CD ROMs of a
5  gazillion documents.
6    MS. THORPE: They were produced before that to
7  your team.
8    MS. RELKIN: My team got it, the Texas folks
9  got the CD two days ago.
10    MS. THORPE: They got it in a timely fashion,
11  given your request. Go ahead.
12    THE WITNESS: Let me interject. I just would
13  like to read in his concluding discussion, same
14  author on Page 70 says, "The limited amount of
15  data evaluating the metabolic effects of
16  quetiapine therapy and the contradictory nature of
17  some results preclude definitive assessment of the
18  metabolic risks associated with its use." And it
19  goes on to further support that.
20    So I think the author himself has analyzed
21  stuff and has come to a conclusion. That's his
22  summary statement in that first paragraph.
23    Q. (By Ms. Relkin) The date of that was what
24  year, that was back in 2005?
25    A. Yes.

Page 237

1    Q. There is additional data since then, right?
2    A. There may well be, and I guess you have got a
3  paper that you are quoting the guy whose work you were
4  questioning a little while ago. In any event, I am
5  comfortable with him as someone who is expert in the
6  field and I think that there may be more data, but I
7  haven't seen anything that contradicts what he's got
8  here.
9    And again, he is not saying good or bad. He
10  is just saying, one, it is a limited amount of data,
11  and I think we still have a limited amount of data, and
12  it is contradictory in nature.
13    Q. By the way, you reviewed the 2008
14  meta-analysis submitted to the FDA; is that right?
15    MS. THORPE: Object to form as to the title.
16    THE WITNESS: Are you referring to the June
17  2008 submission?
18    Q. (By Ms. Relkin) June 2008.
19    A. The June 2008 submission, yes.
20    Q. Was that a meta-analysis?
21    A. Not really, it wasn't a formal meta-analysis,
22  no. Meta-analysis has a particular methodologic
23  approach that's taken in it where it really combines
24  the data in a different kind of way. This is more a
25  compilation of data, is what I would call it. They are

60 (Pages 234 to 237)