Confidential - Wayne K. Geller, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
- - -

IN RE: SEROQUEL        :   CASE NO.
PRODUCTS LIABILITY     :
LITIGATION             :   6:06-md-01769-ACC-DAB
                       :
MDL Docket No. 1769:
- - -

May 7, 2008

- - -

C O N F I D E N T I A L

- - -

Videotape deposition of WAYNE K. GELLER, M.D. taken pursuant to notice, was held at the offices of Golkow Technologies, Inc., One Liberty Place, 51st Floor, 1650 Market Street, Philadelphia, Pennsylvania 19103, commencing at 9:00 a.m., on the above date, before Linda Rossi Rios, RPR, CCR and Notary Public.

- - -

Golkow Technologies, Inc.
One Liberty Place, 51st Floor
1650 Market Street
Philadelphia, Pennsylvania  19103
877.370.3377

1   short-term clinical trials, which again
2   captures the spirit of significant.
3   Secondly, it was providing long-term
4   clinical study data which they up to that
5   point in time did not have in their
6   possession.
7       Q.   You, yourself -- you,
8   yourself, knew that there was
9   discrepancies with what you told the FDA
10  as opposed to what you had written
11  internally.  You, yourself, knew that,
12  didn't you?
13      A.   No, sir, that's not correct.
14      Q.   You didn't.  Okay.
15              - - -
16          (Exhibit Geller-16, 10/31/00
17  E-mail, was marked for
18  identification.)
19              - - -
20  BY MR. ALLEN:
21      Q.   Let's look at Geller-16.
22  And let's go to the -- this is a series
23  of e-mails, some of which you wrote.
24  This is where I discovered, sir, that you

Confidential - Wayne K. Geller, M.D.

Page 421

1 were the man that allowed the inadvertent
2 data to go out to the Dutch authority.
3 You probably reviewed this e-mail chain
4 in Exhibit 16 in preparation for the
5 deposition, didn't you?
6      A.   I believe I did, sir.
7      Q.   You did?
8      A.   I believe I did.
9      Q.   Yes, sir. As a matter of
10 fact, I want to go to page 6 of this
11 document, Exhibit 16.
12           By the way, without --
13 without reviewing this document in
14 preparation for your deposition, you
15 recall these events fairly well, do you
16 not, sir?
17      A.   Yes.
18      Q.   In fact, you were so
19 concerned about the release of data that
20 was internal only to the Dutch
21 authorities that was inconsistent with
22 what you had told the FDA, that you were
23 staying at work late to work on how to
24 correct this problem, weren't you?

Confidential - Wayne K. Geller, M.D.

Page 422

1  A. When you say "work late,"
2  sir, I don't recall how long I was
3  working on that, so I can't agree or
4  disagree with you on working late.
5  Q. Do you normally work until
6  11:15 at night?
7  A. Not under most
8  circumstances, but we'll say that it does
9  occasionally happen.
10 Q. What you were going to say
11 is not under normal circumstances, the
12 word "normal"? Do you use the word
13 "normal" in your everyday life?
14     MR. RABER: Objection to
15     form.
16 BY MR. ALLEN:
17 Q. Do you use that word?
18 A. Sure.
19 Q. Do you use the word
20 "limited" in your everyday life?
21 A. I typically try to avoid
22 using the term "limited."
23 Q. How about the word
24 "neutral," do you ever use that in your

1  everyday life?
2      A.   I've used the word -- I used
3  at least on one occasion of my life each
4  of those terms.
5      Q.   Neutral means not positive,
6  not negative, no effect.  Right?  Isn't
7  that what neutral means?
8           MR. RABER:  Objection to the
9      form.
10          THE WITNESS:  It really
11     depends upon the context.
12 BY MR. ALLEN:
13     Q.   Okay.  How about "minimal,"
14 you use that word all the time, don't
15 you?
16     A.   I wouldn't characterize
17 myself as using that term all the time,
18 no.
19     Q.   Minimal means not very much,
20 not to any great extent, no big deal,
21 doesn't it?
22          MR. RABER:  Object to the
23     form.
24 BY MR. ALLEN:

1       Q.      Doesn't it?
2       A.      I mean, I can't disagree
3  that those are some of the meanings of
4  minimal, but I can't say that everyone
5  interprets minimal exactly the same way.
6       Q.      That's right, sir.
7               Do you have children?
8       A.      Yes.
9       Q.      Would you want them to come
10 home with a problem and if you asked and
11 inquired about that problem, would you
12 want them to minimize that problem to you
13 or would you want them to tell you the
14 whole truth?
15      A.      I always seek the truth from
16 my kids, as I do from others, sir.
17      Q.      Do you want them to minimize
18 the truth?
19      A.      Minimize the truth by doing
20 what, sir?
21      Q.      What does minimize the truth
22 mean?  It means not to tell the whole
23 truth, right?
24      A.      I guess that's one way of

Confidential - Wayne K. Geller, M.D.

Page 425

1  interpreting it.
2      Q. If you said you always seek
3  the truth from your children, would you
4  want them to limit your information of
5  the truth, to limit it, or would you want
6  them to give you whole truth?
7           MR. ALLEN: Objection to
8      form.
9           THE WITNESS: Sir, my
10     children and I have an open enough
11     relationship and dialogue that I
12     would -- I trust in most
13     circumstances that they tell me
14     truth.
15 BY MR. ALLEN:
16     Q. That means they should not
17 limit it, minimize it or neutralize it.
18 Is that true?
19          MR. RABER: Object to the
20     form.
21 BY MR. ALLEN:
22     Q. You don't want them to do
23 that, do you?
24     A. I guess I'm really having

Confidential - Wayne K. Geller, M.D.

Page 426

1  difficulty understanding the context of
2  your question, sir.
3       Q.   Well, I'm -- okay, sir.  If
4  you look at page 6 of this Exhibit 16,
5  this is an e-mail you prepared from Wayne
6  Geller, October 23, 2000 at 11:18 p.m.
7  Isn't that right, sir, 23:18?
8       A.   I'm sorry, what page are we
9  on again here?
10      Q.   Page 6.  I'll get it.  It's
11 on your screen.  It's also on the screen
12 about 18 inches from you.
13      A.   Yes.
14      Q.   Is it on -- do you see it on
15 the screen?
16           MR. RABER:  In fairness to
17      the witness, the whole page isn't
18      on the screen 18 inches from him.
19      It's a little snippet of it.
20           MR. ALLEN:  Okay.  Well, the
21      jury can see it.
22           MR. RABER:  You keep saying
23      that.
24           MR. ALLEN:  The jury can see

1          it.  And all I was asking, did he
2          write this e-mail October 23,
3          2000 --
4               MR. RABER:  You did more
5          than that.  You said it's just
6          18 inches away from you.
7    BY MR. ALLEN:
8          Q.   Yes, sir, is this screen --
9    can you read the screen, sir?  Can you
10   read the screen is my question?
11         A.   Yes.
12         Q.   Okay.  What time did you
13   write this e-mail?
14         A.   At 23:18.
15         Q.   And what time is that?
16         A.   That would be 11 -- roughly
17   11:18 p.m.
18         Q.   Yes, sir.  And you wrote it
19   to Martin Brecher and Russell Giddins.
20   Who is Russell Giddins?
21         A.   Russell was the global
22   regulatory affairs director.
23         Q.   He was Vikram Dev's boss.
24   Is that right?

Case 6:06-md-01769-ACC-DAB   Document 1324-93   Filed 02/28/09   Page 10 of 13 PageID 35508
Confidential - Wayne K. Geller, M.D.

Page 428

1      A.     That's not correct, sir.
2      Q.     Okay.  Never mind.  I'm not
3  going to go over the rest of it -- all of
4  it.  Subject:  Seroquel and diabetes.
5  The importance level that you put on this
6  e-mail was what, sir, high, high
7  importance?
8      A.     Yes.
9      Q.     Now, I'm just going to ask
10 you whether or not you can agree with me,
11 without having to go over this entire
12 e-mail string, whether or not the
13 information that your company had
14 internally had discrepancies from what it
15 told the FDA in August of 2000, whether
16 or not there were discrepancies, I'm just
17 going to ask you that?
18             MR. RABER:  Objection to
19        form.
20             THE WITNESS:  Discrepancies
21        between which documents?
22 BY MR. ALLEN:
23     Q.     Well, let's ask if there was
24 a discrepancy -- let's take, for example,

Confidential - Wayne K. Geller, M.D.

Page 429

1    was there discrepancies between the
2    Seroquel safety position paper on
3    diabetes and related disorders and what
4    your company told the FDA?
5              MR. RABER: Objection to
6         form.
7              THE WITNESS: What was sent
8         to the MEB, the Dutch regulatory
9         authority, was a template of a
10        position paper predicated upon a
11        draft of a discussion document for
12        the June SERM. Within that
13        document was contained language
14        which was not the final language
15        used in the discussion document at
16        the June SERM as it represented my
17        view of glucose dysregulation and
18        Seroquel therapy. And I fully
19        acknowledge having made the
20        mistake of using a document which
21        was a draft document, number one.
22        Number two, which was not an
23        official position paper and was
24        sent to the MEB, the Dutch

1           regulatory authority.
2                MR. ALLEN:  Objection.
3           Nonresponsive.
4      BY MR. ALLEN:
5           Q.   Was what your company had in
6      its Seroquel safety position paper,
7      discrepant -- did it have discrepancies
8      from what your company told the FDA?
9                MR. RABER:  Object to the
10          form.  No foundation.
11               MR. ALLEN:  Sure it is.  He
12          uses the word twice in this
13          e-mail.
14     BY MR. ALLEN:
15          Q.   Didn't you specifically
16     state in this e-mail --
17               MR. RABER:  There is no
18          foundation.
19     BY MR. ALLEN:
20          Q.   Let me ask it again after
21     your lawyer has interrupted.
22               MR. RABER:  I'm entitled to
23          object.  An objection -- a
24          well-founded objection is not an

Confidential - Wayne K. Geller, M.D.

Page 431

```
 1        interruption, sir.
 2   BY MR. ALLEN:
 3        Q.   Isn't it true that there was
 4   discrepancies with what you told the FDA,
 5   you at AZ, from what your internal safety
 6   position paper on diabetes mellitus was?
 7             MR. RABER:  Objection to
 8        form.  No foundation.
 9             THE WITNESS:  The document
10        that was sent to the Dutch, again,
11        was not factually correct.  And,
12        in fact, as I indicated just a
13        minute ago, was a mistake that I
14        acknowledge having made.  And
15        consequently, I would say that the
16        two documents differ in that
17        regard.  However, the FDA
18        document, by virtue of its
19        content, contains the correct
20        information regarding the data as
21        it relates to diabetes mellitus
22        and related disorders.
23   BY MR. ALLEN:
24        Q.   Including weight gain?
```

Golkow Technologies, Inc. - 1.877.370.DEPS

7f224a33-d0f6-4494-aeda-dd90b99f5a63