1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION

 3               Docket No.6:06-MD-1769

 4   . . . . . . . . . . . . . . .
     IN RE:                    :
 5                             :
     THE SEROQUEL PRODUCTS      :
 6   LIABILITY LITIGATION       :      Orlando, Florida
                               :      February 26, 2009
 7   . . . . . . . . . . . . . .:      10:00 a.m.

 8
                    TRANSCRIPT OF MOTION
 9         BEFORE THE HONORABLE DAVID A. BAKER
                UNITED STATES MAGISTRATE JUDGE
10

11   APPEARANCES:

12   For the Plaintiffs:

13                         Larry M. Roth

14                         Robert Cowan

15                         Ed Blizzard

16                         Camp Bailey

17                         Ken Bailey

18   For the Defendant

19   AstraZeneca:          Chris Coutroulis

20                         Steve McConnell

21                         Mike Brock

22

23   Court Reporter:  Sandra K. Tremel

24   Proceedings recorded by mechanical stenography, transcript

25   produced by computer-aided transcription
```

```
 1              P R O C E E D I N G S

 2           THE DEPUTY CLERK:  Case number 6:06-MD-1769-ORL

 3   22DAB, In Re The Seroquel Products Liability Litigation.

 4      Counsel, please state your appearances for the

 5   record.

 6           MR. COWAN:  Good morning, Your Honor.  Robert

 7   Cowan for the plaintiffs.

 8           MR. CAMP BAILEY:  Camp Bailey for the

 9   plaintiffs.

10           MR. KEN BAILEY:  Ken Bailey, plaintiffs.

11           MR. BLIZZARD:  Ed Blizzard for plaintiffs.

12           MS. GIBSON:  Holly Gibson for plaintiffs.

13           MR. ROTH:  May it please the Court, Larry Roth,

14   liaison counsel for the plaintiffs.

15           MR. MCCONNELL:  Good morning, Your Honor.  Steve

16   McConnell on behalf of defendant AstraZeneca.

17           MR. COUTROULIS:  Good morning, Your Honor.

18   Chris Coutroulis for AstraZeneca.

19           MS. BALAKHANI:  Good morning, your honor.  Liz

20   Balakhani for AstraZeneca.

21           MR. BROCK:  Mike Brock for AstraZeneca.

22           MR. JULIN:  And, Your Honor, I'm Tom Julin,

23   Hunton Williams for the intervenor Bloomberg.

24           THE COURT:  All right.

25      We're starting with defendant and whatever
```

1    presentation it wants to make.

2            MR. MCCONNELL:  Good morning, Your Honor.  Steve

3    McConnell.

4        Your Honor, as we indicated in the papers that we

5    filed in opposition to Bloomberg's motion, the defendant

6    and the plaintiffs have been negotiating the issue of

7    confidentiality over these documents for many months, and

8    that negotiation continued to about 2:00 a.m. last night,

9    and we reached a significant agreement which disposes

10   of -- for all these documents of the issue of

11   confidentiality, and the result is putting aside the Ihor

12   Rak deposition, of the 111 other documents that were at

13   issue in terms of confidentiality, we have agreed to

14   dedesignate 102 of those documents, and that there are

15   nine that remain confidential for now.

16       As for the Ihor Rak deposition, there are a number of

17   exhibits that were attached to that, and we've agreed to

18   dedesignate several of those documents.

19       What I'm going to do, Your Honor, is first just

20   describe the categories of documents where we've reached

21   agreements, basically focusing on those documents where at

22   this point we've agreed that certain categories can remain

23   confidential.

24       Mr. Cowan is then going to stand up, with Your

25   Honor's leave, and actually go through the numbers

1    specifically so that you have an absolutely clear list of

2    where we are.  And then what I would propose after that is

3    if I may then address the nature of the hearing which is

4    obviously in some flux.

5          The presence of the intervenor raises questions about

6    how to proceed beyond this, given the agreement between

7    the plaintiffs and the defendant.

8          But let me talk about the categories of documents

9    where we agree that confidentiality is still appropriate

10   at this time.

11         There were a number of documents on the list

12   involving communications between AstraZeneca and the FDA.

13   And there are two FDA regulatory documents that we've

14   agreed can remain confidential because they pertain to an

15   SNDA, a Supplemental New Drug Application, that is still

16   pending regarding MDD, and there's still a lot more to be

17   done in that process.  Those two documents are a Complete

18   Response Letter dated December 22nd, 2008, from the FDA to

19   AstraZeneca, and a metabolic submission of data, of raw

20   aggregated data by AstraZeneca to the FDA dated June 26,

21   2008.

22         Second category of documents that we've agreed can

23   remain confidential are CSRs, Clinical Study Reports, for

24   two studies that are not far along at all in the

25   publication process, and our concern is that dissemination

1   of those materials would jeopardize the prospects of

2   publication.  Those two CSRs relate to trials 144 and 165.

3   But the remaining CSRs we've agreed can be dedesignated at

4   this time.

5        The third category of documents that we've agreed at

6   this time can remain confidential is IMS data which I

7   think has been discussed in this Court before, Your Honor,

8   and there's been declarations submitted.  IMS data is data

9   that's purchased by AstraZeneca from IMS Health.  There's

10  a confidentiality agreement in place between the company

11  and IMS Health, and to enforce that agreement, we can't

12  agree to disseminate that information.

13       The fourth category of documents, Your Honor, relates

14  to the McFadden documents, or at least a subset of

15  McFadden documents that were attached by the plaintiffs to

16  some of their oppositions to our motions.  For those

17  specific documents, we have agreed, as opposed to keeping

18  them entirely designated as confidential, to redact.  And

19  we're in the process of doing that.

20       The next category of documents, Your Honor, what I

21  have as my fifth category, involves call notes.  Again,

22  that's something that's been subject of some hearings

23  before and we've submitted an affidavit.  The call notes

24  are the notes that are entered into AstraZeneca databases

25  by sales representatives upon calling on physicians and

1   other customers.  And the agreement that we struck with

2   the plaintiffs is that call notes after January -- from

3   January 1, 2004, to the present will remain confidential,

4   but call notes antedating January 1, 2004, will be

5   dedesignated with the exception of a customer list, and

6   we're going to work that out with the plaintiffs.

7        Your Honor, another category of documents that's

8   remaining confidential are certain documents containing

9   correspondence between AstraZeneca and foreign regulators.

10  Some of the documents involving regulation by the Dutch

11  regulatory authority are going to be dedesignated, but

12  there are two -- there's one document, a CBGMEB response,

13  MEB being the Dutch health authority, that's remaining

14  confidential at this point.  And also there was a

15  deposition of Vickram Dev that discussed some of these

16  issues, and that at this point is remaining confidential.

17  And then there is correspondence from the French

18  regularity authorities to AstraZeneca that we've agreed

19  can remain confidential.

20       And then I mentioned, Your Honor, the deposition of

21  Ihor Rak, which has a number of documents attached to it.

22  There are a couple of documents relating to a drug that

23  did not move far along in the regulatory process, and

24  there's another older document that pertains to a

25  different issue that at this point we've agreed can remain

1   confidential.

2        Mr. Cowan is going to stand up and go through the

3   specifics, but that represents a lot of work and a lot of

4   negotiation and a lot of compromise between AstraZeneca

5   and the plaintiffs.

6        We also attempted to meet and confer with Bloomberg

7   about this issue, too, as my colleague, Mr. Coutroulis,

8   did so, and my understanding was Bloomberg would meet and

9   confer only if the substance of the meet and confer itself

10  would have to be a matter of public record which is

11  difficult to do when you're talking about confidentiality

12  issues.  So unfortunately for that reason, we don't

13  have --

14            THE COURT:  Difficulties in talking to the press

15  when they're not a litigant.

16            MR. MCCONNELL:  It was hard to make a complete

17  deal, Your Honor.

18        So Mr. Cowan is going to talk about the specific

19  documents, and then what I'd like to do is discuss with

20  you how we proceed and if there's a way to streamline this

21  proceeding and get to the issues that are still alive.

22            THE COURT:  Well, when you say you've agreed as

23  between you and plaintiffs, does that mean there's nothing

24  between the two of you to -- left to litigate --

25            MR. MCCONNELL:  That's correct.

1          THE COURT:  -- on this issue?

2          MR. MCCONNELL:  That's correct.

3          THE COURT:  And as to the categories of

4    documents that you just recited that are -- that

5    plaintiffs have agreed may remain confidential, how many

6    of those have been filed with the Court one way or

7    another?

8          MR. MCCONNELL:  Nine?  Not including the Rak

9    documents, Your Honor, but nine documents, and then the

10   Rak documents are something like 48.

11         THE COURT:  Is it your thought and that of the

12   plaintiffs that these documents will -- should remain

13   permanently sealed?

14         MR. MCCONNELL:  I don't think the plaintiffs are

15   quite conceding that.  In fact, Your Honor, what we've

16   learned in undertaking this analysis and looking at the

17   balancing test is that when you look at the interest that

18   exists on both sides, our trade secret, our proprietary

19   interest, R&D, marketing, as well as the interest on the

20   other side, including the press, that they're dynamic and

21   they evolve over time and sometimes over time some of the

22   things change.

23       So, for example -- and I'll try to pick the most

24   concrete example I can -- the two FDA documents that we're

25   saying remain confidential are remaining confidential

1  because the FDA hasn't taken final action on the

2  Supplemental New Drug Application for that particular

3  indication.  They will eventually, and when they do, the

4  confidentiality may no longer obtain, so I don't think the

5  plaintiffs are asserting that they remain confidential

6  forever.  I don't think we can make that claim.  We have

7  to keep look -- we have -- the balancing doesn't stop.  We

8  have to keep doing it.

9       That's also true with the CSRs.  The two CSRs that

10  we're saying remain confidential, we want to remain

11  confidential because they're not in the publication

12  process yet.  They're going to be published.  When they

13  get published, then the confidentiality issue doesn't

14  obtain anymore.

15       So for most of these documents, what we're talking

16  about is a temporary period of confidentiality.  In fact,

17  that's been the case for some of the others, the documents

18  where we gave up confidentiality.  The things that made

19  them confidential properly so months ago don't apply now.

20            THE COURT:  Let me hear from Mr. Cowan.

21            MR. COWAN:  Good morning, Your Honor.  Robert

22  Cowan for the plaintiffs.

23       I -- first of all, I'll say I agree with most of what

24  Mr. McConnell said, if not all.  We did reach an agreement

25  very, very late last night with regard to the bulk of the

1    documents at issue.  Plaintiffs were interested in

2    reaching that agreement because that is what Your Honor

3    asked us to do back on November 5th when we first

4    discussed the filing of our responses to the

5    plaintiffs' -- or to the defendants' motions for summary

6    judgment and *Daubert* motions.  And we worked very hard on

7    reaching that agreement.

8        At this point, I want to read into the record the

9    documents that the plaintiffs and defendants have agreed

10   to release the designation of confidentiality.  In other

11   words, it is plaintiffs' intention to file these documents

12   on the PACER system of public record pending the outcome

13   of this hearing.

14       I will say also as a preliminary matter that the

15   documents that we have agreed to maintain confidentiality

16   on, just to clarify, Mr. McConnell is correct, we're not

17   conceding the confidentiality for all time.  And also as

18   defense counsel understood last night in our meet and

19   confers, any confidentiality agreement that we've reached

20   at this point is without prejudice to us reraising that

21   issue at an appropriate time before the Court.

22       With Your Honor's permission, I'd like to inform the

23   Court of the documents to which the parties have agreed.

24              THE COURT:  Go ahead.

25              MR. COWAN:  I'm referring to what is listed on

1    PACER system as document 1222-2, which is plaintiffs' --

2    I'm sorry, rather defendant's Exhibit A to their motion to

3    maintain the confidentiality of documents.  And I'm

4    referring specifically to the column at the far left of

5    the page which lists numbers of -- basically lines of

6    documents, and I'll read which documents the parties have

7    agreed to release confidentiality and to file of public

8    record.

9         Documents 2 through 11 of Exhibit A.  Documents 13

10   through 30 of the same exhibit.  Documents 33 through 46

11   of the same exhibit, with the exception that on

12   document -- what really is a category of documents, and

13   Mr. McConnell already referred to these, with regard to

14   line 45 which refers to the Rak deposition transcript

15   including numerous company documents as deposition

16   exhibits and testimony regarding the same, the parties

17   have agreed to release confidentiality on Exhibits 7, 9,

18   10, 11, 12, 14, 15, 16, 21, 22, 31, 32, 33, 34, 41 and 42,

19   including deposition testimony relating to those documents

20   contained in the transcript.

21        And then reading further down Exhibit A, the -- under

22   the heading that says "Trade Secret and Confidential

23   Documents Retain Confidentiality Status Through Trial,"

24   AstraZeneca and the plaintiffs have agreed that documents

25   2, 5 -- let me say, documents 2 and 5 through 13, they

1   have agreed to release confidentiality of those documents;

2   however, with the further agreement that on documents 7

3   through 13 under that "Trade Secret and Confidential

4   Documents" heading, the call notes after December 31st,

5   2003, would remain confidential.

6       And then with the Court's indulgence, there's a few

7   more documents.

8       Parties have agreed to release confidentiality of

9   *Haller* summary judgment motion Exhibits 9 through 10,

10  Unger summary judgment motion Exhibits 12 through 14,

11  Whittington summary judgment motion Exhibits 5 through 7,

12  and *Guinn* summary judgment motion Exhibits 10, 12 and 13.

13      The parties have also agreed to release

14  confidentiality of plaintiffs' response in the -- well,

15  let me say it this way.  Exhibit A to plaintiffs' response

16  in opposition to AstraZeneca's motion in limine to exclude

17  evidence and argument about alleged ghostwriting, Exhibit

18  B to the same document, and Exhibits C through G of the

19  same document.

20      They have also agreed to release confidentiality of

21  Exhibit C to plaintiffs' response in opposition to

22  AstraZeneca's motion in limine to exclude evidence and

23  argument about clinical investigators' misconduct.

24      Subject to an agreement regarding redaction of

25  certain information in the following documents, the

13

```
 1   parties have agreed to release confidentiality of
 2   Exhibits 1 -- Exhibit 1 to the deposition transcript --
 3   no, I'm sorry.  Let me clarify it.  Exhibits 1, 6, 7, and
 4   8 through 13 of plaintiffs' response in opposition to
 5   AstraZeneca's motion in limine regarding the exclusion of
 6   evidence and argument about Dr. McFadden's personal
 7   relationships.
 8        And finally, the parties have agreed to release
 9   confidentiality of Exhibit B to plaintiffs' emergency
10   motion for sanctions for discovery abuse.
11        Let me just say one other comment, Your Honor.  The
12   parties and Mr. McConnell will address this issue also.
13   The parties have recognized that really by virtue of the
14   circumstances of filing of the responses to the motions
15   for summary judgment and the Daubert motions, that this
16   was a unique but discrete collection of documents that
17   were put before the Court for review for purposes of
18   determining confidentiality protection and whether these
19   documents were to be filed under seal or whether they were
20   to be filed under public record.
21        The parties have agreed to continue the good-faith
22   meet-and-confer discussions that we've had over the course
23   of the last several weeks, if not months, and to reach
24   further agreement as to similar documents that are
25   designated -- attempt to reach further agreement as to
```

1  similar documents that are also designated as confidential

2  currently.  And we have accepted AstraZeneca's good-faith

3  meet-and-confer participation in that process, and we

4  would ask that the Court set a hearing May -- we would ask

5  the Court to -- Court set a hearing around May the 6th for

6  the parties to report back on their progress to the Court

7  on that process.

8       And part of reason why we ask for that particular

9  relief, and Mr. McConnell again will address this, is I

10  believe Judge Conway has indicated her desire to tie up

11  loose ends prior to remanding the non-Florida cases back

12  to their home jurisdictions, and we believe this is one of

13  the loose ends that ought to be tied up so that we don't

14  have a number of different courts in different

15  jurisdictions determining, perhaps on a discrepant basis,

16  the confidentiality of the documents going forward.

17       Thank you, Your Honor.

18       MR. MCCONNELL:  Your Honor, the format that

19  Mr. Cowan used to go through those documents, I have to

20  say, is actually new to us.  And I did hear one or two

21  things that I wasn't sure were right.  So what I'm going

22  to ask is before we conclude today that we be able to take

23  a few minutes and go over this with the plaintiffs to make

24  sure we're right.

25       For example, Mr. Cowan said that the document to be

 1    released -- I think he said it was Exhibit B to the

 2    emergency motion on sanctions -- I thought Exhibit B was

 3    the CRL which is not being released, I thought it was the

 4    other document, the CDE.  It may just be an easy thing to

 5    take care of, but I want to make sure that we're right

 6    about that.  So we want a complete accurate record.

 7         And, Your Honor, I do agree that this process, as I

 8    mentioned before, the whole balancing process is ongoing.

 9    Fifty million pages of documents have been produced in

10    discovery in this case, and as Judge Weinstein said and as

11    the Eleventh Circuit said, one virtue of an umbrella

12    protective order is it actually makes discovery easier,

13    that the process can go forth and at least the notion of

14    confidentiality is addressed for the time being.

15         And it's taken a lot of time to go through those

16    documents and mark them as confidential.  And we do think

17    that those documents are properly confidential in terms of

18    trade secrets proprietary, but we also recognize that's

19    the beginning of the analysis, it's not the end.

20         And the *Chicago Tribune* case is the case that sets

21    out the balancing test looking at the company's interests

22    in trade secrets proprietary, but also other interests.

23    As Judge Weinstein in the *Zyprexa* case said, it's not

24    limited to trade secrets, there are other confidentiality

25    interests that can be at play, too, including those that

1   are recognized in other regulatory regimes like the FDA or

2   FOIA, Exemption 4 which talks about trade secrets, but

3   also Exemption 5 which talks about the deliberative

4   process.

5        Those are all dynamic, and we're going to keep

6   looking at these documents and we're going to keep working

7   with the plaintiffs, and I think it's a good idea to get

8   back together.

9        But now I want to talk about today's hearing and what

10  the contours of that are, and let me make a few

11  suggestions.  And I guess -- I had talked with the

12  Bloomberg lawyer before the hearing where I made a

13  suggestion, and all he said was, "We'll see how it goes."

14  So I guess we're now going to see how it goes.

15       It does seems to me that the scope of dedesignation

16  that we've been talking about is substantial and that

17  what's left is a very small subset.  And my first

18  suggestion would be that Bloomberg should look at what's

19  being dedesignated and reappraise the issue of their need

20  to come in and intervene.  That's point one.

21       Point two, if there is to be a continued hearing on

22  this, I guess the issue, Your Honor, is to what extent the

23  debate involving Bloomberg is a legal debate or to what

24  extent does it involve an evidentiary hearing.  What Your

25  Honor said in your order was that to the extent there were

 1    factual disputes, that the parties should be prepared to

 2    present evidence.  We were prepared to do that because we

 3    thought that there could be factual disputes with the

 4    plaintiffs.  There aren't now.  I don't know to what

 5    extent there are factual disputes with Bloomberg.  I

 6    understand the legal debate and the application of the

 7    balancing test.

 8         Your Honor, I would put on the stand a couple of

 9    witnesses including two company witnesses, Al Paulson and

10    Dr. Art Lazarus, who have submitted declarations to this

11    Court before.  They weren't under seal.  I've given those

12    declarations to counsel for Bloomberg.  And my question

13    that I asked of him was, "Do you have any factual issue

14    with these?  If you do, I guess I have to put those

15    witnesses on, and I guess we'll see how that goes.  If you

16    don't, then what we'll be doing is engaging in legal

17    argument," and Your Honor will make whatever decision you

18    have to make with respect to those categories of documents

19    that are still in play.

20         But to my mind, that makes a huge difference in terms

21    of the scope, contours, and frankly the duration of this

22    hearing.  I'm prepared to proceed either way in terms of

23    argument or in terms of presentation of evidence.

24              THE COURT:  Where do we stand with respect to

25    what we talked about back in November or December about

1    redacted versions of the legal memoranda?

2         MR. MCCONNELL:  We had discussed that with the

3    plaintiffs, and we prepared a redacted version and

4    provided that to the plaintiffs.  And I think Mr. Cowan is

5    going to address that.

6         MR. COWAN:  Your Honor, the short answer is the

7    redacted memoranda on both sides have not been filed of

8    record, at least those that have been filed under seal.

9         Obviously in the last eight hours, the universe has

10   changed with respect to what AstraZeneca has determined to

11   be confidential, and therefore, any redactions that were

12   made prior to this morning will have to be updated.

13        And it is our intention, although I will say that in

14   the course of reviewing the specific documents that were

15   part of Exhibit A to AstraZeneca's motion to maintain

16   confidentiality, as well the other documents that I've

17   just listed off, the parties were so focused on the

18   specific documents that I -- we were somewhat remiss in

19   dealing with the mechanics of getting redactions done.

20   But I think Mr. McConnell would agree with respect to the

21   responses themselves and any other pleadings, memoranda

22   that are filed under seal, that the parties, in the course

23   of other meet and confers that we have, for example, with

24   respect to the McFadden documents, will work that out very

25   promptly and get those filed of public record.  And if

1   Your Honor would like to set a deadline for us to do that,

2   then we will endeavor to certainly meet that deadline.

3               MR. MCCONNELL:  Your Honor, also, I think

4   Mr. Cowan can tell me if he thinks I'm right or wrong, I

5   think a lot of what the redaction should pertain not just

6   to our documents but to the plaintiffs' medical records.

7   I mean, I'm not sure if they have much of an issue with

8   that.  That may be very easily disposed of.

9               MR. COWAN:  I'm sorry.

10              MR. MCCONNELL:  I was going to take your silence

11  as acquiescence.

12              MR. COWAN:  I'm sorry.  I missed that comment.

13              MR. MCCONNELL:  That the redaction process, the

14  briefs had to be redacted not just in terms of our

15  documents but also in terms of the plaintiffs' medical

16  records.  I don't know where you guys are on that.  It may

17  not be a big deal at all.

18              MR. COWAN:  I believe we made a representation

19  to Judge Conway in the last hearing we had with her that

20  plaintiffs did not have an issue with filing those

21  memoranda and the exhibits thereto of public record.

22              THE COURT:  All right.

23              MR. COWAN:  Your Honor, I'm sorry, if I may, I

24  want to address one brief point with respect to the

25  further meet and confers.  Just based on the kind of legal

1    argument that Mr. McConnell gave on confidentiality, you

2    know, one basic stumbling block the parties have had, and

3    I understand why AstraZeneca relies so heavily on the

4    balancing test in the Eleventh Circuit, because in some

5    respects it's favorable to them as I think plaintiffs

6    realized in reaching the agreements they did reach over

7    the course of the last several weeks and up to early this

8    morning.

9         However, the one issue that AstraZeneca glosses over

10   is, you know, the fact that you don't get to the balancing

11   test unless the documents are deserving of confidential

12   status in the first place.  And once you determine that

13   the documents are entitled to confidentiality, then you

14   determine whose interests are greater in either protecting

15   or disclosing the documents.

16        And so that is why plaintiffs have proposed, and

17   we've discussed with AstraZeneca, and as I said, we're

18   moving forward on further meet-and-confer discussions with

19   the remainder of certain documents that have been

20   designated confidential, we want to cross that stumbling

21   block first and then deal with as to -- cross the

22   stumbling block as to whether or not the documents are

23   entitled to confidentiality first, and then deal with the

24   issue of the balancing test, which I think without going

25   through a legal-elements analysis of what happened over

21

1   the course of last 24 hours, for example, that's

2   essentially what happened.

3        And so I just wanted to make that clear, and that's

4   particularly why we're asking the Court to set a deadline

5   for the parties to report back to the Court in the form of

6   a hearing on the progress of those discussions.

7             THE COURT:  Hear from the intervenor.

8             MR. JULIN:  Your Honor, Tom Julin,

9   Hunton & Williams, for Bloomberg.

10       Well, this is all deeply troubling, I would begin by

11  saying.  We had -- we've had many different descriptions

12  of the number of documents that have been designated as

13  confidential.  We had now a midnight agreement struck by

14  the plaintiffs and the defendants that results in the

15  dedesignation of what they're saying is I guess the bulk

16  of the 111 documents.  There's nine documents that remain.

17  I've gotten a lot of different counts on the document

18  numbers here.

19       And obviously in striking a deal, it suggests that

20  there was some horse trading between the plaintiffs and

21  the defendants as to what should remain confidential and

22  what will be made public.  And that's why I say it's

23  deeply troubling that we have clearly had in this case

24  extensive overdesignation of documents as confidential,

25  which I think that all the parties are now, in coming to

1  the Court, are agreeing that there is not a basis to

2  maintain the confidentiality of those.

3      The nine documents we've had the category described

4  is difficult, of course, for a press intervenor to address

5  the specifics of the documents, as we articulated in our

6  memorandum.  We haven't seen the documents, of course.  We

7  don't know anything about them other than what has been

8  described by the parties in the Court.

9      But I guess, Your Honor, what I'm saying here is I'm

10  troubled by the procedure that has been followed because

11  what -- the documents that we're dealing with now are

12  documents that have been filed with the Court, have been

13  relied upon by the parties, primarily by the plaintiffs,

14  of course, in responding to the summary judgment and

15  *Daubert* motions of the defendant, and that will be a part

16  of the substantive consideration of the matters by this

17  Court.

18      The local rules are quite clear as to the procedures

19  that are to be applied in the filing of the documents.

20  This procedure was not followed by the parties.  The

21  protective order that was entered by the Court by Your

22  Honor required the parties to follow those procedures in

23  terms of explaining to the Court why each document must be

24  filed, in the first instance, why each document must be

25  sealed, the basis for the filing and the sealing of the

1   documents.  All that is required by the local rules, and

2   instead what we had was agreements by the parties

3   initially to submit all these matters under seal, and then

4   only when Bloomberg took the trouble of intervening do we

5   then have the parties moving off of their positions.

6        And this is deeply troubling because it really -- it

7   calls into question the whole integrity of the

8   proceedings, not Your Honor, of course, but in terms of

9   the public that's out there watching this.  As we saw in

10  the Zyprexa litigation, the public is deeply interested in

11  what's going on here and how the cases are handled and

12  adjudicated.  And when these deals are struck by the

13  parties to keep matters confidential, it's always

14  unsettling, I would say, certainly to the press, but more

15  so to the public that is watching and observing and trying

16  to evaluate what this case is all about and how it's being

17  dealt with.

18       How do we proceed from here, I think is a good

19  question, and Mr. McConnell certainly has been accurate in

20  describing his efforts to deal with me and with Bloomberg,

21  had approached us and tried to reach a deal with us and we

22  always said, "No, we don't want to have confidential

23  information.  We would like this matter to be resolved by

24  the Court."

25       And I think that that really is what I'm saying, the

24

 1   appropriate mechanism for dealing with this is not by

 2   agreement between the parties and certainly not by

 3   agreements with the press, but that the Court should

 4   follow the procedures that are set out by the local rules.

 5   And quite clearly I would say at that, the Middle District

 6   rules are among the clearest in the country in terms of

 7   describing how the parties are to deal with filing and

 8   sealing of documents that are going to be used certainly

 9   in support of dispositive motions as well as *Daubert*

10   motions and sanctions motions that we have had submitted.

11        So I guess as priority number one, though, I'd like

12   to say I would like to make sure that Bloomberg has the

13   documents that are being agreed to by the parties as

14   appropriately designated.  I'd like to make sure that

15   Bloomberg and anyone else can have those as soon as

16   possible and that we have a directive from the Court that

17   those documents be released today, if possible, so that we

18   don't leave this hearing and have nothing released and

19   then have further debate and discussion among the parties

20   as to what it was that they agreed to here and what's

21   being released and how it's being released and when it's

22   being released.

23        I've heard the plaintiffs suggest that there should

24   be some deadline.  I would suggest the deadline should be

25   today since there is no dispute about most of the

1    documents that are at issue.

2         And then as to the remaining documents, I think that

3    those that seek to maintain confidentiality, those

4    documents should be put to the test and should -- the

5    Court should evaluate those particular documents.  Whether

6    that's by an evidentiary showing or by legal argument, I

7    leave that to Your Honor to decide what is appropriate

8    here.

9         We certainly don't agree with the factual assertions

10   of the defendant here that all of these materials that are

11   the subject of the various categories described are

12   appropriately kept confidential and the public interest

13   does not outweigh whatever interest there is in

14   maintaining confidentiality.

15        Just as an example, the call notes, the call notes

16   were the subject of our intervention in the Alaska Zyprexa

17   proceedings as well as the New York proceedings.  The call

18   notes were ordered disclosed and they were disclosed in

19   Alaska.  They're still -- although Judge Weinstein has

20   ordered disclosure of extensive documents in the New York

21   proceedings, there's still ongoing debate and discussion

22   among the parties and the Court about exactly how they're

23   going to resolve all those disclosure orders.  So -- but,

24   call notes I think this is something that requires a

25   particularized look at exactly what those are, why they're

1    saying that these things would be injurious to their

2    business.

3         Obviously call notes are an important source of

4    information about how these drugs are being marketed, and

5    that's the central -- I think a central aspect of this

6    litigation and support to evaluate those to the extent

7    they're being used and relied upon by the parties to

8    adjudicate the issues in this case.

9              THE COURT:  Is it your desire to cross-examine

10   witnesses on the subject of the basis for AstraZeneca's

11   claims to confidentiality?

12             MR. JULIN:  Your Honor, I -- yes.  The answer is

13   yes.

14             THE COURT:  You'd have witnesses that you want

15   to present on that subject?

16             MR. JULIN:  I do not have my own witnesses, no.

17             THE COURT:  All right.

18        Mr. McConnell, do you want to respond?

19             MR. MCCONNELL:  Yeah, if I may, Your Honor.

20        I've certainly heard more helpful presentations.

21   There are a couple of things that Mr. Julin said,

22   obviously unburdened by knowledge of what's actually

23   transpired in this case, that I find deeply troubling.

24        For example, he said that there was a violation of

25   the local rules.  What happened in this case, as Your

1    Honor well knows since you're the one worked through it,

2    was that an umbrella protective order was entered by Your

3    Honor and then it was -- in hearings before Your Honor

4    when we discussed how these filings would be made, you

5    described the procedures to be followed and we did so.

6    You're perfectly entitled to deviate or come up with more

7    specific rules than the local rule.  We followed exactly

8    the procedure that this Court wanted us to follow and that

9    has worked.  So that's point number one.

10         Point number two, for Mr. Julin to say the only

11   reason the parties were able to meet and confer and arrive

12   at agreements is because of Bloomberg's intervention is

13   manifestly false.  And Mr. Cowan can confirm that well

14   before Bloomberg ever entered the picture, we were having

15   substantial discussions making progress and narrowing down

16   issues.

17         Your Honor, Mr. Julin says he's deeply troubled

18   because deals are being made.  What he calls deals are

19   agreements between parties represented by lawyers who make

20   assessments of the issue based upon the governing law.

21   Both sides have looked at the law, looked at the relevant

22   balancing test and made assessments as how that balancing

23   test is likely to play out in this Court on those

24   particular documents.  It's not horse trading.

25              THE COURT:  But keep in mind that, at least I

```
 1    hope, both sides are undertaking that process with an eye
 2    toward their clients' best interests as they perceive it.
 3              MR. MCCONNELL:  Absolutely.  And we may read the
 4    balancing test a little bit differently but we --
 5              THE COURT:  It's not just a question of reading
 6    it, it's a question of what position you want to take.
 7              MR. MCCONNELL:  Well, it's partly an issue of
 8    the interests of the client, but it's also an effort by
 9    lawyers to predict how this will play out in court.  You
10    know, obviously if it's --
11              THE COURT:  Well, you don't want to make a silly
12    argument --
13              MR. MCCONNELL:  That's exactly right.
14              THE COURT:  -- that's going to make you look
15    bad.
16              MR. MCCONNELL:  Your Honor, with respect to the
17    issue of cross-examination of witnesses, I asked a fairly
18    specific question before and I have haven't gotten
19    anything like a specific answer, and that's this.  We have
20    a witness, Al Paulson, who provided an affidavit on call
21    notes and on IMS data, and it was a very specific
22    affidavit.  And I guess my question is, is there a factual
23    dispute with anything that witness said.  If there is,
24    we'll put the witness on and he'll be cross-examined.  If
25    there's no factual dispute with what that witness says,
```

1    then I'm not sure how Mr. Julin wants to proceed.

2        Similarly, Dr. Art Lazarus submitted a specific

3    affidavit.  I'm just trying to find out if there's a

4    factual dispute.  I understand the legal dispute.

5            THE COURT:  Well, I don't know if there's any

6    historical factual disputes, but given the sorts of

7    characterizations in those affidavits, it's readily

8    understandable to me that those characterizations could be

9    subject to cross-examination without necessarily

10   challenging historical facts by providing additional

11   context or exploring what the characterization or the

12   conclusion as opposed to, you know, that tests were

13   conducted on a certain -- during a certain time period and

14   these results were obtained.  Those are historical facts.

15       The significance of those tests and those results in

16   the scheme of developing and marketing, or whatever the

17   issue is, and how confidential it is and how well it's

18   known in the industry and those kinds of

19   characterizations, could be subject to cross-examination.

20       So I don't think there's a sharp line between factual

21   dispute versus the value of cross-examination.

22           MR. MCCONNELL:  I would disagree with that.  I

23   just need to get a sense from Mr. Julin as to whether he

24   wanted to engage in cross-examination along the lines

25   of --

1          THE COURT:  Well, I don't know either, but I was

2    just asking him the question whether he wanted that at all

3    in terms of trying to go forward.

4          MR. MCCONNELL:  Two other points, Your Honor.

5          The question was raised by the Bloomberg lawyer about

6    access to the documents.  My understanding as to how this

7    would play out is upon dedesignation, that the parties

8    that filed the documents under seal would refile them in

9    the PACER system electronically, they wouldn't be under

10   seal, and then they would be publicly available.  I think

11   that's just the way it would play out.  And Bloomberg can

12   get access to that just like any other member of the

13   public.

14       I do you want to take a moment and talk about the

15   *Zyprexa* decision.  I think a lot of what's going to be

16   decided by this Court on the documents that are still in

17   play can be decided on a legal basis.  I think there's

18   pretty clear case law, in fact, in one example, case law

19   on point that I think resolves pretty clearly some of the

20   major categories of documents here and chose why they have

21   to remain confidential.

22       But let me talk for a moment about *Zyprexa* since

23   that's a case that the Bloomberg about lawyer talked

24   about.  And of course, *Zyprexa* isn't just one decision.

25   Even from Judge Weinstein it was actually two decisions.

1  There was *Zyprexa I* and *Zyprexa II*.  And *Zyprexa I* was a

2  decision where Judge Weinstein sealed the documents and he

3  made a number of findings that were significant.  He did

4  find that 26(c) doesn't just apply to trade secrets but it

5  applies to broad categories of confidentiality.  He

6  addressed the issue of jury taint.  And he basically

7  addressed the issue of the stage of the litigation.

8      And Judge Weinstein did that in both *Zyprexa I* and

9  *Zyprexa II*.  You have to read them together.  Same Judge,

10  same case.  In *Zyprexa I* he says the documents should be

11  sealed.  In *Zyprexa II* he unseals them.  Why the

12  difference?  The clearest answer to that is the passage of

13  time over 18 months in between them.  And in *Zyprexa I*,

14  the cases hadn't really started, there were no trials yet.

15  *Zyprexa II*, cases had already settled.  And

16  Judge Weinstein, in his analysis, keeps referring to the

17  stage of the litigation.

18      I'd suggest that that's one of the factors that goes

19  into the balancing test here, what stage of the litigation

20  are we in.  We're not at a stage where cases have been

21  resolved.  In fact, all that we've had have been a couple

22  of summary judgment dismissals of cases by the plaintiffs.

23      My suggestion is that the balance of interests,

24  including that of jury taint, is one that warrants more of

25  a concern of confidentiality now than at a later stage.

1    Also in the Alaska case, the documents were unsealed after

2    the case was over.  We're talking about an entirely

3    different procedural posture between what we have here and

4    *Zyprexa II* or Alaska.  What we have here is something very

5    similar to *Zyprexa I*.

6         But, Your Honor, with respect to the regulatory

7    issue, I want to address for a moment specifically the

8    Complete Response Letter which is the December letter that

9    the FDA sent to AstraZeneca.  Your Honor, that pertains to

10   an SNDA for major depressive disorder and it's underway.

11        And there's a case that we cited in our brief that

12   I'd ask Your Honor to take some time and focus on that is

13   pretty much on point.  It's called *Citizens Commission on*

14   *Human Rights v. FDA* from the Central District of

15   California, 1993.  And that involved an effort by -- it

16   wasn't the press but an effort by an organization to get

17   access to documents relating to an SNDA and NDA for

18   Prozac.

19        And the Court made a number of findings.  It did it

20   in a -- in paragraph form instead of page form, so it's

21   actually pretty easy to follow along.  But Judge Wardlaw

22   made a number of findings in that case that are right on

23   point here.

24        And what she said is, is that what you have in an NDA

25   and an SNDA, you have trade secrets.  What's going on when

1    a company submits an application to get approval for a

2    drug or approval for a drug to extend to a new indication

3    is replete with trade secrets and commercial information,

4    especially information that, if it were disclosed to

5    competitors, would be incredibly useful.

6         There's no doubt about it that Seroquel's in a

7    competitive market.  There are competitors like Zyprexa,

8    Risperdal and others.  There are other companies that are

9    out there competing vigorously.  It's a competitive

10   market.  And the information that pertains to an SNDA,

11   especially for a new use, a new unapproved indication is

12   highly confidential and highly proprietary, and Judge

13   Wardlaw specifically says that.

14        She also goes on to say, this is in paragraph 66,

15   that what's in an NDA consists of commercial information

16   considered confidential and covered by Exemption 4 FOIA.

17   Exemption 4 is trade secrets.  Exemption 5 is the

18   deliberative process which she also found applied to

19   material relating to an SNDA.  And the Court found that

20   release of the NDA would cause substantial competitive

21   harm in two ways.

22        In paragraph 59, she explicitly says that if a

23   competitor got hands on information relating to an SNDA,

24   it would help them reverse engineer.  So if I make a

25   competing product and I see that AstraZeneca is making an

34

1    application to get its competing product to work for an

2    indicated use that they don't have approved yet and that

3    the competitor doesn't, now the competitor can start

4    aiming for that indicated use and can try to formulate an

5    application, be sort of a free ride to get the same

6    indicated use and avoid a lot of costs that go into that.

7         And in fact, Judge Wardlaw specifically says that

8    that's a benefit conferred upon competitors.  They'd

9    basically get to reduce their cost by seeing what

10   AstraZeneca did, seeing what it did right, seeing what it

11   did wrong and trying to get the same indicated use.

12        But here's the quote that applies dead on because

13   Judge Wardlaw was talking about an SNDA, which is at issue

14   for both the Complete Response Letter and the metabolic

15   submission.  She said, "Information from unapproved

16   supplements," that's an SNDA, "is considered particularly

17   sensitive reflected in FDA's regulations which provide

18   that no unapproved information is available for public

19   disclosure."

20        So when she says -- when you're talking about an SNDA

21   for a new unapproved use, that has a high interest in the

22   party trying to keep confidentiality because of commercial

23   considerations, competitive considerations.  That's one

24   part of the balancing test.

25        Here's what Judge Wardlaw said in paragraph 63,

1    though, looking at the other side, the side that

2    Bloomberg's asserting.  She said:  "It is only if the

3    supplements are approved that the public has an interest

4    in the information because only after approval will the

5    drug be marketed to the public or be marketed in a

6    different manner," which is what we're talking about here.

7    "It is therefore after approval that FDA releases

8    information regarding these applications."

9         And then she went on to talk about FDA's internal

10   deliberative process.  There's a lot of back and forth

11   that goes on.  The company makes the application.  The FDA

12   raises questions.  There's back and forth and positions

13   change.  And that deliberative process has to go unchilled

14   and it doesn't get disclosed until there's a final

15   decision.

16        I mean, Your Honor, you're, I take it, going to write

17   the decision on this issue.  If somebody were to ask you

18   for your first draft and your second draft and your third

19   draft, that's a completely inappropriate request.  The

20   thing that counts is the final action by the FDA.  What

21   basically Bloomberg wants is they want to see the interim

22   drafts that the FDA and back and forth between the

23   parties.

24        FDA regulations -- and we've got an expert who will

25   talk about that if we need to -- but Section

1   21 CFR 314.430 is on point and says this information

2   remains confidential, the FOIA exemptions apply.  And now

3   this case from the Central District of California which

4   deals with the precise same issue says do the balancing,

5   apply the regulations, and the result was that 315,000

6   pages of information relating to an SNDA were kept

7   confidential.  It doesn't get deconfidentialized until the

8   FDA takes final action, which hasn't happened yet with

9   respect to the SNDA regarding MDD.

10       There's one other point.  The back and forth between

11   the FDA and AstraZeneca on the MDD includes draft

12   labeling.  To issue draft labeling now would seem to be

13   the most destructive confusing thing possible.  That's

14   certainly the FDA's position.

15       So it does seem to me on things like the

16   communications between AstraZeneca and the FDA, the two

17   documents that are still in play, the CRL and the

18   metabolic submission, that we've got not just the

19   regulations and not just policy, but we've got case law

20   that's right on point, and all the cross-examination in

21   the world isn't going to change that.

22       Your Honor, what I propose is, to the extent we need

23   to talk about the call notes and the IMS data, I can put

24   Mr. Al Paulson on the stand, from the company.  He'll get

25   on the stand and he'll talk about what call notes are

1   consistent with his affidavit, that what they reflect are

2   things that salespeople say to doctors, what doctors say

3   to salespeople in terms of what communications are working

4   or what's not, that they reflect strategies, that it's

5   competitive data that's never shared with other

6   competitors.  And that's my offer of proof, Your Honor.

7   And I don't know if Mr. Julin wants to challenge that, but

8   I'm happy to put him on.

9       He'll also talk about IMS data which is subject to a

10  confidentiality agreement.  I do know that the attorney

11  for Bloomberg has also represented IMS in cases where IMS

12  wanted the ability to extract this data and use it,

13  basically suggesting that AstraZeneca has to breach a

14  confidentiality agreement with IMS, take the data that IMS

15  gathers and IMS sells, and that that information has to be

16  put out there in the public is not very good for IMS's

17  business and really hurts an innocent third party.

18      But I'm prepared to address the issue of call notes

19  and the IMS data and put on Mr. Al Paulson if that's

20  appropriate at this time.

21      But there's one other legal hurdle that I don't want

22  to forget about, and this applies to Bloomberg, since it's

23  only Bloomberg at this point that's raising the challenge

24  for these remaining documents.  That's the issue of press

25  access.  Your Honor may remember that when the issue of

1    confidentiality arose months ago, what we argued was that

2    there was no public right of access to discovery

3    documents, and we had very good Eleventh Circuit law on

4    that point.

5        And if anything, it seems to me that Bloomberg's

6    briefing vindicates that.  When Bloomberg cites the

7    *Chicago Tribune* case and the *Martin Luther King* case, it's

8    clear that what they're saying is there's a press right of

9    access to documents that are judicial.  It's not discovery

10   documents, but it's documents that actually are used in

11   court.  Certainly in a trial, that's clear.  Trial would

12   be open.  But also as attached to dispositive motions like

13   the summary judgment motion.

14       But there's also case law that says that that would

15   not apply for documents that are attached to motions that

16   are not summary judgment motions.  In fact, we have a case

17   from the Ninth Circuit that we cited in our brief, the

18   *Phyllis v. General Motors* case, where the Court explicitly

19   said that attaching documents to a sanctions motion does

20   not make them judicial documents where there's a

21   right-of-press access.

22       That's actually what happened here with the Complete

23   Response Letter.  The only document to which that was

24   attached was the plaintiffs' emergency motion for

25   sanctions which ended up being dismissed by this Court in

1    any event.

2        So it seems to me that a shortcut on the Complete

3    Response Letter is that Bloomberg just doesn't have any

4    ability to argue for access to that document.

5        That's also true in a way for almost all these

6    documents, Your Honor, because as was said in the

7    *Martin Luther King* case, there's an issue of

8    voluntariness.  It's one thing if AstraZeneca, in filing a

9    dispositive motion, attaches these documents to this

10   motion.  But that's not what happened here.  What happened

11   here was that AstraZeneca filed summary judgment motions

12   in those specific cases that were granted in *Guinn* and

13   *Haller*.  And the plaintiffs filed oppositions and attached

14   a lot of documents.  And in fact Judge Conway issued an

15   order saying, among other things, that she was buried in

16   documents that had nothing to do with the issue.

17       If those are documents that weren't attached

18   voluntarily by AstraZeneca, which is a factor according to

19   the Eleventh Circuit, and those are documents that really

20   weren't pertinent to the legal issue, then I think that

21   those also are documents to which there is no press right

22   of access.

23       Moreover, Your Honor, there are some documents at

24   issue here where Your Honor has actually issued rulings on

25   motions in limine.  For example, there was an issue about

1    communications between AstraZeneca and foreign regulators,

2    foreign regulators applying foreign standard.  Your Honor

3    issued a ruling saying that such documents were

4    irrelevant.  In the *In Re Alexander Grant* case, the

5    Eleventh Circuit, in talking --

6              THE COURT:  I'm not sure I'm the last word on

7    that.

8              MR. MCCONNELL:  What's that?

9              THE COURT:  I'm not sure I'm the last word on

10   that.

11             MR. MCCONNELL:  Quite right, Your Honor.  I'm

12   sure the plaintiffs share that with me, too.  But in the

13   *Alexander Grant* case -- your word is still the word right

14   now -- and what that case said was that a Court looks

15   behind the issue of confidentiality and resolves that

16   issue only for documents that are relevant to the legal

17   issues.

18       If you put that *Alexander Grant* standard next to your

19   motion in limine ruling, at this point we're talking about

20   documents, these foreign documents, for example, that at

21   this point have been deemed not relevant at this point,

22   which is the only point we can deal with, and the Eleventh

23   Circuit says for those documents, there's no right to

24   dedesignate.

25       That's where we are in those documents.  That's not a

 1   legal issue.  Again, it doesn't matter what sort of

 2   cross-examination we have or any sort of factual dispute.

 3   That legal issue is still in play.

 4        With that, Your Honor, I propose to put on

 5   Mr. Paulson unless you'd like me to address the -- some of

 6   the other documents such as the Clinical Study Reports

 7   that I'll cover with another witness, Dr. Lazarus.

 8             THE COURT:  Well, let me ask you this:  Do

 9   you -- it sounded like you were willing to rely on the

10   affidavits as your prima facie case.

11             MR. MCCONNELL:  Yes.

12             THE COURT:  Do you just want to do that, put the

13   witnesses up and expose them to cross-examination?

14             MR. MCCONNELL:  Well, if I'm going put them up,

15   I might as well let them tell their story in a nice

16   coherent fashion.  I'd rather do that, I suppose.

17             THE COURT:  Before we do that, let me make some

18   comments that I hope are consistent with what I've said

19   before in this case in light of the intervention.

20        It was my hope last fall that we would have publicly

21   filed versions of these important motions that provided

22   the public, including the press, with substantial

23   information about the substance of those motions, that

24   would have some redactions but would be sufficiently

25   detailed and informative to perhaps moot out issues of

1   access to some things that the parties agreed was

2   confidential or disagreed was confidential but were

3   willing to go forward on.

4       It's been my stated position and still is, that

5   public interest, and that includes the press, press has a

6   slightly elevated interest, I think, beyond the public

7   interest because of the First Amendment.  The public also

8   has an interest under the First Amendment, but the press

9   as a little extra recognition.  The press, at least at

10  times, has resources to hire counsel to represent its

11  position and the public generally does not have that.

12  That's a fact of life.  So I don't see the press as having

13  any greater really magical standing beyond that, but they

14  certainly have the ability at times to come in with

15  articulate counsel to make the point.

16      So that's what I had hoped and we would have had that

17  all in place really quite some time ago.  That, for

18  various reasons, hasn't quite happened that way, but that

19  will be resolved.  That part of it will be resolved

20  shortly.

21      The more general issue that we have as to how local

22  rules apply, how my orders apply and my directions to the

23  parties, I've said that it's my policy and the policy of

24  this Court, which is to a good degree reflected in the

25  local rule, that -- as everybody recognizes, there's a

1    presumption that anything that's filed is to be publicly

2    filed, and that the placing things under seal either

3    temporarily or longer or even permanently requires a

4    showing, and a substantial showing, that there's a basis

5    for doing that and consistent with the guidance from the

6    directions from the Eleventh Circuit as to sorts of things

7    that we look at in making that determination.

8         And that does apply to the file documents, not to

9    pure discovery documents.  And it's certainly appropriate

10   for the parties, the parties to the litigation, which is

11   the reason why things are being filed, to discuss those

12   things and try to agree what can be publicly filed and if

13   they -- again, the parties in their own interests deciding

14   whether to fight about something.

15        There's certainly been cases in courts and other

16   forums where the parties both agree that they want to keep

17   everything as secret as they can.  That's why private

18   arbitrations have flourished, in substantial part.  But

19   we're not in that.

20        But it still, just as with every other issue in

21   litigation, it's appropriate for the parties to get

22   together and try to narrow the issues into things in

23   dispute that are appropriate for court decision.

24        But as I've made clear, and this was true before the

25   intervenor appeared, the Court has a duty to make sure

1    that things are not inappropriately kept secret.  And the

2    public policy arguments about, in general, apply to any

3    litigation, but in particular application to

4    pharmaceutical litigation are significant.

5        The Court's not blind to the controversy that's

6    enveloped the FDA where, throughout its existence but in

7    recent times about their authority, how that affects

8    private litigation, the preemption issues, how

9    authoritative their rulings are, issues about how all

10   kinds of information goes to the FDA, how they deliberate,

11   political processes, legislative processes, and all of

12   those things are matters of great public concern.  Again,

13   I sort of assume that's why Bloomberg is interested enough

14   to hire counsel to come in here and make arguments,

15   because those are issues that have existed quite apart

16   from the specific issues in this case.

17       So there are lots of things in play there, but it's

18   not the province of this Court to dictate to the FDA or to

19   the Congress the impact of its decision-making process or

20   any of that, but all of those things I think go into the

21   balancing process as we look at how to apply the general

22   legal principles.

23       All of that said, I want the parties, including the

24   intervenor, to have an appropriate record that I can rule

25   on and that any decision I make can be reviewed by Judge

1    Conway or the Eleventh Circuit so that we're not just

2    speaking in platitudes.

3        So I'm going to let AstraZeneca put its witnesses on,

4    on whatever they want to put them on, and to the extent

5    that you just want to rely on your affidavits and you're

6    satisfied with that, you can do that.

7        I don't know whether plaintiffs are going to want to

8    ask any questions given the stipulations that have been

9    reached insofar as the plaintiffs are concerned, but I

10   will allow Mr. Julin to cross-examine the witnesses on --

11   limited to this subject as to the propriety of sealing.

12   And I'm going to be sensitive to that as well.

13           MR. COWAN:  Your Honor, Robert Cowan.  I state

14   one brief clarification for the record.

15       I just want to make sure it's clear on the record

16   that plaintiffs' silence as to AstraZeneca's legal

17   arguments with respect to confidentiality as to the FDA

18   documents that Mr. McConnell referred to as well as the

19   other documents that the parties reached an agreement on

20   as well as confidentiality of documents that the parties

21   are -- have agreed to review going forward, the

22   plaintiffs' silence doesn't mean that they agree to

23   certainly AstraZeneca's position on the confidentiality

24   overall or their argument on the law or their assessment

25   of the documents themselves.  I just want to make that

1    point clear.

2          THE COURT:  Well, I've understood and as this

3    subject has come up previously that for whatever reasons

4    good and sufficient to yourself and your co-counsel on the

5    plaintiffs' side, that you've agreed to acquiesce on

6    various things at various times, not just on this issue

7    but others as well.  But this is an issue where even

8    beyond your, let's just call it acquiescence, it may not

9    be agreement, but to some it's agreement, some it's just

10   acquiesce for present purposes, as I have made clear,

11   the -- I think the Court has a duty to inquire.  We've

12   been lancing at this for some months now.  I think it's

13   time now to pull it together and get it resolved.

14      All right.

15          MR. MCCONNELL:  Your Honor, I'm just going to

16   ask if we could take a five-minute recess for two reasons.

17   One, to clarify some of the issues of the documents, but

18   also I'm going to try to see if I can streamline this

19   issue of which witness is put on and how much to ask them.

20          THE COURT:  Sure.  We'll take a short recess.

21                    (Recess)

22          THE COURT:  Mr. McConnell.

23          MR. MCCONNELL:  Yes.  May it please the Court,

24   Your Honor, we'll call Al Paulson to the stand.

25          **(WITNESS AL PAULSON SWORN)**

1                         **DIRECT EXAMINATION**

2     BY MR. MCCONNELL:

3     Q     Good morning, Mr. Paulson.

4     A     Good morning.

5     Q     Could you state and spell your full name for the

6     record, please.

7     A     Yes.  My name is Alfred Nicholos Paulson, Jr.

8     A-L-F-R-E-D, N-I-C-H-O-L-O-S, P-A-U-L-S-O-N.

9     Q     Where are you currently employed?

10    A     AstraZeneca Pharmaceuticals.

11    Q     Is that in Wilmington, Delaware?

12    A     That's correct.

13    Q     What's your current position at AstraZeneca?

14    A     I'm a commercial brand leader.

15    Q     Mr. Paulson, do you understand that you're here to

16    testify in connection with the confidentiality of

17    AstraZeneca call notes and IMS data?

18    A     I do.

19    Q     Are you personally familiar with call notes?

20    A     I am.

21    Q     Briefly, what are call notes?

22    A     Call notes are a representative's capturing of the

23    dialogue that they would have between themselves and a

24    physician or other healthcare professionals in a medical

25    practice or institution.

1    Q    Do you have personal knowledge as to how call notes

2    at AstraZeneca are created, maintained and disseminated at

3    all?

4    A    I do.

5    Q    Can you testify as to any harm that AstraZeneca would

6    likely sustain as a result of public disclosure of call

7    notes?

8    A    I can.

9    Q    Are you also familiar with IMS data and how

10   AstraZeneca obtains it?

11   A    Yes.

12   Q    What is IMS data in brief?

13   A    IMS data in brief is data that is prescription-level

14   data and it can be captured many different levels, it can

15   be captured at a physician level, a zip code level,

16   national level.  There are different forms of this data,

17   again, script level, it could be longitudinal, it could

18   capture managed markets information.  So they have a -- a

19   whole host of offerings that they sell, but essentially

20   it's prescription-level data.

21   Q    When you say "longitudinal," do you mean over time?

22   A    Over time, correct.

23   Q    Are you aware of any confidentiality obligations that

24   AstraZeneca owes to IMS regarding IMS data?

25   A    I am.

1   Q    Can you also testify as to any harm that AstraZeneca

2   would likely sustain or that others would likely sustain

3   from public disclosure of this IMS data?

4   A    I can.

5   Q    Just briefly I want to turn to your employment

6   history.  How long have you been working at AstraZeneca?

7   A    This is my 23rd year.

8   Q    In general, what types of positions have you held

9   during your 23 years at AstraZeneca or with predecessor

10  companies?

11  A    Yes.  The majority of my time has been in positions

12  of sales leadership, but I've also held positions in

13  leading up our market research or analytics areas and also

14  in marketing.

15  Q    Mr. Paulson, this case is about Seroquel, so I want

16  to ask specifically about that.  How long have you been

17  working on Seroquel?

18  A    On and off for the last 11 years.

19  Q    In your various positions over the years at

20  AstraZeneca, have you gained knowledge regarding how sales

21  representatives call upon physicians and the methods that

22  they use to record information concerning those calls?

23  A    Yes.

24  Q    Did you ever, in your career, actually have occasion

25  to create and use call notes?

```
 1   A     I have.

 2   Q     Mr. Paulson, you have previously submitted a

 3   declaration in this case; have you not?

 4   A     That's correct.

 5   Q     Do you have an extra copy of that?  Do you have a

 6   copy of that declaration with you?

 7   A     Not with me, no.

 8             MR. MCCONNELL:  Your Honor, with your

 9   permission, I'd like to provide a copy of the declaration

10   both to Mr. Paulson and to Your Honor, unless you already

11   happen to have it in front of you.

12             THE COURT:  I've got the electronic version.

13   BY MR. MCCONNELL:

14   Q     Mr. Paulson, is that your signature at the last page

15   of that declaration?

16   A     It is.

17   Q     And you've read this declaration recently?

18   A     Yes.

19   Q     Is that declaration a true and accurate statement

20   regarding your view of call notes and IMS data and the

21   need to main their confidentiality?

22   A     Yes, it is.

23   Q     Let me ask you some general questions about call

24   notes.  Who prepares them?

25   A     Sales specialists do.
```

1    Q     And what you call sales specialists, at other

2    companies sometimes call sales representatives?

3    A     That's correct.

4    Q     Do those call notes contain the thoughts and mental

5    impressions of the sales representative?

6    A     They do.

7    Q     Why are call notes created?

8    A     Primary reason for call notes are for the sales

9    representative to understand and capture the conversation

10   they had with the physician.  Our representatives call on

11   doctors over time, and what they want to capture in these

12   notes are what conversation did they have with the

13   physician, basically promotional materials that they share

14   with that physician, and then also capture the physician's

15   reaction to that conversation.

16         So as they visit physicians over time, they can have

17   one continuous conversation with that physician as opposed

18   to restarting that conversation, you know, over and over

19   again with the doc.  So essentially it's for their ability

20   to remember the conversation with the customer, which, you

21   know, they have many conversations throughout the days and

22   many over time.

23   Q     Does any of the information that's reflected in call

24   notes constitute market research?

25   A     They do because they capture a physician's

1    perceptions of our product and our promotional materials,

2    so, yes, you could consider it a form of market research.

3    Q    How does AstraZeneca determine which doctors to call

4    upon and how frequently to call upon them?

5    A    So we work -- and again this bring back into the --

6    the picture the IMS data.  We work with IMS data to

7    understand prescribing practices of the physicians, and

8    through that data we analyze and understand which

9    physicians would be appropriate for promotion of Seroquel

10   or any of our products.

11        And then from that, we set what we would consider

12   reach targets, in other words, which physicians we would

13   see, the most appropriate physicians, and then frequency

14   targets, how often will we need to see them.

15   Q    Are "reach" and "frequency" terms that are typically

16   used in marketing and marketing planning?

17   A    They are.

18   Q    Are they important terms?

19   A    Yes.

20   Q    In what way?

21   A    Regardless of products marketed, you know, the

22   companies marketing products, they have invested

23   significant resources to communicate the benefit of their

24   products.  So to the point of reach, you want to make sure

25   you make those investments to the appropriate targets, or

1    in this case, physicians.

2        And with respect to frequency, you want to make sure

3    that that message is hitting that appropriate target with

4    enough frequency that the individual customer remembers

5    the messages that you're sending to them.

6    Q    You mentioned "customer."  Do call notes reflect

7    AstraZeneca's customer lists in any way?

8    A    They do.

9    Q    Is that valuable information?

10   A    It is.

11   Q    With respect to the customer lists and the extent to

12   which reach and frequency is captured in call notes, is

13   that information that you believe is potentially valuable

14   to competitors of AstraZeneca if they had access to them?

15   A    It would be because if they had access to that

16   information, they could simply skip all the steps that we

17   go through regarding the purchase of IMS data, analysis of

18   the data, and they could really shortcut to who are the

19   right customers to see and to what frequency.

20   Q    Aside from issues of who the target should be, the

21   customers, and aside from issues of reach and frequency,

22   getting to the substance of what's reflected in the call

23   notes, let me first ask, do call notes reflect information

24   that AstraZeneca sales representatives convey to

25   customers?

1   A     They do.

2   Q     What types of information is conveyed by AstraZeneca

3   to sales reps that are typically reflected in call notes?

4   A     Our sales representatives work with promotional

5   materials, promotional messaging, all regulatory approved.

6   So what you would see there is a representative

7   routinely -- and there's really no set prescribed way in

8   which a rep would capture this information -- but would

9   routinely list promotional messages that discussed

10  indications discussed, promotional materials used.

11  We'd -- we'd offer a whole host of patient support

12  materials.  Those types of things could be captured there

13  as well as far as items that we would share with the

14  physician.

15        And then you would also find follow-up.  Oftentimes

16  customers ask us to follow up on things with them.  So you

17  may see the capturing of the notes for things that we

18  follow up on, specific questions a customer may have had.

19  Q     Is that sort of promotional messaging that you

20  described something you would want to end up in the hands

21  of your competitors?

22  A     No.

23  Q     Now I want to talk about the other side of the

24  equation.  You talked about a dialogue, and I just asked

25  you about what AstraZeneca says to the doctors.

55

1    Do call notes also reflect what it is the doctors say

2    to AstraZeneca sales representatives?

3    A    They do.  And in my opinion, that's probably the more

4    important information that we capture.

5    Q    Why do you say that?

6    A    Because it takes time and the ability to develop a

7    relationship with a customer for a customer to be able to

8    share information, not only regarding what they believe

9    are the benefits and risks of the product, but also

10   information on your competitors' products.

11   Q    That information that you get from doctors that they

12   provide to the sales specialists regarding what works and

13   what doesn't and how they feel about it, is that

14   information that you would like to have end up in the

15   hands of your competitors?

16   A    No.

17   Q    Are you familiar with the notion of counterdetailing?

18   A    I am.

19   Q    What is it?

20   A    That's when a competitive organization perhaps would

21   pick something they would see as a limitation of a -- of

22   a -- of our product and share that information with a

23   physician, call it to the physician's attention.

24   Q    Have competitors ever counterdetailed against

25   Seroquel, to your knowledge?

1    A    They have.

2    Q    How do you know that?

3    A    More than not, physicians will share -- it's not

4    uncommon for a doctor to share with us, "Your competitor

5    was just in here and this is what they said about your

6    product."

7    Q    I'm just going to ask you general questions with

8    respect to regulatory or FDA issues which are at issue in

9    this hearing.

10        Are you aware of any examples in the past of

11   situations where AstraZeneca's competitors counterdetailed

12   because of regulatory issues?

13   A    I am.

14   Q    Prior to the year 2004, what indications was Seroquel

15   marketed for?

16   A    Schizophrenia.

17   Q    In 2004, beginning of 2004, did AstraZeneca secure a

18   new indication?

19   A    We did.

20   Q    What was that new indication?

21   A    For bipolar mania.

22   Q    Since the time that bipolar mania was added, has the

23   overall marketing strategy for Seroquel been fairly

24   consistent?

25   A    No.

1    Q    In what way has it not been?

2    A    So as we add in new indications, for a variety of

3    reasons, number one, our target audience would change.

4    Physicians that treat schizophrenia patients are not

5    also -- not always the physicians that would treat a

6    bipolar mania.

7         So from a targeting perspective, our strategy would

8    have changed.  And also from messaging, you know, we will

9    balance that messaging, schizophrenia messaging with the

10   bipolar mania messaging.

11   Q    Aside from the balancing and the mix of messaging,

12   has the messaging on bipolar mania itself been consistent

13   over time?

14   A    I would say fairly consistent.

15   Q    I want to ask you questions about how call notes are

16   maintained within AstraZeneca.  First of all, why don't

17   you tell us generally how call note information is

18   collected and maintained.

19   A    Yeah.  So all of our sales representatives have

20   laptop computers that they work with daily.  Following a

21   call with a healthcare professional, in general, they

22   would -- when they get back to their vehicles, they would

23   type in their assessment of what transpired in that call.

24   And generally every evening, they -- that information is

25   uploaded to our main computer, main database at

1    headquarters.

2        All of that process is security protected, there's

3    firewalls in place, and that information is protected and

4    shared with very few individuals.

5    Q    Does anyone outside AstraZeneca have access to that

6    proprietary database relating to call notes?

7    A    No.

8    Q    To what extent are AstraZeneca resources expended to

9    collect and maintain call note information?

10   A    Yeah.  That significant resources to the tunes of

11   millions, you know, fairly significant ISIT

12   infrastructure, so information services infrastructure.

13   Q    With respect to sales representatives, are there any

14   guidelines or policies at AstraZeneca regarding

15   confidentiality of call note data?

16   A    There are.

17   Q    Just in general, what sort of policies are in place?

18   A    In general, the policies are in place that

19   AstraZeneca employees cannot share any information

20   regarding call notes, you know, outside of AstraZeneca,

21   that those notes are AstraZeneca property.

22   Q    Why does AstraZeneca safeguard information relating

23   to call notes?

24   A    To protect the organization's proprietary

25   information.

1   Q    Have you ever seen call notes of your competitors?

2   A    No, I have not.

3   Q    Would you like competitors to see your call notes?

4   A    No.

5   Q    Let me ask you about IMS data.  Are you familiar with

6   IMS data?

7   A    I am.

8   Q    What kind of prescription-level data exists in IMS

9   data?

10  A    Again, it could be anywheres from physician level,

11  very specific to the physician, actual prescribing habits

12  of the doctor, and that information could be aggregated up

13  to a ZIP code level all the way up to a national level.

14       There is a longitudinal data which tracks prescribing

15  habits over time.  There is data that tracks prescribing

16  information back to managed care organizations.  So

17  there's a pretty robust offering that IMS has.

18  Q    Does AstraZeneca have to pay the IMS company for this

19  data?

20  A    We do.

21  Q    How does AstraZeneca use IMS data?

22  A    We use it in all of our marketing practices with

23  respect to things like, again, understanding customer

24  prescribing habits, what physicians would be appropriate

25  targets for promotion of Seroquel.  We use it in

1    promotional response work which essentially means if we

2    put this whole promotion against the target, what type of

3    response would we get back.  We use it for allocation of

4    resources.

5    Q    Is IMS data treated as confidential within

6    AstraZeneca?

7    A    Within AstraZeneca?  Within our walls, no.

8    Q    Is it shared with people outside the walls of

9    AstraZeneca?

10   A    No, it's not.

11   Q    Are there any contractual agreements with IMS that

12   limit the dissemination and limit AstraZeneca's use of IMS

13   data?

14   A    Yes, there are.

15   Q    Just generally, what sort of contractual arrangements

16   exist?

17   A    They're pretty specific.  They say that data sold to

18   us is for our use and our use only and that we cannot

19   share the data with anybody outside of AstraZeneca

20   organization.

21   Q    Would any disclosure by AstraZeneca without IMS's

22   consent place AstraZeneca in violation of the contractual

23   agreement?

24   A    It would.

25   Q    Does AstraZeneca have any safeguards in place to

1    prevent dissemination of IMS information without the prior

2    consent of IMS?

3    A    We do.

4    Q    Are sales employees under an obligation to maintain

5    this prescription IMS data as confidential?

6    A    Yes, they are.

7    Q    Mr. Paulson, did AstraZeneca obtain IMS's consent

8    prior to providing this data to plaintiffs in discovery in

9    this case subject to being designated confidential?

10   A    I'm not 100 percent certain of that.

11   Q    Would disclosure of IMS information publicly harm an

12   innocent third party?

13   A    It would.

14   Q    Who's that?

15   A    IMS.

16          MR. MCCONNELL:  No further questions, Your

17   Honor.

18          THE COURT:  Plaintiff wish to inquire?

19          MR. BLIZZARD:  Your Honor, on behalf of

20   plaintiffs, we'll have a few clarifying questions, but I

21   don't know if you want us to go now or --

22          THE COURT:  You should go first.

23          MR. BLIZZARD:  Okay.

24

25

1                          CROSS—EXAMINATION

2    BY MR. BLIZZARD:

3    Q    Mr. Paulson, my name is Ed Blizzard.  I don't think

4    we've met before.  Good morning.

5    A    Good morning.

6    Q    You're familiar with the agreement that's been

7    reached between AZ and the plaintiffs regarding the

8    confidentiality of call notes, at least as of today?

9    A    In general, yes.  I mean, I've learned of the

10   agreement myself this morning.

11   Q    Okay.  And so you heard that the call notes that

12   predate January 1 of 2004 will be designated as no longer

13   confidential; you're familiar with that?

14   A    Yes.

15   Q    And is that because those call notes generally do not

16   reflect ongoing current marketing strategies of the

17   company?

18   A    I understand the agreement.  My answer to that

19   question would be no.

20   Q    Okay.  So you are saying that there are still some

21   current marketing strategies of the company that are

22   reflected in the call notes prior to January of 2004?

23   A    Yes.

24   Q    Similarly, you would agree that there are marketing

25   strategies that are after 2004 that are no longer being

63

1    employed by the company?

2    A    I wouldn't agree to that.

3    Q    Okay.  The messages for marketing Seroquel have

4    changed over time and evolved as new indications have been

5    adopted, haven't they?

6    A    They have evolved, yes.

7    Q    And as that has evolved, some marketing strategies

8    have been abandoned, haven't they?

9    A    They have.

10   Q    Okay.  And the parties, in recognition of the fact

11   that this evolution occurs over time, have agreed that the

12   appropriate cutoff date for disclosure and nondisclosure

13   is January of 2004, correct?

14   A    That's correct.

15   Q    And that is because that is the date when -- after

16   which the company received its bipolar indications and the

17   company's marketing strategies evolved to reflect that,

18   correct?

19   A    That's correct.

20   Q    Principally prior to that time, the company was

21   selling product for schizophrenia, correct?

22   A    That's correct.  And we still do.

23   Q    Okay.  And of course, there's been some evolution of

24   those marketing strategies over time, hasn't there?

25   A    To some extent.

1    Q    Okay.

2         MR. BLIZZARD:  I don't have any additional

3    questions, Your Honor.

4         THE COURT:  Mr. Julin?

5                    **CROSS EXAMINATION**

6    BY MR. JULIN:

7    Q    Good morning, Dr. Paulson.  I'm Tom Julin

8    representing Bloomberg.  And I'd like to ask you a few

9    additional questions about the call notes and what those

10   are and how those come about.

11        These call notes, these are, as I understand it,

12   they're written by the sales representatives.

13   A    Yes, that's correct.

14   Q    And the call notes that we're talking about in court

15   today, have you actually reviewed those notes?

16   A    I have.

17   Q    And have you done that recently?

18   A    Yes.

19   Q    So you're familiar with the particular documents that

20   have been filed with the Court and the subject of this

21   matter?

22   A    Not in totality.  I've reviewed them but not every

23   page.

24   Q    In terms of the volume of call notes that we're

25   dealing with, can you give us some idea of volume of notes

```
 1   we're talking about?
 2   A     As a raw count?
 3   Q     Just to give us some idea of what sort of volume,
 4   whether this is 10,000 or this is 100 or 10 documents,
 5   what are we talking about?
 6   A     I understood and estimate a stack of papers about
 7   that deep (indicating).
 8   Q     And you're indicating about a foot stack of
 9   documents?
10   A     Yeah, about that.
11   Q     Now, these -- the sales representatives that you
12   have, they go into the doctors and they provide
13   information to them; is that correct?
14   A     That's correct.
15   Q     And are there regulatory limitations on what they can
16   say to the doctors?
17   A     There are.
18   Q     And those regulatory limitations come from the FDA;
19   is that correct?
20   A     That's correct.
21   Q     They're basically restricted in what they can tell
22   the doctors to what is on the label or what's on the
23   package insert that's been approved by the FDA; is that
24   correct?
25   A     That's correct.
```

```
1   Q     They're not to stray outside of those documents?

2   A     Correct.

3   Q     They can perhaps point out particular things within

4   the documents, but they can't make up new things

5   themselves; is that correct?

6   A     Correct.

7   Q     And does the FDA also have a fair balance requirement

8   in terms of how presentations can be made to the doctor?

9   A     They do.

10  Q     Now, your sales representatives, they are in

11  competition with sales representatives from the other

12  companies that are also marketing atypical antipsychotics;

13  is that correct?

14  A     That's correct.

15  Q     And these sales representatives from the other

16  companies, they go in and they visit the doctors on a

17  regular basis; is that correct?

18  A     They do.

19  Q     As do yours?

20  A     (Witness nods head.)

21  Q     And how frequently would you say that your sales

22  representatives are visiting the doctors?

23  A     It varies by customer.

24  Q     And it might be on a weekly or even a more often

25  basis; is that correct?
```

1    A     It could be as often as a week.  And it may not be

2    individual sales specialists seeing a physician every

3    week.  We have more than one representative calling on

4    physicians.

5    Q     All right.  But so -- and would that be typical for

6    other companies, too, that they would have sales

7    representatives visiting doctors as frequently as a --

8    as -- as a week?

9    A     To the best of my knowledge.

10   Q     And so I know from going in to my own doctor, I

11   sometimes see more sales representatives sitting there

12   than patients.  They seem to be lined up with their black

13   bags with their materials.  And what I'm wondering here is

14   don't all of the sales representatives basically learn the

15   same information from the doctor one after another after

16   another on a very regular basis?

17            MR. MCCONNELL:  Your Honor, objection to the

18   colloquy.  Objection to the calls for speculation.  Lack

19   of foundation.

20            THE COURT:  Overruled.

21       Go ahead.

22            THE WITNESS:  Not necessarily.

23   BY MR. JULIN:

24   Q     Do you think that some of the doctors are giving

25   different information to different sales representatives?

```
1    A    Yes.

2    Q    Although, you don't have access to the call notes

3    from any of the companies; is that correct?

4    A    That's correct.

5    Q    Now, the information in the call notes you've

6    indicated shows the statements that would be made by the

7    sales representatives to the doctors as well as what the

8    doctors are saying to the sales representatives; is that

9    right?

10   A    Correct.

11   Q    And if the sales representatives strayed outside of

12   the legal requirements of the FDA in terms of what they

13   can say to the doctors, then the call notes may well

14   reflect that; is that correct?

15   A    I wouldn't be sure of that.

16   Q    Well, you've reviewed the call notes that are the

17   subject of this.

18   A    I have.

19   Q    And have you seen in those call notes that in fact

20   the sales representatives' statements to the doctors did

21   stray outside of the legal requirements of the FDA?

22        MR. MCCONNELL:  Objection.  Confidentiality at

23   this time, Your Honor.

24        THE COURT:  Sustained.

25        MR. JULIN:  Not asking, of course, for him to
```

1    disclose exactly what it was that was outside of the scope

2    of the restriction --

3             THE COURT:  All right.  I sustained the

4    objection.

5             MR. JULIN:  Thank you.

6    BY MR. JULIN:

7    Q    Now, you indicated that you have not seen call notes

8    from any other companies; is that correct?

9    A    That's correct.

10   Q    Have you followed the Zyprexa litigation involving

11   the Eli Lilly drug?

12   A    To some extent, yes.

13   Q    And are you familiar with the fact that Bloomberg, my

14   client, intervened in the Alaska action and obtained

15   documents from that litigation?

16   A    I learned that this morning.

17   Q    So you weren't previously aware of that?

18   A    No.

19   Q    And then I guess you were not aware that call notes

20   were publicly released in the Zyprexa litigation to

21   Bloomberg as well as other media?

22   A    That's correct.

23   Q    And although certainly those call notes would be of

24   interest to you, wouldn't they?

25   A    Yes, they would.

1    Q    But you didn't seek to obtain those or review those

2    or try to use those in the course of conducting business

3    for AstraZeneca?

4    A    I did not personally, but I can't speak on behalf of

5    the broader organization.

6    Q    Do you know whether anyone else at AstraZeneca sought

7    out those call notes and tried to use those in the

8    marketing of Seroquel?

9    A    I don't have personal knowledge of that.

10   Q    The call notes, are they used in -- for purposes of

11   disciplining sales representatives?

12   A    No.

13   Q    They're not reviewed in order to determine whether

14   there are violations of AstraZeneca policies to determine

15   whether those sales representatives should continue to

16   market the drugs in the way that they're marketing them?

17   A    No.  They are reviewed by sales managers, but not for

18   that sole purpose, not to discipline representatives.

19   Q    Not for that sole purpose, but they are then used for

20   purposes of disciplining sales representatives; is that

21   correct?

22   A    If there were something in there that was outside of

23   policy, yes, a sales manager would take -- take -- take

24   action then.

25   Q    And as the national sales director, you are familiar

1   with the fact that there have been violations of policy

2   fond in those call notes, correct?

3           MR. MCCONNELL:  Objection.  Scope.

4           THE COURT:  Sustained.

5   BY MR. JULIN:

6   Q    Now, your declaration, it was prepared November 7,

7   2007; is that correct?  It shows that on the last page.

8   A    Yes.  Yes.

9   Q    It was prepared well before this deal was struck by

10  the plaintiffs and the defendants that the call notes from

11  prior to January 1, 2004, would be released and those

12  subsequent to January 1, 2004, would not be released; is

13  that correct?

14  A    That's correct.

15  Q    And your declaration was intended to establish that

16  all of the call notes should be subject to a protective

17  order; is that correct?

18  A    That's correct.

19  Q    And now you've changed your view as to whether it's

20  necessary to maintain the confidentiality of all of the

21  call notes; is that right?

22  A    My personal view, no, has not changed.

23  Q    Your personal view is all the call notes should be --

24  confidentiality should be maintained?

25  A    That's correct.

1  Q    All right.  Now, let me ask you, then, about the --

2  whether there would be a way to redact the call notes in a

3  fashion that would protect the interest of AstraZeneca in

4  the call notes.

5       The call notes do reveal the names of the individual

6  doctors; is that correct?

7  A    That is correct.

8  Q    And the names of the individual sales

9  representatives?

10 A    That's correct.

11 Q    And one of the things I think you said you were

12 concerned about was that if the call notes are revealed,

13 that they would reveal the customers of AstraZeneca?

14 A    Correct.  That's one of my concerns.

15 Q    All right.  And if we redacted the names of the

16 prescribers, would that not protect the list of doctors

17 that AstraZeneca is marketing to?  It may not solve all

18 your problems but at least would solve that problem?

19 A    I believe so.

20 Q    Now, and then Mr. Blizzard was asking you about how

21 there are some of the sales strategies that are reflected

22 in those call notes that have been abandoned, no longer

23 being used, and therefore perhaps those have less value

24 than other strategies that are reflected in the notes; is

25 that correct?

1    A    I would not agree to that.  I'm not sure what

2    Mr. Blizzard was driving at, nor am I sure he got the

3    answer he wants.

4    Q    Okay.  Well, let me ask you an open-ended question,

5    which you're never supposed to do in cross-examination,

6    but I'll ask.  Would there be a way to redact some of the

7    information from the call notes in a way that would

8    satisfy you that the interests of AstraZeneca in

9    confidentiality would be fully protected but still get out

10   some of the substance of those call notes?

11   A    I don't think so.

12   Q    Now, the confidentiality agreement with IMS, did you

13   bring the confidentiality agreement with you?

14   A    I did not.

15           MR. JULIN:  And do we have the confidentiality

16   agreement for the Court to review?

17           MR. MCCONNELL:  I have it, but I understand it's

18   actually confidential itself.  You represent them.  You

19   ought to know.

20           MR. JULIN:  I do.

21   BY MR. JULIN:

22   Q    You're not offering the confidentiality agreement

23   into evidence, I take it?

24   A    I personally am not.

25   Q    The confidentiality -- let me ask you about the

1    confidentiality agreement.  It requires that you maintain

2    the confidentiality of the data that IMS provides; is that

3    correct?

4    A    That's correct.

5    Q    It does not require you to protect the

6    confidentiality of information in call notes, does it?

7    A    It does not.

8    Q    And the -- so the IMS data itself, that's the only

9    thing and that would be prescriber histories; is that

10   correct?  Which drugs which doctors are prescribing,

11   correct?

12   A    That's part of -- yes, that's part of what we

13   purchase from IMS.  There's much more to it than just

14   that.

15   Q    And the documents that are the subject of this

16   proceeding, can you describe to us which of the documents

17   that are the subject of this are the IMS data?  It's a

18   little unclear to me whether any of the documents are IMS

19   data.

20   A    So the call note documents I reviewed are not IMS

21   data.

22   Q    Understood.

23   A    Right.  So beyond that, I'm not sure personally of

24   what data you all are looking at or questioning, but I

25   would say anything that is IMS data that we purchased from

1    IMS is underneath the confidentiality agreement and we

2    can't share that.  Nor would I want to share that and

3    simply because we paid significant dollars to secure that

4    data and certainly would not want a competitor to have

5    that data for free.

6    Q    And then Mr. Blizzard asked you about whether you

7    shared the data with the plaintiffs without the consent of

8    IMS, and I think you said you weren't sure whether you got

9    the consent or not.

10   A    I can only speculate that that happened.

11   Q    And as far as the IMS data being given and made

12   available to competitors who were present in depositions,

13   are you aware of whether that happened?

14   A    No.

15   Q    You're not aware whether it happened or you're aware

16   it did not happen?

17   A    Can you restate the question?

18   Q    Yes.

19        In depositions where there were competitor -- lawyers

20   for competitors of AstraZeneca present and IMS data was

21   used, do you know whether consent was obtained from IMS to

22   share that information with the competitors?

23   A    No.  I'd only be speculating again.

24        MR. JULIN:  Your Honor, I have nothing further.

25                  **EXAMINATION BY THE COURT**

1   Q    Mr. Paulson, is there anything that prevents the

2   doctors from talking about their conversations with your

3   sales representatives?

4   A    Not that I'm aware of.

5   Q    In fact, you said that your people, I take it, one of

6   the things they try to gather is what information the

7   competitors' sales reps may have conveyed to the doctor

8   previously.

9   A    No.  I would say physicians would volunteer that.

10  It's not necessarily information we would want from the

11  physician.  Probably the most important information we

12  want from the physician is what are their needs and what

13  do they think of our product and how might they be using

14  our product.  So it's more of an intelligence gathering

15  one-on-one from the representatives to the customer.

16  Q    You indicated that the competitors do

17  countermarketing?

18  A    They do.

19  Q    I assume your people do countermarketing as well?

20  A    No.  We're competitive in our sales calls but...

21  Q    So it's only the other companies that do

22  countersales, not you?

23  A    There's --

24  Q    You're different from all the other pharmaceutical

25  companies in the world --

```
 1    A     No.

 2    Q     -- in that respect?

 3    A     No, that wouldn't be true.  And I guess what I'm

 4    trying to explain is, so within regulations the only way

 5    that you can do comparative selling is you need two

 6    head-to-head comparative trials to be able to do that

 7    within FDA regulations.

 8          So the way that we, as a company, perhaps, are

 9    competitive very simply is that we knew a competitor

10    product had a limitation, we would speak to the strengths

11    of our product, but we would not disparage a competitor's

12    product.

13    Q     Let me make sure I understood your direct testimony.

14    You said -- I thought you said that your competitors'

15    sales reps did countermarketing.

16    A     They can.

17    Q     But yours don't?

18    A     A --

19    Q     That's what you're telling me now, that your people

20    don't do countermarketing?

21    A     Yeah.  I'm just -- there's a distinction and --

22    Q     I'm trying to find out what the distinction is

23    between how you market and how everybody else markets.

24    A     Yeah.  So if we know there's a limitation to a

25    competitor's product, we would promote on the strengths of
```

```
 1    our product in that area.  I'm not saying all competitor

 2    sales representatives would do a compare and contrast

 3    against our product or call out something negative to our

 4    product, but some do.

 5    Q    Well, you're saying your competitors do something

 6    that you don't do.

 7    A    At times, yes.

 8    Q    And you're sure your people never do that?

 9    A    To the best of my knowledge, no.

10    Q    Do you ever hire sales reps from other companies?

11    A    We do.

12    Q    And do you -- so your sales reps leave AstraZeneca

13    and go work for other companies?

14    A    They do.

15    Q    And they carry with them knowledge of what doctors

16    they've talked to and how to market and all of those

17    things, right?

18    A    That's correct.  But they also sign a confidentiality

19    agreement that they would not share that information.  And

20    when we hire from other companies, we don't seek that

21    information from sales representatives currently hired at

22    AstraZeneca or any employees hired at AstraZeneca.

23    Q    But you expect them to know their territory?

24    A    Know their territory?

25    Q    Right.
```

```
 1   A     Geographically, yes.

 2   Q     Well, they're going to know who all the doctors are

 3   that prescribe that class of medicines, aren't they?

 4   A     They would.  But we provide our own direction as to

 5   who we would expect them to see.

 6   Q     The IMS data that you buy, does that include data

 7   about competitors' sales?

 8   A     It does.

 9   Q     And do your competitors also buy that information?

10   A     They do.

11   Q     Is there any difference between what they can buy and

12   what you buy?

13   A     Not that I'm aware of.

14   Q     Does IMS have a price list in terms of what they

15   charge for various levels of information?

16   A     They do.

17   Q     But basically anybody who wants to buy it can get it?

18   A     To the best of my knowledge.

19             THE COURT:  Mr. McConnell, redirect?

20             MR. MCCONNELL:  Very briefly.

21                    REDIRECT EXAMINATION

22   BY MR. MCCONNELL:

23   Q     With respect to IMS, Mr. Paulson, are there also --

24   are there any other entities out there that perform the

25   same sort of service as IMS?  In other words, does IMS
```

1   have competitors?

2   A    They do.

3   Q    So competitors may not purchase IMS data but they may

4   purchase data from IMS competitors; is that true?

5   A    Correct.  There's many data vendors.

6   Q    Is there something called competitive intelligence?

7   A    There is.

8   Q    And is there a -- are there people at AstraZeneca who

9   do competitive intelligence?

10  A    Yes.

11  Q    That's a different group from you?

12  A    That's correct.

13  Q    You don't know what they're doing in terms of call

14  notes from Zyprexa or anything else, do you?

15  A    That's correct.

16  Q    I want to ask some of the questions following up on

17  what Bloomberg's lawyer said about redaction.

18      If you redacted from call notes names of prescribers,

19  would that solve your problem in terms of disclosing to

20  competitors your reach and frequency?

21  A    Perhaps reach, not frequency.

22  Q    Not frequency.  And just to clarify something you

23  said before, is it only one sales representative who calls

24  on a given doctor?

25  A    No.  That's correct, it's not.

81

1    Q    Is there collective information built up at the

2    company among various sales specialists?

3    A    Correct.

4    Q    With respect to redacting names of doctors, would

5    that solve your problem in terms of call notes disclosure,

6    letting competitors know about our promotional messaging

7    at AstraZeneca?

8    A    It would not.

9              MR. MCCONNELL:  No further questions.

10             THE COURT:  Thank you, Mr. Paulson.  You can

11   step down.

12             THE WITNESS:  Thank you.

13             MR. MCCONNELL:  Your Honor, what I was going to

14   do at this point is call Dr. Lazarus to the stand and talk

15   about CSRs and regulatory correspondence.  But before I

16   did, I did want to address one point that was raised by

17   Bloomberg's lawyer, and that's also a point that was

18   raised in some of the earlier briefing, and that was the

19   assertion that, in fact, information had been disclosed to

20   AstraZeneca's competitors because of documents being used

21   at depositions where lawyers for some of the competitors

22   showed up.

23        Your Honor, when we filed our brief in opposition to

24   Bloomberg two days ago, I believe we attached to that

25   brief the relevant confidentiality agreements that have

1    been executed not only in the MDL but also in other

2    litigations.  And what those agreements provide, and I

3    have heard no evidence or suggestion that anybody has

4    violated them, is that a lawyer for a competitor can show

5    up at a deposition if that deposition is cross-noticed in

6    a case where that competitor is also a party, but that if

7    any documents are used in a deposition from one company

8    and those documents are marked confidential, that the

9    lawyers have access to them but the lawyers may not share

10   them with the client.

11        So, for example, if at a deposition of an AstraZeneca

12   witness an AstraZeneca marketing document is used in the

13   deposition and marked as confidential, it cannot be shown,

14   for example, to Eli Lilly's or a Jannsen's marketing

15   department.  I just wanted that clear on the record.

16             THE COURT:  All right.

17             MR. MCCONNELL:  At this point, I'd like to call

18   Dr. Art Lazarus to the stand.

19             **(WITNESS ART LAZARUS SWORN)**

20                **DIRECT EXAMINATION**

21   BY MR. MCCONNELL:

22   Q    Good morning, Doctor.

23   A    Good morning, Mr. McConnell.

24   Q    Would you state and spell your full name for the

25   record, please.

1   A     Arthur Louis Lazarus, A-R-T-H-U-R, L-O-U-I-S,

2   L-A-Z-A-R-U-S.

3   Q     Are you a medical doctor?

4   A     Yes, I am.

5   Q     And, Dr. Lazarus, where are you currently employed?

6   A     AstraZeneca Pharmaceuticals in Wilmington, Delaware.

7   Q     What is your position at AstraZeneca?

8   A     Senior director of clinical development.  I'm in the

9   neuroscience therapeutic area.

10  Q     Have you worked on Seroquel during your employment at

11  AstraZeneca?

12  A     Yes, I have.

13  Q     How much of your time would you say you devote to

14  Seroquel?

15  A     One hundred percent.

16  Q     How long have you worked on Seroquel?

17  A     Five and a half years.

18  Q     Generally, what are some of your responsibilities on

19  the Seroquel team?

20  A     I serve as the prime medical oversight for our

21  clinical studies, and I interact with our regulatory

22  division regarding product labeling and promotion.

23  Q     Doctor, you stated that you're a medical doctor.  Are

24  you a psychiatrist by training?

25  A     Yes, I am.

1   Q    Have you treated patients?

2   A    I have.

3   Q    Are you a member of the American Psychiatric

4   Association?

5   A    Yes, I am.

6   Q    Are you, in fact, a Distinguished Fellow of the

7   American Psychiatric Association?

8   A    I am.

9   Q    Doctor, have you already submitted an affidavit in

10  this case?

11  A    I have.

12  Q    Do you have it with you?

13  A    Yes.  I brought with it me.

14        MR. MCCONNELL:  Your Honor, with the Court's

15  permission, I'd like to approach and hand the Court a hard

16  copy of Dr. Lazarus' affidavit.

17        THE COURT:  All right.

18  BY MR. MCCONNELL:

19  Q    If you look at the last page, Dr. Lazarus, is that

20  your signature?

21  A    Yes, it is.

22  Q    Is this a declaration that you submitted earlier in

23  this case in connection with AstraZeneca's motion to

24  maintain the confidentiality of certain documents?

25  A    That's correct.

85

```
1    Q    Have you reread this declaration?

2    A    I have.

3    Q    Is it true and accurate -- or let me put that in lay

4    talk.  Do you agree with everything in it?

5    A    Yes, I do.

6    Q    Now, I'm going to focus on certain specific

7    documents, Dr. Lazarus.  I want to focus on the FDA's

8    Complete Response Letter from December of 2008, the

9    company's metabolic submission in June of 2008, and two

10   specific CSRs.  Do you have that in mind?

11   A    Yes, sir.

12   Q    Just generally, those documents -- well, first of

13   all, are you familiar with those documents?

14   A    I am familiar with them.

15   Q    Do those document contain information related to

16   AstraZeneca trade secrets?

17   A    They do.

18   Q    Does AstraZeneca consider the information in those

19   documents to be proprietary?

20   A    It does.

21   Q    Does AstraZeneca generally share its proprietary

22   information?

23   A    No, sir.

24   Q    Why not?

25   A    We own the data.
```

1    Q     Is this the type of information in those documents

2    that could be valuable to competitors?

3    A     Highly valuable.

4    Q     How so?

5    A     It could provide strategy to a competitor and change

6    the nature of their -- everything from their clinical

7    development program to the way they sell their own drugs.

8    Q     I now want to focus on the documents involving the

9    back and forth between AstraZeneca and the FDA,

10   specifically the Complete Response Letter and the

11   metabolic submission.

12        First, as a general question, are ongoing discussions

13   between AstraZeneca and the FDA kept confidential?

14   A     They are.

15   Q     Are there restrictions at AstraZeneca on who can

16   access the labeling correspondence?

17   A     Yes, sir, there are internal restrictions.

18   Q     Does AstraZeneca take any steps to safeguard

19   communications with the FDA?

20   A     Yes, it does.

21   Q     Is encryption used?

22   A     Yes, it is.

23   Q     I'm going to talk about the two FDA documents, but

24   before I do, just to provide a little bit of background,

25   I'd like you to explain generally what an NDA is.

87

1    A    NDA stands for a New Drug Application.  It's a

2    process by which a pharmaceutical company files to the FDA

3    its clinical trials that would support a new drug coming

4    to market.

5    Q    What's a supplemental NDA or an SNDA?

6    A    Following a new drug application, many times there

7    would be an SMDA, or Supplemental New Drug Application, in

8    which the company would seek additional indications for

9    the drug that has already been approved for marketing.

10   Q    After a pharmaceutical company submits an SNDA

11   seeking additional indications, is there typically some

12   back and forth between the company and the FDA before the

13   FDA arrives at a final decision?

14   A    Yes, that's very typical.

15   Q    What sorts of things, just generally, do the company

16   and the FDA go back and forth about?

17   A    Well, to some extent it's time dependent so that

18   early in the process, the FDA may require additional data,

19   either raw data or data in tabular form or additional

20   analysis of that data.  Toward the end, it centers more

21   around the discussion of the final label that would

22   support the product for promotion.

23   Q    Does the company sometimes change its position during

24   this back and forth process?

25   A    Yes, sir.

1   Q    Does the FDA sometimes change its position during

2   this back and forth process?

3   A    Yes, it does.

4   Q    Now I want to ask just about the fact of a filing of

5   an SNDA.  Does AstraZeneca ever announce the fact of the

6   filing of an SNDA?

7   A    Yes, in a press release.

8   Q    Are the details contained within the SNDA disclosed?

9   A    No, sir.

10  Q    Has AstraZeneca submitted SNDAs for Seroquel?

11  A    Yes, sir.

12  Q    There's a chart I'd like to put up.  Do you have in

13  front of you a chart that lists first at the top the

14  initial NDA for Seroquel and then a series of SNDAs?

15  A    Yes, I have.

16  Q    Does that chart accurately list the extent to which

17  the FDA has approved not only the NDA but various SNDAs?

18  A    That is correct.

19  Q    With bipolar mania, bipolar depression, acute

20  schizophrenia for XR, schizophrenia maintenance for the

21  XR, bipolar maintenance for the IR, and bipolar mania and

22  bipolar depression XR; is that right?

23  A    Yes.  That's the chronology of approvals.

24  Q    And in every one of those cases, did the FDA find

25  Seroquel to be safe and effective for those indications?

1   A     Yes, sir.

2   Q     Now, in addition to those SNDAs that have been

3   approved, are there other SNDAs pending for Seroquel?

4   A     Two other pending SNDAs.

5   Q     Now I want to focus specifically on the December 2008

6   Complete Response Letter from the FDA.

7         Generally, what is a Complete Response Letter?

8   A     It's a letter that a pharmaceutical company would

9   receive from the FDA indicating additional steps necessary

10  to bring the product to market.

11  Q     Is a Complete Response Letter the FDA's final

12  position or response?

13  A     No, it is not.

14  Q     Now, the 2008 Complete Response Letter that you're

15  talking about, did that relate to a particular SNDA?

16  A     Yes, sir, it did.

17  Q     What indication is being sought in that particular

18  SNDA?

19  A     It's a condition called major depression or major

20  depressive disorder, more specifically, sometimes referred

21  to as MDD.

22  Q     Is the fact that AstraZeneca sought approval of a

23  major depressive disorder indication a matter of public

24  record?

25  A     Yes, sir.

1    Q    Was -- did AZ issue a press release?

2    A    Yes, it did.

3    Q    Did the press release discuss details of the SNDA?

4    A    No, sir.

5    Q    How would you characterize the press release?

6    A    It was just a high-level overview of the efficacy of

7    the drug and the clinical studies that it was tested in.

8    Q    Aside from the high-level overview in the press

9    release, were the contents of the SNDA public?

10   A    No, sir.

11   Q    Now, the Complete Response Letter, is that the type

12   of correspondence that is kept confidential within

13   AstraZeneca?

14   A    Yes, very much so.

15   Q    What steps are taken to keep it confidential?

16   A    It's only accessed by employees on a need-to-know

17   basis who are actually working on providing answers to the

18   FDA regarding the Complete Response Letter.

19   Q    Why, with respect to that Complete Response Letter,

20   is it being kept confidential?

21   A    It contains data that is owned by AstraZeneca as

22   proprietary in nature.

23   Q    Could premature release of the Complete Response

24   Letter help AstraZeneca's competitors?

25   A    Very much so.

1    Q      In what ways?

2    A      So much as I indicated before, it -- basically it's

3    almost like exposing your playing cards to your competitor

4    and giving them an indication as to what types of

5    information may be required to bring that drug to market,

6    whether it's simply analysis or whether it may in fact be

7    additional clinical trials.  So it would give them very

8    much so a competitive advantage to be able to predict the

9    amount of time that it would take a drug company to bring

10   a product to market.

11   Q      Why is that important, being able to make inferences

12   about the timing of a drug being brought in for new

13   indication?

14   A      Timing is everything in the pharmaceutical industry

15   in terms of competition.  If, for example, a

16   pharmaceutical company were to have to delay introduction

17   of the drug for one, two, or even three years, it would

18   give another company a significant opportunity to develop

19   other drugs or change their strategic plans.

20   Q      Doctor, has a 2008 SNDA for major depressive disorder

21   been approved yet by the FDA?

22   A      No, sir.

23   Q      Is the application still pending?

24   A      Yes, is it.

25   Q      Is the process with the FDA still ongoing?

1    A     Yes.

2    Q     Is the Complete Response Letter issued by the FDA in

3    December of 2008 part of that ongoing process?

4    A     Yes, it is.

5    Q     In general terms, what is AstraZeneca doing in

6    response to the CRL on the MDD application?

7    A     We're working on providing answers to the questions

8    that -- asked by the FDA.

9    Q     Is AstraZeneca adding major depressive disorder

10   indication to this Seroquel label right now?

11   A     Not at this time.

12   Q     Will there be more back and forth between the FDA and

13   AstraZeneca on the MDD application?

14   A     Yes, there will be.

15   Q     Does the FDA ever make a CRL, a Complete Response

16   Letter, public before final action?

17   A     No, sir.

18   Q     Would AstraZeneca ever make a Complete Response

19   Letter public before final approval?

20   A     It would not.

21   Q     Does the -- and I'm just asking this in very general

22   terms -- does the Complete Response Letter at issue in

23   this case, does that contain draft labeling language?

24   A     Yes, it does.

25   Q     Would draft labeling language be potentially valuable

1    to competitors?

2    A    Highly valuable.

3    Q    Why?

4    A    It would indicate areas of strengths and limitations

5    that the competition would be able to counterdetail off

6    of.

7    Q    Is draft labeling potentially confusing to the public

8    in any way?

9    A    Very much so.

10   Q    Is the draft label still subject to change with

11   respect to that particular SNDA?

12   A    Yes.  It's not in its final form.

13   Q    We heard a little bit before about counterdetailing.

14   Is there information in the Complete Response Letter that

15   competitors could conceivably use to counterdetail against

16   Seroquel?

17   A    Yes, sir.

18   Q    I want to ask about the metabolic submission very

19   generally.  Are you aware that in January 2008 the FDA

20   requested that AstraZeneca provide data relating to

21   Seroquel and certain metabolic parameters?

22   A    Yes, sir.

23   Q    Are you aware that AstraZeneca responded to this

24   request by submitting data in June of 2008?

25   A    It did.

1   Q    What was, just generally, the length of that

2   submission?

3   A    It was approximately 500 tables and over 1,000 pages

4   long.

5   Q    Would that constitute aggregated raw data?

6   A    Yes, it would.

7   Q    When AZ, AstraZeneca, submitted this aggregated raw

8   data to the FDA in June of 2008, did it do so while

9   reserving its rights to confidentiality --

10  A    Yes, it did.

11  Q    -- to trade secrets?

12  A    It certainly did.

13  Q    Did it assert Exemption 4 to the Freedom of

14  Information Act?

15  A    Yes, it did.

16  Q    Do you know if, at the same time the FDA requested

17  this data from AstraZeneca, it requested similar data from

18  AstraZeneca's competitors with respect to other atypical

19  antipsychotics?

20  A    Yes, it did.

21  Q    Does AstraZeneca's 2008 submission on metabolic

22  parameters contain data relating to any pending SNDAs?

23  A    Yes, it does.

24  Q    Which SNDAs?

25  A    It would be the two mentioned previously, the MDD, as

1    well as one known as GAD which stands for generalized

2    anxiety disorder which is another indication that

3    AstraZeneca has submitted an SNDA for.

4    Q    And are both those SNDAs still in the process?

5    A    Yes, they are.

6    Q    Does the submission in June of 2008 regarding

7    metabolic parameters contain what you consider to be

8    proprietary data?

9    A    I do.

10   Q    Has the FDA taken any final action yet with respect

11   to the data submitted to it by AstraZeneca in its 2008

12   metabolic submission?

13   A    No, sir.

14   Q    Now, you said before that the FDA requested this

15   metabolic information not only from AstraZeneca but also

16   from its competitors, right?

17   A    That's correct.

18   Q    Would AstraZeneca be harmed in a competitive sense if

19   the information contained in its 2008 metabolic submission

20   were made available to the public, but metabolic data

21   produced by its competitors in response to similar

22   requests from the FDA was not made public?

23   A    I think it's quite obvious that would put AstraZeneca

24   in a competitive disadvantage.

25   Q    Why do you say that?

1    A    The other drug companies would have information privy

2    to AstraZeneca.  On the other hand, we would have no such

3    information.

4    Q    From your experience as a practicing psychiatrist, do

5    you see a danger in having nonfinal information relating

6    to pending SNDAs in the 2008 Complete Response Letter?

7    A    I absolutely do.

8    Q    And does that also apply to the June 2008 metabolic

9    submission?

10   A    Yes, sir.

11   Q    I want to turn now to the issue of CSRs.  What are

12   CSRs?

13   A    Clinical Study Reports.

14   Q    Do they relate to clinical trials?

15   A    It is a comprehensive overview summary and a

16   distillation of the data of the clinical trial.

17   Q    And have you yourself been involved with clinical

18   trials?

19   A    I have.

20   Q    Just generally, what is a clinical trial?

21   A    Clinical trial is a process by which we determine

22   whether or not a drug is safe and effective in human

23   volunteers.

24   Q    Are clinical trials easy to design and execute?

25   A    Not at all.

1    Q    Are they inexpensive to design and execute?

2    A    Very costly.

3    Q    How costly?

4    A    In the millions.

5    Q    Does AstraZeneca ever use external experts to assist

6    with clinical trial design?

7    A    It does.

8    Q    When it does so, does it require such external

9    experts to sign confidentiality agreements?

10   A    It does.

11   Q    Now, let's talk a little bit about CSRs.  Have you

12   yourself ever prepared a CSR?

13   A    Yes, I have.

14   Q    Have you read CSRs in your career?

15   A    I have.

16   Q    Generally, does a CSR contain data?

17   A    It's chock full of data.

18   Q    Does it contain any discussion of methodologies used?

19   A    Yes, it does.

20   Q    Does it contain discussion of objectives that the

21   company has with respect to that particular trial?

22   A    Yes, sir.

23   Q    Does it contain analysis and interpretations?

24   A    It does.

25   Q    Are CSRs kept confidential during the drafting

1  process?

2  A    Yes, they are.

3  Q    Are they ever disclosed to third parties without a

4  confidentiality agreement?

5  A    Never.

6  Q    I want to focus on two that are at issue here, and

7  they are with respect to CSR for 144 and for 165; is that

8  right?

9  A    Yes, sir, that's correct.

10  Q    With respect to those particular CSRs, could

11  AstraZeneca's competitors benefit from gaining access to

12  those unpublished CSRs at this point in time?

13  A    At this point, they could benefit.

14  Q    How could they benefit?

15  A    They could be aware of results of detailed analyses

16  that are not public knowledge.

17  Q    Did AstraZeneca invest time and money in determining

18  which analyses to use to interpret the data in those

19  particular CSRs?

20  A    Considerable time, money, as well as intellectual

21  capital.

22  Q    Is that information that would be useful to

23  competitors?

24  A    Highly so.

25  Q    Is it useful to competitors to know what sorts of

1    scales were used to evaluate outcomes in those studies?

2    A    Yes.

3    Q    Is it useful to competitors to know the conclusions

4    that AstraZeneca drew in those particular studies?

5    A    Very useful.

6    Q    Could a competitor draw conclusions about

7    AstraZeneca's research direction if they had access to

8    AstraZeneca's CSRs?

9    A    Yes, they could.

10    Q    Are the results of CSRs ever published?

11    A    They are published in the form of an article in a

12    peer-reviewed journal.

13    Q    Is it AstraZeneca's goal to publish the results of

14    these particular studies in peer-reviewed journals?

15    A    Absolutely.

16    Q    Why is peer review important?

17    A    Peer review is basically the sacred pillar of

18    science.

19    Q    Why is that?

20    A    It's the standard by which the science is judged to

21    be as accurate as possible.

22    Q    Have you ever written articles in peer-reviewed

23    journals?

24    A    I have.

25    Q    Have you ever served as a peer reviewer?

1    A     I have.

2    Q     Now before publication, these particular CSRs we're

3    talking about, had they been disseminated outside of

4    AstraZeneca?

5    A     No, sir.

6    Q     Have the draft manuscripts been kept confidential

7    prior to publication during the -- I'm sorry.  Let me just

8    back up and ask a general question about the peer review

9    process.

10        When a document is being peer reviewed and being

11   considered for possible publication in peer-reviewed

12   journal, are those draft manuscripts kept confidential

13   during that peer review process?

14   A     They are.

15   Q     Are peer reviewer comments kept confidential?

16   A     Yes, they are.

17   Q     Why?

18   A     It would be in violation of editorial policy to

19   release the names of peer reviewers.

20   Q     Are the identities of peer reviewers and authors kept

21   confidential from each other?

22   A     They certainly are.

23   Q     Why?

24   A     It avoids introduction of bias.

25   Q     If the CSRs that we're talking about, the specific

1    ones, the 144 and 165, were made public before they were

2    published in a peer-reviewed journal, would that threaten

3    the chance of those studies being published in a

4    peer-reviewed journal?

5    A    Yes, it could.

6    Q    Why is that?

7    A    There are journals that have editorial policies that

8    would prevent public disclosure of scientific results.  If

9    that were the case, they would not publish the articles.

10   Q    Now, putting aside all the raw data and the analyses

11   that you were talking about, in very, very general form,

12   have the results of these particular CRSs, 144 and 165,

13   been made public in any way?

14   A    Yes, sir.

15   Q    How so?

16   A    At scientific meetings and through our own website,

17   astrazenecaclinicaltrials.com.

18   Q    What was posted on the website with respect to the

19   CSRs, the full CSRS or synopses?

20   A    No, synopses.

21   Q    How brief are these synopses?

22   A    They're anywhere from one to 15 pages.

23   Q    Why does AstraZeneca -- why has AstraZeneca posted

24   synopses for those CSRs on its publicly available website?

25   A    To fulfill its goal of being transparent with the

1    public.

2    Q    How do you reconcile the goal of transparency that

3    you just described with all the concerns to

4    confidentiality that you expressed regarding these

5    particular CSRs?

6    A    I think it is a difficult balancing act that we

7    eventually discussed here this morning in court.  We feel

8    it is important to offer public to high-level results of

9    clinical trials through the website by presenting results

10   of scientific meetings.

11        On the other hand, we don't provide nearly the level

12   of detail that is contained in a Clinical Study Report

13   that we consider proprietary and confidential.

14   Q    About how long are the synopses for these two CSRs on

15   the website?

16   A    Close to -- synopses are about 10 to 15 pages.

17   Q    How long, roughly, are the CSRs?

18   A    Close to 2,000 pages.

19   Q    Just a couple specific questions about these studies.

20   Are you aware of Study 144?

21   A    I am, sir.

22   Q    Have the results of that study been pushed yet in a

23   peer-reviewed journal?

24   A    They have not.

25   Q    Is it AstraZeneca's intention to have that study

1    result in publication in a peer-reviewed journal?

2    A    Yes, it is.

3    Q    Are you aware of Study 165?

4    A    I am.

5    Q    Have the results of Study 165 been published yet in a

6    peer-reviewed journal?

7    A    Not yet.

8    Q    Is it AstraZeneca's intention that they will be?

9    A    Yes.

10   Q    Now, before, I asked you if publication of full CSRs

11   prior to the articles being accepted for publication in a

12   peer-reviewed journal, I asked you whether that could hurt

13   the chance of the article actually being published in a

14   peer-reviewed journal, you said yes.

15   A    Yes.

16   Q    My question to you is why is that?  Why does --

17   why -- why does that reduce the chance of publication,

18   just the fact that everything about it, the data, the

19   analyses, the interpretations, the objectives, the

20   methodologies, has already been publicly disclosed?

21   A    Well -- I'm sorry.  Could you restate the question?

22   Q    Yeah.  Why would the disclosure of all the

23   information in the CSRs, as opposed to the top-line

24   synopsis that you talked about, why would that jeopardize

25   the chance of the study being published in a peer-reviewed

1    journal?

2    A    Well, for one thing, it could violate an editorial

3    policy of some journals, and even in cases where there

4    were no such policy, journals may not be inclined to

5    publish articles where the results have already been

6    widely disseminated.

7    Q    Dr. Lazarus, if fewer articles are subjected to the

8    rigors of the peer review process, fewer articles are

9    published in peer-reviewed journals because the underlying

10   data analyses and methodologies have been prematurely

11   disclosed, is that a good or bad thing to public health?

12   A    I think that's very bad.

13   Q    Why?

14   A    Again, scientific advancement occurs through

15   publication of peer-reviewed articles.  And for another

16   reason, physicians are already, on average, one month

17   behind in the reading of journal articles, so at yet the

18   same time they're much more likely to read a journal

19   article than a 2000-page Clinical Study Report.

20        MR. MCCONNELL:  No further questions, Your

21   Honor.  Thank you.

22                    **CROSS-EXAMINATION**

23   BY MR. BLIZZARD:

24   Q    Still good morning, Dr. Lazarus.

25   A    Good morning.

```
 1    Q    First of all, with respect to the label for Seroquel,

 2    that label recently changed; did it not?

 3              MR. MCCONNELL:  Objection.  Scope.

 4              THE COURT:  Overruled.  Go ahead.

 5              THE WITNESS:  It did.

 6    BY MR. BLIZZARD:

 7    Q    Okay.  And that was -- that change was made at the

 8    request of the FDA, correct?

 9    A    I believe so.

10    Q    And how recently was this label changed?

11    A    Very recently.

12    Q    Okay.  And as a result of the request of the FDA,

13    information in the label was moved up to the "Warning"

14    section, wasn't it?

15    A    I believe so.

16    Q    And that was the information about hyperglycemia,

17    wasn't it?

18              MR. MCCONNELL:  Objection.  Scope, Your Honor.

19              THE COURT:  Overruled.

20              THE WITNESS:  That's correct.

21    BY MR. BLIZZARD:

22    Q    Okay.  And all this was done after AstraZeneca

23    submitted the metabolic parameters document to the FDA,

24    correct?

25    A    I am not aware of the timing and relationship.
```

1   Q    Okay.  But it was recently that the request was made

2   and recently AstraZeneca has agreed to the request and

3   changed its label to add hyperglycemia information to the

4   "Warning" section of the label; is that right?

5   A    Not -- not -- not quite accurate.  It was -- it was

6   the -- not that the information was changed.  It was the

7   ordering of the sections that was changed.

8   Q    The information that was in the "Adverse Reaction"

9   section of the label for hyperglycemia was transferred up

10  to the "Warning" section of the label; is that accurate?

11  A    Correct.

12  Q    Now, I want to talk to you briefly about the Clinical

13  Study Reports.  As I understand it, Clinical Study Reports

14  are the comprehensive set of data and analysis of clinical

15  trials conducted by the company; is that right?

16  A    That's correct.

17  Q    And for these clinical trials, the company was

18  involved in preparation of the protocol, which is the plan

19  for conducting the study; is that right?

20  A    That is correct.

21  Q    And also involved in the conduct of this study?

22  A    Yes.

23  Q    And involved in the data analysis, correct?

24  A    That's correct.

25  Q    And involved oftentimes in commenting on or drafting

1  a manuscript, right?

2  A     The manuscript intended for publication, or do you

3  mean the manuscript of the Clinical Study Report itself?

4  Q     I'm talking about the manuscript that is submitted

5  for publication.

6  A     Yes, that's correct.

7  Q     And also involved in preparing the manuscript is the

8  Clinical Study Report itself?

9  A     In both cases, correct, yes.

10  Q     Correct.

11        Now, has there been a -- I guess I would say a

12  movement in the pharmaceutical industry and in medicine

13  generally for transparency in clinical trial results?

14  A     Yes, sir, there has.

15             MR. MCCONNELL:  Objection.  Scope.

16             THE COURT:  Overruled.

17  BY MR. BLIZZARD:

18  Q     And is that based upon the fact that there has been

19  some criticism of some pharmaceutical companies for

20  publishing results that are favorable to them but not

21  publishing results that are unfavorable?

22             MR. MCCONNELL:  Objection.  Scope, Your Honor.

23             THE COURT:  Overruled.

24             THE WITNESS:  That's correct.

25

```
 1    BY MR. BLIZZARD:

 2    Q     Now, has AstraZeneca, in response to this movement

 3    within the industry, agreed that there should be more

 4    transparency of its own clinical trial results?

 5    A     That's correct.

 6    Q     And as a matter of fact, does the company have a

 7    website, one section of which is devoted to clinical trial

 8    results?

 9    A     Yes.  I mentioned the URL previously.

10    Q     And in that -- on that website -- I'm not going to

11    show it to you, to save time, but do you recall it saying

12    that, "In line with our group corporate responsibility

13    policy on transparency, we are committed to open

14    communication of information on AstraZeneca's clinical

15    trials"?

16    A     Are you quoting verbatim from the website?

17    Q     I am.  But I'm asking you generally whether you

18    recognize that the company is committed to open

19    communication about the clinical trials?

20    A     I am aware.

21    Q     And that the company will publish results whether

22    they are favorable to AstraZeneca or not?

23    A     That's correct.

24    Q     That's a public commitment of the company, correct?

25              MR. MCCONNELL:  Objection.  Scope.  Calls for a
```

1    legal conclusion.

2             THE COURT:  Overruled.

3             THE WITNESS:  I think I answered that that was

4    correct.

5    BY MR. BLIZZARD:

6    Q    Okay.  And in fact, under the FDA medical -- or the

7    FDA amendments of 2007, the FDA has required clinical

8    trial registry; is that right?

9    A    I believe so.

10   Q    And that requires that certain information about the

11   clinical trials conducted by pharmaceutical companies be

12   made public, correct?

13   A    Correct.

14            MR. MCCONNELL:  Objection.  Scope.  May we

15   approach on a sidebar, Your Honor?

16            THE COURT:  No.  Overruled.

17   BY MR. BLIZZARD:

18   Q    Is that also with respect to it has other medical

19   entities such as World Health Organization, the

20   International Committee of Journal Editors also supported

21   making public clinical trial results?

22   A    There were other groups that did support that notion,

23   yes.

24   Q    Okay.  And I think you said earlier that it's one of

25   the sacred, I don't know if you said principles or tenets

1    of science is peer reviewed, right?

2    A    That's correct.

3    Q    And that's because it's been known in medicine for

4    years that open communication, the free exchange of ideas,

5    data, is more likely to advance the search for scientific

6    truth, right?

7    A    I don't believe that that's the primary purpose of --

8    peer review is not to serve open communication.  It's to

9    serve the -- getting the science right.

10   Q    But the ultimate publication is sent out to doctors

11   and whoever else wants to read the medical journals as a

12   free exchange to say, "Here's what I've found and now you

13   know that, you don't have to take that step, or you can

14   expand on that," correct?

15   A    With the only exception being that journal

16   subscriptions cost money.

17   Q    Now, as I understand it, you have said here that with

18   respect to Study 165 and Study 144, that one of the

19   concerns that the company has is that that will --

20   premature release of that information might impair your

21   ability to get those published, right?

22   A    It could.

23   Q    And there are other studies, Clinical Study Reports,

24   that the company has agreed to -- to make public, such as

25   Clinical Study Report for Study 125, correct?

1   A     Correct.

2   Q     And Study 125 actually involves not only the study of

3   AstraZeneca's product but also the study of Jannsen's

4   product Risperdal as well as Eli Lilly's product Zyprexa,

5   correct?

6   A     That's correct.

7   Q     That's a study that involved a comparison between

8   those three products, right?

9           MR. MCCONNELL:  Objection.  Scope.  This was

10  a -- a study we specifically did not talk about on direct.

11          THE COURT:  Overruled.

12          THE WITNESS:  It does mention those other

13  products.

14  BY MR. BLIZZARD:

15  Q     Okay.  So there's not only data about AstraZeneca's

16  product in that study, there's data about other companies'

17  products?

18  A     Yes.

19  Q     And while -- the manuscript that was submitted for

20  publication for that study is about how many pages?

21  A     Thirty, give or take.

22  Q     Okay.  There are actually over 1,000 pages in the

23  Clinical Study Report, correct?

24  A     I'll take your word for it.  I don't know the exact

25  number of pages.

```
 1   Q    Have you yourself reviewed the Clinical Study Report

 2   for Study 125?

 3   A    Parts of it.

 4   Q    Not the entire thing?

 5   A    No.

 6   Q    How about Study 127?

 7   A    Again, parts of it.

 8   Q    How about Study 165 or 144?

 9   A    Parts of each of those.

10        MR. BLIZZARD:  I don't have any additional

11   questions.

12        THE COURT:  Mr. Julin?
```

<b>CROSS-EXAMINATION</b>

```
14   BY MR. JULIN:

15   Q    Dr. Lazarus, I'm Tom Julin representing Bloomberg.  I

16   just have a few questions for you.

17        The documents that you're discussing, these are

18   documents that AstraZeneca, you testified, has maintained

19   as confidential; is that correct?

20   A    That's correct.

21   Q    And these documents, you're aware, have been

22   requested by the plaintiffs in this case in discovery and

23   have been turned over to them in discovery; are you aware

24   of that?

25   A    Certain documents have.
```

1    Q    The documents that are the subject of your testimony?

2    A    Yes.

3    Q    Right.  And not only --

4    A    I'm sorry.  You said to the plaintiffs, okay.

5    Q    Yes, to the plaintiffs.  They were requested --

6    plaintiffs asked for these documents from AstraZeneca.

7    AstraZeneca determined whether these would be responsive

8    to their request for production of documents, and they

9    were surrendered to the plaintiffs under a protective

10   order.

11   A    That's correct.

12   Q    And then in response -- subsequent to that, the

13   plaintiffs filed these documents with their responses to

14   motions, substantive motions that have been filed by

15   AstraZeneca in this case.  Are you aware of that?

16   A    I'll take your word for it.  I'm not fully apprized

17   of all the legal proceedings.

18   Q    All right.  And that would distinguish these

19   documents from any other documents that AstraZeneca

20   maintains with respect to its own internal operations

21   because those documents have not been produced in

22   discovery or filed in court; is that correct?

23   A    That's correct.

24   Q    Those documents would help the public to understand,

25   would they not, whether the allegations that the

1    plaintiffs are making in this case are true or false?

2    A    Which documents are you referring to, sir?

3    Q    All the documents that are the subject of your

4    testimony, all the various studies, the reports, the

5    submissions to the FDA, those would help the public to

6    understand, would they not, whether the allegations that

7    the plaintiffs are making in this case are true or are

8    false allegations?

9    A    I disagree.

10          MR. JULIN:  Thank you, Your Honor.  I have no

11   further questions.

12          MR. MCCONNELL:  Nothing further, Your Honor.

13   Thank you.

14          THE COURT:  Thank you, Dr. Julin -- I'm sorry,

15   Dr. Lazarus.  You may step down.  I misspoke.

16          MR. MCCONNELL:  If we could just have a moment

17   or two to see what we're doing next.

18          THE COURT:  All right.

19       (Pause in the proceedings.)

20          MR. MCCONNELL:  Your Honor, what we propose is,

21   first, we do want to clarify on the record the issue of

22   which documents were agreed to be dedesignated, which ones

23   were not.

24       There was one, what we thought was a mix-up, and I

25   understand there's been a discussion.  So just to be clear

115

1   with respect to the documents that were attached to

2   plaintiffs' emergency motion for sanctions, Exhibit B to

3   that emergency motion for sanctions is the Complete

4   Response Letter that came out in December of 2008 about

5   which Dr. Lazarus testified, and the agreement is at this

6   point that that is remaining confidential.  Exhibit A is

7   the changes being affected letter which is being

8   dedesignated.  I just wanted that clarification on the

9   record.

10          MR. COWAN:  That's correct, Your Honor.

11          MR. MCCONNELL:  And, Your Honor, at this point,

12   I propose that -- it's Your Honor's pleasure, of course,

13   but that we have our argument on this and submit it.

14          THE COURT:  Well, let me see if anybody else

15   wants to put anything else on the record.

16      Anything else from plaintiffs?

17      Mr. Julin, anything else from you?

18          MR. JULIN:  Nothing else, Your Honor.

19          THE COURT:  All right.  Go ahead, Mr. McConnell.

20          MR. MCCONNELL:  Thank you, Your Honor.  And

21   we've got our, as usual, extraordinarily helpful charts,

22   perhaps helpful to me, I hope helpful to you.

23      I want to go over the documents that are pursuant to

24   the agreement between the defendant and the plaintiffs

25   still being treated confidentially and go over what it is

1    that we presented, also what the law is.

2        First, I'll start off with the call notes and the IMS

3    data that Mr. Paulson talked about, and his testimony,

4    which was not countered or dislodged in any way, is that

5    call notes reflect proprietary business information.  They

6    show what it is that AstraZeneca is doing, its marketing

7    efforts, what its strategies are, what it's saying to its

8    customers.

9        Significantly, it says who the customers are, and

10   there's ample case law that's been cited in the briefs

11   that we already filed with Your Honor that just customer

12   lists by themselves are typically treated as trade secret

13   proprietary information.

14       But also Mr. Paulson described that a review of the

15   call notes shows not just the substance of the individual

16   interactions between the sales specialists and doctors,

17   but shows the reach and frequency, the number of times

18   that the company was reaching out and interacting with

19   doctors, who they're reaching but also how many times

20   they're reaching, and the fact itself that strategic

21   information that a competitor would benefit from and would

22   probably attempt to counter if they had that information.

23       But also perhaps more importantly, according to

24   Mr. Paulson, is that meetings with customers allow us to

25   learn -- allowed AstraZeneca to learn what it is the

1  customers are saying, the reaction -- what, as he said,

2  they think about the product, what they think about

3  competitor products.  That's market research that's

4  valuable.

5      Now, Your Honor asked a question about whether these

6  doctors are free to go and share similar thoughts with

7  other people, and of course they are.  That doesn't mean

8  it's not marketing research.  If somebody conducted a

9  focus group and you had people in a room and you elicited

10  responses from them, it is clear, it is clear case law

11  that the results of focus groups would be marketing

12  research that would be treated as confidential, even

13  though the participants in the focus group could go

14  outside the door and tell other people what happened.

15      Perhaps one of the reasons people don't really do

16  that, they certainly don't do it in the kind of systematic

17  form that would be captured in a focus group analysis or a

18  set of call notes.

19      Mr. Paulson established that call notes constitute

20  significant commercial value to AstraZeneca and that

21  release of them to competitors would constitute

22  competitive harm.

23      On the IMS data, I didn't quite understand the point

24  that Mr. Julin was making when he said that the IMS data

25  is not in call notes.  They're two separate things, and

1    that was the point that I thought Mr. Paulson made

2    carefully and clearly, and that is that the call notes

3    show the interaction.  The IMS data, which is purchased

4    subject to a confidentiality agreement, the IMS data helps

5    the company make its decisions in terms of reach and

6    frequency, and that's data that is to be kept confidential

7    and is not -- certainly not shared with competitors.  And

8    if it were, it would certainly permit competitors a free

9    ride.  Why would you buy something if can you get it for

10   free?

11        The next topic that I want to talk about is the topic

12   that Dr. Lazarus addressed, which are unpublished Clinical

13   Study Reports specifically for 144 and 165.  And he laid

14   out the kinds of things that are in those Clinical Study

15   Reports, the raw data, the analyses, the interpretations,

16   the display of the objectives, where the company is

17   headed, what other sorts of indications they're seeking,

18   what's working in the analysis and the studies, what's not

19   working.

20        He also showed that the disclosure of all that

21   information, the specific information, the specific data,

22   again would result in competitive harm if competitors had

23   access to it.

24        And also, perhaps most significantly, certainly with

25   respect to Studies 144 and 165, that release of those CSRs

1  at this point could jeopardize the prospects for

2  publication in a peer-reviewed journal.

3      And I didn't hear anybody counter the significance of

4  peer-reviewed literature.  When there are trials, if there

5  are trials in these cases ever, peer-reviewed literature

6  is extremely important for experts.  People don't so much

7  rely on raw data or internal company documents to make the

8  point, they rely on peer-reviewed journals.  And it's

9  important to the public health community at large and it's

10  important to companies to be able to have peer-reviewed

11  journals.

12      Let me turn to the next issue.  These are documents

13  that we didn't have factual testimony on, but that's

14  because the law is fairly clear on this, and that is there

15  are certain foreign regulatory documents.  Part of the

16  agreement between the plaintiffs and defendant is that

17  certain of the Dutch documents, including some of those

18  that have been written about by Bloomberg, those are being

19  dedesignated, but there are some that are not, and there's

20  a French document where confidentiality is being

21  maintained.

22      And this Court has already ruled, Your Honor's ruled

23  that foreign regulatory actions have no relevance to the

24  plaintiffs' main case.  And I understand Your Honor's

25  point that there may be an appeal on that, and there can

1    be -- we've been talking a lot today about how people

2    change positions and there's evolution of positions.  I

3    suppose that's possible, but right now the ruling we have

4    is the ruling we have, and when you put that together with

5    the *Alexander Grant* case from the Eleventh Circuit, they

6    said that judicial review of parties' confidentiality

7    designations should be limited to those materials relevant

8    to the legal issues raised, which would suggest that

9    there's no reason to get behind the confidentiality

10   designation of the foreign regulatory documents.  They

11   don't have anything to do with the case.

12        In fact, a number of the cases that we cite in our

13   briefs talk about the danger that you don't want to

14   basically eradicate a protective order by allowing the

15   party willy-nilly to attach documents to filings, call

16   them dispositive filings, and just by virtue of filing

17   those documents with the Court, all of a sudden turn them

18   into live confidentiality issues.  These have to be

19   documents that actually are relevant to the issues in the

20   case.

21        And Judge Weinstein, who we've heard an awful lot

22   about during the whole course of the confidentiality

23   debate, Judge Weinstein himself said in *Zyprexa I* that

24   those documents which played no role in the adjudication

25   process lie beyond the reach of the presumption of access.

1        And again, because of the arrangement between the

2   plaintiffs and defendants at this point, we're viewing all

3   these issues through the prism of the press right of

4   access which doesn't apply to documents that are not in

5   fact relevant to the live issues in the case.

6        Very briefly, we haven't talked about the McFadden

7   documents, and that's because of a couple things.  One,

8   this Court has already issued a ruling, both Your Honor

9   and Judge Conway.  These are a little bit different from

10  the other confidentiality documents, Your Honor, because

11  Your Honor's actually looked at these before and

12  Judge Conway has looked at them before because of the way

13  that issue arose in terms of the sharing of the

14  nonredacted versions with the plaintiffs which of course

15  happened pursuant to your ruling.

16       But in the ruling that we got from the Court, both

17  yourself and Judge Conway, in capital, bolded letters it

18  says, "The parties are directed not to make any

19  dissemination of redacted portions which should be treated

20  as confidential under the protective order."

21       Can we have the next order?

22       And I think this is Judge Conway saying, "The Court

23  trusts that plaintiffs' attorneys and personnel will use

24  the utmost care in handling these documents as the parties

25  have been specifically ordered by Magistrate Judge Baker

1    not," again, caps and bold, "not to make any dissemination

2    of redacted portions."

3         I read those orders to show that these courts -- that

4    Your Honor and Judge Conway have made a determination as

5    to the appropriate confidential treatment of these

6    documents.  And notwithstanding that, we're in discussions

7    right now with plaintiffs' counsel to do in fact exactly

8    what Bloomberg suggested in their brief to the extent it's

9    possible via redaction to address issues, for example, of

10   innocent third parties or of certain sorts of descriptions

11   or activity that would be well beyond the decorum and

12   dignity of any court.  If we can get at those issues that

13   way, we will, and we're working on that and have made

14   progress on that.

15         THE COURT:  Well, I'll tell you what my thinking

16   was behind my order which Judge Conway referred to which

17   was that at that point, those documents were not shown to

18   be pertinent to the litigation.  They were discoverable.

19   But for the reason that you just argued about and quoted

20   Judge Weinstein about, that's why, at least till they

21   became pertinent or become pertinent -- because, I mean,

22   frankly, there are salacious parts of it that -- I don't

23   know about the dignity of the Court.  You'd be surprised

24   some of the cases we hear that would frankly make the

25   material in those documents pale, the criminal cases that

1  really are very difficult to hear.

2      But anyway -- so you're correct to cite that

3  language, but it was, as you noted in your opening

4  remarks, it's part of the dynamics of this case is things

5  change, as we reach different stages, different analyses

6  apply.

7          MR. MCCONNELL:  And in fact, Your Honor, I think

8  there's a motion in limine on those documents that's

9  pending before the Court --

10          THE COURT:  Right.

11          MR. MCCONNELL:  -- that based on the discovery

12  that's happened since then, our position is they're not

13  pertinent, they don't show any effect on the science.

14  Plaintiffs disagree.  Understood.

15          THE COURT:  Right.

16          MR. MCCONNELL:  And Your Honor's taken under

17  advisement.

18      But I think, though, these are documents that you've

19  seen.  And in fact, the subset of documents in that area

20  that are under consideration right now, it's actually

21  relatively small, blissfully small, and this is one of

22  those areas where in your discretion you can read these

23  documents and make your own decision.  We're trying to do

24  that among ourselves to make it easier for you.  Some of

25  those calls aren't that difficult in terms of what

1    properly should be disseminated and what should not.

2         I want to turn to the area of ongoing discussions

3    with the FDA, and that pertains to the two documents that

4    you've heard quite a lot about today, and that is the

5    December 22nd, 2008, Complete Response Letter from the FDA

6    regarding the pending SNDA on major depressive disorder,

7    as well as the metabolic submission in response to FDA's

8    request for data.

9         And, Your Honor, what we've seen is -- and we cite it

10   in the papers, there are FDA regulations that are on point

11   and that cover exactly this sort of situation in which

12   I -- and I'll turn to that in a second.  But the important

13   point is that the Complete Response Letter and the

14   metabolic submission contain information from pending

15   SNDAs and they relate to ongoing discussions with the FDA.

16        And what's really significant is we were talking here

17   about an application for an un -- involving an unapproved

18   label, and that's part of what's contained in this CRL,

19   for an unapproved use.  And that is -- if you're going to

20   talk about a public health dimension, that is a potential

21   issue in terms of putting out there a label that's not the

22   accurate label and it talks about a use that we don't even

23   have approved yet.  And that is something AstraZeneca

24   could not do.  And there's been no showing of any public

25   health benefit from doing that.

1          I mean, if you're going to balance the interests,

2     what we've heard on one side is that there are trade

3     secrets and proprietary information and there is an FDA

4     practice and interest in maintaining the integrity of this

5     ongoing process so they can arrive at whatever their final

6     decision is.  And when their final decision arrives, we'll

7     all know about it and that will be the word and that will

8     be what's communicated to the public.  Because, in the

9     end, it's the FDA that's going to decide what gets

10    communicated to the public.  It's not AZ, it's not the

11    plaintiffs' lawyers, it's not Bloomberg.  The FDA process

12    has to play out.  We have all that on one side and we

13    haven't heard a bit of evidence or any even reasonable

14    logic as to why the dissemination of that sort of

15    information benefits anybody besides voyeurism.

16         And I want to turn to the regulation.  This is 21 CFR

17    Section 314.430(d) which is what governs in this case

18    because what we're talking about, Your Honor, is we're

19    talking about an SNDA for major depressive disorder.  The

20    existence of the application has been publicly disclosed

21    because AstraZeneca issued a press release, just perfectly

22    standard, just saying we submitted the application, that's

23    pretty much it.

24         And what the FDA says, though, is that when you have

25    that situation where you have the SNDA then publicly

126

1    disclosed or acknowledged, no data or information

2    contained in the application or abbreviated application is

3    available for public disclosure before the agency sends an

4    approval letter.  And we're not there yet.  The FDA hasn't

5    sent that approval letter.

6         Similarly, there's another regulation 20 CFR

7    Section 20.61(c) that specifically says that "Data

8    information submitted or divulged to the FDA that

9    constitutes trade secret or confidential commercial or

10   financial information is not available for public

11   disclosure."

12        And I've mentioned a couple of times FOIA, which is

13   another part of the regulatory overlay, and the two

14   exemptions that apply here, 4 and 5, and 4 applies to

15   trade secrets, and 5 applies to the deliberative process,

16   and both of those concerns, both of those elements apply

17   with respect to the Complete Response Letter and the

18   metabolic submission.

19        The FDA regularly relies on these exemptions when

20   responding to FOIA requests.  And in fact in the case law

21   that I discussed before and I'm putting up in front of

22   Your Honor now, there's a discussion exactly about that,

23   about the application of FOIA Exemptions 4 and 5 and also

24   about the FDA regulations.

25        Your Honor, not to be overly repetitive, you've heard

1    enough about this, I just can't say strongly enough how on

2    point this case is and how well reasoned the case is.  And

3    if you just put this case down and put this Central

4    District of California decision next to what we have here

5    on the issue of the FDA correspondence, it's a perfect

6    match.

7         And the balancing that was done in that case was done

8    perfectly appropriately, that on the one hand there was an

9    enormous interest in terms of competitive sensitivity

10   because of the things that are contained in an SNDA, and

11   because it's not yet approved by the FDA.

12        It's says here it is only if the supplements are

13   approved that the public has an interest in the

14   information because only after approval will the drug be

15   marketed to the public in a different manner.  It is

16   therefore after approval that FDA releases information

17   regarding these applications.  And I just suggest that

18   Your Honor follow the reasoning of that specific opinion.

19        But I think that that specific opinion is in accord

20   with the balancing test that everybody's talked about in

21   their papers and everybody's talked about here today.  The

22   Eleventh Circuit decision in *Chicago Tribune v.*

23   *Bridgestone/Firestone*, there is a balancing between

24   AstraZeneca's legitimate interest in confidentiality and

25   the public's interest in disclosure.

1    I think Mr. Cowan said that it's plaintiffs' position

2    that AstraZeneca has to show that it has some

3    confidentiality interest.  I agree with that.  And I think

4    we've done that.  I think a lot of the documents on their

5    face, if you just read them, you see the scientific

6    information that's contained in there.  Or, with respect

7    to the marketing documents, the marking strategies, I

8    think on their face, this is the kind of information

9    that's within the heartland of a lot of the cases that

10   talk about trade secret proprietary information.

11   It's established.  It's undisputed that this is a

12   competitive industry.  This is a competitive product in a

13   competitive market.  And the kinds of scientific

14   information as it's dynamic, as it's evolving, the kinds

15   of marketing information is all competitive sensitivity.

16   The prima facie case or the initial burden it seems

17   to me is clearly met both by the documents themselves,

18   which Your Honor has, and also by the testimony that you

19   heard both from somebody in marketing and somebody in

20   science at AstraZeneca.

21   So we have that on one side of the scale, and I

22   suggest that what we have on that side of the scale is far

23   more significant than anything we've heard from Bloomberg.

24   All that we've heard from Bloomberg is broad sweeping

25   generalizations with absolutely no support whatsoever, no

 1   testimony, no documentary evidence.

 2       And when we talk about the application of the law and

 3   the balancing test to this particular stage of the

 4   litigation where there hasn't been that trial, where there

 5   is an issue of jury taint, or where there's still a lot

 6   more to be done, we're months away from trials.  It's not

 7   like *Zyprexa II* where there were settlements.  It's more

 8   like *Zyprexa I*.  In fact, this is a case where cases have

 9   already been dismissed on summary judgment.  I suggest

10   that when you apply *Zyprexa I* and look at what

11   Judge Weinstein did about the balancing of interests and

12   the different stages of litigation, keeping in mind where

13   we are now, and what was different in that case where

14   documents were in fact sealed until there had been two

15   tranches of settlement, and in *Zyprexa I* where the Court

16   recognized that preventing disclosure of certain documents

17   would serve the purpose of protecting a vulnerable

18   plaintiff patient population because material that might

19   be understood by the lay reader might do some harm.

20   That's what Judge Weinstein said in *Zyprexa I*.  That's

21   what Dr. Lazarus said on the stand when he was

22   cross-examined by Mr. Julin who just said, "Well, wouldn't

23   releasing all this information be good to the public

24   health?"

25       Dr. Lazarus said, "No.  Releasing that tentative,

1    interim, not final, subject-to-change information with

2    labeling that is not the correct labeling would in fact be

3    confusing and not benefit public health."  Dr. Lazarus was

4    saying the same thing that Judge Weinstein said in

5    *Zyprexa I.*

6        Your Honor, I want to turn to the issue again, coming

7    to the close on the issue of public access, since that is

8    where we are being that it's only Bloomberg at this point

9    that's challenging these documents.

10       There is no public right of access when documents

11   played no role in the adjudication process.  That is

12   clearly the case with the Complete Response Letter which

13   was attached merely to a sanctions motion which ended up

14   being dismissed.

15       But I suggest that is also the case with many of

16   these documents, and this is -- we have up on the screen

17   Judge Conway's conclusion about the documents that were

18   attached to plaintiffs' responses to the *Daubert* and

19   summary judgment motions, and she said, "Those responses

20   served more to bury the Court in paperwork, much of which

21   does not appear relevant, than to clarify and narrow the

22   issues in each case."

23       It would be a bizarre incentive to create to say that

24   a way to get around a protective order would be to put

25   documents in play by encouraging parties to attach the

1   documents willy-nilly, documents that don't really have

2   anything to do with the issue, that serve to obscure the

3   issue, and add to the pounds of paperwork in your office.

4        Because these are not properly considered judicial

5   process documents, there's no right of access for

6   Bloomberg.

7        And then I did want to -- I made this point before.

8   I just want it absolutely clear on the record that there

9   is no issue here of these documents already being shared

10  with competitors.  The confidentiality agreements in place

11  protect that.

12       We've all been through this drill before.  There are

13  a lot of cases where there are co-defendants, and this

14  sort of protection is absolutely typical where the lawyers

15  have access to the documents but for those competitive

16  confidential documents, they cannot be shared with the

17  competitors.

18       So there's been no waiver of confidentiality.  And on

19  our last page we have the actual language.  This is not

20  just the confidentiality agreement in this case, but this

21  is this separate confidentiality agreement that's been

22  executed by the different defendants in these cases,

23  AstraZeneca and Jannsen and Lilly.  As you can see,

24  "Outside counsel shall not disclose to any employee, agent

25  or representative of," the other defendant, "nor to any

1    person or entity not party to this agreement, any

2    confidential information produced by AstraZeneca unless

3    there is a written agreement."

4        There hasn't been a written agreement.  There hasn't

5    been any evidence that any of that information has been

6    shared.  There hasn't been any evidence of waiver.  The

7    confidentiality interests that AstraZeneca has in all

8    these documents is there.  It hasn't attenuated for those

9    specific documents that we're talking about.  It's

10   consistent with the FDA regulations and FDA policies.

11   It's consistent with the public health.  And it's

12   absolutely consistent with the Eleventh Circuit case law.

13            THE COURT:  You want to address the issue of

14   public interest in reviewing the integrity of the

15   administrative process?

16            MR. MCCONNELL:  Reviewing the integrity of the

17   administrative process.  You mean the FDA's administrative

18   process?

19            THE COURT:  Right.

20            MR. MCCONNELL:  Well, I think that the integrity

21   of that process can be reviewed after the fact.  I think

22   that after the FDA makes a final decision that the

23   confidentiality issue evaporates and there could be

24   scrutiny of that.  But it almost makes -- it sounds like

25   we're getting into the Heisenberg principle, that by

1   examining something, you alter it.  I think if you tried

2   to perform an autopsy on something that's still alive,

3   that that's not particularly productive.

4       To try to examine the integrity of the FDA's ongoing

5   process and reviewing the SNDA for the MDD, which is

6   pending, I don't think you can do it.  First of all, it's

7   contrary to the regulations, and second, it just doesn't

8   make sense that --

9           THE COURT:  Well, the FDA has decided that it's

10  contrary to its interest to make those things public, to

11  its regulatory interest.  But that doesn't address whether

12  the public might want to know whether the FDA's, for

13  purposes of argument, running a slipshod operation that

14  they don't want the people to see how they're doing it.

15          MR. MCCONNELL:  Well, but it's not just the FDA

16  sort of setting its own rules for what gets to be examined

17  and what doesn't.  We're also talking about a

18  Congressional intent.  We're talking about the Freedom of

19  Information Act and Exemption 4 and 5.  That's Congress,

20  that's not the FDA.

21          THE COURT:  Right.  That's the general rule, but

22  we're not talking about a right to get it under FOIA.

23  We're talking about whether in the balancing test here

24  we're starting with a presumption that the issues that are

25  in those documents have been put into the issue in

1   litigation where -- which changes again the balancing.

2          MR. MCCONNELL:  I don't think all those

3   documents have been put in issue in the litigation.

4          THE COURT:  I understand that.

5          MR. MCCONNELL:  You understand that initial

6   point.

7      I just don't -- it just seems to me, I haven't seen

8   any evidence, first of all.  I mean, what you're saying --

9   you're asking the question, you're raising a policy point.

10         THE COURT:  Well, I'm asking you to address

11  that.  That seems to me that that is a countervailing

12  interest.  How strong it is and whether it's legitimate,

13  and as you correctly point out, the agency has drawn the

14  line a different place.  And -- but you talk about the

15  Court's processes by way of analogy, but, you know, we

16  hear evidence in open court.  How we make our decision is

17  private.

18     But the FDA is gathering the evidence in private with

19  no adversary and asking for more information.  And the

20  people who are subject to FDA regulation, this is true, of

21  course, of many agencies.  But, you know, the person

22  seeking agency approval decides what to submit in

23  response, and, you know, the -- just to take it out of the

24  realm of the FDA in our present cases, you know, there are

25  investment advisers who would send tips to 100 people, and

1    the tip might be right 50 percent of the time and so

2    50 percent of the people think he's a genius and he will

3    send another tip to those 50, and then 25 percent really

4    think he's a genius.  Well, it doesn't mean he's a genius.

5    It means on the odds.

6         So same thing could be done with studies.  If you do

7    100 studies and some of them -- the only ones that get

8    submitted are the favorable ones, you know, the process

9    isn't very good.

10        MR. MCCONNELL:  Well, you said you wanted to

11   take it out of the FDA.  I want to take it back to the FDA

12   and with respect to that process and the integrity of that

13   process and how well it works, and I -- I -- I hear your

14   questions about that, but maybe it's particularly

15   appropriate to say this given the presence of the press

16   intervenor, but sometimes, Your Honor, what you read in

17   the papers ain't necessarily so.  And a lot of the reports

18   on the FDA process and defects in the FDA process aren't

19   necessarily so.

20        It's very easy for people on the outside of that

21   process to throw stones, but when the process is over and

22   when the information is released -- in fact that's

23   happened in this case with a lot of the back and forth

24   between the company and the FDA -- what you end up seeing

25   is that the FDA process is rigorous.  And that's

1    available, and we can do that autopsy after the fact and

2    see that.  There's a lot of back and forth.  It's not

3    simply that the FDA asks questions and then a company

4    submits what's they want to and that's the end of it.  The

5    FDA doesn't stop there.  There is an enormous amount of

6    back and forth, and we heard that.

7         Companies are forced to change positions.  Sometimes

8    the FDA does it.  That's not a bad thing, that kind of

9    open-mindedness.  I mean, the thing that is supposed to be

10   generating the decisions that the FDA makes and the

11   scientists make is data, an accurate interpretation of

12   data.  And I think that the evidence in this case in fact

13   will show that the FDA has been rigorous, they have not

14   been asleep at the wheel.

15        But now you're asking a different question.  What do

16   we do when the process is ongoing, how do we sort of

17   attach a monitor and take a heartbeat of that process now.

18   And my answer to you is, first, I don't think there's a

19   showing of a need to do that.  And second, I think that's

20   incredibly disruptive.  I think there's a reason why there

21   is a FOIA Exemption 5 for deliberative process.  It's not

22   just specific to the FDA.  These agencies have to be able

23   to engage in these deliberative processes without somebody

24   at every point sort of picking and prodding at them and

25   trying to look at things at interim stages.

1       And the thing that has to happen is the process has

2   to play out.  It could be subject to scrutiny and even

3   criticism after the process is played out.  But to say

4   that everybody gets to jump in and analyze and criticize

5   the process as it's happening, I don't think it's

6   accurate.

7       I don't suspect that you would take as a perfectly

8   appropriate analogy what I said before, but the idea of

9   you constantly having to show your interim drafts of an

10  opinion so that people could check and see the quality of

11  your legal analysis or your prose would be silly.  We have

12  to let the deliberative process work out and people do

13  their jobs, and then we can scrutinize it afterwards.

14  Maybe that just sounds platitudinous, Your Honor.

15          THE COURT:  Well, I'll tell you, I don't think

16  that analogy works.  Take this case.  I don't know how

17  many opinions I've issued.  They're all out there in the

18  process of trying to adjudicate whether these plaintiffs

19  have valid claims against your client.  You know, we're

20  not waiting until the end of the case to then open it up

21  and let everybody look at how the magistrate judge and

22  district judge did their work and what was submitted to

23  the Court.

24      We don't know what's going on inside my chambers or

25  in between my ears, but the process is open except for the

1    actual decision-making.  But that's not true with this FDA

2    process.  The only thing the public knows is that you

3    asked for a -- you know, a new indication and that

4    something was submitted, and then there was, you know, a

5    response that didn't include approval, which suggests

6    there's issues.

7                MR. MCCONNELL:  But the things that you said

8    that you release in this process, you know, those interim

9    decisions that you make, those are all decisions.  Those

10   are actually decisions you arrive at as opposed to the

11   process that's going --

12               THE COURT:  But they're making decisions, too.

13   One of the decisions is you need to submit more data.

14   That's what the Complete Response Letter mandates, I

15   suppose, that there's more data needed.

16               MR. MCCONNELL:  But the real decision, I think,

17   Your Honor --

18               THE COURT:  Or that the language is -- you know,

19   it's not a final decision.  None of the other things in

20   here are final until we get a final judgment.

21               MR. MCCONNELL:  I think that the analogy would

22   really be to that chart that we showed before when we

23   showed the various FDA decisions over time, the approval

24   of the NDA, and then approval of the various SNDAs.  Those

25   are decisions, too.  But this is a process that's in

1  motion, too.  I mean, the company has still submitted

2  addition SNDAs.

3       I guess what I'm saying is the interim process

4  that -- you know, between the application and the back and

5  forth and the scientific debate.

6       And by the way, the other thing that was said in the

7  Central District of California case that I cited, is that

8  there's this concern about a chilling of the back and

9  forth if all those things are going to be disclosed

10 publicly.  I mean, that's not unique to the FDA concept.

11 I mean, we've seen that in a lot of the areas where

12 confidentiality, for example, in management-union

13 negotiations, that there's a reason why those

14 negotiations, that interim process, the back and forth,

15 has to remain confidential, that if all that is going to

16 be aired to the public prematurely, that it affects the

17 content of those discussions.  It is sort of the

18 Heisenberg principle.  But it doesn't just affect it but

19 affect it adversely because of the chilling effect.  It

20 reduces candor potentially.

21      There ought to be -- science ought to play out the

22 way science is supposed to.  It's supposed to be

23 free-flowing, a free-flowing exchange.  At the end, it

24 comes to rest and somebody makes a decision and determines

25 what the right analysis is and what the accurate data is,

1    but that's got to play out in terms of science.  It

2    doesn't get played out in terms of -- I said voyeurism

3    before.  There's probably a better word for it.  But I

4    think science has to play out, and I think that's the

5    determination not just of the FDA but of Congress.

6                THE COURT:  All right.

7                MR. MCCONNELL:  Thank you, Your Honor.

8                THE COURT:  Anything from plaintiffs?

9                MR. BLIZZARD:  Briefly, Your Honor.

10        Your Honor, we do have an agreement here with respect

11   to these documents, and so I'm not going to overburden the

12   Court with argument about the documents themselves.  We're

13   not backing off that agreement.

14        But as can you see from the examination of the

15   witnesses, we still have a different approach to this

16   issue, and we want to make sure that that's clear to the

17   Court so that on a going forward basis, the Court

18   understands why we here think the lines that were drawn

19   were appropriate, drawn -- at least from our perspective

20   we thought the lines were drawn properly.

21        First of all, I'd just like to make a comment about

22   what Mr. McConnell says about the FDA process.  We

23   disagree that this is some rigorous process.  I think

24   there are many people, not the press, not just the press,

25   but the GAO, people within the FDA itself who have been

1   the ones throwing stones about the FDA being overburdened,

2   understaffed, and unable to carry out their

3   responsibilities to promote and protect the public health.

4       And so -- and what we have seen here, for example, is

5   that the company changed its label by changes being

6   effected, which was a particular regulation that they

7   could employ to change the label themselves without FDA

8   approval back in the summer of 2007.

9       It's only been within the last two months, really,

10  that the FDA has responded to that and said that that

11  change was not effective to communicate the level of risk.

12  And now we have the FDA's essentially demanding that the

13  information about the hyperglycemia risk, the high blood

14  sugar risk, be moved up from the "Adverse Reaction"

15  section to the "Warning" section of the label.  So for 18

16  months that label has been out there and it's now been

17  determined by the FDA 18 months later that that was not an

18  effective way to convey the risk.

19      So this, I think, is a prime example of how the FDA

20  is not timely responding to the information that's out

21  there.

22      With respect to the call notes --

23          THE COURT:  You understand this Court doesn't

24  sit to monitor the FDA or supervise them or --

25          MR. BLIZZARD:  And I understand that, Your

1    Honor.  And I'm -- actually think that with respect to the

2    line that we drew with regard to the application for their

3    new indication, the major depressive disorder indication,

4    that the line we drew there is appropriate because we

5    don't want, frankly, and I know AZ doesn't want,

6    information going out to doctors that suggest that this is

7    an on-label use of the product, or this draft label for

8    major depressive disorder being publicly disseminated.  I

9    think it potentially is confusing and that's why we

10   supported that particular document pertaining to its

11   confidentiality.

12       With respect to the call notes, I think you heard

13   from the witness that the witness believes that every call

14   note forever is -- contains proprietary data that should

15   remain confidential forever.  We have a basic disagreement

16   with that.  We think that many of these marketing

17   strategies are stale.  But we thought that the appropriate

18   line to be drawn in consultation with the defendant was in

19   2004 when they changed and got a bipolar mania indication,

20   and since then, the primary market for the drug has been

21   for the treatment of bipolar disease, although it's still

22   indicated for treatment of schizophrenia.  So we thought

23   that was the appropriate line to draw, and we did agree

24   with that drawing of that line.

25       With respect to the Clinical Study Reports, we think

1    that the Clinical Study Reports should, to the extent they

2    don't impair publication of the results, we think that

3    those should be made public because we think that the open

4    exchange of scientific information and ideas does promote

5    the search for truth.  And it's not the summaries that

6    promote it as much as the release of the data because

7    there can be many different data analyses of the same data

8    subset.  And our expert's reports indicate that if you

9    used different data analyses, more appropriate data

10   analyses of some of those same studies, you would have

11   come to different results.

12        So we think the public health and really the interest

13   of this case is promoted by making the Clinical Study

14   Reports public so that -- and it's not just treating

15   physicians but medical researchers, independent medical

16   researchers who are interested in this area, so that they

17   can see the underlying data and do their own data analysis

18   if they want.

19        So we clearly think that if it's going to impair the

20   publication of data or publication of reports in the

21   medical journals, that that's an appropriate line to draw.

22   And we have heard that with respect to these two Clinical

23   Study Reports, 165 and 144, that potentially we all agreed

24   to draw the line there.

25        And so with respect to the McFadden documents, Your

1    Honor, I would say that we're moving forward with those

2    documents to redact those, as appropriate, to eliminate

3    the more salacious content of them but still communicate

4    the sort of breach of ethics where the conflict of

5    interest that those documents evidence.

6         If it had been the exchange of money for information,

7    clearly this Court would not need anything redacted.  It

8    wasn't our desire for this to be an exchange of something

9    other than money.  So we're working toward redacting this

10   so that we protect the identity of people who are innocent

11   to this process, and that we also communicate as much as

12   we can what actually happened.

13        So with that, Your Honor, those conclude our remarks

14   at this time about these documents.

15        We would also say that we've heard from AZ that

16   they're willing to make similar dedesignations, look at

17   other documents that are part of the exhibits in this

18   case, and deposition exhibits, and attached to filings in

19   this Court to dedesignate those documents that are similar

20   to the ones that they dedesignated here.  And we look

21   forward to working with them on getting that done

22   promptly.

23             THE COURT:  Mr. Julin?

24             MR. JULIN:  Your Honor, let me thank you for

25   taking the time to look very closely at these issues.

1       Obviously the press, the public, is at very much of a

2   disadvantage in trying to advise the Court as to what to

3   do with these kinds of problems, particularly with the way

4   these arose.  We saw -- when I got into this case perhaps

5   a week and a half ago, saw the many different motions,

6   difficult even to sort out, and still is difficult for us

7   to sort out what it is the parties are trying to keep

8   secret.

9       And it was also very clear that there were many, many

10  things that were filed, many things were designated in

11  discovery.  Those things were filed on substantive

12  motions, and it is very difficult for us to address the

13  specifics.

14      To a large extent, we're really relying on you to

15  look at these things and to make a good judgment about

16  whether these things have been filed in good faith by the

17  plaintiff and not simply dumped into the record to try to

18  burden the Court or try to expose things unnecessarily but

19  whether these are legitimate matters that need and should

20  be considered by the Court.

21      And if they are such matters, then certainly the

22  presumption of openness should attach to them.  As you

23  said, these courts are intended to be open and the

24  adjudicative process is very important to the integrity of

25  the process that these things be open.

1          Now, there was some suggestion that we should just

2    wait, that we should see what happens ultimately.  Well,

3    and there was the suggestion if you try to conduct an

4    autopsy on a living person, well, you're going to kill the

5    person.

6          There's another way to look at it and that's news

7    delayed is news denied.  The people that are looking at

8    this, they're looking at this case, they're wondering

9    about this case, they're wondering about how it's handling

10   the allegations that are being made.  There's discussion

11   of *Zyprexa I* and *Zyprexa II* and how, as those cases

12   progressed, the courts became more and more open.  And

13   that the claim of this is not *Zyprexa I* -- or it's not

14   *Zyprexa II,* it's *Zyprexa I*, and I think the question is

15   whether it's *Zyprexa III*, whether this is simply a repeat

16   of what we've seen.

17         Obviously that's why the press has come forward here

18   in this particular case is because it is so closely

19   related.  Notwithstanding that there's different drugs and

20   different facts of the various cases, it's another

21   atypical antipsychotic case where -- of a competitor that

22   is at issue.  And as Your Honor is fully familiar with the

23   Eli Lilly history, the results in that case are just

24   astounding in terms of the number of claims that were

25   made, the scope of the settlements, the plea to criminal

1    charges and so forth.  And so the scope of the public

2    interest in this particular case is extraordinary.

3         And that's why I think that when we're looking at all

4    these things like the exemptions to the Freedom of

5    Information Act and whether certain documents are

6    generally maintained as confidential, they don't really

7    answer the question of whether these particular documents

8    that have been filed by these parties and have asked the

9    Court to make a decision on the basis of these documents,

10   whether these should be -- that we should be public or

11   not.

12        Now, when we get to the specifics of both the law and

13   the documents, I think that there is general agreement

14   here on the -- on this -- on the framework of -- for a

15   legal analysis to be applied, the documents filed are

16   presumptively open when they're filed with substantive

17   motions.

18        There was some suggestion that documents filed with

19   sanctions motions should be somehow treated separately or

20   procedurally.  Well, this particular sanctions motions

21   that I understand are at issue are really very closely

22   related to summary judgment motions where the plaintiffs

23   are saying, "We should have had these documents.  These

24   documents should have been part of the summary judgment

25   proceedings, but they were withheld."  So those are very

1    closely related to the summary judgment motions.  The

2    *Daubert* documents similarly are very much directed at the

3    substance of the claims.  So I don't think there's a basis

4    to distinguish between the different types of motions and

5    the documents that are filed by the plaintiffs or

6    defendants.

7         There's an argument that's made that, "Well, this

8    wasn't voluntary.  These are not documents that

9    AstraZeneca filed in support of its motion for summary

10   judgment.  These were responses."  Well, quite obviously

11   the responses are equally important.

12        As the moving papers, in trying to evaluate the

13   claims and to evaluate the fairness of the process, I do

14   think that there is a filtering function for the Court to

15   play in deciding on whether these were appropriately

16   filed.  If they were appropriately filed, not simply

17   whether the plaintiffs win or lose on their arguments, but

18   whether these were legitimate arguments, there is

19   good-faith filings of the documents and the Court should

20   consider them in presumption of access should apply to the

21   documents.

22        On the balancing of interest, yes, I see the trade

23   secrets issue.  But again, I think when you're looking at

24   the balance to be struck there, it's because of the

25   extraordinary nature of this litigation that is what

1    requires openness here.  And it was really in -- if you

2    read Judge Weinstein's opinion, when he was looking at the

3    this after having gone through a very difficult process

4    where the *New York Times* had initially gotten documents

5    that were supposed to be sealed and then they were

6    released and then he tried to get them back, he really was

7    quite clear when he came to the end of the day in the

8    middle of and not at the end of the process in that

9    litigation in New York, when he certified the class, he

10   then went through it and he said really, the presumption

11   of openness has got to prevail here.  All of these

12   documents that were filed with motions to dismiss for

13   summary judgment, depositions, records, all of this has

14   got to come out because of the extraordinary public

15   interest in this litigation.

16        And I would submit it's litigation of this type where

17   you have so many claims, such -- such -- so much is really

18   at stake here.

19        With respect to the specific documents, I'll just

20   briefly make several observations on these.

21        The call notes, I think Your Honor was quite correct

22   in getting at the fact that there's really not much that

23   is confidential in the call notes at all.  All of the

24   various pharmaceutical companies that are marketing to the

25   doctors, they all obtain prescriber histories from one of

1    the several companies that provide that to all of the

2    companies.  They all know what the doctors are

3    prescribing.  All of the sales representatives go in one

4    after another and talk to the doctors about what their

5    preferences are, what their concerns are, what their

6    patients are prescribing.

7         The -- the concept that there's some different

8    information that's being obtained from doctors in these

9    call notes, it seems to me is somewhat attenuated.  And

10   that's -- or that some master strategies for marketing

11   these drugs is somehow being disclosed seems also to be

12   very attenuated.

13        And that's, I think, one of the reasons that the

14   judge in Alaska, when he was looking at the call notes and

15   looking specifically at the type of information, the

16   scribblings of various sales representatives about what

17   they were learning, he was concluding, well, yes, I see

18   there's some level of proprietary information, some

19   utility that perhaps competitors could have, but really

20   the important thing about those call notes was that they

21   were revealing that there were efforts being made to

22   market these drugs for off-label uses.  And so those

23   documents had to come out and those documents are coming

24   out in the case in New York.

25        I think just on balance, the public interest weighs

1    in favor of disclosing those documents.

2         The IMS information, again, it's a little unclear

3    what is involved there.  In the documents that were filed,

4    the IMS notes were identified -- in the memos that were

5    filed, the IMS notes were identified as relevant to these

6    issues about ghostwriting.  And that's very unclear to me

7    how those two things are at all connected.

8         So it's an ambiguity that I can't really address

9    whether there's a need to have those IMS notes.  These --

10   and the IMS interests, IMS does have a confidentiality

11   agreement with AstraZeneca as with other pharmaceutical

12   companies.  What we're talking about is not disclosing the

13   world of IMS data.  We're talking about the particular IMS

14   data that was filed by the plaintiffs that they felt was

15   relevant to some -- the issues in the case.

16        The Clinical Study Reports, we've heard, I would say,

17   speculation about whether there's any jeopardy to the

18   publication ability of these -- these works.  The works

19   don't lose their value if they are made publicly

20   available.  Copyright law still protects the copyright so

21   people can't simply go and copy those and repeat those and

22   destroy the value of the publication, but the information

23   would be available in the event that the Clinical Study

24   Reports came out.

25        I don't think you have enough evidence to conclude

1   that any of these -- either of the two Clinical Study

2   Reports that seem still to be at issue would not, in fact,

3   be published or really that there's a serious risk that

4   that would not occur.  We certainly don't have anyone from

5   any of the journals saying that that is the case or even

6   any testimony that they have been told that that's the

7   case.

8        As far as the foreign regulatory documents go, I

9   don't really have much to add on that.  I've seen Your

10  Honor's rulings on the in limine motions and the

11  conclusions that that is perhaps not relevant.  But,

12  again, I think that that's something that the plaintiffs

13  felt was relevant to the disposition of those motions and

14  the public should have in judging those arguments and how

15  the Court disposed of those.

16       The FDA Complete Response Letter and the pending FDA

17  applications, I do think it is significant that we're not

18  talking about the Freedom of Information Act in this case.

19  Whether the CFR sections that have been cited apply or not

20  is really not the question.  Obviously those CFR

21  exemptions, assuming that they're applicable, they're

22  meant to protect premature release of FDA matters while

23  the FDA considers what it's going to do so that the FDA

24  can have its ultimate ruling and that becomes public.

25       But here, we're in a different forum entirely.  We're

1    in a forum where plaintiffs, hundreds or thousands of

2    them, are making allegations about what AstraZeneca did,

3    and AstraZeneca is trying to rebut that.  And the public

4    is trying to look at that and trying to judge what the

5    plaintiffs are saying, what the defendants are saying,

6    what Your Honor is doing with all that.  So I think

7    although -- is it relevant?  It's not certainly

8    dispositive of whether these things should be released.

9         And I believe that is everything.  Before I conclude,

10   I would like to keep the focus on getting the release of

11   those documents that no one objects to as soon as

12   possible.  And again, I would suggest today would be an

13   appropriate day so we don't walk away from this hearing

14   with nothing, and have then all sorts of discussions and

15   debates about when and why and what is going to happen

16   afterwards and then we come back weeks or months later to

17   talk about why nothing was ever released.

18        I understand there's an agreement the documents that

19   were sealed should be released, and that agreement should

20   be made an order of this Court that they be released and

21   made available today, if at all possible.

22        And then there should be some direct limitations on

23   these further negotiations that would take place so that

24   we don't have an ongoing process.  I understand that they

25   think that they can reach agreement on other matters that

1    should be redacted and other documents should be released.

2    I certainly would hope that there would be some clear

3    limitations so that we could get that done and get as much

4    of this out as possible.

5          And finally, I would hope that in the future that the

6    rules of this Court are followed by the parties and that

7    simply we don't have filing documents under seal, many,

8    many, motions piling up that then puts again the burden on

9    the press and the public to come forward, which is quite a

10   burden.  In this day and age when the press doesn't have

11   much in terms of resources to do this, it is quite a

12   burden.

13         And so again, Your Honor, we rely very heavily on you

14   and your good judgment in controlling this process and

15   making sure that the public sees and understands what's

16   going on.  Thank you.

17            THE COURT:  Mr. McConnell?

18            MR. MCCONNELL:  Your Honor, I would just say

19   very briefly that ignorance of what's actually happened in

20   this Court in terms of following the procedures and also

21   the content of the documents doesn't seem to stop the

22   Bloomberg lawyer from saying things that are really kind

23   of distressing.  I don't think there's been a violation of

24   court orders.  I think we've played by the rules that Your

25   Honor has set forth, and those rules have worked.

1       With respect to availability of these documents, I

2   suggest there's no special treatment.  I think the way

3   this is supposed to work is that the documents now get

4   filed in the appropriate fashion, unsealed, and then

5   they're available to Bloomberg or anybody else.

6       I just have to respond to a couple of things very

7   quickly that were said, some of which seem to be sort of

8   startling *non sequiturs*.

9       Mr. Blizzard talking about the CBE and now how the

10  warning has changed.  What's happened is, is that after

11  all these many months of additional data being submitted,

12  what the FDA ended up saying was, "Move this statement

13  here on hyperglycemia to another part of the label," but

14  they didn't change the substance of it at all despite

15  the -- whatever submissions -- despite whatever it is that

16  the plaintiffs want to say, nothing changed in terms of

17  the substance of the hyperglycemia warning.

18      And I mean, this is the issue of sort of trying to

19  litigate in the press and create soundbites.  The reality

20  is something quite different.

21      We agree with the plaintiffs on the CSR issue.

22  Publication is important.  It is not speculation.  You

23  heard testimony from somebody who has written for

24  peer-reviewed journals and who's been a peer reviewer, and

25  it just plain makes sense that a journal would like to

1    publish something that is news as opposed to publishing

2    something that's already out there.  That's just well

3    established that that's what publication policy is, and to

4    reduce the amount of peer-reviewed articles would be a

5    loss in general.

6        On McFadden, I just don't want to let it go unpassed,

7    there is no showing of a breach of ethics in terms of a

8    *quid pro quo*.  We've had lots of discovery since Your

9    Honor first saw those documents months ago.  No

10   *quid pro quo*, ample discovery, nothing.  Your Honor has

11   the motion in limine in front of you.

12       What happened were personal relationships, silly

13   salacious e-mails, no effect in terms of conflict of

14   interest, no effect on the science whatsoever.  Again,

15   that seems to be playing to the press gallery.  No

16   exchange whatsoever.  But we will continue to meet and

17   confer on those documents.

18       The Bloomberg lawyer talks about the sanctions

19   motion, and because things were attached to the sanctions

20   motion, those documents are in play.  He forgets that

21   sanctions motion was denied and then proceeds to make up

22   law that sanctions motions and *Daubert* motions ought to be

23   treated the same way as dispositive motions like summary

24   judgment motions.

25       But he also acknowledges the issue that this Court --

1    and I thought this was interesting he acknowledged this --

2    this Court actually can play a role in looking at whether

3    documents were appropriately attached to dispositive

4    motions.  And that is the case with the summary judgment

5    oppositions by the plaintiffs.  Judge Conway ruled that a

6    lot of these things shouldn't have been there.

7         Let me talk specifically about the IMS data because

8    the Bloomberg lawyer made a good point.  He said, "I don't

9    even know what this is, it's IMS data, but it says

10   ghostwriting."

11        What happened was is that on the ghostwriting issue,

12   the plaintiffs attached to their opposition just a whole

13   bunch of IMS data that was apropos of nothing.  So for

14   that reason, I'd say that the IMS data is also not a

15   judicial document.

16        But besides all the efforts to play to the press

17   gallery, engage in rhetorical flourish is the thing that

18   has to animate this Court's decision is the case law.  I

19   mean, in the end, it's the law that's got to decide where

20   we go on this complex and difficult issue.  And all I'd

21   say to Your Honor is that *Chicago Tribune* in terms of the

22   balancing test and the *Martin Luther King* case in terms of

23   the voluntariness issue, which I'm not making up, that's

24   what the courts have said, and the *Citizens Commission*

25   case from the Central District of California which is the

1    closest thing we have to something on point, that looked

2    at policy issues and FDA regulations and FOIA and the law

3    and put them all together and did the balancing and said

4    there is a reason why ongoing proceedings before the FDA

5    have to remain confidential.  That work has already been

6    done.

7         There's another case we talked about that applies,

8    *Zyprexa*.  And I guess there's a debate as to whether it's

9    a *Zyprexa I* or *Zyprexa II*.  We're saying *Zyprexa I* is the

10   closer case because of the stage of the litigation.  But

11   in a way, it's not *Zyprexa* at all.  This is not *Zyprexa*

12   despite what Bloomberg or the lawyer says.  It's a

13   different drug with different facts, and I'm not just

14   saying that.  I've got rulings from this Court to prove it

15   because whereas in *Zyprexa* there were settlements, what we

16   have in this case are summary judgments granted to the

17   defendant because plaintiffs couldn't make out their case.

18   It's not *Zyprexa* at all, even remotely.

19        I'd suggest that we follow the reasoning of the

20   cases, we follow the agreement of the party, we put aside

21   the speculation and the florid rhetorical flourishes and

22   follow the law.  And the law fully supports the agreement

23   made between the defendant and the plaintiffs.

24        Thank you, Your Honor.

25             THE COURT:  All right.  Well, I'm going to take

1    the merits of the issues we've heard today under

2    advisement.

3        On the other matters we talked about at the

4    beginning, with respect to the documents that the parties

5    have agreed are to be refiled in the public docket, that

6    should be a fairly simple mechanical matter, so I'm going

7    to direct that that be accomplished by tomorrow at noon.

8        With respect to the redacted versions of the memos

9    and motions and related papers that I had really hoped

10   would have been filed some time ago, but I understand now

11   need to be look at again because of the expanded agreement

12   of the parties, I want those redacted versions to be filed

13   in the public record, of the ones that I previously

14   allowed to be filed under seal, to be filed by March 4th

15   by 5:00.

16       And then with respect to plaintiffs' request that we

17   schedule a further hearing about declassification or

18   dedesignation of other materials, do you anticipate that

19   being an evidentiary hearing or oral argument?  Or what

20   was it that you had in mind?

21           MR. COWAN:  Your Honor, it certainly could be an

22   evidentiary hearing.  It would basically be the same

23   proceeding that we had today.

24           THE COURT:  Potentially, you mean?

25           MR. COWAN:  Potentially, right.

160

1          THE COURT:  Well, I'll set aside a date then of

2   May 7th at 10:00, and we'll probably have some further

3   discussion prior to that date to determine what needs to

4   be heard and how long it's going to take.

5          MR. MCCONNELL:  Your Honor, I just heard from

6   somebody in the back there who probably knows the

7   technical issues better than I do, that just as a matter

8   of logistics and technology, and I'll see what the

9   plaintiffs say, that getting all these things filed by

10  noon tomorrow just may not be logistically doable.  It's

11  the system apparently that just can't handle all the

12  documentation that would be -- have to --

13         THE COURT:  They're all going to be separate

14  docket entries.  The redacted ones, I understand, won't be

15  ready, but the -- but I'm talking about things that

16  were -- that you've agreed that can now be refiled

17  publicly.

18         MR. MCCONNELL:  In full.  So not covering the

19  redacted documents.

20         THE COURT:  Yeah, we're not talking about the

21  legal memos that you're going to have to take some things

22  out.  That's what I'm giving you till March 4th for.

23         MR. JULIN:  Your Honor, with respect to those

24  documents that are to be released by agreement, if the

25  plaintiffs have paper copies of the documents, we're glad

1    to take paper copies of the documents.

2              THE COURT:  Well, that's between you and them.

3              MR. JULIN:  So if they --

4              THE COURT:  I'm -- you're not the only one here.

5              MR. JULIN:  No, I understand.

6              THE COURT:  I'm talking about the public.

7              MR. JULIN:  And I appreciate that as well, but

8    just in terms of the interests of expediency and getting

9    this done and making sure there's not a long lag --

10             THE COURT:  If the plaintiffs' agreement with

11   AstraZeneca is that those things are no longer designated

12   as confidential and they choose to share them with you or

13   representatives of your client, that's up to them.

14             MR. JULIN:  Thank you.

15             MR. MCCONNELL:  But they don't have to.

16             THE COURT:  Right.  But I do want them in the

17   public record that reporters and other interested members

18   of the public and your attorneys can look at by tomorrow

19   at noon.

20             MR. COWAN:  Your Honor, if I may, we will

21   make -- we believe we can make the filing, and I believe

22   we have the bulk of the filing to do.  As far as the

23   documents that need to be filed of public record, we

24   believe we can make that by noon tomorrow.

25        We will certainly apprize the Court if we run into a

1    technical problem having that happen, but I believe it can

2    be done.

3             MR. MCCONNELL:  Now I'm told more specifically

4    what the problem is, is that part of the deal is that we

5    will redact certain call notes of pre-'04 call notes in

6    terms of customers.  At least that's the deal, what I'm

7    told, is that process of redacting them.

8             THE COURT:  All right.  Well, everything but

9    those then.  And those can be in by --

10            MR. MCCONNELL:  Thank you, Your Honor.

11            THE COURT:  -- March 5th.

12            MR. COWAN:  Your Honor, I have one brief

13   housekeeping matter, if I may.

14        Along the lines of the hearing that Your Honor

15   intends to set for May 7th, and this is also addressing a

16   housekeeping matter that we kind of left hanging at the

17   last time we were before you on January 28th of 2009, and

18   Mr. Coutroulis and I have had a very brief conversation

19   about it again last night, but we mentioned the privilege

20   log issues to you the last time we were before you, and

21   the parties were somewhat uncertain as to how that issue

22   resolved, and I promised and Mr. Coutroulis promised, I

23   believe, to get back and kind of look at where that issue

24   left off.

25        And my understanding with Mr. Coutroulis is that

1   we -- the parties are going to be able to have additional

2   meet and confers regarding the privilege log and the

3   additional issues that plaintiffs have with the privilege

4   log, and then, if necessary, file a motion to compel to --

5   related to the privilege log issues that are left

6   unresolved from that meet-and-confer process.

7        And I would submit that plaintiffs would try to do

8   that, get through that process in sufficient time in

9   advance of the May 7th hearing so that if we are needing

10  to address those issues with the Court, that we can do

11  that at that time.

12          THE COURT:  Well, we'll just have to see.

13          MR. COUTROULIS:  One thing I -- if I may, very

14  briefly.

15       The only thing I would say in response, yes, we did

16  discuss it very briefly last night.  I'm not aware of any

17  pending motion on any of that.  This goes back months.

18  We've now had summary judgments in two cases.  Had we not

19  had those summary judgments, we would have been in trial.

20       I don't know if any such motion would be timely at

21  this point.  We'll certainly engage in a meet-and-confer

22  process.

23       And what happened is the Court gave us guidance in an

24  order on privilege and in an ex parte proceeding that took

25  place.  We then went ahead and implemented what we

1   understood were the guidelines and produced documents.

2   And this matter only resurfaced again at the last hearing.

3       So while we're certainly prepared to listen to what

4   plaintiffs have to say, I don't want my silence to be

5   interpreted as necessarily agreeing that a motion that

6   would involve a number of documents months after the fact

7   when we're at this stage in the litigation would be

8   timely.  I just want to reserve that.

9           THE COURT:  All right.  We'll take those as they

10  arise.

11      We're in recess.

12      (Proceedings adjourned at 12:40 p.m.)

13                  C E R T I F I C A T E

14      I certify that the foregoing is a correct

15  transcript from the record of proceedings in the

16  above-entitled matter.

17

18  s\Sandra K. Tremel  March 2, 2009

19

20

21

22

23

24

25