**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

IN RE: SEROQUEL PRODUCTS
LIABILITY LITIGATION

This document relates to:

*Linda Guinn v. AstraZeneca Pharm. LP, et al.*, No. 6:07-CV-10291

*Janice Burns v. AstraZeneca Pharm. LP, et al.*, No. 6:07-CV-15959

*Richard Unger v. AstraZeneca Pharm. LP, et al.*, No. 6:07-CV-15812

*Connie Curley v. AstraZeneca Pharm. LP, et al.*, No. 6:07-CV-15701

*Linda Whittington v. AstraZeneca Pharm. LP, et al.*, No. 6:07-CV-10475

*Eileen McAlexander v. AstraZeneca Pharm. LP, et al.*, No. 6:07-CV-10360

*David Haller v. AstraZeneca Pharm. LP, et al.*, No. 6:07-CV-15733

MDL DOCKET NO:

6:06-MDL-1769-ACC-DAB

---

**PLAINTIFFS' RESPONSE IN OPPOSITION AND SUPPORTING MEMORANDUM OF**
**LAW TO ASTRAZENECA'S MOTION TO EXCLUDE NON-CAUSATION EXPERT**
**TESTIMONY UNDER FEDERAL RULES OF EVIDENCE 702, 401 AND 403**

The above-referenced Plaintiffs submit their Response in Opposition and Supporting

Memorandum of Law (collectively, "Opposition") to AstraZeneca's (hereinafter "Defendant")

Motion to Exclude Non-Causation Expert Testimony Under Federal Rules of Evidence 702, 401

and 403 (Doc. 1121, "Motion"), pursuant to the Court's Order of August 1, 2008 (Doc. 1059),

and would respectfully show the Court as follows:

1

# I.  SUMMARY OF THE RESPONSE

_____

*We should not be quick to abandon the principle of easy admissibility of expert and other testimony embodied in the Federal Rules of Evidence.  The Rules were designed to depend primarily on the lawyer-adversaries and sensible triers of fact to evaluate conflicts.  The judge was intended to serve the limited role of facilitator rather than controller.*[1]

_____

Although "rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of [a] proffered expert's methodology, it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Likewise, "a district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." *Maiz v. Virani*, 253 F.3d 641, 666 (11th Cir. 2001). "Quite the contrary, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)); *see also Maiz*, 253 F.3d at 666.

Defendant, however, "would elevate [the Court] to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul – separating the saved from the damned." *United States v. Frazier*, 387 F.3d 1244, 1294 (11th Cir. 2004) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1045 (2d Cir. 1995)).  Because "[s]uch an inquiry would inexorably lead to evaluating the witness's credibility and weight of the evidence, the ageless role of the jury," it must be rejected.  *McCullock,* 61 F.3d at 1045.

---

[1]      Jack B. Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended, 138 F.R.D. 631 (1991), *cited with approval in Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588-89 (1993), *and United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004).

## II.  INTRODUCTION

Without exception, each of Plaintiffs' experts challenged in Defendant's Motion is qualified to offer the opinions for which they have been designated.  Each challenged expert is a distinguished scientist whose expertise will be helpful in deciding relevant pharmacological, medical and epidemiological issues.  Likewise, each has met the standards of *Daubert* and Federal Rules of Evidence 702, 401 and 403 as outlined herein.

Nevertheless, Defendant has moved to exclude all or part of the proposed testimony of Plaintiff's proffered experts, Laura M. Plunkett, Ph.D., DABT, William C. Wirshing, M.D., Donna K. Arnett, Ph.D., M.S.P.H., I. Jack Abramson, M.D., Brian R. Tulloch, M.D., Mitchell A. Young, M.D., Jennifer Marks, M.D. and Bruce D. Perry, M.D., Ph.D.  Drs. Plunkett, Wirshing and Arnett are qualified to offer general causation opinions and, accordingly, have been designated as Plaintiffs' general causation experts pursuant to the Court's Order of August 1, 2008 (Doc. 1059).  Drs. Abramson, Tulloch, Young, Marks and Perry are also qualified to offer general causation opinions in the context of rendering differential diagnoses.  Where Drs. Abramson, Tulloch, Young, Marks and Perry have relied upon the testimony of Plaintiffs' general causation experts, they may offer general causation testimony to the extent it is subsumed within their case-specific opinion.

Attacks on the challenged experts' qualifications and/or opinions by Defendant are, by and large, based on assessments of credibility, which should instead be left for the trier of fact.  Defendant's challenges are, more specifically, attempts to exact premature rulings from the Court on experts' limitations that, if actual, would be more appropriately tested through rigorous cross-examination.  Abusive motion practice such as this has been consistently rejected by the federal Courts of Appeals.  In particular, the Eleventh Circuit has forbidden litigants' attempts to

3

wield *Daubert* challenges as swords by which to strike adversaries' fundamental constitutional rights to jury trials.  *See, e.g., Quiet Tech. DC-8, Inc*., 326 F.3d at 1341 (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 141 (D.C. Cir. 1996) ("By attempting to evaluate the credibility of opposing experts and the persuasiveness of competing scientific studies . . . the questions of the admissibility of the expert testimony and the weight appropriately to be accorded such testimony by a fact finder" was conflated.)); Weinstein, 138 F.R.D. at 634 (the proper application of Rule 702 is critical in that it "deal[s] . . . with judgments about how the United States adversarial system should operate in view of its history and such fundamental constitutional controls as the right to a jury trial," and as to these matters, a "restrictive" approach to the Rule should be avoided).

Under this standard, Defendant bears a heavy burden to show that the challenged experts' opinion should be excluded.  Rather than squarely addressing Plaintiffs' experts' opinions, Defendant's motion re-casts each expert as a "super fact witness", ignoring the legitimate bases of their testimony.  Further, Defendant has challenged testimony that was never offered or intended to be admitted at trial.[2]

If Plaintiffs' experts' were offered for the purposes for which they are challenged, their testimony could be excluded under *Daubert*.

---

[2]     Plaintiffs have outlined for the Court the distinctions between expert opinion as mischaracterized by Defendant and expert opinion that Plaintiffs intend to offer as evidence at trial.  Contrary to Defendant's assertions, for example, Dr. Plunkett will offer no opinions on how doctors use labels "to weigh risk and benefit information for individual patients", whether physicians " 'understand the implications' of the adverse events section of drug labeling," whether "doctors need to see basic medical information such as the 'metabolic complications' of weight gain in pharmaceutical labeling", whether AstraZeneca defrauded the FDA, whether AstraZeneca complied with foreign labeling regulations or whether another drug may have been safer than Seroquel for any individual patient. In addition, Dr. Wirshing will offer no opinion on how doctors read labels or make prescribing decisions in general. Finally, Dr. Arnett will offer no opinion on whether another drug may have been safer than Seroquel for any individual patient, nor will she offer any opinion on whether Defendant defrauded the FDA.

The Court should not be taken in by Defendant's sleight of hand, but should consider only the opinions Plaintiffs seek to admit and the purposes for which they have been offered. A review of the same by the Court will yield the following conclusion: the challenged experts are each qualified to testify competently regarding the matters they were offered to address; the proffered testimony is relevant and will be essential to the trier of fact; and, the methodology by which the challenged experts have reached their conclusions is sufficiently reliable.

For the foregoing reasons, in addition to the facts and arguments set forth in Plaintiffs' Response in Opposition to Defendant's Motion to Exclude Specific Causation Testimony of Plaintiffs' Case-Specific Experts, the Court should deny Defendant's Motion in its entirety.

### III.   ARGUMENT & AUTHORITIES

**A.  Standard.**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702. Rule 702 requires the proponent of expert testimony to show that: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Maiz*, 253 F.3d at 665 (citing *Daubert*, 509 U.S. at 589).

The method for determining the reliability of such testimony is within the discretion of the district court. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). "Many factors will bear on" the inquiry and there is no "definitive checklist or test." *Daubert*, 509 U.S. at 593. *Daubert* stresses that a court's analysis of these factors be "a flexible one." *Id.* at 594.

As Rule 702's admissibility standard "is a liberal one," the assumption the court starts with is that a well qualified expert's testimony is admissible.  *Frazier*, 387 F.3d at 1293 (citing *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000)).   "Weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility."  *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988); *see also In re Zyprexa Prods. Liab. Litig.*, 493 F.Supp.2d 571, 576 (E.D. N.Y. 2007) ("It is well established that credibility assessments . . . are matters for the jury, not for the court . . .").  Accordingly, "[c]ourts have found that an abuse of discretion occurs when under *Daubert* the admissibility bar is too high."  *Id.* at 1294.  Indeed, "[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the *exception* rather than the rule."  *Id.* (quoting Fed. R. Evid. 702, advisory committee notes, 2000 amends.) (emphasis original).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702."  *Daubert,* 509 U.S. at 596.

### i.        Qualifications of Expert Witnesses

Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, or education.  *See* Fed. R. Evid. 702.  In keeping with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony," the standard for qualifying expert witnesses is liberal.  *Daubert,* 509 U.S. at 588-89.  Assertions that the witness lacks particular educational or other experiential background go to the weight, not the admissibility, of the testimony.  *See United States v. Elkins*, 885 F.2d 775, 786 (11th Cir. 1989) ("The weakness of the basis for [an expert's] opinion . . . goes to the weight

rather than to the admissibility of [the] opinion."); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988).

If the expert is qualified by education and experience in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent. *See, e.g., Collins v. Seaboard Coast Line R.R. Co.*, 675 F.2d 1185, 1195 (11th Cir. 1982) (expert witness qualified when experience, knowledge, or training related to general area of construction of highways, not to specific question before trier of fact regarding maintenance of angled railroad crossing); *United States v. Viglia*, 549 F.2d 335, 337 (5th Cir. 1977) (expert witness qualified when experience, knowledge, or training related to general area of pediatric medicine and pharmacology, not to specific question before trier of fact regarding treatment of patients for obesity).

### ii.    *Relevance and Helpfulness*

In deciding whether to allow the witness to give expert testimony the primary issue is whether the expertise provides the witness with the ability to assist the finder of fact in deciding the issues before it.  This inquiry is subsumed within the broader "relevance" analysis governed by Rule 401.  The *Daubert* court described this consideration as one of "fit," requiring a "valid scientific connection" between the subject matter of the expert's testimony and the factual issues to be determined by the jury.  *Daubert,* 509 U.S. at 591-92.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401. "[T]he Rules' basic standard of relevance ... is a liberal one."  *Daubert,* 509 U.S. at 587.  Thus, so long as expert testimony is relevant to one of the issues in a particular case, such testimony

will be admissible.  *See Quiet Tech. DC-8, Inc.*, 326 F.3d at 1348 ("although [expert's] testimony might not have been relevant insofar as it sought to explain [a primary issue in the case], this does not mean that it could not properly have been admitted by the district court at all").  The decision to admit or exclude on these grounds is within the trial court's discretion. *See Frazier*, 387 F.3d at 1259.

In inquiring into the potential helpfulness of the proffered expert testimony, the court decides whether it concerns matters requiring assistance to the kind of people expected to sit on the jury.  *Id.* at 1262 (expert testimony admissible "if it concerns matters that are beyond the understanding of the average lay person").  Freely admitted is evidence or expert testimony that will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; s*ee also Daubert,* 509 U.S. at 591.

After determining that the requirements of general helpfulness and specific "fit" are met, the Court must "weigh[] possible prejudice against probative force under Rule 403."  *Frazier*, 387 F.3d at 1263 (quoting Weinstein, 138 F.R.D. at 632); *see also* Fed. R. Evid. 403.  Only where the probative value of the proffered testimony "is substantially outweighed by the danger of unfair prejudice," will exclusion be appropriate.  *Id.* at n.15.

### iii.    *Reliability*

The most challenging and controversial gate-keeping role, as set out in *Daubert* and elaborated in *Kumho,* is that of ascertaining the reliability of proffered testimony, or "whether the reasoning or methodology underlying the testimony is scientifically valid."  *Daubert,* 509 U.S. at 592. This is partly because "[u]nlike an ordinary witness [governed by Rule 701], an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."  *Daubert,* 509 U.S. at 590.  The exception made for such experts "is

premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.*

The *Daubert* court supplied the following non-exhaustive guidelines for analysis of the reliability of expert testimony: (1) "whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "general acceptance" within the scientific community.  509 U.S. at 593-94; *see also Quiet Tech. DC-8, Inc.*, 326 F.3d at 1341.  However, "[t]he *Daubert* factors are only illustrative and may not all apply in every case." *United States v. Abreu*, 406 F.3d 1304, 1307 (11th Cir. 2005) (citing *Frazier*, 387 F.3d at 1262).  The applicability of any one factor will depend "upon the particular circumstances of the particular case at issue." *Kumho,* 526 U.S. at 137.

While, preferably, the content of the expert's testimony will grow "naturally and directly out of research [the expert or others have] conducted independent of the litigation," testimony based on research conducted solely for litigation is admissible as long as the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Daubert v. Merrell Dow Pharmaceuticals,* 43 F.3d 1311, 1317 (9th Cir.1995); *Kumho,* 526 U.S. at 152.

Of primary importance in determining reliability of expert testimony is the methodological soundness of the expert's study.  *See Frazier,* 387 F.3d at 1261-62 (citing *Daubert*, 509 U.S. at 592-93).  Ideally, the underlying scientific methodology or technique will have been tested or the findings of a study published and peer reviewed, but "[i]t might not be surprising in a particular case . . . that a claim made by a scientific witness has never been the

subject of peer review, for the particular application at issue may never previously have interested any scientist."  *Kumho,* 526 U.S. at 151; *see also Daubert,* 509 U.S. at 592-93.

To be considered is whether there is a sufficient connection between the expert's methodology and the expert's conclusions, and whether the scientific principles and methods have been reliably applied by the expert to the facts of the case.  *See Quiet Tech. DC-8, Inc*., 326 F.3d at 1343-44.

Because the federal rules emphasize "liberalizing expert testimony, doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions."  3 Weinstein & Berger, *Weinstein's Evidence* § 702[03] at 702-36 (1989).  Any more rigorous approach would deny the jury's constitutional role.

### B.  Laura M. Plunkett, Ph.D., DABT

Dr. Plunkett is a pharmacologist, toxicologist and a Food and Drug Administration (FDA) regulatory specialist.[3]  She received her Ph.D. in pharmacology from the University of Georgia in 1980 and is a Diplomat of the American Board of Toxicology.[4]  From 1987 to 1997, the year Seroquel was approved for marketing in the United States, Dr. Plunkett consulted with entities regulated by the FDA, designing preclinical and clinical studies for both safety and efficacy, advising clients on issues related to statements in product labeling regarding efficacy and warnings based on FDA labeling regulations.[5]  Part of her duties was to assess the risk of

---

[3] *See* Plunkett Report, attached hereto as Exhibit "1."

[4] *Id*.

[5] *Id.*

certain side effects with prescription drug treatment and advise clients on the manner in which FDA regulations dictated the communication of such information.[6]

Dr. Plunkett is the author of numerous peer reviewed publications on pharmacology and toxicology, including literature dealing specifically with the pharmacological impact of prescription drugs on the body.[7]   In addition, on multiple occasions, Dr. Plunkett has been invited to speak to healthcare industry groups about FDA regulation and has authored published literature on the subject.[8]

Dr. Plunkett has rendered the following opinions in this litigation:

- Seroquel's pharmacological characteristics, particularly its receptor binding profile, rendered its association with diabetes-related adverse events predictable prior to its approval;

- Seroquel's pharmacological characteristics and peer reviewed literature support an association between Seroquel and diabetes-related adverse events;

- Seroquel's pharmacological characteristics, peer reviewed literature and the actions of foreign regulatory agencies put Defendant on notice of the risk of diabetes-related adverse events and the association between Seroquel therapy and diabetes-related injuries prior to Defendant's revision of Seroquel's label in 2004;

- Prior to 2004, the risk of diabetes-related adverse events was not disclosed in Seroquel's labeling in a manner that was commensurate the severity of the known risk or with the information available to Defendant; and,

- After 2004, Seroquel's labeling inadequately warned of its association with diabetes by, among other things, characterizing the risk as a "class effect."[9]

Defendant has moved the Court to disallow several aspects of Dr. Plunkett's testimony.

First, Defendant argues that Dr. Plunkett is unqualified to testify about "safety issues" associated

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

with Seroquel treatment because she is not a medical doctor.  In support, Defendant's loosely rely on the pre-*Daubert* case *Upjohn Co. v. MacMurdo*, 562 So.2d 680 (Fla. 1990).

Defendant's citation of *MacMurdo* in aid of its argument against Dr. Plunkett is flawed for two reasons.  First, the pharmacologist in *MacMurdo*, Dr. Benjamin, was permitted to offer the opinion Defendant seeks to exclude at trial.  Second, Dr. Benjamin offered entirely distinct opinions from Dr. Plunkett's.  According to the *MacMurdo* court, Dr. Benjamin testified at trial to what specific terms in product labeling "meant to physicians."  *Id*. at 683, n. 3.  On appeal, *MacMurdo* held that his opinion on what information in product labeling means to physicians was not probative.  *Id*.  In other words, the court applied the Florida Rules of Evidence in finding that Dr. Benjamin's testimony did not "fit."  *Id*.  Nothing in *MacMurdo* can be read to imply that Dr. Benjamin was unqualified to render his opinion.  The issue is simply not addressed.

Dr. Plunkett has offered no opinion on what the Seroquel product labeling means to physicians.  Moreover, she has explicitly disclaimed any qualifications that address the use of Seroquel labeling to "weigh risk and benefit information for individual patients."  *MacMurdo* cannot be applied to limit Dr. Plunkett's testimony.  It is factually inapposite.

Nevertheless, Dr. Plunkett's lack of qualifications to offer opinions related to the appropriate use of Seroquel in individual patients does not render her unqualified to testify as to other "safety issues."  Admittedly, Dr. Plunkett's areas of expertise are distinct from practicing physicians'.[10]

---

[10] *Id*.

12

Defendant acknowledges that Dr. Plunkett is qualified to testify regarding the "pharmacology section of the label."[11]  Defendant's implication that such a qualification operates to the exclusion of any other is disingenuous.

As explained by Dr. Plunkett, the pharmacological profile of Seroquel enables its therapeutic effect and accounts for its side effects.[12]  Specifically, Seroquel's action on neurotransmitter systems in the brain that affect appetite and mood, in part, creates its propensity to cause weight gain.[13]  Thus, that Seroquel treatment would be associated with weight gain was known to AstraZeneca at the inception of Seroquel development.[14]

According to Dr. Plunkett, Seroquel's pharmacological profile and its potential to cause weight gain necessitated enhanced scrutiny on metabolic side effects, particularly in light of the increased background risk of diabetes among the patients for whom Seroquel is marketed.[15]

According to Dr. Plunkett, the null hypothesis that Seroquel would be associated with extraordinary weight gain was confirmed within AstraZeneca prior to the inception of marketing and was further established by post-marketing literature.[16]  Defendant asks that the Court deprive the jury of an explanation of this information and seeks to exclude Dr. Plunkett's testimony regarding Defendant's internal corporate documents as well as Defendant's disclosure of facts to the FDA.

---

[11] Motion at 12.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

In a related multi-district litigation, the United States District Court for the Eastern District of Louisiana rejected similar challenges by defendant directed to plaintiff's expert, Richard M. Kapit, M.D., who opined that defendant "was not forthcoming with the FDA with respect to the risks of Vioxx." *See In re Vioxx Prods. Liab. Litig*., 401 F.Supp.2d 565, 593 (E.D. La. 2005). Like Defendant in this case, Merck mischaracterized Dr. Kapit's testimony so that it would appear inadmissible upon review. *Id*. at 594 (in opposition, "the Plaintiff assert[ed] that Merck mischaracterized Dr. Kapit's testimony," and the court agreed finding that Dr. Kapit was qualified to testify regarding the matters for which he had been designated). Attempting to redefine Dr. Kapit's testimony regarding defendant's disclosure of clinical trials data to the FDA, defendant contended that Dr. Kapit's opinions regarding fraud on the FDA, or related claims, should be excluded. *Id*. at 593-94.

Appropriately, the "[p]laintiff argue[d] that there [was] no claim of fraud on the FDA, and courts which have addressed [the issue] have concluded that evidence relating to a defendant's conduct or representations in the course of FDA proceedings is admissible in support of the plaintiff's state law . . . tort causes of action." *Id*. at 594 (citing *Globetti v. Sandoz Pharm. Corp.*, No. CV98-TMP-2649-S, 2001 WL 419160 (N.D. Ala. March 5, 2001); *Eve v. Sandoz Pharm. Corp*., No. IP 98-1429-C-Y/S, 2002 WL 181972 (S.D. Ind. January 28, 2002)). Ruling in favor of the plaintiff, the court agreed that Dr. Kapit was qualified to opine as to whether defendant was forthcoming with the FDA with respect to the risks of Vioxx and rejected defendant's arguments as "inapplicable." *Id*. at 595. The court emphasized that "Dr. Kapit's testimony [would] help the jury understand the applicable FDA regulations and Merck's responses." *Id*.

In addition, the court ruled that regulatory-based testimony "should focus on the significance of certain documents" reviewed within defendant's production. *Id.* In doing so, the court rejected the defendant's argument that plaintiff's expert's opinion regarding internal corporate documents should be excluded as such testimony greatly assists juries. *Id.*

Dr. Plunkett, as a pharmacology expert and through her review of Defendant's FDA disclosures and related internal documentation, will assist the jury in understanding both the mechanism by which Seroquel can cause diabetes, and why Seroquel's chemical structure made Defendant's placement of information about diabetes related side effects in its label inappropriate.

"The terms and applications of a warning on such a drug, in order to have meaning, must be explained to the jury." *Beale v. Biomet, Inc.*, 492 F.Supp.2d 1360, 1369 (S.D. Fla. 2007) (quoting *Dion v. Graduate Hosp. of the Univ. of Pennsylvania*, 520 A.2d 876, 881 (1987) (internal quotations omitted)). "This is a subject so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman." *Id.* Thus, "where the adequacy of the warning is not obvious to the ordinary layperson it is necessary to have expert testimony as to this issue." *Id.*

In *Beale*, because the warning at issue "clearly indicate[d] that weight control is important, as is decreased activity," and because the plaintiffs "did not provide any evidence that the warnings were, in themselves, inadequate," the United States District Court for the Southern District of Florida reasoned that "the warnings [were] not beyond the ken of the average layperson." *Id.* at 1370. Thus, they did "not require expert testimony in order to be understood." *Id.*

Unlike the plaintiffs in *Beale*, the Plaintiffs in this case have "provide[d] expert affidavits stating that the warnings were inadequate" and testimony to the same. *Id*. Moreover, they have "refute[d] the [argument] that the warnings clearly establish the factors applicable to themselves regarding weight." *Id*. This Court should conclude that Dr. Plunkett's testimony is required in order for the jury to render findings as to the adequacy of the Seroquel label.

Plaintiffs clarify that Dr. Plunkett will offer no opinions on how doctors use labels "to weigh risk and benefit information for individual patients", whether physicians " 'understand the implications' of the adverse events section of drug labeling", whether "doctors need to see basic medical information such as the 'metabolic complications' of weight gain in pharmaceutical labeling", whether AstraZeneca defrauded the FDA, whether AstraZeneca complied with foreign labeling regulations or whether another drug may have been safer than Seroquel for any individual patient.

### C. William C. Wirshing, M.D.

Dr. Wirshing brings a depth and array of expertise to this litigation that is unparalleled. Dr. Wirshing has both practiced psychiatry extensively and instructed medical students on the practice of psychiatry, including psychopharmacology.[17] He has not only used Seroquel and every other antipsychotic drug in his clinical practice, he has participated in clinical trials involving every atypical and written extensively on all aspects of their use in treatment.[18]

Dr. Wirshing is an indisputable authority on the association of atypical antipsychotics, including Seroquel, with diabetes, having written multiple peer reviewed articles, performed

---

[17]      Dr. Wirshing estimates that in a typical month he sees 325 new patients; supervises nearly a dozen psychology doctoral candidates; and teaches over a dozen nursing, social work, and nurse practitioner students. He estimates that he has seen over 25,000 patients suffering from mental illness over the course of his career.

[18] *See* Wirshing Report, attached hereto as Exhibit "2."

clinical trials and been invited to speak repeatedly on the subject.[19]   In addition to being a popular speaker to audiences of practicing psychiatrists on the scientific basis of the association, Dr. Wirshing has also undertaken study of the manner in which this critical risk information is communicated by the atypicals' manufacturers.[20]

Among Dr. Wirshing's presentations to doctors on the marketing of atypicals are the following:

- "Marketing Atypical Antipsychotics and the Opacity of Adiposity";

- "The Marketing of Antipsychotic Drugs: A War for Our 'Loyalties' Moves Into its Guerilla Phase"; and,

- "The Side Effects of the Atypical Antipsychotics: Marketing Mischief, Metabolic Mayhem, or Mechanistic Magic?"[21]

Critically, each of the foregoing were grand rounds presentations, which are interactive between the speaker and doctors in the audience.  Dr. Wirshing's experience leading interactive lectures with actual treating physicians on the subject of atypical antipsychotic drug manufacturers' communication of information related to diabetes renders him uniquely qualified to assist the jury in understanding the adequacy of Seroquel's label.

Dr. Wirshing has offered opinions on the following subjects in this litigation:

- The role of atypical antipsychotic drugs, including Seroquel, in the treatment of mentally ill patients;

- The relative safety and efficacy of the various atypical antipsychotics;

- The history of Seroquel's development and post-marketing research;

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

- Seroquel's chemical structure as it relates to its observable therapeutic effect and side-effect profile;

- Seroquel's association with diabetes related side effects;

- The accuracy of scientific information disseminated by Defendant related to Seroquel; and,

- A comparison of the evidence available to Defendant and practicing psychiatrists related to the description of diabetes related side effects in Seroquel's labeling over time.

Defendant seeks to limit Dr. Wirshing's testimony at trial in several ways. First, Defendant argues that Dr. Wirshing should not be permitted to testify regarding the placement and presentation of information in Seroquel's label because "he has never been involved with preparing a drug's label." Further, Defendant re-casts Dr. Wirshing's opinion as "testimony suggesting that physicians do not pay attention to labeling" and argues that such testimony is inadmissible under Rule 702. *Rezulin*, 309 F.Supp.2d at 555-56. Defendant is incorrect.

First, Defendant's standard would limit expert testimony on any aspect of drug labeling to current and former employees of pharmaceutical companies. Dr. Wirshing's knowledge, experience, training and education, including decades of prescribing antipsychotic drugs and instructing medical students on their respective characteristics, more than qualify him to discuss the clinical psychiatrist's perception of scientific information in Seroquel's labeling.

Second, Dr. Wirshing will offer no opinion that doctors do not pay attention to labeling. Instead, Dr. Wirshing will testify that the presentation of information in Seroquel's labeling over time is at odds with evidence available to Defendant. He has no opinion on whether prescribers in general are attentive.

Defendant next argues that Dr. Wirshing should not be permitted to explain scientific information about Seroquel if that information is contained in a Seroquel marketing document.

Defendant disputes Dr. Wirshing's qualifications to explain information in marketing documents to the jury because he "did not perform a study about the impact of Seroquel's labeling on physicians" and he "did not review more general literature about how physicians read labels or how they make prescribing decisions."

Defendant's argument is absurd for two reasons. First, Dr. Wirshing will offer no opinion on how doctors read labels or make prescribing decisions in general. Second, these marketing pieces are scientific in nature. They are targeted at trained physicians and distinct from common advertising with which jurors may be familiar. Dr. Wirshing's experience as a practicing psychiatrist and particular experience as a clinical researcher more than qualify him to explain scientific information in Seroquel marketing pieces and compare that information to both the evidence upon which it is based and other information known only to Defendant. The lay juror cannot be expected appreciate this technical, scientific information without the aid of expert testimony.

Defendant also seeks to prevent Dr. Wirshing from offering opinions related to information contained in internal AstraZeneca documents. Defendant argues that no opinion based on internal documents can be reliable unless it accounts for the tens of millions of pages of documents it has produced.

First, while neither Dr. Wirshing nor any other expert in this litigation has reviewed every document produced by AstraZeneca, he has reviewed a substantial collection. Second, an expert's explanation of the scientific, technical information in the internal documents is critical to the jury's understanding of the distinctions between information that was available to Defendant and information that was ultimately communicated to doctors.

In *Vioxx*, the court addressed and rejected a virtually identical challenge by the defendant. Judge Fallon ruled that although the plaintiff's expert may not testify as to what the defendant was thinking, he may testify regarding defendant's internal corporate documents as such testimony would, in fact, assist the jury.  *Vioxx*, 401 F.Supp.2d at 595.  As with marketing documents, lay jurors cannot be expected to appreciate the significance of the highly technical, scientific information contained in internal documents without the aid of expert testimony.

### D.  Donna K. Arnett, Ph.D., M.S.P.H.

Dr. Arnett is an epidemiologist with more than twenty years of experience in the design and conduct of experimental and observational epidemiological studies, with a focus on cardiovascular and metabolic disease epidemiology, genetic epidemiology and pharmacogenetics.[22]  In 1991, she received her Ph.D. in epidemiology from the University of North Carolina, School of Public Health, Chapel Hill, and, since that time, has served as a Professor of Epidemiology at the University of North Carolina at Chapel Hill and at the University of Minnesota where she was awarded the Mayo Professor of Epidemiology Position within the Division of Epidemiology in 2003.[23]  Thereafter, Dr. Arnett accepted a position as Chair and Professor of Epidemiology within the Department of Epidemiology at the University of Alabama at Birmingham, a role she has served since 2004.[24]

Dr. Arnett is a Fellow of the American Heart Association and the American College of Epidemiology and is an elected member of the American Epidemiology Society.[25]    In 2004, Dr.

---

[22] *See* Arnett Report, attached hereto as Exhibit "3."

[23] *Id.*

[24] *Id.*

[25] *Id.*

Arnett received the Award of Meritorious Achievement from the American Heart Association.[26] In addition, she has served on the American Heart Association's Senior Scientific Advisory Committee.[27]  From 1998 to 2001, Dr. Arnett served as Chair of the Epidemiology Master's Degree Program at the University of Minnesota and as Director for the National Heart, Lung, and Blood Institute funded Training Program in Cardiovascular Genetic Epidemiology.[28]  For the past two years, she has served as Chair for the Cardiovascular and Sleep Epidemiology Study Section ("CASE") for the National Institutes of Health ("NIH").[29]  In addition, she has served on numerous NIH review panels for epidemiological research and is a member of the data safety monitoring board for certain NIH studies.[30]

As an expert in chronic disease epidemiology, pharmacogenetics and related study design, Dr. Arnett has spent her career designing and conducting epidemiological studies, including clinical trials, family studies, cross-sectional surveys, cohort and case-control studies.[31] She has served as either the principal investigator or co-investigator in numerous studies funded by NIH grants.[32]  Dr. Arnett has authored well over two-hundred peer reviewed publications on epidemiology, including literature dealing specifically with study design relative to metabolic syndrome and diabetes as well as the safety and efficacy of prescription drug therapies in treating certain chronic diseases.[33]

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

Dr. Arnett's qualifications, training and experience irrefutably qualify her to testify as an epidemiologist on the matters for which Plaintiffs have proffered her.  Dr. Arnett has rendered the following opinions in this litigation:

- Seroquel can cause clinically significant and relevant metabolic risk, including weight gain and other metabolic complications, including but not limited to hypertriglyceridemia, insulin resistance, and diabetes;

- The metabolic risks from Seroquel appear shortly after treatment and throughout treatment;

- Defendant should have made the data presentation clearer within the New Drug Approval application and included the data regarding metabolic risk within scientific publications of the Phase II and Phase III randomized clinical trials in order to warn the FDA, future patients, and physicians about metabolic risks associated with Seroquel;

- Defendant promoted Seroquel as metabolically neutral when there was insufficient evidence to support this claim but substantial evidence that the drug in fact caused weight gain and other metabolic derangements; and,

- Defendant withheld support for studies that could have demonstrated Seroquel's metabolic risk relative to other atypical antipsychotics.[34]

By its Motion, Defendant has sought to disallow several aspects of Dr. Arnett's testimony.  First, Defendant argues that Dr. Arnett is unqualified to testify about Seroquel's safety, because she is not a medical doctor.[35]  Further, Defendant argues that Dr. Arnett is unqualified to testify regarding the design of Defendant's clinical trials with respect to Seroquel and the presentation of data rendered therein, "because she has never prepared materials for inclusion in an NDA."  (*See* Motion, at 25.)  In doing so, Defendant disingenuously likens Dr.

---

[34] *Id.*

[35]    Defendant has failed to cite to a single case in support of this proposition.  Although Defendant did cite to *MacMurdo* in seeking a similar preclusion with respect to the risk-benefit testimony of Dr. Plunkett, *MacMurdo* was distinguishable and would be equally so if applied to the testimony of Dr. Arnett.  *See* discussion, *supra*, at 11-12.

Arnett to "the Rezulin experts" who had "no relevant experience" in pharmaceutical research. (*See Id*.)

The testimony at issue in *Rezulin* was substantially distinct from that proffered in this litigation by Dr. Arnett.  In *Rezulin*, "plaintiffs' challenged witnesses [had] given opinions on FDA procedures, regulations, and standards as well as statements that [the defendant] failed adequately to disclose material facts about Rezulin to the FDA."  *Rezulin*, 309 F.Supp.2d at 547. All of the challenged opinions included "comments to the effect that [the defendant] misled the FDA by providing incomplete or erroneous information."  *Id*. at 548.

Dr. Arnett will offer no opinion on whether another drug may have been safer than Seroquel for any individual patient, nor will she offer any opinion on whether Defendant defrauded the FDA.  Thus, Defendant's attempt to preclude her testimony regarding the safety and/or design of Defendant's clinical trials and the presentation of related data under *MacMurdo* and *Rezulin* must fail.

Dr. Arnett, however, will opine on whether a significant scientific basis exists, based on clinical data generated from Defendant's trials, to conclude that there is an association between Seroquel treatment and diabetes.[36]  She will testify to the strength of the association and whether it is statistically significant.[37]  Contrary to Defendant's assertion, Dr. Arnett will not testify regarding the "format" of the NDA but regarding the inclusion, or exclusion, of data generated from Defendant's studies and the overall design thereof.[38]  Such testimony will include the following:  "the studies provided in the NDA had consistently high drop-out rates for Seroquel . . . – [an] important characteristic to define the internal validity of a study" and data that, if

---

[36] Arnett Report, attached as Exhibit "3."

[37] *Id*.

[38] *Id*.

included, "could have made the findings even less favorable for Seroquel"; "many of the studies conducted restricted weight as an inclusion criterion, generally between 100 and 230 pounds . . . – [h]ad heavier subjects been included, it is likely that the weight gain would have been even greater"; "the definition of abnormalities for any of the thyroid hormone levels was less than 0.8 times the lower limits of normal or greater than 1.2 times the upper limit of normal" – significant as "[l]ow levels of thyroid hormone are associated with greater body weight"; because "most of the studies were short term, the design may have precluded the development of an increased TSH" – where an increased thyroid stimulating hormone would have signaled clinically relevant thyroid changes.[39]

Dr. Arnett is qualified to testify regarding an association between an exposure or treatment and a disease based on the interpretation of clinical trials data in which confounding variables and temporality may be measured.  Epidemiology, generally, encompasses the evaluation of risks and benefits of particular treatments through clinical changes in participants' conditions whether placebo controlled, observational or case-controlled.  An observational study, such as a cohort study, for example, may allow for the linkage of pharmacy to clinical records to assess a hypothesized association between a particular drug exposure and disease.  Dr. Arnett's expertise in the science of epidemiology in this regard makes admissible, relevant and reliable her testimony regarding the metabolic risks associated with Seroquel and the extent to which those manifested in Defendant's clinical trials.

Based on her review of Defendant's clinical trials data, Dr. Arnett has rendered qualified expert opinions regarding not only the nature of the association between Seroquel treatment and metabolic derangements such as diabetes, but also the time at which Defendant possessed

---

[39] *Id.*

sufficient information to make that association.[40]   In particular, Dr. Arnett will opine as to the presentation of metabolic syndrome during Seroquel treatment in various of Defendant's trials.[41] Based on her review of the data and trial designs, Dr. Arnett will testify that significant weight gain and other components of the metabolic syndrome were observed during Phase II and III trials and subsequently demonstrated throughout the developmental program of Seroquel.[42]   As described above, Dr. Arnett has devoted her career to the design and execution of epidemiological studies, including clinical trials, cohort and case-control studies.   As such, her expert evaluation of the design of Defendant's trials and the data generated therefrom will serve as an essential and useful function to the jury.

Based on Defendant's placebo-controlled studies data, for example, Dr. Arnett will explain that "as much as 90% of the weight gain in Seroquel-treated subjects was caused by the drug" where the studies used doses recommended for schizophrenia.[43]   Moreover, in evaluating the data generated from studies 126 and 127, Dr. Arnett will articulate its demonstration of "Seroquel patients [having] a greater mean increase . . . in glucose relative to participants randomized to placebo."[44]   Likewise, she will describe that an "[e]levated Hba1C . . . a longer term marker of glucose elevation, occurred in 2.1 vs. 0.8 percent of Seroquel versus placebo participants" and the significance thereof.[45]   Dr. Arnett will conclude that data from Defendant's "[s]ubsequent observational studies (cohort and case-control)" also "confirmed the excess risk of

---

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

diabetes with Seroquel."[46]   In sum, Dr. Arnett's expertise in study design and epidemiology generally, has qualified her to offer the following opinion upon her evaluation of Defendant's trials and resulting data: "the data indicate that Seroquel is associated with metabolic abnormalities with respect to glucose, insulin resistance, and diabetes."[47]

In *Vioxx*, the court rejected related *Daubert* challenges by the defendant pharmaceutical manufacturer against personal injury plaintiff's epidemiologist, Wayne A. Ray, Ph.D.   401 F.Supp.2d at 586.   Like Dr. Arnett, Dr. Ray has carried out pharmacoepidemiological research for decades and "is actively involved in the design, execution, and analysis of numerous pharmacoepidemiologic studies."   *Id*.   Dr. Ray's opinions were "derived from his education, training, research, experience, expertise, and review of the peer-reviewed medical literature and other publicly available documents concerning the treatment of musculoskeletal disorders, NSAIDs, COX-2 inhibitors, and cardiovascular illness."   *Id*.   The court held that "because "[*h*]*is career ha[d] been based around pharmacoepidemiology investigations*," and because "*he ha[d] reviewed the scientifically relevant literature* surrounding Vioxx . . . and point[ed] to the raw data of these studies as support for his conclusion," *he was "adequately qualified to testify* as to whether short-term use of Vioxx increases the risk of adverse cardiovascular risks" and "that Vioxx accelerates atherosclerosis."   *Id*. at 586. (emphasis added).[48]

---

[46] *Id*.

[47] *Id*.

[48]      Like the Defendant in this case, the defendant in *Vioxx* attempted to re-characterize Dr. Ray's principal testimony into testimony that was inadmissible.   *Id*. at 585.   Although Dr. Ray would offer no opinion regarding particular prescription habits of physicians, for example, the defendant sought to re-characterize his testimony to this effect.   In turn, the court acknowledged, as Plaintiffs have in this case, that an epidemiologist who is not a medical doctor "is not qualified to testify on what doctors should prescribe to patients and on the specific cause of [a plaintiff's injury]."   *Id*. at 587.   Accordingly, Plaintiffs have not proffered the opinion of Dr. Arnett for such purposes or for the purposes of testifying regarding FDA regulatory matters.

Like the court in *Vioxx*, this Court should deny Defendant's Motion to the extent it seeks to limit Dr. Arnett's testimony regarding the safety of Seroquel or the design of particular clinical trials and the data generated therefrom. Based on her training, skill, clinical experience and review of the scientifically relevant literature relating to Seroquel, she is qualified to testify regarding the matters for which Plaintiffs have proffered her opinion in this litigation.

In addition to the foregoing, Defendant seeks to exclude Dr. Arnett's testimony to the extent it relates to her review of Defendant's internal documents. Dr. Arnett has reviewed a substantial collection of Defendant's internal documents. The scientific, technical information contained within Defendant's documents is critical to the jury's understanding of the distinctions between information that was available to Defendant and information that was ultimately communicated to prescribing healthcare providers. As with marketing documents, lay jurors cannot be expected to appreciate the significance of the highly technical, scientific information contained in internal documents absent expert testimony.

Further, Defendant seeks to exclude Dr. Arnett's testimony regarding certain of Defendant's marketing pieces that Dr. Arnett reviewed in the course of her evaluation of Defendant's clinical trials related to Seroquel. Defendant's marketing pieces are scientific in nature and targeted at trained physicians and scientists. They are distinct from common advertising with which jurors may be familiar. Dr. Arnett's experience as an epidemiologist, specializing in study design, generally, and particular experience as a clinical researcher, qualify her to explain scientific information in Seroquel marketing prices and compare that information to the evidence upon which it is based and other information known only to Defendant. Such testimony "should focus on the significance of certain documents" reviewed. *Vioxx*, 401 F.Supp.2d at 595 (rejecting defendant's argument that expert's opinion regarding internal

corporate documents should be excluded where testimony would greatly assist the jury).  The lay jury cannot be expected to appreciate this technical, scientific information without the aid of expert testimony such as that of Dr. Arnett.

Lastly, Defendant has re-characterized Dr. Arnett's testimony regarding Defendant's clinical trials and the designs thereof so as to exclude testimony regarding Defendant's "alleged failure to fund studies."   (*See* Motion, at 28.)   Dr. Arnett will offer no opinion regarding Defendant's funding of particular studies.  Rather, Dr. Arnett will offer testimony regarding the design of Defendant's studies and resulting manipulation of data presented.  Dr. Arnett is an expert in clinical trials design and should be permitted to offer such testimony in this litigation as it will prove reliable and helpful to the jury.

### E.  Drs. Abramson, Tulloch, Young, Perry and Marks.

The "relevant field" for Drs. Abramson, Tulloch, Young, Perry and Marks is clinical medicine, and in the clinical field the standard diagnostic procedure for establishing the nature and cause of disease is the differential diagnosis.[49][50][51][52][53]   *See Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) (defining differential diagnosis as the method by which a physician determines what disease process caused a patient's symptoms); *Heller v. Shaw*, 167 F.3d 146, 156 (3d Cir. 1999) (stating that differential diagnosis is the basic method of internal medicine).  Typically the approach consists of performing physical examinations, taking medical histories, ordering and reviewing the results of clinical tests, consulting pertinent medical

---

[49] *See* Abramson Reports, attached hereto as Exhibit "4."

[50] *See* Tulloch Reports, attached hereto as Exhibit "5."

[51] *See* Young Report, attached hereto as Exhibit "6."

[52] *See* Perry Report, attached hereto as Exhibit "7."

[53] *See* Marks Report, attached hereto as Exhibit "8."

literature, and assessing the role of other possible causes.  *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999); *Zuchowicz v. U.S.*, 140 F.3d 381, 387 (2nd Cir. 1998).  It is in accordance with that well-established causation method that the five special causation experts approached the question here.  *See also* Plaintiffs' Response in Opposition to AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses and Supporting Memorandum of Law, incorporated herein by reference.

Based on their knowledge, skill, training and clinical expertise, Dr. Abramson, Tulloch, Perry and Marks have offered the following opinions in this litigation:

- Seroquel treatment was a substantial contributing cause to certain Plaintiffs contraction of diabetes; and
- Due to inadequacies in the Seroquel label, certain Plaintiffs were not properly warned of the risk of contracting diabetes and could not give informed consent to Seroquel treatment.[54]

Defendant moves to exclude two non-central components of these opinions: testimony regarding FDA regulatory standards for drug warnings and testimony based on information gleaned from internal AstraZeneca documents.

Plaintiffs concede that Drs. Abramson, Tulloch, Perry, Marks and Young are not regulatory experts.  However, all are medical doctors with knowledge, skill, training and experience in analyzing drug labeling from a clinician's perspective.[55]  Their opinions related to Seroquel's labeling have been confined in accordance with their expertise.[56]

A necessary component of these experts' analysis of the adequacy of Seroquel's label, from a clinician's perspective, is a comparison of information related to diabetes presented by Defendant in the label and elsewhere at the time Plaintiffs took Seroquel with information that

---

[54] *See* Exhibits 4-8.

[55] *Id.*

[56] *Id.*

was known to Defendant but not available to Plaintiffs' doctors.  Defendant concedes that its internal documents and unpublished studies are not publicly available.

While these experts will offer no opinion on the "intent and conduct of AstraZeneca employees" they will explain to the jury discrepancies in public and private data related to Seroquel in the context of Plaintiffs' treatment.[57]  Such a comparison is crucial for the jury's understanding of their opinion that Seroquel's labeling did not provide Plaintiffs' doctors with sufficient information to permit them to make an appropriate risk-benefit analysis.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendant's Motion.

DATED:  November 24, 2008                      Respectfully submitted,


By:    /s/ K. Camp Bailey
        F. Kenneth Bailey Jr.
        K. Camp Bailey
        Fletcher V. Trammell
        Robert W. Cowan
        **BAILEY PERRIN BAILEY**
        440 Louisiana St., Suite 2100
        Houston, Texas 77002
        (713) 425-7100 Telephone
        (713) 425-7101 Facsimile
        kbailey@bpblaw.com
        cbailey@bpblaw.com
        ftrammell@bpblaw.com
        rcowan@bpblaw.com
        **Co-Lead Counsel for Plaintiffs**

---

[57] *Id.*

30

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of November, 2008, I electronically filed the foregoing: PLAINTIFFS' RESPONSE IN OPPOSITION AND SUPPORTING MEMORANDUM OF LAW TO ASTRAZENECA'S MOTION TO EXCLUDE NON-CAUSATION EXPERT TESTIMONY UNDER FEDERAL RULES OF EVIDENCE 702, 401 AND 403 filed with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to the counsel listed as follows:

Via email: Marjorie.shiekman@dechert.com
Marjorie Shiekman
Dechert, LLP

Via email: louise.moyer@dechert.com
Louise Moyer
Dechert, LLP

/s/  Fletcher V. Trammell
**Fletcher V. Trammell**