IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation

MDL DOCKET NO. 1769

This Document Relates to:

| | |
|---|---|
| Linda Guinn | 6:07-cv-10291 |
| Janice Burns | 6:07-cv-15959 |
| Richard Unger | 6:07-cv-15812 |
| Connie Curley | —6:07-cv-15701 |
| Linda Whittington | 6:07-cv-10475 |
| Eileen McAlexander | 6:07-cv-10360 |
| David Haller | 6:07-cv-15733 |

---

**PLAINTIFFS' RESPONSE AND SUPPORTING MEMORANDUM TO
ASTRAZENECA'S MOTION AND SUPPORTING MEMORANDUM UNDER
*DAUBERT* AND FEDERAL RULES OF EVIDENCE 702, 401 AND 403 TO EXCLUDE
OR LIMIT TESTIMONY OF PAUL DEUTSCH AND FREDERICK RAFFA**

---

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

The Court should deny Defendant's motion because Paul Deutsch is eminently qualified

to offer the opinions he has offered in the Plaintiffs' rehabilitation plans, and derived his

opinions through the application of a well-accepted, peer-reviewed and published methodology,

applying the same degree of intellectual rigor that experts in the field of rehabilitation and life-

care planning apply every day in the non-litigation context.  Because Deutsch's opinions are

reliable and admissible, Frederick Raffa's opinions, consisting merely of a standard present-value

calculation of the costs contained in Deutsch's rehabilitation plans, are also admissible.

1

## I.    The role Deutsch and Raffa will play in Plaintiffs' case.

Dr. Paul Deutsch is a Board Certified Rehabilitation Counselor, Life Care Planner, and Case Manager who has prepared rehabilitation plans for six Plaintiffs, projecting the probable cost of the care, treatment and other resources these Plaintiffs will likely need due to their diabetes. *Deutsch CV (Ex. 1), p. 22; Deutsch 10/2/08 depo. (Ex. 2), pp. 56:3-57:19; Δ's Exs. 3-8.* Deutsch's role was to "cost out" the future care the Plaintiffs would need as a result of their diabetes, but not to opine that Seroquel caused the diabetes[1] or to offer medical opinions regarding the Plaintiffs' conditions. *Deutsch Aff. (Ex. 1), ¶ 2; Deutsch 10/2/08 depo., pp. 48:19-49:2; 74:18-75:22.* Frederick Raffa is an economist who will simply calculate the present value of the cost of the Plaintiffs' future care, as calculated by Deutsch. *Δ's motion, pp. 2, 22.*

## II.    The standard for admissibility of expert testimony.

For an expert's opinion to be admissible, the expert must be qualified and his opinion must be relevant and reliable.[2] Yet Rule 702 was intended to ***liberalize*** the standard for admitting expert testimony, leaving it to the jury to weigh the testimony based on cross-examination.[3] Accordingly, "in determining the admissibility of expert testimony, the district court should approach its task with proper deference to the jury's role as the arbiter of disputes

---

[1]    Plaintiffs have demonstrated that they have admissible expert testimony to establish the causal link between Seroquel and diabetes in their response to Defendant's motions to exclude the testimony of Plaintiffs' general causation and case-specific causation experts. Accordingly, the Court should reject Defendant's complaint that the testimony of Deutsch and Raffa is not relevant because Plaintiffs' causation experts should be excluded.

[2]    *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004), *cert. denied*, 544 U.S. 1063 (2005).

[3]    *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 587-88, 596 (1993).

between conflicting opinions."[4] Thus, most criticisms of an expert's opinion go to its weight, not

its admissibility,[5] and exclusion of expert testimony should be the exception, rather than the

rule.[6]

A witness can be qualified as an expert by virtue of knowledge, skill, experience,

training, or education.[7] He qualifies as an expert if his knowledge of the subject matter on which

he is to testify is such that his opinion will likely assist the trier of fact at arriving at the truth.[8]

Thus, he must have specialized knowledge of the subject on which he seeks to testify that is

greater than the knowledge possessed by a layman.[9] "As long as some reasonable indication of

qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping

function. After that, qualifications become an issue for the trier of fact rather than for the court

in its gate-keeping capacity."[10]

With respect to reliability, the court's duty as gatekeeper is simply to ensure that the

---

[4]      *United States v. 14.38 Acres of Land More or Less Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1077 (5th Cir. 1996).

[5]      *Jahn v. Equine Servs., Inc.*, 233 F.3d 382, 393 n.8 (6th Cir. 2000); *14.38 Acres*, 80 F.3d at 1077.

[6]      FED. R. EVID. 702, advisory committee's notes.

[7]      FED. R. EVID. 702.

[8]      *Mannino v. International Mfg. Co.*, 650 F.2d 846, 851 (6th Cir. 1981).

[9]      *Betterbox Communications Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 328-29 (3rd Cir. 2002).

[10]     *Rushing v. Kansas City Southern Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *cert. denied*, 528 U.S. 1160 (2000).

3

expert's opinion is not so unreliable that it can not be helpful to the jury.[11]  The court is to examine whether the expert's *methodology* is sufficiently sound to be helpful to the jury, not to decide whether the expert's *conclusions* are correct.[12]  The critical point of the reliability inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[13]  Put another way, the court must make certain that there is not a great "analytical gap" between data and the opinion offered.[14]  In some cases, the reliability of the expert's opinion is established by the expert's qualifications.[15]  If the witness is relying solely or primarily on experience, then the witness must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.[16]

III.   **Deutsch is qualified to testify about the non-medical care (including case-management) Plaintiffs will need, and has sufficient medical foundation for the medical care that was included in his rehabilitation plans.**

   A.   **Deutsch has specialized knowledge about the non-medical care needed because of diabetes.**

   A rehabilitation plan includes both medical elements (such as medical tests and visits,

---

[11]   *Daubert*, 509 U.S. at 592-93.

[12]   *Id.* at 595; *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743-44 (3rd Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995).

[13]   *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.137, 152 (1999).

[14]   *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[15]   *Kumho Tire*, 526 U.S. at 150; *Frazier*, 387 F.3d at 1260-61.

[16]   *Frazier*, 387 F.3d at 1261.

4

injections, medications, etc.) and non-medical elements (such as supplies, nutrition,

psychological assistance, occupational and speech therapy, rehabilitation and case management).

*Deutsch Aff.,* ¶ 3; *Deutsch 10/2/08 depo., pp. 11:20-12:4; 26:1-10; 50:12-23; 52:1-54:4; 71:1-*

*72:8; 73:19-74:16; 103:4-8.* As a non-physician, Deutsch relied on the Plaintiffs' medical

records, their treating physicians' responses to a questionnaire, and published clinical practice

guidelines and medical literature to determine which medical goods and services to include in the

rehabilitation plan. *Deutsch Aff.,* ¶ 2, 11; *Deutsch 10/2/08 depo., pp. 48:21-49:2; 74:18-75:11.*

However, as a Board Certified Life Care Planner, Rehabilitation Planner, and Case Manager with

a masters degree in Rehabilitation Counseling and a Ph.D. in Counseling Psychology with an

emphasis in Rehabilitation Psychology and over 36 years of experience in the field (including

authoring "A Guide to Rehabilitation Counseling," a three-volume treatise covering the major

medical, psychological and vocational rehabilitation implications for each disability listed in the

"AMA Guide to Permanent Impairments"), Deutsch has extensive specialized knowledge about

the medical and non-medical goods and services (including case-management) that persons with

catastrophic and non-catastrophic medical conditions require. *Deutsch Aff. (Ex. 1),* ¶¶ 4-6;

*Deutsch CV (Ex. 1); Deutsch 10/2/08 depo., pp. 17:18-20:8; 26:16-31:17; 33:5-35:5; 131:17-*

*133:3; 180:22-181:3.* Because Deutsch included only medical elements (medications, tests and

follow-up doctor visits) that were either recommended by the treating physicians or mentioned in

the medical records, *Deutsch Aff.,* ¶ 2, and he has the specialized knowledge to testify regarding

the goods and services the Plaintiffs will need, his testimony is admissible.[17]

---

[17]     *Rivera v. Turabo Med. Ctr. Partnership*, 415 F.3d 162, 171 (1st Cir. 2005), *cert. denied*, 546 U.S. 1172 (2006) (trial court properly admitted rehabilitation and life-care planning expert's opinion on projected cost of plaintiff's future care over objection that it was unreliable

Defendants cite *Norwest Bank, N.A. v. Kmart Corp.*,[18] which excluded a life-care

planner's testimony regarding the medical care the plaintiff would need because (i) he was not a

physician and (ii) it did not satisfy the *Daubert* factors.  With regard to the expert's

---

because costs were not approved by a physician, since expert was qualified and based his opinion on review of records from agency providing nursing care to plaintiff, letter from treating physician, and interview with plaintiff's family and caregiver); *Frometa v. Diaz-Diaz*, No. 07 CIV 6372 (HB), 2008 WL 4192501, at *2-*3 (S.D.N.Y.  Sept. 11, 2008) (expert's life-care plan was reliable because expert (i) held a B.A in Psychology, Certificates in Rehabilitation Management and Life Care Planning, and a Ph.D. in Rehabilitation Counseling; and (ii) based his opinion on Plaintiff's medical records and research into costs of treatment in the area, even though he never spoke to Plaintiff's physicians (only their staff) and did not review bills for Plaintiff's past treatments); *North v. Ford Motor Co.*, 505 F. Supp. 2d 1113, 1119-20 (D. Utah 2007) (registered nurse's life-care plan was admissible because nurse was Certified Life Care Planner and employed reliable methodology by relying on the reports and information of other experts; fact that she did not receive all the professional information she said she needed went to weight, not admissibility, of testimony); *Corrigan v. Methodist Hosp.*, 234 F. Supp. 494, 500 (E.D. Pa. 2002), *aff'd*, 107 Fed. Appx. 269 (3rd Cir. 2004) (RN with certification in rehabilitation nursing and 20 years experience was qualified to testify about plaintiff's future needs for aquatic therapy, occupational therapy, pain medications, and orthotics to facilitate body function based on plaintiff's medical and treatment history); *Pelletier v. Sordoni/Skanska Corp.*, No. X06CV950155184S, 2006 WL 760140, at *1-2 (Conn. Super. Ct. March 9, 2006), *rev'd on other grounds*, 945 A.2d 388 (Conn. 2008) (testimony of certified rehabilitation counselor and certified medical case manager that plaintiff would need future care, including annual hospitalizations and pulmonological evaluations was properly admitted because expert had specialized knowledge of care required by people with similar condition and based his opinion on review of medical records, meeting with plaintiff, published literature and his own specialized knowledge); *Midway Nat'l Bank of St. Paul v. Estate of Bollmeier*, 504 N.W.2d 59, 65 (Minn. Ct. App. 1993) (Deutsch's life-care testimony properly admitted because he "had both an educational background and practical experience in the subject of his testimony;" reviewed the Plaintiff's medical records from after the accident, plaintiffs' depositions, neuropsychological evaluations and test data; and interviewed plaintiff); *SeaRiver Maritime, Inc. v. Pike*, No. 13-05-0033-CV, 2006 WL 1553264, at *3-*4 (Tex. App.—Corpus Christi June 8, 2006, pet. denied) (mem. op.) (trial court properly admitted future-care-costs testimony of expert with 20 years experience as a life-care planner and 30 years experience in health-care management for people with disabilities, because expert had "considerable" relevant specialized knowledge, "based much of his cost evaluation upon the records and recommendations of the treating physicians," and consulted with treating physicians about the need for and cost of ongoing treatment).

[18]    No. 3:94-CV-78RM, 1997 WL 33479072 (N.D. Ind. Jan. 29, 1997).

qualifications, the court apparently concluded that only licensed physicians or nurses can qualify to testify about medical issues, stating, "the court is unaware of any instance in which a witness with no education or licensure in medicine, osteopathy, dentistry, chiropractic, or nursing has been found qualified, regardless of experience, to give an opinion on a person's medical condition and medical future based on a review of medical records and an interview with the patient and her husband."[19] But it was clear by 1997 that the lack of a specialized degree does not disqualify an otherwise qualified expert, and merely goes to the weight of his testimony.[20] Accordingly, non-physicians with adequate specialized knowledge of the subject of their testimony can qualify as experts, even on medical causation issues.[21] The court in *Norwest*

---

[19]     *Id.* at *2.

[20]     *Southern Cement Co., Div. of Martin-Marietta Corp. v. Sproul*, 378 F.2d 48, 49 (5th Cir. 1967); *Plywood Property Assoc. v. Nat'l Flood Ins. Program*, 928 F. Supp. 500, 508 (D.C.N.J. 1996) ("prior qualifications as expert witness, specialized degrees, licenses, publications in field, while all commendable, are not required to be possessed by every witness acting as expert."); *Dickerson v. Cushman, Inc.*, 909 F. Supp. 1467, 1472 (D.C. Ala.1995) ("[i]n general, the fact that an expert does not have a degree or license in his or her professed specialty goes to weight of his or her testimony rather than its admissibility"); *In re Southern Indus. Banking Corp.*, 71 B.R. 351, 369 n. 24 (Bankr. E.D. Tenn. 1987).

[21]     *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 916-17 (3rd Cir. 1991) (toxicologist's testimony that plaintiff's harm could have been caused by exposure to chemicals was not excludable simply because he was not medical doctor, because "[m]edical doctors . . . are not the only experts qualified to render an opinion as to the harm caused by exposure to toxic chemicals."); *Backes v. Valspar Corp.*, 783 F.2d 77, 79 (7th Cir. 1986) ("The judge suggested that only a doctor can opine on the causes of illness. The law is to the contrary."); *Tucker v. American Tel. & Tel. & Tel. Corp.*, 794 F. Supp. 240, 246 (W.D. Tenn. 1992) (physicist with requisite specialized knowledge due to experience was competent to testify on issue of medical causation in suit alleging hearing loss due to exposure to noise heard over telephone); *Mason v. Texaco, Inc.*, 741 F. Supp. 1472, 1497 (D. Kan. 1990), *aff'd*, 948 F.2d 1546, (10th Cir. 1991), *cert. denied*, 504 U.S. 910 (1992) ("A medical degree or training does not confer any magical qualities upon those experts for both plaintiff and defendant who testified on the causation issue."); *Owens v. Concrete Pipe & Prods. Co.*, 125 F.R.D. 113, 114-15 (E.D. Pa. 1989) (". . . the modern trend in the law is to allow experts in subjects such as biochemistry and toxicology to offer opinions on

simply applied an erroneous standard for expert qualifications.

Norwest also excluded the expert's testimony because it did not strictly satisfy the four Daubert factors, stating, "Some of the Daubert factors may have lesser applicability in some areas, but the court still must apply the Daubert analysis . . .."[22]  The court also rejected the expert's opinion, despite his use of a peer-reviewed and reliable methodology, because his opinions were based on his years of experience, rather than "a scientific principle."[23]  Two years later, however, the Supreme Court made clear that (i) non-scientific expert testimony does not have to be measured by the Daubert factors and (ii) experience alone can provide the necessary reliability.[24]  Thus, the Norwest court appears to have applied an erroneous standard for assessing the reliability of the witness's testimony.

In the case at bar, Dr. Deutsch clearly has specialized knowledge that will be helpful to the jury in assessing the Plaintiffs' damages, and reliably applied that specialized knowledge to the underlying data to reach his opinions.  Deutsch Aff, passim.  Accordingly, this Court should follow the lead of the many cases cited above in footnote 17, in which courts have admitted the testimony of life-care and rehabilitation planners under similar circumstances, rather than the erroneous and distinguishable decision in Norwest.

Defendant's complaint that Deutsch has inadequate experience with diabetes to prepare these rehabilitation plans is meritless.  Although Deutsch had not previously prepared a

_____

the causes of illness even though they are not medical doctors.").

[22]      Id. at *4-*6.

[23]      Id. at *5.

[24]      Kumho Tire Co., Ltd. v. Carmichael, 526 U.S.137, 150-51 (1999).

8

rehabilitation plan that *exclusively* addressed the care necessitated by diabetes (as these did), he has had hundreds of cases that included diabetes as one of the conditions for which care was included in the rehabilitation plan, and as such has specialized knowledge about the care necessitated by diabetes. *Deutsch Aff., ¶ 5; Deutsch 10/2/08 depo., pp. 68:5-13; 137:11-139:1; 219:13-23; 222:15-224:6.* The fact that Deutsch could not remember having prepared a plan that included *only* expenses for diabetes-related care at most goes to the weight of his testimony, not its admissibility.[25]  Likewise, Deutsch, who has a B.A. in Psychology and a Ph.D. in Counseling Psychology, has prepared many life-care and rehabilitation plans for patients with mental disorders, and mental health is a fundamental part of his practice. So, he has sufficient specialized knowledge to prepare a rehabilitation plan for a person with a mental disorder like those suffered by the Plaintiffs. *Deutsch Aff., ¶ 6; Deutch 10/2/08 depo., pp. 17:18-18:17; 86:25-88:4; 89:7-10.*

Defendant erroneously relies on *Israel v. Spring Industries, Inc.*,[26] and *Lozada v. Delta Family-Care Disability and Survivorship Plan*,[27] for the proposition that Deutsch's never having prepared a rehabilitation plan exactly like these (containing expenses solely related to diabetes) means he is not qualified. This reliance is misplaced.

In *Israel*, the plaintiffs tendered a physical-medicine physician to establish specific causation between the minor plaintiff's exposure to synthetic fiber allergens in his bedsheets and

---

[25]    *Robinson v. GEICO General Ins. Co.*, 447 F.3d 1096, 1100-01 (8th Cir. 2006); *Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 809 (3rd Cir. 1997); *Mannino*, 650 F.2d at 851.

[26]    No. 98CV5106(ENV)(RML), 2006 WL 3196956 (E.D.N.Y. Nov. 3, 2006).

[27]    No. 96-561CIVORL3ABF(22), 1998 WL 426048 (M.D. Fla. July 24, 1998).

the exacerbation of his severe atopic dermetitis and allergies.[28]  The court excluded the

physician's opinion on specific causation because he did not perform a reliable differential

diagnosis, since he did not attempt to rule out obvious alternative causes.[29]  Further, because the

physician had no objective medical evidence to link the minor plaintiff's conditions to the

allergens in the bedsheets, and had no professional expertise relating to similar medical

conditions (having *"never treated anyone* with similar allergies"), he could not support his

opinion that the minor plaintiff's exposure to the sheets caused his medical condition.[30]  And

because his life-care plan was completely dependent on his inadmissible opinion that these

medical conditions were caused by exposure to the sheets, the life-care plan was inadmissible.[31]

    *Israel* is distinguishable from the case at bar in two critical respects.  First, Deutsch *does*

have specialized knowledge of the rehabilitative treatment necessitated by diabetes, since he has

prepared many rehabilitation and life-care plans including this care.  *Deutsch Aff*, ¶¶ *4-5.*

Second, Deutsch is not offering an opinion on specific causation, *Deutsch Aff.*, ¶ *2*, which is

being provided by Plaintiffs' other experts.

    *Lozada* is even less helpful to Defendants.  That case was a review of a disability Plan's

administrative determination to deny benefits to the insured.  The insured's treating psychiatrist

opined that he was totally and permanently disabled (primarily due to severe psychiatric issues[32]);

---

[28]    *Id.* at *1, *3.

[29]    *Id.* at *5.

[30]    *Id.* at *6 (emphasis added).

[31]    *Id.* at *7.

[32]    *Id.* at *4.

10

the insured's rehabilitation specialist opined that he had no transferrable skills; and an

independent vocational expert who had evaluated the insured in his Social Security Disability

proceeding opined that there was no job in the national economy he could perform.[33]  The Plan

retained Deutsch, who opined that, while the insured was presently disabled due to his lack of job

skills, he would benefit from rehabilitation and could be rehabilitated to the point where he could

work, and that he was physically capable of doing light or sedentary work on a part time basis.[34]

The Plan credited Deutsch's opinion and denied the insured benefits.[35]  The District Court held

the Plan's decision to be arbitrary, emphasizing that:  (i) the Plan had not reviewed the entire

record, as required; (ii) the only medical evidence was the treating psychiatrist's opinion that the

insured was psychiatrically disabled, yet the Plan ignored this evidence; (iii) because Deutsch

was not a physician, his medical opinion that the insured was physically capable of working light

duty was not entitled to *as much weight* as the medical evidence; and (iv) the insurance policy

did not require a disabled insured to attempt rehabilitation not recommended by his doctor at his

own expense, and therefore Deutsch's opinion that rehabilitation would probably succeed was of

"dubious relevance."[36]  Notably, the court did not exclude Deutsch's opinion under Rule 702

based on any lack of qualifications or reliability, and in fact did not even consider that issue.

---

[33]     *Id.* at *2.

[34]     *Id.* at *2-*3.

[35]     *Id.* at *3.

[36]     *Id.* at *4-*5.

**B.    Deutsch's methodology for determining what medical care to include in his rehabilitation plans was reliable.**

Deutsch did not make any unilateral decisions to include as a cost item any particular modality of *medical* treatment that was attributable to a Plaintiff's pre-existing condition. Instead, he relied on the treating physicians' records and responses to his questionnaire, clinical practice guidelines and medical literature. *Deutsch Aff., ¶¶ 2, 16; Deutsch 10/2/08 depo., pp. 48:21-49:2; 74:18-75:21.* This is a reliable methodology for a qualified rehabilitation planner such as Deutsch.[37] *Deutsch Aff., ¶¶ 7, 10-15.*

Defendant nevertheless complains that Deutsch's questionnaire asked the physicians to identify those modalities of treatment "related to diabetes," rather than to *exclude* any modality of treatment that would have been necessary even absent the diabetes. The legal assumption underlying this criticism is that Plaintiffs' damages should include only costs and expenses related solely to diabetes, such that any good or service that might have benefitted Plaintiffs even if they did not have diabetes must be excluded. This assumption erroneously ignores the concepts of concurrent causation and aggravation, under which the defendant is responsible for any damages contributed to by its tortious conduct, even if a preexisting condition also contributed to those damages.

Under Florida substantive law, proximate cause is the causation standard in a product-liability case, whether based on negligence or strict liability.[38] "[T]he proximate cause of an injury is that cause which, in natural and continuous sequence, unbroken by any efficient

---

[37]    *See* footnote 17, above.

[38]    *Colville v. Pharmacia & Upjohn Company LLC*, 565 F. Supp. 2d 1314, 1320 (N.D. Fla. 2008).

intervening cause, produces the injury, and without which the result would have not occurred.  It need not be the only cause, nor the last or nearest cause.  It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.[39]  Thus, "[u]nder Florida law, a defendant is still liable for the consequences of his conduct even though some other cause contributed to the same damage,[40] including "a natural force or condition" like a preexisting medical condition.[41]  Plaintiffs' ultimate burden of persuasion, then, is to prove that it is more likely than not that the Defendant's act was a substantial factor in bringing about the injury.[42]

Furthermore, the wrongdoer takes the plaintiff as he finds him, and is liable to the extent of any increased damages resulting from the tortious aggravation of a preexisting condition.[43]  Ultimately, to the extent any preexisting condition combined with the effects of the Seroquel to cause Plaintiffs to incur a specific medical or non-medical expense, it will be the jury's job to determine what portion of the expense is attributable solely to the preexisting condition, and what portion is attributable to either the diabetes alone or the aggravation of the preexisting condition that resulted from the Seroquel.[44]  However, if it is impossible from the evidence to so

---

[39]    *Miller v. Sconyers*, 189 So.2d 371, 372 (Fla. Ct. App. 1966).

[40]    *Poole v. Lowell Dunn Co.*, 573 So.2d 51, 53 -54 (Fla. Ct. App. 1990).

[41]    *Marrero v. Salkind*, 433 So.2d 1224, 1225 (Fla. Ct. App. 1983), *pet. denied*, 444 So.2d 418 (Fla. 1984).

[42]    *Christopher v. Cutter Labs.*, 53 F.3d 1184, 1191 (11th Cir. 1995).

[43]    *Moore v. Perry*, 944 So.2d 1115, 1117-18 (Fla. Ct. App. 2006), *pet. denied*, 957 So.2d 636 (Fla. 2007); *Thomason v. Gordon*, 782 So.2d 896, 898-99 (Fla. Ct. App. 2001).

[44]    *Moore*, 944 So.2d at 1117-18; *Thomason*, 782 So.2d at 899.

apportion an expense, the Defendant is responsible for the entire expense.[45]

Thus, it is a significant and relevant fact that a particular medical or non-medical expense was necessitated in part by the Plaintiff's diabetes, even if it was also necessitated in part by the Plaintiff's pre-existing condition(s).  Dr. Deutsch's rehabilitation plans in this case project "the economic consequences of the [Plaintiffs'] diabetes into the future," *Δ's Exs. 3-8, p. 1*, so he eliminated any expenses due solely to the Plaintiffs' preexisting conditions, i.e., expenses the Plaintiffs would have incurred anyway even if they had not developed diabetes.[46] *Deutsch Aff., ¶ 16; Deutsch 10/2/08 depo., pp. 58:20-60:1; 174:11-175:12.*[47]  Defendant suggests that because Deutsch's questionnaire asked the physicians to identify those modalities of treatment "related to

---

[45]       *Gross v. Lyons*, 763 So.2d 276, 278-79 (Fla. 2000); *Washewich v. LeFave*, 248 So.2d 670, 672-73 (Fla. Ct. App. 1971).

[46]       It appears Deutsch may have been overly conservative, and eliminated some expenses that could have been included in the plan, since they were expenses related to both diabetes and preexisting conditions. *E.g., Deutsch 10/2/08 depo. at 174:11-175:12.*  However, since Deutsch is *not* opining that such costs are included in the Plaintiffs' damages, his *exclusion* of these expenses cannot harm the Defendant.  Put simply, Deutsch is *not* opining that these expenses would result from Plaintiffs' diabetes, and Rule 702 does not require the trial court to "gatekeep" "nonopinions" witnesses do not intend to offer.

[47]       Defendant's attorney did, over the course of the two full days of Deutsch's deposition, get Deutsch to agree that "the only thing that belongs in here is what specifically and solely results from the diabetes," *Deutsch 10/7/08 depo. (Ex. 3), p. 220:5-21*, and that "if [he] concluded that one of these patients needs something, but [he] believe[s] or concluded that that need preexisted the onset of diabetes, then [he] did not include that as an element of damage on which Raffa would make his calculations." *Deutsch 10/7/08 depo., pp. 274:17-275:1.*  However, on other occasions Deutsch made clear that he excluded "anything that wasn't related to diabetes," *Deutsch 10/2/08 depo., p. 117:22-24*, and that it was appropriate to include items that were necessitated by the combination of the pre-existing conditions and the diabetes. *Deutsch 10/2/08 depo. pp. 232:9-237:11.*  Under the law, as explained above, it is entirely appropriate for Deutsch to "cost out" all the expenses related to diabetes, even if some of them may also be related to the Plaintiffs' pre-existing conditions, for this is evidence that will be helpful to the jury in determining the amount of Plaintiffs' damages.

diabetes," rather than to exclude any modality of treatment that would have been necessary even

absent the diabetes, Deutsch cannot reliably include these expenses. *Δ's motion, p. 15.* But, it is

clear from the physicians' responses that these expenses were "related to diabetes" that they were

not *exclusively* the result of pre-existing conditions. *Deutsch Depo. Ex. 39 (Δ's NF Tab 9).*

Accordingly, under Florida law, Plaintiffs are entitled to recover at least that portion of these

expenses that the jury ultimately determines to be attributable to the diabetes, even if a portion of

them is also attributable to the preexisting conditions.

      Further, Deutsch is not required to provide the jury with an opinion as to the

apportionment of any expenses resulting from the combination of a pre-existing condition and

diabetes in order to make his testimony relevant. Deutsch has provided the jury with an opinion

of the probable total cost of the medical and non-medical goods and services that will be

necessary because of the Plaintiffs' diabetes, such that all of the costs included in his plan are

properly attributable, at least in part, to diabetes. To the extent that a particular item included in

his rehabilitation plan might also be beneficial in light of a Plaintiff's preexisting condition, such

that the item was necessitated by the combination of the Plaintiff's pre-existing condition and the

diabetes, the jury will have to apportion that expense and award only that portion attributable to

the diabetes or the aggravation of the pre-existing condition, if the evidence permits such

apportionment.[48] But other evidence and reasonable inferences can supply the jury with the

foundation for making that apportionment. Deutsch is not required to "make a home run" and

---

[48]    *Gross*, 763 So.2d at 279; *Washewich*, 248 So.2d at 672-73.

provide all the proof necessary to support a verdict.[49]

Put simply, Defendant's critique of the wording of Deutsch's questionnaire, any alleged ambiguity in the physicians' responses thereto, and the effect that this may have had, if any, on the accuracy of Deutsch's cost estimates, are matters going to the weight of his testimony, not its admissibility.[50]

Similarly, Defendant's complaint that Deutsch did not independently confirm that he had all the Plaintiffs' medical records at most goes to the weight of his testimony. "[Q]uestions

_____

[49]     FED. R. EVID. 401, advisory committee's note ("As McCormick § 152, p. 317, says, 'A brick is not a wall,' or, as Falknor, Extrinsic Policies Affecting Admissibility, 10 Rutgers L.Rev. 574, 576 (1956), quotes Professor McBaine, '...[I]t is not to be supposed that every witness can make a home run.'").

[50]     *In re Westminster Assocs., Ltd.*, 265 B.R. 329, 333-35 (Bankr. M.D. Fla. 2001) (construction-cost expert's imprecise utilization of expert entomologist's diagram of multiple causes of damage to buildings, resulting in his failure to subtract from damages some repair costs that were attributable to causes other than termites, went to weight of his testimony, not admissibility); *Smithers v. C & G Custom Module Hauling*, 172 F. Supp. 2d 765, 773 (E.D. Va. 2000) (defendant's criticism that life-care planner included costs without adequate foundation, and that plan included expenses for items that "would merely be 'really good for [plaintiff]," went to weight, not admissibility); *Brom v. Bozell, Jacobs, Kenyon & Eckhardt, Inc.*, 867 F. Supp. 686, 691 (N.D. Ill. 1994) (objections that economist's damage calculation was flawed because based on "speculative assumptions supported only by generalized survey data" "speak to the weight of the Perl evidence not its admissibility."). *Compare Minnesota Supply Co. v. Raymond Corp.*, 472 F.3d 524, 544 (8th Cir. 2006) (criticism that expert who calculated dealership's damages for breach of dealership agreement (1) incorrectly assumed that the termination of the dealership agreement caused dealer to lose all income generated from the sale of breaching party's parts, service, and used equipment, (2) artificially inflated the amount that dealership would have received in cash discounts for purchases from breaching party, and (3) based his calculation of lost commissions to be paid by breaching party to dealership on unsupported assumptions tying commissions to new equipment sales, went to weight, not admissibility); *Cummings v. Standard Register Co.*, 265 F.3d 56, 65 (1st Cir. 2001) (in wrongful termination case, criticism that plaintiff's damage expert failed to take into account company-specific data — such as the average retirement age of its workers or its salary caps — and use of an unusually high earnings year as a base point contributed to an inflated and inaccurate forecast of front pay damages went to weight, not admissibility).

relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility."[51]  Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.[52]  So, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination.  Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded."[53]  "The question under Rule 702 is not whether there are *some* facts in the case that the expert failed to take into account, but whether the expert's testimony took into account *enough* of the pertinent facts to be of assistance to the trier of fact on a fact in issue.  That some facts were not taken into account by the expert is a matter of weight and credibility, not admissibility."[54]  "It is not the court's duty to deny the admission of evidence because of factual inaccuracies and the court should only exclude the evidence if the expert is without sufficient grounds for his conclusion.  Factual inaccuracies are to be explored through cross-examination and go toward the weight and

---

[51]      *United States v. 14.38 Acres of Land More or Less Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1077 (5th Cir. 1996).

[52]      *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2nd Cir.1996) (internal quotation marks and internal citations omitted).

[53]      *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001).

[54]      *Jordan v. State*, 928 S.W.2d 550, 556 (Tex. Crim. App. 1996) (emphasis in original).

17

credibility of the evidence not admissibility."[55]

Deutsch has explained that he asked for *all* of the relevant medical records, independently assessed whether there were any omissions he could detect, and did not need to see all the records in light of the relatively limited nature of these rehabilitation plans. *Deutsch Aff.*, ¶¶ *17; Deutsch 10/2/08 depo., pp. 115:18-118:9; 120:22-122:7; 123:12-125:7.* Defendant's suggestion that Deutsch only saw the records Plaintiffs' counsel "cherry picked" — implying that Plaintiffs' counsel deliberately concealed harmful medical records from Deutsch — is unfounded. In any event, whether there were any significant medical records to which Deutsch did not have access, whether the information revealed in those records would make any difference in terms of the items included in the rehabilitation plan, and the extent to which any such changes might affect the total cost of Plaintiffs' future care are matters for cross-examination, not exclusion.[56]

This case is distinguishable from *Miller v. Pfizer, Inc.,*[57] upon which Defendant relies, in which the court excluded a "neuropsychopharmacologist's" opinion that the ingestion of Zoloft specifically caused the adolescent decedent to commit suicide, "and no other factor in his

---

[55]     *Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 723 (N.D. Ill. 2001).

[56]     *Burton v. R.J. Reynolds Tobacco Co.*, 183 F. Supp. 2d 1308, 1316 (D. Kan. 2002) (when expert physician had interviewed plaintiff three times, defendants' objections that expert had not reviewed plaintiff's medical records, had not examined plaintiff and had not taken plaintiff's medical history in connection with formulating opinion that smoking caused plaintiff's pulmonary vascular disease did not render expert's opinion inadmissible, but could "be addressed in cross-examination and goes to the weight of his opinion."); *Taylor v. Danek Med., Inc.*, No. CIV.A.95-7232, 1999 WL 310647, at *2 (E.D. Pa. May 10, 1999) (defendants' contention that the plaintiffs' medical expert failed to review all of the relevant medical records "goes to the weight of his testimony, rather than the admissibility.").

[57]     196 F. Supp. 2d 1062 (D. Kan. 2002), *aff'd*, 356 F.3d 1326 (10th Cir. 2004), *cert. denied*, 543 U.S. 917 (2004).

background or psychosocial situation could explain his suicide."[58]  In that case, the expert had

not accounted for undisputed evidence that indicated the decedent had engaged in suicidal

ideation prior to taking Zoloft, had been seen by a psychiatrist "because he had been struggling

with mood, anger and school-related issues," and was depressed because his only male friend had

moved away *the day before his suicide*."[59]  Even so, the Court did not exclude the expert's

testimony until it sought the advice of independent, court-appointed experts, who opined that the

expert's selective exclusion of relevant evidence from consideration was not an appropriate

methodology.[60]

     In the case at bar, Dr. Deutsch does not attempt to offer an opinion on specific causation,

but only to opine about the cost of the medical care Plaintiffs will need as a result of their

diabetes, and about the non-medical goods and services they will need (and the cost thereof) as a

result of their diabetes.  Further, Deutsch did not selectively exclude relevant evidence, but

sought all the relevant evidence. *Deutsch Aff., ¶ 17.* Deutsch's  opinion was reliable.[61]

---

[58]    *Id.* at 1085.

[59]    *Id.* at 1085-86.

[60]    Id. at 1086-87.

[61]    *Frometa v. Diaz-Diaz*, No. 07 CIV 6372 (HB), 2008 WL 4192501, at *2-*3 (S.D.N.Y.  Sept. 11, 2008) (expert's life-care plan was reliable because expert (i) held a B.A in Psychology, Certificates in Rehabilitation Management and Life Care Planning, and a Ph.D. in Rehabilitation Counseling; and (ii) based his opinion on Plaintiff's medical records and research into costs of treatment in the area, even though he never spoke to Plaintiff's physicians (only their staff) *and did not review bills for Plaintiff's past treatments*); *North v. Ford Motor Co.*, 505 F. Supp. 2d 1113, 1119-20 (D. Utah 2007) (registered nurse's life-care plan was admissible because nurse was Certified Life Care Planner and employed reliable methodology by relying on the reports and information of other experts; *fact that she did not receive all the professional information she said she needed went to weight, not admissibility, of testimony*); *Midway Nat. Bank of St. Paul v. Estate of Bollmeier*, 504 N.W.2d 59, 65 (Minn. Ct. App. 1993) (Deutsch's

The other case Defendant cites, *In re TMI Litigation*,[62] is even less applicable.  Initially, it is a stretch for Defendants to compare the exotic expert opinions in *TMI* to Dr. Deutsch's run-of-the-mill opinions in this case.  After all,  "TMI" stands for "Three Mile Island," and the court's substantive analysis of the opinions in that case included about thirty pages of almost incomprehensible scientific background, divided into sections with titles like "Overview of Relevant Principles of Nuclear Physics," "Atomic and Nuclear Structure," "Ionizing Radiation," "Radiation Quantities and Units," "Health Effects of Ionizing Radiation," "Nuclear Engineering," "Nuclear Reaction," "The Operation of a Nuclear Power Plant," and "Barriers to Release of Radioactive Materials into the Environment."[63]  There, the plaintiffs alleged that the radiation from the Three Mile Island disaster "caused changes to the atomic structure of their chromosomes and resulted in the formation of neoplasms."[64]  The court excluded the plaintiffs' expert's testimony regarding the results of an immunological study that she performed on blood samples of 19 residents of the Three Mile Island area,[65] which was offered by the plaintiffs to establish that they had been exposed to a sufficiently high dose of radiation to cause their

---

life-care testimony properly admitted because he "had both an educational background and practical experience in the subject of his testimony;" reviewed the Plaintiff's medical records *from after the accident*, plaintiffs' depositions, neuropsychological evaluations and test data; and interviewed plaintiff).

[62]    193 F.3d 613 (3rd Cir. 1999), *opinion amended*, 199 F.3d 158 (3rd Cir. 2000), *cert. denied*, 530 U.S. 1225 (2000).

[63]    *Id.* at 629, 634, 636, 638, 648, 651, 655.

[64]    *Id.* at 629.

[65]    *Id.* at 695.

injuries.[66]  This particular expert originally opined that the 19 TMI plaintiffs exhibited immunodepression, and that the plaintiffs should be further examined to determine whether this was the result of non-radiation causes like aspirin, antibiotic or other immunosuppressant consumption, cancer, autoimmune disease or "chronic weariness."[67]  Thereafter, she received summaries of the plaintiffs' medical histories that had been prepared by the plaintiffs' lawyers' staff, albeit with direction from another expert.[68]  Based on these summaries alone, the expert testified that she could now exclude the other possible causes, and conclude that the immunodepression "could have been" the result of radiation exposure.[69]  The trial court excluded this opinion, and the appellate court affirmed, because it was not reasonable for the expert to rely on a summary prepared by a nonprofessionals from the patients' self-reports.[70]  To be reliable, the court reasoned, the expert should have either *reviewed the plaintiffs' medical records or examined the plaintiffs herself.*[71]

In the case at bar, Deutsch interviewed and tested all the Plaintiffs, and extensively reviewed their medical records. *Deutsch Aff., ¶¶ 14; Δ's Exs. 3-8.*  He did not rely on summaries prepared by interested nonprofessionals that were based solely on the Plaintiffs' self-reporting.

---

[66]   *Id.* at 623, 627-28 (noting that District Court exclude plaintiffs' expert testimony offered to establish that plaintiffs "were exposed to doses of radiation sufficient to cause their neoplasms.")

[67]   *Id.* at 696.

[68]   *Id.* at 697.

[69]   *Id.*

[70]   *Id.* at 698.

[71]   *Id.*

Further, Deutsch was not trying to establish a causal nexus between radiation exposure and neoplasms (or even between Seroquel and diabetes), but was merely testifying to a straightforward matter well within his realm of expertise: what medical and non-medical goods and services will a patient with diabetes need, and what is the cost of those goods and services. Defendants' reliance on *TMI* is misplaced.

Defendant also criticizes Deutsch's rehabilitation plans because he did not send the completed plans to the Plaintiffs' physicians to get their "seal of approval" and had not read all the depositions in the case prior to completing his rehabilitation plans. But it would rarely if ever be appropriate to send an entire completed rehabilitation plan to the physicians for their approval, since only certain portions of the plan relate to any particular physician's area of practice. *Deutsch Aff., ¶ 18; Deutsch 10/2/08 depo., pp. 98:19-102:11.* Although there may be occasions when some physician (for example, a consulting physiatrist) will review an entire plan after it is put together, that is not a required step in the methodology. *Deutsch Aff., ¶ 18; Deutsch 10/2/08 depo., pp. 85:7-15; 99:15-101:13.* The important step in the methodology is to obtain the physician's input before the plan is drafted, either through the physician's response to the questionnaire or through his medical records. *Deutsch Aff., ¶ 18; Deutsch 10/2/08 depo., pp. 91:19-92:16.* Furthermore, although Deutsch did not read the depositions prior to completing his rehabilitation plans (because of an apparent snafu in getting the depositions to him), he has since received, read and summarized about 25 depositions of the Plaintiffs and their treating doctors. *Deutsch Aff., ¶ 17; Deutsch 10/2/08 depo., pp. 126:22-127-8; Deutsch 10/7/08 depo. (Ex. C), pp. 7:7-11:3.* The information in these depositions did not cause him to change his opinions, as expressed in his rehabilitation plans. *Deutsch Aff., ¶ 17.* The fact that Deutsch reviewed these

depositions after preparing his rehabilitation plans, rather than before, is a matter of cross-examination that goes merely to the weight of his testimony.[72]

### C.    Deutsch's opinion regarding case management is reliable.

Defendant's primary objection to Deutsch's opinion is that he included 2-4 hours of case management in the cost of future care for five of the six Plaintiffs. Defendant lodges four complaints about this testimony. First, Defendant complains that no physician recommended case management, and Deutsch is not qualified to determine whether the Plaintiffs will probably need this item of care. But case management is a **non-medical** item of care, and is rarely if ever ordered by a physician. *Deutsch Aff., ¶ 21; Deutsch 10/2/08 depo., pp. 72:1-8; 103:4-8.* As noted above, Deutsch is eminently qualified to opine about the probable case-management needs of persons with chronic medical conditions, including diabetes, so he did not require a physician's opinion to reliably opine that these Plaintiffs will probably need case management as a result of their diabetes. *Deutsch Aff., ¶¶ 4-6, 21.*

Defendant's second challenge to Deutsch's case-management opinion is that these

---

[72]    *United States v. 14.38 Acres of Land More or Less Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1077 (5th Cir. 1996) ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."); *International Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 546 n.6 (1st Cir. 1988) (trial court properly admitted expert's testimony when, in response to defendant's criticism during deposition, expert thereafter reviewed pertinent documents (which he could not guarantee had been reviewed prior to preparation of report), and discovered and corrected error in prior testimony, because this was matter properly addressed in cross-examination); *Square v. LeBlanc*, 903 So.2d 1178, 1183  (La. Ct. App. 3rd Cir. 2005), *writ denied*, 920 So.2d 240 (La. 2006) ("The fact that the doctors neither examined Square nor the vehicles, or read the parties' depositions, or reviewed all the medical records goes to the weight and credibility of each doctor's testimony, not its admissibility, and it is up to the opposing party to examine the factual basis of the opinion in cross-examination." (internal quotation marks omitted)).

Plaintiffs might have benefitted from case management even if they had never developed diabetes, because of their preexisting conditions. But the 2-4 hours of case management Deutsch has included in his rehabilitation plans relates only to case management for diabetes, and does not include case management of the Plaintiffs' other conditions. *Deutsch Aff., ¶ 22; Deutsch 10/2/08 depo., p. 179:2-180:4.* Moreover, the development of diabetes exacerbated the risks posed by the preexisting conditions, and conversely, the presence of the Plaintiffs' other conditions increased the risk of complications from diabetes. Accordingly, case management was even more critical due to the combination of the diabetes and the other preexisting factors.[73] *Deutsch Aff., ¶ 22; Deutsch 10/2/08 depo., pp. 227:17-228:18; 232:14-234:7; 235:9-236:13.* Accordingly, it was appropriate to include these case management expenses.[74]

Defendant also complains that Deutsch "could not identify a single clinical guideline for diabetes, a scholarly publication, or even his own experience or knowledge of what happens as a practical matter in the community to support his purported opinion in this regard." *Δ's motion, pp. 16-17.* To the contrary, Deutsch explained that the clinical practice guidelines and medical literature on diabetes emphasize the importance of the patient's compliance, *Deutsch 10/2/08 depo., pp. 196:24-197:22,* and education through case management is an effective means of ensuring patient understanding and compliance and of avoiding future complications. *Deutsch*

---

[73]    Defendant's suggestion that "as to [Plaintiff] Curley, [Deutsch] agreed that the 'main focus' of the case management in his rehabilitation plan would be on the comorbidities she had before contracting diabetes," *Δ's motion, p. 18,* is disingenuous. What Deutsch said was that because Curley's diabetes was relatively controlled, the diabetes case management he included in his report would focus on controlling the other conditions that exacerbate the risk of complications *from the diabetes* in combination with those other conditions. *Deutsch 10/2/08 depo., pp. 293:15-295:23.*

[74]    *See* discussion above, footnotes 38-45 and accompanying text.

24

*Aff.,* ¶ *23; Deutsch 10/2/08 depo., pp. 196:24-198:6; 207:10-208:24.* Further, contrary to Defendant's assertion, Deutsch did testify that organizations in the community utilize diabetes case management in the non-litigation context, specifically, that various health insurance companies and local hospitals utilize case management for diabetes. *Deutsch Aff.,* ¶ *23; Deutsch 10/2/08 depo., pp. 209:2-210:11.* Thus, Aetna was not Deutsch's "sole example" of an organization that utilizes diabetes case management, as Defendant claims. And Deutsch did not testify that Aetna's case management for diabetes consists of one or two telephone calls per month, as Defendant claims. What Deutsch said was that the level of case management depends upon the patient's condition. If the patient is otherwise healthy, not obese, fairly well educated, and his diabetes is well controlled with no complications, Aetna's case management may be by telephone. *Deutsch 10/2/08 depo., pp. 210:21-211:12.* But the Plaintiffs are far from "otherwise healthy." Indeed, their medical history revealed that they each suffered from a number of comorbidities, and also that they had a history of poor self-management. *Deutsch 10/2/08 depo., pp. 211:9-12; 227:18-230:3; 231:19-234:7; 235:9-236:13.* Thus, Deutsch had a good reason, based on the underlying data, to include case management for these Plaintiffs. *Deutsch Aff.,* ¶ 23. Defendant's criticism goes only to the weight of Deuthsch's opinion, not its admissibility.[75]

Defendant's final complaint is that Deutsch did ***not*** opine that Plaintiff Unger should have case management, and therefore his opinion that the other Plaintiffs ***do*** need it should be

---

[75]    *Jahn v. Equine Servs., Inc.,* 233 F.3d 382, 393 n.8 (6th Cir. 2000) (lack of supporting studies, textual support, or questions as to experts credentials go to weight rather than admissibility); *Zuchowicz v. United States,* 140 F.3d 381, 387 (2nd Cir. 1998) (" . . . lack of textual authority for [expert's] opinion, go[es] to the weight, not the admissibility of his testimony."); *McCullock v. H.B Fuller Co.,* 61 F.3d 1038, 1043 (2nd Cir. 1995) (same as *Zuchowich*).

excluded.  Defendant claims that Deutsch's decision not to include case management for Unger was based on Deutsch's "subjective" interpretations from his testing.  But Deutsch explained that through his clinical interview with and testing of Unger, he determined that Unger was managing his diabetes effectively without case management, in that he had withdrawn himself largely from driving, was complying with his care requirements, and seemed to understand the nature of diabetes and what he had to do to manage it to avoid further complications.  *Deutsch Aff.*, ¶ *24; Deutsch 10/7/08 depo., pp. 151:10-153:9.*  Thus, Deutsch explained why the primary data supported his opinion — an opinion, by the way, that *reduced* Mr. Unger's damages by eliminating the element of case management.  And Deutsch certainly has the experience and qualifications to make a clinical judgment based on his clinical interview and the test results.  *Deutsch Aff.*, ¶¶ *4-6; Deutsch CV.*  Finally, an important factor that Deutsch considered, but failed to mention in his deposition, is that Unger was an R.N. with vocational experience as a case manager.  *Deutsch Aff.*, ¶ *24.*  Thus, Deutsch's treating Unger differently than the other Plaintiffs indicates that he applied a reliable methodology to determine whether case management was warranted, rather than indicating that his methodology was unreliable.

IV.     **Deutsch utilized an objective, reliable methodology in formulating his rehabilitation plans.**

Defendant contends that, because one step in Dr. Deutsch's methodology was to apply his specialized knowledge gained through his education and 36+ years of experience in life-care and rehabilitation planning to the underlying data, his opinion is therefore his "ipse dixit," wholly subjective, and unreliable.  This argument contravenes not only common sense and decades of practical experience with expert testimony based on the very same type of methodology, but also

26

the legal standard for reliability.  Of course, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[76]  But an opinion derived by the application of a qualified expert's specialized knowledge to the underlying data in a logical manner is not the expert's "ipse dixit," even though there is a subjective element in the application step.  As the Federal Rules Advisory Committee has explained:

> Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others.  Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.  The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.  The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.

> Nothing in this amendment is intended to suggest that experience alone — or experience in conjunction with other knowledge, skill, training or education — may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); *Tassin v. Sears Roebuck*, 946 F.Supp. 1241, 1248 (M.D.La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"). *See also Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

---

[76]     *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.[77]

As explained below, Dr. Deutsch is an eminently qualified rehabilitation planner who thoroughly evaluated the underlying data, utilized a well accepted methodology that rehabilitation planners use every day in the litigation and non-litigation context, applied his specialized knowledge to that data in a logical and reasonable way, and reached opinions that are well supported in the underlying data. There are no great "analytical gaps" between the data and Dr. Deutsch's opinions, and he has explained why his opinions are reliably applied to the facts. Thus, his opinions are reliable.

Dr. Deutsch has been called the "father of life care planning," *Deutsch 10/2/08 depo., pp. 19:24-20:5,* and has authored 14 books and 95 journal articles and contributed Chapters relating to life-care planning, rehabilitation planning, case management, and related subjects. *Deutsch Aff., ¶ 4.* Included among his publications are "A Guide to Rehabilitation" and "Introduction to Life Care Planning." *Deutsch Aff., ¶¶ 4, 8.* In these publications, Deutsch outlined the methodology for developing a life care plan (of which a rehabilitation plan is merely a derivation). Indeed, the very definition of a life-care plan is "*A consistent methodology* for analyzing all of the needs dictated by the onset of a catastrophic disability through to the end of life expectancy. Consistency means that the methods of analysis remain the same from case to case and does not mean that the same services are provided to like disabilities." *Deutsch Aff., ¶¶ 8-9.* This methodology involves deliberately and methodically collecting, organizing, evaluating,

---

[77]     FED. R. EVID. 702, advisory committee's note to 2000 amendment (some internal citations omitted).

and interpreting patient-specific information to identify the patient's circumstances in order to determine what nursing/attendant care needs, equipment requirements, maintenance levels of therapy, and other medical and non-medical goods and services are required as a result of the patient's condition and to identify preventative measures that can be applied in an effort to thwart potential medical complications, incongruencies in care, inappropriate equipment/supply recommendations, and unrealistic rehabilitation programs. *Deutsch Aff., ¶ 9.* The methodology requires the rehabilitation planner to construct the plan on the basis of four foundations: medical, rehabilitation, case management, and psychological. *Deutsch Aff., ¶ 10; Deutsch 10/2/08 depo., p. 26:1-10.* The determination of what goods and services should be included in each area is determined by gathering, organizing and analyzing the data relating to the patient's medical condition and needs through the application of the rehabilitation planner's specialized knowledge to the information acquired from the underlying data. *Deutsch Aff., ¶¶ 11-12.* The rehabilitation planner has a number of sources of data available, including (i) the patient's medical records; (ii) interviews with the patient and/or his family or care-giver; (iii) direct input from treating or consulting physicians or other health-care providers; (iv) medical and psychological testing; (v) clinical practice guidelines and (vi) published medical literature. While it is not always necessary for the rehabilitation planner to consult every one of these sources, he should gather as much information as necessary to determine, in reasonable probability, what goods and services the patient will need as a result of his condition. *Deutsch Aff., ¶¶ 10-11.* Once the rehabilitation planner has gathered the relevant data, he must systematically organize it and then analyze it by utilizing his specialized knowledge and experience. Specifically, the rehabilitation planner must utilize his specialized knowledge of the physical and psychological consequences of the patient's

29

disability or condition and the long-term care requirements necessitated by those physical and psychological consequences to determine the goods and services that will likely be needed as a result of the patient's condition. *Deutsch Aff., ¶ 11.* The rehabilitation planner has four resources available to determine the patient's medical needs: (i) treating or consulting health-care providers, (ii) the patient's medical records, (iii) published clinical practice guidelines; and (iv) published medical literature. *Deutsch Aff., ¶ 11. ; Deutsch 10/2/07 depo., pp. 48:21-49:2; 75:3-22.* These sources are also available for determining the patient's non-medical needs, in addition to the rehabilitation planner's own specialized knowledge of what patients with similar conditions require. *Deutsch Aff., ¶ 11. ; Deutsch 10/2/08 depo., p. 52:24-54:1.* By utilizing these sources and applying his specialized knowledge and expertise, the qualified rehabilitation planner can provide a reliable outline of the medical and non-medical goods and services the patient will probably need as a result of his condition. *Deutsch Aff., ¶ 11.* Of course, the methodology calls for and permits the individual rehabilitation or life-care planner to exercise his own clinical judgment based on the specific facts and circumstances of the individual case, and the fact that it does so does not make the methodology unreliable, so long as the rehabilitation planner is competent and exercises his judgment within the confines of this methodology. *Deutsch Aff., ¶¶ 12, 19; Deutsch 10/2/08 depo. at 24:21-25:24.* Indeed, a methodology that eliminated the exercise of independent clinical judgment by a competent rehabilitation planner would itself be less reliable, because it would not account for the individual circumstances of each case. *Deutsch Aff., ¶¶ 12, 19.* For this reason, the rehabilitation or life-care planner's experience and qualifications are a very significant element of the reliability of his plan. *Deutsch Aff., ¶ 12.* Finally, the rehabilitation planner can "cost out" the necessary goods and services by

researching their cost in the geographic community in which the services will be utilized.
*Deutsch Aff.*, ¶ 12.

       The foregoing methodology is the methodology that is utilized by life-care and rehabilitation planners in both the litigation and non-litigation context every day all over the country, taught in graduate rehabilitation planning and life-care planning programs in American colleges and universities, and outlined in published and peer-reviewed texts and articles accepted as reliable in the field.  Indeed, Deutsch himself has authored peer- reviewed literature outlining this methodology, and has taught it in graduate level courses in life-care and rehabilitation planning at the University of Florida, Louisiana State University, and Kaplan University. *Deutsch Aff.*  Deutsch follows this same methodology in the litigation and non-litigation context, and followed this methodology in developing his opinions in this case. *Deutsch Aff.*, ¶¶ *7-8, 13; Deutsch 10/2/08 depo., pp. 24:21-26:10; 48:21-49:6; 77:5-78:17; 90:5-92:16; 95:14-96:20; 97:11-24.*  Specifically, Deutsch gathered the Plaintiffs' relevant medical records, had his R.N. and Social Worker systematically review and organize them, and then reviewed them carefully himself to determine the Plaintiffs' treatment regimens; their identified problems and complications; the medications that had been tried, which had been successful and which had been eliminated; any anticipated changes in treatment; any anticipated onset of complications; any issues in management related to patient behavior; any family dynamics or behavioral issues; and any other relevant information. *Deutsch Aff.*, ¶ *14; Deutsch 10/2/08 depo., pp. 115:12-116:4; 117:5-118:9; 149:11-150:9; 154:9-15; 155:16-159:24.*  Deutsch's staff performed an initial intake interview with the Plaintiffs, and then Deutsch performed a more detailed clinical interview with the patients about their history, condition and complaints and administered

various psychological tests. *Deutsch Aff., ¶ 14; Deutsch 10/2/08 depo., pp.  160:19-165:12;*
*188:3-19; Δ's Exs. 3-8.*  Deutsch and his staff then performed research into the applicable
clinical practice guidelines and medical literature to inform Deutsch's opinions. *Deutsch Aff., ¶*
*14; Deutsch 10/2/08 depo., pp. 189:3-190:4; 215:11-216:25.*   Such research helps Deutsch
ensure that he is addressing all the issues that need to be addressed in light of the patient's
condition and points him to any additional information he needs to seek from the treating
physicians. *Deutsch Aff., ¶ 14; Deutsch 10/2/07 depo., pp. 194:20-195:17; 216:6-219:23.*
Deutsch and his staff then formulated questionnaires to the treating physicians to gather
additional pertinent medical information about the Plaintiffs. *Deutsch Aff., ¶ 14; Deutsch*
*10/2/08 depo., pp. 48:21-49:6; 74:18-75:21; 190:18-24.*  In analyzing the data and formulating
his opinions, Deutsch applied his expertise in rehabilitation, the medical aspects of disability, the
rehabilitation aspects of disability and health care conditions, the long-term psychological impact
of these conditions, the long-term care and support necessitated by these conditions, and case-
management. *Deutsch Aff., ¶ 14; Deutsch 10/2/08 depo., pp. 132:13-133:3.*  In determining the
cost of the modalities of treatment included in his reports, Deutsch accounted for the
geographical location in which the Plaintiffs would be receiving the goods or services by
researching to find the lowest reasonably available cost for these services in those locations.
*Deutsch Aff., ¶ 14; Deutsch 10/2/08 depo., p. 239:6-13.*     The methodology that Dr. Deutsch
applied in this case has been found reliable (when the expert applying it has adequate specialized
knowledge and experience, as Deutsch clearly does) in numerous cases.[78]  It is hardly a "black
box" opinion, as Defendant suggests.  To the contrary, Deutsch's reports thoroughly outline the

---

[78]       *See* footnote 17, above.

medical history and results of the clinical interviews and testing upon which his opinions are based, *Δ's Exs. 3-8*, and his opinions expressed in those reports were sufficiently transparent to permit Defendant to test those opinions, and the bases for them, in considerable detail for nearly 16 hours in Deutsch's deposition. *Δ's Exs. 1-2.* Though Defendant has articulated a few minor criticisms of specific elements of Deutsch's rehabilitation plans, Deutsch has satisfactorily rebutted each of Defendant's criticisms, explaining why he included the particular expense in his original rehabilitation plan, and in those cases in which it would be appropriate to adjust the plan by removing or reducing the expense in light of information subsequently obtained, agreeing that his opinion will be so adjusted. *Deutsch Aff., ¶¶ 16-34; Deutsch 10/7/08 depo., pp. 94:6-97:15 (endocrinologist follow-up for Guinn); 102:16-104:7; 106:4-113:6 (handicapped driving evaluation for Under);147:20-150:14 (podiatrist follow-up for Unger); 197:4-205:2 (Methadone and Lyrica prescriptions for Burns); 221:1-224:22 (neurologist follow-up for Burns); 259:10-263:3; 263:19-266:23; 267:6-269:17 (podiatrist follow-up for Whittington); 310:13-313:14 (Ativan prescription for McAlexander).* So his opinions are admissible.

Defendant's criticisms are quintessential cross-examination fodder, not fundamental flaws in Deutsch's methodology, and it is the jury's province to weigh Defendant's critiques against Deutsch's rebuttals and determine how much weight to afford his testimony.[79] After all,

---

[79]     *Cummings v. Standard Register Co.*, 265 F.3d 56, 65 (1st Cir. 2001) (computational error in expert's damage calculation that inflated damages did not warrant reversal, when error was addressed through cross examination, expert corrected mistake in his testimony, and opposing party was permitted to argue that mistake affected expert's credibility); *International Adhesive Coating Co., Inc. v. Bolton Emerson Int'l, Inc.*, 851 F.2d 540, 546 n. 6 (1st Cir. 1988) (trial court properly admitted expert's testimony when, in response to defendant's criticism during deposition, expert thereafter reviewed pertinent documents (which he could not guarantee had been reviewed prior to preparation of report), and discovered and corrected error in prior testimony, because this was matter properly addressed in cross-examination); *Baldwin v.*

"the focus [of the court's gatekeeper analysis] must be solely on principles and methodology, not on the conclusions that they generate," and "[t]he grounds for the expert's opinion merely have to be good, they do not have to be perfect."[80]  Moreover, to the extent new information has or will warrant an adjustment of a few elements in Deutsch's rehabilitation plans, Deutsch has readily admitted his opinion should be adjusted, and these adjustments can easily be made.  "*Daubert* does not require that an expert's testimony be excluded simply because he admitted and corrected his own mistakes or retracted his false statements.  In fact, one of the very purposes of a *Daubert* hearing is to give experts a chance to explain and even correct errors that they made in their reports.  There is no stigma attached to such error correction, nor should there be.  If anything, it strengthens the quality of the expert report."[81]  In fact, the very fact that Defendant was able to test Deutsch's specific opinions with the level of detail that it has and raise these cross-examination points demonstrates that his opinion is not the inscrutable "black box" Defendant claims it is.

Defendant cites several inapposite cases in support of its argument that Deutsch's methodology was wholly subjective, and therefore inadmissible.  First, Defendant relies on

------

*Bader*, 539 F. Supp. 2d 443, 445-46 (D. Me. 2008) (errors in calculating damages, which expert conceded and corrected after his deposition, went to weight, not admissibility); *Engineered Products Co. v. Donaldson Co., Inc.*, 313 F. Supp. 2d 951, 1011 (N.D. Iowa 2004) (fact that expert's lost-profits calculation had "evolved" through five reports adjusting both methodology and facts went to weight, not admissibility, when expert's ultimate opinion was sufficiently justified to go to the jury).

[80]      *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 743-44 (3rd Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995).

[81]      *.I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, No. Civ. A. 03-4932, 2008 WL 2265269, at *2 (E.D. Pa. June 3, 2008) (ellipses and citation omitted)).

*Norwest Bank, N.A. v. Kmart Corp.*,[82] which is discussed above.[83]  As noted above, the District

Court in *Norwest* erroneously concluded that expert testimony must be based on some "scientific

principle," and could not be based on the application of the expert's specialized knowledge to the

underlying facts.[84]  But as the Federal Rules Advisory Committee has subsequently explained:

> While the terms "principles" and "methods" may convey a certain impression
> when applied to scientific knowledge, they remain relevant when applied to
> testimony based on technical or other specialized knowledge.  For example, when
> a law enforcement agent testifies regarding the use of code words in a drug
> transaction, the principle used by the agent is that participants in such transactions
> regularly use code words to conceal the nature of their activities.  The method
> used by the agent is the application of extensive experience to analyze the
> meaning of the conversations.  So long as the principles and methods are reliable
> and applied reliably to the facts of the case, this type of testimony should be
> admitted.[85]

Further, the *Norwest* court erroneously constrained its analysis to the *Daubert* factors

developed to address scientific experiments,[86] rather than applying the more appropriate and

flexible standard for experience-based, non-scientific testimony.[87]  *Norwest*, therefore, is not

---

[82]     No. 3:94-CV-78RM, 1997 WL 33479072 (N.D. Ind. Jan. 29, 1997).

[83]     *See* footnotes 18-24, above, and accompanying text.

[84]     *Id.* at *5.

[85]     FED. R. EVID. 702, advisory committee's note to 2000 amendment (citations
omitted).

[86]     *Id.* at *4-*6.

[87]     *United States v. Davis*, 397 F.3d 173, 178 (3rd Cir. 2005) (trial court properly
overruled defendants' objection that policy officer's testimony regarding whether conditions
under which defendants were arrested was consistent with drug trafficking was unreliable
because there was "no objective basis for it" since "he provided a reliable opinion based on years
of experience."); *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir.
2004) ("Concerning the reliability of non-scientific testimony such as Caliri's, the *Daubert*
factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind

persuasive, in light of the many other cases evaluating and admitting life-care planning testimony

similar to Deutsch's under a more appropriate analysis.[88]

     Defendant's reliance on *Elcock v. Kmart Corp.*,[89] and *Davidson v. United States*

*Department of Health and Human Services*,[90] is equally misplaced.  In *Elcock*, the District Court

refused to even consider the defendant's *Daubert* objection to the alleged vocational

rehabilitation expert's opinion, because it believed *Daubert* was inapplicable to non-scientific

testimony.[91]  After the Supreme Court clarified that trial courts must gatekeep all expert

testimony, the Third Circuit reversed and remanded the case for the trial court to conduct a

*Daubert* hearing, but expressly stated "we express no opinion as to the outcome of this

hearing."[92]  Although the Court of Appeals noted several apparent flaws in the alleged expert's

methodology (not the least of which was that his experience was so thin he only barely qualified

as an expert in the first place[93]), these comments must be read in light of the fact that the plaintiff

made virtually no effort to defend the expert's methodology against a *Daubert* attack, presumably

because the trial court had ruled that *Daubert* was inapplicable.  So, all the appellate court had to

---

of testimony, whose reliability depends heavily on the *knowledge and experience* of the expert, rather than the methodology or theory behind it.").

[88]    *See* footnote 17, above.

[89]    233 F.3d 734 (3rd Cir. 2000).

[90]    No. Civ. A. 7:06-129-DCR, 2007 WL 3251921 (E.D. Ky. Nov. 2, 2007).

[91]    *Elcock*, 233 F.3d at 744.

[92]    *Id.* at 750.

[93]    *Id.* at 743-45, 749.

examine was the little relevant evidence that happened to be elicited during trial.[94]  That is why the court remanded the case for a new trial — so that the expert's methodology could be thoroughly explored and he could have the chance to explain why it was reliable.[95]

But even the little that came out in the first trial was enough to distinguish the case from that at bar.  The witness in *Elcock* was barely qualified at all, while Deutsch is eminently qualified.  *Deutsch Aff.*, *¶¶ 4-6; Deutsch CV*.  The witness in *Elcock* did not explain his methodology in rigorous detail,[96] while Deutsch certainly has.  *Deutsch Aff.*, *¶¶ 7-15*.  The *Elcock* expert's methodology was a novel combination of two different published methodologies, and he did not explain how this combination produced reliable results.[97]  Deutsch, on the other hand, used the standard methodology that he himself has published, *Deutsch Aff.*, *¶¶ 7-8, 13*, and which has been recognized as reliable in the caselaw.[98]  And unlike the *Elcock* expert, Deutsch has specifically rebutted each criticism leveled at him.[99]  *Deutsch Aff.*, *¶¶ 16-35*.  *Elcock* does not support exclusion of Deutsch's testimony.

Finally, *Davidson* did not, as Defendant suggests, exclude the plaintiffs' experts' opinion that the minor child should have neural stimulation therapy.  To the contrary, that testimony was *admitted* because one of the plaintiffs' experts testified that "the concept of neural stimulation

---

[94]  *Id.* at 746.

[95]  *Id.* at 750.

[96]  *Id.* at 747.

[97]  *Id.* at 748-49.

[98]  *See* footnote 17, above.

[99]  *Elcock*, 233 F.3d at 747-48, 749.

37

for the child is valid, is published, is on the CDC website as an acceptable form of treatment."[100]

Deutsch has offered similar testimony in support of those of his opinions that Defendant attacks

in this case. *Deutsch Aff., ¶¶ 22-34.*

What the *Davidson* court excluded was elements of the plaintiffs' life-care plan that were

reproductions of a treatment regimen the minor child had been receiving from "The Institute for

the Achievement of Human Potential."[101]  These elements were excluded because (i) the

Plaintiffs essentially conceded that the Institute's program could not survive the *Daubert*

analysis, and made no effort to defend it,[102] and (2) their expert life-care planner admitted that

these elements were included in the life-care plan simply to "replicate" the services the child was

receiving at the Institute, and the plaintiffs made no effort to present any independent evidence

that they were appropriate.[103]  In the case at bar, by contrast, Plaintiffs have presented extensive

evidence to support Deutsch's methodology for the life-care plan he prepared, and Deutsch has

specifically addressed each challenged element of his life-care plan. *Davidson* is inapposite.

**V.     Deutsch will not opine that the Plaintiffs will suffer any particular complications**

**from diabetes.**

Deutsch's reports contained a general outline of the recognized complications of diabetes,

taken from well-accepted and reliable medical literature. *Deutsch Aff., ¶ 35.* Deutsch has no

intention of opining that any particular Plaintiff will in fact suffer from any particular

---

[100]     *Davidson,* 2007 WL 3251921, at *3.

[101]     *Id.* at *1, *3.

[102]     *Id.* at *2, *3.

[103]     *Id.* at *3. & n.3.

complication. *Deutsch 10/2/08 depo., p. 249:6-10.* However, Deutsch has opined that the Plaintiffs should receive case-management services to educate them about the disease, ensure compliance, and help them reduce the risk of future complications. In this context, the risk of complications is certainly relevant to Deutsch's opinion that case management is warranted, even though he is not testifying that any particular Plaintiff will likely develop any of these complications. *Deutsch Aff., ¶ 35; Deutsch 10/2/08 depo., pp. 240:15-242:17.* Further, Defendant has not suggested that any of the potential complications identified in Deutsch's report are not, in fact, potential complications of diabetes.

VI.    **Deutsch can explain the factual bases for his opinions, including what he learned about Plaintiffs' medical histories.**

On the one hand, Defendant criticizes Deutsch's opinions because he could not guarantee that he saw every single medical record pertaining to the Plaintiffs, thereby recognizing that it is appropriate for a rehabilitation planner to base his opinion in part on the patient's medical records. And of course, it is beyond dispute that a rehabilitation planner with Deutsch's experience is qualified to review medical records and determine the patient's long-term rehabilitation needs — at least with respect to the non-medical aspects of care.[104] Further, an expert is permitted to explain the factual basis of his opinion, at least to the extent that the underlying factual basis is (a) itself otherwise admissible or, (b) even if it is not otherwise admissible, if the probative value of the underlying data in evaluating the expert's opinion substantially outweighs the prejudicial effect of the underlying evidence.[105] Defendant has thus

---

[104]    *See* footnote 17, above.

[105]    FED. R. EVID. 703 & advisory committee's note to 2000 amendment.

far articulated no "prejudicial effect" of any specific inadmissible medical evidence upon which Deutsch relied, so it is premature for the Court to conduct the required balancing test.  While an expert may not simply function as a "conduit for hearsay," Deutsch's description of the relevant matters in Plaintiffs' medical histories will be based on his clinical interview and the Plaintiffs' medical records, which will presumably be admitted into evidence under a hearsay exception.[106] Accordingly, Defendant's request that the Court preliminarily exclude any testimony by Deutsch about the aspects of the Plaintiffs' medical histories that informed his opinions should be denied.

**VII.  Because Deutsch's rehabilitation plans are admissible, Raffa's discounting testimony is admissible.**

Defendant does not criticize Frederick Raffa's methodology in discounting the Plaintiffs' future damages, as indicated in Deutsch's rehabilitation plans, to present value.  Instead, Defendant simply argues that, if the Court excludes Deutsch's rehabilitation plans, Raffa's opinion would be irrelevant.  Because, as we have explained above, Deutsch's testimony is admissible, Raffa's testimony should not be excluded.  Of course, to the extent Deutsch adjusts a few of the individual cost items in his rehabilitation plans based on subsequently revealed information, Raffa's present-value calculation will have to be adjusted as well.  But the underlying methodology will remain the same.

---

[106]     *E.g.*, FED. R. EVID. 803(4), 803(6).

DATED:  November 24, 2008       Respectfully submitted,


By:      /s/ K. Camp Bailey_____
              F. Kenneth Bailey Jr.
              K. Camp Bailey
              Fletcher V. Trammell
              Robert W. Cowan
              **BAILEY PERRIN BAILEY**
              440 Louisiana St., Suite 2100
              Houston, Texas 77002
              (713) 425-7100 Telephone
              (713) 425-7101 Facsimile
              kbailey@bpblaw.com
              cbailey@bpblaw.com
              ftrammell@bpblaw.com
              rcowan@bpblaw.com
              **Co-Lead Counsel for Plaintiffs**


## CERTIFICATE OF SERVICE


I HEREBY CERTIFY that on this 24th day of November, 2008, the foregoing and attached *Plaintiffs' Response and Supporting Memorandum to AstraZeneca's Motion and Supporting Memorandum Under Daubert and Federal Rules of Evidence 702, 401 and 403 to Exclude or Limit Testimony of Paul Deutsch and Frederick Raffa* was served on opposing counsel, via email, as follows:

        *Via email: marjorie.shiekman@dechert.com*
        Marjorie Shiekman
        Dechert, LLP

        *Via email: louise.moyer@dechert.com*
        Louise Moyer
        Dechert, LLP


            /s/ K. Camp Bailey_____