# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**IN RE: SEROQUEL PRODUCTS**
**LIABILITY LITIGATION**

**MDL DOCKET NO.**
**6:06-MDL-1769-ACC-DAB**

---

**This document relates to:**

*Linda Guinn v. AstraZeneca Pharms. LP*, 6:07-cv-10291
*Janice Burns v. AstraZeneca Pharms. LP*, 6:07-cv-15959
*Richard Unger v. AstraZeneca Pharms. LP*, 6:07-cv-15812
*Connie Curley v. AstraZeneca Pharms. LP*, 6:07-cv-15701
*Linda Whittington v. AstraZeneca Pharms. LP*, 6:07-cv-10475
*Eileen McAlexander v. AstraZeneca Pharms. LP*, 6:07-cv-10360
*David Haller v. AstraZeneca Pharms. LP*, 6:07-cv-15733-ACC

---

**PLAINTIFFS' RESPONSE IN OPPOSITION TO ASTRAZENECA'S**
**MOTION TO EXCLUDE THE SPECIFIC-CAUSATION**
**TESTIMONY OF PLAINTIFFS' CASE-SPECIFIC CAUSATION**
**WITNESSES AND SUPPORTING MEMORANDUM OF LAW**

The above-listed Plaintiffs submit this memorandum of law in opposition to the motion

and memorandum by AstraZeneca Pharmaceuticals LP and AstraZeneca LP (collectively

"AstraZeneca") to exclude the specific-causation testimony of the following Plaintiff-designated

experts: Brian Tulloch, M.D.; Jennifer B. Marks, M.D.; Jack Abramson, M.D.; Mitchell A.

Young, M.D.; and Bruce D. Perry, M.D. As explained below, the experts' methods are sound

and their opinions reliable. AstraZeneca's motion should be denied as to each designated expert.

## I.      INTRODUCTION

In Plaintiffs' "general causation" response filed concurrently with this brief, they show

that Seroquel causes or contributes to serious diseases, most significantly hyperglycemia and

diabetes. In their omnibus legal memorandum filed in response to AstraZeneca's motions for

summary judgment, Plaintiffs show that AstraZeneca carelessly aimed Seroquel at a population already at high risk of these diseases without providing essential warnings to preserve the fragile health status of targeted patients.   The question presented here is whether the seven lead trial-Plaintiffs are part of the "collateral damage" of AstraZeneca's wrongful conduct.

The question is one of medical diagnosis, which falls squarely within the scope of clinical knowledge, training, and experience.   It is appropriate, then, that the experts called upon to assess the specific causation question here are medical doctors who routinely treat populations that include persons like the Plaintiffs.   Each claimant's case has been evaluated by an endocrinologist (Dr. Marks or Dr. Tulloch) who by training and experience has advanced knowledge about the cause and treatment of metabolic disorders, including hyperglycemia and diabetes.   Also testifying in each case is a psychiatrist (Dr. Young, Dr. Abramson, or Dr. Perry) who, as a prescriber of drugs like Seroquel, is a first-line observer of the effects such medications have on subject patients.

These doctors pursued traditional methodologies to arrive at a diagnosis with regard to each Plaintiff: they reviewed medical histories and notes of physical examinations performed by other physicians; they gathered and scrutinized clinical data, including weight recordings and glucose measurements; they reviewed and analyzed existing peer-reviewed medical literature and AstraZeneca's own clinical trials, all pointing to the fact that Seroquel generally causes diabetes; and they considered what role other risk factors might have played in the development of disease in the particular cases.   The analytic result in each instance is a reliable conclusion that the Plaintiff's ingestion of Seroquel, known generally to contribute to the development of diabetes, was in fact a causative agent here.

AstraZeneca's primary arguments about the supposed inadmissibility of these opinions congregate around several themes, the legal and factual underpinnings of which do not survive close scrutiny. Seen in preview, each of AstraZeneca's repeated themes incorporate patent legal or factual distortions, *to wit*:

- "Ruling out" risk factors. AstraZeneca complains that Plaintiffs' experts failed to negate the role of other risk factors in the development of Plaintiffs' injuries. That approach ignores accepted notions about the multifactorial nature of diabetes. Generally, various risk factors (obesity, family history, or metabolic dysfunction) combine to make an individual vulnerable to the disease. Introduction of Seroquel may then "trigger" a disease outbreak that the other conditions had not been sufficient to cause. Seroquel may also *accelerate* the development of diabetes in individuals whose risk factors made disease-onset inevitable but not imminent. In both instances, Florida law permits recovery. *See, e.g., Thomason v. Gordon*, 782 So.2d 896, 898 (Fla. 5th Dist. 2001) (causal effect on preexisting conditions); *Horn v. Tandem Health Care of Florida, Inc.*, 2008 WL 4820760, *3 (Fla. 2nd Dist., November 7, 2008) (not yet published) (acceleration of disease onset). Moreover, courts applying *Daubert* principles permit expert testimony that considers the effect of but does not necessarily "rule out" the precise role of other factors. *See, e.g., Globetti v. Sandoz*, 111 F. Supp.2d 1174, 1179 (N.D. Ala. 2000). *See* Argument IV.B, *infra* at 26.

- Role of Temporality. While the existence of a temporal association between the exposure to a substance and new onset of a disease is one factor that supports a finding of causation, the record does not justify AstraZeneca's claim here that Plaintiffs' experts

based their opinions as to specific causation *solely* on temporal association. The experts adhered instead to a traditional diagnostic methodology that starts with temporality and extends to consideration of other factors, including the strength of the general association between the drug and the disease and the nature of individual clinical manifestations. Doctors offering conclusions based on similar foundations have been permitted to testify in other litigation and that tradition should be continued here. *See* Argument IV.C, *infra* at 30.

- Biological mechanism. AstraZeneca wants the experts' opinions excluded because the witnesses have not pointed to definitive proof of the mechanism by which Seroquel causes diabetes. That is an odd argument given that AstraZeneca has aggressively marketed Seroquel despite not understanding the precise mechanism by which the drug supposedly produces beneficial effects in patients. In any event, the case law is clear that "not knowing the mechanism by which a drug causes injury is not fatal to a plaintiff's claim. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d. 1311, 1314 (9th Cir. 1995). At the same time, the *plausibility* of the connection between Seroquel and diabetes, which is supported by ample evidence, bolsters the conclusions here that Seroquel caused the injuries. *See* Argument IV.D, *infra* at 33.

- Dose-response. AstraZeneca argues that the Seroquel dose levels for two of the Plaintiffs fell below a required exposure threshold, negating causation in those particular cases. AstraZeneca points to no actual science that supports the existence of such a threshold, and the evidence is in fact to the contrary. While Seroquel studies have identified a dose-sensitive effect on weight (greater weight gain occurs as dosage levels rise), significant

4

weight increases have been observed at *all* dose levels in the studies, including at levels comparable to what Plaintiffs took here.   AstraZeneca's attempt to bracket the causal effect based on arbitrary dose levels also ignores the obvious role of individual drug sensitivity, which leaves some low-dose individuals subject to weight due to particular susceptibility to the effect. *See* Argument IV.E, *infra* at 34.

Finally, AstraZeneca appends to its motion a collection of kitchen-sink objections aimed at particular aspects of the Plaintiffs' individual cases.   These complaints are largely predicated on mischaracterizations or material omissions of the facts and the law.   Like the broader themes, the miscellaneous attacks diverge from the carefully crafted procedural parameters of *Daubert* and its progeny and disregard the Florida-law principles that provide the substantive underpinnings of Plaintiffs' claims.

## II.  FACTUAL BACKGROUND

### A.  Nature and Diagnosis of Diabetes

Diabetes is a condition in which the body fails to produce enough insulin action for the body's needs.[1]   Insulin and glucagon help control and fine-tune the level of nutrients derived after meals and during fasting periods.[2]   With insufficient insulin and excess glucagon action, the body produces excess amounts of glucose and fatty acids.[3]   Excess blood sugar above the renal threshold causes spillage of sugar into the urine, excessive urination and significant energy deficit, resulting in weight loss and dehydration.[4]   High levels of fatty acids are broken down in the liver to produce ketone bodies and a metabolic acidosis that can proceed to severe illness and

---

[1] Tulloch Rep. (Unger) at 3 (NF Tab 11).
[2] Tulloch Rep. (Unger) at 3 (NF Tab 11).
[3] Tulloch Rep. (Unger) at 3 (NF Tab 11).
[4] Tulloch Rep. (Unger) at 3 (NF Tab 11).

death.[5]  In some cases, a non-diabetic subject can contract the disease when increased levels of triglyceride are produced from the liver, which can result in massive accumulations of triglycerides in the blood and acute pancreatitis, contributing to the later development of diabetes.[6]

When it became feasible to measure insulin, obese non-diabetic subjects were found to have up to three-fold increased blood insulin levels when compared to lean subjects, while obese patients with diabetes had insufficient insulin for the circumstances of their obesity.[7]  Hence the concept of pancreatic exhaustion has evolved for an understanding of the evolution of Adult onset-, Maturity onset-, or (the current term) Type 2 Diabetes.[8]  It is therefore apparent that obesity and weight gain can predispose people to develop diabetes since obese subjects are required to produce higher levels of insulin and those of limited pancreatic reserve develop high blood sugar.[9]

Diabetes is diagnosed by the detection of an increased blood sugar in the fasting state, or two hours after the ingestion of a glucose challenge.[10]  Fasting sugars are perhaps the best reflection of the balance between sugar production and clearance, and, based on epidemiological data the American Diabetes Association has recommended that values in excess of 126 mgs/dl be delineated as reflecting the diabetic state, while normal sugars are defined as below 100 mgs/dl.[11] This leaves a grey area between 100 and 125 mgs/dl which is defined as "impaired glucose tolerance."[12]  Healthy, non-diabetic individuals have fasting glucose values of 80-90 mgs/dl.[13]

---

[5] Tulloch Rep. (Unger) at 3 (NF Tab 11).
[6] Tulloch Rep. (Unger) at 4 (NF Tab 11).
[7] Tulloch Rep. (Unger) at 4 (NF Tab 11).
[8] Tulloch Rep. (Unger) at 4 (NF Tab 11).
[9] Tulloch Rep. (Unger) at 4 (NF Tab 11).
[10] Tulloch Rep. (Unger) at 5 (NF Tab 11).
[11] Tulloch Rep. (Unger) at 5 (NF Tab 11).
[12] Tulloch Rep. (Unger) at 5. (NF Tab 11).
[13] Tulloch Rep. (Unger) at 5. (NF Tab 11).

Since glucose adheres to proteins, increased blood sugar levels are reflected in an altered state of other blood components, and for those subjects with normal hemoglobin physiology the level of glycosylated hemoglobin gives a valid estimate of the average blood sugar over the previous 6 weeks (HbAlc), normal values being 4.0-6.0%.[14]

## B.    The Seroquel-diabetes connection

Seroquel, the United States trade name for the pharmaceutical quetiapine, is a widely prescribed prescription drug approved by the FDA in 1997 for the treatment of schizophrenia and subsequently in 2004 for management of acute manic episodes associated with bipolar disorder.[15]   It is also widely prescribed for various "off-label" uses, including the treatment of sleep disorders, control of agitation, anxiety, aggression, and behavioral disturbances.[16]   It is part of a class of "atypical" antipsychotics that supposedly present lower risks of adverse neurological effects than first-generation antipsychotics.[17]   AstraZeneca does not understand the precise mechanism by which the drug supposedly produces beneficial effects in patients.   Dr. Jennifer L. Payne, one of AstraZeneca's retained experts, testified:

> Q:     How does an antipsychotic effectively treat anxiety disorder?
>
> A:     We don't know how any of these medications really work.  Even though we know that antipsychotics in general work on the dopaminergic system, for example, we really don't know when it comes down to the molecular level exactly what they're doing.[18]

As early as Seroquel's launch date in 1997, AstraZeneca's own data indicated that clinically significant weight gain was a common side effect of the drug, and the connection has

---

[14] Tulloch Rep. (Unger) at 5. (NF Tab 11).
[15] Plunkett Rep. at 4 (NF Tab 28).
[16] Plunkett Rep. at 4 (NF Tab 28).
[17] Wirshing Rep. at 4-5 (NF Tab 30); Plunkett Rep. at 4 (NF Tab 28).
[18] Payne Dep. at 121:9-17 (NF Tab 25).  *See also* Plunkett Dec. at 9 (NF Tab 26) (referring to the fact that the AstraZeneca package insert for Seroquel states in the Clinical Pharmacology Section 12.1 that "the mechanism of action of SEROQUEL, as with other drugs having efficacy in the treatment of schizophrenia and bipolar disorder, is unknown."

been confirmed by subsequent studies.[19]   The effects of Seroquel and other atypical antipsychotics on weight gain have been shown to be attributable to both increased caloric intake (increased appetite) and decreased energy expenditure.[20] These mechanisms for increased body weight gain are consistent with the fact that Seroquel has effects on neurotransmitter systems in the brain that affect appetite and mood.[21]

It is well established in the medical literature that a clinically significant increase in body weight is a risk factor for diabetes.[22]   Therefore, any effect of Seroquel to increase body weight is a significant risk for the development of diabetes.[23]   Epidemiological studies have confirmed and a consensus in the medical community has formed around the link between Seroquel ingestion and increased risk of diabetes.[24]

**C.     The experts**

   **1.     Jennifer B. Marks, M.D.**

Dr. Marks, designated here as a specific-causation expert for Linda Guinn, Janice Burns, and Connie Curley, is a licensed physician living and practicing in Florida.[25]   She obtained her medical degree from the University of Miami, where she also completed an Internship and Residency in Medicine and a Fellowship in Endocrinology, Diabetes, and Metabolism.[26]   She is board certified in Internal Medicine and in the subspecialty of Endocrinology, Diabetes, and

---

[19] Wirshing Rep. at 7 (NF Tab 30); Arnett Rep. at 4-9 (NF Tab 29).
[20] Plunkett Rep. at 10-11 (NF Tab 28).
[21] Plunkett Rep. at 11 (NF Tab 28).
[22] Plunkett Rep. at 11 (NF Tab 28).
[23] Plunkett Rep. at 11 (NF Tab 28).
[24] The substantial evidence establishing the causal link between Seroquel and diabetes is set out and discussed in Plaintiffs' Opposition to AstraZeneca's Motion to Exclude General-Causation Testimony of Plaintiffs' Generic and Case-Specific Witnesses, filed concurrently with this response.
[25] Marks Rep. (Guinn) at 1 (NF Tab 8).
[26] Marks Rep. (Guinn) at 1 (NF Tab 8).

8

Metabolism.[27]

Dr. Marks also teaches.  She has been on the faculty of the University of Miami School of Medicine, in the Department of Medicine, Division of Endocrinology, Diabetes, and Metabolism, since 1990.[28]  She served for nearly four years there as Interim Chief of the Division of Endocrinology, Diabetes, and Metabolism.[29]  She also was for eight years Chief of the Endocrinology, Diabetes, and Metabolism section at the Miami VA Medical Center, and is currently Medical Director of the Diabetes Management Program at that hospital.[30]

Dr. Marks is the immediate-past Editor-in-Chief of *Clinical Diabetes*, a publication of the American Diabetes Association ("ADA"), and is a Fellow of the American College of Physicians.[31]  She has had continuous diabetes research funding since 1993 from the National Institutes of Health and since 2000 through a VA Cooperative studies funding mechanism.[32]  Over the past ten years she has given around thirty invited lectures nationally and internationally and published over thirty peer-reviewed articles in the area of diabetes and metabolic syndrome and related conditions.[33]

### 2.  Brian Tulloch, M.D.

Dr. Tulloch offers specific-causation opinions here as to Unger, Whittington, McAlexander and Haller.  He is a practicing Endocrinologist at Diagnostic Clinic in Houston, Texas.[34]  He is also an Attending Physician at Methodist Hospital, Hermann Hospital, and Park

---

[27] Marks Rep. (Guinn) at 1 (NF Tab 8).
[28] Marks Rep. (Guinn) at 1 (NF Tab 8).
[29] Marks Rep. (Guinn) at 1 (NF Tab 8).
[30] Marks Rep. (Guinn) at 1 (NF Tab 8).
[31] Marks Rep. (Guinn) at 1-2 (NF Tab 8).
[32] Marks Rep. (Guinn) at 2 (NF Tab 8).
[33] Marks Rep. (Guinn) at 2 (NF Tab 8).
[34] Tulloch Rep. (Unger) at 1 (NF Tab 11).

Plaza Hospital, all in Houston.[35]   He teaches Internal Medicine at The University of Texas Medical School and is a Clinical Associate Professor at M.D. Anderson Hospital and Tumor Institute.[36]   He is a Fellow of the American College of Physicians and the Royal College of Physicians of London.[37]

Dr. Tulloch studied medicine at Oxford University as a Rhodes Scholar.[38]   Currently, through his membership on a pharma-sponsored panel of diabetes experts, he lectures to physicians on topics related to diabetes, obesity, the metabolic syndrome, hyperlipidemia, hypertension and heart disease.[39]   He also is a Manuscript reviewer for the peer-reviewed journals *Diabetologia, Hormone and Metabolic Research, Clinical Science, Cardiovascular Research, Biochemical Pharmacology, Journal of Clinical Investigation, Journal of Biological Chemistry, Artery, and Metabolism: Clinical and Experimental.*[40]

### 3.    Bruce D. Perry, M.D.

Dr. Perry, designated expert for Linda Guinn, Janice Burns, and Connie Curley, is board-certified in general and child and adolescent psychiatry.[41]   He is a Senior Fellow of a Houston-based organization focused on research and education in the field of child trauma and maltreatment.[42]   He serves as a Senior Consultant to the Ministry of Children's Services for the Province of Alberta in Canada.   From 1992 to 2001, he served as the Chief of Psychiatry at Texas Children's Hospital and Research Professor in the Department of Psychiatry and

---

[35] Tulloch Rep. (Unger) at 1 (NF Tab 11).
[36] Tulloch Rep. (Unger) at 1 (NF Tab 11).
[37] Tulloch Rep. (Unger) at 2 (NF Tab 11).
[38] Tulloch Rep. (Unger) at 1 (NF Tab 11).
[39] Tulloch Rep. (Unger) at 1 (NF Tab 11).
[40] Tulloch Rep. (Unger) at 2 (NF Tab 11).
[41] Perry Rep. (Guinn) at 1 (NF Tab 15).
[42] Perry Rep. (Guinn) at 1 (NF Tab 15).

10

Behavioral Sciences at Baylor College of Medicine in Houston.[43]  Prior to that, from 1988 to 1991, he was on the faculty at the University of Chicago School of Medicine.[44]

Dr. Perry has extensive clinical and research experience in the area of psychopharmacology.[45]  He has a Ph.D. in pharmacology and has focused subsequent research on central nervous system pharmacology.[46]  He founded and formerly ran the Pediatric Psychopharmacology Clinic at Texas Children's Hospital.[47]  He has participated in clinical trials of psychotropic medications with adults and serves on academic panels, review boards, study sections and committees focusing directly on psychopharmacology.[48]  His current academic duties include teaching about the use of psychotropic medications, including atypical antipsychotics in off-label situations.[49]  He has served on the Psychopharmacology Panel for the United States Pharmacopoeia (USP).[50]

4.    **Mitchell A. Young, M.D.**

Dr. Mitchell A. Young is testifying in this case as an expert for Richard Unger and Linda Whittington.  A psychiatric physician in private practice in Houston, he is board certified in General Adult, Child and Adolescent, and Forensic Psychiatry.[51]  He obtained his undergraduate degree in psychology from the University of Texas at Austin and his medical degree from Baylor College of Medicine.[52]  He also received post-graduate training at the Institute of Living in

---

[43] Perry Rep. (Guinn) at 1 (NF Tab 15).
[44] Perry Rep. (Guinn) at 1 (NF Tab 15).
[45] Perry Rep. (Guinn) at 1 (NF Tab 15).
[46] Perry Rep. (Guinn) at 1 (NF Tab 15).
[47] Perry Rep. (Guinn) at 1 (NF Tab 15).
[48] Perry Rep. (Guinn) at 1 (NF Tab 15).
[49] Perry Rep. (Guinn) at 1 (NF Tab 15).
[50] Perry Rep. (Guinn) at 1 (NF Tab 15).
[51] Young Rep. (Unger) at 1 (NF Tab 20).
[52] Young Rep. (Unger) at 1 (NF Tab 20).

Hartford, Connecticut.[53]

Dr. Young is a distinguished fellow of the American Psychiatric Association, a fellow of the American Academy of Child and Adolescent Psychiatry, a past president of the Texas Society of Child and Adolescent Psychiatry, and a Clinical Assistant Professor in the Menninger Department of Psychiatry at Baylor College of Medicine.[54] He has experience in conducting pharmaceutical research.[55]

### 5.    Jack Abramson, M.D.

Dr. Jack Abramson is presented here as an expert for Eileen McAlexander and David Haller. He is a medical doctor who is actively engaged in the practice of psychiatry in Dade and Broward Counties in Florida.[56] He holds a medical degree from Laval University in Quebec City, Canada and is licensed to practice medicine in Florida, Massachusetts, Louisiana, Iowa, and Texas.[57] He is board certified in Psychiatry and the subspecialties of Forensic Psychiatry, Addiction Psychiatry, and Geriatric Psychiatry.[58]

### D.    The Plaintiffs

### 1.    Linda Guinn

Linda Guinn is a sixty-one-year-old divorced mother who lives in Palm Bay, Florida. She has a decades-old diagnosis of recurrent major depression and a dependent personality disorder. While she has struggled with obesity since her teenage years, and weighed as much as 205 pounds on a clinic visit in January 2000, she had reduced her weight to 155 by June of

---

[53] Young Rep. (Unger) at 1 (NF Tab 20).
[54] Young Rep. (Unger) at 1 (NF Tab 20).
[55] Young Rep. (Unger) at 1 (NF Tab 20).
[56] Abramson Rep. (Haller) at 1 (NF Tab 19).
[57] Abramson Rep. (Haller) at 1 (NF Tab 19).
[58] Abramson Rep. (Haller) at 1 (NF Tab 19).

2002.[59]  Her psychiatrist prescribed Seroquel for her at a dose of 200 milligrams per day in May of 2002.[60]  The dose rose to as high as 800 mg per day over the ensuing months.[61]  During that time, Guinn's weight began to climb steadily.[62]  She gained a total of almost 40 pounds from commencement of Seroquel to the time she discontinued it in April 2007.[63]

Of the numerous glucose tests performed on Guinn during the years leading up to Seroquel ingestion in May of 2002, none reflected readings that were outside the normal range.[64]  By November 2002, following a twenty-pound weight gain, she was being evaluated for suspicion of diabetes.[65]  Multiple abnormal glucose readings were obtained in ensuing months, and on February 1, 2006 she was diagnosed as having diabetes mellitus.[66]

Dr. Marks concluded on the basis of reasonable medical probability that Guinn's weight gain caused by exposure to Seroquel worsened her underlying insulin resistance and likely accelerated the onset of diabetes.[67]  Dr. Perry concurred that Seroquel was a causative factor in Guinn's weight gain and diabetes.[68]

### 2.    Janice Burns

Burns is a 55-year old disabled registered nurse from Panama City Beach, Florida.  She is divorced and has two children.  She has a history of depression, post-traumatic stress disorder, and panic attacks.[69]

Burns had some elevated glucose readings prior to starting Seroquel in June 2002, but

---

[59] Marks Rep. (Guinn) at 5 (NF Tab 8).
[60] Marks Rep. (Guinn) at 5 (NF Tab 8); Perry Rep. (Guinn) at 2 (NF Tab 15).
[61] Marks Rep. (Guinn) at 6 (NF Tab 8).
[62] Marks Rep. (Guinn) at 6 (NF Tab 8).
[63] Marks Rep. (Guinn) at 6 (NF Tab 8).
[64] Marks Rep. (Guinn) at 5-6 (NF Tab 8); Marks Dec. at 6-7 (NF Tab 32).
[65] Perry Rep. (Guinn) at 3 (NF Tab 15).
[66] Marks Rep. (Guinn) at 6 (NF Tab 8).
[67] Marks Rep. (Guinn) at 6 (NF Tab8), Marks Dep. at 358:3-8 (NF Tab 2); Marks Dec. at 7 (NF Tab 32).
[68] Perry Rep. (Guinn) at 3 (NF Tab 15).
[69] Marks Rep. (Burns) at 5 (NF Tab 9).

those results can largely be explained by her exposure at the time to steroids, which is known to cause spikes in glucose readings.[70]  Her doctor's notes confirm that she was never diagnosed with diabetes during that same time period.[71]

After starting Seroquel, initially at a dose of 200-600 milligrams per day, her weight increased initially about twenty pounds.[72]  The doctors continued Seroquel at a higher dose of 600 to 800 milligrams per day, and by April 2003 her weight had increased another thirty pounds.[73]  In August 2003, a little over a year after starting Seroquel, Burns was diagnosed as having diabetes mellitus.[74]

Dr. Marks and Dr. Perry both believe that Burns's weight gain worsened her underlying insulin resistance and likely accelerated the onset of diabetes.[75]  Dr. Marks concludes further that the weight gain contributed to Burns's development of hypertension and dyslipidemia.[76]

### 3.  Richard Unger

Unger, like Burns, is a former registered nurse.[77]  He is 59-year old and lives in Miami. He sustained a back injury in 1997 that left him disabled.[78]  He received an "off-label" prescription of Seroquel, starting in October 2002, to treat a major depressive disorder.[79]  His dosages during the time he took Seroquel ranged from 75 milligrams in the beginning eventually up to 800 milligrams per day.[80]

---

[70] Marks Rep. (Burns) at 5 (NF Tab 9); Marks Dep. at 82:23-25 (NF Tab 2).
[71] Marks Rep. (Burns) at 5 (NF Tab 9).
[72] Marks Rep. (Burns) at 5 (NF Tab 9).
[73] Marks Rep. (Burns) at 5 (NF Tab 9).
[74] Marks Rep. (Burns) at 5 (NF Tab 9).
[75] Marks Rep. (Burns) at 6 (NF Tab 9); Perry Rep. (Burns) at 3 (NF Tab 16).
[76] Marks Rep. (Burns) at 6 (NF Tab 9).
[77] Tulloch Rep. (Unger) at 10 (NF Tab 11).
[78] Tulloch Rep. (Unger) at 10 (NF Tab 11).
[79] Tulloch Rep. (Unger) at 10 (NF Tab 11).
[80] Tulloch Rep. (Unger) at 10 (NF Tab 11).

Unger's weight, measured a few months before he began Seroquel, was 260 pounds.[81] By June 2003 it had risen to 282 pounds, and then to 310 pounds by April 29, 2004.[82] The highest recorded weight was 325 pounds, on September 6, 2005, a time that coincided with a significant increase in Unger's Seroquel dosage.[83]

Unger's available records do not record glucose levels prior to ingestion of Seroquel, though the first readings after starting on Seroquel are normal, and there are several entries in the medical records reflecting that Unger denied having a diagnosis or history of diabetes prior to ingesting Seroquel.[84] Once Unger started on Seroquel and his weight began to rise, so did his glucose levels, until eventually, on September 7, 2007, following a 43-pound weight gain since commencement of Seroquel, Unger displayed extremely elevated glucose levels over 1000, and he was diagnosed with diabetes mellitus.[85]

Dr. Tulloch and Dr. Young concur that Richard Unger did not have diabetes prior to Seroquel exposure and developed the disease while on a consistent dose of the medication and after a significant weight gain.[86] But for his prolonged use of Seroquel, both doctors believe, Unger would not have developed diabetes at the time he was diagnosed in September 2005.[87]

### 4. Connie Curley

Curley, who is 56 years old and lives in Tampa, has a long history of psychiatric problems, chronic pain, drug use, and post traumatic stress syndrome.[88] She has a strong family history of diabetes, obesity, hypertension, and hyperlipidemia but no personal health risks for

---

[81] Tulloch Rep. (Unger) at 10 (NF Tab 11).
[82] Tulloch Rep. (Unger) at 10 (NF Tab 11).
[83] Tulloch Rep. (Unger) at 10 (NF Tab 11).
[84] Tulloch Dec. at 6 (NF Tab 22).
[85] Tulloch Dec. at 6. (NF Tab 22).
[86] Tulloch Dec. at 6 (NF Tab 22); Young Rep. (Unger) at 12 (NF Tab 20).
[87] Tulloch Dec. at 8 (NF Tab 22); Young Rep. (Unger) at 12 (NF Tab 20).
[88] Marks Rep. (Curley) at 5 (NF Tab 10).

diabetes, other than excess weight.[89]

Curley started a dose of 25 milligrams per day of Seroquel in January 2003, when she weighed 143 pounds.[90] She had gained thirteen pounds in the previous year and a half, but her glucose reading was normal glucose.[91] By November 2004, after taking 75 milligrams of Seroquel per day, her weight had increased to 151 pounds.[92] In January 2005 her doctors raised her Seroquel dose to 100 milligrams per day, and by March 2005 she weighed 167 pounds and had an abnormal random blood glucose of 205 mg/dl.[93] Her records reflect a diagnosis of diabetes in September 2005.[94] Dr. Marks concludes that Seroquel was a cause of the diabetes, and Dr. Perry concurs with that opinion.[95]

### 5.    Linda Whittington

Whittington is fifty-two years old and lives in Balwin, Florida.[96] She is disabled due to mental illness following a diagnosis in 1999 of schizophrenia, paranoid type.[97] She also suffers from neck pain secondary to an accidental injury in 2001.[98] She has a family history of diabetes mellitus, hypertension, and hyperlipidemia.[99] Her doctors started her on Zyprexa in May 1999 and in October 2001 switched her to Seroquel, initially at a dose of 200 milligrams twice daily.[100] There was no evidence or diagnosis of diabetes during the time she was on Zyprexa and her urine glucose readings appeared to be normal during that time.[101]

---

[89] Marks Rep. (Curley) at 5 (NF Tab 10).
[90] Marks Rep. (Curley) at 5 (NF Tab 10).
[91] Marks Rep. (Curley) at 5 (NF Tab 10).
[92] Marks Rep. (Curley) at 5 (NF Tab 10).
[93] Marks Rep. (Curley) at 5 (NF Tab 10).
[94] Marks Rep. (Curley) at 5 (NF Tab 10).
[95] Marks Rep. (Curley) at 5 (NF Tab 10).
[96] Tulloch Rep. (Whittington) at 10 (NF Tab 12).
[97] Tulloch Rep. (Whittington) at 10 (NF Tab 12).
[98] Tulloch Rep. (Whittington) at 10 (NF Tab 12).
[99] Tulloch Rep. (Whittington) at 10 (NF Tab 12).
[100] Tulloch Rep. (Whittington) at 10 (NF Tab 12).
[101] Tulloch Rep. (Whittington) at 10 (NF Tab 12).

Whittington's weight was recorded at 184 pounds just prior to the time she went on Zyprexa, and she had gained twenty pounds by the time she was switched to Seroquel.[102] She had gained another 40 pounds by February 2006, and a fasting glucose measurement taken then was diagnostic for diabetes.[103] After switching from Seroquel to Geoden, her weight dropped back to 200 pounds.[104] Dr. Tulloch and Dr. Young are both of the view that the data support the conclusion that Seroquel contributed to Whittington's weight gain and diabetes.[105]

### 6.    Eileen McAlexander

McAlexander is 49-year-old single mother who lives in Ocala, Florida.[106] She suffers from major depression with psychotic features and is disabled as a result of her mental disease.[107] Prior to Seroquel ingestion, she was at risk of diabetes by virtue of obesity, hypertension, and family history, but no evidence indicates she had diabetes before starting Seroquel on August 30, 2001.[108]

McAlexander was generally obese but had lost weight in the five years prior to the initiation of Seroquel.[109] She had a recorded weight of 260 pounds on August 14, 2001.[110] She started Seroquel two weeks later, initially at 50 milligrams daily, and that dose was increased to 75 milligrams daily several weeks after that.[111] The dose was decreased in December to 25 milligrams at bedtime, but by that time her weight had increased to 278 pounds, for a gain of 18

---

[102] Tulloch Rep. (Whittington) at 10 (NF Tab 12)
[103] Tulloch Rep. (Whittington) at 10 (NF Tab 12).
[104] Tulloch Dec. at 9 (NF Tab 22).
[105] Tulloch Rep. (Whittington) at 10 (NF Tab 12); Young Rep. (Whittington) at 11 (NF Tab 21).
[106] Tulloch Rep. (McAlexander) at 9 (NF Tab 13).
[107] Tulloch Rep. (McAlexander) at 9 (NF Tab 13).
[108] Tulloch Dec. at 3 (NF Tab 22).
[109] Tulloch Dec. at 4 (NF Tab 22).
[110] Tulloch Dec. at 3 (NF Tab 22).
[111] Tulloch Dec. at 3 (NF Tab 22).

pounds since initiation of Seroquel.[112]  By February 5, 2002, she had gained another 9 pounds, for a total increase on Seroquel of 27 pounds.[113]

On February 11, 2002 McAlexander entered the hospital and stated she had stopped taking Seroquel three weeks earlier.[114]  Immediately thereafter, on February 19, 2002, she had a fasting glucose result of 146, which is consistent with a diagnosis of diabetes.[115]  She restarted a 300 milligrams per day dose of Seroquel on February 22, 2002 at a 300 milligram dose, which was raised to 600 milligrams per day in February 2003.[116]  By June 18, 2003, her weight had grown to greater than 300 pounds and her glucose readings were repeatedly consistent with diabetes.[117]

Dr. Tulloch concludes based on reasonable medical probability that, but for the ingestion of Seroquel, McAlexander would not have developed diabetes at the time of her diagnosis in February 2002.[118]  Dr. Abramson believes Seroquel was a contributing factor to McAlexander's development of diabetes.[119]

### 7.    David Haller

Haller is a 47-year-old white male who resides in Dunedin, Florida.[120]  He has a psychiatric history that includes bipolar disorder dating to 1987 and schizophrenia to 1996.[121]  There is no weight data from the time before Haller commenced Seroquel in October 2002,

---

[112] Tulloch Dec. at 4 (NF Tab 22).
[113] Tulloch Dec. at 5 (NF Tab 22).
[114] Tulloch Dec. at 5 (NF Tab 22).
[115] Tulloch Dec. at 5 (NF Tab 22).
[116] Tulloch Dec. at 5 (NF Tab 22).
[117] Tulloch Dec. at 5 (NF Tab 22).
[118] Tulloch Dec. at 6 (NF Tab 22); Tulloch Rep. (McAlexander) at 10 (NF Tab 13).
[119] Abramson Rep. (McAlexander) at 5 (NF Tab 18).
[120] Tulloch Rep. (Haller) at 10 (NF Tab 14); Abramson Rep. (Haller) at 4 (NF Tab 19).
[121] Tulloch Rep. (Haller) at 10 (NF Tab 14); Abramson Rep. (Haller) at 4 (NF Tab 19).

which makes the picture somewhat uncertain.[122] But it is known that Haller's weight went from 226 pounds to 247 pounds in just a few months while he was on a 400 milligram per day dose of Seroquel.[123] Haller's weight then fluctuated, but multiple notations in the medical records indicated that he generally was gaining weight and was concerned about it.[124] His weight on Seroquel peaked at 251 pounds in May 2004, which was at least a 25 pound weight gain since the first weight recorded on Seroquel.[125]

In June 2004 Haller required hospitalization with insulin for elevated blood sugars and suspected pancreatitis, another condition associated with Seroquel use and which Haller's treating physician questioned as being drug induced.[126] Haller lost weight during and after the hospitalization but was diagnosed with uncontrolled diabetes on August 6, 2004, at which time his weight was 225 pounds.[127] Dr. Tulloch determined that the more than ten-percent gain in body weight after commencing Seroquel was likely triggered by the drug.[128] Dr. Abramson has given a similar view that Seroquel was a cause of Haller's diabetes.[129]

**III.    Legal Standards**

    **A.    Daubert and Rule 702**

The Supreme Court set principles for admission of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The Court looked to Rule 702 of the Federal Rules of Evidence as the governing standard:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

---

[122] Tulloch Dec. at 8 (NF Tab 22); Abramson Rep. (Haller) at 5 (NF Tab 19).
[123] Tulloch Dec. at 8 (NF Tab 22).
[124] Tulloch Dec. at 8 (NF Tab 22).
[125] Tulloch Dec. at 8 (NF Tab 22).
[126] Tulloch Dec. at 8 (NF Tab 22).
[127] Tulloch Dec. at 9 (NF Tab 22).
[128] Tulloch Dec. at 9 (NF Tab 22); Tulloch Rep. (Haller) at 11 (NF Tab 14).
[129] Abramson Rep. (Haller) at 6 (NF Tab 19).

an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

FED. R. EVID. 702. *Daubert* explained that Rule 702 must be read in the context of the "liberal thrust" of the Federal Rules of Evidence and must be interpreted consistently with the "general approach of relaxing the traditional barriers to 'opinion' testimony." *Daubert*, 509 U.S. at 588.

Under *Daubert*, the trial court plays a gatekeeping role to ensure that scientific testimony evidence is reliable. Expert opinion testimony is sufficiently reliable if the expert has "good grounds" for his or her testimony—*i.e.*, if the expert's conclusions are based on the knowledge and experience of his or her discipline rather than on "subjective belief or unsupported speculation." *Id.* at 589. "The Court in *Daubert* declared that the 'focus, of course, must be solely on principles and methodology, not on the conclusions they generate.'" FED. RULE EVID. 702, Adv. Comm. Notes (2000) (quoting *Daubert*, 509 U.S. at 595).

The trial court's role is that of "gatekeeper," not "armed guard." *Ruiz-Trioche v. PepsiCola of P. R. Bottling Co.*, 161 F.3d 77, 86 (1st Cir. 1998). The relevant question is whether the methodology employed by the expert is reliable, and *Daubert* does not allow the trial judge to choose one competing methodology over another. *See. e.g., id. at* 85 (1st (Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.").

The gatekeeping role therefore concerns only whether expert testimony is admissible, not how persuasive the evidence may be to the fact-finder. *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003); *Heller v. Shaw Indus., Inc.*, 167 F.3d 140, 152 (3rd Cir. 1999) ("[E]xpert opinion. . . need not be so persuasive as to meet a party's

burden of proof or even necessarily its burden of production.") Per *Daubert*, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. *See Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir.1999).

**B.     Florida law of causation**

While federal rules govern admissibility of evidence, including testimony offered by experts, those principles are "intimately intertwined" with substantive law doctrines supplied under *Erie* by the forum state. *Legg v. Chopra*, 286 F.3d 286, 291 (6th Cir. 2002). *See Daubert v. Merrell Dow Pharmaceuticals, Inc.* 43 F.3d 1311, 1320 (9th Cir.1995) ("In assessing whether the proffered expert testimony 'will assist the trier of fact' in resolving this issue, we must look to the governing substantive standard, which in this case is supplied by California tort law). This is particularly true in the area of tort analysis, given distinct state-law assessments as to the parameters of causation and the nature of proof required to satisfy its requirements. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 761 (3rd Cir. 1994) (observing that "the substantive standard of causation can affect the standard of admissibility").

In addition to proving a product defect, a Florida product-liability plaintiff has the burden of proving proximate cause, which, as in most jurisdictions, incorporates an analysis of cause-in-fact. *See, e.g., Christopher v. Cutter Laboratories*, 53 F.3d 1184, 1191 (11th Cir.1995). While the general test for cause-in-fact is "but for" causation, requiring a showing that "but for" the act or defect the injury would not have occurred, the focus changes to a "substantial factor" formulation when one or more causes are claimed to have "concurrently" caused an injury. The pertinent instruction to the jury provides:

In order to be regarded as the legal cause of loss, injury or damage, negligence

need not be the only cause. Negligence may be a legal cause of loss, injury, or damage even though it operates in combination with the act of another, some natural cause, or some other cause if such other cause occurs at the same time as the negligence and if the negligence *contributes substantially* to producing such loss, injury or damage.

FLORIDA STANDARD CIVIL JURY INSTRUCTION 5.1(b) (emphasis added). *See also Hadley v. Terwilleger*, 873 So.2d 378, 380 Fla. 5th Dist. 2004). The purpose of the concurring cause instruction in a tort case is to negate the idea that a defendant is excused from the consequences of his or her fault by reason of some other cause concurring in time and contributing to the same damage. *Morton Roofing, Inc. v. Prather*, 864 So.2d 64, 68-69 (Fla. App. 5 Dist. 2003)*; Hart v. Stern*, 824 So.2d 927, 930 (Fla. 5th Dist. 2002). The instruction applies specifically to toxic-exposure cases where multiple substances are alleged to have *concurrently* caused the plaintiff's injury, with the proper focus again on whether the defendant's product, along with other potential causative agents, was a "substantial factor in bringing about the injury." *Christopher v. Cutter Laboratories*, 53 F.3d 1184 (11th Cir.) (*citing Reaves v. Armstrong World Industries, Inc.*, 569 So.2d 1307, 1309 (Fla. Dist. Ct. App. 1990)). *See also Colville v. Pharmacia & Upjohn Company* LLC, 565 F. Supp.2d 1314, 1322 (N.D. Fla. 2008); *Elias v. Evenflo Co., Inc.*, 2005 WL 1668427 (M.D. Fla., July 8, 2005); *Barrow v. Bristol-Myers Squibb*, 1998 WL 812318, *36 (M.D. Fla., October 29, 1998) (Fawsett, J.).

The "concurring cause" instruction is deemed equally appropriate and indeed mandated when a defendant's negligence is alleged to have acted in combination with a plaintiff's preexisting physical condition to produce an injury. *Thomason v. Gordon*, 782 So.2d 896, 898 (Fla. 5th Dist. 2001). *See Esancy v. Hodges*, 727 So. 2d 308 (Fla. 2d Dist. 1999) (requiring instruction where negligent operation of the defendant's motor vehicle combined with plaintiff's

22

pre-existing back condition to cause her injury).   The submission must be coupled with an aggravated injury instruction that permits the plaintiff to recover damages for any exacerbation of the underlying condition.  *Morton Roofing, Inc. v. Prather*, 864 W.W.2d at 70.   In cases in which apportionment between the defendant's act and the preexisting condition is not feasible because the injuries are "indivisible," the plaintiff is entitled to recover for the entire injury. *Gross v. Lyons*, 763 S.W.2d 276, 279-80 (Fla. 2000) ("When the tortious conduct of more than one defendant contributes to one indivisible injury, the entire amount of damage resulting from all contributing causes is the total amount of damages recoverable by the plaintiff.")   The purpose of that rule is to prevent a subsequent wrongdoer from escaping responsibility "where his conduct contributed to the creation of the situation in which the problems of apportionment arose." *Hart v. Stern*, 824 So.2d 927, 932 (Fla. 5th Cir. 2002).

**IV.    ARGUMENT**

**A.    The experts employed the reliable methodology of a differential diagnosis in forming their opinions about causation.**

The ultimate aim behind the admissibility procedures crafted by the *Daubert* Court and embodied in Rule 702 is to bring "lawsuit science" into conformity with the science of the real world.   To that end, trial courts are instructed to ensure that a testifying expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The "relevant field" for the five experts at issue here is clinical medicine, and in the clinical field the standard diagnostic procedure for establishing the nature and cause of disease is the differential diagnosis. *See Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001) (defining differential diagnosis as the method by which a physician determines what

23

disease process caused a patient's symptoms); *Heller v. Shaw*, 167 F.3d 146, 156 (3d Cir. 1999) (stating that differential diagnosis is the basic method of internal medicine). Typically the approach consists of performing physical examinations, taking medical histories, ordering and reviewing the results of clinical tests, consulting pertinent medical literature, and assessing the role of other possible causes. *See Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir. 1999); *Zuchowicz v. U.S.*, 140 F.3d 381, 387 (2nd Cir. 1998). It is in accordance with that well-established causation method that the five special causation experts approached the question here.

As outlined in the reports and deposition testimony, the starting point for the analysis for each expert was a review of pertinent medical literature, in addition to FDA materials and documents from AstraZeneca's own files, all of which establish a clear link between Seroquel ingestion and diabetes.[130] That observation supported by the literature that Seroquel causes glucose intolerance and diabetes became an important starting point for the analysis.[131]

The consistent view in the published materials is that Seroquel causes diabetes and related conditions primarily by inducing weight gain, which in turn is a known factor in the development of insulin resistance and drug-induced diabetes.[132] Thus, in processing the

---

[130] *See, e.g.* Marks Dep. at 24:21-33:6 (NF Tab 2); Marks Rep. (Curley) at 21-37 (NF Tab 10); Tulloch Rep. (Haller) at 9 (NF Tab 14); Young Rep. (Unger) at 4-7 (NF Tab 20).

[131] With regard to the literature review, there is no requirement that a clinician forming an expert opinion in the nature of a differential diagnosis establish independent expertise with regard to the subject of a consulted medical authority. If such a requirement existed, few clinicians could render diagnoses. An expert may rely on the research, studies, and expertise of others, so long as they are of the sort of information regularly relied on by experts in the field. *Eclipse Electronics v. Chubb Corp.*, 176 F. Supp. 406, 412 (E.D. Pa. 2001) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 (3rd Cir. 1994). Since by definition clinicians who form differential diagnoses consult articles and treatises to identify the universe of possible causes for a disease or injury, that same information is proper support for the opinions of a clinical expert giving a differential diagnosis, without regard to the expert's independent expertise on the published topic. *See Carroll v. Morgan*, 17 F.3d 787, 790 (5th Cir. 1994) (holding that doctor was qualified under *Daubert* to give an expert opinion as to causation based on his review of, among other things, "a broad spectrum of published materials"); *In re St. Jude Med., Inc. Sizone Heart Valves Prods. Liab. Litig.*, 493 F. Supp. 1082 (D. Minn. 2007) (permitting medical doctor to base expert opinion about causation in part on a review of medical literature). Moreover, the reliability of the consulted materials need not be proved by the clinician's testimony itself but can be independently established. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).

[132] Marks Dec. at 5 (NF Tab 32).

voluminous medical records, the experts paid close attention to patterns of weight gain and instances in which weight increases correlated with the commencement of Seroquel use.[133]  The experts assimilated extensive laboratory data in creating a complete metabolic profile for each Plaintiff, which they used to assess the role Seroquel played in changing glucose functionality.[134]

Finally, the experts gave consideration to the role of other risk factors, which were an important part of each Plaintiff's medical profile.[135]  In all instances the experts determined that preexisting traits or conditions left the Plaintiffs particularly susceptible to development of diabetes, such that the introduction of Seroquel—an agent known generally to cause the disease—became the likely trigger for disease manifestation in the individual patient.[136]  The fact that prior to exposure each Plaintiff had avoided the development of diabetes despite the presence of the various risk factors, and in light of the absence of evidence of the introduction of any other new factor that would better explain the metabolic shift to disease,[137] the experts were well-positioned to identify Seroquel as the likely catalyst for onset of diabetes in these already susceptible individuals.

This technique of differential diagnosis has widespread acceptance, and courts consistently deem the approach to be a sufficiently reliable methodology for reaching conclusions about specific causation.  *See, e.g., Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228-30 (9th Cir.1998) (district court abused its discretion in excluding expert testimony on causation based on differential diagnosis); *Mattis v. Carlon Elec. Prods*, 295 F.3d 856, 861 (8th

---

[133] *See, e.g.* Tulloch Rep. (Haller) at 11 (NF Tab 14); Marks Rep. (Curley) at 6 (NF Tab 10); Perry Rep. (Curley) at 6 (NF Tab 17).
[134] *See, e.g.* Tulloch Rep. (Haller) at 11 (NF Tab 14); Marks Rep. (Curley) at 6 (NF Tab 10); Perry Rep. (Curley) at 6 (NF Tab 17); Tulloch Dec. at 4, 8-9 (NF Tab 22); Marks Dec. at 5-6 (NF Tab 32). ·
[135] Tulloch Dep. at 251:11-254:24 (NF Tab 1); Marks Dep. at 216:7-10 (NF Tab 2); Tulloch Dec. at 10) (NF Tab 22); Marks Dec. at 8-9 (NF Tab 32).
[136] Tulloch Dec. at 10 (NF Tab 22); Marks Dec. at 8 (NF Tab 32).
[137] Tulloch Dec. at 10 (NF Tab 22); Marks Dec. at 8 (NF Tab 32).

Cir.2002) (a differential diagnosis is sufficient for a reasonable jury to find that the plaintiff's exposure to organic solvents in cement was capable of causing his illness). Indeed, differential diagnosis satisfies many of the *Daubert* factors when used for this purpose: (1) it has been peer reviewed and tested; (2) books have been published explaining the process; and (3) it enjoys general acceptance in the medical community. *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154-55 (3rd Cir.1999). For these reasons, the experts reliance on the methodology to render opinions here should be deemed sufficient to establish the admissibility of the opinions.

**B.    The opinions are not unreliable due to a failure to "rule out" other risk factors.**

Almost by definition, the population of persons who are exposed to Seroquel have multiple risk factors for developing diabetes.[138] People with the psychiatric symptoms that doctors seek to alleviate with Seroquel tend to be sedentary, obese, and have poor diet and weight control.[139] According to AstraZeneca, severe mental illness, which by definition exists in the population, is *itself* a risk factor for the development of diabetes.

Of course, these are facts upon which Plaintiffs build their case for *liability* in this litigation, the contention being that AstraZeneca wrongfully aimed a medication known to substantially increase the risk of developing diabetes directly at a patient population that was *already at an elevated risk for the condition*. The particular predispositions these people had to diabetic disorders made them inappropriate candidates for Seroquel therapy, and AstraZeneca placed these people in harm's way by failing to warn their doctors about the potential adverse effect on an already shaky metabolic profile.

In now arguing specific causation, AstraZeneca tries to turn those facts back on Plaintiffs,

---

[138] Tulloch Dep. at 23:22-24:3 (NF Tab 1).
[139] Young Rep. (Unger) at 10 (NF Tab 20).

26

arguing, that the same collection of risk factors that made Plaintiffs susceptible to being pushed into diabetes through ingestion of Seroquel likewise so muddies the causation picture that Plaintiffs, through their experts, are incapable of isolating Seroquel's particular role in the development of their injuries.   Since most if not all Seroquel users present a baseline of complicated risk factors, AstraZeneca's argument about specific causation becomes effectively a quest for comprehensive immunity in this litigation.   To AstraZeneca, under this proposed approach, the same facts that establish its fault would also establish its defense.

Fortunately, nothing in the orthodoxy of science or established legal procedures for admitting evidence of causation creates such an impediment to fair claims adjudication.

First, with regard to science, the Reference Manual on Scientific Evidence, the Federal Judicial Center's definitive treatise on use of scientific evidence in federal court, rejects the notion that the presence of one causal agent or condition automatically excludes the role of another.   Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 475 (2d ed. 2000).   Most diseases have multiple contributing factors, the Manual instructs, and many agents "interact synergistically" or "contribute in an incremental fashion to a disease *and should not be assumed to be mutually exclusive*." *Id.* at 475-76 (emphasis added).   Moreover, the Manual concludes in light of the complexity of the analysis that "the common statement that alternative causes of disease must be ruled out before causation is attributed can be more accurately refined to say that the role of other causes must be *adequately considered*." *Id.* at 476 (emphasis added).

Florida law takes an equivalent approach, providing a viable path to recovery whenever different factors combine to cause harm.   As mentioned, the proper focus in Florida, including in toxic tort cases when multiple agents are claimed to have caused the plaintiff's injury, is on

whether the defendant's product was a "substantial factor in bringing about the injury." *Christopher v. Cutter Laboratories*, 53 F.3d 1184 (11th Cir. 1995). The same formulation applies when a defendant's conduct is alleged to have exacerbated or aggravated a plaintiff's preexisting condition, in which case the claimant is entitled to an additional instruction that permits the jury to award damages for the "entire condition" if the injury is deemed to be "indivisible." FLORIDA JURY INSTRUCTION 6.2(b). *See also Gross v. Lyons*, 763 So.2d 276 (Fla. 2000) (citing *C.F. Hamblen, Inc. v. Owens*, 172 So. 694, 696 (Fla.1937)) ("[I]if there can be no apportionment, *or it cannot be said that the disease would have existed apart from the injury*, then he is responsible for the diseased condition.") (emphasis added). As also mentioned, the rule is designed to prevent a subsequent wrongdoer from escaping responsibility "where his conduct contributed to the creation of the situation in which the problems of apportionment arose." *Hart v. Stern*, 824 So.2d 927, 932 (Fla. 5th Cir. 2002). AstraZeneca does not get a free pass under Florida law here because it targeted a population of persons for whom precise parsing of different complex risk factors is impossible.

Third, nothing in *Daubert* indicates an intent to transform basic relevance and reliability requirements into artificial barriers to recovery. While expert opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation. . . absolute certainty is not required." *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995). Moreover, the Supreme Court has explained that the reliability assessment is a "flexible one" and that no single factor will be determinative or even applicable in every case. *Kumho Tire*, 526 U.S. 1t 150 (quoting *Daubert*, 509 U.S. at 595). Honoring that principle here, assessing the role of possible alternative causes—only one of several components

of a differential diagnosis—should not be given preemptive effect. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 759 n. 27 (3rd Cir.1994). In that spirit, courts generally have declined to exclude testimony of an expert who has failed to rule out every possible alternative cause of a plaintiff's injuries. *See Heller v. Shaw*, 167 F.3d at 156; *Curtis v. M & S Petroleum*, 174 F.3d 661, 670-72 (5th Cir. 1999); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265-66 (4th Cir. 1999). *See also Heller v. Shaw*, 167 F.3d at 156 (acknowledging that requiring experts to rule out categorically all other possible cases for injury could mean that "few experts would ever be able to testify"). The approach is particularly compelling where the causal analysis is difficult because a combination of risk factors is alleged to have concurred in causing Plaintiffs injuries. *See, e.g., Giles v. Wyeth, Inc.*, 500 F. Supp. 1048, 1062 (S.D. Ill. 2007) (holding that an expert was not required to rule out other causes in testifying that depression medication caused a suicide where, according to the expert, the drug "triggered" the suicide in synergistic combination with other risk factors); *Tristrata Technology, Inc. v. Mary Kay, Inc.*, 423 F. Supp. 2d 456, 464 (D. Del. 2006) (refusing to require that plaintiff's expert rule out other explanations for the injury where the causal factors cited by the defendant were "not necessarily exclusive of the explanation offered by [the expert]"). The analysis by another court in this Circuit about the role of the drug Parlodel in causing a plaintiff's acute myocardial infarction (AMI) is particularly apt:

> [T]he opinion expressed by plaintiffs' experts is not made unreliable or inadmissible simply because it may be debatable whether there were other possible causes for [plaintiff's] AMI. That debate creates only a question about the weight to be accorded the plaintiffs' experts' opinions, not their admissibility. In reaching the conclusion, there is no question that [the experts] utilized a recognized and valid technique called a differential diagnosis, which was explained above. Their opinion that Parlodel was the most likely explanation for plaintiff's is reliably grounded on that methodology. It will be for the jury to determine which of the alternative explanations for the AMI is more likely true than not true.

*Globetti v. Sandoz*, 111 F. Supp.2d 1174, 1179 (N.D. Ala. 2000).[140]

Ultimately causation in science is a "judgment" made from the "totality of the data." REFERENCE MANUAL ON SCIENTIFIC EVIDENCE (2d ed. Federal Judicial Center 2000). AstraZeneca's own causation expert, Dr. Jeffrey P. Koplan, concurs that inferring causation requires "judgment" and that different well-qualified scientists can interpret the same data and legitimately come to different conclusions.[141]   Competing assessments by different experts here as to the proper causal inferences to be drawn from the evidence will certainly provide ample fodder for cross examination at trial as it has in depositions.   But excluding evidence on the basis of a disagreement among experts would be a gross misapplication of the *Daubert* principles. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence."); *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir.1999) (district court's gatekeeper role under *Daubert* "is not intended to supplant the adversary system or the role of the jury.")

> **C.   The opinions properly incorporate but also extend beyond the existence of a temporal association between ingestion of Seroquel and development of new onset diabetes.**

Seizing on language from the Eleventh Circuit's decision in *McClain v. Metabolife*, 401 F.3d 1233 (11th Cir. 2005), AstraZeneca chastises Plaintiffs' experts for incorporating in their analysis the fact that a temporal association exists between Plaintiffs' exposure to Seroquel and

---

[140] AstraZeneca says that, if the experts want to talk about the concurrence of risk factors including Seroquel in causing diabetes, they are required in each instance to somehow quantify the role each substance or factor played in the etiology of disease.   That demand finds no support in the science or the law.   The requirement is meaningless in this case in light of testimony that such parsing of risk factors would be impossible in light of the complicated clinical presentations of each Plaintiff. Tulloch Dep. at 44:6-23, 602:7-13 (NF Tab 1); Marks Dep. 158:10-21 (NF Tab 2).   Ample support also shows that such particularized assessments, even where feasible, are not part of common medical practice.   Finally, Florida law does not require such a showing as a basis for tort recovery, particularly where, as here, the defendant has itself created the situation from which the difficulties of apportionment arise. *Hart v. Stern*, 824 So.2d 927, 932 (Fla. 5th Cir. 2002).

[141] Koplan Dep. at 55-57 (NF Tab 24).

the onset of diabetes. AstraZeneca insists that Plaintiffs' experts' consideration of the evidence of temporality somehow destroys the reliability of their causation opinions.

That argument is misdirected, first, because it confuses the primary point in *McClain*, which was that assessment of temporality is a proper and in fact *required* component of a causation analysis. *Id.* at 1243 (requiring that a plausible chronological relationship between exposure and effect be shown). That observation conforms to other generally accepted methodological formulations, including the often-cited Bradford Hill factors,[142] which expressly incorporate temporality as a consideration in a causation analysis. Under those formulations, the existence of temporality supports a determination that causation exists.[143]

The *McClain* court disapproved of causation opinions that rely on *nothing more* than temporal association, but that is not what occurred here. Plaintiffs' experts considered a wide range of data, as has been explained, that extended far beyond the mere fact that onset of diabetes occurred after the Plaintiffs ingested Seroquel. Prompted by published materials pointing to weight gain as a Seroquel-induced effect and a link to diabetes, the experts looked for patterns of weight change that coincided with shifts in each Plaintiff's metabolic state, as measured by tests of glucose function.[144] The differential diagnoses that resulted from their analyses went beyond, but were strengthened by, the existence of a temporal relationship between the exposure and disease. *See Heller v. Shaw*, 167 F.3d 146, 158 (3d Cir. 1999)

---

[142] The Bradford Hill factors were first published in The Environment and Disease: Association or Causation?, 58 Proceedings of the Royal Society of Medicine 295-300 (1965) and were an expansion of the factors used by the U.S. Surgeon General in 1967 to assess the causal link between smoking and lung cancer. Reference Manual on Scientific Evidence at 376 (2d ed. Federal Judicial Center 2000). *See Hollander v. Sandoz Pharm. Corp.*, 289 F.3d 1193, 1204 n. 7 (10th Cir.2002) (explaining that Bradford Hill factors should be considered "before deciding that the most likely interpretation [of the association] is causation").

[143] The remaining factors in the Bradford Hill formulation are the strength of the association; the dose-response relationship; replication of the findings; biological plausibility; consideration of alternative explanations; cessation of exposure; specificity of the association; and consistency with other knowledge. *See* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 375 (Federal Judicial Center 2000).

[144] For example, Dr. Marks explained in her deposition that her opinion with regard to Burns was "based on the fact that after being put on the Seroquel she gained quite a bit of weight and then the diagnosis, then she had a very high blood sugar and the diagnosis of diabetes was made." Marks Dep. at 102:24-103:6 (NF Tab 2).

("[W]hen the temporal relationship is strong and is part of a standard differential diagnosis, it would fulfill many of the *Daubert factors*."). *See also Christopher v. Cutter Laboratories*, 53 F.3d 1184, 1191 n.10 (11th Cir.1995) (upholding admissibility of expert testimony that plaintiff contracted AIDS from exposure to tainted blood factor where opinion was based in part on the "chronology" of exposure and the fact that plaintiff exhibited illness within the time period appropriate for the incubation period of the disease).

It must also be considered that the *McClain* court's observations about temporality came in the context of a case in which there had been no showing of general causation. Absent proof that a substance can cause an illness, the fact that ingestion happened before disease takes on the causal significance of a coincidence. By contrast, when evidence of general causation is present and strong, the temporal sequence between exposure and disease is more important to the analysis. The Fifth Circuit made the very point:

> A temporal connection standing alone is entitled to little weight in determining causation. However, a temporal connection is entitled to greater weight when there is an established scientific connection between exposure and illness or other circumstantial evidence supporting the causal link. In the present case, both scientific literature and strong circumstantial evidence support the causal connection.

*Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 670 (5th Cir. 1999) (citations omitted). *Cf. Moore v. Ashland Chem., Inc.*, 151 F.3d 269 278 (5th Cir. 1998) (finding temporal sequence entitled to little weight "*in the absence of an established scientific connection*") (emphasis added); *Porter v. Whitehall Labs, Inc.*, 9 F.3d 607, 614 (7th Cir. 1993) (rejecting clinical observations and temporal relationship between drug ingestion and renal failure as bases for opinion on causation *where scientific studies were unavailable*).

**D.    While the experts are not required to identify a biological mechanism of injury, the biological *plausibility* of the association between Seroquel and diabetes supports their opinions as to specific causation.**

AstraZeneca argues that Plaintiffs' experts' opinions are excludable under Rule 702 and *Daubert* because the scientific views about "biological mechanism" supposedly are not definitive. That is an odd complaint coming from a company that markets a product whose beneficial effect it does not fully understand.[145]

The truth is that scientists understand a great deal about the way Seroquel causes diabetes. Although increased weight gain has been discussed as a likely factor in the development of insulin resistance and drug-induced diabetes, there are data that demonstrate Seroquel-induced effects on glucose metabolism and insulin resistance that are independent of weight gain.[146]

While the science is not definitive down to the molecular level, there is no requirement that it be so for purposes of giving a causation opinion. AstraZeneca's own expert Dr. Koplan agreed that biological "plausibility" is an important *but not required* element of the Bradford Hill causation analysis.[147] As the Ninth Circuit also noted on remand in *Daubert*: "Not knowing the mechanism whereby a particular agent causes a particular effect is not fatal to a plaintiff's claim." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d. 1311, 1314 (9th Cir. 1995). *See also In re Baycol Products Litigation*, 532 F. Supp. 2d 1029, 1066 D. Minn. 2007) (observing that "the fact that a theory is new or in the process of becoming generally accepted does not prevent its admission in court").

AstraZeneca suggests that the requirement for proof of a biological mechanism comes

---

[145] Payne Dep. at 121:9-17 (NF Tab 25).
[146] Plunkett Rep. at 10-11 (NF Tab 28).
[147] Koplan Dep. at 63:6-17 (NF Tab 24).

from *McClain,* but the cited language, considered in context, does not support the argument here. *See McClain v. Metabolife*, 401 F.3d 1233, 1253 (11th Cir. 2005).   The stated concern in *McClain* was an attempt by two experts to offer unproven theories about a biological mechanism in the absence of proof that the subject drug actually caused the disease.   Their ploy effectively was to substitute a mere hypothesis about how the injury might occur for proof that the causal connection actually existed.   Thus the court rejected the testimony based on the expert's failure to offer "a reliable explanation of the physiological process by which Metabolife causes heart attacks and ischemic strokes, *i.e., establish general causation.*" *Id.* (emphasis added).

The obvious distinguishing characteristic here is that proof of general causation exists with regard to Seroquel in the form of ample epidemiological evidence establishing a more than doubling of the risk for developing diabetes as a result of taking the drug.[148]   No expert is attempting to clear the general causation hurdle merely by offering a mechanism hypothesis. The question of biological mechanism thus provides no basis for excluding any expert's testimony.

> ### E.   The experts properly considered the question of dose.

As outlined in Plaintiffs' general-causation brief filed concurrently with this response, ample evidence establishes the existence of a "dose-response" relationship between Seroquel and diabetes.   The fact that such a correlation exists is a significant factor that supports the view that Seroquel generally causes diabetes.

AstraZeneca wants to strike specific-causation testimony here because the experts supposedly failed to consider dose as a factor in the individual cases.   In particular, AstraZeneca says the experts failed to point to epidemiological evidence that Seroquel causes diabetes at low

---

[148] A mentioned, the case for recognizing a causal link between Seroquel and diabetes is fully made in Plaintiffs' Opposition to AstraZeneca's Motion to Exclude General-Causation Testimony of Plaintiffs' Generic and Case-Specific Witnesses.

dosages. Although AstraZeneca says the point applies to "many" of the Plaintiffs, they specifically identify only Whittington and Curley as "low-dosage" individuals to whom the defense supposedly would apply.

It is not fair to say, first, that no evidence supports causation with regard to the low-dose Plaintiffs. AstraZeneca ignores the one study that applies most directly to the topic. A 2007 peer-reviewed publication by Martin Brecher, one of AstraZeneca's own employees, concludes from an examination of data from AstraZeneca clinical trials (all funded and conducted by AstraZeneca) that "long-term treatment with quetiapine monotherapy is associated with moderate weight gain." Most significant for current purposes is his further observation that weight gain occurred in all dose categories, including in patients taking less than 200 milligrams of Seroquel daily, and he concludes that "the degree of weight gain associated with doses of quetiapine > 600 milligrams per day was generally similar to that observed with doses > 200 milligrams per day."[149]

In any event, known variations in individual drug sensitivity make rigid determinations about dosage thresholds irrational and inappropriate. Individuals vary in their degree of response to any drug, even when consumed at an identical dose. In fact, the same person may not always respond the same way to the same dose of the drug. Nies, Alan S., Ch. 3, *Principals of Therapeutics*, in GOODMAN & GILMAN'S THE PHARMACEUTICAL BASIS OF THERAPEUTICS 45, 50-51 (Hardman, et al., eds., 10th ed., 2001). An individual's sensitivity to drugs is based on several factors, such as genetics, differences in metabolism, physical activity, and interaction between other drugs. REFERENCE MANUAL ON SCIENTIFIC EVIDENCE at 591. Thus, a therapeutic dose of a drug in some people can cause a toxic effect in others. GOODMAN & GILMAN'S at 51.

---

[149] *See* Tulloch Dec. at 11 (NF Tab 22).

35

While "precise information concerning the exposure necessary to cause specific harm [is] beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic . . . and need not invariably provide the basis for an expert's opinion on causation." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999). *See McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233 (11th Cir. 2005) (refusing to require an expert to give "precise numbers about dose-response relationship" since "some ambiguity about individual responses is expected"); *Heller v. Shaw Indus.*, 167 F.3d 146, 157 (5th Cir. 1999) ("[E]ven absent evidence of the level of exposure to the chemical in question, a medical expert could offer an opinion that the chemical caused plaintiff's illness."). Ultimately, what *Daubert* requires is "good grounds, based on what is known." *Daubert*, 509 U.S. at 590. Plaintiffs provided "good grounds" for opinions of causation in the "low-dose" cases.

**F.      The experts considered ample data to render their conclusions.**

AstraZeneca insists that Plaintiffs' experts lack sufficient basis for their opinions because they did not personally view every page in the vast collection of medical records in this case. That argument is misleading and unfair. The great majority of the records pertain to psychiatric care, which the experts did not see the need to personally review at length.[150] The more pertinent information was contained in records dealing with the endocrine-related aspects of patient care, and the experts gave careful focus to those aspects of the case.[151]

AstraZeneca offers the puzzling complaint that Plaintiffs' nurse-paralegal prepared and provided to the experts medical summaries that collated into a single spreadsheet for each Plaintiff the voluminous weight, lab, and prescription data existing in diverse sources. The

---

[150] Tulloch Dep. at 32:23-33:13, 34:5-14 (NF Tab 1).
[151] Tulloch Dep. at 32:23-33:13, 34:5-14, 37:7-12 (NF Tab 1); Marks Dep. at 13:21-14:2, 81:23-82:4, 242:1-6, 14-16, 242:22-243:2 (NF Tab 2).

summaries were an obvious attempt to offer a convenience to the doctors, and AstraZeneca can cite no evidence to support its more sinister spin that this was an attempt to "filter" the data to achieve a favorable review.  To the contrary is Dr. Marks' statement she cross-checked the outlines to see if the summaries were accurate and found that they were.[152]  The experts' decision to rely on the summaries rather than personally track down each particular lab and weight value no more indicates a lack of reliability than does the approach of AstraZeneca's expert, Dr. Koplan, who had one of his graduate students perform part of the all-important medical literature research and assemble pertinent articles for review in this case.[153]

It is also important to consider that the data set for causation opinions in this case did not appear instantly at the beginning of the case.  Records dribbled in over time and in some cases appeared after the experts had written their reports and appeared for depositions.  The doctors, with that situation in mind, expressly reserved the right to supplement their views as new information became available.[154]  In some instances they have done that here, offering in newly issued declarations analysis of medical data that did not appear until after the depositions had occurred.[155]  In no instance has an expert determined that the additional information substantially changed their views in this case.[156]

Finally, with regard to physical examination, Dr. Marks explained that it is well within the scope of common and standard medical practice for a clinician to reach a diagnosis of a patient's illness without actually conducting a patient examination.[157]  AstraZeneca misleads the court by citing *In re Paoli Railroad Yard PCB Litigation* 35 F.3d 717 (3d Cir.1994) for the

---

[152] Marks Dep. at 13:21-14:2, 81:23-82-4, 243:3-10 (NF Tab 2).
[153] Koplan Dep. at 22-23 line 24-5, p. 157 l. 18 (NF Tab 24).  For her part, Dr. Marks confirmed that she performed her own literature search.  Marks Dep. at 38:6-10 (NF Tab 2).
[154] See expert reports.
[155] See Marks Dec. ¶ 9, 13 (NF Tab 32); Tulloch Dec. ¶ 3, 5 (NF Tab 22).
[156] See Marks Dec. ¶ 9 (NF Tab 32); Tulloch Dec. ¶ 3 (NF Tab 22).
[157] Marks Dep. at 402:6-404:12 (NF Tab 2).

contrary notion that a physical examination is always required.   The court in fact said the opposite, explaining at length its view that doctors can render reliable opinions by examining medical records in lieu of a physical examination:

> [W]e think that evaluation of the patient's medical records, like performance of a physical examination, is a reliable method of concluding that a patient is ill even in the absence of a physical examination.  It is hornbook law that medical records are admissible for such a purpose: "[a]s to hearsay symptoms told by third persons,. . . , where the information is that of an attending nurse or physician having personal observation and an interest in learning and describing accurately, there seems to be every reason for admitting testimony based in part on this."  3 John HENRY WIGMORE, WIGMORE ON EVIDENCE § 688(4) (Chadbourn ed. 1970).  *See also Cohen v. Albert Einstein Medical Ctr.*, 405 Pa. Super. 392, 592 A.2d 720 (1991) (holding that the testimony of a doctor who relied on medical records without conducting a physical exam was admissible proof that the plaintiff suffered from a psychiatric disorder); *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1432 (5th Cir.1989) (allowing testimony of a doctor who had not physically examined the plaintiff and noting that, "[a] personal examination of the person or object of the expert's testimony is not required under FED. R. EVID. 703").  Hence, we think that generally, a doctor only needs one reliable source of information showing that the plaintiff is ill and either a physical examination or medical records will suffice-but the doctor does need at least one of these sources.

*In re Paoli*, 35 F.3d at 762.  *See also Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802 (3rd Cir. 1997) (noting that the reliability of expert's opinion was undiminished by the fact that "he himself did not perform a physical examination").   AstraZeneca's objection contravenes this authority and should be denied.

### G.   The psychiatrists are qualified to give opinions about the role Seroquel likely played in the medical histories of these patients.

AstraZeneca argues that the three psychiatrists, Drs. Young, Abramson, and Perry, are not qualified to testify about specific causation because they are not specialists in the particular field of endocrinology.   The complaint ignores the fact, first, that, as psychiatrists and thus prescribers of drugs like Seroquel, the doctors in their every-day practice are front-line observers

of the effects such medications have on subject patients.[158]    While they do not routinely *treat* diabetes and readily admit they are not experts in diabetes *per se*, it remains true that they are required to monitor the patients' status and evaluate both the beneficial and adverse consequences of the drug therapy.[159]

The objection also is disingenuous in light of AstraZeneca's invocation in this litigation of the learned intermediary defense.   AstraZeneca argues in that context that the prescribing psychiatrist is well placed to receive and evaluate the significance of information about drug effects.   The "learned intermediary" role the psychiatrist plays in conducting a risk/benefit analysis about the drug requires assessment of information contained not only in the drug label but in published medical literature—much of the same material that forms the basis for the causation opinions here.[160]   If the doctors are sufficiently trained and knowledgeable to assimilate and form opinions about causation in that context, there is hardly reason to conclude they are not similarly qualified to do so here.

Finally, it cannot be ignored that the experts are medical doctors with extensive resumes and have in that capacity education and training on the subject of diabetes.[161]   The claim that their opinions should be automatically excluded because they are not endocrinology specialists

---

[158] Young Dep. at 22:11-13 (NF Tab 7); Abramson Dep. at 35:7-15 (NF Tab 6).

[159] Young Dep. at 24:8-10, 25:16-24, 30:9-11 (NF Tab 7); Perry Dep. at 77:7-17, 79:24-80:2 (NF Tab 5); Abramson Dep. at 35:7-15 (NF Tab 6).

[160] Abramson Dep. 36:19-39:20 (NF Tab 6); Perry Dep. at 78:7-79:1 (NF Tab 5).  Dr. Young has additional expertise in evaluating drug data, having personally conducted pharmaceutical research.  Young Rep. (Unger) at 1 (NF Tab 20).  Likewise, Dr. Perry has participated in clinical trials of psychotropic medications with adults and serves on academic panels, review boards, study sections and committees focusing directly on psychopharmacology.  Perry Rep. (Guinn) at 1 (NF Tab 15).  His current academic duties include teaching about the use of psychotropic medications, including atypical antipsychotics in off-label situations.  *Id.*  He has served on the Psychopharmacology Panel for the United States Pharmacopoeia (USP).  *Id.*

[161] See Marks Rep. (Guinn) (NF Tab 8); Tulloch Rep. (Unger) (NF Tab 11); Perry Rep. (Guinn) (NF Tab 15); Young Rep. (Unger) (NF Tab 20); Abramson Rep. (Haller) (NF Tab 19); Marks Rep. (Burns) (NF Tab 9); Tulloch Rep. (McAlexander) (NF Tab 13); (Tulloch Rep. (Haller) (NF Tab 14).  With specific regard to Dr. Perry, while he is not an endocrinologist, he has experience that overlaps with that field.  He has published articles on the impact of stress on hormone production.  Perry Dep. at 30:8-20 (NF Tab 5).  He participated in and was the co-author of a report about an epidemiological study of the impact of adverse childhood experiences on the development of physical health problems, including diabetes.  Perry Dep. at 30:21-32:1 (NF Tab 5).  He has taught in medical schools on the subject of neuroendocrinology and the effect of different neuropsychiatric conditions on endocrine profiles.  Perry Dep. at 33:12-17 (NF Tab 5).  He also has a Ph.D. in pharmacology and has examined the neurotoxicological effects of various agents.  Perry Dep. at 34:23-35:4 (NF Tab 5).

violates the consistently held view that a doctor's lack of specialization in a particular field is a question of weight, not admissibility. *Peteet v. Dow Chemical Co.*, 868 F.2d 1428, 1431 -1432 (5th Cir. 1989); *Lofton v. McNeil Consumer & Specialty Pharmaceuticals*, 2008 WL 4878066, 7 (N.D. Tex., July 25, 2008). *See Holbrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 782 (3d Cir. 1996) (finding it "an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate"); *Payton v. Abbott Labs*, 780 F.2d 147, 155-56 (1st Cir. 1985) (upholding the admissibility of two doctors' opinions over the objection that they were clinicians and not research scientists); *Ashland Oil, Inc. v. Delta Oil Prods. Corp.*, 685 F.2d 175, 178 (7th Cir.1982) (upholding admission of expert's opinion despite his lack of specialization in a particular branch of chemistry); E. Cleary, MCCORMICK ON EVIDENCE § 13, at 34 (3d ed. 1984) ("While the court may rule that a certain subject of inquiry requires that a member of a given profession . . . be called; usually a specialist in a particular branch within a profession will not be required.").

## H.   AstraZeneca's Plaintiff-specific objections are groundless.

AstraZeneca isolates certain of the expert's deposition answers and claims the statements negate causation as to particular Plaintiffs. When read in the context of the broader testimony, the statements offer no support for AstraZeneca's arguments.

### 2.   Dr. Jennifer Marks

#### (a)   Janice Burns

Dr. Marks was challenged at her deposition with results of 1994 blood sugar tests that appeared to show elevated glucose. She explained in her deposition and reiterates in her

declaration that the results were *not* diagnostic for diabetes.[162]  Burns was hospitalized at the time, and the resulting stress could easily explain the elevated glucose[163]  She had another abnormal test result during a subsequent hospitalization in 2000 but was at the time taking steroids, which Dr. Marks notes are known to cause hyperglycemia.[164]  It is significant also that none of the glucose readings prompted any of Burns's treating physicians to diagnose diabetes. Based on these circumstances, Dr. Burns adheres to the view that the documentary evidence does not show that Burns had diabetes prior to ingesting Seroquel.[165]

### (b)    Linda Guinn

Dr. Marks likewise finds no reason to conclude that Linda Guinn already had diabetes before taking Seroquel.  Guinn had elevated readings, but, as with Burns, they occurred while she was hospitalized, and Dr. Marks found the readings unreliable and nondiagnostic.[166]  She confirmed in her deposition and declaration that she sees no evidence that Guinn had diabetes before taking Seroquel.[167]

### (c)    Connie Curley

One of Curley's glucose readings taken before Seroquel exposure was elevated if it was fasting, but Dr. Marks notes that the record gives no indication that it was.[168]  It is also notable that no physician offered a diabetes diagnosis or ordered follow-up testing during the relevant time.  Multiple other readings in that period were normal.[169]  These factors point to the fact that

---

[162] Marks Dec. at 5 (NF Tab 32).
[163] Marks Dec. at 5 (NF Tab 32).
[164] Marks Dec. at 5 (NF Tab 32).
[165] Marks Dep. at 98:7-8 (NF Tab 2); Marks Dec. at 5-6 (NF Tab 32).
[166] Marks Dec. at 7 (NF Tab 32).
[167] Marks Dec. at 6-7 (NF Tab 32); Marks Dep. at 329:19-24 (NF Tab 2).  At most Guinn was "pre-diabetic," Dr. Marks said, which if true would simply add a factor to her overall risk profile.  Marks Dec. at 6 (NF Tab 32).
[168] Marks Dec. at 8 (NF Tab 32).
[169] Marks Dec. at 8 (NF Tab 32).

Curley was not diabetic prior to starting on Seroquel.[170]

### 1.   Dr. Brian Tulloch

#### (a)   Eileen McAlexander

Dr. Tulloch was presented at his deposition with McAlexander's February 19, 2002 fasting glucose result, which he had not previously seen and which was dated earlier than the formal diagnosis he had previously focused on. He decided to "suspend" his opinion about causation in McAlexander's case pending his review of weight-gain data leading up to the earlier date of diagnosis.[171] After the deposition, he reviewed the data, including that from records made available after the deposition, and observed a clear weight gain between ingestion of Seroquel and the earlier date of onset. On this basis he has reinstated his opinion that, but for ingestion of Seroquel, Eileen McAlexander would not have developed diabetes at the time of her diagnosis in February 2002.

AstraZeneca also raised an issue at the Tulloch deposition as to whether McAlexander had diabetes prior to ingestion of Seroquel. Though AstraZeneca now claims the question is still open, Dr. Tulloch disagrees.[172] All pre-Seroquel glucose readings available as of the time of the deposition were non-diagnostic for diabetes.[173] Supplemental records showing additional glucose levels before exposure to Seroquel are similarly inconsistent with a diagnosis of diabetes. The entire collection of data supports Dr. Tulloch's opinion that diabetes did not occur prior to Seroquel use.[174]

---

[170] Marks Dec. at 8 (NF Tab 32).
[171] Tulloch Dep. at 458-59 (NF Tab 1).
[172] Tulloch Dec. at 3-4 (NF Tab 22).
[173] Tulloch Dec. at 3-4 (NF Tab 22).
[174] Tulloch Dec. at 3-4 (NF Tab 22).

### (b)    Richard Unger

AstraZeneca wrongly claims that Dr. Tulloch does not know "when or whether" Richard Unger developed diabetes.  It is true that Dr. Tulloch acknowledged during his deposition that Unger's available medical records from prior to ingesting Seroquel do not reflect glucose levels, leaving the precise nature of glucose function unclear for that period.[175]  It is also true, though, that Unger's first glucose reading *after* starting on Seroquel was normal.[176]  Further, there are multiple indications in the records prior to initiation of Seroquel that Unger denied diagnosis or history of diabetes.[177]  Dr. Tulloch concludes unequivocally in his attached Declaration that Unger did not have diabetes prior to Seroquel exposure and developed it afterward as a result of ingesting the drug.

### (c)    David Haller

AstraZeneca claims that uncertainty exists on the issue of whether Haller had preexisting diabetes in light of a glucose reading of 128 that was obtained prior to his ingestion of Seroquel.  Dr. Tulloch points out in his declaration that the solitary finding would not justify a finding of glucose, especially since it is unknown whether the reading was a fasting or non-fasting result.[178]  In any event, the eighteen other *normal* glucose levels obtained from Haller prior to the time he started Seroquel made preexisting diabetes "extremely unlikely," in Dr. Tulloch's view.[179]

### (d)    Linda Whittington

AstraZeneca suggests similarly that Dr. Tulloch cannot rule out that Whittington had diabetes before taking Seroquel because she had a pre-Seroquel glucose reading of 123.  But Dr.

---

[175] Tulloch Dep. at 705:8-16 (NF Tab 1).
[176] Tulloch Dec. at 6-7 (NF Tab 22).
[177] Tulloch Dec. at 7-8 (NF Tab 22).
[178] Tulloch Dec. at 8 (NF Tab 22).
[179] Tulloch Dec. at 8 (NF Tab 22).

Tulloch noted that, as with the other Plaintiffs, the significance of the reading depends on whether it was fasting or non-fasting, and the report does not indicate which it was.[180]  In any event, Dr. Tulloch points out that glucose levels after that date and prior to the time Whittington started Seroquel were all well within normal range, thus supporting the conclusion that Whittington was in a non-diabetic condition prior to Seroquel ingestion.[181]

## V.      CONCLUSION

AstraZeneca has failed to meet the heavy burden to exclude the expert testimony of Drs. Marks, Tulloch, Abramson, Young, and Perry under Federal Rules of Evidence 702 and 703. Plaintiffs have produced more than sufficient evidence that all the experts' scientific testimony is not only relevant but reliable.  The experts have utilized methodologies that satisfy the *Daubert* factors and reflect the level of intellectual rigor doctors would employ in their regular practices. AstraZeneca's challenges to Plaintiffs' experts raise issues related to credibility and are better suited for resolution by the jury.  Accordingly, Plaintiffs respectfully ask this Court to deny AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses.

---

[180] Tulloch Dec. at 9 (NF Tab 22).
[181] Tulloch Dec. at 9 (NF Tab 22).

DATED:  November 24, 2008

Respectfully submitted,

By:  ____/s/ K. Camp Bailey_____
        F. Kenneth Bailey Jr.
        K. Camp Bailey
        Fletcher V. Trammell
        Robert W. Cowan
        **BAILEY PERRIN BAILEY**
        440 Louisiana St., Suite 2100
        Houston, Texas 77002
        (713) 425-7100 Telephone
        (713) 425-7101 Facsimile
        kbailey@bpblaw.com
        cbailey@bpblaw.com
        ftrammell@bpblaw.com
        rcowan@bpblaw.com
        **Co-Lead Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of November, 2008, the foregoing and attached *Plaintiffs' Response in Opposition to AstraZeneca's Motion to Exclude the Specific-Causation Testimony of Plaintiffs' Case-Specific Causation Witnesses and Supporting Memorandum of Law* was served on opposing counsel, via email, as follows:

*Via email: marjorie.shiekman@dechert.com*
Marjorie Shiekman
Dechert, LLP

*Via email: louise.moyer@dechert.com*
Louise Moyer
Dechert, LLP

_____/s/ K. Camp Bailey_____