# NF TAB 1

```
                1132 deutch raffa mtn tab 1 detuch dep.txt
```

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
VOLUME I

----------------------------------------x
IN RE:  Seroquel Products Liability    :
Litigation                             :
                                       :
                                       :
MDL DOCKET NO. 1769                    :
This Document Relates to:              :
                                       :
PLAINTIFFS v. AstraZeneca LP, et al.   :
(Janice Burns 6:07-cv-15959;           :
Connie Curley 6:07-cv-15701;           :
Linda Guinn 6:07-cv-10291;             :
Eileen McAlexander 6:07-cv-10360;      :
Richard Unger 6:07-cv-15812;           :
Linda Whittington 6:07-cv-10475)       :
----------------------------------------x

Tuesday, October 7, 2008
9:12 a.m. - 5:05 p.m.
Oral deposition of PAUL M. DEUTSCH,
PH.D., held at Offices of Paul M. Deutsch, &
Associates, P.A., 10 Windsomere Way, Suite
400, Oviedo, Florida, 32765, beginning at
9:10 a.m., on the above date, before Richard
Castillo, Registered Diplomate Reporter,
Commission No. DD609499 (Expiration 2/25/11)
and a Notary Public.

Esquire Deposition Services
200 East Robinson Street
Suite 425
Orlando, Florida  32801
(407)426-7676

Job No. 958372

APPEARANCES

LAMINACK, PIRTLE & MARTINES, LLP
BY:  RUSS BRUDNER, ESQUIRE
5020 Montrose Boulevard
Ninth Floor
Houston, TX  77006
Phone: (713)292-2750
--Representing the Plaintiff

DECHERT, LLP
BY:  JOHN J. SULLIVAN
902 Carnegie Center
Suite 500
Princeton, New Jersey  08540
Phone:  (609)955-3200
--Representing the Defendants

CARLTON, FIELDS, LLP
BY:  CHRIS COUTROULIS, ESQUIRE
4221 West Boy Scout Boulevard
Suite 1000
Tampa, Florida  33607-5736
Phone:  (813)229-4133
--Representing the Defendants

1132 deutch raffa mtn tab 1 detuch dep.txt

I N D E X

WITNESS                                    PAGE

  PAUL M. DEUTSCH, PH.D.
        DIRECT BY MR. SULLIVAN              6
CERTIFICATE OF OATH                       158
COURT REPORTER'S CERTIFICATE              159
ERRATA                                    160
                    - - - - -
NOTE:  Ellipses (...) used to reflect pauses
between words.

E X H I B I T S
MARKED       DESCRIPTION                   PAGE
   20    Ms. Curley's fact sheet             6
   21    List of depo transcripts            7
   22    NGC Standards Guideline,           19
   23    Glucose reading 114                22
   24    Glucose reading 109                22
   25    Medical record Ms. Guinn, 1/17/91  28
   26    Statement, ADA                     32
   27    Letter 10/6/08, Dr. Deutsch        68
   28    Letter to Ms. McElroy              68
   29    Letters to and from doctors        90
   30    Society Security application      110
   31    Document from Mercy Hospital      117
   32    Letters re Mr. Unger              127

DEPOSITION SUPPORT INDEX

Direction to witness Not to Answer
Page Line          Page Line          Page Line

Request for Production of Documents
Page Line          Page Line          Page Line
                                       Page 2

1132 deutch raffa mtn tab 1 detuch dep.txt

None


Stipulations
Page Line         Page Line          Page Line
  6    1-8


Question Marked
Page Line         Page Line          Page Line
None


                    (It is hereby stipulated
              and agreed by and between counsel
              for the respective parties that
              reading, signing, sealing and
              certification are reserved; and
              that all objections, except as to
              the form of the question, are
              reserved until the time of trial.)
                  (Whereupon, Deposition Exhibit No.
              Deutsch-20, fact sheet from Ms. Curley,
              was marked for identification.)

                    PAUL M. DEUTSCH, PH.D.,
              after having been duly sworn,
              was examined and testified
              as follows:

                    DIRECT EXAMINATION

BY MR. SULLIVAN:
          Q    Just for the record, I've marked
as Exhibit 20, a copy of the fact sheet from
Connie Curley.  If you recall, last Thursday
I presented you with one page from the fact
sheet that showed some of her risk factors.
And Miss Martines objected because we didn't
mark the whole fact sheet, so I am simply
putting this in the record so that we have
the whole fact sheets.
          A    I do remember that.
          Q    I also understand that you just
presented me with a list of depositions
entitled depositions received for Seroquel
cases, and has the title of each of the six
cases in which you've given an opinion, and
certain depositions listed under each case
that you've received since we last spoke; is
that correct?
          A    Right and it's fine to mark
that.  I'll just take a copy so I keep my
list, but you can mark the original.  I don't
have a problem with it.
                  MR. SULLIVAN:  Let's mark that
              as Exhibit 21, please, Richard.
                  (Whereupon, Deposition Exhibit No.
              Deutsch-21, list of deposition
              transcripts was marked for
                                        Page 3

1132 deutch raffa mtn tab 1 detuch dep.txt
identification.)
BY MR. SULLIVAN:
        Q      Okay.  Doctor, how did you come
about to get these deposition transcripts
after the deposition, the first day of our
deposition on Thursday?
        A      I believe -- of course, to be
honest with you, my memory is a little fuzzy
by the end of that deposition, but my
recollection is that Miss Martines indicated
that the materials were actually forwarded by
another law firm, not by her law firm, and
that she would contact that firm and make
sure that they forwarded to me the
depositions that she thought that they had
already been forwarded to me.  So, the next
day I received -- because that was on
Thursday we did the deposition, right?
        Q      Yes.
        A      So the next day, Friday, I
received a large box of materials, the list
that you have.  The problem is that I spent
all day Saturday, trying to catch up on case
work that I had to set aside to deal with
providing the time on Thursday, and so really
didn't have -- because I worked all day
Saturday and Sunday, I've only really gotten
through a couple of these at this point.  I'm
just going to have to keep working away at
it, along with Shannon's assistance.  And, at
this stage, the best I could do is provide
you with a list.  But there was no way I was
going to be able to get through all of that
by today.
        Q      So, it's fair to say, or it's
obvious to say that the opinions that you
rendered in your report in this case were all
reached before you ever looked at one of
these depositions?
        A      Oh, that's certainly true, and
think we agreed on that on Thursday.
        Q      Okay.  Do you know whether you
received -- strike that.
             Do you know whether the
depositions on this list comprise all of the
depositions that have been given in these
cases?
        A      I certainly have no way of
knowing that.  I think what I emphasized
Thursday is the importance of the current
treating doctors and the patients and, if
possible, a family member, as priorities, but
whether that even comprises all treating
physicians whose depositions have been taken,
there's no way for me to tell you that.  You
would know better than I, and of course,
plaintiffs' attorneys would know better than
I.
        Q      Were you told by Miss Martines,
or the other attorney at the other law firm,
whether they were attempting to give you all
the depositions of the treating doctors in
these cases?

1132 deutch raffa mtn tab 1 detuch dep.txt

A    At this point, I just received
this box, and I haven't had a chance to talk
to Miss Martines.  And I'm not sure if she
knows which were sent.  So, when I get the
opportunity, I'll call her and go over the
list or fax her the list of what I've
received, and talk with her about what they
comprise versus what exists.

Q    There's -- I count 25
depositions on this list.  Is it your
intention to read all of these?

A    Oh, certainly.  If they're sent,
I'll read them.

Q    Are you going to read them or
someone in your office is going to read them?

A    What will happen here to speed
this process along is, Shannon will get
through and mark some of the more important
areas so I don't miss them, 'cause I do have
a tendency to speed read, just an old habit,
and so to make sure that I don't miss the
most important parts, she'll go through them.
We don't double charge.  We're very careful
about the amount of time she spends versus
me, but I will have to go through them myself
because it's litigation.

Q    Is that similar to the process
that you and Shannon follow with the review
of medical records --

A    It is.

Q    -- where she flags the important
ones and you're able to focus on those when
you go back over the records; is that
correct.

A    That's true.  And I apologize.
I stepped on you, I'm sorry, to the court
reporter, too, and I will try not to do that
for the rest of the depo.

Q    Great.  Since we met on
Thursday, have you asked for or received any
additional medical records beyond those that
you had already received before you issued
your reports in this case?

A    No.

Q    Okay.  Have you checked on your
certification with the ... what's the name of
the association for case managers?

A    Well, it's certified -- it's ...
the group you check with, actually, they
contract with the Commission on
Rehabilitation Counselor certification,
because they're NOCA certified.  I'm not sure
if you're familiar with NOCA.

Q    I'm not, but --

A    NOCA is the body that certifies
certifying bodies.  They actually certify the
American Medical Association and --

Q    Who certifies them?

A    -- the Bar Association.  It's
got to stop somewhere.

So, they do the bar, they do the
AMA, they do basically all of the major
certifying bodies.  And so -- but it's very

Page 5

1132 deutch raffa mtn tab 1 detuch dep.txt
expensive to become certified by NOCA, so
they contract with CRCC, but I -- yes, I did
contact them, actually on break, to find
out -- had my staff find out what occurred.
          First, I went back to the file.
And we showed that, in fact, there were three
people here who were due to be recertified at
about the same time.  Two went through just
fine.  My package showed it was together, and
I can't really tell you, we never were able
to determine.  Our contention is it went out.
Whether it was lost in the mail, whether they
didn't process it, they show no record of it.
They were switching management companies, but
we certainly will take the blame for it.
          Bottom line is, they said that
this is a common problem, it's not a big
issue.  But nonetheless ... we
Federal-Expressed, you know, the dues check
to them, and, you know, I anticipate the
reinstatement as soon as the committee meets
this week.
          But on my own, in addition to
that, I sent a letter to the Ethics Committee
explaining the situation.  I also spoke to
the chair of the Ethics Committee who also
said, this is not an unusual situation.  And,
normally, it's not handled through the Ethics
Committee, but that if I wished it to be
reviewed by the Ethics Committee, they would
do so.  So they'll take a look at it this
week and respond accordingly.
          Q    Is it possible for us to get
from you a copy of the package that you just
testified that your office believed had
already gone out --
          A    Sure.
          Q    -- for recertification, as well
as the letter that you sent to the Ethics
Committee?
          A    Sure.
          Q    Thank you.
          Do you have the report, your
report for Linda Guinn with you?
          A    How interesting.  That's not
likely to happen too often.
          Q    One out of six.
          A    Out of this whole stack, the
first you pick is the one I have right in
front of me.
          Q    I'd like to ask you a few
questions about your report for Miss Guinn.
          A    Actually, take two seconds.  I'm
sure that's not the last thing you're going
to ask for.  I'd better start listing what
you do ask for.
          (Pause.)
          A    Okay.  Go ahead.
          Q    I'm going to ask you about some
of the risk factors or morbidities that
preexisted her diabetes diagnosis.  And some
of these may be in your reports, so maybe we
can agree on them, and others, if not, I'll
                                    Page 6

1132 deutch raffa mtn tab 1 detuch dep.txt
see if I can put some records in front of
you, okay?
        A    Certainly.
        Q    Can we agree that before Miss
Guinn had diabetes, that she had very serious
mental health problems?
        A    Yes.
        Q    I count her having been
diagnosed and referenced in your report with
major depression, bipolar disorder, and
schizophrenia.  Can we agree on that?
        A    Yes.
        Q    I also see that she's had
seizure problems with seizures.  In
particular, I've seen mention of epilepsy;
can we agree on that?
        A    Yes.
        Q    And I saw a reference in her
records in your report, as well, of her use
of recreational drugs; can we agree on that?
        A    Yes.
        Q    I also see reference in her
records, and I believe in your reports, that
before she had diabetes she was obese; can we
agree on that?
        A    Yes.
        Q    I also see reference in your
records and in your report and in the medical
records, that she was a heavy smoker before
she -- before she was diagnosed with
diabetes; can we agree on that?
        A    I'm sure we can, but I'm going
to turn to that section.  It just doesn't
happen to be on my page two, so bear with me
one second.
            (Pause.)
        A    Yes.
        Q    I've also seen in the medical
records, and I'm not sure whether it's
referenced in your report, it may be, that
before she had diabetes she was diagnosed
with hyperlipidemia?
        A    Yes.
        Q    We can agree on that?
        A    Yes.
        Q    I believe in your report you
even mention that before she had diabetes she
had been diagnosed with hyperglycemia; can we
agree on that?
        A    Yes.
        Q    Do you know what the term,
prediabetes means?
        A    Yes.
        Q    Could you explain your
understanding of what that term means?
        A    Well, basically, I understand
that to suggest that she demonstrates
substantial risk factors for the onset of --
of diabetes, and many of those, without
repeating them, are those that we just
demonstrated or we just listed.  So, it would
suggest that although she may not actually be
at a point where she's diagnosable as
                                  Page 7

                    1132 deutch raffa mtn tab 1 detuch dep.txt
diabetes, that she's at a stage where that
she would be considered a prediabetic because
of the risk factors, the numbers of risk
factors for diabetes she's demonstrating in
testing by the doctor.
        Q    It's my understanding the
definition of prediabetes is based on
clinical lab values that are reached on the
patient.
        A    Okay.
        Q    Are you aware of what those lab
values are in order -- what lab values are
required in blood glucose in order to be
diagnosed as prediabetic?
        A    I'm aware of what you're talking
about, but I can't quote the specific lab
values.
        Q    Okay.  Do you happen to have the
clinical guidelines with you that you -- that
you had your staff --
        A    I do.
        Q    -- search the Internet for?
        A    And I think the definition is in
there for those.
        Q    I believe it is, too.
        MR. SULLIVAN:  Richard, why
don't we mark this as the next
exhibit.
        (Whereupon, Deposition Exhibit
No. Deutsch-22, Standards guideline
was marked for identification.)
BY MR. SULLIVAN:
        Q    Doctor, I'll direct you to the
clinical guideline from the National
Guideline Clearinghouse that you produced to
us with the guideline titled, Standards of
Medical Care in Diabetes, Classification and
Diagnosis.
        A    Okay.  I'm with you.
        Q    If you have trouble finding --
        A    No, I have it.  It's in front of
me.
        Q    I have the same one in front of
me as Exhibit 22.  If you take a look on what
is my second page, you'll see that there's a
heading entitled, Diagnosis of Prediabetes.
        A    I'm with you.
        Q    And do you see it has a couple
of possible ways that you can be diagnosed
with prediabetes, one being impaired fasting
glucose level that comes somewhere between
100 milligrams and 125 milligrams per
deciliter; do you see that?
        A    Yes.
        Q    That's my understanding of
prediabetes, and I would assume that's the
understanding you have from the records, or
from the guidelines that you had your staff
take from the Internet; is that correct?
        A    That's correct.
        Q    Okay.  Have you looked in the
medical records to determine whether
Miss Guinn was prediabetic, even before she
                                        Page 8

1132 deutch raffa mtn tab 1 detuch dep.txt

took Seroquel or had diabetes, whether she
was within that range of 100 to
125 milligrams --
     A    No.
     Q    -- deciliter?
     A    I'm sorry.  I keep thinking, for
some reason, that you're going to end, and I
should just wait until I hear dead silence.
         The answer is no.  I limit
myself to listing all of the diagnoses that
were made by the doctors, but then,
interpreting the lab values or listing the
lab values, I think goes one step beyond
where the doctor should be taking those, and
then interpreting those lab values.
         So, other than showing what the
criteria are within the clinical practice
guidelines, I really am going to defer to
endocrinologists and/or primary care doctors
to -- to make that next step in the
courtroom, because I don't quite honestly
think the judge would allow me to testify to
that, and I really don't think it's
appropriate for me to testify to it, so, I
don't go that next step.
         I think it's -- it is
appropriate, up to the point where you asked
me to establish all of those preexisting
criteria that I had listed, and whether or
not those are risk factors, that, I think is
reasonable and well within my purview, but
beyond that, I think we're starting to just
move over into the physician's purview.
         MR. SULLIVAN:  Let me mark these
      next two exhibits, 23 and 24.
         (Whereupon, Deposition Exhibit No.
    Deutsch-23, glucose reading 114,
    was marked for identification.)
         (Whereupon, Deposition Exhibit No.
    Deutsch-24, glucose reading 109,
    was marked for identification.)
BY MR. SULLIVAN:
     Q    Here you go, Doctor.  These are
laboratory results from Miss Guinn.  I
apologize.  I don't have but the one copy.
         MR. BRUDNER:  You don't have --
      okay.
BY MR. SULLIVAN:
     Q    I'll direct your attention to,
if I may, as I think it's a first reading on
each page of each Exhibit 23 and 24 for
glucose; do you see that?
     A    Yes.
     Q    Do you see, in each of those,
the number, the range for glucose falls
between 100 and 125 milligrams per deciliter?
     A    On Exhibit 23 it's 114; on
Exhibit 24 it's 109.
     Q    So that falls within that
prediabetes range we just discussed?
     A    Right.  The milligram per
deciliter reference range is 70 to 115 on
Exhibit 24, and actually, between 65 and 115

1132 deutch raffa mtn tab 1 detuch dep.txt

on -- on Exhibit 23, and so she's at 114 on
23 and 109 on 24, so she's within the
reference range of both.

Q     Have you looked at the dates on
each of those?

A     On 23, the date is eight ...
8/13/1997.

Q     That's how I see it, as well.

A     Okay. I apologize. It just
took me a second there.

      And on Exhibit 24, the date
appears to be ... 7/31/92.

Q     So one of those is -- Exhibit 24
is over 16 years ago, and Exhibit 23 is over
ten years ago, correct?

A     Yes.

Q     Is it your understanding that
it's not unusual for clinical guidelines to
change as the years move along?

A     Not unusual at all.

Q     And, in fact, that's why your
staff, when they're looking up clinical
guidelines, updates them as often as they
can, whenever you're working on a case,
correct?

A     Always update. Frankly, if we
pull clinical practice guidelines on a
litigation consultation case two weeks ago,
even ... even though we have it on file,
we'll still check to make sure a new one
didn't get released when we go to do a report
two weeks later.

Q     Are you confident that the
clinical guidelines that you utilized for
your reports here, with regard to diabetes
and diagnosis of prediabetes, are current?

A     They were current when we pulled
them. You know, can they change between the
time we pulled them and the time a case goes
to trial? Certainly. Usually, we'll go back
and check to see if there are any changes.
But -- but as reference guidelines, they were
absolutely current the day we pulled them.
They were the ones online and -- and shown as
the current guidelines.

Q     Certainly, they appear to be
more current than the guidelines or reference
ranges that we see in these documents from
1997 and 1992; is that fair to say?

A     I would think so.

Q     Okay. Oh, one other thing I
want to show you on those two documents. If
you look at ... Exhibit 23, it's a little
difficult to see, but if you note down below
the date that you saw before of 8/13/1997,
two boxes below, there's the word "fasting"
is typed in, do you see that, just above 9:00
a.m.?

A     Yes, I do.

Q     Okay. And if you look at
Exhibit 24, it's a little clearer on that
report, it's right under "Remarks," just
before where you see all the lab values.

1132 deutch raffa mtn tab 1 detuch dep.txt

A    Yes.
Q    So, at least taking these reports at their word, these glucose values that we just discussed were fasting glucose values, correct?
A    Yes.
MR. BRUDNER:   Objection to form.
BY MR. SULLIVAN:
Q    Okay.
MR. BRUDNER:   Where does it say that?  Okay.
BY MR. SULLIVAN:
Q    All right.  So, at least, if we're to accept the guidelines that you utilized for your report, these two glucose values we just -- we just went over in Exhibit 23 and 24, put Miss Guinn in 1997, and again in 1992, in the prediabetes range, correct?
A    Yes.
Q    Okay.  A couple of other existing -- preexisting risk factors I'd like to go over.
Can we agree that Miss Guinn, before she was diagnosed with diabetes or even took Seroquel had hypertension?
(Pause.)
Q    And I'm not sure I saw a reference --
A    It's not on my list of prior medical history -- identified prior medical history items.  Now, it doesn't mean it's not in my medical summary.  Do you want me to turn to that and --
Q    And my notes don't indicate that it's anywhere in your report.
A    Okay.
Q    If you want to, I can --
A    If you -- I trust your -- that you scanned it pretty thoroughly, so I'm not worried about going back at the moment. I didn't -- it may be something that we didn't -- it didn't pick up on, in addition to the many others.  There are other things we do have that you haven't mentioned, but they're not -- but I don't specifically show the hypertension.
MR. SULLIVAN:   Let's mark that as Exhibit 25, Richard.
(Whereupon, Deposition Exhibit No. Deutsch-25, medical record for Ms. Guinn January 17, 1991, was marked for identification.)
BY MR. SULLIVAN:
Q    Here you go, Doctor.  This is a medical record, Exhibit 25, for Miss Guinn, from January 17, 1991, over 17 years ago; do you see that?
A    Yes.
Q    With regard to hypertension, I'll refer you to the last sentence of the first paragraph.  It reads:  Other medical problems include hypertension for which the

Page 11

                    1132 deutch raffa mtn tab 1 detuch dep.txt
patient is taking Lasix and recently KCL; do
you see that?
          (Pause.)
     A    Yes.
     Q    So, at least, according to this
medical record for Miss Guinn, she's had
hypertension for close to 20 years?
          MR. BRUDNER:  Objection to form,
     misstates the document.
          THE WITNESS:  Well, it clearly
     establishes that she has it in 1991.
     Now, whether she came off of it, or
     continued to have Lasix -- excuse me,
     continued to have hypertension and
     stay on medication for that 20 years,
     this particular report doesn't
     establish that, but it does establish
     that she had it at that time.
BY MR. SULLIVAN:
     Q    Okay.  Can we agree that Miss
Guinn had a family history of diabetes as
well as hypertension?
     A    I believe that is correct.  I
think that I had an understanding of that.
     Q    And, lastly, can we agree that
she lived a -- I could call it a sedentary
life style, but either that, or that she
certainly wasn't in a regular exercise
regimen?
     A    Yes.
          MR. BRUDNER:  Objection, form.
BY MR. SULLIVAN:
     Q    Now, you mentioned that there
are other preexisting risk factors or
morbidities that she had that are listed in
your report.  What are those?
     A    I didn't -- actually, I didn't
say that there were other preexisting risk
factors.  I said there were other preexisting
medical conditions that we haven't
specifically mentioned.  Her -- her
neurofibroma; her history of two
laminectomies; removal of a small tumor in
the spinal cord in 2006; her total knee
replacement in 2007, although she reports
with a good recovery.  Her left shoulder
pain; a fractured right hip and right femur
with surgical repair with plate; the
hysterectomy in 1988; gallbladder removed in
2003; and then we've already talked about the
psychiatric care.
          Now, those don't specifically
relate to the -- directly to diabetes, but
they do, I think, impact the sedentary
lifestyle, which has an indirect relationship
then to the issues that you're raising.
     Q    Okay.  Let me try to summarize
as best as I can, and you can let me know
whether you agree.
          We've gone through what we
considered to be preexisting conditions, and
we found mental health problems, including
depression, bipolar disorder and
                                        Page 12

1132 deutch raffa mtn tab 1 detuch dep.txt
schizophrenia.  We found obesity.  We found
heavy smoking.  We found hyperlipidemia.  We
found hyperglycemia.  And we have now noticed
at least two fasting glucose levels within
the prediabetic range that's set out in your
clinical guidelines.
            We found that she does not
exercise; that she had a history of diabetes
at least as diagnosed in -- or at least as
shown in her medical records in 1991, and
that she had a family history of diabetes and
hypertension.
            Can we agree on that?
      A    Yes.
            MR. BRUDNER:  Objection, form.
BY MR. SULLIVAN:
      Q    And that those risk factors or
conditions preexisted her onset of diabetes,
correct?
      A    Yes.
      Q    Okay.  Is it fair to say that
Miss Guinn, at that point before she had
diabetes, could have benefited from seeing a
nutritionist?
      A    I don't think there's any
question.  She certainly could have benefited
from a weight loss program.  She certainly
could have benefited, I think, from a good
nutritional program, so a nutritionist
outlining that program would have been --
would have been beneficial.
            MR. SULLIVAN:  Let me mark this
      as 26, Richard.
         (Whereupon, Deposition Exhibit No.
      Deutsch-26, American Diabetes
      Association statement, was marked for
      identification.)
BY MR. SULLIVAN:
      Q    There you go, Doctor.  This is
something that I found on my own.  It's
entitled, the diagnosis and classification of
diabetes mellitus.  It's a position statement
from the American Diabetes Association from
January of this year; do you see that?
      A    Yes.
      Q    Did your office do ... any
research into diagnosis or treatment of
diabetes through the American Diabetes
Association?
      A    We went to their web site and
did pull some materials from their web site,
yes.
            I don't know if we had this
specific article.  I don't think we included
it in our list of articles.
      Q    Do you have an understanding of
what a position statement is from the
American Diabetes Association?
      A    I understand what a position
statement is, yes.
      Q    What's your understanding?
      A    Well, just as position
statements, we've actually made, from time to
                                    Page 13

                    1132 deutch raffa mtn tab 1 detuch dep.txt
time, on specific topics in life-care
planning.  A position statement is when a
group of individuals, professionals in a
given field identified as leading researchers
or leaders in a given topic within that
field, come together, carefully consider the
topic or position that's being addressed,
reach a consensus, and then issue a position
paper regarding that consensus and issue that
as the position that, in this instance, the
American Diabetes Association, takes on as
their current position in this case on the
diagnosis and classification of diabetes
mellitus.
        Q      Would you consider the position
of the American Diabetes Association to be
relevant to your review of clinical
guidelines and treatment of diabetes?
        A      Well, I certainly think so.
        Q      Okay.  Take a look at the
second-to-last page of Exhibit 26.  You'll
see that, in the left-hand column, there's a
section beginning with the title:  Impaired
glucose tolerance and impaired fasting
glucose; do you see that?
        A      Yes.
        Q      And the column rolls over to the
second column, and if you note, the first
full paragraph on the second column it says
that impaired fasting glucose or impaired
glucose tolerance are synonymous with
prediabetes; do you see that?
        A      Yes.
               MR. BRUDNER:   Objection, form.
               MR. SULLIVAN:   What's the
        objection?
               MR. BRUDNER:   Doesn't say that
        they're synonymous.
BY MR. SULLIVAN:
        Q      Okay.  Let's use the exact
terms.  I understand the objection.
               Would you agree that they are
referred to -- that people who have impaired
fasting glucose or impaired glucose tolerance
are referred to as having prediabetes?
        A      Yes.
        Q      Okay.  Take a look a little
further down, I'd say about two-thirds of the
way down that very paragraph, there's a
sentence that begins:  It is worth mentioning
that medical nutrition therapy and the
producing five to 10 percent loss of body
weight, exercise, and certain pharmacological
agents have been variably demonstrated to
prevent or delay the development of diabetes
in people with IGT.  The potential impact of
such interventions to reduce cardiovascular
risk has not been examined to date; do you
see that?
        A      Yes.
        Q      Do you understand that sentence
to be discussing nutritional therapy and
possibly a pharmacological therapy for people
                                        Page 14

                    1132 deutch raffa mtn tab 1 detuch dep.txt
with prediabetes?
        A    Yes.
        Q    Is that information that you
believe is relevant to your decision on
treatment, your decisions regarding treatment
guidelines in these cases?
        A    Well, I certainly think it's
relevant.  Of course, keep in mind that --
that I'm not dealing with the issue of
causation, nor am I -- I'm dealing with what
I see now.

            I think your question, though,
is relevant in that it's asking, given that
we looked at these individuals prior to the
onset of diabetes, would a nutritionist
potentially have been beneficial in helping
stave off risk factors for diabetes.  And the
answer is ... it may well have been.

            There's another issue regarding
ideology in this case that I'm not here to
address.  So, on one hand, I think that
anything you can do to reduce risk factors,
such as a nutritionist pre, clearly would
have been relevant.  I don't disagree with
that.  Whether or not any other etiology may
have interfered with the success of that,
though, I'm not here to answer.
        Q    Let me try to show you where I'm
going with this.  If you take a look at your
report for Miss Guinn on page 26, you'll see
that you recommend nutritional evaluation one
time per year, according to clinical
guidelines --
        A    Absolutely.
        Q    -- correct?
        A    Yes.
        Q    So that's your recommendation,
correct?
        A    Yes.
        Q    Do you make any reference to a
doctor making that recommendation, in your
report?
        A    I don't recall that I did, no.
        Q    Okay.  So, is it fair to say
that whatever nutrition, whatever benefit
Miss Guinn would have had, or can have now,
due to nutritional evaluation, she also could
have had a benefit before she got diabetes;
is that fair to say?
            MR. BRUDNER:  Objection, form.
            THE WITNESS:  I think it's fair
        to say, although I kind of answered
        that a moment ago when I said, the
        only question is whether there would
        have been any other intervening
        variable that might have impacted
        that benefit.  And that I'm not here
        to answer.  I can't say.
            So, the bottom line answer to
        your question is:  Yes, I think that
        nutritional counseling would have had
        a benefit before.  I don't disagree
        with that at all.  There's just a
                                    Page 15

1132 deutch raffa mtn tab 1 detuch dep.txt

separate issue that I can't answer,
and so I'm going to have to leave it
from my perspective of giving you a
yes.
        MR. SULLIVAN:  Could you read
that question back again, please?
        THE WITNESS:  It was a yes, with
some qualification, but you got a
yes.
        COURT REPORTER:  Question:
"Okay.  So, is it fair to say that
whatever nutrition, whatever benefit
Miss Guinn would have had, or can
have now, due to nutritional
evaluation, she also could have a
benefit before she got diabetes; is
that fair to say?"
BY MR. SULLIVAN:
    Q    If you take a look on page 26 in
your report, just below your nutritional
evaluation --
    A    Let me go to it.  Oh, wrong ...
        Okay.  Go ahead, I'm sorry.
    Q    Just below the recommendation
for nutritional evaluation, you make
therapeutic modalities recommendations,
correct?
    A    Yes.
    Q    The first one has to do with
individual counseling.  And is it fair to say
that, with that example or with that
particular recommendation, you're not adding
cost to your plan because it's something that
the patient already was undergoing and was
benefiting from?
    A    Yes.  Or if she wasn't
undergoing it, she needed it.
    Q    Right.
    A    So, in either case, it doesn't
belong as part of a new ... cost.  What I'm
simply emphasizing is, she still needs it.
It just shouldn't add cost to the plan.
    Q    Isn't it the same with
nutritional counseling, that Miss Guinn
needed it before she had diabetes, and she
needs it now, and it should not be an
additional cost in this plan?
        Go ahead.
    A    The -- the difference for me in
that regard is an issue of etiology.  If ...
if one ... my hesitation is 'cause I don't
know how far to go here.
        If one assumes, assumes,
hypothetically, that the underlying etiology
of the ... diabetes is Seroquel, then it's
reasonable to add all of those items that are
necessary to treat the diabetes.  If one
assumes that all of these comorbidities that
represented risk factors pre-onset would have
and, in fact, did lead to diabetes, unrelated
to any outside influence, then the answer is
true, not just for nutritional evaluation,
it's true for any of the recommendations for
                                    Page 16

1132 deutch raffa mtn tab 1 detuch dep.txt
treating diabetes.  They all would have
preexisted -- been a preexisting need.
            Q    And, first of all, you're not
here to answer whether Seroquel caused
diabetes, right?
            A    That's why I was uncomfortable
with exactly where to go with that.
            Q    Whether or not it did, the fact
remains that before Miss Guinn had diabetes,
that she was obese; she had hyperlipidemia;
she had, years ago, been diagnosed with
hypertension; she had hyperglycemia, she had
prediabetes according to the guidelines that
you've used for your report.
            And regardless of whether, later
on, someone wants to believe that Seroquel
caused her diabetes, at that point in time,
she needed nutritional evaluation; fair to
say?
            A    I think she would have benefited
from a nutritional evaluation, but whether
that alone would have solved the problem or
whether that, coupled with all of the other
recommendations on -- for management of
diabetes, would have really been what was
necessary, is really what comes into
question.
            But there's no question, I will
agree with you, I think trying to give her
nutritional evaluation would have been
appropriate.  The question really becomes,
considering the mental health problems,
considering the obesity, considering all of
the issues that you recommend -- or excuse
me -- that you mentioned -- not that you
recommended, I'm sorry -- but that you
mentioned, is clearly --
            Q    I'm not a doctor.
            A    No.  Well, you wouldn't have
recommended somebody have obesity and all of
those other comorbidities, so it had nothing
to do with you being a doctor.  It was simply
a slip of my tongue, and I apologize.
            But considering all of the
comorbidities that you mentioned, the
question really becomes, you know, was such a
difficult patient and group of patients, if
we talk more generalities here, how much
would have any one recommendation like
nutritional counseling really have helped.
Would we have seen these patients take
advantage of -- of one single intervention
strategy.
            So, would it have been of
benefit -- I think it would have been of
necessity.  Whether or not it would have been
a benefit is what is -- what I'm having a
hard time with.  It's one reason why you
asked about the case management and -- as
associated with a diabetic management
program, would you do this extensive diabetic
management program for the average diabetic
patient?
                                        Page 17

1132 deutch raffa mtn tab 1 detuch dep.txt

We have a lot of diabetic
management programs, styles or approaches
available today.  Will these patients benefit
from a simpler program?  And the answer is,
but for their mental health problems and
their significant comorbidities, the answer
is, you know -- you know ... they probably
could deal with a lot less significant a
management program.  It's because of their
mental health problems, it's because of their
comorbidities, it's because of their long
history of -- of poor self compliance with
care, that they need such an intensive
management style.  So, unfortunately, you
take the patient as you find them.
        Q     And you have all of those
complexities with Miss Guinn right now, and
yet you've recommended nutritional
counseling; isn't that right?
        A     Well, as part of an overall
program, that's actually true.
        Q     She had all those complexities
back before she had diabetes, save the
existing diabetes, correct?
        A     But now we have it as part of a
program integrated and overseen -- integrated
by and overseen by this case management
effort, and so it's integrated into a
diabetic management program.  That's the
difference.
        Q     And you believe --
        A     It's not something done
independently.
        Q     You believe that the nutritional
evaluation is more effective, or would have
been more effective -- nutritional
counseling, I should say -- with case
management overseeing it in this particular
patient?
        A     I don't think there's any
question.  But before, you would have had
just -- you had a tougher time ... trying to
pull that together without a focus on
something like diabetes.  I mean, the fact
is, how you would have gotten case management
organized and -- and funded; how you would
have pulled all of that together is a little
bit more difficult to see.
        But there's no question that ...
you know, with -- with the history that you
had before, these were patients who were
increasingly at risk.
        Q     We just read the ADA's position
statement from this year saying that
prediabetics will benefit from medical
nutrition as well as some forms of
pharmacological treatment, correct?
        A     Yes.
        Q     That's something you would have
taken into account if Miss Guinn came to you
as a prediabetic; isn't that fair to say?
        A     That's true.
        Q     Would you have just ordered that

Page 18

1132 deutch raffa mtn tab 1 detuch dep.txt

she -- or recommended that she get no such
treatment?
         A     Oh, absolutely not.  Of course,
typically, somebody doesn't come to me with
nothing but prediabetes.
         Q     Or, typically nobody comes to
you with nothing but diabetes, correct?
         A     That's true.  Usually, I'm going
to have that whole constellation of --
         Q     So we're in the same area.
         A     -- of symptoms.
         Q     Where it's an atypical area
where someone either comes to you with just
diabetes or just prediabetes.  And I'm saying
that, in that situation where someone comes
to you with just diabetes and you've read
what the ADA position statement has to say
about it, along with all her other
comorbidities, you wouldn't simply not
recommend that she have nutritional
counseling, would you?
              MR. BRUDNER:  Objection, form.
              THE WITNESS:  I would never
         recommend that she not have
         nutritional counseling.  And, of
         course, you know, it's not that I
         haven't ever -- I have family members
         that have juvenile diabetic as a
         family member.  I have diabetes as
         family members.  I have a daughter
         with -- with both diabetes and then
         more severe gestational diabetes
         right now.
BY MR. SULLIVAN:
         Q     So you understand it's important
to try to stave off diabetes when someone's
in a prediabetic state?
         A     There's no question.  And I have
plenty of diabetic conditions associated with
disability that we work with on a daily
basis.  It's just that you don't typically
see someone come to me only from a diabetic
condition, unless the diabetic condition has
resulted in amputations or significant
complications from the diabetes, then we see
them all the time.
         Q     We agree that from the moment
you served your report to when we sat down
here, this is an unusual situation for your
practice?
         A     Right.
         Q     I don't -- I think, therefore,
that the discussion of prediabetes -- and
it's in the same bucket, it's an unusual
situation --
              MR. BRUDNER:  Objection, form.
BY MR. SULLIVAN:
         Q     -- correct?
         A     What's not unusual here is the
fact that you're not just seeing diabetes
here.  You're seeing patients who have
significant preexisting histories with a lot
of mental health, a lot of comorbidities, and

                          1132 deutch raffa mtn tab 1 detuch dep.txt
then the diabetes, and that's not so
atypical.
          Q    Right.  If you change what you
just said and insert it with, "and then" the
prediabetes, we have Miss Guinn before she
got diabetes, and having read the ADA
position statement, you wouldn't have let her
leave your office with a report without
recommending nutritional evaluation, correct?
               MR. BRUDNER:  Objection, form.
               THE WITNESS:  I don't think
          that's incorrect at all.  I just
          would have said exactly what I said
          to you.  I would have expressed
          concern as to whether or not she
          would have, in the end, benefited
          from the nutrition.
               I think, probably, I would have
          started out by calling whoever was
          her counselor at that time and worked
          with her counselor to try and keep
          her on track with the nutritionist,
          because the nutritionist alone
          probably would not have had much luck
          in gaining self compliance without
          the support of whoever her counselor
          was.
BY MR. SULLIVAN:
          Q    And another option available to
you then, when she was in -- when she had
prediabetes before she was diagnosed with
diabetes, would have also been to recommend
for her case management; isn't that fair to
say?
               MR. BRUDNER:  Objection, form.
               THE WITNESS:  It may well have
          been an option, but ... it probably
          would have been pretty difficult to
          get case management for prediabetes
          and nutrition.  We would have had to
          try and bring in all of the other
          issues, the mental health issues, the
          other -- the other ... comorbidities
          that we've talked about, to get
          justification for support of case
          management.
               Whereas, with diabetes as a
          diagnosis, you've got a situation
          that has the potential to lead to
          more serious risk factors, and so you
          can get justification off of diabetes
          alone.  But without it, just the
          prediabetes, I think it would be
          difficult.  But if you brought in all
          of the other factors, the
          justification may well be there.
BY MR. SULLIVAN:
          Q    And when you say, to get
justification, are you referring to
generally ... are you referring --
          A    It's a hard word to say, isn't
it?
          Q    I'll take it.  When you say, to
                        Page 20

1132 deutch raffa mtn tab 1 detuch dep.txt

get justification, you're referring to
insurance companies, aren't you?
    A   Or any other source of funding,
however we get it funded in our world as case
managers and -- and life-care planners,
there's a variety of ways to accomplish that,
and --
    Q   I'm sure that's a big part of
your job, isn't it?
    A   And it is a big part, but we
have to have -- we have to have the right
wording and the right justification.
    Q   Well, and I want to get to that.
For this question I want to separate out the
insurers or the payors for the case
management and the nutritional evaluation and
just ask for your opinion.
    A   Okay.
    Q   If Miss Guinn had come to you
before she had diabetes, with all the risk
factors that we just discussed, is it fair to
say you wouldn't have -- you wouldn't have
let her leave your office, setting aside the
insurers, without giving her nutritional
counseling or recommending nutritional
counseling and some form of case management?
    A   Well, I think that's fair to
say.  Knowing all we know, I would have had
to have a doctor say, she's either
prediabetic, or if I suspected it in the lab
tests, I would have had -- I would have gone
back to the doctor, because even outside the
forensic or litigation world, there's certain
things I have to have justified, I have to
have medical foundation for.  I can't just go
off on my own.  But as a case manager, there
are things that I am able to do that a
non-board-certified case manager is not going
to be able to do.
        But once I have that, I've
talked to the primary care doctor or the
endocrinologist, then I would, I think, try
and coordinate the various types of levels of
care or her mental healthcare, her
endocrinology and PCP, primary care -- excuse
me.  Sorry.
    Q   I'm interested to see whether
you succeed.
    A   It's backing up, but it'll come
shortly.
    Q   There's a lot of tension.
    A   It does.  Sorry about that.
It'll come in a minute.
        But, in any instance, I would
have definitely, you know, tried to
coordinate all of that in a plan that made
sense, hopefully, at that point, to avoid
the, what then would have been potential risk
factors for diabetes.  Whether that would
have succeeded or not, I can't say, but
that's obviously the goal always is to reduce
risk factors for further problems down the
road.

1132 deutch raffa mtn tab 1 detuch dep.txt

Q     Promised I'd get to the
insurance company, I'll do that after this
next question, or next set of questions.

What methodology, if any, did
you employ to distinguish in the costs that
you recommend here for nutritional counseling
and case management, the cost that would have
been ... charged for case management or a
nutritional evaluation for Miss Guinn before
she got diabetes as opposed to the costs for
nutritional counseling and evaluation and
case management now that she has -- as you
recommend now that she has diabetes?

A     There -- there is no
distinction.  The case management slash
diabetes management program and the
nutritional evaluation is all based on the
diabetes diagnosis post onset of diabetes,
and did not assume, as the individual
counseling did, and as several other areas
did, that she would have required it in any
instance.

The solution to that on the
stand is to simply ask, hypothetically, if
you assume the onset of nutritional
evaluation premorbidly -- pre-onset, would
there be any difference in cost?

Probably, the simple answer to
that is, no.  Because where it gets complex
is saying, well, if you assume she had it in
2000 ... or in 1997, or ... and move forward,
you get into the very complex issues of -- of
what did it cost in '97, and then start
having the economist move it forward.  And
I'm not sure that even matters, comparing --
trying to compare those cost differentials.

I think the bottom-line answer
is, if it had worked, if you had applied it
in 1997 or in 2000, and you were successful
in applying it, you controlled diet, and you
were successful in controlling obesity, the
question becomes ... even with the onset of
diabetes, even if you assume the onset of
diabetes, subsequently, if obesity were under
control, and she was following that
nutritional plan, would you still then need a
nutritionist now, and the answer, I think,
would be, no.

Q     And I've seen in your web site,
and maybe it was in some of your writings,
that as a life-care planner you should assume
the success of your recommendations, is that
a tenet that you preach?

A     Absolutely.  Why would you put
into a plan a recommendation that you thought
was going to fail?

Q     So, is it fair to say that if
your recommendations work, and if the
nutritional counseling and evaluation and the
case management work, and you assume -- in
other words, you assume the success of those,
it's very possible and probably likely that
Miss Guinn will not need those two things for
Page 22

```
                  1132 deutch raffa mtn tab 1 detuch dep.txt
the rest of her life.  Fair to say?
            MR. BRUDNER:  Objection, form.
            THE WITNESS:  Well, that you
       might have to ask ... the
       endocrinologist.  What I can -- what
       I ... feel comfortable in saying is
       that my purpose in recommending them
       is to bring stability to her -- her
       diabetic management, and
       significantly reduce the risk factors
       for complications from diabetes.
            But I'll leave it up to an
       endocrinologist to say whether she --
       she or any of these other patients
       have a reasonable probability of
       coming out of diabetes.
BY MR. SULLIVAN:
       Q    There's no endocrinologist who
recommended this nutritional evaluation and
case management; that's your recommendation,
correct?
       A    That's true.  But that's not
what I just said.  You want me to repeat what
I just said one more time?
       Q    No.  Whether or not she will
continue to need the things that only you
recommended, nutritional evaluation and case
management, is up to you, correct?
       A    Right.
       Q    That's your opinion, correct?
       A    But let me ... but based on the
question that you asked, what I said was ...
the purpose of using nutrition and diabetic
management programs is to maintain stability
in the diabetes for reduction of any risk
factors for complications.  So, as long as
she has diabetes, or any of these others have
diabetes, the goal is to keep them stable
with their diabetic condition and avoid risk
factors.
            For a lot of patients, I would
agree with you, for patients who have the
kind of mental health history, obesity,
smoking, all these other comorbidities that
they have not had under control and are poor
patients for keeping these things under
control, I believe the kind of management
support they need is really designed to
stable -- keep the diabetes stable and avoid
the much more significant risk factors that
diabetes can lead to.
            And I think we could be very
successful in that, which really are where
the high cost, statistically, of diabetes
lies, not in the basic management of
diabetes, but in the risk factors.  And
that's what you want to avoid.  And I think
that's quite possible.
            The problems I think in diabetes
come with either noncompliant patients or
patients who are, because of other
comorbidities, are very poor candidates for
being compliant, not because they're being
```

1132 deutch raffa mtn tab 1 detuch dep.txt

difficult, but because they legitimately have
problems that make them poor candidates for
managing their own diabetic condition.  And
that's why I have it there.
         Q    So they're more likely to need
ongoing management when -- a patient like
Miss Guinn is more likely to need ongoing
management because of her mental conditions?
         A    Her mental conditions are the
number one reason.  I think that she shows
that with all of her past histories.
         Q    If -- and we'll get into a
hypothetical range here.
         If Miss Guinn had case
management, significant amount of case
management like you recommend here in your
report, before she had diabetes, and was
undergoing ongoing nutritional evaluations
before her diabetes, and she came in here and
you reviewed her case and you recommended
what you recommend here, case management,
nutritional evaluation, is it fair to say
that you would list no additional cost in
your report because she was already
undergoing those things, just as you did with
the mental health counseling?
              MR. BRUDNER:  Objection, form.
              THE WITNESS:  I'm sorry to keep
         doing that to you.
              I believe that ... you would
         have at least added the diabetic
         management portion of the program,
         assuming that you -- let me take a
         step back.
              If you were not able to stave
         off the diabetes -- you know,
         hopefully you were -- with really
         good management, good nutritional
         support, weight reduction, hopefully
         a cessation of smoking program, some
         of these other things, the ... the
         goal obviously would have been to
         work toward reducing the risk factors
         for diabetes.
              But depending upon the etiology
         of the diabetes, then the question
         becomes, what do you do if the
         diabetes occurs?  And so we would
         have had additional costs, but if we
         already had case management in there,
         then, obviously, the cost of an
         additional diabetic program,
         management program, would not have
         been the same.
BY MR. SULLIVAN:
         Q    I think I'm with you.  The case
management program that you had Miss Guinn --
or you're recommending for Miss Guinn here,
addresses a lot of the preexisting risk
factors she has but, in addition, it's
intended to address the diabetes that she now
has and how to deal with that, correct?
         A    I think we're on the same page
                                    Page 24

1132 deutch raffa mtn tab 1 detuch dep.txt
there.  The different direction we might have
is that I see it as addressing it because you
take the patient as you see them; whereas
you, I think, maybe feeling that we're
addressing ... preexisting comorbidities
and -- and ... and mental health problems
that are unrelated, I see them as making the
management of diabetes far more difficult,
and that's the nature of the patient we're
dealing with.  So it becomes part of the
problem.  Although, to me, that's not an
issue for me to answer.  It's just I'm making
the recommendation 'cause I have to deal with
that whole patient, and a jury is going to
have to decide whether it's apportioned or
not.
          Q     And let me try to break it down
so maybe a jury can understand what we just
discussed.
          A     And as soon as you break it
down, if I could take a short break to ...
          Q     Absolutely.
          A     -- take care of the tea I've
been drinking.
          Q     In the hypothetical I just gave
you, where Miss Guinn had nutritional
evaluation and case management for all these
comorbidities before she had diabetes, and
then you recommend after diabetes, the case
management and nutritional evaluation that
you do in your report, the difference in the
case manage -- the difference in cost, the
difference in the case manage -- would come
from the case management end of it, where
there would be -- where the management would
address the existence of the diabetes, that
incremental difference, however big it is,
for the existence of the diabetes, otherwise
they're fairly similar?
                    MR. BRUDNER:  Objection, form.
                    THE WITNESS:  Right.
                    MR. SULLIVAN:  Okay.
                    THE WITNESS:  I'll just be a
          second.
                    (Recess taken from 10:13 a.m. to
          10:20 a.m.)
                    MR. SULLIVAN:  Dr. Deutsch is
          going to put on the record some of
          the documents that -- the medical
          records that I showed him last week.
          Since it's unclear at this moment
          whether they were actually marked as
          exhibits, after the deposition we'll
          check, and if they weren't, we'll
          mark them after the deposition.
                    THE WITNESS:  Okay.  The first
          was a January 5, 2003 record, Tampa
          General Hospital admission report
          showing ... Miss -- showing ...
BY MR. SULLIVAN:
          Q     Miss Curley?
          A     -- Miss Curley, I'm sorry --
Miss Curley's record, weight of 144 pounds.
                    Page 25

```
                 1132 deutch raffa mtn tab 1 detuch dep.txt
             A July 22, 1998 neurological
evaluation showing a height of four foot,
11 inches, and a weight of 100 pounds.
             A June 2, 2000 Tampa health
center record, showing a weight of
118 pounds.
             A June 20, 2001 Tampa General
Hospital record that showed a weight of 129
pounds.
             A 1/21/2000 SmithKline Labs
blood test showing ... what's that, 133 --
         Q    It's going to be a glucose
level.
         A    Must have been a glucose level
in her blood, on her blood test, showing
hyperglycemia.
             And then a 5/15/06 dental record
from Dr. Shama, DPM, showing a family history
of diabetes and migraine headaches.  For a
total of ... six separate records.
         Q    Okay.  Thank you for doing that,
Doctor.
         A    Sure.
         Q    Perfect timing.
         A    These are the two items you
requested that went to two different
locations; one directly to CCMC, to be
forwarded on to their new management company
in New Jersey.  So went through Minnesota to
be forwarded to New Jersey.  Really kind of
crazy the way it's working right at the
moment.
             And then one that went directly
to the chair of the Ethics Committee, care of
one of the management people at the new New
Jersey management company.
             I don't know if you want to --
how you want mark those -- in reference to
the issue you raised of my missed -- my
missing my ... 5/31/08 filing for the dues
and update of my credential for CCM, which
prior to that, I held for 34 straight years
without managing to miss it.
             (Pause.)
             MR. SULLIVAN:  Okay, Richard
         we'll mark as Exhibit 27 -- you have
         26 over there, I think.  The
         guidelines?
             THE WITNESS:  Oh, yes.
BY MR. SULLIVAN:
         Q    A letter dated October 6, 2008,
from Dr. Deutsch to Lou Veerling [ph] at --
             UNIDENTIFIED:  I'm going to get
         a copy of this.

             MR. SULLIVAN:  The chair of the
         CCM Ethics Committee.
             And Exhibit 28 is another letter
         from Dr. Deutsch to Melissa McElroy
         at CCMC, enclosing information
         regarding getting himself
         recertified.
           (Whereupon, Deposition Exhibit No.
                                        Page 26
```

```
                    1132 deutch raffa mtn tab 1 detuch dep.txt
       Deutsch-27, Dr. Deutsch letter, 10/6/08,
       was marked for identification.)
             (Whereupon, Deposition Exhibit No.
       Deutsch-28, letter to Ms. McElroy,
       was marked for identification.)
BY MR. SULLIVAN:
       Q     On Exhibit 27, your letter to
Mr. Veerling -- do you know him?
       A     Yes.
       Q     How long have you known him?
       A     Actually, I worked a lot with
his wife before she passed away last year.  I
don't know Lou quite as well, except through
her.  He's a vocational rehabilitation
counselor and case manager.  But she was a
life-care planner, an R.N., so I've known him
through her ever since they got married.  I
knew her before they got married and so
probably known him ... I think they got
married about maybe seven to eight years ago.
She passed away last year.  So I probably
have known him at least seven or eight years.
And he did contribute a chapter on Americans
with Disabilities Act to one of my texts.
       Q     Is he a friend?
       A     He's a colleague.  I haven't
socialized with him, but I would certainly
consider him a colleague.
       Q     Have you socialized -- did you
socialize with him and his wife when she was
around?
       A     Well, they live in Des Moines,
Iowa, so there was never really an
opportunity to socialize.  I mean, I think
once or twice, at the international symposium
on life-care planning, we probably went out
to dinner together, but in terms of any
ongoing, regular socialization, there really
was never an opportunity.  I certainly would
have, but there just was never really an
opportunity because we were so far apart.
       Q     Okay.
       A     But I did go to the funeral.  I
did ... you know, I felt very close to Patty,
and Patty was a significant loss to the
field, and he knows that.  There is a Patty
McCollom Memorial Research Award at the
Foundation for Life-Care Planning Research.
And -- you know, and I do consider him an
important colleague in the field.  Even
though he's not a life care planner, he's a
well known vocational rehabilitation
counselor.
       Q     I promise you I'd get back to
the insurance companies.
             In Miss Guinn's report, you
recommend two to four hours per month of case
management equaling 24 to 48 hours per year.
             Have you ever had to justify
that amount of case management for diabetes
to a third-party payor, including an
insurance company?
             A     Just for diabetes?  Well, of
                                          Page 27
```

1132 deutch raffa mtn tab 1 detuch dep.txt

course, I'm not justifying it just for
diabetes here.  So -- and I don't know that I
have ever recommended it just for diabetes.
You're recommending it for the totality of
what's going on with this patient here, and
I'm perfectly comfortable with recommending
it for the totality of the issues that are
involved.

But the question you're asking
is more just for diabetes, and I'd have to
answer, no, in relation to that.  Am I not
correct?  You're asking just for diabetes?
          Q    Well, I'm thinking about your
answer.
          (Pause.)
          Q    If you're not recommending this,
just the case management just for diabetes,
why, in your report, haven't you allocated
the cost or expense only related to diabetes
as opposed to giving the complete cost?
          A    Well, I ... I really do feel
like I've answered this, but let me give it
one more stab because it's going to come up
in every single one of these cases, and I
hate to answer it five more times, although I
guess that's probably the reality.  Because
you have to face the patient that you're
working with.

I mean, the totality of the
problems and the real problem with management
of diabetes for these patients is not just
the diabetes.  It's the ability of these
patients to comply with self management.  And
that ability is significantly impacted by
their mental health problems and their other
comorbidities.  Their mental health problems
and their other comorbidities makes the
existence of diabetes much worse.  The
diabetes itself makes a lot of their other
comorbidities that much worse, and so I have
to deal in designing a plan with the totality
of those problems and how they interact.

I'm not going to predict
complications.  That's not appropriate.  But
what I have to do is try and reduce the risk
factors for those complications and that's
what we do in designing a plan.

But I have to confront how
difficult this group of patients are, even
with all of their prior histories, and maybe
especially, I should say, with all of their
prior history.

And that's the reason why I've
made the recommendation for the nutrition,
the case management, and it's a case
management slash diabetes program, diabetes
management program, that simply wouldn't be
there, quite bluntly, in the same fashion, if
you had the average fully functional patient
who just happened to have diabetes, but
otherwise was fully employed, well educated,
had no mental health problems, was fully
compliant with self care, you'd give them a
Page 28

1132 deutch raffa mtn tab 1 detuch dep.txt

program of education, you'd get them started
in management.

Even ongoing management that a
lot of the health insurance carriers used
post education on diabetes, would largely
come from having a nurse contact them once or
twice a month and oversee it largely by
telephone.  You -- you would -- which would
never work with the kinds of patients we're
dealing with here who would just blow that
off.

(Pause.)

Q      Do you rely on any scholarly
source for your opinion that there needs to
be different case management for a patient
with diabetes and mental health problems,
than for a patient -- for a patient without
the mental health problems who has diabetes?

A      I don't know that anybody's
written specifically an article.  I guess I
have to say, no, there's nobody that I know
of that's written specifically an article
that says:  Look, we're going to study
patients with mental health and diabetes.  I
mean, there are certain things that we have
to recognize come from your experiences as a
case manager and life-care planner.

So, you know, I don't have a
separate scholarly source that's specific to
the issue of increasing ... disabilities,
increasing comorbidities, and the increasing
need for management.  It -- it's -- you know,
it's something that I think is inherent in
everything we do in case management to
understand that the greater the numbers and
complexities of problems, the more -- the
more ... skilled -- I think, number one, the
case manager needs to be, but also the more
important it is for the case manager to apply
the tools necessary to carefully organize the
work that we're doing, which is where life
care planning comes into play.

But in terms of a scholarly
work, one work I can point to that addresses
this issue and specifically makes the
statement, if you want to manage diabetes
when there are significant mental health
problems, here's how you have to address it,
no.  Even in my own work, over 30,000
published pages, I don't know that there's a
line that specifically addresses that topic.

Q      What ... can you describe for me
what's going to happen -- what would happen
in these two to four hour visits per month
for case management?

A      Well, I think what really I
would anticipate from the case manager, to
start with, is that they would, first and
foremost, working with the mental health
services, working with the diabetic education
program, working with the physicians who are
dealing with the other comorbidities, would
develop a plan, an integrated plan to address

Page 29

1132 deutch raffa mtn tab 1 detuch dep.txt
all of the issues the individual had.

So if we have the need for weight loss; if we have the need for a smoking cessation program; if we have the need for medication management; we have the need for each specific step in diabetic management, and we have specific steps in psychological management, then we're going to begin to integrate those.

We're going to work with the psychologist, for example, who's providing counseling to develop behavioral supports for weight reduction, and to integrate whatever they're being taught in -- in nutrition and in weight reduction program into their home environment, so that they're not just trying to do this within the body of a program, but they're getting support from family, they're getting support in the home setting.

And same thing for the smoking cessation program, we build a total behavioral program that's supported by that case manager.  The case manager should be responsible for building a program that is coordinated between the various individuals working with the patient and integrated into the home environment, not just handled at the site of each individual program, so that she goes to a weight program and then, boom, that's it.  She leaves the weight reduction program, and leaves all that information behind, goes to a smoking cessation program and leaves that behind.

You address each issue one at a time, but you also then learn to integrate what you -- what you've developed as information in each of those programs, into the natural environment, and you use a behavioral program developed by the psychologist to reinforce that in the natural or home environment.

And the case manager becomes critical to making sure that's integrated in every other component of her life, and that it's reinforced on a constant basis.

And so it's not just that she's managing a diabetic program, but it's recognizing that, to manage the diabetic program, you're really managing every aspect, because the diabetes is influenced by weight, influenced by smoking, it's influenced by the medications that she's taking.

So she really needs, or he really needs, whoever that case manager is, to understand every aspect of the drugs she's taking, the -- if she's seeing an endocrinologist and a primary care doc, and a psychiatrist, that the psychiatrist needs to be a really good psycho-pharmacologist who understands the drug interaction effects of how that's impacting the diabetes.

And all of that needs to be coordinated by a solid case manager who then

1132 deutch raffa mtn tab 1 detuch dep.txt

integrates that plan and maintains it in the
natural environment.  That's what I see the
case manager doing.
        Q    So the case manager will address
mental health issues, as well as parts of
this plan?
        A    They have to.  There's no other
way you're going to manage that diabetes
program here, because that's really been the
problem with compliance with care for a lot
of these patients.
        Q    So the two to four hours of case
management every month is to address the
whole of the patient's ... medical and
psychological problems?
        A    Yes.  They're going to even
attend doctor's appointments.  They're going
to attend those initially.  They're going to
even attend programs with this patient so
that they're learning what those programs are
and assisting the other caregivers in
developing like the behavioral program, to
reinforce what they're learning in those
individual programs outside of those
programs, in the home environment.
            It's not going to work
otherwise.  It's a waste of money to send
them to stop-smoking programs and obesity
programs for weight loss, and to a
nutritionist for counseling because, without
the support they need outside those programs,
they'll never carry that information outside
of those programs.
        Q    Have you ever successfully
justified a case management program like the
one you just described, to a third-party
payor, including an insurance company?
        A    Yes.  But unfortunately, it
comes after risk factors have developed, and
it's now -- we now have an amputation, or we
now have significant wound care problems, and
they realize they're going to shell out --
they are shelling out significant dollars.
            Then they see case management as
inexpensive, and they'll pay for it outside
the normal policy, because normal policies
don't generally pick up case management.
Third-party payors pay for case management
all the time.  But they pay for it outside of
the normal policy coverage to save big
dollars within the policy, but they usually
won't do it until their policy is starting to
pay out so much that they recognize they want
to save dollars.
            What's hard to get them to
justify -- although with the right adjusters
it works, but what's hard to get a lot of
them to see is that if we did it, if we
identified, like in cases of this nature,
high-risk patients, and you started to do
this before you had amputations, or you had
diabetic ulcerations, and you were dealing
with expensive wound care, and you could show

1132 deutch raffa mtn tab 1 detuch dep.txt

that -- and they believed you had the
potential to significantly reduce risk
factors, it would make a lot more sense.  But
I have to tell you that probably 99 percent
of the time the justification is ... post
onset of risk, not pre-onset of risk.
     Q     And the question I'm asking you
is about pre-onset.  Have you ever -- those
are the plans that we're dealing with here,
correct, in your reports?
     A     That's true.  But --
     Q     Have you ever justified -- been
able to successfully justify a case
management plan like the ones here,
pre-onset, to a third-party payor, including
an insurance company?
        MR. BRUDNER:   Objection, asked
    and answered.
        THE WITNESS:   It's happened but
    it's probably one percent of the time
    with -- with companies we have great
    relationships with and who can, who
    have had the experience of paying
    very high costs, and have seen us
    work successfully.
        But -- and then they see this
    increasing number of risks -- they
    haven't had it yet, they haven't had
    the payouts, but they see it coming,
    and they want to stop it before it
    happens.   But you're talking a very
    small percentage.  It's pretty rare.
        But, you know, you have to
    understand, that's an insurance
    company decision.  That doesn't
    necessarily mean it's the right
    decision.
        And I know this isn't asked for,
    but it is also -- there are also huge
    differences between a third-party
    health insurance company, what they
    may decide to do and what an HMO
    decides to do.
        HMO's will hold back paying a
    lot more than a third-party health
    insurance company will, so what an
    HMO decides to do doesn't make it
    right.   And we see that when health
    insurance companies pay, even though
    an HMO doesn't.
        So, the fact that ... a health
    insurance company may not 99 percent
    of the time versus one percent,
    doesn't make it right, either.
BY MR. SULLIVAN:
     Q     Have you ever successfully
justified to a third-party payor, including
an insurance company, two to four hours of
case management for diabetes alone?
     A     I think we asked that, and I
said, no.
     Q     The questions I have just asked
you about case management, you make the same

1132 deutch raffa mtn tab 1 detuch dep.txt
two to four hours per month recommendation in
I think just about every report.
          Do your answers apply to all the
reports that you've issued here --
          A    Yes.
          Q    -- the reasons for, the basis
for your making that recommendation?
          A    I apologize again for stepping
on you.
          The answer is, yes.  And my
apology goes to the court reporter, as well.
          THE WITNESS:  Does that mean we
     could possibly get out a little
     sooner?
          He's not going to answer that.
          MR. SULLIVAN:  I would love to,
     Doctor.
          THE WITNESS:  Well, I only said
     that because we're two hours in, and
     we've only gotten to one case, and
     I'm worried that it's two hours per
     case, we're not going to finish
     today.
          MR. SULLIVAN:  That makes five
     of us.
BY MR. SULLIVAN:
          Q    Okay.  Let's look at some of the
other recommendations you made on Miss Guinn.
          Page 26, you recommend some
medical supplies.  What's your source --
          A    Okay, wait a second, wait a
second.  Let me get -- first of all, let's
get --
          (Pause.)
          Q    Page 26 of your report for
Miss Guinn, you recommend, in the middle of
the page, medical supplies, and I'm asking
you, what's your source --
          A    That's what she's actually using
for, as part of her diabetic testing.
          Q    How do you know that?
          A    Well, I went through with her
what she's actually ... using in terms of
number of lancets per month, the test strips,
the lancet devices, the tester that she's
using which -- and the alcohol wipes.
          I mean, I just went through ...
those specifics.  I have to trust -- at some
point, you have to trust the accuracy of what
you're getting from the patient regarding the
numbers, but the best I can do is confirm ...
that with her, even though ... you know, in
addition to going over it with her at
evaluation, prior to the evaluation, I sent a
homework assignment to her home, so that she
would have all of that material with her at
the house.
          And so that what you saw in the
composite that you got was handwritten notes
from her, in which she listed out exactly
what medications she was on.  So we got the
medications from her.  She listed out what
doctors she was seeing ... I'm not sure --
                                        Page 33

```
                    1132 deutch raffa mtn tab 1 detuch dep.txt
          Q     Let me just interrupt you,
Doctor.
          A     Go ahead.
          Q     Is the short answer to my
question that your source for the medical
supplies you're listing on page 26 of your
report, is Miss Guinn?
          A     Yeah.  Oh, absolutely.
          Q     Okay.
          A     And if it was wildly
inconsistent with what a typical diabetic
might use, I certainly would have tried to
find another way to verify.
          Q     What's an Ascensia lancet
device?
          A     The lancet is what she's using
to draw blood.
          Q     The Ascensia lancet device is
what she uses to draw blood?
          A     Right.
          Q     What's the distinction between
the Ascensia tester and the Ascensia test
strips?
          A     The strips are what you put the
blood on.  And it goes into the tester to
test -- to get a blood sugar level.
          Q     What's the difference between
the Ascensia lancet device and the lancets.
                    (Pause.)
          A     I'm sorry.  The lancets go into
the device.  It's like a spring loader.  So
the lancets go into the device, you pull the
trigger.
          Q     Okay.
          A     It shoots the lancet into the --
into a pre-measured distance, and so that,
you know, you just barely prick the finger or
you prick whatever area you're going to draw
the blood from, and you touch the test strip
to the blood.  The blood -- the strip goes
into the tester, and it gives you your blood
sugar reading.
          Q     A little further down at the
bottom of the page you mention health
strength maintenance recreation as an area of
recommendation; do you see that?
          A     Right.
          Q     You're not assessing any costs
for that?
          A     No.
          Q     Correct?
          A     Right.
          Q     Then we don't need to talk about
it.
                    Above that you list, medical
care.  And we talked about this last week in
connection with Miss Curley's report.
                    Medical care is an area where
you need a doctor's recommendation in order
to insert it in your report, correct?
          A     Correct.
          Q     It's not something you're
qualified to opine on, correct?
```

Page 34

1132 deutch raffa mtn tab 1 detuch dep.txt

A    Generally, I think that's true. In this instance ... if I did not get a specific recommendation back from Miss Guinn's doctors, but I got recommendations back from other endocrinologists treating the others, then I considered the clinical practice guidelines, and I considered what all the other endocrinologists and ... and primary-care doctors said, and I considered how frequently she was seeing her current treaters, and I considered their reports, and used that as a basis, because, in fact, her specific physicians did not respond to my questions.

Q    Let's take a look at the responses and see what they did.

MR. SULLIVAN:  I'll mark this as the next exhibit.

(Whereupon, Deposition Exhibit No. Deutsch-29, doctor responses to Dr. Deutsch, was marked for identification.)

BY MR. SULLIVAN:

Q    Doctor, Exhibit 29 is my best effort to staple together in one exhibit, your letters to and responses from the doctors who were treating Miss Guinn. Take a quick look and see if I came close to succeeding.

(Pause.)

A    I think you did.

Q    Okay.

A    Let's see if there's anybody else, but I think you did. No, you did.

Q    And I believe I've got in there a letter to the ophthalmologist and a letter to the endocrinologist; is that correct?

A    Yes.

Q    And you mentioned earlier that you got no answer from either doctor?

A    That's correct.

Q    Isn't it true that you got an answer from one doctor?

A    Well, not to my questions.  It is true that ... Dr. T-H-R-U-V --

Q    Dr. Thruv.

A    Thruv -- how'd you pronounce it?

Q    Thruv.

A    Thruv?

Q    I'm not sure I'm right, but that's what I'm going with.

A    Okay.  He -- he didn't actually give us an answer in writing.  When we got him by telephone on 7/25/08, he indicated that he would have to do a reevaluation of ... the patient because it had been too long since he had last seen her, and ... would not answer the questions until he had an opportunity to do a re-eval.

Q    Do you believe that you are better qualified to determine the number of visits that Miss Guinn needs to make per year to an endocrinologist and Dr. Thruv?

Page 35

1132 deutch raffa mtn tab 1 detuch dep.txt

    A    Certainly not.

    Q    And so we're clear on the record, the letter that you sent to Dr. Thruv has a note on top of it referencing a telephone call from July 25, 2008; is that correct?

    A    That's what I just read.

    Q    And whose initials is on that -- are on that handwritten note?

    A    Julie Kitchen.

    Q    And it's -- and she wrote:  The doctor would need to do a re-eval.  He has not seen her in a while; do you see that?

    A    That's what I just read.

    Q    And this is a letter in which you asked Dr. Thruv for ... an opinion, within a reasonable probability, as to the questions that you had asked, correct?

    A    Correct.

    Q    And the doctor's telling you that it's not possible to give you the answers to those questions because there needs to be a reevaluation of Miss Guinn, correct?

    A    That's correct.

    Q    Nonetheless, you didn't put that in your report, did you?

    A    Actually, there is a note under the endocrinologist visit, saying:  Awaiting specific endocrinologist recommendations. However, Dr. Thruv indicated Miss Guinn requires an additional evaluation prior to providing an opinion regarding future care.

    Q    But what you did put in your report, that Dr. Thruv did not give to you, was that you were going to recommend two to four visits per year.

    MR. BRUDNER:  Objection.

BY MR. SULLIVAN:

    Q    Correct?

    A    I did indicate two to four visits per year, pending any further opinion from an endocrinologist.

    Q    And that's information that Dr. Thruv did not believe is appropriate to give you until she -- until the doctor had seen Miss Guinn for a reevaluation, correct?

    MR. BRUDNER:  Objection, form.

    THE WITNESS:  He did indicate that he wanted to reevaluate her, based on all the questions I had asked, not just based on that one question.

BY MR. SULLIVAN:

    Q    And isn't it fair to say that, in this section of your report in which you have to rely on medical opinions, that with regard to visits to an endocrinologist, you don't know how many Miss Thruv -- Ms. Guinn should have a year, and that a doctor should be giving us that number?

    A    There's no question I would defer to the doctor, but as a case -- you

Page 36

                    1132 deutch raffa mtn tab 1 detuch dep.txt
know, 34 years in case management, I'm going
to tell you that to say zero visits would --
that there is no follow-up for diabetes,
would be totally inappropriate.  We certainly
know, from clinical practice guidelines, we
know from experience, we know from the
research literature, that she needs to be
followed.
           I also know, from all the
responses I got in -- in those doctors that
answered in the other cases, that there's a
reasonable follow-up that needs to be
considered.
           So to just list zero, would have
been ... professionally inappropriate.  So,
what's more appropriate is to say, look,
based on all that we know, this is a
reasonable amount but for this patient we are
still pending the need for an endocrinologist
to -- to follow up and provide an opinion.
      Q    How about -- would this answer
be more appropriate?  I don't know, I'm not a
doctor.  Miss Guinn's doctor said that she
needs to come back for a reevaluation.
Miss Guinn should do that.
      A    Well, I think we are indicating
that, in fact, that a follow-up with
Dr. Thruv is appropriate, or an
endocrinologist is appropriate.
           But in the meantime, we know we
were going to come into deposition and to
give testimony in deposition that would
suggest it's going to be zero, and that the
economist has a zero, and then you have no
idea of what the dollars are until we come to
trial; that also is inappropriate.
           And so I'm uncomfortable doing
something that leaves you surprised in the
end, 'cause we both know that the
endocrinologist is not going to say ... that
there's zero follow-up for a diabetic patient
on into the future, especially when we just
followed what consistently other
endocrinologists have said regarding other
diabetic patients when they have responded.
           So -- and we've been consistent
with clinical practice guidelines.  So, I was
uncomfortable walking into deposition and
suggesting that, I'm sorry, we're just going
to be incomplete, and you'll hear what we
have to say at trial.  That's not a
consistent or a reasonable approach, in my
opinion.
      Q    But doesn't it reflect reality?
      A    I think the way we've done it
reflects reality, as well.  I understand your
point, but I think that following clinical
practice guidelines, following good case
management guidelines, and following what
other physicians have said in a similar
specialty regarding the almost identical
kinds of cases, reflects reality, as well.
           And we have the medical records
                                        Page 37

1132 deutch raffa mtn tab 1 detuch dep.txt
on these patients.  We know what the
diagnosis is.  So, to suggest that it would
be a zero follow-up while we're pending ...
an evaluation by an endocrinologist, I don't
think is real -- is really reality in terms
of what's going to happen long into the
future.  It may reflect where we are in the
case while we're waiting, but it's really --
it's not realistic in terms of what's going
to happen long into the future.
          Q    We're in the same situation with
regard to the ophthalmologist, as well, in
that the ophthalmologist has not answered
your letter.  And, again, Dr. Thruv did not
answer with a recommendation as number of
ophthalmologist visits per year, correct?
          A    You're absolutely correct.  We
are in the same situation with both of them.
          Q    After you got your response from
Dr. Thruv, and up to the time you gave your
report to the plaintiffs' attorneys, did you
ever have anyone contact Miss Guinn and say:
Hey, get to your endocrinologist, they need
to reevaluate you?
          A    I do not know whether that's
been accomplished or not.  Although I'm sure,
similar to the depositions, I'm sure, on
hearing this, somebody's going to suggest
that to her.
               MR. SULLIVAN:  Okay.  That's all
          I have for the Guinn report.  You can
          put that one away.
BY MR. SULLIVAN:
          Q    Okay, Doctor, you served a
report with regard to the case for Robert
[sic] Unger, correct?
               (Pause.)
          A    Yes.
          Q    I'd like to see if we can agree
again with regards to Mr. Unger as to
preexisting risk factors and morbidities that
he had, okay?
          A    Yes.
          Q    Can we agree that he -- one of
those risk factors was obesity?
          A    Yes.
          Q    And as with Miss Guinn,
Mr. Unger had some serious mental health
problems, correct?
          A    Yes.
          Q    Including general anxiety
disorder and major depressive disorder?
          A    Yes.
          Q    Can we agree that before
Mr. Unger contracted diabetes that he had
hyperlipidemia?
          A    Yes.
          Q    And that he had hypertension?
          A    Yes.
          Q    Were you aware that he had
smoked for 30 years, but had stopped a number
of years before you saw him?
               (Pause.)
                                        Page 38

1132 deutch raffa mtn tab 1 detuch dep.txt

A     Well ... Ron -- Richard Unger,
right?
Q     Yeah.
A     I don't show that he stopped.
That's the only difference.
Q     Okay.
A     I still show him smoking one
pack a day as of the time that I saw him.
Q     Excellent.  We don't have to go
to the records then.
Can we agree that he lived a
sedentary lifestyle?
A     Yes.
Q     Okay.  I'm going to ask some of
the same questions I asked about Miss Guinn,
and hopefully we can get through it fairly
quickly.
A     I'm sorry, what was the last
thing you said before -- after the smoking?
Q     Sedentary lifestyle.
A     Oh, sedentary lifestyle.
Q     Before Mr. Unger got diabetes,
can we agree that he would have benefited
from a program of nutritional evaluation?
A     Yes, with all of the same
answers I just gave.
Q     So if he came into your office
for diabetes, and we can agree it's an
unusual situation for you, for someone in his
condition to come in for treatment of those
risk factors, and he had obesity and mental
health problems and hyperlipidemia and
hypertension and was a smoker and had lived a
sedentary lifestyle, would you have let him
leave here without recommending at least
nutritional evaluation for him?
MR. BRUDNER:  Objection, form.
THE WITNESS:  No, but again,
recognizing the mental health factors
and all of those other comorbidities
we just talked about, I think
nutrition would have to be a part
of ... an overall program.  I don't
think I would have recommended it on
its own, because I don't think it
would have done any good on its own.
BY MR. SULLIVAN:
Q     Is it fair to say that then you
would have also recommended some form of case
management for him, as well?
A     Exactly.  And consistent with
what we've discussed on ... I apologize.
Q     Miss Guinn.
MR. BRUDNER:  Miss Guinn.
THE WITNESS:  Miss Guinn's case.
BY MR. SULLIVAN:
Q     And Miss Curley from last
Thursday.
A     And Miss Curley before.
Q     Okay.
(Pause.)
Q     Okay.  Let's move to some of the
recommendations that you make for Mr. Unger.

Page 39

1132 deutch raffa mtn tab 1 detuch dep.txt
                    We've talked about nutritional
evaluation.  You made a recommendation there,
just as you did for Miss Guinn and
Miss Curley.

                    Another Allied Healthcare
evaluation though, that I hadn't seen in the
previous two cases that you make here, is for
disabled driver education; do you see that on
page 23?
          A     Right.  Exactly.
          Q     And the basis for that
recommendation is Mr. Unger's peripheral
neuropathy?
          A     Correct.
          Q     Do you have any idea whether --
well, strike that.

                    Do you have any idea how much
Mr. Unger was driving a car before he got
diabetes?
          A     I don't.  He said that he had
significant restrictions before in terms of
his limitations on sitting, and his ability
to bend and turn -- bend at the waist, turn
his neck, or bend forward.  Basically, it was
cervical restrictions, not the waist but the
neck, bending forward, turning the neck left
to right.  But that he did drive.

                    Now he has added problems due to
the lack of sensation in his feet.  He's able
to feel pressure on the pedals, but he had
less ability to feel the pedals and to feel
the pressure he was placing on the pedals.

                    And ... but he also has ...
intermittent pain that passes through the
feet.  And ... when you add that to the other
restrictions, but particularly when you have
problems with how well you're feeling the
pedals, you know, there's a real question as
to how safe he is to himself and to others on
the road.

                    And so I recommended he have a
handicapped driver evaluation.  'Cause, quite
bluntly, maybe he shouldn't be driving at
all.
          Q     What other problems that a
patient could have will lead you to recommend
disabled driver evaluation?
          A     Frankly, any disability that,
under Florida law, would leave me to
believe -- lead me to believe -- let me ...
that would lead me to believe that a patient
may be unsafe to themselves or to other
drivers on the road, requires me frankly to
call up motor vehicles and have their -- have
their driver's license lifted.

                    Now, if it's borderline like in
a situation like this, my preference is to,
you know, strongly recommend a handicapped
driver evaluation.  But, you know, brain
injury, suspicion of a seizure disorder,
anything that would require hand controls --
I have a situation right now, it's an
out-of-state client, or I would -- if it were

1132 deutch raffa mtn tab 1 detuch dep.txt
an in-state client, I would have probably
called the Department of Motor Vehicles, I'd
probably do so three or four times.
Actually, you write them, or you don't call
them.
            But he's an ASIAD -- A-S-I-A-D
spinal cord patient.  He's a C.D.  And he ...
got himself a pair of used hand controls and
adapted them to his own vehicle.  Frankly,
that's just a no, no.  He doesn't know if --
no one knows if it's been put on properly.
You don't know if they're right for him.
It's just not the way, legally, you're
supposed to go.  So you don't know if the
vehicle is properly adapted.  You don't know
if he's properly trained, if they're the
right hand controls for him.  It's not been
evaluated.  He shouldn't be driving.
            So, in this state, if he has an
accident, I'm liable, as much as he is, I'm
liable for the accident.  If I know that he
shouldn't be driving, and I was a -- as a
treating professional in that case, or as a
consulting professional, know that that
danger is out there.  So --
        Q     What if a patient came in and
told you that he or she felt -- repeatedly
felt drowsiness when driving and was
concerned about driving, would you recommend
such a patient for driver evaluation?
        A     Well ... depends on the extent
of it.  I mean, if they were actually losing,
seriously losing attentiveness to the road or
falling asleep at the wheel or were starting
to pull to the left or right, or they
couldn't keep the car in the lane,
unquestionably, you know; just depends on how
serious the problem was.
        Q     How about if a patient came in
and told you that their pain was limiting
their ability to drive effectively, and that
they were concerned about that, would you
recommend that patient for driver evaluation?
        A     I've never had ... I've never
had pain itself as the issue.  But usually,
accompanying pain is narcotic management of
pain, and narcotics worries me a great deal
when it comes to driving.  So when I have
people on pain pumps, where they're being
given Dilaudid or morphine as management, I
expect that of pain docs to be responsible
for calling for driving restrictions or
limitations.  But if they don't, I'm not
beyond doing it, because they've exposed me.
If they failed to do it and I have a concern,
I am by no means unwilling to do so.  So it's
quite possible I would.
        Q     What if the patient came in and
you asked them about his or her driving, and
the patient said that, I really limited my
driving because I have fatigue problems and
just problems with endurance of driving my
car, would you recommend that patient for
                                    Page 41

1132 deutch raffa mtn tab 1 detuch dep.txt
driving evaluation?
           A    No, I mean, if they drive -- if
they have a problem with endurance and
fatigue over time, and they've legitimately
restricted themselves, and family members
have supported the fact that they've
restricted themselves within tolerance
levels, they're only driving to the
neighborhood drugstore or grocery store,
they're not exceeding that endurance level, I
don't see that as much of a problem if their
record has stayed safe, and I'm much more
concerned about what you talked about
earlier, where fatigue is actually
representing an interference factor with
their ability to stay in the lane.   The
subsequent description you gave doesn't sound
as ... great a concern as the earlier
description.
           Q    Let's put them all together
then.   What if a patient came in and said:
I've had problems with drowsiness when
driving; pain is concerning me in my ability
to drive; fatigue has been a problem and I
just don't know that I have the endurance to
drive to the point that I've only driven
twice in the last year.   Would that patient
be someone you would recommend for driver
evaluation?
           A    Well, I think if they'd only
driven twice in the last year, and because of
all those factors, then I think it's time to
seriously look at -- seriously look at
whether they should be maintaining a driver's
license.   And at that point, a handicapped
driver evaluation probably makes very good
sense, more for the purpose of determining
whether they should be able to maintain --
           Q    A license?
           A    -- a driver's license than
whether or not there's any adaptations that
should be done.   The biggest concern I have
here is making sure that they're evaluated
with all of those factors kept in mind,
'cause the question is, are you going to
catch all those factors in one evaluation.
           So it's really important that a
clear report is given to the certified
handicapped driver evaluators, that they
understand, you know -- if you're catching
them at their best moment, you may not be
seeing all of these factors that are
interfering with their driving.
           Q    Okay.   Take a look quickly at
the first page of your report.   You indicate
that the date of onset for diabetes was
September 7, 2005.
           (Pause.)
           Q    Do you see that?
           A    Point me to where you are.
           Q    It's the first page of your
report.
           A    Oh, I understand that.
                                    Page 42

                    1132 deutch raffa mtn tab 1 detuch dep.txt
         Q      Demographic information, the
last entry in that paragraph.
         A      Oh, okay.
         Q      Okay?  We agree on that?
         A      That's what it says, yes.
         Q      2005?
         A      That's what it says.
                MR. SULLIVAN:   Let's mark this
         as the next exhibit.
             (Whereupon, Deposition Exhibit No.
         Deutsch-30, Social Security disability
         application, was marked for
         identification.)
BY MR. SULLIVAN:
         Q      This is Exhibit 30, Doctor.  I
apologize, I have highlighting on it, so you
could see how I think now.
                But this is a October 1, 2004 --
it's an application for Social Security
disability.  You see that?
         A      Yes.
         Q      Can you take a look at page four
under -- in the middle of the page there's a
question as to -- it says:  Do you drive?  Do
you see that?
                (Pause.)
         Q      So, you see --
         A      Are you sure it's under number
15?  Getting around, so bear with me.
         Q      Sure.
                (Pause.)
         A      I see, when going out, how do
you travel.  He says, he rides in a car.
         Q      It's a little blurry.
         A      Oh, do you drive?  I see it.
         Q      And we agree this is an
application for Mr. Unger?
         A      Right.
         Q      What did he write next to, "Do
you drive"?
         A      Under that it says, if you don't
drive -- oh, he wrote, "No."  I can't ...
okay.  Then under that there's the question:
"If you don't drive, explain why not."
         Q      Right.  And what did he write?
         A      Drove twice in the past year,
now unsure of myself due to drowsiness, pain
fatigue, and lack of endurance.
         Q      If Mr. Unger came in to you with
those complaints in 2004, you would have
recommended him for driver evaluation; fair
to say?
         A      For the reasons I just
indicated, I would express concern that, you
know, may just, from a practical standpoint,
not be appropriate to maintain a driver's
license.
         Q      And that's -- that application
is from before he was diagnosed with
diabetes, correct?
         A      It's my understanding, correct.
         Q      So, your recommendation for
driver evaluation in your report is something
                     Page 43

1132 deutch raffa mtn tab 1 detuch dep.txt
that he should have had even before he got
diabetes; fair to say?
     A   I would say that's fair to say.
     Q   Is that something we can strike
from your report as a cost attributable to
his diabetes?
     A   I think you'd have to.
     Q   Okay.
     A   Wait, wait.  Give me a moment to
make a note; would you, please?
     Q   Please.
       MR. COUTROULIS:  Off the record.
       (Discussion held off the
    record.)
       THE WITNESS:  Okay, I'm ready.
    Let me give this back.
       MR. SULLIVAN:  That's another
    exhibit.
BY MR. SULLIVAN:
     Q   Doctor, under medications
prescribed, you list some medications for
Mr. Unger to take for his diabetes; is that
correct?
     A   What I understood he is taking,
that's correct.
     Q   And you changed my question a
little bit, because you're not --
     A   Oh, I'm sorry.
     Q   Because you're not qualified to
prescribe this medication to --
     A   Oh, absolutely.
     Q   -- to Mr. Unger, correct?
     A   Absolutely.
     Q   You can only state what his
doctors have said here, correct?
     A   Correct.
     Q   In the middle, that being the
second of your three recommendations, you
include Symalin injection, 15 units
subcutaneously before each meal and large
snack; do you see that?
     A   Yes.
     Q   See it says, five times a day?
     A   Yes.
     Q   So you've recommended, in your
report, 15 units five times a day, correct?
     A   Right.  Again, it's not me
recommending it.  It's what his doctors have
given him.
     Q   Where is your support for that?
     A   Well, that's what he's actually
taking.
     Q   I need to ask a better question,
sorry.
       Where is your support for him
having, not Symalin, but 15 units of it and
five times per day?
     A   Oh.  You know, that's ... you
know, I have to trust that the patient's
giving me an accurate statement of what he's
actually being provided.
       Hold on just a moment.
       (Pause.)

1132 deutch raffa mtn tab 1 detuch dep.txt

       A     In addition, I wrote to
Dr. Quintero, the endocrinologist, and asked,
is it within reasonable medical probability
anticipated which will remain on Symalin or
related injections through his life, and he
said, yes.  And I didn't ask what his
specific dosage was.  I trusted that the
patient was giving me an accurate dosage.
       Q     So you didn't ask the doctor
about dosage or frequency, correct?
       A     No, I trusted the patient's
statements regarding dosage and frequency.
So if Dr. Quintero subsequently says that's
not the dosage I have him on, then I'll defer
to what Dr. Quintero says.
       Q     How about if ... the doctor's --
review of his medical records indicate that
he has been on drugs other than Symalin for
his diabetes, drugs instead of Symalin for
his diabetes; is that information you would
take into account when making this
recommendation?
       A     I think -- I'm sorry.  I think,
historically, I've traced in the intake, and
I've noted it in my report, what he had in
terms of medications from the start, but what
I list in here is what he's on now, and what
I asked the doctor is, will he continue on
Symalin.  So I don't go back and list what
he's -- in the medication section, what he's
had historically that he's no longer taking.
              MR. SULLIVAN:  I'm going to mark
       as an exhibit the letter, the answers
       from Dr. Quintero.
           (Whereupon, Deposition Exhibit No.
       Deutsch-31, was marked for
       identification.)
BY MR. SULLIVAN:
       Q     But it's -- that's not exactly
the question you asked him.  You didn't ask
him just whether he will remain on Symalin;
isn't that true?
              (Pause.)
       A     Well, there's -- there's a
two-part question.  Number one:  How many
endocrinology visits does he want in
follow-up per year.
              And then the second part of that
question:  Is it within reasonable medical
probability to anticipate that Richard will
remain on Symalin or related injections
throughout his life.
       Q     So you didn't ask him just
Symalin; you asked him, or related
injections, correct?
       A     Well, of course, because there's
no way for me to know -- I mean, there's no
way for him to know that, at some point in --
that a replacement technology, a replacement
kind of medication might not come up.  So --
       Q     What about an existing one, just
an alternative?
       A     He may switch to insulin, I
                                        Page 45

1132 deutch raffa mtn tab 1 detuch dep.txt

don't know that he won't, but -- or he may
switch to another medication, another
injection, but --
          Q      We --
          A      -- he's saying he's going to
stay on an injectable.  All I can do is to
note what he's on now.  With medications,
there's no way to know that a change won't
take place, but I have to know from the
doctor, is it likely, more probable than not,
that he's going to stay on this medication,
or at least a reasonable -- a reasonably
similar medication throughout his life.
          Q      And, in your report, did you
state that, or did you simply state Symalin?
          A      I simply state what he's on.
I -- you know, certainly, in testimony, you
can ask, but I don't have another drug I can
talk about in the report.  So all I can talk
about is what the reality is now.
          Q      And we've covered already that
you did not review his testimony, this
doctor's testimony, before you issued your
opinion, correct?
          A      That's true.
          Q      If you had reviewed his
testimony and you'd seen that, in fact,
Mr. Unger had been on at least two other
medications, instead of Symalin, how would
that have affected your report?
          A      I don't know that it would have
affected it at all.  It's nothing unusual to
have one or two other medications as you try
and stabilize diabetes.  Once you get it
stable, if you're -- if the doctor is
generally happy with the stability that's
finally reached on a given drug, that's
usually the drug you'll stay on.
               But it's quite possible.  I
can't tell you it's not, in my experience,
that it could change at some point in the
future.  But it's not really up to me to say.
It's up to Dr. Quintero.
               So if testifies that it may
change in the future, the best I can do
is ... give you a cost of what that
medication would be if he gives it.  If he
says, well, if not, Symalin, then he's likely
to be on this.  But what he'll never be able
to do is tell me what other options might
develop through technological advances in the
future.  He can only say, look, if Symalin
proves not to be the most effective, our
current technology would give us the
following options.  If he wants to name two
or three options, I can give you the cost of
those options, assuming he gives me a dosage.
          Q      You didn't -- well, if you had
seen in his testimony that -- in
Dr. Quintero's testimony, that Mr. Unger had
been on alternative medications, and
reasonably recently, couldn't you have
included that, those medications in your
Page 46

1132 deutch raffa mtn tab 1 detuch dep.txt
calculations, as well?

    A    Wouldn't be inclined to do so if he's taking him off of those.  Not unless he, the doctor, would have said, there's as reasonable a chance for him to go back to those as it is for him to stay on Symalin.

    Q    Couldn't you have asked him ... what other medications he may actually take in the future, rather than simply putting in the question, or related injections?

    A    I suppose as reasonably as he could have said:  I have him on Symalin now, but ... you know, there is an option.  I mean, I did give him a space.  It said, additional comments or suggestions.  He had all the option in the world to say to me, if not Symalin, here are other options.  He could have said it there; he could have said it down below.

    I mean, I can lead these doctors by the hand, but they're very bright, most of them, and you know, I -- I understand what you're saying, but this is ... not that difficult.

    I mean, the truth of the matter is that we're not talking huge cost differentials, and the fact is that it's -- you know, if you have a question, it's easy enough also for you to say, right now, what other drugs would you like me to have costed out prior to my coming to trial, I'll have them available.

    Q    The cost that you've given for Symalin is $1452 a month; do you see that?

    (Pause.)

    Q    It's on page 23 of your report.

    A    I'm sorry, I lost my place there.

    (Pause.)

    I do see that.

    Q    Do you have any idea how much a month's supply of Byetta would cost for Mr. Unger?

    A    I'm sure we have it in one of the other files.  Seems to me we have costed it out, but I don't off the top of my head.

    Q    Okay.

    A    You want me to go check real quick?

    Q    If you have it somewhere else, I'd be interested in hearing it.

    A    I know there -- some of the other patients had started out on Byetta.  I just don't remember if they're still on it, so I have to just check through here.

    (Pause.)

    A    This would be the last file.

    Now, this is Byetta based on ten -- ten MCG per 0.4 -- point zero point four millimeter solution in a 2.4 milliliter cartridge administered two times per day.  She's purchasing 2.4 milliliter cartridges per month at a cost of $229.97 per cartridge.

Page 47

                    1132 deutch raffa mtn tab 1 detuch dep.txt
So I don't know how to compare apples and
apples, because I don't know what his
prescription for Byetta would be.
          Q      What was the monthly cost on the
Byetta?
          A      For her, it was 229.97.
          Q      Per month?
          A      Per month, based on two
cartridges.  I just don't know how many he
would get.
          Q      Certainly, that cost,
understanding your qualification, is
significantly less than the cost in your
report for Symalin for Mr. Unger.
          A      Oh, no question.  I mean --
          Q      Did you review the prescription
records for Mr. Unger to see whether he was
on any other medications for his diabetes
other than Symalin?
          A      Well, he has been, yes.  I'd
have to go back if you bear with me just a
minute.  Let me get back to his file here.
              (Whereupon, Deposition Exhibit No.
      Deutsch-31, admission and discharge from
      Mercy Hospital, was marked for
      identification.)
              THE WITNESS:  Well, he starred
      out on an oral agent, but he couldn't
      tell me what it was.  He went from
      that oral agent to Byetta via
      injection one time per day.  But then
      he says it could have been once per
      month, he doesn't recall.  I don't
      think once per month was realistic,
      but ... he said he was on that for
      several months before he was changed
      to Symalin.  And that's the best
      recall he could give me.
BY MR. SULLIVAN:
          Q      Do you have anything in your
records to show whether he was ever on
Avandia?
          A      Well, Avandia was probably the
oral medication he was taking.  He just
couldn't recall the name of it.
          Q      Okay.  You mentioned that he had
mentioned -- he couldn't tell you whether it
was once a month or once a day for Byetta?
          A      I assume it was once a day, not
once a month.  I mean -- but ... that doesn't
surprise me as far as his historical recall
of exactly the frequency.
          Q      Mr. Unger has, and the other
plaintiffs that you're dealing with in this
case, have mental health problems?
          A      Right.  As far as his telling me
what's going on today, how many times today
he's taking it, or he took it yesterday,
that -- I don't have much concern about that.
But as far as going back several months or a
year, and giving me a history, that's -- that
might be another question.  And being
accurate about dosages.
                                    Page 48

1132 deutch raffa mtn tab 1 detuch dep.txt

Q     We can agree that if, as your
records reflect, Mr. Unger was on some oral
medication; records indicate to me that it
was Avandia and Byetta and then Symalin, that
it's possible in the future, or at least
beyond the time that you spoke with him, he
could be on a different medication for his
diabetes; is that fair to say?
        A     You're really asking the wrong
person.  I mean, in all honesty, that's a
question for his endocrinologist to answer.
        Q     And you never actually asked the
endocrinologist in this case, whether
Mr. Unger was on Symalin, correct?
        A     Whether he was on Symalin?
        Q     Yeah.
        A     Absolutely.  That's exactly how
the question is phrased.
        Q     The question is phrased:
Symalin, open parens, or related, closed
parens, injection, correct?
        A     It says:  Will he remain on
Symalin or a similar injectable.
        Q     Okay.  So you --
        A     So it says clearly to me that
he's on Symalin now.  Will he remain on
Symalin or a related injectable?  So it does
say -- in my view, it does say that he's on
Symalin now.
        Q     Let's take a look at the actual
letter.  I've marked Exhibit 31, I'll show
you that in a second, but for now, let's do
Exhibit 32.
            (Whereupon, Deposition Exhibit No.
        Deutsch-32, letters re Mr. Unger,
        was marked for identification.)
BY MR. SULLIVAN:
        Q     This is, again, my best
compilation of the letters and the answers to
and from doctors, in this instance for
Mr. Unger.  If you want to take a look and
see if I got that right, I'd appreciate it.
            (Pause.)
        A     Yes.
        Q     Okay.  Let's take a look at your
letter to ... to Dr. Quintero, in particular
the questionnaire that ... you included with
it.
            (Pause.)
        Q     Am I reading correctly that your
question with regard to medications in the
first paragraph, question number one reads
this way:  Is it within reasonable medical
probability to anticipate Richard will remain
on Symalin or related injections throughout
his life?
        A     Yes.
        Q     So, you'll agree with me that
you never asked him whether he was going to
remain on Symalin and Symalin only, did you?
            MR. BRUDNER:  Objection, asked
        and answered.
            THE WITNESS:  No, but it's very
                                Page 49

1132 deutch raffa mtn tab 1 detuch dep.txt
clear that it says, Symalin, and I
would certainly think any intelligent
endocrinologist, if he was not on
Symalin, would have said to me, he's
not on Symalin.
BY MR. SULLIVAN:
        Q    I understand that part of your
answer.  I think, when you answered my
question, you anticipated it differently than
I wanted you to, so let me try it again, not
that I just want to keep asking the same
question.
        Do you agree with me that you
never asked Dr. Quintero whether Mr. Unger
will remain on Symalin and Symalin only, for
the rest of his life?
        A    I certainly agree with you, but
that wasn't my intent.  My intent was exactly
to ask what I asked.  Will he stay on Symalin
or at least some related injectable for the
rest of his life?
        Q    And will you also agree with me
that you didn't ask Dr. Quintero, will
Mr. Unger stay on Symalin for the rest of his
life, or is there some other medication he
may take?  You didn't ask him that, did you?
             (Pause.)
        A    Versus another injectable?
        Q    Just any other medication.  You
just asked him, Symalin or related product,
right?
        A    Or related injectable.
        Q    Right.
        A    And which is another product.
But, you're correct, although he had other
opportunities in here, including right there,
'cause it says, "comment", and he could have
easily said in the comment, my goal is to
move him to an oral medication, to move him
back to Avandia, or move him back to -- I
mean, he is a physician, for God's sakes.
It's simple for him -- I can't anticipate
everything --
        Q    It's a difficult --
        A    -- that a physician is likely to
say.
        Q    It's a difficult process to
communicate with a physician about treatment
through a questionnaire, isn't it?
        A    But it's important to document
the file.  And I have to assume that a
physician is an intelligent being, and so
he's -- that's why I leave open comments for
him, a comment section, so that, in addition
to the question, he can come back and he can
say, you know what, my goal is to get him off
Symalin and onto an oral medication.  And I
see physicians do that all the time.
        Q    We talked Thursday about how you
understand, in connection with your
communications with doctors, that they are
very busy; is that fair to say?
        A    That's true.
                              Page 50

1132 deutch raffa mtn tab 1 detuch dep.txt

Q    And that sometimes it's
difficult to get them to sit down with you
and have either a phone call or a meeting
where there's a back-and-forth exchange,
correct?
        A    That's true.  We certainly get
far more responsiveness through this style of
communication than we do through a request
for a lengthy letter, or even a request for a
phone conference.  This gets us about an
85 percent response rate.
        Q    Because it's more user friendly
for the doctor and takes less time for the
doctor, correct?
        A    That's true.  But they do give
us feedback.  I mean, they give us their
comments in addition to just saying yes or
no.  And so I'm confident that if
Dr. Quintero subsequently felt, you know,
it's not just an issue of Symalin, I would --
I have a longer-term goal of getting him back
onto an oral medication, he would have said
so.  But in all due respect, if his
deposition turns out to say something
different, I will have that now, and I will
read it.
        Q    Is it more important to you to
document the record than it is to get it
right?
                MR. BRUDNER:  Objection, form.
                THE WITNESS:  Clearly, the
        importance is to get it right.  But,
        if I get a response from the doctor
        that doesn't document the record,
        that's problematic, as well.  And my
        assumption is, if the doctor answers
        me in writing, that it is correct.
                So, you know, the question
        you're saying, presumes that the
        doctor's going to answer me
        inaccurately.  And I don't -- I
        just -- I would think that's just an
        unreasonable reaction to the way
        these doctors are responding to the
        questionnaires.  I just don't think
        that's right.
BY MR. SULLIVAN:
        Q    There's nothing stopping --
there was nothing stopping you from calling
Dr. Quintero after he sent you this -- this
answer to your questionnaire, true?
        A    Nothing stopping me.
        Q    And you didn't do it, true?
        A    That's true, I didn't.
        Q    Or -- and you didn't call any of
the doctors in these six cases, true?
        A    That's also true.
        Q    And isn't, in this case, a flaw
with regard to getting information from
Dr. Quintero on this medication, just in your
question, by asking him, will Unger remain on
Symalin or related injections for the rest of
his life?

1132 deutch raffa mtn tab 1 detuch dep.txt

         MR. BRUDNER:   Objection, form,
assumes facts not in evidence.
Sorry.   Go ahead.
         THE WITNESS:   I certainly
recognize that that's your
interpretation, that it's a flaw.
But it's an easily fixed flaw.   If
you have the opportunity in
deposition, or had the opportunity in
deposition to ask him, in fact, is it
a flaw, do you anticipate his being
on something like Avandia again, or
Byetta again, you also have the
opportunity to ask that at trial.
BY MR. SULLIVAN:
         Q     You're not asking me to do your
job for you, are you?
         A     No, but the -- you're the one
who's claiming it's a flaw.   So you're the
one who has the opportunity to show me that,
in fact, it is a flaw.   I'm not suggesting at
all that it's your responsibility to do my
job.   But I'm not -- I'm not suggesting, nor
do I believe that it is a flaw in the system.
I think the process works effectively, and I
don't think this is inaccurate.
         You know, the fact is that --
that I'm satisfied with the process.   I see
your expressed concern.   I'll read
Dr. Quintero's deposition and see if he's
suggesting anything other than what has
already been suggested, based on his response
to me.   If he doesn't in his deposition, I
don't intend to change it.   If he does, I
most certainly will change it.
         And if even after the
deposition, if you raise this with him at
trial and come back and say, Dr. Deutsch, I
want you to assume that on the witness stand
in testimony, Dr. Quintero said X, I'm not
going there to argue.   If you -- if you
present a hypothetical showing, in his
testimony, that, in fact, assuming Symalin is
an inaccurate assumption for me to make, I'm
certainly going to be prepared to change.
         Q     Is there any flaw in your
methodology in picking the dose and frequency
in your report for the Symalin injections.
         A     All I can do is pick the dose
and frequency that is currently being
provided to the patient.   If the doctor
testifies --
         Q     Well, you said you got that from
the patient.
         MR. BRUDNER:   You got to let him
finish.
         THE WITNESS:   I understand that.
And that is my understanding of the
prescription.   And bottom line is, is
that I do not believe that it is a
flaw, and until the doctor testifies
otherwise, that is the dosage I'm
going to go with.
                              Page 52

1132 deutch raffa mtn tab 1 detuch dep.txt

BY MR. SULLIVAN:
    Q    Here's what I've marked as
Exhibit 31.  I apologize I only have one
record, so I'm not hovering your shoulder for
any other purpose but to look at it.  I'll
come down so I'm not over your shoulder.
    A    I'm trying to find a date.  Do
you see it?
    Q    Yeah.
    A    Oh, one -- I'm sorry.
    Q    That's the birthday.  Above it I
believe is the date.
    A    12/04/06.  Okay.
    Q    Can you read what it -- his
record says about, this is admission and
discharge medication list from Mercy
Hospital.  Do you see what it says about the
units and frequency of Symalin?
    A    Sure, it says back in '06, he
was taking ten units ... does that say
"subcutaneously"?
    Q    That's how I read it.
    A    Okay.
    Q    Prior, before meals.
    A    Okay.
    Q    Do you see that?
    A    Right.
    Q    Take a look at the next page of
the exhibit.  This is from ... the same year
in May, a little earlier.  It's a progress
note from Dr. Quintero, May 3, 2006.  And do
you see that it says ... Symalin ten
units ... at meals?
    A    I do see that.
    Q    Subcutaneously at meals?
    A    I do see that.  But, again, this
is 2006, and we've already agreed that it's
nothing unusual for dosages in medications to
be changed.  In this case, he's indicating
he's taking it at meals and at snacks, so
five times a day total.  And, you know, I --
I'm perfectly comfortable with what he's told
me until I see a current ... record that
suggests that the dosage is wrong, or
Dr. Quintero says that that's not an accurate
dosage.
    Q    Do you see anything in that --
those two documents that are part of Exhibit
31 that mentions snacks, to take it with
snacks?
    A    It does not.  But again, we're
dealing with 12/04/06 --
    Q    I've got that point.
    A    -- with two years earlier.
So --
    Q    Part of your --
    A    But you're right.  It does not,
going back to December of '06.
    Q    Part of what you do here as a
life-care planner is to review medical
records; isn't that true?
    A    Yes.
    Q    Part of what you did here with
                      Page 53

1132 deutch raffa mtn tab 1 detuch dep.txt

this -- preparing these reports, was to
review medical records; isn't that true?
        A    Yes.
        Q    Can't you go to the medical
records yourself and determine what the
dosage and frequencies are listed?
        A    But going to a dosage of '06
wouldn't have changed.  We would have gone
back to the patient and still said, you know,
we show a dosage in '06; what is your dosage
now.
        Q    Couldn't you have asked the
doctor?
        A    You know, we could have tried.
But, frankly, getting -- getting a
physician's office -- you have no idea how
difficult it is to get a verbal response from
a physician's office regarding something like
that.
        Q    Could have written a question,
couldn't you?
        A    We could have tried but ...
getting -- you know, getting specific
questions like that, where he's got to go
back into the chart and write, "look up
current dosage," that's much more difficult
than the kind of questions that we were
asking for his opinion regarding labs,
regarding frequency of visits.  It takes a
lot longer, it tends to slow up responses
when we're asking questions that have him
researching back into the chart history.
        Q    Could you have looked at the
prescription records?
        A    Well, if we had prescription
records, we could have, but usually we don't
get prescription records.
        Q    Well, why would you not get
prescription records if it would give you
that type of information?
        A    Well, when you say, prescription
records, I mean ... you know, it's not
something that normally comes as part of a
physician's record.  Have you got the records
of every prescription that the doctor wrote?
        Q    How about the records of every
prescription that your plaintiff filled;
couldn't you have gotten that?
        A    Well, I don't have them.  And,
you know, to the -- and the question, I
guess, let me -- I don't know that -- whether
we got -- and I don't think we do, but I'll
look and see if we ... if we have his
pharmacy record.
                (Pause.)
        A    No, I don't think we do.
        Q    Maybe we can show this up
quickly; maybe we can't.
                Is it fair to say that costs --
costing for ten units of Symalin, three times
a day, would be less than 15 units five times
a day?
        A    Sure.

                                    Page 54

1132 deutch raffa mtn tab 1 detuch dep.txt

Q     Is it fair to say that costing
for medication, other than Symalin, be it
Byetta, Avandia, or another related
injection, would be different from the cost
of Symalin?

A     Certainly, although ... Avandia,
I think, was an oral medication not an
injectionable, but nonetheless, the answer is
yes.

Q     With that correction --
          (Pause.)
Q     Okay.  Further down in your
recommendations for Mr. Unger on page 23 of
your report, you mention laboratory testing;
do you see that?
          (Pause.)
Q     I have it at the bottom of page
23 of your report.
A     Oh, yes, I've got it.
Q     Okay.  And you took that
information from the answer that you received
from Dr. Quintero; isn't that correct?
A     True.
Q     Is it true that you did not ask
Dr. Quintero how many of these lab testings
were required that will be above and beyond
the testing that Mr. Unger would already have
had before he had diabetes?
A     True.
Q     And so is it fair to say that
you don't know how many of these, each of
these lab tests, Mr. Unger would have above
and beyond those that he may have had before
he got diabetes?
          (Pause.)
A     That's a fair statement.  The
question did ask, lab work to monitor
diabetes.  But it didn't say, he knows his
medical history pre, can you separate out
labs you would have expected him to have
based on preexisting medications, et cetera,
or preexisting comorbidities.  So it did not
ask him to do that, and I would need a doctor
to do that.
Q     Let me try to come at it from
the way a life-care planner may.  I may fail,
but you tell me that.
          As a life-care planner, knowing
the risk factors and morbidities that
Mr. Unger had before he got diabetes, would
it have been a reasonable area of inquiry and
research for you to look into, whether he was
having or should have had these types of lab
tests, even before he got diabetes?  Is that
something you would have considered and
looked into?
A     Yes.  You know, and tried to
handle it by asking the doctors, considering
only the diabetes, what lab tests would you
order for this -- what do you want, as an
endocrinologist, to follow this individual?
          Perhaps a better question, as
we're talking now, although I don't know how
Page 55

1132 deutch raffa mtn tab 1 detuch dep.txt
much Quintero knew about the prior medical
history, although I'm assuming he would have
known it, and would have understood the
question, because the cover letter makes
clear, I think, that if he read it, that we
were trying to separate out.  But the bottom
line is, is that between the cover letter and
the question, I was hoping to get at the
differentiation between what he would have
needed pre, and what he would have needed for
just the diabetes.
          But your point is certainly
reasonably taken.  If a doctor looked at this
and said, based on the comorbidities, he
would have required at least one, or at least
two of this lab, and at least one or at least
two of this lab, in any instance, therefore
with the onset of diabetes, we would have
only had one additional CBC, or one
additional, you know, of this lab then, what
belongs in the life-care plan is only that
portion made necessary by the onset of the
diabetes.  Is that clear?
          The latter part is all you need.
The only thing that belongs in the life-care
plan is that additional made necessary by the
onset of the diabetes.
          Q     And if you look at laboratory
testing, the second one you have there is for
lipids two times a year, or lipid panels two
times a year; do you see that?
          A     Which is something which most
likely, if he had hyperglycem -- excuse me,
hyperlipidemia, he most likely would have
had --
          Q     Already --
          A     -- at least once or twice a year
already.
          Q     What is CBC, SMA-20?
          A     What is it for?
          Q     No, what is it?  Yeah, what type
of test is it?
          A     Want me to answer ... you know,
I get it myself on a regular basis, but if
you want me tell you all of the things that
it shows, I can't do that.
          Q     So you don't know whether he
would have had those tests, Mr. Unger would
have had those tests before he had diabetes?
          A     You know, I have a book at my
desk that tells me what all the lab studies
show, and I rely on looking those up, you
know, when I have the material in front of
me, but I don't -- you know, I'm not a
physician, and I'm not there to answer all of
the lab studies.
          Q     Okay.
          A     So, whether he would have had
these on the same frequency, is really not
something for me to answer.  It's something
I've got to rely on the physicians to tell
me.
          Q     And that's -- we're in the
                                            Page 56

1132 deutch raffa mtn tab 1 detuch dep.txt

medical care section of your recommendations
in the -- while they're listed as part of
your rehabilitation recommendation plan,
these are things for which you needed doctors
to give.

    A    Well, it says, the medical care
section, and I did ask the doctors, and I did
try and make a distinction, both with the
cover letter and with the way, you know, the
statement, what does he need related to the
diabetes.

    Clearly, he gave me what he felt
he needs, as an endocrinologist, to follow up
for diabetes, but without a consideration as
the cover letter asked him to do, without a
consideration of differentiating it between
the premorbid comorbidities and the diabetes.

    Q    Okay.  And can we agree that in
the next section of your recommendations or
the next bullet point of recommendation in
the medical care section, you have an opinion
from Dr. Quintero, that Mr. Unger should go
to a podiatrist once a year, and you rejected
that opinion?

    (Pause.)

    A    It's not so much that I rejected
it, is that I looked at his opinion related
to just basic clinical guidelines, practice
guidelines versus what's actually occurring.
And based on the fact that -- 'cause I don't
know if Dr. Quintero was aware of his actual
peripheral neuropathy and the treatment
schedule or the follow-up schedule, rather,
that is actually being undertaken.  So, I
followed his actual podiatry schedule, as
opposed to just an evaluation.

    So, I recognize Dr. Quintero's
recommendation for an evaluation, and
incorporated that within, but it's not so
much I'm rejecting it, but I'm not going to
reject the ... records from his podiatrist,
either.

    Q    You didn't get an answer from a
podiatrist, did you?

    A    No, the podiatrist didn't follow
up, but that doesn't mean that I can't look
at the podiatry records.

    Q    The only answer that you got
from a doctor on podiatry visits was from
Dr. Quintero, and he said one visit per year,
correct?

    A    Well, if you are --

    Q    Is that correct?

    A    The only answer I got to written
questions regarding podiatry, was from
Dr. Quintero, yes.  But when you say, the
only answer I got, that answer also comes
through the actual reports from these
doctors.  And so, I would disagree with you.
I don't think it's correct.  Some of those
answers come from reading the actual reports
and the podiatry reports show that he's
following up more frequently than a

Page 57

                    1132 deutch raffa mtn tab 1 detuch dep.txt
once-a-year evaluation.
          Q    How'd you determine that?  Did
you count the number of times he went per
year?
          A    I determined it reading the
record and the frequency of times he's
following up, and the fact that he has a
peripheral neuropathy for which he's being
seen.  And I also talked to the patient to
ask how often he's seeing him.
          Q    What did you see in the records
as to the frequency?  Was it four to six
times a year?
          (Pause.)
          A    I'd have to go back at this
point and look at the record, but I felt,
based on -- basically looking at what records
I had and listening to the patient tell me
how frequently he's seen that -- that the
follow-up four to six times a year was
consistent with what the patient was saying.
          Q    Did you come to your conclusions
in this whole rehabilitation recommendations
section carefully?
          MR. BRUDNER:  Objection, form.
          THE WITNESS:  I believe so, yes.
BY MR. SULLIVAN:
          Q    Do you feel that you did a
thorough review of the medical records,
interview of the patient and have a
satisfactory exchange of information with the
doctors to give these recommendations?
          A    Yes, I do.
          Q    Do you -- did you sit down and
carefully consider what you'd learned and
come up with these recommendations in a
thoughtful and careful way?
          A    I absolutely do, and I think
it's consistent with the clinical practice
guidelines in each area.
          Q    All right.  This is the one
report that I see where you do not recommend
case management for the patient.  Can you
explain what's different here?
          (Pause.)
          Q    From the other five cases?
          A    Actually, in ... after I did the
clinical interview with Richard, and my
testing on Richard, despite the preexisting
psychological condition, I felt that, in his
particular instance, that he was capable of
self management training without having to
have the case management approach applied.  I
felt he was capable of dealing with it, where
I did not feel that way with the rest of
them.
          Q    What ... in particular, made you
feel that Mr. Unger was capable of dealing
with his diabetes care without case
management?
          (Pause.)
          A    I think part of it was just the
degree to which he was -- I felt he was
                    Page 58

1132 deutch raffa mtn tab 1 detuch dep.txt

managing his injectable post onset -- even
though he had a peripheral neuropathy post
onset, my discussions with him regarding the
fact that he had withdrawn himself largely
from driving, the fact that he appeared to be
trying to -- to comply with care, the extent
to which I felt he seemed to understand the
nature of the diabetes and what he had to do
to manage it to avoid further complications,
just coming out a clinical interview, I just
did not feeling willing to -- or maybe
"willing" is the wrong word -- I just did not
come away with the same sense as I did the
others, that he required that level of
support.  I felt he was capable of -- of
management, where I did not feel that way
with the others.  I should say, self
management, that I did not feel that way with
the others.
          Q     This is information you gleaned
from your interview with --
          A     And testing.
          Q     -- Mr. Unger?
          A     And testing.  I'm sorry.   And
testing.
          Q     This is information you gleaned
from your clinical interview with Mr. Unger
and the MMPI tests that you gave him?
          A     It was -- well, of course, there
is more testing than -- well, I guess it was
just the MMPI testing with him, wasn't it?
The answer is, yes.
              (Pause.)
          Q     Is it ... essentially a question
of your subjective sense as to whether the
patient in this case, Mr. Unger, could handle
his diabetes treatment without case
management?
          A     Well, I think you have to -- to
apply -- I'm clear there's a degree of
subjectivity to any time you're assessing an
individual from a mental health standpoint,
but it's a combination of the testing that
you do, your clinical judgment, and so you'd
use what objective data you have, coupled
with, you know, the subjective assessment
that comes through clinical interview.
              But even in interpreting
psychological testing, there's a degree of
subjectivity that goes into it.  So, to a
degree, I have to say, yes.
          Q     What was it in the results of
the MMPI tests that led you to feel more
comfortable with Mr. Unger handling his
diabetes treatment without case management
than with the other five plaintiffs?
              (Pause.)
          A     Well, my comments regarding
the -- the MMPI, and my thoughts about it
were that look, you know, he has a
long-standing chronic pain, chronic
disability disorder.  I recognized the
anxiety disorder and depression, and I felt

1132 deutch raffa mtn tab 1 detuch dep.txt

he had an adjustment disorder, but I didn't
feel that any of those were at a level that
would interfere with his thought processes
and make it difficult or -- or really
interfere with his ability to ... comply with
self care.

        I did not feel we were dealing
with ... with an individual who was, you
know, demonstrating problems like
schizophrenia, problems like bipolar
disorder, things that were really interfering
with thought patterns or thought processes.
And although, you know, I do recognize that
there are a lot of comorbidities and a lot
of -- and he was not -- not managing his
health well, that doesn't necessarily mean
that we had a pattern of problems from a
mental health standpoint, that prevented him
from learning how to manage.  And that was
the biggest issue for me.

        At least in my interview with
him, my personal feeling was, he had the
capacity to be taught disability management
techniques.  And so my focus was on educating
him as opposed to giving him a management
program, where he was going to be using --
having a case manager, basically, over him
throughout life expectancy.
    Q      That's why I asked the question
about the MMPI.  I was trying to isolate
where it is that you felt you saw the
difference.

        Is it -- is there something in
the results of the MMPI that makes you --
that you look at and makes you think he's
more capable of self management, or was it
more what you -- something you gleaned from
the clinical interview?
    A      Well, I think it's more what you
don't see in both the clinical interview and
the MMPI; that you don't see the bipolar
disorder; you don't see schizophrenia; you
don't see the ... the interference with
thought processes; you don't see the confused
thought disorder that comes with things like
manic depressive disorder, bipolar disorder
or schizophrenia that -- that you see with a
lot of the other patients that we're dealing
with here.  And ... you know, that was ...
part of what was important to me.

        But, really, a big part of it
absolutely came out of clinical interview,
just my sense in clinical interview that he
seemed to have ... a better capacity for self
management and understanding than the rest of
these patients that I was interviewing.
        MR. SULLIVAN:  Let's take a
    break.  I think that's it for --
        THE WITNESS:  Your lunches
    should be here.
        MR. SULLIVAN:  That's very nice
    of you to get us a lunch.
        (Luncheon recess at 12:13 p.m.
                                  Page 60

```
                    1132 deutch raffa mtn tab 1 detuch dep.txt
        to 12:52 p.m.)
                        * * * * *
              (Continued in Volume II.)
```

```
                CERTIFICATE OF OATH

STATE OF FLORIDA           )
                           )
COUNTY OF ORANGE           )

        I, the undersigned authority,
certify that PAUL M. DEUTSCH, PH.D.,
personally appeared before me and was duly
sworn.

        WITNESS my hand and official seal
this 15th day of October, 2008.


                    _____
                    Richard Castillo,
                    Registered Diplomate
                    Reporter
                    Notary Public, State
                    of Florida at Large
                    Comm. No. DD609499
                    Expiration:  02/25/11


              CERTIFICATE OF REPORTER
STATE OF FLORIDA              )
COUNTY OF ORANGE              )
I, RICHARD CASTILLO, Professional Court
Reporter and Notary Public, do hereby certify
that I was authorized to and did
stenographically report the deposition of
PAUL M. DEUTSCH, PH.D.; that a review of
the transcript was requested; and that the
foregoing transcript, pages 6 through 157, is
a true record of my stenographic notes.
        I FURTHER CERTIFY that I am not a
relative, employee, or attorney, or counsel
of any of the parties, nor am I a relative or
employee of any of the parties' attorney or
counsel connected with the action, nor am I
financially interested in the action.
        DATED this 15th day of October, 2008, at
Orlando, Orange County, Florida.

----------------------------------------
RICHARD CASTILLO
Registered Diplomate Reporter
Notary Public, State of Florida at Large
Commission No. DD609499
```

```
                  1132 deutch raffa mtn tab 1 detuch dep.txt
Expiration:   February 25, 2011

                        E R R A T A
           I, PAUL M. DEUTSCH, PH.D., do
hereby certify that I have read the foregoing
transcript of my deposition given on October
7, 2008, that, together with any additions or
corrections made therein, it is true and
correct.

Page      Line
----------------------------------------------
----------------------------------------------
----------------------------------------------
----------------------------------------------
----------------------------------------------
----------------------------------------------
----------------------------------------------
----------------------------------------------
----------------------------------------------
----------------------------------------------
----------------------------------------------
----------------------------------------------
Under penalties of perjury, I declare that I
have read the foregoing document and that the
facts stated in it are true.


_____                _____
   Date                   PAUL M. DEUTSCH, PH.D.
Job No. 958372
DATE: October 15, 2008
TO:   Paul M. Deutsch, Ph.D.
      10 Windsomere Way, Suite 400,
      Oviedo, Florida, 3276
IN RE:  Plaintiffs Vs. AstraZeneca
         Case No. 6:07-cv-15959, etc.

       Please take notice that on October 7,
2008, you gave your deposition in the
above-referred matter.  At that time, you did
not waive signature.  It is now necessary
that you sign your deposition.
       Please call our office at the
below-listed number to schedule an
appointment between the hours of 9:00
a.m. and 4:30 p.m., Monday through Friday at
the Esquire office located nearest you.
       If you do not read and sign the
deposition within a reasonable time, the
original, which has already been
forwarded to the ordering attorney, may be
filed with the Clerk of the Court.  If you
wish to waive your signature, sign your name
in the blank at the bottom of this letter and
return it to us.
            Very truly yours,

            RICHARD CASTILLO
            Registered Diplomate Reporter
            Esquire Deposition Services
            Orlando, Florida
            (407)426-7676
```

```
                  1132 deutch raffa mtn tab 1 detuch dep.txt
I do hereby waive my signature.


------------------------------
PAUL M. DEUTSCH, PH.D.

cc via transcript:  John Sullivan, Esquire
                    Russ Brudner, Esquire
                    Chris Coutroulis, Esquire

Job No. 958372
                  LAWYER'S NOTES
PAGE LINE
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
____ ____  _____
```