# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

IN RE: **Seroquel Products Liability Litigation**

**MDL DOCKET NO. 1769**

This document relates to:

| | |
|---|---|
| **Linda Guinn** | **6:07-cv-10291** |
| **Janice Burns** | **6:07-cv-15959** |
| **Richard Unger** | **6:07-cv-15812** |
| **Connie Curley** | **6:07-cv-15701** |
| **Linda Whittington** | **6:07-cv-10475** |
| **Eileen McAlexander** | **6:07-cv-10360** |
| ~~**Sandra Carter**~~ | ~~**6:07-cv-13234**~~ |
| ~~**Clemmie Middleton**~~ | ~~**6:07-cv-10949**~~ |
| ~~**Hope Lorditch**~~ | ~~**6:07-cv-12657**~~ |
| **David Haller** | **6:07-cv-15733** |
| ~~**Charles Ray**~~ | ~~**6:07-cv-11102**~~ |
| ~~**William Sarmiento**~~ | ~~**6:07-cv-10425**~~ |

---

## ASTRAZENECA'S MOTION TO EXCLUDE THE SPECIFIC-CAUSATION TESTIMONY OF PLAINTIFFS' CASE-SPECIFIC CAUSATION WITNESSES AND SUPPORTING MEMORANDUM OF LAW

Under Federal Rules of Evidence 401, 402, 403, 702, and 703, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny, defendants AstraZeneca LP and AstraZeneca Pharmaceuticals LP ("AstraZeneca") hereby move to exclude the specific-causation testimony of case-specific experts Brian Tulloch, M.D.; Jennifer B. Marks, M.D.; I. Jack Abramson, M.D.; Mitchell A. Young, M.D.; and Bruce D. Perry, M.D., that ingestion of Seroquel caused diabetes or increased glucose dysregulation in any of the remaining seven (7) Group One plaintiffs (hereinafter "Plaintiffs").[1]

---

[1] The specific medical causation opinions of these five case-specific witnesses are challenged herein. AstraZeneca's challenge to other non-medical causation opinions of these witnesses, and others, are set

## I.   INTRODUCTION

Under Florida law, causation is an essential element of each of Plaintiffs' claims.  To satisfy their causation burden, Florida law requires Plaintiffs to proffer competent admissible evidence proving that it is "more likely than not" that the tortiously induced ingestion of Seroquel was a substantial factor in producing their alleged injuries such that it can reasonably be said that "but for" the ingestion of Seroquel, Plaintiffs "would not have" suffered those injuries.  *Gooding v. University Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984); Fla. Std. Jury Inst. (Civil) 5.1(a), (b), & Note on Use; 5.2(a); *see also* AstraZeneca's Omnibus Legal Memorandum, at 1-3, 19-22.  Plaintiffs must prove "medical causation" – including both *general* medical causation (that the drug can cause the injuries alleged under the circumstances alleged); and *specific* medical causation (that ingestion of the drug is what did specifically cause that particular plaintiff's alleged injuries).  *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237, 1239 (11th Cir. 2005).  This type of complicated proof requires "expert testimony."  *Id.* at 1237.

Plaintiffs' causation experts first must "rule in" Seroquel as a potential cause of their alleged injuries (general causation), and then must also "rule out" other alternative causes (specific causation), in a scientifically reliable and methodologically valid way.  AstraZeneca separately challenges the general causation testimony of Plaintiffs' putative experts under *Daubert*.  But even if their efforts to "rule in" Seroquel could survive AstraZeneca's *Daubert* challenge, there can be no question that Plaintiffs' putative experts have utterly failed to engage in any scientifically valid *specific-causation* analysis to "rule out" the multiple other causes of Plaintiffs' alleged injuries.

---

forth in AstraZeneca's Motion To Exclude Non-Causation Expert Testimony Under Federal Rules Of Evidence 702, 401 And 403, filed concurrently herewith.

In an effort to meet their burden to prove specific medical causation, Plaintiffs offer the testimony of five putative experts: three psychiatrists (Drs. Abramson, Perry and Young), and two endocrinologists (Drs. Tulloch and Marks).[2]  Under governing Eleventh Circuit authorities, the specific-causation testimony of all of these witnesses is inadmissible under *Daubert* and Rule 702. *Daubert* requires Plaintiffs to establish that (1) their experts are properly *qualified* to give the testimony they purport to offer; (2) the experts' testimony is *scientifically reliable* and constitutes "scientific knowledge" instead of "subjective belief or unsupported speculation"; and (3) the witnesses' testimony is *relevant* in that it fits the substantive issues in the case and will assist the trier of fact. *United States v. Frazier*, 387 F.3d 1244, 1293-94 (11th Cir. 2004) (en banc). Plaintiffs cannot come close to satisfying their burdens here.

In fact, AstraZeneca confirmed at the depositions of these case-specific witnesses that they all have done exactly what *Daubert* and Eleventh Circuit authorities *prohibit*, and not done what the law *requires* specific-causation experts to do.  *See* pp. 12-50, *infra*.

First, all of Plaintiffs' case-specific experts admit that they base their specific-causation opinions on a mere temporal relationship between Plaintiffs' Seroquel ingestion and their alleged injuries.  But the Eleventh Circuit has held that admissible expert causation testimony cannot be based merely on "temporal relationship."  *McClain*, 401 F.3d at 1243; *accord Cartwright v. Home Depot U.S.A.*, 936 F. Supp. 900, 906 (M.D. Fla. 1996) (Baker, M.J.).

---

[2] Dr. Tulloch was offered to give specific-causation opinions for Plaintiffs Unger, Whittington, McAlexander and Haller, although he has since withdrawn his opinion as to Plaintiff McAlexander. Dr. Marks was offered to give specific-causation opinions for Plaintiffs Guinn, Burns and Curley. Dr. Abramson was offered to give specific-causation opinions for Plaintiffs McAlexander and Haller. Dr. Young was offered to give specific-causation opinions for Plaintiffs Unger and Whittington. And Dr. Perry was offered to give specific-causation opinions for Plaintiffs Guinn, Burns and Curley.

Second, all of Plaintiffs' case-specific experts failed to consider and then rule out each Plaintiff's pre-existing obesity, substantial overweight, and many other risk factors and alternative causes for their alleged diabetes injuries. But *Daubert* law is clear that specific-causation witnesses must consider and then "rule out" alternative causes to ensure they are not the "sole cause" of the plaintiff's alleged injury. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 760 n.31 (3d Cir. 1994) ("*Paoli II*"); *see also Haggerty v. Upjohn Co.,* 950 F. Supp. 1160, 1166 (S.D. Fla. 1996), *aff'd*, 158 F.3d 588 (11th Cir. 1998); *accord McClain*, 401 F.3d at 1242, 1252.

Third, none of Plaintiffs' case-specific witnesses even tried quantitatively to assess the relative contribution of each Plaintiff's many other pre-existing risk factors for diabetes. But the pertinent *Daubert* authorities hold that any specific-causation witness must quantitatively assess the relative contribution of alternative causes in a scientifically valid way if he or she purports to give any reliable opinion that the alleged cause in question "more likely than not" caused plaintiff's claimed injuries. *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 610 (D.N.J. 2002), *aff'd*, 68 Fed. Appx. 356 (3d Cir. 2003); *see also McDowell v. Brown*, 392 F.3d 1283, 1300-01 (11th Cir. 2004); *accord Frazier*, 387 F.3d at 1265.

Fourth, none of Plaintiffs' case-specific experts even offers an opinion that meets Florida's "more likely than not standard of causation" including its "but for" test, *Gooding*, 445 So. 2d at 1018 – *i.e.*, that it is "more likely than not" that the Plaintiff "would not have" suffered his or her diabetes injuries "but for" ingestion of Seroquel. *Id.* But Eleventh Circuit law is clear that Plaintiffs' specific-causation witnesses must meet the applicable state law substantive causation standards. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1320-21 (11th Cir. 1999).

Given that Plaintiffs cannot satisfy their burdens under *Daubert*, the Court, in performing its "special gatekeeping role," should exclude these experts' *unscientific*, *unreliable*, and

-4-

*irrelevant* specific-causation testimony. *Id.* at 1310. The specific-causation opinions of Plaintiffs' three psychiatrists must be excluded for the additional reason that (as two admitted) they are *not qualified* to render affirmative causation opinions about what caused anyone's diabetes, much less competent specific-causation opinions sufficient to satisfy Plaintiffs' burden of proof. *See Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1341 (11th Cir. 2003).

Finally, all five of Plaintiffs' specific-causation witnesses compound the errors in their unscientific and unreliable causation opinions by relying on little more than cursory review of *insufficient medical facts* about Plaintiffs – including misleading summary charts of cherry-picked data *prepared by Plaintiffs' counsel* and spoonfed to these putative experts, which is impermissible. *See Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1086-87 (D. Kan. 2002), *aff'd*, 356 F.3d 1326 (10th Cir. 2004); *In re TMI Litig.*, 193 F.3d 613, 698 (3d Cir. 1999); *see also* Fed. R. Evid. 702 (expert opinion must be based on "sufficient facts"); *United States v. City of Miami*, 115 F.3d 870, 873 (11th Cir. 1997). When confronted with the undisputed facts of Plaintiffs' full medical histories, the witnesses all retreated and qualified their opinions, and one actually *withdrew* his causation opinion in one case. *See McClain*, 401 F.3d at 1240 (excluding testimony of expert who "left a trail of equivocation" that "dramatically dilutes the value of [his] conclusions, which, in turn, impugns his methodology").

Any one of the foregoing *Daubert* failures is an independent reason for exclusion of an expert's specific causation testimony. In combination, these deficiencies compel the conclusion that the specific-causation opinions of these witnesses are based on scientifically unreliable bases and methodologies, and amount to nothing but "*ipse dixit*" and "subjective speculation that masquerades as scientific knowledge." *McClain*, 401 F.3d at 1244-45.

-5-

While these experts' irrelevant and scientifically unreliable specific-causation opinions would be improper and excluded in any litigation, they are particularly inappropriate in this litigation, which involves diabetes in chronically overweight and/or obese Plaintiffs.  Science has established, and Plaintiffs' experts have admitted, that long-term obesity and overweight is the overwhelming modifiable cause of diabetes.[3]  In fact, it is one of the largest increased risks known to modern epidemiology,[4] greater than even the increased risk of lung cancer that heavy smokers face compared to non-smokers.  Diabetes also has many other generally accepted risk factors – including pre-existing glucose impairment; family history; increased age; sedentary lifestyle; poor diet; hypertension and hyperlipidemia; steroid usage and smoking; ethnicity; and more.  Yet Plaintiffs' specific-causation witnesses do not even purport to have considered and ruled out these many other risks as the cause of Plaintiff's injuries entirely apart from Seroquel.  When pressed to consider other risk factors at their depositions, many of the experts *admitted* that *it is more likely than not that Plaintiffs' pre-existing obesity and other risk factors – not Seroquel – caused Plaintiffs' diabetes and related injuries.*[5]

Accordingly, as explained further below, the specific-causation opinions of all of Plaintiffs' case-specific experts should be excluded under Rule 702 and *Daubert*.

---

[3] *See, e.g.*, Deposition of Brian R. Tulloch, M.D., FRCP, FACP ("Tulloch Dep") at 131:7-15; 331:3-7 (Notice of Filing, filed concurrently herewith ("NF"), Tab 1); Deposition of Jennifer B. Marks, M.D. ("Marks Dep.") at 246:13-17 (NF Tab 2).

[4] *See, e.g.*, Tulloch Dep. at 132:24-133:12 ("Q. And that's a big whopping risk, right?  A. We're in agreement.") (NF Tab 1).

[5] *See, e.g.*, Marks Dep. at 247:16-25 (combination of long-term obesity and family history made it "more likely than not" that Plaintiff Guinn would develop diabetes) (NF Tab 2).

## II.   BACKGROUND:  DIABETES AND ITS CAUSES

The core scientific facts about diabetes are undisputed, as Plaintiffs' experts concede.[6]

Diabetes is an epidemic in this country.[7]  People with severe mental illness have an even higher rate of diabetes than the general population.[8]  The development of diabetes is not an abrupt event, but rather represents a gradual progression extending over 10 to 12 years – from normal glucose tolerance, to impaired glucose tolerance, and then sometimes to diabetes (*i.e.*, type 2 diabetes).[9]  The actual onset of diabetes typically predates clinical diagnosis by many years, and a patient diagnosed with diabetes likely had sub-clinical disease with few or no symptoms for a decade prior to diagnosis.[10]  In the United States, at least one quarter of all cases of diabetes are undiagnosed, amounting to over 6 million individuals.[11]

The medical specialty for diabetes is "endocrinology."[12]  Endocrinologists apply generally accepted diagnostic criteria for diabetes.  Specifically, it is generally accepted in the

---

[6] These undisputed scientific facts are also discussed in the Declaration of Jeffrey Koplan, M.D., M.P.H. ("Koplan Decl.") (NF Tab 9), who is the former director of the Center for Disease Control ("CDC") and a world-renown expert in health issues related to obesity, including diabetes.

[7] Plaintiffs' generic witness, Dr. Wirshing, confirmed the epidemic nature of diabetes.  Deposition of William C. Wirshing, M.D. ("Wirshing Dep.") at 29:10-21 ("Epidemic is way too small a word for what we're undergoing.") (NF Tab 3); *accord* Koplan Decl. at ¶ 8 (NF Tab 9).

[8] Tulloch Dep. at 23:12-24:18 (NF Tab 1).

[9] *Id.* at 81:11-82:9 (NF Tab 1); *accord* Koplan Decl. at ¶ 12 (NF Tab 9).  There are two broad categories of diabetes mellitus: type 1 and type 2.  Type 1 diabetes, which typically develops in children or young adults, arises from autoimmune destruction of the pancreatic beta cells that produce insulin, and requires exogenous insulin therapy.  Type 2 diabetes, which is the focus of this litigation, is characterized by insulin resistance in target tissues and beta cell dysfunction.  Insulin resistance simply means that body cells do not respond appropriately to insulin, requiring higher levels of insulin to stimulate the cells to take up glucose.  The presence of insulin resistance increases the demand on the pancreatic beta cells to produce insulin; type 2 diabetes occurs when the beta cells of the pancreas cannot meet this demand.  Type 2 diabetes accounts for 90-95% of all cases of diabetes.  *See* Koplan Decl. at ¶¶ 10-11 (NF Tab 9).  This motion uses the term "diabetes" to refer to type 2 diabetes mellitus.

[10] Koplan Decl. at ¶ 12 (NF Tab 9); Tulloch Dep. at 81:21-82:9 (NF Tab 1); *see also* Marks Dep. at 90:14-20 (NF Tab 2).

[11] Tulloch Dep. at 82:10-17 (NF Tab 1); Wirshing Dep. at 31:6-17 ("at least" 50%) (NF Tab 3).

[12] Deposition of Mohan Nair, M.D. ("Nair Dep.") at 101:6-14 (NF Tab 4).

scientific community that diabetes is properly diagnosed if on *two* occasions a patient has (1) a fasting blood glucose test result greater than 126 mg/dL; (2) a random blood glucose test result greater than 200 mg/dL and symptoms of diabetes; or (3) a blood glucose test result two hours after an oral-glucose challenge greater than 200 mg/dL.[13]   Individuals with fasting blood-glucose concentrations between 100 and 125 mg/dL have what is called impaired fasting glucose or "prediabetes"[14] which puts a person at a significant risk for developing diabetes.[15]

The medical community generally recognizes that diabetes has *many* risk factors.[16]  The single most significant, overwhelming risk factor for diabetes is ***chronic overweight or obesity,***[17] which is itself at epidemic proportions in this country.  The increased risk of diabetes posed by long-term obesity is one of the largest associations known to modern epidemiology – greater than the enormous increased risk of lung cancer heavy smokers face as compared to non-smokers.[18]  The risk of diabetes increases across the range of Body Mass Index or "BMI,"[19] such that the diabetes risk in an overweight middle-aged woman with a BMI over 35 is *93.2 times* greater than in a woman with a BMI below 22.5.[20]  Particularly important in these cases, chronic overweight or obesity – not short-term weight gain – causes the enormous increased risk of

---

[13] Tulloch Dep. at 66:18-69:6; 70:23-71:3 (NF Tab 1).

[14] *Id.* at 78:15-79:25 (NF Tab 1).

[15] *Id.* at 103:10-105:25; 114:3-11; 341:12-22 (NF Tab 1).

[16] *See id.* at 43:8-44:3 (adopting Cleveland Clinic list of diabetes risk factors) (NF Tab 1); *accord* Koplan Decl. at ¶¶ 28, 39-48 (NF Tab 9).

[17] Tulloch Dep. at 131:7-15 (NF Tab 1); Marks Dep. at 246:13-17 (NF Tab 2).

[18] Tulloch Dep. at 133:7-10 (admitting that relative risk of diabetes from morbid obesity is "larger than risks" of lung cancer from smoking) (NF Tab 1); *accord* Koplan Decl. at ¶ 28 (NF Tab 9).

[19] BMI is an anthropometric measure of body mass, defined as weight in kilograms divided by height in meters squared. A BMI between 25.0 and 29.0 is considered overweight, and a BMI over 30.0 defines obesity.  Koplan Decl. at ¶ 28 n.14 (NF Tab 9).

[20] Tulloch Dep. at 131:20-24 (NF Tab 1); *accord* Koplan Decl. at ¶ 28 (NF Tab 9).

diabetes observed in overweight and obese individuals.[21]  Thus, weight gain over a period of a few years does not alter diabetes risk, nor does additional weight gain in people who are already significantly obese.[22]

Moreover, it is axiomatic that the potential causes of any individual's weight gain are both enormous in number and individual in nature.[23]  But the most common cause of weight gain across individuals is overeating combined with physical inactivity.[24]  In addition, weight fluctuations are common in persons with obesity, and in persons with psychiatric disorders,[25] who already are more likely than others to be overweight or obese.[26]

In addition to chronic overweight/obesity, other generally recognized risk factors for diabetes include:[27]

- **Family History of Diabetes**:  Having relatives – especially first degree – with diabetes is a significant risk factor for developing diabetes.  Individuals who have a family history of diabetes have at least a 2.0-2.3 times the risk of developing diabetes than those with no family history of the disease.

- **Increased Age**:  The prevalence of diabetes increases dramatically with age.  Prevalence surveys show a relative risk of 4.15 for ages 40-59 and 9.15 for those over 60 years-old, as compared to ages 20-39.

- **Hypertension**:  High blood pressure is a known risk factor for diabetes, creating an approximately 2.5-fold increased risk of developing diabetes.  Seventy-three percent of adults with diabetes have blood pressure greater than 130/80 mm Hg or are on treatment for

---

[21] Marks Dep. at 489:1-17 (NF Tab 2); *accord* Koplan Decl. at ¶¶ 29, 36-37 (NF Tab 9).

[22] Koplan Decl. at ¶¶ 36-37 (NF Tab 9).  Dr. Marks admitted that she knew of no scientific literature which showed that short-term weight gain was a risk factor for diabetes. Marks. Dep. at 336:16-20; 471:24-472:17; 489:1-17 (NF Tab 2).

[23] Marks Dep. at 489:19-23 (NF Tab 2); *see also* Deposition of Bruce D. Perry, M.D., Ph.D. ("Perry Dep.") at 138:2-16 (NF Tab 5); Deposition of Israel Jack Abramson, M.D. ("Abramson Dep.") at 170:9-20 (NF Tab 6); *accord* Koplan Decl. at ¶ 34 (NF Tab 9).

[24] Tulloch Dep. at 356:10-25 (NF Tab 1); Wirshing Dep. at 29:22-25 ("We're eating too much.") (NF Tab 3); *accord* Koplan Decl. at ¶ 34 (NF Tab 9).

[25] Perry Dep. at 311:18-22 (NF Tab 5); Tulloch Dep. at 551:14-552:9 (NF Tab 1).

[26] Wirshing Dep. at 21:16-20; 23:25-24:22 (NF Tab 3); *accord* Koplan Decl. at ¶ 35 (NF Tab 9).

[27] In addition to the concessions of Plaintiffs' specific-causation witnesses discussed in the text, the risk factors set forth herein are discussed in the Koplan Declaration at ¶¶ 39-48 (NF Tab 9).

hypertension.  Forty-eight percent to sixty-seven percent of persons newly diagnosed with diabetes have hypertension.

- ***Sedentary Lifestyle*:** Physical inactivity is a generally accepted risk factor for diabetes. Inactive adults are approximately 1.6 times more likely to develop diabetes.

- ***Poor Diet*:** A low-fiber diet with a high glycemic index has been associated with an increased risk of diabetes.  A combination of physical inactivity and a diet containing red meat, processed meat, french fries, high-fat dairy products, refined grains, and sweets and desserts significantly increases diabetic risk.

- ***Smoking/Drug Abuse*:**  Smoking increases the risk of diabetes independent of other risk factors.  Recent data suggest that illegal drug use also may accelerate the onset of diabetes.

- ***Severe Mental Illness*:** The prevalence of diabetes in those with schizophrenia or other serious mental illness has been reported between 2-to-4 times higher than the general population.

- ***Steroids and Certain Prescription Drugs*:**  Steroids (such as prednisone) and a number of prescription medications used to treat common conditions (such as thiazide diuretics and beta-blockers) have been associated with hyperglycemia and diabetes.

- ***Ethnicity*:**  Ethnicity increases diabetes risk for many minority groups.  According to the CDC, the age-adjusted prevalence of diabetes in the U.S. for those 20 years or older was 14.2% among American Indians and Alaska Natives, 11.8% among non-Hispanic African-Americans, 10.4% among Hispanic/Latino Americans, and 6.6% for non-Hispanic whites.

Given the huge background rate of diabetes and obesity generally, and the fact that Plaintiffs admittedly have multiple pre-existing risk factors for diabetes, any scientifically credible specific-causation opinions in these cases must account for the many other reasons Plaintiffs contracted diabetes completely apart from any Seroquel ingestion.  *See, e.g., McClain*, 401 F.3d at 1243.  As shown below, Plaintiffs' specific-causation witnesses failed to do so, and employed no valid methodology or reasoning in support of their wholly unscientific and unreliable specific-causation opinions.

## III.   ARGUMENT

### A.   *Daubert* Requires This Court To Act As A "Gatekeeper" And To Ensure That Plaintiffs Satisfy Their Burdens Of Establishing The Admissibility Of The Specific-Causation Opinions Of Their Case-Specific Experts

Plaintiffs' case-specific witnesses render unqualified, methodologically flawed and

-10-

irrelevant specific-causation opinions that fall far short of satisfying the "exacting standards of

reliability" established by the Supreme Court in *Daubert* and codified in Federal Rule of

Evidence 702. *See Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). *Daubert* charges this

Court with a strict gatekeeping duty "to ensure that speculative, unreliable expert testimony does

not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir.

2002); *Cayenta Canada, Inc. v. Orange County, Fla. Bd. of Cty. Comm'rs*, 2002 WL 34373972,

*4 (M.D. Fla. Nov. 20, 2002) (Conway, J.); *see also Rink v. Cheminova, Inc.*, 400 F.3d 1286,

1291 (11th Cir. 2005). "Rulings on admissibility under *Daubert* inherently require the trial court

to conduct an exacting analysis of the proffered expert's methodology." *McCorvey*, 298 F.3d at

1257. *Daubert* guarantees that any expert "'employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field.'" *McClain*, 401

F.3d at 1237 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

   "The importance of *Daubert*'s gatekeeping requirement cannot be overstated" given the

"talismanic significance" that expert testimony can have "in the eyes of lay jurors." *United*

*States v. Frazier*, 387 F.3d 1244, 1260, 1263 (11th Cir. 2004) (en banc); *see also Allison v.*

*McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999) (*Daubert*'s "special gatekeeping

role" is critical because juries are "less equipped than the judge to make reliability and relevance

determinations and more likely than the judge to be awestruck by the expert's mystique"). A

district court "abuses its discretion by failing to act as a gatekeeper." *McClain*, 401 F.3d at 1238.

   This Court must engage in "a rigorous three-part inquiry" that requires Plaintiffs to show

by a preponderance of the evidence that: (1) each expert is qualified; (2) the expert's

methodology and opinions are reliable; and (3) the proposed testimony is relevant and assists the

trier of fact. *Frazier*, 387 F.3d at 1260. On any *Daubert* motion, "'the burden of establishing

qualification, reliability and helpfulness rests on the proponent of the expert opinion.'" *McClain*,

401 F.3d at 1238 (quoting *Frazier*, 387 F.3d at 1260).

**B.     Plaintiffs Cannot Come Close To Satisfying Their Burdens To Prove That The Specific-Causation Testimony Of Their Five Case-Specific Experts Survives Scrutiny Under *Daubert***

**1.     As A Threshold Matter, Plaintiffs' Three Psychiatrists Are Not Qualified To Give Diabetes Causation Opinions**

The first requirement to expert admissibility is qualification:  Any expert must be

"'qualified to testify competently regarding the matters he [or she] intends to address.'" *Medina*

*v. Louisville Ladder, Inc.*, 496 F. Supp. 2d 1324, 1327 (M.D. Fla. 2007) (Conway, J.) (quoting

*United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005)).

The specific-causation testimony here involves a complex endocrinologic determination

of what caused Plaintiffs' alleged diabetes and diabetes-related injuries.  The relevant scientific

field is *endocrinology*.  Yet, Plaintiffs purport to offer the specific-causation testimony of three

*psychiatrists* (Drs. Abramson, Perry and Young) who are not qualified to give their proposed

diabetes causation opinions.  In fact, two of them admitted at their depositions that they are *not*

experts in diabetes causation.[28]  The third claimed to be qualified to give diabetes-causation

opinions merely because he has a medical degree,[29] but the law is clear that "merely possessing a

medical degree is not sufficient to permit a physician to testify concerning any medical-related

issue." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001).[30]  Apart

---

[28] Abramson Dep. at 141:4-7 (NF Tab 6); Deposition of Mitchell Young, M.D. ("Young Dep.") at 24:18-20 (NF Tab 7).

[29] Perry Dep. at 33:21-34:4 (NF Tab 5).

[30] Courts have repeatedly applied this principle to exclude causation testimony from medical doctors who were not qualified to give the particular opinions they proposed to offer. *Sutera v. Perrier Group of Am. Inc.*, 986 F. Supp. 655, 667 (D. Mass. 1997); *Whiting v. Boston Edison Co.*, 891 F. Supp. 12, 24 (D. Mass. 1995); *accord Baker v. Smith & Nephew*, 1999 WL 1129650, *3 (N.D. Ga. Sept. 30, 1999).

from any concessions, it is plain that *these particular psychiatrists* are unqualified to opine about

diabetes-causation as required to satisfy Plaintiffs' burden of proof:  They all have no specific

education or experience in endocrinology; they have not testified previously about what caused a

person's diabetes, nor tried to make such a determination before; they have never, or rarely, even

diagnosed whether a person has diabetes; they belong to no diabetes-related professional

associations; they hold no certifications in the relevant area of medicine; they have written no

scientific publications on diabetes or its causes; they have not conducted scientific studies in the

relevant field; and they have not taught any courses in endocrinology.  Thus, the testimony of

these psychiatrists should be excluded because they are *not* "qualified" to render opinions about

what specifically caused Plaintiffs' alleged diabetes injuries.  *Hudgens*, 328 F.3d at 1341;

*Medina*, 496 F. Supp. 2d at 1327; *see also Copley v. Smith & Nephew, Inc.*, 2000 WL 223404,

*3-4 (S.D. Tex. Feb. 2, 2000) (anesthesiologist not qualified to opine on orthopedic causation

issues).[31]

> ### 2.     The Specific-Causation Testimony Of Plaintiffs' Five Case-Specific Experts Is Not The Product Of Scientifically "Reliable" Principles, Methodologies, And Analyses

Plaintiffs' five specific-causation witnesses share the same methodological and analytical

errors that require the exclusion of their causation opinions as scientifically *unreliable*.  They all

relied merely on temporal associations.  They all failed to consider and then rule out other causes

---

[31] While plaintiffs two remaining witnesses, Drs. Tulloch and Marks, are endocrinologists, that does not mean that their testimony is automatically admitted: Qualifications "are by no means a guarantor of reliability" and are not sufficient, by themselves, to justify the admission of any expert's proffered testimony. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341-42 (11th Cir. 2003) ("One may be considered an expert but still offer unreliable testimony."); *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir. 2004) ("'a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method'") (citation omitted).

of Plaintiffs' alleged diabetes injuries.  They all failed to quantify the relative contribution of such other causes.  And they all failed to obtain sufficient medical facts and data to render any scientifically reliable causation opinions.  Simply put, their specific-causation opinions are precisely the sort of speculative "*ipse dixit*" testimony that must be excluded under *Daubert* and its progeny.  *McClain*, 401 F.3d at 1243-44; *Frazier*, 387 F.3d at 1261.

The deposition testimony of these putative specific-causation experts reveals that their challenged opinions amount to nothing "more than subjective belief or unsupported speculation," and certainly not the sort of reliable "scientific knowledge" that is required.  *Daubert*, 509 U.S. at 590.  Indeed, none of their opinions "derive from the scientific method," nor do any of them have the requisite "good grounds and appropriate validation [to] support [them]."  *McClain*, 401 F.3d at 1237 (citing *Daubert*, 509 U.S. at 590).  Plaintiffs apparently hope this Court will just take their witnesses at their word that their causation opinions are based on legitimate methodologies and supported by good grounds – but the law is clear that any "expert's assurances that he has utilized generally accepted scientific methodology are insufficient." *Id.* at 1244.  Even though proponents of expert testimony must prove "the reliability of each of [the] steps" in any expert's analysis and opinions, Plaintiffs' specific-causation experts here make fundamental errors, missteps, and legally illegitimate assumptions, at *every step of the way.  Id.* at 1245 (reaffirming that "'*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible*'") (emphasis in original) (quoting *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)).

In fact, everything that courts – including the Eleventh Circuit – have clearly held that a specific-causation witnesses *cannot* do is **all** that these "experts" purport to have done here.

**a.   Plaintiffs' Specific-Causation Witnesses All Improperly Rely
On Mere Temporal Relationships, Which The Law Prohibits**

To the extent these witnesses used any "methodology" at all, it is their explicit reliance

on *temporal relationships*. They all admitted this at their depositions. *See infra* at 26-49. "It is

well settled that a causation opinion based solely on a temporal relationship is not derived from

the scientific method and is therefore insufficient to satisfy the requirements of Fed. R. Evid.

702." *Cartwright v. Home Depot U.S.A.*, 936 F. Supp. 900, 906 (M.D. Fla. 1996) (Baker, M.J.).

As the Eleventh Circuit held with crystal clarity in 2005 (before the creation of this MDL):

> Proving a *temporal* relationship between taking [defendant's drug] and the onset
> of symptoms does not establish a *causal* relationship. In other words, simply
> because a person takes drugs and then suffers an injury does not show causation.
> Drawing such a conclusion from temporal relationships leads to the blunder of the
> *post hoc ergo propter hoc* fallacy.
>
> The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence.
> It literally means "after this, because of this." Black's Law Dictionary 1186 (7th
> ed.1999). It is called a fallacy because it makes an assumption based on the false
> inference that a temporal relationship proves a causal relationship.

*McClain*, 401 F.3d at 1243 (emphases in original); *id.* at 1254 (expert's use of mere temporal

relationship improperly "assum[es] what the witness is trying to prove"); *accord Allison*, 184

F.3d at 1321 (rejecting specific causation expert's reliance on "coincidence of temporality");

*Jazairi v. Royal Oak Apt. Assocs., L.P.*, 217 Fed. Appx. 895, 898 (11th Cir. 2007) (excluding

specific-causation testimony premised on "temporal proximity and anecdotal evidence").[32]

---

[32] These witnesses' "methodology" of relying on temporal coincidence cannot remotely satisfy the
*Daubert*-related factors identified by courts for evaluating scientific testimony. Indeed, an opinion
derived from the timing of any plaintiff's Seroquel ingestion and either weight gain or diabetes diagnosis
(1) has not and cannot be tested; (2) has not been subjected to peer review and publication; (3) has no
known or potential rate of error; (4) and clearly is not generally accepted by the scientific community.
*Daubert*, 509 U.S. at 592-94; *Rink*, 400 F.3d at 1292; *Frazier*, 387 F.3d at 1262. One of Plaintiffs'
generic experts (Dr. Wirshing) himself stressed that obviously *no temporal association* can form the basis
of any scientifically legitimate specific-causation opinion. *See* Wirshing Dep. at 66:23-67:4 (NF Tab 3).

Plaintiffs' case-specific witnesses admitted at their depositions that their specific-causation opinions are *based merely on temporal relationships* – with some relying on alleged temporal relationships between a plaintiff's Seroquel ingestion and diabetes diagnosis,[33] and others on alleged temporal relationships between a plaintiff's weight gain when taking Seroquel and a subsequent diabetes diagnosis.[34]  The witnesses' temporality-based opinions here are simply "not derived from the scientific method," *Cartwright*, 936 F. Supp. at 906, and none of them could articulate any scientifically valid *methodology* upon which they relied in arriving at their *ipse dixit* specific-causation opinions here.[35]  Their fatally flawed and methodologically infirm specific-causation opinions must be excluded under *Daubert* and Eleventh Circuit law.

> **b.    Plaintiffs' Specific-Causation Witnesses Have Not Ruled Out Alternative Causes Or Even Tried To Quantify Their Relative Role, Which The Governing Law Requires Them To Do**

Plaintiffs' specific-causation witnesses did not even try to *rule out* alternative causes, even though the law is clear that they must.  *See Haggerty v. Upjohn Co.,* 950 F. Supp. 1160, 1166 (S.D. Fla. 1996) (excluding testimony of expert who "failed to eliminate many possible causes"), *aff'd*, 158 F.3d 588 (11th Cir. 1998); *see also Turner v. Iowa Fire Equip. Co.*, 229 F.3d

---

[33] Young Dep. at 100:9-101:12; 80:19-21 (NF Tab 7).

[34] Tulloch Dep. at 541:7-17 (NF Tab 1); Marks Dep. at 132:12-24 (NF Tab 2); Perry Dep. at 19:14-23 (NF Tab 5).  As discussed below, some of the witnesses actually recanted even their reliance on temporal relationships between Seroquel ingestion and weight gain when confronted with the undisputed facts in each case, then admitted that they could not testify that Seroquel caused Plaintiffs to experience any weight gain.

[35] Plaintiffs' experts cannot support their methodologically infirm reliance on mere temporal coincidence by making the vague suggestion that Seroquel has been "associated with" or is "a risk factor" for diabetes or weight gain.  *See Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 840, 846 (W.D. Tex. 2005) ("Simply because each of the possible causes preceded the cancer and therefore could have caused the cancer does not mean that they did cause the cancer. ... The fact that exposure to ionizing radiation from uranium may be a risk factor for cancer does not make it an actual cause simply because cancer developed."); *see also Paoli II*, 35 F.3d at 761 n.31 ("Testimony that PCBs increased the risk that plaintiffs would contract the injuries that they contracted does not show that PCBs were a substantial factor in those injuries.").

1202, 1209 (8th Cir. 2000) (affirming exclusion of specific causation testimony where expert "failed to 'rule out' all other possible causes"); *Paoli II*, 35 F.3d at 763 (same); *Claar v. Burlington Northern R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) (same); *accord Phillips v. American Honda Motor Co., Inc.*, 238 Fed. Appx. 537, 541 (11th Cir. 2007) (affirming exclusion of engineering testimony absent showing that expert "ruled out" alternative causes of temperature variation); *McCorvey*, 298 F.3d 1256-57 (affirming exclusion of causation opinion that "did not consider or test" alternative causes).[36]

None of these witnesses used the specific-causation methodology of differential etiology, *i.e.*, the "process of identifying external causes by a process of elimination." *McClain*, 401 F. 3d at 1252. This fundamental methodological deficiency is critical. Indeed, the failure of Plaintiffs' specific-causation witnesses to evaluate and then *rule out* alternative causes is fatal to the reliability and admissibility of their opinions, because "it means that these alternative causes may have been the *sole causes* of plaintiffs' injuries." *Paoli II*, 35 F.3d at 760 n.31 (emphasis added). Where, as here, "other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the 'more likely than not' threshold for proving causation may not be met." *Cavallo v. Star Enterprise*, 892 F. Supp. 756, 771 (E.D. Va. 1995), *aff'd on this ground, rev'd on other grounds*, 100 F.3d 1150 (4th Cir. 1996); *see also Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 683 (W.D. Tex. 2002).

---

[36] "Critical to establishing specific causation is exclusion of other possible causes of the symptoms." *Mancuso v. Consolidated Edison Co. of New York*, 967 F. Supp. 1437, 1446 (S.D.N.Y. 1997); *see also Diaz v. Johnson Matthey, Inc.*, 893 F. Supp. 358, 376 (D.N.J. 1995) ("A meaningful diagnosis of specific causation must specifically negate other possible causes."); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1485 n.2 (D.V.I. 1994) ("[W]hen an expert witness does not exclude potential alternative causes, the potential for confusion among jurors is evident and is an independent basis for exclusion.").

The failure of Plaintiffs' specific-causation witnesses to rule out other potential causes is particularly egregious here, given that these experts themselves admit that each Plaintiff had *numerous* pre-existing risk factors for diabetes before they ever took Seroquel, including the *massive* increased risk from the Plaintiffs' pre-existing obesity and overweight.[37]  This Court should follow the lead of many other courts applying *Daubert* to exclude specific-causation testimony where, as here, the "record is replete with evidence, including [the expert's] own admissions, that [the plaintiff's alleged injury] could be attributable to medical conditions other than" defendant's alleged misconduct.  *Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 779, 787 (D.N.J. 1996), *aff'd sub nom. Valley Bus. Forms v. Graphic Fine Color, Inc.*, 118 F.3d 1577 (3d Cir. 1997); *accord Farris v. Intel Corp.*, 493 F. Supp. 2d 1174, 1185 (D.N.M. 2007).

Given the host of admitted alternative risk factors for each Plaintiff's alleged diabetes injuries, the specific-causation opinions of these witnesses must be excluded because none of them even tried quantitatively to assess the role of alternative risk factors, as required to support any scientifically credible and reliable "more likely than not" opinion regarding Seroquel.  *McDowell v. Brown*, 392 F.3d 1283, 1300-01 (11th Cir. 2004) (excluding specific-causation testimony from experts who failed to "mete out" various contributors or "quantify" their effect on plaintiff's injuries); *Magistrini*, 180 F. Supp. 2d at 609-10 (same); *accord Frazier*, 387 F.3d at 1265.  Indeed, none of the witnesses could identify any scientifically reliable or valid methodology that they used in arriving at their specific-causations opinions for Plaintiffs.

---

[37] *See, e.g.*, Marks Dep. at 266:21-268:5 (NF Tab 2); Tulloch Dep. at 540:20-541:23 (NF Tab 1).  Indeed, Plaintiffs' generic expert, Dr. Wirshing, expressly confirmed that to analyze weight-gain causation for an individual patient, a doctor would "have to look at other factors that might be contributing to it." Wirshing Dep. at 107:22-108:22 (NF Tab 3).

Even a cursory review of the record reveals that these witnesses have failed to employ any methodology at all to *rule out* the many other possible causes of Plaintiffs' injuries here. *See Paoli II*, 35 F.3d at 763 (excluding testimony of specific causation expert who "provided no reason to explain" why he dismissed specific alternative causes identified by defendant); *accord McCorvey*, 298 F.3d at 1256-57.[38] They do not offer even a conclusory assertion that they ruled out other causes, which would still be insufficient. *Mancuso*, 967 F. Supp. at 1457 n.24 (criticizing expert report that "merely recites in an unacceptably cursory manner that [expert] has 'ruled out to his satisfaction all reasonable causes for [plaintiff's] neurological impairments with the exception of environmental toxins' which he is 'still investigating'"); *McClain*, 401 F.3d at 1253 ("an expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient").

At most, Plaintiffs' specific-causation witnesses assert through their own *ipse dixit* that every risk factor should be considered an actual cause and contributing factor for each Plaintiff's diabetes, without ever attempting to assess the relative contribution of the many potential causes in any scientifically valid and quantitative manner. But courts applying *Daubert* have repeatedly excluded specific-causation testimony of experts who merely "declare[d] all possible causes to be actual causes and but-for causes," and this Court should do the same here. *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 840, 845-46 (W.D. Tex. 2005) ("[s]imply because each of the possible causes preceded the [injury] and therefore could have caused the [injury] does not

---

[38] *See also In re Breast Implant Litig.*, 11 F. Supp. 2d 1217, 1234 (D. Colo. 1998) (excluding specific causation testimony where doctor "offers no tested or testable theory to explain how, from his limited information, he was able to eliminate all other potential causes of [plaintiffs'] conditions"); *Feit v. Great-West Life & Ann. Ins. Co.*, 460 F. Supp. 2d 632, 640 (D.N.J. 2006) (excluding testimony of expert who did "not describe any methodology for eliminating other potential causes"), *aff'd*, 271 Fed. Appx. 246 (3d Cir. 2008) (recognizing expert's failure "to rule out"); *Stover v. Eagle Prods., Inc.*, 1996 WL 172972, *11 (D. Kan. 1996) ("[A]n explanation for discounting those alternative causes is critical to evaluating the methodology used in reaching [expert's] ultimate conclusion.").

mean that they did cause the [injury]"); *id.* at 840 ("A specific causation expert cannot merely

assert that every risk factor is a cause, but must provide a scientific basis to identify the most

likely cause."); *accord Paoli II*, 35 F.3d at 760 n.31; *McClain*, 401 F.3d at 1243.  That sort of

unscientific reasoning is particularly fatal here where the experts admit that pre-existing obesity

is the overwhelming cause of diabetes.[39]  *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452,

470 (E.D. Pa. 2008) (presence of a risk factor is not a sufficient basis for ruling out another

cause, particularly where most cases have that other cause); *see also Paoli II*, 35 F.3d at 763-64.

By simply "declaring all possible causes to be actual causes," these witnesses have engaged in a

"prime example of false-cause reasoning" that itself warrants the exclusion of their specific-

causation opinions under *Daubert*.  *Cano*, 362 F. Supp. 2d at 846.

> ### c.    Plaintiffs' Specific-Causation Experts Have No Reliable Basis For The Speculation That Seroquel "Accelerated" Diabetes in Any Plaintiff

While failing to provide scientifically reliable support for their *ipse dixit* opinions, some

of these witnesses vaguely alluded to the notion that Seroquel somehow "accelerated" Plaintiffs'

development of diabetes.[40]  Indeed, they tried to cloak their opinions in scientifically unreliable

analogies and phrases, such as the "straw that broke the camel's back."[41]  Any such acceleration

opinions must be excluded under *Daubert*.  Indeed, these utterly speculative opinions are

indistinguishable from the sort of unscientific guesswork that the Eleventh Circuit and Supreme

---

[39] *See, e.g.*, Tulloch Dep. at 131:4-15 (NF Tab 1); Marks Dep. at 246:13-17 (NF Tab 2).

[40] Tulloch Dep. at 546:17-548:6 (NF Tab 1); Marks Dep. at 358:3-8; 504:14-25 (NF Tab 2).

[41] *See, e.g.*, Tulloch Dep. at 119:20-120:9 (NF Tab 1).  Attempting to justify his unreliable opinions at his deposition, Dr. Tulloch used the word "camel" 33 times.  Dr. Tulloch also offered "a biblical parable about the soil and the seed." *Id.* at 24:19-25:6 (NF Tab 1).  Apart from the wholly unscientific nature of such phrases – and the patently insufficient nature of employing the *methodology* of colloquial phrases to support specific medical causation opinions – the phrases are simply "too vague to assist the trier of fact" under *Daubert* analysis.  *McDowell*, 392 F.3d at 1299.

Court have rejected under *Daubert*. *See McDowell v. Brown*, 392 F.3d 1283, 1300-01 (11th Cir.

2004) (rejecting acceleration opinion under *Daubert*, which amounted to a "mere guess" without

scientifically valid and reliable support or methodology); *see also General Elec. Co. v. Joiner*,

522 U.S. 136, 139-40 (1997) (excluding expert opinion that chemical "promoted" cancer in

plaintiff "already at a heightened risk"). As in *McDowell*, the untested and unscientific

"acceleration" hypotheses here not only lack the requisite supporting scientific data, but are

premised on fatal methodological infirmities – including the witnesses' inability to "quantify"

what Plaintiff's conditions would have been have been had they not taken Seroquel, and their

failure to "mete out" the comparative contribution of the multiple other causes of Plaintiff's

alleged diabetes as compared to the alleged role of Seroquel. 392 F.3d at 1300-01.

> **d.     Plaintiffs' Specific-Causation Expert Testimony Is Also Suspect Because They Can Identify No Scientifically Reliable Mechanism By Which Seroquel Causes Diabetes**

Plaintiffs' specific-causation witnesses provide no reliable explanation of the

physiological process or mechanism by which Seroquel ingestion supposedly caused Plaintiffs'

diabetes. *McClain*, 401 F.3d at 1253 (experts must provide reliable explanation of "'the

physiological process by which a particular disease or syndrome develops'"); *Cartwright*, 936 F.

Supp. at 903. In fact, these case-specific witnesses (and at least one generic witness) admitted

that they had no scientific basis or knowledge to support the existence of any *direct* mechanism

by which Seroquel supposedly causes diabetes or glucose dysregulation.[42]   Instead, they wish to

rely on the *indirect* mechanism of "weight gain," which they try to link up to Seroquel ingestion

through nothing more than an alleged *temporal relationship* between certain short-term weight

---

[42] Marks Dep. at 125:15-20 (NF Tab 2); Perry Dep. at 117:13-20 (NF Tab 5); Tulloch Dep. at 419:12-20 (NF Tab 1). Plaintiffs' general causation witness, Dr. Wirshing, confirmed the absence of scientific evidence to support a direct mechanism. Wirshing Dep. at 40:9-15 (NF Tab 3).

gain and ingestion of the drug.[43]  Apart from the methodological flaws that require exclusion of

their testimony based on temporal relationships, *see supra* at 14-15,[44] it is independently

dispositive that the experts admit that there is no scientific evidence that *short-term* weight gain

can cause diabetes in the circumstances presented by these Plaintiffs.[45]  Hypothetical biological

possibilities are not reliable bases for any causation opinion.  *See, e.g., In re Accutane Prods.*

*Liab.*, 511 F. Supp. 2d 1288, 1295 (M.D. Fla. 2007) ("[A] biological explanation without

evidence of the mechanism by which it works is merely an unproven hypothesis, a theory."),

*aff'd sub nom. Rand v. Hoffmann-LaRoche Inc.*, 2008 WL 3977611 (11th Cir. Aug. 26, 2008).

> ### e.   The Failure Of Plaintiffs' Specific-Causation Witnesses To Consider "Dose" Further Renders Their Opinions Unreliable, Unscientific, And Inadmissible Under *Daubert*

The witnesses' specific-causation testimony is also not scientifically reliable because

none of them has made any attempt to consider the particular "dose" of Seroquel ingested by

Plaintiff, which is "the single most important factor to consider in evaluating whether an alleged

exposure caused a specific adverse effect." *McClain*, 401 F.3d at 1242.  Plaintiffs "must

demonstrate 'the levels of exposure that are hazardous to human beings generally *as well as the*

*plaintiff's actual level of exposure* to the defendant's toxic substance before he or she may

recover.'" *Id.* at 1241 (emphasis added; citation omitted); *accord Cartwright*, 936 F. Supp. at

906 (excluding expert that failed to address "vital question" of level of toxic dose).

The collective failure of Plaintiffs' specific-causation witnesses to consider dose is

particularly fatal to their causation opinions for those Plaintiffs exposed only to extremely low

---

[43] *See, e.g.*, Tulloch Dep. at 419:12-20 (NF Tab 1); Marks Dep. at 125:22-126:1 (NF Tab 2).

[44] As confirmed by Plaintiffs' own generic witness, Dr. Wirshing, a host of factors would need to be carefully analyzed to assess whether any person's weight gain was related in any way to ingestion of Seroquel.  *See* Wirshing Dep. at 67:12-68:3 (NF Tab 3).

[45] *See, e.g.*, Marks Dep. at 336:16-20 (NF Tab 2).

doses of Seroquel: "Often 'low dose exposures – even for many years – will have no consequence at all, since the body is often able to completely detoxify low doses before they do any damage.'" *McClain*, 401 F.3d at 1242 (citation omitted).  None of these witnesses even bothers to consider the Eleventh Circuit's reasoning that "'thresholds exist, such that there is some dose below which even repeated, long-term exposure would not cause an effect in any individual.'" *Id.* (citation omitted).  For example, Dr. Marks, one of Plaintiffs' putative endocrinology experts, could point to no scientific data that Seroquel at doses of 100 mg or less is associated with clinically significant glucose changes.[46]  Plaintiffs' other endocrinologist, Dr. Tulloch, admitted that he had no scientific basis to testify that Seroquel is *even associated* with diabetes at doses of 400 mg or below,[47] which is dispositive given that "showing *association* is far removed from proving *causation*." *Allison*, 184 F.3d at 1315 n.16 (emphasis in original); *In re Accutane*, 511 F. Supp. 2d at 1297; Federal Judicial Center, *Reference Manual on Scientific Evidence* 336 (2d. ed. 2000).  Hence, Plaintiffs' witnesses have no reliable basis to opine that Seroquel was "a cause" of diabetes in many of these Plaintiffs, including Plaintiffs Whittington and Curley who indisputably took Seroquel only at doses of 100 mg or below.

      **f.**      **In Most Of These Cases, Plaintiffs' Specific-Causation Witnesses Cannot Even Rule Out That Plaintiffs Already Had Diabetes Before They Ever Took Seroquel Or, Conversely, Opine Reliably That A Plaintiff Actually Has Diabetes**

It is axiomatic that ingestion of Seroquel could not have caused an individual to get diabetes if the person *already* had diabetes before he or she first took the drug.  *See, e.g.*, *McClain*, 401 F.3d at 1243 ("[I]f a disease or illness in an individual preceded the established period of exposure, then it cannot be concluded that the chemical caused the disease") (citation

---

[46] Marks Dep. at 516:22-517:8 (NF Tab 2).
[47] Tulloch Dep. at 305:4-14 (NF Tab 1).

omitted).  Here, however, Plaintiffs' specific-causation witnesses could not rule out the

possibility that several Plaintiffs had diabetes before they ever took Seroquel,[48] and in some

cases admitted that particular Plaintiffs likely had diabetes before taking Seroquel.[49]  *See Smelser*

*v. Norfolk S. Ry. Co.*, 105 F.3d 299, 305 (6th Cir.1997), *abrogated on other grounds*, *Morales v.*

*American Honda Motor Co.*, 151 F.3d 500 (6th Cir.1998); *accord Bowers*, 537 F. Supp. 2d at

1356.  In one instance, the witness (Dr. Young) could not even opine reliably that Plaintiff

actually has diabetes or any glucose-related injury whatsoever.[50]  *See Rutigliano*, 929 F. Supp. at

787 (excluding causation testimony of expert who provided no basis for opinion that plaintiff had

a relevant injury); *see also Phillips v. American Honda Motor Co.*, 438 F. Supp. 2d 1328, 1331-

32 (S.D. Ala. 2006), *aff'd*, 238 Fed. Appx. 537 (11th Cir. 2007).

### g.   Plaintiffs' Specific-Causation Testimony Should Also Be Excluded Because It Is Not Based On Sufficient Facts Or Data

Federal Rule of Evidence 702 requires that all experts must base their opinions on

"sufficient facts or data."  Fed. R. Evid. 702.  "Relevant expert testimony is admissible only if an

expert knows of facts which enable him to express a reasonably accurate conclusion."  *United*

*States v. City of Miami*, 115 F.3d 870, 873 (11th Cir. 1997).

These putative experts did not conduct any full and proper investigation of the facts

underlying their opinions.  Apart from the fact that none of them bothered to examine the

Plaintiffs, much less review their full medical histories and medical records, *see Paoli II*, 35 F.3d

at 762, the witnesses remarkably relied on incomplete "filtered" and "preselected excerpts" of

---

[48] Marks Dep. at 74:2-11 (Burns); 343:23-344:1 (Guinn); 416:1-7 (Curley); *see also* Young Dep. at 88:7-9 (Unger) (NF Tab 2).

[49] Marks Dep. at 195:4-20 (Burns) (NF Tab 2); Tulloch Dep. at 186:18-25 (Whittington) (NF Tab 1).

[50] Young Dep. at 207:14-18 (NF Tab 7).

the medical records that they were "spoonfed" by Plaintiffs' counsel.[51] *Crowley v. Chait*, 322 F. Supp. 2d 530, 546-47 (D.N.J. 2004) (excluding expert opinion in such circumstances because its bases were "too unreliable to be trusted"); *accord Miller v. Pfizer, Inc.*, 196 F. Supp. 2d at 1086-87; *McCollin v. Synthes Inc.*, 50 F. Supp. 2d 1119, 1126-27 (D. Utah 1999).  Worse yet, all of these experts principally based their opinions on *summaries* of cherry-picked glucose-test and weight information *prepared by a paralegal employed by Plaintiffs' counsel*, named Glenda Grainger – which fails to meet Rule 702's requirements.[52]  *See In re TMI Litig.*, 193 F.3d 613, 698 (3d Cir. 1999) (affirming exclusion of expert testimony based on medical history summaries prepared by counsel, rather than interviews with plaintiffs or reviews of complete medical records).[53]

### 3.  The Specific-Causation Opinions Of Plaintiffs' Five Case-Specific Witnesses Are Not Even "Relevant"

Plaintiffs' specific-causation testimony also fails *Daubert*'s relevance prong, including its "fit" requirement, 509 U.S. at 591, because the witnesses do not even provide opinions sufficient to meet Florida's governing "'more likely than not' standard of causation," including its "but for" test. *Gooding*, 445 So. 2d at 1018.  As the Eleventh Circuit has held, "[p]roffered expert testimony must meet the legal as well as the substantive issues of the case," including requirements on burden of proof and level of certainty. *Allison*, 184 F.3d at 1320 (applying state

---

[51] *See, e.g.*, Marks Dep. at 248:12-249:1 (NF Tab 2); Tulloch Dep. at *Id.* 196:15-25; 319:17-20 (NF Tab 1)..

[52] Marks Dep. at 60:21-61:2 (NF Tab 2); Perry Dep. at 16:18-18:11 (NF Tab 5); Tulloch Dep. at 187:3-16 (NF Tab 1); Young Dep. at 8:9-23 (NF Tab 7); Abramson Dep. at 190:18-191:6 (NF Tab 6).

[53] Where *Daubert* gatekeepers in large mass tort litigations have encountered attempts to create favorable opinions from experts by controlling the medical facts to which the expert had access, those courts have not hesitated to exclude the resulting plaintiff-specific testimony. *Wooley v. Smith & Nephew Richards, Inc.*, 67 F. Supp. 2d 703, 708 (S.D. Tex. 1999); *Copley v. Smith & Nephew, Inc.*, 2000 WL 223404, *5 (S.D. Tex. Feb. 2, 2000); *In re Silica Prods. Liab. Litig.*, 398 F. Supp. 2d 563, 635 (S.D. Tex. 2005).

law causation requirements in "fit" context). Here, the specific-causation testimony of these case-specific witnesses is irrelevant and inadmissible because none of them actually – much less reliably – opined that Plaintiffs would not have developed diabetes *but for* their ingestion of Seroquel.[54] Several of the witnesses refused even to say that "more likely than not" Seroquel "caused" Plaintiffs' diabetes, and instead articulated equivocal opinions that amounted to nothing more than mere *possibilities*.[55] *Id.* at 1320-21 (affirming exclusion of expert opinion that did not meet substantive state burden of proof); *accord Cano*, 362 F. Supp. 2d at 840, 854 (excluding specific causation testimony that failed to meet state-law "more likely than not" but-for causation standard). In addition, as explained in the individual summary judgment motions, such equivocal testimony independently entitles AstraZeneca to judgment as a matter of law. *See, e.g.*, *Gooding*, 445 So. 2d at 1018.

> **C.    The Record Of Each Witness's Testimony Confirms That Their Specific-Causation Testimony Should Be Excluded Under *Daubert***
>
> > **1.    The Court Should Exclude The Specific-Causation Opinions of Dr. Brian Tulloch**

Dr. Brian Tulloch is an endocrinologist who originally proposed to testify that Seroquel was "a cause" of diabetes for Plaintiffs Unger, Whittington, McAlexander, and Haller. At his deposition, Dr. Tulloch *withdrew* his causation opinion for Plaintiff McAlexander.[56]

---

[54] *See, e.g.*, Abramson Dep. at 232:24-233:7 ("I already said that I couldn't tell you that absent the Seroquel he would not have developed diabetes.") (NF Tab 6); Marks Dep. at 61:3-15 (NF Tab 2); Perry Dep. at 114:10-21 (NF Tab 5); Young Dep. at 216:8-11 (NF Tab 7).

[55] *See, e.g.*, Marks Dep. at 99:22-100:6 ("I think it's possible, because I can't say when she developed diabetes.") (NF Tab 2); Abramson Dep. at 340:3-10 (NF Tab 6).

[56] Tulloch Dep. at 458:16-459:13 (NF Tab 1).

### a.   Dr. Tulloch's Specific-Causation Opinions Are Not Based On Any Scientifically Reliable Methodology

#### (1)   *Dr. Tulloch Relied Solely On Temporal Relationship*

Dr. Tulloch testified that the "only basis" for his "opinion that Seroquel caused the development of diabetes is its *temporal relationship* with weight gain and the weight gain's temporal relationship with the development of diabetes."[57]  When AstraZeneca's counsel confirmed the fact at his deposition, Dr. Tulloch literally shook counsel's hand:

> Q. Is it fair to say that what you're saying is because of the temporal relationship between [Plaintiff's] taking Seroquel and gaining weight, you think Seroquel is a contributing factor?
>
> A. Ah, we're on the same wavelength.  May I shake your hand, madam?[58]

Dr. Tulloch's specific-causation opinions must be excluded on that basis alone.  *See, e.g., McClain* 401 F.3d at 1243, 1254; *Cartwright*, 936 F. Supp. at 906.

When confronted with the full medical facts of these cases, which Plaintiffs' counsel did not give him, Dr. Tulloch had to admit that even the claimed temporal relationships on which he relied did not actually exist, completely negating his causation opinions in all four cases.

As to Plaintiff McAlexander, Dr. Tulloch *withdrew* his causation opinion, admitting that his report was "wrong" and that he would need to "suspend" his causation opinion for her case.[59]

As to Plaintiff Haller, Dr. Tulloch admitted that his only putative basis for causation – weight gain[60] – was speculative,[61] and that Seroquel did not cause Plaintiff Haller's diabetes:

---

[57] Tulloch Dep. at 541:7-17 (emphasis added) ("Q.:       … [T]he only basis for your opinion that Seroquel caused the development of diabetes is its temporal relationship with weight gain and the weight gain's temporal relationship with the development of diabetes, right?  MR. BRUDNER: Objection, form. A: Yes, ma'am I – I think that's the best available data that we can obtain – Q: (BY MS. THORPE) Okay. A. – in these cases, yes, ma'am."); *see also id.* at 439:11-17 ("only" basis); 541:24-542:15 (relying on "the temporal relationship to the weight gain and the appearance of abnormal blood sugar") (NF Tab 1).

[58] *Id.* at 142:16-143:3; *see also id.* at 142:16-143:3 ("temporal") (NF Tab 1).

[59] *Id.* at 458:16-459:13 (NF Tab 1).

Q. So weight gain while he was on Seroquel did not cause him to have diabetes, correct?

A. Okay. I'll buy that.[62]

Dr. Tulloch was thus left with no basis to opine that Seroquel caused diabetes in Mr. Haller.

As to Plaintiff Unger, Dr. Tulloch had no idea when or if Mr. Unger ever got diabetes:

Q. So it's fair to say that you don't know when Mr. Unger actually developed diabetes, correct?

A. That's correct.

Q. You don't know whether or not he had diabetes before he took Seroquel, right?

A. That's correct. We have only one normal sugar, October the 29th of 2003, at least it was a normal sugar and we – we don't know if he'd had any glucose load test before that, that's correct.[63]

See *McClain*, 401 F.3d at 1243 (requiring exposure to precede injury).

As to Plaintiff Whittington, after being shown numerous elevated glucose readings from the 1990s before Plaintiff ever took Seroquel, Dr. Tulloch admitted that it was "more likely than not she had diabetes in the Nineties" before she ever took Seroquel.[64] Although he later tried to back away from that admission, Dr. Tulloch ultimately acknowledged that he *could not rule out* that Plaintiff Whittington had diabetes *before* she ever took Seroquel.[65] In short, Dr. Tulloch's uncertain and methodologically bankrupt temporality-based opinions must be excluded.

### (2)    *Dr. Tulloch Failed To Rule Out Plaintiffs' Other Risk Factors And Conditions As The Sole Cause Of Their Injuries, Or Try To Quantify Their Relative Contribution*

As Dr. Tulloch admitted, each of the four Plaintiffs at issue had numerous diabetes risk factors – including pre-existing obesity, which he admitted is the most important diabetes risk

---

[60] *Id.* at 518:3-8 (NF Tab 1).

[61] *Id.* at 527:5-14 (NF Tab 1).

[62] *Id.* at 586:7-9 (NF Tab 1).

[63] *Id.* 705:8-16 (NF Tab 1).

[64] *Id.* at 186:18-25 (NF Tab 1).

[65] *Id.* at 597:19-598:2 (NF Tab 1).

factor[66] and the overwhelming cause of diabetes in Plaintiffs.[67]  Yet Dr. Tulloch did not try to

rule out these causes of diabetes; he just added Seroquel into the mix based on temporality:

> Q. And you, having not undertaken such a review of the literature, *can't rule out* that
>    preexisting obesity, hypertension, metabolic syndrome, hyperlipidemia, psychosis,
>    age, impaired glucose tolerance were *more probably than not causes of diabetes in
>    these plaintiffs*?
>
> A. *I believe that they were.*  I think we're in agreement in that setting.  The main issue
>    which I have held out for both the patients so far was that on top of all that was a
>    measurable significant weight gain during the single psychotropic that Mr. Unger had
>    and the two psychotropics which Ms. Whittington had.[68]

Dr. Tulloch also admitted that he failed to rule out alternative causes of weight gain, which was

his sole mechanism for connecting Seroquel ingestion to diabetes:

> Q. Is it fair to say that as to all of these plaintiffs, you did not rule out alternative causes
>    for their weight gain because you did not feel that you needed to or had to?
>
> A. I think that's reasonable, yes, ma'am.[69]

Because he posited that all possible causes were actual causes, Dr. Tulloch did no

quantitative assessment of the alleged causative role of Seroquel or any of Plaintiffs' diabetes

risk factors:

> Q. And maybe they will elicit this.  We have agreed that metabolic syndrome,
>    hypertension, hyperlipidemia, impaired fasting glucose, obesity, smoking, family
>    history, psychosis, sedentary lifestyle are all causes of diabetes, right?
>
> A. Yes, ma'am.
>
> Q. Before forming your opinion with regard to any of the plaintiffs in these cases, you
>    didn't try to quantify the contribution that these causes made, right?
>
> A. That's correct.
>
> Q. To the development of diabetes, correct?
>
> A. That's correct.[70]

---

[66] *Id.* 131:4-15; 331:3-7 (NF Tab 1).

[67] *See, e.g., id.* at 139:20-140:2; 344:12-345:1 (NF Tab 1).

[68] *Id.* at 343:1-12 (emphasis added) (NF Tab 1).

[69] *Id.* at 548:13-17 (NF Tab 1).

[70] *Id.* at 540:20-541:5 (NF Tab 1).

Dr. Tulloch also did not try to quantify the role of Seroquel and alternative weight gain risk factors, such as sedentary lifestyle:

> Q. As to any of the weight gains by any of the plaintiffs in these cases, you cannot say how much of the weight was due to Seroquel and how much was due to diet and how much was due to lack of exercise or other factors, correct?
>
> A. That's correct.[71]

See McDowell, 392 F.3d at 1301.  Dr. Tulloch claimed that he knew of no methodology to quantify the relative contribution of various risk factors in each Plaintiff,[72] but he later conceded that scientists have studied the strength of various diabetes risk factors like obesity and reported quantitative relative risks.[73]  Dr. Tulloch never reviewed any of those studies, saying that he was "a busy, active, clinical endocrinologist" and that, if such "data" exist and are "available," they "are in an epidemiologist's field."[74]  Dr. Tulloch admitted that he lacks the expertise to interpret epidemiologic studies.[75]  Thus, Dr. Tulloch did not even try to quantify the relative contribution of each Plaintiff's many risk factors, as he admittedly lacks the expertise to do so.

### (3)   *Dr. Tulloch Failed To Consider Dose Issues*

Dr. Tulloch not only had no idea of "a dose curve for the relationship of Seroquel to diabetes,"[76] and admitted that he could not identify any scientific literature showing that Seroquel is associated with diabetes at doses at or below 400 mg.[77]  Because the Plaintiffs for whom he actually purports to opine admittedly took Seroquel at doses of 400 mg or less prior to

---

[71] *Id.* at 580:23-581:3 (NF Tab 1).

[72] *Id.* at 133:21-24; *see also id.* at 267:6-17; 342:21-25 (NF Tab 1).

[73] *Id.* at 341:2-342:2 (NF Tab 1).

[74] *Id.* at 342:3-20 (NF Tab 1).

[75] *Id.* at 144:10-146:18 (NF Tab 1).

[76] *Id.* at 303:13-21 (NF Tab 1).

[77] *Id.* at 302:8-305:14 (NF Tab 1).

their diagnoses of diabetes, Dr. Tulloch had no scientific basis even to rule in Seroquel as a cause of their alleged diabetes.[78]  *McClain*, 401 F.3d at 1243.

> **b.    Dr. Tulloch's Causation Opinions Are Not Relevant Because They Do Not Satisfy Florida's Governing Causation Standard**

Dr. Tulloch could not testify that Seroquel more likely than not caused any of these Plaintiffs' diabetes injuries, nor give the "but for" causation opinion required under Florida law. In fact, in his opinion, all four Plaintiffs *would have* contracted diabetes *even without Seroquel*.[79]

> **c.    Dr. Tulloch's Opinions Are Not Based On Sufficient Facts and Data About Plaintiffs**

Dr. Tulloch admitted that he had available only portions of each Plaintiff's medical records sent to him by Plaintiffs' counsel.[80]  Dr. Tulloch did not fully review even the partial set of medical records that he listed in his report,[81] and instead relied on a partial summary of medical data selected by Plaintiffs' counsel,[82] which admittedly were missing important weights and glucose data from both before and after the Plaintiffs' Seroquel ingestion (*e.g.*, he had no medical information for the first 50 years of Plaintiff Unger's life).[83]  As Dr. Tulloch admitted, he never examined or even spoke with any of the four Plaintiffs;[84] never read the depositions of

---

[78] *Id.* at 89:12-18 (Whittington); 288:24-290:4, 290:21-291:8, & 300:11-18 (Unger); 459:17-21 (McAlexander); 505:15-506:4 & 507:13-508:3 (Haller) (NF Tab 1).  Plaintiff Haller was prescribed Seroquel in doses exceeding 400 mg, but only after he had been diagnosed with diabetes.

[79] Tulloch Dep. at 541:18-23 ("Q: All right.  And you have said as to all of the plaintiffs that you've looked at that they would get diabetes at some point in time even if they had never taken Seroquel, right? A: Given the risk factors which they carried, yes, ma'am."); *see also id.* at 337:12-17; 439:8-10 (NF Tab 1).

[80] *Id.* at 196:15-25; 319:17-20 (NF Tab 1).

[81] *Id.* at 189:12-16 (NF Tab 1).

[82] *Id.* at 187:3-16 (NF Tab 1).

[83] *Id.* at 319:17-20; *see also id.* at 187:17-19; 196:15-25 (NF Tab 1).

[84] *Id.* at 11:9-11; 75:8-9 (Whittington); 487:12-488:12 (Haller) (NF Tab 1).

-31-

Plaintiffs or their family members,[85] although he admitted it would be important to do so;[86] and never read any of the treating doctor depositions.[87] He just reviewed a few selected weights and glucose readings given to him by Plaintiffs' counsel, perceived some temporal relationships, and raced to render his unscientific opinions.[88] There can be no question that Dr. Tulloch's specific-causation opinions must be excluded under *Daubert*.

### 2.    The Court Should Exclude The Specific-Causation Opinions Of Dr. Jennifer B. Marks

Dr. Jennifer Marks is an endocrinologist who proposes to testify that "Seroquel was a cause" of diabetes in Plaintiffs Guinn, Burns, and Curley.

#### a.    Dr. Marks Has No Reliable Methodology

##### (1)    *Dr. Marks Relied Merely On Temporal Relationships*

Dr. Marks based her specific-causation opinions merely on the alleged temporal relationship between Plaintiffs' Seroquel ingestion and their weight gain and diabetes diagnosis:

> Q. Is your opinion that [Plaintiff] developed diabetes when she did based upon the *temporal connection* between her use of Seroquel and her receiving the diagnosis of diabetes?
>
> A. In part, yes.
>
> Q. Is it based upon a *temporal connection* between your belief that she gained weight and then was given a diagnosis of diabetes while taking Seroquel?
>
> A. Yes.
>
> Q. And is that the primary basis for your opinion that there was a *temporal connection* between her use of Seroquel and her receiving a diagnosis of diabetes?

---

[85] *Id.* at 243:2-6 (Unger); 75:17-18 (Whittington); 417:13-20 (McAlexander); 486:13-16 (Haller) (NF Tab 1).

[86] *Id.* at 589:9-23 (NF Tab 1).

[87] *Id.* at 243:8-21 (Whittington and Unger); 417:13-20 (McAlexander); 486:13-16 (Haller) (NF Tab 1).

[88] Dr. Tulloch's baseless approach to his labeling opinions further illustrates that he drew sweeping conclusions from *no* facts or data at all. While he was willing to offer criticisms of Seroquel's labeling, Dr. Tulloch admitted at deposition that his sole evidence for them was a *conversation* with a paralegal and one of Plaintiffs' lawyers with whom he had been "duck hunting" buddies for years. *Id.* at 12:4-15; 668:8-670:14 (NF Tab 1). In the end, Dr. Tulloch *withdrew* all of his labeling opinions because, among other things, they were based on documents he never himself reviewed. *See id.* at 670:15-21 (NF Tab 1).

A. That together with the weight gain.

Q. So essentially your opinion is that Ms. Curley gained weight while on Seroquel, got a diagnosis of diabetes while on Seroquel, therefore you say that the Seroquel was the cause of her getting diabetes?

A. Yes.

Q. And is there any methodology other than that for forming your opinion that you can describe to me?

A. No.[89]

As a matter of law, Dr. Marks' temporality-based opinions are inadmissible and must be excluded. *See McClain*, 401 F.3d at 1243 and 1254; *Cartwright*, 936 F. Supp. at 906.

## (2)    *Dr. Marks Did Not Consider And Rule Out Other Causes*

Dr. Marks's specific-causation opinions are also scientifically unreliable because she did not consider and then rule out other alternative causes for each Plaintiff's diabetes. Dr. Marks agreed that all three Plaintiffs had many other risk factors for diabetes,[90] and she admitted that those risk factors, individually or in combination, would be more than sufficient to explain the development of diabetes – without any involvement from Seroquel.[91]  Yet she made no effort in forming her opinions to rule out those pre-existing conditions as the sole cause of Plaintiffs' diabetes because she personally knew of no methodology for doing that.[92]  As to the critical weight gain lynchpin of her opinions,[93] Dr. Marks admitted that sedentary lifestyle alone could

---

[89] Marks Dep. at 414:1-21 (NF Tab 2).

[90] *Id.* at 266:21-267:1 (Guinn); 216:2-6 (Burns); 428:16-22 (Curley) (NF Tab 2).  Dr. Marks admitted that there were several important risk factors, such as age, that she did not include in her report, and, when asked why, Dr. Marks explained that Plaintiff-counsel's nurse-paralegal "didn't think of it."  *Id.* at 254:7-23 (NF Tab 2).

[91] *Id.* at 216:2-6 (Burns); 269:2-5 (Guinn); 411:20-23 & 430:12-15 (Curley) (NF Tab 2). Dr. Marks admitted that chronic obesity alone could cause diabetes.  160:6-15.  She also acknowledged that "it is more likely than not" that a person with prediabetes will develop diabetes, "if they don't modify their lifestyle issues."  *Id.* at 326:10-18  (NF Tab 2).

[92] *Id.* at 267:2-268:5 ("I wouldn't know how to do that.") (NF Tab 2).

[93] *Id.* at 102:24-103:6; *see also id.* at 132:12-16 ("Q.  And the thing with the closest temporal connection is the one you blame?  A. It doesn't exclude all the other things, but it certainly means that the thing with the temporal connection is a contributor.") (NF Tab 2).  Dr. Marks admitted that there are drugs that have

explain each Plaintiff's alleged weight gain while on Seroquel, but she made no effort to rule out sedentary lifestyle as the sole cause of Plaintiffs' alleged weight gain.[94]

Although she relied entirely on short-term weight gain as causing diabetes in Plaintiffs, Dr. Marks never tried to quantify the relative contribution of short-term weight gain compared to Plaintiffs' many diabetes risk factors.[95]  While she agreed that Plaintiffs' pre-existing, long-term obesity is "one of the strongest" diabetes risk factors, and played "a significant role" in causing diabetes in Plaintiffs,[96] Dr. Marks could not assign a percentage or otherwise quantify the relative role it played.[97]  She also made no attempt to quantify the amount of weight gain caused by Seroquel as compared to the many other factors that cause weight gain.[98]  *McDowell*, 392 F.3d at 1301.  Indeed, she admitted that she had no methodology for causally attributing *any* weight gain to Seroquel:

> Q.  What method have you used to determine whether or not the weight gain you talk about while she was on Seroquel was caused by Seroquel as opposed to just a normal weight gain and loss cycle that she has experienced over a long period of her life?
> A.  There is no method that I know of.[99]

Dr. Marks also acknowledged that people with diabetes usually have the disease for at least five years before receiving a formal diagnosis,[100] and that she could not rule out that all

---

an effect on weight gain, but not on blood sugar, and that she could not rule out that Seroquel was in that class.  *Id.* at 287:9-288:6 (NF Tab 2).

[94] *Id.* at 297:21-298:7 (NF Tab 2).  Dr. Marks did not rule out any alternative causes of weight gain as the sole cause of any Plaintiff's weight gain because, again, "[she] wouldn't know how to do that."  *Id.* at 294:18-25; *see also id.* at 491:16-492:4 (NF Tab 2).

[95] *Id.* at 158:10-23 ("No, I don't think you could really do that.") (NF Tab 2).

[96] *Id.* at 246:13-17, 159:1-8 (NF Tab 2).

[97] *Id.* at 64:15-65:1 (NF Tab 2).

[98] *Id.* at 294:13-17; 126:24-127:12 (NF Tab 2).

[99] *Id.* 317:19-24; *see also id.* at 126:24-127:12 ("I don't think you can know for sure."); 468:24-469:16 ("No methodology") (NF Tab 2).  Dr. Marks admitted that she knew of no scientific literature which showed that incremental weight gain over a two- to four-year period is a risk factor for diabetes.  *Id.* at 336:16-20 (NF Tab 2).

three Plaintiffs had diabetes before ever taking Seroquel.[101]   In fact, Dr. Marks never even tried

to figure out when Plaintiffs actually developed diabetes, as opposed to when they received

formal diagnoses.[102]   She thus has no scientifically reliable basis to opine that Seroquel more

likely than not caused diabetes in any of these Plaintiffs.   *See McClain*, 401 F.3d at 1243.

**b.    Dr. Mark's Causation Opinions Are Not Relevant Because They Do Not Satisfy Florida's Governing Causation Standard**

In the end, Dr. Marks could not testify that Seroquel "more likely than not" caused any of

these Plaintiff's diabetes.   *Gooding*, 445 So. 2d at 1018.   For instance, as to Plaintiff Curley, Dr.

Marks could not testify that it was more likely than not that Seroquel caused her *any harm at all*:

> Q.   And I want to make sure I heard.   You can't say that Seroquel more likely than not caused any harm to Ms. Curley; isn't that correct?
>
> A.   No, I can't really.[103]

For Plaintiff Burns, Dr. Marks identified Seroquel only as a "possible" cause of diabetes:

> Q   … I am asking you whether you are going to say that it is more probable than not to a reasonable degree of medical probability that *Seroquel was a cause* of her getting diabetes, was a direct contributor to [Ms. Burns] getting diabetes?
>
> A.   I think it's possible, because I can't say when she developed diabetes.
>
> Q.   So your testimony is it was possible?
>
> A.   Yes.[104]

*See Allison*, 184 F.3d at 1320-21 (excluding specific causation "possibility testimony").

As to Plaintiff Guinn, Dr. Marks similarly admitted that, given this Plaintiff's weight

cycling, it was only "possible" that "Seroquel could have been a cause" of her diabetes.[105]

Dr. Marks admitted that two strong risk factors – chronic obesity and family history of diabetes –

---

[100]   *Id.* at 90:14-20 (NF Tab 2).

[101]   *Id.* at 343:23-344:1 (Guinn); 416:1-7 (Curley); 62:1-4; 74:2-11 (Burns) (NF Tab 2).

[102]   *Id.* at 412:23-413:6 (NF Tab 2).

[103]   *Id.* at 565:20-23 (NF Tab 2).

[104]   *Id.* at 99:22-100:6; *see also id.* at 61:3-15 (NF Tab 2).

[105]   *Id.* at 351:22-352:21 (NF Tab 2).

*more likely than not* would have caused Plaintiff Guinn to develop diabetes, whether or not she ever took Seroquel.[106]

### c.     Dr. Marks Relied On Insufficient Facts and Data

Like the other case-specific witnesses, Dr. Marks relied on incomplete facts and data. She did not review the complete medical records in each case, but merely "took what I was given,"[107] *i.e.*, six to eight CDs of partial medical records and scientific literature selected and sent to her by Plaintiffs' counsel.[108] She did not even ask to see earlier records,[109] but merely "assumed there were none available."[110] Also like all the others, Dr. Marks formed her opinions and wrote her reports in these cases by relying almost entirely on summary medical chronologies prepared by Glenda Grainger, a paralegal employed by Plaintiffs' counsel:

> Q.  Did you essentially work off of the chronology that Glenda [Grainger] provided you in putting together your report that is specific to the Burns case?
> A.  Yes.
> Q.  Would that be true if I asked you the same question for Curley and for Guinn?
> A.  Yes.[111]

Dr. Marks had no conversations with Ms. Grainger about the completeness of the summary or the process used to obtain the information on the summary.[112]  Her lack of factual information

---

[106] *Id.* at 247:16-25 (NF Tab 2).  In her report, Dr. Marks also proposed to testify that Seroquel caused Plaintiff Guinn's total cholesterol to increase, but at her deposition, Dr. Marks admitted that the ability to cause increases in cholesterol is only a possibility. *Id.* at 304:22-305:15; 365:19-24 (NF Tab 2).

[107] *Id.* at 248:22-249:1; *see also id.* at 248:12-17; 106:21-107:11 (NF Tab 2).

[108] Dr. Marks admitted that did not read all of the scientific literature listed in her expert report. *Id.* at 373:20-22 (NF Tab 2).

[109] For example, Dr. Marks had no records for Plaintiff Guinn before 1998. Marks Dep. at 248:12-15 (NF Tab 2).  Dr. Marks had no weight data for Plaintiff Curley from before June 2001. *Id.* at 457:7-10 (NF Tab 2).

[110] *Id.* at 248:22-23 (NF Tab 2).

[111] *Id.* at 60:21-61:2; *see also id.* at 12:13-23 (NF Tab 2).  Contrary to the agreed stipulation of the parties, the summary on which Dr. Marks relied was not produced to the defense counsel until the second day of her deposition. *Id.* at 58:7-15 (NF Tab 2).

[112] *Id.* at 13:14-20 (NF Tab 2).

led directly to her obviously unreliable and irrelevant opinions, which must be excluded.

### 3.      The Court Should Exclude The Specific-Causation Opinions of Dr. Bruce D. Perry

Dr. Bruce Perry is a psychiatrist who proposes to testify that "Seroquel was a causative factor" in diabetes for Plaintiffs Guinn, Burns and Curley.

#### a.      Dr. Perry Is Not Qualified To Give Any Diabetes Causation Opinions

Psychiatrist Dr. Bruce Perry is not qualified to give an expert opinion on diabetes causation. He is not an endocrinologist.[113] The focus of his practice is child and adolescent psychiatry, and for the last 20 years, he has worked at a child trauma academy.[114] Dr. Perry has never diagnosed diabetes in one of his patients and would defer to another doctor with expertise in the area; Dr. Perry has never treated diabetes in one of his patients.[115] The sole basis for Dr. Perry's "expertise" in this case is that he is a medical doctor.[116] But just being a doctor is not enough, and Dr. Perry's causation opinions should be excluded. *Ralston*, 275 F.3d at 970.

#### b.      Dr. Perry Has No Reliable Basis For His Specific-Causation Opinions

##### (1)      *Dr. Perry Relies Solely On Temporal Associations*

Even if he were qualified, Dr. Perry's opinions do not survive *Daubert* scrutiny because they are based merely on alleged temporal relationships between Seroquel ingestion, weight gain and diabetes diagnoses.[117] During his deposition, Dr. Perry made crystal clear his methodology

---

[113] Perry Dep. at 33:21-34:1 (NF Tab 5).

[114] *Id.* at 25:20-23; 27:6-14 (NF Tab 5).

[115] *Id.* at 77:7-23; 79:21-80:7 (NF Tab 5).

[116] *Id.* at 33:21-34:4 (NF Tab 5).

[117] Dr. Perry explicitly referred in his expert reports to his reliance on temporal relationship. *See, e.g.*, Perry/Guinn Report at 3 (NF Tab 8).

was based on a temporal association between Seroquel ingestion and weight gain.[118] For this

reason alone, his opinions are inadmissible under *Daubert*.

Dr. Perry was forced to retreat from even his temporal-relationship opinions when

confronted with weight data that Plaintiffs' counsel had not provided to him.[119] First, Dr. Perry

qualified his opinion and claimed only a "weak temporal association."[120] Then Dr. Perry

acknowledged, as to Plaintiff Curley, that her wildly fluctuating weight data showed no temporal

relationship at all.[121] Faced with still more data he had not considered, Dr. Perry withdrew his

reliance on temporal association of Seroquel, weight gain, and diabetes – admitting that he could

not testify that *Seroquel* actually caused any Plaintiff's weight gain:

> Q. You have said that you can't state to a reasonable degree of medical certainty today
> that Seroquel contributed to [Plaintiff's] weight gain, correct?
> A. Correct.[122]

With the premise of his unreliable opinion gone, Dr. Perry simply tried to remove the discredited

weight-gain link[123] by hypothesizing that Seroquel had some direct biological effect on the body.

---

[118] Perry Dep. at 19:10-23 ("I thought there was a solid temporal association between the starting of the Seroquel and the changes in weights"); 125:9-19 ("[I]f you have all the risk factors present and then there is the addition of another risk factor and there's a temporal association then increasing weight and onset of diabetes, I think it's fair to say that that additional risk factor played a causative role.") (NF Tab 5).

[119] Dr. Perry did not have all of the relevant data for each plaintiff because, like the other witnesses here, he relied almost entirely on medical record summaries prepared by plaintiffs' counsel. *Id.* at 16:18-24; 296:24-297:2 (NF Tab 5). Thus, Dr. Perry's opinions should also be excluded because he lacks sufficient facts and data for his opinions under Rule 702.

[120] *Id.* at 141:18-24 (NF Tab 5).

[121] *Id.* at 147:7-12 (NF Tab 5).

[122] *Id.* at 316:11-14 (Plaintiff Guinn); *see also id.* at 352:9-18 (Plaintiffs Curley and Burns) (NF Tab 5).

[123] *Id.* at 316:15-317:4 ("I still believe and feel that there is a temporal association with her taking Seroquel and her developing diabetes") (NF Tab 5).

But Dr. Perry was forced to admit that he could not provide expert testimony about any such direct mechanism.[124]  *See McClain*, 401 F.3d at 1253.

Dr. Perry also was unable to provide any studies showing that Seroquel at "low" doses of 100 mg or less was associated with weight gain or hyperglycemia or diabetes.[125]  Despite that lack of scientific support, Dr. Perry was still willing to opine that Seroquel at the low doses taken by Ms. Curley caused her diabetes "because I think of the temporal association between taking it and the onset of diabetes."[126]  When asked why he was making the "*post hoc ergo propter hoc*" fallacy condemned in *McClain*, Dr. Perry circled back to his unsupported *personal belief* that Seroquel is "a risk factor" for diabetes,[127] even though he was just unable to identify *any* pertinent scientific data for the belief.  Dr. Perry cannot support his temporality-based methodology with *ipse dixit* assertions that Seroquel is a "risk factor."  *See Cano*, 362 F. Supp. 2d at 846 ("The fact that exposure to [a substance] may be a risk factor for [a disease] does not make it an actual cause simply because [the disease] developed."); *see also Paoli II*, 35 F.3d at 761 n.31.  In short, Dr. Perry's unscientific specific-causation opinions must be excluded.

---

[124] *Id.* at 318:19-319:2; *see also id.* at 117:13-20 ("I don't think anybody knows the exact mechanism by which it causes diabetes.  People speculate that it might have to do with influencing the – you know, insulin resistance.") (NF Tab 5).  Dr. Perry's inability to support his new "direct effect" opinion with scientific knowledge about a mechanism is entirely consistent with the testimony of Plaintiffs' other putative experts, who have repeatedly conceded that there exists no reliable or valid scientific bases for any hypothesized "direct" mechanism by which Seroquel could cause diabetes, as opposed to the indirect mechanism of weight gain.  *See, e.g.*, Tulloch Dep. at 244:13-23 (NF Tab 1); Marks Dep. at 125:15-126:1 (NF Tab 2).

[125] Perry Dep. at 109:20-110:3 ("No.  I don't think any of the studies actually use doses that low.") (NF Tab 5).

[126] *Id.* at 130:9-15 (NF Tab 5).

[127] *Id.* at 130:19-24 ("Q: Right.  Just because something happens after something else doesn't mean it was caused by the earlier thing, right?  A: No, it doesn't.  But in this case, the thing that she took, you know, the medication, has been shown to be a risk factor for the development of diabetes.") (NF Tab 5).

### (2)   *Dr. Perry Did Not Rule Out Or Quantify Other Risks*

Dr. Perry also has not ruled out or otherwise quantified the relative contribution of

Plaintiffs' many pre-existing risk factors for diabetes.  Although he admitted that all three

Plaintiffs had many risk factors for diabetes,[128] and admitted the importance of considering other

causes,[129] Dr. Perry did not undertake a differential evaluation of other causes of diabetes or

weight gain for any Plaintiff.[130]  He could not rule out chronic obesity and family history as

causing diabetes in Plaintiffs.[131]  He could not rule out pre-existing hyperglycemia or sedentary

lifestyle as the sole cause of diabetes in Plaintiff Curley.[132]

Dr. Perry testified that he is aware of a methodology for doing quantification using

statistical relative risks, but he admitted that he lacked sufficient information about each

Plaintiff's medical history to undertake such analysis.[133]  Instead, Dr. Perry just "didn't put any

value on how much of a causative factor" Seroquel was in his subjective opinion.[134]  When

confronted with the huge statistical risks of diabetes from risk factors such as chronic obesity and

pre-existing hyperglycemia, Dr. Perry testified that he "would still feel comfortable saying that

[Seroquel] is a causative factor I mean even if it's a small causative factor."[135]  Dr. Perry's

specific-causation opinion amounts to nothing but the legally insufficient proposition that all

---

[128] *Id.* at 56:23-57:7; 148:4-152:11 (Curley); 253:24-259:7 (Burns); 288:20-294:15 (Guinn) (NF Tab 5).

[129] *Id.* at 55:20-56:15 (NF Tab 5).

[130] *Id.* at 151:22-152:5 (NF Tab 5).

[131] *Id.* at 114:2-6 (unable to rule out Plaintiff Curley's pre-existing hyperglycemia and obesity); 151:22-152:5 (unable to rule out Plaintiff Curley's whole list of risk factors); 258:4-10 (unable to rule out Plaintiff Burns' obesity, central adiposity, hypertension, high cholesterol, high triglycerides, and age); 339:9-18 (unable to rule out Plaintiff Guinn's obesity or family history) (NF Tab 5).

[132] *Id.* at 114:7-21 (NF Tab 5).

[133] *Id.* at 32:6-24 (NF Tab 5).

[134] *Id.* at 129:11-18; *see also id.* at 129:19-24 ("I don't think I could really guesstimate what impact, but I – you know as you point out she's had lots of other risk factors.") (NF Tab 5).

[135] *Id.* at 128:12-129:5 (NF Tab 5).

-40-

*potential* risk factors for a disease or injury are *in fact actual causes* of the injury.[136]  Dr. Perry's methodology is just to throw Seroquel into the mix.[137]  But declaring all possible causes are actual causes is certainly not a scientifically reliable basis or methodology for a causation opinion, *Cano*, 362 F. Supp. 2d at 845-46, and Dr. Perry's opinions should be excluded.

**c.      Dr. Perry's Causation Opinions Are Not Relevant Because They Do Not Satisfy Florida's Governing Causation Standard**

Dr. Perry's testimony also does not meet *Daubert* and Florida law requirements for admissible specific-causation testimony.  Dr. Perry admitted that he cannot testify that Seroquel is a but-for cause of Plaintiffs' diabetes:

> Q.   Okay.  Now, let me ask this question:  Assuming that she [Plaintiff Curley] had the diagnosis of diabetes in February of 2006, how can you say that she wouldn't have developed diabetes at that point in time even if she had not been taking Seroquel?
>
> A.   I can't.[138]

On the contrary, Dr. Perry agreed that, given the number of other risk factors, it is *very likely* that Plaintiffs *would have gotten diabetes whether or not they had taken Seroquel.*[139]  His specific-causation testimony should be excluded under *Daubert.*

**4.      The Court Should Exclude The Specific-Causation Opinions of Dr. Jack Abramson**

Dr. I. Jack Abramson is a psychiatrist who proposes to testify that Seroquel was "a contributing factor" to the development of diabetes in Plaintiffs McAlexander and Haller.

---

[136] *Id.* at 338:17-341:6 (NF Tab 5).

[137] *Id.* at 114:10-16 ("I think that adding an additional risk factor is certainly not a wise thing to do and played a causal-was a causal factor, just like her hyperglycemia and her obesity and inactivity and other things – other risk factors.") (NF Tab 5).

[138] *Id.* at 341:16-20; *see also id.* at 114:2-21 (NF Tab 5).

[139] *Id.* at 336:17-337:5 (Guinn); *see also id.* at 352:19-353:11 (Burns and Curley) (NF Tab 5).

### a.      Dr. Abramson Is Not Qualified To Give Any Diabetes Causation Opinions

As Dr. Abramson admitted, he is not qualified to diagnose the cause of diabetes:

"Q.  Would you agree with me that you are not an expert in diagnosing the cause of diabetes in particular individuals?  A.  Correct."[140]  Dr. Abramson does not diagnose, treat, or otherwise manage his patients' diabetes, and instead refers his mentally ill patients to doctors capable of treating endocrinological issues and defers to their medical judgment.[141]  He is not an endocrinologist and repeatedly testified that opinions regarding endocrinology are "beyond [his] expertise."[142]  Dr. Abramson has not conducted any research or published anything related to diabetes or glucose metabolism,[143] and was retained for these cases through an expert witness service called the Atrium Psychological Group, just to provide litigation-driven testimony.[144]  Dr. Abramson is not qualified to give his diabetes causation opinions, which should be excluded.

### b.      Dr. Abramson Has No Scientifically Reliable and Valid Basis To Opine That Seroquel Caused Plaintiffs' Diabetes Injuries

Dr. Abramson's specific-causation testimony should be excluded also because his unscientific methodology and reasoning violates Eleventh Circuit standards.  Although Dr. Abramson tried to deny that he based his causation opinions solely on a temporal relationship,[145] the substance of his testimony revealed that temporality was all he had:

---

[140] Abramson Dep. at 141:4-7 (NF Tab 6).

[141] *Id.* at 35:7-36:4; 235:3-7, 287:6-17 (NF Tab 6).  Indeed, Dr. Abramson consistently refused to opine about Mr. Haller's or Ms. McAlexander's alleged injuries, deferring to and relying instead on the diagnoses and treatment decisions of the plaintiffs' treating specialists.  *Id.* at 193:14-20; 236:14-22; 270:12-15; 332:24-333:4 (NF Tab 6).

[142] *Id.* at 283:24-284:2; 286:21-287:4 (NF Tab 6).

[143] *Id.* at 46:10-12; 138:23-25; 140:16-22; 141:1-3 (NF Tab 6).

[144] *Id.* at 21:21-22:11 (NF Tab 6).

[145] *Id.* at 341:4-15 (NF Tab 6).

> Q: So, in this case, what is your opinion as to how Seroquel ... was a cause for Mr. Haller developing diabetes?
>
> A: I don't know the exact mechanism of the cause of Mr. Haller developing diabetes. However, I do know that he did not have the diabetes prior to taking Seroquel, and his weight was much lower than it was after he started taking the Seroquel, and *within a short time after the prescription for the Seroquel* was given and he began taking the medication, his weight shot up and he began to show evidence of glucose dysregulation, ultimately culminating with the diagnosis of diabetes.[146]

Although he relied on weight gain in his temporal reasoning, Dr. Abramson admitted that weight gain as a mechanism for diabetes was only a "possibility," and that "the exact mechanism by which Seroquel and diabetes are intertwined, is not known."[147]   He admitted that he could not testify that Plaintiffs gained weight because of Seroquel – only that there was a "temporal connection."[148]   Indeed, he had no basis for claiming any temporal connection because he had no opinion about when Plaintiffs actually developed diabetes.[149]

Dr. Abramson did not reliably reach any "more likely than not" opinion because he did not even consider the effect of other causes, much less *rule out* that any of Plaintiffs' other risk factors were the *sole cause* of diabetes.[150]   Nor did he rule out that a combination of other risk factors – without Seroquel – caused Plaintiffs diabetes.[151]   He never even tried quantitatively to assess Plaintiffs' diabetes risks from Seroquel as compared to their many other diabetes risk

---

[146] *Id.* at 198:8-17 (emphasis added); *see also id.* at 290:7-22 ("the facts are that an additional risk factor was added, which was the administration of Seroquel, and then she ultimately went on to develop diabetes"); 340:3-14 (distinguishing other causes because "[t]he facts of the case are that he developed the diabetes after taking Seroquel") (NF Tab 6).

[147] *Id.* at 274:17-22 (NF Tab 6); *see also id.* at  275:3-9 ("I'm not in a position to offer a mechanism within reasonable medical certainty."); 197:22-198:25 ("the exact mechanism is unknown") (NF Tab 6)

[148] *Id.* at 280:7-14; *see also id.* at 278:2-10; 219:15-17 ("Q. These records do not indicate that Mr. Haller gained weight because of Seroquel?  A. Correct.") (NF Tab 6).

[149] *Id.* at 270:16-18 ("Q. Are you giving any opinion as to when Ms. McAlexander developed diabetes? A. No."); 193:21-194:3 (Haller) (NF Tab 6).

[150] *Id.* at 289:12-14 (NF Tab 6).

[151] *Id.* at 289:12-25 (NF Tab 6).

factors.[152]  Instead, Dr. Abramson invoked the false-cause reasoning that *all* known risk factors "can be viewed as the cause of the diabetes."[153]  Such unreliable causation testimony must be excluded.  *See Cano*, 362 F. Supp. 2d at 846.

### c.    Dr. Abramson's Specific-Causation Opinions Are Not Relevant

Although he sometimes invoked the phrase, "more likely than not,"[154] the substance of Dr. Abramson's testimony made clear that his causation opinions are irrelevant to proving causation under Florida law.  Dr. Abramson agreed that "causation" in this context means that "but for taking Seroquel . . . you would not have developed diabetes."[155]  And he repeatedly stated that he could not conclude that Seroquel as a "but for" cause of any Plaintiff's diabetes:

> Q:  ....[C]an you stand up in court and give the opinion to a reasonable degree of medical certainty that if he hadn't taken Seroquel, Mr. Haller would not have developed diabetes?
>
> A:  No.[156]
>
> \* \* \*
>
> Q:  ... [W]e've gone over a number of risk factors that Ms. McAlexander had for developing diabetes.  Can you rule out that Ms. McAlexander would have developed diabetes even if she had never taken Seroquel?
>
> A:  No.[157]

---

[152] *Id.* at 289:5-11 (no "quantitative analysis" for McAlexander); 290:1-4; 233:16-234:10 (no "quantitative assessment" for Haller) (NF Tab 6).

[153] *Id.* at 290:24-291:6 ("all her risk factors together can be viewed as the cause of the diabetes.") (NF Tab 6).  Dr. Abramson's opinions should also be excluded because he relied on insufficient facts and data about Plaintiffs, in violation of Rule 702.  *Id.* at 190:18-191:6 (NF Tab 6).

[154] *Id.* at 228:19-229:1 (NF Tab 6).

[155] *Id.* at 88:16-89:1 (NF Tab 6).

[156] *Id.* at 228:6-11; *see also id.* at 232:24-233:7 ("I already said that I couldn't tell you that absent the Seroquel he would not have developed diabetes."); 267:8-14 (no way to "rule out that [Haller] would have developed diabetes even if he never took Seroquel"); 324:1-19 (agreeing that he "can't say that but for the Seroquel, Mr. Haller would not have developed diabetes when he did"); 340:3-10 (admitting that Haller "could have developed diabetes without taking Seroquel and he could have developed it at the time that he did"); 340:16-21 ("Q. There's no way you can say he would not have developed diabetes at that time, even if he had never taken Seroquel? A. Correct. ..."); 287:21-288:25 (NF Tab 6).

[157] *Id.* at 287:21-24; *see also id.* at 289:12-25 (NF Tab 6).

In short, Dr. Abramson's unscientific and unreliable specific-causation opinions do not fit the legal and substantive issues in Plaintiffs' cases, and should be excluded for this reason as well.

>    **5.    The Court Should Exclude The Specific-Causation Opinions of Dr. Mitchell Young**

Dr. Young, a psychiatrist, proposes to testify that Seroquel "was a cause of diabetes" in Plaintiffs Unger and Whittington.

>    **a.    Dr. Young Is Not Qualified To Assess The Causes Of Diabetes**

Dr. Young admitted he is not an expert in diabetes causation: "Q. Do you hold yourself out as an expert in determining the cause of diabetes in patients? A. Per se, no."[158] Indeed, Dr. Young does not treat patients for diabetes.[159] He has never researched or written on diabetes and could not identify the basic diagnostic laboratory criteria for diabetes (which he initially stated incorrectly) without consulting his notes.[160] Dr. Young is not qualified to opine on diabetes causation and his opinions should be excluded.

>    **b.    Dr. Young Relies On A Temporal Association Between Seroquel And Plaintiffs' Development Of Diabetes**

Dr. Young's opinions are based merely on an alleged temporal association between Plaintiffs' ingestion of Seroquel and their diagnoses of diabetes:

> Q. All right. But if the consensus group cannot say that it's more likely than not that Seroquel is causing diabetes, how is it that you're able to offer that opinion in this case.
>
> A. Because I think it is a risk factor. I think there is an association – there is a *temporal association* between diagnosis and receipt of medication and, therefore, I'm able to render that opinion.
>
> Q. Is there a difference between association and causation?
>
> A. Yes and no.

---

[158] Young Dep. at 24:18-20; *see also id.* at 23:1-3 (admitting he is not an expert in diabetes) (NF Tab 7).

[159] *Id.* at 23:22-25 (NF Tab 7).

[160] *Id.* at 22:17-25; 26:14-27:2; 27:13-29:3; 197:17-23 (NF Tab 7).

Q. Okay. What's the difference between association and causation?

A. I think, by and large, science proves correlation or association versus causation and so, too, you're going to argue the *temporal association* does not necessarily indicate causation, and that gets into what the definition of "is" or "causation" versus "correlation" or "association," okay? It is my best professional opinion, held to a reasonable degree of medical certainty that if you have a new diagnosis of diabetes in an individual who is in receipt of medication, that that is a causal factor.

Q. So, you're basing that on the *temporal association* as you've just described it?

A. Correct.

Q. And that's – you apply that method methodology that you've just described to Mr. Unger's case and Ms. Whittington's case?

A. Correct.[161]

Dr. Young asserts, without scientific support, that Seroquel is somehow a "risk factor" for diabetes, but does so merely because "there is a temporal association between diagnosis and receipt of medication and, therefore, I am able to render that opinion."[162] He conceded multiple times that the scientific evidence does not demonstrate that Seroquel causes diabetes, including at the extremely low doses taken by Plaintiff Whittington.[163] Dr. Young made clear that the medical community does not know whether Seroquel causes diabetes, but he is offering a causation opinion because he would "rather err on the side of caution with a given patient."[164] Dr. Young has not applied any scientific methodology to the question of whether Seroquel

---

[161] *Id.* at 100:9-101:12; *see also id.* at 80:19-21 ("Q. So, what opinion are you giving with regard to Mr. Unger on causation? A. On a temporal basis, Seroquel caused his diabetes.") (NF Tab 7).

[162] *Id.* at 100:4-16 (NF Tab 7). As discussed above at p.16 n.35, the law is clear that a vague assertion that a substance is a "risk factor" does not save a specific causation opinion that is unreliably based on mere temporal relationship. *See Cano,* 362 F. Supp. 2d at 846; *see also Paoli II,* 35 F.3d at 761 n.31.

[163] *Id.* at 233:23-234:3 (admitting that he cannot identify any scientific literature concluding that Seroquel causes diabetes); 107:15-17 (agreeing that the data do not support causality); 139:2-17 (data are "still out ... as to whether in some individuals some of the time Seroquel causes diabetes, okay?"); 96:18-97:3 (agreeing the that data are discrepant); 221:4-11 (admitting that he cannot identify any studies demonstrating causation at Ms. Whittington's low dose of 50 milligrams) (NF Tab 7).

[164] *Id.* at 99:23-100:8; *see also id.* at 92:4-10 ("We don't know in fact sitting here today about which theory is correct in terms of the association between Seroquel and diabetes for some individuals some of the time. It is a risk."); 138:23-139:17 (NF Tab 7).

causes diabetes or caused diabetes in these Plaintiffs, but relies merely on his perception of a temporal connection.

> **c.     Dr. Young Fails To Rule Out Or Assess The Contribution Of Other Causes Of Plaintiffs' Diabetes And Weight Gain**

Dr. Young acknowledged that Plaintiffs had many strong diabetes risk factors prior to taking Seroquel.[165] As he admitted, however, Dr. Young could not rule out any one of those numerous risk factors as the sole cause of each Plaintiff's diabetes.[166] Similarly, Dr. Young conceded that he could not rule out other causes of Plaintiffs' weight gain.[167] Dr. Young could not even rule out the possibility that Plaintiff Unger had diabetes prior to taking Seroquel.[168] As to Plaintiff Whittington, Dr. Young conceded he has no basis to conclude she even has diabetes:

> Q.  All right.  As we sit here talking about Ms. Whittington today, Doctor, do you have a basis for concluding to a reasonable degree of medical certainty that Ms. Whittington, in fact, has diabetes?
>
> A.  I do not.[169]

Dr. Young agreed that some risk factors are more strongly associated with type 2 diabetes than others[170] and that the stronger the association, the more likely it is that the relationship between the risk factor and the disease is causal.[171] Yet, Dr. Young did nothing to assess in a quantitative manner the relative contribution of these risk factors to Plaintiffs' condition.[172]

---

[165] Dr. Young agreed that Ms. Whittington's pre-existing risk factors included family history, impaired glucose tolerance, obesity, hypertension, high triglycerides, low HDL, metabolic syndrome, smoking and prior ingestion of Zyprexa.  Young Dep. at 215:21-216:3; 216:24-217:9 (NF Tab 7).

[166] *Id.* at 75:20-78:4 (Unger); 217:10-19 (Whittington) (NF Tab 7).

[167] *Id.* at 181:20-182:6; 233:17-22 (NF Tab 7).

[168] *Id.* at 88:7-9 (NF Tab 7).

[169] *Id.* at 207:14-18 (NF Tab 7).

[170] *Id.* at 222:18-21 (NF Tab 7).

[171] *Id.* at 218:13-18 (NF Tab 7).

[172] *Id.* at 77:10-16 (NF Tab 7).  Dr. Young did nothing to compare the strength of the association with diabetes of Plaintiffs' risk factors versus Seroquel.  *Id.* at 218:19-219:4 (Unger); 216:20-23 (Whittington) (NF Tab 7).

Dr. Young's opinions are also irrelevant because he could not testify that Plaintiffs would not have developed diabetes had they not taken Seroquel.

> Q. And you would agree that it's not your opinion in this case that but for taking Seroquel [Plaintiff Whittington] would never have developed Type 2 diabetes?
>
> A. That's correct.[173]
>
> * * *
>
> Q. Okay. So, can you say that if Mr. Unger had never taken Seroquel, that he would not have gotten diabetes?
>
> A. Of course not.[174]

In short, in addition to his lack of expertise, Dr. Young has no scientifically reliable and relevant causation opinions to give in these cases, and his opinions should be excluded under *Daubert*.

### 6. Plaintiff Counsel's October 30, 2008 Abandonment Of Sandra Carter, And The Specific-Causation Opinions Of Her Sole Case-Specific Expert, Dr. Mohan Nair

On October 30, 2008, just days before this *Daubert* motion was due to be filed, Plaintiff's counsel determined to dismiss with prejudice the claims of Plaintiff Sandra Carter. Weeks earlier, plaintiffs' counsel had informed AstraZeneca of their intention to dismiss the claims of other Group One Plaintiffs, but they did not mention Ms. Carter. Although Plaintiff Carter did take Seroquel, she admittedly does not have and never had diabetes. She offered the specific-causation testimony of Dr. Mohan Nair, a psychiatrist, to support her dubious claims. Dr. Nair conceded that Plaintiff Carter never had diabetes,[175] but claimed that, out of the numerous blood-glucose readings she had taken from 2002 to 2007, he could identify three outlier readings as what he called "transient hyperglycemic episodes."[176] Dr. Nair admitted that the three outlier test results would need to have been fasting blood-glucose tests for those results to have had any

---

[173] *Id.* at 216:8-11 (NF Tab 7).

[174] *Id.* at 108:3-5 (emphasis added) (NF Tab 7).

[175] Deposition of Mohan Nair ("Nair Dep.") at 255:21-23 (NF Tab 4).

[176] *Id.* at 322:5-6; *see also id.* at 256:19-257:9 (describing three readings) (NF Tab 4).

glycemic significance, and that they would be "perfectly normal" if they were *non*-fasting test results.[177] Yet Dr. Nair admitted that he did not know if the three readings on which he relied were fasting glucose results,[178] and in fact the testimony of Ms. Carter's own physicians revealed that they were not fasting glucose tests.

Had the *Carter* case not been dismissed voluntarily, that no-injury case would have failed upon the Court's exclusion of Dr. Nair's specific-causation testimony. Indeed, like the two other psychiatrist witnesses discussed above, Dr. Nair was simply not qualified to testify about diabetes causation, as he effectively admitted at his deposition.[179] Dr. Nair had no basis (much less a scientifically reliable basis) to testify that Plaintiff Carter had suffered any injury at all from taking Seroquel, and certainly not any legally cognizable injury. Like the other experts here, Dr. Nair relied merely on "temporal relationship,"[180] and he also failed to rule out or quantify the many reasons that Ms. Carter might have had an elevated glucose reading, if she ever did.[181] Thus, like all of the other specific-causation witnesses discussed above, Dr. Nair's testimony would not have survived this Court's scrutiny under *Daubert* if Plaintiff's counsel had not elected to abandon him and Ms. Carter on the eve of AstraZeneca's motion filings.

---

[177] *Id.* at 261:4-13, 290:2-8 (NF Tab 4).

[178] *Id.* at 282:12-19; 289:9-25 (NF Tab 4).

[179] Nair Dep., at 112:5-7 ("Q:  Do you hold yourself out as an expert in the cause of diabetes or hyperglycemia?  A: No, I do not.") (NF Tab 4).

[180] *Id.* at 147:25-148:8; 305:20-24 ("[t]here is a temporal relationship here"); *see also id.* at 321:11-19 ("it was only after exposure to Seroquel that we see these readings"); 328:4-10; 321:1-10 (NF Tab 4).

[181] *Id.* at 322:7-22 (NF Tab 4).

**CONCLUSION**

For the foregoing reasons, the specific-causation testimony of Plaintiffs' case-specific

experts – Drs. Brian Tulloch, Jennifer Marks, Jack Abramson, Mitchell Young, and Bruce Perry

– should be excluded under *Daubert* and the Federal Rules of Evidence.

DATED:  November 3, 2008                    Respectfully submitted,


Steven B. Weisburd
David Venderbush
DECHERT LLP
300 West 6th Street, Suite 1850
Austin, TX  78701
Telephone: (512) 394-3000
Facsimile: (512) 394-3001
steven.weisburd@dechert.com


Stephen J. McConnell
DECHERT LLP
2929 Arch Street
Philadelphia, PA  19103
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
stephen.mcconnell@dechert.com


Chris S. Coutroulis (Fla. Bar No. 300705)
Robert L. Ciotti (Fla. Bar No. 333141)
CARLTON FIELDS, P.A.
Corporate Center Three at International Plaza
4221 W. Boy Scout Blvd.
Tampa, FL  22607
Telephone: (813) 223-7000
Facsimile: (813) 229-4133
ccoutroulis@carltonfields.com


*Counsel for AstraZeneca LP and AstraZeneca
Pharmaceuticals LP*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 3, 2008, pursuant to a service agreement with

Plaintiffs' counsel, I e-mailed an electronic copy of the foregoing brief, filed under seal, to the

individuals identified on the attached service list.  I further certify that at the same time, I sent a

hard copy of all exhibits cited in the foregoing brief, also filed under seal, via Federal Express

for overnight delivery to the individuals identified on the attached service list.

*Attorney*

## SERVICE LIST

**In Re: Seroquel Products Liability Litigation
MDL Docket No. 1769**

| | |
|---|---|
| Camp Bailey, Esq.<br>Bailey Perrin Bailey LLP<br>The Lyric Centre<br>440 Louisiana, Suite 2100<br>Houston, TX 77002<br>Telephone: (713) 425-7240<br>cbailey@bpblaw.com<br>***Plaintiffs' Lead Counsel*** | Larry Roth, Esq.<br>Law Offices of Larry M. Roth, P.A.<br>Post Office Box 547637<br>Orlando, FL  32854-7637<br>Telephone: (407) 872-2239<br>LROTH@roth-law.com<br>***Plaintiffs' Liaison Counsel*** |