# TAB 1-1

tulloch 10 2 08.txt

0001

JOB NO. 99344

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This Document Relates to:

David Haller v. AstraZeneca, LP, et al.       Case No. 6:07-cv-15733
Eileen McAlexander v. AstraZeneca LP, et al. Case No. 6:07-cv-10360
Richard Unger v.  AstraZeneca LP, et al.      Case No. 6:07-cv-15812
Linda Whittington v. AstraZeneca LP, et al.  Case No. 6:07-cv-10475


ORAL DEPOSITION OF
BRIAN R. TULLOCH, M.D., FRCP, FACP
OCTOBER 2, 2008


    ORAL DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP,
produced as a witness at the instance of the Defendant and
duly sworn, was taken in the above styled and numbered cause
on Thursday, October 2, 2008, from 4:31 p.m. to 8:01 p.m.,
before RENE WHITE MOAREFI, CSR, CRR, RPR in and for the State
of Texas, reported by machine shorthand, at Laminack, Pirtle &
Martines, 5020 Montrose Blvd., 9th Floor, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record herein.

                    A P P E A R A N C E S

  FOR THE PLAINTIFF:
        TOM PIRTLE, ESQ.
        LAMINACK, PIRTLE & MARTINES
        5020 Montrose Blvd., 9th Floor
        Houston, Texas  77006-6533
        713.292.2750

  FOR THE DEFENDANTS:
        JANE THORPE, ESQ.
        LUCAS PRZYMUSINSKI
        DECHERT, L.L.P.
        2929 Arch Street
        Philadelphia, Pennsylvania  19104
        215.994.2398

tulloch 10 2 08.txt

I N D E X

PAGE

APPEARANCES.................................    2
      BRIAN R. TULLOCH, M.D., FRCP, FACP
EXAMINATION
      By Ms. Thorpe..........................    4

CORRECTION PAGE.............................  152

SIGNATURE PAGE..............................  153

REPORTER'S CERTIFICATION...................  154

E X H I B I T S

| NO. | DESCRIPTION | | PAGE |
|---|---|---|---|
| 1 | Notice of deposition | 4 | 5 |
| 2 | Expert Report of Brian Tulloch, M.D. re Linda Whittington | 4 | 16 |
| 3 | CD | 4 | 17 |
| 4 | Reference material | | 5 |
| 5 | Printout from the Cleveland Clinic | | 42 |
| 6 | Report of the Expert Committee on the Diagnosis and Classification of Diabetes | | 63 |
| 7 | Screening Adults for Type 2 Diabetes, a Review of the Evidence for the U.S. Preventative Services Task Force | | 80 |
| 8 | Plaintiff's Second Supplemental Fact Sheet | | 83 |
| 9 | Medication log | | 85 |
| 10 | Glucose test results dated 2-16-06 | | 101 |
| 11 | Laboratory test dated 9-16-93 | | 114 |
| 12 | General Clinical Psychiatric Evaluative Interview | | 116 |
| 13 | Nursing Assessment Forms | | 117 |
| 14 | Medical record | | 117 |
| 15 | Medical record | | 126 |
| 16 | Material pulled from witness' | | |
            (Exhibit Nos. 1 through 3 marked.)
            THE REPORTER:   Stipulations or agreements
for the record?
            MR. PIRTLE:  We're by the Rules, reserving
all objections save form and responsive for the time of
trial.
            MS. THORPE:   Let's just go by the Federal
Rules of Civil Procedure.
            MR. PIRTLE:   That's it, by the Rules.
            MS. THORPE:   By the Rules.
            MR. PIRTLE:   And I am reserving all
objections save form and responsiveness until the time
of trial.
            MS. THORPE:  I'm not agreeing to anything
except for the Federal Rules of Civil Procedure.
            And you can swear the witness, please.
            BRIAN R. TULLOCH, M.D., FRCP, FACP,
having been duly sworn, testified as follows:
                  EXAMINATION
                  Page 2

tulloch 10 2 08.txt
BY MS. THORPE:
     Q.   Dr. Tulloch, my name is Jane Thorpe, and I
represent AstraZeneca in this litigation, and I'm going
to be asking you a number of questions today.
          I understand you've given deposition
testimony before; is that correct?
     A.   I have, Jane, yes.
     Q.   And so you know that you need to give a verbal
answer, right, instead of a shake of the head?
     A.   That's correct.
     Q.   Okay.  If at any time I ask you a question that
you do not understand or I'm not communicating with you
in a way that makes sense to you, you'll let me know.
Is that all right?
     A.   I will do that.
     Q.   Okay.  I'm going to show you what's been marked
as Exhibit 1 to your deposition, and it's the notice of
this deposition.  And it has an attached -- Schedule A
attached to it.  And I see that you have before you a
number of documents that you've brought with you today.
     A.   Yes.
     Q.   Okay.  I'd like to mark the whole stack, if we
can, as Exhibit 4.
          (Exhibit No. 4 marked.)
     Q.   (BY MS. THORPE)  You brought those copies for
me, right?
     A.   Yes, indeed.
     Q.   So let's just stack them all up.
     A.   Okay.  I'll be using them through the duration
of the discussion, but if -- let's assume that --
     Q.   If you need any of them, I --
     A.   Let me give you a top one to put on, would you
like?
     Q.   No, I'll--
     A.   Use the top one off?
     Q.   No, I'll manage --
     A.   Why don't we use that one, then.
     Q.   That's fine.
          So we're going to put Exhibit 4 on the
collect -- as a collective exhibit --
     A.   Which will be the contents of that envelope,
which will --
     Q.   Dr. Tulloch, I can tell we're going to have a
problem.  I need to finish my question before -- I
should have told you that -- before you give an answer.
          MS. THORPE:  I am marking a stack of
documents.  The top one is "Economic Costs of Diabetes
in the U.S. in 2007" that Dr. Tulloch has brought with
him to the deposition.
     Q.   (BY MS. THORPE)  Okay.  And did you bring, sir,
the documents in Exhibit 4 in response to Exhibit A of
this notice?  Let -- let me do it this way.
          What is Exhibit 4?  What are the materials
you've brought with you today?
     A.   Yeah, I have brought my list of -- of the legal
work that I've done with this and other groups, and I
have brought this as the information that we'll be
working from.
     Q.   Okay.   What is the information we will be
working from?
     A.   What I have here is a selection of references
which relate to the content of today's assumed
discussion.
                    Page 3

tulloch 10 2 08.txt
    Q.   Have you brought with you, sir, all materials,
including all original documents that relate to Seroquel
which you have reviewed prior to or since you were
retained as an expert in the litigation?
    A.   Yes, I have.
    Q.   Have you brought all materials you've
considered as well as those on which you relied to
support your opinions in the Seroquel litigation and in
this case?
    A.   Yes, I have.
    Q.   Have you brought all work product, including
any that you intend to present at trial, notes, and
memoranda you have prepared in the Seroquel litigation
or any other litigation involving atypical
antipsychotics including -- excluding drafts of your
expert report?
    A.   Yes, I have.
    Q.   Have you brought all documents reflecting time
you have spent as an expert witness in the Seroquel
litigation?
    A.   Yes, I have.
    Q.   Have you brought all documents reflecting time
you have spent as an expert witness in any other
litigation involving atypical antipsychotics like
Zyprexa?
    A.   Those have been listed in the -- in the back
of -- of this, yes, ma'am.
    Q.   Okay.  Did you bring invoices that you have
submitted for payment in the Zyprexa litigation?
    A.   Zyprexa litigation?
    Q.   Yes.
    A.   No, I referred those to Dr. Nations --
Mr. Nations because when that case was settled, I turned
everything back to that law firm.
    Q.   Okay.  And that's Howard Nations?
    A.   Howard Nations, that's correct.
    Q.   And so you don't have any records of how much
money you made in the Zyprexa litigation?
    A.   I sent them all back to Mr. Nations.
    Q.   Okay.  Do you have any work product, notes, and
memoranda that you prepared in connection with Zyprexa
that you still have?
    A.   No, I don't.  I turned them all back.
    Q.   So you literally have no piece of paper related
to the Zyprexa litigation --
    A.   No.
    Q.   -- in this action?
    A.   May I explain?
    Q.   No.  I'll ask for -- I'm trying to move very
quickly through this, and I'll come back and we can
talk -- we'll talk more about some of this stuff.
        A list of -- you've given me a list of all
cases in the past four years in which you've testified
about any topic, right?
    A.   That's correct.
    Q.   And you didn't have any transcripts?
    A.   No.
    Q.   Have you in your -- did you bring with you any
communications including but not limited to e-mails and
expert witness reports in litigation involving Zyprexa
or any other atypical antipsychotic litigation?
    A.   I returned those to Mr. Nations.  The ones that
relate to this product I have the final work product
Page 4

tulloch 10 2 08.txt
here.  And I did not bring any rough copies, because
when I made the final work products, I deleted the
earlier products.
        Q.  Do you have any e-mails relating to Zyprexa on
your computer in your office?
        A.  Not to Zyprexa.
        Q.  Do you have any e-mails relating to Zyprexa on
your computer at your home?
        A.  No, ma'am.
        Q.  So you literally have no computer materials of
any sort, any electronic materials regarding Zyprexa in
your office or home?
        A.  I am not very sophisticated with a computer,
and if anybody wishes to search my hard drives, I'm
happy to share them.  I have one right here.  So -- but
at the level of my ability to get in there, the answer
is no.
        Q.  Okay.  You don't have a folder on your
computer --
        A.  No.
        Q.  -- with --
        A.  No.
        Q.  -- materials relating to Zyprexa --
        A.  No.
        Q.  -- correct?  Okay.
        A.  My main reason for that -- if this is the time
to answer -- I'll go on.
        Q.  I'm just trying to cook through this list.
        A.  Never mind.
        Q.  Do you have any communications -- strike that.
                Do you have any documentation of any kind
of independent medical examination of any of the
plaintiffs in the Seroquel litigation?
        A.  No.  The -- the --
        Q.  You never --
        A.  I hesitated for a moment because I did see the
four Zyprexa plaintiffs that relate, but I did -- I have
not seen any of the four Seroquel plaintiffs physically.
        Q.  Okay.  Have you had any conversation with any
of the four Seroquel plaintiffs?
        A.  I have not.
        Q.  Do you have any communications including but
not limited to e-mails that you have had with any
witness in the Seroquel litigation?
        A.  No.
        Q.  Have you talked to any witness in the Seroquel
litigation?
        A.  No.
        Q.  Have you talked to anyone at AstraZeneca about
Seroquel?
        A.  No.
        Q.  Have you made any speeches, presentations,
written any articles, do you have any manuscripts,
reviews, editorials, or other writings other than your
expert report concerning Seroquel?
        A.  No, ma'am.
        Q.  How about Zyprexa?
        A.  No, ma'am.
        Q.  Do you have a retention agreement with any
lawyer in connection with either Seroquel, Zyprexa, or
any atypical antipsychotics?
        A.  No, ma'am.
        Q.  So you have no letter or written agreement of
                                Page 5

tulloch 10 2 08.txt

any sort?

A.   No, ma'am.

Q.   It's all oral?

A.   Oral.

And if I again may explain.  These people are my duck hunting friends.  We relate in a number of nonacademic contexts and I trust them, they trust me.

Q.   Where do you go duck hunting?

A.   Just about 15 miles west of Freeport.  We own some marsh down there, and we go down there and fish and duck hunt.

Q.   So that's how you got to know these folks?

A.   Yes, ma'am, about 25 years ago.

Q.   All right.  So -- and you have given us all records of the fees for your time that you've spent consulting with or testifying at the request of plaintiffs' lawyers involving Seroquel, right?

A.   Yes, ma'am.

Q.   Now, have you got any other records of payment or records of fees for time you have spent consulting with plaintiffs' lawyers about testifying against other pharmaceutical companies?

A.   I'm -- let me -- let me make a statement that a good 70 if not 80 percent of my time is actually spent in defense.  The Texas Medical Liability Association, TMLT, is a group that defends doctors, and I give them a lot of time.  A fair amount of it is done almost at a casual level.

For those in which I do charge, I have included my exhibit with the expert witness report.

Q.   You've given a list of what your fees -- what your hourly rate is --

A.   Right.

Q.   -- and what depositions you've given, sir.  But I'm asking you how much money you've made, whether you -- strike that.

What I want to know is whether you have brought with you today as requested by Schedule A, which has been marked as Exhibit 1 to this deposition --

A.   Yes, ma'am.

Q.   -- whether you brought with you records of payments or records of fees for time that you've spent consulting with or testifying at the request of plaintiffs' lawyers against pharmaceutical companies.

A.   Okay.

Q.   That's it.  You did or you didn't.

A.   Okay.  I did not -- the only two which I have given are to the two products which you have just mentioned.  I have been on the defense --

Q.   I don't -- I --

A.   -- for pharmaceutical companies.

Q.   -- really don't want to hear about --

A.   Okay.

Q.   I'll ask you about your testimony in a little while.

A.   No problem.

Q.   I just want to know.  You didn't bring it?

A.   I didn't bring it.

Q.   All right.

A.   And they were only the two -- and the two products which are the atypicals.

Q.   All right.  Do you have records of payments and records of fees for time you spent consulting with or

Page 6

tulloch 10 2 08.txt
testifying at the request of plaintiffs' lawyers against
pharmaceutical companies?
     A.  I believe they are with the companies that I
have sent the bills to.  I don't personally keep copies
of those bills.  When they're paid I strike them off.
     Q.  How about 1099 forms?
     A.  1099 forms I have.  I can produce my -- my --
actually, they're all listed -- most of my income is
from defense or from lectures, and the 1099 form relates
to -- to those.  I can produce those.  I do not have
those today.
     Q.  Okay.  Exhibit 4 is literature that you've
brought with you?
     A.  Yes, ma'am.
     Q.  Okay.  Is -- does Exhibit 4 reflect the
literature that is on the list of literature that is
attached to your expert witness report?
     A.  Yes, it does.
     Q.  Is there anything in that stack that isn't on
your list of literature?
     A.  No.
     Q.  Okay.  So it's one in the same?
     A.  But I --
     Q.  Is that right?
     A.  I -- I leave a -- a paragraph at the bottom of
each discussion -- and I believe it's on here -- which
means that anything I offer can be superseded by new
information becoming available.
     Q.  I'm really asking you -- let me show you what's
been marked --
     A.  Okay.
     Q.  -- as Exhibit 2.  This is your report in this
case, right?
     A.  Yes, ma'am.
     Q.  Okay.
     A.  And that list is --
     Q.  And you've got your --
     A.  -- is current as of the 2nd of October.
     Q.  All right.  And you looked at -- in Exhibit 2
there's a document that is -- begins on page 1, and it's
17 pages long, and it's a list of literature and
documents and medical records you've reviewed, correct?
     A.  Yes, ma'am, that's correct.
     Q.  And you have no corrections or changes that you
want to make to pages 1 through 17 of your report
today --
     A.  That's correct.
     Q.  -- is that right?
     A.  Yes, ma'am.
     Q.  And the documents that you have stacked in
front of you that have been marked as Exhibit 4 are
the -- is the medical literature that's on -- described
on pages 1 through 17 --
     A.  That's correct.
     Q.  -- of your report?  Okay.
          I received in the overnight mail last night
a DVD that's been marked as Exhibit 3.  Did you produce
that or how did that come to be?
     A.  Firstly, I didn't produce it.  My belief, it
would have come from Mr. Fibich's office.  Do you know
what the contents are?
     Q.  I know that it's got medical records on it.
And I quite frankly have not had time to look at it
Page 7

tulloch 10 2 08.txt

since I got it at about --
       A.   Okay.
       Q.   -- 11:00 o'clock this morning.
       A.   Okay.  So without -- firstly, I did not
generate it.  My belief -- well, let's -- we can put it
in the computer and find out what it has in a moment.
       Q.   Okay.
            MR. PIRTLE:  I can tell you what it's
supposed to be.
            MS. THORPE:  Okay.
            MR. PIRTLE:  It's supposed to be everything
he'd been provided, the production to you, and you're
supposed to receive it as per our stipulation.
            MS. THORPE:  Okay.  Which I didn't,
but . . .
       A.   I apologize on all of our behalf that it came
so late.
       Q.   (BY MS. THORPE)  So what I'm getting at is did
you bring medical records with you today?
       A.   I brought a disk which includes the medical
records of the patients which we will be discussing.
       Q.   Okay.  All right.  Okay.  So --
       A.   May I make a comment?
       Q.   Sure.
       A.   Okay.  I'm here to share information.  I've
never had a problem with sharing any of the information
that's available.  And the contents of that folder there
is available to you to be copied at any stage.
       Q.   Great.
            So you have --
       A.   I've never had a problem.
       Q.   Great.  I really genuinely appreciate that.
            And do you have a -- another folder?  Is
that what you're saying?
       A.   No, I have what I hope is there.
       Q.   Okay.
       A.   Which are the medical records as they were sent
to me over the last multiple months.
       Q.   Okay.  All right.
            MS. THORPE:  Just for -- I assume when we
started -- did you note the time of the deposition?
Okay.  Thanks.
       Q.   (BY MS. THORPE)  Why don't we take a look at
the folder so I can see what it is.
            MR. PIRTLE:  I think it's a disk.
            MS. THORPE:  Okay.  It sounded like it was.
            MR. PIRTLE:  We can do this off the record.
            (Discussion off the record from 4:48 to
4:48.)
       Q.   (BY MS. THORPE)  The report that has been
marked as Exhibit 2, that is your report for -- for
Ms. Whittington, right?
       A.   Yes, ma'am.
       Q.   And you prepared Exhibit 2?
       A.   Yes, ma'am.
       Q.   And I take it you have no additions or changes
you want to make to Exhibit 2 today?
       A.   Within the limitations of that last paragraph,
yes, ma'am.
       Q.   Today, though, you don't have any --
       A.   That's correct.
       Q.   -- that you know of, right?
       A.   That's correct.
                                   Page 8

tulloch 10 2 08.txt

Q.   And Exhibit 2 fairly and fully reflects your opinions in this case, right?

A.   To the best of my knowledge as of October the 2nd, yes, ma'am.

Q.   And the report is, as best you could do, an accurate and careful summary of your opinions?

A.   Yes, ma'am.

Q.   And --

A.   Subject to the last -- the last paragraph at my statement, yes.

Q.   And the report is an accurate and careful summary of the medical and scientific facts in the -- and excuse me -- in the Whittington case, right?

A.   Yes, ma'am.

Q.   Now, the paragraph -- point out the paragraph again that you keep citing as the --

A.   It's the last full paragraph which basically says, "The observations are based on medical interpretation of the data as available in the charts of the medical facilities listed.  It is my understanding that the document and record production is ongoing and I thus reserve the right to supplement my opinions pending the review of any additional information."

Q.   Okay.

A.   So that leaves us -- new information's coming out all the time and --

Q.   How do you know new information is coming out?

A.   Every now and again, I run a MedEd review and put in the products which we're discussing.

Q.   In terms of the medical -- the medical records on Ms. Whittington, you don't have any understanding that there are going to be additional medical records coming in, do you?

A.   Other than new information that comes out when her physicians interview her.  Sometimes new issues come up about family history of diabetes and whatever.  But no.  My main reservations held in that are the academic information about endocrinology and how the atypical antipsychotics would relate in this particular context.

Q.   Well, to the extent that your report -- any opinion in the report is affected or influenced or you revise your opinion in any way based on additional literature, we would expect you to revise your report and we would expect the opportunity to take an additional deposition.

A.   It would be my pleasure.  No problem.

Q.   All right.  So let's imagine, Dr. Tulloch, that you have a group of 100 people who have taken Seroquel --

A.   Yes, ma'am.

Q.   -- and then thereafter developed diabetes.  Okay?  Are you with me?

A.   I'm with you.

Q.   And would you say, Dr. Tulloch, that in that scenario Seroquel caused or contributed to the development of diabetes in all those 100 people?

MR. PIRTLE:  Objection, form.
Go ahead.

A.   Ma'am, I think -- I think it would be a naive statement if I were to do that.

Q.   (BY MS. THORPE)  You would not do that?

A.   I certainly would not do that.  No.

Q.   What would be the characteristics of the people

Page 9

tulloch 10 2 08.txt
in whom Seroquel was not a cause or contributor to the
development of diabetes in those 100 people?
                    MR. PIRTLE:   Same objection.
                    Go ahead.
        A.   May I make a general statement?
        Q.   (BY MS. THORPE)  I'd like you to answer my
question.
        A.   Okay.  If you're putting it specifically to the
100 patients, I would have to know more about the
background of each individual patient.  I would have to
know what proportion of them had a family history of
diabetes.  I would have to know what proportion of them
were on other diabetic -- diabetogenic medications.  I
would have to know the weight patterns of the patients
that had lived before the first atypical, then what
happened when they got the first atypical, and then if
Seroquel was a subsequent atypical -- because, remember,
it only came out in 1998 -- what happened to the weight
pattern when the patient got Seroquel.
                    And then if the -- there was any change in
glucose physiology, my cautious review would relate to
were there any other diabetes -- diabetogenic
medications what were given synchronously with Seroquel,
and then I would try to proportion the context.  As I
said earlier, I try to be a fair dispassionate assessor
of risk.
        Q.   Okay.  So let's try to go at it this way.
Well, let me -- let me go back a second.
                    The list that you just gave of family
history, other diabetogenic medications, weight patterns
before the first atypical antipsychotic was taken, was
Seroquel a subsequent atypical, what happened to the
weight pattern, all of those things, are there any other
characteristics or questions that you would want to know
about those 100 people before you attributed causation
to Seroquel?
        A.   Well, I -- I wouldn't interpret -- I wouldn't
attribute causation to Seroquel, but I would have it as
part of a balance of all of the other factors.  I mean,
what you heard me say was people are people.  Psychotic
people are psychotic people who by being psychotic
already inherit the possibility of diabetes
statistically.  And then people have a family
background, which can include a racial preponderance
towards diabetes.  We're here in Texas.
Mexican/Americans have a very high prevalence of
diabetes.  If we were in Phoenix, Arizona, the Pima
Indians have a 50 percent prevalence of diabetes by the
age of 50.
                    So you can hear why I'm not going to give
you a simple answer.  There's so many factors out there.
But if all other factors were standard and then the
patient had normal sugar at the time -- let's take one
patient of your hundred -- had normal sugar at the time
of being given quetiapine and six months later had
gained 40 pounds in weight and now had a high blood
sugar, my belief that there could be an etiological
factor at work in that context over that six months.
        Q.   So what you're -- you're saying in that
situation is that Seroquel would be a risk factor --
        A.   Would be --
        Q.   -- for the development of diabetes?
        A.   -- a contributing factor.  There's a biblical
                              Page 10

tulloch 10 2 08.txt
parable about the soil and the seed.  And if you sow
seed on stoney ground, it will not germinate; if you sow
seed on fertile ground and water, it will germinate.
And if that's perhaps too obtuse, let me come back to
the facts.

        The facts are that diabetes will evolve in
people at risk, and diabetogenic factors can bring out
that diabetes by many, many years.

        Ma'am, did you read my deposition for
Zyprexa?

Q.   You know, I'm not here to answer questions,
unfortunately.

A.   May I --

Q.   I'd love to see your copy of your transcript if
you have it.

A.   May I pick that up if it --

Q.   You know what, Doctor --

A.   It would --

        THE REPORTER.  One at a time.

A.   -- accelerate our discussion tonight.

Q.   (BY MS. THORPE)  I can already tell,
Dr. Tulloch, that we're going to have to just kind of
move crisply --

A.   Madam, you are in charge.

Q.   I've taken a lot of depositions in my life, and
I already know that if you don't want to do this for the
rest of your life --

A.   I understand and you are in charge, ma'am.

Q.   -- I have to have a question and an answer.

A.   Okay.

Q.   So let me -- let me go back to my original
premise.  We're talking about these 100 people.

A.   Okay.

Q.   If someone -- some -- one or more of those
people had no weight gain at all after they ingested
Seroquel and thereafter developed diabetes, is it
correct that you would conclude that Seroquel was not a
cause or a contributor to the development of diabetes?

A.   No, ma'am.

Q.   That's not correct?

A.   There are some --

Q.   Is that -- just -- you can say yes or no and
then you can explain.

A.   The answer's no.  And if you ask me why, I'll
tell you why.

Q.   Well, tell me why that is.

A.   Some of the atypicals and I believe -- I
believe Zyprexa definitely is one, and I believe
Seroquel is another -- cause insulin resistance.  And
what we're talking about is the exhaustion of a pancreas
which has a limited capacity by a number of factors.
The atypicals can cause weight gain which can
precipitate diabetes in a fertile ground.

Q.   I want -- I want to know what evidence -- what
scientific literature that you rely on for the
proposition that Seroquel causes insulin resistance in
the pancreas.  Just tell me the cite on your reliance.

A.   There are references in this pile which show a
rise --

Q.   You've got a list --

A.   -- in insulin level with the administration of
Seroquel.

Q.   Tell me which ones.  You can just look at your

tulloch 10 2 08.txt
list.  It's on --
     A.  It will take me a while to find them, but let
me -- and then --
     Q.  I just want you to find that and answer that
question.
     A.  Okay.  Ma'am, it will take me a while to find
it, but if -- let me tell what you I'm looking for.
There are summaries of patients --
     Q.  I just want to know --
     A.  Well, there are summaries of patients in these
references which include patients having been given
quetiapine and there is a rise in the level of insulin
in those patients in --
     Q.  I just need to know the name of the study.
     A.  Okay.
     Q.  Or studies.
     A.  Give me a moment to find it, then.
          Okay.  I am holding a reference by Helliner
and Vestri -- Helliner S. Vestri, et al.  It looks at
the direct effect of atypical antipsychotics on adipose
cells in vitro.  These are 3T3-L1 cells.
     Q.  I don't need an explanation of the article.  I
just need you to identify the article.  Give me the
author and the date of the journal.
     A.  The author is Vestri.  The journal is
Neuropsychopharmacology.  And I can give you the
reference if you need it.
     Q.  I don't need the reference.  I just need the --
that's fine.
          Is that it?  Is that all of them?
     A.  That's -- that's one.  If you --
     Q.  I want to know all of the article -- basically
what you're saying is that Seroquel has a direct effect;
is that right?
     A.  On insulin action in isolated fat cells in
vitro --
     Q.  All right.
     A.  -- yes, ma'am.
     Q.  I want to know all evidence that you're relying
upon that Seroquel -- the mechanism by which it works is
a direct effect.  Go -- just tell me what you got there.
     A.  Okay.  It's going to take a while because what
we look at at the level of patient studies is the
context of your hundred patients.  And in your hundred
patients, what you see is the odds ratio, which is a
representation of the risk of developing diabetes in
that hundred patients that you asked us to -- to review.
That risk ratio varies from 1.3 to 3.4.
          That means if they were given quetiapine
for a length of time under the context of these studies,
the chance of them -- those hundred patients that you
asked me to think about developing diabetes was
3.34-fold greater than were they to be on a placebo or
nonatypical.
     Q.  Dr. Tulloch, I asked you to tell me the names
of the journal articles that you rely on for Seroquel
having a direct effect.
     A.  Yes, ma'am.
     Q.  So --
     A.  I gave you Vestri.
     Q.  -- if you don't have -- I just need the names
of the articles.
     A.  Okay.
                         Page 12

tulloch 10 2 08.txt

Q.   I don't need any other response.

A.   Okay.  May I -- I think this will take a lot of time, ma'am, because what I'm trying to do is to take science and convert it into a way that would answer your question better.  Let me start --

Q.   I just need to know the name --

A.   -- with Vestri.  This is in my view the most concrete evidence that quetiapine has a direct effect in reversing insulin action.

Q.   What I need to know from you, Dr. Tulloch, is the -- whether or not the Vestri article is the only article upon which you rely to establish that Seroquel has a direct effect on the pancreas.

A.   No, ma'am.  You're taking my -- my argument out of context.

Q.   I'm giving you the opportunity to tell me anything else you're relying on.

A.   In here there's references which show there's a rise in circulating --

Q.   Sir, I'm asking for the names of the journal articles.

A.   Oh, okay.  It will take me a while to find them.

MR. PIRTLE:  If it takes a while, just do it.

A.   Okay.  And I'm going to save us some time.  I'm going to have to give you as they come up in random.

Leslie Citrome, the year 2004, the odds ratio for quetiapine associated with diabetes in 13,000 patients who got antipsychotics --

Q.   (BY MS. THORPE)  No, all I need was the --

A.   -- was 3.89.

Q.   I need the title.

And you're saying that that is an article that shows the direct effect of Seroquel on the pancreas?

A.   No, ma'am.

Q.   That's what I'm asking you for, sir.

A.   Okay.

Q.   I'm asking you for articles that show the direct effect of Seroquel on the pancreas.  You've given me Vestri.  Are you also giving me Citrome?

A.   Ma'am, I apologize.  I misheard your question.  What I -- I have offered you with Vestri was a direct effect of quetiapine on insulin action in fat cells.  That's not the pancreas.  And I apologize if you -- if that was the original question.  I do not --

Q.   Let me just -- let me just -- since you're going through these articles, let's just do it this way.  Is it your contention that Seroquel -- the mechanism by which Seroquel causes or contributes to diabetes is a -- that there is a direct effect on the human body apart from weight gain?

A.   What I've shown you -- to make a statement like that, one has to think of the components.  So the first component --

Q.   So you can't --

A.   -- is the pancreas.

Q.   -- answer the question?

A.   Yes, we've looked at one component of the human body, which was the isolated fat cell.  I have offered to you a second context, which was that when patients are given quetiapine, the insulin levels rose.  That can

Page 13

tulloch 10 2 08.txt
be interpreted as the medication causing an insulin
resistance.
          And we as endocrinologists see patients
with high levels of circulating insulin and insulin
resistance ultimately causing their pancreas to burn
out.  And we discussed a number of contexts in which
that would occur.
     Q.  All right.  Let me change horses here and --
     A.  Okay.
     Q.  -- let me ask you to turn to page 16 of your
reliance list.  And on that page you list the medical
records that you reviewed; is that right?
     A.  Yes, ma'am.
     Q.  And it was your intent to review all of the
plaintiff's medical records that exist, correct?
     A.  Ma'am, I have a limited number of time.  I'm a
busy clinician.  So what -- what I did was look at the
endocrine aspects of these patients, which were their
diabetes, their weight, the other factors which might
affect their blood sugar.
          And if you're showing me page 16 which
lists a -- I looked at the records or a summary thereof
of a number of these from the viewpoint of an
endocrinologist.  I did not look at the psychiatric
aspects of these patients.  So, again, I hope that helps
you.
     Q.  Well, I need to know exactly what you read.
So --
     A.  Okay.
     Q.  -- did you read -- tell me which of the medical
records on this list that you did not read.
     A.  What I read is --
     Q.  That's a easier way to go at it.  I just need
to know what you read.  But you can tell me what you
didn't read or what you -- or what you did read.
     A.  We're looking at Linda Whittington and we're
looking at page Opinions Relating to Ms. Linda
Whittington, which is two-thirds of the way through
there.
     Q.  Yes.
     A.  I reviewed the items which are listed in the
first paragraph.
     Q.  Okay.  So you did not review all the records
that are on the page 16 --
     A.  Page 16, that's correct.
     Q.  -- of the --
     A.  Yeah.  And that's what I said.  I -- I'm an
endocrinologist, not a psychiatrist.
     Q.  Okay.  Well -- and is it your testimony that
all of the records that you did not read were
psychiatric records?
     A.  To the best of my understanding, yes.
     Q.  And so if there were glucose levels in those --
the psychiatrists had ordered lab tests --
     A.  I got those.
     Q.  -- you got those?
     A.  Yeah.  They were summarized for me, yeah.
     Q.  And who summarized the records for you?
     A.  They'll be on there.
          One of the office workers for Mr. Fibich.
     Q.  Summarized the records?
     A.  Yeah.  I believe you'll have them on that disk.
     Q.  Okay.  So were these, like, memos about what
Page 14

tulloch 10 2 08.txt
the medical records showed?
      A.   They were a list, a seral -- when those blessed
folk went through and they summarized all the lab, so
you can have -- you can eyeball the sugars and you can
eyeball the weights.
      Q.   Just like a medical chronology prepared by a
paralegal or something like that?
      A.   That's correct.
      Q.   And how long was that document?  Was it very
thick?
      A.   Multiple pages for these patients who were
looked after for some years.
      Q.   Did you actually look at the labs yourself or
did you rely on the medical chronology?
      A.   Both, both.  I went through the items which
were listed there.  And then you know what a chart looks
like, there's multiple areas and then somewhere down
there is the lab.  And then one of those souls had
pulled all the lab and then collated them.
      Q.   All right.  Did you have -- within that summary
were there -- for example, was there a list of the
weights --
      A.   Yes, ma'am --
      Q.   -- for Ms. Whittington?
      A.   -- a list of body weights.  I said they listed
the medications, the weights, and the context.
      Q.   Okay.  And the context?
      A.   The --
      Q.   The context?
      A.   Yeah.  If they had an acute infection, they
were given drug X for period Y.
      Q.   All right.  What other kinds of information was
in this medical chronology that Mr. Fibich's office
prepared for you?  Is that right?
      A.   That's about it.  But you have -- you have
access to it.
      Q.   Okay.  I honestly don't think it's on there.
      A.   Okay.
      Q.   But I --
      A.   Ma'am --
      Q.   Am I hearing correctly that in preparing your
report, you relied on that medical chronology?
      A.   Yes, ma'am.  I said you had access to it.  It's
in your colleague's hands right now.
      Q.   Good.  Okay.  Well, I just got here this
afternoon.
      A.   I don't withhold data, ma'am.
      Q.   Okay.  Well, unfortunately, I didn't have it
before today.  So that's why I'm asking you these
questions.
            MR. PIRTLE:  We'll certainly get it for you
if we owe it to you.
            MS. THORPE:  Okay.
      A.   Let me be on record -- I'm here to be kind to
my colleagues, and you are one of my colleagues.
      Q.   (BY MS. THORPE)  I appreciate that.
            All right.  So -- so the kinds of medical
records that you wanted to review you described as the
endocrine aspect, diabetes, weight, and blood sugar
records?
      A.   Blood fats, cholesterol, triglycerides, special
circumstances, yes, ma'am.
      Q.   Okay.  And did you undertake a review of
                        Page 15

tulloch 10 2 08.txt
these -- well, let me -- strike that.

         As you reviewed the medical records, you needed to know what -- the pattern of weight gain and weight loss Ms. Whittington had before she took Seroquel, right?

    A.  Yes, ma'am.

    Q.  And you needed to know her pattern of weight gain and weight loss while she was on Seroquel, right?

    A.  And subsequent to that as well, ma'am, yes.

    Q.  And -- and why did you need to know that?

    A.  Again, should there be any mitigating circumstances and should there be any tendencies -- some of the psychiatric patients have binge and bust habits which are totally independent of their medication.

         So, again, to be fair to everybody, what I tried to do was establish whether this pattern was part of that particular person's behavior.

    Q.  Okay.  So -- so those weight gain and weight loss patterns before Seroquel and after Seroquel were key to your opinion --

    A.  Yes, ma'am.

    Q.  -- correct?

         And so if after -- well, let me strike that.

         Is weight loss that occurs after Seroquel ingestion important to you?  Excuse me.  Let me reask the question.

         Is weight loss after someone stops taking Seroquel important to your opinion?

    A.  Yes, ma'am.  We -- you by your requirement --

    Q.  Why is that?

    A.  -- are fixated on Seroquel.  But of the atypicals --

    Q.  Yes, I'm only --

    A.  -- there's a group of patients which will gain weight on some medications and not on others, and there are two atypicals which are not associated with weight gain and diabetes.  And I'm a clinician, I'm not in charge of Seroquel.  So I look for the patterns and try to relate them to the medications.

    Q.  So if there is weight loss after Seroquel is stopped, what does that say to you as a clinician?

    A.  Well, it may mean that the medication which caused the weight gain has been terminated and the weight loss may relate to the termination of her weight-inducing substance.

    Q.  And --

    A.  On the other hand, if there had been five years of boom and bust when it came to weight and they were unrelated, then clearly I would also accept that this might have been a boom and bust phenomenon.

         But if we had multiple patients -- and you gave me a hundred to play with -- that had all gained weight and had high sugars while taking Seroquel and lost weight and had normal sugars while not taking Seroquel and you promised me to have a hundred, then the etiology would become more likely.

    Q.  And if there was weight gain after a patient stopped taking Seroquel, would that be important to your opinion?

    A.  Yes, ma'am.  But it would also be important, you know, what other medications they've been given.

    Q.  All right.  Why would it be important to you
Page 16

tulloch 10 2 08.txt
that there was weight gain after a patient stopped
taking Seroquel?
     A.   Because my field is total bricks.  So I'm not
obsessed only by Seroquel.  There are other factors and
other medications which can cause weight gain and weight
loss.
     Q.   Would you infer from the fact that a patient
gained weight after stopping Seroquel that perhaps the
Seroquel did not cause weight gain while the patient was
on Seroquel, that it could have been some other factors?
     A.   No, ma'am.  I believe if a hundred of the
patients you offered me had all gained weight on
Seroquel, that it was more likely than not due to the
Seroquel.
     Q.   If -- if you would look at your opinions
relating to Ms. Whittington.
     A.   Yes, ma'am.
     Q.   And look at the last paragraph.  You say,
"Based on reasonable medical probability, it is my
opinion that Seroquel was a cause of Ms. Whittington's
diabetes"?
     A.   Yes, ma'am.
     Q.   Do you see that?
              Is that your opinion today?
     A.   Please go on with the next sentence.  "The
major weight gain of 40 pounds was noted while on
Seroquel.  At 5'5", an ideal body weight is 125 pounds
plus or minus 10 percent."
              And we saw that while she was taking
Seroquel, there was an increase in weight of whatever
those pounds are there.  We go from 204 pounds from
240 pounds.
     Q.   All right.  Let me ask you:  Is it your opinion
that Seroquel was a cause of Ms. Whittington's diabetes?
     A.   Yes, ma'am.
     Q.   All right.  Now, when you say "a cause," are
there other causes of Ms. Whittington's diabetes?
     A.   Yes, ma'am.
     Q.   What are the other causes of other diabetes?
     A.   The sixth line down on clinical facts records
that she had a family history of diabetes mellitus.
     Q.   Okay.
     A.   The seventh line down records that she received
another atypical antipsychotic which is associated with
weight gain and diabetes.  And then all of the contents
of the next paragraph relate to the doses of Seroquel
which she had got.
     Q.   I'm just asking --
     A.   The second but last relates to a atypical that
does not cause weight gain and diabetes on the best
current evidence which is Geodon and later to another
one which does not cause weight gain and diabetes which
is Abilify.
     Q.   Okay.  Doctor, I'm asking you to tell me the
causes of Ms. Whittington's diabetes.
     A.   Yes, ma'am.
     Q.   Just list them.  You said family history --
     A.   Family history --
     Q.   -- and Zyprexa.
     A.   -- Zyprexa.
     Q.   What else?
     A.   -- and Seroquel.
     Q.   Okay.  Anything else?
                    Page 17

tulloch 10 2 08.txt
        A.   As I saw the chart, no.   And I specifically
excluded Geodon and Abilify because the problems we've
discussed with Zyprexa and Seroquel do not -- do not
seem to be shared by Geodon and Abilify.
             (Exhibit No. 5 marked.)
        Q.   (BY MS. THORPE)  So at this point after
reviewing these records, the only causes of
Ms. Whittington's diabetes that you have identified are
family history, Zyprexa use, and Seroquel use?
        A.   To the context of this paragraph, yes, ma'am.
        Q.   All right.  I'm going to show you a document
that's been marked as Exhibit 5 for identification.
        A.   Thank you, ma'am.
        Q.   And if you look at the middle --
             MR. PIRTLE:   Are you going to let me have a
copy?
             MS. THORPE:   I do have a copy for you, Tom.
I'm sorry.
        Q.   (BY MS. THORPE)  And in the middle of the page,
you see that the Cleveland Clinic has listed risk
factors for type 2 diabetes?  Do you see that?
        A.   Yes, ma'am.
        Q.   Do you agree with that list of risk factors?
        A.   For type 2 diabetes, I would disagree with two,
four, six -- the seventh cause.  The data on autoimmune
etiology for type 2 is -- is not very strong.   But I
think it's reasonable to agree with everything else.
        Q.   Okay.   And is there anything that you would add
to the Cleveland Clinic's list that's been marked as
Exhibit 5?
        A.   Yes.  Actually, if you look at the context of
these, in -- in a number of these references, it
includes people with depression and psychosis.   They
have two and a half to threefold incidence of diabetes.
        Q.   Okay.
        A.   So that's not on this list.
        Q.   All right.  Now --
        A.   So I would strike the seventh and add
depression and psychosis, especially psychosis.
        Q.   Okay.  So is Seroquel -- have you quantified --
strike that.
             Have you quantified Seroquel's contribution
to Ms. Whittington's diabetes?  You say there's three
causes.  Have you quantified Seroquel's contribution?
        A.   No, ma'am.  I -- I think it's a major risk
factor because of the extent of the weight gain in her
context.  I go back to my analogy of the soil and the
seed.  She was a fertile soil on which Seroquel,
quetiapine, then planted seeds and made a fertile
context for the development of diabetes.
        Q.   So is the answer to my question that you have
not quantified Seroquel's contribution to
Ms. Whittington's diabetes?
        A.   I think it's -- in the context of the time that
we are looking at it, it's probably a major factor.   But
if you're asking me if it's 63 percent or 75 percent or
82 percent, I feel it's bad science to -- to put a
number on it.  But I would think it's more than
50 percent.
        Q.   Okay.  And what is the basis for your
conclusion that it's more than 50 percent?
        A.   The basis for the conclusion is the fact that
she gained the number of pounds weight that we've
                           Page 18

tulloch 10 2 08.txt
discussed and a -- two references which I will share.
            Let me give you Helaine Resnick, March
2000, who looked at multi-thousands of patients and
calculated that for every kilogram weight gained over
ten years, the diabetes risk was increased by 49 percent
over the next ten years.  For every kilogram lost over
ten years, the diabetes risk was reduced by 33 percent.
        Q.   And then you said you had a second reference?
        A.   And I -- and the second reference I've related
to and I've brought and -- in the materials shared with
your contact -- with your patient which -- I beg your
pardon -- your friend to your left and that relates to
the Australian study, which was a very nice study.  They
took the likes of Ms. Whittington, 60, 70 of them, and
half of them were sent to the surgeon who summarily put
them on -- summarily put them on a surgical procedure.
And I'm showing to the Court the surgical procedure
which was that.
        Q.   Okay.  Let's just get that -- all I need is the
title of the article so we can really just move quick --
I'll take a lot less of your time, Dr. --
        A.   It's referred to, ma'am.
        Q.   So it's the second article that supports your
opinion that Seroquel had a greater than 50 percent
contribution to --
        A.   Over this --
        Q.   -- the development of diabetes --
        A.   Over this period of time secondary to the
weight gain, yes, ma'am.
        Q.   -- is the Resnick article and then an article
by John Dixon and others appearing in JAMA January 23,
2008, entitled "Adjustable Gastric Banding and
Conventional Therapy for Type 2 Diabetes," right?
        A.   That's correct, yeah.
        Q.   Any other articles?
        A.   Those are examples.
        Q.   Well, I need to know everything that you're
relying on for this opinion.
        A.   I would stop with those.
        Q.   Okay.  Now, what contribution was made by
family history?
        A.   It would be significant.  And, again, it is not
science to put a -- put a number on it.  But if -- there
are -- and let me go from Ms. Whittington and -- and
tell you why I can't answer the question but give you an
analogy.
            There are B subjects who do not have
diabetes at all.  Our belief is that they have unlimited
pancreatic reserve.  There are subjects who gain weight
and develop diabetes, and I've given you some examples.
And those patients had limited pancreatic reserve and
the weight gain precipitated the diabetes.  Anything
that causes weight gain in that context in that group of
patients caused the diabetes in my view.
        Q.   Dr. Tulloch, my question to you is:  Have you
quantified the contribution of family history to the
development of Ms. Whittington's diabetes?
        A.   Yes, ma'am.
        Q.   You have --
        A.   I've said it was present.  I said earlier that
it was not good science to put an exact number.  But if
you're pushing me --
        Q.   So all you have to say is you haven't --
                        Page 19

tulloch 10 2 08.txt

A.   If you're pushing me to give you a number, I'll give you a number 33 percent with the weight gain at 66 percent.  In other words, it's a factor.  But the weight gain is the major -- is the more important factor.  And I've given you data on which that sort of statement is based.

Q.   Okay.  So 33 percent for family history and 66 percent for weight gain?

A.   Yes, ma'am.

Q.   All right.

A.   And --

Q.   And what are the data that show 33 percent for family history?

A.   You heard me say earlier that folk who have obesity without family histories do not tend to get diabetes.  So a requirement for the development of diabetes with weight gain in most subjects is a limited pancreatic reserve.

Q.   All right.  What I'm asking you is an identification of the scientific literature supporting your 33 percent number.

A.   Oh, I told you before, it's bad science to give an exact number.  You pushed me to give a number; I gave you --

Q.   I want you to give me the truth.

A.   I pulled a number out of the --

Q.   Let's just have an understanding between the two of us.

A.   Yeah.

Q.   When you give me information, I'm going to count on it as being true and accurate.  Okay?

A.   Okay.

Q.   So is the 33 percent number not true and not accurate?

A.   Thirty-three percent number is a best guess under the circumstances of this patient.  In other words, it is unlikely for an obese patient to become diabetic unless they have a limited pancreatic reserve.  In the presence of a limited pancreatic reserve, weight gain is a major contributing factor.

So those were the facts behind my statement to you.  The statement to you was related to the only two factors we were discussing, which were weight gain and family history.  And I gave you a number that weight gain would probably be two-thirds as important as family history.

Q.   And you've given me two articles that you say are the only two articles that support it, Dr. Resnick's article and the John Dixon article, right?

MR. PIRTLE:  Objection, form.

Q.   (BY MS. THORPE)  Right?

A.   No, ma'am.

Q.   Is that correct?

A.   No, ma'am.

Q.   I want to know the articles that you are relying on that support your -- your quantification that that weight gain is two-thirds as important as family history.  I want to know what scientific data published in the peer-reviewed literature supports your opinion.

A.   Okay, ma'am.

MR. PIRTLE:  Objection, form.

A.   We have the whole of science to draw from.

Q.   (BY MS. THORPE)  I --

Page 20

tulloch 10 2 08.txt
         A.   I have given you an article which looked at
weight gain and calculated the importance of weight
gain --
         Q.   Are you talking about Dr. Resnick's article?
         A.   -- generally.
              And that's Dr. Resnick's article.
         Q.   Okay.
         A.   I've given you an article that showed the
importance of weight loss and conversely implied the
importance of weight gain in Dr. Dixon's article.
         Q.   What else?
         A.   It would be inappropriate to quote those as the
only articles in the literature.  And as I said in my
last paragraph, it would be naive for me to tell you
those were the only two articles that would --
         Q.   I want to know the articles that you are
relying on --
         A.   Okay.
         Q.   Let's put it that way.
         A.   Okay.
         Q.   -- for the proposition that -- that weight gain
is 66 percent and -- responsible for Ms. Whittington's
diabetes.
         A.   I don't -- I stop with those because that's
what we have this afternoon.
         Q.   Now, when you say 66 percent, what do you mean
by that?
         A.   What I mean by that is it's more important --
in somebody who has a family history of diabetes, weight
gain is more important than other factors.
         Q.   What does the number mean?  How did you derive
that number?  Is it a relative risk, is it --
         A.   Yeah.
         Q.   Okay.  Where -- what's the -- what's the risk
that you're relying on to get to 66 percent?
         A.   What I -- what I said for you is it's my
arbitrary choice more likely than not.  Remember the
probability we're discussing is just 51 percent.  You're
trying to get me to be more specific than that.
              More likely than not, 51 percent, the
weight gain in the presence of somebody with family
history of diabetes precipitated the diabetes at that
time.  And in my --
         Q.   Let me just --
         A.   -- best ability to quantify that for you, I've
given you data which have then related it to the general
population.
         Q.   All right.  What is the -- have you quantified
the contribution that Zyprexa made to the development of
diabetes?
         A.   I would relate it to the weight changes at the
time.  And to be -- give you an accurate answer to that,
I would need to go back to the weight charts that
related to the time that she was taking Zyprexa.  I
believe that's out of today's context.  But if you need
it, I will bring it to you the next time we meet.
         Q.   All right.  Tell me what weight chart you mean.
         A.   Okay.  A moment ago we were talking about a
chart which related blood sugars and body weight.
         Q.   But the medical --
         A.   And your friend on the left holds that chart
right now.
         Q.   Okay.

Page 21

tulloch 10 2 08.txt
            A.   And with a little bit of time, I will go
through and we'll produce the information.  So we are
limited in time and I have offered to you to produce it
given a little more time.
            Q.   Well, let me just ask you this question:  Have
you quantified the contribution Zyprexa has made to the
development of Ms. Whittington's diabetes, just have you
done it?
            A.   No, ma'am.
            Q.   Okay.
            A.   The -- my main reason for doing that was that
her principal weight gain in this context was not when
she was taking Zyprexa and the development of her
diabetes was at the time when she was taking quetiapine,
Seroquel.
            Q.   Well, you say that she gained 20 pounds while
she was on Zyprexa, right?
            MR. PIRTLE:   Objection, form.
            A.   I beg your pardon, ma'am.  I believe it was
40 pounds.  204 pounds October 1st and 244 pounds by
February the 26th.
            Q.   (BY MS. THORPE)  On Zyprexa?  So she gained 40
pounds on Zyprexa?
            A.   Yes, ma'am.
            MR. PIRTLE:   Now we've got a misnomer.   Are
you talking about Zyprexa or Seroquel, because I
misheard it, too.  She's talking about Zyprexa.
            A.   Oh, I beg your pardon.  Okay.  Why don't we go
back to the paragraph on the first page relating to
Linda Whittington.  And we're looking at one, two,
three -- the fourth.  And in that context we're looking
at Zyprexa and a body that started at 184 and reached
204, 20 pounds.
            Q.   (BY MS. THORPE)  Okay.
            A.   At that time she was switched to Seroquel.  At
that time the urine glucose was normal and she had no
evidence of diabetes.
            Q.   All right.  So how would you --
            A.   At the time she was then switched to Seroquel,
the weight was 244 pounds.
            Q.   All right.  Dr. Tulloch, I just asked you
how -- what the weight gain was on Zyprexa --
            A.   Okay.
            Q.   -- okay?  So if you -- let's try to focus on
the question --
            A.   Okay.
            Q.   -- and we'll move along more quickly.
            A.   Okay.   Twenty pounds.
            Q.   Okay.   And what contribution -- strike that.
            Have you quantified the contribution that
the 20 pounds of weight gain on Zyprexa made to the
development of Ms. Whittington's diabetes?
            A.   No, I think it's a reasonable thing to discuss.
            Q.   Okay.   What does that mean?
            A.   I -- let's make it 15 percent of that
60 percent.
            Q.   All right.  And, again, you're just guessing?
            A.   I'm just guessing.
            Q.   All right.
            A.   May I come back to my original attempt to make
this easy for you?
            Q.   You know what, I've got to do this, you know --
            A.   Do your thing.
                              Page 22

tulloch 10 2 08.txt

Q.   -- as they say --
A.   As I --
Q.   In the end they'll say she did it her way.
A.   Understood.
Q.   Okay.  All right.  Now, you have identified --
agreed to the list of risk factors that the Cleveland
Clinic gave that we've marked as Exhibit 5?
A.   Yes, ma'am.
Q.   And you've added psychosis as another risk
factor, right?
A.   Yes, ma'am.
          MR. PIRTLE:   And removed autoimmune
disease.
Q.   (BY MS. THORPE)  And removed autoimmune
disease.
          And if I -- let me just ask you:  Did
Ms. Whittington have any of these risk factors?
A.   In the third paragraph, I reviewed the
background to her clinical situation, and we note that
she had hyperlipidemia, hypertension, tobacco abuse, and
a family history of diabetes.
Q.   Okay.
A.   And so each of those should be factored into
that family history.
Q.   All right.  So we've identified family history,
Zyprexa, and Seroquel as causes.  Do you agree that
hyperlipidemia, hyper -- and hypertension are causes of
Ms. Whittington's diabetes?
A.   Yes, ma'am.  They're part, in fact -- well --
Q.   You said --
A.   You go on.
Q.   -- yes; is that right?
A.   Yes.
Q.   Have you quantified the contribution of her
hyperlipidemia and hypertension to the development of
her diabetes?
A.   It's a stable presence.  It would be a
contributing factor, and I would list it in amongst the
family history.  She was -- she inherited that as part
of her family background.
Q.   Have you quantified it?
A.   Yes, ma'am.
Q.   Okay.  What is it?
A.   You asked me for a number; I gave you
33 percent.
Q.   So it's mixed in with family history?
A.   Yes.
Q.   And, again, you're more or less making a guess?
A.   More likely than not, yeah.  I only have to get
1 percent.
Q.   Okay.  Now, does she have any of -- based on
your review of the portion of the records that you
actually reviewed, did -- does she have any other risk
factors for diabetes?
A.   I do not recall her having any more.  And I
hedge that because one of these patients -- and I'll
have to go back and look -- one of these patients had
asthma and was given glucocorticoid, that's Prednisone.
But I do not believe it was this one.
Q.   So that in your mind she had hyperlipidemia,
hypertension, a family history of diabetes, and Zyprexa
usage and Seroquel usage?
A.   And psychosis.

                    Page 23

tulloch 10 2 08.txt

Q.   And psychosis.
         She had all of those things, and all of
those are causes of diabetes, right?
A.   Yes, ma'am.
Q.   And as best you know, she has no other risk
factors or causes of her diabetes, correct?
A.   To the best of my memory, yes, ma'am.
Q.   All right.  So --
         MR. PIRTLE:   When you get an opportunity,
I'd like to stop here -- we're at an hour -- for, like,
five minutes, but I don't want to interrupt your flow
either.
         MS. THORPE:   That's fine.  We can take a
break.
         (Short recess from 5:38 to 5:44.)
Q.   (BY MS. THORPE)  Doctor, if you would say on
the record what you just said off the record.
A.   Ma'am, what -- what I've tried to do as
somebody who explains diabetes at great length to lay
people is to give the context that if somebody has a
family history of diabetes, they will more likely than
not develop diabetes during their lifetime.  If they
incur by their lifestyle the contents of this list from
the Cleveland Clinic, then they may develop type 2
diabetes by the age of 25.  If they adopt a lifestyle
which is healthy and vigorous and have a lean body mass,
they will still get diabetes but it may be at the age of
105.
         And so they, the patient, and we, the
medical advisors, are beholden to give them the best
advice that the diabetes will occur as late in their
life as possible.  And with that background, every
patient has the ability to choose their method of
lifestyle.
Q.   Well -- and when we were off the record, you
talked a little bit about what your testimony was in the
Zyprexa litigation?
A.   Yes, ma'am.
Q.   Do you want to finish saying that?
A.   And what I said was in that context if all the
worst case scenario had been advanced, in other words,
if they did everything on that list --
Q.   If the patient did everything on the Cleveland
Clinic list?
A.   On the Cleveland Clinic list.  -- then they may
develop type 2 diabetes by the age of 25.  If they did
nothing on that list, they may develop type 2 diabetes
by the age of 105.
         And so I as a clinician view anything that
modifies their life pathway as a risk factor for
diabetes, and that includes medications which alter
their insulin resistance and cause them to gain weight.
Q.   So if a person gains weight, let's say a lot of
weight, let's say they gain a hundred pounds without
regard to taking any drug, you would -- in your mind
that person would be accelerating diabetes?
A.   If that patient has diabetic history.
Q.   Okay.
A.   I go back to remind all of us -- remember we
started with somebody who has a family history of
diabetes.  There are 500-pounders out there with normal
blood sugar.  So the analogy that I brought relates to
somebody who inherits a family history of diabetes.
                    Page 24

tulloch 10 2 08.txt

Q.   Let's take Ms. Whittington specifically.
You've identified family history, Zyprexa use, and her
psychosis as -- and her hypertension and her
hyperlipidemia and also her smoking as causes of her
diabetes, right?
A.   Yes, ma'am, contributing factors, yes.
Q.   But also causes, right?
A.   Yes, ma'am.
Q.   And in the presence of those causes, even if
she had not taken Seroquel, you would expect her at some
point in her life to develop diabetes, correct?
A.   To the best of my knowledge, yes, ma'am.
Q.   And so in your mind, the role of Seroquel is
accelerating what was going to happen anyway?
A.   To the best of my understanding of type 2
diabetes, yes, ma'am.
Q.   Okay.  Now, I want to talk to you about --
well, let me back up a second because we didn't talk
about smoking before very much.
            She's one-and-a-half to two-pack a day
smoker for about 28 years; isn't that right?
A.   She is, ma'am, yes.
Q.   And how -- have you quantified the contribution
of smoking to her diabetes?
A.   No, I haven't.  And my main reason for doing
that is I have not found a good reference that does
that.  I've offered you one that tries to put numbers on
weight gain, and I was delighted to find one.  I hadn't
seen it before.
            But I haven't seen any good data that
relates to quantity.  And with the current background,
we're seeing less and less smoking in our community.
Q.   Now, is it -- so you haven't reviewed any
literature that quantitates the risk of developing
diabetes in a smoker?
A.   No, ma'am.
Q.   And you haven't --
A.   I haven't seen it, which is -- I believe it's
not -- it may not be there.
Q.   Okay.  And you haven't seen any literature
other than the Resnick article quantifying the risk
associated with weight gain of developing diabetes; is
that right?
A.   No, I -- I don't want to be on the record for
that.  There are multiple numbers.  What I liked about
the Resnick article is that it tries to quantitate the
quantity -- the number of kilos related over ten years
and put a number on it as related to diabetes risk.
That -- that's a very sophisticated way of doing it.
I -- there's only 1900 patients, so one has to hedge it
a little bit.  It's 2,000 people, it's not 20,000
people, but it's more than a hundred people.
Q.   All right.  Now, Doctor, tell me how you
diagnose diabetes.
A.   The American Diabetes Association chose a
number, and it was based on what happens to the eyes in
people after ten years of abnormal blood sugar.  And
what they found was ten years after a blood sugar test,
there were changes in the eyes of people who had a
two-hour blood sugar after a glucose load of 220.  And
so the decision was made to make the upper limits of
normal 10 percent less than that.
            So 200 after a glucose load was chosen.  So
                        Page 25

tulloch 10 2 08.txt

you understand why they did that, they looked at the
eyes of people who developed changes that relate to
diabetes and they looked back ten years.  And we can
give you more information if you need it.
        Q.   So you followed the American Diabetes
Association criteria --
        A.   No, ma'am.
        Q.   -- for diagnosing --
        A.   I go back to the original data on which these
figures were based.  But if you're asking, the American
Diabetes Association took those biological
observation -- and they're now agreed round the world --
and the numbers are fasting sugar of 126 after a glucose
load, a two-hour sugar of 200 and one number between
zero and two hours of greater than 200.
            (Exhibit No. 6 marked.)
        A.   But more and more because of practicalities,
the fasting sugar is taken as the more important
predictor of the presence of diabetes.
        Q.   (BY MS. THORPE)  I'm going to show you what's
been marked as Exhibit 6 for identification and show you
a table I'm sure you're quite familiar with that
contains the criteria for the diagnosis of diabetes.  Do
you see that?
        A.   Yes, ma'am, I think --
        Q.   And you're very familiar with Exhibit 6, right?
        A.   Yes, ma'am.
        Q.   And it is the report of the expert committee on
the diagnosis and classification of diabetes?
        A.   Yes, ma'am.
        Q.   And it was this report that became the basis of
the American Diabetes Association criteria for
diagnosing diabetes, right?
        A.   Ma'am, the work I'm talking to you goes back 30
years before this.
        Q.   Right.  But --
        A.   And I explained why they got to those numbers.
But, yes, ma'am, let us accept these are the current
criteria.
        Q.   All right.  And you agree and follow them in
your practice, right?
        A.   Yes.
        Q.   And you followed the criteria that are
contained in Table 3 --
        A.   Yes, ma'am.
        Q.   -- in your office, right?  You treat patients
in your office, right?
        A.   Yes, ma'am.
        Q.   And so I want to talk to you about the criteria
in Table 3.  I first want to focus on the second item on
Table 3, which is fasting plasma glucose.
        A.   Yes, ma'am.
        Q.   Do you see that?
             Tell me what -- how you take a fasting
plasma glucose.
        A.   It's taken after an overnight fast.
        Q.   Is it also possible to fast for eight hours
during the day?
        A.   There are change -- the -- the -- again, one
has to be standardization.  One has to remember that
normal curve.  And what you're trying to do is put a
line on what is in essence a shoulder.  So it is best to
be under most standardized conditions.  And an overnight
                      Page 26

tulloch 10 2 08.txt
fast gives you standard levels of cortisol.  We have
high levels of cortisol in the morning which are
different later on in the afternoon.  So if one has to
split hairs because of somebody's life insurance policy,
you want to make it under the most standard conditions.
     Q.  And so the --
     A.  May I -- may I offer that we leave it as an
overnight fast?
     Q.  Okay.  I hear you.  I believe the fasting
should be overnight.
          And that's because of -- in part because of
the variability in people's glucose levels in their
blood at different times of day, correct?
     A.  Yes.
     Q.  Have I said that right?
     A.  Different times of day and also because the
levels of cortisol are different throughout the day.
     Q.  And people's plasma glucose levels vary from
day to day and week to week, don't they?
     A.  Not a great deal.  Maybe a little but not a
great deal.
     Q.  So you would expect the numbers for, you know,
someone's plasma glucose -- fasting plasma glucose to be
within 10 milligrams per deciliter or --
     A.  Five to 10 percent.
     Q.  And do you agree with the definition of fasting
as defined as no caloric intake for at least eight
hours?  I realize you say it should be overnight.
     A.  Yes, ma'am.
     Q.  Okay.  So, then, Item No. 3 is the oral glucose
tolerance test --
     A.  Yes, ma'am.
     Q.  -- right?
          And we're still looking at Table 3 of
Exhibit 6?
     A.  Yes, ma'am.
     Q.  In that test can you describe what -- how it's
done?
     A.  Yes.  I'm glad you asked -- give me the
opportunity.  There is such a thing as fasting
hyperglycemia.  A person who is not seeing carbohydrates
tends to have -- to lose the ability to make a ready
spurt of insulin in response to oral glucose.  So when a
patient is about to have an oral glucose test, we advise
them for the three days prior to that to have at least a
certain amount of carbohydrate.  And then the oral
glucose is given after the fasting sugar is taken, and
blood sugars are measured at standard times.  They're
usually 30, 60, 90, and 120 minutes.
     Q.  Okay.  And the one that is diagnostic of
diabetes is the two-hour glucose measurement at greater
than 200 milligrams per deciliter?
     A.  That's correct, fasting and greater than 200.
     Q.  All right.  And a patient who has the oral
glucose tolerance test actually drinks a substance
called glucola; is that right?
     A.  Yes, ma'am.  It's a carbohydrate that's mostly
glucose that's 75 grams.
     Q.  And then the plasma glucose levels are measured
at the time increments you described, right?
     A.  Yes, ma'am.
     Q.  And if there's a two-hour plasma glucose at
greater than or equal to 200 milligrams per deciliter,
                    Page 27

tulloch 10 2 08.txt
then -- then that's what you're looking for in terms of
having a tentative diagnosis of diabetes, correct?
       A.   That's correct.
       Q.   So -- and for fasting plasma glucose, you're
looking for a reading of greater than or equal to
126 milligrams per deciliter --
       A.   Yes.
       Q.   -- right?
            Now, underneath Table 3 the proponents of
these criteria say that they must be confirmed by repeat
testing on a different day, correct?
       A.   That's correct.
       Q.   So you have to -- in order to be diagnosed with
diabetes, you have -- under the ADA criteria or under
the criteria of this expert report that we've marked as
Exhibit 6, there must be two fasting glucoses greater
than or equal to 126 or two oral glucose tolerance tests
or one -- or either one of them could confirm the other,
correct?
       A.   Yes, ma'am.  And I also -- if I may, are you
going to come to No. 1 or shall we --
       Q.   I am going to come to No. 1.
            But I guess what I'm stressing is you must
have a second confirmatory test of either the fasting
plasma glucose or the two-hour plasma glucose during an
oral glucose tolerance test, correct?
       A.   I think that's reasonable.  And the reason for
that being the moment one puts diabetes on a patient's
chart, their life insurance and all of their other
insurance rates go up.  It does not change the way we
treat a patient -- clearly, if they have the family
history we've been discussing and if the tendencies are
all there.  But if the diagnosis has to be made and if
the numbers are very close to borderline and we've
looked at where the borderlines are, in the patient's
best interest one asks for at least two different
numbers.
       Q.   All right.  And there are consequences beyond
just the insurance consequences that require -- that
are -- make confirmation important such as you're going
to potentially put the patient on medication for the
diabetes, right?
       A.   Yes, ma'am.
       Q.   And there are risks and benefits associated
with all drugs, isn't that correct, including diabetes
medicines --
       A.   Yes, ma'am.
       Q.   -- right?
            And so before you would -- in fact --
strike that.
            In fact, some of the diabetes medications
carry a risk of weight gain; isn't that correct?
       A.   Only one.
       Q.   Okay.
       A.   And there are a whole lot of issues that we can
discuss, but they're probably outside of today's
discussion.
       Q.   So in your mind only one product used to treat
diabetes is associated with weight gain?
       A.   Of the early oral medications, yes, ma'am.
       Q.   All right.  And what one is that?
       A.   The group called thiazolidinedione, TCD.
       Q.   Okay.
                        Page 28

                                              tulloch 10 2 08.txt
         A.   Of which the one survivor is probably Actos.
There's another one called Avandia, and there was a
third one called Rezulin.
         Q.   And, in fact, you testified in the Rezulin
litigation --
         A.   You have a good memory.
         Q.   -- is that correct?
              The -- and insulin itself is associated
with weight gain, correct?
         A.   I hedged that by saying amongst the oral
medication.
         Q.   I know, I heard that.
              And insulin -- injectable insulin is
associated with weight gain, correct?
         A.   Yes, ma'am.
         Q.   All right.  So it's a serious decision and
requires two confirmatory tests before you diagnose
somebody with diabetes, right?
         A.   I think that's reasonable.
         Q.   That's the method you follow in your clinic --
         A.   Yes.
         Q.   -- correct?
              When -- when a patient comes in for
evaluation in your clinic for diabetes, what are the
things that you do?
         A.   Well, firstly, our clinic is attended by
patients that may have traveled up to 150, 200 miles.
So Category 1 is often the one that is practical.  So
we're looking at a random sugar and it being greater
than 200.
         Q.   All right.  Well, let's talk about Category 1,
then, for just a second and then I'll come back to what
you do.
         A.   Okay.
         Q.   In -- Table 3 of Exhibit 6 talks about fasting
plasma glucose, two-hour plasma glucose with the oral
glucose tolerance test, and then third, a casual or
random glucose concentration of greater than
200 milligrams per deciliter, right?
         A.   Right.
         Q.   And casual, which is the same thing as random,
right?
         A.   Yes, ma'am.
         Q.   Is defined as any time of day without regard to
time since the last meal, right?
         A.   That's correct.
         Q.   And you have to have with it classic symptoms
of diabetes, including polyuria, polydipsia, and
unexplained weight loss, right?
         A.   That's correct.
         Q.   And polyuria is frequent urination?
         A.   Yes, ma'am.
         Q.   And polydipsia is thirst?
         A.   Drinking a lot of water, yes.
         Q.   And unexplained weight loss is clear what it
is.
              So -- now, if you have somebody that comes
in with a random glucose over 200, that also has to be
confirmed by a subsequent test, right?
         A.   Yes, ma'am.
         Q.   Now, confirmation has to occur within a few
days, right?  You can't confirm it two years later?
         A.   Yes.
                                        Page 29

tulloch 10 2 08.txt
        Q.   You'd have to start all over again?
        A.   Yes, ma'am.
        Q.   Okay.   So what is the time period in which you
have to have a confirmatory test?
        A.   Well, I go back to what we've discussed because
if a patient came in with a blood sugar of 230 and the
symptoms of polyuria, polydipsia, and weight loss, your
question was how would I handle that if a patient had
driven 200 miles.   I would give them a home glucose
monitor, ask them to check their sugars over the next 36
hours, and if they were all in excess of 200, we would
consider that they have diabetes.   The issue being a
practical one, the issue being what we discussed earlier
of that lifestyle we had discussed.   This was the time
that her pancreas finally gave up and said that's it.
And so delaying by a day or two for the niceties of
diagnosis is impractical.
        Q.   So -- but you're talking about you would get a
confirmatory test on the home blood glucose --
        A.   Right.
        Q.   -- right?
             Is that right?
        A.   Yes, ma'am.
        Q.   You would not have a confirmatory test?
        A.   That's correct.
        Q.   All right.   And you would do it in a matter of
days?
        A.   My reason for doing that is all of us are
exposed to the risks of random laboratory error.   The
most common laboratory error is mislabeling, so it could
be possible that that lady's blood -- that lady's name
got onto the tube of somebody else's blood.   So one
always asks for a second confirmation to exclude
laboratory error.
        Q.   Okay.   Now, when somebody comes in to your
office to be diagnosed with -- or to be evaluated for
potential diabetes, do you do a history and physical?
        A.   Yes, ma'am.
        Q.   Have you ever diagnosed somebody with diabetes
without doing a history and physical?
        A.   Yes.   That would be in the context of an
emergency room where the patient was brought in with
polyuria, polydipsia, and sugar so high that they'd gone
into ketoacidosis.   When they're in ketoacidosis,
they're often in coma and the history does not occur.
        Q.   And -- I got it.
             And so --
        A.   At that time the sugar is 1,000 or 2,000 --
        Q.   Right.
        A.   -- and the diagnosis is not in doubt.
        Q.   With the exception of DKA in an ER --
        A.   Yes.
        Q.   -- you have -- you do a history and physical,
right?
        A.   With a rational patient, one gets all the
information possible.
        Q.   And then you do the labs and get the
confirmatory labs?
        A.   Yes, ma'am.
        Q.   Have you ever diagnosed a patient with diabetes
without examining the patient?
        A.   No, ma'am.
        Q.   You have not examined Ms. Whittington?
                                                  Page 30

tulloch 10 2 08.txt

    A.  No, ma'am.
    Q.  And so you're not here to diagnose her with
diabetes, right, or are you here to diagnose her with
diabetes?
    A.  Ma'am, in this context Ms. Whittington is not
my patient.  I am not required to treat her, and so I
offer to the Court my best interpretation of the data
available.
    Q.  Have you read her depositions in this case?
    A.  No, I have not.
    Q.  And you've -- I think you said you've not had a
conversation with her?
    A.  No, ma'am.  I've read everything she told to
the physicians that were at the clinics that were listed
on the top paragraph, and that's not the same as taking
a history from her but it's -- it's pretty close.
    Q.  And you have not read -- have you been given
any of her fact sheets that she's filled out for this
case?
    A.  No.
    Q.  I didn't see them.
    A.  No, I saw this -- I saw the summary that we
discussed earlier which was weight, sugar, et cetera.
    Q.  All right.  Now, is it fair to say that you
believe that Ms. Whittington developed diabetes after
she started taking Seroquel?
    A.  With the best available evidence, yes, ma'am.
What -- what we looked at was blood sugars and body
weight.  And the number which I had in Paragraph 4 was a
sugar which was just in excess of the fasting sugar at
126.
        May I extend that?  I'm not in charge of
that lady, so I had to assume that was the diagnosis.
But clearly if she was my patient, I would have had her
measure some more sugars to make sure that that number
was valid for her in a broader context of maybe the next
48 hours.
    Q.  Well, we'll come back to that in just a second.
        So -- so your opinion -- is your
opinion -- well, strike that.
        You agree that for Seroquel to cause
Ms. Whittington's diabetes Seroquel would have to be
taken before the diabetes begins, right?
    A.  Before and during, yes, ma'am.
    Q.  Okay.  In other words, a temporal relationship
has to be there as -- as is necessary for causation,
not --
    A.  Yes.
    Q.  -- sufficient but necessary --
    A.  Yes, ma'am.
    Q.  -- right?
        How can -- well, strike that.
        Diabetes takes a long time to develop,
doesn't it?
    A.  No.  An acute type 1 diabetic can develop
diabetes in 72 hours.
    Q.  Let's talk about --
    A.  Type 2.
    Q.  -- type 2 diabetes, because we're talking about
Ms. Whittington.  Ms. Whittington has type 2 diabetes,
right?
    A.  Yes, ma'am.
    Q.  So type 2 diabetes takes a long time to

Page 31

tulloch 10 2 08.txt
develop, doesn't it?
     A.   Again, if there was a summation of risk
factors, which included weight gain, plus illness.  We
didn't have illness -- acute illness on this list.  But
I would add that, too.  I'm pointing to the Cleveland
Clinic list.  There's no acute illness there.  An acute
illness which caused a major metabolic stress can
produce abnormal sugars in somebody with marginal
physiology within 72 hours.
     Q.   Ms. Whittington doesn't have an acute illness,
right?
     A.   No, no.  If -- I apologize.  I thought your
question --
     Q.   I was being broad.
     A.   -- was global.  And if we're specific to
Ms. Whittington, if her conditions were all otherwise
stable, then the context would be that it could take
some time.
     Q.   And outside the context of the acute illness
you described, type 2 diabetes takes a long time to
develop, right?
     A.   Let me go back to -- I -- the reason why I'm
hesitating is because of the physiological changes we
described earlier.
     Q.   Maybe I can help you out here.  If you look at
page 7 of your report, you'll see where I'm going, I
think.  You can just count seven pages and look at the
last paragraph on the seventh page.
     A.   Thank you.
               This --
     Q.   Can you see your --
     A.   -- type 2 diabetes is a progressive condition
in which the pancreatic steadily loses insulin secretory
capacity; is that correct?
     Q.   Yes --
     A.   Yes.
     Q.   -- that's where I am.
               Over how long?
     A.   Over 5 to 15 years.
               May I expand on that?
     Q.   Yes.
     A.   We go back to that magic number of 126.
Clearly, there's not quite good data that prediabetes,
which is when people have a sugar greater than a hundred
and less than 126, carries many of the risk factors
which we ascribe to diabetes.  So if I hesitate at all,
it's because the adverse metabolic conditions which are
associated with diabetes are often present before
subjects fulfill the criteria for diagnosis.
               So if we can go back to -- an answer to
your question, certainly somebody who has a family
history of diabetes, their blood sugar would rise from
normal, which I would call 80 to 125 over a period of
time.
     Q.   Can you sort of take us through the steps by
which diabetes -- type 2 diabetes occurs and then as to
each step say how long that it would take to -- to go
through that stage or step of development?  Does that
make sense?  Do you understand what I'm asking?
     A.   I'm trying to think of the best published data.
There is good data that by the time the patient's -- by
the time the patient's blood sugar's 110, their loss of
pancreatic function is greater than 70 percent.  The
                         Page 32

tulloch 10 2 08.txt
rate of loss of pancreatic function up to 70 percent --
I started off with a simple analogy -- could be by the
age of 25 or by the age of 105 dependent on all of the
other criteria.
    Q.   Well --
    A.   So if we're -- if you ask me to limit my
comments to a lady who weighed 244 pounds -- are you
hearing my difficulty?  The slope of -- of sugar rise
can depend on all of the other issues we discussed.  So
may I come back and take your question to relate to a
lady who weighed 10 -- 244 pounds, which is this lady?
Does that help?
    Q.   No.
    A.   Okay.
           (Exhibit No. 7 marked.)
    Q.   (BY MS. THORPE)  So let me -- let me just show
you what's been marked as Exhibit 7 for identification.
I'm going to direct your attention to the first column
of -- of this paper which has been marked as Exhibit 7.
And it's entitled "Screening Adults for Type 2 Diabetes,
a Review of the Evidence for the U.S. Preventative
Services Task Force."
           Let me ask you first if you ever read this
paper before.
    A.   Not -- not well enough that I remember its
context.  June of 2008, no, ma'am.
    Q.   Look at the second paragraph in the first
column and tell me if you agree with the statement that
type 2 diabetes often goes undiagnosed for many years
because hyperglycemia develops gradually and may not
produce symptoms.
    A.   Ma'am, I -- I agree with that.  And I think if
you replay what I was saying earlier, that that -- I
was, in fact, saying something very similar --
    Q.   Okay.
    A.   -- yes.
    Q.   And then in the second column, the first real
paragraph, tell me if you agree with this statement:
"Diabetes has a long preclinical phase estimated at 10
to 12 years on the basis of the progression of
microvascular complications, and valid and reliable
tests can detect type 2 diabetes during this
asymptomatic period."
           Do you --
    A.   Yes, ma'am, I think --
    Q.   -- agree with that statement?
    A.   -- if you -- if you replayed what I was saying
earlier about how long it takes to -- to lose up to 60
to 70 percent of pancreatic reserve, I think we were
saying the same sort of thing, yes, ma'am.
    Q.   And you agree that there are about 23.6 million
people in this country who have diabetes as of 2007?
    A.   Yes, ma'am, that's a pretty good estimate.
    Q.   And you agree that over 25 percent of those
people have undiagnosed diabetes?
    A.   About one-third, yes, ma'am.
    Q.   Okay.  Thirty-three percent, right?
    A.   Uh-huh.
    Q.   Now, the -- in your report, Doctor -- I'm going
to kind of change topics here for just a second.
           In your report you say that plaintiff began
taking Seroquel in October of 2001, right?
    A.   Yes, ma'am.
                   Page 33

tulloch 10 2 08.txt
         Q.   And you got this information from that medical
record summary or what -- how did you --
         A.   Yes, ma'am.  If you --
         Q.   -- how did you find out when she --
         A.   -- if you look through the Jackson Heart
Center, the north Florida Bernard -- well, Saleh,
Jacksonville, Charles Haddad, and Jacksonville Family
Practice, you'll see annotations when the use of the
different antipsychotics is referred to.  And then in
the summary chart, those have been summarized beside the
sugar, the body weight, and the patient's psychiatrists.
              (Exhibit No. 8 marked.)
         A.   Yes, ma'am.
         Q.   (BY MS. THORPE)  All right.  I'm going to show
you what's been marked as Exhibit 8 for identification.
And this is the plaintiff's second amended fact sheet in
this case.  And I'm going to ask you if you've seen this
Exhibit 8 before among the materials you were given.
         A.   I believe it was on the list of papers that was
given to me, yes.
         Q.   All right.  You see that it says that she began
to use Seroquel on January 2, 2002, and that she stopped
using Seroquel on December 7, 2005?
         A.   Yes, ma'am.
         Q.   That's not what your report says; is that
correct?
         A.   I believe that's correct.  I hadn't annotated
the two.  The -- my report relates to what I took off
the clinical chart.
         Q.   Okay.
         A.   And --
         Q.   And so my question to you is:  How did you
pick --
         A.   I picked the clinical chart over the memory of
a psychotic patient, but others might disagree with that
choice.
         Q.   All right.  Well, let me --
              MR. PIRTLE:  No, that's funny.
         Q.   (BY MS. THORPE)  And you dismissed reading her
deposition because she was -- because of her mental
illness.  Is that why you didn't read it?
         A.   Just time, just time.
         Q.   Just time.
              And so you don't know that she said in her
deposition -- you don't know what she said about when
she took Seroquel?
         A.   No, ma'am, I do not know what she said.  If it
becomes relevant to the case, I'd be happy to read it by
the time of the court appearance.
         Q.   Well, whenever you read anything new and you
change any substance of this report, I want to know and
I want to depose you.
         A.   I'll refer to the last paragraph of my opinion,
ma'am, yes.
              (Exhibit No. 9 marked.)
         Q.   (BY MS. THORPE)  So what part of the chart told
you that she started taking Seroquel in October of 2001?
         A.   I would go back to whichever of those clinical
charts listed in the top paragraph and ascribe it to
that particular context.  There are -- each time she
arrived, there's a date, a list of what the patient was
talking about, and the patient's review, and then the
medication that the patient was given.
                        Page 34

tulloch 10 2 08.txt
Q.  Okay.  I'm going to show you what's been marked
as Exhibit 9 for identification and ask you if you've
ever reviewed this chart before.
A.  What I'm looking at is Owen's Pharmacy relating
to Linda Whittington.
Q.  And if you see at the bottom, it tells you what
chart it came from.
A.  It stated Center for Medicine and Psychiatry.
Q.  My question is:  Did you review that before you
formed your opinion?
A.  No, ma'am.  What I did was I looked at the
clinical chart.  What you're looking at here is a
medication log from Owen's Pharmacy, and Owen's Pharmacy
is not on this list, so I believe I did not see that.
Q.  Okay.  This is a record out of the Center For
Medicine and Psychiatry --
A.  Right.
Q.  -- from Dr. Saleh's office.  Did you read this?
A.  I saw -- I have Dr. Saleh's chart as this list,
yes.
Q.  Okay.
A.  So if it was in there -- if this was in
Dr. Saleh's chart, then I saw the pages, I skimmed
through that.
Q.  All right.
A.  And I did see lists of medication.
Q.  And you see that she began taking -- there's a
note that she got a Seroquel dose pack in October of
2001.  Do you see that?
A.  10th of October, yes, ma'am.
Q.  Yes.
        And do you see the note beside it and the
arrow?
A.  "Patient does not wish to take."
Q.  What's the date on that note?
A.  10-12-01.
Q.  All right.  And then look down to January 2,
2002.
A.  Yes, ma'am.
Q.  What does it say?
A.  It says, "Seroquel, 25 milligrams, twice a
day."
Q.  Okay.  According to your report, what is the
highest dose of Seroquel that this plaintiff was on
after January 2, 2002?
A.  Of what -- from my report, which I got from
that chart summary, it's listed in the third paragraph,
and I go through the different medications.  I list that
she was on Zyprexa.
Q.  I just want to know the highest dose of
Seroquel.
A.  Okay.  And what it has here, initially up to
200 milligrams twice daily.
Q.  At -- where does it say that in your report?
Oh, I see.  She was initially up to 200 milligrams.
A.  The eighth line of the -- of the third -- yes,
ma'am.
Q.  Okay.  All right.  If you will look at
Exhibit 9 --
A.  Nine.
Q.  -- which I just gave you, you would agree with
me that this log of her medications indicates that the
plaintiff does not wish to take the Seroquel dose pack,
Page 35

tulloch 10 2 08.txt

right?

A.   Right.

Q.   Do you know -- and this Exhibit 9 indicates --
consistent with the fact sheet that's been marked as
Exhibit 8 that she started on Seroquel at 25 milligrams
twice a day, right?

A.   Yes, ma'am.

Q.   In -- and that was in January?

A.   Six lines down in my report, it says her
Seroquel dose was later reduced to 25 milligrams twice
daily and then was altered to 50 milligrams.  And I give
dates.

Q.   Okay.  So let's just be sure that we're clear
because I don't know where you got your facts from.  But
reviewing Exhibit 9 and reviewing the fact sheet, do you
now concur that she started taking Seroquel in January
of 2002?

A.   Yes.  If -- if the -- if this comment here was
that she had not taken the 200 milligrams, we then come
back to match up my statement of four lines down, which
was her Seroquel dose was later reduced to 25 milligrams
twice daily and that relates to January the 2nd,
25 milligrams twice daily.

Q.   Okay.

A.   So, yes, ma'am.

Q.   All right.  So it looks like she began to take
Seroquel in January of 2002 at a dose of 25 milligrams
twice a day, which will be 50 milligrams, right?

A.   Yes, ma'am.

Q.   And then she -- am I correct that she never has
a dose of Seroquel greater than a total of 50 milligrams
a day the entire time she's on Seroquel?

A.   Yes, ma'am, I think that's reasonable.  And
it's pretty much in agreement with what I'd said.

Q.   I'm not saying you didn't say that.

A.   If you negated the 200 milligrams, which is a
lot, I think the 25 milligrams and then 50 milligrams at
bedtime pretty well matches with Exhibit 9.

Q.   All right.  So the best evidence reviewing her
chart and your opinion from your review of the chart is
that the highest dose of Seroquel Ms. Whittington ever
took was 50 milligrams a day?

A.   I think that's reasonable.

Q.   All right.

A.   Yes.

Q.   Now, I showed you her fact sheet that -- where
it says she quit taking Seroquel on December 5th -- I
mean, December of '05.

Do you have any reason -- and that record
shows what?  You have in front of you.

A.   No, ma'am.  I have January 20th of '06.  And I
still see Seroquel, 25 milligrams at bedtime and --
well, I stop at that.

Q.   Okay.  So you -- you're saying that the last
time that you see a prescription is January of '06,
right?

A.   January the 20th of '06.  And she was given 30,
so that would take her to February the 20th of '06.

Q.   All right.  And I don't mean to be -- I just
want to be clear on what the record shows.  So the fact
sheet that I gave you that she has sworn under oath
to --

A.   Uh-huh.

Page 36

tulloch 10 2 08.txt

Q.   -- that's been marked as Exhibit 8, she says she stopped in December '05, stopped taking Seroquel in December of '05, correct?

A.   Yes, ma'am.  But I didn't agree with that because I didn't believe it.

Q.   You didn't believe it?

A.   I think -- we don't believe it now either.

Q.   And so you have rejected what the -- the patient says because of your assessment that her psychosis interfered with her --

A.   Remembrance of the facts.

Q.   -- understanding the facts?

A.   Yes.

Q.   And the -- okay.

And so it would not matter to your opinion that she said in her deposition that she quit taking Seroquel because she had seen an ad on television telling her she -- that, you know, bad things about Seroquel?

A.   No, ma'am.

Q.   That wouldn't matter to you at all?

A.   Psychotic patients are hearing voices telling them to do all sorts of things all the time.

Q.   And so you're -- you just made an assumption that she's just wrong about when she took the medicines?

A.   I'm -- when did you last take aspirin, ma'am?

Q.   Yeah.

A.   You know, one's memory -- one has to be gentle even with our own memory in the context of some years back.

Q.   And you --

A.   And I think the best validity for what she actually took is in Exhibit 9 assuming that she was taking the medication under medical supervision.

Q.   All right.  And you -- so your date that she stopped that you're using is February 20, 2006, right?

A.   March the -- well, it was last given on February the 20th, and she got 30 tablets.

Q.   Okay.  So March 20th --

A.   So it would need to be March the 19th or the 20th, yes, ma'am.

Q.   All right.  Of 2006?

A.   Yes, ma'am.

Q.   Now, her -- because she was psychotic and had -- she had schizophrenia, right?

A.   Yes, ma'am.

Q.   And she was disabled from schizophrenia and from a motor vehicle accident in 2001, right?

A.   Yes, ma'am.

Q.   Because she had a terrible neck injury, right?

A.   Yes, ma'am.

Q.   That disabled her, correct?

A.   Yes, ma'am.

Q.   Just before she started Seroquel?

A.   I take your word for that, yes.  I have to match up the dates, but, yes, ma'am.

Q.   You say she started Seroquel in October of 2001.  We know that it was actually January of 2002 now, but --

A.   Right.

Q.   -- but she had a car wreck -- actually a couple of car wrecks, right?

A.   That's right.

Page 37

tulloch 10 2 08.txt

Q.   She had two car wrecks before she started
Seroquel, correct?

A.   Yes, ma'am.  In my -- and I'm having to work
from my written because my memory is clouded.  Neck pain
secondary to an injury from motor vehicle accident.  It
says in 2001.  And her first dose of Seroquel, okay, is
early --

Q.   January --

A.   Well, putatively December 2001.  But if she
actually started on the lower dose was 2nd of January of
2002.  Yeah, we're in agreement.

Q.   All right.  Now, I want you to -- well, strike
that.

You said she was psychotic and might not
remember when she stopped taking Seroquel.  It's also
correct that people with psychosis often don't take
their psychiatric medicines, isn't it?

A.   Yes, ma'am.  And that's why I said if she had
been taking it under medical supervision.  One hedges a
lot of these things.

Q.   You don't know how much of her Seroquel she
actually took, do you?

A.   No, ma'am.

Q.   And you noticed as you reviewed the chart that
there were many, many statements by doctors that she was
noncompliant?

A.   Yes, ma'am.

Q.   And there were statements by both her
psychiatrists that she didn't take her psychiatric
medicines, right?

A.   Yes, ma'am.

Q.   And there were statements by her cardiologist
that she didn't take her hypertensive medications,
right?

A.   Yes, ma'am.

Q.   So you have no idea whether she took any of the
Seroquel that was prescribed or some portion of it,
right?

A.   No, ma'am.

Q.   Is that right?

A.   I think that's a reasonable statement.  On the
other hand, if she had improved clinically and this was
the mechanism of her clinical improvement, then one
would also look for a clinical effect of each
medication.

Q.   Okay.

A.   So if the blood sugar came down --

Q.   But you're not a psychiatrist.

A.   No.  But, likewise, in those charts would be
measured -- blood pressure would be measured, lipids.
And so if the measured blood pressure was down, if the
measured lipids were reasonably controlled, then one
might reasonably assume that she was taking her
medication.

Q.   All right.  Now, tell me:  During the time that
Ms. Whittington was on Seroquel, what tests were run --
laboratory tests that were -- would meet the criteria of
the ADA for diagnosing diabetes?

A.   Well, I give the best data.  And, remember, I
hedged it because you go with what you've got.  And the
best data --

Q.   What do you mean by saying "you go with what
you've got"?

Page 38

tulloch 10 2 08.txt
          A.   Many psychiatric units don't do a lot of
medical tests and a lot of patients aren't weighed
and -- or certainly go back ten years aren't weighed as
much.   Clearly now that these issues have become
important, there's a little bit more.
               But in some of the earlier Zyprexa
medication, we found very rare cases of blood sugar
measurement and body weight measurement.   In this
context these patients have fairly good data, relatively
speaking.
               The best data I had on this lady were that
she had a normal urine glucose and we have several body
weights and then the best blood sugar abnormality which
I have to offer in excess of the criteria which we
agreed to on -- I think it was Exhibit 9 -- was the
fasting sugar of 131, which I believe was February of
2006.
          Q.   What -- what I need to know from you,
Dr. Tulloch, is during the time that Ms. Whittington was
taking Seroquel, which you've said is January 2002 to
approximately March --
          A.   20th of March --
          Q.   -- 20th of 2006, what laboratory tests that
measure her blood glucose were done?
          A.   Okay.   The best I have to offer is a blood
sugar of 131 from February 2006.   And that's the best
data I have.
               One then looks for other evidence.   And
from August of 2007 --
          Q.   Okay.   I'm only talking right now --
          A.   Okay.
          Q.   Let's stay focused on -- I'm talking about
while she's taking Seroquel --
          A.   Okay.
          Q.   -- I want to know what blood glucoses she had.
          A.   That's all I have at this time.
          Q.   All right.   Was that blood glucose of the
fasting value of which was 131 milligrams per deciliter,
that was -- that was taken in February of 2006, right?
          A.   That's correct.
          Q.   And you saw no other blood glucoses between
January of 2002 and March of 2006 in your review of the
medical records you were given by the plaintiffs?
          A.   I think that would not be correct.   I didn't
note any other blood sugars.   I -- for that to be
totally valid, I would need to go back and review that
summary shot.
          Q.   Okay.   Here is the material you gave me.   I
need to know all the blood glucose tests she had while
she was on Seroquel.
          A.   Okay.   With your permission, ma'am, I'm taking
Exhibit 3 and putting it in another computer and seeing
if I can find it from your data.
          Q.   Okay.   That's your data.   That's not mine.
That's what I was given.
          A.   The data that was given to you --
          Q.   Okay.
          A.   -- at some ungodly hour last night.
          Q.   It was given to me today.
          A.   That's a more civilized time.
               Somewhere there's a nice review that has it
all.   And it's called Linda Whittington summary or
something like that.   I'll look through here.
                              Page 39

tulloch 10 2 08.txt
              Ma'am, I -- to save time, I do not have a
headline that includes Linda Whittington summary.  And I
apologize.  I thought it should be on one of our disks.
It was the nice summary that has everything and which
would give us an immediate colation.
         Q.  Okay.  Well, let's --
         A.  I think in the interest of time, we will be
having other meetings together.  May I promise that I'll
bring it to you because it will save us a lot of time.
         Q.  I think that's a great idea.
              And so let's just make the record clear on
this.  As we sit here today, you can't tell me what her
lab tests were during the time that she was taking
Seroquel other than the one that's in your report from
February of 2006, right?
         A.  That's correct, ma'am.  But I --
         Q.  And you have them on a summary that was
prepared by the plaintiff's law firm, correct?
         A.  Right.  And it does summarize her weight, her
sugar -- well, the available weight, the available
sugars, and the medications as we've looked at on
Exhibit 9.
         Q.  And you're looking at a disk that has medical
records on it that were produced to me this morning
that's been marked as Exhibit --
         A.  At 11:15 this morning.
         Q.  -- Exhibit 3, right?
         A.  (Witness nods.)
         Q.  Right.
         A.  Yes, ma'am.
              MR. PIRTLE:  If mine's correct, I have a
few depos on here.
              MS. THORPE:  I haven't looked at it, Tom,
so you're ahead of me.
              MR. PIRTLE:  Well, I didn't know what was
on it either.
              MS. THORPE:  I knew it had some medical
records.
              MR. PIRTLE:  Although I am quote/unquote
the plaintiff, I was not in charge of this production.
We will certainly get that.  I think it's more efficient
to give that than to have him trudge through to try to
reconstruct it.
         Q.  (BY MS. THORPE)  And so you can't go to the --
as you sit there with those medical records, you're not
able to go in to them to find the laboratory values for
when she was on Seroquel?
         A.  That's correct, ma'am.
         Q.  All right.
         A.  And in the interest of time, what I have chosen
to do was a bullet search because I know there's a nice
summary which has the sort of issues which would make
our decisions easier because of its relationship to --
relationship to --
         Q.  Okay.  So I'm going to -- I'm sorry, I didn't
mean to cut you off there.  Did you --
         A.  No problem.  We were identifying the correct
disk.  That is your disk, Exhibit 3, and I'll get back
mine.
              MR. PIRTLE:  That's not yours.
              THE WITNESS:  Oh, okay.
         A.  And we have promised to produce on all the
patients we're discussing in the interest of simplicity
                          Page 40

tulloch 10 2 08.txt
and time a nice time line which collates weight,
medication, and clinical state.  And it's a review of
the charts which are listed at the beginning of each
report.
     Q.   (BY MS. THORPE)  All right.  And that was
something that was prepared by someone in the
plaintiff's office?
     A.   Yes, ma'am.
     Q.   And you relied upon it, right?
     A.   Yes, ma'am.
     Q.   And without it, you really can't get to those
labs --
     A.   Well, in the interest of time --
     Q.   -- to give me the results, right?
     A.   -- it can be got but it would mean looking at
every -- sat every individual meeting.
               (Exhibit No. 10 marked.)
     Q.   (BY MS. THORPE)  The one glucose level that you
have in your report that you think she had while she was
taking Seroquel is dated February 16, 2006, right?
     A.   That's correct.
     Q.   And it's -- I've just marked it as Exhibit 10,
correct?
     A.   Exhibit 10.
     Q.   Now, in this test she had a fasting blood
glucose of 131, right?
     A.   That's correct.
     Q.   And she had a -- then she had an oral glucose
tolerance test as well, correct?
     A.   Yes, ma'am.
     Q.   And at the second hour is the -- is the hour of
the test where one determines whether the test is
diagnostic of diabetes, correct?
     A.   Yes, ma'am.
     Q.   And her result is 181, correct?
     A.   That's correct.
     Q.   So her oral glucose test in February of 2006
indicates that she had impaired glucose --
     A.   Tolerance.
     Q.   -- tolerance, correct?
     A.   Right.
     Q.   It does not indicate that she has diabetes,
correct?
     A.   Well, no, not really.  You heard me say earlier
that we put greater credence on the fasting sugar than
on the two-hour sugar.  But it -- this is a nice
highlight why you need to do more than one test.
Because in here a fasting sugar -- had we not done the
oral glucose tolerance test, the fasting sugar would
have diagnosed her as having diabetes.  It's a little
bit more than 126.  If we'd only done the two-hour test,
which is done in some of the pregnancies where they load
them, they look at the one-hour test, we'd have looked
at 181.

          From what you understand at the time zone,
it just meant that somewhere over the next few months
her pancreas was about to -- no longer able to normalize
blood sugar.  And so certainly in this context a fasting
sugar was defined as having had diabetes and a two-hour
sugar on her glucose load would define her as having
impaired glucose tolerance.  And you heard me say that
by the time they get to impaired glucose tolerance, they
have lost probably 70 to 80 percent of their pancreatic

tulloch 10 2 08.txt
reserve.
        Q.    And so let me just stop you there.  If you
have -- if you have an impaired fasting glucose as
opposed to impaired glucose tolerance but let's say you
have an impaired fasting glucose, does that same
statement -- that statement that you just made hold
true?
        A.    Yes, ma'am.
        Q.    So say it with regard to impaired fasting.
        A.    What we now know is that subjects who have let
us say a sugar of 124 do not fulfill the criteria for
diabetes as defined by the American Diabetes Association
as we discussed.  But when the pancreas is tested -- and
there are ways of doing that -- it is apparent that by
the time the blood sugar is anything much above -- as
low as 110 and certainly by 124, they have lost more
than two-thirds of their pancreatic reserve.
        Q.    And if someone has an impaired fasting glucose
of 123, they would have lost more than 75 percent of
their pancreatic reserve --
        A.    Exactly.
        Q.    -- of insulin?
        A.    Yes, ma'am.
        Q.    Okay.  Now, Exhibit 10, which is the -- is
the --
        A.    Oral glucose test.
        Q.    -- the test on February 16, 2006, you would say
does not satisfy the ADA criteria for diagnosing
diabetes, correct?
        A.    By glucose tolerance test, although it does by
a random sugar.
        Q.    Well, actually --
        A.    I'm sorry, by a fasting sugar.  Strike
"random."
        Q.    You -- you must be very clear about this,
Dr. Tulloch.  Is there a confirmatory test of the tests
that are contained in Exhibit 10?
        A.    You mean do we have another sugar, then?  We
don't, ma'am.
        Q.    Okay.  Let me just --
        A.    So --
        Q.    And you agree that to satisfy the ADA criteria
for diagnosing diabetes, you have to have a confirmatory
test, correct?
        A.    Ma'am, if you're splitting hairs, yes.  But if
you're asking me about the management of this patient, I
would point out that by August the 23rd of 2007, her
physician gave her Metformin, which is a management
medication for type 2 diabetes.
                So we would be looking at evidence that
other sugars had appeared that were in excess of 131
fasting which caused the doctor who wrote this
prescription on the 23rd of August to write the
prescription for Metformin.
        Q.    Isn't it correct, Dr. Tulloch, that this
patient has never had two laboratory tests, an initial
one and a confirmatory test, that established either a
fasting glucose over 126 or a two-hour oral glucose
tolerance test over 200?
        A.    Ma'am, if we are relating -- if we're looking
at the numbers I have available here, that's correct.
We have only one fasting sugar that's 131, which is
diagnostic of diabetes, but it is paired with a load
                            Page 42

tulloch 10 2 08.txt
sugar at two hours of 184.
        Q.   Exhibit 10 --
        A.   So --
        Q.   -- the lab testing from February of 2006 is
ambiguous because of the two tests and it requires
confirmation, correct?
        A.   That's correct.  And until that --
        Q.   And it never was confirmed, correct?
        A.   Until that, she has impaired fasting glucose,
which as you heard is a stage in the progression of type
2 diabetes.
            MR. PIRTLE:  If you get to a spot, we're
better than an hour.
            MS. THORPE:  I'm not quite to a spot.
            MR. PIRTLE:  I understand.  I'm not pushing
on you.
            MS. THORPE:  I appreciate it.
        Q.   (BY MS. THORPE)  Now, did you review her
glucose testing before she -- Ms. Whittington took
Seroquel?
        A.   I believe it's on that summary.  And when we
have the summary, I'll be able to point them to you as
they run all the way down.
        Q.   But you made every effort to review all of her
labs before she started taking Seroquel, right?
        A.   Yes, ma'am.
        Q.   Then you put in your report that's been marked
as Exhibit 2 no blood glucose levels other than the one
taken in February of 2006, right?
        A.   Yes, ma'am.
        Q.   You did not include in your report her glucose
testing before she started taking Seroquel, right?
        A.   That's right.  I do that in the belief that
they were normal.  But, again, when we have the summary,
I'll be able to point them out to you.
        Q.   You believe -- and it was -- you believed that
she had normal blood glucose levels before she started
taking Seroquel, right?
        A.   To the best of my belief.  And as you saw --
trying, then, to split culpability, the best data I
could get on her after she'd taken another atypical,
Zyprexa, the only thing I could find was a urine
glucose.  And I said earlier we don't see -- as
physicians who care for diabetic patients, we would love
to have seen more data on these psychiatric patients,
but our colleagues clearly are faced with other aspects
of patient care.
        Q.   Now, thinking about the -- the causes that you
said she had for diabetes, for example, let's start with
hypertension and hyperlipidemia.
        A.   Family history.
        Q.   Well, let's just start with hypertension and
hyperlipidemia.  And let me just ask you:  There are
people who have hypertension and hyperlipidemia who
develop diabetes who never take Seroquel, right?
        A.   Yes, ma'am.
        Q.   And hypertension and hyperlipidemia could be a
sole cause of diabetes, correct?
        A.   Well, if -- if I can explain this.  A
condition --
        Q.   Do you agree with that statement?
        A.   I'm trying to put it in a correct context.
        Q.   Well, you're going to talk about metabolic
                        Page 43

tulloch 10 2 08.txt
syndrome.  But first I want to ask you about
hypertension and hyperlipidemia, the two things that
Ms. Whittington, you said, had before she took Seroquel.
Could those two causes of diabetes in and of themself
have caused her to develop diabetes without regard to
Seroquel?
      A.  I -- I think there are other -- they're
indicators of a condition which you just mentioned,
which is the metabolic syndrome, and that's the co --
the co-metabolism or the cooperative presence of several
risk factors which end up with adverse cardiovascular
disease.  And these run -- they almost seem to run
together.  So it's truncal obesity, it's hypertension,
it's high triglycerides, low HDL, and it's abnormal
blood sugar.  And truncal obesity is measured and there
are numbers which are diagnostic.
      Q.  Did Ms. Whittington have metabolic syndrome?
      A.  She given her body weight would have fulfilled
the truncal criteria.  She also had hypertension and
hyperlipidemia.  So she had -- and you only needed three
of the five components.  So by definition this lady had
the metabolic syndrome.
      Q.  She had metabolic syndrome before she took
Seroquel, correct?
      A.  She inherited metabolic syndrome from her two
parents.
      Q.  Right.
             Well -- and her parents -- she has a family
history of hypertension and hyperlipidemia, right?
      A.  That's correct.
      Q.  And a family history of diabetes, right?
      A.  They're all three grouping together.
      Q.  Right.
             So her family had metabolic syndrome, she
had metabolic syndrome.  And my question to you -- let
me just ask it this way.
             Did -- could her metabolic syndrome which
she had before she -- strike that.  I screwed this all
up.
             She had metabolic syndrome before she took
Seroquel, right?
      A.  Yes, ma'am.
      Q.  Her metabolic syndrome could have caused her
diabetes even if she had never taken Seroquel, right?
             MR. PIRTLE:  Objection, form.
      A.  Ma'am, what -- what I -- I go back to my life
pattern that we discussed about an hour ago.  Let us say
that if she didn't have any of the issues we discussed,
she was going to get type 2 diabetes at the age of 105.
And let us say that she lived the lifestyle she had
listed in the first and she got two different atypicals,
each of which cause insulin resistance and weight gain.
And so we take that onset of type 2 diabetes from 105
and we push it down to the age of 44-1/2.
      Q.  (BY MS. THORPE)  I hear -- I heard you when --
      A.  You're asking me --
      Q.  -- you said it.  But now I'm asking you --
      A.  You're asking me to say which was the major
contributing factor.  And -- and with respect, what I
offer you is she had her genes and we -- we the
physicians who gave her the two atypical antispychotics
pushed that -- that onset of diabetes down lower in her
lifespan by what the medications did to her, and this
Page 44

tulloch 10 2 08.txt
was the weight gain and the insulin resistance.   And I
stand offering no culpability to any of us.   We each do
the best we can in the management of our patient.
        Q.   So your testimony is that the fact that she had
metabolic syndrome before she ever took
Seroquel increased --
        A.   Or Zyprexa.
        Q.   -- or Zyprexa increased her risk -- greatly
increased her risk of developing diabetes, right?
        A.   Ma'am, when I gave you that description of the
lifespan and diabetes at 25 or 105, I was talking about
somebody who might have inherited the metabolic
syndrome.   It's a nice way of summarizing it.
        Q.   Somebody who -- who had metabolic syndrome like
Ms. Whittington did, when would you have expected her to
develop diabetes?
        A.   I have to simplify this to give a -- if all
things have been perfect --
        Q.   Actually --
        A.   -- at the age of 105 --
        Q.   -- let me withdraw that question and ask it --
        A.   Yeah.
        Q.   -- a different way.
             Someone who had a family history of
diabetes, who had metabolic syndrome, who was obese, and
who smoked and who took -- and let's just leave out the
Zyprexa at this moment -- when would, in your scale, you
expect that person to get diabetes?
        A.   At any time that she had a further major weight
gain.   And that was why I tried so hard to find some
numbers.   And I offer you the Resnick paper because it
gives numbers.   Anything else is just a guess.
        Q.   Okay.
        A.   But start with the analogy.
        Q.   Always have to have those numbers, don't you?
        A.   105 or 25.   And if she does everything bad,
she'll get it at 25; if she does everything right,
she'll get it at 105.   And we, her caregivers, can help
her push that to the late range group.
        Q.   But I'm asking you:   If she hadn't -- somebody
with her picture that you've described, with a family
history of diabetes and metabolic syndrome before she
started taking Seroquel and obesity, at what age would
you have expected her to develop diabetes?
             MR. PIRTLE:   Objection, form.
        A.   Without major weight gain?   Because what we
have to go was by her weight.   Her weight when she
started was 184 pounds.   Her weight when she finished
the second atypical was 244 pounds.
        Q.   (BY MS. THORPE)   So it would depend on her
weight gain?
        A.   There's a 60-pound weight gain there.   And I
offer the Resnick paper as a for instance.   And in the
Resnick paper, it says each kilogram --
        Q.   I don't need you to read me --
        A.   -- over ten years --
        Q.   -- the Resnick paper, sir.
        A.   -- increases the risk by 49 percent.   So --
        Q.   Okay.
        A.   -- you're asking me to -- to choose a number
and I'm coming back to you with showing you my thought
process because --
        Q.   Well, if you can't choose -- you know what, if
Page 45

                              tulloch 10 2 08.txt
you can't answer the question, it's fine to say that you
can't answer the question --
      A.   Okay.
      Q.   -- all right?
            MR. PIRTLE:  Objection.
      A.   Let me answer it this way, that anything that
she did that made her gain 60 pounds in weight, which is
an eyeball from 184 to 244 -- is that 60 pounds or is it
50 pounds?  It's 60 pounds.
      Q.   (BY MS. THORPE)  Well --
      A.   She gained --
      Q.   -- the same is true at 50 pounds, right?
            THE REPORTER:  One at a time, please.
      Q.   (BY MS. THORPE)  Anything that caused her to
gain 50 pounds of weight would have -- if she has
metabolic syndrome and a family history of diabetes, in
your opinion, that would be enough to be -- to cause her
to have diabetes, right?
      A.   Massively accelerate the probability that she
would develop diabetes within the next six months.
      Q.   Gaining 50 pounds would massively accelerate
the possibility that she would get diabetes in six
months?
      A.   The next six months, yes, ma'am.
      Q.   I assume it's also correct that if she had on
top of all this impaired fasting glucose with her
metabolic syndrome and her obesity and her family
history, that she would -- you would expect her to have
diabetes --
      A.   Then we --
      Q.   -- in a short amount of time, right?
      A.   At that time we would invoke the final straw
that breaks the camel's back.
            (Exhibit No. 11 marked.)
      Q.   (BY MS. THORPE)  All right.  I'm going to show
you a laboratory test that's been marked as No. 11.  And
this is a lab taken from her on September 17, 1993.  And
you see there that she has a glucose of 123?
      A.   I do indeed.
      Q.   All right.  Now, that is an elevated glucose,
isn't it?
      A.   Well, are we assuming it's fasting or are we
assuming it's random?
      Q.   Well, I'm going to ask you.  How do you -- you
don't know, do you?
      A.   We don't, no.
      Q.   And have you ever seen this blood test before?
      A.   If it was in that summary, I will have seen
that number.  And when I was skimming through the charts
of this patient's physicians, I looked at the lab.  So I
probably did.  What you'll also see -- well, go on,
you're talking about sugar and how --
      Q.   And you didn't put this -- you didn't include
this value in your report, right?
      A.   No, ma'am.
      Q.   And you have actually -- well, on your reliance
list, Ms. Whittington's treating physician's deposition
is on there.  Did you read it?
      A.   No, I didn't.
      Q.   Would you disagree with him when he testified
that he thought that as early as 1993 she could have had
diabetes?
      A.   Well, as early as 1993, if this is her fasting
                              Page 46

                                    tulloch 10 2 08.txt
sugar, she had impaired glucose tolerance.
     Q.   Okay.
     A.   More than that, she had a fatty liver, she had
hypercholesterolemia, and she had high triglycerides if
these are fasting numbers.
     Q.   Okay.
             MR. PIRTLE:   Again, when you get to a
stopping point.
             MS. THORPE:   Almost there.
             MR. PIRTLE:   Good.
             (Exhibit No. 12 marked.)
     Q.   (BY MS. THORPE)   I'm going to show you what's
been marked as Exhibit 12 for identification and ask you
if you've read this medical record dated August 31,
1993.
     A.   I'm reading right now.   I saw all of the
earlier stuff some months back.   Yes, ma'am, I'm looking
at it now.
     Q.   And it's the Mental Health Center of
Jacksonville, right?
     A.   Uh-huh.
     Q.   And this is the order for the test that
Ms. Whittington had on September 16, 1993, right?
     A.   Okay.   And down at the bottom it says fasting.
     Q.   Right.
     A.   No. 4.
     Q.   Right.
             So from your review of these records, you
would agree that the tests she had on September 16,
1993, is a fasting blood glucose, correct?
     A.   Yes.
     Q.   More probably than not, the lab on September
16, 1993, is a fasting blood glucose, correct?
     A.   That's correct.
     Q.   So she had impaired fasting glucose before she
started taking Seroquel, right?
     A.   Before she started taking Zyprexa.
     Q.   Right.
             Or Seroquel, correct?
     A.   Yes, ma'am.
     Q.   All right.
             MS. THORPE:   Do you want to -- shall we
take a break now?
             MR. PIRTLE:   Sure.
             (Short recess from 7:06 to 7:14.)
             (Exhibit Nos. 13 and 14 marked.)
     Q.   (BY MS. THORPE)   I'm going to show you what's
been marked as Exhibit 13 and 14 for identification.   So
Exhibit 13, if you look at it, shows -- is dated
September 28, 1990, right?
     A.   I'll take your word for it.   Show me where the
date is.
     Q.   It's right up in the -- right there.
     A.   Okay.   Gotcha.
     Q.   That's the correct date?
     A.   28th.
     Q.   September 28, 1990?
     A.   September 28, 1990.
     Q.   She weighed -- if you look on the left-hand
side of the page, you see her weight and height.   She's
5'5", she weighed 140 pounds?
     A.   Yes, got it.
     Q.   Have you ever seen this record before?
                                Page 47

tulloch 10 2 08.txt

     A.   University Hospital at Jacksonville,
Jacksonville Heart Center.  I don't list University
Hospital on the list of the medication -- of the charts
I looked at, so maybe, maybe not.

     Q.   Okay.

     A.   Sometimes you get reprints of these in
subsequent hospital charts.

     Q.   You don't know --

     A.   I don't --

     Q.   -- whether you saw it or not?

          Do you remember what -- the earliest weight
you saw her have was?  Let me say it better.

          Do you recall what the earliest weight you
know of for Ms. Whittington?

     A.   In honesty, not -- without my time line, I
can't be honest with you.

     Q.   All right.

     A.   What we have here is -- we'll agree is a
weight -- height of 5'5" and a weight of 140, ma'am.

     Q.   All right.  And then if you'll look at
Exhibit 14, dated November 20, 1996, do you see that?

     A.   Yes, ma'am.

     Q.   And what is her weight shown there?

     A.   Five foot -- 194.

     Q.   So she has had a 49-pound weight gain over a
six-year period, correct?

     A.   That's correct.

     Q.   And in your book that's a great big weight
gain, right?

     A.   It's a significant weight gain.

     Q.   And during that same period, she had an
impaired fasting glucose, right?

     A.   That's correct.

     Q.   So she had -- she had many causes of diabetes
in the early Nineties, correct?

     A.   That's correct, ma'am.

     Q.   Including metabolic syndrome, obesity, a
49-pound weight gain, a family history of diabetes,
smoking, right?

     A.   Yes, correct.

     Q.   And how, Doctor, did you rule out those causes
of diabetes as the sole cause of the diabetes that
she -- that your report says she has even though it
hasn't been confirmed?

     A.   No, ma'am, what I said was she had a number of
contributing factors but I felt that the weight gain
which was related to her atypical antipsychotics was a
major contributing factor.  And we used the term "the
final straw that broke the camel's back."

          Now, what you and I are in total agreement
is the lady had a very heavily loaded saddle on that
camel.  And so when we have a final further addition of
40 to 60 pounds, depending on which atypical
antipsychotic we want to discuss, the camel is heavily
at risk.

     Q.   All right.  Seroquel did not cause her to gain
60 pounds; you've not said that?

     A.   No.

     Q.   All right.

     A.   What --

     Q.   What I want to know is you would consider -- or
let me just ask you -- let me start over.

          The metabolic syndrome that she had before

Page 48

tulloch 10 2 08.txt
Seroquel, the 49-pound weight gain she had before
Seroquel, the impaired fasting glucose she had before
Seroquel of 123, the family history of diabetes, and the
smoking that she had, you would agree that those causes
all more likely than not caused her diabetes, correct?
    A.  No, ma'am, they were contributing factors.
    Q.  You would not say that they weren't -- those --
you would not say that all of those factors combined
more likely than not caused her to have diabetes?
          MR. PIRTLE:  Objection, form.
    A.  Were contributing factors, ma'am, yes.  What I
went on to say -- and you corrected me, but I was
looking at both.  Let me go back to my second but last
paragraph.  On Zyprexa she gained 184 to 204.  On
Seroquel she gained 204 to 244.
          My statement was she had gained 60 pounds
on the atypical antipsychotics.  You corrected me and
said she didn't gain 60 pounds on Seroquel.  Both of
those statements are correct.
    Q.  (BY MS. THORPE)  What did you do to rule out
other causes for her weight gain while she was on
Seroquel other than Seroquel?  Did you do anything?
    A.  What I did was I looked at the chart.
    Q.  All right.  And what did you --
    A.  And --
    Q.  And what did you --
    A.  And --
    Q.  -- find as an alternative explanation for her
weight gain, if anything?
    A.  I have no other alternative explanation.  She
was not on glucocorticoids.  She was not on TCB.  She
was not on any of the other appetite stimulants.  So I
felt more likely than not that her 20-pound weight gain
during the time she took Zyprexa was caused by Zyprexa
and her 40-pound weight gain during the time she took
Seroquel was due to the Seroquel.
          Now, if we now compare April 1999 with this
Exhibit 14 which you've just given me, she actually lost
a pound or two.  Between '96 and '99 she went down from
194 to 184, and then the Zyprexa caused the 20-pound
weight gain and the Seroquel caused a 40-pound weight
gain.
    Q.  Let me direct --
    A.  That was my best offering to you, ma'am.
    Q.  Let me ask you how -- whether or not you have
quantified the contribution of the metabolic syndrome,
the impaired fasting glucose, the family history of
diabetes, and her obesity that began at the very latest
in 1996 to the development of her diabetes.  Have you
quantified that?
    A.  I did with the analogy.  We talked about the
analogy and we talked -- we now have a lady --
    Q.  I'm asking if you have a number.  Do you have a
number by which you can quantify?
    A.  Well, the final straw that breaks the camel's
back is the number that tips it over into diabetes.
    Q.  Not my question.
    A.  No, but you're -- let me answer it.  Your
question was she had impaired fasting glucose.  We've
agreed that she had a sugar -- fasting sugar way back of
123.  We now have a fasting sugar in -- after she's
gained 60 pounds of 131.  Your question to me was what
was this -- how can you quantify it.  My -- my --

tulloch 10 2 08.txt
comment --
    Q.   That wasn't my question to you.   That
was not --
    A.   -- is the analogy of the final straw.
    Q.   Not my question.
    A.   Okay.
    Q.   My question was:   Have you quantified the
contribution of family history, metabolic syndrome,
obesity, and impaired fasting glucose, and smoking that
preexist her Seroquel use?
    A.   Yes, ma'am.
    Q.   And --
    A.   They're all there.   And then --
    Q.   What's the quantification?
    A.   And Zyprexa.   And Zyprexa.
    Q.   That's not my question.   My question is yes or
no.  Have you --
    A.   I have quantified it.
    Q.   All right.
    A.   Yes, ma'am.
    Q.   All right.   Have you quantified -- let me get
it out so it's clear.
             Have you quantified the risk, the
contribution to the risk of developing diabetes of
metabolic syndrome, family history, obesity, smoking
that -- and impaired fasting glucose that preexisted her
Seroquel to her diabetes?
    A.   Yes, ma'am.
    Q.   All right.   And what is the number that you --
that you have placed on that?
    A.   I still offer you the 60 percent.
    Q.   Those factors --
    A.   No.
    Q.   -- that I just listed --
    A.   I had listed -- I have to go back and be
consistent.   What I gave you before was all the
preexisting conditions were 30 percent.   The 40-pound
weight gain was the final straw that broke the camel's
back, so I offered that to you as 60 percent.
             But you heard me say -- and I'm more a
scientist than -- than somebody who gives evidence, so I
have to try and go by the best available data.   And I
offered to you some data where they took patients who
were --
    Q.   You were relying --
    A.   -- just obese.
    Q.   -- on Resnick for that number?
    A.   Yeah, yeah.
    Q.   All right.   Let me -- let me direct your --
    A.   But I also in true modesty say none of us have
the Holy Grail.   We give you the best data.
    Q.   On your report you say the last weight recorded
is 236 pounds, down 8 pounds, in May of 2006, right?
    A.   Yes, ma'am.
    Q.   And so what you're trying to tell people when
you write that sentence is that she actually lost weight
after she went off Seroquel, right?
    A.   No, ma'am.   If you read the other half of that
sentence, it says -- and we saw it when it was
written -- it says she was treated with Metformin, which
was Glucophage, and that is a medication that is given
for insulin resistance and for type 2 diabetes and it
facilitates weight loss.   So when she lost weight, two
                     Page 50

tulloch 10 2 08.txt
things happened:  She was switched from Seroquel to
Geodon and she was also given Metformin plus/minus a
month or two.  And those weight changes could be
ascribed to either/or both of those or -- or plus my
suspicion is she was probably given some advice on
dietary choices.
     Q.   After she went off Seroquel, she gained a lot
of weight, didn't she?
     A.   Without that time line, ma'am, I can't be
honest about it.
     Q.   You don't say --
     A.   No.
     Q.   You don't say in your report that she gained a
lot of weight after she went off Seroquel, did you?
     A.   No.  What I say in my report is the last
recorded weight of May 2006 is 236 pounds.
          (Exhibit No. 15 marked.)
     Q.   (BY MS. THORPE)  I'm going to show you what is
her last recorded weight, which has been marked as
Exhibit 15.  And you indicate that -- well, let me just
ask you:  Did you read this record before you formed
your opinions in this case?
     A.   May 2008, my last recorded weight is May 2006.
     Q.   Yeah.
     A.   So I believe I did not have access to May 2008.
     Q.   This is March 24, 2008.  Exhibit 15 is March
24, 2008.
     A.   Okay.  The last one I have reference to is May
2006.
     Q.   Okay.  So your statement that the last weight
recorded is 236 pounds, down 8 pounds, in May of 2006 is
not correct, right?
     A.   No.  It -- at the time I made this record, it
was the last weight that I had access to.
     Q.   Okay.
     A.   If you're now showing me something from a later
date and this says encounter date, March 2008, we now
have new information.
     Q.   So you did not read Dr. Boyd's records before
you formed your opinions?
     A.   I did not have access to this chart, ma'am, no.
     Q.   And they don't appear on any of your disks or
your --
     A.   No.
     Q.   Okay.
     A.   And if they're not listed -- this is Baptist
Primary Care, Fleming Island.  And at the list of
sources at the top, there is no Baptist Primary Care,
Fleming Island.
     Q.   And her weight at that time was 255 pounds,
right?
     A.   You'll have to guide me to where it is.  I
haven't found it yet.  Tell me where it is.
     Q.   It's on the second page under vital signs,
weight 255, BMI 41.2.
     A.   I found the vital signs.  I found blood
pressure --
     Q.   It's at the bottom.
     A.   -- heart rate, respiratory -- okay.  255, okay.
     Q.   So after two years of being off of Seroquel,
she weighs 255 pounds, which is -- will you agree with
me the most she's ever weighed in her life after --
     A.   Yes, ma'am.
                         Page 51

tulloch 10 2 08.txt

Q.    -- she's off Seroquel?
A.    Yes, ma'am.
Q.    Okay.
A.    Okay.
Q.    So she had 49-pound weight gain before she took
Seroquel and then she had a big weight gain up to
255 pounds after she was off Seroquel, right?
A.    Yes, ma'am.
Q.    Now, it was -- how did you -- you note in your
records that she was in -- disabled in 2001 secondary to
an injury from a motor vehicle accident, right?
A.    That's correct.
Q.    What did you do to rule out the impact on her
lifestyle of being injured in a motor vehicle accident
to make her more sedentary or less active?  How did you
rule that out as an explanation for a weight gain?
A.    Ma'am, I said all of those other factors were
in there with family history and psychosis and
everything else, what we ascribed to the two atypical
antipsychotics.  But the biggest was while she was on
Seroquel, was a 40-pound weight gain while on Seroquel.
Q.    So you didn't rule out the contribution of
the -- of the motor vehicle accident to her weight gain?
A.    I left it in there with family history,
hyperlipidemia, smoking history, psychosis.  They're all
there.
Q.    Let me -- well, let me ask you this.  What do
you rely on as scientific support for including the
motor vehicle accident in -- as a contributing factor
of -- so that it comes out to be 33 percent along with
the metabolic syndrome and the impaired glucose and all
of the other obesity and all of the other causes of
diabetes that she had?
A.    What we're looking at is a stable -- a baseline
as one can get on the available evidence.  What we now
looked at was she had a period of weight gain, then she
stabilized, and then she was given two atypical
antipsychotics.  On one she gained 20 pounds, on one she
gained 40 pounds.  And then we found an abnormal fasting
blood sugar.
          We have agreed on new data to me that she
has since gained some more weight having initially lost
weight when she was given Metformin and maybe had been
given a diet.
Q.    Is it fair to say that you have no scientific
literature that you can point to that says that the
combination of metabolic syndrome and family history and
impaired fasting glucose and a motor vehicle accident
that made her more sedentary and that she was obese,
that all of those factors add up to 33 percent but
somehow Seroquel adds up to 66?  You can't point me to
studies that support that, can you?
A.    No, ma'am.  And I said so at the time.
Q.    All right.
A.    What we had to do -- the best analogy is the
final straw to the camel's back -- that she'd gained
another 40 or 50 pounds while on treatment for type 2
diabetes is not unusual, particularly in a psychotic
patient.  As physicians we do the best we can.
Q.    Now, Doctor, let me ask you:  We know that she
was obese back in 1996, right?
A.    Yes, ma'am.
Q.    And we know that -- we know that somebody who's
Page 52

tulloch 10 2 08.txt

5'5", whose weight is 194 pounds, has a BMI of 32.3, right?

A.   Yes, ma'am.

Q.   And anything over 30 is obese, correct?

A.   It's morbidly obese, yeah.

Q.   Okay.  And ultimately after she stopped Seroquel and goes up to 255, she has a BMI of 42.4, which is really, really, really obese, right?

A.   Yes, ma'am.

Q.   Now, you know that obesity is -- is a cause of diabetes.  You've said that, right?

A.   Yes, ma'am.

Q.   And it is -- you agree that obesity is the most important risk factor and most important cause of type 2 diabetes?

A.   Is a most important cause, yes, ma'am.

Q.   Well, I don't want to quibble.  But you would agree that the general consensus of the scientific and medical community is that obesity is the most important risk factor for type 2 diabetes, correct?

A.   I think that's reasonable.

Q.   And you know that scientists have quantitated the risk of obesity in causing diabetes. Epidemiologists have done that, right?

A.   Yes, ma'am.

Q.   And you know that the relative risk for diabetes in women aged 30 to 55 years who have a BMI of 32.3 is 40.3.  You know that that's the relative risk, don't you, Dr. Tulloch?

A.   That sounds a reasonable number, yes.

Q.   That is a huge relative risk, isn't it?

           MR. PIRTLE:  Objection, form.

Q.   (BY MS. THORPE)  Yes?

A.   Yes, indeed.

Q.   Can you name another risk factor that has a relative risk of 40 of any exposure an epidemiologist has ever studied?

A.   Not that I'm -- I think we're in agreement.  I offered you this one which looked more -- not so much at stable numbers but at changing numbers.

Q.   Would --

A.   But, again, what I go back to is the soil and the seed.  If -- there are obese people --

Q.   I'm not asking you about that.

A.   -- who have normal blood sugars and --

Q.   Sir, I have 15 minutes and you're wasting my time.  Okay?

A.   You're in charge.

Q.   I'm sorry.

A.   You're in charge.

Q.   So --

A.   The answer is yes, it is a major risk factor, obesity is a major risk factor.  And I'm sorry but I distracted you.

Q.   You know that in someone who has a BMI of 34.3 and is a woman aged 30 to 55 would have a relative risk of 54?

A.   Yes, ma'am.

Q.   And you know that -- you know what an attributable risk is, don't you?

A.   (Witness nods.)

Q.   Right?

           And you know that relative risks that large

Page 53

tulloch 10 2 08.txt
are larger than the risks of smoking and lung cancer,
right?
     A.   Yes, ma'am.
     Q.   And that's a big whopping risk, right?
     A.   We're in agreement.
     Q.   And -- so you know that -- that if you have a
BMI -- if you have a BMI in that range, you have an
attributable risk percent of 98 percent, right?
     A.   (Witness nods.)
     Q.   Yes?
     A.   Let me see the tables you're getting that from.
     Q.   Well, you just calculate it.
     A.   Okay.
     Q.   If you have a relative -- do you know how to do
that?  If you have a relative risk of 54, do you know
how to calculate attributable risk?
     A.   No.  Show me.
     Q.   All right.  You don't have any reason to think
that the numbers are incorrect, do you?
     A.   If they're on good data, I'll accept them.
     Q.   All right.  Now, you cannot testify that but
for taking Seroquel Ms. Whittington would not have
developed diabetes, would you?
     A.   No, ma'am.  What I said was that 40-pound
weight gain was a major contributing factor.  And what I
get back to was my analogy of diabetes at 25 or diabetes
at 105.  And I believe that the atypical antipsychotics
accelerated it and Seroquel did it more than Zyprexa.
     Q.   Now, what an attributable risk of 98 percent
means for obesity is -- what it means, that 98 percent
of people who have a BMI of 34.3 and also have diabetes
have diabetes because of their BMI, right?  You
understand that's what --
     A.   That sounds reasonable.
     Q.   Okay.  And so, similarly, if you have a BMI of
32.3, you have an attributable risk percent of 97.5
percent.  You understand that, right?
     A.   I'll agree with that.
     Q.   And an attributable risk percent of 97.5
percent means that of people who have a BMI of 32.3 like
Ms. Whittington did before she took Seroquel and have
diabetes, they have diabetes because of their obesity,
right?  That's what it means.
          MR. PIRTLE:   Objection, form.
     A.   What I will have to point out was we had
impaired glucose tolerance some ten years before.
     Q.   (BY MS. THORPE)  Yeah.
     A.   The final straw that broke her camel's back for
a sugar of 131 was a 60-pound weight gain of which
40 pounds was on Seroquel.
     Q.   And tell me:  If somebody comes in to your
office and they gained a lot of weight and they want to
know what's causing them to have a weight gain, what do
you do?
     A.   I explain the issues we have discussed today,
that we started with a family history, we looked at
number of --
     Q.   We're not --
     A.   -- attributable issues --
     Q.   -- communicating.
     A.   -- and then I come back to the issue of
obesity.
     Q.   If somebody has a weight gain and they come to
                       Page 54

tulloch 10 2 08.txt
you and they say, "Doctor, I want to know what is
causing my weight gain," do you conduct a history and do
an examination?
     A.  All of those.  And then I go into the issues of
calories in, calories out, exercise in --
     Q.  Right.
     A.  -- exercise out.  Sorry, I didn't realize you
were going so fundamental as that.
     Q.  Right, I'm being very fundamental.
          And you would ask them what they eat and
what their diet is and how many --
     A.  Calories in --
     Q.  -- calories --
     A.  -- calories out.
     Q.  Right.
          Do they exercise, right?  Those are the
kinds of questions that you would ask, right?
     A.  Yes, ma'am.
     Q.  Do you know those answers for Ms. Whittington?
     A.  No, I don't.
     Q.  You have no idea what her diet's like?
     A.  But I have data on the validity of those
answers, which from caring people who allowed themselves
to be studied are 60 percent away from the facts that
they tell you.  So in a psychotic patient, I'm not sure
I would know what degree of credence one would put on
those answers.
     Q.  Okay.  But you've not asked Ms. Whittington --
     A.  No.
     Q.  -- any of those questions and you didn't read
her deposition?
     A.  No, ma'am.
     Q.  And you don't have any idea what her level of
physical activity is, do you, or do you?
     A.  We would have to assume it's restricted for the
reasons that you have brought out so nicely and because
she's psychotic.  So, no, ma'am.
     Q.  Okay.  And you don't know -- in your report all
of her weight gain after Seroquel you're blaming on
Seroquel, right?
     A.  Only the 40 pounds for which we have good data.
     Q.  Okay.  All of the 40 pounds that you're
claiming, which I'm not conceding, but all of the
40 pounds which you're saying she had because of --
after she -- strike that.
          All of the 40 pounds that you say in your
report she gained after taking Seroquel you're
attributing to Seroquel, right?
     A.  I have to on the best available evidence,
ma'am, yes.
     Q.  Well, you don't say some portion of that
40 pounds was due to the fact that she couldn't exercise
anymore because she had been in two motor vehicle
accidents, right?
     A.  No, ma'am, I believe that would have been
stabilized sometime before.
     Q.  Okay.  Tell me about that --
     A.  And I would point out that she was on two
different atypical antipsychotics and she gained
20 pounds on one and 40 pounds on another.  So I go by
the best available evidence and I offer that to you.
     Q.  Well, you don't know anything about -- you
haven't undertaken a review of her ability to exercise
                    Page 55

tulloch 10 2 08.txt

and what her diet was, right?

A.   At no time there, ma'am.

Q.   Right.

So you haven't ruled out those potential causes for her weight gain, right?

A.   Those are issues that could be out there.

Q.   Have you -- right.

So you don't -- you don't know one way or the other whether they contributed to her weight gain, correct?

A.   You're asking me to speculate, and I'm not prepared to do that.

Q.   You don't know, right?

A.   I don't know.

Q.   And you don't know what -- have you reviewed her MRIs following her automobile accident?

A.   Back in 1991, no.

Q.   No, back in 2001.

A.   2001.

Q.   Contemporaneously with --

A.   No.

Q.   Okay.

A.   I know she had --

Q.   You hadn't reviewed it?

A.   -- I know she had an injury.

Q.   Have you reviewed her records from her orthopedist or her neurologist --

A.   No.

Q.   -- connected to her car wrecks?

A.   No, ma'am.

Q.   Have you -- well, strike that.

Okay.  You cannot say -- well, strike that.

You have patients in your practice, Dr. Tulloch, who have -- who are obese and who don't take Seroquel and have diabetes?

A.   Yes, ma'am.

Q.   And you cannot say -- and you would agree that more likely than not her obesity was a major contributing factor to the development of her diabetes?

A.   Yes, ma'am.

Q.   And, in fact, a cause of her diabetes?

A.   A major contributing factor, yes.

Q.   And a cause of her diabetes?

A.   Obesity, yes, ma'am.

Q.   And you cannot rule out her preexisting obesity before she took Seroquel as the sole cause of her --

A.   No, ma'am.

Q.   -- diabetes, can you?

A.   I go back to the camel's saddle.  And we've agreed with all the factors on that camel's saddle, the family history, hyperlipidemia, hypertension, et cetera. Right now we're talking about her ability to exercise and how her neck injury might have contributed, but I believe things would have been stable during the years that she was on the two atypical antipsychotics.

I believe the weight gain was related -- 40 -- 20 pounds for one and 40 pounds for the other. She's had some significant weight gain since which you've now produced some evidence for, and I would be interested to find out what were the contributing factors in that case.

Q.   But you don't know?

A.   I don't know.

Page 56

tulloch 10 2 08.txt

Q.   And you cannot rule out that -- you cannot rule
out obesity as a sole cause of her diabetes?
A.   No, ma'am, I can't accept sole.
Q.   You can't?
A.   No, I can't accept sole.
Q.   That's not my question.  You can't rule it out
as the sole cause.  What is it about the science that
allows you to rule out her morbid obesity as the sole
cause of her diabetes?
A.   The word "sole."  You're using the word "sole."
And I will show you in the literature some 600-pounders
with normal blood sugar.  So if you came to me and said,
"Obesity is the sole cause of diabetes," immediately my
colleague on the right would produce a 600-pounder with
normal sugar and both of us would have egg on our face.
Q.   You're not understanding the question.
A.   I must be.
Q.   No.  Let me put it this way:  If you combine
all of her characteristics that preexisted Seroquel of
obesity and a 49-pound weight gain and metabolic
syndrome and impaired fasting glucose that predates her
Seroquel use and a family history of diabetes, all of
those things together collectively could solely cause
her diabetes, correct?
A.   "Could" is the right word in that setting,
could.  If we'd been at 60 pounds of weight gain on
that, the final straw analogy is brought out.
Q.   And the -- you cannot rule out those causes,
obesity, the approximately 50-pound weight gain that
preexisted Seroquel, the metabolic syndrome that
preexisted, the family history, the impaired glucose,
you cannot rule those out as the sole cause of her
diabetes?
A.   No, ma'am.  I -- the word is "contributing" and
the analogy --
Q.   All right.
A.   -- is the camel's saddle.
Q.   I got it.  I've heard you say it.
A.   And we're coming back at one another.  I think
we've built up something where we understood, a fertile
soil --
Q.   No --
A.   -- an obese patient, a number of risk factors,
and then a 60-pound weight gain.
Q.   Is it fair to say that what you're saying is
because of the temporal relationship between her taking
Seroquel and gaining weight, you think Seroquel is a
contributing factor?
A.   Ah, we're on the same wavelength.  May I shake
your hand, madam?
Q.   Absolutely.  Am I right?
A.   Yeah, it's a contributing factor.
Q.   Because of the temporal relationship?
A.   Because of the temporal, yeah.
Q.   All right.  And that's -- that's it, right?
Yes?
A.   That's it.
Q.   Okay.  Now -- so let's talk for a second about
Zyprexa.  You testified against Eli Lilly in the Zyprexa
litigation, right?
A.   Yes, ma'am.
Q.   Now, you haven't been involved with
Ms. Whittington in connection with the Zyprexa
Page 57

tulloch 10 2 08.txt

litigation?

A.   No, ma'am, not at all.

Q.   Now, if she hadn't taken Seroquel but had just taken Zyprexa and then developed diabetes, you would have said Zyprexa was the cause of her diabetes, wouldn't you?

A.   A cause, not the cause, a cause, and the final straw if she developed it after the 20-pound weight gain.

Q.   But even if -- if she'd had -- whatever her weight pattern had been after that 20-pound weight gain, she took Zyprexa and sometime down the road she got diabetes, you would have said Zyprexa caused -- was a cause, right?

A.   (Witness nods.)

Q.   And would you have said it was a 66 percent cause?

MR. PIRTLE:   Objection, form.

You can answer.

A.   I would have -- if the temporal relationship had been -- the 20-pound weight gain was the final time when the sugar moved from being marginally normal -- high but -- still high normal to definitely abnormal and the 20-pound weight gain was during that time, I would have had to say there is the final straw.

Q.   (BY MS. THORPE)   Okay.   Now, tell me -- you have said -- well, have you quantified the risk of diabetes associated with Seroquel --

A.   No, I think --

Q.   -- in terms of -- do you know the relative risks or --

A.   No, I think -- I think Dr. Wirshing would be the best guy to do that.   What I've done -- what I've tried to do is look at the best data on relative risks of all of the atypicals and look at the best data statistically.   And -- and certainly there are two that seem to be totally innocent -- that's Abilify and Geodon -- and then the others.   And amongst the others one would include quetiapine or Seroquel.   And I think that's as far as I as a clinician would wish to go.

Q.   So you don't know what the relative risks associated with Seroquel are?

A.   I see it.   I can quote you numbers which go from as low as 1 point -- a risk ratio of 1.8 to a risk ratio of 4 point something.   But I think a psychiatric statistician would give you a better interpretation of that data.

Q.   You're not -- you wouldn't be able to assess the limitations of the various studies and decide which risk is the right one --

A.   Of these numbers?

Q.   -- is that right?

A.   Yes.

Q.   Now, if -- so you don't -- I mean, you couldn't say whether the risk is 1.0 or 1.82 or 4 point --

A.   I can quote you relative risks which go from 1.2 to 4.8.

Q.   Okay.   What does that study --

A.   But I would rather be guided by a statistician for the interpretation of -- of those risk ratios to a single patient.

Q.   Okay.   Now, Dr. Wirshing, have you read his report in this case?

Page 58

tulloch 10 2 08.txt
          A.   I read his Zyprexa report.   I haven't been
given access to his Seroquel report.
          Q.   And have you had any conversations with him --
          A.   No.
          Q.   -- about Seroquel?
          A.   No, ma'am.
          Q.   Or Ms. Whittington?
          A.   No.   We agreed that I've never spoken to
Ms. Linda Whittington.
          Q.   No, I meant to Dr. Wirshing about
Ms. Whittington.
          A.   No.
          Q.   Okay.   Have you -- so you would look to him to
interpret the relative risks?
          A.   Of the different atypical antipsychotics and
the validity of population statistics to a lady with
this level of congenital risks.   And by "congenital," I
mean everything that she inherited until the day she
took the first tablet of Seroquel.
          Q.   That's just not your expertise?
          A.   I know when not to stick my neck out there.
          Q.   You testified earlier that you believe that
psychotics have a higher risk of developing diabetes; is
that right?
          A.   That psychotic patients have a two and a half
to threefold increased risk of type 2 diabetes, yes.
Ma'am, that's from the literature.
          Q.   All right.   And that's a relative risk is what
you're kind of quoting, right?
          A.   Yes, ma'am.
          Q.   And they also have an increased risk of weight
gain totally apart from drug use, correct?
          A.   That's in the literature as well, yes, ma'am.
          Q.   And they also have a tendency to be what are
called weight cyclers.   Do you know what that means?
          A.   Yes, ma'am.
          Q.   And you made a gesture up and down with your
finger, right?
          A.   Up and down, up and down.   We've had a good
example with this lady, in fact.
          Q.   Right.
               And you would say that Ms. Whittington is a
weight cycler, right?
          A.   On the current evidence, she -- well, she had
another massive weight gain in between 2006 to 2008.
          Q.   After she was off Seroquel?
          A.   After she was off Seroquel, yes.
          Q.   Yeah.   And we know she had a massive weight
gain before she ever went on Seroquel, right?
          A.   Yes.
          Q.   The 49-pound weight gain we talked about?
          A.   None -- the biggest weight gain was while she
was on the two atypicals.   She had a 60-pound weight
gain, the first 20 on product X and the second 40 on
product Y.
          Q.   Well, you're sort of drawing fine distinctions,
aren't you, between a 50-pound weight gain and a
60-pound weight gain?
          A.   I'll buy that.
          Q.   Fifty pounds before Seroquel, and you're saying
20 pounds on Zyprexa and 40 pounds on Seroquel, right?
          A.   Yes.
          Q.   She's a weight cycler, right?   She loses
                        Page 59

                          tulloch 10 2 08.txt
weight, right?
        A.  We've seen some weight loss and some weight
gain.
        Q.  Right.  She lost weight while she was on
Seroquel, right?
        A.  A bit.
        Q.  Well, she lost -- you know, between May 24,
'04, and June 10, '04, she lost 20 pounds -- 24 pounds
while she was on Seroquel, right?
        A.  If you have a time line that I remember, yes.
        Q.  I mean, do you remember --
        A.  I don't have that time line.
        Q.  Do you remember that she had some big weight
loss?
        A.  I remember that she'd had some weight loss.
        Q.  While she was on Seroquel?
        A.  Yeah.  But without the time line, I can't --
quite sure of the dates.
        Q.  Okay.
            MS.  THORPE:  Well, Tom, if we're going to
quit at 8:00, I'm kind of running out of --
            MR.  PIRTLE:  It's fine with me.  And we'll
try to readjourn on the 8th or 9th.
            (Discussion off the record.)
            MS.  THORPE:  I think it's going to take
four days.  I'm willing to do this nighttime thing which
is an extraordinary -- but I'd rather do --
            MR.  PIRTLE:  When we're talking four days,
quantify it in terms of hours.  Four times four?
            MS.  THORPE:  Yes.
            MR.  PIRTLE:  So we need basically 12 more
hours, basically?
            MS.  THORPE:  Right.  And I had suggested
that we --
            MR.  PIRTLE:  And whatever block that I can
get it.
            MS.  THORPE:  Yeah.  I mean, I'd --
            MR.  PIRTLE:  The bigger the better, I
guess.
            MS.  THORPE:  Yeah.  I mean, I'd, you know,
rather not do it at night consecutively but we're --
we've headed down this road.  But it's going to take
four days of four hours.  And that's fair given that
there are four cases, it seems like.
            MR.  PIRTLE:  I'm not arguing with you on
time.  But as long as I understand, the bigger the block
the better and --
            MS.  THORPE:  Absolutely.
            MR.  PIRTLE:  He's a busy clinician and I'm
going to have to talk to him about it --
            MS.  THORPE:  Right.
            MR.  PIRTLE:  -- and it may be at nights and
if I can make it work --
            MS.  THORPE:  Right.  And the other thing
I --
            MR.  PIRTLE:  I don't think I want to go
with 12 hours, though.
            MS.  THORPE:  Well, not in one day, but, I
mean, we could do a day -- you know, a day and a bit the
next day or something.
            MR.  PIRTLE:  Yeah.
            MS.  THORPE:  But the other thing is that it
has been a great strain on my schedule to not know what
                          Page 60

tulloch 10 2 08.txt
dates we're going to do.  So I'd really --
          MR. PIRTLE:  I'm going to try to cure that
for you.
          THE WITNESS:  I have offered you guys
several -- let me apologize for this.  I've got a big
chunk of two weeks at the end of November.  So every --
and I have people from everywhere.
          (Discussion off the record.)
          MS. THORPE:  Dr. Tulloch, I'm going to put
a Exhibit 16 sticker on a pile of material that you
pulled out of your briefcase and gave to us, right?
          THE WITNESS:  Yes, ma'am.
          MS. THORPE:  And you'll agree that you gave
that material to us?
          THE WITNESS:  Right.
          MS. THORPE:  Thank you.  All right, sir.
Thank you very much.
          (Exhibit No. 16 marked.)
          (Deposition concluded at 8:01 p.m.)


CORRECTION PAGE
WITNESS NAME:  BRIAN R. TULLOCH, M.D., FRCP, FACP
DATE:  10/02/2008

PAGE  LINE  CHANGE                REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

SIGNATURE PAGE

    I, BRIAN R. TULLOCH, M.D., FRCP, FACP, have read
the foregoing deposition and hereby affix my signature
that same is true and correct, except as noted on the
correction page.


             _____
             BRIAN R. TULLOCH, M.D., FRCP, FACP

tulloch 10 2 08.txt

THE STATE OF TEXAS          )
COUNTY OF _____ )

       Before me _____ on this day
personally appeared _____ known to me
[or proved to me on the oath of _____ or
through _____ (description of identity
card or other document)] to be the person whose name is
subscribed to the foregoing instrument and acknowledged
to me that he/she executed the same for the purposes and
consideration therein expressed.
       Given under my hand and seal of office this _____
day of _____, 2008.

                    _____
                    NOTARY PUBLIC IN AND FOR
                    THE STATE OF T E X A S

My Commission Expires:
_____


THE STATE OF TEXAS          )
COUNTY OF HARRIS            )

              REPORTER'S CERTIFICATION
     DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP
              TAKEN OCTOBER 2, 2008

       I, RENE WHITE MOAREFI, Certified Shorthand Reporter
in and for the State of Texas, hereby certify to the
following:
       That the witness, BRIAN R. TULLOCH, M.D., FRCP,
FACP, was duly sworn by the officer and that the
transcript of the oral deposition is a true record of
the testimony given by the witness;
       That the deposition transcript was submitted on
_____ to the witness or the attorney for the
witness for examination, signature and return to Esquire
Deposition Services, by _____;
       I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
action in which this proceeding was taken, and further
that I am not financially or otherwise interested in the
outcome of the action.
       Certified to by me this _____ day of
_____, 2008.


                    _____
                    RENE WHITE MOAREFI, CSR, CRR, RPR
                    CSR NO. 3070; Expiration Date: 12-31-08
                    ESQUIRE DEPOSITION SERVICES, LLC
                    3401 Louisiana, Suite 300
                    Houston, Texas 77002
                    (713) 524-4600
                         Page 62

tulloch 10 2 08.txt