# TAB 1-2

```
                         tulloch 10 8 08.txt
JOB NO. 99406
              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
                    ORLANDO DIVISION
IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769
This Document Relates to:
David Haller v. AstraZeneca, LP, et al.      Case No. 6:07-cv-15733
Eileen McAlexander v. AstraZeneca LP, et al. Case No. 6:07-cv-10360
Richard Unger v. AstraZeneca LP, et al.      Case No. 6:07-cv-15812
Linda Whittington v. AstraZeneca LP, et al.  Case No. 6:07-cv-10475
                   ORAL DEPOSITION OF
             BRIAN R. TULLOCH, M.D., FRCP, FACP
                    OCTOBER 8, 2008
                       VOLUME 2
     ORAL DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP,
produced as a witness at the instance of the Defendant and
duly sworn, was taken in the above styled and numbered cause
on Wednesday, October 8, 2008, from 4:05 p.m. to 8:24 p.m.,
before RENE WHITE MOAREFI, CSR, CRR, RPR in and for the State
of Texas, reported by machine shorthand, at Laminack, Pirtle &
Martines, 5020 Montrose Blvd., 9th Floor, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and the
provisions stated on the record herein.
                   A P P E A R A N C E S

   FOR THE PLAINTIFF:
         TOM PIRTLE, ESQ.
         RUSS BRUDNER, ESQ.
         LAMINACK, PIRTLE & MARTINES
         5020 Montrose Blvd., 9th Floor
         Houston, Texas   77006-6533
         713.292.2750

   FOR THE DEFENDANTS:
         JANE THORPE, ESQ.
         BRENDAN KRASINSKI, ESQ.
         ALSTON & BIRD, L.L.P.
         1201 West Peachtree Street
         Atlanta, Georgia  30309-3424
         (404) 881-7000
```

I N D E X

PAGE

APPEARANCES................................  156

Page 1

tulloch 10 8 08.txt

BRIAN TULLOCH, M.D., FRCP, FACP

CONTINUED EXAMINATION
     By Ms. Thorpe......................... 158
CORRECTION PAGE........................... 309
SIGNATURE PAGE............................ 310
REPORTER'S CERTIFICATION.................. 311

E X H I B I T S

| NO. | DESCRIPTION | | PAGE |
|-----|-------------|---|------|
| 17 | Laboratory Report dated 11-20-96 | | 172 |
| 18 | Whittington Weight/BMI Chart | | 184 |
| 19 | Whittington time line | | 187 |
| 20 | Medical record dated 3-24-08 | 190 | 195 |
| 21 | Expert Report of Brian Tulloch, M.D. re Richard Unger | | 224 |
| 22 | Unger time line | | 224 |
| 23 | Article titled "Quetiapine Overdose and Severe Rhabdomyolysis" | | 235 |
| 24 | Article titled "Quetiapine: Pancreatitis and thrombocytopenia" | | 235 |
| 25 | Records authorization | | 248 |
| 26 | Letter dated 5-9-08 | | 249 |
| 27 | Medical notes from Dr. Cabeda-Rovirosa | | 285 |
| 28 | Progress Note dated 10-2-06 | | 287 |
| 29 | Progress Note dated 1-6-04 | | 290 |
| 30 | Progress Note dated 1-5-05 | | 290 |

        (Please refer to Volume 1 of the deposition
of Brian R. Tulloch, M.D., FRCP, FACP for the agreements
of counsel.)
        BRIAN R. TULLOCH, M.D., FRCP, FACP,
having been duly sworn, testified as follows:
        CONTINUED EXAMINATION
BY MS. THORPE:
     Q.  Dr. Tulloch, we're going to continue your
deposition.  And lessons learned from the last
deposition are that we need to not talk over each other.
So if you'll let me complete my question before you
respond, we'll get along better.  Okay?
     A.  I promise to do that --
     Q.  All right.
     A.  -- every time I remember it.
     Q.  Okay.  And then secondly, if you will try to
answer -- listen very carefully to the question I'm
asking you and answer that question.  Okay?  Is that all
right with you?
     A.  I will do that.
     Q.  Okay.  Now, I want to talk further about
Ms. Whittington.
     A.  Okay.
     Q.  We agreed the last time we were together that
Ms. Whittington never met the American Diabetes
Association's criteria for the diagnosis of diabetes,
correct?
     A.  We never found a repeat number on any of the
criteria, yes, ma'am.  We found single numbers that
                    Page 2

tulloch 10 8 08.txt
would fulfill that.  And certainly in clinical practice
I doubt I have any other patients in whom I get a second
reading if it is apparent that they will need treatment
and in circumstances similar to this lady.
          Q.  Dr. Tulloch, I need a yes or no answer.  Do you
agree -- let me ask my question.
          A.  Yes.
          Q.  Do you agree that Mrs. Whittington never met
the American Diabetes Association's criteria for the
diagnosis of diabetes?
          A.  I also -- well, the answer's yes to that
statement because we had agreed earlier that the
criteria includes two independent numbers.
          Q.  Okay.
          A.  But I've also said that as a clinician if
somebody comes to me with one of the criteria that
would -- would tell me -- and I go back to the analogy
of 25 to 105 time of onset of type 2 diabetes in
somebody who's likely to get that -- I don't wait for a
second before I start treating them.
          Q.  Okay.
          A.  So it would not change --
          Q.  So you agree --
          A.  Let me finish because I was going to finish
that one.
               So it would not change the way I treated
that patient were she my patient.
          Q.  But you agree that Mrs. Whittington never met
the American Diabetes Association's criteria for the
diagnosis of diabetes in that she did not have
confirmation of a positive lab test for diabetes,
correct?
          A.  Yes, ma'am.
          Q.  Now, tell me the tests -- well, strike that.
               Let me ask you this:  Is it your opinion
that Mrs. Whittington has diabetes?
          A.  Yes, ma'am.
          Q.  All right.
          A.  And I -- as I've explained --
          Q.  Okay.  There's no question.
          A.  -- in the context of how one treats these
patients, one doesn't split hairs unless there is a
medical/legal or insurance related issue that would
require it.
          Q.  Dr. Tulloch, I want you to point me to the
tests you rely on for the diagnosis of diabetes in
Ms. Whittington.
          A.  A fasting sugar in excess of 126.
          Q.  All right.  I want you to show me the test.
I'm going to show you what's been marked as Exhibit 11
and ask you if that is the test you're relying on for
your diagnosis of Ms. Whittington.
          A.  No, ma'am.  Exhibit 11 is dated 1993 and --
          Q.  I'm sorry.  That's the wrong one.
          A.  -- and it's a fasting sugar of 123.
          Q.  All right.
          A.  So that does not fulfill the criteria.
          Q.  Okay.  I'm sorry.  That's fine.  I pulled out
the wrong -- here it is.  Excuse me.
               Let me show you what's been marked as
Exhibit 10 and ask you if that's the test that you rely
on for your diagnosis of Ms. Whittington with diabetes.
          A.  Yes, ma'am, this is a fasting sugar in excess
                            Page 3

tulloch 10 8 08.txt
of 126.  She has a single one -- zero to two-hour sugar
greater than 200.  She misses the third component of the
criteria, which is a two-hour sugar, does not make 200.
          As I explained a moment ago, in somebody
with this clinical picture, I would initiate the
appropriate treatment for diabetes in this case were she
my patient, so --
     Q.  Is -- is Exhibit 11 the only test that you rely
on -- excuse me.  What's the number?
     A.  Ten.
     Q.  Is Exhibit 10 the only test you rely on for
your diagnosis of Ms. Whittington with diabetes?
     A.  In this context, yes, ma'am.  It's the only
data I have.  But as we agreed in an earlier discussion,
the psychiatric charts are not loaded with blood sugars.
     Q.  So Exhibit 10 is the only test you rely upon
for your diagnosis of Ms. Whittington's diabetes?
     A.  The only data I have available to me, yes,
ma'am.
     Q.  Now, the oral glucose tolerance test that you
referred to in your prior answer that has a one-hour
glucose of 261 --
     A.  Yes, ma'am.
     Q.  -- also contains a two-hour glucose, correct?
     A.  Yes, ma'am.
     Q.  And it is the two-hour glucose that doctors
look to to establish whether or not someone has
diabetes, correct?
     A.  No, ma'am.  What you heard me say was we put
greatest load on the fasting sugar.  And when we
discussed all that sometime ago, a -- glucose tolerance
tests are not as frequently done now as they were in the
past.  But if the patient does progress to a two-hour
glucose tolerance test, we look at both the fasting
sugar and the two-hour sugar.  And one of the criteria
in days gone by was also that one other number between
zero and two hours was required to be in excess of 200.
     Q.  Okay.  Dr. Tulloch, Exhibit 10 has a fasting
glucose on it of 131, correct?
     A.  Yes, ma'am.
     Q.  And as we've discussed, that is the only result
you rely on to establish a diagnosis of diabetes in
Mrs. Whittington, correct?
     A.  That's correct.
     Q.  Also on Exhibit 10 are the results of an oral
glucose tolerance test, correct?
     A.  Yes, ma'am.
     Q.  And that oral glucose tolerance test as
reflected in Exhibit 10 reports a number for three
different hours of the test, correct?
     A.  To agree let me just check.  That's correct, we
looked at 1, 2, and 3, yes, ma'am.
     Q.  All right.  The American Diabetes Association
criteria base their analyses of oral glucose tolerance
tests on the second hour of the glucose tolerance test,
correct?
     A.  Yes, ma'am, we've agreed on that.
     Q.  All right.  And the result on Exhibit 10 for
the second hour of the oral glucose tolerance test is
181, correct?
     A.  Yes, ma'am.
     Q.  That result of 181 is not indicative of -- or
does not demonstrate that Ms. Whittington had diabetes,
                              Page 4

tulloch 10 8 08.txt
that test alone?
     A.   That's correct.
     Q.   In fact, what it shows is that she has -- she's
in the range of impaired glucose tolerance at 181,
correct?
     A.   Yes, we agreed on that before --
     Q.   All right.
     A.   -- yes, ma'am.
     Q.   And the -- so in toto, in Exhibit 10 you have
an -- a fasting glucose that you're relying on in and of
itself by itself of 131 for your diagnosis of her
diabetes --
     A.   Yes, ma'am.
     Q.   -- correct?
          And the oral glucose tolerance with its 181
at the second hour indicates impaired glucose tolerance,
not diabetes --
     A.   That's correct.
     Q.   -- correct?  All right.
          Now, it's your testimony, I take it, that
in your practice as a clinician, you do not require
confirmation of a -- when you get a positive fasting
glucose test over 126?
     A.   If -- unless there -- as I explained a moment
ago, unless there's a medical/legal or insurance
required criterion which is necessary, it would not
alter my treatment of that lady.   And my belief is this
physician probably had the same idea in mind because I
note that she was immediately treated with Metformin,
which is -- the trade name for which is Glucophage.   So
I think this -- this doctor thinks the way I do, lady's
got this sort of risk factors -- and we talked about
that -- family history, weight gain, psychosis, et
cetera, we've now got a fasting of 131; this lady
doesn't fully fulfill the criteria for diabetes but she
needs to be treated.
     Q.   Okay.   So what you're saying is that because
she had one test -- fasting glucose test over 126, it
was fine clinically to go ahead and start her treatment
even though it was -- she did not have a diagnosis of
diabetes that met the ADA standard?
     A.   Yes, ma'am, I think it's good medicine to be
proactive in a setting like that, particularly as we
mentioned earlier because of all of her other risk
factors, and we enumerated them earlier on, I won't
bring them back again.
     Q.   And so in your clinical practice when somebody
has one fasting glucose, you go ahead and start treating
them with diabetes medications?
     A.   Yes, ma'am.  I -- well, usually I -- I -- I
give them whatever I consider appropriate for that
patient.
     Q.   But my question for you is:  Is it your general
practice in your clinic that when somebody has a fasting
glucose over 126 one time that you go ahead and start
diabetes medications before you get a confirmatory test?
     A.   I think it's a reasonable proactive clinical
approach.
     Q.   I want to know what you do.
     A.   Oh, and it is what I -- I've said twice already
that that's what I do, and now I'm defending it.   And
let me go a step further because I said earlier on we
are dependent on the most recent of data.   Within the
Page 5

tulloch 10 8 08.txt
last six months, there has been a conference on impaired
glucose tolerance.  And the American Society of
Endocrinologists, of which I am one, have looked at data
which showed that by the time the patients reach the
impaired glucose tolerance step, they probably already
lost 70 to 80 percent of their insulin reserves.  So
proactive therapy for people in this group will probably
be forthcoming within the next few years.
              But I'm standing here saying my proactive
approach would be to treat a single sugar in excess of
126, and I'm also defending it with new data which is
coming out all the time.
     Q.  All right.  Now, you agree that the American
Diabetes Association criteria that require a
confirmation reflect the general consensus of the
scientific community?
     A.  Yes, ma'am.  And I'm a member of the American
Diabetes Association.  I have given it plenty of time in
the past.  And I think that's a reasonable requirement
in the setting that we discussed.
     Q.  The confirmation is a reasonable requirement?
     A.  Confirmation is always sensible.  You never
know it's fasting.  There are certain conditions where
even fasting sugars can be elevated.  But in a special
case like this one with all of the risk factors which
we've enumerated, positive family history,
hyperlipidemia, psychosis, hypertension, et cetera, I
would not fault a physician for making the decision that
this lady's doctor did, which was to give her Metformin.
     Q.  And I'm not asking you to assess fault one way
or the other.  That wasn't the question, sir.  So let
me -- let me come back to my original --
     A.  Yes, ma'am.
     Q.  -- question.  And I'd ask you to answer my
question because I'm not asking you to assess whether
the doctor treated her in accordance with the standard
of care --
     A.  Okay.
     Q.  -- okay?  That's not my interest.
              You would agree that you cannot say to a
reasonable degree of medical probability that she
actually had diabetes based on one fasting glucose test
that has not been confirmed?
     A.  No, ma'am, I'm -- I'm afraid I can't agree to
that.  I have accepted that this lady had an increased
fasting sugar and a two-hour sugar that did not make
200.  I have pointed out that she had many risk factors
that would make her at severe risk for the development
of type 2 diabetes.  And my belief is that this lady had
an abnormal fasting sugar at this time, and a second one
that might have been done a week -- ten days, two weeks
later would have probably also been in excess of 126.
     Q.  So --
     A.  More likely than not, a repeat blood sugar
would have been in excess of 126.  That -- that it
wasn't done, I cannot fault the physician who made these
decisions for the reasons we have just discussed.
     Q.  And so your opinion is based on -- your opinion
that Ms. Whittington has diabetes is based on the lab
test that she had in Exhibit 10 along with an assumption
that if she had a test a week or two later, it would
have shown a 126 -- 126 or greater again --
     A.  Yes, ma'am.
                                          Page 6

tulloch 10 8 08.txt

Q.  -- is that right?

A.  More likely than not with the risk factors which we have enumerated, I would -- I would put -- I would almost put odds of 9 to 1, 10 to 1 that the repeat sugars would have been abnormal.

Q.  And you are willing to make that assumption as a basis of your more probably than -- more probable than not opinion without actually having a lab test -- a confirmatory lab test performed --

A.  Yes, ma'am.

Q.  -- correct?

A.  I think that's a reasonable approach for us all to try to keep the costs down.  But you also remember I had a clause and the clause was that if it ever became an issue for insurance or any other criteria that a second number was required, it would be reasonable to do it.

Now, in retrospect, we have that reason in this case.  We didn't or the physician who gave her Metformin didn't have that reason at that time.  I'm defending my colleague.  I apologize if it's inappropriate.

Q.  So -- so in a nutshell, Dr. Tulloch, you're willing to conclude that more probably than not she has diabetes based on your belief that a lab test that has not been performed on her would exceed 126?

A.  The second time, yes.  We have a first time.

Q.  Okay.

A.  And the second time more likely than not would be a repeat of the first time given --

Q.  But it hasn't been done --

A.  Given --

Q.  -- correct?

A.  Given all the risk factors --

Q.  Sir, it hasn't --

A.  Given all the risk --

Q.  -- been done?

MR. PIRTLE:  Y'all can't talk over each other.

Q.  (BY MS. THORPE)  It hasn't been done?

A.  We agreed that we were not going to talk over one another.  And at the time I had the -- the stand and I will yield it to if you need it right now.

Q.  The second laboratory test that is -- that you're basing your opinion on has not been conducted, correct?

A.  That's correct, we have agreed on that.

Q.  Now, you recall that Ms. Whittington, in Exhibit 11, had a fasting blood glucose in 1993 of 123, right?

A.  Yes, ma'am.

Q.  And tell me, sir, if someone in your practice had a fasting blood glucose of 123, would you start them on diabetes medications and perhaps put them on a ADA diet?

A.  Ma'am, I -- I think in that context this is a lady who is ten years younger than she was at the time we were discussing the second set of numbers, '93 and 2006; is that right?  Yes.  So 11 years before, she would have been 11 years younger.  I would need to look back on the time line to see her weight at the time, but I believe that number would certainly be one indicative of advice for a patient to be given a calorie- and

Page 7

                              tulloch 10 8 08.txt
carbohydrate-restricted diet, the encouragement to
exercise and to take the appropriate nonpharmacological
measures, and then I would expect a reasonable
physician, both family practitioner and endocrinologist,
to follow her up and watch that blood sugar carefully.
     Q.  So it would be appropriate in 1993 to have
started Ms. Whittington on American Diabetes Association
diet of 1800 calories?
     A.  Depending on her weight.  I think 18's probably
a bit more than she needed, maybe 12, maybe 16, which
tends --
     Q.  Okay.  Eighteen -- 1200 or 1600 calories
down --
     A.  Twelve to 1500 calories, yes, ma'am.
          (Exhibit No. 17 marked.)
     Q.  (BY MS. THORPE)  All right.  I'm going to show
you what's been marked as Exhibit 17 for identification.
And let me find one for Tom here.
     A.  No. 17.  Okay.
     Q.  And you have before you a November 20, 1996
laboratory test on Linda Whittington, correct?
     A.  Yes, ma'am.
     Q.  Did you see Exhibit 17 before you formed your
opinions in this case?
     A.  I -- I don't recollect it.  I'll check and see
if it was on the time line.
               MS. THORPE:  Do we have the time line?
               MR. PIRTLE:  Yes, you do.
               MS. THORPE:  Okay.  Can we have a copy of
the time line printed out?
               MR. BRUDNER:  How long did you say they
were?
               THE WITNESS:  I -- it comes through on the
computer.  It's very long, indeed.  But she can put it
up on the computer.
               MS. THORPE:  No, I want a copy of the -- I
want a copy -- let me just -- let me just put on the
record that it is impossible to examine the witness
without having the materials he relied upon in forming
his opinion.  I understand that he relied upon some sort
of time line or a medical chronology in the cases, and
I've asked for them before the deposition began so that
I could prepare for the deposition and not waste time,
and I still don't have them.  We're into the second day
of the deposition, so I'm going to try to move as
efficiently as I can, but if -- I may need more time,
Tom, because I don't -- still don't have them.
               MR. PIRTLE:  Let me respond.  We have --
and I have in all honesty about 30 seconds ago handed
you a disk across the table that I believe contains time
lines for all three.  You've asked me -- or four, I'm
sorry.  You've asked me to print them out.  I've sent my
person into my office work space to actually print them
out in hard copy form.  I would have liked to have
gotten them to you quicker than I did, but that wasn't
my responsibility at the time to do that.
               MS. THORPE:  It was somebody's
responsibility --
               MR. PIRTLE:  Well, certainly --
               MS. THORPE:  -- it's not my responsibility.
               MR. PIRTLE:  Certainly it was.  And there
was some discussion as to whether or not those -- I know
internally within my group as to whether or not those
                          Page 8

tulloch 10 8 08.txt

should rightfully be produced.  My position was they
should and I have won that debate and you've got the
time lines.  I wish you could have had them sooner.
            MS. THORPE:  Well, I'm going to keep going,
but I'm just saying that I -- we may need more time
because I've got to read the document that he relied on,
and I'm going to have more questions about that
document --
            MR. PIRTLE:  Fair enough.
            MS. THORPE:  -- and all those documents.
So -- and I'm sitting here in the middle of the
deposition and I still don't have it.  And when I ask
him if he's seen something, he doesn't know, and I need
to know if he's seen it.
      Q.   (BY MS. THORPE)  So let me ask you,
Dr. Tulloch:  You are -- when you refer to a time
line -- I don't want to look at it -- I can't mark your
computer?
      A.   Okay.  No problem.  Yes, ma'am, please,
continue.
      Q.   Dr. Tulloch --
      A.   Yeah.
      Q.   -- when you refer to a time line, can you tell
me what that is?
      A.   What we have shared today is a very great deal
of data.  What I've tried to do as an endocrinologist
focusing pretty well mostly on the issues related to
this lady's metabolic abnormalities, not to her
psychiatric abnormalities, is I have tended to focus on
endocrine-related criteria such as her blood sugar, her
hyperlipidemia, her body weight.  And what was put
together for us to understand the progress -- because
we're looking at fairly long sequences -- was a summary
which had a date, weight, laboratory tests, the
antipsychotic medications that this patient was on and
any other extenuating circumstances.
            So what it does is it takes a large pile of
data and it summarizes that data from the components of
what I would be interested in as an endocrinologist.
And I offer it to you -- I apologize it didn't came.  I
understood it was in the material that was given to you
nearly a week ago.  When I discovered this afternoon
that it was not in that material, I made it available to
you as soon as possible, and I apologize for the delay.
      Q.   Shall we refer to this document as a time line?
Will you know what I'm talking about when I say that?
      A.   Yeah, I think that's perfectly reasonable.
      Q.   Who prepared the time line?
      A.   It was prepared by the colleagues in
Mr. Pirtle's office.
      Q.   And the -- when did you receive the time lines
for Ms. Whittington's case, the time line for
Ms. Whittington's case?
      A.   I believe I got it at a -- the same time as I
got all of the other material.
      Q.   And you're putting your hand on Exhibit 4 or --
      A.   Sixteen.
      Q.   The articles that you're talking about?
      A.   All the articles which I shared with you, yes,
Exhibit 16.
      Q.   And when did you receive those -- all those
materials?
      A.   My best guess would be about 12 months ago.
                      Page 9

tulloch 10 8 08.txt

Q.   All right.   And you received the materials for
Mr. Unger at the same time, the time line and the
articles?
A.   Subject to a few months one way or the other,
yes.
Q.   And did you receive -- well, how many months?
A.   A few would be two to three.
Q.   Okay.   And did you receive a time line for
Ms. McAlexander?
A.   Yes, ma'am.   I -- when I say --
Q.   And was that at the same time?
A.   -- this applies to this patient, the same
comment applies to all four patients.
Q.   Okay.   So you received Mr. Haller's time line
about 12 months ago?
A.   To the best of my memory, yes.
Q.   And -- okay.   So let's go back to what's been
marked as exhibit -- is it 17?
A.   Seventeen.
Q.   Yeah, Exhibit 17.   And have you seen this
before?
A.   The answer is no.
Q.   All right.   Can you tell me if you've seen
Exhibit 11 before, before your deposition last week?
A.   Correct.   The answer to that is no.
Q.   So before you formed your opinions in this
case, you had not seen the --
A.   Eleven and 17.
Q.   The fact that Ms. Whittington had a fasting
blood glucose of 123 and a glucose of 137 on November
20, 1996 -- that had been marked as Exhibits 11 and 17,
correct?
A.   That's correct, yes.
Q.   Now, the Exhibit 17 is a glucose of 137 which
is high, correct?
A.   It is high.
Q.   If that were a -- if that were a fasting plasma
glucose, that would mean that she had, under your
diagnostic criteria, diabetes, correct?
A.   Without any doubt.
Q.   All right.   Do you know whether Exhibit 17 is a
fasting glucose?
A.   We don't have data on that.
Q.   You can't rule out that it's fasting, can you?
A.   No, ma'am.
Q.   You can't rule in that it's fasting?
A.   Well, the only reason why I think it may not be
fasting is the time which I refer to on the top left
corner and you'll see that that time is 5:00 p.m.   My
suspicion is that a psychotic patient even if told to
fast would probably not still be fasting at 5:00 p.m.
Q.   Isn't it correct, sir, that the collection time
was 1:30 p.m. on Exhibit 17?
A.   Okay.
Q.   Do you agree with that?
A.   I see two -- I had not read that as a time.
But, yeah.   So we have a 5:09 p.m. at the top right and
halfway across we have a number which is, in fact,
1:30 p.m., so -- yeah, so this could have been collected
at 1:30 p.m.
Q.   All right.   In fact, the title above the
1:30 p.m. says collection date and time, doesn't it?
A.   Your -- your print is better than mine.

tulloch 10 8 08.txt

Q.   You can't read that?
A.   I can't read that.
Q.   And you see on the right-hand side of
Exhibit 17 it says -- it says report date, 11-21-96,
time 5:09 p.m.?
A.   Okay.  I'll accept that.  This original -- this
copy here does not -- it doesn't allow that to be read.
Q.   Isn't it correct you don't know one way or the
other whether this is fasting?
A.   That's correct.
Q.   All right.  Now, this lady presents with --
strike that.
          These two exhibits, exhibit --
A.   Exhibit --
Q.   -- Exhibit 11 and 17, make it more likely than
not that Ms. Whittington had diabetes as early as 1996;
isn't that correct?
A.   Ma'am, I think the second one makes it very
probable that she had diabetes if that was a fasting
sugar, yes, correct.
Q.   In November of 1996?
A.   On the date in '96, yes, ma'am.
Q.   All right.  And that was long before she ever
took Seroquel, correct?
A.   Yes, ma'am.
Q.   Now, tell us, Dr. Tulloch, when in your opinion
her diabetes -- Ms. Whittington's diabetes actually did
begin.
A.   And, again, with -- with the best probability,
what I have to provide is -- is at a time when any
two -- any two numbers -- if we need to be strict by
definition, as I said earlier, one -- often as
clinicians makes a decision before the formal
definition.  Any time that two fasting sugars were
greater than 126, she would be labeled, undoubtedly,
diabetes.  Any single fasting sugar she would be labeled
probably having diabetes if she had a number of other
criteria which fitted the issues we discussed.  And as I
said earlier, I would not fault a clinician for treating
her as having diabetes on a single number because of the
importance of getting it under control.
Q.   Well, I guess what I'm getting at is you would
agree with me that a laboratory test that someone has
gone in to the doctor and gotten a lab test, the fact
that that test is positive on a given day doesn't mean
that that's when the diabetes began, right?
A.   No.
Q.   Right?
A.   That's correct.
Q.   That's just -- that's just -- they went to the
doctor and had the test?
A.   Yes, ma'am.
Q.   The diabetes more likely than not, to use your
terminology, began before that test, right?
A.   Yes, ma'am.
Q.   The test is just a diagnostic test, right?
A.   It's a time when the abnormality was brought to
the physician's notice, yes, ma'am.
Q.   And you would agree with me that you cannot
state with any kind of scientific or medical probability
any kind of precise date of the -- the onset of
diabetes; science can't pinpoint this is the day it
started in an individual?

                    Page 11

tulloch 10 8 08.txt

A.   That's correct.

Q.   All right.

A.   I go back to the analogy we shared long ago
because it helps us understand.  We agreed that a lady
with these sort of risk factors would get diabetes
sometime between the age of 25 and 105, and the
variables in her life would pinpoint the date that I
arrived.

Q.   And in this lady we agree that more likely than
not Ms. Whittington developed diabetes, at the very
latest, sometime in the Nineties, correct?

A.   We are looking at a number which is potentially
diagnostic were it fasting, the date of 11-21 --
11-20-96.

Q.   And you agree that more likely than not she was
diabetic in the Nineties?

A.   If that's a fasting sugar that fulfilled the
criteria, yes, ma'am.

Q.   And you don't know whether or not it is a
fasting sugar?

A.   No.  We agreed it was taken at 1:30 midday on
one day, and now I can see a clearer version.  It was
reported at 5:00 in the afternoon on the following day,
so the time that it was collected was 11-20 of '96.

Q.   Okay.  You've got better eyes than I.

A.   And it was recorded 11-21 at 5:00 p.m.

Q.   So what -- so what you're saying, Dr. Tulloch,
is -- let's just say that you had Exhibit 11 and the 123
high result, which is a, clearly, fasting glucose,
you've agreed.  If that were the only test that
Ms. Whittington had, would you conclude that it was more
likely than not that she had diabetes?

A.   I -- I go back to my analogy, but I come back
specifically in a setting like that with her strong
family history, her obesity, her psychosis, the
difference between 123 and 126 is not a great distance.
So if you added anything, a few pounds in weight or a
few months or years in age, the possibility of her
reaching type 2 diabetes would be quite strong.

Q.   All right.  Well, my question is, though:  If
one -- if Exhibit 11 and the 123 were the only fasting
glucose she had in the Nineties, based on what you know
from your review of her medical records, would you say
that it's more likely than not that at that point she
had diabetes?

A.   No, I wouldn't push it that.  But I would go
one step before that that more likely than not she was
in significant danger of developing type 2 diabetes
within a reasonable time span after that.

Q.   Okay.  And what would that reasonable time span
be?

A.   I knew you'd ask that, and I don't have the
answer, but it would be maybe years or maybe pounds.
Remember the -- we have a number of variables in a
patient like this.  If she'd gained 20 pounds, I suspect
that sugar would go up to above 126 or if we added a
couple of years, we -- we -- or as we saw later, or if
she was given medication, the final straw could have
been applied.  And I go back to the analogy of the final
straw.

(Exhibit No. 18 marked.)

Q.   (BY MS. THORPE) All right.  Let me show you
what's been marked as Exhibit 18 for identification.

Page 12

tulloch 10 8 08.txt
And this is a chart of Ms. Whittington's weights.  And I
want you to tell me if you believe that to be a correct
listing of her weights.
          A.   Thank you.  I am looking at Exhibit 18, and
it's -- if I may call it a weight time line, if we
agreed that seral numbers would be called time lines.
And the earliest date for which we have numbers is
September of 1990.  And there are one, two, three, more
times and dates which antedate the time line that you
have been given.  So you have four numbers which are
earlier than what will be called Exhibit 19 which is the
time line that you've been given.  So, yes, ma'am, these
are data.  If they relate to the patient, they are data
which I did not have because my time line starts at the
date which you're reading there, and it would be
analogous to your date No. 5.
          Q.   Dr. Tulloch, this will be unintelligible on the
record, so I'm going to have to ask you a few questions
about it.  Okay?
          A.   Okay.  No problem.  Anything you need to
clarify it, yeah.
          Q.   I want you to assume with me that the medical
records for the dates on Exhibit 18 for September of
1990, November of 1996, January of 1997 are, in fact,
recorded in the medical chart.  Okay?
          A.   Yes, ma'am.
          Q.   For Ms. Whittington.
          A.   Yes, ma'am.
          Q.   All right.  Now, we were talking about her
blood glucose that's reflected in Exhibit 11 of 123,
which was fasting, right?  You remember that's where we
were?
          A.   Yes.
          Q.   And you said that if she put on a few pounds,
she would likely become diabetic in a short amount of
time, correct?
          A.   More likely than not, yes.
          Q.   And you can see by Exhibit 18 that in 1990
Ms. Whittington weighed 145, right?
          A.   That's correct.
          Q.   And by November 20th of 1996, she's gone up to
194 pounds, correct?
          A.   Yes, ma'am.
          Q.   She has a BMI of 31.3 as of November 20, 1996,
correct?
          A.   Yes, ma'am.
          Q.   And you would agree that that gain in weight
over that period of time would be enough to push
Ms. Whittington into diabetes during the Nineties more
probably than not, correct?
          A.   I would say better than that.  You have
produced Exhibit 17 which relates to the time line 11-20
of '96, which would be your second date on Exhibit 18,
and that difference in weight is more likely than not
responsible for the sugar difference which went from 123
to 137.
          Q.   That's reflected in Exhibit 17, correct?
          A.   Yes, ma'am.
          Q.   And so you would agree that more probably than
not Linda Whittington had diabetes in the Nineties,
correct?
          A.   Had numbers which were compatible with
diabetes, yes, ma'am.
                              Page 13

tulloch 10 8 08.txt

Q.   Okay.   And you would agree that more likely
than not she had diabetes in the Nineties?
A.   Yes, ma'am.
Q.   All right.
        (Exhibit No. 19 marked.)
Q.   (BY MS. THORPE)   Now, I have marked, as you
anticipated, Exhibit 19 for identification, which is
your time line for Ms. Whittington, correct?
A.   That's correct.
Q.   And this is -- do you know specifically who
prepared this?
A.   Staff from Mr. Pirtle's office.   I know there
are several nurse practitioners in there, but I do
not -- or nurse paralegals, but I do not know the names.
Q.   Okay.   Now, is it -- you relied on Exhibit 19
for your opinions?
A.   Yes, ma'am, I -- I relied it as a succinct
summary when I started making my conclusions, yes,
ma'am.
Q.   And you've already observed that Exhibit 19
does not contain any weights before 1999, correct?
A.   That's correct.
Q.   And it does not contain citations to the
medical records in terms of, you know, a record cite so
that you can go find the record where the information
described in the chart appears in the actual medical
record, correct?
A.   Yes, ma'am.   What I had said was Exhibit 18 is
numbered on individual dates, and numbers 1, 2, 3, and 4
are dates which antedate the time line which I had which
was Exhibit 19.
Q.   If you will look at the last page of
Exhibit 19, you see that the last entry is on December
4, 2007, correct?
A.   Yes.
Q.   And, in fact, your report on Ms. Whittington
which has been marked as Exhibit 1 -- well, excuse me,
it's not Exhibit 1.
        Your report on Ms. Whittington which has
been marked as Exhibit 2 has a statement in it that the
last weight recorded is 236 pounds.   Do you see that?
A.   Yes, ma'am.
Q.   And you got that information from Exhibit 19,
didn't you, sir?
A.   Yes, ma'am.
Q.   And Exhibit 19 shows a weight of May 24, 2006,
correct?
A.   That's in the last line of my statement, and it
relates to the last observed weight which is on page 13
of Exhibit 19.
Q.   And so you -- you directly relied on Exhibit 19
for that statement in your report that the last weight
recorded on this patient was -- was 236 pounds on May
24, 2006, right?
A.   That's correct, for which I had data.   As I
recall, we --
Q.   Let me just ask you just to -- and the data you
had was what was in this chart that's been marked as
Exhibit 19, right?
A.   That's all I had, yes.
Q.   And you were given -- let's pull out your
report again here.   In Exhibit 2 on page 16, there's a
list of medical records you were given, right?

Page 14

tulloch 10 8 08.txt

A.   Yes, ma'am.

Q.   And you didn't read all those medical records, right?

A.   I said in an earlier statement I had not.  I listed the ones which I had and -- there in the introductory paragraph on my report on this lady.

Q.   And one of the -- one of the medical records you were given that's on page 16 of 17 were the records of Dr. Harold Boyd, right?

A.   Yes, ma'am.

Q.   And you didn't read those records, did you?

A.   I do not -- if I did not have them listed on my report, then I did not read those records.  I listed all the reports that I read.

Q.   And you say in Exhibit 2 in your report that after she went off Seroquel, Ms. Whittington lost 8 pounds, right?

(Exhibit No. 20 marked.)

A.   Yes, ma'am.

Q.   (BY MS. THORPE)  And you wanted people to think that she lost those 8 pounds because she went off Seroquel, right?

A.   I stated it as a fact.  I don't have any ulterior motive to that statement.

Q.   Well, why is it relevant to her -- why is it relevant to your report?

A.   Well, we had been discussing some atypical antipsychotic side effects of which were weight gain.  I had done a review of atypical antipsychotics and pointed out there were at least two whose -- do not have side effects of weight gain.  And since learning about those as an endocrinologist talking to psychologists, psychiatrists, really, I am inclined to encourage them where possible to make use of atypical antipsychotics that have less side effects.

So it's part of what I teach general physicians and general psychiatrists when I speak to them.

Q.   All right.  You mentioned that -- so -- strike that.

In Exhibit 2 when you say that there is a loss of 8 pounds, are you or are you not trying to tell the reader of your report that that loss of 8 pounds after Ms. Whittington stopped taking Seroquel is an indication that Seroquel caused her weight gain while she was on it?

A.   My best belief is that when she comes off a atypical antipsychotic which causes weight gain, I would expect her to lose weight.  If there was clinical data to support that, I would point that out.  I would have a similar content -- comment if she was switched from one of the atypicals that caused weight gain to the two that do not, which are Abilify and Geodon.  And if this lady had been switched to Abilify and Geodon and lost weight, I would say to the physicians, "Look, she went to product X and her weight came down."

Q.   All right.

A.   And that's --

Q.   And so you're saying that the fact that her weight came down after she came off Seroquel was a factor that -- that tends to make it more likely than not that Seroquel was causing her weight gain.  That's what you're saying?

Page 15

tulloch 10 8 08.txt
```
     A.  Yes, ma'am.
     Q.  All right.
     A.  I'm just --
     Q.  Now, you agree with -- you said you know
Dr. Wirshing, right?
     A.  No, ma'am.  I have read his deposition in the
Zyprexa case.
     Q.  Oh, okay.
     A.  I have not yet read his deposition in this
case, but I -- I was -- I thought it was a very good
deposition in the Zyprexa case.
     Q.  Okay.  I think he's an expert on
antipsychotics.
     A.  Oh, I -- yes, ma'am, I think we'd agreed to
that earlier.
     Q.  Okay.  Now, would you -- I want to read you
what Dr. Wirshing said and see if you agree or disagree
with this.  "For any of these drugs and including
Seroquel, is there any evidence if the patient stops
taking the drug they will continue to gain weight?"
Okay, that was the question.
             And Dr. Wirshing asked, "As a consequence
of having consumed the drug?"
             And the next -- and the question was
"Exactly."
             And the answer was "No?"
             "And if they do you'd have to look at
other -- lifestyle, diet, all the other things one would
look at in you or I to figure out why they might be
gaining weight?"
             And Dr. Wirshing replied, "Absolutely.
It's difficult to lose weight, but continuing to gain
weight in the absence of your suspected cause of the
weight gain, really, I think has great doubts on whether
or not that was the cause."
             Do you agree with that statement?
     A.  I think that's a perfectly reasonable
statement.
     Q.  So if you continue to gain weight after you
stopped taking Seroquel, it really casts doubt on
whether Seroquel is the cause of the weight gain?
     A.  Ma'am, we're talking about one specific
patient.  If we also then look at the literature and
look at the --
     Q.  First, tell me if you --
             MR. BRUDNER:  You're interrupting him.
             MS. THORPE:  I'm sorry.  There can only one
person objecting --
             MR. PIRTLE:  You are interrupting.
             MS. THORPE:  If you want to object -- or
whoever's in charge can object, but I'm not going to
have two people objecting while I'm taking the
deposition.
             MR. PIRTLE:  All right.  You're
interrupting.  Let him finish.
     Q.  (BY MS. THORPE)  Finish your answer.  But
you're not answering my question.
     A.  I believe we agreed we weren't going to
interrupt one another.  But what I was saying was if the
literature is -- associates a number of -- and remember,
I'm not a psychiatrist, so I would -- I would be
comfortable to have Dr. Wirshing's input to this.
             But if there's -- literature suggests there
```
                              Page 16

tulloch 10 8 08.txt
is weight gain associated with a group of antipsychotics
and not with others and the patient was either
terminated on those or switched to another, I would
expect to observe weight loss. If weight loss was
present as it was in this case, it would be tempting to
ascribe more likely than not to the patient coming off
that appetite stimulant and losing weight as being the
reason why they lost weight.
        We have a similar analogy when patients are
given Prednisone and other medications like that. When
you stop the Prednisone, they start to lose weight.
    Q.   Dr. Tulloch, this is my question. It requires
a yes or no answer. And if you'll give me a yes or no
answer, then you may explain. Okay?
    A.   Okay.
    Q.   Do you agree that continuing to gain weight
after stopping Seroquel casts great doubts on whether or
not Seroquel caused weight gain to begin with?
            MR. PIRTLE:  Objection, form.
    A.   No, ma'am, I would not agree with that. What I
would have to say was -- do you want me to condition
that as to why?
            MR. PIRTLE:  You can finish.
    Q.   (BY MS. THORPE) Go ahead.
    A.   We agreed there were a number of causes of
weight gain and one of them would be an atypical
antipsychotic. If somebody continued to gain weight
when the atypical antipsychotic was stopped, then it is
quite possible the atypical antipsychotic was not the
sole cause and that there were other causes. But -- but
the data in favor of atypical antipsychotics causing
weight gain of the group that we referred to is fairly
strong.
    Q.   I'm going to show you what's been marked as
Exhibit 20 to this deposition and ask you if --
            MR. PIRTLE:  Do you have a copy?
            MS. THORPE:  I don't have an extra copy of
that one. You can look on.
    Q.   (BY MS. THORPE) Can you tell me what weight
Ms. Whittington had on March 24, 2008?
    A.   I -- if this is later than I had in my time
line -- I think we've looked at this one before, and I'm
already on record as giving you that date -- that
weight, rather, and we had to find it under the
physicals -- it's on the second page, page 2 of 3, and
the weight is 255 pounds.
    Q.   So the highest weight that Ms. Whittington had
in her life that we know of occurred after she went off
Seroquel, correct?
    A.   Yes, ma'am.
    Q.   Dr. Tulloch, in May of 2008, two and half years
after Ms. Whittington stopped -- well, strike that.
Strike that.
            Are you -- have you read any medical
records that go past December 4, 2007, as reflected in
the time line by --
    A.   No, ma'am.
    Q.   -- that's marked as Exhibit 19?
    A.   No. I think we agreed on that before, that I
had not seen Exhibit 20. We talked about this earlier
on.
    Q.   Okay. So you -- you're -- your medical review
ends on December 4, 2007?
                        Page 17

tulloch 10 8 08.txt
    A.   That's correct.
    Q.   All right.   Now, what -- what I want to know,
if you'd look in Exhibit 2 of this -- on page 16,
your -- the list of medical records you were given.
    A.   Yes.
    Q.   I want you to look down the list on Exhibit 2
and tell me which of the ones that you actually read.
It's harder to figure out than you might think when I
look at your report and when I look at this list.
    A.   Okay.
    Q.   So I need to know exactly what you read.
    A.   To the best of my knowledge, when I was
preparing this report, I listed the data which I looked
at, and they are listed on Exhibit 2 under the heading
Opinions Related to Ms. Linda Whittington, and it
includes Mental Health Association Jacksonville,
Jacksonville Heart Center, Baptist Hospital --
    Q.   Can we just stop for a minute?
                If you look at page 16 on your report of
the reliance -- of the long list of medical records --
    A.   Yes, ma'am.
    Q.   -- I don't see Mental Health Association
Jacksonville.
    A.   Okay.
    Q.   I've tried to do this exercise.   That's why I'm
asking you.
    A.   Okay.   I will need to go back to the disks when
I was preparing the report.   I took the titles off the
disks which you were provided with.   If it doesn't
match, I apologize for that.   They may be in there under
a slightly different heading.   For example, this one
we've just looked at, Exhibit 20, were I to list that, I
would list it as Baptist Primary Care, but others might
list it as chart of Dr. Harold Dale Boyd who's the
signatory on page 3.   So there may be some descriptive
differences there.
    Q.   I'll tell you what, I'd like you to take a pen
and just circle the ones on page 16 that you've actually
reviewed.   If you want to use my copy to look at, it
might make it easier.   You can turn -- you'll have --
    A.   Okay.   What I found were the Baptist
Hospital's, which are listed up high; the imaging
center, Jacksonville Heart Center, North Florida OB/GYN.
I'm looking for Dr. M. Saleh, Jacksonville, and
Dr. Charles Haddad, Jacksonville Family Health Center
and those I do not find on the listing of page 16.   But
I -- I put them there because I read them off -- off the
titles of what -- when I was preparing the -- the
report.
                And what we agreed was -- not on the list
were Dr. Harold and Dale Boyd because those were
subsequent to the time line which I was working from and
the chart which I was relating to that time line.
    Q.   So when you say they're not on the list, you
mean on your -- your list about doctor -- about
Ms. Whittington, you're not referring to page 16 of your
report, correct?
    A.   Yes, I'm referring to the group that I reviewed
when I put the report together, which is on the first
paragraph under opinions relating to Ms. Whittington.
    Q.   Okay.   So you have now circled on -- I hope you
did it.
    A.   On your --
                              Page 18

tulloch 10 8 08.txt

Q.   If you would, please, just put them on the exhibit.

A.   I have ticked them and they are there.

Q.   This isn't the exhibit.  You have the exhibit in front of you.  Flip the -- this is Exhibit 2, Doctor. And we have to do it on the copy that we're attaching to the deposition.

A.   Ah, okay.

Q.   So I just want you to be very quick, just mark --

A.   Mark it on this --

Q.   Yes.

A.   -- second copy?  Okay.  No problem.

       Okay.  I have listed six which relate to -- to the numbers, and I have put them on a copy exhibit which I'm returning to you, and I have the original here.

Q.   All right.

A.   To the best of my knowledge, they are --

Q.   Thank you.

A.   -- identical in marking.

Q.   So on Exhibit No. 2 you have identified the medical records that you have reviewed on the list that's -- that's page 16 of your report, right?

A.   That's correct, at the time I made the report, yes, ma'am.

Q.   Now, looking back at Exhibit 20, which is the -- let me ask you this, Doctor.

       Did you -- did you actually read those medical records that you've checked on Exhibit 2?

A.   Yes, ma'am, I read them on disk and I -- when I was making the list, I hand copied the titles -- I gave them an example of how there might have been a discrepancy because of the title and the signature at the bottom.  But the data which I put in the report related to those listed on that paragraph.

Q.   I need the time line is what I'm looking for. You've got it in front of you.  Thanks.  No, this is fine.

       So on Exhibit 19 you did not have any glucose levels that you looked at before you formed your opinion regarding Ms. Whittington that predate her use of Seroquel, right?

A.   What I had said was I had no data listed before the reference number 5 on Exhibit 18 which is March the 8th of '99.

Q.   Okay.  So -- so you didn't have any glucose levels that predated 1999 --

A.   That's correct.

Q.   -- on Ms. Whittington, right?

A.   That's correct.

Q.   And you didn't have any weights that predated 1999 on Ms. Whittington, right?

A.   That's correct.

Q.   And for the hard numbers, labs, weights, any kind of numerical data, you relied on -- on what we're calling the time line that's been marked as Exhibit --

A.   Nineteen.

Q.   -- 19, right?

A.   Ma'am, I -- I -- at the time I looked at the disks, you will find they also had summaries like this. But, yeah, to -- when -- when I was comparing weights to sugars to dates, the best relationship to those were on

Page 19

tulloch 10 8 08.txt
Exhibit 19.
    Q.   All right.  But you relied on the numbers that
somebody from the -- the plaintiffs' lawyer's office
wrote down in Exhibit 19?
    A.   That's correct.
    Q.   And so that would be true for the cholesterol
numbers, right?
    A.   That's correct.
    Q.   So you relied on what the plaintiffs' lawyers
said in Exhibit 19 about triglycerides, right?
    A.   In the summary -- and when I was putting it
together -- remember what I said, I also looked through
the disks which had these copies of -- I'm holding up
examples of physicians' office charts and laboratory
values.
    Q.   But when you --
    A.   -- when I was doing the report.  So I could say
on this date this was the weight, this was the lab.  I
worked from Exhibit 19.
    Q.   But you have listed on Exhibit 2, page 16, all
of the medical charts that you looked at, right?
    A.   That's correct.
    Q.   Okay.  Is --
          MR. PIRTLE:  When you get to a stopping
point.
          MS. THORPE:  Yeah, I'll be done with this
in just -- as best I can in just a minute.
    Q.   (BY MS. THORPE)  Dr. Tulloch, on Exhibit 19, if
you'd look at the first page of it, there's a section
entitled Past Medical History, right?
    A.   Yes, ma'am.
    Q.   And it begins with tobacco abuse and
schizophrenia and esophageal reflux, so on.  Do you see
that?
    A.   Yes, ma'am.
    Q.   And you used that list in -- in your writing of
your report, the third paragraph relating to
Ms. Whittington, right?
    A.   Yes, ma'am.
    Q.   In fact -- and there's also a section entitled
Risk Factors for Diabetes Mellitus, right, on
Exhibit 19?
    A.   Yes.
    Q.   And it says, "Family history of diabetes,
hypertension, and elevated lipids."
          Do you see that?
    A.   Yes, ma'am.
    Q.   And you have a virtually identical sentence in
your report that's been marked as Exhibit 2 where you
say, "There is a family history of diabetes mellitus,
hypertension, and hyperlipidemia," right?
    A.   That's correct.
    Q.   You basically took that sentence and plugged it
into your report?
    A.   Well, it summarized what I'd seen on the disks
which related to those references which I'd ticked on
page 16, yes, ma'am.
    Q.   And those were causes of diabetes that predated
her use of Seroquel as we discussed last time around,
right?
    A.   Yes, ma'am.
    Q.   It does not -- you do not include in that list
her obesity that preexisted her diabetes, right?
                    Page 20

tulloch 10 8 08.txt
          A.   Yes, ma'am, because I -- I then talked about
the weight in a separate paragraph.   But certainly for a
lady of this height, she was obese from fairly early on
in this report.
          Q.   After the February 2006 laboratory test that's
been marked as Exhibit 10, you would agree from your
review of the records that the blood sugars that were
tested using the A1c test on Ms. Whittington were all
normal?
          A.   Yes, ma'am.
          Q.   You would agree with that?
          A.   May I put a little explanation on that?
          Q.   Well, first, you would agree -- first -- yes,
you may.   But first agree with me --
          A.   Yes.
          Q.   -- that all the A1cs after February of 2006
were normal?
          A.   That's correct.
          Q.   Okay.
          A.   If we define normal as between 4 percent and 6
percent.   And I put a little rider on that.   The
problems with -- hemoglobin A1c is an excellent cross
check, but there are -- there are patients that have
abnormal hemoglobins.   And so we train our medical
students that if a hemoglobin A1c doesn't fit the blood
sugar, the blood sugar's more likely to be correct.
          I explain that because somebody from the
Mediterranean area who has thalassemia, that kind of
hemoglobin runs in a different pattern in the tests by
which one derives hemoglobin A1c, and so you can't get
meaningful data.   And there are a number of patients out
there who have discordant hemoglobin A1cs when you look
at blood sugar.   So in that setting the blood sugar is
the more important value.
          Q.   Would you agree that after -- during the time
that Ms. Whittington was taking -- strike that.
          Would you agree that after February of 2006
Ms. Whittington's blood sugars were under control?
          A.   I think that's a reasonable statement, yes,
ma'am.
          Q.   You understand she was hospitalized many times
for her mental health, right?
          A.   Yes, ma'am.
          Q.   She's never been hospitalized for diabetes,
correct?
          A.   She's never had numbers that were sufficiently
discordant to make that necessary, yes, ma'am.
          Q.   So she's never been in the hospital for
diabetes?
          A.   Yes, ma'am.
          Q.   And she's taking oral glucose medications, not
insulin?
          A.   That's correct.
          Q.   And having not had -- well, let's -- let me ask
you this.
          Ms. Whittington has had no complications
that you have seen from her diabetes?
          A.   I think that's a reasonable statement, yes,
ma'am.
          Q.   And you know nothing about her condition after
the last date of Exhibit 19, which is --
          A.   Can I help you?   December the 7th.
          Q.   December --
                              Page 21

tulloch 10 8 08.txt

A.   December the 4th.
Q.   2007 --
A.   Yes.
Q.   -- right?
A.   That's correct.
Q.   All right.
          MS. THORPE:   This would be a good time to
take a quick break.
          (Short recess from 5:19 to 5:30.)
Q.   (BY MS. THORPE)  Dr. Tulloch, you would agree
with me that there is no scientific or medical evidence
that Seroquel exacerbated Ms. Whittington's diabetes
that she had back in the Nineties?  Let me ask that a
better way.  That's a long and too windy question.
          You would agree with me that there is no
medical or scientific evidence that taking Seroquel
exacerbated Ms. Whittington's diabetes that you have
said you believe she had all the way back in the
Nineties?
A.   Ma'am, I think we -- we need to be careful
about facts.  What I'm comfortable with agreeing with
you -- and we need to agree on the best medical data
is -- we have found a sugar which was high before the
earliest data that I had available to me in my report.
And if that was a fasting sugar, it is compatible with
a -- a diagnosis of type 2 diabetes.  We have also noted
that she received two different atypical antipsychotics
during which time she gained a lot of weight.  And I
have given the opinion, which I'm modestly able to stand
up to, that she gained that weight and that she probably
more likely than not had her blood sugar physiology made
adverse by that weight gain.
          But I'm quite comfortable to admit that if
that fasting glucose about the mid-1990s was fasting, we
have a definition -- we have a time when she definitely
had what we would define as diabetes were we to find a
second one which antedated either of the atypical
antipsychotics.  I'm -- I'm --
Q.   So let me get this straight, Dr. Tulloch.  Now
you're saying that for the 1990s you have to have two
tests confirming --
A.   No, ma'am.
Q.   -- her diabetes, correct?
          MR. PIRTLE:   Objection, argumentative.
Q.   (BY MS. THORPE)  Is that what you just said?
          MR. PIRTLE:   Argumentative.
A.   No, ma'am.
Q.   (BY MS. THORPE)  So you don't think you have to
have two tests?
A.   We have agreed that a definition of a fasting
sugar greater than 126 is maximum probability of
diabetes.  A second number is useful if there would be
any doubt for any of the reasons we discussed earlier.
We have agreed that we found a sugar which antedated her
getting either of the atypical antipsychotics which was
compatible if fasting with type 2 diabetes, a single
number.  And I have said that if she had that, she
probably had diabetes.
          What I've also said was the content of my
report related to weight gain during her administration
of two atypicals.  And I'm defending my report for
saying that weight gain probably contributed to the
abnormal blood sugar which we saw on the date which we
                        Page 22

tulloch 10 8 08.txt

agreed.

You have taken my comments, which are very reasonable given the position you're needing to take, that she already had diabetes in the early 1990s.  It would depend on that sugar taken at 1:30 at midday being fasting.  And I don't wish to agree or disagree, I just leave a question mark over the validity of a 1:30 p.m. sugar as being fasting, and neither of us can do anything more than speculate.

Q.   All right.  Let me go back to the original question I started with.

A.   Yes, ma'am.

Q.   Is it your opinion that taking Seroquel exacerbated preexisting diabetes in Ms. Whittington?

A.   And what you heard me say was a clarification of my position.

Q.   I'm just --

A.   Do you need me to redo that?

Q.   No.  I need to you say yes or no.

A.   The answer is no, because I'm not certain about the nature of that 1:30 p.m. blood sugar.  If the 1:30 p.m. blood sugar was definitely fasting, then she had preexisting diabetes.

What you put into my mouth and which I'm not comfortable with leaving it without an explanation is that she definitely had diabetes on a fasting sugar taken at 1:30 midday.  That's my problem.

Q.   Now, tell me, Doctor:  You said somewhere in this answer that her weight gain had an impact on her blood sugars, her weight gain while she was on two antipsychotics have an impact on her blood sugars, right?

A.   I'm just quoting the literature and quoting the --

Q.   That's what you said, right?

A.   Yes, yes, I did.

Q.   All right.  Now, I want you to point to me to the blood sugar or blood sugars that you say her weight gain had an impact on.

A.   Well, what -- what we have discussed is a weight gain which occurred and which we agreed and an abnormal sugar which was defined as right at the marginal level on February the 16th of 2006.

Q.   What do you mean?  So you're talking about exhibit -- Exhibit 10, right?

A.   Yes, ma'am.

Q.   So Exhibit 10 is the only blood sugar that you're contending that weight gain from two antipsychotics, Zyprexa and Seroquel, had an impact on --

A.   To the --

Q.   -- because of weight gain, right?

A.   Yes, to the best of -- of the data -- my interpretation of the data in front of us.  This was clearly a glucose tolerance test.  And I think it is reasonable to suppose that she was fasting on that day.  What I'm putting doubt on is a 1:30 p.m. sugar of 137 and wondering if it's really fasting.

Q.   My question to you was:  You made a statement that two antipsychotics, Seroquel and Zyprexa, caused her to gain weight and have an impact on her blood sugar, right?

A.   More likely than not, yes, ma'am.

Page 23

tulloch 10 8 08.txt

Q.   All right.  And the only data that you're
relying on for that opinion in terms of the blood sugar
is Exhibit 10, correct?
A.   Exhibit 10, yes, ma'am.
Q.   And the only number on Exhibit 10 you're
relying on is the fasting glucose of 131, right?
A.   That's correct.
Q.   All right.  Now -- so what you're saying is
that her weight gain in -- I don't need you to hand me
that.  Okay?

What you're saying is that her weight gain
that occurred after Zyprexa and after Seroquel led to
the 131.  And my question to you is:  What led to the
123 that she had in 1993?
A.   The best weight I have for her in 1993 is not
in 1993.  I'm -- may I offer you Exhibit 18, because we
don't have data.  In Exhibit 18, which was data I did
not have -- do you want me to share it with you?
Q.   No.  You just go ahead and answer the question.
A.   We have a weight from 1990, which is quite
modest for her height, and a BMI of 23.4, a weight of 11
of 1996, which is 194 by which time her BMI is in the
obese range.

So we don't know from '90 to '93 what she
weighed because we don't have the data, unless it's
present on a medical chart that relates to that blood
sugar.

What can I do to help you?
Q.   I'm looking for the 123.  It's disappeared.
MR. PIRTLE:   What is it?
MS. THORPE:   I'm looking for the exhibit
that has the 123, the 1993.
THE WITNESS:   From 1993 a sugar of 123.
MS. THORPE:   Look over on your side of the
table.
MR. PIRTLE:   I don't have it.
A.   It must be floating around here.  Right in
front of you.
Q.   (BY MS. THORPE)  Oh, thank you.
A.   In my house there lives a gremlin called
Murphy.  Murphy is capable of many things.
Q.   So -- so what you're saying, Dr. Tulloch, is
that -- is not that weight gain following Zyprexa and
Seroquel caused her to have diabetes, right?  You're not
saying that?
A.   What I'm saying is that she had abnormal blood
sugars on the 2nd of -- on February the 16th of 2006,
which was after she had had fairly significant weight
gain independent of what -- what the cause.  We have
another sugar which was taken in the mid-Nineties of 123
and another one in the 130s a little bit later.  And you
took my statements and asked me to agree with you that
she hadn't developed diabetes as a result of the
atypical antipsychotics.  And I couldn't.
MS. THORPE:   Move to strike --
A.   I couldn't accept --
MS. THORPE:   -- as nonresponsive.
A.   -- I couldn't accept -- we agreed we weren't
going to speak over one another.  I couldn't accept the
statement the way you'd taken it.  I'm happy to have you
rephrase it in such a way that I can agree, but
otherwise I'm -- I'm waiting for the next question.
MS. THORPE:   Can you read my question back,
Page 24

tulloch 10 8 08.txt
please.
                    THE WITNESS:  It will be several minutes
ago.
                    MS. THORPE:  Yes, it will be.
                    (Requested portion was read as follows:
            "QUESTION:  So -- so what you're saying,
Dr. Tulloch, is that -- is not that weight gain
following Zyprexa and Seroquel caused her to have
diabetes, right?  You're not saying that?")
                    THE WITNESS:  There's an earlier one where
she said --
        Q.  (BY MS. THORPE)  No, that's the question.
        A.  Okay.  What I'm saying is that in a person with
diabetes in the family, any weight gain of 60 pounds is
more likely than not to contribute to abnormal blood
sugars.  If the abnormal blood sugars are compatible
with the definition of diabetes, my belief is that
weight gain contributed to the arrival of diabetes.  I
then took your question and --
                    MS. THORPE:  Sir, I'm going to move to
strike --
        A.  If you want to me to stop, I'll stop.
                    MS. THORPE:  -- as nonresponsive.
                    MR. PIRTLE:  You cut him off.
        Q.  (BY MS. THORPE)  You agree --
                    MS. THORPE:  Yes, I can get an answer to my
question --
                    MR. PIRTLE:  No, you cannot cut him off.
And I will --
                    MS. THORPE:  -- and then he can answer.
                    MR. PIRTLE:  -- stop this deposition if you
cut him off.
                    MS. THORPE:  You know, Tom, he can
answer --
                    MR. PIRTLE:  I will stop this deposition --
                    THE REPORTER:  One at a time, please.
                    MR. PIRTLE:  -- if you cut him off.
                    MS. THORPE:  I am not cutting him off.  I'm
trying to --
                    MR. PIRTLE:  I'm putting you on fair
notice.
                    MS. THORPE:  I'm putting you on notice --
                    MR. PIRTLE:  All right.  Just keep --
                    MS. THORPE:  -- that this is a waste of
time.
                    MR. PIRTLE:  -- on doing it.
                    THE REPORTER:  I can't take two people
talking at the same time.  My hands are off the writer.
                    (Discussion off the record from 5:43 to
5:43.)
        Q.  (BY MS. THORPE)  Dr. Tulloch, I want to know
whether it is your opinion in this case that
Ms. Whittington has diabetes more probably than not as a
result of the ingestion of Seroquel --
                    MR. PIRTLE:  Objection, asked and answered.
        Q.  (BY MS. THORPE)  -- or is it just a
possibility.
        A.  My -- and I'm trying to be scientific and go
with the best available data.  My belief is that the
60-pound weight gain that she incurred prior to the
definition of diabetes, which was on the date that we
discussed, was a terminal contributing factor to her
development of diabetes, in other words, as I recalled
                              Page 25

                                    tulloch 10 8 08.txt
earlier, the last straw that broke the camel's back.
                You had an earlier question which I was
referring to, you had another question which said did I
agree that she hadn't -- that she had diabetes in the
early Nineties, and that was relating to her blood sugar
of 137.  I will let you ask that question again so that
we're both comfortable with my answer.
        Q.  I'll ask the questions I need to ask, sir --
        A.  Okay.
        Q.  -- okay?  I don't need your direction.
        A.  Okay.
        Q.  And I want to ask you, then:  Is it your
opinion as a scientist, sir, that the results that are
expressed in Exhibit 10, which is a fasting glucose of
123, and a result that's expressed as a 137 in
Exhibit 17 are different from a scientific standpoint
than the fasting -- a single fasting glucose that's been
marked as Exhibit 10?
        A.  Yes, ma'am.  What I --
        Q.  So what's the difference?
        A.  What I had said and I'll say it again is -- may
I have exhibit -- the two exhibits so that we're
comfortable with them.  Okay -- is Exhibit 17 was taken
at 1:30 p.m. and Exhibit 11 has a time 1430 p.m. on it,
which I would understand to be 2:30 p.m.  So my concern
is that these two at midmorning and early afternoon
sugars may not be fasting.  What I then said was --
        Q.  Can you identify them by exhibit numbers,
please?
        A.  We agreed we weren't going to speak over one
another.
        Q.  Can you identify them by exhibit numbers,
please --
        A.  Yes.
        Q.  -- so the record will be clear.
        A.  The exhibit -- fasting sugar of 123 was
Exhibit 11, blood sugar taken at 1430, which is 2:30 in
the afternoon.  Exhibit 17, blood sugar of 137, a blood
sugar was taken at 1:30.
                What I'm doing as a physician is
contrasting these two numbers which are above or very
near the defining level of diabetes as maybe not being
fasting.  This one, as I said earlier, because it's a
glucose tolerance test and the requirements are for the
patient to be fasting -- this is Exhibit 10 -- in my
belief are the first definite fasting sugar.  I offer
those as medical probabilities.
                My interpretation, therefore, are based on
the Exhibit 10 with a fasting sugar of 131 during her
glucose tolerance test as definitely being fasting.  The
earlier sugars taken midmorning and early afternoon I am
not sure are fasting, and so any conclusions you ask me
to draw from those numbers, Exhibit 11 and Exhibit 17, I
would hedge with may be -- not be fasting.
                So when you then asked me to say she had
diabetes before the early 1990s, which is what I
understood from your question, I will have to say maybe
but I'm not sure because I'm not sure those two numbers
are fasting, ma'am.  That's all I was trying to offer to
you.
        Q.  And so you're -- well, let me ask you.
                Exhibit 12, which is the order for
Exhibit 11, says that it was ordered as a fasting
                          Page 26

tulloch 10 8 08.txt

glucose, correct?

    A.  Yes, ma'am, we agreed on that.

    Q.  Yes, we did.

        And you agree that it's more likely than not that Exhibit 11 reflects a fasting glucose, right?

    A.  My only concern is the time of the day.

    Q.  Do you agree that it's more likely than not that Exhibit 11 is a fasting glucose?

    A.  I -- you've heard me express concern.  Any number which is as late as 1:30 in one case and 2:30 in another case I would wonder if they were fasting.

    Q.  And --

    A.  I leave my doubts on record and I wish them to remain on record.

    Q.  And so what you're saying now is that you personally don't know whether 11 -- Exhibit 11 is a fasting glucose even though the order was for a fasting glucose --

    A.  That's correct.

    Q.  -- as reflected in Exhibit 12, correct?

    A.  That's correct, ma'am.

    Q.  And so it would be pure speculation on your part to conclude it was anything other -- that Exhibit 11 was anything other than a fasting glucose, correct?

    A.  That any number taken at 1:30 in one case and 2:30 in the other case were fasting, yes, ma'am.

    Q.  Now, where on Exhibit 11 do you see that it was taken at 2:30?  Will you look at the collection time and tell us on Exhibit 11 what the collection time is?

    A.  Okay.  I'm looking at the top row on Exhibit 11 and I see a date and I see the number 1430 after that.

    Q.  Well, sir, let me --

    A.  I have interpreted that as the time, but I'm happy to be corrected.

    Q.  Do you see that I'm pointing to the letters COLL colon?

    A.  Correct.

    Q.  And it says 9:15, doesn't it?

    A.  Okay.  We have two dates -- two times on this, and one of them says 9:15 and the other one says 1430.  And I stand corrected.  The COLL we'll have to assume is collected and, therefore, 9:15 is the probable date.  I stand corrected and thank you, ma'am.

    Q.  And so you would agree that Exhibit 11 more likely than not reflects a fasting glucose, correct?

    A.  Taken at 9:30 in the morning, yes, ma'am.

    Q.  All right.  So let me ask you my question again.

    A.  Okay.

    Q.  When we have a fasting glucose of 123 and another glucose taken several years later of 137 in a patient who has gained in the neighborhood of 50 pounds during that time frame, can you tell me whether or not it is more likely than not that she had diabetes at -- in the 1990s?

    A.  We're hedging on the 137.  I certainly think that it is possible she had impaired fasting glucose because that's a sugar 123 taken at 9:15.  The main problem is the date with the value of 137 which we agreed was taken at 1:30 p.m. with the order for it to be taken fasting, and I'm just not certain about a 1:30 p.m. fasting.

tulloch 10 8 08.txt

Q.   And so --
A.   However, if it were fasting, there's no doubt
the lady had diabetes by our definition.
Q.   So how do you rule out that she had diabetes in
the 1990s?
A.   We don't have the data to rule that out.  As I
mentioned, sugars are rare in the charts of the
psychiatrists.  If the blood sugar of 137 was validated
by other numbers, she might well have had diabetes
before she got the first of the atypical antipsychotics.
Q.   You -- you mean if it was confirmed by other
tests?
A.   Yeah.
Q.   If there was a second test, right?
A.   (Witness nods.)
Q.   Is that right?
A.   Yes, ma'am.
Q.   And so how do you rule out that she got the 131
in 2006 -- the 131 fasting glucose in 2006 simply
because this was a person who already had impaired
glucose tolerance, probably already had diabetes before
she ever had that test in February '06?  How do you rule
that out?
A.   No, I think we are in agreement, ma'am.  My --
my -- the content of my report was that she had gained
60 pounds in weight and whatever her sugar status had
been before I would expect the sugars to be higher
because of the weight gain.
Q.   How do you rule out, Dr. Tulloch, that this
woman was in a state of either preexisting before
Seroquel, before Zyprexa, impaired glucose tolerance or
diabetes before she ever took those drugs?  How do you
rule that out?
A.   Ma'am, I -- I agree.  I believe she did at best
have impaired glucose tolerance.
Q.   And at worse she had diabetes?
A.   At worse if the higher number is correct, she
might have had diabetes, that's correct.
Q.   And you cannot rule out that she had those
conditions before she ever took Seroquel; isn't that
right?
A.   We are in agreement, ma'am, yes.
Q.   All right.  So let's talk about Mr. Unger.
     Oh, I've got to go back to Ms. Whittington.
And let me just say I've got to read carefully
Ms. Whittington's -- this time line that you're relying
on -- on Ms. Whittington.  And I may have additional
questions about Ms. Whittington because --
     MR. PIRTLE:  Well, I don't see any problem
during the course of what you're doing if you feel like
you need to go back and ask some more about that.  I
have now in hard copy form provided to your colleague
what I believe to be the outlines that the doctor looked
at for each of the four individuals.
     MS. THORPE:  Thank you.
     MR. KRASINSKI:  Is this -- the disk, is
this on the disk, also?
     MR. PIRTLE:  I believe it is on disk, too.
     (Short recess from 5:54 to 6:05.)
     (Exhibit No. 21 marked.)
Q.   (BY MS. THORPE)  All right.  Dr. Tulloch, we're
going to talk about Richard Unger.  Okay?
A.   Okay.

Page 28

tulloch 10 8 08.txt

Q.   I'm going to show you what's been marked as
Exhibit 21 for identification.  And that's your report
in the Unger case, right?
      A.   Yes, correct.
            (Exhibit No. 22 marked.)
      Q.   (BY MS. THORPE)  And I'm going to show you
what's been marked as Exhibit 22 for identification and
ask you if that is your time line on Mr. Unger.
      A.   That's correct.
      Q.   Now, you prepared this report on Mr. Unger
yourself?
      A.   Yes, ma'am.
      Q.   Do you have any additions or changes you want
to make to this report?
      A.   Not at this time.
      Q.   This report that's been marked as Exhibit 21
fairly and fully reflects your opinions?
      A.   As of this time, yes, ma'am.
      Q.   And you -- it contains an accurate and careful
summary of the medical and scientific facts in your
opinion?
      A.   Yes, ma'am.
      Q.   You have not reviewed all of Mr. Unger's
medical records, correct?
      A.   That's correct.
      Q.   How did you decide what to read and not to read
of his medical records?
      A.   I read the records which are listed on page 10
of Exhibit 21 and those I considered to be the most
clinically absorbing ones.
      Q.   What does that mean?
      A.   Related to his -- to his clinical care and
yielding of the best data on blood sugar, blood lipids,
blood pressure, et cetera.
      Q.   Can you turn to page 16 of the list of medical
records that were provided to you -- strike that.
            Look at in exhibit -- look in exhibit --
      A.   Ma'am, I have Exhibit 21, page 16, if that
helps you.
      Q.   Okay.  And is that a list on page 16 of all
medical records that were provided to you with regard to
Mr. Unger?
      A.   That's correct.
      Q.   Can you go through page 16 and put a check with
a pen by those records that you reviewed.
      A.   Yes, ma'am.  What I'll be doing is transferring
the list from page 10 and collating them with the list
on page 16.
            Okay.  I have a listing for Memorial
Hospital Pembroke Pines on page 10 which I do not see on
page 16.  I have a listing for Medicaid which I do not
see on page 16.  I have a listing for Norman A. Bloom,
Dr. Norman A. Bloom, which I do not see on page 16.
            I have a list of -- listing for Dr. Ares
Romero on page 10.  And on page 16 there's a listing for
Dr. Patricia Romero.  I'd point out the differences.  I
have a listing for Dr. Marie Williams on 10 which I do
not see on page 16.
            Okay.  I have 12 ticks on page 16 which are
my best matching of page 10.
      Q.   If you -- Dr. Tulloch, let's put the exhibit
back together so that we don't get confused later.  Have
you got the clip there?

Page 29

tulloch 10 8 08.txt

A.   Yeah, I have a clip here which I'll put on it.

Q.   Now, by not reading all of Mr. Unger's records, you are likely not going to be aware of all of his charted weights; isn't that correct?

A.   That's a reasonable possibility, ma'am, yes.

Q.   By not reading all of his records, you may have missed some of his blood sugar readings?

A.   I accept that, ma'am, yes.

Q.   By not reading all of his records, you may have missed some of his glucose readings before he took Seroquel, correct?

A.   That is correct.

Q.   By not reading all of his records, you may have missed laboratory results that reflect high cholesterol or high triglycerides, including such labs before he took Seroquel?

A.   That is correct.

Q.   And by not reading all of his medical records, you may have missed some alternative explanations for his weight gain?

A.   Each of those are reasonable comments.

Q.   By not reading all of his medical records, you may have missed some other causes of diabetes that you did not -- that you just didn't know about, right?

A.   They would be -- if there were any, they would be other items on the saddle of the camel, yes, ma'am.

Q.   Okay.  Are you -- in your -- this analogy you keep using, Mr. Unger is the camel?

A.   No.  There's a -- there's an analogy which refers to the final straw that broke the camel's back. So when a disaster happens, you generally find a stack of issues and then the last thing that happens is the final straw that breaks the camel's back.

Q.   And you're saying --

A.   So I use that analogy because most of these patients have multiple risks for their diabetes.  And I would not wish the Court to have me ascribe any single cause to their diabetes.  Some can be more important than others.  And if the temporal relationship is close to the time when the blood sugar became abnormal, clearly more likely than not they were more important, and that's there -- there's the analogy for the final straw.

Q.   How -- if I understood you correctly, you described the records that you chose to read as being those that you believe bear on his endocrine -- endocrinological condition; is that correct?

A.   Yes, ma'am, to the best of my interpretation at the time.  I had a large number of records and a limited amount of time and I tried to be cost effective with my time.

Q.   And how did you know that the records that you chose to read contained all of the information about his endocrinology -- his endocrinological condition?

A.   I looked at the -- usually this comes in history of present information, so you'll see the -- in any arriving clinical set of data one sees what -- in the first three or four lines, there's usually a summary of the reason for that patient's arrival.

Q.   Well, did you use the time line that's been marked as Exhibit 22 or exhibit -- what did we mark the time line as?  Here it is, Exhibit 22.  Did you use Exhibit 22, Dr. Tulloch, to help you decide what medical

Page 30

tulloch 10 8 08.txt

records you should look at?

A.   I actually looked at the medical records before I looked at the time line.  What I -- as I said in the previous patient, the advantage of the time line is it has a direct association between the -- the date, the time, the laboratory tests, and the medications that the patient was receiving.  It doesn't tell me a lot about the patient at the time.  So I skimmed through the reason why he was going to see the physicians at the different times and then I got down to when I had to put it all back together again to make the report.  That's when the time line became useful, because it -- it related the temporal relationship between the biochemical abnormalities and the body weight.

Q.   For none of the plaintiffs whose records you looked at did you attempt to collect yourself the weights of these patients or their glucoses or other laboratory data, correct?

A.   On my own, no, ma'am.

Q.   You just completely relied on the time lines, this one in the case of Mr. Unger, Exhibit 22, right?

A.   Exhibit 22, yes, ma'am.

Q.   Okay.  Now, Dr. Tulloch, on -- in Exhibit 21, your report, we've referred several times to this long spreadsheet of medical records and scientific literature and various documents that is numbered pages 1 through, I think, 17.  Can you turn back to that spreadsheet?

A.   Oh, okay.  I have it, entitled Reference Exhibit List, yes, ma'am.

Q.   Okay.  Did you prepare the reference exhibit list?

A.   No, ma'am.  This was done for me by the plaintiffs' attorneys' department.

Q.   Did you collect the materials that are on the references in that list and then give them to the lawyers?

A.   I had many of them myself, and others I used in the preparation of these patients, yes, ma'am.

Q.   Okay.  So you collected -- it's your testimony today that you collected the materials that are listed on Exhibits 1 through 17 yourself?

A.   No, ma'am.

Q.   Okay.

A.   Most of the ones relating to the patient and to the science were collected by me or obtained by me.  I ran a Index Medicus thing, the computer study.  Others were provided to me by the plaintiffs' attorney, and some of them were patient -- were references which came over from the Zyprexa issue.

Remember the Zyprexa case had a number of references in which Zyprexa was not the only medication that the patients were given.

Q.   Well, let me -- let me just sort of cut to the chase here.  This identical list appears on the reports of Drs. Perry, Young, Nair, Abramson, Marks, and Kendrick as well as your report.

A.   Okay.  I don't know any of those people.  Who are they, ma'am?

Q.   They're experts testifying in this case.

A.   Oh, okay.

Q.   And so my question to you is:  Did you collect, you know, based on your review -- your Index Medicus review and other efforts these materials and then hand

Page 31

tulloch 10 8 08.txt

them over to someone at the plaintiffs' firm and then
they typed up the reference exhibit list or did they
hand you materials that they typed up and put in this
reference exhibit list?  What's the genesis of this
list?

A.   The -- a large number of these patient -- of
these references antedate the Seroquel literature.   What
I said earlier was I did some work with Zyprexa, so --
and those ones were references which I gained together.
The scientific references which I was interested in I
got from a computer-based search.  I looked through
Seroquel and side effects and I got some references.
Those headlines I got and I gave to the plaintiffs'
attorney and I said, "Please get me copies of these
references."  So the science was generated by me and the
hard copy which you're holding today was provided by the
plaintiffs' attorneys' offices.

                  That they be common references for other
physicians, I don't know, but if that's cost effective
for an office to have one batch of references, I can
understand why they would.

Q.   So -- so you did -- so what happened was you
did a literature search, you got the cites, and you gave
them to the plaintiffs?

A.   Yes, ma'am.

Q.   And all of the cites that you found on Index
Medicus that you thought were supportive of your opinion
you put in -- you gave to them and they put in this
reference list that's pages 1 through 17 --

A.   One through 17, yes, ma'am.

Q.   -- is that right?

A.   (Witness nods.)

Q.   Now -- hang on one second.

                  There are a total of 32 scientific articles
that appear on this reference list.  Do you generally
agree with that number?

A.   I didn't count them.  I'll accept your word for
it.

Q.   Does that accord with what you remember from
your Index Medicus search?

A.   I think to ask me how many -- because we're
talking over a period of a year.  Issues have come up
that were relevant to Seroquel which were present in the
early years and I dug them up.  For example, I remember
specifically pancreatitis.  All of the cases of
pancreatitis that I've been aware of have been related
to another product.  So I then ran the issue over
pancreatitis and Seroquel and bingo, out came several
related to Seroquel.  So these were ones which I had
added in because they clearly were relevant for this
particular product.

Q.   And you have said in your report that Seroquel
causes pancreatitis, haven't you?

A.   Yes, ma'am.  I said that having found the
references.

Q.   All right.

A.   Yes.

Q.   And the references you found are an article by
Gropper, and that reports on three cases -- three case
reports; is that right?

A.   The name -- your memory for names is better
than mine.  As I recall --

Q.   Well, why don't you just tell me --

Page 32

tulloch 10 8 08.txt

A.   -- there were -- two groups of cases were both from Canada.  If you'd like to look them up -- they were both from Canada.  They were temporally, not directly related.

Q.   What do you mean they were temporally, not directly related?

A.   Well, they weren't -- they weren't exactly the same time, which meant I felt they were probably not the same case.

(Exhibit Nos. 23 and 24 marked.)

Q.   (BY MS. THORPE)  Okay.  Doctor, I'm going to show you what's been marked as 24 and 25 -- I've already marked that one -- gosh, let me start that over.

Doctor, I'm going to show you what's been marked as 23 and 24 for identification.  And I want to ask you if those are the two articles or two documents that you've identified as being supporting your opinion that Seroquel causes pancreatitis.

A.   Yes, ma'am.  Let me start by saying -- it's a little misleading because the first page on page 23 relates to muscle damage from Seroquel.  The pancreatitis starts at the bottom right-hand side and goes on to the other -- to the next pages, yes.

Q.   And is this all of the scientific literature that you have identified in your search supporting your opinion that Seroquel causes pancreatitis?

A.   It is what came up at the time that I ran the literature search about four months ago, yes, ma'am.

Q.   And Exhibits 23 and 24 reflect the totality of the scientific literature upon which you rely for your opinion that Seroquel causes pancreatitis?

A.   As of this time, yes.

Q.   And you will agree with me that Exhibit 23 is a case series involving three cases, correct?

A.   That's correct.

Q.   And you will agree with me that Exhibit 24 is a -- is similarly a case series, correct?

A.   Yes, ma'am, I see 11 reported cases in that -- in that reference.

Q.   And you will agree with me that there is -- that pancreatitis occurs in people who don't take Seroquel, correct?

A.   Oh, yes.

Q.   There's a -- this is a chronic disease that occurs in the population, generally?

A.   No, ma'am.  I think if we need a brief treatise on pancreatitis, let me be brief.  But there is -- chronic pancreatitis which you're referring to is usually considered a slightly different condition.  It's often associated with alcohol, sometimes it's associated with autoimmune conditions.  Acute pancreatitis is something which has been reported after some medications, and sometimes it's seen after presence of gallstones causing bile to go up the pancreatic duct.

Q.   So your -- your opinion is that Seroquel causes acute pancreatitis?

A.   I -- that's -- as I read these cases here, yes, ma'am.

Q.   In 23 and 24?

A.   Yes, ma'am, in references 23 and 24.

Q.   These case reports?

A.   Yes, ma'am.

Q.   Okay.  And you will agree with me that acute

Page 33

tulloch 10 8 08.txt
pancreatitis occurs in people who don't take Seroquel,
right?
     A.  I said that it can happen with gallstones, yes,
ma'am.
     Q.  And so in order to determine whether or not
Seroquel causes pancreatitis, you would agree with me
that you would have to have a study that has a control
group that controls for the fact that pancreatitis
occurs in people who don't take Seroquel?
     A.  Ma'am, I think -- I think we're getting a
little bit confused here.
     Q.  If you can tell me whether you agree or
disagree with that statement, you can just say yes or
no.  If you don't agree, that's fine.
     A.  When an adverse effect comes out, one cannot
produce a case control study for every adverse effect.
Let me go to one that I spent quite a lot of time on,
which is Rezulin and toxic hepatitis.
     Q.  Let me just make my record here --
     A.  Okay.
     Q.  -- and then you can finish, Dr. Tulloch.
     A.  Okay.
          MS. THORPE:  I move to strike your answer
as nonresponsive because that's not at all what I asked
you.
     A.  Okay.  Well, let me answer your question, then.
Your question was for my statement to be correct, there
would have to be a case control study.  And my answer is
no.  And I gave you an example which you have refused,
and I accept your refusal.
     Q.  Dr. Tulloch, do you agree that in order to
establish whether or not Seroquel causes pancreatitis,
you need to have a control study, either a cohort study
or a case control study or some other study, that has a
control group that accounts for the fact that acute
pancreatitis occurs in people who aren't taking
Seroquel?
          MR. PIRTLE:  Objection, asked and answered.
     A.  Ma'am --
          THE WITNESS:  Do you want me to answer?
          MR. PIRTLE:  Yes, go ahead and answer.
     A.  What I have to start with by saying is in
medical field there are isolated aberrant case responses
which are reported in the literature.  Some of them are
so rare that we have to accept them as unique to the
combination of that particular patient and that
particular medication.
          And I now bring back, if I may, the Rezulin
example.  Toxin hepatic necrosis occurs in 1 patient in
80,000.  It would not be possible to get enough numbers
for a case control study to prove that Rezulin caused
hepatitis of that magnitude without accepting case
studies.
     Q.  (BY MS. THORPE)  Let me ask you --
     A.  Many other causes of acute hepatitis occur.
This one was nailed to Rezulin and stuck.
     Q.  And -- well, let me ask you, Doctor:  What is
the prevalence of acute pancreatitis?
     A.  Without looking it up, I couldn't give you the
answer.  It's a relatively rare condition as seen by me
in the emergency room.  However, globally in the country
there's probably a case occurring once or twice a week
if not more frequently.  So --
                              Page 34

tulloch 10 8 08.txt

Q.   Do you have any data at all on the prevalence of pancreatitis?

A.   Haven't looked it up because --

Q.   You have no idea?

A.   -- all I needed was association between it and another atypical antipsychotic.  And time will educate us.  As we get more experienced with these cases of -- with these medications, we'll know better.

Q.   You agree that there is an association reported in two case series that have been marked as 23 and 24, correct?

A.   We are in agreement with that.

Q.   And you understand that an association reported in a case series is not the same thing as causation?

A.   Absolutely.

Q.   Looking at Exhibit 23 -- well, strike that.

Nevertheless, in spite of knowing that an association is not causation, you were willing to write in your report that's been marked as Exhibit 22 -- exhibit?

A.   Twenty-one.

Q.   Strike that.

In spite of knowing that an association is not the same thing as causation and that an association in a case series is not the same thing as causation, you were willing to write in your report that's been marked as Exhibit 21 that Seroquel is a cause of pancreatitis, correct?

MR. PIRTLE:  Objection, form.

A.   To the best available data as I interpret it, yes, ma'am.

Q.   (BY MS. THORPE)  And you are aware, are you not, that no one in the world's literature on Seroquel has said that Seroquel causes pancreatitis?

A.   Ma'am, may I ask you to go back to my report on page 9?

Q.   Yes.

A.   Okay.  The wording which I used, which I quote, "Moreover, administration of Seroquel has been shown to be associated with the development of acute and fatal pancreatitis."  Those were my words.

Q.   I'm going to direct your attention to the first paragraph on page 9 under the atypical antipsychotics and diabetes.

A.   Okay.

Q.   If you look at the sentence that is the -- the third sentence of that paragraph, do you see the sentence that says, "After reviewing the medical literature, I am of the opinion that Seroquel can cause weight gain, dyslipidemia, diabetes, and pancreatitis."

A.   Okay.

Q.   Do you see that sentence?

A.   Yes, ma'am.

Q.   Is that misstated?

A.   Well, I guess it's -- it's misinterpreted, then, because I then went back to the next sentence -- or two sentences down and clarified the association of acute and fatal pancreatitis.

Q.   So --

A.   So I guess the earlier statement could be -- could be interpreted as being clarified by the pancreatitis sentence.

Q.   Well, let's just get it clear on the record

tulloch 10 8 08.txt
here in this deposition.
    A.   Okay.
    Q.   It is your opinion that Seroquel is associated
with pancreatitis, but there's not enough evidence to
say that it is a cause of pancreatitis.  Do you agree
with that statement?
    A.   I think that's a reasonable statement on the
best available data.
    Q.   All right.  I apologize if I've asked you this
question.  But have you reviewed any reports of any of
the other expert witnesses --
    A.   No, ma'am.
    Q.   -- in any of these cases?
    A.   I think we've asked that before.
    Q.   I did.
    A.   And that's okay.
    Q.   And I apologize.
    A.   Don't worry about it.
    Q.   I couldn't remember.
            Before forming your opinions about
Mr. Unger, you did not review his deposition or his
wife's deposition --
    A.   No, ma'am.
    Q.   -- correct?
            And you did not review the deposition of
his endocrinologist, Dr. Quintero; is that right?
    A.   That's correct.
    Q.   And you did not review the deposition of his
internal medicine doc, his --
    A.   That's correct.
    Q.   -- internist, right?
    A.   That's correct.
    Q.   And you didn't review any of his psychiatrists'
depositions, correct?
    A.   That's correct.
    Q.   You didn't read any depositions, correct?
    A.   That's what I stated for Ms. Whittington, and
that applies to Mr. Unger as well, yes.
    Q.   Okay.  Now, in -- on the -- in the second
paragraph on page 11 of your report on Mr. Unger, you
say, "Based on reasonable medical probability, the
excess weight gain Mr. Unger experienced as a result of
the administration of the atypical antipsychotic
Seroquel was a cause of his developing diabetes," right?
    A.   Yes, ma'am.
    Q.   The mechanism by which you're contending that
Seroquel caused diabetes in Mr. Unger was gaining
weight, right?
    A.   That's the best explanation that we have at
this time.  One of the other atypicals does seem to have
a direct insulin resistance-inducing effect.  And
clearly, I will be looking for other data that might
relate Seroquel to a similar secondary effect besides
weight gain.
    Q.   Okay.  But in -- let's just focus on Mr. Unger
for a minute.  The only mechanism by which Seroquel
caused diabetes in Mr. Unger, as far as you know today
as we sit here, was through weight gain, right?
    A.   Yes.
    Q.   You're not contending that there is any
evidence anywhere that there was a direct effect of
Seroquel on Mr. Unger that would have caused him to have
diabetes other than through the mechanism of weight
Page 36

tulloch 10 8 08.txt

gain?

A.   That's correct.

Q.   All right.

A.   But I left that paragraph at the bottom of all of these reports, which is if something does turn up between now and -- and court, I reserve the ability to bring that out.

Q.   And you and I have an agreement that because of your paragraph, that if something does come up, you'll let Mr. Pirtle know and you'll give me the opportunity to examine you about any -- any information like that, right?

A.   We will indeed, ma'am, yes.

Q.   And you know that if you -- if I don't hear about it when and if this case ever goes to trial, I will say to you on the stand that I wanted to know if you had any additional information as reflected in that paragraph.  You understand that -- that you'll -- I'll ask you about that later --

A.   Yes, ma'am.

Q.   -- right?

A.   And we agree that my approach to these issues is to share data as much as possible.

MR. PIRTLE:   And you understand I'll probably object when that happens.

Q.   (BY MS. THORPE)  I'm just telling you.

Now, you're saying that weight gain -- let me just ask you the same question about Ms. Whittington just to go back for a minute.

The mechanism by which you contend Seroquel caused diabetes in Ms. Whittington was weight gain, right?

A.   To the best of my understanding, yes, ma'am.

Q.   And you're not making the argument that there was some sort of direct effect on the pancreas in either Ms. Whittington or Mr. Unger by Seroquel, correct?

A.   By Seroquel, yes, ma'am.  Remember, the previous patient had had Zyprexa.

Q.   Right.

A.   So on current best available knowledge --

Q.   Right.

A.   -- yes.

Q.   And as to Ms. Whittington, because she took -- well, strike that.

You believe that Zyprexa has a direct effect on the pancreas, correct?

A.   There was one study.  Clearly, I only quote one study because we don't have any more.  So it's -- it's only that single study.

Q.   And you included that single study in your reliance list, did you not?

A.   It's -- it's present, yes.

Q.   It's --

A.   Because sometimes --

Q.   If you identify the study --

A.   Yes, ma'am.

Q.   -- on page -- I think it's on page --

A.   I will -- I'll find it for you.  It's page 16.

The reason for it being -- it seems that these atypicals include two which are different from all of the others.  So I am cognizant of Eben Blucher's work and would look for somebody else to take the trouble to repeat it with other atypicals, and if that study were

Page 37

tulloch 10 8 08.txt
to be done, then I would reserve the right to bring it
up.  It hasn't so far been done.
     Q.  All right.  Tell me the name of the study that
shows that Zyprexa has a direct effect on the pancreas
that's included in your reference list that's part of
Exhibit 21.
     A.  Yes, ma'am.  The name of the gentleman is Eben
Blucher, E-b-e-n B-l-u-c-h-e-r.  And it's on page 16,
the fifth reference down.
     Q.  And you can not rule out in Ms. Whittington
that Zyprexa had a direct effect on her pancreas that
ultimately caused her to have diabetes, correct?
     A.  I cannot rule it out.  I think that's correct,
yes.  If -- I'm looking for double negatives in your
question.  It is possible that an Eben Blucher
phenomenon was relevant in Ms. Whittington.
     Q.  And --
     A.  But we do not have any data that Seroquel has
the same features as Zyprexa.  So I leave -- as a
scientist, when I say look at the best data and ask if
all rats have tails, therefore, would all tails belong
to rats.
     Q.  Now, you said there were two -- two drugs that
were different from Seroquel, I think --
     A.  Yes, ma'am.
     Q.  -- in one of your -- dialing back a few minutes
ago.
     A.  Yes, ma'am.
     Q.  What are those two drugs that you are --
     A.  Those are Abilify and Geodon.  They do not seem
to cause weight gain, they do not seem to cause
diabetes, they do not seem to cause, et cetera.  And,
again, I would leave the statisticians in this world to
give you better data on that.
     Q.  The -- you cannot rule out that the direct
effect of Zyprexa was the sole cause of
Ms. Whittington's diabetes, correct?
     A.  I -- I would agree with that, yes.
     Q.  Now --
          (Exhibit No. 25 marked.)
     Q.  (BY MS. THORPE) -- let me show you what's been
marked as Exhibit 25 for identification.  And in your
list of medical records that you say you've reviewed,
you said you reviewed records of Memorial Hospital
Pembroke, right?
     A.  Yes, ma'am, if it was on the list I did.
     Q.  Isn't it correct that there are no records of
Memorial Hospital Pembroke regarding Mr. Unger?
     A.  I -- I see that what you gave me is nothing but
a RecordTrak.
     Q.  Well, it says there are no records, right?
     A.  That's correct.
     Q.  Do you -- can you look on your disk and tell if
there are any records for Mr. Unger from Memorial
Hospital Pembroke?
     A.  Yes.  But would you give me time.  I mean,
let's do it on another evening.  I have a number of
disks in here.  I would have to find --
     Q.  Okay.
     A.  -- all the Unger ones.
     Q.  We're going to see each other tomorrow.  Would
you check that?  That would be great.  So that will be
your homework.  Okay.  Is that all right?
                                        Page 38

tulloch 10 8 08.txt

    A.   Yes, teacher.
          (Exhibit No. 26 marked.)
    Q.   (BY MS. THORPE)  Okay.  I'm going to show you
what's been marked as Exhibit 26 for identification.
    A.   Hang on, ma'am, let me just catch up.
Memorial -- Richard Unger and Memorial, that's what I'm
looking for?
    Q.   Right.  Here I gave you 26.
          Let me show you what's been marked as
Exhibit 26 for identification.  And that's a letter from
Medicaid, right?
    A.   Yes, ma'am.
    Q.   And it says there are no records from Medicaid
for Mr. Unger, right?
    A.   Yes, you're correct on that.  And I have it
listed.  Let me see if I have it on this list, Medicaid,
yes.  So I -- I worked through a list of -- of
references.  And, again, I'll need to look on the disk
and see if there's anything on that.
    Q.   Okay.  If you can do that.
    A.   So Memorial and Medicaid, yeah.
    Q.   All right.  Thank you.  So we'll take that up
tomorrow --
    A.   Yeah.
    Q.   -- evening.
          So -- so in your opinion in your report
when you say, "Excess weight gain caused Mr. Unger to
develop diabetes," you say it's a cause of his diabetes,
right?
    A.   Yes.
    Q.   That Seroquel is -- let me get the exact
wording.
          You say that Mr. Unger -- based on
reasonable medical probability, the excess weight gain
Mr. Unger experienced as a result of his -- of the
administration of the atypical antipsychotic Seroquel
was a cause of his developing diabetes, right?
    A.   That's correct, ma'am.
    Q.   All right.  So tell me what the other causes
are of his diabetes.
    A.   I go back to page 10.  I'll refer you to the
second paragraph.  And we would start with he was
getting treatment for hypertension, hyperlipidemia.
Those would be the two.  I do not remember seeing a
family history of diabetes in this man.  So there was --
he was a cigarette smoker.  That was the other thing.
          So hypertension, hyperlipidemia, cigarette
smoker, psychosis would be four reasonable ones that I
can pull up immediately.
    Q.   Okay.  So are those all of the conditions that
Mr. Unger had before he took Seroquel that you believe
are causes of diabetes?
    A.   Contributing causes, yes, ma'am.
    Q.   Okay.  That's the whole list?
    A.   All I have at present.
    Q.   And have you -- how do you rule out those
conditions that you just named, hypertension,
hyperlipidemia, cigarette smoking, and psychosis, as
causes of his -- as sole causes of his diabetes?
    A.   Well, again, we come back to the parable of the
camel.  If he had all of those when he weighed weight X
and six months later he weighs X plus 100 pounds, still
has all those conditions but has developed diabetes, my

tulloch 10 8 08.txt
contention would be the two issues that would have
contributed to diabetes would have been the weight gain
and the passage of six months of time.
     Q.   So -- so you're saying that if you have a
significant -- if a person has a significant weight gain
and they are hypertensive, they have hyperlipidemia,
they're cigarette smokers, and they have psychosis,
within six months they'll have diabetes?
     A.   No, ma'am, no.  What I took was the example.
I'm sorry, you took my example and turned it upside
down.
     Q.   I'm trying to understand it.
     A.   What I said was if a patient was weight X and
six months later after having been given a medication he
weighed X plus 100 pounds and all of the other
conditions were stable, on the best available evidence,
my comment in that hypothetical case would be that the
cause of his diabetes was six months of additional
age -- remember age is a factor -- plus the hundred
pounds that he gained in weight.  Those are the only two
variables which have occurred that we were able to
identify in this hypothetical case.
     Q.   Well, I'm not asking --
     A.   Now, we'll come to this case.  And what I tried
to do for the Court on the bottom of page 10 was to look
at the weight issue and to look at the gain in weight,
which by my calculation was 45 pounds, and say in my
view on reasonable probability, the addition of
45 pounds, plus if Seroquel has any, let us call it,
Zyprexa-like effect, the initiation of his diabetes
was -- those were the two variables that came in during
that time span.
     Q.   So what you're saying is that the fact that he
took Seroquel and then gained 45 pounds and then got
diabetes, that time sequence of events is the basis of
your opinion that he -- that Seroquel caused him to have
diabetes?
     A.   With -- with reasonable medical probability,
yes, ma'am.
     Q.   Okay.  So it's --
     A.   And I go back to the camel and the straw and
the camel's back.
     Q.   So it's the -- it's the sequence in time of
taking Seroquel, then gaining weight, and then
developing diabetes.  That is the basis of your opinion,
right?
     A.   I believe was the best medical probability,
yes, ma'am.
     Q.   Okay.  So I go back to my question that I asked
a minute ago.  How do you rule out hypertension,
hyperlipidemia, cigarette smoking, and psychosis as the
sole causes of Mr. Unger's diabetes?
     A.   I go back to my analogy.  To the best of my
belief, those were present and stable during his time of
weight gain.  He still had hypertension, he still had
hyperlipidemia, he was still psychotic.  The changes
that occurred during the time that we're reviewing were
the presence of another medication and the presence of a
total gain in weight of 45 pounds and the fact that the
medication under review is associated with the
development of both weight gain and diabetes.
     Q.   So if Mr. Unger came into your clinic and he
had hypertension, hyperlipidemia, he was a cigarette
Page 40

tulloch 10 8 08.txt
smoker, and he was a psychotic and he had never taken
Seroquel by history and he had diabetes, what would you
say was likely the cause of his diabetes?
     A.   In that case the maximum medical probability
was the period of time -- remember, age is one of
them -- and the weight gain, whatever its cause, and the
cause may have just been change in diet or change in
physical activity.
     Q.   Okay.
     A.   I mean, what I tried to do is give you my
interpretation of the best available data.
     Q.   Well, I'm -- I'm -- let's postulate there's no
change.  He comes in, he has -- do you have -- let me
just ask you this.
          Do you have patients who are hypertensive,
have hyperlipidemia, smoke cigarettes, and who have
diabetes?
     A.   Do you mean have diabetes or develop diabetes
during a period of time?  Because the answer to both is
yes.
     Q.   Okay.  Well, you -- right.  That's fine.
          And you have patients that meet those --
that have those conditions who aren't taking Seroquel,
right?
     A.   That's correct.
     Q.   All right.  So if in a patient like that who
comes into your clinic who has hypertension,
hyperlipidemia, and smokes cigarettes, setting aside
psychosis, just -- just those three things --
     A.   Yes, ma'am.
     Q.   -- and they're not taking Seroquel and they
develop diabetes, what do you tell them caused their
diabetes?
     A.   I go back to what we've -- we've discussed.
In -- in somebody with a family history of diabetes --
     Q.   I'm asking you those three things.
     A.   -- time is a major issue.
     Q.   Dr. Tulloch --
     A.   We go back to time.  Time is a major issue,
because as we said, I go back to my early analogy, and
you can pull it in any time you like.  Somebody who
develops -- who inherits family history of type 2
diabetes might get it at the age of 105 or get it at the
age of 25.  And if you stack in all of those numbers,
the likelihood of them developing it at 25 becomes much
higher.  If none of those numbers are present and he has
that gene pool, he might develop type 2 diabetes at the
age of 105.
     Q.   How long did Mr. --
     A.   Does that help you understand?  I'm trying to
make it simple.
     Q.   I think I understand perfectly what you're
doing.
          How do you -- how long did Mr. Unger have
hypertension?
     A.   I can't give you that data offhand.  I would
have to look back at the chart.
     Q.   Here you go.  Look at your chart that's been
marked as Exhibit 22 and you tell me how long he had
hypertension.
     A.   Okay.  What we have -- at least at the start of
the time line, which is the 2000 -- February of --
07-02-02, he was already on medications for blood
                    Page 41

tulloch 10 8 08.txt

pressure.
        Q.   Do you know how old he was -- actually, to be
fair, you've got --
        A.   We have his age, we have his date of birth.
        Q.   Dr. Tulloch, you failed to go to the first page
of your time line.
        A.   Okay.
        Q.   So let me just help you out here.
        A.   Sorry.
        Q.   I think your first record is January 25, 2001;
is that right?
        A.   January 25th?
        Q.   Uh-huh.
        A.   Yes, ma'am.
        Q.   That's the first time that you have any
information about --
        A.   This man.
        Q.   -- this fellow.  And Mr. Unger was 52 years old
then, wasn't he?
        A.   Forty-nine to -- that's correct.
        Q.   And so you're missing a half century of medical
history on Mr. Unger, aren't you?
        A.   In his -- it would be in his past medical
history in the chart, but that's correct.
        Q.   Right.  Tell me anything you know about
Mr. Unger before 2001.
        A.   Right now I have summarized what I have here.
For anything earlier I would need to go to the charts of
the physicians listed and pull out the past history.
        Q.   Do you -- do you know right now as you sit here
whether you know anything about Mr. Unger from a medical
record that predates January 25, 2001?
        A.   Yes, ma'am, and I summarized that on page 10.
        Q.   I want you to find me a medical record before
January 25, 2001.
        A.   2000 and --
        Q.   One.
        A.   -- one.  Okay.
             What I have summarized on page 10 is that
he sustained a back injury in 1997, and it gives the
levels which were injured.  It describes that he later
had a problem with infection in an area of his back, and
he then had a cervical fusion in 1990.  So all of these
antedate the date that you mention.
        Q.   That's not my question, Dr. Tulloch, just to
save you the energy.  My question is:  Do you have any
medical records that are dated before 2001?
        A.   Okay.  I -- without looking at the chart, I
can't --
        Q.   Okay.
        A.   -- tell you.
        Q.   Can you make a note to find that out?  I
promise I won't give you any more assignments.  That
will be my last --
        A.   Okay.  Earliest Unger records.
        Q.   Right.
        A.   Okay.  I have Memorial data, Medicaid data, and
earliest records on Unger other than -- well, I have to
point out that when a patient tells you this happened in
this year and this happened in that year, that's the
patient's medical history.  Sometimes that's all we get,
because they don't --
        Q.   Right.

                          Page 42

tulloch 10 8 08.txt
A.   -- have medical records come with them.
Q.   You didn't talk to Mr. Unger?
A.   I have to have the secondhand from the physicians who saw him.
Q.   So you -- other than what you wrote about in your report in Exhibit 2 about his --
A.   Past medical history.
Q.   No.  Other than what -- let me finish my question.  Okay?
Other than what you wrote in your report about his back injury in 1997, you don't know anything about his 50-year history, do you?
A.   Ma'am, I -- I tell you all I have is what's written there.
Q.   Okay.  And so I'm correct, right?
A.   To the best of my knowledge, that's correct.
Q.   All right.  So would you agree with me that hypertension, hyperlipidemia, psychosis, and cigarette smoking can be the sole causes of diabetes in people -- in some persons?
A.   In the absence of any other contributing factor, yes.
Q.   And it's only if -- okay.  That's -- strike that.
What is the -- have you quantified the contribution of hypertension to Mr. Unger's diabetes?
A.   No, ma'am.  And for the Court I would leave it at -- just at that.  I will -- for our science there was a paper by a Italian man called Feranini who looked at adult Italian males with hypertension and showed they had significant insulin resistance.  So I believe the -- for our understanding of this statement, it's through the mechanism of insulin resistance.
Q.   Okay.  But I'm asking you if you have quantified the contribution of this cause to Mr. Unger's diabetes.
A.   No, ma'am.  As I said, it's one of the factors.  And I go back to the camel's -- camel's saddle.
Q.   So you can't put a number on it?
A.   No, ma'am.
Q.   And you have not looked in the science to see what relative risks are associated with hypertension and diabetes?
A.   Other than the article of Feranini which was interesting for our understanding the mechanism, no.
Q.   Does it report a relative risk?
A.   No, because I think we go back to the camel.  It would depend on the level of all the other factors that relate to the patient when they develop diabetes, how much --
Q.   Does Feranini talk about camels?
A.   He talked about high blood pressure and insulin resistance.
Q.   All right.  Does he give a relative risk?
A.   No.  He talks about a mechanism.
Q.   Right.  Did you when you did your Index Medicus search look for the relative risks for any other kind of numerical quantification of the contribution of hypertension to diabetes?
A.   No, ma'am, because to my knowledge, the main issue related to the atypicals was weight gain and the development of diabetes and then the other complicating factors.
Page 43

tulloch 10 8 08.txt
Q.   But you understand Mr. Unger --
A.   I agree --
Q.   -- had hypertension before he took Seroquel?
A.   I understand that --
Q.   Right.
A.   -- and I do not have data that would quantify
it.
Q.   Okay.  So if you -- if you don't have data that
quantifies the contribution of -- of hypertension to
diabetes, how can you conclude that Seroquel was the --
was a cause of his diabetes?
A.   My main basis --
Q.   Let me rephrase that question because that
wasn't a good question.
A.   Okay.
Q.   Is it your opinion in Mr. Unger that Seroquel
more likely than not caused Mr. Unger to have diabetes?
A.   Yes, ma'am.
Q.   So you understand that's a quantitative kind of
opinion, right?
A.   Yes, ma'am.
Q.   So if you don't know the contribution that
hypertension made to diabetes, how do you know -- how do
you know that hypertension wasn't a hugely bigger cause
than Seroquel?
A.   What we have available in the way of data on
this man was that during the time he took Seroquel,
there was a total increase in body weight of 45 pounds.
All the other factors, as far as I understood from the
chart, were stable.
        So I go back to my analogy.  If a patient
is point X, weight gain of 45 pounds, point X plus 45,
develops diabetes, all other conditions have been the
same, the two factors that would have been relevant in
the development of that person's diabetes is the time
from the first observation to the second observation and
the medication which he took if it's of the groups that
cause the onset of diabetes.  And we have a number of
them.  Tonight we're discussing Seroquel.
Q.   So what you're saying is that there was a
temporal relationship between the Seroquel and the
weight gain and then the diabetes --
A.   That's --
Q.   -- is that right?
A.   -- correct --
Q.   And that's --
A.   -- the best of my interpretation of this data,
yes, ma'am.
Q.   All right.  And you say that his hypertension
and hyperlipidemia were stable, right?
A.   I said that to the best of my knowledge, they
were, ma'am, yes.
Q.   All right.  Let me ask you to point to me in
your Exhibit 22, this time line that you rely upon, any
reference to the stability of his blood pressure or that
allows you to conclude that his blood pressure was
stable.
A.   Okay.  What we have is a list of his
medications on page 2, which include Norvasc and
Maxzide.
Q.   Okay.  How does that show that his hypertension
is stable?
A.   No, it just lists his medications.
                    Page 44

tulloch 10 8 08.txt

Q.   Okay.  I want to know what on Exhibit 22 shows
you that his hypertension was stable.

A.   Okay.  No, I do not have data on that.  I would
have to go back and look at the references which relate
to his physicians' visits as they were listed on page 10
and look at the levels of blood pressure.

Q.   What is the contribution of -- I'm sorry.  Say
that last -- what you just said again.

A.   Look at the levels -- your question was was his
blood pressure stable.  Stable blood pressure is one
which measures in an adequate level for treatment by our
definition of an adequate blood pressure.  And I have
not focused on that as a variable other than that he had
high blood pressure and has constant treatment for that.

            If you need an answer to that question, I
would need to find the blood pressure numbers and chart
them out like we charted out the body weights.

Q.   And you didn't do that?

A.   I have not done it.

Q.   All right.  So what is the basis of your
opinion that his blood pressure is stable?

A.   In my belief that when I looked through the
chart, there was no major periods when his blood
pressure was registered as wildly abnormal and the fact
that his medications were not significantly altered
during the time of this weight gain.

Q.   And that's why it's important to know when you
first started looking at the medical -- what the first
medical record you have is for doctor -- for Mr. Unger,
because it's my belief you don't have any records before
January of 2001.  So --

A.   2001?

Q.   Yes.

A.   Okay.

Q.   And I want to know how -- what period of time
you know his blood pressure was stable.  Okay?  So
that's why I need you to check.

A.   Oh, okay.

Q.   So is it fair to say that you have not
quantified the contribution of the causes of
hyperlipidemia, cigarette smoking, and psychosis to
Mr. Unger's diabetes?

A.   I have not considered them to be other than
stable during the duration of these -- the time when he
gained 45 pounds in weight under the administration of
the atypical antipsychotic Seroquel, yes, ma'am.

Q.   So you have not quantified the contribution of
those conditions to causing his diabetes?

A.   Yes, ma'am.  And what I said, in my view it was
reasonable medical probability to assume that they were
stable.  There had not been major comments in the
change, but if the issue becomes under question, I'm
happy to review that.

        MS. THORPE:  Move to strike as
nonresponsive.

Q.   (BY MS. THORPE)  Mr. Tulloch -- I mean
Dr. Tulloch, I want to know whether or not -- yes or
no -- have you quantified the contribution of
hyperlipidemia, cigarette smoking, and psychosis to
Mr. Unger's diabetes.

A.   Ma'am, I have said that they were an additive
and contributing factor.  You're asking me to say were
they 60 percent, 80 percent, or 99 percent --

Page 45

tulloch 10 8 08.txt

Q.  Or you haven't done it.
A.  I do not have that data.
Q.  Okay.
A.  I do not believe it's there.
Q.  Okay.
A.  I did bring you two nights ago our best
estimate from a clinical study on the risk relationship
between gaining weight, and that's there in the record.
And we'll leave it in the record.  I don't want to dig
it up again.
Q.  All I need to know is whether you're -- you
have a number that you've attached --
A.  Okay.  No, I --
Q.  No, you haven't --
A.  No.
Q.  -- right?  For hyperlipidemia, cigarette
smoking, and psychosis, you have not attached a number?
A.  No, ma'am.
Q.  Now, you did attach a number for
Ms. Whittington the other night.  You said 33 percent.
Do you remember that?
A.  Yes, ma'am.
Q.  Okay.  You're not doing that for Ms. Unger?
A.  I'm not willing to do that unless you push me
to -- unless you insist I have to produce a number.  I
don't think that --
Q.  I'm asking you what you've done.
A.  Yes.
Q.  If you say no --
A.  No.
Q.  -- that's --
A.  What I said was --
Q.  No, I'm not asking you what you said.  I'm
asking you as to hyperlipidemia, cigarette smoking, and
psychosis and Mr. Unger you've not come up with a number
contribution --
A.  No.
Q.  -- correct?  All right.
          Now, how -- you're saying that because
these conditions in your opinion more likely than not
were stable, the hypertension, hyperlipidemia, cigarette
smoking, and psychosis were stable in Mr. Unger, that
they could not be sole causes, right?
A.  Yes, they were more likely than not were not
likely to be or were -- let's take away the double
negative -- that they were unlikely to be the sole
causes.
Q.  Because they were stable?
A.  Yes, ma'am.
Q.  Why does being stable make it more likely than
not that they weren't causes?
A.  Well, because the one big variable which is
apparent during the time line during which he developed
diabetes was a 45-pound weight gain.
          MS. THORPE:  Move to strike as
nonresponsive.
Q.  (BY MS. THORPE)  Dr. Tulloch, I don't
understand and I want you to tell me why the fact
that -- let's just take one of them -- hypertension is
stable in someone.  What does that mean?
A.  What that means is that under the medications
which he was receiving, a blood pressure which had
previously been high remained at a clinically acceptable
Page 46

                              tulloch 10 8 08.txt
level for the standards of good medical care.
     Q.   So you mean normal?  His hypertension -- he
wasn't hypertense?
     A.   High blood pressure for normal -- nondiabetic
subjects is defined as in excess of 140/90.  Adequate
blood pressure would be defined as less than 130 over
less than 80 or 85.  And if all of his numbers in his
chart were of the second category while he was
maintained on the medications listed, in my view, those
were -- the blood pressure was well controlled.
     Q.   What do you mean by psychosis is stable, that
the psychosis was stable?
     A.   You're reading too much in my data.  It's -- as
far as I understood, he was -- there was no major change
in his mental state during the time that he was under
treatment.
     Q.   Under treatment for what?
     A.   What we had --
     Q.   Under treatment with what?
     A.   When we were going -- during the time that he
had gained 45 pounds in weight.  What I'm trying to do
is isolate out one major contributing factor --
     Q.   I know that.
     A.   -- during this time and the --
     Q.   I get that.
     A.   -- contributing factor is 45 pounds in weight
gain which occurred while he was taking an atypical
antipsychotic.
     Q.   All right.
     A.   I will be happy to grant you that all of the
other factors are out there.
     Q.   All right.  Let me ask you --
     A.   And I will be happy to -- let me finish.  And I
will be happy to speculate on their quantitation but not
be pinned down to numbers because I don't believe the
numbers would be anything other than illustrative.
     Q.   I want you to tell me if there were any other
causes of Mr. Unger's weight gain other than, in your
opinion, Seroquel.
     A.   In my view, again -- and you being -- asking me
how to define stable -- in my view, there was not a
major change in the other factors that relate to weight
gain.  In other words, I did not read in his chart at
that time an exacerbation of his previous damage to his
back or his cervical spine and had, therefore, read that
as those were present, contributing to his risk for
diabetes but not major contributing factors in the
presence of 45 pounds in weight gain.
     Q.   Okay.  So what was the period of time that the
45-pound weight gain occurred in?
     A.   We have -- and I'm reading from the last
paragraph on page 10.  His weight is recorded in June
2003 as 2,000 -- 282.  He then was on several doses of
Seroquel.  And so I rounded them all off to a total
increase of 45 pounds.  So on the various doses of
Seroquel, he gained 45 pounds.
     Q.   Looking for the time, sir.
     A.   And the time interval would be from 4 of '04 to
9 of '05.
     Q.   It's during that period of time you think he
gained 45 pounds?
     A.   Forty-five pounds.
     Q.   Okay.  And is it your testimony that from April
                              Page 47

```
                              tulloch 10 8 08.txt
```
of '04 to September of '05, there was no exacerbation in
his spine or cervical spine in that period?
        A.   To my best reading of the chart, yes.
        Q.   All right.  And --
              MR. PIRTLE:   When you get to a point.
        Q.   (BY MS. THORPE)  Are there other causes of
Mr. Unger's weight gain besides Seroquel?
        A.   Other contributing causes -- no, not to my
knowledge during that period of time.
        Q.   So the only cause that you know of in your --
your review, your extensive review that you've -- you
believe you've undertaken of Mr. Unger's medical records
is Seroquel?
        A.   Yes, ma'am.
        Q.   You can't think of anything else during the --
this -- the period of time that Mr. Unger was taking
Seroquel that would account for a 45-pound weight gain?
        A.   Other than -- well, we acknowledged the passage
of time to be a contributing factor to diabetes but not
necessarily for the weight gain.
        Q.   I'm focused on weight gain.
        A.   Weight gain.  Focus on --
        Q.   My question is yes or no.  You can't think of
anything else during the time that Mr. Unger was taking
Seroquel that could account for his Seroquel -- account
for his weight gain -- let me start that over.
              You can't think of anything else during the
time that Mr. Unger was taking Seroquel that could
account for his weight gain other than Seroquel?
        A.   That's correct.
        Q.   All right.
              MS. THORPE:   We can take a break.
              (Short recess from 7:19 to 7:29.)
        Q.   (BY MS. THORPE)  Dr. Tulloch, I want to
understand something you said before the break about
your report and this period of time between April of
2004 and September of 2005 as being the period of the
45-pound weight gain.
        A.   Yes, ma'am.
        Q.   I don't think that's borne out by the language
of your report, so I'm trying to find out what you
really mean.  According to your report, he weighed
310 pounds on April 29, 2004, right?
        A.   Yes, ma'am.
        Q.   And then he -- in September of 2005, he weighed
325 pounds, right?
        A.   Right.
        Q.   That's a 15-pound weight gain?
        A.   Yeah.  What -- what -- if you go back --
        Q.   I just want to know the dates.
        A.   Okay.  Yeah, go back to the first half of that
sentence.  What I said was his weight in January of 2001
was 260.  He was given Seroquel; the rate -- the weight
was then 282.  It rose to 310.  And I gave you the
dates.  And then at the increased dose, it rose to 325.
So those.
        Q.   So aren't you --
        A.   -- are the numbers as I -- as I read them.
        Q.   Aren't you comparing June 2003 to September of
'05?  I mean, it comes out to be 43 pounds instead of
45, but I assume you rounded up.  Is that -- is that
what you're -- you're really saying -- I mean --
        A.   Yes.
                                        Page 48

tulloch 10 8 08.txt
        Q.   -- I'm really trying to find out.  I think you
just misspoke.  It's not April of '04, it's June 2003,
isn't it?  The time period --
        A.   Yeah.
        Q.   -- of the weight gain that you were concerned
about?
        A.   That's right.  What I said, the weight is
recorded in June '03 of 282.  We go from 82 to 325.
That's 43.
        Q.   Okay.  And is that where you get your
45-pound --
        A.   That's where I get my 45.
        Q.   Okay.  All right.
        A.   And I believe he was on Seroquel all that time.
        Q.   All right.  So -- so what you're -- you're
telling me is that you can't think of anything between
June 2003 and September 6, 2005, that happened to
Mr. Unger to make him cause weight other than taking
Seroquel, right?
        A.   Reasonable medical probability, yes, ma'am.
        Q.   All right.  Now, the first weight you have for
Mr. Unger, according to your time line -- the time line
that was prepared for you by the plaintiffs' law firm,
is 260 pounds on January 25, 2001?
        A.   That's correct.
        Q.   And you know that Mr. Unger was 5'9", right?
        A.   (Witness nods.)  Yes, ma'am.
        Q.   And his BMI at 5'9" is 38.4, correct?
        A.   You calculated it for me, thank you.
        Q.   You don't have any reason to think I'm --
        A.   No, I'll accept that.
        Q.   And so he was obese before he started taking
Seroquel, correct?
        A.   Yes, ma'am.
        Q.   That's morbidly obese, correct?
        A.   Yes, ma'am.
        Q.   And morbidly means so obese that it can make
you sick, right?  Isn't that what's meant -- what does
"morbidly" mean?
        A.   Being a purist I couldn't give you a definition
without looking it up.  It's -- it's in loose parlance
"very."  But I grew up reading Latin as probably did you
and I -- and without -- without looking up the
derivation I think would just mean "very."
        Q.   So you just mean it's very obese?  That's what
you think "morbidly obese" means.
        A.   Yeah.  Well, there are BMI definitions which I
am purposely avoiding.  But to go back to the linguistic
roots, I would have to go back to the Latin and define
that for you.
        Q.   So -- I understand that you blame Seroquel for
his weight gain from June of 2003 to September of 2005.
Tell me, Doctor:  How did he get to be 260 pounds and
morbidly obese in January of 2001 before he took
Seroquel?
        A.   How did he become?  Well, by the reasons all
other obese folk become.  He was -- he took on more
calories than he burned.
        Q.   Okay.  What happened -- what did he do to cause
himself to take in more calories than he burned before
January 25, 2001, that got him to weigh 260 pounds?
        A.   Do you want me to say anything other than he
took in more calories than he burned?
                        Page 49

tulloch 10 8 08.txt

Q.   Do you know what he did in the way of diet or exercise or anything about his lifestyle that explains how he -- how Mr. Unger got to be 260 pounds in January of 2001 before he ever took Seroquel?

A.   No.  I mean, what we know we've already shared. He had injuries that might mitigate his being a little hypoactive.  He was psychotic and --

Q.   What do you mean by "hypoactive"?

A.   Less -- less inclined to exercise.  And -- and we don't know much about his family, so we don't know if he had a family history of obesity, but that's another possibility.

Q.   Isn't it fair to say that you know absolutely nothing about how Mr. Unger came to weigh 260 pounds?

A.   Well, I -- I think you're being aggressive in that statement.  All we know is that he took on more calories than he burned.

Q.   Can you think of --

A.   That's a fairly reasonable reason for him weighing what he did.

Q.   Can you -- and that's exactly what happened to him after he took Seroquel, right, he took in more calories than he burned?

A.   That's correct.  And the reason why I -- well, let me let you ask the questions.

Q.   And so after he took Seroquel, after he -- Mr. Unger started taking Seroquel -- well, strike that.

Before Mr. Unger started taking Seroquel, you don't know whether he had a habit of eating a gallon of Ben & Jerry's ice cream every day, do you?

A.   Ma'am, I'm not inclined to speculate.

Q.   You don't know.

A.   Clearly, there were calories there.

Q.   You don't know what he did, right?

A.   No.

Q.   And you don't know whether after he started taking Seroquel he picked up the habit of eating a gallon of Ben & Jerry's ice cream every day, do you?

A.   Ma'am, you're -- you're adding the speculation.

Q.   You don't know?

A.   We have no knowledge.

Q.   Right.  Because you've never talked to Mr. Unger, right?

A.   He was not sent to me for interview.  What I will have to say and the reason why I believe Seroquel was a contributing factor was that weight gain and the development of diabetes is present in a group of atypical antipsychotics of which Seroquel is one.  So is Olanzapine, so is Zyprexa.

So in the best available evidence that I have in this patient during this time interval, Seroquel has to be high on that list.  And we're talking about weight gain and then soon we'll be talking about diabetes, and I would have to go back to the analogy of the camel and the -- and the final straw.

Q.   I don't know why that doesn't surprise me, Dr. Tulloch, but it doesn't surprise me that you would go back to the camel and the final straw.

A.   Thank you.

Q.   Can you tell me what it means to be a cause in your mind?

A.   A cause?

Q.   What is a cause?

Page 50

tulloch 10 8 08.txt

A.   A contributing factor.

Q.   A contributing factor and a cause are the same thing?

A.   Well --

Q.   What is a contributing factor?

A.   Well, what -- in clinical context one has to be cognizant of many contributing factors in a condition like type 2 diabetes.  To the best of my beliefs, this man had the causes -- the contributing factors we've list -- if he developed diabetes shortly after a major weight gain, in my view, even for somebody weighing 260 pounds, 43 pounds is a major weight -- major further weight gain.  If he then develops diabetes during that time, my belief is that that was the final straw.

Q.   I'm just asking you what it means to be a cause.

A.   And I'm asking you as a contributing factor.

Q.   Okay.  Then tell me what --

A.   The way I would interpret a cause would be a single contributing factor which was without any doubt, then it's easy to say that was the cause.  A cause would be a number of factors which might contribute to on the best of our available evidence.

Q.   Okay.  And in Mr. Unger's case, there is not a single contributing factor without any doubt that caused him to develop diabetes?

A.   Other than the 45 pounds in weight gain which was the final straw, yes, ma'am.

Q.   Okay.  So you think the 45 pounds was a single contributing factor without any doubt that caused him to have diabetes.  Is that --

A.   Final straw that broke the camel's back.

Q.   I didn't ask you about -- you can say yes or no and then you can say your camel speech.

A.   Okay, ma'am.

Q.   Are you saying that a single contributing factor without any doubt in Mr. Unger is his 45-pound weight gain?

A.   Yes, ma'am.

Q.   Okay.

A.   And remember, any time that there's a time interval, we also have time.

Q.   Okay.  I'll remember that.  I'll try to remember that.  In fact, I think I may think about that philosophically tonight.

MR. PIRTLE:  I'm thinking about this BMI table I'm looking at.  Put it on the record.  It's bull.

MS. THORPE:  Oh, you're worried about your own BMI?

MR. PIRTLE:  Actually, not really, but --

MS. THORPE:  Okay.  I'm sorry.  Don't mean to get personal there.

Q.   (BY MS. THORPE)  All right, Dr. Tulloch.  I want to know -- I want to know if Mr. Unger -- I want to know when you think that he developed diabetes.

A.   What I have here is a weight that relates to the time he developed a very high blood sugar indeed and that sugar is so high that my belief would be there would be sugar slowly rising to that unless there was an acute precipitating factor.

Q.   And I just want to know when you think he developed diabetes.

A.   Well, I'm endeavoring to answer your question

Page 51

tulloch 10 8 08.txt

as well as I can given that 1,590 milligrams is a very
high level.  And sometimes it can be an acute
deterioration that can bring that on.  But usually -- on
September the 7th in 2005, there's a sugar of 544.  And
there are other random sugars which are off the scale
for five occasions and then become in the 300s.
          On the 6th, day before that, there was a
blood sugar just below a thousand, so clearly by that
time his sugars are very high indeed.  Without looking
for a history of polyuria, polydipsia, and weight loss,
one would have to believe that his sugars were rising to
that over at least three months before that.
          So we shared -- we don't get sugars as
frequently as we would like in some of our psychiatric
patients.  So we don't have data from June the 22nd of
'05 until September.  But my belief is that sugar would
have been abnormal at least during that time.
     Q.   I want to know when you think he had diabetes.
When do you think his diabetes began?
     A.   I'm trying to give you my best available data.
     Q.   If you don't know, you can say you don't know.
     A.   What I'm saying is the first grossly abnormal
sugar I have is September the 6th of 2005.  If you look
at the time line, there aren't many other sugars that go
all the way back.
     Q.   So do you not know when he got -- when he
developed diabetes -- it's okay.  If you don't know, you
can say, "I don't know when he got diabetes."
     A.   That's what I was endeavoring to give you was
to -- starting from a sugar of nearly a thousand and go
back.  And I can't tell you when it rose above 126
because we don't have data.
     Q.   So you do not know when Mr. Unger developed
diabetes, do you?
     A.   That's correct.
     Q.   And you cannot say that he had -- that his
diabetes occurred after he took Seroquel.  You don't
know?
     A.   We don't have data on that.
     Q.   So you don't know, correct?
     A.   That's correct.
     Q.   Now, the -- the blood sugars that you were
reading out from --
     A.   September.
     Q.   -- September of 2005 -- let me just ask you in
that -- he was admitted to the hospital in September of
2005.  You're aware of that, right?
     A.   Yes, ma'am.
     Q.   And does that series of blood sugars in your
mind meet the criteria for the American Diabetes
Association for diabetes?
     A.   Yes, ma'am.
     Q.   And so you think that whatever happened to him
in the hospital, those high blood sugars would establish
that he had diabetes?
     A.   Yes, ma'am.
     Q.   Okay.  So your report -- I want to talk to you
about when he took Seroquel.  Okay?  Your report says
that -- says that Mr. Unger started taking Seroquel in
October of 2002, right?  That's -- if you look down at
the third paragraph, it has most of your dose
information.  Do you see that?
     A.   (Witness nods.)  Yeah.  And that's earlier than
Page 52

tulloch 10 8 08.txt
we see it on the time line.
     Q.   Show me on your time line.
     A.   I'm looking at time line, page 3.
     Q.   So this is Exhibit 22?
     A.   Halfway down, February the 28th of '03 is the
first time it's mentioned on the time line.  And so I
must have got that from one of the other sources.
     Q.   You don't know which is right right now?
     A.   No, I -- I believe my report is correct.  I
wouldn't have written it if it wasn't there, but it's
clearly not on the time line.  So I probably got it from
either a clinical chart or a -- you know the printouts
that you get from the pharmacist?  We looked at one with
Whittington, you know, the date when the medication is
prescribed through the pharmacy.
     Q.   Well, let's just see if we can reach agreement
here.  You'll agree that your time line is -- well,
strike that.  Let me just show you --
               (Exhibit No. 27 marked.)
     Q.   (BY MS. THORPE)  I'm going to show you what's
been marked as Exhibit 27 for identification and ask you
if that record doesn't show that on October 17, 2002,
Mr. Unger started Seroquel, 25 milligrams, three times a
day.
     A.   I agree with that.
     Q.   And so your Exhibit 22 is wrong about the dose
of Seroquel, the time line?
     A.   Twenty-two being the time line, yes, ma'am.
And as I said, I -- I got the -- my report came from
somewhere, and clearly it wasn't from the time line.
But thank you for finding the source for me.
     Q.   So now, tell me -- it looks like from your
report that you think he quit taking Seroquel on
September 27, 2006, correct?
     A.   September 22nd, yes, the last but one
paragraph.
     Q.   Right.  Now, is that -- did you get that from
the time line or where did you get that date?
     A.   As you see, there was a comment that he'd
requested to be -- be requested to stop it earlier on.
And I -- I made this report sometime ago, so I can't
recall exactly where it come from.  But at least time
line page 22 is a comment here, "Would like to decrease
and stop Seroquel due to association with increased
blood sugar."  So at least the patient believed that
Seroquel was contributing to his sugar at that time.
     Q.   My question to you is about when he stopped
taking Seroquel.
     A.   Okay.
     Q.   I just want to know the day.  And your chart,
Exhibit 22, doesn't say that he quit Seroquel on
September 27th, it says he quit on October -- there's a
note October 2nd that he quit --
     A.   Okay.
     Q.   -- last night, right?
     A.   I wrote in my report when 9-27-06, the dose,
was stopped, so I got that from somewhere --
     Q.   But you don't know where you got it from?
     A.   Yeah.  Here on page 24 of Exhibit 22 it says,
"Stopped the dose last night."  And that was 10-02.  So
from the time line it would be 10-01, from my report it
would be 9-26, and those were within a few days of one
another.
                                         Page 53

tulloch 10 8 08.txt
Q.  I don't mean to be picky, I just want to be
sure that we agree on what the facts are.
(Exhibit No. 28 marked.)
Q.  (BY MS. THORPE)  I'm going to show you what's
been marked as Exhibit 28 for identification.  And if
you --
MR. PIRTLE:  You don't have another one?
Oh, thank you.
Q.  (BY MS. THORPE)  That's a note dated October 2,
2006, that says, "The patient stopped Seroquel last
night," right?
A.  Okay.  I'll buy that.
Q.  Do you agree that he stopped Seroquel on
October 1, 2006?
A.  Yes.
Q.  So the time period that Mr. Unger was on
Seroquel was October 2002 to October 2, 2006, or October
1, 2006, right?
A.  Yes, I think that's reasonable.
Q.  Now, you have a lot of dose information in the
third paragraph of your report.  Where did you get that?
A.  I wrote that report sometime ago, so I -- I
can't offhand tell you.  My suspicion is it was either
from this time line or from a printout from the -- of
the pharmacy department.
Q.  Okay.  And you don't know which one?
A.  I don't recall, ma'am, no.
Q.  Just so that we'll be clear on the record,
whenever you say time line, you're talking about the
time line prepared by the plaintiffs' law firm?
A.  Exhibit 22.
Q.  Okay.  So your report says that by May 3rd his
Seroquel dose was increased to 400 milligrams a day and
that it tailed off slowly in November of 2004 to
200 milligrams at bedtime and down briefly to
100 milligrams at bedtime on September 11, '05, right?
A.  Yes, ma'am.
Q.  Would you agree with me that Mr. Unger did not
take Seroquel at a 400-milligram dose at any time in
2004, the year before you say he was -- he met the ADA
criteria for diabetes in September of 2005?
A.  Just come back again.  Let me --
Q.  Let me -- let me ask it again.
You agree that Mr. Unger did not take
Seroquel at a 400-milligram dose at any time in 2004?
A.  Tailed off slowly in November 2004 to
200 milligrams.
Q.  Right.  I'm just asking you --
A.  Yeah.  As I read --
Q.  There's an ambiguity in here.
A.  -- this, there was a brief bump up in May 2003,
and as I could see that, it then came down to
200 milligrams from 2000 -- November 2004.
Q.  Let me --
A.  And the 200 milligrams -- seems to be there was
a brief drop to 100, but he went back to 200 after a
recurrence of symptoms, psychiatric symptoms one
assumes.
(Exhibit No. 29 marked.)
Q.  (BY MS. THORPE)  I only have one copy of this,
but I'm going to show you what's been marked as
Exhibit 29 for identification.  And it's a composite
exhibit, sir.  And I want you to tell me whether or not
Page 54

tulloch 10 8 08.txt

during 2004 Mr. Unger took a 400-milligram dose at any
time.

    A.   Okay.   This is dated January of -- 6th of 2004,
and at that time he's getting two 50s and one hundred.

    Q.   All right.

    A.   So that's 200.

    Q.   Right.   There's something for every month in
there.   I just want you to confirm that he was not
taking a 400-milligram dose during 2004.

    A.   Okay.   I believe that what I said here was only
briefly up to 400, and I would have to find off -- find
where that came from, because it came from somewhere.
And what we're agreeing with here is that he definitely
had 200 at bedtime and he got other doses during the
day, either 50 or 25 at morning and midday.

    Q.   Do you agree with me that in 2004 Mr. Unger did
not take Seroquel at a 400-milligram dose?

    A.   I -- I will agree with that.

    Q.   All right.

              (Exhibit No. 30 marked.)

    Q.   (BY MS. THORPE)   Okay.   I'm going to show you
what's been marked as Exhibit 30 for identification.
And that's a compilation of his doses during 2005 up to
just before he went to the hospital in September 2005.

              And my question to you is:   You agree that
Mr. Unger did not take Seroquel at a 400-milligram dose
at any time in 2005?

    A.   I'll agree with that.

    Q.   Okay.   So --

    A.   If these are solo copies, I'm returning them
there.

    Q.   You would agree that Mr. Unger's dose in --
dose of Seroquel in 2004 through 2005 ranged from
200 milligrams a day to 250 milligrams a day and never
went above 250 milligrams a day?

    A.   I think that's a reasonable statement.

    Q.   All right.   After June of 2004 -- and you can
look in this compilation that's been marked as
Exhibit 29 if you want to confirm it -- over a year
before he went into the hospital where you say he was
diagnosed with diabetes in September of '05, he took all
of his Seroquel at night; isn't that right, sir?

    A.   I think that's reasonable, yes.   I saw it in
several of those.

    Q.   Right.   And in July of 2004, again, over a year
before he was diagnosed with diabetes in September of
'05, his dose dropped to 200 milligrams at night?

    A.   I'll accept that.

    Q.   All right.   Now, you say that in -- in your
report that in September -- on September 16th, I think
is what you say, that his dose was raised to 200
milligrams four times a day.   And I want you to tell me
where you find -- where you got that from.

    A.   Well, let's start with where's the statement
and which page of my report.

    Q.   It's in the third paragraph on page 10, the
sentence that begins, "However, his symptoms relapsed
and the dose was increased two days later to
200 milligrams at bedtime."

    A.   At bedtime down briefly to a hundred.   However,
symptoms relapsed, dose was increased two days later to
200 milligrams at bedtime plus 25 three times a day and
then 200 milligrams four times a day on 9-16-05.   So I

Page 55

tulloch 10 8 08.txt
got that from somewhere -- was this '05 that you gave
me?
      Q.  It doesn't include the hospitalization.
      A.  Okay.
      Q.  So --
      A.  I got it from somewhere and --
      Q.  Look at your exhibit.
      A.  -- I'll see if I can try to -- the time line,
see if I got it from there.  9-16-05.  Okay.  Do you
have Exhibit 22?
      Q.  Sure.
      A.  Do you have page 16?  And if you look at the
9-16, which is three-quarters of the way down the page,
discharge medications, Seroquel, 200 milligrams by mouth
four times a day, Dr. Rafael Mas.
      Q.  All right.
      A.  That's where I got it from.
      Q.  All right.  Thank you.
              And you got it from this time line?
      A.  Yeah.  Now, if that doesn't reflect in his
discharge orders, I apologize.  But that's where I got
it from.
      Q.  All right.  Okay.  So -- so you say that --
that you -- you've testified that Seroquel caused
Ms. Whittington to gain 40 pounds, right?
      A.  More likely than not.
      Q.  And you've testified now that Seroquel caused
Mr. Unger to gain 45 pounds between June of 2003 and
September of '05, right?
      A.  I did, ma'am, until you corrected me.  It's 43.
      Q.  Forty-three.
              MR. PIRTLE:  Let me -- I don't want to
interrupt you, but let me bring up a point.  I know that
we're doing these all together, but I would not assume
that you'd want these cases to be tried together.
              MS. THORPE:  No, and you're absolutely
right.
              MR. PIRTLE:  So that questioning pattern is
problematic to me.  You know what I'm saying?
              MS. THORPE:  I'm being very --
              MR. PIRTLE:  I wouldn't play one off the
other unless you want me to make the argument.
              MS. THORPE:  I -- you know, Tom, these
cases should not be tried together, you know that's our
position.  And you know I'm trying to be efficient in
getting through this deposition.
              MR. PIRTLE:  And I think it's just a force
of habit of doing that, and it's probably something I
would do, but you understand my position on it when you
said this and that and this and that --
              MS. THORPE:  Well, I'm not waiving -- I'm
not doing anything about consolidating cases, and I
don't think you're --
              MR. PIRTLE:  You don't want me to stand up
and say they've got 10,000 cases against them, you know,
which I believe I should be able to do.  But anyhow, go
ahead.
              MS. THORPE:  I don't think what question I
ask in a discovery deposition has any impact on the
consolidation of the cases.  That's my position.
      Q.  (BY MS. THORPE)  But anyway, the last paragraph
of your report on page 10 -- I believe it's page 10 --
yeah.  You say after the initiation of Seroquel, the
                        Page 56

tulloch 10 8 08.txt
weight as recorded in June of 2003 is 282 pounds.  Wait
a minute, that's not the right place.  Sorry.  Okay.
              The next sentence, you say after the
increased dose of Seroquel, the weight recorded --
weight is recorded as 325 pounds on September 6, 2005,
about the time of the recorded onset of his diabetes,
right?
     A.  Yes, ma'am.
     Q.  And so you measured the weight gain, as we've
discussed, beginning on June 3, right?
     A.  Yes, ma'am.
     Q.  And the June 3 weights -- June '03 weights and
the September 6, '05 weights are the two key weights in
Mr. Unger's records to establish how much weight he
gained on Seroquel in your opinion, right?
     A.  To a reasonable medical probability, yes.
     Q.  And you agree that it's very important that
your report state the times, the time period, and the
weight gains accurately, right?
     A.  To the best of what can be achieved from the
data, yes, ma'am.
     Q.  And you chose not to include other weights for
Mr. Unger recorded before June 3rd in your report during
the time he was on Seroquel because they're not vital to
your analysis of the cause of his diabetes, right?
     A.  But as I remember, there weren't a lot of
weights.  If you look at Exhibit 22, the best one we
have before he started Seroquel was the first one I gave
you, 260 on January '01.  We don't get any more weights
until the middle of '03.  So that's 18 months when he's
on Seroquel we don't have any data, but by that time --
     Q.  Tell me when you don't have any data.
     A.  -- he's gone up 22 pounds.
     Q.  Tell me when you don't have any data on him.
     A.  On this time line.
     Q.  Yeah.  No, I'm asking --
     A.  If you have them -- if you have them in there.
     Q.  No.
     A.  I'm working from the time line, yeah.
     Q.  But just --
     A.  And then from '03 until he developed diabetes,
we have the numbers which I quoted for you which are up
to 325.  And so there I'm going from page 3 on
Exhibit 22 to page 12 on Exhibit 22.  And there's your
43 pounds.
     Q.  There was a time period you said you don't have
any weights in Exhibit 22.  Can you tell me what that
time period is?
     A.  From January '01 to June of '03.
     Q.  Okay.  And --
     A.  And then from June of '03 to -- well, July of
'03 we got a weight, but then we don't have another one
until April of '04.
     Q.  Now -- but -- but -- let me just get -- go at
it this way.  You're -- you picked June of '03 because
that's about the time you believe him to have been on an
increased dose of Seroquel, right?
     A.  Yes, ma'am.
     Q.  So you picked the weight attached to a certain
dose of Seroquel, right?
     A.  Right.
     Q.  And what is that increased dose?
     A.  Well, before that he was on an earlier dose.
                        Page 57

tulloch 10 8 08.txt
We have him on two 50s and a hundred.  That's 200.  On
6-2-03 is when he goes up to 200 at bedtime.  And that
seems to be fairly stable.  Some of the other days they
add 25s and 50s during the day, but as we mentioned a
moment ago, he gets 100 to 200 at bedtime most nights.
     Q.  Dr. Tulloch, you see on the sentence that's the
fourth line from the bottom of page 10 that says, "After
the increased dose of Seroquel" --
     A.  Uh-huh.
     Q.  -- "the weight is recorded as 325 pounds on
September 6, '05"?
     A.  Uh-huh.
     Q.  What is the increased dose that you're
referring to there?
     A.  Let me go to page 8 on Exhibit 22.  What we
have there is Seroquel, 200 milligrams, take one by
mouth at bedtime; Seroquel, 25 milligrams, take two
tablets by mouth at bedtime.  I make that
300 milligrams.
     Q.  On what day?
     A.  I beg your pardon?
     Q.  On what day?
     A.  7-10-04.
     Q.  Okay.  Is -- you've measured -- we've been over
this before.  You've measured what you say is a 45-pound
weight gain, right?
     A.  Yes, ma'am.
     Q.  And so are you saying in your report that the
45-pound weight gain followed an increase in the dose of
Seroquel?
     A.  No, ma'am.
     Q.  You're not saying that?
     A.  What I'm implying is that on the best of the
data available to me, his weight initially was down at
lower values.  The -- tied to Seroquel without much
doubt in my mind is the increase from 282 to 325, which
we agree is 43 pounds.  And I didn't relate heavily to
the doses.
          Earlier on I said doses went up and down
and they were attempts to wean him off followed by
deterioration of his psychosis and then the dose came
back again.  So I tried to even things up for
simplification, but if this becomes an issue, we can
plot out the dose.
     Q.  I just want to know what you mean by "after the
increased dose of Seroquel."  Is it the July '04 dose
you're talking about --
     A.  Yeah.
     Q.  -- the 300 --
     A.  I mentioned -- yeah, it's July of '04 when he
went up to -- I make that 300 milligrams.
     Q.  Okay.  Is that what you mean by "increased
dose" in your report --
     A.  Yeah.
     Q.  -- right?
          Show me in -- I'm going to show you the
record that's been marked as Exhibit 29, which is a
composite of various -- or all the orders of Seroquel in
2004 and tell me what dose he's on in July of 2004.
     A.  What I see him -- 200 milligrams at bedtime is
definite.  What I see above that is 25 milligrams, two
at bedtime, which would make the 250 doses, but in
handwriting is D/C.  So it may be that that 25 times two
                      Page 58

tulloch 10 8 08.txt

was -- was D/C'd, which means terminated at that date,
and that's two days after this one was written that he
was on 250.

    Q.   I'm really asking you a very simple question,
Dr. Tulloch.  I just want to know what you mean by
"after the increased dose of Seroquel."  In the prior
paragraph, you talk about May of 2003 Seroquel was
increased to 400 milligrams a day.  Is that what you're
talking about?

    A.   On one occasion.  I mean that -- as I read
that, that wasn't for very long.

    Q.   Right.

    A.   And then when they tried to get him down, he
had an exacerbation and then he went back up again.

    Q.   Let me go at it this way because I don't want
to go on about this.  You don't know what you meant by
"increased dose"?

    A.   Well, increased greater than 200 milligrams.
But that's it, I don't -- I don't -- as I sit here, I
don't think he was on 400 milligrams for very long.

    Q.   Right.  He wasn't --

    A.   So I think the main issue then becomes whether
he was on 200, 250 for any length of time.  There's no
doubt he was on Seroquel, there's no doubt in my mind
that he gained 43 pounds in weight.

    Q.   All right.  Does it matter to you what dose of
Seroquel he was on?

    A.   Not to a modest -- not these fairly modest
changes.

    Q.   Do you -- is there a -- you say -- as I read
this, it sounds like you're saying the dose was
increased and then he started to gain this 45 pounds --

    A.   No.

    Q.   -- is that what you're saying?

    A.   No, I don't -- I think --

    Q.   And you can't tell me what the increased dose
is that you're talking about here?

    A.   No.  The only one that he definitely was on for
a brief period of time was 400.  But -- but we're not
certain how long that was -- that was on for.  I think
certainly he was on for 200 milligrams at bedtime for a
major duration of this period of time.  The amount added
and subtracted in the daytime doses I have not plotted
out but can do if we consider it necessary for the
Court.

    Q.   Well, after July of 2004, he's only on Seroquel
at bedtime --

    A.   Bedtime.

    Q.   -- right?  You agreed with me on that earlier?

    A.   I think so, yeah.

    Q.   All right.  I want you to tell me, sir, all of
the scientific medical literature you rely upon that
establishes that Seroquel is associated with or causes
diabetes at a dose of 50 milligrams.

    A.   No, I don't have a dose response curve on -- on
any patient let alone a patient who weighs --

    Q.   I'm not asking about --

    A.   -- 325 pounds.

    Q.   -- Mr. Unger.  I'm asking about generally.

    A.   Yeah, I don't have -- I don't have a dose
curve.

    Q.   Okay.  That's -- that wasn't my question.  I
mean, I appreciate that information, but that wasn't my

                              tulloch 10 8 08.txt
question.
     A.   Okay.
     Q.   I want you to identify for me any scientific or
medical literature that you rely on, if any, to
establish that Seroquel is associated with or causes
diabetes at a dose of 50 milligrams.
     A.   No.  I -- what you're asking -- I interpret as
asking for a dose curve.
     Q.   You don't have any --
     A.   I don't have any data on that.
     Q.   And you don't have any literature?
     A.   No.
     Q.   You're not aware of any such literature?
     A.   I'm not aware of any data.
     Q.   I'm going to ask you the same question about
75 milligrams.
     A.   Okay.
     Q.   Can you tell me whether or not you have any
scientific or medical literature that establishes that
Seroquel causes diabetes in someone who takes it at
75 milligrams a day?
     A.   Okay.  When I say a dose curve, what I mean is
25, 50, 75, 100, 200, and 400.  And what I've said is I
do not have a dose curve for the relationship of
Seroquel to diabetes.  If you want to go on up each
individual dose, my answer will be the same.
     Q.   Okay.  You cannot tell me the name of an
article that reports an association or uses the word
"causation" in connection with Seroquel at a dose of
50 milligrams a day, correct?
     A.   That's correct.
     Q.   You cannot identify any scientific or medical
literature that reports that Seroquel is associated with
or uses the word "causation" at 75 milligrams a day,
correct?
     A.   That's correct.
     Q.   You cannot identify any literature, scientific
or medical literature, which reports an association or
causation between Seroquel and a dose -- at a dose of
100 milligrams a day?
          THE WITNESS:  Tom, I've given her all the
doses up to 400 and now she's going up one at a time.
Is it reasonable to let her go on with this line of
questioning or shall we say it's been asked and
answered?  I'm trying --
          MR. PIRTLE:  Well, I'd say it's asked and
answered, and she can ask and answer it again.  If she
wants to spend her time doing it, I guess the answer is
yes.
     A.   Please continue, ma'am.
     Q.   (BY MS. THORPE)  Can you answer my question?
     A.   Okay.  I have said I do not have a dose curve
for the -- any of the doses from 25 to 400 milligrams.
     Q.   Okay.  Can you identify any scientific or
medical literature that reports an association or uses
the word "causation" in relationship to Seroquel and
diabetes at a dose of 100 milligrams?
     A.   I do not.
     Q.   I've got one more and then I'll stop.  All
right?
          You cannot identify any scientific or
medical literature reporting that Seroquel is associated
with or causes diabetes at a dose of 150 milligrams a
                            Page 60

tulloch 10 8 08.txt
day, correct?
        A.  No.
        Q.  All right.  Now, in between -- if I understood
you correctly, the same is true between 150 and
400 milligrams, correct?
        A.  Yes, ma'am.
        Q.  Can you point to a single article in all your
review of medical and scientific literature that says
Seroquel is a cause of diabetes?
        A.  Ma'am, what I have found is articles which are
associated with weight gain and diabetes.  And as we've
discussed, the issue of -- between weight gain and the
acquisition of insulin resistance is difficult so that
my source materials have associated Seroquel as one of
the atypical antipsychotics associated with weight gain
and the development of diabetes.  There's some isolated
cases of acute development of diabetes with Seroquel.
And given a little time -- for the last few days, you've
had all of my -- my references.  Given a little time, I
could find those for you.
            MS. THORPE:  All right.  That's not my
question.  I move to strike as nonresponsive.
        A.  You asked me about specific dose -- dose levels
and I told you I did not have a dose curve.
        Q.  (BY MS. THORPE)  My -- my question to you is:
Can you point to a single article in the scientific or
medical literature that you've reviewed that says that
Seroquel is a cause of diabetes?
        A.  And I said an association with weight gain and
diabetes was the best I can offer you right now --
        Q.  And so --
        A.  -- to the best of my memory.
        Q.  Is what you're saying is that the medical and
scientific literature reports an association between
Seroquel and weight gain and diabetes, correct?
        A.  That's correct.
        Q.  And you understand that an association does not
mean that something is -- is a cause.  You understand
that, don't you?
            MR. PIRTLE:  Objection, form.
        A.  Well, I go back to Seroquel and hepatitis and 1
in 80,000.  Associations can be very relevant in a
medical practice like mine.
        Q.  (BY MS. THORPE)  Would you say that the
relationship between -- the kind of association that's
reported for Seroquel in diabetes is of the same nature
as the type of association that's reported for Seroquel
and acute pancreatitis that you described earlier today?
        A.  No, ma'am, there are risk ratios.  You've had
my charts for a while.  The risk ratios, as I remember,
went from a low of 1.2 to a high of 4.85.  And don't ask
me to pull them out, it's late.  But you've had those
data.
        Q.  Well, I'm going to ask you to pull them
tomorrow.  Okay?
        A.  And they are there.
            THE WITNESS:  And if I'm going to be
pulling them, could I ask that these be stapled back
again because it's a long time to go through them.
        Q.  (BY MS. THORPE)  We'll do it for you.  We'll
make sure they're stapled.
            Now, we've talked about the 43-pound weight
gain --
                        Page 61

tulloch 10 8 08.txt

    A.   Yes, ma'am.
    Q.   -- of Mr. Unger?
         You cannot identify a single study that
shows that Seroquel is associated with a gain of 40 or
more pounds, can you?
    A.   I go back to risk ratio for weight gain and
diabetes, and I quoted you the numbers.  Right now I
have not had access to my literature for a while and
I -- I can't be specific on -- on dose curves, as I
mentioned, or weight gains to that degree, yes, ma'am.
    Q.   So you're not prepared at this point to -- to
tell me -- and I'm fine with postponing this until
tomorrow.  You can -- you can --
         MS. THORPE:  Or, you know, let me just stop
here and say we need to schedule this other date.  I
don't want to walk out of here without knowing we've got
tomorrow and then we've got to do -- have -- we've got
one more case.
         MR. PIRTLE:  That's fine.  Let's go off the
record and let's talk about that.
         (Short recess.)
         MS. THORPE:  Let's let the -- the record
reflect that it's 8:23 -- 8:24.  Excuse me.
         (Deposition adjourned at 8:24.)




                    CORRECTION PAGE
WITNESS NAME:  BRIAN R. TULLOCH, M.D., FRCP, FACP
DATE:  10/08/2008

PAGE  LINE  CHANGE                 REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
                    SIGNATURE PAGE

    I, BRIAN R. TULLOCH, M.D., FRCP, FACP, have read
the foregoing deposition and hereby affix my signature
that same is true and correct, except as noted on the
correction page.

                    Page 62

tulloch 10 8 08.txt
_____
BRIAN R. TULLOCH, M.D., FRCP, FACP


THE STATE OF TEXAS        )
COUNTY OF _____ )

       Before me _____ on this day
personally appeared _____ known to me
[or proved to me on the oath of _____ or
through _____ (description of identity
card or other document)] to be the person whose name is
subscribed to the foregoing instrument and acknowledged
to me that he/she executed the same for the purposes and
consideration therein expressed.
       Given under my hand and seal of office this _____
day of _____, 2008.


                    _____
                    NOTARY PUBLIC IN AND FOR
                    THE STATE OF T E X A S

My Commission Expires:
_____



THE STATE OF TEXAS         )
COUNTY OF HARRIS          )

            REPORTER'S CERTIFICATION
    DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP
                TAKEN OCTOBER 8, 2008

       I, RENE WHITE MOAREFI, Certified Shorthand Reporter
in and for the State of Texas, hereby certify to the
following:
       That the witness, BRIAN R. TULLOCH, M.D., FRCP,
FACP, was duly sworn by the officer and that the
transcript of the oral deposition is a true record of
the testimony given by the witness;
       That the deposition transcript was submitted on
_____ to the witness or the attorney for the
witness for examination, signature and return to Esquire
Deposition Services, by _____;
       I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
action in which this proceeding was taken, and further
that I am not financially or otherwise interested in the
outcome of the action.
       Certified to by me this _____ day of
_____, 2008.



                    _____
                    RENE WHITE MOAREFI, CSR, CRR, RPR
                    CSR NO. 3070; Expiration Date: 12-31-08
                    ESQUIRE DEPOSITION SERVICES, LLC
                    3401 Louisiana, Suite 300
                           Page 63

```
                    tulloch 10 8 08.txt
Houston, Texas 77002
(713) 524-4600
```