# TAB 1-5

bt101608.txt


JOB NO. 99531

               UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
                    ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This Document Relates to:

David Haller v. AstraZeneca, LP, et al.     Case No. 6:07-cv-15733
Eileen McAlexander v. AstraZeneca LP, et al. Case No. 6:07-cv-10360
Richard Unger v.  AstraZeneca LP, et al.     Case No. 6:07-cv-15812
Linda Whittington v. AstraZeneca LP, et al.  Case No. 6:07-cv-10475




                      ORAL DEPOSITION OF
             BRIAN R.  TULLOCH, M.D., FRCP, FACP
                      OCTOBER 16, 2008
                         VOLUME 5




        ORAL DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP,

    produced as a witness at the instance of the Defendant and

    duly sworn, was taken in the above styled and numbered cause

    on Thursday, October 16, 2008, from 4:27 p.m. to 7:13 p.m.,

    before RENE WHITE MOAREFI, CSR, CRR, RPR in and for the State

    of Texas, reported by machine shorthand, at Laminack, Pirtle &

    Martines, 5020 Montrose Blvd., 9th Floor, Houston, Texas,

    pursuant to the Federal Rules of Civil Procedure and the

    provisions stated on the record herein.

                                                    638


        1                    A P P E A R A N C E S
        2
            FOR THE PLAINTIFF:
                              Page 1

```
                              bt101608.txt
 3         RUSS BRUDNER, ESQ.
           LAMINACK, PIRTLE & MARTINES
 4         5020 Montrose Blvd., 9th Floor
           Houston, Texas  77006-6533
 5         713.292.2750

 6
     FOR THE DEFENDANTS:
 7         JANE THORPE, ESQ.
           BRENDAN KRASINSKI, ESQ.
 8         ALSTON & BIRD, L.L.P.
           1201 West Peachtree Street
 9         Atlanta, Georgia  30309-3424
           404.881.7000
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

♀                                                            639

 1                          I N D E X

 2
                                                    PAGE
 3

 4
     APPEARANCES................................  638
 5
           BRIAN R. TULLOCH, M.D., FRCP, FACP
 6
     EXAMINATION
 7         By Ms. Thorpe..........................  640

                          Page 2

bt101608.txt

8   CORRECTION PAGE........................... 728

9   SIGNATURE PAGE............................ 729

10  REPORTER'S CERTIFICATION.................. 730

11
                      E X H I B I T S
12
    NO.    DESCRIPTION                           PAGE
13  84     Documents produced by witness re
           AstraZeneca                           646
14  85     E-mail dated 8-13-97                  647
    86     Drawing                               692
15  87     Emergency Assessment Record dated
           9-5-05                                699
16  88     Discharge Summary dated 9-16-05       700
    89     Vascular Laboratory Consultation
17         dated 6-19-03                         707
    90     Progress Notes dated 6-3-06           709
18  91     Lab results dated 6-9-06              709
    92     Progress Notes dated 6-12-06          709
19  93     Progress Notes dated 8-10-06          710
    94     Lab results dated 9-22-06             710
20  95     Curriculum Vitae Synopsis             712
21

22

23

24

25

                                                    640


    1           (Please refer to Volume 1 of the deposition

    2   of Brian R. Tulloch, M.D., FRCP, FACP for the agreements

    3   of counsel.)

    4           BRIAN R. TULLOCH, M.D., FRCP, FACP,

    5   having been duly sworn, testified as follows:

    6               CONTINUED EXAMINATION

    7   BY MS. THORPE:

    8       Q.   Doctor, I -- your report in Mr. Haller's case

    9   is right there in front of you.

    10      A.   Okay.   Thank you.

    11      Q.   Exhibit 65.   And let me get you to turn back to

                         Page 3

bt101608.txt

12  his -- the -- your comments about Mr. Haller

13  specifically.

14      A.  Okay.  I have that.

15      Q.  On the second page of those comments, the

16  fourth paragraph that begins, "However, having developed

17  insulin requiring diabetes," are you with me?

18      A.  Yes, ma'am.

19      Q.  Look down -- well, let me just ask you.

20          This paragraph that begins, "However,

21  having developed insulin requiring diabetes" appears in

22  each one of the reports in all of the plaintiffs' --

23      A.  Right.

24      Q.  -- cases, right, that you --

25      A.  Right.

                                                    641


1       Q.  -- where you've prepared a report, correct?

2       A.  Yes, ma'am.

3       Q.  And then there is a sentence that says,

4   "Already able to cope with little productive activity in

5   his profession, he will as a result of his diabetes

6   experience ongoing further loss of productivity."

7           Do you see that sentence?

8       A.  Yes, ma'am.

9       Q.  And that sentence appears in every report that

10  you've made in all the cases involving all the

11  plaintiffs you're testifying in, right?

12      A.  Yes, ma'am.

13      Q.  You know that -- well, let me just ask you.

14          What is Mr. Haller's profession?

15      A.  I don't think he has a profession, so he's --

16  his mental restrictions have been such that he's -- he's

                            Page 4

bt101608.txt

17    not been constructively able to contribute to

18    communities.

19        Q.   So your statement --

20        A.   So I think --

21        Q.   -- here is not --

22        A.   -- if --

23        Q.   -- it doesn't fit Mr. Haller's situation --

24        A.   Activity --

25        Q.   -- correct?

                                                    642


1         A.   -- I think -- his limitations were -- were

2    mental before he became -- before his pancreas was

3    overstressed and he developed high blood sugars, yes,

4    ma'am, so --

5         Q.   He doesn't have a profession that you know

6    of --

7         A.   No, ma'am.

8         Q.   -- correct?

9         A.   And may I also start -- if I go back to the

10   very first sentence, you're quite correct, this was cut

11   and pasted.   And this man, as we agreed yesterday, does

12   not have insulin-requiring diabetes.   So may I start by

13   apologizing --

14        Q.   Right.

15        A.   -- and striking that?  So let us assume the

16   insulin has been removed.

17        Q.   Well -- and as to this other sentence in your

18   report about his profession, you would agree that

19   diabetes complications are not going to impact his

20   profession because he doesn't have --

                        Page 5

bt101608.txt
21      A.   Doesn't have one.

22      Q.   -- a profession?

23      A.   That's correct, ma'am, yes.

24      Q.   That's also true of the other three plaintiffs,

25  correct?

643


1       A.   Well, I think so.  I think we did have -- if I

2   remember, we had one who had started off life as a male

3   nurse.

4       Q.   That was Mr. Unger?

5       A.   Right.  And I think we've agreed that his main

6   restriction that limited his function as a male nurse

7   was actually his back problems.  So I go back to that

8   poor camel that's had multiple layers and we just add

9   sugar on the top.

10      Q.   Okay.  But you will agree that Mr. Unger has

11  been disabled and not working since May of 2002,

12  correct?

13      A.   That's correct, yes, ma'am.

14      Q.   And so your sentence in his report that says

15  that he will as a result of his diabetes experience

16  ongoing further loss of productivity, referring to his

17  profession, would not be true as to Mr. Unger because

18  he's already disabled, correct?

19      A.   Has very little productivity, that's correct,

20  ma'am, yes.

21      Q.   And then as to Ms. Whittington, she, too, was

22  disabled many, many years before she got diabetes,

23  correct?

24      A.   Yes, ma'am, I -- I agree with that.

25      Q.   And so she was not working in any profession,
Page 6

bt101608.txt

644

1    correct?

2         A.   Productively, that's correct, yes.

3         Q.   All right.  And as to Ms. McAlexander, she was

4    disabled and not working, and so this statement in the

5    report about ongoing further loss of productivity in

6    professional activities due to diabetes complications

7    doesn't apply to her either, correct?

8         A.   She wasn't doing much in the first place,

9    that's correct, ma'am, yes.

10        Q.   All right.  Now, if you would look at page 2 of

11   your report, I want to direct your attention to the next

12   to the last paragraph that says, "I have reviewed the

13   Physician's Desk Reference, PDR, medical and scientific

14   journal articles regarding the group of medications

15   referred to as atypical antipsychotics, including

16   Seroquel, and documents produced by AstraZeneca in this

17   litigation, a summary of which is listed and attached

18   hereto as Exhibit B."

19             Did I read that correctly?

20        A.   Yes, ma'am.

21        Q.   Now, it -- what you are calling Exhibit B in

22   this sentence is what is entitled Reference Exhibit

23   List, correct?

24        A.   That's correct.

25        Q.   And it's pages 1 through 17, right?

645

1         A.   That's correct.

2         Q.   And the paragraph that I just read and the --

Page 7

bt101608.txt

3    the reference exhibit list appear in each report in

4    every case that you've given an opinion in, right?

5         A.   That's correct, ma'am, yes.

6         Q.   So there's -- that paragraph appears in the

7    Unger case?  Yes?

8         A.   Yes, ma'am.

9         Q.   And also in Whittington, McAlexander, and

10   Haller?

11        A.   Yes, ma'am.

12        Q.   All right.  The -- you agree that the statement

13   in your report that you've reviewed documents produced

14   by AstraZeneca in this litigation, a summary of which is

15   listed and attached hereto as Exhibit B, tells the

16   reader of your report that you read the documents listed

17   in Exhibit B, that is, the reference exhibit list,

18   before you formed your opinions in the case --

19        A.   Yes, ma'am.

20        Q.   -- right?

21        A.   Uh-huh.

22        Q.   But you have not reviewed the documents in the

23   reference exhibit list that were produced by AstraZeneca

24   in this litigation, right?

25        A.   Well, ma'am, what I said last night and I -- I

                                                         646


1    can clarify today was we -- I had one that related to

2    the 1997 paper, and then when I discussed the issue of

3    what was available from the AstraZeneca litigants, I --

4    I went through with the nurse practitioner the -- the

5    data which we discussed.  I called her last night, and I

6    have available for you the data which I discussed with

7    her.  I understood I would not be shepherding that

                            Page 8

bt101608.txt

8    particular list of documents through the Court for the

9    reasons we discussed last night.  I'm a clinician, I'm

10   primarily more related to diabetes as it applies to a

11   clinical patient.

12            So exactly which AstraZeneca scientist said

13   to what, I did not believe I would be in a position to

14   follow up.  However, the documents which I referred to

15   last night and which were discussed with the nurse

16   practitioner I have brought available and will make

17   available to you.  These were the ones that she sent me.

18            (Exhibit No. 84 marked.)

19   Q.  (BY MS. THORPE)  All right.  Dr. Tulloch, I've

20   marked as Exhibit 84 for identification a collection of

21   documents that you have just testified that a nurse

22   practitioner provided to you yesterday?

23   A.  That's correct.  Actually, this morning.

24   Q.  This morning.

25   A.  Yeah.

                                               647


1    Q.  Okay.  And so does exhibit -- so have you read

2    the documents contained in Exhibit 84?

3    A.  Ma'am, I referred to the document from 1997

4    which I had, and I have got a second copy here.  I

5    referred to our discussing these others, and I did not

6    tender them because -- for the reasons that I mentioned

7    earlier, I had not intended to be standing as a witness

8    for these particular issues.

9            But in light of the discussion of last

10   night, I thought it would be better that we had the

11   documents so the Court could have at least an

                          Page 9

bt101608.txt

12  examination of what I had viewed with her and the 1997

13  document which relates to the phrase that was present in

14  my report.

15          (Exhibit No. 85 marked.)

16      Q.  (BY MS. THORPE)  All right.  I'm going to show

17  you what's been marked as Exhibit 85.  And yesterday

18  evening you referred to an e-mail that you had before

19  you prepared your report.  Is Exhibit 85 that e-mail?

20      A.  Yes, ma'am, that's correct.

21      Q.  Okay.  So Exhibit 84 is a collection of

22  documents that you have not read?

23      A.  As a -- that's correct.  Well, let me

24  say Exhibit 84 includes a collection of documents which

25  I discussed with the nurse practitioner --

♀

                                                        648


1       Q.  Right.

2       A.  -- which I did not read line by line for the

3   reasons I have described.

4       Q.  Right.  My question for you is:  Have you read

5   the documents contained in Exhibit 84?

6       A.  Yes, ma'am.

7       Q.  When did you read them?

8       A.  This morning.

9       Q.  Okay.  Before you wrote your report that's been

10  marked in these --

11      A.  Sixty-five.

12      Q.  -- 65 and the reports in the Unger,

13  McAlexander, and Whittington cases, you did not read the

14  AstraZeneca documents that are contained in Exhibit 84,

15  correct?

16      A.  That's correct.  As I said last night, I was

bt101608.txt

17    aware of the contents of them.  I had discussed them

18    with the nurse practitioner.  I knew what was in the

19    contents, but I had not read them line by line.

20               MR. BRUDNER:  Excuse me.  That reminds me.

21    Were we going to go over 63?  You remember --

22               MS. THORPE:  Oh, thank you for -- I found

23    it last night.

24               MR. BRUDNER:  Oh, okay.

25               MS. THORPE:  But unfortunately, I packed my

                                                          649


 1    boxes up and sent them off without thinking about it,

 2    but we were going to put a stipulation on the record

 3    that it's -- that Exhibit 63 was an incomplete copy of

 4    Dr. Tulloch's report in Haller.  It was inadvertently

 5    missing a page, and so we remarked Exhibit 63 as

 6    Exhibit 65, and we all agree that that's okay, right?

 7               MR. BRUDNER:  That's correct.

 8               THE WITNESS:  Just between us and not on

 9    the record.  If I may, this is off the record?

10               MS. THORPE:  It's okay.

11               (Discussion off the record.)

12         Q.  (BY MS. THORPE)  All right.  So back on the

13    record.

14               Exhibit 85 is the only document produced by

15    AstraZeneca that you reviewed before signing your

16    reports in these cases, correct?

17         A.  That's correct, that I reviewed at length.  I

18    was aware of the other contents, I have discussed them

19    with the nurse practitioner, as I mentioned, but this

20    one I had read line by line.

                        Page 11

bt101608.txt

21          Q.   Let me go back, Doctor, just to be clear.   I

22     understand that you say that you discussed with a

23     paralegal --

24          A.   Yes, ma'am.

25          Q.   -- the content of the documents that have been

                                                              650


1      marked as Exhibit 84 before you signed your reports,

2      right?

3           A.   That's correct, yes.

4           Q.   But you did not read the documents yourself

5      that make up Exhibit 84 before you signed your reports,

6      correct?

7           A.   That's correct.

8           Q.   You relied on the interpretation of those

9      documents that had been marked as Exhibit 84 on a nurse

10     paralegal, correct?

11          A.   That's correct, ma'am.   And I hope I've

12     explained why.

13          Q.   Well, why?

14          A.   As I said, because I did not consider myself an

15     expert in this field and I understood if the issue came

16     up in court, it would be handled by a scientist who

17     would be looking at the medical data in-depth.   And my

18     suspicion is that that would probably be Dr. Wirshing.

19     However, if I was asked to do that, I would be prepared

20     to do so.   But it's -- it's not a field that I've spent

21     a lot of time in.

22          Q.   So when you say you did not consider yourself

23     to be an expert in the field, what field are you talking

24     about?

25          A.   The -- the assessment of psychiatric
                              Page 12

bt101608.txt

♀

651

1    medications under FDA development conditions.   And you
2    asked me last night whether I was an expert in FDA
3    related legislation and I declined expertise in that
4    area.
5         Q.   So you did not feel that you had the expertise
6    to talk about labeling issues with regard to Seroquel,
7    correct?
8         A.   That's correct, ma'am, yes.
9         Q.   And you did not feel that you have the
10   expertise or the background to talk about the content of
11   the documents that have been marked as Exhibit 84,
12   correct?
13        A.   That's correct, other than that would apply to
14   a practicing clinician with my background.   Remember,
15   I'm an endocrinologist with an interest in diabetes and
16   heart disease and hyperlipidemia.
17        Q.   Well, so I need to know.   Are -- do you
18   consider yourself to have the expertise to talk about
19   the contents and the substance of the documents that
20   have been marked as Exhibit 84?
21        A.   Ma'am, as I -- as I've mentioned, I understood
22   I would not be called upon to do it, and, therefore, I
23   didn't focus -- my time is precious as is yours.   So I
24   was comfortable -- as long as I knew what the contents
25   were and as long as I knew that the issues would be

♀

652

1    covered by an expert in the field, I was comfortable
2    with knowing their contents and implying -- how it would

Page 13

bt101608.txt
3    apply to a clinician.

4        Q.   All right.  So you did not intend to offer an

5    opinion about the content or the substance of the

6    documents that have been marked as Exhibit 84; is that

7    correct?

8        A.   Without appropriate requests on behalf of

9    yourself or my -- my colleagues, yes, ma'am.

10        Q.   So -- so the statement in your report on page 2

11    that you have reviewed documents produced by AstraZeneca

12    in this litigation which are listed and attached as

13    Exhibit B is not true, correct?

14        A.   Well, it depends what one means by -- I have

15    not read them line by line.  I knew what the contents

16    were.

17        Q.   Go ahead.

18        A.   I knew what the contents were.  I knew what the

19    issues were, but I did not feel that I would be

20    reviewing that -- those particular details without

21    which -- my focus was on the patients, and I hope the

22    contents of the last depositions have been essentially

23    on the patients.

24              As I said a moment ago, I understand that

25    somebody with a background like Dr. Wirshing would be

                                                    653


1    handling the issue of the FDA legislation.  I considered

2    this to be under the FDA legislation.

3        Q.   In other words, you considered Exhibit 84 to be

4    related to labeling, an area which you do not have

5    expertise in?

6        A.   Which I did not -- that I felt would be covered

7    by another colleague, yes, ma'am.

                         Page 14

bt101608.txt

8        Q.   And that you did not have expertise in?

9        A.   That's correct.

10       Q.   It is correct, is it not, that you did not

11   review the documents produced by AstraZeneca in this

12   litigation, a summary of which is listed and attached

13   hereto as Exhibit B?

14       A.   Ma'am, you just asked me that and I've given

15   you my best answer.  I had reviewed in detail the

16   contents of Exhibit 85.  I had been aware of the

17   contents of the balance of Exhibit 84 which are the

18   others.  I had read them since we made this review last

19   night.

20            At the time I made this report, I was aware

21   of the contents, I was prepared to refer to the

22   situation, but I believed that the details would be

23   covered by a colleague with the expertise of

24   Dr. Wirshing.

25       Q.   You understand that somebody -- well, let me --

                                                            654


1    let me ask you this.

2            Exhibit 84 is not -- does not include all

3    the documents that are on the reference exhibit list,

4    correct?

5        A.   That's correct, ma'am.

6        Q.   So you -- when you say on page 2 of your report

7    that you have reviewed documents produced by AstraZeneca

8    in this litigation, a summary of which is listed and

9    attached hereto is Exhibit B, you did not review all of

10   the AstraZeneca documents that appear on Exhibit B as

11   you say you did in this report, correct?

                         Page 15

bt101608.txt

12      A.   Well, maybe if you -- if you look at the

13  wording of page 2, the wording was "and documents

14  produced by AstraZeneca."  I did not say I had reviewed

15  all of the documents.  And we've agreed that the

16  reference list, which has been attached to my report,

17  seems to be a common reference list, as you pointed out,

18  between myself and other experts that you or your

19  colleagues have deposed.

20          So at the time I was making that statement,

21  I would not have been in the position to itemize all of

22  the references on the common reference list.  Does that

23  help you?

24      Q.   No, it really doesn't help me.  So let me go

25  back, Dr. Tulloch --

                                                    655


1       A.   Okay.

2       Q.   -- and ask another question.

3       A.   Let me go back -- well, please, I'm awaiting

4   your question.

5       Q.   The AstraZeneca documents that are shown on the

6   reference exhibit list that is attached to your report,

7   you did not read them all, correct?

8       A.   That's correct, yes.

9       Q.   Have -- it is also correct that you did not

10  read before signing this report the documents that are

11  contained in Exhibit 84, correct?

12      A.   With the exception of Document 85.

13      Q.   All right.  Let's take the document -- is the

14  document that's been marked as Exhibit 85 also in

15  Exhibit 84?

16      A.   That's correct.

                    Page 16

bt101608.txt

17      Q.   Let's take it out.

18      A.   Okay.

19      Q.   Okay.   Take it out of Exhibit 84.

20           MR. BRUDNER:  It is.

21      Q.   (BY MS. THORPE)  Okay.  That's what I thought.

22      A.   It's out.

23      Q.   All right.  Okay.  So that's -- that's what I

24  understood, but let me reask my question.

25           MR. BRUDNER:  The confusion is it started

656

1  out in that group.

2           THE WITNESS:  It was in the pile.

3      Q.   (BY MS. THORPE)  Then we separated it out,

4  so -- all right, Dr. Tulloch.  Before signing your

5  report, you did not review -- strike that.

6           Before signing your report in these cases,

7  you did not read the documents that are contained in

8  Exhibit 84, which are AstraZeneca documents, correct?

9      A.   That's correct.

10     Q.   The only document you read before signing your

11  report is Exhibit 85, which is an e-mail, right?

12           MR. BRUDNER:  Objection, form.

13     A.   That's correct.

14     Q.   (BY MS. THORPE)  You would agree, wouldn't you,

15  Dr. Tulloch, that your statement in your report that you

16  have reviewed the documents produced by AstraZeneca in

17  this litigation, a summary of which is listed and

18  attached hereto as Exhibit B, is misleading to the

19  reader?

20     A.   Okay.  I'll accept that.

Page 17

bt101608.txt

21      Q.   You -- so let me -- let me get you to look at

22   the next paragraph down from that paragraph that begins,

23   "Based on my education, training, and experience."

24              Do you see that?

25      A.   Yes, ma'am.

657


1      Q.   So on page 2 of your report, you say, "Based on

2   my education, training, and experience, my review of the

3   published literature pertaining to antipsychotics and of

4   documents pertaining to Seroquel produced by AstraZeneca

5   and my review of the medical records, I'm qualified to

6   render the opinions stated below which are stated to a

7   reasonable medical probability," right?

8      A.   Yes, ma'am.

9      Q.   And you put that statement in every report in

10   all four cases you've signed on to testify in, right?

11      A.   Yes, ma'am.

12      Q.   The statement that you have reviewed documents

13   pertaining to Seroquel produced by AstraZeneca is not

14   true, right?

15              MR. BRUDNER:   Objection, form.

16      Q.   (BY MS. THORPE)   At the time you signed this

17   report?

18      A.   It's conditional.   I've reduced -- I

19   produced -- I had reviewed Item 85, I had reviewed the

20   contents of Exhibit 84, and I had not read them line by

21   line.

22              Let me go back to the patients.   When we

23   looked at the patients, I was careful to delineate which

24   parts of the patients' charts I had read, and with those

25   patients I also gave you the lists of what I had looked

Page 18

bt101608.txt

658

1    at and lists of what I had not looked at.

2              I don't feel there's any difference between

3    that and the contents of our current discussion, but I'm

4    happy to clarify them in any way that would help you.

5    Q.   You will agree that when you wrote the

6    paragraph that begins, "Based on my education, training,

7    and experience, my review of the published literature

8    pertaining to antipsychotics and of documents pertaining

9    to Seroquel produced by AstraZeneca," when you read and

10   signed that paragraph, you had read only Exhibit 85,

11   correct?

12   A.   And discussed the contents of Exhibit 84 with a

13   colleague who was active in this case, yes, ma'am.

14   Q.   Is it correct that the only thing that you had

15   read at the time that you signed off on this report that

16   says that you were basing your opinion on your review of

17   documents pertaining to Seroquel produced by AstraZeneca

18   was Exhibit 85?

19   A.   That's correct.

20              MR. BRUDNER:   Objection, form.

21   Q.   (BY MS. THORPE)  When you signed off on this

22   report and this particular paragraph, you agree that you

23   had read only a portion of the medical and scientific

24   literature on Seroquel, correct?

25   A.   Yes, ma'am.

659

1    Q.   And you had reviewed only a portion of the

2    medical records on the four plaintiffs, correct?

Page 19

bt101608.txt

3      A.   That's correct.

4      Q.   And isn't it fair to say, Dr. Tulloch, that you

5   believe at this point you haven't done enough homework

6   in these cases to render a reliable opinion?

7               MR. BRUDNER:   Objection, form.

8      A.   Ma'am, I did the best I can.  I believe I did

9   look at a number of the points that were relevant to

10   these patients' weights and their -- and their

11   development of type 2 diabetes, and I believe that my

12   impressions were the best that could be obtained in the

13   current setting.

14               I have given you information from the time

15   we started that the review had not been exhaustive for

16   the reasons I had said, I had not looked at all the

17   depositions, and some of that relates to our -- the

18   limitation in our being able to meet.  I'm a busy

19   clinician with an active clinical load.  So I have tried

20   to -- to allocate my time to the best possible use for

21   both the Court and for my duties to my patients.

22      Q.   (BY MS. THORPE) So my question was:  Do you

23   agree that you haven't done enough homework in these

24   cases to render a reliable opinion?

25               MR. BRUDNER:   Same objection.

660

1      A.   I believe that my opinion is reasonable in the

2   setting.  I'm always -- I'm a humble man.  I'm always

3   open to criticism.

4      Q.   (BY MS. THORPE) All right.  May I have

5   Exhibit 85, please?

6      A.   Yes, ma'am.

7               (Short recess from 4:57 to 4:59.)

Page 20

bt101608.txt

8      Q.   (BY MS. THORPE)   Okay.   So how did you get

9   Exhibit 85?

10     A.   How did I get it?   I discussed the issues of

11   weight gain with the nurse practitioner and I said --

12     Q.   And who is that?

13          THE WITNESS:   What's the lady's name?

14          MR. BRUDNER:   Granger.

15     A.   Granger, a lady called Granger who had been

16   working with this case.   And I said, "What was the

17   data?"   And she produced this e-mail, and she produced

18   these.   And I said, "Well, if Dr. Wirshing's going to

19   handle those, tell me what the contents of that was."

20   And in here -- in the -- I'm referring to the pile that

21   includes Exhibit 84.   In there is data relating to

22   special considerations for Seroquel marketing in Japan

23   and special considerations for Seroquel marketing in

24   Holland where specific restrictions were put in because

25   of side effects.

661

1          And I said, "Well, what -- what do we know

2   about this country?"   And that was when this data came

3   up.   And that was where I put in the phrase -- under

4   atypical antipsychotics and diabetes, I put, "In my

5   opinion, the company agents were aware as early as 1997

6   of an association between Seroquel and weight gain."

7          On page -- the second page is a statement

8   by the person who wrote this e-mail that says to the

9   effect we know that weight gain in this case relating to

10   Seroquel and patients is dose related.

11          As I mentioned last night, I did not hammer

Page 21

bt101608.txt

12   that when we were discussing it last night.  But here

13   was not only realization that weight gain was an issue

14   but that weight gain in the opinion of this scientist

15   was dose related.  And as I said earlier, I believe that

16   these issues would be covered by somebody who would be

17   reviewing those in detail.

18        Q.   (BY MS. THORPE)  Dr. Tulloch, when did you

19   receive Exhibit 85?

20        A.   I looked at Exhibit 85 on the day that I was

21   completing this report, and that would have been about

22   six weeks ago.  I see the report does not have a date on

23   it.  But I turned in that report at least six weeks ago,

24   and I have mentioned it.  It was not in this pile, which

25   is why I promised I would produce it.  I have had access

662

1    to Exhibit 85 since I wrote the report.

2         Q.   And so how did you receive it?

3         A.   Oh, the same way as I received all the other

4    documents, ma'am.  Some I had which related to Zyprexa,

5    some I got up from the Index Medicus or the electronic

6    equivalent of that.  And when I asked for them, they

7    were printed up by the plaintiffs' attorneys' office and

8    delivered to me.

9         Q.   So a hard copy of Exhibit 85 was delivered to

10   you?

11        A.   That's correct.

12        Q.   It was not e-mailed to you?

13        A.   No, no, ma'am.

14        Q.   And the copy of Exhibit 85 that you brought

15   today, was that a copy that you had in your office

16   before -- at the time that you signed your report?

Page 22

bt101608.txt

17      A.   Ma'am, what I said last night was I'm surprised

18  that Exhibit 85 was not in the file that I had tendered

19  because it was amongst the references which I had

20  discussed.   When it became apparent that it was not, I

21  had promised you last night that I would look into

22  finding it.   When I could not find it in my office, I

23  asked for the whole pile to be sent to me this morning.

24  With any luck, I will still find the original copy of

25  Exhibit 85.

663

1       Q.   So Exhibit 85 that we have marked here as well

2   as Exhibit 84 is a collection of documents that was

3   delivered to you at your office this morning by

4   Ms. Granger; is that right?

5       A.   Yes, ma'am.   We've just made that statement

6   about half an hour ago.

7       Q.   All right.

8       A.   I'm sorry that we're repeating it.

9       Q.   Now, do you know -- do you know to whom

10  Exhibit 85 was addressed?   Do you know this person, John

11  Monyak or Barbara Kowalcyk or Mark Scott?

12      A.   No, ma'am.

13      Q.   Do you know what their jobs are at AstraZeneca?

14      A.   No, ma'am.

15      Q.   Do you know if they work at AstraZeneca?

16      A.   No, ma'am.

17      Q.   Do you know that -- who Lisa Arvanitis is?

18      A.   No, ma'am.

19      Q.   Do you know what her job is at AstraZeneca?

20      A.   No, ma'am.

Page 23

bt101608.txt

21      Q.   Do you know that she's a scientist?  Do you

22  know that she's a scientist?

23      A.   No, ma'am.   And -- and --

24      Q.   Do --

25      A.   -- in anticipation of your further questions, I

                                                        664


1   believe that this was a document from the AstraZeneca

2   pile, and I believe that these issues would be

3   appropriately dealt with by whoever took this issue to

4   court.  And what you heard was my belief is that I would

5   not be that individual.

6       Q.   Because you don't feel like you're qualified?

7       A.   That's correct.

8       Q.   And the exhibit -- it's got an exhibit number

9   from some other deposition, I assume, an Exhibit No.  24

10  that says MacFadden.   Do you see that?

11      A.   Yes, ma'am.

12      Q.   And you haven't read any deposition in which

13  Exhibit 85 was discussed, correct?

14      A.   That's correct.

15      Q.   You have no personal knowledge or understanding

16  of any of the facts contained in Exhibit 85, correct?

17      A.   That's correct.

18      Q.   You know nothing about the context in which

19  Exhibit 85 was created, correct?

20      A.   That's correct.

21      Q.   Any opinion that you've formed based on your

22  review of Exhibit 85 on the day that you finalized your

23  report would be a personal opinion and not an expert

24  opinion, correct?

25      A.   I think that's reasonable, ma'am, yes.

                            Page 24

bt101608.txt

665

1      Q.   Now, if you look at the paragraph in your
2    report that's entitled The Atypical Antipsychotics and
3    Diabetes --
4      A.   Yes, ma'am.
5      Q.   -- as we discussed last night, your first
6    sentence says, "Based on my review of documents produced
7    by AstraZeneca in this litigation, it is my opinion that
8    the company agents were aware as early as 1997 of the
9    association between Seroquel and weight gain."
10              Did I read that correctly?
11     A.   That's correct, ma'am.
12     Q.   That statement as you wrote it is incorrect
13   because it says documents plural and you had only read
14   this one document, Exhibit 85, when you wrote it, right?
15     A.   That's reasonable.   Okay.
16     Q.   And -- but the information that you're
17   referring to in the substance of that sentence is
18   Exhibit 85?
19     A.   That's correct.
20     Q.   And you, in essence, are withdrawing this
21   opinion as an expert witness -- that's this first
22   sentence in your report -- correct, because it's not
23   your area of expertise?
24     A.   I think that's reasonable, yes.   May I tender
25   that -- may I expand on that?

666

1      Q.   There's no question on the floor, so --
2      A.   Okay.

Page 25

bt101608.txt

3      Q.   -- I would object to --

4      A.   Go on.   Never mind.

5      Q.   -- additional expansion.

6              So, Doctor, going back to page 2 of your

7   report where you say that you've reviewed documents

8   produced by AstraZeneca in this litigation, a summary of

9   which is listed and attached hereto as Exhibit B, why

10  did you put that in your report when you didn't

11  review -- didn't read the documents that are in --

12  listed in as Exhibit B?  Why did you put that in?

13     A.   Ma'am, because I was aware of their content.

14     Q.   From your conversation with Ms. Granger?

15     A.   Yes, ma'am.   And I had reviewed the pile.   I

16  mean, the pile was there.   I said, "What's in here?"

17              She said, "There's this, there's this,

18  there's this."

19              And I said, "Okay.   And how early was it?

20              And she said, "There's this."

21              And I'm -- in my first indications I was

22  referring to the contents of Reference 84 -- Exhibit 84.

23  And then when we looked at the earliest available data

24  from documents which I understood to be produced from

25  AstraZeneca.   Because as I was trying to say earlier, I

                                                         667


1   didn't have a direct insight into who Dr. Arvanitis is

2   without accepting the word of my colleagues that this

3   was from AstraZeneca.   You see, there's -- I did -- so I

4   have to assume that that was correct.

5              If that was correct, there was a date of an

6   e-mail that related to 1997.   So I was then quite

7   comfortable saying to the best of my knowledge from data

                          Page 26

bt101608.txt

8    that I have seen from AstraZeneca, as early as 1997 the

9    associations between the product, weight gain, and

10   diabetes were there.   As I mentioned last night, I did

11   not go on further, although it is also mentioned in this

12   e-mail that in their view at the time weight gain was

13   dose related.

14       Q.   So based on your review of one e-mail that's

15   been marked as Exhibit 85, you were willing to write a

16   report that would be used in federal court describing

17   the awareness of company agents whose identity you

18   didn't even know regarding scientific proposition, i.e.,

19   Seroquel being associated with weight gain?

20       A.   Yes, ma'am, with one condition, the condition

21   being my understanding at the time was that the issue

22   would be fully discussed by an expert in this field.

23       Q.   But you were willing to sign your name to

24   something based on one e-mail, right?

25       A.   Yes, ma'am, and the -- and the understanding --

                          668

1    the knowledge of the contents of Exhibit 84.

2       Q.   But you didn't read them?

3       A.   I haven't read them.   I discussed what was in

4    there, and I had been reassured -- or at least I had

5    understood that the issue would be appropriately dealt

6    with by a colleague of the expertise similar to

7    Dr. Wirshing.

8       Q.   Now, the second sentence in the paragraph under

9    the atypical antipsychotics and diabetes part of your

10   report says that evidence also supports my opinion that

11   AstraZeneca had evidence that Seroquel was associated

Page 27

bt101608.txt

12  with glucose dysregulation in 1999 and 2000 though this

13  significant adverse event did not appear as a warning in

14  the Seroquel label for many years, right?  You wrote

15  that sentence?

16      A.  Yes, ma'am.

17      Q.  And that sentence was not based on an e-mail

18  and was not based on any documents you read but was

19  based on a conversation with a lawyer and a paralegal,

20  correct?

21      A.  That's correct.  And the knowledge that the

22  documents existed and that the issue would be clarified

23  by a colleague who was expert in the field, yes, ma'am.

24      Q.  The knowledge that the documents existed was

25  conveyed to you by the lawyer and the paralegal, right?

♀

669

1      A.  That's correct, ma'am, yes.

2      Q.  And you relied on their representation about

3  that?

4      A.  Yes, ma'am.

5      Q.  And that was the basis of your signing a report

6  that -- strike that.

7              You relied on a representation by a lawyer

8  and a paralegal as a basis -- as the sole basis for a

9  statement that AstraZeneca had evidence that Seroquel

10  was associated with glucose dysregulation in 1999 and

11  2000, right?

12      A.  That's correct, ma'am.  And may I go on?  And

13  the knowledge that the issue would be appropriately

14  covered by a colleague.  Do you understand?  I -- in

15  that setting I believed I was part of a team.  My team

16  was to -- my team function was to look at the patients,

Page 28

bt101608.txt

17  look at the weights, and look at the association with

18  diabetes and see if there was reasonable evidence.

19  Another team member would be looking at the issues of

20  legislation through the FDA and the scientists working

21  in the Seroquel presentation to market.  I hope you

22  understand that.  So I was leaving that component to

23  another member of the team.

24      Q.  Well, except you put it in your report, sir.

25      A.  Yes, ma'am.

                                                    670


1       Q.  And the third sentence that I want you to look

2   at is the one that says -- begins, "Based on information

3   available to me."

4       A.  Yes, ma'am.

5       Q.  In that sentence you say, "Based on information

6   available to me, AstraZeneca did not provide accurate

7   information about the risks of weight gain, elevated

8   triglycerides, and diabetes associated with Seroquel

9   ingestion to physicians in a timely manner."

10              You see that?

11      A.  Yes, ma'am.

12      Q.  Now, that's what you would call a labeling

13  opinion, right?

14      A.  Yes, ma'am.

15      Q.  And so you're not going to give a labeling

16  opinion in these cases, correct?

17      A.  I think that's reasonable.  I said earlier I

18  believe there are others with a different background who

19  will do it better than me, yes, ma'am.

20      Q.  It's not your area of expertise?

Page 29

bt101608.txt

21      A.   That's correct.

22      Q.   And the information that you had available to

23 you when you wrote this report was a conversation with

24 lawyers -- lawyer and paralegal and the e-mail that's

25 been marked as Exhibit 85, correct?

671

1       A.   Yes, ma'am.

2       Q.   All right.  If you could take the list that's

3 been marked -- that's part of your report that's been

4 marked as Exhibit 65 that is the exhibit reference

5 list --

6       A.   Yes, ma'am.

7       Q.   -- and mark the things that you haven't read if

8 that's -- that may be easier than marking the things you

9 have read.  Whatever's easier.

10      A.   Okay.

11      Q.   You can say --

12      A.   Let me -- let me --

13      Q.   But you need to say what you're doing.

14      A.   -- relate them.  That's fine, we'll do that.

15      Q.   So what are you going to -- which way are you

16 going to go?

17      A.   I think it's probably easiest if I relate the

18 contents of Exhibit 85 -- I'll need to find it -- and

19 then Exhibit 84 and I'll need to find that.  Is that --

20      Q.   You haven't read Exhibit 84.  I want to -- let

21 me -- let me --

22           MR. BRUDNER:  Objection, form.

23      Q.   (BY MS. THORPE)  Let me say that again.  I want

24 to know the things that you read before you signed off

25 on your report.

Page 30

bt101608.txt

672

```
 1        A.   Okay.   That's fine.
 2        Q.   So that takes out Exhibit 84.
 3        A.   Well, yes, I knew the contents of Exhibit 84.
 4   What I -- let me find Exhibit 85 and then -- okay.   I --
 5   I think I have that -- let me mark it.   It's on page 9
 6   of page 17 and it's about a dozen up from the bottom and
 7   it's numbers 10612514.   On page 9 of 17.
 8        Q.   Okay.   So did you put a check by it or --
 9        A.   Yes, ma'am.
10        Q.   All right.   So that's something you read before
11   you signed your report?
12        A.   That's correct.
13        Q.   All right.   Then I want you to check off
14   everything else you read before -- read before you
15   signed your report.
16        A.   Ma'am, here I will have to go through the
17   contents of that pile because there were a number here,
18   which, as I mentioned, had come up through my -- my
19   searching.
20        Q.   Okay.   I need a list of either what you read or
21   what you didn't read.
22        A.   Okay.
23        Q.   It doesn't matter to me which is easier for
24   you, but --
25        A.   Why don't I skim through --
```

673

```
 1        Q.   Great.
 2        A.   I'll skim through the pile --
```

Page 31

bt101608.txt

3    Q.  That's --

4    A.  -- which is labeled Exhibit 16 --

5    Q.  Okay.

6    A.  -- and tender -- why don't I tender the

7  contents probably in order to save us time.

8    Q.  You know, I want a list that -- where you have

9  checked off what you've read so that we don't have any

10  dispute --

11    A.  Okay.

12    Q.  -- after this is over about what you read

13  before you formed your opinion.

14    A.  Okay.  Okay, ma'am, I have put them on a pile.

15  In the interest of time, I offer the pile, but if you

16  wish me to read them into the court reporter, I can give

17  the first author and the page if --

18    Q.  No, I don't need you to do that.  I asked you

19  to check them off on Exhibit 65.

20    A.  Ma'am, it -- there's 17 pages here, and to find

21  each reference on a page of references that I didn't --

22    Q.  Okay.

23    A.  -- compile is going to be time-consuming.  I

24  understand what you wish to do, and I don't wish to deny

25  you access to your knowledge.  I'm just trying to work

                                                       674


1  in the best interest of our time.

2    Q.  Well, that's why I suggested at the beginning

3  that you mark off on the 17 pages what you have not

4  read.

5    A.  There may be even more than on the list.  What

6  I -- what I've tendered is the pile of references that

7  was in Exhibit 16.  I know I've read all of those.  I

bt101608.txt

8   mentioned earlier that there were multiple other pages

9   that I -- I consulted when the Zyprexa reference was --

10  was in -- in litigation, and those are there in the

11  background of my mind.

12      Q.  Let me make a suggestion here.  I want to walk

13  away with a list of what you have and have not read on

14  the exhibit that's attached to your deposition, which is

15  a very fair -- it's attached to your report.

16      A.  No problem.

17      Q.  And so does this make sense to you?  I'm going

18  to impose on my colleague here and give him the stack

19  and ask him to check off the ones that are on the list

20  on the exhibit and then you can review it and see if

21  it's correct.  And we can go ahead.

22      A.  Okay.  If that's not too much of an imposition

23  on your colleague.

24      Q.  It's an imposition but --

25              MR. KRASINSKI:  I've been imposed worse

                                                        675


1   than that.

2               THE WITNESS:  May I -- another option, if

3   it makes it easier, would -- there's a Xerox machine

4   here, if he'd like to Xerox the front page from each

5   reference.  Whatever makes it easier for you.

6               MS. THORPE:  That doesn't -- that doesn't

7   help.  We just have to go through the list.

8               MR. BRUDNER:  That just imposes on me.

9               MS. THORPE:  That's right.

10              THE WITNESS:  This is one pile.  And I

11  appreciate both of you --

                    Page 33

bt101608.txt

12                 MS. THORPE:   That's Exhibit 4.

13                 THE WITNESS:   -- finding a -- what I think

14   is a perfectly reasonable -- this is No. 16, and that is

15   whatever that other pile was, ma'am.

16                 MR. KRASINSKI:   And then --

17                 THE WITNESS:   Do you want your own copy of

18   this or you're welcome to my copy, 65.

19                 MR. KRASINSKI:   Should I do it?  Do you

20   want me to do it on the exhibit?

21                 MS. THORPE:   Yeah.

22                 THE WITNESS:   Yeah, in which case may --

23        Q.   (BY MS. THORPE)  And so you understand, Dr.

24   Tulloch --

25        A.   I will live with this.

                                                            676


1                  THE REPORTER:   One at a time, please.

2         Q.   (BY MS. THORPE)  You understand, Dr. Tulloch,

3    that my colleague, Mr. Krasinski, is going to go through

4    each piece -- article that you have separated out and

5    look at the title and check it off on Exhibit 65 and

6    that process is okay with you and you're going to verify

7    that it's correct, right?

8         A.   More than that, ma'am, your colleague has

9    earned my eternal gratitude.

10        Q.   He already has mine.  Okay.  So let's -- let's

11   keep -- are you handing him another?

12        A.   I think that came off this one.

13        Q.   Okay.  Do you know what that pile is?

14                 MR. KRASINSKI:   This exhibit should be 16.

15                 THE WITNESS:   Three PDR articles.  They

16   were in that pile.  And 85 you already have ticked.

                          Page 34

bt101608.txt

17  That's the e-mail.

18              MR. KRASINSKI:   Okay.

19              THE WITNESS:   Great.  If there are any

20  questions, I'm here to help.

21      A.   Ma'am, thank you.  I really appreciate your

22  working with a time practical way of solving that issue.

23      Q.   (BY MS. THORPE)  Okay.

24      A.   Thank you.

25      Q.   Now, how much time have you spent on medical

                                                    677


 1  record review in each of these four cases?

 2      A.   My belief is each case, about eight to ten

 3  hours.

 4      Q.   All right.  And do you have invoices that you

 5  have submitted to the law firm?

 6      A.   I don't have them today.  I can produce them,

 7  yes, ma'am.

 8      Q.   All right.

 9      A.   I can.

10      Q.   Did you give them to Russ and then get them --

11      A.   Yes.

12      Q.   -- sent to us?

13      A.   Certainly.

14      Q.   Because I think we're entitled to those --

15      A.   Of course, yes.

16      Q.   -- invoices.

17              And how much time did you spend in

18  reviewing the scientific literature?

19      A.   I would guess another -- maybe -- may I guess

20  15 hours?  And the reason why I'm vague is, as I'm sure

                          Page 35

bt101608.txt

21  do you, I do a little bit of traveling on the airlines

22  and these references travel with me, so the -- the

23  reference are read while flying on the airlines, et

24  cetera.

25              I try to be fair to my colleagues in the

678

1  law firm and I add up the hours.  And you will get from

2  the invoices the total number of hours which included

3  the references, the patients' material, and the

4  preparation of the report.

5      Q.  So you think you've spent about 40 hours in

6  reviewing the medical records for the four cases, right?

7  That would be ten hours apiece?

8      A.  Yes, ma'am.

9      Q.  And then about 15 hours in your reviewing the

10  literature which would add up to about 55 hours in

11  review?

12      A.  Yes, ma'am, I think that's reasonable.

13      Q.  How much time did you spend writing the report?

14      A.  As I mentioned, I was writing the report -- on

15  each individual patient, I was writing the report while

16  I was reviewing, so the review -- the writing of the

17  report would be part of the patient review process.

18      Q.  All right.  How about the introductory portion

19  of your report that is separate from the two pages that

20  you have on the individual patient?

21      A.  That took me quite a long time, but as you

22  understand, at least some of that review of diabetes as

23  a whole I made for the Zyprexa report, and those hours I

24  did not bill to my colleagues in this context.

25      Q.  Okay.  So how much time did you spend on

Page 36

bt101608.txt

679

⚲

1  writing the nonpatient-specific part of your report --

2      A.   My guess --

3      Q.   -- in this case?

4      A.   -- in this case -- right.

5      Q.   Not -- not what you got from your Zyprexa

6  litigation.

7      A.   In this case my -- my guess would be about

8  another four hours.

9      Q.   So if you look at your report -- here's a copy

10  of it.  If you look at your report, Doctor, the --

11  looking at the portion that is not related to a specific

12  plaintiff --

13      A.   Yes, ma'am.

14      Q.   -- the beginning part of it, how much of that

15  report is the same as what you wrote in Zyprexa?

16      A.   Oh, very similar, ma'am.  And I -- if you -- I

17  have to write about diabetes in a number of contexts.

18  My belief is that the -- the content -- the discussion

19  of the disease of diabetes would almost be verbatim from

20  what I used for the folk in Zyprexa.  The changes would

21  be -- for an example on page 7 -- and I'm happy to share

22  that with you.  Since I wrote that report, the

23  Australian study -- let me refer you to page 7, the

24  third paragraph down.  Got it?  The Australian study on

25  stomach size and stomach stapling and recovery of

680

⚲

1  diabetes is new data.  I added that.

2                  I believe the reduction in life expectancy

Page 37

bt101608.txt

3   I updated with new available data, which is in one of

4   the exhibits that your colleagues are checking out.  The

5   annual cost of being a diabetic I think totally

6   remodified -- the American Diabetes Association produces

7   a report every two to three years, and I got a new

8   report that hadn't been in the Zyprexa case.

9              The atypical section I significantly

10  modified, again, by looking up what was unique to

11  Seroquel as opposed to what was present in the family of

12  atypicals and in the Zyprexa case.

13      Q.   Okay.  So it took you about four hours to do

14  that?

15      A.   To the best of my remembrance, yes, ma'am.

16      Q.   And the section on general opinions about

17  diabetes is identical to what you used in the Zyprexa

18  case, right?

19      A.   I believe so, yes, ma'am.

20      Q.   And the section on diagnosis of diabetes would

21  be identical to what you had in the Zyprexa case,

22  correct?

23      A.   I believe so, yes.  Just trying to think if

24  there was -- let me leave on record it would be very

25  similar.  If there was any nuances that have been --

                                                        681


1   come out relating to a new American Diabetes Association

2   report, I would have included that.

3       Q.   And then the complications of diabetes and the

4   increased risk of vascular disease, that would have been

5   virtually identical to your Zyprexa report, correct?

6       A.   To the best of my remembrance, yes, ma'am.

7       Q.   And then the section on small vessel disease

                        Page 38

bt101608.txt

8    and the impact of treatment of diabetic complications,

9    those two paragraphs are virtually identical to what

10   they were in your Zyprexa report, right?

11        A.   To the best of my recollection, yes, ma'am.

12        Q.   Okay.   Now, I want to return for a minute to

13   Mr. Haller, just really one last question which is:

14   From your review of his records, you know of no

15   complications that he has from his diabetes at present?

16        A.   Yes, ma'am, I think that's a correct statement.

17        Q.   Okay.   Dr. Tulloch, tell me what diabetic

18   nephropathy is.

19        A.   Ma'am, in the presence of consistently high

20   levels of sugar, the proteins of the body obtain an

21   adherence of sugar which modifies their structure.   The

22   kidney in essence is a filtration mechanism, and as the

23   proteins become modified by the presence of sugar, the

24   filtration mechanism of the kidney becomes deficient and

25   it starts to leak small quantities of albumin.

                                                    682

1                 Some research workers about 15 years ago --

2         Q.   Where does that albumin go when it leaves?

3         A.   It comes up -- the kidney filters essentially

4    all of the blood.   It's then modified through a tubular

5    system that has a -- let me call it a wriggly worm at

6    the top and a loop and another wriggly worm at the

7    bottom, to use medical students' terminology, and then

8    from there it ends up in the bladder.   In the wriggly

9    worm at the top and the bottom various parts of the

10   filtration are reabsorbed by the body.

11                But when the proteins are modified in the

                           Page 39

bt101608.txt

12 filtration system, some of the albumin that leaks out is

13 not re-collected in the wriggly part of the first or the

14 second part of the filtration system, and that starts to

15 be picked up in the urine.

16          Research workers have found that those very

17 small quantities of urine which are called

18 microalbumin -- and I think I discuss that -- are

19 predictive of the patients which are going to get

20 vascular disease later on amongst all the group of

21 diabetics.  So if one had a hundred diabetics, those who

22 had positive microalbuminuria would be the ones who

23 would most likely be getting stroke or a heart attack.

24     Q.   So when you do labs on someone who has diabetic

25 nephropathy, you would expect an elevated level of

                                                       683


1 microalbumin in the urine?

2     A.   That's correct, ma'am.  If I can help you,

3 again, as a medical student, the numbers are -- micro

4 levels, if we choose a round number, would be 30 or

5 more.   Significant proteinuria would be 300 or more.

6 And we're talking about quantitation of the amount of

7 albumin in our urine which in a normal person is zero.

8 So mostly what -- any albumin which has filtered through

9 the system is reabsorbed through the squiggly system of

10 the -- of the tube.

11          If it's overcome, micro quantities would be

12 between 30 and 300, and then gross loss of protein would

13 be greater than 300 and if -- in terms of milligrams per

14 24 hours.   And then people who have diabetic kidneys

15 that are in the process of failing, gram quantities of

16 urine start to leak out of the kidney and ultimately
Page 40

bt101608.txt

17    those kidneys no longer function and then the patient

18    has to be presented for either dialysis or

19    transplantation.

20             So if -- in answer to your question I have

21    described a progression from the very earliest of damage

22    to the kidney when it leaks just a tiny bit of

23    albumin -- but that's predictive of the guys who are

24    going to get stroke and heart attack -- to the other end

25    of the spectrum where somebody's literally in gram

                                                    684


1    quantities of protein and that kidney is about to fail

2    and that guy will need either dialysis, transplantation,

3    or good-bye.

4        Q.   So if I'm looking at a lab report and I want to

5    know if this person is having a -- basically a protein

6    spill into the urine such as you've described --

7        A.   Yes, ma'am.

8        Q.   -- what would be the -- the descriptors on the

9    lab report that you would look for?

10       A.   What you would look for would be -- Medicare

11   pays for a microalbuminuria test to be done once a year

12   and it's done because it's predictive and you don't need

13   to do a whole lot of other things.

14             Every time the urine is tested, it's tested

15   for proteinuria and that's with a dip stick and that is

16   set at about 300 milligrams.   So if you're looking for

17   the smallest quantities of kidney damage, you'd be

18   asking for microalbuminuria; if you were looking for

19   significant protein damage, you'd be looking for a dip

20   stick positive proteinuria.

                    Page 41

bt101608.txt

21    Q.  Okay.  And the lab result would be protein in

22  urine --

23    A.  Yes.

24    Q.  -- which is the way it would read, or

25  microalbumin?

685

1    A.  In the urine, yes, ma'am.

2    Q.  Okay.  Is there any other lab test that would

3  relate to indicating that there was nephropathy?

4    A.  Yes.  When the kidney is starting to fail,

5  it -- the function of the kidney is to clear nitrogenous

6  waste.  And let's use the word "creatinine," which is

7  the protein which comes from our muscles.  We -- a

8  normal kidney can keep the level of creatinine below

9  1.2.

10         So if you are looking for how well is the

11  kidney doing, you'd look for protein in the mechanisms

12  we discussed.  If you were looking for how well is the

13  kidney keeping the blood clean, you would look in the

14  blood tests for the level of creatinine.  And any number

15  much in excess of 1.2 -- and it varies from lab to

16  lab -- would be the earliest manifestation of kidney

17  failure.  When the creatinine is much above 6, between 6

18  and 10, the patient would be on the list for dialysis or

19  transplantation.

20    Q.  So when someone has diabetic nephropathy, is --

21  is that -- the presence of that condition predictive of

22  how long they've actually had diabetes?

23    A.  Regrettably, no, ma'am.  There are some folk

24  who develop diabetic nephropathy very early, and that's

25  been looked at.  And there seem to be HLA markers which

Page 42

bt101608.txt

686

1   predict which patient will get kidney problems, and

2   there's also HLA markers which predict which patients

3   are unlikely to get kidney markers.

4          So we've started with a genetic

5   predisposition.  And then amongst the other variables is

6   the level of blood sugar, so a hemoglobin A1c would give

7   you a best estimate of that, and then blood pressure

8   folks who have poorly controlled blood pressure are

9   inclined to get rapidly progressive damage to the

10  kidneys.

11     Q.   Uncontrolled blood pressure?

12     A.   Yes, ma'am.  Well, let me be quantitative if

13  you need those numbers.  If -- we now believe a diabetic

14  subject should have his numbers controlled such that the

15  top number should be less than 130 and the bottom number

16  should be less than 85.

17     Q.   And if they have blood pressure in that level

18  or lower, then they are less likely to develop diabetic

19  nephropathy quickly --

20     A.   That's correct.

21     Q.   -- is what you're saying?

22          So do you agree that there have been

23  studies on the relationship between the presence of

24  diabetic nephropathy and the origin or -- of the

25  development of diabetes, type 2 diabetes?  In other

687

1   words, the time relationship between the onset of type 2

2   diabetes and the development of diabetic nephropathy?

Page 43

bt101608.txt

3          A.   If -- if you have a reference, you've caught

4     me.

5          Q.   You don't know?

6          A.   That's right.  No, I don't.

7               You heard me say earlier that there are

8     genetic markers which predict for those who will and

9     those -- those who are likely to and those who are

10    unlikely to.  And I've discussed the other variables.

11              A -- another variable is whether the

12    physician chooses to use two groups of blood pressure

13    medications called ACE and ARB -- ACE, angiotensin

14    converting enzyme, and angiotensin receptor blockers.

15    Those two have been shown to be protective of the

16    development of proteinuria.  So anybody who has

17    diabetes, even if they have normal blood pressure, we

18    encourage our colleagues to treat them with an ACE or a

19    ARB -- that's a term for blood pressure medication --

20    because it's inclined to reduce the chance of developing

21    proteinuria with everything else that that means, later

22    onset of strokes and heart attacks.

23         Q.   But I take it from what you're saying, you are

24    unfamiliar with literature which suggests that one can

25    predict the onset -- the time period in which diabetes

                                                  688


1     developed in relationship to the onset of diabetic

2     nephropathy?

3          A.   Tell me how -- tell -- I'm trying to understand

4     the -- the subtleties of that question.  I've described

5     that diabetic nephropathy is proportional to bad

6     treatment, high blood pressure, absence of ACEs or ARBs,

7     and congenital bad luck as reflected by an HLA blocker.

                        Page 44

bt101608.txt

8   And are you asking me for something else or --

9       Q.   Yes.

10      A.   -- have I --

11      Q.   Okay.  I'm asking you whether or not you are

12  familiar with any literature that studies the question

13  of whether or not those who have diabetic nephropathy

14  have had type 2 diabetes for certain periods of time.

15      A.   Ah, yes.  The -- I leave implication of time.

16  But -- but the reason why it's not high on the list --

17  because, clearly, the implication being the longer

18  they've had diabetes, the more likely they are to have

19  diabetic nephropathy.

20           But more overriding than that are some of

21  the other factors I've mentioned.  If they've had

22  diabetes for many, many years, the blood pressure's been

23  well-controlled, the diabetes has been well-controlled

24  as reflected by a hemoglobin A1c of down 6.5 or less,

25  and they happen to be lucky with their HLA group, we may

689

1   have patients who have had diabetes for 50 years with

2   very little, if any, nephropathy.

3            On the other hand, there are type 2

4   diabetics who can present with almost just newly

5   discovered high sugar who already have evidence of

6   leakage of protein in the kidney.  So time is not high

7   on my list.  You asked me for a list and I -- I

8   understand you're now asking for time, but time is not

9   high on my list because the other issues I mentioned can

10  be so much more dominant.

11      Q.   Well, it wouldn't surprise you that there would

Page 45

bt101608.txt

12  be people who would present with high sugars and

13  undiagnosed diabetes, because at least 25 percent of the

14  population at any given time we know now has undiagnosed

15  diabetes, correct?

16       A.  Yes, that's --

17       Q.  So whether or not you're diagnosed with

18  diabetes has nothing whatsoever to do with when you

19  develop diabetes, correct?

20       A.  I think that's a reasonable statement.  And --

21       Q.  So --

22       A.  -- so one looks at average blood sugars over

23  the prevailing time until the point of reference, yes,

24  ma'am.

25       Q.  And you know that there is, you know,

690

1  relatively exquisite literature on the develop -- the

2  length of time it takes to develop diabetic retinopathy,

3  right?

4       A.  Again, ma'am, yes, but time isn't as much of a

5  variable as prevailing hemoglobin A1c.  And if I --

6       Q.  I'm -- so you don't know of any literature --

7  my question to you is:  You don't know of any literature

8  that -- that says if you've got diabetic nephropathy,

9  you've had diabetes -- you've more likely than not had

10  diabetes for a certain number of years?

11            MS. THORPE:  Let the record reflect that

12  the witness is drawing a picture.

13       A.  Ma'am, thank you for asking that question.

14  From the early treatment diabetic retinopathy study,

15  which is one of the studies we discussed, and -- it

16  related to type 1 diabetics -- a number of work --

Page 46

bt101608.txt

17    research workers in essence crunched the data.   And I

18    will show you a diagram which we can use if you feel

19    it's clear enough and would use something or I can

20    produce the original given a little time.

21          And what we have is a summary of what

22    happened to those patients.   And what we saw was -- on

23    the X axis was time, on the Y axis was a representation

24    of something going wrong in the eye, where up at the top

25    was a lot and down at the down was very little.   And I'm

691

1    showing you a family of curves, and the lowest curve

2    would be a hemoglobin Alc of 7, and the highest curve is

3    a hemoglobin Alc of 11.

4          And the original chart that this is a rough

5    diagram of essentially, therefore, shows that as you

6    progress in time, if the hemoglobin Alc is near normal,

7    the rate of progression of retinopathy is very low.   On

8    the other hand, if the subject has a hemoglobin Alc of

9    11, the rate of progression of retinopathy is quite

10    fast.

11          Now, early treatment of diabetic -- the

12    diabetes control and complications trial is useful

13    because they were type 1 diabetics, the implication

14    being they didn't have -- they didn't carry all the

15    other environmental baggage that a type 2 does.   We've

16    mentioned high blood pressure, obesity, abnormal lipids.

17    Type 1 diabetics on average are lean and sugar is their

18    main abnormality.   So this is a clearer curve than it

19    would be if one used type 2 diabetics for that.

20          Having described it, I offer it to the

Page 47

bt101608.txt
21  Court as an example of time and sugar and eye --

22  progression of eye disease or I can produce the original

23  if you prefer.

24      Q.  (BY MS. THORPE)  I -- my question to you, sir,

25  was about diabetic nephropathy.  Is there literature

692

1   like you've just described with retinopathy for diabetic

2   nephropathy?

3       A.  Ma'am, the -- there should be.  The reason for

4   diabetic nephropathy not being as clean is that it's not

5   so easy to measure.  But my suspicion is -- and I

6   haven't looked at it because I use this one far more for

7   teaching.  In that setting one would have on the Y axis

8   to be grams or -- milligram of protein leakage and then

9   creatinine change.  So it's not such a clean measurable

10  commodity as changes in the eye.

11      Q.  My question to you is:  Do you know of any

12  literature that has the time course of the development

13  of diabetic nephropathy in people who have type 2

14  diabetes?

15      A.  Offhand, I can't think of a -- a study which

16  would clarify it as clearly as this EBDRS -- I mean --

17  DCTT study for the reasons I've mentioned.

18      Q.  Can you think of any literature on the topic of

19  the time course of diabetic nephropathy and people who

20  have type 2 diabetes?

21      A.  Not offhand.  Clearly, I'm sure it's out there.

22  I just haven't used it for -- for teaching in the manner

23  that I've used this particular curve.

24      Q.  Let me mark your drawing as Exhibit 86.

25          (Exhibit No. 86 marked.)

Page 48

bt101608.txt

693

1      Q.   (BY MS. THORPE)  All right.  You agree I've
2  just marked your drawing?
3      A.   Yes, ma'am.
4      Q.   You agree that an acute illness can cause a
5  major metabolic stress and can produce abnormal sugars
6  in somebody within 72 hours?
7      A.   Yes, ma'am.
8      Q.   And that can be -- can that be in somebody
9  who's not even diabetic to start?
10     A.   I don't think so.  I think -- excuse me -- most
11  of us have -- have more than adequate insulin reserve.
12     Q.   Okay.  So you have to be -- either have
13  impaired fasting glucose or be diabetic, then develop an
14  acute illness and then you can have a major metabolic
15  stress and that can produce abnormal sugars within 72
16  hours?
17     A.   Yes, ma'am.
18     Q.   All right.  And the kind of acute illness you
19  might be talking about, for example, might be an
20  infection, right?
21     A.   A good example which often comes on is
22  influenza.
23     Q.   Okay.  Or pneumonia?
24     A.   Or pneumonia.
25     Q.   How about urinary tract infection?

694

1      A.   Yes.  But there the difficulty is the symptoms
2  in the urinary tract infection often overlay, but

Page 49

bt101608.txt

3   certainly that can cause high sugar.

4       Q.   Urosepsis could cause the manifestation of high

5   sugar, right?

6       A.   Yes, in those subjects who have reduced insulin

7   reserve, yes, ma'am.

8       Q.   What kind of labs would you expect to see that

9   would, you know, mark an infection that would be

10  stressful enough to produce abnormal sugars in someone

11  within 72 hours?  Not glucose but other labs.  What kind

12  of markers of infection would you be looking for?

13      A.   Well, if it's a bacterial infection, the white

14  cell count would be elevated.

15      Q.   To what?  To what?

16      A.   A normal white cell count is 10.8 in most labs,

17  thousand, and an acute bacterial infection, the number

18  could be twice that, 22 to 24,000.  If it's a viral

19  infection, the white cell count may be normal or low, in

20  which case all you'd had would be the signs of an

21  infection as reflected by high fever and muscle aches

22  and pains.  But the white cell count could be normal.

23      Q.   Any other markers?

24      A.   Of an acute infection ?  Well, if it's in the

25  lungs, it would be associated with cough and sputum.  If

                                                695

1   it's in the bloodstream, it could be associated with

2   embolic signs or red cells in the urine.  If -- if it's

3   in the gut, it would be associated with maybe diarrhea.

4   If it's in the gallbladder or the appendix, it would be

5   associated with tenderness and rebound in the organs in

6   the area of the organs that were inflamed or infected.

7       Q.   And let's talk a little bit about

                        Page 50

bt101608.txt

8   hyperosmolari.  Tell me what can cause hyperosmolari.

9       A.   Okay.  I'm assuming that your question relates

10  to a condition called hyperosmolar coma, which is a

11  common -- well, at least which is a known presenting

12  complication of elderly type 2 diabetic subjects.  Our

13  best interpretation of that is that a condition produces

14  stress on the body, the sugar rises.

15      Q.   Like an infection?

16      A.   Like an infection.

17      Q.   Like a urinary tract infection or pneumonia?

18      A.   Why don't we use influenza because it's virus

19  and, therefore, isolated from any other issues.

20           Let's assume our subject -- an elderly

21  subject gets a viral pneumonia such as influenza.  The

22  temperature would be up, the stress hormones which

23  include cortisol and prolactin and adrenaline would go

24  up.  The net effect of that would be to cause a rise in

25  sugar.  In a elderly subject, quite often the fever

                                                    696

1   would cause a lot of fluid loss.  The high sugar would

2   cause fluid loss through the kidneys.  And some elderly

3   subjects do not drink enough to maintain the fluid that

4   they are losing.

5           The net effect of that over the next 36

6   hours is -- as I mentioned yesterday, any time the

7   sugar's above 180 to 200, there's an obligate diuresis

8   from the kidney.  So fluid is being lost and a person

9   who is a grape turns into a raisin.  If one then

10  measured the sugar in the raisin, if there's enough

11  insulin not to allow free fatty acids to mobilize, the

                            Page 51

bt101608.txt

12  patient comes in with a very high level of sugar.

13  That's what we would call hyperosmolar, sugars may be as

14  high as 2,000 but without evidence of ketosis.

15             Let me explain why that is.  If we look at

16  the action of insulin, you need a little bit of insulin

17  to stop free fatty acids breaking down and making fatty

18  acids which become ketones.  You need a little more

19  insulin, about tenfold more, to get sugar into the

20  cells.  So in these older patients in whom there's

21  enough insulin not to allow free fatty acids to mobilize

22  but not enough to bring that high sugar down normal,

23  that's -- those are the subjects who are at risk from

24  hyperosmolar coma.  Does that help?

25       Q.  Yes.  And hyperosmolar -- you could have a

♀

697

1  hyperosmolar condition without being in a coma, correct?

2       A.  Yes, ma'am.  The level of coma depends on the

3  height of sugar and the time that the brain is squeezed

4  back to a raisin or down to a raisin.

5       Q.  And you don't have to have a coma at all?

6       A.  Absolutely, ma'am.

7       Q.  All right.  I mean -- okay.

8             So the hyperosmolar condition can be caused

9  by -- could be caused by urosepsis, could be triggered

10  by urosepsis?

11       A.  Ma'am, the term "urosepsis" is implied that

12  there are bacteria circulating in the blood that

13  originated in the urinary tract.  This could be from the

14  bladder or it could be from an abscess near the kidney,

15  yes, ma'am.  And having defined that, yes, it would be

16  one of the -- it could be one of the contributing

Page 52

bt101608.txt

17  factors that would produce a hyperosmolar state.

18       Q.  All right.  And what about trauma?  Can trauma

19  produce a hyperosmolar state?

20       A.  Well, I'm thinking.  If we ask for a trauma to

21  a limb such as a broken arm or a broken leg,

22  theoretically it could but it's very rare just because

23  of the combination of circumstances.  Usually the broken

24  limb is brought to medical attention so that the 36

25  hours that is usually required for the development of

                                                        698

1   the hyperosmolar state is -- doesn't -- isn't occurred.

2   The patient receives medical care.

3            So you would have to then hypothesize an

4   elderly person breaking a limb in an isolated set of

5   circumstances where they were not brought to medical

6   care.  Certainly in that setting hyperosmolar state

7   could occur.

8        Q.  Do you agree that there are certain medications

9   that can trigger a hyperosmolar state like diuretics

10  such as Hyzaar?

11       A.  Yes, ma'am.  The substance you have mentioned

12  is actually a combined medication.  It's got an ARB plus

13  a diuretic.

14       Q.  Which is hydrochlorothiazide?

15       A.  Yes, ma'am.  And that can lead to loss of salt

16  and water.  The dose of hydrochlorothiazide, which has

17  been associated with development of high sugars, is

18  usually a little bit more than is present in Hyzaar.

19  The -- much above 25 milligrams in 24 hours is

20  associated with a rise in blood sugar in the elderly

Page 53

bt101608.txt

21  subjects.  If Hyzaar has 12-1/2 milligrams, it's on the

22  safer side.

23      Q.  Okay.  But it can be associated with the

24  development -- Hyzaar or other diuretics can be

25  associated with the development of a hyperosmolar state?

699

1       A.  Yes, ma'am.

2           May I -- may I simplify your question and

3  say let's forget the ARB component of Hyzaar, let's just

4  take hydrochlorothiazide.  If a subject was on

5  50 milligrams a day of hydrochlorothiazide and had

6  marginal pancreatic reserve, it would be possible to

7  lose a lot of fluid, to raise the sugar, and develop a

8  hyperosmolar state, at least theoretically.

9       Q.  All right.

10          (Exhibit No. 87 marked.)

11      Q.  (BY MS. THORPE)  Let me show you what's been

12  marked as Exhibit 87 for identification.  And, Doctor,

13  this is a record on Mr. Unger in September of 2005 when

14  he went to the emergency room, right?  You've looked at

15  this?

16      A.  Yes, ma'am.

17      Q.  And he slipped and fell at home and went to the

18  emergency room complaining of ankle pain and swelling,

19  right?

20      A.  Yes, ma'am.

21      Q.  And if you look at the report, his blood

22  pressures measured, on the front page, when he first

23  came in -- is recorded as 80/45, right?

24      A.  Yes, ma'am.

25      Q.  That's a very low blood pressure, correct?

Page 54

bt101608.txt

700

1          A.   Well, in a fit young school girl, that could

2   almost be normal.   In an obese subject of this man's

3   weight, that is getting down.

4          Q.   It's pretty low, isn't it?

5          A.   Yes, ma'am.

6          Q.   And if you go to the next page of Exhibit 87,

7   you see that his blood pressure is recorded two more

8   times, a second time at 98/62 and a third time at

9   101/44.   Both of those are abnormal blood pressures for

10  someone of Mr. Unger's girth, correct?

11         A.   Could be, yes, ma'am.

12         Q.   And if you look at the top of the page, you see

13  that he's noted to have bilateral edema, right?

14         A.   Yes, ma'am.

15         Q.   And then you understand that Mr. Unger was sent

16  home from the emergency room, right?

17         A.   Yes, ma'am.

18         Q.   Now, the next day you know that Mr. Unger was

19  admitted to Mercy Hospital, right?

20         A.   Yes, ma'am.

21               (Exhibit No. 88 marked.)

22         Q.   (BY MS. THORPE)  And I'm going to show you

23  his -- the discharge summary from his admission at -- at

24  Mercy Hospital.

25         A.   Thank you, ma'am.

701

1          Q.   And -- and you've seen that document before,

2   correct?

bt101608.txt

 3      A.   Yes, ma'am.

 4      Q.   And it's been marked as Exhibit 88, correct?

 5      A.   Yes, ma'am.

 6      Q.   And Mr. Unger had an admitted -- admitting

 7  diagnosis of altered mental status and urosepsis, right?

 8      A.   That's correct.

 9      Q.   And the laboratory data on admission reflected

10  a high white blood cell count?

11      A.   Yes, ma'am.

12      Q.   And a left shift in his neutrophils and

13  lymphocytes?

14      A.   That's correct.

15      Q.   Which is indicative of infection, correct?

16      A.   Acute infection, yes, ma'am.

17      Q.   And he had a high sed rate, which is a general

18  lab result but also reflects infection, correct?

19      A.   Yes, ma'am.

20      Q.   And Mr. Unger was noted to have a -- also a

21  questionable infection of his left lower extremity,

22  right?

23      A.   Yes, ma'am.

24      Q.   Would you agree that the hyperosmolar condition

25  that Mr. Unger had was caused by his infection that is

                                                        702


 1  reflected in his lab -- you know, his laboratory values?

 2      A.   I -- I believe that that was one of the

 3  factors, yes, ma'am.

 4      Q.   All right.  What were the other factors?

 5      A.   He was obese; he is on an atypical

 6  antipsychotic; he was on Hyzaar, which we agreed

 7  contained hydrochlorothiazide, and in this case the dose

                        Page 56

bt101608.txt

8    was 25 milligrams.  He was on two other diuretics, one

9    is Bumex and the other one is Zaroxolyn, and each of

10   those would have reduced his free water and serum

11   sodium.

12        Q.   So he was on multiple diuretics which would

13   have been in your mind contributing causes of his

14   hyperosmolar condition, correct?

15        A.   Yes, ma'am.

16        Q.   And his obesity was in your mind a contributing

17   cause of his hyperosmolar condition, correct?

18        A.   Well, of the abnormal blood sugar which was a

19   contributing factor, yes, ma'am.

20        Q.   And his infection that his labs reflected was

21   also a contributing factor, correct?

22        A.   Yes, ma'am.

23        Q.   And also a cause of his hyperosmolar condition,

24   right?

25        A.   Yes, ma'am.

                                                      703


1         Q.   Now, as with many things we've discussed, you

2    have not reviewed the literature to figure out the

3    particular quantitative contribution any of these

4    drawings or his obesity or the infection played in

5    leading him to develop this hyperosmolar condition,

6    right?

7              MR. BRUDNER:  Objection, form.

8         A.   That's -- that's correct, ma'am.

9         Q.   (BY MS. THORPE)  And any of these conditions,

10   the diuretics he was on, his obesity, the infection, in

11   and of itself could have led this very obese man to

                         Page 57

bt101608.txt

12  develop the abnormal hyperosmolar condition, right?

13      A.  Yes, ma'am.

14      Q.  You would agree that -- well, let -- let me ask

15  you this.

16          When did Mr. Unger develop diabetes, not

17  when was he diagnosed, but when did he develop diabetes?

18      A.  Well, from my report I note that in September

19  of 2005 after a fall he was noted to have a blood sugar

20  of 1590.

21      Q.  That was his admission, right, to Mercy

22  Hospital --

23      A.  That was this particular admission.

24      Q.  -- right?

25      A.  So to appropriately answer your question, I

704

1  would need to go back to the time line which summarizes

2  his clinical state and see if we can find an earlier --

3      Q.  That's not it.

4      A.  -- Haller -- see if we can find an earlier

5  number for you.

6          MS. THORPE:  Let's go off the record for a

7  minute while I look for this.

8          THE WITNESS:  Okay.  Thank you.

9          (Short recess from 6:16 to 6:21.)

10      Q.  (BY MS. THORPE)  So we found Mr. Unger's time

11  line for you.

12      A.  Thank you, ma'am.

13      Q.  So do you need the question to refresh you?

14      A.  No, ma'am.  What I recall -- we discovered when

15  he had a very high sugar which was associated with a

16  fall and then a hyperosmolar state, and what we're

Page 58

bt101608.txt

17  looking for is evidence of a sugar before that which

18  would be compatible with the diagnosis of diabetes.

19              On my time line, I really don't have a

20  sugar value between October 29th of 2003 and September

21  the 6th of 2005.  Given the natural history which we've

22  discussed, my belief is he would have had a -- would

23  have probably -- more likely than not would have had

24  abnormal sugars in the fasting or maybe in the loaded

25  state between those two times.

705

1       Q.   Well, my question to you is:  When did he get

2   diabetes?

3       A.   We do not have an answer to that for all that

4   we've shared.  But there are a number of folk whose

5   sugar's compatible with the diagnosis of diabetes which

6   is greater than 126, is so modest in their effect on the

7   body's functions that they remain undiagnosed.

8       Q.   So it's fair to say that you don't know when

9   Mr. Unger actually developed diabetes, correct?

10      A.   That's correct.

11      Q.   You don't know whether or not he had diabetes

12  before he took Seroquel, right?

13      A.   That's correct.  We have only one normal sugar,

14  October the 29th of 2003, at least it was a normal

15  sugar, and we -- we don't know if he'd had any glucose

16  load test before that, that's correct.

17      Q.   What is edema?  What is edema?

18      A.   Edema is a term that relates to the occurrence

19  of free water in the tissues under the skin.

20      Q.   Edema contributes to your weight?

Page 59

bt101608.txt

21      A.   Yes, ma'am.

22      Q.   So when you're weighed, this water that

23  accumulates under your skin can add to your weight,

24  right?

25      A.   Yes, ma'am.  We use --

706

1      Q.   It's not --

2      A.   -- the word "water."  Usually it's salt and

3  water.  It's actually tissue fluid.  But, yes, ma'am.

4      Q.   Okay.  And the tissue fluid that accumulates

5  isn't created by the calories that you would take in,

6  right?

7      A.   That's correct.

8      Q.   It is not caused -- edema is not caused by

9  eating?

10      A.   Woo.   There are many causes of edema.

11      Q.   Okay.   Tell me what the causes of edema are.

12      A.   The main causes of edema are an inability of a

13  kidney to clear free salt and water, and this can be

14  because the kidney is damaged for the mechanisms we

15  mentioned earlier, for example, long-standing diabetes.

16  It could be because the patient has abnormal blood

17  pressure which modifies the kidneys' ability to work.

18  It could be because the patient has a heart condition

19  which reduces the ability of the kidney to function when

20  the heart is not perfusing it right.  And then finally

21  there's a fine balance between the proteins in the

22  tissues and the proteins in the capillaries, and if that

23  balance is upset by a loss of albumin, then one can get

24  edema because there isn't enough oncotic pressure in the

25  capillaries to bring sugar back out to bring fluid,

Page 60

bt101608.txt

⚥

1   meaning salt and water, back out of the tissues.

2       Q.   When you've talked about Seroquel being

3   associated with weight gain, you're not talking about

4   weight gain from edema?

5       A.   That's correct, ma'am.   To the best of my

6   interpretation of the available literature, I believe

7   it's to do with retention of calories.

8       Q.   Okay.   And edema can actually add to your --

9   edema can actually add to your weight considerably,

10  right?

11      A.   Yes, ma'am, in folk who have a low protein

12  state in their serum, you could get 15 to 20 pounds

13  worth of fluid retained --

14      Q.   And you --

15      A.   -- and maybe more.

16      Q.   You know that Mr. Unger had edema, you just saw

17  that he had it when he went to the ER, right?

18      A.   Yes, ma'am.

19      Q.   And I'm going to show you a record dated June

20  19, 2003 --

21               (Exhibit No. 89 marked.)

22      Q.   (BY MS. THORPE)  -- which I've just marked as

23  Exhibit 89.

24      A.   Thank you, ma'am.

25      Q.   And he has gotten consultation from a vascular

⚥

1   laboratory because he's reporting his main problem is

2   unexplainable edema in both of his legs below the knees,

Page 61

bt101608.txt

3   correct?

4          A.   Yes, ma'am.

5          Q.   How much of Mr. Unger's weight gain is related

6   to his edema?

7          A.   We don't have measurements of his limb girth

8   other than these ones.   So you've heard me say I believe

9   at least 15 to 20 pounds might be retained in subjects

10  with significant edema.   But we don't know -- we don't

11  have a way of discriminating from the reading of the

12  scale how much of the weight change is from retention of

13  salt and water and how much is from retention of

14  calories.

15         Q.   So you don't know in Mr. Unger how much of his

16  weight gain was attributable to edema that didn't have

17  anything to do with Seroquel, right?

18         A.   Yes, ma'am.

19         Q.   That's correct?

20         A.   That's correct.

21         Q.   Okay.   Now, Mr. Unger, as we've discussed, was

22  on Seroquel during the year 2006 up until October,

23  right?

24         A.   Yes, ma'am.

25         Q.   I'm going to show you -- I'm looking for a pen

                                                          709


1   here.

2                   (Exhibit No. 90 marked.)

3          Q.   (BY MS. THORPE)  -- a document that's been

4   marked as Exhibit 90 that is a note from his doctor,

5   Dr. Quintero, who you know is an endocrinologist, right?

6          A.   Thank you, ma'am.   Yes.

7          Q.   And Dr. Quintero's note from May 3, 2006, while

                        Page 62

bt101608.txt

8    Mr. Unger was taking Seroquel, shows that his blood

9    glucose has been stable, right?

10        A.   Yes, ma'am.

11            (Exhibit No. 91 marked.)

12        Q.   (BY MS. THORPE)  And then I'm going to show you

13   a lab report that's been marked as Exhibit 91 from

14   June -- on June 9th of 2006.  And you can see that his

15   glucose level in June of 2006 was 88, right?

16        A.   Yes, ma'am.

17        Q.   And that was normal?

18        A.   Yes, ma'am.

19        Q.   And he had an A1c, which is on the next page,

20   which was 6.1, which indicates pretty good control of

21   his blood sugar, right?

22        A.   Yes, ma'am.

23        Q.   And this was while he was on Seroquel, correct?

24        A.   Yes, ma'am.

25            (Exhibit No. 92 marked.)

                                                    710


1         Q.   (BY MS. THORPE)  And I'm going to show you

2    another note from Dr. Quintero that's been marked as

3    Exhibit 92.  And this is a -- a record of June 12, 2006,

4    right?

5         A.   Yes, ma'am.

6         Q.   And you've seen this before, right?

7         A.   Yes, ma'am.

8         Q.   And he says that Mr. Unger comes in for

9    follow-up and that he has excellent blood glucose,

10   right?

11        A.   Yes, ma'am.

                      Page 63

bt101608.txt

12          Q.   And that's at a time when he was on Seroquel?

13          A.   Yes, ma'am.  I would also point out that his

14    blood pressure is quite low.   Remember we were

15    speculating.   And there's a guy under an otherwise

16    stable condition and his pressure's 90/60.

17                   (Exhibit No. 93 marked.)

18          Q.   (BY MS. THORPE)  I'm going to show you what's

19    been marked as Exhibit 93 for identification.   And

20    that's an August of '06 note from Dr. Quintero during

21    the time that Mr. Unger was on Seroquel.   And he has a

22    note that he has an A1c of 6.1, which, again, is good

23    control of his blood sugar, correct?

24          A.   Yes, ma'am.

25                   (Exhibit No. 94 marked.)

                                                              711

 1          Q.   (BY MS. THORPE)  All right.  I'm going to show

 2    you what's been marked as Exhibit 94 for identification.

 3    And this is a lab report from September of 2006 while

 4    Mr. Unger is still taking Seroquel.   And, again, his

 5    glucose --

 6          A.   Eighty-seven.

 7          Q.   -- is 87, and that's normal, right?

 8          A.   Yes, ma'am.

 9          Q.   And his A1c is 6.0, which is also normal?

10          A.   Yes, ma'am.

11          Q.   And so during the -- the time after his

12    admission to Mercy Hospital in September of 2005 when he

13    had the trauma and the infection and the diuretics and

14    he had the high blood sugar, after that point his blood

15    sugars were well-controlled, correct?

16          A.   Yes, ma'am.

                          Page 64

bt101608.txt

17          Q.   In October of 2006, he went off Seroquel and

18     his blood sugars after he went off Seroquel remained the

19     same, didn't they?

20          A.   Yes, ma'am.

21          Q.   They still remained in the normal range after

22     he went off Seroquel, correct?

23          A.   Yes, ma'am.

24          Q.   So there's really no difference in his blood

25     sugars before and after his Seroquel use, correct?

                                                          712


1          A.   That's correct.

2          Q.   And you saw no differences in his other labs

3     before or after Seroquel like cholesterol and

4     triglycerides?

5          A.   That's correct.

6               (Exhibit No. 95 marked.)

7          Q.   (BY MS. THORPE)  All right.  I'm going to show

8     you what's been marked as Exhibit 95 for identification,

9     which is your curriculum vitae.

10          A.   Thank you, ma'am.

11          Q.   This is the C.V. that was produced to us,

12     Dr. Tulloch.  Is it current?

13          A.   It's as current as my C.V. is.  In other words,

14     I -- I've done a lot of things and I don't write

15     everything down on my C.V.  An academic C.V. is

16     sometimes updated every six to nine months, and so there

17     would be a lot more current stuff in an academic

18     physician's.

19          Q.   Well, what I want to know is if this has all

20     your publications, grants, and abstracts on it.

                          Page 65

bt101608.txt
21    A.   Yes, that's right.

22    Q.   Is it correct that the last time you received a

23  research grant was in 1998?

24    A.   Yes.

25    Q.   When was the last time you -- well, strike

                                                         713


1  that.

2              It looks like from looking at your C.V. the

3  last time you authored a peer-reviewed publication was

4  1985?

5    A.   That's reasonable.

6    Q.   When was the -- it also looks like the last

7  time you authored an abstract was 1985?

8    A.   That's correct.

9    Q.   Have you ever published anything regarding

10  Seroquel?

11    A.   No, ma'am.

12    Q.   Have you ever published anything regarding

13  second-generation antipsychotics?

14    A.   No, ma'am.

15    Q.   Have you ever published anything regarding any

16  kind of antipsychotic?

17    A.   No.

18    Q.   Have you conducted any original research that

19  hasn't been published regarding Seroquel?

20    A.   No, ma'am.

21    Q.   Or any other antipsychotic?

22    A.   No, ma'am.

23    Q.   Have you ever published or conducted research

24  on weight gain?

25    A.   No, ma'am.

                        Page 66

bt101608.txt

⚲

714

```
 1      Q.   How many times have you served as an expert
 2   witness in your career?  Is -- I know you have the
 3   four -- you know, you have the last four years.
 4      A.   I really don't think I have a -- an answer to
 5   that.  What you have listed are the most recent ones.
 6   But I did mention I'm -- I'm -- I do a lot for TMLT,
 7   which is Texas Medical Liability Trust.  And probably --
 8   fairly commonly I get a phone call, we think
 9   such-and-such has happened, what do you think.  And
10   that's, in essence, a casual opinion which I often give
11   back on the phone.
12                Medical Liability Trust is a sort of
13   doctors looking after doctors.  And I probably give --
14   and have over the last 15 years given a casual report
15   quite frequently.  Now, quite frequently, some years can
16   be 12 times a year and other years may be only once a
17   year.  So, clearly, if I tender a guess, the guess could
18   be 40 or 50 occasions.  And a lot of those times they're
19   just telephone calls.
20                What you have listed in Exhibit -- give me
21   the number --
22      Q.   D.
23      A.   -- D are the major public appearances in which
24   I appeared -- gave a deposition or appeared in court.
25      Q.   I guess what I'm looking for is whether --
```

715

```
 1   other than the six items that are listed on your
 2   testimony list, have -- you know, outside of the past
```

bt101608.txt

3   four years, have you given any other sworn testimony

4   where you've given a deposition or you've been --

5        A.   Yes.

6        Q.   -- to court or whatever?

7        A.   I think -- outside the four years, I think the

8   biggest one was the Rezulin trials, and that -- that was

9   probably six or seven years ago.  And I did a lot of

10  work with the defense for Rezulin, and the colleague

11  busy at the time was -- was Mr. Tom Sartwelle.

12       Q.   Can you spell that?

13       A.   S-a-r-t-w-e-l-l-e.

14       Q.   Do you remember where he worked?

15       A.   Well, he had his own law firm for many years.

16  He was a active medical defense attorney in this

17  community.

18       Q.   Other than that, has there been any other sworn

19  testimony that you've given?

20       A.   To the best of my knowledge, in the last four

21  years in public, what you have is there.

22       Q.   And, I mean --

23       A.   Oh, going back before that?

24       Q.   Yes.

25       A.   Not at the level of public depositions.  Much

716

1   of what I give is -- is casual and on the phone.

2        Q.   I'm only asking you for your --

3        A.   I would --

4        Q.   -- sworn testimony.

5        A.   I would stay with the Rezulin as the most

6   memorable of those.

7        Q.   Okay.  I'm not looking for memorable, I'm

bt101608.txt

8    looking for all, all that you know of where you gave

9    either a deposition or you testified in court.

10        A.   I can't remember other cases coming through to

11   court other than the Rezulin one.

12        Q.   So you don't remember ever giving a deposition

13   other than Rezulin and these six cases that are in

14   your --

15        A.   That's correct.

16        Q.   -- report?

17             Has any Court ever entered any kind of

18   order that you're aware of excluding your testimony?

19        A.   No, ma'am, not at all.

20        Q.   On your C.V. you list that you serve as a

21   clinical associate professor at M.D. Anderson?

22        A.   Ma'am, that's an honorary position.  Clearly,

23   I'm not a cancer doctor.  What it was -- for many years

24   I gave lectures at the training unit at the M.D.

25   Anderson.  And usually so that the -- whatever paper

                                                      717

1    work they need for their lectures, they award an

2    honorary position for that.  It does not mean I have

3    spent time caring for cancer patients in the M.D.

4    Anderson.

5         Q.   Okay.  I'm trying to understand what it does

6    mean.

7         A.   Yeah.  No, that's why I'm trying --

8         Q.   You mention it in your report.  You say you're

9    a clinical associate professor at M.D. Anderson Hospital

10   in Houston.

11        A.   Actually, if you look at the wording, it's the

                          Page 69

bt101608.txt

12  University of Texas and M.D. Anderson, because those two

13  are parallel.

14      Q.  Okay.  I'm looking at the first page of your

15  report.  You say, "I'm a clinical associate professor in

16  internal medicine and ophthalmology at the University of

17  Texas Medical School at Houston and a clinical associate

18  professor at M.D. Anderson Hospital and Tumor Institute

19  also in Houston."

20      A.  That's correct.

21      Q.  Do you teach at M.D. A -- M.D. Anderson

22  Hospital?

23      A.  Not now.  I have in the past.

24      Q.  Right.

25      A.  And that -- that's historical.

                                              718


 1      Q.  All right.  When was that?

 2      A.  Oh, probably five years ago.

 3      Q.  And in the -- in that time, that five years

 4  ago, what was the work involved?

 5      A.  I would give a lecture on the abnormalities of

 6  blood lipids with endocrine cases.  I would give a

 7  lecture on hyperlipidemia and its management.

 8      Q.  How many times did you do that?

 9      A.  It was once a year for many years, and it was

10  sort of part of their curriculum.  They would have

11  external lecturers that would come in.

12      Q.  Okay.  And who at M.D. Anderson would know

13  about your relationship to do that?  Was there -- is

14  there anybody who would --

15      A.  I could call up and find out.  Ma'am, once a

16  year I would get a renewal from the dean, and I think

                        Page 70

bt101608.txt

17    the dean that was employing me at the time has since

18    retired.

19         Q.   So it wouldn't surprise you that you're --

20    you're not on their --

21         A.   Current.

22         Q.   -- materials currently, right?

23         A.   Currently.  That's right, yeah.

24         Q.   And so it was at least five years ago that you

25    did this?

                                                          719


 1         A.   Yes, ma'am.

 2         Q.   And it was a one time -- once a year --

 3         A.   Once a year.

 4         Q.   -- lecture for how many years?

 5         A.   Oh, probably 10 years, maybe 15.

 6         Q.   Okay.  The -- similarly, you list yourself as a

 7    clinical associate professor at the University of Texas

 8    Medical School, right?

 9         A.   That's correct.

10         Q.   And you're not such a professor now?

11         A.   I'm not active -- well, clinic -- clinical

12    associate is the context which is an honorary -- an

13    honorary position.  Essentially they keep us on their

14    list so that if they need another lecturer in a

15    particular topic, we are invited.  And pretty well the

16    same applies for the University of Texas as for the M.D.

17    Anderson, that I have given talks there, we have an

18    endocrine meeting on a Thursday night, and I am invited

19    to give lectures at that endocrine meeting from time to

20    time.

                              Page 71

bt101608.txt
21            But, again, I suspect the last one I gave
22  was at least three or four years ago.
23       Q.  And so -- and how many times have you given
24  such a lecture at the University of Texas Medical
25  School?

                                                     720


 1       A.  Probably once a year, once every second year.
 2       Q.  About three or four years ago?
 3       A.  Yeah, up until about three or four years ago,
 4  ma'am, yes.
 5       Q.  And you are not on the faculty of either M.D.
 6  Anderson or the University of Texas?
 7       A.  At present, that's correct.
 8       Q.  And you were not on the faculty of those
 9  schools four or five years ago.  You've never been --
10       A.  No.
11       Q.  -- on the faculty of those schools, correct?
12       A.  I was.  I was a full-time lecturer until -- and
13  clinical -- and non -- not -- I was an associate
14  professor, not a clinical associate professor.  The word
15  "clinical" implies honorary.  I was a full-time
16  professor from 1977 until 1981.
17       Q.  Where?
18       A.  At -- at the University of Texas.
19       Q.  Okay.
20       A.  I was recruited by the University of Texas to
21  serve as a full-time professor.
22       Q.  And that -- and you served there until 1981?
23       A.  That's correct, ma'am.
24       Q.  And then after that you were not on the faculty
25  of the University of Texas?
                     Page 72

bt101608.txt

♀

721

1          A.   Then I became on the honorary faculty and
2    remained on that for the next probably 15 years.
3          Q.   And then four years ago you stopped doing that?
4          A.   Right.
5          Q.   And you -- and during that time period that you
6    were an honorary faculty member, that meant you gave a
7    lecture about once a year?
8          A.   And taught medical students and took medical
9    students into the office for teaching and physical --
10   let me go back to the problem of a medical school, which
11   is to get clinicians to spend time with the students
12   who've had experience.  And we still have students who
13   come to our offices from time to time.  In fact, we have
14   some right now in our office.
15               And for those offices to be credentialed,
16   the medical school essentially carries a number of
17   clinical associate professorships.  I last received a
18   salary from the University of Texas in 1981.
19         Q.   When's the last time you received -- so when
20   you've done these lectures, they've been voluntary?
21         A.   Yes, ma'am.
22         Q.   All right.
23         A.   And when I've done teaching, they've been
24   voluntary as well, yeah.
25         Q.   So you have not been paid -- ever been paid by

♀

722

1    M.D. Anderson?
2          A.   After 1981, no.

Page 73

bt101608.txt

3      Q.   You were paid by M.D. Anderson before 1981?

4      A.   No, I was -- the administration for University

5   of Texas and M.D. Anderson were a common umbrella.

6      Q.   All right.  So up until 1981, you -- you were

7   at the University of Texas --

8      A.   Right.

9      Q.   -- and you taught full-time and you got paid

10  and after that you weren't paid again?

11     A.   That's right.

12     Q.   All right.  You would agree, Dr. Tulloch, that

13  the ADA/APA consensus statement we've discussed is

14  consistent with the generally accepted view of the state

15  of science with regard to atypical antipsychotics and

16  diabetes risks?

17               MR. BRUDNER:   Objection, form.

18     A.   Ma'am, I missed the first part of that

19  sentence.   Could you ask it again?

20     Q.   (BY MS. THORPE)   The ADA/APA consensus

21  statement, you would agree, is consistent with the

22  generally accepted view of the state of the science with

23  regard to atypical antipsychotics and diabetes risk?

24               MR. BRUDNER:   Same objection.

25     A.   At the time that it was produced, yes, ma'am.

                                                    723


1      Q.   (BY MS. THORPE)   And do you agree that it still

2   reflects -- that the ADA/APA consensus statement still

3   is consistent with the generally accepted view of the

4   state of the science with regard to atypical

5   antipsychotics and diabetes risks?

6      A.   Yes, ma'am.   But as we mentioned earlier, it

7   acknowledged that there was a deficiency in some of the

bt101608.txt

8   atypical antipsychotics, and, clearly, any statement

9   like that is subject to the arrival of -- of new

10  information.

11       Q.   But you still agree that that statement

12  represents the general consensus currently of scientific

13  opinion with regard to atypical antipsychotics and

14  diabetes risk?

15       A.   Yes, ma'am.

16       Q.   You would agree that a significant percentage

17  of patients taking Seroquel would be expected to develop

18  diabetes because of the background incidence of diabetes

19  in the mentally ill even assuming no drug effect?

20       A.   Yes, ma'am, we've acknowledged that as a

21  factor, yes, ma'am.

22       Q.   You would agree that it would be important in

23  studying Seroquel and diabetes in epidemiologic studies

24  to control for factors such as obesity, BMI, family

25  history, smoking, and those types of things in order to

                                                      724


1   have a good study?

2        A.   Yes, ma'am.

3        Q.   And you would agree that to the extent that the

4   epidemiologic studies do not control for obesity, family

5   history, smoking, they cannot provide reliable evidence

6   of an association between Seroquel and diabetes?

7        A.   Ma'am, I think in all of these clinical

8   studies, one has to take the best available information

9   given the inadequacy or the imperfection of the

10  subjects' risk factors.  So, yes, you -- one takes the

11  best conclusion one can.

Page 75

bt101608.txt

12      Q.   A -- you would agree that a substantial

13  percentage of patients lose weight while being treated

14  with Seroquel?

15              MR. BRUDNER:   Objection, form.

16      A.   It has been recorded that patients have lost

17  weight with Seroquel, yes, ma'am.

18      Q.   (BY MS. THORPE)  And one cannot rule out the

19  possibility that weight changes associated with Seroquel

20  treatment are due to changing lifestyles of patients

21  arising from reduction in the symptoms of their mental

22  illness or any number of other factors?

23              MR. BRUDNER:   Objection, form.

24      A.   That's a reasonable statement.

25      Q.   (BY MS. THORPE)  You would agree that the

                                                   725


1   reported findings of observational epidemiologic studies

2   comparing Seroquel -- strike that.

3              Okay.  Why don't I go through my notes just

4   to make sure that I've covered what I need to cover and

5   we'll give Brendan a few more minutes to finish up the

6   list and I think we'll be close to being done.

7              (Short recess from 6:55 to 7:11.)

8              MS. THORPE:   Let me just say that at

9   Dr. Tulloch's request we asked my colleague, Brendan

10  Krasinski, to go through Exhibits 4 and 16 and identify

11  those articles and materials that are on the reference

12  exhibit list that you produced to us.

13      Q.   (BY MS. THORPE)  And as I understand it,

14  Dr. Tulloch, the materials that are in Exhibits 4 and 16

15  are all of the materials that you read in the way of

16  scientific or medical literature that pertain to your

                          Page 76

bt101608.txt

17    opinions in this case, right?

18         A.   In Seroquel, yes, ma'am.

19         Q.   Right.

20         A.   I mentioned I'd spent some time with Zyprexa

21    and that there's a whole lot of articles on Zyprexa

22    which are in my computer but which I don't believe

23    should cloud out our reference list today.

24         Q.   Right.  Now, as I understand it from conferring

25    with my colleague, a number of the articles -- some of

726

1     the articles that are in your stack are not included in

2     the reference exhibit list.  So we have only checked the

3     ones that are on the reference list that you've read,

4     because my goal is to establish what you read on the

5     Reference Exhibit List.

6          A.   Okay.

7          Q.   That's not to say that we don't know that you

8     also read the other things that are in Exhibit 4 and 16.

9     So our effort was to identify those records at your

10    request -- since you didn't want to sit there and do it,

11    those articles that you read on the reference exhibit

12    list.

13              So I want you to look at Exhibit 65 and

14    tell me if those articles appear to be the ones on the

15    reference list that you -- that you read.

16         A.   Yes, ma'am.  I believe they are.  And I thank

17    your colleague for taking that time and trouble for

18    doing that.  I really do appreciate that.

19         Q.   And then, of course, you've also marked the

20    document Exhibit 85 --

Page 77

bt101608.txt

21    A.  Yes, ma'am.

22    Q.  -- which you read on the reference list?

23    A.  Yes, ma'am.   Thank you.

24    Q.  Okay.

25          MS. THORPE:   At this time that's all I

727

1  have.   Thank you, Dr. Tulloch.

2          THE WITNESS:   Thank you.

3          MR. BRUDNER:   We'll reserve our questions.

4          (Deposition concluded at 7:13 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 78

bt101608.txt

728

```
1                    CORRECTION PAGE
2   WITNESS NAME:  BRIAN R. TULLOCH, M.D., FRCP, FACP
    DATE:   10/16/2008
3
    PAGE  LINE  CHANGE                REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

729

```
1                    SIGNATURE PAGE
2
        I, BRIAN R. TULLOCH, M.D., FRCP, FACP, have read
```

Page 79

bt101608.txt

3   the foregoing deposition and hereby affix my signature
     that same is true and correct, except as noted on the
4   correction page.

5

6                _____
                 BRIAN R. TULLOCH, M.D., FRCP, FACP
7

8

9
    THE STATE OF TEXAS      )
10  COUNTY OF _____ )

11

         Before me _____ on this day
12  personally appeared _____ known to me
    [or proved to me on the oath of _____ or
13  through _____ (description of identity
    card or other document)] to be the person whose name is
14  subscribed to the foregoing instrument and acknowledged
    to me that he/she executed the same for the purposes and
15  consideration therein expressed.
         Given under my hand and seal of office this _____
16  day of _____, 2008.

17

18                _____
                 NOTARY PUBLIC IN AND FOR
19                 THE STATE OF T E X A S

20

    My Commission Expires:
21  _____

22

23

24

25

                                         730

1   THE STATE OF TEXAS        )
    COUNTY OF HARRIS        )
2

3               REPORTER'S CERTIFICATION
      DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP
4            TAKEN OCTOBER 16, 2008

5

        I, RENE WHITE MOAREFI, Certified Shorthand Reporter
6  in and for the State of Texas, hereby certify to the
    following:
7        That the witness, BRIAN R. TULLOCH, M.D., FRCP,
                        Page 80

bt101608.txt

8   FACP, was duly sworn by the officer and that the
    transcript of the oral deposition is a true record of
    the testimony given by the witness;

9       That the deposition transcript was submitted on
    _____ to the witness or the attorney for the
10  witness for examination, signature and return to Esquire
    Deposition Services, by _____;

11      I further certify that I am neither counsel for,
    related to, nor employed by any of the parties in the
12  action in which this proceeding was taken, and further
    that I am not financially or otherwise interested in the
13  outcome of the action.

        Certified to by me this _____ day of
14  _____, 2008.

15

16

17

18

19  _____
    RENE WHITE MOAREFI, CSR, CRR, RPR
20  CSR NO. 3070; Expiration Date: 12-31-08
    ESQUIRE DEPOSITION SERVICES, LLC
21  3401 Louisiana, Suite 300
    Houston, Texas 77002
22  (713) 524-4600

23

24

25

Page 81