# TAB 6-1

ia100708.txt

0001
1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                         ORLANDO DIVISION
3                    CASE NO.  6:07-cv-15733
                              6:07-cv-10360
4
     IN RE:  Seroquel Products Liability      )
5    Litigation                               )
     MDL DOCKET NO.  1769                      )
6                                             )
     This Document Relates To:                )
7                                             )
     David Haller v. AstraZeneca, LP, et al.  )
8    Eileen McAlexander v. AstraZeneca, LP,   )
     et al.                                   )
9    - - - - - - - - - - - - - - - - - - - - -x
10
11              DEPOSITION OF ISRAEL JACK ABRAMSON
12
13         Taken before Brian Gary Berkowitz, Shorthand
14    Reporter and Notary Public in and for the State of
15    Florida at Large, pursuant to notice of taking
16    deposition filed in the above cause.
17
18                            -  -  -
19    1021 Ives Dairy Road
      Building 3 - Suite 214
20    North Miami, Florida 33179
      Tuesday, October 7, 2008
21    1:10 p.m. - 4:55 p.m.
22
23
24
25
0002
1    APPEARANCES:
2    On behalf of the Plaintiffs:
3            BAILEY PERRIN BAILEY LLP
             440 Louisiana Street
4            Suite 2100
             Houston, Texas 77002
5            BY:  FLETCH TRAMMELL, ESQ.
6    On behalf of the Defendants:
7            DECHERT LLP
             Cira Centre
8            2929 Arch Street
             Philadelphia, Pennsylvania 19104-2808
9            BY:   JOSEPH K. HETRICK, ESQ.
                   KRISTA A. SCHMID, ESQ.
10                 MATTHEW  DelDUCA, ESQ.
11                       I N D E X
12    WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
      ISRAEL JACK ABRAMSON
13    BY MR. HETRICK         3
14                      EXHIBITS
                     NUMBER        PAGE
15                      1           5
                        2           5
16                      3           7
                        4           7
17                      5           7
                        6           7
                     Page 1

ia100708.txt

| | | |
|---|---|---|
| 18 | 7 | 8 |
| | 8 | 8 |
| 19 | 9 | 11 |
| | 10 | 12 |
| 20 | 11 | 13 |
| | 12 | 15 |
| 21 | 13 | 16 |
| | 14 | 17 |
| 22 | 15 | 18 |
| | 16 | 20 |
| 23 | 17 | 65 |
| | 18 | 76 |
| 24 | 19 | 106 |
| | 20 | 122 |
| 25 | 21 | 144 |

```
0003
 1                P R O C E E D I N G S
 2              Whereupon, ISRAEL JACK ABRAMSON,
 3              having been first duly sworn,
 4              was examined and testified as
 5              follows:
 6              DIRECT EXAMINATION
 7  BY MR. HETRICK:
 8       Q    Dr. Abramson, we met very briefly before
 9  you were sworn in.  My name is Joe Hetrick, and I
10  represent AstraZeneca in a number of lawsuits
11  involving its drug, Seroquel.
12              Do you understand that?
13       A    Yes, I do.
14       Q    I'm here today to take your deposition.
15  You understand that, as well?
16       A    Yes.
17       Q    I know, sir, you've had your deposition
18  taken a number of times before, but I just want to
19  take a minute and go over some basic ground rules
20  that I will follow and ask you to follow, as well.
21              The first is, as you can see, we have a
22  court reporter who, as you know, will take down my
23  questions and your answers.  So, I would ask you to
24  let me finish my question before you begin your
25  answer, so that we do not talk over top of each
0004
 1  other.  Is that acceptable?
 2       A    Yes.
 3       Q    Secondly, again, because this is all being
 4  recorded, you will need to answer the questions
 5  verbally.  You can't shake your head or say "uh-huh"
 6  or "uh-uh," which are very difficult to pick up.
 7  So, if you can answer the questions verbally, that
 8  would be helpful.  Is that okay?
 9       A    Yes.
10       Q    Next, if you need to take a break at any
11  time for any reason, just let me know and we will be
12  happy to accommodate you.
13       A    Thank you.
14       Q    You are represented by counsel today?
15              MR. TRAMMELL:  Yes.
16  BY MR. HETRICK:
17       Q    If you need to confer with counsel at any
18  time, just let us know and we can do that, as long
19  as there is not a question pending.  Fair enough?
20       A    Yes, sir.
21       Q    I suppose most importantly, if I ask a
                          Page 2
```

ia100708.txt
```
22      question at any point today and it is unclear, or
23      you do not understand the question, let me know that
24      and I will do my best to clarify it for you.  Is
25      that okay?
0005
 1           A    Yes.
 2           Q    If you answer my question, I will assume
 3      that you understood it, that you are answering it as
 4      truthfully and honestly as you can, to the best of
 5      your ability.  Is that fair enough?
 6           A    Yes.
 7                MR. HETRICK:  Let me begin with a couple
 8      of housekeeping matters, if I may.
 9                     (Whereupon, Deposition Exhibit 1
10                     was marked for identification.)
11                     (Whereupon, Deposition Exhibit 2
12                     was marked for identification.)
13      BY MR. HETRICK:
14           Q    Let me show you what I have marked as
15      Exhibit 1 and Exhibit 2.  You can take a minute and
16      look through them, if you like.
17                Have you had a chance to look at them?
18           A    Yes.
19           Q    Each of them is a four page document and
20      they are pretty much identical, I think you will
21      find, other than one bears the caption of Eileen
22      McAlexander versus AstraZeneca, and that, I believe,
23      is Exhibit 1, and the other bears the caption, David
24      Haller versus AstraZeneca, which is Exhibit 2.
25                Do you see that?
0006
 1           A    Yes, sir.
 2           Q    I want to direct your attention, if I may,
 3      to the last page of either one of them, and you will
 4      see something called Schedule A.
 5                Do you see that?
 6           A    Yes, I do.
 7           Q    It asks you to bring with you a number of
 8      things, in fact, 12 different things, some of which
 9      we already have, but my question to you is simply,
10      what have you brought with you today to this
11      deposition?
12           A    Okay.  I brought electronic copies of all
13      the records that I reviewed.
14           Q    Let's just start there for a minute.
15      Otherwise it will get out of control.
16           A    Okay.
17           Q    Could you hand those to me, please?
18                What you brought with you is a set of CDs.
19      Correct?
20           A    Correct.
21           Q    And there are, I believe, five of them.
22      No, six.  There are six of them?
23           A    Yes, sir.
24                MR. HETRICK:  I'm going to mark these as
25      exhibits and then I will ask you to simply
0007
 1           identify them.  So, let me do that.
 2                     (Whereupon, Deposition Exhibit 3
 3                     was marked for identification.)
 4      BY MR. HETRICK:
 5           Q    Let me show you what I marked as Exhibit
 6      3.  If you can tell me what that is, if you can?
```
Page 3

ia100708.txt
```
 7          A    This is a CD that's marked with Mr.
 8   Haller's name, and it states that this has
 9   additional medical records.
10                        (Whereupon, Deposition Exhibit 4
11                        was marked for identification.)
12   BY MR. HETRICK:
13          Q    Exhibit 4, does it bear the same caption?
14          A    Similar, except that there are deposition
15   transcripts included.
16          Q    How do you know that?
17          A    Because it says so on it.
18          Q    Okay.  I see it.  Thank you.
19                        (Whereupon, Deposition Exhibit 5
20                        was marked for identification.)
21   BY MR. HETRICK:
22          Q    And No. 5 is also deposition transcripts?
23          A    And medical records.
24          Q    And medical records.  All right.
25                        (Whereupon, Deposition Exhibit 6
0008
 1                        was marked for identification.)
 2   BY MR. HETRICK:
 3          Q    And No. 6 is?
 4          A    Additional medical records.
 5                        (Whereupon, Deposition Exhibit 7
 6                        was marked for identification.)
 7   BY MR. HETRICK:
 8          Q    And No. 7 also bears the caption of
 9   additional medical records.  Is that correct?
10          A    Correct.
11                        (Whereupon, Deposition Exhibit 8
12                        was marked for identification.)
13   BY MR. HETRICK:
14          Q    Let me mark No. 8, and can you tell me
15   what that is?
16          A    This one included a variety of things.  It
17   had a variety of exhibits from previous court cases.
18   They were labeled with different names, and
19   basically it's a time line, things like reports from
20   AstraZeneca, E-mails from AstraZeneca.
21          Q    Okay.
22          A    And it included the PDRs for every year
23   for Seroquel.
24          Q    Okay.  So, in a general sense, these are
25   company documents from AstraZeneca?
0009
 1          A    Correct.
 2          Q    Is there anything else on Exhibit 8 other
 3   than company documents?
 4          A    Not that I believe.
 5          Q    Let me ask you, first of all, all of
 6   these --
 7          A    I'm sorry.  Let me correct it.  There is a
 8   time line prepared by your office, I believe -- I'm
 9   not sure who prepared it, because it's not labeled
10   as to who prepared it.
11          Q    Okay.
12          A    Just all the company documents listed in
13   chronological order and labeled.
14          Q    So there's some kind of a chronology or a
15   time line for AstraZeneca documents?
16          A    Yes, sir.
17          Q    Am I correct that it would say January 1,
```
Page 4

ia100708.txt
```
18      2000, memo from somebody to somebody, January 10,
19      this document, that type of thing?
20          A    Yes, sir.
21          Q    Is there also on any of those disks a
22      chronology, a medical chronology for either of the
23      plaintiffs?
24          A    No.
25          Q    You have not received any medical
0010
1       chronology?
2           A    I did, but that was sent to me by E-mail,
3       and I printed out a copy.
4           Q    We will get there in a minute.  Let me
5       just ask you, because I will forget, all of these
6       are labeled for Mr. Haller, medical records and
7       additional documents.  Correct?
8           A    Correct.  This one, Exhibit 8, is general,
9       and applies to both cases, because it's the
10      documentation CD.
11          Q    Fair enough.  What about Ms. McAlexander's
12      medical records?
13          A    I have some CDs.  I didn't bring them
14      today because I thought the notice was for Haller
15      for today.
16          Q    That's fine.  We can just mark them at a
17      later time.
18               So, you have a similar set for her?
19          A    Yes, sir.
20          Q    In addition to the CDs, that we've just
21      talked about, and with the understanding that we
22      will get to Ms. McAlexander's medical records at a
23      future time, what else have you looked at in
24      preparation for preparing your opinions in this
25      case?
0011
1           A    This is the chronology that I was
2       referring to.  Here you go.
3               MR. HETRICK:  Okay.  I'll mark that.
4                    (Whereupon, Deposition Exhibit 9
5                     was marked for identification.)
6       BY MR. HETRICK:
7           Q    I've marked that as Exhibit 9.  What is
8       Exhibit 9?
9           A    Exhibit 9 is a summary which was prepared
10      by counsel, and it a chronological summary,
11      beginning in 1996, extending through 2007,
12      summarizing various laboratory data, prescription
13      information, a synopsis of what occurred in medical
14      records, summarizing Mr. Haller's medical and
15      psychiatric history, as it relates to this case.
16          Q    Do you know who prepared Exhibit 9?
17          A    No, I do not.
18          Q    How did it come to you?
19          A    It was E-mailed to me.
20          Q    Who E-mailed it to you?
21          A    I am not sure as I sit here today, who
22      sent the E-mail to me.
23          Q    If you could find that out?  We will be
24      here tomorrow.  If you can check that and let me
25      know, I'd appreciate it.
0012
1           A    Okay.
2           Q    When did you receive Exhibit 9?
```
Page 5

ia100708.txt
```
 3          A    It's dated July 2008.  I think I received
 4     it over the summer.
 5          Q    So, you have received it before the last
 6     couple of days?
 7          A    Yes, sir.
 8          Q    You've had it for a while?
 9          A    Yes, sir.
10          Q    What else did you bring with you today?
11          A    I brought a billing statement.  I think
12     that was included in what you wanted.
13          Q    Yes.  Let me do them one at a time.
14                    (Whereupon, Deposition Exhibit
15                     10 was marked for
16                     identification.)
17     BY MR. HETRICK:
18          Q    Exhibit 10 is your billing statement?
19          A    Correct.
20          Q    Is it all time that you have spent on this
21     case?
22          A    Essentially, yes, up until maybe a day or
23     two ago.
24          Q    But it covers all the time prior to a day
25     or two ago?
0013
 1          A    Yes, sir.
 2          Q    From the time you started work on the case
 3     until, let's say, two or three days ago, all of your
 4     time that you have spent is recorded there?
 5          A    Yes, sir.
 6          Q    Is the time that's recorded there for both
 7     cases?
 8          A    Yes, sir.
 9          Q    You can put it aside for a minute and
10     let's get through our catalog.
11          A    Next are printouts of all the E-mail that
12     I could find that were exchanged back and forth,
13     related to both of these cases.
14               MR. HETRICK:  Let me mark that.
15                    (Whereupon, Deposition Exhibit
16                     11 was marked for
17                     identification.)
18     BY MR. HETRICK:
19          Q    Now that we've marked it, what is Exhibit
20     11?
21          A    Exhibit 11 is printouts from all the
22     E-mail that I could find related to these two cases.
23          Q    Just taking a look through it, who are
24     these E-mails from, for the most part?
25          A    Most of them are correspondence between
0014
 1     myself and Glenda Grainger.
 2          Q    Who is Ms. Grainger?
 3          A    I'm not sure who she is.
 4          Q    She just sends you E-mails?
 5          A    Yes.  She sends me cases, and
 6     correspondence to me by E-mail.
 7          Q    Do you know by whom she is employed?
 8          A    I'm assuming she has some relationship
 9     with the attorneys here.
10          Q    Okay.
11          A    But I do not know specifically.
12          Q    Do you know if she works for a company
13     called Atrium Services?
```
Page 6

ia100708.txt
```
14          A    I don't think that she works for them,
15    because she's -- she has intervened with them for me
16    because of their reluctance to pay their bills.
17               So, I don't think that she works in their
18    office with them.
19          Q    Do you know what her relationship is, if
20    any, with Atrium Services?
21          A    No, I don't.
22          Q    Other than to mediate fee disputes?
23          A    Correct.
24          Q    What do we have next?  Let me see.
25          A    Next, I have my report.
0015
1          Q    Okay.
2          A    With trial testimony and deposition list
3    and my CV.
4               MR. HETRICK:  We can mark them all as one.
5                    (Whereupon, Deposition Exhibit
6                    12 was marked for
7                    identification.)
8    BY MR. HETRICK:
9          Q    Just so we're straight here, Exhibit 12 is
10    your report for Mr. Haller?
11          A    Correct.
12          Q    Along with your CV and what else?
13          A    Trial testimony list.
14          Q    Did you by any chance bring the report for
15    Ms. McAlexander with you today?
16          A    No, sir, I did not.  It will be here
17    tomorrow morning.
18          Q    That's fine.  What is the next item that
19    you brought with you?
20          A    This is an article that was in the box, so
21    I assume I had looked at it during the summer.
22          Q    This is the Sernyak article?
23               This is the article that's mentioned in
24    your report?
25          A    Did I mention it?
0016
1          Q    I believe you did.
2          A    Yes.
3                    (Whereupon, Deposition Exhibit
4                    13 was marked for
5                    identification.)
6    BY MR. HETRICK:
7          Q    Let me hand 13 back to you.  The front
8    page of it appears to be a synopsis or summary of
9    the Sernyak article.  Correct?
10          A    Correct.
11          Q    What are the remaining pages?
12          A    A continuation of the article, and --
13          Q    Actually, it isn't.  That's why I asked.
14          A    That's interesting.  The other pages are
15    articles that have referenced the Sernyak article.
16          Q    So, there's a way to search -- I mean we
17    have it in the law, I can tell you, but do you have
18    a way of searching other articles which have
19    referred back to the Sernyak article?
20          A    Yes.
21          Q    And cited it as authority?
22          A    Yes.
23          Q    And that's what the remainder of Exhibit
24    13 is?
```
Page 7

ia100708.txt

```
25        A    Yes.
0017
 1        Q    One last piece of paper.
 2        A    Which is just a definition of what the
 3    metabolic syndrome is, that I had found for my own
 4    use.
 5                         (Whereupon, Deposition Exhibit
 6                         14 was marked for
 7                         identification.)
 8    BY MR. HETRICK:
 9        Q    I have marked that as 14.  It is a
10    definition of the metabolic syndrome?
11        A    Correct.
12        Q    Was this a result of independent research
13    that you did, or did someone give it to you?
14        A    No, independent research that I did.  No
15    one gave it to me.
16        Q    Do you have a hard copy list of everything
17    that is on the CDs?
18        A    I do not.  I know that Ms. Grainger said
19    that one had been produced and supplied to you.
20             MR. HETRICK:  Do we have a hard copy?  My
21        question was, does he have a hard copy list of
22        everything on the CDs?
23             MS. SCHMID:  No, we do not, at this
24        juncture.
25
0018
 1    BY MR. HETRICK:
 2        Q    Here's what I am trying to verify.  We
 3    were sent a single CD that we were told was
 4    everything that you reviewed for this case, but I
 5    don't know how I can verify that in fact everything
 6    you looked at in this case is on this CD.  But why
 7    don't I put that -- well, let me --
 8        A    I am more than happy to make you copies of
 9    those CDs, if you would like.
10        Q    That's, I think, the only way we can do it
11    properly.
12             MR. HETRICK:  Let me just mark, so we have
13        it, as Exhibit 15, what has been sent to us by
14        plaintiffs' counsel purporting to be the
15        entirety of documentation that Dr. Abramson has
16        looked at in forming his opinions.
17                         (Whereupon, Deposition Exhibit
18                         15 was marked for
19                         identification.)
20    BY MR. HETRICK:
21        Q    Doctor, let me ask you, we have in front
22    of us now this whole collection of exhibits that we
23    started with Exhibit 3, all the way through 14.
24             Is that the entirety of everything that
25    you have looked at in forming your opinions in this
0019
 1    case?
 2        A    Regarding Haller, yes.  There may be other
 3    things in the McAlexander box that I have not
 4    brought with me today.
 5        Q    Fair enough.  But in terms of Mr. Haller
 6    and your report for Mr. Haller, this is the universe
 7    of everything that you have looked at?
 8        A    Yes, I believe so.
 9        Q    Before I forget, did you examine
                        Page 8
```

ia100708.txt

```
10      Mr. Haller at all?
11          A    No, sir.
12          Q    How about Ms. McAlexander?
13          A    No, sir.
14          Q    Have you talked to either of them?
15          A    No, sir.
16          Q    I assume then you have not done any
17      testing of either of them?
18          A    That's correct.
19          Q    The materials that you have in front of
20      you that you have told me is everything that you
21      have relied on, aside from the definition of the
22      metabolic syndrome, was everything else provided to
23      you by the attorneys in this case?
24          A    The Sernyak article was a result of my own
25      finding.  It was not supplied by the attorneys.
0020
 1          Q    So, the Sernyak article you found on your
 2      own?
 3          A    Correct.
 4          Q    The metabolic syndrome definition you
 5      found on your own?
 6          A    Correct.
 7          Q    Was everything else supplied to you by the
 8      plaintiffs' lawyers?
 9          A    Other than the billing statement, yes.
10          Q    Have you reviewed all of the information
11      that is on the six CDs?
12          A    Yes, I have.  Some to -- some in detail,
13      some briefly, but, yes, I have.
14          Q    So, you've reviewed everything that's on
15      all six of those CDs?
16          A    Yes.
17          Q    When did you first receive materials
18      concerning this case?
19          A    I believe in August of 2008.  July or
20      August of 2008.  August.
21                         (Whereupon, Deposition Exhibit
22                         16 was marked for
23                         identification.)
24      BY MR. HETRICK:
25          Q    Doctor, I'm going to show you what I have
0021
 1      marked as Exhibit 16.
 2          Have you seen this before?
 3          A    No, sir.
 4          Q    This is a list that was produced to us in
 5      the course of litigation as materials that you
 6      relied on in preparing your report.
 7          In fact, I think it says in your report,
 8      attached is a list of things that you relied on.
 9          Can you tell me, sir, whether this is the
10      same stuff that is on the CDs?
11          A    No, I cannot.
12          Q    But you have never seen this before?
13          A    Correct.  There are too many pages of
14      things for me to tell you with certainty.
15          Q    Fair enough.  So, you cannot say then
16      whether you have read or even looked at everything
17      that's on the 17 page document?
18          A    Yes, sir.
19          Q    Yes, you cannot say so?
20          A    Yes, I cannot say.
```

Page 9

ia100708.txt
```
21         Q     Let me ask you, Doctor, when were you
22    first contacted by anyone concerning working on
23    behalf of plaintiffs in antipsychotic litigation?
24         A     Most likely, early summer of this year.
25    So, summer of 2008.  I received a call from Atrium,
0022
 1    which you spoke about before, and I'm not exactly
 2    sure what they do.  They appear to be a company that
 3    finds qualified doctors to review material, and they
 4    asked me if I would be interested in reviewing
 5    issues related to Seroquel litigation, and I said I
 6    would be happy to hear about it.  And then following
 7    that, soon after that, I received a call from
 8    Ms. Grainger, who we spoke about before, and she
 9    told me that she had a few cases that she would like
10    to send to me, which she did, either toward the end
11    of July or the beginning of August.
12         Q     Those were the Haller and McAlexander
13    cases?
14         A     Yes.
15         Q     As we sit here today, have you been sent
16    any other cases to look at?
17         A     No.
18         Q     Have you ever been involved in any other
19    litigation concerning antipsychotics?
20         A     I don't think so.  I'm trying to think in
21    my other work of -- I don't think so.
22         Q     Let me make it a little easier for you.
23         Have you ever been involved in litigation
24    where there was an allegation by a patient that they
25    had contracted diabetes as a result of an
0023
 1    antipsychotic?
 2         A     No.
 3         Q     Do you know how Atrium came to reach out
 4    to you?
 5         A     No.
 6         Q     Did you make any notes during your initial
 7    discussions with the people from Atrium?
 8         A     It is possible.  Again, in the McAlexander
 9    box, I did see there was at least one yellow paper
10    with some handwritten notes on it.  I'll bring that
11    tomorrow.
12         Q     Thank you.  If you would bring that
13    tomorrow, that would be helpful.
14         Do you know who it was who called you the
15    first time?
16         A     I've had -- I've spoken with a gentleman
17    by the name of Stuart at Atrium.  I don't know his
18    last name.
19         Q     He did the original call?
20         A     I believe so.
21         Q     In the original call, I think you told me
22    it was just a general discussion of might you have
23    any interest in getting involved in these sorts of
24    cases?
25         A     Correct.
0024
 1         Q     What was the second call?  I mean, what
 2    happened next?
 3         A     He called me back and said that for them
 4    to proceed, he wanted me to fill out their -- they
 5    have a contract.  Basically, it's a letter of
```
                            Page 10

ia100708.txt
```
 6    agreement, which I thought I printed out, and it
 7    might actually be in this, because I did try to
 8    print it out.
 9         Q    It's in Exhibit 11?
10         A    Yes.  So, I sent that back to him, and
11    then that was the end of it until I heard of a call
12    from Ms. Grainger.
13         Q    Were you asked at either -- at any point
14    before signing the contract, what your views were,
15    if any, on antipsychotics and blood sugars and
16    diabetes?
17         A    I don't think so.
18         Q    Would the notes that you have which you
19    will be kind enough to bring tomorrow, hopefully,
20    would they reflect any notes that were made in the
21    subsequent conversations, as well?
22         A    They may or may not.  It's really not my
23    habit to take extensive notes when I'm on the
24    telephone with someone.
25         Q    What is the date of the contract that you
0025
 1    signed with Atrium?
 2         A    I didn't bring my -- the signed one.  I
 3    brought an unsigned one, because that's what I
 4    found, but the E-mail in which he asked for it was
 5    actually June 25, 2008.
 6         Q    Is it fair to say you would have signed it
 7    sometime shortly thereafter?
 8         A    I -- yes.  I sent him an E-mail back the
 9    next day saying I was sending him my CV, and a bunch
10    of other stuff.  So, I assume I sent this, as well.
11         Q    Do you recall what else you sent other
12    than the signed contract and your CV?
13         A    An office fee schedule.
14         Q    Your hourly rate?
15         A    Correct.
16         Q    What is your hourly rate?
17         A    $500 per hour.
18         Q    Is that for all tasks?
19         A    Yes.
20         Q    Record review, depositions, et cetera?
21         A    Correct.
22         Q    Was the arrangement that Atrium was to pay
23    you directly?
24         A    Yes.
25         Q    And they were to pay you the $500 per
0026
 1    hour.  They didn't take any fee out of it?
 2         A    Correct.
 3         Q    Had you ever worked with Atrium before?
 4         A    I don't think so.
 5         Q    I just want to make sure I understand the
 6    sequence.  The next thing that you received was the
 7    medical records for Haller and McAlexander.  Is that
 8    the next thing that was sent to you?
 9         A    Yes.  I think so.
10         Q    Were you also sent the CD with company
11    documents on it at that time, as well?
12         A    That came later.
13         Q    Were you sent initially, other than
14    medical records, any scientific articles, any
15    journal articles?
16         A    I don't remember.
```
Page 11

ia100708.txt

17          Q     At any point, were you sent any journal
18    articles to review?
19          A     No.
20          Q     So, the journal article that you have, and
21    we will talk in some detail about this later, the
22    Sernyak article, was one you found on your own?
23          A     Yes, sir.
24          Q     So you haven't reviewed any articles that
25    were sent to you by the plaintiffs' lawyers?
0027
 1          A     Yes, sir.  I have not.
 2          Q     You have not.  Okay.
 3                Other than Sernyak, have you reviewed any
 4    other journal articles that formed part of -- forms
 5    a basis of your opinion in this case?
 6          A     Not specifically for this case, but
 7    insofar as education, CME and the like, yes, I have.
 8          Q     But I notice, it is the only one, and I'll
 9    mark your reports in a minute, it's the only article
10    that you actually cite in your report.  Correct?
11          A     Correct.
12          Q     In all of the materials that you received,
13    have you received copies of depositions?
14          A     Yes.
15          Q     Whose -- if you can tell me just by group.
16    I don't expect you to remember all the names, but
17    have you received deposition transcripts of
18    Mr. Haller's treaters?
19          A     Yes.
20          Q     And you have read those?
21          A     Yes.
22          Q     Have you received deposition
23    transcripts -- first of all, let me ask you, how
24    many of his treaters do you recall receiving
25    transcripts from?
0028
 1          A     There were two.
 2          Q     Can you remember the names?
 3          A     No.
 4          Q     Have you received deposition transcripts
 5    of any AstraZeneca employees?
 6          A     No.
 7          Q     None?
 8          A     No, I have not.
 9          Q     Have you received deposition transcripts
10    of any other experts in these cases?
11          A     No.
12          Q     And you have not read the reports of any
13    other experts in these cases?
14          A     No.
15          Q     Are you aware, sir, that what you have in
16    front of you is not the entire universe of documents
17    that deal with Seroquel?
18          A     I would imagine so, yes.  I am aware of
19    that.
20          Q     Did you request at any time that anything
21    else be sent to you?
22          A     No, I did not.  They sent me so much, that
23    it was a lot to go through as it was.
24          Q     Did you ever ask to be sent anything that
25    reflected AstraZeneca's position in this litigation?
0029
 1          A     I didn't specifically ask, but I was
Page 12

ia100708.txt
```
 2    provided with company documents that do express
 3    their position over the years regarding Seroquel.
 4         Q    I will have some more detailed questions
 5    on that in a little bit.
 6              Let me just switch gears for a moment and
 7    ask you a little bit about your --
 8         A    Actually, that's not true.  Excuse me.
 9    Let me just go back.
10         Q    Okay.
11         A    I actually did ask an AstraZeneca
12    representative to request medical information from
13    the company regarding Seroquel and elevated blood
14    glucose.
15         Q    Is that what's called a physician
16    information request?
17         A    Yes.
18         Q    So, you asked one of the AstraZeneca sales
19    reps to send you whatever information the company
20    had on glucose disregulation and that kind of thing?
21         A    Yes.
22         Q    Was the material sent to you?
23         A    Yes, it was.
24         Q    Let me ask you, just as a general matter,
25    you are called on from time to time, I assume, by
0030
 1    AstraZeneca sales reps?
 2         A    One of my best friends is an AstraZeneca
 3    sales rep.
 4         Q    Have they, by and large, been courteous
 5    and responsive to you over the years?
 6         A    Yes.  I love Jeanne.  A good friend.
 7         Q    So you did get the information that you
 8    requested?
 9         A    Yes.
10         Q    Let me ask you a couple of questions about
11    the nature of your practice currently.
12         A    Absolutely.
13         Q    Can you tell me what you do?
14         A    Well, I am a medical doctor specializing
15    in the field of psychiatry.  I have been in private
16    practice since September 1990.
17              I completed my training in Boston, in the
18    end of July of -- no, beginning of July of that
19    year, and moved down to Florida, where I joined
20    another psychiatrist in practice, and I have been
21    here ever since.
22              My practice is both out-patient and
23    in-patient psychiatry.  I work five days a week.  I
24    take a couple of weeks off a year.
25              I see patients from 18 years of age
0031
 1    through the end of the life cycle.
 2              Being in South Florida, I do see a lot of
 3    geriatric patients.  Probably over a third of my
 4    practice is psychiatric problems with the elderly.
 5              Like I said, I do in-patient and
 6    out-patient work.  My day typically starts in the
 7    hospital, where I see patients both on an in-patient
 8    psychiatric unit and in consultation on medical and
 9    surgical floors.  My office begins in the morning
10    and I see patients there through the day and into
11    the afternoon.
12              The kind of problems I deal with are
```

ia100708.txt
```
13   varied, the whole general spectrum of psychiatric
14   problems, mood disorders, psychotic disorders.
15           I do have a subspecialty in geriatric and
16   addiction psychiatry, so I do see quite more
17   addiction cases than my general colleagues would
18   see.
19           Any more details you would like?
20       Q   I will follow up on a couple.  You have
21   given me a lot of information to work with.  Let me
22   take a step back.
23           You have, I think, as part of Exhibit 12
24   in front of you, your CV.
25       A   Yes, sir.
0032
1        Q   And that may be the easiest way to get at
2    some of my questions.
3            First of all, you said that when you came
4    to Florida you went into practice with another
5    doctor?
6        A   Yes.
7        Q   Who was that?
8        A   His name is Jack Greener.
9        Q   G-R-E-E-N-E-R?
10       A   Yes.  He's married to my sister.  He's in
11   his mid-60s, so he's been in practice a little bit
12   longer than I have, and he was terminating his
13   relationship with a psychiatrist down here and asked
14   me if I would be interested in joining him.
15       Q   And you did that?
16       A   I was cursed to join him.  I did.
17       Q   Are you still practicing with Dr. Greener?
18       A   Yes.
19       Q   Just the two of you?
20       A   Correct.
21       Q   Do you have a nurse practitioner?
22       A   No, sir.
23       Q   Just the two of you?
24       A   Yes.
25       Q   I assume you have some front office staff?
0033
1        A   Yes.  A full-time transcriptionist, a
2    receptionist, an office manager and another woman
3    who does file clerk type work.
4        Q   How many patients do you see on an average
5    week?
6        A   On a typical day, I'll see 12 to 16
7    patients in the office and a few patients in the
8    hospital.
9        Q   So, you see as many as twenty patients a
10   day?
11       A   Yes.
12       Q   You work five days a week?
13       A   Yes.
14       Q   On the sixth day you rest?
15       A   And every other weekend.
16       Q   I think you said you treat patients from
17   18 years on through the full life cycle?
18       A   Correct.
19       Q   You do not do any pediatric psychiatry?
20       A   No.
21       Q   Do you treat patients with schizophrenia?
22       A   Yes.
23       Q   Do you treat patients with bipolar
```
Page 14

ia100708.txt
```
24      disorder?
25      A       Yes.
0034
1       Q       Do you treat patients with major
2       depressive disorder?
3       A       Yes.
4       Q       And how about general anxiety disorder?
5       A       Yes.
6       Q       Let me just ask you, would you agree with
7       me, Doctor, that these are serious conditions?
8       A       Yes.
9       Q       They can be debilitating?
10      A       Absolutely.
11      Q       And can make a person non-functional?
12      A       Depending on the patient, yes.
13      Q       Currently, how many bipolar patients do
14      you have?
15      A       Many.
16      Q       Well, I mean, more than fifty?
17      A       Likely, yes.
18      Q       More than a hundred?
19      A       Yes.
20      Q       So, quite a few then?
21      A       Yes.
22      Q       How about schizophrenic patients?
23      A       Around 50.  Fewer than the bipolar
24      patients.
25      Q       Let me just ask you, in a general sense,
0035
1       let's say in the last year, how many new patients
2       have you taken on?
3       A       I would say on a typical week, there are
4       between five and eight new patients that come into
5       the office.  I'm thinking about the most recent
6       weeks in giving you an estimate.
7       Q       In the patients that you have seen, have
8       you ever been the first person, the first doctor, to
9       diagnose one of your patients with diabetes?
10      A       It's very difficult for me to answer that
11      question based upon 18 years of practice.  I can
12      recall doing routine labs and finding elevated blood
13      sugars and referring patients to colleagues, but I
14      wouldn't say that I diagnosed the diabetes in the
15      patient.
16      Q       If you saw an elevated blood sugar, you
17      would send them to a different doctor?
18      A       I would send them to a primary care
19      physician for assessment.
20      Q       Would you send them, from time to time, to
21      an endocrinologist?
22      A       Yes.
23      Q       As we sit here, you do not remember
24      actually making a diagnosis of diabetes on any of
25      your patients?
0036
1       A       Correct.
2       Q       Do you treat any of your patients for
3       their diabetes?
4       A       No.
5       Q       Have you ever written a prescription for
6       diabetes medication of any kind?
7       A       I probably have, but that would more
8       likely than not have been a patient who I was
```
Page 15

ia100708.txt

```
 9    discharging from the hospital and needed to continue
10    with their medication.
11         Q    It's not part of your normal practice?
12         A    Only in that sense of assuring patients
13    have enough medication when they leave the hospital.
14         Q    Fair enough.  I want to ask you a couple
15    of general questions.
16              You mentioned before about sources of
17    information, CMEs and so forth.  I just want to ask
18    you some questions.
19              When you prescribe a medication for one of
20    your patients, is it your practice to consult the
21    label for that drug before you prescribe the drug?
22         A    If it's a brand new medication, yes.  If
23    it's a medication that I am familiar with, I do not
24    generally consult the label unless I have a specific
25    concern or question that I'm researching and need to
0037
 1    know about.
 2         Q    Would it be fair to say that the label is
 3    one thing that you might look at, among others?
 4         A    Yes, sir.
 5         Q    Do you subscribe to the PDR?  Do you keep
 6    a copy in your office?
 7         A    Yes.
 8         Q    It's updated every six months, I think?
 9         A    It's updated once a year.  They send
10    supplements to it over the course of the year.
11         Q    And the PDR is the same as the drug label.
12    Correct?
13         A    Correct.
14         Q    Other than the drug label, do you also
15    rely on your own clinical experience in prescribing
16    medications?
17         A    Yes.
18         Q    What has worked for you in the past?  What
19    you have had success with with patients, is that
20    something you consider?
21         A    Yes.
22         Q    Do you look at journals dealing with
23    antipsychotic medications and related medications?
24         A    Yes.
25         Q    What journals do you subscribe to?
0038
 1         A    I get the Journal of the American
 2    Psychiatric Association.  I get -- I don't think
 3    I'll remember every journal that I get.
 4         Q    That's fair.
 5         A    There's one called "Essentials in
 6    Psychiatry."  There's -- it would be easier for me
 7    to write the names down and bring them to you
 8    tomorrow, because I see all the journals, but I
 9    can't remember the names and titles.
10         Q    That's fine.  You do regularly receive
11    journals?
12         A    Yes.
13         Q    So, is it fair to say -- and I'm assuming
14    these are peer reviewed journals.
15         A    Yes.
16         Q    So, the peer reviewed literature is
17    another thing that you look at in making prescribing
18    decisions?
19         A    Yes.
```

Page 16

ia100708.txt
```
20        Q    Do you discuss prescription medicine with
21   Dr. Greener?
22        A    On occasion we have.
23        Q    How about other colleagues at seminars,
24   things like that?
25        A    Yes, on occasion.
0039
1         Q    And you mentioned CMEs before.  Have you
2    been to CMEs where prescription medications have
3    been talked about?
4         A    Yes.
5         Q    That's another source of information?
6         A    Yes.
7         Q    How about medical websites?  Do you do
8    online research on pharmaceuticals?
9         A    Rarely.
10        Q    But from time to time?
11        A    Yes.
12        Q    You also mentioned before that you have
13   the company sales representatives as a source of
14   information.  Correct?
15        A    Yes.
16        Q    So, would it be fair to say that as a
17   practitioner, you have several sources of
18   information other than the drug label itself, for
19   any prescription medication?
20        A    Yes.
21        Q    Now, we have your CV as part of Exhibit
22   12, I think it is.  I just wanted to run quickly
23   through some of the background.
24             Were you born in Canada?
25        A    Yes, I was.
0040
1         Q    You are now a U.S. citizen?
2         A    Yes.
3         Q    Are you currently affiliated with any
4    university?
5         A    No.
6         Q    Your undergraduate work was done at
7    McGill?
8         A    Correct.
9         Q    In Montreal?
10        A    Yes.
11        Q    Your degree is in psychology?
12        A    It's a bachelor of science with
13   specialization in psychology.
14        Q    And you graduated from McGill in what
15   year?
16        A    June 1981.
17        Q    When did you begin your medical training?
18        A    August 1982.
19        Q    Do you have a gap year?
20        A    I did a year of graduate studies at the
21   Montreal Neurological Institute.
22        Q    Did you get any sort of degree or
23   certificate as a result of that year?
24        A    No, I did not.
25        Q    What did those studies involve?
0041
1         A    I did -- I took some classes in
2    neuroanatomy, neurophysiology, and I participated in
3    research studies on kindling as a model of human
4    behavior.
```
Page 17

ia100708.txt
```
 5        Q     What do you mean by "kindling"?
 6        A     Kindling is an animal model where it
 7   stimulates the brain of a test animal, and you do
 8   periodic stimulations over the course of time, a
 9   week, a month or whatever, and soon what happens is
10   that animal develops epilepsy in the focus of where
11   you have been stimulating the brain, and that
12   becomes a model of learning and behavioral
13   adaptation.
14        Q     Did the research work that you do involve
15   sounds?
16        A     That was during my undergraduate.
17        Q     Because I've read your publication.
18        A     It is an obscure publication.
19        Q     It is an obscure publication, but
20   informative.
21        A     I did some work on psychoacoustics.
22        Q     But that's during undergraduate work at
23   the time?
24        A     Yes.
25        Q     Did you publish any of these studies that
0042
 1   you did on neuroanatomy and so forth?
 2        A     No.  My supervisor was very upset when I
 3   left.  If he published, I don't think he put my name
 4   on any of the papers.
 5        Q     You began medical school in August of '82?
 6        A     Yes.
 7        Q     Where did you go?
 8        A     Laval University, in Quebec City.
 9        Q     You finished your medical training there
10   when?
11        A     June 1986.
12        Q     What did you do next?
13        A     I did an internship.
14        Q     Where was that?
15        A     At the Jewish General Hospital in
16   Montreal.  It's also part of McGill University.
17   That was a rotating internship, and what that means,
18   you do two months of each specialty, two months of
19   internal medicine, emergency, intensive care,
20   surgery, psychiatry, and that I completed in June
21   1987.
22        Q     Had you decided at that point on a
23   specialization?
24        A     I applied to training programs during that
25   year, so it was during that year I made a decision.
0043
 1        Q     You decided to specialize in psychiatry?
 2        A     Yes.
 3        Q     In July of '87, you went to Beth Israel
 4   Hospital?
 5        A     Yes.
 6        Q     In Boston?
 7        A     In Boston.
 8        Q     Is that a residency?
 9        A     That's a residency.
10        Q     Did you do any fellowships?
11        A     Well, when you are doing your residency in
12   psychiatry at Beth Israel, you are appointed as a
13   clinical fellow in psychiatry at Harvard.
14        Q     The two go together?
15        A     Correct.
```
Page 18

ia100708.txt
```
16          Q    On your CV, you list -- and I'm looking on
17   the first page, where it says, "Subspecialty
18   Certifications."
19               Do you see that?
20          A    Yes.
21          Q    You are board certified; right?
22          A    Yes, I am.
23          Q    You are board certified in psychiatry?
24          A    Correct.
25          Q    You are not board certified in
0044
1    endocrinology?
2          A    No, I'm not.
3          Q    You are not board certified in family
4    practice?
5          A    No, I'm not.
6          Q    The subspecialty certifications, the first
7    is forensic psychiatry.
8          A    Correct.
9          Q    I'll come back to that in one minute.
10               You mentioned before geriatric psychiatry.
11   I assume that there is a specialization of
12   psychiatry dealing with the elderly?
13          A    Correct.
14          Q    And you hold this certificate?
15          A    Yes, I do.
16          Q    I think you said before that -- did you
17   say 30 percent of your practice is geriatrics?
18          A    Yes.
19          Q    Then you have addiction psychiatry.
20   Correct?
21          A    Correct.
22          Q    And you hold a certificate in that, as
23   well?
24          A    Yes, do I.
25          Q    Can you estimate for me, Doctor, what
0045
1    percentage of your practice deals with addiction
2    psychiatry?
3          A    Between a third and a half.  You have to
4    understand, there is an overlap, so you have
5    addicted old people, so that's --
6          Q    Okay.  So, between a third and a half is
7    addiction?
8          A    Correct.
9          Q    Allowing for the overlap, am I correct in
10   assuming that the remainder is just a general
11   psychiatric adult practice?
12          A    Correct.
13          Q    I want to go back to the forensic
14   psychiatry.  What does that mean?
15          A    Forensic psychiatry is a specialized field
16   having to do with areas where psychiatry and the law
17   overlap and interact.
18          Q    So, it would include, but not be limited
19   to work like we're talking about today, expert
20   opinions?
21          A    Yes, sir.
22          Q    And it could also include, I assume,
23   consultations with other sorts of institutions,
24   other than litigation?
25          A    Yes.
0046
```
Page 19

ia100708.txt
```
 1          Q     And I'll get back to that in a minute.
 2                Have you published any peer reviewed
 3     articles at all?
 4          A     Just the ones that you found.
 5          Q     The early ones?
 6          A     Correct.
 7          Q     You have not published anything in the
 8     field of general psychiatry?
 9          A     No, I have not.
10          Q     You have not published anything related to
11     diabetes?
12          A     No, I have not.
13          Q     You are currently licensed to practice in
14     Florida.  Correct?
15          A     Yes.
16          Q     Have you ever lost your license?
17          A     No.  I gave up my license in Quebec
18     because I wasn't intending to return, so I just sent
19     them a letter saying, "I'm not going back.  Please
20     take me off your roll."
21          Q     I think you told me you've been in private
22     practice since 1990?
23          A     Correct.
24          Q     18 years?
25          A     Yes.
0047
 1          Q     Which other states are you licensed in?
 2          A     Massachusetts, Louisiana, Iowa and Texas.
 3          Q     Why the licenses in the other states?
 4          A     Well, Massachusetts, because I trained in
 5     Massachusetts, and while I was there, I did some
 6     moonlighting, so better to hold an unrestricted
 7     license in the state.
 8                The Texas license has to do with the fact
 9     that in order to review cases of patients in Texas,
10     you have to -- the Texas -- they changed the rules.
11     You have to have Texas licensing.  So, I got a Texas
12     license in April of this year.
13                The Louisiana and Iowa license had to do
14     with the fact that back in 2000 and 2002 I was
15     giving opinions regarding care provided to patients
16     in Louisiana and Iowa, and you needed licenses in
17     those states to do that, as well.
18          Q     That was my next question.  I assume those
19     states are similar, in that you have to be licensed
20     there before you can give opinions?
21          A     Correct.
22          Q     So, the licenses that you hold in Texas,
23     in Iowa, and in Louisiana, are all connected to your
24     forensic psychiatry work?
25          A     Yes.
0048
 1          Q     You don't actually see patients in those
 2     states other than as part of your forensic work?
 3          A     That is correct.
 4          Q     Where do you currently have hospital
 5     privileges?
 6          A     At Aventura Hospital, which is
 7     A-V-E-N-T-U-R-A.
 8          Q     Where is where?
 9          A     Aventura, Florida.
10          Q     Nearby to where we are today?
11          A     Ten minutes from here.  Correct.
```
Page 20

ia100708.txt
```
12        Q    Is it actually in North Miami?
13        A    No, the city is actually Aventura.  They
14   are incorporated as a city.  It started off as a
15   mall and then became a city.
16        Q    That's interesting.
17             Do you have hospital privileges anywhere
18   else?
19        A    No.  At this point, I do not.
20        Q    Have you had in the past ten years
21   privileges anywhere else?
22        A    I have over -- in the past 18 years.  I
23   don't know when I gave up privileges in the other
24   hospitals, but it became too difficult to schlep
25   from hospital to hospital every day.  So we made a
0049
1    strategic decision to locate our practice at
2    Aventura Hospital and gave up our privileges in the
3    other facilities.
4         Q    Can you give me some time frame?  The last
5    five years, ten years?
6         A    Probably close to ten years.
7         Q    Have any of your medical licenses ever
8    been revoked?
9         A    No.
10        Q    Have any of them ever been suspended?
11        A    No.
12        Q    Have you ever had privileges revoked at
13   any hospital?
14        A    No.
15        Q    Have you ever been censured by any medical
16   body?
17        A    No.
18        Q    Have you ever been disciplined by any
19   medical body?
20        A    No.
21        Q    Have you ever been sued for malpractice?
22        A    No.
23        Q    You have not been employed by anyone other
24   than your private practice since you began here in
25   Florida?
0050
1         A    Correct.
2         Q    So, you have never been fired or never
3    left other employment?
4         A    No.
5         Q    Have you ever been sued?
6         A    Yes.  I had a lien on a property, and the
7    mortgage company foreclosed, and they had to sue me
8    to remove my lien from the property.
9         Q    But that suit involved, obviously, just
10   some real property issues?
11        A    Correct.
12        Q    You have never been sued in your
13   professional capacity?
14        A    No.
15        Q    Have you ever been arrested or convicted
16   of a crime?
17        A    No, other than traffic tickets.
18        Q    Currently, do you have any teaching
19   responsibilities?
20        A    No.
21        Q    Have you in the past?
22        A    Yes.
```
                          Page 21

ia100708.txt

```
23         Q    At what point in time?
24         A    As a resident you're responsible for
25    teaching medical students who come through your
0051
 1    units, so when I was at Harvard I was helping to
 2    teach the medical students.
 3              In the hospitals, at various times, nurses
 4    rotate through, nurse trainees rotate through, and
 5    part of your responsibility as an attending and your
 6    relationship with the hospital is, you do interact
 7    with the students and teach them issues related to
 8    managing psychiatric patients.
 9         Q    You do not do any formal academic
10    teaching?
11         A    No.
12         Q    You have told me you have not published at
13    all anything in a peer reviewed journal.  Correct?
14         A    No, that's not what I said.  I said I did
15    publish many years ago, but I have not published
16    anything other than those articles on
17    psychoacoustics.
18         Q    Which were done during your undergraduate?
19         A    Correct.
20         Q    Since you received your medical degree,
21    you have not published anything in a peer reviewed
22    journal?
23         A    No.  I had something accepted for
24    publication, but I got bored with it and never
25    proceeded with it.
0052
 1         Q    I want to ask you some questions about --
 2    in a little more detail, about your forensic work.
 3              You do consulting in what, if I may, I'll
 4    call medical/legal cases.  Is that fair?
 5         A    That's part --
 6         Q    By that I mean litigation.
 7         A    That's part of what I do, yes.
 8         Q    What else do you do?
 9         A    I do work for the Board of Medicine in
10    Florida, where I take cases from them, complaints
11    that have been filed against physicians and they
12    need expert opinions whether something really merits
13    continuing with the case or whether nothing really
14    happened in the case.
15              So, I provide opinions in that regard to
16    the board, and I'll do that for the Board of
17    Medicine.  I have seen nurses in that capacity,
18    physical therapists, occupational therapists,
19    various health care providers.
20              I have consulted with federal
21    organizations, including the Department of Justice,
22    regarding Medicare and Medicaid fraud cases.
23              I have provided opinions to insurance
24    companies regarding appropriateness of care and
25    medical necessity for care.
0053
 1         Q    Okay.
 2         A    I also evaluate patients for attorneys
 3    regarding forensic issues, things like competency
 4    evaluations or testamentary capacity type
 5    evaluations.
 6         Q    You do testify regularly both at
 7    depositions and in courtrooms?
```

Page 22

ia100708.txt
```
 8        A    All depends how you define "regularly."
 9        Q    Let's say twice a year.
10        A    Yes.
11        Q    You provided us, I'm not sure if it's part
12   of Exhibit 12 or not -- yes.  I think if you look at
13   Exhibit 12, you will find a list of your trial
14   testimony.
15        A    Yes.
16        Q    The cases -- I took a look at the cases,
17   and is it fair to say that these are all medical
18   malpractice cases?
19        A    Some of them are not.  For example, the
20   Goldstein case on that second page involved a
21   gentleman's capacity to modify his will which was
22   being contested by the family.
23        Q    All right.
24             Are the rest of them --
25        A    The Ott case also, Carol Ott, I do not
0054
 1   believe was a medical malpractice case.
 2        Q    I've read some of your prior depositions
 3   in the cases, and I know you stated a couple of
 4   times that your testimony is approximately 90 to 95
 5   percent on behalf of plaintiffs.  Is that still
 6   accurate?
 7        A    Yes.
 8             THE WITNESS:  When you reach an
 9        appropriate segue, if I can take a break?
10             MR. HETRICK:  Certainly.
11                  (Thereupon, a short recess was
12                  taken.)
13   BY MR. HETRICK:
14        Q    Doctor, we're back on the record.  Just
15   before I go forward, I want to go back for a couple
16   of questions.
17             I asked you before if you had reviewed the
18   depositions of any of Mr. Haller's treaters and you
19   said yes, you had reviewed two of them?
20        A    Yes.
21        Q    Was Dr. Keene one of them?
22        A    Yes.
23        Q    And Dr. Burke?
24        A    I don't remember.
25        Q    Let me ask you, since the original receipt
0055
 1   of the disks that we marked as exhibits that
 2   contained the medical records, have you received any
 3   additional medical records?
 4        A    They didn't all come at the same time.
 5   Disks were sent at different times.  That's the
 6   totality of all the disks that were sent to me.
 7        Q    Do you know how far they go,
 8   chronologically?  Obviously, now we're in October of
 9   '08.  Do you know what the most recent medical
10   records you have for Mr. Haller are?
11        A    '06 or '07, I believe.
12        Q    You don't have anything in '08?
13        A    No.
14        Q    One other thing.  I think you said, and
15   please correct me if I'm wrong, but the retainer
16   agreement, the contract that you have in there
17   that's blank, do you have the completed one in your
18   files?
```
Page 23

ia100708.txt
```
19          A    I should have it.
20          Q    If you do, if you would bring it along,
21     because that one, I think, everything is blank.  The
22     amounts are blank, the dates are blank and
23     everything is blank.
24          A    There are actually no -- there's no
25     precision about the amounts on it, so it wouldn't be
0056
1      any different.
2           Q    It will just be signed?
3           A    It will just be signed, yes.
4           Q    If you have the signed one.
5           A    Okay.
6           Q    Do you know where the fee agreement is
7      contained then, if it isn't in there?
8           A    They asked me what my fees were and I told
9      them.
10          Q    But you don't have that -- that's not
11     recorded anywhere?
12          A    I have a paragraph, whenever anybody asks
13     me what my fee schedule is, that I send, and I did
14     note on one of the E-mails that I sent it to them.
15     So, I'm happy to bring that tomorrow.
16          Q    If you would.
17               When did you first begin doing work
18     related to litigation?
19          A    In the early 1990s.
20          Q    So, soon after you started practice?
21          A    Yes.
22          Q    Forensic work has been a regular part of
23     your practice throughout your career?
24          A    Yes.
25          Q    As I mentioned to you before, I read a
0057
1      couple of prior depositions, and one is in a case
2      called Wiggins, which is a malpractice case in Ohio,
3      in 1998.
4                You said in that deposition that you spent
5      about 25 percent of your time on litigation work.
6           A    I might have said that, yes.
7           Q    Is that still the case today?  Is the
8      forensic part of your practice about 25 percent of
9      your practice?
10          A    The forensic part has actually declined in
11     the percentage of the practice.
12               However, the past few months have been an
13     exception to that, in that this case has taken a lot
14     of time, and there were two other cases that have
15     taken a lot of time.
16          Q    What are the other two cases that you are
17     working on?
18          A    One relates to a woman who became addicted
19     to pain medication iatrogenically, and is suing the
20     surgeon who did the -- who did surgery on her and
21     failed to diagnose a non-union in the orthopedic
22     site.
23          Q    It's a malpractice case?
24          A    Correct.
25          Q    You are representing the plaintiff?
0058
1           A    The plaintiff, yes.
2           Q    What is the other one?
3           A    Now, in that case I am not involved in
```
Page 24

ia100708.txt
```
 4    anything related to standard of care.  It's more of
 5    a damages opinion that I'm being asked to render.
 6         Q    Okay.
 7         A    The other one, I can't remember the
 8    circumstances sitting here today.  I'm sorry.  It's
 9    another malpractice case.
10         Q    Does it involve antipsychotic drugs?
11         A    I believe not.
12         Q    Does it involve diabetes?
13         A    No.
14         Q    I noted in prior testimony you said that
15    you have done some work in the past for TennCare?
16         A    Correct.
17         Q    What is TennCare?
18         A    TennCare is the Tennessee Medicaid
19    program, the state program for providing health care
20    to Medicaid beneficiaries in Tennessee, and a
21    company has to manage the mental health benefits.
22    Managing means they have to oversee the mental
23    health benefits and make decisions as to whether
24    treatment is necessary or not necessary, utilization
25    patterns and the like, and they send me cases and
0059
 1    ask for my opinion regarding whether care is
 2    appropriately being given or not.
 3         Q    Thank you, because that's helpful.  I saw
 4    the term "utilization review" in a number of these
 5    prior depositions, and am I correct that utilization
 6    review means just this, whether a patient who is
 7    requesting treatment, in your view, the treatment is
 8    appropriate or not?
 9         A    Correct.  It's not only that.  It will
10    also apply to whether there are any quality of care
11    issues with care that's being provided, whether the
12    intensity of service is appropriate to care being
13    requested, whether care should be provided in one
14    level of care as opposed to another level of care.
15         Q    You said in a case called Kesselrig, which
16    was in St. Louis, that you do about 30 to 40 cases
17    per week on this utilization review?
18         A    Far less than that now.
19         Q    You were doing that many back then?
20         A    Yes.
21         Q    You also said it takes you usually just
22    five to 15 minutes to review a file to see -- for
23    utilization review.  Does that sound right?
24         A    Some files, yes.  Some files, much longer.
25         Q    Have you ever turned down a litigation
0060
 1    engagement?
 2         A    Yes.  Well, typically, what happens is --
 3    I'll give a -- when you get a case from an attorney
 4    who wants to speak with you, and the attorney speaks
 5    with you and discusses the case with you, and says,
 6    "Do you think you can help me?"  Oftentimes I'll
 7    say -- there have been times when I said, "No, I
 8    don't think I can."
 9         Q    I wanted to ask you about, you have worked
10    over the years with a -- is it Ms. Rieback?
11         A    Yes.
12         Q    Ellen?
13         A    Yes.
14         Q    When did you first begin working with her?
```
Page 25

ia100708.txt
```
15          A    1993, 1994.
16          Q    Is she a friend of yours?
17          A    Yes.  She's a neighbor, a friend.
18          Q    She owns a company called Rieback
19     Medical/Legal Consultants?
20          A    Yes, she does.
21          Q    You have worked for her over the years?
22          A    Yes, I have.
23          Q    She, I think, is a go-between between
24     attorneys and physicians to match them up, so to
25     speak?
0061
1           A    Yes.
2           Q    I looked at the website and it says,
3      quote, that the company is, quote, "dedicated to
4      providing the best physicians to assist the legal
5      community and has played an active role in
6      litigating countless multi-million dollar
7      settlements and verdicts."
8                Are you familiar with that statement on
9      their website?
10          A    No.  I have never seen her website.
11          Q    I may have asked you this.  You've worked
12     with her over the past 14 years?
13          A    Yes.
14          Q    I don't know if I asked you before, what
15     percentage of your income derives from the forensic
16     part of your practice?
17          A    Less than a third, but close to a third.
18          Q    When you worked through Ms. Rieback, you
19     had an hourly rate and she would take a percentage
20     of that, or take a flat dollar amount of that?
21          A    No.  She would pay me a fee that we
22     negotiated, and that fee has stayed the same for the
23     last ten years.
24          Q    I've read in one of the depositions that
25     when you did work for Ms. Rieback, you had a form
0062
1      that you had to check a box to say whether you
2      thought the claim was meritorious, non-meritorious,
3      or "I can't decide at this point in time."  Do you
4      remember that?
5           A    Yes.
6           Q    Did you in fact do that with Ms. Rieback's
7      clients?
8           A    I have.
9           Q    Did you do it in this case?
10          A    No.
11          Q    Were you ever asked whether you thought
12     these cases were meritorious or not?
13          A    No.
14          Q    You were simply asked whether you could --
15     whether you had interest in getting involved in this
16     area?
17          A    Yes.
18          Q    You also said that you have done some work
19     for insurance companies.  Correct?
20          A    Yes.
21          Q    Is that also utilization review?
22          A    Yes.
23          Q    It's approval for claims, that sort of
24     thing?
25          A    Yes.
```
Page 26

ia100708.txt

```
0063
 1          Q     You said, I believe, in one of your
 2     reports, and I don't know if it's in the Haller
 3     report or not, but that a court has never not
 4     allowed your opinions.  Is that right?
 5          A     Correct.
 6          Q     Is that still true as we sit here today?
 7          A     Yes.
 8          Q     Has any court ever been critical of your
 9     reports?
10          A     Not that I know.
11          Q     Do you advertise on your own website?
12          A     Yes, I do.
13          Q     You advertise your forensic services?
14          A     Yes, I do.
15          Q     At some point in time, you were involved
16     with something that had a website, www.mdjd.com.
17          Do you remember that?
18          A     I've been asked that question in countless
19     depositions, and I have no recollection whatsoever
20     of ever being involved with that company.
21          Q     Other than your own website and
22     Ms. Rieback's own company, you also now work with
23     Atrium.  Correct?
24          A     Correct.
25          Q     Primarily, it seems, with Glenda Grainger.
0064
 1     That's your main contact?
 2          A     Yes.
 3          Q     Do you know a David, I would assume it's
 4     pronounced Gyepes, G-Y-E-P-E-S, at Atrium?
 5          A     Does he have a professional designation,
 6     do you know?
 7          Q     I don't know.  I just saw his name in
 8     connection with Atrium.
 9          A     I don't know.  I think I did speak at one
10     point to a person who had a professional license, at
11     Atrium, but I can't recall the name.  It might be
12     this person.
13          Q     Aside from your own website, Ms. Rieback's
14     organization and Atrium, do you work with any other
15     professional witness services?
16          A     No.
17          Q     Are you listed, to your knowledge, on any
18     other Internet sites as a potential expert witness?
19          A     I don't -- as far as I know, I'm not.
20          Q     Other than your professional practice, do
21     you own any other companies?
22          A     No.
23          Q     I think I asked you before, you have not
24     been involved in any lawsuits other than that
25     dispute about the lien on the property.  Correct?
0065
 1          A     Correct.
 2          Q     You've never had any judgments entered
 3     against you?
 4          A     No.
 5          Q     Okay.  May I take a look at Exhibit 10,
 6     which I think is your billing statement?
 7          I'm looking at Exhibit 10, and we only
 8     have one copy of this, so -- it says it's printed on
 9     10/7/2008, which would be yesterday.  Correct?
10          A     Today.
```

Page 27

ia100708.txt
11          Q    You printed it today.  Is this invoice
12    current up to what date?  That's what I am trying to
13    figure out.
14          A    Well, the last charges that were entered
15    on the invoice is September 4, 2008.  I know that no
16    other charges have been generated to Atrium since
17    that time, and I know that no payments have been
18    received.  So, this is a current invoice to today.
19          MR. HETRICK:  Let me just show you -- I'm
20    going to mark as Exhibit 17 --
21                     (Whereupon, Deposition Exhibit
22                     17 was marked for
23                     identification.)
24    BY MR. HETRICK:
25          Q    Let me show you Exhibit 17, which is
0066
1     actually a two page document, and this is for, I
2     think, just the Haller case, if you look at it.
3          A    It's actually both.  It included
4     McAlexander and Haller.
5          Q    And that one reflects charges, if I'm
6     reading it correctly -- these charges are for work
7     done on July 28, 29 and August 1 in the Haller case,
8     and in the McAlexander case, work done on July 30,
9     31 and August 5.
10               Do you see that?
11          A    Yes.
12          Q    Are these charges included in Exhibit 11
13    or are these before that?  I'm sorry, Exhibit 10,
14    your billing statement.
15          A    No, these are all included.
16          Q    So Exhibit 10 then is everything that
17    you've charged Atrium to date for the work that
18    you've done in this case?
19          A    Yes, sir.
20          Q    Can I see that for just a moment?  And you
21    said there are no further charges.  Correct?
22          A    Correct.
23          Q    So, the total here, and I'm just trying to
24    make sure that I'm reading this correctly, the total
25    time that you've spent to date is five hours on the
0067
1     McAlexander case and six hours on the Haller case?
2          A    No.
3          Q    Then I'm reading it wrong.  What is the
4     correct number of hours?
5          A    Haller is 11 and McAlexander is 11.
6          Q    So it's 11 hours total you've spent to
7     date on each of these cases?
8          A    Correct.
9          Q    That's start to finish?
10          A    Correct.
11          Q    On the earlier statement, the one I've
12    marked as Exhibit 17, I think, there are two
13    different price quotes on there.  I just wondered if
14    you could help me with that.
15               The second page, the hours are the same
16    and the dates are the same.  I mean, I think I can
17    represent that to you, but you can take a look, but
18    one of them has a billing rate of $500 an hour and
19    the other has a billing rate of $375 an hour.
20    What's going on?
21          A    I have no idea.  Atrium is going to have
                              Page 28

ia100708.txt
```
22        to take money out of their pocket to pay me, because
23        my billing rate hasn't changed.
24            Q     You don't know why one of them says 375
25        and the other one says 500?
0068
 1            A     I have no idea.
 2            Q     Are these prepared by your office?
 3            A     No.  This is the first time I've ever seen
 4        this.
 5            Q     In the time that you have spent on the
 6        Haller case, have you reviewed all of his medical
 7        records?
 8            A     I've looked through all his medical
 9        records, yes, some in more detail than others.
10            Q     Is the same true of Ms. McAlexander?
11            A     Yes.
12            Q     And you have looked at the depositions of
13        two of Mr. Haller's treaters.  Correct?
14            A     Yes.
15            Q     Did you tell me before you don't know
16        whether you looked at any of Ms. McAlexander's?
17            A     No, I did, Ms. McAlexander, as well.
18            Q     Do you remember how many of her treaters'
19        deps you've looked at?
20            A     I don't remember how many depositions
21        there were, but I'll be happy to tell you tomorrow.
22                  Actually, I might be able to help you with
23        that.
24                      (Pause.)
25                  THE WITNESS:  Yes.  If you -- in Exhibit
0069
 1        11, there is a list of the depositions that
 2        were sent to me.
 3        BY MR. HETRICK:
 4            Q     You've reviewed each one that was sent to
 5        you?
 6            A     Yes.
 7            Q     Is that true in Haller, as well?
 8            A     There isn't a list for Haller.
 9            Q     Let me just ask you, and then I will turn
10        to your report, what did you do, if anything, to
11        prepare for your deposition today?
12            A     I reviewed my reports.  I briefly looked
13        over the summaries that the attorney had prepared.
14        We spoke for about an hour today.
15            Q     When you say, "We spoke," you are
16        referring to your counsel?
17            A     Correct.  And that's it.
18            Q     When you say you looked at the chronology,
19        you're referring to Exhibit 9?
20            A     Correct.
21            Q     Total, how much time did you spend
22        preparing for the deposition?
23            A     Two, 2-1/2 hours.
24            Q     Other than your discussions with counsel,
25        have you talked to anybody else about your
0070
 1        involvement in the Seroquel litigation?
 2            A     Other than people that have already been
 3        mentioned here today, no.
 4            Q     Have you talked with any other attorneys
 5        about becoming involved in other Seroquel cases?
 6            A     No.
```
Page 29

ia100708.txt
```
 7          Q    Have you talked about getting involved in
 8    other cases with your current lawyers?
 9          A    No, other than Ms. Grainger mentioning
10    that she had other cases she might want to send, but
11    nothing has happened at this point.
12          Q    I'm going to turn to your report in just a
13    minute, but before I do, I want to ask you, you have
14    some opinions, obviously, in your expert report.
15               Have you published anywhere your opinions
16    on Seroquel and any possible association between it
17    and hyperglycemia or diabetes?
18          A    No.
19          Q    Did you ever write down your opinions
20    concerning Seroquel and hyperglycemia or diabetes or
21    weight gain, before you became involved in these
22    cases?
23          A    No.
24          Q    I think you told me you just brought
25    Haller with you today.  Correct?
0071
 1          A    Correct.
 2          Q    It is No. 12, I believe.  So, if you would
 3    get Exhibit 12.
 4               The report we have in Exhibit 12 is dated
 5    September 1, 2008.
 6               Do you see that?
 7          A    Yes.  There is a modification on the first
 8    page, because in reading it this morning, I noticed
 9    that, if you look at it, it says, "Expert, United
10    States District Court."
11          Q    I saw that.
12          A    I had that removed, because my
13    transcriptionist had a template she was using.
14          Q    We won't count that as a substantive
15    change in opinion.  We will get rid of it.
16               The report itself is a 7 page document.
17    Correct?
18          A    Yes.
19          Q    And --
20          A    Excuse me.  You asked me about the fee
21    schedule paragraph.  The fee schedule paragraph that
22    is in this report is the exact same fee schedule
23    paragraph that I sent to Atrium.
24          Q    I see.  At the end?
25          A    The last page.
0072
 1          Q    I see it.
 2          A    That's the exact same.  I just pasted it
 3    and used it.
 4          Q    The report begins with a summary of your
 5    qualifications.
 6               Do you see that?
 7          A    Yes.
 8          Q    I'm just going about, I don't know,
 9    two-thirds of the way down that paragraph and it
10    says, "I have special health care knowledge and
11    skill about the matter addressed below and for which
12    I am providing opinions."
13               Do you see that?
14          A    Yes.
15          Q    What are the special health care knowledge
16    and skills that you believe you have about these
17    matters?
```
Page 30

ia100708.txt
```
18        A    I am a board certified psychiatrist.  I
19   have treated mood disorders and psychotic disorders
20   throughout my entire career in psychiatry.
21             I have experience using all antipsychotic
22   agents, including atypical and older antipsychotic
23   agents.
24             In addition, I have completed a voluntary
25   certification provided by the -- where's my CV?
0073
1    Neuroscience Educational Institute, which is a
2    continuing education program of study and competency
3    as verified by examination in psychopharmacology.
4             So, I also have some specialized training
5    in psychopharmacology.
6        Q    Is there a board certification in
7    psychopharmacology?
8        A    No.  The board certification is in
9    psychiatry.
10       Q    So, this was a CME course that you did?
11       A    Yes.  It's a program of study leading them
12   to certifying you in psychopharmacology.
13       Q    How many hours of study does it involve?
14       A    I think about a hundred hours.
15       Q    You now have a certificate?
16       A    Correct.
17       Q    It is current?
18       A    I believe so, yes.
19       Q    I want to look -- and obviously I'm not
20   going to read through each and every sentence here,
21   but I just have a couple of general questions for
22   you.
23             I'm on page 3 of your report, but let me
24   ask you, first of all, beginning on page 1 and all
25   the way down through page 2, is a list of materials
0074
1    that you have reviewed.
2        A    Correct.
3        Q    These are the materials that we would find
4    on those disks if we looked, among others?
5        A    Yes.
6        Q    But you have reviewed all of the documents
7    that you have listed here on page 1 and 2?
8        A    Yes.
9        Q    In the first paragraph, on page 3, you say
10   that "Seroquel is a member of the dibenzothiazapene
11   class of atypical antipsychotics," and that "It is
12   used to treat symptoms of psychotic conditions such
13   as schizophrenia and bipolar disorder."
14             Did I read that correctly?
15       A    Yes.
16       Q    Then you say, "It works as an
17   antipsychotic by changing the actions of chemicals
18   in the brain."  Correct?
19       A    Yes.
20       Q    Do you know how it works?
21       A    People have -- we have theories in how
22   it's worked based upon models, but no one knows
23   specifically how Seroquel works to change behaviors
24   or perceptions.
25             It's felt, if you read the next paragraph,
0075
1    it's felt it's related to Dopamine and serotonin
2    action.
```
Page 31

ia100708.txt
```
 3        Q     Actually, you're a question ahead of me.
 4    When we get to the second paragraph, you say, "The
 5    exact mechanism of actions of Seroquel is unknown."
 6    Correct?
 7        A     Correct.
 8        Q     So, we in fact don't know how it works.
 9    Correct?
10        A     Correct.
11        Q     But it is felt that it may be related to
12    Dopamine and serotonin receptor antagonism?
13        A     Correct.
14        Q     But that has never been demonstrated.
15    Correct?
16        A     It's been demonstrated in vitro.  It has
17    not been demonstrated in in vivo human studies.
18        Q     In vitro means laboratory tests; correct?
19        A     Yes.
20        Q     Animal models?
21        A     Yes.
22        Q     We will talk a little later, but -- let me
23    take a step back.
24        I did look at your website, and one of the
25    things that it says on your website is that you
0076
 1    provide to your patients evidence based medical
 2    care.  Is that what it says?
 3        A     I haven't looked at my website in about a
 4    year, but --
 5        Q     Let me ask a free-standing question.
 6        Do you practice evidence based medicine?
 7        A     I try to, yes.
 8        Q     What do you mean by "evidence based
 9    medicine"?
10        A     That the treatments I use are based upon
11    evidence of efficacy and safety.
12        Q     Are you familiar with the Family Practice
13    Journal rating scale of different kinds of evidence?
14        A     No.
15        Q     One sees it, I mean, I'll tell you, you
16    see it from time to time in journal articles, and it
17    lists different types of evidence.  Let me show it
18    to you.
19                        (Whereupon, Deposition Exhibit
20                         18 was marked for
21                         identification.)
22    BY MR. HETRICK:
23        Q     Let me mark this as Exhibit 18.  Exhibit
24    18, which I have showed you, Doctor, it is an
25    article from -- a special article from the American
0077
 1    Family Physician, and you can look through it all if
 2    you like, but my question is really just on page 3,
 3    I think it is, I'm sorry, the fourth page, where
 4    they talk about different levels of evidence.  Do
 5    you see that?
 6        A     Yes.
 7        Q     There's level one, level two and level
 8    three?
 9        A     Yes.
10        Q     Level one, I think, is referring to
11    randomized clinical trials?
12        A     Not alone.  It's the first time I'm
13    looking at this article, but from the way
```
Page 32

ia100708.txt
14    understand, it says level one evidence would be
15    meta-analyses of randomized clinical trials, or
16    individual randomized clinical trials, or all or
17    none studies.  I'm not sure what an all or none
18    study is.
19         Q    Let me ask you this to make life easier on
20    both of us, and put the exhibit aside for a moment.
21         Would you agree with me that the most
22    reliable form of medical evidence comes from
23    randomized controlled clinical trials?
24         MR. TRAMMELL:  Objection.
25         THE WITNESS:  That would depend on the
0078
1         particular therapy that you are looking at, and
2         the specific details of that particular study.
3    BY MR. HETRICK:
4         Q    Have you ever heard randomized clinical
5    trials referred to as the gold standard for medical
6    data?
7         A    Yes.
8         Q    Do you agree with that?
9         MR. TRAMMELL:  Objection.
10         THE WITNESS:  Once again, I would have to
11         say that would depend on the particular study
12         in question.  I would need to look at a
13         particular study and see if I felt it met the
14         gold standard or not.
15    BY MR. HETRICK:
16         Q    Would you agree with me that the next
17    level down from a clinical controlled study is
18    retrospective studies?
19         MR. TRAMMELL:  Objection.
20         THE WITNESS:  Once again, it would depend
21         on the particular study.  I've seen some very
22         well designed retrospective studies that do
23         provide us with a lot of information and that
24         are accepted in the field.
25
0079
1    BY MR. HETRICK:
2         Q    Do you find those to be as reliable as
3    controlled clinical studies?
4         MR. TRAMMELL:  Objection.
5         THE WITNESS:  Once again, it depends on
6         the particular studies.
7    BY MR. HETRICK:
8         Q    We started this by talking about in vitro
9    studies.  Correct?
10         A    Yes.
11         Q    Are they, by and large, less reliable than
12    the other types of studies that we've talked about?
13         MR. TRAMMELL:  Objection.
14         THE WITNESS:  Well, a study is reliable
15         insofar as how it's designed.  If the in vitro
16         study is designed to answer a particular
17         question, it can be an extremely reliable
18         study.
19    BY MR. HETRICK:
20         Q    Are you aware of any studies that have --
21    any studies that have been designed to specifically
22    test how Seroquel works on the brain?
23         A    Over the course of the past ten years, I
24    have seen studies which have looked at atypical
Page 33

ia100708.txt
25    antipsychotics and how they act in the brain.
0080
 1                As I'm sitting here today, I do not know
 2    if the studies specifically involved Seroquel or
 3    not.
 4         Q    You can't, as you sit here today, tell me
 5    that you've seen any kind of study that has studied
 6    Seroquel and how -- its mechanism?
 7         A    Correct.
 8         Q    Now, in the next paragraph, it says, "The
 9    class of atypical antipsychotics has been marketed
10    as a significant improvement over previously
11    available antipsychotic medications."
12                Do you see that?
13         A    Are we setting this aside now?
14         Q    Yes.  I'm sorry.  We're back to your
15    report, which is Exhibit 12.
16         A    On the third paragraph?
17         Q    It says, "The class of atypical
18    antipsychotics has been marketed as a significant
19    improvement over previously available antipsychotic
20    medications."
21                Do you agree with that?
22         A    Yes.
23         Q    It's been your clinical experience that
24    the second generation antipsychotics provided you a
25    better tool to treat your patients?
0081
 1                MR. TRAMMELL:  Objection.
 2                THE WITNESS:  As I've written in my
 3           report, they are a tool that are less
 4           problematic in certain ways.  The older
 5           antipsychotic agents are still very good
 6           medications, and for the right patient they
 7           work very well, and in the right clinical
 8           circumstances they work very well.
 9                In looking at a lot of chronically
10           mentally ill patients, I've seen situations
11           where in fact patients have to be taken off the
12           atypicals and put back on older antipsychotics
13           to achieve results.
14                So, it really is very dependent on the
15           particular patient and the particular case.
16    BY MR. HETRICK:
17         Q    Fair enough.  It has been your experience,
18    has it not, that patients react differently to
19    different medications?
20         A    Yes.
21         Q    And that a drug that works on one patient
22    may not work on another?
23         A    Yes.
24         Q    And that's why it's helpful to have a
25    number of different medications within a particular
0082
 1    class?
 2         A    Yes.
 3         Q    So, it's helpful to have, say, five or six
 4    different second generation antipsychotics?
 5                MR. TRAMMELL:  Objection.
 6                THE WITNESS:  Yes.
 7    BY MR. HETRICK:
 8         Q    Because one may work for a particular
 9    patient and another may not.  Correct?
                            Page 34

ia100708.txt

```
10        A    Correct.  There are other reasons, also.
11  You would like a variety of medications.  Different
12  medications have different side effect profiles, and
13  very often choices about medications are made based
14  upon what side effects you want to expose a patient
15  to.
16        Q    Those decisions are usually made as part
17  of the risk/benefit analysis by that patient's
18  treating physician.  Correct?
19             MR. TRAMMELL:  Objection.
20             THE WITNESS:  Yes.
21  BY MR. HETRICK:
22        Q    The paragraph concludes, that we were
23  reading, that says, "The first widely marketed
24  atypical antipsychotic medication in this country
25  was Clozapine."  Correct?
0083
1         A    Correct.
2         Q    Do you say "Clozapine" or "Clozapine"?
3         A    Sometimes "tomato," "tomato."
4         Q    Fair enough.  You note that Clozapine was
5   problematic because of the incidence of
6   agranulocytosis and leukopenia.  Correct?
7         A    Correct.
8         Q    What is agranulocytosis?
9         A    What Clozapine did and does is, it causes
10  suppression of white blood cells and that, of
11  course, can be problematic for patients.
12        Q    It can be in fact fatal?
13        A    Yes.
14        Q    The first of the atypical antipsychotics
15  had some very serious and very significant side
16  effects.  Right?
17        A    Yes.
18        Q    Then over time, other second generation
19  psychotics were approved and put on the market.
20  Correct?
21        A    Antipsychotics.
22        Q    Antipsychotics, yes.
23        A    Yes.
24        Q    And you note that the later, so to speak,
25  antipsychotics, were marketed without this
0084
1   problematic side effects, that is the
2   agranulocytosis and the leukopenia.  Correct?
3         A    Correct.
4         Q    Seroquel is one of those?
5         A    Yes.
6         Q    Now, it then says, "With the
7   widespread" -- the very last sentence on that
8   paragraph.  "With the widespread use of atypical
9   antipsychotics, it soon became evident that there
10  was an association between the use of atypical
11  antipsychotics, including Seroquel, and the
12  development of diabetes."
13             Did I read that correctly?
14        A    That's correct.
15        Q    The first second generation antipsychotics
16  came out when?  Do you remember?
17        A    I don't remember specifically.  Mid-'90s,
18  I would say.
19        Q    You say here, "As they became more widely
20  used, it became apparent that there was an
```

Page 35

ia100708.txt
```
21   association."
22        A    Correct.
23        Q    When do you -- when was your first
24   awareness of a possible -- this possible
25   association?
0085
 1        A    I remember probably about five, six years
 2   ago, that psychiatrists began to talk about weight
 3   gain, metabolic syndrome and diabetes when, as
 4   before, we never really spoke about those issues
 5   associated with our medications.  So, I would say
 6   2001, 2002.
 7        Q    Is the same true of the first generation
 8   antipsychotics?
 9        A    By that you mean --
10        Q    I mean, was there discussion before 2001,
11   2002, about side effects, including weight gain and
12   so forth, with first generation antipsychotics?
13        A    Yes.
14        Q    Before '91, '92 -- I'm sorry, before 2001,
15   2002?
16        A    Yes.
17        Q    It was a known side effect of the first
18   generation antipsychotics?
19        A    Weight gain, correct.
20             MR. TRAMMELL:  Objection.
21   BY MR. HETRICK:
22        Q    Now, you note in the next paragraph that,
23   "In April 2002, an article appeared in the American
24   Psychiatric Association's American Journal of
25   Psychiatry."  Correct?
0086
 1        A    Correct.
 2        Q    That's the Sernyak article.  Correct?
 3        A    Correct.
 4        Q    That you told me before you found in your
 5   research.  Correct?
 6        A    Correct.
 7        Q    The article you note, I'm just sort of
 8   skipping a sentence or two down, "Patients who
 9   received atypical antipsychotics were nine percent
10   more likely to have diabetes than those who received
11   typical antipsychotics."
12             Do you see that?
13        A    Yes.
14        Q    "The prevalence of diabetes was
15   significantly increased for patients who received
16   Clozapine, Olanzapine and Quetiapine."  Correct?
17        A    Yes.
18        Q    You note, "This information was not put in
19   the Seroquel labeling or disseminated to
20   physicians."  Correct?
21        A    Correct.
22        Q    By that you mean in or after April '02?
23        A    Correct.
24        Q    And in the next paragraph, you say, "The
25   use of Seroquel is associated with the development
0087
 1   of metabolic syndrome, hyperglycemia and diabetes."
 2   Correct?
 3        A    Yes.
 4        Q    The only article that you have cited in
 5   your report is the Sernyak article.  Correct?
```
Page 36

ia100708.txt

```
 6        A    Yes.
 7        Q    Is the Sernyak article the only one you
 8   are relying on for this statement that Seroquel has
 9   been associated with hyperglycemia and diabetes?
10        A    No, I'm not relying on the Sernyak article
11   one way or the other.  The reason I cited the
12   Sernyak article, and the reason I even looked for
13   it, is because this was knowledge I had through my
14   training, experience, CMEs, et cetera.
15             I just was looking for -- I knew the time
16   period in my mind about when we -- when the general
17   psychiatric community became aware of these issues,
18   and I was looking for a point in time where I saw
19   this beginning to be mentioned in the literature.
20        Q    And the Sernyak April 2002 seems to you
21   the appropriate date that this -- that awareness
22   became --
23        A    Began to emerge.
24        Q    Began to emerge.  Thank you.
25             To your knowledge then, in your opinion,
0088
 1   it did not begin to emerge prior to April of 2002?
 2             MR. TRAMMELL:  Objection.
 3             THE WITNESS:  Yes.
 4   BY MR. HETRICK:
 5        Q    Now, I notice in your report, throughout
 6   the whole report, when you speak about Seroquel and
 7   diabetes or elevated sugars, you talk about an
 8   association.  Correct?
 9        A    Correct.
10        Q    Nowhere in the report that I could find in
11   the general section, and I'm not talking now about
12   the case specific section, but nowhere in there do
13   you say that Seroquel causes diabetes.  Is that
14   correct?
15        A    Correct.
16        Q    What is your understanding, first of all,
17   of the difference between an association and
18   causality?
19        A    Causality means if not for something, then
20   something else would not happen.
21        Q    But for?
22        A    But for.  Correct.
23        Q    So, causation means that you if -- but for
24   taking Seroquel, you would have developed diabetes,
25   or you would not have developed diabetes?
0089
 1        A    Yes.
 2        Q    And what then does "association" mean to
 3   you?
 4        A    Association is -- for example, what
 5   Sernyak found, that when they looked at a population
 6   exposed to particular medications, they found higher
 7   levels of a particular disease.  Hence, the two
 8   appear to be associated when you remove the
 9   extraneous factors.
10        Q    But association is not causation?
11        A    It may or may not be.
12        Q    An example that I've heard before is,
13   there's an association, in fact a strong
14   association, between people who carry matches and
15   people who have lung cancer.  All right?
16        A    Okay.
```

Page 37

ia100708.txt
```
17          Q     But that association is obviously not a
18     causal relationship.  Carrying matches doesn't cause
19     you to have lung cancer.  Correct?
20          A     Correct.
21          Q     What causes you to have lung cancer is,
22     presumably, smoking cigarettes, which is what's
23     related to the matches.  Right?
24          A     If you speak to certain attorneys, they
25     will question that.
0090
 1          Q     I'm not asking about certain attorneys.
 2     I'm asking you, the association is just an
 3     association, is all I'm trying to get at.  Correct?
 4          A     Yes.
 5          Q     Sometimes you have an association with
 6     actual causation.  Correct?
 7          A     Yes.
 8          Q     My question to you, and really what I am
 9     trying to focus on is, what kind of questions I need
10     to ask you in some of the remainder of this, is,
11     putting aside your case specific opinions about
12     Mr. Haller and Ms. McAlexander, nowhere in the
13     general part do you say that Seroquel causes
14     diabetes.  Correct?
15          A     Correct.
16          Q     So, is it a fair statement to say then the
17     general part of your report supports the proposition
18     that you do not have an opinion that but for taking
19     Seroquel, people would not develop diabetes as a
20     general proposition?
21          A     No, I would not agree with that.  The
22     purpose of the general opinion section of this
23     report was to provide background and a framework
24     with which to then apply and make specific
25     conclusions regarding a case in particular.
0091
 1                I don't think I would support a general
 2     statement such as the one you made.
 3          Q     Would you support a general statement
 4     either way, that is, that Seroquel does not cause
 5     diabetes or that it does?
 6          A     I would prefer to use the terminology that
 7     Seroquel is a factor in the development of diabetes
 8     in the case of Mr. Haller or Ms. McAlexander.  I
 9     would much rather be specific than general.
10          Q     Fine.  I think I understand.
11                Now, your report goes on to say that, if I
12     can paraphrase, please correct me if I'm wrong, that
13     it is your view that at least as of April 2002 --
14          A     Where are you now?  I'm sorry.
15          Q     I'm sort of paraphrasing the rest of it.
16     I can read it verbatim, if you like, but that from
17     at least April 2002, it is your view that
18     AstraZeneca should have shared with physicians some
19     information about this newly emerging association
20     between Seroquel and high blood sugar?
21          A     Yes.
22          Q     You also say in one paragraph, I'm just
23     trying to find it, that they also should have shared
24     this information with patients?
25          A     I believe on page 4, the first paragraph,
0092
 1     where I say, "Patients should also be informed."
```
Page 38

ia100708.txt
```
 2        Q    Right.
 3        A    I think that that's the job of the -- of
 4   the provider, to inform the patient.
 5        Q    That was my question.  That the patient
 6   should have been informed through their health care
 7   provider?
 8        A    Correct.
 9        Q    Not by AstraZeneca directly?
10        A    No, not necessarily.
11        Q    Let me ask you just a couple of general
12   questions before I go on.
13             Were there any prior drafts of this
14   report?
15        A    Yes, there were.
16        Q    Do you still have the prior drafts?
17        A    No.
18        Q    Did you just write over them?
19        A    Yes.
20        Q    You didn't save them?
21        A    I can check.  If I did save them, I'll be
22   happy to produce them, but I do not believe they're
23   saved.  The substantive opinions are unchanged in
24   the prior draft.
25             MR. TRAMMELL:  My understanding is, we had
0093
 1             an agreement not to produce draft reports on
 2        either side.
 3             MR. HETRICK:  I think that's right.  I'll
 4        check the stipulation, but that's fine.  I just
 5        wanted to know if there were any.  That's all.
 6             THE WITNESS:  Therefore, I should not --
 7   BY MR. HETRICK:
 8        Q    You should not produce them.  I'm not
 9   asking you to produce them.
10             Did you discuss your report with any of
11   the plaintiffs' lawyers?
12        A    I did not discuss it with an attorney.  I
13   sent a copy to Ms. Grainger.  She gave me some
14   feedback, some language issues, and changes were
15   made in that regard.
16        Q    Did you follow her suggestions?
17        A    Sometimes yes.  Sometimes no.
18        Q    Did you consult with any other doctors in
19   connection with your report?
20        A    No.
21        Q    Did you write the report yourself?
22        A    Yes.
23        Q    All of it?
24        A    All of it.
25        Q    How long did it take to write it?
0094
 1        A    Well, I dictated it, so a couple of hours
 2   from start to finish.
 3        Q    Does your report state all of your
 4   opinions -- and we're looking now specifically at
 5   Exhibit 12, which is the Haller report, and so I'll
 6   limit my question to the Haller case, but does your
 7   report contain all of your opinions in the Haller
 8   case?
 9        A    Yes.
10        Q    Does it identify the bases that support
11   your opinions?
12        A    I believe it does.
```
Page 39

ia100708.txt
13        Q    Is there any opinion that you hold in this
14   case, that's not contained in your report?
15        A    Of course I have opinions.  The issue is,
16   if the question is asked of me, I'm happy to expand
17   upon my opinions, but the seminal opinions are in
18   the report.
19        Q    Let me try to ask maybe a little more
20   precise question.  That is, as we sit here, is there
21   anything that went into your thinking, your analysis
22   and your conclusions concerning Mr. Haller and his
23   diabetes, that's not contained in Exhibit 12?
24        A    Can you expand on "anything that went in"?
25   I don't understand what that means.
0095
1                 MR. HETRICK:  Okay.  Can you read back the
2           question?
3                         (Whereupon, the requested
4                         portion of the record was read
5                         by the reporter.)
6   BY MR. HETRICK:
7         Q    Let me try to rephrase that.
8              As we sit here, is there anything, any
9   opinions or any bases for your opinion concerning
10   Mr. Haller and his diabetes, that are not in Exhibit
11   12?
12        A    No, I don't think so.
13        Q    By the way, I think you said you looked at
14   the report in preparing for the deposition?
15        A    Yes.
16        Q    Other than the word "expert" on page 1,
17   are there any other errors in the report?
18        A    Not that I could see.
19        Q    In the preparation of your report, did you
20   review any internal AstraZeneca documents?
21        A    Yes.
22        Q    Those were the ones that the plaintiffs'
23   lawyers sent you?
24        A    Yes.
25        Q    Did you ask for any other AstraZeneca
0096
1   documents?
2         A    I did.  I have not been provided with any.
3         Q    You have not gotten any of the others that
4   you have asked for?
5         A    Yes.
6         Q    What did you ask for?
7         A    There were certain -- in the list of
8   AstraZeneca documents, there were some documents
9   that were listed but were not included in what I was
10   provided.
11        Q    And you requested those?
12        A    Correct.
13        Q    And you have not gotten them?
14        A    Correct.
15        Q    Did you request anything beyond what was
16   in the original list?
17        A    No.
18             THE WITNESS:  Can I pause again?
19             MR. HETRICK:  Sure.  Absolutely.
20                     (Thereupon, a short recess was
21                     taken.)
22   BY MR. HETRICK:
23        Q    Dr. Abramson, you told me before that
                     Page 40

ia100708.txt
```
24        you -- I think you said that you used the article
25        that you cited in there simply as kind of a
0097
 1        bookmark, as a place in time.  Is that a fair
 2        statement?
 3             A    Correct.
 4             Q    For when this association began to emerge.
 5        Correct?  The association between second generation
 6        antipsychotics and possible glucose disregulation?
 7                  MR. TRAMMELL:  Objection.
 8                  THE WITNESS:  Yes.
 9        BY MR. HETRICK:
10             Q    Is the same true for weight gain?
11             A    Well, that's how it first became presented
12        to psychiatrists by the representatives of the
13        second generation antipsychotics.  They began to
14        talk about needing to consider watching patients for
15        weight gain.  They didn't talk about glucose
16        deregulation.  They spoke about weight gain.
17             Q    Were the discussions that you had with --
18        I assume you are talking about sales reps?
19             A    Correct.
20             Q    With weight gain, is this also in the 2002
21        period?
22             A    Yes.
23             Q    Was it consistent with your clinical
24        practice experience, by the way?
25             A    The practice experience tended to show
0098
 1        that there were some people who would gain weight
 2        quickly on these medications.  So, it was not
 3        inconsistent.
 4             Q    Were there also some people who lost
 5        weight on these medications?
 6             A    Yes.
 7             Q    Let me just ask you, as we sit here, can
 8        you identify, other than the Sernyak article, any
 9        other published articles that you considered in
10        basing your opinions in this case?
11             A    No.
12             Q    Did you make any attempt to go and collect
13        up and read all of the scientific literature on
14        Seroquel?
15             A    No.
16             Q    It's quite voluminous, you would agree?
17             A    Yes.
18             Q    You haven't reviewed it all?
19             A    Correct.
20             Q    Have you reviewed any of the full clinical
21        trial reports on Seroquel?
22             A    No.
23             Q    You know what I mean by, "full clinical
24        trial reports"?
25             A    Yes.
0099
 1             Q    You have not reviewed those?
 2             A    Correct.
 3             Q    Have you reviewed even a synopsis of the
 4        clinical trial reports?
 5             A    Just insofar as that information was
 6        provided to me by AstraZeneca in my medical request.
 7             Q    But you would agree with me that there are
 8        a good number of articles involving Seroquel and
```
Page 41

ia100708.txt

```
 9      associations or lack of associations with weight
10      gain and hyperglycemia, that you have not read?
11           A    Yes.
12           Q    I want to ask you, in your report, and
13      I'll just have to find it, here it is, on --
14                MR. HETRICK:  I always forget.  Is it
15           Exhibit 10, the report?
16                MS. SCHMID:   12.
17      BY MR. HETRICK:
18           Q    Exhibit 12 is the Haller report.  On page
19      4 of that exhibit, just about halfway down, you say,
20      "A review of corporate documentation" -- about
21      halfway down page 4 of Exhibit 12, there's a
22      paragraph that says, "A review of corporate
23      documentation shows that AstraZeneca knew about the
24      adverse effects of Seroquel as it relates to weight
25      gain, hypercholesterolnemia, evaluation of
0100
 1      triglycerides" --
 2           A    "Elevation."
 3           Q    I'm sorry.  "Elevation of triglycerides,
 4      metabolic syndrome and diabetes before this
 5      information became widely known to the professional
 6      community, and failed to warn physicians about these
 7      adverse effects in a timely manner."
 8                Did I read that correctly?
 9           A    Yes, you did.
10           Q    What I would like to ask you is, first of
11      all, based on your review of these corporate
12      documents, when do you think AstraZeneca first knew
13      about those?
14           A    Well, there was a great deal of discussion
15      in the documentation of issues related to regulatory
16      agencies in Japan and France and Holland, and I
17      believe the time course of those discussions was
18      between 2000 and 2002.
19           Q    Do I take it from that, that what you are
20      saying is you think between 2000 and 2002, is when
21      AstraZeneca first became aware of some of these
22      adverse effects?
23           A    Well, that's when I see evidence in their
24      internal discussions that they were talking about
25      it.
0101
 1           Q    Let me ask you one question, because it
 2      will -- it may, depending on your answer, eliminate
 3      some further questions.
 4                You mentioned a Japanese label and a --
 5      some other country.  There is nowhere in your report
 6      where you talk about foreign labeling or foreign
 7      approval of these drugs.  Correct?
 8           A    No.
 9           Q    You are not going to offer any opinions
10      about foreign labels or foreign approvals --
11           A    No.
12           Q    -- for Seroquel.
13           A    Correct.
14           Q    Then I don't have to ask you about that.
15      That's why I wanted to just clarify it.
16                Which of the internal documents do you
17      believe support that view, the one you just gave me,
18      that you think between 2000 and 2002 AstraZeneca
19      became aware of these adverse effects?
```

Page 42

ia100708.txt
```
20        A    I don't have the specific list that I
21   used, but I'm looking over your Exhibit No. 16,
22   which seems to have many of the internal documents
23   that I looked at, and there are references to
24   internal E-mails from AstraZeneca regarding Seroquel
25   and the Japanese Health Authority, for example, as
0102
 1   one of them.
 2        Q    To your recollection, does that -- that
 3   document deal in particular with weight gain?
 4        A    Yes, I believe so.
 5        Q    Does it also deal with
 6   hypercholesterolnemia?
 7        A    I believe so.
 8        Q    How about elevated triglycerides?
 9        A    I don't recall.
10        Q    Do you know of any other document that you
11   believe supports your view that they were aware of
12   elevation of triglycerides in the 2000, 2002 time
13   period?
14        A    Yes.  I am aware of other documentation.
15   I don't have the exact documentation name -- the
16   exact document name in front of me.
17        Q    Can you just describe for me what you
18   think you've seen that relates to elevation of
19   triglycerides?
20        A    It was an internal AstraZeneca document
21   where that, in fact, was referenced as an issue.
22        Q    "That" being elevation of triglycerides?
23        A    Correct.
24        Q    Was it an E-mail?
25        A    It may have been an E-mail or it may have
0103
 1   been a report that was prepared by them.
 2        Q    Do you recall any, or can you identify for
 3   me what, if any, documents you have seen that talk
 4   about AstraZeneca being aware of metabolic syndrome
 5   as a side effect of Seroquel?
 6        A    I believe the documents at the same period
 7   of time that I'm referencing, do discuss abdominal
 8   girth, weight gain, other metabolic syndrome issues.
 9        Q    Is the same true of diabetes?
10        A    These documents also began to discuss case
11   reports of diabetes.
12        Q    By "case reports," do you mean adverse
13   event reports that were coming into the company?
14        A    Yes.
15        Q    Have you ever submitted an adverse event
16   report dealing with diabetes in one of your
17   patients?
18        A    No.
19        Q    In the 2000, 2002 time period that we're
20   talking about, weren't these issues known in the
21   psychiatric community anyway?
22        MR. TRAMMELL:  Objection.
23   BY MR. HETRICK:
24        Q    I'm talking about side effects of this
25   class of drugs that include weight gain and
0104
 1   metabolic syndrome, these sorts of things.
 2        MR. TRAMMELL:  Objection.
 3        THE WITNESS:  They were known as an
 4        adverse reactions to medications.  They were
```
Page 43

ia100708.txt

```
 5          not specifically known as cautions in using the
 6     medications.
 7 BY MR. HETRICK:
 8     Q     What do you mean by, "as cautions"?
 9     A     Well, if you look at the PDR, you will see
10 pages of possible adverse reactions, and if you look
11 at Seroquel, for example, weight gain is listed as
12 an adverse reaction in 2002, but it's not -- but
13 it's not specifically addressed as a caution or
14 warning, as it is now.
15     Q     I believe I understand your testimony, and
16 in fact, I can show you, if you like, I'll do it in
17 a little bit, but that's true of the original label
18 for Seroquel, all the way back to 1997.  Do you
19 agree with that?
20     A     Yes.
21     Q     That weight gain is listed as an adverse
22 event relating to the use of the drug.  Correct?
23     A     Yes.
24     Q     As is diabetes?
25     A     Yes.
0105
 1          Q     And I think hyperglycemia, as well, is
 2 also listed.  Correct?
 3     A     Yes.
 4     Q     If I understand your opinion, it is that
 5 those things, instead of being listed in the
 6 precautions section, should have been up in the
 7 warnings section?
 8     A     Yes.
 9     Q     Let me ask you, first of all, as a
10 physician, do you read the entire drug label?
11     A     Rarely.
12     Q     What do you not read?
13     A     You focus on the salient parts of the
14 label.
15          As you well know, a label can be four or
16 five pages of very small font information.  As a
17 physician, you rely on safety issues related to
18 medications, whether there are particular warnings,
19 what the medication is indicated for and how to
20 prescribe it.
21          Typically, you don't look at every
22 possible adverse event in the caution section,
23 because -- you don't look at every possible adverse
24 event, because there are just so many of them.
25     Q     We talked before, if you remember, that
0106
 1 you also get your prescribing information from a
 2 number of other sources other than the label.
 3 Correct?
 4     A     Yes.
 5     Q     Is it fair to say that in this 2000, 2002
 6 time period, that this was a topic of discussion in
 7 the psychiatric community?
 8          MR. TRAMMELL:  Objection.
 9 BY MR. HETRICK:
10     Q     By that I mean weight gain associated with
11 second generation antipsychotics.
12          MR. TRAMMELL:  Objection.
13          THE WITNESS:  Yes, it is fair.
14 BY MR. HETRICK:
15     Q     So, you were aware of it, you were aware
```

Page 44

ia100708.txt
```
16      of this issue, in that time frame?
17          A    Correct.
18              MR. HETRICK:  I want to take a look -- we
19      talked a little bit before about the Sernyak
20      article, and I just want to take a look at that
21      article with you, if I may.
22                  (Whereupon, Deposition Exhibit
23                  19 was marked for
24                  identification.)
25
0107
1      BY MR. HETRICK:
2          Q    I think you may have a copy of that
3      article with you, but I'm going to mark a separate
4      one so we all have the same thing.
5              Do you recognize Exhibit 19 as a copy of
6      the Sernyak article?
7          A    Yes, sir.
8          Q    This is the one that's referenced in your
9      report?
10          A    Yes, sir.
11          Q    This is the only article that's referenced
12      in your report?
13          A    Yes, sir.
14          Q    The Sernyak article -- and I'm reading now
15      from just the objective part, up in the abstract.
16      It says, "This study used administrative data from a
17      large national sample of patients with a diagnosis
18      of schizophrenia to compare the prevalence of
19      diabetes mellitus in patients receiving
20      prescriptions for atypical and typical
21      neuroleptics."  Correct?
22          A    Yes.
23          Q    So, the purpose of this study was to look
24      at a data base.  Correct?
25          A    Well, that wasn't the purpose.  It was the
0108
1      methodology.
2          Q    Thank you.  It was a poor question.
3              The purpose of this was to look at a data
4      base to compare patients who took first generation
5      antipsychotics as opposed to patients who took
6      second generation antipsychotics, and to see the
7      occurrence of diabetes in those two populations.  Is
8      that correct?
9          A    Yes.
10          Q    Now, the study itself is limited to a four
11      month period.  Correct?
12          A    Yes.
13          Q    If you look under "Method."
14          A    Yes.
15          Q    It's really just looking at a very narrow
16      window of time.  Correct?
17          A    Correct.
18          Q    And perhaps more importantly, there was no
19      diagnosis made of diabetes before or after that four
20      month period.  Correct?
21          A    Say again.  I'm sorry.
22          Q    Was there a diagnosis made of these
23      patients as to when they became diabetic?
24          A    That question doesn't make sense.  Is
25      there a diagnosis of a diagnosis?  I don't
0109
```
                        Page 45

ia100708.txt
```
 1    understand.
 2         Q    Maybe I misspoke.  Let me ask it to you
 3    this way.
 4              The study looks and sees if a patient has
 5    diabetes or not.  Okay?
 6         A    Yes.
 7         Q    And they did that in part by just looking
 8    at the coding that was used in their medical
 9    records.  Correct?
10         A    Yes.
11         Q    Would you agree with me, first of all,
12    that's not a very reliable way of making diagnoses?
13              MR. TRAMMELL:  Objection.
14              THE WITNESS:  A diagnosis is made by --
15         you are saying is use of codes in a data base
16         reliable?
17    BY MR. HETRICK:
18         Q    Yes.  No.  What I am saying is, is looking
19    at the coding a reliable tool for finding out
20    whether in fact the patient had diabetes mellitus or
21    not?
22              MR. TRAMMELL:  Objection.
23              THE WITNESS:  That depends on the
24         particular health care system that did the
25         coding, I would have to say, and this was done
0110
 1         through the VA, and the VA is typically very
 2         good at this kind of thing.
 3              As a matter of fact, if you look at the
 4         internal documentation, there's a letter from
 5         the FDA in which they actually asked
 6         AstraZeneca to consider doing this exact thing
 7         and polling either large health care
 8         organizations or places like the VA.
 9    BY MR. HETRICK:
10         Q    All right.  First of all, just before I
11    get into some of the specifics of this, on the front
12    page, where we start to get into the article itself,
13    if you look down to the last sentence of that first
14    paragraph, where they're talking about awareness of
15    various side effects in second generation
16    antipsychotics, they note that there is also -- I'm
17    quoting.  "There is also a single case report of
18    Quetiapine associated new onset of diabetes
19    mellitus."
20              Do you see that?
21         A    Yes.
22         Q    There's just one single case reported at
23    this time.  Correct?
24         A    That's of new onset diabetes.  Yes.  That
25    report, I believe, was in 2000.
0111
 1         Q    You say in your report that this, that the
 2    Sernyak article, supports a greater frequency of
 3    diabetes with atypical patients than with those on
 4    the first generation antipsychotics.  Correct?
 5         A    What I said was that patients who received
 6    atypical antipsychotics were nine percent more
 7    likely to have diabetes than those who received
 8    typical antipsychotics.
 9         Q    Now I want to get back to my prior
10    question, which is, in this study there was no
11    screening done for preexisting diabetes.  Correct?
```
Page 46

ia100708.txt
```
12        A    I don't know the answer to that question.
13        Q    I think we'll -- I'm just trying to see if
14   I can find it.
15                      (Pause.)
16   BY MR. HETRICK:
17        Q    If we go to page 565 of Exhibit 19 -- I'm
18   looking at the left-hand column, the first full
19   paragraph.  Do you see that?
20        A    Yes.
21        Q    It says, "Several methodological
22   limitations deserve mention."
23             Do you see that?
24        A    Yes.
25        Q    This is the authors talking about the
0112
1    limitations of their study.  Correct?
2         A    Correct.
3         Q    It says, "First, although the study
4    examined data from more than 38,000 patients with
5    the diagnosis of schizophrenia and who received
6    prescriptions for neuroleptics."
7             Let me stop there for a minute.
8             Neuroleptics means first or second
9    generation antipsychotics?
10        A    Yes, I believe so.  Let me read it.
11        Q    Okay.
12        A    Yes.
13        Q    I think the remainder of this sentence
14   will answer or will point out my prior point, and
15   that is, it says, "The narrow time frame of four
16   months yielded a virtual cross-sectional sample,
17   precluding determination of the temporal
18   relationship between the prescription of
19   neuroleptics and the development of diabetes
20   mellitus."
21             Do you see that?
22        A    Yes.
23        Q    Does it appear that the -- the records
24   that were looked at, they were not prescreened to
25   find out when their diabetes was first diagnosed?
0113
1         A    If you look at their methodology, they
2    said that a patient was operationally defined as
3    having a diagnosis of diabetes if the patient had at
4    least one out-patient encounter or in-patient stay
5    with either a primary or secondary diagnosis of
6    diabetes during the four month period that the data
7    was being analyzed.
8         Q    Let's look at the next sentence then,
9    where I left off.  It says, "It is possible,
10   therefore, that patients may have been switched from
11   an atypical to either a typical neuroleptic or
12   another atypical secondary" -- I'm sorry, "secondary
13   to development of diabetes before the four month
14   prescription window."
15             Do you see that?
16        A    Yes.
17        Q    "And such a switch would have the
18   practical consequence of underestimating the risk of
19   those medications more likely to cause diabetes, and
20   overestimating the risk of those medications less
21   likely to cause the diabetes."  Correct?
22        A    Correct.
```
                      Page 47

ia100708.txt
```
23        Q    So, the authors themselves are saying
24  there's a methodological flaw, or limitation, in
25  this study, because in the way that it's done, you
0114
 1  can't tell if someone was switched from one
 2  medication to another and, therefore, you can't tell
 3  whether there's an overestimating or an
 4  underestimating for any particular drug.  Is that
 5  right?
 6             MR. TRAMMELL:  Objection.
 7             THE WITNESS:  Please repeat that
 8        complicated statement.
 9             MR. HETRICK:  Can you read it back?
10                      (Whereupon, the requested
11                      portion of the record was read
12                      by the reporter.)
13             THE WITNESS:  Correct.
14  BY MR. HETRICK:
15        Q    And then secondly -- and this again is the
16  authors' writing.  The second, "Data on changes in
17  weight in patients who received prescriptions for
18  atypical neuroleptics, were also unavailable."
19             Do you see that?
20        A    Yes.
21        Q    It says, "These data might have clarified
22  one potential mechanism of action for the
23  development of diabetes."
24             In other words, these folks were never
25  weighed.  Correct?
0115
 1        A    Correct.
 2        Q    We don't know whether they gained weight
 3  during this period, or anything like that?
 4        A    They may have been weighed.  They just
 5  didn't use that data.
 6        Q    All right.  But if we look at the evidence
 7  in the study, we don't know anything about their
 8  weights.
 9        A    Correct.
10        Q    Third, it says, "The patients who received
11  prescriptions for typical neuroleptics, may have
12  been less likely to take the medications because of
13  their side effect profiles than were those with
14  prescriptions for the atypical neuroleptics."
15  Correct?
16        A    Correct.
17        Q    So, there's another methodologic flaw here
18  in that because of the more severe side effect
19  profile for the typical neuroleptics, the patients
20  simply might not have taken them.  Right?
21        A    Correct.
22        Q    And then fourth, it says, "The study
23  relied on screening and administrative data base for
24  appropriate ICD-9 codes to identify cases of
25  diabetes mellitus."
0116
 1             Then they note that, "Although the
 2  validity of this method has not been established
 3  empirically, there's no reason to believe that the
 4  method would result in any bias."
 5             Do you see that?
 6        A    Correct.
 7        Q    The point is, they relied just on the
```
Page 48

ia100708.txt
```
  8     study codes for a determination of whether the
  9     patient had diabetes or not.
 10          A    Correct.
 11          Q    Would you agree with me that a more
 12     reliable method would be the American Diabetes
 13     Association criteria for diabetes, repeated fasting
 14     blood sugar above 126?
 15          A    Yes, I would agree with that.
 16          Q    And that therefore reliance on the ICD-9
 17     codes is a less reliable way of determining who
 18     actually had diabetes mellitus?
 19          A    Correct.
 20          Q    It also says, "Finally, several possible
 21     alternative explanations of our observation deserve
 22     comment."  And it says, "It's possible that patients
 23     with preexisting diabetes mellitus were selectively
 24     switched to atypical neuroleptics."
 25               Do you see that?
0117
  1          A    Yes.
  2          Q    Again, some of these patients could have
  3     had diabetes before this four month snapshot that
  4     we're looking at, and they're saying they may have
  5     been changed to the atypicals.  Right?
  6          A    Yes.
  7          Q    That would give you a sort of false high
  8     reading for the atypicals, because they've already
  9     had diabetes when they were switched.  Correct?
 10               MR. TRAMMELL:  Objection.
 11               THE WITNESS:  They go on to say that they
 12          felt this was unlikely, the explanation was
 13          unlikely.
 14     BY MR. HETRICK:
 15          Q    But I'm reading further down.  It says,
 16     "It's also possible, however, that clinicians who
 17     were aware of the potential risks could have chosen
 18     to monitor blood sugars more carefully in patients
 19     taking atypical neuroleptics, thereby identifying
 20     additional cases of diabetes and inflating the
 21     effects on it."  Correct?
 22          A    Yes.  However, you skipped an important
 23     part of the paragraph, where they say that they in
 24     fact think it's more likely that clinicians aware of
 25     the case reports asserting a connection between some
0118
  1     atypicals and diabetes, might have avoided these
  2     medications in patients with diabetes, artificially
  3     decreasing the ability to detect an association.
  4               So, they argue on both sides.  I think my
  5     opinion, honestly, is, in order to get this article
  6     accepted for publication, the editors demanded a
  7     self-critique of the methodology, and I think one
  8     can argue on both sides of the point, in the
  9     methodological discussion.
 10          Q    That's fine, and really, that in some ways
 11     is my point.  That this study has some
 12     methodological limitations to it.  Do you agree with
 13     that?
 14          A    Yes.
 15          Q    Even after this statement, there are some
 16     open questions about the reliability of this data.
 17          A    This particular study, yes.
 18          Q    And those open questions remained for some
```
Page 49

ia100708.txt
```
19     period of time, at least in connection with
20     Seroquel.  Correct?
21         A    Correct, but this was an article that was
22     published in the most respected psychiatric journal,
23     where before this article, in my reading of it, what
24     you saw were case reports and less kind of
25     comprehensive looks at the issue, which is one of
0119
 1     the reasons why I selected this article.
 2         Q    I understand that, and -- but my point is,
 3     this is far from definitive proof of anything?
 4         MR. TRAMMELL:   Objection.
 5         THE WITNESS:   Well, what it shows is the
 6         association that it shows.  You know, then they
 7         go on to say that there's a high suggestion of
 8         this relationship, that it needs to be examined
 9         further, and that if it bears fruit, the
10         risk/benefit ratio of these medications needs
11         to be looked at again.
12     BY MR. HETRICK:
13         Q    All right.  Are you aware of the fact that
14     at or about the same time, there were other articles
15     published that the data went the other way, that is,
16     it didn't show any increased risk of diabetes among
17     Seroquel users?
18         A    Yes.
19         MR. TRAMMELL:   Objection.
20     BY MR. HETRICK:
21         Q    So, there were articles going both ways.
22     Correct?
23         A    Right.
24         Q    The data then, what's the term I want, is
25     discrepant?  Is that a fair statement?
0120
 1         MR. TRAMMELL:   Objection.
 2         THE WITNESS:   Well, I mean, the data
 3         speaks for itself.  There were conflicting
 4         articles.
 5     BY MR. HETRICK:
 6         Q    Fair enough.
 7         My question to you is, in a situation
 8     where there are conflicting articles on a scientific
 9     point, do you think that's an appropriate time to
10     change the label for that medication?
11         MR. TRAMMELL:   Objection.
12         THE WITNESS:   It is not up to me when
13         labels should change.  My point is that the
14         AstraZeneca internal documentations show that
15         AstraZeneca was aware of the association and
16         wasn't forthright in bringing it out to the
17         people who were prescribing the medication.
18     BY MR. HETRICK:
19         Q    But the way you think they should have
20     been forthright, was to change the label?
21         A    That's one way it could have been done.
22         Q    How else could it have been done?
23         A    It could have been done by just making
24     that information available to prescribers.
25         Q    But if they did that, wouldn't they be
0121
 1     promoting the drug off label, because they would be
 2     sharing information with physicians that was not
 3     contained in the label?
```
                        Page 50

ia100708.txt
```
 4                  MR. TRAMMELL:  Objection.
 5                  THE WITNESS:  I don't think they would be
 6          promoting a drug off label if they spoke to
 7          side effects.
 8      BY MR. HETRICK:
 9          Q     If those side effects were not in the
10      label?
11          A     Well, the side effects were in the label,
12      but they were just hidden among other universe of
13      side effects.
14          Q     Well, I would object to the word "hidden,"
15      but they were in the precautions section.  Correct?
16          A     So they were in the label.
17          Q     But you do agree with me that at the time
18      that the Sernyak article was published, there were
19      also articles with data that conflicted this data?
20          A     Yes, I will agree with you.
21          Q     Is it your opinion then that when an
22      association begins to emerge, the pharmaceutical
23      company should put that information out to the
24      medical community?
25          A     My opinion is that all the information
0122
 1      should be out to the community, and that providers
 2      should make decisions based upon their clinical
 3      judgment and the availability of all information.
 4          Q     Do you understand that labeling and the
 5      dissemination of information is regulated by the
 6      FDA?
 7          A     Yes.
 8          Q     And the FDA did not require or ask for any
 9      label change at this point in time, in 2000, 2002?
10          A     Correct.
11          Q     They could have done so; correct?  Is that
12      your understanding?
13          A     Yes.  I don't work for the FDA, but I
14      assume the FDA can ask for anything they want to
15      ask.
16                  MR. HETRICK:  Let me --
17                         (Whereupon, Deposition Exhibit
18                          20 was marked for
19                          identification.)
20      BY MR. HETRICK:
21          Q     Let me show you what I have marked as
22      Exhibit 20, if I may.  Are you familiar with Exhibit
23      20?
24          A     I'm not familiar with the article per se,
25      but I am familiar with the consensus statement.
0123
 1          Q     This was a report that was put together
 2      jointly by the American Diabetes Association, the
 3      American Psychiatric Association, the American
 4      Association of Clinical Endocrinologists and the
 5      North American Association for the Study of Obesity.
 6      Correct?
 7          A     Yes.
 8          Q     Now, would you agree with me that all four
 9      of those are well regarded institutions?
10          A     Yes.
11          Q     And these are folks who are expert in
12      their respective fields?
13                  MR. TRAMMELL:  Objection.
14                  THE WITNESS:  I don't know the credentials
```
Page 51

ia100708.txt
```
15          of the particular authors, so I can't render an
16          opinion one way or the other.
17     BY MR. HETRICK:
18          Q    That's fine.  I think my question wasn't
19     clear.
20               All I'm asking you is, you agree that the
21     American Psychiatric Association is an organization
22     that is expert in psychiatric issues?
23          MR. TRAMMELL:  Objection.
24          THE WITNESS:  I mean, the APA does publish
25          position papers and guidelines meant to help
0124
1          psychiatrists in the field.
2               I don't think that they would agree with
3          that -- with the fact that those guidelines or
4          position papers are meant to reflect expert
5          opinions, but rather just the thinking of the
6          field at a particular time.
7     BY MR. HETRICK:
8          Q    I think I understand your answer.
9               If you look down at the first column on
10     the left-hand side of the first page of this, it
11     says that, "An eight member panel heard
12     presentations from 14 experts drawn from the areas
13     of psychiatry, obesity and diabetes."
14               Do you see that?
15          A    Yes.
16          Q    Do you have any reason to disagree with
17     that?
18          A    No.
19          Q    So, there was an eight member panel and
20     they heard from 14 different experts in the areas of
21     psychiatry, obesity and diabetes.  Right?
22          A    Yes.
23          Q    By the way, do you know -- I think it
24     tells you that presentations were also made by some
25     of the drug manufacturers, AstraZeneca,
0125
1     Bristol-Myers, Janssen, Lilly and Pfizer.
2               Do you see that?
3          A    Correct.  And they also paid for this.
4          Q    They supported this consensus?
5          A    And the conference.  They all went away on
6     vacation at the expense of the drug companies.
7          Q    You would call this a vacation?
8          A    It could be a working vacation.
9          Q    Do you have any question that there was
10     work done?
11          A    Absolutely, no.
12          Q    In fact, there's a pretty full blown
13     report produced.  Right?
14          A    Yes.
15          Q    My question to you was, do you have any
16     problem with the fact that AstraZeneca was one of
17     the presenters at this conference?  Do you think
18     this in any way invalidates the data?
19          A    I don't have an opinion on that one way or
20     the other.
21          Q    Would you agree with me that the
22     manufacturer of the drug is probably in the best
23     position to have the relevant data on its product?
24          A    Yes.
25          Q    Because they would have had all the
```
Page 52

ia100708.txt
```
0126
 1      clinical trial results.   Correct?
 2          A    Correct.
 3          Q    Now, I want to take a look at -- I'm on
 4      page -- the small number on the bottom, 598, but
 5      it's page 3 of the study.
 6          A    Okay.
 7          Q    It says that, and I'm about halfway in the
 8      middle column -- about a third of the way, a quarter
 9      of the way in the middle column.  It says, "Despite
10      limitations in study design."
11               Do you see that?
12          A    Yes.
13          Q    "Despite limitations in study design, the
14      data consistently show an increased risk for
15      diabetes in patients treated with Clozapine or
16      Olanzapine, compared with patients not receiving
17      treatments with FGAs," which is first generation
18      antipsychotics, "or other second generation
19      antipsychotics."  Correct?
20          A    Correct.
21          Q    So, what the data showed was an increased
22      risk of diabetes for people who took Olanzapine or
23      Clozapine.  Correct?
24          A    Correct.
25          Q    But not Seroquel?
0127
 1          A    It says, the next sentence, "The risk in
 2      patients taking Risperdal and Seroquel is less
 3      clear, some studies showing an increased risk for
 4      diabetes while others do not."
 5          Q    Do you agree with that conclusion?
 6          A    Yes.
 7          Q    I just wanted to direct your attention --
 8      I think there's a little table on page -- the
 9      previous page.
10               Do you see table 2 on page 597?
11          A    Yes.
12          Q    And this table is sort of a summary of the
13      data in the paper?
14          A    I have not read the complete paper, so I
15      don't know if it's summarizing all the results or
16      not.
17          Q    Let's look at what it does summarize, in
18      any case.
19               The second column is titled, "Risk for
20      Diabetes."
21               Do you see that?
22          A    Yes.
23          Q    For Clozapine and Olanzapine, there is a
24      plus sign, a positive sign, which, if we look down
25      at the legend, says, "Increased effect."  Correct?
0128
 1          A    Correct.
 2          Q    That's what we just read, that the data
 3      indicated an increased risk of diabetes for
 4      Clozapine and Olanzapine.  Correct?
 5          A    Yes.
 6          Q    For Risperidone and Quetiapine, which is
 7      Seroquel, there's a capital D, which, if we look at
 8      the legend, says it is discrepant results.  Correct?
 9          A    Yes.
10          Q    What this expert panel concluded was that
```
Page 53

ia100708.txt
```
11      the data for Seroquel was discrepant on the issue of
12      diabetes.  Correct?
13         A    Correct.
14         Q    And in the column to the left of that, is
15      a column -- well, let me do it the other way around.
16              On the right-hand column is, "Worsening
17      lipid profile."  Correct?
18         A    Yes.
19         Q    This is what we talked about before,
20      hyperlipidemia, metabolic syndrome, that type of
21      stuff?
22         A    Yes.
23         Q    It also notes there that the data for
24      Quetiapine is discrepant.  Correct?
25         A    Correct.
0129
1          Q    As someone who practices evidence based
2       medicine, would you want to draw conclusions on
3       discrepant data?
4               MR. TRAMMELL:  Objection.
5               THE WITNESS:  I think the answer to that
6               is, when a class is beginning to show concern,
7               that one needs to be cautious in the presence
8               of discrepant data.
9       BY MR. HETRICK:
10         Q    Okay.  My question was, would you be
11      comfortable making scientific decisions based on
12      discrepant data?
13              MR. TRAMMELL:  Objection.
14              THE WITNESS:  I believe I answered that.
15              I think in this case, when you're talking about
16              Quetiapine, Seroquel, as a member of the class
17              of atypical antipsychotics and this position
18              paper is discussing weight gain, diabetes risk,
19              worsening lipid profile, and the data is
20              uncertain, that one needs to err on the side of
21              caution in treating patients.
22      BY MR. HETRICK:
23         Q    So, you think it would be appropriate --
24      it's your opinion it would be appropriate to add
25      warnings to a label in a situation where the data
0130
1       that you have is discrepant?
2               MR. TRAMMELL:  Objection.
3               THE WITNESS:  I don't believe I said that.
4       BY MR. HETRICK:
5          Q    All right.
6          A    I said one needs to be -- as a
7       practitioner, one needs to be cautious in the face
8       of such discrepant data.
9          Q    As a practitioner, one needs to be
10      vigilant in care given the discrepant data.
11      Correct?
12              We agree about that?
13         A    Yes.
14         Q    My question is, when all you have is
15      discrepant data, not as a practitioner, but as a
16      manufacturer, do you think that's the appropriate
17      time to be changing your label?
18              MR. TRAMMELL:  Objection.
19              THE WITNESS:  I don't know.
20      BY MR. HETRICK:
21         Q    Okay.  Would you agree with me that it
```
Page 54

ia100708.txt
```
22     really makes better scientific sense to wait until
23     the discrepant data is sorted out one way or the
24     other, before changing your label?
25               MR. TRAMMELL:  Objection.
0131
 1               THE WITNESS:  I think it makes sense to
 2          study the phenomenon and obtain more
 3          information.
 4     BY MR. HETRICK:
 5          Q    And this consensus report is 2004.
 6     Correct?
 7          A    Yes.
 8          Q    If you look down at the bottom, it's
 9     published February 2004.  So, this discrepant data
10     is going on now in 2004.  Right?  We still don't
11     have an answer to the question, definitively, in
12     2004, at least according to this expert panel, as to
13     Seroquel?
14          A    Correct.
15          Q    I'm going to shift gears a little bit with
16     you, Doctor, but I just want to get clear on a
17     couple of things, because I can streamline my
18     questioning.
19               I think we have -- I think we have
20     established that your opinion, as expressed in
21     Exhibit 12, is that AstraZeneca should have
22     strengthened its warnings before it did, in its
23     label.  Is that a fair statement?
24          A    Yes.
25          Q    I just want to rule out some areas that
0132
 1     you are not going to testify in, so I know whether I
 2     need to ask you any questions about it or not.
 3               Do you have any criticism at all of the
 4     clinical trials that were performed by AstraZeneca
 5     on Seroquel?
 6          A    No.
 7          Q    And you are not going to render any
 8     opinions on that?
 9          A    Correct.
10          Q    You are not an expert in designing or
11     executing clinical trials?
12          A    Correct.
13          Q    This sounds a bit odd, but putting the
14     label itself aside, are you going to offer any
15     opinion about the marketing practices of
16     AstraZeneca?
17               MR. TRAMMELL:  Object.
18     BY MR. HETRICK:
19          Q    I understand you have an opinion on the
20     label, and we will discuss that, but I'm talking
21     about the actual marketing practices of AstraZeneca.
22          A    The only opinions I can offer about
23     marketing practices are related to my interaction
24     with their marketers, you know, and we've discussed
25     some of those today already.
0133
 1          Q    You have had no problems with their --
 2     with your interactions with their marketers?
 3          A    Correct.
 4          Q    So, you have no criticisms of
 5     AstraZeneca's marketing practices?
 6               MR. TRAMMELL:  Objection.
```

ia100708.txt

```
 7                   THE WITNESS:  Well --
 8     BY MR. HETRICK:
 9          Q    All I'm trying to find out is, are you
10     going to come to trial and talk about anything, any
11     problems with AstraZeneca's, or any opinions that
12     you have about flaws in AstraZeneca's marketing
13     practice?
14          A    No, I don't intend to.
15          Q    That's what I needed to know.
16               The only other area that I want to ask you
17     about is, do you intend to offer any opinions at the
18     time of trial, and, again, I just want to set aside
19     the question of changes in the label, I understand
20     what your position is on the changes in the label,
21     but putting that aside, do you intend to offer any
22     criticisms of the corporate conduct of AstraZeneca?
23               MR. TRAMMELL:  Objection.
24               THE WITNESS:  Can you elaborate on the
25     question?
0134
 1     BY MR. HETRICK:
 2          Q    Yes.
 3          A    What does "corporate conduct" mean?
 4          Q    In the stuff you've reviewed, have you
 5     seen anything in there that indicates to you, for
 6     example, that AstraZeneca acted improperly in terms
 7     of disclosing data to the FDA, that it did anything
 8     illegal or improper?
 9          A    I'm surely not going to offer opinions as
10     to the legality or non-legality of AstraZeneca's
11     conduct.
12          Q    Okay.
13          A    You know, my criticisms of AstraZeneca's
14     conduct are pretty clear in my report.  I think they
15     were not forthright about what they knew about
16     Seroquel, when they knew about it, that they could
17     have taken steps to notify practitioners earlier and
18     more vigorously.  So, as such, that relates to their
19     conduct.
20          Q    And that's what I tried to clarify.  I
21     understand that that is your opinion, but that is
22     the extent of your opinion dealing with their
23     conduct.  Correct?
24          A    Correct.
25          Q    Thank you.  Let me go on for a bit.
0135
 1               You are not an epidemiologist.  Correct?
 2          A    No.
 3          Q    You don't hold yourself out as an expert
 4     in epidemiology?
 5          A    I have more knowledge of epidemiology than
 6     the lay population, being trained as a medical
 7     doctor, so I do have expert knowledge of
 8     epidemiology, but that's not my primary focus here
 9     today.
10          Q    But I just mean in general, you do not --
11     in dealing with agencies and so forth, you don't
12     hold yourself out to be an epidemiologist; do you?
13          A    No.
14          Q    Is the same true of biostatistics?  You
15     are not a biostatistician?
16          A    Correct.
17          Q    And you are not an endocrinologist?
```

Page 56

ia100708.txt

```
18         A     No.
19         Q     You have never worked for a pharmaceutical
20    company.   Correct?
21         A     In what capacity?
22         Q     Any capacity.
23         A     I have given some talks for pharmaceutical
24    companies.
25         Q     That was my next question.  Have you
0136
1     talked on behalf of pharmaceutical companies?
2          A     Yes, I have.
3          Q     Which ones?
4          A     Reckett-Benkieser.
5          Q     What's the product?
6          A     The product is Seboxin.
7          Q     What is Seboxin?
8          A     Seboxin is an oral opiate,
9     agonist-antagonist, that is used for the out-patient
10    treatment of substance abuse.
11         Q     When you say you have talked about that, I
12    assume you mean you have addressed your peers at
13    dinner meetings or CMEs, that type of thing?
14         A     Correct.
15         Q     You've been compensated for your time in
16    doing that?
17         A     Yes.
18         Q     You have no criticism of that?
19         A     I'm sorry?
20         Q     You think that's an appropriate practice,
21    to be compensated for your time?
22         A     They pay very poorly.  They're an English
23    company that's very cheap.  They pay very poorly.
24         Q     My question is, you have no problem with
25    physicians being compensated for the time they spend
0137
1     educating other physicians?
2          A     As long as it's disclosed.
3          Q     Have you -- I think I know the answer to
4     this.  Have you ever consulted with a pharmaceutical
5     company in any capacity?
6          A     No.
7          Q     Have you ever participated in any clinical
8     trials?
9          A     Yes.
10         Q     Which ones?
11         A     The Geodon cardiovascular study that was
12    done a few years ago.  I had some patients involved
13    in that study.
14         Q     What was the end point of that study?
15         A     I don't remember, but it's over and done
16    with years ago.
17         Q     I should have asked you before, did you,
18    by any chance, participate in this -- in the
19    consensus conference?
20         A     No, I did not.
21         Q     Were you asked to speak or anything like
22    that?
23         A     At the consensus conference?
24         Q     Yes.
25         A     No.
0138
1          Q     Did you make any attempt to review any of
2     the proceedings of the conference?
```

Page 57

ia100708.txt
```
 3          A    No, other than I did have a discussion
 4   with an endocrinologist colleague of mine when the
 5   statement came out.
 6          Q    Obviously, you have seen the report.
 7   Correct?
 8          A    Correct.
 9          Q    You didn't read any -- if there are
10   transcripts or summaries, you haven't read any of
11   those?
12          A    No.
13          Q    Have you participated personally in any
14   conferences that dealt with antipsychotic drugs and
15   diabetes?
16          A    I participated as an --
17          Q    As an attendee?
18          A    Yes.
19          Q    You've gone to conferences?
20          A    Correct.
21          Q    Have you spoken at any of them?
22          A    No.
23          Q    We've established before, you have not
24   published in this area.  Correct?
25          A    Correct.
0139
 1          Q    Have you ever been asked to participate in
 2   the development of any guidelines to advise
 3   physicians on caring for people with mental illness?
 4          A    No.
 5          Q    How about, have you ever been asked to
 6   participate in the development of any guidelines to
 7   advise physicians on caring for people who have
 8   diabetes?
 9          A    No.
10          Q    You told me before you participated in one
11   clinical trial involving Geodon.  Correct?
12          A    Correct.
13          Q    Have you ever been involved in a clinical
14   trial involving Seroquel?
15          A    No.
16          Q    Have you ever been involved in any kind of
17   observational study concerning antipsychotics?
18          A    No.
19          Q    Have you ever received any funding from
20   anyone to conduct research into antipsychotics?
21          A    No.
22          Q    Have you ever been asked by a journal to
23   peer review an article concerning Seroquel?
24          A    No.
25          Q    Have you ever taught a class on
0140
 1   antipsychotics?
 2          A    No.
 3          Q    Have you ever served on -- you know the
 4   FDA has advisory committees for particular purposes?
 5          A    Yes, I do.
 6          Q    Have you ever been asked to serve on an
 7   FDA advisory committee to assess the risks or
 8   benefits of any medicine?
 9          A    No.
10          Q    Have you ever testified before an FDA
11   advisory committee?
12          A    No.
13          Q    You have never filed an adverse event
```
Page 58

ia100708.txt

```
14    report concerning Seroquel.   Right?
15         A    I believe not.
16         Q    Have you done any research concerning
17    diabetes?
18         A    Nothing more than just the normal
19    educational CME type research.
20         Q    You have never published any articles
21    concerning diabetes?
22         A    No.
23         Q    Do you hold yourself out as an expert in
24    diabetes?
25         A    No.
0141
 1         Q    Have you ever published any articles on
 2    glucose metabolism?
 3         A    No.
 4         Q    Would you agree with me that you are not
 5    an expert in diagnosing the cause of diabetes in
 6    particular individuals?
 7         A    Correct.
 8         Q    You have never worked at the FDA?
 9         A    No.
10         Q    Never consulted with the FDA?
11         A    No.
12         Q    Have you ever read the Federal regulations
13    that govern the labeling of prescription
14    medications?
15         A    No.
16         Q    Do you know how those regulations have
17    changed over the last, say, ten or twelve years?
18         A    No, I don't.
19         Q    Have you ever advised a pharmaceutical
20    company on the labeling of its medicine?
21         A    No.
22         Q    Have you ever participated in the drafting
23    of a label for a medicine?
24         A    No.
25         Q    Have you ever been involved in making
0142
 1    decisions about changing labels to move things from,
 2    say, precautions to warnings?
 3         A    No.
 4         Q    But you are aware that Federal regulations
 5    govern the content of drug labels?
 6         A    Yes.
 7         Q    And you are aware that the FDA ultimately
 8    decides what data can be put into a label?
 9         A    Yes.
10         MR. TRAMMELL:  Objection.
11    BY MR. HETRICK:
12         Q    And the FDA also ultimately decides what
13    section of the label they're to be placed in?
14         A    I was not aware of that.
15         Q    You have no reason to disagree with that?
16         A    No, I don't.
17         Q    I think I asked you this before, but have
18    you looked at any reports of other experts
19    concerning Seroquel?
20         A    No.
21         Q    Have you talked to any AstraZeneca
22    employees other than sales representatives?
23         A    No.
24         Q    You have not talked to anybody whose names
```

Page 59

ia100708.txt
```
25      appear on the E-mails and the documents that you
0143
 1      have looked at?
 2          A    No, sir.
 3          Q    Have you read the depositions of any of
 4      the AstraZeneca employees?
 5          A    No.
 6          Q    Can you tell from what you saw in the
 7      documents that were provided to you by plaintiffs'
 8      counsel, what went on before or after any of the
 9      discussions that you saw in a particular document?
10          A    No, other than what's in the document.
11          Q    But you don't know the context in which
12      the document was created?
13          A    Correct.
14          Q    And you certainly don't know the intention
15      of the author?
16          A    Correct.
17          Q    Do you think it's possible that you might
18      interpret a document incorrectly, given the limited
19      amount of documentation that you have?
20          MR. TRAMMELL:  Objection.
21          THE WITNESS:  Anything is possible.
22          MR. HETRICK:  Why don't we take two
23      minutes?
24                      (Thereupon, a short recess was
25                       taken.)
0144
 1      BY MR. HETRICK:
 2          Q    I think when we left off -- we've talked
 3      about the labels for Seroquel, and we've talked
 4      about your view that they should have been
 5      strengthened.
 6          In '04 -- are you aware of the fact,
 7      Doctor, that the label was changed for Seroquel in
 8      '04?
 9          A    I am.
10          Q    You are?
11          A    Yes.
12          Q    In '04, the label is changed, among other
13      things, to do precisely what I think you suggested
14      should have been done earlier, and that is, the
15      material on hyperglycemia and so forth, is moved up
16      into the warnings section.  All right?
17          If you look at page 9 --
18          MR. HETRICK:  I'm sorry.  I should have
19      marked that.  Let me mark that for you.
20          Exhibit 21 is the January 2004 Seroquel label.
21                      (Whereupon, Deposition Exhibit
22                       21 was marked for
23                       identification.)
24      BY MR. HETRICK:
25          Q    If you look at page 9, do you see that's
0145
 1      where the warning section begins?
 2          A    Yes.
 3          Q    And if we go over to page 11, you see now
 4      that hyperglycemia and diabetes mellitus are now
 5      listed up in the warning section.  Correct?
 6          A    Correct.
 7          Q    This is what you were suggesting should
 8      have been done earlier?
 9          A    Yes.
```
Page 60

ia100708.txt
```
10          Q    Is it your opinion that the January '04
11    label is adequate to make physicians aware of the
12    potential side effects of Seroquel?
13              MR. TRAMMELL:  Objection.
14              THE WITNESS:  Insofar as they are warning
15          about hyperglycemia and diabetes connected with
16          the class of medication, yes.
17    BY MR. HETRICK:
18          Q    And Seroquel, obviously, is a member of
19    the class?
20          A    Correct.
21          Q    Do you have any criticisms of any of the
22    labels from 2004 going forward, which all have the
23    warnings on hyperglycemia and diabetes mellitus up
24    in the warning section?
25          A    No.
0146
1          Q    Doctor, in your practice, you prescribe
2    antipsychotics?
3          A    Yes.
4          Q    Which ones?
5          A    All of them.
6          Q    When did you start prescribing
7    antipsychotics?
8          A    In my training.  So, in the eighties.
9          Q    Over the years, have you prescribed
10    Seroquel?
11          A    Yes.
12          Q    And you still do today?
13          A    Yes.
14          Q    In appropriate patients?
15          A    Yes.
16          Q    Have you used Seroquel to treat bipolar
17    disorder?
18          A    Yes.
19          Q    Have you found it to be effective?
20          A    Yes.
21          Q    Is the same true for schizophrenia?
22          A    Yes.
23          Q    And psychoses, generally?
24          A    Yes.
25          Q    Have you ever prescribed Seroquel for
0147
1    anxiety?
2          A    Rarely.
3          Q    Anxiety would be an off label use?
4          A    Yes.
5          Q    Because anxiety is not a labeled
6    indication for the drug?
7          A    Correct.
8          Q    I assume you have no criticisms of off
9    label uses of prescription drugs?
10          A    No.
11              MR. TRAMMELL:  Objection.
12    BY MR. HETRICK:
13          Q    You believe it should really be up to a
14    physician when to use a drug with a particular
15    patient?
16          A    Correct.  It should be up to the
17    physician, given a particular patient and the
18    clinical circumstances of the case.  In a specific
19    case, there might be criticism.  So, the blanket
20    statement, I have no criticisms of off label --
```
Page 61

ia100708.txt

```
21        Q    Fair enough.  But you have no criticism of
22   the practice of allowing physicians to use a drug
23   off label?
24        A    Correct.
25        Q    Seroquel has a known sedative effect.
0148
1    Correct?
2         A    Correct.
3         Q    Have you used it at all as a sedative?
4         A    Yes.  I have used Seroquel as an hypnotic.
5         Q    Has it been successful?
6         A    Yes.
7         Q    This is an area that you are interested
8    in.  Correct?
9         A    Correct.
10        Q    I know you've done media interviews and so
11   forth on sleep?
12        A    Did I look good?
13        Q    Terrific.
14             Do you have any idea of how many patients
15   you have prescribed Seroquel to?
16        A    No, I don't.  Many.
17        Q    Many?  More than a hundred?
18        A    Yes.
19        Q    Have you used Seroquel as monotherapy in
20   some patients?
21        A    Yes.
22        Q    Have you also used it as adjunct therapy
23   in some patients?
24        A    Yes.
25        Q    How many patients, currently, do you have
0149
1    taking Seroquel?
2         A    I would be guessing.  Over ten, less than
3    a hundred.
4         Q    From, let's say, the time period 2000 to
5    the present, what determines which antipsychotic you
6    prescribe for a particular patient?
7         A    You conduct an appropriate evaluation of
8    the patient, make a diagnosis.  If the diagnosis is
9    amenable to treatment with an atypical antipsychotic
10   agent, then one is basically selected based upon
11   side effect profile.
12             There's always, in this day and age,
13   issues of financial concerns that come into play.
14   It's really useless to prescribe a medication that a
15   patient can't afford to get.  So, those decisions
16   have to be taken into account.
17             Occasionally, there are patients who can't
18   afford medication, and I provide samples for them.
19   So, if samples are available, I give them samples.
20        Q    Have you, from time to time, prescribed
21   Zyprexa?
22        A    Yes.
23        Q    Have you ever switched a patient off
24   Zyprexa and on to Seroquel?
25        A    Yes, I likely have.  I can't remember the
0150
1    particular patient.
2         Q    Was it due to weight gain?
3         A    I don't recall.
4         Q    In your clinical experience, have you
5    found Seroquel to be better than Zyprexa in terms of
```

Page 62

ia100708.txt

```
 6    weight gain?
 7         A    It depends on the particular patient.
 8    There are some patients I've had who I've given
 9    Seroquel, who have ballooned up in weight.  There
10    are other patients who have not.  It really depends
11    on the particular patient.
12         Q    So, it has to be made on a case-by-case
13    basis?
14         A    Correct.
15         Q    Did you also prescribe conventional
16    antipsychotics?
17         A    Yes.
18         Q    Which ones?
19         A    Over the years?
20         Q    Yes.
21         A    Haloperidol, Mellaril, Thorazine,
22    Perphenazine.  A variety of medications.
23         Q    As a general statement, is the side effect
24    profile of the second generation antipsychotics,
25    better than that of the original antipsychotics?
0151
 1         A    Yes, it is.
 2         Q    In the original antipsychotics you had
 3    side effects such as tardive dyskinesia?
 4         A    Correct.
 5         Q    What is that?
 6         A    Tardive dyskinesia is a disregulation of
 7    motor functioning, such that one sees uncontrolling,
 8    flailing type movements in patients, and the effect
 9    can last long, can persist long after the
10    medications are withdrawn.
11         Q    And that's a very serious side effect?
12         A    Correct.
13         Q    Is tardive dyskinesia one type of
14    extraparametal symptom?
15         A    Yes.
16         Q    What are the others?
17         A    One can have dystonic type reactions.
18         Q    What does that mean?
19         A    It is almost like an uncontrolled
20    contraction of muscle groups, and one can see that
21    with both typical and atypical antipsychotics.  Most
22    frequently with the high potency typical, older
23    antipsychotic medications.
24         Q    Are the tardive dyskinesia and these type
25    of symptoms, much rarer in the second generation
0152
 1    antipsychotic?
 2         A    Yes.
 3         Q    Have you found Seroquel to have side
 4    effects like tardive dyskinesia?
 5         A    Rarely.
 6         Q    And a better question may be, is the side
 7    effect profile for Seroquel in terms of tardive
 8    dyskinesia, a favorable one?
 9         A    Yes.
10         Q    Do you see more of the extraparametal
11    symptoms in Geodon than in Seroquel?
12         A    Yes.
13         Q    And in Abilify?
14         A    Yes.  Much more in Abilify.
15         Q    So, Seroquel has a better side effect
16    profile for extraparametal symptoms than both Geodon
```

Page 63

ia100708.txt
```
17     and Abilify.  Correct?
18          A    Yes.
19          Q    Geodon also has a side effect of causing
20     some -- is it Q wave abnormalities?
21          A    Correct.
22          Q    And Seroquel does not have that.  Correct?
23          MR. TRAMMELL:  Objection.
24          THE WITNESS:  Correct.
25
0153
 1     BY MR. HETRICK:
 2          Q    Doctor, do you have any opinion whether
 3     low dose Seroquel causes weight gain?
 4          A    I have seen it in my patients.
 5          Q    How low a dose?
 6          A    50 milligrams, 25 milligrams.
 7          Q    So, you have seen people who take as
 8     little as 25 or 50 milligrams, gain weight?
 9          A    Correct.
10          Q    I think I asked you this before, but I
11     just want to make sure.
12               Do you believe that it is valuable to have
13     different medications within a particular group to
14     use with patients, that is, a number of different
15     second generation antipsychotics?
16          A    Yes, I do.
17          Q    Because some people will react to one but
18     not another, or will improve on one or not another?
19          A    That is one reason.
20          Q    What are the others?
21          A    Different medications have different side
22     effect profiles which can be manipulated to the
23     advantage of the patient.
24          Q    You told me before that when you reviewed
25     some of the internal documentation from AstraZeneca,
0154
 1     you thought that they were not, I think you used the
 2     word "forthright," in sharing that information with
 3     the health care community.
 4               Is that a fair summary?
 5          A    Yes.
 6          Q    When exactly, if you can, can you tell me
 7     when they had information that you think they should
 8     have shared?
 9          A    I can't tell you sitting here today,
10     exactly.  I mean, I think that in your prior
11     questioning, I did tie it down to a window of time.
12          Q    And it was, I think, if I remember, you
13     said it was in the time period around the Japanese
14     labeling issue.  Correct?
15          A    Correct.
16          Q    You understand that there's a whole
17     different system of regulation in Japan?
18          A    Of course.
19          Q    There may be changes that are appropriate
20     in Japan that are not appropriate in the United
21     States?
22          A    Possibly, yes.
23          Q    Did you see anything in there, in any of
24     the documents, that indicated to you that the
25     company was purposefully withholding information?
0155
 1          A    In the Japanese correspondence?
```
Page 64

ia100708.txt
```
 2          Q    No.  Well, in anything you've looked at.
 3          A    No.  I wouldn't say that.
 4          Q    Doctor, do you know that the FDA is the
 5    agency that's tasked with determining the risks and
 6    benefits of every medication approved in the United
 7    States?
 8          A    Yes.
 9          Q    The FDA only approves a drug for marketing
10    after it's concluded that the potential benefits of
11    that drug outweigh the potential risks?
12          A    Yes.
13          Q    And the FDA has access to all of the peer
14    reviewed literature on a particular drug.  Correct?
15          A    Correct.
16               MR. TRAMMELL:  Objection.
17    BY MR. HETRICK:
18          Q    The FDA also has access to all of the
19    clinical trial data on that drug before it makes its
20    determination?
21          A    I believe the FDA is supplied with
22    information by the sponsor of the particular
23    medication.  So, they have what they are given.
24          Q    Would you agree with me, as a general
25    matter, that the FDA has more information about a
0156
 1    particular drug than you do in forming your opinion
 2    in this case?
 3               MR. TRAMMELL:  Objection.
 4               THE WITNESS:  I wouldn't know the answer
 5          to that question.
 6    BY MR. HETRICK:
 7          Q    Well, you know they have all of the
 8    clinical trial data.  Correct?
 9          A    Correct.
10          Q    You have not looked at the clinical trial
11    data for Seroquel.
12          A    Correct.
13          Q    So, they at least have that much more
14    information, presumably, that they've looked at than
15    you have?
16          A    Yes.
17          Q    They also, I think we just said -- you
18    agree they have access to all of the published
19    journal articles on that particular drug.  Correct?
20          A    Correct.
21          Q    You have not looked at all of those
22    articles in forming your opinions.
23          A    Correct.
24          Q    So, in that sense they have more
25    information than you do.  Correct?
0157
 1          A    Yes.
 2          Q    Are you aware, sir, of any article that
 3    was published anywhere before 2004, stating that the
 4    Seroquel label was inadequate?
 5          A    No.
 6          Q    Are you aware of any article published
 7    since 2004, that states that the Seroquel label is
 8    inadequate?
 9          A    No.
10          Q    I think you told me before, you have no
11    problems with the label as it is since the change in
12    January of 2004.  Correct?
```
Page 65

ia100708.txt

```
13          A     Correct.
14          Q     Do you know that Seroquel has been, after
15     its initial approval, approved six different times
16     by the FDA for different indications?
17          A     I didn't know the number of times.  I know
18     there were other indications.
19          Q     And as we sit here today, the drug is
20     still on the market and fully approved.  Correct?
21          A     Correct.
22          Q     The FDA, to your knowledge, never
23     concluded that the risks of diabetes outweighed the
24     potential benefits of Seroquel?
25          A     Not that I know.
0158
1           Q     And similarly, the FDA has never concluded
2      that hyperglycemia as a side effect, outweighed the
3      potential benefits of Seroquel?
4           A     The same response.
5                 MR. TRAMMELL:  Objection.
6                 THE WITNESS:  Not that I know.
7      BY MR. HETRICK:
8           Q     By the way, just one thing on Exhibit --
9      the last one, 21, the 2004 label, if you have it in
10     front of you.
11                I think the warnings that we're looking at
12     are on page 11, for hyperglycemia.  Do you see that?
13     Do you have that in front of you?
14          A     Yes.
15          Q     I'm reading the second sentence in the
16     warning and it says, "Assessment of the relationship
17     between atypical antipsychotic use and glucose
18     abnormalities is complicated by the possibility of
19     an increased background risk of diabetes mellitus in
20     patients with schizophrenia and the increasing
21     incidence of diabetes mellitus in the general
22     population."
23                Let me stop there for a moment.  First of
24     all, do you agree that diabetes is increasing in the
25     general population?
0159
1           A     Yes.
2           Q     Have you seen it described in some
3      publications, as an epidemic?
4           A     Yes.
5           Q     I think it's one of the -- one of the
6      reports that I saw sets the percentage at between 7
7      and 10 percent of Americans have diabetes.  Does
8      that sound right?
9           A     Yes.
10          Q     And it's increasing, correct, in the
11     general population?
12          A     Correct.
13          Q     The background rate of diabetes is higher
14     in people who suffer from mental illness.  Correct?
15          A     Correct.
16          Q     And have you seen estimates of the
17     background rate for schizophrenics?
18          A     I have.  I don't remember the exact
19     figure.
20          Q     Does fifteen to twenty percent sound
21     right?
22          A     Yes.  That's what I was thinking.
23          Q     Which is about twice the normal rate.
```
Page 66

ia100708.txt
```
24    Correct?
25         A    Correct.
0160
 1         Q    Is the same true for bipolar patients?
 2         A    I don't know.
 3         Q    So, people, schizophrenics, even if they
 4    are not taking any medication whatsoever, are twice
 5    as likely to develop diabetes as a non-psychotic
 6    individual?
 7              MR. TRAMMELL:  Objection.
 8              THE WITNESS:  Say that again.
 9    BY MR. HETRICK:
10         Q    Yes.  If you are psychotic, your chances
11    of having diabetes are twice those of a
12    non-psychotic person?
13         A    I think if you have schizophrenia.  I
14    think you are misphrasing it.
15         Q    That's what I meant to say.  If you have
16    schizophrenia, you are twice as likely to have
17    diabetes as someone who does not have schizophrenia?
18         A    I'm not sure you can take the data and
19    reverse it that way.  If there's a 20 percent
20    higher -- if the risk is 20 percent as opposed to 7
21    to 10 percent of the general population, I'm not
22    sure that epidemiologically it holds to say that for
23    a particular individual, the risk is double.
24              I think you can say that the incidence is
25    higher.
0161
 1         Q    Your point is well taken.  To take the
 2    general statements and to try to apply them to a
 3    particular individual may be an improper way to use
 4    the data, but my question really is simply, as it
 5    says here in the label, it's difficult to interpret
 6    the diabetes rates in schizophrenic populations
 7    because it is higher, generally, than the general
 8    population.  Correct?
 9         A    Correct.
10         Q    And the label goes on to say, "Given these
11    confounders, the relationship between atypical
12    antipsychotic use and hyperglycemia related adverse
13    events, is not completely understood."
14              Do you see that?
15         A    Yes.
16         Q    Do you agree with that?
17         A    Yes.  Almost every article I have ever
18    read has a statement like that.
19         Q    So you have no problem with that
20    statement?
21         A    Correct.
22         Q    Am I right that as a psychiatrist,
23    treating someone like a schizophrenic, that giving
24    them nothing is not an option?
25              MR. TRAMMELL:  Objection.
0162
 1              THE WITNESS:  It is an option.  I don't
 2         think it would be a highly preferred option.
 3    BY MR. HETRICK:
 4         Q    I mean, schizophrenia, for example, is a
 5    very serious disorder.  Correct?
 6         A    Correct.
 7         Q    I think we said before it can be a
 8    debilitating disease.
```
Page 67

ia100708.txt
```
 9        A    Yes.
10        Q    So, they need some sort of treatment.
11   Fair enough?
12        A    Correct.
13        Q    And the same is true for psychotics,
14   generally?
15        A    Correct.
16        Q    Also for schizoaffective disorder?
17        A    Yes.
18        Q    Initially, the treatment, as we've talked
19   about, was first generation antipsychotics.
20   Correct?
21        A    Well, initial treatments, many, many years
22   ago, consisted of insulin, convulsive therapy, and
23   electroshock therapy.
24        Q    That actually was going to be my next
25   question.  Prior to the first generation
0163
 1   antipsychotics, how were these folks treated?
 2        A    They were treated with what we would
 3   consider very Draconian methods.
 4        Q    Electroshock?
 5        A    Correct.
 6        Q    And in some cases, lobotomies?
 7        A    Correct.
 8        Q    So the first generation antipsychotics
 9   were a step forward in the treatment?
10        A    Correct.
11        Q    But they had a less than ideal risk
12   profile, the first generation antipsychotics.
13   Correct?
14        A    Correct.
15        Q    This is what we've talked about before
16   with extraparametal syndromes and so forth.
17        A    Yes.
18        Q    Did the side effects of the first
19   generation antipsychotics, cause many of the
20   patients to stop taking their medications?
21        A    Yes.
22        Q    Because of tardive dyskinesia and this
23   sort of thing?
24        A    Actually, tardive dyskinesia is really
25   rarely distressing to a patient, but things like
0164
 1   drooling, and dry mouth, and constipation, and
 2   mental dulling, were all not liked by patients.
 3   These were side effects patients didn't like.
 4        Q    There were also reports of sexual
 5   dysfunction, as well.  Correct?
 6        A    Correct.
 7        Q    And even, rarely, arrhythmias?
 8        A    Correct.  With certain antipsychotics.
 9        Q    And even blindness with some of them?
10        A    Correct.
11        Q    So, there were very serious side effects
12   to first generation antipsychotics?
13        A    Yes.
14        Q    Those side effects limited the usefulness
15   of those products?
16        A    Yes.
17        Q    Did you feel, as a practitioner, that the
18   second generation antipsychotics was a significant
19   improvement over the previously available
```
Page 68

ia100708.txt
```
20      medications?
21          A    Yes.
22          Q    When did the use of second generation
23      antipsychotics become widespread?
24          A    Middle nineties to late nineties.
25          Q    I should have asked you this early on, but
0165
1       I assume you would agree with me that all drugs have
2       some side effects?
3           A    Yes.
4           Q    I mean, even aspirin can be fatal in
5       certain dosages and in certain patients.  Correct?
6           A    Correct.
7           Q    Did you see -- and I think I've asked you
8       this, but I don't know if I've asked it quite
9       carefully enough.
10              Did you ever see any extraparametal
11      symptoms with Seroquel use?
12          A    In my clinical practice?
13          Q    Yes.
14          A    Yes.
15          Q    Would you agree with me that there's
16      little or no drug induced Parkinsonism with
17      Seroquel?
18          A    Yes.
19          Q    And there was with first generation
20      antipsychotics.  Correct?
21          A    Yes.
22          Q    Would you agree with me that there's
23      little or no acathisia with Seroquel?
24          A    Yes, I would.
25          Q    And there was with the first generation
0166
1       antipsychotics?
2           A    Yes.
3           Q    Would you also agree we me that there's
4       very little tardive dyskinesia with Seroquel?
5           A    Correct.
6           Q    Have you, in your clinical experience,
7       found any sexual dysfunction as a side effect of
8       Seroquel?
9           A    Minimal.  And that's hard to parse out,
10      because very often patients are on other
11      medications.
12          Q    Like antidepressants?
13          A    Yes.
14          Q    And antidepressants have a suppressed
15      sexual side effect?
16          A    Correct.
17          Q    Is that class-wide, with all the SSRIs?
18          A    Pretty much, except with Remeron, and the
19      chemical name is mirtazapine.
20          Q    Are you aware of any suggestion by the
21      American Psychiatric Association that Seroquel
22      should not be used in appropriate patients?
23          A    No.
24          Q    The standard of care these days is to do
25      base line monitoring of glucose levels and so forth
0167
1       in patients?
2           A    Yes.
3           Q    You have no criticisms with that?
4           A    No.
```
Page 69

ia100708.txt

```
 5          Q    Would you agree there is an APA paper that
 6     states that atypical antipsychotics are generally
 7     better tolerated and more effective than the first
 8     generation antipsychotics?  Would you agree with
 9     that?
10          A    I don't think they're any less effective.
11     I think they're much better tolerated, so it's
12     easier to get patients to accept them, so you get
13     better efficacy.
14          Q    Would you agree in the consensus statement
15     it says, "The second generation antipsychotics have
16     become the first line treatment for mental
17     disorders"?  Would you agree with that?
18          A    Yes.
19          Q    Have they --
20          A    For -- not for all mental disorders.
21          Q    Not for all mental disorders, but for
22     schizophrenia?
23          A    Yes.
24          Q    And bipolar disorder?
25          A    Certain bipolar disorders.  I mean, I
0168
 1     think the first line treatment for bipolar disorder
 2     is mood stabilization, and mood stabilization would
 3     be things like lithium, valproic acid, but in acute
 4     manic states, atypical antipsychotics are standards
 5     of care.
 6          Q    They've become the standard of care?
 7          A    Yes.
 8          Q    Would you agree with me that many people
 9     who have had serious mental diseases, have been
10     helped by Seroquel?
11          A    Yes.
12          Q    Are you familiar with an organization
13     called the National Institute for Health and
14     Clinical Excellence, called NIHCE?
15          A    I have heard of them.
16          Q    Have you ever reviewed any of their
17     clinical guidelines for treating bipolar disorder,
18     for example?
19          A    No.
20          Q    Do you know that they've recommended that
21     treatment of bipolar disorder be based primarily on
22     psychotropic medications?
23          A    What do they mean by "psychotropic
24     medications"?
25          Q    I don't know.  I'm reading what they said.
0169
 1     I assume they mean antipsychotic medications.
 2          A    A psychotropic is any medication that acts
 3     in the brain to change thought processes.  It could
 4     be mood stabilizers, antipsychotics,
 5     antidepressants, when needed.
 6          Q    Are you aware that the National Institute
 7     of Health and Clinical Excellence recommended that
 8     Seroquel be among the atypical antipsychotics
 9     normally used to treat acute mania?
10          A    I'm not aware, but I have no dispute with
11     that statement.
12          Q    So, you have no basis to disagree with
13     those recommendations?
14          A    Correct.
15          Q    Are you aware of any scientific literature
```

Page 70

ia100708.txt
```
16      that links diabetes to the weight gain in -- that
17      might be associated with second generation
18      antipsychotics?
19          A    Other than happening together, no.
20          Q    But happening together is certainly not
21      causation.  Correct?
22          A    Correct.
23          Q    And some people get diabetes who have
24      never taken a second generation antipsychotic.
25      Correct?
0170
1           A    Yes.
2           Q    Are you aware that the literature shows
3       that there really is no strong association between
4       people who gain weight on these drugs and people who
5       develop diabetes?
6                MR. TRAMMELL:  Objection.
7                THE WITNESS:  No, I'm not aware of that.
8       BY MR. HETRICK:
9           Q    Would you agree that weight changes in
10      mentally ill patients can be due to a number of
11      different factors?
12          A    Yes.
13          Q    And it can be due to their lifestyle, for
14      example, not eating properly and exercising?
15               MR. TRAMMELL:  Objection.
16               THE WITNESS:  Yes, it can be due to that.
17      BY MR. HETRICK:
18          Q    That's not unusual in people with mental
19      illness; is it?
20          A    No, it's not unusual.
21          Q    Have you studied any of the data that
22      looks at weight gain with atypical antipsychotics as
23      a class?
24          A    Yes.
25          Q    Have you looked at the data concerning
0171
1       weight gain with respect to Seroquel in particular?
2           A    Yes.
3           Q    What conclusions have you reached?
4           A    The articles that I have seen have spoken
5       of something like a 7 percent gain in body weight.
6           Q    Have you reviewed all of the weight gain
7       data from all of the controlled clinical trials?
8           A    No, of course not.
9           Q    Do you know in the clinical trials, what
10      percentage of people gained weight at all on
11      Seroquel?
12          A    No, I don't.
13          Q    Do you know what percentage of them gained
14      more than 7 percent of their body weight?
15          A    No, I do not.
16          Q    You agree there's a risk of weight gain
17      with all the atypical antipsychotics?
18          A    Yes, I do.
19          Q    The risk of weight gain with conventional
20      antipsychotics has been known for decades.  Correct?
21          A    Yes.
22          Q    Would you agree with me that the risk of
23      weight gain with atypical antipsychotics has been
24      known since they were first introduced?
25               MR. TRAMMELL:  Objection.
0172
```
                            Page 71

ia100708.txt
```
 1            THE WITNESS:  I know when Seroquel was
 2       introduced, the company was telling us that it
 3       was a weight neutral medication.
 4  BY MR. HETRICK:
 5       Q    That wasn't my question.  My question was,
 6  would you agree that for the class of second
 7  generation antipsychotics, that weight gain has been
 8  known since they were introduced?
 9            MR. TRAMMELL:  Objection.
10            THE WITNESS:  I would say that knowledge
11       of weight gain as a side effect, yes.  I would
12       agree, yes.
13  BY MR. HETRICK:
14       Q    Would you agree with me that weight gain
15  can be monitored and managed by a general
16  practitioner?
17       A    Yes.
18       Q    Have you looked at any data that studies
19  whether weight gain with second generation
20  antipsychotics is a function of the patient's
21  starting weight?
22       A    I'm aware of those observations, but I
23  don't know the specific literature to support it one
24  way or the other.
25       Q    Do you know whether a person -- well, you
0173
 1  are familiar with the term, "BMI," body mass index?
 2       A    Yes.
 3       Q    Do you know if someone with a low BMI is
 4  more likely to gain weight on a second generation
 5  antipsychotic, than someone with a high BMI?
 6       A    I would think the elevated BMI patients
 7  would be at higher risk to gain.
 8       Q    Have you looked at any studies on that
 9  issue?
10       A    I remember reading things on it, but I
11  don't remember a particular study, sitting here.
12       Q    Have you looked, by the way, at
13  Dr. Brecker's article on weight gain relating to
14  Seroquel?
15       A    I don't know which article you are
16  referring to.
17       Q    Well, are you familiar with any article by
18  Dr. Brecker?
19       A    I might be familiar with the article.  I
20  don't recognize his name, so --
21       Q    I was going to say, do you know who
22  Dr. Brecker is?
23       A    No.
24       Q    He's a scientist at AstraZeneca, and he's
25  published on studies looking at weight gain with
0174
 1  Seroquel.
 2            My question simply is, are you familiar
 3  with any of those studies?
 4       A    Not as I sit here today.
 5            MR. HETRICK:  I may have done better than
 6       I thought.  I don't think I have any other
 7       questions at this point.
 8            THE REPORTER:  I'll send you the rough.
 9            MS. SCHMID:  Thank you.
10                    (Witness excused.)
11                    (Thereupon, at 4:55 p.m., the
                           Page 72
```

```
                              ia100708.txt
  12                   deposition was adjourned.)
  13                        -----------
  14
  15
  16
  17
  18
  19
  20
  21
  22
  23
  24
  25
0175
   1                 C E R T I F I C A T E
   2                      - - - - -
   3
   4    STATE OF FLORIDA     )
   5    COUNTY OF MIAMI-DADE )
   6
   7         I, hereby certify that I have read the
   8    foregoing transcript of my deposition by me given,
   9    and that the statements contained therein are true
  10    and correct to the best of my knowledge and belief,
  11    with any exception of any corrections or notations
  12    made on the errata sheet, if any.
  13
                 Dated this _____ day of _____ 2008.
  14
  15
                      _____
  16                  ISRAEL JACK ABRAMSON
  17
  18
  19
  20         The foregoing certificate was subscribed to
  21    before me this _____ day of _____ 2008.
  22
  23                  _____
                      Notary Public-State of Florida
  24
  25
0176
   1    FLETCH TRAMMELL, ESQ.
        c/o BAILEY PERRIN BAILEY LLP
   2    440 Louisiana Street
        Suite 2100
   3    Houston, Texas 77002
   4                              October 9, 2008
   5    RE:   SEROQUEL LITIGATION
   6    Please take notice that on the 7th day of
        October, 2008 you gave your deposition in the
   7    above-styled case.  At that time, you did
        not waive your signature.  It is now necessary that
   8    you sign your deposition.
   9    Please call our office at the below listed number
        to schedule an appointment between the hours of
  10    9:00 a.m. and 4:30 p.m., Monday
        through Friday, at the Esquire office located
  11    nearest to you.
  12    If you do not appear to read and sign your
        deposition in thirty (30) days, the original,
                              Page 73
```

                          ia100708.txt
13   which has already been forwarded to the
     ordering attorney, may be filed with the
14   Clerk of the Court.  If you wish to
     waive your signature at this time, you may sign
15   your name in the blank at the bottom of this page
     and return it to us.
16
                              Very truly yours,
17
                              BRIAN G. BERKOWITZ
18                            ESQUIRE DEPOSITION SERVICES
                              44 West Flagler Street
19                            Miami, Florida 33130
                              305-371-2713
20
                              ---------------------------
21                                 Notary Public
22   I do hereby waive my signature:
23   _____
     The deponent did (  )  Did not (  )
24   appear to sign the deposition.
                                   _____
25                                   Court Reporter
0177
 1               E R R A T A   S H E E T
 2   DEPOSITION OF:  ISRAEL JACK ABRAMSON
 3   TAKEN:  October 7, 2008
 4
        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
 5
     PAGE #    LINE#    CHANGE          REASON
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
     Please forward the original signed errata sheet to
20   this office so that copies may be distributed to
     all parties.
21
     Under penalty of perjury, I declare that I have
22   read my deposition and that it is true and correct
     subject to any changes in form or substance entered
23   here.
24   DATE:_____  SIGNATURE OF DEPONENT:_____
25
0178
 1
 2               CERTIFICATE OF OATH
 3
 4   STATE OF FLORIDA     )
 5   COUNTY OF MIAMI-DADE )
 6
 7       I, the undersigned authority, certify that
                         Page 74

ia100708.txt

```
 8    ISRAEL JACK ABRAMSON personally appeared before me
 9    and was duly sworn.  Witness my hand and official
10    seal this 9th day of October, 2008.
11
12
13                    _____
                      Brian Gary Berkowitz
14                    Notary Public - State of Florida
15
16
17
18
19
20
21
22
23
24
25
0179
 1               C E R T I F I C A T E
 2
 3    STATE OF FLORIDA      )
 4    COUNTY OF MIAMI-DADE  )
 5
 6        I, Brian Gary Berkowitz, Shorthand Reporter, do
      hereby certify that ISRAEL JACK ABRAMSON was by me
 7    first duly sworn to testify the whole truth; that I
      was authorized to and did stenographically report
 8    the foregoing deposition in stenotype; and that the
      foregoing pages, numbered from 1 to 174 inclusive,
 9    are a true and correct transcription of my shorthand
      notes of said deposition.
10
          I further certify that said deposition was
11    taken at the time and place hereinabove set forth
      and that the taking of said deposition was commenced
12    and completed as hereinabove set out.
13        I further certify that I am not a relative,
      employee, attorney or counsel of any of the parties,
14    nor am I a relative or employee of any of the
      parties or counsel connected with the action, nor am
15    I financially interested in the action.
16        The foregoing certification of this transcript
      does not apply to any reproduction of the same by
17    any means unless under the direct control and/or
      direction of the certifying reporter.
18
          IN WITNESS WHEREOF, I have hereunto set
19    my hand this 9th day of October, 2008.
20
                      _____
21                    Brian Gary Berkowitz
                      Notary Public - State of Florida
22
23
24
25
```