# TAB 7

my101308.txt

1

1    08-I-99476 sh

2                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
3                         ORLANDO DIVISION

4
     IN RE:  Seroquel Products Liability Litigation
5    MDL DOCKET NO. 1769

6    This document relates to:

7    Richard Unger v. AstraZeneca LP, et al.   Case No. 6:07-cv-15812
     Linda Whittington v. AstraZeneca LP, et al.   Case No. 6:07-cv-10475
8

9    **************************************************************

10                       ORAL DEPOSITION OF

11                    MITCHELL ALAN YOUNG, M.D.

12                        October 13, 2008

13                           Volume 1

14   **************************************************************

15                    ORAL DEPOSITION of MITCHELL ALAN YOUNG, M.D.,

16   produced as a witness at the instance of the Defendants, and

17   duly sworn, was taken in the above-styled and numbered causes

18   on the 13th of October, 2008, from 9:00 a.m. to 5:18 p.m.,

19   before Shanon M. Hair, CSR in and for the State of Texas,

20   reported by machine shorthand, at the office of Fibich,

21   Hampton & Leebron, L.L.P., 1401 McKinney Street, Suite 1800,

22   Houston, Texas  77010-9998, pursuant to the Federal Rules of

23   Civil Procedure and the provisions stated on the record or

24   attached hereto.

25

♀

2

1                            INDEX

my101308.txt

2   Appearances...............................................5

3   MITCHELL ALAN YOUNG, M.D.

4       Examination by Mr. Raber.............................6

5       Examination by Mr. Elder...........................194

6   Signature and Changes...................................236

7   Reporter's Certificate..................................238

8

9                              EXHIBITS
    NO.  DESCRIPTION                                      PAGE
10
11      1.................................................6
            Amended Notice of Deposition of Mitchell Alan
            Young, M.D.
12      2................................................13
            File materials
13      3................................................20
            Expert Report of Mitchell Alan Young, M.D.
14          (Unger)
        4................................................31
15          08-12-08 invoice to K. Camp Bailey from
            Mitchell Alan Young, M.D.
16      5...............................................112
            Article entitled "Effectiveness of
17          Antipsychotic Drugs in Patients with Chronic
            Schizophrenia"
18      6...............................................115
            Article entitled "Effectiveness of Olanzapine,
19          Quetiapine, Risperidone, and Ziprasidone in
            Patients With Chronic Schizophrenia Following
20          Discontinuation of a Previous Atypical
            Antipsychotic"
21      7...............................................129
            Article entitled "Risk of Treatment-Emergent
22          Diabetes Mellitus in Patients Receiving
            Antipsychotics
23      8...............................................151
            06-19-06 History and Physical   (Unger)
24      9...............................................160
            12-04-06 Mercy Hospital Preadmission Record
25          (Unger)

♀

3

1                              INDEX
                            (Continued.)
2
                               EXHIBITS
3   NO.  DESCRIPTION                                     PAGE

4      10...............................................165
            07-02-02 West Broward Orthopaedics & Spine
                            Page 2

my101308.txt

5          medical record  (Unger)
      11....................................................166
6          06-27-02 medical record  (Unger)
      12....................................................169
7          07-14-03 letter to Dr. Rafael Mas from Terence
           Peppard, M.D., P.A.
8      13....................................................176
           10-01-04 Social Security Administration
9          Function Report - Adult  (Unger)
      14....................................................189
10         05-03-07 letter to Helen Showers from Arnold
           S. Zager, M.D., P.A.
11     15....................................................192
           12-18-07 letter to Helen Showers from Arnold
12         S. Zager, M.D., P.A.
      16....................................................194
13         Expert Report of Mitchell Alan Young, M.D.
           (Whittington)
14     17....................................................198
           Medication Log  (Whittington)
15     18....................................................199
           01-02-02 Progress Note  (Whittington)
16     19....................................................201
           Medication Log  (Whittington)
17     20....................................................203
           02-17-06 Lab Order Detail   (Whittington)
18     21....................................................206
           Article entitled "Diagnosis and Classification
19         of Diabetes Mellitus"
      22....................................................209
20         09-16-93 lab report  (Whittington)
      23....................................................210
21         08-31-93 General Clinical Psychiatric
           Evaluative Interview Monitoring  (Whittington)
22     24....................................................213
           11-21-96 Laboratory Report  (Whittington)
23     25....................................................214
           11-20-96 medical record  (Whittington)
24     26....................................................225
           09-28-90 Nursing Assessment Forms
25         (Whittington)

                                                              4

1                           INDEX
                        (Continued.)
2
                         EXHIBITS
3    NO.   DESCRIPTION                                 PAGE

4          27....................................................226
           09-11-01 Progress Notes  (Whittington)
5          28....................................................226
           02-15-02 Progress Notes  (Whittington)
6          29....................................................227
           07-08-02 Progress Notes  (Whittington)
7          30....................................................230
           03-24-08 medical record  (Whittington)
                         Page 3

my101308.txt

```
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

♀

5

```
 1                    A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3        Tommy Fibich, Esq.
          Sara J. Fendia, Esq.
 4        FIBICH, HAMPTON & LEEBRON, L.L.P.
          1401 McKinney Street, Suite 1800
 5        Houston, Texas  77010-9998
          (713) 751-0025, fax (713) 751-0030
 6        tfibich@fhl-law.com
 7   FOR THE DEFENDANTS:
 8        Stephen D. Raber, Esq.
          WILLIAMS & CONNOLLY LLP
 9        725 Twelfth Street, N.W.
          Washington, D.C.  20005
10        (202) 434-5538, fax (202) 434-5029
          sraber@wc.com
                         Page 4
```

```
                              my101308.txt
11
                                      -and-
12
          Scott A. Elder, Esq.
13        ALSTON & BIRD LLP
          1201 West Peachtree Street
14        Atlanta, Georgia  30309-3424
          (404) 881-7000 fax (404) 253-8580
15        scott.elder@alston.com

16

17

18

19

20

21

22

23

24

25
```

⚥

6

```
 1              (Young Exhibit No. 1 marked.)

 2              (9:00 a.m.)

 3                  MITCHELL ALAN YOUNG, M.D.,

 4      having been first duly sworn, testified as follows:

 5                          EXAMINATION

 6      BY MR. RABER:

 7         Q.    Good morning, Dr. Young.  My name is Steve Raber and

 8      I'm an attorney who represents AstraZeneca in the lawsuits

 9      relating to the drug Seroquel.  Would you please state your

10      full name for the record?

11         A.    Good morning, sir.  My full name for the record is

12      Mitchell Alan Young, M.D.  That's M-i-t-c-h-e-l-l, middle name

13      A-l-a-n, last name Young, Y-o-u-n-g.
```

Page 5

my101308.txt

14      Q.    Dr. Young, you understand that you are under oath

15   today?

16      A.    Yes, sir.

17      Q.    And that the testimony you are giving today is just

18   as though you were testifying live in a courtroom?

19      A.    I understand.

20      Q.    I'm going to ask that if for some reason you don't

21   understand any of my questions today, that you please let me

22   know and give me a chance to fix it.  Is that fair?

23      A.    Will do.

24      Q.    And if you don't ask for clarification, I'm going to

25   assume that you understood my question.  Is that fair?


♀

                                                              7


1       A.    Yes, sir.

2       Q.    If you want to take a break at any time, just let us

3   know and we'll do that, okay?

4       A.    Okay.

5       Q.    And let me ask you this:  Are you taking any

6   medication that would interfere with your ability to give

7   truthful or accurate answers today?

8       A.    No.

9       Q.    Dr. Young, what did you do to prepare for your

10   deposition today?

11      A.    Reviewed a lot of materials, and those have been

12   provided to you.

13      Q.    When did that review of those materials begin?

14      A.    Oh, gosh.  Sometime this past year.

15      Q.    I want to ask you specifically about preparing for

16   the deposition today.  Was there a time when you specifically

                                 Page 6

my101308.txt
17    began preparing for that as opposed to preparing for your

18    report and so on?

19         A.    Yes, sir.

20         Q.    When did you first begin to prepare for your

21    deposition?

22         A.    There was a meeting with Mr. Fibich and Ms. Grainger

23    last week and then over the weekend I reviewed some materials

24    which have been provided to you, or a list of those materials,

25    and this morning I looked at my reports again.

♀

8

1          Q.    Did you meet with Mr. Fibich this morning?

2          A.    Before coming into this room, yes.

3          Q.    For how long?

4          A.    Fifteen, 20 minutes, less.

5          Q.    How long did your meeting with Mr. Fibich and

6     Ms. Grainger last during last week?

7          A.    Let's see.   Ms. Grainger was there and then

8     Mr. Fibich came, so it was for an hour or two.

9          Q.    Who is Ms. Grainger?

10         A.    Ms. Grainger is a nurse, I believe, that works with

11    the attorneys in this matter on the plaintiffs' side.

12         Q.    Did she indicate to you why she was attending?

13         A.    To help prepare for the deposition.

14         Q.    Has she provided you with some materials in the past?

15         A.    Yes, she has.

16         Q.    What has she provided you?

17         A.    It would be hard to separate out what the attorneys

18    and what Ms. Grainger provided, but specifically what

19    Ms. Grainger provided was a timeline and treatment summaries

my101308.txt

20   with respect to Ms. Whittington and Mr. Unger.

21       Q.   Ms. Grainger works for one of the plaintiffs' law

22   firms?

23       A.   Correct.

24       Q.   Did you rely on the timeline and treatment summaries

25   provided to you by Ms. Grainger in forming your opinions?

9

1       A.   Yes.

2       Q.   Did you do any independent review of the medical

3   records to confirm or verify the materials that Ms. Grainger

4   had provided to you?

5       A.   Yes.

6       Q.   How long did that take?

7       A.   All the documents, including medical records and

8   AstraZeneca internal documents and literature pertaining to

9   scientific research on typicals, atypicals, and diabetes,

10   probably a hundred-plus hours.

11       Q.   Have you ever examined the plaintiff?

12       A.   No, I have not.

13       Q.   And when I say "plaintiff," I mean, I guess,

14   Mr. Unger or Ms. Whittington.

15       A.   I have not personally examined either of those

16   individuals.

17       Q.   Has somebody examined them on your behalf?

18       A.   Lots of people.   Oh, on my behalf?

19       Q.   Yes.

20       A.   No.

21       Q.   Now, you mention that your review of documents took

22   on the order of a hundred-plus hours.   Can you tell me

Page 8

my101308.txt

23   approximately the total number of hours you've spent forming

24   your opinions and doing work on this litigation?

25       A.   Over a hundred hours.

♀

              10

1       Q.   Have you billed for any of your time yet?

2       A.   Prior to Hurricane Ike, I think I sent out a

3   statement that was misdated, and that was for about a hundred

4   hours.

5       Q.   And what is your hourly rate for your work in this

6   case?

7       A.   $425.

8       Q.   Have you been paid yet for any of that?

9       A.   No, I have not.

10      Q.   Do you have a copy of the bill that you sent in your

11   materials?

12      A.   That I don't know.

13      Q.   Okay.  If you don't, Tommy, we would just ask that we

14   be provided a copy of that.

15      A.   I have a copy of the retainer check, but I don't

16   think I have a copy of --

17           MR. FIBICH:  Let me ask you this --

18      Q.   (BY MR. RABER)  I didn't see it in the materials.

19   That's why I asked.

20           MR. FIBICH:  Let me ask this:  I thought the

21   statement was attached to your report.  Was it?

22           THE WITNESS:  The fee --

23           MR. FIBICH:  Fee agreement?

24           THE WITNESS:  Not a fee agreement.

25           MR. ELDER:  Schedule.

my101308.txt

⚥

11

1              THE WITNESS:  A fee schedule was attached to the
2    report, as requested.
3              MR. ELDER:  Yeah.  We didn't get the bill.
4         A.   I don't think I provided that.
5         Q.   (BY MR. RABER)  Is that something that you would be
6    able to provide, if asked?
7         A.   Sure.
8              MR. RABER:  Okay.  Tommy, we'd ask that we get
9    that.
10             MR. FIBICH:  Okay.
11             You have it here?  Okay.  Well, we'll -- on a
12   break, I'll have his office fax it.
13             MR. RABER:  Thank you.
14        Q.   (BY MR. RABER)  Dr. Young, we've marked this document
15   that I'm handing you as Young Exhibit 1, which is the amended
16   notice of deposition for today's deposition.  Have you ever
17   seen that or something like it?
18        A.   Before today?
19        Q.   Yes.
20        A.   I don't believe so.
21        Q.   Okay.  If you look at the last page of Exhibit 1, it
22   requests that you bring certain documents with you to the
23   deposition.  Do you see that?
24        A.   Yes, sir.
25        Q.   And have you brought documents with you today?

⚥

12

my101308.txt

1          A.    Yes, I have.

2          Q.    Okay.  I see -- just for the record, we received from

3     Mr. Fibich's office by letter dated October 9th, 2008, a stack

4     of paper that I'll estimate is maybe 2 inches thick.  And I see

5     that you have in front of you what look like originals of some

6     handwritten notes and various documents.

7                Is the pile of paper that's lying in front of

8     you the -- essentially the documents that you brought with you

9     today?

10         A.    Yes.

11         Q.    Do you have any -- and I also see that you have some

12    CDs in front of you as well; is that right?

13         A.    Correct.

14         Q.    Other than the documents sitting in front of you and

15    the CDs sitting in front of you, do you have any other

16    documents that relate to your work in this case?

17         A.    No, sir, other than the bill --

18         Q.    Okay.

19         A.    -- that we talked about.

20               MR. RABER:  All right.  I'd like to mark then

21    the information -- the copies that were provided to me as

22    Exhibit 2.  I'll just note for the record that the copy I'm

23    marking right now has some tabs on it that I've put there and

24    I've actually highlighted some things in it; but we'll make

25    arrangements to get this copied after the deposition, then I'll

⚲

                                                              13


1     take back the set that has the highlighting and stuff, if

2     that's acceptable, Mr. Fibich.

3               MR. FIBICH:  That's fine.
                                Page 11

my101308.txt

4              MR. RABER:  Okay.

5              (Young Exhibit No. 2 marked.)

6        Q.   (BY MR. RABER)  Okay.  Dr. Young, I'm handing you

7   what's been marked as Exhibit 2, and can you just confirm for

8   us that that appears to be copies of the documents that you

9   brought to your deposition today?

10       A.   More or less.  I'm not sure what that is.

11       Q.   Okay.  I may have an answer for that, but go ahead

12  and look through it and we'll clarify.

13       A.   I don't think I produced an internet print-off of

14  diabetic socks.

15       Q.   Okay.  My -- okay.  The stack you're looking at

16  appears to be materials from a rehabilitation plan that was

17  done by Mr. Deutsch and it came in the package that we

18  received.  Do you remember getting something along those lines?

19       A.   I may have gotten it, but I certainly did not review

20  that.  I don't recall seeing materials related to diabetic

21  socks and such.

22       Q.   Okay.

23       A.   That does not ring a bell.

24              MR. RABER:  Okay.  All right.  Well, then with

25  counsel's permission, I'll go ahead and remove the Deutsch

♀

                                                      14

1   materials.  Tommy, I don't know if they were sent as a courtesy

2   or whether they were actually in his files, but they were

3   separately bound when they came to us.

4        A.   I don't recall seeing this, the materials by Allegro

5   Medical, the shoes and such, socks.

6              (Sotto voce discussion.)

my101308.txt

7        Q.    (BY MR. RABER)  Okay.  So, do you want to hand me

8   what you just looked at there?  And can we agree then that you

9   did not review or consider the materials you're about to hand

10  me in forming your opinions and that what's left is the set of

11  documents that you reviewed and considered?

12       A.    More or less.

13       Q.    Do you recall reading any --

14             MR. FIBICH:  Well, I think what he's asking you

15  is this stuff on the diabetic socks and all that, you didn't --

16  pull out what you didn't review.

17             Steve, you think we sent you that?

18             MR. RABER:  Yeah, that came together.  And it

19  didn't look like he had reviewed it.  It was done separately

20  and, you know, I don't know whether it was just sent as a

21  courtesy or what.

22             MR. FIBICH:  It was in my letter to you?

23             MR. RABER:  Actually, it came -- that's a good

24  question.  It came to me from the counsel that you sent it to.

25  It was all put together and so I don't know for sure.  It all

⚲

15

1   came in one big stack and the cover letter from your firm was

2   on the top, in other words, but that was a segregated stack of

3   materials that was -- had a separate --

4             MR. FIBICH:  I don't think it really matters,

5   quite frankly, but I don't think I sent it.

6             MR. RABER:  Okay.

7             MR. FIBICH:  But, you know, there's enough paper

8   in here that people could make a mistake, but --

9        A.    Rehabilitation firm of Paul Deutsch & Associates,

Page 13

my101308.txt

10    that does not ring a bell.

11         Q.    (BY MR. RABER)  Okay.

12         A.    So -- let me see.  Paul Deutsch, Paul Deutsch.  I

13    think at least that.  And not sure what this is.  This looks

14    like stuff I reviewed, medical records and -- this is a

15    definite maybe.  Yeah, I think I saw this.  Paul Deutsch.  I

16    don't recall -- at least I don't recall the advertisements and

17    the socks and stuff like that because I would have wondered why

18    it was being sent to me, so it would have stood out.

19                    And this all goes back to you, sir?

20         Q.    We'll just leave -- why don't you put that

21    rubber-banded part in the bottom of that stack, and then I'm

22    going so ask you some questions about some of those things.

23         A.    Yes, sir.

24         Q.    In that stack of materials there, I see that there's

25    some handwritten notes included, correct?

♀

                                                                16

1          A.    Yes, sir.

2          Q.    And are those -- is that your handwriting?

3          A.    Yes.

4          Q.    What were the circumstances of taking those notes?

5     In other words, did you take notes as you read things, did you

6     take notes as you spoke to people, or how did that work?

7          A.    Initially, in reviewing the massive amount of

8     materials for this matter, I took notes.  And then it became

9     readily apparent I was not going to get through the materials

10    or the bulk of materials by doing that, and so at some point I

11    stopped taking notes of everything I read.

12                    I took notes of meetings I had with Mr. Fibich

my101308.txt

13    and Ms. Grainger; I took notes of what internet sites I looked

14    at; I took some notes off of Medscape, one of the online search

15    engines; I wrote a note about some articles I was inquiring

16    after at the Texas Medical Center library; and I took notes

17    this weekend about materials that were provided over the

18    weekend in preparation for this deposition; and I took a note

19    off of a Baylor College of Medicine newsletter from this past

20    month regarding the ongoing study of second-generation

21    antipsychotics.

22        Q.   All right.   And in Exhibit 2 there on the top,

23    there's a set of handwritten notes that I understand -- the

24    first entry there, it says "Medicare" and it refers to a 2008

25    article, September 15th, 2008, "Newer antipsychotics appear no

♀

17

1    better than Moban in treating child and adolescent

2    schizophrenia."

3             Did I correctly identify this stapled document?

4        A.   The heading says "Medscape."

5        Q.   Oh, Medscape.   I'm sorry.

6        A.   M-e-d-s-c-a-p-e, not "Medicare," not yet.

7        Q.   Okay.

8        A.   And the rest of it is correct, sir.

9        Q.   Okay.   And tell me what that subset of handwritten

10    notes consists of?

11        A.   Online research that came to my e-mail that I then

12    looked at and I thought might be relevant or germane to this

13    matter.

14        Q.   And the items that are written on that subset of

15    Exhibit 2, that's material that you looked at this weekend?

Page 15

my101308.txt

16      A.      Yes.

17      Q.      After you wrote your report?

18      A.      Yes.

19      Q.      And then the next attachment -- or the next subset of

20  documents was another one handed to us this morning.  If you

21  look below that, it's a typewritten document that says

22  "Seroquel Product Liability Litigation Terms of Art."

23              Tell us what that is.

24      A.      If I could go back through for one moment, sir.

25      Q.      Sure.

1       A.      Some of these handwritten notes on that first

2   document of Exhibit 2 were materials I had relied on before,

3   the internet sites I had visited, but I don't think I had

4   previously supplied that to you-all.

5       Q.      Okay.

6       A.      Second group of documents is -- one of the things I

7   tried to do as I read the clinical, the business, the research

8   materials was to keep a separate list of acronyms or

9   abbreviations -- there were multiple in this matter, many of

10  which I was not familiar with -- as well as terms of art or

11  definitions.  And I had not previously given Mr. Fibich, when

12  he asked me for all my materials, this file which is labeled

13  "Seroquel Product Liability Litigation Terms of Art."

14      Q.      Who prepared this Seroquel Products Liability

15  Litigation Terms of Art?

16      A.      I did.

17      Q.      You typed that yourself?

18      A.      Yes.

my101308.txt

19      Q.    And where did you find all that information?

20      A.    In part, in things that I read; in part, in

21   textbooks; in part, online.

22      Q.    When did you prepare that?

23      A.    As I went along.

24      Q.    We'll come back to those things.

25      A.    Business people are almost as bad as medical people

♀

19

1   for abbreviations.

2       Q.    And who are the business people you're referring to?

3       A.    AstraZeneca, Birkett, and Brennan and the

4    pharmaceutical sales representatives, the marketing people, the

5    research people --

6       Q.    You think this case is about a business?

7             MR. FIBICH:   Object to form.

8       A.    In part, absolutely, yes.

9       Q.    (BY MR. RABER)  Do you consider yourself to be an

10   expert in business?

11            MR. FIBICH:   Object to form.

12      A.    I don't hold myself out as an expert in business, per

13   se, but I have been in the private or public practice of

14   psychiatry for around 30 years.  I have been the medical

15   director of Houston operations for a large managed care

16   company.  I have consulted on the -- in the public and private

17   sectors concerning mental health matters.  And my understanding

18   is that Seroquel was produced by AstraZeneca and AstraZeneca

19   is -- even with the fluctuations in the market today, is a

20   for-profit business.

21      Q.    (BY MR. RABER)  Are you aware of any not-for-profit

Page 17

my101308.txt

22   pharmaceutical businesses?

23        A.    There's a foundation, I believe, that helps support a

24   lot of research.

25        Q.    Sir, do you hold yourself out as an expert in the

♀

                                                                    20

1    pharmaceutical business?

2                   MR. FIBICH:  Object to form.

3        A.    Per se, no.

4                   MR. RABER:  All right.  Let's mark this next

5    document as Exhibit 3.

6                   (Young Exhibit No. 3 marked.)

7                   MR. FIBICH:  Have we marked 1 and 2 yet?

8                   MR. RABER:  Yeah.  One was the notice of

9    deposition and 2 is the documents he brought with him, copies

10   of the documents he brought.

11       Q.    (BY MR. RABER)  Dr. Young, the court reporter has

12   marked the next document as Exhibit 3, which is entitled

13   "Expert Report of Mitchell Alan Young," dated the 2nd of

14   September, 2008.  Do you see that?

15       A.    Yes, sir.

16       Q.    And that's -- says "This document relates to:  Unger

17   v. AstraZeneca LP," correct?

18       A.    Correct.

19       Q.    Tell us what this is.

20       A.    It's a report I made.

21       Q.    How -- did you write this report yourself?

22       A.    Yes.

23       Q.    Did you get any help from anyone writing it?

24       A.    No.

                            Page 18

my101308.txt

25      Q.   Did you type it yourself?

                                                    21

1       A.   Yes.

2       Q.   Did you cut and paste any information in preparing

3    it?

4       A.   Yes.

5       Q.   Okay.  How long did it take you to write this report?

6       A.   I don't recall.

7       Q.   Can you estimate?

8       A.   Would be conjecture.  I can take a look at the bill

9    and it would have an indication of that.  But part of it was

10   written during review of materials and part of it was written

11   after review of materials, so I do not wish to hazard a guess

12   at this time.

13      Q.   Did the attorneys for the plaintiff provide you with

14   any source material that you used to cut and paste into your

15   report?

16      A.   No.

17      Q.   The first enclosure or attachment to your report is a

18   curriculum vitae.  Do you see that?

19      A.   Yes, sir.

20      Q.   Does the curriculum vitae attached to your report

21   truthfully and accurately set forth your experience?

22      A.   Yes, it does.

23      Q.   I noticed on your curriculum vitae -- well, let me

24   ask you this way:  Have you ever done any research in the area

25   of atypical antipsychotics?

my101308.txt

22

```
 1        A.    You're talking about in bringing an atypical to
 2   market?
 3        Q.    Any kind of research; bringing it to market,
 4   post-marketing research.
 5        A.    Other than research related to this matter, no.
 6        Q.    So, being hired as an expert witness was the first
 7   time you've done any research into atypical antipsychotics,
 8   correct?
 9        A.    Specifically literature reviews, correct; or
10   histories, yes.
11        Q.    I take it you've had some personal experience
12   prescribing atypical antipsychotics, true?
13        A.    Yes, sir.
14        Q.    Have you ever written any articles or published
15   anything relating to atypical antipsychotics?
16        A.    No, I have not.
17        Q.    Have you ever done any research in the area of
18   diabetes?
19        A.    Independent of this matter, no, I have not.
20        Q.    So, this litigation was the first time that you ever
21   did any research into diabetes, correct?
22        A.    Yes, sir.
23        Q.    Have you ever written any articles or published
24   anything in the area of diabetes?
25        A.    No, I have not.
```

23

```
 1        Q.    Do you hold yourself out to be an expert in diabetes?
```

Page 20

my101308.txt

2              MR. FIBICH:   Object to form.

3       A.   Per se, no.

4       Q.   (BY MR. RABER)  What do you mean when you say "per

5   se"?

6       A.   I am a physician.  My training and expertise is as a

7   psychiatric physician.  Over the course of my education and

8   experience in approximately 30 years of practice, I've had

9   diabetic patients and am familiar with some issues related to

10  diabetes and have conferred over time with diabetologists or

11  endocrinologists; but I am not specifically trained or boarded

12  in the field of endocrinology, and specifically diabetology.

13      Q.   Do you diagnose diabetes in your practice?

14      A.   Rarely.

15      Q.   Have you ever?

16      A.   Yes.

17      Q.   When did you do that?

18      A.   I believe patients have presented with symptoms

19  consistent with the diagnosis and I've recommended follow-up,

20  but I did not specifically or formally render that diagnosis

21  myself.

22      Q.   In your practice, have you ever treated patients for

23  diabetes?

24      A.   Other than perhaps writing a script for an oral

25  hyperglycemic when their primary physician was out of town, no.

♀

                                                            24

1       Q.   As part of your work, do you determine the cause of

2   diabetes?

3       A.   Which work, sir?

4       Q.   Your work as a psychiatrist, the work laid out in

                        Page 21

my101308.txt

5      your curriculum vitae.

6         A.    Have I done research with respect to the causes of

7      diabetes?

8         Q.    In your present or prior work experience, have you

9      determined the causes of diabetes in patients?

10        A.    Some of them, yes.

11        Q.    How many times?

12        A.    Gosh.   During my general medical rotations, diabetes

13     was right up there with alcoholism as a common presenting

14     complaint.   And so in taking histories and performing

15     laboratory evaluations on patients, I would consider that to be

16     diagnosing causes or -- if not diagnosing causes, a better way

17     to say that might be assessing risk factors in individuals.

18        Q.    Do you hold yourself out as an expert in determining

19     the cause of diabetes in patients?

20        A.    Per se, no.

21               MR. FIBICH:   Object to form of that question.

22               MR. RABER:   What was wrong with the form?

23               MR. FIBICH:   Well, the issue is what do you mean

24     by "expert"?  You mean somebody that specializes in a

25     particular field of medicine or are you applying the test for

                                                       25

1      an expert, as I understand it under the law of this case, that

2      being a person who has knowledge above that of an ordinary

3      person that would assist the jury in determining factual

4      matters in this case?

5         Q.    (BY MR. RABER)   Well, your report, Exhibit 3, is

6      captioned "Expert Report of Mitchell Alan Young, M.D."

7               Do you see that?

my101308.txt

     8        A.    Yes, sir.

     9        Q.    Okay.  Using the term "expert" in that context, do

    10   you hold yourself out as an expert in determining the cause of

    11   diabetes in a patient?

    12              MR. FIBICH:   Object to form.

    13        A.    I have expertise or knowledge about those issues, but

    14   do not hold myself out as a diabetologist or a researcher, per

    15   se, in diabetes.

    16        Q.    (BY MR. RABER)  Describe for us as fully as you can

    17   the nature of your expertise in the area of diabetes.

    18        A.    Over the course of 30 years of medical practice, I've

    19   had a lot of patients with diabetes.  Certainly, in my medical

    20   training, diabetes was a common -- an increasingly common

    21   ailment people suffer.  And general medicine, internal

    22   medicine, endocrinology, the subject matters that I studied for

    23   this particular matter, I reviewed risk factors and current

    24   thinking about causes of diabetes.

    25        Q.    What are the generally-accepted criteria for

♀

                                                              26

     1   diagnosing diabetes?  Excuse me.  Can you answer that question

     2   without looking at any documents?

     3        A.    Yes, but not as well.

     4        Q.    Well, let's try it without looking at any documents.

     5   Can you tell us what the currently generally-accepted criteria

     6   are for diagnosing someone with diabetes?

     7        A.    Symptomatically, it has to do with increased

     8   urination, increased thirst, tiredness, weight changes related

     9   to increased blood glucose or insulin resistance or failure to

    10   utilize glucose appropriately in the body.  There are

                              Page 23

my101308.txt

11    currently, I think, three accepted types of diabetes, including

12    Type 1, Type 2, and gestational diabetes.

13              What else would you like to know?

14    Q.    I'd like to know what's the generally-accepted

15    diagnostic criteria for determining whether somebody has

16    diabetes?

17    A.    That has to do with blood glucose levels.  Some

18    people would include Alpha 1 hemoglobin in that diagnosis.

19    There is some variance about when diabetes versus prediabetes

20    occurs and what the difference is.  I think you need one or

21    more fasting blood glucoses above a hundred, and then there are

22    diagnostic criteria with respect to so-called glucose tolerance

23    tests.

24    Q.    Okay.  Can you add anything to that answer?

25    A.    I would prefer to look at my documents, lest I err --

♀

27

1     Q.    Would you --

2     A.    -- to refresh my memory.

3     Q.    Would you defer to an endocrinologist in answering

4     those types of questions?

5              MR. FIBICH:  Object to form.

6     A.    Not completely.

7     Q.    (BY MR. RABER)  Is there a difference between the

8     criteria for diabetes versus the criteria for impaired fasting

9     glucose?

10    A.    I think impaired fasting glucose is a laboratory

11    test.  I think diabetes is a syndrome or illness or symptom

12    constellation.

13    Q.    Can you tell me the difference between the

Page 24

my101308.txt

14    generally-accepted diagnostic criteria for impaired fasting

15    glucose versus diabetes?  Are you able to do that?

16         A.   I think if you have a spot impaired so-called fasting

17    glucose, reported fasting, by a psychotic or mentally-impaired

18    individual, that I would not be particularly comfortable about

19    diagnosing diabetes on that basis.  My recollection without

20    refreshment by looking at the definitions is I think if you

21    have a spot fasting glucose above 150, plus/minus, that that is

22    a cause of concern, particularly if it's fasting; although that

23    may be 125.  I'd have to refresh my memory.

24         Q.   What's the difference in the numerical range for

25    blood glucose for impaired fasting glucose versus diabetes, if

♀

                                                              28

1     you know?

2          A.   I'm not sure I understand your question, sir.

3          Q.   Okay.  Is there a different numerical range for blood

4     glucose that meets the criteria for impaired fasting glucose

5     than the numerical range for diabetes?

6          A.   I'm sorry.  I'm still not clear on your question.

7          Q.   Okay.  What is the numerical range that's generally

8     accepted as diagnostic for impaired fasting glucose?

9          A.   I think, generally speaking, a fasting glucose above

10    a hundred is a source of concern for clinicians.

11         Q.   Does that amount to a diagnosis of impaired fasting

12    glucose?

13              MR. FIBICH:  Object to form.

14         A.   I'm not sure.

15         Q.   (BY MR. RABER)  Okay.  What is the numerical range

16    for a finding of diabetes?

                          Page 25

my101308.txt

17    A.    I think there's several ways to get at that.  One is

18    several spot fasting glucoses and one is glucose tolerance

19    tests and another is -- for the broader picture is the Alpha 1C

20    hemoglobin.

21    Q.    What is the fasting glucose level that's diagnostic

22    for diabetes?

23    A.    I would ask to refresh my memory with the documents I

24    brought.

25    Q.    So, you can't answer that question without looking at

♀

                                                          29

1    documents; is that correct?

2              MR. FIBICH:   Object to form.

3    A.    At this point in time, that's correct.

4    Q.    (BY MR. RABER)  What does the A1C measure?

5    A.    It's a kind of hemoglobin that's related to -- kind

6    of like a batting average -- the long-term glucose picture of

7    the person.

8    Q.    How long term?

9    A.    I would have to refer to the documents to refresh my

10   memory to specifically know the window that that reflects.

11   Q.    Is the A1C test used to diagnose diabetes?

12   A.    Yes.

13   Q.    Dr. Young, have you ever had any licenses to practice

14   medicine suspended or revoked?

15   A.    No, I have not, sir.

16   Q.    In what areas are you board certified?

17   A.    I am board certified in adult, child and adolescent,

18   and forensic psychiatry.

19   Q.    Are you board certified in endocrinology?

Page 26

my101308.txt

20      A.      No, I am not.

21      Q.      In what states are you licensed to practice medicine?

22      A.      Currently, I'm licensed to practice medicine in the

23   State of Texas.

24      Q.      Have you been licensed anywhere else before?

25      A.      Yes.

♀

30

1       Q.      Where?

2       A.      Connecticut.

3       Q.      Why are you no longer licensed there?

4       A.      Because I no longer train or practice in Connecticut.

5       Q.      What were the circumstances of not being licensed

6    anymore in Connecticut?

7       A.      I had no desire to continue dual licensure in the

8    fair state of Connecticut.

9       Q.      Have you ever been the first doctor who diagnosed

10   diabetes in a patient?

11      A.      Yes.

12      Q.      How many times?

13      A.      Don't know.

14      Q.      Your attachment -- let's see.  Attachment C of your

15   expert report has the heading "Archival Information Reference

16   Exhibit List."

17      A.      Yes.

18      Q.      Can you tell us what that is?

19      A.      That is a list of the materials provided to me by the

20   attorneys.

21      Q.      Did you review everything on that list?

22      A.      No, I did not.

my101308.txt
```
23       Q.    Okay.  I'm going to hand you a red pen.  I'm going to

24  ask you if you would go through Attachment C and put a

25  checkmark by everything that you did review, as best you can
```

♀

                                                                    31


```
 1  recall.

 2       A.    That would take hours and cross-referencing what's on

 3  the disk, sir.

 4       Q.    Well, it's 18 pages and, you know, just do the best

 5  you can.

 6             MR. FIBICH:  Here's that bill we got for you.

 7             MR. RABER:  Thank you, Tommy.

 8             THE WITNESS:  I did provide it.

 9             MR. FIBICH:  Huh?

10             THE WITNESS:  I did provide it.

11             (Young Exhibit No. 4 marked.)

12             MR. FIBICH:  While you're doing that, I'm going

13  to take a short break.

14             (Recess at 9:44 a.m.)

15       Q.    (BY MR. RABER)  Okay.  Doctor, is it easier for you,

16  you think, to identify what you did not review?

17       A.    I think what might be helpful here is putting a plus

18  by what I remembered I did review and a minus by what I

19  remember I clearly did not review --

20       Q.    Okay.  Let's do that.

21       A.    -- with or without question marks for what I'm not

22  sure.

23       Q.    And if you want to -- let's do it this way, if you

24  agree to this:  Put a plus by the materials you remember

25  reviewing --
```
                              Page 28

my101308.txt

♀

32

1        A.    Yes, sir.

2        Q.    -- a minus by the ones that you did not remember

3    reviewing, and a question mark if you're not sure.

4        A.    Sure.   That's fair.

5        Q.    Okay.

6              (Recess from 9:45 a.m. to 9:47 a.m.)

7        A.    Want clarification?

8        Q.    (BY MR. RABER)  Yes, sir.

9        A.    For these studies, I did not -- on some of them, I

10   reviewed the whole study.   On some of them, I just reviewed the

11   abstracts or synopsis.

12       Q.    Okay.

13             (Recess from 9:47 a.m. to 10:08 a.m.)

14       Q.    (BY MR. RABER)  Okay.  Dr. Young, just so the

15   record's clear, you have gone through the Attachment C of your

16   expert report and put a plus sign next to items that you recall

17   reviewing, you've put a minus sign next to items that you do

18   not recall reviewing, and you've put a question mark next to

19   those items for which you can't remember whether or not you

20   reviewed them.  Is that a fair summary?

21       A.    Yes, sir.

22       Q.    And on a few occasions, it looks like you've drawn a

23   line.  I'm looking, for example, on Page 5 of 18 where you have

24   a question mark at the top, a question mark at the bottom, and

25   a line connecting the two.  Does that indicate that all of them

♀

33

my101308.txt

```
 1   are a question mark?
 2        A.   Yes, sir.
 3        Q.   Okay.  If you could put that back with that
 4   attachment, in that exhibit.  Here.  It's part of this one
 5   here.
 6        A.   Part of the same exhibit?
 7        Q.   Yes.  It's an attachment.
 8             MR. FIBICH:  All marked as one.
 9             THE WITNESS:  This is all one exhibit?
10        Q.   (BY MR. RABER)  Dr. Young, did you see your report
11   before it was sent out?
12        A.   Yes.  I wrote it.
13        Q.   Did you see it with all the attachments?
14        A.   I attached them, yes; except for the protective
15   order, which the attorney already had.
16        Q.   But you didn't prepare Attachment C, did you, which
17   is the reliance -- the reference list we just looked at?
18        A.   That's correct.  I did not prepare that.
19        Q.   Now, for some reason, one of the pages has
20   disappeared.  Is that -- what's that to your right there?
21        A.   Oh, I'm sorry.  That's Page 1 of 18.
22        Q.   Dr. Young, how were you retained in this case?
23        A.   I was approached by Mr. Fibich.
24        Q.   Had you ever worked with him before?
25        A.   Yes.
```

♀

34

```
 1        Q.   All right.  In what context?
 2        A.   Years ago on a hospital case, or cases.
 3        Q.   What was the nature of the case, in general?
```
Page 30

my101308.txt

4       A.      I think inappropriate hospitalization or confinement.

5       Q.      How much expert witness work have you done in the

6  last ten years?

7       A.      You mean testifying, per se, or reviewing documents?

8       Q.      Well, let's start with testifying.

9       A.      Not all that much.

10      Q.      Okay.  What --

11      A.      I believe I provided a list of cases I have testified

12  to in the past --

13      Q.      Four years?

14      A.      -- four years.

15      Q.      Okay.  Well, let's look at that then.  Well, let me

16  ask you this first:  Do you advertise your services as an

17  expert witness?

18      A.      No, I do not.

19      Q.      Let's look at the attachment to Exhibit 3 which sets

20  forth your list of testified cases in the past four years, and

21  I just want to ask you a few questions about that.

22      A.      Sure.

23      Q.      You've listed four cases there.  Can you describe the

24  nature of those four cases that are listed on the attachment,

25  starting with the Kelley case?

♀

                                                            35

1       A.      Kelley -- the Ford Motor Company deposition,

2  12-10-04, evaluation of children following maternal death in

3  motor vehicle accident.

4       Q.      What was the nature of your testimony?

5       A.      I believe it had to do with the effects of loss of a

6  primary caretaker on a child.

                              Page 31

my101308.txt

7      Q.     Their psychiatric health?

8      A.     Yes, and their academic functioning, I believe.

9      Q.     Then there's the appeal of Catherine Crump that's

10   referred to there.  Can you tell us the nature of your

11   testimony in that case?

12     A.     Yes.  It was at an administrative hearing regarding

13   insurance company or third-party payor denial of treatment

14   benefits.

15     Q.     The next case involves the Scheinbaum minor children.

16   Can you tell us the nature of your testimony there?

17     A.     Yes.  I was talking about diagnoses and relevance, or

18   lack thereof, to parenting ability.

19     Q.     And the last case listed is the Ybarra, Y-b-a-r-r-a,

20   case.  What was the nature of your testimony there?

21     A.     That was a capital habeas case.

22     Q.     Were you testifying about someone's mental capacity,

23   or what was the nature of it?

24     A.     It was an Atkins evidentiary hearing involving the

25   issue of whether the defendant was mentally retarded and,

♀

36

1    therefore, excluded from capital sentencing.

2      Q.     Have you ever testified as an expert witness in the

3    area of pharmaceutical drugs?

4      A.     No.

5      Q.     Have you ever testified as an expert witness relating

6    to FDA rules and regulations?

7      A.     No.

8      Q.     Have you ever testified as an expert witness in the

9    area relating to the labeling of prescription drugs, either in

Page 32

my101308.txt

10    the United States or anywhere else in the world?

11        A.    No.

12        Q.    Have you ever testified as an expert witness as to

13    the cause or causes of somebody developing diabetes?

14        A.    No.

15        Q.    I want to show you a document that's been marked as

16    Young Exhibit 4.  Is that the -- a copy of the bill that you've

17    sent for your work so far on the case?

18        A.    Yes, it is.

19        Q.    I notice that the statement -- the bill is dated

20    August 12th, 2008.  Do you see that?

21        A.    Yes, I do.

22        Q.    I also see that there's time on that bill for work

23    done that's dated both August 21st and September 2nd, 2008.

24    Can you explain that?

25        A.    Sure.

♀

                                                              37

1        Q.    Okay.  Please do.

2        A.    Sure.  The date is wrong.

3        Q.    Okay.  The date on the statement?

4        A.    Yes.

5        Q.    Okay.  Now, does Exhibit 4 represent the totality of

6    work that you performed in the Seroquel litigation up to

7    September 2nd of 2008?

8        A.    Yes.

9        Q.    Can you tell us how much you've -- time you've spent

10    between September 2nd, 2008, and today?

11        A.    I could guesstimate.

12        Q.    What's your best estimate?

my101308.txt

13          A.    My best estimate would be somewhere between 2 and 10

14    hours, maybe 12 hours.

15          Q.    Doctor, I want to go back to your report, and

16    specifically I want to ask you about Attachment D, which is

17    captioned "Treatment Chronology of Richard Unger."

18          A.    Yes, sir.

19          Q.    Do you see that?

20          A.    I do.

21          Q.    Who prepared Attachment D?

22          A.    My understanding is Ms. Grainger prepared that.

23          Q.    Ms. Grainger is a nurse who works for the plaintiffs'

24    law firm?

25          A.    Yes, sir, that's correct.

♀

                                                                    38

1           Q.    Did you provide any input into the preparation of

2     Attachment D?

3           A.    No, I did not.

4           Q.    How did you use Attachment D in forming your opinions

5     in this case?

6           A.    After I reviewed the clinical record of Richard Unger

7     and the depositions of Mr. Unger, his wife, and Mr. Unger's

8     doctors, I requested assistance with a timeline or chronology

9     in order to assist me in preparation of my report.

10          Q.    Okay.  Well, I notice the date of Attachment D is

11    June 29th of 2008.  Do you see that?

12          A.    I see that, yes, sir.

13          Q.    And that appears to be before the first notation you

14    have on your bill, which is July 2008.

15          A.    Yes, it does.

my101308.txt

16     Q.     Okay.  So, do you know anything about the

17  circumstances under which Attachment D was prepared by

18  Ms. Grainger?

19     A.     The specific circumstances, no.

20     Q.     And did you feel like Attachment D gave you

21  sufficient information about the treatment chronology of

22  Mr. Unger in order to develop and form your opinions?

23             MR. FIBICH:  Object to form.

24     A.     Sufficient, no; contributory, yes.

25     Q.     (BY MR. RABER) Dr. Young, what is the nature of your

♀

                                                39

1   current practice?

2      A.     I am in the private practice of psychiatric medicine

3   in Houston, Texas.

4      Q.     What kinds of patients do you treat?

5      A.     I treat a broad spectrum of patients, couples, and

6   families.

7      Q.     Do you treat any patients with bipolar disorder,

8   major depression, or schizophrenia?

9      A.     Yes, all the above.

10     Q.     Do you treat children, adults, or both?

11     A.     Both.

12     Q.     How long have you been in private practice in Houston

13  doing what you're doing now?

14     A.     Approximately since 1984.

15     Q.     Dr. Young, do you currently prescribe any -- well,

16  strike that.

17             Are you familiar with the class of medicines

18  known as the atypical antipsychotics?

my101308.txt

19        A.    Yes, I am.

20        Q.    And those medicines include drugs like olanzapine,

21   risperidone, Seroquel, Geodon, and Abilify, correct?

22        A.    Yes, among others.

23        Q.    Okay.  Do you currently prescribe any of the atypical

24   antipsychotics in your work?

25        A.    Yes.

♀

                                                         40

1        Q.    Do you currently prescribe Seroquel for any patients?

2        A.    Yes.

3        Q.    And what are the reasons for your prescribing

4   Seroquel to at least some of your patients?

5        A.    Following a risk-benefit analysis, I believe it's the

6   most appropriate medication and/or they have come to me on that

7   medication.

8        Q.    Is there any particular type of patient for whom

9   you've determined that the benefits of Seroquel outweigh the

10   potential risks?

11        A.    Yes.

12        Q.    What is that?

13        A.    Patients who've had a poor response to other

14   medications, patients who are not demented, patients who do not

15   have diabetes or prediabetes, patients who do not have family

16   histories of diabetes, patients who are not obese or morbidly

17   obese, patients who require an antipsychotic who need sedation

18   or major tranquilization, and patients who do not have

19   metabolic syndrome, dyslipidemias, or hyper- or proinflammatory

20   states.

21        Q.    Do you ever prescribe Seroquel off-label?

Page 36

my101308.txt

22        A.    Less so, but, yes.

23        Q.    Okay.  And what kinds of off-label uses do you

24   prescribe Seroquel for?

25        A.    I don't know that I'm doing that currently, but what

♀

                                                                41

1    I used to do was sometimes prescribe Seroquel off-label for

2    people with insomnia.

3         Q.    Did you find that it was effective for that

4    particular use?

5         A.    Yes.

6         Q.    Are you offering an opinion in this case that there

7    is anything improper about using Seroquel in an off-label

8    manner like that?

9         A.    It may be improper, given the issues with respect to

10   dose-dependent weight gain or metabolic conditions or

11   conditions of hyperglycemia or diabetes or prediabetes.  That

12   would affect my risk-benefit analysis.

13        Q.    But I'm talking about the off-label, per se, as

14   opposed to all the other factors you've just identified.  Are

15   you going to offer an opinion that the prescription of Seroquel

16   for off-label purposes is, in and of itself, improper?

17        A.    No, I'm not going to offer that opinion.

18        Q.    Okay.  It would depend on the facts and circumstances

19   of each patient.  Is that fair to say?

20        A.    That's correct.

21        Q.    Now, you mentioned that you -- one category of

22   patients that you at least don't or try not to prescribe

23   Seroquel for are people who have diabetes or prediabetes; is

24   that correct?

                                    Page 37

my101308.txt

25          A.    That's correct, or family histories of.

♀

                                                                            42

1           Q.    Okay.   What anti -- what atypical antipsychotic, if
2     any, do you prescribe to patients falling into those
3     categories?
4           A.    I've been moving away from the atypicals -- and I
5     prefer to call them second-generation antipsychotics because,
6     over time, I think the atypicals are more typical than atypical
7     compared to the first-generation antipsychotics.
8                 Within the atypicals, I've moved towards Abilify
9     and Geodon and -- I don't think I've prescribed Invega, as yet.
10    It's still new to me and I'm still learning about it.   However,
11    my general trending has been to go back to the typicals, or
12    first-generation antipsychotics, because of efficacy, safety,
13    tolerability, and cost concerns.
14          Q.    Is there any particular first-generation
15    antipsychotic that you're moving toward?
16          A.    Yes.
17          Q.    Which one?
18          A.    Trilafon.   I've also prescribed Navane, or
19    thiothixine, and -- let me see.   Those would be the two main
20    ones.
21          Q.    Do you understand that Abilify and Geodon carry the
22    same warning as Seroquel relating to diabetes and
23    hyperglycemia?
24          A.    I understand.
25                MR. FIBICH:   Object to form.

♀

                                Page 38

my101308.txt

43

1      Q.    (BY MR. RABER)  Does Trilafon carry a warning

2    relating to diabetes or hyperglycemia?

3      A.    It may be in the adverse events or reactions; but

4    whether it has a separate warning, per se, I don't recall.

5      Q.    How do you assess that information in the adverse

6    events section of the label?

7      A.    With difficulty.

8      Q.    Okay.  Explain.

9      A.    Typical product information or package insert or

10   Physician Desk Reference information is in -- on average, four

11   to six pages in the Physician's Desk Reference, in small print,

12   close to the binding or not.  In the adverse event section, the

13   information is not alphabetized.  So, in attempting to compare

14   years or medications for -- to compare and contrast that is

15   difficult.

16     Q.    Who sets the format for the label that you just

17   referred to, the FDA or the pharmaceutical company?

18     A.    I don't know.

19     Q.    Are there rules and regulations that apply to the

20   format of an FDA label?

21     A.    Yes, and they have changed over time, and I did not

22   take the time at this juncture to look at the history of FDA

23   regulation as it relates to this matter.

24     Q.    Do you hold yourself out as an expert in the area of

25   FDA labeling of prescription drugs?

♀

44

1                    MR. FIBICH:  Object to form.

Page 39

my101308.txt

```
 2        A.    Per se, no.

 3        Q.    (BY MR. RABER)  Do you hold yourself out as an expert

 4   in the area of the foreign labeling of prescription drugs?

 5               MR. FIBICH:   Object to form.

 6        A.    No.

 7        Q.    (BY MR. RABER)  Have you ever worked for the FDA?

 8        A.    No.

 9        Q.    Have you ever drafted an FDA label for a prescription

10   drug?

11        A.    No, I have not.

12        Q.    Have you ever dealt with the FDA in any way in --

13   with respect to the labeling of a prescription drug?

14        A.    I e-mailed the FDA in this matter to inquire as to

15   information they had about Seroquel and diabetes in their

16   consumer e-mail capacity.

17        Q.    Did you get a response?

18        A.    No.

19        Q.    I'd like to show you -- I think that e-mail --

20               MR. RABER:   Tommy, do you mind if I come around

21   and show him the e-mail?

22               MR. FIBICH:  No.

23        Q.    (BY MR. RABER) Okay.  Doctor, I'm showing you what

24   looks like an e-mail from Exhibit 2 dated August 14th, 2008,

25   8:43 a.m., addressed "To Whom It May Concern," and says
```

                                                                45

```
 1   "Sincerely, Mitchell Alan Young."  Do you see that?

 2        A.    Yes, I do.

 3        Q.    Is that the e-mail that you sent to the FDA

 4   requesting information about Seroquel and diabetes?
```

Page 40

my101308.txt

5          A.    Yes, it is.   And I think this is the drug development

6     or regulatory cites for bringing new medication to market or

7     regulatory oversight for that, yes.

8          Q.    Okay.   In your e-mail to the FDA, you say, "To Whom

9     It May Concern:   Given considerable and increasing on- and

10    off-label usage of Seroquel, as a practicing psychiatrist, I am

11    concerned about Seroquel causing or exacerbating diabetes.   Any

12    published studies or studies in progress," question mark.

13    "Base rates of diabetes in the general or healthy population

14    versus schizophrenic versus bipolar population versus those

15    receiving atypical antipsychotics," parentheses,

16    "second-generation," close parentheses, "Seroquel, in

17    particular," question mark.   "Thank you very much.   Sincerely,

18    Mitchell Alan Young, M.D."

19               Have I read that correctly?

20         A.    Yes.

21         Q.    Now, how come you didn't tell the FDA that you had

22    been hired as an expert witness for plaintiffs in litigation

23    relating to Seroquel?

24               MR. FIBICH:   Object to form.

25         A.    Didn't occur to me.

♀

                                                              46

1          Q.    (BY MR. RABER)  The truth is you weren't writing that

2     as a practicing psychiatrist, you were writing that as an

3     expert witness, weren't you?

4          A.    I am a practicing psychiatrist and expert witness, so

5     I fail to understand how I could divorce those two.

6          Q.    Sir, you wrote to the FDA in your capacity as an

7     expert witness, didn't you?

my101308.txt

```
 8                    MR. FIBICH:   Object to form.
 9         A.    I think I answered your question, that I cannot
10   divorce being a practicing psychiatrist from being an expert
11   witness.
12         Q.    (BY MR. RABER)  Have you ever made a similar request
13   like that to the FDA?
14         A.    No.   What I did do and the reason I did write is I
15   thought, gee, independent of all the materials that have
16   provided me, as a practicing psychiatrist, if I wanted
17   information about these issues, what would a reasonably prudent
18   individual do?  Write them an e-mail.  So, I did.
19         Q.    Okay.  In your experience with patients for whom
20   you've prescribed Seroquel, has it been a good medicine?
21                    MR. FIBICH:   Object to form.
22         A.    In some ways, yes, and some ways, no.
23         Q.    (BY MR. RABER)  Has it helped some of your patients?
24         A.    Yes.
25         Q.    Is it important for you, as a practicing
```

♀

47

```
 1   psychiatrist, to have a choice of medications?
 2         A.    Yes.
 3         Q.    Is that because some medications work better than
 4   others with certain patients?
 5         A.    Yes.
 6         Q.    And you've made the judgment that for at least some
 7   of your patients, Seroquel is their best option, correct?
 8         A.    Correct.
 9         Q.    What are some of the significant risks of prescribing
10   first-generation antipsychotics to your patients?  And I
```

Page 42

my101308.txt

11    include Trilafon in that question.

12         A.    The emphasis on the first -- of the risks of the

13    first-generation antipsychotics, also known as major

14    tranquilizers, neuroleptics, or neurologic disease-producing or

15    ataractic -- which is another way to say tranquilizer --

16    basically emphasized tardive dyskinesia, a potentially

17    irreversible movement disorder; neuroleptic malignant syndrome;

18    and extrapyramidal symptoms.

19         Q.    Are those three side effects, tardive dyskinesia and

20    neuroleptic malignant syndrome and EPS, serious potential side

21    effects?

22         A.    Yes.

23         Q.    Were they among the reasons why scientists developed

24    the second-generation antipsychotic drugs --

25         A.    Yes.

♀

                                                                    48

1          Q.    -- to avoid those complications?

2          A.    To attempt to avoid those, yes.

3          Q.    And do you believe that they've been successful in

4    doing that?

5          A.    No, I do not.

6          Q.    Does that put you in the minority view?

7                MR. FIBICH:   Object to form.

8          A.    Compared to whom?

9          Q.    (BY MR. RABER)   Compared to the American Diabetes

10    Association, the American Psychiatric Association, for example.

11         A.    I'm not sure --

12               MR. FIBICH:   Object to form.

13         A.    -- what the current state of the art or

                                Page 43

my101308.txt

14  recommendations are with my colleagues or professional

15  associations with the increasing research and data that has

16  been showing that "new and improved" is really same and

17  potentially worse.

18      Q.   (BY MR. RABER)  Has the American Psychiatric

19  Association identified the second-generation atypicals,

20  including -- or antipsychotics, including Seroquel, as

21  first-line treatment?

22      A.   Independent of the Catie study and the National

23  Institute of Mental Health data, I don't know.  I hope not.

24      Q.   But you can't say one way or the other?

25      A.   With respect to a position paper by the American

♀

49

1   Psychiatric Association, in a blanket way, comparing first- and

2   second-generation antipsychotics, no.

3       Q.   Well, I didn't ask you for all those qualifiers, sir.

4   My question is very simple.  Is there an APA guide or

5   publication that recommends second-generation antipsychotics as

6   first-line therapy or treatment?

7       A.   It's not a simple question, sir.

8       Q.   Are you aware of any such guideline that exists?

9       A.   There are multiple treatment guidelines.  With

10  respect to a blanket American Psychiatric Association guideline

11  that states second-generation first, first-generation second,

12  no, I'm not aware of that.

13      Q.   In your practice, do you use the first-generation

14  antipsychotics as your first line of treatment?

15      A.   Sometimes, yes.

16      Q.   Under what circumstances?

Page 44

my101308.txt

17    A.    Under circumstances where there are -- the individual

18  is new to treatment, under circumstances where they have issues

19  with respect to metabolic syndrome or diabetes, under

20  circumstances with respect to cost.

21    Q.    Does Trilafon cause weight gain?

22    A.    It can.

23    Q.    In how many patients and in what amount?

24    A.    Don't know.

25    Q.    Is it as much as 25 percent of patients?

♀

50

1     A.    Don't know.

2     Q.    What's been your clinical experience?

3     A.    Weight gain with Trilafon has not been significant.

4   I haven't used it much, but the only antipsychotic I'm aware of

5   that still remains untainted with respect to weight gain --

6   and, again, predicting to the group as opposed to the

7   individual -- would be Moban, or molindone.

8     Q.    And what do you mean when you say "predicting as to

9   the group as to the individual"?

10    A.    Science, as a whole, is basically geared or better at

11  predicting to the group versus the individual.

12    Q.    And what do you mean by that?

13    A.    I think it speaks for itself.

14    Q.    Are you saying then that it's difficult to attribute

15  cause of weight gain to a particular patient as opposed to a

16  large population of people, on average?

17    A.    I think it's a different process.

18    Q.    How does it differ?

19    A.    Well, you can certainly have case studies regarding

my101308.txt

20  individuals or groups of small individuals.  You would then

21  raise issue with respect to the power/ability of that to

22  predict large groups of people.  So, too, if you have large

23  case studies looking at larger ends where subjects or groups of

24  people, you can potentially apply that to the individual, but

25  you would have to take the individual considerations into

♀

51

1  account.

2              You can't automatically predict to the

3  individual from a group or predict from a group to the

4  individual.

5      Q.   Doctor, would you agree with me that when you're

6  looking at data from studies, that it's better to consider more

7  data as opposed to a smaller subset of data?

8      A.   Generally speaking, yes, that's true.

9      Q.   Are you familiar with the concept of a pooled

10  analysis or a meta-analysis?

11      A.   Yes, I am.

12      Q.   And would you agree with me that a larger pooled

13  analysis or meta-analysis provides better information than an

14  individual study?

15              MR. FIBICH:  Object to form.

16      A.   It may or may not, depending, in part, by who is

17  funding that analysis, what the internal or external biases may

18  be.  And I recall recently reading one article poor-mouthing

19  meta-analyses as opposed to analyses.

20      Q.   (BY MR. RABER)  Are you an epidemiologist?

21      A.   I'm a student of epidemiology.  No, I am not holding

22  myself forth or promoting to the public that I am an

Page 46

my101308.txt

23   epidemiologist.

24       Q.    In forming your opinions -- well, strike that.

25             Can you tell me what the Bradford Hill criteria

♀

52

1    are?

2        A.    Yes.

3        Q.    What are they?

4        A.    I believe Bradford Hill was a British epidemiologist,

5    and those are criteria of causation.

6        Q.    Did you apply any Bradford Hill criteria in forming

7    the opinions you have in this case?

8        A.    Yes.

9        Q.    How did you do that?

10       A.    How did I do what?

11       Q.    Apply the Bradford Hill criteria.   What are they?

12       A.    Six, seven, eight, nine of them.   They include things

13   like temporal association, coherence, specificity, scientific

14   studies, and the others I don't recall at the moment.

15       Q.    Did you do that in writing anywhere?

16       A.    Did do I what in writing anywhere?

17       Q.    Apply the Bradford Hill criteria in writing anywhere.

18       A.    I think in my opinion that Seroquel caused diabetes,

19   yes, in my written report.

20       Q.    Okay.   So, to the extent you applied the Bradford

21   Hill criteria, that would be set forth in your expert report.

22   That's your testimony?

23       A.    No, that is not my testimony.

24       Q.    Okay.   Well, what is it?  Where -- if I want to see

25   how Dr. Young applied the Bradford Hill criteria, what would I

my101308.txt

♀

1    look at?

2        A.    My report.

3        Q.    Okay.  Anything else?

4        A.    I'm not sure what you're speaking to.

5        Q.    Well, I'm just -- if I want to know how did Dr. Young

6    apply the Bradford Hill criteria to any plaintiff in this case,

7    what do I look at to determine that?  You've said your report,

8    and my question is:  Any other documents?

9        A.    Yes.

10       Q.    What?

11       A.    In the material I supplied to you today entitled

12   "Seroquel Product Liability Litigation Terms of Art" --

13       Q.    Okay.

14       A.    -- I have listed Hill's criteria -- or Bradford --

15   Austin Bradford Hill criteria in the document I provided you.

16       Q.    Okay.  When did you do that?

17       A.    When did I do what?

18       Q.    Apply the Bradford Hill criteria.

19       A.    It -- I'm not sure how I would answer that --

20       Q.    Well, the document you're referring to is a document

21   you handed me today.

22       A.    Right.

23       Q.    And my question to you is:  When did you actually

24   apply the Bradford Hill criteria in any way to either plaintiff

25   in this case?

♀

my101308.txt

1        A.    From the get-go 'til now, because causation is an

2    important issue in this matter, as is duty to warn or provide

3    appropriate information to prescribing physicians and

4    consumers.

5        Q.    Do you hold yourself out as an expert in warnings to

6    physicians?

7                MR. FIBICH:   Object to form.

8        A.    I'm not sure how to answer that question.

9        Q.    (BY MR. RABER)   Okay.   What's a changes being

10   effected?

11       A.    Pardon me, sir?

12       Q.    What is a changes being effected?   Do you know what

13   that is?

14       A.    A changes being effected?

15       Q.    Right.

16                MR. FIBICH:   Object to form.

17       Q.    (BY MR. RABER)   Or abbreviated as CBE.   Do you know

18   what that is?

19                MR. FIBICH:   Object to form.

20       A.    Not without a context.

21       Q.    (BY MR. RABER)   How about FDA labeling.   That's the

22   context.   Do you know what a CBE, or changes being effected,

23   is?

24       A.    In relationship to FDA labeling?

25       Q.    Right.

♀

                                                              55


1        A.    Maybe.

2        Q.    What is it?

3        A.    Sounds like a work in progress.

Page 49

my101308.txt

4        Q.    Can you add to that anything else?

5        A.    Not at this time.

6        Q.    Do you hold yourself out as an expert in determining

7    what is an appropriate warning to provide to prescribing

8    physicians in the FDA system?

9                  MR. FIBICH:   Object to form.

10       A.    I have expertise in that area.

11       Q.    (BY MR. RABER)  What is that?

12       A.    As a psychiatric physician in practice for about 30

13   years in one capacity or another, I rely or depend upon

14   accurate information versus misinformation versus misdirection.

15       Q.    How does that make you an expert?

16       A.    I didn't finish my answer, sir.

17       Q.    Okay.

18       A.    And for 30 years have done risk-benefit analyses,

19   both in treatment and, to the extent I've done some teaching in

20   that time, to physician and non-physician colleagues in mental

21   health and/or the community and/or schools about the use of

22   medications, and psychotropic or psychiatric medications in

23   particular, that -- and, in general, as a physician, under the

24   principle of primum non nocere -- or first of all, do no

25   harm -- that warnings are important.

♀

                                                              56

1        Q.    What's the FDA standard for giving a warning about a

2    drug?

3                  MR. FIBICH:   Object to form.

4        A.    The specific standard about warning and whether it is

5    black box or not versus -- in other words, absolute versus

6    relative, contraindication versus warning versus adverse event

                              Page 50

my101308.txt

7    and how that sorts out, my understanding is that is a

8    complicated and -- that is a complicated process that involves

9    the politics of regulation and the economics of marketeering.

10        Q.   (BY MR. RABER)  It's a complicated process about

11   which you're not an expert.  Is that fair to say?

12        A.   I do not hold myself forth as an FDA expert, that is

13   correct.

14        Q.   And particularly as it relates to labels and

15   warnings, correct?

16             MR. FIBICH:   Object to form.

17        A.   As a consumer, I will say I have -- and as a

18   prescribing physician, I say -- I would say I have considerable

19   expertise, but do not present myself as an expert, per se, or

20   advertise as such.

21        Q.   (BY MR. RABER)  Have you ever been a defendant in a

22   lawsuit?

23        A.   I don't think so.

24        Q.   Do you hold yourself out as an expert in

25   pharmacology?

♀

                                                                57

1              MR. FIBICH:   Object to form.

2         A.   Yes and no.

3         Q.   (BY MR. RABER)  Okay.  How are you an expert in

4    pharmacology?

5         A.   I've been studying, practicing, and prescribing in

6    the pharmacologic area for 30-plus years.

7         Q.   Have you ever studied the topic of pharmacology in

8    terms of formal training?

9         A.   Yes.

                          Page 51

my101308.txt

```
10        Q.    Are you familiar with the pharmacology of Seroquel?

11        A.    Yes.

12        Q.    What is it?

13        A.    I wouldn't know where to begin to answer that broad a

14   question, sir.

15        Q.    Can you generally describe the pharmacology of

16   Seroquel?

17        A.    Can I generally --

18        Q.    Yeah.

19        A.    -- describe it?  Yes.

20        Q.    Okay.   What?

21        A.    The brand name is quetiapine.

22        Q.    Actually, it's quetiapine.  Go ahead.

23        A.    Please go ahead.

24        Q.    No.  Go ahead.

25        A.    After you.
```

♀

58

```
1         Q.    Please describe for us the pharmacology of Seroquel,

2    or quetiapine, if that's how you want to refer to it.

3         A.    Quetiapine?  Is that what you're telling me is the

4    proper pronunciation?

5         Q.    Yes.

6         A.    Okay.  Say again, please.

7         Q.    Quetiapine.

8         A.    Quetiapine fumarate?

9         Q.    Close enough.

10        A.    The proper pronunciation being?

11        Q.    I said it's close enough.

12        A.    Okay.
```
                                Page 52

my101308.txt

13      Q.    Okay.  Let's hear the pharmacology of it.

14      A.    It is a -- in the general class of medications known

15   as antipsychotics.  It is a -- correct me on my pronunciation

16   of this, too, please, sir -- dibenzothiazepine.

17      Q.    Okay.

18      A.    Is that close enough?

19      Q.    Close enough.

20      A.    Thanks.  It is currently FDA approved for the

21   treatment of schizophrenia.

22      Q.    My question is the pharmacology, not what the FDA

23   approvals are.  I want to know what the pharmacology is,

24   because you've said you have some expertise in pharmacology.

25      A.    It is a D2 antagonist.  It has some serotonergic

♀

                                                                59


1   effect.  It has relatively low muscarinic and anticholinergic

2   effect.  It's sedating, so it has some histamine receptor

3   effects.  The exact mechanism of action is not known.

4      Q.    Okay.

5                MR. FIBICH:  When you get a chance, I need to

6   take a restroom break.

7                MR. RABER:  All right.  Let's take a break now

8   then.

9                (Recess from 10:53 a.m. to 10:59 a.m.)

10      Q.    (BY MR. RABER)  Dr. Young, do you hold yourself out

11   as an expert in the marketing of pharmaceutical products?

12                MR. FIBICH:  Object to form.

13      A.    I have some specialized knowledge and experience, on

14   the one hand.  On the other hand, I do not advertise or market

15   myself as an expert.

                            Page 53

my101308.txt

16      Q.      (BY MR. RABER)  What's your specialized knowledge and

17      experience in the area of pharmaceutical -- the marketing of

18      pharmaceutical products?

19      A.      Back when I was medical director of Houston

20      operations for Prudential Psychiatric Management, I was asked

21      as the medical director by one of the national organizations

22      about creating or managing pharmacy benefits and was there on

23      the front end of that issue or the so-called managed pharmacy

24      or pharmacy benefit plans, and so I had some activity related

25      to the issue of marketing pharmaceuticals and costs therein.

♀

                                                                    60

 1      Q.      When did -- when was that experience?

 2      A.      May I refresh my memory with my vitae?

 3      Q.      Sure.

 4      A.      Was it the Nineties?  Let me take a look, not guess.

 5      Q.      It's probably in your report, which is this right

 6      here.

 7      A.      There we go.  Thank you, sir.

 8              Early Nineties, '92 to '96.

 9      Q.      Is that the sum and substance of the specialized

10      knowledge and experience you claim to have in the area of

11      pharmaceutical marketing?

12      A.      No, that's not the sum and substance.

13      Q.      What other specialized knowledge and experience do

14      you have in the area of the marketing of pharmaceutical

15      products?

16      A.      I've been a recipient or targeted consumer of

17      pharmaceutical marketing for 30-plus years.

18      Q.      Anything else?

                            Page 54

my101308.txt

```
19        A.    No.
20        Q.    What's DDMAC, D-D-M-A-C?
21              MR. FIBICH:  Object to form.
22        A.    Without a context, don't know.
23        Q.    (BY MR. RABER)  FDA is your context.
24        A.    Food and Drug Administration.
25        Q.    Right.  What's DDMAC in that context?
```

♀

61

```
1         A.    Don't know.
2         Q.    Do you hold yourself out as an expert in the area of
3    assessing company conduct or ethics?
4         A.    I have some experience training and knowledge in
5    those areas but do not hold myself forth, per se, as an expert
6    in that area.
7         Q.    Do you hold yourself out as an expert in assessing or
8    interpreting internal company documents?
9              MR. FIBICH:  Object to form.
10        A.    Same answer.
11        Q.    (BY MR. RABER)  Okay.  Is Seroquel a bad drug?
12        A.    What do you mean by "bad," sir?
13        Q.    Is it an unsafe drug?
14        A.    In some respects, yes.
15        Q.    Okay.  But there are some cases where you've felt
16   that it was safe and effective when you balanced the risks
17   against the benefits?
18        A.    Correct.
19        Q.    Do you know a Dr. Wirsching?
20        A.    I know of him.
21        Q.    And are you familiar with his reputation in the field
```

my101308.txt

22    of psychiatry?

23         A.    Somewhat.

24         Q.    Is he someone whose opinions you respect?

25         A.    Yes.

♀

                                                          62

1          Q.    Did you read his deposition in this case?

2          A.    Yes.

3          Q.    Is there anything that stands out -- I know I don't

4    want to ask you about everything.   Is there anything that

5    stands out from his deposition that you disagree with?

6                MR. FIBICH:   Object to form.

7          A.    That's a tough question.   In many, if not most,

8    respects, I agreed with Dr. Wirsching.   And certainly

9    Dr. Wirsching has areas of expertise and knowledge that I

10   don't.   With respect to the issue of how things got to this

11   point, I think there was some disagreements.

12         Q.    (BY MR. RABER)   What do you mean, how things got to

13   this point?   What are you talking about?

14         A.    Although metabolic syndrome has been associated with

15   first-generation antipsychotics, I don't ever recall that being

16   an issue before -- or a prominent issue before the development,

17   marketing, and consumption of second-generation antipsychotics.

18   I also think that over time the division between mind and body

19   or psychiatric and internal or physical medicine has been fast

20   eroding; and that in traditional psychiatric training, there

21   was -- there was and, to some extent, continues to be a

22   division between mental disorders and physical disorders and,

23   as a result of that, psychiatrists are, at times, less

24   attentive to monitoring the physical parameters than they

                            Page 56

my101308.txt

25      should be.

1       Q.    Were Mr. Unger and Ms. Whittington monitored for

2   their blood glucose?

3       A.    Yes.

4       Q.    I want to turn, if we can, to your report.  I have

5   some questions about it.  It's Exhibit 3 right here.

6       A.    Thank you.

7       Q.    Looking at Page 2 of your report, you talk about the

8   current Diagnostic and Statistical Manual of Mental Disorders.

9   Do you see that?

10      A.    Yes, sir.

11      Q.    Now, would you agree with me that in diagnosing

12  psychiatric disorders, that the lines can sometimes be blurry?

13      A.    Just like in diagnosing in medicine in general.

14      Q.    Okay.  So, for example, someone who is in a

15  depressive cycle of manic -- of bipolar disorder, that that

16  line can be maybe blurred with someone who has major depressive

17  disorder?

18      A.    Could you ask your question again, please, sir?

19      Q.    Are -- just as an example of blurred lines, can major

20  depressive disorder look a lot like the depression that occurs

21  in bipolar disorder?

22      A.    They can coexist, or so-called double depression, or

23  you can have a depression -- we used to call it exogenous

24  versus endogenous depression.  You can have a low-grade

25  depression superimposed -- or so-called dysthymias superimposed

my101308.txt

64

1    on bipolar disorder or so-called double depression or having

2    major and minor depression at the same time.

3         Q.    I'd like you to turn to Page 4 of your report, if you

4    would.  On Page 4 in that first big paragraph, you write

5    "Seroquel was initially approved by the U.S. Food and Drug

6    Administration in 1997 for the sole indication of treating

7    schizophrenia in adults, a relatively rare condition."

8              Do you see that?

9         A.    Yes.

10        Q.    Are you familiar with the standard that the FDA

11   applies in approving an indication for a drug?

12        A.    Somewhat.

13        Q.    Have you heard the phrase "safe and effective for use

14   as labeled"?

15        A.    Yes.

16        Q.    Okay.  And did you understand that when the FDA

17   approved Seroquel in 1997, that it was concluding that, based

18   on its judgment, Seroquel was safe and effective if used in

19   accordance with the labeling that had been approved?

20        A.    Yes and no.  I believe a truer and more accurate

21   statement would be it was initially approved for the

22   manifestation of psychotic disorders and, for reasons that are

23   unclear to me, that changed in -- was it 2004 or was it

24   earlier?

25        Q.    I think you say 2003 in your report in the next

♀

65

1    paragraph.

Page 58

my101308.txt

2      A.    2003.

3      Q.    Right.  But my --

4      A.    That's correct.

5      Q.    But my question:  Do you understand that when the FDA

6  approves a drug for an indication, that it has reached the

7  conclusion that, based on the FDA's review, the drug is safe

8  and effective if used according to the label?

9      A.    Yes.

10     Q.    Do you disagree with the FDA's decision to approve

11  Seroquel in 1997?

12           MR. FIBICH:  Object to form.

13     A.    No.

14     Q.    (BY MR. RABER)  Okay.  Do you understand that

15  Seroquel, since 1997, has been approved for several new

16  indications?

17     A.    Yes.

18     Q.    And you understand that each time the FDA concluded

19  that, in considering the data, Seroquel was safe and effective

20  if used according to the label?

21     A.    Yes.

22     Q.    Do you disagree with those conclusions by the FDA?

23     A.    In part.

24     Q.    How do you disagree with it?

25     A.    I think burying the metabolic or diabetes or weight

♀

66

1  issue in the product information or PDR or putting it where it

2  is -- and, again, I'm not familiar with in intimate detail with

3  the negotiation process between the regulator and the regulee

4  (sic), between the pharmaceutical company and the FDA, but I am

Page 59

my101308.txt

5    most concerned about those advisements not being parsed out as

6    warnings or as contraindication or black box or at least

7    relative contraindications versus burying it in the

8    information.

9              So, I support the FDA's approval.  I take issue

10   with how that is communicated in a readily understandable and

11   visible fashion for the physician consumer and the patient

12   consumer.

13        Q.   Sir, you understand that the information about

14   diabetes and hyperglycemia has been in the Seroquel label in

15   the warnings section since 2004, correct?

16              MR. FIBICH:  Object to form.

17        A.   Is it 2004 or 2005, sir?

18        Q.   (BY MR. RABER)  Well, what's your understanding?

19        A.   Let me see what I wrote in terms of my review,

20   refresh my memory.

21              There was no warning of diabetes or weight gain

22   in the Seroquel labeling until the FDA required a class

23   labeling, which did not appear in the Seroquel PDR listing

24   until 2005.

25        Q.   Do you know when that label actually was communicated

⚥

67

1    and provided to doctors, setting that apart from the PDR?

2              MR. FIBICH:  Object to form.

3        A.   I believe there was a warning letter in 2004.

4        Q.   (BY MR. RABER)  Okay.  And do you know whether or

5    not -- and, in fact, you know that Mr. Unger's prescriber

6    received a copy of that Dear Doctor letter with the new warning

7    in January of 2004, true?

Page 60

my101308.txt

8       A.    I believe so.

9       Q.    And do you believe that by putting the information

10   about diabetes and hyperglycemia in the warning section that

11   AstraZeneca was somehow burying that information?

12      A.    Through a warning letter to doctors, no.

13      Q.    So, I take it then you're not going to offer the

14   opinion that with regard to Mr. Unger's prescriber,

15   Dr. Ares-Romero -- you're not going to say that the warning was

16   buried and that she didn't know about it, are you?

17      A.    You would have to ask Dr. Romero.

18      Q.    Well, you've read her deposition, right?

19      A.    Yes.

20      Q.    And you saw that she said she knew about this warning

21   in January of 2004.  Remember that?

22      A.    Yes.

23      Q.    So, you're not going to offer an opinion that she

24   didn't know, are you?

25      A.    Correct.

♀

68

1       Q.    And you're not going to offer the opinion that

2    AstraZeneca buried the warning about diabetes or hyperglycemia

3    with respect to Mr. Unger's prescriber, are you?

4       A.    The reason that question is difficult is based on my

5    review of the marketing and internal AZ documents -- in terms

6    of a general warning, the answer to your question is, no, I'm

7    not going to offer that opinion.

8       Q.    Did you understand that the warning that was put into

9    the Seroquel label in 2004 was something that was required by

10   the FDA?

Page 61

my101308.txt

11      A.    That is my understanding.

12      Q.    And that that addition of a warning applied not only

13  to Seroquel but to the entire class of second-generation

14  antipsychotics?

15      A.    Yes.

16      Q.    Looking at Page 5 on your report, there's a paragraph

17  that says "Diabetes."  And down near the bottom of the big

18  paragraph, you write "The argument that diabetes can be tightly

19  controlled or managed for reduced mortality is in contention,"

20  comma, "if not spurious."  Do you see that?

21      A.    Yes.

22      Q.    What's your basis for saying that?

23      A.    The article quoted in my report.

24      Q.    Okay.  Are you disagreeing with the expert

25  endocrinologist who has testified that diabetes can be

♀

69

1   controlled?

2       A.    What do you mean by "controlled," sir?

3       Q.    Meaning keeping blood sugar levels in a range where

4   the downstream consequences of diabetes are unlikely to occur.

5       A.    Yes, but that's rather like saying, "The operation

6   was a success, but the patient died," as diabetes is one of the

7   leading and increasing causes of death in this country, and it

8   does kill you.

9       Q.    Can you --

10      A.    So, if you're saying control is better and you live

11  longer, yes, but --

12      Q.    Can you --

13      A.    -- it will kill you.

Page 62

my101308.txt

14        Q.    Can you say with reasonable certainty that diabetes

15   is going to kill Mr. Unger?

16        A.    I cannot predict the future.

17        Q.    Can you say with reasonable certainty that

18   Mr. Unger's diabetes is going to kill him?

19        A.    Don't know.

20        Q.    Can you say with reasonable certainty -- strike that.

21              Can you identify any complications or

22   consequences of diabetes that you believe are reasonably

23   certain to occur in Mr. Unger?

24        A.    Yes.

25        Q.    What?

♀

70

1         A.    Cardiovascular.

2         Q.    What's your basis for saying that you're reasonably

3    certain that they'll occur?

4         A.    Because cardiovascular disease and diabetes are

5    leading causes of death.

6         Q.    You're talking in the general population, right?

7         A.    I'm talking about Mr. Unger as well; but I cannot

8    predict what will kill Mr. Unger specifically, no.

9         Q.    And for that matter, specifically as to Mr. Unger,

10   you can't predict what downstream consequences of diabetes are

11   reasonably certain to occur, correct?

12        A.    In a given individual, no.

13        Q.    And when you say "no," you mean you cannot predict

14   that, right?

15        A.    Correct.

16        Q.    On Page 5 of your report, you refer to modifiable

my101308.txt

17  risk factors for diabetes.  You see that?

18      A.    Yes, sir.

19      Q.    And you've listed a number of them.  The first one is

20  obesity.  Would you agree with me that Mr. Unger was obese?

21      A.    Yes.

22      Q.    Would you agree with me that he was morbidly obese

23  before he ever took Seroquel?

24      A.    Yes.

25      Q.    You mention high blood glucose.  Do you see that?

♀

                                                                71

1       A.    Yes.

2       Q.    Did Mr. Unger have any elevated or high blood glucose

3   levels before he took Seroquel?

4       A.    Don't know.

5       Q.    Okay.  Do you know what his blood glucose was when he

6   was in the hospital, end of August of 2002, for his diskitis?

7       A.    I would have to refresh myself with the medical

8   record.

9       Q.    It's not in the outline that you have, is it?

10      A.    What's the date of that, sir?

11      Q.    August 7th, 2002.

12      A.    No, it's not.

13      Q.    So, next to the risk factor of high blood glucose,

14  you would put a question mark with regard to Mr. Unger?

15      A.    To more fully answer your question, I would have to

16  review my notes of -- of the medical records to see if I wrote

17  it in there.

18            What is your question, sir?

19      Q.    Okay.  My question is:  With regard to Mr. Unger and

                          Page 64

my101308.txt
20    the risk factor of high blood glucose, you would have to say as
21    we sit here that you don't know one way or the other if he had
22    any high blood glucose readings before he took Seroquel.  Fair
23    to say?
24         A.    I don't recall.
25         Q.    Okay.  Hypertension.  Was Mr. Unger -- did he have

                                                                    72

1    hypertension before he started Seroquel?
2         A.    Don't recall.
3         Q.    Did he have abnormal lipid metabolism?
4         A.    Don't recall.  I'd have to refresh my memory.
5         Q.    Was he physically inactive?
6         A.    Yes.
7         Q.    So, would you consider Mr. Unger's physical
8    inactivity a risk factor for diabetes?
9         A.    Yes.
10         Q.    Was he a smoker?
11         A.    Yes.
12         Q.    Did you consider that to be a risk factor for
13    Mr. Unger developing diabetes?
14         A.    There's some debate about that.  I would say yes.
15         Q.    Was Mr. Unger's age a risk factor for developing
16    diabetes?
17         A.    Was he older than 65?  Let me see.  His date of
18    birth --
19         Q.    He was born in 1949.
20         A.    '49.  So, he's 51, plus eight now; and talking about
21    three, four, five, six years ago.  If not, he's getting close.
22         Q.    What's the age cut-off that is commonly accepted
                               Page 65

my101308.txt

23    for -- as a risk factor for diabetes?

24         A.    I think 65.

25         Q.    Did Mr. Unger have hyperlipidemia?

♀

                                                            73

1          A.    Don't recall.

2          Q.    How long had Mr. Unger been morbidly obese before he

3     took Seroquel?

4          A.    A good number of years.

5          Q.    Do you recall seeing that his obesity dates back to

6     his teenage years?

7          A.    Yes.   Whether it was morbid obesity I don't think is

8     clear.

9          Q.    And you remember seeing that he had actually been

10    prescribed amphetamines because of his obesity?

11         A.    Correct.

12         Q.    His testimony was that he had weight problems that he

13    believed were congenital.   Do you remember that?

14         A.    Yes.

15         Q.    And do you recall his testimony that at least back as

16    far as 1997 to 1998, he had a 54-inch waist?

17         A.    I don't recall the specific circumference; but, yes,

18    he had a large waist.

19         Q.    Okay.   Would you consider a 54-inch waist to put one

20    in the morbidly obese category?

21         A.    Yes.

22         Q.    Do you recall Mr. Unger's testimony that he carries

23    his weight in his midsection?

24         A.    Yes.

25         Q.    Is there any difference in the risk for morbid

my101308.txt

♀

74

1   obesity for people who carry their weight in their midsection
2   as opposed to, you know, their rear end or their arms or legs?
3       A.   Apparently so.
4       Q.   Higher risk if you carry your weight around your
5   midsection, right?
6       A.   So-called central or truncal or omental adiposity,
7   yes.
8       Q.   Would you agree with me that Mr. Unger's longstanding
9   obesity was a sufficient factor that could explain his getting
10  diabetes all by itself?
11      A.   No.
12      Q.   You don't agree with that?
13      A.   I don't agree with that.
14      Q.   Okay.  You ever heard of a Dr. Tulloch?
15      A.   I don't recall.
16      Q.   Dr. Tulloch is the expert endocrinologist who's
17  testified about Mr. Unger's case for the plaintiffs.  Have you
18  read his testimony?
19      A.   No.
20      Q.   So, if Mr. Tulloch testified that Mr. Unger would
21  have developed diabetes even if he had not taken Seroquel,
22  you'd disagree with that?
23           MR. FIBICH:  Object to form.
24      A.   Since I haven't read -- is it mister or doctor or --
25      Q.   (BY MR. RABER)  Doctor.

♀

75

Page 67

my101308.txt

1      A.    -- Tulloch's material.  You're asking me if I had

2    read it or if it were the case that Dr. Tulloch --

3      Q.    Well, let me ask you this -- let me just ask it to

4    you this way --

5      A.    Sure.

6      Q.    -- is it fair to say that Mr. Unger would have

7    developed -- strike that.

8            Based on his risk factors for diabetes, is it

9    fair to say that Mr. Unger would have developed diabetes even

10   if he had not taken Seroquel?

11     A.    Don't know.

12     Q.    What attempt did you make in forming your opinions to

13   rule out the risk factors that Mr. Unger has for diabetes as

14   the sole cause of his diabetes other than Seroquel?

15     A.    It gets back to those Bradford Hill criteria;

16   specificity, in particular.  I don't think science is capable

17   of that.

18     Q.    So, are you saying that you did not attempt to

19   determine -- let me strike that.

20            Are you saying then that you did not attempt to

21   rule out Mr. Unger's risk factors for diabetes as the sole

22   cause of his diabetes?

23     A.    I'm having a difficulty understanding your question,

24   sir, because you're referring to multiple risk factors and then

25   you're referring to a sole cause and I don't think anyone is

♀

76

1    capable of determining a sole, s-o-l-e, cause.  Even in cases

2    of bacterial pneumonia, there are people who have the bacteria

3    who don't get pneumonia; and in the instant matter, there are

Page 68

my101308.txt

4    people who are obese that never get diabetes.  So, I don't know

5    how to answer your question --

6        Q.    Okay.   My question is just what you did.   My question

7    is:  Did you make any attempt to rule out Mr. Unger's risk

8    factors as the causes of his diabetes, with or without

9    Seroquel?

10       A.    Did I consider Mr. Unger's multiple risk factors --

11       Q.    No.   My question is -- let's read it back.

12             My question is:   Did you make any attempt to

13   rule out Mr. Unger's risk factors as the causes of his

14   diabetes, with or without Seroquel?

15       A.    I'm sorry, sir.  I don't -- how can I change history

16   and rule something out that has occurred in a given patient or

17   make Mr. Unger a skinny individual and then come to a

18   conclusion as to what would have occurred were he now skinny.

19   I'm not capable of doing that.

20       Q.    So, you didn't do it.  Is that fair to say?

21       A.    I didn't do what?

22       Q.    Attempt to rule out his risk factors for diabetes as

23   the sole causes of his diabetes, with or without Seroquel?

24       A.    I didn't treat Mr. Unger.

25       Q.    Sir, please answer the question.

♀

                                                                   77

1        A.    I'm answering to the best of my ability, sir.

2        Q.    What did you do to rule out Mr. Unger's risk factors

3    for diabetes as the causes of his diabetes, with or without

4    Seroquel?

5        A.    I cannot parse or rule out a given risk factor from

6    the others to meet a specificity Bradford Hill criterion in

my101308.txt

7     this matter.  I cannot do that.

8         Q.    And, therefore, you did not do that, correct?

9         A.    If I can't do it, I didn't do it, that's correct.

10        Q.    Did you attempt to assess the relative contribution

11   of factors that caused Mr. Unger to develop diabetes?

12        A.    Did I look at them, yes.

13        Q.    Did you attempt to quantify their relative

14   contributions?

15        A.    As far as specific relative risks due to specific

16   risk factors, no.

17        Q.    Can you rule out his morbid obesity as the sole cause

18   of his diabetes?

19        A.    No.

20        Q.    Did you attempt to rule it out as the sole cause?

21        A.    No, nor can anybody else.

22        Q.    Did you -- can you rule out Mr. Unger's sedentary

23   lifestyle as the sole cause of his developing diabetes?

24        A.    No, I cannot.

25        Q.    And did you attempt to do that?

⚲

                                                              78

1         A.    No.

2         Q.    Can you rule out Mr. Unger's sedentary lifestyle as

3    the sole cause of his weight gain?

4         A.    No.

5         Q.    Are you aware of any mechanism by which Seroquel

6    directly causes diabetes?

7         A.    Yes.

8         Q.    What is that mechanism?

9         A.    There are three theories and there's ongoing research

                              Page 70

my101308.txt

10    about these theories and there's nothing definitive at present.

11        Q.    Have any of these three theories been proven to a

12    reasonable degree of medical probability or certainty?

13        A.    No.

14        Q.    Okay.  What are these theories that you've mentioned,

15    the three theories?

16        A.    They basically fall down into direct versus indirect

17    effects.  One theory is Seroquel causes diabetes as mediated

18    through weight gain; and there's a lot in and of itself in that

19    as far as whether that's direct effects on limbic system

20    satiety centers, weight regulation, or operates through being

21    sedating and, therefore, the individual is more sedentary,

22    therefore, the individual gains weight.

23              Wirsching was disfavoring currently the opinion

24    of direct pancreatic toxicity, although that's a theory.  And

25    then there's a theory about direct effect on adipose tissues

♀

79

1     with respect to insulin resistance.  I think those are the

2     three current leading theories.

3        Q.    Which, if any, of those three theories are you

4     relying on here?

5        A.    I think the medical record clearly shows in a

6     temporal way, accompanied by the weight gain.  And so I think

7     it is reasonable to argue or opine he would -- to a reasonable

8     degree of medical certainty, that the Seroquel -- Mr. Unger --

9     was related to the weight gain and, therefore, precipitated,

10    caused, exacerbated, or contributed to his diabetes.

11        Q.    And you're making that opinion based solely on the

12    temporal connection as you've just described it?

Page 71

my101308.txt

13          MR. FIBICH:  Object to form.

14      A.    Not solely.

15      Q.    (BY MR. RABER)  Okay.  What else?  Other than the

16  temporal connection, what else are you -- how else are you

17  connecting the dots for the Seroquel ingestion, the weight

18  gain, and the diabetes?

19      A.    In-house AstraZeneca studies about the association

20  between Seroquel and diabetes, about the dose-dependent effect

21  of Seroquel on weight gain in spite of its weight neutrality

22  spin, the -- my clinical experience with respect to patients I

23  prescribed Seroquel to gaining weight, the associated increased

24  risks of weight and diabetes, and the Japanese and Dutch

25  experience with respect to warnings about -- or

♀

80

1  contraindications about Seroquel and diabetes.

2      Q.    Did the Dutch conclude that Seroquel causes diabetes?

3      A.    What do you mean by "cause," sir?

4      Q.    Well, you've said that, you know, to a reasonable

5  degree of medical certainty, you think Seroquel causes

6  diabetes.  My question to you:  Is it the same way?  Did the

7  Dutch conclude that Seroquel causes diabetes?

8      A.    Specifically or directly in isolation, no.

9      Q.    Okay.  Did the Japanese conclude that Seroquel causes

10  diabetes?

11      A.    No.

12      Q.    So, you disagree with the Japanese and the Dutch on

13  that?

14      A.    What do you mean by "cause"?

15      Q.    The same way you've used it in your report.

Page 72

my101308.txt

16      A.    Contributes to, exacerbates, is a risk factor for,

17   yes.  Specifically causes, in isolation of other risk factors,

18   no.

19      Q.    So, what opinion are you giving with regard to

20   Mr. Unger on causation?

21      A.    On a temporal basis, Seroquel caused his diabetes.

22      Q.    The sole specific cause?

23      A.    No.

24      Q.    Okay.  How are you using "cause" in that opinion?

25      A.    Contributes to, exacerbates, produces.

♀

81

1       Q.    Which one?

2       A.    All the above.

3       Q.    Well, "exacerbates" would mean he already had

4    diabetes, correct?

5       A.    Exacerbates his risk factors or contributes to his

6    risk factors.  If I have somebody who has a lot of risk factors

7    for diabetes, I certainly do not want to prescribe a medication

8    that is going to tip him over the edge and ultimately may kill

9    him.

10      Q.    What does the Seroquel data show for the effects on

11   blood glucose of people who are on -- at high risk, as you've

12   just described it?

13      A.    I would have to revisit the Seroquel data in terms of

14   whether it compared high risk versus low risk people.

15      Q.    Have you seen the fairly recent submission to the FDA

16   that was requested that specifically analyzes that question?

17      A.    I'm not sure what you're referring to, sir.

18      Q.    So, you haven't seen it?

my101308.txt

19          MR. FIBICH:   Object to form.

20     A.   I'm not sure what you're referring to.

21     Q.   (BY MR. RABER)  I'm referring to analysis of all

22  clinical trials in which Seroquel was used as monotherapy.

23  Have you seen that data?

24     A.   I don't recall.

25     Q.   Can you identify a single AstraZeneca clinical trial

♀

82

1  where the data show that people with higher risk for diabetes

2  did worse on Seroquel than others?

3     A.   I don't recall.  I do recall recently reviewing one

4  study in which they did better.

5     Q.   So, that would be inconsistent with your opinion then

6  as it pertains to Mr. Unger, wouldn't it?

7     A.   Correct.

8     Q.   When you mention dose-dependent data, what dose are

9  we talking about for Seroquel where the data is different?

10     A.   Different than --

11     Q.   Well, you said it's dose dependent.  What do you mean

12  by that?

13     A.   That who's dose dependent?

14     Q.   The -- in your causation opinions, you mention that

15  you were relying on studies that showed a dose dependency, and

16  my question is:  What were you talking about there?

17     A.   There's AstraZeneca data known from 1997, I believe,

18  that there was dose-dependent weight gain.

19     Q.   What -- at what doses is -- would you -- do you

20  believe there's a cut-off, where there's a difference?

21     A.   I was looking at this the other day and it's not

my101308.txt

22    coming to me.

23          Q.    400 milligrams?

24          A.    I don't recall and -- because I start to confuse that

25    with the efficacy data above 300 milligrams, but that's

♀

                                                                        83

1    different than the weight gain data.

2          Q.    Was Mr. Unger taking what you would consider to be a

3    low dose of Seroquel or a high dose Seroquel?

4          A.    He was not being -- low dose.

5          Q.    He was low dose, correct?

6          A.    Yes.

7          Q.    And so the dose-dependent data which shows higher

8    weight gain for people at higher doses would not apply to

9    Mr. Unger, true?

10          A.    That specific data, true.

11          Q.    Now, you mentioned you are relying on certain

12    in-house studies on your causation opinion.   Which specific

13    in-house studies are you referring to?

14          A.    Brecher's study, the studies Arvanitis was talking

15    about; and with respect to diabetes, I think it was the Geller

16    studies and/or communications --

17          Q.    The Geller studies?  What are those?

18          A.    I think that had to do with diabetes and Seroquel.

19          Q.    There's a study by Dr. Geller?

20          A.    I don't recall whether there were "studies" or

21    "study" at this time.

22          Q.    Are you talking about e-mails?

23          A.    There were a lot of e-mails.

24          Q.    And what Arvanitis study are you talking about?

my101308.txt

25      A.    I would have to refresh my memory through my notes

♀

84

1   and the like.

2       Q.    You're talking about an e-mail, aren't you?

3       A.    I would have to refresh my memory in order to give

4   you my best answer.

5       Q.    What Brecher study are you referring to?

6       A.    The weight neutrality study.

7       Q.    How does the Brecher study show or provide evidence

8   that Seroquel causes diabetes?

9       A.    That would be on the theory that Seroquel causes

10  diabetes through weight gain.

11      Q.    And what did the Brecher study show on weight gain?

12      A.    Skinny people gain more weight.  Fat people don't.

13  And the company's spin on that, in spite of the warnings in the

14  product information, is that -- the spin was that it was weight

15  neutral.

16      Q.    And this spin you're referring to, that was a

17  description of the data that Dr. Brecher reported in his

18  article?

19      A.    "Description" can be one way you language that.

20      Q.    Okay.  But the data was there that people could see

21  what the data was, right?

22      A.    I don't disagree with that, sir.

23      Q.    Well, in the printed study -- you knew that in the

24  published study the skinnier people gained weight and the

25  heavier people lost weight.  You knew that the data from the

♀

my101308.txt

85

1    study showed that, right?

2        A.    Correct.

3        Q.    And whether somebody wants to apply the term "weight

4    neutral" or "skinny people gain weight, fat people lose

5    weight," however it wants to be characterized, people are free

6    to use whatever characterizations they want of that data,

7    right?

8             MR. FIBICH:   Object to form.

9        A.    People are free to describe phenomena.   However,

10   there is an ethical or a moral, if not legal, obligation to

11   communicate in a way that doesn't obscure the information but

12   explains the information, as Dr. Wirsching said.   But more than

13   that.   Primum non nocere.   First of all, don't hurt people.

14           If you are branding a product -- if you are

15   branding Seroquel as a standout is or standalone or

16   distinguishing it from the other atypicals and you have your

17   pharmaceutical sales rep quoting Brecher's weight neutrality,

18   you are communicating to prescribing physicians and the

19   consuming public that weight is off the table.   That does not

20   reflect the reality or the danger of the medication.

21       Q.    (BY MR. RABER)  Do you disagree with the data that

22   was contained in the Brecher article?

23       A.    No.

24       Q.    You just disagree with the way he characterized it.

25   Is that fair to say?

♀

86

1        A.    No.

Page 77

my101308.txt

2      Q.    Okay.  What do you disagree with?

3      A.    Mark Twain said there were lies, damned lies, and

4   there were statistics.

5      Q.    Right.  And what are you offering today?

6            MR. FIBICH:  Object to form.

7      A.    What I am offering today and other people have

8   offered, not just me, is it's a misdirection or

9   miscommunication, although maybe -- somehow I get the feeling

10   that in this marketing stuff, they ran it by legal -- that to

11   say Seroquel is weight neutral does not accurately reflect the

12   import, the effect that Seroquel has on a quarter to a third of

13   individuals, that that is a miscommunication or misdirection.

14      Q.    (BY MR. RABER)  Was that miscommunication or

15   misdirection that you're referring to ever made to the

16   prescribing doctors for Mr. Unger or Ms. Whittington?

17      A.    Probably so, more likely than not.

18      Q.    How do you know that?

19      A.    Because -- through the drug reps coming to my

20   office --

21      Q.    Have you read --

22      A.    -- and saying it's weight neutral.

23            MR. FIBICH:  Let him finish.

24      Q.    (BY MR. RABER)  Have you read the doctor's testimony

25   on that?

♀

                                                              87

1      A.    Yes.

2      Q.    What did Dr. Ares-Romero say about what sales reps

3   communicated to her?

4      A.    Those doctors and all the doctors would tell you that

                          Page 78

my101308.txt

5      they preserved an independent decision about the medication --

6          Q.   I'm asking what she said, not what "those doctors"

7      do.  What did Dr. Ares-Romero say about interactions with the

8      sales representatives from AstraZeneca?

9          A.   Specifically, I would ask that my memory be refreshed

10     by looking at the deposition.

11         Q.   You don't know, do you?

12              MR. FIBICH:  Object to form.

13         A.   I don't recall here today and now specifically.

14         Q.   (BY MR. RABER)  Are you offering an opinion that

15     Dr. Ares-Romero was misled by AstraZeneca with regard to weight

16     gain and Seroquel?

17         A.   Specifically her?

18         Q.   Yes.

19         A.   Is it more likely than not, given the marketing and

20     branding strategy of the company?  Am I able to say that

21     specifically with her?  No, I'm not.

22         Q.   Did you receive a complete set of the medical record

23     for Mr. Unger?

24         A.   I believe so.

25         Q.   Did you rely on the plaintiffs' lawyers to provide

♀

88

1      you the medical records?

2          A.   Yes.

3          Q.   And they selected the medical records they sent you?

4          A.   I would assume so.  I also, in addition, asked for

5      any and all records or materials they deemed relevant to this

6      matter.

7          Q.   Can you rule out that Mr. Unger had diabetes before

Page 79

my101308.txt

8    he started taking Seroquel?

9        A.    No.

10       Q.    Can you rule out that Mr. Unger had prediabetes

11   before he started Seroquel?

12       A.    No.

13       Q.    Now, you've -- throughout your report, you've leveled

14   some criticisms towards AstraZeneca's marketing and development

15   of Seroquel.  Is that fair to say?

16       A.    Yes.

17       Q.    Did AstraZeneca do anything right in its development

18   and marketing of Seroquel?

19             MR. FIBICH:  Object to form.

20       A.    Absolutely.

21       Q.    (BY MR. RABER)  Okay.  Can you tell us some of the

22   things they did right?

23       A.    Sure.

24       Q.    Okay.

25             MR. FIBICH:  Object to form.

♀

89

1        A.    Presumably, they wanted to help people, bring a new

2    antipsychotic or central nervous system agent to market to

3    relieve pain and suffering and disability of individuals with

4    these conditions.

5        Q.    (BY MR. RABER)  Anything else that they did right?

6        A.    Yes.

7        Q.    Let's hear it.

8        A.    In terms of product development, regulatory

9    standards, research and development moneys, they spent a lot of

10   money.

                        Page 80

my101308.txt

11      Q.      Anything else?

12      A.      They devoted a lot of time and effort towards

13  bringing this medicine to market.

14      Q.      Do you have any criticism of the types of studies

15  that AstraZeneca did with Seroquel?

16      A.      Yes.

17      Q.      Okay.  What are those criticisms?

18      A.      One would be -- I think it was a three-week

19  open-label study that led to FDA approval to begin with.  Where

20  as that meets regulatory standard, have concerns about the

21  length of that study, as well as the fact that it was open

22  label.

23      Q.      Okay.  Was that three-week open-label study the only

24  study that was considered when Seroquel was approved?

25      A.      No.

♀

90

1       Q.      Aside from your criticism of the three-week

2   open-label study, do you have any other criticisms about the

3   studies that AstraZeneca did relating to Seroquel?

4       A.      No.

5       Q.      And you have no expert opinions on that subject,

6   correct?

7       A.      Correct.

8       Q.      Was Mr. Unger psychotic at any point in time?

9       A.      Yes.

10      Q.      When do you believe he was psychotic?

11      A.      When he had the hyperosmolar state.  His psychotic

12  state was, I think, more properly medically described as

13  delirium.

Page 81

my101308.txt

14     Q.     Before his hyperosmolar state, was he psychotic?

15     A.     No.

16     Q.     Have you read the deposition of his original

17   prescriber, Dr. Cabada?

18     A.     Yes.

19     Q.     Did you see his testimony about why he prescribed

20   Seroquel to Mr. Unger?

21     A.     Yes.

22     Q.     And given that testimony, was -- in your opinion, was

23   Dr. Cabada's decision to prescribe Seroquel in the manner he

24   did appropriate?

25     A.     Yes.

♀

91

1     Q.     Okay.  And same questions as to Dr. Ares-Romero.  Do

2   you believe that her decisions to prescribe Seroquel to

3   Mr. Unger were appropriate?

4     A.     Point of clarification.  Did Dr. Romero --

5     Q.     Romero took over after Dr. Cabada closed his

6   practice.

7     A.     If I can finish, sir, my greatest concern in a

8   retrospective review of the medical records of Mr. Unger was

9   that after he had his hyperosmolar coma, he was still

10   prescribed Seroquel, and that was alarming to me.

11     Q.     Why?

12     A.     Because of the association between Seroquel and

13   diabetes.

14     Q.     Was Mr. Unger able to control his blood sugar while

15   he was taking Seroquel after the hyperosmolar state?

16     A.     Yes.

my101308.txt

17     Q.     And how has his ability to control his blood sugar

18   compared while he was on Seroquel versus since he stopped

19   taking Seroquel?

20     A.     Don't recall.

21     Q.     Isn't that important information to know?

22     A.     Yes.

23     Q.     And given that Mr. Unger was able to control his

24   blood pressure while taking Seroquel after his hyperosmolar

25   state, why was it alarming that he was -- continued to have it

♀

                                                                    92

1   prescribed to him?

2     A.     His blood pressure, did you say?

3     Q.     No.   His blood glucose.

4     A.     His blood glucose.   We don't know, in fact, sitting

5   here today about which theory is correct in terms of the

6   association between Seroquel and diabetes for some individuals

7   some of the time.   It is a risk.   Given alternate medications

8   that are potentially available to Mr. Unger, medications which

9   may not cause diabetes, medications which may not be as

10   sedating, there are alternatives available.

11     Q.     Well, did Mr. Unger need an antipsychotic medication,

12   in your view?

13     A.     No.

14     Q.     Did you read the testimony by Dr. Cabada that he was

15   concerned that Mr. Unger was about to go postal towards his

16   supervisor?

17     A.     Yes.

18     Q.     Okay.   And would an antipsychotic medication be

19   something that you would recommend under those circumstances to

Page 83

my101308.txt

20    prevent someone from harming someone else?

21        A.    You're talking about as a form of pharmacologic or

22    chemical restraint?  "Fixing to go postal," I don't think has

23    an indication.   But are these medications used as

24    tranquilizers?  Absolutely.

25        Q.    Is there anything wrong with that, in your opinion?

                                                              93

1         A.    Yes.

2         Q.    Okay.   But in Mr. Unger's case, you believe

3     Dr. Cabada's decision was appropriate under all the

4     circumstances?

5         A.    The benefit of 20/20 hindsight, yes.

6         Q.    Sir, let's go back to your report, if we can.   On

7     Page 6, you refer to the -- in 2004, the American Diabetes

8     Association, the American Psychiatric Association, etcetera,

9     published a consensus statement.   Do you see that?

10        A.    Yes, sir, I do.

11        Q.    And you've read that?

12        A.    Yes, I have.

13        Q.    You've considered it in forming your opinions?

14        A.    Yes, I have.

15        Q.    Do you disagree with the ultimate findings of that

16    consensus group?

17        A.    No.

18        Q.    And you -- let's mark this.  You know what?  It's --

19    I've already marked it.

20               I want to show you a document that's been

21    premarked as Defendant's Exhibit 500.   Do you recognize

22    Defendant's Exhibit 500 as the consensus statement that's

my101308.txt

23    identified in your report?

24         A.    Yes, sir, I do.

25         Q.    Looking at Defendant's Exhibit 500, on the right-hand

♀

94

1    side of this exhibit -- well, strike that.

2               Do you feel like this group of people that got

3    together was qualified to express opinions and recommendations

4    on the questions they addressed?

5         A.    Yes, sir.

6         Q.    Can you think of any group or -- or organizations

7    that would be better equipped to address these questions than

8    the ones that were involved in this consensus conference?

9         A.    No, sir.

10        Q.    Looking at the far right-hand column on the first

11   page of Exhibit 500, it says "For people who respond well,

12   antipsychotics can mean the difference between leading an

13   engaged, fulfilling community life and being severely

14   disabled."  Do you agree with that statement?

15        A.    Where is that statement, sir?

16        Q.    The far right-hand column on the first page at the

17   top.

18        A.    Yes, sir.

19        Q.    Do you see where halfway down the right-hand column

20   on the first page, the group says, "In addition, all FGAs can

21   produce significant extrapyramidal effects at clinically

22   effective doses"?

23        A.    Where are you, sir?

24        Q.    About -- a little less than halfway down the far

25   right column.

Page 85

my101308.txt

♀

95

1      A.     Yes, sir, I see it.

2      Q.     Do you agree or disagree with that statement?

3      A.     Agree.

4      Q.     Okay.  It goes on to say "These side effects, which

5    include dystonic reactions, drug-induced parkinsonism,

6    akathisia, and tardive dyskinesia, can make treatment

7    intolerable for some people, leading to subjective distress,

8    diminished function, stigma, and nonadherence."

9             Do you agree with that?

10     A.     Yes.

11     Q.     Then it says "The effort to find more effective

12   medications with fewer and less-severe side effects led to the

13   development of the SGAs, often referred to as the atypical

14   antipsychotics.  SGAs have fewer or no extrapyramidal side

15   effects at clinically effective doses."

16            Do you see that?

17     A.     Yes.

18     Q.     Do you agree with that statement?

19     A.     Not completely.

20     Q.     Okay.  How do you disagree with it?

21     A.     Because SGAs can have and do have extrapyramidal side

22   effects for some people.

23     Q.     But not to the same extent as the FGAs, do they?

24     A.     Apparently not.

25     Q.     And you know, don't you, that Seroquel, in

♀

96

my101308.txt

 1    particular, has a better risk profile for extrapyramidal side

 2    effects than, say, Risperdal?

 3        A.    Correct.

 4        Q.    And Seroquel has a better risk profile for

 5    extrapyramidal side effects than first-generation

 6    antipsychotics?

 7        A.    All of them?  I don't know that.

 8        Q.    Okay.  Better than Trilafon, right?

 9              MR. FIBICH:  Object to form.

10        A.    There was a subsequent Catie analysis which was

11    discrepant with the notion of improvement without impairment.

12    I forget whether it was the second or -- the first or second

13    Catie meta-analysis that was -- said no different than, better

14    than.  I'm not sure about that.  I'd have to look at that data

15    again to refresh my memory.

16        Q.    (BY MR. RABER)  All right.  Well, we'll come to that.

17        A.    Okay.

18        Q.    Now, you understood that the consensus group

19    concluded that the data for Seroquel and a potential

20    association with diabetes was discrepant, right?

21        A.    Correct.

22        Q.    And "discrepant" means some studies shows an

23    increased risk, other studies did not show an increased risk,

24    right?

25        A.    Correct.

♀

                                                             97


 1        Q.    And is that still the case today, that the data is

 2    discrepant on that question?

 3        A.    I believe so.
                        Page 87

my101308.txt

```
 4        Q.    And if you look at the third page of Exhibit 500,
 5   which is actually Page 598 of the article, do you see in the
 6   upper left column where it says "The mechanisms responsible for
 7   weight gain associated with SGA therapy are unknown"?
 8        A.    Yes.
 9        Q.    And do you agree with that?
10        A.    Yes.
11        Q.    Then the consensus statement goes on to say "Even a
12   small chronic imbalance between energy intake and expenditure
13   can lead to large changes in body weight over time.   For
14   example, ingestion of approximately 500 calories per day more
15   than is expended can account for the largest average weight
16   gain reported with SGA therapy, 4.5 kilograms in ten weeks."
17                  Do you see that?
18        A.    Yes.
19        Q.    So, we're talking there about 10 pounds in 10 weeks,
20   right?
21        A.    4.5 kilogram times 2.2 is about 10 pounds.   That's
22   correct, sir.
23        Q.    Okay.  So, about a pound a week?
24        A.    Yes.
25        Q.    So, at this rate, you could -- just by ingesting 500
```

♀

98

```
 1   calories a day in excess of what you're burning off, you could
 2   gain 50 pounds in a year.
 3        A.    Approximately, yes.
 4        Q.    Okay.  And they go on to say "This amount of daily
 5   increase in energy intake represents the calories in a normal
 6   sized candy bar plus a soda or in an ice cream dessert."
```

my101308.txt

```
 7              Do you see that?

 8       A.    Yes, sir, I do.

 9       Q.    Okay.  Do you remember reading that Mr. Unger said he

10  had a weakness for ice cream?

11       A.    I don't recall that specifically.  There's a lot of

12  that going around.

13       Q.    That's a -- that's reached epidemic proportions in

14  this country, hasn't it?

15       A.    Yes, as has depression.

16       Q.    So, you would agree with the consensus statement's

17  observation that for someone who's sedentary and taking in more

18  calories than they burn off, that that alone could explain a

19  weight gain of up to 50 pounds in a year?

20       A.    Correct.

21       Q.    Did the consensus group find that Seroquel causes

22  diabetes?

23       A.    No.

24       Q.    Did the consensus group find that Seroquel

25  contributes to the cause of diabetes?
```

♀

                                                                99

```
 1       A.    It may.

 2       Q.    It may?  Where does it say that here?

 3       A.    I think they said numerous case reports have

 4  documented the onset or exacerbation of diabetes, including the

 5  occurrence of hyperglycemic crises following initiation of

 6  therapy with many of the SGAs, Page 598, left-hand column under

 7  boldfaced "Diabetes."

 8       Q.    Right.  That doesn't refer to Seroquel, does it?

 9       A.    It doesn't specifically state "Seroquel."
```
                              Page 89

my101308.txt

10      Q.      Okay.

11      A.      That's correct.

12      Q.      And, in fact, they found that -- if you look at the

13  middle column on that same page, they say "Despite limitations

14  in study design, the data consistently show an increased risk

15  for diabetes in patients treated with clozapine or olanzapine

16  compared with patients not receiving treatment with

17  first-generations or with other SGAs," correct?

18      A.      That's what that says, correct.

19      Q.      Then they say "The risk in patients taking

20  Risperidone and quetiapine is less clear.  Some studies show an

21  increased risk for diabetes where others do not," correct?

22      A.      Correct.

23      Q.      Now, do you read that as the consensus group saying

24  it's more likely than not that quetiapine causes or contributes

25  to diabetes?

♀

100

1       A.      I read that as they don't know.

2       Q.      And that's still the case today, isn't it?

3       A.      I believe so.

4       Q.      Okay.  And so are you saying then that you disagree

5   with the consensus group on their conclusion that they don't

6   know?

7       A.      No.  I'm saying if I don't know, I'd rather err on

8   the side of caution with a given patient.

9       Q.      All right.  But if the consensus group cannot say

10  that it's more likely than not that Seroquel is causing

11  diabetes, how is it that you're able to offer that opinion in

12  this case?

Page 90

my101308.txt

13      A.   Because I think it is a risk factor.  I think there
14   is an association -- there is a temporal association between
15   diagnosis and receipt of medication and, therefore, I'm able to
16   render that opinion.
17      Q.   Is there a difference between association and
18   causation?
19      A.   Yes and no.
20      Q.   Okay.  What's the difference between association and
21   causation?
22      A.   I think, by and large, science proves correlation or
23   association versus causation and so, too, you're going to argue
24   the temporal association does not necessarily indicate
25   causation, and that gets into what the definition of "is" is or

♀

101

1   "causation" versus "correlation" or "association," okay?
2            It is my best professional opinion, held to a
3   reasonable degree of medical certainty, that if you have a new
4   diagnosis of diabetes in an individual who is in receipt of
5   medication, that that is a causal factor.
6      Q.   So, you're basing that on the temporal association as
7   you've just described it?
8      A.   Correct.
9      Q.   And that's -- you apply that method methodology that
10   you've just described to Mr. Unger's case and Ms. Whittington's
11   case?
12      A.   Correct.
13      Q.   I had a statistics professor who once told me the
14   eleventh commandment of statistics is that thou shall not infer
15   causation from association alone.  Do you agree with that?

my101308.txt

16      A.      Correct.  Yes, I agree with that.  I also agree with

17   not exposing people to potential hurt or illness if there are

18   alternatives available or to taking risk factors off the table,

19   if possible, for a given patient.

20      Q.      But in some patients, there's -- well, there's risks

21   with every medication, right?

22      A.      Yes.

23      Q.      Okay.  And the doctor's job is to balance those risks

24   against the potential benefits?

25      A.      Based on reliable information.

♀

102

1       Q.      And that's what Mr. Unger's doctors did, right?

2       A.      Yes.

3       Q.      And you're not disagreeing with their prescription

4    decision.  You're just saying that you believe that there was

5    some causal relationship between the Seroquel ingestion and

6    Mr. Unger's diabetes, right?

7       A.      I am saying that the notion of antipsychotics causing

8    metabolic dysfunction was not commonly known or on the front

9    burner with respect to the first-generation antipsychotics.  It

10   is now a front-burner issue with respect to the

11   second-generation antipsychotics and, given the efficacy and

12   safety data as we know it to date, that there are alternatives

13   available to Seroquel in high-risk individuals.

14      Q.      And those alternatives are -- you mentioned some

15   first-generation medications earlier today?

16      A.      Sure.  Possibly Abilify.  Those studies are ongoing.

17   Possibly Geodon.  Possibly Invega.

18      Q.      Did you see Dr. Wirsching's testimony that the data

Page 92

my101308.txt

19    for Abilify actually shows that Abilify has the same weight

20    gain over time as Seroquel?

21             MR. FIBICH:  Object to form.

22        A.   I read his testimony this weekend, therefore, casting

23    doubt upon my recommendation for Abilify.

24        Q.   (BY MR. RABER)  So, would you agree or disagree with

25    Dr. Wirsching on his characterization of Abilify data?

♀

                                                              103


 1             MR. FIBICH:  Object to form.

 2        A.   I would defer to his learned opinion.

 3        Q.   (BY MR. RABER)  I want to show you a document that

 4    has been marked as Defendant's Exhibit 501.  But first I want

 5    to ask you, you refer to the Dutch label in 2000 providing for

 6    a stronger warning than was contained in the U.S. label.

 7             Do you remember that?

 8        A.   Yes.

 9        Q.   Do you have any knowledge as to whether or not the

10    Dutch were operating under the same rules and regulations as

11    the FDA?

12        A.   The exact same identical rules and regulations, I

13    doubt it.

14        Q.   Okay.  Do you know whether the Dutch were looking at

15    the same data that the FDA were looking at?

16        A.   Don't know.

17        Q.   Do you have any -- well, strike that.

18             Do you think the Dutch got it right and the FDA

19    got it wrong?

20        A.   I think truth is probably in the middle.

21        Q.   Do you know what other European countries said about

                                  Page 93

my101308.txt

22    Seroquel?

23        A.    Astra -- AstraZeneca was also based in Britain and

24    there was some internal company documents talking about weight

25    gain or responding to the press or that sort of thing; but as

♀

104

 1    far as knowing their specific -- European-specific warnings or

 2    regulatory requirements, the answer to your question is no.

 3        Q.    In how many countries has Seroquel been approved for

 4    use?

 5        A.    Don't know.

 6        Q.    It's a lot, isn't it?

 7        A.    I told you, sir, I don't know.

 8        Q.    Why did you single out the Dutch and the Japanese in

 9    your report?

10        A.    Because in 2000 and 2002, those countries who rank

11    above ours as far as the World Health Organization's ranking of

12    countries' health care systems sounded warnings that were not

13    sounded here.

14        Q.    Any other reasons?

15        A.    Why I mention those two?

16        Q.    Yeah.

17        A.    Well, that was provided to me by plaintiffs' counsel.

18        Q.    Okay.   What about France?  Did you mention them?

19        A.    Did I mention France?

20        Q.    Yeah.

21        A.    No, although I believe France is ranked No. 1 in the

22    World Health Organization's ranking of health care systems.

23        Q.    Okay.   And do you know what France's position has

24    been about Seroquel?

Page 94

my101308.txt

25      A.    No, I do not.  Do you know that France has never

♀

105

1    approved Seroquel for use?

2                    MR. FIBICH:   Object to form.

3      A.    Do I know that?

4      Q.    (BY MR. RABER)  Yeah.

5      A.    No, I do not.

6      Q.    Do you think that the FDA should defer to the French

7    health regulatory authorities and not have Seroquel on the

8    market at all?

9                    MR. FIBICH:   Object to form.

10      A.    By "defer," you mean do what the French do without

11    independent consideration?

12      Q.    (BY MR. RABER)  Yeah.

13      A.    No.

14      Q.    Okay.  And do you think that -- do you agree with the

15    French decision not to allow any use of Seroquel?

16      A.    If, in fact, that has been what the French have

17    decided, no.

18      Q.    Okay.  I want to show you this document marked as

19    Defendant's Exhibit 501.

20      A.    Yes, sir.

21      Q.    And this is a document that's entitled "Schizophrenia

22    and Diabetes 2003 Expert Consensus Meetings, Dublin, 3-4

23    October 2003 Consensus Summary."

24                    Have you ever seen this publication before?

25      A.    I'm not sure.

♀

Page 95

my101308.txt

106

```
 1        Q.    And this appears to be another consensus statement
 2   for Europe, true?
 3        A.    That is correct, sir.
 4        Q.    All right.  And do you see under the introduction
 5   there, the first column on the left, little more than halfway
 6   down, it says "It is thought that the pathological process that
 7   leads to the development of Type 2 diabetes starts, on average,
 8   10 to 15 years before diagnosis"?
 9        A.    Where is that, sir?
10        Q.    On the left-hand column on the first page, little
11   below halfway down.  Says "It is thought that the pathological
12   process that leads to the development of Type 2 diabetes
13   starts, on average, 10 to 15 years before diagnosis."
14              Do you see that?
15        A.    Yes, sir.
16        Q.    Do you agree with that statement?
17        A.    I have no reason to disagree.
18        Q.    Turn the page, if you would, please.
19        A.    (Witness complies.)
20        Q.    On the far left column, about halfway down the page,
21   there's a paragraph that begins "The available evidence."
22              Do you see that?
23        A.    Yes, sir.
24        Q.    This consensus group concluded, quote, "The available
25   evidence supports an association between antipsychotics and
```

♀

107

```
 1   impaired glucose metabolism but does not establish causality,"
```

Page 96

my101308.txt

2  close quote.  Do you agree with that statement?

3      A.    That that's what this says?

4      Q.    Yes.

5      A.    That's what that says, yes.

6      Q.    Okay.  And do you agree that that's what the evidence

7  showed when this was published in 2003?

8      A.    Under what definition of "causality" in which country

9  in what context, sir?

10      Q.    Are you telling me that different countries have

11  different definitions of "causality"?  Let me back up.  They're

12  making a distinction between "association" and "causality,"

13  aren't they?

14      A.    Yes.

15      Q.    Okay.  And do you agree with their assessment that

16  the evidence supports an association but not causality?

17      A.    In some context, that's correct, sir.

18      Q.    What about the context of this case?

19      A.    Product liability?

20      Q.    Yes.

21      A.    Causality, my understanding, is -- and I'm certainly

22  not an attorney and I'm certainly not an expert on the issue of

23  legal causality, although I attempted to do some reading on

24  that related to this matter -- that -- it is my understanding

25  that Seroquel causes, exacerbates, or produces diabetes.

♀

108

1      Q.    In everyone?

2      A.    No.

3      Q.    Okay.  So, can you say that if Mr. Unger had never

4  taken Seroquel, that he would not have gotten diabetes?

Page 97

my101308.txt

5       A.    Of course not.

6       Q.    Have you -- was this Exhibit 501 among the things

7   that you considered in forming your opinions?

8       A.    I don't recall whether it was one of the documents I

9   reviewed.   The Dublin heading is familiar because that caught

10  my attention.

11      Q.    Now --

12      A.    And I also vaguely remember in the appendix looking

13  at the symptoms of diabetes where they included recurrent

14  infections, particularly mentioning thrush.   That jogs

15  something in me because I don't recall seeing thrush or

16  candiditis as, per se, mentioned in the other criteria or

17  symptoms of diabetes, either ADA or Cleveland Clinic.

18      Q.    Dr. Young, in your report on Page 7 --

19      A.    Do you want this back?

20      Q.    Just put that with the exhibits.

21            MR. FIBICH:   Here.   Let me see.

22      A.    And this goes --

23      Q.    (BY MR. RABER)  They're right here.   We'll just keep

24  a little pile here.   We'll keep Shanon happy.

25            On Page 7 of your report, on the second

♀

109

1   paragraph there near the bottom, you say, "The United States

2   spends more than twice as much on each person for health care

3   as most other industrialized countries, yet it has fallen to

4   last place among those countries in preventing deaths through

5   the use of timely and effective medical care."

6            Do you see that?

7       A.    Yes.

Page 98

my101308.txt

8          Q.     What impact on the cost of -- or expense of medical

9     care have lawsuits had on that?

10         A.     I imagine a significant effect.

11         Q.     Okay.   And frivolous lawsuits have had a significant

12    effect on the cost of health care in this country, haven't

13    they?

14                MR. FIBICH:   Object to form.

15         A.     Probably so.

16         Q.     (BY MR. RABER)  Might that explain why the United

17    States spends more than twice as much as other industrialized

18    countries?

19                MR. FIBICH:   Object to form.

20         A.     I believe that is a contributory or causal but not

21    specific or sole factor.

22         Q.     (BY MR. RABER)  All right.   Now, also on Page 7, you

23    say, "The FDA warning did not reach the PIPDR until the 2005

24    edition," correct?

25         A.     Where are you, sir?

♀

                                                              110


1          Q.     Page 7 of your report.

2          A.     Yes, sir.

3          Q.     Second paragraph.

4          A.     Yes, sir.

5          Q.     But I think we've already -- you've already agreed

6     that, in fact, the prescriber for Mr. Unger actually received

7     that warning in January of 2004 with a Dear Doctor letter,

8     true?

9          A.     Yes.

10         Q.     And you mention that there was not a

                            Page 99

my101308.txt

11    contraindication, as had been done in the Japanese label.  Is

12    your opinion that the FDA should have made diabetes and

13    hyperglycemia a contraindication as opposed to a warning?

14         A.    Not yet, but it's heading that way.

15         Q.    Is it your opinion that they should have done that

16    with the 2004 label change?

17         A.    No.

18         Q.    At the bottom of Page 7, you say in the third line

19    down, "AstraZeneca waited until January 30th, 2004, to send out

20    a Dear Doctor letter to advise physicians of the warning."

21               Do you see that?

22         A.    Yes, sir.

23         Q.    Could AstraZeneca have sent out this Dear Doctor

24    letter any earlier?

25         A.    Possibly so.

♀

                                                          111


1          Q.    Do you know one way or the other?

2          A.    No, I don't.

3          Q.    Do you know whether there were any FDA regulations

4     that controlled when and how AstraZeneca could send out that

5     Dear Doctor letter?

6          A.    Do I know specifically, no, but my guess would be

7     probably.

8          Q.    Looking at Page 8 of your report, you refer in the

9     third line to the -- to metabolic syndrome.

10         A.    Yes, sir.

11         Q.    You would agree with me that Mr. Unger had the

12    metabolic syndrome before he ever took Seroquel, wouldn't you?

13         A.    Yes.

my101308.txt

14      Q.    And so you're not testifying that Seroquel caused

15   Mr. Unger to develop metabolic syndrome, are you?

16      A.    No.

17      Q.    On Page 8 in your report, you say that -- well,

18   strike that.

19              MR. RABER:   When do you want to break for lunch,

20   Tommy?

21              MR. FIBICH:   Whenever is convenient for you,

22   either right now or --

23              THE WITNESS:   I'm needing a bathroom break.

24              MR. RABER:   Why don't we just break for lunch

25   now if we're going to do that.

♀

                                                              112

1              (Recess from 12:25 p.m. to 12:59 p.m.)

2              (Young Exhibit No. 5 marked.)

3      Q.    (BY MR. RABER)  Dr. Young, we've placed in front of

4   you a document that's been marked as Young Exhibit 5.  Is Young

5   Exhibit 5 what's -- it's a publication from the New England

6   Journal of Medicine dated September 22nd, 2005.  Is that the

7   Catie study that you refer to, C-a-t-i-e?

8      A.    Yes, sir.

9      Q.    Okay.  And you refer to that on Page 8 and 9 of your

10   report; is that right?

11      A.    Yes, sir.

12      Q.    Okay.  Now, in the Catie study, that study found that

13   in terms of efficacy as measured by discontinuation rates, that

14   there was really no difference among the second-generation and

15   some of the first-generation atypical -- antipsychotics, right?

16      A.    Correct.

my101308.txt

17    Q.   It wasn't that the first-generation drug Trilafon was

18    better, it's just that it was found to be about the same,

19    correct?

20    A.   Yes.

21    Q.   All right.  And the Catie study also found though

22    that Trilafon was worse than Seroquel with regard to

23    discontinuation for extrapyramidal effects, didn't it?

24    A.   Let's see.

25    Q.   If you look at the first page under the results, if

♀

113

1    you -- where -- it says "Perphenazine was associated with more

2    discontinuation for extrapyramidal effects," correct?

3    A.   Yes.

4    Q.   And that's Trilafon?

5    A.   Yes.

6    Q.   So, comparing Seroquel to Trilafon, the takeaway from

7    the Catie study was that they have similar efficacy but that

8    Trilafon has a higher risk of extrapyramidal effects.  Is that

9    a fair summary?

10    A.   Yes.

11    Q.   And the Catie study also found that olanzapine was

12    associated with more discontinuation for weight gain or

13    metabolic effects, true?

14    A.   Correct.

15    Q.   So, if you compared Seroquel to olanzapine, you would

16    have two drugs with similar efficacy, but Seroquel having a

17    better risk profile for weight gain and metabolic effects than

18    olanzapine.

19    A.   Your question, sir?

Page 102

my101308.txt

20        Q.     So, the -- one conclusion from the Catie study is

21   that if you compare Seroquel to olanzapine, the two drugs have

22   comparable efficacy, but Seroquel has a better risk profile

23   with regard to weight gain or metabolic effects, true?

24        A.     Yes.

25        Q.     Now, did Catie show whether or not Seroquel had a

♀

114

1    better or worse risk profile than Trilafon with regard to

2    weight gain or metabolic effects?

3         A.     I think the Seroquel is a plus/minus at this point.

4    Talking about which issue, sir, the weight gain?

5         Q.     Weight gain, metabolic effects.

6         A.     I'm on Page 215, weight gain and metabolic changes --

7         Q.     Yes.

8         A.     -- and I don't see it.

9         Q.     Okay.  So, there wasn't a significant enough

10   difference anyway to report any difference between Seroquel and

11   Trilafon with regard to weight gain and metabolic effects.  Is

12   that fair to infer?

13        A.     Yes.

14        Q.     And then, finally, if you're still looking at Page

15   1215, if you were to compare Seroquel to risperidone, you would

16   find that the drugs have similar efficacy but that risperidone

17   was associated with a higher increase in prolactin levels; is

18   that right?

19        A.     Correct.  It also says quetiapine was associated with

20   a higher rate of anticholinergic effects than were the other

21   drugs.

22        Q.     What page are you on there?

Page 103

my101308.txt

23      A.    1213, adverse events, last sentence of adverse
24   events.
25      Q.    And what are anticholinergic effects?


                                                          115


1       A.    Dry mouth, blurred vision, constipation, fluid
2    retention.
3       Q.    Okay.  So, can you conclude from the Catie study,
4    Exhibit 5, that Trilafon is a better choice than Seroquel?
5       A.    Under what circumstances, sir?
6       Q.    In general.  Can you make that conclusion across the
7    board?
8       A.    Across the board for each and every patient, no.
9       Q.    Can you make that conclusion across the board
10   comparing Seroquel to any of the antipsychotic drugs that were
11   studied in the Catie study?
12      A.    What conclusion about Seroquel, sir?
13      Q.    That Seroquel is not as good a choice as any of the
14   other drugs that were studied here.
15      A.    Generally speaking, across the board, no.
16      Q.    Now, you mention in your report on Page 8 a --
17   subsequent analyses published in the American Journal of
18   Psychiatry.  Do you see that at the very bottom of Page 8 of
19   your report?
20      A.    I don't see the subsequent analyses on the bottom of
21   Page 8.
22            (Young Exhibit No. 6 marked.)
23      Q.    (BY MR. RABER)  Page 8 of your report, at the bottom,
24   you say -- the last half of that sentence says "With subsequent
25   analyses published in the American Journal of Psychiatry," Page

                               Page 104

my101308.txt

♀

1    8 of your report.   "Results were published in the September
2    22nd, 2005, issue of the New England Journal of Medicine."
3              We just looked at that, right?
4        A.   Oh, yeah.
5        Q.   And then it says "With subsequent analyses published
6    in the American Journal of Psychiatry."
7        A.   Correct.
8        Q.   What did those subsequent analyses show about the
9    effect of Seroquel on weight gain or blood glucose levels?
10        A.   I recall subsequent analyses, there was an EPS
11    effect.  I'm trying to recall weight gain, metabolic syndrome.
12    I don't recall specifically though.
13        Q.   Okay.  Let me see if I can help you here.  I'm going
14    to show you a document that's been marked as Young Exhibit 6.
15    Does Exhibit 6 appear to be a publication from the Catie
16    investigators in the American Journal of Psychiatry with a
17    publication date in April of 2006?
18        A.   Yes, this shows that.
19        Q.   Okay.  Is this one of the subsequent analyses that
20    you were referring to in your report?
21        A.   Yes.
22        Q.   All right.  Let's look, if we can, at Table 4, which
23    starts on Page 620.  Table 4 says "Adverse events among all
24    patients in Catie Phase 2," correct?
25        A.   Yes, sir.

♀

my101308.txt

1        Q.    And then it lists on Page -- the first page of this,

2   Page 620, it has olanzapine and risperidone at the top, the top

3   of the table.

4        A.    Correct.

5        Q.    And then if you turn the page, the table continues

6   and you see quetiapine and ziprasidone, right?

7        A.    That's correct.

8        Q.    Okay.  And among the things they looked at, if you

9   look about halfway down the table, is you see weight change

10  over course of treatment stated as pounds per month, right?

11       A.    Where are you looking, sir?

12       Q.    On Table 4, Page 620.  You see right almost in the

13  dead middle of that table, "Weight change over course of

14  treatment, pounds per month"?

15       A.    Yes.

16       Q.    Okay.  And if you -- and it lists a median and a

17  range for each drug, right?

18       A.    Yes, sir.

19       Q.    Now, if you turn the page and look in that same spot,

20  what does it say the median weight change over the course of

21  treatment was for quetiapine?

22       A.    It says zero.

23       Q.    Okay.  Would "weight neutral" be a way to describe

24  that data?

25       A.    Yes, if you were advising a 5-foot tall person that

♀

                                                        118

1   the river they were fixing to cross, on average, was 5 feet

2   deep and then telling them they weren't going to drown.

3        Q.    Okay.  But we know more specifically that -- well, it

                              Page 106

my101308.txt

4  would depend on whether they could swim, too, wouldn't it?

5      A.    And a host of other factors --

6      Q.    Right.

7      A.    -- in conjunction versus isolation.

8      Q.    Right.  And then it provides a range of 8 -- negative

9  8.3 to 6.1 for Seroquel, right?

10      A.    Correct.

11      Q.    All right.  And then the next line down is the

12  average weight change over the course of treatment stated in

13  terms of pounds per month.  Do you see that?

14      A.    Yes, sir.

15      Q.    And for the mean, what does it say it was for

16  Seroquel?

17      A.    0.1.

18      Q.    Okay.  Does that look like a substantial amount of

19  weight gain to you?

20      A.    No, it does not.

21      Q.    And, in fact, if you look at the Catie author's

22  characterization of that data on Page 618 -- do you see where

23  it says "Weight Gain and Metabolic Changes"?

24      A.    Yes, sir.

25      Q.    It says "Those receiving risperidone and quetiapine

♀

119

1  had negligible mean changes in weight over the course of Phase

2  2."  Do you see that?

3      A.    Yes, I do.

4      Q.    Is that spin?

5          MR. FIBICH:  Object to form.

6      A.    Is there some spin involved in presentation of this

Page 107

my101308.txt

7    data?  Yes.

8         Q.    (BY MR. RABER)  Okay.  So, you think the Catie

9    investigators spun the data, too?

10                   MR. FIBICH:  Object to form.

11        A.    No.  I'm saying you have data and then you have

12   interpretation of data.

13        Q.    (BY MR. RABER)  Okay.  So, the Catie authors chose to

14   characterize a median weight change over the course of

15   treatment of zero pounds and an average weight change over

16   course of treatment, pounds per month, as 0.1 pounds -- they

17   chose to use the word "negligible" to describe that.

18        A.    Correct.

19        Q.    Do you think that that's an unfair characterization

20   of that data?

21        A.    No, I do not.

22        Q.    Would you agree with that characterization of that

23   data?

24        A.    Yes, I would.

25        Q.    Is that data inconsistent with the notion of Seroquel

⚥

120

1    causing significant weight gain?

2         A.    Yes.

3         Q.    Now look at the next data point under -- on Table 4

4    for quetiapine.  And there's something that says "Blood

5    Chemistry Changes," and it says "Blood Glucose Milligrams Per

6    Deciliter, Mean and Median."  Do you see that line across?

7         A.    Yes, I do.

8         Q.    And does it say for quetiapine that the blood glucose

9    mean and median changes were minus 0.2 to minus 1.0?

my101308.txt

10        A.    That's correct.

11        Q.    And does that -- is that data consistent or

12   inconsistent with the notion that Seroquel causes increases in

13   blood glucose levels?

14        A.    Inconsistent.

15        Q.    And inconsistent with your opinion in this case?

16        A.    Correct.

17        Q.    How did you factor in this data from the Catie study

18   into your opinions in this case, or did you?

19        A.    I did not.

20        Q.    All right.  I want to talk to you about another

21   study, if we can.  And this particular study was in your file,

22   and it's the article by Newcomer.  Let me see if I can find it.

23        A.    Don't know if this was part of the exhibits or not.

24        Q.    That's attached to your report.

25        A.    Okay.  And one of these was as well.

♀

121

1        Q.    That's the documents you gave me.  That pile stays

2   there.

3        A.    Stays?  Oh, okay.

4        Q.    Okay.  I want to show you a document that was in your

5   file.  It's a study called "Metabolic Syndrome and Mental

6   Illness" by John W. Newcomer, M.D., dated November 2007.

7              Do you see that?

8        A.    Yes, sir.

9        Q.    Is this an article that you considered in forming

10   your opinions?

11        A.    Yes, it is.

12              MR. FIBICH:  Let's go off the record just a

Page 109

my101308.txt

13    second.

14              (Recess from 1:16 p.m. to 1:17 p.m.)

15              (Mr. Fibich leaves and Ms. Fendia enters.)

16    Q.    (BY MR. RABER)  Dr. Young, we're looking at a

17    document that was contained within Exhibit 2.  Exhibit 2 was

18    your file, we'll call it.

19    A.    Yes, sir.

20    Q.    And, specifically, we're looking at the article

21    entitled "Metabolic Syndrome in Mental Illness" by John W.

22    Newcomer, M.D., dated November 2007.  You with me?

23    A.    Yes, sir.

24    Q.    Okay.  And Dr. Newcomer -- did you consider this

25    article in forming your opinions?

♀

                                                        122

1     A.    I think I saw this article for the first time this

2     past weekend.

3     Q.    And is this article consistent with or inconsistent

4     with your opinions?

5     A.    Consistent.

6     Q.    It is?  Okay.  Well, let's look at the first page of

7     the article and --

8     A.    Well, it's consistent and inconsistent in some

9     respects, depending on how you look at the data.

10    Q.    Okay.  Well, let's look at the data.  You understand

11    that he says here in sort of his introduction in the first

12    paragraph, "Treatment with psychotropic medications, including

13    second-generation or atypical antipsychotic medication, can

14    also be associated with adverse metabolic effects"?

15    A.    Where are you, sir?

                         Page 110

my101308.txt

16          Q.    Right-hand column, right there where it says

17    "Treatment."

18          A.    Okay.

19          Q.    And do you understand he's sort of teeing up the

20    issue, for lack of a better term?

21          A.    Yeah.   He also does that in the abstract in terms of

22    saying -- talking about non-disease-related factors, as well as

23    adverse metabolic side effects associated with psychotropic

24    medications, such as antipsychotic drugs.

25          Q.    Okay.   Let's look at the next page then and see what

♀

                                                                    123

1     Dr. Newcomer did about it.   Do you see the first full paragraph

2     that begins "To clarify these findings"?   He says, "To clarify

3     these findings, a recent meta-analysis of 14 studies -- 11

4     retrospective, 5 case control -- examined the association of

5     diabetes incidence among patients treated with atypical

6     antipsychotics compared with conventional or no antipsychotic

7     treatments."   You see that?

8          A.    Yes, sir.

9          Q.    And would you agree that that's a useful exercise to

10    see how the second-generation antipsychotics compare, on the

11    one hand, to people taking nothing at all?

12          A.    Yes.

13          Q.    And that it's a useful comparison to compare how

14    people taking second-generation antipsychotics compare to

15    people taking the first-generation antipsychotics?

16          A.    What are we comparing here?   Talking about which

17    drugs?

18          Q.    Well, let's just not get ahead ourselves.   He says

my101308.txt

19  they examined the association of diabetes incidence among

20  patients treated with atypical antipsychotics compared with

21  conventional or no antipsychotic treatment, right?

22      A.   Well, again, my question would be which drugs?

23      Q.   Well, he lays it out here farther on down.

24      A.   Clozapine, olanzapine, quetiapine, risperidone to

25  conventionals.  And does -- did he not mention any

♀

124

1   conventionals?  I think that was a question I had when I read

2   it, what the conventionals were.

3       Q.   Okay.

4       A.   I don't think he did.

5       Q.   All right.  Well, let's look at the -- what the data

6   show.  The first -- you would agree that this is a

7   meta-analysis that contains more data than any single study,

8   true?

9       A.   Correct.

10      Q.   All right.  And --

11      A.   Or different kinds of data.

12      Q.   Okay.  And -- but presumably there are rules that

13  people follow to determine whether or not studies can be pulled

14  together, true?

15          MS. FENDIA:  Object to form.

16      A.   Yes.

17      Q.   (BY MR. RABER)  That's what statisticians do, among

18  other things, right, is determine whether you can combine data

19  or not?

20          MS. FENDIA:  Object to form.

21      A.   In part, that's what they do.

Page 112

my101308.txt

22      Q.    (BY MR. RABER)   Okay.   And do you see where this

23    article says that neither risperidone versus conventional or

24    versus no antipsychotic treatment at all, nor quetiapine versus

25    conventional or no antipsychotic treatment, was associated with

♀

125

1    an increased diabetes risk?

2      A.    I'm not sure whether it was Newcomer.   I know that

3    the article said that the relative risk with quetiapine was

4    1.6.

5      Q.    Well, let's look at what this data shows from this

6    recent meta-analysis.   What does it show about quetiapine

7    versus conventional?   It shows an odds ratio of 1.22, correct?

8      A.    Where are you, sir?

9      Q.    At the bottom of the first column and heading over to

10    the top of the next column.

11      A.    Yes, sir.

12      Q.    And we know that the confidence interval is 0.92 to

13    1.61.   Do you see that?

14      A.    0.92 to 1.61.

15      Q.    And what does that indicate to you as to whether or

16    not this relative risk of 1.22 is statistically significant?

17      A.    I don't know if it's statistically significant.

18      Q.    You can't tell from looking at that?

19      A.    I'm not sure where you're looking at.

20      Q.    "Nor quetiapine" --

21      A.    Right.

22      Q.    -- "versus conventional, OR" --

23      A.    Unspecified.

24      Q.    -- "OR 1.22."

Page 113

my101308.txt

25      A.    And the "OR" stands for what now, sir?

⚥

126

1       Q.    Do you -- can you tell me what it stands for?

2       A.    Odds ratio.

3       Q.    Okay.

4       A.    Right, 1.22.  Got it.  95 percent confidence

5   interval, right.

6       Q.    And the confidence interval is 0.92 to 1.61, correct?

7       A.    Right.

8       Q.    What does that tell you about whether or not this

9   odds ratio number for quetiapine is statistically significant?

10      A.    It says it may not be.

11      Q.    May not be or is not?

12      A.    According to this study, not.

13      Q.    Okay.  And so that is inconsistent then -- this data

14  is inconsistent with the opinion you have in this case, right?

15      A.    This particular statistic, yes.

16      Q.    And then the next full paragraph refers to -- or I'm

17  sorry.  Then let's look at the comparison where quetiapine is

18  compared to no antipsychotic.  And what does it say the odds

19  ratio is there?

20      A.    For quetiapine?

21      Q.    Yes, versus no antipsychotic.

22      A.    One.

23      Q.    And the confidence interval is 0.83 to 1.2, correct?

24      A.    Correct.

25      Q.    And what does that say about whether this odds ratio

⚥

my101308.txt

127

1   of 1.00 is statistically significant?

2       A.   It says it's not statistically significant.

3       Q.   So, at least according to this meta-analysis of 14

4   studies, would you agree that this data shows no increased risk

5   for Seroquel and diabetes compared either to conventional

6   antipsychotics or no antipsychotics?

7       A.   Yes, without the conventionals being specified.

8       Q.   Okay.   Fair enough.   But at least the data from that

9   meta-analysis of 14 studies is inconsistent with your opinion,

10  true?

11      A.   Correct.

12      Q.   Is it your opinion in this case that Seroquel caused

13  Mr. Unger's cholesterol to rise?

14      A.   I have not previously rendered that opinion.

15      Q.   You have not?

16      A.   That it causes cholesterol to rise?  I said it was

17  instrumental in his metabolic syndrome, if not causing and

18  exacerbating --

19      Q.   Well, we know --

20      A.   -- or producing.

21      Q.   We know that Mr. Unger already had high cholesterol

22  before he ever started Seroquel, right?

23      A.   I don't recall that.

24      Q.   Well, is it your opinion or not that Seroquel caused

25  him to develop high cholesterol?

○

128

1                   MS. FENDIA:   Object to form.

Page 115

my101308.txt

2       A.    I would have to refresh my memory with the data and

3   medical record, the chronology.  I don't recall independently.

4       Q.    (BY MR. RABER)  Do you see that this Newcomer article

5   on the second page also talks about the risk of hyperlipidemia

6   among individuals with schizophrenia taking second-generation

7   antipsychotics?  It's in the right-hand column where it says

8   "Lambert, et al."

9       A.    Yes, sir.

10      Q.    Then it describes studies that were done, and then

11  the results were reported where it says "For the 12-week

12  exposure period, olanzapine increased the risk of developing

13  hyperlipidemia compared with our other second-generation

14  antipsychotic medications."  Do you see that?

15      A.    Yes.

16      Q.    Then it says "Exposure to clozapine, risperidone, or

17  quetiapine did not increase risk," correct?

18      A.    Right.

19      Q.    And it shows an odds ratio for quetiapine of 1.01

20  with a confidence interval of 0.78 to 1.32, correct?

21      A.    Correct.

22      Q.    That means that that 1.01 odds ratio is not

23  statistically significant, true?

24      A.    That's correct.

25      Q.    That data would be inconsistent with an opinion that

⚲

129

1   Seroquel caused Mr. Unger to develop hyperlipidemia.

2       A.    That's correct.

3                   (Young Exhibit No. 7 marked.)

4       Q.    (BY MR. RABER)  Showing you a document that we've

Page 116

my101308.txt

```
 5   marked as Young Exhibit 7.  Young Exhibit 7 is an article
 6   called "Risk of Treatment-Emergent Diabetes Mellitus in
 7   Patients Receiving Antipsychotics," with the lead author Leslie
 8   Citrome, C-i-t-r-o-m-e.
 9        A.   Yes.
10        Q.   You ever seen this article before?
11        A.   "Citrome" sounds familiar.
12        Q.   This one is dated October 2007 in Volume 41 in the
13   Annals of Pharmacotherapy.  Do you see that at the bottom?
14        A.   Correct.
15        Q.   Under results, do you see where it says that a total
16   of 25 observational pharmacoepidemiologic studies were found
17   comparing antipsychotics on the outcome of diabetes mellitus?
18        A.   Say again, please, sir.
19        Q.   Do you see where it says under results on the first
20   page that a total of 25 observational pharmacoepidemiologic
21   studies were found comparing antipsychotics on the outcome of
22   diabetes mellitus?
23        A.   Yes.
24        Q.   And does that sound like data that you would be
25   interested in knowing what it says?
```

♀

130

```
 1        A.   Yes.
 2        Q.   Data from October of 2007, right?
 3        A.   Yes.
 4        Q.   Look, if you would, at Table 1.
 5        A.   Table 1?
 6        Q.   Yes.
 7        A.   Yes, sir.
```

my101308.txt

8      Q.    And that identifies the various studies that were

9   available for this analysis of 25 studies.  Is that what it

10  looks like to you?

11     A.    Yes, sir.

12     Q.    And if you look on the page that has -- starts with

13  discussion on Page -- 1, 2, 3, 4 -- the fifth page of this

14  exhibit, you see where the authors conclude the overall results

15  of our analysis do not demonstrate a significantly increased

16  risk of diabetes during treatment with second-generation

17  antipsychotics compared with first-generation drugs.

18           Do you see that?

19     A.    Yes, I see that.

20     Q.    That's inconsistent with your opinion in this case,

21  isn't it?

22     A.    That's correct.

23     Q.    And then it refers us to Table 3 and Figure 1, true?

24     A.    Say that again, please, sir.

25     Q.    That statement then refers the reader to Table 3 and

⚥

131

1   to Figure 1, right?

2      A.    That's what it says.

3      Q.    Okay.  Let's look at Figure 1, if we can, which is

4   two pages down.

5      A.    Two pages hence?

6      Q.    Two pages --

7      A.    Previously?

8      Q.    No.  Other way, towards the end.

9      A.    Hence.

10     Q.    I -- hence.  I thought "hence" meant -- never mind.

Page 118

my101308.txt

```
11                    And do you see Figure 1?
12        A.    That right.
13              (Sotto voce discussion.)
14        A.    I see Table 3.  I see Figure 1.   Here we go.
15        Q.    (BY MR. RABER)   Then Figure 1 lays out data which
16   shows four of the second-generation atypicals, including
17   quetiapine, true?
18        A.    True.
19        Q.    And do you understand how this figure works, that if
20   a dot is above the line of zero, it favors the
21   first-generation -- the data favors the first-generation
22   antipsychotic; and if it's below the line, it favors the
23   particular drug listed there, but that there are also
24   confidence intervals drawn to show whether or not the
25   difference is statistically significant?
```

♀

                                                                132

```
1         A.    Yes.
2         Q.    Okay.   And so let's look at quetiapine.   So, for
3    example, Citation -- there's -- does it appear to you that
4    there's one dot out of eight that appears above the zero line
5    favoring the FGA for quetiapine?
6         A.    It appears that way, yes.
7         Q.    And that's for Citation No. 13?
8         A.    Correct.
9         Q.    But you can see from the confidence interval bars
10   that that is not a statistically significant difference, true?
11        A.    True.
12        Q.    All right.   And all of the other data points show
13   that actually quetiapine has the same as or lower diabetes risk
```

my101308.txt

14   than the first-generation antipsychotics, correct?

15        A.   Predominantly the same as.

16        Q.   But there's one, No. 16, which is a statistically

17   significant difference in favor of quetiapine, right,

18   predominantly the same as?  Do you see that?

19        A.   You said the dot before was not statistically

20   significant, but the dot below is statistically significant?

21        Q.   Well, look at Citation No. 16.  Do you see that?

22        A.   Yes.

23        Q.   And do you see how the range of the confidence

24   interval is entirely below zero?

25        A.   Yes.

♀

                                                           133

1         Q.   That means that that's a statistically significant

2    difference, doesn't it?

3         A.   Wait.  No.  The bar graphs represent a confidence

4    interval.

5         Q.   That's right.  And because in Citation No. 16 the

6    high end of the confidence interval is below zero, that means

7    that this -- that particular study showed a statistically

8    significantly lower risk of diabetes with quetiapine compared

9    to the first-generation antipsychotic.

10        A.   Right.  Most were neutral, one above showed diabetes

11   association, one below didn't.

12        Q.   Right.  But the difference is the one above, the

13   confidence interval crosses zero.  And so that means it's not

14   statistically significant, correct?

15        A.   And you have -- says what now?  Measuring what?

16   "Favors quetiapine versus favors FGA."  So, that isn't a

Page 120

my101308.txt

17    measure of statistically significant.  That's a -- some sort of

18    measuring scale.

19         Q.    You're not able to read this figure, are you?

20              MS. FENDIA:  Object to form.

21              Doctor, take whatever time you need to study

22    that in answering the questions.

23         A.    And the explanation for Figure 1, "Confidence

24    intervals for the attributable risk calculations pass through

25    zero for two-thirds of the computed comparisons."

♀

134

1         Q.    (BY MR. RABER)  That means for two-thirds of them,

2    there's no statistically significant difference, right?

3         A.    I believe so.

4         Q.    Okay.  So, let's go back to Figure 1.  And let me ask

5    it this way:  Do any of those citations there show a

6    statistically significant difference where quetiapine looks

7    worse than the FGA?

8         A.    If you're defining that as not passing through that

9    zero point on Figure 1, that's correct.

10         Q.    All right.  And if you look at the one where there

11    was a statistically significant difference that made quetiapine

12    have a lower risk than the FGA, Citation No. 16 -- do you see

13    that?

14         A.    Yes, I do.

15         Q.    And do you see the N above that?

16         A.    Yes, I do.

17         Q.    And do you know what that refers to?

18         A.    Not sponsored by a pharmaceutical company.

19         Q.    Okay.  So, the one study that's included here that

my101308.txt

20   shows that quetiapine has a more favorable risk profile than

21   the FGA in terms of diabetes was one that was not sponsored by

22   a pharmaceutical company.  Is that what that appears to show?

23        A.    That is what that appears to show, yes.

24        Q.    That data is inconsistent with your opinions in this

25   case, isn't it?

135

1         A.    Yes.

2         Q.    All right.  We've now seen the Catie study, the

3    Newcomer study, and the Citrome study, all of which appear to

4    be inconsistent with the opinions that you hold in this case,

5    and my question to you is:  How do you reconcile those studies

6    with your opinions?

7         A.    Reasonable people can disagree.

8         Q.    Well, did you systematically go through all of the

9    available clinical trial data and epidemiological studies

10   relating to Seroquel in order to form your opinion that you

11   believe that there's a causal relationship between Seroquel and

12   diabetes?

13        A.    Reasonably so, yes.

14        Q.    Reasonably so?

15        A.    Yes.  Line by line, every word, no.

16        Q.    Okay.  Every study?

17        A.    Not every study.

18        Q.    Okay.  And, in fact, we've seen that at least two of

19   the three we just looked at, you hadn't considered, the --

20              MS. FENDIA:  Object to form.

21        Q.    (BY MR. RABER)  Right?

22        A.    I didn't say that.

Page 122

my101308.txt
```
23      Q.   Well, you didn't know about the -- you didn't --
24  hadn't seen the Catie follow-up data on glucose that we looked
25  at and you hadn't seen this Citrome 2007 study, right?
```

♀

                                                                136


```
 1                  MS. FENDIA:  Object to form.
 2      A.   Like I told you, sir, "Citrome" rings a bell.  In the
 3  conclusion of the Citrome article on the first page, says "The
 4  avoidance of diabetes as an outcome cannot be predictably
 5  achieved with precision by choice of a second- versus a
 6  first-generation antipsychotic," and to me what that says is
 7  the second-generations aren't better than the first in that
 8  regard.
 9      Q.   (BY MR. RABER)  With regard to metabolic risks and
10  weight gain, right?
11      A.   Right.
12      Q.   I'm sorry.  This is relating to diabetes, right?
13      A.   Yes.
14      Q.   And so there -- she's concluding no difference.
15      A.   What that tells me is that new and improved is not
16  new and improved.
17      Q.   Well, have they ever said that they're new and
18  improved on the metabolic side effects compared to the
19  first-generation?
20      A.   Compared to first-generation specifically, "they"
21  being AstraZeneca?
22      Q.   No.  The promise of the atypicals was that they were
23  better on the EPS and movement-type disorders, not on the
24  metabolic issues.  Am I right about that?
25      A.   The promise of the second-generation antipsychotics
```
                              Page 123

my101308.txt

♀

137

1    was that we would not be hurting patients, number one; number
2    two, we would be helping them; and, No. 3, there wasn't an
3    issue of pre-prescription or premedication or monitoring of the
4    patient while on the medication closely in the sense that from
5    the Catie study, 70 percent of all subjects ultimately
6    discontinued the medication; meaning, across the board,
7    medications, like other medications in medicine, not complied
8    with or taken over time.
9        Q.    Let's go back to my question.
10       A.    And --
11       Q.    You're not answering it.
12       A.    What is your question, sir?
13             MS. FENDIA:  You can finish your answer.
14             MR. RABER:   No.  He's not answering the
15   question.
16       Q.    (BY MR. RABER)  The question is --
17             MS. FENDIA:  Excuse me, sir.
18       Q.    (BY MR. RABER)  The question is --
19             MS. FENDIA:  Let him finish his answer or we're
20   going to break it.  Let him finish it and then you can object
21   to --
22             MR. RABER:  Well, I'll tell you what.  I'm
23   trying to finish this deposition.  I'm not --
24             MS. FENDIA:  Let him finish his response.
25             MR. RABER:   He's not answering the question.

♀

138

my101308.txt

1                     MS. FENDIA:  Let him finish the response.  We're

2      not answering another question until he finishes his response.

3      How's that?  Do you want to take it up with the court?

4                     MR. RABER:  Yeah, I'd like to.  I'd like to.

5                     MS. FENDIA:  Okay.

6                     MR. RABER:  I'd like to.

7                     MS. FENDIA:  Proceed.  Finish your question --

8      finish your answer, Doctor.

9           A.   I'm sorry.  I was distracted by the lawyering.  What

10     is your question?

11          Q.   (BY MR. RABER)  My question is this:  Wasn't the

12     primary benefit that was touted for the second-generation

13     antipsychotics that they would provide similar efficacy with

14     fewer movement problems, EPS problems, tardive dyskinesia,

15     those kinds of things?

16          A.   Not --

17                    MS. FENDIA:  Object to form.

18          A.   Not exactly.

19          Q.   (BY MR. RABER)  Did the second-generation

20     antipsychotics -- were they developed to have a more favorable

21     profile on weight gain and diabetes?

22          A.   I don't recall that as a primary focus.

23          Q.   Now, you mentioned that one reason that you use

24     Trilafon instead of Seroquel is because you want to put people

25     who are more at risk for diabetes on Trilafon, right?

⚲

                                                                139

1           A.   Correct.

2           Q.   That's because it's your perception that Trilafon has

3      a better risk profile for diabetes and weight gain than
                                  Page 125

my101308.txt

4    Seroquel does?

5        A.    It may in a given individual, yes.

6        Q.    But you don't know that, do you?

7        A.    I think the data is out on that as well as to

8    whether -- still out on that as to whether in some individuals

9    some of the time Seroquel causes diabetes, okay?  And there's

10   studies being done on that.  And to the extent that I can

11   remove the risk or take it off the table in prescribing for a

12   patient, I would want to do that.

13              And with respect to the EPS to the

14   first-generation antipsychotics, there was treatment for that

15   as well.  And then the question becomes one of cost and are you

16   getting value or value added for the dollar cost of your

17   medication, and at what risk.

18       Q.    The data that we've just looked at does not support

19   the notion that Seroquel has a higher risk for diabetes than

20   conventional antipsychotics, does it?

21       A.    Correct, with the conventional antipsychotic -- with

22   the conventional -- conventional -- with the first-generation

23   antipsychotics not being specified.  In the, for example,

24   Newcomer article, they were not specified.

25       Q.    Going to show you a document that has previously been

♀

                                                                140

1    marked as Defendant's Exhibit 107.

2              MS. FENDIA:   Thank you.

3        Q.    (BY MR. RABER)  Have you ever seen Defendant's

4    Exhibit 107 before?

5        A.    Give me a moment to review it, sir.

6        Q.    Okay.
                          Page 126

my101308.txt

7      A.   This is pertaining to Seroquel XR.

8      Q.   That's correct.

9      A.   I don't recall seeing this.

10     Q.   Okay.  Well, if you turn to the very last page,

11 you'll see that this is a communication from the FDA from just

12 last week on October 8th, 2008, true?

13               MS. FENDIA:  Object to form.

14               MR. RABER:  What's wrong with the form?

15               MS. FENDIA:  I'm not sure that having the name

16 Thomas Laughren here and that date and time confirms your

17 statement.

18     A.   On the last page of the document you gave me, there

19 is a date of 10-08-2008.

20     Q.   (BY MR. RABER)  Right.  From Thomas Laughren?

21               MS. FENDIA:  Object to form.

22     A.   I assume.  I don't know.

23     Q.   (BY MR. RABER)  Do you know who Thomas Laughren is?

24     A.   No.

25     Q.   Look at the third page of the Exhibit 107.  See where

♀

                                                        141

1 he's listed as the director of the Division of Psychiatry

2 Products, Office of Drug Evaluation 1, Center For Drug

3 Evaluation and Research?

4      A.   Yes, I see that.

5      Q.   And do you see under the "Sincerely" it says "See

6 appended electronic signature page"?

7      A.   Yes, sir, I see that.

8      Q.   Okay.  Do you understand that -- well, let me ask you

9 this:  Are your opinions different for the Seroquel XR

Page 127

my101308.txt

10    formulation than they are for the regular Seroquel formulation?

11        A.    I hadn't considered the Seroquel XR formulation in my

12    opinion.

13        Q.    Is it the same active molecule?

14        A.    In some respects, it's -- the product is the same and

15    in some respects it's different.  "XR" stands for extended

16    relief (sic).  Beyond that, I don't know.

17        Q.    Okay.  Now, do you see that on the first page of

18    Exhibit 107 that the FDA is approving three new indications for

19    Seroquel XR?

20        A.    What page, sir?

21        Q.    First page.  Says "NDA 22-047S-006 provides for the

22    use of Seroquel XR as monotherapy in the treatment of bipolar

23    depression."

24        A.    New drug application.  Yes, it says that.

25        Q.    And then it refers to another one that provides for

⚥

142

1    the use of Seroquel XR as monotherapy in the treatment of

2    bipolar mania?

3        A.    As opposed to acute mania.  Yes, it says that.

4        Q.    And then the next one says that it provides for the

5    use of Seroquel XR as adjunctive therapy in the treatment of

6    bipolar mania.  Do you see that?

7        A.    Yes.

8        Q.    And do you understand that this is referring to three

9    new proposed indications?

10        A.    I understand.

11        Q.    And then the next paragraph says "We have completed

12    our review of your submissions as amended.  They are approved

my101308.txt

13    effective on the date of this letter for use as recommended in

14    the enclosed agreed-upon labeling text."   See that?

15         A.    Yes.

16         Q.    And do you understand that just last week the FDA

17    approved Seroquel XR for three new indications?

18         A.    Based on this document, yes.

19         Q.    And that the regulatory requirement for such approval

20    is a finding that the drug is safe and effective as labeled?

21              MS. FENDIA:   Object to form.

22         A.    I don't see that statement in this --

23         Q.    (BY MR. RABER)   Okay.

24         A.    -- document as yet.   Maybe it's in there.

25         Q.    Okay.   Do you agree or disagree with the FDA's

♀

143

1    decision to approve Seroquel for three new indications as

2    recently as last week?

3              MS. FENDIA:   Object to form.

4         A.    I don't have an opinion on that.

5         Q.    (BY MR. RABER)   Do you -- are you aware of the FDA

6    ever concluding that Seroquel causes diabetes?

7         A.    Am I aware?

8         Q.    Yeah.

9         A.    Yes, I'm aware.

10        Q.    Has the FDA made that conclusion?

11        A.    No, it has not.

12        Q.    Has the FDA made the conclusion that Seroquel

13    exacerbates diabetes or prediabetes?

14        A.    Exacerbates as opposed to may be correlated it with,

15    thereby earning a class warning, yes.

Page 129

my101308.txt

16      Q.   It's your testimony that the FDA has concluded that

17   Seroquel actually exacerbates diabetes or prediabetes?

18              MS. FENDIA:  Object to form.

19      A.   I don't think -- I would have to look at the language

20   of the warning, whether they use the word "exacerbates" or

21   "is -- "may be associated with."  They say there's a

22   relationship.

23      Q.   (BY MR. RABER)  Okay.  What are you looking at?

24      A.   The 2003 FDA required class warning.

25      Q.   Okay.  Well, let's look at the most recent state of

⚲

                                                        144


 1   the art science here in Exhibit 107.  You see that it refers --

 2              MS. FENDIA:  Object to the sidebar.

 3      Q.   (BY MR. RABER)  Okay.  Do you see that it refers to

 4   the enclosed agreed-upon labeling text in the approval letter?

 5      A.   I'm sorry.  Where are you --

 6      Q.   The bottom of the first page, "We have completed our

 7   review," and it talks about the enclosed agreed-upon labeling

 8   text.

 9      A.   Yes, I see that.

10      Q.   Okay.  And you see that there's actually a label

11   attached to this approval letter?

12      A.   Yes.

13      Q.   And on the first page of that label, there's an --

14   upper right-hand corner, there's a warning and precaution for

15   hyperglycemia and diabetes mellitus.

16      A.   Yes.  I see that.

17      Q.   Okay.  Does it say there that Seroquel causes or

18   exacerbates diabetes?

my101308.txt

19      A.      No.  It says "Hyperosmolar coma" -- "ketoacidosis,

20  hyperosmolar coma, and death have been reported in patients

21  treated with atypical antipsychotics, including" --

22      Q.      Quetiapine.

23      A.      -- "quetiapine."  Thank you.

24      Q.      And then if you look at -- refers you to Section 5.3,

25  correct?  At the end of that paragraph there, it says,

♀

                                                            145

1  parentheses, "5.3"?

2      A.      That's what it does.

3      Q.      Okay.  If you go to Page 10, which is Section 5.3,

4  you'll see that there's the warning for hyperglycemia and

5  diabetes mellitus, right?

6      A.      Yes.

7      Q.      And does that warning say anywhere that the FDA has

8  conclude that Seroquel either causes or exacerbates

9  hyperglycemia or diabetes?

10     A.      "Causes" as distinguished from "associated with"?

11     Q.      Right.

12     A.      It doesn't use the word "cause," that's correct.

13     Q.      Okay.  In fact, it says "Assessment of the

14  relationship between atypical antipsychotic use and glucose

15  abnormalities is complicated by the possibility of an increased

16  background risk of diabetes mellitus in patients with

17  schizophrenia and the increasing incidence of diabetes mellitus

18  in the general population."  Do you see that?

19     A.      Yes.

20     Q.      Would you agree with that statement?

21     A.      Yes.

my101308.txt

22        Q.    And then it says "Given these confounders, the
23   relationship between atypical antipsychotic use and
24   hyperglycemia-related adverse reactions is not completely
25   understood."  You see that?

♀

                                                                    146

1         A.    Yes.
2         Q.    Do you agree with that?
3         A.    Yes.
4         Q.    All right.  So, you have no quarrel with the FDA
5    approving Seroquel for three new indications.  Is that fair to
6    say?
7                    MS. FENDIA:  Object to form.
8         A.    I have not seen this document before, was not asked
9    to opine about new indications for Seroquel Extended Release
10   and, at this point in time, I have no quarrel.
11                   Correct me if I'm wrong, but I think the
12   Japanese did say -- implicate Seroquel as causing diabetes,
13   but -- I would have to refer to that document, but --
14        Q.    (BY MR. RABER)  Did I ask you about the Japanese?
15        A.    Earlier you did, sir.
16        Q.    Did I ask you about the Japanese just now?
17                   MS. FENDIA:  Object to form.
18                   MR. RABER:  Move to strike.
19                   MS. FENDIA:  Finish your answer, Doctor, then he
20   can make his objection, like he's supposed to.
21                   MR. RABER:  Look, if I ask him about the FDA and
22   he's going to talk about the Japanese, we're never going to
23   finish this deposition.
24                   MS. FENDIA:  Well, then we'll just have to stay
                         Page 132

my101308.txt

25      until it finishes.   Let the gentleman finish his answer.

                                                                    147


 1              MR. RABER:   Thank you for saying that.

 2      Mr. Fibich says something else.

 3              MS. FENDIA:   Well, you know what, when

 4      Mr. Fibich comes back, if he wants to change the rules back to

 5      where you can badger this witness, cut him off, and not let him

 6      finish his answers, that's up to Mr. Fibich.

 7              Doctor, finish your answer, please.

 8      A.      What was the question, please, sir?

 9      Q.      (BY MR. RABER)   Why are you referring to the Japanese

10      label?

11      A.      It has relevance of bearing in this matter.

12      Q.      Do you know whether the Japanese were looking at the

13      same data or different data from what the FDA looked at?

14      A.      Specifically, no.

15      Q.      Do you know whether the Japanese apply a different

16      standard than the FDA in determining what gets listed as a

17      contraindication?

18      A.      Specifically, no.

19      Q.      And you know that aside from these recent XR

20      approvals that we just looked at, that Seroquel was approved

21      for new indications between January of 2004 and these most

22      recent approvals in October of 2008, true?

23      A.      Correct.

24      Q.      And do you agree or disagree with the FDA's decision

25      to approve Seroquel for those new indications?

my101308.txt

148

1           MS. FENDIA:  Object to form.

2       A.   What was your question again, sir?

3       Q.   (BY MR. RABER)  Do you agree or disagree with the

4   FDA's decision to approve Seroquel for those new indications?

5           MS. FENDIA:  Object to form.

6       A.   I do not disagree or take issue with the FDA on that

7   matter, or those matters.

8       Q.   (BY MR. RABER)  And would you -- would it be fair to

9   say that the FDA had the benefit of reviewing more data than

10  you've had in forming your opinions here?

11          MS. FENDIA:  Object to form.

12      A.   More data and perhaps different data.

13      Q.   (BY MR. RABER)  They had data not only about Seroquel

14  but about all the other atypical antipsychotics, true?

15      A.   I do not know what data the FDA had or didn't have in

16  its approval process.

17      Q.   Okay.  It's likely, isn't it, that they had more data

18  than you've had available to you, correct?

19          MS. FENDIA:  Object to form.

20      A.   Probably so.

21      Q.   (BY MR. RABER)  And they have experts at the FDA

22  whose job it is to analyze and review data like that, don't

23  they?

24      A.   Yes.

25      Q.   They have endocrinologists, correct?

♀

149

1       A.   I don't know.

Page 134

my101308.txt

2      Q.    Diabetes experts?

3      A.    I imagine --

4            MS. FENDIA:   Object to form.

5      A.    It would be conjecture on my part to tell you what

6    experts from what disciplines are represented at the FDA in

7    their approval process.

8      Q.    (BY MR. RABER)  Looking at Page 11 of your report, if

9    we can dig that out -- here it is here.

10     A.    We're no longer looking at the material I didn't see

11   before today?

12     Q.    We're not looking at that right now.

13     A.    Okay.

14     Q.    Do you want to look at it some more?

15     A.    Perhaps later.

16     Q.    Okay.  You'll get a copy of it.

17     A.    Thank you.

18     Q.    You can probably actually get it on the FDA website.

19           Let's look at Exhibit 3, which is your report,

20   and Page 11 specifically.  On Page 11, you state specific

21   opinions relating to Richard Unger; is that correct?

22     A.    Correct.

23     Q.    And you note in the second paragraph that his past

24   medical history includes chronic pain requiring opioid

25   medication and ambulatory assistance, correct?

                                                        150

1      A.    Correct.

2      Q.    And opioid medication -- is "narcotics" another word

3    for that?

4      A.    Correct.

my101308.txt

5      Q.     Can narcotics like that be addictive?

6      A.     Yes.

7      Q.     And what effect do narcotics like what you refer to

8   in this report have on a person's sedation?

9      A.     They can be sedative.

10     Q.     Did you see evidence of that with Mr. Unger, that the

11  narcotics he was taking for his pain had a sedation effect on

12  him?

13     A.     I was concerned about that.

14     Q.     And his doctors were concerned as well, weren't they?

15     A.     Correct.

16     Q.     And do you know how the -- what impact on sedation

17  those narcotics had compared to any sedative effects of

18  Seroquel?

19     A.     No, I do not.

20     Q.     You mention -- in the third paragraph here, you refer

21  to diabetic risk factors for Mr. Unger.  Do you see that?

22     A.     Yes, I do.

23     Q.     You say "Diabetic risk factors include hypertension,

24  morbid obesity, hyperlipidemia, smoking, and medications"; is

25  that right?

⚥

                                                                    151


1      A.     Correct.

2      Q.     Does that refresh your recollection that Mr. Unger

3   had both hypertension and hyperlipidemia?

4      A.     Yes.

5      Q.     I think you mentioned before that you couldn't

6   remember that fact, right?

7      A.     Right.

Page 136

my101308.txt

8      Q.   And you say Seroquel was prescribed off-label.

9      A.   Right.

10     Q.   Then you say, "Insulin-dependent diabetes appears

11  treatment-emergent with ingestion of Seroquel," correct?

12     A.   Correct.

13     Q.   Is Mr. Unger insulin dependent as we sit here today,

14  insulin dependent?

15     A.   As we sit here today?

16     Q.   Yes.

17     A.   Don't know.  As of his last record, I thought he was

18  taking insulin, although I may be confusing him with

19  Whittington because one was insulin dependent and one was on

20  metformin.  Insulin-dependent diabetes appears treatment

21  emergent.

22     Q.   Bear with me just a second here.

23          (Young Exhibit No. 8 marked.)

24     Q.   (BY MR. RABER)  Doctor, I'm showing you a document

25  we've marked as Young Exhibit 8.  And you see that this is a

♀

152

1  medical record relating to a Rafael Mas and Mr. Unger, date --

2  bottom right -- of June 19th, 2006?

3          MS. FENDIA:  Thank you.

4      A.   Yes.

5      Q.   (BY MR. RABER)  And that's approximately nine months

6  after Mr. Unger was diagnosed with diabetes.  Do you see that?

7  He was diagnosed in September of 2005, and this is nine months

8  later, right?

9      A.   September 2005.  Six, seven, eight, nine.  Correct.

10     Q.   All right.  And do you see near the top there there's

my101308.txt

11    a reference that says "NIDDM" under the history?

12              MR. RABER:  Is it okay if I walk around and

13    point it to him?

14              MS. FENDIA:  I can show it to him.

15        A.    NIDDM.

16        Q.    (BY MR. RABER)  What does that stand for?

17        A.    Non-insulin-dependent diabetes mellitus.

18        Q.    Okay.  And does that indicate to you that at least as

19    of September of -- I mean, June of 2006, his treating

20    physicians considered him to have non-insulin-dependent

21    diabetes?

22        A.    That's correct.

23        Q.    So, is your report incorrect here in stating that he

24    had insulin-dependent diabetes?

25        A.    I'm not sure in terms of the time frame and the

♀

153

1     records I reviewed because he did receive -- I thought he

2     received insulin.  If he didn't receive insulin, then that

3     would be incorrect.  If he is currently not receiving insulin,

4     then that would be incorrect.

5         Q.    Now, you say in your report on Page 11, "Upon

6     discontinuation of Seroquel, Mr. Unger claims he lost 30 pounds

7     and did not need his power scooter to move from one place to

8     another."  Do you see that?

9         A.    Looking for it.

10        Q.    Near the bottom.  On -- it's about eight lines from

11    the bottom.

12        A.    Yes.

13        Q.    Okay.  The statement there, "Upon discontinuation of

my101308.txt

14    Seroquel, Mr. Unger claims he lost 30 pounds" --

15         A.    Are you through with this, sir?

16         Q.    Put that down, yes.  Let's start over.

17               The statement in your report which says "Upon

18    discontinuation of Seroquel, Mr. Unger claims he lost 30

19    pounds," that statement's not correct, is it?

20         A.    Mr. Unger didn't claim that?

21         Q.    Did Mr. Unger lose 30 pounds upon discontinuation of

22    Seroquel?

23         A.    I would have to look at the record.

24         Q.    All right.  Let's look at actually your report.

25    Turn, if you would, to the attachment, the medical timeline

♀

154

1     that's attached -- it's attached to your report.  The report's

2     right there.

3          A.    I don't see the timeline.

4          Q.    Okay.  Here.  It should be right here.  This should

5     be attached to this.  Let's attach it.

6                Okay.  Specifically looking at Page 23 of the

7     timeline chronology in your report --

8          A.    One moment, sir --

9          Q.    Okay.

10         A.    -- because I'm now mixed up on what's been copied and

11    yours and what's in my file and mine.

12               Your question, sir?

13         Q.    Okay.  Looking at Page 23 of this timeline,

14    chronology, whatever we want to call it, that shows that -- for

15    the October 2nd, 2006, entry, it says "The patient stopped the

16    Seroquel last night," right?

Page 139

my101308.txt

17      A.    Yes.

18      Q.    And so that means he stopped it on October the 1st,

19  right?

20      A.    Yes.

21      Q.    Okay.  And just three days -- three or four days

22  before that his weight was 313 pounds, right?

23      A.    About five days.

24      Q.    Well --

25      A.    Well, the night before.

♀

                                                    155


1       Q.    Was the 1st --

2       A.    Four days.

3       Q.    Four days.  And that's the closest weight we have in

4   time to when he stopped Seroquel, 313 pounds, right?

5       A.    Yes.

6       Q.    All right.  And if you look about two weeks later,

7   he's been off Seroquel for 11 days.  On October 12th, 2006, how

8   much does he weigh?

9       A.    Well, it says "Seroquel," so I'm not sure on that

10  date he's on Seroquel or not.

11      Q.    Okay.  Well, we know that the record on the 2nd says

12  he stopped the Seroquel last night, right?

13      A.    But according to this, the record on the 12th per

14  Dr. Quintero says he's on Seroquel.

15      Q.    It does?  It just says "Seroquel" on this outline,

16  right?

17      A.    Yes.

18      Q.    Okay.  And you don't know what that means.

19      A.    Well, I don't know whether he's on or off the

                              Page 140

my101308.txt

20    Seroquel at this point according to this document.

21        Q.    Okay.  How much did he weigh -- did he gain or lose

22    weight after this record indicates he had stopped the Seroquel?

23        A.    Depending on whether he's receiving Seroquel, there

24    is a 12-pound weight difference between 09-27-06 and 10-12-06.

25        Q.    So, if we interpret the note as saying he stopped the

♀

                                                                      156


1    Seroquel last night -- meaning October 1st, 2006 -- there's

2    about a 12-pound weight gain after he stopped, true?

3             MS. FENDIA:   Object to form.

4        A.    Ask your question again, please, sir.

5        Q.    (BY MR. RABER)  According to the note which says the

6    patient stopped the Seroquel last night -- meaning October 1st,

7    2006 -- there appears to be approximately a 12-pound weight

8    gain after he stopped using Seroquel, true?

9             MS. FENDIA:   Object to form.

10        A.    I don't know if that's true or not.

11        Q.    (BY MR. RABER)  Okay.  And that's because the

12    reference on October 12th in this summary has the word

13    "Seroquel" in it?

14        A.    Correct.

15        Q.    What was his weight on December 4th of 2006?

16        A.    Talking about a 12-pound weight gain in --

17        Q.    Two weeks.

18        A.    -- three -- in two weeks?  That's a lot.

19        Q.    Well, remember we saw the study that said a pound a

20    day with just a little bit of ice cream more than what you're

21    supposed to burn off, right?

22        A.    Do I remember that?  Yes.

                                Page 141

my101308.txt

23   Q.    Do you remember that?  Okay.

24   A.    Yes, I do.

25   Q.    And so at least according to this chronology, he

♀

157

1   gained 12 pounds between September 27th, 2006, and October 12th

2   of 2006, correct?

3   A.    Correct.

4   Q.    And then on December 4th of 2006, how much does he

5   weigh?

6   A.    December 4th of 2006?

7   Q.    Yes.

8   A.    345.1.

9   Q.    So, it looks like in little over two months after he

10   stopped Seroquel, he gained 32 pounds, right?

11   A.    If the Seroquel has been stopped during this time,

12   yes.

13   Q.    That would be inconsistent, wouldn't it, with your

14   theory that Seroquel caused him to gain weight?

15             MS. FENDIA:  Object to form.

16   A.    Yes.

17   Q.    (BY MR. RABER)  And that weight that was taken on

18   December 4th, 2006, we know that that's a reliable weight,

19   don't we?

20             MS. FENDIA:  Object to form.

21   A.    I have no way of knowing.

22   Q.    (BY MR. RABER)  Okay.  You see, for one thing, it's

23   to -- measured to the tenth of a pound.  Do you see that?

24   A.    Yes.  It would be unlikely for Mr. Unger to report

25   that to the tenth of a pound.

Page 142

my101308.txt

♀

1      Q.    Okay.  Let's look, if we can, at -- let me ask you

2    this:  When someone goes in for surgery for preadmission, do

3    they sometimes get weighed?

4      A.    Pardon me.  I was distracted by the record which

5    states he was getting insulin injections, Symlin; although I

6    was reading something about Symlin not being insulin or

7    different somehow, which would indicate he was being treated

8    with injections.

9      Q.    Well, is being treated with injections something

10    different from being insulin dependent?

11      A.    I assume that --

12      Q.    Do you know?

13      A.    I assume, if I can finish my answer --

14      Q.    Well, I'm sorry, but the -- but assumptions aren't --

15            MS. FENDIA:  Let's let him finish his answer,

16    please.

17            Finish your answer, Doctor.

18      A.    I assume if he's taking injections, that means the

19    current state of his disease management is insulin dependent.

20    That is my assumption.

21      Q.    (BY MR. RABER)  Okay.  But you don't know that to be

22    true.

23      A.    Could it, in fact, be possible for an endocrinologist

24    or a diabetologist to say that a person injecting themselves

25    with insulin to treat their diabetes is not insulin dependent

♀

my101308.txt

1    because it's temporary or time limited and, therefore, not

2    dependent in a given period of time?  That's certainly

3    possible, sir.

4         Q.    Sir -- sir, how do you know he's injecting himself

5    with Symlin as opposed to something else?

6         A.    It says "Symlin, ten units before meals."

7         Q.    Where does it say that?

8         A.    Page 24, bottom of the paragraph.  I don't think I

9    made up the statement in my report that he was being treated

10   with insulin injections out of whole cloth.

11        Q.    Okay.  And it's your testimony that Symlin is

12   insulin?

13        A.    No, it is not.  I raised the issue in my earlier

14   answer that I had read something about how Symlin is used to

15   treat diabetes but may not technically be insulin and did not

16   fully understand that.  However, my understanding is the guy

17   is -- Mr. Unger, the patient, is being subjected to

18   prescribed -- experiencing needles into his skin in order to

19   treat his condition.

20        Q.    Okay.  Now, my question is:  When somebody goes

21   through a preadmission process for surgery, is it your

22   understanding that people get weighed?

23        A.    Yes.

24        Q.    And it's -- that weight is an important one because

25   it affects, for example, the anesthesia that someone gets in

♀

160

1    surgery, right?

2         A.    That's one reason, yes.

3         Q.    Okay.  And so a weight like that would be more

Page 144

my101308.txt

 4    reliable than a self-reported weight, wouldn't it?

 5        A.    May be, yes.

 6              (Young Exhibit No. 9 marked.)

 7        Q.    (BY MR. RABER)  Okay.  I want to show you a document

 8    that we've marked as Young Exhibit 9.  This is a Mercy Hospital

 9    preadmission record dated December 1st of 2006.  You see that?

10        A.    Yes.

11        Q.    And --

12        A.    Well --

13        Q.    -- procedure date --

14        A.    Oh, pre-admit time.  Yes.

15        Q.    Okay.  And so you understand that Mr. Unger was at

16    the hospital on December 1st of 2006 to have certain tests done

17    before a surgical procedure?

18        A.    He was having a melanoma removed, is my

19    understanding.

20        Q.    Okay.  And if you look at the patient information

21    section, the middle, you see where it says "Weight:   345.1

22    pounds"?

23        A.    Yes, sir.

24        Q.    Okay.  That's more -- strike that.

25              On December 1st of 2006, Mr. Unger is not taking

⚥

                                                                    161

 1    Seroquel, is he?

 2        A.    I would have to refresh my memory on that.  Let me

 3    look at his medications because that's certainly a part of a

 4    presurgical or preadmission hospital record, and if I look for

 5    a list of the medications the patient is on prior to his

 6    surgery -- I don't see it.
                          Page 145

my101308.txt

7      Q.    You don't see the list of medications or you don't
8    see Seroquel?
9      A.    I don't see a list of medications on this hospital
10   preadmission record.  I'm looking for it.  Anesthesia,
11   achievement plate (sic), medical -- where is meds?  That's
12   important, too, prior to surgery.
13     Q.    Well, let me ask you this:  Do you remember
14   Mr. Unger's testimony that he stopped taking Seroquel in
15   October of 2006?
16     A.    The specific date, no; that he self-discontinued
17   based on concerns he had, yes.  But there are no medications
18   listed on this pre-op form and preadmission record.
19     Q.    Okay.  Well, in looking at Exhibit 9, are you
20   assuming that he's taking Seroquel or not taking Seroquel?
21     A.    Neither.  I make no assumption.
22     Q.    Okay.  Would you agree with me that this weight of
23   345.1 pounds on December 1st of 2006 is higher than it was at
24   any time when we know that Mr. Unger was actually taking
25   Seroquel?

                                                          162

1      A.    Appears to be so.
2      Q.    In fact, the highest weight listed in your chronology
3    when he was definitely on Seroquel is 325 pounds, true?
4      A.    In the chronology I was supplied with, yes.
5      Q.    All right.  And so this weight on December 1st of
6    2006 is 20 pounds more than that, right?
7      A.    Correct.
8      Q.    That would be inconsistent with your theory that
9    Seroquel caused him to gain weight, wouldn't it?
                          Page 146

my101308.txt

10      A.      No.

11      Q.      If he's not taking Seroquel and he -- his weight

12  increases to 20 pounds above the all-time high on Seroquel, how

13  can you say that Seroquel caused him to gain that weight?

14      A.      Post hoc ergo proctor hoc.  Fluctuations in weight

15  can be due to a number of factors.  I don't know if he's on

16  Seroquel at this time or not according to this document.

17  Weight is important for presurgical procedures.  I would think

18  medications are as well.  They are not here.  This is the

19  highest weight according to the chronology.  If he is not on

20  Seroquel, then his weight gain is not due to the Seroquel.

21      Q.      And you would agree with me that the same factors

22  that caused him to gain weight off Seroquel can exist while

23  he's taking Seroquel as well?

24      A.      Yes.

25      Q.      Is it your opinion that Mr. Unger gained weight while

♀

163

1   he was taking Seroquel?

2       A.      Yes.

3       Q.      There was a temporal association there?

4       A.      Yes.

5       Q.      Was there another temporal association with

6   Mr. Unger's weight gain other than Seroquel?

7       A.      Meaning were there other risk factors for weight

8   gain?

9       Q.      Yes.

10      A.      Yes.

11      Q.      There was a pretty significant one, wasn't there?

12      A.      Yes.

Page 147

my101308.txt

13      Q.    His injury, right?

14      A.    Yes.

15      Q.    Okay.  And, in fact, his extreme disability coincides

16  with the time he began taking Seroquel, doesn't it?

17      A.    Say that again, sir.

18      Q.    His most extreme disability coincides with the time

19  he begins taking Seroquel in October of 2002, correct?

20      A.    Yes.

21      Q.    Among other things, he had a diskitis in August of

22  2002, right?

23      A.    I would have to check the date on that, but I'm aware

24  he had diskitis.  I didn't list the date in my report, so --

25      Q.    You knew that before Mr. Unger started taking

♀

                                                              164

1   Seroquel, he was walking with the assistance of a walker?

2       A.    Correct.

3       Q.    He described his pain as incapacitating?

4       A.    Correct.

5       Q.    He was taking significant amounts of pain medication,

6   such as OxyContin, Anexa, and Vicodin, right?

7       A.    Yes.

8       Q.    And because of those -- because of that

9   incapacitating pain, Mr. Unger was leading a very sedentary

10  lifestyle in the couple months leading up to his starting

11  Seroquel.

12            MS. FENDIA:  Object to form.

13      A.    That was one of the factors.

14      Q.    (BY MR. RABER)  And what were the others?

15      A.    His obesity.  That's one of the other factors.

Page 148

my101308.txt

16      Q.     And after Mr. Unger started Seroquel, he was

17   extremely sedentary, correct?

18      A.     Correct.  Seroquel is sedating.  It's one of the

19   reasons it's frequently prescribed.

20      Q.     Are you saying, sir, that his sedentary lifestyle was

21   because of the Seroquel?

22      A.     I'm saying the Seroquel is likely to have contributed

23   to that because one of the main reasons Seroquel is prescribed

24   versus other medications is because of its sedating quality;

25   although, I don't think for Mr. Unger that sedation was the

♀

165

1    primary consideration in prescribing the Seroquel off-label.

2       Q.     What do you think was?

3       A.     I think at that time Seroquel was being advocated as

4    an antidepressant-type antipsychotic with utility in mood

5    disorders.

6              (Young Exhibit No. 10 marked.)

7       Q.     (BY MR. RABER)  Showing you a document that we've

8    marked as Young Exhibit 10.  Exhibit 10 is a letter -- or I'm

9    sorry.  It's a note from Dr. Neil Schechter dated July 2nd,

10   2002; is that right?

11      A.     Correct.

12      Q.     And Dr. Schechter is one of the doctors that treated

13   Mr. Unger for his back pain, right?

14      A.     Correct.

15      Q.     In his July 2nd, 2002, note, Dr. Schechter says, "He

16   has been out of work since 05-01-02 and states that the pain

17   has become more severe and incapacitating," right?

18      A.     Correct.

my101308.txt

19      Q.    He was in that condition before he ever took
20  Seroquel, right?
21      A.    Yes.
22      Q.    So incapacitated that he couldn't even work, right?
23      A.    Correct.
24      Q.    It mentions that he was on medications for blood
25  pressure, true?

♀

166

1       A.    Yes.
2       Q.    And then it says "He is also on pain medication from
3   Drs. Posner and Ramirez consisting of OxyContin, 40 milligrams
4   BID, and Anexa, two pills every four to six hours," right?
5       A.    Right.
6       Q.    That describes a sedentary person before he ever took
7   Seroquel, doesn't it?
8       A.    Yes, decidedly so.
9            (Young Exhibit No. 11 marked.)
10      Q.    (BY MR. RABER)  Want to show you a document that has
11  been marked as Young Exhibit 11.
12      A.    Pardon me.
13      Q.    You recognize Exhibit 11 as progress notes from
14  Dr. Cabada-Rovirosa?  Do you recognize those as progress notes
15  of Dr. Rovirosa?
16      A.    Yes.
17      Q.    Or Cabada-Rovirosa.
18      A.    Yes.
19      Q.    You've reviewed those before?
20      A.    Yes.
21      Q.    And looking at the entry there on August the 20th,

Page 150

my101308.txt

22    2002, he says, "Recently had a diskitis and is having severe
23    ambulatory problems which jeopardizes the quality of his
24    lifestyle."
25              Would you agree that before Mr. Seroquel --

♀

                                                              167


1     "before Mr. Seroquel."  Would you agree that before Mr. Unger
2     ever took Seroquel, that he was so sedentary that he basically
3     had almost no quality of life?
4              MS. FENDIA:   Object to form.
5         A.   That he had no quality of life?
6         Q.   (BY MR. RABER)  Almost.
7         A.   I think that the diskitis from the discogram
8     recommended by Dr. Schechter set him back.
9         Q.   The diskitis did?
10        A.   That was one of the things, yes, recommended by
11    Dr. Schechter.
12        Q.   And it caused -- he -- the diskitis was recommended
13    by Dr. Schechter?
14        A.   The discogram, for Mr. Seroquel.
15        Q.   Are you saying that he was -- are you trying to be
16    cute there, "for Mr. Seroquel"?
17             MS. FENDIA:   Object to form.  Let's just --
18    object to -- that's a sidebar.  Let's just move on.
19        Q.   (BY MR. RABER)  Why did you say that?  Were you
20    trying to tease me about saying "Mr. Seroquel" instead of
21    "Mr. Unger"?
22             MS. FENDIA:   Don't answer that question.  Let's
23    just move on.
24        Q.   (BY MR. RABER)  You're not going to answer me?
                        Page 151

my101308.txt

25            MS. FENDIA:  I've lodged an objection.   You

♀

168

1    don't need to be harassing this witness.

2        Q.    (BY MR. RABER)  Sir, are you saying that Mr. -- that

3    Dr. Schechter somehow contributed to Mr. Unger's sedentary

4    lifestyle?

5        A.    No.

6        Q.    We can agree, can't we, that before Mr. Unger ever

7    took Seroquel, that he was severely sedentary in his lifestyle?

8        A.    Yes.

9        Q.    And Seroquel had nothing to do with that.

10       A.    Prior to his taking Seroquel, Seroquel had nothing to

11   do with that, correct, sir.

12       Q.    And Mr. Unger felt that it was so bad that it was

13   jeopardizing the quality of his lifestyle.

14       A.    Dr. Cabada-Rovirosa reports that.

15       Q.    And, in fact, that's why Mr. Unger came to get help,

16   right, because he was so depressed and distraught from his

17   physical incapacity?

18            MS. FENDIA:  Object to form.

19       A.    Says he is very invested into his process.

20       Q.    (BY MR. RABER)  Well, look at the July 9th, 2002,

21   entry.

22       A.    Yes, sir.

23       Q.    Do you see that?  It's on the first page.  Do you see

24   where it says "He was very distraught and very besieged by his

25   pains.  Finds a lot of difficulty finding a way out of his

♀

my101308.txt

169

1    situation.   Feels very hopeless and incapable of functioning."
2               See that?
3        A.   Yes.
4        Q.   And do you interpret that that Mr. Unger's major
5    depression was precipitated by these terrible pains that left
6    him almost totally physically incapacitated?
7        A.   Yes.
8        Q.   And that was before he took Seroquel?
9        A.   Yes.
10       Q.   And after he started taking Seroquel, he remained
11   sedentary, didn't he?
12       A.   Yes.
13       Q.   And his doctors were concerned about his sedentary
14   lifestyle, weren't they?
15       A.   Correct.
16            (Young Exhibit No. 12 marked.)
17       Q.   (BY MR. RABER)  Dr. Young, I'm showing you a document
18   that we've marked as Young Exhibit 12.  This is a letter dated
19   July 14th, 2003, from a Dr. Terence Peppard to a Dr. Rafael
20   Moss, with a copy to Richard Unger.  Do you see that?
21       A.   Yes, sir.
22       Q.   And Dr. Peppard says that the case -- at the bottom
23   of the first page, "The case was discussed at length with the
24   patient and his supportive wife, who is a nurse here at Mercy
25   Hospital."  Do you see that?

♀

170

1        A.   Yes.

Page 153

my101308.txt

2      Q.    He says, "The patient requires a comprehensive

3   approach to his pain problems.  He needs to have increased

4   physical activity, although this may increase his pain

5   symptoms.  He also needs his pain medications and psychotropics

6   tapered over a period of time as they are having a negative

7   effect on his cognition and possibly on his mood."

8             Do you agree with that assessment?

9      A.    Yes.

10     Q.    Then it says "The patient also requires a meaningful

11  weight loss program."

12            To your knowledge, what, if any, efforts did

13  Mr. Unger make to try to lose weight in response to this?

14     A.    Think in his deposition he talked about salads and

15  foods and trying to eat healthy.

16     Q.    Then on the second page of this exhibit, it says "I

17  have also stressed to the patient that his level of inactivity,

18  chronic use of significant amounts of medication, affected

19  mental status, and morbid obesity represent a significant risk

20  to his overall health."

21            Do you agree with that assessment?

22     A.    Yes.

23            MS. FENDIA:   Object to form.

24     Q.    (BY MR. RABER)  The pain for Mr. Unger got so bad

25  that he had difficulty walking even a hundred feet, right?

♀

171

1      A.    Correct.

2      Q.    It got so bad that he needed an electric scooter to

3   get around, correct?

4      A.    Correct.

Page 154

my101308.txt

5      Q.     Are you saying that the Seroquel was a cause of that?

6      A.     The cause of what, sir?

7      Q.     His inability to get around to the point that he

8   needed to use an electric scooter.

9      A.     I think in conjunction with his other medications at

10  one point that the sedating nature of Seroquel may have

11  contributed to his being sedentary.

12     Q.     Okay.  But the reason for the scooter was not because

13  of the sedative effects.  It was because he was in pain, wasn't

14  it?

15     A.     The pain contributed to his difficulty with

16  independent ambulation.

17     Q.     He needed the scooter because he was in so much pain

18  that he couldn't walk more than a few steps without getting

19  fatigued and overwhelmed by the pain, true?

20     A.     He needed the scooter to transport himself.

21     Q.     Because he was in too much pain to walk, right?

22     A.     Pain was one of the issues, yes, sir.

23     Q.     Okay.  What were the other issues?

24     A.     His obesity.

25     Q.     Okay.  Anything else?

♀

172

1      A.     His smoking.

2      Q.     Okay.  Anything else?

3      A.     His medications.

4      Q.     Are you saying that Seroquel played some role in him

5   needing to have a scooter to get around?

6             MS. FENDIA:  Object to form.

7      A.     What I am opining to, sir, is the fact that if you

Page 155

my101308.txt

8    are treating a mood disorder, if you are treating a person's

9    depression, and they have a problem with decreased activity

10   level, that if you prescribe a medicine to be used as an

11   antidepressant or mood stabilizer and it has a well-known

12   sedating effect, that that sedation may contribute to a

13   person's lack of ambulation.  I would not say the Seroquel has

14   an adverse side effect of scooters.  No, I'm not saying that.

15        Q.   (BY MR. RABER)  And I didn't ask you that.

16             Are you saying to a reasonable degree of medical

17   probability that Seroquel was a cause of him needing to have a

18   scooter in order to move around?

19        A.   I would have to look at the time sequence.  If he was

20   on the scooter before the Seroquel, then I would not opine that

21   the Seroquel contributed to his needing a scooter.

22        Q.   We know he was on a walker before he ever had

23   Seroquel, don't we?

24        A.   Correct.

25        Q.   And so as we sit here today, you're unable to say

♀

173

1    whether -- to a reasonable degree of medical probability

2    whether the Seroquel played a role in causing him to need a

3    scooter to get around.

4             MS. FENDIA:  Object to form.

5        A.   Without knowing when he rode the scooter and when he

6    didn't and when he received Seroquel and when he didn't, that

7    is correct, sir.

8        Q.   (BY MR. RABER)  Mr. Unger's pain and incapacity got

9    so bad that he couldn't bathe himself.  Do you remember that?

10       A.   I believe that's correct at some point or points,

Page 156

my101308.txt

11    yes, sir.

12        Q.    And are you saying that Seroquel played a role in

13    causing that?

14        A.    His inability to bathe?

15        Q.    Yes.

16        A.    What I am saying, sir, what I am opining to, held to

17    a reasonable degree of medical certainty, is that Mr. Unger had

18    issues pertaining to his difficulty ambulating and sedentary

19    lifestyle; and if he was in receipt of Seroquel, that given the

20    well-known sedating effects of that medication, it may well

21    have contributed to his being sedentary.

22        Q.    My question had to do with bathing.

23              Are you saying that Seroquel played a role in

24    his not being able to bathe himself?

25        A.    That concrete and that specific, no, I'm not saying

♀

174

1    that at all.

2        Q.    Did you make any attempt to identify the relative

3    contribution of the sedative effects of Seroquel versus the

4    many other medications he was taking at that time?

5        A.    Did I make any attempt to quantify it?

6        Q.    Yes, to say that it was the Seroquel as opposed to

7    the OxyContin or the Vicodin or any of the other narcotics he

8    was taking.

9        A.    To parse that out as one factor having more -- a

10    heavier weight than another or a relative risk or a percentage

11    of causation, no, I made no attempt to do that because I don't

12    think that's possible.  I don't think anyone can.

13              Before you ask your next question, sir, I'd like

my101308.txt

14        to take a bathroom break, please.

15             Q.    Sure.    Absolutely.

16                   (Recess from 2:46 p.m. to 2:54 p.m.)

17             Q.    (BY MR. RABER)    Okay.    I want to just go back and

18        clarify one point, if we can.    I'm going to show you Exhibit 3,

19        which is your report with the medical chronology attached to

20        it, okay?    And, specifically, we're looking at the entry on

21        05-02-07.    And you mention that -- it says "The patient is now

22        maintained on insulin injections, mainly Symlin, ten units

23        before meals."    You see that?

24             A.    I see that.

25             Q.    And is that the basis for your opinion that Mr. Unger

♀

175

1        has insulin-dependent diabetes, that entry there?

2             A.    Yes.

3             Q.    Okay.    And that --

4             A.    That's part of my opinion.

5             Q.    Okay.

6             A.    As well as the fact that he was treating with insulin

7        in the hospital when he presented with -- in a hyperosmolar

8        state.

9             Q.    Okay.    But as far as his status in May of 2007, the

10        basis for your testimony that he is insulin dependent is that

11        entry that's there on the medical chronology, right?

12             A.    In part, yes.

13             Q.    Well, what else?

14             A.    Review of the medical record independent of this

15        chronology.

16             Q.    Okay.    That chronology that's attached to your report

Page 158

my101308.txt

17  was prepared by a nurse who works for the plaintiffs' law firm,

18  right?

19        A.    Correct.

20        Q.    And is it your testimony that Symlin is insulin?

21        A.    No.

22        Q.    What is Symlin?

23        A.    It's not insulin.  I started to do some research on

24  that.  I'm not sure.

25        Q.    Okay.  So, if all he's doing is injecting himself

♀

                                                              176


 1  with Symlin, would that be a basis for concluding that he's an

 2  insulin-dependent diabetic?

 3        A.    No.  It would be a basis for an opinion that he is a

 4  needle-dependent diabetic.

 5              (Young Exhibit No. 13 marked.)

 6        Q.    (BY MR. RABER)  I want to show you a document that

 7  has been marked as Young Exhibit 13.

 8        A.    Thank you.

 9        Q.    This exhibit is a function report for the Social

10  Security Administration dated October 1st, 2004, correct?

11        A.    Yes.

12        Q.    Have you seen that document before?

13        A.    Yes, I have.

14        Q.    Okay.  Mr. Unger was taking Seroquel at this time,

15  correct?

16        A.    There are no medications listed on this document you

17  handed me.

18        Q.    Okay.  Well, independent of that, are you able to say

19  whether he was taking Seroquel at this time?

Page 159

my101308.txt

20     A.     What was the date of that, sir?

21     Q.     October 1st, 2004.

22     A.     Discontinued the Seroquel 6-6.  And this is what

23   date?

24     Q.     10-01-04.

25     A.     There's no year on that.  Seroquel, 10-01-01.  That's

♀

177

1    Whittington.  And the date here is 10-01-04?  I'm looking at

2    pharmacy records now.  I don't see that.  10-01-04.

3              06-03-04, he was on Seroquel, and the Seroquel

4    was discontinued 10-22-06.  So, he was on Seroquel.

5       Q.    Okay.  On Page 1 of Exhibit 13, Mr. Unger notes,

6    quote, "My only outings are to doctor appointments.  I spend

7    most of my day watching TV and falling asleep"; is that right?

8       A.    Correct.

9       Q.    Look at Page 6 of Exhibit 13, if you would, please.

10   Section C, Information About Abilities.  Are you with me?

11   Right here, Section C, Information About Abilities, Page 6, at

12   the bottom of Page 6.

13      A.    Yes, sir.

14      Q.    Okay.  You see the middle of the page, Mr. Unger

15   writes "I am unable to walk even a block with my walker, then I

16   get weak, fatigue, pain becomes unbearable."  Do you see that?

17      A.    Yes.

18      Q.    Is it your opinion that the Seroquel is contributing

19   to that situation?

20      A.    It may be.

21      Q.    May be or is to a reasonable degree of medical

22   probability?

my101308.txt

23       A.    The patient is complaining of fatigue among -- and

24   weakness, among other things.

25       Q.    Is it your opinion to a reasonable degree of medical

                                                                178

 1   probability that the Seroquel was causing the weakness,

 2   fatigue, and pain that's being referred to here?

 3       A.    Seroquel is a major tranquilizer.  It may be

 4   contributing to the weakness and fatigue.

 5       Q.    Please answer the question, sir.  I didn't ask you if

 6   it may be.  I said, "To a reasonable degree of medical

 7   probability, is it your opinion that Seroquel was, in fact,

 8   contributing to the weakness, fatigue, and pain that's referred

 9   to here?"

10       A.    I have answered the question to the -- your question

11   to the best of my ability.

12       Q.    You're just not going to answer it, are you?

13             MS. FENDIA:  Object to form.

14             MR. RABER:  Come on, Counsel.  You can see that

15   he's not answering my question.

16             MS. FENDIA:  I object to the comment and the

17   argument.  Just move on, please.

18       Q.    (BY MR. RABER)  To a reasonable degree of medical

19   probability, is it your opinion that Seroquel was, in fact,

20   contributing to the weakness, fatigue, and pain that's referred

21   to here?

22             MS. FENDIA:  Object to form.

23       A.    If Mr. Unger was on Seroquel at this time -- and

24   Seroquel is well-known to be a sedating major tranquilizer --

25   the answer to your question is:  Yes.

                          Page 161

my101308.txt

♀

179

1      Q.   (BY MR. RABER)  And what is the scientific basis for
2   your conclusion that Seroquel causes pain?
3      A.   I think that mischaracterizes my testimony, sir.
4      Q.   I asked you if the Seroquel is contributing to or
5   causing the weakness, fatigue, and pain referred to in Exhibit
6   13.  You said, "Yes."
7      A.   Are you asking me about whether Seroquel is known to
8   cause pain?
9      Q.   I'm asking you just to give me a straightforward
10   answer to a question, sir.
11           MS. FENDIA:  Could you and I -- excuse me.
12   Could you and I chat a minute?
13           MR. RABER:  Yes.
14           MS. FENDIA:  Thank you.  Off the record, please.
15           (Recess from 3:05 p.m. to 3:06 p.m.)
16      Q.   (BY MR. RABER)  Do you stand by your answer?
17      A.   I stand by all my answers.
18           If I may, sir --
19      Q.   Go ahead.
20           MS. FENDIA:  Just respond to --
21           THE WITNESS:  I'm sorry.
22      Q.   (BY MR. RABER)  Did you want to say something?
23      A.   No, sir.
24      Q.   If Mr. Unger was able to lose weight at times while
25   he was taking Seroquel, would that be inconsistent with your

♀

180

my101308.txt

1    theory that Seroquel causes weight gain?

2        A.    Yes.

3        Q.    Were there periods when Mr. Unger was able to lose

4    weight while he was taking Seroquel?

5        A.    Yes.

6        Q.    How do you reconcile that then with your opinion?

7        A.    Seroquel is not the only factor involved in

8    Mr. Unger's weight gain and/or weight loss.

9        Q.    Well, how is it possible -- if Seroquel is a

10   weight-causing agent, how is it possible for Mr. Unger to lose

11   weight while he's taking it?

12       A.    The other factors may have more bearing.

13       Q.    And did you do any analysis of Mr. Unger's weight

14   cycling to determine whether or not his increases and decreases

15   in weight were caused by Seroquel or other factors that exist?

16       A.    There were multiple factors that contributed to

17   Mr. Unger's weight.

18       Q.    Did you do any sort of an analysis to try to

19   determine whether or not the weight cycling, the ups and downs

20   with Mr. Unger's weight, was related to Seroquel or other

21   factors that cause weight gain and weight loss?

22       A.    Yes.

23       Q.    What did you do?

24       A.    Looked at the time Mr. Unger was on Seroquel and

25   looked at his weights.


                                                                181


1        Q.    And there were times, however, when he lost weight on

2    Seroquel, true?

3        A.    Yes.

my101308.txt

 4      Q.    Okay.  How do you explain that then?

 5            MS. FENDIA:  Object to form.

 6      A.    There are multiple factors involved in weight gain

 7  and weight loss --

 8      Q.    (BY MR. RABER)  Okay.  So, my question is --

 9      A.    -- for Mr. Unger and anybody else.

10      Q.    Okay.  So, my question then is:  How did you -- what

11  did you do to determine whether the periods of weight gain and

12  periods of weight loss were attributable to Seroquel or to the

13  other factors?

14      A.    My best professional opinion held to a reasonable

15  degree of medical certainty is that -- given the known

16  dose-dependent relationship of Seroquel at least at that time

17  and at least that being my understanding at the time my report

18  was written is that the Seroquel was contributory to

19  Mr. Unger's weight gain.

20      Q.    That's not an answer to my question, sir.

21            My question to you is:  What did you do to

22  assess or determine whether the ups and downs that occurred

23  while Mr. Unger was taking Seroquel were the result of the

24  Seroquel or the other factors that influence weight?

25            MS. FENDIA:  Object to form.

♀

                                                         182

 1      A.    I cannot go back in history and control the

 2  parameters from the past, sir, so I did not do anything.

 3      Q.    (BY MR. RABER)  So, you're unable to rule out that

 4  his ups and downs are explained solely by the other factors,

 5  right?

 6      A.    Right.

                         Page 164

my101308.txt

7        Q.    Okay.  Now, let me ask you this question -- let me

8    change topics here.  Do you have any knowledge today as to

9    whether or not Mr. Unger's blood glucose is under good control?

10       A.    I do not.

11       Q.    I take it then you're not in a position to express an

12    opinion about his specific prognosis given his current

13    condition, true?

14       A.    Correct.

15       Q.    You would defer to either his treating

16    endocrinologist or an expert endocrinologist?

17       A.    Yes, that's correct, sir.

18       Q.    Sir, do you agree in your experience that severe

19    mental illness can destroy families and ruin lives?

20       A.    Yes, I do, sir.

21       Q.    And do you see some evidence here that Mr. Unger's

22    mental illness substantially interfered with his family life

23    and his relationships with his wife and children?

24       A.    With his wife and daughter, yes, sir.

25       Q.    Do you feel that -- would you agree that Seroquel has

                                                         183

1    helped some patients?

2        A.    Absolutely.

3        Q.    Would you agree that Seroquel filled an unmet need,

4    at least for some patients?

5        A.    Yes.

6        Q.    What knowledge, if any, do you have about how

7    AstraZeneca studied and examined the metabolic effects of

8    Seroquel during the time that it's been on the market?

9        A.    I reviewed in-house documents pertaining to weight

                        Page 165

my101308.txt

10    gain and the like.

11        Q.    Did AstraZeneca do anything to monitor data relating

12    to adverse events relating to the metabolic system?

13        A.    Yes.

14        Q.    Did they do any studies that were designed to

15    determine whether Seroquel has any impact on glucose

16    regulation?

17        A.    Yes.

18        Q.    And did -- what did those studies show?

19        A.    I think those studies were mixed; although sitting

20    here today, I don't recall whether it was in-house or

21    out-of-house studies.

22        Q.    You're familiar with Trial 125?

23        A.    Not by that name.

24        Q.    Okay.  Do you know a study that involved an oral

25    glucose tolerance test?

♀

                                                                    184

1        A.    Not as I recall.

2        Q.    Do you know what an oral glucose tolerance test is?

3        A.    Yes, I do.

4        Q.    Okay.  What is it?

5        A.    The individual is given high concentration glucose --

6    typically it's called Glucola -- to drink.  Baseline and

7    half-hourly or hourly glucose measurements are then taken of

8    the individual, two- or four-hour.  I'm trying to recall if

9    there was a six-hour, but I don't remember.

10        Q.    Do you know what result, if any, there were of that

11    test involving Seroquel?

12        A.    I do not recall.

                        Page 166

my101308.txt

13      Q.    Did AstraZeneca meet with outside scientists and

14    experts to get advice about the data that it had relating to

15    Seroquel and glucose regulation?

16      A.    Yes, sir.

17      Q.    Did you consider that to be a responsible thing for

18    them to do?

19      A.    Yes, sir.

20      Q.    Do you know what AstraZeneca's outside advisors told

21    them about any potential causal relationship between Seroquel

22    and diabetes?

23      A.    No, I do not know.

24      Q.    Did the FDA closely monitor diabetes-related events

25    for Seroquel?

♀

                                                                185


1            MS. FENDIA:   Object to form.

2      A.    I don't know what the FDA did or didn't do

3    specifically.

4      Q.    (BY MR. RABER)   You ever hear of a periodic safety

5    update report?

6      A.    Periodic safety update report, PSUR?

7      Q.    Right.

8      A.    Not specifically, no.

9      Q.    Did AstraZeneca provide those to the FDA?

10            MS. FENDIA:   Object to form.

11      A.    Don't know.

12      Q.    (BY MR. RABER)   You mentioned, sir, that September of

13    2005, Mr. Unger went to the hospital in a hyperosmolar state.

14    Do you remember that?

15      A.    I went -- he went to hyperosmolar state, but I'm not

Page 167

my101308.txt

16    sure of the date on that.

17        Q.    Okay.  I'll represent to you that it was September

18    6th of 2005, okay?

19        A.    Yes, sir.

20        Q.    What are the most frequent or common triggers of a

21    hyperosmolar state?

22        A.    First and foremost is elevated blood sugar.  I don't

23    know if dehydration is on that list.  I suspect so.  I'm not --

24    infection could be a factor.  Medications can be a factor.

25        Q.    Do you have an opinion to a reasonable degree of

♀

186

1    medical probability as to what triggered Mr. Unger's

2    hyperosmolar state in September 2005?

3        A.    There are a number of factors.

4        Q.    What are they?

5        A.    Certainly his blood sugar was clearly elevated and

6    all the associated risk factors that we've talked about

7    previously were present.

8        Q.    Was he taking antidiuretics?

9        A.    I think he was taking hydrochlorothiazide.

10        Q.    You ever heard of Bumex, B-u-m-e-x?

11        A.    He may have been taking that, yes.

12        Q.    Was he taking antidiuretics?

13        A.    I believe so.

14        Q.    Okay.  Do you believe that those -- I'm sorry.  Hang

15    on a second.  I meant to say "diuretics."  I mean -- strike the

16    question about diuretics.

17              Can diuretics lead to a person being dehydrated?

18        A.    Yes, sir.

Page 168

my101308.txt

19        Q.    Was Mr. Unger taking diuretics when he was admitted

20   to the hospital in September of '05 in a hyperosmolar state?

21        A.    Yes, he was.

22        Q.    Okay.  Do you believe that those diuretics triggered

23   the hyperosmolar coma?

24        A.    They may be contributory, yes.

25        Q.    Okay.  Did Mr. Unger have any infections when he went

♀

                                                         187


 1   into his hyperosmolar state?

 2        A.    I don't recall that he had any infections.  I don't

 3   remember, but that doesn't stand out to me.

 4        Q.    Is it your opinion to a reasonable degree of medical

 5   probability that Seroquel caused him to go into a hyperosmolar

 6   state in September of 2005?

 7        A.    That is one of the risk factors he had at the time.

 8        Q.    Okay.  It's a risk factor --

 9        A.    Medications, yes.

10        Q.    Okay.

11        A.    To include antipsychotics.

12        Q.    Are you saying to a reasonable degree of medical

13   probability that, more likely than not, Seroquel was a cause of

14   him going into a hyperosmolar state on September 6th of 2005?

15        A.    That's a compound question, sir, so I'm not quite

16   sure how to answer that.  What I can say is that the Seroquel

17   was a risk factor at that time and was one of the causes or was

18   a contributory cause.

19        Q.    Which one is it, risk factor, cause, or contributory

20   cause?  You said it was a risk factor, you said it was a cause,

21   or it was a contributory cause.  I'm asking you, which one was

                              Page 169

my101308.txt

22    it?

23              MS. FENDIA:  Object to form.

24        A.    I don't see those as different.

25        Q.    (BY MR. RABER)  Did you do anything to rule out

♀

188


 1    Mr. Unger's dehydration as the only cause of his going into a

 2    hyperosmolar state on September 6, 2005?

 3        A.    There's nothing I could have possibly done to change

 4    the past.  The answer to your question is:  No.

 5        Q.    Did Mr. Unger start smoking again after he was

 6    diagnosed with diabetes?

 7        A.    Unfortunately so, yes.

 8        Q.    Why do you say "unfortunately so"?

 9        A.    Whether you're diagnosed with diabetes or not,

10    smoking is not conducive to good health.

11        Q.    Now, you're familiar with cigarette packages.  They

12    have a warning that basically says "If you smoke these things,

13    they can kill you."

14        A.    I would hope they still have that warning, sir.

15        Q.    Okay.  And would you consider that warning to be

16    buried or is it obvious?

17        A.    On a cigarette package?

18        Q.    Yes.

19        A.    It's pretty obvious, or at least it was the last time

20    I looked.

21        Q.    And, yet, Mr. Unger continues to smoke.

22        A.    To this day, I don't know; but as of my review of the

23    medical record and certainly after the diagnosis of diabetes,

24    yes.

Page 170

my101308.txt

25        Q.    In your report on Page 11, it says near the bottom

♀

189

1     "Upon discontinuation of Seroquel, Mr. Unger claims he lost 30

2     pounds and did not need his power scooter to move from one

3     place to another."  Do you see that?

4        A.    Yes, sir.

5        Q.    This statement about the power scooter is not true,

6     is it?

7        A.    I don't know.

8        Q.    Well, why did you say it in your report if you don't

9     know whether it's true?

10        A.    I said in my report, "Upon discontinuation of

11     Seroquel, Mr. Unger claims he lost 30 pounds and did not need

12     his power scooter to move from one place to another."

13              I believe it's true that Mr. Unger stated that.

14        Q.    Okay.  You don't know whether --

15        A.    He stated that under oath, too.

16        Q.    Well, I want to show you a document that we'll mark

17     as No. 14.

18              (Young Exhibit No. 14 marked.)

19        Q.    (BY MR. RABER)  Sir, I'm handing you a document that

20     we've marked as Young Exhibit 14.  This is a letter from an

21     Arnold S. Zager, M.D., to a Helen Showers dated May 3rd, 2007.

22              Do you see that?

23        A.    Yes.

24        Q.    And, in fact, I think you've seen this letter before,

25     haven't you?

♀

Page 171

my101308.txt

190

1          A.    Yes, I have.

2          Q.    And May -- May 3rd of 2007, that's after Mr. Unger

3    has stopped taking Seroquel, isn't it?

4          A.    Yes, it is.

5          Q.    And if we believe the records that say he stopped

6    taking it in October of 2006, this is maybe seven or eight

7    months after that approximately, right?

8          A.    Yes.

9          Q.    And it says in the first paragraph "The patient's

10   presentation was remarkable in that he ambulated with the

11   assistance of a motorized wheelchair."  Do you see that?

12         A.    Yes, I do.

13         Q.    So, Mr. Unger's statement to you that he did not need

14   his power scooter to move from one place to another after he

15   discontinued Seroquel was not correct, was it?

16         A.    Depending on the time frame, and it wasn't a

17   statement to me.

18         Q.    Well, the statement that's in your report which says

19   "Upon discontinuation of Seroquel, Mr. Unger claims he did not

20   need his power scooter to move from one place to another," that

21   statement is not true, is it?

22         A.    If he, in fact --

23               MS. FENDIA:  I'm going to object to form.   Go

24   ahead.

25         A.    If he, in fact -- and as evidenced by Dr. Zager's

♀

191

1    report of Mr. Unger's statement to Dr. Zager -- is using a

Page 172

my101308.txt
2    wheelchair -- motorized wheelchair or scooter at that time,

3    then Mr. Unger has not stayed off the scooter.

4         Q.    (BY MR. RABER)   And it certainly made an impression

5    or Dr. Zager, didn't it?

6         A.    Yes.

7         Q.    He stated it in the first paragraph and said that the

8    presentation was remarkable, right?

9         A.    Correct.

10        Q.    You don't have any reason to doubt Dr. Zager's

11   observation of Mr. Unger in May of 2007, do you?

12        A.    I do not.

13        Q.    And would you agree with me that from a psychiatric

14   standpoint, Mr. Unger still has basically the same psychiatric

15   problems today that he had when he was on Seroquel?

16        A.    Basically, yes.

17        Q.    He still has what Dr. Zager refers to as a smoldering

18   depression, right?

19        A.    I recall the term "smoldering depression."  Is that

20   in this report?

21        Q.    I don't know if it's in this one or not, but do you

22   recall that?

23        A.    I recall the phrase "smoldering depression," yes.

24        Q.    Okay.

25        A.    I don't know if it's in this report that you handed

⚨

                                                            192


1    me.  I don't see that in this report that you handed me.

2         Q.    Like to show you a document that we'll mark as

3    Exhibit 15.

4                   (Young Exhibit No. 15 marked.)

                          Page 173

my101308.txt
```
 5        A.    Are we through with Exhibit 14, sir?

 6        Q.    (BY MR. RABER)  We are.  Exhibit 15 is a December

 7   18th, 2000 --

 8        A.    Thank you.

 9        Q.    -- letter from Dr. Zager to Helen Showers.  Am I

10   right?

11        A.    Yes, it is.

12        Q.    And you see in the first paragraph there it says that

13   he notes that his pain complaints unfortunately persist, as

14   does his chronic smoldering depression, secondary to his work

15   injury, correct?

16        A.    Yes, sir.  I see that.

17        Q.    And that's about the same condition he was in when he

18   first went to see Dr. Cabada back in 2002, isn't it?

19        A.    Yes, which suggests it's not a medication issue.

20        Q.    Is it your opinion that Seroquel -- the relationship

21   between Seroquel and weight gain is because Seroquel somehow

22   causes people to eat more or it has some direct effect on the

23   metabolism?

24        A.    I think there are three theories about that.

25        Q.    Well, I want to know what you think.
```

♀

                                                                  193

```
 1        A.    I'm trying to tell you, if you'd let me answer, sir.

 2        Q.    Okay.

 3        A.    I think there are three theories about that.  I think

 4   the exact mechanism for some people is not known.  And to be

 5   fair, Dr. Wirsching opined that it may not have that effect in

 6   women, I believe.  It may be even be a weight loss, although

 7   that may be a difference based on how depression manifests in
```

                              Page 174

my101308.txt

8    men and women.

9         Q.    What do you think?

10        A.    I think the jury is out on that.

11        Q.    So, you can't state an opinion to a reasonable degree

12   of medical probability as to how Seroquel is associated with

13   weight gain.  Is that fair to say?

14        A.    I can state that currently I believe, to my best

15   professional opinion held to a reasonable degree of medical

16   certainty, that there are three theories about that.

17        Q.    Okay.  And have any of those theories been proven to

18   a reasonable degree of medical probability?

19        A.    No.

20        Q.    Okay, Doctor.  Thank you.  I'm going to, at this

21   time, pass the microphone to Mr. Elder here who has some

22   questions for you about the Whittington case.

23        A.    Thank you, sir.

24        Q.    Okay.  Thank you.

25              MR. ELDER:  Let's take a quick break and I'll

♀

                                                              194

1    get organized and get some stickers over here.

2              (Recess from 3:32 p.m. to 3:38 p.m.)

3                           EXAMINATION

4    BY MR. ELDER:

5         Q.    Dr. Young, good afternoon.  I'm going to be asking

6    you about the Whittington case in which you've also prepared a

7    report.  Before I do so, the answers that you've given up to

8    this point today that are not specific to Richard Unger would

9    apply equally for the Unger and the Whittington cases; is that

10   right?

                          Page 175

my101308.txt

11          A.    That's correct, sir.

12          Q.    Okay.  And let me go ahead and mark your report in

13     Whittington as Exhibit 16.

14                    (Young Exhibit No. 16 marked.)

15          Q.    (BY MR. ELDER)  And I believe up until Page 11 of

16     your report, which begins "Specific Opinions:  Linda

17     Whittington," it's, in fact, identical to your report in Unger;

18     is that right?

19          A.    I believe so, sir.

20          Q.    All right.  To turn to Ms. Whittington, what was

21     Ms. Whittington's psychiatric diagnosis?

22          A.    Schizophrenia, chronic paranoid type.

23          Q.    Okay.  And in your review of the records, did you

24     agree with that diagnosis?

25          A.    Yes, I did.

♀

195

1          Q.    And do you agree that her -- that she is a patient

2     who needed treatment with an atypical antipsychotic?

3          A.    No, I don't.

4          Q.    Okay.  Why not?

5          A.    I agree that she needed treatment with an

6     antipsychotic, not necessarily an atypical.  Pardon me.

7     Second-generation.

8          Q.    But given her diagnosis with schizophrenia, you would

9     agree that she does need treatment with an antipsychotic

10     medication?

11          A.    Yes, sir, that's correct.

12          Q.    You were asked some questions earlier about

13     diagnosing diabetes.  When you diagnosed diabetes, you would

my101308.txt

14    agree that a single blood glucose test is not sufficient?

15         A.    Yes, sir.

16         Q.    Okay.  You need to repeat that test?

17         A.    Yes, sir.

18         Q.    And you need to repeat that test within a reasonable

19    time frame -- and by that, I mean ten days, not several

20    months -- to make sure that you get a repeat value that's

21    diagnostic of diabetes.

22         A.    Yes, sir.

23         Q.    And why is the repeat test important?

24         A.    Redundancy or repeat test is important because on a

25    given day at a given time with a given lab, you can have a

♀

196

1     spuriously elevated blood glucose and it would be important to

2     accurately diagnose an individual before you told them they had

3     diabetes, given the import of that diagnosis.

4          Q.    Because you're going to be making medication

5     decisions --

6          A.    Yes, sir.

7          Q.    -- that could impact their life and health insurance.

8          A.    Yes.

9          Q.    How much does a person's glucose typically vary?

10         A.    It would depend on the individual.  If they eat

11    sweets or savories, it could increase.  I think normal variance

12    would be less than 150 milligrams per deciliter, or whatever

13    that unit of measurement is.  Beyond that, I think that might

14    be outside the range of normal.

15         Q.    Okay.  But how much within the range of normal would

16    a person's glucose typically vary?

my101308.txt

17      A.   I don't know.

18      Q.   If you saw two glucose measurements on an individual

19   that were 10 percent different, could you say that that

20   person's glucose was worse?

21           MS. FENDIA:   Object to form.

22      A.   Let's say the difference between 100 and 110?  No, I

23   don't think you could.

24      Q.   (BY MR. ELDER)  What degree of difference would you

25   need to see in order to conclude that an individual's glucose

♀

197

1   control had gotten worse?

2      A.   May I refresh my memory with materials I have before

3   me?

4      Q.   If you need to consult them, sure.

5      A.   Thank you, sir.

6           My understanding by the American Diabetes

7   Association is that a fasting plasma glucose test of 126 and

8   above, not 150 -- I stand corrected -- confirmed by repeating

9   the test on a different day.  But I don't see percentage

10   differences here in the materials I have, so I don't know about

11   percents.

12      Q.   Okay.  So, you have consulted this document that you

13   prepared and produced to us, Seroquel Product Liability

14   Litigation Terms of Art; is that right?

15      A.   Yes, sir, the document I created when I was doing

16   research on the diagnosis of diabetes.

17      Q.   Okay.  And prior to creating this document and

18   without reference to the document, you weren't familiar with

19   the numbers for the diagnostic criteria that are in here, the

my101308.txt

20    126 standard?

21        A.    No, other than from my general medical training and

22    experience that glucose up to approximately a hundred was

23    normal.

24        Q.    And so because it's not in your document here in

25    terms of the degree to which a person's glucose would typically

♀

198

1    vary over the course of a day or over a week, you can't answer

2    that question?

3        A.    Correct.  I believe normal glucose is 60 to a hundred

4    or thereabouts.

5        Q.    Let's see if we can get some basic facts about

6    Ms. Whittington.  There is a medical chronology attached to

7    your report.

8        A.    Yes, sir.

9        Q.    And it says "Treatment Summary - Linda Whittington"

10    at the top.

11        A.    Yes, sir.

12        Q.    And as with the chronology for Mr. Unger, was this

13    prepared by Ms. Grainger?

14        A.    Yes, sir, that's correct.

15        Q.    Did you change anything about this chart?

16        A.    No, I did not.

17        Q.    Did you have any input into its creation?

18        A.    Pardon me.  No, I did not.

19        Q.    On your chart, it indicates that Ms. Whittington was

20    first prescribed Seroquel October 10th of 2001; is that right?

21        A.    Yes, sir, that's correct.

22        Q.    And she was given -- I believe it says in your

my101308.txt
23    chart -- yeah, she was given a dose pack; is that correct?

24         A.    Yes, that's correct.

25              (Young Exhibit No. 17 marked.)

♀

                                                             199

 1         Q.    (BY MR. ELDER)  All right.  I've marked as Exhibit 17

 2    a record from Dr. Saleh.  Have you seen that record before?

 3         A.    This record is from whom, sir?

 4         Q.    From Dr. Saleh, The Center For Medicine and

 5    Psychiatry.

 6         A.    Yes, I've seen it before.

 7         Q.    Okay.  And --

 8         A.    Or his records.

 9         Q.    And this record refers to Ms. Whittington and it's a

10    medication log.  And next to the October 10th, '01, you see

11    where the Seroquel dose pack is prescribed, correct?

12         A.    Yes, sir.

13         Q.    And then there's a note next to that that says

14    "Patient does not wish to take," and it's dated 10-12-01.

15              Do you see that?

16         A.    Yes, sir, I see that.

17              (Young Exhibit No. 18 marked.)

18         Q.    (BY MR. ELDER)  Okay.  I've marked as Exhibit 18,

19    Doctor, a record from the same set of medical records that's

20    from January 2nd, 2002; and this indicates that when

21    Ms. Whittington returned to the -- to Dr. Saleh's office on

22    January 2nd, 2002, she indicated that the 100 milligrams of

23    Seroquel was too strong.  And that's also reflected in this

24    summary that was provided for you, correct?

25         A.    Yes, sir.

my101308.txt

♀

200

1      Q.    Okay.  Given those two entries, the fact that

2   Ms. Whittington apparently called in and reported that she

3   didn't want to take the Seroquel and she also reported when she

4   came back in January 2nd of 2002 that it was too strong, do you

5   know whether or not Ms. Whittington took Seroquel between

6   October 2001 and January of 2002?

7      A.    Yes.

8      Q.    And did she?

9      A.    Yes.  She took it prior to January 2nd, 2002.

10     Q.    Okay.  Could you say whether or not she took it

11  consistently over that time period?

12     A.    No, I cannot.

13     Q.    Okay.  In fact, it appears that she took it

14  inconsistently over that time period.

15           MS. FENDIA:  Object to form.

16     A.    It's difficult to know what she did or didn't take in

17  reality.

18     Q.    (BY MR. ELDER)  Okay.  And there's an indication here

19  that she didn't take everything she was prescribed during this

20  time period, correct?

21     A.    Correct.

22           MS. FENDIA:  Object to form.

23     Q.    (BY MR. ELDER)  All right.  And beginning in January

24  2nd, 2002, her dose is reduced to 50 milligrams a day; is that

25  right?

♀

201

my101308.txt

1       A.    Correct.

2       Q.    Okay.  Did Ms. Whittington ever take more than 50

3    milligrams per day after January 2nd, 2002?

4       A.    I don't see an indication of that.

5       Q.    And you don't see any indication that she took more

6    than 50 milligrams at any time; is that right?

7       A.    That's correct.

8             (Young Exhibit No. 19 marked.)

9       Q.    (BY MR. ELDER)  Let me show you what I've marked as

10   Exhibit 19, Doctor, and this is a different page of the same

11   medication log from Dr. Saleh.  And does this indicate that

12   Seroquel was discontinued on February 20th, 2006?

13      A.    Yes, it does.

14      Q.    And as far as you know, is that, in fact, the date

15   that it was discontinued?

16      A.    As far as I know, yes.

17      Q.    Okay.  The Seroquel usage that you and I have just

18   looked at here, is that your understanding of Ms. Whittington's

19   Seroquel usage?  And so we're on the same page, let me tell you

20   what I think we've established.  She was first prescribed it in

21   October of 2001 when she was given the dose pack.  We're in

22   agreement on that?

23      A.    At this clinic, yes.

24      Q.    Do you know of any other prescription earlier than

25   that?

♀

202

1       A.    Not at this time, although I recall looking at the

2    records that she bounced back and forth between two or three

3    clinics.

Page 182

my101308.txt

    4        Q.    Okay.  But as far as you know, her first prescription
    5   was October 10th, 2001?
    6        A.    That's correct, although there were pharmacy records
    7   or I thought there were pharmacy records on here, but there may
    8   not be.
    9        Q.    Okay.  Do you have any different information than
   10   that?
   11        A.    Not at this time, no.
   12        Q.    Okay.  And between October and January, we know she
   13   indicated that she didn't want to take the dose pack and that a
   14   hundred milligrams was too strong.  And beyond that, we really
   15   don't know if she took Seroquel between those dates; is that
   16   fair?
   17        A.    Yes, sir, that's fair.
   18        Q.    Okay.  And we know she started in January of 2002 on
   19   a 50-milligram-per-day dose, correct?
   20        A.    Correct.
   21        Q.    Okay.  And she continued that, it appears, until
   22   February of '06, at which point it was discontinued.
   23        A.    Yes, sir, that's correct.
   24        Q.    Okay.  Does Ms. Whittington -- well, let me ask you,
   25   what are the first laboratory values for Ms. Whittington that


♀

                                                                    203


    1   are reported in your report here?
    2        A.    10-06-04, I believe.
    3        Q.    Okay.  And the values on 10-06-04, she did not have
    4   diabetes at that time, correct?
    5        A.    Glucose, 99.  Correct.
    6                        (Young Exhibit No. 20 marked.)
                                Page 183

my101308.txt

7       Q.    (BY MR. ELDER)  Let me show you what I've marked as

8  Exhibit 20.  Do you recognize Exhibit 20?

9       A.    Requested by Dr. Haddad.  Yes.

10      Q.    Okay.  These are laboratory values dated February

11  16th, 2006.  And do you believe that these laboratory values

12  are diagnostic of diabetes?

13      A.    Yes.

14      Q.    And why do you believe that?

15      A.    She's got an elevated fasting.  And then according to

16  parameters for glucose tolerance tests, third hour -- so, it's

17  a -- well, that's odd.  Why did they stop it at the third hour?

18  Huh.  I guess because the values were elevated.  And for

19  diagnosis of diabetes on a glucose tolerance test, my

20  understanding per the American Diabetic Association is --

21  that's gestational.  Let's see.  Yeah, two hours, 139 and below

22  is normal, and she's at 181.  140 to 199 is an impaired glucose

23  tolerance and 200 and above is diabetes.

24      Q.    And, Doctor, are you referring to the same document

25  that you referred to earlier in looking up the diagnostic

♀

204

1  criteria Seroquel product liability litigation?

2       A.    Yeah.  Terms of art, yes, sir.

3       Q.    And, in fact, what you just found -- and let me back

4  up.

5              In the oral glucose tolerance test, in terms of

6  diagnosing diabetes, you would agree that the two-hour value is

7  the value that's used to diagnose diabetes, correct?

8       A.    I believe that's correct.

9       Q.    Okay.  And the two-hour oral glucose tolerance value

Page 184

my101308.txt

10    of 200 or above is diagnostic of diabetes?

11        A.    That is my understanding, sir.

12        Q.    Okay.  And so in this value -- in this lab value that

13    we're looking at for Ms. Whittington, her two-hour oral glucose

14    tolerance value is, in fact, not diagnostic of diabetes; is

15    that true?

16        A.    Correct.

17        Q.    Okay.  And she has a glucose fasting value of 131; is

18    that right?

19        A.    Correct.

20        Q.    Okay.  And a 131 is above the threshold for diabetes,

21    correct?

22        A.    On a glucose fasting, the criteria is -- I think the

23    cutoff is 125, if it, in fact, is fasting.  What was hers, 131?

24    Hundred to 125, 126 and above, diabetes.  So, that's suggestive

25    of diabetes.

⚲

205

1         Q.    Okay.  So, on this lab, we have one test that's

2    suggestive of diabetes and one test that's suggestive only of

3    impaired glucose tolerance, true?

4         A.    Within this glucose tolerance test, yes.

5         Q.    Okay.  Now -- so, this is a situation where you would

6    want a confirming test because, in fact, within the test that

7    you performed here, you have inconsistent results.

8         A.    Yes.

9         Q.    Okay.  Is there a confirming test in

10    Ms. Whittington's records?

11        A.    I hope so.  Let's see.  This is 02-16-06.

12                    On 02-28-06, there's a hemoglobin A1C of 5.9.
                             Page 185

my101308.txt

13    That's within normal range.

14         Q.    And how long was that after the test that we were

15    just talking about?

16         A.    2-17 -- well, no.  Collected 02-16-06, and this is

17    02-28-06.  So, it's within reasonable or same time period.

18         Q.    Okay.  So, about two weeks later, you have located in

19    your summary there a normal hemoglobin A1C?

20         A.    Correct.

21         Q.    Okay.  Now, let me ask you, on the criteria that

22    you're referencing and that you put in this document, did you

23    get those from the American Diabetes Association?

24         A.    Yes, sir, I did.

25         Q.    Okay.  And so you would defer to the American

♀

206

1     Diabetes Association on which tests are appropriate to diagnose

2     diabetes?

3          A.    Absolutely.

4          Q.    Okay.  And do you know whether or not, according to

5     the American Diabetes Association, the A1C should be used to

6     diagnose diabetes?

7          A.    I do not recollect at this time.  I think they said

8     something about -- well, I wouldn't want to hazard a guess.

9                   (Young Exhibit No. 21 marked.)

10         Q.    (BY MR. ELDER)  All right, Doctor.  Let me show you

11    what I've marked as Exhibit 21 to your deposition, and this is

12    the diagnosis and classification of diabetes mellitus published

13    by the American Diabetes Association.  And if you'll look at

14    the bottom, that was published in January of this year; is that

15    correct?

Page 186

my101308.txt

16      A.    January 2008, yes, sir.

17      Q.    Okay.  And if you'll look with me on the bottom on

18  Page -- the pages begin with an S -- S59 --

19      A.    It says "S59"?

20      Q.    Yes, on the bottom right-hand corner.

21      A.    Yes, sir.

22      Q.    Okay.  Right in the top right-hand corner of that,

23  right under position statement at the top of that column, is

24  there a sentence that reads "The use of hemoglobin A1C for the

25  diagnosis of diabetes is not recommended at this time"?

⚲

                                                                207

1       A.    Yes, sir, it says that.

2       Q.    Okay.  And you wouldn't disagree with the American

3  Diabetes Association on that issue, correct?

4       A.    Correct.

5       Q.    Okay.  And the A1C that you found there that was done

6  after this February '06 glucose tolerance test on

7  Ms. Whittington was normal?

8       A.    Correct.

9       Q.    Any other value in her records that you believe

10  confirms her diagnosis of diabetes?

11      A.    Not that I'm aware of.  Somehow I recall other

12  elevated fasting blood glucoses, but I don't have that at my

13  fingertips at this point in time.

14      Q.    All right.  As we sit here talking about

15  Ms. Whittington today, Doctor, do you have a basis for

16  concluding to a reasonable degree of medical certainty that

17  Ms. Whittington, in fact, has diabetes?

18      A.    I do not.

                    Page 187

my101308.txt

19      Q.    What did you do to assess Ms. Whittington's risk for
20  developing diabetes prior to the time that she took Seroquel?
21      A.    Reviewed her medical records.
22      Q.    Okay.  And did you summarize or characterize that
23  risk anywhere?
24      A.    I thought I did in the report.  I listed her risk
25  factors.


♀

                                                                  208


1       Q.    Okay.  Could you show me that in your report?
2       A.    Yes.  With -- if I may, sir, with respect to the
3   glucose issue, there was some records upon initial diagnosis
4   and I don't recall whether those had elevated glucose values or
5   not, but -- your current question is about risk factors prior
6   to Seroquel?
7       Q.    Right.
8       A.    Tobacco dependence, elevated lipids -- was she a
9   smoker?  I don't recall her being a smoker.  Yeah, tobacco
10  dependence.  So, tobacco dependence.  There was a family
11  history of diabetes mellitus, which was known prior to
12  initiation of treatment with Seroquel.  Risk factors for
13  diabetes mellitus include hypertension, elevated lipids,
14  smoking, obesity, and sedentary lifestyle associated with
15  schizophrenia, results of prior receipt of Zyprexa, and there
16  was an approximate four- to five-year history of exposure to
17  Seroquel.
18      Q.    Okay.  And you were now just then reading from Page
19  11 of your report, correct?
20      A.    Correct.
21      Q.    Okay.  And those risk factors that you gave me and
                                    Page 188

my101308.txt

22    that you've listed there, were all of those present prior to

23    the time that Ms. Whittington took Seroquel?

24         A.    With exception of Seroquel, that's correct.

25         Q.    Did Ms. Whittington have any elevated glucose values

♀

209

1     prior to the time that she took Seroquel?

2          A.    I don't recall.

3          Q.    If she had an elevated glucose value, that would be

4     another risk factor, would it not?

5          A.    Absolutely.

6                (Young Exhibit No. 22 marked.)

7          Q.    (BY MR. ELDER)  Doctor, I'm going to show you what

8     I've marked as Exhibit 22.  And Exhibit 22 is a laboratory

9     report dated September 16th, 1993, correct?

10         A.    Yes, sir.

11         Q.    Okay.  And you've seen this before, correct?

12         A.    Where is this from?  Jacksonville, Cantrell,

13    Patterson, Mental Health Street, 20th Street Center (sic)?

14               I believe so, sir.

15         Q.    Okay.  And this is -- in September -- or on September

16    16th, 1993, Ms. Whittington had an elevated glucose of 123,

17    correct?

18         A.    Yes, she did.

19         Q.    Okay.  And she also had high cholesterol?

20         A.    Yes, she did.

21         Q.    And high triglycerides?

22         A.    That's correct, sir.

23         Q.    Okay.  And, in fact -- well, let me ask you, when you

24    saw this laboratory value, did you try to determine whether or

Page 189

my101308.txt

25      not this is a fasting value?

⚥

210

1       A.   I wondered about that.  I don't know that it is.

2       Q.   Okay.  A fasting 123 would mean that as of September

3   16th, 1993, Ms. Whittington had impaired fasting glucose?

4       A.   If it was fasting.  The cutoff, I thought, was 125.

5   Let me check that criterion again.

6            Correct.  If it is fasting, 100 to 125 is

7   impaired fasting, meaning you didn't eat for six to eight hours

8   before the test.

9       Q.   Right.  What time were those labs collected?

10      A.   9:15 in the morning.

11           (Young Exhibit No. 23 marked.)

12      Q.   (BY MR. ELDER)  Show you what I've marked as Exhibit

13  23 in Ms. Whittington's deposition.  Have you seen that record

14  before, Doctor?

15      A.   I may have this past weekend, yes.

16      Q.   Okay.  And the date of this record is August 31st,

17  1993, correct?

18      A.   Yes.

19      Q.   Okay.  It's roughly a little more than two weeks

20  prior to the lab we just looked at?

21      A.   08-31-93 and 9-16 -- little over two weeks.

22      Q.   Okay.  And do you see in this record that we've

23  marked as Exhibit 23, under the Plan No. 4, says "Ordered for

24  the client a CBC, blood chemistry, TSH, and a T4 to be done in

25  two to three weeks, fasting"?

⚥

my101308.txt

211

```
 1        A.    Yes, sir, I see that.
 2        Q.    Okay.  And the labs we looked at that are dated about
 3   two weeks later, in fact, did those report a T4 and a TSH?
 4        A.    Yes.
 5        Q.    And a CBC?
 6        A.    Yes.
 7        Q.    Does it appear to you based on these records, Doctor,
 8   that this lab from 09-16-93 collected at 9:15 in the morning
 9   was done fasting?
10              MS. FENDIA:   Object to form.
11        A.    I know that it was requested.  We would have to ask
12   the paranoid schizophrenic whether they fasted or not prior to
13   the collection.  That information is not on here, so I don't
14   know.
15        Q.    (BY MR. ELDER)  Okay.  The records that you have
16   available to you indicate that it was ordered fasting and it
17   was collected at a time that would be consistent with fasting.
18        A.    Yes, sir, that's correct.
19        Q.    Doctor, prior to forming your opinions in this case,
20   were you familiar with metabolic syndrome?
21        A.    Vaguely.
22        Q.    So, in working on this case, did you go do some
23   reading about metabolic syndrome?
24        A.    Yes, I did, sir.
25        Q.    Okay.  What is metabolic syndrome?
```

212

```
 1        A.    Metabolic syndrome is a group of risk factors in one
```

my101308.txt

2   person:  Central obesity, atherogenic dyslipidemia, blood fat

3   disorders -- mainly high triglycerides and low HDL -- plaque

4   buildup, insulin resistance or glucose intolerance,

5   prothrombotic state -- e.g., high fibrinogen or plasminogen

6   activator inhibitor in the blood -- raised blood pressure, and

7   a proinflammatory state; namely, elevated C-reactive protein in

8   the blood.

9       Q.   Okay.  And you were reading to me from your Seroquel

10  Product Liability Litigation Terms of Art document, correct?

11      A.   Yes, sir.

12      Q.   Okay.  Would it be fair to say that without reading

13  that answer, you wouldn't have been able to answer that

14  question?

15      A.   No, that wouldn't be fair.

16      Q.   Okay.  Have you investigated the relationship between

17  metabolic syndrome and the development of Type 2 diabetes?

18      A.   Yes.

19      Q.   And you would agree that metabolic syndrome is

20  strongly associated with the development of Type 2 diabetes?

21      A.   That's correct, sir.

22      Q.   Okay.  In your opinion, it's a risk factor for Type 2

23  diabetes.

24      A.   Yes, or contains within it several risk factors for

25  diabetes.

♀

213

1       Q.   Okay.  So -- and the things that go into metabolic

2   syndrome are, in and of themselves, risk factors for Type 2

3   diabetes.

4       A.   Correct.

Page 192

my101308.txt

5              (Young Exhibit No. 24 marked.)

6       Q.   (BY MR. ELDER)  All right.  Let me show you what I've

7   marked as Exhibit 24.  And this is a laboratory report for

8   Ms. Whittington dated November 20th, 1996; is that right?

9       A.   Yes, sir, that's correct.

10      Q.   And have you seen this before?

11      A.   Where is it from and who's the ordering doctor?

12      Q.   Looks like the ordering doctor is Dr. -- looks like

13  D-a-i-a-c to me.

14      A.   Could be a trainee though.  It's Family Medical

15  Center of Jacksonville.  Yes, I'm fairly certain I've seen this

16  before.

17      Q.   Okay.  And on this date in 1996, Ms. Whittington's

18  glucose was high, correct?

19      A.   Yes.

20      Q.   Okay.  And her triglycerides were elevated?

21      A.   Yes, that's correct.

22      Q.   Okay.  And her HDL cholesterol was low?

23      A.   That's correct.  The collection time, however, sir,

24  was 1:30 p.m.

25      Q.   Do you know whether fasting status affects

♀

                                                            214


1   triglycerides?

2       A.   That I don't know.

3       Q.   Okay.  Do you know whether fasting status affects the

4   results of low HDL?

5       A.   I don't know.

6       Q.   How much did Ms. Whittington weigh in 1996?

7       A.   I don't have an independent recollection.

                          Page 193

my101308.txt
```
 8              (Young Exhibit No. 25 marked.)

 9         Q.    (BY MR. ELDER)  Show you what I've marked as Exhibit

10    25.  And this is a record dated November 20th, 1996, correct?

11         A.    Yes, sir.

12         Q.    Okay.  And it indicates that her height and weight as

13    5'-5", 194?

14         A.    Yes, sir, that's correct.

15         Q.    Okay.  At that height and weight, she was obese on

16    November 20th, 1996, correct?

17         A.    That's correct, sir.

18         Q.    Okay.  You would agree that as of 1996,

19    Ms. Whittington had metabolic syndrome?

20         A.    Well, she had the obesity, she had the dyslipidemia.

21    Don't know what her abdominal girth was.  Did she have

22    hypertension?  No.

23              She had some features of it, yes, but I don't

24    know if one would say she had the whole syndrome.

25         Q.    Okay.  She had -- she was obese.
```

♀

215

```
 1         A.    Right.

 2         Q.    She had dyslipidemia.

 3         A.    Right.

 4         Q.    And she had impaired glucose tolerance.

 5         A.    Correct.

 6         Q.    And three out of the five gets you metabolic

 7    syndrome, correct?

 8         A.    I believe so.

 9         Q.    Okay.  So, as of 1996, Ms. Whittington had metabolic

10    syndrome?
```
                              Page 194

my101308.txt

11      A.      Yes, sir.

12      Q.      Okay.  So, we can add metabolic syndrome to her risk

13 of -- to her list of risk factors for developing Type 2

14 diabetes, yes?

15      A.      Is that a question, sir?

16      Q.      Yes.

17      A.      Yes.

18      Q.      And we can also add impaired glucose tolerance,

19 correct?

20      A.      Yes, sir.

21      Q.      Okay.  So, I believe the list we have now for risk

22 factors for developing Type 2 diabetes before Ms. Whittington

23 ever took Seroquel are family history, impaired glucose

24 tolerance, obesity, hypertension, high triglycerides, low HDL,

25 metabolic syndrome, and smoking; is that right?

⚲

                                                        216

1       A.      Well, yeah.  You combine the hypertension, lipids,

2 and obesity.  I didn't have the sugar in there under metabolic

3 syndrome.  That's correct.

4       Q.      Given her risk factors, how would you characterize

5 Ms. Whittington's chances for developing diabetes prior to the

6 time that she ever took Seroquel?

7       A.      Relatively high risk.

8       Q.      And you would agree that it's not your opinion in

9 this case that but for taking Seroquel, she would never have

10 developed Type 2 diabetes?

11      A.      That's correct.

12      Q.      Okay.  In fact, in all likelihood, she would have

13 developed Type 2 diabetes anyway, given her risk factors.

my101308.txt
```
14              MS. FENDIA:   Object to form.
15       A.     That I don't know.
16       Q.     (BY MR. ELDER)  Okay.  But you would agree she was at
17  very high risk for developing Type 2 diabetes prior to ever
18  taking Seroquel?
19       A.     Yes.
20       Q.     Have you done anything to compare the strength of
21  association between this list of risk factors that you and I
22  just talked about in Ms. Whittington versus Seroquel?
23       A.     No.
24       Q.     One thing that we didn't talk about on this list is
25  Zyprexa.  Ms. Whittington took Zyprexa prior to taking
```

♀

217

```
 1  Seroquel; is that right?
 2       A.     That's correct, sir.
 3       Q.     Okay.  And would we then add, in your opinion,
 4  Zyprexa to this list of risk factors?
 5       A.     I think it's already added there in my report.
 6       Q.     Okay.  So, your report says there was also -- there
 7  was prior receipt of Zyprexa.  And what you mean by that is the
 8  Zyprexa's also a risk factor?
 9       A.     Yes.
10       Q.     Was Ms. Whittington's obesity prior to taking
11  Seroquel a cause of her Type 2 diabetes?
12       A.     Yes.
13       Q.     And are you able to rule out that it was the sole
14  cause of her diabetes?
15       A.     No, I'm not.
16       Q.     And if I asked you that for every one of those risk
```

my101308.txt

17    factors that we just listed, other than Seroquel, would --

18    those two questions -- would your answer be the same?

19         A.    Yes, sir, my answers would be the same.

20         Q.    In your -- this Seroquel Product Liability Terms of

21    Art Document, you've listed the Hill criteria there.

22         A.    Yes, sir.

23         Q.    Okay.  And if you'll turn with me on Page 11, under

24    Strength -- and, by the way, where -- this -- let me back up a

25    second.

♀

218

1              The two paragraphs that you have here and then

2    the Hill criteria, did you cut and paste those out of

3    something?

4         A.    Yes, sir, off the internet.

5         Q.    Okay.  And do you know where they came from?

6         A.    Oh, some epidemiologic website, but I don't recall

7    the specific website.

8         Q.    Okay.  And when did you do that?

9         A.    That was added yesterday, I believe.

10         Q.    And was that added at the request of any of the

11    lawyers in this case?

12         A.    No.

13         Q.    Going back to Paragraph 2, under Strength, it says

14    "This is defined by the size of the association as measured by

15    appropriate statistical tests.  The stronger the association,

16    the more likely it is that the relation of A to B is causal."

17              Do you agree with that?

18         A.    Yes.

19         Q.    And have you assessed the strength of the association

Page 197

my101308.txt

20    between Ms. Whittington's risk factors for diabetes and Type 2

21    diabetes at any time?

22        A.    In terms of controlling for risk factors and doing

23    tests, no.

24        Q.    Okay.  Well, in terms of anything.  And let me make

25    sure my question is clear.

♀

219

1              What I'm asking is -- let's take obesity as an

2    example.  Have you gone and assessed the strength of the

3    association between obesity and Type 2 diabetes?

4        A.    No.

5        Q.    Have you done that for any of her risk factors?

6        A.    I reviewed through Catie studies and the like.

7    There's some documentation with respect to the medication, what

8    the -- in some of the literature, what some of the risk factors

9    were for the medication or the odds ratios; but not for the

10   specific risk factors in and of themselves in comparison to the

11   medications, no, sir.

12       Q.    What would you consider to be a strong risk factor

13   under the Hill criteria?  If you -- when you assess strength of

14   association, how do you determine whether something is a strong

15   association, a weak association, or something in the middle?

16       A.    I'm not sure how to answer that question.  The

17   ultimate statistical criterion in clinical medicine would be

18   through double-blind crossover controlled studies on a given

19   issue, and I'm not sure -- I'm pretty certain when applied to

20   neuropsychiatry or human beings, institutional review boards

21   wouldn't allow you to manipulate those variables to get clean

22   data in that there's an intention to treat.  But you also

Page 198

my101308.txt

23  wouldn't want to make controls fat and see what happened, for

24  example, so --

25      Q.   Okay.  It was my understanding of your testimony

♀

220

1   earlier that you've applied these Hill criteria to this case.

2   Tell me how you assessed the strength of the association under

3   the second enumerated Hill criteria in connection with

4   Ms. Whittington's case.

5       A.   I believe -- to clarify the matter, I looked at these

6   criteria in relationship to Ms. Whittington and the primary

7   criteria I was looking at was temporal relationship and

8   dose-dependent response of the medication.  There is some

9   consistency, there is some plausibility.  I did not experiment

10  with Ms. Whittington.  And certainly I would consider alternate

11  explanations for her metabolic syndrome other than medication,

12  and I listed those risk factors.

13      Q.   And, in fact, here, the metabolic syndrome, it

14  preexisted the Seroquel by a number of years.

15      A.   Correct.

16      Q.   And when you say there is some consistency, you

17  didn't sit down -- well, let me back up.

18           You did not sit down and apply the Bradford Hill

19  criteria in a systematic manner to the question of does

20  Seroquel cause diabetes; is that correct?

21      A.   At the time of the writing of my report, that's

22  correct.

23      Q.   And you said there's some consistency.  What I

24  understood you to say earlier is, in fact, the data are

25  discrepant.

my101308.txt

♀

221

1      A.    Correct.

2      Q.    Okay.  And so there's some inconsistency.

3      A.    Yes, sir, that's correct.

4      Q.    Now, let's talk about the dose-dependent manner.  We

5      agreed earlier that Ms. Whittington never took more than 50

6      milligrams of Seroquel, right?

7      A.    Correct.

8      Q.    Okay.  Do you have any scientific studies that you

9      can point to that show that taking 50 milligrams of Seroquel

10     causes diabetes?

11     A.    No, I do not.

12     Q.    Same question for weight gain.  Any studies that you

13     believe show taking 50 milligrams of Seroquel causes weight

14     gain?

15     A.    I think there are some studies that show a

16     dose-dependent relationship with Seroquel concerning weight,

17     but I do not recall what the lower limit or dose was of those

18     studies.

19     Q.    So, as you sit here, you can't refer me to any

20     particular study that you believe demonstrates weight gain at a

21     50-milligram dose of Seroquel?

22     A.    Correct.

23     Q.    In epidemiology, Doctor, are you familiar with the

24     term "threshold effect"?

25     A.    In epidemiology, in general, no.  Threshold effect, I

♀

222

Page 200

my101308.txt

1   think I have an understanding.

2        Q.    Okay.   What's your understanding of threshold effect?

3        A.    You have to reach a certain threshold or level of

4   whatever it is you're measuring before you have an effect.

5        Q.    A certain dose?

6        A.    Or in case of medication, threshold effect would be a

7   dose at a certain level, that level being called a threshold in

8   which the effect would manifest.

9        Q.    Okay.   And with Seroquel and weight gain, do you know

10  whether or not there's a threshold effect?

11       A.    As I sit here now, I don't recall.

12             MS. FENDIA:   When you get to a break, I'd like

13  to take just a short break.

14             MR. ELDER:   Sure.   Take one --

15             MS. FENDIA:   Is this a good time?

16             MR. ELDER:   This is a good time.

17             (Recess from 4:38 p.m. to 4:44 p.m.)

18       Q.    (BY MR. ELDER)  Doctor, would you agree that some

19  risk factors are more strongly associated with the development

20  of Type 2 diabetes than others?

21       A.    Yes.

22       Q.    And what risk factors do you believe are the most

23  strongly associated with developing Type 2 diabetes?

24             (Mr. Fibich returns.)

25       A.    The greatest risk factor, I think, would be

                                                              223

1   hyperglycemia or glucose intolerance.

2        Q.    (BY MR. ELDER)  What else would you put at the top of

3   your list?

my101308.txt

4          A.    At this time, nothing else is on that list.

5                    (Ms. Fendia leaves.)

6          Q.    (BY MR. ELDER)  Doctor, what amount of weight gain do

7    you think Seroquel causes?

8          A.    The data I reviewed suggested -- well, it depends on

9    whose data you read, but I think it was somewhere 6 to 8, 9

10   pounds, 6 to 10 pounds, somewhere in that range.  And --

11         Q.    And the weight gain that you believe occurs following

12   Seroquel doesn't have a pattern?

13         A.    It does have a pattern over time.

14         Q.    And what's the pattern?

15         A.    I think it increases and then there's the plateau,

16   but I don't recall over what period of time that occurs.

17         Q.    Okay.  But you believe there's an initial increase

18   and then a plateau?

19         A.    Yes.

20         Q.    In Ms. Whittington's case, in forming your opinions,

21   did you take into account her pattern of weight gain or loss

22   before and after Seroquel?

23         A.    I looked at her weight gains and losses over time,

24   yes.

25         Q.    Okay.  And would her pattern of weight gain or loss

⚲

                                                            224

1    before and after Seroquel inform your opinion as to whether

2    taking Seroquel caused her to gain weight?

3          A.    Yes.

4          Q.    Why?

5          A.    What -- what?

6          Q.    Why would that be important?

Page 202

my101308.txt

7        A.    In terms of temporal association, in terms of risk

8    factor for the development of diabetes and/or metabolic

9    syndrome or exacerbation of metabolic syndrome.

10        Q.    Well, what I asked was why would knowing her pattern

11    of weight gain before and after she took Seroquel be important

12    in developing your opinion as to whether Seroquel caused her to

13    gain weight?

14        A.    Because if she gained or lost weight when she wasn't

15    taking Seroquel, it would not be due to the Seroquel that she

16    was gaining or losing weight.

17        Q.    Did Ms. Whittington gain weight prior to taking

18    Seroquel?

19        A.    Yes, she did.

20        Q.    And for a period of time prior to that, she was

21    taking Zyprexa, correct?

22        A.    Correct.

23        Q.    Okay.  Prior to that, did she gain weight?

24        A.    Prior to taking Zyprexa?

25        Q.    Right.

♀

225

1        A.    I don't know.

2        Q.    You didn't assess that before you prepared your

3    report in this case?

4        A.    I'm not sure I had that data.

5        Q.    Did you have her medical records?

6        A.    I believe so, although there was some medical records

7    that I looked at on Ms. Whittington this weekend which were not

8    available to me prior to the writing of my report.

9        Q.    And do you recall seeing anything in there about her

Page 203

my101308.txt

10    weight gain over time prior to the time that she took Zyprexa

11    or Seroquel?

12        A.   I don't have an independent recollection at this

13    time.

14                MR. FIBICH:   How much more you think you have?

15                MR. ELDER:   Not too much.  Pretty close.

16                MR. FIBICH:   I think we've been going seven

17    hours.  But, you know, if you can finish up, I'd like to get it

18    done.

19                (Young Exhibit No. 26 marked.)

20        Q.   (BY MR. ELDER)  Doctor, I've marked as Young 26 a

21    record from September of 1990 from the University Hospital of

22    Jacksonville.  Have you seen that record before?

23        A.   I believe so.

24        Q.   Okay.  And on this date, she weighed 145 pounds; is

25    that right?

♀

226

1        A.   Yes, sir, that's correct.

2        Q.   Okay.  And we looked at our record that we marked

3    earlier from November of '96 when we were talking about her

4    weight and she weighed 194 pounds.

5        A.   Yes, sir, that's correct.

6        Q.   So, over that six-year period prior to taking Zyprexa

7    or Seroquel, she gained 50 pounds?

8        A.   That's correct.

9                (Young Exhibit No. 27 marked.)

10        Q.   (BY MR. ELDER)  Doctor, I've marked as Exhibit 27 a

11    record from Dunn Avenue Family Practice from September 11th,

12    '01.  And this would reflect Ms. Whittington's weight just

Page 204

my101308.txt

13      prior to starting Seroquel; is that right?

14          A.      09-11-01?

15          Q.      Yes, sir.

16          A.      Yes, I believe so.

17          Q.      And she weighed 204 pounds?

18          A.      That's what it says.

19                  (Young Exhibit No. 28 marked.)

20          Q.      (BY MR. ELDER)   I've marked as Exhibit 28 a record

21      from February 15th of 2002.   And at this point, Ms. Whittington

22      weighs 203 pounds, correct?

23          A.      Yes, sir.

24          Q.      Okay.   So -- and she started taking Seroquel in some

25      amount in October of '01, right?

♀

227

1           A.      Between October of '01 and January of '02.

2           Q.      Okay.   So, this is in February of 2002.   She's lost a

3       pound, correct?

4           A.      Lost a pound compared to when, sir?

5           Q.      September of '01.

6           A.      Yes, sir, that's correct.

7           Q.      Okay.   Is that pattern of weight over the first few

8       weeks of taking Seroquel typical for people who gain weight on

9       Seroquel?

10          A.      No, it is not.

11          Q.      How much weight do you believe she gained on

12      Seroquel?

13          A.      She was on Seroquel for a four-year period, give or

14      take, between either October '01/January '02 and February '06,

15      '02 and '06.   02-15-02, she was 203 pounds.   02-14-06, she was

                        Page 205

my101308.txt

16    244 pounds.

17                    (Young Exhibit No. 29 marked.)

18    Q.    (BY MR. ELDER)  Okay.  I'm going to show you Exhibit

19    29.  Doctor, in Exhibit 29, this is now July of 2002.  Do you

20    see that?

21    A.    Yes, sir.

22    Q.    And she weighs 215 pounds?

23    A.    January of -- no.  July --

24    Q.    July of '02.

25    A.    Yes, sir, that's correct.

                                                            228

1    Q.    She weighs 215 pounds?

2    A.    Yes, sir, that's correct.

3    Q.    Okay.  And on your own chart there that's attached to

4    your report, that has some weights for Ms. Whittington on it,

5    correct?

6    A.    Yes, sir.

7    Q.    Okay.  And what do you have for Ms. Whittington's

8    weight in March of 2003?

9    A.    215 pounds.

10    Q.    Okay.  So, between July of 2002 and March of 2003,

11    the medical records reflect a net change in Ms. Whittington's

12    weight of zero; is that right?

13    A.    That's correct.

14    Q.    Okay.  Having stayed on Seroquel for that period of

15    time with no change in weight, how do you attribute any weight

16    gain after that period of time to Seroquel?

17    A.    I would say there were other factors involved based

18    on that data alone.

my101308.txt

19    Q.    Does that mean that you cannot attribute weight gain

20  after that period of time to Seroquel, you would attribute it

21  to those other factors?

22    A.    If, in fact, she was taking the Seroquel as

23  prescribed.

24    Q.    If she was taking it as prescribed, you would

25  attribute it to other factors?

♀

229

1    A.    That's correct.

2    Q.    And that's because -- and I -- is the reason that

3  you're saying that because her dose didn't change, in your

4  opinion?

5    A.    Yes.

6    Q.    As you sit here, are you aware of evidence that her

7  dose did change?

8    A.    No.

9    Q.    So, as you sit here, your opinion would be that based

10  on the evidence you are aware of, weight gain after that time

11  couldn't be attributed to Seroquel, given the period of time

12  that her weight didn't change while taking Seroquel?

13        MR. FIBICH:  Object to form.

14    A.    If, in fact, she took the Seroquel as prescribed,

15  correct.

16    Q.    (BY MR. ELDER)  Did Ms. Whittington gain weight after

17  stopping Seroquel?

18    A.    The Seroquel was discontinued February '06.  If I

19  compare her weight on 02-14-06 to 05-24-06, she went from 244

20  to 236.

21    Q.    Okay.  Did you look beyond that?

Page 207

my101308.txt

22        A.    In terms of weight?

23        Q.    That's right.

24        A.    No.

25        Q.    Did you have Dr. Boyd's records?

♀

230

1         A.    I don't have an independent recollection of that as

2    we sit here now.

3         Q.    As you would look down your page there -- I've handed

4    you my copy of your handwritten notes on this case -- did you

5    have Dr. Boyd's records?

6         A.    Yes.

7               (Young Exhibit No. 30 marked.)

8         Q.    (BY MR. ELDER)  Let me show you what I've marked as

9    Exhibit 30, Doctor.

10               Can I have my copy?  Thank you.

11        A.    Sure.

12        Q.    Exhibit 30 is a record from Dr. Boyd dated March 24th

13    of 2008.  And on the second page there, do you see that

14    Ms. Whittington weighed 255 pounds as of that visit?

15        A.    Yes, sir, I do.

16        Q.    Okay.  And she's been off of Seroquel -- by March of

17    '08, she's been off of Seroquel over two years, correct?

18        A.    Yes, sir, that's correct.

19        Q.    Okay.  And 255 pounds, according to your chart that's

20    attached to your report, is that the most she's ever weighed?

21        A.    Yes, it is.

22        Q.    Okay.  And would you agree that the fact that she

23    attained her highest weight after she went off of Seroquel

24    casts doubt on the hypothesis that Seroquel caused her to gain

Page 208

my101308.txt

25    weight?

♀

231

1        A.    After she discontinued the Seroquel, yes.

2        Q.    Before forming your opinions in this case, did you

3    review the scientific literature on the relationship between

4    weight and schizophrenia?

5        A.    I reviewed some literature on schizophrenia and

6    metabolic syndrome.

7        Q.    Okay.  But not weight specifically?

8        A.    I don't have independent recollection of that.

9        Q.    Okay.  Is it your opinion that people who suffer from

10    schizophrenia are more likely to be overweight than people who

11    do not?

12        A.    I don't recall if that holds up independent of

13    treatment.

14        Q.    You didn't look at that issue before writing your

15    report?

16        A.    I don't have an independent recollection as we sit

17    here now of that specific issue.

18        Q.    You would agree you've written it as one of your risk

19    factors in your report here that Ms. Whittington had a

20    sedentary lifestyle, on Page 11 of your report?

21        A.    Thank you, sir.

22              What I wrote is "sedentary lifestyle associated

23    with schizophrenia."  I do not know how sedentary

24    Ms. Whittington was as an individual.  Nowhere in the medical

25    records did I see a description of her typical day, for

♀

my101308.txt

232

1   example.

2       Q.    And what do you mean, "sedentary lifestyle associated

3   with schizophrenia"?  I'm not understanding the distinction

4   you're making.

5       A.    My understanding, sir, is that there is a sedentary

6   lifestyle associated with -- an increased sedentary lifestyle

7   associated with schizophrenia.  What I don't know is details

8   about Ms. Whittington's lifestyle.

9       Q.    So, you didn't assess prior to writing your report

10  whether or not Ms. Whittington is sedentary or was sedentary

11  during the time she was taking Seroquel?

12      A.    Correct.

13      Q.    Did you review her medical records for possible

14  alternate causes of the weight gain during the period that she

15  took Seroquel?

16      A.    Yes.

17      Q.    And did you find any?

18      A.    Yes.

19      Q.    What did you find?

20      A.    She certainly had a family history of diabetes, she

21  certainly had a history of elevated lipids, there was prior

22  receipt of Zyprexa.

23      Q.    She was involved in two motor vehicle accidents?

24      A.    One that I recall for sure.

25      Q.    Okay.  And as a result of those, she sought medical

♀

233

1   treatment.

Page 210

my101308.txt

2     A.    That's correct.

3     Q.    Okay.   Over a fairly long period of time.

4     A.    Yes, sir, that's correct.

5     Q.    Okay.   And she reported -- in fact, at one point in

6  her records, it said she had chronic neck pain.

7     A.    Yes, sir.

8     Q.    Said she had several MRIs.

9     A.    That's correct.

10    Q.    Okay.   And she consulted a neurologist about her

11 pain.

12    A.    I believe so, yes.

13    Q.    Okay.   And pain -- the effects of pain from those

14 motor vehicle accidents could have caused Ms. Whittington to be

15 less active.   Is that fair?

16    A.    Yes, sir, that's fair.

17    Q.    And you can't rule out in this case that a sedentary

18 lifestyle or physical inactivity as a result of pain or

19 whatever it was that caused her to gain weight both before and

20 after taking Seroquel was, in fact, the cause of the weight

21 gain she experienced while on Seroquel; is that true?

22    A.    Yes, sir.

23    Q.    Did you review any scientific literature in

24 connection with this case that concluded that Seroquel is a

25 cause of diabetes?

♀

234

1     A.    That specifically states Seroquel causes diabetes?

2     Q.    That's right.

3     A.    No, sir.

4     Q.    In Ms. Whittington's case, would you characterize her

Page 211

my101308.txt

```
 5  schizophrenia as severe?
 6       A.   Yes.
 7       Q.   You would agree that her mental illness has had a
 8  significant impact on her life?
 9       A.   Yes.
10       Q.   It's affected her ability to really function on a
11  daily basis?
12       A.   Yes, sir.
13       Q.   Are you offering any opinions in this case regarding
14  the cause of Ms. Whittington's pancreatitis?
15       A.   No.
16            MR. ELDER:  Let me look over my notes for a
17  minute, but I think we're about there.
18            MR. FIBICH:   Okay.  We'll take a break while he
19  does that.
20            (Recess from 5:13 p.m. to 5:17 p.m.)
21       Q.   (BY MR. ELDER)  Dr. Young, my only other question is
22  similar to what I asked you at the beginning.  We talked about
23  some general issues, in addition to some Whittington-specific
24  issues, and I just wanted to confirm that your testimony would
25  apply equally in the Unger case on those issues that were not
```

♀

235

```
 1  specific to Ms. Whittington.
 2       A.   That's correct, sir.
 3       Q.   Okay.  That's all I have for you.  Thank you.
 4       A.   Thank you, sir.
 5            MR. FIBICH:  We'll reserve our questions.
 6            (Deposition concluded at 5:18 p.m.)
 7
```

my101308.txt

```
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

♀

236

```
 1                    CHANGES AND SIGNATURE

 2    PAGE      LINE      CHANGE                 REASON

 3    _____

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____
```

my101308.txt

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24          I, MITCHELL ALAN YOUNG, M.D., have read the foregoing

25  deposition and hereby affix my signature that same is true and

♀

237

1   correct, except as noted above.

2                         _____

3                         MITCHELL ALAN YOUNG, M.D.

4

5   THE STATE OF _____)

6   COUNTY OF      _____)

7          Before me, _____, on this day

8   personally appeared MITCHELL ALAN YOUNG, M.D., known to me (or

9   proved to me under oath or through _____) to be

10  the person whose name is subscribed to the foregoing instrument

11  and acknowledged to me that they executed the same for the

12  purposes and consideration therein expressed.

13          Given under my hand and seal of office this _____ day

Page 214

my101308.txt

14    of _____, _____.

15

16

17                              _____

18                              NOTARY PUBLIC IN AND FOR

19                              THE STATE OF _____

20

21

22

23

24

25

♀

238

 1    STATE OF TEXAS
      COUNTY OF HARRIS
 2
              I, the undersigned certified shorthand reporter
 3    in and for the State of Texas, certify that the facts stated in
      the foregoing pages are true and correct.
 4
              I further certify that I am neither attorney or
 5    counsel for, nor related to or employed by, any of the parties
      to the action in which this deposition is taken and, further,
 6    that I am not a relative or employee of any counsel employed by
      the parties hereto, or financially interested in the action.
 7
              The amount of time used by each party at the
 8    deposition is as follows:

 9            STEPHEN D. RABER, ESQ. - 5:20
              SCOTT A. ELDER, ESQ. - 1:30
10
              SUBSCRIBED AND SWORN TO under my hand and seal
11    of office on this the _____ day of _____, 2008.

12

13

14                              _____
                                SHANON M. HAIR, CSR
15                              Certified Shorthand Reporter
                                In and for the State of Texas
16

                            Page 215

```
                                my101308.txt
       17    Certificate No. 6513
             Expiration Date:  12-31-09
       18    Firm Registration No. 03

       19

       20

       21

       22

       23

       24

       25
```