# EXHIBIT 42

Dee Burke
August 9, 2008

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: SEROQUEL PRODUCTS LIABILITY LITIGATION,
MDL DOCKET NO. 1769

THIS DOCUMENT RELATES TO:

HALLER v. ASTRAZENECA LP, ET AL.
[DAVID D. HALLER 6:07-cv-15733]

------------------------------------

THE VIDEOTAPED DEPOSITION OF

DEE BURKE

August 9, 2008

Deborah K. Watson, RPR

STRATOS LEGAL SERVICES

1001 West Loop South, Suite 809

Houston, Texas 77027

713.481.2180 * Fax 713.583.9191

Toll Free 800.971.1127

Page 41

stamps, transportation, applying for disability, getting to their mental health appointments, getting to their physical doctor appointments. They were busy.
Q. And you would consult with them for additional perspective regarding the patients that you were treating?
A. That's correct.
Q. That includes David Haller; am I right?
A. That was.
Q. Do you recall the names of the case managers that you interacted with regarding David Haller?
A. There was Honey Weber. Terry was a male and he's in here, but I can't --
Q. Wallace?
A. Terry Wallace.
  Tracy Mahaney. Laura Orcutt.
Q. Can you spell Mahaney?
A. M-A-H-A-N-E-Y.
Q. And what was the next one?
A. Laura Orcutt, O-R-C-U-T-T.
Q. You mentioned Honey Weber. One B?
A. Not sure.
Q. Any others?

Page 42

A. Keith Lake.
Q. Grady Poole?
A. I don't -- I mean, I interact with Grady, but I don't remember interacting with Grady regarding David.
Q. Okay. Any others?
A. Terry, more than anybody. Terry Wallace was the main one where David was concerned.
Q. Any others?
A. I recognized some of the other names in the chart, but I can't tell you that I --
Q. Don't recall?
A. -- yeah, that I interacted with them regarding David.
Q. Is the number of people that you've identified, in your view, a large number of case managers?
A. For one client, yes.
Q. Yes, ma'am. Why?
A. David was extremely difficult.
Q. In what way?
A. He'd fire us.
Q. What do you mean?
A. He would become disturbed and think that he was not being served or wasn't being treated right or

Page 43

they weren't doing as much for him as they could. You know, in his words they were worthless, and he would fire them. He'd fire the agency.
Q. At the beginning of -- of the dep while we were off the record, you suggested that you didn't want David Haller to have your own unlisted cell number. Did I hear you correctly?
A. That's correct.
Q. Why?
A. I think David can be dangerous.
Q. In what regard?
A. I think that he could harm others, especially if he feels he's been wronged.
Q. Do you think he could kill someone?
A. I do.
Q. You said that very quickly.
A. Uh-huh.
Q. You're nodding and saying yes.
A. Yes.
Q. Do you think he'd kill himself?
A. I think he could mistakenly kill himself. He has made several suicide attempts and --
Q. Was that to manipulate people?
A. I think it was to gain what he was going after. And he admitted that. It's in one of my notes

Page 44

that he admitted that.
Q. Did he ever threaten you?
A. Yes.
Q. In what way?
A. That he was going to kill me.
Q. How often?
A. One time.
Q. Can you explain the circumstances?
A. It was regarding lab work. He didn't want to do lab work. And I was trying to explain to him that if he was going to be on the medications he was on, he was going to have to do lab work. And those medications were Seroquel, lithium, and Depakote.
Q. The lab work included glucose checking?
A. Yeah, it did. And it -- and the lithium level and the Depakote level and liver function. And he told me he didn't need to do lab work. He knew that his medications were fine and that he was not in any way being risked by the medications; he was fine. And I told him if he wasn't going to comply with the treatment program, I wasn't going to treat him.
Q. And that's when he threatened to kill you?
A. And he told -- you know, "You do what -- you write my prescriptions; I'm going to kill you." Terry Wallace was sitting there. He threatened him as

Page 45

1  well.
2  Q. Did he describe how he was going to kill
3  you?
4  A. No.
5  Q. He wasn't graphic. He just said he'd
6  kill --
7  A. No.
8  Q. And you believed him?
9  A. I do believe him.
10 Q. Do you -- did Terry say whether he believed
11 him or not?
12 A. He did.
13 Q. And Terry did believe that David would kill
14 him?
15 A. Terry did believe that he could harm either
16 one of us. He immediately got a form that discharged
17 us, that he didn't want care provided by us any
18 longer, he didn't want case management services
19 provided by Terry any longer, services provided by
20 Directions any longer, and he signed it.
21 Q. Did he ever threaten to sue you?
22 A. Several times.
23 Q. That wasn't at all unusual for him; is that
24 right?
25 A. No.

Page 46

Q. He threatened to sue Directions too?
A. Yes.
Q. Would it come, as a treater of his, as a
surprise to learn that he threatened to sue me?
A. No.
Q. That's perfectly consistent with what you
saw?
A. That's perfectly -- that's very consistent.
Q. And David threatened to kill you even
though he was on his medications; is that correct?
A. He did.
Q. Did you perceive David to be a complicated
case to treat?
A. He was complicated in that he was so
noncompliant.
Q. Had he taken his medications, do you think
he would have been more capable of dealing with
every-day-to-day things?
MR. BARRINGER: Objection; form.
Q. (By Mr. Ellison) Yeah, let me try that one
again.
It's your view he was noncompliant?
A. He was noncompliant.
Q. In what way?
A. He would adjust his medications or not take

Page 47

1  them or not do the lab work or go to the lab not
2  fasting when he knew it should have been fasting.
3  Q. Why -- do you have an understanding of why
4  he would do that?
5  A. I can't speak for -- David's just
6  noncompliant. David's going to do what David wants to
7  do and how he perceives it can be done.
8  Q. Did you ever perceive of David as
9  sociopathic?
10 A. I think he's antisocial.
11 Q. What do you mean by that?
12 A. I think that he doesn't think that the
13 normal societal norms abide, you know, that he should
14 abide by them, that they pertain to him.
15 Q. Kind of --
16 A. He has a distorted view that everybody and
17 everything owes him, that he's a victim.
18 Q. And he had that view during the whole time
19 you were treating him?
20 A. The entire time.
21 MR. ELLISON: Let's take a quick break.
22 THE VIDEOGRAPHER: We're off the record at
23 10:50.
24 (Recess from 10:50 a.m. to 10:54 a.m.)
25 THE VIDEOGRAPHER: We're back on the record

Page 48

at 10:54.
Q. (By Mr. Ellison) I was asking you before the
break about the different folks that actually provided
care and treatment for David during the time you were at
Directions. And you were telling me that David was a
difficult patient, and among other things, he would fire
the caseworkers, he'd fire the nurse practitioners, and
he'd fire Directions. Did I understand that correctly?
A. That's correct.
Q. I asked you about some of the case
managers. Are you aware of whether David threatened
any of the other case managers apart from Terry
Wallace?
A. I don't know. I can't answer that one.
Q. Okay. Did you -- what about the other
nurse practitioners? Do you know whether David
threatened any of the other nurse practitioners?
A. I don't know that either.
Q. You don't recall any discussions amongst
your colleagues about that?
A. We discussed how difficult he was --
Q. In what regard?
A. -- and the fact that he got passed around
because he would wear people out.
Q. What do you mean by that?

Page 49

1  A. Because he was so noncompliant. He moved
2  frequently, he would not show up for appointments, he
3  would then call nonstop to the case manager on call
4  who was then coming to the nurse practitioner or
5  physician who was treating him at the time, and he had
6  then a lot of needs. And it wasn't needs. David had
7  demands. They weren't always needs.
8  Q. What do you mean by "demands"?
9  A. Whether it be a demand to come and pick him
10 up or to bring him money or to take him shopping or to
11 find him a place to stay. The shelters in the area
12 had refused to allow him to come into the shelters
13 anymore because of his violence. So he couldn't go to
14 shelters and he would end up homeless frequently
15 because he wouldn't pay bills. So he -- he absorbed a
16 lot of resources within Directions.
17 Q. Was it your view that David thought he was
18 entitled?
19 A. He was very entitled, but there was a
20 reasoning even behind that. David was what was called
21 a class member. In Florida, as the
22 deinstitutionalization took place of the state
23 hospitals and these folks were put into the community
24 mental health centers, you had a contract that you
25 treated them, no matter what their behavior was. So

Page 50

1  that is why he was allowed to come back several times
2  even though he had been threatening, even though he
3  had fired us. He moved between Directions For Mental
4  Health and Suncoast For Mental Health down in
5  St. Petersburg.
6  Q. Did that make him even harder to treat
7  and --
8  A. Exactly, because you could not do any kind
9  of continuity with him either.
10 Q. Did David ever throw that class member
11 status in your face?
12 A. Yes.
13 Q. And how would he do that?
14 A. He would -- he told Dr. Zenel, "You have to
15 treat me."
16 Q. Kind of a "nyeah, nyeah, nyeah, nyeah,
17 nyeah" --
18 MR. BARRINGER: Objection.
19 Q. (By Mr. Ellison) -- sort of thing?
20 MR. BARRINGER: Objection; form.
21 Q. (By Mr. Ellison) You can answer.
22 A. Yes.
23 Q. Exactly right? Am I right?
24 A. Yes.
25 Q. My colleague, or I, for that matter, will

Page 51

1  sometimes object to the nature of a question. That is
2  simply to preserve an objection for the record. It
3  has nothing to do with whether or not you have to
4  answer the question. Do you understand that?
5  A. Okay.
6  Q. Okay. Did David ever taunt you?
7  A. No.
8  Q. Did David ever make an -- what you
9  perceived to be an inappropriate sexual advance?
10 A. (No answer.)
11 Q. You're pausing.
12 A. I'm trying to remember. Not an
13 inappropriate sexual comment. It would -- degrading,
14 you know, --
15 Q. In what regard?
16 A. -- in -- in that -- you know.
17 Q. Do you recall what he said?
18 A. I don't, but it was within regards to me
19 being female.
20 Q. And you don't remember what he said?
21 A. But I don't. I don't remember exactly what
22 he said.
23 Q. You said -- you referenced violence in
24 shelters. David wasn't welcome at any of the shelters
25 in the area?

Page 52

1  A. None of them.
2  Q. And you said violence. What do you mean by
3  violence?
4  A. He had hit people. He had attacked people.
5  He had exposed himself.
6  Q. What do you mean by that?
7  A. He had exposed his penis.
8  Q. Did he masturbate in public?
9  A. I don't know. But he would expose himself
10 to young girls.
11 Q. Why would he do that?
12 A. He told me it was just for the kick.
13 Q. What sort of kick?
14 A. I don't --
15 Q. Sexual arousing?
16 A. (Witness shrugs.)
17 Q. You're shaking your head.
18 A. I just don't explore that with him, you
19 know?
20 Q. Why not?
21 A. Because I wasn't going to help him explore
22 that.
23 Q. Did you think David would tell you those
24 things because he found public discussion with you and
25 making you uncomfortable satisfying to him?

Page 53

1  A. I think that's what he had hoped for. I
2  wasn't uncomfortable, but I wasn't going to entertain
3  him either.
4  Q. He was -- in other words, he was raising
5  that subject with you to make you feel uncomfortable?
6  A. Exactly.
7  Q. Okay.
8  A. Intimidating.
9  Q. Did he try to intimidate you?
10 A. He tried to intimidate everybody he came in
11 contact with. That is how I always saw him. With the
12 front office staff, he had been spoken to about that,
13 with --
14 Q. What would he do?
15 A. Just very physically aggressive, coming
16 into your space. He was very loud, cursing,
17 threatening, that he'd have their jobs, that he'd have
18 them. "I'll see you outside." He would do it
19 outside. We ran a day treatment program. If he felt
20 someone was not doing what he thought they should do
21 or not responding to him --
22 Q. Not giving him what he wanted?
23 A. -- not giving what he wanted, you know, he
24 would act out in the parking lot.
25 Q. What do you mean by "act out"?

Page 54

A. Threatening people, cursing at them,
yelling.
Q. Were the staff afraid of him?
   MR. BARRINGER: Objection; form.
A. I can't answer for the other people. I
was --
Q. (By Mr. Ellison) Did anyone ever tell
you they were afraid of him?
A. No.
Q. Did you ever observe anyone who was being
subjected to one of David's rants as cringing or
concerned?
A. The front office staff would. They were
young girls.
Q. What do you mean by "young girls"?
A. Early 20s.
Q. Did you perceive David's behavior as an
aspect of his disease?
A. As part of his personality disorder, not
part of his bipolar.
Q. How do you distinguish?
A. The bipolar has more to do with mood. The
personality disorder has to do with behavior.
Q. David's had numerous diagnoses over the
course of his treatment at --

Page 55

1  A. He has.
2  Q. -- disorders -- at Directions, correct?
3  A. He has.
4  Q. Is it difficult to identify a particular
5  diagnosis in David?
6  A. I think so.
7  Q. Why?
8  A. Because of the personality disorder.
9  Q. What is the personality disorder?
10 A. His is antisocial personality disorder.
11 Q. Can you describe what that is?
12 A. It means that he has no regard for others.
13 He cannot show empathy. He doesn't display sympathy.
14 He doesn't think societal norms apply to him. And he
15 will use anything and anyone to get what he wants.
16 Q. You've said a lot. Do you perceive of
17 David as not having regard for human life?
18 A. I don't think he has regard for human life.
19 Q. And that's even while he's being treated?
20 A. That's even while he's being treated.
21 Q. I assume you've had a number of very
22 difficult patients over the course of your career. Is
23 that a fair assumption?
24 A. I have. That is.
25 Q. Where does David fit into the totem pole?

Page 56

Was he your most difficult patient?
A. He's not my most difficult patient
clinically. He was one of the most difficult patients
with his personality disorder, because I truly think
he is a true forensic kind of patient.
Q. What do you mean by that?
A. Meaning he has served prison time and
probably shouldn't have been let out.
Q. You think David should still be
incarcerated; is that correct?
A. I do.
Q. Do you perceive of him as a threat to
society?
A. I do.
Q. Do you think the least of his concerns is
diabetes?
A. I think that's the least concern with --
Q. You're laughing out loud. Is that correct?
A. That's true.
Q. You think David needs his medications;
isn't that correct?
A. I do think he needs his meds.
Q. And that if he doesn't take his meds, he
poses a risk to himself as well as the rest of us; is
that correct?

25 (Pages 97 to 100)

Dee Burke
August 9, 2008

Page 97

1 treat the depression within these illnesses. People
2 forgot that these people get depressed as well.
3 That's a huge thing. Haldol, you know, you've
4 probably heard of the flat face, you know; people just
5 kind of stumbling down the hall. They're not hearing
6 voices anymore, but they're miserable. You know,
7 these medications can help that.
8    Q. And you have patients that you prescribe
9 atypicals, including Seroquel, to who can live very
10 productive lives; am I correct?
11    A. They can get jobs.
12    Q. In your view, could David work?
13    A. No.
14    Q. How come?
15    A. Because he would not be able to function in
16 an environment where he was -- had a boss.
17    Q. And that's even medicated?
18    A. Even medicated.
19    Q. Why? Do you think he'd kill his boss?
20       MR. BARRINGER: Objection; form.
21    A. I just don't think he'd do what he was
22 supposed to do.
23    Q. (By Mr. Ellison) Do you think his boss
24 would be at risk if they were to have an
25 altercation?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 98

1    A. Yes.
2    Q. And you think it likely he would have an
3 altercation with someone who was --
4    A. Guaranteed.
5    Q. Okay. So the answer to my question that
6 David might kill him was yes? Am I right?
7    A. Yes.
8       MR. BARRINGER: Same objection.
9    Q. (By Mr. Ellison) When -- when treating
10 David, did the risk of diabetes, given his mental
11 health, matter to you at all?
12    A. It always matters, because then you worry
13 can they handle that illness on top of what's going on
14 with them.
15    Q. Okay. If I understood you earlier, you
16 said -- you agreed that diabetes would have been the
17 least of David's problems?
18    A. That would be correct.
19    Q. And you would prescribe and did prescribe
20 atypicals for David, including Seroquel,
21 notwithstanding the risk of diabetes; is that correct?
22    A. Right. Yeah, but you still have concerns.
23    Q. I understand. And you talked with David
24 about the diabetes issues, right?
25    A. Correct.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 99

1    Q. And you recommended that notwithstanding
2 the diabetes issues, he uses Seroquel; is that
3 correct?
4    A. I did.
5    Q. And you thought it was important to him; is
6 that right?
7    A. I did.
8    Q. And your view hasn't changed at all having
9 reviewed the records; is that right?
10    A. It has not.
11    Q. You have no qualms, looking back over your
12 records, about having prescribed Seroquel; is that
13 right?
14    A. I did not.
15    Q. You thought --
16    A. I thought it was the perfect medication at
17 the time for him.
18    Q. And you found him responsive to it; isn't
19 that correct?
20    A. Very responsive.
21    Q. The drug worked well for him; isn't that
22 correct?
23    A. That's right.
24    Q. And you have no opinions as to whether it
25 caused or contributed to any negative condition David

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 100

1 might have, whether it be stomach pains, diabetes, or
2 anything else; is that correct?
3    A. I don't think it caused any of his
4 problems.
5    Q. You -- you thought David only benefited
6 from it; am I right?
7    A. I did.
8    Q. Are atypical antipsychotics, including
9 Seroquel, a necessary part of your treatment of
10 available therapies to you as a -- someone who treats
11 bipolar?
12       Shall I try that one again?
13    A. Yeah. I'm not sure what you're saying. I
14 don't use them all the time.
15    Q. I --
16    A. I use them when they're appropriate.
17    Q. I understand.
18       Do you think it's important that you have
19 them available to you?
20    A. Absolutely.
21    Q. So it would be bad if AstraZeneca and the
22 other providers went back and withdrew all atypical
23 antipsychotics from the market; is that correct?
24       MR. BARRINGER: Objection; form.
25    Q. (By Mr. Ellison) You're kind of rolling

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 113

1  identify family medical history, correct?
2  A.  That's right.
3  Q.  Further down, last paragraph, it says: "He
4  has had laparoscopy in the past for kidney stones," --
5  that's L-A-P-A-R-O-S-C-O-P-Y -- correct?
6  A.  Right.
7  Q.  And you wrote that because that's what
8  David told you; am I right?
9  A.  Right.
10  Q.  Now, the paragraph above that, he says:
11  "He himself denies hypertension, cardiac disease, a
12  history of cancer, diabetes, thyroid disease, or
13  kidney disease."
14    Did I read that -- read that correctly?
15  A.  You did.
16  Q.  And that is what David told you, correct?
17  A.  Right.
18  Q.  You did nothing to independently verify
19  that; is that correct?
20  A.  No.
21  Q.  And if the medical records reflect that
22  David, in fact, had hypertension and indeed instances
23  where he had elevated blood glucose levels prior to
24  this first visit, you would have no reason to dispute
25  those records, would you?

Stratos Legal Services
800 971 1127

Dee Burke
August 9, 2008

Page 114

1  A.  I would not have.
2  Q.  Now, further down under Medications, it
3  identifies Eskalith, lithium, and Depakote.  Did I
4  read that correctly?
5  A.  Correct.
6  Q.  I neglected to ask you, what's Eskalith?
7  A.  Lithium.  It's another form of lithium.
8  Q.  So he's on two forms of lithium, right?
9  A.  Right.
10  Q.  One is extended release and the other one
11  is taken at night, right?
12  A.  Right.
13  Q.  Depakote twice a day?
14  A.  Right.
15  Q.  And then you've identified a number of
16  medications as medications that have been tried with
17  David; am I correct?
18  A.  Correct.
19  Q.  Xanax, Klonopin, Vistaril, Sinequan, Moban,
20  Serentil, Thorazine, Haldol -- Haldol, Mellaril,
21  Loxitane, Stelazine, Prolixin, and Risperdal; am I
22  correct?
23  A.  That's correct.
24  Q.  Those are medications that had been tried
25  with David?

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 115

1  A.  That's what he reported he had tried in the
2  past.
3  Q.  And he reported that those didn't work for
4  him?
5  A.  Correct.
6  Q.  One of those medications is Risperdal; is
7  that correct?
8  A.  That's right.
9  Q.  Oral Risperdal?
10  A.  At that point, it would have been oral.
11  Q.  And at that point in time, you understood
12  that there was a risk of diabetes, weight gain,
13  metabolic process associated with Risperdal; am I
14  correct?
15  A.  There was potential for weight gain with
16  that.
17  Q.  I -- I should be careful when I say that.
18  You recognize --
19  A.  Right.
20  Q.  Let me make sure I understand.  You said
21  that as of this date, October 2002, you were aware
22  that there was a risk of increased appetite associated
23  with atypicals which could lead to weight gain which
24  could lead to diabetes; is that correct?
25  A.  Correct.

Stratos Legal Services
800-971-1127

Dee Burke
August 9, 2008

Page 116

1  Q.  And you discussed that issue as well as
2  that process from weight gain to -- or appetite to
3  weight gain to diabetes as well as other consequences
4  with the patients, correct?
5  A.  Correct.
6  Q.  David told you he was allergic to
7  ampicillin; am I correct?
8  A.  He did.
9  Q.  Now, further, under Legal History on
10  page 4, it says he had a battery, a number of
11  different battery convictions; am I correct?
12  A.  Right.
13  Q.  He says then in 1986, he had four counts of
14  what you wrote as "rude" -- lewd -- "and
15  lasciviousness."
16    Did I read that correctly?
17  A.  Right.
18  Q.  Battery on a law enforcement officer and
19  then conditional release.
20    Did I read that generally right?
21  A.  Yes.
22  Q.  Do you know the circumstances around the
23  lewd and lasciviousness, the four counts?
24  A.  I know that he exposed himself to the -- to
25  four young girls.  Other than that, I don't know what

Stratos Legal Services
800-971-1127

```
 1   STATE OF TENNESSEE    )
 2   COUNTY OF SUMNER      )
 3              I, Deborah K. Watson, Registered
 4   Professional Reporter and Notary Public in and for the
 5   State of Tennessee, at Large,
 6              DO HEREBY CERTIFY the foregoing proceedings
 7   were taken at the time and place set forth in the
 8   caption thereof; the witness therein was duly sworn on
 9   oath to testify the truth; the proceedings were
10   stenographically reported by me in shorthand; and the
11   foregoing proceedings constitute a true and correct
12   transcript of said proceedings to the best of my
13   ability.
14              I FURTHER CERTIFY I am not a relative or
15   employee or attorney or counsel of any of the parties
16   hereto, nor a relative or employee of such attorney or
17   counsel, nor do I have any interest in the outcome or
18   events of this action.
19              IN WITNESS WHEREOF, I have hereunto affixed
20   my official seal and signature this 20th day of
21   August, 2008, at Goodlettsville, Sumner County,
22   Tennessee.
23
                          _____
24                        Deborah K. Watson, RPR
                          Notary Public at Large
                          State of Tennessee
25                        My Commission Expires: 10/11/2008
```