UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: Seroquel Products Liability Litigation

MDL DOCKET NO. 1769

This document relates to:

| | |
|---|---|
| Linda Guinn | 6:07-cv-10291 |
| Janice Burns | 6:07-cv-15959 |
| Richard Unger | 6:07-cv-1581 2 |
| Connie Curley | 6:07-cv-15701 |
| Linda Whittington | 6:07-cv-10475 |
| Eileen McAlexander | 6:07-cv-10360 |
| ~~Sandra Carter~~ | ~~6:07-cv-13234~~ |
| ~~Clemmie Middleton~~ | ~~6:07-cv-10949~~ |
| ~~Hope Lorditch~~ | ~~6:07-cv-12657~~ |
| David Haller | 6:07-cv-15733 |
| ~~Charles Ray~~ | ~~6:07-cv-11102~~ |
| ~~William Sarmiento~~ | ~~6:07-cv-10425~~ |

PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
ASTRAZENECA'S MOTION TO EXCLUDE THE GENERAL CAUSATION
TESTIMONY OF PLAINTIFFS' GENERIC AND CASE-SPECIFIC WITNESSES

WEITZ & LUXENBERG, P.C
180 Maiden Lane, 17th Floor
New York, New York  10038
Telephone:  (212) 558-5500
Facsimile:  (212) 363-2721
E-Mail:  PPennock@weitzlux.com

-and-

BAILEY PERRIN & BAILEY
The Lyric Centre
440 Louisiana Street, Suite 2100
Houston, Texas  77002
Telephone: (713) 425-7100
Facsimile:  (713) 425-7101

*On the Brief:*
Paul J. Pennock
Ellen Relkin

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1.     The Evidence That Seroquel Can Contribute to Type 2 Diabetes
Is Extensive and Generally Accepted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.     Data from Clinical Trials and Epidemiologic Studies Show Seroquel's
Propensity to Cause or Contribute to Glucose Changes, Weight Gain
and Type 2 Diabetes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

         1)     The Clinical Trials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            a) Study 125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

            b) Diabetes Results in AZ's June 2008 Submission
to the FDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            c) Study 144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            d) Studies 49, 135 and 15 . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            e) Studies 126 and 127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

         2) Epidemiologic Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     B.     Astrazeneca's Experts And Consultants Have Agreed That Seroquel
Substantially Contributes To Weight Gain And Diabetes . . . . . . . . . . . . . . 21

     C.     Additional Published Literature Demonstrates That Seroquel Can
And Does Cause Diabetes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

         1)     Dechallenge/Rechallege Evidence . . . . . . . . . . . . . . . . . . . . . 25

         2)     Literature regarding Mechanism . . . . . . . . . . . . . . . . . . . . . 28

i

D.      Plaintiffs' Experts Employ Appropriate Methodologies . . . . . . . . . . . . . . . 29

        Dr. Laura Plunkett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Donna Arnett, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        William Wirshing, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E.      Defendants Have Not Come Forward With Sufficient Evidence
        Challenging the Validity of Plaintiffs' Experts' Methodologies . . . . . . . . . . 37

2.      Legal Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

3.      State Substantive Standard of Causation: Substantial Contributing Factor . . . . . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

# TABLE OF AUTHORITIES

## Cases

*Allen v. Pennsylvania Engineering Corp.,*
    102 F.3d 194 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Allison v. McGhan Corp.,*
    184 F.3d 1300 (11th Cir.1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Barrow v. Bristol-Myers Squibb Co.,*
    1998 WL 812318 (M.D. Fla. 1998)
    aff'd, 190 F.3d 541 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 27, 50

*Bowers v. N. Telecom, Inc.,*
    905 F. Supp. 1004 (N.D. Fla. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Brasher v. Sandoz Pharm. Corp.,*
    160 F. Supp.2d 1291 (N.D. Ala. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Capizzano v. Sec'y of Health & Human Servs.,*
    440 F.3d 1317 (C.A. Fed. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Capizzano v. Sec'y of Health & Human Servs.,*
    2006 WL 3419789 (Fed.Cl. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Claar v. Burlington Northern Railroad Co..*
    23 F.3d 499 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Cleveland v. U.S.,*
    2006 WL 5334601(N.D. Ga. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Conde v. Velsicol Chem. Corp.,*
    804 F. Supp. 972 (S.D. Ohio 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Daubert v. Merrell-Dow Pharmaceuticals, Inc.,*
    509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Seriatum*

*Daubert v. Merrell Dow Pharm., Inc.*,
   43 F.3d 1311 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*General Electric Co. v. Joiner*
   522 U.S. 136 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 44

*Globetti v. Sandoz*,
   111 F. Supp.2d 1174 (N.D. Ala. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Haggerty v. Upjohn Co.*,
   950 F. Supp. 1160 (S.D. Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Hi-Tech Pharm., Inc. v. Crawford*
   2008 WL 4479714 (11th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Hopkins v. Dow Corning Corp.*,
   33 F.3d 1116 (9th Cir. 1994)
   cert. denied, 513 U.S. 1082 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Accutane Prods. Liab.*,
   511 F. Supp.2d 1288 (M.D. Fla. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 48

*In re Bextra and Celebrex Mktg. & Prod. Liab. Litig.*,
   524 F. Supp.2d 1166 (N.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*In re Ephedra Prods. Liab. Litig.*,
   393 F.Supp.2d 181 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
   289 F.Supp.2d 1230 (W.D. Wash. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 3, 26, 28

*In re Zyprexa Prods. Liab. Litig.*,
   489 F. Supp.2d 230 (E.D.N.Y 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 36

*Jones v. Otis Elevator Co.*,
   861 F.2d 655 (11th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Kumho Tire Co. Ltd. v. Carmichael*,
   526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 33, 40, 42

*Magistrini v. One Hour Martinizing Dry Cleaning*,

180 F. Supp.2d 584 (D.N.J. 2002)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Maiz v. Virani*,
253 F.3d 641 (11ᵗʰ Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Marshall Auto Painting v. Westco*,
2003 WL 25668018 (M.D. Fla. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*McClain v. Metabolife International, Inc.*,
401 F.3d 1233 (11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 3, 31, 34, 43, 46, 47, 48

*Migliorini v. U.S.*,
521 F. Supp. 1210 (M.D. Fla. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Mills v. Rogers*,
457 U.S. 291 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Quiet Technology DC-8 Inc., v. Hurel-Dubois UK LTD.*,
326 F.3d 1333 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Rider v. Sandoz Pharm. Corp.*,
295 F.3d 1194 (11th Cir. 2002)
aff'g *Siharath v. Sandoz*, 131 F. Supp. 2d 1347 (N.D. Ga. 2001)  27, 32, 34, 44, 45, 46

*U.S. v. Rutherford*,
442 U.S. 544 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Wilson v. U.S.*,
594 F. Supp. 843 (M.D. Ala. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Statutes

Stephen Breyer, Introduction to REFERENCE MANUAL ON
SCIENTIFIC EVIDENCE (Federal Judicial Center, 2d ed. 2000) . . . . . . . . . . . 5, 27, 29, 39

# INTRODUCTION

The science and medicine establishing that Seroquel can and does cause or contribute to diabetes is not merely compelling but is in fact profound. Both the unpublished AstraZeneca [AZ] clinical trial results and the extensive body of published peer-reviewed medical literature, as well as the general acceptance of this causal relationship by clinicians nationwide, refute any assertion that there somehow remains an open question. AZ experts disclosed in this MDL have recognized, written and even taught others in the medical community about the causal relationship between Seroquel [SQ], other Second Generation Antipsychotics [SGAs] and diabetes. These prior causation acknowledgments by AstraZeneca experts and consultants underscore that not only is plaintiffs' experts' methodology valid and generally accepted, but the conclusions they reached represent established medical opinion, including the opinions of defendants' own agents. Plaintiffs' experts have reviewed the same fundamental data as defendants' experts and, as set forth in their Declarations,[1] Reports and Depositions, have explained how they concluded that Seroquel is a substantial contributing factor in the development of diabetes.

Although generally not known by prescribing doctors for several years after launch of the drug, Seroquel (SQ) causation of weight gain, blood glucose changes, triglyceridemia and diabetes is now so broadly accepted that references in new textbook editions are emerging.[2] For example, the recent 11th edition of Goodman & Gillman's, the "gold standard" pharmacology textbook, specifically includes Seroquel as one of the antipsychotics that can cause weight gain

---

[1] Declarations of Laura Plunkett, Ph.D.(**Ex.1**), William Wirshing , M.D. (**Ex. 2**) and Donna Arnett, PhD. (**Ex. 3**) with their Reports and CV's are annexed.
[2] See Wirshing Declaration, **Ex. 2.**, Par. 12.

and its likely adverse consequence of diabetes.[3]   The 2008 edition of Harrison's Principles of

Internal Medicine succinctly notes in chapter 386, "Mental Disorders":

> The risk of type 2 diabetes mellitus appears to be increased in schizophrenia,
> and atypical agents as a group produce greater adverse effects upon glucose
> regulation, independent of effects on obesity, than traditional agents.
> Clozapine, olanzapine, and quetiapine [Seroquel] seem more likely to cause
> hyperglycemia, weight gain, and hypertriglyceridemia than other atypical
> antipsychotic drugs.[4]

General acceptance is one of the four enumerated *Daubert* factors, *Daubert v. Merrell*

*Dow*, 509 U.S. 579, 592-94.   Another factor is peer-reviewed publication.   As *Daubert*

explains, the factors listed as "general observations" included testability and testing, *id.* at

593; peer review and publication, *id.* at 593-94; error rate and standards (especially for "a

particular scientific technique"), *id.* at 594; and general acceptance.   *Id.*   As recognized by

---

[3] Goodman & Gilman's The Pharmacological Basis of Therapeutics, 11th Ed., McGraw Hill (2006) at p. 474 (**Ex. 4**).  The United States Supreme Court has relied upon Goodman & Gilman's in three opinions. *U.S. v. Article of Drug, Bacto-Unidisk*, 394 U.S. 784, 785 n.1 (1969); *U.S. v. Rutherford*, 442 U.S. 544, 555 n.11 (1979); *Mills v. Rogers*, 457 U.S. 291, 293 n.1 (1982).
[4] Harrison's Principles of Internal Medicine, 17th Ed., McGraw-Hill (2008) at p. 2723 (**Ex. 5**).  This textbook has been cited in approximately 120 cases in both federal and state courts, over twenty of which were decisions by the U.S. Courts of Appeal.  It is "a textbook of medicine used throughout the world" and medical experts recognize it as "reliable and authoritative." *Migliorini v. U.S.*, 521 F. Supp. 1210, 1214 (M.D. Fla. 1981); *Wilson v. U.S.*, 594 F. Supp. 843, 850 (M.D. Ala. 1984). The 2008 Merck Manual states: "Weight gain, hyperlipidemia, and elevated risk of type 2 diabetes are the major adverse effects of SGAs. Thus, before treatment with SGAs is begun, all patients should be screened for risk factors, including personal/family history of diabetes, weight, waist circumference, BP, and fasting plasma glucose and lipid profile." The Merck Manual of Diagnosis and Therapy, 19th Ed. Merck Research Labs 2006, at p. 1730 (**Ex. 6**). *See also*, Type 2 Diabetes, Pre-Diabetes, and the Metabolic Syndrome, Codario, A. Humana Press 2005 at p. 17. (**Ex. 7**) See also, Applied Therapeutics which states: "Weight gain is emerging as one of the most significant concerns associates with the use of antipsychotics, particularly among the atypical agents," and "The issue of weight gain has important clinical implications in light of the link with impaired glucose tolerance and type II diabetes, hyperlipidemia, and increased mortality." Koda-Kimble, Mary Anne, *et al.* Applied Therapeutics: The Clinical Use of Drugs. 9th ed. Philadelphia, PA: Lippincott Williams & Wilkins, 2009 at p. 78-22 (**Ex. 8**). *See also* Pharmacotherapy Principles & Practice, by Marie Chisholm-Burns *et al.*, which states: "As a group, however, they [atypical antipsychotics] are more likely [than conventional agents] to cause metabolic side effects such as weight gain, glucose dysregulation, and dyslipidemia." Chisholm-Burns, Marie A., *et al.* Pharmacotherapy Principles & Practice. McGraw-Hill, 2008 at p. 601 (**Ex. 9**). See Declarations of Drs. Plunkett and Wirshing (**Ex. 1 and Ex. 2**) describing the importance of these texts and how they signify general acceptance.

Judge Barbara Rothstein in a pharmaceutical product liability MDL litigation, "[w]hile not conclusive, the multitude of textbooks and treatises including PPA as a risk factor for stroke adds to the reliability of plaintiffs' experts' opinions." *In re Phenylpropanolamine (PPA) Litigation,* 289 F. Supp.2d 1230, 1242 (W.D. Wash. 2003). (referencing *Daubert,* 509 U.S. at 594: "Widespread acceptance can be an important factor in ruling particular evidence admissible"). Moreover, the Eleventh Circuit recognizes, that "[t]he court need not undertake an extensive *Daubert* analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges." *McClain v. Metabolife International, Inc.,* 401 F.3d 1233, 1239 (11th Cir. 2005).

The body of published medical literature is extensive, including numerous epidemiologic studies describing the association between Seroquel and diabetes or its precursors. The causal relationship recognized in the public literature is confirmed by the results and data in AZ's clinical trials and internal assessments. The 2004 American Diabetes Association, *et al.* consensus statement (**Ex. 10**) was the harbinger of the now generally accepted understanding that Seroquel and other SGAs can cause and contribute to diabetes. Five years ago, high-level academic physicians and scientists had taken note following a consensus panel conference of the emerging evidence that suggested a health threat to hundreds of thousands of Americans[5]: the development of Type 2 Diabetes due to SGA use. Plaintiffs' expert William Wirshing, M.D. was an invited presenter to the consensus panel[6]. Prior to the studies that have been published in recent years[7] and review of

---

[5] See Wirshing Decl., **Ex. 2.**, Paras. 1-4.
[6] See Wirshing Decl., **Ex. 2**.

defendants' internal evidence regarding causation, the consensus statement concluded that: (1) Seroquel was associated with weight gain and the occurrence of diabetes and dyslipidemia but apparently less so than two SGAs[8] but more so than two other SGAs[9]; (2) "considerable evidence" indicated that treatment with SGAs can cause a rapid increase in body weight; (3) "clear-cut trends" could be identified with regard to "SGA's and obesity or diabetes," despite the consensus panel noting limitations of the studies available at the time; and (4) patients on SGAs such as Seroquel should be monitored for diabetes development. What does not appear in the consensus statement and what cannot be reasonably inferred is defendants' assertion that the consensus panel "concluded that scientific evidence does not establish that Seroquel causes diabetes." (Def. Br. p. 2.)[10]  On the contrary, the consensus statement identified the likely diabetes burden that Seroquel and its sister drugs were creating, and sparked the efforts to further evaluate and address this problem.

---

[7] The conference responsible for the consensus statement (**Ex. 10**) was held in mid-November 2003. Consequently, the authors only had the evidence that had sporadically been reported to that time. Since then, 28 publications including clinical trials, epidemiological studies, observational studies, retrospective studies, reviews, surveys showing SQ's association with diabetes have been published. Furthermore, the defendants' own clinical trials showing an increased risk of diabetes, hyperglycemia and weight gain have become available for review.

[8] Zyprexa and clozapine.

[9] Geodon and Abilify.

[10] Another fiction in the opening lines of defendants' brief is that the Food and Drug Administration (FDA) believes that Seroquel has not been proven to cause diabetes. The quote in the 2006 FDA letter referenced by defendants is dramatically out of context. The FDA letter (**Ex. 11**) actually warned AstraZeneca that it was violating federal law (21 U.S.C. §§ 352(a) and 321(n)), due to improper Seroquel marketing materials. The first paragraph states: "This piece is false and misleading because it minimizes the risk of hyperglycemia and diabetes mellitus….The promotional material raises significant public health and safety concerns through its minimization of the risks associated with Seroquel" (*Id.*). Notably, the author of the letter is a non-physician, non-scientist marketing enforcement officer, who was not charged with declaring FDA conclusions on adverse event causality. Importantly, the FDA has continued its efforts through this year to induce AZ to more fully elucidate the magnitude of Seroquel's diabetes risk (*see* **Ex. 12**, FDA letter, January 2008).

In sum, a non-selective recitation of the evidence that Seroquel substantially contributes to the development of diabetes reveals, in resounding fashion, that defendants' motion fails.

## 1. THE EVIDENCE THAT SEROQUEL CAN CONTRIBUTE TO TYPE 2 DIABETES IS EXTENSIVE AND GENERALLY ACCEPTED

### A. Data from Clinical Trials and Epidemiologic Studies Show Seroquel's Propensity to Cause or Contribute to Glucose Changes, Weight Gain and Type 2 Diabetes.

**1)** **The Clinical Trials**: In the review of a drug/effect issue, clinical trials are important evidence; however, due to the relatively few number of patients involved, they are often not large enough to detect certain unintended effects. As explained by the Federal Judicial Center Reference Manual on Scientific Evidence [FJC MANUAL]:

> A clinical trial is an experimental study in which the subjects would be randomly assigned to one of two groups...exposed and not exposed...[and] evaluated for development of the disease. This type of study, called a randomized trial, clinical trial, or true experiment, is considered the gold standard for determining the relationship of an agent to a disease....[11]

There were numerous clinical trials conducted by AZ that we now know provided evidence confirming that Seroquel had diabetogenic effects.   Importantly, AZ did not conduct any clinical trials with diabetes as a primary endpoint.[12]  The closest that AZ came to examining the diabetes issue as an intended a primary objective of a trial, was the narrowly designed Study 125 discussed below.[13]  Despite the limited scope of AZ's clinical trials, many trials nonetheless produced relevant clinically and/or statistically significant[14] evidence

---

[11]FJC MANUAL 338 (2d ed. 2000). *See also In re Bextra and Celebrex Mktg. & Prod. Liab. Litig.*, 524 F. Supp.2d 1166, 1173 (N.D. Cal. 2007) (stating that clinical trials are the gold standard of scientific evidence)
[12] See Wirshing Decl., **Ex. 2.**
[13] Plunkett Decl., **Ex. 1** at p. 14. Wirshing Decl., **Ex. 2**., Paras. 22-26.
[14] Plunkett Decl., **Ex. 1** at pp. 14-15. *See also* the FJC MANUAL 396 for definitions of statistical significance.

5

of glucose regulation disturbances, weight gain, insulin changes, triglyceride increases[15] and new-onset diabetes.[16]

**a) Study 125**: AZ relies on Study 125[17] as dispositive evidence that Seroquel neither substantially contributes to nor causes diabetes. AZ submits that: "a scientist would, at a minimum, have to explain away the results in Study 125" in order to conclude that Seroquel causes diabetes. (Def. Br. at p. 12.) By AZ's own standard and also applying a non-selective analysis of Study 125, the study's results reveal significant evidence *supporting* causation.[18] Study 125 compared Seroquel to Zyprexa and Risperdal (both SGAs) over 24 weeks. There was no placebo group. All patients had schizophrenia. Four glucose results were recorded over a 24 week period: (1) oral glucose tolerance; (2) two hour glucose; (3) fasting plasma glucose; (4) HbA1C.[19] AZ touts the 125 oral glucose tolerance (OGTT) results as the best evidence that SQ does not contribute to diabetes. AZ asserts that SQ did not cause a statistically significant change in glucose metabolism as measured by OGTT. (Def. Br. at p. 10.) In fact, there were subgroups that showed *statistically significant* increases in OGTT results directly contradicting AZ's assertion.[20] Specifically, patients who were considered "non-diabetic patients" showed a statistically significant mean increase from baseline by

---

[15] Metabolic syndrome is considered a pre-diabetic state and dyslipidemia involving triglycerides or HDL (high density lipoproteins) is one of the diagnostic criteria along with central obesity, raised blood pressure, low HDL –cholesterol and fasting hyperglycemia (increased fasting blood glucose); **Ex. 13** Alberti, K., The Metabolic Syndrome – A New Worldwide Definition, The Lancet (2005) 366:1059-1062; *see also* **Ex. 14** Grundy, S.M., et al., Clinical Management of Metabolic Syndrome: Report of the American Heart Association/National hearth, Lung, and Blood Institute/American Diabetes Association Conference on Scientific Issues Related to Management, Circulation (2004) 103:551-556.
[16] Wirshing Decl., **Ex. 2.**, paras. 10-26.
[17] **Ex. 15**.
[18] Wirshing Decl., **Ex. 2**, paras. 22-26.
[19] Wirshing Decl., **Ex. 2**, par. 7 for explanations of these terms.
[20] Wirshing Decl., **Ex. 2.**, par. 24.

OGTT of .967.[21]   Another subgroup showed an even greater statistically significant OGTT increase of nearly 2.898.[22]

AZ also fails to acknowledge 125's significance as to the other major glucose parameters, which showed statistically significant increases from their baseline tests at the commencement of the study.[23]   The fasting plasma glucose (FPG) showed a statistically significant mean increase over the 24 weeks of 3.19 mg/dL.[24]   In other words, on average, the SQ group, after not eating for 8 hours and, therefore, at a time when their plasma glucose should have normalized, had increased plasma glucose as compared to the SQ group baseline (measurement at study commencement).[25]   Furthermore, the HbA1C test also showed an increase of **.12%** on average in SQ patients over the 24 weeks as compared to their baseline measurement.[26]   Though the HbA1C increase was small, it can not be ignored because it further proves that SQ patients were developing increases in their glucose over time.[27]   Finally, there were four SQ patients out of 115 who crossed over to diabetic range.  In the study report, AZ states that "No patients received a diagnosis of diabetes mellitus during the study...."[28]   However, the data shows that four patients were normal at baseline but went on to cross to fasting plasma glucose $\geq$ 126mg/dL  or 2 hour glucose $\geq$ 200mg/dL, both of which

---

[21] **Ex. 15** at p. 335.
[22] Known as Area Under Curve (AUC) 0-2 hours of plasma glucose value following OGTT.
[23] Wirshing Decl., **Ex. 2.**, par. 26.
[24] **Ex. 15** at p. 156 (0.177mmol/L is equivalent to 3.19mg/dL).
[25] Principles of Harrison's Internal Medicine 17th Edition page 2277, Table 338-2 Criteria for the Diagnosis of Diabetes Mellitus.
[26] Wirshing Decl., **Ex. 2.**, par. 26.
[27] In fact, HbA1C is blood test that measures the *average* glucose *over a 3 month period.*  Thus, someone could have diabetic range glucose on the day an HbA1C test is done, but if they were normal throughout most of the prior 90 days, the HbA1C might not appear abnormal.  *See generally* **Ex. 5** at p. 2296.
[28] **Ex 15** at p. 161.

are in diabetic range.[29]  The study, which has never been published and exists only in abstract and internal report form, mentions but does not discuss these patients.  Since there was no placebo group and the only comparators are drugs that also cause or contribute to diabetes (Zyprexa and Risperdal), and those drugs also had patients cross to diabetic range, there is no comparison that will show that these 4 patients are a statistically significant increase to diabetic range.  Regardless, they are additional proof that Study 125 supports plaintiffs' experts opinions as to SQ and diabetes and, together with the other results outlined above, they show that 125 cannot be held up to disprove diabetes causation.[30]



In his report (**Ex. 17** at p. 20), Dr. Koplan acknowledges that when looking across 13 placebo controlled clinical trials *there was a statistically significant increase in patients on Seroquel*

---

[29] AZ patients were excluded from the study if they had fasting glucose values >126 mg/dL and therefore any patient who had such a FPG at the conclusion would be a new-onset diabetes event.  Although AZ later said that an error occurred where they "accidentally" included 20 patients who already had diabetes (3 were "accidentally" placed in the SQ group, 17 in the competitor drug groups), the 2 SQ patients who developed ≥126 mg/dL were not part of these mistakenly included diabetes patients and, therefore, were new-onset diabetes cases on SQ. (*see* **Ex 15** at p. 157-58).

[30] Plunkett Decl., **Ex. 1** at p. 14;  Wirshing Decl., **Ex. 2**., par. 26.

REDACTED

*who crossed over to ≥ 126 mg/dL in at least one measured glucose.*[33]   Although he

apparently attaches no importance to this result in his submissions to this Court, in his recent

MDL deposition, the importance of an increase to 126 mg/dL was admitted:[34]

```
17   Q.  So if someone has a change of 5 in two
18       measurements and they start with a baseline fasting
19       glucose of 121, would you agree that 5 for that patient
20       is clinically significant?
21   A.  It has clinical significance if that would
22       cause the doctor to alter their treatment plan.
23   Q.  That would render them to be diagnosed under
24       accepted criteria as being diabetic; is that correct?
25   A.  That's correct.
```

REDACTED

REDACTED

REDACTED

[34] Deposition of Dr. Jeffrey Koplan, Nov. 16, 2008, p. 134 (**Ex. 18**).
[35] Study 135 was one of the 13 but its data demands some specific recitation and, thus, is discussed below.

REDACTED



REDACTED

**d)  Studies 49, 135 and 15**: Study 49 (**Ex. 20**) evaluated the safety and efficacy of SQ

compared to placebo in bipolar patients.  Despite the fact that the design called for fasting

glucose tests, after the study, when AZ saw that the blood chemistries were higher than

expected, the decision was made to *assume* that these tests were non-fasting due to the time

REDACTED

---

[40] In a letter to AZ in June 2008, the FDA criticized this design-type in another AZ study for precisely these reasons: "If subjects did not tolerate quetiapine in the open-label phase, if they dropped out due to elevation in blood glucose for example, they would not be randomized and the overall effect of the drug on this parameter would be skewed.  Therefore because of this design issue, the overall effect of Seroquel on blood glucose could be underestimated" (**Ex. 21**).

of day they were conducted.[41]  If the study was not assumed by AZ to have been done incorrectly, the results show that the 600mg SQ patients' insulin increase from baseline was 8 times higher than placebo and the 300mg SQ patients' insulin increase was approximately 4 times higher than placebo.  These outcomes were only reported in AZ's internal study report. When published, no mention is made that insulin was even measured, let alone that the results were dramatic.  In fact, AZ's paid consultants for AZ's sponsored study flatly state that "No clinically relevant differences between groups were seen in mean change from baseline for any…clinical chemistry parameters" (**Ex. 22** at 1358).  The weight data was unaffected by the assumption regarding blood chemistries and clinically significant increases in weight gain were observed in 9.7% (300mg) and 11.2% (600mg) of SQ patients but in only 2.0% of placebo-treated patients.  **Study 135 (Ex. 24** at p. 135) also found a nearly triple clinically significant weight gain in 600mg SQ patients versus placebo, 11.2% vs. 3.7%.[42] Furthermore, mean changes in glucose and insulin were all greater in the quetiapine treatment groups than in the placebo treatment group.[43]  The fasting[44] glucose results were: 300mg - 6.02 mg/dL and 600mg - 7.38mg/dL vs. placebo 2.90mg/dL.  Insulin results were: 300mg - 31.05pmol/L and 600mg - 26.27pmol/L vs. placebo 2.61pmol/L.  **Study 15 (Ex. 25** at 116) clearly found a dose response-weight gain in SQ patients.[45]  Weight gain, as early as

---

[41] Before Study 49 was started, Study 41 was concluded and when looking at that data, AZ decided that the fasting glucose data was probably not fasting for the same reason they later decided this in Study 49.  The Study 41 data, if ,contrary to AZ's position, is assumed to be fasting as called for in the study design, 49 shows changes in fasting glucose in the SQ patients vs. placebo, but the results were not entirely consistent.  In the internal study report, AZ's authors note the difference between SQ and placebo triglyceride and admit that "this was consistent with known effects of quetiapine on triglycerides." (**Ex 23** 152.)

[42] **Ex. 24** at p. 141.

[43] **Ex. 24** at p. 127.

[44] **Ex. 24** at p. 127.  By study design these glucose tests were fasting and AZ scientists later confirmed that fasting was documented. **Ex. 26** Email string; Lisa Boornazian, April 25, 2007.

[45] Plunkett Decl., **Ex. 1** at p. 14.

11

1997, was "not surprising" to AZ scientists. AZ's Director of Central Nervous System drugs (under which SQ falls) found that Study 15 and other trials showed that "the proportion of patients with clinically significant weight gain at 52 weeks (regardless of pool or cohort) is about 45%...." and that the "weight gain is dose related."[46]

**e) Studies 126 and 127**: Studies 126 and 127 offer additional evidence that Seroquel causes diabetes.[47]  Both studies compared the safety and efficacy of Seroquel with a mood stabilizer drug to placebo with mood stabilizer. **Study 126**[48] reported that "clinically important values for glucose regulation measures were more common in quetiapine-treated patients." Glucose levels increased on average by 4mg/dL in Seroquel patients whereas in the placebo group the mean glucose decreased by .35mg/dL. There was also a mean increase in HbA1C in SQ patients of .17% vs. placebo which was .04%. Insulin levels in the Seroquel group increased by a mean of 20.63pmol/L vs. only 2.79pmol/L in the placebo group. Clinically significant weight gain was almost four times more common in Seroquel-treated patients (7.4%) than in placebo-treated patients (2.0%). Moreover, triglyceride shifts to $\geq$ 150 mg/dL occurred in 29.2% of patients receiving SQ and in 20.4% of patients receiving placebo. **Study 127** also found that clinically important values for glucose regulation measures were more common in the SQ treatment group.[49] Mean glucose increases were 6.11 mg/dL and .29 mg/dL in the

---

[46] **Ex 27**. Lisa Arvanitis email, Aug. 13, 1997. Other trials showed significant weight gain. A dose-response relationship between Seroquel and weight gain were observed in **Study 12**, which indicated a two-fold increase in the percentage of patients with clinically significant weight gain between patients receiving 50mg of Seroquel and patients receiving 450mg of Seroquel. The incidence of clinically significant weight gain in the 50mg BID (twice a day) group was 7%, whereas the incidence was 13% in the 450mg group and 14% in the 450mg BID group. (**Ex 28** at pp. 140-41.) REDACTED
REDACTED

[47] Wirshing Decl., **Ex. 2**., par. 21.
[48] **Ex. 30** at pp. 224-228 and p. 245. *See also*, **Ex. 31**, Arnett Amended Report.
[49] Wirshing Decl., **Ex. 2**., par. 21.

quetiapine and placebo treatment groups, respectively. In addition to glucose levels, the

Study 127 HbA1C mean increase was .2% in SQ patients vs. .03% in placebo.[50]

2)   **Epidemiologic Studies**:   There is an extensive body of epidemiologic literature

examining and supporting the relationship between Seroquel and diabetes (the positive

studies). The positive studies were designed and conducted by doctors, epidemiologists,

statisticians and scientists who are not AstraZeneca employees or consultants. These studies

were initiated with the public emergence, such as case reports, suggesting that SGAs cause or

contribute to new onset diabetes.[51]   The positive studies collected and analyzed data from

thousands of patients.  One study alone looked at data from a population of over 15,000.[52]

The risk was identified with different study types, design, populations and controls.[53] These

statistically significant positive results are not in dispute. Dr. Koplan specifically

acknowledges that eight epidemiologic studies confirm a statistically significant association

between Seroquel and diabetes but, like the statistically significant finding in the clinical

trials, Dr. Koplan discards these. He bases his rejection on 12 epidemiologic studies that he

posits as finding no relationship (**Ex. 17** at 11-14; Koplan Decl. at p. 10-13), thus refuting the

positive studies.  A court in this District has recognized that a "negative" epidemiological

study could be a false negative, crediting an expert's acknowledgment that "epidemiological

studies can have different results...[s]ometimes a false negative can occur because the study

---

[50](**Ex. 32** at pp. 226-27)There was also clinical trial funded by the National Institute of Health (aka CATIE),
which was designed to assess the efficacy of antipsychotic drugs including Seroquel, but which collected some
data that was analyzed with an eye toward some diabetes harbingers.  CATIE reported data suggesting that
SGAs including Seroquel caused weight gain or metabolic effects.  See **Ex. 33**.

[51] See eg., Sacchetti, E., et al., Incidence Of Diabetes In A General Practice Population: A Database Cohort
Study On The Relationship With Haloperidol, Olanzapine, Risperidone Or Quetiapine Exposure Int Clin
Psychopharmacol (2005) 20:33-37 (**Ex. 34**)

[52] **Ex. 35** Lambert, B.L., Diabetes Risk Associated with Use of Olanzapine, Quetiapine, and Risperidone in
Veterans Health Administration Patients With Schizophrenia, Am. J. Epidemiology (2006) 164(7):672-681.

[53] *See* Plunkett Decl and Arnett Decl.

is too small, the exposure is too low or short, the follow-up is too short or incomplete, or there is improper allowance for the latency period." *In Barrow v. Bristol-Myers Squibb Co.*, 1998 WL 812318 at *23 n.217 (M.D. Fla. 1998) *aff'd*, 190 F.3d 541 (11th Cir. 1999) (unpublished table decision).  In any event, an examination of the data and what the authors opine in those 12 studies (the discrepant 12) subverts Dr. Koplan's conclusions.

"Diabetes Risk Associated with the use of Olanzapine, Quetiapine, and Risperidone in Veterans Health Administration Patients with Schizophrenia (**Lambert 3**[54], **Ex. 35** ) studied new users of SQ, Zyprexa, risperdone, comparing them with haloperidol, and consisted of 15,767 schizophrenic patients.  The data was obtained from the US Veterans Health Administration.  **Lambert 3** determined a diabetes hazard ratio for SQ patients of 1.67, 95% CI, 1.01-2.76.  Thus, SQ patients were at 67% greater risk of developing diabetes than those on the comparator drug.[55]  The other SGAs in the study had approximately the same 1.6 to 1.7 hazard ratio, which is consistent a diabetes class effect from SGAs, with some variation in which SGA is associated with the highest risk.  Lambert 3 conducted additional analyses to more carefully consider the primary analysis conclusions.  When doing a careful matched case-control analysis, matched on sex, age, and location of VHA care with up to six controls who had showed no evidence of prior diabetes diagnosis, the risk was clear, statistically significant and increased with the length of time on the drug: 12 weeks - 46% increase risk, 24 weeks – 47% and 52 weeks – 82%.  The Lambert 3 results were compelling and the authors so stated:

---

[54] Two studies where Dr. Bruce Lambert was the lead author and one by Dr. Michael Lambert are discussed, and will be referred to as **Lambert 1** (**Ex. 36**) (2005), **MLambert 2** (**Ex. 37**) (2006) and **Lambert 3** (**Ex 35**) (2006).
[55] For patients who were younger than 45 and over 65, the hazard ratios were even higher, 2.98 for under 45 and between 2.59 and 3.21 for over 65.

> We believe that the risk of diabetes can be attributed confidently to each agent evaluated in the study because of the new-user cohort design and because each study patient was exposed to one and only one drug during the follow-up period.[56]

Remarkably, Dr. Koplan rejects this study and instead relies on two other studies. **Lambert 1**[57] (2005) looked at Zyprexa, Risperdal, Seroquel and Clozapine and found a statistically significant increased risk with Zyprexa and Clozapine but not SQ. However, unlike Lambert 3 where 877 patients took SQ, in Lambert 1 only 47 patients were on SQ. Unnoted by Dr. Koplan is that the authors specifically say: "The small number of patients on quetiapine in our sample and the consequent imprecision and low power may explain why we did not detect a significant association between quetiapine exposure and diabetes as others have."[58] Dr. Koplan's reliance on **MLambert 2** is even more unusual.[59] First, like Lambert 1, there were a small number of SQ patients, 100, compared to Lambert 3. Second, the authors begin the paper by noting:

> While the association between atypical antipsychotics and these metabolic side effects *is clear*, especially in patients with schizophrenia, information about *comparative* risks of weight gain and diabetes between the specific atypical medications, the exact relationship between weight gain and diabetes…remain important areas of concern [emphasis added].[60]

In the final analysis, the MLambert 2 authors did not draw any conclusions from their data one way or the other regarding SQ and diabetes, let alone a negative conclusion. Reporting

---

[56] **Ex. 35**.
[57] **Ex. 36**. Lambert BL et al, Antipsychotic exposure and type 2 diabetes among patients with schizophrenia: a matched case-control study of California Medicaid claims. Pharmacoepidemiology and Drug Safety (2005)14: 417-425.
[58] **Ex. 36** at p. 422.
[59] Wirshing Decl., **Ex. 2.**, par. 15.
[60] **Ex. 37** at p. 919.

only that the results of the study indicate that Zyprexa patients are at increased risk and should be carefully monitored, Seroquel is not even mentioned.[61]

The **Buse** study also found that Seroquel substantially increased risk for those who had the largest and longest exposure to SQ, with a hazard ratio of 3.1.[62] Importantly, the *P*-value for this statistically significant finding was ≤ 0.0001, which reflects an extremely high level of statistical reliability.[63]  Like Lambert 3, Buse detected a statistically significant hazard ratio of 1.7 for all SQ patients.[64]  Similar to the Lambert 3 and Buse results were the findings in **"Guo 1",**[65] which determined a statistically significant 2.3 hazard ratio for SQ patients (**Ex. 38** at 1058) with *P*-value of ≤ 0.0001.  The authors stated:

> In conclusion, some atypical antipsychotics like clozapine, olanzapine, risperdone, and quetiapine are consistently associated with a clinically important risk of diabetes mellitus in bipolar patients after adjustment for relevant risk facors. (**Ex. 38** at 1060.)

In **Guo 2**[66], the authors conducted a second analysis on the issue and replicated the result, finding a statistically significant increased risk of diabetes on SQ with a hazard ratio of 2.5.[67]

Consistently, **Feldman,**[68] an extensive study of SGA use in an elderly population, confirmed

---

[61] **Ex. 37** at p. 923.

[62] Plunkett Decl. at p. 16 (**Ex. 1**.)

[63] **Ex. 40.**  Importantly, the hazard ratio was statistically significant at a mean dose of only 203.7. Although 200mg is not the lowest SQ dosing, AZ internally recognized that low dose was implicated in SQ's adverse effects.  See March 18, 2005 communication from Richard Owen, Global Medical Affairs Manager-Seroquel, UK to Ronald Leong (Senior Medical Director, US) and Matthew Lowe (Product Manager-Seroquel in New Zealand): "I don't know we can state that metabolic disturbances are absent (or even minimal) at low doses" (SQ1ED01608498) (**41**).

[64] Plunkett Decl. at p. 16 (**Ex. 1**.)

[65] Guo J.J., et al., Risk of diabetes mellitus associated with atypical antipsychotic use among patients with bipolar disorder: A retrospective, population-based, case-control study, J Clin Psychiatry (2006) 67: 1055-1061 **Guo1 (Ex. 38**)

[66] Guo J.J., et al., Risk of diabetes mellitus associated with atypical antipsychotic use among Medicaid patients with bipolar disorder: A nested case-controlled study, Pharmacotherapy (2007) 27-35. (**Ex. 42**.)

[67] Ex 42.

[68] **Ex. 43.** Feldman P.D., et al., Retrospective cohort study of diabetes mellitus and antipsychotic treatment in a geriatric population in the US, J Am Med Dir Assoc. (2004) 5(1):38-46

a statistically significant increased risk of diabetes in SQ patients detecting a relative risk of 1.9. This risk was detected with a mean daily dose of only 64.6mg. In **Sernyak**[69], the statistically significant risk for SQ patients under 40 and 40-49 years of age were 1.82 and 1.86, respectively, and in **Citrome**[70] determined that the SQ risk was 3.09. It bears noting that this body of positive, statistically significant, consistent epidemiology was developed over the last several years by scientists from government, private practice and non-AstraZeneca industry sponsors. Across the studies, various confounding factors were controlled for, and in several of the studies the authors expressed clear and explicit confidence that the results were not confounded but instead reflected an accurate assessment of the risk. Plaintiffs' experts have reviewed these studies and agree with the studies' authors that the epidemiologic association between Seroquel and diabetes is clear.[71]

Dr. Koplan's basis for asserting that Lambert 1 and 2 somehow undermine the outlined positive epidemiology is at best obscure. The remaining studies that he posits as confounders suffer from similar impotence. In **Ostbye**, the authors found that rates of diabetes among users of SGAs were "significantly higher than in [the] population reference group" but not as compared to antidepressant users.[72] One of the authors "*Key Points*" is: "Concern about a potential association between atypical antipsychotic and diabetes remains; therefore, continued vigilance and further research is required."[73] Another study in the

---

[69] **Ex. 44.** Sernyak M.J., et al., Association of diabetes mellitus with use of atypical neuroleptics in the treatment of schizophrenia, Am J Psychiatry (2002) 159: 561-566.

[70] **Ex. 45** Citrome L., et al., Relationship between antipsychotic medication treatment and new cases of diabetes among psychiatric inpatients, Psychiatric Services 2004 (Sept); 55[9]: 1006-1061

[71] Plunkett Decl., **Ex. 1** at p. 4; see Wirshing Decl., **Ex. 2**.

[72] **Ex. 46 at 412.** Østbye, T., et al., Atypical antipsychotic drugs and diabetes mellitus in a large outpatient population: a retrospective cohort study, Pharmacoepidemiology and Drug Safety (2005) 14:407-415

[73] **Ex. 46** at 414.

discrepant 12 specifically states: "Comparison of both typical and atypical antipsychotics to PPI's *found an increased* [emphasis added] but non-significant risk of developing diabetes."[74]   The **Leslie** paper actually reported a risk with SQ, but not statistically significant, and the authors note, "…while these attributable risks are small, they may still be of concern."[75]   Dr. Koplan's assertion that the **Ollendorf** article confounds the positive studies (Koplan Decl. at p.12) is baseless.  This article compared SGAs including Seroquel with FGAs to look for new-onset diabetes. The result:

> We found that, in a managed-care population, patients receiving atypical antipsychotic medications for schizophrenia had a statistically significant, moderately increased risk of new-onset DM relative to patients treated with conventional medications.[76]

The article also noted that, "Other published database studies have also found that patients treated with atypical or conventional antipsychotics have an increased risk of developing DM as compared with the general population."[77]   The article continues: "…in addition, patients treated with clozapine, olanzapine, and quetiapine, not risperidone, *had a significantly increased prevalence of DM in logistical regression analyses* [emphasis added]."[78]

Although the Ollendorf findings were limited in magnitude and the sample sizes were small, Dr. Koplan's use of this study as part of his discrepant dozen is incomprehensible.

---

[74] **Ex 47** at p. 1.  Barnett, M., et al., A Regional Comparison of Developing Diabetes Among VA Patients Exposed to Typical and Atypical Antipsychotics Relative to Corticosteroids and Proton Pump Inhibitors, Annals of Clinical Psychology, (2006) 18(1):1-7.
[75] **Ex. 48** at p.1710.  Leslie, D., et al., Incidence of Newly Diagnosed Diabetes Attributable To Atypical Antipsychotic Medications, Am. J. Psychiatry (2004) 161:9
[76] **Ex 49** at p. 5. Ollendorf, DA et al. Rate of new-onset diabetes among patients treated with atypical or conventional antipsychotic medications for schizophrenia, MedGenMed. (2004) 6(1): 5
[77] **Ex 49** at p. 5.
[78] **Ex. 49** at p. 5.

The 3 **Gianfrancesco** articles on which Dr. Koplan relies are of also of little moment. At the time of the articles Dr. Gianfrancesco was a consultant to AZ working extensively on studies to counter the evidence that was beginning to emerge on Seroquel and diabetes.[79] One of his articles that Dr. Koplan cites was a "study" designed to criticize study designs. In other words, the hypothesis was that depending on the study design used, the results would vary. This was a thinly veiled effort by AZ to place something in the published literature to undercut database, such as claims database studies. AZ's influence on Dr. Gianfrancesco is illustrated by a comparison of the draft manuscript for this article and the published article. The following are statements in Dr. Gianfrancesco's draft to AZ that are not included in the published article: "Despite the lack of significance, quetiapine's odds ratios increased with dose as did olanzapine's and risperidone's and this in itself may suggest some diabetogenic effect"[80]; "Regardless of statistical significance, however, all three atypicals showed an increasing relationship between estimated odds of diabetes and dose level"; "Among all three of the atypical antipsychotics, there was a clear tendency for diabetes frequencies to increase with dose level". Using Gianfrancesco's articles to challenge extensive positive studies is a reasonably valid exemplar of the flawed methodology that AZ and its experts so vigorously

---

[79] Between 2003 and 2006, Dr. Gianfrancesco published 3 studies regarding atypical antipsychotics and diabetes. Illustrative of his connection to AZ, a search for his name in document production database shows that he is mentioned in 11,000 AZ documents (**Ex. 50**). One AZ email chain, entitled "Gianfrancesco work" reflects a discussion about not submitting an abstract by Dr. Gianfrancesco. Starkly, there was an ongoing discussion about whether to wait until "Frank" (Dr. Gianfrancesco) is "100% confident" of a favorable outcome for AZ on a study he was doing before they went ahead and submitted the study abstract to the American Society of Clinical Psychopharmacology. With reference "the preliminary data we saw on diabetes incidence", "Frank" had told AZ that he "thinks there is a possible risk that the full analysis could look different than what we have now." **Ex 51.**

[80] **Ex. 52**. On his typed draft someone crossed out "in itself may suggest".

assert on this motion.   In the **Miller** study, one of the remaining three studies from the discrepant 12,[81] the authors note the then-developing acceptance of the diabetes association:

> Although the Food and Drug Administration recently concluded that increased risk of diabetes, hyperglycemia, and related symptoms is an adverse effect with atypical antipsychotics as a general class of medications, additional research is needed to determine the true association between the risk of DM and use of atypicals and the variation in this risks across subgroups.[82]

Furthermore, although the Miller study merely did not detect a statistically significant association of diabetes in the SGA group as compared to the FGA group, the authors recognized that their study results were "unlike previous research"[83] and stated that, notwithstanding their results, doctors should be aware of the SGA diabetes issue and "monitor patients appropriately."[84]

The final "discrepant dozen" study that purportedly trumps the positive epidemiology relied upon by Drs. Plunkett, Arnett, Wirshing, Tulloch, and the other renowned plaintiffs' experts in this litigation, is the very first on Dr. Koplan's list (Koplan Decl. at p. 10), **Lamberti**. Yet again, the basis for using this study's results to discard the others is entirely

---

[81] As to the **Barner** study, (Barner, et al. Frequency of New-onset Diabetes Mellitus and Use of Antipsychotic Drugs Among Central Texas Veterans. Pharmacotherapy (2004) 11:1529-1538, **Ex. 18**) although Dr. Koplan touts it in support of the motion, at his post-motion deposition he testified: "All I'm saying to the court in both the report and in this document [his declaration] is I'm not making any case for the great value of this study." P. 122, L. 18-20.  He added that he feels all of the studies, positive and negative, are flawed. P.122-L.24 -23, P.L.2.  The relevant pages can be found **Ex 53**; Dr. Koplan's full deposition is found at **Ex. 18**.  In his declaration, Dr. Koplan asserted that Barner was the only acceptable study because it controlled for baseline BMI.  However, Dr. Wirshing explains in his Declaration that Dr. Koplan's critique is unavailing.  Dr. Wirshing presents extensive data reflecting that in fact it is individuals with pre-existing obesity or elevated BMI that have a disproportionate development of diabetes when given Seroquel.  He explains how the combination of risk factors result in this unfortunate outcome, and that is why he and other psychiatrists must monitor the population taking Seroquel, and that this is precisely the population that needs study.  **See Ex. 2**, Wirshing Declaration.

[82] **Ex. 54** at p. 394. Miller, E.A., et al., Incidence of New-Onset Diabetes Mellitus Among Patients Receiving Atypical Neuroleptics in the Treatment of Mental Illness – Evidence From a Privately Insured Population, J. of Nervous and Mental Disease (2005) 193(6):387-395

[83] **Ex. 54** at p. 394.

[84] **Ex. 54** at p. 394.

unclear. The authors found that "a trend was noted for higher prevalence rates of diabetes among patients receiving atypical antipsychotic drugs" (15% in SGAs and 6.3% in the comparator drugs).[85] The conclusion was as follows: "Patients with severe mental disorders receiving antipsychotic drugs are at increased risk for developing diabetes mellitus compared with the general population."[86]   In sum, a review of the review of the discrepant dozen reveals that the numerous, well designed and conducted epidemiologic studies finding an association between Seroquel and diabetes are not contradicted.   The positive studies are clear and consistent – there is a clear association between Seroquel and diabetes.

## B. Astrazeneca's Experts And Consultants Have Agreed That Seroquel Substantially Contributes To Weight Gain And Diabetes.

> So what we are beginning to see with the emergence of these atypical agents for the management of schizophrenia is the emergence of more insulin resistance in the setting of certain kinds of medications.  And what are the consequences of that?  The consequences are that we are beginning to see more stigmata of the insulin resistance syndrome.  And because of that, we are likely to see more type 2 diabetes….And in our attempts to actually improve life for them, we may be making them feel better psychiatrically, but negatively affecting what is likely to happen to them metabolically over a period of time.[87]

This statement was made in an extensive presentation by four physicians including Dr. James Gavin (the leader of the presentation), who is a disclosed AstraZeneca expert in these cases. The presentation, made before Dr. Gavin was a retained AZ litigation expert, focused on diabetes, weight gain and atypical antipsychotics.  Dr. Gavin and his team of 3 co-presenters

---

[85] **Ex. 53** at p. 704.
[86] **Ex 53** at 705.
[87] New Insights in Diabetes and Psychiatric Illness: Integrating Management:  Faculty: James R. Gavin III, MD, PhD; Peter J. Weiden, MD; F. Xavier Pi-Snyer, MD; John W. Newcomer, MD (**Ex. 55**).

detailed SGA short term weight gain in a meta-analysis of several studies and a chart showed

Seroquel to be among the worst.[88]  Dr. Gavin opened the teaching session by saying:

> What we're doing in this program is looking at the interface between the major disability of psychiatric illness and the place where it meets another major disabling disease, type 2 diabetes.  **There is indeed an interrelationship, in part driven by the new emergent treatments used to control psychiatric diseases.**
>
> For example, you don't get type 2 diabetes unless you have the combination of insulin resistance and diminished beta-cell function.  By the end of this program, you will see that the emerging developments in the management of many psychiatric illnesses do, in fact, heavily influence this particular problem, and **what we're beginning to be concerned about is the extent to which the management of psychiatric illness will be driving the development of more insulin resistance and indeed more type 2 diabetes in the future.  And there are implications for all of us in that** [emphasis added].[89]

Needless to say, Dr. Gavin has offered the opposite opinions in the report AZ has submitted

in this MDL.  Similarly, in an article published in the journal *Glucose Regulation*, another

AZ disclosed MDL expert, Samuel Dagogo-Jack, observed:  "Virtually all available agents in

the class, including clozapine, olanzapine, risperidone, and quetiapine [Seroquel] have been

associated with hyperglycemia....based on available data, there is no discernable hierarchy of

antipsychotic drugs and their propensity for inducing glucose dysregulation."[90]   Before he

could be deposed, AZ withdrew him as an expert. [91]   Setting aside whether discrepant

opinions by a *Daubert* movant's experts should undermine the validity of such a motion,

AZ's own experts and consultants have previously reviewed the available evidence regarding

---

[88] **Ex. 55.**

[89] **Ex. 55.**

[90] **Ex. 56.**  Dagogo-Jack, S., Glucose Regulation – Diabetes and Insulin Resistance in the Neuropsychiatric Population, April 2003 Supplement (AZSER00506588-93)

[91] AZ served a report by Dr. Dagogo-Jack on October 3, 2008.  His deposition was set for October 27, 2008.  He was withdrawn as an expert on October 22, 2008.  Interestingly, the quoted article was not listed in his report, even though he had a section dedicated to his "Interest in Antipsychotics and Metabolic Disorders".

Seroquel and diabetes and concluded, as have plaintiffs' experts, that SQ has the propensity to cause glucose dysregulation, weight gain and diabetes. There would seem to be no better evidence that plaintiffs' experts' methodology is valid. At his deposition, Dr. Koplan acknowledged that Dr. John Newcomer is an authority whose work he respects and would rely on.[92]   AZ engaged Dr. Newcomer to write the manuscript for Study 125.   In the unpublished manuscript, Dr. Newcomer noted that SQ patients had an average statistically significant weight increase of over 8 lbs.[93]   Importantly, he also found that SQ patients had a statistically significant increase in waist circumference.[94]   As Dr. Newcomer has emphatically taught with regard to atypical antipsychotics and weight gain, "One of the major factors that increases insulin resistance[95] is increases in abdominal adiposity."[96]   Dr. Koplan also made admissions regarding weight gain in SQ users, agreeing that 10 to 25% of SQ users gained more than 7% of their baseline weight due to the drug.[97]   AZ has internally accepted that a 7% increase in weight is clinically significant and the significance is that diabetes risk is increased.

Internally, AZ has been aware that SQ can cause weight gain and diabetes for nearly a decade.[98]   Wayne Geller, M.D. was AZ's Medical Director and Global Safety Physician.  On August 10, 2000, AZ responded to the European Union regulatory authority's questions

---

[92] **Ex. 18 at** p. 189, L. 7-8.

[93] **Ex. 57** at p. 20.

[94] *Id.*

[95] Insulin resistance: Insulin helps glucose get into various cells. When cells can't attach to the insulin and they are "resistant" to insulin. The cell's resistance to insulin causes glucose to remain in the blood. When the body sees that it's not getting enough glucose from the blood, it releases even more insulin even though cells are resistant to it.  Diabetes exists when the blood glucose is regularly high ($\geq$126 mg/dL).

[96] **Ex. 55** at p. 44.  Abdominal adiposity is the fatty weight gain about the waist.

[97] **Ex. 18** at p. 206, L.12-21.  Even a clinical trial using very low doses (avg. dose of 56.5mg), weight gain >7% was seen at a two times greater rate with Seroquel vs. placebo (6% of SQ patients vs. 3% placebo) Effectiveness of Atypical Antipsychotic Drugs in Patients with Alzheimers Disease, N.E.J.M. Vol 355, No. 15 2006.

[98] Wirshing Decl., **Ex. 2.**, par. 10.

regarding SQ and diabetes.  Dr. Geller authored the response **(Ex. 58)** entitled "Safety Position Paper, Seroquel, Diabetes Mellitus, Diabetic Ketoacidosis, Non-Ketotic Hyperosmolar Coma, and Hyperglycaemia."  In the face of AZ's present assertions to this Court, his conclusion is striking:

> While there were no reports of positive dechallenge and rechallenge, there is reasonable evidence to suggest that Seroquel therapy can cause impaired glucose regulation including diabetes mellitus in certain individuals. Consideration should be given to adding diabetes mellitus to the core data sheet[99] based upon postmarketing and clinical trial safety data.[100]

Since this admission, dozens of studies have been conducted both by AZ and unaffiliated investigators that confirm what Dr. Geller observed[101], and what plaintiffs' experts have as well concluded.  Notably, the Supreme Court has explained that "[t]he objective of [the *Daubert* gatekeeping] ... is to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co.*, 526 U.S. 137, 152 (1999).  Here we see that the defense experts in their real practice of medicine, and in writings and lectures to colleagues, freely accepted the scientific evidence that Seroquel causes or contributes to diabetes, yet in the litigation context, they have contrived unrealistic standards that are disparate from what their real practice and beliefs are and what *Kumho Tire* demands.

---

[99] A "core data sheet" contains world-wide prescribing label information for a drug.

[100] **Ex. 58** at p. AZ/SER 6971528.

[101] AZ's position in this litigation is that this detailed report was sent "inadvertently" and should not have been filed. *See* **Ex 59** at p. 420, l 16 – 431, l. 22.  Dr. Geller's email at the time belies this position: "Attached are the position paper and justification document for diabetes etc. and weight gain, respectively.  Please let me know if the electronic version is acceptable or if you need me to sign and send it to you." (**Ex. 60.**)  Filed inadvertently not, the senior medical safety officer in AZ succinctly and cogently stated this opinion and provided supporting material.  Neither an AZ decision that it would not abide Dr. Geller's submission nor Dr. Geller's disowning his own conclusions changes the fact that this was the senior safety physician's conclusion, a conclusion that underscores the validity of plaintiffs' experts' opinions before this Court.

## C.  Additional Published Literature Demonstrates That Seroquel Can And Does Cause Diabetes.

**1) Dechallenge/Rechallenge Evidence**:  Dr. Geller referred to evidence that is used when analyzing drug/effect relationships.  It is a basic model: when the drug is given, an effect is observed ("challenge"); when the drug is withdrawn, the effect recedes ("dechallenge"); when the drug is given again, the effect recurs ("rechallenge").  Such evidence has been published with respect to Seroquel.

In 2004, Meyer *et al.*, published a Seroquel challenge/dechallenge.[102]   The authors published this challenge/dechallenge report specifically to recommend that Seroquel users be monitored for diabetes development, as was then being recommended for Zyprexa. While taking Seroquel as an in-patient, the patient developed metabolic acidosis (acute onset of diabetes) within 4 weeks.  The authors stated: "The addition of high dose [800mg p/day] quetiapine in our patient resulted in the rapid development of uncontrolled diabetes with metabolic acidosis, which, fortunately, occurred in a hospital setting where it was promptly treated."  In another report (**Ex. 51**) a teenager was believed to have developed diabetes after starting SQ.  SQ was discontinued and the authors noted that "she did demonstrate improved serum glucose control after it was discontinued." (*Id.*)  In yet another challenge/de-challenge report, a patient developed new onset diabetes one month after initiating SQ (**Ex. 62**).  He was placed on insulin, and SQ was discontinued.  Upon discontinuation, his insulin use was reduced and within 5 months of his diagnosis of diabetes, he was able to entirely discontinue insulin use.  The authors acknowledge that this was not "absolute proof" that SQ caused the

---

[102] **Ex. 63**.  Meyer, J.M., Quetiapine-induced Diabetes With Metabolic Acidosis, International Clinical Psychopharmacology (2004) 19:169-171

diabetes, but they were "reasonably sure that other explanations were ruled out." (Id.)  AZ

even advised doctors regarding re-challenge situations saying internally that doctors should

be told:

> [W]e cannot advise the physician to re-challenge or not to re-challenge the
> patient.  If the physician has tried other antipsychotics, and has the best
> response to Seroquel, he or she may feel that outweighs the risk of diabetes or
> hyperglycemia.  If the patient develops hyperglycemia or diabetes on re-
> challenge, the physician may decide to continue Seroquel and use standard
> treatments for diabetes (e.g. diet, orally hypoglycemic drugs, and possibly
> insulin).[103]

Thus, the scientific evidence that AZ's Global Safety Physician noted would be important

additional evidence of causation has since been developed and AZ can not deny the

significance.

Dechallenge/rechallenge data are the highest level of case reports due to the

experimental nature of the evidence.  Generally, case reports of adverse events temporally

associated with a drug are an important branch of evidence in causality assessment and these

branches of evidence, when taken together, "present a compelling picture, one which can

support a reasonable scientific inference."  *See Brasher v. Sandoz Pharm. Corp.*, 160 F.

Supp.2d 1291, 1296 (N.D. Ala. 2001); *see also In re Phenylpropanolomine (PPA) Prods.

Liab. Litig.*, 289 F. Supp.2d 1230, 1248 (W.D. Wash. 2003) (Judge Barbara Rothstein, the

MDL Judge, found the cumulative evidence of case and adverse drug reports, comparison to

like agents, textbooks and treatises, and the clinical experience of experts and other scientists

satisfied the mandate of *Daubert*).

---

[103] **Ex. 64** at SQ1ED00165892.  Email from Dr. Ron Leong, successor to Dr. Geller's Global Safety Physician
position and now AZ's Senior Medical Director.

In *Rider v. Sandoz Pharmaceuticals Corp.*, the Eleventh Circuit also noted that a court may rely on case reports. 295 F.3d 1194, 1199 (11th Cir. 2002). The court explained that detailed case reports may support other proof of causation, just that they cannot *alone* prove causation. *Id.* This kind of evidence "may be carefully considered in light of other information available, including toxicological data." FJC MANUAL 439, 475. Moreover, these reports "are essential in assessing drug safety" in the "real life practice of drug safety monitoring and regulation." *Brasher*, 160 F. Supp. Notably, in *Barrow v. Bristol-Myers Squibb Co.*, this District embraced an defense expert's opinion that "case reports can establish diseases for which no epidemiology then exists and did so for thalidomide malformation, vinyl chloride and cancer, and vaginal cancer in DES offspring before experts in the field accepted the results or epidemiological studies established the association." 1998 WL 812318 at *24. Actually, in some situations courts have found that dechallenge/rechallenge evidence alone is sufficient to establish causation. In 2003, the U.S. Court of Federal Claims reached that conclusion in a preliminary hearing in *Capizzano v. Secretary of Health and Human Services*, a National Childhood Vaccine Injury Act of 1986 case. 2003 Westlaw 22425000 (Fed.Cl. 2003), *aff'd in relevant part, rev'd in part*, *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317 (C.A.Fed. 2006); *see also Capizzano v. Sec'y of Health & Human Servs.*, 2006 WL 3419789 at *15 (Fed.Cl. 2006). Based on four cases of rechallenge, the court found that there was enough evidence to show that the Hepatitis B vaccine could in fact cause rheumatoid arthritis, stating that "[i]n essence, rechallenge cases are such strong proof of causality that it is unnecessary to determine the mechanism of cause-it is understood to be occurring." *Capizzano*, 2003

Westlaw 22425000 at *1, *4.[104]     Here, the case reports, dechallenge and rechallenge evidence are important evidence, especially in conjunction with all the other data.[105]

**2) Literature regarding Mechanism**:  While evidence of mechanism is rarely available to establish the causal relationship between a drug and its effects, intended as well as unintended[106], there are numerous peer-reviewed studies that attempt to determine the precise mechanism by which SQ and the other SGAs causes diabetes.[107]  This literature indicates that several molecular mechanisms may be involved.[108]     In any event, the fact that the mechanism remains unclear does not call the reliability of the opinion into question: "Not knowing the mechanism whereby a particular agent causes a particular effect is not always fatal to a plaintiff's claim. Causation can be proved even when we don't know precisely *how* the damage occurred, if there is sufficiently compelling proof that the agent must have caused the damage *somehow*." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1314 (9th Cir. 1994) (emphasis in original); *see also Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 590 ("Of course, it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science.") *In re PPA*, 289 F. Supp.2d at 1247.

---

[104] Even though the procedural rules and burden of proof are different in Vaccine Act cases than in common law tort cases, the ruling in this case is still instructive on the importance of dechallenge/rechallenge evidence.
[105] Plunkett Decl. at p. 5 (**Ex 1**).
[106] As with many medications, AZ can not state the mechanism by which SQ causes its claimed beneficial psychiatric effects.  AZ can only assert that patients will have a symptom resolution or reduction, or some improvement in their day to day life, but AZ *admits* that it can not show how SQ is acting on the brain to cause that resolution or improvement. **Ex. 65.** Deposition of Jamie Mullen, M.D. AstraZeneca Senior Director, Clinical Research;  see also,  Package Insert (**Ex. 66**); See Declaration of Laura Plunkett, PhD.
[107] *See* **Ex. 67**. Dwyer DS et al., Mechanistic Connections Between Glucose/Lipid Disturbances and Weight Gain Induced by Antipsychotic Drugs, 65 International Review Of Neurobiology (2005) 211,247 (2005).
[108] Plunkett Decl. at pp. 9-13 (**Ex 1**); see Wirshing Decl. at paras. 10-27 (**Ex 2**).

**D. Plaintiffs' Experts Employ Appropriate Methodologies.**

Plaintiffs' experts explained that they utilize the Bradford Hill considerations in assessing the scientific evidence regarding Seroquel and Diabetes. As recognized in the Reference Manual of Scientific Evidence, this is a valid methodology for assessing causality and explores recognized considerations. FJC MANUAL 336. S*ee* Plunkett Dec.; Wirshing Dec.; Arnett Dec. Indeed, defendants' main experts Drs. Koplan and Weintraub also employ the Hill Methodology. The Bradford Hill considerations, in determining general causation and whether exposure is the cause of the disease, consider: temporal relationship; strength of the association; dose-response relationship; replication of results; biological plausibility; alternative explanations; effect of ceasing exposure; specificity; and consistency with other relevant knowledge. FJC MANUAL 334.

Plaintiffs experts explain how temporality is met, in that the SQ exposure precedes the onset of weight gain and diabetes; they explain the strength of the association documented by multiple positive statistically significant clinical trial and observational studies; they show consistent dose patterns in clinical trials and observational studies of an incidence of diabetes increasing as the dose increases, the results they rely upon have been replicated in multiple studies both clinical and epidemiological including the recently completed pooled analysis of most of the clinical trials; they explain its biological plausibility recognizing the historic data that all antipsychotics have this profile to varying degrees (as explained by the Consensus Statement) and Dr. Plunkett, the pharmacologist details the specific pharmacology of the drug and compares it to the other agents in the chemical class; the experts consider alternate

explorations in the general causation context of recognizing other risk factors to diabetes, and explain how the risk factors work in conjunction to enhance the risk. The importance of the class effect with other SGAs was noted in the MDL involving SQ's sister drug, Zyprexa where the scientific evidence was approved based on testimony concerning, *inter alia*, class effect. *See In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp.2d 230 (E.D.N.Y 2007). With regard to ceasing exposure, the experts all discuss the compelling de-challenge data, and Dr. Wirshing discussed his own direct experience with that in the treatment of patients. (*See* Wirshing Decl. **Ex. 2**.) The specificity reflects the striking pattern of rapid weight gain and rapid change in glucose measurements following commencement of SQ treatment and finally, it is consistent with other knowledge as to the effects of SGAs.[109]

**Dr. Laura Plunkett:**   As an expert, Dr. Laura Plunkett has met the *Daubert* standard in the past. *See In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp.2d 571, 580 (E.D.N.Y. 2007). In that case, the court noted that each expert, including Dr. Plunkett, "is a distinguished scientist whose expertise probably will be helpful in deciding relevant scientific…issues. Attacks on them …are primarily based on assessments of credibility best left for the trier." *Id.*, at 580 (E.D.N.Y.2007); *see also In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 96, 179 (E.D.N.Y. 2008).

Defendant improperly criticizes Dr. Plunkett, pharmacologist, for being a Ph.D. as opposed to a medical doctor (Def. Br p. 21). It is well established that non-physicians can be qualified to render opinions regarding causation. *Hopkins v. Dow Corning Corp.*, 33 F.3d

---

[109]   To provide the court with a more focused brief on the evidence and law,  Plaintiffs will not counter each pejorative and inaccurate attacks based upon inapposite case law and medicine regarding Plaintiffs' experts, and respectfully refer the Court to the accompanying expert Declarations.

1116, 1124 (9th Cir. 1994), *cert. denied*, 513 U.S. 1082 (1995) (finding that a toxicologist who was not a medical doctor had the knowledge, skill, and experience to testify to causation); *Haggerty v. Upjohn Co.*, 950 F. Supp. 1160, 1163 n.1, 168 n.6 (S.D. Fla. 1996) (although ultimately excluding the pharmacologist because, *inter alia*, she did not depend on relevant epidemiology or clinical trials, the court noted *two separate times* that an expert need not be a medical doctor to render opinions relevant to causation) *aff'd*, 158 F.3d 588 (11th Cir. 1998) (unpublished table decision); *Conde v. Velsicol Chem. Corp.*, 804 F. Supp. 972, 989 (S.D. Ohio 1992) (finding that two non-physician's opinions were helpful in resolving causation issues), *aff'd*, 24 F.3d 809 (6th Cir. 1994); *Bowers v. N. Telecom, Inc.*, 905 F. Supp. 1004, 1009 (N.D. Fla. 1995) (finding two non-physicians were qualified to render opinions on causation). The Northern District of Georgia aptly recognized that experts other than medical doctors are perfectly qualified to offer causation opinions in toxic tort cases; they have particular understanding of non-medical circumstances that can cause certain medical effects. *See, Cleveland v. U.S.*, 2006 WL 5334601 at *4-5 (N.D.Ga. 2006) (noting that, in determining how to assess *Daubert* issues in toxic tort cases, the 11th Circuit in *McClain v. Metabolife, Inc.*, 401 F.3d 1233 (11th Cir. 2005), relied heavily on a report written by a toxicologist).

Dr. Plunkett is a toxicologist, has a Ph.D. in pharmacology, and has twenty years of experience in both fields, and thus is more than qualified to speak to whether Seroquel contributes to diabetes. Contrary to AZ's assertion (Def Br p. 25), Dr. Plunkett relies on scientific evidence that *certainly can* reliably support a causation opinion under the law of this Circuit. The evidence she relies upon is hardly "hollow" and each element of that

31

evidence does "have some individual validity." *Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp.2d 1347, 1317 (N.D. Ga. 2001), *aff'd sub nom Rider v. Sandoz Pharmaceuticals Corp.*, 295 F.3d 1194 (11th Cir. 2002).

AZ claims that Dr. Plunkett's opinion is infected with methodological failings recognized by the 11th Circuit and other courts (Def. Br. p. 29), but defendant takes commentary and dicta out of context from misapplied factual scenarios. In criticizing Dr. Plunkett, defendants state that the "weight of the evidence methodology [] has been rejected by the courts," implying that it is not allowed and then negatively refers to it throughout their brief (Def. Br. pp. 4, 22). First, they ignore the fact that she in fact uses the Bradford Hill causality considerations, as part of her methodology. Instead, defendants seek to disparage her opinions by calling it "weight of the evidence" because they obtained a few inapposite opinions that criticize that methodology. Moreover, lead defense expert and affiant, William Weintraub, M.D. concedes that one should not exclude any type of evidence in assessing causality. (**Ex. 68** p. 25: 1 8 – p. 27: 7.)

In the case defendants cite as support, *General Electric Co. v. Joiner*, although the court did reverse the prior 11th Circuit decision, the reversal was not based on a "weight of the evidence" methodology (but instead a decision on the standard of review). 522 U.S. 136 (1997). In the other cited case, *Allen v. Pennsylvania Engineering Corp.*, the court found that it could not accept the "weight of the evidence" methodology in *that* case based on "[t]he paucity of epidemiological evidence, the unreliability of animal studies, and the inconclusiveness of cell biology." 102 F.3d 194, 198 (5th Cir. 1996). In fact, in *Magistrini v. One Hour Martinizing Dry Cleaning*, the final case defendants cite to in this context, a

New Jersey District Court Judge discusses the "weight of the evidence" methodology, stating that "flexible application of the *Daubert* factors permits this Court to find that, properly applied, the weight-of-the-evidence methodology is not an unreliable methodology…" 180 F. Supp.2d 584, 602-03 (D.N.J. 2002) (plaintiff, former dry cleaner employee, brought suit against defendant manufacturer alleging that exposure to their dry cleaning fluid caused leukemia). The question "is not the reasonableness, in general, of undertaking a 'weight-of-the-evidence' analysis," instead it is "the reasonableness of using such approach." *Magistrini*, 180 F. Supp.2d at 603 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153-54 (1999)).

In her assessment of SQ, Dr. Plunkett uses this approach reasonably by applying the Bradford Hill considerations (Plunkett Dec, para. 29), an approach widely recognized in the medical and scientific communities, including by defendants' own experts.   Koplan Dep. 59:7-61:1 (he states that he defines cause by "referring back to Bradford Hill's criteria for causation" and acknowledges that the B-H criteria is "not like a mathematical formula"); *see also* Tulloch Affidavit, p. 12.  The defendants criticize Dr. Plunkett for using this method only because it contradicts their position; even so, it should be noted that different scientists can interpret the same data and legitimately come to different conclusions (Koplan Dep. 61:2-19) – this is an issue that goes to the weight of the evidence, **not** to the admissibility.

AZ claims that Dr. Plunkett has "cherry-picked" evidence, when in fact she has extensively considered both studies that support a causation opinion and studies that do not, as noted in her deposition and reference list.  At her deposition, she was prepared to discuss

why she does not find some studies persuasive, and is prepared to be cross-examined about them at trial.

Defendants criticize Dr. Plunkett's use of the class effect analysis. They mischaracterize her use of it and the cases they cite are inapposite. In *McClain*, the court criticized the plaintiff's expert because he assumed the validity of the association within the class without offering any scientific evidence of it. 401 F.3d at 1246. In *Rider*, the court did not approve of the analogy because it applied to an entirely different injury.. 295 F.3d at 1202. In *In re Accutane Prods. Liab.*, the court faulted the plaintiff's expert for using studies of rats exposed to Vitamin A, and then not analogizing properly to humans let alone to the drug at issue, Accutane. 511 F.Supp.2d 1288, 1294 (M.D. Fla. 2007). Here, Dr. Plunkett does not assume that all antipsychotics have the same effect, but instead she considers studies involving *structurally similar* atypical antipsychotics, analogizing in a scientifically reliable method. Plunkett Affidavit, paras. 32, 38.

Defendants' criticism of Dr. Plunkett's non-use of dose-response and mechanism evidence, and her use of case reports is unfounded.

Dr. Plunkett acknowledges the disadvantages of animal studies, however she recognizes the advantages as well, like with any other type of evidence. Defendants cite to *In re Accutane* for two disadvantages of using animal studies in making a causation opinion, yet they fail to mention that the court first notes the numerous advantages of animal studies. 511 F.Supp.2d 1288. The court acknowledges that animal studies can be conducted as true experiments because all aspects of the animals lives can be controlled, including exposure; refusals to participate in a study are not an issue; loss to follow-up is very minimal; ethical

34

limitations are diminished; animals often provide useful information about pathological mechanisms and compliment epidemiology. *Id.*, at 1291 (internal citations omitted).

***Donna Arnett, Ph.D.:***  In this case, as an epidemiologist with a Ph.D. and over twenty years of experience, Dr. Arnett is uniquely qualified to speak to factors affecting the health and illness of populations ingesting Seroquel. Furthermore, as an expert, Dr. Arnett has met the Daubert standard in the past. (**Ex. 69**). Contrary to defendants' assertions, Dr. Arnett, along with plaintiffs' experts Drs. Plunkett and Wirshing, depend upon forms of evidence found to be reliable by the courts and scientific and medical communities.     Her reliance upon "confounded" data is explained in her Declaration. She also explains her reliance on certain studies. Defendants criticize Dr. Arnett for reaching conclusions before completing her review of relevant scientific evidence and for "cherry-picking" sources. This assertion is incorrect. After reviewing Seroquel and diabetes related articles, Dr. Arnett agreed to serve as a plaintiff's expert in the Seroquel litigation. *See* Arnett Dec. In forming her opinions she reviewed an immense amount of literature in order to write her report. *See* Arnett Dec. At her deposition, after insisting on specifically listing each document reviewed from a list of over 7,700 documents received, the defendant's lawyer stopped the plaintiff while she was providing such a list. Arnett Dep. 90:12-92: 3. See also Arnett Dep. (84:19-87:2).

Alleging that she failed to read the "most important data" they cite to *Claar v. Burlington Northern Railroad Co.*, 23 F.3d 499 (9th 1994). In that case, the court found that the experts "formed their opinions before reading the relevant literature, even though they admitted that they were not sufficiently familiar with the field to diagnose the causes of plaintiffs' injuries without first reviewing that literature." *Id.* at 502. The instant case is

35

distinguishable.  Here, Dr. Arnett had read the important and relevant literature prior to making conclusions and writing her report, and she then reviewed further literature due to defendants' belated production methods.  Arnett Dec.  Furthermore, she is a qualified epidemiologist with over 20 years of experience in the field – she hardly needs to be taught how to opine in a case extensively involving epidemiological issues.  Indeed, the doctors that defendant offers to this court in Declarations as epidemiologists, Drs. Koplan and Weintraub, do **not** have doctorates in epidemiology.

***William Wirshing, M.D.***:  Defendants make improper criticisms of Dr. William Wirshing's opinions.  Notably however, they do not at all challenge his impressive credentials.  Indeed, Judge Weinstein noted "he was likely to be impressive to a jury" and commented that "Dr. Wirshing himself had been 'among the very first to report on the curious metabolic effects' of the new SGAs in the early to mid 1990s" 166, 168. *In re Zyprexa Products Liability Litigation*, 253 F.R.D. 69, 166 (E.D.N.Y. 2008).  Defendant claims that Dr. Wirshing improperly extrapolates from an accepted premise – that obesity can cause diabetes – to an unfounded claim "that any amount of weight gain over any period of time will cause diabetes."  The defendants misstate the facts.  Dr. Wirshing never makes such a claim.  He explains that quetiapine leads to weight gain and that weight gain leads to diabetes and he does not say "any weight gain."  Rather, he says "using the FDA's definition of clinically pertinent weight gain (i.e., a 7% increase) quetiapine routinely impacted over 25 % of the treated population."  Dr. Wirshing does not actually offer an opinion that Seroquel causes diabetes.  Instead, Dr. Wirshing opines that Seroquel causes weight gain and, as a result, Dr. Wirshing contends "it is axiomatic" that Seroquel will lead to diabetes – eventually."

The word "eventually" is tacked on by the defendants. Dr. Wirshing says is that "it is axiomatic that increases in obesity will result in subsequent increases in hyperglycemia, frank diabetes, and other adverse outcomes." Dr. Wirshing cites to multiple studies showing the increased diabetes incidence for each increment of weight gain in his Declaration, **Ex. 2**. Moreover, Dr. Wirshing explains the multifactorial nature of diabetes and how studies show that precisely those patients with pre-existing obesity are disproportionately damaged with diabetes manifestation following SQ weight gain.

**E.  Defendants Have Not Come Forward With Sufficient Evidence Challenging the Validity of Plaintiffs' Experts' Methodologies**

Defendants rely upon two experts, Drs. Jeffrey Koplan and William Weintraub, as the main support for their motion. Neither doctor is an expert in diabetes, psychiatry, toxicology, or pharmacology, nor are they clinical trialists (Dr. Koplan's academic training in epidemiology ended with a master's degree and Dr. Weintraub's epidemiology education was "self-trained) (Koplan Dep. 35:18-25, 36:14-15, 47:19-21) (*see* Weintraub CV Def. Exhibit), and instead are frequent defense experts who render contradictory and litigation-driven opinions.

Dr. Koplan has been working for defense counsel Alston & Bird for close to a decade, defending the purported "safety" of products like asbestos and Fen-Phen. Deposition of Dr. Jeffrey Koplan (Feb. 5, 2003), *Kavanaugh v. ACandS, Inc.*, 16:4-6. He was first contacted for this litigation by the same Alston & Bird defense lawyer he had worked with in the past, since they had overlapping social contacts, including the fellow defense expert in this and other litigations, Dr. Howard Ory. Koplan Dep., 6:24-7:9, 10:11-11:24.

In presenting their evidence, defendants rely heavily upon Dr. Koplan (relying on him in 38 footnotes in Def. Br., a number that dwarfs their use of other sources), making him their chief voice. Yet, although he is a medical doctor, he has not treated a patient in practice for more than twenty years, and he has never prescribed Seroquel, let alone any psychiatric medications. Koplan Dep. 31:25-32:12, 31:2-3, 33:17-20. His education in epidemiology ended with a master's degree. *See* Koplan CV, p. 1. Furthermore, he does not even hold opinions on issues that an expert in this area would consider fundamental, such as whether first generation antipsychotics or other atypical antipsychotics are associated with diabetes. Stunningly, he repeatedly claimed he did not consider that issue since he was not asked to, despite the fact that many of the studies at issue had as the comparator, not a placebo, but instead other antipsychotics. Koplan Dep. 79:18-22, 83:21-25. Equally stunning, is that this principal expert did not answer anything substantive from memory including the simple diagnostic criteria for Type II diabetes. Koplan Dep. 132:2-10. Nor could he remember whether he worked with Alston & Bird as a expert in a Fen-Phen litigation, even though he consulted for them on Fen-Phen for four to six months and remembered this fact during a deposition in 2003. Koplan Dep. 7:22-9:19.; Koplan Dep. (Feb. 5, 2003), 17:8-11. Further he has not published any of his opinions regarding Seroquel issues, nor tried to write them up for publication or even discussed them with any peer. Koplan Dep. 247:4-17. In short, his opinions were derived exclusively for litigation.

Further, in his deposition, he stated that studies in this litigation should be disregarded because they do not control for body mass index. Koplan Dep. 100:1-9. However, the Reference Manual on Epidemiology recognizes the reality that confounding factors are

endemic to epidemiology, thus acknowledging the role of animal studies since "they can avoid the problem of confounding, which epidemiology often confronts."   Ref. Manual at 345.  Of course, Dr. Koplan did not and could not even opine on the animal studies nor did the other chief expert Dr. William Weintraub.

Of course Dr. Koplan needs to maintain that unrealistic and radical position to adhere to his strategy of disregarding eight independent epidemiologic studies showing statistically significant findings with Seroquel and diabetes.

Dr. Weintraub admits that one does not have to know the mechanism to assess causality.  Defendant has made a great effort throughout this litigation, including in the current motion, to argue that without knowing the mechanism of action by which an agent causes a disease, it cannot be determined to be a causative factor.  This position belies Defendant's own label for Seroquel which states that the mechanism of action of Seroquel is unknown. (**Ex.  68** Weintraub Dep., 214:8-18).   Similarly, Dr. Weintraub agrees with Bradford Hill, that the mechanism of action is not required to find a positive causality assessment.  (**Ex. 68** Weintraub Dep., 211:18-212:11.)  Critically, Dr. Weintraub admits that if there are two or even three risk factors with relative risk over 1, **each factor can be considered causative and substantial contributing factors.**  (11/22/08 Weintraub Dep., 111:17-114:21.)

## 2. LEGAL DISCUSSION

As set forth in the statement of facts, multiple courts in this Circuit and elsewhere, as well as the FJC MANUAL, explicitly allow the types of evidence presented in this litigation including clinical trials; epidemiology studies; authoritative textbooks; case reports -

especially those involving dechallenge and or rechallenge;  pertinent animal studies; and chemical class analogies.   The supporting law was discussed within the confines of the statement of facts and need not be repeated.

A brief discussion of *Daubert* principles, followed by an analysis of 11th Circuit law will lead to the inexorable conclusion that the issues raised by the defense are precisely those that should be decided by a jury as they address credibility and go to the jury's task in weighing the evidence.   In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court provided several general, non-exclusive observations to guide federal judges in assessing "whether the reasoning or methodology underlying [an expert's] testimony is scientifically valid and. . .properly can be applied to the facts in issue." 509 U.S. 579, 592-93 (1993).   The factors listed as "general observations" included testability and testing, *id.* at 593; peer review and publication, *id.* at 593-94; error rate and standards (especially for "a particular scientific technique"), *id.* at 594; and general acceptance.   *Id.*   The Court also cautioned that the inquiry it envisioned should be flexible, and that the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594-95.

In *Kumho Tire*, Justice Breyer stated that the district court had not abused its discretion in excluding expert testimony on why a tire had failed because it "fell outside the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts, even though the evidence is 'shaky.'"   526 U.S. at 153.[110]   In the *Seroquel* litigation, the evidence is extremely sound; and defendants' central

---

[110] In his introduction to the 2nd edition of the FJC MANUAL, Justice Breyer explained the appropriate scope of review by giving the example of a famous physicist who once was asked if a certain scientific paper was wrong.

piece of evidence, which plaintiffs also advocate, the American Diabetes Association (ADA)
Consensus Statement from 2004, itself recognizes the legitimacy of the relationship between
Seroquel, the other SGA's and diabetes, and merely acknowledges that there is some data
that is "discrepant" which reflects that experts could differ, depending on how much weight
they give to the varying studies and data.[111]

Defendants' objections to plaintiffs' experts are of the type that should be addressed
at trial, as they go to the weight of the evidence, not the admissibility. As this Court aptly
noted in *Marshall Auto Painting v. Westco,* "'[i]ndeed, a ... district court's gatekeeper role
under Daubert is not intended to supplant the adversary system or the role of the jury.'" 2003
WL 25668018 at *4 (M.D. Fla. 2003) (quoting *Quiet Technology DC-8, Inc. v. Hurel-Dubois
UK,* 326 F.3d 1333 (11th Cir. 2003)). "'Quite the contrary, [v]igorous cross-examination,
presentation of contrary evidence, and careful instruction on the burden of proof are the
traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* As the
11th Circuit held in *Quiet Tech,* it is not the district court's role under *Daubert* to make
ultimate conclusions on the persuasiveness of the proffered evidence, 326 F.3d at 1341, and
here the disagreement is over just that issue. Similarly, in addressing the admissibility of
plaintiff's experts' opinions on causation, the court in *In re Vioxx Products Liability
Litigation* noted that the parties relied on the same material, they "simply interpret[ed] it
differently and reach[ed] contrary decisions" and because its role is to scrutinize

---

The physicist replied: "That paper isn't even good enough to be wrong!" It is only this kind of "science,"
Justice Breyer explained, that the law should exclude from the courtroom. *Introduction* to FJC MANUAL 1, 4.
[111] A central "discrepant" issue is the relative risk of SQ as compared to some of the other SGA's. The Court
here is not deciding whether SQ is safer or more dangerous than its competitors; the inquiry is limited to the
reasonableness of the evidence and the methodology in assessing whether it is capable of precipitating diabetes.

methodology and not conclusions, the court thus admitted plaintiff's experts' testimony. 401 F. Supp.2d 565, 599 (E.D. La. 2005).

An important objective of *Daubert* gatekeeping "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practices of an expert in the relevant field," *Kumho Tire*, 526 U.S. at 152. Here the evidence reflects that plaintiffs' experts apply the same methodologies in this litigation as they do in their practice of medicine, pharmacology and epidemiology. Indeed, Dr. Wirshing's role in his practice as a leading thinker in the use of psychiatric medications and their risks and benefits is entirely consonant with his opinions in the litigation. Further, the evidence from the internal documents of defendants reflect that internally, AZ's experts apply the same methodology and have reached the same conclusions about the metabolic hazards of Seroquel, the importance of dechallenge/rechallenge data, the diabetogenic effect of weight gain, etc., yet they feign different standards in this litigation.

Defendants cite repeatedly to a series of 11th Circuit *Daubert* cases which are simply inapposite to the facts surrounding Seroquel, and yet defendants ignore important guidance from other cases in this Circuit. Thus, it is useful to discuss these cases' underlying facts to highlight the extraordinarily different proofs involved in SQ from the cases to which defendants repeatedly cite. As will become evident, the SQ scientific evidence far surpasses the evidence available in those scientific debates. With Seroquel, the causal association is well recognized in leading medical treatises and consensus statements, and supported by statistically significant placebo controlled clinical trials, unlike the situation with breast implant, Parlodel, ephedra and the PCB scenarios in the cited cases. Indeed, as stated by the

11th Circuit in *McClain*, 401 F.3d at 1239 (involving a herbal supplement, ephedra), "[t]he court need not undertake an extensive *Daubert* analysis on the general toxicity question when the medical community recognizes that the agent causes the type of harm a plaintiff alleges." Here, the medical community, as exemplified by authoritative treatises, recognizes that Seroquel causes and contributes to diabetes, especially in vulnerable individuals.

In *Allison v. McGhan*, the 11th Circuit excluded the experts' testimony in the face of poor epidemiological support. 184 F.3d 1300, 1316 (11th Cir. 1999). The four epidemiological studies presented were: 1) a re-analysis of other studies that had found no statistical correlation between the toxin and the disease; 2) a study that did not examine systemic disease (the injury at issue); 3) a study that examined an issue the plaintiff did not suffer from; and 4) a study that had a relative risk of only 1.24; and were thus each found to be insufficient evidence to support the expert's opinion. *Id.*, at 1315. Further, the court found the studies "were in direct contrast to over twenty other epidemiological studies which found no statistical correlation between silicone breast implants and systemic disease, strong evidence that a consensus exists in the general scientific community that no correlation exists." *Id.* The court acknowledged the use of animal studies, but because the expert was unable to adequately explain the study's correlation to humans (rats were injected directly with the toxin silicone, whereas the plaintiff's silicone implants had not actually ruptured), the animal studies were excluded. *Id.*, at 1313-1314. In this case, unlike *Allison*, the experts are basing their testimony on not only multiple strong epidemiological studies, but also placebo blinded clinical trial data, case reports (including dechallenge/rechallenge data), animal studies, chemical analogy and hence biological plausibility.

In *Joiner*, the Supreme Court found that the district court did not abuse its discretion in finding that in assessing a lung cancer case of Mr. Joiner, who was an ex-smoker and had a family history of lung cancer, that four epidemiological studies on which Joiner relied were not a sufficient basis for the experts' opinions, since the authors of two of the studies were unwilling to suggest a link between increases in the injury and toxin exposure among the people they examined, the third study involved exposure to a particular type of substance that was not necessarily relevant to the case, and the fourth involved exposure to numerous potential other toxins along with the toxin at issue. 522 U.S. at 145-146. The Court also found that it was not an abuse of discretion to conclude that reliance on the proffered animal studies was inappropriate. *Id.*, at 144. The animal studies involved mice that were injected directly with highly concentrated toxin, whereas the plaintiff had come into contact with a much smaller concentration, and furthermore the mice developed a *different type of injury* than the plaintiff. *Id.* The plaintiff's experts did not attempt to explain how they could have extrapolated their opinions from the "seemingly far-removed animal studies." *Id.*

In this case, unlike *Joiner*, the experts are basing their testimony on strong epidemiological connections and animal studies which have a correlation to the case at hand. Furthermore, the experts have relied on challenge and other case reports, class comparisons, treatises and clinical trials, all types of evidence that were not available to the court in *Joiner*.

In *Rider*, the plaintiffs, who suffered brain hemorrhages, presented as evidence of causation negative or non-supportive epidemiology, case reports of different injuries, animal studies where the endpoint at issue was not brain hemorrhage, and class comparisons. 295 F.3d at 1198. The plaintiffs presented four statistically *insignificant* epidemiological studies,

three of which found *no relationship or else a negative relationship* between the drug and the injury (stroke). *Id.* Only one of those studies was published and as the plaintiffs' expert Dr. Kulig stated, "there is no good epidemiology on the subject." *Siharath*, 131 F. Supp. 2d at 1358. And although epidemiology is generally considered to be the "best evidence of causation in toxic tort actions," the court acknowledged that "[i]n the absence of epidemiology, plaintiffs *may* still prove medical causation by other evidence." *Rider*, 295 F.3d at 1198-1199 (emphasis added). However in *Rider*, the court found substantial problems with each of the other types of evidence. The court found that the case reports did not, by themselves, provide reliable proof of causation. *Id.*, at 1199. In particular, it found that the dechallenge/rechallenge data, which "can be particularly useful in determining whether a causal relationship exists," was not useful here because none of the studies involved a patient with the particular injury suffered by the plaintiffs (and in one the doctor thought the patient might be faking symptoms) and none of the reports involved stroke. *Id.*, at 1199-1200. Plaintiffs also presented animal studies that did not suggest the active ingredient in the drug caused stroke. *Id.*, at 1201-1202. Furthermore, plaintiffs argued overall that because there was some proof that the drug caused one type of stroke, that it also caused the type of stroke plaintiffs suffered, even though they involve a wholly different biological mechanism. *Id.*, at 1202. Finally, plaintiffs presented evidence of other drugs of the same class, but because the ergot alkaloid class of drugs has a wide range of effects, it is not obvious that the drug would have the same exact effect as the others, considering that "two widely-reported symptoms...are...precisely the opposite of what the plaintiffs allege." *Id.*, at 1201.

With Seroquel, multiple statistically significant epidemiological studies of hundreds of thousands of patients show a positive relationship between Seroquel and diabetes, the case reports are directly linked to clinically remarkable acute manifestations of the injury such as diabetic coma and ketoacidosis, and the animal studies are easily extrapolated to humans. The class comparison here does not depend on proof of a separate injury unrelated to diabetes. Finally, plaintiffs' experts also rely on the gold standard of evidence, clinical trials, which were not available in *Rider*.

In *McClain*, the experts' opinions on ephedrine were based on, class comparison, FDA reports, and consumer case reports. 401 F.3d 1233. The 11th Circuit found that this evidence did not support the experts' conclusions on causation, and thus excluded the testimony. *Id.*, at 1255. The *McClain* experts were comparing drugs within the same class to not only conclude that ephedrine caused the same injury as the other drug (hemorrhagic stroke), but to also then extend that conclusion to claim that it caused different injuries (ischemic stroke and heart attack). *Id.*, at 1246. The 11th Circuit noted the absence of evidence "that might have supported the reliability" of the opinions in this case, such as peer review of proffered opinions, epidemiological data, clinical trials, and animal studies. *Id.*, at 1251.

Here, unlike in *McClain*, the experts have cited to substantially more types of reliable evidence – the experts rely upon multiple epidemiology studies, animal studies, and clinical trials, as well as class comparison and case reports. Notably, the *McClain* trial judge affirmatively rejected his *Daubert* gate-keeping duties as to assessing the strength of the

scientific evidence on ephedra and stroke,[112] so the 11th Circuit was compelled to reverse. This was thus an anomalous record. Indeed, the 11th Circuit recently revisited the ephedra safety issue in *Hi-Tech Pharm., Inc. v. Crawford* and upheld the FDA's finding that dietary supplements containing ephedrine alkaloids are adulterated. 2008 WL 4479714 (11th Cir. 2008). In that case, plaintiff Hi-Tech appealed against an FDA ruling that would effectively "ban the sale and distribution of all dietary supplements containing ephedrine alkaloids" *Id.* at *1. The FDA had banned the product under a federal law that classified adulterated dietary products as *inter alia* those that "present[] a significant or unreasonable risk of illness or injury" and the 11th Circuit allowed the adulteration ruling to stand. *Id.,* at *2.

Furthermore, while the 11th Circuit was reviewing an isolated opinion of a judge from the Northern District of Alabama in *McClain*, there was ultimately an MDL formed and assigned to Judge Rakoff of the Southern District of New York. After extensive *Daubert* briefing, Judge Rakoff, in finding that a qualified general causation opinion was admissible, concluded that the evidence (some identical to that presented in *McClain*) was sound corroboration to otherwise "good but inconclusive science." *In re Ephedra Prods. Liab. Litig.,* 393 F.Supp.2d 181, 186 (S.D.N.Y. 2005). Judge Rakoff noted that even though "no scientific study has been conducted that 'proves' that ephedra or ephedrine 'causes' any of the listed injuries in the sense of establishing the high statistical relationship...that meets accepted scientific standards for inferring causality," *Daubert* was "never intended to keep from the jury the kind of evidence scientists regularly rely on in forming opinions of

---

[112] "This court does not pretend to know enough to formulate a logical basis for a preclusionary order that would necessarily find, as a matter of law, that these witnesses cannot express to a jury the opinions they articulated to the court." *McClain,* 401 F.3d at 1238 n. 3 (quoting the trial judge).

causality simply because such evidence is not definitive." *Id.*, at 189-190. The court noted, "[a]lthough the gaps between [plausible and suggestive, even if inconclusive] data and definitive evidence of causality are real and subject to challenge before the jury, they are not so great as to require the opinion to be excluded from evidence." *Id.*, at 194. Judge Rakoff's thoughtful opinion recognizes the realities of medicine and science, and once placed in context, it is apparent that *McClain* should not be afforded the influence defendants attempt to attribute to it. Moreover, as noted *infra,* the scientific evidence on the herbal product ephedra is vastly weaker than the Seroquel evidence. In *McClain*, there was not a single epidemiological study pertinent to the injuries at issue.

In *In re Accutane*, the Middle District of Florida excluded the testimony of a gastroenterologist who concluded that Accutane caused inflammatory bowel disease (IBD) based solely upon analogies to animal and cell culture studies, biological plausibility of possible mechanisms, documents summarizing complaints made to the company and case reports. 511 F. Supp.2d 1288. The court mentioned that "[n]otably, there is nothing in the medical literature that concludes Accutane causes IBD." *Id.* at 1290. The instant case is distinguishable as the evidence here is extensive, inclusive of three important types of evidence not available in *In re Accutane*, clinical trials, observational studies and text book recognition that Seroquel causes or contributes to diabetes.

Defendant overlooks important 11th Circuit law recognizing that certitude is not required and scientific evidence issues involving credibility of the experts goes to the weight of the evidence to be determined by a jury after cross-examination. The expert must know "of facts which enable him to express a reasonably accurate conclusion as opposed to

conjecture or speculation. However, *absolute certainty is not required.*"  *Jones v. Otis Elevator Co.,* 861 F.2d 655, 662 (11th Cir. 1988) (internal citations omitted) (emphasis added). *See generally Daubert,* 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Maiz v. Virani,* 253 F.3d 641, 667 (11th 2001).   As noted by the Northern District of Alabama in a different pharmaceutical product liability case:

> It is not part of the trial judge's gatekeeping role to determine whether the proffered opinion is scientifically *correct* or *certain* in the way one might think of the law of gravity.   The gatekeeping role is addressed to mere evidentiary admissibility; it is the fact-finder's role (usually a jury) to determine whether the opinion is correct or worthy of credence.  For the trial court to overreach in the gatekeeping function and determine whether the opinion evidence is correct or worthy of credence is to usurp the jury's right to decide the facts of the case.  All the trial judge is asked to decide is whether the proffered evidence is based on "good grounds" tied to the scientific method.

*Globetti v. Sandoz*, 111 F.Supp.2d 1174, 1177 (N.D.Ala. 2000).

## 3.  STATE SUBSTANTIVE STANDARD OF CAUSATION: SUBSTANTIAL CONTRIBUTING FACTOR

To avoid redundancy, as the law and plaintiffs' argument regarding the substantive standard of causation is contained in Plaintiffs' Omnibus Legal Memorandum Responding In Opposition To AstraZeneca's Summary Judgment Motions In The Florida Trial Pool "Group One" Cases, plaintiffs do not reiterate those arguments and law here.  However, it should be noted that Judge Fawsett of this court recognized in a medical products liability case that:

> [I]n those cases in which each of two or more concurring causes could alone have produced the plaintiff's injury, the court will apply the "substantial factor" test for causation-in-fact. In such case, a defendant's conduct is considered a cause of the

plaintiff's injury if such conduct was a material and substantial factor in bringing about the injury [citations omitted].

*Barrow*, 1998 WL 812318 at *72.[113]

## CONCLUSION

For the reasons stated herein and in the accompanying Declarations of Drs. Wirshing, Plunkett and Arnett, and the accompanying Certification of Paul Pennock with Exhibits, Plaintiffs Opposition to the Case specific *Daubert* motions[114] and the Summary Judgment Motion, incorporated herein by reference, it is respectfully submitted that the defendants' motion should be denied in its entirety.[115]

Dated: November 24, 2008

Respectfully submitted,

By: _____
Ellen Relkin
Paul J. Pennock
WEITZ & LUXENBERG, P.C
180 Maiden Lane, 17th Floor
New York, New York 10038
Telephone: (212) 558-5500
Facsimile: (212) 363-2721
E-Mail: PPennock@weitzlux.com

---

[113] Plaintiffs' counsel Weitz & Luxenberg represented Melinda Barrow and tried the case to a successful conclusion in a bench trial.

[114] Critique of the general causation opinions of the case specific experts are addressed in the companion opposition papers regarding case specific experts. However, the general causation data here is applicable.

[115] Given the time allotted for the numerous dispositive and *Daubert* motions, and the number of experts, *inter alia*, the parties agreed that they would not present live witnesses at the *Daubert* oral argument. Instead, the record sets forth the experts' opinions and methodology. However, if the Court determines after reviewing the written submission that oral testimony is necessary or preferred, arrangements will be made to present the expert(s).

-and-

BAILEY PERRIN & BAILEY
The Lyric Centre
440 Louisiana Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 425-7100
Facsimile: (713) 425-7101

CERTIFICATE OF SERVICE

I hereby certify that, on November 24, 2008, I caused to be filed the foregoing with the Clerk of the Court via hand delivery.   I further certify that counsel for defendants listed below were served via Federal Express:

Stephen J. McConnell
Dechert LLP
2929 Arch Street
Philadelphia, PA 19103

Paul J. Pennock