# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
Case No. 6:07-cv-10291

IN RE:  Seroquel Products Liability Litigation,
MDL DOCKET NO. 1769

LINDA GUINN,

Plaintiff,

v.

ASTRAZENECA PHARMACEUTICALS LP, et al.,

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - /


DEPOSITION OF
GUIDO F. NODAL, JR., M.D.


Tuesday, August 12, 2008
11:31 a.m. - 3:24 p.m.


Held at:
The Office of Dr. Guido Nodal
900 West 49th Street
Suite 503
Hialeah, Florida


Reported By:
Tamra K. Piderit, RPR, CRR
Notary Public, State of Florida
Esquire Deposition Services, LLC
North Miami Office  Job No. 948918
Phone - 800.292.6952

22

1 on page 39?
2    A. Yes, sir, I do.
3    Q. And I'm going to have trouble with the
4 pronunciation. Is it Dr. Urquiza?
5    A. Urquiza, yes.
6    Q. Who admitted the patient to the hospital,
7 correct?
8    A. That's correct.
9    Q. And do you see that he has a principal
10 diagnosis listed there for this patient?
11    A. That's correct.
12    Q. Including drug overdose, rule out suicidal
13 ideation, history of schizophrenia, history of
14 recreational drug use, and history of seizure
15 disorder?
16    A. That's correct, sir.
17    Q. You see that there is a section of the
18 admission note that's called the hospital course.
19 Do you see that?
20    A. Yes, sir.
21    Q. And in terms of a physician's use of
22 admission notes, what's the purpose of an admission
23 note?
24    A. Just to compile a history of a patient so
25 you can formulate a plan on how you are going to

23

1 treat this patient.
2    Q. And for this patient we see that she had a
3 history of a psychiatric disorder being diagnosed as
4 schizophrenia several years back, and during the
5 last couple of weeks has been slowly decompensating,
6 correct?
7    A. That's correct.
8    Q. When you all use the term "slowly
9 decompensating," what does that mean?
10    A. That she is slowly getting worse.
11    Q. And then we see in the next paragraph that
12 some history is taken from the family members who
13 say that she has been handling her own medications
14 for a period of time, correct?
15    A. That's correct.
16    Q. Now, down in the third paragraph under
17 hospital course, do you see that Dr. Urquiza records
18 that the patient was brought in because on the day
19 of admission she became very confused, combative,
20 and then later on became very restless, and this
21 prompted him, but I think that should be her, to
22 seek medical attention in the emergency room. She
23 is very agitated, hallucinating, and with the
24 paranoid type attitude?
25    A. That's correct. That's what it says.

24

1    Q. Just looking at that note and understanding
2 what you know about this patient and psychiatry,
3 what is being described here in terms --
4    A. She is paranoid psychiatric.
5    Q. What does that mean?
6    A. That her thoughts are not reality based.
7 There is distortions in reality.
8    Q. Do you see at the bottom the family states
9 after she was brought into the hospital, they went
10 back home, and they found multiple meds throughout
11 the house, including under the beds, in her purse,
12 loosely mixed in different bottles, and they also
13 did find marijuana under the bed. And she did test
14 positive for cannabis on a urine drug screen,
15 correct?
16    A. That's correct, sir.
17    Q. When you see a note like this with a patient
18 taking lots of medicines that are mixed up and the
19 patient is tested positive for marijuana on
20 admission, as a psychiatrist sort of what does that
21 say to you to the patient's overall condition?
22    A. Poor, non-reliable, very hard to treat.
23    Q. And then down at the bottom it says on
24 physical she was awake and alert, clearly paranoid,
25 and hallucinating. Just so the jury will

25

1 understand, when a patient is paranoid and
2 hallucinating, what is that describing?
3    A. Well, paranoid means that you think that
4 people are against you. Hallucinating is a very
5 vague term. It's not unusual for a primary care
6 physician to describe it that way. Hallucinations
7 is being that you have either auditory
8 hallucinations or visual hallucinations. You are
9 hearing or seeing things that are not there.
10    Q. Okay.
11    A. So most likely in schizophrenia people
12 usually have auditory hallucinations, so that's
13 probably what he was talking about at that time. He
14 didn't specify what type of hallucinations.
15    Q. Are patients who present to hospitals with
16 conditions like described here for Ms. Guinn
17 potential suicide risk?
18    A. Well, she already was a suicide risk. She
19 had come on an overdose. But you pay close
20 attention to any person who is psychotic, you have
21 to pay attention to them to what will manifest later
22 on.
23    Q. Why is that?
24    A. Because they are unpredictable.
25    Q. Now, just to sort of round out this note, if

26

1   you look at the last paragraph on page 40 of
2   Exhibit 2, do you see that it says, "From the
3   medical point of view, patient has been here for
4   approximately 22 hours and has remained stable from
5   the medical point of view and may be transferred to
6   psych for further evaluation"?
7       A. That's correct, sir.
8       Q. And is this a pretty typical course for
9   patients who present as Ms. Guinn did in terms of
10  achieving stabilization before transfer to the psych
11  unit?
12      A. Yes. Usually monitored at least 24 hours.
13      Q. Why do you do that?
14      A. Basically just to monitor to make sure there
15  is no problems with the heart, heart beat.
16      Q. Let me ask you, if you would, to turn back
17  to page 24 of Exhibit 2. I was going to see if I
18  could get you to help me a little bit with the
19  writing here. Do you see that this is a Certificate
20  of Professional Initiating Involuntary Examination?
21      A. That's correct.
22      Q. Is this a form that you sometimes use for
23  the treatment of your patients?
24      A. That's correct.
25      Q. And it says under 1, "There is reason to

27

1   believe this person is mentally ill as defined in
2   section 394 Florida statutes. My initial diagnosis
3   is," and can you tell me what that diagnosis is?
4       A. I can't read it real well, but it says
5   psychosis something.
6       Q. Okay.
7       A. I will tell you what it says. It says
8   psychosis not otherwise specified.
9       Q. All right.
10      A. NOS.
11      Q. And then if you come down to the "Either"
12  box, it says either, and then there is a box A that
13  is checked there. Do you see that?
14      A. Right.
15      Q. It says, "Without care or treatment person
16  is likely to suffer from neglect or abuse to care
17  for himself, herself, and such neglect or refusal
18  poses a real and present threat of a substantial
19  harm to his or her well being and it is not apparent
20  that such harm may be avoided through the help of
21  willing family members and friends or through the
22  provision of other services."
23          Did I read that right?
24      A. That's correct, sir.
25      Q. And then I can't read some of this.

28

1       A. Grossly psychiatric, unable to care for
2   self.
3       Q. So when this patient first presented to the
4   hospital, a determination was made that without
5   treatment, she posed a real or present threat to
6   herself and was unable to care for herself; true?
7       A. That's correct, sir.
8       Q. Could you look over to page 28 of the
9   document, please. Do you see the note 1830 in the
10  emergency department?
11      A. Um-hm.
12      Q. And I think that says, "Patient with history
13  of ingesting medication more than prescribed dose."
14  And can you finish that for me?
15      A. I can't make that out, sir.
16      Q. The last three words are "patient agitated
17  and upset"?
18      A. That's correct.
19      Q. All right. Let me ask you to look at
20  page 35 in that document now, if you would.
21      A. Thirty-five?
22      Q. Thirty-five, yes, sir.
23      A. Okay.
24      Q. Do you see that this is the emergency
25  department admission info checklist?

29

1       A. Yes, that's correct.
2       Q. And it's dated 4/28/02, correct?
3       A. That's correct.
4       Q. And it gives as the diagnosis drug overdose,
5   and floor care ordered is critical care. Do you see
6   that?
7       A. That's correct.
8       Q. And is critical care, is that the same thing
9   as CCU, critical care unit?
10      A. Critical care can be CCU or ICU.
11      Q. And for a patient like this, why is it
12  important that this patient be moved to critical
13  care?
14      A. To have intense monitoring. Basically
15  intense monitoring based mostly on the heart. She
16  was moved to CCU, so she was in cardiac critical
17  care.
18      Q. Now, if you would look over at page 37, do
19  you see that that is handwritten notes which furnish
20  history followed by physical examination?
21      A. Um-hm.
22      Q. Do you recognize that handwriting or the
23  signature at the bottom?
24      A. No, sir. That's a house physician. It was
25  cosigned by Dr. Urquiza.

8 (Pages 26 to 29)

30

1    Q. What is this note describing, please, on 37?
2    A. It's just a drug overdose. Patient's family
3    said the patient began to act strange and became
4    more psychotic. I really can't read that last line.
5    Q. That's fine. If you look at the page
6    before, page 36?
7    A. That's correct.
8    Q. Do you see that there is an admitting
9    diagnosis, and the first one is DOD. Is that drug
10   overdose?
11   A. I imagine that's what it is.
12   Q. Right. Can you read No. 2?
13   A. I think it says schizophrenia.
14   Q. Three is?
15   A. Cannabis.
16   Q. And 4?
17   A. Seizure disorder.
18   Q. All right. If you would look at page 41,
19   please.
20   A. Okay.
21   Q. Are these nurses progress notes?
22   A. That's correct.
23   Q. For April 3, '02?
24   A. I think it's May, isn't it?
25   Q. May 3, '02. I'm sorry. Do you see that on

31

1    the second line it says, "Patient in four-point
2    restraint"?
3    A. That's correct.
4    Q. "At this time with positive CMS. Checks to
5    all extremities." What does that mean?
6    A. That the patient was put in restraints is
7    basically what that is. Four ways, that all
8    extremities are tied.
9    Q. So the hands are restrained as well as the
10   feet?
11   A. Yeah. For that to happen the person has to
12   be extremely agitated to where it feels like they
13   could be a danger to themselves or others.
14   Q. If you look at the next page, do you see
15   that that's a neurology consult it looks like from
16   5/3/2004, and that's on page 42. Do you see that?
17   A. Um-hm.
18   Q. Do you see, as you have just said, it's
19   reflecting that the patient is very agitated and
20   delusional, can't follow or comprehend single --
21   A. Command.
22   Q. -- command. That last line there that says
23   "very strong," can you read that last word? Very
24   strong for?
25   A. No, I can't -- very strong -- I think it

32

1    says "very strong for extremities."
2    Q. Okay. Does that reflect a patient who is
3    anxious, agitated, and struggling?
4    A. Extremely.
5    Q. If you look at page 44, do you see that
6    that's a document at the top it says, "Note progress
7    of case complication. Consultation change in
8    diagnosis." Do you see that?
9    A. Forty-four?
10   Q. Forty-four, yes, sir. It just has a date of
11   5/3/02.
12   A. That's correct.
13   Q. So then it has a P, and then it says
14   alterations in mental status. What does the P
15   stands for?
16   A. Usually P stands for plan, but I don't know
17   what it is right there.
18   Q. Okay.
19   A. Because it's usually what's called SOAP
20   notes, you start with subjective, objective,
21   assessment, and plan.
22   Q. All right. Do you see that it says, "Awake
23   and alert with confusion"?
24   A. Right.
25   Q. And then down in the physical examination

33

1    line you see that the nurse records agitated? It
2    says: Respiratory distress noted. Agitated.
3    A. "No respiratory distress noted. Agitated."
4    Q. My apologies.
5    A. Right.
6    Q. And then you see down at 10:45 it says,
7    "Patient getting combative and very confused." On
8    down at 1300, "Remains quite agitated. Short
9    periods of quiet and quietness. Review safety
10   advice remains in place. Unable to leave off for
11   more than a few minutes."
12       Do you see that?
13   A. That's correct.
14   Q. And then down the next line from the bottom,
15   "Sitting up in bed attempting to get out." Do you
16   see that?
17   A. That's correct.
18   Q. In terms of the patient's overall health and
19   well being at this point in time, what is this
20   describing?
21   A. A very agitated patient, out of control.
22   Q. Now, can you look at your patient file that
23   you have here and share with the jury what your
24   findings with this patient were and what your course
25   of treatment would have been? If it will help you,

34

1  in this hospital record your discharge summary is at
2  149.
3      A. I have got it here.
4      Q. And within your patient chart you also have
5  some of your orders.
6      A. You have got more info than I have.
7      Q. Okay. Let's do the discharge summary, and
8  then let's see maybe we can work back from that and
9  maybe this will refresh you.
10     A. Let me begin by telling you that 99 percent
11 of discharge summaries I never did myself. The
12 hospital pays somebody to do them, and this one I
13 did myself. That shows me that if I did this, I
14 thought this was a litigious patient. Don't ask me
15 why, but that's the only time I would dictate a
16 discharge summary.
17     Q. Okay.
18     A. Because I thought there could be, and there
19 is no -- nothing documented or anything. But if I
20 dictated it myself, this is something that for some
21 reason I picked up that this is a litigious patient,
22 so I wanted to make sure that everything is dictated
23 properly.
24     Q. Okay. How is it that you know that you
25 dictated this as opposed to --

35

1      A. Because when somebody else dictated it, they
2  had to write the name and then I cosign. This is my
3  signature myself, and this is my style of doing it
4  anyway, so I know that I dictated this.
5      Q. Now, for those discharge summaries that
6  would have been dictated by someone at the hospital,
7  you would still be ultimately responsible for the
8  content of the note and would have the --
9      A. That's correct.
10     Q. -- authority to make changes to the
11 document, correct?
12     A. That's correct.
13     Q. And if we went and looked at your discharge
14 summaries for patients that were at the psychiatric
15 unit at Palmetto General Hospital, you were
16 ultimately responsible for the language that appears
17 in the discharge summary?
18     A. That's correct.
19     Q. So you would review them and make changes to
20 them, but someone else would go through the records
21 and identify some of the details of admission,
22 discharge, medication, and that type of thing?
23     A. That's correct.
24     Q. And when you --
25     A. I can always go back, if I want to, and

36

1  dictate a postdischarge with any date. I can go
2  back and dictate a note in 2008 myself, but I did
3  this right off the bat.
4      Q. Okay. Now, when you say that you thought
5  this patient might be litigious, that means that you
6  were concerned that she might file a claim against
7  you?
8      A. Against anybody.
9      Q. Okay.
10     A. This is my point right here. I can tell you
11 this is --
12     Q. All right.
13     A. I have done this -- for the many years that
14 I admitted, I did this a handful of times, and this
15 is one. When this came and I saw this, it hit me in
16 the face. I said there it is.
17     Q. When you say "this," you are pointing to
18 your discharge summary?
19     A. That's correct.
20     Q. So let's go through this discharge summary
21 that you prepared. First of all, you identified the
22 admission diagnosis as schizophrenia, chronic
23 paranoid type, correct?
24     A. That's correct.
25     Q. And then you refer in the first sentence to

37

1  the fact that you saw the patient up on the medical
2  floor. You say, "This is a 54-year-old, white
3  female who I had seen on the medical floor at
4  Palmetto General Hospital after an overdose."
5      A. Um-hm.
6      Q. Correct?
7      A. That's correct.
8      Q. Now, when you refer to seeing her on the
9  medical floor, is that talking about the psychiatric
10 unit?
11     A. No. That's up on the medical floor, either
12 ICU or the regular bed before she was transferred to
13 psychiatry.
14     Q. All right. Now, it says that the patient
15 was admitted to the psychiatric floor after she had
16 been medically cleared?
17     A. Yes.
18     Q. We talked about that?
19     A. That's correct.
20     Q. You monitored her vital signs for a period
21 of time, made sure she was stable, and moved her to
22 the psychiatric unit, correct?
23     A. That's correct.
24     Q. And that's because that was the course of
25 treatment that was in her best interest?

10 (Pages 34 to 37)

38

1      A. That's right. We don't admit to psychiatry
2  until they have been medically cleared by the
3  primary care physician.
4      Q. You record here that you had learned that
5  she had a history of psychiatric problems over
6  20 years with a history of auditory hallucinations,
7  paranoid delusions, and much agitation, correct?
8      A. That's correct, sir.
9      Q. The patient apparently had a suicide attempt
10 at home that she did not remember and was abusing
11 marijuana at home, correct?
12     A. That's correct, sir.
13     Q. Now, that history, would that have been
14 obtained either from family members or from the
15 patient herself?
16     A. Or both.
17     Q. She had been on multiple psychotropics, and
18 according to the mother had not been doing well for
19 the past few months. Do you see that?
20     A. That's correct.
21     Q. And then you refer to some of these
22 medicines that she had been taking, Trilafon,
23 Prozac, and low doses of Geodon, correct?
24     A. That's correct.
25     Q. Geodon is one of the atypical or

39

1  second-generation antipsychotics, correct?
2      A. That's correct.
3      Q. What's Trilafon?
4      A. Trilafon is a typical.
5      Q. What about Prozac?
6      A. That's an antidepressant.
7      Q. You noted that she had a history of
8  seizures, and so she was admitted to the unit and
9  put on 100 milligrams of Seroquel b.i.d. Do you see
10 that?
11     A. That's correct.
12     Q. Now, what does b.i.d. mean?
13     A. Two times a day.
14     Q. Are you the physician who ordered Seroquel
15 for this patient initially at 100 milligrams b.i.d.?
16     A. Yes, I was, sir.
17     Q. When you made this prescribing decision, did
18 you take into account the risks and benefits of
19 Seroquel to this patient?
20     A. Yes, I did.
21     Q. And so did you do a risk/benefit analysis?
22     A. Yes, I did, sir.
23     Q. And based on that risk/benefit analysis, did
24 you believe that Seroquel was an appropriate
25 medicine for this patient?

40

1      A. That's correct, sir.
2      Q. By this point of time you knew that
3  antipsychotic medicines were associated with weight
4  gain and diabetes?
5          MR. PIRTLE: Objection. Form.
6      A. Repeat the question, sir.
7      Q. By this point of time, May of 2002, you knew
8  that antipsychotics were associated with weight gain
9  and diabetes?
10         MR. PIRTLE: Objection to form.
11     A. Yes.
12     Q. And did you consider that in making this
13 prescribing decision?
14     A. Yes, sir.
15     Q. Now, your knowledge about weight gain and
16 diabetes, that came from your training and education
17 in terms of your psychiatry residency as well as
18 your practice experience?
19     A. My continued education.
20     Q. Now, you say the medication was increased up
21 to 200 milligrams b.i.d. on which the patient slowly
22 recovered and the delusions and hallucinations went
23 away?
24     A. That's correct, sir.
25     Q. So in looking at your note, do you believe

41

1  that Seroquel was effective in treating this
2  patient?
3      A. Yes, I do.
4      Q. On Seroquel did this patient go from a
5  patient who could not take care of herself, could
6  not think rationally, and was hearing things to a
7  patient that you felt was appropriate to discharge
8  from the hospital because you believed that the
9  patient could take care of the activities of daily
10 living?
11     A. That's correct, sir.
12     Q. In terms of what you knew about the
13 antipsychotics and association with diabetes and
14 weight gain, did that derive, in part, from your
15 knowledge about the first-generation antipsychotics?
16     A. Yes, sir.
17     Q. All right. You say here that --
18     A. There is no -- there is empirical data for
19 years with people with schizophrenia of having a
20 high incidence of diabetes per se.
21     Q. All right. So I think what you are saying
22 now is that in patients who didn't take
23 antipsychotics, there has been information available
24 to the psychiatric community that patients with
25 schizophrenia have a higher incidence of diabetes --

42

1    A. Yes, sir.
2    Q. -- than patients in the general population?
3    A. That's correct.
4    Q. You see that on the last page of this
5    document, 150, there is a statement, "All possible
6    side effects of medications and alternative methods
7    of treatment have been explained at length to the
8    patient and the mother."
9        Do you see that?
10   A. That's correct, sir.
11   Q. Now, just to refresh your recollection on
12   this, when you discharged the patient, you
13   discharged the patient to continue taking Seroquel,
14   correct?
15   A. That's correct.
16   Q. And did you think that was an appropriate
17   prescribing decision for this patient given her
18   presentation?
19   A. Definitely. Extreme improvement with the
20   medication, the patient was well enough to be
21   discharged, there was no reason to use anything
22   else. Not only was this done orally and documented
23   orally, she signed this paper with what medications
24   and that we had explained all possible side effects
25   of the medications, and she signed that.

43

1    Q. So if you don't mind, I'm going to stick an
2    exhibit sticker on this one.
3        (Document marked as Exhibit 4
4        for identification)
5    Q. All right. So we are looking at Exhibit 4
6    now, which is your discharge order and instruction
7    form, correct?
8    A. That's correct.
9    Q. Let me get that one so I can track it with
10   you. In that discharge order do you state the
11   medicines that the patient is being discharged on?
12   A. That's correct, sir.
13   Q. And then if you would, for the benefit of
14   the jury, read the statement at the bottom that the
15   patient signed.
16   A. Okay. The list of the medications that she
17   is taking, which is Neurontin and Seroquel and the
18   dosages were put on top, the diet instructions were
19   given, the exercise, work activity instructions were
20   given. The next doctor's appointment with me was
21   given and also to call Dr. Urquiza, the primary care
22   physician, for follow up.
23       And then it says, "These instructions
24   have been discussed with the patient on 5/10/02,
25   including side effects of medications. The patient

44

1    appears to understand these instructions. In the
2    event that the patient cannot understand, they have
3    been discussed with the following family member,"
4    and she signed it.
5    Q. And in terms of the risks that the patient
6    would have been advised of at that point in time,
7    what would you have said to the patient about the
8    sides effects of the medicines that she was taking?
9    A. Basically the same thing that we have been
10   discussing, about side effects of antipsychotics.
11   Q. Would you list those, please.
12   A. These medications you have to be careful
13   because they can cause weight gain, they can cause
14   diabetes, they can cause some type of movement
15   disorders at times. So we just go through the gamut
16   from you get too sedated, if you start hearing
17   voices again, you make sure to contact me. Just
18   very routine kinds of stuff.
19       We try to talk about a lot, make sure
20   that if you see that you are gaining weight, that
21   you report to me very quickly. So always monitor
22   your weight, that kind of thing.
23   Q. Okay. Now, you saw this patient in
24   follow-up in your office, correct?
25   A. That's correct, sir.

45

1    Q. And could you turn to the follow-up office
2    visit note?
3    A. Yes. She came on 5/14.
4    Q. And would you describe for the jury, maybe
5    just go through that note and tell the jury -- let
6    me start over.
7        You saw the patient on 5/14/2000,
8    correct?
9    A. Of 2002.
10   Q. This was after the patient's discharge from
11   the hospital?
12   A. That's correct.
13   Q. Tell the jury what happened on that visit.
14   A. She basically came in, I basically outlined
15   that she had recently been discharged from the
16   hospital, and she described at that time that she
17   had been having a lot of paranoid delusions. Okay.
18   So at that time I increased the medication a little
19   bit more. Instead of taking 200 and 200, we
20   increased it to 300 and 300.
21   Q. So that would be 600 milligrams per day?
22   A. That's correct.
23   Q. And the purpose in increasing the dosage was
24   what, please, sir?
25   A. To control the hallucinations and try to

12 (Pages 42 to 45)

46

1  prevent her from being rehospitalized again.
2      Q. And then if you would look at the next
3  office visit, I believe that's on 5/28/2002,
4  correct?
5      A. That's correct. She reported that she was
6  doing better, she denied hallucinations, denied
7  suicidal-homicidal ideations. I continued the
8  medication the same. She informed me that she was
9  moving to Melbourne, Florida, so I gave her a little
10 bit of extra medication, samples, so she could take,
11 and I referred her to a psychiatrist that I happen
12 to know that worked there.
13     Q. Without medicines like Seroquel, what does
14 the future hold for a patient like Ms. Guinn?
15     MR. PIRTLE: Objection. Form.
16     A. Well, that's like -- that's like a person
17 that has diabetes without insulin. They are going
18 to be out of control, they are going to be psychic
19 all the time. Unfortunately, this is a chronic
20 illness. This is one of the worst illnesses that we
21 treat. It has a poor prognosis, and they basically
22 have to be on an antipsychotic. These are the type
23 of patients where the antipsychotics -- they used to
24 live most of their lives in hospitals, in state
25 hospitals for years and years and years.

47

1          These type of medications will basically
2  keep these people out of becoming hospitalized
3  chronically and more or less able to function in
4  society.
5      MR. BROCK: I need to grab one document,
6      if you give me just one second.
7      Q. Before I do that, just one housekeeping
8  matter. Since you have referred to your original
9  record today, would it be okay with you if we mark
10 that as an exhibit, have your administrative
11 assistant make a copy for us, and then deliver that
12 to the court reporter so that we have everything
13 that you have?
14     A. No problem. You have this, though.
15     Q. I do have it, but I prefer -- just leave
16 that there. I'm going to mark the whole file.
17     (Document marked as Exhibit 5
18     for identification)
19     MR. BROCK: Is this okay if they copy it
20     here?
21     MR. PIRTLE: I'm fine with that.
22     (Document marked as Exhibit 6
23     for identification)
24     Q. I'm going to hand you now Exhibit 6, which
25 is the original Seroquel label from 1997. Do you

48

1      see that?
2      A. That's correct, sir.
3      Q. And a product label has different sections,
4  correct?
5      A. That's correct.
6      Q. It has a section for clinical pharmacology,
7  a section for warnings, a section for precautions, a
8  section for adverse reactions, correct?
9      A. That's correct.
10     Q. And physicians use these labels to learn
11 about medicines, correct?
12     A. That's correct. You don't learn much about
13 medication reading labels. This is legal stuff.
14     Q. Let me just ask you a question about that
15 since you mentioned that. In terms of your personal
16 practice, in terms of how you learn about medicines,
17 what is your methodology for that?
18     A. Reading and going to conferences.
19     Q. And when you say reading is one of the ways
20 that you learn about medicines, what do you read?
21     A. Journals, books, Internet articles.
22     Q. And then the kinds of conferences that you
23 attend would include what?
24     A. All different types of psychiatric
25 conferences. We talk about treatment of

49

1  schizophrenia or depression or whatever, and we have
2  options of different medications.
3      Q. Let me just direct you to one thing in this
4  label, if I could. If you look three pages from the
5  back.
6      A. Okay.
7      Q. Do you see that there is a section there
8  under adverse reactions that refers to weight gain?
9  It's about halfway down.
10     A. You are basically talking the second page,
11 right?
12     Q. So adverse reactions is here about four
13 pages from the back.
14     A. Okay. This is the last page for me.
15 Adverse reactions.
16     Q. And then if you turn the page, do you see
17 there is a section for weight gain? It's the fourth
18 page from the back.
19     A. I'm sorry, can you point it out to me?
20     Q. I would be happy to. This document would
21 normally be on a fold out, but it's in four
22 different pages here.
23          Well, the problem is I didn't give you a
24 full copy. I will give you this one. I will just
25 mark this one as 7.

13 (Pages 46 to 49)

50

1        (Document marked as Exhibit 7
2        for identification)
3        Q. Now, do you see on the fourth page from the
4    back of Exhibit 7 about halfway down it's a section
5    called weight gain?
6        A. Yes, sir.
7        Q. And do you see that AstraZeneca is reporting
8    through its label that "The proportions of patients
9    meeting a weight gain criterion of greater than or
10    equal to 7 percent of body weight were compared in a
11    pool of four 3- to 6-week placebo-controlled
12    clinical trials, revealing a statistically
13    significantly greater incidence of weight gain for
14    Seroquel (23%) compared to placebo
15    (6%)."
16        A. Over 7 percent body weight, not 70.
17        Q. I thought I said 7. Let me say it again.
18    "The proportions of patients meeting a weight gain
19    criterion of greater than or equal to 7 percent of
20    body weight were compared in a pool of four 3- to
21    6-week placebo-controlled clinical trials, revealing
22    a statistically significantly greater incidence of
23    weight gain for Seroquel (23%) compared to placebo
24    (6%)."
25        A. That's correct.

51

1        Q. So this is information that would have been
2    available to you at the time you made your
3    prescribing decisions for Ms. Guinn, correct?
4        A. That's correct.
5        Q. Let me just ask you this in general terms:
6    Were you aware that in 2004 the Seroquel label was
7    amended to include class labeling for diabetes and
8    hyperglycemia?
9        A. Yes.
10        Q. Have you continued to prescribe Seroquel
11    since the amendment to the label relating to
12    diabetes and hyperglycemia?
13        A. Yes, I have.
14        Q. Why is that?
15        A. Because I think that the people benefit from
16    it. The person that responds well to it needs to
17    get it.
18        Q. Based on everything that you know today
19    about Seroquel, if you were making a prescribing
20    decision for Ms. Guinn today based on the
21    circumstances that you were presented with in 2002,
22    would you still prescribe Seroquel?
23        A. I wouldn't change a thing.
24        Q. Now, from time to time sales representatives
25    from AstraZeneca call on you in this office,

52

1    correct?
2        A. That's correct.
3        Q. And could you just describe what frequency
4    the sales representatives from AstraZeneca stop by?
5        A. No. AstraZeneca doesn't pass here very
6    often. Four, five times a year.
7        Q. And in terms of the way that you make your
8    decisions about prescribing medicines for patients,
9    are they influenced by things that representatives
10    of AstraZeneca tell you when they make a sales call?
11        A. No. Their influence about what I read tell
12    me. I listen to them, sometimes they have the
13    material and good studies, and that's important to
14    me, but they are salesmen. They need to pitch their
15    drug. I make my decision on my own.
16        Q. Okay. Now, do you understand just in
17    general terms that sales representatives, when they
18    talk to you about medicines, are limited to
19    describing things for you that are consistent with
20    the label?
21        A. That's correct.
22        Q. And in your dealings with the AstraZeneca
23    representatives, have they conducted themselves in
24    an appropriate and fair way and presented things to
25    you only consistent with the label?

53

1        A. That's correct.
2        Q. Do you have any complaints about the
3    AstraZeneca representatives and the way they have
4    conducted themselves when they have been here in
5    your office?
6        A. I have no complaint by any of the drug
7    companies that visit me.
8        Q. Have you ever written an article in the area
9    of psychiatric disorders as they relate to the
10    development of diabetes?
11        A. No.
12        Q. You pretty well understand what sales
13    representatives do in terms of stopping by and
14    giving you information with the product that would
15    be consistent with the label. Do you sort of
16    understand when they stop by to see you they will
17    make a short note of the visit just to record what
18    they have done? Would that be something that you
19    would expect them to do?
20        A. For them to write a note?
21        Q. Yeah. Just to write a short note of the
22    visit of where they have been and what they have
23    done?
24        A. They keep a record by what I sign off. They
25    usually bring a little computer thing that tracks

14 (Pages 50 to 53)

54

1 that they have been here.
2    Q. Okay. Is the thing that you sign off on, is
3 that for the receipt of samples, or is that just to
4 verify that they were here?
5    A. I think it works both ways. Sometimes they
6 leave samples, sometimes they don't.
7    Q. By name do you know of any of the
8 AstraZeneca representatives?
9    A. I don't know their names.
10    Q. In terms of sales call activities through
11 your office, and when I say "sales calls," I mean
12 drug representatives stopping by to visit with you
13 about the different medications, how many visits a
14 week will you generally get?
15    A. From different drug reps?
16    Q. Yeah, all drug companies.
17    A. In a week three, four, five. It varies.
18    Q. Okay. Have you ever told Ms. Guinn that her
19 diabetes -- strike that.
20       Do you know from any conversations with
21 anyone what Ms. Guinn is complaining about in the
22 lawsuit against AstraZeneca?
23    A. I have no idea.
24    Q. Have you ever told her that Seroquel caused
25 her diabetes?

55

1    A. I told her?
2    Q. Yes. Did you ever tell her that?
3    A. I don't even know that she has diabetes. I
4 imagine if we are here it's because she does. She
5 didn't when I treated her.
6    Q. Okay. If Ms. Guinn at the time that you saw
7 her had a family history of diabetes, had mental
8 health issues, had elevated cholesterol, had been a
9 smoker, had high blood pressure, would she be -- and
10 also had exogenous obesity, would she be a person
11 who would be at risk to develop diabetes whether or
12 not she took an antipsychotic?
13    A. Of course. A lot of people in good shape
14 get diabetes.
15    Q. Right.
16    A. This is -- it's very hard to point to
17 diabetes due to one product or one issue. This is a
18 person who has been on antipsychotics for 20 years
19 who hasn't taken care of herself who has been a drug
20 abuser. How can she point out to one thing causing
21 diabetes? To me that's senseless. It makes no
22 sense to me at all.
23    Q. Okay.
24    A. And I don't have any reason to take sides
25 here, but to me this is senseless. Senseless.

56

1    MR. PIRTLE: Objection.
2    MR. BROCK: Thank you.
3    MR. PIRTLE: Give me about 5 minutes to
4 get my stuff in the stack that I need it.
5    MR. BROCK: Sure.
6 (Recess taken from 12:44 p.m. to 12:49 p.m.)
7       CROSS EXAMINATION
8 BY MR. PIRTLE:
9    Q. Good afternoon, Doctor.
10    A. How are you doing, sir?
11    Q. My name is Tom Pirtle, and I represent Linda
12 Guinn. I have some questions that I need to ask
13 you. All right?
14    A. Yes, sir.
15    Q. You treated Linda, didn't you?
16    A. Yes, sir.
17    Q. From what I can see from the record, you
18 treated her in May of 2002, am I correct?
19    A. That's correct, sir.
20    Q. She was transferred to the psychiatric floor
21 of the Palmetto Hospital on 5/4/02, correct?
22    A. The psychiatric floor? That's correct.
23    Q. And your involvement with her case continued
24 with two office visits up to 5/28/02?
25    A. That's correct, sir.

57

1    Q. So less than a month?
2    A. That's correct, sir.
3    Q. Do you remember Ms. Guinn?
4    A. Do I remember her?
5    Q. Yes.
6    A. Vaguely.
7    Q. If you met her walking down the street,
8 would you recognize her?
9    A. I don't know.
10    Q. Do you remember any of the specifics of her
11 case other than what's in your medical records?
12    A. What's in my medical records basically.
13    Q. All right. You don't have any recollection
14 independently of any conversations that you had with
15 her; is that fair?
16    A. Conversations independently?
17    Q. Yes, other than what's reflected in your
18 medical records?
19    A. What's in my medical records.
20    Q. All right. In other words, it would be hard
21 for you to point her out in a lineup, isn't that
22 fair?
23    A. I have a pretty good memory. I could
24 probably point her out. In a lineup I can probably
25 pick her out.

15 (Pages 54 to 57)

58

1    Q. What does she look like?

2    A. She was somewhat short, had like her hair
3    was down to the back of her neck, a little bit
4    chunky. Now, if you want me to describe her color
5    of eyes and stuff, no.

6    Q. But as we sit here today, it is true to say,
7    is it not, sir, you are functioning solely on what's
8    in your medical records as to what went on?

9    A. Yes, of course.

10   Q. Now, there are a few areas that I want to go
11   into about the medical records and your care and
12   treatment.

13        By the way, total time, how many times
14   did you see her when she was on the psychiatric
15   unit?

16   A. Every day.

17   Q. You made your rounds?

18   A. Yes, sir.

19   Q. And she was there for about 10 days?

20   A. Whatever it says. Yeah.

21   Q. And then she came into your office, and you
22   had an office visit with her two times?

23   A. That's correct, sir.

24   Q. Since that time you have had no involvement
25   with her?

59

1    A. Never heard of her again.

2    Q. Since that time you don't know what her
3    treatment of second-generation antipsychiatric drugs
4    are?

5    A. I have no idea.

6    Q. Since that time you don't know what her
7    current health status is?

8    A. No idea, sir.

9    Q. Since that time you don't know what her
10   current mental status is?

11   A. That's correct, sir.

12   Q. Don't know whether she has gotten better or
13   worse?

14   A. That's correct.

15   Q. Since the time that you treated her, you
16   don't know what her body weight has done?

17   A. That's correct.

18   Q. Whether she has increased or decreased and
19   what medicines she was on?

20   A. That's correct, sir.

21   Q. At the time that you placed her on Seroquel,
22   she wasn't diabetic, isn't that true?

23   A. Not that the records show so, no.

24   Q. There wasn't any indication that you had
25   that she was diabetic at the time?

60

1    A. No.

2    Q. And you drew her blood and tested her blood?

3    A. Um-hm.

4    Q. And it came back normal?

5    A. That's correct.

6        MR. BROCK: Object to form.

7    Q. I want to move now and talk to you about
8    what I'm going to mark as -- well, let me just --
9    what's the next number?

10       THE COURT REPORTER: Eight.

11       (Document marked as Exhibit 8

12       for identification)

13   Q. Doctor, is it true or not that an important
14   source that doctors get information about drugs is
15   the Physicians' Desk Reference or what's in the
16   product labeling, which is the same thing?

17   A. You can say so. I mean, there is
18   information there. That's not where we learn about
19   medications.

20   Q. Let me ask you about it this way: If a
21   pharmaceutical manufacturer wants to inform doctors
22   about the information of drugs, one of the places
23   that information where it's sure to be circulated in
24   the general psychiatric community would be the PDR?

25   A. Yes, sir.

61

1    Q. Every doctor or almost every doctor in the
2    United States, including yourself, has the PDR in
3    his office?

4    A. That's correct, sir.

5    Q. In fact, when I look to my right and up, I
6    see two hard copies of the Physicians' Desk
7    Reference in your office?

8    A. That's correct.

9    Q. So from time to time you use that text to
10   reference drugs?

11   A. That's correct.

12   Q. And what you want to know about is really
13   what are the major side effects of the drugs and
14   what are the major benefits of the drugs and what is
15   the dosing of the drug; fair?

16       MR. BROCK: Object to form.

17   A. Yes.

18   Q. If a product manufacturer such as
19   AstraZeneca wants to get the word out to you, there
20   are other mechanisms they can use, word out to you
21   about risks of a drug, correct?

22   A. That's correct.

23   Q. They have salespeople that come into your
24   office to try to sell drugs. You have already
25   talked about that, right?

16 (Pages 58 to 61)

62

1    A. That's correct.
2    Q. They can send a message through the sales
3  force if they want to?
4         MR. BROCK: Object to the form.
5    A. That's correct.
6    Q. From time to time do you get "Dear Doctor"
7  letters?
8    A. Yes.
9    Q. From various drug companies, correct?
10    A. That's correct.
11    Q. I bet you receive them on a fairly regular
12  basis; is that fair?
13    A. Regular? We get some.
14    Q. And if a drug company wants to get the word
15  out about risks of a drug, risk of its drug, one of
16  the things that the drug company can do is send out
17  a "Dear Doctor" letter to the doctors that are
18  actually prescribing the drug?
19         MR. BROCK: Object to the form.
20    A. Okay.
21    Q. Correct?
22    A. Yes.
23    Q. That's reasonable, isn't it?
24         MR. BROCK: Object to the form.
25    A. Yes.

63

1    Q. That's something you would expect a
2  pharmaceutical manufacturer to do as they come
3  across the new risks associated with their drug, is
4  that they would try to inform you as the person on
5  the front lines of using that drug of that risk?
6         MR. BROCK: Object to the form.
7    A. A new risk, yes.
8    Q. Now, as of 2002 can we agree that as far as
9  the Physicians' Desk Reference or the package insert
10  for the product Seroquel, there was no warning about
11  diabetes or glucose disregulation whatsoever?
12    A. Not that I'm aware of.
13    Q. I'm going to hand you what I have marked as
14  Exhibit 8, which is the copy of the PDR for 2002. I
15  want to ask you in the warnings and precautions
16  section, is it fair to say that a doctor prescribing
17  Seroquel would not be warned of diabetes and glucose
18  disregulation or, as far as that goes, weight gain?
19         MR. BROCK: Object to form.
20    A. Warning and precautions, what page is that,
21  sir?
22    Q. Right up front, second page.
23    A. First page?
24    Q. Second page, actually.
25    A. Okay. That's correct.

64

1    Q. Now, in terms of other sources of
2  information out there, doctors can rely on other
3  sources of information to look at the side effects
4  of drugs, correct?
5    A. Yes, sir.
6    Q. Let me tell you why this is important,
7  Dr. Nodal. Can we agree that your level of
8  knowledge concerning the product Seroquel has
9  changed since you started using it up until today?
10    A. Not really.
11    Q. We will go over some documents in a minute
12  about when you first started using Seroquel, you
13  were leery of it, weren't you?
14    A. Leery?
15    Q. Yes.
16    A. When I start using a product that's been out
17  for a while, I'm not really leery.
18    Q. Seroquel, when you started using Seroquel,
19  it hadn't been out that long, had it?
20    A. Probably. I don't know exactly how long
21  it's been out, but it's been out probably a few
22  months.
23    Q. To you now. At the time, and you have
24  testified here, that in 2002 you had knowledge that
25  Seroquel had an association between itself and

65

1  diabetes.
2         MR. BROCK: Object to the form.
3    Q. Do you remember that testimony?
4         MR. BROCK: That misstates the
5       testimony. I object to it.
6    A. That's a class-action effect, sir. That's
7  any antipsychotic you are going to have higher
8  incidence of diabetes.
9    Q. When you say a class-action effect, what do
10  you mean?
11    A. Of any antipsychotic.
12    Q. Well, is it fair to say that at some point
13  in time you learned of a class effect of
14  antipsychotics having the propensity to cause
15  diabetes?
16         MR. BROCK: Object to form.
17    A. Yes.
18    Q. Now, the warning for the class came out in
19  2004, isn't that true?
20    A. I don't know exactly. It came out later,
21  yes.
22    Q. You prescribed this product, the Seroquel
23  product, to Ms. Nodal in 2002, correct?
24    A. To who?
25    Q. Ms. Guinn in 2002?

17 (Pages 62 to 65)

66

1    A. Yes.
2    Q. That was before the class warning came out,
3  correct?
4    A. That's correct.
5    Q. Is it fair to say that you can't warn about
6  a risk you don't know about?
7    A. Yes.
8    Q. Now, prior to the time that you started
9  prescribing Seroquel in May of 2002 to Ms. Guinn,
10  there was nothing in the published medical
11  literature that implicated Seroquel, was there?
12    A. Implicated Seroquel for?
13    Q. Diabetes.
14    A. That's well-known in the literature for all
15  antipsychotics and all people with schizophrenia.
16  That's something that we are very aware of. The
17  warning that came out in 2004, for the most part,
18  has not changed the mind set of how we use this
19  medication. That hasn't changed the medication --
20  of how I use the medication at all.
21    Q. I understand that. Let me break this down
22  in two parts. Prior to 2004 there was nothing in
23  the medical literature that you could point to that
24  Seroquel was implicating and causing diabetes?
25    A. Right. In black and white, sure.

67

1    Q. In 2004 the FDA issued a class warning for
2  all second-generation antipsychotics, correct?
3    A. That's correct.
4    Q. Now, it's true, is it not, that prior to
5  2004 the company's position with the doctors is that
6  this product, Seroquel, was not associated with
7  diabetes?
8    A. It wasn't really discussed.
9    Q. In fact, you have been provided literature
10  that shows that not only -- by the sales force from
11  AstraZeneca that shows that not only is Seroquel not
12  associated with diabetes, it actually may have a
13  preventative component to it, haven't you?
14    A. Preventative component?
15    Q. Yes, sir.
16    A. If that's been shown to me, I don't remember
17  that. I never had anybody that I remember ever
18  telling me that something has a preventative
19  component.
20    Q. We will get to that in a second. Let's keep
21  working on this.
22    A. Okay.
23    Q. Prior to 2002 you didn't have the knowledge
24  base to see that Seroquel, the product specifically
25  Seroquel, causes diabetes, correct?

68

1    A. That's correct.
2    Q. And there was some information out there in
3  2002 about another second-generation antipsychotic
4  called Zyprexa that indicated that there might be an
5  association between Zyprexa and diabetes. Do you
6  remember that?
7    MR. BROCK: Form.
8    A. Yes.
9    Q. And Zyprexa was the first second-generation
10  antipsychotic where that information became public,
11  and it was a big deal, right?
12    A. That's correct.
13    Q. But up until and through May of 2002,
14  Seroquel hadn't been implicated as a causative or an
15  associative agent with diabetes?
16    MR. BROCK: Object to the form.
17    Q. Is that fair?
18    A. Yes.
19    Q. You don't remember when you talked to
20  Ms. Guinn about Seroquel any of the things that you
21  said, correct?
22    MR. BROCK: Object to the form.
23    A. I can tell you what I tell every patient.
24    Q. Well, you can tell me generally what you
25  tell every patient. But as far as sitting here

69

1  today, 6 something years later, you can't tell the
2  jury specifically what you told her?
3    MR. BROCK: Objection to form.
4    A. I can tell you pretty much what I have said,
5  because I have been saying the same thing for
6  20 years.
7    Q. Well, in terms of -- let's take diabetes,
8  for example. In terms of the entity diabetes, if
9  there hadn't been anything put out in 2002 about
10  Seroquel and diabetes, you couldn't have very well
11  told them about Seroquel and diabetes, could you?
12    MR. BROCK: Object to form.
13    A. I could tell them possible side effects of
14  antipsychotic medication, and that's always been
15  included, especially with a schizophrenic, what we
16  discuss.
17    Q. Now --
18    A. I cannot tell you exactly word by word what
19  I told a patient 6 years ago. I can tell you what I
20  tell a patient on antipsychotics in general.
21    Q. I understand.
22    A. It's basically the same thing, because we
23  say it over and over again.
24    Q. Being this is a legal proceeding, let me get
25  this narrowed down. It's fair to say you can't

70

1  remember what you told Ms. Guinn and her mother in
2  2002 about Seroquel?
3      MR. BROCK:  Object to form.
4      Q. Sitting here today.
5      A. Exactly?
6      Q. Right.
7      A. That's impossible.
8      Q. And you don't have any positive memory
9  sitting here today of telling Ms. Guinn or her
10  mother about an association with diabetes sitting
11  here today, correct?
12      MR. BROCK:  Object to form.
13      A. If you put it in that manner, no.
14      Q. The no means you don't have any memory of
15  it, right?
16      A. Again, like I said before, I say the same
17  thing to every patient.  Basically the
18  antipsychotics I'm going to go over the whole spiel,
19  over the same thing.  Doesn't matter if it's
20  Seroquel, Zyprexa, Geodon, or Haldol, I basically
21  tell them about the same thing, because they all
22  basically cost the same thing to a certain extent or
23  another.
24      Q. Let's cover that.  All second-generation
25  antipsychotics are not the same, are they?

71

1      A. No.
2      Q. You use numerous second-generation
3  antipsychotics, don't you?
4      A. That's correct, sir.
5      Q. What's your most prevalent use of
6  second-generation antipsychotic?
7      A. Prevalent?  Which one I use the most?
8      Q. Yeah.
9      A. It's probably Seroquel.
10      Q. There are some newer ones that have come out
11  since Seroquel, correct?
12      A. That's correct.
13      Q. One of them is Abilify, isn't it?
14      A. That's correct.
15      Q. And there hasn't been the same reports of
16  diabetes associated with Abilify, has there?
17      MR. BROCK:  Object to the form.
18      A. That's correct.
19      Q. Now, take out Exhibit 4.  It's in front of
20  you.
21      A. Four?  Yes, sir.
22      Q. I have covered what's verbally been said.
23  It's the informed consent.  You pulled it out and it
24  was marked.
25      A. Yes.

72

1      Q. Can I see that?  Is this a discharge
2  summary?
3      A. That's from the hospital.
4      Q. Okay.  It says, "These instructions have
5  been discussed with the patient on this date
6  including side effects of medications."  That's what
7  you read, correct?
8      A. That's correct.
9      Q. There is nothing in here that specifies what
10  side effects were discussed, correct?
11      A. No.
12      Q. And you weren't actually the person that had
13  that discussion, were you?
14      A. No, that was me.
15      Q. That was you?
16      A. Here is my signature right here.
17      Q. Let me show you what I'm going to mark as
18  Exhibit 9.
19      (Document marked as Exhibit 9
20      for identification)
21      A. She probably gets it from the nurses, too.
22      Q. Here is the specific authorization for
23  antipsychotic medications.  Do you see that?
24      A. That's correct, sir.
25      Q. Is Seroquel listed on there?

73

1      A. Yes, sir.
2      Q. Do you see the bottom paragraph?  What does
3  it say?
4      A. "The patient shall always be asked to sign
5  this authorization form.  However, if the patient is
6  a minor, is incapacitated, or is incompetent to
7  consent to treatment, the consent of his or her
8  guardian, guardian advocate, or health care
9  surrogate/proxy is required."
10      MR. BROCK:  Can I see that?
11      MR. PIRTLE:  Sure.
12      Q. Now, at the time this was executed, you have
13  testified that Ms. Guinn was not competent, correct?
14  She was restrained to the bed, she was having
15  hallucinations, right?
16      A. Yes.
17      Q. She needed some help, right?
18      A. At the time that what?
19      Q. At the time this was signed.  This is 5/04.
20  May 4, '02, excuse me.
21      A. Okay.
22      Q. Right?
23      A. That doesn't mean -- you are a lawyer.  You
24  know that's not the definition of competence or
25  incompetence.

74

1    Q. Was she competent or not?
2    A. That's not the definition of competent or
3  incompetence. The only person that can do that is a
4  judge, sir.
5    Q. I'm asking you as a psychiatrist.
6    A. As a psychiatrist I have to explain it to a
7  patient, and they have to sign it, and legally that
8  person is competent to sign.
9    Q. Well, was competent when she was in the
10  hospital to take care of her own affairs?
11    A. I can't tell you minute by minute. She was
12  not doing well. Remember that schizophrenia you can
13  be psychotic, but that doesn't mean that you are
14  cognitively impaired. You have to make treatment
15  decisions.
16         Each patient that we treat, each
17  psychiatric patient that we treat, unless they are
18  deemed incompetent by the courts, has to give us
19  informed consent. By law, unless that patient has
20  been deemed incompetent, that patient is competent
21  to sign her treatment.
22    Q. Let's talk about --
23    A. That's what we are here that you are asking
24  me about. We have to go by the letter of the law.
25    Q. Let's go by the letter of the law. Read the

75

1  paragraph above her signature.
2    A. "The information I have relied upon to make
3  the decision to consent to treatment, including full
4  disclosure of each of the above subjects, is
5  attached to this authorization and signed by me. I
6  have read and had this information fully explained
7  to me and I have had the opportunity to ask
8  questions and receive answers about the treatment."
9    Q. You have been through the medical record
10  from the hospital with the AstraZeneca lawyer,
11  correct?
12    A. Pardon me?
13    Q. You went through the medical records from
14  the hospital with the AstraZeneca lawyer?
15    A. Yes. Yes. Yes.
16    Q. This is a page out of the medical records
17  from the hospital. My question to you is: Where is
18  the attached full disclosure and information that
19  she was supposed to read?
20    A. I have no idea, sir.
21    Q. Why isn't it in there?
22    A. I don't know, sir.
23    Q. Won't you search the medical records and
24  tell the jury where it's at?
25    A. I don't know what you are talking about.

76

1    Q. Let's reread the paragraph. It says here
2  "including full disclosure of each of the above
3  subjects, is attached to this authorization and
4  signed by me."
5         I would assume that since Seroquel is
6  listed, there is something about Seroquel that's
7  attached and signed by her. Where is it?
8    MR. BROCK: Object to the form.
9    A. As far as I'm concerned, that's the paper
10  right there.
11    Q. That's not attached. That's in the body of
12  it. It says attached and signed by me.
13    MR. BROCK: Object to the form.
14    A. We are talking semantics here. Attachment
15  it's in the paper. She signed Seroquel and there it
16  says Seroquel, spelled out the dosage, and she
17  signed it.
18    Q. Dr. Nodal, you know what "attached" means,
19  don't you?
20    A. Oh, yes. We are talking semantics. That
21  could be an attachment right there.
22    Q. Was there --
23    A. If we are going to argue semantics --
24    Q. Was there anything attached to the paper
25  which I have marked separately as Exhibit 9?

77

1    A. There is nothing attached to this paper,
2  sir, that's correct.
3    Q. The truth of the matter is before, during,
4  and after the time that you were prescribing
5  Seroquel to Ms. Guinn, the company's position was
6  that Seroquel was not associated with diabetes nor
7  its exacerbation? That's AstraZeneca's position,
8  right?
9    MR. BROCK: Object to the form.
10    A. Yes.
11    Q. That's what you were being told, right?
12    MR. BROCK: Object to the form.
13    You can answer.
14    A. Yes.
15    (Document marked as Exhibit 10
16       for identification)
17    Q. And you were also being told that Seroquel
18  was weight neutral, weren't you?
19    A. I don't remember that, sir.
20  REDACTED
21
22
23
24
25

20 (Pages 74 to 77)



**78**

REDACTED

**80**

1  Q. You were shown the "Weight and Diabetes
2  Sales Sheet" while you were being seen by the
3  AstraZeneca folks, weren't you?
4       MR. BROCK:  Object to the form.
5  A. I cannot tell you specifically when they
6  visited me.  They still visit me four or five times
7  a year.
8  Q. We will get to that.
9  A. To me, I will be honest with you, to me I
10 don't go very much by any salesman, any company.
11 You know, that's fine, I listen to them, if they
12 have articles, but I pretty much listen to what I
13 read on my own and the conferences that I go to.
14 Q. Let's go through this and see what this
15 company was saying about weight and diabetes.  This
16 is also Gaskill Exhibit 34.  Do you see the second
17 page, "For Diabetes consider pointing out"?  Second
18 page.
19 A. Second page?
20 Q. Yes.
21 A. Yes, sir.
22 Q. "Seroquel has over 8 million patient
23 exposures worldwide since it was approved for use in
24 1997.  While hyperglycemia-related adverse events
25 have been reported in patients taking atypical

**79**

REDACTED

17 Q. Let me show you what I'm going to mark as
18 Exhibit No. 11 to your deposition.
19     (Document marked as Exhibit 11
20         for identification)
21 Q. It's a document which is the "Weight and
22 Diabetes Sell Sheet."  By the way, you were shown
23 this particular document, weren't you?
24     MR. BROCK:  Object to the form.
25 A. I was what?

**81**

1  antipsychotics, including Seroquel, to date the
2  available data has not established a causal link
3  between diabetes and Seroquel."
4      Did I read that correctly?
5  A. That's correct, sir.
6  Q. And then it goes on to talk about
7  hyperglycemia, correct?
8  A. Right.
9  Q. And that's what you were being -- and do you
10 see the bottom paragraph here?  "Our objective is to
11 neutralize"?
12 A. The training thing is hyperglycemia and
13 diabetes is the same thing.
14 Q. I think some people draw a distinction.  Do
15 you see the bottom paragraph, "Our objective is to
16 neutralize customer objections to Seroquel's weight
17 and diabetes profile"?
18     MR. BROCK:  Object to form.
19 A. Yes.
20 Q. You are the customer, aren't you?
21 A. I'm the customer?
22 Q. Yeah.  Doctors --
23 A. I don't think I'm a customer.  I don't buy
24 anything from them.
25 Q. But the patients that you prescribe to --



82

1   A. They are the customers.
2   **Q. Through you?**
3   A. Yes.
4      (Document marked as Exhibit 12
5      for identification)
6   **Q. Let me show you what I will mark as**
7   **Exhibit 12 to your deposition. Is this a document**
8   **that you were provided while you were prescribing**
9   **Seroquel?**
10  A. I don't remember, sir.
11  **Q. Do you see this is a November 6, 2002,**
12  **document, after you stopped treating Ms. Guinn,**
13  **correct?**
14  A. That's correct, sir.
15  **Q. It's from a Lisa Lloyd-Washington, brand**
16  **director of Seroquel, correct?**
17  A. That's correct, sir.
18  **Q. The audience is hospital, long-term and**
19  **specialty care sales teams?**
20  A. Yes, sir.
21  REDACTED
22
23
24
25

83

1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18  **Q. Now, let me show you what I'm going to mark**
19  **as Exhibit 13 to your deposition.**
20     (Document marked as Exhibit 13
21     for identification)
22  **Q. This is one that I don't have extras of. I**
23  **just pulled it out. Sorry.**
24     MR. BROCK: Let me take a look at it.
25     MR. PIRTLE: This is a deposition

84

1   transcript. I'm sorry, there is another one
2   on there, too. You can look at both. Let
3   me have this one back.
4   **Q. Let me ask you before we read that, do you**
5   **know who David Brennan is?**
6   A. David Brennan? No, I don't.
7   **Q. All right. Evidence in this case will show**
8   **that David Brennan is the CEO of this entire**
9   **company.**
10  A. Okay.
11  **Q. Do you see the date on this document?**
12  A. The date?
13  **Q. Yes.**
14  A. June 20, 2008.
15  **Q. Yes, sir. On June 20, 2008, we had the**
16  **opportunity to depose Mr. Brennan in London,**
17  **England, at the headquarters of AstraZeneca. All**
18  **right? You can assume that.**
19     MR. BROCK: Object to the form.
20  A. Yes, sir.
21  **Q. Let's flip over to the next page. Do you**
22  **see on page 121, line 21?**
23  A. Yes, sir.
24  **Q. What's the question?**
25  A. "Does it cause diabetes?"

85

1   **Q. You can assume it's Seroquel from the**
2   **context. What's the answer?**
3     MR. BROCK: Object to the form.
4   A. "Seroquel has not been shown to cause
5   diabetes, no."
6   **Q. That's 2008, correct?**
7   A. That's correct, sir.
8   **Q. Let me show you what I'm going to mark as**
9   **Exhibit 14 to your deposition.**
10    (Document marked as Exhibit 14
11    for identification)
12  **Q. Do you know who Anthony P. Zook is?**
13  A. No, sir.
14  **Q. He goes by Tony Zook. Does that help you?**
15  A. Nope.
16  **Q. You can assume for purposes of these**
17  **questions that Tony Zook is the president and CEO of**
18  **AstraZeneca North America.**
19  A. Okay.
20  **Q. Which would be part of AstraZeneca that**
21  **sells to the United States. All right?**
22  A. Okay.
23  **Q. I'm going to show you page 201 of Mr. Zook's**
24  **deposition starting at line 17. I asked the**
25  **question. Can you read the question?**

86

1    A. "Truth is, the company's position during
2  this period of time was that the Seroquel doesn't
3  cause diabetes. Correct?"
4    Q. What's Mr. Zook's answer?
5    A. Correct.
6    Q. Does he go on to say anything else?
7       MR. BROCK: Object to form.
8    A. "My understanding at this time, and to this
9  point in time, that the data does not show a causal
10  relationship with Seroquel and diabetes."
11    Q. Now, turn over -- what's the date of that
12  deposition transcript?
13    A. June 6, 2008.
14    Q. Doctor, I have shown you documents starting
15  in 2001, before you prescribed this drug to my
16  client, I have shown you documents in 2002, I can
17  actually show you documents for every year, and I
18  went all the way up to 2008 with the top leadership
19  of this company answering a question about Seroquel
20  and diabetes. Isn't it fair to say that this
21  company was telling you that their product,
22  Seroquel, didn't cause diabetes?
23       MR. BROCK: Object to form.
24    A. I don't know. To be honest with you, I
25  don't know how to answer that. I don't think I was

87

1  told that, that it doesn't cause diabetes.
2       You know, I have always known that this
3  product and this illness -- these products and this
4  illness cause a high incidence of diabetes. Now, I
5  don't know if I have enough data to point my finger
6  at any single point. This is probably mostly
7  factorial.
8    Q. Well, did you --
9    A. The thing is that there is nothing new that
10  I didn't learn 25 years ago, 24 years ago, that
11  there is now. I mean, it's the same illness, we are
12  basically using the same drugs with less side
13  effects. I'm not swayed by the new data. There is
14  not that much difference in the way we treat these
15  people. We don't have any more choice. The perfect
16  drug doesn't exist.
17    Q. What I'm going to ask you sitting here today
18  is do you believe that Seroquel causes diabetes in
19  some people?
20       MR. BROCK: Object to form.
21    A. I don't think it's answerable. I can tell
22  you that people who are on antipsychotics and are
23  schizophrenic have a higher incidence of having
24  diabetes. Now, one specific drug, I could tell you
25  the same thing if they are on Haldol, which is a

88

1  50-year-old drug.
2    Q. I think I may understand what you are
3  getting at. What you are saying is the background
4  rate of diabetes is higher in this population in
5  general based on studies?
6    A. Right.
7    Q. And there is not a causal relationship
8  between schizophrenia and diabetes, but there has
9  been shown epidemiological studies to be an
10  association?
11       MR. BROCK: Object to form.
12    Q. Am I correct?
13    A. That's pretty much true.
14    Q. And most of the leading experts out there in
15  the field believe that this association, if real, is
16  probably an effect of lifestyle?
17       MR. BROCK: Object to form.
18    A. I think it's multifactorial.
19    Q. Schizophrenics are more apt to be
20  deconditioned than the normal healthy population?
21    A. Deconditioned in?
22    Q. In terms of being in less good physical
23  shape?
24    A. Yes.
25    Q. Poor diets?

89

1    A. Yeah. They tend to have poor health and
2  they tend to die younger.
3    Q. And what you are saying and what you mean to
4  convey, I believe, with the antipsychotics and
5  diabetes is you are talking about that background
6  rate is higher in the population in general?
7    A. Yeah. Basically I'm saying for me to find a
8  schizophrenic with diabetes with any medication they
9  are on does not surprise me. As I say, but it
10  doesn't -- to me it doesn't make a difference if
11  it's A, B, C, or D. In my experience I have seen
12  the same thing that I'm seeing now. I was seeing it
13  before these medications existed when the old
14  medications existed, so I haven't seen a difference.
15    Q. All right. You are talking about the
16  diabetic?
17    A. In diabetics. Schizophrenics in general
18  have a high incidence of diabetes, and I think a lot
19  of it is their lifestyle is slow, and they all tend
20  to gain more weight than they need to, and they
21  don't exercise very much.
22    Q. So let me see if I understand. Back during
23  the day when you were using the first-generation
24  antipsychotics, you saw schizophrenics that had
25  diabetes?

23 (Pages 86 to 89)

90

1    A. That's correct.
2    Q. Now, since you have been using the second
3  generation of antipsychotics, you see schizophrenics
4  and they have diabetes?
5    A. That's correct.
6    Q. You are saying that schizophrenics are more
7  apt to get diabetes?
8        MR. BROCK: Object to form.
9    A. I think the combination of the schizophrenia
10  with the antipsychotics causes a higher incidence of
11  diabetes. What I'm saying is that I have a very
12  hard time pointing out to one, because I could
13  probably pull out all my files and I could -- I
14  probably have more or less the same rate of diabetes
15  with any medication that you pull out.
16    Q. Any second-generation antipsychotic?
17    A. No. I go back to the first generation.
18    Q. Any first or second generation?
19    A. Yes. I trained in the period of first
20  generation, so I have enough experience with first
21  generation to where it's -- I haven't seen a big
22  difference.
23    Q. Let me move and talk to you about another
24  area. What's important to me now is what you were
25  told by this company at this point in time. Did you

92

1    Q. Is that fair?
2        MR. BROCK: Object to form.
3    A. Have they told me directly that their
4  product is --
5    Q. Yes.
6    A. They told me when the new labeling came.
7    Q. Okay.
8    A. I remember a rep telling me. I think, as a
9  matter of fact, almost all the reps, different reps,
10  came in and told me.
11    Q. What new labeling?  '04?
12    A. I believe it was '04, yes.
13    Q. Well, in 2002 do you remember asking
14  questions of the company where they sent you written
15  correspondence?  "The company" being AstraZeneca?
16    A. Do I remember it?
17    Q. Yes.
18    A. I don't remember it, no.
19    Q. Let me show you what I'm going to mark as
20  Exhibit No. 15 to your deposition.
21        (Document marked as Exhibit 15
22          for identification)
23    Q. These are Bates numbered documents produced
24  by AstraZeneca.
25    A. Yes, sir.

91

1  from time to time ask questions of the company,
2  AstraZeneca, about Seroquel?
3    A. Let me tell you something, to me what the
4  company tells me has very little value. To me the
5  professor at such and such university who has done
6  20 studies with this medication and when I have
7  three of them and four of them with different
8  things, and they have used ten medications, that's
9  what has -- that's who I listen to.
10      I don't listen to drug companies. Drug
11  companies they have to sell their drugs. That's
12  their job. I cannot rely on that. I rely on what
13  the scientific community tells me. I don't rely on
14  what a 22-year-old kid comes in here and tells me.
15    Q. I understand that. I will move back to the
16  scientific community in time context in a minute. I
17  appreciate what you have to say about that.
18  Actually, I'm eager to talk to you about it.
19      However, what I want to nail down now is
20  when you had communications with this company, and
21  they had an opportunity to explain or to warn you
22  about whether or not Seroquel causes diabetes, when
23  you asked your questions, they did not tell you that
24  their product was associated with diabetes?
25        MR. BROCK: Object to form.

93

1    Q. If you will, please turn to page 204 of the
2  disclosure.
3        MR. BROCK: Can I get one more of those?
4        MR. PIRTLE: Probably.
5    Q. 204 on the Bates number, Doctor.
6        MR. BROCK: Mine are all 291.
7    A. Okay.
8    Q. I'm sorry.
9        MR. BROCK: I think these don't have --
10  I think they all have the same number.
11        MR. PIRTLE: They all have the same
12  Bates number?
13    Q. Do you see page 204 down at the bottom?
14  Right down here. Turn over to page 204.
15    A. Yes, sir. Okay.
16    Q. What is 204?
17    A. "Dear Dr. Nodal, Your Pharmaceutical Sales
18  Specialist, Manuel L. Vazquez, has forwarded your
19  request for information regarding Seroquel. The
20  following information is attached for your review.
21      "The attached information is supplied to
22  you as a professional courtesy in response to your
23  request. It is intended to provide pertinent data
24  to assist you in forming your own conclusions and
25  making decisions."

24 (Pages 90 to 93)

94

1    Q. Sir, do you recognize the document that
2  starts at page 204?
3    A. I don't remember this document, sir.
4    Q. Do you remember Manuel Vazquez?
5    A. No, sir.
6    Q. Do you see that it looks like there has been
7  a question and information sent back to you on
8  Seroquel used in combination with other
9  antipsychotics?
10    A. Yes, use in combination.
11    Q. This document is dated July 2, 2002, just
12  after -- about a month after you had been treating
13  Ms. Guinn, correct?
14    A. That's correct, sir.
15    Q. And you say there is information attached to
16  the back, and it goes through and talks about
17  various studies, correct?
18    A. Yes, sir.
19    Q. Then attached to that on the back there is a
20  label, correct?
21    A. A label?
22    Q. There is a label on the back of it.  One
23  more page deep, I believe.
24    A. 291?
25    Q. 209.

95

1    A. 209?  Yes.
2    Q. And this label --
3    A. Was this what they sent me at this time?
4    Q. That's what I was going to ask you.  The
5  company has produced this as documents that were
6  sent to you.  Do you have any reason to dispute that
7  you got the document?
8    A. I don't remember it, but I have no reason to
9  dispute that I received the document, sir.
10    Q. Now, in terms of the prescribing information
11  that is attached, which starts at 209 --
12    A. Yes, sir.
13    Q. -- in terms of warnings or precautions,
14  there is no mention of diabetes, hyperglycemia, or
15  weight gain.  Can we agree to that?
16    A. That's correct, sir.
17    Q. Turn over to page 211.  Do you see there is
18  another letter dated August 20, 2002?
19    A. Yes.
20    Q. Looks like this is a letter that was sent to
21  you answering the questions doses greater than
22  800 milligrams a day?
23    A. Yes.
24    Q. Do you remember this letter?
25    A. I don't remember it, sir.

96

1    Q. Do you have any reason to dispute getting
2  it?
3    A. No.  Because this is something that I might
4  ask that I have asked of some medications, so it's
5  very possible that I could have asked.
6    Q. Will you turn over to page 215.  And I will
7  ask you to confirm for me and the jury that there is
8  no warning or precaution about diabetes and weight
9  gain given in this prescribing information.
10    MR. BROCK:  Form.
11    A. It's the same one, right?
12    Q. Correct.
13    A. So, no, sir.
14    Q. And there is others, but the next one comes
15  in 2006, and it's a ways out in terms of time frame,
16  so I'm going to leave it alone.
17    A. Yes.
18    Q. Now, let's go back to Ms. Guinn for a
19  minute.  Will you look at the hospital records now.
20    A. Yes, sir.
21    Q. I want to see if I understand -- turn to
22  page 39, which you talked about with the AstraZeneca
23  lawyer.
24    MR. BROCK:  You can refer to me as
25    Mr. Brock, if you don't mind.

97

1    MR. PIRTLE:  Mr. Brock, the AstraZeneca
2  lawyer.
3    MR. BROCK:  I guess that's better.
4    A. I'm sorry?
5    MR. PIRTLE:  I normally say company
6  lawyer.
7    MR. BROCK:  Thank you.
8    MR. PIRTLE:  But you are complaining
9  now.
10    Q. Page 39.
11    A. Where?
12    Q. It's your admission note.
13    A. Admission note?
14    Q. Yes, sir.
15    A. I have got it right here.  I'm not finding
16  it.
17    Q. Well, we have become a little disorganized.
18    MR. BROCK:  It's 39 in that big stack.
19    THE WITNESS:  In this big stack here?
20    MR. BROCK:  Um-hm.  Is that your set or
21  our set?
22    THE WITNESS:  That should be your set.
23    MR. BROCK:  Okay.
24    Q. Do you remember going over this with
25  Mr. Brock, the company lawyer?

25 (Pages 94 to 97)

102

1  litigation over Seroquel at that point in time in
2  2002?
3      A. No, not at all. I can't tell you exactly,
4  because I don't know, but if I did this, I was
5  suspecting something from this lady.
6      Q. Well, she had been placed in the hospital
7  and been in four-point restraints at some point in
8  time, correct?
9      A. Yes.
10     Q. And you deemed that necessary or the
11 hospital deemed it necessary?
12     A. Yes.
13     Q. I better be more specific.
14     A. I think that was before I even started
15 treating her.
16     Q. Right. After you started treating her, she
17 wasn't in four-point restraints?
18     A. That's correct.
19     Q. At that time when she came in when she was
20 overdosed on whatever medication she overdosed on,
21 she needed to be restrained?
22         MR. BROCK: Object to form.
23     A. That's correct.
24     Q. And you felt like you needed to document
25 this case a little bit better probably because of

103

1  that, correct?
2      A. I can't tell you exactly why, but there was
3  something in her nature that I must have seen that I
4  saw this lady is litigious. I did not do what I
5  usually do with the discharge summaries.
6      Q. All right.
7      A. I don't know why. I wanted to make sure to
8  document everything that I did at that time.
9      Q. And typically if you have somebody that you
10 put in four-point restraints, would that be a time
11 that you would document it?
12     A. No, sir. I would document by hand, but not
13 dictate a discharge summary, because that was a
14 service that the hospital gave. It was very
15 convenient for us.
16     Q. When you say it's a service that the
17 hospital gave, sometimes they would dictate --
18     A. No. The hospital at that time would give
19 the service when we discharge. A dictating service
20 would pick up and would dictate the discharge
21 summary for us.
22     Q. You would have a service dictate and you
23 would look over it?
24     A. Exactly. We would have to sign it off, we
25 can add or --

104

1      Q. At the point in time after she came down off
2  of this overdose of this prescription medication and
3  she went to the psychiatric floor, she did that
4  voluntarily, didn't she?
5          MR. BROCK: Object to the form.
6      A. Voluntarily?
7      Q. Yes.
8      A. Sure.
9      Q. Because she wanted help?
10     A. I don't know why. I don't know if she
11 wanted to die at that time or -- most people who
12 overdose is because they want to die.
13     Q. Well, there are more effective ways of
14 killing yourself than taking an overdose of Geodon
15 or Prozac?
16     A. People don't know that. You know that and I
17 know that.
18     Q. Now, you said that you would rather have
19 your information coming from doctors who had done
20 studies. Going back to this time period of May
21 2002, you didn't have any information from doctors
22 who had done studies as to its propensity to cause
23 diabetes, correct?
24         MR. BROCK: Object to form.
25     A. Nothing different than the normal

105

1  antipsychotic side effects that we expect.
2      Q. There were some studies out there on
3  antipsychotics, correct?
4      A. Sure.
5      Q. And there was definitely some studies out
6  there on the second-generation antipsychotic Zyprexa
7  in 2002, correct?
8          MR. BROCK: Form.
9      A. That's correct.
10     Q. In 2002 when you were treating Ms. Guinn, as
11 far as the scientific community is concerned, you
12 hadn't received any publication or seen any lectures
13 that you can point out --
14     A. Linking it directly with it, no.
15     Q. Or associating directly with it?
16     A. That's correct.
17     Q. Now, this company sold you hard on the fact
18 that Seroquel wasn't related, particularly during
19 the time, wasn't related to diabetes particularly
20 during the time when Zyprexa was under such fire
21 about diabetes and its association with it, didn't
22 it?
23         MR. BROCK: Object to the form.
24         You may answer.
25     A. I'm sorry, repeat the question.

27 (Pages 102 to 105)

106

1    Q. Sure. I said this company sold you on their
2    drug as opposed to Zyprexa on the --
3    A. No company sells me.
4    Q. All right.
5    A. I hear them. I'm very pleasant to them.
6    Q. Let's go through some of these call notes
7    which begins on what page? 115. Turn to page 115
8    of Exhibit No. 15.
9    A. Fifteen of 15?
10        MR. HUNGER: Yes, sir. It's this one,
11       sir. It's to your left hand, sir. Right
12       there.
13        THE WITNESS: I got it.
14   A. Yes, sir.
15        MR. PIRTLE: It's the same thing only
16       condensed, Chuck?
17        MR. BROCK: 115, 8/25/97 is the first
18       entry?
19        MR. HUNGER: Tom, do 116.
20   Q. Go to 116.
21   A. Okay.
22   Q. Let's pick up with 116, Doctor. Let me
23   first ask you, you said a couple of times in here
24   this company details you four or five times a year.
25   Do you remember the testimony?

107

1    A. Yes, sir.
2    Q. That's not true, is it? They detailed you a
3    whole lot more than that?
4    A. Well, I'm telling you recent times. I can
5    tell you that the recent times now it might not even
6    be four or five times a year.
7    Q. We will go forward to recent time. But
8    right now I want to point out entry No. 4, which is
9    a --
10   A. What year was what?
11   Q. 2000 entry, 3/09/2000.
12   A. Okay.
13   Q. And then above it is a 2/17/2000 entry. Do
14   you see?
15   A. I see the entries here.
16   Q. I'm going to show you how these work.
17   A. I got it.
18   Q. On entry No. 3 you see the full name of the
19   physician appears in the second column?
20   A. Yes.
21   Q. That's you, isn't it? Nodal?
22   A. Yes, that's me.
23   Q. And then the sales rep is Martinez under
24   section J?
25   A. Yes.

108

1    Q. The date is 2/17/2000, and it's a sit-down
2    detail?
3    A. Yes.
4    Q. It says, "Duara's presentation, need samples
5    as soon in. Will not attend tiger movie. Reinstein
6    weight gain risk." Below that it says Reinstein and
7    eps.
8    A. What's Reinstein?
9    Q. That's what I'm going to show you. And then
10   Reinstein weight gain. Do you see that?
11   A. Um-hm.
12   Q. Let me show you Exhibit 16 to your
13   deposition.
14        (Document marked as Exhibit 16
15         for identification)
16   Q. Do you see that this is an excerpt from a
17   patient case study from Michael J. Reinstein?
18   A. Yes.
19   Q. Do you know Dr. Reinstein?
20   A. I don't know him personally, no.
21   Q. It appears here that this was discussed with
22   you, if the sales representative was being honest
23   with the company, correct?
24        MR. BROCK: Object to the form.
25   A. Is that what we are talking about?

109

1    Reinstein?
2    Q. Yes, sir.
3        MR. BROCK: Object to the form.
4    Q. It was back in 2000.
5    A. Yes, sir.
6    Q. Turn over to the second page of the
7    Reinstein exhibit.
8    A. Second page, yes.
9    Q. Do you see down in the very fine print on
10   the left-hand side of the page it says, "1999
11   Zeneca, Inc."?
12   A. Yes, sir.
13   Q. And then there is a patient presentation of
14   past medical psychiatric history and a personal
15   history?
16   A. Yes.
17   Q. There is a 49-year-old white male with a
18   long-standing history of psychiatric
19   hospitalizations going back to age 25?
20   A. Yes, sir.
21   Q. Various diagnoses including acute
22   schizophrenia, paranoid schizophrenia, bipolar
23   disorder, and schizoaffective disorder?
24        MR. BROCK: Object to form.
25   A. Yes, sir.

28 (Pages 106 to 109)

110

1    Q.  This patient here had a history of alcohol
2  abuse, correct?  Are you with me?
3    A.  I don't see.
4    Q.  Third bullet point.
5    A.  If you say so I will believe you.
6    Q.  It's the left-hand side, top, third bullet
7  point.
8    A.  Okay.
9    Q.  A lot of folks with psychiatric illnesses
10 have a history of substance abuse, isn't that true?
11   A.  A lot of people have a history of what?
12   Q.  A lot of people that have psychiatric
13 illnesses have a history of substance abuse?
14   A.  Yes.
15   Q.  It goes on to talk about the patient had
16 been hospitalized.  Let's turn on over to the mental
17 and physical evaluation, which is on the next page.
18   A.  Okay.
19   Q.  Hold on.  Let's skip that and go to the next
20 page so I can get through this.
21   A.  Okay.
22   Q.  It says -- I think the only thing of import
23 in the preceding page was that the patient was on
24 olanzapine and gained weight and had diabetes.
25 Olanzapine is for?  Olanzapine therapy was

111

1  discontinued to weight gain and development of
2  diabetes.  Do you see that?
3    A.  Yes, sir.
4    Q.  "Seroquel was instituted at 150 milligrams a
5  day for one week."
6        Did I read this correctly?
7    A.  Yes.
8    Q.  "The Seroquel dose was increased to
9  300 milligrams a day where it remains."
10   A.  Yes, sir.
11   Q.  "Response to Seroquel," do you see that?
12   A.  Yes.
13   Q.  "The patient has shown a positive response
14 to Seroquel, becoming more spontaneous, more
15 interested in his surroundings, and has demonstrated
16 improved interactions with others."
17       Did I read that correctly?
18   A.  That's correct.
19   Q.  "Blood glucose levels were brought under
20 control, permitting the substitution of an oral
21 hypoglycemic agent for insulin treatments."
22   A.  Yes, sir.
23   Q.  And then it says, "Metabolic stability was
24 maintained, allowing the patient to discontinue the
25 hypoglycemic agent and return to a normal diet."

112

1    A.  That's correct.
2    Q.  "Not only did the patient not gain weight
3  with Seroquel, he lost approximately 8 of the
4  10 pounds he had gained while on olanzapine."
5        Did I read that correctly?
6    A.  That's correct.
7    Q.  Then over on the right-hand side there is a
8  quote from Michael Reinstein, M.D., correct?
9    A.  Yes.
10   Q.  "We have found Seroquel to be ideal in
11 patients who have problems with weight gain and, due
12 to this, the development of diabetes.  In this
13 patient, since olanzapine was discontinued and
14 Seroquel was started, the weight was lost, the
15 diabetes resolved, and the patient was able to stop
16 taking hypoglycemic medication.  In our experience,
17 weight gain is not an issue with Seroquel, unlike
18 some other antipsychotic medications."
19       Did I read that correctly?
20   A.  That's correct.
21       MR. BROCK:  What number was that?
22       MR. BRUDNER:  That was 16.
23       MR. BROCK:  Thank you.
24   Q.  Now, Michael Reinstein is thought to be a
25 leader in the psychiatric community, isn't he?

113

1    A.  I don't know him.
2    Q.  What did you think when you were provided
3  this document in 2000?
4        MR. BROCK:  Object to the form.
5    A.  I don't remember the document, sir.
6    Q.  Let me see if we can agree.  In 2008 this
7  document certainly does not implicate Seroquel in
8  the development of diabetes, does it?
9        MR. BROCK:  Object to the form.
10   A.  That's correct.
11   Q.  In fact, it implicates olanzapine, Zyprexa
12 in weight gain and diabetes.  In this particular
13 case report from this doctor, the patient was taken
14 off of the olanzapine, Zyprexa, put on Seroquel, and
15 the problems with both weight gain and diabetes
16 resolved, correct?
17       MR. BROCK:  Object to form.
18   A.  Yes.
19   Q.  As a reasonably intelligent doctor sitting
20 here today, or as an intelligent doctor sitting here
21 today, you can see, can't you, and will admit that
22 the purpose of this particular article is to point
23 out that hey, Seroquel is better in terms of weight
24 gain and diabetes than olanzapine/Zyprexa?
25       MR. BROCK:  Object to form.

29 (Pages 110 to 113)

114

1    Q. Right?
2    A. Yes.
3    Q. Would you expect that if you were provided
4  information from a learned colleague, so to speak,
5  or somebody that's a representative of a learned
6  colleague, that the company would have a high
7  respect for the doctor that they quote?
8    A. Yes.
9    Q. It's only fair that if they are going to
10  provide information to the medical community from a
11  doctor, that they ought to believe the doctor's
12  work, right?
13    MR. BROCK:  Object to form.
14    A. Yes.
15    Q. And it would be disingenuous of a company to
16  use a doctor that they think is a hack just to try
17  to sell a product to people that like to listen to,
18  as you say, the medical community versus reads PDR?
19    MR. BROCK:  Object to form.
20    A. That's correct.
21    Q. Let me show you this document, Exhibit 17.
22    (Document marked as Exhibit 17
23        for identification)
24    Q. I won't ask you to read all of Exhibit 17,
25  but will you confirm that this document is dated

115

1  November 5, 2001, from Don Beamish?
2    A. Um-hm.  Who is Don Beamish?
3    Q. He was a brand director for Seroquel at one
4  time.  He held various positions, but he was upper
5  mid-level management on the Seroquel project.
6    Doctor, we deposed him, and this is his
7  document.  Attached is a response document,
8  "Reinstein Letter and Backgrounder."  Do you see
9  that?
10    A. Yes, sir.
11    Q. Turn over to the last page of this document
12  that starts with a background letter from Michael
13  Reinstein, et al., to D. Brennan dated October 23,
14  2001.
15    A. Okay.
16    Q. Now, Michael Reinstein or M. Reinstein is
17  the author of Exhibit 16, correct?
18    A. That's correct.
19    Q. It says, "Background: Letter.  This group
20  does generate a significant amount of Seroquel sales
21  for us."
22    Did I read that first sentence
23  correctly?
24    MR. BRUDNER:  On the last page?
25    Q. Last page.  First sentence, last page.

116

1    A. Okay.
2    Q. Are you with me?
3    A. Yes.
4    Q. Go down to the fourth paragraph.  Starts off
5  "Our Clinical."  Are you with me?
6    A. Yes.
7    Q. "Our Clinical colleagues have significant
8  and numerous issues in past with the quality of
9  research that this group has produced in the past."
10    Did I read that correctly?
11    A. That is correct.
12    Q. "Matters such as not getting informed
13  consent from study participants, modification of
14  protocols without permission, etc has made the
15  business understandably reluctant to place studies
16  with this group."
17    Did I read that correctly?
18    A. Yes.
19    Q. Go on down two paragraphs.  It starts,
20  "Drs. Reinstein and Chasnov are prolific speakers on
21  our behalf and are particularly with prescribers
22  outside the Chicago regional area."
23    Did I read this correctly?
24    A. Um-hm.
25    Q. "Because of their importance to our

117

1  business, they have had an extraordinary amount of
2  attention given to them."
3    Did I read that correctly?
4    A. Yes.
5    Q. It would be absolutely unfathomable and
6  disingenuous to use research from a doctor that you
7  think is a hack to try to promote Seroquel sales
8  among doctors of your ilk and not tell you, right?
9    MR. BROCK:  Object to the form.
10    A. Yes.
11    Q. Now, have you had speaker training from
12  AstraZeneca?
13    A. I don't think so, sir.  It's possible, but I
14  don't think so.
15    Q. Turn back to page 116.
16    MR. PIRTLE:  What exhibit is it, Chuck?
17    Q. You have your left elbow on it, of
18  Exhibit 15.  You are at it, I believe.
19    A. 116?
20    Q. I believe you are.  I believe it's open to
21  116.
22    A. Okay.  Yes.
23    Q. Remember I started and we looked at the
24  detail with Reinstein?
25    A. Yes.

30 (Pages 114 to 117)

118

1    Q. Will you go down to the ninth line. It's an
2  entry dated 7/06/2000.
3    A. Ninth line?
4    Q. Number 9 line. They are numbered.
5        MR. BRUDNER: On the left column?
6    A. Yes.
7    Q. Do you see over the message on the
8  right-hand side?
9    A. Minimal weight gain?
10   Q. Yes. Is it fair to say that this sales
11 representative is being genuine in the entries that
12 you were detailed on the fact that Seroquel had
13 minimal weight gain?
14       MR. BROCK: Object to form.
15   A. The question, I'm sorry?
16   Q. Is it fair to say if this sales
17 representative was being honest in these entries,
18 you were detailed on Seroquel having minimal weight
19 gain?
20   A. Right. Okay.
21   Q. Turn over to page 118. Turn over to page
22 118. Do you see entry 73?
23   A. Yes.
24   Q. Do you see that there is a notation down
25 there for you?

119

1    A. Yes.
2    Q. Dr. Nodal from Manuel Vazquez, who is the
3  same person in the information that was sent to you,
4  correct?
5        MR. BROCK: Object to form.
6    A. Yes.
7    Q. It's dated 12/06/2001, correct?
8    A. Yes.
9    Q. And that's two days less than 6 months from
10 the date when you started treating Ms. Guinn?
11   A. Yes.
12   Q. And do you see under the call notes?
13   A. Yes.
14   Q. "Does not feel comfortable yet with
15 Seroquel. Stated that he would keep it on his mind
16 when he sees smoking schizophrenic patients."
17       Did I read that correctly?
18   A. Smoking schizophrenic patients.
19   Q. That's what it says. Do you have any memory
20 of that?
21   A. No, sir.
22   Q. Turn to the next page.
23   A. What is a smoking schizophrenic patient?
24   Q. I guess a schizophrenic that smokes.
25       Turn to the next page and let's go to

120

1  81.
2        MR. BROCK: Object to form.
3    A. Okay.
4    Q. Do you see the entry for 81 and the date on
5  this entry is 2/04/2002?
6    A. Yes.
7    Q. It's really the top entry on the page.
8    A. Yes.
9    Q. This was a detail with a Maria Martinez. Do
10 you remember Ms. Martinez?
11   A. I'm sorry, I don't.
12   Q. "Sit down call. Loves Seroquel for
13 elderly."
14       Was that true for the elderly
15 population?
16   A. Yeah, I like it.
17   Q. Then it says, "Talked about" -- it's
18 misspelled -- "clean SE profile."
19   A. Side effect profile.
20   Q. And then go down to No. 86.
21   A. Eighty-six in?
22   Q. The same page. This is Manuel Vasquez on
23 2/07. That's 3 days after the visit on 2/04.
24   A. Okay.
25   Q. "Discussed possibility of case study

121

1  presentation."
2        Were they talking to you about doing
3  case study presentations?
4    A. That's possible. I don't remember these
5  specifics. I don't even remember these reps. The
6  thing is that the reps change so much, and there are
7  so many and so many companies, I don't -- unless
8  it's a person that comes the same person for a long
9  time, I don't. I can't -- I really can't tell you
10 who they are.
11   Q. Now, looking at these entries and the time
12 period building up to Ms. Guinn's prescription of
13 Seroquel, it looks to me like you were getting
14 visited pretty regular by these folks from
15 AstraZeneca; is that fair?
16   A. Yes, sir.
17   Q. There is some entries where they are in
18 there every third day, right? I just showed you
19 one?
20   A. Yes.
21   Q. And they wanted you to use the product,
22 right?
23   A. I imagine so.
24   Q. And they hyped the lack of side effects, and
25 they hyped the minimal weight gain, according to

31 (Pages 118 to 121)

122

1 their own notes, correct?
2     MR. BROCK: Object to the form.
3 A. Yes.
4     Q. And you were afraid of using Seroquel in
5 high doses, weren't you?
6 A. Apparently, yes. At the beginning, yes.
7     Q. Do you remember why?
8 A. Probably just because the product was rather
9 new and I didn't have that much experience with it.
10     Q. And you believe that your schizophrenic
11 patients didn't respond well to Seroquel, didn't
12 you?
13 A. That's apparently -- yeah, apparently that's
14 what I was thinking at that time, yes.
15     Q. You had some problems with the product
16 during 2001, 2002, in that time frame, right?
17     MR. BROCK: Object to form.
18 A. Importantly from what I'm reading there I
19 wasn't getting good response from low doses.
20     Q. Well, let me ask you now: Did there become
21 a time when you became more friendly with this
22 company, AstraZeneca?
23     MR. BROCK: Object to the form.
24 A. Sir, I don't remember ever having any
25 relationship with them. If I did it's possible, but

123

1 I don't even remember doing talks for them. It's a
2 possibility, but I don't remember it.
3     Q. What I'm curious about --
4 A. These people, as I tell you, these people
5 hardly visit me for -- these records show they
6 visited me quite often. If you look at the records
7 for the past few years, it's very little, as a
8 matter of fact.
9     Q. Well, what I'm curious of, and maybe you
10 could help me out --
11 A. As a matter of fact, if you look at my
12 records of how much I use the product, this period,
13 as you see it stated there, is probably the period
14 of time where I was using it the least.
15     Q. Sure.
16 A. When they were visiting me the most.
17     Q. They were chipping on you at that time to
18 use it, right?
19     MR. BROCK: Object to the form.
20     Q. You know what that means, you were from
21 Waco. They were chipping on you to use it?
22     MR. BROCK: Object to the form.
23     Q. Weren't they?
24 A. All these companies wanted you to use their
25 product. They are not any different.

124

1     Q. There came a time, did there not, when they
2 started paying you?
3 A. I don't remember. It's a possibility that I
4 spoke for them, but I don't remember. I can tell
5 you that if I did, it was a long time ago, because I
6 don't remember.
7     Q. Turn over to page entry 497.
8     MR. PIRTLE: Chuck, tell him the page.
9     MR. HUNGER: Page 136, sir.
10 A. Yes.
11     Q. Do you see that there is an entry for this
12 Manuel Vasquez visiting you again in a sit-down
13 call?
14 A. What number?
15     Q. 497.
16 A. Yes.
17 REDACTED

125

REDACTED



**126**

REDACTED

19    Q. Were you interested in speaking for these
20 folks for money?
21       MR. BROCK: Object to form.
22    A. Yes. What's wrong with that?
23    Q. I'm not saying there is anything wrong with
24 it. I'm pointing it out. You had developed as of
25 '04 a relationship where you were willing to speak

**127**

1 with them?
2       MR. BROCK: Object to form.
3    A. Yes. I have been a speaker for many
4 medications, sir. I'm presently a speaker for
5 Lexapro.
6    Q. Let's turn over to entry 633.
7       MR. HUNGER: Page 143.
8    A. 633?
9 REDACTED
18    Q. Were you upset with these folks?
19    A. It's possible if they came in here with
20 20 patients in there, and I don't like to be asked a
21 lot of questions. I say please tell me what you
22 need to tell me -- I don't appreciate somebody
23 standing here when I have 20 patients out there, and
24 that happens sometimes. That could have been one of
25 the cases.

**128**

1    Q. Well, you were upset with them because they
2 didn't make you a speaker or they didn't recertify
3 you as a speaker, weren't you?
4    A. I don't know.
5 REDACTED

**129**

REDACTED

22    Q. You had already been educated, hadn't you?
23       MR. BROCK: Object to form.
24    A. When I speak for a product, I know the
25 product inside and out.



130

1   Q. Sir, AstraZeneca doesn't let a speaker speak
2   for them unless they have had speaker training?
3       MR. BROCK:  Object to form.
4       A. You have to have speaker training.
5       Q. You have to have speaker training and you
6   have to use their materials?
7       A. I know I haven't spoken for them for a long
8   time, and my use of it has not wavered.  I probably
9   still use it more than any other product.
10      Q. Let's keep on going to entry 706.
11      A. The sales stuff is the sales stuff.
12  REDACTED

131

REDACTED

6       Q. I understand.
7       A. I don't think I have done anything for them
8   in years.  I don't remember -- as a matter of fact,
9   I know there is only one product that I speak for at
10  this time.
11  REDACTED

132

REDACTED

133

REDACTED



**134**

REDACTED

2   Q.  Well, the truth is these drug companies will
3   pay doctors for sales representatives to follow them
4   around for a half day or day, and they call that a
5   preceptorship, and they are granted an honorarium
6   for it, correct?
7         MR. BROCK:  Object to form.
8   A.  Yes.
9   Q.  And the honorarium will go to the doctor,
10  right?
11  A.  Yes.
12  Q.  Do you remember a preceptorship with Mary?
13  A.  That's correct.  She went with me to a
14  nursing home once.  She spent an afternoon with me.
15  Q.  And they will pay you several hundred
16  dollars for that, right?
17  A.  No.  It was minimal.
18  Q.  400?
19  A.  I think it was less than that.
20  Q.  You may not have got the going rate.
21        MR. BROCK:  Object to form.

REDACTED

**135**

REDACTED

**136**

REDACTED

**137**

REDACTED

138

REDACTED

9　　Q. Now, isn't it fair to say that even going
10　into late 2005 after the class warnings had changed
11　concerning diabetes -- I mean, excuse me, glycemic
12　disregulation and the class of second-generation
13　atypical antipsychotics, that this company was
14　making calls to you still trying to neutralize
15　questions of whether Seroquel could cause weight
16　gain?
17　　　　MR. BROCK:  Object to form.
18　　A. There is entries that state that, sir, yes.
19　　Q. And you don't disagree that's what they were
20　doing, do you?
21　　　　MR. BROCK:  Object to form.
22　　A. Like I say, I don't remember most of these
23　visits, but if they wrote it down.  I don't agree
24　with everything that they have written down.
25　　Q. Go to 910.

139

1　　A. But it's written.  I can't tell you.  I
2　don't even remember Silvia Parrott.  If you brought
3　her in front of me, I'm sure I can recognize her
4　right away, but right now I don't know who she is.
5　　Q. You met with Ms. Parrott a whole lot more
6　than you met with Ms. Guinn, didn't you?
7　　　　MR. BROCK:  Object to the form.
8　　A. Yes.
9　　Q. A lot more?
10　　A. Yes.  But it's not the same relationship
11　with a drug rep as a patient.  It's a completely
12　different relationship.
13　　Q. 910.
14　　A. I want the drug rep to get out of here.
15　REDACTED

140

REDACTED

2　　Q.  Now, you know as a practicing doctor that
3　the general perception out there in the community is
4　that Abilify doesn't cause the kinds of weight gain
5　that Seroquel does, don't you?
6　　　　MR. BROCK:  Object to form.
7　　A.  That Abilify doesn't cause the weight gain?
8　　Q.  The weight gain that Seroquel does.
9　　　　MR. BROCK:  Object to form.
10　　A.  Um-hm.
11　　Q.  You know that, don't you?
12　　　　MR. BROCK:  Object to form.
13　　A.  Yes.
14　REDACTED

141

REDACTED

2　　Q.  Were you aggravated with this company at
3　this point in time, Doctor, trying --
4　　A.  I don't get aggravated with people.  But I
5　can see, again, if you put here in front of me, I'm
6　sure I would know who she is.  I don't remember her,
7　but there is something going on with this lady that
8　she keeps -- I'm very rarely rude.  For me to be
9　rude to a drug rep, they have to be really out of
10　control.
11　REDACTED





142

1 REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

144

1 REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

143

1 REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

145

1 REDACTED
2
3
4
5
6
7
8
9
10
11
12 **Q. So when you told the AstraZeneca lawyer,**
13 **Mr. Brock, that the sales representatives to your**
14 **knowledge hadn't lied, now you can tell me,**
15 **Mr. Pirtle, that they are liars?**
16     MR. BROCK:  Object to the form.
17   A. In that respect, yeah, they have.
18 **Q. If they lie about one thing, they will lie**
19 **about something else, right?**
20     MR. BROCK:  Object to the form.
21 **Q. Been your experience in life?**
22     MR. BROCK:  Object to the form.
23   A. I don't know about that.  But I can tell you
24 that they have lied on the form here, because I do
25 not ask about -- I'm sure that I inquired about it,



146

1  because I have spoken with them.  And the fact that
2  I have experience with the product, and the fact
3  that I write the product a lot, so I feel like I'm
4  very qualified to speak for them.  On an ongoing
5  basis like this has been written, but that's not so.
6     **Q. So they are falsifying records they are**
7  **submitting to the company?**
8         MR. BROCK:  Object to the form.
9     **Q. That make you look bad?**
10        MR. BROCK:  Object to the form.
11    A.  True.
12    **Q. Well, speaking of perks, have you ever been**
13 **to Sunny Isles, Florida?**
14    A.  Sunny Isles, Florida?
15    **Q. A resort.**
16    A.  Sunny Isles, Florida?  I have heard of Sunny
17 Isles.  I don't know if I have been there.
18    **Q. Did this company ever take you to Sunny**
19 **Isles, Florida?**
20    A.  Sunny Isles, Florida?
21    **Q. A resort in Sunny Isles, Florida.**
22    A.  I don't remember.  I don't remember that,
23 sir.
24    **Q. Did you know you gave a talk at a resort in**
25 **Sunny Isles, Florida -- at a restaurant in Sunny**

147

1  Isles, Florida?
2     A.  When?
3     **Q. March of '07.**
4     A.  March of '07 for Seroquel?
5     **Q. Um-hm.**
6     A.  March of '07?
7     **Q. March of '07.**
8     A.  Does it say the name of the place?
9     **Q. I will see if I can find it.  No, I don't**
10 **see the name of the restaurant.**
11    A.  I don't remember that, sir.  It's a
12 possibility.  I don't remember speaking for Seroquel
13 in years.
14    **Q. I will see if we can't find it.  Let me now**
15 **direct your attention to entry 1093.**
16    A.  1093?  Yes.
17 REDACTED
18
19
20
21
22
23    **Q. What they were saying as late as '07, to**
24 **you, Doctor, was that this class warning -- Seroquel**
25 **had to put the class warning on there because of**

148

1  reports from other atypical antipsychotics, and
2  **their's was the best and safest?  That's true, isn't**
3  **it?**
4         MR. BROCK:  Object to form.
5     **Q. As late as '07.**
6         MR. BROCK:  Object to the form.  What
7  number entry is this?  I'm sorry.
8         MR. PIRTLE:  1093.
9     **Q. Do you have my question, Doctor?**
10    A.  No.
11    **Q. As late as February of '07, of course this**
12 **company was still saying that Seroquel was the best**
13 **in terms of metabolic profile as compared to these**
14 **other second-generation antipsychotics in the class?**
15        MR. BROCK:  Object to form.
16    **Q. Saying it to you?**
17        MR. BROCK:  Object to form.
18    A.  Yes.
19    **Q. Turn over to entry 1183.**
20    A.  783?
21 REDACTED
22
23
24
25

149

1  REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



150

1  REDACTED
2
3
4
5
6
7
8  **Q.  Do you believe those records are erroneous?**
9     MR. BROCK:  Object to form.
10  A.  They might be, sir.
11  **Q.  Do you believe they produced false records**
12  **to me?**
13  A.  Object to the form.
14  **Q.  A federal judge will want to know that.**
15     MR. BROCK:  That's argumentative and
16  inappropriate.  I object.
17  **Q.  Do you believe that they are falsified**
18  **records?**
19     MR. BROCK:  Object to the form.
20  A.  I hate to say this, because I can't answer
21  with one hundred percent certainty, but I can tell
22  you off the top of my head they don't visit me very
23  often.
24  **Q.  So you believe if there is entries that show**
25  **that you were visited sometimes every other day,**

151

1  those would be incorrect?
2  A.  If I see my signature, I will believe it.  I
3  don't want to say, because I hate to implement -- a
4  lot of times when they come in, I'm very busy, and I
5  might be completely setting them up.  So that's --
6  I'm not 100 percent sure, but I do not believe, like
7  I testified before, they don't solicit me very
8  often, and I don't think that I would be wrong in
9  that.  I have no reason to be wrong in that.
10  **Q.  Well, if you turn over starting with the**
11  **entries on 1337.**
12  A.  That's correct.
13  REDACTED
14
15
16
17
18
19
20
21
22
23
24
25

152

1  REDACTED
2
3
4
5
6
7
8
9
10
11  **Q.  Do you know what Bolder I and II is, Doctor?**
12  A.  No.
13  **Q.  You don't know that Bolder I and II are**
14  **studies sponsored by AstraZeneca?  Lead author on**
15  **Bolder I is Dr. Kabreezie?**
16  A.  I don't pay a lot of attention --
17  **Q.  Did they tell you in Bolder I and II that**
18  **they lied about the number of folks who got glucose**
19  **disregulation?**
20     MR. BROCK:  Object to form.
21  A.  I'm not aware of that study.  I can't
22  comment on that study.  I don't know the study.
23  **Q.  Let's see if we can agree about this point:**
24  **Back in 2002, you would agree, Doctor, that if a**
25  **company believes that you should warn a patient**

153

1  about a certain extreme risk concerning a drug, that
2  they ought to tell you about that risk?
3  A.  Yes.
4  **Q.  If the company really believed that their**
5  **drug can cause diabetes, they ought to come out and**
6  **say and tell you and your colleagues that it can**
7  **cause diabetes, put it on the table?**
8     MR. BROCK:  Object to the form.
9  A.  Yes.
10  **Q.  And do you feel having read the testimony**
11  **from the two top executives in this company that say**
12  **as of 2008 it doesn't cause diabetes, that doctors**
13  **out there in America should feel justified in**
14  **relying on the fact that Seroquel doesn't cause**
15  **diabetes?**
16     MR. BROCK:  Object to form.
17  A.  Repeat the question.
18  **Q.  I said if the top people of this company say**
19  **that Seroquel doesn't cause diabetes, you as a**
20  **doctor ought to be able to rely on that point?**
21     MR. BROCK:  Object to form.
22  A.  We have to go on clinical data.  I can't --
23  I don't pay attention to what a drug rep tells me
24  that much, and I don't pay attention from what a guy
25  from a drug company tells me.

154

1    Q. Now, after 2004 --
2    A. Yes.
3    Q. -- there was clinical data that showed that
4  Seroquel might be associated with glucose
5  disregulation and diabetes?
6    A. Yes.
7    Q. But as of mid 2002 you didn't have any
8  clinical data in your files that showed that?
9    A. No.
10    MR. PIRTLE:  Let me take a break.  I
11  might be through.
12    (Recess taken from 2:46 p.m. to 2:50 p.m.)
13    REDIRECT EXAMINATION
14  BY MR. BROCK:
15    Q. Do you mind if I just stand right here?
16    A. That's fine, sir.
17    Q. Just a few questions in follow-up in terms
18  of some questions that were asked of you in the
19  cross examination.
20    First of all, in the period of time that
21  AstraZeneca sales representatives were calling on
22  you from the launch of Seroquel until the time you
23  prescribed the medicine for Ms. Guinn, did anything
24  that they said influence your decision to prescribe
25  for Ms. Guinn?

155

1    A. No.
2    Q. Would you describe --
3    A. Either before or after.  As a matter of
4  fact, you see that I still prescribe the medication
5  quite often.
6    Q. Right.
7    A. It doesn't make that much of a difference.
8    Q. Does Seroquel continue today to be the
9  antipsychotic that you use most often in the
10  treatment of patients with schizophrenia and bipolar
11  disease?
12    A. I don't know if it's most often.  I can tell
13  you that I use it significantly.  It could be one of
14  my top antipsychotics that I use.
15    Q. Does it continue to be a medicine that is
16  effective in treating your patients with
17  schizophrenia and bipolar disease?
18    MR. PIRTLE:  Objection.  Form.
19    A. Yes, sir, it is.
20    Q. Now, there were a number of questions asked
21  of you about entries in the sales log where you were
22  asking about being a speaker for AstraZeneca.  Do
23  you remember those questions?
24    A. Yes.
25    Q. And it is true, is it not, that from time to

156

1  time you did stress an interest in being a speaker
2  for AstraZeneca, correct?
3    A. That's correct.
4    Q. One of the reasons for that is that you feel
5  like you have a lot of experience with the medicine
6  and have good and valuable information to share with
7  the medical community, correct?
8    MR. PIRTLE:  Objection.  Form.
9    A. Correct.
10    Q. For instance, when you all present to
11  colleagues, you are able to share in general terms
12  your experience with the medicine and also your
13  knowledge of the data that exists on the medicine,
14  correct?
15    A. Right.
16    Q. And is participating in speaker programs and
17  attending speaker programs a useful way for
18  physicians to learn about medicines?
19    A. Yes, it is.
20    Q. And do you think it's a good idea to have
21  speaker programs sponsored by medicine companies
22  that physicians can attend and learn about medicine?
23    A. Yes, it is, because usually the people who
24  speak are usually researchers, and they have pretty
25  much a high use rate of not only that medication,

157

1  but all of the similar types of medications.  So you
2  can ask relevant questions regarding the
3  medications.
4    Because most of the questions that I
5  have when the medications come out is how does it
6  compare to another medication?  Why do you like this
7  medication more than the other one?  These people
8  usually have a lot of experience with that.
9    Q. As you have used the medicine Seroquel over
10  the years, have you learned things about the
11  medicine in terms of how to dose it with patients?
12    A. Yes.
13    Q. You were sharing with us earlier that there
14  was really no reason for sales representatives to be
15  talking to you about dosing, because you had a
16  pretty good understanding of the dosing and how to
17  titrate it and how to use it in your patients,
18  correct?
19    A. Yes.
20    Q. There was one note that referred to you
21  being sold on the dose.  Do you remember that?
22    A. No.
23    MR. PIRTLE:  Neither do I.
24    Q. Let me see if I can find it.
25    A. A drug rep doesn't sell me on the dose.

170

1    Q. And in terms of Seroquel and its
2  relationship to the entity diabetes, you yourself --
3  you're a practicing psychiatrist, right?
4    A. That's correct, sir.
5    Q. You don't do clinical research, do you?
6    A. No, sir.
7    Q. You certainly don't do clinical research on
8  drugs?
9    A. That's correct.
10    Q. You have never done any type of a clinical
11  study on Seroquel that asks the question of whether
12  Seroquel causes diabetes?
13    A. That's correct.
14    Q. Never got any epidemiologic study on the
15  subject of whether Seroquel causes diabetes?
16    A. That's correct.
17    Q. You never have done any type of bench
18  research in animal models to determine whether
19  Seroquel has the potential to alter blood chemistry
20  in animals?
21    A. That's correct.
22    Q. And in terms of the published medical
23  literature, you have never published a paper on the
24  subject of Seroquel and diabetes?
25    A. That's correct.

171

1    Q. In terms of being a doctor that treats
2  diabetes, typically if you have a patient on
3  diabetes, they are managed by either their primary
4  care physician or somebody who is --
5    A. Endocrinologist.
6    Q. -- an endocrinologist who would treat the
7  diabetic, right?
8    A. That's correct.
9    Q. So it's fair to say you are not an expert on
10  whether or not Seroquel can or does cause diabetes
11  from a clinical standpoint or from a research
12  standpoint?
13    A. No.
14    Q. No, you are not an expert? No means you are
15  not an expert?
16    A. I'm not.
17    Q. And along the same lines being you are not a
18  doctor who regularly would in the course of his
19  practice treat diabetics for the condition diabetes?
20  You are not an expert in the treatment of diabetes?
21    A. That's correct.
22    Q. You would leave that to other doctors?
23    A. That's correct.
24    Q. You were asked a question earlier about your
25  use of Seroquel today and whether or not it's

172

1  effective in treating your patients. Do you
2  remember?
3    A. Yes.
4    Q. Is it fair to say in all honesty it's
5  effective in some patients, it's not effective in
6  all of them?
7    A. Repeat.
8    Q. In terms of your clinical experience in
9  using Seroquel in treating psychoses --
10    A. Yes.
11    Q. -- which is your area, Seroquel is effective
12  in treating some, but not all patients who receive
13  it? Not everybody responds to Seroquel?
14    A. Of course. Not anybody responds to any
15  certain medication.
16    Q. So there is a set of patients that you treat
17  that do respond well to Seroquel, in your view?
18    A. Exactly.
19    Q. Now, you were asked questions about whether
20  or not based on anything the sales force had told
21  you changed your prescribing habits today. Do you
22  remember the questions?
23    A. No, I'm sorry.
24    Q. I believe you were asked -- well, based on
25  what you have been given from 2002 forward to 2008

173

1  by the company, would you change your prescribing
2  habits, and you say no?
3    A. No.
4    Q. Let me pose a different question to you. If
5  you were shown, not given, but shown scientific data
6  that showed that the company falsified and hid the
7  true risk of diabetes in the population of folks
8  using high-dose Seroquel, and that they had
9  information going back into the '90s that Seroquel
10  changes blood glucose levels in a large percentage
11  of their patients, and they did not publish that and
12  actually hid it from the doctors and the FDA, would
13  that change your mind and make you reevaluate this
14  drug?
15    MR. BROCK: Object to the form.
16    A. I would have to see all sides of it. I have
17  to weigh it.
18    Q. Sure. But you want the information?
19    A. I would want the information. Definitely I
20  want all the information. I want -- the problem
21  that we have with this illness is there is not a
22  panacea and there is not anything that we use that's
23  not going to cause side effects. We don't have
24  great drugs. We good drugs as far as possible
25  side effects.

44 (Pages 170 to 173)

174

1      Q. I understand. What I'm talking about is if
2  you were shown information that this company knew a
3  long time ago that the drug Seroquel caused a
4  disregulation of glucose and diabetes, and they
5  actively took steps to keep that information away
6  from you, the regulators, and other, quite frankly,
7  other regulators around the world, you would want
8  that information, and you would want to put it in
9  your risk analysis, wouldn't you?
10         MR. BROCK:  Object to the form.  It's
11      argumentative.
12      A. I would want all the information that's
13  possible.
14      Q. And depending on how that analysis comes
15  out, then you would decide about the drug?
16         MR. BROCK:  Object to form.
17      A. That's correct.
18      Q. It would be a new beginning, in other words?
19         MR. BROCK:  Object to form.
20      Q. You said earlier that you listened to your
21  colleagues when they spoke about drugs.  Do you
22  remember?
23      A. Um-hm.
24      Q. And you also testified that one of the
25  reasons why you wanted to speak was to convey your

175

1  information that you had on the drug Seroquel,
2  correct?
3      A. That's correct.
4      Q. It's true, is it not, sir, that it was this
5  company, AstraZeneca's, policy that their speakers
6  should not talk to doctors and their sales force
7  should not at conferences ask speakers about the
8  negatives, that being diabetes and metabolic issues?
9         MR. BROCK:  Object to form.
10      A. That they are not to ask me?
11      Q. They are not supposed to ask the speakers
12  and the speakers aren't supposed to bring it up.
13  Did you know that?
14      A. That speakers are not supposed to bring it
15  up?
16      Q. Yes.
17      A. I was never told that.
18      Q. Let me show you Exhibit 18.
19         (Document marked as Exhibit 18
20            for identification)
21      A. It doesn't matter what it says, nobody can
22  tell me.  When I speak, I speak my mind.
23      Q. I'm not saying you.  I'm talking about in
24  general.
25      A. No.  No, I wasn't aware.

176

1  REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

177

1  REDACTED
2
3
4
5
6      Q. Do you remember you were asked the last
7  series of questions from Mr. Brock --
8         MR. BROCK:  Thank you.
9      Q. -- the company lawyer --
10         MR. BROCK:  Thank you.  Just Mr. Brock
11      will do.
12      Q. -- about weight gain?  And he read some
13  dates out about weight gain that Ms. Guinn
14  experienced after she started Seroquel use?
15      A. Yes.
16      Q. You stopped treating in May of '02?
17      A. Ms. Guinn?
18      Q. May 2nd of '02?
19      A. Yes.
20      Q. I believe that's right.
21      A. Yes.  May 28th, I think, was the last visit.
22      Q. If between 6/19/02 and -- beginning on
23  6/19/02 when she was on Seroquel, and continuing
24  from 6/09/02, she weighed 155; 6/19, 161; on 7/9,
25  166; 8/5, 170; 9/27/02, 182; 12/3, 191; and 197 on