# EXHIBIT 1 – Part a

Confidential - Wayne Macfadden, M.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

- - -

IN RE:  SEROQUEL  :CASE NO.
PRODUCTS LIABILITY :
LITIGATION       :6:06-md-01769-ACC-DAB
                 :
MDL Docket No. 1769:
                 :

- - -

December 20, 2007
CONFIDENTIAL

- - -

Oral deposition of WAYNE
MACFADDEN, M.D. taken pursuant to notice,
was held at the offices of Golkow
Technologies, Inc., One Liberty Place,
51st Floor, 1650 Market Street,
Philadelphia, Pennsylvania, beginning at
9:01 a.m., on the above date, before Ann
Marie Mitchell, a Federally Approved
Certified Realtime Reporter, Registered
Diplomate Reporter and Notary Public for
the Commonwealth of Pennsylvania.

- - -

GOLKOW TECHNOLOGIES, INC.
One Liberty Place, 51st Floor
1650 Market Street
Philadelphia, Pennsylvania 19103
877.370.3377

Confidential - Wayne Macfadden, M.D.

Page 30

1   by AstraZeneca for the time you spent in
2   preparation and/or attending this
3   deposition?
4       A.   No.
5       Q.   What was your approximate
6   salary at the time you left AstraZeneca?
7       A.   It was -- I don't recall the
8   exact figure.  Approximately 185.
9       Q.   That's your base salary?
10      A.   Yes.
11      Q.   And with bonuses, what did
12  you make as approximate income with
13  salary, bonuses and stock options that
14  you exercised in 2005?
15      A.   The bonus each year would be
16  variable.  I'll estimate maybe 25 per
17  year.
18      Q.   And you also had stock
19  options, did you not?
20      A.   I had some stock options
21  that I exercised, yes.
22      Q.   Tell the jury the
23  approximate amount of the value of the
24  stock options you have exercised with

Page 31

1   AstraZeneca, please.
2       MR. McCONNELL:  Objection to
3   form.
4       THE WITNESS:  I don't recall
5   the figure.  Perhaps 50,000.
6   BY MR. ALLEN:
7       Q.   Total?
8       A.   There was only one occasion,
9   so that's to the best of my recollection.
10  Approximately 50,000.
11      Q.   What year was that, this one
12  occasion?
13      A.   That was shortly before I
14  resigned.
15      Q.   Okay.  So you made in excess
16  of $200,000 a year with base salary and
17  bonuses at the time of your resignation;
18  is that correct?
19      A.   That's approximately
20  correct, yes.
21      Q.   Okay.  What did Mr. LeGower
22  or Mr. Fritch or Mr. McConnell tell you
23  about this deposition?
24      MR. McCONNELL:  Objection.

Page 32

1   Instruction not to answer,
2   attorney/client privilege.  Next
3   question.
4       MR. ALLEN:  So you're
5   asserting the attorney/client
6   privilege?
7       MR. McCONNELL:  I am, sir,
8   yes.
9       MR. ALLEN:  Okay.  I just
10  need to know it for the record.
11      MR. McCONNELL:  Of course.
12      MR. ALLEN:  I mean, I think
13  it would be within my rights to
14  try to make that determination.
15      MR. McCONNELL:  I think
16  you're being within your rights
17  and you're being perfectly
18  delightful and courteous about it,
19  yes.
20      MR. ALLEN:  Okay.  Thank
21  you.
22  BY MR. ALLEN:
23      Q.   Have you consulted with any
24  other counsel besides Mr. McConnell, Mr.

Page 33

1   LeGower or Mr. Fritch about your
2   deposition, any personal attorneys?
3       A.   No.
4       Q.   Did you have a recall that
5   each and every event that occurred while
6   you worked at AstraZeneca in regard to
7   your duties and responsibilities on --
8   about Seroquel?  Did you have a good
9   recall of all that?
10      MR. McCONNELL:  Objection to
11  form.
12      THE WITNESS:  Did I recall
13  all the -- all my -- I'm sorry,
14  could you say that -- could you --
15  BY MR. ALLEN:
16      Q.   Yes, sir.  Yes, sir.  I'll
17  be glad to repeat it.
18      Did you recall everything
19  you did with regard to Seroquel at
20  AstraZeneca?  Do you recall it all?
21      MR. McCONNELL:  Objection,
22  foundation as to time.
23      MR. ALLEN:  The time?
24  BY MR. ALLEN:

9 (Pages 30 to 33)

Confidential - Wayne Macfadden, M.D.

Page 34

```
1        Q.   Let me rephrase the question
2   just so we get it really clear.
3            From the -- when did you
4   begin working at AstraZeneca?  2001.
5   Correct?  At least according to your CV.
6        A.   Yes, 2001.
7        Q.   And what month?
8        A.   I believe it was August or
9   September.
10       Q.   Okay.  And you left in
11  approximately August or September of
12  2006.  Right?
13       A.   Yes.
14       Q.   So you worked at AstraZeneca
15  for five years.  Correct?
16       A.   Yes.
17       Q.   Did you spend 100 percent of
18  your time or almost 100 percent of your
19  time in regard to the product Seroquel
20  while at AstraZeneca?
21       A.   Most of my time at
22  AstraZeneca was spent on job functions
23  relating to the drug Seroquel, yes.
24       Q.   Okay.  And again, I said
```

Page 35

```
1   almost 100 percent, and I understand,
2   well, maybe it isn't 100 percent.
3            What percent, 98, 99, 100,
4   what would it be?
5        A.   Hard to say.  At least
6   90 percent.
7        Q.   Now, I take it in a
8   five-year time period, where you spent at
9   least 90 percent of your time working on
10  Seroquel, you could not recall every --
11  each and every single event that occurred
12  concerning your job responsibilities and
13  activities during those five years; is
14  that correct?
15           MR. McCONNELL:  Objection to
16       form.
17           THE WITNESS:  I could not
18       recall every single thing that
19       happened within those five years,
20       yes.
21  BY MR. ALLEN:
22       Q.   You had to have your memory
23  refreshed, did you not?
24       A.   My memory refreshed?  What
```

Page 36

```
1   do you mean?
2        Q.   Let me see if I can use the
3   term.
4            Do you know what having your
5   memory refreshed means?
6            MR. McCONNELL:  Objection to
7       the extent it calls for a legal
8       conclusion.
9            MR. ALLEN:  It doesn't.
10      Just calls for common sense.
11  BY MR. ALLEN:
12       Q.   Do you know what it means to
13  have your memory refreshed?
14       A.   Could you give me an
15  example?
16       Q.   You really don't know?  So
17  you -- if I were to tell you something
18  like, do you need me to refresh your
19  memory, you just don't understand what
20  that means?
21           MR. McCONNELL:  Objection.
22  BY MR. ALLEN:
23       Q.   Is that your testimony under
24  oath to this jury?
```

Page 37

```
1            MR. McCONNELL:  I'm sorry, I
2       didn't mean to interrupt.
3            Objection, calls for a legal
4       conclusion.
5            THE WITNESS:  I'd just like
6       a specific example so I can
7       understand your question better.
8   BY MR. ALLEN:
9        Q.   Well, let me see if I can
10  help jog your memory.
11           Do you know what it means to
12  jog your memory?
13       A.   I think that means different
14  things to different people.
15       Q.   Yes, sir.  And I'm asking
16  whatever it means to you, since you could
17  not possibly recall and no one would
18  expect you to recall each and every
19  activity you did in regard to Seroquel
20  for five years, I would expect you would
21  need your memory jogged.
22           Did you -- is that true or
23  not true?
24           MR. McCONNELL:  Objection to
```

10 (Pages 34 to 37)

Confidential - Wayne Macfadden, M.D.



Page 90

1  the fact that Dr. Macfadden was involved
2  in strategizing concerning the marketing
3  and commercialization of Seroquel, yes?
4        MR. McCONNELL:  Objection to
5  form.
6        THE WITNESS:  It seems like
7  a very broad term, so I'm not
8  exactly sure of what that means
9  regarding my responsibilities
10  there.
11  BY MR. ALLEN:
12     Q.   Do you know what marketing
13  is?
14     A.   Marketing involves selling.
15     Q.   You were involved in the
16  selling and marketing of Seroquel in your
17  job responsibilities at AstraZeneca, were
18  you not?
19        MR. McCONNELL:  Objection to
20  form.
21        THE WITNESS:  Selling
22  Seroquel was not part of my
23  specific job responsibilities.
24  BY MR. ALLEN:

Page 91

1     Q.   Okay.  Who did you report to
2  as one of your direct reports?  Mr. Jack
3  Schwartz?
4     A.   Did I report to Jack
5  Schwartz?
6     Q.   Yes, sir.
7     A.   No.
8     Q.   Who was Jack Schwartz?
9     A.   Jack Schwartz was an
10  employee of AstraZeneca who held the
11  position of -- I forget the exact title.
12  Seroquel development leader or something
13  like that.
14             - - -
15        (Deposition Exhibit No.
16  Macfadden-2, Seroquel Commercial
17  Organizational Charts, Bates
18  stamped AZSER 10379213 through
19  AZSER 10379221, was marked for
20  identification.)
21             - - -
22  BY MR. ALLEN:
23  REDACTED
24

Page 92

REDACTED
1
2
3
4
5
6
7
8
9
10
11     Q.   Okay.  So you were a part of
12  the commercial organization at
13  AstraZeneca in regard to Seroquel, were
14  you not?
15     A.   I was -- I represented the
16  US physicians on the brand team.
17  REDACTED
18
19
20
21
22
23
24

Page 93

REDACTED
1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16  BY MR. ALLEN:
17  REDACTED
18
19
20
21
22
23
24

24 (Pages 90 to 93)

Confidential - Wayne Macfadden, M.D.

Page 94

REDACTED

Page 96

REDACTED

```
 3        And did you work with Mr.
 4  Jack Schwartz and the other members of
 5  the Seroquel leadership team on issues
 6  involving the marketing, sales and
 7  commercialization of Seroquel, yes or no?
 8        A.   Marketing, sales and
 9  commercialization of Seroquel were not my
10  responsibilities at AstraZeneca.
11        Q.   So you didn't -- so if any
12  documents today that we show reflect that
13  you were involved in such activities, are
14  those documents somehow falsified and/or
15  incorrect?
16        MR. McCONNELL:  Objection to
17  form.
18        THE WITNESS:  I was in the
19  clinical development division, and
20  my main responsibility was
21  designing and executing clinical
22  trials.  I was also a member of
23  the leadership team.  I
24  represented the US physicians at
```

Page 95

BY MR. ALLEN:

REDACTED

Page 97

```
 1        those meetings.
 2  BY MR. ALLEN:
 3        Q.   You were also a member of
 4  the Seroquel communications team, were
 5  you not?
 6        A.   Early in my stay there,
 7  there was a Seroquel communications team
 8  which I sat in on, yes.
 9        Q.   You were a member of that
10  team?
11        A.   Yes.
12        Q.   Okay.  You were also a
13  member of the bipolar execution and
14  strategy team, were you not?
15        A.   Yes.
16        Q.   Bipolar execution and
17  strategy.
18        That was execution and
19  strategy involving the marketing of
20  Seroquel, was it not?
21        A.   My involvement on that team
22  primarily involved publications.
23        Q.   And publications were
24  utilized in the marketing activities for
```

25 (Pages 94 to 97)

Confidential - Wayne Macfadden, M.D.

Page 98

1  Seroquel, weren't they, sir?
2      A.   Appropriate publications can
3  be used in the marketing of medicines,
4  yes.
5          MR. ALLEN:  Objection,
6      nonresponsive.
7  BY MR. ALLEN:
8      Q.   My question was more
9  directed.
10         And the publications which
11  you helped develop on Seroquel were
12  intended and in fact were utilized in the
13  marketing activities surrounding
14  Seroquel.  True?
15         MR. McCONNELL:  Objection to
16      form.
17         THE WITNESS:  The
18      publications were intended to
19      inform prescribers about the
20      results of our clinical trials so
21      they could make more informed
22      choices about which medicines to
23      use for different conditions.
24  BY MR. ALLEN:

Page 99

1      Q.   The publications were
2  utilized to effectuate marketing
3  strategies for Seroquel.  True?
4      A.   To effectuate market
5  strategies?
6      Q.   Yes, sir.  Marketing
7  strategies.
8      A.   I'm not sure I understand
9  the question.
10      Q.   If Dr. Jamie Mullen has
11  testified -- you know Dr. Mullen, do you
12  not?
13      A.   Dr. Mullen was an employee
14  at AstraZeneca, yes.
15      Q.   Yeah.  He worked with you on
16  Seroquel, did he not?
17      A.   For -- yes, for a time he
18  did, yes.
19      Q.   If he's sworn under oath, if
20  he gave an oath, sat right in that chair
21  and testified under oath that the
22  publications were utilized in
23  effectuating marketing strategies for
24  Seroquel, is he right or is he wrong?

Page 100

1      A.   I can't answer the context
2  in which that conversation took place
3  with Dr. Mullen.
4      Q.   But you can -- all right.
5          I think you can definitely
6  testify, however, that you know, because
7  you were personally involved in the fact
8  that the publication -- Seroquel -- let
9  me rephrase it.
10         AstraZeneca had a
11  publication plan, did it not?
12      A.   Yes.
13      Q.   And the publication plan was
14  part of the marketing plan, was it not?
15      A.   I don't know that to be
16  true.
17      Q.   Okay.  You know that the
18  publication plan was developed with input
19  from individuals in the marketing
20  department, was it not?
21      A.   The publication plan, to the
22  best of my recollection, was developed by
23  the clinicians.  There were marketing
24  people whom we alerted to of our plans

Page 101

1  and allowed them to see our plans.  But
2  to the best of my recollection, the
3  publishing plans were developed -- were
4  not developed, I should say, by the
5  marketing individuals.
6      Q.   You in fact worked with a --
7  you personally and the other "Seroquel
8  physicians" worked personally with
9  marketing companies who helped you
10  develop these publications, did you not?
11      A.   We employed companies as
12  vendors to assist us in the -- pardon me,
13  in the publishing process.  Their role
14  involved assisting us with these meetings
15  and assisting with the submission of
16  publications.
17         MR. ALLEN:  Objection,
18      nonresponsive.
19  BY MR. ALLEN:
20      Q.   My question to you was, sir,
21  you were personally involved in working
22  with marketing companies concerning the
23  publication of Seroquel articles.  True?
24         MR. McCONNELL:  Objection,

26 (Pages 98 to 101)

Confidential - Wayne Macfadden, M.D.

Page 138

1    of conduct.
2    BY MR. ALLEN:
3        Q.   Okay.  I'm going to look for
4    an exhibit at the break.  There it is.
5        Dr. Macfadden, aren't you
6    the doctor who was leading the diabetes
7    and glucose issue on Seroquel at
8    AstraZeneca?
9        MR. McCONNELL:  Object to
10   form.  I also object that it's
11   unfair to read from a document and
12   not allow the witness to see it.
13       MR. ALLEN:  That's not true
14   at all.  As a matter of fact, I
15   read from my notes all the time, I
16   read from documents and ask
17   questions.  I've never heard that
18   in Texas, at least, that you can't
19   read from a document when asking
20   questions, but let me --
21       MR. McCONNELL:  And I do --
22   by the way, if you're reading from
23   your notes, I agree and I
24   apologize.  That was my

Page 139

1    misunderstanding.
2        MR. ALLEN:  I'm reading from
3    my notes --
4        MR. McCONNELL:  Then I
5    apologize.
6        MR. ALLEN:  -- that I took
7    in regard to the documents I
8    reviewed, which is a very common
9    thing for a lawyer to do.
10       MR. McCONNELL:  I withdraw
11   my objection.
12       MR. ALLEN:  Okay.  Thank
13   you.
14   BY MR. ALLEN:
15       Q.   Now, let me ask you again
16   the question that I asked.  It's a hard
17   document for me to find for some reason.
18   A hard note.  I'll find it, though.
19       Isn't it true, Doctor, that
20   you were the doctor at AstraZeneca who
21   was leading the diabetes and glucose
22   issue on Seroquel?  Isn't that true?
23       A.   I don't recall that being my
24   role.

Page 140

1        Q.   Okay.  So if that was your
2    role, that would be news to you.
3        Is that what you're telling
4    this jury?
5        MR. McCONNELL:  Objection to
6    form.
7        THE WITNESS:  There was a
8    safety division there, and Martin
9    Brecher had the ultimate
10   responsibility for the safety
11   profile of the product.
12       MR. ALLEN:  Objection,
13   nonresponsive.
14   BY MR. ALLEN:
15       Q.   Doctor, I'm going to hand
16   you what we've marked as Macfadden
17   Exhibit Number 4.
18            - - -
19       (Deposition Exhibit No.
20   Macfadden-4, "Dear Health Care
21   Provider" letter dated January 30,
22   2004, Bates stamped AZSER 10376373
23   and AZSER 10376374, was marked for
24   identification.)

Page 141

1            - - -
2    BY MR. ALLEN:
3        Q.   I can't reach that far.  My
4    arms aren't that long.
5        You don't mind reaching, do
6    you?
7        Okay.  There's two copies
8    for your counsel.
9        MR. McCONNELL:  Thank you.
10   BY MR. ALLEN:
11       Q.   This is the January 30, 2004
12   "Dear Healthcare Provider" letter, and
13   who signed it?
14       A.   I see that my signature is
15   on this letter.
16       Q.   So the answer is, I, Dr.
17   Macfadden, signed this letter concerning
18   the change in the warning on
19   hyperglycemia and diabetes dated January
20   30, 2004; is that correct?
21       MR. McCONNELL:  Objection,
22   asked and answered.
23       THE WITNESS:  Yes.
24   BY MR. ALLEN:

36 (Pages 138 to 141)

Confidential - Wayne Macfadden, M.D.

Page 142

1    Q.   And what was the -- and the
2  whole issue discussed in this letter, or
3  at least the focal point of this letter,
4  was a warning change to the AstraZeneca
5  Seroquel product label on hyperglycemia
6  and diabetes.  True?
7    A.   This was a letter to
8  healthcare providers informing them of a
9  change to the label of Seroquel regarding
10 hyperglycemia and diabetes.
11   Q.   Was there any other issues
12 besides the change to the label on
13 hyperglycemia, diabetes that were the
14 focus of this letter, any other issues?
15   A.   Any other issues besides
16 hyperglycemia and diabetes?
17   Q.   Yes, sir.  Listen to my
18 question.  I make them very particular.
19 And I will rephrase it again, since you
20 answered my question with a question.
21       Were there any other --
22       MR. McCONNELL:  Objection to
23 form.
24       MR. ALLEN:  He answered my

Page 143

1  question with a question, so I'm
2  going to answer his question.
3        MR. McCONNELL:  Well, I
4  think telling my witness listen to
5  the question is an admonition that
6  is inappropriate.
7        MR. ALLEN:  Well, I don't,
8  when he asks me a question.
9  BY MR. ALLEN:
10   Q.   Doctor, are there any other
11 issues that are the focal point of
12 Exhibit Number 2, other than the warning
13 change concerning hyperglycemia and
14 diabetes?
15   A.   That was the focal point of
16 this letter.
17   Q.   All right.  The only heading
18 on this letter is "Warnings Hyperglycemia
19 and Diabetes Mellitus."  True?
20   A.   That's the -- one of the
21 subheaders, yes.
22   Q.   What are the other
23 subheaders?  None?
24   A.   Well, "Warnings," I guess.

Page 144

1  And then "Hyperglycemia and Diabetes" are
2  the subheaders.
3    Q.   Yes, sir.
4        Did Dr. Brecher sign this
5  letter?
6    A.   No.
7    Q.   Did any -- who selected you
8  to sign this letter to healthcare
9  professionals concerning the warning
10 change on diabetes and hyperglycemia?
11       MR. McCONNELL:  Objection,
12 form.
13       THE WITNESS:  As the
14       physician at AstraZeneca with the
15       most tenure on Seroquel, that was
16       given to me.
17 BY MR. ALLEN:
18   Q.   Oh, it's just length of
19 service, is that what your testimony, it
20 was a length of service issue, how you
21 were selected?
22       MR. McCONNELL:  Objection to
23 form.
24       THE WITNESS:  I represented

Page 145

1        the US physicians on the brand
2        team, and therefore, was -- also
3        had the title of US physician.
4        Therefore, it was given to me as a
5        responsibility to sign the letter.
6  BY MR. ALLEN:
7    Q.   Did you write this letter?
8    A.   This letter was put together
9  by the regulatory department at
10 AstraZeneca.
11   Q.   Did you have any -- who at
12 the regulatory department put the letter
13 together which you signed?
14   A.   I don't recall the
15 individuals there at this time.
16   Q.   Did you have any input
17 whatsoever into this letter?
18   A.   I was able to look at it
19 before I signed it.
20   Q.   Did you approve this letter?
21   A.   I signed the letter as it
22 appeared accurate.
23   Q.   Okay.  All right.  And then
24 of course, you followed up -- is one of

37 (Pages 142 to 145)

Confidential - Wayne Macfadden, M.D.

Page 146

1    the reasons you signed this letter,
2    Doctor, is because you were the doctor
3    leading the diabetes and glucose issue at
4    AstraZeneca? Is that one of the reasons
5    you signed this letter?
6        A.   No.
7        Q.   Okay. Let me just hand you
8    Exhibit Number 5.
9              - - -
10            (Deposition Exhibit No.
11        Macfadden-5, "Dear Health Care
12        Provider" letter dated April 22,
13        2004, Bates stamped AZSER 10376375
14        through AZSER 10376377, was marked
15        for identification.)
16             - - -
17   BY MR. ALLEN:
18       Q.   That's a follow-up letter
19   that you sent after the January 2004
20   letter, is it not?
21       A.   Yes.
22       Q.   You had to correct your
23   January letter that you sent out, didn't
24   you?

Page 147

1        A.   This was a correction from
2    the January letter, yes.
3        Q.   Yes, sir.
4             And this time you signed the
5    letter again, your title is different
6    than I saw on the Exhibit 4 letter.
7             Did you get promoted during
8    this interim time period? Because on
9    Exhibit 4 in January, you signed the
10   letter as senior director of clinical
11   research. And then in April, you sign it
12   as US medical director, Seroquel.
13            Is that the same person or
14   did you get promoted?
15       A.   This new title was to
16   reflect my participation in the US brand
17   team. It wasn't a promotion in terms of
18   salary.
19       Q.   But it is a fact, I guess,
20   just so the jury understands, you, Dr.
21   Wayne Macfadden, you said -- wait. Let
22   me rephrase the question.
23            You said your
24   responsibilities didn't change when your

Page 148

1    title changed.
2             You just said that. Right?
3        A.   I don't know if I said that.
4        Q.   Okay. Well, then, we'll
5    just see what you said when the jury sees
6    it at trial. Let me just go to my next
7    question.
8             MR. McCONNELL: Objection.
9    BY MR. ALLEN:
10       Q.   Doctor, just so the jury
11   understands, as reflected in the April
12   22, 2004 letter, we're going to hear
13   testify today Dr. Wayne Macfadden,
14   medical doctor, who was the US medical
15   director for Seroquel. True?
16       A.   Yes.
17       Q.   Okay. Was there anybody in
18   the US, in the US department -- US
19   division at AstraZeneca that was more
20   superior than you, who is designated in
21   your letter of April 22, 2004, as more
22   superior to the US medical director for
23   Seroquel on Seroquel? Anybody more
24   superior than you?

Page 149

1             MR. McCONNELL: Objection to
2        form.
3             THE WITNESS: I was not the
4        overall leader on Seroquel. I
5        reported into Gil Block, with a
6        dotted line to Martin Brecher, who
7        had ultimate responsibility for
8        the product.
9    BY MR. ALLEN:
10       Q.   What's a dotted line mean?
11       A.   Martin Brecher was the
12   overall leader of the Seroquel physicians
13   and charged us with our usual
14   responsibilities.
15            MR. ALLEN: Objection,
16   nonresponsive.
17   BY MR. ALLEN:
18       Q.   I was questioning you on
19   your terminology.
20            You reported to Gil Block,
21   who had a dotted line to Martin Brecher.
22            And I'm asking you, what
23   does a dotted line mean?
24            MR. McCONNELL: Objection to

38  (Pages 146 to 149)

Confidential - Wayne Macfadden, M.D.

Page 150

1  form.
2       THE WITNESS:  A dotted line
3  is an expression by which your
4  general work duties are dictated
5  by a person; however, they're not
6  your manager, per se.
7  BY MR. ALLEN:
8       Q.   A dotted line means your
9  general work duties are dictated by that
10  person.
11       How long have you known
12  that's a definition of a dotted line?
13       A.   That's my best recollection
14  of a definition of a dotted line of
15  responsibility.
16  REDACTED
17
18
19
20       Where does your dotted line
21  go?  To a doctor or to a businessman?
22       MR. McCONNELL:  Objection to
23  form.
24       THE WITNESS:  That dotted

Page 151

1  line was to Jack Schwartz, who was
2  the development leader.
3  BY MR. ALLEN:
4       Q.   Yes, sir.
5       And that's where your dotted
6  line went on Seroquel.  Right?
7       MR. McCONNELL:  Objection to
8  form.
9       THE WITNESS:  The reporting
10  structure changed several times
11  during my employment at
12  AstraZeneca with different
13  managers there, so I can't speak
14  to who was my manager or dotted
15  line responsibilities at a
16  particular time.
17  BY MR. ALLEN:
18       Q.   But to be consistent, a
19  dotted line means that's the person who
20  dictates your work activities.
21       That would be the consistent
22  answer, wouldn't it, sir?
23       A.   That was my best
24  recollection of what a dotted line

Page 152

1  definition means.
2       MR. ALLEN:  Thank you, sir.
3       We'll take our first break.
4       MR. McCONNELL:  15 minutes?
5       MR. ALLEN:  Sure.  That
6  would be fine.  Thank you.
7       VIDEOTAPE TECHNICIAN:  46
8  minutes after 10:00.  We're going
9  off the record.  This is the end
10  of Tape Number 1.
11       - - -
12       (A recess occurred.)
13       - - -
14       VIDEOTAPE TECHNICIAN:  Three
15  minutes after 11:00.  This is the
16  beginning of Tape Number 2, and
17  we're back on the record.
18  BY MR. ALLEN:
19       Q.   Dr. Macfadden, we're back on
20  the record.
21       When we went off, we had
22  discussed Exhibit Number 4, which was a
23  January 30, 2004 letter you signed for
24  AstraZeneca on hyperglycemia and

Page 153

1  diabetes.  And Exhibit Number 5 was the
2  April 2004 letter you signed as US
3  medical director for Seroquel.
4       Do you recall that?
5       A.   Yes.
6       Q.   And Exhibit 5 was a
7  correction to the January 30th letter
8  that you had previously signed.  Correct?
9       A.   Yes.
10       Q.   And these two letters, as
11  you've testified, dealt with the issue of
12  hyperglycemia and diabetes.  Right?
13       A.   Yes.
14       Q.   Now, I'm going to hand you
15  what's been marked as Macfadden Exhibit
16  Number 6.  And I have copies for your
17  counsel.
18       - - -
19       (Deposition Exhibit No.
20  Macfadden-6, E-mail chain, dated
21  July 05, 2004, Bates stamped
22  AZ/SER 2703900 and AZ/SER 2703901,
23  was marked for identification.)
24       - - -

39  (Pages 150 to 153)

Confidential - Wayne Macfadden, M.D.

Page 154

1        MR. McCONNELL:  Thank you.
2   BY MR. ALLEN:
3        Q.   Which is e-mail
4   correspondence we located in the files in
5   preparation for your deposition in this
6   case.
7        Did you at AstraZeneca
8   obviously communicate via e-mail?
9        A.   I would often communicate
10  via e-mail, yes.
11  REDACTED
12
13
14
15
16
17
18
19
20
21
22        Q.   Okay.  KOLs are key opinion
23  leaders?
24        A.   Yes.

Page 155

1        Q.   And you were intimately
2   involved in hiring, interacting with,
3   communicating with key opinion leaders?
4   That was one of your main jobs, wasn't
5   it?
6        MR. McCONNELL:  Objection to
7   form.
8        THE WITNESS:  KOLs aren't
9   hired.  They're often contracted
10  or consulted with.
11  BY MR. ALLEN:
12        Q.   They're paid, aren't they?
13        A.   They are often paid
14  consultants, yes.
15        Q.   And they're often paid
16  consultants with contracts with
17  AstraZeneca, as you just testified.
18  Correct?
19        A.   Paid consultants have
20  contracts, yes.
21        Q.   Okay.  So -- and back to my
22  original question.
23        You were intimately
24  involved, as one of your job

Page. 156

1   responsibilities, in interacting with,
2   hiring, or contracting or consulting with
3   key opinion leaders on the issues
4   involving Seroquel, were you not?
5        MR. McCONNELL:  Objection to
6   form.
7        THE WITNESS:  I wasn't
8   involved with the contracting, but
9   I did often interact with KOLs,
10  yes.
11  BY MR. ALLEN:
12  REDACTED
13
14
15
16
17
18
19
20
21
22
23
24        Q.   And the subject of diabetes

Page. 157

1   was the subject of your letter -- letters
2   that you had previously written earlier
3   in 2004.  Correct?
4        A.   The letters in 2004 were
5   letters to healthcare providers about
6   changes to the label involving
7   hyperglycemia and diabetes.
8        Q.   Yes.
9        And the letters were
10  directed to healthcare professionals,
11  which would include doctors.  Correct?
12        A.   Yes.
13        Q.   Now, the e-mail is from Lynn
14  Gionta.
15        How do you pronounce that?
16        A.   I don't know.
17        Q.   Well, you -- Marianne
18  Jackson, she was on the Seroquel
19  leadership team with you, wasn't she?
20        A.   For part of my time at
21  AstraZeneca, yes.
22        Q.   Yes.
23        And Georgia Tugend, you
24  worked with her fairly often.

40  (Pages 154 to 157)

Confidential - Wayne Macfadden, M.D.

Page 158

1           She worked in the area of
2    publications, did she not?
3       A.   She was in the marketing
4    division for part of my time at
5    AstraZeneca.
6       Q.   Yes.
7           And you worked with her, did
8    you not?
9       A.   We sat together on some
10   teams, yes.
11      Q.   Okay.  Now, I'm wondering
12   and they're attaching a voicemail.
13          Did AstraZeneca have a
14   voicemail system which could broadcast
15   voicemails to different departments or
16   different individuals at AstraZeneca?
17      A.   There was a voicemail system
18   where you could send messages to other
19   individuals, yes.
20      Q.   To groups?  You could send
21   it to groups.  Correct?
22      A.   You could send it to more
23   than one person, yes.
24      Q.   Okay.  And by the way, maybe

Page 159

1    you don't know this, but I'll ask and see
2    if you understand it to be true.
3           Approximately two-thirds of
4    the employees of AstraZeneca are sales
5    specialists, are professional sales
6    specialists.  Correct?  Of the total
7    employees of the company, about
8    two-thirds of them are salespeople.
9    Right?
10      A.   I can't speak to the
11   percentages of employees there regarding
12   what they do.
13   REDACTED
14
15
16
17
18
19
20
21
22
23
24

Page 160

REDACTED

Page 161

REDACTED

5       Q.   And that's true, is it not,
6    when you hire a speaker and you get him
7    under contract -- him or her under
8    contract and pay them, what they say may
9    well be attributed to your company; is
10   that correct?
11          MR. McCONNELL:  Objection,
12   calls for a legal conclusion.
13          THE WITNESS:  I do want to
14   state that I've never seen this
15   document before.
16          MR. ALLEN:  Objection,
17   nonresponsive.
18   BY MR. ALLEN:
19      Q.   My question -- do you need
20   me to rephrase the question?  Sir?
21          My question is, and I'll
22   rephrase it.
23          When AstraZeneca contracts
24   with or hires a speaker, what the speaker

41 (Pages 158 to 161)

Confidential - Wayne Macfadden, M.D.

Page 174

1  psychosis were at an increased risk of
2  death if they took Seroquel.  Correct?
3      A.   This was data that the FDA
4  compiled and instructed all the
5  manufacturers of atypical antipsychotics
6  to include in their label.
7          MR. ALLEN: Objection,
8      nonresponsive.
9  BY MR. ALLEN:
10     Q.   My question to you was, this
11 label change dealt with the fact that the
12 black box warning informed doctors and
13 healthcare providers that patients with
14 dementia-related psychosis were at an
15 increased risk of death if they took
16 Seroquel.  True?
17         MR. McCONNELL: Objection.
18     Document speaks for itself.
19         THE WITNESS: The black box
20     warning showed that numerically
21     patients treated with atypical
22     antipsychotics such as Seroquel
23     had a higher rate of death than
24     those prescribed to placebo, if I

Page 175

1      recall it correctly.
2  BY MR. ALLEN:
3      Q.   Okay.  And then if you see
4  the last sentence of the black box
5  warning, it says, "Seroquel (quetiapine)
6  is not approved for the treatment of
7  patients with Dementia-Related
8  Psychosis."
9          Is that true?
10         MR. McCONNELL: I'm sorry.
11     Objection to form.  I can't tell
12     if you're asking if that's what it
13     says or if that's a true
14     statement.
15         THE WITNESS: That's what it
16     says, and that is a true statement
17     at the time.
18 BY MR. ALLEN:
19     Q.   Right.
20     A.   And now, to the best of my
21 knowledge, too.
22     Q.   Right.  That's what it says,
23 "Seroquel...is not approved for the
24 treatment of patients with

Page 176

1  Dementia-Related Psychosis."
2          And that statement is a true
3  statement, not only in the time it was
4  made in July 2005, but at all times prior
5  to that point.
6          Isn't that true?
7      A.   Yes.
8      Q.   Now, my assistants left me.
9          You were involved, though,
10 in planning and researching, through
11 marketing efforts, you were involved in a
12 process where AstraZeneca was trying to
13 expand the use of Seroquel -- let me
14 rephrase it.
15         You, though, Dr. Macfadden,
16 were involved in meetings in which
17 AstraZeneca had attempted to expand the
18 use of Seroquel via primary care
19 physicians for the treatment of dementia.
20         You had been involved in
21 that process, had you not?
22         MR. McCONNELL: Objection to
23     form.
24         THE WITNESS: I can't recall

Page 177

1  everything that was discussed at
2  all the meetings I went to.  The
3  treatment of dementia, demented --
4  dementia-related psychosis is not
5  approved by the FDA.
6          MR. ALLEN: Objection,
7      nonresponsive.
8  BY MR. ALLEN:
9      Q.   Doctor, I apologize, I have
10 mismarked an exhibit, so I'm going to
11 have to write a new exhibit sticker here.
12         Is Macfadden spelled M-A-C,
13 your Macfadden?
14     A.   It starts with M-A-C, yes.
15     Q.   Yes, sir, I apologize.  I
16 just want to make sure I spell it right.
17         MR. McCONNELL: And that's a
18     small F.
19         MR. ALLEN: It is?  Well,
20     I'll tell you, I've been spelling
21     it wrong in my own personal notes,
22     but I appreciate that.
23 BY MR. ALLEN:
24     Q.   Sir, I'm going to mark

45 (Pages 174 to 177)

Confidential - Wayne Macfadden, M.D.

Page 178

1  you -- hand -- mark you.
2       I'm going to hand you what
3  I've marked as Macfadden Exhibit 8, an
4  e-mail chain of October of 2002 which you
5  are included in.
6            - - -
7       (Deposition Exhibit No.
8  Macfadden-8, E-mail dated October
9  02, 2002, Bates stamped AZ/SER
10 4209846 and AZ/SER 4209847, was
11 marked for identification.)
12           - - -
13      MR. ALLEN:  And I have
14 copies for your counsel.
15      MR. McCONNELL:  Thank you.
16 BY MR. ALLEN:
17 REDACTED
18
19
20
21
22
23
24

Page 179

REDACTED
1
2
3
4
5
6
7
8
9
10
11
12
13      Q.   Now, the people included on
14 this e-mail, let me just go through some
15 of them.
16      Lisa Lloyd Washington, what
17 was her job?
18      A.   My recollection, she was in
19 the -- had a marketing function at
20 AstraZeneca.
21      Q.   Yes.  Okay.  And let me --
22 there's a bunch of marketing people on
23 this e-mail, are there not?
24      MR. McCONNELL:  Objection to

Page 180

1       form.
2  BY MR. ALLEN:
3       Q.   Addressees?
4       MR. McCONNELL:  Sorry.
5       Objection to form.
6  BY MR. ALLEN:
7       Q.   There's a lot of them?
8       A.   I recognize other names as
9  members of the marketing function, yes.
10      Q.   Okay.  Also, Dr. Jamie
11 Mullen, in addition to yourself, is a
12 recipient of this e-mail; is that
13 correct?
14      A.   Yes.
15      Q.   Doctor, that reminds me, and
16 sometimes I need to digress, and I had
17 this.
18      Your resume, Exhibit 1,
19 indicated that from January of 2004 to
20 the time you left, you were senior
21 director of clinical research for
22 Seroquel at AstraZeneca.  That's what it
23 says.  A senior director, clinical
24 research, US medical director, Seroquel.

Page 181

1       Do you see that?
2       A.   Yes.
3       Q.   Okay.  I may be mistaken,
4  sir, but I thought Dr. Mullen testified
5  to me he was senior clinical research
6  director for Seroquel at that time.
7       Was there more than one?
8       A.   The designation senior is
9  reflective of a grade.
10      Q.   So there was more than one
11 senior medical director -- excuse me.
12      There was more -- there was
13 more than one senior director of clinical
14 research on Seroquel at AstraZeneca?
15      A.   There could have been more
16 than one at any one time, yes.
17 REDACTED
18
19
20
21
22
23
24

46 (Pages 178 to 181)

Confidential - Wayne Macfadden, M.D.

Page 182

REDACTED

11    Q.    And a focus group is a
12  mark -- focus groups are used in the
13  marketing of a drug, is it not?
14    A.    Focus groups can be used in
15  market research.
16    Q.    Yes, sir.
17        And so you were being -- you
18  were one of the individuals that were
19  copied on market research on Seroquel.
20  True?
21    A.    I was one of the folks
22  copied on this e-mail which reports on
23  market research, yes.
24    Q.    Yeah.  And Doctor, maybe you

Page 183

1  can just answer directly for the jury.
2        Who are these people on this
3  e-mail?  Is this some team, from Lisa
4  Lloyd Washington down to Carrie Lapp?
5    A.    I don't recall that they all
6  belonged to one specific team.
7    Q.    Well, they all, you.
8        What team were you on?  We
9  know you're on the Seroquel leadership
10  team at this time, were you not?
11    A.    I don't recall when that was
12  made precisely.
13    Q.    Okay.  What teams were you
14  on?  We've seen that you were on the
15  Seroquel leadership team and the Seroquel
16  brand team.
17        What other teams were you on
18  that necessitated you getting this
19  marketing focus group e-mail?
20    A.    I can't respond as to why
21  Christopher Maurer e-mailed me this
22  e-mail at this particular time.
23    Q.    Who's Christopher Maurer?
24  You know him, don't you?

Page 184

1    A.    That's who this e-mail is
2  from.
3    Q.    Yes, sir.
4        And who is he?  I'm asking
5  you to tell the jury, please.
6    A.    My recollection is that he
7  was involved in market research while at
8  AstraZeneca.

REDACTED

Page 185

REDACTED

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Wayne Macfadden, M.D.

Page 186

REDACTED

BY MR. ALLEN:
Q.   Right.  And then back to Exhibit 7, the letter you later wrote in 2005, about two-and-a-half -- over two-and-a-half years later, you wrote, "Seroquel...is not approved for the treatment of patients with Dementia-Related Psychosis"; is that correct?
MR. McCONNELL:  Objection, asked and answered, the document speaks for itself.
THE WITNESS:  This was language from the FDA that was given to us to update the label with.
So I didn't write it, but

Page 187

yes, that is what the new label reflects.

REDACTED

MR. McCONNELL:  Objection, asked and answered.
THE WITNESS:  No.
BY MR. ALLEN:
Q.   Thank you, sir.
Now, one of the things you -- one of your other functions as the US medical director for Seroquel, you were on the Seroquel leadership team. Right?
MR. McCONNELL:  Objection, asked and answered.

Page 188

THE WITNESS:  That was that team we spoke about, yes.
BY MR. ALLEN:
Q.   Right.  And you attended leadership team meetings.  Right?
A.   Yes.
Q.   And one of the things you and your team at Seroquel leadership team meetings would want to look at was calculate dollars and how much patients were worth.  Right?
MR. McCONNELL:  Objection to form.
THE WITNESS:  There were financials that we discussed, but I can't speak to the particulars of them.
BY MR. ALLEN:
Q.   Right.  There were financials.
Financials, meaning there was you, as a member of the Seroquel leadership team, would discuss money and how much money AstraZeneca was making on

Page 189

Seroquel patients.  Right?
A.   The overall finances of Seroquel and the company were discussed, yes.
Q.   Okay.  And why would you be -- why would you be involved, you as the US medical director for Seroquel, discussing the overall finances of Seroquel at AstraZeneca?
A.   I wasn't actively involved with those discussions; however, I did attend those meetings.
Q.   Well, you attended the meetings because you were placed upon the Seroquel leadership team, and that was part of your role, was to get involved in determining how much money AstraZeneca was making on Seroquel.  True?
A.   I represented the medical physicians in the US on the leadership team.  The financial aspects of the brand were not part of my involvement with those meetings.
Q.   Well, back to Exhibit Number

48  (Pages 186 to 189)

Confidential - Wayne Macfadden, M.D.

Page 218

```
 1        e-mail to which Dr. Macfadden is a
 2     recipient.
 3  BY MR. ALLEN:
 4        Q.   Doctor, do you see an e-mail
 5     that you received from the global brand
 6     manager, Bill Hess, on Seroquel?
 7        MR. McCONNELL:  And just for
 8     the record, I am going to object
 9     to the use of this document, since
10     I don't have the rest of the chain
11     so I can't really apply the
12     Doctrine of Completeness.
13        MR. ALLEN:  Oh, yeah, you
14     do.  You have -- you have both of
15     your counsel here with computers.
16     You have printers available.
17     These are your documents.  They
18     have them on disk.  I've been told
19     at depositions before in the
20     middle of a deposition that y'all
21     can tell me what file they come
22     from.  You brought in documents
23     and your other counsel at other
24     depositions.  You have these
```

Page 219

```
 1     documents available.  The judge
 2     knows they're available.  You can
 3     just -- you can go run them off
 4     within a minute.
 5        Now, let me get back to my
 6     question.
 7  BY MR. ALLEN:
 8        Q.   Exhibit Number 11, are you a
 9     recipient of this e-mail from Bill Hess,
10     the global brand manager of Seroquel,
11     bipolar committee?
12        A.   I see I was copied on this
13     e-mail, yes.
14        Q.   Yes.
15        And you remember working --
16     you've told us you worked with Parexel.
17     Correct?
18        A.   Yes.
19  REDACTED
20
21
22
23
24
```

Page 220

```
 1  REDACTED
 2        Q.   Now, trial 49 was a bipolar
 3  depression study, was it not?
 4        A.   Yes.
 5        Q.   And in May of 2004, Seroquel
 6  was not approved for bipolar depression,
 7  was it?
 8        A.   To the best of my
 9  recollection, it was not.
10        Q.   In fact, trial 49 is what
11  y'all refer to I believe as BOLDER I.
12  True?
13        A.   Yes.
14        Q.   BOLDER II is study 135.
15  Right?
16        A.   I don't recall the number of
17  BOLDER II.
18        Q.   Okay.  You worked on trial
19  49, did you not?
20        A.   Yes.
21        Q.   You're familiar with all the
22  data that was generated after trial 49.
23  Right?
24        A.   I was familiar with the data
```

Page 221

```
 1  from trial 49, yes.
 2        Q.   You're still familiar with
 3  it as you sit here today, are you not?
 4        A.   I don't recall every bit of
 5  data from that trial.
 6        Q.   Whatever.
 7        MR. McCONNELL:  Objection.
 8  BY MR. ALLEN:
 9        Q.   His e-mail to you and
10  others, you're an addressee on this
11  e-mail.  Correct?
12        A.   Yes.
13        Q.   Now, where did Maribeth
14  Pawlak work?
15        A.   She was an employee of
16  Parexel.
17        Q.   Yeah, she was.
18  REDACTED
19
20
21
22
23
24        Now, tell the jury who Joan
```

56 (Pages 218 to 221)

Confidential - Wayne Macfadden, M.D.

Page 222

1   Shaw is.
2        A.   She was an AstraZeneca
3   employee with various functions during my
4   time at AstraZeneca.
5        Q.   Yes, sir.
6             And back to Exhibit 2, it
7   will be on the screen.
8             You worked with Ms. Shaw on
9   the Seroquel leadership team.  Correct?
10        A.   She was on the clinical
11   leadership team for part of my time
12   there, yes.
13   REDACTED
14
15
16
17
18
19
20
21
22
23
24

Page 224

1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 223

1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 225

1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

57 (Pages 222 to 225)

Confidential - Wayne Macfadden, M.D.

Page 226

REDACTED

Page 228

02, 2005, Bates stamped AZ/SER
4717728, and Deposition Exhibit
No. Macfadden-13, Parexel MMS
Seroquel Team - Updated 1st
August, 2005, Bates stamped AZ/SER
4717729 and AZ/SER 4717730, were
marked for identification.)
                - - -
BY MR. ALLEN:
    Q.   I'm going to hand you what
I've marked as Exhibits 12 and 13.  And I
have copies for your counsel.
        Sir, Exhibit 12 is an
e-mail as you were --
        MR. McCONNELL:  Scott, could
    you tell us real quick which
    one is 12 and 13 again?
        MR. ALLEN:  I think 12 is
    the one I think I have on the
    board here.  He has it right
    there.
        MR. McCONNELL:  Oh, okay.  I
    got you.  I got you.  Thank you.
BY MR. ALLEN:

Page 227

REDACTED

BY MR. ALLEN:
    Q.   Okay.  By the way, I'm going
to hand you what's been marked as
Exhibit 12.  And I'm going to try to give
you, if I can find it here, 13 at the
same time.
        Hold on.  I apologize.  I'm
trying to get a good copy of 13.
                - - -
        (Deposition Exhibit No.
    Macfadden-12, E-mail dated August

Page 229

    Q.   Exhibit 12, sir, is from
Claudia Piano.
        She's at Parexel.  Right?
    A.   Yes.

REDACTED

    Q.   Okay.  Now, this e-mail,
Exhibit 12, was sent to you and to other
people at AstraZeneca.  Correct?
    A.   Yes.
    Q.   Including individuals at the
marketing and sales departments.
Correct?
    A.   Although my -- pardon me.
Although my name was on the e-mail, it
may not have gotten to me, because my
name was spelled incorrectly.
    Q.   Okay.  Well, nevertheless,
you're listed on here as a recipient; is
that correct?

                                 58  (Pages 226 to 229)

Confidential - Wayne Macfadden, M.D.

Page 230

1    A.   Yes.
2    Q.   Now, you got e-mails from
3  Claudia Piano -- let me ask this.  Maybe
4  you can just tell me.
5        Didn't you get e-mails from
6  people at Parexel all the time?
7    A.   I would get e-mails from
8  Parexel, yes.
9    Q.   Yeah.  The people at Parexel
10  knew how to -- you exchanged e-mails back
11  and forth, back and forth, multiple
12  e-mails in a day, wouldn't you?
13    A.   Often, yes.
14    Q.   Yeah.
15        You had a lot of e-mails
16  from people at Parexel, didn't you?
17        MR. McCONNELL:  Objection,
18        asked and answered.
19        THE WITNESS:  I would
20        frequently e-mail back and forth
21        from Parexel.
22  BY MR. ALLEN:
23    Q.   Right.  You in fact, you
24  would get excited and you were pleased

Page 231

1  when you got to engage in e-mail
2  conversations with people at Parexel.
3  True?
4        MR. McCONNELL:  Objection to
5        form.
6        THE WITNESS:  Not always.
7  BY MR. ALLEN:
8    Q.   Sometimes?
9        MR. McCONNELL:  Objection to
10        form.
11        THE WITNESS:  Parexel was a
12        frequent vendor with whom we
13        communicated, yes.
14  BY MR. ALLEN:
15    Q.   Yeah.  You've got to be
16  careful, though.  You're the US medical
17  director.
18        You know there's a conflict
19  of interest policy there at AstraZeneca,
20  don't you?
21        MR. McCONNELL:  Objection to
22        form.
23        THE WITNESS:  I don't know
24        the specifics of that conflict of

Page 232

1        interest -- their conflict of
2        interest policy.
3  BY MR. ALLEN:
4    Q.   But you knew there was one.
5        You knew that AstraZeneca
6  had a conflict of interest policy.
7  Right?
8    A.   I'm assuming most large
9  corporations have conflicts of interest
10  policies, yes.
11    Q.   Did you familiarize yourself
12  with the AstraZeneca conflict of interest
13  policy when you were US medical director
14  for Seroquel?
15    A.   I didn't familiarize myself
16  with the details of it, no.
17    Q.   Why, did you just feel you
18  knew what a good -- what a conflict of
19  interest was when you saw it?
20    A.   There were a lot of rules
21  and regulations that I was aware of but
22  didn't know all the detailed specifics
23  of.
24    Q.   Aren't some rules and

Page 233

1  regulations just plain old common sense?
2        MR. McCONNELL:  Objection to
3        form, argumentative.
4  BY MR. ALLEN:
5    Q.   I'm just asking.
6        In your opinion, aren't some
7  rules and regulations just plain old
8  common sense?
9        MR. McCONNELL:  Same
10        objection.
11        THE WITNESS:  Yes.
12  BY MR. ALLEN:
13    Q.   Okay.  Let's just go back to
14  Exhibit 12.
15        By the way, you knew there
16  was a corporate integrity agreement that
17  AstraZeneca had to sign with the Office
18  of Inspector General, didn't you?
19    A.   I received e-mails about a
20  Corporate Integrity Agreement that
21  AstraZeneca was involved with, yes.
22    Q.   Right.  You knew there also
23  was a corporate responsibility -- a
24  corporate responsibility policy at

59 (Pages 230 to 233)

Confidential - Wayne Macfadden, M.D.



Page 234

```
1   AstraZeneca.
2        You knew that, too, didn't
3   you?
4        A.   I don't know the corporate
5   responsibility policy -- specifics of the
6   corporate responsibility policy.
7   REDACTED
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 235

```
1   REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 236

```
1   REDACTED
2
3
4
5        Q.   Okay.  Now, we saw where
6   Parexel -- and by the way, as you said
7   earlier, you were responsible, part of
8   your role was publications.  Right?
9        A.   I participated on the
10  publication teams, yes.
11  REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 237

```
1   REDACTED
2
3
4        Q.   Now, these are -- and were
5   you involved in any of those projects,
6   BOLDER I, CAFE?
7        A.   I was involved in BOLDER I
8   and II and CAFE.
9   REDACTED
10
11
12
13
14
15
16
17
18
19
20       Q.   Okay.  Now, do you remember,
21  we talked about your role with key
22  opinion leaders.
23            Would you attend advisory
24  board meetings where key opinion leaders
```

60 (Pages 234 to 237)

Confidential - Wayne Macfadden, M.D.

Page 238

1  would meet with you and other people at
2  AstraZeneca?
3       A.  Yes.
4       Q.  And --
5       A.  Excuse me. I need a
6  one-minute bathroom break.
7            MR. ALLEN:  Oh, we'll take
8  a -- let's take a -- just go off
9  the record for two minutes.
10           MR. McCONNELL:  Watch your
11  clip.
12           MR. ALLEN:  For however long
13  you need to go to the bathroom.
14           THE WITNESS:  Okay.
15           MR. ALLEN:  Don't limit
16  yourself to one, but let's come
17  back after your bathroom.  Let's
18  not go anywhere else.
19           THE WITNESS:  Right.
20           VIDEOTAPE TECHNICIAN:  It's
21  12 minutes after 12:00.  We're
22  going off the record.
23            - - -
24       (A recess occurred.)

Page 239

1            - - -
2       (Deposition Exhibit No.
3  Macfadden-14, Hypotheses
4  Generation Meeting 2, June 15,
5  2005, Bates stamped AZSER 10112148
6  through AZSER 10112162, was marked
7  for identification.)
8            - - -
9            VIDEOTAPE TECHNICIAN:  17
10  minutes after 12:00, and we're
11  back on the record.
12  BY MR. ALLEN:
13       Q.  Doctor, I was discussing
14  with you your roles at AstraZeneca in
15  regard to Seroquel. I've now handed to
16  your counsel and you Exhibit 14.  Hypo --
17  hypothesis. I'm just from Galveston,
18  Texas.  Sometimes I have a hard time.
19       "Hypotheses Generation
20  Meeting."
21       Did I read that correctly?
22       A.  Yes.
23       Q.  That's June 15, 2005, and
24  this was a meeting in Pittsburgh,

Page 240

1  Pennsylvania.
2       You recall that meeting,
3  don't you?
4       A.  I recall attending that
5  meeting, yes.
6       Q.  Now, in fact, this is a
7  draft summary of the meeting prepared by
8  Parexel.
9       Do you see that?
10      A.  Yes.
11      Q.  Okay.  That's what happened
12  at these meetings.  Parexel would in fact
13  prepare the minutes in draft form, and
14  individuals at AstraZeneca could go back
15  and finalize the minutes to reflect what
16  they wanted the minutes to reflect.
17  True?
18      A.  Part of their -- what they
19  did was attend such meetings and provide
20  executive summaries for us to review,
21  yes.
22      Q.  All right.  And just if you
23  go three pages back, I believe, you were
24  in attendance at this meeting with

Page 241

1  individuals from Wilmington, including
2  Dr. Mullen, and individuals from the UK
3  and Sweden; is that correct?
4       A.  Yes, yes.
5       Q.  Now, Goran Stening, and
6  Dr. -- is -- who is Dr. Stening -- it is
7  Mr. Stening or Dr. Stening?  I can't
8  remember right now.
9       A.  Doctor.  Pardon me, doctor.
10      Q.  Yeah, he -- wasn't he the
11  medical director for Seroquel in Sweden?
12      A.  He was a physician employed
13  by AstraZeneca who worked on Seroquel
14  projects, and he was based in Sweden.
15      Q.  Well, maybe this will help
16  me. I don't have a perfect memory.
17      Wasn't he the head of the
18  commercial support team, the head of the
19  commercial support team in Sweden for
20  Seroquel?
21      A.  I don't recall what his --
22      Q.  Okay.
23      A.  -- all his duties.
24      Q.  Nevertheless, this meeting

61 (Pages 238 to 241)

Confidential - Wayne Macfadden, M.D.

Page 270

1    him to correct his misperception.
2  BY MR. ALLEN:
3      Q.   Well, do you think that Mr.
4  Ungerstedt could be correct about the
5  fact you were leading the diabetes and
6  glucose issue, sir?
7      A.   No.
8      Q.   Well, do you think maybe his
9  perception of such was related to the
10 fact that you signed the letters
11 concerning the changes in the warnings in
12 both January and April of 2004?
13     MR. McCONNELL:  Objection,
14 calls for speculation.
15     THE WITNESS:  I can't
16 attribute what his conclusion that
17 I was this physician leading the
18 issue came from.
19 BY MR. ALLEN:
20 REDACTED
21
22
23
24

Page 271

1  REDACTED

Page 272

1  REDACTED
2
3
4  BY MR. ALLEN:
5      Q.   Well, let me just ask this
6  question.  Put that e-mail aside.
7      What's the exhibit number on
8  that again, by the way?
9      MR. McCONNELL:  15.
10 BY MR. ALLEN:
11     Q.   Put 15 aside and let me ask
12 this question.
13     Were you involved in your
14 role at AstraZeneca as medical director
15 of Seroquel, as senior clinical research
16 director for Seroquel, were you ever
17 involved in making strategic decisions
18 concerning the measurement of glucose or
19 HbA1c in your clinical trials?
20     MR. McCONNELL:  Objection to
21 form.
22     THE WITNESS:  That decision
23 was ultimately made by Martin
24 Brecher, who was the global

Page 273

1  medical director, in conjunction
2  with our safety department.
3  BY MR. ALLEN:
4      Q.   Have you finished your
5  answer?
6      A.   Yes.
7      MR. ALLEN:  Objection,
8  nonresponsive.
9  BY MR. ALLEN:
10     Q.   My question to you is, were
11 you, Dr. Wayne Macfadden, involved in the
12 strategy and decision-making, involved in
13 how glucose and HbA1c would be monitored
14 in the AstraZeneca clinical trials?
15     A.   My recollection was that
16 Martin proposed a monitoring plan for
17 future clinical trials, which was agreed
18 upon and implemented.
19     MR. ALLEN:  Can you read my
20 question back, please?
21     - - -
22     (The court reporter read the
23 pertinent part of the record.)
24     - - -

69 (Pages 270 to 273)

Confidential - Wayne Macfadden, M.D.

Page 274

```
1        THE WITNESS:  To the extent
2    that I was consulted about this
3    decision or this process, I
4    believe that Martin did circulate
5    this plan around before it was
6    approved, including to myself.
7    REDACTED
8
9
10
11
12
13
14
15        Q.   Yeah, there's two Martins.
16   There's Martin Jones, is that correct,
17   and a Martin Brecher?  They're often
18   involved in the same e-mail strings.  And
19   then there's a Marten, M-A-R-T-E-N.
20        Do you know all these
21   individuals?
22        A.   Martin Jones is employed at
23   AstraZeneca.  I don't recall a Marten.
24        Q.   Okay.  So you were consulted
```

Page 275

```
1    on the change in the clinical trial plan
2    concerning the monitoring of glucose and
3    HbA1c?
4        A.   Yes.
5        Q.   When did that change take
6    place?
7        A.   I don't recall.
8        Q.   Approximately when did that
9    change take place?
10       A.   I can't recall.
11       Q.   Can you help the jury in any
12   regard?
13            MR. McCONNELL:  Objection to
14   form.
15   BY MR. ALLEN:
16       Q.   Can you just help us in any
17   regard about when the change took place
18   concerning the monitoring of blood
19   glucose and HbA1c in AstraZeneca clinical
20   trials?
21            MR. McCONNELL:  Objection,
22   asked and answered.
23            THE WITNESS:  The FDA, in
24   their request to us, asked that
```

Page 276

```
1    glucose be monitored in clinical
2    trials.  And I believe that the
3    plan to monitor glucose in
4    clinical trials was enacted
5    shortly thereafter.
6    BY MR. ALLEN:
7        Q.   When did the FDA make this
8    request?  Before or after your change in
9    the warnings in 2004 concerning diabetes
10   and hyperglycemia?
11       A.   I believe that part of the
12   label change included monitoring of
13   glucose.
14       Q.   The FDA, as part of the
15   process in changing and mandating that
16   you change your label for Seroquel in
17   2004, also requested of AstraZeneca that
18   they change their monitoring of
19   glucose --
20            MR. McCONNELL:  Objection to
21   form.
22   BY MR. ALLEN:
23       Q.   -- in the clinical trial
24   participants?
```

Page 277

```
1            MR. McCONNELL:  Sorry.
2        Objection to form.
3            THE WITNESS:  My
4        recollection was that the process
5        and monitoring of glucose in
6        clinical trials was changed to
7        comply with FDA requests.
8    BY MR. ALLEN:
9        Q.   Okay.  And where would these
10   requirements for monitoring of glucose be
11   maintained?  In what document?  What's
12   the title of the document?  Protocols or
13   SPAs or what?
14       A.   Protocols that went forth
15   after that included the new monitoring
16   guidelines.
17       Q.   Yes.
18            And what would that be
19   called?  So the jury that's listening to
20   your testimony, and we just -- I'm asking
21   on behalf of my clients, for the jury,
22   what would the monitoring requirements be
23   called, in some document somewhere, and
24   what would that be?
```

Confidential - Wayne Macfadden, M.D.

Page 302

1    yes, it does.
2    BY MR. ALLEN:
3        Q.   Does it say that above any
4    of the other columns on this page?
5        A.   No.
6        Q.   Okay.  Mandatory, where I
7    come from, means it's required.
8            Is that your same definition
9    of mandatory there at AstraZeneca?
10           MR. McCONNELL:  Objection to
11    form.
12           THE WITNESS:  Mandatory are
13    things that should be done, yes.
14    BY MR. ALLEN:
15    REDACTED
16
17
18
19
20
21
22
23
24

Page 303

1    REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 304

1        MR. ALLEN:  Objection,
2    nonresponsive.
3        We'll come back and ask that
4    question after the break,
5    contemplate it.
6        VIDEOTAPE TECHNICIAN:
7    Sorry.
8        It's eight minutes after
9    1:00.  We're going off the record.
10    This is the end of Tape Number 2.
11        - - -
12    (A luncheon recess
13    occurred.)
14        - - -
15        VIDEOTAPE TECHNICIAN: The
16    time is 56 minutes after 1:00.
17    This is the beginning of Tape
18    Number 3, and we're back on the
19    record.
20    BY MR. ALLEN:
21        Q.   Good afternoon, Doctor.
22            How are you?
23        A.   Good.
24        Q.   Scott Allen, again.  We're

Page 305

1    back from our lunch break.
2        And just to refocus our
3    attention, I put back on the board
4    Exhibit 16, which is the vocabulary and
5    descriptions final version dated February
6    14, 2005.
7        Are you with me?
8        A.   I have this document, yes.
9        Q.   Doctor, this is not the
10    first time you have seen in your entire
11    life the Seroquel vocabulary and
12    descriptors documents, is it?
13        A.   I recall there was a
14    document like this around, but I was not
15    familiar with the specifics of it.
16        Q.   Well, in fact, Doctor,
17    you -- there was one for every year,
18    wasn't there?
19        A.   I don't recall that.
20        Q.   And in fact, Doctor, you're
21    on the e-mail chain as one of the
22    individuals who was asked to give
23    feedback concerning the drafting of this
24    document.  True?

77 (Pages 302 to 305)

Confidential - Wayne Macfadden, M.D.

Page 306

1    A.   It was requested I give -- I
2  was one of the listed people to whom it
3  was sent, asking for feedback, yes.
4    Q.   Right.  And the initial
5  request for feedback came from Parexel,
6  who you worked with on the publications.
7  Right?
8    A.   Evidently, Parexel was
9  involved with organizing this document,
10  yes.
11    Q.   And Parexel helped prepare
12  and in fact sometimes prepared entire
13  manuscripts on AstraZeneca's clinical
14  trials.  True?
15    A.   AstraZeneca -- excuse me.
16    Parexel would often draft
17  manuscripts for AstraZeneca to complete.
18    Q.   And Parexel would drafts
19  manuscripts and then contact later
20  authors, "authors," who would then be
21  listed as the actual author of paper that
22  was initially drafted by Parexel.  True?
23    A.   Parexel was often engaged in
24  providing first drafts of manuscripts.

Page 307

1    Q.   Yes, sir.
2    And then if we go --
3    MR. McCONNELL:  Excuse me.
4  He didn't finish.
5  BY MR. ALLEN:
6    Q.   Oh, I'm sorry.
7    Anything else you'd like to
8  say?
9    A.   These manuscripts were then
10  circulated to authors for their comments
11  and reviews.
12  REDACTED
13
14
15
16
17
18
19
20
21
22
23
24    And publications again is

Page 308

1  what Parexel was involved in.  True?
2    A.   That was one of their
3  activities, yes.
4    Q.   Yes.
5    Tell the jury the other
6  activities, such as slide sets and
7  PowerPoints, advisory committee meetings,
8  preparing poster boards for conventions
9  and abstracts.
10    Are those the other
11  activities?
12    A.   They would often help with
13  development of slide sets.  They would
14  often be present and help organize
15  advisory committees and provide minutes.
16  They would often produce the posters that
17  were presented by AstraZeneca at
18  meetings.
19    Q.   Right.  Those would be
20  external communications.  Correct?
21    A.   Yes.
22  REDACTED
23
24

Page 309

1  REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

78  (Pages 306 to 309)

Confidential - Wayne Macfadden, M.D.

Page 310

```
 1  REDACTED
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  BY MR. ALLEN:
```

Page 311

```
 1  REDACTED
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 312

```
 1  REDACTED
 2
 3
 4
 5
 6
 7
 8
 9
10
11
```

12  BY MR. ALLEN:
13      Q.  Doctor, by the way, what is
14  the difference between random glucose and
15  fasting glucose?
16      A.  A random glucose can be
17  obtained any time of the day.  Fasting
18  refers to not eating for at least eight
19  hours prior to the blood test.
20      Q.  Isn't it true that in
21  AstraZeneca's short-term
22  placebo-controlled clinical trials of
23  3,342 patients treated with Seroquel, in
24  approximately 1,490 patients treated with

Page 313

1  placebo, the percent of patients who had
2  a fasting blood glucose greater than
3  126 milligrams per deciliter, or a
4  nonfasting blood glucose greater than or
5  equal to 200 milligrams per deciliter,
6  was 3.5 percent for quetiapine and
7  2.1 percent with placebo?
8      A.  I can't comment on that.  I
9  don't remember those numbers.  Moreover,
10  I'm not sure what document you're
11  referring to.
12      Q.  I'm not asking, Doctor --
13  see, Doctor, let's put it in context.
14      Zeroed out on your resume,
15  did you draft -- did you prepare this
16  resume?
17      A.  Yes.
18      Q.  Okay.  Put it in focus here,
19  if I can.
20      Your resume that you
21  prepared in this case, is it a truthful
22  and accurate resume?
23      MR. McCONNELL:  I object to
24  the form, prepared in this case.

79 (Pages 310 to 313)

Confidential - Wayne Macfadden, M.D.

Page 338

1  BY MR. ALLEN:
2      Q.  I asked you, as -- the court
3  reporter took down my question and your
4  answer.
5          I asked you, "As a former
6  senior director of clinical research and
7  US medical director for Seroquel, were
8  you familiar with the diabetes adverse
9  events discovered in trial 43 or not?"
10         And you said, "No, I was
11 not"; is that correct?
12     A.  That's apparently what I
13 said.
14     Q.  Is that correct?  Is that a
15 true answer?
16     A.  To the best of my
17 recollection, I was not aware of diabetes
18 AEs from that trial.
19     Q.  Okay.  Were you familiar
20 with the metabolic side effects and
21 adverse events discovered in trial 49,
22 BOLDER I?
23     A.  I was familiar with some of
24 the data from trial 49, yes.

Page 339

1          MR. ALLEN:  Objection,
2      nonresponsive.
3  BY MR. ALLEN:
4      Q.  Listen to my question,
5  please.
6          Were you familiar with the
7  metabolic adverse event data discovered
8  in trial 49?
9          MR. McCONNELL:  Objection to
10     the colloquy.
11         THE WITNESS:  At the time I
12     had familiarity with, in general
13     terms, of the AE and tolerability
14     data, yes.
15 BY MR. ALLEN:
16     Q.  And was some of the adverse
17 event and safety and tolerability data
18 discovered in trial 49 associated with
19 the metabolic syndrome?
20     A.  The metabolic syndrome, I
21 believe, refers to several different
22 assessments of safety and tolerability.
23 The safety data did provide some data
24 regarding those symptoms of metabolic

Page 340

1  syndrome.
2      Q.  Not just symptoms of
3  metabolic syndrome.  In fact, there's a
4  difference between symptoms and signs, is
5  there not, sir?
6          Symptoms are what patients
7  complain of; signs are actual physical
8  findings, either through laboratory data
9  or physical exam.
10         Isn't there a difference
11 between symptoms and signs?
12         MR. McCONNELL:  Objection to
13     form.
14         THE WITNESS:  That's
15     generally true, yes.
16 BY MR. ALLEN:
17     Q.  And in fact, there was
18 actual diagnostic signs of the metabolic
19 syndrome exhibited by the patients in
20 trial 49.  True?
21     A.  I don't recall the specifics
22 of the safety or tolerability data
23 pertaining to the different aspects of
24 the metabolic syndrome.

Page 341

1      Q.  That was not my question.
2          My question was whether or
3  not there were signs and symptoms
4  exhibited by the clinical trial
5  participants in trial 49, BOLDER I, in
6  which you participated.
7          Isn't that true?
8          MR. McCONNELL:  Objection,
9      asked and answered.
10         THE WITNESS:  Was there any
11     patient who had any symptom or any
12     lab finding?  That was one of the
13     parameters looked at in metabolic
14     syndrome.
15 BY MR. ALLEN:
16     Q.  No, sir, that wasn't my
17 question.
18         MR. McCONNELL:  Well, no.
19     Let him finish.
20 BY MR. ALLEN:
21     Q.  That's called bridging.
22 We'll get to that in a second.
23         MR. McCONNELL:  Finish your
24     answer.

86 (Pages 338 to 341)

Confidential - Wayne Macfadden, M.D.

Page 342

1    THE WITNESS:  Were there any
2    patients who had any signs or
3    symptoms of any of the parameters
4    of the metabolic syndrome during
5    the course of trial 49, probably,
6    although I can't recall the
7    specific numbers or details.
8        MR. ALLEN:  Objection,
9    nonresponsive.
10   BY MR. ALLEN:
11       Q.   My question to you was,
12   wasn't there a significant degree of data
13   concerning the clinical trial
14   participants in trial 49 of metabolic
15   syndrome.
16       Isn't that true?
17       MR. McCONNELL:  Objection to
18   form.
19       THE WITNESS:  The parameters
20   by which metabolic syndrome are
21   assessed were assessed in the
22   BOLDER I trial, that's true.
23   BY MR. ALLEN:
24       Q.   And the BOLDER I trial, you

Page 343

1    were the responsible clinical research
2    physician?
3        A.   Yes.
4        Q.   And it was determined in the
5    trial 49 -- and let me paraphrase, and
6    we'll get to the documents later, but
7    let's see if you can recall this.
8        It was determined from the
9    data in trial 49 that there was a
10   definite statistical significant concern
11   that patients who took Seroquel would
12   develop the metabolic syndrome.  True?
13       A.   A statistical significant --
14   I don't recall if that specific statement
15   is true.
16       Q.   Wasn't there a detailed
17   discussion between you and Dr. Brecher
18   and other individuals in the clinical
19   research department following study 49
20   where y'all discussed the elevated
21   triglycerides, lowering of HDL, the
22   increase in weight gain, the increase of
23   blood pressure, that there was a concern
24   that this was symptomatic or a sign of

Page 344

1    the metabolic syndrome in the study trial
2    participants, yes or no?
3        A.   I can't recall the specific
4    meeting to discuss the metabolic syndrome
5    after trial 49.
6        Q.   Well, it became such a
7    concern to you that you got into your own
8    hands a definition of the metabolic
9    syndrome that you would have available at
10   your desk so you could determine whether
11   or not what you were seeing in trial 49
12   was consistent with a metabolic syndrome.
13   True?
14       A.   A metabolic syndrome was
15   something that was increasingly spoken
16   about or talked about.  Therefore, we
17   wanted to see if the -- any signs of the
18   metabolic syndrome were present in
19   patients.
20       Q.   Tell the jury the signs of
21   the metabolic syndrome.
22       A.   I can't recall all of the
23   signs and symptoms of the metabolic
24   syndrome by memory.

Page 345

1        Q.   Well, then tell the jury as
2    to the best of your knowledge, as the
3    former US medical director for Seroquel,
4    some of the signs that you're familiar
5    with of the metabolic syndrome.
6        A.   I believe glucose was one of
7    the parameters that are assessed in the
8    metabolic syndrome.
9        Q.   What else?
10       A.   I would be speculating.  I'd
11   rather not.
12       Q.   It would be speculation.
13       So if the former US medical
14   director for Seroquel would have to
15   speculate about the signs of metabolic
16   syndrome, who would we ask that would not
17   speculate at AstraZeneca?  Who's the best
18   person to ask?
19       MR. McCONNELL:  Objection to
20   form.
21       THE WITNESS:  I believe
22   people in the safety department
23   would be more up to date and
24   familiar with that.

87  (Pages 342 to 345)

Confidential - Wayne Macfadden, M.D.

Page 354

```
 1   familiar with the fact that the FDA has
 2   told AstraZeneca that those statements
 3   are false and misleading and you've got
 4   to stop making them?
 5           MR. McCONNELL:  Objection to
 6       form.
 7           THE WITNESS:  I was not
 8       aware of all the correspondence
 9       within the company, between the
10       company or from the company.
11   BY MR. ALLEN:
12   REDACTED
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 356

```
 1   REDACTED
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12   BY MR. ALLEN:
13       Q.  I didn't ask you under whose
14   jurisdictions you now claim it's under.
15           And by the way, that
16   statement you just made wasn't true.
17   This is -- the publications for Seroquel
18   was under the safety department's
19   jurisdiction.
20           Is that what you're telling
21   this jury?
22           MR. McCONNELL:  Objection to
23       form.
24   BY MR. ALLEN:
```

Page 355

```
 1   REDACTED
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 357

```
 1       Q.  Are you telling this jury
 2   that the publication of clinical trial
 3   data via Parexel was under the direction
 4   of Dr. Rem Dev and Dr. Leong and the
 5   people in the safety surveillance
 6   department?
 7           MR. McCONNELL:  Objection to
 8       form.
 9           THE WITNESS:  In terms of
10       comments and statements about
11       post-marketing reports, those
12       comments and statements, to the
13       best of my recollection, were from
14       the safety department.
15   BY MR. ALLEN:
16   REDACTED
17
18
19
20
21
22
23
24
```

90 (Pages 354 to 357)

Confidential - Wayne Macfadden, M.D.

| Page 358 |
|---|

1  REDACTED

2

3

4  BY MR. ALLEN:

5      Q.   Okay.  Sir.

6          James Gaskill, you know Dr.

7  Gaskill, don't you?

8      A.   He was an employee at

9  AstraZeneca.

10     Q.   Yeah.

11         How do you know him?

12     A.   He was a medical writer

13 there.

14     Q.   Well, when would you work

15 with this medical writer, Dr. Gaskill?

16     A.   I believe he was the main

17 writer on the BOLDER trial report.

18     Q.   Now, when you discovered, by

19 the way, on BOLDER -- back up.

20         Is that BOLDER I or BOLDER

21 II you're talking about?

22     A.   I don't recall which of the

23 two he worked on.

24     Q.   I'm talking about which one

| Page 359 |
|---|

1  you -- which one were you in charge of,

2  BOLDER I or BOLDER II?

3      A.   I was the clinical research

4  physician for BOLDER I and BOLDER II.

5      Q.   Both of them.

6          Now, when you discovered

7  this metabolic syndrome data in this

8  BOLDER I study, 49 -- you did discover

9  that data.  Right?

10     A.   We reviewed safety and

11 tolerability and efficacy data after the

12 trial.

13         MR. ALLEN:  Objection,

14     nonresponsive.

15 BY MR. ALLEN:

16     Q.   I was talking about specific

17 safety data concerning the metabolic

18 syndrome.

19         When you discovered this

20 safety data that exhibited concerns about

21 the metabolic syndrome in study 49, what

22 did you do?  Tell the jury what you did.

23     A.   I don't recall.  That was a

24 while ago.

| Page 360 |
|---|

1      Q.   Well, can you tell the jury

2  anything you did after you discovered the

3  data that raised a concern about the

4  metabolic syndrome in study 49?  Can you

5  tell the jury anything you did?

6      A.   I remember reviewing the

7  data and discussing the data and making

8  changes in BOLDER II.

9      Q.   Discussing the data with

10 whom?

11     A.   The clinical study team.

12     Q.   And who would that be?

13     A.   I recall it was myself,

14 Robin McCoy, Margaret Mincwitz.

15     Q.   So that's all you recall, is

16 yourself, Robin McCoy, and was it

17 Mincwitz, excuse me -- yourself and

18 Robin, and Ms. Mincwitz, is that the only

19 people you recall?

20     A.   Those were the people in the

21 study team that I worked most closely

22 with, yes.

23     Q.   Was Ms. Mincwitz, is she a

24 statistician?

| Page 361 |
|---|

1      A.   Yes.

2      Q.   That's what I thought.

3          The other statistician in

4  these studies a lot was Robin, was her

5  name Rohini Chitra.

6          Is that the other

7  statistician that was often involved?

8          MR. McCONNELL:  Objection to

9  the colloquy.

10         THE WITNESS:  I don't

11 believe she had a role as study --

12 study statistician.

13 BY MR. ALLEN:

14     Q.   Okay.  I'm sorry.  Let me

15 just go back to who you talked to.

16         You said after you

17 discovered the metabolic syndrome data in

18 BOLDER I, you met with the study team and

19 changed the reporting of BOLDER II.

20         Isn't that what you

21 testified to?

22     A.   I don't believe I said

23 changed the reporting of BOLDER II.

24     Q.   You said you made changes in

91  (Pages 358 to 361)

Confidential - Wayne Macfadden, M.D.

Page 438

1  when you were there, when the label was
2  changed back in 2004 and then again in
3  2005, dealing with hyperglycemia and
4  diabetes and then the elderly, a "Dear
5  Healthcare Professional" letter was sent
6  out. Correct?
7      A.   Yes.
8      Q.   And why wasn't a "Dear
9  Healthcare Professional" sent out to the
10 healthcare professionals at the time the
11 label changes were made as reflected in
12 the letters you signed?
13     A.   To the best of my
14 recollection, that request was made by
15 the FDA, to inform clinicians about the
16 label change.
17     Q.   And did you at AstraZeneca,
18 obviously as demonstrated by your
19 signature, you had the ability to send
20 out "Dear Healthcare Professional"
21 letters notifying those recipients of the
22 changes. Right?
23     A.   I was the signatory on these
24 letters, yes.

Page 439

1      Q.   Okay. Now, what's a "change
2  is being effected"?
3      A.   I can't give you a -- I
4  can't recall the accurate definition of
5  that phrase.
6      Q.   Where did you hear that
7  phrase?
8      A.   That's a regulatory term.
9      Q.   You heard it when you worked
10 for drug companies as a pharmaceutical
11 physician. Right?
12     A.   Yes.
13     Q.   And you heard it when you
14 worked at AstraZeneca. Right?
15     A.   Yes.
16     Q.   And you knew as a fact and
17 you can tell this jury as a fact, as a
18 pharmaceutical physician and as the US
19 medical director for Seroquel, that
20 AstraZeneca could have changed its
21 package insert on Seroquel to strengthen
22 its warnings at any time if it so chose.
23 True?
24         MR. McCONNELL: Objection,

Page 440

1  calls for a legal conclusion.
2          THE WITNESS: Drug companies
3  collect safety information via
4  pharmacovigilance and clinical
5  trial sources, and if they believe
6  that there is something important
7  to change the label, they will --
8  they have the prerogative to do
9  such is my understanding, yes.
10 BY MR. ALLEN:
11     Q.   Yes.
12         And in fact, did you know
13 that the recent changes we discussed
14 under "Hyperglycemia" in Exhibit 18 were
15 changes being effected that AstraZeneca
16 did itself? Did you know that?
17     A.   I'm not familiar with the
18 history behind this new change.
19     Q.   Okay. All right. Let's go
20 to the third paragraph under
21 "Hyperglycemia," and then we'll take our
22 afternoon break.
23         It says, "In a 24 week trial
24 (active-controlled, 115 patients treated

Page 441

1  with Seroquel) designed to evaluate
2  glycemic status with oral glucose
3  tolerance testing of all patients, at
4  week 24 the incidence of a
5  treatment-emergent post-glucose challenge
6  glucose level" greater than or equal to
7  200 milligrams per deciliter "was 1.7%
8  and the incidence of a fasting
9  treatment-emergent blood glucose level"
10 greater than or equal to 126 milligrams
11 per deciliter "was 2.6%."
12         Do you see that?
13     A.   Yes.
14     Q.   What study does that refer
15 to?
16     A.   That study I believe was a
17 study to evaluate the glycemic status of
18 Seroquel.
19     Q.   Yeah.
20         What study? You know the
21 number, don't you? 125?
22     A.   120-something, yes.
23     Q.   125?
24     A.   That sounds right, yes.

111 (Pages 438 to 441)

Confidential - Wayne Macfadden, M.D.

Page 442

1    Q.  Okay.  You were working on
2  125 at the time you were fired.  Right?
3         MR. McCONNELL:  Objection to
4    form.
5  BY MR. ALLEN:
6    Q.  Weren't you working on 125
7  at the time you were fired?
8         MR. McCONNELL:  Objection to
9    form, assumes facts not in the
10   record.
11 BY MR. ALLEN:
12   Q.  Doctor, let me -- let me
13 rephrase it, since he's objecting.
14   Weren't you fired?
15   A.  No.
16   Q.  So had you not resigned,
17 AstraZeneca would have kept you on?
18        MR. McCONNELL:  Objection,
19   calls for speculation.
20        MR. ALLEN:  That's not
21   speculation.
22 BY MR. ALLEN:
23   Q.  Didn't AstraZeneca tell you
24 either you resign or you're going to be

Page 443

1  fired?
2    A.  No.
3    Q.  Okay.  Well, who did you
4  talk to about your "resignation," so we
5  can depose that person?
6    A.  I was given the opportunity
7  to resign.
8    Q.  Who gave you that
9  "opportunity"?
10        By the way, let me ask this.
11 Was that a good opportunity you were
12 given, this opportunity to resign?
13        MR. McCONNELL:  Objection to
14   form.
15        THE WITNESS:  I can't speak
16   if it was good or if it was bad,
17   but it was a change certainly.
18 BY MR. ALLEN:
19   Q.  Sir, it was a bad thing when
20 you were given the opportunity to resign.
21 It was like getting fired, wasn't it?
22        MR. McCONNELL:  Objection to
23   form.
24        THE WITNESS:  I accepted the

Page 444

1    opportunity to resign.
2  BY MR. ALLEN:
3    Q.  Who gave you that
4  opportunity?
5    A.  I don't recall the person,
6  but it was an HR person there.
7    Q.  Tell me the name of the
8  person.
9    A.  I don't recall.
10   Q.  Okay.  When you got to work
11 that morning, did you consider -- and
12 they gave you this opportunity to resign,
13 were you happy about this opportunity?
14   A.  No.
15   Q.  Okay.  This was a
16 displeasing opportunity.  Correct?
17   A.  Yes.
18   Q.  And if you had not seized
19 upon the opportunity to resign, you would
20 have been fired.  True?
21        MR. McCONNELL:  Objection,
22   lacks foundation, calls for
23   speculation.
24        THE WITNESS:  I don't know

Page 445

1    that, no.
2  BY MR. ALLEN:
3    Q.  Did you prepare a
4  resignation letter?
5    A.  I didn't offer a letter.  I
6  didn't prepare a resignation letter, no.
7    Q.  Did you prepare any type of
8  resignation document?
9    A.  No.
10   Q.  Did you sign -- did you sign
11 a severance agreement?
12   A.  A severance agreement?
13   Q.  Doctor, I'm going to get to
14 it.
15        So did you sign any type of
16 agreement with AstraZeneca, either at the
17 day of your opportunity to resign or at
18 any other time?  Do you have any written
19 agreement, contract or letter agreement
20 with AstraZeneca?
21   A.  I resigned in writing.
22   Q.  Okay.  Well, when I ask you
23 did you write a letter of resignation,
24 you said no, but you said you resigned in

112  (Pages 442 to 445)

Confidential - Wayne Macfadden, M.D.

Page 446

1  writing.
2      What does that mean?
3      A.   They offered me the
4  opportunity to resign and had prepared a
5  letter in case I chose that opportunity.
6      Q.   So when I said did you
7  sign a -- write a resignation letter, you
8  said no, I'm confused.
9      So now you agree there is a
10  resignation letter?
11      MR. McCONNELL:  Objection to
12  form.
13  BY MR. ALLEN:
14      Q.   Let me rephrase it.
15      Didn't you previously
16  testify under oath within the last three
17  minutes there wasn't a resignation
18  letter?
19      MR. McCONNELL:  Objection to
20  form.
21      THE WITNESS:  I believe I
22  answered that I did not write a
23  resignation letter.
24  BY MR. ALLEN:

Page 447

1      Q.   Oh.  So you were giving
2  me -- do you remember when she said tell
3  the truth, the whole truth and nothing
4  but the truth?  Do you remember that?
5      A.   Yes.
6      Q.   Don't you think it would
7  have been more truthful when I said did
8  you prepare a resignation letter to say,
9  yes, sir, Mr. Allen, I signed a
10  resignation letter that was prepared for
11  me?  Don't you think that would be more
12  truthful and open and honest?
13      MR. McCONNELL:  Objection,
14  argumentative.
15      THE WITNESS:  No.
16  BY MR. ALLEN:
17      Q.   Okay.  You don't.
18      Now, let's get back to --
19  your technical answer is, so who had
20  prepared this resignation letter for you
21  to sign?
22      A.   AstraZeneca offered me the
23  opportunity to resign, and they had
24  prepared a letter in case I chose that

Page 448

1  opportunity.
2      Q.   Who gave you the letter?
3      A.   I don't recall the person
4  who slid it across the table.
5      Q.   Who was in the room?
6      A.   I don't recall the HR
7  representative's name.  There was an
8  attorney in the room and my manager was
9  on the telephone.
10      Q.   Who -- what was the
11  attorney's name?
12      A.   It was John Bogan, I think
13  was his name.
14      Q.   Bogan?
15      A.   Something like that.
16      Q.   In-house counsel for
17  AstraZeneca?
18      A.   I don't know what his exact
19  responsibilities were.
20      Q.   Had you met him before?
21      A.   I had a meeting with him
22  and -- about a month prior to that for
23  the first time.
24      Q.   To discuss the events that

Page 449

1  later led to your resignation?
2      A.   At the first meeting, they
3  presented some personal e-mail
4  correspondence that they had discovered.
5      Q.   Okay.  Well, when you went
6  in the morning of your resignation when
7  you signed this letter, were you
8  intending to resign that morning?  When
9  you got to work, when you walked and
10  parked your car in your spot and hit the
11  elevator button and rode up to the third
12  floor, were you intending to resign when
13  you got there?
14      A.   I was considering resigning,
15  yes.
16      Q.   And then they forced your
17  hand, didn't they?
18      A.   No.
19      Q.   Oh, really?  So they gave
20  you an opportunity.
21      Is that your -- so your
22  testimony was this is an opportunity.
23  Right?
24      MR. McCONNELL:  Objection,

113  (Pages 446 to 449)

Confidential - Wayne Macfadden, M.D.

Page 450

1    asked and answered.
2         THE WITNESS:  They gave me
3    the opportunity to resign, yes.
4    BY MR. ALLEN:
5         Q.  Okay.  When you -- who was
6    the manager that was in the room or on
7    the phone?
8         A.  My manager was Gil Block.
9         Q.  Dr. Gil Block.  Correct?
10        A.  Yes.
11        Q.  And his -- his manager is
12   Ihor Rak, how do you pronounce that name,
13   Ihor Rak?
14        A.  I didn't know who his
15   manager was.
16        Q.  Who is Ihor Rak, Ihor Rak?
17        A.  He is or was an employee at
18   AstraZeneca.
19        Q.  Well, I knew that, sir.  The
20   jury is going to know that.  We're going
21   to see an e-mail from Ihor Rak before
22   this two days is over.
23        But I'm asking you to do us
24   a favor and tell the jury, please, who

Page 451

1    Ihor Rak is.
2         MR. McCONNELL:  Objection to
3    form; objection to the colloquy.
4         THE WITNESS:  He's a
5    physician at AstraZeneca.  And I
6    can't speak about what his exact
7    roles and responsibilities were at
8    the time.
9    BY MR. ALLEN:
10        Q.  Did you retain a copy of the
11   letter that you -- that you signed at the
12   time of your resignation from
13   AstraZeneca?
14        A.  I don't recall if I still
15   have it.
16        Q.  So yes -- the answer is yes,
17   Mr. Allen, I retained a copy at the time
18   I resigned; is that correct?
19        MR. McCONNELL:  Objection to
20   form.
21        MR. ALLEN:  No.  I think his
22   answer is yes.  I didn't ask if he
23   still had it.  I asked did he
24   retain a copy at the time of his

Page 452

1    resignation.
2    BY MR. ALLEN:
3         Q.  My question is, did you
4    retain a copy of the letter that you
5    signed at the time of your resignation?
6         A.  I don't recall.
7         Q.  Was it a Monday, a Wednesday
8    or a Friday when you resigned?
9         A.  I don't remember.
10        Q.  What date was it, exactly?
11        A.  It was August or September
12   in -- of last year.
13        Q.  Who was on the phone?  Dr.
14   Gil Block.
15        What did he say?
16        A.  I don't recall he said very
17   much.
18        Q.  Had you had discussions with
19   him about your resignation prior to this
20   day that you, quote, were given this
21   opportunity to resign?
22        A.  No.
23        Q.  You said you talked to --
24   what was this lawyer's name again?  What

Page 453

1    was his name?  Tell me.  I forgot
2    already.  Tell me the name, please.  I
3    beg you.
4         A.  John Boogan or Bogan.
5         Q.  Okay.  You said you had
6    talked to him before.
7         Had you talked to anybody
8    else at AstraZeneca prior to talking to
9    Mr. Bogan, or after you talked to Mr.
10   Bogan but before the day of your
11   resignation, about the reasons you were
12   given the opportunity to resign?
13        A.  There was a meeting about a
14   month or so prior to my accepting the
15   offer to resign in which I was confronted
16   with personal e-mail correspondences.
17        Q.  I knew that.
18        I asked you, did you talk to
19   anybody else besides this lawyer?
20        MR. McCONNELL:  Objection,
21   asked and answered.
22        THE WITNESS:  I don't recall
23   speaking to anybody else about
24   this, no.

114  (Pages 450 to 453)

Confidential - Wayne Macfadden, M.D.

Page 458

1    Of course this would apply
2  to you when you were there. Right?
3    A.  I haven't seen this
4  document, so I don't know the date.
5    Q.  Well, I do.  It is listed on
6  one of the pages.  There it is.  Page 2,
7  "Amended version approved by the
8  AstraZeneca Board in July 2003."
9    Do you see that?
10    MR. McCONNELL: 02, page 02.
11    THE WITNESS: Yes.
12  BY MR. ALLEN:
13    Q.  So it would apply to you.
14  Right?
15    A.  It appears it would, yes.
16    Q.  Okay.  Now, let's go to page
17  04.  Under "Standards of conduct,
18  Business practices," it says, "Gifts,
19  entertainment and personal favours may
20  only be offered to a third party if
21  modest in value and if they are
22  consistent with customary business
23  practice.  No gifts, entertainment or
24  personal favour may be offered in

Page 459

1  contravention of any applicable law or
2  code of practice."
3    Did I read that correctly?
4    A.  Yes.
5    Q.  Do you agree that in your
6  role at AstraZeneca, you should not have
7  offered any gifts, entertainment or
8  personal favors to any third party unless
9  they were both modest in value and
10  consistent with customary business
11  practice?
12    A.  That would have been against
13  this code of conduct, it appears.
14    Q.  Yes.
15    Should you have spent
16  AstraZeneca funds on personal matters?
17    A.  Spending company money on
18  personal matters, no.
19    Q.  Okay.  Then you go to page
20  06, "Personal harassment."
21    Do you agree that the
22  business code of conduct says, "Personal
23  harassment, such as verbal abuse or
24  sexual harassment, of any employee of

Page 460

1  AstraZeneca, its suppliers or customers
2  is unacceptable in any form whatsoever."
3    Do you agree with that?
4    A.  I see that's written in the
5  code of conduct, yes.
6    Q.  And do you agree with that?
7    A.  Verbal and sexual abuse are
8  not good things.
9    Q.  Right.  Then you go to page
10  08, "Conflicts of interest."
11    And I've highlighted the
12  second paragraph.
13    You know what a conflict of
14  interest is, sir, do you not?  Sir, do
15  you know what a conflict of interest is?
16    A.  I see that it is part of
17  this document with a lot of different --
18  different options.
19    Q.  Okay.  Let's just put this
20  document aside for a minute.  You don't
21  even need to refer to it, and I'm going
22  to ask you a question.
23    Do you know what a conflict
24  of interest is?

Page 461

1    MR. McCONNELL: Objection,
2  asked and answered.
3    THE WITNESS:  A conflict of
4  interest may pertain to a
5  situation where one uses one's --
6  where inappropriate use of one's
7  position or title.
8  BY MR. ALLEN:
9    Q.  Okay.  And it was an
10  AstraZeneca code of conduct, under
11  conflicts of interest, that "Employees,"
12  that would be you.  Correct?
13    A.  Yes.
14    Q.  "Should avoid entering into
15  situations in which their personal,
16  family or financial interests may
17  conflict with those of AstraZeneca."
18    Is that true?
19    A.  Yes.  That's part of the
20  Code of Conduct, yes.
21    Q.  And that applied to you, did
22  it not?
23    MR. McCONNELL: Objection,
24  asked and answered.

116  (Pages 458 to 461)

Confidential - Wayne Macfadden, M.D.

Page 462

1    THE WITNESS:  As I was an
2  employee of AstraZeneca, yes.
3  BY MR. ALLEN:
4    Q.  Okay.  I screwed up again.
5  All right.  Let me -- let me hand -- let
6  me mark another -- I marked my copy.
7    I'm going to hand you and
8  your counsel what's been marked as
9  Exhibit Number 19.
10    - - -
11    (Deposition Exhibit No.
12  Macfadden-19, Corporate
13  Responsibility Summary Report
14  2006, was marked for
15  identification.)
16    - - -
17  BY MR. ALLEN:
18    Q.  The 2006 -- that's pretty
19  bad.  Here.  I'm focusing it.  Here we
20  go.  I don't have a color copy.
21    MR. ALLEN:  Lou, is there
22  something I can do to make this
23  come in better?  Here, let's see.
24  Maybe I'll do...

Page 463

1    There you go.  Thanks, Lou.
2  I could have been here all day.
3    VIDEOTAPE TECHNICIAN:  Is
4  that better?
5    MR. ALLEN:  Yeah.
6    VIDEOTAPE TECHNICIAN:  That
7  made it a little darker.
8    MR. ALLEN:  That's perfect.
9  BY MR. ALLEN:
10    Q.  Sir, Exhibit 19 is the
11  Corporate Responsibility Summary Report
12  for 2006 from AstraZeneca.
13    Do you see that?
14    A.  Yes.
15    Q.  Of course, if you turn with
16  me -- by the way, there was a corporate
17  responsibility document prepared for
18  2005, wasn't there?
19    A.  I don't know.
20    Q.  Okay.  Well, let me just --
21  you certainly -- let me turn to page --
22  this page, sir, and let's see if it's
23  paginated.  Get my glasses on.  They are
24  paginated.  This one, yeah, you can

Page 464

1  barely see it.  It's actually page 11,
2  sir.  It's difficult to read.  It's the
3  page with the three Rs and the rat in the
4  left-hand column.
5    MR. McCONNELL:  Which page?
6    MR. ALLEN:  It's page 11.
7  If you look in the right -- in the
8  bottom right-hand corner.
9    MR. McCONNELL:  Okay.
10  BY MR. ALLEN:
11    Q.  "We are committed to driving
12  continuous" -- "We are committed to
13  driving continuous improvement in the
14  replacement, reduction and refinement of
15  animal studies."
16    That page, do you see it,
17  sir?
18    A.  Yes.
19    Q.  And then it also talks about
20  on that page clinical trials?
21    A.  Yes.
22    Q.  And it says, "As part of our
23  commitment to providing information about
24  our medicines to those who need it, we

Page 465

1  publish and provide open access via the
2  Internet to the findings of our clinical
3  trials, whether favorable or
4  unfavorable."
5    Do you see that?
6    MR. McCONNELL:  Where is
7  that, Scott?  I'm sorry.
8    MR. ALLEN:  Upper left-hand
9  corner.
10    MR. McCONNELL:  Okay.
11    THE WITNESS:  Yes, I see
12  that.
13  BY MR. ALLEN:
14    Q.  Okay.  Now, that was -- did
15  you know at the time you worked as the
16  senior director of clinical research on
17  Seroquel, and at the time you were the
18  medical affairs director for the United
19  States on Seroquel, that AstraZeneca has,
20  as it's stated, commitment to provide
21  publication and provision, through open
22  access via the Internet to the finding of
23  our clinical trials, whether they're
24  favorable or unfavorable?  Did you know

117 (Pages 462 to 465)

Confidential - Wayne Macfadden, M.D.

Page 466

1  about that policy?
2      A.  I believe that was a policy
3  that was evolving when I was at
4  AstraZeneca, yes.
5      Q.  Well, let me ask this:  At
6  the time you started working at
7  AstraZeneca in 2001 until you took the
8  opportunity to resign in 2006, was it a
9  policy to provide full information to
10  your clinical trial data, whether
11  favorable or unfavorable?
12     A.  I don't believe a policy as
13  such was stated.  However, the
14  expectation was that clinical trial data
15  would be reported.
16     Q.  Okay.  And then if you look
17  over at AstraZeneca in the 2006 corporate
18  responsibility, under the sections,
19  "Issue," and then they have "Animal
20  Research," and then they have "Clinical
21  Trials."
22         Do you see the "Issue" is
23  "Clinical Trials"?  Do you see it, sir?
24     A.  Yes.

Page 467

1      Q.  Okay.  And then they have
2  the "Objective," the "Action Plan," and
3  then the "KPI Where Appropriate."  And
4  KPI stands for key performance index.
5  And then they have the "2006 Performance
6  against KPI and Where to Find More
7  Details."
8         Do you see those sections?
9      A.  Yes.
10     Q.  Okay.  Now, I want to go
11  down to the clinical trials.
12         That's something as you told
13  us at 9:00 this morning that you were
14  intimately involved with at AstraZeneca.
15  Right?
16         MR. McCONNELL:  Objection to
17  form.
18         THE WITNESS:  That was my
19  main responsibility at
20  AstraZeneca, yes.
21  BY MR. ALLEN:
22     Q.  Okay.  So your main
23  responsibility under "Issue" was clinical
24  trials, and under the section of

Page 468

1  "Objective," you have the objective of,
2  "Ensure that our clinical trial
3  programmes continue to be safe and well
4  designed and appropriate wherever they
5  take place."
6         That's one of your
7  objectives.  Right?
8      A.  Yes.
9      Q.  And in that regard, after
10  you had the -- you've already told us
11  about what you did.
12         After you saw the blood
13  glucose results in BOLDER I, you
14  instituted a new protocol in BOLDER II to
15  more closely monitor blood glucose.
16  Correct?
17     A.  To more accurately assess
18  blood glucoses, yes.
19     Q.  Yes.
20         Because when you saw the
21  findings in BOLDER I about elevations in
22  blood glucose, you wanted to more
23  accurately and more safely monitor the
24  participants in BOLDER II.  Correct?

Page 469

1      A.  We wanted more accurate
2  clinical trial data, yes.
3      Q.  And the reason you wanted
4  that, for example, in BOLDER II is
5  because of the elevations in blood
6  glucose that were seen in BOLDER I.
7  True?
8      A.  My recollection was there
9  was a lot of variance in the blood
10  glucose levels in BOLDER I, indicating
11  that they were not likely drawn in the
12  fasted state.
13     Q.  Okay.  Now, and then of
14  course we know that once the label
15  changed in 2004, when you wrote the
16  letter, you even began to monitor blood
17  glucose even more closely in your
18  clinical trials.  Right?
19     A.  Yes.
20     Q.  Okay.  Now, the other
21  objective here is, "Open communication of
22  appropriate data."
23         Do you see that?
24     A.  Yes.

118  (Pages 466 to 469)

Confidential - Wayne Macfadden, M.D.

Page 470

1    Q.   Now, in order to make
2  something beyond an objective, there's a
3  plan of action instituted.
4        Do you see "Action Plan"?
5    A.   Yes.
6    Q.   Now, just for the jury, I
7  think you can testify, there's one thing
8  to have an objective, but in order to
9  make your objective come true, you have
10 to take action.  Right?
11   A.   Yes.
12   Q.   Just wishing it so doesn't
13 make it so, does it?
14   A.   Yes.
15   Q.   Okay.  Now, under the
16 "Objective" of "Open communication of
17 appropriate data," it says, "Continue to
18 update our public global clinical trials
19 website with latest information."
20       Did I read that correctly?
21   A.   Yes.
22   Q.   Okay.  Did you do that when
23 you were at AstraZeneca and had knowledge
24 of the clinical trial data?

Page 471

1    A.   I don't recall regular
2  updates to a global clinical trials
3  website, if one existed, while I was
4  there.
5    Q.   Okay.  Then we go to --
6  well, Doctor, let me ask this.
7        You're the medical director
8  in the United States for Seroquel.
9  You're a senior research director on
10 Seroquel.
11       If you didn't know about the
12 updates, who would?
13       MR. McCONNELL:  Objection to
14 form.
15       THE WITNESS:  If I didn't
16 know about updates to the global
17 clinical trial website?
18 BY MR. ALLEN:
19   Q.   Yes, sir.  If you --
20   A.   I'm not sure of the person
21 or people responsible for updating that
22 website.
23   Q.   Of course, in your role as
24 medical director for Seroquel, you would

Page 472

1  check that website out to make sure that
2  the appropriate updates had been made,
3  though, wouldn't you?
4    A.   That was not my
5  responsibility as I understood it, to
6  check a global clinical trial website if
7  one existed while I was there.
8    Q.   Well, didn't you care about
9  whether or not AstraZeneca was openly
10 communicating all the relevant clinical
11 trial data?
12       MR. McCONNELL:  Objection to
13 form.
14       THE WITNESS:  I assumed that
15 that was what was going on.
16 BY MR. ALLEN:
17   Q.   Why did you assume that was
18 going on?
19   A.   That's the right thing to
20 do.
21   Q.   Thank you, sir.
22       Now, we go "KPI" --
23 remember, that's the key -- I think that
24 stands for key performance index --

Page 473

1  "Where Appropriate."
2        And under that section on
3  "Clinical Trials," it says, "Percentage
4  of disclosed data on hypothesis-driven
5  global clinical trials on all major
6  products."
7        Do you see that?
8    A.   Yes.
9    Q.   And then we go out to the
10 "2006 Performance Against KPI and Where
11 to Find More Details."  And y'all said
12 the 2006 performance against KPI was
13 100 percent.
14       Do you see that?
15   A.   Yes.
16   Q.   Okay.  So at the time you
17 left or in the year that you left
18 AstraZeneca, 100 percent of the clinical
19 trial data of AstraZeneca on Seroquel had
20 been disclosed on the Internet in an open
21 fashion?
22   A.   I don't know.
23   Q.   Well, the document says
24 100 percent, doesn't it?

119  (Pages 470 to 473)

Confidential - Wayne Macfadden, M.D.

Page 601

1    A.   Yes.
2    Q.   And then Wayne Geller, he's
3  in the safety surveillance department,
4  right?
5    A.   Yes.
6    Q.   And these are the
7  individuals, some of whom you've
8  identified in your deposition as persons
9  who would be knowledgeable concerning
10  safety surveillance and the reporting of
11  serious adverse events on Seroquel,
12  right?
13    A.   Dr. Geller and Dr. Dev, to
14  my recollection, were part of the safety
15  division at AstraZeneca, yes.
16    Q.   Yes.
17        And then we saw Mr. Schwartz
18  was head of the Seroquel brand team,
19  right?
20    A.   He was a co-leader of the
21  Seroquel brand team for part of my time
22  there, yes.
23    Q.   Yeah.
24        And he was co-leader with

Page 602

1  Don Beamish, correct?
2    A.   Yes.
3    Q.   By the way, this e-mail is
4  in the time period you just identified
5  for me that Mr. Schwartz was your dotted
6  line reporting chain.  Remember you just
7  said it was between about 2002 and 2004,
8  right?
9    A.   I gave you an approximation
10  with those dates, yes.
11    Q.   Yes, sir.
12        And Margaret Melville
13  was, I believe, global regulatory affairs
14  director for Seroquel at this time
15  period, right?
16    A.   My recollection was that her
17  job was in the global regulatory division
18  at AstraZeneca, yes.
19  REDACTED
20
21
22
23
24

Page 603

1  REDACTED
2
3
4    Q.   Do you remember yesterday I
5  asked you, wasn't diabetes a big issue
6  internally in the company at the time
7  that you started at AstraZeneca?  Do you
8  recall that line of questioning?
9    A.   I think so, yes.
10    Q.   And to answer the question,
11  you can tell the jury, at or near the
12  time you started at AstraZeneca, diabetes
13  and hyperglycemia and its potential
14  relationship to Seroquel was a big issue
15  in the company, was it not?
16        MR. MCCONNELL:  Objection,
17    form.
18        THE WITNESS:  I don't
19    believe I said that yesterday.
20  BY MR. ALLEN:
21    Q.   No, sir, I don't believe you
22  did either.  I'm asking you today, and
23  you can go ahead and just tell us, at or
24  near the time you started at AstraZeneca,

Page 604

1  diabetes and hyperglycemia and its
2  potential relationship to Seroquel was a
3  big issue in the company, was it not?
4        MR. MCCONNELL:  Objection,
5    form.
6        THE WITNESS:  I can't speak
7    about how every division within
8    the company had -- I can't speak
9    about every division in the
10    company's opinion on that, but to
11    the best of my recollection, in
12    clinical development, that was not
13    considered to be a big issue.
14  BY MR. ALLEN:
15    Q.   Tell the jury what you mean
16  by "clinical development."
17    A.   My job primarily was
18  responsible for clinical trials in the
19  U.S. that I was assigned to.
20    Q.   So you were in clinical
21  development?
22    A.   The organization was
23  clinical development.  I think that was
24  their title, yes.

14  (Pages 601 to 604)

Confidential - Wayne Macfadden, M.D.

Page 605

1    Q.   And then you were going to
2  be responsible to assist in getting these
3  trials published, right?
4    A.   My job function included the
5  planning of the trials, executing them
6  and presenting the results, yes.
7    Q.   When was the last time you
8  had your media training?
9        MR. MCCONNELL:  Objection,
10  assumes facts not in the record.
11  BY MR. ALLEN:
12    Q.   When was the last time you
13  had your media training?
14    A.   I think it was when I was at
15  GSK, I believe, which was over five years
16  ago.
17    Q.   Didn't you have message
18  training while you were at AstraZeneca?
19    A.   I don't recall.
20    Q.   Well, if the documents in
21  evidence, that are going to be in
22  evidence in the case by the time your
23  deposition is played indicate that you
24  definitely have had message training

Page 606

1  while you were at AstraZeneca, are you
2  denying that or are you now admitting
3  that?
4        MR. MCCONNELL:  Objection,
5  form.
6        THE WITNESS:  I just spoke
7  to my recollections.  If there's a
8  document to show that I was
9  present, then I'll look at that.
10  BY MR. ALLEN:
11    Q.   Okay.
12        Let's assume there's no
13  document, and I'm just asking you to tell
14  us whether or not you attended message
15  training at AstraZeneca, and you're under
16  oath and you have to tell the truth,
17  what's your answer?
18    A.   I don't recall being in
19  message training at AstraZeneca.
20    Q.   Okay.
21        Is one of the things you've
22  learned in your message training and your
23  media training is to look directly into
24  the camera, and then no matter what

Page 607

1  question is asked, give a message or a
2  standard answer to that question?  Is
3  that one of the things you were taught in
4  either your media training and/or message
5  training?
6        MR. MCCONNELL:  Objection to
7  form.
8        THE WITNESS:  I don't
9  believe so.
10  BY MR. ALLEN:
11  REDACTED
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 608

1  REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

15 (Pages 605 to 608)

Confidential - Wayne Macfadden, M.D.

Page 797

1   AstraZeneca, representing you?
2          MR. MCCONNELL: Objection,
3      asked and answered.
4          THE WITNESS: My
5      understanding is yes.
6   BY MR. PIRTLE:
7      Q.   What have you paid them to
8   represent you?
9      A.   I have not paid them
10  personally.
11     Q.   So, you haven't paid them
12  anything to represent you, right?
13     A.   Yes.
14     Q.   Are they representing you
15  for free, per your understanding?
16     A.   I don't think so.
17     Q.   Are you expecting to pay
18  them in the future?
19     A.   No.
20     Q.   Who are you expecting to pay
21  them?
22         MR. MCCONNELL: Objection,
23     calls for speculation.
24         THE WITNESS: I assume it

Page 798

1      would be the AstraZeneca.
2   BY MR. PIRTLE:
3      Q.   Do you have an agreement
4   with AstraZeneca for them to cover your
5   legal fees in this matter?
6      A.   No.
7      Q.   Do you have any
8   understanding whatsoever with AstraZeneca
9   that they will cover your legal fees in
10  this matter?
11     A.   No.
12     Q.   Approximately how many
13  documents have been read to you?
14     A.   You mean during the break?
15     Q.   Yes.
16     A.   I recall there was one.
17     Q.   Tell me what was read to
18  you.
19         MR. MCCONNELL: Objection
20     and instruct him not to answer --
21  BY MR. PIRTLE:
22     Q.   Are you going to follow --
23         MR. MCCONNELL: -- work
24     product.

Page 799

1   BY MR. PIRTLE:
2      Q.   Excuse me.
3          Are you going to follow the
4   AstraZeneca's lawyer's advice?
5      A.   Yes.
6      Q.   So, you're not going to tell
7   me what was read to you?
8      A.   Yes.
9      Q.   I think it's no, but that's
10  okay.  I'm just making a record.
11         MR. PIRTLE: Let me just
12     state for the record, I believe
13     pursuant to the Federal rules,
14     coaching the witness during
15     cross-examination is prohibited,
16     and we do have a right to that, no
17     matter how clever the coaching is.
18         MR. MCCONNELL: We disagree.
19         MR. PIRTLE: I understand.
20     That's not for here.
21  BY MR. PIRTLE:
22     Q.   Sir, I want to pick up where
23  Mr. Allen left off to an extent, and that
24  is, as in your role as the U.S. medical

Page 800

1   director, do you believe you did a good
2   job?
3      A.   Yes.
4      Q.   Do you believe, in your role
5   as U.S. medical director, that you acted
6   with honor and integrity?
7      A.   I believe in my professional
8   responsibilities I acted with honor and
9   integrity.
10     Q.   Do you believe, in your role
11  as a medical director for the United
12  States Seroquel product, that you acted
13  ethically?
14     A.   I believe so, yes.
15     Q.   Do you believe, in your role
16  as the senior director of clinical
17  research, you acted with honor, integrity
18  and ethics?
19     A.   In my professional
20  responsibilities, yes.
21     Q.   Why are you qualifying that
22  answer, sir?
23     A.   There are things in my
24  personal life that I have regrets about.

63 (Pages 797 to 800)

Confidential - Wayne Macfadden, M.D.

Page 801

1     Q.   Well, we're going to look at
2  some documents in a little bit, and maybe
3  we'll get to that point.  I don't want to
4  go into it now.
5          I want to ask you, in your
6  role as the senior medical -- the U.S.
7  medical director, and in your role as
8  senior director of clinical research at
9  AstraZeneca, did you act in your utmost
10  to avoid conflicts of interest?
11     A.   I believe I did not engage
12  in conflicts of interest while at
13  AstraZeneca.
14     Q.   Do you believe that you
15  tried to avoid bias in those roles?
16     A.   I believe I did not engage
17  in bias when I was at AstraZeneca.
18     Q.   In your role as the U.S.
19  medical director and the senior director
20  of clinical research, do you believe that
21  you acted honorably towards the
22  researchers that you had contact with?
23     A.   Yes.
24     Q.   And do you believe that you

Page 802

1  acted with ethics and integrity towards
2  those researchers?
3     A.   Yes.
4     Q.   You were involved in some
5  clinical trials that Mr. Allen went
6  through with you.  I can think of several
7  off the top of my head, but I'll just use
8  two as an example, BOLDER I and BOLDER
9  II.  Did you have respect for the
10  clinical researchers that were involved
11  in those studies?
12     A.   Yes.
13     Q.   In terms of the employees
14  that you worked with at AstraZeneca, do
15  you hold them in high esteem?
16     A.   Yes.
17     Q.   Now, what I mean by that is,
18  I'm talking about your Seroquel team
19  co-workers.  Do you hold them in high
20  esteem?
21     A.   I think most of them
22  performed competently, yes.
23     Q.   You realize in your role as
24  a senior director of clinical research

Page 803

1  that it was important that your conduct
2  not create bias in the studies that you
3  were shepherding through the scientific
4  process, didn't you?
5     A.   Avoidance of bias is
6  important in clinical trials, yes.
7     Q.   You realized that, didn't
8  you?
9     A.   Yes.
10     Q.   And you realized it was
11  important to avoid conflicts of interest
12  so that the research could be pure and
13  only on the points that it was directed
14  towards the outcomes of the study,
15  correct?
16          MR. MCCONNELL:  Objection to
17     form.
18          THE WITNESS:  Bias is
19     important to be avoided in
20     clinical trials, yes.
21  BY MR. PIRTLE:
22     Q.   And you believed that in
23  your work as the senior director of
24  clinical research, right?

Page 804

1     A.   Yes.
2     Q.   You said a while ago you
3  believe most of the employees acted with
4  integrity.  Who did not perform
5  competently?
6     A.   There were some individuals
7  who I can't -- who I believe did not
8  always perform competently.
9     Q.   Who?
10     A.   Well, there was a person
11  named Larry Potter who I believe did not
12  perform competently.
13     Q.   What was Larry Potter's role
14  at AstraZeneca?
15     A.   I believe he was an
16  assistant to the clinical research
17  associates.
18     Q.   What was his incompetence,
19  in your view?
20     A.   He would be late or delayed
21  in assignments that were asked of him.
22     Q.   Anything more meaningful
23  than that?
24     A.   I can't recall.

Confidential - Wayne Macfadden, M.D.

Page 865

1    Q.   Was she in public affairs?
2    A.   Her title after her
3  electronic signature indicates public
4  affairs, yes.
5    Q.   Do you remember her?
6    A.   Yes.
7    Q.   "Hi, Wayne, Hope you are
8  well. I just received your," it looks
9  like "v-mail," voicemail. Did I read
10 that correctly?
11   A.   Yes.
12   Q.   "Attached below please find
13 the message points." Did I read that
14 correctly?
15   A.   Yes.
16   Q.   "I will be sure to call you
17 tomorrow in hopes that we will have some
18 interviews set up." Did I read that
19 correctly?
20   A.   Yes.
21   Q.   Now, I thought at one point
22 in time you told this jury that your main
23 focus was science.
24   A.   Yes.

Page 866

1    Q.   Now, this isn't about
2  science, is it?
3    A.   I don't recall this specific
4  thing she's referring to. However,
5  people at the company who would present
6  data would often have training for
7  presentations.
8    Q.   On the next one I see, "Hi,
9  Wayne, I hope you found the message
10 training yesterday to be valuable." So,
11 evidently you did get some training,
12 correct?
13   A.   She is referring to message
14 training, which I can't clearly recall.
15   Q.   You say "I can't clearly
16 recall." Is some of it coming back to
17 you now?
18   A.   No.
19   Q.   All right.
20        Well, what were the
21 messages? Can you clearly recall that?
22   A.   No.
23   Q.   It says there's an
24 attachment, and it says, "Messaging,

Page 867

1  Wayne after" something.
2        MR. ALLEN:  After M-E-D-I.
3  BY MR. PIRTLE:
4    Q.   "After medi"?
5    A.   Yes.
6    Q.   What does that refer to?
7    A.   I don't know.
8    Q.   Doesn't it say, "Messaging
9  for Wayne after media training," perhaps?
10   A.   It appears to be cut off.
11   Q.   You can't make it out, huh?
12   A.   Right.
13   Q.   What?
14   A.   Yes.
15   Q.   "Based on our productive
16 meeting, we have put the key messages
17 down in format we thought you would find
18 most useful." Did I read that correctly?
19   A.   Yes.
20   Q.   Now, you had said earlier
21 presentation training, correct?
22   A.   That was how I recall it,
23 yes.
24   Q.   Well, then, why does she say

Page 868

1  up here, "I will be sure to call you
2  tomorrow in hopes...we have some
3  interviews to set up." It doesn't sound
4  like a presentation to me, does it to
5  you?
6    A.   "We'll be sure to let you
7  know of any media interviews we are able
8  to set up." That's what it reads.
9    Q.   They're not talking about
10 scientific presentations. What she's
11 talking about is media interviews,
12 correct?
13   A.   It appears that way, yes.
14   Q.   You were getting media
15 trained to talk to the media using
16 message points, right?
17   A.   It appears as if she was
18 setting up media interviews for me, yes.
19   Q.   That's not what I asked you.
20        I said you were getting
21 media trained to talk to the media using
22 message points, correct?
23   A.   I don't think she -- I don't
24 recall the exact context of what she is

80 (Pages 865 to 868)

Confidential - Wayne Macfadden, M.D.

**Page 869**

1  exactly saying or referring to.
2      Q.  Well, did you give any media
3  interviews, Dr. Macfadden?
4      A.  I recall speaking to a
5  newspaper reporter at least once.
6      Q.  Oh, Dr. Macfadden, don't you
7  remember bragging to people in e-mails
8  about being quoted on Forbes.com?
9      A.  I recall speaking to Forbes,
10  yes.
11      Q.  Don't you recall bragging to
12  REDACTED about being a somewhat
13  washed up media star?
14      A.  I don't recall the specific
15  context of that.
16      Q.  Don't you recall saying, I'm
17  getting into this, I'm enjoying it?  Come
18  on.
19      MR. MCCONNELL:  Objection.
20      THE WITNESS:  I don't recall
21  specifically saying that.
22  BY MR. PIRTLE:
23      Q.  Well, maybe I'll have some
24  documents after a while to refresh your

**Page 870**

1  recollection.
2      Will you give me and the
3  jury this:  You were getting into getting
4  interviewed, and you tried to give a lot
5  of interviews, didn't you?
6      A.  I don't know that I tried to
7  give interviews.  When I was asked to
8  give an interview, I tried to accommodate
9  AstraZeneca.
10      Q.  Let's move on to talk about
11  another subject, sir.
12      Who was Lyn Pilinsky?
13      A.  I don't know Lyn Pilinsky.
14      Q.  Do you know a REDACTED
15      A.  Yes.
16      Q.  Who was her boss?
17      A.  I think she -- Lyn Pilowsky
18  was the section head that she worked
19  with.
20      Q.  All right.  Who is REDACTED
21  REDACTED
22      A.  She was a nurse researcher
23  at the Institute of Psychiatry.
24      Q.  The Institute of Psychiatry

**Page 871**

1  in London?
2      A.  Yes.
3      Q.  And if I understand the
4  relationship, the Institute of Psychiatry
5  in London, REDACTED was Lyn Pilowsky's
6  employee, or worked under her?
7      A.  They were together, yes.
8      Q.  Now, did the Institute,
9  Dr. Pilowsky or REDACTED do research
10  on behalf of AstraZeneca?
11      A.  I believe that they have
12  done research on behalf of AstraZeneca,
13  yes.
14      Q.  They've done several studies
15  on behalf of AstraZeneca, hadn't they?
16      A.  I don't know the total
17  number.
18      Q.  Well, give me an estimate,
19  sir.
20      A.  There was one that I recall.
21  I can't speak to others.
22      Q.  You only recall one?
23      A.  That's all that comes to
24  mind, yes.

**Page 872**

1      Q.  Truth of the matter is, Dr.
2  Pilowsky has done slides and presented
3  them for AstraZeneca, hasn't she?
4      A.  I don't recall if she was a
5  speaker for AstraZeneca.  She may have
6  been.
7      Q.  Y'all prepared slides for
8  her, didn't you?
9      A.  We assisted many KOLs with
10  slide presentations.
11      Q.  That didn't answer my
12  question.
13      Do you remember preparing
14  slides for her?
15      A.  Not with her particularly,
16  but we did assist with the presentation
17  of slide presentations.
18      Q.  Do you remember her
19  preparing posters that were presented
20  with y'all supporting it, Dr. Pilinsky --
21  Pilowsky?
22      A.  I believe Dr. Pilowsky
23  presented results on behalf of
24  AstraZeneca before, yes.

Confidential - Wayne Macfadden, M.D.

Page 873

```
 1        Q.  Do you remember the nurse,
 2  REDACTED        did the same thing, she
 3  presented abstracts on behalf of
 4  AstraZeneca?
 5        A.  I assume so, yes.
 6        Q.  She published papers about
 7  quetiapine and Seroquel, which are one
 8  and the same I guess, right?
 9        A.  Yes.  She was an author on
10  at least one manuscript that I can
11  recall, yes.
12        Q.  Did the Institute of London
13  or any of these two individuals receive
14  payments from AstraZeneca?
15        A.  AstraZeneca would pay KOLs
16  or consultants for time or compensation.
17        Q.  So, the answer to my
18  question is yes, they both did, didn't
19  they?
20        A.  I assume at some point in
21  time they received compensation for
22  efforts or time on behalf of AstraZeneca,
23  yes.
24        Q.  Now, what was your
```

Page 874

```
 1  involvement in terms of the scientific
 2  process with these two individuals?
 3        A.  When I met Lyn and REDACTED
 4  they were already conducting an
 5  AstraZeneca study.
 6        Q.  What was your involvement,
 7  sir?
 8        A.  I was not involved with the
 9  conduct or approval of their study.
10        Q.  Well, you looked at their
11  work, their draft work, didn't you?
12        A.  I believe I was copied on a
13  draft of their manuscript before it was
14  finalized.
15        Q.  And AstraZeneca had input
16  into the final draft of the manuscript,
17  didn't it?
18        A.  My recollection was that
19  AstraZeneca would often suggest text or
20  draft manuscripts for authors to add,
21  amend, change or suggest additions to.
22        Q.  Well, AstraZeneca had
23  Complete Health Communications draft
24  manuscripts and send to Dr. Pilowsky,
```

Page 875

```
 1  correct?
 2        A.  I don't know about that
 3  particular, however, we would often have
 4  vendors draft manuscripts to be added
 5  upon by authors and by the company.
 6        Q.  Well, some of REDACTED
 7  work is still being used by AstraZeneca
 8  today to respond to doctors' inquiries,
 9  isn't it?
10           MR. MCCONNELL:  Objection,
11  foundation.
12           THE WITNESS:  I don't know
13     that.
14  BY MR. PIRTLE:
15        Q.  We'll look at some
16  documents.
17        Let me show you what I'm
18  going to mark as Exhibit 50 to your
19  deposition.
20              -  -  -
21        (Whereupon, Deposition
22  Exhibit Macfadden-50, E-mail
23  5-13-03 AZSER 09024567, was marked
24  for identification.)
```

Page 876

```
 1              -  -  -
 2           MR. PIRTLE:  I'm giving you
 3  a copy, too.
 4           MR. MCCONNELL:  Thank you.
 5  BY MR. PIRTLE:
 6  REDACTED
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Confidential - Wayne Macfadden, M.D.

Page 877

1   REDACTED
2
3
4
5
6
7
8
9
10
11       Q.   Let me show you what I'm
12   going to mark as Exhibit Number 51 to
13   your deposition.
14              - - -
15       (Whereupon, Deposition
16   Exhibit Macfadden-51, Letters to
17   the Editor "Safety of Quetiapine
18   During Pregnancy" (Taylor, et al)
19   Am. J. Psychiatry 160: 3, March
20   2003 588-590, was marked for
21   identification.)
22              - - -
23       MR. PIRTLE:  I'll give one
24   to the AstraZeneca lawyer.

Page 878

1       (Handing over document.)
2       MR. MCCONNELL:  Thank you.
3   BY MR. PIRTLE:
4       Q.   This appears to be a letter
5   to the editor, correct?
6       A.   Yes.
7       Q.   I'm going to go straight to
8   what I'm interested in.  It's a letter
9   titled "Safety of Quetiapine During
10   Pregnancy," correct?
11       A.   Yes.
12       Q.   That's Seroquel, right?
13       A.   Yes.
14       Q.   And it's to the editor, and
15   it's a report of a woman who was pregnant
16   receiving Seroquel, right?
17       A.   It's a -- it appears to be,
18   yes.
19       Q.   All right.
20           And more precisely, "We
21   report the case of a woman who was
22   treated with risperidone then quetiapine
23   throughout pregnancy without
24   complications," right?  That's the

Page 879

1   message?
2       A.   That appears to be what
3   they're doing, yes.
4       Q.   All right.
5           Now, this was a favorable
6   letter to the editor for AstraZeneca,
7   correct?
8       A.   I don't believe I've ever --
9   I don't recall seeing this before, so, I
10   can't speak to that yet.
11       Q.   You don't recall seeing this
12   letter to the editor before?
13       A.   I don't remember it.
14       Q.   Well, sir, there's a
15   difference in -- okay.
16           You don't remember whether
17   you've seen it before, right?
18       A.   Yes.
19       Q.   Let's go down to after they
20   described the -- after the author
21   describes the particular case, and I
22   won't read it, the authors go on, "This
23   case adds to the small database on the
24   safety of administering atypical

Page 880

1   antipsychotic drugs at conception and
2   throughout pregnancy."  Did I read that
3   correctly?
4       A.   Yes.
5       Q.   "Given the low risk of
6   extrapyramidal" -- is that EPS?
7       A.   Extrapyramidal can be
8   abbreviated EPS, yes.
9       Q.   -- "and sexual side effects
10   with these drugs, it is likely that they
11   will be used in younger, sexually active
12   patient groups."  Did I read that
13   correctly?
14       A.   Yes.
15       Q.   "This report, and that of
16   Dr. Tenyi, et al., on safety of
17   quetiapine during pregnancy are
18   encouraging."  Did I read that correctly?
19       A.   Yes.
20       Q.   So, it's a positive letter
21   to the editor for Seroquel, correct?
22       A.   I didn't read the entire
23   letter; however, they are apparently
24   feeling positively about it.

83  (Pages 877 to 880)

Confidential - Wayne Macfadden, M.D.

Page 881

1 REDACTED
2
3
4
5
6          Q.  Let's go off the record if
7 you're going to do that.
8          THE VIDEOTAPE TECHNICIAN:
9 38 minutes after 3:00.  We're
10 going off the record.
11          - - -
12          (Whereupon, there was a
13 recess from 3:38 p.m. until 3:53
14 p.m.)
15          - - -
16          (Whereupon, Deposition
17 Exhibit Macfadden 52, "Seroquel -
18 Use During Pregnancy and Nursing"
19 AZ/SER 0987479 - AZ/SER 0987481,
20 was marked for identification.)
21          - - -
22          THE VIDEOTAPE TECHNICIAN:
23 It is 53 minutes after 3:00.  This
24 is the beginning of tape number 4,

Page 882

1 and you are back on the record,
2 Mr. Pirtle.
3 BY MR. PIRTLE:
4          Q.  Dr. Macfadden, we've taken a
5 brief recess.  Are you ready to continue?
6          A.  Yes.
7          Q.  Prior to the recess or
8 during the recess, I had asked you to
9 review a few documents during the recess
10 so we can talk about them in somewhat
11 summary fashion.  Have you done that
12 task?
13          A.  Yes.
14          Q.  The first document I want to
15 talk to you about is Exhibit 52.  It's
16 the Seroquel use during pregnancy and
17 nursing prescribing information.  Do you
18 have the document before you?
19          A.  Yes.
20          Q.  Was it common and standard
21 practice at AstraZeneca during your time
22 both as the senior director of clinical
23 research and the U.S. medical director
24 for physicians to call the company with

Page 883

1 questions about uses for Seroquel?
2          A.  Physicians or clinicians
3 would often call the company about
4 specific questions or data requests about
5 Seroquel in a variety of situations or
6 conditions, yes.
7          Q.  Was it also standard
8 practice at AstraZeneca for there to be a
9 response prepared, a more or less pat
10 response for certain questions that are
11 asked frequently or somewhat frequently?
12          MR. MCCONNELL:  Objection to
13 form.
14          THE WITNESS:  My
15 recollection was there were
16 typically prepared responses for
17 commonly asked questions, yes.
18 BY MR. PIRTLE:
19          Q.  Y'all had an acronym for
20 this called PIR, right?
21          A.  I can't recall what the
22 acronym stands for.
23          Q.  Physician info --
24 information request, correct?

Page 884

1          A.  Maybe product information
2 request, but I'm guessing.
3          Q.  Okay.
4          So you're familiar with the
5 acronym at least?
6          A.  I'm familiar with the
7 process by which folks or clinicians or
8 physicians would inquire to the company
9 about data regarding Seroquel.
10          Q.  If there was an inquiry, by
11 way of example 52, about the use of
12 Seroquel during pregnancy and nursing,
13 this PIR would be what would be sent to
14 the doctor or clinician requesting
15 information, correct?
16          A.  If this was the PIR that was
17 developed and approved at the time, then
18 this would be what was given out, yes.
19          Q.  Do you know enough about the
20 internal workings of the promotional
21 regulatory affairs department that if it
22 has an SR number on it, that it was
23 approved for dissemination?
24          A.  I'm not sure about what this

84  (Pages 881 to 884)

Confidential - Wayne Macfadden, M.D.

Page 885

```
 1   SR number exactly refers to.
 2      Q.   Okay.
 3           We've asked some other
 4   people about that, and what we've been
 5   told is if there's an SR number on the
 6   document, the promotional regulatory
 7   affairs have reviewed it and approved it
 8   for dissemination.  Do you have any
 9   information to the contrary, sir?
10      A.   No.
11      Q.   This particular PIR, 52, if
12   a physician was to call in and inquire
13   about Seroquel use during pregnancy and
14   nursing, turn to the second page of this
15   document.  The company cites a number of
16   studies, some of them case reports,
17   giving information about the use of
18   Seroquel during pregnancy and nursing,
19   correct?
20      A.   There appears to be three
21   case reports identified, yes.
22      Q.   One of the case reports is
23   by Taylor and colleagues.  It's footmark
24   4, correct?
```

Page 886

```
 1      A.   Yes.
 2      Q.   If we go back to the back
 3   and look at the reference to footnote 4,
 4   the title of the document, Taylor TM,
 5   O'Toole MS, Ohlsen RI, et al. "Safety of
 6   quetiapine during pregnancy," American
 7   Journal of Psychiatry, 2003, 160, Page 3.
 8   Correct?
 9      A.   I think that's 160, volume
10   3, yes.
11   REDACTED
12
13
14
15
16
17
18
19
20
21
22      Q.   Do you have any information
23   to the contrary that this PIR -- excuse
24   me -- this PIR was sent out to physicians
```

Page 887

```
 1   making inquiry in the United States about
 2   the use of Seroquel in pregnancy and
 3   nursing, correct?
 4      A.   As before, I don't have
 5   firsthand knowledge that this was the
 6   actual approved document that went out
 7   regarding questions of that nature.  But
 8   generally the process was AstraZeneca
 9   would construct documents to answer
10   frequently asked questions, yes.
11      Q.   Sir, this document that
12   cites REDACTED article and Taylor's
13   article is being used today in inquiries
14   by physicians regarding the use of
15   Seroquel in pregnancy by AstraZeneca,
16   isn't it?
17           MR. MCCONNELL:  Objection,
18   foundation.
19           THE WITNESS:  I don't know.
20   BY MR. PIRTLE:
21      Q.   Go back to Exhibit 51,
22   please.
23      A.   (Witness complies.)
24      Q.   In regard to Exhibit 51, the
```

Page 888

```
 1   last page where REDACTED and Lyn
 2   Pilowsky cited, do you see any conflicts
 3   information disclosed?
 4      A.   Any conflicts?
 5      Q.   Relationships, conflicts,
 6   information at all.
 7      A.   I don't see any other
 8   disclosures.
 9      Q.   There's no disclosure of
10   relationship between AstraZeneca and any
11   of the authors, correct?
12      A.   That doesn't appear to be
13   noted on this letter to the editor.
14      Q.   Go back to Exhibit 50.  In
15   May of 2003, your company, while you were
16   the director of clinical research, was
17   aware that Dr. Pilowsky's group was
18   planning to publish what became the
19   letter to the editor in a case report
20   from their first study on the use of
21   Seroquel in pregnancy, correct?
22      A.   From this e-mail, it appears
23   that the author of the e-mail, Allison
24   Wilkie, stated her group are planning to
```

85 (Pages 885 to 888)