# EXHIBIT 1 – Part b

Confidential - Wayne Macfadden, M.D.

Page 889

```
1   publish a case report, yes.
2        Q.   Her group is AstraZeneca,
3   isn't it?
4        A.   I think she was referring to
5   Lyn Pilowsky and her group.
6   REDACTED
```

Page 890

```
1   meeting, yes.
2        - - -
3        (Whereupon, Deposition
4   Exhibit Macfadden 54,
5   "Naturalistic study of the
6   antipsychotic medication review
7   service at the Maudsley Hospital"
8   (Stone, et al) Psychiatric
9   Bulletin (2002) 26, 291-294, was
10  marked for identification.)
11       - - -
12  BY MR. PIRTLE:
13       Q.   Go to Exhibit 54, sir.
14       A.   (Witness complies.)
15       Q.   Sir, have you seen this
16  document before?
17       A.   I don't believe I saw it
18  before you handed it to me shortly ago.
19  I don't recall seeing it.
20       Q.   Turn to the second page.
21       A.   (Witness complies.)
22       Q.   This is talking about
23  patients in a clinic, correct?  Just
24  generally?
```

Page 891

```
1        A.   There's a subtitle called
2   "Medication started in clinic," yes.
3        Q.   Do you see the "Medication
4   started in clinic" subtitle?
5        A.   Yes.
6        Q.   Do you see it says, "A total
7   of 47/58 (81 percent) of patients were
8   treated with an atypical antipsychotic in
9   a clinic"?
10       A.   Yes.
11       Q.   It says, "Twenty" and then
12  in parenthesis "(42 percent) patients
13  were started on quetiapine," which is
14  Seroquel, correct?
15       A.   Yes.
16       Q.   Let's go to the last page.
17       A.   (Witness complies.)
18       Q.   Above Acknowledgments: "The
19  findings of this study are in keeping
20  with previous work, which has
21  demonstrated the benefits of atypical
22  antipsychotics over typical
23  antipsychotics when used in closely
24  controlled but less naturalistic
```

Page 892

```
1   settings.  It is hoped that these data
2   will aid further service development and
3   will assist in defining elements of the
4   AMRS that are transferable to standard
5   community mental health teams or depot
6   clinic settings."
7        Did I read that correctly?
8        A.   Yes.
9        Q.   There's a declaration of
10  interest, correct?
11       A.   Yes.
12       Q.   "D.T." that's one of the
13  authors, "has received unrelated
14  consultancy fees from all manufacturers
15  of a typical antipsychotics.  L.P. has
16  received unrelated and unrestricted
17  charitable grants and lecture and
18  consultancy fees from AstraZeneca, Eli
19  Lilly, Novartis, Janssen, Synthelabo and
20  GlaxoSmithKline.  She is also a Medical
21  Research Council Senior Clinical Research
22  Fellow."
23       Did I read that correctly?
24       A.   Yes.
```

86 (Pages 889 to 892)

Confidential - Wayne Macfadden, M.D.

**Page 893**

1    Q.   That's Lyn Pilowsky,
2  correct?
3    A.   I assume so, yes.
4  REDACTED
5
6
7
8
9
10
11
12
13
14           - - -
15      (Whereupon, Deposition
16  Exhibit Macfadden 55, "Cortical
17  Effects of Quetiapine in
18  First-Episode Schizophrenia: A
19  Preliminary Functional Magnetic
20  Resonance Imaging Study," (Jones
21  et al) Biol Psychiatry
22  2004;56:938-942, was marked for
23  identification.)
24           - - -

**Page 895**

1  literature, back to the back, last page,
2  it says, "The study was supported by a
3  charitable grant from AstraZeneca."  And
4  then it goes through the authors and what
5  they have received, correct?
6    A.   Yes.
7    Q.   "RIO has received speakers
8  and consultancy fees from AstraZeneca,
9  Novartis and Janssen."  Correct?
10   A.   Yes.
11   Q.   And it also talks about Dr.
12 Pilowsky, correct?
13   A.   It notes "LSP," which I
14 assume is Lyn Pilowsky, yes.
15   Q.   This was published in 2004,
16 correct?
17   A.   That's the date on the...
18   Q.   Where was it published, sir?
19   A.   It appears to have been
20 published in Biological Psychiatry.
21   Q.   That's a peer-reviewed
22 journal?
23   A.   I assume so.
24           - - -

**Page 894**

1  BY MR. PIRTLE:
2    Q.   Look at Exhibit 55.  It's
3  called "Cortical Effects of Quetiapine in
4  First-Episode Schizophrenia: A
5  Preliminary Functional Magnetic Resonance
6  Imaging Study."  Are you with me?
7    A.   Yes.
8    Q.   REDACTED is listed as an
9  author along with Lyn Pilowsky, correct?
10   A.   Amongst the others, yes.
11   Q.   Sir, you've seen this study
12 prior to today, haven't you?
13   A.   I can't recall.  I can't
14 recall.
15   Q.   You can't recall whether
16 you've seen it or not?
17   A.   Right.  I can't recall
18 whether I've seen this or not.
19   Q.   Do you recall that it was
20 actually your suggestion that caused this
21 study to be done?
22   A.   No.
23   Q.   At any rate, going through
24 the study, which is in the published

**Page 896**

1      (Whereupon, Deposition
2  Exhibit Macfadden 56, "Effects of
3  Quetiapine in First Episode
4  Schizophrenia. Comparison with
5  Drug Naive Patients and Healthy
6  Controls" (Jones, et al)
7  International Congress on
8  Schizophrenia Research 2003
9  224-225, was marked for
10 identification.)
11          - - -
12 BY MR. PIRTLE:
13   Q.   Let me show you Exhibit 56
14 to your deposition.  I'm interested in
15 the first page, the third study listed,
16 "Effects of Quetiapine in First Episode
17 Schizophrenia.  Comparison With Drug
18 Naive Patients and Healthy Controls."
19 Did I read that correctly?
20   A.   Yes.
21   Q.   Are you familiar with this
22 document, this abstract?
23   A.   I don't recall seeing this
24 particular abstract.

87  (Pages 893 to 896)

Confidential - Wayne Macfadden, M.D.

**Page 897**

1  Q.  Who are the authors of the
2  abstract, sir?
3  A.  They are listed as H.M.
4  Jones, M.J. Brammer, R. Ohlsen, M.
5  O'Toole, T. Taylor, R. Brown, S.V.
6  Williams, L.S. Pilowsky.
7  Q.  Where was this published?
8  A.  On the document at the
9  bottom, it notes International Congress
10  on Schizophrenia Research 2003.
11  Q.  Are there any conflicts
12  disclosures?
13  A.  On these two pages, which I
14  assume is part of a larger book, I don't
15  see any.
16          - - -
17  (Whereupon, Deposition
18  Exhibit Macfadden 57, "Clinical
19  effectiveness in first-episode
20  patients" REDACTED European
21  Neuropsychopharmacology 14 (2004)
22  S445-S451, was marked for
23  identification.)
24          - - -

**Page 898**

1  BY MR. PIRTLE:
2  Q.  Let me show you this next
3  document which I'll mark as Exhibit 57 to
4  your deposition.
5  MR. PIRTLE:  I'll give the
6  AstraZeneca lawyers a copy.
7  MR. MCCONNELL:  Thank you.
8  THE WITNESS:  (Witness
9  reviewing document.)
10  BY MR. PIRTLE:
11  Q.  Sir, have you had an
12  opportunity to review Exhibit 57?
13  A.  Well, it's a long article,
14  but I have it here, yes.
15  Q.  We'll put it up on the
16  screen for the jury to look at.  This is
17  titled "Clinical effectiveness in
18  first-episode patients" correct?
19  A.  Correct.
20  REDACTED
21
22  Q.  Is from the Section of
23  Neurochemical Imaging, Institute of
24  Psychiatry, London, correct?

**Page 899**

1  A.  Yes.
2  Q.  The article at least in the
3  abstract section which I prefer reading
4  says, the article "will discuss available
5  data on atypical antipsychotics in
6  first-episode patients and present the"
7  preliminary "results from the FIRST
8  (Southwark first-onset psychosis) study,
9  which examined the use of quetiapine for
10  the first-line management of
11  schizophrenia as part of a specialist
12  episode psychosis service."
13  Did I read that correctly,
14  reasonably?
15  A.  Yes.
16  Q.  Have you seen this document
17  before, sir?
18  A.  I've seen it before, yes.
19  Q.  It was transmitted to you,
20  wasn't it?
21  A.  I believe I was copied on
22  this manuscript at some point during its
23  approval process, yes.
24  Q.  Well, let me ask you now.

**Page 900**

1  Was this document published?
2  A.  This appears to be a copy
3  from a journal publication.
4  Q.  It was put into a
5  peer-reviewed journal, it looks like,
6  owned by Elsevier, European
7  Neuropsychopharmacology, correct?
8  A.  Yes.
9  Q.  And it was published in
10  2004, correct?
11  A.  It appears so, yes.
12  Q.  It is an article that is
13  favorable to Seroquel, isn't it?
14  A.  I will assume that some of
15  what's in here is favorable to Seroquel,
16  yes.
17  Q.  Well, you've seen it before.
18  You know it's favorable to Seroquel,
19  don't you?
20  A.  It's been a while since I've
21  seen this.  I would have to look at it
22  more carefully to say it was favorable to
23  Seroquel relative to other drugs.
24  Q.  Okay.

Confidential - Wayne Macfadden, M.D.

Page 901

1      Well, if you can't say it
2  based on your own knowledge of it, why
3  don't we just put it down, and the jury
4  can read it later. Okay?
5          - - -
6      (Whereupon, Deposition
7      Exhibit Macfadden 58, E-mail
8      9-24-03 AZSER 10375552, was marked
9      for identification.)
10         - - -
11 BY MR. PIRTLE:
12     Q.  Let me show you what I've
13 marked as Exhibit 58 to your deposition.
14 By the way, before you do put it down,
15 confirm for the jury that there's no
16 disclosures of conflicts in the document
17 entitled "Clinical effectiveness in
18 first-episode patients."
19     A.  (Reviewing document.)
20         There don't appear to be any
21 disclosures.
22     Q.  This document was published
23 -- this article was published April 2nd
24 of 2004, received in revised format, 30

Page 902

1  June, 2004, correct?
2      A.  It said it was received
3  April 2004, then again June 2004, and I'm
4  not sure exactly when in 2004 it was
5  published.
6      Q.  Okay.
7          Let me refer you to Exhibit
8  Number 58. Sir, do you recognize Exhibit
9  58?
10     A.  It appears to be e-mail
11 correspondence from REDACTED to
12 myself.
13     Q.  Within this e-mail
14 correspondence, is there attachments?
15     A.  It appears as if there were
16 attachments in the original e-mail, yes.
17     Q.  The first attachment was the
18 first episode paper, correct?
19     A.  The attachment appears to be
20 titled "First episode psychosis..."
21     Q.  So, you received this
22 document prior to -- I mean, you received
23 a copy of the study, which is Exhibit 57,
24 prior to it being published, correct?

Page 903

1      A.  I can't speak of what
2  exactly was in that attachment.
3      Q.  You don't remember receiving
4  a draft of first episode psychosis before
5  it was published, sir?
6      A.  I believe at some point
7  before its publication I received a
8  draft, yes.
9      Q.  You read the draft, didn't
10 you?
11     A.  I can't recall the level of
12 scrutiny or if I read the entire draft.
13     Q.  Now, your relationship with
14 REDACTED was such that you tried to
15 get studies funded for her, correct, by
16 AstraZeneca?
17     A.  I was not part of the global
18 process which approved studies outside of
19 the U.S.
20         - - -
21     (Whereupon, Deposition
22     Exhibit Macfadden 59, E-mail
23     3-29-02 AZSER 10376076 - AZSER
24     10376077, was marked for

Page 904

1      identification.)
2          - - -
3  BY MR. PIRTLE:
4      Q.  Let me show you what I'll
5  mark as Exhibit 59, sir.
6          MR. PIRTLE:  I'll hand a
7      copy to AstraZeneca's lawyer.
8          MR. MCCONNELL:  Thank you.
9  BY MR. PIRTLE:
10     Q.  I'll put it up on the
11 screen. Let me know when you've read it.
12 I'm only interested in specific parts of
13 it.
14     A.  (Reviewing document.)
15         MR. MCCONNELL:  Which
16     Exhibit Number is this?
17         THE COURT REPORTER:  59.
18 BY MR. PIRTLE:
19     Q.  You need to tell me when you
20 finish, Doctor.
21     A.  (Reviewing document.)
22         Okay.
23     Q.  All right. Have you had an
24 opportunity to review Exhibit 59?

89 (Pages 901 to 904)

Confidential - Wayne Macfadden, M.D.

Page 905

1    A.   Yes.
2    Q.   Does reviewing this document
3  refresh your recollection, sir, that you
4  did give REDACTED input as to what
5  type of studies might be desirable for
6  AstraZeneca or might get published by
7  AstraZeneca?
8    A.   I believe I spoke about
9  certain trial designs which would be of
10 interest to the field and the company,
11 yes.
12   Q.   All right.  This is from
13 Wayne Macfadden to REDACTED
14 3/29/2000, correct?
15       MR. ALLEN:  2002.
16 BY MR. PIRTLE:
17   Q.   2002, correct?
18   A.   Yes.
19   Q.   And the subject is "Movies,
20 et cetera."  And you say, "Hello again,
21 my Venus Princess," and you go into some
22 stuff that I'm actually not going to go
23 into, right?
24   A.   Okay.

Page 906

1    Q.   Then you go -- by the way,
2  this was written on the company's e-mail,
3  wasn't it, while you were working for
4  AstraZeneca, correct?
5    A.   It appears that this was on
6  the company e-mail.
7    Q.   It came off the company
8  e-mail at a time you were getting paid
9  for working for AstraZeneca, correct?  If
10 the time is right on it?
11   A.   If the time and date are
12 correct, yes.
13   Q.   It says, "OK, since I am
14 officially on the meter," that context is
15 confusing now, correct, "i.e. working)
16 today, a few words RE drug abuse."  Did I
17 read that correctly?
18   A.   Yes.
19   Q.   So, you were working, right?
20   A.   It appears as if I was
21 working, yes.
22   Q.   You had a special interest
23 in drug abuse, didn't you?
24   A.   I'm a board certified

Page 907

1  psychiatrist with added qualifications in
2  addiction psychiatry.
3    Q.   You say, "I think a dual
4  diagnosis trial would be great, good for
5  the field, perhaps of interest to your
6  side.  Briefly, one of these 2 designs
7  would be preferable (but if you, Lyn, or
8  anyone else has any ideas, bring them
9  on!)"  Did I read that correctly?
10   A.   Yes.
11   Q.   Then -- well, let me say,
12 "you" was REDA correct?
13   A.   I believe so, yes.
14   Q.   "Lyn" was Lyn Pilowsky,
15 correct?
16   A.   Yes.
17   Q.   Then you go on down at the
18 bottom and you say "An imaging study of
19 some sort may be interesting, but those
20 are notoriously difficult to demonstrate
21 separations between arms, and the
22 clinical significance is always an
23 issue."  Did I read that correctly?
24   A.   Yes.

Page 908

1    Q.   "I am on the team that
2  reviews global IITs as well as the U.S.
3  team."  What's an IIT, sir?
4    A.   Investigator initiated
5  trial.
6    Q.   So, you were on the team
7  that reviewed global IITs, correct?
8    A.   I believe in this e-mail, I
9  overstated my role and that I was not a
10 regular reviewer of global IITs.
11   Q.   But you did review global
12 IITs from time to time, right?
13   A.   If they pertained to
14 substance abuse, they were occasionally
15 sent to me for my opinions and reviews.
16   Q.   You go on, "I am on the
17 team...but a few caveats."
18       "I'm an invited guest on the
19 global team."
20       That was true, correct?
21   A.   I would be only asked to
22 review things occasionally, yes.
23   Q.   "Not the lead medic like I
24 am in the" United "states."  Was that

90  (Pages 905 to 908)

Confidential - Wayne Macfadden, M.D.

Page 909

1  true?
2      A.   I assume that was true, yes.
3      Q.   "So my influence may be
4  less."  Correct?
5      A.   Yes.
6      Q.   More "importantly, the
7  global program is not nearly funded as
8  well as the U.S. program, so a relatively
9  small budget would be necessary (under
10  50,000 US dollars)."  Correct?
11      A.   Yes.
12      Q.   "As you might imagine, a
13  drug company's main interest is showing"
14  the "effect of their treatment; CBT
15  or...other" psycho" --
16          MR. ALLEN: " Psychosocial."
17  BY MR. PIRTLE:
18      Q.   Thank you -- "psychosocial
19  or therapy type for Rx would not be
20  encouraged, and may be necessary to
21  curtail or delete, as it probably dilute
22  out any effect."  I think I read it
23  reasonably correct.
24      A.   Yes.

Page 910

1      Q.   "Despite the above, it would
2  be really exciting if you folks took this
3  on...I realize it would even be more
4  work...but I don't think we have any
5  European data on studies like this...not
6  to mention great" exercises "to
7  rondez-vous."  Did I read that correctly?
8          MR. ALLEN:  "Excuses."
9  BY MR. PIRTLE:
10      Q.   "Great excuses to
11  rondez-vous."  Did I read that correctly?
12      A.   Yes.
13      Q.   You're promising or implying
14  funding dollars to RED and Lyn, correct?
15      A.   I don't believe I am
16  implying or promising funding dollars,
17  no.
18      Q.   Was it ethical for you to
19  overstate your role as a researcher on
20  the global team?
21      A.   It was inaccurate of me to
22  overstate my role on the global team.
23      Q.   That was unethical, wasn't
24  it?

Page 911

1      A.   It was inaccurate.
2      Q.   Was it unethical, sir?
3      A.   I don't believe so.
4      Q.   You see a difference between
5  inaccurate and unethical, right?
6      A.   Yes.
7      Q.   You're dancing on the head
8  of that pin, aren't you?
9          MR. MCCONNELL:  Objection,
10  form.
11          THE WITNESS:  I don't know.
12  BY MR. PIRTLE:
13      Q.   Sir, the truth of the matter
14  is, you were having an illicit sexual
15  affair with REDACTED weren't you?
16      A.   I was having a personal,
17  intimate affair with REDACTED yes.
18      Q.   You were having an intimate
19  affair with REDACTED and you were
20  doing it on company time, and you were
21  doing it when you were a researcher for
22  AstraZeneca, correct?
23      A.   I would see REDACTED Usually,
24  to the best of my recollection, it was

Page 912

1  off hours, but I can't state for sure if
2  that's all true.
3      Q.   It wasn't all true, was it?
4  Y'all arranged to meet at conferences on
5  the company dollar, right?
6      A.   We would meet occasionally
7  at conferences, yes.
8      Q.   And in hotel rooms that the
9  company paid for, AstraZeneca, paying for
10  both hotel rooms, right?
11      A.   My travel was generally
12  reimbursed by AstraZeneca, yes.
13      Q.   And you were having a sexual
14  relationship with REDACTED correct?
15      A.   Yes.
16      Q.   That's not all you were
17  doing.  You were also, as part of your
18  role at AstraZeneca, trying to get
19  information out of REDACTED by using
20  y'all's sexual relationship, correct?
21      A.   We would engage in banter in
22  a joking fashion about that.
23      Q.   No, sir.  You were trying to
24  get information that would give

91 (Pages 909 to 912)

Confidential - Wayne Macfadden, M.D.

Page 913

1 AstraZeneca a competitive advantage in
2 the United States market out of REDACTED
3 REDACT because she was doing research for
4 not only AstraZeneca, but also other
5 pharmaceutical companies who were in
6 competition with Seroquel, correct?
7        MR. MCCONNELL: Objection to
8 form.
9        THE WITNESS: To the best of
10 my knowledge, there was no
11 confidential information from
12 other companies that was disclosed
13 to me by REDACTED
14           - - -
15        (Whereupon, Deposition
16 Exhibit Macfadden 60, E-mail
17 2-1-06 AZSER 10375844, was marked
18 for identification.)
19           - - -
20 BY MR. PIRTLE:
21     Q.   Let me show you what I'm
22 going to mark as Exhibit 60 to your
23 deposition. It's a short e-mail. I'm
24 handing your lawyers a copy. I'll put

Page 914

1 one up for the jury.
2        By the way, this
3 relationship went on for years, right?
4     A.   It went on for a few years,
5 yes.
6     Q.   From 2001 through at least
7 2006, correct?
8     A.   No.
9     Q.   2002?
10    A.   I met RED ACTE in 2002, yes.
11    Q.   From 2002 to 2006 you were
12 having a sexual affair with researcher,
13 REDACTED        correct?
14    A.   It began in 2002.
15    Q.   What month?
16    A.   I believe it was in the
17 winter of 2002.
18    Q.   Okay.
19        When did it end?
20    A.   I haven't seen RED ACTE in
21 almost two years.
22    Q.   Have you looked, had an
23 opportunity to review Exhibit 60?
24    A.   Yes.

Page 915

1     Q.   From Wayne Macfadden, that's
2 you, correct?
3     A.   Yes.
4     Q.   Using your company e-mail,
5 correct?
6     A.   It appears so, yes.
7     Q.   February 1st, 2006, correct?
8     A.   Yes.
9     Q.   To REDACTED      e-mail,
10 correct?
11    A.   Yes.
12    Q.   You were working, weren't
13 you?
14    A.   Can't be sure.
15    Q.   Well, let's read it. Hey,
16 "babe, just a friendly reminder, as
17 requested, to obtain info from BMS re:
18 bipolar depression, specifically, when
19 they plan to complete their trials & when
20 they plan to file in the U.S..."
21        Did I read that correctly?
22    A.   Yes.
23    Q.   That's insider competitive
24 information from Bristol-Myers Squibb on

Page 916

1 the product Abilify's filing for bipolar
2 depression, correct?
3     A.   To the best of my knowledge,
4 I never received information from RED ACTE or
5 anybody else about this.
6     Q.   Well, I don't have it, but
7 let's keep on talking about it. You know
8 that's unethical, don't you?
9     A.   Confidential information
10 from other companies should be
11 confidential, yes.
12    Q.   Sir, you're using sex to try
13 to get trade secrets out of Bristol-Myers
14 Squibb to benefit AstraZeneca. That's
15 not only unethical, it's illegal, isn't
16 it?
17        MR. MCCONNELL: Objection to
18 the form. Objection to the extent
19 it calls for a legal conclusion.
20        THE WITNESS: I don't know
21 that.
22 BY MR. PIRTLE:
23    Q.   You weren't taught at
24 AstraZeneca that it's illegal to steal

92 (Pages 913 to 916)

Confidential - Wayne Macfadden, M.D.

**Page 917**

1 trade secrets?
2     A. I don't believe there was a
3 specific directive.
4     Q. You were pumping her for
5 information, correct? I withdraw that
6 question.
7     You were trying to get
8 information out of her?
9     A. It appears that I asked her
10 for information.
11     Q. And you promised her
12 something if she succeeded, right?
13     A. In a joking fashion, it
14 apparently --
15     Q. "If you succeed" --
16     A. -- implies.
17     Q. -- "there'll be a surprise
18 in store for you REDACTED
19 REDACTED
20 REDACTED Did I read that correctly?
21     A. Yes.
22     Q. We won't engage in rhymes,
23 not on my watch.
24     Now, you had a role for a

**Page 918**

1 long time with AstraZeneca to try to
2 obtain and learn the competitor's
3 strategies for the bipolar market, didn't
4 you?
5     A. Information that we were
6 able to obtain was information that we
7 were interested in.
8     Q. I'm sorry. I didn't get
9 that. It was very cloak and dagger
10 stuff, wasn't it?
11     MR. MCCONNELL: Objection to
12 form.
13     THE WITNESS: I don't
14 believe there was cloak and
15 dagger. However, competitive
16 intelligence was something
17 companies are generally interested
18 in.
19 BY MR. PIRTLE:
20     Q. Let me show you what I'm
21 going to mark as Exhibit 61 to your
22 deposition.
23     - - -
24     (Whereupon, Deposition

**Page 919**

1     Exhibit Macfadden 61, E-mails
2     AZSER 10376068 - AZSER 10376069,
3     was marked for identification.)
4     - - -
5 BY MR. PIRTLE:
6     Q. First off, the date on this
7 document -- this is from you on your
8 company e-mail, right?
9     A. It's from me.
10     Q. It's on your company e-mail,
11 isn't it?
12     A. My company address isn't on
13 there, but...
14     Q. Well, if you want to banter
15 with me, I'll try to get your private
16 e-mails and compare them. That's what
17 this company told me, it's your e-mail.
18     MR. MCCONNELL: Objection to
19 the colloquy.
20 BY MR. PIRTLE:
21     Q. Is it your company e-mail or
22 not?
23     A. It's an e-mail from me, and
24 it is likely in the company e-mail.

**Page 920**

1     Q. And it's dated May 6, 2002,
2 correct?
3     A. Yes.
4     Q. Does this refresh your
5 recollection that you were actually
6 having a sexual relationship with REDAC
7 REDACT prior to late 2002 or fall of
8 2002?
9     A. I met with REDAC in the
10 winter of 2002. By that I meant the
11 winter in the early part of the year.
12     Q. So, can we say that this
13 relationship, this sexual relationship
14 started in the early part of 2002, prior
15 to 5/6/02?
16     A. Yes.
17     Q. Because y'all are talking
18 about it in this e-mail, and I don't want
19 to have to read it, but if you make me, I
20 will.
21     A. I met RED in the early part
22 of 2002.
23     Q. By the way, did you write to
24 REDA from another e-mail address or

93 (Pages 917 to 920)

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Wayne Macfadden, M.D.

Page 925

1   yes.
2        Q.   That's a prescribing
3   database, correct?
4        A.   I don't recall the basis for
5   the data for which this guideline was
6   developed.
7        Q.   If you turn over to the
8   second page, REDACTED writes at least
9   on an entry 2 "The pharmacology of
10  atypical antipsychotic drugs," and then
11  on 10, "Practical guidelines for
12  switching from one antipsychotic drug to"
13  the other.  Did I read that correctly?
14       A.   Yes.
15       Q.   This prescribing guideline,
16  written by REDACTED was favorable to
17  the use of the product Seroquel.  Will
18  you concede that, sir?
19       A.   I don't -- I would have to
20  review this before making that conclusion
21  that it was favorable to Seroquel
22  relative to other treatments.
23       Q.   So, you don't know.  Is that
24  what you're saying?

Page 926

1        A.   I don't know -- I can't
2   speak to the specifics of the content of
3   this review.
4        Q.   Sir, you knew full well what
5   you were doing with REDACTED was a
6   conflict of interest, didn't you?
7        A.   No.
8        Q.   Well, you knew for a person
9   in your position to have a conflict of
10  interest, that would be wrong and
11  unethical, right?
12       A.   Conflicts of interest were
13  not something that we should be engaged
14  with, yes.
15       Q.   That can cause bad science
16  to be produced or science to get
17  generated that otherwise wouldn't get
18  generated, right?
19       A.   I don't know that conflicts
20  of interest correspond or correlate with
21  bad science or bad data.
22       Q.   Let me see if I understand
23  your testimony.  You're testifying as the
24  former US medical director for Seroquel

Page 927

1   that you don't know that conflicts of
2   interest correlate with bad science?
3   Come on.
4        MR. MCCONNELL:  Objection.
5   BY MR. PIRTLE:
6        Q.   Is that your testimony?  You
7   don't know as the former U.S. Seroquel
8   director, medical director, that
9   conflicts of interest correlate with bad
10  science?
11       A.   Conflicts of interest do not
12  necessarily correlate with bad science,
13  yes.
14       Q.   You don't know as the former
15  U.S. medical director for Seroquel that
16  biases can result in bad science?
17       A.   Biases may affect the
18  science, yes.
19       Q.   And relationships, sexual
20  relationships between researcher and
21  management members of the company that's
22  funding the research can cause a bias,
23  can't it?
24       A.   It may or it may not.

Page 928

1              - - -
2         (Whereupon, Deposition
3   Exhibit Macfadden 62, E-mails with
4   attachment AZSER 10376064 - AZSER
5   10376065; AZSER 10136483 - AZSER
6   10136484, was marked for
7   identification.)
8              - - -
9   BY MR. PIRTLE:
10       Q.   Let me show you what I'll
11  mark as Exhibit 62 to your deposition.
12       A.   (Reviewing document.)
13       Q.   Have you had an opportunity
14  to review Exhibit 62, sir?
15       A.   Yes.
16       Q.   Exhibit 62 is an e-mail from
17  you sent October 8, 2003 to REDACTED
18  correct?
19       A.   Yes.
20       Q.   It was sent on your company
21  e-mail, right?
22       A.   I'll assume that to be so,
23  yes.
24       Q.   Is there any other place

Confidential - Wayne Macfadden, M.D.

| Page 929 |
| --- |

1  that this document would have came from,
2  sir?
3      A.   No.
4      Q.   The subject is "FIRST team
5  abstract for Davos 2004," correct?
6      A.   Yes.
7      Q.   It says, "Look what came
8  across my desk to review." So, you were
9  reviewing her work, correct?
10     A.   I would occasionally be
11  copied on things.
12     Q.   No, sir, you say "to
13  review." Were you lying?
14         MR. MCCONNELL: Objection to
15  form.
16  BY MR. PIRTLE:
17     Q.   You say "to review," don't
18  you?
19     A.   That is what I say.
20  However --
21     Q.   However, there's a bunch of
22  exclamation points after that, isn't
23  there?
24         MR. MCCONNELL: Objection.

| Page 930 |
| --- |

1      You didn't let the witness finish
2  his answer.
3          THE WITNESS: However --
4  BY MR. PIRTLE:
5      Q.   He's going to launch off
6  into some type of bullet point and try to
7  get himself out of it. Go ahead. What
8  do you want to say? Tell the jury.
9      A.   I don't believe from the
10  request that I was asked to review it by
11  the person who sent it to me.
12     Q.   So, you were lying to her,
13  right?
14         MR. MCCONNELL: Objection to
15  form.
16  BY MR. PIRTLE:
17     Q.   It's one or the other.
18  Either you were reviewing it or you're
19  lying to REDACTED a researcher
20  working for the company. I'll take it
21  either way. Tell the jury which one it
22  was.
23         MR. MCCONNELL: Objection.
24         THE WITNESS: I think the

| Page 931 |
| --- |

1      word "review" was meant as
2  something that was sent to me. It
3  could have been sent as a for your
4  information which it appears was
5  the intent.
6  BY MR. PIRTLE:
7      Q.   Oh, really? What's the next
8  -- after those ten exclamation points, it
9  says "Definitely a conflict of interest,"
10  doesn't it? It wouldn't be no conflict
11  of interest in you just scanning it for
12  your amusement to review, would it?
13     A.   I believe those words were
14  used in jest.
15     Q.   So, you've got a pretty good
16  memory of this e-mail, right?
17     A.   That was my recollection for
18  the words that I wrote, yes.
19     Q.   When is the last time you
20  looked at this e-mail, sir? You're under
21  oath.
22     A.   I looked at this e-mail --
23         MR. MCCONNELL: I'm going to
24  object and instruct the witness

| Page 932 |
| --- |

1      not to disclose if you reviewed
2  that at the direction of counsel
3  in a meeting with counsel.
4  BY MR. PIRTLE:
5      Q.   I want to know the last time
6  you reviewed this e-mail, regardless of
7  who instructed you what, when and where?
8          MR. MCCONNELL: Well, he can
9  say whatever he wants, but I'm
10  asking you to follow my
11  instruction. You're going to omit
12  any reference to anything that you
13  reviewed at the direction or with
14  counsel.
15         MR. ALLEN: Mr. McConnell,
16  let me let the witness finish, but
17  I want to put something on the
18  record here so we don't waste
19  everybody's time later. But go
20  ahead and answer.
21         THE WITNESS: I'll be
22  following my attorney's advice.
23         MR. ALLEN: Mr. McConnell,
24  if you're instructing this witness

Confidential - Wayne Macfadden, M.D.

Page 933

1  not to tell us the last time he
2  reviewed this e-mail and it's
3  within the last several days, no
4  matter who instructed him, we
5  believe it goes directly to the
6  evidence of conflict of interest,
7  bias and prejudice, improper
8  behavior, influencing the
9  literature, and we will ask to
10 redepose this witness again. I'm
11 just putting that on the record.
12       MR. MCCONNELL: All right.
13 Couple things in response. First
14 of all, I think the person who
15 should be doing the discussion
16 about a particular document is the
17 interrogator and the defending
18 lawyer, and that's it. That's
19 number one.
20       Number two, all I'm saying
21 to the witness is in his answer to
22 exclude anything that occurred
23 while communicating with counsel.
24       Number three, you want to

Page 934

1  explore what it means in terms of
2  conflict of interest or anything
3  like that? Go right ahead. But
4  that doesn't have anything to do
5  with exploring counsel's choice as
6  to what documents to review with
7  witnesses during preparation for a
8  deposition. But I'm sure a judge
9  will decide all of this.
10      MR. ALLEN: You've
11 misrepresented my position. I do
12 not agree with what you said. It
13 goes to this witness' credibility
14 as a witness, bias and prejudice,
15 recall, and if you instruct this
16 witness not to answer when he last
17 reviewed this document on this
18 highly relevant topic, I'm letting
19 you know in advance we're going to
20 ask to redepose him on these
21 matters.
22      MR. MCCONNELL: You've heard
23 my instruction, haven't you, Mr.
24 Macfadden?

Page 935

1       THE WITNESS: Could you
2  repeat it, please.
3       MR. MCCONNELL: My
4  instruction is, Doctor, that you
5  answer the question, but in
6  answering, exclude any information
7  that you learned from counsel or
8  anything you did at the direction
9  of counsel while meeting with
10 counsel to prepare for this
11 deposition. Other than that,
12 answer the question.
13      THE WITNESS: All right.
14 Now, can we restate the question?
15 BY MR. PIRTLE:
16      Q.  I want to know the last time
17 you looked at this document, last time
18 you reviewed the document that's in front
19 of you?
20      A.  I can't recall the exact
21 time.
22      Q.  Have you reviewed the
23 document within the last two weeks?
24      MR. MCCONNELL: Same

Page 936

1  instruction.
2       THE WITNESS: No.
3  BY MR. PIRTLE:
4       Q.  Have you reviewed the
5  document within the last two months?
6       MR. MCCONNELL: Same
7  instruction.
8       THE WITNESS: I don't
9  recall.
10 BY MR. PIRTLE:
11      Q.  You state in this document,
12 "Definitely a conflict of interest."
13 That's what you write, correct?
14      A.  Yes.
15      Q.  What's attached to the back
16 of the document is a marked up draft of
17 the first episode patient study, correct?
18      A.  This appears to be an
19 abstract of a first episode study, yes.
20      Q.  And this is an abstract that
21 bears the edits from AstraZeneca,
22 correct?
23      A.  It appears there are edits
24 included in the document, yes.

97 (Pages 933 to 936)

Confidential - Wayne Macfadden, M.D.

Page 937

1    Q.   This abstract was to be
2  presented where, sir?
3    A.   It appears it was to be
4  submitted to a Davos 2004 meeting.
5    Q.   Where was that, sir?
6    A.   Davos is in Switzerland.
7    Q.   What person within
8  AstraZeneca or what contractor,
9  third-party contractor at AstraZeneca did
10 the edits and revisions on this poster
11 presentation of the first data?
12   A.   Personally, for the record,
13 to the best of my recollection, I did not
14 comment or edit or review this in respect
15 to a reply e-mail.  And the edit included
16 in the abstract doesn't appear to be
17 signed.
18   Q.   Well, there's a name on it,
19 isn't there?
20   A.   (Witness reviewing
21 document.)
22   Q.   The first name on the page,
23 Wayne Macfadden, your name is up there,
24 isn't it?

Page 938

1    A.   On the e-mail, yes.
2    Q.   And there was a conflict of
3  interest, wasn't there, sir?
4    A.   The term "conflict of
5  interest" was written in jest.  I did
6  not, to the best of my recollection,
7  actually review or send any comments
8  about this abstract back to AstraZeneca,
9  nor had any influence about its
10 submission or acceptance.
11   Q.   Sir, in your --
12        In fact, the conflicts of
13 interest you had regarding your
14 relationship with this woman was so bad,
15 you lost your job over it, right?
16   A.   No.
17   Q.   This is why or one of the
18 two or three reasons why you lost your
19 job, isn't it?
20   A.   I resigned from AstraZeneca.
21   Q.   You resigned from
22 AstraZeneca under a quit or be fired
23 condition, didn't you?
24        MR. MCCONNELL:  Objection,

Page 939

1   asked and answered.
2        THE WITNESS:  No.
3  BY MR. PIRTLE:
4    Q.   And the e-mails that you
5  referred to when talking to Mr. Allen,
6  we're looking at some of them, aren't we?
7    A.   The e-mails I referred to
8  when?
9    Q.   When you were talking to Mr.
10 Allen about whether or not you were fired
11 or whether you resigned or whether or not
12 you brought your toothpaste that day or
13 whatever, these are the very e-mails that
14 got you fired or that got you requested
15 to resign, right?
16   A.   I was given the opportunity
17 to resign, firstly.  Secondly, I was
18 confronted with some personal e-mails.  I
19 can't recall which of the personal
20 e-mails I was confronted with.
21   Q.   They were between you and
22 REDACTED       you and REDACTED
23 right?
24   A.   I recall I was shown

Page 940

1  personal correspondence between myself
2  and REDACTED    yes.
3    Q.   So, this is the same
4  e-mails, right, about the same
5  relationship?
6    A.   I don't recall the specific
7  e-mails that I -- personal e-mails that I
8  was confronted with.
9    Q.   If you didn't do anything
10 wrong, why did you have to resign?
11        MR. MCCONNELL:  Objection to
12 form.
13        THE WITNESS:  I was given
14 the opportunity to resign.
15 BY MR. PIRTLE:
16   Q.   Were you given an
17 opportunity to stay, sir?  I guess that's
18 the most relevant issue.  Were you given
19 an opportunity to stay?
20   A.   That didn't come up.
21   Q.   They didn't even mention the
22 opportunity for you to stay, did they?
23   A.   I decided to accept their
24 opportunity to resign.

98  (Pages 937 to 940)

Confidential - Wayne Macfadden, M.D.

Page 941

```
 1        Q.   By the way, you were having
 2   an illicit sexual affair with REDACTED
 3   REDACTED too, weren't you?
 4        A.   Yes.
 5        Q.   She's another person who was
 6   involved in studies, this time at
 7   Parexel, right?
 8        A.   She was an employee at
 9   Parexel, which as a company was involved
10   with the publication process, yes.
11        Q.   We're going to get to that
12   in a minute.  Were you having any more
13   sexual affairs?
14        MR. MCCONNELL:  Objection.
15   I instruct the witness not to
16   answer.  That's private.
17   BY MR. PIRTLE:
18        Q.   Is it?  Who is REDACTED
19        A.   Perhaps you mean REDACTED
20   REDACTED
21        Q.   That's exactly who I mean.
22   Were you having any more sexual affairs,
23   sir?
24        A.   We had an intimate affair.
```

Page 942

```
 1        Q.   Was it sexual?
 2        A.   Yes.
 3        MR. PIRTLE:  Sit down.
 4        MR. ALLEN:  Hey, hey.
 5               -  -  -
 6        (Whereupon, an
 7   off-the-record discussion was
 8   held.)
 9               -  -  -
10        MR. PIRTLE:  Let's take a
11   break.
12        MR. MCCONNELL:  All right.
13   We'll take a break.
14        THE VIDEOTAPE TECHNICIAN:
15   We're going off the record.  It is
16   55 minutes after 4:00.
17               -  -  -
18        (Whereupon, a recess was
19   taken from 4:55 p.m. until 5:10
20   p.m.)
21               -  -  -
22        THE VIDEOTAPE TECHNICIAN:
23   It is 10 minutes after 5:00.  This
24   is the beginning of tape number 5.
```

Page 943

```
 1        We're back on the record, Mr.
 2   Pirtle.
 3   BY MR. PIRTLE:
 4        Q.   We've taken a recess.  Are
 5   you ready to continue?
 6        A.   Yes.
 7        Q.   Prior to the recess, I was
 8   talking to you about conflicts of
 9   interest.  Let me finish that up, and
10   then I'm going to go on to another
11   subject.  We're going to continue on with
12   REDACTED  Okay?
13        A.   Yes.
14        Q.   I'm trying to understand
15   now, whether we call it fired or whether
16   we call it an opportunity to resign,
17   because of the relationship that you had
18   with this researcher REDACTED the
19   executive over at Parexel, that's what
20   got you in the position where you were
21   given an opportunity to resign, right?
22        A.   AstraZeneca confronted me
23   with personal e-mails.  To my
24   recollection, they were between REDACTED and
```

Page 944

```
 1   I, and they eventually offered me the
 2   opportunity to resign.  That's it.
 3        Q.   They were between you and
 4   REDACTED  a researcher who was working
 5   for AstraZeneca turning out scientific
 6   work whom you had a secret sexual affair
 7   with between early 2002 and sometime in
 8   2006.  What was the end date, sir?
 9        A.   It was early 2006 to the
10   best of my recollection.
11        Q.   During the same period of
12   time or during some of the same period of
13   time, you also had a secret sexual
14   relationship with a lady named REDACTE
15   REDACTED correct?
16        A.   Yes.
17        Q.   What was the period of time
18   that you had a secret sexual relationship
19   with REDACTED at Parexel?
20        A.   I can't recall the year it
21   started.  It also ended in 2006.
22        Q.   Can you recall it was
23   sometime around 2004, sometime in 2004?
24        A.   That may be right, but I
```

99 (Pages 941 to 944)

Confidential - Wayne Macfadden, M.D.

Page 945

1    can't say with certainty.
2        Q.   And you had a sexual affair
3    with REDACTED too, correct?
4        A.   Yes.
5        Q.   For how long?
6        A.   It was approximately three
7    months to the best of my recollection.
8        Q.   She works for AstraZeneca,
9    correct?
10       A.   She worked for AstraZeneca,
11   yes.
12       Q.   What was her role at
13   AstraZeneca?
14       A.   I don't recall her exact
15   title.  It was something like clinical
16   research associate.
17       Q.   So, she was in research at
18   AstraZeneca?
19       A.   She was involved in the
20   research at AstraZeneca, yes.
21       Q.   So, she was in your area?
22       A.   Well, she was involved in
23   clinical research at AstraZeneca, yes.
24       Q.   Now, was that your area?

Page 946

1        A.   I was involved in the
2    clinical research department, yes.
3    However, I did not have any reporting
4    relationship to her or vice versa.
5        Q.   Sir, do you understand that
6    a secret sexual relationship between a
7    researcher and one of the executives or
8    one of the directors in the company that
9    she's doing research with can affect in
10   this case your judgment?
11       A.   If you mean REDACTED she
12   was already conducting
13   AstraZeneca-sponsored research before we
14   met, and I had nothing to do with her
15   conduct of the clinical trial she was
16   associated with.
17       Q.   I didn't ask you that
18   question.
19            What I'm asking you is, can
20   you understand why your relationship with
21   this researcher, whether she started
22   researching before, after or during the
23   relationship, that the relationship could
24   affect your judgment, sir?

Page 947

1        A.   Can a sexual relationship
2    affect judgment?  Is that your question?
3        Q.   Yes.
4        A.   It may.
5        Q.   And it might have affected
6    yours, mightn't it?
7        A.   I don't believe it did.
8        Q.   You don't believe it did.
9            Can you understand that a
10   sexual relationship between a researcher,
11   in this case, REDACTED and yourself,
12   can affect her judgment?
13       A.   I can't speak to how a
14   relationship would affect her judgment.
15       Q.   You don't know whether it
16   affected her judgment, do you?
17       A.   Correct.
18       Q.   Now, y'all were both
19   married, weren't you?
20       A.   Yes.
21            - - -
22            (Whereupon, Deposition
23            Exhibit Macfadden 63, E-mails
24            AZSER 10375875, was marked for

Page 948

1        identification.)
2            - - -
3    BY MR. PIRTLE:
4        Q.   I want to show you a
5    document that I marked as Exhibit 63 to
6    your deposition.  I'm going to start at
7    the bottom of it, and I'll work my way
8    up.
9            On the bottom, REDACTED
10   writes to you on Friday, January 13,
11   2006, correct?
12       A.   Yes.
13       Q.   It's from REDACTED to
14   Wayne Macfadden, 2006.  She says "Hello"
15   and says "Hi babe."  Right?
16       A.   Yes.
17       Q.   "Just a quickie as I'm
18   writing frantically at my desk trying to
19   finish my quetiapine paper."  Stop right
20   there.  Did I read that correctly?
21       A.   Yes.
22       Q.   That's a paper about
23   Seroquel that she's writing, correct?
24       A.   I don't know exactly what

Confidential - Wayne Macfadden, M.D.

Page 949

1    that paper refers to.
2        Q.   Look, what is quetiapine?
3        A.   Seroquel.
4        Q.   So, "Trying to finish my"
5    Seroquel "paper." That's pretty
6    self-explanatory, isn't it?
7        A.   That's what she writes, yes.
8        Q.   "Hope your day is going
9    well. Was wondering if you have access
10   to a paper (you won't like it much
11   because it says that quetiapine isn't as
12   effective as olanzapine or
13   risperidone!!!)" Did I read that
14   correctly?
15       A.   Yes.
16       Q.   "In fact I will probably
17   need to be punished for even looking at
18   it." Did I read that correctly?
19       A.   Yes.
20       Q.   She has requested that if
21   you have access to a paper that is not
22   complimentary to Seroquel because it says
23   that olanzapine and risperidone is more
24   effective, and she makes the comment to

Page 950

1    you that she will probably need to be
2    punished just for looking at this paper,
3    correct?
4        A.   I believe that was said in
5    jest, yes.
6        Q.   Regardless of how you
7    believe it was said, that's what's said,
8    right?
9        A.   Yes.
10       Q.   You at the top reply, right?
11   You say, "Hi, doll. Logged off early to
12   hang with kids...hope this is not getting
13   to you too late." You don't say in this
14   e-mail at the time when these events were
15   going on I believe you were joking with
16   me. What you say is, "And yes, you will
17   be punished," and in parenthesis, "(in
18   the usual fashion!) when I see you... but
19   perhaps more harshly this time." Did I
20   read that correctly?
21       A.   Yes.
22       Q.   "Miss hearing your
23   voice...maybe" you'll "have better luck
24   tomorrow." Did I read that correctly?

Page 951

1        A.   It's "maybe we'll have
2    better luck tomorrow."
3        Q.   Whether or not this is said
4    in jest or not, she references the fact
5    that you're going to punish her, right?
6        A.   I believe this is a
7    reference to sexual play.
8        Q.   Bondage?
9        A.   Perhaps.
10       Q.   You used your influence from
11   time to time within the company to do
12   favors for REDACTED didn't you?
13       A.   This apparently was a
14   request for a reference. I don't know
15   that I supplied it. But that apparently
16   was what this e-mail was about.
17       Q.   By the way, there are gaps
18   in these e-mails that I've got. Did you
19   delete some of them, sir?
20       A.   I don't recall deleting
21   many -- any e-mails while I was at
22   AstraZeneca.
23       Q.   Well, let me show you what
24   I've marked as Macfadden Exhibit 64.

Page 952

1                - - -
2            (Whereupon, Deposition
3        Exhibit Macfadden 64, E-mails
4        AZSER 10375545 - AZSER 10375546,
5        was marked for identification.)
6                - - -
7            MR. PIRTLE: I'll hand a
8        copy to the company lawyers.
9            MR. MCCONNELL: Thank you.
10   BY MR. PIRTLE:
11       Q.   This is an e-mail from you
12   to REDACTED in 2002, August, right?
13       A.   Yes.
14       Q.   And you say "Hello,
15   beautiful woman. Below is a top secret
16   company" e-mail "that I fired off after
17   getting your message...I hope it is
18   discrete enough! Let me know what you
19   think...Must duck into a few meetings...
20   will try to write later, and will
21   definitely call tomorrow. Miss you and
22   love you like crazy."
23           What you have done is,
24   you're suggesting to -- and I can't

101  (Pages 949 to 952)

Confidential - Wayne Macfadden, M.D.

Page 953

1   pronounce that name in the below e-mail.
2   It starts with a G, Ghavamzadeh.  Who is
3   that?
4       A.   I can't pronounce her name.
5   Her first name is Lilli.
6       Q.   What you're suggesting is
7   there's a conference coming up, and maybe
8   since Lyn Pilowsky, REDACTED
9   can't go, that perhaps RED ACT can go in her
10  stead, right?
11      A.   Yes.
12      Q.   You were trying to do RED ACT a
13  favor, right?
14      A.   Lyn and RED ACT and the IOP I
15  believed to be an excellent research
16  group, and I believe they did good
17  quality work.
18      Q.   No, sir.  You were doing
19  REDA CTED a favor because you were having a
20  sexual relationship with her, right?
21          MR. MCCONNELL:  Objection,
22  argumentative.
23          THE WITNESS:  I was
24  interested in seeing RED yes.

Page 954

1   BY MR. PIRTLE:
2       Q.   You wanted to have sex with
3   RED because of y'all's relationship, and
4   you were manipulating the situation to
5   get her over here, and that's the only
6   reason why you were doing it, right?
7       A.   I believe her group did good
8   research and was thus justified for her
9   or someone in her group participating.
10      Q.   You picked REDACTED
11  because y'all were having a sexual
12  affair.  You didn't pick Mary O'Toole or
13  Rick Purvis or any of the other
14  co-authors, right?  That's just the truth
15  of the matter?
16      A.   I believe I suggested to
17  invite one of her colleagues if she was
18  unable -- if Lyn was unable to attend.
19      Q.   You write RED who you're
20  having an affair with "Below is a top
21  secret company" e-mail "that I" just
22  "fired off...I hope it is discrete
23  enough!"  What you're talking about is,
24  "discrete enough."  They don't know that

Page 955

1   you're having a relationship, but they'll
2   pick RED and bring her over here so you
3   can have sex with her, right?
4       A.   I think I was saying --
5   speaking in jest when I referred to a
6   "top secret company memo."  I was
7   interested in seeing REDA CTED  However, I
8   also believe that she and her group did
9   good quality research and it was
10  appropriate to invite to the meeting.
11      Q.   And you didn't cc anybody on
12  the e-mail that you sent to REDACTED
13  did you, anybody within AstraZeneca?
14      A.   That was meant to be a
15  private e-mail, yes.
16      Q.   It was meant to be a secret
17  e-mail, wasn't it?
18      A.   It was meant to be a private
19  e-mail between RED and I.
20      Q.   And at this point in time as
21  early as August of 2002, y'all's
22  relationship was at least affecting your
23  judgment as to who you got invited to
24  conferences, right?

Page 956

1       A.   No.
2       Q.   Well, let me show you what
3   I'm going to mark as Exhibit Number 65.
4             - - -
5           (Whereupon, Deposition
6   Exhibit Macfadden 65, E-mail
7   1-2-03 AZSER 10375549, was marked
8   for identification.)
9             - - -
10  BY MR. PIRTLE:
11      Q.   She did get invited, didn't
12  she?  Didn't she, sir?
13      A.   I believe she did, yes.
14      Q.   All right.
15          This is an e-mail from you
16  to RED in January of 2003 about the
17  conference, right?
18      A.   It's an invite.
19      Q.   To the AZI meeting in
20  February, right?
21      A.   It appears to be an invite
22  to an AZI meeting February 2003.
23      Q.   And you tell her, "Please
24  see the attached invite.  Feel free to

Confidential - Wayne Macfadden, M.D.

Page 957

1  suggest or make changes.  I shall be
2  very" disappointed "if I do not hear back
3  from you promptly, as your presence is"
4  required "at this 'meeting.'"
5        Did I read that correctly?
6     A.  Yes.
7     Q.  "Meeting" means a secret
8  meeting between you and her to have sex,
9  right?  That's why it's in quotation
10  marks?
11    A.  I believe the meeting was an
12  AstraZeneca meeting.  However, I was
13  probably referring to a double entendre,
14  getting together with her personally, in
15  addition to her presence professionally
16  at the meeting.
17    Q.  You were being cute?
18    A.  I was speaking in jest.
19    Q.  You say, REDACTED
20  REDACTED
21
22
23
24

Page 958

1  REDACTED
2        Did I read that correctly?
3     A.  That was also written in
4  jest, but, yes, that was read correctly.
5     Q.  And then you put your
6  official company stamp on there, "Wayne
7  Macfadden" in big letters boldface,
8  "M.D., Director Clinical Research, CNS
9  Therapeutic" group, correct?
10    A.  Yes.
11    Q.  Y'all didn't have an
12  ordinary sexual relationship, did you?
13       MR. MCCONNELL:  Objection to
14  form.
15       THE WITNESS:  We had an
16  intimate relationship, yes.
17  BY MR. PIRTLE:
18  REDACTED
19
20
21
22
23
24

Page 959

1  REDACTED
2
3
4
5
6
7        MR. MCCONNELL:  Objection,
8  asked and answered.
9        THE WITNESS:  REDACTED
10  REDACTED
11  BY MR. PIRTLE:
12  REDACTED
13
14           - - -
15       (Whereupon, Deposition
16  Exhibit Macfadden 66, E-mails
17  AZSER 10375588 - AZSER 10375589,
18  was marked for identification.)
19           - - -
20  BY MR. PIRTLE:
21    Q.  Let me show you what I'm
22  going to mark as Exhibit 66 to your
23  deposition.  I'm sorry I highlighted it.
24  I accidentally marked that copy too

Page 960

1  quick.  That's what I'm going to be
2  working on.
3        MR. PIRTLE:  Here is y'all's
4  copy.
5        (Handing over document.)
6        MR. MCCONNELL:  Thank you.
7  BY MR. PIRTLE:
8     Q.  Are you with me?
9     A.  Yes.
10    Q.  Look down at the bottom.
11  From: Coles, Lucy.  Was Lucy Coles with
12  Parexel?
13    A.  I don't recall.
14    Q.  Was she with AstraZeneca?
15    A.  No.
16    Q.  So, she was an outside
17  contractor, so to speak, according to
18  this e-mail, CHC, actually?
19    A.  Yes.
20    Q.  This is to Rod Sayce.  Who
21  is that?
22    A.  He was a person who worked
23  in publications at AstraZeneca to the
24  best of my recollection.

103  (Pages 957 to 960)

Confidential - Wayne Macfadden, M.D.

Page 961

1    Q.   Was he over you?
2    A.   I believe we were in
3  different divisions.
4    Q.   Leslie R. Fitton.  Who was
5  that?
6    A.   I don't remember what she
7  did or who she was.
8    Q.   Wayne Macfadden is on here,
9  right?
10   A.   Yes.
11   Q.   And the subject is ▮REDACT
12  ED▮ "WWS poster for ATP."  What is
13  that about?
14   A.   I forget what the acronym
15  ATP means.
16   Q.   What's "WWS"?
17   A.   I'm not certain.
18   Q.   Sir, does looking at this
19  memo refresh your recollection that you
20  were not only reviewing, but you were
21  approving ▮REDACTED▮ work during the
22  time you were having a sexual affair with
23  her?
24   A.   I don't believe I was in a

Page 962

1  position of authority to provide final
2  approval to any abstract.
3    Q.   Well, you were providing
4  approval, whether it was final or not.
5  Whatever level of approval that you had
6  to provide, you were providing it, right?
7    A.   It appears from this
8  correspondence that I thought the
9  abstract looked good and didn't provide
10  any other comments or statements about
11  approval.
12   Q.   Well, let's read it for the
13  jury.  In the next e-mail from you, and
14  you sent it back -- you sent it to this
15  outside source who is clearly not a
16  person who can approve anything, right?
17   A.   It was sent to ▮REDACTED▮
18   Q.   I'm talking about the middle
19  e-mail.  Wayne Macfadden to Lucy Coles
20  and others.  You say, "Looks very good."
21  So, you've reviewed it at this point in
22  time, right?
23   A.   I can't recall the level of
24  intensity of --

Page 963

1    A.   I'm not asking you that.
2  I'm asking if you reviewed it, sir,
3  honestly, and you did, didn't you?
4    A.   I write it "looks very
5  good."  I don't recall exactly if I
6  reviewed it or not.
7    Q.   Well, how in the world could
8  you know it looks good or very good if
9  you didn't review it?
10   A.   I may have looked at it
11  briefly and then the e-mail back.
12   Q.   This relationship is
13  affecting your judgment so much, sir,
14  that it's even affecting it today sitting
15  here under oath, isn't it?
16   A.   No, I don't believe so.
17   Q.   You can't even admit that
18  you looked at her poster when you got an
19  e-mail that says "Looks very good,"
20  right?
21       MR. MCCONNELL:  Objection to
22  form.
23       THE WITNESS:  From the
24  e-mail, it's apparent that I

Page 964

1  looked at the poster, yes.
2  BY MR. PIRTLE:
3    Q.   "I've attached the new form
4  as well.  Regards, Wayne," right?
5    A.   Yes.
6    Q.   Then you write to her and
7  you say, "Here's my 'stamp' of approval
8  for your groundbreaking work...good
9  show."
10       Did I read that correctly?
11   A.   Yes.
12   Q.   You say, "Here's my 'stamp'
13  of approval for your groundbreaking
14  work...good show."  Right?
15   A.   Yes.
16   Q.   Again, the relationship is
17  affecting your judgment, isn't it?
18  Because this wasn't -- it might have been
19  good work, but it wasn't groundbreaking
20  work, was it?
21   A.   I believe the term
22  "groundbreaking work" was said in jest.
23   Q.   You sure do joke a lot.
24       MR. MCCONNELL:  Objection.

104  (Pages 961 to 964)

Confidential - Wayne Macfadden, M.D.

Page 965

1  BY MR. PIRTLE:
2      Q.   "Groundbreaking" means
3  something that discovers something new,
4  right?
5      A.   "Groundbreaking" implies
6  importance, yes.
7      Q.   You say, "I will be sure to
8  inspect the rest of your 'body' of
9  literature in detail quite shortly."  Did
10 I read that correctly?
11     A.   Yes.
12     Q.   And then, of course, it's a
13 hard word for a Texan to use, but you use
14 another double entendre, correct?
15     A.   I believe I used a double
16 entendre again for jest, yes.
17     Q.   What you meant by "body" was
18 you meant you were going to inspect the
19 work, and you were going to inspect her
20 body when she gets over here, right?
21     A.   I believe it referred to her
22 physical body, yes.
23     Q.   Now, what does ATP stand
24 for?

Page 966

1      A.   I forget the exact acronym.
2      Q.   Authority to publish,
3  correct?
4      A.   That may be correct, yes.
5      Q.   The form you're talking
6  about attaching the new form is the form
7  for authority to publish that you had to
8  sign off on, right?
9      A.   I don't specifically recall
10 that form that I attached.
11     Q.   You signed off on forms that
12 authorize publications, didn't you?  You
13 were one of the signators?
14     A.   It was rare, if ever, that I
15 actually was the signatory, the final
16 signatory of a publication.
17     Q.   No, no.  You qualified it
18 too much.  It wasn't rare that you were a
19 signatory.  It was rare that you were the
20 final signatory, right?
21     MR. MCCONNELL:  Objection,
22 argumentative.
23     THE WITNESS:  I don't recall
24 being the final signatory often or

Page 967

1      at all.
2  BY MR. PIRTLE:
3      Q.   What about a signatory?
4      A.   Manuscripts and abstracts
5  were often sent to me as either an FYI or
6  to review.
7      Q.   And you had to sign off on
8  them, too, didn't you?
9      A.   I was not the final approver
10 or signatory on manuscripts to the best
11 of my recollection.
12     Q.   I'm trying to get out of
13 here, but if you're going to dance with
14 me, let's just show the jury what you
15 are.
16          It's true, is it not, sir,
17 that you were on the
18 manuscript/abstract/poster approval list.
19          MR. MCCONNELL:  Objection,
20 argumentative.
21 BY MR. PIRTLE:
22     Q.   Within AstraZeneca?
23     A.   May I see that?
24     Q.   No.  Answer the question to

Page 968

1      the jury.
2          Tell the jury under oath
3  whether or not you were on the
4  manuscript/abstract/poster approval list?
5      A.   I don't recall that my
6  signature or approval was absolutely
7  required before things were published or
8  presented to the best of my recollection.
9          MR. ALLEN:  Objection,
10 nonresponsive.
11 BY MR. PIRTLE:
12     Q.   What I'm asking --
13          MR. MCCONNELL:  Hold up.
14 Mr. Allen, I don't believe you
15 have any right to move to strike
16 as being nonresponsive or object.
17 This is Mr. Pirtle's examination.
18 One lawyer at a time, please.
19          MR. ALLEN:  Is that your
20 policy?
21          MR. PIRTLE:  I'm going to
22 object to being nonresponsive.
23          MR. ALLEN:  Is that your
24 policy, Mr. McConnell?

105  (Pages 965 to 968)

Confidential - Wayne Macfadden, M.D.

Page 977

1    Q.   Using the company's
2 resources?
3    A.   This appears to have been
4 sent through the company e-mail.
5    Q.   Let me check on you now.
6         After reviewing this scheme,
7 and we'll go to the next page in a
8 second, after reviewing this scheme, you
9 won't concede to this jury that this
10 relationship with REDACTED affected
11 your professional judgment?
12    A.   Attempting to hide personal
13 e-mails was something I did.  I don't
14 believe, however, it affected my
15 professional judgment.
16    Q.   Then, of course, if somebody
17 looked at the first page, it would look
18 like it's an informed consent.  If you
19 turn over to the second page, this, quote
20 unquote, personal e-mail starts going,
21 right?
22    A.   Yes.
23    Q.   And it's explicit, isn't it?
24    A.   Yes.

Page 978

1    Q.   It's internet sex, isn't it?
2    A.   It's explicit, yes.
3    Q.   It's internet sex, isn't it?
4         MR. MCCONNELL:  Objection to
5 form.
6         THE WITNESS:  It has
7 explicit sexual content, yes.
8 BY MR. PIRTLE:
9    Q.   Let's talk about another
10 subject.  I may come back to RED ACTED in a
11 minute.  Let's talk about --
12    A.   Excuse me.
13    Q.   REDACTED Parexel was
14 AstraZeneca's largest contractor, to your
15 knowledge, third party contractor, wasn't
16 it?
17    A.   I don't know who was the
18 largest contractor.
19    Q.   Let's not be coy.  Y'all
20 paid Parexel millions of dollars annually
21 to run y'all's studies program.  You know
22 that.  It was in your budget?
23         MR. MCCONNELL:  Objection,
24 argumentative.

Page 979

1         THE WITNESS:  I wasn't
2 involved with the budgets or
3 payments or selection of Parexel,
4 and it didn't run clinical
5 studies.
6 BY MR. PIRTLE:
7    Q.   Let's see what it did do.
8 All right?
9              - - -
10        (Whereupon, Deposition
11 Exhibit Macfadden 69, E-mail
12 12-2-05 AZSER 10145798, was marked
13 for identification.)
14             - - -
15
16 BY MR. PIRTLE:
17    Q.   I'm going to hand you
18 Macfadden Exhibit 59.  McFadden Exhibit
19 59 is an e-mail from REDACTED at
20 Parexel, right?
21    A.   Yes.
22    Q.   She is the lady you had the
23 secret sexual affair with at Parexel,
24 correct?

Page 980

1    A.   Yes.
2    Q.   As of the date of this
3 e-mail, y'all were already having y'all's
4 affair, correct?
5    A.   I believe so, yes.
6    Q.   And you're a recipient of
7 the e-mail among others, correct?
8    A.   Yes.
9    Q.   Her name changes from REDACTED
10 REDACT because she got divorced during
11 y'all's affair, right?
12    A.   Her divorce became final, to
13 the best of my recollection, during our
14 affair, yes.
15        MR. ALLEN:  To point it out,
16 you referred to this as 59, but
17 this is 69.
18        MR. PIRTLE:  Sorry.  Exhibit
19 69.
20        MR. ALLEN:  Pardon the
21 double entendre.
22        MR. MCCONNELL:  You're a
23 class act, Allen, all the way.
24        MR. ALLEN:  Just state for

108  (Pages 977 to 980)

Confidential - Wayne Macfadden, M.D.

Page 981

1    the record you were laughing, were
2    you not?
3        MR. MCCONNELL:  I was
4    laughing.
5        MR. LEGOWER:  Mr. McConnell
6    found himself very funny.
7    BY MR. PIRTLE:
8        Q.   All right.
9        This is "APA 2006 abstracts
10   have been submitted." REDACTED is
11   transmitting them to you, among others,
12   correct?
13       A.   Yes.
14       Q.   "We are pleased to inform
15   you that all 19 abstracts that Parexel
16   MMS" -- which you discussed with Mr.
17   Allen, correct?
18       A.   I believe so, yes.
19       Q.   -- "worked on have been
20   successfully submitted to APA."  What's
21   APA?
22       MR. ALLEN:  American -- I
23   thought you were asking me.
24   BY MR. PIRTLE:

Page 982

1        Q.   What's APA, sir?
2        A.   American Psychiatric
3    Association.
4        Q.   "We will send around a zip
5    file on Monday containing all submitted
6    abstracts.  Thanks to everyone who helped
7    push these through the necessary review
8    processes."  Did I read that correctly?
9        A.   Yes.
10       Q.   So, your girlfriend is
11   telling everybody about the abstracts,
12   right?
13       A.   REDACTED has put together a
14   list of abstracts that were submitted to
15   the APA, it appears, yes.
16       Q.   There's BOLDER here.  You
17   worked on that, didn't you?
18       A.   Yes.
19       Q.   With REDACTED
20   REDACTED          You worked on the
21   project with REDACTED
22       A.   She was not involved in the
23   conduct or execution of the study.  She
24   and Parexel facilitated the submission

Page 983

1    process.
2        Q.   Well, they wrote on the
3    studies, correct?
4        A.   Parexel would often draft
5    manuscripts for AstraZeneca and the
6    authors to contribute comment to and add
7    to, yes.
8        Q.   They found authors for the
9    studies, didn't they?
10       A.   Parexel would occasionally
11   suggest authors for presentations or
12   publications.  However, those were
13   ultimately decided upon by AstraZeneca.
14       Q.   They got the manuscripts or
15   papers published, didn't they?
16       A.   I believe to my
17   recollection, they assisted with
18   submission of these abstracts and
19   publications to conferences and journals.
20       Q.   And REDACTED was a manager
21   over at Parexel, in fact, the manager of
22   the account, the AstraZeneca account,
23   right?
24       A.   To the best of my

Page 984

1    recollection, she was the manager of the
2    account before we met, yes.
3        Q.   And I would assume after
4    y'all got together?
5        A.   Yes.
6        Q.   And it says -- let's go over
7    all the studies that were worked on.  In
8    BOLDER, there was "Thase (main results),"
9    that's 135, correct, BOLDER 2?
10       A.   I believe so, yes.
11       Q.   Then you had an adjunct.
12   What number was that?  You had another
13   arm, Macfadden, that's you?
14       A.   Yes.
15       Q.   Do you remember the number?
16       A.   It says "suicidality."
17       Q.   Yes.
18       A.   I believe that was a
19   subanalysis of the suicidality
20   information from the bipolar depression
21   trial, to the best of my recollection.
22       Q.   I'm not going to waste too
23   much time, because I don't have much
24   time.  But there's also "Lydiard,"

Confidential - Wayne Macfadden, M.D.

Page 985

1  "bipolar I," which I believe is 49, and
2  then "Hirschfeld (bipolar II)," correct,
3  all out of BOLDER, correct?
4      A.   They are under the list for
5  BOLDER, yes.
6      Q.   Then there's DelBello,
7  Carta, Hardoy, Dunn, Connor, Kampman and
8  Byerly under ISS, correct?
9      A.   Yes.
10     Q.   What is ISS?
11     A.   Investigator-sponsored
12  studies.
13     Q.   Under "Managed Market,"
14  there was Brook, there's another Brook, a
15  Stern, Hassan and a Hassan, correct?
16     A.   Yes.
17     Q.   Then under "Other," there
18  was Keefe, which is the CAFE
19  neurocognition, correct?
20     A.   Yes.
21     Q.   And then there was Garcia,
22  correct?
23     A.   That's what's listed, yes.
24     Q.   That was just for 2006,

Page 986

1  right?
2      A.   These looked like they were
3  the abstracts submitted for the 2006 APA,
4  yes.
5      Q.   There was others in 2005,
6  and there was others in 2007, right?
7      A.   For the APA, there were
8  abstracts submitted each of those years,
9  yes.
10     Q.   Was there any studies that
11  Parexel -- that AstraZeneca did that
12  Parexel didn't touch in some way or form?
13     A.   Parexel was not involved in
14  the conduct or the data collection or the
15  design of these clinical trials.  They
16  were involved in assisting with the
17  publication process for several years.
18     Q.   Hold on.  Answer my
19  question.
20          Was there any studies that
21  came out of Parexel -- I mean that came
22  out of AstraZeneca in the U.S. that
23  Parexel didn't touch during the years
24  that you were there?

Page 987

1      A.   I don't recall if they were
2  the only vendor for all my time while I
3  was there.
4      Q.   Can you recall any other
5  vendor?
6      A.   I can't recall that.
7      Q.   You can't recall any other
8  vendor?
9      A.   Right.
10     Q.   They were the only ones that
11  you know of, fair enough?
12     A.   They're the only ones I can
13  recall today, yes.
14     Q.   Now, REDAC I guess I'll
15  call her REDACTED now, we talked
16  about her being a manager.  She actually
17  directly managed Parexel personnel who
18  worked on the AZ study projects including
19  those who were members of the BEST team,
20  right?
21     A.   I'm not sure of her
22  managerial duties or responsibility with
23  other Parexel employees.
24     Q.   I guess I'll have to ask her

Page 988

1  about that.
2          MR. MCCONNELL:  Objection.
3  BY MR. PIRTLE:
4      Q.   She was on the BEST team,
5  wasn't she?
6      A.   She would participate, as a
7  few other Parexel employees would, in the
8  BEST team meetings.
9      Q.   She was on the BEST team
10  according to the company documents that
11  Mr. Allen showed you, correct?
12     A.   To the best of my
13  recollection, the BEST team comprised of
14  AstraZeneca individuals only.
15     Q.   We'll have to pull those
16  out.
17          Now, sir, as a person in
18  your position in 2006 and 2005, and you
19  were the medical director for United
20  States Seroquel, you realize that a
21  relationship with a manager of the
22  company that's trying to get your
23  scientific research published for you can
24  affect the judgment of that manager,

110 (Pages 985 to 988)

Confidential - Wayne Macfadden, M.D.

Page 989

```
 1   don't you?
 2        A.   I don't believe my judgment
 3   was affected by this relationship.
 4        Q.   What about REDACTED
 5        A.   I don't recall anything on
 6   her behalf that indicated that she was
 7   acting differently.
 8        Q.   Well, AstraZeneca had rules
 9   against these types of relationships,
10   didn't it?
11        A.   I can't speak to all the
12   rules from AstraZeneca.
13        Q.   You knew they had rules.
14   That's why you were hiding it, right?
15        MR. MCCONNELL:  Objection,
16   argumentative.
17        THE WITNESS:  Personal
18   correspondences of an intimate
19   nature and personal relationships
20   I attempted to keep private.
21   BY MR. PIRTLE:
22        Q.   Sir, you were hiding it
23   because there's rules against it, and you
24   know it, right?
```

Page 990

```
 1        MR. MCCONNELL:  Objection to
 2   form.
 3        THE WITNESS:  I attempted to
 4   hide personal e-mails between REDACTED
 5   and myself, and I attempted to
 6   hide the relationships between
 7   myself and RED and REDACTED
 8   BY MR. PIRTLE:
 9        Q.   Did RED know about REDACTED
10   and REDA know about REDACTED
11        A.   No.
12        Q.   You were hiding a lot.
13        MR. MCCONNELL:  Objection to
14   form.
15   REDACTED
16
17
18
19
20
21
22
23
24
```

Page 991

```
 1   REDACTED
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16        Q.   Okay.
17             So, it's your testimony that
18   it was only AstraZeneca people on the
19   BEST team?
20        A.   That's my recollection, yes.
21        Q.   Did you not want her on the
22   BEST team?
23        A.   Parexel was employed to
24   assist with the publication process.
```

Page 992

```
 1   They also assisted with the organization
 2   and minutes and preparation for the BEST
 3   team meetings.
 4        Q.   Well, sir, I've had other
 5   witnesses that sat right there in that
 6   chair you're sitting there under oath and
 7   tell me that Parexel people were members
 8   of the BEST team, and all I'm wondering
 9   is, is this relationship affecting your
10   judgment?
11        MR. MCCONNELL:  Objection,
12   form.
13        THE WITNESS:  I don't
14   believe the relationship affected
15   my professional judgment, and to
16   the best of my understanding, the
17   BEST team comprised of AstraZeneca
18   personnel only, and that Parexel
19   as a vendor assisted in the
20   organization of these meetings.
21             - - -
22        (Whereupon, Deposition
23   Exhibit Macfadden 70, E-mails
24   AZSER 10375708, was marked for
```

111 (Pages 989 to 992)

Confidential - Wayne Macfadden, M.D.

Page 993

1    identification.)
2        - - -
3    BY MR. PIRTLE:
4        Q.   Let me hand you Exhibit 70.
5    Your relationship with REDACTED went
6    beyond an ordinary sexual relationship
7    that was concealed, didn't it?
8        MR. MCCONNELL:  Objection to
9    form.
10       THE WITNESS:  We had an
11   intimate, personal and sexual
12   relationship, yes.
13   BY MR. PIRTLE:
14       Q.   There's an e-mail from Wayne
15   Macfadden to REDACTED "Poster number
16   and presentation info needed."  And then
17   it starts by REDACTED
18   REDACTED
19
20
21
22
23       Q.   REDACTED        is not
24   approved for psychiatrists here in the

Page 994

1    United States, is it?
2        A.   I don't believe so.
3        Q.   That wouldn't be an approved
4    therapeutic method?
5        A.   I believe this was said in
6    jest to REDAC at the time.
7        Q.   Boy, you're just a joker.
8        Now, what's going on is,
9    REDACT writes you, and she's feeling bad,
10   isn't she?
11       A.   She notes that she's feeling
12   a bit depressed again, yes.
13       MR. MCCONNELL:  By the way,
14   objection to the colloquy.  I
15   would also point out that we are
16   up at 6:00, and I think your time
17   is just about up.
18       MR. PIRTLE:  I thought I had
19   18 hours.
20       MR. MCCONNELL:  I believe
21   you used 18 hours.  It has only
22   felt like 180.
23       MR. PIRTLE:  Hold on a
24   second.  Off the record.  Lou,

Page 995

1    give me official count of the
2    time.
3        THE VIDEOTAPE TECHNICIAN:
4    Can we go off the record?
5        MR. PIRTLE:  Yes.
6        THE VIDEOTAPE TECHNICIAN:
7    It is 6:00.  We're going off the
8    record.
9        - - -
10       (Whereupon, a recess was
11   taken from 6:00 p.m. until 6:13
12   p.m.)
13       - - -
14       THE VIDEOTAPE TECHNICIAN:
15   Video it is 13 minutes after 6:00
16   and you're back on the record, Mr.
17   Pirtle.
18   BY MR. PIRTLE:
19       Q.   Dr. Macfadden, we've taken a
20   brief recess.  Are you ready to continue?
21       A.   Yes.
22       Q.   I was talking to you about
23   Exhibit 71.  In this exhibit, you talk
24   about giving REDACTED

Page 996

1    right?
2        A.   That's 70?
3        Q.   71, isn't it?
4        MR. FRITCH:  I believe you
5    are at 72.
6        - - -
7        (Whereupon, an
8    off-the-record discussion was
9    held.)
10       - - -
11   BY MR. PIRTLE:
12       Q.   71.  I'm simply asking,
13   you're talking about giving REDACTED
14   REDACTED
15       A.   She apparently is asking for
16   suggestions, and in jest I note REDACTED
17   REDAC yes.
18       Q.   Did y'all use prescription
19   drugs?
20       THE VIDEOTAPE TECHNICIAN:
21   Sorry, there's interference.
22   Thank you very much.  Would you
23   mind repeating that.
24   BY MR. PIRTLE:

112  (Pages 993 to 996)

Confidential - Wayne Macfadden, M.D.

Page 997

1     Q.   Did you and ▮REDACT▮ use
2  prescription drugs, scheduled
3  prescription drugs?
4     A.   I have used prescription
5  drugs, as I assume she has at times, yes.
6     Q.   Do you use Vicodin?
7     A.   I have used Vicodin in the
8  past, yes.
9     Q.   Did you offer to prescribe
10 her Vicodin?
11    A.   I believe I made that offer
12 at some point, yes.
13    Q.   Did you give her some of
14 your Vicodin?
15    A.   I don't recall ever doing
16 that, no.
17    Q.   I had asked you earlier
18 about your esteem for -- or how you held
19 researchers that were authors of the
20 papers that you were the head Seroquel
21 doctor on.  Do you remember early on in
22 the deposition I asked you about that?
23    A.   About authors on --
24    Q.   Papers that you were in

Page 998

1  charge of at AstraZeneca?
2     A.   If you can ask a question
3  that would -- a specific question,
4  please.
5     Q.   Sure.  Who was the author of
6  the BOLDER 2 study, the lead author?
7     A.   I believe the publication
8  lead author was Michael Thase.
9     Q.   Michael Thase is who?
10    A.   He is considered a KOL in
11 psychiatry.
12    Q.   That's a key opinion leader?
13    A.   Yes.
14            - - -
15       (Whereupon, Deposition
16       Exhibit Macfadden 72, E-mails
17       AZSER 10375818, was marked for
18       identification.)
19            - - -
20 BY MR. PIRTLE:
21    Q.   Let me show you an e-mail
22 between you and ▮REDACTED▮ dated March
23 14, 2006.  Do you see the e-mail?
24    A.   Yes.

Page 999

1     Q.   Is this about Dr. Thase?
2     A.   Dr. Thase is mentioned in
3  this e-mail, yes.
4     Q.   You were also listed as an
5  author on the BOLDER 2 study, correct?
6     A.   Yes.
7     Q.   Parexel found Dr. Thase
8  adequate to be the author of the BOLDER 2
9  study, correct?
10    A.   No.
11    Q.   I'll get to that in a
12 minute.  Let's get to what y'all are
13 talking about.  This is an e-mail between
14 you and ▮REDAC▮ correct?
15    A.   Yes.
16    Q.   Confirm for the jury both
17 you and ▮REDA▮ were working on BOLDER 2?
18    A.   ▮REDAC▮ as part of Parexel
19 was assisting with the publication
20 process of outputs of data from BOLDER 2.
21    Q.   And you as part of your role
22 as the Seroquel physician in charge of
23 BOLDER 2 were doing the internal work at
24 AstraZeneca, correct?

Page 1000

1     A.   There was a team, a study
2  team who was running BOLDER 2.  It was
3  not only myself.
4     Q.   I'm not asking that.  I'm
5  asking, you were working on it, right?
6     A.   I was working on BOLDER 2,
7  yes.
8     Q.   Second e-mail from the
9  chain, I'm not going to go down to the
10 bottom, from ▮REDACTED▮ Parexel, March
11 14, 2006.  Those's picture.  Did you
12 y'all get pictures of the authors?
13    A.   I knew Thase.  I don't --
14    Q.   Thase.  Let's see what she
15 writes.  She writes to you, ▮REDACTED▮
16 ▮REDACTED▮
17 ▮REDACTED▮
18 ▮REDAC▮ I did picture him being a little
19 more handsome...he is definitely no Wayne
20 Macfadden."  Did I read that correctly?
21    A.   Yes.
22    Q.   This is Parexel's person on
23 BOLDER 2 talking to AstraZeneca's person
24 on BOLDER 2 about the lead author of

113 (Pages 997 to 1000)

Confidential - Wayne Macfadden, M.D.

Page 1001

1  BOLDER 2 REDACTED
2  REDACTED
3      A.  We were engaging in some
4  playful dialogue about Michael Thase,
5  yes.
6      Q.  Let's go up to the top.  You
7  say, "Hi, doll," you agree, REDACTED
8  REDACTED
9  REDACTED
10  Did I read that correctly?
11     A.  Yes.
12     Q.  REDACTED
13  REDACTED
14
15
16
17
18     Q.  It missed the mark, didn't
19  it?
20         MR. MCCONNELL:  Objection to
21  the form.
22  BY MR. PIRTLE:
23     Q.  Do you think that Dr. Thase
24  would like your comments?

Page 1002

1         MR. MCCONNELL:  Objection,
2  form.
3         THE WITNESS:  No.
4  BY MR. PIRTLE:
5     Q.  Do you think Dr. Thase might
6  have something to say about his
7  participation in the study had he known
8  this, quote, unquote, private
9  conversation was going on between you two
10  working on the BOLDER 2 study which he
11  was the lead author?
12         MR. MCCONNELL:  Objection to
13  form.
14         THE WITNESS:  I can't know
15  what his response would be.  I
16  don't think he would like this.
17  BY MR. PIRTLE:
18     Q.  It was inappropriate, wasn't
19  it?
20     A.  It was personal
21  correspondence that meant to be joking
22  between the two of us.
23     Q.  It was correspondence done
24  on business computers during business

Page 1003

1  time about a business matter concerning a
2  person that was purely related to you
3  regarding business, right?
4     A.  It was a personal
5  correspondence done on the company
6  computer I'll assume during company time,
7  yes.
8     Q.  Do you think your
9  relationship was clouding both of y'all's
10  judgment talking about REDACTED
11  REDACTE and he's a lead author on
12  BOLDER 2, probably one of the most
13  important studies you participated in?
14         MR. MCCONNELL:  Objection to
15  form.
16         THE WITNESS:  I don't
17  believe our correspondences or our
18  relationship affect my
19  relationship with Dr. Thase.
20  BY MR. PIRTLE:
21     Q.  Had he known the truth, it
22  would have, right?
23         MR. MCCONNELL:  Objection to
24  form.

Page 1004

1         THE WITNESS:  I don't think
2  he would have liked to have seen
3  the private personal
4  correspondence that REDACTED and I
5  had.
6  REDACTED
7
8
9
10
11         - - -
12  BY MR. PIRTLE:
13     Q.  You told me earlier that
14  Thase wasn't selected by Parexel for the
15  BOLDER 2, to be the BOLDER 2 lead author.
16  REDACTED
17
18
19
20
21
22
23
24

114 (Pages 1001 to 1004)

Confidential - Wayne Macfadden, M.D.

Page 1021

```
 1      Q.   What about REDACTED
 2      A.   I believe I met REDA      after
 3   I -- after my personal relationship with
 4   REDA   had ended.
 5      Q.   Was RED   married?
 6      A.   At the time she was not
 7   married.
 8      Q.   I don't like asking this
 9   question, but I've got to ask it for what
10   I'm doing here under the circumstances.
11   Does your wife know about any of this?
12          MR. MCCONNELL:  I'm sorry.
13      Could I have that question read
14      back?
15   BY MR. PIRTLE:
16      Q.   Does your wife know about
17   any of this?
18          MR. MCCONNELL:  Does, you
19      said?
20   BY MR. PIRTLE:
21      Q.   I said, does your wife?
22          MR. MCCONNELL:  I couldn't
23      hear.
24   BY MR. PIRTLE:
```

Page 1022

```
 1      Q.   I'm just asking the
 2   question.
 3      A.   My wife is aware of all
 4   these relationships that I had, yes.
 5      Q.   When did she learn?
 6      A.   She learned in 2006.
 7      Q.   About the same time these
 8   e-mails came out?
 9      A.   No.  It was before.
10      Q.   Was it about the time that
11   you took the opportunity to resign?
12      A.   No, it was before.
13      Q.   Was it about the time that
14   you figured you were fixing to have to
15   take the opportunity to resign?
16      A.   The personal relationships
17   caused family problems between my wife
18   and I that contributed to my decision to
19   accept the opportunity to resign.
20      Q.   Let me ask you, are there
21   any more?
22          MR. MCCONNELL:  That's the
23      question?
24   BY MR. PIRTLE:
```

Page 1023

```
 1      Q.   Yes.  Any more affairs?
 2          MR. MCCONNELL:  I instruct
 3      the witness not to answer unless
 4      you can somehow tie it into this
 5      case.
 6   BY MR. PIRTLE:
 7      Q.   Who is REDACTED
 8      A.   I'll listen to my counsel's
 9   advice.
10      Q.   Who is REDACTED
11      A.   Say that again, please.
12      Q.   Who is REDACTED
13      A.   You may mean REDACTED
14      Q.   I think I do.
15      A.   She was a research person at
16   AstraZeneca while I was employed there.
17      Q.   What was y'all's
18   relationship?
19      A.   We were friends.
20      Q.   Only?
21      A.   We were friends -- yes.
22      Q.   Let me ask two questions
23   this way.
24          Did you have any other
```

Page 1024

```
 1   sexual relationships with people who were
 2   affiliated with AstraZeneca or any
 3   third-party contractor or researcher of
 4   AstraZeneca?
 5      A.   Did I have any sexual
 6   relationship with any other -- say it
 7   again, please.
 8      Q.   Sure.
 9          Did you have any other
10   sexual relationships with any researcher,
11   contractor or employee of AstraZeneca?
12      A.   I had a sexual relationship
13   with a person in California who had done
14   clinical trials with AstraZeneca and with
15   other companies.
16      Q.   What was that person's name?
17      A.   REDACTED
18      Q.   REDACTED
19      A.   Yes.
20      Q.   How long did the sexual
21   relationship with REDACTED
22      A.   I think it was just one
23   time.
24      Q.   When was it?
```

119 (Pages 1021 to 1024)

Confidential - Wayne Macfadden, M.D.

Page 1025

1    A.  I can't recall the month or
2  the year.
3    Q.  You say you think it was
4  just one time.  Was it one time or not?
5    A.  I saw her on two occasions.
6  I believe sex was only on one of those
7  occasions.
8    Q.  Was this during the time
9  that you were seeing REDACTED or
10 REDACTED or REDACTED
11    A.  It may have been, yes.
12    Q.  Was this person doing
13 research at the time for AstraZeneca?
14    A.  I don't recall if she was an
15 active researcher at that time.
16    Q.  But you know now that she
17 was?
18    A.  She was not an investigator
19 in any of the studies that I was working
20 with while at AstraZeneca.
21    Q.  I didn't ask you that.
22 Anybody else in the broadest sense out
23 there?  I don't mean that.  I'll limit it
24 to the AstraZeneca and contractors and

Page 1026

1  researchers and vendors.  Anybody
2  associated with work?
3    A.  No.
4    Q.  Who was the person that you
5  spoke with about RED regarding having
6  the affair -- excuse me.  Strike that.
7    Who was the person that you
8  had the affair with that you described to
9  REDA who could not spell, and it turned
10 you off?
11    A.  I don't recall.
12    MR. PIRTLE:  Can we go off
13 the record for just a second?
14    MR. MCCONNELL:  I have two
15 minutes to go.
16    THE VIDEOTAPE TECHNICIAN:
17 42 minutes after 6:00.  We're
18 going off the record.
19        - - -
20    (Whereupon, a recess was
21 taken from 6:42 p.m. until 6:55
22 p.m.)
23        - - -
24    THE VIDEOTAPE TECHNICIAN:

Page 1027

1  55 minutes after 6:00.  This is
2  the beginning of tape number  6,
3  and you're back on the record, Mr.
4  Pirtle.
5        - - -
6    (Whereupon, Deposition
7  Exhibit Macfadden 79, E-mails
8  AZSER 10376231, was marked for
9  identification.)
10        - - -
11 BY MR. PIRTLE:
12    Q.  Dr. Macfadden, we've taken a
13 brief recess.  Are you ready to finish?
14    A.  Yes.
15    Q.  I've now put before you the
16 next exhibit, I believe it's 74.  It was
17 in your chair.  Are you with me?
18    A.  There is a 79 that was in my
19 chair.
20    Q.  79.  Will you confirm for me
21 that this is an e-mail chain between you
22 and REDACTED
23    A.  Yes.
24    Q.  In the middle she writes to

Page 1028

1  you, "Hope you have some Vicodin left.
2  That will take the edge off.  I am on my
3  last 5... bad girl."
4    Did I read that correctly?
5    A.  Yes.
6    Q.  Your response is, "Will have
7  to look for the Vicodins...should have
8  thought of that last nite!  Will use
9  ethanol tonite instead...have a work
10 dinner for Simon & Nick who are leaving
11 Seroquel."
12    Did I read that correctly?
13    A.  Yes.
14    Q.  Ethanol is booze, isn't it?
15    A.  It refers to alcohol, yes.
16    Q.  The REDAC woman in
17 California, I didn't get her name.  What
18 studies did she work on?
19    A.  I don't recall.
20    Q.  You don't know what studies
21 she worked on?
22    A.  Yes.  I don't know what
23 studies she worked on.
24    Q.  Are you a sex addict?

120  (Pages 1025 to 1028)

Confidential - Wayne Macfadden, M.D.

Page 1029

1    MR. MCCONNELL:  Objection to
2  form.
3    THE WITNESS:  No.
4  BY MR. PIRTLE:
5    Q.   Are you receiving any
6  therapy for sexual addiction?
7    A.   No.
8    Q.   Are you receiving any mental
9  therapy?
10    A.   No.
11    Q.   I'm just about through, but
12  here's my last question.
13    Based on everything you
14  reviewed and what you've seen here today,
15  are you still proud of the time and your
16  work at AstraZeneca?
17    A.   Yes, I am.
18    Q.   So, you feel no remorse
19  whatsoever?
20    A.   I was involved in some
21  personal relationships for which I have
22  regret.  However, professionally, I
23  believe I did an excellent job there.
24    Q.   And they fired you for it?

Page 1030

1    MR. MCCONNELL:  Objection,
2  asked and answered several times.
3    MR. PIRTLE:  Pass the
4  witness.  Pass the witness.
5    THE WITNESS:  I --
6    MR. MCCONNELL:  That's it.
7  He's done.
8    MR. PIRTLE:  That was a
9  comment.
10    MR. MCCONNELL:  What was
11  that?
12    MR. PIRTLE:  I said that was
13  a comment.
14    MR. MCCONNELL:  Are we ready
15  to go?
16    MR. PIRTLE:  Ready to go
17  when you are.
18    - - -
19    EXAMINATION
20    - - -
21  BY MR. MCCONNELL:
22    Q.   Good evening, Dr. Macfadden.
23    A.   Hello.
24    Q.   I'm Steve McConnell, and I

Page 1031

1  represent AstraZeneca, and I will try to
2  make this brief.
3    First of all, while you were
4  at AstraZeneca, were you ever working in
5  the regulatory department?
6    A.   No.
7    Q.   Were you ever working in the
8  safety department?
9    A.   No.
10    Q.   Have you ever attended at
11  AstraZeneca a safety and efficacy review
12  meeting, otherwise known as SERM?
13    A.   No.
14    Q.   Now, Mr. Allen, over a day
15  and a half asked you many times about
16  your role as the U.S. medical director
17  for Seroquel.  Do you recall that?
18    A.   Yes.
19    Q.   In that role, were you in
20  charge of the Seroquel study physicians?
21    A.   No.
22    Q.   Who was?
23    A.   Martin Brecher.
24    Q.   Were you the only Seroquel

Page 1032

1  physician who oversaw clinical trials?
2    A.   No.
3    Q.   How many study physicians
4  were there at AstraZeneca during your
5  stint?
6    A.   That varied from
7  approximately four to approximately ten.
8    Q.   Now, with respect to the
9  studies that these study physicians
10  oversaw, where did those studies take
11  place?
12    A.   Studies took place in the
13  United States, in addition to other
14  countries around the world.
15    Q.   Did you have responsibility
16  for overseeing all those clinical trials?
17    A.   No, I did not.
18    Q.   I'd like you to take a look
19  at what has been marked as Exhibit 2 to
20  this deposition.  It was a document that
21  Mr. Allen provided to you the first day.
22  Let's see if you can find it in front of
23  you.  Are those in order?
24    A.   I don't know.

121  (Pages 1029 to 1032)