# EXHIBIT 7

Confidential - Claudia A. Piano

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

- - -

IN RE:   SEROQUEL          :
PRODUCTS LIABILITY         : Case No.
LITIGATION                 : 6:06-md-01769-ACC-DAB
                           :
MDL Docket No. 1769        :
    (This Document Relates To All Cases.)

- - -

Hackensack, New Jersey
Wednesday, June 25, 2008

- - -

C O N F I D E N T I A L

- - -

Videotaped Deposition of CLAUDIA A. PIANO held at Best Western Oritani Hotel, 414 Hackensack Avenue, on the above date, beginning at 9:21 a.m., before Kimberly A. Overwise, a Certified Realtime Reporter and Notary Public.

- - -

Golkow Technologies, Inc.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

Confidential - Claudia A. Piano

Page 22

1  notice for June 25, 2008, here at this hotel.
2       A    Okay.
3            (Piano Exhibit No. 2 was marked
4       for identification.)
5  BY MR. PIRTLE:
6       Q    Now I'm going to show you what I'm
7  going to mark as Exhibit 2 to your deposition.
8  And I'll ask you, can you identify Exhibit 2
9  for me?
10      A    Yes. This is a list of team members
11 that were working on Seroquel at the time.
12 And I'm not sure what the time is because I
13 don't think it's got a date on it.
14      Q    And it doesn't have a date, but do
15 you recognize the folks that are on this list?
16      A    Yeah, I do.
17      Q    Because the name, the title of
18 Exhibit 2 is PAREXEL MMS Seroquel team. It
19 was used in another deposition of someone I
20 bet you know.
21      A    Donna Casparro.
22      Q    And you're the first name on the
23 list under client services team.
24      A    That's right.
25      Q    So you were the head of the client

Page 23

1  services team?
2       A    Yes.
3       Q    Now, the folks underneath you, are
4  they folks that would be on the client
5  services team?
6       A    Yes.
7       Q    And would this be folks that either
8  worked wholly or in part on AstraZeneca
9  products?
10      A    Yeah. Maribeth Pawlak was the
11 director of client services for Seroquel at
12 the time that this was written. And she was
13 the primary contact for -- she was the primary
14 client contact for the Seroquel business.
15      Q    Well, it's got you listed up here,
16 oversees all -- and I'm going to try to get
17 into these acronyms -- that would be
18 PAREXEL --
19      A    MMS.
20      Q    -- Medical Marketing Services.
21 Seroquel business Hackensack and --
22      A    Uxbridge.
23      Q    -- Uxbridge teams.
24      A    Yeah.
25      Q    Were you over both Hackensack and

Page 24

1  Uxbridge?
2       A    Yeah, I was global at the time.
3       Q    So there was a UK team also?
4       A    Yes.
5       Q    And would they work on AstraZeneca
6  projects in the UK?
7       A    Yes.
8       Q    Or I guess all of Europe?
9       A    Yeah.
10      Q    Was it divided up where Hackensack
11 handled the northern -- I'm sorry -- the
12 United States had North America and Uxbridge
13 handled the rest of the world?
14      A    Actually, it wasn't. We do -- we
15 did 80 percent global business. So even
16 though we're based in the US, probably about
17 80 percent of the work that we did was for
18 the, quote/unquote, global team. The global
19 team, some of them sat in the US, some of them
20 sat in the UK. And so the staff that worked
21 on the business, it kind of pertained to where
22 the client sits.
23      Q    Okay. So you had contacts over in
24 the UK?
25      A    Yeah.

Page 25

1       Q    And you had contacts here?
2       A    Yes.
3       Q    Going down this list, I count one,
4  two, three, four, five, six, seven folks in
5  client services team.
6       A    Yes.
7       Q    Now, did all of these folks work
8  exclusively on AstraZeneca products?
9       A    No.
10      Q    Which ones did and which ones
11 didn't?
12      A    Maribeth Pawlak, Donna Casparro,
13 Barbara Goworek, and Lauren Duby were
14 exclusively AstraZeneca and not exclusively
15 Seroquel because we also worked on other
16 accounts. So we worked on Exanta business and
17 other -- you know, other brands, but the first
18 one, two -- the first four names under mine
19 were exclusively AstraZeneca.
20      Q    And the first four names under
21 yours, which ones of those were exclusively
22 Seroquel?
23      A    None of them.
24      Q    Now, under Donna Casparro, who we've
25 already deposed, it says: Services director

Confidential - Claudia A. Piano

Page 26

1  global publications.
2  A   Yeah.
3  Q   Were you all contracted with to do
4  publications concerning Seroquel?
5  A   Yeah. At that time her role was
6  limited to that particular budgetholder. In
7  other words, we split up the business or we
8  referred to it according to who holds the
9  budget. So she worked for the global
10 publications budgetholders.
11 Q   Now, when we use the term
12 "publications" in this deposition, what are
13 y'all referring to?
14 A   Primarily peer-reviewed publications
15 that either appear in a peer-reviewed journal
16 or in scientific literature. And what I mean
17 by peer-reviewed is that it's reviewed by a
18 number of outside objective sources, generally
19 an editorial board of the journal and also
20 congresses. So like association meetings,
21 American Psychiatric Association or various
22 association meetings, they hold congresses
23 throughout the year. And anything that -- an
24 abstract that they put in their abstract book
25 or poster that they display there at a poster

Page 27

1  session or an oral session, that's considered
2  a publication.
3  Q   All right. And that is some of the
4  work that was done for AstraZeneca on
5  Seroquel-involved publications?
6  A   Yes.
7  Q   Now, the next entry that I see under
8  global communications, I see in all caps
9  REACH?
10 A   Yes.
11 Q   Do you recognize that? And I assume
12 it's an acronym.
13 A   Yes. Well, it wasn't really an
14 acronym. It was just the name of a program.
15 Q   Was there a number of different
16 programs that PAREXEL worked on for Seroquel?
17 A   Yes.
18 Q   Was one of the programs called
19 REACH?
20 A   Yes.
21 Q   Will you describe generally what
22 REACH was?
23 A   Sure. REACH was -- and the reason
24 they called it REACH was it was a bit of an
25 outreach program. It was an educational

Page 28

1  program that essentially involved a steering
2  committee of key opinion leaders. They were
3  global psychiatrists. And the steering
4  committee determined the kinds of educational
5  activities that the group would endeavor to
6  undertake. And then we would get AstraZeneca
7  to fund it, and it was funded through a CME
8  company.
9  Q   What's the name of the CME company?
10 A   It's our sister company, the Center
11 for Biomedical Communication.
12 Q   When you say "sister company," was
13 this another division of PAREXEL
14 International?
15 A   Yes.
16 Q   Where is it located?
17 A   433 Hackensack Avenue, 10th floor.
18 Q   Where are you located?
19 A   433 Hackensack Avenue, 10th floor.
20 There is a firewall and fire doors.
21 Q   Are they locked?
22 A   Yeah. You have to have a special
23 key card to get in, and I don't have it.
24 Q   Same floor?
25 A   Same floor.

Page 29

1  Q   Same address. All right. Next --
2  we've already covered publications. Then
3  under Kyle Weldon, "Live" Meetings.
4  A   Yeah.
5  Q   And it has examples of Advisory
6  Boards and Roundtables.
7  A   Yes.
8  Q   In PAREXEL's work on Seroquel work,
9  was PAREXEL contracted to do work on advisory
10 boards and roundtables and the like?
11 A   Yes.
12 Q   Will you explain to me what an
13 advisory board is?
14 A   Yes. An advisory board meeting is
15 where advisers that have been -- they've all
16 signed consultancy agreements with AstraZeneca
17 and so they have to keep all the information
18 confidential. And they're kind of working on
19 behalf of AstraZeneca. They get together for
20 a meeting and AstraZeneca shares data with
21 them, and they give advice about what to do
22 with it. So, for example, you would -- let's
23 say you were studying -- you had some Phase 3
24 data available for one of your products and
25 you shared it with the advisers. They might

Confidential - Claudia A. Piano

Page 186

1  progress. And then No. 1: Overall efficacy
2  and tolerability of quetiapine monotherapy
3  versus placebo for major depressive episodes
4  in patients with bipolar 1 and 2 disorder.
5       Of course, the lead author on that
6  is Calabrese; correct?
7     A   Yes.
8     Q   Action PAREXEL: Send first draft
9  for AZ review by March 5 even if missing data
10 has not been received and include draft
11 messages from AZ's messaging team meeting.
12      Did I read that correctly?
13    A   Yes.
14        MR. JOSEPHSON: Objection.
15    Q   The messaging team were commercial,
16 weren't they?
17    A   I do not know. It could have been
18 clinical.
19    Q   Two: Subanalysis of patients with
20 Bipolar 1, Keck, Calabrese AZ authors. Action
21 PAREXEL: Send first draft for AZ review by
22 March 12 even if missing data has not been
23 received and include draft messages from AZ
24 messaging team meeting.
25      Did I read that correctly?

Page 187

1     A   Yes, you did.
2     Q   Well, what was the AZ messaging
3  team, do you remember?
4     A   I honestly am trying to remember and
5  I don't. I didn't know there was a team per
6  se. Maybe they had a meeting and out of it
7  came some new messages that we needed to
8  incorporate, but again it's speculation at
9  this point.
10    Q   I've got some documents we'll look
11 at later and we can decide. Let me ask you,
12 we've seen the name a few times. Who is
13 REDACTED
14    A   She's currently known as REDACTED
15 REDACTED was her married name. She since
16 got divorced. She works on my team. She's a
17 senior program specialist is the new title.
18 We changed our titles internally.
19    Q   Senior program?
20    A   Specialist.
21    Q   What is that?
22    A   It's somebody who specializes in the
23 delivery of programs to -- various programs to
24 clients, whether the program is a publication
25 program or a meetings program or an advisory

Page 188

1  board, et cetera.
2     Q   In 2005, what was she doing? Was
3  she working for you?
4     A   Yeah. She was same job, just not
5  senior.
6     Q   And was she working on Seroquel?
7     A   Yes, and Exanta. She worked on two
8  AstraZeneca brands.
9        (Piano Exhibit No. 18 was
10       marked for identification.)
11 BY MR. PIRTLE:
12    Q   Let me show you what I'm going to
13 mark as Exhibit 18 to your deposition. I'm
14 trying to see if you're on this.
15    A   Okay.
16    Q   Have you had an opportunity to
17 review Exhibit 18?
18    A   Yes.
19    Q   Do you recognize it?
20    A   Not specifically but --
21    Q   Do you recognize some of the
22 subjects?
23    A   Yeah.
24    Q   I want to talk to you about it.
25 Now, you were REDACTED supervisor, her name

Page 189

1  was REDACTED then, back in 2005?
2     A   Donna Casparro was her direct
3  supervisor.
4     Q   And you were over Donna?
5     A   Yeah.
6     Q   So you were --
7     A   I'm like her grand supervisor.
8     Q   The big supervisor?
9     A   Yeah, right.
10    Q   That'll work. See this is from
11 REDACTED at PAREXEL to John Tumas and a
12 number of other people? See?
13    A   Correct.
14    Q   Then it says CC: MMS Seroquel.
15 Subject: APA 2006 abstracts have been
16 submitted. Dear all.
17       Are you with me?
18    A   Yes.
19    Q   It says: We are pleased to inform
20 you that all 19 -- no -- that all 19 abstracts
21 that PAREXEL MMS have been successfully
22 submitted to APA.
23       Did I read that correctly?
24    A   Yes.
25       MR. KUSIAK: No, actually.

Confidential - Claudia A. Piano

### Page 190

1  MR. PIRTLE: Would you like to
2  read it for me?
3      MR. KUSIAK: I will since I
4  think my eyes are slightly better. We
5  are pleased to inform you that all 19
6  abstracts that PAREXEL MMS worked on have
7  been successfully submitted to APA. You
8  forgot the "worked on."
9      MR. PIRTLE: All right.
10 BY MR. PIRTLE:
11     Q  And APA we've already talked about?
12     A  Yes.
13     Q  American Psychiatric --
14     A  Association.
15     Q  -- association? That's the big
16 meeting?
17     A  Correct.
18     Q  And then there were 19 abstracts for
19 this one meeting?
20     A  That was a big one.
21     Q  That's a lot, isn't it?
22     A  Oh, yeah.
23     Q  And you see there are BOLDER
24 abstracts -- I assume that I'm reading this
25 correct.

### Page 191

1     A  Yes.
2     Q  And was BOLDER broken up into
3  separate abstracts?
4     A  Yes.
5     Q  Including BOLDER Thase, BOLDER
6  MacFadden, BOLDER -- how do you pronounce that
7  name?
8     A  Lydiard.
9     Q  Lydiard. BOLDER Weisler and
10 Suppes/Hirschfeld?
11     A  Suppes.
12     Q  So that would just be on BOLDER;
13 correct?
14     A  That's correct.
15     Q  Then ISS is as we talked about
16 earlier?
17     A  Yes.
18     Q  That's the independent --
19     A  Sponsored studies.
20     Q  -- sponsored studies. And then you
21 have DelBello, Carta, and so on; correct?
22     A  Correct.
23     Q  Then managed market. What is that?
24     A  They have to do with health
25 economics outcomes. Generally, it's

### Page 192

1  pertaining to lost days at work. And in this
2  case, it was probably just general stuff
3  pertaining to the disease state and how it
4  affects the number of missed days and
5  hospitalization, all that kind of stuff. But
6  there's also -- I should mention AstraZeneca
7  does health economic studies, and we do help
8  put those papers and things together as well.
9     Q  Did you have an understanding that
10 Seroquel was a drug that was heavily
11 subsidized by managed markets, including the
12 United States government?
13        MR. KUSIAK: Objection.
14        MR. JOSEPHSON: Objection;
15 form.
16     A  No. I actually -- I don't think we
17 started -- I think this was probably the first
18 year we ever worked on health economics stuff.
19 So, frankly, I don't think I've ever read any
20 of them so I couldn't tell you.
21     Q  Well, that's an honest answer. All
22 right. Then you've got managed market. After
23 that you've got other.
24     A  Yeah.
25     Q  And it looks like we have CAFE,

### Page 193

1  which is neurocognition and onset of action,
2  Garcia?
3     A  Uh-huh.
4     Q  Which totals the 19?
5     A  Yes.
6     Q  Now, this wasn't all that PAREXEL
7  was working on, this was for one APA
8  presentation or -- yeah, presentation, poster
9  session?
10        MR. KUSIAK: Is that a
11 question?
12        MR. PIRTLE: Yes.
13    A  Yes. These were all abstracts that
14 were submitted that year. I don't know if
15 they were all accepted. I do recall a lot
16 were accepted.
17    Q  Well, it says up here they were
18 successfully submitted so --
19    A  That just means we met the deadline.
20    Q  So y'all met the deadline on 19?
21    A  Yeah.
22    Q  All right. Fair enough. Now, in
23 terms of REDACTED what kind of employee was
24 she?
25        MR. KUSIAK: Objection.

Confidential - Claudia A. Piano

Page 202

1  Q  Joe Calabrese?
2  A  Yes.
3  Q  In terms of AstraZeneca's
4  involvement, Dr. Wayne MacFadden was a person
5  that you know was involved with BOLDER 1 and
6  2; correct?
7  A  Yes.
8  Q  And BOLDER 1 and 2 is -- BOLDER 1 is
9  Trial 49?
10  A  Right. I don't know what the number
11  was for 2, but yeah.
12  Q  135.
13  A  Okay.
14  Q  So Dr. MacFadden was the person
15  involved from the AstraZeneca side?
16  A  And Jamie Mullen.
17  Q  And Jamie Mullen. And I don't
18  dispute that both of them were involved. From
19  the PAREXEL side, one of the people involved
20  was REDACTED
21  A  She had nothing to do with the
22  creation of any of the manuscripts or the
23  editing of any of the manuscripts or content.
24  She was involved in managing the projects,
25  making sure everybody met timelines.

Page 203

1  Q  Kind of like what you do; she wasn't
2  a medical writer?
3  A  Right.
4  Q  Turn to the second page of Exhibit
5  20. This is an e-mail from REDACTED
6  PAREXEL, to Wayne MacFadden dated August 17,
7  2005. Do you see that?
8  A  Uh-huh.
9  Q  And do you see that it starts off:
10  NJ -- and this could be New Jersey, I don't
11  know -- fabulous. Thanks for taking care of
12  this. And PS: Are you presenting the CAFE
13  slides at the US ad board on September 26?
14       Did I read that reasonably correct?
15  A  Yes.
16  Q  Now, CAFE was another study;
17  correct?
18  A  Yes.
19  Q  And is it fair to say that CAFE was
20  done in response to the imminent publication
21  of a study called CATIE?
22  A  I have to tell you I'm not really
23  familiar with CAFE. That's one of the ones
24  that I'm pretty vague on.
25  Q  Who worked on CAFE?

Page 204

1  A  On our end, the writers were a
2  couple of the UK folks. I want to say Anusha
3  Bolonna, maybe Bill Wolvey, Aruna Seth, but
4  this thing about a US ad board meeting is
5  meaningless to me. It's probably somebody
6  else's ad board.
7  Q  United States advisory board?
8  A  Yeah. In other words, I don't think
9  we were managing the ad board. I think REDACTED
10  was just referring to some US ad board.
11  Q  Do you see that if folks that are on
12  your side, who are either writing or working
13  on projects that are supposed to have some
14  type of scientific validity, have personal
15  relationships with folks on the AstraZeneca
16  side, that there can be a potential for
17  conflict of interest?
18  A  Yes.
19  Q  And I would assume that there is a
20  policy against that?
21  A  Yeah, certainly.
22  Q  Do you know, ma'am, sitting here
23  today if there were any inappropriate
24  relationships between the folks at PAREXEL and
25  the clients at AstraZeneca?

Page 205

1  A  Other than this?
2  Q  Yes.
3  A  No.
4  Q  Do you know the extent and depth of
5  the inappropriateness of any of the
6  relationships?
7       MR. KUSIAK: Objection. She
8   just stated that she doesn't know of any
9   other relationship besides this. So when
10  you're trying to suggest there was more
11  than one relationship --
12      MR. PIRTLE: No, I don't mean
13  that.
14  BY MR. PIRTLE:
15  Q  Do you know the extent and depth of
16  any of the inappropriate relationships?
17      MR. KUSIAK: Objection. Again,
18  you're suggesting that there was more
19  than one inappropriate relationship. And
20  she just testified that she didn't know
21  of any other than this one that you're
22  apparently pointing out through Exhibit
23  20.
24  A  I did not know about the extent or
25  the depth of this, and this is the only

Confidential - Claudia A. Piano

Page 206

1  example that I am aware of. And an hour ago I
2  was aware of no examples.
3  Q   So this, whatever this is, has went
4  undetected as of 2008 by you?
5  A   I was aware that she had struck up
6  a, quote/unquote, friendship with Wayne
7  MacFadden. I brought it to her manager's
8  attention, to Donna Casparro's attention. I
9  asked Donna to speak with her, try to get to
10  the bottom of it. Donna was unsuccessful at
11  really getting anywhere with it and said they
12  were just friends. And I let her know that I
13  didn't think she should be friends with him.
14  Q   So we're clear now --
15  A   But as far as the extent and the
16  depth, I had no idea.
17  Q   Just so we're clear now, Wayne
18  MacFadden was also an author on BOLDER 1 and
19  BOLDER 2?
20  A   Correct, although I heard they took
21  his name off after they fired him. They took
22  his name off all subsequent stuff.
23          MR. JOSEPHSON: Objection;
24      form.
25          (Piano Exhibit No. 21 was

Page 207

1      marked for identification.)
2  BY MR. PIRTLE:
3  Q   Let me show you Exhibit 21 and move
4  on. We'll start winding this down. During
5  the time that you were working on this
6  project, did you become aware that Wayne
7  MacFadden was prescribing REDACTED
8  prescription drugs?
9  A   Certainly not.
10  Q   How about scheduled prescription
11  drugs?
12  A   Certainly not.
13  Q   Now, if you've got an author and
14  someone involved in a coordination study
15  taking scheduled prescription drugs, could you
16  see how there's a potential for tainting the
17  study?
18          MR. JOSEPHSON: Objection;
19      form.
20          MR. KUSIAK: Objection.
21  A   REDACTED was not senior
22  enough to impact the data dissemination in any
23  meaningful way. She was a project -- probably
24  at the time she was either account exec or
25  project manager. I mean, she's not in a

Page 208

1  position to do that.
2  Q   I'm not asking you whether you
3  believe it happened.
4  A   Okay.
5  Q   On one side -- you've got to take it
6  from my point of view. On one side, I've got
7  someone working for you who's an account
8  executive doing administrative stuff. On the
9  other side, I've got a guy handling the data..
10  What I'm asking you is: Do you see where them
11  doing scheduled narcotics might have a
12  potential for adversely impacting the
13  scientific integrity of that study?
14          MR. KUSIAK: Objection.
15          MR. JOSEPHSON: Objection.
16          MR. KUSIAK: Tom, the last
17      thing she should be doing is looking at
18      this from your point of view, which I
19      think is just to make money in this case.
20      And No. 2, she's here just to tell the
21      truth as she sees it, which she's doing.
22          MR. PIRTLE: And that's what
23      I'm getting at. And from my point of
24      view let me inform you no, I'm doing this
25      because I believe in it. I've long since

Page 209

1      passed the point in my life where I need
2      money.
3          MR. KUSIAK: If you say so.
4          MR. PIRTLE: I guess more's
5      always better, but that's everybody's
6      attitude. I actually happen to believe.
7  BY MR. PIRTLE:
8  Q   You see that there's a potential for
9  adversely impacting the scientific integrity
10  of this work, ma'am?
11          MR. KUSIAK: Objection.
12          Do not speculate on
13      hypotheticals.
14          MR. JOSEPHSON: Objection;
15      form.
16  A   I see where his credibility has
17  seriously been called into question by this
18  sort of behavior. If he worked for me, I'd
19  fire him.
20          MR. PIRTLE: I'll take that.
21      Let's go to another subject, take a
22      break. Off the record.
23          THE VIDEOGRAPHER: The time is
24      3:20. We're off the record.
25          (Short recess.)

Confidential - Claudia A. Piano

Page 210

1   THE VIDEOGRAPHER: The time is
2   3:35. We're on the record.
3   BY MR. PIRTLE:
4   Q   Ms. Piano, we've taken a brief
5   recess. Are you ready to continue?
6   A   Yes.
7   Q   I'm going to move to a new subject
8   now. I'm going to wrap back around and talk
9   about something that we talked initially
10  before the noon break, that being we had spent
11  some time going over the differences between
12  PAREXEL International and PAREXEL MMC -- or S.
13  A   MMS.
14  Q   MMS. And I had some memos I showed
15  you if you remember that showed payments going
16  for clinical studies. Do you remember?
17  A   Yes.
18  Q   Let me ask you: Do you know how far
19  back the relationship between PAREXEL
20  International and AstraZeneca generally goes?
21  A   I'm sorry. I don't.
22  Q   And specifically do you know how far
23  back the relationship between PAREXEL
24  International and the product, AstraZeneca
25  product Seroquel goes?

Page 211

1   A   I don't. I only know that MMS, my
2   division, I was told we started work on it in
3   '99.
4   Q   That division?
5   A   Yeah, but I really don't know what
6   the contract research group was doing.
7       (Piano Exhibit No. 22 was
8       marked for identification.)
9   BY MR. PIRTLE:
10  Q   I want to show you what I have
11  marked as Exhibit 22 to your deposition and
12  ask you to review the document. Then I'll
13  have some questions.
14  A   Okay.
15  Q   Have you had an opportunity to
16  review Exhibit 22?
17  A   Yes.
18  Q   Do you recognize it?
19  A   No.
20  Q   I wouldn't expect you to because of
21  the date on the cover of the document, but
22  that being said, I think maybe you can shed
23  some light on it. You see that this
24  document's titled "Seroquel," the date's April
25  of 1996?

Page 212

1   A   Yes.
2   Q   Do you know when Seroquel was
3   approved in any country or particularly the
4   first country, which was the US?
5   A   The late '90s is all I know.
6   Q   I think the evidence is going to
7   show that Seroquel was approved in September
8   of 1997.
9   A   Okay.
10  Q   Although it may not have been
11  released until closer to November of 1997.
12  A   Okay.
13  Q   You can assume that to be true. If
14  that is true, this document is dated April
15  1996, prior to the approval of Seroquel.
16  A   Uh-huh.
17  Q   You see: Market definition:
18  Antipsychotics. Registered indication:
19  Treatment of acute and chronic psychoses,
20  including schizophrenia. Pharmacological
21  class: D2/5HT2 agonist. Therapy: CNS.
22  Customer group specialist care:
23  Psychiatrists. And under development.
24      Now, it has underneath there: Known
25  attributes?

Page 213

1   A   Uh-huh.
2   Q   Is that a yes?
3   A   Oh, yes. I'm sorry.
4   Q   And of those listed, I've
5   highlighted No. 12: Weight gain comparable to
6   other atypical antipsychotics.
7       Did I read that correctly?
8   A   Yes.
9   Q   Turn over to Page 374 of the
10  document. Do you see there's a summary of
11  project history at the bottom?
12  A   Oh, yeah, there we go. Yes.
13  Q   Then it's got: NDA, in your
14  parlance, /MAA. What's NDA?
15  A   NDA's a new drug application.
16  That's the term in the US. And then MAA is I
17  believe it's marketing approval application,
18  which is the term that they use outside of the
19  US.
20  Q   That's an EU term?
21  A   Yes.
22  Q   And here I am using an acronym.
23  European Union?
24  A   Exactly.
25  Q   Europe, in other words?