**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**IN RE:  Seroquel Products Liability Litigation**

**MDL DOCKET NO. 1769**

**This Document Relates to:  All Cases**

_____

**ASTRAZENECA'S SUBMISSION**
**ON THE FUTURE OF THE MDL**

In accordance with the Court's February 11, 2009 Order, Doc. No. 1270, defendants

AstraZeneca LP and AstraZeneca Pharmaceuticals LP ("AstraZeneca") hereby submit their

views on the future of the MDL.

**I.      INTRODUCTION**

The Court should continue to address in a coordinated and consolidated fashion the

common issues that thread these cases together.  Simultaneously, the Court should

immediately implement a preliminary screening program requiring plaintiffs' counsel to

certify some basic facts in each case, and should then dismiss those cases that cannot be so

certified.  In addition, after the Eleventh Circuit has decided the *Guinn* appeal, the Court

should implement a *Lone Pine* program, as many other MDL courts have done, to weed out

cases in which plaintiffs have been unable to obtain a *Daubert*-worthy expert opinion on

specific causation.  Such a program will greatly reduce the number of cases that will need to

be remanded to district courts across the country, and thereby dramatically decrease the

burden imposed on the federal judicial system by Seroquel cases that never should have been

filed in the first place.

While this Court has recently raised the issue of whether it should remand the 5,992 non-Florida cases, the remand of thousands of unscreened, unexamined cases would increase the burden of the Seroquel litigation on the federal judiciary, and likely spawn dozens of mini-MDLs to perform tasks that this Court, with its substantial expertise in the litigation, is far more capable of doing on its own.  To avoid creating havoc in scores of other federal district courts, remand of the non-Florida cases should occur only after the Court has (a) completed general discovery on general issues, (b) resolved common issues, and (c) adopted time-tested procedural screening devices, employed by other MDL courts, to weed out the cases that are not worthy of remand.  Remand before these tasks occur would disserve judicial economy and the interests of justice in the fair, economical, and expeditious resolution of this litigation.

## II.    SEVERAL COMMON ISSUES REQUIRE THE COURT'S RESOLUTION BEFORE REMAND

A core purpose of multidistrict litigation is to coordinate cases for the efficient and uniform disposition of common issues.  *See* 28 U.S.C. § 1407.  No suggestion of remand should issue where "common" or "core" proceedings are ongoing.  *See In re Patenaude*, 210 F.3d 135, 146 (3d Cir. 2000).  A number of common issues must still be resolved in this litigation.[1]

---

[1]    This MDL was established, pursuant to 28 U.S.C. § 1407(a), to implement "coordinated or consolidated pretrial proceedings … for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions."  Specifically, the Joint Panel on Multidistrict Litigation ("JPML") concluded that:  "Centralization under Section 1407 is necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary."  JPML Transfer Order, MDL No. 1769 (July 6, 2006) at 2.

A.      **Generic Expert Disclosure, Discovery, and *Daubert* Proceedings**

One of the core MDL functions is coordination of generic expert discovery and

related *Daubert* motion practice.[2]  That work has not yet been completed in this MDL

because the parties, thus far, have been operating under CMO No. 5, which states:

> Plaintiffs shall identify and provide reports for all general experts expected to testify at trials of cases selected for the [Florida] Initial Trial Pool by August 8, 2008. AstraZeneca shall identify and provide reports for all general experts expected to testify at trials of cases selected for the [Florida] Initial Trial Pool by September 12, 2008.  Depositions of general experts shall occur between September 15 and October 15, 2008.  **As to MDL cases not selected for the Initial Trial Pool, the Parties shall be permitted, on dates that may be set by agreement of the Parties or by later orders of this Court or transferor courts, to identify additional general experts not previously identified for Initial Trial Pool cases.**

Doc. No. 792 at § 3.C. (emphasis added).  Consistent with this Order, plaintiffs and

AstraZeneca have not yet identified their general experts for any MDL cases other than the

30 cases in the Initial Trial Pool.

Attached as Appendix 1 is a proposed Order setting forth a schedule for:  (a)

identification of "generic" experts for all MDL cases; (b) discovery of those experts'

opinions;  and (c) *Daubert* proceedings to enable the Court to perform its gatekeeping

function and determine whether those "generic" opinions satisfy *Daubert* standards as

articulated by this Court and the Eleventh Circuit.  This Court's *Daubert* rulings on the

---

[2]      *See, e.g.*, *In re Rezulin Prods. Liab. Litig.* (MDL No. 1348), 309 F. Supp. 2d 531, 544-66 (S.D.N.Y. 2004); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.* (MDL No. 1407), 289 F. Supp. 2d 1230, 1237-51 (W.D. Wash. 2003); *In re Orthopedic Bone Screw Prods. Liab. Litig.* (MDL No. 1014), 1998 U.S. Dist. LEXIS 21857, at **17-19 (E.D. Pa. Jan. 12, 1998).

admissibility of "generic" expert opinions will apply to all cases, both the Florida cases that will stay here and the non-Florida cases that eventually will be remanded.[3]

**B.      Rulings on Objections to Generic Depositions**

This Court should also address the generic depositions.  Plaintiffs have deposed 27 present and former AstraZeneca personnel and 8 third parties on generic issues.[4]  Plaintiffs also have taken 12 days of Rule 30(b)(6) depositions on 9 topics.  To the extent not already done for *Guinn*, *Haller* and the other Group One cases, the parties should be required to designate and counter-designate the "generic" deposition testimony that they might seek to offer at trial, and then to meet and confer about their objections to the designations as well as their evidentiary objections to particular questions.  Thereafter, the Court can resolve the remaining issues.  This will promote uniformity across all MDL cases on common issues, and will allow the parties to prepare deposition videos that can be shown at all trials in this Court or in other courts after remand, without the need for further designations or judicial rulings.

---

[3]      Even though most of the cases in this MDL were transferred here from other courts, the Court is required to follow Eleventh Circuit precedent on issues of federal law.  *See Murphy v. FDIC*, 208 F.3d 959, 964 (11th Cir. 2000); *In re Korean Air Lines Disaster of September 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987), *aff'd*, 490 U.S. 122 (1989); *In re Managed Care Litig.*, 150 F. Supp. 2d 1330, 1336 (S.D. Fla. 2001).  Further, any variation in the state law underlying plaintiffs' substantive claims does not alter the ***federal law*** evidentiary requirements of *Daubert*,  nor in any way "lower[ ] the burden of admissibility" under Rule 702.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 760 n.31 (3d Cir. 1994) ["*Paoli II*"].

[4]      This number does not include the 36 sales representatives whom plaintiffs have deposed on case-specific issues.

C.     **Common-Issue (Generic) Fact Discovery**

Plaintiffs have suggested that they may seek additional common-issue (generic) fact discovery from AstraZeneca.  It is inevitable, of course, that plaintiffs and AstraZeneca will disagree about the scope and timing of any such discovery.  This Court has overseen generic fact discovery to date, and it should continue to do so.  Coordinating any further common-issue discovery will promote efficiency and uniformity, and lead to closure of all common-issue fact discovery for all cases in the MDL.

III.    **THE POOL OF NON-FLORIDA CASES SHOULD BE SCREENED AND NARROWED BEFORE ANY CASES ARE REMANDED**

This Court should set up a system to screen the non-Florida cases before considering remand.  As recognized by the JPML, judicial economy is served by assigning related cases to a single judge "committed to disposing of spurious cases quickly."  *See* July 6, 2006 JPML Transfer Order, Doc. No. 1 at 2.  Only this Court has the expertise in this litigation – an intimate familiarity with the facts, the law, the medicine and the science – that is required to efficiently screen these cases, and identify those that might be worthy of trial.  A remand of 5,992 unscreened cases to more than 50 separate transferor courts, followed by possible further transfer from the transferor courts to the 91 different districts where plaintiffs reside, would be unworkable and inconsistent with the purpose of an MDL.

A.     **A Remand Now of Almost 6,000 Unscreened Cases Would Be Unworkable**

A general remand at this time of all 5,992 non-Florida cases without pre-screening would create an unworkable and undue burden on other federal courts around the country.  "Although remand is apparently contemplated in the statute to occur in every case where

transfer is ordered, in fact it occurs much less often."  David F. Herr, *Multidistrict Litigation Manual* § 10.4 (2008).  Indeed, out of more than 2,000 MDLs involving more than 300,000 cases, a total of only 11,665 cases (less than 4%) have ever been remanded.[5]  To date, the largest number of cases ever remanded by any MDL court was in the Breast Implant Litigation, MDL No. 926, in which, slowly over the course of four years, the court remanded 5,228 out of 27,426 total cases.[6]  In the other 62 pharmaceutical or medical device MDLs, no court has ever remanded more than 1,300 cases.[7]  Remand of almost 6,000 unscreened Seroquel cases in this MDL, therefore, would be unprecedented.

Remand of almost 6,000 unscreened non-Florida cases would also create a procedural morass.  Because so few plaintiffs filed suit in their home districts, the transferor courts, after remand, might well further transfer thousands of cases under 28 U.S.C. § 1404.[8]  If all 5,992 non-Florida cases were transferred to the plaintiffs' home districts, there would be Seroquel

---

[5]     *See* September 30, 2008 JPML Fiscal Year and Cumulative Terminated Statistics, *available at* http://www.jpml.uscourts.gov/General_Info/Statistics/Statistical-Analysis-2008.pdf and http://www.jpml.uscourts.gov/General_Info/Statistics/Terminated_Dockets_2008.pdf.

[6]     *See id.*; *see also* http://www.fjc.gov/BREIMLIT/mdl926.htm.

[7]     Only three MDLs have remanded more than 1,000 cases:  the Breast Implant Litigation (see above); the Swine Flu Litigation, MDL No. 330 (remanding 1,299 cases); and the Bone Screw Litigation, MDL No. 1014 (remanding 1,251 cases).  No other MDL court has remanded more than 600 cases.  *See* JPML Statistics.

[8]     The three transferor jurisdictions with the most cases are:  the District of Massachusetts (4,919 cases); the District of Minnesota (454 cases); and the Southern District of Texas (118 cases).  However, based on the information provided in the Fact Sheets, only six of the 4,919 District of Massachusetts cases were filed by Massachusetts residents; only eight of the 454 plaintiffs who filed in the District of Minnesota live in that state; and three-quarters of the plaintiffs who filed in the Southern District of Texas do not live in Texas.

cases *in 91 of the 94 United States District Courts*.  For example, the District of South

Carolina would have 375 cases, 304 cases would end up in the Southern District of Ohio, and

the Southern District of Mississippi would have to deal with 243 cases.  (Attached as

Appendices 2 and 3 are charts showing where the cases were filed and how many cases

would end up in each separate federal district court if the transferor courts further transferred

the cases to the districts where plaintiffs reside.)

Once the cases found their way to the proper district courts, 91 separate judges would

have to deal with large numbers of cases of dubious merit.  As a practical matter, each of

these judges would have to decide how to oversee the numerous Seroquel cases in his or her

court, and particularly how to dispose of the many spurious cases in the mix.  To do the

latter, each court would likely look for a way to screen the cases by means of a *Lone Pine*

order or similar procedure.[9]  Hence, a general remand would not lessen the burden on the

federal judicial system; it would merely shift the burden of screening these 5,992 cases from

this Court to scores of other judges who know nothing about the litigation, and would

inevitably spawn dozens of "mini-MDLs" in courts across the country to do work that this

Court, with the expertise it has developed in this litigation, is far more capable of doing on its

own.  A remand of almost 6,000 unscreened cases would be antithetical to the concept of

multidistrict litigation:  that one judge who becomes intimately familiar with the litigation –

who develops expertise on the facts, the law, the science, and the medicine, and on how

---

[9]     Theoretically, of course, each of the 91 judges could open case-specific discovery in *all* the cases in his or her court, followed by case-specific expert disclosures and reports in *all* the cases, followed by expert depositions, and *Daubert* motions and hearings in *all* the cases. As a practical matter, however, every judge likely would look for some effective screening device to address the large number of cases.

*Daubert* applies – can far more efficiently "dispos[e] of spurious cases quickly," July 6, 2006
JPML Transfer Order, Doc. No. 1 at 2, than can multiple judges, in scores of separate courts,
each acting independently.

      One of the reasons that screening is so important here is that very little has been
learned to date about 98% of the cases in the MDL.  Plaintiffs have provided Fact Sheets in
many cases, of course,[10] but further discovery has revealed that those Fact Sheets are often
unreliable.  Depositions have been taken in only 145 of the 6,148 cases (3 or 4 depositions
per case in 115 cases, and full discovery in the 30 Florida cases selected for the Initial Trial
Pool).  No depositions at all have been taken in the other 6,003 cases.  Moreover, the Court
has so far had an opportunity to subject only a handful of cases (*Guinn*, *Haller* and five other
Group One cases) to thorough analysis.

      This Court has expressed concern that screening of cases might require it to resolve
issues arising under the law of other states, but that is not necessarily so.  As an MDL Court,
this Court is required to apply **federal law** *Daubert* standards, as interpreted by the Eleventh
Circuit (particularly, of course, in *Guinn*), to all the experts in all the cases in this MDL, no
matter where the cases originated.  *McDowell v. Brown*, 392 F.3d 1283, 1294-95 (11th Cir.
2004) ("[T]he admissibility of expert testimony is a matter of federal, rather than state
procedure …."); *Long v. Raymond Corp.*, 2007 WL 2376785, at **3 (11th Cir. Aug. 21,
2007) (affirming trial court's application of *Daubert* and Rule 702 to determine admissibility
of expert testimony); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 47 (2d Cir. 2004) (holding

---

[10]    As of March 12, 2009, AstraZeneca had not yet received Fact Sheets from
approximately 476 plaintiffs who only recently filed their cases.

that standards of admissibility for expert testimony are governed by the "strictures of Rules 702 and *Daubert*," regardless of the applicable state law's causation standards). Whatever variations there may be from state to state in substantive standards of causation, state substantive law cannot lower the *Daubert*-based federal law standard for admissibility of expert testimony under Rule 702. *Paoli II,* 35 F.3d at 760 n.31. Hence, this Court need only apply **federal law** *Daubert* standards to determine if a particular plaintiff's specific-causation expert opinion should be excluded. Thereafter, it will be relatively easy for the Court to confirm that applicable state law does not allow plaintiff's claims to survive in the absence of expert testimony on medical causation.[11]  *See PPA*, CMO 17C at 3 (W.D. Wash., June 23, 2004), *available at* http://www.wawd.uscourts.gov/SpecialCaseNotices/

---

[11]  That was exactly what happened in the *Baycol* litigation, where the court was left (after screening) with fewer than 150 claims, all of which were subject to motions for summary judgment. The court has so far considered on their merits (and granted) motions for summary judgment relating to 105 plaintiffs, and has encountered no great difficulty in confirming that under the law of 22 different states, the plaintiffs could not go forward without expert testimony on medical causation. *See, e.g., Ballard v. Bayer Corp.*, No. 03-5984, slip op. at 13 (D. Minn. Oct. 23, 2008) (applying West Virginia law); *Anderson v. Bayer Corp., et al.*, No. 03-2933, slip op. at 5 (D. Minn. Oct. 21, 2008) (applying Alabama, Mississippi, and West Virginia law); *Roper, et al. v. Bayer Corp.*, No. 03-3140, slip op. at 5 (D. Minn. Oct. 13, 2008) (applying Mississippi law); *Deffenbaugh v. Bayer AG, et al.*, No. 03-3127, slip op. at 7 (D. Minn. Sept. 9, 2008) (applying California law).

It is entirely appropriate for an MDL court to deal with individual cases. Section 1407(a) expressly defines the scope of an MDL court's duties as "coordinated or consolidated pretrial proceedings." Under this provision, an MDL court's authority is not limited to litigation of "identical issues on common evidence." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34 (1998). Rather, the court's authority to manage "coordinated" proceedings is broadly construed: "a proceeding that relates only to a single individual's case or claim can nonetheless be coordinated," and MDL proceedings need not be "concluded at the point that only case-specific proceedings remain." *Patenaude*, 210 F.3d at 143, 145.

mdl1407_casemgmtorders.htm; *In re Norplant Contraceptive Prods. Liab. Litig.*, 215 F.

Supp. 2d 795, 830-31 (E.D. Tex. 2002).

### IV.   THE COURT SHOULD IMMEDIATELY REQUIRE CERTIFICATION OF FUNDAMENTAL FACTS

Mass tort litigations are often populated with hundreds or thousands of cases that

were filed without any meaningful attorney review whatsoever.  When screening devices are

imposed in such litigations, many cases quickly disappear from the docket.  In the *Baycol*

litigation, for example, screening reduced to just a few hundred cases a pool that had

originally included 15,000 cases with over 22,500 plaintiffs.  *See In re Baycol Prods. Litig.*,

532 F. Supp. 2d 1029, 1035 (D.Minn. 2007) (describing history of litigation).

There is ample reason to believe that this MDL does indeed include thousands of

cases that were filed without meaningful attorney review.  First, the Fact Sheets themselves

evidence a lack of such review:  (a)  the overwhelming majority of plaintiffs stated in their

Fact Sheets that they had no medical records, which means that their complaints were filed

without counsel having confirmed that the plaintiffs' claims were consistent with their

medical records; (b) in at least 36 cases, plaintiffs state in their Fact Sheets that they took

Seroquel long before the drug was even on the market; and (c) many Fact Sheets reveal that

plaintiffs were diagnosed with diabetes before their first use of Seroquel.[12]

Second, whenever the plaintiffs have felt even slight pressure because of the Court's

orders, large numbers of cases have dropped out of the litigation:  (a) the Court has dismissed

more than 1,200 cases because plaintiffs could not meet even the minimal PFS

_____

[12]      Copies of Fact Sheets can be supplied at the Court's request.

requirements;[13] (b) many plaintiffs abandoned their cases as soon as they were faced with an obligation to give minimal case-specific discovery;[14] and (c) plaintiffs voluntarily dismissed 7 of the 12 cases that AstraZeneca selected for Florida trial Groups One and Two, and the Court dismissed three more for failure to prosecute.

Because it seems obvious that many of the cases in this MDL were filed without meaningful attorney review, AstraZeneca urges the Court to implement a simple certification program now. There is no reason why a simple certification program should be deferred until the Court of Appeals decides *Guinn*. Counsel for each plaintiff should be required to certify that he/she has actually obtained and reviewed (or had another responsible person review) the plaintiff's medical records, and counsel should be required to provide, with citations to the medical records, the most basic information about the claim, *i.e.*, the dates and dosage of Seroquel use, the reason for the Seroquel prescription, the date of plaintiff's diabetes diagnosis, and the plaintiff's Body Mass Index before taking Seroquel and at the time of diagnosis. *See*

---

[13]    *See*, *e.g.*, Nov. 21, 2008 Order, Doc. No. 1155; Oct. 22, 2007 Order, Doc. No. 595 (dismissing with prejudice the claims of hundreds of plaintiffs); Oct. 2, 2007 Order, Doc. No. 523 (same).

[14]    Nineteen plaintiffs whom AstraZeneca was entitled to depose either failed to offer dates for their depositions or failed to show up for their depositions. Those plaintiffs include Kathryn Alvarez (Case No. 6:07-cv-13032); Burl Cook (Case No. 6:07-cv-16017); Vickie Davis (Case No. 6:07-cv-14788); Lisa Ellerbee (Case No. 6:07-cv-13399); Tracy Flye (Case No. 6:06-cv-1222); Joseph Gawails (Case No. 6:07-cv-10136); Anita Grant (Case No. 6:07-cv-444); Antonia Henderson (Case No. 6:07-cv-14972); Pamela Lambert (Case No. 6:07-cv-13788); Bruce Monson (Case No. 6:07-cv-10372); Brian Murphy (Case No. 6:07-cv-12719); Sheryl Salmons (Case No. 6:07-cv-12818); Maureen Sanchez (Case No. 6:07-cv-12819); Robert Schuenemeyer (Case No. 6:06-cv-1136); Carolyn Smith (Case No. 6:07-cv-16568); Anthony Tomlin (Case No. 6:07-cv-12911); Willie White (Case No. 6:07-cv-15816); Malcolm Williams (Case No. 6:07-cv-12988); and George Zackschewski (Case No. 6:07-cv-14554).

*Tatum v. Pactiv Corp.*, 2007 WL 60931 (M.D. Ala. Jan. 8, 2007) (requiring signed declarations). Although the Plaintiff Fact Sheets purport to provide this information, most of the Fact Sheets were prepared without any review of medical records (as explained above), and depositions in the 145 cases that have been subject to discovery have confirmed that the Fact Sheets are often largely inaccurate.

A sample certification is attached as Appendix 4. AstraZeneca suggests that plaintiff's counsel be given 90 days to submit these certifications, and that any case not then so certified be dismissed with prejudice. AstraZeneca suggests that Special Master Orran Brown (the existing Special Master for Case-Specific Discovery), or another special master, administer the certification program.[15] The Special Master will easily be able to compile a list of cases for which no certifications are submitted or in which the certifications are incomplete. Also, the Special Master will be able to recommend dismissals of cases in which the certifications on their face suggest that there is no possible merit to the claim, *e.g.*, the plaintiff's diabetes was diagnosed before first use of Seroquel.

---

[15]    As a complement to the certification program, AstraZeneca can bring to the Court's attention for potential dismissal groups of cases of questionable merit. The Court could then issue Orders to Show Cause why such cases should not be dismissed. For example, AstraZeneca could provide a list of cases in which plaintiffs have acknowledged even on the face of their Fact Sheets that they were diagnosed with diabetes before they ever took any Seroquel, and the Court could order these plaintiffs to show cause why their cases should not be dismissed. As another example, AstraZeneca could list the cases in which the Seroquel users are deceased, but it appears from the Fact Sheets that the plaintiffs who have brought claims on behalf of their estates are not in fact duly-appointed personal representatives authorized to bring such suits. Again, an Order to Show Cause process could be used to test those cases and to dismiss those that ought to be dismissed.

## V.   AFTER THE ELEVENTH CIRCUIT DECIDES *GUINN*, THE COURT SHOULD IMPLEMENT A *LONE PINE* PROGRAM

After the United States Court of Appeals for the Eleventh Circuit decides the appeal in *Guinn*, this Court should implement a *Lone Pine* program in which it requires every plaintiff to submit an appropriate expert report on medical causation, or suffer dismissal.  A *Lone Pine* program is a time-tested procedural device used by MDL courts, and has proven to be the most effective and efficient way to separate the wheat from the chaff and, thus, to identify those cases that may truly merit remand.

An effective *Lone Pine* order would require each plaintiff to provide, at a minimum, a signed and sworn declaration by a physician setting forth:  (a) the dates of plaintiff's Seroquel use and the records establishing that use; (b) plaintiff's exact injuries, including the date of onset of each claimed injury and confirming medical records; and (c) the expert's non-speculative opinion that Seroquel was the medical cause of plaintiff's injury, together with the grounds for that opinion.  Consistent with Eleventh Circuit *Daubert* law, the principles already articulated by this Court in *Guinn* and *Haller*, and the additional guidance that the Eleventh Circuit may provide in its *Guinn* decision, the expert specific-causation opinion would necessarily have to be premised on more than mere temporal relationship or temporality in disguise.  Rather, it would have to be premised on scientifically reliable methodology and principles, based on a genuine application of the scientific method, which undertakes, in a scientifically reliable way, carefully to consider and then rule out the plaintiff's other diabetes risk factors, including pre-existing obesity, as sufficient in and of themselves to account for the plaintiff's alleged diabetes injury.  Plaintiffs who failed to comply with this order would have their cases dismissed with prejudice.

A *Lone Pine* order could also require each plaintiff to identify which state's law governs his claim, and to set forth (with citation to the standard jury instructions or the like) the causation standard applicable under that state law.  This would aid the Court or the transferor jurisdictions in assessing whether the plaintiff's expert opinion does or does not satisfy the causation standard that likely governs that particular plaintiff's claim, assuming the opinion is otherwise *Daubert*-compliant.[16]  It would also allow the parties to identify those cases in which there is disagreement about the legal standard governing the core causation inquiry, so that the parties can present the dispute to this Court or the transferor (or subsequent transferee court) for resolution.

A *Lone Pine* order would allow this Court to dispense with meritless cases, enabling the Court to remand only cases that actually have the minimum medical proof needed to go forward.  A *Lone Pine* order would put the responsibility of weeding out legally deficient claims where the law places it in the first instance – on plaintiffs.  *See Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 340 (5th Cir.), *cert denied*, 530 U.S. 1229 (2000).  *See also Burns v.*

---

[16]  The expert opinion required by *Lone Pine* is merely a screening tool and would not prejudice plaintiffs' ability to supplement that opinion at a later date.  Nor would it prejudice AstraZeneca's ability to raise substantive challenges to the opinion stated in the *Lone Pine* report or in any subsequent expert opinion offered by plaintiffs.  *See In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No, 1014, 1997 WL 303239, at *1 (E.D. Pa. Feb. 13, 1997) ("The court will defer to the transferor courts on whether the parties may identify additional case-specific liability expert witnesses as well as whether additional time should be afforded to engage in expert discovery with respect to any additional experts permitted to be named.").  *See also In re Baycol Prods. Liab. Litig.*, MDL No. 1431, 2004 WL 626866, at *2 (D. Minn. Mar. 18, 2004) (entering *Lone Pine* order that provided, "[a] case specific expert report may be supplemented by other expert reports, or additional expert reports may be submitted pursuant to ongoing discovery, pretrial, and trial preparation procedures and pretrial orders."); *In re Vioxx Product Liability Litig.*, MDL 1675, 557 F. Supp.2d 741, 743 (E.D. La. 2008) (imposing a *Lone Pine* Order requiring "plaintiffs to provide some basic facts in the form of expert reports or run the risk of having their case dismissed").

*Universal Crop. Protection Alliance*, 2007 WL 2811533, at *3 (E.D. Ark. Sept. 25, 2007), stating:

> The Court agrees that in this case, a preliminary showing on causation is necessary for efficient case management. If Plaintiffs intend to proceed under a theory of causation that would obviate each plaintiff's burden to show that exposure to a particular defendant's product was a substantial factor in producing alleged crop damage, now is the time for Plaintiffs to reveal their theory of causation. Otherwise, the Court finds that a case management order identical or similar to Defendants' proposed order should be entered in this case.
>
> IT IS THEREFORE ORDERED that Defendants' motion for adoption of a modified *Lone Pine* order is GRANTED.

Like the certification program, the *Lone Pine* program could be administered by Orran Brown or by another special master. The special master could easily identify those plaintiffs who fail to submit any declaration, and almost as easily identify whether the submitted declarations satisfied the Court's criteria. To the extent issues of interpretation arise, appeals could be taken as appropriate.

A *Lone Pine* order would substantially reduce the number of cases in this MDL. *Lone Pine* orders have proven to be particularly useful in mass pharmaceutical products litigation in culling uninvestigated cases that never should have been filed in the first place. *See*, *e.g.*, *In re Bextra and Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, MDL No. 1699, Case No. 05-cv-1699, Pretrial Order No. 29 (N.D. Cal. Aug. 1, 2008) (requiring plaintiffs to serve case-specific expert reports regarding causation); *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 2005 WL 1105067, *passim* (S.D.N.Y. May 9, 2005) (requiring each plaintiff to consult with a medical advisor to determine whether there are good grounds to continue the action, and

produce a sworn case-specific declaration by a physician or other medical expert containing

causation opinion); *In re Rezulin Prods. Liab. Litig.*, 441 F. Supp. 2d 567, 570-71, 579 (S.D.N.Y.

2006) (granting summary judgment where *Lone Pine* reports provided insufficient evidence of

exposure to support causation); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014,

1997 WL 303239, at *1 (E.D. Pa. Feb. 13, 1997) (requiring "each plaintiff [to] identify and

provide [case-specific] expert discovery with respect to at least one duly-qualified, medical

expert on the issues of injury and causation").[17]

---

[17]     An effective use of a *Lone Pine* order occurred in *Acuna v. Brown & Root, Inc.*,
200 F.3d 335 (5th Cir.), *cert. denied*, 530 U.S. 1229 (2000), in which a district court required
each of approximately 1,600 plaintiffs to produce, prior to discovery, a case-specific expert
report supporting his/her claim of injury and causation allegedly stemming from exposure to
defendants' uranium mining and processing activities. *Id*. at 338. Plaintiffs complained that
pre-discovery orders imposed too high a burden for that stage in the litigation. *Id*. at 340. In
the alternative, they contended that they had complied with the district court's order by
submitting form affidavits from a single expert. *Id*. at 338, 340. The district court dismissed
plaintiffs' cases, and the Fifth Circuit affirmed. *Id*. at 338, 341. The Court of Appeals held
that the district court acted within its discretion to manage the litigation and observed that the
orders "essentially required that information which plaintiffs should have had *before* filing
their claims pursuant to Fed. R. Civ. P. 1l(b)(3)." *Id*. at 340 (emphasis added). Accordingly,
the Fifth Circuit concluded that the district court acted within its discretion in dismissing the
cases for violating the discovery order. *Id*. at 341.

        The *Baycol* MDL provides another example of how a *Lone Pine* order, combined
with other docket management tools, can filter out the multitude of cases that should never
have been filed in the first place. *See In re Baycol Prods. Liab. Litig.*, MDL No. 1431,
Pretrial Order Nos. 114, 131, 149 (D. Minn.), *available at*
http://www.mnd.uscourts.gov/MDL-Baycol/orders-minutes.shtml. Of the more than 22,500
plaintiffs in the *Baycol* MDL, about 3,500 were dismissed for failure to comply with written
discovery requirements, but an additional 6,200 were dismissed with prejudice (by
stipulation or court order) after the Court ordered plaintiffs to produce case-specific expert
reports in support of their claims. Several thousand more plaintiffs voluntarily dismissed
their cases with prejudice outside the expert report enforcement process, but the *Lone Pine*
order likely played a role in the decision to dismiss.

**VI.    MANY OF THE COURT'S RULINGS IN THE FLORIDA CASES WILL PROVIDE GUIDANCE FOR THE NON-FLORIDA CASES AS WELL**

This Court will retain jurisdiction of at least 156 Florida cases, which will stay in this Court until final disposition on the merits.  The Court has indicated that it intends to stay proceedings in such cases until the Court of Appeals decides *Guinn*, but thereafter, the cases should be moved aggressively toward resolution.  Meanwhile, while the appeal is pending, the certification program (*see* Section IV) should be applied to the Florida cases.[18]

The Court's rulings in the Florida cases will also advance the non-Florida cases. First, this Court's resolution of discovery disputes that will arise in the Florida cases will provide valuable guidance on how similar discovery issues should be resolved in non-Florida cases.  Second, if plaintiffs identify new case-specific experts for the remaining Florida cases, new *Daubert* issues will arise, and this Court's rulings will provide valuable guidance that will be equally applicable to non-Florida cases as well.  Thus, because the Court will necessarily be resolving many important issues in dealing with the remaining Florida cases, it would be efficient to defer remands of the non-Florida cases at this time.

**VII.    CONCLUSION**

For the foregoing reasons, AstraZeneca respectfully submits that this Court should finish dealing with the common issues, and that the Court should also implement screening programs –  an immediate certification program and, once *Guinn* is decided, a *Lone Pine* program – to determine which few cases are appropriate for remand.  Once the common

---

[18]    After *Guinn* is decided, the *Lone Pine* program can be applied not only to the non-Florida cases but also to the Florida cases.

issues have been addressed and the cases have been screened, the remaining non-Florida cases can be remanded to the transferor courts.

Respectfully submitted on this 16th day of March, 2009,

<u>/s/ Fred T. Magaziner</u>
Fred T. Magaziner
Steven B. Weisburd
Stephen J. McConnell
Shane T. Prince
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
E-mail: fred.magaziner@dechert.com
       steven.weisburd@dechert.com
       stephen.mcconnell@dechert.com
       shane.prince@dechert.com

Chris S. Coutroulis
Carlton Fields
4221 W. Boy Scout Boulevard, Suite 1000
Tampa, FL  33607-5736
Telephone: (813) 229-4301
Facsimile: (813) 282-1970
E-mail: ccoutroulis@carltonfields.com

*Counsel for Defendants AstraZeneca LP
and AstraZeneca Pharmaceuticals LP*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on March 16, 2009, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system, through which all participating parties are

deemed served.  I further certify that, by using the CM/ECF, the foregoing has been served

on Plaintiffs' Liaison Counsel, who is charged with serving non-CM/ECF participants on the

attached Service List.

<u>/s/ *Shane T. Prince*</u>

<u>**SERVICE LIST**</u>

**In Re: Seroquel Products Liability Litigation**
**MDL Docket No. 1769**

| | |
|---|---|
| Paul J. Pennock, Esq.<br>Michael E. Pederson, Esq.<br>Weitz & Luxenberg, P.C.<br>180 Maiden Lane - 17th Floor<br>New York, NY 10038<br>Telephone: (212) 558-5500<br>Ppennock@weitzlux.com<br>MPederson@weitzlux.com<br>***Plaintiffs' Lead Counsel*** | Camp Bailey, Esq.<br>Michael W. Perrin, Esq.<br>Fletcher Trammell, Esq.<br>Bailey Perrin Bailey LLP<br>The Lyric Centre<br>440 Louisiana, Suite 2100<br>Houston, TX 77002<br>Telephone: (713) 425-7240<br>cbailey@bpblaw.com<br>mperrin@bpblaw.com<br>***Plaintiffs' Lead Counsel*** |
| Larry Roth, Esq.<br>Law Offices of Larry M. Roth, P.A.<br>Post Office Box 547637<br>Orlando, FL 32854-7637<br>Telephone: (407) 872-2239<br>LROTH@roth-law.com<br>***Plaintiffs' Liaison Counsel*** | Tommy Fibich, Esq.<br>Fibich, Hampton & Leebron, L.L.P.<br>1401 McKinney, Suite 1800<br>Five Houston Center<br>Houston, TX 77010<br>Telephone: (713) 751-0025<br>tfibich@fhl-law.com |
| Matthew F. Pawa, Esq.<br>Law Offices of Matthew F. Pawa, P.C.<br>1280 Centre St., Suite 230<br>Newton Centre, MA 02459<br>Telephone: (617) 641-9550<br>Mp@pawalaw.com | Robert L. Salim, Esq.<br>Robert L. Salim Attorney at Law<br>P.O. Box 2069<br>Natchitoches, LA 71457-2069<br>Telephone: (318) 352-5999<br>robertsalim@cp-tel.net |
| Keith M. Jensen, Esq.<br>Jensen, Belew & Gonzalez, PLLC<br>1024 North Main<br>Fort Worth, TX 76106<br>Telephone: (817) 334-0762<br>kj@kjensenlaw.com | Scott Allen, Esq.<br>Cruse, Scott, Henderson & Allen, L.L.P.<br>2777 Allen Parkway, 7th Floor<br>Houston, Texas 77019<br>Telephone: (713) 650-6600<br>sallen@crusescott.com |
| Matthew E. Lundy, Esq.<br>Lundy & Davis, LLP<br>333 North Sam Houston Parkway East<br>Suite 375<br>Houston, TX 77060<br>Telephone: (281) 272-0797<br>mlundy@lundydavis.com | W. Todd Harvey, Esq.<br>E. Ashley Cranford, Esq.<br>Whatley Drake & Kallas, LLC<br>2323 2nd Avenue North<br>Birmingham, AL 35203<br>Telephone: (205) 328-9576<br>THARVEY@whatleydrake.com<br>ccf@whatleydrake.com |

| | |
|---|---|
| Robert L. Ciotti, Esq.<br>Carlton Fields, P.A.<br>4221 W. Boy Scout Boulevard<br>Suite 1000<br>Tampa, FL 33607-5736<br>Telephone: (813) 223-7000<br>rciotti@carltonfields.com<br>**Attorney for Defendants AstraZeneca**<br>**Pharmaceuticals, LP, and AstraZeneca LP** | Gregory P. Forney, Esq.<br>Shaffer Lombardo Shurin<br>911 Main Street, Suite 2000<br>Kansas City, MO 64105<br>Telephone: (816) 931-0500<br>gforney@sls-law.com<br>rbish@sls-law.com<br>**Attorney for Defendant,**<br>**Marguerite Devon French** |
| Randy Niemeyer<br>22442 Pike 309<br>Bowling Green, MO 63334-5209<br>**Pro Se** | Eric B. Milliken, Esq.<br>3 Sir Barton Ct.<br>Newark, DE 19702<br>**Pro Se** |
| Catherine Solomon<br>3100 N.E. 83<br>Gladstone, MO 64119<br>**Pro Se** | Louisiana Wholesale Drug Co. Inc.<br>C/O Gayle R. White<br>Registered Agent<br>Highway 167N<br>Sunset, LA 70584<br>**Pro Se** |
| Aaron C. Johnson, Esq.<br>Summers & Johnson<br>717 Thomas<br>Weston, MO 64098<br>Telephone: (816) 640-9940<br>firm@summersandjohnson.com | Robert A. Schwartz, Esq.<br>Bailey & Galyen<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744<br>bschwartz@galyen.com |
| Todd S. Hageman, Esq.<br>Simon and Passanante, PC<br>701 Market St., Suite 1450<br>St. Louis, MO 63101<br>Telephone: (314) 241-2929<br>thageman@spstl-law.com | Mark P. Robinson, Jr., Esq.<br>Robinson, Calcagnie & Robinson<br>620 Newport Center Drive, 7th Floor<br>Newport Beach, CA 92660<br>Telephone: (949) 720-1288<br>mrobinson@robinson-pilaw.com |
| Thomas F. Campion, Esq.<br>Steven M. Selna, Esq.<br>Drinker Biddle & Reath, LLP<br>500 Campus Drive<br>Florham Park, New Jersey 07932-1047<br>Telephone: (973) 360-1100<br>Thomas.Campion@dbr.com<br>steven.selna@dbr.com<br>**Attorneys for Defendants Janssen**<br>**Pharmaceutical Products and Johnson &**<br>**Johnson Co.** | Michael Davis, Esq.<br>James Mizgala, Esq.<br>Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Telephone:  (312) 853-7731<br>mdavis@sidley.com<br>jmizgala@sidley.com<br>**Attorneys for Defendants AstraZeneca LP**<br>**and AstraZeneca Pharmaceuticals, LP** |

| | |
|---|---|
| Elizabeth Raines, Esq.<br>Baker, Sterchi, Cowden & Rice, LLC<br>2400 Pershing Road, Suite 500<br>Kansas City, MO 64108<br>Telephone: (816) 471-2121<br>raines@bscr-law.com | Timothy Reese Balducci, Esq.<br>The Langston Law Firm, PA<br>P.O. Box 787<br>100 South Main Street<br>Booneville, MS 38829-0787<br>Telephone: (662) 728-3138<br>tbalducci@langstonlaw.com |
| Kenneth W. Bean, Esq.<br>Sandberg, Phoenix & von Gontard<br>One City Centre<br>15th Floor<br>St. Louis, MO 63101-1880<br>Telephone: (314) 231-3332<br>kbean@spvg.com<br>***Attorney for Defendant Dr. Asif Habib*** | John Driscoll, Esq.<br>Brown & Crouppen, PC<br>720 Olive St.<br>St. Louis, MO 63101<br>Telephone: (314) 421-0216<br>Jdriscoll@brownandcrouppen.com<br>asmith@brownandcrouppen.com<br>blape@brownandcrouppen.com |
| Aaron K. Dickey, Esq.<br>Goldenberg and Heller, PC<br>P.O. Box 959<br>2227 S. State Road 157<br>Edwardsville, IL 62025<br>Telephone: (618) 650-7107<br>aaron@ghalaw.com | Matthew J. Hamilton, Esq.<br>Pepper Hamilton<br>3000 Two Logan Square<br>18th & Arch Street<br>Philadelphia, PA 19103<br>Telephone: (215) 981-4000<br>hamiltonm@pepperlaw.com |
| Justin Witkin, Esq.<br>Ken Smith, Esq.<br>Aylstock, Witkin & Sasser, PLC<br>4400 Bayou Boulevard<br>Suite 58<br>Pensacola, FL 32503<br>Telephone: (850) 916-7450<br>Jwitkin@AWS-LAW.com<br>ablankenship@aws-law.com<br>ksmith@aws-law.com<br>noverholtz@aws-law.com | David P. Matthews, Esq.<br>Lizy Santiago, Esq.<br>Matthews & Associates<br>2905 Sackett Street<br>Houston, TX 77098<br>Telephone: (713) 222-8080<br>dmatthews@thematthewslawfirm.com<br>lsantiago@thematthewslawfirm.com<br>msalazar@thematthewslawfirm.com |
| Howard Nations<br>Lori A. Siler<br>Howard L. Nations Attorney At Law<br>4515 Yoakum Blvd.<br>Houston, TX 77006-5895<br>Telephone: (713) 807-8400<br>nations@howardnations.com | Mary B. Cotton<br>John D. Giddens, P.A.<br>226 North President Street<br>P.O. Box 22546<br>Jackson, MS 39225-2546<br>Telephone:  (601) 355-2022<br>betsy@law-inc.com |

| | |
|---|---|
| Salvatore M. Machi<br>Ted Machi & Associates PC<br>18333 Egret Bay Blvd., Suite 120<br>Houston, TX 77058<br>Telephone: (281) 335-7744 | Jona R. Hefner, Esq.<br>3441 W. Memorial, Suite 4<br>Oklahoma City, OK 73134-7000<br>Telephone: (405) 286-3000<br>attorneyokc@hotmail.com |
| David Dickens<br>Miller & Associates<br>105 North Alfred Street<br>Alexandria, VA  22314-3010<br>(703) 519-8080<br>ddickens@doctoratlaw.com | Pete Schneider, Esq.<br>Grady, Schneider & Newman, L.L.P.<br>801 Congress, 4th Floor<br>Houston, TX  77002<br>(713) 228-2200<br>pschneider@gsnlaw.com |
| Fred T. Magaziner<br>Marjorie Shiekman<br>A. Elizabeth Balakhani<br>Shane T. Prince<br>Eben S. Flaster<br>DECHERT LLP<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA  19103<br>(215) 994-4000<br>fred.magaziner@dechert.com<br>shane.prince@dechert.com<br>marjorie.shiekman@dechert.com<br>eben.flaster@dechert.com<br>elizabeth.balakhani@dechert.com | Lawrence J. Gornick, Esq.<br>William A. Levin, Esq.<br>Dennis J. Canty, Esq.<br>Levin Simes Kaiser & Gornick LLP<br>44 Montgomery Street, 36th Floor<br>San Francisco, CA 94104<br>Telephone: (415) 646-7160<br>lgornick@lskg-law.com<br>dcanty@lskg-law.com<br>lsimes@levins-law.com<br>jkaiser@lskg-law.com<br>echarley@lskg-law.com<br>ddecarli@lskg-law.com<br>bsund@lskg-law.com<br>astavrakaras@lskg-law.com |
| Scott Burdine, Esq.<br>Hagans Burdine Montgomery<br>Rustay & Winchester, P.C.<br>3200 Travis, Fourth Floor<br>Houston, TX  77006<br>Telephone:  (713) 222-2700<br>sburdine@hagans-law.com | Lowell Finson<br>Phillips & Associates<br>3030 North 3rd Street<br>Suite 1100<br>Phoenix, AZ 85012<br>(602) 258-8900, ext. 295<br>lowellf@phillipslaw.ws |
| Gale D. Pearson<br>Stephen J. Randall<br>Pearson, Randall & Schumacher, P.A.<br>Fifth Street Towers, Suite 1025<br>100 South 5th Street<br>Minneapolis, MN 55402<br>(612) 767-7500<br>attorneys@outtech.com | Robert H. Shultz<br>Heyl, Royster<br>103 West Vandalia Street<br>P.O. Box 467<br>Edwardsville, IL 62025<br>(618) 656-4646<br>rshultz@hrva.com<br>bwallace@hrva.com |

| | |
|---|---|
| Ellen R. Serbin<br>Perona, Langer, Beck, Lalande & Serbin<br>300 San Antonio Drive<br>Long Beach, CA 90807-0948<br>(562) 426-6155<br>davidhwang@plblaw.com | Scott Armstrong<br>1719 West Main Street<br>Suite 201<br>Rapid City, SD 57702<br>(605) 399-3994<br>scottarmstrong1235@eathlink.net |
| Linda S. Svitak<br>Faegre & Benson, LLP<br>90 South 7th Street, Suite 2200<br>Minneapolis, MN 55402-3901<br>(612)766-7000<br>lsvitak@faegre.com<br>wjohnson@faegre.com | James J. Freebery<br>McCarter & English, LLP<br>919 N. Market Street, 18th Floor<br>Wilmington, DE 19801<br>(973) 622-4444<br>jfreebery@mccarter.com<br>tpearson@mccarter.com |
| Richard D. Hailey<br>Ramey & Hailey<br>3891 Eagle Creek Parkway<br>Suite C<br>Indianapolis, IN<br>(317) 299-0400<br>rhailey@sprynet.com | B. Andrew List<br>Clark, Perdue, Arnold & Scott<br>471 East Broad Street, Suite 1400<br>Columbus, OH 43215<br>(614) 469-1400<br>alist@cpaslaw.com<br>lcollins@cpaslaw.com |