# EXHIBIT 9

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 1

1        IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2                  ORLANDO DIVISION

3
      IN RE:
4
       SEROQUEL PRODUCTS LIABILTY LITIGATION
5
          CASE NO. 6:06-MD-01769-ACC-DAB
6
              .MDL DOCKET NO. 1769
7

8                    ------
              May 28, 2008
9                    ------

10              Confidential Videotaped
      Oral Deposition of MARTIN BRECHER, M.D.,
11    D.M.Sc., MBA, held in the offices of
      Golkow Technologies, Inc., One Liberty
12    Place, 51st Floor, Philadelphia,
      Pennsylvania beginning at approximately
13    9:00 a.m., before Ann V. Kaufmann, a
      Registered Professional Reporter,
14    Certified Realtime Reporter, Approved
      Reporter of the U.S. District Court, and
15    a Notary Public.

16
                     ------
17

18

19

20

21

22        GOLKOW TECHNOLOGIES, INC.
          One Liberty Place, 51st Floor
23       Philadelphia, Pennsylvania   19103
                  877.370.3377
24

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 42

1      Q.   And Dr. Newcomer was
2   involved in giving you advice on study
3   125; is that correct?
4      A.   You know, I forgot about
5   both Newcomer and there's another guy.
6   There was an expert from Baltimore that
7   we also spoke to.  Newcomer is not an
8   endocrinologist.  Newcomer is a
9   psychiatrist who is expert in the areas
10  of diabetes.  He talks about it but he
11  is not a trained endocrinologist.
12         And we talked to, what's his
13  name, Ratner.  Dr. Robert Ratner we also
14  consulted with in 2007.  So I forgot to
15  mention those two.
16     Q.   Okay.
17     A.   And as you mentioned,
18  actually, we spoke with Newcomer about
19  study 125 as well.
20     Q.   Okay.  Were you the point
21  person for interactions with
22  Dr. Newcomer?
23     A.   Yes.
24     Q.   Were you the point person

Page 43

1   for interactions with Dr. Ratner?
2      A.   Yes.
3      Q.   Did Dr. Ratner also work on
4   study 125?
5      A.   Yes.
6      Q.   So did Dr. Newcomer consult
7   with the company on anything other than
8   study 125?
9      A.   He might have.  We may have
10  engaged him prior to 125.  I don't
11  recall.
12     Q.   Do you know how Dr. Ratner
13  was selected as a consultant for study
14  125?
15     A.   We -- there was also one
16  other internal expert named Sandy Raff
17  that we were working with in the first
18  half of 2007.  And partly through her
19  expertise and perhaps other means -- I
20  don't recall what other sources we
21  used -- we identified the leading
22  diabetologists in the United States.
23  And we called a number of them and
24  Dr. Ratner was the -- including

Page 44

1   Dr. Ratner.  Dr. Ratner had the time,
2   and that's how we settled on him.
3      Q.   Okay.  So you did not
4   consult with Dr. Woolf or Dr. Goldstein
5   about 125?
6      A.   No; I think we did.  I
7   would be surprised if we hadn't shared
8   the results of 125 with them.  But I
9   can't say that.  I'm not certain.  I
10  know we spoke with Newcomer about it.
11  I'm not certain whether to -- whether
12  and to what extent we discussed 125 with
13  Woolf and Goldstein, but I'm inclined to
14  think that we did share it with them at
15  some point.
16     Q.   Did Dr. Ratner also consult
17  with respect to studies 126 and 127?
18     A.   Yes.
19     Q.   And when was he first
20  consulted about those studies?
21     A.   I remember meeting him
22  around May of 2007, was the first time
23  we met him.  We had one lengthy meeting
24  with him after we had internally

Page 45

1   reviewed the final results of 126 and
2   127, and then we shared our assessments
3   with him and he commented on those
4   assessments.
5      Q.   When was that?
6      A.   That was the end of May of
7   2007.
8      Q.   So you did not analyze any
9   of the glucose data for 126 and 127
10  until the end of May of 2000?
11     A.   No, no, I'm not saying that
12  at all.
13     Q.   Okay.
14     A.   We spent months analyzing
15  that data.
16     Q.   When did you start?
17         MR. McCONNELL:  Excuse me.
18         Did you finish your answer,
19  Doctor?
20         THE WITNESS:  Yes.
21         We -- those two trials ended
22  sometime in the fall of 2006.  And in
23  February of 2007 we began an intensive
24  review of the glucose results of those

12 (Pages 42 to 45)

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 46

1  two trials, and by the middle to end of
2  May we had reached several conclusion
3  summaries around that data after what
4  was a lot of work for us.
5      And after we had reached
6  what we thought were our final
7  conclusions, we then vetted them with
8  Dr. Ratner to see if he agreed, based on
9  the data that we had, whether our
10 conclusions were -- whether he agreed
11 with our conclusions.
12     Q.   Okay. So let me see if I
13 understand. You had the -- the data was
14 complete in late 19 -- in late 2006;
15 correct?
16     A.   The complete data set was
17 available.
18     Q.   Right. You began the
19 analysis of the glucose data in February
20 of 2007?
21     A.   No. We had a standard
22 analysis completed in late 2006 and
23 early 2007, and in February of 2007 we
24 realized that we needed to do additional

Page 47

1  analyses of the glucose results.
2      Q.   From 126 and 127?
3      A.   That's right.
4      Q.   Okay. So the standard
5  analysis this was completed at the end
6  of 2006, is that in writing?
7      A.   The data compilation was a
8  standard document which was and is
9  available. The facts didn't change,
10 given the facts in those documents
11 suggested to us that we needed to do
12 additional analyses.
13     Q.   So the data compilation is
14 called what, if I was to look for it --
15     A.   I think --
16     Q.   -- or ask for it?
17     A.   Yeah, yeah. I think that
18 the -- all of the data is in the
19 clinical summary of safety for that FDA
20 submission. And that was the -- it was
21 that document in its pretty close to --
22 in its -- the standard document was
23 ready in February, and that standard
24 document revealed that there was

Page 48

1  questions around Seroquel and glucose
2  metabolism that necessitated further
3  analysis, and the fruits of that
4  analysis were then added to the clinical
5  summary of safety.
6      Q.   Okay. Now, the clinical
7  summary of safety, is that an internal
8  document?
9      A.   That's a document that's
10 generated internally and submitted to
11 the regulatory -- submitted to the FDA.
12     Q.   Okay. Were there any other
13 documents that actually were performed
14 that document the standard analysis that
15 was done in late 2006 of the glucose
16 data?
17     MR. McCONNELL: Objection to
18 form.
19     A.   I think that the -- if you
20 were to look at the clinical summary of
21 safety that was submitted to the FDA,
22 you will find in there the results of
23 the standard analysis in terms of the
24 standard tables. And, in addition, you

Page 49

1  will find the summary of the additional
2  analysis that we conducted between
3  February and May.
4      Q.   I'm not really -- I don't
5  think I got an answer to my question. I
6  understand that a document was prepared
7  for regulatory purposes called the
8  clinical summary of safety and that
9  there would be data in there reflecting
10 the standard analysis.
11     My question is, are there
12 other documents that were prepared for
13 internal use or for internal analysis
14 that reflect the standard analysis that
15 was complete as of late 2006?
16     A.   I'm not -- if you are
17 asking are there different versions of
18 the standard analysis --
19     Q.   No, I'm not. I'm asking
20 whether there are other versions of it.
21     A.   Yeah. I -- in the course
22 of reviewing the data, there may have
23 been changes or corrections to the
24 standard -- to the analysis that was

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 410

1    THE VIDEOGRAPHER: Good
2  morning. Today is Thursday May 29,
3  2008. The time is 9:14 a.m. We are now
4  on the record.
5    MARTIN BRECHER, M.D., D.M.Sc.,
6  MBA, having been previously sworn, was
7  examined and testified as follows:
8    EXAMINATION
9  BY MR. BLIZZARD:
10   Q.   Good morning, Dr. Brecher.
11   A.   Good morning.
12   Q.   I want to talk to you about
13  a subject that we talked about late
14  yesterday afternoon, and that was I was
15  asking you questions about the results
16  of study 126 and 127, and I believe I
17  asked you whether real people were
18  diagnosed with diabetes and I think you
19  on several occasions indicated very
20  vigorously no.
21    MR. McCONNELL: Objection.
22  BY MR. BLIZZARD:
23   Q.   Do you recall that?
24    MR. McCONNELL: Sorry.

Page 411

1  Objection to form.
2    A.   I think that what I was
3  trying to say was that the studies 126
4  and 127 were not designed to diagnose
5  diabetes. Investigators could have made
6  a diagnosis of diabetes or I should say
7  investigators could have reported an
8  adverse event of diabetes, but the
9  investigators were not endocrinologists,
10  so as I understand it, their reports --
11  that -- they reported adverse events of
12  diabetes, and I distinguish between
13  their reports of diabetes and a clinical
14  diagnosis of diabetes.
15   Q.   Are you an endocrinologist?
16   A.   No.
17   Q.   Do you have to be an
18  endocrinologist to diagnose diabetes?
19   A.   No.
20   Q.   As a matter of fact, aren't
21  most cases of diabetes diagnosed by
22  general internists and family
23  practitioners?
24   A.   Yes, but they are diagnosed

Page 412

1  on the basis, I would assume, of
2  criteria laid down by the American
3  Diabetes Association --
4    Q.   Sure.
5    A.   -- which usually requires
6  or requires a second and confirmatory
7  blood draw to confirm the elevated blood
8  glucose and -- I'm sorry, to confirm a
9  second fasting elevated blood glucose.
10    MR. BLIZZARD: Objection,
11  non-responsive.
12  BY MR. BLIZZARD:
13   Q.   Yesterday you said that
14  actually all these were were lab
15  values. Do you recall that testimony?
16   A.   I'm not sure I know the
17  context in which you --
18   Q.   Well, I guess the jury will
19  recall it, but I think what you were
20  saying was that the Study 126 and 127
21  just reported lab values.
22   A.   Well, I didn't -- I hope I
23  didn't say that. I didn't mean to say
24  that. Study 126 and 127, like all of

Page 413

1  our studies, collected adverse events.
2  Some of those adverse events were
3  reports of diabetes. The finding of the
4  study, the primary finding of the study
5  with regard to glucose metabolism and
6  diabetes was a finding of an increased
7  incidence of hyperglycemia.
8    Q.   Okay. Now -- and
9  hyperglycemia is high blood sugar that
10  you see when you do these lab tests;
11  right?
12   A.   That's right, and -- but it
13  was hyperglycemia recorded on one other
14  indication without followup.
15   Q.   All right. Each of these
16  lab values that we've discussed are
17  attached to real people; right?
18   A.   Yes.
19   Q.   And some of these real
20  people developed real sickness, didn't
21  they?
22   A.   There were patients who
23  developed symptoms of diabetes. There
24  was one individual who got very sick and

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 1035

1 what it was that was studied in trials
2 126 and 127?
3      A.    Trials 126 and 127 were
4 designed to show that Seroquel could
5 prevent relapse in patients with bipolar
6 disorder. It was a complicated trial
7 insofar as we studied patients who
8 either -- had recently had or were having
9 either a manic episode or an episode of
10 depression and who had recovered on
11 Seroquel and the mood stabilizer. And
12 then we randomly assigned patients to
13 continue on the combination or on the
14 mood stabilizer alone. It was a -- it
15 took a long time to recruit the number of
16 patients. And it was a long time to
17 accumulate the number of relapses. And
18 we conducted that study twice in order to
19 be sure of the result.
20      Q.    What was the primary
21 endpoint of 126 and 127?
22      A.    The primary endpoint was
23 relapse of -- having a relapse of either
24 a manic episode or a depressed episode.

Page 1036

1      Q.    Were trials 126 and 127
2 designed to determine if Seroquel can
3 cause hyperglycemia?
4      A.    No.
5      Q.    Nevertheless, did
6 AstraZeneca collect fasting glucose
7 samples from the patients to monitor the
8 glucose issues?
9      A.    Yes.
10      Q.    What were the efficacy
11 results of trials 126 and 127?
12      A.    Both 126 and 127 were
13 robustly positive showing the decrease in
14 relapse rates to both manic events and
15 depressive events.
16      Q.    Has AstraZeneca submitted
17 the results of trials 126 and 127 to the
18 FDA?
19      A.    We submitted to the FDA and
20 the indication was approved about two
21 weeks ago.
22      Q.    Prior to the submission of
23 the results of 126 and 127 to the FDA,
24 did there come a time when you analyzed

Page 1037

1 the glucose results from those studies?
2      A.    Yes.
3      Q.    Did you, in fact, do an
4 extensive reanalysis of the results?
5      A.    We did extensive additional
6 analyses of the results of the glucose
7 parameters.
8      Q.    And why did you do that
9 extensive reanalysis?
10      A.    What we found in the pooled
11 safety results was changes in blood
12 glucose of similar magnitude that we had
13 observed before. We also saw similar
14 changes in hemoglobin A1c of the
15 magnitude we had seen before. But in
16 this trial, there were seven reports,
17 seven adverse event reports of diabetes,
18 six of which occurred in the Seroquel
19 patients and only one occurred in the
20 placebo patients. And that could have
21 been a matter of chance, but we wanted to
22 investigate whether or not there was a
23 relationship between Seroquel and the
24 emergence of diabetes. And we undertook

Page 1038

1 an extensive analysis of all of the data
2 in that trial.
3      Q.    Did that extensive
4 reanalysis involve endocrinologists
5 employed by AstraZeneca?
6      A.    Yes.
7      Q.    Did that reanalysis involve
8 an endocrinologist who is not employed by
9 AstraZeneca?
10      A.    After extensive review and
11 discussion internally, we presented the
12 results to an external endocrinologist.
13      Q.    And after an external
14 discussion and after getting the results
15 from the endocrinologist, was there a
16 consensus among the SERM team about what
17 the data revealed?
18      A.    There was consensus among
19 the clinical team that we took to SERM
20 and we -- the data showed that there was
21 an increase in the -- of about twofold in
22 the rate of emergent hyperglycemia in
23 patients who took Seroquel and a mood
24 stabilizer compared to those that took a

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 1039

1   mood stabilizer alone.
2       Q.   What did SERM conclude based
3   upon the results of trials 126 and 127?
4       A.   SERM concluded that the core
5   data sheet needed to be changed to
6   reflect that observation.
7       Q.   Did AstraZeneca also submit
8   or eventually submit any changes being
9   effected to FDA to change the United
10  States label for Seroquel?
11      A.   Yes.
12               - - -
13          (Exhibit Brecher-62, 6/22/07
14          Letter, Bates D339-L0066031-00001
15          - 00003, was marked for
16          identification.)
17               - - -
18  BY MR. McCONNELL:
19      Q.   Dr. Brecher, Exhibit 62 has
20  been placed in front of you, and the
21  question is what is it?
22      A.   Give me a moment.
23      Q.   Of course.
24      A.   This -- this document

Page 1040

1   informs FDA of a change to be made to the
2   label within 30 days.
3       Q.   What new information was
4   added to the U.S. label?
5       A.   The precise wording is not
6   included in this document, but it
7   basically reflected the results of trials
8   126 and 127. I believe it also included
9   results from trial 125. And it included
10  a summary statistics for all the
11  short-term clinical trials.
12      Q.   Why was that information
13  added to the label?
14      A.   Because we wanted the label
15  to reflect the laboratory finding of
16  emergence of hyperglycemia.
17      Q.   Though that information was
18  added to the label, did the label already
19  include reference to hyperglycemia and
20  diabetes, in fact, have a warning
21  regarding hyperglycemia and diabetes?
22      A.   Yes.
23      Q.   Why did AstraZeneca not
24  issue a "Dear Healthcare" letter?

Page 1041

1       A.   The changes were driven by
2   an observation in laboratory parameters
3   and it was, therefore, not felt to be a
4   sufficiently large change to the label
5   that it would require -- be necessary to
6   alert the healthcare community by letter.
7       Q.   Doctor, did SERM conclude
8   that trials 126 and 127 showed that
9   Seroquel causes diabetes?
10      A.   No, they did not.
11      Q.   What was SERM's conclusion?
12      A.   SERM's conclusion was that
13  there was an increased rate of emergent
14  hyperglycemia in patients taking Seroquel
15  and a mood stabilizer compared to a mood
16  stabilizer alone.
17      Q.   In your view, do trials 126
18  and 127 demonstrate that any patient who
19  takes Seroquel is at an increased risk
20  for hyperglycemia?
21          MR. PIRTLE:  Objection.
22      Form.
23          THE WITNESS:  Could you ask
24      that again?

Page 1042

1   BY MR. McCONNELL:
2       Q.   Let me re -- let me ask a
3   different question.
4           Did AstraZeneca act
5   conservatively when it changed the
6   Seroquel label in June of 2007?
7           MR. PIRTLE:  Objection.
8       Form.
9           THE WITNESS:  I think
10      AstraZeneca acted appropriately in
11      changing the label -- in changing
12      the core data sheet following the
13      SERM meeting.  Or as discussed in
14      the SERM meeting.
15  BY MR. McCONNELL:
16      Q.   Why do you say that?
17      A.   Because I think that the
18  observation -- it was appropriate to make
19  that observation in the core data sheet.
20      Q.   I want to ask you some
21  questions about some documents that the
22  plaintiff counsel showed you today.  They
23  are Exhibits 54, 55 and 56. Can we get
24  those in front of you? And I'll just

69 (Pages 1039 to 1042)

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 1207

```
 1            CERTIFICATE
 2
 3
 4        I HEREBY CERTIFY that the
 5    witness was duly sworn by me and that the
 6    deposition is a true record of the
 7    testimony given by the witness.
 8
 9
10    _____
      Linda Rossi Rios, RPR, CCR and
11    Notary Public
      Dated:  May 30, 2008
12
13
14
          (The foregoing certification
15    of this transcript does not apply to any
      reproduction of the same by any means,
16    unless under the direct control and/or
      supervision of the certifying reporter.)
17
18
19
20
21
22
23
24
```

Page 1209

```
 1        - - - - - -
         E R R A T A
 2        - - - - - -
 3    PAGE  LINE  CHANGE
 4    _____ _____ _____
 5    _____ _____ _____
 6    _____ _____ _____
 7    _____ _____ _____
 8    _____ _____ _____
 9    _____ _____ _____
10    _____ _____ _____
11    _____ _____ _____
12    _____ _____ _____
13    _____ _____ _____
14    _____ _____ _____
15    _____ _____ _____
16    _____ _____ _____
17    _____ _____ _____
18    _____ _____ _____
19    _____ _____ _____
20    _____ _____ _____
21    _____ _____ _____
22    _____ _____ _____
23    _____ _____ _____
24    _____ _____ _____
```

Page 1208

```
 1      INSTRUCTIONS TO WITNESS
 2
 3        Please read your deposition
 4    over carefully and make any necessary
 5    corrections.  You should state the reason
 6    in the appropriate space on the errata
 7    sheet for any corrections that are made.
 8        After doing so, please sign
 9    the errata sheet and date it.
10        You are signing same subject
11    to the changes you have noted on the
12    errata sheet, which will be attached to
13    your deposition.
14        It is imperative that you
15    return the original errata sheet to the
16    deposing attorney within thirty (30) days
17    of receipt of the deposition transcript
18    by you.  If you fail to do so, the
19    deposition transcript may be deemed to be
20    accurate and may be used in court.
21
22
23
24
```

Page 1210

```
 1    ACKNOWLEDGMENT OF DEPONENT
 2
 3        I,_____, do
      hereby certify that I have read the
 4    foregoing pages,  770 - 1206, and that
      the same is a correct transcription of
 5    the answers given by me to the questions
      therein propounded, except for the
 6    corrections or changes in form or
      substance, if any, noted in the attached
      Errata Sheet.
 7
 8    _____
                  DATE
 9
10
      Subscribed and sworn
11    to before me this
      _____ day of _____, 20____.
12
      My commission expires:_____
13
14    _____
15    Notary Public
16
17
18
19
20
21
22
23
24
```