**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| IN RE: SEROQUEL PRODUCTS LIABILITY LITIGATION<br><br>This document relates to:<br><br>ALL CASES | MDL DOCKET NO:<br>6:06-MDL-1769-ACC-DAB |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**ASTRAZENECA'S SUBMISSION ON THE FUTURE OF THE MDL**

Now that the Court has completed its task of conducting coordinated and consolidated pretrial proceedings over matters common among all cases,[1] once again the name of the game for AstraZeneca is *delay*. In fact, one hallmark of the *Seroquel* MDL from AstraZeneca's perspective has been its success in miring the parties and Court in protracted and expensive, but unproductive, discovery efforts—such as the year that AstraZeneca attempted to discover, on a case-by-case basis and at its urging, all 7,000 cases in the MDL.[2] Then there was the custodial document production AstraZeneca promised to complete in six months, but which took a year to certify completion, and then was still incomplete.[3]

This Court has indicated its desire to consider remand of the non-Florida cases at this time. (Tr. of Jan. 28, 2009 Hr'g at 3, 18.) Despite the Court's request for written submissions on remand to "aid the Court in facilitating an orderly and efficient *remand* of the non-Florida cases" (Order of Feb. 11, 2009), AstraZeneca's submission parrots earlier

---

[1] *See* 28 U.S.C. § 1407; *In re: Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791, 798 (N.D. Ohio 2004).
[2] *See* Doc. 603 at 6 & n.1.
[3] *Id.*

1

"Future of the MDL" proposals it has submitted and advocates quite literally *years* of additional, *case-specific* discovery before the non-Florida cases are remanded to their transferor courts.

For the reasons that follow, the Court should not accede to AstraZeneca's wishes. For three years, by AstraZeneca's own admission, 98% of the MDL cases (including the vast majority of the non-Florida cases) have sat idle. (Doc. 1386 at 8.) AstraZeneca contends that those cases should continue to be held 'on ice' while the *Guinn* appeal navigates the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit"). Meanwhile, AstraZeneca proposes that the Court and parties—particularly Plaintiffs—engage in certain unprecedented and costly make-work that will have very little practical use for this Court or any transferor court. Then, once the year-or-more-long *Guinn* appeal is completed, AstraZeneca requests that the Court and parties engage in case-specific expert discovery for every case in the MDL. Only then, AstraZeneca contends, should the Court consider remand.[4]

AstraZeneca's arguments in favor of years of additional case-specific discovery in this Court do not address, much less counter, the basic tenets of MDL procedure. Also critically, AstraZeneca's proposal requires the Court's predisposal to AstraZeneca's continuing allegations that "this MDL does indeed include thousands of cases" of "dubious

---

[4] Such an approach turns the MDL proceeding on its head because the resolution of "common questions of fact"—which here is substantially complete—is the impetus (not to mention statutory justification) for the consolidated proceeding in the first place, and because a "multidistrict proceeding is not the appropriate mechanism for the conduct of case-specific discovery" that, "[b]y definition, . . . is not of general interest to the parties in all of the individual cases which comprise the MDL." *In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 169 F.R.D. 632, 638 (N.D. Ill. 1996); *see In re Bridgestone/Firestone, Inc.*, 128 F. Supp. 2d 1196, 1198 (S.D. Ind. 2001) (stating that a *suggestion of remand may be appropriate* "[i]n personal injury/death cases *where only case-specific discovery and motion practice remains*") (emphasis added).

merit." (Doc. 1386 at 7, 10.) But this Court has rightly refused to prejudge Plaintiffs' cases in the manner AstraZeneca proposes,[5] and it should continue to do so.

## I.     "BACK TO THE FUTURE" OF THE MDL

The Court should deny AstraZeneca's efforts to regress this litigation by 16 months. At that time, in November 2007, the MDL had already been pending for 17 months. AstraZeneca argued that before any general liability discovery could be completed, the entire MDL docket of Plaintiffs' cases needed to be "filtered" and "weeded out." (*See* Docs. 602, 618.) Never one for efficiency, AstraZeneca made that argument *after* it had initially, and misguidedly, persuaded the Court to adopt a program to complete basic case-specific discovery in (then) all 7,000 MDL cases. (*See* Doc. 603 at 5-7.) Despite AstraZeneca's assurances that it "devote whatever resources we need to—on AstraZeneca's side—to take the discovery,"[6] by November 2007 the Court agreed with Plaintiffs that AstraZeneca's case-specific discovery program was "broken," and abandoned it in favor of the Florida trial program. (Doc. 603 at 5; *see* Report & Recommendation of Nov. 16, 2007, Doc. 695.) The Court also denied at that time AstraZeneca's proposed "filtering" mechanisms it sought to apply to Plaintiffs' cases. (Order of Nov. 16, 2007, Doc. 688).

---

[5]     [By defense counsel, Mr. Austin:] We do believe that the Court can before transferring these cases back, set up a process by which we could dramatically reduce this inventory at a fraction of the cost. We spent millions of dollars on both sides to develop these cases over a year and a half, and this is where we have ended up: The cases aren't triable.

    * * *

THE COURT: Well, it's fair to say these two cases [*Guinn* and *Haller*] are not triable. I don't think it's fair to say that none of these cases are triable.

Tr. of 1/28/2009 Hr'g at 21:24-22:9.

[6]     Tr. of 3/2/2007 Hr'g at 94:7-15.

Given AstraZeneca's track record in this litigation, the Court should view AstraZeneca's "Future of the MDL" submission with a jaundiced eye. Indeed, neither the Court nor Plaintiffs are to blame for AstraZeneca's inability to resolve large numbers of cases, as it clearly wishes it had at this juncture. AstraZeneca has been entirely unsuccessful in dismissing more than two Plaintiffs' cases, or even specific claims, on substantive legal grounds—after at least five (and, perhaps, soon to be six) failed attempts. Also, AstraZeneca has for three years steadfastly refused to engage in any form of alternative dispute resolution, notwithstanding mounting, undeniable evidence—including evidence recently acted upon by the FDA, that Seroquel indeed causes "significant weight gain" and poses "serious metabolic risks." (*Guinn* Doc. 41.) Meanwhile, Professor Saltzburg, the parties' agreed-upon and Court-appointed mediator, has been unable to engage so much as a telephone conference between the parties regarding ADR. And AstraZeneca's legal fees from the inception of the MDL through 2008—***half a billion dollars*** paid to its lawyers—continue to mount.[7] In fact, AstraZeneca reported in its 2008 Annual Report that it has nearly exhausted its insurance coverage for defense costs and damages claims in Seroquel cases.[8]

The financial disclosures speak volumes: AstraZeneca's goal has never been to resolve these cases or compensate injured Plaintiffs, but instead to focus on driving up the

---

[7] *See* AstraZeneca Annual Report and Form 20-F Information 2008 ("Annual Report"), at 155 ("As of 31 December 2008, legal defence costs of approximately $512m have been incurred (of which approximately $335m was incurred during 2008). AstraZeneca has product liability insurance that is considered to respond to the vast majority of claims brought in these *Seroquel* cases, subject to a retention. This insurance provides coverage for legal defence costs and potential damage amounts in connection with the *Seroquel* product liability cases. AstraZeneca has recorded an insurance receivable of $426m at 31 December 2008 (2007: $139m). AstraZeneca currently estimates that its defence costs alone may exceed its insurance coverage with respect to the *Seroquel* cases."), *available at* http://www.astrazeneca-annualreports.com/2008/downloads/AZ_AR08_Full.pdf.

[8] *Id.*

cost of the litigation borne by Plaintiffs' *attorneys*. AstraZeneca hopes to exponentially increase those costs by asking the Court to undertake two additional and unnecessary layers of case-specific discovery prior to remand: "certification" of basic facts by Plaintiffs' counsel, and implementation of a *Lone Pine* case-specific expert program.

Yet, AstraZeneca now complains about the large number of cases that are still pending in and transferred to this MDL. Unhappy with the Court's consideration of remand at this time, AstraZeneca seeks to alarm the Court, stating that it would be "unprecedented" and inferring that the Court would somehow commit error to remand *so many* cases. (Doc. 1386 at 6.) But, as noted, it is neither the Court's nor Plaintiffs' fault that over 6,000 cases remain pending at this juncture, with the Court's statutory "coordinated and consolidated" pretrial mission already complete.[9]

## II. THE COURT MAY DISREGARD ASTRAZENECA'S "DATA" CONCERNING NUMBERS OF REMANDED MDL CASES.

In attempt to condition remand upon a protracted screening process, AstraZeneca has, in typical fashion, cherry-picked statistics and omitted facts essential to an accurate contrast of this MDL with other MDLs. AstraZeneca's analysis promotes a false precedent against

---

[9] In its attempt to invoke the "filtering" procedures of the *Baycol* MDL, AstraZeneca portrays *Baycol* as the model for consolidated proceedings. In fact, at the time submissions on the future of the MDL were made in the *Baycol* litigation, *nearly three-thousand Baycol lawsuits, with a total value of $1.13 billion, had been settled*. *See Bayer Opposes Proposal To Dissolve Baycol MDL*, 8 No. 12 Andrews Drug Recall Litigation Reporter 3 (2005). Like *Baycol*, the majority of mass tort litigations have involved some form of settlement negotiations and/or proceedings that has—more than any court-imposed procedure—resolved thousands of cases prior to remand. *See, e.g., In re Zyprexa Prods. Liab. Litig.*, 489 F.Supp.230 (E.D.N.Y. 2007); *In re Zyprexa* MDL-1596, 2006 WL 335448, at *1 (E.D.N.Y. February 14, 2006) (where, in related MDL involving parallel allegations of off-label promotion and failure to warn against atypical antipsychotic manufacturer, approximately thirty (30) cases remained in transferee court for case-specific proceedings, *after the settlement of more than 10,000 cases*); *In re Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, CIV. A. 98-20594, 1999 WL 782560, at *3-4 (E.D. Pa. September 27, 1999) (less than two years after the establishment of the *Fen-phen* MDL, defendant began negotiating for a *global settlement, ultimately consisting of tens of thousands of plaintiffs*).

5

remand and should be disregarded. (Of course, there is no legal or judicial requirement that the Court even consider any analysis of the number of remanded cases in any other MDL.) As more fully described below, remand has often been used by MDL courts managing mass tort claims, particularly where settlement was not achieved either in whole or in part.

A. **A Large Percentage Of Actions Once Pending In MDLs Have Been Remanded.**

AstraZeneca has referred the Court to the J.P.M.L.'s Cumulative Summary of Multidistrict Litigation, which includes terminated actions closed since October 1, 2007 in addition to actions pending since September 30, 2008.[10] With the inclusion of pending actions, this summary combines MDLs that have recently commenced, those otherwise proceeding with consolidated and coordinated non-case-specific discovery, and those that have terminated, for a cumulative total of actions subjected to section 1407 proceedings. In many of the actions, remand has not occurred, nor is it imminent. Employing this summary in an analysis of remand as AstraZeneca has done, therefore, necessarily yields a significantly smaller remand percentage, factoring in hundreds of cases wherein remand could not possibly have occurred.[11]

AstraZeneca has portrayed its analysis as an all-inclusive summary of MDL precedent. In doing so, it has attempted to persuade the Court that less than four percent of cases from more than 2,000 MDLs have ever been remanded, and that only three MDL

---

[10] *See* September 30, 2008 J.P.M.L. Fiscal Year and Cumulative Summary of Multidistrict Litigation, *available at* http://www.jpml.uscourts.gov/General_Info/Statistics/Statistical-Analysis-2008.pdf.

[11] The J.P.M.L.'s Cumulative Summary includes this litigation, for example. Therefore, for the *Seroquel* MDL, the Summary includes a cumulative total of 5,887 actions transferred and a cumulative remand total of zero. *See id*. Despite the fact that remand has yet to be suggested in this litigation, the 0 total is factored into the cumulative remand percentage cited by AstraZeneca. In addition, the Cumulative Summary does not account for settlements that negate the necessity for remand altogether.

courts have ever remanded more than 1,000 cases. These assertions are both erroneous and irrelevant, serving only to dissuade remand.

Instead, analyzing statistics from the Summary of Terminated Litigations yields a significantly larger remand percentage, particularly in the Eleventh Circuit, than that cited by AstraZeneca. This summary includes only terminated MDLs and, therefore, presents a more accurate picture of historical remand percentages. Under this dataset, of all 975 MDLs terminated through September 30, 2008, an approximate total of 9,582 filed cases (more than 15%) have been remanded, with the remainder having been dismissed.[12] In the Eleventh Circuit in particular, more than 18% of all such actions have been remanded.[13]

Importantly, however, neither the Cumulative Summary nor the Summary of Terminated Litigations captures all cases and claims subject to MDL proceedings. Therefore, a truly accurate remand percentage cannot be ascertained using those values. While AstraZeneca has improvidently applied Cumulative Summary statistics to its analysis of the future of this litigation, more appropriate statistics, for purposes of determining precedent, should exclude pending litigations where remand may not yet be possible, as well as include all putative claims that may have been pending alongside filed cases.[14]

Thus, AstraZeneca's attempt to show the Court that remand of large numbers of cases is uncommon or disfavored is predicated purely on incomplete and misconstrued statistics and should be rejected.

---

[12] *See* Summary of Multidistrict Litigation Terminated Through September 30, 2008, *available at* http://www.jpml.uscourts.gov/General_Info/Statistics/Terminated_Dockets_2008.pdf.

[13] *See id*.

[14] In the *Welding Fume* MDL, for example, approximately 5,500 active cases had been filed by early 2006, and another 8,600 putative plaintiffs had not filed formal cases, instead electing to participate in a tolling agreement filed with the court. *In re Welding Fume Prods. Liab. Litig.*, No. 1:03- CV 17000, MDL No. 1535, 2006 WL 1173960, at *6 (N.D. Ohio April 5, 2006).

### B. Where Mass Tort Settlements Are Unachieved, Remand Is Favored.

Where partial, or comprehensive settlement, cannot be effectuated within an MDL—which is one of the purposes of an MDL proceeding—controlled or wholesale remand is a particularly effective method for determining case values necessary for the accurate evaluation of mass tort claims. *See*, *e.g.*, *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1020 (7th Cir. 2002). A decentralized process "of multiple trials, involving different juries, and different standards of liability, in different jurisdictions," may be the only mechanism for such evaluation. *Id.* Only after "a series of settlements has produced an accurate evaluation of a subset of claims," may others in that subset be settled or resolved at an established price. *Id.* "Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court." *Id*. Accordingly, AstraZeneca's portrayal of remand as unworkable and burdensome ignores such the practicalities and benefits of a decentralized post-remand trial program that any other transferor court could ably facilitate.

### III. ASTRAZENECA'S PROPOSED "CERTIFICATION" PROGRAM IS UNPRECEDENTED AND UNWARRANTED.

AstraZeneca advocates an unprecedented (so-called "simple") "certification" program to be conducted while the *Guinn* appeal is pending. But, this Court has had a form of 'certification' program in place since the inception of this MDL. Plaintiffs have each been required to complete and serve upon defense counsel extensive "Fact Sheet" questionnaires and verify, under penalty of perjury, that their answers to the broad inquiries therein are true and correct. Those Plaintiffs who failed to complete and return a Fact Sheet within the time permitted under the Court's schedule, or who failed to verify their Fact Sheet responses, have

had their cases dismissed. By AstraZeneca's own most recently filed count, it has been successful at "weeding out" 1,701 cases almost exclusively on the basis of Fact Sheet dismissals. (Doc. 1137 at 2.) Since that report, Plaintiffs' counsel has committed to ongoing re-screening of the case docket, and has voluntarily dismissed another 120 cases. Plaintiffs' counsel's review of cases in that manner continues today.

AstraZeneca's new request for additional screening through "certification" by Plaintiffs' counsel goes too far. AstraZeneca would have the Court mandate Plaintiffs' *counsel* to (a) assemble hundreds of millions of pages of medical records for comprehensive analysis, (b) create attorney work product recording Plaintiffs' counsel's analyzes of those records, (c) certify the correctness of the work product, then (d) share that completed work product with defense counsel, all within 90 days. The manifest unfairness of that proposal, requiring Plaintiffs' counsel to conduct discovery *as directed by* AstraZeneca's counsel, as well as the prejudice through expense, harassment, and undue burden suffered by those Plaintiffs subjected to such an order, requires no further elucidation. The proposal is also repugnant to the Federal Rules of Evidence and Civil Procedure for obvious reasons, and merits no consideration by the Court.

Given AstraZeneca's nascent concern for "unprecedented" action by the Court (Doc. 1386 at 6), it is worth mentioning that no MDL court has ever entered such an order. Indeed, not surprisingly, AstraZeneca is unable to point to *any* other court that has ever required such an undertaking of either plaintiff *or* defense counsel. The lone, unreported Alabama case AstraZeneca cites for having "requir[ed] signed declarations" (Doc. 1386 at 12) merely required plaintiffs' counsel in that litigation, upon completion of service of *plaintiffs' fact*

9

*sheets* to defense counsel, to file a certification informing the court of that completion. *Tatum v. Pactiv. Corp.*, No. 2:06CV83-LES, 2007 WL 60931, at *2 (M.D. Ala. Jan. 28, 2007) ("Plaintiffs' counsel shall file a declaration of compliance with this order, on behalf of each plaintiff, when the required affidavits are served on defendants."). Had AstraZeneca desired Plaintiffs' counsel to certify completion of the Fact Sheet submissions here, it certainly could have requested that instruction from the Court at the beginning of the MDL—indeed, AstraZeneca delayed uttering a word of the issue until remand appeared imminent.

### IV. THE COURT SHOULD REFUSE ASTRAZENECA'S RENEWED REQUEST FOR A *LONE PINE* ORDER.[15]

AstraZeneca again demands that the Court order over 6,000 Plaintiffs to prove a prima facie case simultaneously. Fundamentally, the problem with AstraZeneca's request is that such *Lone Pine* orders emanate from procedural rules that do not specifically grant the authority for courts to issue such orders. It is not surprising, then, that AstraZeneca cites not a single case from the Eleventh Circuit supporting the Court's adoption of such an order. That is because no such case exists. Indeed, despite AstraZeneca's contrary assurances, *Lone Pine* orders are very much the exception rather than the rule.[16]

---

[15] Plaintiffs incorporate herein by reference as if repeated in full their Response in Opposition and Incorporated Memorandum to AstraZeneca's Motion and Memorandum Seeking a "*Lone Pine*" Order Requiring Each Plaintiff to Produce a Case-Specific Expert Report on Injury and Causation. (Doc. 660.)

[16] AstraZeneca cites only a handful of other federal MDL proceedings that entered such an order. That feeble number stands in stark contrast to the considerable volume of MDL proceedings where a *Lone Pine* order, or its functional equivalent, has not issued, including the sister litigation to this MDL, *In re Zyprexa Products Liability Litigation* (MDL-1596). *See In re St. Jude Med. Ctr., Inc. Silzone Heart Valves Prods. Liab. Litig.* (MDL-1396); *In re Serzone Prods. Liab. Litig.* (MDL-1477); *In re Prempro Prods. Liab. Litig.* (MDL-1507); *In re Paxil Prods. Liab. Litig.* (MDL 1574); *In re Ephedra Prods. Liab. Litig.* (MDL 1598); *In re Deep Vein Thrombosis Litig.* (MDL-1606); *In re Vioxx Mktg., Sales Practices and Prods. Liab. Litig.* (MDL 1657); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.* (MDL-1708); *In re Medtronic, Inc. Implantable Defibrillators Prods. Liab. Litig.* (MDL-1726); *In re Celexa and Lexapro Prods. Liab. Litig.* (MDL-1736); *In re Human Tissue Prods. Liab. Litig.* (MDL-1763); *In re Zyprexa Prods. Liab. Litig.* (MDL-1596); *In re Bausch & Lomb Inc. Contact Lens Solution Prods. Liab. Litig.* (MDL-1785); *In re Fosamax Prods. Liab. Litig.* (MDL-

### A. *Lone Pine* Orders Afford Defendants An Unfair, Prejudicial Advantage In The Litigation.

With no real guidelines to control the parameters and scope of *Lone Pine* orders—not to mention no guiding Eleventh Circuit precedent—they are fertile ground for inconsistency, prejudice, and ultra vires action. *See* John T. Burnett, Lone Pine *Orders: A Wolf in Sheep's Clothing for Environmental and Toxic Tort Litigation*, 14 J. Land Use & Envtl. L. 53, 75-76 (1998). More specifically, such *Lone Pine* orders are inherently unfair and prejudicial to Plaintiffs for at least two reasons: (1) they serve as improper, untimely substitutes for summary judgment motions, and (2) they ignore other existing procedural safeguards and rules.

First, AstraZeneca's *Lone Pine* request is the functional equivalent of it filing a "no evidence" summary judgment motion before discovery is complete in this litigation. In other words, potentially little difference may result from AstraZeneca's filing a summary judgment motion, asserting that Plaintiffs had no evidence of causation, instead of their *Lone Pine* Motion. As with the grant of a *Lone Pine* order, such a summary judgment motion would put Plaintiffs to their proof, forcing them to obtain expert witness reports posthaste to overcome the motion. Meanwhile, Defendants would not be required to further participate in discovery at all, much less produce their own expert reports.[17]

---

1789). In fact, most jurisdictions have not even considered *Lone Pine* orders. James P. Muehlberger & Boyd S. Hoekel, *An Overview of Lone Pine Orders in Toxic Tort Litigation*, 71 Defs. Couns. J. 366 (2004).

[17] *See Morgan v. Ford Motor Co.*, No. 06-1080, 2007 WL 1456154, at *9 (D.N.J. May 17, 2007) (refusing to enter defendants' requested *Lone Pine* order in part because it would give "[d]efendants an opportunity to attack" the justification for the lawsuit premised on plaintiff's hastily prepared medical affidavits; like the defendants, "[p]laintiffs must have an opportunity to contest the reasonableness of any experts relied upon by their adversary"). As AstraZeneca well knows, significant due process concerns prohibit such summary judgment practice, explaining why "summary judgment is appropriate only 'after adequate time for discovery' has passed." *Shotz v. City of Plantation*, 344 F.3d 1161, 1184 n.35 (11th Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In fact, "[t]he law in this circuit is clear: the party

Second, the Federal Rules of Civil Procedure, in fact, counsel against implementation of *Lone Pine* orders. Under Rule 26(a)(2), *all* parties are automatically mandated to disclose additional information—including expert witness information—following pretrial disclosures. At base, the rule demands that *all parties* disclose the identity of any person who "may be used at trial" to present evidence under Federal Rules of Evidence 702, 703, or 705 and, in absence of other instruction by the court, to produce expert reports for each such witness. Fed. R. Civ. P. 26(a)(2)(A)-(C). The rule in the Eleventh Circuit is that one side should not be accorded the palpable procedural advantage gained by unilateral production of expert reports by its adversary. *See Cooper v. Southern Co.*, 390 F.3d 635, 728 (11th Cir. 2004) ("Because the expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise, . . . compliance with requirements of Rule 26 is not merely aspirational.") (citation omitted).

### B.     The Few MDL Cases Cited By AstraZeneca Are Inapposite.

AstraZeneca's *Lone Pine* request is not supported by its reliance on *In re Rezulin Prods. Liab. Litig.*, MDL No. 1348, 2005 WL 1105067, at *1 (S.D.N.Y. May 9, 2005). In

---

opposing a motion for summary judgment should be permitted an adequate opportunity to complete discovery prior to consideration of the motion." *Jones v. City of Columbus*, 120 F.3d 248, 253 (11th Cir. 1997); *see Snook v. Trust Co. of Ga. Bank of Savannah, N.A.*, 859 F.2d 865, 870 (11th Cir. 1988) ("This court has often noted that summary judgment should not be granted until the party opposing the motion has had an opportunity for discovery."); *Littlejohn v. Shell Oil Co.*, 483 F.2d 1140, 1145 (5th Cir. 1973) (en banc), *cert. denied*, 414 U.S. 1116 (noting the high fatality rate of summary dispositions at a time before the facts have been fully developed).

For example, AstraZeneca's own submission reveals the prejudicial nature of the *Lone Pine* procedure. AstraZeneca claims that a *Lone Pine* expert opinion is "merely a screening tool" and would not prejudice Plaintiffs' ability to supplement that opinion later. (Doc. 1386 at 14.) However, AstraZeneca is also quick to clarify that AstraZeneca would not be prevented from "raising substantive challenges to the opinion stated in the *Lone Pine* report." In fact, a *Lone Pine* order would be an ineffective "weeding" tool for this MDL if there were no dispositive motion phase incorporated with it to "dispense with" cases. Moreover, the *Lone Pine* procedure would necessarily entail state-by-state analysis of causation standards—the same analysis that the Court performed under Florida law in *Guinn* and *Haller*—which the Court has repeatedly declared it does not intend to do.

that proceeding, Judge Kaplan had already ruled in the defendants' favor on no fewer than five summary judgment motions addressing five different issues that potentially affected all cases, such as statutes of limitations and barring claims on certain side-effects and types of injuries. *Id.* The scope of viable claims had been greatly narrowed by those judgments, and the district court required plaintiffs, in conjunction with their counsel and medical professionals of plaintiffs' choosing, "to consider whether there are good grounds to continue the action in light of the plaintiff's individual circumstances and the Court's decisions," and then submit a case-specific report if the plaintiff and his/her counsel determined there was good grounds to proceed. *Id.* As noted, AstraZeneca has enjoyed no such success in narrowing Plaintiffs' claims through dispositive rulings on the merits.

AstraZeneca's argument for a *Lone Pine* order to "filter" cases likewise gains no traction by its reliance on *In re Orthopedic Bone Screw Products Liability Litigation*, MDL 1014, 1997 WL 303239, at *1 (E.D. Pa. Feb. 13, 1997). In its zeal to convince the Court that the federal court in Pennsylvania entered a *Lone Pine* order, AstraZeneca disingenuously omit the following ("mildly" significant) portion of that court's order: **both plaintiffs <u>and</u> defendant** were required to furnish a case-specific expert opinion prior to remand, something AstraZeneca has not (unsurprisingly) volunteered to do here. *See id.*

Last, and strangely, given a *Lone Pine* order's purported ability to "weed out" and "substantially reduce the number of cases" in an MDL, Pfizer settled virtually all of its *In re Bextra and Celebrex* MDL cases for $894 million less than two months after the *Lone Pine* order AstraZeneca cites was entered in that MDL. (Doc. 1386 at 15.) *See* Stephanie Saul, *Pfizer to Settle Claims Over Bextra and Celebrex*, N.Y. Times, Oct. 17, 2008, *available at*

13

http://www.nytimes.com/2008/10/18/business/18drug.html.  In addition, the MDL court in *Bextra* had already narrowed the scope of permissible claims to those brought by patients taking more than the 200-milligram dose of the drug.  *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1184 (N.D. Cal. 2007).  As noted, there has been no similar narrowing of claims here by dispositive motions on the merits.

V. **ASTRAZENECA'S CLAIMED NEED FOR ADDITIONAL DISCOVERY IS FOR DELAY ONLY.**

Finally, this Court need not delay its suggestion of remand to complete the generic expert discovery and rule on the parties' "generic" deposition cuts, as AstraZeneca proposes. In fact, CMO 5 expressly contemplates that additional general expert designations and discovery shall be permitted pursuant to a schedule by "agreement of the Parties" or "by later orders of this Court ***or transferor courts*** . . . ."  (Doc. 792 at 3; emphasis added.)  As Plaintiffs have previously explained, because Seroquel is still on the market, and there are rapidly changing developments with respect to Seroquel's warnings and the FDA, Plaintiffs cannot be certain (any more than can AstraZeneca) of the necessity or type of additional generic expert testimony that may be required in the future for every case in this MDL.  The parties may simply seek leave of the transferor courts to designate and conduct discovery regarding additional experts, as needed.  Similarly, depositions cannot be cut and ruled on in all cases for all times.  Different factual circumstances and litigation needs will arise that will dictate the specific testimony required for trial for each side.  The most obvious example of those changing circumstances is the fact that the generic depositions that were cut for the *Guinn* and *Haller* cases did not contain any testimony (or sufficient testimony, if there was any) regarding off-label promotion and use of Seroquel because *Guinn* and *Haller* were not

14

off-label cases. And, the fact that Plaintiffs have not ruled out the mere possibility of needing to conduct additional general discovery in the future does not warrant delaying the Court's suggestion of remand. The fact that the Court "has overseen generic fact discovery to date, and it should continue to do so" as AstraZeneca argues (Doc. 1386 at 5) appears to indicate that AstraZeneca prefers the non-Florida cases to remain before this Court in perpetuity.

## CONCLUSION

There exists no basis for the non-Florida cases to sit idle pending the *Guinn* appeal or further Florida-law-related proceedings in this Court. This Court has effectively completed its task of comprehensively readying the transferred cases on a global, coordinated, and consolidated basis. The remaining, case-specific trial preparation belongs to the transferor Courts. Prompt suggestion of remand to the J.P.M.L. is now appropriate.

DATED: March 31, 2009                                Respectfully submitted,

By:   /s/ K. Camp Bailey
        F. Kenneth Bailey Jr.
        K. Camp Bailey
        Fletcher V. Trammell
        Robert W. Cowan
        **BAILEY PERRIN BAILEY**
        440 Louisiana St., Suite 2100
        Houston, Texas 77002
        (713) 425-7100 Telephone
        (713) 425-7101 Facsimile
        kbailey@bpblaw.com
        cbailey@bpblaw.com
        ftrammell@bpblaw.com
        rcowan@bpblaw.com
        **Co-Lead Counsel for Plaintiffs**

## **CERTIFICATE OF SERVICE**

      I HEREBY CERTIFY that on this 31st day of March, 2009, I electronically filed the foregoing: PLAINTIFFS' RESPONSE IN OPPOSITION TO ASTRAZENECA'S SUBMISSION ON THE FUTURE OF THE MDL with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.

                                                     /s/  Robert W. Cowan
                                                   Robert W. Cowan