# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

IN RE: SEROQUEL PRODUCTS
LIABILITY LITIGATION

This document relates to:

ALL CASES

**MDL DOCKET NO:
6:06-MDL-1769-ACC-DAB**

---

**PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO ASTRAZENECA'S BRIEF
IN SUPPORT OF PARTIAL SUMMARY JUDGMENT IN ALL MDL CASES
<u>BASED ON FEDERAL PREEMPTION</u>**

The Court ordered the parties to submit briefs on the issue of federal preemption "specifically focusing on the impact of" the United States Supreme Court's recent opinion in *Wyeth v. Levine*, 555 U.S. ___, 2009 WL 529172 (Mar. 4, 2009). (Doc. 1366.) AstraZeneca submitted its Brief on March 23, 2009. ("Brief," Doc. 1391.) AstraZeneca states that, although it is not conceding any preemption arguments, its Brief is strictly focused on alleged implied conflict preemption applicable to Plaintiffs' claims arising sometime in 2004 through June 2007. (Defs.' Br. at 1-2.)

Although the Supreme Court rejected wholesale the preemption theories urged by pharmaceutical manufacturer Wyeth in its appeal, AstraZeneca nevertheless presses on with its preemption defense. But, *Levine* made clear that absent congressional intent to preempt state-law tort suits or some legal authority of the FDA to mandate prescription drug label changes, no implied conflict preemption may be found. AstraZeneca's proffered summary judgment "evidence" simply does not change that outcome. Indeed, by manufacturing exceptions to *Levine*'s plain mandate, AstraZeneca's misguided submission disregards this

1

Court's heavy responsibility as one of the first district courts in the nation to interpret and apply *Levine* mere weeks after the opinion's release.   The Court should deny summary judgment.

# I.
## INTRODUCTION

Given *Levine*'s sweeping disapproval of federal preemption in the prescription drug context, AstraZeneca might reasonably (and prudently) have conceded the preemption issue.[1] That approach would have been especially justified in light of the Supreme Court's remand of two other pending prescription drug preemption cases five days after *Levine* issued.[2]

Instead, AstraZeneca dusts off petitioner Wyeth's *losing arguments* and the *minority opinion in Levine* and paradoxically recasts them as controlling over the *Levine majority* opinion and this Court.   It its review, the Court should have front-of-mind awareness of AstraZeneca's remarkable departures from *Levine* and the relevant facts in order to convince the Court to adopt its preemption arguments.   For example:

- Myth:   *Levine* permits a finding of implied conflict preemption where a pharmaceutical manufacturer demonstrates by "clear evidence" that the FDA would not have approved the change to a drug label that a plaintiff advocates.[3]

---

[1]      At least one other pharmaceutical defendant has done so in recent days.  *See, e.g.*, Defendants Johnson & Johnson, Johnson & Johnson Pham. Research & Dev., L.L.C., and Ortho-McNeil Pharm., Inc.'s Notice of Withdrawal of Defendants' Motion for Summary Judgment (Federal Preemption), Mar. 25, 2009, *In re Ortho Evra Prods. Liab. Litig.*, MDL No. 1742 (W.D. Ohio) (Exhibit 1).

[2]      *Colacicco v. Apotex, Inc.*, 555 U.S. ___, 2009 WL 578682 (Mar. 9, 2009) (mem.); *Pa. Employees Benefit Trust Fund v. Zeneca, Inc.*, 555 U.S. ___, 2009 WL 578681 (Mar. 9, 2009) (mem.).  In *Colacicco*, the Third Circuit held that the lawsuits of surviving family members of consumers who had committed suicide after taking selective serotonin reuptake inhibitors ("SSRIs") were impliedly preempted due to conflict with the FDA's regulatory actions.  521 F.3d 253, 276 (3d Cir. 2008).  In accord with AstraZeneca's arguments here, the Third Circuit noted that the FDA had "actively monitored the possible association between SSRIs and suicide for nearly twenty years, and ha[d] concluded that the suicide warnings desired by plaintiffs [were] without basis and would therefore be false and misleading."  *Id.* at 269.

[3]      *Id.* at 4, 15-16.

- Reality:  While any such carve out may or may not be found in *Levine*, the Supreme Court indisputably concluded that (1) congressional purpose is one of the "cornerstones" of any implied conflict preemption analysis,[4] (2) a "presumption against pre-emption" must be overcome unless Congress evinced a purpose to supersede state law that was "clear and manifest,"[5] and (3) "Congress[] deci[ded] not to pre-empt common-law tort suits."[6] AstraZeneca simply ignores these points in its Brief.

- Myth:  The regulatory record here "presents the polar opposite of what the Supreme Court found in *Levine*."[7]

- Reality:  The regulatory records between the cases are more alike than they are dissimilar, and to the extent they are different, it is because *Levine*'s facts presented a *stronger* preemption case than here.[8]

- Myth:   The FDA "mandated" the so-called "classwide warning" in 2003-2004.[9]

- Reality:  As *Levine* notes, the FDA had no authority to order a company to change its label until Congress granted it that authority in 2007.[10]  Moreover, the "changes being effected" ("CBE") regulation permitted AstraZeneca to strengthen Seroquel's label as soon as there was "reasonable evidence of an association of a serious hazard with" Seroquel.[11]  Finally, the facts simply do not bear out AstraZeneca's position.  AstraZeneca's own evidence shows that the FDA "request[ed]" Seroquel's 2004 label change.[12]  Further, the FDA negotiated with the atypical antipsychotic manufacturers concerning the content of the label change before and during implementation,[13] and while the FDA had no legal authority to force the warning change, it was well-known to AstraZeneca that FDA approval of Seroquel's pending new indication for bipolar mania was contingent upon the company's acceptance of the 2004

---

[4]     *Levine*, 2009 WL 529172, at *5.

[5]     *Id.*

[6]     *Id.* at *12.

[7]     Defs.' Br. at 17, 18.

[8]     *See* discussion of the respective factual records, *infra* at 6-7 and 35-38.

[9]     Defs.' Br. at 1, 3, 5-8, 15, 17-20, 22, 24-25, 27.

[10]    *Levine*, 2009 WL 529172, at *7, *9.

[11]    *Id.* at *8-9.

[12]    *See* discussion of the facts of the 2004 label change, *infra* at § III.B.

[13]    *Id.*

label change.[14]   Therefore, it was a business decision for AstraZeneca to accept, and not fight, the 2004 label change—nothing more.

- Myth:  Once the FDA "mandated" the "classwide warning," AstraZeneca was powerless to strengthen the label because there is clear evidence the FDA would not have approved it.[15]

- Reality:  As noted, until 2007, the FDA could not have mandated a label change for Seroquel.[16]   Moreover, *Levine* expressly held that the drug manufacturer, not the FDA, retains responsibility for its products' labeling "at all times,"[17] and unequivocally rejected Wyeth's arguments (and the FDA's position) that FDA drug regulation and labeling decisions represent a "ceiling" or final decision with which state law may not conflict.[18]   That is in large part due to the CBE regulation allowing a manufacturer to "add or strengthen a contraindication, warning, precaution, or adverse reaction" absent preapproval by the FDA.[19]

- Myth:   "AstraZeneca had no new evidence or new analyses of existing evidence that FDA had not considered when FDA made its judgment; all of this had already been provided to FDA."[20]

- Reality:  That statement is deceiving on many levels.  First, it was not until 2008 that a manufacturer could only change its label to reflect "newly acquired information."   Second, AstraZeneca underreported adverse event reports to the FDA in 2000.  Third, AstraZeneca acquired new information after 2004 that could have supported a label change under the CBE regulation.

The fundamental flaw in AstraZeneca's preemption analysis is that it hinges on the FDA having reached a "final judgment as to the precise warning that physicians should receive . . . ."[21]  But there is no holding more central to *Levine* than the Court's ruling that "the mere fact that the FDA approved" a particular label "does not establish that it would

---

[14]     *Id.*

[15]     *E.g.*, Defs.' Br. at 19 ("AstraZeneca could not have [proposed a stronger warning for Seroquel after the "class" warning issued], because FDA certainly would have disapproved it.").

[16]     *Levine*, 2009 WL 529172, at *7, *9.

[17]     *Id.* at *8.

[18]     *Id.* at *10-13.

[19]     *Id.* at *7.

[20]     Defs.' Br. at 19.

[21]     *Id.*

4

have prohibited . . . a change" to that label.[22]  In fact, "nothing in the text of the statutory or regulatory scheme necessarily insulates [a drug manufacturer] from liability under state law *simply because the FDA has approved a particular label*."[23]

The Court should not be led astray by AstraZeneca's arguments based on a deceptively narrow reading of *Levine* and contrived factual premises.  Thus, it is readily apparent that AstraZeneca should not be granted summary judgment on the issue of implied conflict preemption.

**II.**

**RELEVANT BACKGROUND**

The much-anticipated *Levine* opinion stemmed from pharmaceutical manufacturer Wyeth's petition of certiorari from the Vermont Supreme Court, which had upheld a jury verdict in favor of professional guitarist Diana Levine, whose right hand and forearm required amputation after a physician's assistant administered Wyeth's anti-nausea medication "Phenergan" to Ms. Levine for a migraine headache utilizing the "IV-push" method.[24]  Because the drug is "corrosive and causes irreversible gangrene if it enters a patient's artery," and because of the close proximity of arteries and veins in areas of the body most commonly used for intravenous injection, Levine alleged that Phenergan's labeling was defective "because it failed to instruct clinicians to use the IV-drip method of intravenous

---

[22]     *Levine*, 2009 WL 529172, at *9.

[23]     *Id.* at *20 (Thomas, J., concurring in the judgment) (emphasis added).

[24]     "IV-push" involved intravenous administration of the medicine by direct injection into a patient's vein. *Levine*, 2009 WL 529172, at *2.  Phenergan was also approved to be administered through the "IV-drip" method, whereby the drug is introduced into a saline solution in a hanging intravenous bag and slowly descends through a catheter inserted in a patient's vein.  *Id.*

5

administration instead of the higher risk IV-push method."[25]  "More broadly, she alleged that Phenergan is not reasonably safe for intravenous administration because the foreseeable risks of gangrene and loss of limb are great in relation to the drug's therapeutic benefits."[26]

The Supreme Court's key rulings in *Levine* are discussed in detail in the Argument and Authorities section below.  By way of background, Wyeth had argued that the "FDA was fully aware of the harm that could result from exposure of arterial blood to Phenergan" and "[t]hat is why FDA repeatedly directed Wyeth to include prominent warnings" of the relevant risks through orders that "represented FDA's considered judgment of how the labeling should address the risk at issue in this case."[27]  According to Wyeth, the "FDA reached that judgment with full attention to all methods of [drug] administration."[28]  Thus, concluded Wyeth, it was "entirely clear that FDA made a judgment about" Phenergan's risks based on "labeling that FDA reviewed and approved," the "record of meetings and correspondence," the FDA's apparent consideration of 20 medical journal articles concerning the relevant risks, and other record evidence.[29]  Adopting Wyeth's contentions, the *Levine* minority determined that Phenergan's warning label had "been subject to the FDA's strict regulatory oversight since the 1950's," and based on "voluminous materials [in] suppor[t]," the FDA "ordered Wyeth to include [the] specific warning" that Levine claimed, and the Vermont jury and supreme court deemed, was inadequate.  As this Court is aware, the

---

[25]    *Id.*

[26]    *Id.*

[27]    *Levine*, 2009 WL 529172, at *26 n.1, *30-34 (Alito, J., Roberts, C.J., & Scalia, J., dissenting); Reply Br. of Pet. Wyeth (hereinafter "Wyeth Reply Brief"), *Wyeth v. Levine*, No. 06-1249, in the Supreme Court of the United States, at 2.

[28]    Wyeth Reply Br. at 2-3.

[29]    *Id.* at 16-17.

Supreme Court held that Levine's state-law failure-to-warn claims were not preempted by federal law.

Parroting Wyeth's arguments (which is surprising because AstraZeneca also argues that the regulatory record here and in *Levine* are "polar opposite[s]"),[30] AstraZeneca contends that Plaintiffs' state-law failure-to-warn claims are likewise impliedly preempted by federal law. AstraZeneca contends that the FDA was fully aware of Seroquel's risks because "over several years" leading up to the "class" warning the FDA undertook "a 'comprehensive review' and 'thorough assessment' of the diabetes and glucose-related risks about which Plaintiffs complain,"[31] and that is why the FDA decided in September 2003 "to mandate a classwide warning" reflecting the "FDA's considered judgment on the [risks] . . . based on FDA's own careful assessment of the underlying science."[32] The FDA reached that judgment by "analyz[ing] all of the relevant evidence."[33] Thus, AstraZeneca argues, it is clear that the "warning . . . reflects the [FDA's] own considered effort to evaluate the scientific basis for risks created by an uncertain relationship between a drug and certain side effects, and to balance the risks and benefits of how best to present its conclusions on that subject."[34] "FDA itself has made an affirmative decision as to the warning physicians should receive . . . ."[35]

Wyeth's and AstraZeneca's preemption arguments and evidence aren't different, they're the same. The "regulatory record" here is not meaningfully distinguishable from that

---

[30]     Defs.' Br. at 18.
[31]     *Id.* at 17.
[32]     *Id.* at 5.
[33]     *Id.* at 19.
[34]     *Id.* at 18.
[35]     *Id.*

in Ms. Levine's case.  Try as it might, AstraZeneca cannot sufficiently distance itself from the factual record or *Levine*'s broad and plain rulings.

### III.
### ARGUMENT & AUTHORITIES

Top to bottom, AstraZeneca misinterprets *Levine*.  AstraZeneca's Brief spins a fanciful yarn of purported FDA "mandates" and feigned AstraZeneca helplessness that curiously parallels the *Levine* minority opinion and Wyeth's failed preemption arguments.

In essence, AstraZeneca seizes upon what it perceives as a loophole in *Levine*—that had the High Court found "clear evidence in the record that FDA would have rejected a stronger warning"—as the three-justice *Levine* minority found[36]—a jury verdict resulting from state-law tort claims over such a warning would impliedly conflict with federal law/regulation and would be preempted.  (Defs.' Br. at 4 (citing *Levine*, 2009 WL 529172, at *9); *see* Defs.' Br. at 14-22.)   Wrenching its version of the facts into that restrictive interpretation of *Levine*, AstraZeneca's main argument goes as follows:

- The FDA "mandated" a hyperglycemia/diabetes warning for Seroquel and other atypical antipsychotics in late 2003 for use beginning in 2004.  (*See*, *e.g.*, Defs.' Br. at 5-8.)

- AstraZeneca was powerless to have self-implemented (or even suggested to the FDA) a stronger warning for Seroquel because the "FDA certainly would

---

[36]    *Levine*, 2009 WL 529172, at *26 n.1.  In rejecting the *Levine* minority's position, the *Levine* majority stated:

> The dissent's suggestion that the FDA intended to prohibit Wyeth from strengthening its warning does not fairly reflect the record.  The dissent creatively paraphrases a few FDA orders . . . to suggest greater agency attention to the question, and it undertakes a study of Phenergan's labeling that is more elaborate than any FDA order.  But even the dissent's account does not support the conclusion that the FDA would have prohibited Wyeth from adding a stronger warning pursuant to the CBE regulation.

*Id.* at *9 n.6 (majority opinion).

have disapproved it" given that the FDA was satisfied with the so-called "class" warning.  (*See*, *e.g.*, Defs.' Br. at 18-19.)

- Until 2007, AstraZeneca had "no new evidence or new analysis of existing evidence" that would have supported FDA approval of a CBE label amendment.  (*See*, *e.g.*, Defs.' Br. at 19, 22-24.)

- It would be "impossible" for AstraZeneca to have complied with state law requiring a stronger Seroquel warning because the FDA would not have approved such a warning in light of the "class" label's issuance and the purported lack of evidence supporting a CBE amendment; therefore "impossibility" implied conflict preemption bars Plaintiffs' claims.[37]  (*See*, *e.g.*, Defs.' Br. at 5, 15-19, 22-24.)

- At a minimum, compliance with state law under the above-described circumstances would create an "obstacle" to or "frustrate Congress's purposes and objectives in delegating regulatory authority to the FDA; therefore, "frustration of purpose" implied conflict preemption bars Plaintiffs' claims. (*See*, *e.g.*, Defs.' Br. at 5, 19-22.)

Unfortunately for AstraZeneca, *Levine* and the underlying facts here belie those contentions.  Additionally, the fact that Plaintiffs have suggested that an adequate Seroquel warning should state that persons with high blood sugar or diabetes should not be prescribed Seroquel does not warrant summary judgment based on preemption, as Ms. Levine made a similar argument regarding Phenergan.  Moreover, there is no qualitative distinction between

---

[37]     Just like Wyeth, AstraZeneca attempts to shift the burden to Plaintiffs to show that implied conflict preemption does not apply here.  AstraZeneca's position is directly contrary to *Levine*, in which the Supreme Court declared:

> Wyeth contends that it could have changed Phenergan's label only in response to new information that the FDA had not considered.  And it maintains that Levine has not pointed to any such information concerning the risks of IV-push administration.  Thus, Wyeth insists, it was impossible for it to discharge its state-law obligation to provide a stronger warning about IV-push administration without violating federal law.  Wyeth's argument misapprehends both the federal drug regulatory scheme and ***its burden in establishing a pre-emption defense***.

*Id.* at *7 (majority opinion) (emphasis added).

a contraindication and a stronger warning, and the CBE regulation expressly authorizes manufacturers to add or strengthen contraindications.[38]

A.   **The Court May Deny Summary Judgment On Purely Legal Grounds Under _Levine_, Without Considering AstraZeneca's Contrived Factual Record.**

_Levine_ actually confirms Plaintiffs' earlier preemption arguments already briefed to this Court demonstrating that AstraZeneca is not entitled to judgment as a matter of law on the basis of federal preemption.[39]   Utterly undeterred, however, AstraZeneca brushes aside and ignores those arguments in this Brief, and remarkably still argues it is entitled to summary judgment based on federal preemption.  The following sections demonstrate why those principles of law from _Levine_ cannot be ignored.

1.   _AstraZeneca Ignores Levine's First Major Tenet: "Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness."_[40]

Fundamentally, AstraZeneca cannot overcome—so its Brief simply avoids—the Supreme Court's clear determination that Congress never intended the FDCA to preempt state-law failure-to-warn claims like Plaintiffs bring here.  The Court reasoned that to answer the question of "whether federal law pre-empts [a plaintiff's] claim that a [prescription drug

---

[38]   Of special import is the fact that AstraZeneca's Brief focuses exclusively on Seroquel's labeling from 2004-2007.  Yet, in this Court's earlier preemption ruling (Order of 11/6/2007, Doc. 644), the Court agreed that Plaintiffs' failure-to-warn claim was "not so limited."  (_Id._ at 5.)  Therefore, the Court's findings that the "plain language of the complaint does not limit Plaintiffs' claim to AstraZeneca's failure to include appropriate warnings in the drug labeling."  (_Id._)  "Instead, Plaintiffs allege a more general failure to communicate the risks of using Seroquel that also encompasses promotional materials used by AstraZeneca's sales representatives during meetings with members of the medical community, as well as 'Dear Doctor' letters disseminated by the company."  (_Id._)  For this additional reason, then, AstraZeneca is not entitled to summary judgment on all claims related to "warnings" given by the company from 2004 to 2007.

[39]   Plaintiffs incorporate herein by reference all their prior briefing to this Court on preemption issues, including but not limited to Docs. 1334 (Pls.' Omnibus Memorandum Responding in Opposition to AstraZeneca's Motions for Summary Judgment) and 365 (Pls.' Response in Opposition to AstraZeneca's Motion for Partial Judgment on the Pleadings on the Basis of Federal Preemption).

[40]   _Levine_, 2009 WL 529172, at *10.

label] did not contain an adequate warning" about its use, it "must be guided by two cornerstones of . . . pre-emption jurisprudence. *Levine*, 2009 529172, at *5. "First, 'the purpose of Congress is the ultimate touchstone in every pre-emption case.'" *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted)). And, "[s]econd, '[i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Lohr*, 518 U.S. at 485 ).

Thus, the High Court reaffirmed the presumption against preemption, which AstraZeneca in its Omnibus Memorandum, like Wyeth, argued did not apply.[41]  More importantly for this Court's purposes, the Supreme Court held that the presumption was not overcome by Wyeth's contentions that (1) it is impossible to comply with both federal and state laws regarding prescription drug warnings, and (2) state court-imposed warnings frustrate objectives of the FDA and FDCA as established by Congress—both arguments that AstraZeneca mimics in its Brief.  As shown below, the Supreme Court concluded those arguments failed as an initial matter because federal regulatory history of prescription drugs demonstrates congressional intent *not* to preempt common-law tort suits, and because the FDCA and other federal pronouncements do not establish both a "floor and a ceiling" for prescription drug regulation.

---

[41]     *Compare* Defs.' Omnibus Mem. (Doc. 1113) at 25 n.22, *with Levine*, 2009 WL 529172, at *5 n.3.

(a)     Federal Drug Regulation History Confirms "Congress' decision not to pre-empt common-law tort suits."[42]

In holding that it would neither be "impossible" nor "frustrate Congress's purposes and objectives in delegating regulatory authority to FDA" (Defs.' Br. at 5) for drug companies to comply with state and federal law obligations, the Supreme Court in *Levine* reviewed the history of federal regulation of drugs and drug labeling and found it lacking the requisite congressional intent for FDA labeling approvals to preempt state-law tort claims. *Levine*, 2009 WL 529172, at *6-7, *9-10, *13.

The High Court observed that Congress, after enacting the FDCA in the 1930s, had in 1962 amended the FDCA to shift the burden of proving that a drug was safe for use as labeled from the FDA to the manufacturer. *Id.* at *6. Critically, as it enlarged the FDA's powers to "protect the public health" and "assure the safety, effectiveness, and reliability of drugs," Congress "took care to preserve state law." *Id.* (internal quotation marks and citation omitted). "The 1962 amendments added a saving clause, indicating that a provision of state law would only be invalidated upon a 'direct and positive conflict' with the FDCA." *Levine*, 2009 WL 529172, at *6 (citation omitted). "Consistent with that provision, state common-law suits 'continued unabated despite . . . FDA regulation.'" *Levine*, 2009 WL 529172, at *6 (quoting *Riegel v. Medtronic, Inc.*, 552 U.S. ___, 129 S. Ct. 999 (2008) (Ginsberg, J., dissenting)). Later, when Congress enacted an express preemption provision for medical devices in 1976, it declined to enact such a provision for prescription drugs. *Id.* Finally, in enacting the 2007 FDCA amendments, Congress rejected a provision in the Senate bill that would have required FDA preapproval for all drug label changes. *Id.* at *7 (citation omitted).

---

[42]      *Levine*, 2009 WL 529172, at *12.

Instead, Congress adopted a rule of construction to make clear that drug manufacturers remain responsible for updating their labels.[43]  *Id.*

In light of the foregoing, the Supreme Court broadly and plainly concluded that "Congress[] deci[ded] not to pre-empt common-law tort suits" asserting failure-to-warn claims akin to those urged by Plaintiffs in this MDL.  *Id.* at *12.

        (b)      <u>*Levine* Clarifies That Congress Does Not Intend Federal Law To Serve As Both A "Floor" And A "Ceiling" For Drug Regulation.</u>

In order to accept AstraZeneca's pivotal argument in its Brief—that it was helpless to strengthen Seroquel's warnings once the FDA "mandated" the so-called class warning[44]—the Court must view the FDA and FDCA as establishing both a "floor" and "ceiling" for drug regulation.  To phrase the argument another way, "[o]nce the FDA ha[d] approved" the class label, "a state-law verdict may not deem the label inadequate," whether or not there is evidence that the FDA had considered and rejected the stronger warning at issue.[45]  *Levine*, 2009 WL 529172, at *10 (paraphrasing Wyeth's losing "floor and ceiling" contention regarding FDA regulation).

But, the Supreme Court found "no merit" in the argument that Congress had entrusted the FDA *exclusively* "to make drug labeling decisions that strike a balance between competing objectives."  *Id.* (deeming Wyeth's argument reliant on an "untenable interpretation of congressional intent and an overbroad view of an agency's power to pre-

---

[43]    *See* more thorough discussion of drug manufacturers' responsibility for the content of their products' labels *infra* at § III.A.2.

[44]    Contrary to AstraZeneca's assertion, the FDA merely *requested* that AstraZeneca incorporate the FDA's proposed "class" warning.  *See* more thorough discussion of the 2004 Seroquel label change, *infra* at § III.B.1.

[45]    AstraZeneca mistakenly argues that it was not permitted to change the classwide warning that the FDA allegedly wrote itself.  *See* more thorough discussion of the 2004 Seroquel label change, *infra* at III.A.

empt state law"). "The most glaring problem with this argument," the Supreme Court recognized, "is that all evidence of Congress' purpose is to the contrary." *Id.* The Court again revisited the history of the FDCA, noting that Congress failed to provide in the FDCA or any amendment thereto a federal remedy for consumers harmed by unsafe or ineffective drugs. *Id.* "Evidently, [Congress] determined that widely available state rights of action provided appropriate relief for injured consumers." *Id.*; *see id.* n.7. Indeed, when it enacted its express preemption provision for medical devices in 1976, it "could have applied the pre-emption clause to the entire FDCA. It did not do so . . . ." *Id.* at *10 (quoting *Riegel*, 552 U.S. at ___, 128 S. Ct. at 1009) (internal quotation marks omitted)).

The Supreme Court decided that Congress's "silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that ***Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness***." *Id.* (emphasis added). Quoting Justice O'Connor's explanation in her unanimous opinion in *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*: "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Id.* (quoting *Bonito Boats*, 489 U.S. 141, 166-67 (1989) (internal quotation marks omitted)). Lastly, the Court declared that the FDA's own "recently adopted position that state tort suits interfere with its statutory mandate is entitled to *no weight*." *Levine*, 2009 WL 529172, at *13 (emphasis added); *see also id.* at *12 ("Not once prior to Levine's injury did the FDA suggest that state tort law stood as an obstacle to its statutory mission. To the contrary, it cast federal labeling

14

standards as a floor upon which States could build and repeatedly disclaimed any attempt to pre-empt failure-to-warn claims.").

Here, AstraZeneca's arguments that it was "impossible" or would have "frustrate[d] Congress's purpose" for it to have proposed a stronger warning for Seroquel once the class warning issued fatally conflict with *Levine* in numerous ways. Those conflicts include the Court's clear mandate that manufacturers, not the FDA, bear ultimate responsibility for labeling content and that the CBE regulation empowers drug companies to augment drug safety warnings without prior FDA approval, both discussed in detail below. But with particular respect to the above discussion, it is also critical that the Court recognize that *Levine* rejected the *concept and fact of* a regulatory "ceiling" applicable to prescription drugs under the FDCA based on the utter absence of congressional intent in that regard. Because AstraZeneca's post-*Levine* preemption arguments necessarily depend upon the presence of such a "ceiling," its preemption arguments fail.

       **2.**      ***AstraZeneca Ignores Levine's Second Major Tenet: Manufacturers, Not FDA, "bear[] primary responsibility for drug labeling."***[46]

Another errant notion courses through AstraZeneca's Brief—that by virtue of the "classwide warning," FDA assumed responsibility for the content of Seroquel's labeling. (*See*, *e.g.*, Defs.' Br. at 19 ("FDA *itself independently* and exhaustively analyzed all of the relevant evidence and reached a *final judgment as to the precise warning* physicians should receive, which it mandated AstraZeneca to give exactly as directed by FDA.") (emphasis added)).[47]

---

[46]     *Levine*, 2009 WL 529172, at *9.

[47]     *See also* Defs.' Br. at 6.

The factual untruths of AstraZeneca's contentions used to support that concept are described below in section III.B.1.  Alleged summary judgment facts aside, however, this Court's preemption decision must be faithful to the Supreme Court's endorsement of the "central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label *at all times*."  *Levine*, 2009 WL 529172, at *8 (emphasis added).  Indeed, the manufacturer "is charged with crafting an adequate label and with ensuring that its warnings remain adequate *as long as the drug is on the market*."  *Id.* at *8 (emphasis added). Both because the CBE and related regulations not only permit, but *require*, a drug maker to "unilaterally strengthen" drug warnings, *id.* at *8-9, and because until very recently, the FDA lacked authority to order manufacturers to revise their labels, *id.* at *7, *9, this Court should reject for those additional reasons AstraZeneca's unsubtle (and legally wrong) attempt to saddle the FDA with ensuring the adequacy of Seroquel's warnings.

---

FDA's review and analysis of the underlying science has been part of its broader analysis of all other medications in the "class" of atypical antipsychotic medications, and in 2003 culminated in FDA's determination to create and to mandate a particular classwide warning concerning the risks of diabetes and hyperglycemia—which FDA crafted itself based on its own determinations about the underlying science and found to be in the public interest, and which remains in effect to this day.

*Cf.* Defs.' Br. at 7 ("As FDA explained when promulgating the classwide warning that FDA wrote itself, the Agency's labeling change reflected and embodied its expert conclusions about what the scientific data would support.").

       (a)     <u>The CBE And Related Regulations Undercut Drug Manufacturers'</u>
<u>Claims Of Impossibility Preemption.</u>

Even defense commentators recognize that a "linchpin of the preemption analysis in [*Levine*] was the Court's discussion of the 'changes being effected' regulation . . . ."[48] Because the CBE and related regulations made it possible for Wyeth to have complied with a state-law requirement to provide stronger warnings on Phenergan while continuing to market Phenergan in compliance with federal law, Wyeth's argument that "impossibility preemption" barred respondent's state-law tort claims failed. *Levine*, 2009 WL 529172, at *9.

Specifically, as Justice Thomas thoroughly explained in his concurring opinion, and as the majority also recognized, *id.* at *8-9, the CBE regulation allows drug manufacturers to change their labels without FDA preapproval if the changes "add or strengthen a contraindication, warning, precaution, or adverse reaction," 21 C.F.R. § 314.70(c)(6)(iii)(A), or "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," 21 C.F.R. § 314.70(c)(6)(iii)(C). *See Levine*, 2009 WL 529172, at *19 (Thomas, J., concurring in the judgment) (quoting the cited regulations). Further, related "FDA regulations require a drug manufacturer—after initial federal approval of a drug's label—to revise the federally approved label 'to include a warning as soon as there is reasonable evidence of an association of a serious hazard with a drug.'" *Id.* (quoting 21 C.F.R. § 201.80(e)); *accord id.* at *8 (majority opinion) (quoting section 201.80(e) as well as citing section 314.80(b) (placing responsibility for postmarketing surveillance on the

---

[48]     James M. Beck & Mark Herrman, *The State-Of-The-Art Defense In Drug/Device Cases After Levine*, Drug and Device Law, March 20, 2009, http://druganddevicelaw.blogspot.com/2009/03/state-of-art-defense-in-drugdevice.html.

manufacturer) and 73 Fed. Reg. 49605 ("Manufacturers continue to have a responsibility under Federal Law . . . to maintain their labeling and update the labeling with new safety information.")).   Therefore, the Court held that the "CBE regulation permitted Wyeth to unilaterally strengthen its warning," and that Wyeth "failed to demonstrate that it was impossible for it to comply with both federal and state requirements."   *Levine*, 2009 WL 529172, at *9.

This Court should reach the same conclusion here.   AstraZeneca cannot avoid *Levine*'s unequivocal ruling that drug manufacturers "at all times" are responsible for the content of their labeling.  *Id.* at *8.  As Justice Thomas rightly concluded in his concurrence:

> The text of the statutory provisions and the accompanying regulatory scheme governing the FDA drug approval process, therefore, establish that FDA's initial approval of a drug is not a guarantee that the drug's label will never need to be changed. *And nothing in the text of the statutory or regulatory scheme necessarily insulates [manufacturers] from liability under state law simply because the FDA has approved **a particular label**.*

*Id.* at *20 (Thomas, J., concurring in the judgment) (emphasis added).  Furthermore, nothing in AstraZeneca's weak effort to distinguish the regulatory and factual record from that in *Levine*, as described later, justifies a different legal conclusion regarding AstraZeneca's ability (and duty) to strengthen Seroquel's warnings.

Lastly, it is axiomatic that not only is it *possible* for drug makers to strengthen warnings on drugs through CBE label changes, which Congress in fact authorized and repeatedly reaffirmed, *id.* at *9 (majority opinion), the manufacturers' use of that very regulation cannot legitimately "frustrate" any purpose of Congress.  *See id.* at *12 (noting that "[f]ailure-to-warn actions, in particular, lend force to the *FDCA's premise* that

manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times")
(emphasis added); *accord id.* at *24 (Thomas, J., concurring in the judgment) (observing that
"the text of the relevant statutory and regulatory provisions" compels the conclusion "that
Congress believed state lawsuits pose no obstacle to federal drug-approval objectives"); *cf.*
*Dodd v. United States*, 545 U.S. 353, 359 (2005) (reaffirming that when statutory language is
plain, it must be enforced according to its terms).

Because the CBE label change scheme neither makes it impossible for AstraZeneca to
have strengthened Seroquel's warning at any time, nor obstructs or frustrates any
congressional purpose, any argument or inference that the FDA mandated a particular label
for Seroquel—and would have rejected a stronger warning—must fail.

> (b)  In Contrast To AstraZeneca's Unilateral CBE Powers, The FDA Had
> No Legal Authority To Mandate The So-Called "Classwide" Label.

Likewise, as a purely legal matter, the Court may disregard AstraZeneca's oft-
repeated but entirely disingenuous assertions that the FDA "mandated" Seroquel's label
change in 2004.  (*See* Defs.' Br. at 1 (x2), 3, 5 (x4), 6 (x2), 7, 8, 15, 17, 18, 19 (x3), 20, 22,
24, 25, 27.)  As the Supreme Court repeatedly recognized in *Levine*, "prior to 2007, the FDA
lacked the authority to order manufacturers to revise their labels."  2009 WL 529172, at *9;
*see id.* at *7 ("In 2007, after *Levine's* injury and lawsuit, Congress again amended the
FDCA.  121 Stat. 823.  For the first time, it granted the FDA statutory authority to require a
manufacturer to change its drug label based on safety information that becomes available
after a drug's initial approval."); 21 U.S.C. § 355(o)(4)(E) ("[T]he Secretary may issue an
order directing the responsible person or the holder of the approved application . . . to make
such a labeling change as the Secretary deems appropriate to address the new safety

information.") (eff. 9/2007); 21 U.S.C. § 355(o)(4)(H) ("[I]f the Secretary concludes that such a labeling change is necessary to protect the public health, the Secretary may accelerate the timelines [herein].") (eff.9/2007).

Legal commentators (who were also among respondent's *amici* in *Levine*) aptly described as follows the "FDA's inability to force labeling changes" prior to 2007 in the context of Vioxx's emerging safety hazards early this decade:

> Vioxx is only the most recent, and perhaps most widely publicized, example of this problem. Dr. Sandra Kweder, Deputy Director of the FDA's Office of New Drugs, said in testimony in a Senate Hearing that safety concerns over Vioxx prompted the FDA to convene an advisory committee meeting in 2001 to examine whether the drug raised the risk of heart attacks and strokes. But despite the panel's recommendation that Vioxx's label be changed to reflect this risk, it took more than a year of negotiations between the FDA and Merck before the company changed Vioxx's label. "[T]hey rejected many of our proposals," Dr. Kweder told the Senate. "[W]e don't have the authority to tell a company, this is how your label has to look." Instead, she said, "[w]e have to negotiate with the company the specific language of how things should be worded, the placement, those kinds of things, after talking to them." * * * The Vioxx negotiations show that the FDA does not always get its way. The FDA had pushed Merck for a strong warning on Vioxx, but settled for a much weaker warning that simply said that patients with a history of heart disease should use Vioxx with caution.

David A. Kessler, M.D. & David C. Vladeck, *A Critical Examination Of The FDA's Efforts To Preempt Failure-To-Warn Claims*, 96 Geo. L.J. 462, 480 n.82 (2008). The Vioxx example reveals the reality of case after case:[49] companies *fight* stronger warnings that might

---

[49] *See*, *e.g.*, Kessler & Vladeck, 96 Geo. L.J. at 480 (and authorities cited therein); *McDarby v. Merck*, 949 A.2d 223, 238-48 (N.J. App. Div. 2008) (recounting dispute between Merck and FDA over Vioxx's label); *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 776, 779, 783 (E.D. La. 2007) (same); Margaret A. Berger & Aaron D. Twerski, *From the Wrong End of a Telescope: A Response to Professor David Bernstein*, 104 Mich.

discourage doctors from prescribing drugs they manufacture and thereby decrease profitability.[50]  Before 2007, the FDA was powerless to fight back.  Therefore, the idea that the FDA could have legally forced AstraZeneca to adopt a particular label in 2003-04 is pure fiction.

*   *   *

To summarize, even before considering any evidence—which if considered will additionally nullify AstraZeneca's arguments—the Court may deny AstraZeneca's "impossibility" and "frustration of purpose" preemption arguments as a matter of law on the above-described bases alone.  With respect to congressional intent or purpose to preempt state-law tort claims, *Levine* concluded that

> [i]f Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history.  But despite its 1976 enactment of an express pre-emption provision for medical devices, . . . Congress has not enacted such a provision for prescription drugs.

*Levine*, 2009 WL 529172, at *10.  Therefore, the Supreme Court resolutely held that "Congress deci[ded] not to pre-empt common-law tort suits."  *Id.* at *12.  AstraZeneca does not argue that congressional intent is not a fundamental prerequisite to a finding of implied conflict preemption.  (*See*, *e.g.*, Defs.' Br. at 19-20.)  Moreover, that AstraZeneca could have unilaterally effectuated a label change through the CBE regulation at any time, and the

---

L. Rev. 1983, 1987-88 (2006) (giving account of Sandoz Pharmaceuticals' effort to avoid labeling changes for its lactation-suppressing drug Parlodel, which like Merck with Vioxx, it ultimately withdrew from the market).

[50]      Br. of *Amici Curiae* Former FDA Commissioners Dr. Donald Kennedy & Dr. David A. Kessler In Support of Respondent Diana Levine, *Wyeth v. Levine*, No. 06-1249, in the Supreme Court of the United States, at 14-15.

FDA's lack of authority to mandate a label change, further compel the denial of summary judgment here.

**B.** **AstraZeneca's Artful Factual Rendition And Narrow Reading Of The Opinion Fail To Overcome *Levine*'s Profound Legal Limitations On Federal Preemption In The Prescription Drug Context.**

As mentioned, AstraZeneca argues that a loophole in *Levine* exists that would arguably permit it to adduce sufficient record evidence to overcome *Levine*'s substantial abrogation of implied conflict preemption as a matter of law in prescription drug cases.  For all the reasons discussed above, the Court would be ill-advised to find implied conflict preemption here after *Levine*.   But, if the Court is inclined to disregard Plaintiffs' legal arguments, AstraZeneca's summary judgment evidence is nevertheless so flawed and inconclusive that it cannot properly support summary judgment.   Moreover, Plaintiffs' contrary evidence at least raises a fact question that overcomes summary judgment.

Before evaluating the specific "facts" and "evidence" relative to AstraZeneca's cramped reading of *Levine*, it is critically important to consider the evidentiary standard that AstraZeneca purports to meet.  The Supreme Court in *Levine* held that "absent *clear evidence* that the FDA would not have approved a change to Phenergan's label, we will not conclude that it was impossible for Wyeth to comply with both federal and state requirements." *Levine*, 2009 WL 529172, at *9.  Wyeth, the Court determined, "offered no such evidence." *Id.*  Specifically, Wyeth did "***not argue that it attempted to give the kind of warning required by the Vermont jury but was prohibited from doing so by the FDA***." *Id.* (emphasis added).  The Court further rejected Wyeth's assertion that the FDA regulation set a ceiling on Phenergan's labeling because "***the FDA did not consider and reject a stronger warning***" for

Phenergan, concluding that "Wyeth has not persuaded us that failure-to-warn claims like Levine's obstruct the federal regulation of drug labeling." *Id.* at *13 & n.14 (emphasis added). Thus, assuming *arguendo* that AstraZeneca is correct in that the Supreme Court "did not reject preemption" in prescription drug cases, then absent *clear evidence* that the FDA considered and rejected a stronger warning proffered by the manufacturer, such as the FDA turning down or denying a CBE amendment strengthening the warning, *Levine* signifies that implied conflict preemption cannot be found.[51]

As the analysis below reveals, AstraZeneca's summary judgment "facts" simply do not reach the evidentiary threshold set in *Levine*. AstraZeneca's characterizations of FDA "mandates" to implement a warning the "FDA itself wrote" unfairly misrepresent the record. Indeed, the evidence shows that AstraZeneca and other atypical antipsychotic manufacturers had the opportunity to meet and confer with the FDA, comment on the label change, and even modify the so-called "class" label. And while the FDA may have incentivized

---

[51]      Even defense commentators agree, including counsel from AstraZeneca's leading law firm. "If the FDA *actually rejected a CBE label change*," for example, "there *might be* preemption." Further,James M. Beck & Mark Herrmann, *Wyeth v. Levine – First Real Thoughts*,  Drug and Device Law, March 4, 2009, http://druganddevicelaw.blogspot.com/2009/03/_wyeth-v-levine-first-real-thoughts.html  (emphasis added). Further,

> [N]obody on this side of the 'v.' should kid him/herself.  After <u>Levine</u> [defendants will] need strong ("clear") evidence for preemption to work. Not a lot of cases are going to have it. * * * So where does preemption still have a chance? Well, formal, drug-specific rulemaking [by the FDA] would be nice, but that's not going to happen very often, if ever.  * * *  So effectively we're left with the majority's other distinctions.  ***Has the FDA considered and rejected a stronger warning about the risk in question?  Turned down or required significant modification of a CBE because the basis for the change wasn't there?  Said yes where the plaintiff says no?***  Any/all of those would be very good facts.  * * *  ***Affirmative, contrary FDA action is the best scenario left for preemption in litigation involving prescription drugs.***

*Id.*,    March    5,    2009,    http://druganddevicelaw.blogspot.com/2009/03/wyeth-v-levine-and-end-of-deregulation.html (emphasis added).

AstraZeneca to accept the FDA's proposed "class" label change, it did not do so through any legal authority, but through other means AstraZeneca *best* understood: the promise of greatly increased Seroquel sales.

      **1.**      ***False: "FDA wrote itself" and "mandated" the "classwide warning."***[52]

In a September 11, 2003 letter to AstraZeneca, the FDA merely *requested* that AstraZeneca adopt proposed changes to Seroquel's labeling.[53]  Although AstraZeneca makes it seem as though it played no role whatsoever in determining what language would be included in its "classwide" label change, the regulatory record establishes that AstraZeneca negotiated this language with the FDA.  During an ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[52]    Defs.' Br. at 7, 18.

[53]    Sept. 11, 2003 Ltr. from Russell Katz, M.D., FDA Director of the Division of Neuropharmacological Drug Products to Gerald  L. Limp, Director of Regulatory Affairs for AstraZeneca ("Sept. 11, 2003 FDA Ltr.") at 1 ("We ***request*** that the following changes in labeling be made so as to furnish adequate information for the safe and effective use of the drug . . . .") (emphasis added) (Exhibit 2).

[54]    ████████████████████.



████████████████████████████████████████████████████████

████████,[55]

AstraZeneca even assembled a team that ████████████████████████████████

██████████████████████████████████████████████████████

███████████████████[56] During ██████████████████████ telephone conference

with ████████████, he arranged a meeting with ██████████████████████████

██████████████████████████████████████████████████████

██████████████████████████[57] On ████████████████████████████████

████████████████████████████████████████████████[58]

Moreover, rather than mandating that all manufacturers of atypical antipsychotics

adopt its proposed classwide label change, the FDA ██████████████████████████

██████████████████████████████████████████████████████

███████████████████████████. In describing his ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[55] *Id.* (emphases added); ████████████████████████████████████████████████

████████████████████████████████████████████████████████

[56] ██████████████████████████████████████████████████████

████████████████████████

[57] ████████████████████████████████

[58] ██████████████████████████████████████████████████████

███████████████



As such, the evidence belies AstraZeneca's assertion that the FDA itself "wrote the classwide warning that Plaintiffs now attack" and "mandated under federal law that its carefully calibrated classwide warning must be provided by AstraZeneca in Seroquel's labeling exactly as directed by FDA beginning in January 2004."   (Defs.' Br. at 18.) Moreover, under *Levine*, absent an FDA regulation "bearing the force of law" to the contrary, a state jury is free to deem an FDA-approved label inadequate under state tort law, *Levine*, 2007 WL 529172, at *13, and it is irrelevant whether the FDA wrote the label or not because a pharmaceutical manufacturer "is charged both with crafting an adequate label and with ensuring that its warnings remain adequate for as long as the drug is on the market."   *Id.* at

*8.  Even the FDA acknowledged that its proposed class warning would need to be changed when new information emerged about antipsychotic use and diabetes milletus.[61]

> **2.      False: "Plaintiffs have no competent admissible evidence that, between 2004 and 2007, AstraZeneca was in possession of . . . information . . . or . . . data that reasonably could have supported a CBE Supplement."[62]**

There is no merit to AstraZeneca's contention that it did not have sufficient information to support a diabetes or hyperglycemia label change between 2004 and June 2007, when it claims to have finished analyzing data from Studies 126 and 127.  (Defs.' Br. at 10, 23-24.)  Like Wyeth, AstraZeneca "misapprehends both the federal drug regulatory scheme and *its burden in establishing a pre-emption defense*" by attempting to shift the burden of proof to Plaintiffs.  *Levine*, 2009 WL 529172, at *7 (emphasis added).[63]  At any rate, the evidence shows that AstraZeneca could have analyzed data that accumulated from 1997 through 2006 and added a stronger warning about diabetes and hyperglycemia prior to June 2007.

As an initial matter, at the June 2007 Safety Evaluation Review Meeting ("SERM"), which prompted AstraZeneca to change Seroquel's labeling that same month (Defs.' Br. at 10-11), AstraZeneca considered not just Studies 126 and 127, but "all clinical trial data," including Study 125 (a glucose metabolism completed in October 2005), "epidemiology literature, and post-marketing data."[64]  This circumstance alone undermines AstraZeneca's

---

[61]     Sept. 11, 2003 FDA Ltr. at 2 (Ex. 2) ("[W]e acknowledge that additional labeling changes may be required as new information becomes available.").

[62]     Defs.' Br. at 23.

[63]     *See* note 37, *supra*.

[64]     Minutes of June 8, 2007 SERM Meeting at 1 (Exhibit 8).

assertion that it did not possess sufficient information to support a CBE amendment to the 2004 classwide warning until it finished analyzing the results of Studies 126 and 127.

AstraZeneca's attempt to restrict the inquiry to post January 1, 2004 information that would have supported a CBE amendment to the 2004 classwide warning is fundamentally at odds with *Levine* and the CBE and related regulations.  (*See* Defs.' Br. at 23 ("Plaintiffs have no competent admissible evidence that, between 2004 and 2007, AstraZeneca was in possession of 'newly acquired information' – either "new data" or "new analyses of previously submitted data' – that was not provided to FDA and that reasonably could have supported a CBE Supplement . . . .").)  In *Levine*, the record was "limited concerning what newly acquired information Wyeth had or should have had about the risks of IV-push administration of Phenergan,"[65] but "Levine did . . . present evidence of at least 20 incidents prior to her injury in which a Phenergan injection resulted in gangrene and amputation."  *Id.* at *8.  After Wyeth notified the FDA in 1967 about the first such incident that came to its attention, amputations continued to occur.  *Id.*  The *Levine* Court concluded that, "[i]n later years . . . Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug" under the CBE regulation.  *Id.*

---

[65]    As the *Levine* Court noted, "a 2008 amendment [to the CBE regulation] provides that a manufacturer may only change its label 'to reflect newly acquired information.'"  *Levine*, 2009 WL 529172, at *7 (citing 73 Fed. Reg. 49609).  "Newly acquired information means data, analyses, or other information not previously submitted to the agency, which may include (but are not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (e.g., meta-analyses) if the studies, events or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA."  21 C.F.R. § 314.3(b).  "The [2008 amendment] accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments . . . ."  *Levine*, 2009 WL 529172, at *7.  As AstraZeneca has only moved for summary judgment based on preemption for the period from 2004 through 2007, the 2008 amendment to the CBE regulation is inapplicable here.  Nevertheless, for the reasons explained below, AstraZeneca could have revised Seroquel's label "even in accordance with the amended regulation," as was the case with Wyeth in *Levine*.  *Id.*

Thus, under *Levine*, as soon as AstraZeneca began receiving adverse event reports and other information related Seroquel's association with weight gain, hyperglycemia, or diabetes, it had notice that there was a problem with Seroquel.  When AstraZeneca continued to receive such adverse event reports and other information, it had the ability and duty to analyze the accumulating data and add a stronger warning about Seroquel's association with hyperglycemia and diabetes.  *See id.* at *9 ("Thus, when the risk of gangrene from IV-push became apparent, Wyeth had a duty to provide a warning that adequately described the risk, and the CBE regulation permitted it to provide such a warning before receiving the FDA's approval.").

If AstraZeneca had added a stronger warning about Seroquel's association with hyperglycemia and diabetes prior to 2004, any number of other things could have happened.  For example, the FDA might not have requested AstraZeneca to incorporate the classwide warning in 2004, or the FDA might have requested all manufacturers of atypical antipsychotics to incorporate a stronger classwide warning in 2004.  In other words, the period from 2004 through 2007 cannot be viewed in a vacuum, as AstraZeneca maintains.

Moreover, *Levine* certainly does not stand for the proposition that the 2004 classwide warning absolved AstraZeneca of all it knew about Seroquel's association with hyperglycemia and diabetes before January 1, 2004.  Such an interpretation would impermissibly reward AstraZeneca for burying its head in the sand, ceding control of and responsibility for Seroquel's labeling to the FDA, and rendering *Levine*'s interpretation of the CBE regulation and the FDCA meaningless.  *See Levine*, 2009 WL 529172, at *8 ("[T]hrough many amendments to the FDCA and FDA regulations, it has remained a central

premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times.").

        (a)      <u>Between 1997 And 2003, AstraZeneca Could Have Strengthened Seroquel's Warning Under The CBE Regulation.</u>

Prior to 2004, AstraZeneca had more than sufficient information to support a stronger warning about Seroquel's association with hyperglycemia and diabetes under the CBE regulation; AstraZeneca certainly had knowledge of more than 20 adverse incidents, which was enough to support a stronger warning for Phenergan and defeat implied conflict preemption in *Levine*.[66] Beginning in 1997, AstraZeneca was aware of Seroquel's critical association with weight gain, which is a leading factor contributing to the onset of diabetes.[67] In 1997, Lisa Arvanitis, Seroquel Product Physician, analyzed the severity of Seroquel's association with weight gain[68] based on AstraZeneca's Study 15 in an internal Company email, noting the rapid, consistent, clinically significant, and dose-dependent nature of the weight gain.[69]

In or about June 2000, AstraZeneca convened a SERM meeting concerning "SEROQUEL" and "DIABETES MELLITUS, DIABETIC KETOACIDOSIS, NON-KETOTIC HYPEROSMOLAR COMA, AND HYPERGLYCEMIA" as a result of the FDA's investigation of a possible causal link between the atypical antipsychotics and

---

[66]     At most, of course, Plaintiffs need only present enough evidence to raise a genuine issue of material fact regarding whether AstraZeneca could have strengthened Seroquel's warning about hyperglycemia and diabetes under the CBE regulation.

[67]     William C. Wirshing, M.D., Decl. ("Wirshing Decl.") ¶7 (Exhibit 9).

[68]     *See* Donna K. Arnett, Ph.D Expert Report at 4-8 (analyzing studies conducted and submitted to the FDA with Seroquel's NDA, and concluding that "[s]ignficant weight gain was observed in the Phase II and Phase III trials and subsequently demonstrated throughout the developmental program of Seroquel for other treatment indications") (Exhibit 10).

[69]     Aug. 13, 1997 Email Correspondence from Lisa Arvanitis to Seroquel employees at 1-2 (Exhibit 11).

diabetes.[70]  Wayne Geller, M.D., AstraZeneca Medical Director, prepared a Discussion Document for the meeting, in which he stated:

> Safety data derived from clinical trials and spontaneous reports, despite often containing limited information, suggest the possibility of an association between SEROQUEL use and impaired glucose regulation including occasional reports of new onset diabetes mellitus.  While none of those reports are absolutely steadfast, *the number of reports is fairly sizeable. [C]onsideration should be given to the suggestion that SEROQUEL therapy may cause impaired glucose regulation including diabetes mellitus in certain individuals.*[71]

The Discussion Document also provided synopses of diabetes and hyperglycemia-related adverse event reports that had been received by AstraZeneca to date (29 reports), which the document characterized as "fairly sizeable."[72]   Significantly, a SERM meeting is the identical procedure that AstraZeneca underwent in 2007 before changing Seroquel's labeling and submitting a CBE amendment in 2007.  (Defs.' Br. at 10.)

Following the June 2000 SERM meeting, Dr. Geller was charged with writing a "Safety Position Paper,"[73] indicating that SERM determined the Core Data Sheet did not

---

[70]     Minutes of June 22, 2000 SERM Meeting (Exhibit 12).

[71]     *Id.* at 2 (emphasis added).

[72]     *Id.* at 6-16.  Either in advance of the June 2000 SERM meeting, or during the meeting, Dr. Martin Brecher, AstraZeneca's then Medical Science Director, annotated by handwritten notes his copy of the Discussion Document Dr. Geller prepared.  Discussion Doc. for June 2000 SERM Meeting (Exhibit 13).  Dr. Brecher testified that the handwritten notes appearing on Exhibit 20 were written by him either before or during the June 2000 SERM meeting.  Deposition of Martin Brecher ("Brecher Dep.") at 333:8-12 (Ex. 14).  Dr. Brecher "starred" certain of the adverse event reports.  Dr. Brecher testified that he could not remember why he starred certain adverse event reports, but he agreed they were presumably important to him.  *Id.* at 343:9-346:12.  Significantly, on the last page of the report, Dr. Brecher wrote: "*Seroquel may cause impaired glucose regulation in some individuals.*"  Discussion Doc. for June 2000 SERM Meeting at 17 (emphasis added) (Ex. 13).

[73]     Dr. Geller testified that he wrote the Safety Position Paper in the Fall of 2000.  Deposition of Wayne Geller, M.D. ("Geller Dep.") at 459:23-24; 460:1-5 (Exhibit 15).

require a change, which, as noted, would have also required a Seroquel label change.[74]   That position paper again individually summarized the diabetes/hyperglycemia-related adverse event reports that had been received.[75]   It again stated that the number of diabetes/hyperglycemia adverse event reports was "fairly sizeable."   Significantly, Dr. Geller—by then AstraZeneca's Global Drug Safety Physician—concluded:

> While there were no reports of positive dechallenges and rechallenges,[76] **there is reasonable evidence to suggest that Seroquel therapy can cause impaired glucose regulation including diabetes mellitus** in certain individuals. Consideration should be given to adding diabetes mellitus to the core data sheet [requiring a labeling change] based upon postmarketing and clinical trial safety data.[77]

Meanwhile, in response to an FDA request for further safety information to assess the possibility of a causal association between Seroquel treatment and disturbances in glucose regulation, AstraZeneca reported a conclusion directly contradictory to its own assessment: "Overall, following extensive reviews of all the preclinical, clinical, and postmarketing data, AstraZeneca believes that the diabetogenic potential for Seroquel is unlikely."[78] AstraZeneca told the FDA that it estimates 623,000 patients have been exposed to Seroquel since its launch.  According to AstraZeneca, during that time, 12 cases of new onset diabetes, 3 cases of diabetic ketoacidosis, 2 cases of hyperglycemia and no cases of hyperosmolar

---

[74]   Geller Safety Position Paper at 1 (Exhibit 16).

[75]   *Id.* at 5-11.

[76]   FDA describes positive dechallenge reactions as an adverse event that disappears on withdrawal of the medication, and a negative dechallenge as an adverse event that continues after withdrawal of the medication. A positive rechallenge signifies that the adverse event re-occurred on re-administration of the drug, and a negative rechallenge means the symptom did not re-occur after re-administration.

[77]   Geller Safety Position Paper at 11 (emphasis added) (Ex. 16).

[78]   Oct. 31, 2000 Email Correspondence from Emma Witch to Edward Haas at 12 (Exhibit 17).

coma had been reported.[79]  Yet, in his June 2000 Safety Position Paper, Dr. Geller listed 28 reports of diabetes mellitus, hyperglycemia, diabetic ketoacidosis, and non-ketonic hyperosmolar coma reported with Seroquel.[80]  In an email dated November 20, 2001, Dr. Geller disagreed that only 12 cases of diabetes mellitus have been reported with Seroquel use by 623,000 patients.[81]  He wrote that he presented this issue at the June 2000 SERM and at that time there were 27 reports of diabetes and 2 reports of hyperglycemia.[82]  Ultimately, the smaller numbers were submitted to the FDA.[83]  Dr. Geller attempted to explain this discrepancy by testifying that AstraZeneca gave the FDA exactly what the FDA requested— i.e., post-marketing reports for new-onset diabetes, hyperosmolar coma, diabetic ketoacidosis, weight gain and hyperglycemia—which, while technically true, also allowed AstraZeneca to avoid reporting to the FDA the other incidents contained in its database.[84]

In November 2002, the Japanese government informed AstraZeneca that there were 12 "serious cases (including 1 death) of hyperglycaemia, diabetic ketoacidosis, and diabetic coma" in the short 21-month period Seroquel had been available in that country and that "causality with [Seroquel] could not be ruled out."[85]  As such, prior to 2004, AstraZeneca was aware of far more information about Seroquel's association with hyperglycemia and diabetes than Wyeth was aware of regarding Phenergan's association with gangrene and amputation.  Under the CBE regulation, therefore, AstraZeneca had the ability and duty to

---

[79]    *Id.* at 4.

[80]    Geller Safety Position Paper at 5 (Ex. 16).

[81]    Dec. 5, 2001 Email Correspondence from Wayne Geller to Melissa Patridge at 7 (Exhibit 18).

[82]    *Id.* at 7.

[83]    *Id.* at 6.

[84]    Geller Dep. at 528:10-24; 529:1-24; 530:1-10 (Ex. 15).

[85]    Japanese Dear Doctor Letter.  *See* Exhibit 30 to Plaintiffs' Omnibus Summary Judgment Response.

strengthen Seroquel's warning to reflect that knowledge.

    (b)   <u>Between 2004 and 2007, AstraZeneca could have strengthened the classwide warning.</u>

According to ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████[86]  Under *Levine*, this evidence alone raises a genuine issue

of material fact regarding whether AstraZeneca had the ability and duty to strengthen the

2004 classwide warning with Seroquel-specific information during that period under the

CBE regulation. ███████████████████████████████████

████████████████████████████████████████████████████████

███████

      ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[86] ████████████████████████████████████████████.

[87] ████████████████████████████████████████████████████████
████████████████████████████████

[88] ████████████████████████████████



[REDACTED],[89]

However, during her deposition, [REDACTED]

[REDACTED]:

Q.    [REDACTED]?

A.    [REDACTED].[90]

---

[89] [REDACTED]

[90] [REDACTED]

3.   **False: "This record . . . presents the polar opposite of what the Supreme Court found in Levine."**[91]

AstraZeneca's attempt to distinguish the factual record in this case from that in *Levine* is unavailing, primarily because AstraZeneca grossly mischaracterizes the record in *Levine*. In fact, the differences between the two cases show that Wyeth had a *stronger* implied preemption argument than does AstraZeneca.

First, the *Levine* Court did not find that the warnings the FDA suggested for Phenergan in 1987, and which Wyeth incorporated in revised labeling it submitted to the FDA in 1988, "did not materially strengthen the warning." (Defs.' Br. at 16.) Rather, the *Levine* Court simply described the suggested warnings as "different." 2009 WL 529172, at *3. However, the *Levine* minority emphasized that the FDA's suggested warnings in 1987 were stronger than the existing warnings. *Id.* at *30 (Alito, J., Roberts, C.J., & Scalia, J., dissenting) ("In its 1987 labeling order, the FDA cited voluminous materials to 'suppor[t]' its new and stronger warnings related to IV push and the preferability of IV drip.") (alteration in original). Second, Wyeth did not "concede[] that the drug . . . caused Ms. Levine's injury." (Defs.' Br. at 16.) Instead, "the jury rejected Wyeth's argument that the clinician's conduct was an intervening cause that absolved it of liability," and Wyeth simply did not challenge on appeal the jury's finding that the inadequate Phenergan label was both a but-for and proximate cause of Ms. Levine's injury. *Levine*, 2009 WL 529172, at *5. Third, although the *Levine* Court stated that the FDA had paid "no more than passing attention to the question whether to *warn against* IV-push administration of Phenergan," *id.* at *4 (emphasis added),

---

[91]    Defs.' Br. at 18.

the Court did not conclude that the "FDA had paid 'no more than passing attention' to the *strength of the warning* about IV-push administration" (Defs.' Br. at 16 (emphasis added).).

Moreover, the *Levine* minority demonstrated that the FDA had given much consideration to IV-push as a means of administering Phenergan.  2009 WL 529172, at *30-32 (Alito, J., Roberts, C.J., & Scalia, J., dissenting); *id.* at *30 ("For at least the last 34 years, the FDA has focused on whether IV-push administration is 'safe' and 'effective' when performed in accordance with Phenergan's label.").  In 1975, Wyeth and the FDA met to discuss the dangers associated with IV-push administration, and they agreed "that there was a need for better instruction regarding the problems of intraarteial injection."  *Id.* at *30.  The following year, the FDA convened an advisory committee to study a number of subjects, including the risks associated with IV-push administration.  *Id.*  ("At the conclusion of its study, the committee recommended an additional IV-push specific warning for Phenergan's label . . . .  In response to the committee's recommendations, the FDA instructed Wyeth to make several changes to strengthen Phenergan's label, including the addition of upper case warnings related to IV-push.").  In addition, as mentioned, the FDA suggested stronger warnings for Phenergan in 1987.  *Id.*; *see also id.* at *32 ("[I]t cannot be said that the FDA 'paid no more than passing attention to' IV push, nor can it be said that the FDA failed to weigh [the] costs and benefits [of IV-push administration of Phenergan].") (internal citation omitted).

Further, similar to AstraZeneca's incorrect assertion that the "FDA mandated a classwide diabetes/hyperglycemia labeling change" in September 2003 (Defs.' Br. at 6), the FDA "instructed [Wyeth] to '[r]etain verbiage in current label' regarding intra-arterial

injection" in 1996 and "approved Wyeth's 1981 [sNDA] application in 1998, instructing that Phenergan's final printed label 'must be identical' to the approved package insert." *Levine*, 2007 WL 529172, at *3 (citations omitted; second alteration in original).  As such, even if the FDA did mandate AstraZeneca to change its label in 2003 to one the FDA crafted, which it did not do and could not have done until 2007, the FDA determined the precise language Wyeth was required to put on Phenergan's label.  Yet, the Supreme Court concluded that Ms. Levine's failure-to-warn claim was not preempted.

Finally, while the FDA ignored a stronger warning Wyeth submitted for Phenergan, the FDA has not ignored, let alone rejected, a stronger warning for Seroquel, in large part because AstraZeneca has never submitted a stronger warning.  *See id.* at *9 (stating that Wyeth argued that "the FDA intended to prohibit it from strengthening the warning about IV-push administration because the agency deemed such a warning inappropriate in reviewing Phenergan's drug applications"); *see also id.* at *8 ("And the very idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation is difficult to accept – neither Wyeth nor the United States has identified a case in which the FDA has done so.").  Thus, the differences between *Levine* and this case make clear that *Levine* involved a much stronger implied preemption claim.

**C.     AstraZeneca's Argument That Plaintiffs' So-Called "Contraindication Claim" Is Preempted Fares No Better Than Its Other Failure-To-Warn Preemption Arguments.**

AstraZeneca's final attack on Plaintiffs' failure-to-warn claims fails for the same reason as the rest of its attacks—it finds no support in *Levine*.  As an initial and fundamental matter, the fact that Plaintiffs have suggested that an adequate warning "should include the

statement that persons who already have high blood sugar or suffer from diabetes should not be prescribed Seroquel" (Pls.' Omnibus Mem. at 35) is irrelevant because the question for the jury to decide is whether Seroquel's warning was adequate during the period at issue.[92] Moreover, there is no qualitative distinction between a stronger warning and a contraindication—the question the jury must answer is simply whether the warning that was used was "adequate" to convey the risks of which Plaintiffs complain.

Indeed, contrary to AstraZeneca's assertion, *Levine* did not suggest that, "if plaintiff were pursuing a state-law 'duty to contraindicate claim' that conflicted with FDA's approach, conflict preemption may apply." (Defs.' Br. at 26.) Rather, the *Levine* Court simply noted that "the **jury verdict** established only that Phenergan's warning was insufficient" and "did not mandate a particular replacement warning, nor did it require contraindicating IV-push administration." 2009 WL 529172, at *5 (emphasis added); *see also id.* ("We therefore need not decide whether a state rule proscribing intravenous administration would be pre-empted."). In fact, "Levine . . . offered evidence that the IV-push method should be contraindicated and that Phenergan should never be administered intravenously, even by the IV-drip method," yet the *Levine* Court clearly did not conclude that this fact preempted Ms. Levine's failure-to-warn claim. *Id.*

---

[92]   AstraZeneca grossly mischaracterizes Plaintiffs' position by suggesting that Plaintiffs' state-law claims are premised on AstraZeneca's failure to include the Japanese contraindication in its Seroquel labeling. (Defs.' Br. at 24.) Plaintiffs do not contend that a contraindication was warranted because the Japanese government concluded that a contraindication was necessary under its regulatory standards. Instead, Plaintiffs assert that a contraindication would have been proper under the CBE regulation. For the same reason, AstraZeneca's attempt to invoke the Court's *in limine* rulings is unavailing. (Defs.' Br. at 25.) Moreover, as the Court stated in its *in limine* ruling on foreign regulatory materials: "[A] final determination regarding the admissibility of this more limited class of evidence – the information foreign regulators communicated to AstraZeneca regarding the dangers of Seroquel – must await the trial of this cause." *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2009 WL 614764, at *5 (M.D. Fla. Mar. 11, 2009). Without question, the Japanese contraindication communicated information to AstraZeneca regarding Seroquel's dangers.

Finally, AstraZeneca's argument also ignores the fact that the CBE regulation expressly permits a pharmaceutical manufacturer to "add or strengthen a contraindication." 21 C.F.R. § 314.70(c)(6)(iii)(A).  As such, there is no merit to AstraZeneca's last-ditch effort to obtain partial summary judgment based on preemption.

**IV.**
**CONCLUSION**

For all the foregoing reasons, AstraZeneca's summary judgment argument based on implied conflict preemption should be denied.

DATED:  March 31, 2009                    Respectfully submitted,


By:    /s/ K. Camp Bailey
          F. Kenneth Bailey Jr.
          K. Camp Bailey
          Fletcher V. Trammell
          Robert W. Cowan
          **BAILEY PERRIN BAILEY**
          440 Louisiana St., Suite 2100
          Houston, Texas 77002
          (713) 425-7100 Telephone
          (713) 425-7101 Facsimile
          kbailey@bpblaw.com
          cbailey@bpblaw.com
          ftrammell@bpblaw.com
          rcowan@bpblaw.com
          **Co-Lead Counsel for Plaintiffs**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 31st day of March, 2009, I electronically filed the foregoing: PLAINTIFFS' RESPONSE BRIEF IN OPPOSITION TO ASTRAZENECA'S BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT IN ALL MDL CASES BASED ON FEDERAL PREEMPTION with the Clerk of the Court by using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record that are registered with the Court's CM/ECF system.


/s/  Robert W. Cowan
Robert W. Cowan