# EXHIBIT 14

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:

SEROQUEL PRODUCTS LIABILTY LITIGATION

CASE NO. 6:06-MD-01769-ACC-DAB

MDL DOCKET NO. 1769

------

May 28, 2008

------

Confidential Videotaped Oral Deposition of MARTIN BRECHER, M.D., D.M.Sc., MBA, held in the offices of Golkow Technologies, Inc., One Liberty Place, 51st Floor, Philadelphia, Pennsylvania beginning at approximately 9:00 a.m., before Ann V. Kaufmann, a Registered Professional Reporter, Certified Realtime Reporter, Approved Reporter of the U.S. District Court, and a Notary Public.

------

GOLKOW TECHNOLOGIES, INC.
One Liberty Place, 51st Floor
Philadelphia, Pennsylvania  19103
877.370.3377

Golkow Technologies, Inc. - 1.877.370.DEPS

## MARTIN BRECHER, M.D.
## May 28, 2008

| PAGE/LINE | ACTION |
|---|---|
| 72:21 – 73:3 | REDACTED |

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 330

1  Q. Okay. So he wasn't happy,
2  was he?
3       MR. McCONNELL: Objection to
4  form.
5  A. Well, I think his e-mail
6  speaks for itself. I think he was --
7  expressed concern, I would say. As he
8  said he questioned the rationale for
9  distributing it to the marketing people
10 for, quote, informal review.
11 Q. And your response is to say
12 I don't see a problem with marketing
13 knowing where we're going; correct?
14 A. Yes.
15 Q. Were you trying to lobby
16 the marketing people to support you in
17 the decision to keep "limited" in the
18 core data sheet?
19 A. I don't think that's where
20 that e-mail is going at all. I think
21 all I'm saying there is I didn't see a
22 problem with marketing knowing what our
23 position was. And that's what I said
24 before, before you showed me this

Page 331

1  document, I said I didn't see a problem
2  with the marketing people seeing the
3  discussion documents prior to the
4  meeting.
5  Q. Well, do you see a problem
6  with soliciting their comments to the
7  discussion document?
8  A. I think that this -- it
9  would be inappropriate if a drug safety
10 person would ask for marketing comments,
11 and I don't think that ever happened.
12 This --
13 Q. Well, you were -- I'm
14 sorry. Go ahead.
15 A. This discussion document,
16 as I said, immediately after you showed
17 it to me, is unusual in that it's being
18 produced by a member of the Seroquel
19 team. And I have offered a possible
20 explanation why. And clearly the writer
21 wanted to get marketing's view on the
22 content.
23 Q. Well, did you -- you were
24 on the e-mail that was sent by Emma

Page 332

1  Witch soliciting comments of the
2  marketing folks and others; correct?
3  A. Yes.
4  Q. Okay. Did you say "Whoa,
5  Emma, don't go submitting this for
6  comment to the marketing people"?
7  A. I did not.
8  Q. Did you tell her in any way
9  that she should hold off sending this to
10 marketing for comment because it was
11 inappropriate?
12 A. I did not.
13 Q. Now, the discussion -- the
14 SERM meeting that occurred in June of
15 2000, did you attend that in person?
16 A. The June 2000 SERM, yes.
17 Q. Where did it occur?
18 A. It must have occurred in
19 Wilmington.
20 Q. Okay. But you specifically
21 have a memory of being there for the
22 meeting?
23 A. Not a strong one. You
24 know, it's clear from the earlier

Page 333

1  document that you showed me that I was
2  there. And I don't have a vivid
3  recollection of the meeting, but I do
4  have a recollection of being there.
5       (Below-described document
6  marked Brecher Exhibit 18.)
7  BY MR. BLIZZARD:
8  Q. I have handed you
9  Exhibit No. 18, and it has a number of
10 handwritten notes on it. Are those --
11 is that your handwriting?
12 A. Yes.
13      (Below-described document
14 marked Brecher Exhibit 19.)
15 BY MR. BLIZZARD:
16 Q. Before I get to what that
17 says, let me mark as Exhibit 19 to your
18 deposition -- are these draft minutes of
19 a meeting in July of 2000?
20 A. This is -- are you talking
21 about 19?
22 Q. Yes.
23 A. They are draft minutes.
24 Q. Okay. Is that a -- are the

84 (Pages 330 to 333)

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 342

1  from the text, is that the criteria used
2  in the assessment was either a fasting
3  blood sugar greater than 126 or a
4  two-hour glucose value following 75
5  grams of glucose -- in other words, a
6  glucose tolerance test -- with a value
7  greater than 200.
8      Q.  Okay.  If you go turn the
9  page to the next note that we have.  It
10 looks like it's over on Page 6.
11     Okay.  What does that say?
12     A.  On the top?
13     Q.  Yes.
14     A.  "No attribution."  And then
15 to the right of that it says "16,
16 SPONT," probably referring to --
17 standing for spontaneous; "10
18 clinical" -- "10 CLIN trials," referring
19 to ten clinical trials; and "2 lit
20 reports."  So what this is referring to
21 is 16 spontaneous reported adverse
22 events, ten clinical trial reports, and
23 two reports in the literature, and they
24 are pointing to no attribution.

Page 343

1      Q.  Okay.  Under "CLINTRACE
2  Database (In House Safety Data),"
3  there's a note that says "9 cases"?
4      A.  "9 cases new onset, 4 DKA,
5  2 new onset, 2 worsening."  And then
6  below that is "NKHOC-0."  And NKHOC
7  would stand for nonketotic hyperosmolar
8  coma.
9      Q.  And then you've got a star
10 next to this particular description of
11 this event of a 43-year-old male with a
12 history of mental illness who developed
13 new onset diabetes.  Do you see that?
14     A.  Yes.
15     Q.  Do you know why it was
16 starred?
17     A.  No.  And I'm just curious
18 whether I starred other cases.
19     Q.  I think you did.  Look over
20 at the next page.  Do you see that?
21     A.  Yes.
22     Q.  And this particular case is
23 a diabetes case with weight gain;
24 correct?

Page 344

1      A.  Yes.
2      Q.  And you starred that?
3      A.  Yes.
4      Q.  And do you know why you
5  starred it?
6      A.  No.
7      Q.  I assume that you starred
8  things that were important to you; is
9  that correct?
10     A.  Presumably.  I certainly
11 don't -- I'd have to pore over this
12 document to see what were the common
13 features of the starred cases.  I don't
14 recall that now.
15     Q.  Okay.  Look over at the
16 next page.  Do you see that there's a
17 starred event on this page as well?
18     A.  Yes.
19     Q.  And the next page, "Loss of
20 Diabetic Control, Tooth Pain, Insomnia"?
21     A.  Yes.
22     Q.  Do you see that that event
23 is starred?
24     A.  Yes.

Page 345

1      Q.  If you look over at Page
2  11 --
3      A.  Yes.
4      Q.  -- do you see a star there?
5      A.  Yes.
6      Q.  Do you know anything about
7  why that star is there?
8      A.  I don't recall the
9  principle leading to the starring of
10 cases.
11     Q.  Okay.  If you look over on
12 Page 15, there's a star next to another
13 case of hyperglycemia?
14     A.  Yes.
15     Q.  Okay.  On Page 16 --
16     A.  Yes.
17     Q.  -- could you read that
18 handwriting for us?
19     A.  It says "Median?"  Below
20 that "time to onset."  There's text that
21 reads "The former patient reportedly
22 lost 30 pounds," and then there's a line
23 from that going to a handwritten note
24 saying "Type 1 - pattern."

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 346

1  Below that it says "2 cases
2  of DKA - weight gain associated." And
3  then below that there's a -- it says
4  "criteria greater than 110" -- it looks
5  like greater than 110 pounds, but I'm
6  not sure what that means.
7     Q.  This relates to reports of
8  hyperglycemia.
9     A.  Oh, I'm sorry. I can --
10 this one on Page 16 on the bottom that
11 the arrow says "criteria greater than
12 110 fbs," it's for fasting blood sugar.
13    Q.  Okay. And the last page,
14 Page 17, what does the note at the top
15 say?
16    A.  "Note, Wayne impressed by 2
17 physicians noting diabetes onset with
18 dose increase."
19    Q.  Okay. So does that note
20 reflect that Dr. Geller was impressed
21 with the dose-response?
22    A.  I don't think that
23 represents a dose-response so much as
24 exactly what it says, that two

Page 347

1  physicians noted diabetes onset
2  following a dose increase. I don't
3  think that indicates a dose-response.
4     Q.  It indicates that the
5  diabetes onset occurred after the dose
6  was increased; right?
7     A.  That's right. It is
8  different from a dose-response.
9     Q.  Okay. The next item in the
10 middle of the page says what?
11    A.  "Usually no baseline blood
12 glucose. 7 taking drugs associated with
13 diabetes. Some reports - scant
14 information" -- "scant inf" meaning
15 scant information -- "no positive de,"
16 which means no positive dechallenge or
17 rechallenge.
18    Q.  What's the next note say?
19    A.  "Seroquel may cause
20 impaired glucose regulation in some
21 individuals. No signal of Type 1 ie no
22 negative impact on insulin production."
23    Q.  Okay.
24    A.  Well, that -- "Discussion:

Page 348

1  No positive re,de challenge. No
2  baseline CHO," referring to no baseline
3  glucose. "Low number of cases for a
4  common condition."
5     That's actually an important
6  point because diabetes is very common.
7  And my comment here, I think, reflects
8  the view that this is a small number of
9  cases for an illness as common as
10 diabetes, given the exposure that we had
11 by 2000.
12    "No mechanism of effect."
13    On the right it says "For
14 my part only 4 cases of DKA speaks to
15 absence of diabetogenic effect."
16    Below that: "Other
17 patients: 1., will get long term data
18 from olanz trial. 2., will" --
19    Q.  What's "olanz trial"?
20    A.  That would refer to
21 olanzapine, but I'm not -- I don't know
22 what olanzapine trial I was referring
23 to, unless -- probably given that it was
24 2000, it could either have referred to

Page 349

1  the long-term trials that Lilly
2  conducted or to the long-term trial that
3  Janssen conducted.
4     And then below that,
5  "will" --
6     Q.  "Know more?"
7     A.  "Will" --
8     Q.  -- "know more after
9  response to FDA concludes."
10    A.  I think so.
11    Q.  I may have stared at it
12 longer than you, so whatever you need to
13 do to confirm it.
14    A.  Yeah, I think that's right.
15    Q.  Okay. So in looking at
16 this, you made the -- when you started
17 talking about this discussion down here
18 below the line, you may have said, well,
19 here are a couple of important points.
20    And then there's these
21 comments above the line that you read
22 without making a comment about it.
23    Is it your memory, from
24 looking at this now, that the points

88 (Pages 346 to 349)

Confidential - Martin Brecher, M.D., D.M.Sc., MBA

Page 947

1  are ongoing.
2       Q.  Does anyone or any
3  department at AstraZeneca monitor adverse
4  events?
5       A.  Primarily drug safety and
6  also the clinical group.
7       Q.  Does AstraZeneca submit
8  periodic safety updates to the FDA?
9       A.  Yes.
10      Q.  In your experience, did
11 AstraZeneca closely monitor the safety of
12 Seroquel?
13      A.  Yes.
14      Q.  Now, you've discussed the
15 SERM process generally. Are there
16 documents that are associated with the
17 SERM process?
18      A.  Yes. Prior to a SERM
19 meeting there's a discussion document.
20 Following the SERM meeting there is
21 either a position paper or justification
22 document that's prepared.
23      Q.  What's the purpose of a
24 discussion document for SERM?

Page 948

1       A.  A discussion document is
2  written so as to inform the discussions
3  at SERM of all the relevant facts.
4       Q.  What's the purpose of a SERM
5  position paper?
6       A.  A SERM position paper is
7  that -- is a paper that is written after
8  a SERM meeting when the core data sheet
9  is not changed on a particular issue.
10 And it reflects the reasoning as to why
11 the core data sheet is not changed on
12 that point.
13      Q.  Now, we talked about the FDA
14 request in May of 2000 regarding glucose
15 data. Did you participate in a SERM in
16 2000 regarding glucose issues?
17      A.  Yes.
18      Q.  Was there, in fact, a
19 discussion at AstraZeneca at the SERM
20 regarding glucose data?
21      A.  Yes.
22      Q.  What did that SERM conclude
23 regarding whether there was reasonable
24 evidence of an association between

Page 949

1  Seroquel and hyperglycemia or diabetes?
2       A.  SERM decided to keep those
3  issues under review, but not to change
4  the core data sheet.
5       Q.  What did SERM conclude as to
6  whether there was a causal link between
7  Seroquel and hyperglycemia or diabetes?
8       A.  SERM did not conclude that
9  there was a causal link between Seroquel
10 and hyperglycemia or diabetes.
11      Q.  What did SERM conclude in
12 2000 as to whether the data demonstrated
13 reasonable evidence of an association
14 between Seroquel and hyperglycemia or
15 diabetes?
16      A.  SERM concluded that the data
17 did not show a reasonable evidence of an
18 association.
19      Q.  I want you to take a look at
20 a document that the plaintiffs' lawyers
21 put in front of you. It's Exhibit 18.
22 Could we get a look at that?
23          Doctor, first of all, do you
24 remember taking a look at Exhibit 18, I

Page 950

1  don't know if it was yesterday or the
2  day -- I think it was the day before
3  yesterday?
4       A.  Yes, I remember.
5       Q.  Could you turn to the last
6  page, please?
7       A.  Yes.
8       Q.  Do you see handwritten notes
9  on that page?
10      A.  Yes.
11      Q.  And that's your handwriting.
12 Is that right?
13      A.  Yes.
14      Q.  I want to direct your
15 attention to the handwritten notes that
16 are underneath the typed section of the
17 page. Do you see what I'm talking about?
18      A.  Yes.
19      Q.  All right. Do you recall
20 testifying on Wednesday that those notes
21 were your reflections on reading the
22 document?
23      A.  Yes.
24      Q.  I want to get you to focus

46 (Pages 947 to 950)