1

```
 1                    UNITED STATES DISTRICT COURT
                       MIDDLE DISTRICT OF FLORIDA
 2                         ORLANDO DIVISION

 3              Docket No.6:06-MD-1769-Orl-22DAB

 4    . . . . . . . . . . . . . . . ..
      IN RE:                       :
 5    SEROQUEL PRODUCTS LIABILITY   :
      LITIGATION                    :          Orlando, Florida
 6    MDL DOCKET No. 1769           :          April 22, 2009
                                    :          10:00 a.m.
 7    ALL CASES                     :
                                    :
 8    . . . . . . . . . . . . . . .:

 9

10                TRANSCRIPT OF PREEMPTION MOTION
               BEFORE THE HONORABLE DAVID A. BAKER
11               UNITED STATES MAGISTRATE JUDGE
                             AND
12             THE HONORABLE ANNE C. CONWAY
               CHIEF UNITED STATES DISTRICT JUDGE

13

14    APPEARANCES:

15    For the Plaintiffs:        Paul Pennock

16                               Larry M. Roth

17                               Robert Cowan

18    For the Defendant

19    AstraZeneca:               Michael Brock

20                               Chris Coutroulis

21                               Steven Weisburd

22

23    Court Reporter:  Sandra K. Tremel, RMR,CRR

24    Proceedings recorded by mechanical stenography, transcript

25    produced by computer-aided transcription
```

```
 1                    P R O C E E D I N G S

 2             THE COURT:  Good morning.  Case number

 3   06-MD-1769.

 4        Could we have appearances, please.

 5             MR. ROTH:  May it please the Court, Your Honor,

 6   Larry Roth, liaison counsel for plaintiffs.

 7             MR. PENNOCK:  Paul Pennock, Weitz and Luxenberg

 8   for the plaintiffs.

 9             MR. COWAN:  Robert Cowan for the plaintiffs.

10             MR. TRAMMELL:  Fletch Trammell for the

11   plaintiffs.

12             MR. WEISBURD:  Steven Weisburd for Defendant

13   AstraZeneca.

14             MR. COUTROULIS:  Chris Coutroulis for

15   defendants.

16             MR. BROCK:  Mike Brock for the defendants.

17             THE COURT:  All right.  Who wants to go first?

18             MR. COUTROULIS:  Your Honor, we -- I think we

19   have two matters up for today, both preemption and future

20   of the MDL.  Future of the MDL was on for last time.

21             THE COURT:  I'd like to do that second because

22   Judge Baker is going to try to come in in a while.  So we

23   will start with preemption.

24             MR. ROTH:  Your Honor, in terms of timing

25   between those two subjects, the preemption and where we go
```

1  from here, I don't know how much time you have allotted

2  today.  Give us some idea.

3          THE COURT:  Well, I have a 1:00 hearing, but if

4  I don't give Sandy a break, she'll probably poison me.  So

5  I was thinking we would go until maybe 12:30.  Do you -- I

6  mean, we can shorten the time to discuss preemption and

7  get into the other issue and --

8          MR. ROTH:  I think that'll be enough time.  If

9  we spill over, I guess we will just go --

10         THE COURT:  So why don't we just try to go until

11  11:00 on preemption.  That's 50 minutes.  That should be

12  enough.  I got at least this much already that I have

13  read, so we will try that.

14         MR. WEISBURD:  All right.  Your Honor, Steven

15  Weisburd for AstraZeneca to argue AstraZeneca's preemption

16  motion.

17     In the wake of Wyeth and Levine, I would like to

18  reserve five minutes of my time for rebuttal if Your Honor

19  would permit.

20         THE COURT:  Okay.

21         MR. WEISBURD:  Today we're going to talk about

22  the standards for implied preemption under Wyeth and

23  Levine and generally under the Supreme Court's preemption

24  jurisprudence, how and why AstraZeneca has indeed met

25  those standards on the two inadequate warning claims under

1  state law that we have focused on in our motion after

2  Wyeth and Levine and how the regulatory record, the FDA

3  regulatory record is materially different than the record

4  that was before the Supreme Court in Wyeth and Levine.

5       First, Your Honor, I'd like to pull back for a

6  second, I think, to stress a fundamental and important

7  point, which is that all prescription drugs have risks and

8  side effects, including Seroquel.

9       Drug labeling in the United States is about making

10  sure that physicians receive credible scientifically

11  substantiated information about risks so they can make

12  informed decisions about prescription drugs and whether to

13  prescribe drugs to sick people that might help them.

14  Federal drug labeling and state drug labeling law is not

15  about overstating risks and providing unsubstantiated

16  information that might scare people and deter beneficial

17  uses.  And plaintiffs don't contend the contrary.  So that

18  threshold point is really undisputed.  It's also

19  undisputed that the FDA is the expert federal agency

20  charged by Congress with the authority to regulate federal

21  drug labeling.

22       And here the record shows that the FDA carefully

23  focused on the risks of diabetes and hyperglycemia,

24  especially during the time period that our motion focuses

25  on, which, you know, to pull back just for a couple of

1    highlights again of the regulatory record, the record

2    shows that FDA carefully studied from 1999 to 2003 the

3    data, glucose regulatory data across the entire class of

4    atypical antipsychotic medications.

5        That's a unique vantage point that only the agency

6    has.  AstraZeneca can't look and couldn't look across all

7    the different drugs and all the different science.  Only

8    the FDA could.

9        And when the FDA completed its analysis, the FDA

10   determined to do something really extraordinary and

11   something that is totally distinguishable from the facts

12   of Wyeth and Levine, and that is to arrive at a federal

13   policy of uniformity and class-wide labeling with respect

14   to the risks of diabetes and hyperglycemia.

15       From its unique vantage point, it determined that

16   class-wide labeling was the right way to go to address the

17   risks of hyperglycemia and diabetes.  And in particular,

18   it's our Exhibit 1 and Plaintiff's Exhibit 2, the

19   September 11th FDA letter pronouncing the FDA's policy of

20   class-wide labeling specifically states, "The available

21   data are insufficient to provide reliable estimates of

22   differences in hyperglycemic-related adverse event risks

23   among the marketed atypical antipsychotics."

24       So we know in the record what the Agency determined,

25   class-wide labeling, and then we know that the Agency

1   determined to draft the language of the class-wide label

2   itself.  And that again distinguishes this record from the

3   record of Wyeth and Levine.  This is not a circumstance

4   where a drug manufacturer obtained initial or supplemental

5   approval of risk labeling by the FDA.

6        THE COURT:  Clarify for me what time periods

7   you're asking for preemption.  It wasn't clear to me in

8   your brief.

9        MR. WEISBURD:  Well, Your Honor, we have

10   attacked two state law inadequate warning theories, and

11   the time periods vary.  One of the theories is plaintiffs'

12   theory that AstraZeneca violated state law by failing to

13   contraindicate Seroquel, saying that Seroquel should never

14   be used, ever, by people with diabetes or with a history

15   of blood glucose problems.  On that argument, on our

16   preemption argument, as to that state law claim, the

17   contraindication claim, there was no time period

18   limitation.  So it would be from 1997 up through and until

19   today.

20        With respect to the second claim that we're attacking

21   under state law, is plaintiffs' theory that AstraZeneca

22   violated state law by failing to abandon the FDA's

23   class-wide label entirely and instead give some

24   Seroquel-specific warning that was stronger than the FDA's

25   class-wide labeling.  And that, Your Honor, is where our

 1    argument for preemption, because we think it is the

 2    strongest is time limited today.  That argument goes from

 3    the day that the class-wide labeling policy went into

 4    effect through until June 2007.

 5          And now, the FDA announced, as I was referring to

 6    Plaintiffs' Exhibit 2 and our Exhibit 1, announced its

 7    class-wide policy September 11, 2003.  But it wasn't until

 8    January 2004 that the manufacturers, including

 9    AstraZeneca, actually went forward with approved labeling.

10    So it's really the beginning of 2004 through till

11    June 2007.  And we put that outside time limit.

12          And I'll explain the significance of it, because

13    that's when AstraZeneca had received and analyzed the data

14    from Trials 126 and 127 that the Court has heard about in

15    connection with the Daubert hearings and throughout this

16    litigation where the data from Trial 126 and 127

17    ultimately supported AstraZeneca in June 2007 doing a CBE

18    supplement, that supplemented the class-wide label with

19    Seroquel-specific data.  So that's the time window for

20    preemption -- for preemption that's at issue in our

21    arguments.

22              THE COURT:  Okay.

23              MR. WEISBURD:  Now, pulling back again, what

24    distinguishes this case from Wyeth and Levine?  FDA policy

25    of uniformity and class-wide labeling and the fact that

1   the FDA crafted and wrote the warning itself, the

2   plaintiffs attacked as insufficient under state law.  It's

3   also undisputed, Your Honor, there's -- the fact is that

4   FDA exacted -- extracted compliance and adherence to its

5   class-wide labeling by employing the many regulatory tools

6   that federal agencies have.  Federal agencies don't just

7   make federal law by regulations published in the Federal

8   Register.  And really that is undisputed.

9       What FDA did in this instance, as plaintiffs even

10  acknowledge is, FDA refused to approve a pending

11  supplemental MDA for Seroquel unless AstraZeneca agreed

12  more broadly to provide the FDA's class-wide label drafted

13  by the FDA itself.  And that's what the record shows.

14  That constitutes the FDA announcing federal policy and

15  enforcing federal policy ensuring compliance by the

16  regulated entity; here AstraZeneca.

17      So I've outlined what our -- what the two state law

18  claims are that we're attacking.  And our argument is that

19  those claims actually conflict not just with agency

20  initial approval of labeling, but rather affirmative

21  action that's different in kind from that that was at

22  issue in Wyeth and Levine.  Affirmative action by the

23  Agency to shape the labeling, and in fact, to craft the

24  labeling based on its analysis of the underlying science,

25  and the Agency's determinations about what that

1   complicated science actually supported, what warning

2   language was substantiated by that very complicated

3   science.

4       So we really have a very clear sense, clear evidence

5   in this record of exactly what the FDA determined was the

6   appropriate scientifically substantiated risk warning from

7   2004 onward.  That is entirely unlike Wyeth and Levine.

8   And we will talk about why that matters and why that is

9   significant.

10      And if we can put up Chart 1 for a second.

11      The Court has seen the language over the last year of

12  the FDA's class-wide label.  And what's important, I

13  think, is to emphasize several components of that

14  class-wide label.  First of all, it's in the warning

15  section.  Second of all, it's boldly headed "Hyperglycemia

16  and diabetes mellitus."  Next, it says that hyperglycemia

17  has been reported in patients treated with atypical

18  antipsychotics including Seroquel.  It acknowledges the

19  limitations of the scientific evidence saying that the

20  relationship is complicated, it's not completely

21  understood, in the next couple of sentences.  But

22  nevertheless, it advises and warns physicians of an

23  increased risk of treatment-emergent hyperglycemic-related

24  adverse events.

25      That was the Agency's language.  And as we will

1   discuss today, that language and the determinations of FDA

2   underlying that language, has preemptive significance.

3        The plaintiffs' core argument is that AstraZeneca

4   could have and should have done a CBE supplement like

5   discussed in Wyeth and Levine that provided a stronger

6   Seroquel-specific label.  And plaintiffs make that

7   argument as to the contraindication.  They say AstraZeneca

8   could have and should have done a CBE supplement from the

9   day after approval back in 1997.  That contraindicated

10  Seroquel.  Said Seroquel should never be used by somebody

11  like David Haller who had diabetes or a history of blood

12  glucose.  Never, ever under any circumstances be used by

13  David Haller and prescribed to David Haller.  That claim

14  we will discuss is preemptive.

15       Second, in terms of FDA's class-wide label,

16  plaintiffs' theory is that AstraZeneca should have done a

17  CBE supplement the day after FDA's class-wide label went

18  into effect in 2004 to basically abandon that class-wide

19  label.  Disregard the FDA's judgments; disregard the FDA's

20  federal determination that class-wide labeling was

21  appropriate, and instead gone forward with some sort of

22  unstated Seroquel-specific warning label.

23       Plaintiffs don't particularly tell us what that label

24  should have been.  They just say some stronger warning was

25  appropriate.  Well, today we're going to look through the

1   evidence the plaintiffs point to in the record.  Is there

2   evidence in the record to substantiate their contention,

3   scientifically credible evidence to substantiate their

4   contention that AstraZeneca should have done a CBE

5   supplement akin to what Justice Stevens talked about in

6   Wyeth and Levine.  And the answer is no.  There is no such

7   evidence.  And, in fact, at most, the evidence that

8   plaintiffs point to in the record doesn't support a CBE

9   supplement.  It supports the language of this chart.  It

10  supports the language of the FDA's class-wide label.  Not

11  any CBE supplement strengthening that language.

12      We will take piece by piece of evidence and

13  demonstrate why that's so.  And therefore, their entire

14  preemption argument collapses.  Their argument against

15  preemption is linked entirely to the CBE supplement.

16  Because their conflicting state law claims are only

17  excused from preemption based on their contention that

18  they can shoehorn their whole theory of state law warning

19  liability into the federal regulations through the CBE

20  supplement provision.

21      So if the evidence that they point to in the record

22  doesn't provide scientifically credible evidence to

23  support any CBE supplement, they have nothing left to

24  excuse the blatant conflict between their state law claims

25  and the FDA's regulatory determinations even under Wyeth

1    and Levine.

2        Now, let's talk for a second about Wyeth and Levine,

3    because plaintiffs first argument in their opposition

4    brief is that Justice Stevens' majority opinion for six

5    members of the court is so broad and so categorical that

6    there literally can never be implied conflict preemption

7    anymore, whether it's because of the presumption against

8    preemption that they'll talk about or whether it's because

9    Congress failed to include it in its preemption provision.

10   In the FDCA, they broadly wrap up the decision and say

11   implied conflict preemption is gone, so much so that they

12   criticized AstraZeneca in their brief for failing to

13   entirely give up and abandon federal preemption.

14       Well, that argument is wrong, and they're misreading

15   Wyeth and Levine.  And in fact, the language of Justice

16   Stevens' opinion can't bear the reading that plaintiffs

17   press on the Court.  Levine does not eliminate conflict

18   preemption categorically.  What the Court did clearly is

19   reject the particular implied preemption arguments that

20   the defendant Wyeth pressed both under the impossibility

21   strain and the obstacle strain of implied conflict

22   preemption.  But it did so on very different facts

23   concerning a totally different drug and a different FDA

24   regulatory record.  And the differences in this record and

25   the differences of our facts have preemptive significance

 1   here.

 2        First, let's start with obstacle preemption, what

 3   Levine really does.  The Levine majority rejected Wyeth's

 4   very broad argument, which is different than the argument

 5   that I'm pressing here today.  Wyeth's argument that was

 6   rejected on the obstacle preemption front by the Supreme

 7   Court was that any approval, initial approval or other

 8   approval by FDA of a warning label establishes both a

 9   floor and a ceiling and is always preemptive.

10        And in support of that argument, Wyeth pointed to the

11   Bush administration's FDA in its 2006 preemption preamble,

12   which Your Honor might remember from prior preemption

13   arguments before the Court.  What Wyeth argued was that

14   preemption preamble established preemption.  And the

15   Supreme Court looked at the preemption preamble and said,

16   not so fast.  That's a preemption power grab, as Justice

17   Stevens treated it.  We're not going to conclude that the

18   Agency, the FDA here itself, could establish preemption in

19   all circumstances based on its approval, when really,

20   number one, the preemption preamble wasn't the product of

21   notice and comment rule making so adversely affected

22   parties didn't have a procedural opportunity to criticize

23   that approach.

24        Number two, Justice Stevens said, that position is

25   inconsistent with historical positions by the FDA that

1     were contrary to that very broad preemption position.

2          And third, Justice Stevens focused on the fact that

3     Congress itself had refused to include an expressed

4     preemption provision in the FDCA even while it was

5     amending the FDCA to include other expressed preemption

6     provisions.

7          So when all these respects, the Supreme Court said,

8     we're not going to credit the argument based on the FDA

9     preemption preamble in 2006 that approval of a drug label

10    by FDA always in all circumstances has preemptive

11    significance and establishes a floor and a ceiling.

12         Plaintiffs misconstrue that portion of the decision

13    to mean that obstacle preemption is vanished forever.  It

14    is true that Justice Thomas doesn't like obstacle

15    preemption.  If you read his concurrence, his concurring

16    opinion, he doesn't know how to apply that doctrine and

17    would rather do away with it.  But not Justice Stevens and

18    not the majority of the Supreme Court in Wyeth and Levine.

19         And in particular, if you could put up Chart 2, we

20    see the language actually of the opinion.  What Justice

21    Stevens says in the Supreme Court majority in Wyeth says

22    is Wyeth hasn't persuaded us that failure to warn claims

23    like Levine's obstruct federal regulation of drug

24    labeling.

25         Congress has repeatedly declined preempt -- to

1    preempt state law, and the FDA's recently adopted position

2    that state tort suits interfere with its statutory

3    authority is entitled to no deference.  Critically, the

4    Court concludes, although we recognize that some state law

5    claims might well frustrate the achievement of

6    Congressional objectives, this is not a case.

7         Well, Your Honor, I submit this is a case where

8    plaintiffs' state law claims would obstruct Congress'

9    fundamental purposes, because the FDA has the authority.

10   Plaintiffs don't dispute that FDA has the Congressionally

11   delegated authority to announce class-wide labeling as the

12   best way in the public interest to address and warn of a

13   particular risk.  Just like it did here.

14        And plaintiffs don't dispute that Congress has the

15   authority, the Congressionally delegated authority to

16   craft the language of the warning itself.  In this

17   context, for plaintiffs to contend, as they do on their

18   second of the challenged state law theories, that

19   AstraZeneca violated state law by failing to disregard and

20   abandon the FDA's approach, has -- does not just have

21   preemptive significance, but it attacks the action of the

22   federal agency, the FDA, acting within the scope of its

23   Congressionally delegated authority.

24        If you could go to number 6, please, Chart 6.

25        Plaintiffs try to cobble together aspects of Wyeth

1    and Levine to say, oh, well, the language of Wyeth and

2    Levine really says obstacle preemption is dead, which is

3    not true.  But in fact, other decisions of the Supreme

4    Court make clear that when a federal agency like the FDA

5    here does acts within the scope of its Congressional

6    delegated authority to pronounce a federal policy of

7    class-wide labeling, that has preemptive significance.

8        And my quote on the particular point is Louisiana

9    Public Service Commission v. FCC, which the Supreme Court

10   held in 1986, "A federal agency acting within the scope of

11   its congressionally delegated authority may preempt state

12   regulation."  That's what happened here.  Because

13   plaintiffs' claims conflict with FDA's new policy of

14   uniformity, the FDA's class-wide labeling.

15       Now, turning to impossibility preemption, which was

16   the other strain of preemption that the Wyeth decision

17   addresses, again, the Supreme Court rejected on the record

18   in Wyeth v. Levine the Defendant Wyeth's impossibility

19   preemption arguments.  Not all impossibility preemption,

20   contrary to what plaintiffs say.

21       Specifically, the holding in the next chart, Chart

22   No. 3, is that the Court held that "absent clear evidence

23   that FDA would not have approved the change to Phenergan's

24   label, we will not conclude it was impossible for Wyeth to

25   comply with both federal and state requirements."  Wyeth

1     has offered no such evidence.

2          Well, clearly, what that language and the holding of

3     the Supreme Court makes clear is on a record that does

4     provide clear evidence, that FDA would not have approved

5     the label change the plaintiff says was required under

6     state law, preemption would follow.

7          The Supreme Court didn't say absent clear evidence

8     that FDA did not approve the change that plaintiffs

9     contend was appropriate.  That's significant because

10    plaintiffs in their briefing do a little slight of hand.

11    They quote the standard and then they say, preemption

12    should never exist unless the record shows the defendant

13    put the precise warning to the FDA and the FDA rejected

14    that precise warning.  That's not what Justice Stevens

15    says.  He does refer to the fact that Wyeth did not

16    contend that it put the warning to the FDA.  But Justice

17    Stevens then goes on to point to other aspects of the

18    record that were critical to the Supreme Court's

19    preemption holding.

20         First of all, the Court emphasizes that the FDA gave

21    no more than a passing attention to the particular risk at

22    issue; that the FDA had not made an affirmative decision

23    about whether any stronger warning was supported by the

24    underlying science and thus appropriate; and finally,

25    emphasized that Wyeth hadn't even argued that it supplied

1    FDA with any analysis or evaluations of the risks at issue

2    based on the science.

3         So it was for all those reasons that Justice Stevens

4    rejects the impossibility strain of argument that Wyeth

5    pressed.

6         Finally, Justice Stevens, as we talked about earlier,

7    made reference and discussed CBE supplement provision.

8    And as Justice Stevens explained, CBE supplement provision

9    exists in the federal regulations and provides that

10   manufacturing without first having FDA approval can add or

11   strengthen a warning basically when such label changes are

12   supported by new scientific data or by new analysis of

13   previously submitted scientific data.

14        And then Justice Stevens not only pointed to the

15   existence of that CBE supplement regulation, but the fact

16   that in the record there were 20 reports of injuries

17   exactly like Miss Levine experienced, that was IV push

18   administration of Phenergan, a nausea medication, where

19   what had happened was the IV push administration led to

20   gangrene in an exact particular place, and the gangrene

21   led to the need to amputate the individual's arm.  Here

22   Miss Levine, a musician, very extreme circumstance.

23        So in that circumstance, as we emphasize in our

24   briefing, and unlike here, causation had been conceded.

25   It wasn't disputed.  Causation was conceded by Wyeth and

1    Levine.  And that's why we will discuss the adverse event

2    reports the plaintiffs talk about are really in this

3    record different than the adverse event reports in Wyeth

4    and Levine.

5        But what Justice Stevens did is say that Wyeth could

6    have done a CBE supplement because it had 20 prior events

7    that it could have used to strengthen its -- the warning

8    that it gave through a CBE supplement.

9        Now, turning to why the standards of Wyeth and Levine

10   are met here.  Let's focus on the plaintiffs' two

11   arguments, and I'll quickly take you through the core

12   points before reserving my time.

13       First of all, the contraindication claim.  The record

14   is clear that since 1997 and the initial approval of

15   Seroquel, Seroquel has never been contraindicated by FDA

16   for use by any subclass of individuals.  Plaintiffs'

17   theory is we violated state law by failing to

18   contraindicate Seroquel for people like David Haller who

19   have diabetes or a history of blood glucose problems.

20   That claim conflicts with the FDA's determinations.

21       FDA consistently determined that Seroquel is approved

22   for that subclass of individuals, provided that there are

23   warnings that are given, the FDA's class-wide warnings.

24   And in fact, the FDA's authoritative policy determinations

25   are embodied in Exhibit 1.  Going back to Exhibit 1 again,

1   in the second paragraph of Exhibit 1, the FDA pronounces

2   that patients with an established diagnosis of diabetes

3   mellitus who are started on atypical antipsychotics should

4   be monitored -- should be monitored regularly for

5   worsening of glucose control, not that they shouldn't be

6   prescribed the drug under any circumstances, which is what

7   a contraindication is.  So we have clear evidence in the

8   warning itself drafted by FDA pronouncing its position

9   that a contraindication isn't appropriate for patients

10  with diabetes.

11      And the same is true in the next sentence, for

12  patients with risk factors for diabetes, which includes

13  those with a history of blood glucose problems, they

14  should, "undergo fasting blood glucose testing at baseline

15  and periodically during treatment."

16      So again, plaintiffs' theory of state law liability,

17  failure to include a contraindication, is contrary to

18  FDA's determinations as embodied in the class-wide label.

19      Plaintiffs offer no response, no meaningful response

20  to our arguments on contraindication and preemption except

21  to point again to the CBE supplement provision and the

22  language of the regulation, because the language of the

23  regulation says that a CBE supplement can be done not only

24  to add or strengthen a warning, but also to add a

25  contraindication.  We know that.  That is the language of

1   the CBE supplement provision.  But what evidence do

2   plaintiffs point to in the record to support their broad

3   argument that people with diabetes or hyperglycemia never

4   should be prescribed Seroquel?  And the answer is, they

5   offer no evidence, no evidence at all.

6       Going to Chart 4, what's most significant is that

7   plaintiffs in their brief don't even claim that any

8   evidence supports their having satisfied the standards for

9   contraindication under federal law that would support a

10  CBE supplement.  Those standards are set forth in 21 CFR

11  Section 201.57.  And it sets forth the standard that a

12  contraindication is appropriate where the risk of use

13  clearly outweighs any possible benefit.  Plaintiffs don't

14  contend any evidence supports meeting that standard for

15  those with diabetes or with blood glucose problems.

16      That standard was expanded in June 2006, and

17  plaintiffs don't satisfy this expanded standard either --

18  Slide 5 -- where a contraindication is appropriate where

19  the subclass at issue of patients, "have a substantial

20  risk of being harmed by the drug and for whom no potential

21  benefit makes the risk acceptable."

22      That's the standard for doing a CBE for a

23  contraindication, Your Honor.  And plaintiffs have no

24  evidence -- much less evidence that shows why that

25  standard was met.  And for that reason, they have nothing

1    to support their CBE supplement contentions which are

2    their only excuse and explanation for why the blatant

3    conflict between their state law duty to contraindicate

4    claims aren't fatally conflicting with the FDA's

5    determination that Seroquel not be contraindicated for

6    people with diabetes and those with blood glucose

7    problems.

8         Finally, as I have alluded to before, the

9    significance of plaintiffs' arguments -- it's pretty

10   profound when you think about the facts of David Haller's

11   case.  David Haller who testified himself that Seroquel

12   was the only medication, after he tried many, that could

13   help him control his criminal sexually violent urges, and

14   where his nurse and physicians testified that was the only

15   medicine that kept him from being a danger to himself or

16   others.  Yet plaintiffs would have the Court conclude that

17   state law should hold AstraZeneca liable for not telling

18   physicians that they should never and they can never

19   prescribe Seroquel to somebody like David Haller.  Your

20   Honor, that claim is preempted by federal law, even in the

21   wake of Wyeth and Levine and under the standards of Wyeth

22   and Levine.

23        Now, next, turning to the final argument, which is

24   really plaintiffs' frontal --

25             THE COURT::  You're about out of time, if you

```
 1    want to reserve any.
 2              MR. WEISBURD:  I'll do five minutes, if Your
 3    Honor would permit, on the frontal assault on the
 4    class-wide label.
 5         My core point is, if you focus on plaintiffs'
 6    argument, they're saying that the day after the class-wide
 7    label went into effect, we had to abandon the class-wide
 8    label.  We had to provide a Seroquel-specific warning.
 9    That doesn't make any sense to say that state law requires
10    a company to abandon an FDA class-wide label determination
11    of uniformity and be different.  You can't be uniform and
12    adhere to uniformity in the FDA policy by being different.
13    So there's the conflict.
14         Plaintiffs need to point to evidence that would
15    support a CBE supplement under Wyeth and Levine.  They do
16    try.  They point to three categories of evidence:  Trial
17    41, Trial 125, and adverse event reports, none of which
18    support their CBE supplement contentions.  And at most,
19    all that evidence does is support the language of the
20    class-wide label itself.
21         Trial 41, they don't even rely on the clinical data
22    from the trials, Your Honor.  They rely on one sentence in
23    an e-mail that vaguely talks about seven clinically high
24    glucose levels.  They don't offer testimony from the
25    individual who wrote that e-mail about what that was
```

 1   talking about.  But what we know about the data of Trial

 2   41 is that it didn't produce consistent results, and it

 3   didn't produce statistically significant elevated blood

 4   glucose levels.

 5       Second, Trial 125 -- it's ironic that they point to

 6   Trial 125 because that's some of the best evidence against

 7   plaintiffs' causation case in this litigation, not in

 8   support of plaintiffs' causation approach.  And their only

 9   argument advanced in their brief is that when AstraZeneca

10   did its CBE supplement in 2007, it didn't do so just based

11   on the new data of Trials 126 and 127, but also

12   acknowledged that it went back and looked at the results

13   of Trial 125 as well.  It doesn't say that Trial 125's

14   results standing alone supported any earlier CBE

15   supplement, and plaintiffs don't even articulate that

16   position based on the data of Trial 125.

17       Finally, adverse event reports.  Given the McClain --

18   the 11th Circuit and McClain's discussion of adverse event

19   reports emphasizing how scientifically unreliable, as Your

20   Honor knows, adverse event reports are in terms of

21   causation, it's really dubious for plaintiffs to be saying

22   that adverse event reports could -- standing alone could

23   support a CBE supplement.

24       What the plaintiffs say is there were 20 adverse

25   event reports in the Wyeth case, and here they say they

1    can point to over 100 adverse event reports.  So just

2    counting numbers, they say if 20 was enough in Wyeth and

3    Levine, 100 has to be enough here to support a CBE, but

4    that's not true.  Because there's a difference, as I was

5    trying to explain, between an adverse event report of

6    gangrene following IV push administration leading to

7    amputation of someone's arm in Wyeth and Levine and an

8    adverse event report of diabetes following someone's

9    ingestion of Seroquel in a temporal relationship.

10        Your Honor, specific causation opinions focus on that

11   issue.  The notion that AstraZeneca should have done an

12   adverse -- a CBE supplement based merely on some

13   additional adverse event reports is suspect, but it's even

14   more illegitimate as an argument against preemption when

15   you look at the language of the class-wide label, Exhibit

16   1 again, that talks about an increased risk of

17   treatment-emergent hyperglycemic-related adverse event

18   reports.  It acknowledges adverse event reports of people

19   who have taken Seroquel.

20        So I'm not sure what plaintiffs contend the CBE

21   supplement would be.  But their evidence does not support

22   any CBE supplement.  And as a consequence, without

23   evidence to support a CBE supplement, plaintiffs' one

24   excuse for their conflicting state law claims under

25   federal law is CBE supplement procedure is without

1    evidentiary support, and they're left with their

2    conflicting state law claims.

3        And I will, I apologize, reserve a few minutes of my

4    time for rebuttal.

5            THE COURT:  All right.

6            MR. COWAN:  Good morning, Your Honor.  May it

7    please the Court.

8            THE COURT:  Good morning.

9            MR. COWAN:  Robert Cowan for the plaintiffs.

10       Your Honor, I want to first say that I have

11   tremendous respect for Mr. Weisburd and many of

12   AstraZeneca's counsel that I've come to know and work with

13   over the last couple of years, but I still cannot help but

14   be surprised that we're here arguing preemption after the

15   opinion that the Supreme Court issued in Levine.

16       The scope of the opinion, as I'll point out, is that

17   sweeping and that clear.  I will endeavor to keep my

18   remarks brief, but I have a few additional comments that I

19   would like to make specifically responding to

20   Mr. Weisburd's presentation, and I'll discuss that first.

21       First of all, I'll generally say that AstraZeneca's

22   argument that Mr. Weisburd presented could largely have

23   been the same argument that Wyeth presented to the Supreme

24   Court.  In fact, the majority opinion in Levine indicates

25   as much.

1      Responding briefly to some specific point Mr.

2   Weisburd raised in his argument, which -- some of which

3   I'll deal with in more depth in a few minutes,

4   Mr. Weisburd said that, in opening, the FDA is the

5   regulatory authority for prescription drugs.  But Levine

6   clearly said that that authority is not exclusive,

7   repeatedly said so.

8      Secondly, he argued that the FDA had exclusively, in

9   a way that AstraZeneca was unable to do, looked at all

10   atypical data in issuing the class warning because it

11   is -- but that point is immaterial in that we're talking

12   about Seroquel's warning and not the warning that applies

13   broadly to all atypical antipsychotics and specifically --

14         THE COURT:  What is it you're contending they

15   should have done?

16         MR. COWAN:  Well, we raised that argument in our

17   initial summary judgment briefing, and specifically, with

18   respect to the 2004 warning, we have supplied expert

19   opinion from Dr. Wershing saying that, first of all, a

20   Seroquel-specific warning should have been given based on

21   Seroquel-specific data.  And to give you a prime example

22   of that, the weight-gain issue --

23         THE COURT:  So you're saying that they should

24   have done a CBE saying we will use your class-wide label,

25   but we will also use another one that's Seroquel specific?

1          MR. COWAN:  No, not necessarily.  I mean -- and

2    I want to clarify that we don't make the argument that the

3    day after the FDA negotiated and the companies approved

4    the so-called class warning, that AstraZeneca should then

5    have changed the warning.  I mean, the timing just doesn't

6    lay out like that.  AstraZeneca knew of its weight-gain

7    data years before the class warning issued.  And it's not

8    absolved of that knowledge simply because the FDA steps in

9    and negotiates a class-wide warning for all atypical

10   antipsychotics.

11         And to buy into that argument ignores what Levine

12   expressly says, which is that the mere fact that the FDA

13   approved a particular label does not establish that it

14   would have prevented -- prohibited a change to that label.

15   And so I can't go back in time and demonstrate for the

16   Court how things would have been different in 2003, 2004,

17   had AstraZeneca perhaps moved for a CBE amendment in 1999,

18   2000, when the safety position paper came out.  It could

19   have been that at the time the FDA was considering a

20   class-wide warning, Seroquel already had a stronger

21   warning on its drug.

22         And in the specific example with respect to the class

23   warning that I want to point out to the Court is what

24   Dr. Wershing points out in his report that's appended to

25   our response to motion for summary judgment; and that is,

1    specifically, that the weight-gain issue should have been

2    included in the warning.  And AstraZeneca scoffed at that

3    idea back in January that we would include any such

4    warning -- or they would include any such warning in the

5    label.  But lo and behold, it was a month later that we

6    learned that the FDA was expressly mandating that warning

7    in AstraZeneca's -- in Seroquel's label.  And so -- and it

8    has not appeared there until this year, and that was data

9    they had back in 1997.

10    And so that's the type of different information that

11    we contend that AstraZeneca had that supports a CBE

12    amendment from 1997 through 2008.  And one other point I

13    want to make on that issue, though, is one that -- and

14    it's a very cleaver argument that AstraZeneca makes in

15    this regard.  AstraZeneca is essentially shifting the

16    burden to plaintiffs to prove -- to disprove their

17    affirmative defense on preemption.

18    And essentially, what they're doing is what the

19    Levine Court recognized that Wyeth was also arguing, and

20    that is specifically that effectively what AstraZeneca

21    argues is that we say we did not have information that

22    would support a CBE label amendment until 2007.  It's a

23    flat statement and they provide those -- that data from

24    studies 126 and 127 to support that.  But they then go and

25    say, now, plaintiffs, you prove that we did.  And if you

1    can't, then your failure to warn claims are preempted.

2         But like everything else that AstraZeneca tries in

3    this brief, Wyeth tried the exact same thing, and the

4    Levine majority rejected it.  The Supreme Court was clear

5    that Wyeth's argument that Levine had not -- the

6    appellee, the plaintiff, had not pointed to any

7    information that the FDA had not considered in support of

8    a CBE label change, open quote, "misapprehends Wyeth's

9    burden in establishing a preemption defense."  The Court

10   then faulted Wyeth itself for not having offered its own

11   clear evidence that the FDA would not have approved the

12   stronger warning, pointing out that Wyeth specifically did

13   not argue that it had attempted to give a stronger warning

14   but was prohibited from doing so by the FDA.

15        AstraZeneca, too, has no evidence at all that it

16   offered a stronger warning that was rejected by the FDA,

17   but merely speculates that because of the adoption of the

18   class warning the FDA would have rejected a stronger

19   warning.

20        Your Honor, I'd like to also add, with respect to the

21   class warning itself, a couple of points I want to clarify

22   from Mr. Weisburd's presentation, why is the class label

23   any different from any other FDA approval process?

24   AstraZeneca contends that it is because of, one, the

25   extensive and ongoing review of glucose dysregulation by

1    the FDA in advance of the class warning, and two, that the

2    FDA, quote/unquote, mandated the warning.

3         But as the minority opinion points out in great depth

4    as to what the record showed -- and I would offer that the

5    record before the Supreme Court is the record before the

6    Supreme Court, the fact that the majority opinion found

7    this unpersuasive only adds to our argument.  But the

8    minority opinion found that in its 1987 labeling order,

9    the FDA cited voluminous materials to support its new and

10   stronger warnings related to IV push and the preferability

11   of IV drip.

12        One of those articles specifically discussed the

13   relative advantages and disadvantages of IV drip compared

14   to IV push, cited published case reports from the 1960s of

15   gangrene, and the FDA instructed Wyeth to amend

16   Phenergan's label in accordance with the latest medical

17   research.

18        The majority opinion characterizes the minority's

19   opinion of -- or -- a rendition of the facts that are

20   before the FDA as more extensive than the FDA itself would

21   have undertaken given the minority jab there.  But the

22   point is that here the facts are no different.  Wyeth is

23   more similar to -- I'm sorry -- Levine is more similar to

24   this case than it is different.

25        And as far as the FDA mandating any particular

1    warnings, as I'll show in just a minute, and it's in our

2    brief as well, that even so-called class label like all

3    FDA-approved labels were a product of negotiation between

4    AstraZeneca and the other atypical antipsychotic

5    manufacturers, and that was how the class label came to

6    be.

7         Your Honor, three preemption principals, which I'll

8    be brief on because they are in the Levine opinion and in

9    our brief, are central to that holding and unmistakable.

10   The first is the Supreme Court's holding at pages 1195 and

11   1196, the majority opinion, that a proponent of federal

12   preemption must show a clear and manifest purpose of

13   Congress to supersede state laws in order to overcome the

14   presumption against preemption.

15        The second is the holding at page 1199 that the

16   majority opinion -- at page 1199 of the majority opinion,

17   as I said earlier, that the mere fact that the FDA

18   approved a particular label does not establish that it

19   would have prohibited a change to that label.  And the

20   third, and finally, is the Supreme Court's holding at 1197

21   and 1198 of the majority opinion that the central premise

22   of federal drug regulation is that the manufacturer bears

23   responsibility for its label at all times.  At all times

24   the drug is on the market.  AstraZeneca doesn't want to

25   talk about those points today, and its briefing and

1   Mr. Weisburd's argument here today are silent in that

2   regard.  That is because AstraZeneca's preemption argument

3   crumbles under the weight of those holdings which are the

4   very core of the Levine opinion.

5        AstraZeneca argues that, and Mr. Weisburd argued this

6   morning, that plaintiffs' position goes too far, that

7   preemption lives and lo and behold it lives right here in

8   the Seroquel MDL.

9             THE COURT:  So it's your position that since

10  Levine preemption in all drug cases is barred?

11            MR. COWAN:  That is not necessarily our

12  position, and I will clarify our position.

13       However, I will say that the Court cannot ignore, as

14  AstraZeneca is attempting to do, these fundamental

15  principals that support the Levine opinion.  In fact, I

16  would argue that the way the Levine opinion is really set

17  out is that the Court established through those precise

18  and apposite holdings the legal framework of implied

19  conflict preemption in the prescription drug context as

20  the Court saw it after Levine.  And then they turn to and

21  denied Wyeth's various attempts to circumvent those

22  principals.

23       And so we can't just jump to the evidence as -- of a

24  CBE label change which is where -- exactly where

25  AstraZeneca would like to go.  And we have evidence that

 1   they knew in the exact time frame that they are

 2   discussing, and before as I mentioned, that a CBE label

 3   change was appropriate in view of what Levine found

 4   appropriate, what the majority found appropriate there.

 5        But in clarifying what our position is on preemption

 6   in general, I'll simply say that clearly AstraZeneca

 7   thinks there's a loophole in Levine under which they are

 8   trying to fit, and they have come up with a factual

 9   record -- factual rendition that they claim gets them

10   there.

11        However, it's interesting to know that defense

12   commentators, including some from AstraZeneca's own lead

13   law firm, have kind of opined on what Levine really means

14   in terms of the type of evidence, the type of clear

15   evidence that the Supreme Court would require to get over

16   the presumption against preemption, to get over the lack

17   of -- complete lack of congressional intent to preempt,

18   and -- and the type of evidence that they are -- that's

19   been discussed are things like formal drug specific rule

20   making by the FDA.  And that is, I assume, the type of

21   evidence that AstraZeneca claims it has here.  But for the

22   reasons I have discussed, it's not.  The commentator also

23   adds -- the defense commentator that I'm referring to adds

24   that that's not going to happen very often, if ever.  It

25   hasn't happened here.

1        Another distinction the commentator makes is, has the

2   FDA considered and rejected a stronger warning about the

3   risk in question?  And there's simply no evidence that

4   AstraZeneca proffered a stronger warning for Seroquel than

5   what was issued before the class warning or after until

6   2007 that the FDA then rejected.  And those are essential

7   elements of the Levine opinion.

8        So that is the scope of any loophole, and I would

9   argue that it's clear that Levine at least substantially

10  limited preemption.  And if there is any opening, it is

11  simply that, one, the FDA considered and rejected a

12  warning that was offered, or two, there was the form of

13  formal drug-specific rule making that, as defense

14  commentators say, just doesn't happen.

15       Your Honor, forgive me.  I lost track of where we are

16  on time.

17            THE COURT:  You have another five minutes.

18            MR. COWAN:  Let me address the -- what I thought

19  was a secondary argument, but came to the forefront, it

20  seems, this morning from AstraZeneca's part, and that's

21  this duty to contraindicate argument.

22       A contraindication claim is simply not a separate

23  claim that plaintiffs are bringing.  Regardless of whether

24  plaintiffs assert for summary judgment purposes that an

25  adequate warning may have contraindicated Seroquel use in

1   diabetes patients, as in Levine, that is a different

2   question than what a jury would be asked to decide.

3        It is simply that whether the warnings that were

4   actually given were legally adequate under the applicable

5   state standards.  That is the question in general form

6   that the jury would have to decide, and that's the

7   question also before the Court.

8        The jury is not required to choose among a menu of

9   alternative warnings which might or might not include such

10  a contraindication.  Levine notes that in that case, and I

11  quote, "The jury verdict established only that Phenergan's

12  warning was insufficient, and it did not mandate a

13  particular replacement warning."  And it would be no

14  different here.  The jury is not required to choose among

15  a menu of warnings and decide which one would be the

16  adequate replacement.  It could be that that warning would

17  include some form of contraindication.  That would depend

18  on the proof that plaintiffs present at trial.  And it's

19  not a summary judgment issue.

20       At any event, the duty to contraindicate issue is a

21  nonstarter because, as I pointed out in the Supreme Court,

22  Levine did not suggest, as AstraZeneca argues in its

23  brief, that if plaintiffs were pursuing a state law duty

24  to contraindicate claim that conflicted with the FDA's

25  approach, conflict preemption may apply.  Rather, the

1    Court simply avoided the issue altogether.  Therefore,

2    Levine offers no guidance to the Court as to whether such

3    a claim would be preempted.

4        And the argument is also a nonstarter because to the

5    extent that AstraZeneca misunderstood the plaintiffs were

6    seeking a separate duty to contraindicate claim,

7    plaintiffs were not and plaintiffs would withdraw any such

8    claim.

9        In the end the Court should recognize this argument

10   for what it is, Your Honor, and what it is not.  It is

11   merely a trial balloon on behalf of defense lawyers

12   anxious to see -- anxious to begin reshaping federal

13   preemption jurisprudence in their client's favor after the

14   blow that Levine landed here on behalf of a very litigious

15   client that has instructed their counsel to leave no stone

16   unturned.  But it is not a limb on which this Court should

17   venture too far, particularly on this record.

18       As plaintiffs have shown, the broad legal principals

19   for which Levine stands makes that a shaky branch.  And

20   the so-called facts that AstraZeneca contends overcome

21   Levine are quite simply, Your Honor, without merit.

22       The Court should also keep in mind that AstraZeneca

23   is moving for summary judgment here on its own affirmative

24   defense, and therefore, bears the burden of conclusively

25   establishing as matter of law it's entitlement to that

1    defense.

2        Plaintiffs have raised significant and unavoidable

3    fact issues to overcome any such finding which are in our

4    brief but time doesn't allow me to delve into in detail

5    here this morning.  I'll simply say, for all those reasons

6    that I have discussed, plaintiffs respectfully ask the

7    Court to deny AstraZeneca's motion.

8            THE COURT:  All right.

9            MR. WEISBURD:  Briefly, because I know I don't

10   have a lot of time, Your Honor, the Court should conclude

11   consistent with the argument I advanced on

12   contraindication that preemption applies.  If the

13   plaintiffs' counsel don't want to use that preemptive

14   theory at trial, good.  Your Honor should make clear,

15   consistent with the arguments that we made, that that

16   theory which they have advanced in this litigation is

17   preempted and rule as a matter of partial summary

18   judgment, whether it's a separate state cause of action or

19   not, but they're advancing, it's a theory that's in their

20   briefing that they've pressed.  It's preemptive for the

21   reasons that I've explained.

22       Second, class-wide label, plaintiffs' counsel says,

23   quoting from the Levine decision, the mere fact that FDA

24   approved a particular label is not enough.  What the Court

25   was talking about there was a label that had been drafted

1    by the manufacturer put to the FDA, and the FDA approved

2    it without paying too much attention to it, according to

3    the Levine majority.  That is materially different than

4    the class-wide label that is the exclusive focus of this

5    aspect of our preemption argument.

6         Your Honor should rule that from the day that the

7    class-wide label went into effect and was given by

8    AstraZeneca a class-wide hyperglycemia and diabetes

9    warning, not the weight-gain language that counsel was

10   talking about in response to the Court's question about

11   what AstraZeneca should have done differently.  We're

12   talking about the FDA's diabetes and hyperglycemia

13   warning.  And the reason that preemption follows under

14   Wyeth and Levine is that we have presented clear evidence

15   that FDA would not have approved a change to that label

16   until the time when there was new scientific evidence from

17   Trials 126 and 127 that supported a Seroquel

18   supplementation, the CBE that the company did do.

19        Preemption should follow from 2004 up until

20   June 2006.  Plaintiffs' counsel did not justify and

21   respond to my arguments and the arguments in our brief

22   about why each piece of evidence they identified was

23   insufficient to support a CBE supplement.  What they said

24   was -- what he said was, we're trying to shift the burden

25   of proof on summary judgment, which is simply not true.

1       What we have demonstrated in our briefing, and I

2  believe in my arguments to Your Honor, is we have clear

3  evidence in the record.  The FDA's class-wide label

4  embodied its judgments based on what it believed science

5  substantiated.  Then we have the argument that no new

6  evidence exists in the record to support a CBE supplement

7  until we did a CBE supplement.  And plaintiffs can't

8  identify evidence that would support a CBE supplement

9  contention, and as a consequence, preemption follows.

10  That is exactly the kind of argument that Wyeth and Levine

11  envisions.  That's the argument we're advancing to Your

12  Honor.

13       And there's good reason for Your Honor to render a

14  preemption ruling.  The focused narrow relief that we're

15  asking, and that is to make sure that plaintiffs' counsel

16  are limited to the FDA's class-wide label and not able to

17  ask a jury in this Court or any other court to

18  second-guess FDA's class-wide label policy during the

19  period under which there is no evidence to support a CBE

20  supplement.  That is why the Court should conclude

21  preemption applies here because the facts are

22  extraordinarily different than Wyeth and Levine.

23       And for Counsel to say, here the class-wide label is

24  no different, it was the process of ordinary negotiation,

25  is wrong.  The FDA wrote the language of the label.  He

1    says AstraZeneca had an opportunity to comment, but don't

2    point to one comma or one sentence or one word in that

3    warning that's actually given that is anything other than

4    crafted by the FDA embodying its judgments about what

5    warning is substantiated by the science.  Preemption

6    therefore follows.

7        Presumption against preemption has been rebutted here

8    based on our clear evidence, and the manufacturer bearing

9    the ultimate responsibility, the last principal that

10   counsel said we didn't talk about, that's true.  But a

11   manufacturer has to comply with the FDA's federal policy

12   including its class-wide policy of class-wide labeling.

13   And that's what AstraZeneca did, and preemption follows.

14       Thank you, Your Honor.

15           THE COURT:  All right.  We'll be in recess until

16   11:15 on that clock.

17       (Recess taken.)

18           THE COURT:  All right.  Who wants to go first?

19   Mr. Roth?

20           MR. ROTH:  Please the Court.  I don't know if I

21   want to go first, but I'm going first.

22       I'm going to split my time with Mr. Pennock, and

23   we're going to address, Your Honor, since I was here at

24   the beginning, I'm here at the end of the long-winding

25   road, I look over and only see one familiar face over

1   there, to talk to you about why this case should be

2   remanded, that you should file your suggestion of remand,

3   whether it's a report and recommendation, to the JPMDL,

4   and also to talk for a few minutes about a very big issue,

5   I believe, and submit to the Court, on credibility on the

6   road that the defendants are trying to lead this Court

7   down at this stage of the litigation.

8        I have a PowerPoint.  I'm not going to be able to use

9   too much of it.

10       But let me just start first with Number 2, David.

11       There's two issues I want to argue:  One is that this

12  Court has achieved its mandate.  It has met its

13  milestones; it has met its mission.  It's got basically

14  three issues left:  The preemption issue we just heard

15  today.  There was a Daubert hearing two weeks ago.  And I

16  believe there's an issue in front of Judge Baker May --

17  first part of May on a confidentiality issue.

18       But in terms of what this Court was asked to do by

19  the panel, it has achieved that, a coordinated

20  consolidated proceeding dealing with the general issues of

21  this case, not with 7,000 specific case issues or 5,992

22  case-specific issues, as they now have defined those in

23  terms of what's before the Court.  And I want to remind

24  the Court first in terms of the achievements and the

25  success that this Court has had.

1          And if you go to Number 4, David, please.  I can't

2     see these, so I'm assuming it's same thing I'm reading

3     from here.

4          One, this is -- has been a successful MDL.  It's

5     complied with and you have completed your 1407 mission

6     that was handed to you in July of 2006.  The common issues

7     of fact and law have been addressed.  We've had nearly

8     three years of general and case-specific discovery; 44,

9     approximately, general liability depositions.  If you

10    recall from the first case-specific program that you gave

11    the defendants the benefit of doubt on, there was

12    approximately 550, 560 depositions.  Sometimes there were

13    depositions three, four going on during a day on what was

14    termed as a Bellwether or a test program that the

15    defendants had submitted to you.  Nearly 3 million

16    documents -- or more than 3 million documents produced

17    between the plaintiffs and defendants.  General causation

18    experts on each side have been deposed.  Reports have been

19    submitted.  Of course, you've held extensive, I believe

20    three, Daubert hearings and ruled on those, except for the

21    ones from two weeks ago -- one from two weeks ago.  The

22    common and nonspecific legal issues of preemption have

23    been decided except for the one for today.

24         Probably, and I can't give you an exact account, but

25    maybe 7,000-plus plaintiffs' fact sheets have been

1    submitted.  Two thousand cases have been dismissed or

2    dropped.  Based upon the information I got from the record

3    folks that got the medical records, 69,000 sets of medical

4    records were turned over and ordered by the defendants,

5    AstraZeneca in this case.

6         We can go to Number 6, David.

7         The MDL mission of this transferee court to "direct

8    the transfer of multidistrict civil cases involved one or

9    more common questions of fact to a single federal district

10   for purposes of consolidated or coordinated nationwide

11   pretrial proceedings.  The judicial panel must remand when

12   the coordinated and consolidated proceedings have been

13   concluded, but may in its unusually broad discretion

14   remand when all that remains to be accomplished is case

15   specific."  And that's all that they have argued in their

16   paperwork is something case specific.

17        And if you go to Number 8, David.

18        This is a case cited by the defendants, and it's In

19   re: Factor 8 or 9 concentrated blood products.

20   "Multidistrict proceedings is not the appropriate

21   mechanism for the conduct of case-specific discovery that

22   by definition is not of general interest to the parties

23   and all of the individual cases which comprise the MDL."

24        Go to the next one, David, Number 11.

25        Judge, I submit to you that the defendants here from

1    the beginning have cried wolf.  Why have they cried wolf?

2    Initially they cried wolf because they said, we have all

3    these cases here and we don't know anything about them.

4    We've got to learn things about them.  And what did this

5    Court do?  You gave them the opportunity to learn about

6    them.  The plaintiffs wanted short fact sheets.  You gave

7    them fact sheets, Your Honor, which I want to submit to

8    you, if I might, and put exhibit stickers on them so you

9    remember this.

10        They had to know about all these specific cases, so

11   you gave them the detailed fact sheet, which I'll talk

12   about in a few minutes.

13        Then they wanted a procedure, well, what they don't

14   adequately comply with the fact sheets.  We gave them

15   procedure for that, CMO2, which is ultimately amended.  We

16   gave them all sorts of opportunities to rebut what they're

17   now saying that we have a bunch of frivolous cases that we

18   want to get rid of now, not cases that they had plenty of

19   opportunity dating back from, if you give them the best

20   date, September '06, the first time we appeared in this

21   Court, for that Court across -- next door, when they asked

22   for specific fact sheets.  You gave them all that

23   information, and yet today when you look at what they're

24   asking the Court to do, it's no different than what they

25   asked you to do beginning September of '06, which is we

1   need information; we need information; we need information

2   so that we can weed out these cases.

3       Then when the fact sheets weren't enough, when CMO2

4   wasn't enough, what did they want?  The next thing they

5   want is they wanted a huge Bellwether test program, and

6   that Bellwether test program went all over the map, Your

7   Honor.  A hundred cases, 200 cases, 300 cases.  Judge

8   Baker, in a proceeding in April, said -- April of '07, 300

9   cases was cumbersome.  It was a -- it separated the

10   efforts and, yet, what Your Honor gave them, because

11   that's what they were asking for, you gave them an even

12   bigger program which ultimately led to some 550

13   depositions.  And finally, late in 2007 that program was

14   discontinued or phased out because it was not workable,

15   and then we concentrated on the specific Florida cases.

16       Your Honor, I want to talk in terms of the

17   credibility issue on a couple of things.  I want to talk

18   first about the ADR program.  Credibility is important

19   because they want you to continue this MDL for an

20   indefinite period of time.  They want you to basically be

21   the judges of 5,992 cases, and go through all those cases.

22   Same thing they asked you from the very beginning, same

23   thing that they have had the opportunity now for over

24   two-and-a-half years to weed out those cases which they

25   represented to this Court that they were going to do.

1          If you go to Number 16, David.

2          I mention ADR not because I'm talking to the Court

3     that these -- any case should be settled; that's not the

4     issue.  The issue is Judge Baker brought up initially, as

5     early as I believe November of '06, about ADR.  And look

6     at some of the things in this pleading, Docket 204, that

7     the other side said about ADR.  "Requiring that once a

8     party has completed case-specific discovery in at least

9     300 cases" -- you gave them a lot more cases than that --

10    "the parties meet and confer to determine whether any

11    cases or subset of cases may be amenable to ADR."  Never

12    heard from them.

13         Further in that pleading.  Number 3, subparagraph 3,

14    "Some cases may resolve informally pursuant to settlement

15    negotiations in ADR in the MDL.  Further, prior to the

16    case-specific discovery, there can be no possibility of

17    meaningful ADR."  You gave them that opportunity.  We

18    can't even get a conference call with them on ADR issues.

19    Again, I'm not talking about the substance of the

20    settlement.  I'm talking about credibility and

21    representations to this Court.

22         They also said there, "AstraZeneca with sufficient

23    information to litigate these cases prepared dispositive

24    motions in the MDL" -- which they really have not done --

25    "and evaluate their merits, if any, for ADR."  They have

1    never done any of those aspects even after you gave them

2    complete full detailed fact sheets, gave them all the

3    case-specific discovery to the point that became

4    unworkable.

5         Now, what are they saying today?  They're saying,

6    well, we still don't know about these cases.  We think

7    they may be frivolous cases.  Well, we had a hearing way

8    back in December of '06, as I recall, when the second lead

9    counsel for AstraZeneca appeared.  And they had all

10   this -- all these statistics and this evaluation of about

11   650 PFSs that they had looked at, and they broke them down

12   by percentages of this person took Seroquel after warnings

13   and this person took some other drug.  And they

14   represented to the Court that we can analyze these cases,

15   we can break them down, and it will be just like Baycol.

16   They'll all go away.

17        Well, they've had all these fact sheets for all this

18   time, and despite the representations to the Court that

19   I'm going to point out right now, we've never seen

20   anything other than the cases that either were dismissed

21   voluntarily by us or cases that were dismissed under CMO2

22   that we still have a large number of cases simply because,

23   and the conclusion is, those cases have merit.  Those

24   cases are entitled to be tried in the transferor court or

25   be sent back to the transferor court for trials.

1          And let me ask David, if you would, go to Number 29.

2          I have labeled this "Delay, delay, delay" because, as

3    you know, I've spent my entire life being a defense lawyer

4    and to, you know, paraphrase Potter Stewart, I guess, I

5    know it when I see it.  I submit to the Court that we have

6    a lot of delay going on in this case; we have had it from

7    the very beginning.

8          December 11, '06 got into a big discussion about

9    something as simple as a corporate organizational chart.

10   And the Court said, Judge Baker, to the plaintiffs'

11   counsel, that should have been done in September.  I

12   really don't understand here on December 11th, we're

13   prepared to do it almost immediately, quote/unquote, that

14   is weasel language and you know it.  And then he went on

15   further to say, this -- if we go to -- I lost my place

16   here.

17         But Judge Baker basically went on to say, here we

18   were a year -- nearly a year in the litigation and the

19   defendants were saying we don't know anything about this

20   case.  And Judge Baker's comments to them were that it

21   defies credibility to tell me that AstraZeneca has not

22   gone out and talked to hundreds and hundreds and hundreds

23   and hundreds of doctors and know what this case is already

24   about, and it's disingenuous to now say I don't know what

25   this case about.  And that was in -- that was a year into

1    this litigation.

2         If you go to Number 31, David.

3         The plaintiffs' fact sheet, Your Honor, this is

4    important.  This is a document that goes far beyond, if

5    this was an individual case, of 25 interrogatories allowed

6    by this Court under its local rules.  This -- and I ask

7    you to take a few minutes to look at it when you have a

8    chance, but there are -- even under best of circumstances,

9    any of us would have difficulty filling this out.  Ten

10   years of doctors, 10 years of employment, 10 years of

11   pharmacies, all medications, 22 different medical

12   condition questions that they have asked about, complete

13   family history of diseases, 12 questions of other

14   psychotic medications taken.  And it goes on and on.

15        But the point is that what they're asking you to do

16   in their specific questionnaire that they now have

17   submitted to you, it's no different than the information

18   that's already in the fact sheets.  When did you take

19   Seroquel?  Who prescribed Seroquel for you?  Why did you

20   take Seroquel?  How long did you take Seroquel for?  They

21   now want you to, with 5,992 cases, go through that

22   exercise.

23        And Judge, I want to talk about something that I

24   submit to you is going on.  Two things:  One, lying in the

25   weeds until we get to this point in the litigation to

1   suddenly say, oh, you can't send these cases back because

2   we haven't gone enough or deep enough into the

3   case-specific facts of all these different plaintiffs.  I

4   submit to you, you, your Honors, that you both have given

5   them more than ample opportunity on the case-specific

6   issues.

7       But what's -- the other issue that's lurking here

8   that seems like no one wants to talk about, and I'll call

9   it a 900-pound gorilla, a 900-pound invisible gorilla.

10  And what is that gorilla?

11      That's Judge Conway and their argument's going to be

12  you can't send back 5,992 cases from an MDL.  That's

13  unprecedented.  And they're going to cite you some

14  statistics, because usually you send back 50 cases or five

15  cases.  Well, first of all, there's nothing under the rule

16  or the statute that says whether you send back one case or

17  50 cases or 50,000 cases.  As long as this Court has met

18  its obligation, statutory obligation, the mission it was

19  handed, it doesn't matter how many cases go back.  If the

20  gorilla is in this courtroom, it's sitting over here on

21  one of those chairs on the defense side, because if

22  there's 5,992 cases existing, it's because they have merit

23  and they should go back to the transferor court.  They

24  have said, as recently as a couple weeks ago, a fellow by

25  the name of Tony Jewel says, we're going to try every one

1    of these cases.  Well, that's fine.  They have the right

2    to do that, as Judge Baker has said that on the record.

3              THE COURT:  Mr. Roth, let me ask you this

4    question.

5              MR. ROTH:  Yes.

6              THE COURT:  We will take an easy one.  Eastern

7    District of North Carolina sent one case here.  Are you

8    ready to try that case?

9              MR. ROTH:  When it gets sent back, it goes just

10   like I read -- submitted to the Court, the transferor

11   Court then deals with the pretrial proceedings.  There may

12   be further depositions.  There may be further hearings.

13   That case will be ready to try on whatever schedule that

14   that Court says.

15             THE COURT:  Do you have -- so you're saying you

16   don't have all the discovery you need to try that case

17   now?

18             MR. ROTH:  What I'm saying, Your Honor, is that

19   the general discovery on common issues -- that's what this

20   MDL is about, not about every single factual issue and

21   every single factual case -- no.  That has not been --

22             THE COURT:  So you don't need any general

23   discovery from AstraZeneca to try that case?

24             MR. ROTH:  Yes.  We have.  And that's been

25   completed.

1            THE COURT:  You have completed -- so you --

2    let's not get --

3            MR. ROTH:  Remember, they said they'd have all

4    that discovery in six months, and it took a year to do it.

5            THE COURT:  Right.

6            MR. ROTH:  And remember, they were sanctioned,

7    talk about delay, for purposefully sluggish conduct that

8    prejudiced the plaintiffs and delayed these proceedings,

9    Your Honor.

10       We have the general discovery that we need.  We're

11   ready to try the Florida cases the Court made rulings on.

12   That's fine.  We will go to the Eastern District of North

13   Carolina.  We will go to the District of Massachusetts,

14   wherever the transfer point is.

15           THE COURT:  It might be a little harder in

16   Massachusetts with 4900 cases.  That's why I picked an

17   easy one.  So you could --

18           MR. ROTH:  Okay.  I understand.  And that's why

19   I said I'm not shying away from the 900-pound gorilla

20   because --

21           THE COURT:  What specific discovery -- what do

22   you think you would have to do in North Carolina?

23           MR. ROTH:  Case-specific doctor and -- or

24   doctors.

25           THE COURT:  The doctor hasn't already been

1   taken?

2          MR. ROTH:  In all the case in Massachusetts?  I

3   would say no.

4          THE COURT:  Or --

5          MR. ROTH:  But case-specific doctor, I'm talking

6   about, Your Honor, because that is entirely different than

7   a general -- a general issue as to, as you've already

8   ruled once, you know, can this drug cause these diseases?

9   And then it's a question on individual factual basis for

10  an individual plaintiff.  Did it cause or was it a

11  contributing cause or concurring cause to diabetes or

12  whatever the disease is?  It's a very focused piece of

13  litigation.  Not like Phen-Fen or anything else where

14  there was all sorts of illnesses being alleged in those

15  cases.  This is very focused and very directed.

16      But the opposite is an MDL trying 5900 cases, doing

17  discovery.  You've already rejected that.  They want to

18  take 21,000 depositions at one time that they submitted.

19      So my point is, on the general issue, yes, Your

20  Honor, you have done that.  We have done that.  We have

21  got the discovery.  This case goes to North Carolina or

22  wherever the case is, and you have your pretrial

23  conference.  And just like I read to -- showed to the

24  Court, in terms of what the commentators all say, that

25  that transferor court then goes through its pretrial

1   proceedings.

2        And whether it's one deposition or 10 depositions or

3   whatever it may be, it may be on a fast track; it may be

4   tried within 30 days.  I don't know.  But the point is,

5   that's a case-specific matter for the transferor court,

6   not for this Court.  This Court's job was to compile all

7   the discovery that applies generally to all the cases, and

8   to have depositions taken, to do test cases, which this

9   Court has done -- or allowed to have done, and then send

10  those cases back for trial.  And whether it's, again, one

11  or 5,000 or whatever, that is what this Court should do.

12       This -- what they're asking you to do, Your Honor,

13  and you made a comment once in a hearing about, well, in

14  six years, I'm going to be in senior status, well, if you

15  buy into their program, and that's why I say credibility

16  is so important --

17            THE COURT:  He's trying to scare me.

18            MR. ROTH:  -- you know, you're going to be long

19  into your senior status and still be dealing with these

20  cases.

21       If you look at Baycol --

22            THE COURT:  Half that statement is wrong.

23            MR. ROTH:  Okay.  If you look at Baycol, where

24  they had much fewer cases, and I think it's less than

25  100 -- Mr. Pennock may correct me on that since he was

```
 1   involved in it.  But five years after Lone Pine, which I
 2   also wanted to address, which I don't have time to, but I
 3   ask the Court to read Lone Pine.  But five years after
 4   that, Judge Davis, I believe his name is, is still dealing
 5   with those issues.  And if you think about that and what
 6   they want you to do in all these cases, that's why I say,
 7   you will be long into -- we'll all be long into
 8   retirement, and this MDL will still be going on.
 9        You had set a goal for September 2008.  You allowed
10   flexibility in that so that you could meet their requests
11   of a very broad and far-ranging case-specific discovery
12   program, which you allowed.  And now, here we are
13   approaching -- you know, getting close to two-and-a-half
14   years, and they still want you to be doing the same things
15   that they were ask -- asked to be done way back when when
16   this first started.  Their argument is no different.  It's
17   they don't want to be out of this MDL.  They want to
18   live -- they want to spend their lives in this MDL and
19   $500 million worth of attorneys' fees by the company.
20   That's the decision they've made.
21        They want to try the cases.  The plaintiffs have an
22   equal right to have their individual cases tried or at
23   least presented to the transferor court for trial, and
24   that's what we're asking you to do, Judge.  And if I have
25   a --
```

1          THE COURT:  Well, if I told each of these

2    transferor courts, I guess we have 52 of them, that as far

3    as your discovery of AstraZeneca's people, you're done?

4          MR. ROTH:  Yes.  In fact, Judge, what they

5    submitted to you in Appendix B in their response was a

6    proposed order that said no general discovery of

7    AstraZeneca should be allowed to be used in any case;

8    whereas, CMO3, which they agreed to, says, any general

9    discovery that was done can be used in any court, this

10   court, any other federal court or any state court.  So

11   that's why I say, credibility.  They not only have cried

12   wolf from the beginning, but now they're talking out of

13   both sides of their mouths.

14          THE COURT:  Right.  But you're agreeing that

15   you're finished with that?

16          MR. ROTH:  We're finished with the general

17   discovery, yes, Your Honor.

18          THE COURT:  All right.

19          MR. ROTH:  And if I could have maybe a couple

20   minutes.  Thanks, Judge.

21          MR. PENNOCK:  Your Honor, if I may have just a

22   few minutes to outline what we -- how we think this remand

23   could work and why we think it could work in addition to

24   the reasons that Mr. Roth indicated.

25        May I just -- this monitor can move a little bit.  Do

1    you mind if I just turn that to face me since I do have

2    some slides I'd like to go through.

3         Your Honors, Mr. Roth hit it quite well on the head,

4    that this has been a tremendously successful MDL for the

5    precise purposes that this MDL came here, and that is the

6    completion of general discovery.  As I have said several

7    times, at least in Judge Baker's court, that despite what

8    I think have been well-documented problems initially with

9    the discovery from the defendants' end, this Court has

10   moved this MDL to conclusion in truly unprecedented speed,

11   in terms of the general issues.

12        In terms of the diabetes cases that we're litigating,

13   I don't think there's any doubt from anyone on our side or

14   even the defendants' side that we have achieved a level of

15   discovery against AstraZeneca particularly with regard to

16   the document and electronically stored information

17   production that has not yet occurred in any other MDL.

18   So, yes, we are indeed ready to go back to the districts

19   and start trying the cases.

20        I think the 900-pound gorilla is the question that

21   needs to be answered.  I don't think it's a gorilla.  I

22   think it's a chimpanzee.  These cases can go back.  They

23   can go back in an orderly way.  They can go back this

24   year.  And we can begin to try them.  And I'd just like to

25   take about 10 to 15 minutes and describe my thoughts on

1    that.

2         And first, here's sort of an outline, Your Honors, of

3    the chronology that we're proposing.  We're suggesting

4    that both sides, as has happened in prior MDLs,

5    particularly MDL926 that I was involved in, provide to

6    Your Honors some proposals that you can consider for the

7    report and recommendation that may go to the panels and

8    then ultimately to the transferor courts.  We're proposing

9    that we get that together to you by May 31st and that

10   July 1st -- and again, this is simply initial proposal,

11   but that by July 1st, I think we can start to -- we can

12   suggest to the panel the remands that should occur and how

13   that remand process should occur.

14        We believe that we can and should and this Court can

15   provide a detailed order, as other courts have done, again

16   in MDL926 will be my example of how this is done.  And

17   that will include -- next slide, please.

18        That will include a chronicling of what has happened

19   in this MDL.  That would include some suggestions for how

20   discovery should take place after these cases go back to

21   the transferor courts.

22        In MDL926 which was the breast implant MDL, as the

23   Court may see or may be aware, it was an enormous MDL.

24   There were, I think, 26,000 cases filed.  Judge Sam

25   Pointer of Northern District of Alabama handled that MDL,

1    moved it through almost to the conclusion of general

2    discovery, although the plaintiffs still wanted some

3    discovery that was acknowledged and admitted.  And Judge

4    Pointer nevertheless started to remand the cases and

5    ultimately remanded many hundreds and several thousand

6    cases.  I was involved, as I said, in that process.

7         Next slide, please.

8         As noted he remanded these cases with -- in a very

9    complicated situation.  There was multiple defendants

10   versus single defendant, and single defendant here.  There

11   had been bankruptcy of two -- one major defendant, Dow

12   Corning, and another defendant, Bioplasty.  There was a

13   limited fund class action settlement that had already been

14   put in place for mentor.  There was a -- what was called a

15   revised settlement program that the other defendants had

16   offered.  And despite all these complications and many

17   more transferor courts and many more cases, he -- and the

18   fact that general discovery had -- there's still some yet

19   to do, he began to transfer the cases.

20        Back to the remand courts.  I met with Judge Pointer

21   and discussed with him these remands and the issues

22   regarding the remands that went back to the Eastern

23   District of New York.  We brought back several hundred --

24   I think it was 5 or 600 Bristol-Myers Squibb cases.  I

25   worked very closely with the magistrate there for that

1   wave of remands as well as the subsequent waves for Baxter

2   International and 3M to work out how the program would

3   proceed in terms of the remand.  We had hundreds and

4   hundreds, in fact, about 2,000 cases.

5        It went very smoothly, thanks, in no small part, to

6   Judge Pointer's Order Number 30, which, if you don't mind,

7   Judge, I'd like to hand up to you.  Simply -- perhaps the

8   Court has seen this previously, but Order Number 30 was

9   the suggestion -- went with the suggestion of remand, and

10   it outlined everything that had happened in the MDL and

11   some suggestions by Judge Pointer at that time for what

12   should happen upon remand.

13        And it was an excellent guidebook, if you will, for

14   the remand judges.  It worked exceedingly well.  And we

15   went back and -- next slide, please.

16        We went back.  We had a consolidated trial.  I

17   mean -- well, first of all, we had discovery in numerous

18   cases, the case-specific discovery, depositions of

19   plaintiffs from around the country, and doctors and so

20   forth, then individual expert reports, real Rule 26

21   reports, real reports based on factual predicate record,

22   not some review of medical records such as they're seeking

23   in Lone Pine, but what is truly contemplated by the

24   federal rulings.  We had expert depositions.

25        We additionally had another wave of Daubert hearings

1   upon remand because there were new issues that came up.

2   There was no havoc for many of this, Judge.  We proceeded

3   to trial, a consolidated trial of 11 Bristol-Myers Squibb

4   cases initially in the fall of '97, within, I think it was

5   12 months of the remand.  Ultimately, those cases, the

6   Bristol cases resolved.  Then we proceeded with the other

7   two defendants, Baxter and 3M.

8        And as I note here, there was no -- there were no

9   many MDLs.  The remand judge was not concerned with that.

10  There was no havoc.  Quite the contrary.  It was a very

11  orderly process and it worked very well to dispose of some

12  cases and resolve others.

13       Next slide, please.

14       As Mr. Roth outlined, and I won't reiterate it too

15  much here, but we are done here.  This Court has complied

16  with the purposes that for which it got this litigation.

17  And with a coordinated and organized remand plan, this can

18  happen.

19       Next, please.

20       We are proposing as follows, and again, Judge, this

21  is simply a proposal of thought that give this Court an

22  idea that this can work and has worked.  And we're

23  suggesting that we proceed by circuits and that these

24  cases go back in these waves over this period, and that

25  upon remand that this Court consider recommending to the

1    remand courts that it allow the plaintiffs to select a

2    case -- well, in fact, I would suggest we do it before it

3    even goes.  We will select the first wave of cases to be

4    tried.  We can begin trying those cases in the -- in each

5    district in a staggered and rolling basis throughout 2010.

6    And that type of trial schedule, which is exactly what an

7    MDL is supposed to be, is to do the discovery and send it

8    back so cases can be tried.  That type of trial schedule

9    will separate the wheat from the chaff.

10         And we -- as you can see, Your Honor, we're proposing

11   that we start out with a fairly limited number of seven

12   trials in the first and -- particularly in the first and

13   second circuits, and then -- also the third circuit, the

14   Pennsylvania cases, and we move on through.  Again, this

15   is all subject to more fine-tune thinking, but the concept

16   is that the cases be remanded and a recommendation be made

17   that for a very concrete finishing discovery and trial

18   program in individual cases so that the remand courts have

19   some idea of what Your Honor has done, what Your Honor is

20   thinking should be done and how this can be accomplished.

21         Next slide, please.

22         We think that perhaps some specific recommendations

23   regarding the discovery plan may be put in place.  Judge

24   Pointer in MDL926 actually had orders regarding the length

25   of depositions that ran with the case back to the remand

1    court.  But remand court, of course, could modify that.

2    He acknowledged that.  But again, he was just trying to

3    give some uniformity to the remand courts for the

4    litigation that he was sending back to several thousand

5    cases in the late 1990s.

6         Next slide, please.

7         We think that this plan ultimately will work and will

8    work well, and it is really the only -- a plan like this

9    is the only place we can go, because this MDL has

10   concluded in an extremely rapid fashion what needed to be

11   done.

12        Next slide, please.

13        A few final comments, Your Honor.  I think that the

14   defendants' plan really is fraught with contradictions.

15   Let's remember that the defendants originally opposed this

16   MDL at the panel.  They fought it.  They did not want it.

17   They said there was no need for an MDL.  Now there is a

18   tremendous need for an MDL that is -- I agree with

19   Mr. Roth, would clearly continue for years into the future

20   with very little practical benefit to anyone involved

21   including, from my vantage point, their client.  But in

22   any event, certainly for my clients there is no practical

23   benefit.

24        AstraZeneca has proceeded to use every opportunity.

25   I believe there has been delay.  I'm not saying that

1    that's an untoward thing.  Maybe that's an appropriate

2    strategy or tactic for defendants to use.  That's fine.

3    That has been employed.  But in any event, we cannot have

4    an indefinite MDL.

5          This is what I think would be the real havoc here,

6    Your Honor, and Mr. Roth alluded to it, and that's 6,000,

7    quote, expert reports without any, as I mentioned,

8    predicate factual discovery.  So you have an expert who is

9    only allowed to look at a fact sheet and medical records

10   and is supposed to come up with a Daubert proof opinion?

11         I would suggest that if I -- in a non-Lone Pine

12   situation, if I marched an expert into court who never

13   read any depositions or what treating doctors had to say

14   about the little chart that they had scribbled up, that

15   defendants would march in and say, oh, methodology,

16   flawed, has no idea what Dr. So-and-So really has to say

17   about the treatment of this patient.  Has no idea what the

18   other doctor really thought regarding the issues of

19   alternative causation or family history.  So there -- this

20   expert of the plaintiffs, they would argue, fails under

21   Daubert.  And yet, they want us to produce 6,000 expert

22   reports that, in essence, are doomed to failure.  So we

23   can't have a situation without factual -- predicate

24   factual discovery.

25         I think there's --

1          MAGISTRATE JUDGE BAKER:  To what extent do you

2    anticipate having to have state-by-state determinations by

3    somebody of tort law?  And where is that going to fit in

4    your proposed schedule?

5          MR. PENNOCK:  Your Honor, I think that in terms

6    of the schedule that we're proposing, in each district we

7    will set up a single case for trial for an initial

8    Bellwether trial in that district as the cases come back.

9    And in that particular case, all the choice of law issues

10   will, as Your Honor's pointing out, have to be decided,

11   including any issues on, for example, the causation

12   standard.  So that will happen in that initial Bellwether

13   case.

14       I think what we're proposing is that you -- as you

15   move through this wave of 50 trials, it will -- over the

16   12 to 15 months upon remand, that at that point, at that

17   juncture, the remand courts will have to address that

18   issue and many other issues.  But that is a case-specific

19   issue for the remand court.  It is not, and frankly cannot

20   humanly be handled by a single judge sitting in the MDL or

21   anywhere else.  Issues such as the choice of law analysis

22   in each individual case, that work needs to be spread --

23         MAGISTRATE JUDGE BAKER:  It may need to be

24   spread.  I mean, in my mind, I see it as semi-case

25   specific.  I mean, it's really state by state.

1          MR. PENNOCK:  It would be a state-by-state

2     analysis, although there could be -- you know, certainly

3     in any individual case, there will be so many nuances or

4     certainly some nuances of the facts that will have to be

5     considered, thus rendering it, I think, practically

6     difficult, if not impossible, for this Court to do.

7          For example, if a -- if you have plaintiffs --

8     plaintiff lived in one state, now lives in another state,

9     was prescribed the medication in the prior state,

10    diagnosed in the prior state suffering from the disease in

11    this state, you begin to get into a lot of details of the

12    fact as to which state law will really apply.

13         And if we are talking about standards of causation

14    where one state is the but-for causation and the other

15    state is the substantial contributing factor issue, those

16    are going to be hotly contested issues.  And I would

17    suggest that if we keep these cases here even for that

18    limited purpose, limited in quotes, we will be bogged down

19    in a substantial amount of motion practice that will --

20    that easily could continue for a year or more.  Probably

21    more than a year.

22         The factual -- as Your Honors probably undoubtedly

23    know more than I do -- the factual issues that have to be

24    sorted out in a conflicts decision are sometimes very

25    detailed, and I think that this Court has actually saved

1    the federal judicial system from a huge amount of work.

2    Let's remember, as I pointed out, AstraZeneca didn't want

3    this Court to do anything that it has done.  So everything

4    that has happened to benefit the many remand judges who

5    will be dealing with these other issues wouldn't have

6    happened if AstraZeneca had had its way.

7         So that issue, Your Honor, in terms of choice of law,

8    and all these other issues, yes.  Will they be a burden on

9    the remand courts?  Of course.  Just as if you're in the

10   Eastern District of New York, there are probably 100 cases

11   filed a week, or 500 cases.  I don't know the number.  I'm

12   sure it's a heavy volume.  And all those cases present a

13   burden with the individual issues.

14        I would suggest that a Court getting a group of a few

15   hundred cases with identity of certain issues and all of

16   the common discovery done would probably not be as big of

17   a burden to that court as the combination of 20 Social

18   Security appeals and 40 immigration cases and 50 criminal

19   cases and so on and so forth.  You put that group

20   together, that's a burdensome docket compared to dealing

21   with basically two sets of lawyers, common discovery all

22   done, and even the individual issues can at least be dealt

23   with across the board with common rulings.  And as I said,

24   I mean, I'm not -- we have dealt with this before, and it

25   has worked and it has worked well, if I answered your

1    question.

2          Next slide, please.

3          I do think that the proposal AstraZeneca has made

4    here, regardless of whether this Court keeps these cases

5    for other reasons such as additional trials or some other

6    common rulings, the proposal they have made is just -- and

7    I don't like to speak hyperbole -- I don't think this is

8    hyperbole.  It's absurd.

9          Your Honor, we are going to be dealing with hundreds

10   of appeals, maybe thousands, from this situation.  It's

11   such an unprecedented Lone Pine.  They keep throwing up

12   Baycol.  I was extensively involved in that.  The Baycol

13   Bayer had settled everything.  Every significant case was

14   done, closed, settled and paid when they sought the Lone

15   Pine on what they call the aches and pains cases, which

16   were people who took the Baycol drug, which was a statin,

17   and suffered musculoskeletal pain for a period of

18   basically less than three months, never really -- never

19   went to a hospital, may have gone to the doctor, may not

20   have been able to play golf for three months or -- which

21   is a pretty significant injury, but they -- these injuries

22   did not rise to the level of lifelong diabetes disease or

23   even the rhabdomyolysis that was the real subject of the

24   Baycol litigation.

25         So when Judge Davis said everything else is settled,

1    all the serious cases are settled, I have to turn to these

2    7,000 aches and pains cases, and he did not use that term.

3    That's when he decided to issue a staged Lone Pine order.

4    And at that point, cases began to be dismissed, really

5    primarily just due to the cost of getting the report

6    relative to the severity of the case.

7         But in any event, the entire litigation, the focus of

8    the litigation was done.  The discovery was done.  The

9    litigation was settled.  It would be like here if we had

10   7,000 fear of future injury cases or something in addition

11   to the diabetes cases, and the diabetes cases were all

12   settled.  So that's the comparison that should truly be

13   drawn between this litigation and Baycol -- or I should

14   say contrast.

15        In any event, here with this proposal they made, I

16   just -- I do not see anything other than a morass.  This

17   Court, both of Your Honors have really -- you know,

18   there's -- just look at the timeline.  You have avoided

19   the morass.  You -- this Court has gone and done what the

20   MDL panel asks every MDL court to do.  Take the

21   litigation, get the discovery done, get these cases ready

22   so they can go back to individual judges to deal with a

23   mass of individual cases.  The morass has been avoided.

24   And they're trying to create it at the midnight hour.

25        Next slide, please.

1       The last thing I want to say, Judge, is that there's

2   another concern that maybe it's the gorilla in the room,

3   but maybe it's the elephant in the room.  And it's

4   something that's emerging that I think really needs to be

5   on the table and considered here.  I would like the Court

6   to consider it on behalf of our clients.  The question is

7   whether there's a new iceberg in sight -- or a tip of an

8   iceberg in sight.

9       Next slide, please.

10      There is an emerging -- we do not have these cases.

11  The lawyers in this MDL are not working on these cases.

12  But there is an emerging sudden cardiac death litigation

13  against AstraZeneca for Seroquel.  Those are not cases

14  that are the subject of this MDL, as far as we're

15  concerned.  As you know, Your Honors, it's dealing with

16  diabetes and metabolic injury.

17      But there certainly is the appearance that this tort

18  is -- this mass tort is emerging.  I know I have -- I know

19  from a fact and from direct hearsay, if you will, that the

20  defendants have been seeking experts to defend this

21  litigation, very highly placed cardiologists and

22  epidemiologists.  This is a happening event.  Whether it

23  will become a new mass tort, I can't say.  But it is a

24  risk to my clients that it become a new mass tort -- next

25  slide, please -- that it become a new mass tort, and

1    someone decides to put it here.  And while -- even though

2    it would essentially be a different set of injuries than

3    what we're dealing with now, my question is, will that in

4    some way rebog us down, rebog down the metabolic cases?  I

5    don't know.  There's -- the Court has been very efficient

6    in separating and moving ahead.

7        But I'm concerned that if this MDL is still extant if

8    and when this emerges that we may find ourselves with lots

9    of new lawyers and lots of new cases seeking the same

10   discovery that we have already conducted, meaning getting

11   the documents and the depositions and maybe supplementing

12   it, and then there will be the arguments of, well, we

13   have -- you have to go -- we want to use all the

14   electronically stored information that Judge Baker

15   fostered, but we need to supplement and how are we going

16   to do that.

17       You know, frankly, this is -- these are the real

18   concerns.  Will we get rebogged down?  And this is not --

19   as I point out here, it's not idle speculation by the --

20   that the defendants may want to bring the litigation here,

21   the sudden cardiac death litigation.  Even if they don't,

22   I can't speak for plaintiffs that may take these cases,

23   let alone the panel.  So -- and it is not idle speculation

24   because the defendant has already tried -- and the title

25   of that slide is actually wrong.  I apologize for that.

1    Somebody put that title in, and I didn't catch it.

2        But the defendants have already tried to get two

3    other types of cases here.  Just last week it was denied.

4    They tried to get -- they originally opposed the MDL, but

5    last week -- or in the last few months, they tried to get

6    these fainting cases.  Apparently there are two cases.  I

7    think one of them was pro se, and the plaintiffs had faked

8    it numerous times resulting in a motor vehicle accident

9    and some type of trauma resulting in fractures, et cetera.

10   And they wanted to transfer the cases here, and the panel

11   denied that and wouldn't let them because they were so

12   disparate from the metabolic cases, and there were only

13   two of them.

14       But I think the -- this highlights the concern.  Are

15   the clients who have been suffering from diabetes as we

16   claim for years and who have had the good fortune of

17   moving through this MDL in less than three years, are we

18   going to get rebogged down by new tort litigation?  It's a

19   very real risk or at least a very real concern.

20       And so in summation, Your Honors, I believe the --

21   clearly the litigation can be remanded.  Clearly the work

22   has been done.  Clearly the common discovery is over with.

23   We're not seeking any additional common discovery against

24   the defendants.

25       What they have proposed will -- setting aside any new

litigation, sudden cardiac death, what they have proposed

will undoubtedly bog us down for a very long time, and

create myriad of issues including possible appellate

issues when we're ready for trial, to the extent that the

common discovery is done.  As I said, it can be done.  We

can take this litigation back, organize it, and move ahead

and let both sides see where it's going to end, which may

be in trials for the next 10 years.  I don't know.

Maybe that we will achieve some resolution.  Maybe

there will dispositions in different jurisdictions based

on the causation standards.  We don't know.  But that work

cannot humanly be done in one court, and I do not believe

that the MDL practice ever anticipated that it would or

should be.  And I think the commentators and everything

that's been written about MDL supports the position that

it -- that that type of case-specific work needs to

happen, among the many, many judges who are more than

capable of dealing with many, many cases as they do

throughout the year.

Thank you, Your Honors.

THE COURT:  Okay.

MR. BROCK:  Good morning, Your Honors.  My name

is Mike Brock.  I'm here on behalf of AstraZeneca today.

We would like to discuss with Your Honors today two

primary issues.  The first being the things that we

1   believe still need to be done in this Court, and the

2   second being while we're finishing the task that we

3   believe should be conducted here, a method through which

4   we can screen the cases that have been filed by the

5   plaintiffs.

6       And it's not the sort of thing where we are seeking

7   to place an undue burden on the plaintiffs.  It's not the

8   situation where we are attempting delay.  But we are

9   indeed asking the Court to do what the multidistrict panel

10  indicated should be done at the time the MDL was created.

11      So just thinking in terms of, you know, there have

12  been several references today of the fact that AstraZeneca

13  initially opposed the creation of the MDL.  Indeed that is

14  correct.  The Court noted in the order creating the MDL

15  that at that point in time, there were about 114 actions

16  that were pending.  And the Court noted in its order that

17  AstraZeneca's objections centralization is rooted in the

18  concern that the creation of the multidistrict proceedings

19  pursuant to Section 1407 encourages the filing of numerous

20  actions with little or no merit.

21      And the Court addressed that particular issue by

22  saying the response to such concerns more properly inures

23  to assign -- in assigning all related actions to one judge

24  committed to disposing of spurious claims quickly.

25      What we have seen as we have gone through the

 1   discovery process in the case, in the litigation, is that

 2   every time the plaintiffs are required to take a little

 3   closer look at their case, that many of the cases will go

 4   away.  And I'd like to just sort of walk through, if I

 5   could, the history, sort of what has occurred to date in

 6   terms of what we know about the plaintiffs' inventory.

 7   And I will note that after the creation of the MDL only

 8   just a few weeks after the creation of the MDL, it was a

 9   filing of a mass case in Massachusetts, some 4500 cases

10   filed in at one time in October of 2006 after the creation

11   of the MDL.

12       It is true, as they allege, that at each step along

13   the way, we have been asking to take a closer look at the

14   inventory of cases.  That is true.  What we would say to

15   the Court is, at this point, given the developments that

16   we have had in the discovery and the ways that we have

17   been able to get at information about the cases, it's

18   pretty clear that we don't have a lot of information about

19   the cases, on the one hand.  And on the other hand, those

20   cases where we do have information, a lot of them are

21   going away because of factors like preexisting diabetes or

22   the plaintiffs don't show up for a deposition that's

23   scheduled.  And I think, as Your Honors see these numbers,

24   it will become abundantly clear by some form of screening

25   at this point it is indicated.

1        So, Chris, if I could see Slide 2.

2        After the creation of the MDL, we eventually got to

3    almost 8,000 cases.  After plaintiff fact sheets were

4    required, you can see here that a good number of the cases

5    were dismissed for failure to serve the fact sheets,

6    failure to substitute proper parties, failure to prosecute

7    after counsel moved to withdraw, or for dispositive motion

8    purposes.  So just the mere fact of requiring the

9    plaintiffs' fact sheets led to work on the cases and led

10   to a number of the cases being dismissed.

11       If you look at the other categories of things where

12   we have done substantial work when -- we will talk about

13   this a little bit more, but when we got to the point where

14   we were looking at 30 cases for full fact discovery, 13 of

15   those cases have been dismissed, 12 out of the 24 where we

16   not to expert discovery have been dismissed, and as Your

17   Honors know, the two cases where we've actually litigated

18   summary judgment and have rulings, both of those cases

19   have had summary judgments entered.

20       As part of the case-specific discovery program, in

21   August of '07, we started a program of taking depositions.

22   There were 105 cases selected to participate in the

23   discovery program.  Nineteen of those plaintiffs were not

24   deposed because they didn't offer a date or they offered a

25   date and didn't show or canceled or they offered a date

1    and failed to appear; and two of the plaintiffs

2    voluntarily dismissed their cases after appearing for

3    depositions.

4         From that point we went to looking specifically at

5    the Florida cases.  And there were 174 total Florida cases

6    in January of '08.  The plaintiffs were required to

7    supplement their fact sheets, and so we undertook to do

8    case-specific discovery, limited case-specific discovery

9    in 75 of those cases; 25 selected by the court; 25

10   selected by AstraZeneca; and 25 selected by the

11   plaintiffs.  And we took limited depositions in those

12   plaintiff prescribing doctor, treating doctor.  They had

13   the option of taking the sales rep, and a few of those

14   were taken.

15        And from there -- turn the page to the 5th -- we then

16   selected 30 discovery pool cases for full discovery.  And

17   this is where, Your Honors, we get to the place where we

18   start understanding that the plaintiff fact sheets that we

19   have access to are not a reliable way of understanding the

20   cases, because as we got into specific full fact discovery

21   in the cases, we found that a good number of the

22   plaintiffs either had preexisting diabetes and so

23   dismissed their case or, for instance, this one that we've

24   shown here, Plaintiff Joe McDaniel, he dismissed his case

25   after claiming that he had been on a several-week coma

1    from diabetes, and it turns out, after we take several

2    depositions, Plaintiff Joe McDaniel did not have diabetes.

3    He was not in a diabetic coma for several weeks.  For

4    Michael Shapiro, he dismissed his case after the medical

5    records and the doctor's testimony confirmed that he had

6    been diagnosed with diabetes two years before he began the

7    use of Seroquel.

8         And I think Your Honors understand that for each of

9    these cases where we're doing case-specific discovery,

10   both sides are expending a lot of time, resources and

11   money traveling and working these cases up and getting at

12   the real facts of the case.  And you know, what we see is

13   is that the information that's being provided in the

14   plaintiffs' fact sheet is very different than the

15   information that we're finding out when we get into the

16   discovery.

17        Chris, if you would turn to Slide 13, please.

18        This is just a brief summary of Plaintiff Joe

19   McDaniel, where when we get his initial plaintiff fact

20   sheet, he says he doesn't recall his dates of use.  When

21   we ask him for his diagnosis, he does not recall.  He

22   files a supplemental plaintiff fact sheet, and he gives

23   dates of use of 4/2003 to 2005 and a diagnosis of 12/2005.

24   And then when we drilled just a little deeper and we start

25   taking physician depositions and looking at medical

1    records, it turns out he's never had diabetes.

2        Now, the reason for this is we think that most of the

3    plaintiff fact sheets that are being furnished to us are

4    not based on a review of the medical records.  So you have

5    patients probably who don't do the best job of giving

6    their medical histories.  You have plaintiff fact sheets

7    that are not reliable because they're not based on a

8    review of the medical records.

9        And sort of getting to an understanding of what the

10   cases look like in terms of how many of the plaintiffs had

11   preexisting diabetes, what -- you know, what are the cases

12   really about, the plaintiff fact sheets, though, they are

13   designed to deliver substantial information.  If they're

14   done in the absence of a review of the records, you don't

15   really get reliable information from those fact sheets.

16       MAGISTRATE JUDGE BAKER:  Mr. Brock, what makes

17   this Court a superior vehicle for supervising the

18   reconciliation of the plaintiff fact sheets with the

19   medical records?  You're talking case by case.  Why would

20   we do that here rather than back where the cases came

21   from?

22       MR. BROCK:  All right.  So I think the main

23   thing is is to sort of think about the order that created

24   the MDL which was to sift through the cases that did not

25   have merit.

81

1           MAGISTRATE JUDGE BAKER:  Not one by one.  That's

2    never done.

3           MR. BROCK:  In the context of a remand order --

4           THE COURT:  We've talked at case management

5    meetings about motions that were going to involve four or

6    more cases where one of the specific things we talked

7    about was preexisting conditions or they took a different

8    drug or something else.  I had the contemplation that we

9    would be seeing a series of motions months and months or

10   years ago where based on what that sifting that would

11   occur on a -- not on a case-by-case basis.  I mean,

12   obviously you would be doing it, or your experts would,

13   but you were going to be presenting them in a group to the

14   Court where, look, these 75 cases or these two case --

15   these 10 cases, whatever it was, can't possibly proceed.

16   We're not picking these off one by one by looking at the

17   PFS comparing it to medical records for people from

18   Montana.

19           MR. BROCK:  Right.  So if you were to sit down

20   with the plaintiff fact sheets and you would look at

21   them -- for instance, there are about 1200 plaintiff fact

22   sheets in cases outside of the State of Florida that have

23   been amended and furnished to the defendant, about 1200 of

24   those.  In about 85 percent of those, the plaintiffs say

25   in that amended fact sheet they still have not looked at

1    the medical records.  So --

2              MAGISTRATE JUDGE BAKER:  You've had months and

3    years to bring that to resolution.

4              MR. BROCK:  Right.  We have not had the

5    opportunity to bring to resolution those cases outside the

6    State of Florida because we have not been involved in

7    discovery in those cases, except for a few limited

8    depositions early in the --

9              MAGISTRATE JUDGE BAKER:  You're relying on

10   individual discovery to establish these things, why does

11   it make sense to do it here?

12             MR. BROCK:  Because, Your Honor, we believe that

13   the plaintiffs' lawyers have the obligation to take a

14   closer look at their cases given --

15             MAGISTRATE JUDGE BAKER:  Begging the question as

16   to whether this Court should be holding their feet to the

17   fire on a case-by-case basis or whether --

18             MR. BROCK:  All right.  I understand what you're

19   saying.

20             MAGISTRATE JUDGE BAKER:  You have -- I mean, we

21   literally had that discussion several times during my

22   status conferences, where we talked about the defendant's

23   ability to sift these out and find the ones that on their

24   face didn't make sense, and present those in groups and

25   blocks.  And there was some debate about, you know,

1    whether you could -- what the best way to do that on sort

2    of a grid that, you know, this person has a preexisting

3    condition, plus they took this other drug, or this person

4    had some other obvious problem that makes the claim.  And

5    I have never seen any of those.

6            MR. BROCK:  All right.  So to the first

7    question, as to why this Court should do it before remand,

8    the reason that we say that this Court should do it

9    through an attorney certification of what the case is

10   about or some type of Lone Pine procedure is that we think

11   that when you look at the detail of the cases, in terms of

12   the discovery that's been conducted and you try to match

13   up the plaintiff fact sheets with what the actual facts

14   are, you see that the plaintiff fact sheets are not

15   especially useful.

16       A large percentage of the plaintiffs -- when they

17   fill out these plaintiff fact sheets and the question is

18   asked what was the date that you used the medicine, you

19   get do not recall.  What was the date of onset of

20   diabetes?  Do not recall.  The same for these cases that

21   are outside the State of Florida.  More than 85 percent

22   say they don't have the medical records when they filed

23   the answers.  They don't -- you don't get that kind of

24   information where you could group the cases and present a

25   summary judgment motion.

1    If our very straight-forward protocol in terms of

2   attorney certification was implemented on -- you know, by

3   this Court, whether it be to require all 6,000 or whether

4   it be to do it on a rolling basis, we would be able to get

5   at the issue of did diabetes preexist ingestion, we would

6   be able to get at the issue of whether there was weight

7   gain during the course of time that the plaintiff was

8   taking the medicine.  And that would allow us to group the

9   cases and bring those types of motions.

10    But the plaintiff fact sheets that we have access to

11  do not give us that type of reliable information.  There's

12  too many I don't knows, do not recalls, histories being

13  given in the absence of medical records.  That information

14  is just not there.

15    So the reason I think that this Court should do it,

16  as opposed to having, you know, a rolling remand where

17  6,000 cases go out over a period of time, is to find out

18  now, before other federal district courts are burdened

19  with this, what does the real inventory look like?  What

20  are the cases in the inventory?  Many of the decisions

21  that we looked at when we looked at the creation of, you

22  know, Lone Pine programs is an invitation by the Court to

23  the plaintiffs' lawyers, take a good close look at your

24  cases.  Decide if this is something you should continue

25  with.  And if you look at these amended fact sheets, the

85

1    plaintiffs and the plaintiffs' lawyers say, we don't have

2    the medical records yet, I don't think that work has been

3    done yet.

4         And I think if you look at what happens when we drill

5    down, and we actually look at the cases -- so the 30 cases

6    we had for full case workup, eight had preexisting

7    diabetes, and one didn't have diabetes at all.  Nine out

8    of 30 had preexisting diabetes or didn't have it at all.

9    And so if you look at the numbers in that context, I think

10   you see our attorney certification is not that

11   complicated.  It just asks for verify the dates of

12   ingestion, verify the date of diabetes, verify what the

13   weight was before you started taking the medicine, verify

14   what the condition was for which it was being given, and

15   take a look at the case, see yourself if you think it's a

16   viable case, and furnish that information to us.  That

17   would give us the ability to group the motions and bring

18   them.

19        And it would also, I think, if you look at the way

20   these cases unfold when you look at case-specific

21   discovery, if there's to be a remand, then the remand is

22   not going to be of 6,000 cases.  It's going to be

23   something dramatically less than that, and if that's

24   coupled with a Lone Pine type program, where they come

25   forward with an expert.  The expert says that they've

1    looked at the records, they verify ingestion, they verify

2    the disease state, whatever it is that they're contending,

3    then at that point, you know, a case would be ready for

4    remanding.

5         So, you know, the other point that we have about this

6    is even, you know, if you continue on and you look at the

7    Group 2 cases -- if we could see Slide 8, so now we're

8    into the second group, grouping of six.  Five of these

9    have also been dismissed by the plaintiffs for failure to

10   serve expert reports.  So you have got another whole

11   grouping of cases when we start looking closely at what

12   the facts look like that are going away.

13        And we just think that that is significant because

14   these are the ones we know about.  These are the ones

15   where we've conducted discovery, and this is sort of what

16   we get to when we do that.

17        Now, as I have said, I don't think that what we're

18   asking for in terms of certification is that complicated.

19   It's going to require gathering some records; it's going

20   to require some review of the records; it's going to

21   require interaction with the plaintiff.  But what we say,

22   Your Honors, is these are things that should have been

23   done when the case was filed, if it wasn't.

24        And you know, if you look at the complaints that were

25   filed in this litigation, you will see a massive complaint

1   with lots of names, not a single date on when a plaintiff

2   took Seroquel, not a date of onset of jury.  Not anything

3   about the plaintiffs is contained in the complaints that

4   were file.  And so what we're asking the Court to do is to

5   require, and this is the same thing that's suggested by

6   the courts that are -- in terms of the cases that we cite

7   in our brief, require the plaintiffs to take a close look

8   at their cases, and before we remand -- before we have a

9   remand program, to -- let's weed out the ones that are

10  meritless, as the panel asks be done, instructed be done,

11  indicated should be done, so that one judge committed to

12  the disposing of these claims can do it.  So that's what

13  we're asking for in terms of the other certifications.

14      Now, in terms of, you know, having time to do this,

15  we think that we do, because we think that the general

16  discovery is not yet complete, and I just want to sort of

17  respond to a couple of things that the plaintiffs have

18  indicated.

19      As Your Honor indicated in her order, which brings us

20  here today, the Court notes that before any non-Florida

21  cases are remanded, the plaintiffs will be required to

22  complete all corporate and third-party discovery to the

23  extent such discovery is not already complete.

24      Now, they have said today that they don't see any

25  further discovery, but we know on a -- of at least two

1   occasions where they have indicated that they do want

2   discovery.  Mr. Pennock in an e-mail recently wrote to one

3   of AstraZeneca's lawyers, this is attached to our

4   briefing, and referring to the recent advisory committee,

5   said, "We want discovery on the entire Adcom development.

6   We want some deps and document productions.  I'd like to

7   know who knows the most about how this came about.  I'll

8   also want any information AZ or its consultants have, if

9   anything, about the 19 people who popped up to speak

10   during the public hour.  Also want a deposition of whoever

11   is most knowledgeable about AZ's relationship with the

12   committee chair and the other committee members.  We want

13   all documents relating to the Adcom prep including any

14   mock meetings, et cetera, and anything that has been

15   submitted to and/or received from the FDA."

16        In open court, on the day Your Honor announced that

17   the Guinn and Haller cases would have summary judgments

18   entered, Mr. Laminack appeared before the Court and said

19   what he wants is discovery reopened.  We have to get ahold

20   of the rest of these documents, the documents that

21   surround this.  We need to know what AstraZeneca's

22   response to this has been, which is now, by the way,

23   overdue.  We want to take their experts' depositions.  We

24   want to take the depositions of a few key AstraZeneca

25   people involved in both presenting this new supplemental

1    application and responding to the FDA's demand.

2         So I heard them say they don't want to take any more

3    discovery in the MDL, but I think what needs to be made

4    clear to this Court is what they intend to do is take

5    depositions and other discovery but to do it somewhere

6    else.  And if you think about the purpose of the MDL,

7    which is to conduct the general discovery, we think that

8    discovery should be conducted here.  We think it can be,

9    you know, done over the next five or six months.  It's not

10   going to take that long to do it.  And during that period

11   of time, we think also that, as Your Honor has indicated,

12   that some time can be devoted to putting together a

13   package of the deposition cuts that have been designated

14   by both parties with rulings on those things so that when

15   there are remands, it will be consistent rulings in the 92

16   federal district courts where cases are pending.  We think

17   that gives us time to have rulings on exhibits and

18   objections to exhibits during that same period of time.

19        So in addition to that general discovery that they

20   have said they're going to take, what we're asking for is

21   that that discovery be conducted here; that Your Honor be

22   the person to watch over the objections that might come up

23   about the discovery requests; if there are issues about

24   depositions, to be the consistent voice on that particular

25   issue.  And then as that process is completed, then we can

1   put together a package that would be ready to send to

2   federal district courts on deposition designations,

3   responses, and objections.  And the exhibits go hand in

4   hand with that in terms of what would be -- what would

5   need to be completed before the cases are sent out.

6        Your Honor, also indicates here that the parties have

7   the ability still to designate general experts for cases

8   that would be remanded.  I will tell the Court that

9   AstraZeneca does indeed intend to designate additional

10  general causation, general liability type witnesses for

11  other cases that will be pending, you know, at the point

12  of time when remand occurs.  So that still needs to be

13  done.  We're still working on confidentiality issues.  We

14  have a recent additional list of documents that the

15  plaintiffs say they would like to dedesignate.  There's a

16  meet-and-confer process going on with regard to that.

17  Those issues still need to be resolved.

18       And we still potentially have some privilege issues.

19  There have been some questions about the privilege log

20  that have been raised by the plaintiffs.  We went back and

21  redid the privilege log after consultation with Your Honor

22  and think that it is in order, but there are some

23  questions about that that we are in the process of

24  answering also with the meet-and-confer process.

25       So the bottom line is there's still work to be done,

1   we think, in the MDL that will be helpful to the federal

2   district courts when remand occurs.  That work that needs

3   to be done is the completion of this general discovery,

4   rulings on the depositions and the deposition cuts, ruling

5   on the general exhibits, the confidentiality work, the

6   privilege work, if anything comes up on that.

7       And while that's being done, we think it's really

8   important to take a step back to require the plaintiffs to

9   look at their cases, to see if there's preexisting

10  diabetes, see if there's weight gain, see what the cases

11  look like, because if they turn out to be what we have

12  looked at so far in a detailed way, we know that a great

13  percentage of those cases are going to go away, they're

14  going to fall by the wayside.  And there's no reason to

15  burden district courts all around the country with looking

16  at cases that are ultimately going to go away.  And this

17  is the one opportunity where one judge can do that in a

18  consistent fashion.  So if the cases go out, then each

19  federal district court is going to have to fashion its own

20  way of doing -- you know, screening about its cases;

21  whereas, if done here, it will be centralized, it will be

22  done in one way, and it will be efficient and serve the

23  interest of justice, we believe.

24          THE COURT:  Okay.  Do you have any questions?

25  All right.  Well --

92

1          MR. PENNOCK:  May I have 60 seconds to reply to

2    the e-mail search?

3          THE COURT:  Yes.

4          MR. PENNOCK:  Your Honor, on that e-mail which

5    was written about a month ago, we then had a meeting about

6    discovery here in the MDL and elsewhere.  Mr. Brock was

7    not at the meeting so I'm going to assume he's unaware of

8    what transpired.  I went to Dechert's offices in New York

9    on Wednesday, April 15th, last Wednesday.  I met with

10   Steve McConnell.  I met also with Glenn Pogust who

11   essentially is running the New Jersey litigation for

12   AstraZeneca.  There was another lawyer there for

13   AstraZeneca.  I don't recall who that was.

14        The issue of additional continued discovery came up

15   in the context of the remand.  I was informed by

16   AstraZeneca that if there was any additional discovery

17   that was going to be sought, that they would oppose the

18   remand of any cases.  And I -- myself and Mr. Blizzard

19   both took the position, well, that's true since trials are

20   more important, we're ready to go and we are not going to

21   proceed with any additional discovery; we're not going to

22   seek any additional discovery.

23        And in fact, that very -- at that very meeting, I

24   pulled down a deposition notice of Dr. Newcomer that I had

25   served at the New Jersey litigation, because it was

general discovery in nature.  Because our position is that

this MDL has concluded and cases need to be tried.  And if

they're going to use as a pretext for keeping this MDL

going indefinitely, the need for some additional

depositions, very limited as they may be, then we do not

want them.  We do not need that last duck in a row, is

exactly what I said to them.  And so we would not pursue

that discovery here or elsewhere.

So I just felt that needed to be cleaned up.  Again,

Mr. Brock wasn't there.  I didn't send my e-mail to him.

I don't know where he got it, but I'm assuming he was

unaware of that very clear discussion that we had last

week.

THE COURT:  What is the status of the New Jersey

case -- cases?

MR. PENNOCK:  The New Jersey cases, all of the

discovery, I agreed with Mr. Pogust at the beginning, that

we would adopt any discovery that was done here and only

if we were -- if we reached a point where we were unable

to get discovery here, then we would seek additional

discovery in New Jersey.  We have not sought any there.

And so the cases are -- have been moving forward.  We had

20 cases in an initial trial pool selected.  I think 16

remain, are moving through the discovery process.  Expert

reports are due July 31st in those cases.  The Court there

1   is --

2            THE COURT:  Case-specific experts?

3            MR. PENNOCK:  Case specific, Your Honor.

4      The Court in New Jersey, Judge Haptis, (phonetic) is

5   then going -- she suggested she was going to select the

6   cases that would be tried, that there may be consolidated

7   trials, and what -- we will go through all the motion

8   practice in the fall.  And the first cases -- or cases are

9   to start in February of 2010.  So that's the status.

10            THE COURT:  Do you intend to use the same

11   general experts that you have identified in the MDL for

12   all the other federal cases and the New Jersey cases?

13            MR. PENNOCK:  Your Honor, that's a very good

14   question.  In fact, I had a specific discussion on this

15   issue with Mr. Magaziner when that order we looked at

16   earlier the night before it was entered, and it was at

17   AstraZeneca's suggestion and assistance, which I was fine

18   with but surprised, that -- that the -- any experts -- or

19   that the parties could both designate new experts in the

20   event of remand.  That language came from them.  I was

21   happy with it.  I agree with it.  But the point is, I

22   think that there is this issue of an about-face on that,

23   as well.  So that's the context.

24      The answer is, there will undoubtedly be new general

25   experts, and I say that because we already have designated

1   two general experts who went to Daubert in front of Judge

2   Slights in the Delaware litigation.  Judge Slights sits

3   under the federal rules.  So it was a Daubert hearing,

4   although slightly different.  Daubert is a little bit

5   different.

6        In any event, I handled that hearing this

7   Dr. Peritsky, Dr. Gallagher with two general experts, but

8   we additionally designated Dr. Arnett who -- that

9   testimony that happened here is being adopted for that

10  hearing in Delaware.  We additionally designated

11  Dr. Plunkett.  Judge Slights did not ask to hear from her.

12  So there is sort of a crosshatching of general experts.

13  In New Jersey, I would imagine that there will be the same

14  crosshatching, some of the experts that have already been

15  designated here generally and some that have been

16  designated in Delaware already, which are the only two

17  places that -- where I'm litigating where the -- where

18  experts have been designated.

19             MAGISTRATE JUDGE BAKER:  Just to be clear, with

20  respect to any FDA proceedings, anything related to the

21  preemption issues, anything related to labeling, you have

22  got everything you need?

23             MR. PENNOCK:  Your Honor, I think that with

24  respect -- my e-mail is directed at the recent advisory

25  committee, which I sent when we learned that it had been

1    set up.  As to that advisory committee meeting, the

2    concerns that I had at that time for this -- this is an

3    advisory committee meeting on new indications, generalized

4    anxiety disorder, a major depressive disorder as

5    monotherapy alone, Seroquel alone.  That both those

6    indications were recommended by the advisory committee be

7    denied, unanimously.  It was one extension on one of them.

8         So we do not need any discovery on that advisory

9    committee because as things turned out the advisory

10   committee, it appears, got the picture.  I will say that I

11   had to make two motions in New Jersey under First

12   Amendment Right to Petition to get documents unsealed that

13   we said might suggest a conflict of interest between

14   sitting advisory committee members and AstraZeneca.  And

15   we said the conflicts that might exist were significant

16   enough that the documents needed to be unsealed and shown

17   to the FDA.  We did that.  The judge -- we made those

18   motions.  AstraZeneca contented.  We got those documents

19   to the FDA.  And lo and behold, three of those -- four of

20   those members suddenly were pulled off the committee at

21   the last minute.  So the advisory committee issue, I can

22   tell you, is a done issue.

23        As far as more generally and discovery from the FDA

24   on preemption issues, as we said earlier, we are done with

25   general discovery with respect to this case, and we are

```
1   ready to proceed to trial.  There may be some -- I will
2   say, hearing the arguments here today, I think there may
3   be some evidence that already exists that we've already
4   obtain through Your Honors' efforts that we -- that I
5   might ask the Court to consider in a supplemental
6   submission regarding the preemption, but that's just
7   something that came to my head as I was listening today.
8        But in terms of additional discovery of FDA
9   information, we have none that we are contemplating at
10  this time, nor is there any that we were contemplating and
11  decided against.  It's just not been on the table.  I hope
12  that's answered your question although in a long-winded
13  fashion.
14            MAGISTRATE JUDGE BAKER:  Thank you.
15            MR. PENNOCK:  Any further questions?
16            MR. BROCK:  May I respond very briefly?
17            THE COURT:  Yes.
18            MR. BROCK:  I was aware of the meeting that took
19  place with Mr. Pennock when he declined to meet and confer
20  about documents and depositions.  The purpose of that
21  meeting was to talk about the very discovery issues that
22  we're talking about here today.  The very purpose of that
23  meeting was to talk about the discovery that they wanted
24  out of the advisory committee.  My understanding is when
25  it came up that it was our position that that discovery
```

1    should take place in this Court, that that was basically

2    the end of the meeting.

3         So I just wanted to advise the Court that I am aware

4    of that, and I am aware of why that meeting ended.

5         What I have not heard them say today -- they've said

6    they don't intend to take any further discovery in the

7    MDL, but I think we have to sort of have our eyes open to

8    what's going on here.  And that is that they do intend to

9    take further discovery.  I believe that they will take

10   further discovery or ask for it in other courts.

11        And it's our view that if over the next months cases

12   are remanded, that if they are declaring that they are

13   through with discovery in the MDL, then whatever discovery

14   they obtained anywhere else, they should be precluded from

15   using in any future case that comes forward in a federal

16   district court.  The discovery program in this Court, as

17   they have said in their opening remarks, has accomplished

18   a lot.  All of the discovery that's taken place to date in

19   the litigation has been overseen by this Court.  The

20   corporate depositions, the third-party depositions, all

21   has taken place in this Court.  And our point of view is

22   that it should be completed in this Court.

23        So if there is to be -- if they're going to take

24   further discovery in other places, Your Honor should

25   specifically preclude them from using anything that they

1    discover or anything that they find out, any discovery

2    they have taken, that they take in the future, they should

3    not be allowed to use that.

4        One more thing I wanted to point out to Your Honor.

5    For the non-Florida cases, we have almost no discovery in

6    those cases.  We did get started with the discovery

7    program where we took a few depositions, but there is

8    almost no discovery in those cases.  As I mentioned, with

9    the regard at least to the supplemental fact sheets that

10   we have been furnished, more than 85 percent of those the

11   plaintiffs assert in their amended plaintiff fact sheet

12   they don't even have their medical records yet.

13       So we do feel like that the plaintiffs gathering

14   those records, taking a look at them and verifying what's

15   there is important.

16       Thank you.

17           THE COURT:  All right.  Thank you.

18               (End at 12:45 p.m.)

19               C E R T I F I C A T E

20       I certify that the foregoing is a correct

21   transcript from the record of proceedings in the

22   above-entitled matter.

23

24   s\Sandra K. Tremel  April 24, 2009

25